UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION
www.flsb.uscourts.gov

IN RE:                               Chapter 11 Case

VITAL PHARMACEUTICALS, INC., *et al.*,[1]     Case No.: 22-_____

        Debtors.                    (Joint Administration Pending)

_____/

**DEBTORS' APPLICATION, PURSUANT TO SECTION 363(b) OF THE BANKRUPTCY CODE, FOR AUTHORITY TO EMPLOY AND RETAIN, ON AN INTERIM AND FINAL BASIS, HURON CONSULTING SERVICES LLC, TO PROVIDE THE SERVICES OF A CHIEF TRANSFORMATION OFFICER AND ADDITIONAL PERSONNEL, EFFECTIVE AS OF THE PETITION DATE**
**(Expedited Hearing Requested)**

Vital Pharmaceuticals, Inc., Bang Energy Canada, Inc., JHO Intellectual Property Holdings, LLC, JHO Real Estate Investment, LLC, Quash Seltzer, LLC, Rainbow Unicorn Bev LLC and Vital Pharmaceuticals International Sales, Inc. (collectively, the "Debtors"), by and through their proposed undersigned counsel, file this *Debtors' Application, Pursuant to Section 363(b) of the Bankruptcy Code, for Authority to Employ and Retain, on an Interim and Final Basis, Huron Consulting Services LLC to Provide The Services of a Chief Transformation Officer, Effective as of the Petition Date* (the "Application"). The Application seeks entry of an order authorizing the retention of Huron Consulting Services LLC ("Huron") to provide a Chief Transformation Officer ("CTO") of the Debtors, effective as of the Petition Date. In support of the Application, the Debtors rely on the *Declaration of John C. DiDonato in Support of the Debtors' Application, Pursuant to Section 363(b) of the Bankruptcy Code, for Authority to Employ*

---

[1] The address of the Debtors is 1600 N. Park Drive, Weston, FL 33326. The last four digits of the Debtors' federal tax identification numbers are: (i) Vital Pharmaceuticals, Inc. (8430); (ii) Bang Energy Canada, Inc. (5454); (iii) JHO Intellectual Property Holdings, LLC (0010); (iv) JHO Real Estate Investment, LLC (9394); (v) Quash Seltzer, LLC (6501); (vi) Rainbow Unicorn Bev LLC (2254); and (vii) Vital Pharmaceuticals International Sales, Inc. (8019).

*and Retain Huron Consulting Services LLC,  on an Interim and Final Basis, to Provide a Chief Transformation Officer, Effective as of the Petition Date* (the "DiDonato Declaration") attached hereto as **Exhibit "A."**   In support of the Application, the Debtors also rely upon the *Declaration of John C. DiDonato in Support of Chapter 11 Petitions and First Day Pleadings* (the "First Day Declaration") filed on the Petition Date (as defined below), and respectfully represent as follows:

## Jurisdiction and Venue

1.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

2.      Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The statutory predicates for the relief sought herein are sections 105(a) and 363(b) 503, 507(a)(8), 541, 1107(a) and 1108 of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), and Rule 6003 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## Background

4.      On the day hereof (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under the Bankruptcy Code.

5.      The Debtors are operating their businesses and managing their affairs as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

6.      For a detailed description of the Debtors and their operations, the Debtors respectfully refer the Court and parties in interest to the First Day Declaration.

## Relief Requested and Basis Therefor

7.      The Debtors initially employed Huron on May 8, 2022, in a staff augmentation capacity to review and make Company approved enhancements to their financial projections. Huron and the Company executed amendments to their original engagement letter on May 20,

2

2022, June 28, 2022, and July 8, 2022, expanding the scope of services to include assistance with reporting and communications with the Secured Lenders and Secured Lender financial advisor. Huron's engagement with the Company in a staff augmentation capacity was mutually terminated on August 23, 2022.

8.      Huron was retained as a financial advisor on August 15th to provide contingency planning services. Subsequently, on September 15, 2022, effective as of September 6, 2022, Huron was retained by the Company to manage workstreams related to the Company's restructuring initiatives, including contingency planning.  In that capacity, Huron has reviewed the financial and operating performance of the Debtors, reviewed and helped manage the Debtors' operating budgets and liquidity, and advised the Debtors in regard to their restructuring initiatives.

9.      The Debtors now seek to employ Huron to provide the services of John C. DiDonato as CTO, pursuant to the terms of that certain engagement letter dated as of September 15, 2022,[2] as may be amended from time to time, and the accompanying Attachment to Engagement Letter dated September 15, 2022, between Huron Consulting Services LLC and Vital Pharmaceuticals, Inc. (collectively the "Engagement Letter").  A true and correct copy of the Engagement Letter is attached hereto as **Exhibit "B."**  The requested retention by the Debtors is sought pursuant to Section 363(b) of the Bankruptcy Code, and Bankruptcy Rule 6003.

10.     The Debtors have determined that obtaining the ongoing services of a CTO will substantially enhance their ability to (a) operate and meet their administrative obligations in these cases and (b) preserve and maximize the value of their assets pending any sale.  As such, the

---

[2] As set forth in the Engagement Letter, although the Engagement Letter is dated September 15, 2022, it has an effective date of September 6, 2022.

11648639-5

Debtors have chosen to retain the services of Huron and have appointed DiDonato of Huron to the position of CTO, subject to the Court granting this Application.

        **A.**    **<u>Services to be Provided by CTO and Huron</u>**

      11.    As per the terms contained in the Engagement Letter, DiDonato, Huron's managing director and practice leader, has agreed to serve as CTO.  The CTO will be assisted by other Huron professionals (the "<u>Supplemental Business Team</u>"), in carrying out the duties and responsibilities of the CTO in connection this engagement.   The scope of the CTO's services (collectively, the "<u>Services</u>") shall include the following, to the extent necessary and requested by the Debtors in consultation with the Debtors' Chief Executive Officer:

        a.    Managing those workstreams relating to the Debtors' restructuring initiatives.

        b.    Liaise with and serve as principal contact with (i) Senior Lenders and significant creditors concerning financial and operations matters that relate to the restructuring activities only; and (ii) the Debtors' other stakeholders.

        c.    Support and/or manage: (i) the preparation and maintenance of: (A) Debtor in Possession ("<u>DIP</u>") cash flow budget, (B) liquidity and related cash flow forecasting, and (C) financial projections; (ii) providing the Debtors' approved enhancements to the financial projections based on the review and discussions with the Debtors' designated investment banker; (iii) cash disbursement process, controls and protocols; (iv) initiatives to enhance liquidity by developing and implementing the plan(s) to: (A) enhance lease and trade payment terms; (B) optimize near-term staffing and resulting payroll costs; and (C) other cost savings and performance improvement initiatives; (v) bankruptcy preplanning and post-bankruptcy management workstreams including: (A) preparation of schedules including executory contracts and other matters as required by the Bankruptcy Court and the U.S. Trustee; (B) DIP financing sizing,

4

budgeting, and variance reporting; (C) first day motions and orders, monthly operating reports and other reporting and analysis requirement; and (D) select accounting matters.

       d.     Assisting in facilitating information flow relating to the capital markets processes with the Debtors' advisors, including assisting with the Debtors' designated investment banker with information reasonably necessary to effectuate a transition.

       e.     Direct negotiations with significant creditors, including, without limitation, Truist Bank, as agent ("Agent") for the lenders and lenders' advisors under the existing credit facilities and other holders of secured debt.

       f.     Communicating directly with and providing information as reasonable requested by Agent in connection with its existing credit facilities.

       g.     Assisting in managing the Debtors' designated vendors, including how vendors are managed and paid.

       h.     Providing such other services as are customarily provided in connection with the analysis and negotiation of a restructuring initiative, as mutually agreed upon in writing between the CTO and the Debtors.

