UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION
www.flsb.uscourts.gov

In re:                                              Chapter 11 Cases

VITAL PHARMACEUTICALS, INC., *et al.*,    Case No. 22-17842 (PDR)
                                                    (Joint Administration Pending)
        Debtors.[1]

_____/

**DEBTORS' EMERGENCY MOTION FOR INTERIM
AND FINAL ORDERS (I) APPROVING POSTPETITION FINANCING, (II)
AUTHORIZING USE OF CASH COLLATERAL, (III) GRANTING LIENS AND
PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (IV)
GRANTING ADEQUATE PROTECTION, (V) MODIFYING AUTOMATIC STAY,
(VI) SCHEDULING A FINAL HEARING, AND (VII) GRANTING RELATED RELIEF**

**(Emergency Hearing Requested)**

**Statement of Exigent Circumstances**

The Debtors respectfully request the Court to conduct an emergency hearing on this Motion within two business days of the Petition Date (as defined herein), consistent with Local Rule 9013-1(F). The Debtors must have immediate access to postpetition financing to continue operating their business for the benefit of all stakeholders, while simultaneously preventing direct, immediate, and substantial harm to the Debtors' estates. The Debtors respectfully request that the Court waive the provisions of Local Rule 9075-1(B), which requires an affirmative statement that a bona fide effort was made to resolve the issues raised in this Motion, as the relief requested herein is urgent in nature and does not lend itself to advance resolution.

In support of this motion (this "Motion"), the above-captioned debtors and debtors-in-

possession (collectively, the "Debtors") rely on the *Declaration of John C. DiDonato in Support*

*of Chapter 11 Petitions and First Day Pleadings* (the "First Day Declaration") and the *Declaration*

---

[1] The address of the Debtors is 1600 N. Park Drive, Weston, FL 33326. The last four digits of the Debtors' federal tax identification numbers are: (i) Vital Pharmaceuticals, Inc. (8430); (ii) Bang Energy Canada, Inc. (5454); (iii) JHO Intellectual Property Holdings, LLC (0010); (iv) JHO Real Estate Investment, LLC (9394); (v) Quash Seltzer, LLC (6501); (vi) Rainbow Unicorn Bev LLC (2254); and (vii) Vital Pharmaceuticals International Sales, Inc. (8019).

*of Homer Parkhill in Support of DIP Financing* (the "<u>Parkhill Declaration</u>" and together with the First Day Declaration, the "<u>DIP Declarations</u>") filed concurrently herewith and respectfully state as follows:

**RELIEF REQUESTED**

1.      By this Motion, the Debtors seek entry of interim and final orders, substantially in the form attached hereto as **<u>Exhibit A</u>** (the "<u>Interim Order</u>"[2] and "<u>Final Order</u>"[3] and, collectively, the "<u>DIP Orders</u>"):

> (a)      authorizing the Debtors to obtain senior secured postpetition financing on a super-priority basis pursuant to the terms and conditions of that certain Superpriority Secured Debtor-in-Possession Credit Agreement (as the same may be amended, restated, supplemented, or otherwise modified from time to time, the "<u>DIP Credit Agreement</u>" and the facility thereunder, the "<u>DIP Facility</u>"), by and among the Borrowers, the Guarantors, Truist Bank, as administrative agent (in such capacity, the "<u>DIP Agent</u>") for and on behalf of the lenders party thereto (collectively, the "<u>DIP Lenders</u>"), and the DIP Lenders substantially in the form of **<u>Exhibit B</u>** attached hereto;

> (b)      authorizing the Debtors to obtain from the DIP Lenders, during the interim period pending the entry of the Final Order, up to $34,000,000 in accordance with the DIP Credit Agreement and the Interim Order;

> (c)      authorizing the Debtors to obtain from the DIP Lenders, upon entry of the Final Order, total advances in an amount not to exceed a maximum outstanding principal amount of $454,770,201.56 in accordance with the DIP Credit Agreement, the DIP Documents (as defined herein), and the Final Order;

> (d)      authorizing the Debtors, upon entry of the Final Order, (i) to convert to DIP Obligations (as defined herein) under the DIP Credit Agreement a portion of the outstanding principal amount representing an increase in net borrowings under the Prepetition Credit Agreement (as defined herein) from and after June 3, 2022, accrued interest and outstanding fees thereunder, and the cash receipts of the Debtors through the entry of the Final Order which receipts constitute cash collateral of the Prepetition Lenders (as defined in the Interim Order) and (ii) thereafter repay the

---

[2]  Capitalized terms used but not defined herein have the meanings given to them in the Interim Order.

[3]  The Debtors will file a proposed Final Order prior to a final hearing on the Motion.

Prepetition Loans as permitted by the Final Order (the foregoing defined as the "<u>Roll Up</u>");

(e)    authorizing the Debtors to execute and deliver the DIP Credit Agreement, the other "Loan Documents" as described in the DIP Credit Agreement and any other agreements and documents related thereto (collectively with the DIP Credit Agreement, the "<u>DIP Documents</u>"), and to perform such other acts as may be necessary or desirable in connection with the DIP Documents and the transactions contemplated thereby;

(f)    subject to the Carve-Out (as defined in the Interim Order), granting to the DIP Agent and the DIP Lenders, on account of the DIP Facility and all obligations owing thereunder and under the DIP Documents, including the Roll Up (collectively, and including all "Obligations" as described in the DIP Credit Agreement, the "<u>DIP Obligations</u>"), allowed super-priority administrative expense claim pursuant to section 364(c)(1) of the Bankruptcy Code having priority over any and all expenses and claims specified in any other section of the Bankruptcy Code, including, without limitation, sections 503(b), 507(a)(2), 507(b), and 507(d) of the Bankruptcy Code, in each of the Cases and any Successor Cases (as defined in the Interim Order);

(g)    subject to the Carve-Out and the Prepetition Prior Liens (as defined in the Interim Order), granting to the DIP Agent, for the benefit of itself and the DIP Lenders, automatically perfected security interests in and liens on all of the DIP Collateral (as defined in the Interim Order), including, without limitation, all property constituting "Cash Collateral" as defined in section 363(a) of the Bankruptcy Code, which liens shall be subject to the priorities set forth herein;

(h)    authorizing and directing the Debtors to pay the principal, interest, fees, expenses and other amounts payable under the DIP Documents as such become due, including, without limitation, upfront fees, structuring fees, unused commitment fees, administrative agent's fees, the reasonable fees and disbursements of the DIP Agent's attorneys, advisors, accountants and other consultants, all to the extent provided in, and in accordance with, the DIP Documents;

(i)    (i) authorizing the use of Cash Collateral of the Prepetition Secured Parties (each as defined herein) pursuant to section 363 of the Bankruptcy Code and subject to the Approved Budget (as defined in the Interim Order), the initial form of which is attached to the Interim Order as <u>Exhibit A</u> (ii) from and after entry of a Final Order, authorizing the Debtors to collect and segregate the Cash Collateral of the Prepetition Secured Parties and to apply such Cash Collateral to the Prepetition Secured Parties on the terms set forth herein, and (iii) subject to the Carve-Out, providing adequate protection to the Prepetition Secured Parties for any Diminution in Value (as defined in

3

the Interim Order) of their respective interests in the Prepetition Collateral (as defined herein), including the Cash Collateral, as a result of the relief granted herein;

(j)   subject to the Carve-Out, providing adequate protection to the Arizona Mechanics' Lienholders (as defined in the Interim Order) for any Diminution in Value of their respective interests in the Arizona Real Property (as defined in the Interim Order), as a result of the relief granted by the Interim Order;

(k)   waiving, subject to entry of a Final Order approving such waiver, certain rights of the Debtors to surcharge collateral pursuant to section 506(c) of the Bankruptcy Code;

(l)   waiving, subject to entry of a Final Order approving such waiver, the application of the "equities of the case" exception under section 552(b) of the Bankruptcy Code as to the Prepetition Secured Parties with respect to proceeds, product, offspring or profits of any of the Prepetition Collateral;

(m)   vacating and modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Documents and the Interim Order; and

(n)   granting related relief.

## JURISDICTION

2.    This Court has jurisdiction over this matter under 28 U.S.C. §§ 157 and 1334.  This is a core proceeding under 28 U.S.C. § 157(b).

3.    Venue is proper under 28 U.S.C. §§ 1408 and 1409.

4.    The statutory bases for the relief sought in this Motion are sections 105, 361, 362, 363(c), 363(e), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e), 503, 506, 507, and 552 of title 11 of the United States Code (the "Bankruptcy Code"), rules 2002, 4001, 6003, 6004, 9013, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and rules 2002-1, 4001-1, 4001-2, 4001-3, and 9013-1 of the Local Bankruptcy Rules for the Southern District of Florida (the "Local Rules").

4

## STATEMENT OF MATERIAL TERMS

5.     The following chart contains a summary of the material terms[4] of the proposed DIP

Facility and Interim Order in accordance with Bankruptcy Rules 4001(b)(1)(B) and 4001(c)(1)(B),

Local Rules 4001-2 and 4001-3, and the *Guidelines for Motions Seeking Authority to Use Cash*

*Collateral and Motions Seeking Approval of Postpetition Financing* (the "Guidelines"):

| Bankruptcy Rule | Summary of Material Terms |
|---|---|
| **Parties to the DIP Credit Agreement**<br><br>Bankruptcy Rule 4001(c)(1)(B) | **Borrower**:  Vital Pharmaceuticals, Inc., as debtor-in-possession in these chapter 11 cases (the "Borrower" or "Vital Pharmaceuticals").<br><br>**Guarantor(s)**:  The subsidiaries and affiliates of the Borrower identified in the DIP Credit Agreement (collectively, the "Guarantors"), which are comprised of the Debtors.<br><br>**DIP Agent**:  Truist Bank ("Administrative Agent" or "Prepetition Agent")<br><br>**DIP Lenders**: The lenders from time to time party to the DIP Credit Agreement.<br><br>*See* DIP Credit Agreement, Preamble. |
| **Term**<br><br>Bankruptcy Rules 4001(b)(l)(B)(iii), 4001(c)(1)(B) | The DIP Loans would be repaid in full, and the DIP Loan Commitment would terminate on, the earliest to occur of the following:<br><br>(a)     unless the Final Order shall have been entered, the date that is thirty (30) calendar days after the date of entry of the Interim Order; provided, that, the date contemplated in this clause (a) may be extended with the consent of the Administrative Agent and the Required Lenders (as defined in the DIP Credit Agreement) to a date that is no later than sixty (60) calendar days after entry of the Interim Order;<br><br>(b)     the date upon which any plan of reorganization or Sale Transaction (as defined in the Interim Order) becomes effective;<br><br>(c)     the date that is the seven (7) month anniversary of the Petition Date; and<br><br>(d)     acceleration by the DIP Agent following an Event of Default.<br><br>*See* DIP Credit Agreement, §1.1. |
| **Commitment** | Extensions of credit in the maximum principal amount of $454,770,201.56, which amount is composed of the sum of (a) $100,000,000 of new money that the Debtors |

---

[4]  The summaries contained in this Motion are qualified in their entirety by the provisions of the documents referenced including, without limitation, the DIP Documents and the Interim Order.  To the extent anything in this Motion is inconsistent with such documents, the terms of the applicable documents shall control.  Capitalized terms used in this summary chart but not otherwise defined have the meanings ascribed to them in the DIP Documents or the Interim Order, as applicable.

| Bankruptcy Rule | Summary of Material Terms |
|---|---|
| Bankruptcy Rule 4001(c)(1)(B) | require for the continued operation of their business during the pendency of the Chapter 11 Cases plus (b) $354,770,201.56 of additional "Roll Up" commitments.<br><br>*See* DIP Credit Agreement, §1.1. |
| **Conditions of Borrowing**<br><br>Bankruptcy Rule 4001(c)(1)(B) | The DIP Credit Agreement includes standard and customary conditions of borrowing, the satisfaction of which is a condition precedent to the obligations of each DIP Lender to make DIP Loans under the DIP Facility.<br><br>*See* DIP Credit Agreement, Art. III. |
| **Interest Rates**<br><br>Bankruptcy Rule 4001(c)(1)(B) | The DIP Loans will bear the following interest:  1-month SOFR + 8.50% or Base Rate + 7.50%, at the election of the Borrower.<br><br>*See* DIP Credit Agreement, §2.13 |
| **Use of DIP Facility and Cash Collateral**<br><br>Bankruptcy Rule 4001(b)(l)(B)(ii) | As set forth more fully in the DIP Credit Agreement, the proceeds of the DIP Loan will be used:<br><br>(i) on or after the Effective Date, only for the following purposes: (A) subject to Section 6.1 of the DIP Credit Agreement, for working capital and other general purposes of the Loan Parties, including the payment of professional fees and expenses and other administrative expenses in the Chapter 11 Case, and the Specified Entities[5] and the Specified Foreign Entities;[6] (B) to pay the reasonable fees and expenses of the Administrative Agent and the Prepetition Agent as set forth in the Orders and in this Agreement; (C) to pay claims in respect of certain Prepetition creditors, which may include, without limitation, employees, taxing authorities and trade vendors in the ordinary course, in each case to the extent authorized by orders of the Bankruptcy Court reasonably acceptable to the Administrative Agent and paid in accordance with the Budget; and (D) after entry of the Interim DIP Order of the Final DIP Order, and to the extent authorized by the Bankruptcy Court and paid in accordance with the Budget, to repay Prepetition Facility Obligations; and<br><br>(ii) contemporaneously with the Final DIP Order Entry Date, to refinance and replace a portion of Prepetition Facility Obligations outstanding on the Final DIP Order Entry Date, in an aggregate amount not to exceed the Initial Roll-Up.<br><br>*See* DIP Credit Agreement. §5.9. |

---

[5] "Specified Entity" shall mean (a) JHO GA-1 Investment, LLC, a Florida Limited liability company, (b) JHO NV-1 Investment, LLC, a Florida limited liability company, (c) Sheridan Real Estate Investment A, LLC, a Florida limited liability company, (d) Sheridan Real Estate Investment B, LLC, a Florida limited liability company, or (e) Sheridan Real Estate Investment C, LLC, a Florida limited liability company.

[6] "Specified Foreign Entity" shall mean (a) Bang Energy Canada, ULC, (b) Bang Energy Mexico S. DE R.L. de C.V., (c) Bang Energy B.V., (d) Bang Energy (Australia) Pty Ltd., (e) Bang Energy VPX Sports Ecuador S.A.S., (f) Energy Peru, LLC, (g) Bang Energy Peru S.A.C., (h) Bang Energy Costa Rica LTDA, (i) Bang Energy Brazil LTDA, (j) Bang Energy Chile SPA or (k) Bang Energy Columbia SA.

| Bankruptcy Rule | Summary of Material Terms |
|---|---|
| **Limitations on Use of DIP Facility and Cash Collateral** | In no event shall the proceeds of any Loan be used for the payment of professional fees, costs or disbursements incurred in connection with (A) any challenge to (I) the amount, extent, priority, validity, perfection or enforcement of the Indebtedness of the Loan Parties owing to the Administrative Agent, the Lenders, the Prepetition Agent, the Prepetition Issuing Bank, the Prepetition Swingline Lender, the Prepetition Lenders, the other holders of the Obligations or the other holders of the Prepetition Facility Obligations or (II) the investigation or prosecution by the Loan Parties of any prepetition claims or causes of action against the Prepetition Agent, the Prepetition Issuing Bank, the Prepetition Swingline Lender, any Prepetition Lender or any other holder of Prepetition Facility Obligations or (B) the collateral securing such indebtedness or the perfection, priority or validity of the Liens granted in favor of the Administrative Agent, the Lenders, the Prepetition Agent, the Prepetition Issuing Bank, the Prepetition Swingline Lender, the Prepetition Lenders, the other holders of the Obligations or the other holders of the Prepetition Facility Obligations with respect thereto or (2) any action to limit, impede or restrict the Administrative Agent's enforcement of remedies with respect to the Collateral securing the Obligations following an Event of Default or to otherwise modify or limit the rights of the Administrative Agent, the Lenders, the Prepetition Agent, the Prepetition Issuing Bank, the Prepetition Swingline Lender, the Prepetition Lenders, the other holders of the Obligations or the other holders of the Prepetition Facility Obligations, in each case under any Order; provided, further, that, notwithstanding anything to the contrary herein, no more than an aggregate of $50,000 (or such higher amount as may be specified in the Final DIP Order) of the Carve-Out may be used to investigate the matters in the foregoing clauses (1) and (2).<br><br>Under no circumstances will the Debtors transfer any such advances or Cash Collateral to any non-Debtor affiliates other than to fund the operations of the Foreign Non-Debtor Affiliates and to pay obligations owing to the Landlord Non-Debtor Affiliates, in each case, as permitted by the DIP Documents and in compliance with the Approved Budget (subject to Permitted Variances).[7]<br><br>*See* Interim Order, ¶¶ 9-10; DIP Credit Agreement §5.9. |
| **Entities with Interests in Cash Collateral**<br><br>Bankruptcy Rule 4001(b)(l)(B)(i) | The Prepetition Secured Parties have an interest in Cash Collateral.<br><br>*See* Interim Order, ¶ E (iii). |
| **Fees**<br><br>Bankruptcy Rule 4001(c)(1)(B) | The DIP Facility includes the following fees:<br><br>• **DIP Structuring Fee:**  A one-time fee of $300,000 payable to the Administrative Agent, non-refundable and payable in cash out of the proceeds of the initial funding of the DIP Facility.<br><br>• **Upfront Fee:**  A one-time fee of $2,500,000, non-refundable and payable in cash out of the proceeds of the initial funding of the DIP Facility and shared |

---

[7]   The Specified Entities and the Specified Foreign Entities noted above are the same entities as the Foreign Non-Debtor Affiliates and the Landlord Non-Debtor Affiliates.

| Bankruptcy Rule | Summary of Material Terms |
|---|---|
| | ratably by the DIP Lenders. |
| | • **Commitment Fee:** A fee equal to 0.50% per annum on the unused amount of the DIP Loan Commitment that constitutes the DIP Facility Available Amount, non-refundable and payable monthly in arrears on the last day of each month during the term of the DIP Facility and shared ratably by the DIP Lenders holding any portion of the DIP Loan Commitment. |
| | *See* DIP Credit Agreement, §2.14. |
| **Budget**<br><br>Bankruptcy Rule 4001 (c)(1)(B) | The use of cash and proceeds from the DIP Facility is subject to the Approved Budget, the initial form of which is attached to the Interim Order as <u>Exhibit A</u>.<br><br>*See* Interim Order, ¶ 18. |
| **Reporting Information**<br><br>Bankruptcy Rule 4001(c)(l)(B) | The DIP Credit Agreement requires customary financial and other informational reporting by the Borrower to the DIP Agent.<br><br>In addition to the reporting required under the Prepetition Credit Agreement and the DIP Credit Agreement, the Debtors shall provide or cause to be provided to the DIP Agent and the Prepetition Agent a weekly report from Rothschild & Co (or the Debtors' investment banker) and the management team of the Debtors (with any written reports being in form and substance reasonably satisfactory to the DIP Agent and the Prepetition Agent), which report shall address such items as are reasonably requested by the DIP Agent and the Prepetition Agent, including addressing the status of the marketing and sale process of the Debtors. Any non-legally privileged written materials prepared or produced by Rothschild & Co (or the Debtors' investment banker) for any of the Debtors shared with the DIP Agent and the Prepetition Agent may be shared respectively with the DIP Lenders and the Prepetition Lenders. The Debtors shall also cause their management team and Rothschild & Co (or the Debtors' investment banker) to provide periodic telephonic updates of such reports to the DIP Agent, the DIP Lenders, the Prepetition Agent, and the Prepetition Lenders from time to time (but not less than weekly), as reasonably requested by the DIP Agent.<br><br>*See* Interim Order, ¶ 46; DIP Credit Agreement, §5.1 |
| **Budget/Variance Covenant**<br><br>Bankruptcy Rule 4001(c)(l)(B) | The Debtors are required to comply with the Approved Budget, subject to the following "Permitted Variances": (a) Total Operating Receipts (as defined in the Approved Budget) must not be less than, for all Variance Testing Periods, 90% of the budgeted amount for the applicable Variance Testing Period on a cumulative basis; and (b) Total Operating Disbursements (as defined in the Approved Budget) must not exceed, for all Variance Testing Periods, 110% of the budgeted amount for the applicable Variance Testing Period on a cumulative basis.<br><br>*See* Interim Order, ¶ 18 (iv). |
| **Chapter 11 Milestones** | It shall be a Termination Event if the Debtors fail to adhere to any of the following milestones with respect to the refinance of the DIP Obligations and Prepetition Obligations and/or the sale of all or substantially all of their assets (collectively, the "<u>Transaction Milestone</u>"): |

| Bankruptcy Rule | Summary of Material Terms |
|---|---|
| Bankruptcy Rule 4001(c)(1)(B) | (a) within 105 days of the Petition Date, (x) deliver to the DIP Agent and Prepetition Agent fully-executed and bona fide commitment papers (in form and substance reasonably acceptable to the DIP Agent), from a third party investor (or group of investors) with the financial wherewithal to consummate the transaction, in respect of a credit facility, equity investment, or other investment or financing that would, upon closing (and in any event prior to the Facility Termination Date under the DIP Facility), provide for the payment in full in cash of the DIP Obligations and Prepetition Obligations (any such credit facility, equity investment, or other investment or financing, an "Acceptable Financing"); or (y) have filed a bid procedures motion in form and content reasonably acceptable to the DIP Agent and the Prepetition Agent seeking authority to (A) designate a "stalking horse" reasonably acceptable to the DIP Agent and the Prepetition Agent, (B) establish bidding procedures and (C) set a date for an auction within 75 days thereafter (such motion, the "Bid Procedures Motion"); provided that if the Debtors have obtained fully-executed commitment papers for Acceptable Financing and after the Transaction Milestone such commitment is terminated or rescinded, then the Debtors would promptly, and in any event within 14 days thereafter, file the Bid Procedures Motion;<br><br>(b) within 30 days after filing the Bid Procedures Motion (in the event it is required to be filed as provided above), have obtained an order in form and content reasonably acceptable to the DIP Agent and the Prepetition Agent approving the Bid Procedures Motion; and<br><br>(c) in the event that a Bid Procedures Motion has been filed, have consummated a Sale Transaction consistent with the Bid Procedures Motion no later than fourteen (14) days prior to the outside date set forth in clause (d) of the definition of "DIP Facility Maturity Date" in the DIP Credit Agreement.<br><br>*See* Interim Order, ¶ 46; DIP Credit Agreement § 5.18. |
| **Liens and Priorities**<br><br>Bankruptcy Rule 4001(c)(1)(B)(i) | The DIP Liens securing the DIP Obligations are valid, automatically perfected, non-avoidable, senior in priority and superior to any security, mortgage, collateral interest, lien, claim or interest to or on any of the DIP Collateral, except that the DIP Liens shall be junior only to: (a) the Prepetition Prior Liens, (b) any permitted senior liens, if any, under the DIP Documents and (c) the Carve-Out. "Prepetition Prior Liens" means any liens that are valid, properly perfected (before the Petition Date or in accordance with section 546 of the Bankruptcy Code), non-avoidable, and senior in priority as a matter of law to the liens securing the Prepetition Loans (including without limitation the liens and rights of setoff of banks and other financial institutions providing treasury services comprising the Debtors' cash management system).<br><br>*See* Interim Order, ¶ 6. |
| **Carve Out**<br><br>Bankruptcy Rule 4001(c)(1)(B), Guidelines §II(B)(6) | The Interim Order provides a "Carve Out" of certain statutory fees and allowed professional fees of the Debtors and any official committee of unsecured creditors appointed in the Chapter 11 Cases pursuant to section 328 or 1103 of the Bankruptcy Code.<br><br>*See* Interim Order, ¶ 37. |

| Bankruptcy Rule | Summary of Material Terms |
|---|---|
| **Challenge Period**<br><br>Bankruptcy Rule 4001(c)(l)(B) | The Interim Order provides for a challenge period as follows: (a) with respect to the Creditors' Committee (if appointed), the earlier of (i) sixty (60) calendar days from the formation of the Creditors' Committee and (ii) seventy-five (75) calendar days from the entry of the Interim Order, and (b) with respect to any other party-in-interest (other than the Debtors) with requisite standing, seventy-five (75) calendar days from the entry of the Interim Order (the "Challenge Period"); *provided*, that any trustee that is appointed in any Case or in any Successor Case prior to the expiration of the Challenge Period shall have until the later of the expiration of the Challenge Period or twenty (20) days after such trustee's appointment to assert a Challenge; and *provided*, *further*, that the Challenge Period may be extended with respect to a particular party with the written consent of the Prepetition Agent.<br><br>*See* Interim Order, ¶ 40. |
| **Adequate Protection**<br><br>Bankruptcy Rules 4001(b)(l)(B)(iv), 4001(c)(1)(B)(ii) | Subject to the challenge rights set forth in the Interim Order and pursuant to sections 361, 363(e), 364(d) and 507 of the Bankruptcy Code, the Prepetition Secured Parties and the Arizona Mechanics' Lienholders are entitled to adequate protection of their respective interests in all Prepetition Collateral against any Diminution in Value of such respective interests in the Prepetition Collateral:<br><br>***Adequate Protection Liens***:  As adequate protection of: (a) the interests of the Prepetition Secured Parties in the Prepetition Collateral against any Diminution in Value of such interests in the Prepetition Collateral, the Debtors grant to the Prepetition Agent, for the benefit of itself and the other Prepetition Secured Parties, continuing valid, binding, enforceable and perfected postpetition security interests in and liens on all of the Debtors' assets, including, without limitation, the DIP Collateral, but excluding all proceeds or property recovered in connection with the Prepetition Avoidance Actions (such liens, the "Prepetition Secured Parties Adequate Protection Liens"); and (b) the interests of the holders of mechanics' liens and/or materialmen's liens arising under applicable Arizona law (such holders, the "Arizona Mechanics' Lienholders") against any Diminution in Value of the Arizona Mechanics' Lienholders' interest, if any, in the real property of Debtor JHO Real Estate Investment, LLC located at 1635 S. 43rd Avenue, Phoenix, AZ 85009 (the "Arizona Real Property"), the Debtors grant to the Arizona Mechanics' Lienholders continuing valid, binding, enforceable and perfected postpetition security interests in and liens on the DIP Collateral (such liens, the "Arizona Mechanics' Lienholders Adequate Protection Liens" and together with the Prepetition Secured Parties Adequate Protection Liens, the "Adequate Protection Liens").<br><br>The Adequate Protection Liens shall be senior to all other security interests in, liens on, or claims against any of the Debtors' assets.  As between the Prepetition Secured Parties Adequate Protection Liens and the Arizona Mechanics' Lienholders Adequate Protection Liens, the Prepetition Secured Parties Adequate Protection Liens shall be senior.<br><br>***Adequate Protection Superpriority Claims***: As further adequate protection of the interests of: (a) the Prepetition Secured Parties in the Prepetition Collateral against any Diminution in Value of such interests in the Prepetition Collateral, the Prepetition Agent, on behalf of itself and the other Prepetition Secured Parties, is to be granted, as and to the extent provided by section 507(b) of the Bankruptcy Code, an allowed super-priority administrative expense claim in each of the Cases and any Successor Cases (collectively, the "Prepetition Secured Parties Adequate Protection Superpriority |

| Bankruptcy Rule | Summary of Material Terms |
|---|---|
| | Claim"); and (b) the Arizona Mechanics' Lienholders against any decrease in the value of the Arizona Mechanics' Lienholders' interest, if any, in the Arizona Real Property, the Arizona Mechanics' Lienholders is to be granted, as and to the extent provided by section 507(b) of the Bankruptcy Code, an allowed super-priority administrative expense claim in each of the Cases and any Successor Cases (collectively, the "Arizona Mechanics' Lienholders Superpriority Claim" and together with the Prepetition Secured Parties Adequate Protection Superpriority Claim, the "Adequate Protection Superpriority Claims").<br><br>Except as set forth in the Interim Order, the Adequate Protection Superpriority Claims shall have priority over all administrative expense claims and unsecured claims against the Debtors or their estates, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 507(a), 507(b), 546(c) (subject to entry of a Final Order), 546(d), 726, 1113 and 1114 of the Bankruptcy Code; *provided, however,* that (i) the Adequate Protection Superpriority Claims shall be junior to the Carve-Out and the DIP Superpriority Claim and (ii) as between the Prepetition Secured Parties Adequate Protection Superpriority Claim and the Arizona Mechanics' Lienholders Superpriority Claim, the Prepetition Secured Parties Adequate Protection Superpriority Claim shall be senior; *provided, further, however,* that all Adequate Protection Liens granted by paragraph 11 of the Interim Order are subject to being set aside and all Adequate Protection Superpriority Claims granted by paragraph 13 of the Interim Order are subject to being disallowed, in each case if and to the extent that the corresponding Prepetition Lien or underlying claim is successfully challenged (in a manner that undermines the granting of adequate protection to the recipient thereof) pursuant to paragraph 40 of the Interim Order (in the case of the Prepetition Secured Parties) or otherwise (in the case of the Arizona Mechanics' Lienholders).<br><br>***Adequate Protection Payments and Other Consideration***: As additional adequate protection to the Prepetition Secured Parties, the Debtors shall:<br><br>(i)  make monthly payments to the Prepetition Agent (for the ratable benefit of the Prepetition Lenders) on the last business day of each month in an amount equal to the interest accrued on or after the Petition Date under the Prepetition Credit Agreement for such month at the Default Rate (as defined therein) as the applicable reference rate and giving effect, for avoidance of doubt, to any future increases in the applicable rate of interest after the Petition Date to the extent provided for under the Prepetition Credit Agreement) (*i.e.*, the current applicable margin for purposes of adequate protection is 8.50%, and such rate will increase by 50 bps per month);<br><br>(ii)  reimburse (without duplication of and only to the extent not reimbursed pursuant to Paragraph 31 of the Interim Order) the Prepetition Agent for all reasonable and documented out-of-pocket expenses of the Prepetition Agent incurred in connection with the Prepetition Credit Agreement (including without limitation, legal, accounting, collateral examination, monitoring and appraisal fees, financial advisory fees, fees and expenses of other consultants, and indemnification and reimbursement of fees and expenses payable under the Prepetition Credit Agreement, and including for avoidance of doubt any such expenses incurred in connection with the Prepetition Agent successfully defending itself in connection with any Challenge); |

| Bankruptcy Rule | Summary of Material Terms |
|---|---|
| | (iii) upon entry of the Final Order and as described therein, be deemed to have converted a portion of the obligations outstanding under the Prepetition Credit Agreement to obligations under the DIP Credit Agreement; and<br><br>(iv) upon entry of the Final Order and as described therein, segregate all collections received by the Debtors, deliver such collections to the DIP Agent, which would deliver such collections on a weekly basis to the Prepetition Agent to be applied to reduce, on a dollar-for-dollar basis, the Prepetition Obligations (first to principal and thereafter to interest and fees).<br><br>*See* Interim Order, ¶¶ 11-15. |
| **Events of Default**<br><br>Bankruptcy Rule 4001(c)(l)(B) | The DIP Credit Agreement and Interim Order contain events of default that are usual and customary for debtor-in-possession financings and the use of cash collateral, including without limitation, failure to satisfy the Transaction Milestone.<br><br>A Change in Control (as defined in the DIP Credit Agreement) is an Event of Default. A Change in Control includes: (i) the board of directors or other equivalent governing body of the Borrower or any other Loan Party ceases to be composed of five (5) individuals at least three (3) of whom (A) do not have a relationship by blood (to the second (2nd) degree of consanguinity), marriage or adoption to John Henry Owoc, (B) are not employees, officers, managers or consultants of, or independent contractors or advisors to, any Loan Party (other than in respect of service on such board or other equivalent governing body) and (C) are otherwise reasonably acceptable to the Required Lenders, it being understood that the individuals serving the board of directors or other equivalent governing body of the Borrower and each other Loan Party as of the Effective Date (as defined in the DIP Credit Agreement) are reasonably acceptable to the Required Lenders, (ii) the board of directors or other equivalent body of the Borrower or any other Loan Party ceases to have all or any portion of the authority invested in or otherwise designated to it as of the Effective Date Agreement (without giving effect to any provision of such authority allowing for the amendment thereof), (iii) the board of directors or other equivalent governing body of the Borrower or any other Loan Party ceases to include a restructuring committee composed of one (1) individual (the "<u>Restructuring Committee</u>") reasonably acceptable to the Required Lenders, it being understood that Steven G. Panagos is reasonably acceptable to the Required Lenders, or (iv) the Restructuring Committee ceases to have all or any portion of the authority invested in or otherwise designated to it as of the Effective Date (without giving effect to any provision of such authority allowing for the amendment thereof), which authority shall include, at a minimum, the making of recommendations to the board of directors or other equivalent body of the Borrower or such other Loan Party, as applicable, regarding all aspects of the Chapter 11 Case, including without limitation the undertaking by any Debtor of any action necessary to satisfy any requirement of Section 5.18; provided, that, upon the death, incapacity or resignation (but, for the avoidance of doubt, not the removal) of any individual serving on the board of directors or other equivalent governing body of the Borrower or any other Loan Party or serving on the Restructuring Committee, there shall not occur a Change in Control pursuant to this clause (c) if a replacement therefor that satisfies the criteria set forth in this clause (c)(i) or (iii), as the case may be, shall have been appointed within seven (7) days after such death, incapacity or resignation, and, upon such appointment, such replacement is vested with the same scope of authority held by his or her predecessor. |

| Bankruptcy Rule | Summary of Material Terms |
|---|---|
| | Additionally, it shall be a Termination Event if any Debtor seeks or supports, directly or indirectly, the entry of any order that provides for either the sale of the stock of the Debtors or the sale of all or substantially all of the assets of any Debtor under section 363 of the Bankruptcy Code (such sale, a "<u>Sale Transaction</u>") to any party unless (a)(i) the Requisite DIP Lenders and the Requisite Prepetition Lenders consent or (ii) the Sale Transaction or the net proceeds thereof are sufficient to pay in full in cash the DIP Obligations and Prepetition Obligations and (b) the order approving such sale provides that the sale proceeds shall be distributed in accordance with the DIP Documents, the Prepetition Credit Documents, the Interim Order, the Final Order and order approving such Sale Transaction at the closing of such sale.<br><br>*See* Interim Order, ¶ 46; DIP Credit Agreement, Art. VIII. |
| **Remedies Notice Period** | Any automatic stay otherwise applicable to the DIP Agent, DIP Lenders, and the Prepetition Secured Parties will be modified so that four (4) business days after the Termination Declaration Date (such four (4) business day period, the "<u>Remedies Notice Period</u>") the DIP Agent or the Prepetition Agent, as applicable, shall be entitled to immediately exercise its rights and remedies in accordance with the DIP Documents, the Prepetition Credit Documents and/or the Interim Order, as the case may be, and shall be permitted to satisfy the DIP Obligations, the DIP Superpriority Claim, the DIP Liens, the Prepetition Secured Parties Adequate Protection Liens, and the Prepetition Secured Parties Adequate Protection Superpriority Claim, as applicable, in each case subject to the Carve-Out.  During the Remedies Notice Period (A) the Debtors may use Cash Collateral solely to pay payroll and other expenses critical to keep the business of the Debtors operating in accordance with the Approved Budget, and (B) the Debtors and/or the Creditors' Committee shall be entitled to seek an emergency hearing before the Court, within the Remedies Notice Period, for the purpose of contesting whether a Termination Event has occurred and/or is not continuing and such other matters as the parties may raise or the Court may wish to consider.<br><br>*See* Interim Order, ¶ 28. |
| **Waiver/Modification of Applicability of Nonbankruptcy Law Relating to Perfection or Enforceability of Liens**<br><br>Bankruptcy Rule 4001(c)(1)(B)(vii) | The Interim Order provides for a customary waiver/modification of applicability of nonbankruptcy law to the perfection or enforcement of liens.<br><br>*See* Interim Order, ¶ 20. |
| **Indemnification**<br><br>Bankruptcy Rule 4001(c)(1)(B)(ix) | The Debtors shall indemnify and hold harmless the DIP Agent and the DIP Lenders in accordance with the terms and conditions of the DIP Credit Agreement.<br><br>*See* Interim Order, ¶ 32. |
| **Limitations of Rights of Parties Under Section 506(c) of** | Subject to entry of a Final Order granting the waiver set forth in paragraph 43 of the Interim Order, no costs or expenses of administration which have been or may be incurred in the Cases or any Successor Case at any time shall be charged against the DIP Agent, DIP Lenders or Prepetition Secured Parties, or any of their respective |

| Bankruptcy Rule | Summary of Material Terms |
|---|---|
| the Bankruptcy Code | claims, the DIP Collateral, or the Prepetition Collateral pursuant to sections 105 or 506(c) of the Bankruptcy Code, or otherwise, without the prior written consent, as applicable, of the DIP Agent, DIP Lenders or Prepetition Secured Parties, and no such consent shall be implied from any other action, inaction, or acquiescence by any such agents or lenders.<br><br>*See* Interim Order, ¶ 43. |
| Granting of Lien on Claims/Causes of Action | The DIP Liens shall not attach to or encumber claims and causes of action available to the Debtors or their estates through the exercise of the powers granted by Sections 544, 545, 547, 548, 550 (other than with respect to any applicability to section 549) and 553 of the Bankruptcy Code ("Avoidance Actions") or proceeds thereof.<br><br>*See* Interim Order, ¶ 5. |

## BACKGROUND

6.     On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

7.     The Debtors are operating their businesses and managing their affairs as debtors-in-possession under sections 1107(a) and 1108 of the Bankruptcy Code.

8.     For a detailed description of the Debtors and their operations, the Debtors respectfully refer the Court and parties in interest to the First Day Declaration.

## THE DEBTORS' PREPETITION CAPITAL STRUCTURE

### A.     Revolving Credit and Term Loan Facility

9.     Debtor Vital Pharmaceuticals, as borrower, certain subsidiaries and affiliates of Vital Pharmaceuticals (collectively, with Vital Pharmaceuticals, the "Prepetition Loan Parties"), as guarantors, the lenders from time to time party thereto (the "Prepetition Secured Lenders"), and Truist Bank, as administrative agent (in such capacity the "Prepetition Agent") swingline lender (in such capacity, the "Prepetition Swingline Lender"), and issuing bank (in such capacity, the "Prepetition Issuing Bank" and, together with the Prepetition Secured Lenders, the Prepetition Agent and the Prepetition Swingline Lender, the "Prepetition Secured Parties"), are parties to the

*Amended and Restated Revolving Credit and Term Loan Agreement*, dated as of August 14, 2020, (as amended by those five amendments thereto, dated as of June 15, 2021, June 30, 2021, December 31, 2021, June 30, 2022, and August 8, 2022 and as further modified, amended, or supplemented from time to time, the "Prepetition Credit Agreement"). The Credit Agreement provides two separate credit facilities, each maturing on August 14, 2025: (a) a revolving credit facility (the "Prepetition Revolving Credit Facility") and (b) a term loan A (the "Prepetition Term Loan" and, together with the Prepetition Revolving Credit Facility and all other obligations arising under the Prepetition Credit Agreement, the "Prepetition Loans"). As of the Petition Date, the Prepetition Lenders are owed on account of the Prepetition Loans (i) $240,000,000.00 in revolving loan principal obligations, (ii) $104,190,218.45 in term loan principal obligations, (iii) $6,349,912.27 in respect of unpaid interest accrued through October 9, 2022, (iv) $4,188,187.51 in respect of unpaid forbearance fees accrued through October 9, 2022, and (v) $41,883.33 in respect of unpaid commitment fees accrued through October 9, 2022 (collectively, with any other reimbursement obligations (contingent or otherwise) in respect of letters of credit, any other fees, expenses and disbursements (including, without limitation, attorneys' fees, accountants' fees, appraisers' fees and financial advisors' fees, and related expenses and disbursements), treasury, cash management and derivative obligations, indemnification obligations, and other charges, amounts and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing, or chargeable in respect of any of the Prepetition Credit Parties' obligations pursuant to the Prepetition Credit Documents, including all "Obligations" as defined in the Prepetition Credit Agreement, the "Prepetition Obligations").

10.    In connection with the Prepetition Credit Agreement, the parties executed the *Amended and Restated Security and Pledge Agreement*, dated as of August 14, 2020 (as amended,

supplemented or otherwise modified from time to time, the "Prepetition Security Agreement"). Under the Prepetition Security Agreement, the Prepetition Loans are secured by first-priority liens on the Collateral (as defined therein, the "Prepetition Collateral").[8]

### A. Unsecured Debt

11.    The Debtors have no funded unsecured debt.  In the ordinary course, the Debtors incur trade debt with certain vendors and suppliers in connection with the operation of their business.  In addition, the Debtors have other potential and contingent liabilities related to, among other things, ongoing litigation, certain of which is described in the First Day Declaration.

### THE DEBTORS' NEED FOR
### DIP FINANCING AND CASH COLLATERAL

12.    The Debtors require immediate access to the DIP Facility in addition to continued use of the Cash Collateral in order to satisfy near-term and long-term expenses critical to the business and their chapter 11 efforts, which, in turn, will preserve and maximize the Debtors' enterprise value.  The Debtors are unable to generate sufficient levels of operating cash flow in the ordinary course of business to cover their operating and capital costs and the projected costs of these Chapter 11 Cases absent immediate funding. *See* First Day Declaration, ¶ 79.

13.    The Debtors require the funding available from the DIP Facility in order to, among other things, fund working capital, meet payroll obligations, pay suppliers, cover overhead costs, and make any other payments that are essential for the continued management, operation, and preservation of the Debtors' business. *See id.*, ¶ 80.  The ability to make these payments when due

---

[8]    The Prepetition Collateral, which consists of substantially all of the Debtors' assets, includes, without limitation, all Accounts, all Chattel Paper, those certain Commercial Tort Claims set forth on Schedule 3(j) to the Prepetition Security Agreement, all Copyrights, all Copyright Licenses, all Deposit Accounts, all Documents, all Equipment, all Fixtures, all General Intangibles, all Goods, all Instruments, all Inventory, all Investment Property, all Letter-of-Credit Rights, all Money, all Patents, all Patent Licenses, all Pledged Equity, all Software, all Supporting Obligations, all Trademarks, all Trademark Licenses, all books and records relating to the Collateral, all Accessions, and all Proceeds of any and all of the foregoing, but excludes Excluded Property (in each case, as defined in the Prepetition Security Agreement).

is essential to the continued operation of the Debtors' business during the pendency of these Chapter 11 Cases. *See id.* If the Debtors cannot quickly access the DIP Facility, based on the Debtors' financial forecasts and the Approved Budget, the Debtors will not be able to operate their business in the ordinary course until the hearing on the Final Order. *See id*, ¶ 81. In turn, this would negatively impact the Debtors' revenue, jeopardize the Debtors' stakeholders' confidence in the Debtors' business, and harm the value of the Debtors' estates to the detriment of all stakeholders. *See id.* Based on the Debtors' financial forecasts and the Approved Budget, the liquidity provided by the DIP Facility should allow the Debtors to implement their business plan while they focus on a refinancing process to pay their prepetition lenders in full. *See id.*

14.     Therefore, absent immediate access to the DIP Facility and Cash Collateral, the Debtors could (a) face a severe interruption of their businesses; (b) lose the support of key constituencies, including the Debtors' workforce, key marketing partners, and customers; and (c) be forced to significantly modify, or shut down entirely, their operations. *See id.*, ¶ 83. To avoid those outcomes, it is imperative that the Debtors have access to the DIP Facility from the outset of these cases in order to signal to the Debtors' stakeholders, including their employees, marketing partners, vendors, and customers, that despite the filing the outlook for the Debtors and their stakeholders is strong, and that they have the liquidity necessary to meet their obligations in the ordinary course until the business is able to emerge from the chapter 11 process. *See id.*

15.     As set forth more fully in the First Day Declaration, recent events in the months leading up to the commencement of these chapter 11 cases have underscored the Debtors' need to access the proceeds of the DIP Facility and the Cash Collateral on an interim basis. *See id.*, ¶ 41. Specifically, the Debtors require the DIP Facility in order to obtain an essential infusion of liquidity to help stabilize the Debtors' operations at a critical juncture (i.e., on the precipice of completing

its distribution network transition), and pursue a recapitalization, refinancing or other transaction that will result in the payment in full of the Debtors' outstanding obligations under the Prepetition Credit Agreement.  *See id.*

16.     Absent funds available from the DIP Facility, access to Cash Collateral, and the cooperation of key business partners at this critical early stage, the Debtors could face a value-destructive interruption to their business and, simultaneously, eliminate their best chance for consummating a recapitalization transaction or an orderly sale process, to the detriment of the Debtors, their estates, and their creditors.  *See id.*, ¶ 83.  For all these reasons, access to the proposed DIP Facility is a necessity.  *See id.*

**ALTERNATIVE SOURCES OF FINANCING
ARE NOT AVAILABLE ON BETTER TERMS**

17.     As set forth more fully in the Parkhill Declaration, in June 2022, the Debtors, together with the assistance of their advisors (in particular, Rothschild & Co US Inc. ("Rothschild & Co"), the Debtors' proposed investment banker), commenced an initial marketing process, seeking proposals for secured debt financing or a minority equity investment (the "Initial Marketing Process"), with a specific focus on completing an out-of-court transaction intended to stabilize the company in the face of ongoing defaults and liquidity concerns and the overhang from contingent, unliquidated, and disputed liabilities, including amounts potentially necessary to post a *supersedeas* bond in the event that an adverse judgment was entered in the OBI District Court Action (as defined and described in the First Day Declaration).  *See* Parkhill Declaration, ¶ 8. However, transactions reflecting the fair value of the Debtors did not materialize in the capital raise process due to, among other factors, uncertainty regarding the Debtors' then-nascent distribution network transition.  *See id.*, ¶ 11.

18.     As the Initial Marketing Process proved unfruitful, in mid-September 2022 the Debtors and their advisors launched a formal marketing process to (a) solicit bids for debtor-in-possession financing (on a priming or junior lien basis) in anticipation of a potential chapter 11 filing, (b) resolicit bids for secured take-out financing, and (c) solicit bids for out-of-court bridge financing to obtain a short-term extension of liquidity runway.  *See id.*, ¶ 11.

19.     To leverage the efforts of the Initial Marketing Process and to limit speculation in the market that could cause irreparable harm to the Debtors' business during a critical period of transition, the Debtors and their advisors reached out to 15 parties who were already under non-disclosure agreements ("NDA") as part of the Initial Marketing Process.  *See id.*, ¶ 12.  These parties encompass the entities that would likely be interested and able to provide financing of this kind – including debtor-in-possession financing.  *See id.*  During its outreach to these 15 parties, Rothschild & Co and the Debtors solicited proposals for debtor-in-possession financing either (i) secured by liens junior to those securing the Debtors' prepetition debt or (ii) secured by priming liens senior to those securing the Debtors' prepetition debt.  *See id.*  In parallel, the Debtors and their advisors reached out to a limited subset of five new financing parties who executed an NDA with the Debtors in an effort to solicit their interest in providing either take-out financing or out-of-court bridge financing.  *See id.*

20.     After engaging with a number of parties and providing those potential lenders with additional access to diligence materials—including an investor presentation, weekly and monthly cash flow analyses, information on the proposed collateral, and access to additional information contained within a virtual data room—the Debtors received no debtor-in-possession financing proposals other than the DIP Facility.  *See id.*, ¶ 13.

21.     Because the Debtors received no proposals for debtor-in-possession financing based on their outreach efforts, the Debtors and Rothschild & Co do not believe that (a) there is debtor-in-possession financing available to the Debtors on a junior or unsecured basis and (b) there is any viable alternative postpetition financing available to the Debtors on better terms than the DIP Facility. *See id.*, ¶ 14.

22.     Thus, following a robust marketing process and hard-fought, arm's-length negotiations with the Prepetition Secured Parties, in which the Debtors obtained several material concessions (including with respect to tenor/maturity, pricing, and maturity) the Debtors determined that the DIP Facility is fair, reasonable, and appropriate, meets the Debtors' business and financing needs for these Chapter 11 Cases, provides the most cost-effective and beneficial financing to the Debtors, and is the only reasonable option available to finance the chapter 11 process and allow the Debtors to pursue their restructuring goals and maximize the value of their estates. *See id.*, ¶¶ 20, 24.

## BASIS FOR RELIEF REQUESTED

### I.     The Debtors Should Be Authorized to Obtain Postpetition Financing through the DIP Documents

#### A.     Standards for Approval Under Sections 364(c) and 364(d)(1) of the Bankruptcy Code

23.     Section 364(c) of the Bankruptcy Code requires a finding, made after notice and a hearing, that a debtor seeking postpetition financing on a secured basis cannot "obtain unsecured credit allowable under section 503(b)(1) of [the Bankruptcy Code] as an administrative expense." 11 U.S.C. § 364(c).

24.     In addition, under section 364(d)(1) of the Bankruptcy Code, courts may, after notice and a hearing, authorize a debtor to obtain postpetition credit secured by a "priming" lien from affected secured parties if (i) the debtor obtains the consent of such parties or (ii) the debtor

cannot obtain credit elsewhere and the interests of existing lienholders are adequately protected.

11 U.S.C. § 364(d)(1). Specifically, section 364(d)(1) provides, in relevant part, that a court may,

after notice and a hearing:

> authorize the obtaining of credit or the incurring of debt secured by
> a senior or equal lien on property of the estate that is subject to a lien
> only if –
>
> > (A)   the [debtor] is unable to obtain credit otherwise; and
> >
> > (B)   there is adequate protection of the interest of the
> > holder of the lien on the property of the estate on
> > which such senior or equal lien is proposed to be
> > granted.

11 U.S.C. § 364(d)(1).

25.    In evaluating proposed postpetition financing under sections 364(c) and 364(d)(1)

of the Bankruptcy Code, courts perform a qualitative analysis and generally consider factors

including whether:

> (a)   unencumbered credit or alternative financing without superpriority status is
> available to the debtor;
>
> (b)   the credit transactions are necessary to preserve assets of the estate;
>
> (c)   the terms of the credit agreement are fair, reasonable, and adequate;
>
> (d)   the proposed financing agreement was negotiated in good faith and at arm's-
> length and entry thereto is an exercise of sound and reasonable business
> judgment and in the best interest of the debtors' estate and their creditors;
> and
>
> (e)   the proposed financing agreement adequately protects prepetition secured
> creditors.

*See, e.g., In re Aqua Assoc.*, 123 B.R. 192 (Bankr. E.D. Pa. 1991) (applying the first three factors

in making a determination under section 364(c)); *In re Crouse Group, Inc.*, 71 B.R. 544 (Bankr.

E.D. Pa. 1987) (same); *Bland v. Farmworker Creditors*, 308 B.R. 109, 113-14 (S.D. Ga. 2003)

(applying all factors in making a determination under section 364(d)).

26.     For the reasons discussed below, the Debtors satisfy the standards required to access postpetition financing on a superpriority claim and priming lien basis under sections 364(c) and 364(d) of the Bankruptcy Code.

**B.      The Terms of the DIP Facility Are the Best Available Under the Circumstances, and DIP Financing on a Junior Secured or Unsecured Basis is Not Available**

27.     In demonstrating that credit was not available without the protections afforded by section 364(c) or 364(d) of the Bankruptcy Code, a debtor need only make a good faith effort.  *See, e.g., In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr.  S.D.N.Y. 1990) (approving financing facility and holding that debtor made reasonable efforts to satisfy the standards of section 364(c) to obtain less onerous terms where debtor approached four lending institutions, was rejected by two and selected the least onerous financing option from the remaining two lenders); *see also In re Snowshoe Co.*, 789 F.2d 1085, 1088 (4th Cir. 1986) ("[t]he statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable"); *In re Phoenix Steel Corp.*, 39 B.R. 218, 222 (D.  Del. 1984) (holding the debtor satisfied its burden to show an inability to obtain credit on other terms through its time and effort spent trying to obtain credit on alternative terms and conditions); *In re Reading Tube Indus.*, 72 B.R. 329, 332 (Bankr. E.D. Pa 1987).

28.     Moreover, where few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing."  *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr.  N.D. Ga. 1988), *aff'd sub nom., Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); *see also In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D.  Colo. 1981) (bankruptcy court's finding that two national banks refused to grant unsecured loans was sufficient to support conclusion that section 364 requirement was met).

29.     The Debtors conducted a robust marketing process that confirmed the only actionable financing option was the DIP Facility. Following hard-fought, arm's-length negotiations with the Prepetition Secured Parties and a thorough marketing process, the Debtors determined that the DIP Facility is fair, reasonable, and appropriate, meets the Debtors' business and financing needs for these Chapter 11 Cases, provides the most cost-effective and beneficial financing to the Debtors, and is the only reasonable option available to finance the chapter 11 process (in light of the fact that the Debtors received no other proposals for debtor-in-possession financing, including on a junior or unsecured basis) and allow the Debtors to pursue their restructuring goals and maximize the value of their estates. *See* Parkhill Declaration ¶¶ 14, 27.

### C.    The DIP Facility Is Necessary to Preserve the Value of the Debtors' Estates

30.     As debtors in possession, the Debtors have a fiduciary duty to protect and maximize their estates' assets. *See In re Mushroom Transp. Co.*, 382 F.3d 325, 339 (3d Cir. 2004). The DIP Facility, if approved, will provide working capital critical to fund the Debtors' day-to-day operations and administration of the Chapter 11 Cases while the Debtors attempt to maximize the value of their estates through a recapitalization or sale process.

31.     The Debtors' preexisting cash balances and cash generated from operations are not sufficient to fund business operations and the administration of these Chapter 11 Cases. A significant cash infusion is a critical necessity to the continued operation of the Debtors' businesses, the preservation of going concern value, and the maintenance of the Debtors' valuable business relationships. The Debtors' ability to maintain business relationships with their vendors, suppliers, operators and managers, to make capital expenditures and to satisfy other working capital and operational needs and otherwise finance their operations is essential to the Debtors' continued viability.

32.     In short, the ability of the Debtors to sustain their operations and emerge from these Chapter 11 Cases with a viable business intact is dependent upon obtaining adequate postpetition financing immediately and, absent the relief sought in the Interim Order, the Debtors and their estates will be immediately and irreparably harmed.  Further, if the Debtors do not receive the funds available pursuant to the DIP Facility and access to Cash Collateral, it will destroy the possibility of conducting a robust marketing process that would benefit the Debtors and all parties in interest in these Chapter 11 Cases.  Accordingly, the DIP Facility is necessary to preserve the Debtors' estates.

**D.      The Terms of the DIP Facility are Fair, Reasonable and Appropriate Under the Circumstances**

33.     In considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the proposed lender.  *In re L.A. Dodgers LLC*, 457 B.R. 308, 312 (Bankr. D. Del. 2011) (stating that approval of the DIP facility transaction requires terms that are "fair, reasonable and adequate, given the circumstances of the debtor-borrower and the proposed lender"); *In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Ellingsen MacLean Oil Co.)*, 65 B.R. 358, 365 (W.D. Mich. 1986) (a debtor may have to enter into hard bargains to acquire funds).  The appropriateness of a proposed financing facility should also be considered in light of current market conditions.  *See* Transcript of Record at 740:4-6, *In re Lyondell Chem. Co.*, No. 09-10023 (REG) (Bankr. S.D.N.Y. Feb. 27, 2009) ("[B]y reason of present market conditions, as disappointing as the [DIP] pricing terms are, I find the provisions [of a DIP that included a roll-up of prepetition secured debt] reasonable here and now.").

34.    The material terms of the DIP Facility are fair, reasonable, and appropriate under the circumstances. The terms of the DIP Facility resulted from the Debtors' negotiations that resulted in, among other things: (a) more new money DIP financing to fund a longer case; (b) a longer maturity and milestones to facilitate the Debtors' pursuit of a recapitalization transaction rather than an immediate sale; and (c) materially improved economics. *See* Parkhill Declaration, ¶ 16. The DIP Facility provides the Debtors with $100,000,000 of new money that the Debtors have requested for the continued operation of their business during the pendency of the Chapter 11 Cases plus $354,770,201.56 of outstanding obligations under the Prepetition Credit Agreement, structured to permit increased borrowings over time, subject to certain conditions. In addition to solving the Debtors' immediate cash needs, the DIP Facility also contains appropriate adequate protection provisions and fees, discussed further below.

35.    Additionally, the Roll Up—a common feature in debtor-in-possession financing arrangements—was a necessary inducement for the Prepetition Secured Lenders to provide a DIP Facility with this tenor, and in a sufficient amount, and consent to use of Cash Collateral, both of which are necessary to the viability of the Debtors' Chapter 11 Cases and the Debtors' ultimate reorganization. *See id.*, ¶ 26. The Prepetition Secured Lenders' willingness to extend the Debtors' runway prior to the filing of the Chapter 11 Cases via their agreement to: (i) forbear from exercising their rights and remedies in respect of the Debtors' continuing default under the Prepetition Credit Agreement since March 2022; and (ii) advance critical funding (totaling approximately $60 million) to the Debtors, enabled the Debtors to continue operations, pursue a capital raise process, and engage in contingency planning around a potential filing since June 2022. *See* First Day Declaration. ¶ 42. This portion of the Roll Up was, in effect, a "pre-DIP" facility and the Roll Up ensures that the Prepetition Secured Lenders will not be penalized for advancing

funds they had no obligation to provide outside of bankruptcy instead of forcing the Debtors into prematurely filing for chapter 11.  The second, "creeping" component of the Roll Up – pursuant to which the Debtors will pay down the Prepetition Loans with postpetition collections and draw on the DIP Facility for liquidity – was an essential inducement to the Prepetition Secured Lenders' willingness to provide seven months *postpetition* runway and a DIP Facility large enough to fund the Chapter 11 Cases for that duration.  Understandably, the DIP Lenders are unwilling to extend a (long) bridge to a "cram up" plan, and the "creeping" Roll Up feature provides reasonable protection for the DIP Lenders in that regard.  Simply put, the Roll Up was a necessary provision of the DIP Facility and should be approved.

36.     Ultimately, the reorganization will permit the Debtors to emerge as a stronger, more productive business, and will maximize recoveries for all stakeholders.  Given the facts and circumstances of these cases and the enormous benefit to the Debtors (and their stakeholders), the Roll Up and the other terms and conditions of the DIP Facility are fair, reasonable, and appropriate, and should be approved.

**E.     Entry into the DIP Documents Reflects the Debtors' Reasonable Business Judgment**

37.     A debtor's decision to enter into a postpetition lending facility under section 364 of the Bankruptcy Code is governed by the business judgment standard.  See *In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr.  D. Del 1994) (noting that the interim loan, receivable facility and asset based facility were approved because they "reflect[ed] sound and prudent business judgment [were] reasonable under the circumstances and in the best interests of TWA and its creditors"); *Ames Dep't Stores, Inc.*, 115 B.R. at 40 ("cases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage

the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit parties in interest"); *Grp. of Institutional Holdings v. Chicago Mil. St. P. & Pac. Ry.*, 318 U.S. 523, 550 (1943); *In re Simasko Prod. Co.*, 47 B.R. 444, 449 (Bankr. D. Colo. 1985) ("Business judgments should be left to the board room and not to this Court."); *In re Lifeguard Indus., Inc.*, 37 B.R. 3, 17 (Bankr. S.D. Ohio 1983) (same).

38.     Bankruptcy courts typically defer to a debtor's business judgment on the decision to borrow money unless such decision is arbitrary and capricious. *See In re Trans World Airlines, Inc.*, 163 B.R. at 974. In fact, "[m]ore exacting scrutiny would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate and threaten the court's ability to control a case impartially." *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985).

39.     The Debtors' determination to move forward with the DIP Facility is a sound exercise of their sound business judgment following a robust marketing process and careful evaluation of alternatives. Specifically, the Debtors and their advisors determined that the Debtors would require significant postpetition financing to support the administration of their Chapter 11 Cases and their ongoing operations. The Debtors negotiated the DIP Documents with the DIP Lenders in good faith, at arm's length, and with the assistance of their advisors, having gone to the market in search of alternative DIP financing, and the Debtors believe that they have obtained the best financing available. *See* Parkhill Declaration, ¶¶ 17, 27. As discussed herein and in the Parkhill Declaration, the Debtors determined that the DIP Facility is the best available alternative after a robust marketing process. *See id.*, ¶ 27. Accordingly, the Court should authorize the Debtors' entry into the DIP Documents as a reasonable exercise of the Debtors' business judgment.

### F.     The Proposed Adequate Protection Is Appropriate

40.     To the extent a secured creditor's interests in collateral constitute valid and perfected security interests and liens as of the Petition Date, section 364(d)(1)(B) of the Bankruptcy Code requires that the Debtors provide adequate protection to such creditor where a debtor-in-possession financing facility primes the liens of such secured creditor.    While section 361 of the Bankruptcy Code provides a non-exclusive list of possible forms of adequate protection—including periodic cash payments, additional liens, replacement liens and other forms of relief—the Court must determine what constitutes adequate protection on a case-by-case basis. *See In re Columbia Gas Sys., Inc.*, 1992 WL 79323, at *2 (Bankr.  D. Del.  Feb. 18, 1992); *In re O'Connor*, 808 F.2d 1393, 1396 (10th Cir. 1987); *In re Martin*, 761 F.2d 472 (8th Cir. 1985).  The focus of the adequate-protection requirement is to protect a secured creditor from the diminution in the value of its interest in the collateral during the period of use.  *See Resolution Trust Corp. v. Swedeland Dev. Group, Inc. (In re Swedeland Dev. Group, Inc.)*, 16 F.3d 552, 564 (3d Cir. 1994) ("The whole purpose of adequate protection for a creditor is to insure that the creditor receives the value for which he bargained prebankruptcy.") (internal citations omitted); *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986) (the application of adequate protection "is left to the vagaries of each case, but its focus is protection of the secured creditor from diminution in the value of its collateral during the reorganization process") (citation omitted).

41.     Here, Prepetition Secured Parties have consented to the proposed adequate protection, which consists of Adequate Protection Liens, Adequate Protection Superpriority Claims, Adequate Protection Payments, and other consideration.    The proposed adequate protection was bargained for at arm's length, and includes terms that are commonplace in consensual DIP financing and cash collateral arrangements.  Accordingly, the Debtors submit that

their provision of adequate protection to the Prepetition Secured Parties is (a) fair and reasonable and (b) in the best interests of the Debtors and their estates.

### G. The Debtors Should Be Authorized to Pay the Interest and Fees Required by the DIP Agent and the DIP Lenders under the DIP Documents.

42.     Under the DIP Documents, the Debtors have agreed, subject to Court approval, to pay certain interest and fees to the DIP Agent and the DIP Lenders.  In particular, the Debtors have agreed to pay:

(a) *Interest Rate*:  1-month SOFR + 8.50% or Base Rate + 7.50%, at the election of the Borrower.

(b) *DIP Structuring Fee*:  A one-time fee of $300,000 payable to the Administrative Agent, non-refundable and payable in cash out of the proceeds of the initial funding of the DIP Facility.

(c) *Upfront Fee*:  A one-time fee of $2,500,000, non-refundable and payable in cash out of the proceeds of the initial funding of the DIP Facility and shared ratably by the DIP Lenders.

(d) *Commitment Fee*:  A fee equal to 0.50% per annum on the unused amount of the DIP Loan Commitment that constitutes the DIP Facility Available Amount, non-refundable and payable monthly in arrears on the first business day of each month during the term of the DIP Facility and shared ratably by the DIP Lenders holding any portion of the DIP Loan Commitment.

43.     As set forth in the Parkhill Declaration, the Debtors believe that the interest and fees to be paid under the DIP Facility are consistent with the market and are reasonable and appropriate, particularly in light of the credit profile of the Debtors, the nature and extent of the collateral securing the facility, the state of the global economy and the Debtors' industry, and the relevant risks associated with lending in the postpetition financing context.  *See* Parkhill Declaration, ¶¶ 22-24.  The Debtors considered the fees described above when determining, in their sound business judgment, that the DIP Facility constituted the best, and only, actionable terms on which the Debtors could obtain the postpetition financing necessary to continue their operations, prosecute their cases, and benefit the Debtors' estates.  *See id.*  Accordingly, the Court

should authorize the Debtors to pay the interest and fees provided under the DIP Loan Documents in connection with the DIP Facility.

**H.    The Debtors Should Be Authorized to Use Cash Collateral**

44.    Section 363(c)(2) of the Bankruptcy Code provides that a debtor may not use, sell or lease cash collateral unless "(a) each entity that has an interest in such cash collateral consents; or (b) the court, after notice and hearing, authorizes such use, sale, or lease in accordance with the provisions of this section." 11 U.S.C. § 363(c)(2).

45.    The Debtors have an urgent need for the immediate use of the Prepetition Collateral, including Cash Collateral, and seek to use all Cash Collateral existing on or after the Petition Date pursuant to the terms of the DIP Documents.  The Debtors need Cash Collateral to pay operating expenses, including essential vendors and employees, in order to ensure a continued supply of goods and services essential to the Debtors' business.  Indeed, absent such relief, the Debtors' business will be brought to a halt, with damaging consequences for the Debtors and their estates and creditors.

46.    The Debtors believe that the terms and conditions of their use of Cash Collateral (including the provision of adequate protection described above and provided in the DIP Orders) are appropriate and reasonable and, as described above, that such adequate protection is sufficient to secure any adequate protection obligations under the circumstances.  As described above, the Debtors propose to use Cash Collateral to fund the orderly administration of the Chapter 11 Cases and a recapitalization or sale process designed to maximize the value of the Debtors' estates.  The Prepetition Secured Parties consent to the use of Cash Collateral in light of the adequate protection provided, which, as noted above, the Debtors believe is necessary and sufficient.  For the reasons set forth herein, the Debtors submit that they should be authorized to use Cash Collateral on the terms set forth in the DIP Documents.

## I.     Approval of Interim Relief is Appropriate

47.     Bankruptcy Rules 4001(b)(2) and 4001(c)(2) provide that a final hearing on a motion to use cash collateral or obtain credit, respectively, may not be commenced earlier than fourteen (14) days after the service of such motion.  Upon request, however, the Court may conduct a preliminary expedited hearing on the motion and authorize the use of cash collateral and the obtaining of credit on an interim basis "to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing."  Fed. R. Bankr. P. 4001(b)(2), (c)(2).

48.     As set forth in the DIP Declarations, the Debtors have an urgent and immediate need for access to the DIP Facility and Cash Collateral on an interim basis.  *See* Parkhill Declaration, ¶¶ 25, 27; First Day Declaration, ¶ 79. The Debtors require immediate access to $34,000,000 of cash in the form of DIP financing, in addition to the use of Cash Collateral, to meet their obligations and avoid irreparable harm pending a final hearing.  *Id.*  Absent immediate access to the DIP Facility and Cash Collateral at this pivotal stage, among other things, the Debtors could (a) face a detrimental interruption of their business; (b) lose the support of key constituencies, including the Debtors' workforce, vendors, and customers on which the success of the chapter 11 cases depend; and (c) be forced to significantly modify, or shut down entirely, their operations, each of which could detrimentally affect the Debtors' ability to maximize the value of the estates. *See* First Day Declaration, ¶ 83.

49.     Moreover, immediate access to both the DIP Facility and Cash Collateral is the stabilizing assumption upon which the Approved Budget, attached as <u>Exhibit A</u> to the Interim Order, is based.  Without such access, the Debtors could lose the confidence and cooperation of employees and key business partners, including creditors, vendors, and customers.  *See id.*, ¶ 84. In short, without immediate access to both the DIP Facility and Cash Collateral, the Debtors' liquidity situation will be more bleak than the Approved Budget in that the Debtors would in all

likelihood face a liquidity crisis and run out of cash more quickly than the Approved Budget projects and the erosion of confidence concerning the Debtors' ongoing operations would be significant and irreparably harm the Debtors' estates.  *See id*, ¶ 85.

50.    The Debtors' ability to preserve and maximize the value of their estates and the business's continuing viability depend heavily upon the interim relief sought in this Motion.

**J.    Request for a Final Hearing**

51.    The DIP Credit Agreement includes a maturity date that will occur within 30 days after entry of the Interim Order unless a Final Order approving the Motion has been entered.  As such, pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a date for the Final Hearing that is as soon as practicable, but in no event later than 30 days following the Petition Date, and fix the time and date prior to the Final Hearing for parties to file objections to the Motion.

**REQUEST FOR WAIVER OF STAY**

52.    To implement the foregoing immediately, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the fourteen-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).  As explained above and in the First Day Declaration, the relief requested herein is necessary to avoid immediate and irreparable harm to the Debtors, because the DIP Facility in order to pay critical expenses during the interim period that, if unpaid, would result in the erosion of the Debtors' business and enterprise value. Accordingly, ample cause exists to justify the finding that the notice requirements under Bankruptcy Rule 6004(a) have been satisfied and to grant a waiver of the fourteen-day stay imposed by Bankruptcy Rule 6004(h), to the extent such notice requirements and stay apply.

## RESERVATION OF RIGHTS

53.     Nothing contained herein is intended or shall be construed as: (a) an admission as to the amount of, basis for, or validity of any claim against any of the Debtors under the Bankruptcy Code or other applicable nonbankruptcy law; (b) an impairment or waiver of any Debtor's or any other party in interest's right to dispute any claim against, or interest in, any Debtor, its property, or its estate on any grounds; (c) a promise or requirement to pay any claim; (d) an assumption, adoption, or rejection of any agreement, contract, or lease under section 365 of the Bankruptcy Code; (e) an implication or admission that any particular claim is of a type specified or defined in the Motion, or any order granting the relief requested by the Motion; (f) an implication, admission, or finding as to the validity, enforceability, or perfection of any interest or encumbrance on the property of any Debtor or its estate; (g) an impairment or waiver of any claims or causes of action which may exist against any entity; or (h) a waiver of any Debtor's or any other party in interest's rights under the Bankruptcy Code or any other applicable law.

## NOTICE

54.     The Debtors have provided notice of this Motion to (a) the Office of the United States Trustee for the Southern District of Florida; (b) the holders of the 20 largest unsecured claims against the Debtors (on a consolidated basis); (c) the administrative agent under the Debtors' prepetition credit facilities and proposed postpetition revolving credit facility and its counsel; (d) the United States Attorney's Office for the Southern District of Florida; (e) the Internal Revenue Service; (f) the United States Securities and Exchange Commission; (g) the state attorneys general for states in which the Debtors conduct business; and (h) all parties that have requested or that are required to receive notice pursuant to Bankruptcy Rule 2002.  The Debtors submit that, under the circumstances, no other or further notice is required.

*[Remainder of Page Intentionally Left Blank]*

**WHEREFORE**, the Debtors respectfully request that the Court (i) enter the proposed Interim Order, substantially in the form attached hereto as **Exhibit A** and, following a noticed hearing on the relief sough, enter the Final Order granting the relief requested in this Motion and (ii) grant such other and further relief as may be just and proper.

Dated:   October 10, 2022
        Miami, Florida

Respectfully submitted,

*/s/ Jordi Guso*
_____

George A. Davis (*pro hac vice* pending)
Tianjiao ("TJ") Li (*pro hac vice* pending)
Brian S. Rosen (*pro hac vice* pending)
Jonathan J. Weichselbaum (*pro hac vice* pending)
**LATHAM & WATKINS LLP**
1271 Avenue of the Americas
New York, NY 10020
Telephone:  (212) 906-1200
Email:  george.davis@lw.com
       tj.li@lw.com
       brian.rosen@lw.com
       jon.weichselbaum@lw.com

– and –

Andrew D. Sorkin (*pro hac vice* pending)
**LATHAM & WATKINS LLP**
555 Eleventh Street, NW, Suite 1000
Washington, D.C. 2004
Telephone:  (202) 637-2200
Email:  andrew.sorkin@lw.com

– and –

Jeramy D. Webb (*pro hac vice* pending)
Whit Morley (*pro hac vice* pending)
**LATHAM & WATKINS LLP**
330 North Wabash Avenue, Suite 2800
Chicago, IL 60611
Telephone: (312) 876-7700
Email:  jeramy.webb@lw.com
       whit.morley@lw.com

Jordi Guso
Florida Bar No. 863580
Michael J. Niles
Florida Bar No. 107203
**BERGER SINGERMAN LLP**
1450 Brickell Avenue, Suite 1900
Miami, FL 33131
Telephone:  (305) 755-9500
Email:  jguso@bergersingerman.com
       mniles@bergersingerman.com

*Proposed Co-Counsel for the Debtors*

**<u>Exhibit A</u>**

**Interim Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FORT LAUDERDALE DIVISION**
**www.flsb.uscourts.gov**

| | |
|---|---|
| In re: | Chapter 11 Cases |
| VITAL PHARMACEUTICALS, INC., *et al.*, | Case No. 22-17842 (PDR) |
| | (Joint Administration Pending) |
| Debtors.[1] | |
| _____ / | |

**INTERIM ORDER (I) APPROVING POSTPETITION FINANCING, (II)**
**AUTHORIZING USE OF CASH COLLATERAL, (III) GRANTING LIENS AND**
**PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (IV)**
**GRANTING ADEQUATE PROTECTION, (V) MODIFYING AUTOMATIC STAY,**
**(VI) SCHEDULING A FINAL HEARING, AND (VII) GRANTING RELATED RELIEF**

THIS MATTER came before the Court for a hearing on October ___, 2022 at ___ a.m./p.m.

in Fort Lauderdale, Florida upon the *Debtors' Emergency Motion for Entry of Interim and Final*

---

[1] The address of the Debtors is 1600 N. Park Drive, Weston, FL 33326. The last four digits of the Debtors' federal tax identification numbers are: (i) Vital Pharmaceuticals, Inc. (8430); (ii) Bang Energy Canada, Inc. (5454); (iii) JHO Intellectual Property Holdings, LLC (0010); (iv) JHO Real Estate Investment, LLC (9394); (v) Quash Seltzer, LLC (6501); (vi) Rainbow Unicorn Bev LLC (2254); and (vii) Vital Pharmaceuticals International Sales, Inc. (8019).

*Orders (I) Approving Postpetition Financing, (II) Authorizing Use of Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* [ECF No.____] (the "DIP Motion") filed by Vital Pharmaceuticals, Inc. (the "Borrower"), and each of the other above-captioned debtors and debtors in possession (collectively, the "Guarantors" and together with the Borrower, the "Debtors"), in the above-captioned chapter 11 cases (the "Cases"), seeking entry of an interim order (this "Interim Order") pursuant to sections 105, 361, 362, 363(c), 363(e), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e), 503, 506, 507, and 552 of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 4001, 6003, 6004, 9013, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rules 2002-1, 4001-1, 4001-2, 4001-3, and 9013-1 of the Local Rules of the United States Bankruptcy Court for the Southern District of Florida (the "Local Rules"), *inter alia*:

(i)     authorizing the Debtors to obtain senior secured postpetition financing on a super-priority basis pursuant to the terms and conditions of that certain Superpriority Secured Debtor-in-Possession Credit Agreement (as the same may be amended, restated, supplemented, or otherwise modified from time to time, the "DIP Credit Agreement" and the facility thereunder, the "DIP Facility"), by and among the Borrowers, the Guarantors, Truist Bank, as administrative agent (in such capacity, the "DIP Agent") for and on behalf of the lenders party thereto (collectively, the "DIP Lenders"), and the DIP Lenders substantially in the form of Exhibit B, attached to the DIP Motion;[2]

(ii)    authorizing the Debtors to obtain from the DIP Lenders, during the interim period pending the entry of the Final Order (as defined herein), up to $34,000,000 in accordance with the DIP Credit Agreement and this Interim Order;

(iii)   authorizing the Debtors to obtain from the DIP Lenders upon entry of the Final Order total advances in an amount not to exceed a maximum outstanding principal

---

[2] Capitalized terms used herein but not otherwise defined shall have the respective meanings given to such terms in the DIP Credit Agreement or the DIP Motion, as applicable.

amount of $454,770,201.56 in accordance with the DIP Credit Agreement, the DIP Documents (as defined herein), and the Final Order;

(iv)    authorizing the Debtors, upon entry of the Final Order, to convert to DIP Obligations (as defined herein) under the DIP Credit Agreement a portion of the outstanding principal amount representing an increase in net borrowings under the Prepetition Credit Agreement (as defined herein) from and after June 3, 2022, accrued interest and outstanding fees thereunder, and the cash receipts of the Debtors through the entry of the Final Order which receipts constitute cash collateral of the Prepetition Lenders (the foregoing proposed conversion defined as the "Roll Up");

(v)    authorizing the Debtors to execute and deliver the DIP Credit Agreement, the other "Loan Documents" as described in the DIP Credit Agreement and any other agreements and documents related thereto (collectively with the DIP Credit Agreement, the "DIP Documents"), and to perform such other acts as may be necessary or desirable in connection with the DIP Documents and the transactions contemplated thereby;

(vi)    subject to the Carve-Out (as defined herein), granting to the DIP Agent and the DIP Lenders, on account of the DIP Facility and all obligations owing thereunder and under the DIP Documents, including the Roll Up (collectively, and including all "Obligations" as described in the DIP Credit Agreement, the "DIP Obligations"), allowed super-priority administrative expense claim pursuant to section 364(c)(1) of the Bankruptcy Code having priority over any and all expenses and claims specified in any other section of the Bankruptcy Code, including, without limitation, sections 503(b), 507(a)(2), 507(b), and 507(d) of the Bankruptcy Code, in each of the Cases and any Successor Cases (as defined herein);

(vii)    subject to the Carve-Out and the Prepetition Prior Liens (as defined herein), granting to the DIP Agent, for the benefit of itself and the DIP Lenders, automatically perfected security interests in and liens on all of the DIP Collateral (as defined herein), including, without limitation, all property constituting "Cash Collateral" as defined in section 363(a) of the Bankruptcy Code, which liens shall be subject to the priorities set forth herein

(viii)    authorizing and directing the Debtors to pay the principal, interest, fees, expenses and other amounts payable under the DIP Documents as such become due, including, without limitation, upfront fees, structuring fees, unused commitment fees, administrative agent's fees, the reasonable fees and disbursements of the DIP Agent's attorneys, advisors, accountants and other consultants, all to the extent provided in, and in accordance with, the DIP Documents;

(ix)    (a) authorizing the use of Cash Collateral of the Prepetition Secured Parties (each as defined herein) pursuant to section 363 of the Bankruptcy Code and subject to the Approved Budget (as defined herein), the initial form of which is attached hereto as Exhibit A, (b) from and after entry of a Final Order, authorizing the

Debtors to collect and segregate the Cash Collateral of the Prepetition Secured Parties and to apply such Cash Collateral to the Prepetition Secured Parties on the terms set forth herein, and (c) subject to the Carve-Out, providing adequate protection to the Prepetition Secured Parties for any Diminution in Value (as defined herein) of their respective interests in the Prepetition Collateral (as defined herein), including the Cash Collateral, as a result of the relief granted herein;

(x)    subject to the Carve-Out, providing adequate protection to the Arizona Mechanics' Lienholders (as defined herein) for any Diminution in Value of their respective interests in the Arizona Real Property (as defined herein), as a result of the relief granted herein;

(xi)    waiving, subject to entry of a Final Order approving such waiver, certain rights of the Debtors to surcharge collateral pursuant to section 506(c) of the Bankruptcy Code;

(xii)    waiving, subject to entry of a Final Order approving such waiver, the application of the "equities of the case" exception under section 552(b) of the Bankruptcy Code as to the Prepetition Secured Parties with respect to proceeds, product, offspring or profits of any of the Prepetition Collateral;

(xiii)    vacating and modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Documents and this Interim Order; and

(xiv)    scheduling a final hearing (the "Final Hearing") for this Court to consider entry of a final order (the "Final Order"), which shall be in form and substance satisfactory to the DIP Agent, authorizing and approving on a final basis the relief requested in the DIP Motion.

The Court having considered the DIP Motion and the exhibits attached thereto, the *Declaration of John C. DiDonato in Support of First Day Pleadings* [Docket No. [___]], the *Declaration of Homer Parkhill in Support of DIP Financing* [Docket No. [___]], the DIP Documents, and the evidence submitted at the interim hearing held on October [__], 2022 (the "Interim Hearing"); and notice of the Interim Hearing having been given in accordance with Bankruptcy Rules 2002, 4001(b), (c) and (d), and Local Rules 4001-2, 4001-3 and 9013-1(F); and the Interim Hearing having been held and concluded; and all objections, if any, to the interim relief requested in the DIP Motion having been withdrawn, resolved or overruled by the Court; and it appearing that approval of the interim relief requested in the DIP Motion is necessary to avoid

4

immediate and irreparable harm to the Debtors and their estates pending the Final Hearing, and

otherwise is fair and reasonable and in the best interests of the Debtors and their estates as

contemplated by Bankruptcy Rules 4001 and 6003 and to all parties-in-interest, and is essential

for the continued operation of the Debtors' businesses and the preservation of the value of the

Debtors' assets; and it appearing that the Debtors' entry into the DIP Credit Agreement is a sound

and prudent exercise of the Debtors' business judgment; and it further appearing that the Debtors

are unable to obtain credit on terms more favorable than those of the DIP Facility; and after due

deliberation and consideration, and good and sufficient cause appearing therefor;

**BASED UPON THE PLEADINGS AND THE RECORD ESTABLISHED AT THE INTERIM HEARING, THE COURT MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:[3]**

A.      Petition Date. On October 10, 2022 (the "Petition Date"), each of the Debtors filed

voluntary petitions for relief under chapter 11 of the Bankruptcy Code with the United States

Bankruptcy Court for the Southern District of Florida (the "Court").

B.      Debtors in Possession. The Debtors have continued in the management and

operation of their businesses and properties as debtors in possession pursuant to sections 1107 and

1108 of the Bankruptcy Code.

C.      Jurisdiction and Venue. This Court has core jurisdiction over the Cases, the DIP

Motion and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334.

Venue for the Cases and proceedings on the DIP Motion is proper before this Court pursuant to

---

[3] Findings of fact shall be construed as conclusions of law, and conclusions of law shall be construed as findings of fact, as appropriate, pursuant to Bankruptcy Rule 7052.

28 U.S.C. §§ 1408 and 1409. The Court may enter a final order consistent with Article III of the United States Constitution. The predicates for the relief sought herein are sections 105, 361, 362, 363(c), 363(e), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e), 503, 506, 507, and 552 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6003, 6004, 9013, and 9014, and Local Rules 2002-1, 4001-1, 4001-2, 4001-3, and 9013-1.

D.    <u>Committee Formation</u>. As of the date hereof, the United States Trustee for the Southern District of Florida (the "<u>U.S. Trustee</u>") has not appointed an official committee of unsecured creditors in these Cases pursuant to section 1102 of the Bankruptcy Code (a "<u>Creditors' Committee</u>").

E.    <u>Debtors' Stipulations</u>. In requesting the DIP Facility and in exchange for and as a material inducement to the DIP Lenders to provide the DIP Facility, and to the Prepetition Secured Parties in exchange for the Diminution in Value, and after consultation with their attorneys and financial advisors, and without prejudice to the rights of parties-in-interest as set forth in paragraph 40 herein, the Debtors admit, stipulate, acknowledge, and agree as follows (paragraphs E(i) through E(vii) below are referred to herein, collectively, as the "<u>Debtors' Stipulations</u>"):

(i)    *Prepetition Facility.* Pursuant to that certain Amended and Restated Revolving Credit and Term Loan Agreement dated as of August 14, 2020, (as amended, restated, supplemented, or otherwise modified from time to time, the "<u>Prepetition Credit Agreement</u>") among (a) the Borrower (the "<u>Prepetition Borrower</u>"), (b) the guarantors party thereto from time to time (such guarantors as of the date hereof, the "<u>Prepetition Guarantors</u>" and collectively with the Prepetition Borrower, the "<u>Prepetition Credit Parties</u>"), (c) Truist Bank, as administrative agent (in such capacity, the "<u>Prepetition Agent</u>"), swingline lender (in such capacity, the "<u>Prepetition Swingline Lender</u>") and letter of credit issuer (in such capacity, the "<u>Prepetition L/C Issuer</u>"), and (d) the lenders party thereto from time to time (such lenders as of the date hereof, the "<u>Prepetition Lenders</u>" and collectively with the Prepetition Agent, the Prepetition Swingline Lender and the Prepetition L/C Issuer, the "<u>Prepetition Secured Parties</u>"), the Prepetition Lenders and the Prepetition Swingline Lender extended loans and other financial accommodations to, and the Prepetition L/C Issuer issued letters of credit for the account of, the Prepetition Borrower (the "<u>Prepetition Facility</u>"). The Prepetition Credit Agreement, the other

6

Loan Documents (as defined in the Prepetition Credit Agreement) and any other agreements and documents executed or delivered in connection therewith or pursuant thereto, each as may be amended, restated, supplemented, or otherwise modified from time to time, are collectively referred to herein as the "Prepetition Credit Documents".

(ii)  *Prepetition Obligations*. The Prepetition Facility provided the Prepetition Borrower with, among other things (a) $260,000,000 in aggregate principal amount of revolving commitments, including a $25,000,000 sublimit for the issuance of letters of credit, and (b) $231,400,000 in aggregate principal amount in a term loan facility. As of the Petition Date, the Prepetition Lenders are owed on account of the Prepetition Facility (i) $240,000,000.00 in revolving loan principal obligations, (ii) $104,190,218.45 in term loan principal obligations, (iii) $6,349,912.27 in respect of unpaid interest accrued through October 9, 2022, (iv) $4,188,187.51 in respect of unpaid forbearance fees accrued through October 9, 2022, and (v) $41,883.33 in respect of unpaid commitment fees accrued through October 9, 2022 (collectively, with any other reimbursement obligations (contingent or otherwise) in respect of letters of credit, any other fees, expenses and disbursements (including, without limitation, attorneys' fees, accountants' fees, appraisers' fees and financial advisors' fees, and related expenses and disbursements), treasury, cash management and derivative obligations, indemnification obligations, and other charges, amounts and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing, or chargeable in respect of any of the Prepetition Credit Parties' obligations pursuant to the Prepetition Credit Documents, including all "Obligations" as defined in the Prepetition Credit Agreement, the "Prepetition Obligations").

(iii)  *Prepetition Liens and Prepetition Collateral*. As more fully set forth in the Prepetition Credit Documents, prior to the Petition Date, the Prepetition Credit Parties granted to the Prepetition Agent, for the benefit of itself and the other Prepetition Secured Parties, a first-priority security interest in and continuing lien (the "Prepetition Liens") on substantially all of the Prepetition Credit Parties' assets and properties (which, for the avoidance of doubt, includes Cash Collateral) and all proceeds, products, accessions, rents, and profits thereof, in each case whether then owned or existing or thereafter acquired or arising (collectively, the "Prepetition Collateral"). Each of the Prepetition Guarantors jointly and severally, absolutely, unconditionally and irrevocably guaranteed the Prepetition Obligations.

(iv)  *Validity, Perfection and Priority of Prepetition Liens and Prepetition Obligations*. The Debtors acknowledge and agree that as of the Petition Date: (a) the Prepetition Liens on the Prepetition Collateral are valid, binding, enforceable, non-avoidable, and properly perfected and were granted to, or for the benefit of, the Prepetition Secured Parties for fair consideration and reasonably equivalent value; (b) the Prepetition Liens are senior in priority over any and all other liens on the Prepetition Collateral, subject only to liens that are valid, properly perfected (before the Petition Date or in accordance with section 546 of the Bankruptcy Code), non-

7

avoidable, and senior in priority as a matter of law to the Prepetition Liens (including without limitation the liens and rights of setoff of banks and other financial institutions (the "Cash Management Banks") providing treasury services comprising the Debtors' cash management system) (collectively the "Prepetition Prior Liens");[4] (c) the Prepetition Obligations constitute legal, valid, binding, and non-avoidable obligations of the Prepetition Credit Parties enforceable in accordance with the terms of the applicable Prepetition Credit Documents; (d) no offsets, challenges, objections, defenses, claims or counterclaims of any kind or nature to any of the Prepetition Liens or Prepetition Obligations exist, and no portion of the Prepetition Liens or Prepetition Obligations (or any payment made in respect of any thereof) is subject to any challenge or defense, including, without limitation, avoidance, disallowance, disgorgement, recharacterization, or subordination (equitable or otherwise) pursuant to the Bankruptcy Code or other applicable law; (e) any payments made on account of the Prepetition Obligations before the Petition Date were (1) payments out of the Prepetition Collateral and/or (2) made in the ordinary course of business and in exchange for reasonably equivalent value and did not diminish any property otherwise available for distribution to unsecured creditors; and (f) the Debtors and their estates have no claims, objections, challenges, causes of action, and/or choses in action, including without limitation, avoidance claims under chapter 5 of the Bankruptcy Code or actions for recovery or disgorgement, against any of the Prepetition Secured Parties, or any of their respective affiliates, or any of the respective agents, attorneys, advisors, professionals, officers, directors and employees of the foregoing, arising out of, based upon or related to their respective obligations under the Prepetition Credit Documents. For the avoidance of doubt, the Debtors acknowledge and agree that as of the Petition Date, the Prepetition Secured Parties have perfected, first-priority (subject only to Prepetition Prior Liens) liens on substantially all of the assets of the Prepetition Credit Parties.

(v)    *Release of Claims*. Subject only to the reservation of rights set forth in paragraph 40 below, each Debtor shall be deemed to have forever waived, discharged, and released each of the Prepetition Secured Parties, each of their affiliates, assigns or successors and each of the respective directors, members, managers, equity holders, officers, employees, agents, trustees, representatives, attorneys, financial advisors, accountants, collateral auditors, appraisers, consultants and each insurance, environmental, legal, financial and other advisor and other consultants and agents of or to the foregoing (collectively, the "Prepetition Secured Party Releasees") from any and all "claims" (as defined in the Bankruptcy Code), counterclaims, causes of action (including causes of action in the nature of "lender liability"), defenses, setoff, recoupment, other offset rights and other rights of disgorgement or recovery against any and all of the Prepetition Secured Party Releasees, whether arising at

---

[4] Nothing herein shall constitute a finding or ruling by this Court that any asserted Prepetition Prior Lien is valid, senior, enforceable, prior, perfected or non-avoidable. Moreover, nothing shall prejudice the rights of any party-in-interest, including, but not limited to the Debtors, the Prepetition Secured Parties, or the Creditors' Committee (if appointed), to challenge the validity, priority, enforceability, seniority, non-avoidability, perfection or extent of any alleged Prepetition Prior Lien.

CHAR2\2689298v14
US-DOCS\135159742.23

law or in equity, relating to and/or otherwise in connection with the Prepetition Liens, the Prepetition Obligations, the Prepetition Credit Documents, or the debtor-creditor relationship between any of the Prepetition Secured Parties, on the one hand, and any of the Prepetition Credit Parties, on the other hand, including, without limitation, (a) any recharacterization, subordination, avoidance, disallowance or other claim arising under or pursuant to section 105 or chapter 5 of the Bankruptcy Code or under any other similar provisions of applicable state law, federal law, municipal law, or foreign law and (b) any right or basis to challenge or object to the amount, validity, or enforceability of the Prepetition Obligations or any payments or other transfers made on account of the Prepetition Obligations, or the validity, enforceability, priority, or non-avoidability of the Prepetition Liens securing the Prepetition Obligations, including any right or basis to seek any disgorgement or recovery of payments of cash or any other distributions or transfers previously received by any of the Prepetition Secured Party Releasees.

(vi)    *Cash Collateral.* Subject to certain exclusions set forth in the Prepetition Credit Documents, including certain segregated Cash Collateral that is defined as "Excluded Property" under the Prepetition Credit Documents (if any), all of the Debtors' cash, including any cash in deposit accounts of the Debtors, wherever located, constitutes Cash Collateral of the Prepetition Secured Parties.

(vii)   *No Control.* None of the DIP Agent, DIP Lenders or the Prepetition Secured Parties is a control person or insider (as defined in section 101(31) of the Bankruptcy Code) of any Debtor.

F.    Findings Regarding Corporate Authority. Each Debtor has all requisite corporate power and authority to execute and deliver the DIP Documents to which it is a party and to perform its obligations thereunder.

G.    Adequate Notice of Interim Hearing. On the Petition Date, the Debtors filed the DIP Motion with this Court pursuant to Bankruptcy Rules 2002, 4001, 9013, and 9014, and represent that they provided notice of the DIP Motion and the Interim Hearing to the following parties and/or their respective counsel as follows: (i) the U.S. Trustee, (ii) the Debtors' thirty (30) largest unsecured creditors on a consolidated basis (excluding insiders), (iii) counsel to the Prepetition Agent, (iv) counsel to the DIP Agent, and (v) any other party entitled to notice pursuant to Local Rule 9013-1(F). Under the circumstances, the notice given by the Debtors of the DIP

9

Motion, the relief requested therein and the Interim Hearing complies with Bankruptcy Rules 4001(b) and (c).

        H.      <u>Findings Regarding Postpetition Financing</u>.

        (i)      *Request for Postpetition Financing.* The Debtors seek authority to (a) enter into the DIP Facility on the terms described herein and in the DIP Documents, and (b) use Cash Collateral on the terms described herein to administer the Cases and fund their operations. Notice of the Final Hearing and Final Order will be provided in accordance with this Interim Order.

        (ii)      *Priming of the Prepetition Liens.* The priming of the Prepetition Liens of the Prepetition Secured Parties on the Prepetition Collateral under section 364(d) of the Bankruptcy Code, as contemplated by the DIP Credit Agreement and as further described herein, will enable the Debtors to obtain the DIP Facility and to continue to operate their businesses to the benefit of their estates and creditors. The Prepetition Secured Parties are entitled to receive adequate protection as set forth in this Interim Order pursuant to sections 361, 363, and 364 of the Bankruptcy Code, solely to the extent that (a) the imposition of the stay under section 362 of the Bankruptcy Code, (b) the use, sale or lease of the Prepetition Collateral (including Cash Collateral) under section 363 of the Bankruptcy Code or (c) any grant of a lien under section 364 of the Bankruptcy Code (including, without limitation, the granting of the DIP Liens (as defined herein), subject to the Carve-Out) results in a decrease in the value of the Prepetition Secured Parties' interest in the Prepetition Collateral (including the Cash Collateral) (diminution in the value of any collateral of any party, including, without limitation, the Prepetition Collateral, resulting from any of the foregoing causes, "<u>Diminution in Value</u>").

        (iii)      *Need for Postpetition Financing and Use of Cash Collateral.* The Debtors have an immediate and critical need to use Cash Collateral on an interim basis and to

obtain credit on an interim basis pursuant to the DIP Facility in order to, among other things, administer and preserve the value of their estates. The ability of the Debtors to finance their operations, maintain business relationships with their vendors, suppliers and customers, pay their employees and otherwise finance their operations requires the availability of working capital from the DIP Facility and the use of Cash Collateral, the absence of either of which would immediately and irreparably harm the Debtors, their estates, and parties-in-interest. The Debtors do not have sufficient available sources of working capital and financing to operate their businesses or maintain their properties in the ordinary course of business without the DIP Facility and authorized use of Cash Collateral.

    (iv) *No Credit Available on More Favorable Terms.* The DIP Facility is the best source of debtor-in-possession financing available to the Debtors. The Debtors are unable to obtain financing from sources other than the DIP Lenders on terms more favorable than the DIP Facility and are unable to obtain unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense. The Debtors have also been unable to obtain credit that is: (a) unsecured having priority over that of administrative expenses of the kind specified in sections 503(b), 507(a) and 507(b) of the Bankruptcy Code; (b) secured by a lien on property of the Debtors and their estates that is not otherwise subject to a lien; or (c) secured solely by a junior lien on property of the Debtors and their estates that is subject to a lien. Financing on a postpetition basis is not otherwise available without granting the DIP Agent, for the benefit of itself and the DIP Lenders: (1) perfected security interests in and liens on (each as provided herein) all of the Debtors' existing and after-acquired assets with the priorities set forth in paragraph 6 hereof; (2) super-priority claims and liens; and (3) the other protections set forth in this Interim Order.

(v)    *Use of Proceeds of the DIP Facility.* The Debtors shall use the proceeds of the DIP Facility and any Cash Collateral, in accordance with the Approved Budget, solely as follows: (a) on the Effective Date (as defined in the DIP Credit Agreement), to pay costs and expenses associated with the closing of the transactions under the DIP Credit Agreement, including those required to be paid pursuant to the DIP Credit Agreement; and (b) on or after the Effective Date, to fund the Cases in accordance with the Approved Budget or as otherwise set forth in this Interim Order and for the financing of Debtors' ordinary working capital and other general corporate needs, including certain fees and expenses of professionals retained by the Debtors and for certain other prepetition and pre-filing expenses that are approved by this Court and permitted by the Approved Budget (subject to Permitted Variances) and including, after the entry of the Final Order, for the Roll Up to the extent provided for therein and the payment of the Prepetition Obligations as described therein. The Debtors shall not be permitted to use the proceeds of the DIP Facility or any Cash Collateral in contravention of the provisions of the DIP Documents, this Interim Order or the Bankruptcy Code, including any restrictions or limitations on the use of proceeds contained therein.

I.    <u>Adequate Protection</u>. The Prepetition Agent, for the benefit of itself and the other Prepetition Secured Parties, is entitled to receive adequate protection to the extent of any Diminution in Value of their respective interests in the Prepetition Collateral, as provided herein.

J.    <u>Sections 506(c) and 552(b)</u>. In light of (i) the DIP Agent's and the DIP Lenders' agreement to subordinate their liens and super-priority claims to the Carve-Out and (ii) the Prepetition Secured Parties' agreement to subordinate their liens and super-priority claims to the Carve-Out, DIP Liens and DIP Superpriority Claim and to permit the use of Prepetition Collateral (including Cash Collateral): (a) subject to entry of a Final Order providing for such waiver, the

Prepetition Secured Parties are each entitled to a waiver of any "equities of the case" exception under section 552(b) of the Bankruptcy Code; and (b) subject to entry of a Final Order providing for such waiver, the DIP Agent, DIP Lenders, and Prepetition Secured Parties are each entitled to a waiver of the provisions of section 506(c) of the Bankruptcy Code.

  K.  <u>Good Faith of the DIP Agent and the DIP Lenders</u>.

    (i)  *Willingness to Provide Financing*. The DIP Lenders have indicated a willingness to provide financing to the Debtors subject to *inter alia*: (a) entry of this Interim Order and the Final Order; (b) approval by the Court of the terms and conditions of the DIP Facility and the DIP Documents; (c) satisfaction of the closing conditions set forth in the DIP Documents; and (d) findings by this Court that such financing is essential to the Debtors' estates, that the DIP Agent and the DIP Lenders are extending credit to the Debtors pursuant to the DIP Documents in good faith, and the DIP Agent's and the DIP Lenders' claims, super-priority claims, security interests and liens and other protections granted pursuant to this Interim Order and the DIP Documents will have the protections provided in section 364(e) of the Bankruptcy Code.

    (ii)  *Business Judgment and Good Faith Pursuant to Section 364(e)*. The terms and conditions of the DIP Facility and the DIP Documents, and the fees paid, and to be paid, thereunder, are fair, reasonable, and the best available to the Debtors under the circumstances, are ordinary and appropriate for secured financing to debtors in possession, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and consideration. The terms and conditions of the DIP Facility and the use of Cash Collateral were negotiated in good faith and at arms' length among the Debtors, DIP Agent, DIP Lenders, and Prepetition Secured Parties, with the assistance and counsel of their respective advisors. Use of Cash Collateral and credit to be extended under the DIP Facility shall

13

be deemed to have been allowed, advanced, made, or extended in good faith by the DIP Agent, DIP Lenders and Prepetition Secured Parties (as applicable) within the meaning of section 364(e) of the Bankruptcy Code.

L.    Immediate Entry.    Sufficient cause exists for immediate entry of this Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2).

Based upon the foregoing findings and conclusions, the DIP Motion and the record before the Court with respect to the DIP Motion, and good and sufficient cause appearing therefor, **IT IS HEREBY ORDERED** that:

1.    Interim Financing Approved. The DIP Motion is granted on an interim basis as set forth herein, the Interim Financing (as defined herein) is authorized and approved, and the use of Cash Collateral on an interim basis is authorized, in each case subject to the terms and conditions set forth in the DIP Documents and this Interim Order. All objections to this Interim Order to the extent not withdrawn, waived, settled or resolved are hereby denied and overruled.

**DIP Facility Authorization**

2.    Authorization of the DIP Financing. The Debtors are expressly and immediately authorized and empowered to execute and deliver the DIP Documents, and to incur and to perform the DIP Obligations in accordance with, and subject to, the terms of this Interim Order, the DIP Documents and the Approved Budget, and to deliver all instruments and documents which may be required or necessary for the performance by the Debtors under the DIP Facility and the creation and perfection of the DIP Liens (as defined herein) described in and provided for by this Interim Order and the DIP Documents. The Debtors are hereby authorized to pay, in accordance with this Interim Order, the principal, interest, fees, expenses and other amounts described in the DIP Documents and all other documents comprising the DIP Facility as such become due and without

14

need to obtain further Court approval, including, without limitation, upfront fees, structuring fees, unused commitment fees, administrative agent's fees, the reasonable and documented fees and disbursements of the DIP Agent's attorneys, advisors, accountants, and other consultants, to implement all applicable reserves and to take any other actions that may be necessary or appropriate, all to the extent provided in the DIP Documents. Upon execution and delivery, the DIP Documents shall represent valid and binding obligations of the Debtors, enforceable against each of the Debtors and their estates in accordance with their terms.

3.      Authorization to Borrow and to Use Cash Collateral. In order to prevent immediate and irreparable harm to the Debtors' estates, from the entry of this Interim Order through and including the earlier to occur of (i) entry of the Final Order or (ii) the Termination Declaration (as defined herein), and subject to the terms, conditions, limitations on availability and reserves set forth in the DIP Documents and this Interim Order, and subject to the Approved Budget, the Debtors are hereby authorized to request and obtain extensions of credit (in the form of loans under the DIP Facility) up to an aggregate outstanding principal amount of $34,000,000 at any one time outstanding (the "Interim Financing").

4.      DIP Obligations. The DIP Documents and this Interim Order shall constitute and evidence the validity and binding effect of the DIP Obligations, which DIP Obligations shall be enforceable against the Debtors, their estates and any successors thereto, including without limitation, any trustee appointed in the Cases, or in any case under chapter 7 of the Bankruptcy Code upon the conversion of any of the Cases, or in any other proceedings superseding or related to any of the foregoing (collectively, the "Successor Cases"). Upon entry of this Interim Order, the DIP Obligations will include all loans and any other indebtedness or obligations, contingent or absolute, which may now or from time to time be owing by any of the Debtors to the DIP Agent

or any of the DIP Lenders under the DIP Documents or this Interim Order, including, without limitation, all principal, accrued interest, costs, fees, expenses and other amounts under the DIP Documents.

5.    DIP Liens. To secure the DIP Obligations, effective immediately upon entry of this Interim Order, pursuant to sections 361, 362, 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code, the DIP Agent, for the benefit of itself and the DIP Lenders, is hereby granted, against each of the Debtors on a joint and several basis, continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected postpetition security interests in and liens (collectively, the "DIP Liens") on all real and personal property, whether now existing or hereafter arising, tangible or intangible, of each of the Debtors (the "DIP Collateral"), including without limitation: (a) all monies, cash (including without limitation, promotional cash), cash equivalents, deposit accounts, lockbox accounts, securities accounts, commodities accounts, or other accounts owned by any Debtor, other receivables, accounts, chattel paper (whether tangible or electronic), contract rights, inventory (wherever located and including without limitation inventory in transit), instruments (including promissory notes), documents (as defined in the Uniform Commercial Code and including, if applicable, electronic documents), securities (whether or not marketable) and investment property (including, without limitation, all of the issued and outstanding capital stock of each of its subsidiaries), goods, furniture, fixtures, equipment and any accessions thereto, franchise rights, trade names, trademarks, servicemarks, copyrights, patents, intellectual property, general intangibles, payment intangibles, rights to the payment of money (including, without limitation, tax refunds and any other extraordinary payments), supporting obligations, guarantees, letter of credit rights (whether or not evidenced by a writing), commercial tort claims, claims and causes of action and all substitutions, other real and personal property, leases and leaseholds, in

each case not constituting Excluded Property (as defined in the DIP Credit Agreement); and (b) upon entry of a Final Order, any amounts that are recovered or otherwise received by the Debtors in respect of avoidance actions pursuant to sections 549 and 550 of the Bankruptcy Code and any proceeds thereof; provided, that the DIP Liens shall not attach to or encumber claims and causes of action available to the Debtors or their estates through the exercise of the powers granted by sections 544, 545, 547, 548, 550 (other than with respect to any applicability to section 549) and 553 of the Bankruptcy Code ("Prepetition Avoidance Actions") or proceeds thereof.

6.    DIP Lien Priority. The DIP Liens securing the DIP Obligations are valid, automatically perfected, non-avoidable, senior in priority and superior to any security, mortgage, collateral interest, lien, claim or interest to or on any of the DIP Collateral, except that the DIP Liens shall be junior only to: (a) the Prepetition Prior Liens; (b) any permitted senior liens, if any, under the DIP Documents; and (c) the Carve-Out. Other than as set forth herein, the DIP Liens shall not be made subject to, or pari passu with, any lien or security interest heretofore or hereinafter granted in the Cases or any Successor Cases and shall be valid and enforceable against any trustee appointed in the Cases or any Successor Cases and/or upon the dismissal of any of the Cases or Successor Cases. Subject to entry of the Final Order, the DIP Liens securing the DIP Obligations are expressly senior to the rights of any seller of goods to reclaim such goods under section 546(c) of the Bankruptcy Code. The DIP Liens shall not be subject to section 510, 549 or 550 of the Bankruptcy Code. No lien or interest avoided and preserved for the benefit of the estate pursuant to section 551 of the Bankruptcy Code shall be pari passu with or senior to the DIP Liens.

7.    DIP Superpriority Claim. Upon entry of this Interim Order, the DIP Agent and the DIP Lenders are hereby granted, against each of the Debtors on a joint and several basis, pursuant to section 364(c)(1) and 364(d) of the Bankruptcy Code, an allowed, senior secured, super-priority

17

administrative expense claim in each of the Cases and any Successor Cases (collectively, the "DIP Superpriority Claim") for all DIP Obligations that shall: (a) be payable from and have recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof, including, without limitation, subject to entry of the Final Order, any proceeds or property recovered in connection with the pursuit of Prepetition Avoidance Actions; (b) subject only to the Carve-Out, have priority over any and all administrative expense claims and unsecured claims against the Debtors or their estates in any of the Cases and any Successor Cases, at any time existing or arising, of any kind or nature whatsoever, including, without limitation, costs, claims and expenses of the kinds specified in or ordered pursuant to Bankruptcy Code sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(c) (subject to entry of a Final Order), 507(a), 507(b), 546(c) (subject to entry of a Final Order), 546(d), 726, 1113, and 1114, or any other provision of the Bankruptcy Code or otherwise, as provided under section 364(c)(l) of the Bankruptcy Code; and (c) at all times be senior to the rights of the Debtors and their estates, and any successor trustee or other estate representative in the Cases or any Successor Case.

8.    No Obligation to Extend Credit. The DIP Agent and DIP Lenders shall have no obligation to make any loan or advance under the DIP Documents unless all of the conditions precedent to the making of such extension of credit under the DIP Documents and this Interim Order have been satisfied in full or waived in accordance with the DIP Documents.

9.    Use of DIP Facility Proceeds. From and after the Petition Date, the Debtors shall use advances of credit under the DIP Facility only for the purposes specifically set forth in this Interim Order, as permitted by the DIP Documents and in compliance with the Approved Budget (subject to Permitted Variances), and under no circumstances will the Debtors transfer any such advances to any non-Debtor affiliates other than to fund the operations of the Foreign Non-Debtor

Affiliates[5] and to pay obligations owing to the Landlord Non-Debtor Affiliates,[6] in each case, as permitted by the DIP Documents and in compliance with the Approved Budget (subject to Permitted Variances).

**Authorization to Use Cash Collateral**

10.    <u>Authorization to Use Cash Collateral</u>. The Debtors are authorized to use Cash Collateral subject to the terms and conditions of this Interim Order, the DIP Facility and the DIP Documents and in accordance with the Approved Budget (subject to Permitted Variances) and under no circumstances will the Debtors transfer any such Cash Collateral to any non-Debtor affiliates other than to fund the operations of the Foreign Non-Debtor Affiliates and to pay obligations owing to the Landlord Non-Debtor Affiliates, in each case, as permitted by the DIP Documents and in compliance with the Approved Budget (subject to Permitted Variances). Nothing in this Interim Order shall authorize the disposition of any assets of the Debtors or their estates outside the ordinary course of business, or any Debtor's use of any Cash Collateral or other proceeds resulting therefrom, except as permitted in this Interim Order, the DIP Facility and the DIP Documents, and in accordance with the Approved Budget.

11.    <u>Prepetition Adequate Protection Liens</u>. Pursuant to sections 361, 363(e) and 364(d) of the Bankruptcy Code, as adequate protection of: (a) the interests of the Prepetition Secured Parties in the Prepetition Collateral against any Diminution in Value of such interests in the Prepetition Collateral, the Debtors hereby grant to the Prepetition Agent, for the benefit of itself

---

[5]   The "<u>Foreign Non-Debtor Affiliates</u>" are (a) Bang Energy Canada, ULC, (b) Bang Energy Mexico S. DE R.L. de C.V., (c) Bang Energy B.V., (d) Bang Energy (Australia) Pty Ltd., (e) Bang Energy VPX Sports Ecuador S.A.S., (f) Energy Peru, LLC, (g) Bang Energy Peru S.A.C., (h) Bang Energy Costa Rica LTDA, (i) Bang Energy Brazil LTDA, (j) Bang Energy Chile SPA, and (k) Bang Energy Columbia SA.

[6]   The "<u>Landlord Non-Debtor Affiliates</u>" are (a) JHO GA-1 Investment, LLC, (b) JHO NV-1 Investment, LLC, (c) Sheridan Real Estate Investment A, LLC, and (d) Sheridan Real Estate Investment C, LLC.

and the other Prepetition Secured Parties, continuing valid, binding, enforceable and perfected postpetition security interests in and liens on all of the Debtors' assets, including, without limitation, the DIP Collateral, but excluding all proceeds or property recovered in connection with the Prepetition Avoidance Actions (such liens, the "<u>Prepetition Secured Parties Adequate Protection Liens</u>"); and (b) the interests of the holders of mechanics' liens and/or materialmen's liens arising under applicable Arizona law (such holders, the "<u>Arizona Mechanics' Lienholders</u>") against any Diminution in Value of the Arizona Mechanics' Lienholders' interest, if any, in the real property of Debtor JHO Real Estate Investment, LLC located at 1635 S. 43rd Avenue, Phoenix, AZ 85009 (the "<u>Arizona Real Property</u>"), the Debtors hereby grant to the Arizona Mechanics' Lienholders continuing valid, binding, enforceable and perfected postpetition security interests in and liens on the DIP Collateral (such liens, the "<u>Arizona Mechanics' Lienholders Adequate Protection Liens</u>" and together with the Prepetition Secured Parties Adequate Protection Liens, the "<u>Adequate Protection Liens</u>").[7]

      12.    <u>Priority of Adequate Protection Liens</u>.

      (i)    The Adequate Protection Liens shall be junior only to: (a) Prepetition Prior Liens; (b) the Carve-Out; (c) the DIP Liens; and (d) the Prepetition Liens. The Adequate Protection Liens shall be senior to all other security interests in, liens on, or claims against any of the Debtors' assets. As between the Prepetition Secured Parties Adequate Protection Liens and the Arizona Mechanics' Lienholders Adequate Protection Liens, the Prepetition Secured Parties Adequate Protection Liens shall be senior.

---

[7] Nothing herein shall constitute a finding or ruling by this Court that any lien asserted by any Arizona Mechanics' Lienholder is valid, senior, enforceable, prior, perfected or non-avoidable. Moreover, nothing shall prejudice the rights of any party-in-interest, including, but not limited to the Debtors, the Prepetition Secured Parties, or the Creditors' Committee (if appointed), to challenge the validity, priority, enforceability, seniority, non-avoidability, perfection or extent of any such alleged lien.

(ii)    Except as provided herein, the Adequate Protection Liens shall not be made subject to or *pari passu* with any lien or security interest heretofore or hereinafter granted or otherwise created in or during the Cases or any Successor Cases and shall be valid and enforceable against any trustee appointed in any of the Cases or any Successor Cases, or upon the dismissal of any of the Cases or Successor Cases. The Adequate Protection Liens shall not be subject to (a) section 510(c) of the Bankruptcy Code with respect to the Prepetition Obligations, or (b) sections 549 or 550 of the Bankruptcy Code. No lien or interest avoided and preserved for the benefit of the estate pursuant to section 551 of the Bankruptcy Code shall be *pari passu* with or senior to the Prepetition Liens or the Adequate Protection Liens.

13.    <u>Adequate Protection Superpriority Claims</u>.    As further adequate protection of the interests of: (a) the Prepetition Secured Parties in the Prepetition Collateral against any Diminution in Value of such interests in the Prepetition Collateral, the Prepetition Agent, on behalf of itself and the other Prepetition Secured Parties, is hereby granted, as and to the extent provided by section 507(b) of the Bankruptcy Code, an allowed super-priority administrative expense claim in each of the Cases and any Successor Cases (collectively, the "<u>Prepetition Secured Parties Adequate Protection Superpriority Claim</u>"); and (b) the Arizona Mechanics' Lienholders against any decrease in the value of the Arizona Mechanics' Lienholders' interest, if any, in the Arizona Real Property, the Arizona Mechanics' Lienholders are hereby granted, as and to the extent provided by section 507(b) of the Bankruptcy Code, an allowed super-priority administrative expense claim in each of the Cases and any Successor Cases (collectively, the "<u>Arizona Mechanics' Lienholders Superpriority Claim</u>" and together with the Prepetition Secured Parties Adequate Protection Superpriority Claim, the "<u>Adequate Protection Superpriority Claims</u>").

14.    _Priority of the Adequate Protection Superpriority Claims_. Except as set forth herein, the Adequate Protection Superpriority Claims shall have priority over all administrative expense claims and unsecured claims against the Debtors or their estates, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 507(a), 507(b), 546(c) (subject to entry of a Final Order), 546(d), 726, 1113 and 1114 of the Bankruptcy Code; _provided_, _however_, that (i) the Adequate Protection Superpriority Claims shall be junior to the Carve-Out and the DIP Superpriority Claim and (ii) as between the Prepetition Secured Parties Adequate Protection Superpriority Claim and the Arizona Mechanics' Lienholders Superpriority Claim, the Prepetition Secured Parties Adequate Protection Superpriority Claim shall be senior; _provided_, _further_, _however_, that all Adequate Protection Liens granted by paragraph 11 are subject to being set aside and all Adequate Protection Superpriority Claims granted by paragraph 13 are subject to being disallowed, in each case if and to the extent that the corresponding Prepetition Lien or underlying claim is successfully challenged (in a manner that undermines the granting of adequate protection to the recipient thereof) pursuant to paragraph 40 of this Interim Order (in the case of the Prepetition Secured Parties) or otherwise (in the case of the Arizona Mechanics' Lienholders).

15.    _Adequate Protection Payments and Other Consideration_.  In consideration for the consent of the Prepetition Secured Parties to the relief granted herein, and as additional adequate protection provided to the Prepetition Secured Parties in connection with the relief granted herein, including the priming of their liens contemplated hereby, the Debtors shall, subject to paragraph 33 hereof:

(i) make monthly payments to the Prepetition Agent (for the ratable benefit of the Prepetition Lenders) on the last business day of each month in an amount equal to the

interest accrued on or after the Petition Date under the Prepetition Credit Agreement for such month at the Default Rate (as defined therein) as the applicable reference rate and giving effect, for avoidance of doubt, to any future increases in the applicable rate of interest after the Petition Date to the extent provided for under the Prepetition Credit Agreement; [8]

(ii) reimburse (without duplication of and only to the extent not reimbursed pursuant to paragraph 31 hereof) the Prepetition Agent for all reasonable and documented out-of-pocket expenses of the Prepetition Agent incurred in connection with the Prepetition Credit Agreement (including without limitation, legal, accounting, collateral examination, monitoring and appraisal fees, financial advisory fees, fees and expenses of other consultants, and indemnification and reimbursement of fees and expenses payable under the Prepetition Credit Agreement, and including for avoidance of doubt any such expenses incurred in connection with the Prepetition Agent successfully defending itself in connection with any Challenge);

(iii) upon entry of the Final Order and as described therein, be deemed to have converted a portion of the obligations outstanding under the Prepetition Credit Agreement to obligations under the DIP Credit Agreement; and

(iv) upon entry of the Final Order and as described therein, segregate all collections received by the Debtors, deliver such collections to the DIP Agent, which would deliver such collections on a weekly basis to the Prepetition Agent to be applied to reduce, on a dollar-for-dollar basis, the Prepetition Obligations (first to principal and thereafter to interest and fees).

16.    <u>Section 507(b) Reservation</u>. Nothing herein shall impair or modify the application of section 507(b) of the Bankruptcy Code in the event that the adequate protection provided to the Prepetition Secured Parties hereunder is insufficient to compensate for any Diminution in Value of their respective interests in the Prepetition Collateral during the Cases or any Successor Cases.

**<u>Provisions Common to DIP Financing and Use of Cash Collateral</u>**

17.    <u>Amendments, Consents, Waivers, and Modifications</u>. The Debtors, with the express written consent of the requisite DIP Lenders required under the DIP Credit Agreement for

---

[8] As of October 1, 2022, the applicable rate under the Prepetition Credit Agreement (*i.e.*, the all-in rate under the Prepetition Credit Agreement, which is the Default Rate) is for Base Rate Loans (as defined in the Prepetition Credit Agreement) the sum of (i) Base Rate (as defined in the Prepetition Credit Agreement), subject to a 0.75% per annum floor, <u>plus</u> (ii) 5.50% per annum, <u>plus</u> (iii) 2.00% per annum (in accordance with section 2.13(d) of the Prepetition Credit Agreement).

any such action contemplated thereby (the "Requisite DIP Lenders") and in accordance with the terms and conditions of the DIP Documents, may enter into any amendments, consents, waivers or modifications to the DIP Documents without the need for further notice and hearing or any order of this Court, so long as such amendments, consents, waivers or modifications are non-material; provided, that copies of any such amendments, waivers or modifications shall be promptly filed with the Court. A copy of any such amendment, consent, waiver or modification shall be promptly provided by the Debtors to the DIP Agent, the Prepetition Agent, the U.S. Trustee and counsel for the Creditors' Committee (if appointed). Any material changes to the DIP Documents must be filed with the Court and will require (i) the consents of the Requisite DIP Lenders, the requisite Prepetition Lenders required for any applicable action under the Prepetition Credit Agreement (the "Requisite Prepetition Lenders") and any other express written consents required by the DIP Documents (provided that, for the avoidance of doubt, increases in the amount of the loans under the DIP Facility shall further require the consent of all DIP Lenders whose commitments are being increased), and (ii) Court approval after notice and a hearing (which hearing may be held no sooner than two (2) business days after the filing of the proposed amendments with the Court and service of such amendments on (i) the U.S. Trustee, (ii)  the Creditors' Committee, if appointed, and (iii) all parties who have requested notice pursuant to Bankruptcy Rule 2002).

18.    Approved Budget.

(i)    The use of borrowings and other extensions of credit by the Debtors under the DIP Credit Agreement and the other DIP Documents shall be limited in accordance with the Approved Budget (subject to Permitted Variances). The Debtors have delivered to the DIP Lenders and the Prepetition Lenders a detailed thirteen (13) week budget that sets forth projected

CHAR2\2689298v14
US-DOCS\135159742.23

cash receipts and cash disbursements (by line item) on a weekly basis for the time period from and including the Petition Date through January 6, 2023 that has been approved by the Requisite DIP Lenders and the Requisite Prepetition Lenders, and a copy of which is attached hereto as Exhibit A (as updated, amended, supplemented or otherwise modified in accordance herewith, the "Approved Budget"). The Approved Budget shall also set forth, for each week, the amount of loans under the DIP Facility anticipated to be advanced or otherwise used for such week after giving effect to any budgeted inflows. Funds borrowed under the DIP Credit Agreement and Cash Collateral used under this Interim Order or the Final Order shall be used by the Debtors in accordance with the DIP Documents, including the Approved Budget (subject to Permitted Variances), this Interim Order and the Final Order. The consent of the Requisite DIP Lenders and the Requisite Prepetition Lenders to the Approved Budget shall not be construed as a commitment of the DIP Lenders to provide loans under the DIP Facility or of the DIP Lenders or the Prepetition Lenders to permit the use of Cash Collateral after the occurrence of a Termination Event (as defined herein) under this Interim Order or the Final Order, regardless of whether the aggregate funds shown on the Approved Budget have been expended.

(ii)    The Approved Budget and Approved Variance Report (as defined herein) shall, including any updates, amendments, supplements and modifications approved hereunder, at all times be in form and substance reasonably acceptable to the Requisite DIP Lenders and the Requisite Prepetition Lenders and approved by the DIP Agent (at the direction of the Requisite DIP Lenders) and the Prepetition Agent (at the direction of the Requisite Prepetition Lenders) and, after the Facility Termination Date (as defined in the DIP Credit Agreement), the Prepetition Agent (at the direction of the Requisite Prepetition Lenders) prior to the implementation thereof and shall not require further notice, hearing, or Court order.

CHAR2\2689298v14
US-DOCS\135159742.23

(iii)  Once every four (4) weeks, the Borrower may seek the approval of the DIP Agent (acting on behalf of the Requisite DIP Lenders) and, after the Facility Termination Date, the Prepetition Agent (acting on behalf of the Requisite Prepetition Lenders) to replace the Approved Budget (as in effect immediately prior to giving effect to any such replacement) with an updated budget (an "Updated Budget") delivered in accordance with the DIP Credit Agreement, which approval shall be made in writing (which may be provided by email) at the reasonable discretion of the DIP Agent or, after the Facility Termination Date, the Prepetition Agent; *provided*, that, if any DIP Lender, or after the Facility Termination Date, any Prepetition Lender, shall object to any such replacement, then the approval of such replacement shall be at the reasonable discretion of the Requisite DIP Lenders or, after the Facility Termination Date, the Requisite Prepetition Lenders; *provided*, *further*, that, the DIP Agent and the DIP Lenders, and after the Facility Termination Date, the Prepetition Agent and the Prepetition Lenders, shall be deemed to have approved of any such Updated Budget unless the DIP Agent or any DIP Lender, as applicable, or after the Facility Termination Date, the Prepetition Agent and the Prepetition Lenders, as applicable, shall have objected thereto by written notice to the Borrower within five (5) business days after receipt thereof, and if the DIP Agent (or the Requisite DIP Lenders, as applicable), or after the Facility Termination Date, the Prepetition Agent (or the Requisite Prepetition Lenders, as applicable), so approves of such replacement, then such Updated Budget shall become the Approved Budget; *provided*, *further*, *however*, that, to the extent that either the DIP Agent or any DIP Lender (or after the Facility Termination Date, the Prepetition Agent or any Prepetition Lender) does provide such objection notice within such five (5) business day period, the then-existing Approved Budget shall constitute the Approved Budget for the projection period, without giving effect to any update, modification or

26

supplement (with appropriate adjustments for the timing of monthly or semi-monthly disbursements), until such time as an Updated Budget is approved by the DIP Agent (or Requisite DIP Lenders, as applicable) or, after the Facility Termination Date, the Prepetition Agent (or Requisite Prepetition Lenders, as applicable) in each case, in its (or their) reasonable discretion.

(iv) The DIP Lenders (a) may assume the Debtors will comply with the Approved Budget (subject to Permitted Variances), (b) shall have no duty to monitor such compliance, and (c) shall not be obligated to pay (directly or indirectly from the DIP Collateral) any unpaid expenses incurred or authorized to be incurred pursuant to any Approved Budget other than to permit the Debtors' use of Cash Collateral as expressly provided herein prior to the occurrence of a Termination Event. Subject to the terms and conditions of this Interim Order and the Final Order, the DIP Lenders shall have the right, but not the obligation, to extend credit independent of any Approved Budget restrictions on loan availability set forth in the DIP Documents, and all loans under the DIP Facility shall be entitled to the benefits and protections of this Interim Order and the Final Order. For the avoidance of doubt, no DIP Lender shall be obligated to extend credit outside the terms of the DIP Documents.

(v) On or before 11:00 a.m. Eastern time on the fourth business day of each week (provided that the first Approved Variance Report (as defined herein) will be delivered commencing after the end of the first full week following the Petition Date), the Debtors shall deliver to the DIP Agent and the Prepetition Agent (with concurrent copies to the Creditors' Committee (if appointed) and the U.S. Trustee) a cash flow reconciliation and variance report in form and detail reasonably acceptable to the DIP Agent and the Prepetition Agent (an "Approved Variance Report") that shows (a) comparisons of actual results for each line item

27

against such line item in the Approved Budget for the prior periods ended and (b) for each Approved Variance Report delivered after the end of the third full week following the Petition Date, a report setting forth compliance or non-compliance with the Permitted Variance for such Variance Testing Period. As used herein, "Variance Testing Period" means the period from the Petition Date through the week most recently ended. The first Variance Testing Period shall be the period from the Petition Date through the end of the third full week following the Petition Date. As used herein, "Permitted Variance" means: (a) Total Operating Receipts (as defined in the Approved Budget) must not be less than, for all Variance Testing Periods, 90% of the budgeted amount for the applicable Variance Testing Period on a cumulative basis; and (b) Total Operating Disbursements (as defined in the Approved Budget) must not exceed, for all Variance Testing Periods, 110% of the budgeted amount for the applicable Variance Testing Period on a cumulative basis. The Approved Variance Report shall also provide a commercially reasonable narrative explanation of each variance. The DIP Agent shall promptly deliver to the DIP Lenders, and the Prepetition Agent shall promptly deliver to the other Prepetition Lenders, a copy of each Approved Variance Report upon such agent's receipt. For the avoidance of doubt, the cash disbursements considered for determining compliance with the Approved Budget shall exclude (i) the Debtors' disbursements in respect of professional fees paid to professionals of the Debtors and the Creditors' Committee (if appointed), and (ii) fees, costs and expenses of the DIP Agent and Prepetition Agent (collectively, "Restructuring Fees").

19.    Budget Compliance. The Debtors' payment of any expenses or other disbursements other than those set forth in the Approved Budget (subject to Permitted Variances) or otherwise permitted by the DIP Documents or this Interim Order, in each case without the written consent of the DIP Agent, shall constitute a Termination Event; *provided*, *however*, that in the case of the

Restructuring Fees, the Debtors shall pay such fees, costs and expenses in accordance with the DIP Documents and this Interim Order, and the Final Order, without being limited by the Approved Budget or constituting a Termination Event.

20.     <u>Modification of Automatic Stay</u>. The automatic stay imposed under section 362(a) of the Bankruptcy Code is hereby modified as necessary to effectuate all of the terms and provisions of this Interim Order, including, without limitation, to: (a) permit the Debtors to grant the DIP Liens, Adequate Protection Liens, DIP Superpriority Claim, and Adequate Protection Superpriority Claims; (b) permit the Debtors to perform such reasonable acts as the DIP Agent, DIP Lenders or the Prepetition Secured Parties may request, each in its reasonable discretion, to assure the perfection and priority of the liens granted herein; (c) permit the DIP Agent and Prepetition Agent, to file, as each in its sole discretion deems necessary or advisable, such financing statements, mortgages, notices of liens and other similar documents to perfect in accordance with applicable non-bankruptcy law or to otherwise evidence the DIP Liens and Adequate Protection Liens; (d) permit the Debtors to incur all liabilities and obligations to the DIP Agent, DIP Lenders, and Prepetition Secured Parties under the DIP Documents, the DIP Facility and this Interim Order; (e) authorize the Debtors to pay, and the DIP Agent, the DIP Lenders and the Prepetition Secured Parties to retain and apply, payments made in accordance with the terms of this Interim Order and the DIP Documents; (f) upon entry of the Final Order, authorize the Debtors to segregate collections and apply such collections to the Prepetition Obligations as set forth therein; and (f) permit the Debtors and DIP Agent to take any other actions necessary and appropriate to implement the terms of this Interim Order and the DIP Documents, including, without limitation, the implementation of applicable reserves.

21.  <u>Perfection of DIP Liens and Adequate Protection Liens</u>. This Interim Order shall be sufficient and conclusive evidence of the validity, perfection, and priority of all liens granted herein, including the DIP Liens and the Adequate Protection Liens, without the necessity of (i) filing or recording any financing statement, deed of trust, mortgage, or other instrument or document that may otherwise be required under the law of any jurisdiction, (ii) obtaining "control" (as defined in any applicable Uniform Commercial Code or other law) over any DIP Collateral (and the DIP Agent shall be deemed, without any further action, to have control over all the Debtors' deposit accounts, securities accounts and commodities accounts within the meaning of such Uniform Commercial Code and other law) or (iii) taking any other action to validate or perfect the DIP Liens and Adequate Protection Liens or to entitle the DIP Liens and Adequate Protection Liens to the priorities granted herein. Notwithstanding the foregoing, the DIP Agent and the Prepetition Agent each are authorized to file, as each in its sole discretion deems necessary or advisable, such financing statements, mortgages, notices of liens and other similar documents to perfect in accordance with applicable non-bankruptcy law or to otherwise evidence the DIP Liens and Adequate Protection Liens, and all such financing statements, mortgages, notices and other documents shall be deemed to have been filed or recorded as of the Petition Date; *provided, however*, that no such filing or recordation shall be necessary or required in order to create or perfect the DIP Liens or Adequate Protection Liens. The Debtors are authorized to execute and deliver promptly upon demand to the DIP Agent and the Prepetition Agent all such financing statements, mortgages, notices and other documents as the DIP Agent or Prepetition Agent may reasonably request. The DIP Agent and Prepetition Agent, each in its discretion, may file a photocopy of this Interim Order as a financing statement, notice of lien or similar instrument with any filing or recording office or with any registry of deeds or similar office, in addition to or in

30

lieu of such financing statements, notices of lien or similar instrument. To the extent that the Prepetition Agent is the secured party under any security agreement, guaranty, pledge agreement, deed, mortgage, leasehold mortgage, landlord waiver, credit card processor notices or agreements, bailee letters, custom broker agreements, transfer power, financing statement, fixture filing, deposit account control agreements or securities account control agreements, listed as loss payee, lender loss payee, mortgagee or additional insured under any of the Debtors' insurance policies, or is the secured party under any of the Prepetition Credit Documents (the foregoing collectively, the "Ancillary Collateral Documents"), the DIP Agent shall also be deemed to be the secured party under such Ancillary Collateral Documents, shall have all rights and powers attendant to that position (including rights of enforcement), and shall act in that capacity and distribute any proceeds recovered or received in accordance with the DIP Documents.

22.     <u>Protections of Rights of DIP Agent, DIP Lenders and Prepetition Secured Parties</u>. Through the applicable Consummation Date (as defined herein), the Debtors (and/or their legal and financial advisors in the case of clauses (ii) through (iv) below) will: (i) maintain books, records, and accounts to the extent and as required by the DIP Documents and the Prepetition Credit Documents; (ii) reasonably cooperate with, consult with, and provide to the DIP Agent and the Prepetition Agent all such information and documents that any or all of the Debtors are obligated (including upon request by any of the DIP Agent or the Prepetition Agent) to provide under the DIP Documents, Prepetition Credit Documents, or the provisions of this Interim Order; (iii) permit, upon reasonable advance written notice to the Debtors, consultants, advisors and other representatives (including third party representatives) of each of the DIP Agent and the Prepetition Agent to visit and inspect any of the Debtors' respective properties, to examine and make abstracts or copies from any of their respective books and records, to tour the Debtors' business premises

31

and other properties, and to discuss, and provide advice with respect to, their respective affairs, finances, properties, business operations, and accounts with their respective officers, employees, independent public accountants and other professional advisors (other than legal counsel) as and to the extent required by the DIP Documents and/or the Prepetition Credit Documents as applicable, in each case at reasonable times during normal business hours; (iv) at the reasonable request of the DIP Agent or Prepetition Agent, upon reasonable advance written notice to the Debtors, permit the DIP Agent and the Prepetition Agent and their respective consultants, advisors and other representatives to consult with the Debtors' management and advisors on matters concerning the Debtors' businesses, financial condition, operations and assets, at reasonable times during normal business hours; and (v) permit, upon reasonable advance written notice to the Debtors, the DIP Agent and the Prepetition Agent and their respective consultants, advisors and other representatives to conduct, at their reasonable discretion and at the Debtors' cost and expense, field audits, collateral examinations and inventory appraisals at reasonable times during normal business hours, in respect of any or all of the DIP Collateral and the Prepetition Collateral; *provided*, that any DIP Lender or Prepetition Lender and its respective consultants, advisors or other representatives may join the DIP Agent and/or the Prepetition Agent, as applicable, in connection with the exercise of any of the foregoing rights. As used herein, the term "Consummation Date" shall mean (1) with respect to any matters relating to the DIP Credit Agreement, the date upon which the Facility Termination Date has occurred within the meaning of the DIP Credit Agreement, and (2) with respect to any matters relating to the Prepetition Credit Agreement, the date upon which (A) the Debtors have confirmed a chapter 11 plan or plans of reorganization or liquidation in each of the Cases with the consent of the Prepetition Agent and the Requisite Prepetition Lenders, and (B) each such plan (or plans) has been substantially

consummated. Notwithstanding anything to the contrary in herein, the Debtors shall not be required to disclose, or to permit the inspection or discussion of, any document, information or other matter (I) that constitutes trade secrets or proprietary information, (II) in respect of which disclosure to the DIP Agent, the Prepetition Agent, the DIP Lenders or the Prepetition Lenders (or any of their respective representatives) is prohibited by applicable law, fiduciary duty, or any binding agreement (*provided*, that, such binding agreement was not entered into in contemplation of the limitations of this clause (II)), or (III) that is subject to attorney client or similar privilege, or constitutes attorney work product.

23.    Proceeds of Subsequent Financing. If the Debtors, any trustee, any examiner with enlarged powers, or any responsible officer subsequently appointed in these Cases or any Successor Cases, shall obtain credit or incur debt pursuant to Bankruptcy Code sections 364(b), 364(c) or 364(d) in violation of the DIP Documents or this Interim Order at any time prior to the Facility Termination Date, including subsequent to the confirmation of any plan with respect to any or all of the Debtors and the Debtors' estates, and such facilities are secured by any DIP Collateral, then all the cash proceeds derived from such credit or debt shall immediately be turned over to the DIP Agent to be applied in accordance with this Interim Order and the DIP Documents.

24.    Cash Collection and Cash Management. From and after the date of the entry of this Interim Order, all collections and cash proceeds of any DIP Collateral, Prepetition Collateral, accounts, checks and other items of payment or services provided by any Debtor and all Cash Collateral that shall at any time come into the possession, custody, or control of any Debtor, or to which any Debtor is now or shall become entitled at any time, shall be handled in accordance with the DIP Credit Agreement and the Cash Management Orders (as defined herein). Upon the direction of the DIP Agent, at any time after the occurrence of the DIP Termination Date (defined

herein), and subject to the provisions of paragraph 28 and the rights in favor of the Cash Management Banks set forth in the Cash Management Orders, all cash proceeds shall be remitted to the DIP Agent for application in accordance with the DIP Documents and this Interim Order. Each of the Debtors shall establish and maintain cash management arrangements and procedures in accordance with the DIP Documents and any interim and final cash management orders entered by the Court (the "Cash Management Orders"), which shall be in form and substance reasonably acceptable to the DIP Agent and the Prepetition Agent. Unless otherwise agreed to in writing by the DIP Agent and Prepetition Agent, the Debtors shall maintain no deposit accounts except those identified in or opened pursuant to the Cash Management Orders. The Debtors and the Cash Management Banks are authorized and directed to remit, without offset or deduction, funds in such accounts upon receipt of any direction to that effect from the DIP Agent or Prepetition Agent, subject to the provisions of paragraph 28 of this Interim Order and subject to the rights in favor of Cash Management Banks set forth in the Cash Management Orders.

25.    <u>Maintenance of DIP Collateral</u>. Until the Consummation Date, the Debtors shall: (a) insure the DIP Collateral as required under the DIP Credit Agreement and the Prepetition Credit Documents; and (b) cause the DIP Collateral to be maintained in compliance with the requirements of the DIP Documents and the Prepetition Credit Documents.

26.    <u>Disposition of DIP Collateral</u>. Until the Consummation Date, except as otherwise provided for in the DIP Documents, the Debtors shall not sell, transfer, lease, encumber or otherwise dispose of any portion of the DIP Collateral or the Prepetition Collateral other than in the ordinary course of business without the prior written consent of the DIP Agent (at the direction of the Requisite DIP Lenders), and the Prepetition Agent (at the direction of the Requisite Prepetition Lenders) (not to be unreasonably withheld), and no such consent shall be implied, from

any other action, inaction or acquiescence by the DIP Agent, DIP Lenders, or the Prepetition

Secured Parties, or from any order of this Court; *provided*, that at least five (5) business days prior

to seeking such authorization, the Debtors shall consult in good faith with the DIP Agent and

Prepetition Agent concerning the proposed sale, transfer, lease, encumbrance or other disposition

of such property.

27.    <u>Termination Events</u>. The occurrence of any of the following events, unless waived

in writing in accordance with the DIP Documents, shall constitute a "<u>Termination Event</u>" (and

collectively, the "<u>Termination Events</u>"): (a) the failure of the Debtors to perform, in any respect,

any of the terms, provisions, conditions, covenants, or obligations under this Interim Order; (b) any

Debtor seeks any modification or extension of this Interim Order or the Final Order without the

consent of the Requisite DIP Lenders and the Requisite Prepetition Lenders; (c) any application is

filed by any Debtor for the approval of (or an order is entered by the Court approving) any claim

arising under section 507(b) of the Bankruptcy Code or otherwise, or any lien in any of the Cases,

which is *pari passu* with or senior to the DIP Obligations, the DIP Liens, the DIP Superpriority

Claim, the Prepetition Obligations, the Adequate Protection Liens or the Adequate Protection

Superpriority Claims (except to the extent granted by this Interim Order); (d) the (i)

commencement of any action by any Debtor or (ii) support by any Debtor of the commencement

of any action by any other party-in-interest with standing against any of the DIP Agent, the DIP

Lenders or the Prepetition Secured Parties, or their respective agents and employees, to subordinate

or avoid any liens made in connection with the Prepetition Credit Documents or the DIP

Documents or to avoid any obligations incurred in connection with the Prepetition Credit

Documents or the DIP Documents; (e) any order shall be entered granting relief from the stay

arising under section 362 of the Bankruptcy Code to the holder or holders of any security interest,

lien or right of setoff to permit foreclosure (or the granting of a deed in lieu of foreclosure or similar instrument), possession, set-off or any similar remedy with respect to any assets of the Debtors with an aggregate value of more than $5,000,000; (f) any Debtor shall assert in any pleading filed in any court that any material provision of this Interim Order or the Final Order is not valid and binding for any reason; (g) any Debtor files, withdraws or modifies a motion to approve the sale of all or substantially all of the Debtors' assets without the prior written consent of the Requisite DIP Lenders and the Requisite Prepetition Lenders; (h) any Debtor shall fail in any material respect to comply with any provisions in the DIP Credit Agreement or the Prepetition Credit Agreement governing the maintenance of the Debtors' insurance coverage on the DIP Collateral; or (i) the occurrence of an "Event of Default" under the DIP Credit Agreement.

       28.    <u>Rights and Remedies Upon Occurrence of Termination Event</u>. Upon the occurrence and during the continuation of a Termination Event and notwithstanding the provisions of section 362 of the Bankruptcy Code, but subject to the expiration of the Remedies Notice Period (as defined herein):

       (i)    the DIP Agent, in its discretion or at the direction of the Requisite DIP Lenders, may declare (a) all DIP Obligations owing under the DIP Documents to be immediately due and payable, (b) the termination, reduction or restriction of any further commitment to extend credit to the Debtors to the extent any such commitment remains, (c) the termination of the DIP Facility and the DIP Documents as to any future liability or obligation of the DIP Agent and the DIP Lenders, but without affecting any of the DIP Liens or the DIP Obligations, (d) that the Carve-Out has been triggered through the delivery of the Carve-Out Termination Notice (as defined herein), (e) the termination, reduction or restriction on the ability of the Debtors to use Cash Collateral other than in accordance with

this paragraph 28, and (f) the imposition of the default rate of interest set forth in the DIP Credit Agreement; and

(ii)    the Prepetition Agent, in its discretion or at the direction of the Requisite Prepetition Lenders, may declare the termination, reduction or restriction on the ability of the Debtors to use Cash Collateral other than in accordance with this paragraph 28.

Either of the foregoing shall be referred to as a "Termination Declaration". The Termination Declaration shall be given by electronic mail or facsimile (or other electronic means) to counsel to the Debtors, counsel to the Creditors' Committee (if appointed), and the U.S. Trustee (and the earliest date any such Termination Declaration is made shall be referred to herein as the "Termination Declaration Date"). Any automatic stay otherwise applicable to the DIP Agent, DIP Lenders, and the Prepetition Secured Parties is hereby modified so that four (4) business days after the Termination Declaration Date (such four (4) business day period, the "Remedies Notice Period") the DIP Agent or the Prepetition Agent, as applicable, shall be entitled to immediately exercise its rights and remedies in accordance with the DIP Documents, the Prepetition Credit Documents and/or this Interim Order, as the case may be, and shall be permitted to satisfy the DIP Obligations, the DIP Superpriority Claim, the DIP Liens, the Prepetition Secured Parties Adequate Protection Liens, and the Prepetition Secured Parties Adequate Protection Superpriority Claim, as applicable, in each case subject to the Carve-Out. During the Remedies Notice Period (A) the Debtors may use Cash Collateral solely to pay payroll and other expenses critical to keep the business of the Debtors operating in accordance with the Approved Budget, and (B) the Debtors and/or the Creditors' Committee shall be entitled to seek an emergency hearing before the Court, within the Remedies Notice Period, for the purpose of contesting whether a Termination Event has occurred and/or is not continuing and such other matters as the parties may raise or the Court may

37

wish to consider. Unless the Court determines otherwise during the Remedies Notice Period, the automatic stay, as to the DIP Agent and the Prepetition Agent, shall automatically be terminated at the end of the Remedies Notice Period without further notice or order. Upon expiration of the Remedies Notice Period, the DIP Agent and the Prepetition Agent respectively shall be permitted to exercise all remedies set forth herein, in the DIP Documents and/or the Prepetition Credit Documents, and as otherwise available at law without further order of or application or motion to the Court; *provided*, that so long as there are any DIP Obligations outstanding, or the DIP Lenders' commitments to extend credit under the DIP Documents are in effect, no Prepetition Secured Party shall be permitted to take any action in the Court or otherwise related to the enforcement of the Prepetition Secured Parties Adequate Protection Liens without the prior written consent of the DIP Agent and the Requisite DIP Lenders.

29.    <u>DIP Termination Date</u>. Upon the earlier of (a) the expiration of the Remedies Notice Period or (b) the termination of the DIP Credit Agreement in accordance with the terms of this Interim Order or the DIP Documents (whether by acceleration or otherwise) (the "<u>DIP Termination Date</u>"), the Debtors' authority to borrow and obtain other credit accommodations from the DIP Agent and the DIP Lenders pursuant to the terms of this Interim Order and the DIP Documents shall terminate automatically without any application, motion or notice to, hearing before, or order of the Court (unless permitted by the DIP Agent and the Requisite DIP Lenders), and (x) all DIP Obligations shall be immediately due and payable, (y) all commitments to extend credit under the DIP Facility will terminate, and (z) the DIP Agent, in its discretion or at the direction of the Requisite DIP Lenders, or the Prepetition Agent, in its discretion or at the direction of the Requisite Prepetition Lenders, may declare that the Debtors' authority to use Cash Collateral has ceased or is restricted to the extent set forth in paragraph 28 above. Upon the occurrence and

38

during the continuance of a Termination Event, and during the pendency of any Remedies Notice Period, the DIP Lenders shall have no further obligation to provide financing under the DIP Documents.

30.      Good Faith Under Section 364(e) of the Bankruptcy Code; No Modification or Stay of this Interim Order. The DIP Agent, DIP Lenders and the Prepetition Secured Parties have acted in good faith in connection with this Interim Order and are entitled to rely upon the protections granted herein and by section 364(e) of the Bankruptcy Code. Based on the findings set forth in this Interim Order and the record made during the Interim Hearing, and in accordance with section 364(e) of the Bankruptcy Code, in the event any or all of the provisions of this Interim Order are hereafter reargued, reconsidered, reversed, modified, amended or vacated by a subsequent order of this Court or any other court, the DIP Agent, the DIP Lenders and the Prepetition Secured Parties are entitled to the protections provided in section 364(e) of the Bankruptcy Code to the maximum extent set forth therein.

31.      DIP and Other Expenses. The Debtors are authorized and directed to pay all reasonable and documented out-of-pocket expenses of the DIP Agent incurred in connection with the DIP Facility and the preparation and negotiation of the DIP Documents, as provided in the DIP Documents, whether or not the transactions contemplated hereby are consummated, including without limitation, legal, accounting, collateral examination, monitoring and appraisal fees, financial advisory fees, fees and expenses of other consultants, and indemnification and reimbursement of fees and expenses and, without duplication, any such similar fees and expenses of the Prepetition Agent in connection with the DIP Facility, the Prepetition Credit Agreement and the rights of Prepetition Secured Parties under this Interim Order (collectively, the "DIP Negotiation Expenses"). Payment of all such DIP Negotiation Expenses shall not be subject to

allowance by the Court or any Fee Objection (as defined herein). Professionals for the DIP Agent and the Prepetition Agent shall not be required to comply with the U.S. Trustee fee guidelines; provided, however, that on or before receiving payment or reimbursement after the Petition Date for any professional fees (other than the DIP Negotiation Expenses) incurred by the DIP Agent pursuant to the DIP Documents or the Prepetition Agent pursuant to the Prepetition Credit Agreement, the DIP Agent or the Prepetition Agent, as applicable, shall provide a summary fee statement along with a summary of tasks performed by all professionals during such period (such statement, a "Fee Statement") to the U.S. Trustee and counsel for the Creditors' Committee (if appointed) contemporaneously with the delivery thereof to the Debtors. To the extent that the Debtors, the U.S. Trustee, or Creditors' Committee (if appointed) has an objection to the reasonableness of the fees and expenses of any such professional, and cannot resolve the objection within ten (10) days of receipt of the Fee Statement, then the Debtors, the U.S. Trustee, or Creditors' Committee (if appointed) shall file with this Court and serve on such professionals an objection (the "Fee Objection") limited to the issue of the reasonableness of such professionals' fees and expenses, and any failure by the Debtors, the U.S. Trustee, or Creditors' Committee to file a Fee Objection within the ten (10) day period shall constitute a waiver of any right of such party to object to the applicable Fee Statement. The Fee Statement shall not be required to comply with any particular format, may be in summary form only, but must at a minimum include a general, brief description of the nature of the matters worked on, a list of the professionals who worked on the matter, their hourly rate (if such professionals bill at an hourly rate), the number of hours each professional billed and, with respect to the invoices of law firms, shall include the year of law school graduation for each attorney; provided, that the Debtors, the U.S. Trustee, and Creditors' Committee reserve the right to seek that copies of such invoices containing the detailed

time entries of the applicable professional be provided to such party (and each applicable professional reserves all rights to object to such request and to redact privileged, confidential or sensitive information from any information provided to such parties). Any objection to, and any hearing on an objection to, payment of any fees, costs, and expenses set forth in a Fee Statement shall be limited to the reasonableness of the particular items or categories of the fees, costs, and expenses that are the subject of such objection. The Debtors shall promptly pay (a) the undisputed fees, costs, and expenses reflected on any Fee Statement to which a Fee Objection has been timely filed, (b) all fees, costs and expenses on any invoice to which no Fee Objection has been timely filed and (c) all fees, costs and expenses subject to a Fee Objection that are ultimately allowed by a final, non-appealable order resolving such Fee Objection, or pursuant to a consensual resolution of the Fee Objection reached by the DIP Agent or Prepetition Agent (as the case may be) and the party timely submitting such Fee Objection. All unpaid fees, costs, expenses, and charges of the DIP Agent or the Prepetition Agent, as applicable, that have not been disallowed by this Court on the basis of a timely filed Fee Objection shall constitute DIP Obligations and shall be secured by the DIP Collateral. Effective upon entry of the Final Order providing for such relief, any and all fees, commissions, costs, and expenses paid prior to the Petition Date by any Debtor to the DIP Agent in connection with or with respect to the DIP Facility or DIP Documents or to the Prepetition Agent in connection with or with respect to the Prepetition Credit Agreement are approved in full and nonrefundable and shall not otherwise be subject to any challenge.

32.    Indemnification. The Debtors shall indemnify and hold harmless the DIP Agent and the DIP Lenders in accordance with the terms and conditions of the DIP Credit Agreement.

33.    Recharacterization. In the event that it is determined by a final order that the Prepetition Secured Parties are not entitled to the payment of some or all of the fees, expenses, or

41

other amounts described in paragraph 15 of this Interim Order as adequate protection for the Diminution in Value of their interests in the Prepetition Collateral, and the Prepetition Secured Parties are determined to be undersecured or unsecured, then such fees, expenses, interest payments, or other amounts, as applicable, shall be applied as a payment made to be applied to the principal balance of the secured portion of the Prepetition Obligations. All defenses to any effort to recharacterize the payments described in this paragraph are expressed reserved.

34.     <u>Proofs of Claim</u>. The Prepetition Secured Parties will not be required to file proofs of claim in any of the Cases or Successor Cases for any of the Prepetition Obligations. Notwithstanding any order entered by the Court in relation to the establishment of a bar date in any of the Cases or Successor Cases to the contrary, the Prepetition Agent on behalf of itself and the Prepetition Secured Parties is hereby authorized and entitled, in its sole discretion, but not required, to file (and amend and/or supplement, as it sees fit) a proof of claim and/or aggregate proofs of claim in each of the Cases or Successor Cases for any of the Prepetition Obligations. Any proof of claim filed by the Prepetition Agent shall be deemed to be in addition to and not in lieu of any other proof of claim that may be filed by any of the Prepetition Secured Parties. Any order entered by the Court in relation to the establishment of a bar date in any of the Cases or Successor Cases shall not apply to the DIP Agent, the DIP Lenders or the Prepetition Secured Parties.

35.     <u>Consent to Priming and Adequate Protection</u>. The Prepetition Agent, on behalf of itself and the other Prepetition Secured Parties, consents to the Adequate Protection Liens and Adequate Protection Superpriority Claim and the priming provided for herein; *provided, however,* that the consent of the Prepetition Agent, on behalf of itself and the other Prepetition Secured Parties, to the priming of the Prepetition Liens and the use of Cash Collateral is expressly

42

conditioned upon the entry of this Interim Order, and such consent shall not be deemed to extend to any other Cash Collateral usage or other replacement financing or debtor-in-possession financing other than the DIP Facility provided under the DIP Documents; and *provided, further,* that such consent shall be of no force and effect in the event this Interim Order is not entered or is entered and subsequently reversed, modified, stayed, or amended (unless such reversal, modification, stay, or amendment is acceptable to the Prepetition Agent and the Requisite Prepetition Lenders) or the DIP Documents and DIP Facility as set forth herein are not approved.

36.    <u>Right to Seek Additional Adequate Protection</u>. The Court finds that the adequate protection provided herein is reasonable to protect the interests of the Prepetition Secured Parties. However, the Prepetition Agent, on behalf of the Prepetition Secured Parties, may request Court approval for additional or alternative adequate protection, without prejudice to any objection of the Debtors or any other party in interest to the grant of any additional or alternative adequate protection; *provided* that any additional or alternative adequate protection shall at all times be subordinate and junior to the claims and liens of the DIP Agent and DIP Lenders granted under this Interim Order and the DIP Documents. The consent of the Prepetition Secured Parties to the priming of the Prepetition Liens by the DIP Liens, the Adequate Protection Liens and the Carve-Out and the Debtors' use of Cash Collateral on the terms set forth herein does not constitute, and shall not be construed as constituting, an acknowledgment or stipulation by the Prepetition Secured Parties that their respective interests in the Prepetition Collateral are adequately protected pursuant to this Interim Order or otherwise.

37.    <u>Carve-Out</u>.

(i)      Subject to the terms and conditions set forth herein, the DIP Liens, DIP Superpriority Claim, Prepetition Liens, Adequate Protection Liens, and Adequate Protection

43

Superpriority Claims shall be subject to the payment of the Carve-Out. As used in this Interim Order, the "Carve-Out" means the following expenses, subject, in each case, to application of any retainers that may be held by the applicable professionals as well as proceeds from unencumbered assets then currently available: (a) in the event of the occurrence and during the continuance of an Event of Default under the DIP Documents, the payment of unpaid professional fees, costs and disbursements ("Professional Fees") incurred by the Debtors and the Creditors' Committee appointed in the Cases (exclusive of success fees or transaction fees of similar type of nature which are addressed and specified below), in each case to the extent approved by the Court at any time, in an aggregate amount not to exceed the amount of such unpaid Professional Fees incurred prior to the delivery of a Carve-Out Termination Notice (the "Pre-Trigger Amount Professional Fees"), whether or not such fees are allowed prior to or after delivery of a Carve-Out Termination Notice; (b) up to a maximum amount of $2,500,000 of Professional Fees (exclusive of such fees described in clause (c) immediately following this clause (b)) accrued or incurred following the delivery of a Carve-Out Termination Notice in each case to the extent allowed by the Court at any time; (c) all amounts earned by Rothschild & Co US Inc. ("Rothschild & Co") as a Minority M&A Transaction Fee, a Control M&A Transaction Fee, or a New Capital Fee (in each case, as defined in that certain Letter Agreement, dated as of April 8, 2022, by and between Rothschild & Co and the Borrower, as amended by that certain Amendment to Letter Agreement, dated as of August 9, 2022), in each case to the extent allowed by the Court at any time, provided that such amounts, other than the New Capital Fee on account of the DIP Facility, (x) are earned in respect of a transaction implemented through a chapter 11 plan or sale of assets pursuant to section 363 of the Bankruptcy Code, including through a credit bid by the Prepetition Secured Parties, the DIP Agent (on behalf of the DIP Lenders) or any of the DIP Lenders, or (y) are otherwise supported by the

Requisite DIP Lenders and the Requisite Prepetition Lenders (clauses (b) and (c), the "Wind-Down Carve-Out Amounts"); (d) fees assessed pursuant to 28 U.S.C. Section 1930(a)(6); (e) fees due the Clerk of Court; and (f) all reasonable fees and expenses incurred by a trustee under section 726(b) of the Bankruptcy Code in an amount not to exceed $50,000. As used in this Interim Order, the term "Carve-Out Termination Notice" means the DIP Agent's delivery (and, following the Facility Termination Date, the Prepetition Agent's delivery) of a written notice to the Debtors, the U.S. Trustee and counsel to the Creditors' Committee (if appointed) following the occurrence and during the continuation of a Termination Event, expressly stating that the Wind-Down Carve-Out Amounts are invoked. Upon the Debtors' receipt of a Carve-Out Termination Notice, the Wind-Down Carve-Out Amounts and any Pre-Trigger Amount Professional Fees not yet paid or disbursed to the applicable professional (including reasonably estimated fees not yet allowed for the period through and including the date of the Carve-Out Termination Notice) (collectively, the "Carve-Out Fees") shall immediately be funded in an escrow account (the "Carve-Out Escrow") with an escrow agent selected by the Debtors and approved by the DIP Agent and the Prepetition Agent (which such approval shall not be unreasonably withheld, conditioned or delayed) pursuant to an escrow agreement reasonably acceptable to the DIP Agent and the Prepetition Agent, from any and all available Cash Collateral or cash held by the Debtors and, if the then-available cash and Cash Collateral is not sufficient to cover the Carve-Out Fees, the first proceeds from the sale or sales of the DIP Collateral until the Carve-Out Fees are fully funded into the Carve-Out Escrow. The Carve-Out Escrow shall be subject to a first-priority lien securing the Carve-Out Fees, a second-priority lien securing the DIP Obligations and a third-priority lien securing the Adequate Protection Superpriority Claims. Notwithstanding anything to the contrary herein, upon the delivery of a Carve-Out Termination Notice, the DIP Agent (and, following the

CHAR2\2689298v14
US-DOCS\135159742.23

Facility Termination Date, the Prepetition Agent) shall be required to transfer cash that it sweeps, receives or forecloses upon at all times from and after the delivery of a Carve-Out Termination Notice into the Carve-Out Escrow until such time as the Carve-Out Fees have been fully funded into the Carve-Out Escrow; *provided* that prior to the funding of the Carve-Out Escrow the Debtors shall provide the DIP Agent and the Prepetition Agent with such information and supporting documents as the DIP Agent and the Prepetition Agent may reasonably request to confirm the amount of the Carve-Out Fees. For the avoidance of doubt, upon delivery of a Carve-Out Termination Notice, in no instance shall any DIP Obligations or Prepetition Obligations be repaid until the Carve-Out Escrow is fully funded or as further set forth in other order(s) of the Court. So long as no Carve-Out Termination Notice has been delivered, the Debtors shall be permitted to pay compensation and reimbursement of expenses to third-party professionals allowed and payable under sections 330 and 331 of the Bankruptcy Code, but solely as allowed at any time by the Court, regardless of whether allowed by interim order, procedural order or otherwise; *provided*, that, for the avoidance of doubt, the payment of such compensation and reimbursement of such expenses prior to the delivery of a Carve-Out Termination Notice shall not reduce the applicable Wind-Down Carve-Out Amount. No portion of the Carve-Out may be used in contravention of the restrictions or the limitations on the use of the Carve-Out set forth in this Interim Order.

> (ii) *No Direct Obligation to Pay Professional Fees.* The DIP Agent, the DIP Lenders, and the Prepetition Secured Parties shall not be responsible for the direct payment or reimbursement of any fees or disbursements of any third-party professionals incurred in connection with the Cases or any Successor Cases under any chapter of the Bankruptcy Code. Nothing in this Interim Order or otherwise shall be construed to obligate the DIP Agent, the DIP Lenders or the Prepetition Secured Parties in any way to pay compensation to or to reimburse

46

expenses of any third-party professionals, or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

(iii)    *Payment of Carve-Out After Carve-Out Termination Notice.* Any payment or reimbursement made on or after the date of the delivery of the Carve-Out Termination Notice in respect of any Carve-Out Fees accrued or incurred after delivery of the Carve-Out Termination Notice shall permanently reduce the applicable component of the Carve-Out Fees on a dollar-for-dollar basis. For the avoidance of doubt, payment or reimbursement of Wind-Down Carve-Out Amounts shall reduce the component of the Carve-Out relating to Wind-Down Carve-Out Amounts, and any payment or reimbursement of Pre-Trigger Amount Professional Fees shall reduce the component of the Carve-Out relating to Pre-Trigger Amount Professional Fees.

38.    <u>Limitations on Use of DIP Proceeds, Cash Collateral and Carve-Out</u>. No loans and/or proceeds from the DIP Facility, DIP Collateral, Cash Collateral (including any retainer held by any professionals for the below-referenced parties), Prepetition Collateral, or any portion of the Carve-Out may be used by any Debtor, the Creditors' Committee (if appointed) or trustee or other estate representative appointed in the Cases or any Successor Cases, or any other person, party, or entity (including any of the Debtors' professionals, the Creditors' Committee's professionals or the individual members of the Creditors' Committee) to: (i) investigate (except as set forth below) or prosecute any challenge (including any litigation or other action) in connection with the value of the Prepetition Collateral or the DIP Collateral (or to pay any professional fees and disbursements incurred in connection therewith) at any time; (ii) (a) request or seek authorization to obtain postpetition loans or other financial accommodations pursuant to section 364(c) or (d) of the Bankruptcy Code, or otherwise, other than from the DIP Agent and DIP Lenders, (b) request or seek any modification to this Interim Order not approved by the DIP Agent and, to the extent

CHAR2\2689298v14
US-DOCS\135159742.23

such modification would affect the rights of any of the Prepetition Secured Parties, the Prepetition Agent or (c) pay any professional fees and disbursements incurred in connection with any of the foregoing; or (iii) investigate (except as set forth below), assert, join, commence, support, or prosecute any action for any claim, counter-claim, action, proceeding, application, motion, objection, defense, or other contested matter seeking any order, judgment, determination, or similar relief against, or adverse to the interests of, in any capacity, any or all of the DIP Agent, DIP Lenders or Prepetition Secured Parties, their respective affiliates, assigns or successors and the respective officers, directors, employees, agents, attorneys, representatives and other advisors of the foregoing, with respect to any transaction, occurrence, omission, action, or other matter (including formal or informal discovery proceedings in anticipation thereof), including, without limitation, (a) any challenges and any avoidance actions or other actions arising under chapter 5 of the Bankruptcy Code, (b) any action with respect to the validity, enforceability, priority, extent or amount of the DIP Obligations and/or the Prepetition Obligations, or the validity, extent, and/or priority of the DIP Liens, the Prepetition Liens, or the Prepetition Secured Parties Adequate Protection Liens, (c) any action seeking to invalidate, set aside, avoid, or subordinate, in whole or in part, (I) the DIP Liens, the Prepetition Liens, the Prepetition Secured Parties Adequate Protection Liens or any other adequate protection provided to the Prepetition Secured Parties pursuant to the terms of this Interim Order or the Final Order or (II) any of the DIP Obligations or the Prepetition Obligations, (d) subject to the right of the Debtors to seek an emergency hearing as permitted in paragraph 28, any action seeking, or having the effect of, preventing, hindering, or otherwise delaying (I) the DIP Agent's assertion, enforcement, or realization on the Cash Collateral or the DIP Collateral in accordance with the DIP Documents or this Interim Order, as applicable, or (II) the Prepetition Agent's assertion, enforcement, or realization on the Cash

CHAR2\2689298v14
US-DOCS\135159742.23

Collateral, the Prepetition Secured Parties Adequate Protection Liens or the Prepetition Collateral in accordance with the Prepetition Credit Documents or this Interim Order, as applicable, (e) any action seeking to modify any of the rights, remedies, priorities, privileges, protections, and benefits granted to any or all of the DIP Agent, DIP Lenders and Prepetition Secured Parties hereunder or under the DIP Documents or the Prepetition Credit Documents, as applicable, or any payments made thereunder or in respect thereof, or (f) use or seek to use Cash Collateral or sell or otherwise dispose of DIP Collateral or Prepetition Collateral, unless otherwise permitted hereby or by the DIP Documents, without the prior written consent of the DIP Agent, at the direction of the Requisite DIP Lenders, and the Prepetition Agent, at the direction of the Requisite Prepetition Lenders. Notwithstanding the foregoing, up to $50,000 in the aggregate of the Carve-Out, any DIP Collateral, any Prepetition Collateral, any Cash Collateral and proceeds of the DIP Facility may be used by the Creditors' Committee (if appointed) to investigate (but not to draft, file or prosecute claims or challenges relating to) the claims and/or liens of the Prepetition Secured Parties under the Prepetition Credit Documents (but not the claims and/or liens of the DIP Agent and DIP Lenders) so long as such investigation occurs within the Challenge Period (as defined herein).

39.    <u>Payment of Compensation</u>. Nothing herein shall be construed as a consent to the allowance of any professional fees or expenses of any third-party professionals or shall affect the right of the DIP Agent, the DIP Lenders, or the Prepetition Secured Parties to object to the allowance and payment of such fees and expenses.

40.    <u>Reservation of Certain Third-Party Rights and Bar of Challenges and Claims</u>. The findings set forth in this Interim Order and the Debtors' Stipulations shall be binding upon the Debtors in all circumstances upon entry of this Interim Order. Nothing in this Interim Order or the DIP Documents shall prejudice the rights in any of the Cases of the Creditors' Committee (if

appointed), a successor trustee and any other party-in-interest with requisite standing other than the Debtors, to seek to object to or to challenge (collectively, a "Challenge") the findings set forth in this Interim Order or the Debtors' Stipulations, including, but not limited to those in relation to: (i) the amount, validity, extent, priority, or perfection of the mortgage, security interests, and liens of the Prepetition Agent with respect to the Prepetition Collateral; (ii) the validity, allowability and priority of the Prepetition Obligations, subject to the terms of this paragraph 40; and (iii) the releases set forth in the Debtors' Stipulations. A party, including the Creditors' Committee (if appointed), must commence, as appropriate, a contested matter or adversary proceeding raising a Challenge, including, without limitation, any claim against the Prepetition Secured Parties in the nature of a setoff, counterclaim or defense to the Prepetition Obligations, respectively: (a) with respect to the Creditors' Committee (if appointed), the earlier of (i) sixty (60) calendar days from the formation of the Creditors' Committee and (ii) seventy-five (75) calendar days from the entry of this Interim Order, and (b) with respect to any other party-in-interest (other than the Debtors) with requisite standing, seventy-five (75) calendar days from the entry of this Interim Order (the "Challenge Period"); *provided*, that any trustee that is appointed in any Case or in any Successor Case prior to the expiration of the Challenge Period shall have until the later of the expiration of the Challenge Period or twenty (20) days after such trustee's appointment to assert a Challenge; and *provided*, *further*, that the Challenge Period may be extended with respect to a particular party with the written consent of the Prepetition Agent. Only the Challenges expressly raised in a motion and/or complaint filed within the Challenge Period shall be preserved, and the prosecution of such Challenges shall be limited to such person(s) having filed such motion or complaint. The applicable Challenge Period may only be extended: (I) with the written consent of the Debtors and the Prepetition Agent; (II) by the Court after notice and hearing granting a motion filed by a party

50

with requisite standing prior to the expiration of the Challenge Period; and (III) by the Court on its own initiative after notice and hearing prior to the expiration of the Challenge Period. Nothing in this Interim Order shall, or shall be construed to, grant standing on any party-in-interest, including the Creditors' Committee (if appointed), to bring any Challenge. The failure of any party in interest, including the Creditors' Committee (if appointed), to obtain an order of this Court during the Challenge Period granting standing to bring any Challenge shall not be a defense to failing to commence a Challenge during the Challenge Period as required under this paragraph 40 or to require or permit an extension of the Challenge Period. Upon the expiration of the applicable Challenge Period: (A) any and all Challenges by any party (including, without limitation, any Creditors' Committee (if appointed), any chapter 11 trustee, and/or any examiner appointed in these Cases, and any chapter 7 trustee and/or examiner appointed in any Successor Case) to any of the findings set forth in this Interim Order or the Debtors' Stipulations shall be deemed to be forever waived and barred, other than those Challenges specifically and timely asserted during the Challenge Period (a "Timely Filed Challenge"); *provided*, that the Challenges asserted in any such Timely Filed Challenge shall be preserved only with respect to the person who filed such Timely Filed Challenge; (B) all of the findings set forth in this Interim Order and the Debtors' Stipulations (including all waivers, releases, affirmations and other stipulations as to the priority, extent, and validity of the Prepetition Secured Parties' claims, liens, and interests, of any nature, under the Prepetition Credit Documents, or otherwise incorporated or set forth in this Interim Order and the representations by the Debtors that they have no claims or causes of action against the Prepetition Secured Parties) shall be of full force and effect and forever binding upon all creditors, interest holders, and other parties-in-interest in these Cases and any Successor Cases other than those persons who filed a Timely Filed Challenge; *provided*, that all findings set forth in this Interim

CHAR2\2689298v14
US-DOCS\135159742.23

Order and all of the Debtors' Stipulations other than those subject to a Timely Filed Challenge shall be binding on such persons; and (C) upon the entry of a final, non-appealable order dismissing, overruling or denying any Timely Filed Challenge, all of the findings in this Interim Order and all of the Debtors' Stipulations (including all waivers, releases, affirmations and other stipulations as to the priority, extent, and validity of the Prepetition Secured Parties' claims, liens, and interests, of any nature, under the Prepetition Credit Documents, or otherwise incorporated or set forth in this Interim Order and the representations by the Debtors that they have no claims or causes of action against the Prepetition Secured Parties) shall be of full force and effect and forever binding upon the person bringing such overruled or denied Timely Filed Challenge. For the avoidance of doubt, any trustee appointed or elected in these Cases shall, until the expiration of the Challenge Period for asserting challenges, and thereafter for the duration of any adversary proceeding or contested matter commenced pursuant to this paragraph (whether commenced by such trustee or commenced by any other party in interest on behalf of the Debtors' estates), be deemed to be a party other than the Debtors and shall not, for purposes of such adversary proceeding or contested matter, be bound by the acknowledgements, admissions, confirmations and stipulations of the Debtors in this Interim Order.  In the event of a Challenge, the Prepetition Agent and Prepetition Lenders shall be entitled to payment of the reasonable and documented related costs and expenses, included but not limited to reasonable and documented attorneys' fees, incurred in connection with defending itself or themselves in any such proceeding as adequate protection unless such Challenge is successful.  Upon a successful Challenge brought pursuant to this paragraph, the Court may fashion any appropriate remedy related to any such previously paid costs and expenses.

41.     <u>No Third-Party Rights</u>. Except as explicitly provided for herein, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder or any direct, indirect, or incidental beneficiary.

42.     <u>Parties Including Trustees; Bankruptcy Court Proceedings</u>. The DIP Liens, DIP Superpriority Claim, Adequate Protection Liens, Adequate Protection Superpriority Claims and all other rights and privileges created by or pursuant to this Interim Order or the DIP Documents shall be binding upon each of the Debtors and their estates, the Creditors' Committee (if appointed) and any trustee, other estate representative or any successor in interest of the Debtors in the Cases or any Successor Cases. This Interim Order and the DIP Documents shall be binding upon, and inure to the benefit of, the successors of the DIP Agent, any DIP Lender and their respective assigns, transferees and endorsees. The DIP Liens and Adequate Protection Liens shall be and remain valid and perfected in the event of the substantive consolidation or conversion of the Cases or any Successor Case to a case under chapter 7 of the Bankruptcy Code or in the event of dismissal of the Cases or the release of any DIP Collateral from the jurisdiction of the Court for any reason, without the necessity that the DIP Agent or the Prepetition Agent file financing statements or otherwise perfect its liens under applicable law. No Debtor may assign, transfer, hypothecate or otherwise convey its rights, benefits, obligations or duties hereunder or under any of the DIP Documents without the prior express written consent of the DIP Agent and the DIP Lenders. Any such purported assignment, transfer, hypothecation or other conveyance by any Debtor without the prior express written consent of the DIP Agent and the DIP Lenders shall be void.

43.     <u>Section 506(c) Claims</u>. Subject to entry of a Final Order granting the waiver set forth in this paragraph, no costs or expenses of administration which have been or may be incurred in the Cases or any Successor Case at any time shall be charged against the DIP Agent, DIP

Lenders or Prepetition Secured Parties, or any of their respective claims, the DIP Collateral, or the Prepetition Collateral pursuant to sections 105 or 506(c) of the Bankruptcy Code, or otherwise, without the prior written consent, as applicable, of the DIP Agent, DIP Lenders or Prepetition Secured Parties, and no such consent shall be implied from any other action, inaction, or acquiescence by any such agents or lenders.

44.    <u>Lenders Not Responsible Persons.</u>    In (a) making the decision to make the loans under the DIP Facility and consent to the use of Cash Collateral, as applicable, (b) administering the DIP Facility and the extensions of credit made thereunder, (c) extending other financial accommodations to the Debtors under the DIP Documents, and (d) making the decision to collect the indebtedness and obligations of the Debtors, neither the DIP Agent nor any DIP Lender nor any Prepetition Secured Party shall be considered to (x) owe any fiduciary obligation to the Debtors or any other party with respect to their exercise of any consent or other rights afforded them under the DIP Documents, this Interim Order or the Final Order or (y) be exercising control over any operations of the Debtors or acting in any way as a responsible person, or as an owner or operator under any applicable law, including without limitation, any environmental law (including but not limited to the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9601, *et seq.*, and the Resource Conservation and Recovery Act, 42 U.S.C. § 6901, *et seq.*, as either may be amended from time to time, or any similar federal or state statute) or any federal or state labor law or statute.

45.    <u>Limits on Liability.</u>    Nothing in this Interim Order, the Final Order or in any of the DIP Documents or any other documents related to this transaction shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Agent, any DIP Lender, the Prepetition Agent or any other Prepetition Secured Party of any liability for any claims arising

from any and all activities by the Debtors or any of their subsidiaries or affiliates in the operation of their businesses or in connection with their restructuring efforts or the cessation of their business operations or any portion thereof or any sale of all or a substantial portion of their assets.

46.    <u>Transaction Milestone</u>.  It shall be a Termination Event if the Debtors fail to adhere to any of the following milestones with respect to the refinance of the DIP Obligations and Prepetition Obligations and/or the sale of all or substantially all of their assets (collectively, the "<u>Transaction Milestone</u>"):

(a)    within 105 days after the Petition Date, (x) deliver to the DIP Agent and Prepetition Agent fully-executed and bona fide commitment papers (in form and substance reasonably acceptable to the DIP Agent), from a third party investor (or group of investors) with the financial wherewithal to consummate the transaction, in respect of a credit facility, equity investment, or other investment or financing that would, upon closing (and in any event prior to the Facility Termination Date under the DIP Facility), provide for the payment in full in cash of the DIP Obligations and Prepetition Obligations (any such credit facility, equity investment, or other investment or financing, an "<u>Acceptable Financing</u>") or (y) have filed a bid procedures motion in form and content reasonably acceptable to the DIP Agent and the Prepetition Agent seeking authority to (A) designate a "stalking horse" reasonably acceptable to the DIP Agent and the Prepetition Agent, (B) establish bidding procedures and (C) set a date for an auction within 75 days thereafter (such motion, the "<u>Bid Procedures Motion</u>"); <u>*provided*</u>, that if the Debtors have obtained fully-executed commitment papers for Acceptable Financing and after the Transaction Milestone such commitment is terminated or rescinded, then the Debtors would promptly, and in any event within 14 days thereafter, file the Bid Procedures Motion;

55

(b)     within 30 days after filing the Bid Procedures Motion (in the event it is required to be filed as provided above), have obtained an order in form and content reasonably acceptable to the DIP Agent and the Prepetition Agent approving the Bid Procedures Motion; and

(c)     in the event that a Bid Procedures Motion has been filed, have consummated a Sale Transaction consistent with the Bid Procedures Motion no later than fourteen (14) days prior to the outside date set forth in clause (d) of the definition of "DIP Facility Maturity Date" in the DIP Credit Agreement.

It shall be a Termination Event if any Debtor seeks or supports, directly or indirectly, the entry of any order that provides for either the sale of the stock of the Debtors or the sale of all or substantially all of the assets of any Debtor under section 363 of the Bankruptcy Code (such sale, a "Sale Transaction") to any party unless (a)(i) the Requisite DIP Lenders and the Requisite Prepetition Lenders consent or (ii) the Sale Transaction or the net proceeds thereof are sufficient to pay in full in cash the DIP Obligations and the Prepetition Obligations and (b) the order approving such sale provides that the sale proceeds shall be distributed in accordance with the DIP Documents, the Prepetition Credit Documents, this Interim Order, the Final Order and the order approving such Sale Transaction at the closing of such sale.  In addition to the reporting required under the Prepetition Credit Agreement and the DIP Credit Agreement, the Debtors shall provide or cause to be provided to the DIP Agent and the Prepetition Agent a weekly report from Rothschild & Co (or the Debtors' investment banker) and the management team of the Debtors (with any written reports being in form and substance reasonably satisfactory to the DIP Agent and the Prepetition Agent), which report shall address such items as are reasonably requested by the DIP Agent and the Prepetition Agent, including addressing the status of the marketing and sale

CHAR2\2689298v14
US-DOCS\135159742.23

process of the Debtors. Any non-legally privileged written materials prepared or produced by Rothschild & Co (or the Debtors' investment banker) for any of the Debtors shared with the DIP Agent and the Prepetition Agent may be shared with the DIP Lenders and the Prepetition Lenders, respectively. The Debtors shall also cause their management team and Rothschild & Co (or the Debtors' investment banker) to provide periodic telephonic updates of such reports to the DIP Agent, the DIP Lenders, the Prepetition Agent, and the Prepetition Lenders from time to time (but not less frequently than weekly unless agreed to by the DIP Agent), as reasonably requested by the DIP Agent.

47.    No Marshaling/Applications of Proceeds. Subject to entry of a Final Order providing for the waiver set forth in this paragraph, the DIP Agent, DIP Lenders and Prepetition Secured Parties shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral or the Prepetition Collateral, as the case may be, and proceeds shall be received and applied pursuant to this Interim Order and the DIP Documents notwithstanding any other agreement or provision to the contrary.

48.    Section 552(b). Subject to entry of a Final Order providing for the waiver set forth in this paragraph, the Prepetition Secured Parties shall each be entitled to all of the rights and benefits of section 552 of the Bankruptcy Code, and the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the Prepetition Secured Parties, with respect to proceeds, product, offspring or profits of any of the Prepetition Collateral.

49.    No Discharge; Survival of Claims. The DIP Obligations shall not be discharged by the entry of an order confirming a plan of reorganization, compromise or arrangement in any of the Cases (notwithstanding the provisions of section 1141(d)(4) of the Bankruptcy Code) except to the extent paid-in-full in cash in connection therewith, converting any of the Cases to a case

under chapter 7 of the Bankruptcy Code, or dismissing any of the Cases, or withdrawing the reference in any of the Cases or any Successor Case, or terminating the joint administration of the Cases or any Successor Cases. The DIP Superpriority Claim and the DIP Liens granted to the DIP Agent and the DIP Lenders, as applicable, and the Adequate Protection Liens and the Adequate Protection Superpriority Claims granted to the Prepetition Secured Parties and the Arizona Mechanics' Lienholders pursuant to this Interim Order shall not be affected in any manner by the entry of an order confirming a plan of reorganization or liquidation in the Cases or any Successor Case (except to the extent paid-in-full in cash in connection therewith, including on the effective date of any such plan).

50.    <u>Waiver of any Priming Rights</u>. Without in any way limiting the rights of the DIP Agent and the DIP Lenders under paragraph 6 herein, except with the prior written consent of the DIP Agent and the Prepetition Agent, as applicable, it shall be a Termination Event if any Debtor seeks or supports, directly or indirectly, the entry of any order that provides for the grant of any lien of equal or greater priority than the liens securing the DIP Obligations and the Prepetition Obligations, or that approves of a claim of equal or greater priority than the DIP Obligations and the Prepetition Obligations, except as expressly provided in this Interim Order.

51.    <u>Joint and Several Liability</u>. Nothing in this Interim Order shall be construed to constitute a substantive consolidation of any of the Debtors' estates, it being understood, however, that the Debtors shall be jointly and severally liable for the obligations hereunder and in accordance with the terms of the DIP Facility and the DIP Documents.

52.    <u>Rights Preserved</u>. Notwithstanding anything herein to the contrary, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, the DIP Agent's, DIP Lenders' and Prepetition Secured Parties' respective rights: (a) to seek any

other or supplemental relief in respect of the Debtors under the Bankruptcy Code or under non-bankruptcy law, including, without limitation, the right to (i) request modification of the automatic stay of section 362 of the Bankruptcy Code, (ii) request dismissal of any of the Cases or Successor Cases, conversion of any of the Cases to cases under chapter 7, or appointment of a chapter 11 trustee or examiner with expanded powers, or (iii) propose, subject to the provisions of section 1121 of the Bankruptcy Code, a chapter 11 plan or plans; or (b) any other rights, claims or privileges (whether legal, equitable or otherwise). Except as otherwise specifically set forth herein, entry of this Interim Order is without prejudice to any and all rights of any party in interest with respect to the terms and approval of the Final Order and any other position which any party in interest deems appropriate to raise in the Cases.

53.     No Waiver by Failure to Seek Relief. The failure of the DIP Agent, DIP Lenders or Prepetition Secured Parties to seek relief or otherwise exercise their rights and remedies under this Interim Order, the DIP Documents, the Prepetition Credit Documents, or applicable law, as the case may be, shall not constitute a waiver of any of the rights hereunder, thereunder, or otherwise of the DIP Agent, DIP Lenders, Prepetition Secured Parties, Creditors' Committee (if appointed) or any party in interest.

54.     Binding Effect of Interim Order. Immediately upon this Court's entry of this Interim Order, the terms and provisions of this Interim Order shall become valid and binding upon and inure to the benefit of the Debtors, DIP Agent, DIP Lenders, Prepetition Secured Parties, all other creditors of any of the Debtors, any Creditors' Committee (or any other court appointed committee) appointed in the Cases, and all other parties-in-interest and their respective successors and assigns, including any trustee or other fiduciary hereafter appointed in any of the Cases, any Successor Cases, or upon dismissal of any Case or Successor Case.

CHAR2\2689298v14
US-DOCS\135159742.23

55.    <u>Debtors' Waivers With Respect to Modification of Interim Order</u>. It shall be a Termination Event if any Debtor seeks or supports, directly or indirectly: (a) without the prior written consent of the DIP Agent (at the direction of the Requisite DIP Lenders) and the Prepetition Agent (at the direction of the Requisite Prepetition Lenders), as applicable, (i) the entry of any order reconsidering, modifying, staying, vacating or amending this Interim Order, or (ii) the entry of any order granting a priority claim for any administrative expense or unsecured claim against the Debtors (now existing or hereafter arising of any kind or nature whatsoever, including, without limitation any administrative expense of the kind specified in sections 503(b), 506(c), 507(a) or 507(b) of the Bankruptcy Code) in any of the Cases or Successor Cases, equal or superior to the DIP Superiority Claim or the Prepetition Secured Parties Adequate Protection Superiority Claim, other than the Carve-Out; (b) without the prior written consent of the DIP Agent (at the direction of the Requisite DIP Lenders) and the Prepetition Agent (at the direction of the Requisite Prepetition Lenders under the Prepetition Credit Agreement), the entry of any order (other than the Final Order) allowing use of Cash Collateral (other than as permitted during the Remedies Notice Period) derived from DIP Collateral or Prepetition Collateral; (c) without the prior written consent of the DIP Agent (at the direction of the Requisite DIP Lenders under the DIP Credit Agreement), the granting of any lien on any of the DIP Collateral with priority equal or superior to the DIP Liens, except as specifically provided in the DIP Documents; or (d) without the prior written consent of the Prepetition Agent (at the direction of the Requisite Prepetition Lenders), the granting of any lien on any of the DIP Collateral with priority equal or superior to the Prepetition Liens or Prepetition Secured Parties Adequate Protection Liens (other than the DIP Liens). The prior written consent of the DIP Agent or the Prepetition Agent shall not be implied by any other action, inaction or acquiescence of the DIP Agent or the Prepetition Agent, as applicable.

56.    <u>Interim Order Controls</u>. In the event of any inconsistency between the terms and conditions of the DIP Documents and of this Interim Order, the provisions of this Interim Order shall govern and control.

57.    <u>Survival</u>. The provisions of this Interim Order and any actions taken pursuant hereto shall survive entry of any order which may be entered: (a) confirming any plan of reorganization or liquidation in any of the Cases; (b) converting any of the Cases to a case under chapter 7 of the Bankruptcy Code; (c) dismissing any of the Cases or any Successor Cases; or (d) pursuant to which this Court abstains from hearing any of the Cases or Successor Cases. The terms and provisions of this Interim Order, including the claims, liens, security interests and other protections granted to the DIP Agent, DIP Lenders and Prepetition Secured Parties granted pursuant to this Interim Order and/or the DIP Documents, notwithstanding the entry of any such order, shall continue in the Cases, in any Successor Cases, or following dismissal of the Cases or any Successor Cases, and shall maintain their priority as provided by this Interim Order until the Consummation Date. The terms and provisions concerning the indemnification of the DIP Agent and DIP Lenders, and any other terms or provisions contained in the DIP Facility which survive the repayment and discharge of the DIP Facility, shall continue in the Cases, in any Successor Cases, following dismissal of the Cases or any Successor Cases, following termination of the DIP Documents and/or repayment in full and discharge of the DIP Obligations.

58.    <u>Final Hearing</u>. The Final Hearing to consider entry of the Final Order and final approval of the DIP Facility is scheduled for _____ ___, 2022 at ____ a/p.m. (Eastern Time) before the Honorable _____, United States Bankruptcy Judge, in Courtroom ___ at the United States Bankruptcy Court for the Southern District of Florida. Within forty-eight (48) hours of the entry of this Interim Order, the Debtors shall serve, by United States

mail, first-class postage prepaid, notice of the entry of this Interim Order and of the Final Hearing (the "Final Hearing Notice"), together with copies of this Interim Order, the proposed Final Order and the DIP Motion, on: (a) the parties having been given notice of the Interim Hearing; (b) any party which has filed prior to such date a request for notices with this Court; (c) counsel for the Creditors' Committee (if appointed); and (d) the Internal Revenue Service. The Final Hearing Notice shall state that any party in interest objecting to the entry of the proposed Final Order shall file written objections with the Clerk of the Court no later than _____ ____ ___, **2022** at 4:00 p.m. (Eastern Time), which objections shall be served so as to be received on or before such date by: (i) the Debtors, c/o Vital Pharmaceuticals, Inc., 1600 N. Winter Park Drive, Weston FL 33326, Attn: Frank Massabki (frank.massabki@bangenergy.com); (ii) proposed counsel to the Debtors: (A) Latham & Watkins LLP, 555 Eleventh Street, NW, Suite 1000, Washington, D.C. 20004, Attn: Andrew Sorkin (andrew.sorkin@lw.com) and Latham & Watkins LLP, 330 North Wabash Avenue, Suite 2800, Chicago, IL 60611, Attn: Jeramy Webb (jeramy.webb@lw.com) and Whit Morley (whit.morley@lw.com), and (B) Berger Singerman LLP, 1450 Brickell Avenue, Suite 1900, Miami, FL 33131, Attn: Jordi Guso (JGuso@bergersingerman.com) and Michael Niles (mniles@bergersingerman.com); (iii) counsel to the DIP Agent and the Prepetition Agent, (A) Moore & Van Allen PLLC, 100 N. Tryon St., Suite 4700, Charlotte, NC 28202, Attn: Luis M. Lluberas (luislluberas@mvalaw.com) and Steve Gruendel (stevegruendel@mvalaw.com) and (B) Shutts & Bowen LLP, 200 South Biscayne Blvd., Ste 4100, Miami, FL 33131, Attn: Aliette D. Rodz (ARodz@shutts.com) and Peter Levitt (PLevitt@shutts.com); and (iv) the Office of the United States Trustee, 51 S.W. First Avenue, Room 1204, Miami, FL 33130.

59. _Nunc Pro Tunc_ Effect of this Interim Order. This Interim Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect and be enforceable *nunc pro tunc* to the Petition Date immediately upon execution thereof.

60. Retention of Jurisdiction. The Court has and will retain jurisdiction to enforce this Interim Order according to its terms.

# # #

Submitted by:

Jordi Guso, Esq.
BERGER SINGERMAN LLP
1450 Brickell Avenue, Ste. 1900
Miami, FL 33131
Telephone: (305) 755-9500
Facsimile: (305) 714-4340
Email: jguso@bergersingerman.com

*(Attorney Guso is directed to serve this order upon all non-registered users who have yet to appear electronically in this case and file a conforming certificate of service.)*

**Exhibit A**

**Approved Budget**

**Vital Pharmaceuticals, Inc.**
Weekly Cashflow_DIP budget

($ in millions)

BK Filing
10/10/22

| | Oct-22 1 Forecast 10/14/22 | Oct-22 2 Forecast 10/21/22 | Oct-22 3 Forecast 10/28/22 | Nov-22 4 Forecast 11/04/22 | Nov-22 5 Forecast 11/11/22 | Nov-22 6 Forecast 11/18/22 | Nov-22 7 Forecast 11/25/22 | Dec-22 8 Forecast 12/02/22 | Dec-22 9 Forecast 12/09/22 | Dec-22 10 Forecast 12/16/22 | Dec-22 11 Forecast 12/23/22 | Dec-22 12 Forecast 12/30/22 | Jan-23 13 Forecast 01/06/23 | Total 13-Week Forecast 10/08 to 01/06 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Receipts** | | | | | | | | | | | | | | |
| Customer Receipts | $ 3.5 | $ 7.3 | $ 7.3 | $ 9.6 | $ 9.6 | $ 9.5 | $ 9.1 | $ 8.3 | $ 8.1 | $ 8.1 | $ 8.1 | $ 6.9 | $ 7.6 | **103.0** |
| Other Receipts | - | - | 1.0 | - | - | 0.7 | - | - | - | 0.7 | - | - | - | **2.3** |
| **Total Operating Receipts** | $ 3.5 | $ 7.3 | $ 8.3 | $ 9.6 | $ 9.6 | $ 10.2 | $ 9.1 | $ 8.3 | $ 8.1 | $ 8.8 | $ 8.1 | $ 6.9 | $ 7.6 | **105.4** |
| | | | | | | | | | | | | | | |
| DIP Draw | - | 10.0 | 5.0 | 19.0 | - | - | - | 6.0 | - | 3.0 | - | 1.0 | 9.0 | **53.0** |
| **Total Receipts** | $ 3.5 | $ 17.3 | $ 13.3 | $ 28.6 | $ 9.6 | $ 10.2 | $ 9.1 | $ 14.3 | $ 8.1 | $ 11.8 | $ 8.1 | $ 7.9 | $ 16.6 | **158.4** |
| | | | | | | | | | | | | | | |
| **Disbursements** | | | | | | | | | | | | | | |
| Material costs | (0.1) | (3.6) | (3.6) | (3.6) | (0.1) | (0.2) | (0.1) | (0.9) | (2.0) | (2.0) | (2.0) | (1.6) | (1.1) | **(21.0)** |
| Co-Packers | (0.4) | (1.1) | (1.1) | (0.8) | (0.1) | (0.2) | (0.1) | (0.4) | (0.7) | (0.7) | (0.7) | (0.5) | (0.4) | **(7.1)** |
| Freight & handling | (1.1) | (3.4) | (3.4) | (3.3) | (1.0) | (1.3) | (1.0) | (1.7) | (2.3) | (2.3) | (2.3) | (1.9) | (1.4) | **(26.7)** |
| Employee expenses | (0.5) | (4.6) | (0.5) | (4.5) | (0.5) | (4.4) | (0.5) | (4.4) | (0.5) | (4.4) | (0.5) | (4.2) | (0.6) | **(30.1)** |
| Trade promotion | (0.2) | (2.6) | (2.6) | (2.6) | (2.5) | (0.2) | (0.2) | (0.2) | (0.3) | (0.3) | (0.3) | (0.2) | (0.2) | **(12.5)** |
| Facility/Office expenses | (0.7) | (1.9) | (0.7) | (2.5) | (0.6) | (0.7) | (0.5) | (4.5) | (0.5) | (0.6) | (0.6) | (0.4) | (2.5) | **(16.8)** |
| Marketing | (0.1) | (0.5) | (0.3) | (0.7) | (0.1) | (0.3) | (0.1) | (0.7) | (0.2) | (0.2) | (0.2) | (0.2) | (1.0) | **(4.8)** |
| Legal expenses | - | (0.1) | - | - | - | (0.1) | - | - | - | (0.1) | - | - | - | **(0.3)** |
| Other | (1.5) | (1.5) | (1.5) | (1.5) | (1.5) | (1.5) | (1.5) | (1.5) | (1.5) | (0.5) | (0.5) | (0.5) | (0.4) | **(15.0)** |
| **Total Operating Disbursements** | $ (4.8) | $ (19.3) | $ (13.7) | $ (19.4) | $ (6.5) | $ (8.8) | $ (4.1) | $ (14.3) | $ (8.0) | $ (11.0) | $ (7.1) | $ (9.6) | $ (7.6) | **$ (134.2)** |
| | | | | | | | | | | | | | | |
| Operating cash flow | (1.2) | (12.0) | (5.4) | (9.8) | 3.0 | 1.4 | 5.0 | (5.9) | 0.1 | (2.3) | 1.0 | (2.7) | 0.0 | **(28.8)** |
| | | | | | | | | | | | | | | |
| **Professional Fees & Employee Retention** | | | | | | | | | | | | | | |
| Professional Fees Escrow account | - | - | - | (4.7) | - | (1.0) | - | (4.6) | - | - | - | - | (4.7) | **(14.9)** |
| Retention Plans | - | - | - | - | - | - | - | - | - | - | - | - | - | **-** |
| **Subtotal** | $ - | $ - | $ - | $ (4.7) | $ - | $ (1.0) | $ - | $ (4.6) | $ - | $ - | $ - | $ - | $ (4.7) | **$ (14.9)** |
| | | | | | | | | | | | | | | |
| **Debt Service** | | | | | | | | | | | | | | |
| Adequate protection payments | - | - | - | (4.1) | - | - | - | (3.0) | - | - | - | - | (2.6) | **(9.7)** |
| Interest/Fees on DIP | - | (2.8) | - | (0.2) | - | - | - | (1.4) | - | - | - | - | (1.9) | **(6.3)** |
| **Subtotal** | $ - | $ (2.8) | $ - | $ (4.3) | $ - | $ - | $ - | $ (4.4) | $ - | $ - | $ - | $ - | $ (4.5) | **$ (15.9)** |
| | | | | | | | | | | | | | | |
| **Net Cash Flow / (Deficit)** | $ (1.2) | $ (4.8) | $ (0.4) | $ 0.2 | $ 3.0 | $ 0.4 | $ 5.0 | $ (8.8) | $ 0.1 | $ 0.7 | $ 1.0 | $ (1.7) | $ (0.2) | **$ (6.7)** |
| | | | | | | | | | | | | | | |
| **Cash Balance** | | | | | | | | | | | | | | |
| Beginning Cash Balance | 10.8 | 9.5 | 4.8 | 4.4 | 4.6 | 7.6 | 8.0 | 13.0 | 4.1 | 4.2 | 4.9 | 5.9 | 4.3 | **10.8** |
| Ending Cash Balance | 9.5 | 4.8 | 4.4 | 4.6 | 7.6 | 8.0 | 13.0 | 4.1 | 4.2 | 4.9 | 5.9 | 4.3 | 4.1 | **4.1** |

**<u>Exhibit B</u>**

**DIP Credit Agreement**

*Final Form*

SUPERPRIORITY SECURED DEBTOR-IN-POSSESSION CREDIT AGREEMENT

dated as of October [●], 2022,

by and among

**VITAL PHARMACEUTICALS, INC.,**
as the Borrower,

**THE SUBSIDIARIES AND AFFILIATES OF THE BORROWER IDENTIFIED HEREIN,**
as the Guarantors,

**THE LENDERS FROM TIME TO TIME PARTY HERETO,**

and

**TRUIST BANK,**
as Administrative Agent

# TABLE OF CONTENTS

*Page*

ARTICLE I DEFINITIONS; CONSTRUCTION ................................................................................. 1

| Section 1.1 | Definitions ........................................................................................ 1 |
| Section 1.2 | Classifications of Loans and Borrowings ...................................... 34 |
| Section 1.3 | Accounting Terms and Determination ............................................ 34 |
| Section 1.4 | Terms Generally .............................................................................. 35 |
| Section 1.5 | Interest Rate Disclosure .................................................................. 36 |

ARTICLE II AMOUNT AND TERMS OF THE COMMITMENTS ........................................... 36

| Section 2.1 | General Description of Facility ...................................................... 36 |
| Section 2.2 | Revolving Loans .............................................................................. 36 |
| Section 2.3 | Procedure for Borrowings ............................................................... 36 |
| Section 2.4 | [Reserved] ........................................................................................ 37 |
| Section 2.5 | [Reserved] ........................................................................................ 37 |
| Section 2.6 | Interim Roll-Up; Funding of Borrowings ...................................... 37 |
| Section 2.7 | Interest Elections ............................................................................. 38 |
| Section 2.8 | Termination and Reductions of Commitments ............................... 38 |
| Section 2.9 | Repayment of Loans ........................................................................ 39 |
| Section 2.10 | Evidence of Indebtedness ................................................................ 39 |
| Section 2.11 | Optional Prepayments ..................................................................... 40 |
| Section 2.12 | Mandatory Prepayments .................................................................. 40 |
| Section 2.13 | Interest on Loans ............................................................................. 41 |
| Section 2.14 | Fees .................................................................................................. 42 |
| Section 2.15 | Computation of Interest and Fees ................................................... 42 |
| Section 2.16 | Inability to Determine Interest Rates; Benchmark Replacement Setting ............ 42 |
| Section 2.17 | Illegality .......................................................................................... 44 |
| Section 2.18 | Increased Costs ............................................................................... 45 |
| Section 2.19 | Funding Indemnity .......................................................................... 46 |
| Section 2.20 | Taxes ................................................................................................ 46 |
| Section 2.21 | Payments Generally; Pro Rata Treatment; Sharing of Set-offs ......... 49 |
| Section 2.22 | [Reserved] ........................................................................................ 51 |
| Section 2.23 | [Reserved] ........................................................................................ 51 |
| Section 2.24 | Mitigation of Obligations ............................................................... 51 |
| Section 2.25 | Replacement of Lenders .................................................................. 51 |
| Section 2.26 | Defaulting Lenders .......................................................................... 51 |
| Section 2.27 | Priority and Liens ............................................................................ 52 |

ARTICLE III CONDITIONS PRECEDENT TO LOANS ........................................................... 54

| Section 3.1 | Conditions to Effectiveness ............................................................ 54 |
| Section 3.2 | Conditions to Each Credit Event ................................................... 55 |
| Section 3.3 | Initial Roll-Up Borrowing .............................................................. 56 |
| Section 3.4 | Delivery of Documents ................................................................... 57 |

ARTICLE IV REPRESENTATIONS AND WARRANTIES ...................................................... 57

| Section 4.1 | Existence; Power ............................................................................. 57 |
| Section 4.2 | Organizational Power; Authorization; Enforceability ................... 57 |
| Section 4.3 | Governmental Approvals; No Conflicts ......................................... 57 |
| Section 4.4 | No Material Adverse Effect ............................................................ 57 |

i

Section 4.5     Litigation and Environmental Matters ........................................... 58
Section 4.6     Compliance with Laws and Agreements; No Default ................... 58
Section 4.7     Investment Company Act, Etc ...................................................... 58
Section 4.8     Taxes ............................................................................................. 58
Section 4.9     Margin Regulations ...................................................................... 58
Section 4.10    ERISA ........................................................................................... 58
Section 4.11    Ownership of Property; Insurance ............................................... 59
Section 4.12    Disclosure ..................................................................................... 60
Section 4.13    Labor Relations ............................................................................ 60
Section 4.14    Subsidiaries and Loan Parties ...................................................... 60
Section 4.15    [Reserved] ..................................................................................... 61
Section 4.16    Business Locations; Taxpayer Identification Number .................. 61
Section 4.17    Deposit and Disbursement Accounts ............................................ 61
Section 4.18    Collateral Documents ................................................................... 61
Section 4.19    [Reserved] ..................................................................................... 62
Section 4.20    Sanctions and Anti-Corruption Laws ........................................... 62
Section 4.21    No Affected Financial Institutions ............................................... 62
Section 4.22    Cannabis and Hemp Products ....................................................... 62
Section 4.23    Regulatory Matters ....................................................................... 62
Section 4.24    Bankruptcy Matters ...................................................................... 64

ARTICLE V AFFIRMATIVE COVENANTS ................................................................. 65

Section 5.1     Financial and Other Information .................................................. 65
Section 5.2     Notices of Material Events ........................................................... 68
Section 5.3     Existence; Conduct of Business .................................................... 69
Section 5.4     Compliance with Laws .................................................................. 69
Section 5.5     Payment of Obligations ................................................................ 69
Section 5.6     Books and Records ........................................................................ 69
Section 5.7     Visitation and Inspection; Conference Calls ................................ 69
Section 5.8     Maintenance of Properties; Insurance .......................................... 70
Section 5.9     Use of Proceeds; Margin Regulations ........................................... 71
Section 5.10    Casualty and Condemnation ......................................................... 72
Section 5.11    Cash Management ......................................................................... 72
Section 5.12    [Reserved] ..................................................................................... 72
Section 5.13    Additional Subsidiaries and Collateral ........................................ 72
Section 5.14    Additional Real Estate .................................................................. 74
Section 5.15    Further Assurances ....................................................................... 74
Section 5.16    [Reserved] ..................................................................................... 74
Section 5.17    Post-Closing Requirements .......................................................... 74
Section 5.18    Transaction Milestones ................................................................. 74
Section 5.19    Investment Banker ........................................................................ 75
Section 5.20    Postpetition Obligations ............................................................... 75

ARTICLE VI FINANCIAL COVENANTS ...................................................................... 75

Section 6.1     Compliance with the Budget ........................................................ 75
Section 6.2     Liquidity ....................................................................................... 76

ARTICLE VII NEGATIVE COVENANTS ...................................................................... 76

Section 7.1     Indebtedness and Preferred Equity ............................................... 76
Section 7.2     Liens .............................................................................................. 78
Section 7.3     Fundamental Changes; Conduct of Business ................................ 79

Section 7.4    Investments; Loans .................................................................. 80
Section 7.5    Restricted Payments .................................................................. 81
Section 7.6    Asset Sales ................................................................................. 81
Section 7.7    Transactions with Affiliates ...................................................... 81
Section 7.8    Restrictive Agreements .............................................................. 81
Section 7.9    Sale and Leaseback Transactions .............................................. 81
Section 7.10   Hedging Transactions ................................................................ 82
Section 7.11   Amendments to Organization Documents .................................. 82
Section 7.12   Accounting Changes .................................................................. 82
Section 7.13   Prepayments of Certain Indebtedness ....................................... 82
Section 7.14   [Reserved] ................................................................................. 82
Section 7.15   Sanctions and Anti-Corruption Laws ........................................ 82
Section 7.16   Margin Regulations ................................................................... 82
Section 7.17   Preferred Equity ........................................................................ 82
Section 7.18   Bankruptcy Matters ................................................................... 83

ARTICLE VIII EVENTS OF DEFAULT .................................................................. 84

Section 8.1    Events of Default ....................................................................... 84
Section 8.2    Application of Proceeds from Collateral .................................... 88

ARTICLE IX THE ADMINISTRATIVE AGENT ..................................................... 89

Section 9.1    Appointment of Administrative Agent ....................................... 89
Section 9.2    Nature of Duties of Administrative Agent .................................. 90
Section 9.3    Lack of Reliance on the Administrative Agent ........................... 90
Section 9.4    Certain Rights of the Administrative Agent ............................... 91
Section 9.5    Reliance by Administrative Agent .............................................. 91
Section 9.6    The Administrative Agent in its Individual Capacity ................. 91
Section 9.7    Successor Administrative Agent ................................................. 91
Section 9.8    Withholding Tax ......................................................................... 92
Section 9.9    Administrative Agent May File Proofs of Claim ........................ 92
Section 9.10   Authorization to Execute Other Loan Documents ..................... 93
Section 9.11   Collateral and Guaranty Matters ............................................... 93
Section 9.12   [Reserved] ................................................................................. 93
Section 9.13   Right to Realize on Collateral and Enforce Guarantee .............. 93
Section 9.14   Secured Bank Product Obligations ............................................ 93

ARTICLE X THE GUARANTY .............................................................................. 94

Section 10.1   The Guaranty .............................................................................. 94
Section 10.2   Obligations Unconditional ......................................................... 94
Section 10.3   Reinstatement ............................................................................. 95
Section 10.4   Certain Additional Waivers ....................................................... 95
Section 10.5   Remedies .................................................................................... 95
Section 10.6   Rights of Contribution ............................................................... 95
Section 10.7   Guarantee of Payment; Continuing Guarantee ........................... 95

ARTICLE XI MISCELLANEOUS ......................................................................... 96

Section 11.1   Notices ....................................................................................... 96
Section 11.2   Waiver; Amendments ................................................................. 98
Section 11.3   Expenses; Indemnification ....................................................... 100
Section 11.4   Successors and Assigns ............................................................ 102
Section 11.5   Governing Law; Jurisdiction; Consent to Service of Process ......... 106

Section 11.6      WAIVER OF JURY TRIAL.................................................107
Section 11.7      Right of Set-off........................................................107
Section 11.8      Counterparts; Integration .............................................107
Section 11.9      Survival................................................................108
Section 11.10     Severability...........................................................108
Section 11.11     Confidentiality .......................................................108
Section 11.12     Interest Rate Limitation ..............................................109
Section 11.13     Waiver of Effect of Corporate Seal ....................................109
Section 11.14     Patriot Act ...........................................................109
Section 11.15     No Advisory or Fiduciary Responsibility ...............................109
Section 11.16     Location of Closing ...................................................110
Section 11.17     Acknowledgement and Consent to Bail-In of Affected Financial
                  Institutions ..........................................................110
Section 11.18     Certain ERISA Matters..................................................110
Section 11.19     Acknowledgement Regarding any Supported QFCs ..........................111

<u>Schedules</u>

| | | |
|---|---|---|
| Schedule I | – | Commitment Amounts |
| Schedule 4.14 | – | Subsidiaries and Loan Parties |
| Schedule 4.16–1 | – | Locations of Real Estate |
| Schedule 4.16–2 | – | Locations of Chief Executive Office, Taxpayer Identification Number, Etc. |
| Schedule 4.16–3 | – | Changes in Legal Name, State of Formation and Structure |
| Schedule 4.17 | – | Deposit and Disbursement Accounts |
| Schedule 7.2 | – | Existing Liens |
| Schedule 7.4 | – | Existing Investments |

<u>Exhibits</u>

| | | |
|---|---|---|
| Exhibit 1.1 | – | [*Form of*] Interim DIP Order |
| Exhibit 2.3 | – | [*Form of*] Notice of Borrowing |
| Exhibit 2.7 | – | [*Form of*] Notice of Conversion / Continuation |
| Exhibit 2.10 | – | [*Form of*] Note |
| Exhibits 2.20–A-D | – | [*Forms of*] U.S. Tax Compliance Certificates |
| Exhibit 5.13 | – | [*Form of*] Guarantor Joinder Agreement |
| Exhibit 11.4 | – | [*Form of*] Assignment and Assumption |

v

## SUPERPRIORITY SECURED DEBTOR-IN-POSSESSION CREDIT AGREEMENT

This SUPERPRIORITY SECURED DEBTOR-IN-POSSESSION CREDIT AGREEMENT (this "*Agreement*") is made and entered into as of October [●], 2022, by and among VITAL PHARMACEUTICALS, INC., a Florida corporation (the "*Borrower*"), the Guarantors (as defined herein), the Lenders (as defined herein), and TRUIST BANK, in its capacity as Administrative Agent.

## R E C I T A L S

WHEREAS, on October 10, 2022 (the "*Petition Date*"), the Borrower and the other Loan Parties (together with certain Subsidiaries and/or Affiliates that are or are to become debtors under the Chapter 11 Case, collectively, the "*Debtors*") filed voluntary petitions for relief under Title 11 of the United States Code (as now or hereafter in effect, or any successor thereto, the "*Bankruptcy Code*") in the United States Bankruptcy Court for the Southern District of Florida (the "*Bankruptcy Court*") (such cases being jointly administered under Case No. [●]-[●] and are referred to herein as the "*Chapter 11 Case*"), and such Debtors continue to operate their businesses and manage their properties as debtors and debtors-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code;

WHEREAS, the Borrower has requested that the Lenders provide senior secured superpriority debtor-in-possession credit facilities to the Borrower in an aggregate principal amount not to exceed $454,770,201.56 (the "*DIP Facility*") for the purposes set forth herein, and the Lenders are willing to do so on the terms and conditions set forth herein;

WHEREAS, each of the Loan Parties acknowledges that such Loan Party will receive substantial direct and indirect benefits by reason of the making of the Loans and other financial accommodations to the Loan Parties as provided in this Agreement; and

WHEREAS, to provide for the security and repayment of all obligations of any kind of the Loan Parties hereunder and under the other Loan Documents, each of the Loan Parties will provide to the Administrative Agent (for the benefit of the Lenders and the other holders of the Obligations) the Liens, status and protection set forth in the Interim DIP Order and the Final DIP Order.

NOW, THEREFORE, in consideration of the premises and the mutual covenants herein contained, each of the parties hereto agrees as follows:

## A G R E E M E N T

## ARTICLE I

## DEFINITIONS; CONSTRUCTION

Section 1.1    Definitions. In addition to the other terms defined herein, the following terms used herein shall have the meanings specified below (to be equally applicable to both the singular and plural forms of the terms so defined):

"*Acquisition*" shall mean: (a) any Investment by any Loan Party or Subsidiary in any other Person pursuant to which such Person shall become a Subsidiary, or shall be merged with a Loan Party or Subsidiary; or (b) any acquisition by a Loan Party or Subsidiary of the assets of any Person (other than a Subsidiary) that constitute all, or a substantial portion, of the assets of such Person, or a division or business unit of such Person, whether through purchase, exercise of an option to purchase, merger or other business combination or transaction. For purposes of determining the amount of an Acquisition, such amount shall include all consideration (including,

without limitation, any deferred payments or other contingent consideration) set forth in the applicable purchase, acquisition and/or sale agreements governing such Acquisition, as well as the assumption of any Indebtedness in connection therewith.

"*Adjusted Daily SOFR*" shall mean, as of any date of determination, with respect to any calculations relating to any Loan bearing interest at a rate determined by reference to Daily SOFR and/or the determination of the Base Rate in accordance with clause (c) of such definition below, the *sum of*: (a) the rate per annum equal to Daily SOFR determined as of such date; *plus* (b) the SOFR Adjustment.

"*Adjusted Term SOFR*" shall mean, as of any date of determination, with respect to any calculations relating to a SOFR Loan for any applicable Interest Period or a SOFR Borrowing for any selected Interest Period, the *sum of*: (a) the rate per annum equal to Term SOFR for such Interest Period determined as of such date; *plus* (b) the SOFR Adjustment.

"*Administrative Agent*" shall mean Truist, in its capacity as administrative agent under any of the Loan Documents, or any successor administrative agent.

"*Administrative Questionnaire*" shall mean, with respect to each Lender, an administrative questionnaire in the form provided to such Lender by the Administrative Agent and submitted to the Administrative Agent duly completed by such Lender.

"*Affected Financial Institution*" means: (a) any EEA Financial Institution; or (b) any UK Financial Institution.

"*Affiliate*" shall mean, with respect to any Person, any other Person that directly, or indirectly through one (1) or more intermediaries, Controls, is Controlled by, or is under common Control with, such specified Person. For the purposes of this definition of "*Affiliate*", "*Control*" shall mean the possession, directly or indirectly, of the power to either: (a) vote ten percent (10.0%) or more of the Capital Stock having ordinary voting power for the election of directors or managers (or Persons performing similar functions), as applicable, of a Person; or (b) direct, or cause the direction of, the management and policies of a Person, whether through the ability to exercise voting power, by control, or otherwise. The term "*Controlling*", and the phrases "*Controlled by*" and "*under common Control with*", shall have the meanings correlative thereto.

"*Agent Parties*" shall have the meaning set forth in Section 11.1(b)(iv).

"*Aggregate Revolving Commitment Amount*" shall mean, at any time, the aggregate principal amount of the Aggregate Revolving Commitments outstanding as of such time. On the Effective Date, the Aggregate Revolving Commitment Amount is $454,770,201.56.

"*Aggregate Revolving Commitments*" shall mean, collectively, all Revolving Commitments of all Lenders at any time outstanding.

"*Aggregate Revolving Credit Exposure*" shall mean, in aggregate, the Revolving Credit Exposure of all Lenders at any time outstanding.

"*Agreement*" shall have the meaning set forth in the introductory paragraph hereto.

"*Anti-Corruption Laws*" shall mean all Laws, rules and regulations of any jurisdiction applicable to any Loan Party or Subsidiary from time to time concerning, or relating to, bribery or corruption.

"*Applicable Lending Office*" shall mean, for each Lender and for each Type of Loan, the "Lending Office" of such Lender (or an Affiliate of such Lender) designated for such Type of Loan in the Administrative Questionnaire submitted by such Lender to the Administrative Agent, or such other office of such Lender (or an

Affiliate of such Lender) as such Lender may from time to time specify to the Administrative Agent and the Borrower as the office by which its Loans of such Type are to be made and maintained.

"*Applicable Margin*" shall mean, as of any date of determination, with respect to (a) interest on all SOFR Loans outstanding on such date, a rate per annum equal to 8.50% and (b) interest on all Base Rate Loans outstanding on such date, a rate per annum equal to 7.50%.

Notwithstanding anything to the contrary in the foregoing: the provisions of this definition of "*Applicable Margin*" shall *not* limit the rights of the Administrative Agent and/or the Lenders with respect to either of <u>Section 2.13(d)</u> or <u>Article VIII</u>.

"*Approved Fund*" shall mean any Person (other than a natural Person) that is (or will be) engaged in the making, purchasing or holding of, or otherwise investing in, commercial loans and similar extensions of credit in the ordinary course of its business and that is administered or managed by: (a) a Lender; (b) an Affiliate of a Lender; or (c) an entity, or an Affiliate of an entity, that administers or manages a Lender.

"*Asset Sale*" shall mean the sale, transfer, license, lease or other disposition of any property by any Loan Party or Subsidiary, including, without limitation, any sale and leaseback transaction and any sale, assignment, transfer or other disposal, with or without recourse, of any notes or accounts receivable, or any rights and claims associated therewith, but *excluding*: (a) the sale or other disposition of inventory in the ordinary course of business; (b) the sale or disposition, for fair market value (as reasonably determined by the applicable Loan Party or Subsidiary in good faith), of obsolete, surplus, damaged or worn out property; (c) the disposition of property (including the cancellation of Indebtedness permitted by <u>Section 7.4(d)</u>) to any Loan Party or Subsidiary, <u>provided, that</u>, if the transferor of such property is a Loan Party, then the transferee thereof must be a Loan Party; (d) the write-off, discount, sale or other disposition of accounts receivable and similar obligations in connection with the collection or compromise thereof; (e) licenses, sublicenses, leases or subleases granted to others in the ordinary course of business, or *not* interfering in any material respect with the business of any Loan Party or Subsidiary; (f) the sale or disposition of cash or Cash Equivalents, for fair market value, in the ordinary course of business; (g) the disposition of shares of Capital Stock of any Foreign Subsidiary in order to qualify members of the governing body of such Subsidiary, if required by applicable Law; (h) the termination or surrender of any real property lease of any Loan Party in the ordinary course of business, so long as the loss of such leased location could *not* reasonably be expected to have an adverse and material effect on any business of any Loan Party; (i) [reserved]; (j) *solely* to the extent *not* otherwise permitted hereunder, sales, transfers and other dispositions permitted by <u>Section 7.3</u>; and (k) to the extent constituting a sale, transfer, lease, or other disposition of any property and/or asset, any Restricted Payment made pursuant to <u>Section 7.5</u>.

"*Assignment and Assumption*" shall mean an assignment and assumption entered into by a Lender and an Eligible Assignee (with the consent of any party whose consent is required by <u>Section 11.4(b)</u>) and accepted by the Administrative Agent, in the form of <u>Exhibit 11.4</u> attached hereto (or such other form approved by the Administrative Agent).

"*Availability Period*" shall mean the period from, and including, the Effective Date to, but *excluding*, the Revolving Commitment Termination Date.

"*Available Tenor*" shall mean, as of any date of determination and with respect to the then-current Benchmark, as applicable, (a) if such Benchmark is a term rate, any tenor for such Benchmark (or component thereof) that is, or may be, used for determining the length of any interest period (including any Interest Period) pursuant to this Agreement, and (b) if such Benchmark is *not* a term rate, any payment period for interest calculated with reference to such Benchmark (or component thereof) that is, or may be, used for determining any frequency of the making of payments of interest calculated with reference to such Benchmark pursuant to this Agreement, in each case of the foregoing <u>clauses (a)</u> and <u>(b)</u>, as of such date of determination, but *excluding*, in any event and for the avoidance of doubt, any tenor for such Benchmark that is removed as of such date of determination from the definition of "*Interest Period*" below in accordance with <u>Section 2.16(e)</u>.

3

"*Avoidance Actions*" means actions for preferences, fraudulent conveyances and other avoidance power claims under Sections 544, 545, 547, 548, 549, 550 and 553 of the Bankruptcy Code.

"*Bail-In Action*" shall mean the exercise of any Write-Down and Conversion Powers by the applicable Resolution Authority in respect of any liability of an Affected Financial Institution.

"*Bail-In Legislation*" shall mean: (a) with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing Law for such EEA Member Country from time to time which is described in the applicable EU Bail-In Legislation Schedule; and (b) with respect to the United Kingdom, Part I of the United Kingdom Banking Act of 2009 (as amended from time to time), and any other Law applicable in the United Kingdom relating to the resolution of unsound or failing banks, investment firms or other financial institutions, or any affiliates of any of the foregoing (other than through liquidation, administration, or other insolvency proceedings).

"*Bank Product Amount*" shall have the meaning set forth in the definition of "*Bank Product Provider*" below. Notwithstanding anything to the contrary in the definition of "*Bank Product Provider*" below: (a) the Bank Product Amount may be changed from time to time upon written notice to the Administrative Agent by the applicable Bank Product Provider; and (b) no Bank Product Amount may be established at any time that a Default or an Event of Default exists.

"*Bank Product Obligations*" shall mean, collectively, all obligations and other liabilities of any Loan Party or Subsidiary to any Bank Product Provider arising with respect to any Bank Products.

"*Bank Product Provider*" shall mean any Person that: (a) (i) at the time it provides any Bank Product(s) to any Loan Party or Subsidiary, is a Lender or an Affiliate of a Lender, or (ii) has provided any Bank Product(s) to any Loan Party or Subsidiary that exist on the Effective Date, and such Person is a Lender, or an Affiliate of a Lender, on the Effective Date; and (b) except when the Bank Product Provider is Truist and/or any of its Affiliates, has provided prior written notice to the Administrative Agent, which notice has been acknowledged by the Borrower, of (i) the existence of any specified Bank Product(s), (ii) the maximum Dollar amount of Bank Product Obligation(s) arising under such Bank Product(s) (such amount, the "*Bank Product Amount*"), and (iii) the methodology to be used by such parties in determining the Bank Product Obligation(s) arising under such Bank Product(s) from time to time. Notwithstanding anything to the contrary in the foregoing: (A) in no event shall any Bank Product Provider, acting in such capacity, be deemed a Lender for purposes hereof to the extent of, and as to, any Bank Product(s), provided, that, each reference to the term "*Lender*" in Article IX, Section 11.3(b) and Section 11.4 shall be deemed to include such Bank Product Provider; and (B) in no event shall the approval of any such Person, in its capacity as Bank Product Provider, be required in connection with the release or termination of any security interest or Lien of the Administrative Agent.

"*Bank Products*" shall mean any of the following services provided to any Loan Party or Subsidiary by any Bank Product Provider: (a) any treasury or other cash management services, including, without limitation, any deposit accounts, automated clearing house (ACH) origination and other funds transfer, depository (including cash vault and check deposit), zero balance accounts and sweeps, return items processing, controlled disbursement accounts, positive pay, lockboxes and lockbox accounts, account reconciliation and information reporting, payables outsourcing, payroll processing, trade finance services, investment accounts and securities accounts; and (b) card services, including, without limitation, credit cards (including purchasing cards and commercial cards), prepaid cards, including payroll, stored value and gift cards, merchant services processing, and debit card services.

"*Bankruptcy Code*" shall have the meaning set forth in the recitals hereto.

"*Bankruptcy Court*" shall have the meaning set forth in the recitals hereto.

"*Base Rate*" shall mean, for any date of determination, a rate per annum equal to the *highest* of (a) the rate of interest that the Administrative Agent announces from time to time as its prime lending rate, as in effect

from time to time (the "*Prime Rate*"), (b) the Federal Funds Rate, as in effect from time to time, *plus* one-half of one percent (0.50%) per annum, (c) Adjusted Daily SOFR, *plus* one percent (1.00%) per annum (with any change(s) in any of the rates described in the foregoing clauses (a) through (c) to be effective as of the date of any such change(s) in such rates), and (d) the Floor. The Prime Rate is a reference rate and does *not* necessarily represent the lowest or best rate actually charged to any customer. The Administrative Agent and the Lenders may make commercial loans, or other loans, at rates of interest at, above, or below the Prime Rate. Any change(s) to the Base Rate due to a change in the Prime Rate, the Federal Funds Rate and/or Adjusted Daily SOFR, as the case may be, will be deemed to be effective from, and including, the date of effectiveness of such change(s) to the Prime Rate, the Federal Funds Rate and/or Adjusted Daily SOFR. For the avoidance of doubt and notwithstanding anything to the contrary in the foregoing, if, at any time, the Base Rate is *less than* the Floor, then the Base Rate shall be deemed to equal the Floor for all purposes of this Agreement and the other Loan Documents.

"*Base Rate Borrowing*" shall mean a Borrowing, the Loans in respect of which bear interest at a rate determined by reference to the Base Rate.

"*Base Rate Loan*" shall mean a Loan bearing interest at a rate determined by reference to the Base Rate.

"*Benchmark*" shall mean, initially as of the Effective Date, the Term SOFR Reference Rate; provided, that, if a Benchmark Transition Event has occurred with respect to the SOFR Reference Rate or the then-current Benchmark, then "*Benchmark*" shall thereafter mean the applicable Benchmark Replacement, to the extent that such Benchmark Replacement has replaced such prior benchmark rate pursuant to Section 2.16(b).

"*Benchmark Replacement*" shall mean, with respect to any Benchmark Transition Event, the first (1st) alternative set forth in the alphabetic order immediately below that can be determined by the Administrative Agent for the applicable Benchmark Replacement Date:

        (a)      Adjusted Daily SOFR; or

        (b)      the *sum of*: (i) the alternate benchmark rate that has been selected by the Administrative Agent and the Borrower, giving due consideration to (A) any selection or recommendation of a replacement benchmark rate, or the mechanism for determining such a replacement rate, by the Relevant Governmental Body, and (B) any evolving, or then-prevailing, market convention for determining a benchmark rate as a replacement to the then-current Benchmark for Dollar-denominated syndicated credit facilities; and (ii) the related Benchmark Replacement Adjustment;

provided, that, notwithstanding anything to the contrary in the foregoing or elsewhere in this Agreement or any other Loan Document, if, at any time, the Benchmark Replacement (as determined pursuant to the foregoing clauses (a) or (b), as applicable) would be *less than* the Floor, then the Benchmark Replacement shall be deemed to equal the Floor for all purposes of this Agreement and the other Loan Documents.

"*Benchmark Replacement Adjustment*" shall mean, with respect to any replacement of the then-current Benchmark with an Unadjusted Benchmark Replacement, the spread adjustment, or method for calculating or determining such spread adjustment (which may be a positive or negative value or equal to zero), that has been selected by the Administrative Agent and the Borrower, giving due consideration to: (a) any selection or recommendation of a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement by the Relevant Governmental Body; or (b) any evolving, or then-prevailing, market convention for determining a spread adjustment, or a method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement for Dollar-denominated syndicated credit facilities at such time.

"*Benchmark Replacement Date*" shall mean a date and time determined by the Administrative Agent, which date shall be *no later than* the *earliest* to occur of the following events with respect to the then-current Benchmark:

(a)    in the case of the occurrence of any event(s) described in clauses (a) or (b) of the definition of "*Benchmark Transition Event*" below, the *later* to occur of: (i) the date of the public statement or publication of information, as applicable, referred to in such clause (a) or (b), as applicable; and (ii) the date on which the administrator of such Benchmark (or the published component used in the calculation thereof) permanently or indefinitely ceases to provide all Available Tenors of such Benchmark (or such component thereof); or

(b)    in the case of the occurrence of any event(s) described in clause (c) of the definition of "*Benchmark Transition Event*" below, the first (1st) date on which such Benchmark (or the published component used in the calculation thereof) has been determined and announced by the regulatory supervisor for the administrator of such Benchmark (or such component thereof) to be non-representative; provided, that, such non-representativeness shall be determined by reference to the most recent statement or publication referred to in such clause (c), notwithstanding that any Available Tenor of such Benchmark (or such component thereof) may continue to be provided as of such date.

For the avoidance of doubt, in any such case of occurrence of the foregoing clauses (a) or (b) of this definition of "*Benchmark Replacement Date*" with respect to any Benchmark, the Benchmark Replacement Date will be deemed to have occurred upon the occurrence of the applicable event(s) set forth therein with respect to all then-current Available Tenors of such Benchmark (or the published component used in the calculation thereof).

"*Benchmark Transition Event*" shall mean, with respect to the then-current Benchmark, the occurrence of one (1) or more of the following events:

(a)    a public statement or publication of information by, or on behalf of, the administrator of such Benchmark (or the published component used in the calculation thereof), in either case, announcing that such administrator has ceased, or will cease, to provide all Available Tenors of such Benchmark (or such component thereof), permanently or indefinitely; provided, that, at the time of such statement or publication, no successor administrator has been identified that will continue to provide any Available Tenor of such Benchmark (or such component thereof);

(b)    a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof), the Federal Reserve Board, the FRBNY, an insolvency official with jurisdiction over the administrator for such Benchmark (or such component thereof), a resolution authority with jurisdiction over the administrator for such Benchmark (or such component thereof), or a court or other Person with similar insolvency or resolution authority over the administrator for such Benchmark (or such component thereof), in any such case, which states that the administrator of such Benchmark (or such component thereof) has ceased, or will cease, to provide all Available Tenors of such Benchmark (or such component thereof), permanently or indefinitely; provided, that, at the time of such statement or publication, no successor administrator has been identified that will continue to provide any Available Tenor of such Benchmark (or such component thereof); or

(c)    a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that all Available Tenors of such Benchmark (or such component thereof) are *not*, or, as of a specified future date, will *not* be, representative.

For the avoidance of doubt, a "*Benchmark Transition Event*" shall be deemed to have occurred, with respect to any Benchmark, if a public statement or publication of information as described above has occurred

with respect to each then-current Available Tenor of such Benchmark (or the published component used in the calculation thereof).

"*Benchmark Unavailability Period*" shall mean the period (if any): (a) *beginning* at the time that a Benchmark Replacement Date has occurred if, at such time, no Benchmark Replacement has replaced the then-current Benchmark for all purposes hereunder and under any other Loan Document in accordance with Section 2.16; and (b) *ending* at the time that a Benchmark Replacement has replaced the then-current Benchmark for all purposes hereunder and under any other Loan Document in accordance with Section 2.16.

"*Beneficial Ownership Certification*" shall mean a certification regarding beneficial ownership as required by the Beneficial Ownership Regulation.

"*Beneficial Ownership Regulation*" shall mean 31 C.F.R. §–1010.230, as amended and in effect from time to time.

"*Benefit Plan*" shall mean any of: (a) an "employee benefit plan" (as defined in ERISA) that is subject to Title I of ERISA; (b) a "plan" as defined in, and subject to, Section 4975 of the Code; or (c) any Person whose assets include (for purposes of ERISA Section 3(42), or otherwise for purposes of Title I of ERISA or Section 4975 of the Code) the assets of any such "employee benefit plan" or "plan".

"*BHC Act Affiliate*" of a party means an "affiliate" (as such term is defined under, and interpreted in accordance with, 12 U.S.C. §–1841(k)) of such party.

"*Borrower*" shall have the meaning set forth in the introductory paragraph hereof.

"*Borrower Materials*" shall have the meaning set forth in Section 5.1.

"*Borrowing*" shall mean, as the context may require, a borrowing consisting of Loans of the same Type, made, converted or continued on the same date, and, in the case of SOFR Loans, as to which a single Interest Period is in effect.

"*Budget*" shall mean (a) the Initial Budget or (b) the most recent Updated Budget, if any.

"*Business Day*" shall mean any day, other than: (a) a Saturday, Sunday or other day on which commercial banks in Charlotte, North Carolina or New York, New York are authorized, or required by applicable Law, to close; and (b) if such day relates to a determination of, or a calculation involving, SOFR, any SOFR Reference Rate and/or any SOFR-Based Rate (or any notice with respect to any of the foregoing), any day on which any of SIFMA, the New York Stock Exchange and/or the FRBNY is *not* open for business because such day is a legal holiday under the federal laws of the United States or the laws of the State of New York, as applicable.

"*Capital Lease*" shall mean, for any Person, each lease (or other arrangement conveying the right to use) of real or personal property, or a combination thereof, which obligations are required to be classified, and accounted for, as capital leases on a balance sheet of such Person in accordance with GAAP (subject to the provisions in Section 1.3 hereof).

"*Capital Lease Obligations*" of any Person shall mean all obligations of such Person to pay rent or other amounts under any Capital Lease, and the amount of such obligations shall, for purposes of this Agreement and the other Loan Documents, be deemed to be the capitalized amount thereof determined in accordance with GAAP (subject to the provisions in Section 1.3 hereof).

"*Capital Stock*" shall mean all shares, options, warrants, general or limited partnership interests, membership interests or other equivalents (regardless of how designated) of or in a corporation, partnership, limited liability company, or equivalent entity, whether voting or non-voting, including, without limitation,

common stock, preferred stock, or any other "equity security" (as such term is defined in Rule 3a11–1 of the General Rules and Regulations promulgated by the SEC under the Securities Exchange Act).

"*Carve-Out*" has the meaning given to such term in the Interim DIP Order and, as applicable, the Final DIP Order.

"*Cash Equivalents*" shall mean:

(a)     direct obligations of, or obligations the principal of and interest on which are unconditionally guaranteed by, the United States (or by any agency thereof, to the extent such obligations are backed by the full faith and credit of the United States), in each case, maturing within one (1) year from the date of acquisition thereof;

(b)     commercial paper having the highest rating, at the time of acquisition thereof, of S&P or Moody's, and, in either case, maturing within six (6) months from the date of acquisition thereof;

(c)     certificates of deposit, bankers' acceptances and time deposits maturing within one hundred eighty (180) days of the date of acquisition thereof, issued or guaranteed by or placed with, and money market deposit accounts issued or offered by, any domestic office of any commercial bank organized under the Laws of the United States, or any state thereof, which has a combined capital and surplus and undivided profits of *not less than* $500,000,000;

(d)     fully collateralized repurchase agreements with a term of *not more than* thirty (30) days for securities described in clause (a) above and entered into with a financial institution satisfying the criteria described in clause (c) above; and

(e)     mutual funds investing *solely* in any one (1) or more of the Cash Equivalents described in clauses (a) through (d) above.

"*Cash Management Order*" shall mean, collectively, the orders entered by the Bankruptcy Court with respect to the Loan Parties in the Chapter 11 Case authorizing and approving the Loan Parties' cash management arrangements and procedures, and which orders shall be in form and substance reasonably satisfactory to the Administrative Agent.

"*Change in Control*" shall mean the occurrence of one (1) or more of the following events:

(a)     the Permitted Holders cease to: (i) own and control, beneficially and of record, directly or indirectly, *at least* seventy-five percent (75.0%) of the outstanding Voting Stock in the Borrower; or (ii) possess the right to elect (through contract, ownership of voting securities, or otherwise), at all times, a majority of the board of directors or managers (or equivalent governing body) of each Loan Party, and to direct the management policies and decisions of each Loan Party;

(b)     except to the extent that a merger or consolidation transaction, or a liquidation or dissolution of a Subsidiary, is expressly permitted by Section 7.3, the Borrower ceases to own and control, beneficially and of record, directly or indirectly, *at least* one-hundred percent (100.0%) of each class of the outstanding Capital Stock in each other Loan Party; or

(c)     (i) the board of directors or other equivalent governing body of the Borrower or any other Loan Party ceases to be composed of five (5) individuals at least three (3) of whom (A) do not have a relationship by blood (to the second (2nd) degree of consanguinity), marriage or adoption to John Henry Owoc, (B) are not employees, officers, managers or consultants of, or independent contractors or advisors to, any Loan Party (other than in respect of service on such board or other equivalent governing body) and (C) are otherwise reasonably acceptable to the Required Lenders, it being understood that the individuals serving the board of directors or other equivalent governing body of the Borrower and each other Loan Party as of the Effective Date are reasonably

8

acceptable to the Required Lenders, (ii) the board of directors or other equivalent governing body of the Borrower or any other Loan Party ceases to have all or any portion of the authority invested in or otherwise designated to it as of the Effective Date (without giving effect to any provision of such authority allowing for the amendment thereof), (iii) the board of directors or other equivalent governing body of the Borrower or any other Loan Party ceases to include a restructuring committee composed solely of one (1) individual (the "_Restructuring Committee_") reasonably acceptable to the Required Lenders, it being understood that Steven G. Panagos is reasonably acceptable to the Required Lenders, (iv) the Restructuring Committee ceases to have all or any portion of the authority invested in or otherwise designated to it as of the Effective Date (without giving effect to any provision of such authority allowing for the amendment thereof), which authority shall include, at a minimum, the making of recommendations to the board of directors or other equivalent governing body of the Borrower or such other Loan Party, as applicable, regarding all aspects of the Chapter 11 Case, including without limitation the undertaking by any Debtor of any action necessary to satisfy any requirement of Section 5.18, or (v) the board of directors or other equivalent governing body of the Borrower or any other Loan Party delegates any of its authority in respect of the Chapter 11 Case to any individual(s) or committee(s) (other than the Restructuring Committee); provided, that, upon the death, incapacity or resignation (but, for the avoidance of doubt, _not_ the removal) of any individual serving on the board of directors or other equivalent governing body of the Borrower or any other Loan Party or serving on the Restructuring Committee, there shall not occur a Change in Control pursuant to this clause (c) if a replacement therefor that satisfies the criteria set forth in this clause (c)(i) or (iii), as the case may be, shall have been appointed within seven (7) days after such death, incapacity or resignation, and, upon such appointment, such replacement is vested with the same scope of authority held by his or her predecessor.

"_Change in Law_" shall mean the occurrence, after the date of this Agreement, of any of the following: (a) the adoption, or taking effect, of any applicable Law, (b) any change in any applicable Law, or in the administration, interpretation, implementation or application thereof by any Governmental Authority, or (c) the making or issuance of any request, rule, guideline or directive (whether or not having the force of law) of any Governmental Authority. Notwithstanding anything to the contrary herein, (i) the Dodd-Frank Wall Street Reform and Consumer Protection Act, and all requests, rules, guidelines and/or directives promulgated in connection therewith, and (ii) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the U.S. or foreign regulatory authorities, in each case of this clause (ii), pursuant to Basel III, shall, in each case of the foregoing clauses (i) and (ii), be deemed to be a Change in Law, regardless of the date enacted or adopted.

"_Chapter 11 Case_" shall have the meaning set forth in the recitals hereto.

"_Charges_" shall have the meaning set forth in Section 11.12.

"_Code_" shall mean the Internal Revenue Code of 1986, as amended and in effect from time to time.

"_Collateral_" shall mean all tangible and intangible property, real and personal, of any Loan Party that is, or purports to be, the subject of a Lien in favor of the Administrative Agent, for the ratable benefit of the holders of the Obligations, to secure, in whole or in part, the Obligations (or any Guarantee thereof), and shall include, without limitation, all casualty insurance proceeds and condemnation awards with respect to any of the foregoing.

"_Collateral Access Agreement_" shall mean each landlord waiver or bailee agreement granted to, and in form and substance reasonably acceptable to, the Administrative Agent.

"_Collateral Documents_" shall mean, collectively, the Security Agreement, any Mortgages, any Collateral Access Agreements, any Controlled Account Agreements, all other instruments and agreements, now or hereafter in effect, securing or perfecting the Liens securing, in whole or in part, the Obligations (or any Guarantee thereof), all UCC financing statements and fixture filings, all stock and unit powers and similar instruments of transfer, and all other documents, instruments, agreements and/or certificates executed and delivered by any Loan Party to the Administrative Agent and the Lenders in connection with the foregoing.

9

"*Commitment*" shall mean, as to each Lender, a Revolving Commitment.

"*Commitment Fee*" shall have the meaning set forth in <u>Section 2.14(b)</u>.

"*Commodity Exchange Act*" shall mean the Commodity Exchange Act (7 U.S.C. §–1 *et seq*.), as amended and in effect from time to time, and any successor statute(s), together with any rules and regulations promulgated in connection therewith, any rulings or orders issued by any applicable Governmental Authorities (including, without limitation, the U.S. Commodity Futures Trading Commission) thereunder, or the application or official interpretation of any of the foregoing.

"*Communications*" shall have the meaning set forth in <u>Section 11.1(b)(iv)</u>.

"*Conforming Changes*" shall mean, with respect to (a) the use and/or administration of, and/or any conventions associated with, SOFR, any SOFR Reference Rate and/or any SOFR-Based Rate (for any Interest Period, as applicable), or (b) the use, administration, adoption and/or implementation of, and/or any conventions associated with, any Benchmark Replacement, in each case of the foregoing <u>clauses (a)</u> and <u>(b)</u>, any technical, administrative and/or operational change(s) (including, without limitation, any such change(s) to the definition of "*Base Rate*" above, the definition of "*Business Day*" above, the definition of "*Interest Period*" below (or any similar or analogous definition, or the addition of an applicable concept of "interest period"), the definition of "*U.S. Government Securities Business Day*" below, the timing and frequency of determining rates and making payments of interest, the timing of delivery of any Notices of Borrowing (or other requests for borrowing of Loans), the timing of delivery of any notices of optional reduction or termination of any Commitment(s), the timing of delivery of any notices of optional prepayment of Loans (or other notices of prepayment of Loans), the timing of delivery of any Notices of Continuation / Conversion (or other notices of the continuation or conversion of Loans), the applicability and length of lookback periods, the applicability of <u>Section 2.19</u>, and any other technical, administrative and/or operational matters) that the Administrative Agent determines, in its discretion, may be appropriate to reflect the adoption and/or implementation of any such rate and/or to permit the use and administration thereof by the Administrative Agent in a manner substantially consistent with market practice (or, if the Administrative Agent determines, in its discretion, that (i) the adoption and/or implementation of, or of any portion of, such market practice is *not* administratively feasible for the Administrative Agent, or (ii) no market practice for the administration of any such rate exists, then, in each case of the foregoing <u>clauses (i)</u> and <u>(ii)</u>, permit the use and administration thereof by the Administrative Agent in such other manner of administration as the Administrative Agent determines is reasonably necessary in connection with the administration of this Agreement and the other Loan Documents).

"*Connection Income Taxes*" shall mean Other Connection Taxes that are imposed on, or measured by, net income (however denominated), or that are franchise Taxes or branch profits Taxes.

"*Contingent Liability*" shall mean, with respect to any Person, each obligation and liability of such Person, and all such obligations and liabilities of such Person incurred pursuant to any agreement, undertaking or arrangement by which such Person: (a) guarantees, endorses or otherwise becomes, or is contingently liable upon (by direct or indirect agreement, contingent or otherwise, to provide funds for payment, to supply funds to, or otherwise to invest in, a debtor, or otherwise to assure a creditor against loss), the indebtedness, dividend, obligation or other liability of any other Person in any matter (other than by endorsement of instruments in the course of collection), including any indebtedness, dividend or other obligation which may be issued or incurred at some future time; (b) guarantees the payment of dividends or other distributions upon the Capital Stock of any other Person; (c) undertakes or agrees (whether contingently or otherwise): (i) to purchase, repurchase, or otherwise acquire any indebtedness, obligation or liability of any other Person or any property or assets constituting security therefor, (ii) to advance or provide funds for the payment or discharge of any indebtedness, obligation or liability of any other Person (whether in the form of loans, advances, stock purchases, capital contributions or otherwise), or to maintain solvency, assets, level of income, working capital or other financial condition of any other Person, or (iii) to make payment to any other Person other than for value received; (d) agrees to lease property or to purchase securities, property or services from such other Person with the purpose or

10

intend of assuring the owner of such indebtedness or obligation of the ability of such other Person to make payment of the indebtedness or obligation; (e) to induce the issuance of, or in connection with the issuance of, any letter of credit for the benefit of such other Person; or (f) undertakes or agrees otherwise to assure a creditor against loss. The amount of any Contingent Liability shall (subject to any limitation set forth herein) be deemed to be the outstanding principal amount (or maximum permitted principal amount, if larger) of the indebtedness, obligation or other liability guaranteed or supported thereby.

"*Contractual Obligation*" of any Person shall mean any provision of any security issued by such Person or of any agreement, instrument or undertaking under which such Person is obligated, or by which it or any of the property in which it has an interest is bound.

"*Controlled Account*" shall have the meaning set forth in Section 5.11(a).

"*Controlled Account Agreement*" shall mean any tri-party agreement by and among a Loan Party, the Administrative Agent, and a depositary bank or securities intermediary, as applicable, at which such Loan Party maintains a Controlled Account, in each case, in form and substance satisfactory to the Administrative Agent.

"*Copyrights*" shall have the meaning set forth in the Security Agreement.

"*Covered Entity*" means any of the following: (a) a "covered entity" as that term is defined in, and interpreted in accordance with, 12 C.F.R. §–252.82(b); (b) a "covered bank" as that term is defined in, and interpreted in accordance with, 12 C.F.R. §–47.3(b); and (c) a "covered FSI" as that term is defined in, and interpreted in accordance with, 12 C.F.R. §–382.2(b).

"*Covered Party*" shall have the meaning set forth in Section 11.18.

"*Credit Event*" shall mean the advancing of any Loan to any Loan Party or Subsidiary, or the issuance, extension of the maturity date or expiration date, or increase in the amount, of, any Indebtedness of any Loan Party.

"*Daily SOFR*" shall mean, as of any specified date of determination, for any calculations with respect to any Loan bearing interest at a rate determined by reference to Daily SOFR and/or any determination of the Base Rate pursuant to clause (c) of the definition of "*Base Rate*" above, the rate per annum equal to the Daily SOFR Reference Rate, determined as of the date that is five (5) U.S. Government Securities Business Days prior to such specified date of determination (such prior date, a "*Periodic Daily SOFR Determination Date*"), as such rate is published by the SOFR Administrator on such Periodic Daily SOFR Determination Date; provided, that, (a) if, as of 5:00 P.M. on any Periodic Daily SOFR Determination Date, (i) the Daily SOFR Reference Rate has *not* been published by the SOFR Administrator, and (ii) a Benchmark Replacement Date with respect to the Daily SOFR Reference Rate has *not* occurred, then "*Daily SOFR*" shall instead mean the Daily SOFR Reference Rate as published by the SOFR Administrator on the first (1st) preceding U.S. Government Securities Business Day for which the Daily SOFR Reference Rate was published by the SOFR Administrator, so long as such first (1st) preceding U.S. Government Securities Business Day is *not more than* three (3) U.S. Government Securities Business Days prior to such Periodic Daily SOFR Determination Date, and (b) if, at any time, Daily SOFR (determined in accordance with the foregoing of this definition of "*Daily SOFR*", including in accordance with the foregoing clause (a) of this proviso) is *less than* the Floor, then Daily SOFR shall be deemed to equal the Floor for all purposes of this Agreement and the other Loan Documents. Any change(s) in Daily SOFR due to any change(s) in the Daily SOFR Reference Rate shall be effective from, and including, the effective date of any such change(s) in the Daily SOFR Reference Rate, without further notice to any Loan Party or Subsidiary, any other party to this Agreement or any other Loan Document, or any other Person.

"*Daily SOFR Reference Rate*" shall mean the rate per annum determined by the Administrative Agent as the daily published index rate based on SOFR.

"*Debtor Relief Laws*" shall mean the Bankruptcy Code, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief Laws of the United States or other applicable jurisdictions from time to time in effect.

"*Debtors*" shall have the meaning set forth in the recitals hereto.

"*Default*" shall mean any condition or event that, with the giving of notice or the lapse of time or both, would constitute an Event of Default.

"*Default Interest*" shall have the meaning set forth in Section 2.13(d).

"*Default Right*" has the meaning assigned to that term in, and shall be interpreted in accordance with, 12 C.F.R. §§–252.81, 47.2 or 382.1, as applicable.

"*Defaulting Lender*" shall mean, at any time, any Lender as to which the Administrative Agent has notified the Borrower that: (a) such Lender has failed, for three (3) or more Business Days, to comply with its obligations under this Agreement to make a Loan, unless such Lender notifies the Administrative Agent and the Borrower in writing that such failure is the result of such Lender's determination that one (1) or more conditions precedent to funding (each of which conditions precedent, together with any applicable default, shall be specifically identified in such writing) has not been satisfied (each, a "*funding obligation*"); (b) such Lender has notified the Administrative Agent or the Borrower, or has stated publicly, that it will not comply with any such funding obligation hereunder (unless such writing or public statement relates to such Lender's obligation to fund a Loan hereunder and states that such position is based on such Lender's determination that a condition precedent to funding (which condition precedent, together with any applicable default, shall be specifically identified in such writing or public statement) cannot be satisfied), or has defaulted on, its obligation to fund generally under any other loan agreement, credit agreement or other financing agreement; (c) such Lender has, for three (3) or more Business Days, failed to confirm in writing to the Administrative Agent, in response to a written request of the Administrative Agent, that it will comply with its funding obligations hereunder (provided, that, such Lender shall cease to be a Defaulting Lender pursuant to this clause (c) upon receipt of such written confirmation by the Administrative Agent and the Borrower); (d) a Lender Insolvency Event has occurred and is continuing with respect to such Lender; or (e) such Lender has become the subject of a Bail-In Action. The Administrative Agent will promptly send to all parties hereto a copy of any notice to the Borrower provided for in this definition.

"*Disqualified Institution*" shall mean: (a) any competitor (as reasonably determined by the Borrower) identified in writing to the Administrative Agent on or prior to the Effective Date; and (b) any Affiliate of a "Disqualified Institution" described in the foregoing clause (a) of this definition of "Disqualified Institution"; provided, that, (i) "Disqualified Institution" shall exclude any Person that the Borrower has designated as no longer being a "Disqualified Institution" by written notice delivered to the Administrative Agent and the Lenders from time to time and (ii) notwithstanding anything to the contrary in the foregoing, no Person shall constitute a Disqualified Institution during the continuance of an Event of Default.

"*DIP Facility*" shall have the meaning set forth in the recitals hereto.

"*DIP Facility Available Amount*" shall mean, at any time, the *lesser* of (a) the Aggregate Revolving Commitment Amount and (b) the sum of the following:

(i)      the Interim DIP Facility Amount, *plus*

(ii)      from and after the Full DIP Commitment Date, an amount equal to $100,000,000 *minus* the Interim DIP Facility Amount, *plus*

(iii)      from and after the Full DIP Commitment Date, an amount equal to the difference of (A) the Specified Prepetition Facility Obligations Amount *minus* (B) the portion of the Prepetition Facility Obligations

remaining outstanding as of the date of determination after giving effect to (I) repayments of the Prepetition Facility Obligations as permitted by the Final DIP Order and (II) the deemed conversion of a portion of the Prepetition Facility Obligations to outstanding Revolving Loans in the amount of the Initial Roll-Up as permitted by the Final DIP Order.

"*DIP Facility Maturity Date*" shall mean the earliest to occur of the following:

(a)    unless the Final DIP Order Entry Date shall have occurred, the date that is thirty (30) calendar days after the Interim DIP Order Entry Date; provided, that, the date contemplated in this clause (a) may be extended with the consent of the Administrative Agent and the Required Lenders to a date that is no later than sixty (60) calendar days after the Interim DIP Order Entry Date;

(b)    the date upon which any Plan of Reorganization becomes effective;

(c)    the date upon which the Sale Transaction is consummated; and

(d)    the date that is the seven (7) month anniversary of the Petition Date.

"*Dollar*(*s*)" and the sign "$" shall mean lawful money of the United States.

"*Domestic Subsidiary*" shall mean any Subsidiary that is organized under the Laws of the United States or of any state, district or other political subdivision thereof.

"*DQ List*" shall have the meaning set forth in Section 11.4(h)(iv).

"*EEA Financial Institution*" shall mean: (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority; (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition; or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described the foregoing clauses (a) or (b) and is subject to consolidated supervision with its parent.

"*EEA Member Country*" shall mean any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"*EEA Resolution Authority*" shall mean any public administrative authority, or any Person entrusted with public administrative authority, of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"*Effective Date*" shall mean the date hereof.

"*Eligible Assignee*" shall mean any Person that meets the requirements to be an assignee as set forth in Section 11.4 (subject to such consents, if any, as may be required under Section 11.4(b)(iii)).

"*Environmental Laws*" shall mean all Laws, rules, regulations, codes, ordinances, orders, decrees, judgments, injunctions, notices or binding agreements issued, promulgated or entered into by or with any Governmental Authority, relating in any way to the environment, preservation or reclamation of natural resources, the management, Release or threatened Release of any Hazardous Material or to health and safety matters concerning exposure to Hazardous Materials.

"*Environmental Liability*" shall mean any liability, contingent or otherwise (including any liability for damages, costs of environmental investigation and remediation, costs of administrative oversight, fines, natural resource damages, penalties or indemnities), of any Loan Party or Subsidiary directly or indirectly resulting from, or based upon: (a) any actual or alleged violation of any Environmental Law; (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials; (c) any actual or alleged exposure to

13

any Hazardous Materials; (d) the Release or threatened Release of any Hazardous Materials; or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"*ERISA*" shall mean the Employee Retirement Income Security Act of 1974 (29 U.S.C. §–18 *et seq.*), as amended and in effect from time to time, and any successor statute(s), together with any rules and regulations promulgated in connection therewith, any rulings or orders issued by any applicable Governmental Authorities (including, without limitation, the U.S. Department of Labor) thereunder, or the application or official interpretation of any of the foregoing.

"*ERISA Affiliate*" shall mean any Person that, for purposes of Title I or Title IV of ERISA or Section 412 of the Code, would be deemed, at any relevant time, to be a "single employer", or otherwise aggregated with any of the Loan Parties and Subsidiaries, under Section 414(b), Section 414(c), Section 414(m), or Section 414(o) of the Code, or Section 4001(b)(1) of ERISA.

"*ERISA Event*" shall mean: (a) any "reportable event", as defined in Section 4043 of ERISA with respect to a Plan (other than an event as to which the PBGC has waived, under subsection .22, .23, .25, .27 or .28 of PBGC Regulation Section 4042, the requirement of Section 4043(a) of ERISA that the PBGC be notified of such event); (b) any failure to make a required contribution to any Plan that would result in the imposition of a Lien or other encumbrance, or the provision of security, under Section 430 of the Code or Section 303 or Section 4068 of ERISA, or the arising of such a Lien or encumbrance, there being or arising any "unpaid minimum required contribution" or "accumulated funding deficiency" (each, as defined, or otherwise set forth, in Section 4971 of the Code or Part 3 of Subtitle B of Title 1 of ERISA), whether or not waived, or any filing of any request for, or receipt of, a minimum funding waiver under Section 412 of the Code or Section 302 of ERISA with respect to any Plan or Multiemployer Plan, or that such filing may be made, or any determination that any Plan is, or is expected to be, in at-risk status under Title IV of ERISA; (c) any incurrence by any Loan Party or Subsidiary, or any of their respective ERISA Affiliates, of any material liability under Title IV of ERISA with respect to any Plan or Multiemployer Plan (other than for premiums due and not delinquent under Section 4007 of ERISA); (d) any institution of proceedings, or the occurrence of any event or condition that would reasonably be expected to constitute grounds for the institution of proceedings, by the PBGC, under Section 4042 of ERISA for the termination of, or the appointment of, a trustee to administer any Plan(s); (e) any incurrence by any Loan Party or Subsidiary, or any of their respective ERISA Affiliates, of any liability with respect to the withdrawal, or partial withdrawal, from any Plan or Multiemployer Plan; (f) the receipt by any Loan Party or Subsidiary, or any of their respective ERISA Affiliates, of any notice that a Multiemployer Plan is in endangered or critical status under Section 305 of ERISA; (g) any receipt by any Loan Party or Subsidiary, or any of their respective ERISA Affiliates, of any notice, or any receipt by any Multiemployer Plan from any Loan Party or Subsidiary, or any of their respective ERISA Affiliates, of any notice, in each case, concerning the imposition of Withdrawal Liability, or a determination that a Multiemployer Plan is, or is expected to be, insolvent or in reorganization, within the meaning of Title VI of ERISA; (h) engaging in a non-exempt prohibited transaction within the meaning of Section 4975 of the Code or Section 406 of ERISA that results in material liability to any Loan Party or Subsidiary; or (i) any filing of a notice of intent to terminate any Plan, if such termination would require material additional contributions in order to be considered a standard termination within the meaning of Section 4041(b) of ERISA, any filing under Section 4041(c) of ERISA of a notice of intent to terminate any Plan, or the termination of any Plan under Section 4041(c) of ERISA.

"*EU Bail-In Legislation Schedule*" shall mean the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor Person), as in effect from time to time.

"*Event of Default*" shall have the meaning set forth in Section 8.1.

"*Excluded Accounts*" shall mean: (a) deposit and/or securities accounts, the balance of which consists exclusively of (i) withheld income taxes and federal, state or local employment taxes, in such amounts as are required, in the reasonable judgment of the Borrower, to be paid to the IRS or state or local government agencies

14

within the following two (2) months, with respect to employees of any of the Loan Parties, or (ii) amounts required to be paid over to an employee benefit plan pursuant to DOL Reg. §–2510.3–102 on behalf of, or for the benefit of, employees of one (1) or more Loan Parties; and (b) all tax accounts (including, without limitation, sales tax accounts), accounts used *solely* for payroll, accounts maintained *solely* in trust for the benefit of third parties and fiduciary purposes, escrow accounts, zero balance or swept accounts, and employee benefit accounts (including 401(k) accounts and pension fund accounts), in each case of this clause (b), so long as such account is used *solely* for such purpose.

"*Excluded Property*" shall mean, with respect to any Loan Party, (a) Avoidance Actions (other than such actions arising under Sections 549 and 550 (other than with respect to any applicability to section 549 of the Bankruptcy Code), which shall not constitute Excluded Property), and the proceeds thereof, (b) Excluded Accounts, and (c) the Capital Stock held by any Loan Party in (i) any Foreign Subsidiary that is not a direct Subsidiary of a Loan Party and (ii) any direct Subsidiary of any Loan Party that is an Excluded Subsidiary solely pursuant to clause (iii) of such definition, except for (A) sixty-five percent (65.0%) of the issued and outstanding Capital Stock in any such Subsidiary entitled to vote (within the meaning of Treasury Regulations Section 1.956-2(c)(2)) and (B) one hundred percent (100.0%) of the issued and outstanding Capital Stock in any such Subsidiary not entitled to vote (within the meaning of Treasury Regulations Section 1.956-2(c)(2)).

"*Excluded Subsidiary*" shall mean, collectively, each Subsidiary that is (i) not a Loan Party under the Prepetition Credit Agreement as of the Petition Date, (ii) is not a Debtor at the applicable time of determination or (iii) a Foreign Subsidiary (or any Subsidiary of any Foreign Subsidiary).

"*Excluded Taxes*" shall mean any of the following Taxes imposed on, or with respect to, a Recipient, or required to be withheld or deducted from a payment to a Recipient: (a) Taxes imposed on, or measured by, net income (however denominated), franchise Taxes, and branch profits Taxes, in each case of this clause (a), (i) imposed as a result of such Recipient being organized under the Laws of, or having its principal office, or in the case of any Lender, its Applicable Lending Office, in the jurisdiction imposing such Tax (or any political subdivision thereof), or (ii) that are Other Connection Taxes; (b) in the case of a Lender, U.S. federal withholding Taxes imposed on amounts payable to, or for the account of, such Lender with respect to an applicable interest in a Loan or Commitment, pursuant to a Law in effect on the date on which (i) such Lender acquires such interest in the Loan or Commitment (other than pursuant to an assignment request by the Borrower under Section 2.25), or (ii) such Lender changes its lending office, except, in each case of this clause (b), to the extent that, pursuant to Section 2.20, amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender became a party hereto or to such Lender immediately before it changed its lending office; (c) Taxes attributable to such Recipient's failure to comply with Section 2.20(g); and (d) any U.S. federal withholding Taxes imposed under FATCA.

"*Facility Termination Date*" means the date as of which all of the following shall have occurred: (a) the Commitments have expired or been terminated; and (b) all Obligations have been paid in full in cash or immediately available funds (other than contingent indemnification obligations for which no claim has been asserted) or, with respect to any Obligations constituting Bank Product Obligations, other arrangements with respect thereto satisfactory to the applicable Bank Product Provider shall have been made.

"*FATCA*" shall mean Sections 1471 through 1474 of the Code, as in effect as of the Effective Date (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof, any agreements entered into pursuant to Section 1471(b)(1) of the Code, any applicable intergovernmental agreements implementing any of the foregoing, and any fiscal or regulatory legislation, rules or practices adopted pursuant to any such intergovernmental agreements.

"*FDA*" shall mean the U.S. Food and Drug Administration, or any Governmental Authority succeeding to any of its principal functions.

"*FD&C Act*" shall mean the U.S. Federal Food, Drug, and Cosmetic Act of 1938 (21 U.S.C. §–301 *et seq.*), as amended and in effect from time to time, and any successor statute(s), together with any rules and regulations promulgated in connection therewith, any rulings or orders issued by any applicable Governmental Authorities (including, without limitation, the FDA) thereunder, or the application or official interpretation of any of the foregoing.

"*Federal Funds Rate*" shall mean, for any date of determination, the rate per annum (expressed as a decimal, rounded upwards, if necessary, to the next higher one one-hundredth of one percent (0.01%)) equal to the weighted average of the rates on overnight federal funds transactions with member banks of the Federal Reserve System, as published by the FRBNY on the Business Day next succeeding such day; provided, that, (a) if such day is *not* a Business Day, the Federal Funds Rate for such day shall be such rate on such transactions on the next preceding Business Day as so published on the next succeeding Business Day, and (b) if no such rate is so published on such next succeeding Business Day, the Federal Funds Rate for such day shall be the average rate per annum (expressed as a decimal, rounded upwards, if necessary, to the next higher one one-hundredth of one percent (0.01%)) of the quotations for such day on such transactions received by the Administrative Agent from *at least* three (3) federal funds brokers of recognized good standing selected by the Administrative Agent, as determined by the Administrative Agent. Notwithstanding anything to the contrary in the foregoing, if, at any time, the Federal Funds Rate is *less than* the Floor, then the Federal Funds Rate shall be deemed to equal the Floor for all purposes of this Agreement and the other Loan Documents.

"*Federal Reserve Board*" shall mean the Board of Governors of the Federal Reserve System (or any successor).

"*Fee Letter*" shall mean that certain letter agreement, dated as of the date hereof, executed by Truist and accepted by the Borrower.

"*Final DIP Order*" shall mean, collectively, the final order or orders entered by the Bankruptcy Court with respect to the Loan Parties in the Chapter 11 Case after a final hearing under Bankruptcy Rule 4001(c)(2) or such other procedures as approved by the Bankruptcy Court, which order shall be substantially in the form of the Interim DIP Order (with only such modifications thereto as are satisfactory in form and substance to the Administrative Agent), and from which no appeal or motion to reconsider has been timely filed, or if timely filed, the making of the Loans and/or the performance by any Loan Party of any of their respective obligations under any of the Loan Documents, and the rights and remedies granted to the Administrative Agent and the Lenders pursuant to this Agreement and the other Loan Documents, shall not be the subject of a presently effective stay pending such appeal (unless the Administrative Agent waives such requirement), together with all extensions, modifications and amendments thereto, in form and substance satisfactory to the Administrative Agent.

"*Final DIP Order Entry Date*" shall mean the date on which the Final DIP Order (which, for purposes of this definition, shall be determined without regard to whether or not the time to appeal, petition for certiorari, or move for re-argument or rehearing has expired) shall have been entered on the docket of the Bankruptcy Court in the Chapter 11 Case.

"*Fiscal Quarter*" shall mean any fiscal quarter of the Borrower.

"*Fiscal Year*" shall mean any fiscal year of the Borrower.

"*Flood Insurance Laws*" shall mean, collectively: (a) the National Flood Insurance Reform Act of 1994 (which comprehensively revised the National Flood Insurance Act of 1968 and the Flood Disaster Protection Act of 1973), as now or hereafter in effect, or any successor statute thereto; (b) the Flood Insurance Reform Act of 2004, as now or hereafter in effect, or any successor statute thereto; and (c) the Biggert-Waters Flood Insurance Reform Act of 2012, as now or hereafter in effect, or any successor state thereto.

"*Floor*" shall mean a rate of interest equal to three-fourths of one percent (0.75%) per annum (subject to the proviso to the last sentence of Section 2.16(a)).

"*Foreign Lender*" shall mean: (a) if the Borrower is a U.S. Person, a Lender that is not a U.S. Person; and (b) if the Borrower is *not* a U.S. Person, a Lender that is resident, or organized under the Laws, of a jurisdiction other than the jurisdiction in which the Borrower is resident for tax purposes.

"*Foreign Subsidiary*" shall mean any Subsidiary that is *not* a Domestic Subsidiary.

"*FRBNY*" shall mean the Federal Reserve Bank of New York (or any successor).

"*Full DIP Commitment Date*" shall mean the first date as of which all of the following shall have occurred: (a) the entry of the Final DIP Order shall have occurred; and (b) no Default or Event of Default shall have occurred and be continuing.

"*GAAP*" shall mean generally accepted accounting principles in the United States, applied on a consistent basis and subject to the terms of Section 1.3.

"*Governmental Authority*" shall mean the government of the United States, any other nation, or any political subdivision of any of the foregoing, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of, or pertaining to, government (including, without limitation, the FDA and any supra-national bodies such as the European Union or the European Central Bank).

"*Guarantee*" of or by any Person (the "*guarantor*") shall mean any obligation, contingent or otherwise, of the guarantor guaranteeing, or having the economic effect of guaranteeing, any Indebtedness or other obligation of any other Person (the "*primary obligor*") in any manner, whether directly or indirectly, and including any obligation, direct or indirect, of the guarantor (a) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation, or to purchase (or to advance or supply funds for the purchase of) any security for the payment thereof, (b) to purchase or lease property, securities or services for the purpose of assuring the owner of such Indebtedness or other obligation of the payment thereof, (c) to maintain working capital, equity capital, or any other financial statement condition or liquidity of the primary obligor, so as to enable the primary obligor to pay such Indebtedness or other obligation, or (d) as an account party in respect of any letter of credit or letter of guaranty issued in support of such Indebtedness or obligation; provided, that, the term "*Guarantee*" shall not include endorsements for collection or deposit in the ordinary course of business. The amount of any Guarantee shall be deemed to be an amount equal to the stated or determinable amount of the primary obligation in respect of which such Guarantee is made, or, if not so stated or determinable, the maximum reasonably anticipated liability in respect thereof (assuming that such Person is required to perform thereunder), as determined by such Person in good faith. The term "*Guarantee*" used as a verb shall have a corresponding meaning.

"*Guarantor Joinder Agreement*" shall mean a joinder agreement, substantially in the form of Exhibit 5.13, executed and delivered by a Subsidiary in accordance with the provisions of Section 5.13, or any other documents as the Administrative Agent shall deem appropriate for such purpose.

"*Guarantors*" shall mean, collectively: (a) each Subsidiary identified as a "*Guarantor*" on the signature pages hereto; (b) each Person that joins as a Guarantor pursuant to Section 5.13 or otherwise; (c) with respect to any Bank Product Obligations owing by any Loan Party (other than the Borrower) or Subsidiary, the Borrower; and (d) the successors and permitted assigns of each such Person referred to in the foregoing clauses (a) through (c).

"*Guaranty*" shall mean that certain Guaranty made by the Guarantors in favor of the Administrative Agent, for the ratable benefit of the holders of the Obligations, pursuant to Article X.

17

"*Hazardous Materials*" shall mean all explosive or radioactive substances or wastes and all hazardous or toxic substances, wastes or other pollutants, including petroleum or petroleum distillates, asbestos or asbestos containing materials, polychlorinated biphenyls, radon gas, infectious or medical wastes and all other substances or wastes of any nature regulated pursuant to any Environmental Law.

"*Healthcare Law*" shall mean, individually or collectively (as the context may require), (a) the FD&C Act, and (b) any and all other applicable Laws, regulations, manual provisions, policies and administrative guidance, applicable to any Loan Party or Subsidiary, in respect of each of the foregoing clauses (a) and (b), as may be amended and in effect from time to time.

"*Hedge Termination Value*" shall mean, in respect of any one (1) or more Hedging Transactions, after taking into account the effect of any legally enforceable netting agreement relating to such Hedging Transactions: (a) for any date on or after the date on which such Hedging Transactions have been closed out and termination value(s) have been determined in accordance therewith, such termination value(s); and (b) for any date prior to the date referenced in clause (a) above, the amount(s) determined as the mark-to-market value(s) for such Hedging Transactions, as determined based upon one (1) or more mid-market or other readily available quotations provided by any recognized dealer in such Hedging Transactions (which, for the avoidance of doubt, may include any Lender or any Affiliate of a Lender).

"*Hedging Obligations*" of any Person shall mean any and all obligations of such Person, whether absolute or contingent, and howsoever and whensoever created, arising, evidenced or acquired, under: (a) any and all Hedging Transactions; (b) any and all cancellations, buy backs, reversals, terminations, or assignments of any Hedging Transactions; and (c) any and all renewals, extensions and modifications of any Hedging Transactions, and any and all substitutions for any Hedging Transactions.

"*Hedging Transaction*" of any Person shall mean: (a) any transaction (including an agreement with respect to any such transaction) now existing, or hereafter entered into, by such Person that is a rate swap transaction, swap option, basis swap, forward rate transaction, commodity swap, commodity option, equity or equity index swap or option, bond option, interest rate option, foreign exchange transaction, cap transaction, floor transaction, collar transaction, currency swap transaction, cross-currency rate swap transaction, currency option, spot transaction, credit protection transaction, credit swap, credit default swap, credit default option, total return swap, credit spread transaction, repurchase transaction, reverse repurchase transaction, buy/sell-back transaction, securities lending transaction, or any other similar transaction (including any option with respect to any of these transactions) or any combination thereof, whether or not any such transaction is governed by, or subject to, any Master Agreement; and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any Master Agreement, including any such obligations or liabilities under any Master Agreement.

"*Hemp*" has the meaning set forth in the Agriculture Improvement Act of 2018 (7 U.S.C. ch. 38 §§– 1639o, *et seq.*), as amended, restated or replaced from time to time.

"*Indebtedness*" of any Person shall mean, without duplication: (a) all obligations of such Person for borrowed money; (b) all obligations of such Person evidenced by bonds, debentures, notes or other similar instruments; (c) all obligations of such Person in respect of the deferred purchase price of property or services (other than trade payables incurred in the ordinary course of business, provided, that, for purposes of Section 8.1(f), trade payables overdue by more than one-hundred twenty (120) days shall be included in this definition of "Indebtedness", except to the extent that any of such trade payables are being disputed in good faith and by appropriate measures); (d) all obligations of such Person under any conditional sale or other title retention agreement(s) relating to property acquired by such Person; (e) all Capital Lease Obligations of such Person; (f) all obligations, contingent or otherwise, of such Person in respect of letters of credit, acceptances or similar extensions of credit and all Contingent Liabilities; (g) all obligations of such Person, contingent or otherwise, to purchase, redeem, retire or otherwise acquire for value any Capital Stock of such Person; (h) Off-Balance Sheet Liabilities; (i) the Hedge Termination Value of all Hedging Obligations; (j) all Guarantees of such Person of the type of

18

Indebtedness described in clauses (a) through (j) above; and (k) all Indebtedness of a third-party secured by any Lien on property owned by such Person, whether or not such Indebtedness has been assumed by such Person. The Indebtedness of any Person shall *include* the Indebtedness of any partnership or joint venture in which such Person is a general partner or a joint venturer, except to the extent that the terms of such Indebtedness provide that such Person is not liable therefor.

"*Indemnified Taxes*" shall mean: (a) Taxes, other than Excluded Taxes, imposed on, or with respect to, any payment made by, or on account of, any obligation of any Loan Party under any Loan Document; and (b) to the extent not otherwise described in clause (a) above, Other Taxes.

"*Indemnitee*" shall have the meaning set forth in Section 11.3(b).

"*Initial Budget*" shall have the meaning set forth in Section 3.1(h).

"*Initial Roll-Up*" shall mean an aggregate amount equal to the sum of (a) $60,000,000 of Prepetition Revolving Loans, *plus* (b) the amount of the Specified Prepetition Accruals, *plus* (c) the aggregate amount of collections received by any Loan Party during the period from (and including) the Petition Date through (and including) the last Business Day occurring during the week prior to the week during which the Final DIP Order Entry Date occurs, or such other amount as is specified in the Final DIP Order.

"*Interest Period*" shall mean, with respect to any SOFR Borrowing or any SOFR Loan, a period of one (1) month (subject to availability), provided, that:

(a)    the initial Interest Period for such Borrowing shall commence on the date of such Borrowing (including the date of any conversion from a Borrowing of another Type), and each Interest Period occurring thereafter in respect of such Borrowing shall commence on the day on which the next preceding Interest Period expires;

(b)    if any Interest Period would otherwise end on a day other than a Business Day, such Interest Period shall be extended to the next succeeding Business Day, unless such Business Day falls in another calendar month, in which case, such Interest Period would end on the next preceding Business Day;

(c)    any Interest Period which begins on the last Business Day of a calendar month, or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period, shall end on the last Business Day of such calendar month;

(d)    [reserved];

(e)    no Interest Period may extend beyond the Revolving Commitment Termination Date; and

(f)    notwithstanding anything to the contrary in the foregoing of this definition of "*Interest Period*" or elsewhere in this Agreement or any other Loan Document, no tenor that has been removed from this definition of "*Interest Period*" by operation of Section 2.16(e) shall be available for specification by the Borrower in any Notice of Borrowing and/or any Notice of Conversion / Continuation, as applicable.

"*Interim DIP Facility Amount*" means $34,000,000.

"*Interim DIP Order*" shall mean, collectively, the interim order or orders entered by the Bankruptcy Court with respect to the Loan Parties in the Chapter 11 Case after an interim hearing, together with all extensions, modifications and amendments thereto, in form and substance satisfactory to the Administrative Agent, which, among other matters but not by way of limitation, authorizes, on an interim basis, the Loan Parties to execute and perform under the terms of this Agreement and the other Loan Documents, as applicable, pay all fees and expenses provided for herein, and incur (and guarantee) and secure the Loans and other Obligations in connection therewith, and which approves all of the rights and remedies granted to the Administrative Agent and the Lenders pursuant

to this Agreement and the other Loan Documents, which order shall be in form and substance satisfactory to the Administrative Agent, and which shall be deemed satisfactory to the Administrative Agent if such order is substantially in the form of Exhibit 1.1.

"*Interim DIP Order Entry Date*" shall mean the date on which the Interim DIP Order was entered on the docket of the Bankruptcy Court in the Chapter 11 Case.

"*Investment Banker*" shall mean any investment banking firm satisfactory to the Administrative Agent (it being understood that Rothschild & Co US Inc. is satisfactory) retained by the Loan Parties to market the assets of the Loan Parties and their Subsidiaries for sale.

"*Investment Company Act*" shall mean the Investment Company Act of 1940 (15 U.S.C. §§–80a-1, 80a-64 *et seq*.), as amended and in effect from time to time, and any successor statute(s), together with any rules and regulations promulgated in connection therewith, any rulings or orders issued by any applicable Governmental Authorities (including, without limitation, the SEC) thereunder, or the application or official interpretation of any of the foregoing.

"*Investments*" shall mean, as to any Person, any direct or indirect acquisition of or relating to, or investment by, such Person (including pursuant to any merger with any Person that was *not* a Wholly-Owned Subsidiary prior to such merger), whether by means of: (a) any purchase or other acquisition of any Capital Stock in another Person; (b) any loan or advance to, any other evidence of Indebtedness of, any other security (including, without limitation, any option, warrant, or other right to acquire any of the foregoing) of, any Guarantee or assumption of any Indebtedness or obligations of, any purchase or other acquisition of any Indebtedness of, any capital contribution to, and/or any equity participation or other interest in, another Person; or (c) an Acquisition. For purposes of calculating compliance with the financial covenants set forth in Article VI (and, for purposes of any calculations substantially based on, or derivative from, such compliance), the amount of any Investment shall be deemed to be the amount *actually* invested, without adjustment for subsequent increases or decreases in the value of such Investment.

"*IP Notice Filings*" shall mean, collectively, (a) with regard to any Copyrights, a Notice of Grant of Security Interest in Copyrights for filing with the United States Copyright Office, (b) with regard to any Patents, a Notice of Grant of Security Interest in Patents for filing with the United States Patent and Trademark Office, and (c) with regard to any Trademarks, a Notice of Grant of Security Interest in Trademarks for filing with the United States Patent and Trademark Office, in each case of the foregoing clauses (a) through (c), substantially in the form of the applicable Exhibit to the Security Agreement (or such other form as reasonably requested by the Administrative Agent) that are, or are required to be, filed under, or in connection with, the Security Agreement.

"*IP Rights*" shall mean all of the trademarks, service marks, trade names, copyrights, patents, patent rights, franchises, licenses, and other intellectual property rights that are reasonably necessary for the operation of their respective businesses that any Loan Party or Subsidiary owns, or possesses the legal right to use.

"*IRS*" shall mean the United States Internal Revenue Service.

"*Laws*" or "*Law*" shall mean, collectively, all international, foreign, federal, state and local statutes, treaties, rules, guidelines, regulations, ordinances, codes and administrative or judicial precedents or authorities, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and all applicable administrative orders, directed duties, requests, licenses, authorizations and permits of, and agreements with, any Governmental Authority, in each case, whether or not having the force of law.

"*Lender Insolvency Event*" shall mean that (a) a Lender or its Parent Company is insolvent, or is generally unable to pay its debts as they become due, or admits in writing its inability to pay its debts as they become due, or makes a general assignment for the benefit of its creditors, (b) a Lender or its Parent Company is the subject of

20

a bankruptcy, insolvency, reorganization, liquidation or similar proceeding, or a receiver, trustee, conservator, custodian or the like has been appointed for such Lender or its Parent Company, or such Lender or its Parent Company has taken any action in furtherance of, or indicating its consent to, or acquiescence in, any such proceeding or appointment, or (c) a Lender or its Parent Company has been adjudicated as, or determined by any Governmental Authority having regulatory authority over such Person or its property or assets to be, insolvent; provided, that, for the avoidance of doubt, a Lender Insolvency Event shall *not* be deemed to have occurred *solely* by virtue of the ownership or acquisition of any equity interest in or control of a Lender or a Parent Company thereof by a Governmental Authority or an instrumentality thereof.

"*Lenders*" shall mean each of the Persons identified as a "*Lender*" on the signature pages hereto, and each of their respective successors and assigns.

"*Lien*" shall mean any mortgage, pledge, security interest, lien (statutory or otherwise), charge, encumbrance, hypothecation, assignment, deposit arrangement, or other arrangement having the practical effect of any of the foregoing, or any preference, priority or other security agreement or preferential arrangement of any kind or nature whatsoever (including, without limitation, any conditional sale or other title retention agreement and any Capital Lease having the same economic effect as any of the foregoing).

"*Liquidity*" shall mean, as of any date of determination, the sum of (a) Unrestricted Cash as of such date *plus* (b) the difference between (i) the DIP Facility Available Amount as of such date *minus* (ii) the Aggregate Revolving Credit Exposure as of such date.

"*Loan Documents*" shall mean, collectively, this Agreement, the Collateral Documents, the Fee Letter, all Notices of Borrowing, all Notices of Conversion / Continuation, any promissory notes issued hereunder, and any and all other instruments, agreements, documents and writings executed in connection with any of the foregoing.

"*Loan Parties*" shall mean, collectively, the Borrower and each Guarantor.

"*Loans*" shall mean all Revolving Loans in the aggregate or any of them, as the context shall require.

"*Master Agreement*" shall mean any form of master agreement published by the International Swaps and Derivatives Association, Inc. or any executed master agreement based on such form, any International Foreign Exchange Master Agreement, or any other master agreement relating to the documentation of, or entered into in connection with, any Hedging Transactions (any such master agreement, together with any related schedules and/or annexes thereto, a "*Master Agreement*").

"*Material Adverse Effect*" shall mean, with respect to any event, act, condition or occurrence of whatever nature (including any adverse determination in any litigation, arbitration, or governmental investigation or proceeding), whether singularly or in conjunction with any other event(s), act(s), condition(s) and/or occurrence(s), whether or not related, resulting in a material adverse change in, or a material adverse effect on: (a) the business, results of operations, financial condition, assets or liabilities of the Loan Parties and Subsidiaries, taken as a whole; (b) the ability of the Loan Parties to perform any of their respective obligations under the Loan Documents; (c) the rights and remedies of the Administrative Agent and the Lenders under any of the Loan Documents; or (d) the legality, validity or enforceability against any Loan Party of any of the Loan Documents to which it is party; provided, that, changes, events, effects, or circumstances which, directly or indirectly, to the extent they relate to or result from the following, shall be excluded from the determination of a Material Adverse Effect: (i) the filing of the Chapter 11 Case and the circumstances and events leading up thereto to the extent such event(s) would reasonably be expected to result therefrom (including, without limitation, any defaults under Prepetition agreements, so long as the exercise of remedies as a result of such defaults are stayed under the Bankruptcy Code or such agreements are voided or invalidated by the Bankruptcy Court); (ii) any litigation or claim threatened or initiated by creditors of the Loan Parties against the Loan Parties or any of their respective officers or directors, in each case, arising out of filing of the Chapter 11 Case or the transactions contemplated

thereby; and (iii) the existence of any Prepetition claim or liability which is unsecured and junior in priority to the Obligations.

"*Material Indebtedness*" shall mean any Indebtedness (other than the Loans) and Hedging Obligations of any Loan Party or any Subsidiary owing to any Person, individually or, together with all other such Indebtedness (other than the Loans) and Hedging Obligations of the Loan Parties and Subsidiaries owing to such Person and/or its Affiliates, in an aggregate, committed or outstanding principal amount in *excess* of the Threshold Amount. For purposes of determining the amount of attributed Indebtedness from Hedging Obligations, the "*principal amount*" of any Hedging Obligations at any time shall be deemed to be the Net Mark-to-Market Exposure of such Hedging Obligations.

"*Maximum Rate*" shall have the meaning set forth in Section 11.12.

"*Moody's*" shall mean Moody's Investors Service, Inc.

"*Mortgaged Property*" shall mean, collectively, all Real Estate subject, or required hereunder or under any Collateral Document to be subject, to a Mortgage.

"*Mortgages*" shall mean, collectively with respect to all of the Real Estate, each mortgage, deed of trust, trust deed, security deed, debenture, deed of immovable hypothec, deed to secure debt, or similar document or instrument that grants, or purports to grant, to the Administrative Agent, for the ratable benefit of the holders of the Obligations, a security interest in such Real Estate, each in form and substance satisfactory to the Administrative Agent (as the same may be amended, restated, amended and restated, supplemented, increased, extended, refinanced, renewed, replaced, and/or otherwise modified in writing from time to time).

"*Multiemployer Plan*" shall mean any "multiemployer plan", as defined in Section 4001(a)(3) of ERISA, which is contributed to by (or to which there is, or may be, an obligation to contribute of) any Loan Party or Subsidiary, or any of their respective ERISA Affiliates, and each such plan for the five (5) year period immediately following the latest date on which any Loan Party or Subsidiary, or any of their ERISA Affiliates, contributed to, or had an obligation to contribute to, such plan.

"*Net Cash Proceeds*" shall mean the aggregate cash or Cash Equivalents proceeds received by any Loan Party or Subsidiary in respect of any Asset Sale, Recovery Event, or any issuance of Indebtedness or Capital Stock, net of: (a) direct costs incurred in connection therewith (including legal, accounting and investment banking fees, and sales commissions); (b) taxes paid or payable as a result thereof; and (c) in the case of any Asset Sale or any Recovery Event, the amount necessary to retire any Indebtedness secured by a Lien permitted by Section 7.2 (ranking senior to any Lien of the Administrative Agent) on the related property.

"*Net Mark-to-Market Exposure*" of any Person shall mean, as of any date of determination with respect to any Hedging Obligation, the *excess* (if any) of all unrealized losses *over* all unrealized profits of such Person arising from such Hedging Obligation. "*Unrealized losses*" shall mean the fair market value of the cost to such Person of replacing the Hedging Transaction giving rise to such Hedging Obligation as of the date of determination (assuming that such Hedging Transaction were to be terminated as of that date), and "*unrealized profits*" shall mean the fair market value of the gain to such Person of replacing such Hedging Transaction as of the date of determination (assuming such Hedging Transaction were to be terminated as of that date).

"*Non-Consenting Lender*" shall have the meaning set forth in Section 2.25.

"*Non-Defaulting Lender*" shall mean, at any time, a Lender that is not a Defaulting Lender.

"*Non-U.S. Plan*" shall mean any plan, fund (including, without limitation, any superannuation fund), or other similar program established, contributed to (regardless of whether through direct contributions or through employee withholding), or maintained outside the United States by any Loan Party or Subsidiary primarily for the benefit of employees of such Loan Party or Subsidiary residing outside of the United States, which plan, fund, or

other similar program provides, or results in, retirement income, a deferral of income in contemplation of retirement, or payments to be made upon termination of employment, and which plan is *not* subject to ERISA or the Code.

"*Note*" shall have the meaning set forth in Section 2.10(b).

"*Notice of Borrowing*" shall have the meaning set forth in Section 2.3.

"*Notice of Conversion / Continuation*" shall have the meaning set forth in Section 2.7(b).

"*Obligations*" shall mean, collectively, (a) all amounts owing by the Loan Parties to the Administrative Agent or any Lender pursuant to, or in connection with, this Agreement or any other Loan Document, or otherwise with respect to any Commitment, any Loan, including, without limitation, all principal, interest (including any interest accruing after the filing of any petition in bankruptcy or the commencement of any insolvency, reorganization or like proceeding relating to any Loan Party, whether or not a claim for post-filing or post-petition interest is allowed in such proceeding), all reimbursement obligations, fees, expenses, indemnification and reimbursement payments, costs and expenses (including all fees and expenses of counsel to the Administrative Agent incurred pursuant to this Agreement or any other Loan Document), whether direct or indirect, absolute or contingent, liquidated or unliquidated, now existing or hereafter arising hereunder or thereunder, and (b) all Bank Product Obligations, together with all renewals, extensions, modifications and/or refinancings of any of the foregoing.

"*OFAC*" shall mean the U.S. Department of the Treasury's Office of Foreign Assets Control.

"*Off-Balance Sheet Liabilities*" of any Person shall mean: (a) any repurchase obligation or liability of such Person with respect to accounts or notes receivable sold by such Person; (b) any liability of such Person under any sale and leaseback transactions that do *not* create a liability on the balance sheet of such Person; (c) any Synthetic Lease Obligation; or (d) any obligation arising with respect to any other transaction that is the functional equivalent of, or takes the place of, borrowing but which does *not* constitute a liability on the balance sheet of such Person.

"*Operating Lease*" shall mean any lease of, or other agreement conveying the right to use, any real or personal property by any Loan Party, as lessee, other than any Capital Lease.

"*Orders*" shall mean, collectively, the Interim DIP Order and the Final DIP Order.

"*Organization Documents*" shall mean: (a) with respect to any corporation, the certificate or articles of incorporation and the bylaws (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction); (b) with respect to any limited liability company, the certificate or articles of formation or organization and operating agreement; and (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization, and any agreement, instrument, filing or notice with respect thereto, filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization, and, if applicable, any certificate or articles of formation or organization of such entity.

"*OSHA*" shall mean the Occupational Safety and Health Act of 1970 (29 U.S.C. §–15 *et seq.*), as amended and in effect from time to time, and any successor statute(s), together with any rules and regulations promulgated in connection therewith, any rulings or orders issued by any applicable Governmental Authorities (including, without limitation, the U.S. Occupational Safety and Health Administration and the National Institute for Occupational Safety and Health) thereunder, or the application or official interpretation of any of the foregoing.

"*Other Connection Taxes*" shall mean, with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Tax (other than connections arising from such Recipient having executed, delivered, become a party to, performed its obligations

23

under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

"*Other Taxes*" shall mean all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to Section 2.25).

"*Parent Company*" shall mean, with respect to a Lender, the "bank holding company" (as defined in Regulation Y), if any, of such Lender, and/or any Person owning, beneficially or of record, directly or indirectly, a majority of the shares of such Lender.

"*Participant*" shall have the meaning set forth in Section 11.4(d).

"*Participant Register*" shall have the meaning set forth in Section 11.4(e).

"*Patents*" shall have the meaning set forth in the Security Agreement.

"*Patriot Act*" shall mean the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Pub. L. §–107–56), as amended and in effect from time to time, and any successor statute(s), together with any rules and regulations promulgated in connection therewith, any rulings or orders issued by any applicable Governmental Authorities thereunder, or the application or official interpretation of any of the foregoing.

"*Payment Office*" shall mean the office of the Administrative Agent located at 303 Peachtree Street, N.E., Atlanta, Georgia 30308, or such other location as to which the Administrative Agent shall have given written notice to the Borrower and the Lenders.

"*PBGC*" shall mean the U.S. Pension Benefit Guaranty Corporation, as referred to and defined in ERISA, and any successor entity performing similar functions.

"*Periodic Daily SOFR Determination Date*" shall have the meaning provided for such term in the definition of "*Daily SOFR*" above.

"*Periodic Term SOFR Determination Date*" shall have the meaning provided for such term in the definition of "*Term SOFR*" below.

"*Permitted Encumbrances*" shall mean:

(a)     Liens imposed by Law for taxes not yet due or which are being contested in good faith by appropriate proceedings diligently conducted and with respect to which adequate reserves are being maintained in accordance with GAAP;

(b)     statutory Liens of landlords, carriers, warehousemen, mechanics, materialmen and other Liens imposed by Law in the ordinary course of business for amounts not yet due, or which are being contested in good faith by appropriate proceedings and with respect to which adequate reserves are being maintained in accordance with GAAP;

(c)     pledges and deposits made in the ordinary course of business in compliance with workers' compensation, unemployment insurance and other social security Laws or regulations;

CHAR1\1930324v9

(d)         deposits to secure the performance of bids, trade contracts, leases, statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature, in each case in the ordinary course of business;

(e)         judgment and attachment Liens not giving rise to a Default or an Event of Default, or Liens created by, or existing from, any litigation or legal proceeding that are currently being contested in good faith by appropriate proceedings and with respect to which adequate reserves are being maintained in accordance with GAAP;

(f)         customary rights of set-off, revocation, refund or chargeback under deposit agreements, the UCC, or common law of banks or other financial institutions where any Loan Party or Subsidiary maintains deposits (other than deposits intended as cash collateral) in the ordinary course of business;

(g)         Liens consisting of precautionary filings of UCC financing statements filed with respect to Operating Leases permitted hereunder, and any interest of title of a lessor under any Operating Lease permitted hereunder; and

(h)         easements, zoning restrictions, rights-of-way and similar encumbrances on any Real Estate imposed by Law, or arising in the ordinary course of business, that do *not* secure any monetary obligations and do *not* materially detract from the value of the affected property or materially interfere with the ordinary conduct of business of the Loan Parties and Subsidiaries, taken as a whole;

provided, that, the term "*Permitted Encumbrances*" shall *not* include any Lien securing borrowed money.

"*Permitted Holders*" shall mean: (a) John Henry Owoc, an individual resident of the State of Florida; and (b) any trust or other estate-planning vehicle established for the benefit of any such individual, or any other individual having a relationship by blood (to the second (2nd) degree of consanguinity), marriage, or adoption to any such individual, and, in respect of which, such individual serves as sole trustee or in a similar capacity.

"*Permitted Prior Liens*" shall have the meaning specified in Section 2.27(a).

"*Permitted Refinancing*" means any extension, renewal or replacement of any existing Indebtedness so long as any such renewal, refinancing and extension of such Indebtedness: (a) has market terms and conditions; (b) has an average life to maturity that is *greater than* or *equal to* that of the Indebtedness being extended, renewed or refinanced; (c) does *not* include a Loan Party as an obligor that was not an obligor with respect to the Indebtedness being extended, renewed or refinanced; (d) remains subordinated, if the Indebtedness being refinanced or extended was subordinated to the prior payment of the Obligations; (e) does *not exceed* in a principal amount the Indebtedness being renewed, extended or refinanced *plus* reasonable fees and expenses incurred in connection therewith; and (f) is *not* incurred, created or assumed, if any Default or Event of Default has occurred and continues to exist or would result therefrom.

"*Person*" shall mean any natural person or individual, corporation, limited liability company, trust, joint venture, association, company, firm, partnership (whether a general partnership, a limited partnership or otherwise), Governmental Authority, or other entity.

"*Personal Information*" shall mean: (a) all information that could reveal the identity of any natural Person; and (b) all other information regarding natural Persons, the collection, use, or disclosure of which is subject to applicable Privacy Laws.

"*Petition Date*" shall have the meaning set forth in the recitals hereto.

"*Plan*" shall mean any "employee benefit plan" as defined in Section 3 of ERISA (other than a Multiemployer Plan) subject to Section 412 of the Code and/or Title IV of ERISA that is maintained or contributed to by any Loan Party or Subsidiary, or to which any Loan Party or Subsidiary has, or may have, an obligation not

contribute, and each such plan that is subject to Section 412 of the Code and/or Title IV of ERISA for the five (5) year period immediately following the latest date on which any Loan Party or Subsidiary maintained, contributed to, or had an obligation to contribute to (or is deemed, under Section 4069 of ERISA, to have maintained, contributed to, had an obligation to contribute to, or otherwise had liability with respect to) such plan.

"*Plan of Reorganization*" shall mean any plan of reorganization or plan of liquidation filed under Section 1122 of the Bankruptcy Code.

"*Platform*" shall mean Debt Domain, IntraLinks, Syndtrak, ClearPar, or a substantially similar electronic transmission system.

"*Postpetition*" shall mean the time period commencing immediately upon the filing of the Chapter 11 Case.

"*Postpetition Indebtedness*" means the Indebtedness and other obligations of the Loan Parties arising on or after the Petition Date, including related to the Postpetition operation of the Loan Parties' businesses (including the Obligations).

"*Prepetition*" shall mean the time period prior to the filing of the Chapter 11 Case.

"*Prepetition Agent*" shall mean the "Administrative Agent" under and as defined in the Prepetition Credit Agreement.

"*Prepetition Collateral*" shall mean, collectively, all collateral securing the Prepetition Facility Obligations.

"*Prepetition Credit Agreement*" shall mean the Amended and Restated Revolving Credit and Term Loan Agreement, dated as of August 14, 2020 (as amended and otherwise modified from time to time prior to the Petition Date), among, *inter alios*, the Borrower, the guarantors party thereto, the lenders party thereto and Truist, in its capacity as Prepetition Agent.

"*Prepetition Facility Obligations*" shall mean the "Obligations" under and as defined in the Prepetition Credit Agreement, which as of the Petition Date were in the amount of the Specified Prepetition Facility Obligations Amount.

"*Prepetition Issuing Bank*" shall mean the "Issuing Bank" under and as defined in the Prepetition Credit Agreement.

"*Prepetition Lenders*" shall mean the "Lenders" under and as defined in the Prepetition Credit Agreement.

"*Prepetition Loan Documents*" shall mean the "Loan Documents" under and as defined in the Prepetition Credit Agreement.

"*Prepetition Payment*" means a direct or indirect payment, redemption, purchase, defeasance or acquisition for value (by way of adequate protection or otherwise) of principal or interest or otherwise on account of any Prepetition (a) Indebtedness (including, without limitation, the Indebtedness under the Prepetition Loan Documents), (b) "critical vendor payments" or (c) trade payables (including, without limitation, in respect of reclamation claims), or other Prepetition claims against any Loan Party.

"*Prepetition Revolving Loans*" shall mean the "Revolving Loans" under and as defined in the Prepetition Credit Agreement.

"*Prepetition Swingline Lender*" shall mean the "Swingline Lender" under and as defined in the Prepetition Credit Agreement.

"*Prime Rate*" shall have the meaning set forth in the definition of "*Base Rate*" above.

"*Primed Lien*" shall have the meaning specified in Section 2.27(a).

"*Priming Lien*" shall have the meaning specified in Section 2.27(a).

"*Privacy Laws*" shall mean all Laws applicable to the privacy or security of individually identifiable information of any patient or individual.

"*Pro Rata Share*" shall mean with respect to the Commitment or Loans of any Lender at any time, a percentage, the *numerator* of which shall be such Lender's Commitment (or, if such Commitment has been terminated or expired, or the Loans have been declared to be due and payable, such Lender's Revolving Credit Exposure), and the *denominator* of which shall be the *sum of* all Commitments of all Lenders (or, if such Commitments have been terminated or expired or the Loans have been declared to be due and payable, all Revolving Credit Exposure of all Lenders).

"*Professional Fees*" shall mean fees and expenses of third-party professionals engaged by or for the benefit of the Administrative Agent, the Prepetition Agent, the Loan Parties or the Unsecured Creditors Committee.

"*PTE*" shall mean a prohibited transaction class exemption issued by the U.S. Department of Labor, as any such exemption may be amended from time to time.

"*Public Lender*" shall have the meaning set forth in Section 5.1.

"*QFC*" has the meaning assigned to the term "qualified financial contract" in, and shall be interpreted in accordance with, 12 U.S.C. §–5390(c)(8)(D).

"*QFC Credit Support*" shall have the meaning set forth in Section 11.18.

"*Real Estate*" shall mean all real property owned or leased by any Loan Party or Subsidiary.

"*Real Estate Documents*" shall mean, with respect to any fee interest of a Loan Party in any Real Estate that is *not* Excluded Property:

(a)     a fully executed and notarized Mortgage encumbering the fee interest of such Loan Party in such Real Estate; and

(b)     evidence as to (i) whether such Real Estate is in an area designated by the Federal Emergency Management Agency as having special flood or mud slide hazards (a "*Flood Hazard Property*"), and (ii) if such Real Estate is a Flood Hazard Property: (A) whether the community in which such Real Estate is located is participating in the National Flood Insurance Program; (B) the applicable Loan Party's written acknowledgment of receipt of written notification from the Administrative Agent (I) as to the fact that such Real Estate is a Flood Hazard Property, and (II) as to whether the community in which each such Flood Hazard Property is located is participating in the National Flood Insurance Program; and (C) copies of flood insurance policies under the National Flood Insurance Program (or private insurance endorsed to cause such private insurance to be fully compliant with the federal Law as regards private placement insurance applicable to the National Flood Insurance Program, with financially sound and reputable insurance companies not Affiliates of any Loan Party or Subsidiary) or certificates of insurance of the Loan Parties and Subsidiaries evidencing such flood insurance coverage, in such amounts and with such deductibles as the Administrative Agent may request and naming the Administrative Agent, and its successors and/or assigns, as sole loss payee on behalf of the holders of the Obligations.

"*Recipient*" shall mean, as applicable, (a) the Administrative Agent and/or (b) any Lender.

"*Recovery Event*" shall mean any loss of, damage to or destruction of, or any condemnation or other taking for public use of, any property of the Loan Parties and/or Subsidiaries.

"*Register*" shall have the meaning set forth in Section 11.4(c).

"*Regulation D*" shall mean Regulation D of the Federal Reserve Board, as the same may be in effect from time to time, and any successor regulations.

"*Regulation T*" shall mean Regulation T of the Federal Reserve Board, as the same may be in effect from time to time, and any successor regulations.

"*Regulation U*" shall mean Regulation U of the Federal Reserve Board, as the same may be in effect from time to time, and any successor regulations.

"*Regulation X*" shall mean Regulation X of the Federal Reserve Board, as the same may be in effect from time to time, and any successor regulations.

"*Regulation Y*" shall mean Regulation Y of the Federal Reserve Board, as the same may be in effect from time to time, and any successor regulations.

"*Related Parties*" shall mean, with respect to any Person, such Person's Affiliates, together with the respective managers, administrators, trustees, partners, directors, officers, employees, agents, advisors, legal counsel, consultants and/or other representatives of such Person and such Person's Affiliates.

"*Release*" shall mean any release, spill, emission, leaking, dumping, injection, pouring, deposit, disposal, discharge, dispersal, leaching or migration into the environment (including ambient air, surface water, groundwater, land surface or subsurface strata) or within any building, structure, facility or fixture.

"*Relevant Governmental Body*" shall mean the Federal Reserve Board and/or the FRBNY, or a committee officially endorsed or convened by the Federal Reserve Board and/or the FRBNY, or any successor thereto.

"*Replacement Lender*" shall have the meaning set forth in Section 2.25.

"*Required Lenders*" shall mean, at any time that there are two (2) or more Lenders that are not affiliated, *at least* two (2) Lenders that are not affiliated holding, in aggregate, *more than* fifty percent (50.0%) of the Aggregate Revolving Commitments at such time (or, if there is only one (1) Lender at such time, such Lender), or, if the Lenders have no Commitments outstanding at such time, then Lenders holding *more than* fifty percent (50.0%) of the Aggregate Revolving Credit Exposure of the Lenders at such time; provided, that, to the extent that any Lender is a Defaulting Lender, such Defaulting Lender, and all of its Revolving Commitments and Revolving Credit Exposure, shall be *excluded* for purposes of determining the Required Lenders.

"*Resolution Authority*" shall mean an EEA Resolution Authority, or, with respect to any UK Financial Institution, a UK Resolution Authority.

"*Responsible Officer*" shall mean: (a) with respect to certifying compliance with the financial covenants set forth in Article VI, the chief financial officer or the treasurer (or director, manager, member or other titled officer, in each case, of substantially equivalent title and authority) of the Borrower; and (b) otherwise, any of the president, the chief executive officer, the chief operating officer, the chief financial officer, the treasurer, or a vice president of the Borrower, or such other representative of the Borrower as may be designated in writing by any one (1) of the foregoing with the consent of the Administrative Agent.

"*Restricted Payment*" shall mean: (a) any dividend or other distribution (whether in cash, securities or other property) with respect to any Capital Stock of any Person, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement,

28

defeasance, acquisition, cancellation or termination of any such Capital Stock, or on account of any return of capital to such Person's stockholders, partners or members (or the equivalent Person thereof), or any option, warrant or other right to acquire any such dividend or other distribution or payment; and (b) any payment of management fees, transaction-based fees, or similar fees to any Person holding Capital Stock in any Loan Party or Subsidiary, or any Affiliate thereof.

"*Restructuring Committee*" shall have the meaning set forth in the definition of "*Change in Control*" above.

"*Restructuring Fees*" shall mean, collectively, (i) the Debtors' disbursements in respect of professional fees paid to professionals of the Debtors and the Unsecured Creditors Committee (if appointed), and (ii) fees, costs and expenses of the Administrative Agent and the Prepetition Agent.

"*Revolving Commitment*" shall mean, with respect to each Lender, the commitment of such Lender to make Revolving Loans to the Borrower in an aggregate principal amount *not to exceed* the amount set forth with respect to such Lender on Schedule I hereto, or, in the case of a Person becoming a Lender after the Effective Date, the amount of the assigned "Revolving Commitment" as provided in the Assignment and Assumption executed by such Person as an assignee, or the joinder executed by such Person, in each case, as such commitment may subsequently be increased or decreased pursuant to the terms hereof (including, without limitation, pursuant to Section 2.8).

"*Revolving Commitment Termination Date*" shall mean the *earliest* of: (a) the DIP Facility Maturity Date; (b) the date on which the Revolving Commitments are terminated pursuant to Section 2.8; and (c) the date on which all amounts outstanding under this Agreement have been declared, or have automatically become, due and payable (whether by acceleration or otherwise).

"*Revolving Credit Exposure*" shall mean, with respect to any Lender at any time, the outstanding principal amount of such Lender's Revolving Loans at such time.

"*Revolving Loan*" shall mean a loan made by a Lender to the Borrower under its Revolving Commitment, which may either be a Base Rate Loan or a SOFR Loan.

"*S&P*" shall mean Standard & Poor's, a Standard & Poor's Financial Services LLC business, and any successor thereto.

"*Sale Order*" shall mean a final order entered by the Bankruptcy Court approving the Sale Transaction, which Sale Order shall be in form and content reasonably acceptable to the Administrative Agent and the Prepetition Agent.

"*Sale Transaction*" shall mean one or more sale(s) by the Loan Parties of all or substantially all of their respective assets pursuant to Section 363 of the Bankruptcy Code to the Stalking Horse Bidder or another third party bidder.

"*Sanctioned Country*" shall mean, at any time, a country, region or territory that is, or whose government is, the subject or target of any Sanctions.

"*Sanctioned Person*" shall mean, at any time: (a) any Person that is the subject or target of any Sanctions; (b) any Person listed in any Sanctions-related list of designated Persons maintained by OFAC, the U.S. Department of State, the United Nations Security Council, the European Union or any European Union member state, or other relevant Sanctions authority; (c) any Person located, organized, operating or resident in a Sanctioned Country; or (d) any Person owned or controlled by any Person referred to in the foregoing clauses (a) through (c).

"*Sanctions*" shall mean economic or financial sanctions or trade embargoes imposed, administered or enforced from time to time by: (a) the U.S. government, including those administered by OFAC or the U.S.

Department of State; (b) the United Nations Security Council, the European Union or Her Majesty's Treasury of the United Kingdom; or (c) any other relevant sanctions authority.

"*SEC*" shall mean the U.S. Securities and Exchange Commission, or any Governmental Authority succeeding to any of its principal functions.

"*Secured Parties*" shall mean, collectively, the Administrative Agent, the Lenders, the Bank Product Providers, the Indemnitees and each other holder of Obligations.

"*Securities Exchange Act*" shall mean the Securities Exchange Act of 1934 (15 U.S.C. §–78a *et seq.*), as amended and in effect from time to time, and any successor statute(s), together with any rules and regulations promulgated in connection therewith, any rulings or orders issued by any applicable Governmental Authorities (including, without limitation, the SEC) thereunder, or the application or official interpretation of any of the foregoing.

"*Security Agreement*" shall mean that certain security and pledge agreement, dated as of the Effective Date, executed in favor of the Administrative Agent, for the ratable benefit of the holders of the Obligations, by each of the Loan Parties (as amended, restated, amended and restated, supplemented, extended, replaced, and/or otherwise modified in writing from time to time in accordance with the terms hereof and thereof).

"*Segregated Funds*" shall have the meaning set forth in the Final DIP Order.

"*SIFMA*" shall mean the Securities Industry and Financial Markets Association (or any successor thereto).

"*SOFR*" shall mean a rate per annum equal to the secured overnight financing rate as administered by the SOFR Administrator.

"*SOFR Adjustment*" shall mean a percentage equal to 0.11448% (11.448 basis points) per annum.

"*SOFR Administrator*" shall mean the FRBNY (or any successor administrator of the secured overnight financing rate).

"*SOFR-Based Rate*" shall mean each of Adjusted Daily SOFR, Daily SOFR, Adjusted Term SOFR for any Interest Period and Term SOFR for any Interest Period.

"*SOFR Borrowing*" shall mean a Borrowing, the Loans in respect of which bear interest at a rate determined by reference to Adjusted Term SOFR for any available Interest Period.

"*SOFR Loan*" shall mean a Loan bearing interest at a rate determined by reference to Adjusted Term SOFR for any available Interest Period.

"*SOFR Reference Rates*" shall mean, collectively, the Daily SOFR Reference Rate and any Term SOFR Reference Rate for an applicable tenor.

"*Specified Cash Collateral*" shall mean all "Cash Collateral" as defined in Section 363 of the Bankruptcy Code and all deposits subject to setoff and cash arising from the collection or other conversion to cash of property of the Loan Parties in which the Prepetition Lenders or Prepetition Agent has a security interest, Lien or mortgage, whether such security interests, Liens or mortgages existed as of the commencement of the Chapter 11 Case or arise thereafter pursuant to an Order, and whether the property converted to cash existed as of the commencement of the Chapter 11 Case or arose or was generated thereafter, including, without limitation, all proceeds from the sale or other disposition of the Prepetition Collateral or Collateral.

"*Specified Entity*" shall mean (a) JHO GA-1 Investment, LLC, a Florida limited liability company, (b) JHO NV-1 Investment, LLC, a Florida limited liability company, (c) Sheridan Real Estate Investment A, LLC, a

Florida limited liability company, (d) Sheridan Real Estate Investment B, LLC, a Florida limited liability company, or (e) Sheridan Real Estate Investment C, LLC, a Florida limited liability company.

"*Specified Entity Mortgage Support Amount*" shall mean $174,370,000.

"*Specified Entity Prepetition Obligation Repayment Amount*" shall have the meaning set forth in Section 2.8(c).

"*Specified Foreign Entity*" shall mean (a) Bang Energy Canada, ULC, (b) Bang Energy Mexico S. DE R.L. de C.V., (c) Bang Energy B.V., (d) Bang Energy (Australia) Pty Ltd., (e) Bang Energy VPX Sports Ecuador S.A.S., (f) Energy Peru, LLC, (g) Bang Energy Peru S.A.C., (h) Bang Energy Costa Rica LTDA, (i) Bang Energy Brazil LTDA, (j) Bang Energy Chile SPA or (k) Bang Energy Columbia SA.

"*Specified Prepetition Accruals*" shall mean $10,579,983.11 in accrued and unpaid interest, unused fees and forbearance fees arising under the Prepetition Loan Documents through September 29, 2022 and owing as of the Petition Date.

"*Specified Prepetition Facility Obligations Amount*" shall mean $354,770,201.56, which amount is comprised of (x) $344,190,218.45 in outstanding principal of loans arising under the Prepetition Credit Agreement owing as of the Petition Date *plus* (y) the Specified Prepetition Accruals.

"*Stalking Horse Bidder*" shall have the meaning set forth in Section 5.18(b).

"*Subsidiary*" shall mean, with respect to any Person (the "*parent*"), as of any date, any corporation, limited liability company, joint venture, association, company, firm, partnership (whether a general partnership, a limited partnership or otherwise), or other Person, the accounts of which would be consolidated with those of the parent in the parent's consolidated financial statements if such financial statements were prepared in accordance with GAAP as of such date, as well as any other corporation, limited liability company, joint venture, association, company, firm, partnership (whether a general partnership, a limited partnership or otherwise), or other Person (a) of which securities (or other ownership interests) representing *more than* fifty percent (50.0%) of the equity, or *more than* fifty percent (50.0%) of the ordinary voting power, or, in the case of a partnership, *more than* fifty percent (50.0%) of the general partnership interests, are, as of such date, owned, controlled or held, or (b) that is, as of such date, otherwise controlled, in each case of the foregoing clauses (a) and (b), by the parent, by one (1) or more subsidiaries of the parent, or by the parent together with one (1) or more subsidiaries of the parent. Unless otherwise indicated, all references to "*Subsidiary*" hereunder shall mean a Subsidiary of the Borrower or a Loan Party, as applicable.

"*Superpriority Claim*" shall mean a claim against the Borrower or other Loan Parties in any Chapter 11 Case which is an administrative expense claim having priority over any or all administrative expenses of a Chapter 11 and Chapter 7 trustee, subject and subordinate to the Carve-Out, of the kind specified in Sections 364(c)(1), 503(b), 507(a)(2) and 507(d) of the Bankruptcy Code.

"*Supported QFC*" shall have the meaning set forth in Section 11.18.

"*Swap Obligation*" shall mean, with respect to any Loan Party, any obligation to pay or perform under any agreement, contract or transaction that constitutes a "swap" within the meaning of Section 1a(47) of the Commodity Exchange Act.

"*Synthetic Lease*" shall mean a lease transaction under which the parties intend that: (a) the lease will be treated as an "operating lease" by the lessee pursuant to Accounting Standards Codification Sections 840–10 and 840–20, as amended; and (b) the lessee will be entitled to various tax and other benefits ordinarily available to owners (as opposed to lessees) of like property.

"*Synthetic Lease Obligations*" shall mean, with respect to any Person, the *sum of*: (a) all remaining rental obligations of such Person as lessee under Synthetic Leases which are attributable to principal; and, without duplication, (b) all rental and purchase price payment obligations of such Person under such Synthetic Leases assuming such Person exercises the option to purchase the lease property at the end of the lease term.

"*Taxes*" shall mean any and all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees, or charges imposed by any Governmental Authority, including any interest, additions to tax, or penalties applicable thereto.

"*Term SOFR*" shall mean, as of any date of determination, for any calculations with respect to a SOFR Loan and/or a SOFR Borrowing, the rate per annum equal to the Term SOFR Reference Rate for a tenor comparable to the then applicable or selected (as applicable) Interest Period for such SOFR Loan or SOFR Borrowing, determined as of the date (such date, a "*Periodic Term SOFR Determination Date*") that is two (2) U.S. Government Securities Business Days *prior* to the first (1st) day of such Interest Period, as such rate is published by the Term SOFR Administrator on such Periodic Term SOFR Determination Date; provided, that, (a) if, as of 5:00 P.M. on any Periodic Term SOFR Determination Date, (i) the Term SOFR Reference Rate for the applicable tenor has *not* been published by the Term SOFR Administrator, and (ii) a Benchmark Replacement Date with respect to such Term SOFR Reference Rate has *not* occurred, then "*Term SOFR*" shall instead mean the Term SOFR Reference Rate for such applicable tenor as published by the Term SOFR Administrator on the first (1st) preceding U.S. Government Securities Business Day for which such Term SOFR Reference Rate for such applicable tenor was published by the Term SOFR Administrator, so long as such first (1st) preceding U.S. Government Securities Business Day is *not more than* three (3) U.S. Government Securities Business Days prior to such Periodic Term SOFR Determination Date, and (b) if, at any time, Term SOFR (determined in accordance with the foregoing of this definition of "*Term SOFR*", including in accordance with the foregoing clause (a) of this proviso) is *less than* the Floor, then Term SOFR shall be deemed to equal the Floor for all purposes of this Agreement and the other Loan Documents. Any change(s) in Term SOFR for any Interest Period due to any change(s) in the Term SOFR Reference Rate for a comparable tenor shall be effective from, and including, the effective date of any such change(s) in such Term SOFR Reference Rate, without further notice to any Loan Party or Subsidiary, any other party to this Agreement or any other Loan Document, or any other Person.

"*Term SOFR Administrator*" shall mean the CME Group Benchmark Administration Limited (CBA) (or a successor administrator of the applicable Term SOFR Reference Rate selected by the Administrative Agent in its reasonable discretion).

"*Term SOFR Reference Rate*" shall mean the rate per annum determined by the Administrative Agent as the forward-looking term rate based on SOFR for an applicable tenor.

"*Threshold Amount*" shall mean $5,000,000.

"*Trade Date*" shall have the meaning set forth in Section 11.4(h)(i).

"*Trademarks*" shall have the meaning set forth in the Security Agreement.

"*Truist*" shall mean Truist Bank and its successors.

"*Type*", when used in reference to a Loan or Borrowing, refers to whether the rate of interest on such Loan, or on the Loans comprising such Borrowing, is determined by reference to Adjusted Term SOFR or the Base Rate.

"*U.S. Government Securities Business Day*" shall mean any day, other than: (i) a Saturday or a Sunday; or (ii) any day on which SIFMA recommends that the fixed income departments of its members be closed for the entire day for purposes of trading in U.S. government securities.

"*U.S. Person*" shall mean any Person that is a "United States person" as defined in Section 7701(a)(30) of the Code.

"*U.S. Special Resolution Regime*" shall have the meaning set forth in <u>Section 11.18</u>.

"*U.S. Tax Compliance Certificate*" shall have the meaning set forth in <u>Section 2.20(g)</u>.

"*UK Financial Institution*" means any BRRD Undertaking (as such term is defined under the PRA Rulebook (as amended from time to time) promulgated by the United Kingdom Prudential Regulation Authority) or any person falling within IFPRU 11.6 of the FCA Handbook (as amended from time to time) promulgated by the United Kingdom Financial Conduct Authority, which includes certain credit institutions and investment firms, and certain affiliates of such credit institutions or investment firms.

"*UK Resolution Authority*" means the Bank of England or any other public administrative authority having responsibility for the resolution of any UK Financial Institution.

"*Unadjusted Benchmark Replacement*" shall mean the Benchmark Replacement without giving effect to the Benchmark Replacement Adjustment.

"*Unfunded Pension Liability*" of any Plan shall mean the amount, if any, by which the value of the accumulated plan benefits under the Plan, determined on a plan termination basis in accordance with actuarial assumptions as of such time that are consistent with those prescribed by the PBGC for purposes of Section 4044 of ERISA, in *excess* of the fair market value of all Plan assets allocable to such liabilities under Title IV of ERISA (but excluding any accrued but unpaid contributions).

"*Uniform Commercial Code*" or "*UCC*" shall have the meaning assigned to such term in the Security Agreement.

"*United States*" or "*U.S.*" shall mean the United States of America.

"*Unrestricted Cash*" shall mean, as of any date of determination, the aggregate amount of cash and Cash Equivalents (measured at fair market value) of the Loan Parties on such date maintained in the United States that do not constitute Segregated Funds, do not appear (or would not be required to appear) as "restricted" on a combined balance sheet of the Loan Parties and Subsidiaries (other than solely as a result of Liens thereon under this Agreement or any other Loan Document or imposed by any Prepetition Loan Document), and are otherwise available for use by the Loan Parties without restriction (other than as required by the Budget (subject to compliance with the permitted variance contemplated by <u>Section 6.1(a)</u>)) in the ordinary course of business, measured based on daily closing account balances.

"*Unrestricted Cash Threshold Amount*" shall mean $15,000,000.

"*Unsecured Creditors Committee*" shall mean the official committee of unsecured creditors (if any) appointed in the Chapter 11 Case, as the composition thereof may be amended from time to time.

"*Updated Budget*" shall have the meaning set forth in <u>Section 5.1(k)</u>.

"*Variance Report*" shall have the meaning set forth in <u>Section 5.1(i)</u>.

"*Variance Testing Period*" shall mean the period from the Petition Date through the week most recently ended; <u>provided</u> that the first Variance Testing Period shall be the period from the Petition Date through the end of the third full week following the Petition Date.

"*Voting Stock*" shall mean, with respect to any Person, any Capital Stock issued by such Person the holders of which are ordinarily, in the absence of contingencies, entitled to vote for the election of directors (or persons

33

performing similar functions) of such Person, even though the right so to vote has been suspended by the happening of such a contingency.

"*Waterfall*" shall have the meaning set forth in Section 8.2.

"*Wholly-Owned Subsidiary*" means, as of any date of determination, any Person, one-hundred percent (100.0%) of whose Capital Stock (other than director-qualifying shares, as required by applicable Law) is, as of such date, owned by one (1) or more Loan Parties, directly or indirectly through other Persons one-hundred percent (100.0%) of whose Capital Stock (other than director-qualifying shares, as required by applicable Law) is, as of such date, owned, directly or indirectly, by one (1) or more Loan Parties.

"*Withdrawal Liability*" shall mean liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of Title IV of ERISA.

"*Withholding Agent*" shall mean any Loan Party and/or the Administrative Agent, as applicable.

"*Write-Down and Conversion Powers*" shall mean: (a) with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule; and (b) with respect to the United Kingdom, any powers of the applicable Resolution Authority under the Bail-In Legislation to cancel, reduce, modify or change the form of a liability of any UK Financial Institution, or any contract or instrument under which that liability arises, to convert all or part of that liability into shares, securities or obligations of that Person or any other Person, to provide that any such contract or instrument is to have effect as if a right had been exercised under it, or to suspend any obligation in respect of that liability, or any of the powers under that Bail-In Legislation that are related or ancillary to any of those powers.

Section 1.2    Classifications of Loans and Borrowings. For purposes of this Agreement and the other Loan Documents, Loans may be classified and referred to by Type (*e.g.*, a "SOFR Loan", a "Base Rate Loan" or "Revolving SOFR Loan"). Borrowings also may be classified and referred to by Type (*e.g.*, "SOFR Borrowing" or "Revolving SOFR Borrowing").

Section 1.3    Accounting Terms and Determination.

(a)    Unless otherwise defined or specified herein, all accounting terms used herein shall be interpreted, all accounting determinations hereunder shall be made, and all financial statements required to be delivered hereunder shall be prepared, in accordance with GAAP as in effect from time to time, applied on a basis consistent with the past practice of the Borrower; provided, that, if the Borrower notifies the Administrative Agent that the Borrower wishes to amend any covenant in Article VI to eliminate the effect of any change in GAAP on the operation of such covenant (or, if the Administrative Agent notifies the Borrower that the Required Lenders wish to amend Article VI for such purpose), then the Loan Parties' compliance with such covenant shall be determined on the basis of GAAP as in effect on the date immediately prior to the date on which the relevant change in GAAP became effective, until either such notice is withdrawn or such covenant is amended in a manner satisfactory to the Borrower and the Required Lenders.

(b)    Notwithstanding any other provision contained herein: (i) all terms of an accounting or financial nature used herein shall be construed, and all computations of amounts and ratios referred to herein shall be made, without giving effect to any election under Accounting Standards Codification Section 825–10 (or any other Financial Accounting Standard having a similar result or effect) to value any Indebtedness or other liabilities of any Loan Party or Subsidiary at "fair value", as defined therein; and (ii) all liability amounts shall be determined *excluding* any liability relating to any operating lease, all asset amounts shall be determined *excluding* any right-of-use assets relating to any operating lease, all amortization amounts shall be determined *excluding* any amortization of a right-of-use asset relating to any operating lease, and all interest amounts shall be determined

*excluding* any deemed interest comprising a portion of fixed rent payable under any operating lease, in each case of the foregoing, to the extent that such liability, asset, amortization or interest, as the case may be, pertains to an operating lease under which the covenantor, or a member of its consolidated or combined group, is the lessee and would *not* have been accounted for as such under GAAP as in effect on December 31, 2015.

Section 1.4    Terms Generally. The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "*include*", "*includes*" and "*including*" shall be deemed to be followed by the phrase ", *without limitation*,". The word "*will*" shall be construed to have the same meaning and effect as the word "*shall*". In the computation of periods of time from a specified date to a later specified date, the word "*from*" means "*from, and including,*" and the word "*to*" means "*to, but excluding,*". Unless the context requires otherwise:

(a)    any definition of, or reference to, any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as it was originally executed, or as it may from time to time be amended, restated, amended and restated, supplemented, increased, extended, refinanced, renewed, replaced, and/or otherwise modified in writing, as applicable (subject to any restrictions on such amendments, restatements, amendments and restatements, supplements, increases, extensions, refinancings, renewals, replacements, and/or other written modifications as set forth herein);

(b)    any reference herein to any Person shall be construed to include such Person's successors and permitted assigns;

(c)    the words "*hereof*", "*herein*" and "*hereunder*", and words of similar import, shall be construed to refer to this Agreement as a whole, and not to any particular provision hereof;

(d)    all references herein to Articles, Sections, Exhibits and/or Schedules shall be construed to refer to Articles, Sections, Exhibits and/or Schedules, as applicable, to this Agreement;

(e)    all references contained in a Section to clauses or definitions occurring "above" or "below" shall refer to the applicable clause of, or definition set forth in, such Section, and all general references contained in a Section or clause thereof to "the above" or "the below" shall refer collectively to all provisions of such Section or clause, as applicable, occurring prior to or after, as applicable, the occurrence of such general reference;

(f)    all references herein to sums denominated in Dollars, or with the symbol "$", refer to the lawful currency of the United States, unless such reference specifically identifies another currency;

(g)    all references herein to a specific time of day shall be construed to refer to such time in the city and state of the Administrative Agent's principal office as set forth in Section 11.1, unless otherwise indicated;

(h)    any reference herein to a merger, transfer, consolidation, amalgamation, consolidation, assignment, sale, disposition or transfer, or similar term shall be deemed to apply to a division of or by a limited liability company, or an allocation of assets to a series of a limited liability company (or the unwinding of such a division or allocation), as if it were a merger, transfer, consolidation, amalgamation, consolidation, assignment, sale, disposition or transfer, or similar term, as applicable, to, of, or with a separate Person. Any division of a limited liability company shall constitute a separate Person hereunder (and each division of any limited liability company that is a Subsidiary, joint venture, or any other like term shall also constitute such a Person); and

(i)    any definition of, or reference to, any Law shall include all statutory and regulatory provisions consolidating, amending, or interpreting any such Law, and any reference to, or definition of, any Law or regulation, unless otherwise specified, shall refer to such Law or regulation as amended, modified, and/or supplemented from time to time.

CHAR1\1930324v9

Section 1.5    <u>Interest Rate Disclosure</u>. The Administrative Agent does *not* warrant or accept responsibility for, and shall *not* have any liability whatsoever with respect to: (a) the continuation, administration, submission and/or calculation of, or any other matter related to, any of the Base Rate, any SOFR Reference Rate and/or any SOFR-Based Rate (for any Interest Period, as applicable), or any component definition used or referred to in, or any rate(s) used or referred to in, the definitions of any of the foregoing in <u>Section 1.1</u>, or for any alternative, successor or replacement rate thereto (including, without limitation, any Benchmark Replacement), including whether the composition and/or characteristics of any such actual or proposed alternative, successor or replacement rate (including, without limitation, any Benchmark Replacement) is or will be similar to, or produces or will produce the same or substantially equivalent value or economic equivalence of, or has or will have the same or a comparable volume or liquidity as, any of the Base Rate, any SOFR Reference Rate, any SOFR-Based Rate (for any Interest Period, as applicable) and/or any other Benchmark prior to its discontinuance or unavailability; or (b) the effect, implementation and/or composition of any Conforming Changes. The Administrative Agent, together with its Affiliates and other related entities, may engage in transactions that affect the calculation of any of the Base Rate, any SOFR Reference Rate, any SOFR-Based Rate (for any Interest Period, as applicable), any alternative, successor or replacement rate of any of the foregoing (including, without limitation, any Benchmark Replacement), and/or any relevant adjustments to any of the foregoing, in any such case of the foregoing, in a manner adverse to the Borrower and the other Loan Parties. The Administrative Agent may select information sources or services in its reasonable discretion to ascertain any of the Base Rate, any SOFR Reference Rate, any SOFR-Based Rate (for any Interest Period, as applicable), and/or any other Benchmark, in each case of the foregoing, pursuant to the terms of this Agreement, and the Administrative Agent shall have no liability whatsoever to the Borrower, any other Loan Party, any Subsidiary, any Lender and/or any other Person for damages of any kind, including direct or indirect, special, punitive, incidental and/or consequential damages, costs, losses and/or expenses (whether in tort, contract or otherwise and whether at law or in equity), for any error or calculation of any such rate (or any component thereof) provided by any such information source or service.

ARTICLE II

<u>AMOUNT AND TERMS OF THE COMMITMENTS</u>

Section 2.1    <u>General Description of Facility</u>. Subject to and upon the terms and conditions herein set forth, the Lenders hereby establish in favor of the Borrower a revolving credit facility, pursuant to which: (a) each Lender severally agrees (to the extent of such Lender's Revolving Commitment) to make Revolving Loans to the Borrower in Dollars in accordance with <u>Section 2.2</u>; and (b) subject to entry of the Final DIP Order, convert a portion of the Prepetition Facility Obligations to outstanding Revolving Loans in the amount of the Initial Roll-Up; <u>provided</u>, <u>that</u>, in no event shall the Aggregate Revolving Credit Exposure *exceed* the DIP Facility Available Amount in effect from time to time.

Section 2.2    <u>Revolving Loans</u>. Subject to the terms and conditions set forth herein, each Lender severally agrees to make Revolving Loans, ratably in proportion to its Pro Rata Share of the Aggregate Revolving Commitments, to the Borrower in Dollars, from time to time during the Availability Period, in an aggregate principal amount outstanding at any time that will not result in: (a) such Lender's Revolving Credit Exposure *exceeding* such Lender's Revolving Commitment; or (b) the Aggregate Revolving Credit Exposure *exceeding* the DIP Facility Available Amount. During the Availability Period, the Borrower shall be entitled to borrow, prepay and reborrow Revolving Loans in accordance with the terms and conditions of this Agreement; <u>provided</u>, <u>that</u>, the Borrower may *not* borrow or reborrow should there exist a Default or Event of Default.

Section 2.3    <u>Procedure for Borrowings</u>. The Borrower shall give the Administrative Agent written notice (or telephonic notice promptly confirmed in writing) of each Borrowing substantially in the form of <u>Exhibit 2.3</u> (a "<u>*Notice of Borrowing*</u>") (i) prior to 11:00 A.M. *at least* one (1) Business Day prior to the requested date of each Base Rate Borrowing, and (ii) prior to 11:00 A.M. *at least* three (3) Business Days prior to the requested date of each SOFR Borrowing; <u>provided</u>, <u>that</u>, notwithstanding anything to the contrary in the foregoing, the Notice of Borrowing with respect to the Borrowing on the Effective Date may be delivered on or prior to 11:00 A.M. on the

36

date that is one (1) Business Day prior to the Effective Date, in the case of a Base Rate Borrowing. Each Notice of Borrowing shall be irrevocable and shall specify: (a) the aggregate principal amount of such Borrowing; (b) the date of such Borrowing (which shall be a Business Day); (c) the Type of such Revolving Loan comprising such Borrowing; and (d) in the case of a SOFR Borrowing, the duration of the initial Interest Period applicable thereto (subject to the provisions of the definition of Interest Period). Each Borrowing shall consist entirely of Base Rate Loans or SOFR Loans (or a combination thereof), as the Borrower may request. The aggregate principal amount of each SOFR Borrowing of Revolving Loans shall *not* be *less than* One Million Dollars ($1,000,000) or a larger multiple of Five-Hundred Thousand Dollars ($500,000) in excess thereof (or such lesser amount of the undrawn Aggregate Revolving Commitment Amount), and the aggregate principal amount of each Base Rate Borrowing of Revolving Loans shall *not* be *less than* One Million Dollars ($1,000,000) or a larger multiple of Five-Hundred Thousand Dollars ($500,000) in excess thereof (or such lesser amount of the undrawn Aggregate Revolving Commitment Amount); provided, that, Base Rate Loans made pursuant to Section 2.22(d) may be made in lesser amounts as provided therein. Notwithstanding anything to the contrary herein or in any other Loan Document, the total number of SOFR Borrowings outstanding at any time shall *not exceed* six (6). Promptly following the receipt of a Notice of Borrowing in accordance herewith, the Administrative Agent shall advise each Lender of the details thereof and the amount of such Lender's Revolving Loan to be made as part of the requested Borrowing.

Section 2.4    [Reserved].

Section 2.5    [Reserved].

Section 2.6    Interim Roll-Up; Funding of Borrowings.

(a)    On and from the Final DIP Order Entry Date, in accordance with the terms of the Final DIP Order and Section 3.3 (and, for the avoidance of doubt, without the need for a Notice of Borrowing with respect thereto), each Lender agrees that a portion of the Prepetition Facility Obligations outstanding as of the Petition Date in an aggregate amount equal to the Initial Roll-Up shall be deemed exchanged for and converted into its Pro Rata Share of Revolving Loans in the aggregate principal amount equal to the amount of the Initial Roll-Up on a dollar-for-dollar basis, which exchange and conversion (for the avoidance of doubt) shall not constitute a novation, and such portion of the Revolving Loans shall constitute a Borrowing and be deemed a SOFR Borrowing with an Interest Period commencing on the Final DIP Order Entry Date and shall constitute Obligations hereunder for all purposes under the Loan Documents and in the Orders.

(b)    Each Lender will make available each Loan to be made by it hereunder on the proposed date thereof by wire transfer in immediately available funds by 11:00 A.M. to the Administrative Agent at the Payment Office. The Administrative Agent will make such Loans available to the Borrower by promptly crediting the amounts that it receives, in like funds by the close of business on such proposed date, to an account maintained by the Borrower with the Administrative Agent, or, at the Administrative Agent's sole discretion and at the Borrower's option, by effecting a wire transfer of such amounts to an account designated by the Borrower to the Administrative Agent that is *not* maintained by the Borrower with the Administrative Agent.

(c)    Unless the Administrative Agent shall have been notified by any Lender, prior to 5:00 P.M. one (1) Business Day prior to the date of a Borrowing in which such Lender is to participate, that such Lender will not make available to the Administrative Agent such Lender's share of such Borrowing, the Administrative Agent may assume that such Lender has made such amount available to the Administrative Agent on such date, and the Administrative Agent, in reliance on such assumption, may make available to the Borrower on such date a corresponding amount. If such corresponding amount is *not* in fact made available to the Administrative Agent by such Lender on the date of such Borrowing, the Administrative Agent shall be entitled to recover such corresponding amount on demand from such Lender, together with interest: (i) at the Federal Funds Rate until the second (2nd) Business Day after such demand; and (ii) thereafter, at the Base Rate. If such Lender does *not* pay such corresponding amount forthwith upon the Administrative Agent's demand therefor, the Administrative Agent shall promptly notify the Borrower, and the Borrower shall immediately pay such corresponding amount to the Administrative Agent together with interest at the rate specified for such Borrowing. Nothing in this clause (c)

CHAR1\1930324v9

shall be deemed to relieve any Lender from its obligation to fund its Pro Rata Share of any Borrowing hereunder or to prejudice any rights which the Borrower may have against any Lender as a result of any default by such Lender hereunder.

(d)     All Borrowings shall be made by the Lenders on the basis of their respective Pro Rata Shares. No Lender shall be responsible for any default by any other Lender in its obligations hereunder, and each Lender shall be obligated to make its Loans provided to be made by it hereunder, regardless of the failure of any other Lender to make its Loans hereunder.

Section 2.7     Interest Elections.

(a)     The Revolving Loans funded pursuant to Section 2.6(a) shall, initially, be SOFR Borrowings and each other Borrowing initially shall be of the Type specified in the applicable Notice of Borrowing therefor. Thereafter, the Borrower may elect to convert such Borrowing into a different Type or to continue such Borrowing, all as provided in this Section 2.7. The Borrower may elect different options with respect to different portions of the affected Borrowing, in which case, each such portion shall be allocated ratably among the Lenders holding Loans comprising such Borrowing, and the Loans comprising each such portion shall be considered a separate Borrowing.

(b)     To make an election pursuant to this Section 2.7, the Borrower shall give the Administrative Agent prior written notice (or telephonic notice promptly confirmed in writing) of each Borrowing that is to be converted or continued, as the case may be, substantially in the form of Exhibit 2.7 attached hereto (a "*Notice of Conversion / Continuation*") (A) prior to 10:00 A.M. *at least* one (1) Business Day prior to the requested date of a conversion into a Base Rate Borrowing, and (B) prior to 11:00 A.M. *at least* three (3) Business Days prior to a continuation of, or conversion into, a SOFR Borrowing. Each such Notice of Conversion / Continuation shall be irrevocable and shall specify: (i) the Borrowing to which such Notice of Conversion / Continuation applies, and, if different options are being elected with respect to different portions thereof, the portions thereof that are to be allocated to each resulting Borrowing (in which case, the information to be specified pursuant to clauses (b)(iii) and (b)(iv) below shall be specified for each resulting Borrowing); (ii) the effective date of the election made pursuant to such Notice of Conversion / Continuation, which shall be a Business Day; (iii) whether the resulting Borrowing is to be a Base Rate Borrowing or a SOFR Borrowing; and (iv) if the resulting Borrowing is to be a SOFR Borrowing, the Interest Period applicable thereto after giving effect to such election, which shall be a period contemplated by the definition of "*Interest Period*". If any such Notice of Conversion / Continuation requests a SOFR Borrowing but does *not* specify an Interest Period, the Borrower shall be deemed to have selected an Interest Period of one (1) month. The principal amount of any resulting Borrowing shall satisfy the minimum borrowing amount for SOFR Borrowings and Base Rate Borrowings set forth in Section 2.3.

(c)     If, on the expiration of any Interest Period in respect of any SOFR Borrowing, the Borrower shall have failed to deliver a Notice of Conversion / Continuation, then, unless such Borrowing is repaid as provided herein, the Borrower shall be deemed to have elected (subject to the immediate next sentence) to continue such Borrowing as a SOFR Borrowing for the immediate succeeding one (1) month Interest Period. No Borrowing may be converted into, or continued as, a SOFR Borrowing if a Default or an Event of Default exists, unless the Administrative Agent and each of the Lenders shall have otherwise consented in writing. No conversion of any SOFR Loan shall be permitted, except on the last day of the Interest Period in respect thereof.

(d)     Upon receipt of any Notice of Conversion / Continuation, the Administrative Agent shall promptly notify each Lender of the details thereof and of such Lender's portion of each resulting Borrowing.

Section 2.8     Termination and Reductions of Commitments.

(a)     Unless previously terminated, all Revolving Commitments shall terminate on the Revolving Commitment Termination Date.

38

(b)      Upon *at least* three (3) Business Days' prior written notice (or telephonic notice promptly confirmed in writing) to the Administrative Agent (which notice shall be irrevocable), the Borrower may reduce the Aggregate Revolving Commitments in part, or terminate any such Revolving Commitments in whole; provided, that, (i) any partial reduction shall apply to reduce proportionately and permanently the Revolving Commitment of each Lender, as applicable, (ii) any partial reduction pursuant to this Section 2.8(b) shall be in an amount of *at least* One Million Dollars ($1,000,000) and any larger multiple of Five-Hundred Thousand Dollars ($500,000) in *excess* thereof, and (iii) no such reduction of the Aggregate Revolving Commitment shall be permitted which would reduce the Aggregate Revolving Commitments to an amount that is *less than* the sum of (A) the Aggregate Revolving Credit Exposure *plus* (B) to the extent that the Final DIP Order authorizes the use of Segregated Funds to repay the Prepetition Facility Obligations, the then-outstanding balance of the Prepetition Facility Obligations.

(c)      The Revolving Commitments shall be reduced in part to the extent of any prepayment made from and after the Petition Date in respect of the Prepetition Facility Obligations with the net proceeds of any sales of real property owned by any Specified Entity (the aggregate of all such payments, the "Specified Entity Prepetition Obligation Repayment Amount"), which any such partial reduction shall apply automatically to reduce proportionately and permanently the Revolving Commitment of each Lender on the date of any such prepayment; provided, that, the reductions of the Revolving Commitments pursuant to this clause (c) shall be without duplication of the reductions of the Revolving Commitments pursuant to Section 2.8(d) (*i.e.*, reductions pursuant to Section 2.8(d) shall reduce the amount of reductions pursuant to this clause (c) on a dollar-for-dollar basis).

(d)      Upon at least one (1) Business Days' prior written notice (or telephonic notice promptly confirmed in writing) to the Borrower (which notice shall be irrevocable), the Administrative Agent may, at any time after the Final DIP Order Entry Date and at the written request of the Required Lenders, reduce the Revolving Commitments by an aggregate amount that is not more than the *lesser* of (i) the difference between (A) the Aggregate Revolving Commitment Amount at such time *minus* (B) the Aggregate Revolving Credit Exposure at such time and (ii) the difference between (A) the Specified Entity Mortgage Support Amount *minus* (B) the Specified Entity Prepetition Obligation Repayment Amount, which such partial reduction shall apply automatically to reduce proportionately and permanently the Revolving Commitment of each Lender on the date; provided, that, the Administrative Agent shall not be permitted to reduce the Revolving Commitments pursuant to this Section 2.8(d) unless at the time of such reduction the Administrative Agent and the Prepetition Agent have terminated the application of Segregated Funds to the repayment of the Prepetition Facility Obligations as authorized by the Final DIP Order.

Section 2.9      Repayment of Loans. The outstanding principal amount of all Revolving Loans shall be due and payable (together with accrued and unpaid interest thereon) on the Revolving Commitment Termination Date.

Section 2.10      Evidence of Indebtedness.

(a)      Each Lender shall maintain, in accordance with its usual and customary practice, appropriate records evidencing the Indebtedness of the Borrower to such Lender resulting from each Loan made by such Lender from time to time, including the amounts of principal and interest payable thereon and paid to such Lender from time to time under this Agreement. The Administrative Agent shall maintain appropriate records in which shall be recorded: (i) the Revolving Commitment of each Lender; (ii) the amount of each Loan made hereunder by each Lender, the Type thereof, and, in the case of each SOFR Loan, the Interest Period applicable thereto; (iii) the date of any continuation of any Loan pursuant to Section 2.7; (iv) the date of any conversion of all, or a portion, of any Loan to another Type pursuant to Section 2.7; (v) the date and amount of any principal or interest due and payable, or to become due and payable, from the Borrower to each Lender hereunder in respect of the Loans; and (vi) both the date and amount of any sum received by the Administrative Agent hereunder from the Borrower in respect of the Loans and each Lender's Pro Rata Share thereof. The entries made in such records shall be *prima facie* evidence of the existence and amounts of the obligations of the Borrower therein recorded; provided, that, the failure or delay of any Lender or the Administrative Agent in maintaining or making entries into any such

39

record, or any error therein, shall not in any manner affect the obligation of the Borrower to repay the Loans (both principal and unpaid accrued interest) of such Lender in accordance with the terms of this Agreement.

(b)    This Agreement evidences the obligation of the Borrower to repay the Loans and is being executed as a "noteless" credit agreement. However, at the request of any Lender at any time, the Borrower agrees that it will prepare, execute and deliver to such Lender a promissory note payable to the order of such Lender (or, if requested by such Lender, to such Lender and its registered assigns) in the form of Exhibit 2.10 (a "*Note*"). Thereafter, the Loans evidenced by such promissory note and interest thereon shall, at all times (including after assignment permitted hereunder), be represented by one (1) or more promissory notes in such form payable to the order of the payee named therein (or, if such promissory note is a registered note, to such payee and its registered assigns).

Section 2.11    Optional Prepayments. The Borrower shall have the right, at any time and from time to time, to prepay any Borrowing, in whole or in part, without premium or penalty, by giving irrevocable written notice (or telephonic notice promptly confirmed in writing) to the Administrative Agent *no later than*: (a) in the case of any prepayment of any SOFR Borrowing, 11:00 A.M. on a date that is *not less than* three (3) Business Days prior to the date of any such prepayment; and (b) in the case of any prepayment of any Base Rate Borrowing, 11:00 A.M. on a date that is *not less than* one (1) Business Day prior to the date of any such prepayment. Each such notice shall be irrevocable and shall specify the proposed date of such prepayment and the principal amount of each Borrowing, or portion thereof, to be prepaid. Upon receipt of any such notice, the Administrative Agent shall promptly notify each affected Lender of the contents thereof and of such Lender's Pro Rata Share of any such prepayment. If such notice is given, the aggregate amount specified in such notice shall be due and payable on the date designated in such notice, together with accrued interest to, and including, such date on the amount so prepaid in accordance with Section 2.13(d); provided, that, if a SOFR Borrowing is prepaid on a date other than the last day of an Interest Period applicable thereto, the Borrower shall also pay all amounts required pursuant to Section 2.19. Each partial prepayment of any Loan shall be in an amount that would be permitted in the case of an advance of a Borrowing of the same Type pursuant to Section 2.3. Each prepayment of a Borrowing shall be applied ratably to the Loans comprising such Borrowing.

Section 2.12    Mandatory Prepayments.

(a)    Within three (3) Business Days of the receipt by any Loan Party or Subsidiary of Net Cash Proceeds of any Asset Sale or Recovery Event (other than the Sale Transaction), the Borrower shall prepay the Obligations in accordance with clause (e) below in an amount equal to such Net Cash Proceeds.

(b)    Within one (1) Business Days of the receipt by any Loan Party or Subsidiary of Net Cash Proceeds of any issuance of Indebtedness (other than Indebtedness permitted under Section 7.1), the Borrower shall prepay the Obligations in accordance with clause (e) below in an amount equal to such Net Cash Proceeds.

(c)    Within three (3) Business Days of the receipt by any Loan Party or Subsidiary of Net Cash Proceeds from the issuance of any Capital Stock (other than Capital Stock issued by a Subsidiary of a Loan Party to such Loan Party, or to another such Subsidiary that is a Loan Party), the Borrower shall prepay the Obligations in accordance with clause (e) below in an amount equal to the portion of such Net Cash Proceeds that are attributable to such excess issuance.

(d)    On the Business Day immediately following the last Business Day of any calendar week on which, as of the close of business, Unrestricted Cash exceeds the Unrestricted Cash Threshold Amount, the Borrower shall prepay the Obligations in accordance with clause (e) below in an amount equal to such excess.

(e)    Any prepayments made by the Borrower pursuant to clauses (a) through (d) above shall be applied as follows: (i) *first*, to the Administrative Agent's fees and reimbursable expenses then due and payable pursuant to any of the Loan Documents; (ii) *second*, to all reimbursable expenses of the Lenders then due and payable pursuant to any of the Loan Documents, *pro rata* to the Lenders based on their respective Pro Rata Shares of such

fees and expenses; (iii) *third*, to interest and fees then due and payable hereunder, *pro rata* to the Lenders, based on their respective Pro Rata Shares of such interest and fees; (iv) *fourth*, [reserved]; and (v) *fifth*, to the principal balance of the Revolving Loans, until the same shall have been paid in full, *pro rata* to the Lenders based on their respective Revolving Commitments.

(f)        If, at any time, the Aggregate Revolving Credit Exposure *exceeds* the DIP Facility Available Amount, the Borrower shall, within one (1) Business Day of the occurrence of such excess, repay the Revolving Loans in an amount equal to such excess, together with all accrued and unpaid interest on such excess amount and any amounts due under Section 2.19. Each prepayment shall be applied as follows: (i) *first*, to Revolving Loans consisting of Base Rate Loans to the full extent thereof; and (ii) *second*, to Revolving Loans constituting SOFR Loans to the full extent thereof.

Section 2.13    Interest on Loans.

(a)        The Borrower shall pay interest on: (i) each Base Rate Loan at the Base Rate, *plus* the Applicable Margin in effect from time to time; and (ii) each SOFR Loan at Adjusted Term SOFR for the applicable Interest Period in effect for such Loan, *plus* the Applicable Margin in effect from time to time.

(b)        [Reserved].

(c)        [Reserved].

(d)        Notwithstanding anything to the contrary in the foregoing of this Section 2.13, if an Event of Default has occurred and is continuing, at the option of the Required Lenders, the Borrower shall pay interest ("*Default Interest*") with respect to all SOFR Loans at the rate per annum equal to two percent (2.0%) above the otherwise applicable interest rate for such SOFR Loans for the then-current Interest Period until the last day of such Interest Period, and thereafter, and with respect to all Base Rate Loans and all other Obligations hereunder (other than Loans), at the rate per annum equal to two percent (2.0%) above the otherwise applicable interest rate for Base Rate Loans.

(e)        Interest on the principal amount of all Loans shall accrue from, and including, the date such Loans are made to, but *excluding*, the date of any repayment thereof. Interest on all outstanding Base Rate Loans shall be payable monthly in arrears on the last day of each calendar month and on the Revolving Commitment Termination Date. Interest on all outstanding SOFR Loans shall be payable on the last day of each Interest Period applicable thereto, and on the Revolving Commitment Termination Date. Interest on any Loan which is converted into a Loan of another Type, or which is repaid or prepaid, shall be payable on the date of such conversion or on the date of any such repayment or prepayment (on the amount repaid or prepaid) thereof. All Default Interest shall be payable on demand.

(f)        The Administrative Agent shall determine each interest rate applicable to the Loans hereunder and shall promptly notify the Borrower and the Lenders of such rate in writing (or by telephone, promptly confirmed in writing). Any such determination shall be conclusive and binding for all purposes, absent manifest error.

(g)        In connection with the use and/or administration of SOFR, any SOFR Reference Rate and/or any SOFR-Based Rate, the Administrative Agent shall have the right to make Conforming Changes from time to time and, notwithstanding anything to the contrary in this Agreement or in any other Loan Document, any amendment(s) implementing any such Conforming Changes shall become effective without any further action(s) and/or consent(s) of any other party to this Agreement or any other Loan Document or of any other Person. The Administrative Agent shall promptly notify the Borrower and the Lenders of the effectiveness of any Conforming Changes implemented in connection with the use and/or administration of SOFR, any SOFR Reference Rate and/or any SOFR-Based Rate.

Section 2.14      Fees.

(a)      The Borrower shall pay to the Administrative Agent for its own account fees in the amounts and at the times previously agreed upon in writing by the Borrower and the Administrative Agent.

(b)      The Borrower agrees to pay to the Administrative Agent, for the account of each Lender, a commitment fee (the "*Commitment Fee*"), which shall accrue at a rate per annum equal to (i) fifty basis points (0.50%) *multiplied by* (ii) the average daily amount of each Lender's ratable share of the unused DIP Facility Available Amount during the Availability Period calculated based on such Lender's respective Pro Rata Share. For purposes of computing the Commitment Fee, the ratable share of the DIP Facility Available Amount of each Lender shall be deemed used to the extent of the outstanding Revolving Loans of such Lender.

(c)      [Reserved].

(d)      The Borrower shall pay on the Effective Date, for the account of each Lender, an upfront fee (the "*Upfront Fee*") in an amount equal to each Lender's ratable share of $2,500,000 calculated based on each Lender's respective Pro Rata Share. Such Upfront Fees shall be in consideration for the Lenders' participation in the Revolving Commitments established hereunder and shall be due and payable in full on, and subject to the occurrence of, the Effective Date. For the avoidance of doubt, the aggregate amount of all such Upfront Fees shall be equal to $2,500,000.

(e)      The Borrower shall pay on the Effective Date to the Administrative Agent and/or its Affiliates, as applicable, all fees in the Fee Letter (including, for the avoidance of doubt, any upfront fees payable to any Lender) that are due and payable on the Effective Date. The Borrower shall pay on the Effective Date to the Lenders all upfront fees previously agreed in writing.

(f)      Accrued fees under clauses (b) and (c) above shall be payable monthly in arrears on the last day of each calendar month, commencing on the first (1st) such date to occur after the Effective Date and on the Revolving Commitment Termination Date (and, if later, on the date that Loans shall be repaid in their entirety); provided, that, any such fees accruing after the Revolving Commitment Termination Date shall be payable on demand.

(g)      Anything herein to the contrary notwithstanding, during such period as a Lender is a Defaulting Lender, such Defaulting Lender will *not* be entitled to Commitment Fees during such period pursuant to clause (b) above (without prejudice to the rights of the Lenders other than Defaulting Lenders in respect of such fees). The *pro rata* payment provisions of Section 2.21 shall automatically be deemed adjusted to reflect the provisions of this clause (g).

Section 2.15      Computation of Interest and Fees.

All computations of interest and fees hereunder shall be computed on the basis of a year of three hundred sixty (360) days and paid for the actual number of days elapsed (including the first (1st) day, but excluding the last day). Each determination by the Administrative Agent of an interest rate or fee hereunder shall be made in good faith and, except for manifest error, shall be final, conclusive, and binding for all purposes.

Section 2.16      Inability to Determine Interest Rates; Benchmark Replacement Setting.

(a)      Inability to Determine SOFR. Subject to clauses (b) through (f) below, if, at any time (prior to the commencement of any affected Interest Period) for any SOFR Borrowing:

(i)      the Administrative Agent shall have determined (which determination shall be conclusive and binding absent manifest error) that any SOFR-Based Rate (for any affected Interest Period) cannot be determined pursuant to the applicable definition thereof in Section 1.1; or

42

(ii)    the Administrative Agent shall have received notice from the Required Lenders that any SOFR-Based Rate (for any affected Interest Period) will *not* adequately and fairly reflect the cost to such Lender(s) of making, funding and/or maintaining their (or its, as the case may be) SOFR Loans (for any affected Interest Period);

then, the Administrative Agent shall give written notice (or telephonic notice, promptly confirmed in writing) thereof to the Borrower and to the Lenders as soon as practicable thereafter. Upon notice thereof by the Administrative Agent to the Borrower, any obligation of the Lenders to make SOFR Loans, and any right of the Borrower to continue SOFR Loans (for any affected Interest Period) and/or to convert Base Rate Loans to SOFR Loans, shall be suspended (to the extent of the affected SOFR Loans and/or the affected Interest Periods) until the Administrative Agent shall have revoked such notice. Upon receipt of such notice: (A) the Borrower may revoke any pending request for a Borrowing of, conversion to, and/or continuation of any SOFR Loans (to the extent of the affected SOFR Loans and/or the affected Interest Periods), or, failing that, the Borrower will be deemed to have converted any such request into a request for a Borrowing of or a conversion to (as applicable) Base Rate Loans in the amount specified therein; and (B) any outstanding affected SOFR Loans will be deemed to have been converted into Base Rate Loans (at the end of the applicable Interest Period). Upon any such conversion, the Borrower shall also pay accrued interest on the amount so converted, together with any additional amounts required pursuant to Section 2.19. Subject to clauses (b) through (f) below, if the Administrative Agent determines (which determination shall be conclusive and binding absent manifest error) that Adjusted Daily SOFR cannot be determined pursuant to the applicable definition thereof in Section 1.1 on any given day, then applicable interest rate for Base Rate Loans shall be determined by the Administrative Agent without reference to clause (c) of the definition of "*Base Rate*" in Section 1.1, until the Administrative Agent shall have revoked such determination; provided, that, notwithstanding anything to the contrary in this Agreement or in any other Loan Document, at any time that the applicable interest rate for Base Rate Loans is determined without reference to clause (c) of the definition of "*Base Rate*" in Section 1.1 by operation of this clause (a), then the "*Floor*", for purposes of calculating such applicable interest rate, shall be increased by one percent (1.00%) per annum.

(b)    Benchmark Replacement.

(i)    Notwithstanding anything to the contrary herein or in any other Loan Document, if a Benchmark Transition Event, together with its related Benchmark Replacement Date, have occurred *prior* to any setting of the then-current Benchmark, then: (i) if a Benchmark Replacement is determined in accordance with clause (a) of the definition of "*Benchmark Replacement*" in Section 1.1 for such Benchmark Replacement Date, such Benchmark Replacement will replace such Benchmark for all purposes of this Agreement and each other Loan Document in respect of such Benchmark setting and any subsequent Benchmark settings, without any amendment to, or further action or consent of any other party to, this Agreement or any other Loan Document; and (ii) if a Benchmark Replacement is determined in accordance with clause (b) of the definition of "*Benchmark Replacement*" in Section 1.1 for such Benchmark Replacement Date, such Benchmark Replacement will replace such Benchmark for all purposes of this Agreement and each other Loan Document in respect of any Benchmark setting at or after 5:00 P.M. on the date that is five (5) Business Days after the date on which notice of such Benchmark Replacement is first provided to the Lenders, without any amendment to, or further action or consent of any other party to, this Agreement or any other Loan Document, so long as the Administrative Agent shall *not* have received, by the date that is five (5) Business Days after the date on which notice of such Benchmark Replacement is first provided to the Lenders, written notice of objection to such Benchmark Replacement from Lenders comprising the Required Lenders at such time.

(ii)    Notwithstanding anything to the contrary herein or in any other Loan Document, no Master Agreement and/or any other agreement evidencing Swap Obligations shall be deemed to be a "*Loan Document*" for purposes of this Section 2.16.

(c)    Benchmark Replacement Conforming Changes. In connection with the use, administration, adoption and/or implementation of a Benchmark Replacement, the Administrative Agent will have the right to

43

make Conforming Changes from time to time, and, notwithstanding anything to the contrary herein or in any other Loan Document, any amendments implementing such Conforming Changes will become effective without any further action(s) and/or consent(s) of any Loan Party, any other party to this Agreement or any other Loan Document and/or any other Person.

(d)    Notices; Standards for Decisions and Determinations. The Administrative Agent will promptly notify the Borrower and the Lenders of: (i) the implementation of any Benchmark Replacement; and (ii) the effectiveness of any Conforming Changes implemented in connection with the use, administration, adoption and/or implementation of a Benchmark Replacement. The Administrative Agent will notify the Borrower of: (A) the removal or reinstatement of any tenor of a Benchmark pursuant to clause (e) below; and (B) the commencement of any Benchmark Unavailability Period. Any determination, decision, or election that may be made by the Administrative Agent or, if applicable, any Lender (or group of Lenders) pursuant to this Section 2.16, including, without limitation, any determination with respect to a tenor, rate or adjustment, or of the occurrence or non-occurrence of an event, circumstance, or date, and any decision to take, or refrain from taking, any action or any selection, will be conclusive and binding absent manifest error, and may be made in its or their, as applicable, sole discretion, and, in any event, without consent from any Loan Party, any other party to this Agreement or any other Loan Document or any other Person, except, in each case, as expressly required pursuant to this Section 2.16.

(e)    Unavailability of Tenor of Benchmark. Notwithstanding anything to the contrary in this Agreement or any other Loan Document, at any time (including in connection with the implementation of a Benchmark Replacement): (i) if the then-current Benchmark is a term rate (including the Term SOFR Reference Rate for any applicable tenor) and either (A) any tenor for such Benchmark is *not* displayed on a screen or other information service that publishes such rate from time to time as selected by the Administrative Agent in its reasonable discretion, or (B) the regulatory supervisor for the administrator of such Benchmark has provided a public statement or publication of information announcing that any tenor for such Benchmark is *not* or will *not* be representative, then, in any such case of the foregoing clauses (e)(i)(A) or (e)(i)(B), the Administrative Agent may modify the definition of "*Interest Period*" in Section 1.1 (or any similar or analogous definition) for any Benchmark settings at or after such time in order to remove such unavailable or non-representative tenor; and (ii) if a tenor that was removed pursuant to the foregoing clause (e)(i) either (A) is subsequently displayed on a screen or information service for a Benchmark (including, without limitation, a Benchmark Replacement), or (B) is *not*, or is no longer, subject to an announcement that it is *not* or will *not* be representative for a Benchmark (including, without limitation, a Benchmark Replacement), then, in any such case of the foregoing clauses (e)(ii)(A) or (e)(ii)(B), the Administrative Agent may modify the definition of "*Interest Period*" in Section 1.1 (or any similar or analogous definition) for all Benchmark settings at or after such time in order to reinstate such previously removed tenor.

(f)    Benchmark Unavailability Period. Upon the Borrower's receipt of notice of the commencement of a Benchmark Unavailability Period, the Borrower may revoke any pending request for a SOFR Borrowing of, a conversion to, or a continuation of SOFR Loans to be made, converted or continued, as the case may be, during any Benchmark Unavailability Period, and, failing that, the Borrower will be deemed to have converted any such request into a request for a Borrowing of, or a conversion to, Base Rate Loans. During a Benchmark Unavailability Period or at any time that a tenor for the then-current Benchmark is *not* an Available Tenor, the component of the Base Rate that is based upon the then-current Benchmark or such tenor for such Benchmark, as applicable, shall *not* be used in any determination of the Base Rate for purposes of this Agreement or the other Loan Documents.

Section 2.17    Illegality. If any Change in Law shall make it unlawful or impossible for any Lender to perform any of its obligations hereunder, to make, maintain or fund any SOFR Loan or to determine or charge interest rates based upon SOFR, any SOFR Reference Rate and/or any SOFR-Based Rate (for any Interest Period, as applicable), and, in any such case, such Lender shall so notify the Administrative Agent, then the Administrative Agent shall promptly give notice thereof to the Borrower and the other Lenders, whereupon, until such Lender notifies the Administrative Agent and the Borrower that the circumstances giving rise to such suspension no longer exist: (a) the obligation of such Lender to fund or maintain SOFR Loans, or to continue or convert outstanding

Loans as or into SOFR Loans, shall be suspended; and (b) the Base Rate shall, if necessary to avoid such illegality, be determined by the Administrative Agent without reference to the component thereof described in clause (c) thereof. Thereafter, in the case of the making of a SOFR Borrowing, such Lender's Revolving Loan shall be made as a Base Rate Loan as part of the same Borrowing and for the same Interest Period; and, if the affected SOFR Loan is then outstanding, such Loan shall be converted to a Base Rate Loan either (A) on the last day of the then current Interest Period applicable to such affected SOFR Loan, if such Lender may lawfully continue to maintain such affected SOFR Loan to such date, or (B) immediately, if such Lender shall determine that it may *not* lawfully continue to maintain such affected SOFR Loan to such date (and, in each instance, the Base Rate shall, if necessary to avoid such illegality, be determined by the Administrative Agent without reference to the component thereof described in clause (c) thereof). Notwithstanding anything to the contrary in the foregoing, the affected Lender shall, prior to giving such notice to the Administrative Agent, use reasonable efforts to designate a different Applicable Lending Office if such designation would avoid the need for giving such notice, and if such designation would *not* otherwise be disadvantageous to such Lender in the good faith exercise of its discretion. Upon any such prepayment or conversion in accordance with this Section 2.17, the Borrower shall also pay accrued interest on the amount so prepaid or converted, together with any additional amounts required pursuant to Section 2.19.

Section 2.18    Increased Costs.

(a)    If any Change in Law shall:

(i)    impose, modify or deem applicable any reserve (including pursuant to regulations issued from time to time by the Federal Reserve Board for determining the maximum reserve requirement (including any emergency, special, supplemental and/or other marginal reserve requirement)) with respect to any special deposit, compulsory loan, insurance charge and/or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in by, any Lender;

(ii)    subject any Recipient to any Taxes (other than (A) Indemnified Taxes, and/or (B) Taxes described in clauses (b) through (d) of the definition of "*Excluded Taxes*" in Section 1.1, and/or (C) Connection Income Taxes); or

(iii)    impose on any Lender or the secured overnight financing or any other applicable interbank lending market any other condition, cost or expense (other than Taxes) affecting this Agreement or any Loans made by such Lender;

and the result of any of the foregoing is to increase the cost to such Lender of making, converting into, continuing or maintaining a Loan, or to reduce the amount received or receivable by such Lender hereunder (whether of principal, interest or any other amount), then, from time to time, such Lender may provide the Borrower (with a copy thereof to the Administrative Agent) with written notice and demand with respect to such increased costs or reduced amounts, and, within five (5) Business Days after receipt of such notice and demand, the Borrower shall pay to the Administrative Agent, for the account of such Lender, such additional amounts as will compensate such Lender for any such increased costs incurred or reduction suffered.

(b)    If any Lender shall have determined that any Change in Law regarding capital or liquidity ratios or requirements has, or would have, the effect of reducing the rate of return on such Lender's capital (or on the capital of the Parent Company of such Lender) as a consequence of its obligations hereunder to a level *below* that which such Lender or such Parent Company could have achieved *but for* such Change in Law (taking into consideration such Lender's policies or the policies of such Parent Company with respect to capital adequacy and liquidity), then, from time to time, such Lender may provide the Borrower (with a copy thereof to the Administrative Agent) with written notice and demand with respect to such reduced amounts, and, within five (5) Business Days after receipt of such notice and demand, the Borrower shall pay to the Administrative Agent, for the account of such Lender, such additional amounts as will compensate such Lender or such Parent Company for any such reduction suffered.

(c)      A certificate of such Lender setting forth the amount(s) necessary to compensate such Lender or such Parent Company, as applicable, specified in clauses (a) or (b) above shall be delivered to the Borrower (with a copy to the Administrative Agent) and shall be conclusive, absent manifest error.

(d)      Failure or delay on the part of any Lender to demand compensation pursuant to this Section 2.18 shall *not* constitute a waiver of such Lender's right to demand such compensation; provided, that, the Borrower shall *not* be required to compensate a Lender pursuant to this Section 2.18 for any increased costs incurred, or reductions suffered, *more than* six (6) calendar months prior to the date that such Lender delivers to the Borrower the certificate referenced in the foregoing clause (c) and notifies the Borrower of such Lender's intention to claim compensation therefor (provided, that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the six (6) month period referred to in the foregoing shall be extended to include the period of retroactive effect thereof).

Section 2.19      Funding Indemnity. In the event of (a) the payment of any principal of a SOFR Loan other than on the last day of the Interest Period applicable thereto (including, without limitation, as a result of an Event of Default), (b) the conversion or continuation of a SOFR Loan other than on the last day of the Interest Period applicable thereto, or (c) the failure by the Borrower to borrow, prepay, convert or continue any SOFR Loan on the date specified in any applicable notice (regardless of whether such notice is withdrawn or revoked), then, in any such event, the Borrower shall compensate each Lender, promptly and, in any event, within five (5) Business Days after written demand therefor from such Lender, for any loss, cost or expense attributable to such event. In the case of a SOFR Loan, such loss, cost or expense shall be deemed to include an amount determined by such Lender to be the *excess*, if any, of: (i) the amount of interest that would have accrued on the principal amount of such SOFR Loan if such event had *not* occurred, at Adjusted Term SOFR for the then current Interest Period for such SOFR Loan (or, in the case of a failure to borrow, convert or continue, for the requested Interest Period for the applicable SOFR Borrowing) for the period from, and including, the date of such event to, and including, the last day of such Interest Period; over (ii) the amount of interest that would accrue on the principal amount of such SOFR Loan for the same period, if Adjusted Term SOFR for such Interest Period were set on the date on which such SOFR Loan was prepaid or converted, or the date on which the Borrower failed to borrow, convert, or continue such SOFR Loan, as the case may be. A certificate as to any additional amount payable under this Section 2.19 submitted to the Borrower by any Lender (with a copy to the Administrative Agent) shall be conclusive, absent manifest error.

Section 2.20      Taxes.

(a)      Defined Terms. For purposes of this Section 2.20, the phrase "*applicable Law*" includes FATCA.

(b)      Payments Free of Taxes. Any and all payments by or on account of any obligation of any Loan Party under any Loan Document shall be made without deduction or withholding for any Taxes, except as required by applicable Law. If any applicable Law (as determined in the good faith discretion of an applicable Withholding Agent) requires the deduction or withholding of any Tax from any such payment by a Withholding Agent, then the applicable Withholding Agent shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable Law, and, if such Tax is an Indemnified Tax, then the *sum* payable by the applicable Loan Party shall be *increased* as necessary so that, after such deduction or withholding has been made (including, without limitation, such deductions and withholdings applicable to additional sums payable under this Section 2.20), the applicable Recipient shall receive an amount equal to the sum it would have received had no such deduction or withholding been made.

(c)      Payment of Other Taxes by the Loan Parties. In addition, the Loan Parties shall timely pay to the relevant Governmental Authority in accordance with applicable Law, or at the option of the Administrative Agent timely reimburse it for the payment of, any Other Taxes.

(d)      <u>Indemnification by the Loan Parties</u>. The Loan Parties shall, jointly and severally, indemnify each Recipient, within ten (10) Business Days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this <u>Section 2.20</u>) payable or paid by such Recipient or required to be withheld or deducted from a payment to such Recipient and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to the Borrower by a Lender (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of a Lender, shall be conclusive and binding absent manifest error.

(e)      <u>Indemnification by the Lenders</u>. Each Lender shall severally indemnify the Administrative Agent, within ten (10) days after demand therefor, for: (i) any Indemnified Taxes attributable to such Lender (but only to the extent that the Loan Parties have not already indemnified the Administrative Agent for such Indemnified Taxes, and without limiting the obligation of the Loan Parties to do so); (ii) any Taxes attributable to such Lender's failure to comply with the provisions of <u>Section 11.4(e)</u> relating to the maintenance of a Participant Register; and (iii) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by the Administrative Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive and binding absent manifest error. Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under any Loan Document, or otherwise payable by the Administrative Agent to such Lender from any other source, against any amount due to the Administrative Agent under this <u>clause (e)</u>.

(f)      <u>Evidence of Payments</u>. As soon as practicable after any payment of Taxes by any Loan Party to a Governmental Authority pursuant to this <u>Section 2.20</u>, such Loan Party shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(g)      <u>Status of Lenders</u>.

(i)      Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Loan Document shall deliver to the Borrower and the Administrative Agent, at the time or times reasonably requested by the Borrower or the Administrative Agent, such properly completed and executed documentation reasonably requested by the Borrower or the Administrative Agent as will permit such payments to be made without withholding or at a reduced rate of withholding. In addition, any Lender, if reasonably requested by the Borrower or the Administrative Agent, shall deliver such other documentation prescribed by applicable Law or reasonably requested by the Borrower or the Administrative Agent as will enable the Borrower or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements. Notwithstanding anything to the contrary in the preceding two (2) sentences, the completion, execution and submission of such documentation (other than such documentation set forth in clauses (g)(ii)(A), (g)(ii)(B) and (g)(ii)(D) below) shall *not* be required if, in the Lender's reasonable judgment, such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense, or would materially prejudice the legal or commercial position of such Lender.

(ii)      Without limiting the generality of the foregoing, in the event that the Borrower is a U.S. Person:

(A)      any Lender that is a U.S. Person shall deliver to the Borrower and the Administrative Agent on, or prior to, the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed originals of IRS Form W–9 certifying that such Lender is exempt from U.S. federal backup withholding tax;

47

(B)     any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on, or prior to, the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), whichever of the following is applicable:

(I)     in the case of a Foreign Lender claiming the benefits of an income tax treaty to which the United States is a party: (1) with respect to payments of interest under any Loan Document, executed originals of IRS Form W–8BEN or IRS Form W–8BEN–E, as applicable, establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "interest" article of such tax treaty; and (2) with respect to any other applicable payments under any Loan Document, IRS Form W–8BEN or IRS Form W–8BEN–E, as applicable, establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

(II)     executed originals of IRS Form W–8ECI;

(III)     in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code: (1) a certificate substantially in the form of Exhibit 2.20–A to the effect that such Foreign Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of the Borrower within the meaning of Section 881(c)(3)(B) of the Code, or a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code (a "U.S. Tax Compliance Certificate"); and (2) executed originals of IRS Form W–8BEN or IRS Form W–8BEN–E, as applicable; or

(IV)     to the extent a Foreign Lender is not the beneficial owner, executed originals of IRS Form W–8IMY, accompanied by IRS Form W–8ECI, IRS Form W–8BEN or IRS Form W–8BEN–E, as applicable, a U.S. Tax Compliance Certificate substantially in the form of Exhibit 2.20–B or Exhibit 2.20–C, IRS Form W–9, and/or other certification documents from each beneficial owner, as applicable; provided, that, if the Foreign Lender is a partnership and one (1) or more direct or indirect partners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide a U.S. Tax Compliance Certificate substantially in the form of Exhibit 2.20–D on behalf of each such direct and indirect partner;

(C)     any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on, or prior to, the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed originals of any other form prescribed by applicable Law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by applicable Law to permit the Borrower or the Administrative Agent to determine the withholding or deduction required to be made; and

(D)     if a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrower and the Administrative Agent, at the time or times prescribed by Law, and at such time or times reasonably requested by the Borrower or the Administrative Agent, such documentation prescribed by applicable Law (including, without limitation, as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent, as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from

48

such payment. Solely for purposes of this clause (g)(ii)(D), "*FATCA*" shall include any amendments made to FATCA after the date of this Agreement.

Each Lender agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Borrower and the Administrative Agent in writing of its legal inability to do so.

(h)    Administrative Agent. On or prior to the date the Administrative Agent becomes a party to this Agreement, the Administrative Agent (or any sub-agent or successor Administrative Agent) shall provide to the Borrower a duly completed and executed IRS Form W-9.

(i)    Treatment of Certain Refunds. If any party determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified pursuant to this Section 2.20 (including by the payment of additional amounts pursuant to this Section 2.20), it shall pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made under this Section 2.20 with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of such indemnified party and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund). Such indemnifying party, upon the request of such indemnified party, shall repay to such indemnified party the amount paid over pursuant to this clause (i) (*plus* any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event that such indemnified party is required to repay such refund to such Governmental Authority. Notwithstanding anything to the contrary in this clause (i), in no event will the indemnified party be required to pay any amount to an indemnifying party pursuant to this clause (i) the payment of which would place the indemnified party in a less favorable net after-Tax position than the indemnified party would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid. This clause (i) shall not be construed to require any indemnified party to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the indemnifying party or any other Person.

(j)    Survival. Each party's obligations under this Section 2.20 shall survive the resignation or replacement of the Administrative Agent, any assignment of rights by, or the replacement of, a Lender, and the repayment, satisfaction and/or discharge of all Obligations, and the termination of all Commitments, under the Loan Documents.

Section 2.21    Payments Generally; Pro Rata Treatment; Sharing of Set-offs.

(a)    The Borrower shall make each payment required to be made by it hereunder (whether of principal, interest or fees, or of amounts payable under Section 2.18, Section 2.19 or Section 2.20, or otherwise) prior to 2:00 P.M. on the date when due, in immediately available funds, free and clear of any defenses, rights of set-off, counterclaim, or withholding or deduction of taxes (except as otherwise expressly provided herein). Any amounts received after such time on any date may, in the discretion of the Administrative Agent, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon. All such payments shall be made to the Administrative Agent at the Payment Office, except that payments pursuant to Section 2.18, Section 2.19, Section 2.20 and Section 11.3 shall be made directly to the Persons entitled thereto. The Administrative Agent shall distribute any such payments received by it for the account of any other Person to the appropriate recipient promptly following receipt thereof. If any payment hereunder shall be due on a day that is not a Business Day, the date for payment shall be extended to the next succeeding Business Day, and, in the case of any payment accruing interest, interest thereon shall be made payable for the period of such extension. All payments hereunder shall be made in Dollars.

(b)    If, at any time, insufficient funds are received by and available to the Administrative Agent to pay fully all amounts of principal, interest and fees then due hereunder, such funds shall be applied as follows: (i) *first*, to all fees and reimbursable expenses of the Administrative Agent then due and payable pursuant to any of

the Loan Documents; (ii) *second*, to all reimbursable expenses of the Lenders then due and payable pursuant to any of the Loan Documents, *pro rata* to the Lenders based on their respective Pro Rata Shares of such fees and expenses; (iii) *third*, to all interest and fees then due and payable hereunder, *pro rata* to the Lenders based on their respective Pro Rata Shares of such interest and fees; and (iv) *fourth*, to the payment of principal of all Loans then due and payable hereunder, *pro rata* to the parties entitled thereto based on their respective Pro Rata Shares of such principal.

(c)    If any Lender shall, by exercising any right of set-off or counterclaim or otherwise, obtain payment in respect of any principal of, or interest on, any of its Loans that would result in such Lender receiving payment of a greater proportion of the aggregate amount of its Revolving Credit Exposure and accrued interest and fees thereon than the proportion received by any other Lender with respect to its Revolving Credit Exposure receiving such greater proportion shall purchase (for cash at face value) participations in the Revolving Credit Exposure of other Lenders to the extent necessary so that the benefit of all such payments shall be shared by the Lenders ratably in accordance with the aggregate amount of principal of and accrued interest on their respective Revolving Credit Exposure; provided, that, (i) if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest, and (ii) the provisions of this clause (c) shall *not* be construed to apply to any payment made by the Borrower pursuant to, and in accordance with, the express terms of this Agreement (including, without limitation, the application of funds arising from the existence of a Defaulting Lender), or any payment obtained by a Lender as consideration for the assignment of, or sale of a participation in, any of its Revolving Credit Exposure to any assignee or Participant, other than to the Borrower or any Subsidiary or Affiliate thereof (as to which the provisions of this clause (c) shall apply). The Borrower consents to the foregoing and agrees, to the extent it may effectively do so under applicable Law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against the Borrower rights of set-off and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of the Borrower in the amount of such participation.

(d)    Unless the Administrative Agent shall have received notice from the Borrower prior to the date on which any payment is due to the Administrative Agent for the account of the Lenders hereunder that the Borrower will not make such payment, the Administrative Agent may assume that the Borrower has made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the Lenders the amount or amounts due. In such event, if the Borrower has not in fact made such payment, then each of the Lenders severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Lender with interest thereon, for each day from, and including, the date such amount is distributed to it to, but excluding, the date of payment to the Administrative Agent, at the greater of the Federal Funds Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.

(e)    Notwithstanding anything herein to the contrary, any amount paid by the Borrower for the account of a Defaulting Lender under this Agreement (whether on account of principal, interest, fees, indemnity payments or other amounts) will be retained by the Administrative Agent in a segregated non-interest bearing account until the Revolving Commitment Termination Date at which time, the funds in such account will be applied by the Administrative Agent, to the fullest extent permitted by Law, in the following order of priority: (i) *first* to the payment of any amounts owing by such Defaulting Lender to the Administrative Agent under this Agreement; (ii) *second*, [reserved]; (iii) *third*, to the payment of all interest due and payable to the Lenders hereunder that are not Defaulting Lenders, ratably among them in accordance with the amounts of such interest then due and payable to them; (iv) *fourth*, to the payment of all fees then due and payable to the Lenders hereunder that are not Defaulting Lenders, ratably among them in accordance with the amounts of such fees then due and payable to them; (v) *fifth*, to pay principal then due and payable to the Lenders hereunder that are not Defaulting Lenders, ratably in accordance with the amounts thereof then due and payable to them; (vi) *sixth*, to the ratable payment of all other amounts then due and payable to the Lenders hereunder that are not Defaulting Lenders; and (vii) *seventh*, to pay all amounts owing under this Agreement to such Defaulting Lender, or as a court of competent jurisdiction may otherwise direct.

CHAR1\1930324v9

Section 2.22    [Reserved].

Section 2.23    [Reserved].

Section 2.24    Mitigation of Obligations. If any Lender requests compensation under Section 2.18, or if the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 2.20, then such Lender shall use reasonable efforts to designate a different lending office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or Affiliates, if, in the sole judgment of such Lender, such designation or assignment: (a) would eliminate or reduce amounts payable under Section 2.18 or Section 2.20, as the case may be, in the future; and (b) would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender. The Borrower hereby agrees to pay all costs and expenses incurred by any Lender in connection with such designation or assignment.

Section 2.25    Replacement of Lenders. If (a) any Lender requests compensation under Section 2.18, (b) the Borrower is required to pay any additional amount to any Lender or any Governmental Authority of the account of any Lender pursuant to Section 2.20, (c) any Lender notifies the Borrower and the Administrative Agent that it is unable to fund SOFR Loans pursuant to Section 2.16 or Section 2.17, (d) a Lender (a "*Non-Consenting Lender*") does *not* consent to a proposed change, waiver, discharge or termination with respect to any Loan Document that has been approved by the Required Lenders as provided in Section 11.2(b), but which requires the unanimous consent of all Lenders or of all of the Lenders directly affected thereby (as the case may be), or (e) any Lender is a Defaulting Lender, then, the Borrower may, at its sole expense and effort, upon notice to such Lender and the Administrative Agent, require such Lender to assign and delegate, without recourse (in accordance with, and subject to the restrictions set forth in, Section 11.4(b)), all of its interests, rights (other than its existing rights to payments pursuant to Section 2.18 and/or Section 2.20, as applicable), and obligations under this Agreement and the related Loan Documents to an assignee that shall assume such obligations (which assignee may be another Lender) (a "*Replacement Lender*"); provided, that, (i) the Borrower shall have received the prior written consent of the Administrative Agent, which consent shall *not* be unreasonably withheld, (ii) such Lender shall have received payment of an amount equal to the outstanding principal amount of all Loans owed to it, accrued interest thereon, accrued fees and all other amounts payable to it hereunder, from the assignee (in the case of such outstanding principal and accrued interest) and from the Borrower (in the case of all other amounts), (iii) in the case of a claim for compensation under Section 2.18 or payments required to be made pursuant to Section 2.20, such assignment will result in a reduction in such compensation or payments, (iv) such assignment does *not* conflict with applicable Law, and (v) in the case of any such assignment resulting from a Non-Consenting Lender's failure to consent to a proposed change, waiver, discharge or termination with respect to any Loan Document, the applicable assignee consents to the proposed change, waiver, discharge or termination, provided, that, the failure by such Non-Consenting Lender to execute and deliver an Assignment and Acceptance shall *not* impair the validity of the removal of such Non-Consenting Lender, and the mandatory assignment of such Non-Consenting Lender's Commitments and outstanding Loans pursuant to this Section 2.25 shall nevertheless be effective without the execution by such Non-Consenting Lender of an Assignment and Acceptance. A Lender shall *not* be required to make any such assignment and delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the Borrower to require such assignment and delegation cease to apply.

Section 2.26    Defaulting Lenders. If the Borrower and the Administrative Agent agree in writing in their discretion that any Defaulting Lender has ceased to be a Defaulting Lender, the Administrative Agent will so notify the parties hereto, whereupon as of the effective date specified in such notice and subject to any conditions set forth therein, such Lender will purchase at par such portion of outstanding Revolving Loans of the other Lenders and/or make such other adjustments as the Administrative Agent may determine to be necessary to cause the Revolving Credit Exposure of the Lenders to be on a pro rata basis in accordance with their respective Revolving Commitments, whereupon such Lender will cease to be a Defaulting Lender and will be a Non-Defaulting Lender (and such Revolving Credit Exposure of each Lender will automatically be adjusted on a prospective basis to reflect the foregoing); provided, that, (i) no adjustments will be made retroactively with respect to fees accrued or payments made by, or on behalf of, the Borrower while such Lender was a Defaulting

51

Lender, and (ii) except to the extent otherwise expressly agreed by the affected parties, no change hereunder from Defaulting Lender to Non-Defaulting Lender will constitute a waiver or release of any claim of any party hereunder arising from such Lender's having been a Defaulting Lender.

Section 2.27    Priority and Liens.

(a)    Superpriority Claims and Liens. Each Loan Party hereby covenants, represents and warrants that, upon entry of the Interim DIP Order (or, where indicated below, the Final DIP Order), the Obligations are authorized by the Orders and:

(i)    pursuant to Sections 364(c)(1) and 507(b) of the Bankruptcy Code, constitute joint and several allowed administrative expense claims in the Chapter 11 Case having superpriority over all administrative expenses of the kind specified in Section 364(c)(1), 503(b), 507(a)(2), 507(b) or 507(d) of the Bankruptcy Code;

(ii)    pursuant to Sections 361, 362, 364(c)(2), 364(c)(3) and 364(d) of the Bankruptcy Code and the Collateral Documents, shall be secured by, and each Loan Party shall have granted to the Administrative Agent, for the benefit of the Secured Parties, a perfected first-priority Lien on all presently owned and hereafter acquired unencumbered tangible and intangible property and assets of the Borrower, the Guarantors and their respective estates wherever located, and any proceeds and products thereof, including, without limitation, accounts, deposit accounts, cash, chattel paper, investment property, letter-of-credit rights, securities accounts, software, supporting obligations, commercial tort claims, causes of action, investments, instruments, documents, inventory, contract rights, general intangibles, intellectual property, real property, fixtures, goods, equipment, vessels and other fixed assets, and accessions and proceeds and products of all of the foregoing (including earnings and insurance proceeds) and including (subject to entry of the Final DIP Order) any amounts that are recovered or otherwise received by the Debtors in respect of Avoidance Actions pursuant to Sections 549 and 550 of the Bankruptcy Code and any proceeds thereof;

(iii)    pursuant to Section 364(c)(3) of the Bankruptcy Code and the Collateral Documents, shall be secured by, and each Loan Party shall have granted to the Administrative Agent, for the benefit of the Secured Parties, a perfected junior Lien on all property of the Borrower, the Guarantors and their respective estates wherever located, and any proceeds and products thereof, including, without limitation, accounts, deposit accounts, cash, chattel paper, investment property, letter-of-credit rights, securities accounts, software, supporting obligations, commercial tort claims, causes of action, investments, instruments, documents, inventory, contract rights, general intangibles, intellectual property, real property, fixtures, goods, equipment, vessels and other fixed assets, and accessions and proceeds and products of all of the foregoing (including earnings and insurance proceeds), that is subject to valid and perfected Liens in existence as of the Petition Date (including Liens (if any) perfected subsequent to the Petition Date as permitted by and in accordance with Section 546(b) of the Bankruptcy Code but excluding the Primed Liens in favor of the Prepetition Agent for the benefit of the holders of the Prepetition Facility Obligations which Liens will be primed as described in the next clause) (such existing Liens, the "*Permitted Prior Liens*") but with a priority immediately junior to such Liens; and

(iv)    pursuant to Section 364(d)(1) of the Bankruptcy Code and the Collateral Documents, shall be secured by, and each Loan Party shall have granted to the Administrative Agent, for the benefit of the Secured Parties, a perfected first-priority, senior priming Lien (the "*Priming Lien*") on the Prepetition Collateral, which Priming Lien shall prime (A) all Liens securing the Prepetition Facility Obligations and (B) any existing Liens that are junior thereto, and shall also be senior to any Liens arising after the Petition Date to provide adequate protection in respect of any Liens to which the Priming Lien is senior (collectively, the "*Primed Liens*"), provided, that, such Priming Liens in favor of the Administrative Agent shall not prime Liens that are valid, properly perfected, non-avoidable and senior in priority as a matter of law to the Primed Liens as of the Petition Date;

CHAR1\1930324v9

*provided*, *that*, the Liens in favor of the Administrative Agent, for the benefit of the Secured Parties, shall: (A) not encumber any Excluded Property; and (B) be subject to the Carve-Out, any senior Liens, if any, permitted under this Agreement and the other Loan Documents, and the rights of the cash management banks as set forth in the Cash Management Order.

(b)    Security Perfection. Each of the Loan Parties agrees to take all action that the Administrative Agent or the Required Lenders may reasonably request as a matter of nonbankruptcy law to perfect and protect the Administrative Agent's Liens for the benefit of the Secured Parties, and upon the Collateral and for such Liens to obtain the priority therefor contemplated hereby, including, without limitation, executing and delivering such documents and instruments, financing statements, providing such notices and assents of third parties, obtaining such governmental authorizations and providing such other instruments and documents in recordable form as the Administrative Agent or any Lender may reasonably request. Each Loan Party hereby irrevocably authorizes the Administrative Agent (or its designee) at any time and from time to time to file in any filing office in any UCC jurisdiction any initial financing statements and amendments thereto that (i) indicate the Collateral (A) as all assets of such Loan Party or words of similar effect, regardless of whether any particular asset comprised in the Collateral falls within the scope of Article 9 of the UCC, or (B) as being of an equal or lesser scope or with greater detail, and (ii) provide any other information required by part 5 of Article 9 of the UCC for the sufficiency or filing office acceptance of any financing statement or amendment, including (A) whether such Loan Party is an organization, the type of organization and any organization identification number issued to such Loan Party and, (B) in the case of a financing statement filed as a fixture filing, a sufficient description of real property to which the Collateral relates. Such Loan Party agrees to use commercially reasonable efforts to furnish any such information to the Administrative Agent promptly upon request. Notwithstanding the provisions of this Section 2.27(b), the Administrative Agent and the Lenders shall have the benefits of the Orders.

(c)    Real Property. Subject in all respects to the priorities set forth in Section 2.27(a) above and to the Carve-Out and subject to the entry of the Final DIP Order, the Borrower and the Guarantors shall grant to the Administrative Agent on behalf of the Secured Parties a security interest in, and Mortgage on, all of the right, title and interest of the Borrower and the Guarantors in all real property, if any, now or hereafter owned or leased by either the Borrower or any of the Guarantors, together in each case with all of the right, title and interest of the Borrower or such Guarantor in and to all buildings, improvements, and fixtures related thereto, any lease or sublease thereof, all general intangibles relating thereto and all proceeds thereof, except to the extent constituting Excluded Property. The Borrower and the Guarantors shall acknowledge that, pursuant to the Final DIP Order, the Liens in favor of the Administrative Agent on behalf of the Secured Parties in all of such real property and leasehold interests shall be perfected without the recordation of any instruments of mortgage or assignment and the Administrative Agent and the Lenders shall have the benefits of the Final DIP Order. Notwithstanding the foregoing, at the reasonable request of the Administrative Agent but subject to the entry of the Final DIP Order, the Loan Parties shall enter into Mortgages in recordable form with respect to such properties on terms reasonably satisfactory to the Administrative Agent, which the Administrative Agent may, in its sole discretion, elect to record. In the event of a conflict between, or inconsistency among, the Interim DIP Order or the Final DIP Order, on the one hand, and any Loan Document, on the other hand, the Interim DIP Order or the Final DIP Order, as the case may be, shall control.

(d)    No Modification. Except as otherwise agreed to by the Lenders, the Liens, Lien priorities, Superpriority Claims and other rights and remedies granted to the Secured Parties pursuant to the Orders, this Agreement or the other Loan Documents (specifically including, but not limited to, the existence, perfection, enforceability and priority of the Liens provided for herein and therein, and the Superpriority Claims provided herein and therein) shall not be modified, altered or impaired in any manner by any other financing or extension of credit or incurrence of indebtedness by the Borrower or any other Loan Party (pursuant to Section 364 of the Bankruptcy Code or otherwise), or by dismissal or conversion of any Chapter 11 Case, or by any other act or omission whatsoever.

ARTICLE III

CONDITIONS PRECEDENT TO LOANS

Section 3.1    Conditions to Effectiveness. This Agreement, and the obligations of the Lenders to make Loans shall *not* be effective until the date on which each of the following conditions precedent is satisfied (or waived in accordance with Section 11.2), in each case, in form and substance satisfactory to the Administrative Agent and each Lender:

(a)    Loan Documents. Receipt by the Administrative Agent of a counterpart of this Agreement and each of the other Loan Documents signed by, or on behalf of, each party hereto or thereto, or written evidence satisfactory to the Administrative Agent (which may include telecopy transmission of such signed signature page) that such party (including, without limitation, each Loan Party and each Lender party thereto) has signed a counterpart of this Agreement and the other Loan Documents (including, without limitation, a Note payable to the order of each Lender that requested such Note at least one (1) Business Day prior to the Effective Date) to which such party is a party.

(b)    Organization Documents; Resolutions and Certificates. Receipt by the Administrative Agent of:

(i)    a certificate of the Secretary or Assistant Secretary (or a Responsible Officer of substantially equivalent title and authority) of each Loan Party, attaching and certifying copies of such Loan Party's Organization Documents and resolutions of its board of directors or managers (or equivalent governing body), authorizing the execution, delivery and performance of the Loan Documents to which it is a party, and certifying the name, title and true signature of each officer of such Loan Party executing the Loan Documents to which it is a party;

(ii)    certified copies of the articles or certificate of incorporation, certificate of organization or limited partnership, or other registered organizational documents of each Loan Party, together with certificates of good standing or existence, as may be available from the Secretary of State of the jurisdiction of organization of such Loan Party; and

(iii)    evidence reasonably satisfactory to the Administrative Agent that, as of the Effective Date, the board of directors or other equivalent governing body of the Borrower and each other Loan Party (A) is composed of five (5) individuals at least three (3) of whom (I) do not have a relationship by blood (to the second (2nd) degree of consanguinity), marriage or adoption to John Henry Owoc, (II) are not employees, officers, managers or consultants of, or independent contractors or advisors to, any Loan Party (other than in respect of service on such board or other equivalent governing body) and (III) are otherwise reasonably acceptable to the Required Lenders, and (B) includes the Restructuring Committee composed solely of one (1) individual reasonably acceptable to the Required Lenders, it being understood that Steven G. Panagos is reasonably acceptable to the Required Lenders, with authority to, at a minimum, make recommendations to the board of directors or other equivalent governing body of the Borrower or such other Loan Party, as applicable, regarding all aspects of the Chapter 11 Case, including without limitation the undertaking by any Debtor of any action necessary to satisfy any requirement of Section 5.18.

(c)    Commencement of Chapter 11 Case. The Loan Parties shall have commenced the Chapter 11 Case in the Bankruptcy Court.

(d)    Interim DIP Order. The Bankruptcy Court shall have entered the Interim DIP Order, which Interim DIP Order shall be in full force and effect and shall not have been amended, modified, stayed or reversed other than in respect of (i) immaterial modifications with the prior written consent of the Administrative Agent (such consent not to be unreasonably withheld) or (ii) material modifications with the prior written consent of the Administrative Agent. If the Interim DIP Order is the subject of a pending appeal in any respect, neither the

54

Interim DIP Order nor the making of the Loans or the performance by any Loan Party of any of its obligations under any of the Loan Documents shall be the subject of a presently effective stay pending appeal.

(e)　　[Reserved].

(f)　　First Day Orders. All of the "first day orders" (other than the Interim DIP Order) entered by the Bankruptcy Court in the Chapter 11 Case shall be reasonably satisfactory in form and substance to the Administrative Agent and the Required Lenders in all material respects, and all adequate protection payments and critical vendor payments approved by the Bankruptcy Court in the Interim DIP Order or otherwise shall be satisfactory to the Administrative Agent.

(g)　　[Reserved].

(h)　　Initial Budget; Other Financial Information. The Administrative Agent shall have received a reasonably detailed weekly budget of projected receipts and expenditures of the Loan Parties for the period commencing on the Petition Date and ending on the date that is thirteen (13) weeks after the Petition Date, in form and substance reasonably satisfactory to the Administrative Agent and the Required Lenders and consistent with the budget prepared by the Loan Parties and delivered to the Administrative Agent prior to the Effective Date (the "*Initial Budget*"), with such supporting detail as the Administrative Agent may reasonably request.

(i)　　[Reserved].

(j)　　Patriot Act; Anti-Money Laundering Laws. *At least* one (1) day prior to the Effective Date, receipt by the Administrative Agent of all documentation and other information required by bank regulatory authorities, or reasonably requested by the Administrative Agent or any Lender at least two (2) days prior to the Effective Date, under, or in respect of, applicable "know your customer" and anti-money laundering Laws, including, without limitation, the Patriot Act, and, if any Loan Party qualifies as a "legal entity customer" under the Beneficial Ownership Regulation, a Beneficial Ownership Certification in relation to such Loan Party.

(k)　　[Reserved].

(l)　　Other Information. Subject to applicable legal privileges, trade secrets, proprietary information, fiduciary duty, binding agreements and applicable Law, the Administrative Agent shall have received all information (financial or otherwise) and copies of all material documents reasonably requested in writing at least one (1) Business Day prior to the Effective Date by the Administrative Agent.

(m)　　Fees and Expenses. Receipt by the Administrative Agent of payment of all fees, expenses and other amounts due and payable on, or prior to, the Effective Date, including, without limitation, reimbursement or payment of all out-of-pocket expenses of the Administrative Agent and its Affiliates (including, without limitation, all reasonable fees, charges and disbursements of the Administrative Agent's counsel and financial advisor) required to be reimbursed or paid by the Borrower hereunder, under any other Loan Document, and under any agreement with the Administrative Agent.

Without limiting the generality of the provisions of this Section 3.1, for purposes of determining compliance with the conditions specified in this Section 3.1, each Lender that has signed this Agreement shall be deemed to have consented to, approved of, accepted, or been satisfied with, each document or other matter required thereunder to be consented to or approved by, or acceptable or satisfactory to, a Lender, unless the Administrative Agent shall have received notice from such Lender prior to the proposed Effective Date specifying its objection thereto. The Administrative Agent shall notify the Borrower and the Lenders of the Effective Date, and such notice shall be conclusive and binding.

Section 3.2　　Conditions to Each Credit Event. The obligation of each Lender to make a Loan on the occasion of any Borrowing (other than any Borrowing effectuated pursuant to Section 2.6(a)) is subject to Section 2.26 and the satisfaction of the following conditions:

CHAR1\1930324v9

(a)      on the date on which such Borrowing is to become effective, both immediately prior to, and immediately after giving effect to, the incurrence of such Borrowing, no Default or Event of Default shall exist;

(b)      on the date on which such Borrowing, is to become effective, both immediately prior to, and immediately after giving effect to, the incurrence of such Borrowing, all representations and warranties of each Loan Party set forth in the Loan Documents (including, without limitation, the representations and warranties of each Loan Party set forth in <u>Article IV</u>) shall be true and correct in all material respects (other than those representations and warranties that are expressly qualified by a Material Adverse Effect or other materiality, in which case, such representations and warranties shall be true and correct in all respects), except to the extent that such representations and warranties specifically relate to an earlier date, in which case, they shall be true and correct in all material respects (other than those representations and warranties that are expressly qualified by a Material Adverse Effect or other materiality, in which case, such representations and warranties shall be true and correct in all respects) as of such earlier date;

(c)      the Borrower shall have delivered the required Notice of Borrowing;

(d)      at the time of such Borrowing, (i) if such extension of credit has been requested before the Final DIP Order has been entered by the Bankruptcy Court, the Interim DIP Order shall be in full force and effect and shall not have been vacated, reversed, stayed, modified or amended in any respect other than immaterial modifications made with the prior written consent of the Administrative Agent (such consent not to be unreasonably withheld), and (ii) if such extension of credit is requested after the Final DIP Order has been entered by the Bankruptcy Court, the Administrative Agent and the Lenders shall have received a copy of the Final DIP Order and the Final DIP Order shall be in full force and effect and shall not have been vacated, reversed, stayed, modified or amended in any respect other than immaterial modifications made with the prior written consent of the Administrative Agent (such consent not to be unreasonably withheld); <u>provided, that</u>, if either the Interim DIP Order or the Final DIP Order is the subject of a pending appeal in any respect, none of such Order, the making of Loans or the performance by any Loan Party of any of its obligations under any of the Loan Documents shall be the subject of a presently effective stay pending appeal; <u>provided, further, that</u>, the Loan Parties, the Administrative Agent and the Lenders shall be permitted and required to perform their respective obligations in compliance with this Agreement, notwithstanding any such objection or appeal unless the relevant Order has been stayed by a court of competent jurisdiction;

(e)      the Borrower shall have paid the balance of all fees and expenses then due and payable to the Administrative Agent and, the Lenders as of the date of such extension of credit that (i) have been invoiced to the Borrower in writing at least one (1) Business Day prior to such extension of credit and (ii) are permitted to be paid under the Orders (as applicable);

(f)      the Borrower shall have operated in all material respects in accordance with the Budget (subject to compliance with the permitted variance contemplated by <u>Section 6.1(a)</u>);

(g)      [reserved]; and

(h)      immediately after giving effect to such Borrowing, Unrestricted Cash shall not exceed the Unrestricted Cash Threshold Amount.

Each Borrowing shall be deemed to constitute a representation and warranty by the Borrower, on the date thereof, as to the matters specified in <u>clauses (a)</u>, <u>(b)</u>, <u>(d)</u>, <u>(e)</u>, <u>(f)</u> and <u>(h)</u> above.

Section 3.3      <u>Initial Roll-Up Borrowing</u>. Notwithstanding anything herein to the contrary, to the extent that the Effective Date shall have occurred on or prior to such date, the Borrowing effectuated pursuant to <u>Section 2.6(a)</u> shall be (and shall be deemed to have been) made immediately and automatically upon the Final DIP Order Entry Date (and subject to the terms of the Final DIP Order), without the need for the taking of any action by any Person or the satisfaction of any other condition.

56

Section 3.4    <u>Delivery of Documents</u>. All of the Loan Documents, certificates, legal opinions, and other documents, papers and instruments referred to in this Article III shall, unless otherwise specified, be: (a) delivered to the Administrative Agent, for the account of each of the Lenders, in sufficient number of original counterparts and/or ".pdf" copies as requested by the Administrative Agent; and (b) in form and substance otherwise satisfactory in all respects to the Administrative Agent.

## ARTICLE IV

## <u>REPRESENTATIONS AND WARRANTIES</u>

Each Loan Party represents and warrants to the Administrative Agent and each Lender as follows:

Section 4.1    <u>Existence; Power</u>. Each Loan Party and Subsidiary (a) is duly organized, validly existing and in good standing as a corporation, partnership or limited liability company under the Laws of the jurisdiction of its organization, (b) has all requisite power and authority to (i) carry on its business as now conducted and (ii) execute, deliver and perform its obligations under the Loan Documents to which it is a party, and (c) is duly qualified to do business, and is in good standing, in each jurisdiction where such qualification is required, except in the case of the foregoing <u>clauses (b)(i)</u> and <u>(c)</u> where a failure to be so qualified could not reasonably be expected to result in a Material Adverse Effect, and except, in the case of each of the foregoing <u>clauses (a)</u>, <u>(b)</u> and <u>(c)</u>, where failure or non-compliance is permitted by the Bankruptcy Code.

Section 4.2    <u>Organizational Power; Authorization; Enforceability</u>. Subject to entry of the Interim DIP Order and, as applicable, the Final DIP Order, the execution, delivery and performance by each Loan Party of the Loan Documents to which it is a party are within such Loan Party's organizational powers and have been duly authorized by all necessary organizational, and if required, shareholder, partner or member (as the case may be), action. This Agreement has been duly executed and delivered by each Loan Party, and constitutes, and each other Loan Document to which any Loan Party is a party, when executed and delivered by such Loan Party, will constitute, a legal, valid and binding obligation of such Loan Party, enforceable against such Loan Party in accordance with its respective terms, except as may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, or similar Laws affecting the enforcement of creditors' rights generally and by general principles of equity.

Section 4.3    <u>Governmental Approvals; No Conflicts</u>. Subject to entry of the Interim DIP Order and, as applicable, the Final DIP Order, the execution, delivery and performance by each Loan Party of this Agreement, and by each Loan Party of the other Loan Documents to which it is a party, do *not*, and will *not*: (a) require any consent or approval of, registration or filing with, notice to, or any action by, any Governmental Authority, except (i) those as have been obtained or made and are in full force and effect, and (ii) filings necessary to perfect, and/or maintain the perfection of, the Liens created under the Loan Documents; (b) violate (i) the Organization Documents of any Loan Party, or (ii) any Law applicable to any Loan Party or Subsidiary, or any judgment, order, decree and/or ruling of any Governmental Authority; (c) violate, conflict with, result in a breach of, or constitute (with due notice, lapse or time, or both) a default under, any material contract of any Loan Party or Subsidiary, or any of their respective property or assets, or give rise to a right thereunder to require any payment to be made by any Loan Party or Subsidiary; (d) result in the creation or imposition of any Lien on any asset or property of any Loan Party or Subsidiary, except Liens (if any) created under the Loan Documents; or (e) require any approval of stockholders, members or partners (as the case may be), or any approval or consent of any Person under any material contract, of any Loan Party or Subsidiary, except for such approvals or consents which will be obtained on or before the Effective Date and disclosed in writing to the Administrative Agent, in the case of each of the foregoing <u>clauses (a)</u>, through <u>(e)</u>, where failure or non-compliance is permitted by the Bankruptcy Code.

Section 4.4    <u>No Material Adverse Effect</u>. Since the Petition Date, there have been no changes with respect to the Loan Parties and Subsidiaries that have had, or could reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect.

Section 4.5        Litigation and Environmental Matters.

(a)        No litigation, investigation or proceeding of or before any arbitrators or Governmental Authorities (including, without limitation, the FDA) is pending against, or, to the knowledge of any Responsible Officer of the Loan Parties, threatened against or affecting, the Loan Parties or their Subsidiaries: (i) as to which there is a reasonable possibility of an adverse determination that could reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect; or (ii) which, in any manner, challenges the validity or enforceability of this Agreement or any other Loan Document.

(b)        Except with respect to any matters that, either individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect, neither any Loan Party nor any Subsidiary: (i) has failed to comply with any Environmental Law or to obtain, maintain or comply with any permit, license or other approval required under any Environmental Law; (ii) has become subject to any Environmental Liability; (iii) has received written notice of any claim with respect to any Environmental Liability; or (iv) knows of any basis for any Environmental Liability.

Section 4.6        Compliance with Laws and Agreements; No Default.

(a)        Each Loan Party and Subsidiary is in compliance with (i) all applicable Laws, and all judgments, decrees and/or orders of any Governmental Authority, and (ii) all Contractual Obligations binding upon it or its assets or property, and neither any Loan Party nor any Subsidiary is in default under, or with respect to, any Contractual Obligation, except, with respect to the foregoing clauses (a)(i) and (a)(ii), where such non-compliance or default (x) either individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect or (y) is permitted under the Bankruptcy Code.

(b)        No Default or Event of Default has occurred and is continuing.

Section 4.7        Investment Company Act, Etc. Neither any Loan Party nor any Subsidiary is: (a) an "investment company" or is "controlled" by an "investment company", as such terms are defined in, or subject to regulation under or in connection with, the Investment Company Act; or (b) otherwise subject to any other regulatory scheme limiting its ability to incur debt, or requiring any approval or consent from, or registration or filing with, any Governmental Authority in connection therewith.

Section 4.8        Taxes. The Loan Parties and Subsidiaries have timely filed, or caused to be filed, all U.S. federal, and material state and other tax returns that are required to be filed by them, and have paid all material taxes shown to be due and payable on such returns or on any assessments made against it or its property and all other material taxes, fees or other charges imposed on it or any of its property by any Governmental Authority, except where the same are currently being contested in good faith by appropriate proceedings and for which such Loan Party or Subsidiary, as the case may be, has set aside on its books adequate reserves in accordance with GAAP. The charges, accruals and reserves on the books of the Loan Parties and Subsidiaries in respect of such taxes are adequate, and no tax liabilities that could be materially in excess of the amount so provided are anticipated.

Section 4.9        Margin Regulations. None of the proceeds of any of the Loans will be used, directly or indirectly, for "purchasing" or "carrying" any "margin stock" within the respective meanings of each of such terms under Regulation U or for any purpose that violates the provisions of Regulation T, Regulation U or Regulation X. Neither any Loan Party nor any Subsidiary is engaged principally, or as one of its important activities, in the business of extending credit for the purpose of purchasing or carrying "margin stock".

Section 4.10        ERISA.

(a)        Each Plan is in material compliance, in form and operation, with its terms, with ERISA, with the Code (including, without limitation, the Code provisions compliance with which is necessary for any intended

favorable tax treatment), and with all other applicable Laws. Each Plan (and each related trust, if any) that is intended to be qualified under Section 401(a) of the Code has received a favorable determination letter from the Internal Revenue Service, to the effect that it meets the requirements of Section 401(a) and Section 501(a) of the Code covering all applicable tax Law changes, or is comprised of a master or prototype plan that has received a favorable opinion letter from the Internal Revenue Service, and, to the knowledge of any Responsible Officer of any Loan Party or Subsidiary, nothing has occurred since the date of such determination that would adversely affect such determination (or, in the case of a Plan with no determination, nothing has occurred that would adversely affect the issuance of a favorable determination letter, or otherwise adversely affect such qualification).

(b)        No ERISA Event has occurred or is reasonably expected to occur. There exists no Unfunded Pension Liability with respect to any Plan. No Loan Party or Subsidiary, nor any of their respective ERISA Affiliates, is making, or accruing an obligation to make, contributions, or has, within any of the five (5) calendar years immediately preceding the date on which the assurance provided by this Section 4.10 is given, or deemed to be given, made, or accrued an obligation to make, contributions to any Multiemployer Plan.

(c)        There are no actions, suits or claims pending against or involving a Plan (other than routine claims for benefits), or, to the knowledge of any Loan Party or Subsidiary, or any of their respective ERISA Affiliates, threatened, which would reasonably be expected to be asserted successfully against any Plan, and, if so asserted successfully, would reasonably be expected, either individually or in the aggregate, to result in material liability to any Loan Party or Subsidiary. Each Loan Party and Subsidiary, and each of their respective ERISA Affiliates, have made all contributions to or under each Plan and Multiemployer Plan required by applicable Law within the applicable time limits prescribed thereby, by the terms of such Plan or Multiemployer Plan, respectively, or by any contract or agreement requiring contributions to a Plan or Multiemployer Plan. No Plan that is subject to Section 412 of the Code or Section 302 of ERISA has applied for, or received, an extension of any amortization period within the meaning of Section 412 of the Code or Section 303 or 304 of ERISA. No Loan Party or Subsidiary, nor, to the knowledge of any Responsible Officer of any Loan Party or Subsidiary, any of their respective ERISA Affiliates, have ceased operations at a facility so as to become subject to the provisions of Section 4068(a) of ERISA, withdrawn as a substantial employer so as to become subject to the provisions of Section 4063 of ERISA, or ceased making contributions to any Plan subject to Section 4064(a) of ERISA to which it made contributions.

(d)        Each Non-U.S. Plan has been maintained in compliance in all material respects with its terms and with the requirements of any and all applicable Laws, and has been maintained, where required, in good standing with applicable regulatory authorities, except as would *not* reasonably be expected to result in material liability to any Loan Party or Subsidiary. All contributions required to be made with respect to a Non-U.S. Plan have been timely made, except as would *not* reasonably be expected to result in material liability to any Loan Party or Subsidiary. No Loan Party or Subsidiary has incurred any obligation in connection with the termination of, or withdrawal from, any Non-U.S. Plan. The present value of the accrued benefit liabilities (whether or not vested) under each Non-U.S. Plan, determined as of the end of the most recently ended Fiscal Year on the basis of reasonable actuarial assumptions, did *not exceed* the current value of the assets of such Non-U.S. Plan allocable to such benefit liabilities.

Section 4.11        Ownership of Property; Insurance.

(a)        Each of the Loan Parties and Subsidiaries has good title to, or valid leasehold interests in, all of its real and personal property material to the operation of its business, in each case, free and clear of Liens not permitted by this Agreement. All leases that, individually or in the aggregate, are material to the business or operations of the Loan Parties and Subsidiaries are valid and subsisting and are in full force, other than as a result of the Chapter 11 Case.

(b)        Each of the Loan Parties and Subsidiaries owns, or is licensed, or otherwise has the right, to use, all patents, trademarks, service marks, trade names, copyrights and other intellectual property material to its

business, and the use thereof by the Loan Parties and Subsidiaries, to the knowledge of any Responsible Officer of any Loan Party or Subsidiary, does *not* infringe in any material respect on the rights of any other Person.

(c)        The property and assets of the Loan Parties and Subsidiaries are insured with financially sound and reputable insurance companies which are not Affiliates of any Loan Party, in such amounts, and with such deductibles and covering such risks, as are customarily carried by companies engaged in similar businesses and owning similar property and assets in localities where any Loan Party, or any Subsidiary thereof, operates.

(d)        Each Loan Party and Subsidiary has taken all reasonable action to maintain all material licenses necessary or desirable in the normal conduct of its business, except to the extent that the failure to do so could not reasonably be expected to have a Material Adverse Effect.

Section 4.12        Disclosure.

(a)        Each Loan Party has disclosed to the Lenders all agreements, instruments, and corporate or other restrictions to which such Loan Party, or any of its Subsidiaries, is subject, and all other matters known to any of them, that, either individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect. None of the reports (including, without limitation, all reports that any Loan Party is required to file with the SEC), financial statements, certificates or other information furnished by, or on behalf of, any Loan Party to the Administrative Agent or any Lender in connection with the negotiation of this Agreement or any other Loan Document, or delivered hereunder or thereunder (as modified and/or supplemented by any other information so furnished), contains any material misstatement of fact or omits to state any material fact necessary to make the statements therein, taken as a whole, in light of the circumstances under which they were made, not misleading; provided, that, with respect to projected financial information, each Loan Party represents only that such information was prepared in good faith based upon assumptions believed to be reasonable at the time, it being understood that any such projected information may vary from actual results and such variations could be material.

(b)        As of the Effective Date, the information included in the Beneficial Ownership Certification is true and correct in all respects.

Section 4.13        Labor Relations.  There are no strikes, lockouts, or other material labor disputes or grievances against any Loan Party or Subsidiary, or, to the knowledge of a Responsible Officer of any Loan Party, threatened in writing against or affecting any Loan Party or Subsidiary, and no significant unfair labor practice, charges, or grievances are pending against any Loan Party or Subsidiary, or, to the knowledge of a Responsible Officer of any Loan Party, threatened in writing against any of them, before any Governmental Authority. All payments due from the Loan Parties and Subsidiaries pursuant to the provisions of any collective bargaining agreement have been paid or accrued as a liability on the books of any such Loan Party or Subsidiary, except where the failure to do so could not reasonably be expected to have a Material Adverse Effect.

Section 4.14        Subsidiaries and Loan Parties.  Schedule 4.14 hereto sets forth: (a) the name of, the ownership interest of each applicable Loan Party, as the case may be, in, the jurisdiction of incorporation or organization of (as the case may be), and the type of, each Subsidiary and Loan Party, and identifies each Subsidiary that is a Loan Party, in each case, as of the Effective Date; and (b) the authorized Capital Stock of each Loan Party, and each Subsidiary thereof, as of the Effective Date. All issued and outstanding Capital Stock of each Loan Party, and each Subsidiary thereof, is duly authorized and validly issued, fully paid, non-assessable, as applicable, and free and clear of all Liens, other than those in favor of the Administrative Agent, for the ratable benefit of the holders of the Obligations. All such securities were issued in compliance with all applicable state and federal Laws concerning the issuance of securities. As of the Effective Date, all of the issued and outstanding Capital Stock of each Loan Party and Subsidiary is owned by the Person(s), and in the amount(s) and class(es), set forth on Schedule 4.14 hereto. Except as set forth on Schedule 4.14 hereto, there are no pre-emptive or other outstanding rights, options, warrants, conversion rights, commitments, or other similar agreements or understandings for the purchase or acquisition of any Capital Stock of any Loan Party or Subsidiary, and there are no membership interest or other Capital Stock of any Loan Party or Subsidiary outstanding that, upon conversion

or exchange, would require the issuance by any Loan Party or Subsidiary of any additional membership interests or other Capital Stock of any Loan Party or Subsidiary, or other securities convertible into, exchangeable for, or evidencing the right to subscribe for a purchase, a membership interest or other Capital Stock of, any Loan Party or Subsidiary.

Section 4.15    [Reserved].

Section 4.16    Business Locations; Taxpayer Identification Number. Set forth on Schedule 4.16–1 hereto is a list of all Real Estate as of the Effective Date (identifying whether such Real Estate is owned or leased, and which Loan Party owns or leases such Real Estate). Set forth on Schedule 4.16–2 hereto is the chief executive office, U.S. taxpayer identification number, and organizational identification number of each Loan Party as of the Effective Date. The exact legal name and state of organization of each Loan Party, as of the Effective Date, is as set forth on the signature pages hereto. Except as set forth on Schedule 4.16–3 hereto, no Loan Party has, during the five (5) years preceding the Effective Date: (i) changed its legal name; (ii) changed its state of formation; or (iii) been party to a merger, consolidation, or other change in structure.

Section 4.17    Deposit and Disbursement Accounts. Schedule 4.17 hereto lists all banks and other financial institutions at which any Loan Party maintains any deposit account, lockbox account, disbursement account, investment account, and/or other similar account(s) as of the Effective Date, and such Schedule 4.17 correctly identifies the name, address, and telephone number of each such financial institution, the exact name in which any such account is held, the type of any such account, and the complete account number thereof.

Section 4.18    Collateral Documents.

(a)    The Security Agreement, together with the entry of the Interim DIP Order and, as applicable, the Final DIP Order, are each effective to create in favor of the Administrative Agent, for the ratable benefit of the holders of the Obligations, a legal, valid, and enforceable security interest in the Collateral (or any other similar term) (in each case, as defined therein) except as may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar Laws affecting the enforcement of creditors' rights generally and by general principles of equity, and, when UCC financing statements in appropriate form are filed in the appropriate offices and when the Interim DIP Order and, as applicable, the Final DIP Order have been entered, the Liens created under the Security Agreement, together with Interim DIP Order and, as applicable, the Final DIP Order, shall constitute a fully perfected Lien (in the case of such UCC financing statements, to the extent that such Lien may be perfected by the filing thereof) on, and security interest in, all right, title, and interest of the Obligors (in each case, as defined therein) in such Collateral, in each case, prior, and superior in right, to any other Person(s), other than with respect to (i) Liens expressly permitted by Section 7.2, and (ii) Liens perfected by "control" (as defined in the UCC); provided, that, when the certificates evidencing all Capital Stock pledged pursuant to the Security Agreement are delivered to the Administrative Agent, together with appropriate stock and/or unit powers (or other similar instruments of transfer) duly executed in blank, the Liens in such Capital Stock shall be fully-perfected, first priority security interests, perfected by "control" (as defined in the UCC).

(b)    When the filings described in clause (a) above are made, and when, if applicable, any IP Notice Filings are filed in the United States Copyright Office or the United States Patent and Trademark Office, as applicable, and when the Interim DIP Order and, as applicable, the Final DIP Order have been entered, the Liens created under the Security Agreement, together with the Liens created under the Interim DIP Order and, as applicable, the Final DIP Order, shall constitute a perfected Lien on, and security interest in, all right, title, and interest of the Loan Parties in all Copyrights, Patents and Trademarks, if any, with respect to which a security interest may be perfected by the filing, recording, or registering a security agreement, financing statement, notice of security interest, or analogous document in the United States Patent and Trademark Office or the United States Copyright Office, as applicable, in each case, prior, and superior in right, to any other Person(s), other than with respect to Liens expressly permitted by Section 7.2.

(c)      Each Mortgage, when duly executed and delivered by the relevant Loan Party, together with the entry of the Interim DIP Order and, as applicable, the Final DIP Order, will be effective to create, in favor of the Administrative Agent, for the ratable benefit of the holders of the Obligations, a legal, valid and enforceable Lien, except as may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar Laws affecting the enforcement of creditors' rights generally and by general principles of equity, on all of such Loan Party's right, title, and interest in and to the Real Estate covered thereby, and the proceeds thereof, and, when such Mortgage is filed in the real estate records where the underlying Mortgaged Property is located, such Mortgage, together with the entry of the Interim DIP Order and, as applicable, the Final DIP Order, shall constitute a perfected Lien on, and security interest in, all right, title, and interest of such Loan Party in such Real Estate, and the proceeds thereof, in each case, prior, and superior in right, to any other Person(s), other than with respect to Liens expressly permitted by <u>Section 7.2</u>.

(d)      No Mortgage encumbers any improved Real Estate that is located in an area that has been identified by the Secretary of Housing and Urban Development as an area having special flood hazards, and in which flood insurance has been made available under applicable Flood Insurance Laws, except to the extent that the applicable Loan Party maintains flood insurance with respect to such improved Real Estate in compliance with the requirements of Section 5.8.

Section 4.19      [Reserved].

Section 4.20      <u>Sanctions and Anti-Corruption Laws</u>.

(a)      No Loan Party or Subsidiary, or any of their respective directors, officers, employees or, to the knowledge of any Responsible Officer of any Loan Party, any of their respective agents and/or affiliates, is a Sanctioned Person.

(b)      Each Loan Party and Subsidiary, and each of their respective directors, officers and employees, and, to the knowledge of any Responsible Officer of any Loan Party, the agents of each Loan Party and Subsidiary, are in compliance with all applicable Anti-Corruption Laws and applicable Sanctions. The Loan Parties and Subsidiaries have instituted and maintain policies and procedures designed to ensure continued compliance with all applicable Sanctions and Anti-Corruption Laws.

Section 4.21      <u>No Affected Financial Institutions</u>. No Loan Party or Subsidiary is an Affected Financial Institution.

Section 4.22      <u>Cannabis and Hemp Products</u>.

(a)      None of the Loan Parties or Subsidiaries manufactures, purchases, sells, distributes or invests in, or finances any other Person that manufactures, purchases, sells, distributes, invests in or finances, any products containing parts of the plant Cannabis sativa L., whether growing or not, including, without limitation, the seeds thereof, the resin extracted from any part of such plant, and every compound, manufacture, salt, derivative, mixture, or preparation of such plant, its seeds and/or its resin.

(b)      Except for shared legal, administrative, operations, management and/or distribution services with certain of its Affiliates permitted under applicable Laws, none of the Loan Parties or Subsidiaries manufactures, purchases, sells, distributes, or invests in, or finances any other Person that manufactures, purchases, sells, distributes, invests in or finances, any products containing Hemp or any compound, manufacture, salt, derivative, mixture, or preparation from Hemp, including, without limitation, Cannabidiol (commonly known as "CBD") derived from Hemp.

Section 4.23      <u>Regulatory Matters</u>.

(a)      Each Loan Party and Subsidiary is in compliance with, and is conducting, and has conducted, its respective business and operations in compliance with applicable Healthcare Laws, including, without limitation,

CHAR1\1930324v9

the FD&C Act and regulations promulgated by the FDA, and all products manufactured, marketed or distributed by any of the Loan Parties or Subsidiaries comply with applicable Healthcare Laws, except as would *not* reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect. Each Loan Party and Subsidiary obtains and maintains all licenses, permits, certifications, registrations, authorizations and approvals of all applicable Governmental Authorities as are required for the conduct of its business as currently conducted and herein contemplated (including, without limitation, any required by the FDA), except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(b)       During the period of six (6) years immediately preceding the Effective Date, no Loan Party nor any Subsidiary has introduced into commercial distribution any product that was, upon its shipment, adulterated or misbranded in violation of 21 U.S.C. §-331. No Loan Party nor any Subsidiary has received any correspondence, warning letter, or notice from the FDA or any other federal, state or local Governmental Authority with regard to any product, or the manufacture, processing, packaging or holding thereof, or any comparable correspondence from any foreign counterpart of the FDA, or any comparable correspondence from any foreign counterpart of any federal, state or local Governmental Authority with regard to any product or the manufacture, processing, packing, or holding thereof that would be reasonably expected to have a Material Adverse Effect, or that would be reasonably expected to result in a cessation of production or recall of any product manufactured, processed, packaged, or distributed by any Loan Party or Subsidiary. No Loan Party nor, to the actual knowledge of a Responsible Officer of any Loan Party, any Subsidiary has undertaken a recall or field correction or removal of any product manufactured, processed, packaged, or distributed by any Loan Party or Subsidiary, except for any recalls, field corrections, or removals that, individually or in the aggregate, could *not* reasonably be expected to have a Material Adverse Effect.

(c)       No Loan Party or Subsidiary has received any written, or, to the knowledge of any Responsible Officer of any Loan Party, oral notice of any pending or threatened legal proceeding, claim, suit, proceeding, hearing, enforcement, audit, inquiry, inspection, investigation, arbitration or other action from any applicable Governmental Authority, or any *qui tam* relator, alleging that any operation or activity of any member of any Loan Party or Subsidiary is in violation of any applicable Healthcare Law, and to the knowledge of any Responsible Officer of any Loan Party, no such action currently exists. No Loan Party or Subsidiary has received any subpoenas or civil investigative demands or similar written, or, to the knowledge of any Responsible Officer of any Loan Party, oral requests for information, has been a party to a corporate integrity agreement, or has had any reporting obligations pursuant to a settlement agreement, monitoring agreement, consent decree, order or other similar contract or remedial measure entered into with any Governmental Authority. No Loan Party or any Subsidiary has entered into any consent decree or order with any Governmental Authority, nor is, or has been, subject to any judgment, decree or judicial or administrative order, except for (i) any decrees, judgments, or orders that could *not* reasonably be expected to have a Material Adverse Effect and (ii) any decree, judgment or order of the Bankruptcy Court (including, without limitation, the Interim DIP Order and, as applicable, the Final DIP Order).

(d)       No Loan Party or Subsidiary, nor, to the knowledge of any Responsible Officer of any Loan Party, any of their respective equityholders, directors, limited liability company managers, officers, personnel (whether employees or independent contractors), distributors or other agents or representatives, in their capacities as such, are reasonably be expected to have individual culpability for any material violation of applicable Law, or have made any materially false statements on, or material omissions from, any application, notification, registration, report or other submission to any Governmental Authority, or made any materially false statements on, or omissions from, any other records and documentation prepared or maintained to comply with applicable Law (or applicable requirements of the any Governmental Authority thereunder).

(e)       No Loan Party or Subsidiary, nor, to the knowledge of any Responsible Officer of any Loan Party, any of their directors, officers, employees, agents or, to the knowledge of any Responsible Officer of any Loan Party, any other Person authorized to act on any Loan Party or Subsidiary's behalf, has knowingly or willfully taken, directly or indirectly, any act in furtherance of an offer, payment, promise to pay, authorization, or ratification of the payment, directly or indirectly, of any gift, money, payment, contribution, or anything of value

63

to any Person to secure any improper advantage, or to obtain or retain business that would cause any Loan Party or Subsidiary to be in violation of any Healthcare Laws.

(f)        No Loan Party or Subsidiary employs or contracts with any physicians, pharmacists or other health care professionals to provide professional health care services requiring a license or accreditation under any Healthcare Laws.

(g)        No Loan Party or Subsidiary nor, to the knowledge of any Responsible Officer of any Loan Party, any of their respective equityholders, directors, limited liability company managers, officers, personnel (whether employees or independent contractors) distributors or other agents or representatives, in their capacities as such, is, or ever has been: (i) debarred or otherwise disqualified from submitting applications to the FDA under 21 U.S.C. §–335a(k) or otherwise transacting business with the FDA; or (ii) designated a Specially Designated National or Blocked Person by the Office of Foreign Asset Control of the U.S. Department of Treasury.

(h)        To the extent that any Loan Party or Subsidiary has access to any individually identifiable information of any individual, the Loan Parties and Subsidiaries are in material compliance with all applicable Privacy Laws and maintain information security processes that include safeguards for the security, privacy confidentiality, and integrity of transactions and confidential or proprietary data or Personal Information used, disclosed, or accessed by the Loan Parties and Subsidiaries. No Loan Party or Subsidiary has received written notice, nor, to the knowledge of any Responsible Officer of any Loan Party, oral notice, of any claim that any Loan Party, or any of its respective Subsidiaries, have suffered a breach of Personal Information as defined under applicable Law, except to the extent that any such breach: (A) did *not* require, and is *not* likely to require, any Loan Party or Subsidiary to provide notification in accordance with applicable Law to affected customers, patients or other impacted individuals, or to any Governmental Authority; and (B) would *not* be reasonably likely to have a Material Adverse Effect.

(i)        Each Loan Party or Subsidiary is, and has been, in compliance, in all material respects, with all applicable Laws related to: (i) the requirement for, and the terms of, all necessary registrations, listings, or other authorizations necessary and applicable to the performance of its services; and (ii) payment of all establishment registration fees. No Loan Party or Subsidiary has received any written notice or communication from any Governmental Authority of any actual or threatened investigation, inquiry, or administrative, judicial or regulatory action, hearing or enforcement proceeding against any member of any Loan Party or Subsidiary regarding any violation of applicable Law. No Responsible Officer of any Loan Party has any knowledge of any material obligation arising under an investigation, inquiry, or administrative, judicial or regulatory action, hearing or enforcement proceeding by, or on behalf of, the FDA or other Governmental Authority, except where such obligation could *not* reasonably be expected to be material to any Loan Party or Subsidiary.

Section 4.24        Bankruptcy Matters.

(a)        The Interim DIP Order and, at all times after its entry by the Bankruptcy Court, the Final DIP Order, is in full force and effect, and has not been reversed, modified, amended, stayed or vacated absent the written consent of the Administrative Agent.

(b)        Upon the maturity (whether by acceleration or otherwise) of any of the Obligations, the Lenders shall, subject to the provisions of the Interim DIP Order or the Final DIP Order, as applicable, be entitled to immediate payment of such Obligations, and to enforce the remedies provided for hereunder in accordance with the terms hereof, without further application to or order by the Bankruptcy Court.

(c)        If either the Interim DIP Order or the Final DIP Order is the subject of a pending appeal in any respect, none of such Order, the making of the Loans or the performance by the Loan Parties of any of their obligations under any of the Loan Documents is or shall be the subject of a presently effective stay pending appeal. The Loan Parties, the Administrative Agent and the Lenders shall be entitled to rely in good faith upon the Orders, notwithstanding objection thereto or appeal therefrom by any interested party. The Loan Parties, the

Administrative Agent and the Lenders shall be permitted and required to perform their respective obligations in compliance with this Agreement notwithstanding any such objection or appeal unless the relevant Order has been stayed by a court of competent jurisdiction.

(d)      The Loan Parties are in compliance with all material agreements entered into and all orders entered by the Bankruptcy Court from and after the Petition Date.

ARTICLE V

AFFIRMATIVE COVENANTS

Until the Facility Termination Date, each Loan Party covenants and agrees with the Lenders that such Loan Party shall, and shall cause each Subsidiary to:

Section 5.1      Financial and Other Information. Deliver to the Administrative Agent (for further distribution to each Lender):

(a)      [reserved];

(b)      as soon as available and, in any event, within forty-five (45) days after the end of each Fiscal Quarter, commencing with the Fiscal Quarter ending September 30, 2022 (and including, for the avoidance of doubt, each Fiscal Quarter whose end corresponds with the end of a Fiscal Year), an unaudited combined balance sheet of the Loan Parties and Subsidiaries as of the end of such Fiscal Quarter, and the related unaudited combined statements of income or operations, changes in stockholders' equity and cash flows of the Loan Parties and Subsidiaries for such Fiscal Quarter and the then elapsed portion of such Fiscal Year, setting forth, in each such case in comparative form, the figures for the corresponding Fiscal Quarter and the corresponding portion of the Borrower's previous Fiscal Year and the corresponding figures for the budget for the current Fiscal Year, all in reasonable detail and prepared in accordance with GAAP, such combined statements to be certified by the chief executive officer, chief financial officer, treasurer or controller (or a Responsible Officer of substantially equivalent title and authority) of the Borrower as presenting fairly the financial condition, results of operations, stockholders' equity and cash flows of the Loan Parties and Subsidiaries in accordance with GAAP, and including management discussion and analysis of operating results, profitability trends and customer retention, subject only to normal year-end audit adjustments and the absence of footnotes and, in the case of such combined statements, certified by the chief executive officer, chief financial officer, treasurer or controller (or a Responsible Officer of substantially equivalent title and authority) of the Borrower, to the effect that such statements are fairly stated in all material respects when considered in relation to the combined financial statements of the Loan Parties and Subsidiaries;

(c)      [reserved];

(d)      as soon as available and, in any event, within sixty (60) days after the end of each Fiscal Year: (i) a pro forma budget for the current Fiscal Year, containing an income statement, balance sheet, and statement of cash flows of the Loan Parties and Subsidiaries on a Fiscal Quarter basis for such succeeding Fiscal Year; and (ii) financial projections of the Loan Parties and Subsidiaries, prepared on a Fiscal Year basis, for the remaining Fiscal Years ending during the term of this Agreement;

(e)      promptly after the same become publicly available, copies of all periodic and other reports, proxy statements and other materials filed with the SEC, any Governmental Authority succeeding to any or all functions of the SEC, or any national securities exchange, or distributed by the Borrower to its shareholders or members (as the case may be) generally;

65

(f)        promptly following any request therefor: (i) subject to applicable legal privileges, trade secrets, proprietary information, fiduciary duty, binding agreements and applicable Law, the Administrative Agent such other information regarding the results of operations, business affairs, and financial condition of any or all of the Loan Parties and Subsidiaries as the Administrative Agent or any Lender may reasonably request, in a form and containing a level of detail reasonably satisfactory to the Administrative Agent or such Lender, as applicable; and (ii) information and documentation reasonably requested by the Administrative Agent or any Lender for purposes of compliance with applicable "know your customer" requirements under the Patriot Act or other applicable anti-money laundering Laws;

(g)        on or before 11:00 a.m. on the fourth Business Day of each week, a report of (i) the previous week's sales volume, itemized by brand and (ii) the month-to-date secured sales orders;

(h)        on or before 11:00 a.m. on the second Business Day of each week, a report showing the balance of cash and Cash Equivalents of the Loan Parties as of the close of business on the last Business Day of the immediately preceding week, including current cash balance calculations, in a form and containing a level of detail reasonably acceptable to the Administrative Agent;

(i)        on or before 11:00 a.m. on the fourth Business Day of each week, commencing after the end of the first full week following the Petition Date, a certificate including (i) a cash flow reconciliation and variance report in a form and containing a level of detail reasonably acceptable to the Administrative Agent (A) showing comparisons of actual results for each line item against such line item in the Budget for the prior period from the Petition Date through the calendar week most recently ended prior to the date of such report and (B) demonstrating compliance or non-compliance with the financial maintenance covenant set forth in Section 6.1 for the applicable Variance Testing Period (each, a "*Variance Report*") and (ii) calculations, presented in form and containing a level of detail reasonably acceptable to the Administrative Agent, demonstrating compliance or non-compliance with the financial maintenance covenant set forth in Section 6.2 as of the end of the calendar week most recently ended prior to the date of such certificate;

(j)        on or before 11:00 a.m. on the fourth Business Day of each week, commencing after the end of the first full week following the Petition Date, a report from the Investment Banker and the management team of the Borrower, in a form and containing a level of detail reasonably satisfactory to the Administrative Agent, addressing such items as are reasonably requested by the Administrative Agent, including addressing the status of the marketing and sale process with respect to the Sale Transaction;

(k)        on or before 11:00 a.m. on the fourth Business Day of every fourth week, commencing with the fourth full week following the Petition Date, an updated detailed weekly budget of projected receipts and expenditures of the Loan Parties for the thirteen-week period following such delivery date, which updated weekly budget shall be in form of, and contain the detail set forth in, the Budget and shall include any supporting information reasonably requested by the Administrative Agent; provided, that, not more than once every four (4) weeks, the Borrower may seek the approval of the Administrative Agent (acting on behalf of the Required Lenders) to replace the Budget (as in effect immediately prior to giving effect to any such replacement) with the updated budget most recently delivered pursuant to this Section 5.1(k), which approval shall be made in writing (which may be provided by email) at the reasonable discretion of the Administrative Agent (provided, that, if any Lender shall object to any such replacement, approval of such replacement shall be at the reasonable discretion of the Required Lenders; provided, further, that, Administrative Agent and the Lenders shall be deemed to have approved of any such updated budget unless the Administrative Agent or any Lender, as applicable, shall have objected thereto by written notice to the Borrower within five (5) Business Days after receipt thereof), and if the Administrative Agent (or the Required Lenders, as applicable) so approves such replacement, then such updated budget (the "*Updated Budget*") shall become the "Budget" for purposes of this Agreement; provided, further, that, to the extent that either the Administrative Agent or any Lender does provide such objection notice within such five (5) Business Day period, the then-existing Budget shall constitute the Budget for the projection period, without giving effect to any update, modification or supplement (with appropriate adjustments for the timing of

66

monthly or semi-monthly disbursements), until such time as an Updated Budget is approved by the Administrative Agent (or the Required Lenders, as applicable), in its (or their) reasonable discretion;

(l)       as soon as reasonably practicable in advance of filing with the Bankruptcy Court: (i) the motions seeking approval of the DIP Facility and use of cash management arrangements and proposed forms of the Interim DIP Order, Final DIP Order and Cash Management Order, the filed forms of which shall be in form and substance reasonably satisfactory to the Administrative Agent; (ii) as applicable, any motions seeking approval of any transaction contemplated by Section 5.18; (iii) any such proposed orders and pleadings relating to the Loan Documents, the filed forms of which orders and pleadings shall be in form and substance reasonably satisfactory to the Administrative Agent; (iv) any Plan of Reorganization and/or any disclosure statement relating to such Plan of Reorganization (which Plan of Reorganization or disclosure statement shall comply with the requirements set forth in this Agreement); (v) any motion and proposed form of order seeking to extend or otherwise modify the Loan Parties' exclusive periods set forth in section 1121 of the Bankruptcy Code (so long as the Administrative Agent has confirmed in writing that the Administrative Agent and the Lenders will not object to such order); and (vi) any motion and proposed form of order filed with the Bankruptcy Court relating to any management equity plan, incentive, retention or severance plan, or the assumption, rejection, modification or amendment of any material contract;

(m)     promptly upon providing such information or documents to other parties, copies of all financial information and other documents provided by or on behalf of the Loan Parties to the Unsecured Creditors Committee or any other party in interest in the Chapter 11 Case; and

(n)      promptly after the same have been produced, any written materials prepared or produced by any Investment Banker for any of the Loan Parties, in each case, that are not (i) subject to attorney client or similar privilege and (ii) commercially sensitive, in each case in the good faith judgment of the Borrower.

Each Loan Party hereby acknowledges that: (A) the Administrative Agent and/or any Affiliates thereof may, but shall *not* be obligated to, make available to the Lenders materials and/or information provided by, or on behalf of, the Loan Parties hereunder (collectively, "*Borrower Materials*") by posting the Borrower Materials on a Platform; and (B) certain of the Lenders (each, a "*Public Lender*") may have personnel who do *not* wish to receive material non-public information with respect to the Loan Parties and their Subsidiaries and Affiliates, or the respective securities of any of the foregoing, and who may be engaged in investment and other market-related activities with respect to such Persons' securities. Each Loan Party hereby agrees that it will use commercially reasonable efforts to identify that portion of the Borrower Materials that may be distributed to the Public Lenders, and that: (I) all such Borrower Materials shall be clearly and conspicuously marked "PUBLIC", which, at a minimum, shall mean that the word "PUBLIC" shall appear prominently on the first (1st) page thereof; (II) by marking Borrower Materials "PUBLIC", the Borrower shall be deemed to have authorized the Administrative Agent, any Affiliates of the foregoing, and the Lenders to treat such Borrower Materials as *not* containing any material non-public information (although such information may be sensitive and proprietary) with respect to the Loan Parties or their securities for purposes of U.S. federal and state securities laws (provided, that, to the extent that such Borrower Materials constitute information subject to the confidentiality provisions of Section 11.11, they shall be treated as set forth in Section 11.11); (III) all Borrower Materials marked "PUBLIC" are permitted to be made available through a portion of a Platform designated "Public Side Information;" and (IV) the Administrative Agent and/or any Affiliates thereof, shall be entitled to treat any Borrower Materials that are not marked "PUBLIC" as being suitable *only* for posting on a portion of a Platform that is *not* designated "Public Side Information".

Section 5.2    Notices of Material Events. Furnish to the Administrative Agent (for forwarding to the Lenders):

(a)    promptly and, in any event, within:

(i)    two (2) Business Days thereafter, written notice of the occurrence of any Default or Event of Default;

(ii)    five (5) Business Days thereafter, written notice of the filing or commencement of, or any material development in, any action, suit or proceeding by or before any arbitrator or Governmental Authority (including, without limitation, the FDA) against, or, to the knowledge of any Loan Party, affecting, any Loan Party or Subsidiary, which, if adversely determined, could reasonably be expected to result in a Material Adverse Effect;

(iii)    five (5) Business Days thereafter, written notice of the occurrence of any event or any other development by which any Loan Party or Subsidiary, (A) fails to comply with any Environmental Law or Healthcare Law, or to obtain, maintain or comply with any permit, license or other approval required under any Environmental Law or Healthcare Law, (B) becomes subject to any Environmental Liability or non-compliance with any Healthcare Law, (C) receives notice of any claim with respect to any Environmental Liability or non-compliance with any Healthcare Law, or (D) becomes aware of any basis for any Environmental Liability or non-compliance with any Healthcare Law, and, in each such case of the foregoing clauses (a)(iii)(A) through (a)(iii)(D), which, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect;

(iv)    two (2) Business Days thereafter, written notice of the occurrence of any default or event of default, or the receipt by any Loan Party or Subsidiary of any written notice of an alleged default or event of default, with respect to any Material Indebtedness of any Loan Party or Subsidiary;

(v)    [reserved];

(vi)    two (2) Business Days thereafter, written notice of any other development that results in, or could reasonably be expected to result in, a Material Adverse Effect; and

(vii)    ten (10) Business Days thereafter, written notice of any change in the information provided in the Beneficial Ownership Certification that would result in a change to the list of beneficial owners identified in part (c) or part (d) of such certification.

(b)    promptly and, in any event, within fifteen (15) days thereafter, written notice of: (i) any Responsible Officer of any Loan Party or Subsidiary knows, or has reason to know, that an ERISA Event has occurred, a certificate of the chief financial officer (or a Responsible Officer of substantially equivalent title and authority) of the Borrower describing such ERISA Event, together with the action(s), if any, taken, or proposed to be taken, with respect to such ERISA Event, and a copy of any notice(s) filed with the PBGC or the IRS pertaining to such ERISA Event, together with any notice(s) received by any Loan Party or Subsidiary from the PBGC or any other Governmental Authority with respect thereto; and (ii) any Responsible Officer of any Loan Party or Subsidiary becoming aware, or having reason to become aware, (A) that there has been an increase in Unfunded Pension Liabilities (but not taking into account Plans with negative Unfunded Pension Liabilities) since the most recent date on which the representations and warranties contained in this Article IV were given, or deemed to be given, or from any prior notice, as applicable, (B) of the existence of any Withdrawal Liability, (C) of the adoption of, or the commencement of contributions to, any Plan by any Loan Party or Subsidiary, or (D) of the adoption of any amendment to a Plan that results in a material increase in contribution obligations of any Loan Party or Subsidiary, together with detailed written description thereof from the chief financial officer (or a Responsible Officer of substantially equivalent title and authority) of the Borrower;

68

(c)      promptly and, in any event, *at least* ten (10) days prior thereto, written notice of any change: (i) in any Loan Party's legal name; (ii) in any Loan Party's chief executive office, its principal place of business, any office in which it maintains books or records, or any office or facility at which Collateral owned by it is located (including, without limitation, the establishment of any such new office or facility); (iii) in any Loan Party's identity or legal structure; (iv) in any Loan Party's federal taxpayer identification number or organizational number; or (v) in any Loan Party's jurisdiction of organization; and

(d)      as soon as available and, in any event, within thirty (30) days after receipt thereof, a copy of any environmental report or site assessment obtained by, on behalf of, or for any Loan Party or Subsidiary after the Effective Date with respect to any Real Estate.

Each notice or other document delivered under this Section 5.2 shall be accompanied by a written statement of a Responsible Officer of the Borrower setting forth the details of the event(s) or development(s) requiring such notice or other document, together with any action(s) taken, or proposed to be taken, with respect thereto.

Section 5.3      Existence; Conduct of Business.

(a)      Do, or cause to be done, all things necessary to preserve, renew, and maintain in full force and effect its legal existence and, to the extent that the failure to do so would *not* reasonably be expected to result in a Material Adverse Effect its respective rights, licenses, permits, privileges, franchises, copyrights, patents, trademarks, and trade names material to the conduct of its business; provided, that, nothing in this Section 5.3 shall prohibit any merger, consolidation, liquidation or dissolution permitted under Section 7.3; and

(b)      Engage *solely* in the same line(s) of business as conducted by the Loan Parties and Subsidiaries on the Effective Date, or any business(es) reasonably related thereto.

Section 5.4      Compliance with Laws. (a) Except where failure or non-compliance is permitted by the Bankruptcy Code, comply with all Laws applicable to its business, real and personal property and assets, including, without limitation, all Environmental Laws, Healthcare Laws, ERISA and OSHA, except where the failure to do so, either individually or in the aggregate, could *not* reasonably be expected to result in a Material Adverse Effect; and (b) maintain in effect and enforce policies and procedures designed to ensure compliance by the Loan Parties and Subsidiaries, and each of their respective directors, officers, employees and agents, with applicable Healthcare Laws (including, without limitation, the FD&C Act and HIPAA), applicable Anti-Corruption Laws and applicable Sanctions.

Section 5.5      Payment of Obligations. Except as prohibited by the Bankruptcy Code, and in each case subject to Section 6.1, pay and discharge, at or before maturity, all of its obligations and liabilities (including, without limitation, all taxes, assessments and other governmental charges, levies and all other claims that could result in a statutory Lien) before the same shall become delinquent or in default, except where: (a) the validity or amount thereof is being contested in good faith by appropriate proceedings; (b) such Loan Party or Subsidiary has set aside on its books adequate reserves with respect thereto in accordance with GAAP; and (c) in the case of a tax or claim which has, or may become, a Lien against any of the Collateral, such contest proceedings conclusively operate to stay the sale of any portion of the Collateral to satisfy such tax or claim. For the avoidance of doubt, nothing herein shall permit payment of any obligation subject to the automatic stay under the Bankruptcy Code; provided, that, such obligations may be paid as required in or permitted by the Orders.

Section 5.6      Books and Records. Keep proper books of record and account in which full, true and correct entries shall be made of all dealings and transactions in relation to its business and activities to the extent necessary to prepare the combined financial statements of the Loan Parties and Subsidiaries in conformity with GAAP.

Section 5.7      Visitation and Inspection; Conference Calls.

69

(a)      Permit any representative, independent contractor, financial advisor or agent of the Administrative Agent or any Lender to visit and inspect its properties, to examine its books and records, and to make copies and take extracts therefrom, to monitor the Collateral, and to discuss its affairs, finances and accounts with any of its officers and with its independent certified public accountants (at which an authorized representative of the Loan Parties shall be entitled to be present, so long as such Person uses commercially reasonable efforts to be available), and to conduct appraisals, field audits and field examinations, all at such reasonable times and during normal business hours and as often as the Administrative Agent or such Lender may reasonably request after reasonable prior notice to the Borrower, and, in each case of the foregoing, all at the Borrower's reasonable expense; provided, that, (a) no Lender nor any of its representatives, independent contractors, financial advisors or agents may exercise the rights contemplated in this Section 5.7(a) unless accompanying the Administrative Agent or any representative, independent contractor, financial advisor or agent thereof, and (b) such visits, inspections, examinations and discussions shall be subject to public health and safety limitations required by applicable Law. Notwithstanding anything to the contrary in the foregoing: (i) neither any Loan Party nor any Subsidiary will be required to disclose, or to permit the inspection or discussion of, any document, information or other matter (A) that constitutes trade secrets or proprietary information, (B) in respect of which disclosure to the Administrative Agent or any Lender (or any of their respective representatives) is prohibited by applicable Law, fiduciary duty, or any binding agreement (provided, that, such binding agreement was not entered into in contemplation of the limitations of this clause (B)), or (C) that is subject to attorney client or similar privilege, or constitutes attorney work product; and (ii) nothing in the foregoing shall prohibit any Lender from requesting information regarding the results of operations, business affairs, and financial condition of any or all of the Loan Parties and Subsidiaries pursuant to Section 5.1(f) or from otherwise discussing the results of operations, business affairs, and financial condition of any or all of the Loan Parties and Subsidiaries with management of the Loan Parties and Subsidiaries.

(b)      Cause appropriate members of the Loan Parties' management and other professionals engaged by the Loan Parties (including, without limitation, the Investment Banker) to be available during normal business hours upon reasonable advance written notice to discuss (in person or telephonically) the Budget, the information delivered pursuant to clauses (b), (d), (f), (g), (h), (i), (j), (k) and (n) of Section 5.1 and such other information relating to the Chapter 11 Case and the financial results and condition of the Loan Parties and their Subsidiaries, from time to time (but no less than weekly) as and when reasonably requested by the Administrative Agent.

Section 5.8      Maintenance of Properties; Insurance.

(a)      Subject to the Interim DIP Order and, as applicable, the Final DIP Order, keep and maintain all property material to the conduct of its business in good working order and condition, ordinary wear and tear excepted, except where failure to do so would *not* materially adversely affect the operations of the business of the Loan Parties and their Subsidiaries, taken as a whole;

(b)      maintain, with financially sound and reputable insurance companies not Affiliates of any Loan Party: (i) insurance with respect to its business, property and assets, and the business, property and assets of its Subsidiaries, against loss and/or damage of the kinds customarily insured against by companies in the same or similar businesses operating in the same or similar locations; and (ii) all insurance required to be maintained pursuant to the Collateral Documents (including, in any event, flood insurance to the extent required hereunder or by any other Loan Document);

(c)      at all times, shall name the Administrative Agent as additional insured on all liability policies of the Loan Parties and Subsidiaries, and as lender's loss payee (pursuant to a lender's loss payee endorsement approved by the Administrative Agent) on all casualty and property insurance policies of the Loan Parties and Subsidiaries;

70

(d)      cause all Mortgaged Property that constitutes Flood Hazard Property to be covered by flood insurance provided under the National Flood Insurance Program (or with private insurance endorsed to cause such private insurance to be fully compliant with the federal Law as regards private placement insurance applicable to the National Flood Insurance Program, with financially sound and reputable insurance companies not Affiliates of any Loan Party), in such amounts, and with such deductibles, as the Administrative Agent may request; and

(e)      upon the request of the Administrative Agent, furnish to each Lender, at reasonable intervals, a certificate of a Responsible Officer of the Borrower setting forth the nature and extend of all insurance maintained by the Loan Parties and Subsidiaries in accordance with this Section 5.8;

Section 5.9      Use of Proceeds; Margin Regulations.

(a)      Subject to the Interim DIP Order and, as applicable, the Final DIP Order, use the proceeds of Revolving Loans:

(i)      on or after the Effective Date, only for the following purposes: (A) subject to Section 6.1, for working capital and other general purposes of the Loan Parties, including the payment of professional fees and expenses and other administrative expenses in the Chapter 11 Case, and the Specified Entities and the Specified Foreign Entities; (B) to pay the reasonable fees and expenses of the Administrative Agent and the Prepetition Agent as set forth in the Orders and in this Agreement; (C) to pay claims in respect of certain Prepetition creditors, which may include, without limitation, employees, taxing authorities and trade vendors in the ordinary course, in each case to the extent authorized by orders of the Bankruptcy Court reasonably acceptable to the Administrative Agent and paid in accordance with the Budget; and (D) after entry of the Interim DIP Order of the Final DIP Order, and to the extent authorized by the Bankruptcy Court and paid in accordance with the Budget, to repay Prepetition Facility Obligations; and

(ii)      contemporaneously with the Final DIP Order Entry Date, to refinance and replace a portion of Prepetition Facility Obligations outstanding on the Final DIP Order Entry Date, in an aggregate amount not to exceed the Initial Roll-Up;

in each case of the foregoing clauses (a)(i) through (a)(ii), not in violation of this Agreement or applicable Laws; provided, that, in no event shall the proceeds of any Loan be used for the payment of professional fees, costs or disbursements incurred in connection with (A) any challenge to (I) the amount, extent, priority, validity, perfection or enforcement of the Indebtedness of the Loan Parties owing to the Administrative Agent, the Lenders, the Prepetition Agent, the Prepetition Issuing Bank, the Prepetition Swingline Lender, the Prepetition Lenders, the other holders of the Obligations or the other holders of the Prepetition Facility Obligations or (II) the investigation or prosecution by the Loan Parties of any prepetition claims or causes of action against the Prepetition Agent, the Prepetition Issuing Bank, the Prepetition Swingline Lender, any Prepetition Lender or any other holder of Prepetition Facility Obligations or (B) the collateral securing such indebtedness or the perfection, priority or validity of the Liens granted in favor of the Administrative Agent, the Lenders, the Prepetition Agent, the Prepetition Issuing Bank, the Prepetition Swingline Lender, the Prepetition Lenders, the other holders of the Obligations or the other holders of the Prepetition Facility Obligations with respect thereto or (2) any action to limit, impede or restrict the Administrative Agent's enforcement of remedies with respect to the Collateral securing the Obligations following an Event of Default or to otherwise modify or limit the rights of the Administrative Agent, the Lenders, the Prepetition Agent, the Prepetition Issuing Bank, the Prepetition Swingline Lender, the Prepetition Lenders, the other holders of the Obligations or the other holders of the Prepetition Facility Obligations, in each case under any Order; provided, further, that, notwithstanding anything to the contrary herein, no more than an aggregate of $50,000 (or such higher amount as may be specified in the Final DIP Order) of the Carve-Out may be used to investigate the matters in the foregoing clauses (a)(i) and (a)(ii).

(b)      No part of the proceeds of any Loan will be used, whether directly or indirectly, for any purpose that would violate any rule or regulation of the Federal Reserve Board, including, without limitation, Regulation T, Regulation U and/or Regulation X.

Section 5.10    Casualty and Condemnation. Subject to the Interim DIP Order and, as applicable, the Final DIP Order: (a) furnish to the Administrative Agent and the Lenders prompt written notice of any casualty or other insured damage to any material portion of any Collateral, or the commencement of any action or preceding for the taking of any material portion of any Collateral, or any part thereof or interest therein, under power of eminent domain, by condemnation or by similar proceeding; and (b) ensure that the net cash proceeds of any such event (whether in the form of insurance proceeds, condemnation awards, or otherwise) are collected and applied in accordance with the applicable provisions of this Agreement and the Collateral Documents.

Section 5.11    Cash Management. Subject to the Interim DIP Order and, as applicable, the Final DIP Order, (a) maintain all primary cash management and treasury business of the Loan Parties and Subsidiaries with Truist, including, without limitation, all primary deposit accounts, disbursement accounts and lockbox accounts (other than any Excluded Accounts, all of which the Loan Parties may maintain without restriction, and accounts existing on the Petition Date that are covered by a control agreement under the Prepetition Credit Agreement) (each such deposit account, disbursement account and lockbox account, a "*Controlled Account*") and (b) from and after the Final DIP Order Entry Date, comply with the requirements of the Final DIP Order regarding the collection and segregation of the Segregated Funds. Each Controlled Account shall be a cash collateral account, with all cash, Cash Equivalents, checks, and other similar items of payment in such account securing payment of the Obligations, and in which the Loan Parties shall have granted a first priority Lien to the Administrative Agent, ratably on behalf of the holders of the Obligations, perfected either automatically under the UCC (with respect to Controlled Accounts at Truist) or otherwise in accordance with the Orders.

Section 5.12    [Reserved].

Section 5.13    Additional Subsidiaries and Collateral.

(a)      In the event that, after the Effective Date, any Person becomes a Domestic Subsidiary (other than an Excluded Subsidiary), whether pursuant to formation, acquisition or otherwise, (I) promptly provide written notice thereof to the Administrative Agent and the Lenders, and (II) as promptly as practicable and, in any event, within twenty (20) days after such Person becomes a Domestic Subsidiary (or such longer period as the Administrative Agent shall agree in its sole discretion):

(i)      cause such Domestic Subsidiary to: (A) become a new Guarantor, and to grant Liens in favor of the Administrative Agent, for the ratable benefit of the holders of the Obligations, in all of its personal property and any personal property, by (I) executing and delivering to the Administrative Agent a Guarantor Joinder Agreement, in form and substance reasonably satisfactory to the Administrative Agent, accompanied by (1) all other Loan Documents related thereto, (2) certified copies of Organization Documents, (3) appropriate authorizing resolutions of the board of directors or managers (or equivalent governing body), as applicable, of such Domestic Subsidiary, (4) [reserved], and (5) any IP Notice Filings reasonably requested by the Administrative Agent, and (II) authorizing and/or delivering, at the request of the Administrative Agent, such UCC financing statements and/or similar instruments required by the Administrative Agent to perfect the Liens in favor of the Administrative Agent, for the ratable benefit of the holders of the Obligations, and granted under any of the Loan Documents; (B) grant Liens in favor of the Administrative Agent, for the ratable benefit of the holders of the Obligations, in all interests in Real Estate (other than any Excluded Property) by executing and delivering to the Administrative Agent such Real Estate Documents as the Administrative Agent shall require; and (C) deliver to the Administrative Agent all such other supplements, documents, certificates and/or instruments (including, without limitation, any filings and/or deliveries to perfect such Liens, Lien searches, title insurance policies, surveys, environmental reports, and

legal opinions), and take all such other actions, as such Domestic Subsidiary would have been required to deliver and take, as applicable, pursuant to Section 3.1 if such Domestic Subsidiary had been a Loan Party on the Effective Date, or that such Domestic Subsidiary would have been required to deliver or take, as applicable, pursuant to Section 5.13 with respect to any Real Estate, or as the Administrative Agent may otherwise reasonably request; and

(ii)    (A) cause sixty-five percent (65%) of the issued and outstanding Capital Stock in such Foreign Subsidiary (other than Excluded Property) entitled to vote (within the meaning of Treasury Regulations Section 1.956-2(c)(2)), and one hundred percent (100.0%) of the issued and outstanding Capital Stock in such Domestic Subsidiary (other than any Excluded Property) *not* entitled to vote (within the meaning of Treasury Regulations Section 1.956-2(c)(2)) to be subject, at all times, to a first priority, perfected Lien in favor of the Administrative Agent, for the ratable benefit of the holders of the Obligations, to secure the Obligations pursuant to the Collateral Documents (subject to Liens expressly permitted by Section 7.2); and (B) in connection with the actions described in the foregoing clause (a)(ii)(A), deliver to the Administrative Agent (I) the original stock and/or unit certificate(s) evidencing such pledged Capital Stock, together with appropriate stock and/or unit powers (or other similar instruments of transfer) duly executed in blank, and (II) all such other supplements, documents, certificates and/or instruments (including, without limitation, any filings and/or deliveries to perfect such Liens, lien searches, and legal opinions), and take all such other actions, as the Administrative Agent may reasonably request;

(b)    In the event that, after the Effective Date, any Person becomes a Foreign Subsidiary, whether pursuant to formation, acquisition or otherwise, (I) promptly provide written notice thereof to the Administrative Agent and the Lenders, and (II) to the extent that such Foreign Subsidiary is owned directly by any Loan Party, as soon as practicable and, in any event, within thirty (30) days after such Person becomes a Foreign Subsidiary (or such longer period as the Administrative Agent shall agree in its sole discretion):

(i)    cause sixty-five percent (65%) of the issued and outstanding Capital Stock in such Foreign Subsidiary (other than Excluded Property) entitled to vote (within the meaning of Treasury Regulations Section 1.956-2(c)(2)), and one hundred percent (100.0%) of the issued and outstanding Capital Stock in such Foreign Subsidiary (other than any Excluded Property) *not* entitled to vote (within the meaning of Treasury Regulations Section 1.956-2(c)(2)) to be subject, at all times, to a first priority, perfected Lien in favor of the Administrative Agent, for the ratable benefit of the holders of the Obligations, to secure the Obligations pursuant to the Collateral Documents (subject to Liens expressly permitted by Section 7.2); and

(ii)    in connection with the actions described in the foregoing clause (b)(i), deliver to the Administrative Agent: (A) the original stock and/or unit certificate(s) evidencing such pledged Capital Stock, together with appropriate stock and/or unit powers (or other similar instruments of transfer) duly executed in blank; and (B) all such other supplements, documents, certificates and/or instruments (including, without limitation, any filings and/or deliveries to perfect such Liens, lien searches, and legal opinions), and take all such other actions, as the Administrative Agent may reasonably request;

provided, that, notwithstanding anything to the contrary in this clause (b) or elsewhere in this Agreement or any other Loan Document, to the extent that the granting of a first-priority, valid Lien in favor of the Administrative Agent, for the benefit of the holders of the Obligations, in the Capital Stock in any Foreign Subsidiary requires that one (1) or more of the Loan Parties enter into documentation governed by Laws other than those of the United States, the District of Columbia, or any state or subdivision of any of the foregoing, then the Loan Parties, unless otherwise requested by the Administrative Agent or the Required Lenders, shall *not* be required to cause such Capital Stock to be subject to the requirements set forth above in this clause (b) if, in the sole judgment of the Administrative Agent, the cost or burden of creating or perfecting such pledge(s) or security interest(s) therein

73

would be excessive in light of the benefit(s) to be obtained therefrom by the Lenders and the other holders of the Obligations.

(c)      All actions to be taken pursuant to this Section 5.13 shall be at the expense of the Borrower and any other applicable Loan Party, and shall be taken to the reasonable satisfaction of the Administrative Agent.

Section 5.14      Additional Real Estate. To the extent otherwise permitted hereunder, if any Loan Party proposes to acquire an interest in Real Estate (other than any Excluded Property) after the Effective Date, as promptly as practicable and, in any event, within ninety (90) days (or such later date as the Administrative Agent may agree in its sole discretion) after the date of such acquisition, deliver, or cause to be delivered, to the Administrative Agent such Real Estate Documents with respect to such acquired Real Estate as the Administrative Agent shall require.

Section 5.15      Further Assurances.

(a)      Execute and deliver any and all further documents, financing statements, agreements, certificates and/or instruments, and take all such further actions (including, without limitation, the filing and recording of financing statements, fixture filings, Mortgages, and other documents) that may, in the determination of the Administrative Agent, be required under applicable Law, or that the Administrative Agent or the Required Lenders may reasonably request, in each case of the foregoing, to effectuate the transactions contemplated by the Loan Documents, or to grant, preserve, protect or perfect the Liens created under the Collateral Documents, or the validity and/or priority of any such Lien, all at the expense of the Loan Parties; and

(b)      Provide to the Administrative Agent, from time to time upon request, evidence, reasonably satisfactory to the Administrative Agent, as to the perfection and priority of the Liens created, or intended to be created, by the Collateral Documents.

Section 5.16      [Reserved].

Section 5.17      Post-Closing Requirements.

(a)      Insurance. As soon as practicable and, in any event, within thirty (30) calendar days of the Effective Date (or such later date as the Administrative Agent may agree in its sole discretion), deliver to the Administrative Agent insurance policy endorsements naming the Administrative Agent as additional insured on liability insurance policies and lender's loss payee on property and casualty insurance policies.

(b)      Florida Documentary Stamp Taxes. As soon as practicable and, in any event, within seven (7) days of the Effective Date (or such later date as the Administrative Agent may agree in its sole discretion), deliver to the Administrative Agent evidence reasonably satisfactory to the Administrative Agent that all applicable documentary stamp taxes in respect of this Agreement and the Loan Documents have been paid.

Section 5.18      Transaction Milestones. The Loan Parties shall:

(a)      within one hundred and five (105) calendar days of the Petition Date (such date, the "*Outside Date*"):

(i)      deliver to the Administrative Agent fully-executed commitment papers (in form and substance reasonably acceptable to the Administrative Agent) from a third party investor (or group of investors) with the financial wherewithal to consummate the transaction, in respect of a credit facility, equity investment, or other investment or financing that would, upon the closing thereof and initial funding thereunder (which date must, pursuant to the terms of such commitment papers, be committed to occur prior to the DIP Facility Maturity Date) provide for the occurrence of the Facility Termination Date and the repayment in full in cash of all Prepetition Facility Obligations; or

(ii)    file in the Bankruptcy Court a motion, in form and substance reasonably acceptable to the Administrative Agent (the "*Bid Procedures Motion*"), seeking authority to (i) designate a "stalking horse" (a "*Stalking Horse Bidder*") for the Sale Transaction reasonably acceptable to the Administrative Agent, (ii) establish bidding procedures with respect to other potential bidders in the Sale Transaction and (iii) in connection with such Sale Transaction, set a date for an auction in connection therewith within seventy-five (75) calendar days after the date of the filing of such Bid Procedures Motion;

(b)    within thirty (30) days after filing the Bid Procedures Motion (in the event it is required to be filed as provided in clause (a)), have obtained an order in form and content reasonably acceptable to the Administrative Agent and the Prepetition Agent approving the Bid Procedures Motion; and

(c)    in the event that a Bid Procedures Motion has been filed, have consummated a Sale Transaction consistent with the Bid Procedures Motion no later than fourteen (14) days prior to the date set forth in clause (d) of the definition of "*DIP Facility Maturity Date*" in Section 1.1;

provided, that, if as of the Outside Date the requirements of the foregoing clause (a) have been satisfied but, *after* the Outside Date, such commitment papers are terminated or otherwise rescinded, then the Loan Parties shall, within fourteen (14) calendar days of such termination or other rescission, file a Bid Procedures Motion satisfying the requirements of the foregoing clause (a)(ii) (with the date for such auction contemplated thereby set on a date in advance of the DIP Facility Maturity Date that is reasonably acceptable to the Administrative Agent), and upon doing so shall be deemed to have satisfied this proviso and the foregoing clause (a).

Section 5.19    Investment Banker. Each Loan Party shall (a) retain and continue to retain the Investment Banker subject to terms of engagement reasonably satisfactory to the Administrative Agent; (b) file with the Bankruptcy Court an application seeking authority to retain the Investment Banker *nunc pro tunc* to the Petition Date on, or as soon as reasonably practicable after, the Petition Date; and (c) obtain Bankruptcy Court approval of the retention of the Investment Banker in accordance with the foregoing clause (a) and (b), no later than thirty (30) calendar days after the Petition Date.

Section 5.20    Postpetition Obligations. Except as otherwise permitted by the Bankruptcy Code, each Loan Party shall perform and comply with all of its material Postpetition obligations, including without limitation compliance in all respects with the Interim DIP Order and the Final DIP Order and, subject to Section 6.1, payment of all Postpetition taxes to the extent required by applicable Law, in each case except to the extent that any such obligation is being contested in good faith by appropriate proceedings with adequate reserves set aside therefor. For the avoidance of doubt, nothing herein requires payment of any obligation subject to the automatic stay of the Bankruptcy Code.

ARTICLE VI

FINANCIAL COVENANTS

Until the Facility Termination Date, each Loan Party covenants and agrees with the Lenders that no Loan Party shall, nor shall it permit any Subsidiary to, directly or indirectly:

Section 6.1    Compliance with the Budget. Permit: (a) Total Operating Receipts (as defined in the Budget) to be less than, for all Variance Testing Periods, 90% of the budgeted amount for the applicable Variance Testing Period on a cumulative basis; or (b) Total Operating Disbursements (as defined in the Budget) to exceed, for all Variance Testing Periods, 110% of the budgeted amount for the applicable Variance Testing Period on a cumulative basis. For the avoidance of doubt, the cash disbursements considered for determining compliance with the Budget shall exclude the Restructuring Fees.

Section 6.2     <u>Liquidity</u>. Permit Liquidity, as of the close of business of the last Business Day of any calendar week, to be less than $4,500,000.

ARTICLE VII

<u>NEGATIVE COVENANTS</u>

Until the Facility Termination Date, each Loan Party covenants and agrees with the Lenders that no Loan Party shall, nor shall it permit any Subsidiary to, directly or indirectly:

Section 7.1     <u>Indebtedness and Preferred Equity</u>. Create, incur, assume, issue, or suffer to exist any Postpetition Indebtedness, except:

(a)     (i) Indebtedness created pursuant to the Loan Documents; and (ii) Indebtedness created pursuant to the Prepetition Loan Documents;

(b)     [reserved];

(c)     (i) Indebtedness of any Loan Party incurred to finance the acquisition, construction or improvement of any fixed or capital assets, including Capital Lease Obligations, in each case incurred in the ordinary course of business after the Effective Date, together with Permitted Refinancings thereof and (ii) Permitted Refinancings of any such Indebtedness or Capital Lease Obligations outstanding on the Effective Date;

(d)     Indebtedness (x) of any Loan Party owing to any Subsidiary, and (y) of any Subsidiary owing to any Loan Party or any other Subsidiary; <u>provided, that</u>, (i) any such Indebtedness shall be subject to <u>Section 7.4</u>, and (ii) (A) such Indebtedness in a principal amount in *excess* of $1,500,000, or, if reasonably requested by the Administrative Agent, such Indebtedness in a principal amount *not* in *excess* of $1,500,000, shall be evidenced by a demand note, in form and substance reasonably satisfactory to the Administrative Agent, (B) any such demand note contemplated in the foregoing <u>clause (A)</u> evidencing Indebtedness owed by a Subsidiary that is *not* a Loan Party to a Loan Party shall be pledged and delivered to the Administrative Agent pursuant to the Collateral Documents as additional collateral security for the Obligations, and (C) the obligations under any such demand note contemplated in the foregoing <u>clause (A)</u> evidencing Indebtedness owed by a Loan Party to a Subsidiary that is *not* a Loan Party shall be subordinated to the obligations of the Loan Parties under the Loan Documents (including, without limitation, the Obligations of the Borrower hereunder) in a manner reasonably satisfactory to the Administrative Agent;

(e)     [reserved];

(f)     Indebtedness arising in connection with endorsements of instruments for deposit in the ordinary course of business;

(g)     Contingent Liabilities arising with respect to: (i) customer indemnification obligations in favor of purchasers in connection with dispositions permitted under <u>Section 7.3</u>; and (ii) the Guarantee by any Loan Party or Subsidiary of a lease, sublease, license or sublicense entered into in the ordinary course of business by another Loan Party or Subsidiary;

(h)     [reserved];

(i)     [reserved];

(j)     [reserved];

76

(k)       Indebtedness owed to any Person (including obligations in respect of letters of credit for the benefit of such Person) providing workers' compensation, health, disability or other employee benefits, or property, casualty or liability insurance or self-insurance, pursuant to reimbursement or indemnification obligations to such Person or to finance insurance premiums, in each case of the foregoing, incurred in the ordinary course of business or consistent with past practice;

(l)       Indebtedness in respect of, or Guarantees of, performance bonds, bid bonds, appeal bonds, surety bonds, performance and completion guarantees, workers' compensation claims, letters of credit, bank guarantees and banker's acceptances, warehouse receipts or similar instruments and similar obligations (other than in respect of other Indebtedness for borrowed money), in each case of the foregoing, provided in the ordinary course of business or consistent with past practice;

(m)       cash management obligations and other Indebtedness in respect of netting services, overdraft protection and similar arrangements, in each case of the foregoing, incurred in connection with cash management and deposit accounts maintained in the ordinary course of business;

(n)       to the extent constituting Indebtedness, take or pay obligations contained in supply arrangements, in each case of the foregoing, incurred in the ordinary course of business or consistent with past practice;

(o)       to the extent constituting Indebtedness, obligations arising from agreements providing for indemnification, purchase price adjustments or similar obligations (other than earnout obligations), in each case of the foregoing, incurred or assumed in connection with the disposition of any business or assets permitted under this Agreement;

(p)       to the extent constituting Indebtedness, Guarantees in the ordinary course of business of the obligations of suppliers, customers, franchisees and licensees of the Loan Parties and Subsidiaries;

(q)       performance guarantees primarily Guaranteeing performance of contractual obligations to a third-party, and *not* for the purpose of Guaranteeing payment of Indebtedness;

(r)       obligations in respect of letters of support, Guarantees or similar obligations issued, made or incurred for the benefit of any of the Loan Parties or Subsidiaries, to the extent required in connection with any statutory filing or the delivery of audit opinions performed in jurisdictions other than the United States;

(s)       [reserved];

(t)       [reserved];

(u)       other unsecured Indebtedness of the Loan Parties incurred in the ordinary course of business, which Indebtedness shall not constitute a Superpriority Claim that is senior to or *pari passu* with the Obligations;

(v)       [reserved];

(w)       [reserved];

(x)       to the extent constituting Indebtedness, the Carve-Out; and

(y)       to the extent constituting Indebtedness, any adequate protection provided to the Administrative Agent, the Lenders, the Bank Product Providers, the Prepetition Agent, the Prepetition Lenders, the Prepetition Issuing Bank and the Arizona Mechanics' Lienholders (as defined in the Interim DIP Order and/or, as applicable, the Final DIP Order), in each case, under the Orders, as the same may be amended in accordance with the terms of this Agreement.

Section 7.2    Liens. Create, incur, assume or suffer to exist any Lien on any of its property or assets now owned or hereafter acquired, except:

(a)    (i) Liens securing the Obligations pursuant to the Loan Documents, (ii) Liens securing the Prepetition Facility Obligations pursuant to the Prepetition Loan Documents, and (iii) Permitted Prior Liens;

(b)    Permitted Encumbrances;

(c)    any Liens on any property or assets of the Loan Parties or Subsidiaries existing on the Petition Date set forth on Schedule 7.2 hereto; provided, that, such Lien shall not apply to any other property or asset of any Loan Party or Subsidiary;

(d)    Liens securing any Indebtedness of any Loan Party incurred to finance the acquisition, construction or improvement of any fixed or capital assets, including Capital Lease Obligations, in each case incurred in the ordinary course of business; provided, that, (i) with respect to any such Indebtedness incurred after the Effective Date, such Indebtedness is permitted by Section 7.1(c), and (ii) such Lien does not extend to any other asset;

(e)    [reserved];

(f)    extensions, renewals, and/or replacements of any Lien referred to in clauses (b) through (d) above; provided, that, (i) the principal amount of the Indebtedness secured thereby is not increased, and (ii) any such extension, renewal and/or replacement is limited to the assets originally encumbered thereby; and

(g)    Liens (i) of a collecting bank arising in the ordinary course of business under Section 4–208 of the UCC, as in effect in the relevant jurisdiction, covering only the items being collected upon, (ii) in favor of a banking or other financial institution, arising as a matter of law or contract, encumbering deposits or other funds maintained with a financial institution (including netting arrangements or the right of set off) and which are within the general parameters customary in the banking industry; and (iii) encumbering reasonable customary initial deposits and margin deposits and similar Liens attaching to commodity trading accounts or other brokerage accounts, in each case of the foregoing clauses (g)(i) through (g)(iii), incurred in the ordinary course of business, not for speculative purposes, and not in connection with the incurrence of any Indebtedness for borrowed money;

(h)    Liens representing (i) any interest or title of a licensor, lessor or sub-licensor or sub-lessor under any lease or license permitted by this Agreement, (ii) any Lien or restriction that the interest or title of such lessor, licensor, sub-lessor or sub-licensor may be subject to, or (iii) the interest of a licensee, lessee, sub-licensee or sub-lessee arising by virtue of being granted a license or lease not prohibited by this Agreement, in each case of the foregoing clauses (h)(i) through (h)(iii), not interfering, in any material respect, with the ordinary conduct of the business of the Loan Parties and Subsidiaries, taken as a whole;

(i)    Liens arising out of conditional sale, title retention, consignment or similar arrangements for the sale of goods;

(j)    Liens granted by a Subsidiary that is not a Loan Party in favor of any Loan Party in respect of Indebtedness or other obligations owed by such Subsidiary to such Loan Party;

(k)    [reserved];

(l)    Liens on insurance policies, and the proceeds thereof, granted in the ordinary course of business to secure the financing of insurance premiums with respect thereto;

(m)    Liens encumbering deposits made to secure obligations arising from contractual or warranty requirements entered into in the ordinary course of business;

(n)        Liens in favor of customs and revenue authorities to secure payment of customs duties in connection with the importation of goods in the ordinary course of business;

(o)        Liens of bailees in the ordinary course of business;

(p)        Liens on deposits made with utilities pursuant to any order of the Bankruptcy Court, in an aggregate amount not to exceed the Threshold Amount;

(q)        Liens disclosed as exceptions to coverage in title policies and endorsements with respect to any Real Estate, in each case of the foregoing, approved by the Administrative Agent;

(r)        Liens that are contractual rights of set-off: (i) relating to the establishment of depository relations with banks or other financial institutions not given in connection with the incurrence of Indebtedness for borrowed money; (ii) relating to pooled deposit or sweep accounts of any Loan Party to permit satisfaction of overdraft or similar obligations incurred in the ordinary course of business of the Loan Parties; or (iii) relating to purchase orders and other agreements entered into by any Loan Party or Subsidiary in the ordinary course of business;

(s)        [reserved];

(t)        non-exclusive licenses and sub-licenses granted by any Loan Party or Subsidiary, and leases and sub-leases by any Loan Party or Subsidiary, in each case of the foregoing: (i) to third-parties in the ordinary course of business; (ii) *not* interfering with any business of any Loan Party or Subsidiary; and (iii) existing on or prior to the Effective Date;

(u)        [reserved];

(v)        [reserved];

(w)        other Liens securing Indebtedness outstanding in an aggregate principal amount *not to exceed* the Threshold Amount at any time;

(x)        [reserved];

(y)        [reserved];

(z)        Liens junior to the Liens created pursuant to the Loan Documents to secure the Obligations that are granted by the Interim DIP Order and/or, as applicable, the Final DIP Order pursuant to Section 364(d)(1) of the Bankruptcy Code as adequate protection for the Prepetition Lenders and the Arizona Mechanics' Lienholders; provided, that, prior to the Facility Termination Date, the holders of such junior liens are not authorized by an order of the Bankruptcy Court to take any action to foreclose their rights with respect to such junior liens; and

(aa)        Liens pursuant to the Carve-Out.

Section 7.3        Fundamental Changes; Conduct of Business.

(a)        Merge into, or consolidate into, any other Person, or permit any other Person to merge into or consolidate with it, or sell, lease, transfer, or otherwise dispose of (in a single transaction or a series of transactions) all, or substantially all, of its property or assets (in each case, whether now owned or hereafter acquired) or any line of business, or all, or substantially all, of the equity interests in any of its Subsidiaries (in each case, whether now owned or hereafter acquired), or otherwise liquidate or dissolve, other than in connection with any transaction that would result in the occurrence of the Facility Termination Date and the payment in full in cash of the Prepetition Facility Obligations immediately upon the consummation thereof.

(b)     Engage in any business, other than any business in the same line(s) of business as conducted by the Loan Parties and Subsidiaries on the Effective Date, or any business(es) reasonably related thereto, except for any changes (i) that result from any Asset Sale permitted hereunder, or (ii) that are required by the Bankruptcy Court or under the Bankruptcy Code.

Section 7.4     Investments; Loans. Make, purchase, hold, acquire, or permit to exist (as applicable) any Investment, or purchase or otherwise acquire (in one (1) transaction or a series of transactions) any assets of any other Person that constitute a business unit, or create or form any Subsidiary, except:

(a)     Investments (other than Cash Equivalents) existing on the date hereof and set forth on Schedule 7.4 hereto (including, without limitation, Investments in Subsidiaries so scheduled);

(b)     Investments in the form of cash or Cash Equivalents;

(c)     Guarantees permitted by Section 7.1 (other than by reference to this Section 7.4);

(d)     (i) Investments made by any Loan Party in or to any other Loan Party, (ii) Investments made by any Loan Party in or to any Subsidiary that is not a Loan Party and either (A) existing on the Petition Date or (B) consisting of payments made after the Petition Date by such Loan Party in respect of such Subsidiary's ordinary course costs of operation and operating expenses, in each case consistent with past practice and in an amount not to exceed the Threshold Amount at any one time, and (iii) Investments made by any Subsidiary of a Loan Party to such Loan Party, or in or to another such Subsidiary;

(e)     [reserved];

(f)     [reserved];

(g)     [reserved];

(h)     Contingent Liabilities constituting Indebtedness permitted by the Cash Management Order;

(i)     bank deposits established in accordance with the Loan Documents;

(j)     Investments received in connection with the bankruptcy or reorganization of, or settlement of delinquent accounts and disputes with, customers and suppliers, or upon the foreclosure with respect to any secured Investment or other transfer of title with respect to any secured Investment;

(k)     [reserved];

(l)     Investments resulting from pledges or deposits described in clauses (c) and/or (d) of the definition of "*Permitted Encumbrances*" in Section 1.1;

(m)     receivables or other trade payables owing to any Loan Party or Subsidiary if created or acquired in the ordinary course of business and payable or dischargeable in accordance with customary trade terms; provided, that, such trade terms may include such concessionary trade terms as such Loan Party or Subsidiary deems to be reasonable under the circumstances;

(n)     [reserved];

(o)     Investments consisting of endorsements for collection or deposit in the ordinary course of business;

(p)     Guarantee obligations of the Loan Parties or Subsidiaries in respect of letters of support, Guarantees or similar obligations issued, made or incurred for the benefit of any Loan Party or Subsidiary, to the

extent required in connection with any statutory filing or the delivery of audit opinions performed in jurisdictions other than within the United States; and

(q)     Guarantees by any Loan Party or Subsidiary of leases of real property (other than Capital Lease Obligations), contracts, or of other obligations that do not constitute Indebtedness, in each case of the foregoing, entered into in the ordinary course of business.

Section 7.5     <u>Restricted Payments</u>. Declare or make, or agree to pay or make, directly or indirectly, any Restricted Payment, except Restricted Payments made by any Wholly-Owned Subsidiary of the Borrower to Persons that own Capital Stock in such Subsidiary, on a *pro rata* basis according to their respective holdings of the type of Capital Stock in respect of which such Restricted Payment is being made with any other holder(s) thereof; <u>provided</u>, <u>that</u>, no Default or Event of Default has occurred and is continuing at the time of any such Restricted Payment or would result therefrom.

Section 7.6     <u>Asset Sales</u>. Make any Asset Sale, except (a) the Sale Transaction as approved by the Sale Order, (b) other Asset Sales, to the extent required by the Bankruptcy Code and (c) other Asset Sales, to the extent required by an order of the Bankruptcy Court with the consent of the Administrative Agent (such consent not to be unreasonably withheld).

Section 7.7     <u>Transactions with Affiliates</u>. Sell, lease, or otherwise transfer any property or assets to, or purchase, lease or otherwise acquire any property or assets from, or otherwise engage in any other transactions with, any of its Affiliates, except: (a) in the ordinary course of business, at prices, and on terms and conditions, *not* less favorable to such Loan Party or Subsidiary than could be obtained on an arm's-length basis from unrelated third parties; (b) transactions between or among the Loan Parties and *not* involving any other Affiliates that are not Loan Parties; and (c) any Restricted Payment permitted by <u>Section 7.5</u>.

Section 7.8     <u>Restrictive Agreements</u>. Enter into, incur or permit to exist any agreement that prohibits, restricts or imposes any condition upon (a) the ability of any Loan Party or Subsidiary to create, incur or permit any Lien upon any of its property or assets, whether now owned or hereafter acquired, or (b) the ability of any Subsidiary to pay dividends, or other distributions, with respect to its Capital Stock, to make or repay loans or advances to any Loan Party or Subsidiary, to Guarantee Indebtedness of any Loan Party or Subsidiary, or to transfer any of its property or assets to any Loan Party or Subsidiary; <u>provided</u>, <u>that</u>, (i) the foregoing shall *not* apply to restrictions or conditions imposed by Law, or by this Agreement or any other Loan Document, or by the Prepetition Credit Agreement or any other Prepetition Loan Document, (ii) the foregoing shall *not* apply to customary restrictions and conditions contained in purchase, acquisition or sale agreements relating to the sale of a Subsidiary pending such sale, <u>provided</u>, <u>that</u>, (A) such restrictions and conditions apply *only* to the Subsidiary that is sold, and (B) such sale is permitted hereunder, (iii) <u>clause (a)</u> above shall *not* apply to (A) restrictions or conditions imposed by any agreement relating to secured Indebtedness or Capital Lease Obligations permitted under this Agreement, so long as such restrictions and conditions apply only to the property or assets securing such Indebtedness, (B) customary provisions in leases restricting the assignment thereof, (C) [reserved], and (D) customary provisions in leases and other contracts restricting the assignment thereof, (iv) [reserved], (v) <u>clause (a)</u> above shall *not* apply to any restrictions regarding licensing or sub-licensing by the Loan Parties and Subsidiaries of IP Rights in the ordinary course of business entered into on or prior to the Effective Date, (vi) [reserved], (vii) <u>clause (a)</u> shall *not* apply to restrictions on cash or other deposits imposed by customers under contracts entered into in the ordinary course of business, (viii) <u>clause (a)</u> shall *not* apply to restrictions on any Foreign Subsidiary by the terms of any Indebtedness of such Foreign Subsidiary permitted to be incurred under this Agreement, if such limitations only apply to the property and/or assets of such Foreign Subsidiary, and (ix) <u>clause (a)</u> shall *not* apply to restrictions that arise in connection with Indebtedness permitted to be incurred pursuant to <u>Section 7.1(j)</u>.

Section 7.9     <u>Sale and Leaseback Transactions</u>. Enter into any arrangement, directly or indirectly, whereby any Loan Party or Subsidiary shall sell or transfer any property, real or personal, of the Loan Parties used or useful in their business(es), whether now owned or hereafter acquired, and thereafter, rent or lease such

property, or any other substitute property that any Loan Party or Subsidiary intends to use for substantially the same purpose(s) as the property so sold or transferred.

Section 7.10    Hedging Transactions. Enter into any Hedging Transaction.

Section 7.11    Amendments to Organization Documents. Amend, modify and/or waive any of its rights under its Organization Documents, except in any manner that would *not*, in the reasonable determination of the Administrative Agent, have a material adverse effect on the Lenders, the Administrative Agent, the Prepetition Lenders, the Prepetition Agent, the Loan Parties, or any Subsidiary.

Section 7.12    Accounting Changes. (a) Make any significant change in accounting treatment or reporting practices, except as required by GAAP, or (b) change the fiscal year of any Loan Party or Subsidiary, except to change the fiscal year of such Loan Party or Subsidiary other than the Borrower to conform to the Fiscal Year.

Section 7.13    Prepayments of Certain Indebtedness. No Loan Party shall, nor shall it permit any of its Subsidiaries to, directly or indirectly, declare, order, set apart any sum for or make any voluntary or mandatory payment, prepayment, redemption, acquisition for value, refund, refinancing or exchange of (a) any Indebtedness or claim arising prior to the Petition Date except as set forth in the Budget (subject to permitted variances); or (b) any Postpetition Indebtedness (including, without limitation, any interest, premium or other amounts owing in respect thereof but excluding, for the avoidance of doubt, regularly scheduled payments at maturity), except, in the case of this clause (b), (i) with respect to Indebtedness under the Loan Documents and (ii) for payments made pursuant to the Interim DIP Order or the Final DIP Order and, in each case, as set forth in the Budget (subject to permitted variances) or otherwise reasonably acceptable to the Administrative Agent and the Required Lenders.

Section 7.14    [Reserved].

Section 7.15    Sanctions and Anti-Corruption Laws.

(a)    Request any Borrowing, or, directly or indirectly, use, or allow any of their respective officers, directors, employees and/or agents to use, the proceeds of any Borrowing, or lend, contribute, or otherwise make available such proceeds to any Subsidiary, joint venture, or any other Person: (i) to fund, finance, or facilitate any activities, business or transactions of or with any Sanctioned Person, or in any Sanctioned Country; (ii) in any manner that would result in a violation of Sanctions by any Person (including, without limitation, any Person participating in the Loans, whether as the Administrative Agent, any Lender, underwriter, advisor, investor, or otherwise); or (iii) in furtherance of any offer, payment, promise to pay, or authorization of the payment, or giving of money or anything else of value, to, any Person in violation of applicable Anti-Corruption Laws.

(b)    (i) Be or become subject, at any time, to any Law or list of any U.S. Governmental Authority (including, without limitation, the OFAC list) that prohibits or limits the Lenders or the Administrative Agent from making any advance or extension of credit to the Borrower, or from otherwise conducting business with the Loan Parties; or (ii) fail to provide, promptly upon request therefor, documentary and/or other evidence of the identity of the Loan Parties as may be requested by any Lender and/or the Administrative Agent at any time to enable the Lenders and the Administrative Agent to: (A) verify the identity of the Loan Parties; or (B) comply with any applicable Law, including, without limitation, Section 326 of the Patriot Act.

Section 7.16    Margin Regulations. Use all, or any portion, of the proceeds of any Borrowing, directly or indirectly, for any purpose that would violate any rule or regulation of the Federal Reserve Board, including, without limitation, Regulation T, Regulation U, or Regulation X.

Section 7.17    Preferred Equity. Permit any Subsidiary to issue, or have outstanding, any shares of preferred Capital Stock.

Section 7.18    Bankruptcy Matters.

(a)    At any time, seek or consent to any reversal, modification, amendment, stay or vacation of (i) any "first day order" entered by the Bankruptcy Court in the Chapter 11 Case, if such reversal, modification, amendment, stay or vacation could have an adverse effect on the rights of the Lenders under this Agreement, (ii) the Interim DIP Order or (iii) the Final DIP Order;

(b)    at any time, seek or consent to a priority for any administrative expense or unsecured claim against any Loan Party (now existing or hereafter arising) of any kind or nature whatsoever (including, without limitation, any administrative expenses of the kind specified in, or arising or ordered under, Sections 105(a), 326, 328, 330, 331, 503(b), 506(c), 507, 546(c), 726, 1113 and 1114 of the Bankruptcy Code) equal or superior to the priority of the Secured Parties in respect of the Obligations, other than for the Carve-Out and as otherwise expressly permitted by this Agreement or the Orders;

(c)    permit the incurrence of any administrative expense or unsecured claim against any Loan Party (now existing or hereafter arising) of any kind or nature whatsoever (including, without limitation, any administrative expenses of the kind specified in, or arising or ordered under, Sections 105(a), 326, 328, 330, 331, 503(b), 506(c), 507, 546(c), 726, 1113 and 1114 of the Bankruptcy Code) equal or superior to the priority of the superpriority adequate protection claims of the Prepetition Lenders granted under the Orders, other than for the Carve-Out, the Obligations under this Agreement and as expressly permitted by this Agreement or the Orders;

(d)    permit to be filed with the Bankruptcy Court any of the following unless such motion, pleading, proposed order or other document is in form and substance reasonably satisfactory to the Administrative Agent: (i) any motion seeking approval of the DIP Facility, any cash management arrangements and procedures, any Order or the Cash Management Order; (ii) the proposed form of the Interim DIP Order; (iii) the proposed form of the Final DIP Order; (iv) any pleading or proposed order relating to the Loan Documents not addressed in the preceding clauses (i) through (iii); (v) [reserved]; (vi) any motion or proposed form of order relating to any management equity plan, incentive, retention or severance plan; or (vii) any motion and proposed form of order relating to the assumption, rejection, modification or amendment of any material contract;

(e)    file or permit to be filed with the Bankruptcy Court any Plan of Reorganization, related disclosure statement, motion to approve any Plan of Reorganization or related disclosure statement or any form of order relating to the foregoing, in each case unless such filing (i) is in form and substance satisfactory to the Administrative Agent and the Required Lenders in their sole discretion or (ii) would provide for the Facility Termination Date and the payment in full in cash of the Prepetition Facility Obligations on the effective date thereof; or

(f)    prior to the Facility Termination Date, (i) pay any administrative expense claims of the Loan Parties except (A) the Obligations then due and payable, (B) other administrative expense claims in accordance with the Budget (subject to the variances therefrom permitted under Section 6.1(a)) and as allowed by an order of the Bankruptcy Court, to the extent and having the order of priority set forth in the Orders or (C) Professional Fees as allowed or permitted prior to allowance by an order of the Bankruptcy Court or (ii) file with the Bankruptcy Court any alternative debtor-in-possession financing proposal that does not provide for the occurrence of the Facility Termination Date and for the Prepetition Facility Obligations to be paid in cash in full.

## ARTICLE VIII

## EVENTS OF DEFAULT

Section 8.1    <u>Events of Default</u>. If any of the following events (each, an "*Event of Default*") shall occur:

(a)    any Loan Party shall fail to pay any principal of any Loan when and as the same shall become due and payable, whether at the due date thereof, at a date fixed for prepayment, or otherwise; or

(b)    any Loan Party shall fail to pay any interest on any Loan, or any fee or any other amount (other than an amount (i) payable under <u>clause (a)</u> above, or (ii) related to a Bank Product Obligation) payable under this Agreement or any other Loan Document, when and as the same shall become due and payable, and such failure shall continue unremedied for a period of five (5) Business Days; or

(c)    any representation or warranty made, or deemed to be made, by, or on behalf of, any Loan Party or any Subsidiary in, or in connection with, this Agreement or any other Loan Document (including, without limitation, the Schedules attached hereto and thereto), or in any amendment, restatement, amendment and restatement, supplement, and/or other written modification hereof, or waiver hereunder, or in any certificate, report, financial statement or other document submitted to the Administrative Agent and/or the Lenders by, or on behalf of, any Loan Party or any Subsidiary, or any representative of any Loan Party or Subsidiary, pursuant to, or in connection with, this Agreement or any other Loan Document, shall prove to be incorrect in any material respect (other than any representation or warranty that is expressly qualified by a Material Adverse Effect or other materiality, in which case, such representation or warranty shall prove to be incorrect in any respect) when made or deemed made or submitted; or

(d)    any Loan Party shall fail to observe or perform any covenant or agreement contained in <u>Section 2.27</u>, <u>Section 5.1</u> (and such default or non-compliance remains uncured for a period of five (5) Business Days), <u>Section 5.2</u>, <u>Section 5.3(a)</u> (solely with respect to the existence of any Loan Party in their respective jurisdiction of organization or incorporation), <u>Section 5.7</u>, <u>Section 5.8</u> (other than in <u>clause (a)</u> thereof), <u>Section 5.9</u>, <u>Section 5.11</u> (and such default or non-compliance remains uncured for a period of two (2) Business Days), <u>Section 5.12</u>, <u>Section 5.14</u>, <u>Section 5.17</u>, <u>Section 5.18</u>, <u>Section 5.19</u> or <u>Section 5.20</u> or in <u>Article VI</u> or <u>Article VII</u>; or

(e)    any Loan Party shall fail to observe or perform any covenant or agreement contained in this Agreement (other than those referred to in <u>clauses (a)</u>, <u>(b)</u>, <u>(c)</u> and <u>(d)</u> above) or any other Loan Document or related to any Bank Product Obligation, and such failure shall remain unremedied for ten (10) Business Days after the *earlier* of (A) any Responsible Officer of any Loan Party becomes aware of such failure, or (B) notice thereof shall have been given to any Loan Party by the Administrative Agent or any Lender; or

(f)    (i) (A) any Loan Party or Subsidiary (whether as primary obligor or as guarantor or other surety) shall fail to pay any principal of, or premium or interest on, any Material Indebtedness (other than Hedging Obligations), when and as the same shall become due and payable (whether at scheduled maturity, required prepayment, acceleration, demand or otherwise), and such failure shall continue after the applicable grace period, if any, specified in the agreement or instrument evidencing or governing such Material Indebtedness, (B) any other event shall occur, or condition shall exist, under any agreement or instrument relating to any Material Indebtedness and shall continue after the applicable grace period, if any, specified in such agreement or instrument, if the effect of such event or condition is to accelerate, or permit the acceleration of, the maturity of such Material Indebtedness, or (C) any such Material Indebtedness shall be declared to be due and payable, or required to be prepaid or redeemed (other than by a regularly scheduled required prepayment or redemption), purchased or defeased, or any offer to prepay, redeem, purchase or defease such Material Indebtedness shall be required to be made, in each

CHAR1\1930324v9

case of this <u>clause (g)(i)(C)</u>, prior to the stated maturity thereof; or (ii) there occurs under, or in connection with, any Hedging Transaction an Early Termination Date (or substantially equivalent term, in each case, as defined in the definitive documentation for such Hedging Transaction) resulting from (A) any event of default under, or in connection with, such Hedging Transaction, as to which (I) any Loan Party or Subsidiary is the Defaulting Party (or substantially equivalent term, as defined in the definitive documentation for such Hedging Transaction), and (II) the Hedge Termination Value owed to such Loan Party or Subsidiary as a result thereof is *greater than* the Threshold Amount, or (B) the occurrence of a Termination Event (or substantially equivalent term, as defined in the definitive documentation for such Hedging Transaction), and the Hedge Termination Value owed by such Loan Party or Subsidiary as a result thereof is *greater than* the Threshold Amount and is not paid; <u>provided</u>, <u>that</u>, with respect to any such failure, event, condition, declaration, requirement, or occurrence contemplated in this <u>clause (g)</u>, such failure, event, condition, declaration, requirement or occurrence shall constitute an Event of Default *solely* to the extent *not* subject to the automatic stay of the Bankruptcy Court;

(g)    [reserved]; or

(h)    [reserved]; or

(i)    [reserved]; or

(j)    (i) an ERISA Event shall have occurred that, in the opinion of the Required Lenders, when taken together with other ERISA Events that have occurred, could reasonably be expected to result in liability to the Loan Parties and Subsidiaries in an aggregate amount in *excess* of the Threshold Amount; (ii) there is or arises an Unfunded Pension Liability (but not taking into account Plans with negative Unfunded Pension Liability) in an aggregate amount in *excess* of the Threshold Amount; or (iii) there is or arises any potential Withdrawal Liability in an aggregate amount in *excess* of the Threshold Amount; or

(k)    any final, non-appealable judgment, writ, warrant of attachment, other order for the payment of money, involving an amount in *excess* of the Threshold Amount (to the extent not covered by insurance or indemnities as to which the applicable insurance company or third-party has been notified of such claim and has confirmed coverage), individually or in the aggregate, shall be rendered against any Loan Party or Subsidiary, and either: (i) enforcement proceedings shall have been commenced by any creditor upon such judgment or order (and such proceedings are not subject to any stay, by reason of the commencement of the Chapter 11 Case or otherwise); or (ii) there shall be a period of sixty (60) consecutive days during which a stay of enforcement of such judgment or order, by reason of a pending appeal or otherwise, shall not be in effect; or

(l)    any non-monetary judgment or order shall be rendered against any Loan Party or Subsidiary that could reasonably be expected, either individually or in the aggregate, to have a Material Adverse Effect, and there shall be a period of thirty (30) consecutive days during which a stay of enforcement of such judgment or order, by reason of a pending appeal or otherwise, shall not be in effect; or

(m)    a Change in Control shall occur or exist; or

(n)    (i) any provision of any Loan Document, at any time after the execution and delivery of such Loan Document, and for any reason other than (I) as expressly permitted hereunder or thereunder, or (II) the occurrence of the Facility Termination Date, ceases to (A) be valid and binding on, and enforceable against, any Loan Party, or (B) grant to the Administrative Agent, for the ratable benefit of the holders of the Obligations, all, or any material portion, of the Liens otherwise created, or purported to be created, thereby, with the priority required by the applicable Loan Document (subject to Permitted Prior Liens); (ii) any Loan Party or Subsidiary, or any other Person contests, in any manner, the validity

85

and/or enforceability of any Loan Document; or (iii) any Loan Party denies that it has any or further liability or obligation under any Loan Document to which it is party, or purports to revoke, terminate and/or rescind any such Loan Document (other than with respect to the release of any Guaranty or Collateral, to the extent permitted pursuant to Section 9.11); or

(o)      any Lien granted, or purported to be granted, under any Collateral Document shall fail or cease to be, or shall be asserted by any Loan Party or Subsidiary not to be a valid and perfected Lien on any Collateral with the priority required by the applicable Collateral Documents (subject to Permitted Prior Liens); or

(p)      any of the following shall occur:

(i)      (A) any Chapter 11 Case shall be dismissed (which dismissal does not require as a condition to such dismissal the occurrence of the Facility Termination Date and the payment in full in cash of all Prepetition Facility Obligations) or converted to a case under Chapter 7 of the Bankruptcy Code or the Loan Parties (or any of them) shall file a motion or other pleading seeking the dismissal or conversion of any Chapter 11 Case under Section 1112 of the Bankruptcy Code or otherwise, in each case without the consent of the Administrative Agent or the Required Lenders; (B) a trustee under Chapter 7 or Chapter 11 of the Bankruptcy Code, a responsible officer or an examiner with enlarged powers relating to the operation of the business of any of the Loan Parties (powers beyond those set forth in Sections 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code shall be appointed in any Chapter 11 Case, provided, that, the appointment of a Chapter 11 trustee or officer or examiner with enlarged powers shall not be an Event of Default hereunder if (1) such relief is sought by the Administrative Agent or (2) the Administrative Agent waives such Event of Default in connection with such appointment; (C) the board of directors of one or more of the Loan Parties shall authorize a liquidation of any Loan Party's business, except with the prior written consent of the Administrative Agent; (D) the Loan Parties file an application or motion for the approval of any other Superpriority Claim that is *pari passu* with or senior to the claims of the Secured Parties granted or created hereunder, under any of the other Loan Documents or any of the Orders if the proceeds thereof are not used to cause the occurrence of the Facility Termination Date (other than the Carve-Out, which shall have a Superpriority Claim ranking as set forth in the Interim DIP Order and, when applicable, the Final DIP Order); or (E) the Loan Parties shall file an application or motion for the approval of any Lien in any Chapter 11 Case that is *pari passu* with or senior to the Liens of the Secured Parties granted or created hereunder, under any of the other Loan Documents or any of the Orders (other than Liens of third parties securing the Carve-Out and any other Liens permitted by this Agreement and the other Loan Documents, which shall have the ranking as set forth in the Interim DIP Order, the Final DIP Order or this Agreement, as applicable);

(ii)      the Bankruptcy Court shall enter an order or orders granting relief from the automatic stay applicable under Section 362 of the Bankruptcy Code pertaining to the Collateral to the holder or holders of any security interest to (A) permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any assets of the Loan Parties in an amount in excess of the Threshold Amount, individually or in the aggregate (except as otherwise permitted in writing by the Administrative Agent and the Required Lenders) or (B) permit other actions that would reasonably be expected to have a Material Adverse Effect;

(iii)      (A) an order of the Bankruptcy Court shall be entered reversing, amending, supplementing, staying for a period in excess of ten (10) calendar days, vacating or otherwise amending, supplementing or modifying the Interim DIP Order and/or the Final DIP Order without the prior written consent of the Administrative Agent and the Required Lenders, or any Loan Party shall apply for authority to do so, without the prior written consent of the Administrative

86

Agent and the Required Lenders, (B) an order with respect to any Chapter 11 Case shall be entered by the Bankruptcy Court without the express prior written consent of the Administrative Agent and the requisite Lenders granting any administrative expense or any claim (now existing or hereafter arising, of any kind or nature whatsoever) with priority equal or superior to the priority of the claims of the Secured Parties in respect of the Obligations except as otherwise provided in this Agreement, (C) an order of the Bankruptcy Court shall be entered permitting the grant of a Lien on the Collateral, other than as contemplated herein and in the Orders, or as otherwise consented to by the Administrative Agent and the Required Lenders, (D) the Interim DIP Order and/or the Final DIP Order shall cease to create a valid and perfected first-priority (subject to the priorities of other Liens and the Carve-Out referenced in Section 2.27(a)) Lien on the Collateral or otherwise cease to be valid and binding and in full force and effect, (E) any of the Loan Parties shall fail to comply with any material provision (or any provision in such a way as is materially adverse to the interests of the Secured Parties) of the Interim DIP Order and/or the Final DIP Order, (F) any Loan Party shall seek any modification of the Interim DIP Order and/or the Final DIP Order or assert in any pleading filed in any court that any material provision of the Interim DIP Order and/or the Final DIP Order is not valid and binding for any reason or otherwise modifying the Interim DIP Order and/or the Final DIP Order in a manner adverse to the Secured Parties, (G) [reserved], or (H) any Loan Party is enjoined, restrained or in any way prevented by court order from continuing or conducting all or any material part of its business or affairs;

(iv)    except as permitted by this Agreement, the Orders or the Budget or as otherwise agreed to by the Administrative Agent and the Required Lenders, the Loan Parties shall make (or shall have made) any Prepetition Payment other than Prepetition Payments authorized by the Bankruptcy Court in accordance with orders of the Bankruptcy Court entered without objection by the Administrative Agent;

(v)    the Bankruptcy Court shall enter an order avoiding or requiring disgorgement by the Secured Parties of any amounts received in respect of the Obligations;

(vi)    the Bankruptcy Court shall enter an order or orders to sell, transfer, lease, exchange, alienate or otherwise dispose of any assets, properties or equity of any Loan Party pursuant to Section 363 of the Bankruptcy Code without the consent of the Administrative Agent unless such order or orders contemplate the occurrence of the Facility Termination Date and the payment in full in cash of the Prepetition Facility Obligations;

(vii)    any of the Loan Parties shall take any action in support of any matter set forth in clauses (i) through (vi) above or any other Person shall do so and such application is not contested in good faith by the Loan Parties and the relief requested is granted in an order that is not stayed pending appeal;

(viii)    any Loan Party shall file a motion, pleading or proceeding which could reasonably be expected to result in a material impairment of the rights or interests of the Lenders or a determination by a court with respect to a motion, pleading or proceeding brought by another party which results in such a material impairment;

(ix)    any Loan Party shall file a motion in any Chapter 11 Case (A) to use Specified Cash Collateral under Section 363(c) of the Bankruptcy Code without the consent of the Lenders and the Prepetition Lenders, (B) to obtain additional financing under Sections 364(c) or (d) of the Bankruptcy Code not otherwise permitted under this Agreement or (C) to take any other action or actions materially adverse to Administrative Agent, the Lenders, the Prepetition Agent, the Prepetition Issuing Bank, the other holders of the Obligations or the other holders of the Prepetition Facility Obligations or their rights and remedies hereunder or under any of the other Loan Documents, the Prepetition Loan Documents or the Orders, or the interest of the

87

Administrative Agent, the Lenders, the Prepetition Agent, the Prepetition Issuing Bank, the other holders of the Obligations or the other holders of the Prepetition Facility Obligations in any of the Collateral;

(x)        the filing or support by any Loan Party of, or the entry of the Bankruptcy Court confirming, any Plan of Reorganization that is not approved by the Administrative Agent and the Required Lenders unless such Plan of Reorganization causes the occurrence of the Facility Termination Date and the repayment in full in cash of all Prepetition Facility Obligations, in each case, on the effective date of such Plan of Reorganization;

(xi)        subject to any requirements to the contrary in the Orders, the Loan Parties fail to disburse sale proceeds to the Administrative Agent contemporaneously with the closing of a sale of substantially all of the Loan Parties' assets, subject to funding of any escrows in respect of the Carve-Out and any wind-down fund provided for in the Orders;

(xii)        the grant of a change of venue with respect to the Chapter 11 Case or any adversary proceeding shall be granted without the consent of the Administrative Agent and the Required Lenders;

(xiii)        entry of an order by the Bankruptcy Court authorizing or directing payment of any claim or claims under Section 506(c) of the Bankruptcy Code against any holder of the Obligations or the Prepetition Facility Obligations or requiring the application of the "equities of the case" exception under Section 552(b) of the Bankruptcy Code as to the holders of the Prepetition Facility Obligations with respect to the Prepetition Collateral;

(xiv)        [reserved];

(xv)        the failure of any Loan Party to comply with the terms of the Interim DIP Order, the Cash Management Order or the Final DIP Order (after giving effect to any applicable grace period or periods in the Interim DIP Order, the Cash Management Order or Final DIP Order, as applicable); or

(xvi)        the entry of an order of the Bankruptcy Court confirming any Plan of Reorganization that is not approved by the Administrative Agent and the Required Lenders unless such Plan of Reorganization causes the occurrence of the Facility Termination Date on the effective date of such Plan of Reorganization;

then, and in every such event, and, at any time thereafter during the continuance of such event, subject to the terms of the Interim DIP Order and, as applicable, the Final DIP Order, the Administrative Agent may, and upon the written request of the Required Lenders shall, by notice to the Borrower, take any or all of the following actions, at the same or different times: (i) terminate the Commitments, whereupon the Commitment of each Lender shall terminate immediately; (ii) declare the principal of, and any accrued interest on, the Loans, and all other Obligations owing hereunder, to be, whereupon the same shall become, due and payable immediately, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrower; (iii) exercise all remedies contained in any other Loan Document; and (iv) exercise any other remedies available at Law or in equity.

Section 8.2        Application of Proceeds from Collateral. All proceeds from each sale of, or other realization upon, all, or any portion, of the Collateral by the Administrative Agent, or any other holder of the Obligations, after an Event of Default arises shall be applied as follows (such order of application, the "*Waterfall*"):

(a)        *first*, to the reimbursable expenses of the Administrative Agent incurred in connection with such sale or other realization upon the Collateral, until the same shall have been paid in full;

(b)        *second*, to the fees, indemnities, reimbursable expenses and other amounts constituting Obligations owing to the Administrative Agent (other than any such fees or other amounts constituting Obligations owing to any such Person described in any other clause of this Section 8.2), if any, then due and payable pursuant to any of the Loan Documents, until the same shall have been paid in full;

(c)        *third*, to all fees, indemnities, reimbursable expenses and other amounts constituting Obligations owing to the Lenders (other than any such fees or other amounts constituting Obligations owing to the Lenders described in any other clause of this Section 8.2), if any, then due and payable pursuant to any of the Loan Documents, until the same shall have been paid in full;

(d)        *fourth*, to the fees due and payable under Section 2.14 of this Agreement and interest then due and payable under the terms of this Agreement, until the same shall have been paid in full;

(e)        *fifth*, to the aggregate outstanding principal amount of the Loans, the Bank Product Obligations, until the same shall have been paid in full, allocated *pro rata* among the holders of the Obligations, based on their respective Pro Rata Shares of the aggregate amount of such Loans and Bank Product Obligations; and

(f)        to the extent any proceeds remain, to the Borrower, or as otherwise provided by a court of competent jurisdiction.

All amounts allocated pursuant to the foregoing *third* through *fifth* clauses of the Waterfall to the Lenders as a result of amounts owed to the Lenders under the Loan Documents shall be allocated among, and distributed to, the Lenders *pro rata* based on their respective Pro Rata Shares.

Notwithstanding anything to the contrary in this Agreement or any other Loan Document, Bank Product Obligations shall be excluded from the Waterfall without any liability to the Administrative Agent, if the Administrative Agent has *not* received written notice thereof, together with such supporting documentation as the Administrative Agent may request, from the applicable Bank Product Provider(s). Each Bank Product Provider that has given the notice contemplated by the foregoing clause (B) shall, by such notice, be deemed to have acknowledged and accepted the appointment of the Administrative Agent pursuant to the terms of Article IX, for itself and its Affiliates, as if a "*Lender*" party hereto.

## ARTICLE IX

## THE ADMINISTRATIVE AGENT

Section 9.1        Appointment of Administrative Agent.

(a)        Each Lender irrevocably appoints Truist as the Administrative Agent and authorizes it to take such actions on its behalf and to exercise such powers as are delegated to the Administrative Agent under this Agreement and the other Loan Documents, together with all such actions and powers that are reasonably incidental thereto. The Administrative Agent may perform any of its duties hereunder or under the other Loan Documents by or through any one (1) or more sub-agents or attorneys-in-fact appointed by the Administrative Agent. The Administrative Agent and any such sub-agent or attorney-in-fact may perform any and all of its duties and exercise its rights and powers through their respective Related Parties. The exculpatory provisions set forth in this Article IX shall apply to any such sub-agent, attorney-in-fact or Related Party and shall apply to their respective activities in connection the credit facilities provided for herein as well as activities as the Administrative Agent.

(b)        [Reserved].

89

(c)      It is understood and agreed that the use of the term "agent" (or any similar term) herein, or in any other Loan Document, with reference to the Administrative Agent, is *not* intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable Law. Instead, such term is used herein and in the other Loan Documents *solely* as a matter of market custom, and is intended to create or reflect only an administrative relationship between the contracting parties.

Section 9.2      Nature of Duties of Administrative Agent. The Administrative Agent shall not have any duties or obligations except those expressly set forth in this Agreement and the other Loan Documents. Without limiting the generality of the foregoing: (a) the Administrative Agent shall not be subject to any fiduciary or other implied duties, regardless of whether a Default or an Event of Default has occurred and is continuing; (b) the Administrative Agent shall not have any duty to take any discretionary action or exercise any discretionary powers, except those discretionary rights and powers expressly contemplated by the Loan Documents that the Administrative Agent is required to exercise in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in Section 11.2), provided, that, the Administrative Agent shall not be required to take any action that, in its opinion or the opinion of its counsel, may expose the Administrative Agent to liability or that is contrary to any Loan Document or applicable Law, including for the avoidance of doubt any action that may be in violation of the automatic stay under any Debtor Relief Law or that may effect a forfeiture, modification or termination of property of a Defaulting Lender in violation of any Debtor Relief Law; and (c) except as expressly set forth in the Loan Documents, the Administrative Agent shall not have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Borrower or any of its Subsidiaries that is communicated to or obtained by the Administrative Agent or any of its Affiliates in any capacity. The Administrative Agent shall not be liable for any action taken or not taken by it, its sub-agents or its attorneys-in-fact with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in Section 11.2) or in the absence of its own gross negligence or willful misconduct as determined by a court of competent jurisdiction in a final, non-appealable judgment. The Administrative Agent shall *not* be responsible for the negligence or misconduct of any sub-agents and/or attorneys-in-fact selected by it, except to the extent that a court of competent jurisdiction determines in a final, non-appealable judgment that the Administrative Agent acted with gross negligence or willful misconduct in the selection of any such sub-agents and/or attorneys-in-fact. The Administrative Agent shall not be deemed to have knowledge of any Default or Event of Default unless and until written notice thereof (which notice shall include an express reference to such event being a "*Default*" or "*Event of Default*" hereunder) is given to the Administrative Agent by the Borrower or any Lender, and the Administrative Agent shall not be responsible for or have any duty to ascertain or inquire into: (i) any statement, warranty or representation made in or in connection with any Loan Document; (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith; (iii) the performance or observance of any of the covenants, agreements, or other terms and conditions set forth in any Loan Document; (iv) the validity, enforceability, effectiveness or genuineness of any Loan Document or any other agreement, instrument or document; or (v) the satisfaction of any condition set forth in Article III or elsewhere in any Loan Document, other than to confirm receipt of items expressly required to be delivered to the Administrative Agent. The Administrative Agent may consult with legal counsel (including counsel for the Borrower) concerning all matters pertaining to such duties. Neither the Administrative Agent nor any of its Related Parties shall be responsible, or have any liability, for, or have any duty to ascertain, inquire into, monitory or enforce, compliance with the provisions of this Agreement relating to Disqualified Institutions. Without limiting the generality of the foregoing, the Administrative Agent shall not: (A) be obligated to ascertain, monitor or inquire as to whether any Lender or prospective Lender is a Disqualified Institution; or (B) have any liability with respect to, or arising out of, any assignment of Loans, or disclosure of confidential information, to any Disqualified Institution.

Section 9.3      Lack of Reliance on the Administrative Agent. Each of the Lenders acknowledges that it has, independently and without reliance upon the Administrative Agent or any other Lender and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement. Each of the Lenders also acknowledges that it will, independently and without reliance upon the Administrative Agent or any other Lender and based on such documents and information as it has deemed

90

appropriate, continue to make its own credit analyses, appraisals and decisions in taking, or not taking, any action under, or based on, this Agreement, any related agreement, or any document furnished hereunder or thereunder, and to make such investigations as it deems necessary to inform itself as to the business, prospects, operations, property and assets, financial and other condition, and creditworthiness of the Loan Parties. Each Lender represents and warrants that: (a) the Loan Documents set forth the terms of a commercial lending facility; (b) such Lender is engaged in making, acquiring, and/or holding commercial loans in the ordinary course of its business, and is entering into this Agreement as a Lender for the purpose of making, acquiring, and/or holding commercial loans, and providing other facilities set forth herein as may be applicable to such Lender, and *not* for the purpose of purchasing, acquiring, and/or holding any other type of financial instrument; and (c) such Lender is sophisticated with respect to decisions to make, acquire, and/or hold commercial loans, and to provide other facilities set forth herein as may be applicable to such Lender, and either such Lender, or the Person exercising discretion in making such Lender's decision to make, acquire, and/or hold such commercial loans, or to provide such other facilities, is experienced in making, acquiring, and/or holding such commercial loans or providing such other facilities. Each Lender agrees *not* to assert a claim in contravention of any of the foregoing.

Section 9.4    <u>Certain Rights of the Administrative Agent</u>. If the Administrative Agent shall request instructions from the Required Lenders with respect to any action or actions (including the failure to act) in connection with this Agreement, the Administrative Agent shall be entitled to refrain from such act or taking such act unless and until it shall have received instructions from such Lenders, and the Administrative Agent shall not incur liability to any Person by reason of so refraining. Without limiting the foregoing, no Lender shall have any right of action whatsoever against the Administrative Agent as a result of the Administrative Agent acting or refraining from acting hereunder in accordance with the instructions of the Required Lenders where required by the terms of this Agreement.

Section 9.5    <u>Reliance by Administrative Agent</u>. The Administrative Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, posting or other distribution) believed by it to be genuine and to have been signed, sent or made by the proper Person. The Administrative Agent may also rely upon any statement made to it orally or by telephone and believed by it to be made by the proper Person and shall not incur any liability for relying thereon. The Administrative Agent may consult with legal counsel (including counsel for the Borrower), independent public accountants and other experts selected by it and shall not be liable for any action taken or not taken by it in accordance with the advice of such counsel, accountants or experts.

Section 9.6    <u>The Administrative Agent in its Individual Capacity</u>. The bank serving as the Administrative Agent shall have the same rights and powers under this Agreement and any other Loan Document in its capacity as a Lender as any other Lender and may exercise or refrain from exercising the same as though it were not the Administrative Agent; and the terms "*Lenders*", "*Required Lenders*", or any similar terms shall, unless the context clearly otherwise indicates, include the Administrative Agent in its individual capacity. The bank acting as the Administrative Agent and its Affiliates may accept deposits from, lend money to, and generally engage in any kind of business with the Borrower or any Subsidiary or Affiliate of the Borrower as if it were not the Administrative Agent hereunder.

Section 9.7    <u>Successor Administrative Agent</u>.

(a)    The Administrative Agent may resign at any time by giving notice thereof to the Lenders and the Borrower. Upon any such resignation, the Required Lenders shall have the right to appoint a successor Administrative Agent, subject to approval by the Borrower, <u>provided, that</u>, no Default or Event of Default shall exist at such time. If no successor Administrative Agent shall have been so appointed, and shall have accepted such appointment within thirty (30) days after the retiring Administrative Agent gives notice of resignation, then the retiring Administrative Agent may, on behalf of the Lenders, appoint a successor Administrative Agent which shall be a commercial bank organized under the laws of the United States or any state thereof or a bank which maintains an office in the United States.

(b)        Upon the acceptance of its appointment as the Administrative Agent hereunder by a successor, such successor Administrative Agent shall thereupon succeed to and become vested with all the rights, powers, privileges and duties of the retiring Administrative Agent, and the retiring Administrative Agent shall be discharged from its duties and obligations under this Agreement and the other Loan Documents. If, within forty five (45) days after written notice is given of the retiring Administrative Agent's resignation under this Section 9.7, no successor Administrative Agent shall have been appointed and shall have accepted such appointment, then on such forty-fifth (45th) day: (i) the retiring Administrative Agent's resignation shall become effective; (ii) the retiring Administrative Agent shall thereupon be discharged from its duties and obligations under the Loan Documents; and (iii) the Required Lenders shall thereafter perform all duties of the retiring Administrative Agent under the Loan Documents until such time as the Required Lenders appoint a successor Administrative Agent as provided above. After any retiring Administrative Agent's resignation hereunder, the provisions of this Article IX shall continue in effect for the benefit of such retiring or removed Administrative Agent and its representatives and agents in respect of any actions taken, or not taken, by any of them while it was serving as the Administrative Agent.

Section 9.8        Withholding Tax. To the extent required by any applicable Law, the Administrative Agent may withhold from any interest payment to any Lender an amount equivalent to any applicable withholding tax. If the Internal Revenue Service or any authority of the United States or any other jurisdiction asserts a claim that the Administrative Agent did not properly withhold tax from amounts paid to or for the account of any Lender (because the appropriate form was not delivered or was not properly executed, or because such Lender failed to notify the Administrative Agent of a change in circumstances that rendered the exemption from, or reduction of, withholding tax ineffective, or for any other reason), such Lender shall indemnify the Administrative Agent (to the extent that the Administrative Agent has not already been reimbursed by the Borrower and without limiting the obligation of the Borrower to do so) fully for all amounts paid, directly or indirectly, by the Administrative Agent as tax or otherwise, including penalties and interest, together with all expenses incurred, including legal expenses, allocated staff costs and any out of pocket expenses.

Section 9.9        Administrative Agent May File Proofs of Claim.

(a)        In case of the pendency of any receivership, insolvency, liquidation, bankruptcy, reorganization, arrangement, adjustment, composition or other judicial proceeding relative to any Loan Party, the Administrative Agent (irrespective of whether the principal of any Loan or any Revolving Credit Exposure shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on the Borrower) shall be entitled and empowered, by intervention in such proceeding or otherwise:

(i)        to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans or Revolving Credit Exposure and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders and the Administrative Agent (including, without limitation, any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders and the Administrative Agent and its agents and counsel and all other amounts due the Lenders and the Administrative Agent under Section 10.3) allowed in such judicial proceeding; and

(ii)        to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

(b)        Any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender to make such payments to the Administrative Agent and, if the Administrative Agent shall consent to the making of such payments directly to the Lenders, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Administrative Agent and its agents and counsel, and any other amounts due the Administrative Agent under Section 11.3.

(c)    Nothing contained herein shall be deemed to authorize the Administrative Agent to authorize or consent to or accept or adopt on behalf of any Lender any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any Lender or to authorize the Administrative Agent to vote in respect of the claim of any Lender in any such proceeding.

Section 9.10    <u>Authorization to Execute Other Loan Documents</u>. Each Lender hereby authorizes the Administrative Agent to execute on behalf of all Lenders all Loan Documents (including, without limitation, the Collateral Documents and any subordination agreements) other than this Agreement.

Section 9.11    <u>Collateral and Guaranty Matters</u>. The Lenders irrevocably authorize the Administrative Agent, at its option and in its discretion:

(a)    to release any Lien on any property granted to or held by the Administrative Agent under any Loan Document: (i) upon the occurrence of the Facility Termination Date; (ii) that is sold, or to be sold, as part of, or in connection with, any sale permitted hereunder or under any other Loan Document; or (iii) if approved, authorized or ratified in writing in accordance with <u>Section 11.2</u>; and

(b)    to release any Loan Party from its obligations under the applicable Collateral Documents if such Person ceases to be a Subsidiary as a result of a transaction permitted hereunder.

Upon request by the Administrative Agent at any time, the Required Lenders will confirm in writing the Administrative Agent's authority to release its interest in particular types or items of property, or to release any Loan Party from its obligations under the applicable Collateral Documents pursuant to this <u>Section 9.11</u>. In each case as specified in this <u>Section 9.11</u>, the Administrative Agent is authorized, at the Borrower's expense, to execute and deliver to the applicable Loan Party such documents as such Loan Party may reasonably request to evidence the release of such item of Collateral from the Liens granted under the applicable Collateral Documents, or to release such Loan Party from its obligations under the applicable Collateral Documents, in each case in accordance with the terms of the Loan Documents and this <u>Section 9.11</u>.

Section 9.12    [Reserved].

Section 9.13    <u>Right to Realize on Collateral and Enforce Guarantee</u>. Anything contained in any of the Loan Documents to the contrary notwithstanding, the Borrower, the Administrative Agent and each Lender hereby agree that: (a) no Lender shall have any right individually to realize upon any of the Collateral or to enforce the Collateral Documents, it being understood and agreed that all powers, rights and remedies hereunder and under the Collateral Documents may be exercised solely by the Administrative Agent; and (b) in the event of a foreclosure by the Administrative Agent on any of the Collateral pursuant to a public or private sale or other disposition, the Administrative Agent or any Lender may be the purchaser or licensor of any or all of such Collateral at any such sale or other disposition and the Administrative Agent, as agent for and representative of the Lenders (but not any Lender or Lenders in its or their respective individual capacities unless the Required Lenders shall otherwise agree in writing), shall be entitled, for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Collateral sold at any such public sale, to use and apply any of the Obligations as a credit on account of the purchase price for any collateral payable by the Administrative Agent at such sale or other disposition.

Section 9.14    <u>Secured Bank Product Obligations</u>. No Bank Product Provider that obtains the benefits of <u>Section 8.2</u>, the Collateral Documents, or any Collateral by virtue of the provisions hereof or of any other Loan Document shall have any right to notice of any action, or to consent to, direct, or object to, any action hereunder, under any other Loan Document, or otherwise in respect of the Collateral (including, without limitation, the release or impairment of any Collateral), other than in its capacity as a Lender, and, in such case, only to the extent expressly provided in the Loan Documents. Notwithstanding anything to the contrary in this <u>Article IX</u>, the Administrative Agent shall *not* be required to verify the payment of, or that other satisfactory arrangements have been made with respect to, any Bank Product Obligations, unless the Administrative Agent shall have received

written notice of such Obligations, together with such supporting documentation as the Administrative Agent may request, from the applicable Bank Product Provider(s).

ARTICLE X

THE GUARANTY

Section 10.1    The Guaranty. Each of the Guarantors hereby jointly and severally guarantees to the Administrative Agent, each Lender and/or each Affiliate of a Lender that enters into Bank Products with the Borrower, or any Subsidiary, and each other holder of the Obligations as hereinafter provided, as primary obligor and not as surety, the prompt payment of the Obligations in full when due (whether at stated maturity, as a mandatory prepayment, by acceleration, as a mandatory cash collateralization or otherwise) strictly in accordance with the terms thereof. The Guarantors hereby further agree that, if any of the Obligations is not paid in full when due (whether at stated maturity, as a mandatory prepayment, by acceleration, as a mandatory cash collateralization or otherwise), the Guarantors will, jointly and severally, promptly pay the same, without any demand or notice whatsoever, and that in the case of any extension of time of payment or renewal of any of the Obligations, the same will be promptly paid in full when due (whether at extended maturity, as a mandatory prepayment, by acceleration, as a mandatory cash collateralization or otherwise) in accordance with the terms of such extension or renewal.

Notwithstanding any provision to the contrary contained herein or in any other of the Loan Documents or the other documents relating to the Obligations, the obligations of each Guarantor under this Agreement and the other Loan Documents shall not exceed an aggregate amount equal to the largest amount that would not render such obligations subject to avoidance under applicable Debtor Relief Laws.

Section 10.2    Obligations Unconditional. The obligations of the Guarantors under Section 10.1 are joint and several, absolute and unconditional, irrespective of the value, genuineness, validity, regularity or enforceability of any of the Loan Documents or other documents relating to the Obligations, or any substitution, release, impairment or exchange of any other guarantee of or security for any of the Obligations, and, to the fullest extent permitted by applicable Law, irrespective of any other circumstance whatsoever which might otherwise constitute a legal or equitable discharge or defense of a surety or guarantor, it being the intent of this Section 10.2 that the obligations of the Guarantors hereunder shall be absolute and unconditional under any and all circumstances. Each Guarantor agrees that such Guarantor shall have no right of subrogation, indemnity, reimbursement or contribution against the Borrower or any other Guarantor for amounts paid under this Article X until the Facility Termination Date. Without limiting the generality of the foregoing, it is agreed that, to the fullest extent permitted by Law, the occurrence of any one (1) or more of the following shall not alter or impair the liability of any Guarantor hereunder, which shall remain absolute and unconditional as described above:

(a)    at any time or from time to time, without notice to any Guarantor, the time for any performance of or compliance with any of the Obligations shall be extended, or such performance or compliance shall be waived;

(b)    any of the acts mentioned in any of the provisions of any of the Loan Documents or any other document relating to the Obligations shall be done or omitted;

(c)    the maturity of any of the Obligations shall be accelerated, or any of the Obligations shall be modified, supplemented and/or amended in any respect, or any right under any of the Loan Documents or any other document relating to the Obligations shall be waived or any other guarantee of any of the Obligations or any security therefor shall be released, impaired or exchanged in whole or in part or otherwise dealt with;

(d)    any Lien granted to, or in favor of, the Administrative Agent or any other holder of the Obligations as security for any of the Obligations shall fail to attach or be perfected; or

94

(e)      any of the Obligations shall be determined to be void or voidable (including for the benefit of any creditor of any Guarantor) or shall be subordinated to the claims of any Person (including any creditor of any Guarantor).

With respect to its obligations hereunder, each Guarantor hereby expressly waives diligence, presentment, demand of payment, protest and all notices whatsoever and any requirement that the Administrative Agent or any other holder of the Obligations exhaust any right, power or remedy or proceed against any Person under any of the Loan Documents or any other document relating to the Obligations or against any other Person under any other guarantee of, or security for, any of the Obligations.

Section 10.3      Reinstatement. The obligations of each Guarantor under this Article X shall be automatically reinstated if, and to the extent that, for any reason, any payment by, or on behalf of, any Person in respect of the Obligations is rescinded or must be otherwise restored by any holder of any of the Obligations, whether as a result of any Debtor Relief Law or otherwise, and each Guarantor agrees that it will indemnify the Administrative Agent and each other holder of the Obligations on demand for all reasonable costs and expenses (including, without limitation, the fees, charges and disbursements of counsel) incurred by the Administrative Agent or such holder of the Obligations in connection with such rescission or restoration, including, without limitation, any such costs and expenses incurred in defending against any claim alleging that such payment constituted a preference, fraudulent transfer or similar payment under any Debtor Relief Law.

Section 10.4      Certain Additional Waivers. Each Guarantor agrees that such Guarantor shall have no right of recourse to security for the Obligations, except through the exercise of rights of subrogation pursuant to Section 10.2 and through the exercise of rights of contribution pursuant to Section 10.6.

Section 10.5      Remedies. The Guarantors agree that, to the fullest extent permitted by Law, as between the Guarantors, on the one hand, and the Administrative Agent and the other holders of the Obligations, on the other hand, the Obligations may be declared to be forthwith due and payable as specified in Section 8.1 (and shall be deemed to have become automatically due and payable in the circumstances specified in Section 8.1) for purposes of Section 10.1 notwithstanding any stay, injunction or other prohibition preventing such declaration (or preventing the Obligations from becoming automatically due and payable) as against any other Person, and that, in the event of such declaration (or the Obligations being deemed to have become automatically due and payable), the Obligations (whether or not due and payable by any other Person) shall forthwith become due and payable by the Guarantors for purposes of Section 10.1. The Guarantors acknowledge and agree that their obligations hereunder are secured in accordance with the terms of the Collateral Documents and that the holders of the Obligations may exercise their remedies thereunder in accordance with the terms thereof.

Section 10.6      Rights of Contribution. The Guarantors agree among themselves that, in connection with payments made hereunder, each Guarantor shall have contribution rights against the other Guarantors as permitted under applicable Law. Such contribution rights shall be subordinate and subject in right of payment to the obligations of such Guarantors under the Loan Documents and no Guarantor shall exercise such rights of contribution until the occurrence of the Facility Termination Date.

Section 10.7      Guarantee of Payment; Continuing Guarantee. The guarantee in this Article X is a guaranty of payment and not of collection, is a continuing guarantee, and shall apply to the Obligations whenever arising.

ARTICLE XI

<u>MISCELLANEOUS</u>

Section 11.1    <u>Notices</u>.

(a)    <u>Written Notices</u>.

(i)    Except in the case of notices and other communications expressly permitted to be given by telephone, all notices and other communications to any party herein to be effective shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by telecopy, as follows:

|  |  |
|---|---|
| <u>To any Loan Party</u>: | 1600 N. Park Dr.<br>Weston, FL 33326<br>*Attn*:    Office of General Counsel |
| *With a copy (for Information purposes only) to*: | Latham & Watkins LLP<br>555 Eleventh St., NW<br>Washington D.C. 20004<br>*Attn*:    Andrew D. Sorkin<br>Phone:  202-637-3302 |
| <u>To the Administrative Agent</u>: | Truist Bank<br>Agency Services<br>303 Peachtree St., N.E. / 25th Floor<br>Atlanta, Georgia 30308<br>*Attn*:    Agency Services Manager<br>Phone:  (404) 221–2001 |
| *With a copy (for Information purposes only) to*: | Truist Bank<br>10500 Little Patuxent Parkway Ste 450,<br>Columbia, MD 21046<br>Mail Code:  420-80-01-00<br>*Attn*:    Jade Silver<br>Phone:  443-367-3535 |
|  | Moore & Van Allen PLLC<br>100 North Tryon Street, Suite 4700<br>Charlotte, NC  28202<br>*Attn*:    Steve Gruendel<br>Phone:  (704) 331–3533 |
|  | Moore & Van Allen PLLC<br>100 North Tryon Street, Suite 4700<br>Charlotte, NC  28202<br>*Attn*:    Luis Lluberas<br>Phone:  (704) 331–3548 |
| <u>To any other Lender</u>: | To the address or facsimile number, set forth in the Administrative Questionnaire or the Assignment and Assumption executed by such Lender. |

96

Any party hereto may change its address or telecopy number for notices and other communications hereunder by notice to the other parties hereto. All such notices and other communications sent to any party hereto in accordance with the provisions of this Agreement or made upon the earlier to occur of (A) actual receipt by the relevant party hereto, and (B) (I) if delivered by hand or by courier, when signed for by, or on behalf of, the relevant party hereto, (II) if delivered by mail, four (4) Business Days after deposit in the mails, postage prepaid, (III) if delivered by facsimile, when sent and receipt has been confirmed by telephone, and (IV) if delivered by electronic mail, to the extent provided in clause (b) below and effective as provided in such clause; provided, that, notices and other communications to the Administrative Agent pursuant to Article II shall not be effective until actually received by such Person. In no event shall a voice mail message be effective as a notice, communication or confirmation hereunder.

(ii)        Any agreement of the Administrative Agent or any Lender herein to receive certain notices by telephone or facsimile is solely for the convenience, and at the request, of the Borrower. The Administrative Agent and the Lenders shall be entitled to rely on the authority of any Person purporting to be a Person authorized by the Borrower to give such notice, and the Administrative Agent and the Lenders shall not have any liability to the Borrower or other Person on account of any action taken, or not taken, by the Administrative Agent and the Lenders in reliance upon such telephonic or facsimile notice. The obligation of the Borrower to repay the Loans and all other Obligations hereunder shall not be affected in any way, or to any extent, by any failure of the Administrative Agent and the Lenders to receive written confirmation of any telephonic or facsimile notice, or the receipt by the Administrative Agent and the Lenders of a confirmation which is at variance with the terms understood by the Administrative Agent and the Lenders to be contained in any such telephonic or facsimile notice.

(b)        Electronic Communications.

(i)        Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communication (including e-mail and Internet or intranet websites) pursuant to procedures approved by the Administrative Agent, provided, that, the foregoing shall not apply to notices to any Lender if such Lender and the Administrative Agent have agreed to receive notices by electronic communication and have agreed to the procedures governing such communications. The Administrative Agent or the Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it; provided, that, approval of such procedures may be limited to particular notices or communications.

(ii)        Unless the Administrative Agent otherwise prescribes: (A) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement), provided, that, if such notice or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next Business Day for the recipient; and (B) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (ii)(A) of notification that such notice or communication is available and identifying the website address therefor.

(iii)        The Borrower agrees that the Administrative Agent may, but shall not be obligated to, make Communications (as defined below) available to the Lenders by posting the Communications on a Platform.

(iv)        THE PLATFORMS USED BY THE ADMINISTRATIVE AGENT ARE PROVIDED "AS IS" AND "AS AVAILABLE". THE AGENT PARTIES (AS DEFINED BELOW) DO *NOT* WARRANT THE ADEQUACY OF ANY PLATFORM, AND EXPRESSLY DISCLAIM LIABILITY

97

FOR ERRORS AND/OR OMISSIONS IN THE COMMUNICATIONS. NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING, WITHOUT LIMITATION, ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD-PARTY RIGHTS, OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS, IS MADE BY ANY AGENT PARTY IN CONNECTION WITH THE COMMUNICATIONS OR ANY PLATFORM. In no event shall the Administrative Agent or any of its Related Parties (collectively, the "*Agent Parties*") have any liability to any Loan Party, any Lender or any other Person or entity for damages of any kind, including, without limitation, direct or indirect, special, incidental or consequential damages, losses or expenses (whether in tort, contract or otherwise) arising out of any Loan Party's or the Administrative Agent's transmission of Communications through the Platform. "*Communications*" means, collectively, any notice, demand, communication, information, document or other material provided by, or on behalf of, any Loan Party pursuant to any Loan Document or the transactions contemplated therein which is distributed by the Administrative Agent, any Lender by means of electronic communications pursuant to this Section 11.1, including through the Platform.

(c)     Telephonic Notices. Unless otherwise expressly provided herein, all notices and/or other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail, or sent by telecopier or electronic mail, as follows, and all notices and/or other communications expressly permitted hereunder to be given by telephone shall be made to the applicable telephone number, as follows:

(i)     if to any Loan Party, the Administrative Agent, or, to the address, telecopier number, electronic mail address, or telephone number specified for such Person on Schedule 11.2, or to such other address, telecopier number, electronic mail address, or telephone number as shall be designated by such party in a notice to the other parties hereto, as provided in Section 11.2(d); and

(ii)     if to any other Lender, to the address, telecopier number, electronic mail address, or telephone number specified in its Administrative Questionnaire.

(d)     All such notices and other communications sent to any party hereto in accordance with the provisions of this Agreement or made upon the *earlier* to occur of (i) actual receipt by the relevant party hereto, and (ii) (A) if delivered by hand or by courier, when signed for by, or on behalf of, the relevant party hereto, (B) if delivered by mail, four (4) Business Days after deposit in the mails, postage prepaid, (C) if delivered by facsimile, when sent and receipt has been confirmed by telephone, and (D) if delivered by electronic mail, to the extent provided in clause (b) above and effective as provided in such clause (b); provided, that, notices and other communications to the Administrative Agent pursuant to Article II shall not be effective until actually received by such Person. In no event shall a voice mail message be effective as a notice, communication, or confirmation hereunder.

(e)     Loan Documents may be transmitted and/or signed by facsimile or other electronic communication. The effectiveness of any such documents and signature shall, subject to applicable Law, have the same force and effect as manually signed originals, and shall be binding on all Loan Parties, the Administrative Agent, and the Lenders.

Section 11.2     Waiver; Amendments.

(a)     No failure or delay by the Administrative Agent or any Lender in exercising any right or power hereunder or under any other Loan Document, and no course of dealing between any Loan Party and the Administrative Agent or any Lender, shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power or any abandonment or discontinuance of steps to enforce such right or power, preclude any other or further exercise thereof or the exercise of any other right or power hereunder or thereunder. The rights and remedies of the Administrative Agent and the Lenders hereunder and under the other Loan Documents are cumulative and are *not* exclusive of any rights or remedies provided by Law. No waiver of any provision of this

Agreement or any other Loan Document, or consent to any departure by any Loan Party therefrom, shall in any event be effective, unless the same shall be permitted by this clause (b) below, and then, such waiver or consent shall be effective only in the specific instance and for the purpose for which given. Without limiting the generality of the foregoing, the making of a Loan shall not be construed as a waiver of any Default or Event of Default, regardless of whether the Administrative Agent or any Lender may have had notice or knowledge of such Default or Event of Default at the time.

(b)    No amendment or waiver of any provision of this Agreement or the other Loan Documents (other than the Fee Letter), nor consent to any departure by any Loan Party therefrom, shall in any event be effective, unless the same shall be in writing and signed by each Loan Party and the Required Lenders, or the Borrower and the Administrative Agent with the consent of the Required Lenders, and then, such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given; provided, that, subject to Section 2.16(b):

(i)    no amendment or waiver shall:

(A)    extend or increase the Commitment of any Lender or change Section 2.8(c), without the written consent of such Lender;

(B)    reduce the principal amount of any Loan or reduce the rate of interest thereon, or reduce any fees payable hereunder, without the written consent of each Lender affected thereby; provided, that, the waiver of (or amendment to the terms of) any (I) mandatory prepayment of the Loans (but, for purposes of clarity, *not* the manner of application of any mandatory prepayment), (II) Default or Event of Default, or (III) payment of Default Interest shall *not* constitute a reduction of the payment of principal or interest;

(C)    postpone the date fixed for any payment of any principal (excluding any mandatory prepayment) of, or interest on, any Loan or interest thereon or any fees hereunder or reduce the amount of, waive or excuse any such payment, or postpone the scheduled date for the termination or reduction of any Commitment, without the written consent of each Lender affected thereby; provided, that, no amendment, modification or waiver of, or consent to departure from, any condition precedent contained in Article III, any Default or Event of Default, any waiver of the obligation to pay Default Interest, or any mandatory prepayment or mandatory reduction of the Commitments shall constitute a postponement of any date scheduled for the payment of principal or interest, or an extension of the final maturity of any Loan or the scheduled termination date of any Commitment;

(D)    change Section 2.21(b) or Section 2.21(c) in a manner that would alter the pro rata sharing of payments required thereby or change the provisions of Section 8.2, without the written consent of each Lender;

(E)    change any of the provisions of this Section 11.2 or the definition of "*Required Lenders*" or any other provision hereof specifying the number or percentage of Lenders which are required to waive, amend or modify any rights hereunder or make any determination or grant any consent hereunder, without the consent of each Lender;

(F)    release the Borrower without the consent of each Lender, or release all, or substantially all, of the Guarantors, or limit the liability of all, or substantially all, of the Guarantors under any Guaranty, in each case, without the written consent of each Lender; or

(G)    release all, or substantially all, of the Collateral (if any) securing any of the Obligations, without the written consent of each Lender; or

(ii)          [reserved]; or

*provided, further, that*, no such agreement shall amend, modify or otherwise affect the rights, duties or obligations of the Administrative Agent without the prior written consent of such Person. Notwithstanding anything to the contrary herein: (i) no Defaulting Lender shall have any right to approve or disapprove any amendment, waiver or consent hereunder, except that (A) the Commitment of such Lender may *not* be increased or extended, and amounts payable to such Lender hereunder may *not* be permanently reduced, in each case of the foregoing, without the consent of such Lender (other than reductions in fees and interest in which such reduction does *not* disproportionately affect such Lender), and (B) any amendment, waiver or consent requiring the consent of all Lenders or each affected Lenders that, by its terms, affects any Defaulting Lender disproportionately and adversely relative to the other affected Lenders shall require the consent of such Defaulting Lender; (ii) this Agreement may be amended (A) to effect Conforming Changes in accordance with Section 2.13(e), and (B) in connection with the implementation of a Benchmark Replacement and/or any related Conforming Changes, all as provided in Section 2.16; (iii) this Agreement may be amended to extend the DIP Facility Maturity Date as provided in the definition of such term; (iv) this Agreement may be amended and restated without the consent of any Lender (but with the consent of the Borrower and the Administrative Agent) if, upon giving effect to such amendment and restatement, such Lender shall no longer be a party to this Agreement (as so amended and restated), the Commitments of such Lender shall have terminated (but such Lender shall continue to be entitled to the benefits of Section 2.18, Section 2.19, Section 2.20 and Section 11.3), such Lender shall have no other commitment or other obligation hereunder and shall have been paid in full all principal, interest and other amounts owing to it or accrued for its account under this Agreement; (v) each Lender is entitled to vote as such Lender sees fit on any bankruptcy reorganization plan that affects the Loans, and each Lender acknowledges that the provisions of Section 1126(c) of the Bankruptcy Code of the United States supersedes the unanimous consent provisions set forth herein; (vi) the Required Lenders shall determine whether or not to allow a Loan Party to use cash collateral in the context of a bankruptcy or insolvency proceeding and such determination shall be binding on all of the Lenders; and (vii) if, following the Effective Date, the Administrative Agent and the Borrower shall have jointly identified an inconsistency, obvious error or omission of a technical or immaterial nature, in each case, in any provision of the Loan Documents, then the Administrative Agent and the Loan Parties shall be permitted to amend such provision and such amendment shall become effective without any further action or consent of any other party to any Loan Documents if the same is not objected to in writing by the Required Lenders within five (5) Business Days following receipt of notice thereof.

Section 11.3        Expenses; Indemnification.

(a)        The Loan Parties, on a joint and several basis, shall pay (i) all reasonable out-of-pocket costs and expenses of the Administrative Agent, the Prepetition Agent and their Affiliates in connection with the preparation, negotiation, execution, delivery and administration of this Agreement and the other Loan Documents, the Interim DIP Order, the Final DIP Order, any Plan of Reorganization, any amendments, modifications or waivers of the provisions hereof or thereof (whether or not the transactions contemplated hereby or thereby shall be consummated) or such other orders of the Bankruptcy Court for which the Administrative Agent or any Lender consent or approval is required under the terms of this Agreement or the Orders and (ii) all reasonable out-of-pocket costs and expenses of the Administrative Agent in connection with the enforcement or protection of its rights (A) in connection with this Agreement or the other Loan Documents, including its rights under this Section, and (B) in connection with Loans made hereunder, including all such documented expenses incurred during any workout, restructuring or negotiations in respect of such Loans; *provided, that*, such costs and expenses shall be limited (x) in the case of legal costs and expenses to the reasonable fees, charges and disbursements of one (1) primary counsel for the Administrative Agent, the Prepetition Agent and their Affiliates and of one (1) additional special and/or local counsel in each applicable specialty and/or jurisdiction, as applicable, for the Administrative Agent, the Prepetition Agent and their Affiliates, taken as a whole (and, in the event of any actual or potential conflict of interest, of one (1) additional special and/or local counsel for each party subject to such conflict) and (y) in the case of costs and expenses incurred in connection with the retention of a financial advisor, to one (1) financial advisor for both the Administrative Agent and the Prepetition Agent. For the avoidance of doubt, and notwithstanding anything to the contrary set forth in this Agreement, (i) the fees and expenses contemplated by

100

this <u>Section 11.3(a)</u> shall not be subject to the limitations set forth in the Budget and (ii) the Loan Parties' obligations to pay the fees and expenses contemplated by this <u>Section 11.3(a)</u> shall be subject to paragraph 31 of the Interim DIP Order (and such similar provision(s) of the Final DIP Order, when entered by the Bankruptcy Court).

(b)        The Loan Parties, on a joint and several basis, shall indemnify the Administrative Agent (and any sub-agent thereof), each Lender, and each Related Party of any of the foregoing Persons (each such Person, an "<u>*Indemnitee*</u>") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities, penalties and related expenses (including, without limitation, the fees, charges and disbursements of counsel for any Indemnitee), incurred by any Indemnitee or asserted against any Indemnitee by any third party, or by the Borrower or any other Loan Party, arising out of, in connection with, or as a result of (i) the execution or delivery of this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, the performance by the parties hereto of their respective obligations hereunder or thereunder or the consummation of the transactions contemplated hereby or thereby (including, without limitation, the payment of any documentary and/or stamp taxes owing in connection with any Mortgaged Properties, including as a result of the foreclosure of any Mortgaged Property), (ii) any Loan or the use or proposed use of the proceeds therefrom, (iii) any actual or alleged presence or Release of Hazardous Materials on or from any property owned or operated by any Loan Party or Subsidiary, or any actual or alleged Environmental Liability related in any way to any Loan Party or Subsidiary, or (iv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by a third party or by any Loan Party, and regardless of whether any Indemnitee is a party thereto, <u>provided</u>, <u>that</u>, such indemnity shall *not*, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities, penalties or related expenses are determined by a court of competent jurisdiction by final, non-appealable judgment to have resulted: (A) from the gross negligence or willful misconduct of such Indemnitee (including any Related Party of such Indemnitee); or (B) *solely* from a claim brought by a Loan Party against an Indemnitee for breach in bad faith of such Indemnitee's obligations hereunder or under any other Loan Document. This <u>clause (b)</u> shall not apply with respect to Taxes other than any Taxes that represent losses, claims, damages, etc. arising from any non-Tax claim.

(c)        The Loan Parties shall pay, and hold the Administrative Agent and each of the Lenders harmless from and against, any and all present and future stamp, documentary, and other similar taxes with respect to this Agreement and the other Loan Documents, any Collateral described therein, or any payments due thereunder, and save the Administrative Agent and each Lender harmless from and against any and all liabilities with respect to, or resulting from, any delay or omission to pay such taxes.

(d)        To the extent that the Loan Parties fail to pay any amount required to be paid to the Administrative Agent under <u>clauses (a)</u> or <u>(b)</u> above, each Lender severally agrees to pay to the Administrative Agent such Lender's Pro Rata Share (determined as of the time that the unreimbursed expense or indemnity payment is sought) of such unpaid amount; <u>provided</u>, <u>that</u>, the unreimbursed expense or indemnified payment, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against the Administrative Agent in its capacity as such.

(e)        To the extent permitted by applicable Law, no Loan Party or Subsidiary shall assert, and hereby waives, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to actual or direct damages) arising out of, in connection with or as a result of, this Agreement or any agreement or instrument contemplated hereby, the transactions contemplated therein, any Loan or the use of proceeds thereof.

(f)        All amounts due under this <u>Section 11.3</u> shall, except as otherwise provided in this Section, be payable within ten (10) calendar days of receipt of written demand therefor.

Section 11.4     Successors and Assigns.

(a)     The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that the Borrower may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of the Administrative Agent and each Lender, and no Lender may assign or otherwise transfer any of its rights or obligations hereunder, except: (i) to an assignee in accordance with the provisions of clause (b) below; (ii) by way of participation in accordance with the provisions of clause (d) below; or (iii) by way of pledge or assignment of a security interest subject to the restrictions of clause (f) below (and any other attempted assignment or transfer by any party hereto shall be null and void). Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided in clause (d) below, and, to the extent expressly contemplated hereby, the Related Parties of each of the Administrative Agent and the Lenders) any legal or equitable right, remedy or claim under, or by reason of, this Agreement.

(b)     Any Lender may at any time assign to one (1) or more assignees all, or a portion, of its rights and obligations under this Agreement (including all, or a portion, of its Commitments, Loans, and other Revolving Credit Exposure at the time owing to it); provided, that, any such assignment shall be subject to the following conditions:

(i)     Minimum Amounts.

(A)     in the case of an assignment of the entire remaining amount of the assigning Lender's Commitments, Loans and other Revolving Credit Exposure at the time owing to it or in the case of an assignment to a Lender (including, in any event on the Effective Date, Federal Agricultural Mortgage Corporation), an Affiliate of a Lender (including, in any event on the Effective Date, Federal Agricultural Mortgage Corporation) or an Approved Fund, no minimum amount need be assigned; and

(B)     in any case not described in clause (b)(i)(A) above, the aggregate amount of the Commitment (which for this purpose includes Loans and Revolving Credit Exposure outstanding thereunder) or, if the applicable Commitment is not then in effect, the principal outstanding balance of the Loans and Revolving Credit Exposure of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent, or, if "Trade Date" is specified in the Assignment and Assumption, as of the Trade Date) shall *not* be *less than* $2,000,000 with respect to the Loans and in minimum increments of $500,000, unless the Administrative Agent otherwise consents (such consent not to be unreasonably withheld, conditioned or delayed).

(ii)     Proportionate Amounts. Each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement with respect to the Loans, other Revolving Credit Exposure or the Commitments assigned.

(iii)     Required Consents. No consent shall be required for any assignment except to the extent required by clause (b)(i)(B) above and, in addition:

(A)     [reserved];

(B)     the consent of the Administrative Agent (such consent *not* to be unreasonably withheld, conditioned or delayed) shall be required for: (I) assignments to a Person that is *not* a Lender (including, in any event on the Effective Date, Federal Agricultural Mortgage Corporation) with a Commitment, an Affiliate of such a Lender (including, in any event on the

CHAR1\1930324v9

Effective Date, Federal Agricultural Mortgage Corporation) or an Approved Fund; and (II) assignments by Defaulting Lenders; and

(C)    [reserved].

(iv)    <u>Assignment and Assumption</u>. The parties to each assignment shall deliver to the Administrative Agent: (A) a duly executed Assignment and Assumption; (B) a processing and recordation fee of Three Thousand Five Hundred Dollars ($3,500); (C) an Administrative Questionnaire unless the assignee is already a Lender; and (D) the documents required under <u>Section 2.20</u> if such assignee is a Foreign Lender.

(v)    <u>No Assignment to Certain Persons</u>. No such assignment shall be made to: (A) the Borrower or any of the Borrower's Affiliates or Subsidiaries; or (B) to any Defaulting Lender or any of its Subsidiaries, or any Person who, upon becoming a Lender hereunder, would constitute any of the foregoing Persons described in this <u>clause (b)(v)(B)</u>. For the avoidance of doubt, any Disqualified Institution is subject to <u>clause (h)</u> below.

(vi)    <u>No Assignment to Natural Persons</u>. No such assignment shall be made to a natural person.

(vii)    <u>Certain Additional Payments</u>. In connection with any assignment of rights and obligations of any Defaulting Lender hereunder, no such assignment shall be effective unless and until, in addition to the other conditions thereto set forth herein, the parties to such assignment shall make such additional payments to the Administrative Agent in an aggregate amount sufficient, upon distribution thereof as appropriate (which may be outright payment, purchases by the assignee of participations or sub-participations, or other compensating actions, including, without limitation, funding, with the consent of the Loan Parties and the Administrative Agent, the applicable pro rata share of Loans previously requested but not funded by the Defaulting Lender, to each of which the applicable assignee and assignor hereby irrevocably consent), to: (A) pay and satisfy in full all payment liabilities then owed by such Defaulting Lender to the Administrative Agent and each other Lender hereunder (and interest accrued thereon); and (B) acquire (and fund as appropriate) its full *pro rata* share of all Loans. Notwithstanding anything to the contrary in the foregoing, in the event that any assignment of rights and obligations of any Defaulting Lender hereunder shall become effective under applicable Law without compliance with the provisions of this <u>clause (b)(viii)</u>, then the assignee of such interest shall be deemed to be a Defaulting Lender for all purposes of this Agreement until such compliance occurs.

Subject to acceptance and recording thereof by the Administrative Agent pursuant to <u>clause (c)</u> below, from and after the effective date specified in each Assignment and Assumption, the assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto) but shall continue to be entitled to the benefits of <u>Section 2.18</u>, <u>Section 2.19</u>, <u>Section 2.20</u> and <u>Section 11.3</u> with respect to facts and circumstances occurring prior to the effective date of such assignment. Any assignment or transfer by a Lender of rights or obligations under this Agreement that does *not* comply with this paragraph shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with <u>clause (d)</u> below. If the consent of the Borrower to an assignment is required hereunder (including, without limitation, a consent to an assignment which does not meet the minimum assignment thresholds specified above), the Borrower shall be deemed to have given its consent five (5) Business Days after the date notice thereof has actually been delivered by the assigning Lender (through the Administrative Agent) to the Borrower, unless such consent is expressly refused by the Borrower prior to such fifth (5th) Business Day.

(c)      The Administrative Agent, acting *solely* for this purpose as an agent of the Borrower, shall maintain at one of its offices in Charlotte, North Carolina or Atlanta, Georgia a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitments of, and principal amounts (and stated interest) of the Loans and Revolving Credit Exposure owing to, each Lender pursuant to the terms hereof from time to time (the "*Register*"). The entries in the Register shall be conclusive and binding absent manifest error, and the Borrower, the Administrative Agent and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement. The Register shall be available for inspection by the Borrower and any Lender at any reasonable time and from time to time upon reasonable prior notice; information contained in the Register shall also be available for inspection by the Borrower at any reasonable time, and from time to time upon reasonable prior notice. In establishing and maintaining the Register, the Administrative Agent shall serve as the agent of the Loan Parties *solely* for tax purposes and *solely* with respect to the actions described in this Section 11.4, and the Loan Parties hereby agree that, to the extent that Truist serves in such capacity, Truist and its officers, directors, employees, agents, sub-agents, and affiliates shall constitute "*Indemnitees*".

(d)      Any Lender may at any time, without the consent of, or notice to, the Borrower or the Administrative Agent sell participations to any Person (other than a natural person, the Borrower or any of the Borrower's Affiliates or Subsidiaries, a Disqualified Institution or a Defaulting Lender) (each, a "*Participant*") in all, or a portion, of such Lender's rights and/or obligations under this Agreement (including all, or a portion, of its Commitment and/or the Loans owing to it), provided, that, (i) such Lender's obligations under this Agreement shall remain unchanged; (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations; and (iii) the Borrower, the Administrative Agent and the Lenders shall continue to deal *solely* and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.

(e)      Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement, provided, that, such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver with respect to the following to the extent affecting such Participant: (i) increase the Commitment of any Lender without the written consent of such Lender; (ii) reduce the principal amount of any Loan or reduce the rate of interest thereon, or reduce any fees payable hereunder, without the written consent of each Lender affected thereby; (iii) postpone the date fixed for any payment of any principal of, or interest on, any Loan or interest thereon or any fees hereunder or reduce the amount of, waive or excuse any such payment, or postpone the scheduled date for the termination or reduction of any Commitment, without the written consent of each Lender affected thereby; (iv) change Section 2.21(b) or Section 2.21(c) in a manner that would alter the pro rata sharing of payments required thereby, without the written consent of each Lender; (v) change any of the provisions of this Section 11.4 or the definition of "*Required Lenders*" or any other provision hereof specifying the number or percentage of Lenders which are required to waive, amend or modify any rights hereunder or make any determination or grant any consent hereunder, without the consent of each Lender; (vi) release any Guarantor, or limit the liability of any such Guarantor under any Guaranty, in each case, without the written consent of each Lender, except to the extent such release is expressly provided under the terms of this Agreement; or (vii) release all, or substantially all, Collateral (if any) securing any of the Obligations. The Borrower agrees that each Participant shall be entitled to the benefits of Section 2.18, Section 2.19, and Section 2.20 (subject to the requirements and limitations therein, including the requirements under Section 2.20(g) (it being understood that the documentation required under Section 2.20(g) shall be delivered to the participating Lender)) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to clause (b) above; provided, that, such Participant (A) agrees to be subject to the provisions of Section 2.24 and Section 2.25 as if it were an assignee under clause (b) above, and (B) shall not be entitled to receive any greater payment under Section 2.18 or Section 2.20, with respect to any participation, than its participating Lender would have been entitled to receive, except to the extent such entitlement to receive a greater payment results from a Change in Law that occurs after the Participant acquired the applicable participation. Each Lender that sells a participation agrees, at the Borrower's request and expense, to use reasonable efforts to cooperate with Borrower to effectuate the provision

104

of Section 2.25 with respect to any Participant. To the extent permitted by Law, each Participant also shall be entitled to the benefits of Section 11.7 as though it were a "Lender", provided, that, such Participant agrees to be subject to Section 2.21 as though it were a "Lender". Each Lender that sells a participation shall, acting solely for this purpose as an agent of the Borrower, maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under the Loan Documents (the "*Participant Register*"); provided, that, no Lender shall have any obligation to disclose all, or any portion, of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any commitments, loans, letters of credit or its other obligations under any Loan Document) to any Person, except to the extent that such disclosure is necessary to establish that such commitment, loan, letter of credit or other obligation is in registered form under Section 5f.103–1(c) of the United States Treasury Regulations. The entries in the Participant Register shall be conclusive and binding absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary. For the avoidance of doubt, the Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.

(f)    A Participant shall *not* be entitled to receive any greater payment under Section 2.18 or Section 2.20 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the prior written consent of the Loan Parties. A Participant shall *not* be entitled to the benefits of Section 2.20 unless the Borrower is notified of the participation sold to such Participant and such Participant agrees, for the benefit of the Loan Parties, to comply with Section 2.20(c) and Section 2.20(f) as though it were a Lender.

(g)    Any Lender may at any time pledge or assign a security interest in all, or any portion, of its rights under this Agreement to secure obligations of such Lender, including, without limitation, any pledge or assignment to secure obligations to a Federal Reserve Bank; provided, that, no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(h)    The following provisions shall apply only to the extent that no Event of Default shall have occurred and be continuing:

        i.    No assignment shall be made to any Person that was a Disqualified Institution as of the date (the "*Trade Date*") on which the applicable Lender entered into a binding agreement to sell and assign all, or a portion, of its rights and obligations under this Agreement to such Person (unless the Borrower has consented to such assignment as otherwise contemplated by this Section 11.4, in which case, such Person will not be considered a Disqualified Institution for the purpose of such assignment). For the avoidance of doubt, with respect to any assignee that becomes a Disqualified Institution after the applicable Trade Date (including, without limitation, as a result of the delivery of a notice pursuant to, and/or the expiration of the notice period referred to in, the definition of "Disqualified Institution" in Section 1.1), such assignee shall not retroactively be considered a Disqualified Institution. Any assignment in violation of this clause (h)(i) shall not be void, but the other provisions of this clause (h) shall apply.

        ii.    If any assignment is made to any Disqualified Institution without the Borrower's prior consent in violation of the foregoing clause (h)(i), then the Borrower may, at its sole expense and effort, upon notice to the applicable Disqualified Institution and the Administrative Agent, (A) terminate any Revolving Commitment of such Disqualified Institution and repay all obligations of the Borrower owing to such Disqualified Institution in connection with such Revolving Commitment or (B) require such Disqualified Institution to assign and delegate, without recourse (in accordance with, and subject to the restrictions contained in, this Section 11.4), all of its interest, rights and obligations under this Agreement and related Loan Documents to an assignee that meets the requirements of the foregoing clause (b) that shall assume such obligations at the lesser of (I) the principal amount thereof, and (II) the amount that

105

such Disqualified Institution paid to acquire such interests, rights and obligations, in each case of the foregoing, plus accrued interest, accrued fees and all other amounts (other than principal amounts) payable to it hereunder and other the other Loan Documents; provided, that, (1) the Borrower shall have paid to the Administrative Agent the assignment fee (if any) specified in the foregoing clause (b) and (2) such assignment does not conflict with applicable Laws.

      iii.      Notwithstanding anything to the contrary contained in this Agreement, Disqualified Institutions (A) will *not* (I) have the right to receive information, reports or other materials provided to Lenders by the Borrower, the Administrative Agent or any other Lender, (II) attend or participate in meetings attended by the Lenders and the Administrative Agent, or (III) access any electronic site established for the Lenders or confidential communications from counsel to, or financial advisors of, the Administrative Agent or the Lenders and (B) (I) for purposes of any consent to any amendment, waiver or modification of, or any action under, and for the purpose of any direction to the Administrative Agent or any Lender to undertake any action (or refrain from taking any action) under this Agreement or any other Loan Document, each Disqualified Institution will be deemed to have consented, in the same proportion as the Lenders that are not Disqualified Institutions consented, to such matter, and (II) for purposes of voting on any Plan of Reorganization, each Disqualified Institution party hereto hereby agrees (1) not to vote on such Plan of Reorganization, (2) if such Disqualified Institution does vote on such Plan of Reorganization notwithstanding the restriction in the foregoing clause (h)(iii)(B)(II)(1), such vote will be deemed not to be in good faith and shall be "designated" pursuant to Section 1126(e) of the Bankruptcy Code (or any similar provision in any other Debtor Relief Laws), and such vote shall not be counted in determining whether the applicable class has accepted or rejected such Plan of Reorganization in accordance with Section 1126(c) of the Bankruptcy Code (or any similar provision in any other Debtor Relief Laws), and (3) not to contest any request by any party for a determination by any bankruptcy court (or other applicable court of competent jurisdiction) effectuating the foregoing clause (h)(iii)(B)(II)(2).

      iv.      The Administrative Agent shall have the right, and the Borrower hereby expressly authorizes the Administrative Agent, to: (A) post the list of Disqualified Institutions provided by the Borrower and any updates thereto from time to time (collectively, the "*DQ List*") on the Platform, including that portion of the Platform that is designated for "public side" Lenders; or (B) provide the DQ List to each Lender requesting the same.

Section 11.5      Governing Law; Jurisdiction; Consent to Service of Process.

      (a)      Subject to any applicable Debtor Relief Law, this Agreement and the other Loan Documents and any claims, controversy, dispute or cause of action (whether in contract or tort or otherwise) based upon, arising out of, or relating to, this Agreement or any other Loan Document (except, as to any other Loan Document, as expressly set forth therein), and the transactions contemplated hereby and thereby, shall be construed in accordance with, and be governed by, the Law (without giving effect to the conflict of law principles thereof) of the State of New York (and, to the extent applicable, the Bankruptcy Code).

      (b)      Each Loan Party hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of the Bankruptcy Court and, if the Bankruptcy Court does not have or abstains from exercising jurisdiction, the United States District Court of the Southern District of New York, and of Supreme Court of the State of New York sitting in New York county and any appellate court from any thereof, in any action or proceeding arising out of, or relating to, this Agreement or any other Loan Document or the transactions contemplated hereby or thereby, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such courts. Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law. Nothing in this Agreement or any other Loan Document shall affect any right that the Administrative Agent or any Lender may otherwise have to bring any action or proceeding relating to this

CHAR1\1930324v9

Agreement or any other Loan Document against any Loan Party or its property or assets in the courts of any jurisdiction.

(c)      Each Loan Party irrevocably and unconditionally waives any objection that it may now or hereafter have to the laying of venue of any such suit, action or proceeding described in clause (b) above, and brought in any court referred to, in clause (b) above. Each of the parties hereto irrevocably waives, to the fullest extent permitted by applicable Law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(d)      Each party to this Agreement irrevocably consents to the service of process in the manner provided for notices in Section 11.1. Nothing in this Agreement or in any other Loan Document will affect the right of any party hereto to serve process in any other manner permitted by Law.

Section 11.6      WAIVER OF JURY TRIAL. EACH PARTY HERETO IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO: (a) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER; AND (b) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 11.6.

Section 11.7      Right of Set-off. In addition to any rights now or hereafter granted under applicable Law, and not by way of limitation of any such rights, subject to the terms of the Orders, each Lender shall have the right, at any time or from time to time, upon the occurrence and during the continuance of an Event of Default, without prior notice to the Borrower, any such notice being expressly waived by the Borrower to the extent permitted by applicable Law, to set off and apply against all deposits (general or special, time or demand, provisional or final) of any Loan Party at any time held, or other obligations at any time owing by such Lender to, or for the credit or the account of, a Loan Party, against any and all Obligations held by such Lender, irrespective of whether such Lender shall have made demand hereunder and although such Obligations may be unmatured; provided, that, in the event that any Defaulting Lender shall exercise any such right of setoff, (i) all amounts so set-off shall be paid over immediately to the Administrative Agent for further application in accordance with the provisions of Section 2.26, and, pending such payment, shall be segregated by such Defaulting Lender from its other funds and deemed to be held in trust for the benefit of the Administrative Agent and the Lenders, and (ii) the Defaulting Lender shall provide promptly to the Administrative Agent a statement describing in reasonable detail the Obligations owing to such Defaulting Lender as to which it exercised such right of set-off. Each Lender agrees promptly to notify the Administrative Agent and the Borrower after any such set-off and any application made by such Lender; provided, that, the failure to give such notice shall not affect the validity of such set-off and application. Each Lender agrees to apply all amounts collected from any such set-off to the Obligations before applying such amounts to any other Indebtedness or other obligations owed by the Borrower and any of its Subsidiaries to such Lender.

Section 11.8      Counterparts; Integration. This Agreement may be executed by one (1) or more of the parties to this Agreement on any number of separate counterparts (including by telecopy), and all of said counterparts taken together shall be deemed to constitute one (1) and the same instrument. This Agreement, the Fee Letter, the other Loan Documents, any separate letter agreement(s) relating to any fees payable to the Administrative Agent and its Affiliates, the Interim DIP Order and, as applicable, the Final DIP Order, constitute the entire agreement among the parties hereto and thereto and their affiliates regarding the subject matters hereof and thereof, and supersede all prior agreements and understandings, oral or written, regarding such subject matters. Delivery of an executed counterpart of a signature page of this Agreement and any other Loan Document by

facsimile transmission or by any other electronic imaging means (including ".pdf"), shall be effective as delivery of a manually executed counterpart of this Agreement or such other Loan Document.

Section 11.9    Survival. All covenants, agreements, representations and warranties made by any Loan Party herein, in the Loan Documents and in the certificates or other instruments delivered in connection with, or pursuant to, this Agreement shall be considered to have been relied upon by the other parties hereto, and shall survive the execution and delivery of this Agreement and the making of any Loans, regardless of any investigation made by any such other party, or on its behalf, and notwithstanding that the Administrative Agent or any Lender may have had notice or knowledge of any Default or Event of Default or incorrect representation or warranty at the time any credit is extended hereunder, and shall continue in full force and effect as long as the principal of, or any accrued interest on, any Loan or any fee, or any other amount payable under this Agreement, is outstanding and unpaid, and so long as the Commitments have not expired or terminated. The provisions of <u>Section 2.18</u>, <u>Section 2.19</u>, <u>Section 2.20</u>, and <u>Section 11.3</u> and <u>Article IX</u> shall survive and remain in full force and effect regardless of the consummation of the transactions contemplated hereby, the repayment of the Loans, the expiration or termination of the Commitments, or the termination of this Agreement or any provision hereof. All representations and warranties made herein, in the Loan Documents, in the certificates, reports, notices, and other documents delivered pursuant to this Agreement shall survive the execution and delivery of this Agreement and the other Loan Documents and the making of the Loans.

Section 11.10    Severability. Any provision of this Agreement or any other Loan Document held to be illegal, invalid or unenforceable in any jurisdiction, shall, as to such jurisdiction, be ineffective to the extent of such illegality, invalidity or unenforceability without affecting the legality, validity or enforceability of the remaining provisions hereof or thereof; and the illegality, invalidity or unenforceability of a particular provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

Section 11.11    Confidentiality. Each of the Administrative Agent and the Lenders agrees to take normal and reasonable precautions to maintain the confidentiality of any information relating to the Loan Parties and/or their Subsidiaries, or any of their respective businesses, to the extent designated in writing as confidential and provided to it by any Loan Party or Subsidiary, other than any such information that is available to the Administrative Agent or any Lender on a non-confidential basis prior to disclosure by any Loan Party or Subsidiary, except that such information may be disclosed: (a) to any Related Party of the Administrative Agent or any such Lender, including, without limitation, accountants, legal counsel and other advisors; (b) to the extent required by applicable Laws or regulations or by any subpoena or similar legal process; (c) to the extent requested by any regulatory agency or authority purporting to have jurisdiction over it (including any self-regulatory authority such as the National Association of Insurance Commissioners); (d) to the extent that such information becomes publicly available other than as a result of a breach of this <u>Section 11.11</u>, or which becomes available to the Administrative Agent, any Lender or any Related Party of any of the foregoing on a non-confidential basis from a source other than the Loan Parties; (e) in connection with the exercise of any remedy hereunder or under any other Loan Documents or any suit, action or proceeding relating to this Agreement or any other Loan Documents, or the enforcement of rights hereunder or thereunder; (f) subject to an agreement containing provisions substantially the same as those of this <u>Section 11.11</u>, to (i) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Agreement, or (ii) any actual or prospective party (or its Related Parties) to any swap or derivative or similar transaction under which payments are to be made by reference to the Borrower and its obligations, this Agreement or payments hereunder; (g) any rating agency; (h) the CUSIP Service Bureau or any similar organization; or (i) with the consent of the Borrower. Any Person required to maintain the confidentiality of any information as provided for in this <u>Section 11.11</u> shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such information as such Person would accord its own confidential information. Notwithstanding anything to the contrary in the foregoing, the Loan Parties consent to the publication by the Administrative Agent and the Lenders of a tombstone or similar advertising material relating to the financing transactions contemplated by this Agreement, and the Administrative Agent and the Lenders reserve the right to provide to industry trade organizations information necessary and customary for inclusion in league table measurements; <u>provided</u>, <u>that</u>, to the extent that such marketing, press releases or other transactional

announcements include non-public information about the Loan Parties, their Subsidiaries and/or their businesses other than the names and logos of the Loan Parties and their Subsidiaries and the amount, type and effectiveness date of the Loans established hereby, each such Lender or Affiliate of a Lender shall obtain the prior written consent of the Borrower (which consent shall not be unreasonably withheld, conditioned or delayed). If any provision of any confidentiality agreement, non-disclosure agreement, or other similar agreement between any Loan Party and any Lender conflicts with, or contradicts, this Section 11.11 with respect to the treatment of confidential information, this Section 11.11 shall supersede all such prior or contemporaneous agreements and understandings between the parties.

Section 11.12   Interest Rate Limitation. Notwithstanding anything herein to the contrary, if, at any time, the interest rate applicable to any Loan, together with all fees, charges and other amounts which may be treated as interest on such Loan under applicable Law (collectively, the "Charges"), shall exceed the maximum lawful rate of interest (the "Maximum Rate") which may be contracted for, charged, taken, received or reserved by a Lender holding such Loan in accordance with applicable Law, the rate of interest payable in respect of such Loan hereunder, together with all Charges payable in respect thereof, shall be limited to the Maximum Rate and, to the extent lawful, the interest and Charges that would have been payable in respect of such Loan but were not payable as a result of the operation of this Section 11.12 shall be cumulated and the interest and Charges payable to such Lender in respect of other Loans or periods shall be increased (but not above the Maximum Rate therefor) until such cumulated amount, together with interest thereon at the Federal Funds Rate to the date of repayment (to the extent permitted by applicable Law), shall have been received by such Lender.

Section 11.13   Waiver of Effect of Corporate Seal. Each Loan Party represents and warrants to the Administrative Agent and the Lenders that neither it nor any other Loan Party is required to affix its corporate seal to this Agreement or any other Loan Document pursuant to any Law, agrees that this Agreement is delivered by the Loan Parties under seal, and waives any shortening of the statute of limitations that may result from not affixing the corporate seal to this Agreement or such other Loan Documents.

Section 11.14   Patriot Act. The Administrative Agent and each Lender subject to the Patriot Act hereby notifies the Loan Parties that: (a) pursuant to the requirements of the Patriot Act, it is required to obtain, verify and record information that identifies each Loan Party, which information includes the name and address of such Loan Party and other information that will allow such Lender or the Administrative Agent, as applicable, to identify such Loan Party in accordance with the Patriot Act; and (b) pursuant to the Beneficial Ownership Regulation, it is required to obtain a Beneficial Ownership Certification.

Section 11.15   No Advisory or Fiduciary Responsibility. In connection with all aspects of each transaction contemplated hereby (including in connection with any amendment, waiver or other modification hereof or of any other Loan Document), each Loan Party acknowledges and agrees, and acknowledges its Affiliates' understanding, that: (a) (i) the services regarding this Agreement provided by the Administrative Agent and/or the Lenders are arm's-length commercial transactions between the Borrower, each other Loan Party and their respective Affiliates, on the one hand, and the Administrative Agent and the Lenders, on the other hand, (ii) each of the Borrower and the other Loan Parties have consulted their own legal, accounting, regulatory and tax advisors to the extent they have deemed appropriate, and (iii) the Borrower and each other Loan Party are capable of evaluating and understanding, and understands and accepts, the terms, risks and conditions of the transactions contemplated hereby and by the other Loan Documents; (b) (i) each of the Administrative Agent and the Lenders is, and has been, acting *solely* as a principal, and, except as expressly agreed in writing by the relevant parties, has not been, is not, and will not be acting as an advisor, agent or fiduciary, for the Borrower, any other Loan Party, or any of their respective Affiliates, or any other Person, and (ii) none of the Administrative Agent and any Lender has any obligation to the Borrower, any other Loan Party or any of their Affiliates with respect to the transaction contemplated hereby, except those obligations expressly set forth herein and in the other Loan Documents; and (c) the Administrative Agent, the Lenders and their respective Affiliates may be engaged in a broad range of transactions that involve interests that differ from those of the Borrower, the other Loan Parties and their respective Affiliates, and each of the Administrative Agent and the Lenders has no obligation to disclose any of such interests to the Borrower, any other Loan Party of any of their respective Affiliates. To the fullest extent permitted by Law,

CHAR1\1930324v9

each of the Borrower and the other Loan Parties hereby waive and release, any claims that it may have against the Administrative Agent and each Lender with respect to any breach, or alleged breach, of agency or fiduciary duty in connection with any aspect of any transaction contemplated hereby.

Section 11.16    <u>Location of Closing</u>. Each Lender acknowledges and agrees that is has delivered, with the intent to be bound hereby, its executed counterparts of this Agreement to the Administrative Agent, c/o Moore & Van Allen PLLC, 100 N. Tryon St., Suite #4700, Charlotte, North Carolina 28202. Each Loan Party acknowledges and agrees that it has delivered, with the intent to be bound hereby, its executed counterparts of this Agreement and each other Loan Document, together with all other documents, instruments, opinions, certificates, and/or other items required pursuant to Section 3.1, to the Administrative Agent, c/o Moore & Van Allen PLLC, 100 N. Tryon St., Suite #4700, Charlotte, North Carolina 28202. All parties agree that the closing of this Agreement and the other Loan Documents, and the transactions contemplated hereby and thereby, have occurred in Mecklenburg County, North Carolina.

Section 11.17    <u>Acknowledgement and Consent to Bail-In of Affected Financial Institutions</u>. Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any Lender that is an Affected Financial Institution arising under any Loan Document, to the extent that such liability is unsecured, may be subject to the Write-Down and Conversion Powers of the applicable Resolution Authority, and each party hereto agrees and consents to, and acknowledges and agrees to be bound by: (a) the application of any Write-Down and Conversion Powers by the applicable Resolution Authority to any such liabilities arising hereunder that may be payable to it by any Lender that is an Affected Financial Institution; and (b) the effects of any Bail-In Action on any such liability, including, if applicable, (i) a reduction, in full or in part, or cancellation of any such liability, (ii) a conversion of all, or a portion, of such liability into shares or other instruments of ownership in such Affected Financial Institution, its parent undertaking, or a bridge institution that may be issued to, or otherwise conferred on, it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document, or (iii) the variation of the terms of such liability in connection with the exercise of the Write-Down and Conversion Powers of the applicable Resolution Authority.

Section 11.18    <u>Certain ERISA Matters</u>.

(a)    Each Lender (I) represents and warrants, as of the date on which such Person became a Lender party hereto, to, and (II) covenants, from the date on which such Person became a Lender party hereto to the date on which such Person ceases being a Lender party hereto, for the benefit of, the Administrative Agent and any of its Affiliates, and *not*, for the avoidance of doubt, to or for the benefit of any Loan Party or Subsidiary, that *at least* one (1) of the following is and will be true:

(i)    such Lender is *not* using "plan assets" (within the meaning of 29 CFR §–2510.3–101, as modified by Section 3(42) of ERISA or otherwise) of one (1) or more Benefit Plans with respect to such Lender's entrance into, participation in, administration of, and performance under, the Loans, the Commitments, and/or this Agreement;

(ii)    the transaction exemption set forth in one (1) or more PTEs, such as PTE 84–14 (a class exemption for certain transactions determined by independent qualified professional asset managers), PTE 95–60 (a class exemption for certain transactions involving insurance company general accounts), PTE 90–1 (a class exemption for certain transactions involving insurance company pooled separate accounts), PTE 91–38 (a class exemption for certain transactions involving bank collective investment funds) or PTE 96–23 (a class exemption for certain transactions determined by in-house asset managers), is applicable with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement;

(iii)        (A) such Lender is an investment fund managed by a "Qualified Professional Asset Manager" (within the meaning of Part VI of PTE 84–14); (B) such Qualified Professional Asset Manager made the investment decision on behalf of such Lender to enter into, participate in, administer and perform the Loans, the Commitments and this Agreement; (C) the entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement satisfies the requirements of sub-sections (b) through (g) of Part I of PTE 84–14; and (D) to the best knowledge of such Lender, the requirements of sub-section (a) of Part I of PTE 84–14 are satisfied with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement; or

(iv)        such other representation, warranty and covenant as may be agreed in writing between the Administrative Agent, in its sole discretion, and such Lender.

(b)        In addition, unless either <u>clause (a)(i)</u> above is true with respect to a Lender, or such Lender has provided another representation, warranty and covenant as provided in <u>clause (a)(iv)</u> above, such Lender further (I) represents and warrants, as of the date on which such Person became a Lender party hereto, and (II) covenants, from, and including, the date on which such Person became a Lender party hereto to, but excluding, the date on which such Person ceases being a Lender party hereto, in each case of the foregoing <u>clauses (b)(I)</u> and <u>(b)(II)</u>, for the benefit of the Administrative Agent and each of its Affiliates, and *not*, for the avoidance of doubt, to or for the benefit of any Loan Party, that, none of the Administrative Agent or any of its Affiliates, is a fiduciary with respect to the assets of such Lender involved in such Lender's entrance into, participation in, administration of, and/or performance under, the Loans, the Commitments, and/or this Agreement (including, without limitation, in connection with the reservation or exercise of any rights by the Administrative Agent or any of its Affiliates, under this Agreement, any Loan Document, or any other documents related hereto or thereto).

Section 11.19    <u>Acknowledgement Regarding any Supported QFCs</u>. To the extent that the Loan Documents provide support, through a guarantee or otherwise, for any Swap Obligation or any other agreement or instrument that is a QFC (such support, "<u>*QFC Credit Support*</u>"; and each such QFC, a "<u>*Supported QFC*</u>"), the parties acknowledge and agree as follows with respect to the resolution power of the Federal Deposit Insurance Corporation under the Federal Deposit Insurance Act and Title II of the Dodd-Frank Wall Street Reform and Consumer Protection Act (together with the regulations promulgated thereunder, the "<u>*U.S. Special Resolution Regimes*</u>") in respect of such Supported QFC and QFC Credit Support (with the provisions below applicable notwithstanding that the Loan Documents and any Supported QFC may in fact be stated to be governed by the laws of the State of New York and/or of the United States or any other state of the United States).

In the event that a Covered Entity that is a party to a Supported QFC (each, a "<u>*Covered Party*</u>") becomes subject to a proceeding under a U.S. Special Resolution Regime, the transfer of such Supported QFC and the benefit of such QFC Credit Support (and any interest and obligation in or under such Supported QFC and such QFC Credit Support, and any rights in property securing such Supported QFC or such QFC Credit Support) from such Covered Party will be effective to the same extent as the transfer would be effective under the U.S. Special Resolution Regime if the Supported QFC and such QFC Credit Support (and any such interest, obligation and rights in property) were governed by the laws of the United States or a state of the United States. In the event that a Covered Party, or a BHC Act Affiliate of a Covered Party, becomes subject to a proceeding under a U.S. Special Resolution Regime, Default Rights under the Loan Documents that might otherwise apply to such Supported QFC or any QFC Credit Support that may be exercised against such Covered Party are permitted to be exercised to no greater extent than such Default Rights could be exercised under the U.S. Special Resolution Regime if the Supported QFC and the Loan Documents were governed by the laws of the United States or a state of the United States. Without limitation of the foregoing, it is understood and agreed that rights and remedies of the parties with respect to a Defaulting Lender shall in no event affect the rights of any Covered Party with respect to a Supported QFC or any QFC Credit Support.

*[Remainder of Page Intentionally Left Blank; Signature Pages Follow]*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the date first above written.

BORROWER:               VITAL PHARMACEUTICALS, INC.,
a Florida corporation


By:_____
Name:
Title:


GUARANTORS:         BANG ENERGY CANADA, INC.,
a Florida corporation
JHO INTELLECTUAL PROPERTY HOLDINGS, LLC,
a Florida limited liability company
JHO REAL ESTATE INVESTMENT, LLC,
a Florida limited liability company
QUASH SELTZER, LLC,
a Florida limited liability company
VITAL PHARMACEUTICALS INTERNATIONAL SALES, INC.,
a Delaware corporation
RAINBOW UNICORN BEV, LLC,
a Florida limited liability company


By:_____
Name:
Title:

ADMINISTRATIVE AGENT:                   TRUIST BANK,
                                        as Administrative Agent


                                        By:_____
                                        Name:
                                        Title:

LENDERS:

TRUIST BANK,
as a Lender

By:_____
Name:
Title:

COBANK, ACB,
as a Lender

By:_____
Name:
Title:

AGCOUNTRY FARM CREDIT SERVICES, FLCA,
as a Lender

By:_____
Name:
Title:

FARM CREDIT BANK OF TEXAS,
as a Lender

By:_____
Name:
Title:

CITIZENS BANK, N.A.,
as a Lender

By:_____
Name:
Title:

COMPEER FINANCIAL, PCA,
as a Lender


By:_____
Name:
Title:




SYNOVUS BANK,
as a Lender


By:_____
Name:
Title:


FEDERAL AGRICULTURAL MORTGAGE
CORPORATION,
as a Lender


By:_____
Name:
Title:


THE HUNTINGTON NATIONAL BANK,
as a Lender


By:_____
Name:
Title:




GREENSTONE FARM CREDIT SERVICES, FLCA,
as a Lender


By:_____
Name:
Title:

COMERICA BANK,
as a Lender


By:_____
Name:
Title:


HSBC BANK USA, N.A.,
as a Lender


By:_____
Name:
Title:


UNITED COMMUNITY BANK d/b/a SEASIDE
BANK AND TRUST,
as a Lender


By:_____
Name:
Title: