UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION
www.flsb.uscourts.gov

| | |
|---|---|
| IN RE: | Chapter 11 |
| VITAL PHARMACEUTICALS, INC., *et al.*, | Case No. 22-27842 (PDR) |
| Debtors.[1] | (Jointly Administered) |

**PRELIMINARY OBJECTION OF MONSTER ENERGY COMPANY TO DEBTORS' EMERGENCY MOTION FOR INTERIM AND FINAL ORDERS (I) APPROVING POSTPETITION FINANCING, (II) AUTHORIZING USE OF CASH COLLATERAL, (III) GRANTING LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (IV) GRANTING ADEQUATE PROTECTION, (V) MODIFYING AUTOMATIC STAY, (VI) SCHEDULING A FINAL HEARING, AND (VII) GRANTING RELATED RELIEF**

Monster Energy Company ("Monster Energy"), by and through undersigned counsel, hereby files this preliminary objection (the "Preliminary Objection") to the *Debtors' Emergency Motion for Interim and Final Orders (I) Approving Postpetition Financing, (II) Authorizing Use of Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, (VI) Scheduling A Final Hearing, and (VII) Granting Related Relief* [Docket No. 24] (the "DIP Motion").[2]  In support of this Preliminary Objection, Monster Energy respectfully states as follows:

---

[1] The address of the Debtors is 1600 N. Park Drive, Weston, FL 33326. Tire last four digits of the Debtors' federal tax identification numbers are: (i) Vital Pharmaceuticals, Inc. (8430); (ii) Bang Energy Canada. Inc. (5454); (iii) JHO Intellectual Property Holdings, EEC (0010); (iv) JHO Real Estate Investment, EEC (9394); (v) Quash Seltzer, EEC (6501); (vi) Rainbow Unicom Bev EEC (2254); and (vii) Vital Pharmaceuticals International Sales, Inc. (8019).

[2] Capitalized terms not otherwise defined herein shall have their meaning as set forth in the DIP Motion.

**INTRODUCTION**

1. Through the DIP Motion, the Debtors have acceded to the overreaching demands of their Prepetition Lenders, giving up control of these nascent bankruptcy cases and depriving other parties (including the to-be-formed official creditors' committee) of any meaningful opportunity to actually protect the Debtors' estates.[3] Most notably, the Debtors seek authority to borrow up to $454,770,201.56, **_less than 22% of which is new money_** and of which over $350 million is a Roll Up of prepetition debt—"the ultimate priority jump" for an undersecured lender that also "eliminates potential challenges to the validity of that debt or its secured status"[4]—albeit subject to the Final Order.

2. More immediately, though, the Interim Order serves to firmly entrench the Prepetition Secured Parties at the helm of these bankruptcy cases, all while enriching potentially undersecured lenders to the detriment of unsecured creditors like Monster Energy and insulating the lenders' claims from meaningful challenge. First, under the Interim Order, the Debtors are making pages of stipulations related to the Prepetition Secured Parties, the Prepetition Obligations, the Prepetition Collateral, and the Prepetition Liens, while depriving a creditors' committee of any opportunity to bring a meaningful Challenge. Most shockingly, the Interim Order contemplates that the Creditors' Committee must not only seek standing to bring a Challenge within just sixty days of its formation, its standing motion must be **_granted_** by the Challenge Deadline (over near-

---

[3] *See generally* Kenneth Ayotte and David A. Skeel, Jr., "An Efficiency-Based Explanation for Current Corporate Reorganization Practice," 73 U. Chi. L. Rev. 425, 464 n. 95 (2006) ("the bankruptcy process often does not examine the old collateral's adequacy and the old loan's bona fides carefully").

[4] Frederick Tung, "Financing Failure: Bankruptcy Lending, Credit Market Conditions, and the Financial Crisis," 37 Yale J. on Reg. 651, 670 (Spring 2020)

certain opposition from the Debtors and Prepetition Secured Parties) effectively shortening the Challenge period to well less than sixty days. As a further complication, to the Creditors' Committee's ability to assert a Challenge is that certain Debtors are limited liability companies, calling into question the conduct of a debtor in possession waiving all defenses and claims against the Prepetition Secured Parties when arguably no other party in interest can obtain standing to assert the estate's claims.

