UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION
www.flsb.uscourts.gov

In re:

VITAL PHARMACEUTICALS, INC., *et al.*,

Debtors.[1]

_____/

Chapter 11 Cases

Case No. 22-17842 (PDR)

(Joint Administration Pending)

## DECLARATION OF HOMER PARKHILL IN SUPPORT OF DIP FINANCING

I, Homer Parkhill, hereby declare under penalty of perjury as follows:

1. I am a Co-Head of Restructuring and Partner of Rothschild & Co US Inc. ("Rothschild & Co"), an investment banking firm with its principal office at 1251 Avenue of the Americas, New York, New York 10020. Rothschild & Co has been engaged as a financial advisor to the above-captioned debtors and debtors in possession (collectively, the "Debtors") since April 2022.[2]

2. I am generally familiar with the Debtors' businesses, operations, debt structure, creditors, financial performance, and restructuring efforts. I submit this declaration (this "Declaration") in support of the relief requested in the *Debtors' Emergency Motion for Interim and Final Orders (I) Approving Postpetition Financing, (II) Authorizing Use of Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting*

---

[1] The address of the Debtors is 1600 N. Park Drive, Weston, FL 33326. The last four digits of the Debtors' federal tax identification numbers are: (i) Vital Pharmaceuticals, Inc. (8430); (ii) Bang Energy Canada, Inc. (5454); (iii) JHO Intellectual Property Holdings, LLC (0010); (iv) JHO Real Estate Investment, LLC (9394); (v) Quash Seltzer, LLC (6501); (vi) Rainbow Unicorn Bev LLC (2254); and (vii) Vital Pharmaceuticals International Sales, Inc. (8019).

[2] A detailed description of the Debtors and their businesses, and certain facts and circumstances supporting the Motion and the Debtors' chapter 11 cases, are set forth in greater detail in the *Declaration of John DiDonato in Support of Chapter 11 Petitions and First Day Pleadings* (the "First Day Declaration"), filed contemporaneously with the Debtors' voluntary petitions for relief filed under chapter 11 of the Bankruptcy Code on October 10, 2022 (the "Petition Date").

US-DOCS\135624164.11

*Related Relief* (the "Motion"),[3] filed contemporaneously herewith, which seeks approval of a debtor in possession, senior secured postpetition financing on a super-priority basis in the aggregate maximum principal amount of $454,770,201.56 (the "DIP Facility"), consisting of $100,000,000 in new money and $354,770,201.56 of outstanding obligations under the Prepetition Credit Agreement that, upon entry of the Final Order and as set forth more fully in the DIP Motion and Interim Order, will be converted to DIP Obligations under the DIP Credit Agreement and will be paid down from post-petition collections (the "Roll Up"). I understand that, in accordance with and subject to the terms of Interim Order, $34,000,000 of new money loans under the DIP Facility will be made available upon entry of the Interim Order, with the remaining amounts of the DIP Facility available upon entry of the Final Order.[4]

3. Except where specifically noted, the statements in this Declaration are based on (a) my personal knowledge, belief, or opinion; (b) information I have received from the Debtors' employees or advisors and/or employees of Rothschild & Co working directly with me or under my supervision, direction, or control; or (c) the Debtors' records maintained in the ordinary course of their business. I am authorized by the Debtors to submit this Declaration and, if I were called upon to testify, I could and would testify competently to the facts set forth herein.

## Qualifications

4. Rothschild & Co is a member of one of the world's leading independent investment banking groups, with over fifty offices in more than forty countries. Rothschild & Co has expertise in domestic and cross-border restructurings, mergers and acquisitions, new capital raises, debt advisory, and other investment banking services and particular experience in providing high-quality financial

---

[3] Capitalized terms used but not defined herein have the meanings given to them in the Motion.

[4] The material terms of the DIP Facility are set forth in detail in the Motion. For the avoidance of doubt, any description of the DIP Facility herein or in the Motion is qualified in its entirety by reference to the DIP Loan Documents (as defined in the Motion).

US-DOCS\135624164.11  2

advice to financially troubled companies. Rothschild & Co has extensive experience representing the interests of debtors, creditors, and institutional investors in business and sovereign restructurings and workouts both in and out of chapter 11, and in representing clients in a wide range of industries. Rothschild & Co is both a member of the Financial Industry Regulatory Authority and the Securities Investor Protection Corporation.

