UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA (FORT LAUDERDALE)

```
                                        .
IN RE:                                  .  Case No. 22-17842-PDR
                                        .  Chapter 11
                                        .
VITAL PHARMACEUTICALS, INC.,            .  299 E. Broward Boulevard
                                        .  Fort Lauderdale, FL  33301
               Debtor.                  .
                                        .  Thursday, October 13, 2022
. . . . . . . . . . . . . . . . .       .  2:41 p.m.
```

TRANSCRIPT OF EMERGENCY MOTION FOR AUTHORIZAZTION TO
(I) CONTINUE TO ADMINISTER INSURANCE POLICIES AND RELATED
AGREEMENTS; AND (II) HONOR CERTAIN OBLIGATIONS IN RESPECT
THEREOF (EMERGENCY HEARING REQUESTED) [11];

EMERGENCY MOTION FOR PAYMENT OF PREPETITION OBLIGATIONS OWING
TO FOREIGN VENDORS, SERVICE PROVIDERS, AND GOVERNMENTS AND TO
HONOR AND CONTINUE PAYING FOREIGN VENDORS IN THE ORDINARY
COURSE OF BUSINESS (EMERGENCY HEARING REQUESTED) IN THE AMOUNT
OF NOT MORE THAN $3,000,000.00 [12];

EMERGENCY MOTION FOR PAYMENT OF PREPETITION CLAIMS OF CRITICAL
VENDORS (EMERGENCY HEARING REQUESTED) IN THE AMOUNT OF
$14,892,981.78 [13];

EMERGENCY MOTION FOR PAYMENT OF CERTAIN PREPETITION
CLAIMS OF AND TO HONOR CERTAIN CONTRACTS WITH SHIPPERS
AND WAREHOUSEMEN (EMERGENCY HEARING REQUESTED), IN THE
AMOUNT OF $5,940,559.81 [14];
(CONTINUED)
BEFORE THE HONORABLE PETER D. RUSSIN
UNITED STATES BANKRUPTCY COURT JUDGE

```
Audio Operator:          MELVA WELDON, ECR

Transcription Company:   Access Transcripts, LLC
                         10110 Youngwood Lane
                         Fishers, IN 46048
                         (855) 873-2223
                         www.accesstranscripts.com
```

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

TRANSCRIPT OF (CONTINUED):

EMERGENCY MOTION (A) AUTHORIZING, BUT NOT DIRECTING, THE DEBTORS TO (1) MAINTAIN AND ADMINISTERE CUSTOMER PROGRAMS, AND (II) TO HONOR OR PAY CERTAIN PREPETITION OBLIGATIONS TO THEIR CUSTOMERS IN THE ORDINARY COURSE OF BUSINESS; AND (B) GRANTING CERTAIN RELATED RELIEF (EMERGENCY HEARING REQUESTED) [15]

MOTION TO FILE CONSOLIDATED CREDITOR MATRIX AND CONSOLIDATED LIST OF THE TOP THIRTY UNSECURED CREDITORS (EXPEDITED HEARING REQUESTED) [9];

MOTION TO PAY PRE-PETITION SALES TAXES , USE, TRUST FUND, PROPERTY, AND OTHER TAXES AND SIMILAR OBLIGATIONS (EMERGENCY HEARING REQUESTED) [16];

EMERGENCY MOTION FOR APPROVAL OF FORM OF NOTICE OF COMMENCEMENT AND PROOF OF CLAIM (EMERGENCY HEARING REQUESTED)[10];

MOTION FOR PRE-PETITION WAGES DEBTORS' EMERGENCY MOTION FOR ORDER (I) AUTHORIZING DEBTORS TO PAY (A) CERTAIN PREPETITION EMPLOYEE OBLIGATIONS AND (B) PREPETITION WITHHOLDING OBLIGATIONS, (II) AUTHORIZING THE DEBTORS TO MAINTAIN EMPLOYEE BENEFIT PROGRAMS, AND (III) DIRECTING BANKS TO HONOR RELATED PREPETITION TRANSFERS (EMERGENCY HEARING REQUESTED) [17];

MOTION FOR MAINTENANCE OF EXISTING BANK ACCOUNTS , TO (I) MAINTAIN CASH MANAGEMENT SYSTEM, (II) HONOR CERTAIN PREPETITION AND POSTPETITION OBLIGATIONS RELATED THERETO, (III) TO USE EXISTING BUSINESS FORMS, AND (IV) PERFORM INTERCOMPANY TRANSACTIONS, AND GRANTING RELATED RELIEF (EMERGENCY HEARING REQUESTED) [18];

APPLICATION TO EMPLOY HURON CONSULTING SERVICES LLC AS TO PROVIDE THE SERVICES OF A CHIEF TRANSFORMATION OFFICER AND ADDITIONAL PERSONNEL, EFFECTIVE AS OF THE PETITION DATE (EXPEDITED HEARING REQUESTED) [19];

EMERGENCY APPLICATION TO EMPLOY STRETTO, INC. AS NOTICE, CLAIMS AND SOLICITATION AGENT, EFFECTIVE AS OF THE PETITION DATE (EMERGENCY HEARING REQUESTED) [20];

EMERGENCY APPLICATION TO EMPLOY JORDI GUSO AND THE LAW FIRM OF BERGER SINGERMAN LLP AS LOCAL COUNSEL FOR DEBTORS-IN-POSSESSION, EFFECTIVE AS OF THE PETITION DATE (EMERGENCY HEARING REQUESTED)[21];

EMERGENCY APPLICATION TO EMPLOY LATHAM & WATKINS LLP AS CO-COUNSEL FOR DEBTORS-INPOSSESSION, EFFECTIVE AS OF THE PETITION DATE (EMERGENCY HEARING REQUESTED) [22];

TRANSCRIPT OF (CONTINUED)

APPLICATION TO EMPLOY ROTHSCHILD & CO US INC. AS INVESTMENT
BANKER FOR THE DEBTORS, EFFECTIVE AS OF THE PETITION DATE
(EXPEDITED HEARING REQUESTED) [23];

EMERGENCY MOTION FOR INTERIM AND FINAL ORDERS (I) APPROVING
POSTPETITION FINANCING , IN ADDITION TO EMERGENCY MOTION TO USE
CASH COLLATERAL (III) GRANTING LIENS AND PROVIDING
SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, IN ADDITION TO
MOTION FOR ADEQUATE PROTECTION , IN ADDITION TO MOTION FOR
RELIEF FROM STAY (MODIFYING AUTOMATIC STAY), SCHEDULING A FINAL
HEARING AND GRANTING RELATED RELIEF (EMERGENCY HEARING
REQUESTED) [24]

APPEARANCES:

For the Debtors:          Berger Singerman LLP
                          By:  JORDI GUSO, ESQ.
                          1450 Brickell Avenue, Suite 1900
                          Miami, FL 33131
                          (305) 755-9500

                          Berger Singerman LLP
                          By:  MICHAEL J. NILES, ESQ.
                          313 North Monroe Street, Suite 301
                          Tallahassee, FL 32301
                          (850) 521-6736

                          Latham & Watkins LLP
                          By:  ANDREW SORKIN, ESQ.
                          555 Eleventh Street, NW, Suite 1000
                          Washington, D.C., 20004
                          (202) 637-3302

                          Latham & Watkins LLP
                          By:  JERAMY DANIEL WEBB, ESQ.
                          330 North Wabash Avenue, Suite 2800
                          Chicago, IL 60611
                          (312) 876-7645

                          Latham & Watkins LLP
                          By:  AMY C. QUARTAROLO, ESQ.
                          355 South Grand Avenue, Suite 100
                          Los Angeles, CA 90071
                          (213) 891-8966

APPEARANCES (Continued):

| | |
|---|---|
| For Jack H. Owoc: | Genovese Joblove & Battista, P.A.<br>By:  PAUL J. BATTISTA, ESQ.<br>100 Southeast Second Street<br>44th Floor<br>Miami, Florida 33131<br>(305) 372-2457 |
| For Monster Energy Company: | Akerman LLP<br>By:  MICHAEL I. GOLDBERG, ESQ.<br>     EYAL BERGER, ESQ.<br>201 Las Olas Boulevard, Suite 1800<br>Fort Lauderdale, Florida 33301<br>(954) 463-2700 |
| For Truist Bank: | Shutts & Bowen LLP<br>By:  HARRIS J. KOROGLU, ESQ.<br>200 South Biscayne Boulevard<br>Suite 4100<br>Miami FL 33131<br>(305) 358-6300 |
| | Moore & Van Allen<br>By:  LUIS M. LLUBERAS, ESQ.<br>100 North Tryon Street, Suite 4700<br>Charlotte, NC 28202-4003<br>(704) 331-3548 |

TELEPHONIC APPEARANCES:

| | |
|---|---|
| For Monster Energy Company: | Pachulski Stang Ziehl & Jones<br>By:  ROBERT J. FEINSTEIN, ESQ.<br>780 Third Avenue, 34th Floor<br>New York, NY 10017-2024<br>(212) 561-7700 |
| For Crown Cork & Seal USA, Inc.: | Dilworth Paxson LLP<br>By:  ANNE M. AARONSON, ESQ.<br>1500 Market Street, Suite 3500E<br>Philadelphia, PA 19102<br>(215) 575-7000 |
| For the Office of the United States Trustee Region 21: | Office of the United States Trustee<br>By:  J. STEVEN WILKES, ESQ.<br>501 East Polk Street, Room 1200<br>Tampa, FL 33602<br>(813) 228-2173 |

1        (Proceedings commence at 2:41 p.m.)

2            THE COURT:  All right.  Vital Pharmaceuticals,

3   22-17842.  I think I'll take appearances, I guess, in the

4   courtroom first, and then on Zoom.

5            So, Mr. Guso.

6            MR. GUSO:  Yes, sir.  May it please the Court.  Good

7   afternoon, Your Honor.  Jordi Guso and Michael Niles from

8   Berger Singerman.  Our firm is proposed co-counsel for the

9   debtors.

10            We are joined at counsel table, Your Honor, from

11   the Latham & Watkins firm, Andrew Sorkin, Jeramy Webb, and

12   Amy Quartarolo.  Q-U-A-R-T-A-R-O-L-O, if I butchered it.

13   Your Honor has entered orders authorizing their appearance pro

14   hac vice in the cases.

15            THE COURT:  I have.  Thank you.

16            MR. GUSO:  And Your Honor, once counsel are through

17   with their introductions, I'd like a moment just to introduce

18   the debtors' representatives who are in the courtroom.

19            THE COURT:  Sure.

20            MR. GUSO:  Thank you.

21            THE COURT:  Of course.  Hold on one second.

22            THE CLERK:  We need everyone to spell their names for

23   the record.

24            MR. GUSO:  Guso, G-U-S-O.

25            UNIDENTIFIED:  That was easier than Quartarolo.

```
1              MR. GUSO:  It sure was.

2              THE COURT:  Go ahead.  Yes.  Spell your name, please.

3              MR. SORKIN:  Andrew Sorkin, S-O-R-K-I-N.

4              MR. WEBB:  Jeramy Webb, J-E-R-A-M-Y, and then Webb is

5    the standard E-B-B.

6              THE COURT:  Not E, A.  Okay.  Got it.

7              Yes.

8              MS. QUARTAROLO:  Amy Quartarolo, A-M-Y, last name

9    Q-U-A-R (audio interference) A-R-O-L-O.

10             THE CLERK:  (Audio interference) --

11             MS. QUARTAROLO:  Q-U-A-R-T-A-R-O-L-O.

12             MR. NILES:  And Michael Niles, N-I-L-E-S.

13             THE COURT:  All right.  Mr. Battista.

14             MR. BATTISTA:  Good afternoon, Judge.  I'm Paul

15   Battista of Genovese Joblove & Battista.  My surname is spelled

16   B as in boy, A-T-T-I-S-T-A, and I represent Jack Owoc, O-W-O-C,

17   who is the sole shareholder and chief executive officer.  And I

18   believe Mr. Owoc is on Zoom.

19             THE COURT:  All right.

20             MR. BATTISTA:  Amongst a hundred or so other

21   participants.

22             THE COURT:  Yes.  Thank you.

23             All right.  Mr. Goldberg.

24             MR. GOLDBERG:  Good afternoon, Your Honor.  Michael

25   Goldberg, Akerman LLP, G-O-L-D-B-E-R-G.  With me at counsel
```

1  table is Eyal Berger, B-E-R-G-E-R.  Your Honor, we also have

2  co-counsel, and I know you're taking appearances online.  We

3  have some pro hac motions pending.  I don't know if you want to

4  take them now, before counsel speaks, or --

5            THE COURT:  We can take them in any order you wish.

6            MR. GOLDBERG:  If I could take them now, then, that

7  would be great.

8            THE COURT:  I'm memorizing all of this.  Definitely

9  not.  Go ahead.

10           MR. GOLDBERG:  Your Honor, we filed a motion for the

11  admission -- pro hac admission of Robert Feinstein and Steven

12  Golden of the Pachulski Stang firm.  I have filed the requisite

13  papers and declarations.  I spoke to Mr. Guso prior.  There was

14  no objection.  I did not speak to everybody else in the

15  courtroom; but as debtor's counsel rep, Mr. Guso represented he

16  had no objections, so I'd like to move for their pro hac

17  admission.

18           THE COURT:  Certainly.  Any objections?

19           MR. GUSO:  No objection, Your Honor.

20           THE COURT:  All right.  That will be granted, and I

21  assume we'll get an order uploaded.  It's usually ex parte.

22  Let's just leave it at ex parte, just keep it simpler, so you

23  don't have to change the order to reference a hearing date.

24           MR. BATTISTA:  Thank you, Your Honor.

25           THE COURT:  Okay.  Sure.

| | |
|---|---|
| 1 | In person.  In 3D. |
| 2 | MR. KOROGLU:  Yes, sir.  Good afternoon, Your Honor. |
| 3 | Harris Koroglu, K-O-R-O-G-L-U, from the law firm of Shutts & |
| 4 | Bowen, appearing on behalf of Truist Bank.  And with me is my |
| 5 | co-counsel, Mr. Luis Lluberas, from the Moore & Van Allen firm. |
| 6 | I'll let him make his appearance, and he has been admitted |
| 7 | graciously by the Court pro hac vice already. |
| 8 | THE COURT:  Did you spell your last name? |
| 9 | MR. KOROGLU:  Yes, sir. |
| 10 | THE COURT:  Okay.  Good. |
| 11 | MR. KOROGLU:  Thank you. |
| 12 | THE COURT:  Go ahead. |
| 13 | MR. LLUBERAS:  Good afternoon, Your Honor.  Luis |
| 14 | Lluberas, L-L-U-B as in boy E-R-A-S, of the Moore & Van Allen |
| 15 | law firm representing Truist Bank, who's the administrative |
| 16 | agent for the prepetition credit facility and the |
| 17 | administrative agent for the proposed post-petition credit |
| 18 | facility that will be before Your Honor today. |
| 19 | Your Honor, there are also -- two of my colleagues |
| 20 | are on Zoom, listen only, but have been admitted graciously by |
| 21 | Your Honor:  Steve Gruendel, G-R-U-E-N-D-E-L, and my partner |
| 22 | and co-counsel as well, Cole Richins, R-I-C-H-I-N-S.  Thank |
| 23 | you, Your Honor. |
| 24 | THE COURT:  Thank you. |
| 25 | Any other appearances in the courtroom? |

1      (No audible response)

2            THE COURT:  All right.  No on Zoom, we've heard about

3  Mr. Feinstein already, but Mr. Feinstein, if you want to make

4  your appearance, you certainly cane.

