**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**Fort Lauderdale Division**
**www.flsb.uscourts.gov**

| | |
|---|---|
| **In re:** | **Chapter 11** |
| **VITAL PHARMACEUTICALS, INC.,** *et al.,* | **Case No.: 22-17842-PDR** |
| **Debtors.** | **(Joint Administration)** |

_____/

**EASTGROUP PROPERTIES, L.P.'S**
**MOTION FOR RELIEF FROM THE AUTOMATIC STAY AND**
**MOTION TO COMPEL IMMEDIATE PAYMENT OF ADMINISTRATIVE RENT**

   **MOVANT**, EASTGROUP PROPERTIES, L.P. ("EastGroup" or "Movant"), pursuant to 11 U.S.C. § 362, 11 U.S.C. § 365, Local Rule 4001-1 and all other applicable Rules, Statutes and laws files this its Motion For Relief from the Automatic Stay and to Compel Immediate Payment of Administrative Rent  and in support there of states:

   1.      Debtor filed for Chapter 11 relief on October 10, 2022 and is operating as a debtor in possession. No Trustee has been appointed.

   2.       Movant, EastGroup entered into a Lease with Debtor, Vital Pharmaceuticals, Inc. for non residential real property located at 1951 N. Commerce Parkway, Units A, B, C and E, Weston, Florida 33326 ("Property") on June 28, 2017 and there were subsequently two Amendments to the lease ("Lease"). The Lease expires by its terms on March 31, 2026.  A true and correct copy of the Lease and two Amendments are attached hereto as Composite Exhibit "1".

   3.      The Lease consists of 134,400 square feet of warehouse space with monthly Base Rent in the amount of $ 98,027.16.  The Debtor did not pay the rent due on October 1, 2022. [1]

_____

[1] As the stay relief concerns a lease and the default occurred  October 1, 2022 with pre- petition rent having accrued for  the 9 days prior to the petition date and 9 days post petition as of the date of this filing  an affidavit and worksheet are not included pursuant to Local Rule 4001-1( B) (3).

4.      The Debtor has not utilized the premises in over 30 days which under Florida law is an element of the presumption of abandonment. 83.05(3)(a).

5.      Movant has consulted with Debtor's counsel regarding its intentions concerning the Lease, including whether it consents to stay relief, will be commencing payment of administrative rent and its intent regarding assumption or rejection of the Lease and is awaiting a response.

6.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. 157(a)(b)(1)(2) and 1334, Federal Rules of Bankruptcy Procedure 4001 and 9004 and 11 U.S.C. 362.

## MEMORANDUM

### Stay Relief

Stay relief is appropriate for cause, including lack of adequate protection under 362 (d)(2)(A) or under 362 (d)(2) (B) as the debtor does not have equity in the property and such property is not necessary for an effective reorganization. Under the circumstances presented, cause exists as the Debtor is not and has not been utilizing the property and Movant is not adequately protected absent payment of rent on a timely basis. Moreover, Debtor does not have equity in the property and it is not necessary for an effective reorganization.

### Payment of Administrative Rent

Pursuant to 11 U.S.C. 365 (d)(3) the debtor is required to perform all of the obligations of the debtor arising after the order for relief under any unexpired lease until such lease is assumed or rejected, notwithstanding 503(b)(1). *In re Florida Lifestyle Apparel*, 221 B.R. 897, 899 (Bankr. M.D. Fla. 1997) (the literal language of Section 365(d)(3) which requires a trustee to perform all obligations under leases of nonresidential real property, including the obligation to make timely rent payments, is interpreted to waive the requirement that the lessor must

demonstrate that the estate benefited from the post-petition rental charge); *In re CHS Electronics*, 265 B.R. 339(Bankr.S.D.Fla.2001).  Accordingly, until the Debtor assumes or rejects the subject Lease the Debtor should be compelled to timely pay rent and all other obligations under the Lease.  The amount of rent is significant and Movant should not be prejudiced to the extent Debtor maintains possession during this Chapter 11 case.

　　　　**WHEREFORE**, Movant, EastGroup Properties, L.P., requests that this Court enter an order granting its Motion For Relief from the Automatic Stay and/or to Compel Immediate Payment of Administrative Rent and such other and further relief this court deems just and proper.

## <u>CERTIFICATE OF SERVICE</u>

　　　　**I HEREBY CERTIFY** that a true and correct copy of the foregoing was served via  ***U.S. Mail and/or electronically via CM/ECF to all parties registered to receive electronic notice and as noted on the attached service list:*** including but not limited to Debtors counsel Jordi Guso, Esq., jguso@bergersingerman.com, 1450  Brickell Ave .#1900, Miami, FL  33131, on this  19th day of <u>October, 2022</u>.

Dated: <u>October 19,2022</u>

Respectfully submitted,

I HEREBY CERTIFY that I am admitted to the Bar of the United States District Court of the compliance with the additional qualifications to practice in this Court as set forth in Local Rule 2090-1(A).

GAMBERG & ABRAMS
Counsel for Movant,
　　EastGroup Properties, L.P.
633 S. Andrews Avenue, #500
Fort Lauderdale, Florida 33301
Telephone:　(954) 523-0900
Facsimile:　(954) 915-9016
E-mail: tabrams@tabramslaw.com
By: /s/ Thomas L. Abrams
　　Thomas L. Abrams, Esquire
　　Florida Bar No. 764329

## SERVICE LIST

***Notice Service via CM/ECF electronic filing:***

Thomas L Abrams on behalf of Creditor EASTGROUP Properties, L.P.
tabrams@tabramslaw.com, fcolumbo@tabramslaw.com

Scott Andron on behalf of Creditor Broward County
sandron@broward.org, swulfekuhle@broward.org

Jordi Guso, Esq. on behalf of Debtor Bang Energy Canada, Inc.
jguso@bergersingerman.com,
fsellers@bergersingerman.com;efile@bergersingerman.com;efile@ecf.inforuptcy.com

Jordi Guso, Esq. on behalf of Debtor JHO Intellectual Property Holdings, LLC
jguso@bergersingerman.com,
fsellers@bergersingerman.com;efile@bergersingerman.com;efile@ecf.inforuptcy.com

Jordi Guso, Esq. on behalf of Debtor JHO Real Estate Investment, LLC
jguso@bergersingerman.com,
fsellers@bergersingerman.com;efile@bergersingerman.com;efile@ecf.inforuptcy.com

Jordi Guso, Esq. on behalf of Debtor Quash Seltzer, LLC
jguso@bergersingerman.com,
fsellers@bergersingerman.com;efile@bergersingerman.com;efile@ecf.inforuptcy.com

Jordi Guso, Esq. on behalf of Debtor Rainbow Unicorn Bev LLC
jguso@bergersingerman.com,
fsellers@bergersingerman.com;efile@bergersingerman.com;efile@ecf.inforuptcy.com

Jordi Guso, Esq. on behalf of Debtor Vital Pharmaceuticals International Sales, Inc.
jguso@bergersingerman.com,
fsellers@bergersingerman.com;efile@bergersingerman.com;efile@ecf.inforuptcy.com

Jordi Guso, Esq. on behalf of Debtor Vital Pharmaceuticals, Inc.
jguso@bergersingerman.com,
fsellers@bergersingerman.com;efile@bergersingerman.com;efile@ecf.inforuptcy.com

Office of the US Trustee
USTPRegion21.MM.ECF@usdoj.gov

By: /s/ Thomas L. Abrams, Esq.
Thomas L. Abrams, Esquire

# Composite
# Exhibit
# "1"

## LEASE AGREEMENT

THIS LEASE AGREEMENT ("Lease") is made and entered into as of the *28* day of June, 2017, by and between **EastGroup Properties, LP, a Delaware limited partnership** ("Landlord") and **Vital Pharmaceuticals, Inc., d/b/a VPX Sports, a Florida corporation** (Tenant").

### WITNESSETH:

1.    Premises. Landlord, in consideration of the payments to it by Tenant of the rents herein contained, which Tenant agrees to pay, and in consideration of the performance by Tenant of the covenants hereinafter provided, which Tenant agrees to fully and promptly perform, does hereby lease to Tenant approximately 67,200 square feet of space, hereinafter referred to as the "Premises," as shown on the plan attached hereto as "Exhibit A" and incorporated herein by reference, located within Building 1951 (the "Building") of Weston Commerce Park (the "Center"). The address of the Premises is 1951 N. Commerce Parkway, Suite "C", Weston, FL  33326. For purposes of calculating sums owed under this Lease, it is agreed that the Premises constitutes approximately 50.00% of the total leasable area within ☒ the Building, or ☐ the Center in which it is located. Said percentage is hereinafter referred to as "Tenant's Share." If the size of the Premises, or Building/Center is for any reason adjusted, Tenant's Share shall be likewise adjusted accordingly.

2.    Term. The term of this Lease shall be for a period of Thirty-Six(36) months beginning on the date upon which the improvements to be constructed to the Premises in accordance with Exhibit C-1" attached hereto have been substantially completed (the "Commencement Date"). It is currently anticipated to begin on August  1, 2017, and ending at 11:59:59 PM EST on July 31, 2020. This period (including any renewals), shall be referred to as the "Term." As used herein, the term "substantially completed" shall mean, that in the reasonable opinion of the architect or space planner that prepared the plans for such improvements, such improvements have been completed in accordance with the plans and the Premises are in good and satisfactory condition, subject only to completion of minor punch list items.

3.    Rent. As "Rent" for the use and occupancy of the Premises, Tenant shall pay to Landlord, without demand, deduction or offset, as an independent covenant of all other covenants of this Lease, in lawful money of The United States of America, "Base Rent" as set forth in subparagraph (b) below, Tenant's Share of "Operating Expenses" (based on an initial estimated annual Operating Expense Factor of $2.75 (per square foot) as described in Section 6 below, and State of Florida sales tax ("Sales Tax") on all amounts due from Tenant to Landlord pursuant to this Lease. Such sums shall be payable in monthly installments in advance on the first day of each and every month of the Term as set forth below.

With respect to rents, the parties also agree as follows:

(a)    Tenant has deposited with Landlord simultaneously with Tenant's execution of this Lease, the sum of Fifty-Six Thousand and 00/100 Dollars ($56,000.00) plus all applicable Sales Tax for a total of Fifty-Nine Thousand, Three Hundred Sixty and 00/100 Dollars ($59,360.00) which will be credited to Tenant for payment of the first month's Rent.

(b)    Rent Schedule: Base Rent shall be payable through the initial Term in accordance with the following schedule:

| Lease Months | Base Rent Per SF | Monthly Base Rent* | Annual Base Rent* |
|---|---|---|---|
| Months 1 – 12 | $7.25 | $40,600.00 | $487,200.00 |
| Months 13 – 24 | $7.47 | $41,832.00 | $501,984.00 |
| Months 25 - 36 | $7.69 | $43,064.00 | $516,768.00 |

*\* Amounts do not include applicable Sales Tax and Operating Expenses to be paid by Tenant.*

(c)    If the Commencement Date occurs on a day other than the first day of a calendar month, the Rent for such initial fractional month shall be prorated based on the actual number of days in such month. Any excess from the initial payment of Rent made by Tenant shall be applied to Rent due for the second (2nd) month of the Term.

1



(d)    Rent shall be delivered by Tenant to Landlord at such place as Landlord may designate in writing and Rent shall be payable to *EastGroup Properties LP, East Coast Lock Box, P.O. Box 534563, Atlanta, GA 30353-4563*, or paid to Landlord by ACH transfer pursuant to transfer instructions to be provided by Landlord upon request.

(e)    Tenant hereby agrees with Landlord that in the event that Rent is received after the fifth (5th) day of the month in which it is due, Tenant shall pay to Landlord a late charge equal to three percent (3%) of the total sum due.

4.    <u>Additional Rent</u>.  In addition to Rent set forth herein, all other payments (if any) to be made by Tenant to Landlord shall be deemed to be and shall become additional rent hereunder, whether or not the same be designated as such; and shall be due and payable with the next succeeding installment of monthly Rent, together with Sales Tax thereon.  Landlord shall have the same remedies for failure to pay the same as for a non-payment of Rent.  Following any returned check or other demand for payment, Tenant must remit all payments thereafter either by Wire Transfer or Bank Official Check only.  An administrative fee will be assessed for all dishonored checks.

5.    <u>Security Deposit</u>.  Tenant shall, upon the execution of this Lease, deposit with Landlord as security for the payment of Rent and the performance of all other covenants to be performed by Tenant, the sum of Twenty-Five Thousand and 00/100 Dollars ($25,000.00).  Said security deposit shall be non-interest bearing and shall be held by Landlord for the entire Term.  If Tenant defaults in the payment of any monthly Rent installment or fails to perform any other covenant within ten (10) days after receipt of written demand therefor, Landlord, at its option, may apply sufficient sums from the security deposit towards payment thereof.  If Landlord elects to so apply the security deposit, or any part thereof, Tenant shall be obliged to immediately replenish the security deposit for the amount so applied by Landlord.  The total security deposit shall be held by Landlord until expiration of the Term, and the unused portion of the security deposit not having been drawn against shall be refunded by Landlord to Tenant after the end of the Term, provided, however, Landlord may retain all or any portion of the deposit as Landlord deems reasonably necessary as security for the payment of the final year-end Operating Expense reconciliation.  The security deposit shall not be applied to final Rent at the end of the Term.

6.    <u>Operating Expenses</u>.  (a)   Initially, the estimated "Operating Expense Factor" equals <u>$2.75</u> per square foot of the Premises, for the calendar year in which the Commencement Date occurs, to cover Tenant's Share of the projected Operating Expenses.

With respect to Operating Expenses, the parties agree to the following:

(i)    The term "Operating Expenses" used in this Lease shall mean the total annualized cost of operating the Building/Center including, but is not limited to, owner's association costs and assessments, Common Maintenance and Service Costs, Real Estate Taxes and Assessments, Insurance Premiums, accounting, management fees and other reasonable costs associated with the management and operation of the Building/Center.  Said term shall not include depreciation on any improvement, any major capital expenses or improvements  except all net expenses required by any change in the laws, rules, regulations or orders of any governmental or quasi-governmental authority having jurisdiction, which expenses shall be repaid in equal monthly installments together with interest at applicable rates over the useful capital life of the capital improvement not to exceed ten (10) years, moving or relocation costs and real estate commissions.

(ii)    The term "Common Maintenance and Service Costs" shall include without limitation routine cleaning and maintenance of the exterior of the Premises to include periodic window cleaning; the cleaning, maintenance and sweeping of the parking lot and sidewalks; the care and maintenance of the landscaping and landscaped areas to include the retention pond areas, conduits, pumps and irrigation systems; common area lighting and other utility charges, if any; domestic and irrigation water, and sanitary sewer charges and assessments; rubbish collection, if any; painting; and any other costs customarily considered as common repair, maintenance and service costs.

(iii)    The term "Real Estate Taxes and Assessments" shall include, without limitation, all ad valorem and non ad valorem real and personal property taxes and assessments or any new and different taxes, and assessments levied against or assessed to the Building or Center.  All Sales Tax on Rent and personal property taxes charged or levied against Tenant's furniture, fixtures and equipment in the Premises shall be paid by Tenant when due.  Landlord shall have the

2

_____     _____
       Initial                    Initial

right to employ a tax consultant to attempt to assure a fair tax burden on the Building or Center. Tenant agrees to pay Tenant's Share of the cost of such consultant as a part of Operating Expenses.

(iv)    The term "Insurance Premiums" shall include, without limitation, the cost of Landlord's insurance as set forth in Section 9. In the event the cost of premiums on said fire and extended insurance increases due to the hazardous nature of the use and occupancy by Tenant of the Premises, then the entire increase in insurance cost shall be paid by Tenant in a lump sum within thirty (30) days following receipt of invoice from Landlord.

(b)    From and after the Commencement Date, on a monthly basis during the Term of the Lease, Tenant shall pay Landlord one-twelfth (1/12) of Tenant's Share of estimated Operating Expenses in advance, at the same time and in the same place as Base Rent. The Operating Expense Factor portion of the Rent set forth in Section 6(a) above (and, as a result, the Rent) shall be periodically adjusted to reflect Tenant's Share of actual or estimated decreases or increases in Operating Expenses. Landlord shall provide the cost data upon which the determination of costs, and any decreases or increases therein, are based in a format it shall determine to be consistent with reasonable and customary business practices. Landlord shall annually reconcile Tenant's annual Operating Expense payments for the preceding calendar year against Tenant's Share of the actual Operating Expenses for such calendar year. In the event that Tenant's Share of actual Operating Expenses for such calendar year is less than the Operating Expense payments made by Tenant during such period, Landlord shall promptly refund or credit such excess to the account of Tenant. If the sum paid by Tenant is less than Tenant's Share of the actual Operating Expenses for such period, Tenant shall pay Landlord the difference upon invoice therefor accompanied by supporting data. In no event shall Landlord's delay in the computation of such adjustment or the communication thereof to Tenant relieve Tenant of Tenant's obligation to pay monthly estimated Operating Expenses each month during the Term based upon the estimate then in effect. The obligation to pay Tenant's Share of Operating Expenses incurred during the Term shall survive the expiration or termination of this Lease.

(c)    Tenant acknowledges that if the Building is part of a Center, the Center may include not only the Building but other buildings either already existing or to be constructed in the future. Tenant understands and agrees that, for the purposes of administering the provisions of this Section 6, so long as the Building is owned and/or managed in conjunction with other buildings, Operating Expenses and other costs reimbursable by Tenant may be paid, recorded and reported on a consolidated overall project basis.

