UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA


| | | |
|---|---|---|
| IN RE: | . | Case No. 22-17842(PDR) |
| | . | |
| | . | |
| VITAL PHARMACEUTICALS, | . | |
| INC., et al., | . | 299 E. Broward Blvd., Suite 310 |
| | . | Ft. Lauderdale, FL 33301 |
| | . | |
| Debtors. | . | October 13, 2022 |
| . . . . . . . . . . . . .. | | 3:46 p.m. |


TRANSCRIPT OF EMERGENCY MOTION FOR AUTHORIZATION
TO, (I) CONTINUE TO ADMINISTER INSURANCE POLICIES
AND RELATED AGREEMENTS; AND (II) HONOR
CERTAIN OBLIGATIONS IN RESPECT THEREOF;
EMERGENCY MOTION FOR PAYMENT OF PREPETITION
OBLIGATIONS OWING TO FOREIGN VENDORS
BEFORE HONORABLE PETER D. RUSSIN
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtor:          Berger Singerman, LLP
                         By: JORDI GUSO, ESQ.
                             MICHAEL J. NILES, ESQ.
                         1450 Brickell Ave. #1900
                         Miami, FL 33131

                         Latham & Watkins, LLC
                         By:  ANDREW SORKIN, ESQ.
                              JERAMY WEBB, ESQ.
                              AMY C. QUARTAROLO, ESQ.
                         555 Eleventh Street, NW,
                         Suite 1000
                         Washington D.C., 20004

For Jack H. Owoc:        Genovese, Joblove & Battista, P.A.
                         By:  PAUL J. BATTISTA, ESQ.
                         100 SE 2 St #4400
                         Miami, FL 33131


Proceedings recorded by electronic sound recording, transcript
            produced by transcription service.

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@jjcourt.com**

**(609) 586-2311   Fax No. (609) 587-3599**

2

```
For Monster Energy          Ackerman LLP
Company:                    By:  EYAL BERGER, ESQ.
                                 MICHAEL GOLDBERG, ESQ.
                            201 E Las Olas Blvd. #1800
                            Ft. Lauderdale, FL 33301


For Truist Bank:            Shutts & Bowen, LLP
                            By:  HARRIS J. KOROGLU, ESQ.
                            200 S. Biscayne Blvd.,
                            Suite 4100
                            Miami, FL 33131

                            Moore & Van Allen PLLC
                            By:  LUIS LLUBERAS, ESQ.
                                 STEPHEN GRUENDEL, ESQ.
                                 COLE B. RICHINS, ESQ.
                            100 N Tryon Street, Suite 4700
                            Charlotte, NC 28202

TELEPHONIC APPEARANCES:

For Monster Energy          Pachulski Stang Ziehl & Jones
                            By:  ROBERT J. FEINSTEIN, ESQ.
                            780 Third Avenue, 34th Floor
                            New York, NY 10017

For Crown Cork & Seal       Dilworth Paxson LLP
USA, Inc.:                  By:  ANNE AARONSON, ESQ.
                            1500 Market St., Suite 3500e
                            Philadelphia, PA 19102

For the United States       Office of the U.S. Trustee
Trustee:                    By:  J. STEVEN WILKES, ESQ.
                            51 S.W. 1st Ave., Suite 1204
                            Miami, FL 33130
```

- - -

# I N D E X

|                  |                       | **ID.** | **PAGE** **EVD.** |
|------------------|-----------------------|---------|-------------------|
| **EXHIBITS**     |                       |         |                   |
| Exhibit 1        | Declaration           | --      | 22                |
| Exhibit 2        | Declaration           | --      | 22                |
| Exhibit 3        | Declaration           | --      | 22                |
| Exhibit 5        | Amended Document      | --      | 45                |
| Exhibit 4        | DiDonato's Declaration| --      | 49                |

4

1          THE COURT:  Vital Pharmaceuticals, 22-17842.

2          I think I'll take appearances, I guess, in the

3  courtroom first, and then on Zoom.  So, Mr. Guso?

4          MR. GUSO:  Yes, sir.  May it please the Court, good

5  afternoon, Your Honor.  Jordi Guso and Michael Niles from

6  Berger Singerman.  Our firm is proposed co-counsel for the

7  debtors.  We are joined at counsel table, Your Honor, from the

8  Latham Watkins firm, Andrew Sorkin, Jeramy Webb, and Amy

9  Quartarolo, Q-u-a-r-t-a-r-o-l-o.

10          THE COURT:  Right.

11          MR. GUSO:  I butchered it.  Your Honor, has entered

12  orders authorizing their appearance pro hac vice in the cases.

13          THE COURT:  I have.  Thank you.

14          MR. GUSO:  And, Your Honor, once counsel are through

15  with their introductions, I'd like a moment just to introduce

16  the debtors' representatives who are in the courtroom.

17          THE COURT:  Sure.

18          MR. GUSO:  Thank you.

19          THE COURT:  Of course.  Hold on one second.

20          COURT CLERK:  How do you spell their names?

21          MR. GUSO:  Guso, G-u-s-o.

22          UNIDENTIFIED ATTORNEY:  That was easier than

23  Quartarolo.

24          MR. GUSO:  It sure was.

25          THE COURT:  Go ahead.  Yes, spell your name, please.

1          MR. SORKIN:  Andrew Sorkin, S-o-r-k-i-n.

2          MR. WEBB:  Jeramy Webb, J-e-r-a-m-y --

3          THE COURT:  Not "e", "a", okay.  Got it.  Yes?

4          MS. QUARTAROLO:  Amy Quartarolo, A-m-y, last name

5  Q-u-a-r-t-a-r-o-l-o.  Q-u-a-r-t-a-r-o-l-o.

6          MR. NILES:  Michael Niles, N-I-l-e-s.

7          THE COURT:  All right.  Mr. Battista?

8          MR. BATTISTA:  Good afternoon, Judge.  I'm Paul

9  Battista of Genovese, Joblove & Battista.  My surname is

10 spelled B, as is boy, a-t-t-I-s-t-a, and I represent Jack Owoc,

11 O-w-o-c, who's the sole shareholder and chief executive

12 officer, and I believe Mr. Owoc is on Zoom.

13         THE COURT:  All right.

14         MR. BATTISTA:  Amongst 100 or so other participants.

15         THE COURT:  Yes, thank you.  All right, Mr. Goldberg?

16         MR. GOLDBERG:  Good afternoon, Your Honor, Michael

17 Goldberg, Akerman, LLP, G-o-l-d-b-e-r-g.  With me at counsel

18 table is Ayel Berger, B-e-r-g-e-r.

19         Your Honor, we also have co-counsel and I know you're

20 taking appearances, online.  We have some pro hac motions

21 pending.  I don't know if you want to take them now before

22 counsel speaks or --

23         THE COURT:  We can take them in any order you wish.

24         MR. GOLDBERG:  If I could take them now then, that

25 would be great.

1       THE COURT:  Memorizing all of this.  Definitely not.
2  Go ahead.

3       MR. GOLDBERG:  Your Honor, we filed a motion for the
4  admission, pro hac admission of Robert Feinstein and Steven
5  Golden of the Pachulski Stang firm.  I have filed the requisite
6  papers and declarations.  I spoke to Mr. Guso prior.  There was
7  no objection.  I did not speak to everybody else in the
8  courtroom.  As debtors' counsel rep, Mr. Guso represented he
9  had no objection, so I'd like to move for their pro hac
10 admission.

11      THE COURT:  Certainly, any objections?

12      UNIDENTIFIED ATTORNEY:  No objection.

13      THE COURT:  All right, that will be granted and I
14 assume we'll get an order uploaded.  It's usually ex parte.
15 Let's just leave it at ex parte, just keep it simpler, so you
16 don't have to change the order to reference a hearing date.

17      MR. GOLDBERG:  Thank you, Your Honor.

18      THE COURT:  In person, in 3D.

19      MR. KOROGLU:  Yes, sir.  Good afternoon, Your Honor,
20 Harris Koroglu, K-o-r-o-g-l-u, from the law firm of Shutts &
21 Bowen appearing on behalf of Truist Bank, and with me is my
22 co-counsel Mr. Luis Lluberas from the Warren Van Allen firm.
23 I'll let him make his appearance and he has been admitted
24 graciously by the Court pro hac vice already.

25      THE COURT:  Did you spell your last name?

 1              MR. KOROGLU:  Yes, sir.

 2              THE COURT:  Okay, good.  Go ahead.

 3              MR. LLUBERAS:  Good afternoon, Your Honor, Luis

 4  Lluberas, L-l-u-b-e-r-a-s, of the Warren Van Allen law firm,

 5  representing Truist Bank, who is the administrative agent for

 6  the pre-petition credit facility and the administrative agent

 7  for the proposed post-petition credit facility that will be

 8  before Your Honor today.  Your Honor, there are also two of my

 9  colleagues are on Zoom, listen only, but have been admitted

10  graciously by Your Honor.  Steve Gruendel, G-r-u-e-n-d-e-l, and

11  my partner and co-counsel, as well, Cole Richins,

12  R-i-c-h-i-n-s.  Thank you, Your Honor.

13              THE COURT:  Thank you.  Any other appearances in the

14  courtroom?  All right.

15              Now, on Zoom.  We've heard about Mr. Feinstein

16  already, but, Mr. Feinstein, if you want to make your

17  appearance you certainly can.

18              MR. FEINSTEIN:  Thank you, Your Honor.  Robert

19  Feinstein, Pachulski Stang Ziehl & Jones appearing for Monster

20  Energy, and I assume my partner Betty Orr (phonetic).  Your

21  Honor, on behalf of all the Zoom participants, we can -- we

22  can't see you.  In the prior hearing we were able to see your

23  picture.

24              THE COURT:  Oh.  Because sometimes I forget to turn

25  on my video, so there you go.

8

1           MR. FEINSTEIN:  Thank you.

2           THE COURT:  Sorry.

3           MR. FEINSTEIN:  Okay.  It makes it easier.

4           THE COURT:  All right.

5           MR. FEINSTEIN:  Thank you for your information on

6   that, Your Honor.

7           THE COURT:  Sure.  Ms. Aaronson?

8           MS. AARONSON:  Good morning, Your Honor, Anne

9   Aaronson, A-a-r-o-s-o-n, from Dilworth Paxson, representing

10  Crown Cork & Seal, USA, Inc.

11          THE COURT:  All right.  Does anyone else wish to make

12  an appearance from Zoom.  Mr. Wilkes?

13          MR. WILKES:  Good afternoon, Your Honor, J. Steven

14  Wilkes for the United States Trustee, Region 21.

15          THE COURT:  Thank you.  Anyone else?  All right.  So,

16  I have seen the agenda.  Mr. Guso, this is -- it's fine with me

17  to proceed in that fashion.  Although, I have to tell you,

18  given the objection that's been filed to the DIP financing, we

19  may want to handle slightly more perfunctory matters prior to

20  that and leave that for the end, but that's just a suggestion,

21  so --

22          MR. GUSO:  Happy to do that, Your Honor.  Thank you.

23          THE COURT:  All right.

24          MR. GUSO:  May I proceed?

25          THE COURT:  Yes, you may.

1        MR. GUSO:  Yes, sir.  May I please the Court, good

2 afternoon again, Your Honor.  Jordi Guso, Berger Singerman on

3 behalf of the debtors.  First and foremost, Your Honor, thank

4 you very much for accommodating the debtors and for hearing us

5 on an expedited basis.  We also wish to thank Mr. Wilkes, Your

6 Honor, for making himself available and for previewing with us

7 the matters that are before the Court this afternoon.  And as I

8 said earlier, Your Honor, I'd like to begin by introducing the

9 debtors' representatives and our co-advisors, who are in the

10 courtroom.  Your Honor, starting with the second row, from left

11 to right, standing, Your Honor, is Mr. Greg Robbins,

12 R-o-b-b-i-n-s.  Mr. Robbins is the senior vice president of

13 finance for the debtors.

14        THE COURT:  Welcome.

15        MR. GUSO:  To his left is Ms. Sury Rodriguez, R-o-d-

16 r-i-g-u-e-z.  Ms. Rodriguez is the vice president of finance.

17 To her left, Your Honor, is Ms. Katherine Cole, C-o-l-e, the

18 debtors' chief operating officer, and to Ms. Cole's left, Your

19 Honor, is Mr. Greg Metzger, M-e-t-z-g-e-r.  Mr. Metzger is

20 chief litigation counsel for the debtors.

21        THE COURT:  Welcome.

22        MR. GUSO:  Your Honor, moving one row up.  I'll start

23 with the gentleman in the center.  Your Honor, this is John

24 DiDonato, D-i-D-o-n-a-t-o.  Mr. DiDonato is the chief

25 tranformation officer of the debtors, Your Honor, and has

1  submitted his sworn declaration in support of the relief the

2  debtors' seek today.  That declaration is Docket Entry 26.

3            THE COURT:  Thank you.

4            MR. GUSO:  To Mr. DiDonato's right, Your Honor, is

5  Mr. Avhi, A-v-h-i, Gupta, G-u-p-t-a.  Mr. Gupta is with Huron

6  Consulting.  And then, Your Honor, working our way left from

7  Mr. DiDonato, this is Mr. Charles Delo, D-e-l-o, from

8  Rothschild & Co., and to his left, Your Honor, is Homer

9  Parkhill, P-a-r-k-h-i-l-l, also from Rothschild & Co., and Mr.

10 Parkhill has submitted a declaration in support of the debtor

11 in financing facility, which the debtors are seeking this

12 afternoon.

13           Your Honor, this afternoon, with the Court's

14 permission, the debtors' presentation will cover three areas.

15 First, Your Honor, I will tell the Court the notice the debtors

16 provided with respect to the first-day papers and the hearing

17 that scheduled for this afternoon.  Secondly, Your Honor, Mr.

18 Sorkin will tell the Court briefly about the debtors, their

19 operations, the circumstances that led them to the filing, and

20 what the general objectives of the case are.  And then, lastly,

21 Your Honor, we'll make our way into the first-day papers that

22 are before you.

