UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION
www.flsb.uscourts.gov

| | |
|---|---|
| In re: | Chapter 11 Cases |
| VITAL PHARMACEUTICALS, INC., *et al.*,[1] | Case No.: 22-17842-PDR |
| Debtors. | (Jointly Administered) |

_____/

**DEBTORS' MOTION FOR ENTRY OF AN ORDER
AUTHORIZING AND APPROVING A KEY EMPLOYEE RETENTION PLAN**

**(Hearing Requested for December 1, 2022 at 2:00 p.m.)**

The above-captioned debtors and debtors-in-possession (collectively, the "Debtors"), by and through their proposed undersigned counsel, pursuant to sections 105(a), 363(b), 503(b)(1)(A) and 503(c)(3) of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), file this *Debtors' Motion for Entry of an Order Authorizing and Approving a Key Employee Retention Plan* (this "Motion") seeking entry of an order (the "Order"), substantially in the form attached hereto as **Exhibit A**, authorizing the Debtors to establish and implement a key employee retention plan (the "KERP") for certain non-insider employees (collectively, the "KERP Participants"), and granting administrative expense status to the retention payments paid thereunder.  In support of this Motion, the Debtors rely upon the *Declaration of John C. DiDonato, Chief Transformation Officer, in Support of Debtors' Motion for Entry of an Order Authorizing and Approving a Key Employee Retention Plan* (the "DiDonato Declaration"), attached hereto as **Exhibit B**.  In further support of the Motion, the Debtors respectfully represent as follows:

---

[1] The address of the Debtors is 1600 N. Park Drive, Weston, FL 33326.  The last four digits of the Debtors' federal tax identification numbers are: (i) Vital Pharmaceuticals, Inc. ("Vital Pharmaceuticals") (8430); (ii) Bang Energy Canada, Inc. (5454); (iii) JHO Intellectual Property Holdings, LLC (0010); (iv) JHO Real Estate Investment, LLC (9394); (v) Quash Seltzer, LLC ("Quash Seltzer") (6501); (vi) Rainbow Unicorn Bev LLC (2254); and (vii) Vital Pharmaceuticals International Sales, Inc. (8019).

## JURISDICTION

1.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

2.     Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3.     The statutory bases for the relief requested herein are sections 105(a), 363(b), 503(b)(1)(A), and 503(c)(3) of the Bankruptcy Code.

## BACKGROUND

4.     On October 10, 2022 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

5.     The Debtors are operating their businesses and managing their affairs as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

6.     On November 1, 2022, the Office of the United States Trustee appointed the official committee of unsecured creditors (the "Committee") [ECF No. 245].  No request has been made for the appointment of a trustee or examiner.

7.     For a detailed description of the Debtors and their operations, the Debtors respectfully refer the Court and parties in interest to the *Declaration of John C. DiDonato in Support of Chapter 11 Petitions and First Day Pleadings* [ECF No. 10] (the First Day Declaration"),[2] which is incorporated herein by reference.

## RELIEF REQUESTED

8.     By this Motion, the Debtors request entry of the Order, pursuant to sections 105(a), 363(b), 503(b)(1)(A), and 503(c)(3) of the Bankruptcy Code, approving and authorizing the implementation of the KERP to provide retention payments to the KERP Participants.

---

[2] Capitalized terms used but not defined herein have the meanings given to them in the First Day Declaration.

9.     In addition, the Debtors request that all amounts payable under the KERP be afforded administrative expense priority under sections 503(b)(1)(A) of the Bankruptcy Code for all purposes in the Chapter 11 Cases.

## THE KERP

10.     Recognizing that employee morale and retention is critical to maximizing the value of the Debtors' estates, the Debtors undertook a deliberative process to design an effective and appropriate KERP intended to assist in retaining necessary, non-insider employees during the pendency of the Chapter 11 Cases. Collectively, the KERP Participants maintain valuable industry expertise and specific knowledge of the Debtors' businesses, and are vital to the success of the Debtors' ability to operate and generate revenue. The Debtors believe that the KERP will help prevent the significant and costly turnover of employees during the Chapter 11 Cases, thus preserving value for the Debtors, their estates, and their stakeholders.

**A.     Terms of the KERP**

11.     The key terms of the KERP are as follows:

(a)     Eligible Participants:  The KERP Participants include 151 non-insider employees across the Debtors' sales, manufacturing plant, supply chain, warehouse, human resources, marketing, finance, IT, creative, operations, research and development, and legal departments.

(b)     KERP Payments:  The KERP payments represent fixed cash amounts (each, a "KERP Payment") payable in three lump sums based on the continued employment of the KERP Participant with the Debtors. The aggregate amount of the KERP Payments for all KERP Participants is approximately $2,766,835.79. Individual KERP Payments range from approximately $7,154.17 to $56,200.04 per KERP Participant, and average approximately $18,323.42 per KERP Participant.

(c)     Payment Dates:  Subject to the KERP Participants' continued employment on the applicable payment date (each date, the "KERP Retention Date"), the KERP Payments will be paid as follows:

i.    upon entry of the Order, each KERP Participant shall be paid 25% of their aggregate KERP Payment (the "Initial KERP Payment");

ii.    on March 31, 2023, each KERP Participant shall be paid 25% of their aggregate KERP Payment; and

iii.    on the earlier of (x) the effective date of a plan of reorganization or (y) the closing of a sale transaction, each KERP Participant shall be paid the remaining balance of their respective KERP Payment.

(d)    Termination of Employment for Without Cause:  In the event a KERP Participant's employment is terminated by the Debtors without cause or due to the KERP Participant's death/disability, then the KERP Participant shall be entitled to a pro-rata portion of his/her respective KERP Payment based on the number of days worked from the prior KERP Retention Date.

