UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION
www.flsb.uscourts.gov

IN RE:

VITAL PHARMACEUTICALS, INC., *et al.*,

Debtors.[1]

Chapter 11

Case No. 22-17842 (PDR)

(Jointly Administered)

**MOTION OF MONSTER ENERGY COMPANY, THE AMERICAN BOTTLING COMPANY, INC., SONY MUSIC ENTERTAINMENT, UMG RECORDINGS, INC. AND ORANGE BANG, INC. FOR AN ORDER PURSUANT TO 11 U.S.C. § 1102(a)(2) DIRECTING THE APPOINTMENT OF AN OFFICIAL COMMITTEE OF CREDITORS HOLDING NON-TRADE CLAIMS**

**[Hearing Date of December 6, 2022 Requested][2]**

Monster Energy Company ("Monster Energy"), Orange Bang Inc. ("Orange Bang"), The American Bottling Company, Inc. ("ABC"), Sony Music Entertainment ("Sony") and UMG Recordings, Inc. ("UMG") (collectively, "Movants"), by and through undersigned counsel, hereby move pursuant to section 1102(a)(2) of title 11 of the United States Code (the "Bankruptcy Code") for entry of an order directing the Office of the United States Trustee for Region 21 (the "U.S. Trustee") to appoint an official committee of creditors holding non-trade claims (a "Non-Trade Creditors' Committee") in the chapter 11 case of Vital Pharmaceuticals, Inc. ("VPX") and its co-debtors (together with VPX, the "Debtors") in these jointly administered chapter 11 cases.  In support of this Motion, Movants respectfully state as follows:

---

[1] The address of the Debtors is 1600 N. Park Drive, Weston, FL 33326. Tire last four digits of the Debtors' federal tax identification numbers are: (i) Vital Pharmaceuticals, Inc. (8430); (ii) Bang Energy Canada. Inc. (5454); (iii) JHO Intellectual Property Holdings, EEC (0010); (iv) JHO Real Estate Investment, EEC (9394); (v) Quash Seltzer, EEC (6501); (vi) Rainbow Unicom Bev EEC (2254); and (vii) Vital Pharmaceuticals International Sales, Inc. (8019).

[2] Movants respectfully request a hearing date of December 6, 2022 in order to preserve judicial and administrative resources.

## INTRODUCTION

1.      The Debtors filed these cases in the immediate aftermath of another major defeat in the endless litigation engendered by the reckless business practices and intentional misconduct of its founder, Chief Executive Officer, and sole shareholder, Jack Owoc.  By their own count, the Debtors are party to ***63*** disputes in active or threatened litigation, and ***six of the seven largest scheduled unsecured claims in these cases are held by non-trade claimants***, which comprise by far the largest members of the Debtors' unsecured creditor constituency.  The six largest non-trade claims by themselves total at least ***$853 million in filed claims***, an amount about ***twelve times the total amount of trade claims*** in these cases.

2.      These non-trade claims are not at all speculative: Monster Energy holds the largest of the Debtors' litigation liabilities, with a filed claim of over $389,739,257 based on a judgment and a jury verdict.  The same judgment also supports Orange Bang's scheduled $87 million claim.  Others are based on settlement agreements, such as Pepsico's claim of $115 million and Doehler USA's claim of $22 million.  ABC has a scheduled claim of $17.68 million and filed a proof of claim for not less than $225.1 million.  Sony's claim of not less than $35.5 million and UMG's claim of not less than $22.15 million are based on copyright infringement.[3]  Suffice to say, these cases are driven by the Debtors' inability to address non-trade liabilities, not by an inability to service trade liabilities.  ***It will not be possible to confirm a plan of reorganization without the consent of the moving parties***.

---

[3] The claim amounts stated for Sony and for UMG are aggregate calculations for: (1) Sony and certain affiliated entities (collectively, the "Sony Entities" and each, a "Sony Entity"); and (2) UMG and certain affiliated entities (collectively, the "UMG Entities" and each, a "UMG Entity").  Sony and UMG (including, for the avoidance of doubt, the remaining Sony Entities and UMG Entities, as applicable) reserve all rights with respect to the (i) amount of their claims and (ii) filing of their claims, including the filing of separate claims by each Sony Entity and UMG Entity.

3.      Section 1102 of the Bankruptcy Code directs that creditors' committees shall ordinarily consist of the seven largest creditors willing to serve holding claims of the kind represented on the committee.  Movants all requested to serve.  For reasons unknown, contrary to section 1102 and U.S. Trustee practice across the country, the U.S. Trustee appointed a seven member Official Committee of Unsecured Creditors (the "Committee") that has only one of the top seven creditors (No. 5), and is composed exclusively of trade creditors that represent a comparatively tiny portion of the Debtors' creditor constituency.  Those seven appointed trade creditors hold aggregate claims of only $48 million, barely over 5% of the six largest non-trade claims.  That the claims held by those creditors are not representative of the claims against the Debtors is therefore an understatement.  Their interests, in fact, will in all likelihood conflict with the interests of the non-trade creditors who hold the key to any consensual outcome in these cases.

4.      Movants immediately requested that the U.S. Trustee appoint a separate Non-Trade Creditors' Committee, so that the largest creditor constituency would have committee representation.  We requested that such representation be in the form of a separate committee specifically because we believe that a minority position on a Committee dominated by trade creditors would not be meaningful or appropriate, given the fundamentally conflicting interests and the much smaller claims of the trade creditors.  We requested a conference with the U.S. Trustee, which finally took place nine days later, and ended with the U.S. Trustee asking for additional information related to the governance of such a committee.  After we provided the U.S. Trustee with additional requested information on the next business day, the U.S. Trustee communicated in writing on November 21, 2022, that she was inclined to appoint the Non-Trade Creditors' Committee.  *See* Exh. A (e-mail from U.S. Trustee's office of 11/21/22).

5.      On November 23, 2022, however, the U.S. Trustee changed course and announced

that she had decided instead to reconstitute the Committee by adding four non-trade creditors (not including the largest, Monster Energy) who would occupy a minority position on the now 11-member Committee, despite having enormously higher claims. *The U.S. Trustee did not consult with those non-trade creditors beforehand, and ABC has declined its appointment to a Committee in which non-trade creditors would be in the minority.* The remaining three non-trade creditors are (i) Pepsico, which has a settlement; (ii) a putative class action claimant; and (iii) Warner Music, a litigation claimant that has indicated that, like ABC, *it is not inclined to sit on a committee in which non-trade creditors are in the minority, though it has not yet had opportunity to make a final decision*.

