UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION
www.flsb.uscourts.gov

| | |
|---|---|
| IN RE: | Chapter 11 |
| VITAL PHARMACEUTICALS, INC., *et al.*, | Case No. 22-27842 (PDR) |
| Debtors.[1] | (Jointly Administered) |

**OBJECTION OF MONSTER ENERGY COMPANY TO DEBTORS' EMERGENCY MOTION FOR INTERIM AND FINAL ORDERS (I) APPROVING POSTPETITION FINANCING, (II) AUTHORIZING USE OF CASH COLLATERAL, (III) GRANTING LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (IV) GRANTING ADEQUATE PROTECTION, (V) MODIFYING AUTOMATIC STAY, (VI) SCHEDULING A FINAL HEARING, AND (VII) GRANTING RELATED RELIEF**

Monster Energy Company ("Monster Energy"), by and through undersigned counsel, hereby files this objection (the "Objection") to the *Debtors' Emergency Motion for Interim and Final Orders (I) Approving Postpetition Financing, (II) Authorizing Use of Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, (VI) Scheduling A Final Hearing, and (VII) Granting Related Relief* [Docket No. 24] (the "DIP Motion").[2]  In support of this Objection, Monster Energy respectfully states as follows

**INTRODUCTION**

1.      Monster Energy is the Debtors' single largest creditor and holds a royalty in all

---

[1] The address of the Debtors is 1600 N. Park Drive, Weston, FL 33326. Tire last four digits of the Debtors' federal tax identification numbers are: (i) Vital Pharmaceuticals, Inc. (8430); (ii) Bang Energy Canada. Inc. (5454); (iii) JHO Intellectual Property Holdings, EEC (0010); (iv) JHO Real Estate Investment, EEC (9394); (v) Quash Seltzer, EEC (6501); (vi) Rainbow Unicom Bev EEC (2254); and (vii) Vital Pharmaceuticals International Sales, Inc. (8019).

[2] Capitalized terms not otherwise defined herein shall have their meaning as set forth in the DIP Motion.

Bang products that are sold that gives it a vested interest in the Debtors' successful reorganization and continued operation as a going concern post-emergence.  Through the 5% Ongoing Royalty (as defined below), Monster Energy benefits from the Debtors' ongoing business operations and, accordingly, has no interest in seeing the Debtors shut down and every interest in seeing that the Debtors' chapter 11 cases are well-executed so as to maximize the value of the estate.

2.    Monster Energy is deeply concerned that these cases are set up for failure. Specifically, the proposed DIP Loan has a short maturity and case milestones that, coupled with the continuing dominant role of the Debtors' founder, Chief Executive Officer, and sole shareholder, Jack Owoc ("Mr. Owoc"), may be a road to a very bad outcome. The DIP Loan by its terms gives the Debtors in total a mere seven months[3] of runway to emerge from bankruptcy, some of which is already behind us.  Under the case milestones established by the DIP Facility, the Debtors have only 57 days left (until January 23, 2023) to find an investor to assist in confirming a plan of reorganization that must provide that **all** of the DIP Lenders' and Prepetition Lenders' debt be "taken out" in full, accompanied by executed financing commitment letters. Failing that condition, the Debtors will be forced to sell all of their assets.[4]

3.    The Debtors entered bankruptcy with no defined exit strategy, but Mr. Owoc has spoken boldly about reorganizing the Debtors, presumably in a manner that will maintain his control.  Given the mountain of claims against the Debtors totaling over a billion dollars, that does not seem a realistic possibility.  Monster Energy is deeply concerned that the precious little time afforded by the DIP Facility for the Debtors to reorganize will be squandered by Mr. Owoc in a vain attempt to pursue a plan that leaves him in control—until it is too late for third parties to

---

[3] *Id.*, § 1.1 (definition of "DIP Facility Maturity Date").

[4] *Id.*, § 5.18(a)(i).

67480626;1

become a part of a value-maximizing transaction, whether as plan sponsor or buyer.  Unless the people with actual decision-making power for the Debtors are independent, good faith, rational actors who will act in the best interests of the Debtors' estates (and not their own self-interest) and without the predetermined goal of allowing Mr. Owoc to retain control of the Debtors upon emergence, Monster Energy fears this case will end up as a train wreck with a forced sale of valuable assets harming Monster Energy and other creditors.

4.      To be clear, notwithstanding the façade of adding three "independent directors" to the Debtors' board of directors (the "Board"), ostensibly to comply with a condition of the DIP Loan Agreement, only one of the new directors, Steven Panagos, is truly independent. [5]  Mr. Owoc appears to have continuing control over the Debtors' Board, and the newly-formed Restructuring Committee consisting of just Mr. Panagos has no decision-making authority, but can only make recommendations to the entire, Owoc-controlled, Board.

5.      Apart from the serious concerns raised by Mr. Owoc's continued control over the Debtors' management coupled with the timeline mandated by the DIP Facility, Monster Energy has numerous additional objections to the proposed DIP Financing, including that:

- The Debtors propose to pledge nearly all of their unencumbered assets, including commercial tort claims, to the Prepetition Secured Lenders to secure a DIP loan of $454,770,201.56, ***less than 22% of which is new money*** and of which over $350 million is a Roll Up of prepetition debt.  It would appear that notwithstanding the Court's comments at the hearing on October 13, 2022 (the "First Day Hearing") regarding the proposed Roll Up, the Debtors still[6] seek authority to roll up 3.5 times the new money financing, which is well above market and constitutes the ultimate

---

[5] It defies logic to state—as the Debtors have—that three of those individuals "are unaffiliated with the company." For instance, one "unaffiliated" Board member, Guillermo Escalante, was a paid expert for the Debtors in the False Advertising Lawsuit and the Arbitration Action (each as defined below).  Another "unaffiliated" Board member, Eric Hillman, is not only a friend of Mr. Owoc's, but is the Co-CEO of Europa Sports, a company that distributes and appears to promote the Debtors' products.  And the only truly "unaffiliated" individual on the Board merely has the power to provide recommendations to the rest of the Owoc-controlled Board.