12.    As set forth in the Engagement Letter, the CTO will not attest to financial events, reports, or other facts which precede his appointment in that capacity and will not exercise any check signing authority.

13.    To the extent that the Debtors request additional advisory services, Huron will amend the Engagement Letter accordingly and seek approval of the Court.  Huron may provide additional personnel as the Debtors may request to assist the CTO in performing the services described above and such other services as may be agreed to, on such terms and conditions and for such compensation as the Debtors and Huron shall agree and as approved by the Court.

B.     **Terms of Retention**

14.     The terms of the CTO and Huron's proposed compensation are set forth in the Engagement Letter.  As set forth in the Engagement Letter, as compensation for providing the CTO's services, the Debtors will pay Huron a fee of $15,000.00 per week.  Huron will provide written weekly estimates for the services of Huron's Supplemental Business Team.  The fees for the services of Huron's Supplemental Business Team will be billed at Huron's standard hourly rates, as set forth below.   Should the CTO and/or Huron expect any changes greater than 10% to Huron's written weekly estimates, the CTO and Huron will seek the Debtors' express written approval before incurring any such supplemental fees.   Any adjustments from time to time to the following standard hourly rates will be subject to the Debtors' express written approval:

| | |
|---|---|
| Managing Directors: | $965.00 - $1,315.00 |
| Senior Directors: | $920.00 - $950.00 |
| Directors: | $605.00 - $770.00 |
| Managers: | $575.00 |
| Associates: | $495.00 |
| Analysts: | $400.00 |

15.     In addition to compensation for services rendered by Huron, Huron will seek reimbursement for the reasonable out-of-pocket expenses (including transportation, lodging, meals, communications, supplies, copying, etc.) incurred on behalf of the Debtors.  Out-of-pocket expenses that are expressly preapproved by the Debtors in writing will be billed at the actual amounts incurred.  Out-of-pocket expenses also include reasonable fees and expenses of attorneys consulted or engaged by Huron to assist it with matters under the Engagement Letter, such as retention applications, fee applications, and collection of fees and expenses.   Further, travel time that is expressly preapproved by the Debtors in writing during which no work is performed shall be itemized separately and billed at fifty percent (50%) of the regular hourly rates.

16.     Huron will bill on a weekly basis and invoices are due upon presentation. Undisputed amounts remaining outstanding for more than 45 days (past due) may be subject to an interest charge of 1.5% per month from the date of invoice.

17.     As set forth in the Engagement Letter, Huron does not provide attest services, audits, or other engagements in accordance with standards established by the American Institute of Certified Public Accountants or promulgated by the Public Company Accounting Oversight Board.  Except as stated in the Engagement Letter, the risk of loss with respect to the Debtors' operations and assets shall be borne by the Debtors.  Huron shall not be deemed to have assumed or be liable for any claim, liability, or obligation of the Debtors whether known or unknown, fixed or contingent accrued or un-accrued with respect to the Debtor' operations.

18.     As set forth in the Engagement Letter, the Debtors agree, as reasonably practicable, to provide all Huron personnel duly appointed and acting as officers of the Debtors the most favorable indemnities provided by the Debtors to their officers and directors, whether under the Debtors' by-laws, operating agreements, by contract or otherwise.

19.     In addition, as set forth in the Engagement Letter, to the fullest extent permitted under applicable law, Huron, on the one hand, and the Debtors, on the other, agree to indemnify and hold each other and their personnel, agents, and contractors harmless against all costs, fees, expenses, damages, and liabilities (including reasonable defense costs and legal fees), associated with any legal proceeding or other claim brought against any of them by a third party, including a subpoena or court order, arising from or relating to any Services that Huron provides to the Debtors.  This indemnity shall not apply to the extent a claim arises out of the other's gross negligence or willful misconduct, as finally adjudicated by a finder of fact.

7

20.     Neither the Debtors nor Huron will be liable to the other for any special, consequential, incidental, indirect or exemplary damages or loss (nor any lost profits, savings or business opportunity.   Further, Huron's liability relating to this engagement will in no event exceed an amount equal to the fees (excluding taxes and expenses) it receives from the Debtors for the portion of the engagement giving rise to such liability.

## C.     Huron and DiDonato's Qualifications

21.     Huron and DiDonato have extensive experience in providing restructuring services in and out of chapter 11 proceedings and have an excellent reputation for the services they have rendered on behalf of debtors and creditors through the United States.  DiDonato has over 35 years of extensive experience guiding organizations through restructuring, operational transformation, capital raising, buy-side advisory and merger integration.    Among many examples, DiDonato served as (i)the Chief Restructuring Officer of Rockdale Marcellus Holdings in the Western District of Pennsylvania; and (iii) in numerous matters in the District of Delaware including NORDAM Aerospace, Maines Paper, Food Services and Town Sports International in the District of Delaware.   Additionally, DiDonato has advised and represented debtors and creditors' committees in formulating, analyzing and negotiating plans of reorganization.    DiDonato's restructuring and bankruptcy experience include serving, among others, as: (i) board member, chief restructuring officer and president to a highly leveraged provider of enterprise management software and cloud solutions, and led a team of professionals through a prepackaged restructuring and operational turnaround (Allen Systems Group) that included nearly $700 million of restructured debt and an 18% cost reduction plan; (ii) directed the financial and operational restructuring of a $750 million provider of integrated rail system construction and services, negotiating the bifurcation of debtor-in-possession credit and surety agreements; (iii) as President and Chief Restructuring Officer of $3.0 B automotive assembler selling a substantially portion of

8

11648639-5

its equipment to start up electric vehicle manufacturer; (iv) as President and Chief Restructuring Officer of REVSTONE and its affiliates selling and winding down in excess of 16 businesses. Attached hereto as **Exhibit "C"** is the Curriculum Vitae of John C. DiDonato.

22.    Further, as a result of prepetition work performed on behalf of the Debtors, since September 6, 2022, Huron has acquired knowledge of the Debtors and their businesses and is now familiar with the Debtors' financial affairs, debt structure, operations and related matters.   Huron has worked closely with the Debtors' management and other advisors.  Accordingly, Huron has developed relevant experience regarding the Debtors that will assist it in providing effective and efficient services to the Debtors in these cases.

23.    The Debtors submit that the employment of Huron under the terms and conditions contained in the Engagement Letter will benefit the Debtors' estates and their creditors.

24.    The Debtors seek entry of an order, on an interim basis, approving the employment of Huron, effective as of the Petition Date, and scheduling a final hearing to consider the Application.

**WHEREFORE,** the Debtors respectfully request the entry of an order in the form annexed hereto as **Exhibit "D"** (i) approving this Application, (ii) authorizing the Debtors to engage Huron, on an interim basis, to provide the services of DiDonato as CTO, upon the terms and conditions contained in the Engagement Letter, effective as of the Petition Date; (iii) scheduling a final hearing to consider the Application; and (iv) granting such other and further relief as may be just and proper.