        3.    It is also apparent from the DIP budget that over a third of the proposed interim borrowings of $34 million will be round-tripped back to the lenders in the form of upfront fees, commitment fees, adequate protection and interest payments, or escrowed to pay for the Debtors' professional fees. Very little benefit is actually coming to the bankruptcy estates in exchange for millions of dollars in fees and the granting of senior liens to the Prepetition Secured Parties. They should not be allowed to use their leverage to tilt the playing field acutely in their favor on the first day of the case.[5]

        4.    Further, there is no evidence that the lenders are entitled to a 506(c) surcharge waiver, and such a waiver should not be granted, if at all, unless the Debtors' budget can be adequately vetted to be sure that it provides for the payment of all their anticipated administrative expenses, not just bank fees and professional expenses. Further, this waiver should not be granted in an interim order, and yet there is opaque wording in the proposed Interim Order appearing to suggest that the surcharge waiver, as well as marshaling rights and equities of the

---

[5] *See, e.g., In re FCX, Inc.*, 54 B.R. 833, 838 (Bankr. E.D.N.C. 1985) ("[T]he court should not ignore the basic injustice of an agreement in which the debtor, acting out of desperation, has compromised the rights of unsecured creditors.); *General Elec. Cap. Corp. v. Hoerner* (*In re Grand Valley Sport & Marine*), 143 B.R. 840, 852 (Bankr. W.D. Mich. 1992) (stating that DIP financing should not be approved when "a creditor leverages a debtor in possession into making a concession unauthorized by, or in conflict with, the Bankruptcy Code as a condition for the requested credit").

case, are being waived immediately, subject to a condition subsequent, the entry of a Final Order. No surcharge or other waivers should be effective, if at all, before a Final Order is entered. Further, any surcharge, equities of the case, and marshaling waivers should not be perpetual, as proposed, but limited to the time period prior to any termination of the DIP Facility so that the estate is not unfairly saddled with the costs of preserving and disposing of the lenders' collateral.

5. In sum, the DIP Facility as currently proposed needlessly prejudices the rights and recoveries of unsecured creditors on the first day of the case. The Court should decline to approve the prejudicial extraordinary provisions of an Interim Order, including, without limitation, the 3.5 to 1 ratio of Roll Up to new money financing that would appear to be the product of the undue leverage exerted by the Prepetition Secured Parties over the Debtors.[6] All of these material issues should be preserved until a committee is formed to avoid substantial prejudice to creditors including Monster Energy without providing them due process.[7]

**BRIEF STATEMENT OF FACTS**

6. On October 10, 2022 (the "Petition Date"), the Debtors each commenced cases under chapter 11 of the Bankruptcy Code.

7. Monster Energy and the Debtors are adverse parties in numerous disputes, two of which the Debtors lost just prior to the Petition Date. Specifically, on September 29, 2022,

---

[6] *See, e.g.,* Jonathan C. Lipson, "The Secret Life of Property: Corporate Reorganization After *Jevic*," 93 Wash. L. Rev. 631, 689 (June 2018) ("The concern is that lenders . . . can bargain for a roll-up because they can make it difficult for the debtor to shop elsewhere for a loan. [T]he secured creditor may not cooperate with other potential lenders or declare a default, forcing the debtor to commence a Chapter 11 case before it is ready to do so. Because corporate debtors' assets are often fully encumbered, their lender's prebankruptcy priority will give them leverage to become the only lender – and thus the lender under a priority-enhancing DIP loan.")

[7] For the avoidance of doubt, Monster Energy's Preliminary Objection does not comprehensively discuss all objectionable provisions of the DIP Motion, and the omission of any provision of the Interim Order, Final Order, or DIP Credit Agreement from this Preliminary Objection does not constitute a waiver of any such objection.