5.  I have over 24 years of restructuring, reorganization and strategic advisory expertise, including 21 years at Rothschild & Co. I have restructured over $100 billion of debt, advising U.S. and international debtors and creditors in high-profile restructurings, including: Grupo Aeroméxico, S.A.B. de C.V., PG&E Corporation, Windstream Holdings, Inc., Westinghouse Electric Company LLC, SunEdison Inc., Alpha Natural Resources Inc., NII Holdings, Inc., AMR Corp., OGX and Corporación Geo. My experience also includes substantial distressed merger and acquisition transaction experience as well as an expert witness testimony on financing and valuation matters.

**Preliminary Statement**

6.  In April 2022, Rothschild & Co was engaged by the Debtors to provide investment banking services in connection with restructuring, financing, and strategic initiatives. Rothschild & Co has worked closely with the Debtors' management and retained professionals, including Latham & Watkins LLP, Berger Singerman LLP, and Huron Consulting Services LLC, to evaluate the Debtors' cash requirements for their business.

7.  By working with the Debtors to evaluate their financing and strategic alternatives, Rothschild & Co and the Debtors' other restructuring advisors have become sufficiently knowledgeable about the Debtors' business, finances, operations, and systems to evaluate their liquidity and cash needs. Access to liquidity in the form of postpetition financing is critical to provide the necessary liquidity to fund these Chapter 11 Cases, facilitate a refinancing or restructuring, and maximize the likelihood of the Debtors' ability to execute their business plan. The DIP Facility

provides the Debtors with the liquidity necessary to fund operations during the Chapter 11 Cases. Additionally, the DIP Facility will signal to the Debtors' customers, distributors, vendors, and employees that operations can and will continue in the ordinary course during these Chapter 11 Cases. Approval of the DIP Facility is expected to assist in the prompt stabilization of the Debtors' operations and mitigate against the substantial uncertainty caused by the circumstances surrounding these Chapter 11 Cases.

## Marketing and Negotiation Processes

A.   **Prepetition Capital Raise and Sale Efforts**

8.   In June 2022, the Debtors commenced an initial marketing process, seeking proposals for secured debt financing or a minority equity investment (the "Initial Marketing Process"), with a specific focus on completing an out-of-court transaction intended to stabilize the Debtors in the face of ongoing defaults and liquidity concerns and the overhang from contingent, unliquidated, and disputed liabilities, including amounts potentially necessary to post a *supersedeas* bond in the event that an adverse judgment was entered in the OBI District Court Action (as defined and described in the First Day Declaration).  Beginning in April 2022, Rothschild & Co assisted with the preparation and planning of the Initial Marketing Process.

9.   In the furtherance of the Initial Marketing Process, Rothschild & Co, in concert with and on behalf of the Debtors, contacted 30 parties, which included sophisticated asset managers with industry-specific and distressed company expertise as well as strategic counterparties.  Of those parties contacted, 23 executed non-disclosure agreements ("NDAs") and the Debtors and their advisors, including Rothschild & Co, provided those parties under NDA with access to a virtual data room and responded to numerous diligence requests to enable interested parties to formulate proposals.

10. Despite months of effort, the Debtors could not effectuate a secured debt financing transaction that would sufficiently recapitalize their business. Additionally, no parties were willing to consider a minority equity investment that would provide sufficient capital for the Debtors to address their needs.

**B.     DIP Marketing and Negotiation Process**

11. The Debtors found themselves facing many challenges. The Debtors continued to be in default under the Prepetition Credit Agreement, and the Prepetition Secured Parties were unwilling to extend forbearance agreements indefinitely. The Initial Marketing Process had proven unfruitful, and the Debtors faced constrained liquidity—all amidst the backdrop of the Debtors' distribution network transition and crucial contractual negotiations. The Prepetition Secured Parties continued to support the Debtors and after several rounds of negotiations, agreed to provide the Debtors with the DIP Facility, as further discussed below. Given these challenges and in parallel with the negotiations with the Prepetition Secured Parties, in mid-September 2022 the Debtors and their advisors launched a formal marketing process to (a) solicit bids for debtor-in-possession financing (on a priming or junior lien basis) in anticipation of a potential chapter 11 filing, (b) resolicit bids for secured take-out financing, and (c) solicit bids for out-of-court bridge financing to obtain a short-term extension of liquidity runway.