5            MR. FEINSTEIN:  Thank you, Your Honor.  Robert

6  Feinstein, Pachulski Stang Ziehl & Jones, appearing for Monster

7  Energy.  I assume my partner, Teddy Kapur, is on the line as

8  well.

9            Your Honor, on behalf of all the Zoom participants,

10  we can't see you.  In the prior hearing, we were able to see

11  your picture.

12            THE COURT:  Oh.  Because sometimes I forget to turn

13  on my video.

14            MR. FEINSTEIN:  Great.  Thank you.

15            THE COURT:  So there you go.  Sorry.

16            MR. FEINSTEIN:  All right.  Thanks for (audio

17  interference).  Thank you for hearing from me today,

18  Your Honor.

19            THE COURT:  Sure.

20            MS. Aaronson.

21            MS. AARONSON:  Good morning, Your Honor.  Anne

22  Aaronson, A-A-R-O-N-S-O-N, from Dilworth Paxson, representing

23  Crown Cork & Seal USA, Inc.

24            THE COURT:  All right.  Does anyone else wish to make

25  an appearance from Zoom?

1          Mr. Wilkes.

2          MR. WILKES:  Good afternoon, Your Honor.  J. Steven

3  Wilkes for the United States Trustee Region 21.

4          THE COURT:  Thank you.  Anyone else?

5      (No audible response)

6          THE COURT:  All right.  So I have seen the agenda,

7  Mr. Guso.  This is -- it's fine with me to proceed in that

8  fashion, although I have to tell you, given the objection

9  that's been filed to the DIP financing, we may want to handle

10  slightly more perfunctory matters prior to that and leave that

11  for the end.  But that's just a suggestion, so --

12          MR. GUSO:  Happy to do that, Your Honor.  Thank you.

13          THE COURT:  All right.

14          MR. GUSO:  May I proceed?

15          THE COURT:  Yes, you may.

16          MR. GUSO:  Yes, sir.  May it please the Court.  Good

17  afternoon again, Your Honor.  Jordi Guso of Berger Singerman on

18  behalf of the debtors.  First and foremost, Your Honor, thank

19  you very much for accommodating the debtors and for hearing us

20  on an expedited basis.  We also wish to thank Mr. Wilkes,

21  Your Honor, for making himself available, and for previewing

22  with us the matters that are before the Court this afternoon.

23          And as I said earlier, Your Honor, I'd like to begin

24  by introducing the debtors' representatives and our co-advisors

25  who are in the courtroom.  Your Honor, starting with the second

1  row, from left to right, standing, Your Honor, is Mr. Greg

2  Robbins, R-O-B-B-I-N-S.  Mr. Robbins is the senior vice

3  president of finance of the debtors.

4          THE COURT:  Welcome.

5          MR. GUSO:  Your Honor, to his left is Ms. Sury

6  Rodriguez, R-O-D -- R-I-G-U-E-Z.  Ms. Rodriguez is the vice

7  president of finance.

8          To her left, Your Honor, is Ms. Katherine [sic] Cole,

9  C-O-L-E, the debtors' chief operating officer.

10          And to Ms. Cole's left, Your Honor, is Mr. Gregg

11  Metzger, M-E-T-Z-G-E-R.  Mr. Metzger is chief litigation

12  counsel for the debtors.

13          THE COURT:  Welcome.

14          MR. GUSO:  Your Honor, moving one row up, we'll start

15  with the gentleman in the center.  Your Honor, this is John

16  DiDonato, D-I-D-O-N-A-T-O.  Mr. DiDonato is the chief

17  transformation officer of the debtors, Your Honor, and has

18  submitted his sworn declaration in support of the relief the

19  debtors seek today.  That declaration is Docket Entry 26.

20          THE COURT:  Thank you.

21          MR. GUSO:  To Mr. DiDonato's right, Your Honor, is

22  Mr. Abhi, A-B-H-I, Gupta, G-U-P-T-A.  Mr. Gupta is with Huron

23  Consulting.

24          And then, Your Honor, working our way left from

25  Mr. DiDonato, this is Mr. Charles Delo, D-E-L-O, from

1  Rothschild & Company.

2          And to his left, Your Honor, is Homer Parkhill,

3  P-A-R-K-H-I-L-L, also from Rothschild & Company.  And

4  Mr. Parkhill has submitted a declaration in support of the

5  debtor-in-financing facility, which the debtors are seeking

6  this afternoon.

7          Your Honor, this afternoon, with the Court's

8  permission, the debtors' presentation will cover three areas.

9  First, Your Honor, I will tell the Court the notice the debtors

10 provided with respect to the first-day papers and the hearing

11 that's scheduled for this afternoon.  Secondly, Your Honor,

12 Mr. Sorkin will tell the Court briefly about the debtors, their

13 operations, the circumstances that led them to the filing, and

14 what the general objectives of the case are.  And then lastly,

15 Your Honor, we'll make our way into the first-day papers that

16 are before you.

17         Your Honor, as I indicated, we've previewed with both

18 Mr. Falzone and Mr. Wilkes the relief the debtors seek this

19 afternoon in the first-day motions.  For purposes of the first-

20 day hearings, Your Honor, we resolved all of their concerns

21 raised by both the U.S. Trustee and Mr. Falzone.  Although some

22 of the relief the debtors seek today will be interim in nature,

23 if granted, of course -- and Your Honor, we are optimistic that

24 we'll reach final agreement with the United States Trustee

25 between now and the date of the final hearing.  But if, for any

1   reason, we do not, all rights are preserved and all objections

2   are preserved.

3          THE COURT:  You'll let me know what that applies to

4   as we go.

5          MR. GUSO:  Yes, sir.  Yes, sir.

6          THE COURT:  Okay.

7          MR. GUSO:  As we work out way through the agenda.

8   Thank you, Your Honor.

9          THE COURT:  Okay.

10          MR. GUSO:  Your Honor, first on the issue of notice,

11   as is evidenced by the certificate of service that's in the

12   record at Docket Entry 80, Stretto, Inc., the proposed noticing

13   and claims agent for the debtors, caused the motions that are

14   before you this afternoon, as well as the various notices of

15   hearing issued by the clerk of court, to be served by overnight

16   mail and email upon the creditors holding the 30 largest

17   unsecured claims; the Internal Revenue Service; the Security

18   and Exchange Commission; the United States Attorneys General;

19   the attorney generals of the states in which the debtors'

20   products are sold; and Truist Bank as agent, and its counsel.

21          In addition, Your Honor, Stretto served the debtors'

22   emergency motion to continue to administer its insurance

23   programs and the notice of hearing on that motion on all of the

24   insurers which are the subject of that motion.  And Your Honor,

25   we submit that, in the circumstances, good and adequate notice

1  of the matters that are before you and of the hearings that are

2  on has been provided in the circumstances.

3          Your Honor, with the Court's permission, I'll yield

4  the podium to Mr. Sorkin, who will address the Court in the

5  manner that I described.

6          THE COURT:  Well, before you do that, does anyone

7  contest the adequacy of notice?  You're all here, so clearly

8  you all got notice.  So that's good.  All right.  Then have you

9  -- you've not heard any issues with respect to notice from

10  anyone else?

11          MR. GUSO:  We have not, Your Honor.

12          THE COURT:  Okay.  All right.  Certainly, yes.

13          MR. GUSO:  Thank you, Your Honor.

14          MR. SORKIN:  I'm not quite as tall as Mr. Guso.  Good

15  afternoon, Your Honor.

16          THE COURT:  He's not that tall.

17          MR. SORKIN:  Andrew Sorkin, Latham & Watkins, on

18  behalf of the debtors.  And I would echo Mr. Guso's comments

19  and thank the Court and its staff for your time today, as well

20  as Mr. Wilkes --

21          THE COURT:  Not today.  It's the last three days.

22          MR. SORKIN:  All of the above, Your Honor.

23          THE COURT:  No.  It's all good.  It's actually --

24  this is -- you know, it's nice to be in a courtroom with lots

25  of lawyers and lots of parties in a case that, you know, we

1    haven't had many of over the last couple years, but -- anyway.

2              MR. SORKIN:  I'm glad we can give the Court that

3    opportunity.

4              THE COURT:  Great.

5              MR. SORKIN:  And I should also note --

6              THE COURT:  And even topped with a last-minute

7    objection, as always.

8              MR. SORKIN:  Exactly.  Exactly.  You get a little bit

9    of everything, even on the first day.

10             THE COURT:  Exactly.

11             MR. SORKIN:  And I should also thank Mr. Wilkes for

12   his constructive approach as we worked through his comments to

13   the first-day papers, which seek very important relief that

14   you'll hear about over the remainder of the hearing.

15             As Mr. Guso mentioned, did want to start with a brief

16   company overview, and I will try to keep it brief and not be

17   overly redundant of the first-day declaration, which I'm sure

18   you've read.

19             THE COURT:  Yeah.  We have read everything, including

20   those declarations and the affidavits, the objection.  But yes,

21   make your presentation.  I don't want to interfere with it.

22             MR. SORKIN:  Thank you, Your Honor.

23             Your Honor, I think most people in the courtroom and

24   on the Zoom are familiar with the debtors' leading product.

25   That's the Bang Energy drink.  Well, just like that beverage,

1  the company prides itself on being dynamic, vibrant, and

2  innovative.  The lead debtor is Vital Pharmaceuticals.  That

3  company was established in 1993 by Jack Owoc, right here in

4  South Florida, and initially focused on sports nutrition

5  products.

6          In 2012, the company launched the Bang Energy drink,

7  which has since become their flagship product.  Bang was and is

8  unique among its competitors in several respects, including in

9  the breadth of its flavor offerings -- there are 45 in total,

10  its zero-sugar ingredient profile, and a cutting-edge marketing

11  strategy that relies heavily on a robust media -- social media

12  presence and a network of approximately 1,000 influencers.

13          The results of that strategy spoke for themselves.

14  The company's sales grew exponentially over the following years

15  as Bang took hold in the market, and Bang achieved strong

16  profitability.

17          The company then ran into some challenges when they

18  transitioned to a centralized distribution network in 2020.

19  Simply put, the relationship there, with that distributor,

20  PepsiCo, didn't work out as the parties had hoped --

21          THE COURT:  Can I --

22          MR. SORKIN:  For sure.

23          THE COURT:  Can I just stop you for one second?  We

24  might be having some technical difficulties here.

25          Mr. Wiener, I'm seeing all these messages.  Are we

1   having issues?

2           MR. WIENER:  (Indiscernible) --

3           THE COURT:  Okay.  That's it.  Everybody else can

4   hear on Zoom what's happening in the courtroom?  Is that right?

5           UNIDENTIFIED:  Yes.

6           THE COURT:  Okay.  All right.  I don't know who the

7   person is, but -- anyway, I didn't mean to interrupt.  But it's

8   just, you know, when you're having hybrid hearings, we're at

9   the mercy of technology which doesn't always pan out.  So

10  anyway, go ahead.

11          MR. SORKIN:  Understood, Your Honor.  I was just

12  getting to around 2020 when the company ran into some

13  challenges from a distribution standpoint.  The relationship

14  with the centralized distributor they were using at that time,

15  PepsiCo, just didn't work out as I think either party had

16  hoped, and the company's ability to get the products on the

17  shelves and into the hands of the ultimate consumers was

18  impaired, and sales suffered as a result.

19          The good news is the company is in the home stretch

20  in terms of getting the distribution network back on track.

21  And over the past few months, we've been -- the company, I

22  shouldn't say "we" -- has worked tirelessly to rebuild a

23  decentralized network of the type that they had prior to the

24  Pepsi arrangement when they experienced exponential growth.

25          That network will be comprised of approximately 269

1  distributors who are focused on particular regions of the

2  country and are best in class in those regions.  And as we sit

3  here today, we're 93 percent of the way to that target in terms

4  of the anticipated volume of distribution across that whole

5  network, and we expect the network to be fully operational by

6  mid-November.

7          I've spent some time on that subject because I can't

8  emphasize enough that we are extremely excited about the new

9  distribution network, and it wouldn't be an exaggeration to say

10  that it's one of the most important assets that this estate

11  has.  Preserving our relationships with those distributors and

12  the retailers to whom they distribute and allowing that network

13  to perform as we all know it's capable of is essential to our

14  ability to maximize value here, and it's going to be one of the

15  central operational goals of this case.

16          So, in sum, Your Honor, from an operational

17  standpoint, we believe the future of this business is bright.

18  Regardless of what you might hear about liquidity challenges,

19  litigation, other challenges that we've been facing in recent

20  months, demand for our products remains strong and we're

21  fortunate to have the customer base we do, and it's a loyal and

22  enthusiastic one.

23          If I could shift gears just a little bit, I did want

24  to talk about one item I know was highlighted in the first-day

25  declaration, but there have been some governance changes in the

1  works that we expect to be completed later this week.  By way

2  of background, historically, Mr. Owoc, the founder, served as

3  the sole director or manager of each of the debtor entities.

4  In the leadup to the filing, Mr. Owoc decided to expand the

5  boards at each debtor entity to ensure that the decisions that

6  are going to be before him and the other new board members in

7  these cases are made with the benefit of deliberation among a

8  group of directors with diverse perspectives.

9            The new boards will consist of five members including

10  Mr. Owoc and the company's chief operating officer, who you

11  were just introduced to, Ms. Cole, as well as three directors

12  who are unaffiliated with the company, and that will include

13  one restructuring-focused independent director, Steve Panagos.

14           Each board will also appoint a restructuring

15  committee of one.  The one will be Mr. Panagos, who will have a

16  mandate to report back to the full board and make

17  recommendations concerning key decisions in connection with

18  this Chapter 11 process.

19           THE COURT:  Mr. Panagos is one of the -- with one of

20  the professional firms that's to be retained today, correct?

21           MR. SORKIN:  Mr. Panagos is not with one of the

22  professional firms.  I was actually just about to get to that

23  individual.  That would be Mr. DiDonato --

24           THE COURT:  Ah, Mr. DiDonato.

25           MR. SORKIN:  -- who is our chief transformation

1    officer and will be working very closely with Mr. Panagos in

2    that capacity.  He's with Huron Consulting Group.

3                THE COURT:  Understood.

4                MR. SORKIN:  So suffice it to say, Your Honor, the

5    debtors will have a wealth of capable hands kind of guiding

6    them through this process.

7                Next -- not to jump around too much -- I'd like to

8    talk a little bit about our lender group.  They have been

9    generally supportive of the company in the leadup to this

10   filing, and they're committed through our proposed DIP to

11   continuing to provide that support through the Chapter 11

12   process.  Truist Bank serves as agent under the prepetition

13   secured credit facility.  We have about 354 million of

14   outstanding obligations under that facility as of the petition

15   date, and it's been in default since March of this year.

16               Our lenders have been very constructive throughout.

17   They've agreed to five forbearance agreements since that

18   default occurred.  The last of those expired on September 30th.

19   And they've even advanced 60 million in additional funding

20   during that post-default period to give us runway to conduct an

21   out-of-court capital raise process and bridge to this Chapter

22   11 case.  Now they stand committed to provide an additional

23   hundred million dollars in new money under the DIP to fund

24   operations and the cost of these cases without putting us on an

25   unduly short fuse in terms of maturity and interim milestones

1  and the like.

2          So, as I've said, the future of the business is

3  bright.  We believe there's significant enterprise value here.