(d)    Upon computation of the Operating Expenses and the corresponding adjustment of the estimated monthly Operating Expense payments due from Tenant for the current lease year and the communication of that adjustment by Landlord to Tenant, Tenant shall pay, with the monthly installment of Base Rent next due following communication of such adjustment, the difference, if any, between the monthly estimated Operating Expenses for the preceding year and the monthly estimated Operating Expenses for the current year, multiplied by the number of months, if any, elapsed during the then current year prior to such communication (i.e. the number of months elapsed since the last anniversary of the Commencement Date).

7.    <u>Construction</u>.  Tenant accepts the Premises as follows:

☐ "As Is"

☐ With the following improvements to be made by Landlord, using Landlord's standard materials and finishes, unless otherwise specified: _____ .

☒ With improvements to be constructed in accordance with "Exhibit C-1" attached hereto.

Tenant acknowledges that neither Landlord nor its agents or employees have made any representations or warranties as to the suitability or fitness of the Premises for the conduct of Tenant's business or for any other purpose, nor has Landlord or its agents or employees agreed to undertake any alterations or construct any tenant improvements to the Premises except as expressly provided in this Lease. If for any reason Landlord cannot deliver possession of the Premises to Tenant on the Commencement Date, this Lease will not be void or voidable, and Landlord will not be liable to Tenant for any resultant loss or damage. If any delay in substantial completion of the Premises is caused by delays attributable to Tenant, then the Commencement Date as shown in Section 2 "Term" shall not be postponed or delayed. If none of the boxes in this paragraph are marked at the time of the execution of this Lease, Tenant shall be deemed to be accepting the Premises on an "As Is" basis, with no representation or warranties from Landlord of any kind except as expressly provided in this Lease.

3

Initial        Initial

(a)     Landlord shall provide Tenant a maximum of Fifty Thousand and 00/100 Dollars ($50,000.00) Improvement Reimbursement Allowance ("Improvement Allowance") to be used on or before December 31, 2019, for Premises improvements as mutually agreed upon by Landlord and Tenant in accordance with "Exhibit C-2" attached hereto. Any portion of the Improvement Allowance remaining unused by Tenant after December 31. 2019, shall be deemed waived by Tenant.  With the exception of cosmetic changes (paint, carpet, etc.) any alterations completed by Tenant shall be submitted for review and approval by Landlord prior to start of work. All improvements shall be performed by licensed and insured contractors, and per any and all applicable Landlord requirements and governing codes. Landlord finish specifications attached herein. After work is improved, approved and completed, Tenants shall submit proof of work completed, including (but not limited to) scope of work, invoices, proof of payment, and release of lien from all contractors conducting the work. Landlord shall inspect the Work completed to insure compliance.  All alterations submitted and completed shall be in compliance and of Lease requirements.

8.     Utilities.  Tenant shall pay when due electric power consumed at the Premises, which shall be separately metered. Tenant shall reimburse Landlord for water and sewer charges as part of the "Operating Expense Factor" pursuant to Section 6. Landlord reserves the right to install, at Landlord's discretion, separate meters (or submeters) for any utility, and may further require Tenant to place service in Tenant's name, whereupon Tenant shall pay any necessary deposits to the applicable utility company, and thereafter pay for such utilities directly.   Tenant shall arrange and pay for trash collection services at the Premises.

9.     Insurance. (a)     Landlord shall, at all times during the Term of this Lease, insure the Building of which the Premises form a part against loss or damage to the Building/Center with coverage for perils as set forth under the "Causes of Loss-Special Form" or equivalent property insurance policy in an amount equal to the full insurable replacement cost of the Building/Center (excluding coverage of Tenant's personal property and any alterations by Tenant), and such other insurance, including liability and rent loss coverage, as Landlord may reasonably deem appropriate.  Tenant shall procure and maintain throughout the Term of this Lease: (i) a commercial general liability insurance policy, including insurance against assumed or contractual liability under this Lease, for liability arising out of Tenant's operations in, and the use, occupancy or maintenance of, the Premises and all areas appurtenant thereto, including any portion of the common areas used by Tenant, to afford protection with respect to bodily injury, death or property damage (including loss of use) of not less than One Million Dollars ($1,000,000) each occurrence/Two Million Dollars ($2,000,000) general aggregate, and in the event property of Tenant's invitees or customers are kept in or about the Premises, warehouser's legal liability or bailee customers insurance for the full value of the property of such invitees or customers; (ii) an all-risks property and casualty insurance (special form building and personal property coverage) policy, including theft coverage, written at replacement cost value with replacement cost endorsements, covering all of the Tenant's property; (iii) a worker's compensation insurance policy with applicable statutory limits, including a waiver of subrogation in favor of Landlord, (iv) automobile liability insurance with single limit coverage of at least $1,000,000 for all owned, leased/hired or non-owned vehicles; (v) an excess/umbrella liability policy "following form" of not less than Two Million Dollars ($2,000,000), including a "drop down" feature in case the limits of the primary policy are exhausted; and (vi) in the event Tenant will generate, handle or store Hazardous Materials (as defined in Section 32 below) at the Premises, pollution legal liability insurance of not less than One Million Dollars ($1,000,000).  All such policies shall be occurrence based and shall provide primary/ non-contributory coverage to Landlord (any policy issued to Landlord providing duplicate or similar coverage shall be deemed excess over Tenant's policies), and shall be procured by Tenant from responsible insurance companies satisfactory to Landlord that are rated no less than A-, Class VII, by A.M. Best Company.  All commercial general liability, automobile liability and, if applicable, warehouser's legal liability or bailee customers insurance policies shall include an "Additional Insured Endorsement" and a "Waiver of Subrogation Endorsement" in favor of Landlord, its affiliated companies, as well as the employees, officers, directors and agents of such companies and any other designees of Landlord. The limits and types of insurance maintained by Tenant shall not limit Tenant's liability under this Lease.  Landlord may also require all contractors performing work at the Premises for Tenant to provide, in addition to the insurance coverages referenced above, such other insurance in amounts and types and with such companies as may be reasonably requested by Landlord, including, without limitation, construction all risk/builder's risks (including loss of revenue) insurance, professional errors and omissions liability insurance, and insurance covering such contractor's equipment and tools.  Certificates of insurance in a form reasonably satisfactory to Landlord, or certified copies of the policies, shall be furnished to Landlord on or before the earlier of the Commencement Date or ten (10) days after execution of the Lease, reflecting the limits and endorsements required herein, and renewal certificates or certified copies of renewal policies shall be delivered to Landlord at least ten (10) days prior to the expiration date of any policy.  Each policy shall require notice of nonrenewal to Landlord and shall further provide that it may not be altered or canceled without thirty (30) days prior notice to Landlord.  Landlord agrees to cooperate

4

Initial     Initial

with Tenant to the extent reasonably requested by Tenant to enable Tenant to obtain such insurance. Landlord shall have the right to require increased limits and/or specific additional coverages if, in Landlord's reasonable judgment, either is necessary; provided, however, Landlord shall only be entitled to require such increased or additional coverages once during the Lease Term and only to the extent such increased or additional coverages are customary for commercial leases in the Ft. Lauderdale metropolitan market for buildings similar to the Building If Tenant fails to comply with the foregoing requirements relating to insurance, Landlord may, following ten (10) days written notice to Tenant, obtain such insurance and Tenant shall pay to Landlord within thirty (30) days of receipt of invoice the premium cost thereof.

(b)    Landlord and Tenant each waive, and release each other from and against, all claims for recovery against the other for any loss or damage to the property of such party arising out of fire or other casualty coverable by a standard "Causes of Loss-Special Form" property insurance policy with, in the case of Tenant, such endorsements and additional coverages as are considered good business practice in Tenant's business, even if such loss or damage shall be brought about by the fault or negligence of the other party or its employees, agents or contractors; provided, however, such waiver by Landlord shall not be effective with respect to Tenant's liability described in Sections 13 and 32 below. This waiver and release is effective regardless of whether the releasing party actually maintains the insurance described above in this Section 9 and is not limited to the amount of insurance actually carried, or to the actual proceeds received after a loss. Each party shall have its insurance company that issues its property coverage waive any rights of subrogation, and shall have the insurance company include an endorsement acknowledging this waiver, if necessary. Tenant assumes all risk of damage of Tenant's property within the Property, including any loss or damage caused by water leakage, fire, windstorm, explosion, theft, act of any other tenant, or other cause.

10.    Use of Premises, Parking and Loading. Tenant shall use and occupy the Premises only for use as administrative office and warehouse purposes and for no other purpose without Landlord's prior written consent, which shall not be unreasonably withheld or delayed. Landlord hereby grants to Tenant, its employees, guests and invitees the right to use the off-street auto parking lot and truck loading areas on the site upon which the Building is situated. The auto parking lot shall be used by Tenant, its employees, guests and invitees, in common with other tenants of said Building, their employees, guests and invitees, and in common with Landlord and its employees, guests and invitees; provided, however, Tenant shall be entitled to use 34 parking spaces in the location depicted on "Exhibit B" attached hereto. The exterior truck loading and trailer parking areas immediate to the Premises are reserved for the exclusive use of Tenant. Tenant shall not use, block or otherwise interfere with the loading areas of other occupants in the Building or Center. Tenant shall cause all trucks coming to the Premises to enter the truck loading area behind the Premises from the north side of the Building only. At no time will outside storage be permitted at the property without the express written consent of Landlord.

11.    Interruption of Utility Service. Landlord does not warrant that any utilities or public services will be free from interruption or defect. In the event of interruption of such services, the same shall not be deemed an eviction or disturbance of Tenant's use and possession of the Premises nor render Landlord liable to Tenant for damage by abatement of Rent or otherwise; provided, however, if any utility service to the Premises is interrupted for any period greater than five (5) consecutive business days due solely to Landlord's negligence or willful misconduct, and such interruption or failure prevents Tenant's use of the Premises for the purposes allowed by this Lease, then as liquidated damages for such interruption or failure, Rent payable hereunder shall be abated for each day after such five (5) business day period that such interruption or failure continues.

12.    Waiver of Claim; Indemnification. Except to the extent caused by the gross negligence or willful misconduct of Landlord, its employees, agents, representatives or servants, Tenant waives and releases all claims against Landlord, its agents, employees, and servants, in respect of, and they shall not be liable for, injury or damage to persons or property sustained by Tenant or by any occupant of the Premises, the Building, or the Center or any other person occurring in or about the Building/Center or the Premises resulting directly or indirectly from any existing or future condition, defect, matter or thing in the Premises or the Building or any part of it, or from equipment or appurtenance therein, or from accident, or from any occurrence, act, negligence or omission of any tenant or occupant of the Building, or of any other person. The aforesaid waiver and release shall apply also to damage caused by flooding, sprinkling devices, air conditioning apparatus, water, frost, steam, excessive heat or cold, falling objects, broken glass, sewage, gas, odors or noise, or the bursting or leaking of pipes or plumbing fixtures and shall apply equally whether any such damage results from the act or circumstance, whether of a like or wholly different nature. If any damage to the Premises or to the Building or any equipment or appurtenance therein, or to Tenant thereof, results from any act or omission or negligence of Tenant, its agents, employees, invitees or representatives, Landlord, at Landlord's option, may repair such damage and Tenant shall, within ten (10) days following demand by Landlord, reimburse Landlord forthwith for all cost of such repairs and damages both to the Building and to tenants or occupants thereof, in excess of the amount, if any, paid to

5

Initial          Initial

Landlord under insurance covering such damages. All property in the Building or in the Premises belonging to Tenant, its agents, employees or invitees, or to any occupant of the Premises, shall be there at the risk of Tenant or other person only, and Landlord shall not be liable for damage thereto or theft, misappropriation, or loss thereof. Tenant agrees to protect, defend, hold Landlord harmless and to indemnify it against claims and liability for injuries to all persons and for the damages due to any act or omission of Tenant, its agents, employees, guests, customers, clients and invitees and against any expense, cost and attorney's fees incurred in connection with any claim for such loss or damage, including costs and attorney's fees on appeal. Tenant shall pay all loss or damage occasioned by or growing out of the use and occupancy of the Premises by Tenant, its agents, employees, guests, customers and invitees, and Tenant will protect, defend, hold harmless and indemnify Landlord from and against any loss or liability thereof or therefor and from and against any expense, cost and attorney's fees incurred in connection with any claim for such loss or damage, including costs and attorney's fees on appeal.

13.     Care of Premises. (a)     Tenant shall, throughout the Term, take good care of the Premises and all fixtures, appurtenances, doors and windows, locks, walls, ceilings, flooring and mechanical and plumbing equipment located therein, excepting that which may be covered by applicable warranty, and, at its sole cost and expense, make all non-structural repairs thereto and perform maintenance thereon as and when needed to preserve them in good working order and condition, reasonable wear and tear from use and damage from the elements, fire or other casualty excepted. Notwithstanding the foregoing, all damage or injury to the Premises or to any other part of the Building, or to its fixtures, equipment and appurtenances, whether requiring structural or non-structural repairs, caused by or resulting from carelessness, omission, neglect or conduct of Tenant, its servants, employees, invitees or licensees, shall be repaired by Tenant at its sole expense to the satisfaction of Landlord reasonably exercised. Tenant shall replace or repair, as needed, all lamps, bulbs, ballasts and other lighting fixtures and apparatus. Tenant shall also repair all damage to the Building and the Premises caused by the moving of Tenant's fixtures, furniture or equipment. All the aforesaid repairs shall be of quality or class equal to the original work or construction. If Tenant fails after ten (10) days' notice to proceed with due diligence to make repairs required to be made by it, the same may be made by Landlord at the expense of Tenant. Tenant shall give Landlord prompt notice of any defective condition in the Premises which Landlord is required to repair or replace. Landlord shall remedy the condition with due diligence but at the expense of Tenant if repairs are necessitated by damage or injury attributable to Tenant, Tenant's servants, agents, employees, invitees, or licensees as aforesaid. All repair work and/or modifications made to the Premises must be made by licensed and bonded contractor(s) approved by Landlord.

        (b)     As of the Commencement Date, the heating, ventilating and air conditioning system(s) ("HVAC") serving the Premises shall be in good working order. Thereafter, Tenant shall be responsible for the cost of all maintenance, repair and replacement thereof. Tenant shall, within thirty (30) days of occupancy, contract with a licensed HVAC maintenance company approved by Landlord to maintain the system in proper working order with no less than three (3) quarterly inspections and maintenance services plus one (1) complete cleaning of coils and condensing units per year. Upon execution and renewal, Tenant agrees to supply a copy of the maintenance agreement to Landlord and shall at all times during the Term of the Lease keep in full force such HVAC maintenance agreement. If Tenant fails to enter into a maintenance agreement as herein provided or Landlord elects to provide same through its contractor, Landlord, at Landlord's option, may elect to enter into a service contract and Tenant shall pay the cost thereof. Landlord represents and warrants that all HVAC units in the Premises are new.

        (c)     Landlord agrees that during the Term it will keep the exterior and structural parts of the Building in good condition and repair, and that it will make such repairs promptly as they become necessary. If Tenant becomes aware of any condition that is Landlord's responsibility to repair, Tenant shall promptly notify Landlord of the condition. Exterior parts of the Building shall be deemed to include exterior walls, foundations, pavement, roof replacement, gutters, downspouts, and plumbing which is a part of the structure or foundation. Landlord shall make such interior replacements as are necessitated by building equipment failure and repairs and replacements necessitated by fire or perils covered by extended coverage insurance for which damage or loss insurance is carried by Landlord and for which insurance proceeds are recovered, including interior reconstruction and/or redecorating necessitated by such fire or other perils.

14.     Compliance with Laws and Regulations. (a) Tenant shall comply with all federal, state, county and city laws, ordinances, rules and regulations affecting or respecting the use or occupancy of the Premises by Tenant or the business at any time thereon transacted by Tenant, and Tenant shall comply with all rules which may be hereafter adopted by Landlord for the protection, welfare and orderly management of the Building and its tenants or occupants.

        (b)     Patriot Act. Each party hereby represents, warrants and certifies that: (i) neither it nor its officers, directors, or controlling owners is acting, directly or indirectly, for or on behalf of any person, group, entity, or nation named by any

6

Initial        Initial

Executive Order, the United States Department of Justice, or the United States Treasury Department as a terrorist, "Specifically Designated National or Blocked Person," or other banned or blocked person, entity, nation, or transaction pursuant to any law, order, rule or regulation that is enforced or administered by the Office of Foreign Assets Control ("SDN"); (ii) neither it nor its officers, directors or controlling owners is engaged in this transaction, directly or indirectly on behalf of, or instigating or facilitating this transaction, directly or indirectly on behalf of, any such person, group, entity, or nation; and (iii) neither it nor its officers, directors or controlling owners is in violation of Presidential Executive Order 13224, the USA PATRIOT Act, (Public Law 107-56), the Bank Secrecy Act, the Money Laundering Control Act or any regulations promulgated pursuant thereto. Each party hereby agrees to defend, indemnify and hold harmless the other party from and against any and all claims, damages, losses, risks, liabilities and expenses (including reasonable attorneys' fees and costs) arising from or related to any breach of the foregoing representations, warranties and certifications by the indemnifying party. The provisions of this Paragraph shall survive the expiration or earlier termination of this Lease.