23           Your Honor, as I indicated, we've previewed with both

24 Mr. Falzone (phonetic) and with Mr. Wilkes about the relief the

25 debtors seek this afternoon in the first-day motions.  For

purposes of the first-day hearings, Your Honor, we've resolved
all of their concerns raised by both the U.S. Trustee and Mr.
Falzone.  Although, some of the relief the debtors seek today
will be interim in nature if granted, of course.  And, Your
Honor, we are optimistic that we will reach final agreement
with United State's Trustee between now and the date of the
final hearing.  But, if for any reason we do not, all rights
are preserved and all objections are preserved.

THE COURT:  Applies -- you'll let me know what that
applies to as we go?

MR. GUSO:  Yes, sir.  Yes, sir.

THE COURT:  Yes, okay.

MR. GUSO:  As we work our way through the agenda.
Thank you, Your Honor.

THE COURT:  Yes.

MR. GUSO:  Your Honor, first on the issue of notice,
as is evidenced by the certificate of service that's in the
record at Docket Entry 80, Stretto, Inc., the proposed noticing
and claims agent for the debtors, caused the motions that are
before you this afternoon as well as the various notices of
hearing issued by the Clerk of the Court, to be served by
overnight mail and e-mail upon the creditors holding the 30
largest unsecured claims, the Internal Revenue Service, the
Security and Exchange Commission, United State's Attorney's
General, the Attorney General of the States in which the

1  debtors' products are sold, and Truist Bank as agent and its

2  counsel.

3         In addition, Your Honor, Stretto served the debtors'

4  emergency motion to continue to administer its insurance

5  programs and the notice of hearing on that motion on all of the

6  insurers, which are the subject of that motion.  And, Your

7  Honor, we submit that in the circumstances, good and adequate

8  notice of the matters that are before you and of the hearings,

9  Huron has been provided in the circumstances.  Your Honor, with

10  the Court's permission, I'll yield the podium to Mr. Sorkin,

11  who will address the Court in the manner that I described?

12         THE COURT:  Well, before you do that, does anyone

13  contest the adequacy of notice?  You're all here, so clearly

14  you all got notice, so that's good.  All right, and I -- have

15  you -- you've not heard any -- any issues with respect to

16  notice from anyone else?

17         MR. GUSO:  We have not, Your Honor.

18         THE COURT:  Okay.  All right, certainly, yes.

19         MR. GUSO:  Thank you, Your Honor.

20         MR. SORKIN:  Not quite as tall as Mr. Guso.  Good

21  afternoon, Your Honor.

22         THE COURT:  He's not that tall.

23         MR. SORKIN:  Andrew Sorkin, Latham & Watkins, on

24  behalf of the debtors.  And I would echo Mr. Guso's comments

25  and thank the Court and its staff for your time today, as well

1 as Mr. Wilkes.

2 　　　　　THE COURT:  Not today, it's the last three days.

3 　　　　　MR. SORKIN:  All of the above, Your Honor.

4 　　　　　THE COURT:  No, it's all good.  Actually, this is you

5 know it's nice to be in a courtroom with lots of lawyers, and

6 lots of parties, in a case that, you know, we haven't had many

7 of over the last couple of years, but anyway.

8 　　　　　MR. SORKIN:  I'm glad we could give the Court that

9 opportunity.

10 　　　　　THE COURT:  Right.

11 　　　　　MR. SORKIN:  And I should also note --

12 　　　　　THE COURT:  And even topped off with a last minute

13 objection, which is always --

14 　　　　　MR. SORKIN:  Exactly.  Exactly, you get a little bit

15 of everything even on the first day.

16 　　　　　THE COURT:  Exactly.

17 　　　　　MR. SORKIN:  And I should also thank Mr. Wilkes for

18 his constructive approach as we work through his comments to

19 the first-day papers, which seek the very important relief that

20 you'll hear about over the remainder of the hearing.  As Mr.

21 Guso mentioned, I did want to start with a brief company

22 overview and I will try to keep it brief and not be overly

23 redundant of the first-day declaration, which I'm sure you've

24 read.

25 　　　　　THE COURT:  Yes, we have read everything, including

1  those declarations, and the affidavits, the objection, but,

2  yes, make your -- make your presentation.  I don't want to

3  interfere with it.

4       MR. SORKIN:  Thank you, Your Honor.  Your Honor, I

5  think most people in the courtroom and on the Zoom are familiar

6  with the debtors' leading product.  That's the Bang Energy

7  drink.  Well, just like their beverage, the company prides

8  itself on being dynamic, vibrant, and innovative.  The lead

9  debtor is Vital Pharmaceuticals.  That company was established

10  in 1993 by Jack Owoc, right here in South Florida.  It

11  initially focused on sports nutrition products.

12       In 2012, the company launched the Bang Energy drink,

13  which has since become their flagship product.  Bang was and is

14  unique among its competitors in several respects, including in

15  the breadth of its flavor offerings.  There are 45 in total.

16  It's zero sugar ingredient profile and a cutting edge marketing

17  strategy that relies heavily on a robust social media presence

18  and a network of approximately 1,000 influences.

19       The results of that strategy spoke for themselves.

20  The company sales grew exponentially over the following years

21  as Bang took hold in the market and Bang achieved strong

22  profitability.  The company then ran into some challenges when

23  they transitioned to a centralized distribution network in

24  2020.  Simply put, the relationship there with that

25  distributor, PepsiCo, didn't work out as the parties had hoped.

1            THE COURT:  Can I --

2            MR. SORKIN:  Sure.

3            THE COURT:  Can I just stop you for one second.  We

4   might be having some technical difficulties here.  Mr. Wiener

5   I'm seeing all of these messages.  Are we having issues?

6            LAW CLERK:  There's some concern about --

7            THE COURT:  Okay.  That's it.  Everybody else can

8   hear on Zoom what's happening in the courtroom, is that right?

9            LAW CLERK:  Yes.

10           THE COURT:  Okay.  All right, I don't know who the

11  person is but -- anyway, I didn't mean to interrupt, but it's

12  just you know when you're having hybrid hearings, we're at the

13  mercy of technology, which doesn't always pan out, so anyway go

14  head.

15           MR. SORKIN:  Understood, Your Honor.  I was just

16  getting to around 2020 when the company ran into some

17  challenges from a distribution standpoint.  The relationship

18  with the centralized distributor they were using at that time,

19  PepsiCo, just didn't work out as I think either party had

20  hoped, and the company's ability to get the products on the

21  shelves and on the ultimate consumers was impaired and sales

22  suffered as a result.

23           The good news is, the company is in the home stretch

24  in terms of getting that distribution network back on track,

25  and over the past few months we've been -- the company, I

1  shouldn't say we, has worked tirelessly to rebuild a
2  decentralized network of the type that they had prior to the
3  Pepsi arrangement when they experiences exponential growth.

4        That network will be comprised of approximately 269
5  distributors who are focused on particular regions of the
6  country and are best in class in those regions.  And as we sit
7  here today, we're 93 percent of the weight of that target in
8  terms of the anticipated volume of distribution across that
9  whole network, and we expect the network to be fully
10 operational by mid-November.

11       I spent some time on that subject, because I can't
12 emphasize enough that we are extremely excited about the new
13 distribution network, and it wouldn't be an exaggeration to say
14 that it's one of the most important assets that this estate
15 has.  Preserving our relationships with those distributors and
16 the retailers to whom they distribute, and allowing that
17 network to perform as we all know it's capable of, is essential
18 to our ability to maximize value here, and it's going to be one
19 of the central operational goals of this case.

20       So, in sum, Your Honor, from an operational
21 standpoint, we believe the future of this business is bright,
22 regardless of what you might here about liquidity challenges,
23 litigation, other challenges that we've been facing in recent
24 months.  Demand for our products remain strong and we're
25 fortunate to have the customer base we do and it's a loyal and

1  enthusiastic one.

2        If I could just shift gears a little bit, I did want

3  to talk about one item I know is highlighted in the first-day

4  declaration.  But, there have been some governance changes in

5  the works that we expect to be completed later this week.  By

6  way of background, historically, Mr. Owoc, the founder, served

7  as the sole director or manager of each of the debtor entities.

8  And the lead up to the filing, Mr. Owoc decided to expand the

9  boards at each debtor entity to ensure that the decisions that

10 are going to be before him and the other new board members in

11 these cases, are made with the benefit of deliberation among a

12 group of directors with the first perspectives.

13       The new boards will consist of five members,

14 including Mr. Owoc and the company's chief operating officer,

15 who you were just introduced to, Ms. Cole, as well as three

16 directors who are unaffiliated with the company, and that will

17 include one restructuring focused independent Steve Panagos.

18       Each board will also appoint a restructuring

19 committee of one.  The one will be Mr. Panagos, who will have a

20 mandate to report back to the full board and make

21 recommendations concerning key decisions in connection with

22 this Chapter 11 process.

23       THE COURT:  Mr. Panagos is one of the -- with one of

24 the professional firms that's to be retained today, correct?

25       MR. SORKIN:  Mr. Panagos is not with one of the

18

1  professional firms.  I was actually just about to get to that

2  individual.

3          THE COURT:  Okay.

4          MR. SORKIN:  That would be Mr. DiDonato, who is our

5  --

6          THE COURT:  Mr. DiDonato.

7          MR. SORKIN:  -- chief transformation officer and will

8  be working very closely with Mr. Panagos in that capacity.

9  He's with Huron Consulting Group.

10          THE COURT:  Understood.

11          MR. SORKIN:  So, suffice it to say, Your Honor, the

12  debtors will have a wealth of capable hands guiding them

13  through this process.  Next, not to jump around too much, I'd

14  like to talk a little bit about our lender group.  They have

15  been generally supportive of the company and the lead up to

16  this filing and they're committed through our proposed DIP to

17  continue and to provide that support through the Chapter 11

18  process.

19          Truist Bank serves as agent under the pre-petition

20  secured credit facility.  We have about 354 million of

21  outstanding obligations under that facility as of the petition

22  date, and it's been in default since March of this year.  Our

23  lenders have been very constructive throughout.  They've agreed

24  to five forbearance agreements since that default occurred.

25  The last of those expired on September 30th and they've even

19

advanced 60 million in additional funding during that
post-default period to give us runway to conduct an out of
court capital grace process and bridge to this Chapter 11 case.

Now, they stand committed to provide an additional
$100 million in new money under the DIP to fund operations and
the costs of these cases, without putting us on an unduly short
fuse in terms of maturity and inner milestones and the like.

So, you know, as I've said, the future of the
business is bright. We believe there's significant enterprise
value here. You may be wondering why we're here and where we
intend to do. In a nutshell, we're here to obtain a critical
infusion of liquidity through that DIP facility, obtain
breathing room from pending litigation, verdicts, and
judgments, and use that breathing room to attempt to pursue a
Chapter 11 plan or other value maximizing transaction.

To break each of those points down just a little bit
further and then I promise I will be done. Starting with
liquidity. I mean, we've been operating on very tight
liquidity for several months now. The proposed DIP will
restore liquidity to a healthy level. It will also send, you
know, a strong message to, you know, the world, and our key
stakeholders, vendors, distributors, retailers, et cetera, that
any concerns they had over the last several month should be
allayed, and we will have the financial wherewithal to meet our
obligations in the ordinary course throughout these cases.

1          Second, breathing room.  Debtors are party to various

2     litigation claims and a couple of larger verdicts and judgments

3     have come down in just in the last recent weeks.  Those are

4     explained in Paragraphs 30 to 39 of Mr. DiDonato's declaration.

5     I won't belabor those descriptions here unless Your Honor has

6     questions.  But suffice it to say, the automatic stay is itself

7     a key benefit from this filing because it protects this

8     business and these assets from enforcement efforts while the

9     company attempts to restructure its affairs.

10          Third and finally, the debtors, with the assistance

11     of their investment bankers at Rothschild & Co. will use that

12     breathing room to continue to pursue a recapitalization or

13     financing or other transactions, all of which the goal will be

14     to repay that bank -- that facility in full and allow the

15     company to emerge from bankruptcy with a stronger balance

16     street and an even stronger brand.  And, our DIP lenders,

17     again, by agreeing to a seven-month DIP with relatively few

18     milestones that are relatively long dated, have given the

19     company ample runway to get to that result.  So, that concludes

20     my presentation, Your Honor, subject to any questions you may

21     have.

22          THE COURT:  I have no questions.  I'm familiar with

23     it, having read the declaration prior to the hearing, but very

24     helpful.  Thank you for that.  And, I guess, Mr. -- where do we

25     go from here?

1          MR. SORKIN:  Well, I think there might be just a

2  couple of housekeeping matters before we get into the agenda.

3          THE COURT:  Sure.

4          MR. SORKIN:  The first of which I think is to move

5  our three declarations into evidence, as they provide the

6  evidentiary support for the relief we're asking Your Honor to

7  grant today.

8          MR. GUSO:  May I approach, Your Honor.

9          THE COURT:  Certainly, and I know two -- go ahead,

10  Mr. Guso.  I know of two declarations.  Actually, you don't --

11  I mean, you can hand them up.  I -- it's more all electronic

12  these days anyway, so.

13          MR. GUSO:  We have two more that we're going to share

14  with you, Judge --

15          THE COURT:  Okay, fair enough.  You're offering these

16  affidavits or declarations as proffers and subjecting of course

17  these witnesses to cross examination I assume?

18          MR. SORKIN:  I am.  They're all available for cross

19  examination.  Mr. DiDonato and Mr. Parkhill, two of the

20  declarants are sitting in the courtroom, and Ms. Betance, who

21  is the representative of Stretto, our proposed claims agent, is

22  available by video conference to the extent anybody would like

23  to cross examine them.

24          THE COURT:  Okay, understood.  Anyone object to the

25  submission of these declarations in to evidence?  All right,

1  none.  And, I don't know whether there will be cross

2  examination requested, but what I would ask you to do is during

3  each of the matters that are at issue, point to those aspects

4  of the declaration that are relevant to that particular matter

5  if that's relatively easy to do.  If not, you can point to the

6  entire declaration or whichever declaration you feel apply, and

7  then once you've presented your evidence, it seems to me that

8  we would need to turn that opportunity for cross examination

9  over to any parties that wish to do so.  So, just as you're

10  presenting, just keep an eye out for a need to do that.  All

11  right?