(e)    Termination of Employment for With Cause:  In the event a KERP Participant voluntarily resigns from employment or is terminated by the Debtors for cause, then the KERP Participant shall not be eligible for any portion of unpaid KERP Payment, and the Debtors shall maintain the right to recoup and claw back the Initial KERP Payment made upon entry of the Order from such KERP Participant.  Any unused funds allocated towards a KERP Participant who has voluntarily resigned or is terminated for cause by the Debtors may, after notice and consultation with the Committee, be allocated towards another KERP Participant absent further relief and in the Debtors' sole discretion, *provided that*, in no event shall the aggregate cost of the KERP exceed $2,766,835.79.

12.    The Debtors submit that the proposed payments under the KERP are consistent with and well within the "market" for similar key employee retention plans approved in comparable chapter 11 cases based on revenue, employee count and asset value.

13.    As detailed in the DiDonato Declaration and as shown on **Annex 1** attached thereto, the Debtors' KERP is well within the range of reasonableness of comparable retention plans.  In particular, the revenue of the comparable companies for which retention plans were analyzed ranged from $2.1 billion to approximately $221.7 million, with an average revenue of approximately $813 million.  The Debtors' revenue of approximately $728 million falls within one standard deviation of such average revenue.  With respect to the cost of the retention plans

4

analyzed as a percentage of the applicable company's revenue, the percentages for the comparable companies ranged from 1.28% to 0.02%, with an average of 0.24%. The cost of the Debtors' proposed KERP as a percentage of the Debtors' revenue is 0.38%, which is within one standard deviation of the average of comparable retention plans studied.

B.     **The KERP Participants**

14.     The KERP Participants are comprised of approximately 151 nonexecutive personnel currently employed by the Debtors. The Debtors and their advisors selected the KERP Participants based on their status as critical, non-insider, hard-to-replace employees who are not members of senior management. No KERP Participants is an "insider" as such term is defined in section 101(31) of the Bankruptcy Code.

15.     The KERP Participants are employed across nearly all the Debtors' business divisions, and have developed valuable institutional knowledge regarding the Debtors' ongoing business operations. Many have longstanding relationships with the Debtors' vendors and customers that would be difficult and expensive to replace. Preserving this institutional knowledge and these relationships is crucial to the successful administration of the Debtors' operations over the coming months, the preservation of the value of the Debtors' estates, and, ultimately, the efficient administration of the Chapter 11 Cases.

C.     **Necessity and Development of the KERP**

16.     The Debtors seek to implement the KERP to motivate key personnel to remain employed with the Debtors during the pendency of the Chapter 11 Cases. To date, the Debtors have incurred significant and costly employee losses both before and following the Petition Date, resulting in a high degree of uncertainty among the Debtors' employees regarding their job security, and consequently, impacting overall employee morale and productivity. Specifically, a substantial number of employees departed the Debtors' employment in the months leading up to

the Petition Date, and since the Petition Date, an additional 41 employees have voluntarily resigned. These recent resignations represent over 3% of the Debtors' overall workforce of 1,105 employees as of the Petition Date. The Debtors are concerned that, absent authority to implement the KERP, the KERP Participants may similarly leave the Debtors' employment during the pendency of the Chapter 11 Cases.

17. Additionally, in connection with the Chapter 11 Cases, KERP Participants have been called upon to undertake additional responsibilities, thus further impacting morale and potentially compromising employee retention. These additional duties have impacted KERP Participants across nearly all departments. For example:

(a) KERP Participants in the finance, sales, operations, and legal departments have been called upon to address concerns raised by the Debtors' customers and distributors relating to the Debtors' bankruptcy cases and the impact the cases may have on their ongoing relationship with the Debtors;

(b) KERP Participants in the finance, operations, supply chain, IT, legal, human resources, and warehouse divisions have been called upon to inform suppliers and other key vendors of the Debtors' bankruptcy cases and to allay any concerns these suppliers and vendors may have as to their ongoing relationship with the Debtors;

(c) KERP Participants in the finance, legal, operations and supply chain departments have been asked to negotiate with the Debtors' suppliers and vendors to ensure the continued provisions of critical goods and services necessary to sustain Debtors' business during the Chapter 11 Cases; and

(d) KERP Participants in nearly all departments, including legal, finance, IT, supply chain, warehouse, human resources and operations, have been asked to compile and analyze financial data in order to comply with the Debtors' various reporting obligations under the Bankruptcy Code, as well as to analyze hundreds of contracts and leases with, among others, customers, distributors, and landlords to determine whether such contracts or leases should be assumed or rejected in the Chapter 11 Cases.

18. The Debtors are concerned that, absent the implementation of an appropriate retention program, the Debtors will lose the KERP Participants, which would detrimentally impact the Debtors' reorganization efforts. Accordingly, the Debtors have determined that

implementation of the KERP is necessary to motivate and retain the KERP Participants throughout the Chapter 11 Cases and ensure that the Debtors' anticipated business needs will be met during the Chapter 11 Cases.

## AUTHORITY FOR RELIEF

A. **The KERP Does Not Provide for Payments to Insiders and Thus Should Not Be Governed by Bankruptcy Code Sections 503(c)(1) and 503(c)(2)**

19.     Section 503(c) of the Bankruptcy Code provides criteria for courts to use in approving certain types of payments to insiders and "other transfers of obligations that are outside of the ordinary course of business." 11 U.S.C. § 503(c). Section 503(c)(1) contains a general prohibition of retention plans for insiders of a debtor. Section 503(c)(2) contains limitations on severance payments to insiders of a debtor.