6.      It remains a complete mystery to Movants why trade creditors with comparatively small claims would control the Committee, while the creditors with far larger claims whose support is necessary if there is to be any consensus in these cases have a subordinate role. Movants inferred from correspondence that the U.S. Trustee believed that Monster Energy and other litigants need not be appointed because they are represented by bankruptcy counsel and have adequate resources to advocate for their own interests. But that criterion for committee appointment is simply not supported by the law, by practice nationally, or by the rationale and purpose of creditors' committees (nor was it even reflected in the appointments made by the U.S. Trustee). In short: (a) the Bankruptcy Code requires that the creditors on a committee hold representative claims, regardless of nature; (b) the largest creditors are by law and in practice routinely appointed to official committees by U.S. Trustees across the country, regardless of whether their claims are litigation-based and regardless of their individual resources; (c) committee membership is important for reasons that have nothing to do with whether an individual creditor is able to advocate for its particular interests; and (d) five of the seven creditors selected by the U.S. Trustee

also have their own bankruptcy counsel, and one has a market capitalization of $53 billion. If the criterion really was whether the applicant has bankruptcy counsel and resources, its application was arbitrary and capricious.[4]

7.    Section 1102 of the Bankruptcy Code authorizes the Court to direct the U.S. Trustee to appoint a second committee in order to ensure adequate representation of the creditor constituency. It also authorizes the Court to direct the reconstitution of the Committee, but for the reasons described herein, the Movants strongly believe that the appointment of a separate Non-Trade Creditors' Committee is appropriate here. The interests of trade creditors are likely to fundamentally diverge from those of non-trade creditors in these cases, given the vast gulf in the size of their respective aggregate claims, the Debtors' expressed ability to service trade debt, the Debtors' authority to pay more than $14.8 million in trade claims as critical vendors, and the Debtors' unwillingness and/or inability to address non-trade debt (and the continued control exercised by the Debtors' litigant-in-chief, Mr. Owoc). Trade creditors place value on the continuation of their business relationships with the Debtors, whereas non-trade creditors will likely favor whichever exit transaction generates maximum proceeds. Even in a sale context, a purchaser has incentives to structure its acquisition so that debts held by trade creditors are paid or assumed but has no such incentive as to amounts owed to litigants or other non-trade creditors.

8.    The U.S. Trustee's reconstitution of the Committee to add four non-trade creditors would not resolve this conflict, as the non-trade creditors would simply be outvoted both as to official positions and to such smaller but vital decisions as the agenda and nature of services to be performed by retained professionals. In a case with over $1 billion in debts, with an operating business that Mr. Owoc maintains nonetheless has value, that was filed to address non-trade

---

[4] To be clear, it need not be established that the Committee appointments were arbitrary or capricious. By statute, the Court analyzes the issue de novo. *See generally* n. 7 *infra*.

claims, the appointment of a second committee for holders of non-trade claims is not unusual or unduly burdensome, and will make the administration of these cases significantly ***more*** efficient, rather than less, by reducing duplicative litigation and greatly increasing the odds that consensus can be built among the necessary creditors.  As discussed herein, all of the factors recognized as relevant to the decision strongly support the establishment of a Non-Trade Creditors' Committee.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

10.      Venue of this case and this Motion is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

11.      The statutory predicates for the relief requested herein are section 1102(a)(2) of the Bankruptcy Code and Rules 2020 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## STATEMENT OF FACTS

12.      The Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code on October 10, 2022 (the "Petition Date").

13.      On November 1, 2022, the U.S. Trustee appointed the Committee pursuant to section 1102(a) of the Bankruptcy Code.  The initial appointments comprised exclusively seven trade creditors holding an aggregate of approximately $48 million in scheduled claims: (i) Stellar Group, Inc.; (ii) Archer Daniels Midland Co.; (iii) Trinity Logistics, Inc.; (iv) Ardagh Metal Packaging USA Corp.; (v) Crown Cork & Seal USA, Inc.; (vi) QuikTrip Corporation; and (vii) XPO Logistics, LLC.[5]  Only one of those creditors is among the seven largest creditors of the

---

[5] *See* ECF No. 245.

Debtors: six of the members are numbers 5, 8, 9, 10, 16 and 20 from the Debtors' list of the 30 largest creditors,[6] and one (Archer Daniels Midland) does not appear on that list and has no scheduled claim.

14.    The absence of *any* non-trade creditors from the Committee is especially striking given that creditors holding litigation and other non-trade claims are *by far* the largest creditor constituency in these cases, certainly by dollar amount.  In the First Day Declaration, the Debtors attest that they are party to *63 disputes* in pending or threatened litigation.  Decl. of John C. DiDonato, ¶ 29.  Monster Energy has the largest scheduled claim, at over $292 million, and has filed a proof of claim in the amount of not less than $389,739,257.  Other non-trade claims include: (1) Orange Bang, in the amount of not less than $87.5 million; (2) PepsiCo, scheduled in the amount of $115 million based upon a settlement agreement with the Debtors; (3) Doehler USA, Inc., scheduled in the amount of $22 million based upon a settlement agreement with the Debtors; (4); ABC, scheduled in the amount of approximately $17.68 million, but which filed a proof of claim for not less than $225.1 million; (5) Sony, for copyright infringement in an amount not less than $35.5 million; (6) UMG, for copyright infringement in an amount not less than $22.15 million; and (7) Dairy Farmers, in a scheduled amount of $14 million.  These non-trade claims[7] alone aggregate at least $853 million, an amount about twelve times the amount of the trade claims in this case.

15.    The large litigation claims are not even remotely speculative.  Just prior to the Petition Date, Monster Energy prevailed in two actions stemming from the Debtors' history of false advertising, trademark infringement, and other willful and malicious misconduct by the

---

[6] *See* Debtors' Consolidated List of 30 Largest Unsecured Creditors [ECF No. 2].
[7] Certain creditors may have hybrid claims that include settlement-related claims and claims based on trade relations with the Debtors.

Debtors and Mr. Owoc, its Chief Executive Officer and sole owner.  On September 29, 2022, in two separate matters, (i) Monster Energy was awarded a $293 million jury verdict against VPX and Mr. Owoc in *Monster Energy Company v. Vital Pharmaceuticals, Inc. et al.*, Case No. 5:18-cv-1882 (C.D. Cal.) (the "False Advertising Lawsuit"); and (ii) Judge Dale S. Fischer entered a final judgment confirming an arbitration award of $185 million in favor of Monster Energy and Orange Bang against VPX in *Vital Pharmaceuticals, Inc. v. Orange Bang, Inc.*, Case No. 5:20-cv-1464-DSF-SHK (C.D. Cal.) (the "Arbitration Action").