[6] As of the date hereof, the Debtors have not filed the Proposed Final Order with the Court and served it upon parties-in-interest.  Accordingly, Monster Energy reserves all of its rights with respect to the Proposed Final Order, including to supplement this Objection at or prior to the final hearing on the Motion based on the Proposed Final Order.

67480626;1

"priority jump" for an undersecured lender that also "eliminates potential challenges to the validity of that debt or its secured status."[7]

- A remarkable amount of new money actually being lent under the DIP Facility, ***nearly sixty percent***, will either be round-tripped back to the lenders in the form of upfront fees, commitment fees, adequate protection, and interest payments, or escrowed to pay for professional fees.[8]

- The Debtors propose to grant their secured lenders a permanent blanket section 506(c) surcharge waiver, notwithstanding that the proposed Budget does ***not*** provide for the Debtors to operate on an administratively solvent basis; the Budget does not provide for funds to satisfy all of the Debtors' reasonably anticipated administrative expenses, including the 5% Ongoing Royalty (as defined below) owed to Monster Energy and Orange Bang on the sale of "Bang" products pursuant to a federal court judgment following an arbitration award.  In addition, the Prepetition Secured Parties/DIP Lenders should not be granted a gratuitous waiver of marshaling and "equities of the case" rights;

- The DIP loan contains milestone covenants that chart these cases on a perilous course, under the continuing direction of Mr. Owoc, whose reckless and intentional misconduct led to a massive jury verdict, a substantial judgment following an arbitration award, and lengthy list of litigation claims against both the Debtors and Mr. Owoc personally for false advertising and other intentional misconduct.  As Monster Energy will show at the final hearing on the DIP Motion, Mr. Owoc's reckless course of conduct has continued post-petition, and poses a threat to the pursuit of a transaction that maximizes value in this case for creditors.

6.      For these and other reasons set forth below, Monster Energy respectfully submits that the Court should deny the DIP Motion as presented.

## STATEMENT OF FACTS

### A.  General Background

7.      Monster Energy is by far the largest single creditor in the Debtors' chapter 11 cases.

---

[7] Frederick Tung, "Financing Failure: Bankruptcy Lending, Credit Market Conditions, and the Financial Crisis," 37 Yale J. on Reg. 651, 670 (Spring 2020); Jonathan C. Lipson, "The Secret Life of Property: Corporate Reorganization After *Jevic*," 93 Wash. L. Rev. 631, 689 (June 2018) ("The concern is that lenders . . .  can bargain for a roll-up because they can make it difficult for the debtor to shop elsewhere for a loan.  [T]he secured creditor may not cooperate with other potential lenders or declare a default, forcing the debtor to commence a Chapter 11 case before it is ready to do so.  Because corporate debtors' assets are often fully encumbered, their lender's prebankruptcy priority will give them leverage to become the only lender – and thus the lender under a priority-enhancing DIP loan.")

[8] *See* Docket No. 120 at p. 66.  To date, the Debtors have not filed a Budget that extends past January 6, 2023.

Monster Energy and the Debtors are adverse parties in numerous litigations arising out of the Debtors' history of false advertising and other willful and malicious misconduct, two of which the Debtors lost just prior to the commencement of the above-captioned bankruptcy cases on October 10, 2022 (the "Petition Date").  Specifically, on September 29, 2022, in two separate matters, (i) Monster was awarded a $293 million jury verdict against Debtor Vital Pharmaceuticals, Inc. ("VPX") and Mr. Owoc in *Monster Energy Company v. Vital Pharmaceuticals, Inc. et al.*, Case No. 5:18-cv-1882 (C.D. Cal.) (the "False Advertising Lawsuit"); and (ii) Judge Dale S. Fischer entered a final judgment confirming a $185 million arbitration award in favor of Monster Energy and Orange Bang, Inc. ("Orange Bang") against VPX in *Vital Pharmaceuticals, Inc. v. Orange Bang, Inc.*, Case No. 5:20-cv-1464-DSF-SHK (C.D. Cal.) (the "Arbitration Action").

8.      Under the final judgment entered in the Arbitration Action, where VPX was found to have been infringing trademarks owned by Orange Bang, the rightful owner of the "Bang" mark for beverages such as energy drinks,[9] Monster Energy and Orange Bang were awarded: (a) monetary damages of $175 million against VPX; (b) a perpetual royalty measured as 5% of VPX's net sales of Bang-branded products (the "Ongoing Royalty"); and (c) attorney's fees and expenses. In the False Advertising Lawsuit, among numerous other things, the jury found that VPX and Mr. Owoc had been willfully and deliberately falsely advertising its product, and VPX had been unlawfully appropriating Monster Energy's trade secrets.[10]

9.      On November 1, 2022, the United States Trustee for Region 21 (the "U.S. Trustee") appointed the official committee of unsecured creditors (the "Committee") pursuant to section

---

[9] *See Vital Pharmaceuticals, Inc. v. Orange Bang, Inc.*, Case No. 5:20-cv-1464-DSF-SHK, Docket No. 127 at pp. 8, 80 (C.D. Cal. Sep. 29, 2022) (entering a judgment set forth in final arbitration award).