Dated:  October 10, 2022          Respectfully submitted,

                                VITAL PHARMACEUTICALS, INC., *et al.*, Debtors
                                1600 N. Park Drive
                                Weston, FL 33326

11648639-5

By: _____
John Owoc (Oct 10, 2022 10:09 EDT)

Jack Owoc, Chief Executive Officer

11648639-5

Dated: October 10, 2022
     Miami, Florida

Respectfully submitted,

*/s/ Jordi Guso*

George A. Davis (*pro hac vice* pending)
Tianjiao ("TJ") Li (*pro hac vice* pending)
Brian S. Rosen (*pro hac vice* pending)
Jonathan J. Weichselbaum (*pro hac vice* pending)
**LATHAM & WATKINS LLP**
1271 Avenue of the Americas
New York, NY 10020
Telephone: (212) 906-1200
Email: george.davis@lw.com
      tj.li@lw.com
      brian.rosen@lw.com
      jon.weichselbaum@lw.com

Jordi Guso
Florida Bar No. 863580
Michael J. Niles
Florida Bar No. 107203
**BERGER SINGERMAN LLP**
1450 Brickell Avenue, Suite 1900
Miami, FL 33131
Telephone: (305) 755-9500
Email: jguso@bergersingerman.com
      mniles@bergersingerman.com

– and –

Andrew D. Sorkin (*pro hac vice* pending)
**LATHAM & WATKINS LLP**
555 Eleventh Street, NW, Suite 1000
Washington, D.C. 20004
Telephone: (202) 637-2200
Email: andrew.sorkin@lw.com

– and –

Jeramy D. Webb (*pro hac vice* pending)
Whit Morley (*pro hac vice* pending)
**LATHAM & WATKINS LLP**
330 North Wabash Avenue, Suite 2800
Chicago, IL 60611
Telephone: (312) 876-7700
Email: jeramy.webb@lw.com
     whit.morley@lw.com

*Proposed Co-Counsel for the Debtors*

11648639-5

**EXHIBIT "A"**

**(Declaration of John DiDonato)**

12

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION
www.flsb.uscourts.gov

| | |
|---|---|
| IN RE: | Chapter 11 Case |
| VITAL PHARMACEUTICALS, INC., *et al.*, | Case No.: 22-_____ |
| Debtors. | (Joint Administration Pending) |
| _____/ | |

**DECLARATION OF JOHN C. DIDONATO IN SUPPORT OF THE DEBTORS'
APPLICATION, PURSUANT TO SECTION 363(b) OF THE BANKRUPTCY CODE,
FOR AUTHORITY TO EMPLOY AND RETAIN HURON CONSULTING SERVICES
LLC, , ON AN INTERIM AND FINAL BASIS, TO PROVIDE THE SERVICES OF A
CHIEF TRANSFORMATION OFFICER AND ADDITIONAL PERSONNEL,
EFFECTIVE AS OF THE PETITION DATE**

1.      My name is John C. DiDonato. I am over 18 years of age and competent to make this Declaration.

2.      I am a certified managerial accountant in the State of Illinois, a certified turnaround professional, and am a Managing Director of the Financial Consulting segment at Huron Consulting Services LLC ("Huron"), at 550 W. Van Buren St., Chicago, IL 60607.  I am familiar with the matters set forth herein and make this declaration in support of the *Debtors' Application, Pursuant to Section 363(b) of the Bankruptcy Code, for Authority to Employ and Retain, on an Interim and Final Basis, Huron Consulting Services LLC to Provide The Services of a Chief Transformation Officer and Additional Personnel, Effective as of the Petition Date* (the "Application").  Except as otherwise noted, I have personal knowledge of the matters set forth herein and, if called as a witness, I would testify competently thereto.[1]

---

[1]  Certain of the disclosures herein relate to matters within the knowledge of other professionals at Huron and are based on information provided by them.

11695783-1

3.      To the best of my knowledge, information and belief, insofar as I have been able to ascertain after reasonable inquiry, other than my status as CTO of the Debtors, neither I, nor Huron, nor any of its partners, principals, employees, agents or affiliates, have any connection with the Debtors, their creditors, the United States Trustee, or any other party with an actual or potential interest in these chapter 11 cases, or their respective attorneys or accountants, except as set forth below:

    (a)      Huron is not employed by, and has not been employed by, any entity other than the Debtors in matters related to these chapter 11 cases.

    (b)      From time to time, Huron has provided services, and likely will continue to provide services, to certain creditors of the Debtors and various other parties adverse to the Debtors in matters wholly unrelated to these chapter 11 cases. As described below, Huron has undertaken a detailed search to determine, and to disclose, whether it is providing or has provided, services to any significant creditor, equity security holder, insider or other party-in-interest in such unrelated matters.

    (c)      Huron provides services in connection with numerous cases, proceedings and transactions unrelated to these chapter 11 cases. Those unrelated matters involve numerous attorneys, financial advisors and creditors, some of which may be claimants or parties with actual or potential interests in these chapter 11 cases, or may represent such parties.

    (d)      Huron's personnel may have business associations with certain creditors of the Debtors unrelated to these chapter 11 cases. In addition, in the ordinary course of its business, Huron may engage counsel or other professionals in unrelated matters who now represent, or who may in the future represent, creditors or other interested parties in these chapter 11 cases.

4.      In connection with the preparation of this Declaration, Huron searched its client database and conducted a review of its professional contacts with the Debtors and other parties in interest that were reasonable known to us to determine whether Huron had any relationship with the following (collectively, the "Interested Parties"):

    (a)      the Debtors and their affiliates;

    (b)      the Debtors' current members, directors and officers (to the extent applicable) and certain of their most significant business affiliations, as provided to Huron by the Debtors;

11695783-1

(c)     the Debtors' secured creditors, as provided to Huron by the Debtors;

(d)     the Debtors' 30 largest unsecured creditors, on a consolidated basis, as provided to Huron by the Debtors;

(e)     the Debtors' creditors and interested parties, as provided to Huron by the Debtors; and

(f)     various other potential parties-in-interest, as identified by the Debtors.

5.      Based on that search, Huron represents that, to the best of its knowledge, and other than my status as CTO of the Debtors, Huron knows of no fact or situation that would represent a conflict of interest for Huron with regard to the Debtors and is a "disinterested person" as that term is defined in Bankruptcy Code section 101(14), as modified by Bankruptcy Code section 1107(b), in that Huron and its employees:

a.      Are not creditors, equity security holders or insiders of the Debtors;

b.      Were not, within two (2) years before the date of filing of the Debtors' chapter 11 petitions, directors, officers, or employees of the Debtors; and

c.      Based upon the results of the search described above, do not have an interest materially adverse to the interests of the estates or any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the debtors, or for any other reasons.

6.      Huron submits that it holds no adverse interest as to the mattes for which it has been employed by the Debtors within the meaning of Bankruptcy Code section 327(a).

7.      Certain individuals affiliated with Huron may render restructuring management services to the Debtors on a part-time basis, while others have been and/or will continue to be engaged full-time. To the extent such individuals are employed on a part-time basis, Huron submits that there are no simultaneous or prospective engagements existing which would constitute a conflict or adverse interest as to the matters for which it has been employed by the

3

11695783-1

Debtors, nor would Huron staff such part-time temporary staff on any future matter that would constitute a conflict or adverse interest to these matters.

8.      Further, as part of its diverse practice, Huron appears in numerous cases, proceedings and transactions that involve many different professionals, including attorneys, accountants and financial consultants, who may represent claimants and parties-in-interest in the Debtors' chapter 11 cases.   As a result, Huron has represented and may in the future represent certain interested parties in matters wholly unrelated to these chapter 11 cases, either individually or as part of representation of a committee of creditors or interest holders. Based upon Huron's current knowledge of the professionals involved, and to the best of my knowledge, none of those relationships create interests materially adverse to the Debtors in matters upon which Huron is to be employed, and none are in connection with these cases.