in two separate matters, (i) Monster Energy was awarded a $293 million jury verdict against Debtor Vital Pharmaceuticals, Inc. ("VPX") and its Chief Executive Officer, John H. Owoc in *Monster Energy Company v. Vital Pharmaceuticals, Inc. et al.*, Case No. 5:18-cv-1882 (C.D. Cal.) (the "False Advertising Lawsuit"); and (ii) Judge Dale S. Fischer entered a final judgment confirming an arbitration award in favor of Monster Energy and Orange Bang, Inc. ("Orange Bang") against VPX in *Vital Pharmaceuticals, Inc. v. Orange Bang, Inc.*, Case No. 5:20-cv-1464-DSF-SHK (C.D. Cal.) (the "Arbitration Action").[8]

## OBJECTION

8. A court should approve a proposed debtor in possession financing only if such financing "is in the best interest of the general creditor body."[9] Moreover, the proposed financing must be "fair, reasonable, and adequate."[10] Postpetition financing should not be

---

[8] Monster Energy welcomes the transparency that the bankruptcy process will bring to the Debtors' years of problematic and unlawful actions. For instance, in the False Advertising Lawsuit, the jury found that VPX had been willfully and deliberately falsely advertising its product and had been unlawfully appropriating Monster Energy's trade secrets. *See Monster Energy Company v. Vital Pharmaceuticals, Inc. et al.*, Case No. 5:18-cv-1882, Docket No. 890 (C.D. Cal. Sep. 29, 2022) (completed jury verdict form indicating that VPX's "false advertising [was] willful and deliberate" and that "VPX maliciously and willfully misappropriate[d] Monster's trade secrets"). And, in the Arbitration Action, VPX was found to have been infringing trademarks owned by Orange Bang, the rightful owner of the "Bang" mark for beverages such as energy drinks. *See Vital Pharmaceuticals, Inc. v. Orange Bang, Inc.*, Case No. 5:20-cv-1464-DSF-SHK, Docket No. 127 at pp. 8, 80 (C.D. Cal. Sep. 29, 2022) (entering a judgment set forth in final arbitration award).

[9] *In re Roblin Indus., Inc.*, 52 B.R. 241, 244 (Bankr. W.D.N.Y. 1985) (*citing In re Vanguard Diversified, Inc.*, 31 B.R. 364, 366 (Bankr. E.D.N.Y. 1983)); *see also In re Chief Executive Officers Clubs*, 359 B.R. 527, 540 n.6 (Bankr. S.D.N.Y. 2007) (a debtor cannot excuse its fiduciary duties to its chapter 11 estate and its creditors for the sake of prompt DIP financing); *In re Tenney Village Co., Inc.*, 104 B.R. 562, 569 (Bankr. D. N.H. 1989) ("The debtor's prevailing obligation is to the bankruptcy estate and, derivatively, to the creditors who are its principal beneficiaries").

[10] *In re Crouse Group, Inc.*, 71 B.R. 544, 546 (Bankr. E.D. Pa. 1987).

authorized if its primary purpose is to benefit or improve the position of a particular secured creditor.[11]

9. Here, the DIP Facility does not reflect an exercise of sound business judgment but rather a surrender to the DIP Lenders/Prepetition Secured Parties. By virtue of the Roll-Up, the DIP Facility would have the effect of: (a) encumbering the most valuable previously unencumbered assets in these cases in favor of the DIP Lenders/Prepetition Secured Parties, (b) granting credit bid rights to such parties in all assets, and (c) imposing tight milestones that would ensure a sale to those same parties without credible third party bids. The DIP Facility is not designed to maximize the value of these estates, but rather to singularly accomplish the goals of the DIP Lenders/Prepetition Secured Parties at the expense of unsecured creditors.

### A. The Court Should Reject the Proposed 3.5 to 1 Roll-Up

10. Roll-ups are "generally viewed as a more controversial form of adequate protection that courts will approve sparingly,"[12] and are generally disfavored because they provide no benefit to the estate while favoring certain prepetition creditors over others.[13] Roll-ups, like the Roll Up in the DIP Facility here, harm unsecured creditors in at least three ways. First, they provide the prepetition debt that is being rolled up with unavoidable liens over existing collateral.

---

[11] *See, e.g., In re Aqua Assocs.*, 123 B.R. 192, 195-98 (Bankr. E.D. Pa. 1991) ("[C]redit should not be approved when it is sought for the primary benefit of a party other than the debtor."); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 37 (Bankr. S.D.N.Y. 1990) ("[A] proposed financing will not be approved where it is apparent that the purpose of the financing is to benefit a creditor rather than the estate."); *Tenney Village*, 104 B.R. at 568 (debtor in possession financing terms must not "pervert the reorganizational process from one designed to accommodate all classes of creditors and equity interests to one specially crafted for the benefit of the secured creditor").