12. To leverage the efforts of the Initial Marketing Process and to limit speculation in the market that could cause irreparable harm to the Debtors' business during a critical period of transition, the Debtors and their advisors reached out to 15 parties who were already under NDA as part of the Initial Marketing Process. Based on my experience, I believe that these parties encompass the entities that reasonably would likely be interested and able to provide financing of this kind – including debtor-in-possession financing. During its outreach to these 15 parties, Rothschild & Co and the Debtors solicited proposals for debtor-in-possession financing either (i) secured by liens

junior to those securing the Debtors' prepetition debt, or (ii) secured by priming liens senior to those securing the Debtors' prepetition debt. In parallel, the Debtors and their advisors reached out to a limited subset of five new financing parties who executed an NDA with the Debtors in an effort to solicit their interest in providing either take-out financing or out-of-court bridge financing.

13. After engaging with a number of parties and providing those potential lenders with additional access to diligence materials—including an investor presentation, weekly and monthly cash flow analyses, information on the proposed collateral, and access to additional information contained within a virtual data room—the Debtors received no debtor-in-possession financing proposals other than the DIP Facility.

14. Because the Debtors received no proposals for debtor-in-possession financing based on these outreach efforts, I do not believe that there is debtor-in-possession financing available to the Debtors on a junior or unsecured basis. I further do not believe there is any viable alternative postpetition financing available to the Debtors on better terms than the DIP Facility.

## The DIP Facility Should Be Approved

15. In light of the foregoing, the Debtors and their advisors concentrated their efforts on the proposed DIP Facility and engaged in, among other things: (a) multiple conferences with the Debtors' management and advisors; (b) an exchange of multiple iterations of term sheet proposals and related documents reflecting the proposed financing terms; and (c) various due diligence.

16. Despite the DIP Facility being the only viable financing, the Debtors and their advisors engaged in substantive and hard-fought negotiations with the DIP Lenders and ultimately were able to achieve significant concessions that resulted in more favorable terms for the Debtors. Specifically, as evidenced by the below chart, after the structure of the DIP Facility took form in early September, the Debtors negotiated, among other things: (a) more new money DIP financing to

fund a longer case; (b) a longer maturity and milestones to facilitate the Debtors' pursuit of a recapitalization transaction rather than an immediate sale; and (c) materially improved economics:

| Negotiations with DIP Lenders | | |
|---|---|---|
| | *As of 9/12/22* | *DIP Facility Final Terms* |
| **New Money Commitment** | • $49,000,000 | • $100,000,000 |
| **Maturity** | • Four months after the Petition Date | • Seven months after the Petition Date |
| **Milestones** | • Required to file a bid procedures motion within 14 days of the Petition Date | • Three and a half months to secure commitments to refinance existing debt before designation of a stalking horse will be required |
| **Upfront Fee** | • Approximately $11,400,000 (2.5% on new money and roll-up) | • $2,500,000 (2.5% on new money only) |
| **Interest Rate** | • 1-month SOFR + 8.50%,[5] subject to monthly increases of 0.50% per annum starting November 1, 2022 | • Fixed at 1-month SOFR + 8.50% (no incremental monthly interest rate increases) |
| **Other** | • Mandatory and optional prepayments consistent with Prepetition Credit Agreement | • Mandatory prepayment to the extent unrestricted cash exceeds $15,000,000 |

17. I believe that the hard-fought, arms'-length negotiations ultimately resulted in overall terms and conditions that are consistent with the market, and that the DIP Facility is the best possible financing available to the Debtors.

A.  **The DIP Facility Size and Budget**

18. The DIP Facility provides the Debtors with $100,000,000 of new money plus $354,770,201.56 to be used to pay down outstanding obligations under the Prepetition Credit Agreement, structured to permit increased borrowings over time, subject to certain conditions.

19. Based on my own personal knowledge, the information set forth in the First Day Declaration, my extensive discussions with the Debtors' management team and advisors, and my and

---

[5] This amount is equal to the applicable rate as of the Petition Date (a monthly increase of 0.50% per annum would have been applied on October 1, 2022).

my team's review and evaluation of the Debtors' financial forecasts and the Approved Budget, I believe that the liquidity provided under the DIP Facility is expected to (i) provide the Debtors with the funds reasonably necessary for working capital and other general corporate purposes, and (ii) enable the Debtors to assure their employees, vendors, suppliers, contract counterparties, and other key stakeholders that the Debtors have sufficient funding to continue their operations, satisfy postpetition liabilities, and administer these Chapter 11 Cases with the ultimate goal of achieving a successful recapitalization through a chapter 11 plan.