4  You may be wondering why we're here and where we intend to go.

5  In a nutshell, we're here to obtain a critical infusion of

6  liquidity through that DIP facility; obtain breathing room from

7  pending litigation, verdicts and judgments; and use that

8  breathing room to attempt to pursue a Chapter 11 plan or other

9  value-maximizing transaction.

10          Just to break each of those points down just a little

11  bit further, and then I promise I will be done.  Starting with

12  liquidity.  I mean, we've been operating on very tight

13  liquidity for several months now.  The proposed DIP will

14  restore liquidity to a healthy level.  It will also send, you

15  know, a strong message to the world and our key stakeholders --

16  vendors, distributors, retailers, et cetera -- that any

17  concerns they had over the last several months should be

18  allayed and we will have, you know, the financial wherewithal

19  to meet our obligations in the ordinary course throughout these

20  cases.

21          Second, breathing room.  Debtors are party to various

22  litigation claims, and a couple of larger verdicts and

23  judgments have come down just in the last recent weeks.  Those

24  are explained in Paragraphs 30 to 39 of Mr. DiDonato's

25  declaration.  I won't belabor those descriptions here unless

1   Your Honor has questions.  But suffice it to say the automatic

2   stay is, itself, a key benefit from this filing, as it protects

3   this business and these assets from enforcement efforts while

4   the company attempts to restructure its affairs.

5           Third and finally, the debtors, with the assistance

6   of their investment bankers at Rothschild & Co, will use that

7   breathing room to continue to pursue a recapitalization or

8   financing or other transactions, all of which the goal will be

9   to repay that bank debt facility in full and allow the company

10  to emerge from bankruptcy with a stronger balance sheet and an

11  even stronger brand.  And our DIP lenders, again, by agreeing

12  to a seven-month DIP with relatively few milestones that are

13  relatively long-dated, have given the company ample runway to

14  get to that result.

15          So that's -- concludes my presentation, Your Honor,

16  subject to any questions you may have.

17          THE COURT:  I have no questions.  I'm familiar with

18  it, having read the declaration prior to the hearing.  But very

19  helpful.  Thank you for that.  And I guess Mr. -- where do we

20  go from here?

21          MR. SORKIN:  Well, I think there might be just a

22  couple of housekeeping matters --

23          THE COURT:  Sure.

24          MR. SORKIN:  -- before we get into the agenda, the

25  first of which, I think, is to move our three declarations into

1    evidence, as they provide the evidentiary support for the

2    relief we're asking Your Honor to grant today.

3              MR. GUSO:  May I approach, Your Honor?

4              THE COURT:  Certainly.  And I know of two -- go

5    ahead, Mr. Guso.  I know of two declarations.  Actually, you

6    don't -- I mean, you can hand them up.  It's all electronic

7    these days anyway, so --

8              MR. GUSO:  We have two more that we're going to share

9    with you, Judge.  There are two --

10             THE COURT:  Okay.  Fair enough.  You're offering

11   these affidavits or declarations as proffers; and subjecting,

12   of course, these witnesses to cross-examination, I assume.

13             MR. SORKIN:  I am.  They're all available for cross-

14   examination.  Mr. DiDonato and Mr. Parkhill, two of the

15   declarants, are sitting in the courtroom.  And Ms. Betance,

16   who's the representative of Stretto, our proposed claims agent,

17   is available by videoconference, to the extent anybody would

18   like to cross-examine them.

19             THE COURT:  Okay.  Understood.

20             Anyone object to the submission of these declarations

21   into evidence?

22        (No audible response)

23             THE COURT:  All right.  None.  And I don't know

24   whether there will be cross-examination requested, but what I

25   would ask you to do is during each of the matters that are at

1  issue point to those aspects of the declaration that are

2  relevant to that particular matter, if that's relatively easy

3  to do.  If not, you can point to the entire declaration or

4  whichever declaration you feel apply.  And then, once you've

5  presented your evidence, it seems to me that we would need to

6  turn that opportunity for cross-examination over to any parties

7  that wish to do so.

8           So just -- as you're presenting, just keep an eye out

9  for the need to do that.  All right?

10          MR. SORKIN:  Understood, Your Honor.  That approach

11  makes sense to us, to go motion by motion, and people can

12  examine the witness as they deem appropriate.

13          THE COURT:  Great.

14          MR. SORKIN:  I think --

15          THE COURT:  So but the exhibit register only deals

16  with -- well, it deals with three declarations, which I guess

17  will be admitted, subject to cross-examination.  But then

18  there's Exhibits 4 and 5.  Are you seeking to admit those at

19  this point, too, or not?

20          MR. SORKIN:  I think Mr. Guso will seek the admission

21  of those exhibits in connection with the foreign and critical

22  vendor relief.

23          THE COURT:  Okay.  Fair enough.

24          MR. SORKIN:  As they relate to those motions.

25          THE COURT:  All right.  And what I generally do is,

1  once the exhibit register is completed, I ask counsel to

2  formalize it and actually file it with the Court after the

3  hearing, so that there's a record in the docket of what matters

4  were admitted.  All right?  What documents.

5          MR. SORKIN:  Sure.  We will do so.

6          THE COURT:  Okay.  Great.

7      (Exhibits 1, 2, and 3 admitted into evidence)

8          MR. SORKIN:  I think we can proceed with the agenda

9  then, and we were going to start with the retention

10  applications.

11          THE COURT:  Okay.

12          MR. SORKIN:  And I will present my own firm's

13  retention application, and I believe Mr. Guso will be

14  presenting the other four.

15          THE COURT:  All right.  Unfortunately, I don't -- in

16  my notes, I don't have them in the same order.  So I may have

17  to be scrolling a bit.  I'm using OneNote, and the OneNote in

18  this case goes on a bit forever.  So tell me what pleading that

19  is, so I can find it.

20          MR. SORKIN:  This would be Docket Number 22, the

21  emergency application to employ Latham & Watkins as co-counsel

22  to the debtors-in-possession.

23          THE COURT:  All right.  Let me make a general

24  statement about emergency motions to retain professionals.  I

25  ended the process of interim approval.  And I know that it all

1    arose as a result of this notion that the professionals fear

2    that somehow, after the 21st day in a hearing on a motion that

3    approves them that they won't get paid for that intervening 21

4    days.  That is not the case, and there should be no fear here

5    in this courtroom that that will occur.

6         I had orders on my website that were submitted

7    regularly approving interim retentions because of that fear.  I

8    don't think that fear is well-grounded in the law, so I have

9    ended that process.  Is there any reason we need to have

10   interim approval of the professionals in this case -- at least

11   the law firms, and we can deal with the other professionals in

12   a moment, but -- what is the issue here?  What's the fear?

13        MR. SORKIN:  I will speak for Latham and say we would

14   be comfortable seeking a final order authorizing our retention

15   at the final hearing.

16        THE COURT:  Okay.

17        MR. SORKIN:  If that's now your practice.

18        THE COURT:  Mr. Guso.

19        MR. GUSO:  Your Honor, if that's where the Court is

20   headed, that -- certainly no objection for Berger Singerman.

21   But just so -- to give the Court some background, Your Honor,

22   this procedure is actually the product of a case called

23   First NLC, which First was before Judge Hyman following the

24   amendments to Rule 6003, and the concern was, Your Honor, that

25   if for some reason a professional retention was not ultimately

1   approved, the only way a professional can get paid is because

2   he's been retained -- he or she has been retained as a

3   professional in the case.

4           So there was some risk of exposure during that gap

5   period of time, admittedly very, very limited, but that's the

6   product of --

7           THE COURT:  Yeah, and I'm aware of that.  And the

8   problem that I see with that, quite frankly, is that the reason

9   counsel would not be approved would be because counsel had some

10  kind of disinterestedness problem, most likely -- I can't think

11  of another reason, unless there was a fallout with their client

12  perhaps, but -- and if there is a disinterestedness problem,

13  what I'm being asked to do on an interim basis is essentially

14  decide that there is no disinterestedness problem, and I'm not

15  prepared to do that.

16          MR. GUSO:  Understood, Your Honor.

17          THE COURT:  So I think it's almost a Catch 22, but I

18  hear you and I understand the fear.  I've been there.  And I

19  filed these motions myself and craved that order.  But at the

20  end of the day, it's not nunc pro tunc relief, it's not

21  prohibited by the Supreme Court of the United States, it's --

22  it's by the Code.  I don't know, frankly, what Congress's

23  reason was for having to wait the 21 days, but I'm not here to

24  question the brilliance of Congress, so -- I just think, if

25  you're all okay with it, and there's no reason that I'm unaware

1  of for that interim relief, it seems to me the appropriate

2  process is to set a final hearing after the 21 days and you'll

3  get your final order.

4         MR. GUSO:  That's certainly acceptable to us,

5  Your Honor.

6         THE COURT:  All right.  Thank you.

7         MR. SORKIN:  And us, too.

8         THE COURT:  Okay.  Great.  So that resolves -- so

9  what I would need is an order on 22 continuing the hearing on

10  the emergency application to a date certain, and you all can

11  work that out.  You know, I don't know if you all are going to

12  be traveling or not traveling or attending by Zoom or whatever,

13  but I don't want to assume a date.  So that would apply to 22.

14  It would also apply to 21, which is Berger Singerman.

15         MR. GUSO:  Yes, sir.

16         THE COURT:  Now, we can get to Stretto.  I think

17  Stretto -- I don't know if they fall within the same category

18  --

19         MR. GUSO:  It's not a professional, Your Honor.  It's

20  an agent of the Court and --

21         THE COURT:  Exactly.  So we don't need to deal with

22  that.  What other professionals would this fall under?

23         MR. GUSO:  Your Honor, this being the deferral or

24  this being be heard?

25         THE COURT:  The deferral to a final hearing.

 1           MR. GUSO:  Oh, I'm sorry.  Your Honor, I believe we'd

 2  have to -- we should proceed with the retention of Huron, given

 3  that they're providing the services of an interim officer to

 4  the debtors, if that's acceptable to Your Honor.

 5           THE COURT:  You want to proceed today with that.

 6           MR. GUSO:  Yes, Your Honor.

 7           THE COURT:  Okay.

 8           MR. GUSO:  Again, it would be an interim order by

 9  agreement with the U.S. Trustee.  And if -- Your Honor, if I

10  may have a moment with Rothschild just to confirm with them

11  about their preference, and I'll be back to you promptly.

12           THE COURT:  Okay.  Sure.

13           MR. GUSO:  Thank you.

14      (Pause)

15           MR. GUSO:  Your Honor, Rothschild is fine deferring,

16  as well.

17           THE COURT:  All right.  So Rothschild is which docket

18  entry?

19           MR. GUSO:  It's 23, Your Honor.

20           THE COURT:  All right.  So 23, I'd need an order on

21  that, as well, setting that hearing.  And I guess proceed with

22  Huron.

23           MR. GUSO:  Would Your Honor like an order for each or

24  is one order --

25           THE COURT:  An order for each --

1          MR. GUSO:  Yes, sir.

2          THE COURT:  -- because otherwise I might get in

3    trouble with the clerk's office.

4          MR. GUSO:  Last thing I want to do is get you in

5    trouble, Judge.

6          THE COURT:  I get in a lot of trouble with the

7    clerk's office, and court reporters if you don't spell your

8    name, so -- anyway, go ahead.

9          MR. GUSO:  Huron?

10          THE COURT:  Yes.

11          MR. GUSO:  Yes, sir.  Thank you.  May it please the

12    Court again, Your Honor.  Jordi Guso on behalf of the debtors.

13    Your Honor, pursuant to this application, the debtors seek

14    authority to retain Huron Consulting --

15          THE COURT:  That number again?

16          MR. GUSO:  That is Docket Entry Number 19,

17    Your Honor.

18          THE COURT:  19.  Okay.  Yeah, I have it.

19          MR. GUSO:  They seek authority to retain Huron

20    Consulting Services LLC, Your Honor, to provide the services of

21    Mr. DiDonato as the chief transformation officer pursuant to

22    the terms of the engagement letter that's attached as Exhibit A

23    to the motion.

24          The scope of Mr. DiDonato's services are summarized

25    in Paragraph 11 of the application, but they include,

1    Your Honor, managing all workstreams relating to the debtors'

2    restructurings initiatives, including serving as the principal

3    contact with the debtors' secured lenders and other significant

4    stakeholders, assisting in managing the debtors' relationships

5    with their vendors, and providing services that would most

6    customarily fall under the umbrella of a chief restructuring

7    officer, if you will.

8            Mr. DiDonato will be assisted by other Huron

9    professionals, including Mr. Gupta, who is present in the

10   courtroom, Your Honor, in carrying out these duties.

11           As compensation, Mr. DiDonato would be paid $15,000

12   per week.  The supplemental personnel, Your Honor, will bill at

13   their usual and customary rates of between $400 and $1,315 per

14   hour.  They've agreed, Your Honor, to provide a budget to the

15   debtors each week in advance, laying out the anticipated scope

16   of services and the attendant costs.  And Your Honor, as is

17   customary in engagements of this type, given that Mr. DiDonato

18   is an officer of the debtor, the debtors will be providing to

19   him the most favorable indemnities provided by the debtors to

20   their other officers and directors.

21           THE COURT:  And do those presently exist and existed

22   prepetition?

23           MR. GUSO:  Yes, sir.

24           THE COURT:  Okay.

25           MR. GUSO:  Under the debtors' bylaws.

1          THE COURT:  They'll be consistent with those.

2          MR. GUSO:  With what existed as of petition date.

3          THE COURT:  What already exists.

4          MR. GUSO:  Correct, Your Honor.

5          THE COURT:  Okay.

6          MR. GUSO:  Your Honor, as with the prior

7    applications, if they were going to go forward, our agreement

8    with Mr. Wilkes is to -- and assuming the application is

9    favorably considered by Your Honor, is to have an interim order

10   entered authorizing that retention subject to a final hearing.

11   There are some issues that we continue to discuss with

12   Mr. Wilkes in respect of the application, but we've had no

13   other objections, Your Honor.

14         THE COURT:  All right.  Before I get to Mr. Wilkes,

15   are there any objections in the courtroom or on Zoom?

16      (No audible response)

17         THE COURT:  All right.  Mr. Wilkes.

18         MR. WILKES:  Thank you, Your Honor.  J. Steven Wilkes

19   for the United States Trustee.  As Mr. Guso said, we are

20   working through issues, but the United States Trustee

21   understands that the CTO is necessary as an officer of the

22   corporate entity and to be -- to proceed, so has no objection

23   to the entry of the interim order as worked out between our

24   office and Mr. Guso's office.

25         THE COURT:  So the interim order will leave for

```
 1   another day those issues you continue to discuss, I assume.

 2             MR. GUSO:  Right.  Yes, sir.

 3             THE COURT:  And I assume --

 4             MR. WILKES:  Affirmative, Your Honor.

 5             THE COURT:  -- the interim order will also set a

 6   final hearing?

 7             MR. GUSO:  Yes, sir.

 8             THE COURT:  All right.  And will that be at the same

 9   time, approximately, as the hearings on the other applications?

10             MR. GUSO:  Yes, sir.

11             THE COURT:  Okay.

12             MR. GUSO:  21 days hence.

13             THE COURT:  Yeah.

14             MR. GUSO:  More or less, Your Honor.

15             THE COURT:  All right.  Fine.

16             Thank you, Mr. Wilkes.

17             All right.

18             MR. GUSO:  Thank you, Your Honor.

19             THE COURT:  Granted.

20             MR. GUSO:  Thank you.  Sorry.  Thank you, Your Honor.

21   Judge, I think then we'll go with your suggestion that we defer

22   the DIP financing motion till the end, and go with more of the

23   housekeeping motions.

24             THE COURT:  What I worry about, Mr. Guso, is that

25   we'll get involved in something more complicated and it will be
```

1  close to the end of the day or beyond the end of the day and

2  then we'll just be --

3            MR. GUSO:  Yes, sir.

4            THE COURT:  -- forgetting things or tired or

5  whatever.  So let's get as much out of the way as we can.