15.    Holding Over.  Tenant has no right to remain in possession of all or any part of the Premises after the expiration of the Term. If Tenant nevertheless remains in possession of all or any part of the Premises after the expiration of the Term, with or without the express or implied consent of Landlord: (a) such tenancy will be deemed to be a periodic tenancy at sufferance from day-to-day only; (b) such tenancy will not constitute a renewal or extension of this Lease for any further term; (c) Rent during such tenancy shall be the greater of (i) an amount equal to 150% of the Rent for the last month of occupancy, or (ii) an amount equal to 150% of the fair market rental value of the Premises as reasonably determined by Landlord, and (d) such tenancy shall be subject to immediate termination by Landlord at any time.  Any other sums due under this Lease will be payable in the amount and at the times specified in this Lease.  In addition to such payment of Rent and other amounts as set forth in the previous sentence, Tenant shall also be liable to Landlord for any losses sustained by Landlord or claims by third parties arising out of and in connection with the holding over of the Premises by Tenant.  Such day-to-day tenancy will be subject to every other term, condition, and covenant contained in this Lease, except for rights to renew and expand.

16.    Signs.  Tenant shall not install or locate signs in the windows and doors of the Premises or any other part of the Building or grounds without first securing Landlord's written consent, which shall not be unreasonably withheld or delayed.  Any signs installed by Tenant with Landlord's permission shall be at the sole cost of Tenant and maintained by Tenant in good repair and shall be removed and any building or grounds damaged therefrom restored by Tenant at the expiration or earlier termination of this Lease at Tenant's expense.

17.    Quiet Enjoyment; Imposition of "Reasonableness" Standard.  Tenant, upon paying the Rent and keeping and performing the covenants of this Lease to be performed by Tenant, shall peacefully and quietly hold, occupy, and enjoy the Premises during the Term without any hindrance or molestation by Landlord or any persons lawfully claiming under Landlord.  Wherever the consent or approval of either party is required herein, it is understood and agreed that such consent or approval may not, unless expressly stated otherwise in this Lease, be unreasonably withheld or delayed.  If either party withholds any consent or approval, such party shall on written request deliver to the other party a written statement giving the reasons therefor. Tenant's sole remedy if Landlord unreasonably withholds or delays consent or approval shall be an action for specific performance, and Landlord shall not be liable for damages.  Whenever this Lease specifies that either party has the right of consent, said consent shall be effective only if in writing and signed by the consenting party.

18.    Waste; Disturbance.  Tenant shall not commit nor suffer any waste upon the Premises nor cause nor allow any nuisance, odor, noise, vibration or other act or thing which does or may disturb any other tenant in the Building/Center containing the Premises or any other building in the Center, including without limitation the parking, loading and landscaped areas.  Tenant shall conduct its business and control its employees, agents, contractors, invitees and visitors in such manner as not to create any nuisance, or interfere with, annoy or disturb any other tenant or Landlord or the operation of the Building.

19.    Assignment and Subletting.  Tenant shall not assign this Lease nor sublet all or any part of the Premises, except to a parent company, subsidiary or affiliated entity of common ownership and business ("Affiliate"), without first securing Landlord's written consent, which shall not be unreasonably withheld or delayed.  In the event of an assignment or subletting, the assignee and/or subtenant shall first assume in writing all of the obligations of Tenant under this Lease and Tenant shall, for the full Term, continue to be jointly and severally liable with such assignee or subtenant for the payment of Rent and the performance of all obligations required of Tenant under this Lease.  Tenant hereby acknowledges that the use to which the Premises are put and the compatibility of any occupant of the Premises with other tenants, and the use, creditworthiness, and ability to pay rent when due are of prime importance and significance to Landlord in the operation and maintenance of the Building in which the Premises are

7

Initial        Initial

located. The consent by Landlord to an assignment or sublease will not be construed to relieve Tenant from obtaining Landlord's prior written consent in writing to any further assignment or sublease. No permitted subtenant may assign or encumber its sublease or further sublease all or any portion of its subleased space, or otherwise permit the subleased space or any part of its subleased space to be used or occupied by others, without Landlord's prior written consent in each instance. Acceptance of payments from a person or entity other than Tenant shall not constitute consent to the assignment or subletting of the Premises. If Landlord consents to a proposed assignment or sublease, then Landlord will have the right to require Tenant to pay Landlord's reasonable attorneys' fees incurred in connection with negotiation, review, and processing of the transfer. All such sums payable will be payable to Landlord at the time the next payment of Base Rent is due. Anything to the contrary in this Lease notwithstanding, except when the assignment or subletting is proposed to an Affiliate, at any time within twenty (20) days after Landlord's receipt of all (but not less than all) of the information and documents reasonably requested by Landlord, Landlord may, at its option by written notice to Tenant, elect to: (a) sublease the Premises or the portion thereof proposed to be sublet by Tenant upon the same terms as those offered to the proposed subtenant; (b) take an assignment of the Lease upon the same terms as those offered to the proposed assignee; or (c) terminate the Lease in its entirety or as to the portion of the Premises proposed to be assigned or sublet, with a proportionate adjustment in the Rent payable hereunder if the Lease is terminated as to less than all of the Premises. If Landlord does not exercise any of the options described in the preceding sentence, then, during the above-described twenty (20) business day period, Landlord shall either consent or deny its consent to the proposed assignment or subletting.

Landlord shall have the right to assign or transfer, in whole or in part every feature of its rights and obligations hereunder and the Premises provided such assignee or transferee recognizes and agrees to be bound by the terms of this Lease. Such assignments or transfers may be made to a corporation, trust, trust company, individual or group of individuals, and howsoever made shall be in all things respected and recognized by Tenant.

20.     Fire or Other Casualty.  In the event the Premises shall be destroyed or so damaged or injured by fire or other casualty during the Term, whereby the same shall be rendered untenantable, then Landlord shall have the right to render the Premises tenantable by repairs within 180 days therefrom and this Lease shall not terminate; provided, however, Landlord shall not be required to rebuild, repair or replace any part of the partitions, fixtures, additions and other improvements which may have been placed in, on or about the Premises by Tenant. If the Premises cannot be rendered tenantable within said time, it shall be optional by either party hereto to cancel this Lease, and in the event of such cancellation, the Rent shall be paid only to the date of such fire or casualty. The cancellation herein mentioned shall be evidenced in writing. During any time that the Premises remain untenantable due to causes set forth in this paragraph, the Rent due hereunder or a just and fair proportion thereof shall abate. Notwithstanding the provisions of this Section 20, if the Premises or the Building are damaged by uninsured casualty, if the proceeds of insurance are insufficient to pay for the repair of any damage to the Premises or the Building, or if all or any portion of the proceeds of insurance are retained by Landlord's mortgagee, Landlord will have the option to repair such damage or cancel this Lease as of the date of such casualty by written notice to Tenant on or before sixty (60) days following the casualty.

21.     Eminent Domain.  If the whole of the Premises shall be taken by any public authority under the power of eminent domain, or if so much of the Building or grounds shall be taken by any such authority under the power of eminent domain so that Tenant cannot continue to operate its business in the Premises, then the Term shall cease as of the day possession is taken by such public authority and Rents shall be paid up to that day with proportionate refund by Landlord of any such Rents as may have been paid in advance or deposited as security. The amount awarded for any taking under the power of eminent domain shall belong entirely to and be the property of Landlord. Nothing herein shall limit Tenant's ability to make an independent claim for damages or awards to the extent Landlord's claims for damages are not affected.

8

Initial          Initial

22.    No Waiver or Accord and Satisfaction. (a)  Neither the waiver by Landlord of any agreement, breach, condition, default, provision, requirement, or term contained in this Lease nor the acquiescence of Landlord to any violation of any agreement, breach, condition, default, provision, requirement, or term contained in this Lease, shall be deemed to be a waiver of any subsequent breach of the same or any other agreement, condition, provision, requirement, or term contained in this Lease, nor constitute a course of dealing regardless of the number of times Landlord may choose to make such a waiver or acquiesce to any violation of any agreement, breach, condition, default, provision, requirement, or term contained in this Lease; nor will any custom or practice that may come to exist between the parties in the administration of the terms of this Lease be construed to waive or to lessen the right of Landlord to insist upon the performance by Tenant in strict accordance with the terms of this Lease.

(b)  Acceptance by Landlord of Rent or other amounts due, in whole or in part, following a breach or default will not be deemed to be a waiver of any existing or preceding breach by Tenant of any agreement, condition, provision, requirement, or term of this Lease, regardless of Landlord's knowledge of such preceding breach at the time of acceptance of such Rent or other payment.  However, payment of the full amount due, including any late fees, administrative charges and other amounts due, shall constitute a waiver of default for the failure of Tenant to pay the particular Rent or other payment so accepted.

(c)  No payment by Tenant or receipt by Landlord of a lesser amount than the full amount of any installment or payment of Rent or other amount due, shall be deemed to be anything other than a payment on account of the amount due, and no endorsement or statement on any check or payment of Rent or related to it shall be deemed an accord and satisfaction. Landlord may accept such check or payment without prejudice to Landlord's right to recover the balance of such installment or payment of Rent, or pursue any other remedies available to Landlord.

23.    Notices.  Prior to the Commencement Date, all notices required under this Lease to be given to Tenant shall be given to Tenant as follows: "Vital Pharmaceuticals, Inc., Attention: Office of the General Counsel, 1600 N Park Drive, Weston, FL 33326." After the Commencement Date, all notices required under this Lease to be given to Tenant shall be given to it at the Premises, or at such other place as Tenant may designate in writing.  Any such notice to be given to Landlord under this Lease shall be given to it at EastGroup Properties, 2966 Commerce Park Drive, Suite 450, Orlando, FL 32819, or at such other place as Landlord may designate in writing.  Notwithstanding anything to the contrary herein, all notices shall be in writing, require a receipt, and shall be sent by certified mail, postage prepaid, or by telecopy facsimile transmission or electronic transmission (email), or by personal delivery, or by commercial courier or overnight delivery service.  Notices shall be deemed to have been given (i) in the case of mailing, when postmarked, (ii) in the case of telecopy or email transmission, when received as evidenced by written transmission report, or (iii) in the case of hand delivery or delivery by commercial courier, when delivered or refused.

24.    Subordination.  This Lease is subject and subordinate to all mortgages which may now or hereafter affect the Premises or the Building of which it forms a part, and to all renewals, modifications, consolidations, replacements and extensions thereof. This clause shall be self-operative and no further instrument of subordination shall be required.

25.    Fixtures and Alterations.  Tenant shall not, without Landlord's prior written consent, attach any fixtures in or to the Premises or change, alter or make additions to the Premises, nor attach or affix any article hereto, nor permit any annoying sound device, overload any floor, or deface the Premises.  Notwithstanding the foregoing, Tenant may install a pre-fabricated office structure within the warehouse portion of the Premises, subject to Landlord's approval of the location and manner of installation. Any attached fixtures or any alterations, additions or improvements made to or attached by Tenant upon the Premises, including, but not limited to, the aforesaid pre-fabricated office structure, shall, on the expiration or termination of this Lease, if requested by Landlord, be promptly removed at Tenant's expense and the Premises restored by Tenant at its expense to its original condition, ordinary wear and tear excepted.  Any such fixture, alteration, addition and/or improvement not requested to be removed shall remain in the Premises in good operating condition and in compliance with all laws (including without limitation, the National Electric Code) and shall become and remain the property of Landlord.  All of Tenant's fixtures, installations and personal property not removed from the Premises upon the expiration or termination, and not required by Landlord to have been removed as provided in this paragraph, shall be conclusively presumed to have been abandoned by Tenant and title thereto shall pass to Landlord under this Lease as if by a bill of sale.

9

Initial          Initial

26.    <u>Redelivery of Premises</u>.  Tenant shall, on the expiration of this Lease, deliver up the Premises in as good order and condition as it now is or may be put by Landlord, reasonable use and ordinary wear and tear thereof and damage by fire or other unavoidable casualty, condemnation excepted.   Additionally, Tenant shall promptly surrender all keys to the Premises to Landlord.

27.    <u>Examination and Exhibiting of Premises</u>.  Landlord or its duly authorized agent shall have the right to enter the Premises at all reasonable times to examine the condition of and to make repairs to the Premises or the Building.  Within six (6) months prior to the date of the expiration of the Lease, Landlord or its authorized agent shall have the right to enter the Premises at all reasonable times for the purpose of exhibiting the same to prospective tenants.

28.    <u>Events of Default</u>.  Any of the following events or occurrences shall constitute a breach of this Lease by Tenant and shall constitute and "Event of Default" hereunder:

    (a)    The failure of Tenant to pay any Rents or other amounts due under this Lease, on or before the date when due.

    (b)    The failure of Tenant to observe or perform any other covenant, agreement, condition or provision of the Lease within the time period in which such covenant, agreement, condition or provision is required to be performed by the terms of this Lease, or, if no time period is specified for performance, within twenty (20) days after written notice of such failure to Tenant.

    (c)    If Tenant becomes insolvent or admits in writing its inability to pay its debts as they mature, or makes an assignment for the benefit of creditors, or applies or consents to the appointment of a trustee or receiver for Tenant or for a major part of its property.

    (d)    The appointment of a trustee or a receiver to take possession of all or substantially all of Tenant's property, or the attachment, execution or other judicial seizure of all or substantially all of Tenant's assets located at the Premises, unless such appointment, attachment, execution or seizure is discharged within thirty (30) calendar days after the appointment, attachment, execution or seizure.

    (e)    The institution of bankruptcy, reorganization, arrangement, insolvency or liquidation proceedings, or any other proceedings for relief under any bankruptcy or insolvency law or any other similar law for the relief of debtors, by or against Tenant, and if instituted against Tenant, the same are not dismissed within thirty (30) calendar days after the institution of such proceedings.

    Any notice periods provided for under this Section 28 shall run concurrently with any statutory notice periods and any notice given hereunder may be given simultaneously with or incorporated into any such statutory notice.

29.    <u>Landlord's Remedies</u>.  On the occurrence of any such Event of Default, Landlord shall, in addition to any other rights or remedies available to Landlord under this Lease and under the laws of the State of Florida, have the following rights and remedies:

    (a)    <u>Re-Entry Without Termination</u>.  Landlord may re-enter the Premises without terminating this Lease, and remove all persons and property from the Premises, and relet the Premises or any part thereof for the account of Tenant, for such time (which may be for a term extending beyond the Term) and upon such terms as Landlord in Landlord's sole discretion shall determine, and Landlord shall not be required to accept any Tenant offered by Tenant or to observe any instructions given by Tenant relative to such reletting.  In the event of any such reletting, Landlord may make repairs, alterations and additions in or to the Premises and redecorate the same to the extent deemed necessary or desirable by Landlord and in connection there-with change the locks to the Premises, and Tenant shall upon demand pay the cost thereof together with Landlord's expenses of reletting.  Landlord may collect the Rent from any such reletting and apply the same first to the payment of the expenses of re-entry, redecoration, repairs and alterations and the expenses of reletting and second to the payment of Rental herein provided to be paid by Tenant, and any excess or residue shall operate only as an offsetting credit against the amount of Rental as the same thereafter becomes due and payable hereunder. No such re-entry or repossession, repairs, alterations and additions or reletting shall be construed as an eviction or ouster of Tenant or as an election on Landlord's part to terminate this Lease unless a written

10

Initial       Initial

notice of such intention be given to Tenant, nor shall the same operate to release Tenant in whole or in part from any of Tenant's obligations hereunder, and Landlord may, at any time and, from time to time, sue and recover judgment for any deficiencies from time to time remaining after the application from time to time of the proceeds of any such reletting.

      (b)    <u>Acceleration</u>. On the occurrence of any such Event of Default, Landlord may declare the entire amount of Rent and any other sums or charges which would become due and payable from Tenant to Landlord during the remainder of the Term to be due and payable immediately, in which event, Tenant agrees to pay the sum at once, together with all Rent, including any other sum theretofore due; provided, however, that such payment shall not constitute a penalty or forfeiture or liquidated damages but shall merely constitute payment in advance of the Rent for the remainder of the Term.

      (c)    <u>Self Help</u>. Landlord may enter upon the Premises, without being liable for prosecution or any claim of damages therefor, and do whatever Tenant is obligated to do under the terms of this Lease, and Tenant agrees to reimburse Landlord on demand for any expenses which Landlord may incur in thus effecting compliance with Tenant's obligations under this Lease.

      (d)    <u>Other Enforcement</u>. Landlord may enforce the provisions of this Lease and may enforce and protect the rights of Landlord hereunder by a suit or suits in equity or at law for specific performance of any covenant or agreement contained herein, or for the enforcement of any other legal or equitable remedy, including recovery of all monies due or to become due from Tenant under any of the provisions of this Lease.

      (e)    <u>Remedies Cumulative</u>. The rights, privileges, elections and remedies of Landlord under this Lease shall be cumulative, and Landlord shall have the right to exercise such remedies at any time and from time to time singularly or in combination. No termination of this Lease (whether upon an Event of Default or otherwise) shall be deemed to limit or negate Landlord's rights hereunder to indemnification from Tenant (or Tenant's insurance carriers) for any claim or liability asserted against or imposed upon Landlord, whether before or after the termination of this Lease, which is directly or indirectly based upon death, personal injury, property damage or other matters occurring prior to the termination hereof.

      (f)    <u>Attorneys' Fees and Collection Charges</u>. In the event of any legal action or proceeding is brought by either party to enforce this Lease, the non-prevailing party shall pay all expenses of the prevailing party incurred in connection with such action or proceeding, including court costs and reasonable attorneys' fees at or before the trial level and in any appellate or bankruptcy proceeding.