12          MR. SORKIN:  Understood, Your Honor.  That approach

13  makes sense to us to go motion by motion --

14          THE COURT:  Yes.

15          MR. SORKIN:  -- and people can examine the witness as

16  they deem appropriate.

17          THE COURT:  Great.

18          MR. SORKIN:  I think --

19          THE COURT:  So, the -- but the exhibit register only

20  deals with -- well, it deals with three declarations, which I

21  guess will be admitted subject to cross examination, but then

22  there's Exhibits 4 and 5.  Are you seeking to admit those at

23  this point, too, or not?

24          MR. SORKIN:  I think Mr. Guso will seek the admission

25  of those exhibits in connection with the foreign and critical

1  vendor relief.

2          THE COURT:  Okay.  Fair enough.

3          MR. SORKIN:  As they relate to those motions.

4          THE COURT:  All right.  And, what I generally do is

5  once the exhibit register is completed, I ask counsel to

6  formalize it and actually file it with the Court after the

7  hearing so that there's a record in the docket of what matters

8  were admitted, all right?  What documents.

9          MR. SORKIN:  Sure.  We will do so.

10          THE COURT:  Okay, great.

11          MR. SORKIN:  I think we can proceed with the agenda

12  then and we were going to start with the retention

13  applications.

14          THE COURT:  Okay.

15          MR. SORKIN:  And I will present my own firm's

16  retention application, and I believe Mr. Guso will be

17  presenting the other four.

18          THE COURT:  All right.  I don't -- in my notes, I

19  don't have them in the same order, so I may have to be

20  scrolling a bit.  I'm using OneNote, and the OneNote in this

21  case goes a bit forever, so tell me what pleading that is, so I

22  can find it.

23          MR. SORKIN:  This would be Docket Number 22, the

24  emergency application to employ Latham & Watkins as co-counsel

25  to the debtors-in-possession.

24

1          THE COURT:  All right, let me make a general

2    statement about emergency motions to retain professionals.  I

3    ended the process of interim approval and I know that it all

4    arose as a result of this notion that the professionals fear

5    that somehow after the 21st day in a hearing on a motion that

6    approves them that they won't get paid for that intervening 21

7    days.  That is not the case and there should be no fear here in

8    this courtroom that that will occur.  I had orders on my

9    website that were submitted regularly approving interim

10   retentions because of that fear.  I don't think that fear is

11   well grounded in the law so I have ended that process.  Is

12   there any reason we need to have interim approval of the

13   professionals in this case, at least the law firms and we can

14   deal with the other professionals in a moment, but what is the

15   issue here?  What's the fear?

16          MR. SORKIN:  I will speak for Latham and say we would

17   be comfortable seeking the final order authorizing a retention

18   at the final hearing.

19          THE COURT:  Okay.

20          MR. SORKIN:  If that's now your practice.

21          THE COURT:  Mr. Guso?

22          MR. GUSO:  Your Honor, if that's the Court extended,

23   then certainly no objection from Berger Singerman, but just so

24   to give the Court some background, Your Honor, this procedure

25   is actually the product of a case called First NLC, which first

1  was before Judge Hyman, following the Amendments Rule 6003, and

2  the concern was, Your Honor, that if for some reason a

3  professional retention was not ultimately approved, the only

4  way a professional can get paid is because he's been retained

5  -- he or she has been retained as a professional in the case.

6  So, there was some risk of exposure during that gap period of

7  time, admittedly, very, very limited, but that's the product of

8  --

9          THE COURT:  Yes, and I'm aware of that and the

10 problem that I see with that, quite frankly, is the reason

11 counsel would not be approved would be because counsel had some

12 kind of disinterestedness problem, most likely.  I can't think

13 of another reason unless there was a fallout with their client

14 perhaps, but -- and if there is a disinterestedness problem,

15 what I'm being asked to do on an interim basis is essentially

16 decide that there is no disinterestedness problem and I'm not

17 prepared to do that.

18         MR. GUSO:  Understood, Your Honor.

19         THE COURT:  So -- so I think -- I think it's almost a

20 catch-22, but I hear you and I understand the fear.  I've been

21 there.  And, I filed these motions myself and craved that

22 order, but at the end of the day, it's not nunc pro tunc

23 relief.  It's not prohibited by the Supreme Court of the United

24 States.  It's by the code.  I don't know frankly what Congress'

25 reason was for having to wait the 21 days, but I'm not here to

1 question the brilliance of Congress.  So, I just think if

2 you're all okay with, and there's no reason that I'm unaware of

3 for that interim relief, it seems to me the appropriate process

4 is to set a final hearing after the 21 days and you'll get your

5 final order.

6          MR. GUSO:  That's certainly acceptable to us, Your

7 Honor.

8          THE COURT:  All right, thank you.

9          MR. SORKIN:  And us, too.

10          THE COURT:  Okay, great.  So, that -- so that

11 resolves -- so what I would need is an order on 22 continuing

12 the hearing on the emergency application to a date certain, and

13 you all can work that out.  You know, I don't know if you all

14 are going to be traveling, or not traveling, or attending by

15 Zoom, or whatever, but I don't want to assume a date.  So, that

16 would apply to 22.  It would also apply to 21, which is Berger

17 Singerman.

18          MR. GUSO:  Yes, sir.

19          THE COURT:  Now, I -- we can get to Stretto.  I think

20 Stretto, I don't know if they fall within the same category --

21          MR. GUSO:  It's not a professional, Your Honor.  It's

22 an agent of the court and I think they --

23          THE COURT:  Exactly, so we don't need to deal with

24 that.  Whatever professionals would this fall under?

25          MR. GUSO:  Your Honor, the this being the deferral or

1  the this being be heard?

2          THE COURT:  The deferral to a final hearing.

3          MR. GUSO:  Oh, I'm sorry.  Your Honor, I believe we'd

4  have to -- we should proceed with the retention of Huron given

5  that they're providing the services of an interim officer of

6  the debtors, if that's acceptable to Your Honor?

7          THE COURT:  Do you want to preside -- proceed today

8  with that?

9          MR. GUSO:  Yes, Your Honor.

10          THE COURT:  Okay.

11          MR. GUSO:  Again, it would be an interim order by

12  agreement with the U.S. Trustee.  And, if, Your Honor, if I may

13  have a moment with Rothschild just to confirm with them about

14  their preference and I'll be back to you promptly?

15          THE COURT:  Okay, sure.

16          MR. GUSO:  Thank you.  Your Honor, Rothschild is fine

17  deferring as well.

18          THE COURT:  All right.  So -- so Rothschild is which

19  docket entry?

20          MR. GUSO:  It's 23, Your Honor.

21          THE COURT:  All right, so 23, I'd need an order on

22  that as well setting that hearing and, I guess, proceed with

23  Huron.

24          MR. GUSO:  Would Your Honor like an order for each or

25  is one order?

1           THE COURT:  No, an order for each because --

2           MR. GUSO:  Yes, sir.

3           THE COURT:  -- otherwise I might get in trouble with

4  the Clerk's Office.

5           MR. GUSO:  The last thing I want to do is get you in

6  trouble, Judge.

7           THE COURT:  I get in a lot of trouble with the

8  Clerk's Office and court reporters if you don't spell your

9  name.  So, anyway, go ahead.

10          MR. GUSO:  Huron?

11          THE COURT:  Yes.

12          MR. GUSO:  Yes, sir.  Thank you.  May it please the

13  Court again, Your Honor, Jordi Guso on behalf of the debtors.

14  Your Honor, pursuant to this application, the debtors seek

15  authority to retain Huron --

16          THE COURT:  That number again?

17          MR. GUSO:  That is Docket Entry Number 19, Your

18  Honor.

19          THE COURT:  19, okay.  Yes, I have it.

20          MR. GUSO:  They seek authority to retain Huron

21  Consulting Services, LLC, Your Honor, to provide the services

22  of Mr. DiDonato as the chief transformation officer pursuant to

23  the terms of the engagement letter that's attached as Exhibit A

24  to the motion.  The scope of Mr. DiDonato's services are

25  summarized in Paragraph 11 of the application, but they

1   include, Your Honor, managing all work streams relating to the

2   debtors' restructuring initiatives, including serving as the

3   principal contact with the debtor secured lenders and other

4   significant stakeholders assisting in managing the debtors'

5   relationships with their vendors and providing services that

6   would most customarily fall under the umbrella of a chief

7   restructuring officer, if you will.

8           Mr. DiDonato will be assisted by other Huron

9   professionals, including Mr. Gupta, who is present in the

10  courtroom, Your Honor, in carrying out these duties.  As

11  compensation, Mr. DiDonato would be paid $15,000 per week.  The

12  supplemental personnel, Your Honor, will bill at their usual

13  and customarily rate, customary rate, so between 400 and $1315

14  per hour.  They've agreed, Your Honor to provide a budget to

15  the debtors each week in advance laying out the anticipate

16  scope of services and the tentative costs.  And, Your Honor, as

17  is customarily in engagements of this type, given that Mr.

18  DiDonato is the officer of the debtor, the debtors will

19  providing to him the most favorable indemnities provided by the

20  debtors to their other officers and directors.

21          THE COURT:  And do those presently exist and exist at

22  pre-petition?

23          MR. GUSO:  Yes, sir.

24          THE COURT:  Okay.

25          MR. GUSO:  Under the debtors' bylaws.

1          THE COURT:  So, it would be consistent with -- with

2    those.

3          MR. GUSO:  With what -- what existed as of petition

4    date.

5          THE COURT:  Which would already exist.  Okay.

6          MR. GUSO:  Correct, Your Honor.  Your Honor, as with

7    the prior applications if they were going to go forward, our

8    agreement with Mr. Wilkes is to -- and assuming the application

9    is favorably considered by Your Honor is to have an interim

10   order entered authorizing that retention subject to a final

11   hearing.  There are some issues that we continue to discuss

12   with Mr. Wilkes in respect to the application, but we've had no

13   other objections, Your Honor.

14         THE COURT:  All right.  Before I get to Mr. Wilkes,

15   are there any objections in the courtroom or on Zoom?  All

16   right, Mr. Wilkes?

17         MR. WILKES:  Thank you, Your Honor, J. Steven Wilkes

18   for the United State's Trustee.  As Mr. Guso said, we are

19   working through issues, but the United State's Trustee

20   understands that the CTO is necessary as an officer of the

21   corporate entity, and to be -- to proceed, so it has no

22   objection to the entry of the interim order, as worked out

23   between our office and Mr. Guso's office.

24         THE COURT:  So, the interim order will leave for

25   another day those issues you continue to discuss, I assume?

31

1          MR. GUSO:  Correct.  Yes, sir.

2          THE COURT:  And I assume --

3          MR. WILKES:  Yes, Your Honor, we are.

4          THE COURT:  -- the interim order will also set a

5    final hearing?

6          MR. GUSO:  Yes, sir.

7          THE COURT:  All right, and will that be at the same

8    time, approximately, as the hearings on the other applications?

9          MR. GUSO:  Yes, sir.

10          THE COURT:  Okay.

11          MR. GUSO:  The 21 days hence, more or less, Your

12   Honor.

13          THE COURT:  Yes, all right, fine.  Thank you, Mr.

14   Wilkes.  All right.

15          MR. GUSO:  Good, Your Honor?

16          THE COURT:  Granted.

17          MR. GUSO:  Thank you.  Sorry.  Thank you, Your Honor.

18   Judge, I think then we'll go with your suggestion that we defer

19   the financing motion til the end and go with what more of the

20   housekeeping motions if --

21          THE COURT:  But, what I worry about, Mr. Guso, is

22   that we'll get involved in something more complicated and it

23   will be close to the end of the day or beyond the end of the

24   day and then we'll just be --

25          MR. GUSO:  Yes, sir.

1          THE COURT:  -- forgetting things, or tired, or

2  whatever, so let's get as much out of the way as we can.

3          MR. GUSO:  Ten four.  Yes, sir.  Your Honor, if I may

4  then, I'll address the emergency motion for the approval of the

5  form of notice of commencement.  It's Docket Entry Number 10.

6  Your Honor, we -- we're not seeking at all to shorten the

7  notice of the bar date in any respect.  In fact, Your Honor,

8  the form that we proposed has been approved by Mr. Falzone and

9  Mr. Falzone, yesterday, gave us a November 18, 2022 date for

10 the first meeting of creditors, a December 19, 2022 date as the

11 deadline for non-governmental entities to file proofs of claim,

12 and April 10, 2023 is the deadline for governmental agencies to

13 file proofs of claims.  Those are consistent with the rules,

14 Your Honor, and not reduced in any respect.

15         The debtors have prepared a customized proof of claim

16 form.  That has been approved by Mr. Falzone, as well, so that

17 a creditor would need only check the box for the appropriate

18 debtor against who the claim is sought.

19         THE COURT:  Yes.  I was going to ask about that.  I

20 saw that form.  Has that changed since you filed the motion?

21         MR. GUSO:  I'm -- again, it was approved by Mr.

22 Falzone.

23         THE COURT:  Okay.  And, you know, in consideration of

24 your -- of one of the motions, which wants to limit the matrix

25 and the top 30 and things of that sort, we're not -- obviously,

1  this is jointly administered, not subsequently consolidated, so

2  I just want to make sure that the goal here is that creditors

3  file proofs of claim within the case in which they have a

4  claim.

5          MR. GUSO:  Correct.

6          THE COURT:  And if it's more than one, they'll just

7  be able to check multiple boxes.  That's the idea?

8          MR. GUSO:  Correct.  Correct, Judge.

9          THE COURT:  Okay.  All right.

10          MR. GUSO:  Correct.  Your Honor, we also propose to

11  serve the notice of commencement with those dates that I

12  mentioned upon all known creditors of the debtor.  We also

13  proposed, Your Honor, to publish notice twice in the Miami

14  Herald and the Sun Sentinel, and once in the Lawstreet Journal.

15  Mr. Falzone has also approved the form of the notice of

16  commencement, Your Honor, and we've received no objection to

17  this motion.