20.     The Bankruptcy Code defines an "insider" to include, among other things, an "officer of the debtor" and a "person in control of the debtor." 11 U.S.C. § 101(31). Courts have also concluded that an employee may be an "insider" if such employee has "at least a controlling interest in the debtor or . . . exercise[s] sufficient authority over the debtor so as to unqualifiably dictate corporate policy and the disposition of corporate assets." *In re Velo Holdings, Inc.*, 472 B.R. 201, 208 (Bankr. S.D.N.Y. 2012) (citations omitted). It is well-established that an employee's job title, alone, does not make such employee an "insider" as defined by the Bankruptcy Code. *See In re Borders Grp. Inc.*, 453 B.R. 459, 469 (Bankr. S.D.N.Y. 2011) (noting that "[c]ompanies often give employees the title 'director' or 'director-level,' but do not give them decision-making authority akin to an executive" and concluding that certain "director level" employees in that case were not insiders).

21.     The KERP Participants do not constitute "insiders," as such term is defined in section 101(31) of the Bankruptcy Code. *First*, none of the KERP Participants has discretionary

control over any substantial budgetary amounts or the ability to dictate company policy. *Second*, although certain of the KERP Participants hold a title such as "manager" or "director," such employees must obtain approval from senior management before taking any action with respect to the disposition of significant assets. *Third*, none of the KERP Participants is an officer or participates in the Debtors' corporate governance. *Fourth*, none of the KERP Participants had input on any aspect of the KERP or its ultimate formulation.[3]

22.    Accordingly, neither section 503(c)(1) nor section 503(c)(2) of the Bankruptcy Code are applicable in evaluating the KERP because none of the KERP Participants are insiders, and payments to be made under the KERP do not constitute severance payments.

### B.    The KERP Satisfies the Requirements of Section 503(c)(3) of the Bankruptcy Code

23.    Section 503(c)(3) of the Bankruptcy Code permits payments to a debtor's employees outside the ordinary course of business if such payments are justified by "the facts and circumstances of the case." 11 U.S.C. § 503(c)(3). Bankruptcy courts routinely hold that whether payments to employees are justified by the "facts and circumstances" of a case is to be determined by application of the business judgment rule. *See In re Velo Holdings, Inc.*, 472 B.R. at 209 ("[The] 'facts and circumstances' language of 503(c)(3) creates a standard no different than the business judgment standard under section 363(b)."); *In re Borders Grp. Inc.*, 453 B.R. at 473–74 (evaluating debtors' KERP under business judgment rule).

24.    Courts have generally utilized the six factors identified in *In re Dana Corp.* when determining if the structure of a compensation proposal and the process for its development meet the business judgment test. 358 B.R. 576-77 (Bankr. S.D.N.Y. 2006); *see, e.g., In re Residential*

---

[3] In addition, none of the KERP Participants are related to Jack Owoc, the founder and chief executive officer of the Debtors,

*Capital, LLC*, 491 B.R. 73, 85-86 (Bankr. S.D.N.Y. 2013) (applying the *Dana* factors to the debtors' retention plan for non-insiders and approving the plan as an exercise of sound business judgment); *In re Borders Grp. Inc.*, 453 B.R. at 473-74 (same).

25.     In *In re Dana Corp.*, the court set forth the following six factors for evaluating whether a debtor has satisfied the "sound business judgment" test for purposes of the approval of a compensation plan under section 503(c)(3) of the Bankruptcy Code:

(a)     Is there a reasonable relationship between the plan proposed and the results to be obtained, *i.e.*, will the key employee stay for as long as it takes for the debtor to reorganize or market its assets, or, in the case of a performance incentive, is the plan calculated to achieve the desired performance?

(b)     Is the cost of the plan reasonable in the context of the debtor's assets, liabilities, and earning potential?

(c)     Is the scope of the plan fair and reasonable; does it apply to all employees; does it discriminate unfairly?

(d)     What were the due diligence efforts of the debtor in investigating the need for a plan; analyzing which key employees need to be incentivized; what is available?

(e)     Is the plan or proposal consistent with industry standards?

(f)     Did the debtor receive independent counsel in performing due diligence and in creating and authorizing the incentive compensation?

*In re Dana Corp.*, 358 B.R. at 576–77 (citations omitted).

26.     The Debtors submit that these factors are satisfied as to the KERP.

27.     *First*, the KERP is designed to retain the Debtors' employees over the pendency of the Chapter 11 Cases.  For example, the three payment tiered structure incentivizes employees to remain with the Debtors during the entire restructuring process.  And, notably, the last and largest payment will be made at the conclusion of these cases, either on the effective date of a chapter 11 plan or the closing of a sale transaction.

28.     *Second*, the costs of the KERP are reasonable.   As stated in the DiDonato Declaration,  the cost of the Debtors' proposed KERP as a percentage of the Debtors' revenue is 0.38%, which is within one standard deviation of the average of the comparable plans reviewed.

29.     *Third*, the scope of the KERP is fair and reasonable.   In connection with the development of the KERP, the Debtors, together with their advisors, analyzed their workforce to determine which non-insider employees are critical to the Debtors' operations and reorganization process, and should therefore be included as KERP Participants. The Debtors selected the KERP Participants based on their status as critical, non-insider, hard-to-replace employees who are not members of senior management, and the KERP payment amounts were determined based upon the KERP Participants' salaries.

30.     *Fourth*, the Debtors recognize the critical need to make payments under the KERP. As described herein and in the DiDonato Declaration, the Debtors have incurred significant employee turnover, which has directly impacted employee morale.   KERP Participants have also been called upon to undertake additional responsibilities in connection with the Chapter 11 Cases. Absent approval of the KERP, the Debtors will likely incur additional and significant employee attrition, negatively impacting the Debtors' ability to operate their business and smoothly navigate these Chapter 11 Cases.

31.     *Fifth*, the KERP is consistent with industry standards for retention payments for companies in chapter 11 as detailed in the DiDonato Declaration.