16.    The Arbitrator found in the final arbitration award that a permanent injunction barring VPX from using the BANG mark in the future was necessary to: "(i) ensure that there are no future acts of trademark infringement; [and] (ii) to ensure that there are no future acts of breach of contract."  However, recognizing that such a permanent injunction would effectively bar VPX from selling its flagship BANG energy drink with the BANG mark, Orange Bang and Monster proposed that the permanent injunction be stayed so long as VPX paid them a per-unit royalty for each sale.  The Arbitrator thus provided VPX the option to pay a continuing 5% royalty and held that the permanent injunction would be stayed so long as VPX continued to pay that royalty.  VPX timely exercised the option to pay the ongoing royalty.

17.    As noted, other claims—such as Pepsico's $115 million claim—are based on settlement agreements, and others—such as ABC's claim of not less than $225.1 million—are based on evidence that had come to light through a lengthy discovery process that was on the verge of completion when the Debtors filed these cases.

18.    Movants applied to be Committee members but were excluded.  On November 4, 2022, Mr. Wilkes of the Office of the U.S. Trustee had written an email, attached as **Exhibit B** posing questions from which might be inferred the U.S. Trustee's considerations:

> We would like to know what Monster and American Bottling believe a second official committee would bring to these jointly administered cases that the first official committee is unable to provide. Likewise, please elaborate as to how having both American Bottling and Monster appointed to a second official committee would enhance their involvement in these jointly administered cases that could not otherwise be achieved with their current legal representation. Further, given the fact that American Bottling and Monster are ably represented as creditors and litigants, please explain why the cases are impaired by not having a second official committee. Also, please explain how having a second official committee would ensure the just, speedy, and inexpensive determination in these jointly administered cases as required under F.R.B.P. 1001.

19.    Immediately after the appointment of the Committee, on November 8, 2022, Movants submitted a joint letter to the U.S. Trustee requesting an opportunity to discuss the rationale for appointing only trade creditors and setting forth the factual and legal basis for the formation of a separate Non-Trade Creditors' Committee, a copy of which is attached as **Exhibit C**.

20.    Ten days later, on November 18, 2022, a teleconference was held with U.S. Trustee and representatives of the Office of the U.S. Trustee, and representatives for seven creditors supporting the appointment of a Non-Trade Creditors' Committee.  The U.S. Trustee asked for a letter during this meeting addressing two topics: how would the second committee deal with competitors sitting on the committee (a very common occurrence since the U.S. Trustee has appointed such members to committees throughout the country), and the group's recommendation of who should be on that second committee.

21.    Movants advised the U.S. Trustee at and prior to the November 18 teleconference that there was an urgency to the decision, because Monster Energy and others intended to file a motion to appoint a second committee if one was not appointed, and that they wished to file that motion by Tuesday, November 22, to give parties reasonable notice of such a motion. The U.S.

Trustee representatives suggested the group get the letter in by Monday, November 21 so the U.S. Trustee could respond by Tuesday, November 22.

22.    On Monday, November 21, 2022, counsel sent the requested follow-up correspondence to the U.S. Trustee, a copy of which is attached as **Exhibit D**.  The letter responded to the U.S. Trustee's questions, identifying information protocols commonly used across the country to protect a debtor's proprietary trade information, namely committee bylaws, non-disclosure agreements ("NDAs") and protective orders, and document management software.  It also referenced numerous cases in which second committees have been appointed, while noting that the list was far from exclusive.

23.    The November 21 letter identified the proposed members of a Non-Trade Creditors' Committee as ABC, Monster Energy, Orange Bang, PepsiCo, Sony, UMG and Doehler USA.

24.    On November 21, 2022, counsel was advised in correspondence attached as **Exhibit A** that "[a]fter due deliberation, the U.S. trustee is inclined to appoint a second, non-trade creditor committee…."  The email stated that the U.S. Trustee's representative would reach out the following day to schedule a follow-up call.

25.    No call was forthcoming by November 22 and upon an inquiry by ABC counsel, the U.S. Trustee representative stated that it would likely be the next day as they were doing some due diligence, a copy of which is attached as **Exhibit E**.  There was no statement in that e-mail indicating that the U.S. Trustee was reconsidering her stated inclination, and Movants, nervous but wishing to be cooperative, did not file this Motion.

26.    On November 23, 2022, however, the U.S. Trustee reversed course and announced that a separate Non-Trade Creditors' Committee would ***not*** be appointed.  A copy of this email correspondence is attached as **Exhibit F**.  Instead, the Committee would be reconstituted so that

the seven trade creditors would be joined by four non-trade creditors: ABC; Warner Music Group; PepsiCo, Inc.; and Peter Fischer, a putative class action claimant.  ABC, Warner Music and Pepsico at least, were not contacted by the U.S. Trustee beforehand.  ABC will not sit on such a committee (**Exhibit G**), and Warner Music has indicated it is not inclined to do so either, though it has not yet had opportunity to make a final decision.  Notably, only two of the four appointees were among the seven that had been proposed, and the four appointees once again did not include the Debtors' largest creditor, Monster Energy.

## RELIEF REQUESTED

27.    Movants respectfully request the entry of an order directing the U.S. Trustee to appoint an official committee of creditors holding non-trade claims against the Debtors pursuant to section 1102(a) of the Bankruptcy Code and Bankruptcy Rules 2020 and 9014.

## BASIS FOR RELIEF

**A.    Statutory Framework**

28.    Section 1102 of the Bankruptcy Code addresses the appointment of committees:[8]

> (a) (1) Except as provided in paragraph (3), as soon as practicable after the order for relief under chapter 11 of this title, the United States trustee shall appoint a committee of creditors holding unsecured claims and may appoint additional committees of creditors or of equity security holders as the United States trustee deems appropriate.

> (2) On request of a party in interest, the court may order the appointment of additional committees of creditors or of equity security holders if necessary to assure adequate representation of creditors or of equity security holders. The United States trustee shall appoint any such committee.

> (4) On request of a party in interest and after notice and a hearing, the court may order the United States trustee to change the membership of a committee appointed under this subsection, if the

---

[8] References to the application of this Section, including Section 1102(a)(3), with respect to Small Businesses have been removed.

court determines that the change is necessary to ensure adequate representation of creditors or equity security holders.

29.    Thus, pursuant to Section 1102(a)(1), responsibility for the appointment of committees falls in the first instance on the U.S. Trustee, but courts are given the express ability to order the appointment of additional committees (§1102(a)(2)) or to require the UST to reconstitute the committee to the extent "necessary to ensure adequate representation of creditors." 11 U.S.C. §1102(a)(4).[9]

## B.    Non-Trade Creditors Are Not Adequately Represented on the Committee

30.    The Committee as originally constituted had only *one* of the Debtors' seven largest creditors and, moreover, did not have a single creditor holding the type of claim that is predominant in these cases.  As reconstituted (even if ABC had not declined its appointment), it would only have four of eleven Committee members holding claims representative of the largest creditor constituency.  *It remains a trade committee in a bankruptcy case that was not filed on account of trade debt, of a debtor that proclaims it can easily service trade obligations*.  This creates a committee that is patently not representative of a critical portion of the creditor body.