[10] *See Monster Energy Company v. Vital Pharmaceuticals, Inc. et al.*, Case No. 5:18-cv-1882, Docket No. 890 (C.D. Cal. Sep. 29, 2022) (completed jury verdict form indicating that VPX's and Mr. Owoc's "false advertising [was] willful and deliberate" and that "VPX maliciously and willfully misappropriate[d] Monster's trade secrets").

1102(a) of the Bankruptcy Code, which Committee consists of the following trade creditors: (i) Stellar Group, Inc.; (ii) Archer Daniels Midland Co.; (iii) Trinity Logistics, Inc.; (iv) Ardagh Metal Packaging USA Corp.; (v) Crown Cork & Seal USA, Inc.; (vi) QuikTrip Corporation; and (vii) XPO Logistics, LLC.[11]   Monster Energy applied to be a member of the Committee but was excluded, as were a number of other litigation claimants and non-vendors who applied for Committee membership with claims in the tens and hundreds of millions of dollars.[12]   On November 23, 2022, the U.S. Trustee added four additional members to the Committee: (viii) Warner Music Group Corp.; (ix) PepsiCo, Inc.; (x) The American Bottling Co., Inc.; and (xii) Peter Fischer.[13]   As set forth in further detail in the recently-filed Motion to Appoint a Non-Trade Creditors' Committee,[14] the U.S. Trustee did not consult with these newly-appointed Committee members and one such member (and perhaps a second) has declined the appointment.

### B.   *The First Day Hearing on the Interim DIP Order*

10.     On the Petition Date, the Debtors filed the DIP Motion.  On an interim basis, the Debtors sought to borrow up to $34 million under the DIP Facility while, among other things, depriving other parties-in-interest from any meaningful opportunity to investigate the *bona fides* of the pages of stipulations in favor of the DIP Lenders/Prepetition Secured Parties.

11.     On October 13, 2022, Monster Energy filed its *Preliminary Objection of Monster Energy Company to Debtors' Emergency Motion for Interim and Final Orders (I) Approving*

---

[11] *See* Docket No. 245.

[12] The Debtors' Consolidated List of 30 Largest Unsecured Creditors [Docket No. 2] lists the following litigation creditors, none of whom were appointed to the Committee: Monster Energy (#1 - $292,939,761.00), Orange Bang (#2 - $214,757,614.74), Doehler USA, Inc. (#4 - $22,000,000.00), The American Bottling Company (#6 - $17,681,149.10), Dairy Farmers of America Inc. (#7 - $14,000,000.00), Webb & Gerritsen (#12 - $2,500,000.00). Monster Energy is aware of numerous other litigation creditors who hold large unsecured claims against the Debtors, none of whom were appointed to the Committee despite having applied for membership.

[13] *See* Docket No. 400.

[14] Docket No. 408.

Postpetition Financing, (II) Authorizing Use of Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, (VI) Scheduling A Final Hearing, and (VII) Granting Related Relief [Docket No. 87] (the "Preliminary Objection").

12.      After holding the First Day Hearing on October 13, 2022, the Court entered the Interim Order (I) Approving Postpetition Financing, (II) Authorizing Use of Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, (VI) Scheduling A Final Hearing, and (VII) Granting Related Relief [Docket No. 120] (the "Interim DIP Order") on October 14, 2022.  The Interim DIP Order includes some changes to the form of order tendered by the Debtors in the Motion in response to Monster's objection and other concerns raised by the Court and other parties in interest.

## OBJECTION

13.      Monster Energy objects to the approval of the DIP Financing on the terms presently proposed, as the terms and conditions thereof are not in the best interest of the Debtors' estates and their creditors in multiple respects.  A court should approve a proposed debtor in possession financing only if such financing "is in the best interest of the general creditor body."[15]  Moreover, the proposed financing must be "fair, reasonable, and adequate."[16]  Postpetition financing should not be authorized if its primary purpose is to benefit or improve the position of a particular secured

---

[15] *In re Roblin Indus., Inc.*, 52 B.R. 241, 244 (Bankr. W.D.N.Y. 1985) (*citing In re Vanguard Diversified, Inc.*, 31 B.R. 364, 366 (Bankr. E.D.N.Y. 1983)); *see also In re Chief Executive Officers Clubs*, 359 B.R. 527, 540 n.6 (Bankr. S.D.N.Y. 2007) (a debtor cannot excuse its fiduciary duties to its chapter 11 estate and its creditors for the sake of prompt DIP financing); *In re Tenney Village Co., Inc.*, 104 B.R. 562, 569 (Bankr. D. N.H. 1989) ("The debtor's prevailing obligation is to the bankruptcy estate and, derivatively, to the creditors who are its principal beneficiaries").

[16] *In re Crouse Group, Inc.*, 71 B.R. 544, 546 (Bankr. E.D. Pa. 1987).

67480626;1

creditor.[17]

14.     Here, the DIP Facility represents the Debtors' surrender to the DIP Lenders/Prepetition Secured Parties and fails to reflect an exercise of sound business judgment. By virtue of the Roll-Up, the DIP Facility would have the effect of:  (a) encumbering the most valuable previously unencumbered assets in these cases in favor of the DIP Lenders/Prepetition Secured Parties, including to secure an extraordinary 3.5 to 1 Roll Up, (b) granting credit bid rights to such parties in all assets, and (c) imposing tight milestones that would ensure a value-destroying sale to those same parties without credible third party bids.  The DIP Facility is not designed to maximize the value of these estates, but rather to singularly accomplish the goals of the DIP Lenders/Prepetition Secured Parties at the expense of unsecured creditors.