9.      According to Huron's records, prior to the commencement of the chapter 11 cases, Huron received retainers from Vital Pharmaceuticals, Inc. in the amount of $1,120,000 to apply against professional services performed and expenses incurred in connection with services rendered as CTO and financial advisory personnel to support the CTO in carrying out the services outlined in the Engagement Letter and anticipation of these bankruptcy filings.

| Date | Source | Amount |
|---|---|---|
| September 15, 2022 | Vital Pharmaceuticals, Inc. | $1,120,000 |

10.     The foregoing payment by the Debtors to Huron were in connection with services rendered and costs incurred by Huron, in contemplation of, and in connection with, prepetition restructuring activities.  Any unused portion of the retainer will be held for post-petition services and applied pursuant to future fee applications and approved by the Court.

11.     Despite the efforts described above to identify and disclose Huron's connections

4

11695783-1

with parties in interest in these chapter 11 cases, because the Debtors are an enterprise with numerous creditors and other relationships, Huron, is unable to state with certainty that every client relationship or other connection has been disclosed.  In that regard, if Huron discovers additional information that requires disclosure, Huron will file a supplemental disclosure with the Court.

12.     Huron does not believe it is a "creditor" of the Debtors within the meaning of Bankruptcy Code section 101(10).  Further, neither I nor any other Huron partner or principal is a holder of any shares of any of the Debtors' stock.

13.     No commitments have been made or received by me and/or Huron nor any partner or employee associate thereof, as to compensation or payment in connection with these cases other than in accordance with the provisions of the Bankruptcy Code. Neither I nor Huron, have any agreement with any other entity to share with such entity any compensation received by Huron in connection with these chapter 11 cases.

14.     I, along with Huron reserve the right to supplement this Declaration in the event that I and/or Huron discovers any facts bearing on matters described in this Declaration regarding Huron's employment by the Debtors.

15.      This concludes my Declaration.

<b><u>28 U.S.C 1746 Declaration</u></b>

I declare under penalty of perjury that the foregoing is true and correct.  Executed on October 10, 2022

/s/ John C. DiDonato
JOHN C. DIDONATO

5

# EXHIBIT "B"

## (Engagement Letter)



huronconsultinggroup.com    |    1166 Avenue of the Americas Suite 300 New York, NY 10036

September 15, 2022

**PROPRIETARY AND CONFIDENTIAL**

Mr. Jack Owoc
Chief Executive Officer
Vital Pharmaceuticals Inc.
1600 N. Park Drive
Weston, Florida  33326

Dear Mr. Owoc:

On behalf of Huron Consulting Services LLC ("Huron"), I am pleased to confirm our engagement to provide Vital Pharmaceuticals, Inc. (the "Company"), certain services as set forth in the Objectives and Scope section below.

This letter (the "Engagement Letter') and the attached General Business Terms (collectively, the "Agreement") confirm the terms of the Company's engagement with Huron, including our mutual understanding and agreement regarding the services to be provided and the manner in which Huron will bill and be paid for these services.  This Engagement Letter shall be effective as of September 6, 2022.

*Objectives and Scope*

Huron understands the engagement objectives and scope to consist of the following services (the "Services"):

Our services will consist of making available to the Company the Services of Huron Managing Director and Practice Leader, John DiDonato as Chief Transformation Officer ("CTO" or the "Executive"), who will exercise the duties and responsibilities customarily associated with the role. The Executive will be assisted by other Huron professionals ("the Supplemental Business Team").  Huron shall cause the Executive and Supplemental Business Team to perform their duties and responsibilities in a diligent, efficient, and faithful manner and to the best of their respective abilities. The scope of the Executive's services shall include the following, to the extent necessary and requested by the Company in consultation with the Company's CEO:

1



huronconsultinggroup.com    |    1166 Avenue of the Americas Suite 300 New York, NY 10036

1. Manage those workstreams relating to the Company's restructuring initiatives.

2. Liaise with and serve as principal contact with:
   a. Senior lenders and significant creditors concerning financial and operational matters that relate to the restructuring activities only.
   b. Company's stakeholders for information requests.

3. Support and/or manage:
   a. Preparation and maintenance of:
      i. Debtor in Possession ("DIP") cash flow budget.
      ii. Liquidity and related cash flow forecasting.
      iii. Financial projections.
   b. Provide the Company approved enhancements to the financial projections based on the review and discussions with the Company's designated investment bank.
   c. Cash disbursement process, controls, and protocols.
   d. Initiatives to enhance liquidity by developing and implementing the plan(s) to:
      i. Enhance lease and trade payment terms.
      ii. Optimize near-term staffing and resulting payroll cost.
      iii. Oher cost savings and performance improvement initiatives.
   e. Bankruptcy preplanning and post-bankruptcy management workstreams including:
      i. Preparation of schedules including executory contracts and other matters as required by the bankruptcy court and US Trustee.
      ii. DIP financing sizing, budgeting, and variance reporting.
      iii. First-day motions and orders, monthly operating reports ("MORs"), and other reporting and analysis requirement
      iv. Select accounting matters.

4. Assist in facilitating information flow related to the capital markets processes with the Company's advisors, including assisting the Company's designated investment bank with information reasonably necessary to effectuate a transition.

5. Direct negotiations with significant creditors, including without limitation, Truist as Agent ("Agent") for the lenders and lenders' advisors under the existing credit facilities and other holders of secured debt.

6. Communicate directly with and provide information as reasonably requested by the Agent in connection with its existing credit facilities.



7.  Assist in managing the Company's designated vendors, including how vendors are managed and paid.

8.  Provide such other services as are customarily provided in connection with the analysis and negotiation of a restructuring initiative, as mutually agreed upon in writing between the Executive and the Company.

The Executive will not attest to financial events, reports, or other facts which precede their appointment in that capacity and will not exercise any check signing authority.

The parties agree that the Services under all prior engagement letters between Huron and the Company (as defined in those prior engagement letters, respectively) have concluded or already have been provided by Huron to the Company.

_Our Services_

Huron is a management consulting firm. Huron does not provide attest services, audits, or other engagements in accordance with standards established by the American Institute of Certified Public Accountants ("AICPA") or promulgated by the Public Company Accounting Oversight Board ("PCAOB").  Except as stated in this Engagement Letter, the risk of loss with respect to your operations and assets shall be borne by you.  Huron shall not be deemed to have assumed or be liable for any claim, liability, or obligation of you whether known or unknown, fixed or contingent accrued or un-accrued with respect to the Company's operations.  Except as otherwise required by applicable law, any reference to the nature or results of Huron's work may not be communicated to the public through public relations media, news media, sales media, or any other means without the prior written consent of both parties; provided that such prior written consent shall not be required with respect to the Company's employees, directors, officers, affiliates, representatives, agents, financing sources, advisors, counsel, or accountants who need to know such information.

_Company's Responsibilities_

The Company agrees, as reasonably practicable, to provide all Huron personnel duly appointed and acting as officers of the Company the most favorable indemnities provided by the Company to its officers and directors, whether under the Company's by-laws, partnership agreement, by contract or otherwise.  This indemnification is in addition to the indemnification afforded Huron under the accompanying General Business Terms.  The Company shall provide Huron with an executed copy of the resolution(s) of the Company's governing body appointing the Huron

3



resource(s) to the offices in question.  **Until Huron receives such a resolution, the Huron personnel will assist the Company as advisors, and not act as its officers. During any period in which Huron is assisting the Company as an advisor, any financial model that Huron personnel create as part of our Services will be unique to this engagement, based upon specific circumstances and assumptions and may not be appropriate to use when those circumstances and assumptions change. Accordingly, during this period deliverables prepared by Huron personnel may not be shared with any third party without Huron's prior written consent; provided that such prior written consent shall not be required with respect to the Company's employees, directors, officers, affiliates, representatives, agents, financing sources, advisors, counsel, or accountants who need to know such information to advise the Company. Use and dissemination of deliverables is addressed in further detail in the accompanying General Business Terms.** The Company shall also provide such Huron personnel who are duly appointed by the Company as officers of the Company full coverage under applicable Company insurance policies that protect officers and directors from liability ("D&O" insurance).  A copy of each applicable D&O policy, including endorsements, shall be furnished to Huron subsequent to the execution of this Engagement Letter. Certificates of insurance evidencing the coverage contemplated by the foregoing shall also be furnished to Huron. The Company will maintain the available limits of the coverage as they were at the inception of the engagement (purchasing additional coverage if necessary), will not permit the D&O insurance to lapse or terminate without notifying Huron, and shall include a quote for a minimum of one year of extended notice reporting ("tail") coverage. The Company will furnish certificates evidencing renewal of the coverage within thirty days of the renewal of insurance coverage referenced herein.