[12] 1 COLLIER LENDING INSTITUTIONS & THE BANKRUPTCY CODE ¶ 5.03[2][b] (citing cases).

[13] *See, e.g., In re Saybrook Mfg. Co., Inc.*, 963 F.2d 1490, 1494–96 (11th Cir. 1992) (noting that postpetition cross-collateralization is an "extremely controversial form of Chapter 11 financing" before holding it was not authorized by section 364 of the Bankruptcy Code); *In re Bruin E&P Partners, LLC*, Tr. of Hr'g at 67:9-10, Case No. 20-33605 (Bankr. S.D. Tex Jul. 17, 2020) (finding that roll-ups are "heavily disfavored under the Bankruptcy Code"); *see also Reynolds v. Servisfirst Bank (In re Stanford)*, 17 F.4th 116, 128 (11th Cir. 2021) (Jordan, J., concurring).

Second, they enhance the lenders' collateral package by providing liens over unencumbered assets – assets that would otherwise be available to unsecured creditors and not available for credit bidding. Third, the Bankruptcy Code requires this "rolled-up" debt to be repaid in full and in cash in order for a debtor to successfully emerge from chapter 11, thereby precluding the debtor from treating the prepetition rolled-up debt in accordance with section 1129(b)(2)(A) of the Bankruptcy Code.[14]

11. But, even where roll-ups are approved, it is usually because substantial new money financing is being provided that is roughly equivalent to the amount of prepetition debt to be rolled-up.[15] Here, the Roll Up exceeds the amount of new money being provided by the DIP Lenders **_by over 350%_**; here, the DIP Lenders propose to provide up to $100 million in new money, but roll up $354,770,201.56 in prepetition debt.

12. Moreover, courts generally refuse to grant a roll-up of prepetition debt that is undersecured because it has the effect of elevating an unsecured deficiency claim to a secured claim.[16] Indeed, where the prepetition debt is undersecured, "the roll-up has the same effect as *Texlon* cross-collateralization," which is prohibited in the Eleventh Circuit under *Saybrook*,

---

[14] *See, e.g.,* 3 COLLIER ON BANKRUPTCY ¶ 364.06[2] (16th ed.).

[15] *See In re Constar Int'l Holdings LLC*, Hr'g Tr. 87:20-25, 88:1-4, Case No. 13-3281 (CSS) (Bankr. D. Del. Jan. 16, 2014) (discussing the benefits of a lower roll-up percentage—*i.e.*, percentage of the full facility that represented rolled-up debt—and noting it was the "driving factor" behind the Court's approval of a 20% DIP roll-up over an alternative 40% DIP roll-up); *In re Vanguard Natural Resources, Inc.,* Docket No. 241 at 2-3, Case No. 19-31786 (Bankr. S.D. Tex. April 30, 2019) (approving roll-up of $65 million with a $65 million new money DIP); *In re Sheridan Holding Company II, LLC*, Docket No. 146 at 2, Case No. 19-35189 (Bankr. S.D. Tex. Oct. 15, 2019) (approving roll-up of $50 million with a $50 million new money DIP).

[16] *See, e.g., In re Saybrook Mfg Co*., 963 F.2d 1490, 1495 (11th Cir. 1992) (holding postpetition financing arrangement *per se* impermissible where undersecured prepetition lender provided postpetition financing in exchange for a security interest in debtor's postpetition property to secure its prepetition debt); *In re FCX, Inc*., 54 B.R. 833, 840 (Bankr. E.D.N.C. 1985) ("[I]f an undersecured creditor can obtain unencumbered assets as security for all of its prepetition claims, that creditor is being preferred to the detriment of other unsecured claimants.").

because it "diverts resources to a preferential satisfaction of the pre-petition financier's unsecured claim, all to the potential detriment of other unsecured claims."[17]

13. The Prepetition Facility Obligations may well be undersecured (and, as discussed below, if the Prepetition Lenders have their way, no party, including the Creditors' Committee, will have a meaningful opportunity to investigate and bring a Challenge if they are) but will seek to convert the Prepetition Facility Obligations to postpetition DIP Obligations at a rate of over 3.5:1 at the expense of unsecured creditors. The Roll-Up would also generously accrue a 0.5% commitment fee on the unused amount of the DIP Loan Commitment, plus interest the 1-month SOFR + 8.50% or Base Rate + 7.50%.