**B.     Other DIP Facility Terms**

20.     As noted above, I believe that the terms of the DIP Facility are fair, reasonable, in line with the market, and should be approved.  The Debtors heavily negotiated substantially all aspects of the DIP Facility, including the maturity, milestones, interest rate, fees, covenants, events of default, conditions precedent, and milestones.  The concessions that the Debtors were able to receive were significant, including a lengthened runway to maximize value, and more favorable economics, including more new money DIP financing and reduced interest and fees.

21.     The DIP Facility contains various fees expressly required by the DIP Lenders as a condition to providing financing that are integral to the financing package.  In particular, the Debtors have agreed to pay the following (as set forth more fully in the DIP Credit Agreement):

    a.     ***Interest Rate***: 1-month SOFR + 8.50% or Base Rate + 7.50%, at the election of the Borrower.

    b.     ***DIP Structuring Fee***:   A one-time fee of $300,000 payable to the Administrative Agent, non-refundable and payable in cash out of the proceeds of the initial funding of the DIP Facility.

  c. ***Upfront Fee***: A one-time fee of $2,500,000, non-refundable and payable in cash out of the proceeds of the initial funding of the DIP Facility and shared ratably by the DIP Lenders.

  d. ***Commitment Fee***: A fee equal to 0.50% per annum on the unused amount of the DIP Loan Commitment that constitutes the DIP Facility Available Amount, non-refundable and payable monthly in arrears on the first business day of each month during the term of the DIP Facility and shared ratably by the DIP Lenders holding any portion of the DIP Loan Commitment.

22. Each of the above fees were the subject of arms'-length and good-faith negotiations between and among the Debtors and the DIP Lenders, are an integral component of the overall terms of the DIP Facility, and are required by the DIP Agent and the DIP Lenders as consideration for the extension of postpetition financing.

23. Given the financial and operating condition of the Debtors, the timing, cost, and risk of administering these Chapter 11 Cases, the fact that there are no viable alternatives, and based on my experience and knowledge of the debtor-in-possession financing market, the fees are consistent with the market and are reasonable and appropriate under the circumstances.  Particularly in light of the credit profile of the Debtors, the nature and extent of the collateral securing the facility, the state of the global economy, and the Debtors' industry, and the relevant risks associated with lending in the postpetition financing context, I believe that the proposed fees and interest should be approved.

24. Additionally, the Debtors and their advisors considered the fees described above when determining, in their sound business judgment, that the DIP Facility constituted the best and only means for the Debtors to obtain the postpetition financing necessary to continue their operations, prosecute their cases, and maximize the value of the Debtors' estates.

25. Upon entry of the Interim Order, the DIP Facility gives the Debtors immediate access to $34,000,000 of DIP financing. This interim availability will avoid irreparable harm by allowing the Debtors to fund these Chapter 11 Cases while continuing to operate their business in the ordinary course until the hearing on the Final Order.

26. Additionally, based on the negotiations, I understand that the Roll Up was a necessary inducement for the Prepetition Secured Lenders to provide a DIP Facility with this tenor, and in a sufficient amount, and consent to use of Cash Collateral, each of which is essential to the viability of the Chapter 11 Cases and the Debtors' ultimate reorganization. The Roll Up also provides an economic benefit to the Debtors because it results in repayment of the prepetition debt on more favorable terms than previously available. Moreover, I understand that the Debtors are not seeking approval of any Roll Up on an interim basis.

27. Further, based on the foregoing, it is my belief that the DIP Facility and use of Cash Collateral address the Debtors' immediate liquidity needs. For these reasons, the Debtors, in consultation with Rothschild & Co and their advisors, determined that the proposed DIP Facility is the best available postpetition financing option available. In conclusion, based on my experience negotiating this and similar debtor-in-possession financing packages, and my assessment of the Debtors' financial position and liquidity needs, I believe that the DIP Facility (i) is the product of good-faith, arms'-length negotiations, (ii) is a critical component of the Debtors' chapter 11 strategy, and (iii) is a sound exercise of the Debtors' business judgment. Therefore, I believe that the DIP Facility should be approved.

*[Remainder of page intentionally left blank.]*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: October 10, 2022

By: _____
Homer Parkhill
Co-Head of Restructuring, Partner
Rothschild & Co US Inc.