6            MR. GUSO:  10-4.  Yes, sir.  Your Honor, if I may

7  then, I'll address the emergency motion for the approval of the

8  form of notice of commencement.  It's Docket Entry Number 10.

9  Your Honor, we -- we're not seeking at all to shorten the

10  notice of the bar date in any respect.  In fact, Your Honor,

11  the form that we proposed has been approved by Mr. Falzone.

12  And Mr. Falzone yesterday gave us a November 18th, 2022 date

13  for the first meeting of creditors, a December 19, 2022 date as

14  the deadline for non-governmental entities to file proofs of

15  claim, and April 10th of 2023 as the deadline for governmental

16  agencies to file proofs of claims.  Those are consistent with

17  the rules, Your Honor, and not reduced in any respect.

18            The debtors have prepared a customized proof of claim

19  form that has been approved by Mr. Falzone, as well, so that a

20  creditor need only check the box for the appropriate debtor

21  against whom the claim is sought.

22            THE COURT:  I was going to ask about that.  I saw

23  that form.  Has that changed since you filed the motion?

24            MR. GUSO:  (Audio interference) sir.  Again, it was

25  approved by Mr. Falzone.

```
 1                 THE COURT:  Ah, okay.  And you know, in consideration
 2     of your -- of one of the motions which wants to limit the
 3     matrix and the Top 30 and things of that sort, we're not --
 4     obviously, this is jointly administered, not subsequently
 5     consolidated, so I just want to make sure that the goal here is
 6     that creditors file proofs of claim within the case in which
 7     they have a claim.
 8                 MR. GUSO:  Correct.
 9                 THE COURT:  And if it's more than one, they'll just
10     be able to check multiple boxes?
11                 MR. GUSO:  Correct.
12                 THE COURT:  That's the idea?
13                 MR. GUSO:  Correct, Judge.
14                 THE COURT:  Okay.  All right.
15                 MR. GUSO:  Correct.  Your Honor, we also propose to
16     serve the notice of commencement with those dates that I
17     mentioned on all known creditors of the debtor.  We also
18     propose, Your Honor, to publish notice twice in the Miami
19     Herald and the Sun Sentinel and once in the Wall Street
20     Journal.  Mr. Falzone has also approved the form of the notice
21     of commencement, Your Honor, and we've received no objection to
22     this motion.
23                 THE COURT:  All right.  Any objections?
24        (No audible response)
25                 THE COURT:  Granted.
```

1           MR. GUSO:  Thank you, Your Honor.  Hand in glove with

2    our conversation now, Your Honor -- just now is the next

3    motion, the debtors' motion for the entry of an order

4    authorizing the debtors to file a consolidated creditor matrix

5    and a --

6           THE COURT:  Number 9.

7           MR. GUSO:  -- consolidated list of the 30 largest

8    creditors.  This, as well, Your Honor, we previewed with

9    Mr. Falzone.

10          The debtors have filed a consolidated list of the 30

11   largest unsecured creditors, Your Honor.  They also seek leave

12   to deliver to Stretto an electronic version of the matrix, as

13   opposed to filing it with the clerk of the court, although we

14   have filed a notice of filing of the copy of the matrix itself,

15   not just in electronic form as it would ordinarily be accepted

16   when one files a case.

17          We will make that matrix available to anyone who

18   wishes to receive it, Your Honor, and we believe that filing a

19   single consolidated list of the 30 largest unsecured creditors

20   will aid the U.S. Trustee in the process of communicating with

21   creditors and appointing a committee in the case.

22          We've had no objection to this motion, as well,

23   Your Honor, and we'd ask the Court grant the motion.

24          THE COURT:  All right.  And it presupposes, of

25   course, that there would be one committee amongst all the

1    jointly administered debtors, correct?

2          MR. GUSO:  Correct, Your Honor.

3          THE COURT:  Okay.  And the matrix and the Top 30

4    doesn't really matter or affect any other issues in the case,

5    because whether they're -- whether folks on the matrix are

6    served separately in each case because it's jointly

7    administered or just with one matrix, it doesn't affect their

8    notice.  They'll receive the same notice.

9          MR. GUSO:  Yes, sir.

10         THE COURT:  And the same holds true for the 30

11   largest, because it's not -- it's really just to facilitate the

12   selection of a committee.  Is that right?

13         MR. GUSO:  Sure.

14         THE COURT:  All right.  Any objections?

15      (No audible response)

16         THE COURT:  Hearing none, granted.

17         MR. GUSO:  Thank you, Your Honor.

18         Your Honor, next is the debtors' emergency motion for

19   an order authorizing them to pay prepetition obligations to

20   their employees and honor their corresponding benefits,

21   Your Honor.  It's Docket Entry 17.

22         THE COURT:  17.  Give me a moment.  All right.

23         MR. GUSO:  Thank you, Your Honor.  In the ordinary

24   course of business, the debtors employ a little over 1,100

25   employees, Your Honor, 432 of which are hourly employees and

1   671 are salaried.  As of the petition date, a payroll period

2   that began on August 3rd and will end on August 16th with the

3   pay actually being made on August 21st was pending, Your Honor,

4   meaning that the employees are owed approximately seven days of

5   prepetition wages.  The motion seeks authority to pay those

6   accrued wages, Your Honor, as well as permitting the debtors to

7   honor other benefits, including paid time off, 401K

8   contributions, et cetera.

9        Your Honor, the aggregated estimated liability is

10  approximately $4.4 million, which includes $1.6 million in

11  accrued and unpaid wages.  These numbers were a little bit more

12  refined since we filed the motion, Your Honor, with a little

13  bit more detail, and it includes, Your Honor, estimated 401K

14  contributions of $21,000 and biweekly payroll taxes of

15  $155,000.

16       Again, the aggregate is $4,453,000.  All of the

17  employees that would be paid remain employed full-time with the

18  debtor.  None are insiders, Your Honor, and none of the

19  recipients will receive prepetition compensation that exceeds

20  the statutory cap set forth in 11 U.S.C. Section 507(a)(4).

21       THE COURT:  15,150 as revised or altered by 104,

22  right?  I suppose.

23       MR. GUSO:  As of April 1st, I believe, 2022.

24       THE COURT:  I think that's right.  Okay.  And let me

25  just make sure I understand.  And your evidentiary support for

1   that is the declaration of Mr. DiDonato.

2          MR. GUSO:  It is, Your Honor.  And I'll turn the

3   pages very quickly to get to -- Your Honor, that is found at

4   Page -- starting at Page 33 with Paragraph 86 through 87.

5          THE COURT:  All right.  Thank you for that.

6          Any objections or anyone wish to cross-examine

7   Mr. DiDonato on that evidentiary submission?

8       (No audible response)

9          THE COURT:  No?  No objections.  All right.  Then the

10  motion will be granted.

11         MR. GUSO:  Thank you, Your Honor.

12         Your Honor, next perhaps we could take up the

13  debtors' emergency motion for authority to continue to

14  administer their insurance policies and programs.

15         THE COURT:  All right.  Give me the number.

16         MR. GUSO:  Docket Entry 11.

17         THE COURT:  Unfortunately, I have these by number,

18  not by name, so it helps.

19         MR. GUSO:  Understood, Your Honor.

20         THE COURT:  All right.  Yep, I see that.

21         MR. GUSO:  So, Judge, in the ordinary course of

22  business, the debtors maintain multiple types of insurance,

23  including worker's compensation, general liability, property,

24  and excess coverage, all as more fully described in the motion.

25  The motion actually goes into quite detailed -- referencing

1  each policy number for each applicable coverage.

2          The debtors finance their insurance programs through

3  an insurance premium finance agreement with First Insurance

4  Funding dated June 22, 2022.  The total premiums under the

5  insurance policies, Your Honor, is approximately $6.3 million.

6  Under the financing agreement, the debtors made an initial down

7  payment of $1,278,989.28 and financed $5,085,564.92 to be paid

8  over nine months, in nine monthly installments of $549,219.

9          And as part of the financing agreement, Your Honor,

10  there is a finance charge of $70,000 and a documentary stamp

11  tax of $4,826.85.  The debtors' insurance programs are

12  monitored both internally and externally, externally through

13  Brown & Brown, the debtors' insurance broker, Your Honor.  And

14  for these services, the debtors pay Brown & Brown an annual fee

15  of $400,000 which is payable $100,000 per quarter.  And

16  pursuant to the motion, Your Honor, we seek authority to honor

17  our obligations both under the insurance premium arrangement

18  that I described, as well as the debtors' obligations to

19  Brown & Brown for the services that they provide that are

20  incidental to the insurance coverage.

21          THE COURT:  Would that be essentially assuming these

22  obligations or --

23          MR. GUSO:  We're not assuming, Your Honor.  We're

24  simply seeking authority to honor them.  Assumption would

25  create post-petition administrative liabilities if, God forbid,

1  there would be a breach.  So we're cautious about that.

2         THE COURT:  Okay.  All right.  And you would seek to

3  assume them at some point in the future if --

4         MR. GUSO:  Yes, sir.

5         THE COURT:  -- pursuant to a plan or whatever.  Okay.

6         All right.  Any objections?  And I assume that the --

7  does the declaration cover the insurance?

8         MR. GUSO:  It does, Your Honor.  Starting at Page 40.

9  By the way, the lights do work better than before Judge Olson,

10  Judge.

11         THE COURT:  Honestly, any lights would have worked

12  better.

13         MR. GUSO:  Stipulate.

14         THE COURT:  Yeah.  I've tried lots of cases in this

15  courtroom, and honestly, it was a challenge, but --

16         MR. GUSO:  Yes, sir.

17         MR. GOLDBERG:  I wore my blue shirt --

18         THE COURT:  So you'd blend in or --

19         MR. GOLDBERG:  Yes.

20         THE COURT:  Well, I can see you, Mr. Goldberg, so --

21         MR. GUSO:  Your Honor, this is found at Page 40 of

22  Mr. DiDonato's declaration, starting at Paragraph 103 through

23  106.

24         THE COURT:  Anybody wish to cross-examine

25  Mr. DiDonato?

1        (No audible response)

2              THE COURT:  Anything think they don't need insurance?

3        (No audible response)

4              THE COURT:  Okay.  Granted.

5              MR. GUSO:  Thank you, Your Honor.

6              Your Honor, next, if I may address the debtors'

7    emergency motion for authority to pay their prepetition sales,

8    use, and trust fund taxes.  That's --

9              THE COURT:  Give me a number.

10             MR. GUSO:  -- Docket Entry 16.

11             THE COURT:  16.

12             MR. GUSO:  Yes, sir.

13             THE COURT:  All right.

14             MR. GUSO:  So, Judge, as described in the motion and

15   the attached Exhibit A, the debtor estimate -- the debtors

16   estimate that as of the petition date they owed various taxing

17   authorities approximately $2.7 million.  Each of the taxes are

18   broken down specifically in the exhibit itself.

19             Of that amount, Your Honor, $850,000 relates to

20   estimated sales and use taxes owed to various taxing

21   authorities.  The figure is an estimate because the debtors

22   operate and sell products throughout the United States, and do

23   not know the exact amount of sales and use tax owed in each

24   jurisdiction.  In the ordinary course, those liabilities are

25   reconciled at the end of the month.  And so that is an

1  estimate, Your Honor.

2         Additionally, Your Honor, most of the debtors' sales

3  flow through distributor channels, as Mr. Sorkin indicated

4  during his opening remarks.  And in that context, Your Honor,

5  there isn't a sales tax liability due.  However, based on an

6  erroneous prepetition filing of a sales tax return, Your Honor,

7  some of the states have assessed a sales tax liability against

8  the debtors.

9         THE COURT:  Erroneously filed by the debtor?

10        MR. GUSO:  By a former employee of the debtor,

11 Your Honor.

12        THE COURT:  Ah, okay.

13        MR. GUSO:  By a former employee of the debtor.  And

14 so, Your Honor, that tax is being challenged outside of this

15 jurisdiction, and we'd --

16        THE COURT:  But it needs to be paid in order to be

17 challenged.

18        MR. GUSO:  It does not, thankfully.

19        THE COURT:  Ah, okay.

20        MR. GUSO:  Not yet.

21        THE COURT:  All right.

22        MR. GUSO:  It doesn't need to be paid.  But,

23 Your Honor, if it is adjudicated adverse to the debtors, they

24 would like authority to pay it.  Obviously, there's a sales tax

25 liability for which there is some trust fund obligation.  The

1  debtor is quite confident that it will prevail.  And so,

2  Your Honor, we only seek the authority but not the obligation

3  to pay these taxes.

4          The taxes include, Your Honor, on Exhibit A to the

5  motion, ad valorem property taxes that are not in the nature of

6  trust fund.  The debtors seek the authority but not the

7  obligation to pay these, particularly if it makes economic

8  sense to avoid the 18 percent interest that would accrue once

9  they go into default.  So --

10          THE COURT:  Understood.  And obviously, if they could

11  be treated under a plan and they could be --

12          MR. GUSO:  Correct.

13          THE COURT:  -- delayed, you would do that.  All

14  right.  Okay.  And you have the declaration --

15          MR. GUSO:  I do, Judge.

16          THE COURT:  -- portions that support that.

17          MR. GUSO:  Yes, sir.  Your Honor, that --

18  Mr. DiDonato's statements in this regard start at Page 37,

19  Paragraphs 98 through 102 of his declaration.

20          THE COURT:  All right.  Anyone wish to cross-examine

21  Mr. DiDonato?

22      (No audible response)

23          THE COURT:  Anyone object?

24      (No audible response)

25          THE COURT:  All right.  You're on a roll.  Granted.

1            MR. GUSO:  I'll keep going.  Next, Your Honor, is --

2    with the Court's permission, of course, debtors' emergency

3    motion for an order authorizing the payment of certain

4    prepetition claims of critical vendors.  And --

5            THE COURT:  Give me a number, because there are

6    several of those.

7            MR. GUSO:  13.

8            THE COURT:  13.  All right.  Yeah.

9            MR. GUSO:  All right.  In this motion, Your Honor,

10   the debtors seek authority to pay the prepetition claims of 18

11   vendors whose claims total $14,892,981.78 in the aggregate that

12   are critical to the debtors' business.  The critical vendors

13   are identified -- or are described, rather -- described in

14   Exhibit A to the motion which was redacted, Your Honor, to

15   remove the names of the vendors, so as not to create some

16   controversy among the creditor body as to who is being treated

17   as a critical vendor or not.  An unredacted version of that

18   exhibit, Your Honor, was provided to Mr. Wilkes.

19           THE COURT:  Okay.

20           MR. GUSO:  And, Your Honor, an unredacted version of

21   that exhibit is also at Tab 5 of the exhibit register we handed

22   to Your Honor.

23           THE COURT:  Okay.

24           MR. GUSO:  All right?

25           THE COURT:  I guess I do need this.  Not that it

1    matters who they are, because I wouldn't know anyway, but --

2                MR. GUSO:  Very well, Judge.

3                THE COURT:  -- anyway, go ahead.

4                MR. GUSO:  Following the discussions with Mr. Wilkes

5    that I mentioned, Your Honor, the debtors prepared the amended

6    exhibit, which is Exhibit 5.  Your Honor, if called to the

7    stand, Mr. DiDonato would testify that Exhibit 5 was prepared

8    by the debtors under his supervision from books and records

9    maintained -- regularly maintained by the debtors in the

10   ordinary course of their business.