30.    <u>Construction Liens</u>. The interest of Landlord in the Premises shall not be subject in any way to any liens, including but not limited to real estate sales commission liens and construction liens for improvements to or other work performed with respect to the Premises by or on behalf of Tenant. Tenant shall have no power or authority to create any lien or permit any lien to attach to the present estate, reversion, or other estate of Landlord (or the interest of any ground Landlord) in the Premises, Building or in the Project and all mechanics, materialmen, contractors, artisans, and other parties contracting with Tenant or its representatives or privies with respect to the Premises or any part of the Premises are hereby charged with notice that they must look to Tenant to secure payment of any bill for work done or material furnished or for any other purpose during the Term. The foregoing provisions are made with express reference to Section 713.10, Florida Statutes (1995). Notwithstanding the foregoing provisions, Tenant, at its expense, shall cause any lien filed against the Premises, Building or the Project for work or materials claimed to have been furnished to Tenant to be discharged of record or properly transferred to a bond pursuant to Section 713.24, Florida Statutes (1995), within ten (10) days after notice thereof to Tenant. Further, Tenant agrees to indemnify, protect, defend, and save Landlord harmless from and against any damage or loss, including reasonable attorneys' fees, incurred by Landlord as a result of any such lien. Tenant shall notify every contractor making improvements to the Premises that the interest of Landlord in the Premises shall not be subject to liens for improvements to or other work performed with respect to the Premises by or on behalf of Tenant. Tenant shall execute, acknowledge, and deliver without charge a short form of lease or notice in recordable form containing a confirmation that the interest of Landlord in the Premises and the Building shall not be subject to liens for improvements or other work performed with respect to the Premises by or on behalf of Tenant. If such a short form of lease or notice is executed, it shall expressly provide that it shall be of no further force or effect after the last day of the Term or on the filing by Landlord of an affidavit that the Term has expired or the Lease has been terminated or that Tenant's right to possession of the Premises has been terminated.

11

Initial        Initial

31.    <u>Estoppel Certificate</u>.  Tenant and Landlord, upon request, one from the other, shall give or exchange with, one with the other, estoppel certificates which shall confirm to others that this Lease is in full force and effect, that neither party is in default and/or such other information regarding this Lease as may be reasonably appropriate and factual.

32.    <u>Hazardous Material</u>.  Throughout the Term of this Lease, Tenant shall prevent the presence, use, generation, release, discharge, storage, disposal, or transportation of any Hazardous Materials (as hereinafter defined) on, under, in, above, to, or from the Premises by Tenant, its employees, agents, servants, subtenants, contractors and invitees (the "Tenant Parties") except for activities which are part of the ordinary course of Tenant's business and are conducted in strict compliance with all applicable federal, state, and local laws, rules, regulations, and orders.  For purposes of this provision, the term "Hazardous Materials" shall mean and refer to any wastes, materials, or other substances of any kind or character that are or become regulated as hazardous or toxic waste or substances, or which require special handling or treatment, under any applicable local, state, or federal law, rule, regulation, or order.  Tenant shall protect, defend, indemnify, and hold Landlord harmless from and against (a) any loss, cost, expense, claim, or liability arising out of or in connection with any investigation, monitoring, clean-up, containment, removal, storage, or restoration work (herein referred to as "Remedial Work") required by, or incurred by, Landlord or any other person or party in a reasonable belief that such Remedial Work is required by any applicable federal, state or local law, rule, regulation or order, or by any governmental agency, authority, or political subdivision having jurisdiction over the Premises, as a result of the actions or omissions of any of the Tenant Parties, and (b) any loss, injury, expense, or damage arising out of the presence, release, or discharge of any Hazardous Materials on, under, in, above, to, or from the Premises by any of the Tenant Parties.  In the event any such Remedial Work is so required under any applicable federal, state, or local law, rule, regulation or order, Tenant shall promptly perform or cause to be performed such Remedial Work in compliance with such law, rule, regulation, or order.  In the event Tenant shall fail to commence the Remedial Work in a timely fashion, or shall fail to prosecute diligently the Remedial Work to completion, such failure shall constitute an Event of Default on the part of Tenant under the terms of this Lease, and Landlord, in addition to any other rights or remedies afforded it hereunder, may, but shall not be obligated to, cause the Remedial Work to be performed, and Tenant shall promptly reimburse Landlord for the cost and expense thereof upon demand.

33.    [Intentionally omitted].

34.    [Intentionally omitted].

35.    <u>Miscellaneous</u>. (a) All approvals required of and between Landlord and Tenant under the provisions of this Agreement shall be in writing and shall not be unreasonably withheld or delayed unless otherwise expressly provided.

(b)    It is understood and agreed that in the event any provision of this Lease shall be adjudged, decreed, held or ruled to be invalid, such portion shall be deemed severable, and it shall not invalidate or impair the agreement as a whole or any other provision of the agreement.

(c)    This Lease and all provisions, covenants and conditions thereof shall be binding upon and inure to the benefit of the heirs, legal representatives, and successors, and assigns of the parties hereto, except that no person, firm, corporation nor court officer holding under or through Tenant in violation of any of the terms, provisions or conditions of this Lease, shall have any right, interest or equity in or to this Lease, the terms of this Lease or the Premises.

(d)    Landlord shall have the right, at any time upon prior notice to Tenant, and without liability to Tenant to make, at Landlord's own expense, repairs, alterations, additions and improvements, structural or otherwise, in or to the Premises, the Building or any part thereof, and to perform any acts related to the safety, protection and preservation thereof, and during such operations to take into and through the Premises or any part of the Building all material and equipment required and to close or temporarily suspend operation of entrances, doors, corridors or other facilities, provided that Landlord shall cause as little inconvenience or annoyance to Tenant as is reasonably necessary in the circumstances, and shall not do any act which permanently reduces the size of the Premises.  Landlord may do any such work during ordinary business hours (i.e., 8:00 am – 6:00 pm Monday – Friday) and Tenant shall pay Landlord for overtime and other expenses incurred if such work is done during other hours at Tenant's request.

(e)    Radon is a naturally occurring radioactive gas that, when it has accumulated in a building in sufficient quantities, may present health risks to persons who are exposed to it over time.  Levels of radon that exceed federal and state guidelines have

12

Initial        Initial

been found in buildings in Florida.  Additional information regarding radon and radon testing may be obtained from your county public health unit, pursuant to Section 404.056(8), Florida Statutes.

(f)    This Lease and the addenda attached hereto constitute the entire agreement between the parties and supersedes all prior agreements.  No waiver, modifications, additions or addenda to this Lease shall be valid unless in writing and signed by both Landlord and Tenant.

(g)    This Lease shall be governed by and construed in accordance with the laws of the State of Florida.

(h)    Time is of the essence of each and every provision of this Lease.

(i)    No Offer:  This Lease is submitted to Tenant on the understanding that it will not be considered an offer by Landlord and will not bind Landlord in any way until (a) Tenant has duly executed and delivered four (4) duplicate originals to Landlord and (b) Landlord has executed and delivered one of such originals to Tenant.  Tenant's offer of this Lease shall be irrevocable and open for acceptance by Landlord until 5:00 p.m. on the fifteenth (15th) day after execution and delivery hereof by Tenant, and if not accepted by then may be withdrawn by Tenant.

(j)    No Construction Against Drafting Party:  Landlord and Tenant acknowledge that each of them and their counsel have had an opportunity to review this Lease and that this Lease will not be construed against Landlord merely because Landlord has prepared it.  This Lease is to be construed in such a manner as to give effect to the provisions herein.

(k)    No Recording of Lease:  This Lease MUST NOT BE RECORDED in any official Public Records, without Landlord's written consent, which consent may be arbitrarily withheld. Tenant's recording this Lease or any memorandum or short form of it will be void and shall constitute an Event of Default under this Lease.

(l)    Waiver of jury trial. Landlord and Tenant by this subparagraph waive trial by jury in any action, proceeding, or counterclaim brought by either of the parties to this Lease against the other on any matters whatsoever arising out of or in any way connected with this Lease and other documents related to it or arising from it, the relationship of landlord and tenant, Tenant's use or occupancy of the premises, or any other claims (including without limitation claims for personal injury or property damage), and any emergency statutory or any other statutory remedy.  Landlord and Tenant are each entering into this waiver as they desire to avoid delays in the resolution of disputes arising out of the above referenced documents and their landlord and tenant relationship.

(m)    Warranty of Authority:  Tenant and the party(ies) executing this Lease on behalf of Tenant represent and warrant to Landlord that such party(ies) is/are authorized to do so by requisite action of the board of directors or partners, as the case may be, and agree upon request to deliver to Landlord a resolution or similar document to that effect.

(n)    Notwithstanding anything in this Lease to the contrary, Landlord shall never be liable to Tenant for any loss of business or profits or other special, incidental, indirect or consequential damages or for punitive or special damages of any kind.  None of Landlord's officers, employees, agents, directors, shareholders, or partners shall ever have any personal liability to Tenant under or in connection with this Lease.  Tenant shall look solely to Landlord's estate and interest in the Building for the satisfaction of any right or remedy of Tenant under this Lease, or for the collection of any judgment (or other judicial process) requiring the payment of money by Landlord, and no other property or assets of Landlord or its principals shall be subject to levy, execution, or other enforcement procedure for the satisfaction of Tenant's rights or remedies under this Lease, the relationship of Landlord and Tenant under this Lease, Tenant's use and occupancy of the Premises, or any other liability of Landlord to Tenant of whatever kind or nature.

(o)    Brokers: Landlord and Tenant respectively represent and warrant to each other that neither of them nor any of their representatives, employees or agents have consulted or negotiated with any broker or finder with regard to this Lease or the Premises except, Jones Lang LaSalle ("JLL"), representing Tenant and Cushman & Wakefield of FL, Inc. ("C&W"), representing Landlord, together as "Brokers". Landlord and Tenant each will indemnify the other against, and hold the other harmless from, any claims for fees or commissions from anyone with whom either of them has consulted or negotiated with regard to the Premises except the Brokers named herein. Landlord will pay the fees or commissions due to the Brokers,

13

Initial          Initial

pursuant to a separate written agreement between Landlord and JLL, and Landlord will pay the fees or commissions due only to C&W, pursuant to a separate written agreement between them.

(p)    No Easements for Air or Light:  Any diminution or shutting off of light, air, or view, by any structure that may be erected on the Project or on lands adjacent to the Building will in no way affect this Lease or impose any liability on Landlord.

(q)    Except for the payment of sums due under this Lease, each party hereto shall be excused for the period of any delay and shall not be deemed in default with respect to the performance of any of its obligations when prevented from so doing by a cause beyond such party's reasonable control, including labor disputes, government regulations, fire, or casualty, inability to obtain any materials or services, or Acts of God.

(r)    Interlineation:  Whenever in this Lease any printed portion has been stricken, whether or not any relative provision has been added, this Lease shall be construed as if the material so stricken was never included in this Lease and no inference shall be drawn from the stricken material which would be inconsistent in any way with the construction or interpretation which would be appropriate if such material were never contained in this Lease.

(s)    Surrender.  No act or thing done or omitted to be done by Landlord or Landlord's agent during the Term of this Lease will constitute a constructive eviction by Landlord, nor will it be deemed an acceptance of surrender of the Premises, and no agreement to accept such termination or surrender will be valid unless in a writing signed by Landlord. The delivery of keys to any employee or agent of Landlord will not operate as a termination of this Lease or a surrender of the Premises unless such delivery of keys is done in connection with a written instrument executed by Landlord approving such termination or surrender.

(t)    Survival of Obligations:  Any obligations of Tenant accruing prior to the date of the expiration or earlier termination of this Lease, or if Tenant continues to occupy the Premises after the expiration or earlier termination of this Lease, on the date Tenant completely vacates the Premises shall survive the same, and Tenant shall promptly perform all such obligations whether or not this Lease has expired or been terminated.

36. Special Stipulations.

(a) Renewal Option:  Landlord grants Tenant One (1) option to extend the term ("Option to Renew") of the Lease on the entirety of the Leased Premises at time of notice for an additional twenty-four (24) months, if but only if, each of the following conditions are met: (a) no uncured Event of Default exists, (b) Tenant has not sublet the Premises in whole or in part except to an Affiliate, and (c) Landlord has received, at least 120 days prior to the applicable Renewal Option period, time being of the essence, written notice of Tenant's exercise of the Option to Renew right. The Base Rent shall be fair market value, but in no event less than the Base Rent in effect during the last year of the immediately preceding Lease Term, and shall increase annually at three percent (3%.).  In the event Tenant elects to exercise this Renewal Option, Landlord shall, at its expense, install new carpet and paint in the office area of the Premises using Landlord's standard materials and finishes. Tenant shall, at its cost, move all furniture, fixtures and equipment as necessary to permit Landlord to install such carpet and paint.

If Landlord and Tenant are unable to come to an agreement as to the fair market value of the Premises within thirty (30) days of the Tenant's renewal option notice, then the fair market value shall be determined by a board of three (3) licensed commercial real estate brokers, one of whom shall be named by Landlord, one of whom shall be named by Tenant, and the two so appointed shall select a third. Each real estate broker so selected shall be licensed in the jurisdiction in which the Premises is located as a real estate broker specializing in the field of commercial office/warehouse leasing in the Ft. Lauderdale metropolitan area, having no less than ten (10) years' experience in such field, and recognized as ethical and reputable within the field.  Landlord and Tenant agree to make their appointments promptly within ten (10) days after the expiration of the thirty (30) day period, or sooner if mutually agreed upon.  The two (2) brokers selected by Landlord and Tenant shall promptly select a third broker within ten (10) days after both brokers have been appointed.  Within ten (10) days after the selection of the third broker, Landlord shall submit in writing Landlord's proposed fair market value of the Premises and Tenant shall submit in writing Tenant's proposed fair market value of the Premises to such third broker.  The third broker shall select whichever of Landlord's or Tenant's proposed fair market value is closer to such broker's determination of the fair market value of the Premises.  Such broker shall not be empowered to select or craft any additional or further proposed rates. The proposed fair

14

Initial        Initial

market value chosen by the third broker shall be binding on both Landlord and Tenant as the Base Rent for the first year of the renewal term.  If the third broker believes that expert advice would materially assist him/her, he/she may retain one or more qualified persons to provide such expert advice.  The parties shall share equally in the costs of the third broker and of any experts retained by such broker.  Any fees or costs of the broker selected directly by Landlord or Tenant, however, shall be borne by the party selecting such broker.  The third broker shall render his/her determination within ten (10) days of the date the third broker is selected.  If either party fails to submit its proposed fair market value within the ten (10) day period, the proposed fair market value submitted by the other party shall be selected.  The fair market value selected by the third broker shall be final and binding upon both Landlord and Tenant and shall be the Base Rent for the first year of the renewal term.

37.  <u>Addenda/Exhibits</u>.  The additional Addenda and Exhibits (if any) listed below or attached hereto are hereby incorporated by reference and made a part of this Lease:

> Exhibit "A" – Space Plan
> Exhibit "B" – Site Plan
> Exhibit "C" – Leasehold Improvement Addendum
> Exhibit "D" – EastGroup Standard Interior Finish Specifications
> Exhibit "E" – Rules and Regulations

Signatures on Following Page

*Remainder of the page intentionally left blank*

15

Initial        Initial

**Original Lease between <u>Vital Pharmaceuticals</u> and <u>EastGroup Properties</u>**
**Signature Page**

IN WITNESS WHEREOF, Landlord and Tenant have hereunto executed this Lease as of the day and year first above written.

Signed, sealed and delivered
in the presence of:

LANDLORD:

EastGroup Properties, LP,
a Delaware limited partnership

By:   EastGroup Properties General Partners, Inc., a Delaware
corporation, its general partner

WITNESSES:

Print Name:  Marlena R. Kotrys

Print Name:  Lisa W. Brown

By: _____

Name: Chris Segrest

Title: Vice President

WITNESSES:

Print Name:  Marlena R. Kotrys

Print Name:  Lisa W. Brown

By: _____

Name:   John Coleman

Title:  Senior Vice President

TENANT

WITNESSES:

Print Name:  Marc J. Kesten

Print Name:  Eugene S. Bukovi, Jr.

Vital Pharmaceuticals, Inc., a
Florida corporation

By: _____

Name: John H. Owoc

Title: Chief Executive Officer

16

Exhibit "A" – Space Plan
Premises – +/- 67,200 square feet



17



Initial          Initial

Exhibit "B" – Site Plan



18

Initial          Initial

Exhibit "C-1" – Leasehold Improvement Addendum
Construction by Landlord

Landlord hereby agrees to complete construction of the Leasehold Improvements to the Leased Premises as described and illustrated below. Landlord shall make its best efforts to complete construction of the Leased Premises by June 30, 2017. If the construction is not substantially completed and the Leased Premises are not available for occupancy by said date, Tenant shall have no claim against Landlord due to such delay, excepting that the term of this Lease shall not commence until the Leased Premises are deemed to be available to Tenant. The Leased Premises shall be deemed to be available to Tenant when construction by Landlord is substantially completed (notwithstanding the necessity of minor repairs and adjustments still to be made by the Landlord, or notwithstanding that Tenant has not completed installation of its fixtures and/or equipment) or when Tenant actually occupies the Leased Premises whichever occurs first. Subject to safety and construction scheduling conditions exercised by Landlord at its sole discretion, Landlord agrees to grant Tenant and its agents, employees, constructors, and suppliers permission to enter into the Leased Premises prior to the Commencement Date to make its installations, but such possession shall be deemed to be upon all the terms, covenants, conditions and provisions of the Lease, except for payment of Rent.

Landlord agrees to construct Premises in accordance with the following space plan. Furniture, Fixtures, and Equipment shown below shall not be considered part of the Improvements to be provided by Landlord. Landlord further agrees to use finishes and specifications as outlined in Exhibit "D".