18          THE COURT:  All right.  Any objections?  Granted.

19          MR. GUSO:  Thank you, Your Honor.  Hand in glove with

20  our conversation now, Your Honor, just now, is the next motion,

21  the debtors' motion for the entry of an order authorizing the

22  debtors' to file a consolidated creditor matrix and a

23  consolidated --

24          THE COURT:  For 19?

25          MR. GUSO:  -- list of the 30 largest creditors.

34

1   This, as well, Your Honor, we previewed with Mr. Falzone.  The

2   debtors have filed a consolidated list of the 30 largest

3   unsecured creditors, Your Honor.  They also seek leave to

4   deliver to Stretto and electronic version of the matrix, as

5   opposed to filing it with the Clerk of the Court, although we

6   have filed a notice of filing of the copy of the matrix itself,

7   not in electronic form as it would ordinarily be accepted when

8   one files the case.  We will make that matrix available to

9   anyone who wishes to receive it.  Your Honor, and we believe

10  that filing a single consolidated list of the 30 largest

11  unsecured creditors will aid the U.S. Trustee in the process of

12  communicating with creditors and appointing a committee in the

13  case.  We've had no objection to this motion, as well, Your

14  Honor, and we ask the Court grant the motion.

15          THE COURT:  All right.  And it presupposes of course

16  that there would be one committee amongst all the jointly

17  administered debtors, correct?

18          MR. GUSO:  Correct, Your Honor.

19          THE COURT:  Okay.  And, the matrix, in the top 30,

20  doesn't really matter or affect any other issues in the case

21  because whether they're -- whether folks on the matrix are

22  served separately in each case because it's jointly

23  administered or just with one matrix, it doesn't -- it doesn't

24  affect their notice.  They'll receive the same notice.

25          MR. GUSO:  Yes, sir.

1        THE COURT:  And the same holds true for the 30
2   largest because it's not -- it's really just to facilitate the
3   selection of a committee, is that right?

4        MR. GUSO:  Sure.

5        THE COURT:  All right.  Any objections?  Hearing
6   none, granted.

7        MR. GUSO:  Thank you, Your Honor.  Your Honor, next
8   is the debtors' emergency motion for an order authorizing them
9   to pay pre-petition obligations to their employees and honor
10  their corresponding benefits.  It's Docket Entry 17?

11       THE COURT:  17, give me a moment.  All right.

12       MR. GUSO:  Thank you, Your Honor.  In the ordinary
13  course of business the debtors employ a little over 1100
14  employees, Your Honor, 432 of which are hourly employees and
15  671 are salaried.  As of the petition date, a payroll period
16  that began on August 3rd and will end on August 16th with the
17  pay actually being made on August 21st was pending, Your Honor.
18  Meaning that the employees are owed approximately seven days of
19  pre-petition wages.  The motion seeks authority to pay those
20  accrued wages, Your Honor, as well as permitting the debtors to
21  honor other benefits including paid time off, 401(k)
22  contributions, et cetera.

23       Your Honor, the aggregate estimated liability is
24  approximately $4.4 million, which includes $1.6 million in
25  accrued and unpaid wages.  These numbers were a little bit more

1 refined since we filed the motion, Your Honor, with a little

2 bit more detail.  And, it includes, Your Honor, estimated

3 401(k) contributions of $21,000 and biweekly payroll taxes of

4 $155,000.  Again, the aggregate is $4,453,000.  All of the

5 employees who would be paid remain employed full-time with the

6 debtor.  None are insiders, Your Honor, and none of the

7 recipients will receive pre-petition compensation that exceeds

8 the statutory cap set forth in 11 USC Section 507(a)(4).

9           THE COURT:  Fifteen thousand one fifty, as revised or

10 altered by 104, right, I suppose?

11           MR. GUSO:  As of April of 1st, I believe, 2022.

12           THE COURT:  I think that's right.  Okay.  And, let me

13 just make sure I understand, and you're evidentiary support for

14 that is the declaration of Mr. DiDonato?

15           MR. GUSO:  It is, Your Honor, and I'm turning pages

16 very quickly to get to -- Your Honor, that is found at Page --

17 starting at Page 33 with Paragraph 86 through 87.

18           THE COURT:  All right.  All right, thank you for

19 that.  Any objections or anyone wish to cross examine Mr.

20 DiDonato on that evidentiary submission?  No, no objections.

21 All right, then the motion will be granted.

22           MR. GUSO:  Thank you, Your Honor.  Your Honor, next

23 perhaps we could take up the debtors' emergency motion for

24 authority to continue to administer their insurance policies

25 and programs?

1          THE COURT:  All right.  Give me the number?

2          MR. GUSO:  Docket Entry 11.

3          THE COURT:  Unfortunately I have these by number, not

4    by name, so it helps.

5          MR. GUSO:  Understood, Your Honor.

6          THE COURT:  All right, yes, I see that.

7          MR. GUSO:  So, Judge, in the ordinary course of

8    business, the debtors maintain multiple types of insurance,

9    including worker's compensation and general liability,

10   property, and excess coverage.  All is more fully described in

11   the motion.  The motion actually goes into quite detail

12   referencing each policy number for each applicable coverage.

13   The debtors finance their insurance programs through an

14   insurance premium finance agreement with First Insurance

15   Funding, dated June 22, 2022.  The total premiums under the

16   insurance policies, Your Honor, is approximately $6.3 million.

17         Under the financing agreement, the debtors made an

18   initial down payment of $1,278,989.28 and financed

19   $5,085,564.92 to be paid over nine months, in nine monthly

20   installments of $549,219.  And, as part of the financing

21   agreement, Your Honor, there is a finance charge of $70,000 and

22   a documentary stamp tax of $4,826.85.

23         The debtors' insurance programs are monitored both

24   internally and externally.  Externally through Brown & Brown,

25   the debtors' insurance broker, Your Honor, and for these

38

1  services, the debtors' pay Brown & Brown an annual fee of

2  $400,000 which is payable $100,000 per quarter.  And pursuant

3  to the motion, Your Honor, we seek authority to honor our

4  obligations both under the insurance premium arrangement that I

5  described, as well as the debtors' obligation to Brown & Brown

6  for the services that they provide that are incidental to the

7  insurance coverage.

8       THE COURT:  Would that be essentially assuming these

9  obligations or how --

10      MR. GUSO:  We're not assuming, Your Honor.  We're

11 simply seeking authority to honor them.  Assumption would

12 create post-petition administrative liabilities if God forbid

13 there would be a breach, so we're cautious about that.

14      THE COURT:  Okay.  All right, and you would seek to

15 assume them at some point in the future if presumed to a plan

16 or whatever, okay.  All right, any objections?  And, I assume

17 the -- does the declaration cover the insurance?

18      MR. GUSO:  It does, Your Honor, starting at Page 40.

19 By the way, the lights do work better than before Judge Olson,

20 Judge.

21      THE COURT:  Honestly, any lights would have worked

22 better.

23      MR. GUSO:  Stipulate.

24      THE COURT:  Yes.  I've tried lots of cases in this

25 courtroom and, honestly, it was a challenge but --

1           MR. GUSO:  Yes, sir.

2           MR. GOLDBERG:  I wore by blue shirt.

3           THE COURT:  So, you'd blend in or --

4           MR. GOLDBERG:  Yeah.

5           THE COURT:  Well, I can see you, Mr. Goldberg, so.

6           MR. GUSO:  Your Honor, this is found at Page 40 of

7  Mr. DiDonato's declaration, starting at Paragraph 103 through

8  106.

9           THE COURT:  Anybody wish to cross examine Mr.

10  DiDonato?  Anybody think they don't need insurance?  Okay,

11  granted.

12           MR. GUSO:  Thank you, Your Honor.  Your Honor, next

13  if I may address the debtors' emergency motion for authority to

14  pay their pre-petition sales, use, and trust fund taxes.

15           THE COURT:  Give me a number.

16           MR. GUSO:  That's Docket Entry 16.

17           THE COURT:  16.

18           MR. GUSO:  Yes, sir.

19           THE COURT:  All right.

20           MR. GUSO:  So, Judge, as described in the motion and

21  the attached Exhibit A, the debtor estimate -- the debtors

22  estimate that as of the petition date they owed various taxing

23  authorities approximately $2.7 million.  Each of the taxes are

24  broken down specifically in the exhibit itself.  Of that

25  amount, Your Honor, $850,000 relates to estimated sales and use

1   taxes owed to various taxing authorities.  The figure is an

2   estimate because the debtors operate and sell products

3   throughout the United States and do not know the exact amount

4   of sales and use tax owed in each jurisdiction.  In the

5   ordinary course, those liabilities are reconciled at the end of

6   the month, and so that is an estimate, Your Honor.

7          Additionally, Your Honor, most of the debtors' sales

8   flow through distributor channels, as Mr. Sorkin indicated

9   during his opening remarks, and in that context, Your Honor,

10  there isn't a sales tax liability due.  However, based on an

11  erroneous pre-petition filing of a sales tax return, Your

12  Honor, some of the states have assessed a sales tax liability

13  against the debtors.

14         THE COURT:  Erroneously filed by the debtor?

15         MR. GUSO:  By a former employee of the debtor, Your

16  Honor.

17         THE COURT:  Ah, okay.

18         MR. GUSO:  By a former employee of the debtor.  And,

19  so, Your Honor, that tax is being challenged outside of this

20  jurisdiction and we --

21         THE COURT:  But it needs to be paid in order to be

22  challenged?

23         MR. GUSO:  It does not thankfully, not yet.

24         THE COURT:  Ah, okay.  All right.

25         MR. GUSO:  It doesn't need to be paid.  But, Your

1  Honor, if it is adjudicated adverse to the debtors, they would

2  like authority to pay it, obviously, it's a sales tax liability

3  for which there is some trust fund obligation.  The debtor is

4  quite confident that it will prevail and so, Your Honor, we

5  only seek the authority but not the obligation to pay these

6  taxes.  The taxes include, Your Honor, on Exhibit A to the

7  motion, ad valorem and property taxes that are not in the

8  nature of trust fund.  The debtors seek the authority, but not

9  the obligation, to pay these, particularly if it makes economic

10 sense, to avoid the 18 percent interest that would accrue once

11 they go into default, so that's the --

12       THE COURT:  Understood.  And, obviously, they're

13 going to be treated under a plan and they could --

14       MR. GUSO:  Correct.

15       THE COURT:  -- be delayed and you would do that.  All

16 right.  Okay, and you know the declaration portions --

17       MR. GUSO:  I do, Judge.

18       THE COURT:  -- that support that?

19       MR. GUSO:  Yes, sir.  Your Honor, that -- Mr.

20 DiDonato's statements in this regard start at Page 37,

21 Paragraphs 98 through 102 of his declaration.

22       THE COURT:  All right.  Anyone wish to cross examine

23 Mr. DiDonato?  Anyone object?  All right, you're on a roll.

24 Granted.

25       MR. GUSO:  I'll keep going.  Next, Your Honor, is the

1 -- with the Court's permission of course -- debtors' emergency

2 motion for an order authorizing the payment of certain

3 pre-petition claims of critical vendors and --

4      THE COURT:  Just give me a number because there's

5 several of those.

6      MR. GUSO:  13.

7      THE COURT:  13, all right.  Yes.

8      MR. GUSO:  All right.  And, in this motion, Your

9 Honor, the debtors seek authority to pay the pre-petition

10 claims of 18 vendors, whose claims total $14,892,981.78 in the

11 aggregate that are critical to the debtors' business.  The

12 critical vendors are identified, or are described rather,

13 described, in Exhibit A to the motion which was redacted, Your

14 Honor, to remove the names of the vendors so as not to create

15 some controversy among the creditor body as to who was being

16 treated as a critical vendor or not.  An unredacted version of

17 that exhibit, Your Honor, was provided to Mr. Wilkes.

18      THE COURT:  Okay.

19      MR. GUSO:  And, Your Honor, and unredacted version of

20 that exhibit is also at Tab 5 of the exhibit register we handed

21 to Your Honor.

22      THE COURT:  Okay.

23      MR. GUSO:  All right.

24      THE COURT:  I guess I do need this.  Not that it

25 matters who they are because I wouldn't know anyway, but anyway

43

1  go ahead.

2          MR. GUSO:  Very well, Judge.  Following the

3  discussions with Mr. Wilkes that I mentioned to Your Honor, the

4  debtors prepared the amended exhibit, which is Exhibit 5.  Your

5  Honor, I've called to the stand, Mr. DiDonato would testify

6  that Exhibit 5 was prepared by the debtors under his

7  supervision from books and records maintained -- regularly

8  maintained by the debtors in the ordinary course of their

9  business.

10         The exhibit accurately describes the goods or

11  services provided to the debtors by each of the proposed

12  critical vendors that are identified therein.  In fact, Your

13  Honor, certain of the vendors are sole source providers of

14  products used in the debtors' business operations.  The

15  debtors' and their research and development team, by way of

16  example, have spent years developing specifications that have

17  been adopted, tested, and perfected over time, with certain of

18  the critical vendors.  Further, the ingredients that these

19  critical vendors provide, Your Honor, provide the debtors with,

20  in our view, a competitive advantage and shifting to other

21  vendors would be very challenging and time consuming, Your

22  Honor, as it would require the debtors' research and

23  development team to start over with a new set of vendors, which

24  would take approximately 60 to 90 days and cause significant

25  disruption to the debtors' businesses.

44

1          Lastly, Your Honor, as Mr. Sorkin indicated in his

2   opening remarks and as Mr. DiDonato would testify if called to

3   the stand, Vital Pharmaceuticals, Inc., one of the debtors

4   before you, maintains a robust social media presence, including

5   through the use of influencers.  These vendors, Your Honor, are

6   essential to the promotional endorsement, advertising, and

7   marketing efforts of the debtors.  These services include the

8   creation and posting of MeSpoke content on social media

9   platforms, and the preparation of photo shoots, videos, demos,

10  fitness shows, and other promotional events that promote the

11  debtors' products.  The debtors estimate, Your Honor, that the

12  aggregate amount owed to the influencers as of the petition

13  date is approximately $350,000 and they are an essential

14  component of the debtors' marketing and overall advertising

15  plan.

16          Your Honor, with that, we believe that the debtors

17  have demonstrated the need to pay these vendors, and we'd ask

18  the Court to grant the motion.

19          THE COURT:  Thank you.  And you -- and you've

20  designated the pages of the declaration?