32.     *Finally*, the KERP was formulated by the Debtors with input from their various professionals.

33.     For all these reasons, the Debtors submit that the KERP satisfies the requirements of section 503(c)(3) of the Bankruptcy Code.

C. **Implementation of the KERP is a Sound Exercise of the Debtors' Business Judgment and Should Be Approved Pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code**

34.     The Court may authorize the Debtors to implement the KERP under sections 105(a), 363(b)(1) and 503(c)(3) of the Bankruptcy Code. Section 105(a) of the Bankruptcy Code provides, in relevant part, "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).

35.     Section 363(b)(1) of the Bankruptcy Code provides that the debtor, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). The use, sale, or lease of property of the estate, outside the ordinary course of business, is authorized if the debtor demonstrates a "sound business purpose." *See Myers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) (noting that under normal circumstances, courts defer to a trustee's judgment concerning use of property under section 363(b) when there is a legitimate business justification); *In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir. 1983) ("The rule we adopt requires that a judge determining a 363(b) application expressly find from the evidence presented before him a good business reason to grant the application."). Once a debtor articulates a valid business purpose for use of the property, a presumption arises that the debtor's decision is made on an informed basis, in good faith, and in the honest belief that the action is in the best interest of the estate and its constituents. *See In re Integrated Res. Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (noting the business judgment rule "is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company.") (citations omitted); *In re Friedman's, Inc.*, 363 B.R. 891, 895 (Bankr. S.D. Ga. 2005) ("Courts should approve an exercise of a debtor's business judgment unless it is so manifestly unreasonable that it could not be based on sound business judgment, but only on bad faith, or whim or caprice.") (citations omitted).

11

36.    Absent approval of the KERP, the Debtors believe they will incur additional employee turnover, including from KERP Participants.  Such losses would detrimentally impact the Debtors' restructuring efforts, strain the Debtors' limited resources even further, and negatively impact the value of the estates.

37.    Furthermore, courts have approved similar retention and compensation programs as valid exercises of a debtor's business judgment.  *See, e.g.*, *In re Liberty Power Holdings, LLC*, Case No. 21-13797 (SMG) (Bankr. S.D. Fla. June 16, 2021) (approving proposed KERP); *In re 1 Global Capital LLC*, Case No. 18-19121 (RBR) (Bankr. S.D. Fla. Nov. 15, 2018) (approving proposed KERP and allowing KERP payments as administrative expenses of the debtors' estates); *In re Walter Energy, Inc.*, 2015 WL 9583521 at *4 (Bankr. N.D. Ala. Dec. 28, 2015) (approving a proposed KERP, finding it a reasonable exercise of the debtors' business judgement); *In re Adinath Corp. and Simply Fashion Stores, Ltd.*, Case No. 15- 16885 (LMI) (Bankr. S.D. Fla. June 8, 2015) (approving an employee incentive program "intended to retain the Plan Participants during the Debtors' liquidation process").

**D.    Payments Made Under the KERP Should be Afforded Administrative Expense Priority Status Under Sections 503(b)(1)(A) and 502(a)(7) of the Bankruptcy Code**

38.    Under section 503(b)(1)(A) of the Bankruptcy Code, "actual, necessary costs and expenses of preserving the estate" may be allowed as administrative expenses of a debtor.  11 U.S.C. § 503(b)(1)(A).  Administrative expenses allowed under section 503(b) of the Bankruptcy Code are afforded priority status pursuant to section 507(a)(2) of the Bankruptcy Code.  11 U.S.C. § 507(a)(2).

39.    The retention payments to be paid pursuant to the KERP are intended to incentivize the KERP Participants to remain with the Debtors throughout the Chapter 11 Cases and to compensate them for the risk of uncertain future employment.  The KERP Participants' continued

employment will not only contribute to the preservation of estate assets, but will also serve to improve creditor recoveries. Such retention payments should therefore be considered allowed administrative expenses and afforded priority status with respect to distributions from the estates.

## **RESERVATION OF RIGHTS**

40.     Nothing contained herein is intended to limit or impair the Debtors from seeking additional relief for authority to make additional retention payments to the Debtors' employees.

## **NOTICE**

41.     The Debtors have provided notice of this Motion to (a) the Office of the United States Trustee for the Southern District of Florida; (b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) the administrative agent under the Debtors' prepetition and proposed postpetition revolving credit facilities and its counsel; (d) the Committee, (e) the United States Attorney's Office for the Southern District of Florida; (e) the Internal Revenue Service; (f) the United States Securities and Exchange Commission; (g) the state attorneys general for states in which the Debtors conduct business; and (h) all parties that have requested or that are required to receive notice pursuant to Bankruptcy Rule 2002. The Debtors submit that, under the circumstances, no other or further notice is required.

**WHEREFORE**, the Debtors respectfully requests the entry of the Order in the form attached hereto as **Exhibit A**, (a) approving the KERP, and (b) granting the Debtors such other and further relief to which they are entitled.