31.    While the Bankruptcy Code does not require the U.S. Trustee to appoint any particular creditors to a committee, it does state that a committee "*shall ordinarily consist* of the persons, willing to serve, that *hold the seven largest claims* against the debtor of the kinds represented on such committee…, if such committee was fairly chosen and is representative of the

---

[9] The Court's decision under section 1102(a)(2) involves *de novo* consideration of the issue, rather than a review of any prior determination of the U.S. Trustee.  *In re Shorebank Corp.*, 467 B.R. 156, 161-62 (Bankr. N.D. Ill. 2012) ("[T]here is no 'standard of review' . . .  The plain language of the statute . . . calls for an independent determination. . . ."); *In re Enron Corp.*, 279 B.R. 671, 684 (Bankr. S.D.N.Y. 2002) (holding that the issue is decided de novo, and "the court must arrive at its own judgment") (citations omitted); *In re Oneida Ltd.*, Case No. 06-10489 (ALG), 2006 Bankr. LEXIS 780, at *3 (Bankr. S.D.N.Y. May 4, 2006) (same).  Courts have held that the bankruptcy court has authority to appoint a separate committee without a prior request to the U.S. Trustee.  *See In re McLean Industries, Inc.*, 70 B.R. 852, 856 (Bankr. S.D.N.Y. 1987) ("The legislative history belies a contention that Congress sought to limit the Court's role to a review of a determination by a U.S. trustee.").  Here, the U.S. Trustee has not stated the basis of the decision, and thus there are not in any event any determinations to review under any standard other than de novo.

different kinds of claims to be represented." 11 U.S.C. § 1102(b)(1) (emphasis added). The original constitution of the Committee—which included only one of the seven largest unsecured creditors listed on Form 204 (*see* ECF 2)—turned section 1102(b)(1) on its head. The reconstituted Committee is hardly better. It now includes four holders of non-trade claims, not including the largest, who will be outvoted on all decisions in which their interests diverge, as they predictably will on the largest issues in these cases.

32.    The Third Circuit has suggested that the failure to appoint one of the seven largest creditors may be an abuse of discretion: "While appointment pursuant to section 1102(c), which allows for appointment of members 'representative of the different kinds of claims or interests to be represented' is within the discretion of the trial court, section 1102(b) allows no such discretion. It states that the committee 'shall ordinarily consist of the persons, willing to serve, that hold the seven largest claims against the debtor of the kinds represented on such committee.' Under the facts of this case, any refusal to appoint the appellant to the creditor's committee would be an abuse of discretion." *In re Altair Airlines, Inc.*, 727 F.2d 88, 91 n.4 (3d Cir. 1984).[10]

33.    Here, the Committee initially appointed by the U.S. Trustee could not have been more at odds with the text and purpose of section 1102(b)(1). The Debtors' single largest creditor was excluded from the Committee. Six of the seven largest creditors were excluded. And non-trade creditors were excluded entirely. The U.S. Trustee's belated appointment of four non-trade creditors to the Committee was too little, too late to cure these defects. The largest creditor is still excluded, only three of the seven largest creditors were appointed to the Committee, and the non-trade creditors are a minority of the Committee even though, by value, they hold a super-majority

---

[10] While this decision is prior to the 1986 and BAPCA amendments to the Bankruptcy Code, the "ordinarily consist of" language remains in the statute, strongly suggesting that the U.S. Trustee would also abuse its discretion under the 1102(b) in refusing to appoint even one of the seven largest creditors to the Committee. *Cf.* 7 *Collier on Bankruptcy* ¶ 1102.02 (16th ed. 2022).

of the claims against the Debtors.

34.    Even if it were somehow permissible to exclude the Debtors' largest creditor from the Committee, the decisive subordination of non-trade creditor interests on the Committee renders it unrepresentative, at least where there is only one committee.  *Collier* advises "if the United States trustee determines only a single committee is warranted, that committee should reflect membership from different categories in order to be representative of the interests of creditors."  7 *Collier on Bankruptcy* ¶ 1102.02 (16th ed. 2022).  "***What the Bankruptcy Code requires is that conflicting groups of creditors have a voice through adequate representation on a Committee***." *In re Hills Stores Co.*, 137 B.R. 4, 7 (Bankr. S.D.N.Y. 1992) (emphasis added) (citing *In re McLean Indus., Inc.*, 70 B.R. 852, 860 (Bankr. S.D.N.Y. 1987)).  *Accord In re Roman Catholic Church of the Archdiocese of New Orleans*, No. 20-10846, 2021 Bankr. LEXIS 302, at *36 (Bankr. E.D. La. Feb. 8, 2021) ("What is required is adequate representation of various creditor types.").  There is no exclusion for litigation claims, tort claims, very large claims, contingent claims (and the Non-Trade Claims are hardly speculative in any event), or claims of competitors. *See* 7 *Collier on Bankruptcy* ¶ 1102.02[2][a][ii] (notes omitted) (discussing the requirement that litigation claims receive committee representation). As *Collier* further provides, "a committee should reflect membership from different categories in order to be representative of the interests of creditors." *Id.*

35.    There should be no question that the interests of trade creditors and non-trade creditors are not aligned.  Trade creditors who are critical vendors may receive more than $14.8 million in cumulative payments under *Order Granting Debtors' Emergency Motion for an Order Authorizing Payment of Prepetition Claims of Critical Vendors* [ECF No. 112].  Remaining trade creditors in a case like this, whose claims are not paid in full as critical vendors and where their

claims are overwhelmed by non-trade claims, are oftentimes not motivated at all by what recovery they are going to get out of the estate.  Not only do they know their claims are swamped by the non-trade claims and at best they will only get pennies on the dollar, but they also often believe that a post-confirmation trade-vendor relationship with the reorganized Debtors offers far greater value than anything they might recover on their bankruptcy claims.  As a result, such trade creditors are motivated by simply keeping the debtor alive so that they have a customer when the debtor exits chapter 11, and to keep the debtors' management happy so that the debtor does not replace that trade creditor with another vendor.  Debtors are very aware of the leverage they hold over such trade creditors, and it is not uncommon for a debtor to threaten a trade creditor with replacing it with another vendor if the trade creditor "rocks the boat" by opposing a particular plan of reorganization, or by directing committee professionals to investigate insiders for fraudulent conveyances. Thus, a committee comprised entirely of trade creditors like the one in this case defeats the fundamental purpose of a committee, which is to serve as a fiduciary for, and adequately represent the interests of, all creditors.  On the other hand, large non-trade creditors in a case like this are solely motivated by maximizing a recovery on their claims, which is in fact one of the primary policy goals of chapter 11; they are not susceptible to threats of a debtor to terminate them from doing business together.