15.     Further, the DIP Facility broadly waives the estates' surcharge, equities of the case, and marshaling rights without adequate provision for the payment of all administrative claims, including the 5% Ongoing Royalty, section 503(b)(9) claims, and any other accrued obligations that may be budgeted for payment.  Under these circumstances and for the reasons set forth below, the DIP Facility should be denied in its present form.

A.     **The DIP Milestones, Coupled with Mr. Owoc's Continued Control of the Debtors and Lack of a Viable Exit Strategy, is a Formula for Disaster**

16.     It is unclear to Monster Energy how the Debtors are in compliance with the governance-related terms of the DIP Credit Agreement such that the DIP Lenders are even required to lend money to the Debtors.  Under the DIP Credit Agreement, the DIP Lenders are not required

---

[17] *See, e.g., In re Aqua Assocs.*, 123 B.R. 192, 195-98 (Bankr. E.D. Pa. 1991) ("[C]redit should not be approved when it is sought for the primary benefit of a party other than the debtor."); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 37 (Bankr. S.D.N.Y. 1990) ("[A] proposed financing will not be approved where it is apparent that the purpose of the financing is to benefit a creditor rather than the estate."); *Tenney Village*, 104 B.R. at 568 (debtor in possession financing terms must not "pervert the reorganizational process from one designed to accommodate all classes of creditors and equity interests to one specially crafted for the benefit of the secured creditor").

to remit any DIP Financing to the Debtors until the Debtors' Board (i) was composed of five individuals, three of whom are not related to Mr. Owoc or "employees, officers, managers or consultants of, or independent contractors or advisors to" the Debtors; and (ii) included a Restructuring Committee composed of one individual acceptable to the DIP Lenders, Steven Panagos.[18]  Any change in the Board's composition also constitutes an Event of Default.[19]

17.     It became clear at the First Day Hearing that the Debtors were not in compliance with this condition, as the Debtors' counsel advised the Court that as of that date, the Board still consisted of only one individual—Mr. Owoc.[20]  For at least several weeks thereafter, the Board still did not have five members and thus the Debtors could not and did not draw on the DIP loan. Although, upon information and belief, the Board now consists of five individuals, it is unclear how its composition complies with the terms of the DIP Credit Agreement.  Of the four new Board members, (i) Kathleen Cole is the Debtors' Chief Operating Officer,[21] (ii) Guillermo Escalante is a paid consultant to the Debtors,[22] and (iii) Eric Hillman is Mr. Owoc's friend and the owner of a former VPX distributor.[23]  Monster Energy accordingly believes that either: (i) the DIP Lenders must expressly waive the corporate governance-related conditions of the DIP Credit Agreement; (ii) the Debtors must reconstitute the Board to consist of at least three *true* independent directors;

---

[18] *DIP Credit Agreement*, § 3.1(b)(iii).

[19] *Id.*, § 8.1(m).

[20] *First Day Tr.* at 18:25 – 19:1.

[21] *Cf.* DIP Credit Agreement § 3.1(b)(iii) (requiring three Board members that are not, among other things, "employees" or "officers" of the Debtors).

[22] *Cf.* DIP Credit Agreement § 3.1(b)(iii) (requiring three Board members that are not, among other things, "consultants of, or independent contractors or advisors to" the Debtors).  *See also* Final Arbitration Award at p. 51 n. 11 (available at https://images.law.com/contrib/content/uploads/documents/292/122627/Vital-Pharmaceuticals-v.-Orange-Bang.Arbitration-award-1.pdf) (stating that "Monster and Orange Bang elicited testimony indicating that Escalante may not be qualified or persuasive as an expert as science issues in this case, and that he may be tainted by bias issues because he has rendered services as an influencer / promoter on behalf of VPX").

[23] *See, e.g.,* https://blog.europasports.com/make-the-most-of-your-pre-workout-via-bang-energy/, https://blog.europasports.com/bangprotein/.

67480626;1

or (iii) the Court should not approve the DIP Motion. Indeed, absent either the DIP Lenders' waiver of section 3.1(b)(iii) of the DIP Credit Agreement or the Debtors' reconstitution of the Board to comply with such section, if the Court granted final approval of the DIP Motion, it would be approving all of the benefits afforded to the DIP Lenders (*e.g.* the Roll-Up, the Challenge provisions, and waivers of surcharge, marshalling, and equities of the case) without the detriments (*i.e.* requiring the DIP Lender to actually lend new money to the Debtors).

18.     Notwithstanding the cosmetic of adding putative "independent directors" to the Debtors' Board to address understandable concerns on the DIP Lenders' part about Mr. Owoc's discharge of his fiduciary responsibilities, the reality is that he remains firmly in control of the Debtors' management. The Restructuring Committee (which consists of one individual, Steven Panagos) is powerless, as it merely has the authority to make recommendations to the full, Owoc-dominated Board.[24] Mr. Owoc, therefore, remains in firm control of the Debtors with no real checks to his authority to dictate the Debtors' direction in these cases. And Mr. Owoc is prepared to lead the Debtors down a dangerous path, in vain pursuit of a plan of reorganization that maintains his existing control over the Debtors' business, a recipe for disaster as the time to pursue a value-maximizing transaction is short given the term of the DIP Credit Agreement.

19.     As the equity owner of the Debtors, Mr. Owoc cannot remain in control of the Debtors post-emergence unless he either (i) raises enough capital to pay off over a billion dollars in debt or, conceivably, (ii) the Debtors propose a "new value" plan which would require the termination of the Debtors' plan exclusivity so that there could be a "market test" of the value of the Debtors' reorganized equity. As the Supreme Court held in *203 North LaSalle*[25], a "new value"

---

[24] *DIP Credit Agreement*, § 1.1 (definition of "Change of Control").