In the event the Company files for relief under Chapter 11 of the Bankruptcy Code, (a) the Company agrees to file an appropriate motion prepared in consultation with Huron as to matters relating to our retention by the Company and provision of Services as contemplated hereunder, on the first day of the bankruptcy case, which seeks the approval of the immediate assumption of this Agreement by the Company, and (b) this Agreement shall be subject to the entry of a final order of the Court approving the assumption of this Agreement, and (c) Huron shall not be required to perform any additional services under this Agreement until the entry of the Court's order approving the assumption of the Agreement or, if this Agreement is deemed not to be an executory contract, an order authorizing the employment of Huron under the terms of this Agreement.  The order approving the Company's assumption of this Agreement or, if this Agreement is deemed not to be an executory contract, the order authorizing the engagement of Huron must be acceptable to Huron in its sole discretion.

4



huronconsultinggroup.com   |   1166 Avenue of the Americas Suite 300 New York, NY 10036

*Fees and Expenses*

As compensation for providing the Executive's services as the CTO, the Company will pay Huron a fee of $15,000 per week.

We will provide written weekly estimates for services of the Supplemental Business Team. Fees for services of the Supplemental Business Team will be billed at our standard rates, as set forth below.  If we expect any changes greater than 10% to the estimates, we will seek the Company's express written approval before incurring any such supplemental fees.  Any adjustment from time to time of the following standards will be subject to the Company's express written preapproval:

| Title | Rate Range |
|---|---|
| Managing Director | $965 - $1,315 |
| Senior Director | $920 - $950 |
| Director | $605 - $770 |
| Manager | $575 - $575 |
| Associate | $495 - $495 |
| Analyst | $400 - $400 |

*Retainer*

Huron will not require a retainer at this time based on the terms of the forbearance agreement currently being prepared between the Company and its existing lender group; provided that Huron reserves the right to require a retainer at any time in its sole discretion prior to the filing of a bankruptcy.  Any retainer will be applied as follows:

(1) Immediately prior to the filing of your bankruptcy petition Huron will apply the retainer to all amounts due to it.  The amount drawn against the retainer may include an estimate for fees and expenses incurred by us but not yet billed prior to the date the Company intends to file its petition for bankruptcy protection.  The precise amount due to Huron as of the petition date will be determined upon the final recording of all of our time and expense charges.  The excess retainer, if any, will be held by Huron for application to post-petition fees and expenses that are finally allowed by a bankruptcy court.  If no such fees are allowed on a final basis by a bankruptcy court the excess retainer will be refunded to the Company at the conclusion of the engagement.

5



(2) If the Company does not file a bankruptcy petition, and a retainer is required, the retainer will either be applied either to  undisputed fees and expenses in Huron's final invoice or will be refunded to the Company at the conclusion of the engagement.

Payment of Huron's invoice will be made by wire transfer or ACH to:

BMO Harris Bank
Chicago, Illinois
Routing No. 071000288
Account Title:  Huron Consulting Services LLC
Account Number:  262-463-3
Swift Code:  HATRUS44
Comments: (Include Invoice Number to ensure proper credit)

Payment by Check:
Huron Consulting Services LLC
P.O. Box 71223
Chicago, IL  60694-1223

Out-of-pocket expenses (including transportation, lodging, meals, communications, supplies, copying, etc.) that are expressly preapproved by the Company in writing will be billed at the actual amounts incurred.  Out -of- pocket expenses also include reasonable fees and expenses of attorneys consulted or engaged by Huron to assist it with matters under this Agreement, such as retention applications, fee applications, and collection of fees and expenses.

Travel time that is expressly preapproved by the Company in writing during which no work is performed shall be itemized separately and billed at fifty percent (50%) of regular hourly rates.

Huron will bill on a weekly basis.  Invoices are due upon presentation.  Undisputed amounts remaining outstanding for more than 45 days (past due) may be subject to an interest charge of 1.5% per month from the date of invoice.  Huron reserves the right to suspend further Services until payment is received on past due invoices, in which event it will not be liable for any resulting loss, damage or expense connected with such suspension.  Huron will send its bills to:

Mr. Jack Owoc
c/o Greg Robbins, Finance Department
Vital Pharmaceuticals Inc.



huronconsultinggroup.com    |    1166 Avenue of the Americas Suite 300 New York, NY 10036

1600 N. Park Drive
Weston, Florida 33326
Phone:  954-790-1382
Email: Greg.Robbins@bangenergy.com

_Business Terms_

The attached General Business Terms apply to this engagement.



huronconsultinggroup.com   |   1166 Avenue of the Americas Suite 300 New York, NY 10036

*   *   *   *   *   *

Please indicate the Company's agreement with these terms by signing and returning to me the enclosed copy of this letter.  This engagement and the enclosed terms will become effective upon our receipt of your signed copy.  We appreciate the opportunity to be of service to the Company and look forward to working with you and the Company on this engagement.

Sincerely,

**HURON CONSULTING SERVICES LLC**

**John C. DiDonato**
Huron | Managing Director - Leader Huron Business Advisory
**T** 646-520-0084
**E** Jdidonato@hcg.com

Attachments:   General Business Terms

Acknowledged and Accepted:

**Vital Pharmaceuticals Inc.**

John Owoc (Sep 15, 2022 14:13 EDT)

By:      Jack Owoc
Title:    Chief Executive Officer
Date:    _____

8



**Attachment to Engagement Letter dated September 15, 2022 between Huron Consulting Services LLC and Vital Pharmaceuticals Inc.**

**GENERAL BUSINESS TERMS**

These General Business Terms, together with the Engagement Letter (including any and all attachments, exhibits and schedules) constitute the entire understanding and agreement (the "Agreement") between us with respect to the services and deliverables described in the Engagement Letter. If there is a conflict between these General Business Terms and the terms of the Engagement Letter, these General Business Terms will govern, except to the extent the Engagement Letter explicitly refers to the conflicting term herein.

**1.Our Services and Deliverables** We will provide the services and furnish the deliverables (the "Services") as described in our Engagement Letter and any attachments thereto, as may be modified from time to time by mutual consent.

**2. Independent Contractor** We are an independent contractor and not your employee, agent, joint venturer or partner, and will determine the method, details and means of performing our Services. We assume full and sole responsibility for the payment of all compensation and expenses of our employees and for all of their state and federal income tax, unemployment insurance, Social Security, payroll and other applicable employee withholdings.

**3. Fees and Expenses** (a) Our fees and payment terms are set out in our Engagement Letter. Those fees do not include taxes and other governmental charges (which will be separately identified in our invoices.) In the event you request that we perform some or all of the Services outside of the United States, we may issue the resulting invoice from a Huron affiliate located in the country where such Services are performed.