14. Ultimately, the Roll Up will automatically cure any shortcomings in the Prepetition Collateral. The previously unencumbered assets will no longer be unencumbered as to over $350 million of rolled-up debt. The Prepetition Lenders will realize an immediate windfall by assimilating all of the unencumbered assets into their collateral package. And it will do so at the expense of unsecured creditors.

**B. The Challenge Provisions Should Be Revised to Protect the Estates**

15. Once appointed, the official committee of unsecured creditors must have adequate time and an adequate budget to investigate and prosecute any Challenge to the Debtors' Stipulations. As proposed in the Interim Order, the Creditors' Committee "must commence, as appropriate, a contested matter or adversary proceeding raising a Challenge" within just 60 days

---

[17] 1B SECURED TRANSACTIONS UNDER THE UCC § 9D.05[5] (2019); *see also Reynolds v. Servisfirst Bank* (*In re Stanford*), 17 F.4th 116, 128 (11th Cir. 2021) (Jordan, J., concurring).

of its formation.[18] Most offensively, the Debtors not only refuse to give the Creditors' Committee standing to pursue a Challenge, but the Creditors' Committee must ***actually seek and obtain standing*** prior to the expiration of the 60-day Challenge Period; the Creditors' Committee's "failure . . . to obtain an order of this Court during the Challenge Period shall not be a defense to failing to commence a Challenge during the Challenge Period . . . or to require or permit an extension of the Challenge Period."[19] And, in order to investigate, seek and obtain standing for, and bring a Challenge at an unprecedented breakneck speed, the Creditors' Committee is afforded a mere $50,000 budget "to investigate (but not to draft, file or prosecute claims or challenges relating to)" the claims and/or liens underlying any Challenge.[20] Taken together, these provisions deny the Creditors' Committee's ability to conduct a meaningful investigation and Challenge, as appropriate, the Debtors' litany of Stipulations in the Interim Order. The Court should decline to do so.

16.  The Interim Order should provide for a Challenge Period of *at least* 75 days from the creditors' committee's formation and a meaningful Challenge budget. Second, the Interim Order should either afford the Creditors' Committee automatic standing to bring a Challenge or provide that any standing motion automatically tolls the Challenge Period. Finally, given that many of the Debtors are limited liability companies, appropriate provisions need to be added to the proposed Interim Order to allow the estates to assert any viable Challenge to the extent that it is impermissible under applicable non-bankruptcy law for the Creditors' Committee to have

---

[18] *Interim Order* at ¶ 40.

[19] *Id.* at ¶ 40.

[20] *Id.* at ¶ 38.

standing to do so.

### C. The Estates Should Retain Rights Relating to Section 506(c) Surcharge

17. There should be no waiver of the estate's section 506(c) surcharge claims against the DIP Agent, DIP Lenders, or Prepetition Secured Parties unless and until it is demonstrated that all costs of administering the Debtors' estates have been adequately provided for, including claims arising under section 503(b)(9) of the Bankruptcy Code and any other accrued obligations budgeted for payment. The elimination of the right to surcharge under section 506(c) of the Bankruptcy Code increases the risk that the costs of the bankruptcy will be borne by unsecured creditors, including administrative claimants, rather than the secured creditors that already are the primary beneficiaries of the process. This result contravenes the essential purpose of section 506(c).[21] Indeed, courts have rejected the waiver of surcharge rights under section 506(c) under similar circumstances.[22]

18. Although the Debtors appear to characterize the 506(c) waiver as being subject to a Final Order, the language in the Interim Order does not clearly provide.[23] Any Interim Order that is entered should make it clear that if any surcharge, marshalling, or equities of the case waivers are to be granted, that would occur only in a final order and take effect from and after the