11               The exhibit accurately describes the goods or

12   services provided to the debtors by each of the proposed

13   critical vendors that are identified therein.  In fact, Your

14   Honor, certain of the vendors are sole source providers of

15   products used in the debtors' business operations.

16               The debtors and their research and development team,

17   by way of example, have spent years developing specifications

18   that have been adopted, tested, and perfected over time with

19   certain of the critical vendors.  Further, the ingredients that

20   these critical vendors provide, Your Honor, provide the debtors

21   with, in our view, a competitive advantage, and shifting to

22   other vendors would be very challenging and time-consuming,

23   Your Honor, as it would require the debtors' research and

24   development team to start over with a new set of vendors, which

25   would take approximately 60 to 90 days and cause significant

1 | disruption to the debtors' businesses.

2 | Lastly, Your Honor, as Mr. Sorkin indicated in his

3 | opening remarks, and as Mr. DiDonato would testify if called to

4 | the stand, Vital Pharmaceuticals, Inc., one of the debtors

5 | before you, maintains a robust social media presence, including

6 | through the use of influencers.  These vendors, Your Honor, are

7 | essential to the promotional endorsement, advertising, and

8 | marketing efforts of the debtors.  These services include the

9 | creation and posting of bespoke content on social media

10 | platforms and the preparation of photo shoots, videos, demos,

11 | fitness shows, and other promotional events that promote the

12 | debtors' products.

13 | The debtors estimate, Your Honor, that the aggregate

14 | amount owed to the influencers as of the petition date is

15 | approximately $350,000, and they are an essential component of

16 | the debtors' marketing and overall advertising plan.

17 | Your Honor, with that, we believe that the debtors

18 | have demonstrated the need to pay these vendors, and we'd ask

19 | the Court to grant the motion.

20 | THE COURT:  Thank you.  And you've designated the

21 | pages of the declaration?

22 | MR. GUSO:  I have, Your Honor.  If you'll give me one

23 | minute.  In addition to the proffer that I made a moment ago,

24 | Your Honor, Mr. DiDonato's testimony in this regard starts at

25 | Page 41, Paragraphs 107 through 109 of his declaration.

1          THE COURT:  And you cite to Liberty Power, which

2    is Judge Grossman's case, as well as IT'SUGAR, which is

3    Judge Mark's case, and it seems that it certainly --

4    declaration seems to support that.

5          Anyone wish to cross-examine the deponent on that --

6    or the declarant?

7      (No audible response)

8          THE COURT:  No?  All right.  Anybody object?

9      (No audible response)

10          THE COURT:  No?  All right.  Granted.

11          MR. GUSO:  Thank you, Your Honor.  Your Honor, the

12    next three are going to be handled by Mr. Niles.  With the

13    Court's permission, I'll yield the podium.

14          THE COURT:  Absolutely.  By the way, we need to -- so

15    we are admitting Exhibit 5.  Is that correct?

16          MR. GUSO:  Yes, sir.  And Mr. Niles will be

17    addressing Exhibit 4 in his presentation.

18          THE COURT:  Okay.  Great.

19          MR. WILKES:  Your Honor, J. Steven Wilkes for the

20    United States Trustee.  For Mr. Guso, just a question.  This is

21    -- Exhibit 5 is being admitted without redaction and without

22    sealing?

23          THE COURT:  Well, it's being admitted for the Court

24    to consider without redaction.  But when it's made a public

25    record, it would have the redaction.

1            MR. GUSO:  Correct, Your Honor.

2            THE COURT:  Is that acceptable to you, Mr. Wilkes?

3  Is there an issue with that?

4            MR. WILKES:  No issue.  I was just wanting to clarify

5  what's going on with Exhibit 5 because it is -- a redacted

6  version is already on the public record.

7            THE COURT:  Well, you get the super secret copy.  I

8  get the super secret copy.  I guess the debtor has the super

9  secret copy.  I guess --

10            MR. GUSO:  The lenders have a secret copy.

11            THEH COURT:  If anybody else needs to have it, I

12  guess they can ask for it.

13            MR. GUSO:  They can ask, Judge.

14            THE COURT:  All right.  Fair enough.

15            MR. GUSO:  Thank you, Your Honor.

16        (Exhibit 5 admitted into evidence)

17            THE COURT:  Mr. Miles [sic].

18            MR. NILES:  Good afternoon, Your Honor.  This is

19  Michael Niles for --

20            THE COURT:  Mr. Niles.  I'm sorry.

21            MR. NILES:  Niles, yes.  On behalf of the debtor.  I

22  am going to be presenting three motions today.  The first one

23  is the emergency motion to maintain and administer customer

24  programs, which is Docket Entry Number 15.

25            THE COURT:  Thank you.

1          MR. NILES:  The factual support for this is in

2    Mr. DiDonato's first-day declaration on Page 45.  It is

3    Paragraphs 116 through 118.  The debtors in this motion,

4    Your Honor, are seeking an order authorizing but not directing

5    the debtor to pay the prepetition obligations under the

6    customer programs and authority to maintain and administer

7    these programs post-petition.

8          As set forth in the motion, the debtors estimate that

9    the prepetition obligations -- outstanding obligations for the

10   customer obligations is to be approximately $12.1 million.  As

11   you may have read, Your Honor, the debtors operate in a highly

12   competitive market for energy drinks and dietary supplements,

13   including products purchased for resale, where there are

14   alternate suppliers of similar products.  As such, these

15   programs are vital to the debtors' marketing.

16         The three programs that are mentioned in the motion

17   and in the declaration, Your Honor, is first the trade

18   promotions, which under this program the debtors' customers

19   advertise their products in marketing campaigns, displays, and

20   otherwise feature the debtors' products to consumers with

21   special offers.  And in return, the debtors offer these

22   customers, which are generally the debtors' vendors,

23   Your Honor, price reductions or cash rebates for the customer

24   products that are sold.

25         THE COURT:  So it's the cash rebates that require a

1   payout of money.

2           MR. NILES:  Yes, Your Honor.

3           THE COURT:  Understood.  Okay.

4           MR. NILES:  Second is the slotting allowances.  And

5   under this program, the debtors incur costs that are associated

6   with purchasing shelf space in retail locations in order to

7   highlight the brand to its customers.  Because of the

8   competition in the industry, it's vital that the debtor has

9   premier shelving space in the vendors' stores.

10          THE COURT:  Understood.

11          MR. NILES:  And then finally, Your Honor, the debtors

12  participate in various other marketing programs which can

13  include weekly ad circulars, product samples, cooler

14  placements, and free-fills or event sponsorships, that also the

15  debtor reimburses the vendors for.

16          So, if the debtors were unable to continue these

17  customer programs and honor the related prepetition customer

18  obligations, the debtors risk alienating their customers, i.e.

19  the vendors, and will suffer irreparable loss.  And customer

20  support and confidence is vital at this time.  So, Your Honor,

21  we would request that you enter an order authorizing the

22  debtors to pay these prepetition customer obligations.

23          THE COURT:  Thank you.  Anyone wish to cross-examine

24  Mr. DiDonato on this?  Any objections?

25      (No audible response)

1          THE COURT:  All right.  Mr. Niles, granted.

2          MR. NILES:  Thank you, Your Honor.

3          The next motion we have for you is the emergency

4    motion for prepetition obligations owing to foreign vendors.

5    This is Docket Entry Number 12.

6          THE COURT:  All right.  Just let me get there.  Okay.

7          MR. NILES:  The factual support for this is in

8    Mr. DiDonato's first-day declaration which is on Page 47.  It's

9    Paragraphs 119 to 125.  Additionally, we have filed Exhibit A

10   to the motion as an exhibit, which you have before you,

11   Your Honor.

12         THE COURT:  And that's Exhibit 4?

13         MR. NILES:  Yes, Your Honor.

14         THE COURT:  Okay.

15         MR. NILES:  So we would request that that gets

16   entered into evidence.

17         THE COURT:  All right.  Any objections?

18      (No audible response)

19         THE COURT:  All right.  Hearing none, then the

20   document will be admitted.

21      (Exhibit 4 admitted into evidence)

22         MR. NILES:  Thank you.  Under this motion,

23   Your Honor, the debtor is seeking authority to pay the

24   prepetition invoices of approximately 26 vendors, which

25   represents $3 million worth of claims to foreign vendors, and

1  to continue funding the operations of the debtors' foreign

2  entities.

3        The debtors are in the process of expanding their

4  reach into foreign markets.  And to help that process, they've

5  created four wholly-owned entities, which is Bang Energy B.V.;

6  Bang Energy Canada, ULC; Bang Energy Chile SPA; and Bang Energy

7  Pty LTD.  These -- as I mentioned, these entities are wholly

8  owned by VPX; and in the ordinary course of business, VPX funds

9  and staffs these foreign entities' operations.

10        THE COURT:  And these are nondebtors.

11        MR. NILES:  Yes, Your Honor.

12        THE COURT:  Okay.  This funding includes payments to

13  the foreign vendors listed on Exhibit A of the motion, which

14  also provides a brief description of services the vendors

15  provide.  In general, these vendors include freight forwarders,

16  co-packers, third party logistics, ingredient suppliers, and

17  quality control agents, taxes, and other marketing expenses, in

18  order to fulfill orders of the debtors' products

19  internationally.

20        In return, each of these foreign entities transfer

21  their revenues received from its operations back to the debtors

22  on a regular basis.  These foreign entities and their vendors

23  are necessary to preserve the debtors' critical relationships

24  in the foreign markets that they serve; and without them, the

25  debtors' foreign operations could collapse and the enterprise

1  would be reduced.

2          As such, we're requesting authority but not the

3  obligation to pay the prepetition invoices of the foreign

4  vendors listed on Exhibit A, and be authorized to continue

5  funding their operations of the foreign entities listed in the

6  motion.  And I do want to point out, Your Honor, that some of

7  this will also be discussed in the cash collateral motion.

8          THE COURT:  All right.  And as nondebtors, the

9  concern is that the stay would not apply and all hell would

10  break loose in --

11          MR. NILES:  Yes, correct.

12          THE COURT:  -- those foreign countries and --

13          MR. NILES:  Because they're foreign vendors, they

14  might argue that they're not subject to the Court's

15  jurisdiction.

16          THE COURT:  Understood.  All right.  Anyone wish to

17  cross-examination -- cross-examine Mr. DiDonato on this point?

18      (No audible response)

19          THE COURT:  All right.  Any objections?

20      (No audible response)

21          THE COURT:  Motion's granted.

22          MR. NILES:  Thank you, Your Honor.  The final motion

23  that I have to present to you today is the emergency motion for

24  order authorizing the payment of certain shippers and

25  warehousemen's prepetition claims.  This is Docket Entry

1  Number 14, and this is Page 43 of the declaration.

2          The debtors are seeking an order authorizing --

3  again, not directing -- to pay the prepetition obligations

4  owing to the debtors' shippers and otherwise deal with those

5  entities in the ordinary course of business, and in accordance

6  with the normal prepetition procedures and agreements during

7  the pendency of their Chapter 11 cases.

8          The debtors are constantly distributing and shipping

9  their products nationwide.  The six vendor -- the six shippers

10 that are listed are an integral part of their operations and

11 are used for certain domestic -- I'm sorry, Your Honor.

12          The shippers deliver the products through established

13 national distribution networks.  The motion and Exhibit A

14 identify these six shippers utilized by the debtors and

15 identifies approximately $6 million owed prepetition to these

16 shippers.  The motion explains that it is essential for the

17 debtors to maintain their relationship with these shippers; and

18 that under applicable state law, there is some concern that the

19 shippers could have a lien on the goods that could be in their

20 possession prepetition.

21          So, Your Honor, we would ask for the authority to

22 continue working with these shippers and authority to pay their

23 prepetition amounts owed.

24          THE COURT:  All right.  Anyone wish to cross-examine

25 Mr. DiDonato on this point?  None?  No objections?  All right.

1  And because of the liens, it certainly seems to make sense that

2  these creditors aren't necessarily being treated any better

3  than they would be treated otherwise.

4          So all right.  The Court will grant that motion as

5  well.  And let me ask you, when these orders are submitted, are

6  we looking out for them from you, Mr. Guso, or will there be

7  others submitting orders?  I just want to make sure.  I always

8  identify who submits the order so if we don't get it, we know

9  who to call.

10          MR. GUSO:  I suspect it will be the brains of the

11  operation, Your Honor, Ms. Kerry Burns, our paralegal.

12          THE COURT:  Gotcha.

13          MR. GUSO:  But it will come from our firm, Your

14  Honor.

15          THE COURT:  All right.  Thank you.

16          Mr. Niles.  Thank you.

17          MR. NILES:  Thank you, Your Honor.

18          THE COURT:  Anything else?

19          Mr. Niles:  I think that we're going to go to

20  Mr. Jeramy Webb, and he's going to present the next motion.

21          THE COURT:  All right.  Great.  Thank you, Mr. Niles.

22          MR. NLES:  Thank you, Judge.  If I may, when we

23  reshuffle the order here, I missed one, if I may approach.

24          THE COURT:  Okay.  Yes.

25          MR. NILES:  Thank you. Thank you, Your Honor.

1          Perhaps very importantly, the debtor's application to

2    employ Stretto as the noticing and claims agent, Your Honor,

3    that's Docket Entry Number 20.  Your Honor, the debtors

4    estimate that they have about 10,500 potential creditors and

5    notice parties.  And therefore, Your Honor, need the assistance

6    of an outside noticing and claims agent, and in connection with

7    the services rendered, the debtor actually obtained three

8    proposals from three separate claims agents and selected

9    Stretto based on the economics, qualifications, and prior

10   experience with the Court.  Stretto actually serves as noticing

11   claim -- claims agent in another case before this Court

12   presently, Liberty Power Holdings, and has served as noticing

13   claims --

14          THE COURT:  Well, it wasn't before this Court.

15          MR. NILES:  What I meant, the Court -- Southern

16   District --

17          THE COURT:  I had to recuse, and it ended up in front

18   of Judge Grossman.

19          MR. NILES:  Well, it was initially yours.

20          THE COURT:  That's true.

21          MR. NILES:  That's true.  Judge, they also serve as

22   noticing claims agent in the American Resource Management case,

23   which was, coincidently, a Judge Olson case, and the Stein Mart

24   case, which is before the Middle District.  Your Honor, their

25   services are outlined in the services agreement dated

1    September 23rd, 2022, which we shared with Mr. Falzone and the

2    clerk of the court as well.  Mr. Falzone has signed off on the

3    form of the agreement and consents to the debtor's retention of

4    Stretto as the noticing claims agent.

5            THE COURT:  He probably thanks you for it.

6            MR. NILES:  Indeed, he does.

7            THE COURT:  Yes.  All right.

8            MR. NILES:  And we've received no objection to the

9    motion.

10            THE COURT:  All right.  No objections, I assume.  All

11    right, granted.

12            MR. NILES:  Thank you, Your Honor.

13            THE COURT:  Mr. Webb.

14            MR. WEBB:  Good afternoon, Your Honor.  Jeramy Webb

15    of Latham & Watkins on behalf of the debtors.  The next item up

16    is the debtor's cash management motion located at Docket Number

17    18.  And this -- to get ahead of the issue, the factual support

18    is in Mr. DiDonato's declaration at Paragraphs 88 through 97,

19    which you'll find on Pages 34 through 37.