19

Initial        Initial

Exhibit "C-2" – Leasehold Improvement Addendum
Construction by Tenant
With Allowance

This Work Letter supplements the Lease to which this Work Letter is attached and, together with the Lease, governs the construction of the Tenant Improvements to the Premises. All capitalized terms appearing in this Work Letter shall have the same meaning as those appearing in the Lease, except as expressly modified herein. In the event of any inconsistencies between this Work Letter and the Lease, this Work Letter shall control.

1.      Pursuant to the terms of this Work Letter, Tenant shall, at its expense, cause the construction of improvements to the Premises as may be mutually agreed upon by Landlord and Tenant as set forth herein, and may also construct, or have Landlord construct, an additional office in the current open space as shown below, and a chain link fence in a mutually agreed upon location in the rear of the Premises to the extent permitted by applicable laws, ordinances, covenants and deed restrictions (collectively, the "Tenant Improvements"). The Tenant Improvements shall be constructed after the Commencement Date. In connection with the services to be provided by Landlord hereunder, Tenant shall pay Landlord a review fee equal to 0 percent (0%) of the total cost attributable to design and construction of Tenant Improvements. As part of the development of the Tenant Improvements, Tenant shall retain an architect or engineer licensed in the state in which the Building is located and who are acceptable to Landlord to prepare complete and detailed architectural, structural, mechanical and engineering plans and specifications and finish schedules prepared by and stamped and certified by such architect or engineer, showing all Tenant Improvements ("Construction Plans"). The Construction Plans shall be prepared, and the Tenant Improvements constructed, in compliance with all applicable laws, ordinances, rules, regulations and codes, including, without limitation, building, plumbing, electrical and fire codes, and shall otherwise be acceptable to Landlord in its reasonable discretion. Landlord shall approve, or provide specific comments in reasonable detail regarding any objections to, the Construction Plans within twenty (20) days of receipt by Landlord, such approval or comments shall not be unreasonably withheld, conditioned or delayed. Landlord may at its option and expense retain the services of an architect, engineer or other consultant to review the Construction Plans and assist in the inspection and oversight of the actual construction (collectively, "Landlord Consultant"). Tenant shall then, if not in compliance with applicable governing codes, laws, regulations or ordinances or Landlord's reasonable requirements, diligently revise the Construction Plans to address the non-compliant concerns. Tenant shall then resubmit the Construction Plans, and Landlord shall have twenty (20) days to approve such revised plans or provide additional comments. Landlord and Tenant agree to use all reasonable efforts to reach mutual agreement on the Construction Plans. Neither review nor approval by Landlord of the Construction Plans shall constitute a representation or warranty by Landlord or any Landlord Consultant that such plans either (i) are complete or suitable for their intended purpose, or (ii) comply with applicable laws, ordinances, rules, regulations and codes, it being expressly agreed by Tenant that Landlord assumes no responsibility or liability whatsoever to Tenant or any other person or entity for such completeness, suitability or compliance. After approval by Landlord, the Construction Plans shall be known as the "Final Plans". The Final Plans shall designate what constitutes Tenant Improvements. Tenant shall cause construction to commence as soon as reasonably possible thereafter.

2.      Upon Landlord's approval of the Construction Plans, Tenant shall complete or cause the completion of the build out of the Premises as shown on the Construction Plans and as more fully described in this Work Letter. All contractors, suppliers and related vendors shall be subject to Landlord's prior approval. Tenant shall use Landlord's designated contractors for any alterations to the roof, fire sprinkler system, electrical, mechanical or plumbing systems serving the Premises. Tenant's contractors', subcontractors', representatives' and agents' entry upon the Project shall be subject to all the terms, covenants and conditions of the Lease. Prior to entering the Premises, Tenant's contractors shall obtain and maintain until final completion of the project, full insurance coverage for Commercial General Liability, Automotive Liability, Workers' Compensation, Employers' Liability and Excess Liability as set forth in Schedule "A" attached hereto. The contractor shall name Landlord, its directors, officers, employees, agents and affiliates, as additional insureds on all insurance policies and coverages, and the contractor's insurance shall be considered primary, without contribution from any other insurance carried by Landlord and shall contain an appropriate cross liability or severability of interests clause or endorsement and a waiver of all rights of subrogation by contractor's insurers against Landlord. If the contractor subcontracts work to other parties, the subcontractors are responsible for complying with the same requirements as the contractor. Tenant shall be responsible for securing Certificates of Insurance from the contractor and providing them to Landlord prior to the work being performed. The contractor shall be responsible for purchasing all coverages as respects its own equipment used on the site. Landlord shall have no responsibility for providing coverage for contractor's tools or equipment. No policy of insurance may be cancelled, materially modified or reduced during the period of construction, without providing Landlord with thirty (30) days prior notice of such change. The contractor shall be

20

Initial            Initial

responsible for payment of all premiums for insurance required herein, but the contractor's obligations shall not be limited to the purchase of insurance.  The contractor shall indemnify and hold harmless Landlord for all damages for which insurance should have been provided pursuant to this contract, irrespective of whether said insurance was actually obtained.

3.      The architectural and engineering costs attributable to the Construction Plans and Tenant Improvements shall be paid by Tenant, but may constitute part of the Improvement Allowance.  Tenant Improvements shall meet or exceed minimum standards established by Landlord in its reasonable discretion.  If applicable, the Construction Plans shall include all information necessary to reflect Tenant's requirements for the installation of any supplemental air conditioning system and ductwork, heating, electrical, plumbing and other mechanical systems and all work necessary to connect any special or non-standard facilities to the Building's base mechanical, electrical and structural systems.  Tenant will produce and provide to Landlord a signed and sealed set of the Final Plans.

4.      Landlord shall not be responsible or liable for any delay in substantially completing Tenant Improvements, including, but not limited to, any delays resulting from the reasonable disapproval by Landlord or Landlord's Consultant of all or any portion of Tenant's revisions of the Final Plans, unless resulting from Landlord's gross negligence or willful misconduct.

5.      Only with Landlord's prior express written permission and under direct supervision of Landlord shall Tenant or Tenant's contractors, subcontractors, representatives or agents alter, add to or modify, or in any manner disturb, any building system which is located within the Premises, including, but not limited to, any plumbing system, electrical system, heating, ventilating and air conditioning system, and fire protection, life safety support and alert systems.

6.      Tenant shall receive from Landlord the "Improvement Allowance" in the amount set forth in the Lease Agreement to offset the cost of the Tenant Improvements.  In the event the cost of the Tenant Improvements is in excess of the Improvement Allowance, Tenant shall provide Landlord reasonable assurance that funds are available to timely pay any such amount as and when due, including, without limitation, providing a letter or credit or cash escrow for the benefit of Landlord.  Other than the Improvement Allowance, Tenant shall be responsible for the entire cost of the Tenant Improvements, including, without limitation, preparation of the Construction Plans and Final Plans.  Notwithstanding anything herein to the contrary, Landlord shall not be responsible for any costs to construct Tenant Improvements in excess of the Improvement Allowance, and all such costs or expenses incurred by Landlord in excess of the Improvement Allowance shall be paid to Landlord by Tenant within thirty (30) days after Landlord submits an invoice to Tenant therefor.

7.      Provided Landlord is satisfied adequate reserves exist for completion of the Tenant Improvements, Landlord shall pay the Improvement Allowance to Tenant within thirty (30) days after Tenant submits to Landlord an invoice together with a detailed cost breakdown, applicable certificates from the architect re: completion and work status and lien waivers from all applicable contractors and subcontractors, all in a form reasonably acceptable to Landlord.  After work is improved, approved and completed, Tenant shall submit proof of work completed, including, (but not limited to) scope of work, invoices, proof of payment, and releases of lien from all contractors conducting the work.  Receipts from supply houses, home improvement stores, or manufacturing plants shall not be considered for reimbursement.  All alterations submitted and completed shall be in compliance with Lease requirements.

8.      Tenant shall cause the Tenant Improvements to be constructed in a workmanlike manner using new materials of good quality.  Landlord shall have the right at any time and from time to time to inspect the Premises during the construction of the Tenant Improvements.  Landlord's Consultant shall have the right to review and inspect the construction of Tenant Improvements by Tenant to ensure compliance with the Final Plans and in the event that Landlord or Landlord's Consultant gives notice to the Tenant of non-compliance with the Final Plans of such construction, Tenant shall promptly undertake to correct such deficiencies in order to bring the construction of the Tenant Improvement in compliance with the Final Plans and all applicable laws, ordinances, rules, regulations and/or code requirements.

9.      Tenant shall have the right to make revisions to the Final Plans that are non-structural in nature, subject to Landlord's prior written approval, which shall not be unreasonably withheld, conditioned or delayed.  Landlord shall either approve or disapprove the revisions within ten (10) business days after submission thereof by Tenant.  The cost of any revisions in excess of the Improvement Allowance shall be borne solely by Tenant and no such revisions shall extend the Commencement Date of the Lease.

21

Initial      Initial

10.    Tenant shall use due diligence to complete the Tenant Improvements as soon as may be practicable.  Completion of the Tenant Improvements shall have no impact or delay on the commencement of Rent pursuant to the Lease.

11.    Senior Property Manager is hereby designated as Landlord's Construction Representative with full authority to act on behalf of Landlord hereunder.

12.    All notices to be given hereunder shall be provided to Landlord's Construction Representative in accordance with the terms of the Lease.

13.    This Work Letter shall be governed by the laws of the State of Florida.



22

Initial _____    Initial _____

SCHEDULE A
Contractor Insurance Requirements

Tenant's contractor shall obtain and maintain insurance as follows, in policy amounts no less than stated hereafter.  These are minimum insurance limit requirements and are in no way a limitation on the actual liability of anyone insured by these policies.

1.      Workers' Compensation
a.      Statutory Coverage
b.      Employers Liability
        $1,000,000      Each Accident
        $1,000,000      Disease, Policy Limit
        $1,000,000      Disease, Each Employee
c.      USL&H Coverages as required
d.      Waiver of Subrogation clause in favor of Owner

2.      General Liability (including Premises-Operations; Independent Contractors' Protective; Products & Completed Operations; Broad Form Property Damage):
a.      $1,000,000 each occurrence (bodily injury and property damage)
        $1,000,000 each occurrence (personal injury & advertising injury)
        $2,000,000 aggregate limit (products & completed operations)
        $2,000,000 general aggregate (other than products/completed operations)

b.      Products and Completed Operations coverage shall be maintained for a minimum period of three (3) years after final payment and the Contractor shall continue to provide evidence of such coverage to the Owner when and as requested.

c.      Property Damage Liability Insurance shall include coverage for the following hazards:
        X (Explosion)
        C (Collapse)
        U (Underground)

d.      Contractual Liability (Hold Harmless Coverage)
        $1,000,000 per occurrence

e.      Personal Injury (with Employment Exclusion deleted, if applicable)
        $1,000,000 per occurrence

f.      General Aggregate Per Project endorsement

g.      Owner named as an Additional Insured as respects work performed by Contractor, including Completed Operations.

3.      Automobile Liability: (Owned, Non-Owned, Hired)
        $1,000,000 per occurrence – Bodily Injury & Property Damage
        Owner named as an Additional Insured as respects operations of the Contractor.

4.      Umbrella Liability:
        $5,000,000 excess Primary Limits on General Liability, Automobile Liability and Employers Liability.
        $10,000 Self Insured Retention

Certificate of Insurance must contain a thirty (30) day Cancellation Notice.  The contractor shall furnish original Certificates of Insurance along with copies of applicable Additional Insured and Waiver of Subrogation endorsements to Landlord prior to commencement of work on the site:  EastGroup Properties, L.P. and EastGroup Properties, Inc. shall be included as an Additional Insured on all policies.

23

_____        _____
     Initial                    Initial

Exhibit "D"
EastGroup Standard Interior Finish Specifications

## Office Area:

1. **Floor Covering:** Direct glue-down commercial grade loop pile carpet (26 oz.); vinyl composition tile (VCT) at work rooms, rest rooms, break rooms, file rooms, and storage rooms (exclusive of warehouse storage areas).

2. **Wall Base:** 4" vinyl cove base through office area at carpet and/or VCT flooring.

3. **Partitions and Wall Finishes:** Interior wall partitions to be 3-5/8" metal studs at 24" on center with 5/8" gypsum board each side extending from concrete floor slab to 9'-6" a.f.f. Separation walls (between tenant lease space to be appropriate fire rated assemblies as may be required, extending from concrete floor slab to underside of /floor assembly above. Partitions separating warehouse from office area to be at 14'-0", provided with fiberglass thermal batt insulation. Office area partitions to be finished with two (2) coats flat latex wall paint, excluding warehouse side of office separation partition.

4. **Ceiling:** 2' x 2' suspended acoustical tile ceiling system throughout office area at 8'-11" a.f.f. Manufacturer standard white lay-in, square edge, omni-fissured, fiberboard tiles with NRC of .55-.65 and STC of 35-39; manufacturer standard white grid, wall angles and accessories; R-19 (6") thermal batt insulation above finish ceiling. Ceiling assemblies area laid into each room individually in lieu of a contiguous grid.

5. **Doors and Frames:** Stain grade light commercial solid core wood doors with hollow metal frames (fire rated where applicable). Light commercial grade hardware in brushed chrome finish throughout. Included are two (2) keyed lock sets for Executive offices and passage locksets on individual restrooms only. Standard passage hardware on all other rooms. Doors are 3' x 7'.

6. **Restrooms:** Accessible restrooms to be provided for each tenant lease space, size and number of fixtures per Standard Plumbing Code. Restrooms provided with laminated plastic toilet stalls (if required for multi-fixture facility), grab bars, mirror, floor mounted tank-type with bladder water closet, lavatory (with hot water), toilet tissue dispenser, paper towel dispenser and soap dispenser.

7. **Window Covering:** Exterior window treatment covering by Tenant.

8. **Electrical and Telephone Outlets:** Standard 110 volt duplex electrical outlets provided at three (3) per enclosed office or work area; two (2) at break rooms and one (1) ground fault outlet at each restroom. Telephone outlet wall box and EMT stub-up above finished ceiling provided at two (2) per enclosed office or work area. All electrical work will be properly labeled and indicated on main electrical panels. Specialty outlets, i.e. higher voltage or amperage, dedicated outlets isolated grounds, etc., may be provided as Tenant optional extra. Tenant to be responsible for all telephone/data cable installation, termination devices, equipment and permitting.

9. **Lighting:** Light fixture to be standard 2' x 4' lay-in fluorescent fixtures with standard acrylic parabolic lens. Office area to attain approximately fifty footcandles (50 fc) at desk surface, approximately one (1) four (4) bulb fixture per one hundred (100) square feet for 9'-0" high ceilings. Minimum of two (2) fixtures per office.

10. **Heating, Ventilation and Air Conditioning (HVAC):** HVAC system to be provided for full office environment. Return air and supply ducts (Super Duct – fiberglass or equal), grilles and diffusers per installing contractor recommendation for maximum convenience, and comfort balanced Thermostatic control for individual Tenant lease space. Gang restrooms to be provided with exhaust fans (2cfm per square foot of restroom floor area). Provide exhaust fan in each restroom, switched separately from light switch and ducted separately up to roof deck and then connected into one duct through deck to exterior. Special exhaust or HVAC requirements to be at Tenant optional extra.

24

Initial          Initial

11. **Breakroom:** Minimum provided is four (4) lineal feet of building standard plastic laminate base cabinets with single bowl stainless steel sink (approximate 15" x 17"). Inclusion of uppers to be at Tenant optional extra. Hot water provided at sink.

12. **Emergency Lights:** Lights will be in compliance with local ordinances. If a fixture is outdated, a newer fixture may be proposed. If existing fixtures to remain, a matching fixture must be specified. If all fixtures are to be replaced, a low profile fixture may be proposed that is not the same specification as existing, but in compliance with local ordinances.

<u>Warehouse</u>

1. **Free Standing Columns:** Any columns identified in warehouse area will be painted caution yellow 12' from floor.

2. **Emergency Lights:** Lights will be in compliance with local ordinances. If a fixture is outdated, a newer fixture may be proposed. If existing fixtures are to remain, a matching fixture must be specified. If all fixtures are to be replaced, a frequently available fixture may be proposed that is not the same specification as existing, but in compliance with local ordinances.

3. **Electrical Outlets:** Standard 110 volt duplex electrical outlets and one (1) ground fault outlet at each warehouse restroom. All electrical work will be properly labeled and indicated on main electrical panels.

Initial     Initial

Exhibit "E"
Rules and Regulations

- Tenant shall faithfully observe and comply with the rules and regulations of the building as may be included in this Lease and modified or added to from time to time by the Landlord.  Landlord shall not be responsible to Tenant for the nonperformance of any of said Rules and Regulations by any other Tenant or occupant of the building.

- No Tenant shall install any radio or television antenna, loudspeaker, or other device on the roof, exterior walls of the Building, or on the property or perimeter of property.  No TV, radio or recorder shall be played in such a manner as to cause a nuisance to any other Tenant.

- The sidewalks, entry passages, corridors, and stairways shall not be obstructed by Tenant or used by it for other than those of ingress and egress.

- Canvassing, soliciting, distribution of handbills or any other written material and peddling in the Building or on the site are prohibited, and each Tenant shall cooperate to prevent the same.

- Tenant shall maintain the Premises free of rodents, insects, and other pests.

- No cargo or delivery vans, trucks or other similar vehicles shall be permitted to park in front of the Service Center building other than temporary delivery.  These approved vehicles should park directly behind the rear of Tenant rental space, or in designated truck court/dock area.  Materials stored or placed by Tenant visible from outside the building will not be permitted.