21          MR. GUSO:  I have, Your Honor.

22          THE COURT:  Okay.

23          MR. GUSO:  If you give me one minute in addition to

24  the proffer that I made a moment ago.  Your Honor, Mr.

25  DiDonato's testimony in this regard starts at Page 41,

45

Paragraphs 107 through 109 of his declaration.

THE COURT:  And you cite to <u>Liberty Power</u>, which is Judge Grossman's case, as well as <u>It'Sugar</u>, which is Judge Mark's case.  And, it seems that certainly the declaration seems to support that.  Anyone wish to cross examine the deponent on that or the declarant?  No, all right.  Anybody object?  No.  All right, granted.

MR. GUSO:  Thank you, Your Honor.  Your Honor, the next three are going to be handled by Mr. Niles.  With the Court's permission, I'll yield the podium.

THE COURT:  Absolutely.  By the way, we need to -- so we are admitting Exhibit 5, is that correct?

MR. GUSO:  Yes, sir.  And, Mr. Niles is will be addressing Exhibit 4 in his presentation.

THE COURT:  Okay, great.

MR. WILKES:  Your Honor, J. Steven Wilkes for the United State's Trustee.  For Mr. Guso, just to question, this is -- Exhibit 5 is being admitted without redaction and without sealing?

THE COURT:  Well, it's being admitted for the Court to consider without redaction, but when it's made a public record, it would have the redaction.

MR. GUSO:  Correct, Your Honor.

THE COURT:  Is that acceptable to you, Mr. Wilkes?  Is there an issue with that?

1          MR. WILKES:  No issue, Your Honor.  I was just

2  wanting to clarify what's going on with Exhibit 5, because it

3  is a redacted version is already on the public record.

4          THE COURT:  Well, you get the super secret copy.  I

5  get the super secret copy.  I guess the debtor has the super

6  secret copy and I guess --

7          MR. GUSO:  The lenders have a secret copy.

8          THE COURT:  If anybody else needs to have it, I guess

9  they ask for it.

10          MR. GUSO:  They could ask, Judge.

11          THE COURT:  All right.  Fair enough.

12          MR. GUSO:  Thank you, Your Honor.

13          THE COURT:  Mr. Miles (sic)?

14          MR. NILES:  Good afternoon, Your Honor.  This is

15  Michael Niles for --

16          THE COURT:  Niles, I'm sorry.

17          MR. NILES:  Niles, on behalf of the debtor.  I am

18  going to be presenting three motions today.  The first one is

19  the emergency motion to maintain and administer customer

20  programs, which is Docket Entry Number 15.

21          THE COURT:  Thank you.

22          MR. NILES:  The factual support for this is in Mr.

23

24  DiDonato's first day declaration on Page 45.  It is Paragraphs

25  116 through 118.  The debtors in this motion, Your Honor, are

1  seeking an order Authorizing But Not Directing the Debtor to

2  Pay the Pre-petition Obligations Under the Customer Programs

3  and Authority to Maintain And Administer These Programs Post-

4  Petition.

5        As set forth in the motion, the debtors estimate that

6  the pre-petition obligations, outstanding obligations for the

7  customer obligations, is to be approximately $12.1 million.  As

8  you may have read, Your Honor, the debtors operate in a highly

9  competitive market for energy drinks and dietary supplements,

10 including products purchased for resale where there are

11 alternate suppliers of similar products.  As such, these

12 programs are vital to the debtor's marketing.

13        The three programs that are mentioned in the motion

14 and in the declaration, Your Honor, as first trade promotions

15 which under this program the debtor's customers advertise their

16 products in marketing campaigns, displays and otherwise feature

17 the debtor's products, the consumers, with special offers.

18 And, in return, the debtors offer these customers, which are

19 generally the debtor's vendors, Your Honor, price reductions or

20 cash rebates for the customer products that are sold.

21        THE COURT:  So, it's the cash rebates that require a

22 payout of money?

23        MR. NILES:  Yes, Your Honor.

24        THE COURT:  Yes.  Understood.  Okay.

25        MR. NILES:  Second is the slotting allowances and in

1  this program, the debtors incur costs that are associated with

2  purchasing shelf space in retail locations in order to

3  highlight the brand to its customers.  Because of the

4  competition in the industry, it's vital that the debtor has

5  premiere shelving space in the vendors' stores.

6            THE COURT:  Understood.

7            MR. NILES:  And then finally, Your Honor, the debtors

8  participate in various other marketing programs which can

9  include weekly ad circulars, product samples, cooler placements

10 and free fills or event sponsorships that also the debtor

11 reimburses the vendors for.

12           So, if the debtors were unable to continue these

13 customer programs and honor the related pre-petition customer

14 obligations, the debtors risk alienating their customers, i.e.,

15 the vendors and will suffer irreparable loss.  And customer

16 support and confidence is vital at this time.  So, Your Honor,

17 we request that you enter an order authorizing the debtors to

18 pay these pre-petition customer obligations.

19           THE COURT:  Thank you.

20           Anyone wish to cross examine Mr. DiDonato on this?

21           Any objections?

22                 (No audible response)

23           THE COURT:  All right.  Mr. Niles, granted.

24           MR. NILES:  Thank you, Your Honor.

25           The next motion we have for you is the Emergency

Motion for Pre-petition Obligations Owing to Foreign Vendors.
This is Docket Entry Number 12.

THE COURT:  All right.  Just let me get there.  Okay.

MR. NILES:  The factual support for this is in Mr.
DiDonato's first day declaration which is on Page 47.  It's
Paragraphs 119 through 125.  Additionally, we have filed
Exhibit A to the motion as an exhibit which you have before
you, Your Honor.

THE COURT:  And that's Exhibit 4?

MR. NILES:  Yes, Your Honor.

THE COURT:  Okay.

MR. NILES:  So we request that that gets entered into
evidence.

THE COURT:  All right.  Any objections?

Hearing none, then the document will be admitted.

MR. NILES:  Thank you.  Under this motion, Your
Honor, the debtor is seeking authority to pay the pre-petition
invoices of approximately 26 vendors, which represents $3
million worth of claims to foreign vendors and to continue
funding the operations of the debtor's foreign entities.

The debtors are in the process of expanding their
reach into foreign markets.  And to help that process they've
created four wholly owned entities, which is Bang Energy BV,
Bang Energy Canada ULC, Bang Energy Chile SPA and Bang Energy
PTY LTD.  As I mentioned, these entities are wholly owned by

1 VPX and, in the ordinary course of business, VPX funds and

2 staffs these foreign entities operations.

3          THE COURT:  These are non-debtors?

4          MR. NILES:  Yes, Your Honor.

5          THE COURT:  Okay.

6          MR. NILES:  This funding includes payments to the

7 foreign vendors listed on Exhibit A of the motion which also

8 provides a brief description of services the vendors provide.

9 In general, these vendors include freight forwarders, co-

10 packers, third party logistics, ingredient suppliers and

11 quality control agents, taxes and other marketing expenses in

12 order to fulfill orders of the debtors' products

13 internationally.

14          In return, each of these foreign entities transfer

15 the revenues received from its operations back to the debtors

16 on a regular basis.  These foreign entities and their vendors

17 are necessary to preserve the debtors' critical relationships

18 in the foreign markets that they serve and without them the

19 debtors' foreign operations could collapse and the enterprise

20 would be reduced.

21          As such, we're requesting authority but not the

22 obligation to pay the pre-petition invoices of the foreign

23 vendors listed on Exhibit A and to be authorized to continue

24 funding their operations of the four entities listed in the

25 motion.  And I do want to point out, Your Honor, that some of

1  this will also be discussed in the cash collateral motion.

2        THE COURT:  All right.  And as non-debtors, the

3  concern is that the stay would not apply and all hell would

4  break loose in these foreign countries and --

5        MR. NILES:  Correct.  Yes, because if they're foreign

6  vendors, they might argue that they're not subject to the

7  Court's jurisdiction.

8        THE COURT:  Understood.

9        All right.  Any one wish to cross examine Mr.

10 DiDonato on this point?

11                    (No audible response)

12       THE COURT:  All right.  Any objections?

13                    (No audible response)

14       THE COURT:  Motion is granted.

15       MR. NILES:  Thank you, Your Honor.  The final motion

16 that I have to present to you today is the Emergency Motion for

17 Order Authorizing the Payment of Certain Shippers and

18 Warehousemen's Pre-Petition Claims.  This is Docket Entry

19 Number 14 and this is Page 43 of the declaration.

20       The debtors are seeking an order Authorizing, again,

21 Not Directing to Pay the Pre-Petition Obligations Owing to the

22 Debtor's Shippers and Otherwise Deal With Those Entities in the

23 Ordinary Course of Business and in Accordance with the Normal

24 Pre-Petition Procedures and Agreements during the pendency of

25 their Chapter 11 cases.

1          The debtors are constantly distributing and shipping

2    their products nationwide.  The six shippers that are listed

3    are an integral part of their operations and are used for

4    certain domestic -- I'm sorry, Your Honor -- the shippers

5    deliver the products through established national distribution

6    networks.  The motion and Exhibit A identify these six shippers

7    utilized by the debtors and identifies approximately $6 million

8    owed pre-petition to these shippers.

9          The motion explains that it is essential for the

10   debtors to maintain their relationship with these shippers and

11   that under applicable state law, there is some concern that the

12   shippers could have a lien on the goods that could be in their

13   possession pre-petition.

14          So, Your Honor, we would ask for the authority to

15   continue working with these shippers and authority to pay their

16   pre-petition amounts owed.

17          THE COURT:  All right.  Anyone wish to cross examine

18   Mr. DiDonato on this point?

19          None?  No objections?

20          THE COURT:  All right.  And because of the liens, it

21   certainly seems to make senses that these creditors aren't

22   necessarily being treated any better than they would be treated

23   otherwise.  So, all right, the Court will grant that motion as

24   well.

25          And, let me ask you, when these orders are submitted,

1 are we looking out for them from you, Mr. Guso, or will there

2 be others submitting orders?  I just want to make sure.  I

3 always identify who submits the order so if we don't get it we

4 know who to call.

5          MR. GUSO:  I suspect it will be the brains of the

6 operation, Your Honor, Ms. Kerry Byrnes, our paralegal.

7          THE COURT:  Got you.

8          MR. GUSO:  But it will come from our firm, Your

9 Honor.

10          THE COURT:  All right.  Thank you.

11          Mr. Niles, thank you.

12          MR. NILES:  Thank you, Your Honor.

13          THE COURT:  Anything else?

14          MR. NILES:  I think that we're going to go to Mr.

15 Jeremy Webb and he's going to present the next motion.

16          THE COURT:  All right.  Great.  Thank you, Mr. Niles.

17          MR. GUSO:  Judge, if I may, when we reshuffled the

18 order here, I missed one.  If I may approach?

19          THE COURT:  Okay.  Yes.

20          MR. GUSO:  Thank you, Your Honor.  Perhaps, very

21 importantly, the Debtors' Application to Employ Stretto as the

22 Noticing and Claims Agent, Your Honor.  That's Docket Entry

23 Number 20.

24          Your Honor, the debtors estimate that they have about

25 10,500 potential creditors and notice parties and, therefore,

54

1  Your Honor, need the assistance of an outside noticing and

2  claims agent.  And in connection with the services, Your Honor,

3  the debtor actually obtained three proposals from three

4  separate claims agents and selected Stretto based on the

5  economics, qualifications and prior experience with the Court.

6  Stretto actually serves as noticing claims agent in another

7  case before this Court presently, Liberty Power Holdings and

8  has served as noticing claims --

9        THE COURT:  Well, it was before this Court.

10        MR. WEBB:  What I meant, the court -- Southern

11 District.

12        THE COURT:  Kind of recused, and it ended up in front

13 of Judge Olson.

14        MR. WEBB:  Well, it was initially yours.

15        THE COURT:  That's true.

16        MR. WEBB:  Judge, they also serve as noticing claims

17 agent in the American Resource Management case which was,

18 coincidentally, a Judge Olson case and the Stein Mart  case

19 which is before the Middle District.  Your Honor, their

20 services are outlined in the services agreement dated September

21 23, 2022 which we shared with Mr. Falzone and the clerk of the

22 court, as well.  Mr. Falzone has signed off on the form of the

23 agreement and consents to the debtors' retention of Stretto as

24 the noticing claims agent.

25        THE COURT:  And probably thanks you for it.

1          MR. GUSO:  Indeed he does.

2          THE COURT:  Yes.  All right.

3          MR. GUSO:  And we've received no objection to the

4  motion.

5          THE COURT:  All right.  No objections I assume?

6                    (No audible response)

7          All right.  Granted.

8          MR. GUSO:  Thank you, Your Honor.

9          THE COURT:  Mr. Webb?

10          MR. WEBB:  Good afternoon, Your Honor.  Jeremy Webb

11  of Latham and Watkins on behalf of the debtors.  The next item

12  up is the debtors Cash Management Motion located at Docket

13  Number 18.  And just to get ahead of the issue, the factual

14  support is in Mr. DiDonato's declaration at Paragraphs 88

15  through 97 which you'll find on Pages 34 through 37.  But --

16          THE COURT:  I assumed Mr. Wilkes' video would pop up

17  on this way, but, anyway, go ahead.

18          MR. WEBB:  By the Cash Management Motion, Your Honor,

19  the debtors request entry of the interim order attached to the

20  motion as Exhibit A which authorizes the debtors to continue to

21  maintain their cash management system which is composed of ten

22  banks and seven financial institutions, honor certain

23  obligations related thereto, use existing business forms and

24  perform certain inter-company transactions.

25          We spoke with Mr. Wilkes earlier today and I know

1  that the debtors have some obligations during the interim

2  period to reach out to certain of the non-authorized banks or,

3  actually, all of the non-authorized banks and discuss entering

4  into a UDA with those banks.

5          THE COURT:  So, meaning, by non-authorized, they are

6  not on the United States Trustee's list --

7          MR. WEBB:  They're not authorized depositories.

8          THE COURT:  -- of debtor-in-possession account banks?

9          MR. WEBB:  Exactly, Your Honor.

10          THE COURT:  Understood.  Okay.

11          MR. WEBB:  And so --

12          THE COURT:  And what, you are going to try to

13  convince them to --

14          MR. WEBB:  We will --

15          THE COURT:  -- be on that list or to comply with the

16  guidelines or --

17          MR. WEBB:  Comply with the guidelines.  I'm sure

18  there will be many more discussions with Mr. Wilkes in the

19  coming weeks, but based on those conversations today, I do not

20  believe he's objecting to entry of the interim order but he can

21  speak for himself if he'd like to be heard.