Dated:    November 14, 2022
       Miami, Florida

Respectfully submitted,

*/s/ Jordi Guso*

Jordi Guso
**BERGER SINGERMAN LLP**
1450 Brickell Avenue, Suite 1900
Miami, FL 33131
Telephone:   (305) 755-9500
Email:   jguso@bergersingerman.com

George A. Davis (admitted *pro hac vice*)
Tianjiao ("TJ") Li (admitted *pro hac vice*)
Brian S. Rosen (admitted *pro hac vice*)
Jonathan J. Weichselbaum (admitted *pro hac vice*)
**LATHAM & WATKINS LLP**
1271 Avenue of the Americas
New York, NY 10020
Telephone:   (212) 906-1200
Email:   george.davis@lw.com
       tj.li@lw.com
       brian.rosen@lw.com
       jon.weichselbaum@lw.com

– and –

Andrew D. Sorkin (admitted *pro hac vice*)
**LATHAM & WATKINS LLP**
555 Eleventh Street, NW, Suite 1000
Washington, D.C. 2004
Telephone:   (202) 637-2200
Email:   andrew.sorkin@lw.com

– and –

Jeramy D. Webb (admitted *pro hac vice*)
Whit Morley (admitted *pro hac vice*)
**LATHAM & WATKINS LLP**
330 North Wabash Avenue, Suite 2800
Chicago, IL 60611
Telephone: (312) 876-7700
Email:   jeramy.webb@lw.com
       whit.morley@lw.com

**EXHIBIT A**

**(Proposed form of Order)**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION
www.flsb.uscourts.gov

In re:                                                    Chapter 11 Cases

VITAL PHARMACEUTICALS, INC., *et al.*,        Case No.: 22-17842-PDR

      Debtors.[1]                                        (Jointly Administered)
_____/

## ORDER GRANTING DEBTORS' MOTION FOR THE ENTRY OF AN ORDER AUTHORIZING AND APPROVING A KEY EMPLOYEE RETENTION PLAN

**THIS MATTER** was before this Court on December ___, 2022, at _____ p.m. in

Fort Lauderdale, Florida, upon the *Debtors' Motion for Entry of an Order Authorizing and*

*Approving a Key Employee Retention Plan* [ECF No. _____] (the "Motion")[2] filed by the above-

captioned debtors and debtors-in-possession (the "Debtors"). The Motion seeks entry of an order

(this "Order") (a) approving and authorizing the implementation of the Debtors' proposed

retention plan for certain non-insider employees (the "KERP"), and (b) granting administrative

expense status to retention payments made thereunder. The Court finds that (a) it has jurisdiction

---

[1] The address of the Debtors is 1600 N. Park Drive, Weston, FL 33326. The last four digits of the Debtors' federal tax identification numbers are: (i) Vital Pharmaceuticals, Inc. ("Vital Pharmaceuticals") (8430); (ii) Bang Energy Canada, Inc. (5454); (iii) JHO Intellectual Property Holdings, LLC (0010); (iv) JHO Real Estate Investment, LLC (9394); (v) Quash Seltzer, LLC ("Quash Seltzer") (6501); (vi) Rainbow Unicorn Bev LLC (2254); and (vii) Vital Pharmaceuticals International Sales, Inc. (8019).

[2] Capitalized terms used but not defined herein have the meanings given to them in the Motion.

over the matters raised in the Motion under 28 U.S.C. §§ 157 and 1334; (b) this is a core proceeding under 28 U.S.C § 157(b)(2)(A), and that this Court may enter a final order consistent with Article III of the Constitution; (c) venue is proper before this Court under 28 U.S.C. §§ 1408 and 1409; (d) the relief requested in the Motion is in the best interests of the Debtors, their estates, their creditors, and other parties in interest; (e) notice of the Motion and the hearing were appropriate under the circumstances and no other notice need be provided; and (f) upon review of the record before the Court, including the legal and factual bases set forth in the Motion, the DiDonato Declaration, and the First Day Declaration and the statements made by counsel at the hearing, good and sufficient cause exists to grant the relief requested in the Motion. Accordingly, it is

      **ORDERED** as follows:

1.      The Motion is **GRANTED** as set forth herein.

2.      The Debtors' proposed KERP is approved.

3.      The Debtors are authorized to (a) adopt and implement the KERP; (b) make payments consistent with the KERP in accordance with the terms of the KERP; and (c) take such other actions as may be necessary to implement the KERP.

4.      Retention payments to be paid pursuant to the KERP shall be allowed as administrative expenses of the Debtors' estates under section 503(b) and 507(a)(2) of the Bankruptcy Code for all purposes in the Chapter 11 Cases and in any other cases under the Bankruptcy Code in the event the Chapter 11 Cases are converted.

5.      Neither this Order nor any performance by the Debtors authorized hereunder shall be deemed an assumption of any executory contract or otherwise affect the Debtors' rights under section 365 of the Bankruptcy Code to assume or reject any executory contract.

6.    Nothing contained in this Order or the Motion is intended to limit or impair the Debtors from seeking additional relief for authority to make additional retention payments to the Debtors' employees.

7.    The Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order.

# # #

Submitted by:
Jordi Guso, Esq.,
Michael J. Niles, Esq.
BERGER SINGERMAN LLP
1450 Brickell Avenue, Ste. 1900
Miami, FL  33131
Telephone: (305) 755-9500
Facsimile: (305) 714-4340
Email: jguso@bergersingerman.com
        mniles@bergersingerman.com

*(Attorney Guso is directed to serve this order upon all non-registered users who have yet to appear electronically in this case and file a conforming certificate of service.)*

**<u>EXHIBIT B</u>**

**(DiDonato Declaration)**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION
www.flsb.uscourts.gov

In re:

VITAL PHARMACEUTICALS, INC., *et al.*,

　　　　Debtors.

_____/

Chapter 11 Cases

Case No.: 22-17842-PDR

(Jointly Administered)

**DECLARATION OF JOHN C. DIDONATO, CHIEF
TRANSFORMATION OFFICER, IN SUPPORT OF DEBTORS' MOTION FOR
ENTRY OF AN ORDER AUTHORIZING AND APPROVING A KEY EMPLOYEE
RETENTION PLAN**

Under 28 U.S.C. § 1746, John C. DiDonato hereby declares as follows under the penalty
of perjury:

1.　　　I am the Chief Transformation Officer ("CTO") of Vital Pharmaceuticals, Inc.
("VPX") and the other debtors and debtors in possession (together with VPX, the "Company" or
the "Debtors") in the above-captioned cases (collectively, the "Chapter 11 Cases"). As such, I am
familiar with the Debtors' day-to-day operations, businesses, and financial affairs.