## C.     A Separate Non-Trade Creditors' Committee Should Be Appointed to Ensure Adequate Representation

36.     As set forth above, section 1102(a)(2) provides that "[o]n request of a party in interest, the court may order the appointment of additional committees of creditors or of equity security holders if necessary to assure adequate representation of creditors or of equity security holders. The United States trustee shall appoint any such committee."

37.     Before addressing the law that has developed in cases in which courts were called

upon to decide the issue, it should be noted that, while not commonplace, the appointment of a second committee is not a rarity. A non-exclusive list of cases in which ***additional*** official committees were appointed includes the bankruptcies of the Archdiocese of New Orleans (trade committee appointed where UCC was tort claimants); American Home Mortgage (borrowers committee); Pacific Gas & Electric (tort claimants); A.H. Robins (tort claimants); Boy Scouts of America (tort claimants); Caesar's Entertainment Operating Company, Inc. (second lien holders); Diocese of Spokane (litigant and non-litigant committees); Dow Corning (tort claimants); Federal Mogul (tort claimants); Kmart I (noteholders); Lamont's Apparel (bondholders and equity committees); Mallinckrodt (opioid-related creditors); Mariner Health (separate UCC's for related entities); Orange County (employees); Revco Drug Stores (noteholders); Takata (PI claimants), Sizzler (franchisee and equity committees), Enron (employee committee)  and W.R. Grace (tort claimants).

38.     The legal foundation for directing the appointment of an additional committee was discussed thoroughly by the bankruptcy court in the recent case of *In re Roman Catholic Church of the Archdiocese of New Orleans*, No.: 20-10846, 2021 Bankr. LEXIS 302 *; 2021 WL 454220 (Bankr. E.D. La. Feb. 8, 2021). Finding that a committee of abuse claimants did not adequately represent the interests of commercial creditors, the court exercised its discretion under section 1102(a)(2) of the Bankruptcy Code to appoint an additional committee of commercial creditors, since it was not convinced that the appointment of additional members to the existing committee would have provided commercial creditors with a meaningful voice.

39.     The 1978 Bankruptcy Reform Act envisioned the possibility of the constitution of more than one committee in a chapter 11 reorganization case and proposed committees to serve as "negotiating bodies for the classes of creditors that they represent." H.R. REP. 95- 595, at 104

(1977), reprinted in 1978 U.S.C.C.A.N. 5963, 6065. "As such, it is important that they be representative of their respective classes." *Id. In re Roman Catholic Church*, 2021 Bankr. LEXIS 302 at *27-28.

40.     "[F]or a creditor group to be adequately represented by a committee, the interests of that group must 'have a meaningful voice on the committee in relation to their posture in the case.'" *In re Roman Catholic Church*, 2021 Bankr. LEXIS 302 at *32-33 (*citing In re Dow Corning Corp.*, 194 B.R. 121, 141 (Bankr. E.D. Mich. 1996), *rev'd on other grounds*, 212 B.R. 258 (E.D. Mich. 1997)).  So, for example, the Roman Catholic Church court found that the interests of commercial creditors and abuse claimants were sufficiently in conflict to warrant separate committees in order to ensure adequate representation of each:

> Congress intended unsecured commercial creditors to be represented in the reorganization process through the unsecured creditors' committee. Although the Abuse Claimants in this case, at times, may share interests with commercial creditors, their interests often differ from the issues facing other creditors. . . .
>
> Given the nature of this particular case, the Court is not convinced that the appointment of additional members to the existing Committee would provide commercial creditors with a meaningful voice. Moreover, separate committees are commonly appointed to represent important constituencies and to provide dynamic tension in negotiations with the debtor and other parties in interest in the reorganization process.

*Id*. at *47-48.

41.     The Bankruptcy Code does not define "adequate representation" under section 1102.  Instead, bankruptcy courts have discretion to determine "adequate representation" on a case-by-case basis based upon the facts and equities of the situation.  *See In re Enron Corp.*, 279 B.R. 671, 685 (Bankr. S.D.N.Y. 2002).  *See generally In re Winn-Dixie Stores, Inc.,* 326 B.R. 853, 858 (Bankr. M.D. Fla. 2005) (internal citations omitted); *In re Park W. Circle Realty, LLC,* No. 10-12965 (AJG), 2010 Bankr. LEXIS 2463, at *7 (Bankr. S.D.N.Y. Aug. 11, 2010) (identifying

factors and collecting cases); *In re Dana Corp.,* 344 B.R. 35, 38 (Bankr. S.D.N.Y. 2006) (same);

*Enron Corp.,* 279 B.R. at 685 (same); *In re Shorebank,* 467 B.R. at 161 (same).

42.     Where there is a request for an additional committee (as opposed to reconstitution

of an existing committee) courts look at the following non-exclusive factors:

(1)     the nature of the case;

(2)     whether an additional committee would provide a benefit to the overall administration of the estate;

(3)     the costs, including the retention of experts other than attorneys, which would result from the appointment of an additional committee;

(4)     whether the requesting parties' interests are already being represented;

(5)     whether the requesting parties' position is unique; and

(6)     the requesting parties' ability to participate in the case without an official committee.

*In re Winn-Dixie Stores*, 326 B.R. at 858.  *See also In re U.S. Tobacco Coop., Inc.,* No. 21-1511-

5-JNC, 2021 Bankr. LEXIS 2276 (Bankr. E.D.N.C. Aug. 20, 2021) (citing to *Winn-Dixie* factors);

*In re Residential Capital, LLC,* 480 B.R. 550, 557-61 (Bankr. S.D.N.Y. 2012) (identifying factors

and collecting cases); *In re Dana Corp.*, 344 B.R. 35, 38 (Bankr. S.D.N.Y. 2006) (identifying

factors and collecting cases).[11]

### (1)   *Nature of the case*

43.     In assessing the "nature of the case" factor, courts have recognized that where there

are several distinct groups of debt and/or equity holders, an additional official committee is

---

[11] Some of these courts have articulated a similar, overlapping list of factors: (1) the ability of the committee to function; (2) the nature of the case; (3) the standing and desires of the various constituencies; (4) the ability for creditors to participate in the cases without an official committee and the potential to recover expenses pursuant to § 503(b); (5) whether different classes may be treated differently under a plan and need representation; (6) the motivation of movants; (7) the costs incurred by the appointment of additional committees; and (8) the tasks that a committee or separate committee is to perform.  *See, e.g., In re Winn-Dixie Stores, Inc., supra, In re Dana Corp., supra,* (identifying factors and collecting cases); *Enron Corp.*, 279 B.R. at 685 (same); *In re Shorebank,* 467 B.R. at 161 (same);  *In re Park W. Circle Realty, LLC*, No. 10-12965 (AJG), 2010 Bankr. LEXIS 2463, at *7 (Bankr. S.D.N.Y. Aug. 11, 2010).

warranted because "committees should be composed of creditors . . . representative of classes as a whole as opposed to dissident factions of particular classes." *In re Beker Industries Corp.*, 55 B.R. 945, 948-49 (Bankr. S.D.N.Y. 1985) (quoting 7 Collier on Bankruptcy ¶ 1102.2 (Lawrence P. King ed., 15th ed. 1984)).  Courts examine whether important groups of creditors have a meaningful voice on the committee.  *See Enron Corp.*, 279 B.R. at 686; *see In re Dow Corning Corp.*, 194 B.R. 121, 141 (Bankr. E.D. Mich. 1996) (benchmark issue in determining whether a class of creditors is being adequately represented is whether "the interests of that particular group of creditors have a meaningful voice on the committee in relation to their posture in the case").