[25] *Bank of America National Trust and Savings Assoc. v. 203 North LaSalle Street Partnership*, 526 U.S. 434 (1999).

plan that vests equity in the reorganized business in the debtor's former equity holders "without extending an opportunity to anyone else either to compete for that equity or to propose a competing reorganization plan" was not confirmable under §1129(b)(2)(B)(ii) of the Bankruptcy Code.[26] According to the Supreme Court, it was "the exclusiveness of the opportunity, with its protection against the market's scrutiny of the purchase price by means of competing bids or even competing plan proposals," that rendered the old equity's right to purchase the equity a property interest extended "on account of" the old equity position and thus afoul of the Bankruptcy Code.[27] Assuming the "new value corollary" exists at all (an issue left undecided), a plan that allows old equity to acquire shares in the reorganized entity "without paying full value" would be fatally flawed. Monster Energy is concerned that Mr. Owoc is intent on pursuing only a plan that keeps him in control and will not be able to raise the capital needed to pay all claims in full or be willing to give up plan exclusivity immediately to allow for a "market test" of the Debtors' value. Given the brief timeline allowed by the DIP Facility, Monster Energy is concerned that the case will end up in a crisis and a forced sale that does not maximize the value of the Debtors' assets.

**B.**   **The Roll-Up is Excessive and Improper and Should be Denied**

20.    Roll-ups are "generally viewed as a more controversial form of adequate protection that courts will approve sparingly,"[28] and are generally disfavored because they provide no benefit to the estate while favoring certain prepetition creditors over others.[29]  Roll-ups, like the Roll Up

---

[26] *203 N. LaSalle*, 526 U.S. at 454.

[27] *Id.* at 456.

[28] 1 COLLIER LENDING INSTITUTIONS & THE BANKRUPTCY CODE ¶ 5.03[2][b] (citing cases).

[29] *See, e.g., In re Saybrook Mfg. Co., Inc.*, 963 F.2d 1490, 1494–96 (11th Cir. 1992) (noting that postpetition cross-collateralization is an "extremely controversial form of Chapter 11 financing" before holding it was not authorized by section 364 of the Bankruptcy Code)*; In re Bruin E&P Partners, LLC*, Tr. of Hr'g at 67:9-10, Case No. 20-33605 (Bankr. S.D. Tex Jul. 17, 2020) (finding that roll-ups are "heavily disfavored under the Bankruptcy Code"); *see also Reynolds v. Servisfirst Bank* (*In re Stanford*), 17 F.4th 116, 128 (11th Cir. 2021) (Jordan, J., concurring).

in the DIP Facility here, harm unsecured creditors in at least three ways.  First, they provide the prepetition debt that is being rolled up with unavoidable liens over existing collateral.  Second, they enhance the lenders' collateral package by providing liens over unencumbered assets – assets that would otherwise be available to unsecured creditors and not available for credit bidding. Third, the Bankruptcy Code requires this "rolled-up" debt to be repaid in full and in cash in order for a debtor to successfully emerge from chapter 11, thereby precluding the debtor from treating the prepetition rolled-up debt in accordance with section 1129(b)(2)(A) of the Bankruptcy Code.[30]

21.    But, even where roll-ups are approved, it is usually because substantial new money financing is being provided that is roughly equivalent to the amount of prepetition debt to be rolled-up.[31]  Here, the Roll Up exceeds the amount of new money being provided by the DIP Lenders ***by over 350%***; here, the DIP Lenders propose to provide up to $100 million in new money, but roll up $354,770,201.56 in prepetition debt.  At the First Day Hearing, the Court noted that "roll-ups are not necessarily favored, arguably disfavored, in the law" and suggested that it "could be a matter of degree, how much of it is rolled up."[32]  Monster Energy agrees.

22.    Moreover, courts generally refuse to grant a roll-up of prepetition debt that is undersecured because it has the effect of elevating an unsecured deficiency claim to a secured claim.[33]  Indeed, where the prepetition debt is undersecured, "the roll-up has the same effect as

---

[30] *See, e.g.,* 3 COLLIER ON BANKRUPTCY ¶ 364.06[2] (16th ed.).

[31] *See In re Constar Int'l Holdings LLC*, Hr'g Tr. 87:20-25, 88:1-4, Case No. 13-3281 (CSS) (Bankr. D. Del. Jan. 16, 2014) (discussing the benefits of a lower roll-up percentage—*i.e.*, percentage of the full facility that represented rolled-up debt—and noting it was the "driving factor" behind the Court's approval of a 20% DIP roll-up over an alternative 40% DIP roll-up); *In re Vanguard Natural Resources, Inc.,* Docket No. 241 at 2-3, Case No. 19-31786 (Bankr. S.D. Tex. April 30, 2019) (approving roll-up of $65 million with a $65 million new money DIP); *In re Sheridan Holding Company II, LLC*, Docket No. 146 at 2, Case No. 19-35189 (Bankr. S.D. Tex. Oct. 15, 2019) (approving roll-up of $50 million with a $50 million new money DIP).

[32] *First Day Tr.* at 93:16 – 17, 19 – 20.

[33] *See, e.g., In re Saybrook Mfg Co*., 963 F.2d 1490, 1495 (11th Cir. 1992) (holding postpetition financing arrangement *per se* impermissible where undersecured prepetition lender provided postpetition financing in exchange for a security interest in debtor's postpetition property to secure its prepetition debt); *In re FCX, Inc*., 54 B.R. 833, 840 (Bankr.