(b) You acknowledge that where out-of-town personnel are assigned to any project by mutual consent on a long-term basis (as defined from time to time in the applicable provisions of the Internal Revenue Code and related IRS regulations, and currently defined, under IRC Section 162, as a period of time reasonably expected to be greater than one year), the associated compensatory tax costs applied to out-of-town travel and living expenses also shall be calculated on an individual basis, summarized, and assessed to such personnel. In such cases, the expenses for which you shall reimburse us hereunder shall be deemed to include the estimated incremental compensatory tax costs associated with the out-of-town travel and living expenses of our personnel, including tax gross-ups. We shall use reasonable efforts

to limit such expenses and will obtain your express written preapproval for such expenses.

(c) We reserve the right to suspend Services if undisputed invoices are not timely paid, in which event we will not be liable for any resulting loss, damage or expense connected with such suspension.

**4. Taxes** (a) You will be responsible for and pay all applicable sales, use, excise, value added, services, consumption and other taxes and duties associated with our performance or your receipt of our Services, excluding taxes on our income generally. You will provide us with a copy of your certificate of tax-exemption, if applicable.

(b) If you are required by the laws of any foreign tax jurisdiction to withhold income or profits taxes from our payment, then the amount payable by you upon which the withholding is based shall be paid to us net of such withholding. You shall pay any such withholding to the applicable tax authority. However, if after 120 days of the withholding, you do not provide us with official tax certificates documenting remittance of the taxes, you shall pay to us an amount equal to such withholding. The tax certificates shall be in a form sufficient to document qualification of the taxes for the foreign tax credit allowable against our corporation income tax.

**5. Confidentiality and Privacy** (a) With respect to any information supplied in connection with this engagement and designated by either of us as confidential, or which the other should reasonably believe is confidential based on its subject matter or the circumstances of its disclosure ("Confidential Information"), the other agrees to protect the confidential information in a reasonable and appropriate manner, and use confidential information only to perform its obligations under this engagement and for no other purpose. This will not apply to information which is: (i) publicly known, (ii) already known to the recipient, (iii) lawfully disclosed by

9



a third party, (iv) independently developed, (v) disclosed pursuant to legal requirement or order, or (vi) disclosed to taxing authorities or to representatives and advisors in connection with tax filings, reports, claims, audits and litigation.

(b) Confidential Information made available hereunder, including copies thereof, shall be returned or destroyed upon request by the disclosing party; provided that the receiving party may retain other archival copies for recordkeeping or quality assurance purposes and receiving party shall make no unauthorized use of such copies.

(c) We agree to use any personally identifiable information and data you provide us only for the purposes of this engagement and as you direct, and we will not be liable for any third-party claims related to such use. You agree to take necessary actions to ensure that you comply with applicable laws relating to privacy and/or data protection, and acknowledge that we are not providing legal advice on compliance with the privacy and/or data protection laws of any country or jurisdiction. Likewise, Huron agrees to take necessary actions to ensure that we comply with applicable laws relating to privacy and/or data protection.

(d) At the conclusion of the engagement, we have the right to use your name, logo and a general description of the engagement in our marketing materials and traditional tombstone advertising, upon your express written preapproval of any such contemplated use.

**6. Our Deliverables and Your License** Upon full and final payment of all amounts due us in connection with this engagement, all right, title and interest in the deliverables set out in our Engagement Letter will become your sole and exclusive property, except as set forth below. Except as set forth in this Engagement Letter, we will retain sole and exclusive ownership of all right, title and interest in our work papers, proprietary information, processes, methodologies, know-how and software ("Huron Property"), including such information as existed prior to the delivery of our Services and, to the extent such information is of general application, anything which we may discover, create or develop during our provision of Services for you. To the extent our deliverables to you contain Huron Property, upon full and final payment of all amounts due us in connection with this engagement, we grant you a non-exclusive, non-assignable, royalty-free, perpetual license to use it in connection with the deliverables and the subject of the engagement and for no other or further use without our

express, prior written consent. If our deliverables are subject to any third party rights in software or intellectual property, we will notify you of such rights. Our deliverables are to be used solely for the purposes intended by this engagement and may not be disclosed, published or used in whole or in part for any other purpose.

**7. Your Responsibilities.** To the extent applicable and reasonably practicable, you will cooperate in providing us with office space, equipment, data and access to your personnel as necessary to perform the Services. You shall provide reliable, accurate and complete information necessary for us to adequately perform the Services and will promptly notify us of any material changes known by your senior management, including C-level officers in any information previously provided. You acknowledge that we are not responsible for independently verifying the truth or accuracy of any information supplied to us by or on behalf of you.

**8. Our Warranty** We warrant that our Services will be performed with commercially reasonable care in a diligent and competent manner. Our sole obligation will be to correct any non-conformance with this warranty, provided that you give us written notice within 10 days after the Services are performed or delivered or after you discover any non-conformance. The notice will specify and detail the non-conformance and we will correct the non-conformance within 30 days of our receipt of the notice and will have a reasonable amount of time, based on its severity and complexity, to complete such correction if the non-conformance cannot be completed to your satisfaction within the initial 30-day period.

We do not warrant and are not responsible for any third party products or services. Your sole and exclusive rights and remedies with respect to any third party products or services are against the third party vendor and not against us.

THIS WARRANTY IS OUR ONLY WARRANTY CONCERNING THE SERVICES AND ANY DELIVERABLE, AND IS MADE EXPRESSLY IN LIEU OF ALL OTHER WARRANTIES AND REPRESENTATIONS, EXPRESS OR IMPLIED, INCLUDING ANY IMPLIED WARRANTIES OF MERCHANTABILITY, OR FITNESS FOR A PARTICULAR PURPOSE, OR OTHERWISE, ALL OF WHICH ARE HEREBY DISCLAIMED.



**9.** **Liability and Indemnification** (a) To the fullest extent permitted under applicable law, Huron agrees to indemnify and hold you and your personnel, agents and contractors harmless against all costs, fees, expenses, damages, and liabilities (including reasonable defense costs and legal fees), associated with any legal proceeding or other claim brought against you by a third party, including a subpoena or court order, arising from or relating to any Services that we provide to you. This indemnity shall not apply to the extent a claim arises out of your gross negligence or willful misconduct, as finally adjudicated by a finder of fact.

(b) To the fullest extent permitted under applicable law, you agree to indemnify and hold us and our personnel, agents and contractors harmless against all costs, fees, expenses, damages, and liabilities (including reasonable defense costs and legal fees), associated with any legal proceeding or other claim brought against us by a third party, including a subpoena or court order, arising from or relating to any Services that you use or disclose, or this engagement generally. This indemnity shall not apply to the extent a claim arises out of our gross negligence or willful misconduct, as finally adjudicated by a finder of fact.

(c) Neither party will be liable to the other for any special, consequential, incidental, indirect or exemplary damages or loss (nor any lost profits, savings or business opportunity). Further, Huron's liability relating to this engagement will in no event exceed an amount equal to the fees (excluding taxes and expenses) it receives from you for the portion of the engagement giving rise to such liability.

(c) Neither party will be liable for any delays or failures in performance due to circumstances beyond its reasonable control.

**10.** **Non-Solicitation** Client recognizes that Service Provider's personnel have access to Service provider's trade secrets and proprietary information and are crucial and necessary to the completion of the project for the Client. During the term of this engagement, and for a period of one year following its expiration or termination, Client will not directly or indirectly solicit, employ or otherwise engage a person who participated in the Services on behalf of Service Provider; provided, that this restriction shall not apply to any general solicitation for employees (such as general newspaper advertisements, employment agency referrals, and internet postings) not targeting any such persons, and

Client shall not be restricted in hiring any such person who responds to any such general solicitation.