---

[21] *See Precision Steel Shearing v. Fremont Fin. Corp. (In re Visual Indus.)*, 57 F.3d 321, 325 (3d Cir. 1995) ("[Section] 506(c) is designed to prevent a windfall to the secured creditor . . . The rule understandably shifts to the secured party . . . the costs of preserving or disposing of the secured party's collateral, which costs might otherwise be paid from the unencumbered assets of the bankruptcy estate . . .") (citation omitted); *see also In re Codesco, Inc.*, 18 B.R. 225, 230 (Bankr. S.D.N.Y. 1982) ("The underlying rationale for charging a lienholder with the costs and expenses of preserving or disposing of the secured collateral is that the general estate and unsecured creditors should not be required to bear the cost of protecting what is not theirs.").

[22] *See, e.g., In re Colad Group, Inc.*, 324 B.R. 208, 224 (Bankr. W.D.N.Y. 2005) (refusing to approve postpetition financing agreement to the extent that the agreement purported to modify statutory rights and obligations created by the Bankruptcy Code by prohibiting any surcharge of collateral under section 506(c)).

[23] *Interim Order* at ¶ 43.

final order is entered, to ensure that a committee can adequately investigate the propriety of granting such relief to the Prepetition Secured Parties.

## RESERVATION OF RIGHTS

19. Monster Energy expressly reserves all rights, claims, defenses, and remedies, including, without limitation, to supplement and amend this Preliminary Objection, to raise further and other objections to the DIP Motion and the proposed form of Interim Order and/or Final Order, and to introduce evidence prior to or at any hearing regarding the DIP Motion in the event that Monster Energy's objections are not resolved prior to such hearing.

## CERTIFICATION FOR EMERGENCY SUBMITTAL PURSUANT TO LOCAL BANKRUPTCY RULE 5005-1(F)(2)

20. Pursuant to Local Rule 5005-1(F)(1), the ordinary course deadline for interested parties to submit a response to the DIP Motion was 4:30 p.m. on Tuesday, October 11, 2022. Pursuant to Local Rule 5005-1(F)(2), an interested party may make an emergency submittal of a response where exceptional circumstances cause the filing of the response beyond the ordinary course deadline set in Local Rule 5005-1(F)(1). Here, it is axiomatic that exceptional circumstances exist for an emergency submittal of this Preliminary Objection as the DIP Motion is a 223 page document, inclusive of exhibits, that was filed by the Debtors on an emergency basis and provided interested parties with less than 24 hours to file a substantive response under the existing response deadline. Undersigned counsel was engaged yesterday and has expedited the preparation and filing of this Preliminary Objection for the Court's consideration. In compliance with Local Rule 5005-1(F)(2), undersigned counsel has promptly notified the Court's law clerk of the filing of this Preliminary Objection and has served the Preliminary Objection by electronic

mail to all interested parties whom an email address is reasonably ascertainable. Accordingly, Monster Energy respectfully requests that the Court consider the Preliminary Objection at today's 2:30 p.m. emergency hearing on the DIP Motion.

## **CONCLUSION**

21.     For all of the foregoing reasons, Monster Energy respectfully requests that the Court deny interim approval to the DIP Facility in the form presented.

Dated: October 13, 2022

AKERMAN LLP

*/s/ Michael I. Goldberg*
Michael I. Goldberg
Florida Bar No. 886602
Eyal Berger
Florida Bar No. 11069
201 East Las Olas Boulevard, Suite 1800
Fort Lauderdale, FL 33301
T: (954) 463-2700
F: (954) 463-2224
michael.goldberg@akerman.com
eyal.berger@akerman.com

-and-

PACHULSKI STANG ZIEHL & JONES LLP
Richard M. Pachulski (*pro hac vice* pending)
Ira D. Kharasch (*pro hac vice* pending)
Robert J. Feinstein (*pro hac vice* pending)
Steven W. Golden (*pro hac vice* pending)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067-4003
T: (310) 277-6910
F: (310) 201-0760
rpachulski@pszjlaw.com
ikharasch@pszjlaw.com
rfeinstein@pszjlaw.com
sgolden@pszjlaw.com

*Counsel to Monster Energy Company*