20            THE COURT:  All right.  I assume Mr. Wilkes' video

21    would pop up on this one.  But anyway, go ahead.

22            MR. WEBB:  By the cash management motion, Your Honor,

23    the debtors request entry of the interim order attached to the

24    motion as Exhibit A, which authorizes the debtors to continue

25    to maintain their cash management system which is composed of

1   ten banks and seven financial institutions.  Under certain

2   obligations related thereto, use existing business forums and

3   perform certain intercompany transactions.

4           We spoke with Mr. Wilkes earlier today and I know

5   that the debtors have some obligations during the interim

6   period to reach out to certain of the non-authorized banks or

7   actually all of the non-authorized banks and discuss entering

8   into a UDA with those banks.

9           THE COURT:  So they are -- so they're meaning by non-

10  authorized they're not on the --

11          MR. WEBB:  They're not authorized depositories.

12          THE COURT:  -- these lists of debtor in possession

13  accountings.

14          MR. WEBB:  Exactly, Your Honor.

15          THE COURT:  Understood.  Okay.

16          MR. WEBB:  And so we --

17          THE COURT:  And what -- you're going to try to

18  convince them to be on that list or to comply with the

19  guidelines or --

20          MR. WEBB:  Comply with the guidelines.  I'm sure

21  there'll be many more discussions with Mr. Wilkes in the coming

22  weeks.  But based on those conversations today, I do not

23  believe he's objecting to entry of the interim order, but he

24  can speak for himself if he'd like to be heard.

25          THE COURT:  Mr. Wilkes?

1           MR. WILKES:  Thank you, Your Honor.  J. Steven Wilkes

2    for the United States Trustee.  The issues left over for the

3    interim time period is for those -- those two true banks.

4    PayPal is a bank but it's not really what most people consider

5    a true bank.  And plus, it's also not FDIC insured.  But for

6    the two banks to get into a discussion with the DIP regarding

7    whether they want to issue a bond in favor of the United States

8    under 345, or to pledge additional collateral to the FDIC to

9    fully insure those amounts on account in the DIP accounts.

10           Absent that, then we may have an issue for the Court

11    to adjudicate, but before that, the adjudication of whether or

12    not to waive the requirements 345 is somewhat premature.

13           THE COURT:  All right.  And we'll deal with that at a

14    final hearing, which will be noticed in the order or will be

15    included in the order.

16           All right, any objections?

17       (No audible response)

18           THE COURT:  All right.  So on an interim basis, the

19    motion's granted.  And you all will get a date for a final

20    hearing from Ms. Weldon and include that in the order.

21           MR. WEBB:  Thank you, Your Honor.

22           THE COURT:  Thank you, Mr. Webb.

23           Mr. Sorkin.

24           MR. SORKIN:  Thank you, Your Honor.  Andrew Sorkin

25    for the debtors.  That just leaves to the DIP.

```
 1              THE COURT:  All right.

 2              MR. SORKIN:  Docket Number 24.  And I will just start

 3  with the evidentiary support for the benefit of the Court and

 4  anybody who would like to cross-examine our witnesses.  We're

 5  relying on both the DiDonato and Parkhill declarations.  The

 6  relevant portions of DiDonato, at least the specific support

 7  for this motion, can be found at Paragraph 77 to 85.  I would

 8  say that the background section at the beginning is also

 9  relevant for contrast.

10              THE COURT:  Oh, I'm sure.

11              MR. SORKIN:  And with respect to Mr. Parkhill's

12  declaration, it's largely the entire thing.  But we can

13  probably skip over the qualifications paragraph and go right to

14  Paragraphs 8 to 27.

15              THE COURT:  All right.

16              MR. SORKIN:  So with that, I think in light of the

17  objection that was filed, it's helpful to clarify for the Court

18  what we are asking the Court to do today.

19              THE COURT:  I was going to ask about that.  You know,

20  I read the objection carefully.  It seems to me to raise some

21  issues that are probably resolvable between you.  Maybe not all

22  of the issues, but some of them.

23              I also am uncertain what is absolutely necessary, on

24  an interim basis, versus on a final basis.  So if you would

25  help me understand number one, whether you've had discussions,
```

1  or whether it might make sense -- I don't know if you've all

2  had the time, given the recent filing of the objection, which

3  totally understandable why it would be filed when it was, to

4  talk about it, whether it might help you to talk about it.  I'm

5  happy to take a recess for that to occur to resolve as many

6  issues as possible.

7        And then I want to focus on what is absolutely

8  necessary on an interim basis.  I will tell you, up front, that

9  I found a number of the objections to be well grounded.  I

10  don't want to approve anything that is not absolutely necessary

11  on a final basis.  I'm also somewhat concerned about the roll-

12  up, whether that needs to be approved today, or whether it can

13  be more fully argued and approved on at a final hearing.

14        And if the roll-up does need to be approved today,

15  I'm going to need to understand why that is.  And I was also

16  curious about the extent of the roll-up.  When I first read the

17  pleadings, my initial reaction was that the roll-up would be

18  for those funds that were advanced with respect to the runway

19  to get over the last 60 days to get to the filing.  And I'm not

20  sure whether Mr. Goldberg or Mr. Berger had it correct that

21  it's the entire prepetition indebtedness that's being rolled

22  up.  I assume they do.  They probably read it more carefully

23  than I did.  So I have some issues there, just in terms of

24  understanding what's being sought, and what the necessity is

25  for it.

1          And I'm not unfamiliar with the differing levels of

2   leverage that the debtor may have with respect to negotiating

3   with lenders and lenders may have, absent a committee and third

4   parties being involved, so that does resonate with me.  And I'm

5   just -- I'm trying to put what's on the table, or what I'm

6   thinking. on the table, so that everyone's aware of it and can

7   discuss the matters accordingly and try to reach an

8   accommodation.  I would much prefer an accommodation here than

9   having to rule on some of these issues.

10          So with that having been said, Mr. Sorkin, how do you

11  wish to proceed?

12          MR. SORKIN:  Yeah, just some preliminary comments.

13  We are always happy to discuss with objectors in the hope of

14  reaching a consensual resolution.  I was introduced to

15  Monster's counsel just a few hours ago before the limited

16  objection was filed, which he, you know, kindly previewed for

17  us.

18          THE COURT:  Yeah.

19          MR. SORKIN:  We've not had a chance to discuss the

20  substance of it.  Fortunately, by my read of their objection,

21  they are not raising any issues that I consider day one issues.

22  To be clear, we are not asking Your Honor to approve any aspect

23  of the roll-up today.  I would like to respond to Your Honor's

24  commentary about it.

25          THE COURT:  Sure.

1          MR. SORKIN:  Just to put it in context, and I can get

2    to that in my presentation.  We are not seeking any waivers

3    under 506(c), 552, marshalling.  None of that today.  We are

4    not --

5          THE COURT:  You're asking for 30 some odd million

6    dollars to get from here to a final hearing.

7          MR. SORKIN:  Correct.

8          THE COURT:  Pay all these things that we've approved

9    today.

10          MR. SORKIN:  Correct.

11          THE COURT:  Et cetera, and survive to live another

12    day.

13          MR. SORKIN:  You just cut to the chase, Your Honor.

14          THE COURT:  Understood.

15          MR. SORKIN:  We are asking for authority to borrow

16    $34 million dollars under the DIP and use cash collateral to

17    fund critical expenses in accordance with the budget.

18          THE COURT:  Okay.  So to me that makes this easier.

19    And I think it sounds to me like it's worthwhile to take a

20    recess for 5 to 10 minutes to save 20 minutes.

21          All right, five to ten minutes lawyer time, which

22    equals, I don't know, half an hour.  Maybe for you all to talk

23    and see if you can get to that point, because I agree with you.

24    It doesn't sound like the issues raised in the objection

25    necessarily relate to the interim relief that you've now

1   clarified.  Maybe it was clear in the motion.  I don't mean to

2   suggest otherwise.

3            But so Mr. Goldberg, are -- he's a nice guy.  I mean,

4   you're a nice guy.

5            MR. GOLDBERG:  They're my friends.  Yeah, we're

6   always happy to talk.

7            THE COURT:  Come to the mic because I'm not sure Zoom

8   catches you, and I think you may have to push the mic on if

9   you're at counsel table.

10            MR. GOLDBERG:  I think and I am approximately

11   Mr. Guso's height so --

12            THE COURT:  But not Battista's, that's for sure.

13            MR. GOLDBERG:  Well, come on.  I am Jewish, Your

14   Honor.  Your Honor --

15            THE COURT:  I'm not going to go there.

16            MR. GOLDBERG:  Yeah, good, good.

17            Your Honor, Mr. Feinstein was really handling this

18   for us.

19            THE COURT:  Well, I didn't mean to --

20            MR. GOLDBERG:  No, no, but we are always happy to

21   talk and come to an agreement.  I can certainly represent that.

22   And we're happy to spend a few minutes, see if we can come to

23   an agreement.

24            THE COURT:  Are you able to get Mr. Feinstein on the

25   phone?

1          Mr. Goldberg:  Yeah.

2          THE COURT:  And all that?

3          MR. GOLDBERG:  Absolutely, he's on the Zoom.

4          MR. FEINSTEIN:  Your Honor --

5          THE COURT:  Yes.

6          MR. FEINSTEIN:  Your Honor -- if Your Honor could --
7   I might be able to short circuit this and avoid a break,
8   because we did have communications with debtor's counsel before
9   the hearing.  And if Your Honor could indulge me, I'd like to
10  make a couple of remarks about the DIP and then talk about what
11  issues are on for today and what concern us and what are
12  clearly future issues like the roll-up.

13          I mean, to be clear, we raised the roll-up because it
14  is way off market.  It's a three and a half to one.  And it's
15  just that that context, Your Honor, it's indicative of the
16  leverage that's been exerted here on the debtor by the lenders.
17  But we appreciate that that's for a final hearing.

18          The other two issues, I think, do require some
19  surgery today.  And one I think conceptually we're -- I think
20  we're already there.  And that is --

21          THE COURT:  What are those two issues, Mr. Feinstein?

22          MR. FEINSTEIN:  So there's -- the -- when the
23  surcharge and other waivers come into effect, and the challenge
24  provision.  So on the former, you've got three paragraphs:  43,
25  47, and 48 in the interim order, that say in effect, subject to

1  the entry of a final order, there's going to be a surcharge

2  waiver.  Subject to the entry of a final order, there's going

3  to be a waiver of the right to argue equities of the case and

4  marshal.

5          So I had an experience recently in another case, Your

6  Honor, where lenders, looking at precisely that language,

7  "subject to the entry of a final order, there's a waiver," took

8  the position that the waiver was effective on day one of the

9  case.  On, you know, when the interim order is entered, and

10  that there's a condition subsequent that there still needs to

11  be a final order that confirms that.

12          But to be clear, the waiver period would begin to run

13  today in this case, if, Your Honor, in our view signed the

14  language that's in the order -- in the proposed order.  The

15  simple fix is to say, "subject to and upon entry of the final

16  order, then those various waivers would come into effect," and

17  then we're done.  So there's no implication that anybody's

18  entitled to any kind of waiver between now and the entry of a

19  final order, which will only be entered after a committee has

20  had a chance to look at all this.

21          THE COURT:  All right.  That sounds like an offer.

22  But since I'm not a mediator, let's take a -- unless

23  Mr. Sorkin, you can just agree right here, right now.  What's

24  your response to that?  Or do you need some time to talk about

25  it?

```
 1              MR. SORKIN:  Just my initial response is it was not
 2    our intent to lock in any of these waivers as of day one.  The,
 3    you know, this is not the first time I've heard someone take
 4    issue with the "subject to a final order" language and question
 5    why they're in here if we're not seeking approval of them.  The
 6    answer I've always come up with is, you know, we're providing
 7    notice to the world that when we do seek entry of the final
 8    order --
 9              THE COURT:  Okay.  It's a language issue.
10              MR. SORKIN:  Yeah, exactly.
11              THE COURT:  Yeah.  And shockingly, the recipient of
12    the waiver has appeared.
13              MR. SORKIN:  I did say I needed to talk to him.
14              MR. LLUBERAS:  Yes, Your Honor.  And I figured I'd
15    short circuit this as well.  Luis Lluberas, L-L-U-B-E-R-A-S, on
16    behalf of Truist Bank, the administrative agent.
17              There is no intent here, Your Honor, to play peekaboo
18    on this language.  I think the proposed fix by Mr. Feinstein is
19    acceptable.  We all intended that this would be a final order
20    issue, but did want to take the opportunity to put it front and
21    center in front of the of the Court today, and certainly are
22    happy to make that accommodation in whatever Your Honor enters.
23              THE COURT:  All right.  So sounds like there's a
24    resolution.  Are there any open issues left?  Sounds like there
25    aren't.
```

```
 1              MR. LLUBERAS:  I believe there was one more.

 2              THE COURT:  Oh, one -

 3              MR. FEINSTEIN:  Well, so that leaves the challenge

 4   provision.

 5              THE COURT:  Oh, I'm sorry.  Yes, the challenge

 6   petition.  Okay.  So -- but I will want you all to sit down

 7   before you leave here today and work on the specific language

 8   of the interim order.  Literally redline it.  Go through it

 9   page by page, because if you leave here and you still don't

10   have an agreement, or there's a problem, then you're going to

11   have to come back in front of me and that's going to be highly

12   inconvenient for everybody.  So and I've had -- I've done that

13   before, believing that the lawyer is going to be able to

14   resolve the language and I have been, unfortunately, wrong, and

15   it ends up requiring an emergency hearing.  So just that's

16   going to be the process regardless of what's agreed to on the

17   record here today, okay?

18              MR. SORKIN:  Understood, Your Honor.

19              THE COURT:  So Mr. Feinstein, so tell me about the

20   challenge period.  I did read the objection.  I understand that

21   there's timing issues with respect to what amounts to starting

22   at 75 days without the committee even having been appointed and

23   all that, and you needing some time after the committee is

24   appointed to deal with these issues.  So tell me what you're

25   looking for.
```

1          MR. FEINSTEIN:  So, the -- if I could rewrite the

2   challenge provision, Your Honor, it would say that there's a --

3   first of all a longer period and a more robust investigation

4   budget.  But perhaps most importantly, that the file that -- in

5   order to really give the parties who are entitled to

6   investigate potential claims a real -- a meaningful

7   opportunity, the order would have to change from what it

8   currently provides, which is that it currently provides that

9   within the 60-day period, the committee would have to seek and

10  obtain standing to bring a challenge.  Otherwise, the challenge

11  period will expire.

12          And it's far more common, Your Honor, to provide that

13  so long as the committee or other party in interest files a

14  motion for standing before the end of the challenge period,

15  that that would toll the period.  Otherwise, you're effectively

16  shortening the period, because you need to file the motion on

17  notice.  So if you haven't heard on day 59, you would need to

18  file it close to day 40.  And now you're really getting to the

19  point where the ability to investigate claims and the like is

20  really being deprived, so tolling a longer period.

21          And then there's one other quirky issue, Your Honor.

22  And again, I can provide language to the debtors' and lenders'

23  counsel, but some of the debtors are limited liability

24  companies.  And there's, in my view, unfortunate case law out

25  there, but it's out there, holding that committees cannot

1   obtain standing, where the debtor's a limited liability

2   company, and the state limited liability statute prohibits

3   anyone from bringing claims derivatively on behalf of an LLC.

4           So if a debtor's LLC --

5           THE COURT:  Is that law, and where is -- is that in

6   Florida?

7           MR. FEINSTEIN:  So well, there's -- this all started

8   --

9           THE COURT:  Because when I read the objection, I

10  wasn't quite sure what that all meant.