- Each Tenant shall store all its trash and garbage within its Premises.  No material shall be placed in the trash boxes or receptacles if such material is of such nature that it may not be disposed of in the ordinary and customary manner of removing and disposing of trash and garbage without being in violation of any law or ordinance governing such disposal.

- The auto parking lot shall be used in common with other Tenants of the Service Center, their employees, guests and invitees, and in common with the Lessor and its employees, guests and invitees.  All parking is free and unassigned.  Tenants, their employees and guests, shall use those parking areas closest to their leased premises to the extent possible.  The exterior truck loading and trailer parking areas immediate to the Leased Premises are reserved for the exclusive use of each Tenant.  Tenants shall not use, block or otherwise interfere with the loading areas of other occupants in the Service Center.

- The Tenant may not store or place rubbish, pallets or other by-products of shopping or manufacturing outside their Leased Premises.  All such items must be hauled away without delay and at the sole cost and expense of the Tenant.  Violations of the Rules and Regulations for Trash disposal are fineable occurrences, at the cost of rectifying such violation plus a 20% administrative fee.  Such fines are considered "Additional Rent" as defined in the Lease Agreement and non-payment of fines shall constitute a default under the Lease Agreement.

- No Tenant shall use or keep in the Premises or the Building, any kerosene, gasoline, or inflammable or combustible fluid or material other than limited quantities thereof reasonable necessary for the operation or maintenance of office equipment.  No Tenant shall use or keep or permit to be used kept any foul or noxious gas or substance in the Premises, or permit or suffer the Premises to be occupied or used in a manner offensive or objectionable to Landlord or other occupants of the Building by reason of noise, odors or vibrations, or interfere in any way with other tenants or those having business in the Building, nor shall any animals or birds be brought or kept in the Premises or the Building.

- Tenant assumes full responsibility for protecting the Premises from theft, robbery and pilferage.

- These Rules and Regulations are in addition to, and shall not be construed to in any way modify or amend, in whole or in part, the agreements, covenants, conditions and provisions of any Lease of the Premises in the Building.  The terms, covenants and conditions set forth in the Lease shall govern in the event of any inconsistency or ambiguity between the Rules and Regulations and the Lease.

26

Initial          Initial

- Each Tenant shall ensure that the doors of its Premises are closed and locked and that all water faucets and water apparatus are shut off before Tenant or Tenant's employees leave the Premises so as to prevent waste or damage. For any default or carelessness in this regard Tenant shall make good all damages sustained by other tenants or occupants of the Building or Landlord.

*Landlord reserves the right to make such other rules and regulations as in its judgment may from time to time be needed for the safety, care and cleanliness of the Building and for the preservation of good order therein. Notice of any such amendment or modification will be provided Tenant, and Tenant will comply with them provided they are reasonable.*

36811468v1

_____    _____
Initial            Initial

### FIRST AMENDMENT TO LEASE AGREEMENT

This First Amendment to Lease Agreement (hereinafter referred to as "First Amendment") is made and entered as of the 6th day of November, 2017, by and between **EastGroup Properties, L.P.**, a Delaware limited partnership, the "Landlord", and **Vital Pharmaceuticals, Inc., d/b/a VPX Sports**, a Florida Corporation, the "Tenant".

WHEREAS, Landlord and Tenant entered into that certain Lease Agreement dated the 28th day of June 2017 (together with all addenda, exhibits, riders, and amendments of any kind made thereto are hereinafter collectively referred to as the "Lease"), for that certain premises of approximately 67,200 square feet of space (hereinafter referred to as the "Original Premises") located at 1951 N. Commerce Parkway, Suite "C"; Weston, FL 33326 comprising part of the real property known as Weston Commerce Park (hereinafter referred to as the "Center").

WHEREAS, Tenant desires to extend the Term of the Lease; and

WHEREAS, Tenant desires to expand the Original Premises into an additional 28,800 square feet as set forth herein; and

WHEREAS, Landlord is agreeable to such renewal and expansion upon the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the mutual promises and conditions contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties do hereby agree as follows:

1. <u>Capitalized Terms</u>. Capitalized terms not defined herein shall have the same meaning as in the Lease.

2. <u>Extension of Term</u>. The Term of the Lease is hereby extended and shall expire on December 31, 2022.

3. <u>Expansion of Premises</u>. Effective upon substantial completion of the Expansion Improvements described in Section 7 below (the "Expansion Date"), the Premises shall be expanded to include approximately 28,800 square feet located at 1951 N. Commerce Parkway, Suite "E", Weston, FL 33326, as depicted on **Exhibit "A"** attached hereto and incorporated herein (the "Expansion Space"). Accordingly, from and after the Expansion Date, the Premise shall total 96,000 square feet, consisting of the Original Premises (67,200 square feet) and the Expansion Space (28,800 square feet). As used herein, the term "substantial completion" shall mean as soon as the City of Weston issues a temporary Certificate of Occupancy for the Expansion Space.

4. <u>Tenant's Share</u>. Effective on the Expansion Date, Tenant's Share shall increase to 71.43% of the Center.

5. <u>Rental Payments</u>. Effective on the Expansion Date, Base Rent shall be payable as follows:

| Square Footage | Lease Months | Base Rent Per SF | Annual Base Rent * | Monthly Base Rent * |
|---|---|---|---|---|
| 28,800 | Expansion Date – 07/31/2018 | $7.00 | $201,600.00 | $16,800.00 |
| 67,200 | 12/01/2017 – 07/31/2018 | $7.25 | $487,200.00 | $40,600.00 |
| 96,000 | 08/01/2018 – 07/31/2019 | $7.47 | $717,120.00 | $59,760.00 |
| 96,000 | 08/01/2019 – 07/31/2020 | $7.69 | $738,240.00 | $61,520.00 |
| 96,000 | 08/01/2020 – 07/31/2021 | $7.92 | $760,320.00 | $63,360.00 |
| 96,000 | 08/01/2021 – 07/31/2022 | $8.16 | $783,360.00 | $65,280.00 |

Initial          Initial

| 96,000 | 08/01/2022 – 12/31/2022 | $8.40 | $806,400.00 | $67,200.00 |

*Amounts do not include applicable Sales Tax and Operating Expenses to be paid by Tenant.*

6.  **Additional Rent**. During the Term of the Lease, as extended hereby, Tenant shall also continue to pay monthly escrows toward Operating Expenses and all other additional rent due pursuant to the terms of the Lease. Nothing herein shall alter the Base Rent and other charges payable by Tenant under the Lease for any period prior to the Expansion Date. Tenant shall not be required to pay any Operating Expenses for the Expansion Space until a temporary certificate of occupancy is issued.

7.  **Leasehold Improvements**. Landlord and Tenant agree and Tenant acknowledges that the Expansion Space is in all respects being leased by Landlord to Tenant and shall be accepted by Tenant in its current "As-Is"/"Where-Is" condition and that Landlord has and shall have no obligation or duty whatsoever to make any alterations, repairs or improvements of any kind or nature in or to the Expansion Space in order to accommodate Tenant's occupancy, except for such alterations, repairs or improvements expressly provided herein.

Landlord agrees to construct improvements to the Expansion Space in accordance with the attached Leasehold Improvement Addendum (the "Expansion Improvements"). Tenant acknowledges that neither Landlord nor its agents or employees have made any representations or warranties as to the suitability or fitness of the Expansion Space for the conduct of Tenant's business or for any other purpose, nor has Landlord or its agents or employees agreed to undertake any alterations or construct any tenant improvements to the Expansion Space except as expressly provided in this First Amendment.

8.  **Additional Security Deposit**. Upon execution of this First Amendment, Tenant shall deposit the sum of $16,800.00 with Landlord to be held by Landlord as additional security deposit pursuant to the terms and conditions of Section 5 of the Lease.

9.  **Parking**. In addition to the parking spaces described in the Lease, Tenant shall have the non-exclusive right to use the parking spaces identified on **Exhibit "D"** attached hereto.

10.  **Entire Agreement**. This First Amendment constitutes and contains the sole and entire agreement of the parties hereto with respect to the subject matter hereof and no prior or contemporaneous oral or written representations or agreements between the parties and affecting the subject matter hereof shall have any force or effect.

11.  **Counterparts; Electronic Signatures**. This First Amendment may be executed in multiple counterparts, each of which shall be deemed an original, but all of which shall constitute one instrument binding on all parties. Telecopied signatures or scanned and electronically transmitted signatures may be used in place of original signatures on this First Amendment. Landlord and Tenant intend to be bound by the signatures on the telecopied document or electronic transmission, are aware that the other party will rely on such signatures, and hereby waive any and all defenses to the enforcement of the terms of this First Amendment based on the form of signature.

12.  **Confidentiality Agreement**. Tenant agrees that, except with the prior written consent of the Landlord, Tenant shall at all times keep confidential and not, directly or indirectly, divulge, furnish or make accessible to anyone or any entity any information, knowledge or data concerning or relating to the terms and conditions of this First Amendment or the discussions and the conduct of the negotiations leading to the execution of same ("Confidential Information"). The provisions of this paragraph shall be in addition to, and not in substitution of the provisions of any separate confidentiality or nondisclosure agreement executed by Tenant.

Initial      Initial

13.     Governing Law.  This First Amendment shall be governed by and construed in accordance with the laws of the State of Florida.

14.     Agency Disclosure.  Landlord and Tenant respectively represent and warrant to each other that neither of them nor any of their representatives, employees, or agents have consulted or negotiated with any broker or finder with regard to this First Amendment or the Expansion Space except as set forth herein.  Cushman & Wakefield, Inc. represents the Landlord, and Jones Lang Lasalle represents Tenant ("Brokers").  Landlord shall not be liable for any other brokerage commission alleged to be due and payable to any person or party claiming any other brokerage fee or commission in connection with this lease transaction, which party claims it is due a commission or fee based upon a course or business dealings with Tenant, and Tenant hereby agrees to indemnify and hold Landlord harmless from and against any and all costs, expenses (including reasonable attorney's fees) and damages incurred by Landlord as the result of, or otherwise arising from, any such claim or action by any such other person or party.  Landlord will pay the fees or commissions due to the Brokers, pursuant to a separate written agreement between Landlord and each Broker.

15.     Continued Effectiveness.  Except as modified by the provisions of this First Amendment, all provisions of the Lease shall remain in full force and effect and shall in no manner be affected by the execution of this First Amendment except as the same are expressly contemplated herein.  In the event there is a conflict between the Lease and this First Amendment, the terms of the latter shall govern and control as to the specific matters addressed herein.

16.     Authorization.  Landlord and Tenant each represent and warrant to the other that: (i) the execution and delivery of this First  Amendment has been fully authorized by all necessary corporate or partnership action, as the case may be; (ii) the person(s) signing this First  Amendment has the requisite authority to do so and the authority and power to bind the corporation or partnership, as the case may be, on whose behalf they have signed; and (iii) this First Amendment is valid, binding and legally enforceable in accordance with its terms.

17.     Addenda/Exhibits.  The Exhibits listed below and attached hereto are hereby incorporated by reference and made a part of the Lease through this First Amendment:

               Exhibit "A" – Expansion Premises Space Plan
               Exhibit "B" – Leasehold Improvement Addendum
               Exhibit "B-1" – Leasehold Improvement Space Plan
               Exhibit "B-2" – Standard Interior Tenant Finish Specifications
               Exhibit "C" – Verification of Expansion Date

18.     Parking.  [please provide new parking schematic reflecting a pro rata number of parking spaces to be allocated to VPX.

*[See next page for signatures]*

Initial     Initial

*[Signature Page – First Amendment to Lease between EastGroup Properties, L.P.*
*and Vital Pharmaceuticals, Inc.]*

**IN WITNESS WHEREOF,** the parties hereto have caused this First Amendment to be executed on the day and year written above.

Signed, Sealed and Delivered
in the presence of:

**LANDLORD:**

EastGroup Properties, L.P., a
Delaware limited partnership

By:   EastGroup Properties General Partners, Inc., a
Delaware corporation, its general partner

WITNESSES (2):

By: _____
Print Name: _____ CHRIS SEGREST
Title: _____ VP

(as to Landlord)

WITNESSES (2):

By: _____
Print Name: _____ JOHN COLEMAN
Title: _____ EVP

(as to Landlord)

**TENANT:**

Vital Pharmaceuticals, Inc., a
Florida corporation

WITNESSES (2):

By: _____
Print Name: _____ JOHN H. OWOC
Title: _____ CEO

(as to Tenant) Signed, Sealed and Delivered In
the presence of:

_____  _____
Initial          Initial

**Exhibit A**
Expansion Space – Suite "E"



Initial    Initial

**Exhibit B**
<u>Leasehold Improvement Addendum</u>

Landlord and Tenant agree and Tenant acknowledges that the Expansion Space is in all respects being leased by Landlord to Tenant and shall be accepted by Tenant in its current "As-Is"/"Where-Is" condition and that Landlord has and shall have no obligation or duty whatsoever to make any alterations, repairs or improvements of any kind or nature in or to the Expansion Space in order to accommodate Tenant's occupancy, except for such alterations, repairs or improvements, if any, as may be expressly provided in this Leasehold Improvement Addendum.

The parties hereto acknowledge and agree that Landlord shall, at Landlord's cost, complete the following improvements ("Expansion Improvements") to the Expansion Space, using Landlord's standard finish specifications attached as Exhibit "B-2":

- Demolish a portion of existing office as outlined in Exhibit B-1
- Supply and install HVAC units to climate control the warehouse portion of the Expansion Space

Tenant and Landlord agree that the cost for finishes and improvements made due to any Tenant ordered changes (the "Tenant Change Orders") subsequent to the commencement of the construction to the Expansion Space, including the costs (if any) of changes to Tenant space plans necessitated by any Tenant Change Orders, shall be at the sole cost of Tenant. Should Tenant fail to pay for such Tenant Change Orders as herein provided, such amount due shall be deemed Additional Rent and will be subject to the terms of the Lease.

Initial        Initial

**Exhibit B-1**
<u>Leasehold Improvement Design</u>





Initial    Initial

**Exhibit B-2**

STANDARD INTERIOR TENANT FINISH SPECIFICATION
EASTGROUP PROPERTIES
OFFICE/WAREHOUSE

Office Area:

1.　　Floor Covering:  Direct glue-down commercial grade loop pile carpet (26 oz.); vinyl composition tile (VCT) at work rooms, rest rooms, break rooms, file rooms, and storage rooms (exclusive of warehouse storage areas).

2.　　Wall Base:  4" vinyl cove base through office area at carpet and/or VCT flooring.

3.　　Partitions and Wall Finishes:  Interior wall partitions to be 3-5/8" metal studs at 24" on center with ½" gypsum board each side extending from concrete floor slab to 9'-0" a.f.f.  Separation walls (between Tenant lease space to be appropriate fire rated assemblies as may be required, extending from concrete floor slab to underside of roof/floor assembly above.  Partitions separating warehouse from office area to be at 10'-0", provided with fiberglass thermal batt insulation.  Office area partitions to be finished with two (2) coats flat latex wall paint, excluding warehouse side of office separation partition.

4.　　Ceiling:  2' x 4' suspended acoustical tile ceiling system throughout office area at 8'-11" a.f.f. Manufacturer standard white lay-in, square edge, omni-fissured, fiberboard tiles with NRC of .55-.65 and STC of 35-39; manufacturer standard white grid, wall angles and accessories; R-19 (6") thermal batt insulation above finish ceiling.  Ceiling assemblies area laid into each room individually in lieu of a contiguous grid.

5.　　Doors and Frames:  Stain grade light commercial solid core wood doors with hollow metal frames (fire rated where applicable).  Light commercial grade hardware in brushed chrome finish throughout.  Included are two (2) keyed lock sets for Executive offices and passage locksets on individual restrooms only.  Standard passage hardware on all other rooms.

6.　　Restrooms:  Accessible restrooms to be provided for each Tenant lease space, size and number of fixtures per Standard Plumbing Code.  Restrooms provided with laminated plastic toilet stalls (if required for multi-fixture facility), grab bars, mirror, floor mounted tank-type with bladder water closet, lavatory (with hot water), toilet tissue dispenser, paper towel dispenser and soap dispenser.  Also provided is a small white plastic laminate cabinet 24" w x 24"h x 8"d with adjustable melamine shelf for supply storage, mounted over water closet at 44" a.f.f. in each handicapped restroom.

7.　　Window Covering:  Exterior window treatment covering by Tenant.

8.　　Electrical and Telephone Outlets:  Standard 110 volt duplex electrical outlets provided at three (3) per enclosed office or work area; two (2) at break rooms and one (1) ground fault outlet at each restroom.  Telephone outlet wall box and EMT stub-up above finished ceiling provided at one (1) per enclosed office or work area.  All electrical work will be properly labeled and indicated on main electrical panels.  Specialty outlets, i.e. higher voltage or amperage, dedicated outlets isolated grounds, etc., may be provided as Tenant optional extra.  Tenant to be responsible for all telephone/data cable installation, termination devices, equipment and permitting.

9.　　Lighting:  Light fixture to be standard 2' x 4' lay-in fluorescent fixtures with standard acrylic prismatic lens.  Office area to attain approximately fifty footcandles (50 fc) at desk surface, approximately one (1) four (4) bulb fixture per one hundred (100) square feet for 9'-0" high ceilings.  Minimum of two (2) fixtures per office.