22          THE COURT:  Mr. Wilkes?

23          MR. WILKES:  Thank you, Your Honor.  J. Steven Wilkes

24  for the United States Trustee.  The issues left over for the

25  interim time period is for those two true banks, paypal is a

57

1 bank, it's not really what most people consider a true bank,

2 and plus it's also not FDIC insured.

3         But for the two banks to get into a discussion with

4 the DIP regarding whether they want to issue a bond in favor of

5 the United States under 345 or to pledge additional collateral

6 to the FDIC to fully insure those amounts on account in the DIP

7 accounts.  Absent that, then we may have an issue for the Court

8 to adjudicate.  But before that, the adjudication of whether or

9 not to waive the requirements of 345 is somewhat premature.

10         THE COURT:  All right.  And we'll deal with that at a

11 final hearing which will be noticed in the order -- or included

12 in the order.

13         All right.  Any objections?

14                 (No audible response)

15         THE COURT:  All right.  So, on an interim basis, the

16 motion is granted and you all will get a date for a final

17 hearing from Ms. Weldon, and include that in the order.

18         MR. WEBB:  Thank you, Your Honor.

19         THE COURT:  Thank you, Mr. Webb.

20         Mr. Sorkin?

21         MR. SORKIN:  Thank you, Your Honor.  Andrew Sorkin

22 for the debtors.  That just leaves the DIP.

23         THE COURT:  All right.

24         MR. SORKIN:  Docket Number 24 and I will just start

25 with the evidentiary support for the benefit of the Court and

1  anybody who would like to cross examine our witnesses.

2           We're relying on both the DiDonato and Parkhill

3  declarations.  The relevant portions of DiDonato, at least the

4  specific support for this motion, can be found at Paragraph 77

5  to 85.  I would say that the background section at the

6  beginning is also relevant for context.

7           THE COURT:  Relevant.  Sure.

8           MR. SORKIN:  And with respect to Mr. Parkhill's

9  declaration, it's largely the entire thing but we can probably

10 skip over the qualifications paragraph and go right to

11 Paragraphs 8 to 27.

12          THE COURT:  All right.

13          MR. SORKIN:  So, with that, I think, in light of the

14 objection that was filed, it's helpful to clarify it for the

15 Court.  What we are asking the Court to do today --

16          THE COURT:  I was going to ask about that.  You know,

17 I read the objection carefully.  It seems to me to raise some

18 issues that are probably resolvable between you, maybe not all

19 of the issues but some of them.  I also am uncertain what is

20 absolutely necessary on an interim basis versus on a final

21 basis.

22          So, if you would help me understand, number one,

23 whether you have had discussions or whether it might make

24 sense, I don't know if you have all had the time given the

25 recent filing of the objection, which totally understandable

1  why it would be filed when it was, to talk about it.  Whether

2  it might help you to talk about it, I'm happy to take a recess

3  for that to occur to resolve as many issues as possible.  And

4  then I want to focus on what is absolutely necessary on an

5  interim basis.

6          I will tell you up front that I found a number of the

7  objections to be well-grounded.  I don't want to approve

8  anything that is not absolutely necessary on a final basis.

9  I'm also somewhat concerned about the roll-up, whether that

10 needs to be approved today or whether it can be more fully

11 argued and approved at a final hearing.  And if the roll-up

12 does need to be approved today, I'm going to need to understand

13 why that is.

14         And I was also curious about the extent of the roll-

15 up.  When I first read the pleadings, my initial reaction was

16 that the roll-up would be for those funds that were advanced

17 with respect to the runway to get, over the last 60 days, to

18 get to the filing.  And I'm not sure whether Mr. Goldberg or

19 Mr. Berger had it correct that it's the entire pre-petition

20 indebtedness is being rolled up.  I assume they do -- they

21 probably read it more carefully than I did.

22         So, I have some issues there just in terms of

23 understanding what's being sought and what the necessity is for

24 it.  And I'm not unfamiliar with the differing levels of

25 leverage that the debtor may have with respect to negotiating

60

1  with lenders and lenders may have absent a committee and third

2  parties being involved.

3          So, that does resonate with me and I'm just -- I'm

4  trying to put what's on the table -- or what I'm thinking on

5  the table so that everyone's aware of it and can discuss the

6  matters accordingly and try to reach an accommodation.  I would

7  much prefer an accommodation here than having to rule on some

8  of these issues.

9          So, with that having been said, Mr. Sorkin, how do

10 you wish to proceed?

11         MR. SORKIN:  Yeah, just some preliminary comments.

12 We are always happy to discuss with objectors in the hope of

13 reaching a consensual resolution.  I was introduced to

14 Monster's counsel just a few hours ago before the limited

15 objection was filed which he, you know, kindly previewed for

16 us.

17         THE COURT:  Yes.

18         MR. SORKIN:  But we've not had a chance to discuss

19 the substance of it.  Fortunately, by my read of their

20 objection, they are not raising any issues that I consider day

21 one issues.  To be clear, we are not asking Your Honor to

22 approve any aspect of the roll-up today.  I would like to

23 respond to Your Honor's commentary about it just to put it in

24 context.

25         THE COURT:  Sure.

1          MR. SORKIN:  And I can get to that in my

2    presentation.  We are not seeking any waivers under 506(c),

3    552, marshaling none of that today.  We are not --

4          THE COURT:  You are asking for 30 some odd million

5    dollars to get from here to a final hearing --

6          MR. SORKIN:  Correct.

7          THE COURT:  -- pay all these things that we have

8    approved today --

9          MR. SORKIN:  Correct.

10          THE COURT:  -- et cetera, and survive to live another

11    day?

12          MR. SORKIN:  You just cut to the chase Your Honor.

13          THE COURT:  Understood.

14          MR. SORKIN:  We are asking for authority to borrow

15    $34 million under the DIP and use cash collateral to fund

16    critical expenses in accordance with the budget.

17          THE COURT:  Okay.  So, to me, that makes this easier

18    and I think it sounds to me like it's worthwhile to take a

19    recess for five to ten minutes to see -- twenty minutes -- all

20    right, five to ten minutes lawyer time which equals, I don't

21    know, half an hour.  Maybe for you all to talk and see if you

22    can get to that point because I agree with you.

23          It doesn't sound like the issues raised in the

24    objection necessarily relate to the interim relief that you've

25    now clarified.  Maybe it was clear in the motion -- I don't

1 mean to suggest otherwise, but -- so, Mr. Goldberg -- he's a

2 nice guy.  I mean, you are a nice guy.

3          MR. GOLDBERG:  Oh, yes.  They're my friends.  Yeah,

4 we're always happy to talk --

5          THE COURT:  Come to the mic because I'm note sure

6 Zoom catches you -- and I think you may have to push the mic on

7 if you are at counsel table.

8          MR. GOLDBERG:  I think, and I am approximately Mr.

9 Guso's height, so --

10          THE COURT:  But not Battista's, that's for sure.

11          MR. GOLDBERG:  Well, come on -- I am Jewish, Your

12 Honor.

13          THE COURT:  I'm not going to go there.

14                         (Laughter)

15          MR. GOLDBERG:  Yeah, good, good.

16          Your Honor, Mr. Feinstein was really handling this

17 for us, but --

18          THE COURT:  Oh, I didn't mean to --

19          MR. GOLDBERG:  No, no, but we are always happy to

20 talk and come to an agreement.  I can certainly represent that.

21 And we're happy to spend a few minutes seeing if we can come to

22 an agreement.

23          THE COURT:  Are you able to get Mr. Feinstein on the

24 phone and --

25          MR. GOLDBERG:  Yeah, absolutely.  He's on the cell.

63

1          MR. FEINSTEIN:  Your Honor?

2          THE COURT:  Yes?

3          MR. FEINSTEIN:  I might be able to.  If Your Honor

4  could, I might be able to short circuit this and avoid a break

5  because we did have communications with various counsel before

6  the hearing.  And if Your Honor could indulge me, I'd like to

7  make a couple of remarks about the DIP and then talk about what

8  issues are on for today and what concern us and what are

9  clearly future issues, like the roll-up.

10          I mean, to be clear, we raised the roll-up because it

11  is way off-market.  It's at three and a half to one.  And it's

12  just that their context, Your Honor, it's indicative of the

13  leverage that's been exerted here on the debtor by the lenders.

14  But we appreciate that that's for a final hearing.  The other

15  two issues, I think, do require some surgery today and one I

16  think, conceptually, we're -- I think we're already there and

17  that is --

18          THE COURT:  What are those two issues, Mr. Feinstein?

19          MR. FEINSTEIN:  So, there's the -- when the surcharge

20  and other waivers come into effect and the challenge provision.

21  So, on the former, you've got three paragraphs -- 43, 47 and 48

22  in the interim order that say, in effect, subject to the entry

23  of a final order, there's going to be a surcharge waiver.

24  Subject to the entry of a final order, there's going to be a

25  waiver of the right to argue equities of the case and marshal

64

1  it.

2       So, I had a experience recently in another case, Your

3  Honor, where lenders looking at precisely that language --

4  subject to the entry of a final order there's a waiver -- took

5  the position that the waiver was effective on day one of the

6  case, you know, when the interim order was entered and that

7  there's a condition subsequent that there still needs to be a

8  final order that confirms that.

9       But to be clear, the waiver period would begin to run

10  today in this case if Your Honor, you know, if you sign the

11  language that's in the order -- in the proposed order.  The

12  simple fix is to say subject to and upon entry of the final

13  order.  Then those various waivers would come into effect and

14  then we're done.  So, there's no implication that anybody's

15  entitled to any kind of waiver between now and the entry of a

16  final order which will only be entered after a committee has

17  had a chance to look at all this.

18       THE COURT:  All right.  That sounds like an offer,

19  but since I'm not a mediator, let's take a -- unless, Mr.

20  Sorkin, you could just agree right here, right now -- what's

21  your response to that or do you need some time to talk about

22  it?

23       MR. SORKIN:  Well, just, my initial response is it

24  was not our intent to lock in any of these waivers as of day

25  one.  You know, this is not the first time I've heard someone

1 take issue with be subject to a final order language and

2 questioning why they're in here if we're not seeking approval

3 of them.  The answer I've always come up with is, you know, we

4 are providing notice to the world that when we do seek entry of

5 the final order --

6         THE COURT:  Okay.  It's a language issue.

7         MR. SORKIN:  Yeah.  Exactly.

8         THE COURT:  Yes.  And shockingly the recipient of the

9 waiver has appeared.

10         MR. LLUBERAS:  Yes.

11         MR. SORKIN:  I did say I needed to talk to him.

12         MR. LLUBERAS:  Yes, Your Honor.  And I figured I'd

13 short circuit this, as well.  Luis Lluberas, L-l-u-b-e-r-a-s,

14 on behalf of Truist Bank, the administrative agent.  There is

15 no intent here, Your Honor, to play peek-a-boo on this

16 language.

17         I think the proposed fix by Mr. Feinstein is

18 acceptable.  We all intended that this would be a final order

19 issue, but did want to take the opportunity to put it front in

20 center in front of the Court today and, certainly, are happy to

21 make that accommodation in whatever Your Honor enters.

22         THE COURT:  All right.  So, sounds like there's a

23 resolution.  Are there any open issues left?  Sounds like there

24 aren't.

25         MR. LLUBERAS:  I believe there was one more.

1          MR. FEINSTEIN:  I believe the challenge provision.

2          THE COURT:  Oh, I'm sorry.  Yes, the challenge

3  provision.  Okay.  But I will want you all to sit down before

4  you leave here today and work on the specific language of the

5  interim order, literally red line it, go through it page by

6  page because if you leave here and you still don't have an

7  agreement or there's a problem, then you're going to have to

8  come back in front of me and that's going to be highly

9  inconvenient for everybody.  And I've done that before,

10 believing that the lawyers are going to be able to resolve

11 language and I have been, unfortunately, wrong and it ends up

12 requiring an emergency hearing.  So, that's going to be the

13 process regardless of what's agreed to on the record here

14 today, okay?

15          MR. SORKIN:  Understood, Your Honor.

16          THE COURT:  So, Mr. Feinstein, so tell me about the

17 challenge period.  I did read the objection.  I understand that

18 there is timing issues with respect to what amounts to starting

19 at 75 days without the committee even having been appointed and

20 all that and you needing some time after the committee is

21 appointed to deal with these issues.  So, tell me what you are

22 looking for.

23          MR. FEINSTEIN:  So, if I could rewrite the challenge

24 provision, Your Honor, it would say that there's a, first of

25 all, a longer period and more robust investigation budget.  But

1  perhaps most importantly in order to really give the parties
2  who are entitled to investigate potential claims a meaningful
3  opportunity, the order would have to change from what it
4  currently provides which is that it currently provides that
5  within the 60-day period, the committee would have to seek and
6  obtain a standing to bring a challenge, otherwise, the
7  challenge period will expire.

8            And it's far more common, Your Honor, to provide that
9  so long as a committee or other party in interest files a
10  motion for standing before the end of the challenge period,
11  that that would toll the period.  Otherwise, you're effectively
12  shortening the period because you needed to file a motion on
13  notice so and to have it heard on Day 59 you would need to file
14  it close to Day 40, and now you're really getting to the point
15  where the ability to investigate claims and the like is really
16  being deprived.  So, tolling a longer period.

17           And then there's one other quirky issue, Your Honor.
18 Again, I can provide language to debtors and lenders counsel,
19 but some of the debtors are limited liability companies and
20 there's, in my view, unfortunate case law out there, but it's
21 out there holding that committees cannot obtain standing where
22 the debtor's a limited liability company and the statement of
23 liability statute  prohibits anyone from bringing claims
24 derivatively on behalf of an LLC.  So, when a debtor's an LLC
25 --

1          THE COURT:  Ah, is that law in -- where is -- is that
2 in Florida?

3          MR. FEINSTEIN:  So -- well there's --

4          THE COURT:  Because when I read the objection, I
5 wasn't quite sure what that all meant.

6          MR. FEINSTEIN:  Yeah, I apologize, Your Honor, we put
7 this together late last night.  But there was a case --

8          THE COURT:  No, no, it was a well-drafted objection.
9 It was just not explained, I don't think, maybe I missed it but
10 I read it quickly, but it didn't seem to explain what that law
11 was.