2.　　　In addition to my current role with the Debtors, I am a Managing Director of Huron
Consulting Services LLC ("Huron") and Huron's Business Advisory Capability Leader. Huron is
an operationally focused consulting firm that specializes in, among other things, bankruptcy and
restructuring consulting, interim management, and financial and operational consulting to
financially distressed companies. I have more than 30 years of experience counseling companies
through operational turnarounds, capital raising, buy and sell side advisories, merger integrations,
and other financial consulting and bankruptcy assignments in both out-of-court and in-court
situations. I have served more than 100 debtors, functioning for many as a chief restructuring
strategist. My expertise encompasses a wide range of industries, including logistics, distribution,

transformation, automotive suppliers, aerospace suppliers, engineering and construction, metals, equipment leasing, and retail.

3.      Except as otherwise specified herein, all the facts set forth in this declaration (the "Declaration") are based upon my personal knowledge, my discussions with members of the Debtors' management team and the Debtors' other advisors, my review of relevant documents and information concerning the Debtors' operations, financial affairs, and restructuring initiatives, or my opinions based upon my experience and knowledge.  If called as a witness, I could and would testify competently to the facts set forth in this Declaration.  I am authorized to submit this Declaration on behalf of the Debtors.

4.      I submit this Declaration in support of the relief requested in the *Debtors' Motion for Entry of an Order Authorizing and Approving a Key Employee Retention Plan* (the "Motion").[1]

## THE KERP

5.      As set forth in the Motion, under my direction and control, the Debtors have identified a number of key employees (the "KERP Participants") who are critical to the continued operation of the Debtors' business and, importantly, the success of the Chapter 11 Cases.  The Debtors seek authority to implement the KERP and make the KERP Payments thereunder.

6.      The aggregate amount of the KERP Payments is $2,766,835.79, with individual KERP Payments ranging from approximately $7,154.17 to $56,200.04 per participant, and averaging approximately $18,323.42.

7.      Subject to each KERP Participant's continued employment with the Debtors on the applicable payment date, the KERP Payments will be paid as follows:

---

[1] Capitalized terms used but not defined herein have the meanings ascribed to such terms in the Motion.

(a)    upon entry of the Order, KERP Participants shall be paid 25% of their individual aggregate KERP Payment;

(b)    on March 31, 2023, KERP Participants shall be paid an additional 25% of their individual aggregate KERP Payment; and

(c)    on the earlier of (x) the effective date of a plan of reorganization, or (y) the closing of a sale transaction, KERP Participants shall be paid the remaining balance of their respective KERP Payment.

8.    The proposed KERP also provides that if a KERP Participant's employment is terminated by the Debtors without cause or due to the KERP Participant's death/disability, then the KERP Participant shall be entitled to a pro-rata portion of his/her respective KERP Payment based on the number of days worked from the prior KERP Retention Date.  In the event a KERP Participant resigns from his/her employment or is terminated by the Debtors for cause, then the KERP Participant shall not be eligible for any unpaid portion of his/her KERP Payment. Furthermore, in the event that a KERP Participant resigns from his/her employment or is terminated by the Debtors for cause, the Debtors shall maintain the right to recoup and claw back the initial KERP Payment made upon entry of the Order from such KERP Participant.  Finally, any unused funds (e.g., payments earmarked for a particular KERP Participant who voluntarily resigns) may, after notice and consultation with the Committee, be allocated towards another KERP Participant absent further relief and in the Debtors' sole discretion, *provided that*, in no event shall the aggregate cost of the KERP exceed $2,766,835.79.

9.    The Debtors and their advisors, under my direction, worked diligently to narrowly tailor the KERP size and structure in line with the stated goals of the KERP of retaining and incentivizing the KERP Participants.  As part of that effort, I compared the Debtors' proposed KERP to similar plans approved in comparable bankruptcy cases.  Attached hereto as **Annex 1** is a chart showing the comparable plans I reviewed and indicating where the Debtors' proposed KERP falls within this range.  Based on this information, I believe that the payments under the

proposed KERP are consistent with and well within the "market" for similar key employee retention plans approved in other chapter 11 cases based on revenue, employee count and asset value. Specifically, the revenue of the comparable companies for which retention plans were analyzed ranged from $2.1 billion to approximately $221.7 million, with an average revenue of approximately $813 million. The Debtors' revenue of approximately $728 million falls within one standard deviation of such average revenue. With respect to the cost of the retention plans analyzed as a percentage of the applicable company's revenue, the percentages for the comparable companies ranged from 1.28% to 0.02%, with an average of 0.24%. The cost of the Debtors' proposed KERP as a percentage of the Debtors' revenue is 0.38%, which is also within one standard deviation of the comparable retention plans. As such, I believe the proposed KERP is well within the range of reasonableness for comparable retention plans.

## THE KERP PARTICIPANTS

10.    The KERP Participants are comprised of approximately 151 non-senior management personnel currently employed by the Debtors. Working along with other members of the Debtors' management and their advisors, we selected the KERP Participants based on their status as critical, non-insider, hard-to-replace employees who are not members of senior management.

11.    The KERP Participants are employed across nearly all the Debtors' business divisions, including, finance, operations, supply chain, IT, legal, and others. The KERP Participants have also developed valuable institutional knowledge regarding the Debtors' ongoing business operations, and many have longstanding relationships with the Debtors' vendors and customers that would be difficult and expensive to replace. I believe that preserving this institutional knowledge and these relationships is crucial to the efficient administration of the

Debtors' operations, the preservation of the value of the Debtors' estates, and, ultimately, the successful administration of the Chapter 11 Cases.