44.    Non-trade liabilities landed these Debtors in bankruptcy, and dwarf the trade claims of the seven continuing Committee members.  As set forth above, their respective interests are fundamentally not in alignment.  Trade creditors will want to continue their business relationships with the Debtors, whereas non-trade creditors may favor whichever exit transaction generates maximum proceeds.  Indeed, "[e]ven if trade creditors also want the debtor to sell its assets, trade creditors' interests may not be well-aligned with tort claimants' interests.  A purchaser may be incentivized to satisfy the debts that a debtor owes to trade creditors because a purchaser may need to do business with those trade creditors once it has assumed the debtor's property.  However, a purchaser will not need to work with tort claimants so it will not have a similar incentive to assume a debtor's tort liability."  Corinne McCarthy, *Creditors' Committees: Giving Tort Claimants a Voice in Chapter 11 Bankruptcy Cases*, 31 Emory Bankr. Dev. Journal 431 (2015).

45.    The legislative history of section 1102(a)(2) indicates that courts may direct the appointment of additional committees when "the debtor proposes to affect several classes of debt or equity holders."  H.R. Rep. No. 95-595, at 401, reprinted in 1978 U.S.C.C.A.N. at 6357.  Any plan proposed by the Debtors will almost certainly attempt to carve up creditors into subgroups

with competing interests, with divergent treatment of non-trade creditors and with respect to provisions such as plan releases and injunctions.  Any sale transaction will also likely raise issues that significantly affect non-trade creditors, such as (i) valuation issues that affect non-trade creditors more than those who expect a continuing trade relationship with the Debtors, (ii) sale releases and injunctions, and (iii) section 363 "free and clear" sale order language and successor liability issues.  In dealing with these issues, the current Committee will be conflicted between its separate constituencies of general unsecured creditors who have an interest in future business relationships and involuntary creditors who will have no ongoing relationship with the Debtors.

46.    The addition of four non-trade creditors to the seven-person Committee creates more problems than it solves.  The non-trade creditors would be outvoted not just in regard to the Committee's official positions, but perhaps even more importantly, as to such issues as the scope or purpose of the services performed by the Committee's financial advisors, counsel and any other professionals.

*(2)    Whether an additional committee would provide a benefit to the overall administration of the estate*

47.    The Debtors are party to 63 disputes involving pending or threatened litigation. These non-trade creditors are certainly the largest in dollar amount, with objectives and strategies that may diverge fundamentally from those of trade creditors.  Given the size of the claims held by the largest non-trade creditors, there can be no consensual resolution in these chapter 11 cases without the support of the non-trade creditors.  Appointing an official committee would help drive these cases toward a consensual resolution in a variety of ways.  It would give the Debtors a single point of contact for plan negotiations and other outreach.  It would avoid a flurry of non-trade-creditor filings on certain contested issues on which each creditor would feel compelled to be heard

to protect their rights.  And perhaps most importantly, it would give the non-trade creditors both the opportunity and the incentive to arrive at consensus and speak with a unified voice

48.     The information provided by a debtor to an official committee is information to which this large constituency should be entitled without demands and litigation.  The collective interests of the non-trade creditors can most efficiently be represented and heard as a single voice, and as a single litigant in discovery proceedings and similar litigation matters, rather than through multiple, duplicative objections and discovery proceedings launched by individual creditors.

49.     The retention of a single team of professionals is also more efficient, not to mention more equitable, in terms of the presentation to the Court of opinions on issues of valuation and the like.  As a matter of efficiency and equity, the administration of the estate is enhanced by the appointment of a committee to represent these interests.

    *(3)*    ***The costs, including the retention of experts other than attorneys, which would result from the appointment of an additional committee***

50.     This is a business with over $1 billion in liabilities that the Debtors maintain nonetheless has value.  Given the size of the estate, the costs of an official Non-Trade Creditors' Committee will be manageable.  In any event, the risk of the added cost of another committee is not enough to deny its appointment.  *See, e.g.*, *In re Hills Stores Co.*, 137 B.R. 4, 6 (Bankr. S.D.N.Y. 1992) (citing *In re McLean Indus., Inc.*, 70 B.R. 852, 860 (Bankr. S.D.N.Y. 1987)) (stating the potential added cost is not sufficient in itself to deprive the creditors of the formation of an additional committee if one is otherwise appropriate); *In re Texaco, Inc.*, 79 B.R. 560, 566 (Bankr. S.D.N.Y. 1987) ("[A] price tag should not be placed on adequate representation.").  A Non-Trade Creditors' Committee, to the extent possible, will work with the separate Committee, the Debtors and other parties in interest to avoid duplication and excess costs.

51.     The Debtors' inevitable objection should be taken with a large grain of salt.  The Debtors, through Mr. Owoc's conduct and business decisions, are the reason the Debtors incurred huge non-trade liabilities, and the bankruptcy cases were filed as a stratagem for addressing those liabilities.  The Debtors should not be heard to complain about carrying the freight that comes with the advantages of bankruptcy, including specifically the creation of creditors' committees under section 1102 of the Bankruptcy Code.  In these chapter 11 cases, the Debtors are paying their fees and costs with funds that are subject to creditors' claims.  Likewise, the Committee's fees and expenses are being paid with the Debtors' funds.  As by far the largest creditor body in amount, Movants should be entitled to their own committee funded the same way.  Otherwise, Movants are not being treated fairly.

### *(4)    Whether the requesting parties' interests are already being represented*

52.     The interests of the large constituency of non-trade creditors have no representation whatsoever on the Committee.  As discussed at length above, the interests of those non-trade creditors are fundamentally distinct from those of the trade creditors appointed to the Committee.  The former group will frequently have no continuing relationship with a debtor, and less interest in any exit strategy that does not maximize the amount available for payment to creditors, while the latter group frequently will desire a continuing relationship, and as a result may be willing to take a significantly smaller cash distribution through a plan.