*Texlon* cross-collateralization," which is prohibited in the Eleventh Circuit under *Saybrook*, because it "diverts resources to a preferential satisfaction of the pre-petition financier's unsecured claim, all to the potential detriment of other unsecured claims."[34]  As Judge Jordan of the United States Court of Appeals for the Eleventh Circuit noted in a recent concurrence, roll-ups are a "formally distinct but functionally similar financing arrangement" to cross-collateralization and, quoting distinguished bankruptcy commentators, "[i]t is unclear why any court that rejects forward cross-collateralization would be more sympathetic to roll-ups, which appear to have precisely the same effect."[35]

23.     The Prepetition Facility Obligations may be undersecured but yet the Debtors seek to convert the Prepetition Facility Obligations to postpetition DIP Obligations at a rate of over 3.5:1 at the expense of unsecured creditors.  The Roll-Up would also generously accrue a 0.5% commitment fee on the unused amount of the DIP Loan Commitment, plus interest at the 1-month SOFR + 8.50% or Base Rate + 7.50%.

24.     Ultimately, the Roll Up will automatically cure any shortcomings in the Prepetition Collateral.  The previously unencumbered assets will no longer be unencumbered as to over $350 million of rolled-up debt.  The Prepetition Lenders will realize an immediate windfall by assimilating all of the unencumbered assets into their collateral package.  And it will do so at the expense of unsecured creditors.  Accordingly, the Court should decline to approve the Roll-Up.

---

E.D.N.C. 1985) ("[I]f an undersecured creditor can obtain unencumbered assets as security for all of its prepetition claims, that creditor is being preferred to the detriment of other unsecured claimants.").

[34] 1B SECURED TRANSACTIONS UNDER THE UCC § 9D.05[5] (2019); *see also Reynolds v. Servisfirst Bank* (*In re Stanford*), 17 F.4th 116, 128 (11th Cir. 2021) (Jordan, J., concurring).

[35] *Reynolds v. Servisfirst Bank* (*In re Stanford*), 17 F.4th 116, 128 (11th Cir. 2021) (Jordan, J., concurring) (quoting Daniel J. Bussel & Kenneth N. Klee, *Recalibrating Consent in Bankruptcy*, 83 Am. Bankr. L.J. 663, 707 n. 209 (2009)).

C.    **Claims Against Insiders and Prepetition Secured Parties**
      **Should Remain Unencumbered for the Benefit of the Estates**

25.    Preliminarily, Monster Energy questions the veracity of the Debtors' chart of material terms in the DIP Motion with respect to the "Granting of Lien on Claims/Causes of Action."[36]  In that section of the chart, which is required pursuant to Bankruptcy Rule 4001 and Local Rules 4001-2 and 4001-3, the Debtors state (by copying and pasting paragraph 5 of the Interim DIP Order) that the DIP Liens will not encumber Avoidance Actions or the proceeds thereof.  The Debtors fail to state, though, that the DIP Superpriority Claim is, upon entry of the Final DIP Order, payable from the proceeds of Prepetition Avoidance Actions.[37]  Despite the fact that the Debtors were required to summarize and call out the location of such a provision pursuant to Bankruptcy Rule 4001(B) and the *Guidelines for Motions Seeking Authority to Use Cash Collateral and Motions Seeking Approval of Postpetition Financing* (per Local Rules 4001-2 and 4001-3), they did not.

26.    Substantively, the DIP Facility proposes to grant liens and superpriority claims in favor of the DIP Lenders not only on any previously unencumbered assets, but also on potential claims against insiders and the Prepetition Secured Parties themselves (and all other commercial tort claims).  In addition, to the extent of any diminution, the Prepetition Secured Parties would be granted adequate protection replacement liens and superpriority claims payable from all of the Debtors' assets, including commercial tort claims.  Monster Energy accordingly objects to any grant of liens or superpriority claims on any commercial tort claims and Prepetition Avoidance Actions, including such claims against insiders and the DIP Lenders/Prepetition Secured Parties.

27.    To the extent that any claims exist against the Debtors' insiders or the Prepetition

---

[36] *DIP Motion* at p. 14.

[37] *Interim DIP Order* at ¶ 7.

67480626;1

Secured Parties themselves, such claims must remain unencumbered and subject in all respects to all parties' challenge rights. Bankruptcy courts across the country routinely exclude unencumbered assets—including commercial tort claims— from the scope of adequate protection liens and superpriority claims.[38]

28.     Given that the DIP Facility primarily benefits the Prepetition Secured Parties, their recoveries should not be further enhanced or protected at the expense of unsecured creditors. No potential claims against insiders or the Prepetition Secured Parties should be made available to the Prepetition Secured Parties/DIP Lenders as collateral or the source of repayment of superpriority claims or adequate protection claims.[39] The Court should not condone this end-run around what could be a meaningful source of recovery for unsecured creditors. At a minimum, the DIP Lenders and the Prepetition Secured Parties should be permitted to turn to the estates' avoidance actions and other claims only if their other collateral is insufficient to satisfy any DIP loans and allowed adequate protection claims (if any).