**11.** **Termination** (a) Termination for Convenience. Either party may terminate this Agreement for convenience at any time on 30 days' prior written notice to the other.

(b) Termination for Breach. Either party may terminate this Agreement for breach if, within 15 days' written notice, the breaching party fails to cure a material breach of this Agreement.

(c) To the extent you terminate this Agreement for convenience, you will pay us for all undisputed Services rendered, effort expended, expenses incurred, contingent fees (if any), or commitments made by us to the effective date of termination and we will return to you a pro-rata share of the retainer for services that we did not provide at the time or because of such termination.

(d) Further, we reserve the right to terminate this Agreement at any time, upon providing written notice to you, if conflicts of interest arise or become known to us that, in our sole judgment, would impair our ability to perform the Services objectively. If we terminate this Agreement pursuant to the foregoing provision, we will return to you a pro-rata share of the retainer for services that we did not provide at the time or because of such termination.

(e) The terms of this Agreement which relate to confidentiality, ownership and use, limitations of liability and indemnification, non-solicitation and payment obligations shall survive its expiration or termination.

**12.** **General** (a) This Agreement supersedes all prior oral and written communications between us, and may be amended, modified or changed only in a writing when signed by both parties.

(b) No term of this Agreement will be deemed waived, and no breach of this agreement excused, unless the waiver or consent is in writing signed by the party granting such waiver or consent.

(c) We each acknowledge that we may correspond or convey documentation via Internet e-mail and that neither party has control over the performance, reliability, availability, or security of Internet e-mail. Therefore, neither party will be liable for any loss, damage, expense, harm or inconvenience resulting from the loss, delay, interception, corruption, or alteration of any Internet e-mail due to any reason



beyond our reasonable control.

(d) The parties hereto agree, with respect to any and all pre-petition disputes or claims arising hereunder, or in any way related to this Agreement or any performance hereunder, to the following bifurcated dispute resolution provisions: (1) binding arbitration if the Company initiates any such dispute or claim; or (2) regular court if Huron initiates any such dispute or claim. Under either scenario (1) or (2) above, this Agreement shall be governed by and construed in accordance with the laws of the State of Florida without giving effect to conflict of law rules. With respect to any arbitration initiated by the Company under scenario (1) above, the parties hereto agree that such arbitration shall be settled in accordance with the Commercial Arbitration Rules of the American Arbitration Association; that questions of arbitrability shall be delegated to and decided by an arbitrator and not a court; that such arbitration will be conducted in Broward County, Florida, or any other location mutually agreed to by the parties; that any arbitration award may be entered in and enforced by any court having jurisdiction thereof; and that, except as may be required by law, neither a party nor an arbitrator may

disclose the existence, content, or results of any arbitration hereunder without the prior written consent of both parties. With respect to any litigation initiated by Huron under scenario (2) above, the parties agree that such litigation shall be brought exclusively in the courts of competent jurisdiction located in Broward County, Florida, and each party hereby irrevocably accepts and submits to the exclusive jurisdiction of the aforesaid courts in personam, with respect to any such action, suit or proceeding and waives any and all objections to the exercise of such jurisdiction in the aforesaid courts, including any objections based upon venue and forum non conveniens.

(e) If any portion of this Agreement is found invalid, such finding shall not affect the enforceability of the remainder hereof, and such portion shall be revised to reflect our mutual intention.

(f) This Agreement shall not provide third parties with any remedy, cause, liability, reimbursement, claim of action or other right in law or in equity for any matter governed by or subject to the provisions of this Agreement.



huronconsultinggroup.com   |   1166 Avenue of the Americas, 3rd Floor, New York, NY 10036

October 7, 2022

Mr. Jack Owoc
Chief Executive Officer
Vital Pharmaceuticals Inc.
1600 N. Park Drive
Weston, Florida 33326

Dear Mr. Owoc:

This amendment describes changes to the engagement letter signed on September 15, 2022, between Huron Consulting Services LLC ("Huron") and Vital Pharmaceuticals, Inc..  The section of the Engagement Letter set forth below is hereby amended by making the changes indicated below:

<u>Engagement Letter</u>

**Substitute Opening Paragraph:**
*"On behalf of Huron Consulting Services LLC ("Huron"), I am pleased to confirm our engagement to provide Vital Pharmaceuticals, Inc (the "Company"), certain services as set forth in the Objectives and Scope section below.*

**With**

"On behalf of Huron Consulting Services LLC ("Huron"), I am pleased to confirm our engagement to provide Vital Pharmaceuticals, Inc., Vital Pharmaceuticals International Sales, Inc., JHO Intellectual Property Holdings, LLC, Bang Energy Canada, Inc., JHO Real Estate Investment, LLC, Quash Seltzer, LLC, and Rainbow Unicorn Bev LLC, (collectively the "Company") certain services as set forth in the Objectives and Scope section below.

\* \* \*



This Amendment constitutes the entire understanding between the Company and Huron with respect to the foregoing changes, supersedes all prior oral and written communications with respect to such changes, and may be amended, modified or changed only in writing when signed by both parties.  Except as expressly modified herein, all other terms and conditions of the Engagement Letter and the General Business Terms remain unchanged.

Please indicate your agreement to this Amendment by signing and returning to Huron the enclosed copy of this letter.  We appreciate the opportunity to be of service to you.

Very truly yours,

HURON CONSULTING SERVICES LLC

By:    _____

Mr. John C. DiDonato
Managing Director – Practice Leader

Date:    Oct. 10, 2022
_____

Acknowledged and Accepted:

Vital Pharmaceuticals, Inc

By:    _____
John Owoc (Oct 10, 2022 10:20 EDT)
Mr. Jack Owoc

Title:    President & CEO

Date:    Oct 10, 2022
_____

V51903

**<u>EXHIBIT "C"</u>**

**(Curriculum Vitae of John DiDonato)**

- As a senior executive, **John has more than 35 years of extensive experience** in reorganization, operational transformation, capital raising, buy-side advisory, and merger integration. He provides guidance to financially and operationally challenged entities.
- His expertise encompasses a wide range of industries, including automotive, retail, logistics, distribution, transportation, and retail, among others, including aftermarket suppliers, specialty paper manufacturers, integrated metal manufacturers, aerospace suppliers, engineering and construction, and equipment leasing.
- Throughout his career, **John has served over 250 companies**, functioning for many as chief transformation officer roles. Served as the President of Glass & Associates, having sold the firm to Huron in 2007. Currently serves as an operating advisor to Resilience Capital Partners.
- John has extensive experience servicing debtors with complex capital structures. John has raised multiple billions in replacement and exit financings throughout his crisis management career.
- **Representative examples of John's engagement experience include:**
  - Chief Restructuring Officer of Maines Paper and Food Services ($3.0 billion), NORDAM ($0.6 billion), and Town Sports International, LLC, driving their successful outcomes through the Chapter 11 process.
  - President of NUMMI, a $3.0 billion automotive assembler of vehicles originally jointly owned by GM and Toyota, led a team that wound down operations. Worked closely with the NUMMI management team to close and sell a 5.4 million square foot manufacturing site and significant equipment bundles to TESLA Motors. Managed the satisfaction of employee, environmental, and product-related obligations.
  - Led the successful outcome by advising leading creditors and agents in the following matters Roadrunner Transportation Services, Aspect Software, and a leading consumer products company,
  - Chief Restructuring Officer to Revstone Industries, SPARA, Metavation, Greenwood Forging, US Tool, and Revstone Transportation Group, a group of industrial businesses whose annual revenues totaled approximately $1.0 billion. Led this group of companies through a hostile Chapter 11, providing significant expert testimony in Delaware, throughout the case and the sale of 12 operating companies, both in and out of court. Reached a consensual resolution among the significant constituents, including the PBGC and highly adversarial creditors.
  - Chief Restructuring Officer to Allen System Group, a $300 million, highly leveraged enterprise software and cloud solutions provider. Led a team of professionals through an operational turnaround.
  - Chief Restructuring Officer of Railworks, a $750 million provider of integrated rail system construction and services. Directed the financial and operational restructuring and negotiated bifurcated DIP credit and surety arrangements. The Plan of Reorganization was confirmed 12 months after the case was filed.
  - Restructuring advisor to Dick Corporation, a $1.5 billion contractor. Advised the company on strategic and restructuring alternatives. Successfully negotiated to refinance the company's existing debt while managing liquidity constraints to keep the company from bankruptcy process reorganization and provided litigation support on PBGC litigation.