11          MR. FEINSTEIN:  Yeah, I apologize, Your Honor.  We

12  put this together late last night.  But there's a case.  It --

13          THE COURT:  No, no.  It's -- it was a well-drafted

14  objection.  I just -- it was just not explained.  I don't think

15  -- maybe I missed it, but I read it quickly.  But I --

16          MR. FEINSTEIN:  Yeah.

17          THE COURT:  -- it didn't seem to explain.  It didn't

18  explain what that law was.

19          MR. FEINSTEIN:  So there's a case that started in the

20  Delaware Chancery Court called Bax, B-A-X, that held that only

21  -- the only parties who could sue derivatively on behalf of a

22  limited liability company are members or assignees of the

23  claim.  And that has -- that provision was construed by the

24  Delaware Bankruptcy Court in a case called HH Holdings, that a

25  committee can't be granted standing to bring claims on behalf

1 of the estate.  And other cases, other courts have followed

2 this -- a few.  There haven't been a lot of decisions.  There's

3 one decision going the other way from Judge Wiles in New York,

4 held -- upholding that federal bankruptcy law decides --

5 controls who can bring standing on behalf of the estate and the

6 state law can't limit that.

7          THE COURT:  Okay.

8          MR. FEINSTEIN:  But most of the other decisions out

9 there follow this Chancery Court opinion that would essentially

10 deprive the committee of ability to, or anybody else, to sue

11 directly on behalf of the estate.

12          So now you go back, in light of that case law, and

13 look at the standard DIP order with stipulations.  It provides

14 on day one that the debtor is stipulating to the validity of

15 the debt; that there's no claims against the lenders; and

16 basically forswearing any ability to ever bring a claim.  So if

17 the debtor has foresworn its ability to bring a claim and

18 nobody else can, then we've basically given the letters of

19 release on the first day of the case, and that can't be, right?

20          But either we can take all the stipulations out,

21 which lenders' counsel don't like to do, or we can improvise.

22 And that's what we've done in other cases where we've

23 represented the committee.  And the provision in sum and

24 substance says that if the committee files a motion identifying

25 a claim that should be brought derivatively on behalf of the

1  estate, but it can't be brought because of the limited

2  liability company provision, then the parties will essentially

3  meet and confer, have the status conference in front of the

4  court, but try to develop some way to either preserve the claim

5  or to have it prosecuted by the debtor, maybe by a new

6  independent director, or what have you, but something that

7  keeps the claim alive.  Otherwise, it's just inappropriate to

8  have these stipulations in the order on the first day.

9        THE COURT:  Are these, by the way, are the debtors

10  Delaware entities or Florida?  Or something else?

11        MR. SORKIN:   No.  All but one are Florida entities,

12  whether they're LLCs or corporations.  The one exception is

13  Vital Pharmaceutical International Sales, Inc.

14        THE COURT:  Understood.  And when -- where is that

15  located or incorporated?

16        MR. SORKIN:  It's incorporated in Delaware.

17        THE COURT:  In Delaware.  All right.  Okay.  So I

18  guess that's sort of an offer also.  So how do you respond?

19        MR. SORKIN:  That one, I mean, I may need more time

20  to digest and I suspect Mr. Lluberas does, too.

21        THE COURT:  Okay.

22        MR. SORKIN:  I would note on the challenge period,

23  generally, in connection with our discussions with Mr. Wilkes

24  today, we did move that 75-day deadline to 90.  It's still 60

25  from appointment for a committee, but I did want to flag, just

1  in case anybody has doubts about our ability to negotiate

2  constructively with the creditors committee, once appointed.

3  And, you know, obviously, this is not a creditors' committee,

4  this is Monster.

5          You know, we've already demonstrated our ability to

6  address these issues before final hearing, but I'm happy to --

7          THE COURT:  Yeah.  And I don't, by the way, I'm not

8  jumping to any conclusions with respect to what the intent of

9  either the lender or the debtor was, in this regard at all.

10  This is -- this battle plays out in every large case so it's

11  certainly to be expected.

12          Having said that, Mr. Wilkes, what is your position

13  on all of this?  Or I guess you would be involved in these

14  discussions once we take a recess.  Is that a fair statement?

15          MR. WILKES:  That would be a fair statement, Your

16  Honor.  J. Steven Wilkes for the United States Trustee.  As was

17  previewed before, as the trustee has had discussions with the

18  lender's counsel as well as debtors' counsel, regarding

19  specifically this challenge period issue, candidly, the United

20  States Trustee did not raise the issue of obtaining an order of

21  standing, because the United States Trustee actually reads that

22  differently than the courts that seem to require it, because of

23  -- this is an objection to -- this would be in line with an

24  objection to claim or a determination of the validity, extent

25  or priority of (audio interference).  And that is a action by a

1  party in interest on both of those.

2          THE COURT:  Interesting.  All right.

3          MR. WILKES:  So it's encompassing anyone.  It would

4  be outside of that window.

5          THE COURT:  I think Mr. Feinstein though, was

6  expressing a fear, not necessarily a conclusion.

7          MR. WILKES:  Oh, sure.

8          THE COURT:  So --

9          MR. WILKES:  True.

10          MR. FEINSTEIN:  Well, Your Honor, it's -- I think the

11  U.S. Trustee's right, that some matters that fall under a

12  challenge would be like a claim objection that any party in

13  interest could bring.  But if the challenge is an outbound

14  claim, like an inferential transfer claim, avoidance under

15  liability, then you run into the LLC statute.

16          THE COURT:  Yeah.

17          MR. FEINSTEIN:  And I do want to add, Your Honor, if

18  I might, for just a minute.

19          THE COURT:  Well, before -- just hold on to that

20  because I'm not sure Mr. Wilkes was finished.  Go ahead,

21  Mr. Wilkes.

22          MR. WILKES:  So to that, the United States Trustee is

23  not -- is cognizant that both the debtor and lender's counsel

24  are amenable to massage the issues and come to the resolution

25  that is probably going to be of the day today.

1           THE COURT:  All right.  Fair enough.  Mr. Feinstein,

2   you wanted to add something?

3           MR. FEINSTEIN:  Yeah.  Yes, Your Honor.  If I could

4   just take a couple of minutes about the -- about Monster's

5   claim and their role in that case and why our raising this is

6   not a hypothetical.  I mean, Monster may well seek standing on

7   its own before the day is out.  I don't know.  I do know this.

8           THE COURT:  Well, Mr. Feinstein, I'm not --I don't

9   mean to cut you off, but I don't really think we need to spend

10  the time to do that.  I am very open to hear about what your

11  view of Monster's motivation might be.  I've certainly heard

12  what Monster's view of others' motivations are, or certainly

13  the leverage plays, et cetera.  My goal today is to get past

14  first day to get an interim order entered.  It sounds like

15  we're, you know, on the five-yard line, and would love you guys

16  to punch it in for a touchdown.  And I'm going to give you some

17  time to do that, Mr. Feinstein, if that's okay with you.

18          I -- you're going to have every opportunity to inform

19  the Court of these issues once we get to the substantive

20  issues.  I'm just not sure I need it right now.

21          MR. FEINSTEIN:  Okay.  Your Honor, I just -- I simply

22  wanted to convey Monster's concern about how the case is

23  proceeding and in particular, some -- a comment that counsel

24  made and a comment that's in the first day declaration about

25  corporate governance.

1          Monster has judgment and verdict for false

2   advertising.  You know, unfortunately, the largest creditor in

3   the case: 293 million against the debtor and Mr. Owoc.  And our

4   concern about this case, and I do think it's appropriate to put

5   this on the record in the first day, Your Honor, is that at

6   least as of a few days ago, Mr. Owoc continued to be the sole

7   director of this company.  He's the CEO.  He was at the helm

8   when the debtor undertook these actions that led to that jury

9   verdict, as well as $175 million-plus arbitration award.  And I

10  think counsel said again, today that the debtor intends to

11  expand its board but that if it hasn't happened, that means

12  that the decision making authority in this company today still

13  resides exclusively with Mr. Owoc.  And if that's going to

14  change, it can't change soon enough, in Monster's view, because

15  you know, that there's all these statements of future intention

16  that Mr. Panagos will be -- become the restructuring committee

17  for each board.  It seems like none of that's in place today.

18  So Monster has real concerns about the overall discharge of the

19  case at this point, as well as the DIP.  Thank you, Your Honor.

20          THE COURT:  All right.  Well, I hear you.  But now

21  what's going to happen, Mr. Feinstein, is everybody has to

22  respond, so --

23          MR. LLUBERAS:  Your Honor, I'll be very brief.  Luis

24  Lluberas, again on behalf of Truist Bank, the administrative

25  agent.  If Monster takes a look at the proposed DIP credit

1  facility as a condition to closing, there will be a requirement
2  that the board be constituted in the manner that was presented
3  earlier by Mr. Sorkin.  So --
4           THE COURT:  By a date certain in order to effectuate
5  the facility?
6           MR. LLUBERAS:  Yes, to close the facility, Your
7  Honor.  We --
8           THE COURT:  All right.  So that -- that helps.
9  Okay.  Understood.
10          MR. LLUBERAS:  Yes.  That -- I think that should
11  solve Mr. Feinstein's concern about governance being in play,
12  because, you know, the lenders are effectively requiring that
13  to provide money.
14          THE COURT:  Understood.  All right.  So we don't --
15  again, I hear you.  It's on -- you've made your statements.
16  It's not before the Court right now.  What's before the Court
17  is interim relief that's being requested for DIP financing,
18  that seems rather necessary.
19          So why don't we take -- how much time do you all
20  need, do you think?
21          All right, so we're going to take a lawyer's version
22  of ten minutes.  I guess the way to let us know you're ready is
23  to -- Melva, know how we do that?  Well, I can leave and they
24  stay in in the courtroom, or they can go in the conference
25  rooms.  However -- where -- we have two conference rooms out

1   there.

2           MR. SORKIN:  We can just go out into the conference,

3   very briefly, Your Honor.

4           THE COURT:  All right.  And so Melva, you'll be here

5   the whole time?  All right, fair enough.  Okay.  So we'll be in

6   recess, and you'll let me know when you're ready.  And again,

7   don't forget, you got to redline the order so that we know --

8   everyone knows exactly what's being entered.

9           MR. SORKIN:  We will do that.

10          MR. LLUBERAS:  (Cross-talk).

11          MR. SORKIN:  We'll take this opportunity to do that

12  Your Honor.

13          THE COURT:  All right.  Thank you all very much.

14          MR. SORKIN:  Thank you.

15          MR. LLUBERAS:  Thank you.

16      (Recess taken at 4:09 p.m.)

17      (Proceedings resumed at 4:38 p.m.)

18          THE COURT:  Are we on the record?  All right.

19          What do you have for me, Mr. Sorkin?

20          MR. SORKIN:  For the record, Andrew Sorkin on behalf

21  of the debtors.  Your Honor, pleased to announce that I think

22  we were able to resolve the Monster objection for purposes of

23  today, with a couple of changes to the order that I will walk

24  the Court through now.

25          THE COURT:  Let me find the order.  Where do I look

1    for that?

2              MR. SORKIN:  That would be at Docket 20 --

3              THE COURT:  Attached to the motion?

4              MR. SORKIN:  Yeah, attached to Docket 24.

5              THE COURT:  Okay.  All right.

6              MR. SORKIN:  And on the first issue, which is the --

7              THE COURT:  The page of the 223 that the order starts

8    on?

9              MR. SORKIN:  Yes.  I believe that would be -- we're

10   going to Paragraph 43 here, and that would be Page 88 of 223.

11             THE COURT:  All right.  Solves all my insomnia

12   problems.

13             MR. SORKIN:  The papers can be good for that.

14             THE COURT:  All right.  Taking me a while to get to

15   88.

16             MR. SORKIN:  No problem.

17             THE COURT:  All right.  Well, that's the paragraph.

18   Oh, that's the paragraph of the order that's changing?

19             MR. SORKIN:  Yeah. 4 -- 43 on the section 506(c)

20   waiver.

21             THE COURT:  Okay.

22             MR. SORKIN:  And there'll be parallel changes for the

23   552(b) and marshalling waivers.

24             THE COURT:  Okay.

25             MR. SORKIN:  On 43, the only addition is after the

1    word "subject to."  We're going to say "and upon entry of a

2    final order."

3              THE COURT:  Okay, the Fein -- we'll call that the

4    Feinstein amendment.

5              MR. SORKIN:  Yes.  And there will be three Feinstein

6    amendments.

7              THE COURT:  Okay.

8              MR. SORKIN:  The second is oi Paragraph 47, which is

9    on Page 92 of 223.  Also, "subject to and upon entry of a final

10   order."

11             THE COURT:  Okay.

12             MR. SORKIN:  And the third is also on the same page

13   right below, for the 552(b) waiver, "subject to and upon entry

14   of a final order."

15             THE COURT:  Okay.

16             MR. SORKIN:  Then, we jump back to Paragraph 40,

17   which is the challenge provision.  That's on Page 80 -- starts

18   on Page 84.  I think we will just be adding a standalone

19   paragraph at the end of this lengthy section.  So, call it the

20   bottom of Page 87 of 223.  And I will read the language into

21   the record.

22             THE COURT:  Notwithstanding anything to the contrary?

23   But go ahead.

24             MR. SORKIN:  It actually -- it starts with "Nothing

25   herein shall limit."

1          THE COURT:  All right.  Close enough.

2          MR. SORKIN:  But let me start with that -- the

3    header.  It will be titled "Reservation regarding committee

4    standing."  "Nothing herein shall limit the committee's ability

5    to X file a timely standing motion in respect of any timely

6    challenge for which it cannot obtain standing as a matter of

7    law because the applicable debtor is a limited liability

8    company, defined as an LLC challenge motion.  And Y, seek

9    pursuant to such LLC challenge motion, a mechanism by which to

10   prosecute such challenge, provided that the committee otherwise

11   satisfies the requirements set forth in this Paragraph 40."

12         THE COURT:  Okay.

13         MR. SORKIN:  "In the event the committee files a

14   timely LLC challenge for which it cannot obtain standing, and

15   provided that the committee otherwise satisfies the

16   requirements set forth in this Paragraph 42, the expiration of

17   the challenge deadline solely for the specific challenge set

18   forth in the LLC challenge motion, and solely as to the

19   defendants named therein shall be tolled pending further order

20   of the court.  And the applicable parties shall meet and confer

21   with respect to an appropriate process, if any, for the

22   prosecution of any such challenge."

23         THE COURT:  So meaning that any party or the, I guess

24   the debtor can appear and or any party can seek to end the

25   tolling.  I suppose that could be a further order of the Court

1  or a court order resolving the issue.

2              MR. SORKIN:  Correct.

3              THE COURT:  Okay.  All right.

4              MR. LLUBERAS:  And Your Honor, for the record, Luis

5  Lluberas, on behalf of Truist Bank.  We are amenable to this

6  language.

7              THE COURT:  Okay, good.  All right.  Is that --

8              MR. FEINSTEIN:  So then the other thing we discussed,

9  Your Honor, what -- I apologize because we probably should have

10 clarified this in the conference room, was the general concept

11 of tolling upon filing of a standing motion.  And I -- it's one

12 of the things we asked for.  I don't know that we came up with

13 precise language but I thought we talked about that

14 conceptually.  Am I right about that?