10.　　Heating, Ventilation and Air Conditioning (HVAC):  HVAC system to be provided for full office environment. Return air and supply ducts (Super Duct – fiberglass or equal), grilles and diffusers per installing contractor recommendation for maximum convenience, and comfort balanced Thermostatic control for individual Tenant lease space.  Gang restrooms to be provided with exhaust fans (2cfm per square foot of restroom floor area).  Provide exhaust

Initial　　　　　Initial

fan in each restroom, switched separately from light switch and ducted separately up to roof deck and then connected into one duct through deck to exterior.  Special exhaust or HVAC requirements to be at Tenant optional extra.

11.    Breakroom:  Provided is four (4) lineal feet of building standard plastic laminate base cabinets with single bowl stainless steel sink (approximate 15" x 17").  Inclusion of uppers to be at Tenant optional extra.  Hot water provided at sink.

12.    Emergency Lights:  Lights will be in compliance with local ordinances.  If a fixture is outdated, a newer fixture may be proposed.  If existing fixtures to remain, a matching fixture must be specified.  If all fixtures are to be replaced, a low profile fixture may be proposed that is not the same specification as existing, but in compliance with local ordinances.

Warehouse

1.    Free Standing Columns:  Any columns identified in warehouse area will be painted caution yellow 12' from floor.

2.    Emergency Lights:  Lights will be in compliance with local ordinances.  If a fixture is outdated, a newer fixture may be proposed.  If existing fixtures are to remain, a matching fixture must be specified.  If all fixtures are to be replaced, a frequently available fixture may be proposed that is not the same specification as existing, but in compliance with local ordinances.

3.    Electrical Outlets:  Standard 110 volt duplex electrical outlets and one (1) ground fault outlet at each warehouse restroom.  All electrical work will be properly labeled and indicated on main electrical panels.

4.    Rolling Doors:  Landlord, at its sole costs and expense, shall install two (2) 14' x 10' commercial grade, automatic overhead rolling doors in the locations as prescribed in the attached Exhibit B-1 "Leasehold Improvement Design."

_____    _____
Initial                      Initial

**Exhibit C**
**Verification of Expansion Date**

**Whereas**, EastGroup Properties, L.P., a Delaware limited partnership ("Landlord") and Vital Pharmaceuticals, Inc., a Florida corporation ("Tenant") entered into that certain First Amendment to Lease Agreement dated Nov. 6, 2017, covering approximately 96,000 square feet of space located at 1951 N Commerce Parkway; Weston, FL,

**Now, Therefore**, both Landlord and Tenant do hereby declare and evidence that the Expansion Date as set forth in said First Amendment to Lease Agreement is the 6th day of November 2017.

**Witnesseth**, the execution hereof this _____ day of _____, 201__.

**LANDLORD:**                                     **TENANT:**

EastGroup Properties, L.P.                        Vital Pharmaceuticals, Inc.

By:  EastGroup Properties General Partners, Inc.

By: _____               By: _____

Title: _____             Title: C.E.O


By: _____

Title: _____

Initial        Initial

**Exhibit D**
<u>Additional Parking</u>



39172249.v1

Initial    Initial

### SECOND AMENDMENT TO LEASE AGREEMENT

This Second Amendment to Lease Agreement (hereinafter referred to as "Second Amendment") is made and entered as of the __12__ day of _FEBRUARY_, 2020, by and between **EastGroup Properties, L.P.**, a Delaware limited partnership, the "Landlord", and **Vital Pharmaceuticals, Inc., d/b/a VPX Sports**, a Florida Corporation, the "Tenant".

WHEREAS, Landlord and Tenant entered into that certain Lease Agreement dated the 28th day of June 2017, and that certain First Amendment to Lease Agreement dated November 6, 2017 (together with all addenda, exhibits, riders, and amendments of any kind made thereto are hereinafter collectively referred to as the "Lease"), for that certain premises of approximately 96,000 square feet of space (hereinafter referred to as the "Existing Premises") located at 1951 N. Commerce Parkway, Suites "C" and "E"; Weston, FL 33326 comprising part of the real property known as Weston Commerce Park (hereinafter referred to as the "Center").

WHEREAS, Tenant desires to extend the Term of the Lease; and

WHEREAS, Tenant desires to expand the Existing Premises into an additional 38,400 square feet as set forth herein; and

WHEREAS, Landlord is agreeable to such renewal and expansion upon the terms and conditions set forth herein;

NOW, THEREFORE, in consideration of the mutual promises and conditions contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties do hereby agree as follows:

1.    <u>Capitalized Terms</u>. Capitalized terms not defined herein shall have the same meaning as in the Lease.

2.    <u>Extension of Term</u>. The Term of the Lease is hereby extended and shall expire on March 31, 2026.

3.    <u>Expansion of Premises</u>. Effective upon the later to occur of (i) March 1, 2020, or (ii) date the Second Expansion Space (as defined herein) is vacated by the current occupant thereof and becomes available for occupancy by Tenant, (the "Second Expansion Date"), the Premises shall be expanded to include approximately 38,400 square feet located at 1951 N. Commerce Parkway, Suite "A and B", Weston, FL 33326, as depicted on **Exhibit "A"** attached hereto and incorporated herein (the "Second Expansion Space"). Accordingly, from and after the Second Expansion Date, the Premise shall total 134,400 square feet, consisting of the Existing Premises (96,000 square feet) and the Second Expansion Space (38,400 square feet).

4.    <u>Tenant's Share</u>. Effective on the Second Expansion Date, Tenant's Share shall increase to 100.00% of the Center.

5.    <u>Rental Payments</u>. Effective on March 1, 2020, Base Rent shall be payable as follows:

| Lease Year | Square Feet | Base Rent Per SF | Monthly Base Rent * | Annual Base Rent* |
|---|---|---|---|---|
| 03/01/2020 – 03/31/2020 | 96,000 | $7.69 | $61,520.00** | $738,240.00** |
| 04/01/2020 – 03/31/2021 | 134,400 | $8.25 | $92,400.00 | $1,108,800.00 |
| 04/01/2021 – 03/31/2022 | 134,400 | $8.50 | $95,172.00 | $1,142,064.00 |
| 04/01/2022 – 03/31/2023 | 134,400 | $8.75 | $98,027.16 | $1,176,325.92 |
| 04/01/2023 – 03/31/2024 | 134,400 | $9.01 | $100,967.97 | $1,211,615.70 |
| 04/01/2024 – 03/31/2025 | 134,400 | $9.29 | $103,997.01 | $1,247,964.17 |
| 04/01/2025 – 03/31/2026 | 134,400 | $9.56 | $107,116.92 | $1,285,403.09 |

A-VV
Initial

Initial

\* Amounts do not include applicable Sales Tax and Operating Expenses to be paid by Tenant.
\*\* Base Rent and Operating Expenses for the Second Expansion Space shall be abated for the period March 1, 2020 – March 31, 2020. If the Second Expansion Date occurs after March 31, 2020, Base Rent and Operating Expenses for the Second Expansion Space shall commence on the Second Expansion Date and shall not be abated. Base Rent for the Existing Premises shall remain at the Base Rent Schedule in the First Amendment until the later of April 1, 2020 or the Second Expansion Date.

6.    Beneficial Occupancy. In the event the Second Expansion Space becomes available for occupancy by Tenant prior to March 1, 2020, the Second Expansion Date shall be deemed to occur on March 1, 2020, but Landlord shall permit Tenant to occupy the Second Expansion Space commencing on the date such space becomes available, subject to any restrictions on such access imposed by applicable laws, rules, regulations, codes or governmental authorities, for the purpose of setting up storage racks, trade fixtures and other equipment necessary for the operation of Tenant's business. Such access shall be subject to all the provisions of the Lease (other than the obligation to pay Base Rent and Operating Expenses for such space), and such access shall not advance the expiration date of the Lease.

7.    Additional Rent. During the Term of the Lease, as extended hereby, Tenant shall also continue to pay monthly escrows toward Operating Expenses and all other additional rent due pursuant to the terms of the Lease. Nothing herein shall alter the Base Rent and other charges payable by Tenant under the Lease for any period prior to April 1, 2020.

8.    Leasehold Improvements. Landlord and Tenant agree and Tenant acknowledges that the Second Expansion Space is in all respects being leased by Landlord to Tenant and shall be accepted by Tenant in its current "As-is"/"Where-is" condition and that Landlord has and shall have no obligation or duty whatsoever to make any alterations, repairs or improvements of any kind or nature in or to the Second Expansion Space in order to accommodate Tenant's occupancy.

Tenant shall have the right to construct improvements to the Premises as mutually agreed upon by Landlord and Tenant in accordance with the terms and conditions of the Leasehold Improvement Addendum attached hereto as Exhibit "B" (the "Second Expansion Improvements"). Tenant acknowledges that neither Landlord nor its agents or employees have made any representations or warranties as to the suitability or fitness of the Second Expansion Space for the conduct of Tenant's business or for any other purpose, nor has Landlord or its agents or employees agreed to undertake any alterations or construct any tenant improvements to the Second Expansion Space except as may be expressly provided in this Second Amendment. Landlord shall provide a tenant improvement allowance of up to $1.25 per square foot of the Premises ($168,000.00) (the "Improvement Allowance") to be applied toward the costs associated with construction of the Second Expansion Improvements, including, but not limited to, construction costs, architectural fees, engineering fees, permitting fees and construction management fees. Any and all costs associated with the construction of the Second Expansion Improvements in excess of the Improvement Allowance shall be the sole responsibility of Tenant. Landlord shall make the Improvement Allowance available to Tenant commencing on January 1, 2020. Any portion of the Improvement Allowance remaining unused by Tenant after March 31, 2021 shall be deemed waived by Tenant, and Landlord shall have no further obligation to provide any such unused funds.

9.    Additional Security Deposit. Upon execution of this Second Amendment, Tenant shall deposit the sum of $25,000.00 with Landlord to be held by Landlord as additional security deposit pursuant to the terms and conditions of Section 5 of the Lease.

10.    Parking. Tenant shall have the exclusive use of all of the parking spaces serving the Building. Landlord shall not be responsible for enforcing Tenant's parking rights against third parties.

11.    Special Stipulations. Section 36(a) of the Lease is hereby deleted in its entirety and shall be of no further effect.

A-W
_____
Initial

_____
Initial

12.    <u>Assignment and Subletting</u>. Notwithstanding Section 19 of the Lease, Tenant agrees that it shall not assign the Lease nor sublet any portion of the Premises to TAG USA Gymnastics, Inc., a Florida corporation, the current occupant of the Second Expansion Space, nor any affiliate thereof.

13.    <u>Entire Agreement</u>. This Second Amendment constitutes and contains the sole and entire agreement of the parties hereto with respect to the subject matter hereof and no prior or contemporaneous oral or written representations or agreements between the parties and affecting the subject matter hereof shall have any force or effect.

14.    <u>Counterparts; Electronic Signatures</u>. This Second Amendment may be executed in multiple counterparts, each of which shall be deemed an original, but all of which shall constitute one instrument binding on all parties. Telecopied signatures or scanned and electronically transmitted signatures may be used in place of original signatures on this Second Amendment. Landlord and Tenant intend to be bound by the signatures on the telecopied document or electronic transmission, are aware that the other party will rely on such signatures, and hereby waive any and all defenses to the enforcement of the terms of this Second Amendment based on the form of signature.

15.    <u>Confidentiality Agreement</u>. Tenant agrees that, except with the prior written consent of the Landlord, Tenant shall at all times keep confidential and not, directly or indirectly, divulge, furnish or make accessible to anyone or any entity any information, knowledge or data concerning or relating to the terms and conditions of this Second Amendment or the discussions and the conduct of the negotiations leading to the execution of same ("Confidential Information"). The provisions of this paragraph shall be in addition to, and not in substitution of the provisions of any separate confidentiality or nondisclosure agreement executed by Tenant.

16.    <u>Governing Law</u>. This Second Amendment shall be governed by and construed and enforced in accordance with the laws of the State of Florida, excluding the conflicts of law principles thereof. In the event of any litigation between the Parties, it is agreed that the sole and exclusive venue for such litigation shall be in a court of convenient jurisdiction in Broward County, Florida. Landlord further agrees to waive any objections challenging such jurisdiction and/or venue.

17.    <u>Agency Disclosure</u>. Landlord and Tenant respectively represent and warrant to each other that neither of them nor any of their representatives, employees, or agents have consulted or negotiated with any broker or finder with regard to this Second Amendment or the Second Expansion Space except as set forth herein. Cushman & Wakefield, Inc. represents the Landlord, and Jones Lang Lasalle represents Tenant ("<u>Brokers</u>"). Landlord shall not be liable for any other brokerage commission alleged to be due and payable to any person or party claiming any other brokerage fee or commission in connection with this lease transaction, which party claims it is due a commission or fee based upon a course or business dealings with Tenant, and Tenant hereby agrees to indemnify and hold Landlord harmless from and against any and all costs, expenses (including reasonable attorney's fees) and damages incurred by Landlord as the result of, or otherwise arising from, any such claim or action by any such other person or party. Landlord will pay the fees or commissions due to the Brokers, pursuant to a separate written agreement between Landlord and each Broker.

18.    <u>Continued Effectiveness</u>. Except as modified by the provisions of this Second Amendment, all provisions of the Lease shall remain in full force and effect and shall in no manner be affected by the execution of this Second Amendment except as the same are expressly contemplated herein. In the event there is a conflict between the Lease and this Second Amendment, the terms of the latter shall govern and control as to the specific matters addressed herein.

19.    <u>Authorization</u>. Landlord and Tenant each represent and warrant to the other that: (i) the execution and delivery of this First Amendment has been fully authorized by all necessary corporate or partnership action, as the case may be; (ii) the person(s) signing this First Amendment has the requisite authority to do so and the authority and power to bind the corporation or partnership, as the case may be, on whose behalf they have signed; and (iii) this Second Amendment is valid, binding and legally enforceable in accordance with its terms.

_AW_                       _____
Initial                    Initial

20.    <u>Addenda/Exhibits</u>. The Exhibits listed below and attached hereto are hereby incorporated by reference and made a part of the Lease through this Second Amendment:

> Exhibit "A" – Second Expansion Premises Space Plan
> Exhibit "B" – Leasehold Improvement Addendum
> Exhibit "B-1" – Standard Interior Tenant Finish Specifications
> Exhibit "C" – Verification of Second Expansion Date

*[See next page for signatures]*

Initial    Initial

*[Signature Page – Second Amendment to Lease between EastGroup Properties, L.P.
and Vital Pharmaceuticals, Inc.]*

**IN WITNESS WHEREOF**, the parties hereto have caused this Second Amendment to be executed on the day and year written above.

Signed, Sealed and Delivered
in the presence of:

**LANDLORD:**

EastGroup Properties, L.P., a
Delaware limited partnership

WITNESSES (2):

By:   EastGroup Properties General Partners, Inc., a
Delaware corporation, its general partner

By: _____
Print Name: ___ Alex Vargas Vila ___
Title: ___ Sr. Asset Manager ___

_____
(as to Landlord)

WITNESSES (2):

By: _____
Print Name: ___ JOHN COLEMAN ___
Title: ___ EVP ___

_____
(as to Landlord)

**TENANT:**

Vital Pharmaceuticals, Inc., a
Florida corporation

WITNESSES (2):

By: _____
Print Name: ___ John H. Owoc ___
Title: ___ CEO ___

_____
(as to Tenant)

Initial _____    Initial _____

**Exhibit A**

<u>Second Expansion Space – Suite "A and B"</u>



Initial    Initial

## Exhibit B
## Leasehold Improvement Addendum

This Leasehold Improvement Addendum ("**Addendum**") supplements the Second Amendment to Lease Agreement to which it is attached and, together with the Second Amendment, governs the construction of the Second Expansion Improvements to the Premises. All capitalized terms appearing in this Addendum shall have the same meaning as those appearing in the Second Amendment or Lease, except as expressly modified herein. In the event of any inconsistencies between this Addendum and the Second Amendment or Lease, this Addendum shall control.

    1.    Pursuant to the terms of this Addendum, Tenant may, at its expense, cause the construction of improvements to the Premises as mutually agreed upon by Landlord and Tenant (the "**Second Expansion Improvements**"). As part of the development of the Second Expansion Improvements, Tenant shall retain an architect or engineer licensed in the state in which the Center is located and who are acceptable to Landlord to prepare complete and detailed architectural, structural, mechanical and engineering plans and specifications and finish schedules prepared by and stamped and certified by such architect or engineer, showing all Second Expansion Improvements ("**Construction Plans**"). The Construction Plans shall be prepared, and the Second Expansion Improvements constructed, in compliance with all applicable laws, ordinances, rules, regulations and codes, including, without limitation, building, plumbing, electrical and fire codes, and shall otherwise be acceptable to Landlord in its reasonable discretion. Landlord shall approve, or provide specific comments in reasonable detail regarding any objections to, the Construction Plans within twenty (20) days of receipt by Landlord, such approval or comments shall not be unreasonably withheld, conditioned or delayed. Landlord may at its option retain the services of an architect, engineer or other consultant to review the Construction Plans and assist in the inspection and oversight of the actual construction (collectively, "**Landlord Consultant**"). Tenant shall then, if required, diligently revise the Construction Plans to address all of the Landlord's comments. Tenant shall then resubmit the Construction Plans, and Landlord shall have twenty (20) days to approve such revised plans or provide additional comments. Landlord and Tenant agree to use all reasonable efforts to reach mutual agreement on the Construction Plans. Neither review nor approval by Landlord of the Construction Plans shall constitute a representation or warranty by Landlord or any Landlord Consultant that such plans either (i) are complete or suitable for their intended purpose, or (ii) comply with applicable laws, ordinances, rules, regulations and codes, it being expressly agreed by Tenant that Landlord assumes no responsibility or liability whatsoever to Tenant or any other person or entity for such completeness, suitability or compliance. After approval by Landlord, the Construction Plans shall be known as the "**Final Plans**". The Final Plans shall designate what constitutes Second Expansion Improvements. Tenant shall cause construction to commence as soon as reasonably possible thereafter.