12          MR. FEINSTEIN:  So, there's a case that started in
13 the Delaware in Chancery Court called Bax -- B-a-x, that held
14 that the only parties who could sue derivatively on behalf of a
15 limited liability company are members or assignees of the
16 claim.  And that provision was construed by the Delaware
17 Bankruptcy Court in a case called H.H. Holdings (phonetic) that
18 a committee can't be granted standing to bring claims on behalf
19 of the estate.

20          And other courts have followed this -- a few.  There
21 haven't been a lot of decisions.  There's one decision going
22 the other way from Judge Wiles in New York holding that federal
23 bankruptcy law controls who can bring standing on behalf of the
24 estate.  And the state law can't limit that.

25          THE COURT:  Okay.

1          MR. FEINSTEIN:  But most of the other decisions out
2     there follow this Chancery Court opinion that would,
3     essentially, deprive the committee the ability to -- or anybody
4     else to sure derivatively on behalf of the estate.

5          So, now you go back, in light of that case law, and
6     look at the standard DIP order with stipulations that provides
7     on day one that the debtor is stipulating to the validity of
8     the debt, that there's no claims against the lenders and,
9     basically, foreswearing any ability to ever bring a claim.  So,
10    if a debtor has foresworn its ability to bring a claim and
11    nobody else can, then we've basically given the lenders a
12    release on the first day of the case and that can't be, right?

13         So, either we can take all the stipulations out,
14    which lenders counsel don't like to do, or we can improvise.
15    And that's what we've done in other cases where we represented
16    the committee and the provision, in sum and substance, says
17    that if the committee files a motion identifying a claim that
18    should be brought derivatively on behalf of the estate but it
19    can't be brought because of the limited liability company
20    provision.

21         Then the parties will, essentially, meet and confer,
22    have a status conference in front of the Court to try and
23    develop some way to either preserve the claim or to have it
24    prosecuted by the debtor, maybe by a new independent director
25    or what have you, but something that keeps the claim alive.

1  Otherwise, it's just inappropriate to have these stipulations

2  in the order on the first day.

3           THE COURT:  Are these, by the way, are the debtors

4  Delaware entities or Florida?

5           MR. SORKIN:  No --

6           THE COURT:  Or something else?

7           MR. SORKIN:  All but one are Florida entities,

8  whether they're LLCs or corporations.  The one exception is

9  Vital Pharmaceutical International Sales, Inc.

10          THE COURT:  Understood.  And where is that located or

11 incorporated?

12          MR. SORKIN:  It's incorporated in Delaware.

13          THE COURT:  All right.  Okay.  So, I guess that's

14 sort of an offer, also.  So, how do you respond?

15          MR. SORKIN:  That one I may need more time to digest

16 and I suspect Mr. Lluberas does, too.

17          THE COURT:  Okay.

18          MR. SORKIN:  I would note, on the challenge period,

19 generally, in connection with our discussions with Mr. Wilkes

20 today, we did move that 75-day deadline to 90.  It's still 60

21 from appointment for a committee.  But I did want to flag, just

22 in case anybody has doubts about our ability to negotiate

23 constructively with a creditors committee once appointed and,

24 you know, obviously, this is not a creditors committee, this is

25 Monster.  You know, we have already demonstrated out ability to

1  address these issues before a final hearing.  But I'm happy to
2  --
3           THE COURT:  Yes, and I don't, by the way, I'm not
4  jumping to any conclusions with respect to what the intent of
5  either the lender or the debtor was in this regard at all.
6  This battle plays out in every large case, so it's certainly to
7  be expected.
8           Having said that, Mr. Wilkes, what is your position
9  on all of this or I guess you would be involved in these
10 discussions once we take a recess, is that a fair statement?
11          MR. WILKES:  That would be a fair statement, Your
12 Honor.  J. Steven Wilkes for the United States Trustee.  As was
13 previewed before, the United States Trustee has had discussions
14 with a lender's counsel as well as debtor's counsel regarding,
15 specifically, this challenge period issue.
16          Candidly, the United States Trustee did not raise the
17 issue of obtaining an order of standing because the United
18 States Trustee actually reads that differently than the courts
19 that seem to require it because this is an objection to -- this
20 would be in line with an objection to claim or a determination
21 of the validity, extent or priority (indiscernible) and that is
22 an action by a party in interest on both of those.
23          THE COURT:  Interesting.  All right.
24          MR. WILKES:  So, it's encompassing anyone that would
25 be outside of that window.

1          THE COURT:  I think Mr. Feinstein, though, was

2    expressing a fear, not necessarily a conclusion.

3          MR. WILKES:  Oh, sure.  True.

4          MR. FEINSTEIN:  Well, Your Honor, I think the U.S.

5    Trustee's right that some matters that fall under a challenge

6    would be, like, a claim objection that any party in interest

7    could bring.  But if a challenge is an outbound claim, like a

8    fraudulent transfer claim, avoidance under liability, then you

9    run into the LLC statute.

10          THE COURT:  Yes.

11          MR. FEINSTEIN:  And I do want to add, Your Honor, if

12    I might for just a minute --

13          THE COURT:  Well, just hold on to that because I'm

14    not sure Mr. Wilkes was finished.  Go ahead, Mr. Wilkes.

15          MR. WILKES:  So, to that, the United States Trustee

16    is cognizant that both the debtor and debtor's counsel are

17    amenable to massage the issues and come to a resolution that is

18    probably going to being of the day today.

19          THE COURT:  All right.  Fair enough.

20          Mr. Feinstein, you wanted to add something?

21          MR. FEINSTEIN:  Yes, Your Honor.  If I could just

22    take a couple minutes about Monster's claim and their role in

23    the case and why are raising this is not a hypothetical.  I

24    mean, Monster may well seek standing on its own before the day

25    is out.  I don't know.  I do know this --

1        THE COURT:  Well, Mr. Feinstein, I don't mean to cut

2    you off but I don't really think we need to spend the time to

3    do that.  I am very open to hear about what your view of

4    Monster's motivation might be.  I've certainly heard what

5    Monster's view of other's motivations are, or certainly the

6    leverage plays et cetera.

7        My goal today is to get past first days to get an

8    interim order entered.  It sounds like we are, you know, on the

9    five yard line and would love you guys to punch it in for a

10   touchdown and I'm going to give you some time to do that, Mr.

11   Feinstein, if that's okay with you?  You are going to have

12   every opportunity to inform the Court of these issues once we

13   get to the substantive issues.  I'm just not sure I need it

14   right now.

15       MR. FEINSTEIN:  Okay.  Your Honor, I simply wanted to

16   convey Monster's concern about how the case is proceeding and,

17   in particular, a comment that counsel made and a comment that's

18   in the first day declaration about corporate governance.

19   Monster has a verdict for false advertising, making it,

20   unfortunately, the largest creditor in the case -- $293 million

21   against the debtor and Mr. Owoc.

22       And our concern about this case, and I do think it's

23   appropriate to put this on the record on the first day, Your

24   Honor, is that at least as of a few days ago, Mr. Owoc

25   continued to be the sole director of this company.  He's the

74

1 CEO.  He was at the helm when the debtor undertook these

2 actions that led to that jury verdict as well as a hundred and

3 seventy-five million dollar plus arbitration award.

4       And I think counsel said again today that the debtor

5 intends to expand its board, but if it hasn't happened, that

6 means that the decision-making authority in this company today

7 still resides exclusively with Mr. Owoc.  And if that's going

8 to change, it can't change soon enough, in Monster's view

9 because, you know, there's all these statements of future

10 intention that Mr. Panagos will become the restructuring

11 committee for each board.  It seems like none of that's in

12 place today.

13       So, Monster has new concerns about the overall

14 discharge of the case at this point, as well as the DIP.

15       Thank you, Your Honor.

16       THE COURT:  All right.  Well, I hear you.  But now

17 what's going to happen, Mr. Feinstein, is everybody has to

18 respond.

19       MR. LLUBERAS:  Your Honor, I'll be very brief.  Luis

20 Lluberas, again, on behalf of Truist Bank, the administrative

21 agent.  If Monster takes a look at the proposed DIP credit

22 facility as a condition to closing, there will be a requirement

23 that the board be constituted in the manner that was presented

24 earlier by Mr. Sorkin.  So --

25       THE COURT:  By a date certain in order to effectuate

1  the facility?

2          MR. LLUBERAS:  Yes, to close the facility, Your

3  Honor.  We --

4          THE COURT:  All right.  So, that helps.  Okay.

5  Understood.

6          MR. LLUBERAS:  Yes.  I think that should solve Mr.

7  Feinstein's concern about governance being in play because, you

8  know, the lenders are effectively requiring that to provide

9  money.

10          THE COURT:  Understood.  All right.

11          So, we don't, again, I hear you.  You've made your

12  statements.  It's not before the Court right now.  What is

13  before the Court is interim relief that's being requested for

14  DIP financing that seems rather necessary.  So, why don't we

15  take -- how much time do you all need do you think?

16                      (No audible response)

17          All right.  So, we are going to take a lawyer's

18  version of ten minutes.  I guess the way to let us know you are

19  ready is to -- well, I can leave, exiting the courtroom or they

20  can go in the conference rooms, however.  We have two

21  conference rooms out there.

22          MR. SORKIN:  We can just go into the conference room

23  very briefly, Your Honor.

24          THE COURT:  All right.  And so, Mel, you will be here

25  the whole time?

1          COURT CLERK:  Yes.

2          THE COURT:  All right.  Fair enough.

3          So, we will be in recess and you will let me know

4  when you are ready.  And again, don't forget you have got to

5  red line the order so we know, everyone knows, exactly what is

6  being entered, okay?

7          MR. SORKIN:  We will take this opportunity to do

8  that, Your Honor.

9          THE COURT:  All right.  Thank you very much.

10         MR. SORKIN:  Thank you.

11                     (Recess)

12         THE COURT:  All right.  What do you have for me, Mr.

13  Sorkin?

14         MR. SORKIN:  For the record, Andrew Sorkin on behalf

15  of the debtors, Your Honor.  Pleased to announce that I think

16  we were able to resolve the Monster objection for purposes of

17  today with a couple of changes to the order that I will walk

18  the Court through now.

19         THE COURT:  Let me find the order.  Where do I look

20  for that?

21         MR. SORKIN:  That would be at Docket --

22         THE COURT:  Attached to the motion?

23         MR. SORKIN:  Yeah, attached to Docket 24.

24         THE COURT:  Okay.  All right.

25         MR. SORKIN:  And on the first issues, which is the --

1          THE COURT:  Would be the page of the 223 that the

2  order starts on.

3          MR. SORKIN:  Yes.  I believe that would be, we're

4  going to Paragraph 43 here and that would be Page 88 of 223.

5          THE COURT:  All right.  Solves all my insomnia

6  problems.

7          MR. SORKIN:  DIP papers can be good for that.

8          THE COURT:  All right.  Taking me awhile to get to

9  88.

10          MR. SORKIN:  No problem.

11          THE COURT:  All right.  Well, that's the paragraph --

12  oh, that's the paragraph of the order that's changing?

13          MR. SORKIN:  Yeah, 43 on the Section 506(c) waiver

14  and there will be parallel changes for the 552(b) and

15  marshaling waivers.

16          THE COURT:  Okay.

17          MR. SORKIN:  On 43, the only addition is after the

18  word subject to.  We're going to say and upon entry of a final

19  order.

20          THE COURT:  Okay.  We will call that the Feinstein

21  amendment.

22          MR. SORKIN: Yes and there will be three Feinstein

23  amendments.

24          THE COURT:  Okay.

25          MR. SORKIN:  The second is in Paragraph 47 which is

1  on Page 92 of 223.  Also subject to and upon entry of a final

2  order.

3           THE COURT:  Okay.

4           MR. SORKIN:  And the third is also on the same page,

5  right below, for the 552(b) waiver, subject to and upon entry

6  of a final order.

7           THE COURT:  Okay.

8           MR. SORKIN:  Then it would jump back to Paragraph 40

9  which is the challenge provision that's on Page -- starts on

10  Page 84.  I think we will just be adding a stand-alone

11  paragraph at the end of this lengthy section.  So, call it the

12  bottom of Page 87 of 223 and I will read the language into the

13  record.

14           THE COURT:  Notwithstanding anything to the contrary?

15  But go ahead.

16           MR. SORKIN:  It actually, it starts with nothing

17  herein shall limit, but let me start with the header.

18           THE COURT:  All right.  Close enough.

19           MR. SORKIN:  It will be titled reservation regarding

20  committee standing.  Nothing herein shall limit the committee's

21  ability to (X) timely challenge for which it cannot obtain

22  standing as a matter of law because the applicable debtor is a

23  limited liability company, defined as an LLC challenge motion

24  and (Y) seek, pursuant to such LLC challenge motion a mechanism

25  by which to prosecute such challenge, provided that the

1  committee otherwise satisfies the requirements set forth in

2  this Paragraph 40.

3          THE COURT:  Okay.

4          MR. SORKIN:  In the event the committee files a

5  timely LLC challenge for which it cannot obtain standing and

6  provided that the committee otherwise satisfies the

7  requirements set forth in this Paragraph 42, the expiration of

8  the challenge deadline solely for the specific challenge set

9  forth in the LLC challenge motion and solely as to the

10 defendants named therein, shall be tolled, pending further

11 order of the court and the applicable parties shall meet and

12 confer with respect to an appropriate process, if any, for the

13 prosecution of any such challenge.

14         THE COURT:  So, meaning that any party or the, I

15 guess, the debtor can appear -- or any party can seek to end

16 the tolling, I suppose -- that can be a further order of the

17 court or a court order resolving the issue?

18         MR. SORKIN:  Correct.

19         THE COURT:  Okay.  All right.

20         MR. LLUBERAS:  And, Your Honor, for the record, Luis

21 Lluberas on behalf of Truist Bank, we are amenable to this

22 language.