12.     It is my understanding that none of the KERP Participants is an "insider" as such term is defined in section 101(31) of the Bankruptcy Code. *First*, none of the KERP Participants has discretionary control over any substantial budgetary amounts or the ability to dictate company policy. *Second*, although certain of the KERP Participants hold a title of "manager" or "director," such employees must obtain approval from senior management before taking any action with respect to the disposition of significant assets. *Third*, none of the KERP Participants is an officer, member of the Debtors' board of directors, or participates in the Debtors' corporate governance. *Finally*, none of the KERP Participants had any input on any aspect of the KERP or its ultimate formulation. In addition, it is my understanding that none of the KERP Participants are related to Jack Owoc, the founder and chief executive officer of the Debtors.

## THE NEED FOR THE KERP

13.     The Debtors seek to implement the KERP to motivate the KERP Participants to remain employees with the Debtors during the Chapter 11 Cases and to ensure that the Debtors do not continue to suffer further employee attrition and turnover, thus negatively impacting the Debtors' operations and the value of their estates.

14.     The Debtors have incurred significant employee losses both prior to and following the Petition Date. Specifically, a significant number of the Debtors' employees departed in the months leading up to the Petition Date, demonstrating perceived uncertainty among the Debtors' employees regarding their job security leading up to the commencement of the Chapter 11 Cases.[2]

---

[2] Certain of these departures were voluntary, others occurred in connection with an internal restructuring initiative that was implemented by the Debtors in July and August of 2022.

Furthermore, since the Petition Date, an additional 41 employees have voluntarily resigned from their employment with the Debtors, representing over 3% of the Debtors' overall workforce of 1,105 employees as of the Petition Date.  The collective impact of these pre- and post-petition departures has led to a high degree of uncertainty among the Debtors' employees, which has, in turn, impacted overall employee morale and productivity.

15.    Further impacting morale and potentially compromising retention on a go-forward basis, all of the KERP Participants have been called upon to undertake supplementary responsibilities in connection with the Chapter 11 Cases.  These additional duties have impacted KERP Participants across nearly all departments.  For example:

- KERP Participants in the finance, sales, operations, and legal departments have been called upon to address concerns raised by the Debtors' customers and distributors relating to the Debtors' bankruptcy cases and the impact the cases may have on their ongoing relationship with the Debtors.

- KERP Participants in the finance, operations, supply chain, IT, legal, human resources, and warehouse divisions have been called upon to inform suppliers and other key vendors of the Debtors' bankruptcy cases and to allay any concerns these suppliers and vendors may have as to their ongoing relationship with the Debtors.

- KERP Participants in the finance, legal, operations and supply chain departments have been asked to negotiate with the Debtors' suppliers and vendors to ensure the continued provisions of critical goods and services necessary to sustain Debtors' business during the Chapter 11 Cases.

- KERP Participants in nearly all departments, including legal, finance, IT, supply chain, warehouse, human resources and operations, have been asked to compile and

analyze financial data in order to comply with the Debtors' various reporting obligations under the Bankruptcy Code, as well as to analyze hundreds of contracts and leases with, among others, customers, distributors, and landlords to determine whether such contracts or leases should be assumed or rejected in the Chapter 11 Cases.

16.    Thus, the workloads of all KERP Participants have been directly impacted by these Chapter 11 Cases.

17.    Absent approval of the KERP, I believe the Debtors will continue to see additional and significant employee turnover during the pendency of the Chapter 11 Cases, including from those individuals identified as KERP Participants, who may opt to depart their employment in the face of the additional workload and perceived uncertainty as a result of the Chapter 11 Cases. Further employee losses would detrimentally impact the Debtors' restructuring efforts, strain the Debtors' limited resources even further, and could impact the value of the estates.  In sum, I believe the KERP (a) will motivate and retain the KERP Participants throughout the Chapter 11 Cases, (b) provides the KERP Participants with market-level retention payments for companies in chapter 11, and (c) helps ensure that the Debtors' anticipated business needs will be met during the pendency of the Chapter 11 Cases, preserving value for all stakeholders.

## CONCLUSION

18.     Based on the foregoing, my experience, and the terms and provisions of the KERP, I believe that the KERP is reasonable, appropriately designed, and narrowly-tailored to incentivize the KERP Participants for the benefit of the Debtors, their stakeholders, and the successful administration of these Chapter 11 Cases.

Dated: November 14, 2022.