53.     Likewise, as discussed, the reconstitution of the Committee is not requested by this Motion, because unless it provides for majority representation of the dominant type of claims, it would not serve the need for adequate representation.  *See In re Roman Catholic Church, supra*, 2021 Bankr. LEXIS 302 at *47-48 ("Although the Abuse Claimants in this case, at times, may share interests with commercial creditors, their interests often differ from the issues facing other

22

creditors. . . . Given the nature of this particular case, the Court is not convinced that the appointment of additional members to the existing Committee would provide commercial creditors with a meaningful voice.").

54.    In that regard, this case is the same as *In re Roman Catholic Church*. The Committee is composed of unsecured trade vendors that dominate the vote and may not have the same enthusiasm for further attempting to maximize value if they simply view a proposed exit strategy as providing an acceptable return in view of the prospect of continuing to do business with the Debtors. Independent representation by a separate committee is the only way to protect their interests.

### (5)    *Whether the requesting parties' position is unique*

55.    Movants' may have the largest of the non-trade claims against the Debtors, but their position is far from unique among the non-trade creditors. As discussed, the Debtors have a large constituency of non-trade creditors, as a result of Mr. Owoc's manner of conducting business, and Monster Energy is informed and believes that its request for the appointment of a Non-Trade Creditors' Committee will be joined by other similarly situated. And to the extent that any one non-trade creditor has a position that is unique, it is axiomatic that it will not be advocated or advanced by a Non-Trade Creditors' Committee.

### (6)    *The requesting parties' ability to participate in the case without an official committee*

56.    Based upon correspondence with the U.S. Trustee's Office, the exclusion of Monster Energy and other large litigant creditors may nominally have been based upon their perceived ability to participate in these cases without Committee membership, based upon the active participation of existing counsel and their substantial interests in the outcome of these cases.

But such a rationale is both legally and conceptually infirm and even if valid, would apply only to the very largest of the non-trade creditors, not to all of the claimants in the 63 disputes in which the Debtors are involved.  Furthermore, demonstrably, it was ***not*** why the litigation creditors were originally excluded, since other creditors with similar if not greater resources were appointed to the Committee.

57.     Even where a party can fund their own representation, courts still appoint official committees to represent a larger class of claim/interest holders and to provide the "checks and balances" essential to the fairness of the chapter 11 process.  *See*, *e.g.*, *Exide Techs. v. State of Wis. Inv. Bd.*, Case No. 02-1572-SLR, 2002 U.S. Dist. LEXIS 27210, at *6-7 (D. Del. Dec. 23, 2002) (affirming bankruptcy court's decision to appoint an equity committee where, in part, the equity holder requesting such appointment would be capable of representing itself in the bankruptcy proceeding, but concluding that "the Chapter 11 process would benefit from having an official committee of equity holders").  Likewise, the court in *Park W. Circle Realty*, *supra*, court found that although the single largest creditor could participate on its own, the committee would benefit from that creditor's involvement, as its substantial claim gave it incentive to invest time and energy in its work on the committee, for the benefit of all creditors.

58.     The cost of serving as a watchdog, in the manner of an official committee, to protect the interests of an entire class of creditors cannot and should not be shouldered by individual creditors.  Participation on a committee is not a means for any creditor to transfer its expenses to a debtor.  Committees retain financial advisors and investment bankers, which are critical in significant cases to assess the options for how the case can ultimately be resolved, including whether a sale or reorganization is appropriate, whether a sale is being properly conducted, the valuation of the debtors' business if an internal reorganization is pursued, and whether fraudulent

conveyances have been made by the debtors.

59.     By being excluded from a committee because a creditor is represented by bankruptcy counsel, that creditor is excluded from participation with a critical statutory committee that not only has the significant advantage of having access to other professionals that are conducting such critical analyses, but speaks with a powerful voice before the Court, and which committee is being provided with critical information by the debtors. Without having such necessary information and professional services of a financial advisor and investment banker that will be provided to a committee, the non-trade creditors will be forced to commence separate discovery to obtain this information, resulting in substantial costs to the estate and nontrade creditors, and will also cause the non-trade creditors to incur the costs of retaining other such professionals.

60.     The ability of large litigation creditors to participate in the bankruptcy cases without committee membership is therefore beside the point; moreover, any such criterion was not consistently applied by the U.S. Trustee.  Five of the seven members originally appointed to the Committee were represented by independent counsel, and one of the other two members (Archer Daniels Midland) has a market capitalization of about *$53 billion*, which easily allows it to afford its own counsel.

**D.     Effective Means Exist to Ensure Protection of Proprietary Trade Information**

61.     The U.S. Trustee expressed concern regarding the manner in which a non-trade creditors' committee would handle confidential business information of the Debtors, given that one or more potential members of that committee could be considered competitors of the Debtors. Perhaps that was the basis for the exclusion of Monster Energy.  But this situation is not uncommon in large bankruptcy cases, and there are established procedures for addressing it, often embodied in a committee's bylaws or a formal confidentiality agreement to preclude sensitive confidential

information of a debtor from being disclosed to a competitor who sits on the committee.

62.     Some of the tools and procedures that could potentially be employed to address concerns around disclosure of the Debtors' confidential business information to potential competitors are:

1.  **Committee Bylaws**: Creditors' committees regularly implement bylaws specifically designed to protect the disclosure of confidential business information of the debtors received by the committee. These bylaw provisions commonly, among other things: (a) prohibit committee members from disclosing, or using outside the bankruptcy, any confidential business information they receive from the debtor; (b) give the debtor the ability to enforce the bylaws' confidentiality obligations; and (c) provide that in the event a conflict of interest arises for a committee member, the member must disclose the conflict and recuse from committee participation and certain information may be withheld from committee members as appropriate.  Bylaws such as those attached to the November 21 letter to the U.S. Trustee have been adopted in a number of prior cases in which counsel have participated.

2.  **Nondisclosure Agreement ("NDA") or Protective Order**:  In addition, or as an alternative, committee members could be required, as a condition of their appointment to the official committee, to sign an NDA—or agree to be bound by a stipulated protective order to be entered by the Court—that prohibited the dissemination or disclosure of any sensitive documents, spreadsheets, or other materials the Debtors provided to the committee, which the Debtors could stamp as confidential to designate as covered by the NDA.  For especially sensitive materials, the NDA or protective order could allow the Debtors to mark the materials as "Professionals' Eyes Only" so that the materials would not be disclosed to employees of the committee members.  A sample NDA and protective order were attached to the November 21 letter to the U.S. Trustee.