29.     The DIP Facility should not be a means by which unsecured creditors are stripped

---

[38] *See, e.g., In re Aralez Pharmaceuticals US Inc.*, Case No. 18-12425 (MG), Docket No. 98 at ¶ 15(i)-(ii) (Bankr. S.D.N.Y. Sept. 14, 2018) (providing that adequate protection liens only attach to prepetition collateral and further providing that adequate protection claims cannot be paid out of the proceeds of avoidance actions); *In re The Weinstein Company Holdings LLC*, Case No. 18-10601 (MFW), Docket No. 267 at ¶ 12(d)-(e)(Bankr. D. Del. Apr. 19, 2018) (excluding avoidance actions and commercial tort claims from adequate protection liens and claims); *In re Gymboree Group, Inc.*, Case No. 19-30258 (KLP), Docket No. 348 at ¶¶ 15, 18 (Bankr. E.D. Va. Feb. 15, 2019) (excluding avoidance actions, commercial tort claims, and the proceeds thereof from adequate protection liens and claims); *In re Frank Theatres Bayonne/South Cove, LLC*, Case No. 18-34808 (SLM), Docket No. 212 at ¶ 3(b)-(c) (Bankr. D. N.J. Jan. 28, 2019) (same); *In re Promise Healthcare Group, LLC*, Case No. 18-12491 (CSS), Docket No. 218 at ¶¶ 12, 14 (Bankr. D. Del. Dec. 4, 2018) (excluding avoidance actions and the proceeds thereof and commercial tort claims and the proceeds thereof, in part, from adequate protection liens and claims); *In re SFX Entertainment, Inc.*, Case No. 16-10238 (MFW), Docket No. 203 at ¶ 11(a)(i)-(ii) (Bankr. D. Del. Mar. 8, 2016) (excluding avoidance actions and the proceeds thereof from adequate protection liens and claims).

[39] *See, e.g., In re Aqua Assocs.*, 123 B.R. 192, 195-98 (Bankr. E.D. Pa. 1991) ("[C]redit should not be approved when it is sought for the primary benefit of a party other than the debtor."); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 37 (Bankr. S.D.N.Y. 1990) ("[A] proposed financing will not be approved where it is apparent that the purpose of the financing is to benefit a creditor rather than the estate."); *Tenney Village*, 104 B.R. at 568 (debtor in possession financing terms must not "pervert the reorganizational process from one designed to accommodate all classes of creditors and equity interests to one specially crafted for the benefit of the secured creditor").

of the benefit of potentially valuable estate litigation claims.  Any Final DIP Order therefore should make clear that potential claims against insiders and the Prepetition Secured Parties themselves shall remain unencumbered under all circumstances, and any superpriority claims shall not be payable therefrom.

D.    **The Estates Should Retain Rights Relating to Section 506(c) Surcharge, <u>Section 552(b) "Equities of the Case," and Marshalling</u>**

30.    There should be no waiver of the estate's section 506(c) surcharge claims against the DIP Agent, DIP Lenders, or Prepetition Secured Parties unless and until it is demonstrated that all costs of administering the Debtors' estates have been adequately provided for.  Critically, the Budget fails to include a cent payable to Monster Energy and Orange Bang on account of the 5% Ongoing Royalty, which is due and owing to Monster Energy and Orange Bang under the judgment on the Arbitration Action to compensate Monster Energy and Orange Bang for the Debtors' ongoing use of their intellectual property in the sales of "Bang" drinks.  The elimination of the right to surcharge under section 506(c) of the Bankruptcy Code increases the risk that the costs of the bankruptcy will be borne by unsecured creditors, including administrative claimants, rather than the secured creditors that already are the primary beneficiaries of the process.  This result contravenes the essential purpose of section 506(c).[40]  Indeed, courts have rejected the waiver of surcharge rights under section 506(c) under similar circumstances.[41]

---

[40] *See Precision Steel Shearing v. Fremont Fin. Corp. (In re Visual Indus.)*, 57 F.3d 321, 325 (3d Cir. 1995) ("[Section] 506(c) is designed to prevent a windfall to the secured creditor . . . The rule understandably shifts to the secured party . . . the costs of preserving or disposing of the secured party's collateral, which costs might otherwise be paid from the unencumbered assets of the bankruptcy estate . . .") (citation omitted); *see also In re Codesco, Inc.*, 18 B.R. 225, 230 (Bankr. S.D.N.Y. 1982) ("The underlying rationale for charging a lienholder with the costs and expenses of preserving or disposing of the secured collateral is that the general estate and unsecured creditors should not be required to bear the cost of protecting what is not theirs.").

[41] *See, e.g., In re Colad Group, Inc.*, 324 B.R. 208, 224 (Bankr. W.D.N.Y. 2005) (refusing to approve postpetition financing agreement to the extent that the agreement purported to modify statutory rights and obligations created by the Bankruptcy Code by prohibiting any surcharge of collateral under section 506(c)).

16

31.     The Debtors also propose that the "equities of the case" exception under section 552(b) not apply to the Prepetition Secured Parties with respect to proceeds or profits of any of their prepetition collateral.  The "equities of the case" exception in section 552(b) of the Bankruptcy Code allows a debtor, committee, or other party in interest to exclude postpetition proceeds from prepetition collateral on equitable grounds, including to avoid having unencumbered assets fund the cost of a secured lender's foreclosure.  "The purpose of the equity exception is to prevent a secured creditor from reaping benefits from collateral that has appreciated in value as a result of the trustee's/debtor-in-possession's use of other assets of the estate (which normally would go to general creditors) to cause the appreciated value."[42]  There is no reason to prospectively waive such rights here.[43]

32.     Further, the DIP Lenders and the Prepetition Secured Parties want to restrict this Court's ability to implement equitable marshaling, which may be important in these cases in order to preserve the value of unencumbered assets, like commercial tort claims, for the benefit of unsecured creditors.[44]  As suggested above, at a minimum, the Debtors' assets should be marshaled such that the DIP Lenders and the Prepetition Secured Parties are only permitted to turn to previously unencumbered assets (including commercial tort claims) to the extent that the DIP loans and allowed adequate protection claims (if any) are not otherwise satisfied from the proceeds of

---

[42] *In re Muma Servs.*, 322 B.R. 541, 558-559 (Bankr. D. Del. 2005) (quoting *Delbridge* v. *Prod. Credit Ass'n & Fed. Land Bank*, 104 B.R. 824, 826 (E.D. Mich. 1989)).