# JOHN C. DIDONATO

**T** 646.520.0084
**E** jdidonato@hcg.com

**BUSINESS ADVISORY**
PRACTICE LEADER AND MANAGING DIRECTOR

1

**EXHIBIT "D"**

**(Proposed Order)**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION
www.flsb.uscourts.gov

IN RE:                                                    Chapter 11 Case

VITAL PHARMACEUTICALS, INC., *et al.*,[1]                  Case No.: 22-_____

      Debtors.                                        (Joint Administration Pending)

_____/

**INTERIM ORDER APPROVING DEBTORS' APPLICATION, PURSUANT TO
SECTION 363(b) OF THE BANKRUPTCY CODE, FOR AUTHORITY TO EMPLOY AD
RETAIN, ON AN INTERIM AND FINAL BASIS, HURON CONSULTING SERVICES
LLC, TO PROVIDE THE SERVICES OF A CHIEF TRANSFORMATION OFFICER
AND ADDITIONAL PERSONNEL, EFFECTIVE AS OF THE PETITION DATE,
<u>AND SETTING A FINAL HEARING</u>**

      **THIS MATTER** having come before the Court on October _____, 2022 at _____ _.m.,

in Fort Lauderdale, Florida, upon the *Debtors' Application, Pursuant to Section 363(b) of the*

---

[1] The address of the Debtors is 1600 N. Park Drive, Weston, FL 33326.  The last four digits of the Debtors'
federal tax identification numbers are: (i) Vital Pharmaceuticals, Inc. (8430); (ii) Bang Energy Canada, Inc.
(5454); (iii) JHO Intellectual Property Holdings, LLC (0010); (iv) JHO Real Estate Investment, LLC
(9394); (v) Quash Seltzer, LLC (6501); (vi) Rainbow Unicorn Bev LLC (2254); and  (vii) Vital
Pharmaceuticals International Sales, Inc. (8019).

*Bankruptcy Code, for Authority to Employ and Retain, on an Interim and Final Basis, Huron Consulting Services LLC to Provide The Services of a Chief Transformation Officer and Additional Personnel, Effective as of the Petition Date* (the "<u>Application</u>") [ECF No. _____] filed by the above-captioned debtors in possession (collectively, the "<u>Debtors</u>").  The Application seeks entry of an order authorizing the Debtors to retain Huron Consulting Services LLC ("<u>Huron</u>") to provide to provide the services of a Chief Transformation Officer, John C. DiDonato, to the Debtors upon the terms and conditions set forth in the Engagement Letter[2] attached as Exhibit B to the Application. Upon the Application, the DiDonato Declaration attached as Exhibit A to the Application; and it appearing that neither Huron nor DiDonato holds nor represents any interest adverse to the Debtors' estates; and this Court having jurisdiction to consider the Application and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334; and consideration of the Application and the relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and it appearing that proper and adequate notice of the Application has been given and that no other and further notice is necessary; and the relief requested in the Application being in the best interests of the Debtors and their estates and creditors; and this Court having reviewed the Application and having heard the statements in support of the relief requested therein at a hearing before this Court (the "<u>Hearing</u>"); and this Court having determined that the legal and factual bases set forth in the Application and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before this Court and after due deliberation thereon; and good and sufficient cause appearing therefore, it is

      **ORDERED** that:

---

[2] Capitalized terms used but not defined herein shall have the meanings ascribed in the Motion.

1.      The Application is **APPROVED**, on an interim basis.

2.      The Debtors are authorized, pursuant to 11 U.S.C. § 363(b), effective as of the Petition Date, to: (i) employ and retain Huron on an interim basis on the terms set forth in the Engagement Letter entered into on September 15, 2022 (with an effective date of September 6, 2022); and (ii) designate John C. DiDonato as Chief Transformation Officer ("CTO") for the Debtors, pending a final hearing as set forth below.

3.      As compensation for providing the CTO's service, the Debtors shall pay Huron a fee of $15,000.00 per week. Huron shall provide weekly estimates for the services of Huron's Supplemental Business Team. The fees for the services of Huron's Supplemental Business Team will be billed at Huron's standard hourly rates, as set forth below.

| | |
|---|---|
| Managing Directors: | $965.00 - $1,315.00 |
| Senior Directors: | $920.00 - $950.00 |
| Directors: | $605.00 - $770.00 |
| Managers: | $575.00 |
| Associates: | $495.00 |
| Analysts: | $400.00 |

4.      Should the CTO and/or Huron expect any changes greater than 10% to Huron's written weekly estimates, the CTO and Huron shall seek the Debtors' express written approval before incurring any such supplemental fees. Any adjustments from time to time to the standard hourly rates set forth above shall be subject to the Debtors' express written approval.

5.      Huron shall submit weekly statements to the Debtors, the Office of the United States Trustee (the "US Trustee") and the Official Committee of Unsecured Creditors (if one is appointed (the "Committee") for the work performed and expenses incurred by the CTO and Huron. Huron shall provide a detailed statement of the services rendered and expenses incurred for the prior week, hours worked in tenth of an hour increments and individual time entries describing the tasks performed. In addition to compensation for professional services and

11648772-2

expenses incurred by the CTO and his staff, Huron will seek reimbursement for its reasonable and necessary out-of-pocket expenses incurred in connection with these chapter 11 cases and the retention of John C. DiDonato as CTO.  Such claims for reimbursement of expenses shall be included in the detailed weekly statement.

6.     The Debtors shall indemnify and hold harmless Huron and the CTO to the same extent as the most favorable indemnification it extends to its officers and or directors, whether under the Debtors' bylaws, partnership agreement, by contract or otherwise.

7.     The Court shall conduct a final hearing on the Application on **October _____, 2022 at _____ a.m./p.m. (Eastern Time)** ("Final Hearing").

8.     Entry of this Interim Order is without prejudice to the rights of any party-in-interest to interpose an objection to the Application, and any such objection will be considered on a *de novo* standard at the Final Hearing.

9.     In the event the Application is not granted on a final basis, Huron and the CTO shall be authorized to submit a fee application with this Court for compensation for fees and expenses incurred in the period between the Petition Date and the Final Hearing.

10.    This Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation of this Order.

11.    To the extent that there may be inconsistency between the terms of the Application the Engagement Letter or this Order, the terms of this Order shall govern.

12.    The Debtors are authorized and empowered to take all actions necessary to implement the relief granted in this Order.

#   #   #

Submitted by:
Jordi Guso, Esq.,
BERGER SINGERMAN LLP

11648772-2

1450 Brickell Avenue, Ste. 1900
Miami, FL  33131
Telephone: (305) 755-9500
Facsimile: (305) 714-4340
Email:  jguso@bergersingerman.com

*(Attorney Guso is directed to serve this order upon all non-registered users who have yet to appear electronically in this case and file a conforming certificate of service.)*