15             MR. SORKIN:  Yeah, I think so.  If I may address the

16 Court on it.  We did speak about that.  But I think this

17 language solves, for the concerns that I think all of us had in

18 there.  So if we accept this language as it is, effectively, as

19 a practical matter, we will be before the Court.  If there is

20 this issue, seeking an order, identifying how long the tolling

21 period would be, it's almost reserved for a later date.

22             THE COURT:  All right.

23             MR. FEINSTEIN:  Yeah, and I don't -- maybe I wasn't

24 clear about it.  That new paragraph deals with a situation

25 where there's a claim on behalf of an LLC that can't be brought

1  by a committee.  What I was talking about was the general

2  challenge deadline, whether it's 60 days, or 75 days, the order

3  currently reads that the committee or party in interest has to

4  seek and obtain standing by the deadline.  And what I was

5  raising was that if you seek it by filing a motion before the

6  challenge deadline, that that would toll it, pending the

7  outcome of the challenge proceeding or standing motion.

8           THE COURT:  Yes.  I think I think we have an

9  agreement in principle on that.  We don't have the specific

10  language because we spent most of our time focusing on this

11  LLC-specific situation, but I -- I'm sure that we can adapt

12  this language to address the concept that Mr. Feinstein just

13  raised.

14           MR. FEINSTEIN:  It was.

15           THE COURT:  Alright, so Mr. Feinstein, your concern

16  is not so much limited to the LLC.  That's been covered.  Your

17  concern, just to make sure I understand it, is that the 60 to

18  75, or the 75 days needs to be tolled under what circumstance?

19           MR. FEINSTEIN:  If a standing motion is filed.

20           THE COURT:  Okay.  So it would be probably a sentence

21  that simply says and if -- or added to this paragraph that "In

22  the event a standing motion is filed, then that automatically

23  tolls the challenge period."

24           MR. SORKIN:  Yep.

25           THE COURT:  Right?

1        MR. FEINSTEIN:  Until further order of the Court.

2        MR. LLUBERAS:  Yes, Your Honor.  And my

3   recommendation would be so that we're not in limbo, Luis

4   Lluberas on behalf of Truist Bank.  So that we're not in limbo

5   on this, I would just say, I would respectfully submit that we

6   just have a 30-day clock on it.  It tolls it for 30 days, and

7   we can all get in front of Your Honor to figure out how much

8   longer that may be necessary.

9        THE COURT:  Well, I don't -- I'm not here to

10  negotiate.  You guys are supposed to negotiate, and that's not

11  been resolved apparently.  We have two choices.  You can talk

12  about it further and just try to put a cap on this, or I

13  suppose we can continue talking about it here and I can give

14  you my thoughts.  But I'd much rather you all agree to specific

15  language on this.  It doesn't seem like a big task to get

16  there.  And I'm happy to take a recess for in this case, three

17  minutes of lawyer time instead of ten.

18        Does that work for you all?  Mr. Feinstein?

19        MR. LLUBERAS:  Yes, Your Honor.

20        MR. SORKIN:  Yes.

21        MR. FEINSTEIN:  Yes, Your Honor.  I think I have

22  language from another order.  I spent most of the break finding

23  the LLC language, but this one, I think I have in front of me

24  and I can just send it quickly to counsel to review.

25        THE COURT:  Not a heavy lift.

1          MR. FEINSTEIN:  I apologize -- (indiscernible).

2          THE COURT:  Doesn't sound like a heavy lift.

3          MR. LLUBERAS:  It's not, Your Honor.

4          THE COURT:  So we'll be in recess then for three

5   minutes of lawyer time.

6          MR. SORKIN:  Thank you, Your Honor.

7          MR. LLUBERAS:  Thank you.

8          MR. FEINSTEIN:  Thank you, Your Honor.

9      (Recess taken at 4:46 p.m.)

10      (Proceedings resumed at 5:07 p.m.)

11          THE COURT:  Okay, what do you got, Mr. Sorkin?

12          MR. SORKIN:  Thank you for the time, Your Honor.  And

13   I -- we were able to resolve this one as well.

14          So this language, also in Paragraph 40, I will get

15   you the page number again, sorry.

16          THE COURT:  I have it.  87?

17          MR. SORKIN:  Yeah, it's around there.

18          THE COURT:  There's nothing -- there's no language

19   there that I'm -- that's relevant.

20          MR. SORKIN:  Let's see.  I'm on 80 -- I think we're

21   going to be in the 85, 86 range here.

22          THE COURT:  Okay.  Go ahead.

23          MR. SORKIN:  And if you look down to subclause (b).

24          THE COURT:  Yep.

25          MR. SORKIN:  It begins "with respect to any other

1    party in interest."

2            THE COURT:  I'm there.

3            MR. SORKIN:  All right.  So after the definition of

4    challenge period, sorry, that was the fastest way to get there.

5    We will add the following proviso.  "Provided that the filing

6    of a motion by the committee or any other party in interest

7    seeking standing to commence a challenge prior to the

8    applicable deadline shall toll such deadline for a period of 45

9    days from the filing of the motion.

10           And then there's just a tracking change on Page 86.

11           THE COURT:  In that 45 days, they either need to

12   extend it or resolve the standing issue?

13           MR. SORKIN:  Presumably we'll either resolve it or

14   really not we --

15           THE COURT:  Right.

16           MR. SORKIN:  -- they will resolve it or we'll be in

17   front of you either, you know, on the motion or for an

18   extension or --

19           THE COURT:  Okay.

20           MR. SORKIN:  The other change is at the end of the

21   sentence that runs on to Page 86.  That ends with a Clause III,

22   Roman numerals.  We will be adding a clause IV that says

23   "pursuant to the tolling provided in the preceding sentence."

24   This is just all about the circumstances under which the

25   deadline can get extended.

```
 1              THE COURT:  Okay.  All right.  Great.
 2              MR. SORKIN:  So with that, I think we have --
 3              THE COURT:  All issues?
 4              MR. SORKIN:  All of our issues resolved.
 5              THE COURT:  Okay.
 6              MR. FEINSTEIN:  Yes, we do.  Thank you.
 7              THE COURT:  All right.  I don't see -- do you need
 8  other lawyers here?  Are we -- have we covered every, I think,
 9  single issue now --
10              MR. SORKIN:  I believe --
11              THE COURT:  -- that's apparent?
12              MR. SORKIN:  Yeah.  I believe we've covered
13  everything for purposes of today's hearing.  I don't know
14  whether we want to go ahead and schedule a second day hearing.
15              THE COURT:  We can certainly do that.  Tell me what
16  you're looking to file.  This would not be final hearings on
17  these matters.  This would be just setting up some time for
18  additional matters sooner rather than later or --
19              MR. SORKIN:  Oh, no, sorry.  I was thinking the final
20  hearing --
21              THE COURT:  Oh, the final hearings?  Okay, sure.
22              MR. SORKIN:  -- on these matters if --
23              THE COURT:  How much time do you need?
24              MR. SORKIN:  So we have kind of an outside date under
25  the DIP of 30 days from entry of the interim order, which may
```

1    be today or tomorrow, which I think would take us out to some

2    time before November 12th would be ideal.

3              THE COURT:  Okay, what do we have, Ms. Weldon?

4    November 10th is a Thursday.  Is it a pretty heavy calendar?

5              What's -- what is that Wednesday, November 9th?  What

6    -- do we have anything on November 9th?  Let's do it on

7    November 9th, just in case it happens to be longer and we don't

8    have to keep these folks from missing their planes back to

9    wherever they're from, which I hope didn't happen today.  But

10   it is what it is.

11             All right.  So why don't we start in the morning then

12   on November 9th?  That -- unless you have -- I don't know who's

13   traveling or tell me what's convenient.

14             MR. SORKIN:  Morning is fine, here.

15             THE COURT:  Okay, what time?  10 a.m.?

16             MR. SORKIN:  Sure.

17             THE COURT:  Okay.  November 9th, 10 a.m.

18             MR. LLUBERAS:  I can do that as well.

19             THE COURT:  Do you want to speak to Mr. Guso,

20   Battista and whoever else is missing or did they leave you?

21             MR. SORKIN:  We should, Your Honor.

22             MR. LLUBERAS:  We should, yes.

23             MR. SORKIN:  We should, yes.

24             THE COURT:  Yeah.

25             MR. SORKIN:  Don't want to keep you too long.

1              MR. LLUBERAS:  They've started drinking.

2              THE COURT:  I'm already stuck in traffic for a while

3  so tell them about the sanction, okay?  Just kidding.

4              MR. GUSO:  Judge, it's nice to have bright white

5  light here.

6              THE COURT:  Yep.  You know?

7              MR. GUSO:  I was going to come up and ask for a

8  drink.

9              THE COURT:  I was going to tell you it wasn't easy to

10  do.  It was not easy to do, I mean, working with GSA.  And

11  apparently these lights aren't as simple as they seem and

12  whatever.  I don't know why it was so difficult, but it was.

13             MR. GUSO:  Kind of appropriate for this.

14             THE COURT:  Yeah.  Yeah.

15             MR. LLUBERAS:  And Your Honor, I think -- sorry, Luis

16  Lluberas on behalf of Truist Bank.  I think that timeframe

17  works fine.  We just confirm with folks.

18             THE COURT:  Okay.  All right.  Great.  So include

19  that in all of the orders as the final hearing date.  And

20  whether it's final or not, that -- the next hearing date for

21  any of these matters.

22             MR. LLUBERAS:  Sure.

23             THE COURT:  Anything else we need to do here today?

24             MR. GUSO:  Just for my clarity, your last remarks.

25  That's the hearing date for all of the matters that have either

1   been continued, or for the retention applications as well?

2            THE COURT:  Does that -- we can have other hearings.

3   I -- we can move those up if you want.  I'm not wedded to that

4   for everything.

5            MR. GUSO:  November 9th is perfect, Judge.  High

6   clarity.

7            THE COURT:  So whatever you all need.

8            MR. GUSO:  Yes, sir. Thank you.

9            THE COURT:  I'm here to serve you.

10           Mr. GUSO:  Thank you, Judge.

11           MR. SORKIN:  Thank you, Your Honor.

12           THE COURT:  All right.

13           MR. LLUBERAS:  Your Honor, Luis Lluberas on behalf of

14   Truist Bank again.  If I'm -

15           THE COURT:  There are limits.  Anyway, go ahead.

16           MR. LLUBERAS:  If I may just take two minutes, Your

17   Honor.  I did want to take an opportunity to introduce Miss

18   Jade Silver from Truist Bank, who's here, had made the trip.

19   Also Morgan McCaskey of FTI, who's our financial advisor.

20           THE COURT:  Great, welcome.

21           MR. LLUBERAS:  If I could, I realize that this is

22   almost closing time.  But if I may just have two minutes, Your

23   Honor.

24           THE COURT:  Sure.

25           MR. LLUBERAS:  I did just want to identify the, you

1  know, the role that the Truist Bank plays as administrative

2  agent for the lender syndicate.  We've got 13 financial

3  institutions in this credit facility, including Truist.  And

4  because each institution has its own separate credit decision,

5  credit chain, you know, Miss Silver's role and that of Truist

6  is really of an intermediary for her institution, as well as

7  for the lenders.

8          And in light of that, and the diversity of the

9  lenders and their respective viewpoints, I did just want to

10 note that it's been tough, candid, respectful, arm's length

11 negotiations, trying to get to a point where all 13 of the

12 lenders have agreed to provide the prepetition -- the

13 prepetition lenders have agreed to support the DIP facility.

14         And, you know, there was just a quick comment made by

15 counsel to Monster, which I think is ultimately for the final

16 hearing.  And this is obviously not up before Your Honor at

17 this point, but I did want to emphasize that the lenders'

18 willingness to provide more funds than originally contemplated

19 in the DIP facility, approximately $50 million more, provide

20 more time to the debtors, three additional months plus a lot

21 easier milestones, to be honest, than what was originally

22 contemplated.  And the predicate for this factual information,

23 Your Honor, is in the Parkhill declaration.

24         THE COURT:  Okay.

25         MR. SORKIN:  There's a summary grid that identifies

1  the negotiations as they happened over the course of several

2  months.  I did just want to mention that Your Honor had

3  identified potentially some concerns about the roll-up.  We'll

4  be ready to brief it.  We'll be ready to explain the bases for

5  it.

6          But I did just want to put the bug in Your Honor's

7  ear, that that is just part and parcel of the structure that we

8  have for the lenders here.  And so, I just didn't want it to be

9  lost on folks of how important all this dovetails together,

10  that the company is going to get new money and ultimately,

11  again, reserve for another day, but I didn't want it to be lost

12  in the discussion.

13          THE COURT:  I understand it.  It's not lost.  It's,

14  you know, I think I approved a roll-up, I think it was in

15  Unipharma.  But I don't know that it was contested to this

16  degree, frankly.  You know, roll-ups are not necessarily

17  favored, arguably disfavored in the law.  There has to be

18  adequate grounds for it, and, you know, I'm not -- I've not

19  decided the issue by any means.  It's also -- could be a matter

20  of degree, how much of it is rolled up, whether it's all of it,

21  whether it's some other portion of it.

22          So, you know, it's an issue that we're all familiar

23  with.  It's certainly become a very popular term of DIP

24  financing in the last few years, so I get it.  But we're here

25  in a court, and you'll put on your case and Monster will put on

1  its case, and we'll see where it falls.

2        I am, as I should be, completely neutral at this

3  point.  And we'll just have to see how it plays out because I

4  don't necessarily understand all the implications either way.

5        MR. LLUBERAS:  No, understood, Your Honor.  I -- and

6  I appreciate Your Honor being so candid and clear about the

7  fact that this is an issue to be decided at a later date.

8  Again, without belaboring the point, I just wanted to --

9        THE COURT:  And I, by the way, I understand the

10  internal workings of the loan that's, you know, that's, you

11  know, that has the framework that you've described.  I've been

12  in negotiations with lenders in similar circumstances, and I

13  get it.  It's not all that easy but I assume there's a

14  governance process within that, where, you know, decisions have

15  to be made and can be made.  And if it's not settled, that's

16  what I'm here for,  so --

17        MR. LLUBERAS:  Well, we appreciate your time.  Thank

18  you, Your Honor.

19        THE COURT:  Of course.  All right.  So we're good for

20  the day?

21        MR. GUSO:  Yes, sir.  Other than to thank you again,

22  Judge.  Thank you.

23        MR. SORKIN:  Thank you, Your Honor.

24        MR. LLUBERAS:  Thank you, Judge.

25        THE COURT:  My pleasure.  Thank you all for being

1    here and for the fine legal work.  And I don't know, if I get

2    really unable to sleep tonight, I'll -- I don't know, read this

3    223 pages again.  Anyway.

4            And as I said, Mr. Guso, in the last case, try to

5    keep the pleadings a little shorter and the orders a little

6    shorter.  I just don't need to read all those words.

7            All right.  Well, for all of you.  Anyway.

8            MR. GUSO:  thank you, YOUR HONOR.

9            THE COURT:  Thank you Mr. Feinstein and those on

10   Zoom, and we'll see you next time.

11           MR. FEINSTEIN:  Yes, sir.

12           MR. GUSO:  Thank you.

13       (Proceedings concluded at 5:17 p.m.)

14                            *  *  *  *  *

15                   **C E R T I F I C A T I O N**

16

17           I, Alicia Jarrett, court-approved transcriber, hereby

18   certify that the foregoing is a correct transcript from the

19   official electronic sound recording of the proceedings in the

20   above-entitled matter.

21

22

23   _____

24   ALICIA JARRETT, AAERT NO. 428      DATE:  October 18, 2022

25   ACCESS TRANSCRIPTS, LLC