    2.    Upon Landlord's approval of the Construction Plans, Tenant shall complete or cause the completion of the build out of the Premises as shown on the Construction Plans and as more fully described in this Addendum. All contractors, suppliers and related vendors shall be subject to Landlord's prior approval. Tenant shall use Landlord's designated contractors for any alterations to the roof, fire sprinkler system, electrical, mechanical or plumbing systems serving the Premises. Tenant's contractors', subcontractors', representatives' and agents' entry upon the Project shall be subject to all the terms, covenants and conditions of the Lease. Prior to entering the Premises, Tenant's contractors shall obtain and maintain until final completion of the project, full insurance coverage for Commercial General Liability, Automotive Liability, Workers' Compensation, Employers' Liability and Excess Liability as set forth in **Schedule "A"** attached hereto. The contractor shall name Landlord, its directors, officers, employees, agents and affiliates, as additional insureds on all insurance policies and coverages, and the contractor's insurance shall be considered primary, without contribution from any other insurance carried by Landlord and shall contain an appropriate cross liability or severability of interests clause or endorsement and a waiver of all rights of subrogation by contractor's insurers against Landlord. If the contractor subcontracts work to other parties, the subcontractors are responsible for complying with the same requirements as the contractor. Tenant shall be responsible for securing Certificates of Insurance from the contractor and providing them to Landlord prior to the work being performed. The contractor shall be responsible for purchasing all coverages as respects its own equipment used on the site. Landlord shall have no responsibility for providing coverage for contractor's tools or equipment. No policy of insurance may be cancelled, materially modified or reduced during the period of construction, without providing Landlord with thirty (30) days prior notice of such change. The contractor shall be responsible for payment of all premiums for insurance required herein, but the contractor's obligations shall not be limited to the purchase of insurance. The contractor shall indemnify and hold harmless Landlord for all damages for which insurance should have been provided pursuant to this contract, irrespective of whether said insurance was actually obtained.

    3.    The architectural and engineering costs attributable to the Construction Plans and Second Expansion Improvements shall be paid by Tenant, but may constitute part of the Improvement Allowance. Second Expansion Improvements shall comply with Landlord's standard interior tenant finish specifications attached hereto as **Exhibit "B-1"**

Initial      Initial

unless otherwise agreed in writing by Landlord. Tenant will produce and provide to Landlord a signed and sealed set of the Final Plans.

4.  Landlord shall not be responsible or liable for any delay in substantially completing Second Expansion Improvements, including, but not limited to, any delays resulting from the reasonable disapproval by Landlord or Landlord's Consultant of all or any portion of Tenant's revisions of the Final Plans, unless resulting from Landlord's gross negligence or willful misconduct.

5.  Only with Landlord's prior express written permission and under direct supervision of Landlord shall Tenant or Tenant's contractors, subcontractors, representatives or agents alter, add to or modify, or in any manner disturb, any building system which is located within the Premises, including, but not limited to, any plumbing system, electrical system, heating, ventilating and air conditioning system, and fire protection, life safety support and alert systems.

6.  Tenant shall receive from Landlord the **"Improvement Allowance"** in the amount set forth in the Second Amendment to offset the cost of the Second Expansion Improvements. In the event the cost of the Second Expansion Improvements is in excess of the Improvement Allowance, Tenant shall provide Landlord reasonable assurance that funds are available to timely pay any such amount as and when due. Other than the Improvement Allowance, Tenant shall be responsible for the entire cost of the Second Expansion Improvements, including, without limitation, preparation of the Construction Plans and Final Plans.

7.  Provided Landlord is satisfied adequate reserves exist for completion of the Second Expansion Improvements, Landlord shall pay the Improvement Allowance to Tenant within thirty (30) days after Tenant submits to Landlord an invoice together with a detailed cost breakdown, applicable certificates from the architect re: completion and work status and lien waivers from all applicable contractors and subcontractors, all in a form reasonably acceptable to Landlord.

8.  Tenant shall cause the Second Expansion Improvements to be constructed in a workmanlike manner using new materials of good quality. Landlord shall have the right at any time and from time to time to inspect the Premises during the construction of the Second Expansion Improvements. Landlord's Consultant shall have the right to review and inspect the construction of Second Expansion Improvements by Tenant to ensure compliance with the Final Plans and in the event that Landlord or Landlord's Consultant gives notice to the Tenant of non-compliance with the Final Plans of such construction, Tenant shall promptly undertake to correct such deficiencies in order to bring the construction of the Tenant Improvement in compliance with the Final Plans and all applicable laws, ordinances, rules, regulations and/or code requirements.

9.  Tenant shall have the right to make revisions to the Final Plans that are non-structural in nature, subject to Landlord's prior written approval, which shall not be unreasonably withheld, conditioned or delayed. Landlord shall either approve or disapprove the revisions within ten (10) business days after submission thereof by Tenant. The cost of any revisions in excess of the Improvement Allowance shall be borne solely by Tenant and no such revisions shall extend the Commencement Date of the Lease.

10. Tenant shall use due diligence to complete the Second Expansion Improvements as soon as may be practicable. Completion of the Second Expansion Improvements shall have no impact or delay on the commencement of Rent pursuant to the Lease.

11. _____ is hereby designated as Landlord's Construction Representative with full authority to act on behalf of Landlord hereunder.

12. All notices to be given hereunder shall be provided to Landlord's Construction Representative in accordance with the terms of the Lease.

A-W

Initial        Initial

**SCHEDULE A**

Insurance Requirements for Contractors

1. Workers' Compensation
   a. Statutory Coverage
   b. Employers Liability

   | | |
   |---|---|
   | $1,000,000 | Each Accident |
   | $1,000,000 | Disease, Policy Limit |
   | $1,000,000 | Disease, Each Employee |

   c. USL&H Coverages as required
   d. Waiver of Subrogation clause in favor of Owner

2. General Liability (including Premises-Operations; Independent Contractors' Protective; Products & Completed Operations; Broad Form Property Damage):
   a. $1,000,000 each occurrence (bodily injury and property damage)
      $1,000,000 each occurrence (personal injury & advertising injury)
      $2,000,000 aggregate limit (products & completed operations)
      $2,000,000 other than products/completed operations)

   b. Products and Completed Operations coverage shall be maintained for a minimum period of three (3) years after final payment and the Contractor shall continue to provide evidence of such coverage to the Owner when and as requested.

   c. Property Damage Liability Insurance shall include coverage for the following hazards:
      X (Explosion)
      C (Collapse)
      U (Underground)

   d. Contractual Liability (Hold Harmless Coverage)
      $1,000,000 per occurrence

   e. Personal Injury (with Employment Exclusion deleted, if applicable)
      $1,000,000 per occurrence

   f. General Aggregate Per Project endorsement
   g.
   h. Owner named as an Additional Insured as respects work performed by Contractor, including Completed Operations.

3. Automobile Liability: (Owned, Non-Owned, Hired)
   $1,000,000 per occurrence – Bodily Injury & Property Damage
   Owner named as an Additional Insured as respects operations of the Contractor.

4. Umbrella Liability:
   $5,000,000 excess Primary Limits on General Liability, Automobile Liability and Employers Liability.
   $10,000 Self Insured Retention

Certificate of Insurance must contain a thirty (30) day Cancellation Notice. The Contractor shall furnish original Certificates of Insurance along with copies of applicable Additional Insured and Waiver endorsements to the Owner prior to commencement of work on the site. EastGroup Properties, Inc. shall be included as an Additional Insured on all policies.

_AW_     _(signature)_
Initial     Initial

**Exhibit B-1**

STANDARD INTERIOR TENANT FINISH SPECIFICATION
EASTGROUP PROPERTIES
OFFICE/WAREHOUSE

Office Area:

1.      Floor Covering: Direct glue-down commercial grade loop pile carpet (26 oz.); vinyl composition tile (VCT) at work rooms, rest rooms, break rooms, file rooms, and storage rooms (exclusive of warehouse storage areas).

2.      Wall Base: 4" vinyl cove base through office area at carpet and/or VCT flooring.

3.      Partitions and Wall Finishes: Interior wall partitions to be 3-5/8" metal studs at 24" on center with ½" gypsum board each side extending from concrete floor slab to 9'-0" a.f.f. Separation walls (between Tenant lease space to be appropriate fire rated assemblies as may be required, extending from concrete floor slab to underside of roof/floor assembly above. Partitions separating warehouse from office area to be at 10'-0", provided with fiberglass thermal batt insulation. Office area partitions to be finished with two (2) coats flat latex wall paint, excluding warehouse side of office separation partition.

4.      Ceiling: 2' x 4' suspended acoustical tile ceiling system throughout office area at 8'-11" a.f.f. Manufacturer standard white lay-in, square edge, omni-fissured, fiberboard tiles with NRC of .55-.65 and STC of 35-39; manufacturer standard white grid, wall angles and accessories; R-19 (6") thermal batt insulation above finish ceiling. Ceiling assemblies area laid into each room individually in lieu of a contiguous grid.

5.      Doors and Frames: Stain grade light commercial solid core wood doors with hollow metal frames (fire rated where applicable). Light commercial grade hardware in brushed chrome finish throughout. Included are two (2) keyed lock sets for Executive offices and passage locksets on individual restrooms only. Standard passage hardware on all other rooms.

6.      Restrooms: Accessible restrooms to be provided for each Tenant lease space, size and number of fixtures per Standard Plumbing Code. Restrooms provided with laminated plastic toilet stalls (if required for multi-fixture facility), grab bars, mirror, floor mounted tank-type with bladder water closet, lavatory (with hot water), toilet tissue dispenser, paper towel dispenser and soap dispenser. Also provided is a small white plastic laminate cabinet 24" w x 24"h x 8"d with adjustable melamine shelf for supply storage, mounted over water closet at 44" a.f.f. in each handicapped restroom.

7.      Window Covering: Exterior window treatment covering by Tenant.

8.      Electrical and Telephone Outlets: Standard 110 volt duplex electrical outlets provided at three (3) per enclosed office or work area; two (2) at break rooms and one (1) ground fault outlet at each restroom. Telephone outlet wall box and EMT stub-up above finished ceiling provided at one (1) per enclosed office or work area. All electrical work will be properly labeled and indicated on main electrical panels. Specialty outlets, i.e. higher voltage or amperage, dedicated outlets isolated grounds, etc., may be provided as Tenant optional extra. Tenant to be responsible for all telephone/data cable installation, termination devices, equipment and permitting.

9.      Lighting: Light fixture to be standard 2' x 4' lay-in fluorescent fixtures with standard acrylic prismatic lens. Office area to attain approximately fifty footcandles (50 fc) at desk surface, approximately one (1) four (4) bulb fixture per one hundred (100) square feet for 9'-0" high ceilings. Minimum of two (2) fixtures per office.

10.     Heating, Ventilation and Air Conditioning (HVAC): HVAC system to be provided for full office environment. Return air and supply ducts (Super Duct – fiberglass or equal), grilles and diffusers per installing contractor recommendation for maximum convenience, and comfort balanced Thermostatic control for individual Tenant lease space. Gang restrooms to be provided with exhaust fans (2cfm per square foot of restroom floor area). Provide exhaust

_AW_        _____

Initial        Initial

fan in each restroom, switched separately from light switch and ducted separately up to roof deck and then connected into one duct through deck to exterior. Special exhaust or HVAC requirements to be at Tenant optional extra.

11.      Breakroom: Provided is four (4) lineal feet of building standard plastic laminate base cabinets with single bowl stainless steel sink (approximate 15" x 17"). Inclusion of uppers to be at Tenant optional extra. Hot water provided at sink.

12.      Emergency Lights:  Lights will be in compliance with local ordinances.  If a fixture is outdated, a newer fixture may be proposed. If existing fixtures to remain, a matching fixture must be specified. If all fixtures are to be replaced, a low profile fixture may be proposed that is not the same specification as existing, but in compliance with local ordinances.

Warehouse

1.      Free Standing Columns: Any columns identified in warehouse area will be painted caution yellow 12' from floor.

2.      Emergency Lights:  Lights will be in compliance with local ordinances.  If a fixture is outdated, a newer fixture may be proposed. If existing fixtures are to remain, a matching fixture must be specified. If all fixtures are to be replaced, a frequently available fixture may be proposed that is not the same specification as existing, but in compliance with local ordinances.

3.      Electrical Outlets: Standard 110 volt duplex electrical outlets and one (1) ground fault outlet at each warehouse restroom. All electrical work will be properly labeled and indicated on main electrical panels.

_____      _____
Initial          Initial

**EastGroup Property Services of Florida, LLC.**
**Leasing Commission Agreement**

The undersigned parties agree that in the event of consummation, execution and delivery of a lease at the property located at *1951 N. Commerce Parkway Weston, FL 33326* between *Vital Pharmaceuticals, Inc, d/b/a/ VPX Sports* "Tenant" and *EastGroup Properties, LP* as "Owner", EastGroup Property Services of Florida, LLC (EastGroup) will pay a commission to *Jones Lang LaSalle Brokerage, Inc.* as "Broker" in accordance with the terms described below.

1.  The Broker shall be the procuring cause of Tenant and shall register each prospective Tenant with EastGroup either in writing by the Tenant designating Broker as Tenant's exclusive representative or by the Broker bringing the Tenant into the offices of EastGroup. The Tenant shall then be considered registered for a period of ninety (90) days, which will be extended if negotiations are still active.  Co-brokers or split-commission arrangements shall be revealed to EastGroup at the time of registration of the prospect.

2.  The Tenant must execute a lease agreement/amendment that will increase the Premises and take occupancy of the space.

3.  A commission of 4% of the base rent amount will be paid for each year of the lease term years one (1) through five (5) and 2% for years six (6) through ten (10). Commissions will not be paid on leases exceeding ten (10) years.

4.  Commissions will be payable 50% within thirty (30) days after lease execution and 50% within thirty (30) days after the Tenant occupies the space.

5.  If the lease contains a termination or cancellation provision the commission will be paid on the entire lease term only if the cancellation provision allows for the recovery of unearned or unamortized fees. Otherwise, the commission will be calculated to the date of termination or cancellation with the balance of the commission paid within thirty (30) days after the Tenant waives their right to terminate or cancel.

6.  No commissions will be paid for rent abatements, amortized tenant improvements, common area and other pass-through expenses. Commissions for expansions, renewals, rights of first refusal, and extensions will not be paid unless Broker is actively involved in the negotiation and Broker's representation is acknowledged by the tenant in writing.

7.  Only one (1) full commission as defined in item 3 above will be paid. If more than one Broker claims a commission is due it shall be the responsibility of the Broker(s) to resolve the percentage of the commission to be paid to each Broker.

8.  EastGroup reserves the right to pay the commission over the term of the lease if, in EastGroup's sole discretion, the Tenant is deemed to be a credit risk.

9.  EastGroup reserves the right to amend or modify this policy at any time.

EastGroup Property Services of Florida, LLC

By: _____

Date: _____2/4/20_____

Broker: Jones Lang LaSalle Brokerage, Inc.

By: _____

Date: _2/5/2020_____

**EastGroup Property Services of Florida, LLC**
**Leasing Commission Agreement**

The undersigned parties agree that in the event of consummation, execution and delivery of a lease at the property located at *1951 N. Commerce Parkway Weston, FL 33326* between *Vital Pharmaceuticals, Inc, d/b/a/ VPX Sports* "Tenant" and *EastGroup Properties, LP* as "Owner", EastGroup Property Services of Florida, LLC (EastGroup) will pay a commission to *Jones Lang LaSalle Brokerage, Inc.* as "Broker" in accordance with the terms described below.

1. The Broker shall be the procuring cause of Tenant and shall register each prospective Tenant with EastGroup either in writing by the Tenant designating Broker as Tenant's exclusive representative or by the Broker bringing the Tenant into the offices of EastGroup. The Tenant shall then be considered registered for a period of ninety (90) days, which will be extended if negotiations are still active. Co-brokers or split-commission arrangements shall be revealed to EastGroup at the time of registration of the prospect.

2. The Tenant must execute a lease renewal agreement.

3. A commission of 2% of the base rent amount will be paid for the increase in base rent over the existing rate and the term added for up to ten (10) years. Commissions will not be paid on leases exceeding ten (10) years.

4. Commissions will be payable 50% within thirty (30) days after lease execution and 50% within thirty (30) days after the Rent commences.

5. If the lease contains a termination or cancellation provision the commission will be paid on the entire lease term only if the cancellation provision allows for the recovery of unearned or unamortized fees. Otherwise, the commission will be calculated to the date of termination or cancellation with the balance of the commission paid within thirty (30) days after the Tenant waives their right to terminate or cancel.

6. No commissions will be paid for rent abatements, amortized tenant improvements, common area and other pass-through expenses. Commissions for expansions, renewals, rights of first refusal, and extensions will not be paid unless Broker is actively involved in the negotiation and Broker's representation is acknowledged by the tenant in writing.

7. Only one (1) full commission as defined in item 3 above will be paid. If more than one Broker claims a commission is due it shall be the responsibility of the Broker(s) to resolve the percentage of the commission to be paid to each Broker.

8. EastGroup reserves the right to amend or modify this policy at any time.

EastGroup Properties, LP

By: _____

Date: _____ 2/4/20 _____

Broker:  Jones Lang LaSalle Brokerage, Inc.

By: _____

Date: __2/5/2020_____