23         THE COURT:  Okay.  Good.  All right.

24         Is that --

25         MR. FEINSTEIN:  So, then the other thing we

1   discussed, Your Honor -- I apologize because we probably should
2   have clarified this in the conference room, was the general
3   concept of tolling whereupon filing of a standing motion.
4   That's one of the things we asked for.  I don't know that we
5   came up with precise language, but I thought we talked about
6   that conceptually.  Am I right about that?

7           MR. LLUBERAS:  Yeah, I think so.  If I may address
8   the Court on it, we did speak about that but I think this
9   language solves for the concerns that I think all of us had in
10  there.  So, if we accept this language as it is, effectively,
11  as a practical matter, we will be before the Court if there is
12  this issue seeking an order identifying how long the tolling
13  period would be.  It's almost reserved for a later date.

14          THE COURT:  All right.

15          MR. FEINSTEIN:  I don't -- maybe I wasn't clear about
16  it.  That new paragraph deals with a situation where there's a
17  claim on behalf of an LLC that can't be brought by a committee.
18  What I was talking about was the general challenge
19  (indiscernible), whether it's 60 days or 75 days, the order
20  currently reads that the committee or party in interest has to
21  seek and obtain standing by the deadline.  And what I was
22  raising was that if you seek it by filing a motion before the
23  challenge deadline, that that would toll it pending the outcome
24  of the challenge proceeding or a standing motion.

25          MR. SORKIN:  Yes.  I think we have an agreement in

1  principle on that.  We don't have the specific language because

2  we spent most of our time focusing on this LLC specific

3  situation, but I'm sure that we can adapt this language to

4  address the concept that Mr. Feinstein just raised.

5          THE COURT:  All right.  So, Mr. Feinstein, your

6  concern is not so much limited to the LLC -- that's been

7  covered.  Your concern, just to make sure I understand it, is

8  that the 60 to -- or the 75 days needs to be tolled under what

9  circumstance?

10          MR. FEINSTEIN:  If a standing motion is filed.

11          THE COURT:  Okay.  So, it would be probably a

12  sentence that simply says, or added to this paragraph, that in

13  the event a standing motion is filed, then that automatically

14  tolls the challenge period, right?

15          MR. FEINSTEIN:  Yes.

16          THE COURT:  Until further order of the Court?

17          MR. LLUBERAS:  Yes, Your Honor.  And my

18  recommendation would be, so that we're not in limbo -- Luis

19  Lluberas on behalf of Trust Bank -- so that we're not in limbo

20  on this, I would just say, I would respectfully submit, that we

21  just have a 30 day clock on it.  It tolls it for 30 days and we

22  can all get in front of Your Honor to figure out how much

23  longer that may be necessary.

24          THE COURT:  Well, I'm not here to negotiate.  You

25  guys are supposed to negotiate and that's not been resolved

1   apparently.  We have two choices.  You can talk about it

2   further and just try to put a cap on this or I suppose we can

3   continue talking about it here and I can give you my thoughts.

4   But I'd much rather you all agree to specific language on this.

5   It doesn't seem like a big task to get there and I'm happy to

6   take a recess for, in this case, three minutes of lawyer time

7   instead of ten  Does that work for you all?

8            MR. LLUBERAS:  Yes, Your Honor.

9            THE COURT:  Mr. Feinstein?

10           MR. FEINSTEIN:  Yes, Your Honor.  I think I have

11  language from another order.  I spent most of the break finding

12  the LLC language, but this one I think I have in front of me

13  and I can just send it quickly to counsel to review.  I

14  apologize.

15           THE COURT:  Not a heavy lift.  Doesn't sound like a

16  heavy lift, so --

17           UNIDENTIFIED ATTORNEY:  It's not, Your Honor.

18           THE COURT:  So, we will be in recess, then, for three

19  minutes of lawyer time.

20           UNIDENTIFIED ATTORNEYS:  Thank you, Your Honor.

21                        (Recess)

22           THE COURT:  Okay.  What do you got, Mr. Sorkin?

23           MR. SORKIN:  Thank you for the time, Your Honor.  And

24  we will able to resolve this one, as well.  So, this language,

25  also in Paragraph 40, I will get you the page number again,

83

1  sorry.

2          THE COURT:  I have it.  Eighty-seven.

3          MR. SORKIN:  Yeah, it's around there.

4          THE COURT:  There's nothing -- there's no language

5  there that I'm -- that's relevant, but anyway --

6          MR. SORKIN:  I think we're going to be in the 85, 86

7  range here.

8          THE COURT:  Okay.  Go ahead.

9          MR. SORKIN:  And if you look down to Subclause B, it

10 begins with respect to any other party in interest.

11         THE COURT:  I'm there.

12         MR. SORKIN:  All right.  So, after the definition of

13 challenge period -- sorry, that was the fastest way to get

14 there.  We will add the following proviso:  Provided that the

15 filing of a motion by the committee or any other party in

16 interest seeking standing to commence a challenge prior to the

17 applicable deadline shall toll such deadline for a period of 45

18 days from the filing of the motion.  And then there's just a

19 tracking change on Page 86.

20         THE COURT:  In that 45 days they either need to

21 extend it or resolve the standing issue?

22         MR. SORKIN:  Presumably will either resolve it or

23 really that we, they, will --

24         THE COURT:  Right.

25         MR. SORKIN:  -- resolve it or we'll be in front of

84

1   you either, you know, on the motion or for an extension.

2          THE COURT:  Okay.

3          MR. SORKIN:  The other change is at the end of the

4   sentence that runs on to Page 86 that ends with a Clause III,

5   Roman Numerals, we will be adding a Clause IV that says,

6   pursuant to the tolling provided in the proceeding sentence.

7   This is just all about the circumstances under which the

8   deadline can get extended.

9          THE COURT:  Okay.  All right.  Great.

10         MR. SORKIN:  So, with that, I think we have --

11         THE COURT:  All issues.

12         MR. SORKIN:  -- all of our issues resolved.

13         MR. FEINSTEIN:  Yes, we do.  Thank you.

14         THE COURT:  All right.  I don't see -- do you need

15  other lawyers here or have we covered every single issue now at

16  this hearing?

17         MR. SORKIN:  Yeah I believe we've covered everything

18  for purposes of today's hearing.  I don't know whether we want

19  to go ahead and schedule a second day hearing?

20         THE COURT:  We can certainly do that.  Tell me what

21  you are looking to file.  This would not be final hearings on

22  these matters.  This would be just setting up some time for

23  additional matters sooner rather than later or --

24         MR. SORKIN:  Oh, no, sorry, I was thinking the final

25  hearing on these matters if --

1          THE COURT:  Oh, the final hearings?  Okay.  Sure.
2   How much time do you need.
3          MR. SORKIN:  So, we have kind of an outside date
4   under the DIP of 30 days from entry of the interim order which
5   may be today or tomorrow which I think would take us out to
6   sometime before November 12th would be ideal.
7          THE COURT:  Okay.
8                    (Court/clerk discussion)
9          THE COURT:  Let's do it on November 9th just in case
10  it happens to be longer and we don't have to be longer and we
11  don't have to keep these folks from missing their planes back
12  to wherever they're from which I hope didn't happen today, but
13  it is what it is.
14         All right.  So, why don't we start in the morning,
15  then, on November 9th unless you -- I don't know who is
16  traveling or tell me what is convenient.
17         MR. SORKIN:  Morning is fine here.
18         THE COURT:  Okay.  What time -- 10:00 a.m.?
19         MR. SORKIN:  Sure.
20         THE COURT:  November 9th 10:00 a.m.  Do you want to
21  speak to Mr. Guso, Battista and whoever else is missing or --
22         MR. LLUBERAS:  We should, Your Honor.
23         MR. SORKIN:  We should, yes.  Don't want to keep you
24  too long, but --
25         MR. LLUBERAS:  They've started drinking.

1       THE COURT:  I'm already stuck in traffic for a while,

2  so -- tell them about the sanction, okay?  Just kidding.

3                      (Laughter)

4              (Court spoke on another matter)

5       MR. LLUBERAS:  Your Honor, I think -- sorry, Luis

6  Lluberas on behalf of Truist Bank.  I think that time frame

7  works fine.  We just confirmed with folks.

8       THE COURT:  Okay.  All right.  Great.  So, include

9  that in all of the orders as the final hearing date.  And

10 whether it is final or not, the next hearing date for any of

11 these matters.

12      MR. LLUBERAS:  Sure.

13      THE COURT:  Anything else we need to do here today?

14      MR. GUSO:  Just for high clarity, Judge, that's the

15 hearing date for all of the matters that have either been

16 continued or for the retention applications, as well?

17      THE COURT:  We can have other hearings.  We can move

18 those up if you want.  I'm not wedded to that for everything.

19      MR. GUSO:  November 9th is perfect.  I just wanted

20 high clarity.

21      THE COURT:  Whatever you all need.

22      MR. GUSO:  Yes, sir.  Thank you.

23      THE COURT:  I'm here to serve you.

24      MR. GUSO:  Thank you, Judge.

25      MR. SORKIN:  Thank you, Your Honor.

1          MR. LLUBERAS:  Your Honor, Luis Lluberas on behalf of

2  Truist Bank again --

3          THE COURT:  Certain limits -- anyway, go ahead.

4          MR. LLUBERAS:  If I may just take two minutes, Your

5  Honor?  I did want to take an opportunity to introduce Ms. Jade

6  Silver from Truist Bank who's here, had made the trip.  Also,

7  Morgan McCaskey of FTI who's our financial advisor.

8          THE COURT:  Right.  Welcome.

9          MR. LLUBERAS:  If I could, I realize that this almost

10  closing time, but if I may just have two minutes, Your Honor?

11          THE COURT:  Sure.

12          MR. LLUBERAS:  I did just want to identify that, you

13  know, that the role that Truist Bank plays as administrative

14  agent for the lender syndicate.  We've got 13 financial

15  institutions in this credit facility including Truist and

16  because each institution has its own separate credit decision

17  and credit chain, you know, Ms. Silver's role and that of

18  Truist is really of an intermediary for her institution as well

19  as for the lenders.

20          And in light of that and the diversity of the lenders

21  and their respective viewpoints, I did just want to note that

22  it's been tough, candid, respectful, arms length negotiations

23  trying to get to a point where all 13 of the lenders have

24  agreed to provide -- the pre-petition lenders have agreed to

25  support the DIP facility.  And, you know, there was just a

1 quick comment made by counsel to Monster which I think is,

2 ultimately, for the final hearing and this is obviously not up

3 before Your Honor at this point, but I did want to emphasize

4 that the lender's willingness to provide more funds than

5 originally contemplated in the DIP facility, approximately $50

6 million more, provide more time to the debtors -- three

7 additional months plus a lot easier milestones, to be honest,

8 than what was originally contemplated.  And the predicate for

9 this factual information, Your Honor, is in the Parkhill

10 declaration.

11          THE COURT:  Okay.

12          MR. LLUBERAS:  There's a summary grid that identifies

13 the negotiations as they happened over the course of several

14 months.  I did just want to mention that Your Honor had

15 identified, potentially some concerns about the roll-up.  We'll

16 be ready to brief it.  We'll be ready to explain the bases for

17 it.

18          But I just want to put the bug in Your Honor's ear

19 that that is just part and parcel of the structure that we have

20 for the lenders here.  And so I just didn't want it to be lost

21 on folks of how important all this dovetails together.  That

22 the company's going to get new money and, ultimately, again,

23 reserve for another day but I didn't want it to be lost in the

24 discussion.

25          THE COURT:  I understand it.  It's not lost.  It's,

1   you know, I think I approved a roll-up.  I think it was in

2   Unapharma but I don't know that it was contested to this

3   degree, frankly.  You know, roll-ups are not necessarily

4   favored, arguably disfavored in the law.  There has to be

5   adequate grounds for it and, you know, I've not decided the

6   issue by any means.  It also could be a matter of degree how

7   much of it is rolled up, whether it is all of it, whether it is

8   some other portion of it.

9           So, you know, it is an issue that we are all familiar

10  with.  It is certainly become a very popular term of DIP

11  financing in the last few years, so I get it.  But we're here

12  in a court and you will put on your case and Monster will put

13  on its case and we will see where it falls.  I am, as I should

14  be, completely neutral at this point and we will just have to

15  see how it plays out because I don't necessarily understand all

16  the implication.

17          MR. LLUBERAS:  No, understood, Your Honor.  And I

18  appreciate Your Honor being so candid and clear about the fact

19  that this is an issue to be decided at a later date.  Again,

20  without belaboring the point, I just wanted to --

21          THE COURT:  And, by the way, I understand the

22  internal workings of a loan that's, you know, that has the

23  framework that you have described.  I've been in negotiations

24  with lenders in similar circumstances and I get it.  It's not

25  all that easy, but I assume there's a governance process within

1 that where, you know, decisions have to be made and can be

2 made.  And if it is not settled, that is what I am here for.

3          MR. LLUBERAS:  Well, we appreciate your time.  Thank

4 you, Your Honor.

5          THE COURT:  Of course.

6          All right.  So, we are good for the day?

7          ATTORNEYS:  Thank you.

8          THE COURT:  Honestly, it is my pleasure.  Thank you

9 all for being here.  And, I don't know, if I get really unable

10 to sleep tonight, I will, I don't know, read this 223 pages

11 again.

12          UNIDENTIFIED SPEAKER:  There you go.

13          THE COURT:  And as I said Mr. Guso, in the last case,

14 try to keep the pleadings a little shorter.  And the orders a

15 little shorter.  I just don't need all those words.

16          All good.  Thank you, Mr. Feinstein, and those on

17 Zoom and we will see you next time.

18                    * * * * *

19

20

21

22

23

24

25

# **C E R T I F I C A T I O N**

We, WENDY ANTOSIEWICZ and ALYCE H. STINE, court approved transcribers, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter, and to the best of our ability.


/s/ Wendy Antosiewicz
WENDY ANTOSIEWICZ


/s/ Alyce H. Stine
ALYCE H. STINE

J&J COURT TRANSCRIBERS, INC.       DATE: October 21, 2022

**WWW.JJCOURT.COM**