/s/ *John C. DiDonato*
John C. DiDonato
Chief Transformation Officer

**Annex 1**

**KERP Comparables**

| Company | Industry | Bankruptcy Filing Date | Eligible Employees | Total KERP Payments | Average KERP Payment Per Eligible Employee | Annual Revenue Amount | Total KERP (% of Annual Revenue) | Debtor Assets Amount | Total KERP (% of Assets) |
|---|---|---|---|---|---|---|---|---|---|
| Celsius Network | Financial Services | 7/13/2022 | 62 | $ 2,760,000 | $ 44,516.1 | $ 800,000,000 | 0.35% | $ 4,310,000,000 | 0.06% |
| Town Sports International LLC | Fitness and Sports Clubs | 9/14/2020 | 135 | $ 1,500,000 | $ 11,111.1 | $ 434,261,294 | 0.35% | $ 106,454,879 | 1.41% |
| RTW Retailwinds, Inc. | Retail | 7/13/2020 | 18 | $ 625,000 | $ 34,722.2 | $ 826,990,000 | 0.08% | $ 411,984,000 | 0.15% |
| Tuesday Morning Corporation | Retail | 5/27/2020 | 48 | $ 887,510 | $ 18,489.8 | $ 1,006,844,346 | 0.09% | $ 587,571,093 | 0.15% |
| The McClatchy Company | Media | 2/13/2020 | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| Fairway Group Holdings, Corp. | Consumer Staples | 1/23/2020 | 27 | $ 1,152,781 | $ 42,695.6 | $ 643,300,000 | 0.18% | $ 158,867,000 | 0.73% |
| Celadon Group, Inc | Transportation | 12/8/2019 | 43 | $ 736,093 | $ 17,118.4 | N/A | N/A | $ 427,000,000 | 0.17% |
| Legacy Reserves Inc. | Oil & Gas | 6/18/2019 | 32 | $ 1,435,184 | $ 44,849.5 | $ 554,861,000 | 0.26% | $ 1,474,931,000 | 0.10% |
| FTD Companies, Inc. | Consumer Discretionary | 6/3/2019 | 68 | $ 1,930,000 | $ 28,382.4 | $ 1,014,244,000 | 0.19% | $ 312,700,000 | 0.62% |
| Bristow Group Inc | Oil & Gas | 5/11/2019 | 84 | $ 2,845,786 | $ 33,877.5 | $ 221,676,000 | 1.28% | $ 764,863,000 | 0.37% |
| Cloud Peak Energy, Inc. | Oil & Gas | 5/10/2019 | 54 | $ 1,236,748 | $ 22,902.7 | $ 832,405,000 | 0.15% | $ 928,656,000 | 0.13% |
| PHI, Inc. | Transportation | 3/12/2019 | 52 | $ 3,466,647 | $ 66,666.3 | $ 325,978,098 | 1.06% | $ 1,314,227,772 | 0.26% |
| Aceto Corporation | Chemicals | 2/20/2019 | 26 | $ 4,910,000 | $ 188,846.2 | $ 682,970,000 | 0.72% | $ 753,159,000 | 0.65% |
| Charlotte Russe Holding, Inc. | Retail | 2/3/2019 | 32 | $ 630,518 | $ 19,703.7 | $ 795,500,000 | 0.08% | N/A | N/A |
| Gymboree Group, Inc. | Consumer Discretionary | 1/17/2019 | 17 | $ 650,000 | $ 38,235.3 | $ 785,294,118 | 0.08% | $ 303,409,091 | 0.21% |
| Welded Construction, L.P. | Construction / Oil & Gas | 10/22/2018 | 69 | $ 1,172,000 | $ 16,985.5 | $ 835,070,240 | 0.14% | $ 3,268,969 | 35.85% |
| Brookstone Inc (2018) | Retail | 8/2/2018 | 25 | $ 392,023 | $ 15,680.9 | $ 264,000,000 | 0.15% | N/A | N/A |
| AcuSport Corporation | Consumer Products | 5/1/2018 | 40 | $ 444,191 | $ 11,104.8 | N/A | N/A | $ 30,946,067 | 1.44% |
| Nine West Holdings, Inc. | Retail | 4/6/2018 | 51 | $ 655,000 | $ 12,843.1 | $ 1,770,000,000 | 0.04% | $ 354,400,000 | 0.18% |
| Claire's Stores, Inc. | Consumer Discretionary | 3/19/2018 | 29 | $ 998,231 | $ 34,421.8 | $ 1,337,610,000 | 0.07% | $ 2,000,723,000 | 0.05% |
| Appvion, Inc. | Industrial Products | 10/1/2017 | 42 | $ 1,000,000 | $ 23,809.5 | $ 529,700,000 | 0.19% | $ 381,000,000 | 0.26% |
| Ignite Restaurant Group, Inc. | Restaurant, Food & Beverage | 6/6/2017 | 27 | $ 306,000 | $ 11,333.3 | $ 492,044,000 | 0.06% | $ 207,371,000 | 0.15% |
| Marsh Supermarkets, LLC | Retail | 5/11/2017 | 16 | $ 160,228 | $ 10,014.3 | $ 727,117,398 | 0.02% | $ 94,665,608 | 0.17% |
| Ciber, Inc. | IT Services | 4/9/2017 | 17 | $ 407,891 | $ 23,993.6 | $ 610,000,000 | 0.07% | $ 334,327,000 | 0.12% |
| Gordmans Stores, Inc. | Consumer Discretionary | 3/13/2017 | 21 | $ 120,000 | $ 5,714.3 | $ 610,500,000 | 0.02% | $ 274,000,000 | 0.04% |
| Gander Mountain Company, Inc. | Consumer Discretionary | 3/10/2017 | 37 | $ 2,545,000 | $ 68,783.8 | $ 1,323,000,000 | 0.19% | $ 928,221,117 | 0.27% |
| RadioShack Corporation | Retail | 2/5/2015 | 30 | $ 1,000,000 | $ 33,333.3 | $ 2,100,000,000 | 0.05% | $ 1,200,300,000 | 0.08% |

**Benchmarks**

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| *Median* | | | | | $ 23,901.6 | $ 756,205,758 | 0.14% | $ 396,492,000 | 0.18% |
| *Mean* | | | | | $ 33,851 | $ 813,473,562 | 0.24% | $ 735,960,233 | 1.82% |
| *Standard Deviation* | | | | | $ 34,904 | $ 438,026,257 | 0.32% | $ 895,208,140 | 7.11% |
| *One Standard Deviation Below Average* | | | | | $ (1,053) | $ 375,447,305 | -0.07% | $ (159,247,907) | -5.29% |
| *One Standard Deviation Above Average* | | | | | $ 68,755 | $ 1,251,499,819 | 0.56% | $ 1,631,168,373 | 8.93% |

**Debtors' KERP Proposal**

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Vital Pharmaceuticals, Inc. | Food and Beverage | 10/10/2022 | 151 | $ 2,766,836 | 18,323.4 | $ 728,296,049 | 0.38% | $ 649,215,639 | 0.43% |