3.  **Software Tools**:  Finally, software tools are also available that limit the ability to forward or otherwise disseminate confidential material.  For example, for PDF documents, Adobe allows users to restrict document access to unique digital user ID and password combination, so that only specified users are able to open and view the document.  Digital rights management software can create similar controls for non-PDF-format documents.

63.     These are commonly-used, effective procedures and processes for protecting proprietary trade information, and there is no reason to believe this case would be any different.

## RESERVATION OF RIGHTS

64.     Movants expressly reserve all rights, claims, defenses, and remedies, including, without limitation, to supplement and amend this Motion to raise further and other arguments and to introduce evidence prior to or at any hearing regarding the Motion.

## NOTICE

65.     Notice of this Motion will be provided to: (i) the Office of the United States Trustee, Region 21; (ii) counsel to the Debtors; and (iii) any other parties requesting notice pursuant to Bankruptcy Rule 2002.  Movants submit that, in light of the nature of the relief requested, no other or further notice need be given.

## CONCLUSION

66.     For all of the foregoing reasons, Movants respectfully request that the Court issue an order directing the appointment of the proposed Non-Trade Creditors' Committee.

Dated:  November 27, 2022                 **AKERMAN LLP**

                                           /s/ Michael I. Goldberg
                                          Michael I. Goldberg
                                          Florida Bar No. 886602
                                          Eyal Berger
                                          Florida Bar No. 11069
                                          201 East Las Olas Boulevard, Suite 1800
                                          Fort Lauderdale, FL 33301
                                          T: (954) 463-2700 /F: (954) 463-2224
                                          michael.goldberg@akerman.com
                                          eyal.berger@akerman.com

                                          -and-

                                          **PACHULSKI STANG ZIEHL & JONES LLP**[12]
                                          Richard M. Pachulski (pro hac vice)
                                          Ira D. Kharasch (pro hac vice)
                                          Robert J. Feinstein (pro hac vice)
                                          Teddy M. Kapur (pro hac vice)
                                          Steven W. Golden (pro hac vice)
                                          10100 Santa Monica Blvd., 13th Floor
                                          Los Angeles, CA 90067-4003
                                          T: (310) 277-6910 /F: (310) 201-0760
                                          rpachulski@pszjlaw.com
                                          ikharasch@pszjlaw.com
                                          rfeinstein@pszjlaw.com
                                          tkapur@pszjlaw.com
                                          sgolden@pszjlaw.com

                                          *Counsel to Monster Energy Company*

---

[12] Michael I. Goldberg hereby certifies that the undersigned attorneys are appearing *pro hac vice* in this matter pursuant to court orders dated as follows: (i) Teddy M. Kapur, October 14, 2022 [ECF 103]; (ii) Robert J. Feinstein, October 17, 2022  [ECF 133]; (iii) Steven Golden, October 17, 2022 [ECF No. 134]; (iv) Richard M. Pachulski, October 18, 2022 [ECF 158] ; and (v) Ira D. Kharasch, October 18, 2022 [ECF 159].

**FENDER, BOLLING AND PAIVA, P.A.**

/s/ G. Steven Fender
G. Steven Fender, Esq.
Fla. Bar No. 060992
P.O. Box 1545
Ft. Lauderdale, FL 33302
T: (407) 810-2458
steven.fender@fender-law.com

-and-

**KTBS LAW LLP**[13]
Thomas E. Patterson, Esq. (pro hac vice)
Nir Maoz (pro hac vice)
1801 Century Park East
Twenty Sixth Floor
Los Angeles, CA 90067
T: (310) 407-4000
F: (310) 407-9090
tpatterson@ktbslaw.com
nmaoz@ktbslaw.com

*Counsel to Orange Bang, Inc.*

---

[13] G. Steven Fender hereby certifies that the undersigned attorneys are appearing *pro hac vice* in this matter pursuant to court orders dated as follows: (i) Thomas E. Patterson, November 8, 2022 [ECF 269]; (ii) Nir Maoz, November 8, 2022 [ECF 270].

**FURR AND COHEN, P.A.**

/s/ Marc P. Barmat
Marc P. Barmat
Florida Bar No. 22365
Robert C. Furr
Florida Bar No. 210854
2255 Glades Road, Suite 419A
Boca Raton, FL 33431
Telephone: (561) 395-0500
Facsimile: (561) 338-7532
mbarmat@furrcohen.com
rfurr@furrcohen.com

-and-

**GIBSON, DUNN & CRUTCHER LLP**[14]
Russell H. Falconer (*pro hac vice*)
2001 Ross Ave., Suite 2100
Dallas, TX 75201-2923
Telephone: (214) 698-3100
Facsimile: (214) 571-2936
rfalconer@gibsondunn.com
Matthew G. Bouslog (*pro hac vice*)
3161 Michelson Drive
Irvine, CA 92612-4412
Telephone: (949) 451-4030
Facsimile: (949) 475-4640
mbouslog@gibsondunn.com

*Counsel to America Bottling Company*

---

[14] Marc P. Barmat hereby certifies that the undersigned attorneys are appearing *pro hac vice* in this matter pursuant to court orders dated as follows: (i) Mathew G. Bouslog, October 20, 2022 [ECF 170]; (ii) Russell H. Falconer, October 20, 2022 [ECF 171].

**PRYOR CASHMAN LLP**

*/s/ Brendan Everman*
James G. Sammataro
Florida Bar No. 520292
Brendan Everman
Florida Bar No. 68702
255 Alhambra Circle, 8th Floor
Miami, Florida 33134
Telephone:  (212) 421-4100
Facsimile:  (212) 326-0806
Email:       jsammataro@pryorcashman.com
               beverman@pryorcashman.com

- and –

**PRYOR CASHMAN LLP**

Seth H. Lieberman (*pro hac vice* forthcoming)
David C. Rose (*pro hac vice* forthcoming)
Stephanie P. Chery (*pro hac vice* forthcoming)
Sameer M. Alifarag (*pro hac vice* forthcoming)
7 Times Square, 40th Floor
New York, NY 10036-6596
Telephone:  (212) 421-4100
Facsimile:   (212) 326-0806
Email:       slieberman@pryorcashman.com
               drose@pryorcashman.com
               schery@pryorcashman.com
               salifarag@pryorcashman.com

*Counsel to Sony Music Entertainment and UMG
Recordings, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true and correct copy of the forgoing was served via CM/ECF

Notice of Electronic Filings to all parties registered to receive electronic noticing in this case on

November 27, 2022.

Respectfully submitted,

By: _/s/ *Michael I. Goldberg, Esq.*_
Michael I. Goldberg, Esq.
Florida Bar No. 886602
michael.goldberg@akerman.com
**AKERMAN LLP**
201 East Las Olas Blvd., Suite 1800
Fort Lauderdale, FL  33301-2999
Tel: 954-463-2700
Fax: 954-463-2224