[43] *See, e.g., In re Metaldyne Corp.*, No. 09-13412 (MG), 2009 Bankr. LEXIS 1533, at *20 (Bankr. S.D.N.Y. June 23, 2009) ("[T]he Court, in its discretion, declines to waive prospectively an argument that other parties in interest may make.  If, in the event, the Committee or any other party [in] interest argues that the equities of the case exception should apply to curtail a particular lender's rights, the Court will consider it."); *Sprint Nextel Corp. v. U.S. Bank Nat'l Ass'n (In re TerreStar Networks, Inc.)*, 457 B.R. 254, 272-73 (Bankr. S.D.N.Y. 2011) (request for section 552(b) waiver was premature because factual record not fully developed).

[44] *See Official Comm. v. Hudson United Bankr. (In re America's Hobby Center)*, 223 B.R. 275, 287 (Bankr. S.D.N.Y. 1998); *Ramette v. United States (In re Bame)*, 279 B.R. 833 (8th Cir. B.A.P. 2002) (marshaling doctrine invoked against taxing authorities to benefit of estate's unsecured creditors).

the Prepetition Collateral.  Such marshaling relief has been granted in various bankruptcy courts across the country.[45]

E.   **Miscellaneous Objections**

33.   Monster Energy has various additional objections to the DIP Facility:

a.   ***Reporting Rights***.  Monster Energy, as the single largest unsecured creditor, must be concurrently provided with all financial and sale-related reporting delivered by the Debtors to the DIP Lenders, the Prepetition Secured Parties, and the Committee, particularly in light of Monster Energy's (and all litigation claimants') complete disenfranchisement from the Committee.

b.   ***Challenge Provisions***.  The Final DIP Order must be clarified to afford all parties-in-interest the same rights as the Committee with respect to the assertion of (including with respect to standing and tolling) any Challenge.

c.   ***Events of Default***.  Particularly in light of the Debtors' continuing governance issues and domination by Mr. Owoc, the Court's appointment of a chapter 11 trustee or examiner with expanded powers should not be an Event of Default under the DIP Facility.[46]

d.   ***Credit Bidding***.  Any rights of the Prepetition Secured Parties to credit bid must be expressly limited by parties' rights to assert a Challenge.

## RESERVATION OF RIGHTS

34.   Monster Energy expressly reserves all rights, claims, defenses, and remedies,

---

[45] *See, e.g., In re Nine West Holdings, Inc.*, Case No. 18-10947 (SCC), Docket No. 450 at ¶ 10(f) (Bankr. S.D.N.Y. June 28, 2018); *In re Frank Theatres Bayonne/South Cove, LLC*, Case No. 18-34808 (SLM), Docket No. 212 at ¶ 9 (Bankr. D. N.J. Jan. 28, 2019); *In re Westmoreland Coal Co.*, Case No. 18-35672 (DRJ), Docket No. 520 at ¶ 37 (Bankr. S.D. Tex. Nov. 15, 2018); *In re Samuel's Jewelers, Inc.*, Case No. 18-11818 (KJC), Docket No. 252 at ¶ 5 (Bankr. D. Del. Sept. 18, 2018); *In re The Weinstein Company Holdings LLC*, Case No. 18-10601 (MFW), Docket No. 267 at ¶ 11(c) (Bankr. D. Del. Apr. 19, 2018); *In re The Bon-Ton Stores, Inc.*, Case No. 18-10248 (MFW), Docket No. 352 at ¶ 7 (Bankr. D. Del. Mar. 12, 2018).

[46] *See* DIP Credit Agreement, § 8.1(p)(i)(B).

67480626;1

including, without limitation, to supplement and amend this Objection, to raise further and other objections to the DIP Motion and the proposed form of Final DIP Order, and to introduce evidence prior to or at any hearing regarding the DIP Motion in the event that the Committee's objections are not resolved prior to such hearing.

## **CONCLUSION**

35.    For all of the foregoing reasons, Monster Energy respectfully requests that the Court deny final approval to the DIP Facility in the form presented.

Dated:  November 28, 2022

**AKERMAN LLP**

*/s/ Michael I. Goldberg*
Michael I. Goldberg
Florida Bar No. 886602
Eyal Berger
Florida Bar No. 11069
201 East Las Olas Boulevard, Suite 1800
Fort Lauderdale, FL 33301
T: (954) 463-2700 / F: (954) 463-2224
michael.goldberg@akerman.com
eyal.berger@akerman.com

-and-

**PACHULSKI STANG ZIEHL & JONES LLP**
Richard M. Pachulski (*pro hac vice*)
Ira D. Kharasch (*pro hac vice*)
Robert J. Feinstein (*pro hac vice*)
Teddy M. Kapur (*pro hac vice*)
Steven W. Golden (*pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067-4003
T: (310) 277-6910 / F: (310) 201-0760
rpachulski@pszjlaw.com
ikharasch@pszjlaw.com
rfeinstein@pszjlaw.com
tkapur@pszjlaw.com
sgolden@pszjlaw.com

*Counsel to Monster Energy Company*

67480626;1

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the forgoing was served via CM/ECF

Notice of Electronic Filings to all parties registered to receive electronic noticing in this case on

November 28, 2022.

_/s/ *Michael I. Goldberg*_____

20