UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION
www.flsb.uscourts.gov

| | |
|---|---|
| IN RE: | Chapter 11 |
| VITAL PHARMACEUTICALS, INC., *et al.*, | Case No. 22-17842 (PDR) |
| Debtors.[1] | (Jointly Administered) |

**OFFICIAL COMMITTEE OF UNSECURED CREDITORS' OBJECTION TO DEBTORS' EMERGENCY MOTION FOR INTERIM AND FINAL ORDERS (I) APPROVING POSTPETITION FINANCING, (II) AUTHORIZING USE OF CASH COLLATERAL, (III) GRANTING LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (IV) GRANTING ADEQUATE PROTECTION, (V) MODIFYING AUTOMATIC STAY, (VI) SCHEDULING A FINAL HEARING, AND (VII) GRANTING RELATED RELIEF**

The Official Committee of Unsecured Creditors ("the Committee"), by and through its undersigned proposed counsel, hereby files this objection (the "Objection") to the *Debtors' Emergency Motion for Interim and Final Orders (I) Approving Postpetition Financing, (II) Authorizing Use of Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, (VI) Scheduling A Final Hearing, and (VII) Granting Related Relief* [Docket No. 24] (the "DIP Motion").[2]  In support of this Objection, the Committee respectfully states as follows:

---

[1]  The address of the Debtors is 1600 N. Park Drive, Weston, FL 33326. The last four digits of the Debtors' federal tax identification numbers are: (i) Vital Pharmaceuticals, Inc. (8430); (ii) Bang Energy Canada. Inc. (5454); (iii) JHO Intellectual Property Holdings, EEC (0010); (iv) JHO Real Estate Investment, EEC (9394); (v) Quash Seltzer, EEC (6501); (vi) Rainbow Unicom Bev EEC (2254); and (vii) Vital Pharmaceuticals International Sales, Inc. (8019).

[2]  Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the DIP Motion or the Interim DIP Order (as defined herein), as applicable.

## PRELIMINARY STATEMENT

1.    There are numerous problems with the proposed DIP Facility, but chief among them is that it is designed to exert pressure on the Debtors to satisfy the demands of the prepetition secured lenders (the "DIP Lenders").  Indeed, the DIP Lenders' concerns about ensuring their repayment has precipitated a DIP Facility that imposes burdens at the direct expense of the Debtors' estates and their creditor constituencies.   By requiring an above-market Roll-Up, abbreviated milestones, excessive adequate protection, and waivers of necessary protections for creditors, the DIP Lenders use the DIP Facility as leverage to get paid and to get out of the Prepetition Credit Agreement as soon as possible.  While the Committee appreciates that the DIP Lenders have doubts about the Debtors' timely repayment of this postpetition financing, as well as cash they characterize as a "pre-DIP,"[3]  the Committee cannot consent to a DIP Facility that is prejudicial to unsecured creditors and weakens the likelihood of the Company's successful sale or reorganization.

2.    Specifically, by the DIP Motion, the Debtors seek authority to borrow from the DIP Lenders up to $454,770,201.56.  While, at first glance, the overall size of this DIP Facility would appear on par with those in similar bankruptcy cases, simple arithmetic belies its true nature: the proposed DIP Facility provides only $100 million in new money and reconstitutes approximately $355 million of prepetition debt as a roll-up (the "Roll-Up").  This means that the needed infusion of cash comprises less than 22% of the DIP Facility and that the ratio of Roll-Up to new money is approximately *3.5 to 1*.  As discussed herein, this 3.5:1 Roll-Up exceeds market norms and affords the DIP Lenders the benefit of bankruptcy protections that they would not ordinarily deserve.

---

[3] *See* DIP Motion ¶ 35.

3.    Moreover, the Roll-Up works in concert with the aggressive Milestones to generate cash for the DIP Lenders and to elevate their financial interests over other creditor constituencies. The DIP Motion proposes Milestones that are imposed at a breakneck pace and do not provide the breathing room necessary to conduct a thorough, let alone robust, marketing process.  For example, the Milestones provide that by January 23, 2023, the Debtors must either (i) provide a third-party investor commitment to consummate the transaction for the payment in full in cash of the DIP and prepetition obligations or (ii) file a bid procedures motion for the sale of substantially all the Debtors' assets. Currently, the Debtors' best projection of the completion of their business plan is December 2, 2022, with distribution to third parties on December 5, 2022.  Surely, 49 days is not nearly enough time to have interested parties complete diligence and obtain committed proposals for a refinancing or sale of the Debtors' business, and, at the same time, the delay of not filing bidding procedures until January 23, 2023, seems equally shortsighted.

4.    In addition, as the DIP Facility requires the Debtors to quickly satisfy the DIP Lenders in cash in full, the Debtors forfeit the optionality to reinstate the prepetition debt under a proposed plan of their choosing during their period of exclusivity.  While these Milestones are clearly scheduled to provide a quick turnaround of the DIP Lenders' money, they deprive the Company's vendors, creditors, business counterparties – and the Debtors themselves – the necessary time to ensure a value maximizing outcome.  Accordingly, these Milestones must be extended.

5.    The DIP Motion also includes excessive adequate protection payments, waives all surcharge rights under Sections 506(c) and 552(b) as well as marshaling, and proposes restrictive provisions that erode what little control the creditors constituencies retain over the Chapter 11 Cases.  Reviewing these provisions in light of the Roll-Up, it is apparent that very little benefit is

being delivered to the Debtors' estates in exchange for millions of dollars in fees and the granting of senior liens to the DIP Lenders.

6.    Finally, although the DIP Lenders required the Company's founder and sole shareholder, John Owoc, to appoint independent directors to the Board as a pre-condition to funding, Mr. Owoc has flanked himself with directors who are closely affiliated with the Company and with Mr. Owoc personally, raising serious concerns with respect to their ability to make decisions with the best interest of the Company and its creditors in mind. To date, the directors have yet to wrestle control away from Mr. Owoc, only solidifying the DIP Lenders' resolve to enforce the DIP Facility's aggressive and punitive terms.

7.    Despite these issues, the Committee believes that pragmatic solutions are available: First, the Committee has sought to work cooperatively with the DIP Lenders to reach resolutions on certain of the objectionable terms of the DIP Facility.   Despite engaging in productive negotiations, the DIP Lenders have failed to agree on the modifications necessary to provide the Committee with comfort that the DIP Facility would not jeopardize the success of the Chapter 11 Cases.

8.    Second, from the onset of the Committee's appointment, the Committee has urged the Debtors to appoint new independent directors to the Board, who will act with the Company's and its creditors' best interests in mind.  As discussed in more detail below, the Committee proposed alternate governance in its demand letter dated November 10, 2022 (the "November 10th Demand Letter")**,[4]** and the Committee's professionals have also provided the Debtors with a list of qualified and independent candidates fit for the role.  To date, the Debtors have refused to accept the Committee's suggestions.

---

[4] The November 10th Demand Letter is attached hereto as **Exhibit A**.

9.      Accordingly, while the Debtors' decisions are at the behest of a biased Board and for the sole benefit of their DIP Lenders, and for the reasons set forth above and in further detail below, the DIP Motion should not be approved as proposed on a final basis, absent modifications consistent with the objections raised herein.

## BACKGROUND

**A.    Procedural History**

10.      On October 10, 2022 (the "Petition Date"), the Debtors each filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Florida (the "Court") commencing these cases (the "Chapter 11 Cases").  No trustee or examiner has been appointed in the Chapter 11 Cases.

11.      Pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, the Debtors continue to manage their properties and operate their businesses as debtors in possession.

12.      On November 1, 2022, the Office of the United States Trustee (the "U.S. Trustee") appointed the Committee pursuant to section 1102(a)(1) of the Bankruptcy Code. [Docket No. 245]. The Committee was originally comprised of seven members: (i) Stellar Group, Inc..; (ii) Archer Daniels Midland Co.; (iii) Trinity Logistics, Inc.; (iv) Ardagh Metal Packaging USA Corp.; (v) Crown Cork & Seal USA, Inc.; (vi) Quik Trip Corporation; and (vii) XPO Logistics, L.L.C. (a.k.a. RXO Inc.).  On November 2, 2022, the Committee selected Lowenstein Sandler to serve as its lead counsel. On November 4, 2022, the Committee selected Sequor Law, P.A. as its local counsel.

13.      On November 23, 2022, the U.S. Trustee appointed four additional members to the Committee pursuant to section 1102(a)(1) of the Bankruptcy Code. [Docket No. 400]: (i)

Warner Music Group Corp.; (ii) PepsiCo., Inc.; (iii) The American Bottling Co., Inc. [5]; and (iv) Peter Fischer, c/o Daniel F. Harvath, putative class action plaintiff.

14.    Information regarding the Debtors' history, business operations, capital structure, secured indebtedness, and the events leading up to the commencement of the Chapter 11 Cases can be found in the *Declaration of John C. DiDonato in Support of Chapter 11 Petitions and First Day Pleadings* (the "DiDonato Declaration") [Docket No. 26].

**B.    The Debtors' Prepetition Indebtedness**

15.    On August 14, 2020, Debtor Vital Pharmaceuticals, as borrower, and certain subsidiaries and affiliates of Vital Pharmaceuticals (collectively, with Vital Pharmaceuticals, the "Prepetition Loan Parties"), as guarantors, with the Prepetition Secured Lenders, and Truist Bank, as administrative agent (the "Prepetition Agent"), swingline lender (in such capacity, the "Prepetition Swingline Lender"), and issuing bank (in such capacity, the "Prepetition Issuing Bank" and, together with the Prepetition Secured Lenders, the Prepetition Agent and the Prepetition Swingline Lender, the "Prepetition Secured Parties" or "DIP Lenders"), entered into the *Amended and Restated Revolving Credit and Term Loan Agreement* (as amended, the "Prepetition Credit Agreement"). The Prepetition Credit Agreement provides two separate credit facilities, each maturing on August 14, 2025: (a) a revolving credit facility (the "Prepetition Revolving Credit Facility") and (b) a term loan A (the "Prepetition Term Loan" and, together with the Prepetition Revolving Credit Facility and all other obligations arising under the Prepetition Credit Agreement, the "Prepetition Loans").

---

[5] As stated in a letter attached as Exhibit G to the *Motion of Monster Energy Company, The American Bottling Company, Inc., Sony Music Entertainment, UMG Recordings, Inc., and Orange Bang, Inc. For an Order Pursuant to 11 U.S.C. § 1102(a)(2) Directing the Appointment of an Official Committee of Creditors Holding Non-Trade Claims* [Docket No. 408], The American Bottling Co., Inc. has apparently resigned from the Committee.

16.    As of the Petition Date, the DIP Lenders are owed on account of the Prepetition Loans (i) $240,000,000.00 in revolving loan principal obligations, (ii) $104,190,218.45 in term loan principal obligations, (iii) $6,349,912.27 in respect of unpaid interest accrued through October 9, 2022, (iv) $4,188,187.51 in respect of unpaid forbearance fees accrued through October 9, 2022, and (v) $41,883.33 in respect of unpaid commitment fees accrued through October 9, 2022, for a total aggregate amount of $354,770,201.56 (collectively, including all "Obligations" as defined in the Prepetition Credit Agreement, the "Prepetition Obligations").

17.    In connection with the Prepetition Credit Agreement, the parties executed the *Amended and Restated Security and Pledge Agreement*, dated August 14, 2020 (the "Prepetition Security Agreement"). Under the Prepetition Security Agreement, the Prepetition Loans are secured by first-priority liens on the Collateral (as defined therein, the "Prepetition Collateral").

18.    The Debtors have no funded unsecured debt. In the ordinary course, the Debtors incur trade debt with certain vendors and suppliers in connection with the operation of their business. In addition, the Debtors have other potential and contingent liabilities related to, among other things, ongoing litigation, certain of which is described in the DiDonato Declaration.

## C.    The Proposed DIP Financing

19.    Pursuant to the DIP Motion, the Debtors now seek final approval of debtor in possession financing ("DIP Financing") pursuant to the Prepetition Credit Agreement, consisting of a $455 million DIP facility from its DIP Lenders (the "DIP Facility"), of which $100 million is new-money and $354,770,201.56 is the Roll-Up.  The Roll-Up consists of: (i) a prepetition advance of approximately $60 million and (ii) a "creeping" roll-up where the Debtors propose to pay down the Prepetition Obligations with postpetition collections and draw on the DIP facility

for liquidity.  The Roll-Up translates to a prepetition debt to new money ratio of approximately 3.5:1.

20.    On October 13, 2022, the Bankruptcy Court entered the *Interim Order (I) Approving Postpetition Financing, (II) Authorizing Use of Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* (the "Interim DIP Order") [Docket No. 120]. The Interim DIP Order authorized the Debtors to obtain from the DIP Lenders, during the interim period pending the entry of a final order, up to $34,000,000 in accordance with the Prepetition Credit Agreement. *See* Interim DIP Order ¶3.

21.    Upon entry of a final order authorizing the DIP Motion, in addition to the Roll-Up, the Debtors seek the Court's authorization to enforce the below objectionable provisions, among other things:

- DIP Superpriority Claim: Grant the DIP Agent and the DIP Lenders allowed super-priority administrative expense claim pursuant to section 364(c)(1) of the Bankruptcy Code having priority over any and all expenses and claims and automatically perfected security interests in and liens on all of the DIP Collateral. *See* Interim DIP Order ¶¶ 5-7.

- Transaction Milestones:   The DIP Motion imposes the following Transaction Milestones to govern the dual-process approach to obtain exit financing and/or a sale:
  - **January 23, 2023**: Debtors either:
    - (i) provide a third-party investor commitment to consummate a refinancing transaction for the payment in full in cash of the DIP and prepetition obligations, or
    - (ii) file a bid procedures motion for the sale of substantially all of the debtors' assets;
      - **Within 30 days after filing a bid procedures motion, if pursued**: Order approving the bid procedures motion;
      - **75 days from filing of bid procedures motion**: Auction; and

- **14 days prior to the outside DIP maturity date**: Consummation of a sale if a bid procedures motion is filed. *See* Interim DIP Order, ¶ 46.

- Adequate Protection Payments: In addition, the DIP budget requires certain adequate protection payments. Although the current applicable margin for purposes of adequate protection is 8.50%, such rate increases by 50 bps per month.  *See* Interim DIP Order, ¶¶ 11-15; *see also* DIP Credit Agreement, §2.14 (*emphasis added*).

- Challenge Deadline and Standing: The Challenge Period for the Committee to bring a claim against the DIP Lenders terminates the earlier of (a) 60 days from the formation of the Committee and (b) 90 days from the entry of the Interim Order, and, in the case of bringing a claim against any other party-in-interest (other than the Debtors), the Committee's Challenge period terminates 75 days from entry of the Interim Order. The Committee does not have automatic standing, but the Challenge Period shall toll for 45 days from the filing of a Motion for Standing. *See* Interim DIP Order ¶ 40.

- Investigation Budget: The Interim DIP Order provides that up to $50,000 in the aggregate of the Carve-Out, any DIP Collateral, any Prepetition Collateral, any Cash Collateral and proceeds of the DIP Facility (the "Investigation Budget") may be used by the Committee to investigate (but not to draft, file or prosecute claims or challenges relating to) the claims and/or liens of the Prepetition Secured Parties under the Prepetition Credit Documents (but not the claims and/or liens of the DIP Agent and DIP Lenders) and the Debtors' Stipulations, as they are defined in the DIP Motion, so long as such investigation occurs within the Challenge Period. *See* Interim DIP Order ¶ 40.

- The Waiver Sections 506(c) and 552(b) of the Bankruptcy Code and the Equitable Doctrine of Marshaling: The Debtors request authority to waive rights to surcharge collateral pursuant to section 506(c) of the Bankruptcy Code and the application of "equities of the case" exception under section 552(b) of the Bankruptcy Code as to the Prepetition Secured Parties with respect to proceeds, product, offspring or profits of the Prepetition Collateral. *See* Interim DIP Order ¶¶ 43, 47-48.

## D.    Corporate Governance Changes

22.    Historically, John Owoc (the founder and sole shareholder of the Company) had served as the sole director or member, as well as the Chief Executive Officer or managing member, as applicable, of the each of the Debtor entities. *See* DiDonato Decl. ¶ 23. Under the DIP Credit Agreement, the DIP Lenders required, as a condition precedent to funding the loans

thereunder, (i) Mr. Owoc's expansion of the boards of directors or other equivalent governing body (collectively, the "Board") of each of the Debtor entities to include five directors (at least three of whom do not have a relationship by blood, marriage, or adoption to Mr. Owoc, and are not employees, consultants, etc.), and (ii) the inclusion on the Board of a one-person restructuring committee with authority to, *at a minimum*, make recommendations to the Board regarding all aspects of the Chapter 11 Case. *See* DIP Credit Agreement §3.1(b)(iii) (emphasis added).[6]

23.    Neglecting to mention that a governance overhaul was in fact, a precondition to funding of the proposed DIP Facility that was specifically implemented by the DIP Lenders, the DiDonato Declaration touts that Mr. Owoc "authorized a number of changes to the Debtors' governance structure" in the months leading up to the Chapter 11 Cases "in order to facilitate a value-maximizing restructuring process." *See DiDonato Decl.* ¶ 23.  The DiDonato Declaration goes on to state that Mr. Owoc intended to expand the Board by adding Kathleen Cole (the Company's Chief Operating Officer) and constitute a restructuring committee (the "Restructuring Committee") comprised solely of Mr. Panagos (the Board's third member) to be charged with "overseeing the restructuring process." *See DiDonato Decl.* ¶ 23. Predictably, however, such

---

[6] Requiring as a condition precedent to funding, receipt by the Administrative Agent of: "evidence reasonably satisfactory to the Administrative Agent that, as of the Effective Date, the board of directors or other equivalent governing body of the Borrower and each other Loan Party

(A) is composed of five (5) individuals at least three (3) of whom

> (I) do not have a relationship by blood (to the second (2nd) degree of consanguinity), marriage or adoption to John Henry Owoc,
>
> (II) are not employees, officers, managers or consultants of, or independent contractors or advisors to, any Loan Party (other than in respect of service on such board or other equivalent governing body) and
>
> (III) are otherwise reasonably acceptable to the Required Lenders, and

(B) includes the Restructuring Committee composed solely of one (1) individual reasonably acceptable to the Required Lenders, it being understood that Steven G. Panagos is reasonably acceptable to the Required Lenders, with authority to, at a minimum, make recommendations to the board of directors or other equivalent governing body of the Borrower or such other Loan Party, as applicable, regarding all aspects of the Chapter 11 Case, including without limitation the undertaking by any Debtor of any action necessary to satisfy any requirement of Section 5.18."

oversight is limited to the Restructuring Committee's ability to merely **make recommendations** to the full board with respect to the restructuring process and the Chapter 11 Cases. *See DiDonato Decl.* ¶ 23.

24.    The Committee has serious concerns with two of the Debtors' Board members.  In particular, the DiDonato Declaration noted Mr. Owoc's intention to appoint Dr. Guillermo Escalante and Eric Hillman (together, the "Directors") to the Board, characterizing the Directors as "unaffiliated with the Company." *See* DiDonato Decl. ¶ 23.  While the Committee's investigation remains ongoing since its appointment on November 1, 2022, its preliminary findings with respect to the Directors' lack of disinterestedness are concerning.  Specifically, the Committee's investigation, to date, has revealed that the Directors are, in fact, closely affiliated with the Company and with Mr. Owoc personally.  *See generally, Declaration of Brent C. Williams in Support of Committee's Objection to the Debtors' DIP Financing Motion* (the "Williams Declaration").[7]

25.    Dr. Guillermo Escalante.  As set forth more fully in the Williams Declaration, the Company has a history of paying Dr. Escalante personally for various services.  In connection with the trial and arbitration involving Orange Bang, Inc. ("OBI") and Monster Energy Company ("Monster"), which resulted in, *inter alia*, a $175 million disgorgement award in favor of Monster and OBI (*see* DiDonato Decl. at ¶ 34), the arbitrator noted that the Company paid Dr. Escalante to act as "its most important expert" on the question of whether the product at issue was "creatine-based"—a claim that was adjudicated during the litigations to be specious. *See* Williams Decl. at ¶ 18. Indeed, in those litigations, both OBI and Monster raised similar concerns about Dr. Escalante's ability to act as an unbiased and untainted "expert."  Specifically, OBI and Monster

---

[7] The Williams Declaration is attached hereto as **Exhibit B**.

raised issues of bias because Dr. Escalante had rendered services to the Company as an influencer and promoter of the Company's products.  *See* Williams Decl. at ¶ 18.   He also testified that he previously served as an "expert" on creatine on behalf of the Company in another matter. *See* Williams Decl. at ¶ 18.   In addition, Dr. Escalante has posted on multiple occasions on social media extolling the Company, including making claims found by the arbitrator or court to be false. *See* Williams Decl. at ¶ 18.

26.    In addition to his work testifying for and promoting the Company, Dr. Escalante is also, evidently, ***a paid consultant to the Company***. *See* Williams Decl. at ¶ 19. In August 2020, Dr. Escalante, with various other authors, published an article on the effects of certain of the Company's products. *See* Williams Decl. at ¶ 19.   The article expressly admits that Dr. Escalante is a paid consultant and has served as a "scientific consultant" for the Company.  *See* Williams Decl. at ¶ 19.   Mr. Owoc is well-aware of this; he has posted to his Instagram account about Dr. Escalante and a "study" he purportedly performed on the Company's products.  *See* Williams Decl. at ¶ 19.   Indeed, at the recent trial on September 20, 2022, Dr. Escalante himself testified that he had worked as a consultant for the Company on "an on-and-off basis" for three years. *See* Williams Decl. at ¶ 19.

27.    <u>Eric Hillman</u>. Mr. Hillman served as Chief Executive Officer of Europa Sports Partners, LLC ("<u>Europa</u>").  It is undisputed that Europa has acted—and may still be acting as—a major distributor of the Company's BANG energy drinks. *See* Williams Decl. at ¶ 20. Although it is unclear from publicly available information whether Mr. Hillman is still employed at Europa (*See* Williams Decl. at ¶ 20), the fact that the Company previously employed and paid a company under Mr. Hillman's leadership calls into question Mr. Hillman's ability to make independent and unbiased decisions for the Company.

28.    Perhaps more concerning, Mr. Hillman also has a personal relationship with Mr. Owoc.  During a trial in 2020 involving the Company, Monster, and Reign Beverage Company, LLC, Mr. Owoc testified that Mr. Hillman is "a buddy of [his who] owns Europa Sports, which is the biggest sports nutrition distributor in the world.  We've done probably hundreds of millions of dollars with them." *See* Williams Decl. at ¶ 20.  Mr. Owoc also listed Mr. Hillman as a personal reference on his application for the Company's liquor license in Georgia in August 2021. *See* Williams Decl. at ¶ 20.  And, like Dr. Escalante, Mr. Hillman has promoted the Company on social media on multiple occasions, repeating claims found to be false during the litigations, and engaging in public conversations on social media with Mr. Owoc in support of the Company, during one of which Mr. Owoc discusses going to Mr. Hillman's home. *See* Williams Decl. at ¶ 20.

29.    Against this backdrop, proposed counsel to the Committee sent the November 10th Demand Letter setting forth the factual support provided above and requesting (i) the appointment of two different and ***independent*** board members, and (ii) for those individuals to constitute the three-member Restructuring Committee (along with Mr. Panagos) with binding authority with respect to the restructuring process and the Chapter 11 Cases.  On November 14, 2022, counsel to the Debtors responded to the November 10th Demand Letter indicating, among other things, the Committee's requests were unfounded, that the letter did not raise concerns "about any particular action taken by the Board or Dr. Escalante or Mr. Hillman specifically[,]" and that the DiDonato Declaration's characterization of the Directors as "unaffiliated" was not improper because neither "Dr. Escalante nor Mr. Hillman meets any of the criteria to be considered an affiliate under the Bankruptcy Code. *See* 11 U.S.C § 101(2)."[8]

---

[8] The November 14th Response is attached hereto as **Exhibit C**.

30.    Notwithstanding the Committee's request in its November 10th Demand Letter for, *inter alia*, (i) copies of Dr. Escalante's and Mr. Hillman's *curriculum vitae*, (ii) documents illustrating the due diligence that was performed on the Directors prior to their respective appointments, (iii) documents sufficient to identify all payments to Dr. Escalante and to Mr. Hillman within the last five years—to date, the Committee has only received copies of Dr. Escalante's and Mr. Hillman's *curriculum vitae* from the Debtors and a list of unidentified payments to Dr. Escalante (nearly two weeks after the initial request).

31.    On November 22, 2022, proposed counsel to the Committee separately sent an additional letter to counsel for the Debtors proposing alternative directors fit to serve as members of the Debtors' Board, which was likewise declined.

## <u>ARGUMENT</u>

**A.    The DIP Motion Should Not Be Approved on a Final Basis Because the Roll-Up is Not Fair or Reasonable.**

32.    Roll-up provisions are generally a disfavored form of postpetition financing because they improve the priority of a prepetition creditor without providing any additional postpetition value to the debtor's estate. Effectively, a roll-up cross-collateralizes a portion of a lender's prepetition debt with postpetition collateral, and grants that debt super-priority administrative expense status. That cross-collateralization and grant of a super-priority administrative claim for prepetition debt improperly circumvents the Bankruptcy Code's priorities and distribution framework.  *See, e.g., In re Saybrook Mfg. Co., Inc.*, 963 F.2d 1490, 1494-96 (11th Cir. 1992) (noting that postpetition cross-collateralization is an "extremely controversial form of Chapter 11 financing" before holding it was not authorized by section 364 of the Bankruptcy Code); *In re Bruin E&P Partners, LLC*, Tr. of Hr'g at 67:9-10, Case No. 20-33605 (Bankr. S.D. Tex Jul. 17, 2020) (finding that roll-ups are "heavily disfavored under the Bankruptcy Code"); *see also*

*Reynolds v. Servisfirst Bank* (*In re Stanford*), 17 F.4th 116, 128 (11th Cir. 2021) (Jordan, J., concurring); *Tenney Vill.*, 104 B.R. at 570 (holding that Bankruptcy Code section 364 does not authorize the granting of administrative expense priority for prepetition debt).

33.    Here, the Roll-Up is being used by the DIP Lenders to improve their position relative to the Debtors' other creditor constituencies and to cure any deficiencies in their Prepetition Loans, including the underlying Prepetition Collateral. If the Roll-Up is ultimately approved, the Roll-Up component will be treated as a post-petition claim in these cases (on which the Debtors must then make current payments of interest) and will seriously impact the Debtors' optionality to propose a plan of their choosing during their period of exclusivity. Indeed, as the Roll-Up requires the Debtors to pay the DIP Lenders' claims in full, the Debtors will necessarily forfeit the ability to treat the DIP Facility as prepetition secured debt and cannot subject the DIP Lenders to a "cram up" under a proposed plan.

34.    The proposed Roll-Up is even more egregious because the size of the Roll-Up relative to the new money component of the DIP Facility far exceeds other similarly sized DIP facilities in other recent Chapter 11 cases. *See Declaration of John D'Amico in Support of the Committee's Objection to the DIP Motion* (the "D'Amico Declaration") at ¶ 24.[9]  Indeed, in chapter 11 cases where roll-ups *are* approved, it is usually because a substantial infusion of new cash is being provided.  In comparable chapter 11 cases, for example, the mean and median roll-up factors were approximately 1.9x and 1.8x the new money components, reflecting prepetition loans-to-new-money ratios of approximately 1.9:1 and 1.8:1. *See id.* at ¶ 21.  Here, the new money to Prepetition Loans ratio is approximately 3.5:1.  In other words, the roll-up factor of the Roll-Up is **approximately 82% higher than the mean and approximately 103% higher than the**

___

[9] A copy of the D'Amico Declaration is attached hereto as **Exhibit D.**

**median of similarly sized recent DIP facilities**.  *Id.* at ¶ 22.  The Committee expects the Debtors

to argue that the proposed Roll-Up is within the range of roll-ups approved in other similarly sized

chapter 11 cases.  However, it is clear that the Roll-Up is well above market and very few roll-ups

at this extreme end of the range are approved.  *See id.* at ¶¶ 18-24.

35.     In addition, although the DIP Lenders and Debtors describe the Roll-Up as

"creeping," meaning the ratio of Prepetition Loans to new money is not so imbalanced from the

start, the DIP Financing *will* eventually roll up $354,770,201.56 worth of Prepetition Obligations

into postpetition DIP Obligations for a comparably small amount of new money. At such point in

the Chapter 11 Cases, the DIP Financing will consist of only 22% new money and 78% Roll-Up,

with no material benefit to the Debtors' estates and creditors.

36.     To date, the Debtors have yet to explain how a roll-up of this size is reasonable, fair,

or benefits the Debtors' estates or its creditors.   In fact, the support for the Roll-Up in the

*Declaration of Homer Parkhill in Support of DIP Financing* (the "Parkhill Declaration") [Docket

No. 25] emphasizes how the Roll-Up benefits the Debtors only relative to their situation with the

DIP Lenders: "The Roll Up . . .  provides an economic benefit to the Debtors because it results in

repayment of the prepetition debt on more favorable terms than previously available."  *See*

Parkhill Declaration at ¶ 26.   Again, the Debtors' financial desperation is not sufficient

justification to approve an unfair DIP Facility.  *See In re LandSource Communities Development,*

*LLC*, Case No. 08-11111 (KJC) (Bankr. D. Del. July 14, 2008), Hr'g Tr. 206:12-16 ("The

standard here is not that there's only one option available to the Debtor, and therefore the Court

has to approve it.   In my view such an arrangement has to be fair and reasonable under the

circumstances.  And I don't think this proposed D-I-P financing is."). No matter what incremental

economic benefits might be found in the proposed DIP Financing, such benefits are outweighed by the Debtors' loss of fundamental rights under the Bankruptcy Code.

37.    Based on the foregoing, it is readily apparent that this Roll-Up is not fair or reasonable. There is no justification to approve a Roll-Up of this magnitude that serves only the DIP Lenders' needs and is unduly prejudicial to the rights of unsecured creditors.  Therefore, in their current form, the DIP Facilities should not be approved on a final basis.

**B.    The Transaction Milestones Must Be Extended to Ensure a Robust Sale Process.**

38.    The Committee is also concerned about the aggressive Transaction Milestones (or "Milestones") proposed by the DIP Motion.   At this juncture in the Chapter 11 Cases, the information the Debtors have provided to third parties in the marketing process has been largely limited to historical information. *See* D'Amico Declaration at ¶ 26.  The Debtors are 49 days out from the Petition Date and only 56 days away from the January 23, 2022 Milestone—***and they have yet to formulate and circulate the Company's business plan***.   Although the Debtors' advisors previously estimated that the business plan would be finalized no later than November 2022, the Committee understands that the Debtors are targeting finalizing the business plan on December 2, 2022 and distributing the business plan to third parties on December 5, 2022.  *See id.* at ¶ 27.  However, it is unclear whether the Debtors will be able to meet these dates, and further delays will result in third parties having even less time to perform diligence and evaluate a transaction.  Moreover, a significant number of third parties have only recently been included in (or have yet to be added to) the Debtors' marketing process.  *See id.* at ¶ 29.  Following the Committee's appointment in early November, and its initial review of the Debtors' marketing process, the Committee's professionals quickly identified more than 40 additional potential targets that should have been included in the Company's marketing outreach and whom the

Debtors' investment banker has only recently contacted. *See id*. The Committee understands that the Debtors have identified a number of third parties that, as of November 22, 2022, the Debtors' investment banker had yet to contact. *See id*. Indeed, it seems that the Debtors cannot keep up with the pace required by the DIP Lenders' imposed Milestones. Given these circumstances, it is distressing that the Debtors still seek such a compressed process timeline.

39.    The Debtors currently anticipate releasing the business plan to potential buyers and investors during the first week of December, specifically, on December 5, 2022. *See id*. at ¶ 27. Although the Debtors would like to represent that they have been, and intend to continue, running a parallel process between now and the January 23rd Milestone, there is no question that their "process" falls woefully short of market expectations. Without a business plan, it is impossible for interested parties to meaningfully diligence the Company, and without a fulsome process, the potential for prejudice to unsecured creditors is high. Put simply, the Debtors are not building in sufficient time to solicit letters of interest from potential bidders and/or investors by the impending Milestone. Indeed, the Committee understands that the Debtors have not formally communicated any interim deadline with respect to the submission of any indications of interest from third parties in advance of the January 23rd Milestone. *See id*. at ¶ 30. Importantly, a meaningful portion of the remaining marketing process anticipated under the January 23rd Milestone will overlap with the calendar year end, including the holiday season. This timing will likely negatively impact the activity level and amount of diligence performed by third parties. *See id*. at ¶ 28. Even if the Debtors were prepared to circulate their business plan on the day they currently anticipate having it available for distribution, that would leave a mere 49 days for parties to review the diligence information (assuming they have already negotiated and executed a non-disclosure agreement), perform diligence on the Debtors, and negotiate and finalize transaction

documents to comply with the January 23rd Milestone.  *See id.*  It is obvious that this push for tight Milestones is driven by the DIP Lenders, who fear that extended deadlines will necessitate yet another infusion of cash; however, this breakneck pace is unsupportable.  The Debtors are ill prepared to conduct the robust marketing process necessary to maximize the value of the estates for unsecured creditors, and do not have enough runway over the upcoming weeks to obtain commitments for exit financing and/or to file a bid procedures motion with qualified bidders at the ready.

40.    In order to allow the Debtors time to develop a business plan and engage productively with potential investors and bidders, the January 23rd Milestone needs to be extended by one month ***at an absolute minimum***.  This timeline will provide the Debtors the breathing room to evaluate each path and begin next steps towards executing a successful sale or exit financing plan. For the Court's consideration, the Committee suggests something akin to the following proposed schedule:

- **January 23, 2023**: Deadline for Debtors to market the business plan;
- **March 13, 2023:** Deadline for Debtors to either

    (i) obtain a refinancing commitment OR

    (ii) file a bidding procedures motion and

        (a) designate a "stalking horse",

        (b) establish bidding procedures and

        (c) set a date for an auction;

- **Within 30 days after filing a bid procedures motion, if pursued**: Order approving the bid procedures motion;
- **75 days from filing of bid procedures motion**: Auction date; and
- **14 days prior to the outside DIP maturity date**: Consummation of a sale if a bid procedures motion is filed.

**C**.    **The DIP Motion Cannot Be Approved Because the Directors are Not Impartial Members of the Debtors' Board, as is a Condition of the DIP Lenders under the Prepetition Credit Agreement.**

41.    Although the DIP Lenders did have the foresight to draw the line at Mr. Owoc's blood relatives and the Company's employees/consultants as eligible Board members, their diligence does not align with the applicable standards for director independence. As noted above, while the Committee's investigation remains ongoing, its preliminary findings with respect to the Directors' lack of disinterestedness are concerning, to say the least.

42.    Here, the Debtor entities are all incorporated or formed under Delaware or Florida law. Under Delaware law,[10] there is a general presumption that directors are independent. *In re MFW S'holders Litig.,* 67 A.3d 496, 509 (Del. Ch. 2013), *aff'd sub nom. Kahn v. M & F Worldwide* Corp., 88 A.3d 635 (Del. 2014). When a director's independence is challenged, Delaware courts employ a flexible, fact-based analysis that centers on whether the "director is, for any substantial reason, incapable of making a decision with only the best interest of the corporation in mind." *In re Oracle Corp. Deriv. Litig.*, 824 A.2d 917, 920 (Del. Ch. 2003). Because Delaware has adopted a context-specific standard to determine director independence, where appropriate, courts will consider NASDAQ's bright-line criteria for independence. *See Sandys v. Pincus*, 152 A.3d 124, 131 (Del. 2016) ("[T]he criteria NASDAQ has articulated as bearing on independence [is] relevant under Delaware law and likely influenced by our law."); *see also* NASDAQ Marketplace Rule 5605(a)(2) (asserting that a director is not independent if he has a "relationship which, in the opinion of the Company's board of directors, would interfere with the exercise of independent judgment in carrying out the responsibilities of a director.").

---

[10] *See Boettcher v. IMC Mortg. Co.*, 871 So. 2d 1047, 1052 n. 5 (Fla. Dist. Ct. App. 2d 2004) ("We may also look to the law of Delaware for guidance because '[t]he Florida courts have relied upon Delaware corporate law to establish their own corporate doctrines.'") (*quoting Connolly v. Agostino's Ristorante, Inc.*, 775 So. 2d 387, 388 n. 1 (Fla. Dist. Ct. App. 2d 2000)).

43.   A director lacks independence if he is "beholden" to the controlling party "or so under [the controller's] influence that [the director's] discretion would be sterilized." *In re MFW S'holders Litig.*, 67 A.3d at 509 (citing *Rales v. Blasband*, 634 A.2d 927, 936 (Del. 1993)).  What constitutes a material relationship or one that would interfere with the exercise of independent judgment is a fact-based question.  *See id.* at 509 (citing *Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1156, 1167 (Del.1995) (maintaining that a court must conclude the director's material ties to the interested person are sufficiently substantial that the director cannot objectively fulfill his fiduciary duties).  Courts evaluate the totality of factual allegations when determining whether a director's business or personal relationships "give rise to human motivations compromising the participants' ability to act impartially toward each other on a matter of material importance." *Sandys,* 152 A.3d at 129-34.

44.   Here, the facts described above—including Dr. Escalante's work testifying, promoting, consulting, and influencing, for the Company, and Mr. Hillman's affiliated entities having have done hundreds of millions of dollars of business with Mr. Owoc's businesses *see* Williams Decl. at ¶¶18-20—raise serious concerns with respect to whether the Directors are capable of making decisions with the best interest of the Company in mind.

45.   In addition, since it appears that Dr. Escalante is a consultant to the Company, the current Board does not comply with the strictures of the section 3.1 of the DIP Credit Agreement, and accordingly, puts the Company at serious risk of triggering an event of default.  *See* DIP Credit Agreement §3.1(b)(iii) (requiring the Board's composition of at least three individuals who are not officers or consultants of the Company); *see also* DIP Credit Agreement, Art. VIII (providing that a change in control including the Debtors' Board's ceasing to be composed of at

least three individuals who are not officers or consultants of the Debtors constitutes an event of default).

46.    There can be no doubt that their appointment to the Board creates, at the very least, an appearance of impropriety that will be detrimental to the restructuring process.  Accordingly, it is clear that Mr. Owoc does not understand or respect the necessity of having truly *independent* members of the Board.

**D.    The DIP Motion Should Not Be Approved on A Final Basis Because It Proposes an Excessive Adequate Protection Package For The DIP Lenders.**

47.    The Debtors seek to provide assurances to the DIP Lenders by conferring adequate protection in the form of superpriority administrative expense claims and liens (excluding all proceeds or property recovered in connection with the Prepetition Avoidance Actions), as well as the monthly payment of prepetition and postpetition accrued interest and fees.

48.    However, the adequate protection fees, which were added into the Prepetition Credit Agreement through the 5th amendment just prior the commencement of the Chapter 11 Cases, provides for a "ticking" interest rate on the prepetition debt that increases 50 basis points each month. *See* Williams Decl. at ¶ 22. The cumulative effect of this ticking interest rate is unprecedented: by May 2023, ***the interest rate of the prepetition debt is estimated to be 19.10%*** compared to that of the DIP at 12.86%.  This is an outrageous result.  By the end of the 7 months of DIP Financing, this interest compounds into an extra $1.3 million payment to the DIP Lenders. *See* Williams Decl. at ¶ 22.  On the other hand, the DIP Lenders have designed the DIP Facility in such a way that if less of the prepetition amount is rolled-up, those dollars are subject to the adequate protection ticking fee, resulting in extra interest to the DIP Lenders of ~$3.0 million. *See* Williams Decl. at ¶ 22.  The DIP Lenders are exerting pressure from all sides, essentially

implementing the adequate protection interest as a punishment on every dollar that is not subject to the Roll-Up.

49.    While the Committee recognizes that providing adequate protection is necessary to provide the DIP Lenders with the same level of protection they would have had in the absence of any postpetition financing,[11] these adequate protection fees sought by the DIP Motion disproportionately enrich the DIP Lenders to the detriment of the Debtors' estates.  If the Court determines that the DIP Lenders are entitled to some form of adequate protection, the adequate protection package must be pared back significantly.

**E.    The DIP Motion Should Not Be Approved on a Final Basis Because the DIP Facility's Short Challenge Period, Investigation Budget, and Standing Requirements Unduly Restrict the Committee's Ability to Fulfill Its Fiduciary Duties.**

50.    In addition to the Roll-Up and the Milestones, the DIP Motion also proposes several provisions that constrain the Committee's ability to fulfill its fiduciary duties to investigate and prosecute potential Challenges for the benefit of the Debtors' estates.  For instance, pursuant to the Interim DIP Order, the Committee's deadline to commence a Challenge (the "Challenge Deadline"), is currently December 31, 2022 (60 days from the formation of the Committee), and the Committee's budget for investigating any such Challenges (the "Investigation Budget") is only $50,000.00. Substantial changes must be made in the Final DIP Order to lengthen this unreasonably short Challenge Deadline and increase inadequate Investigation Budget.  Together, the Challenge Period, the Investigation Budget severely restrict the Committee's ability to perform its statutorily mandated functions to investigate and potentially challenge the Prepetition Secured Parties' claims and liens.

---

[11] *See SouthPoint Global Invs., LLC v. Warren (In re Westport Holdings Tampa, Ltd. P'ship),* 607 B.R. 715, 729 (M.D. Fla. 2019).

51.   As an initial matter, the current Challenge Deadline provides an insufficient amount of time for the Committee to complete its investigation.   While the Committee and its professionals have been, and are in the process of, obtaining and reviewing the prepetition loan and security documents, the current Challenge Period is too short.  As these Chapter 11 Cases are on a dual track sale and plan process, and as the first Milestone is quickly approaching, the Committee must devote much of its time and resources elsewhere during this period.  Therefore, the Committee requests that the Challenge Deadline be extended to at least January 16, 2023, without prejudice to the Committee seeking such further extensions if necessary for the Committee to complete an appropriate investigation in accordance with its fiduciary duties.

52.   In addition, the proposed Investigation Budget of $50,000 is woefully insufficient and negatively impacts the Committee's ability to fulfill its statutory and fiduciary duties.  The limited Investigation Budget deliberately forces the Committee's professionals to finance matters related to the Debtors' Chapter 11 Cases and harms the adversary system characteristic of the chapter 11 process.  *See In re Tenney Vill. Co., Inc.*, 104 B.R. 562, 568 (Bankr. D.N.H. 1989) (finding cap on fees unacceptably limited the right of debtor's counsel to payment for bringing actions against the DIP Lenders, creating an economic incentive to avoid bringing such actions in disregard of its fiduciary duties toward the estate, and therefore, refusing to approve the post-petition financing); *see also In re Channel Master Holdings, Inc.*, No. 03-13004, 2004 Bankr. LEXIS 576, at *8-9 (Bankr. D. Del. Apr. 26, 2004).  Therefore, at the very least, the Investigation Budget should be increased to at least $100,000 without prejudice to the Committee seeking further increases to facilitate the Committee's exercise of its fiduciary duties.

53.   Finally, the Committee should be granted automatic standing to commence and prosecute any Challenge.  Such standing should be immediately conferred to the Committee in

the Final DIP Order. Indeed, bankruptcy courts often grant a creditors' committee standing in DIP financing orders to bring a challenge to prepetition liens and claims or assert affirmative claims against a prepetition lender without the need for a formal standing motion. *See, e.g.*, *Klausner Lumber One LLC*, Case No. 20-11033 (KBO) (Bankr. D. Del. June 8, 2020) ("The Committee has standing to pursue the subordination and/or recharacterization of all purported insider claims and prepetition liens, including, without limitation, the Prepetition Liens and Taylor Industrial Rights."); *TZEW Holdco LLC*, Case No. 20-10910 (CSS) (Bankr. D. Del. June 4, 2020) ("the Committee . . . shall have standing to bring any such Objection"); *In re Lily Robotics, Inc.*, Case No. 17-10426 (KJC) (Bankr. D. Del. June 27, 2017); *In re Rupari Holding Corp., et al.*, Case No. 17-10793 (KJC) (Bankr. D. Del. May 12, 2017); *In re Prestige Industries LLC*, Case No. 17- 10186 (KG) (Bankr. D. Del. Mar. 13, 2017); *In re Xtera Communications, Inc.*, Case No. 16- 12577 (KJC) (Bankr. D. Del. Dec. 28, 2016); *In re Phoenix Payment Sys., Inc.*, Case No. 14-11848 (MFW) (Bankr. D. Del. Sept. 3, 2014) [Doc. No. 149, at ¶ 20] ("The Creditors' Committee is hereby granted standing to file, seek relief and prosecute any and all Claims and Defenses and no further order or notice granting the Creditors' Committee standing shall be necessary."); *In re Exide Techs.*, Case No. 13-11482 (KJC) (Bankr. D. Del. Jul. 25, 2013) [Doc. No. 427, at ¶ 19] ("The Creditors' Committee is granted standing and authority to pursue any Claims and Defenses in the name and on behalf of the Debtor and its estate . . . ."); *In re American Safety Razor, LLC*, Case No. 10-12351 (MFW) (Bankr. D. Del. Aug. 27, 2010) at ¶ 6; *In re Pliant Corp.*, Case No. 09-10443 (MFW) (Bankr. D. Del. Mar. 20, 2009) at ¶ 19. As the requirement of filing a motion for standing is unnecessary and a waste of judicial and estate resources, the Committee should be granted automatic standing and authority to commence a Challenge in the Final DIP Order.

54.    Unless the foregoing provisions are substantially modified in the Final DIP Order, the Committee cannot support the approval of the DIP Motion.

**F.      The DIP Motion Should Not Be Approved on A Final Basis Because the Proposed Waivers Are Inappropriate.**

55.    The DIP Motion proposes waivers of the Debtors' and their estates' (i) surcharge rights under section 506(c) of the Bankruptcy Code absent the prior written consent of the of the DIP Agent, DIP Lenders or Prepetition Secured Parties, (ii) right to invoke the equities of the case exception under section 552(b) of the Bankruptcy Code, and (iii) rights under the equitable doctrine of marshalling.  These waivers are inappropriate and prejudicial to unsecured creditors.

56.    First, the Section 506(c) waiver is inappropriately broad and should be stricken. If the Court is unwilling to strike the Debtors' waiver of their Section 506(c) rights, the Committee should be explicitly vested with standing to seek a surcharge against the collateral if the facts ultimately prove that a surcharge is appropriate in these Chapter 11 Cases.

57.    Second, the DIP Financing includes a provision that would waive the application of the "equities of the case" exception under section 552(b) of the Bankruptcy Code as to the DIP Lenders with respect to proceeds, product, offspring or profits of any of the Prepetition Collateral. This too is inappropriate. Under the "equities of the case" exception, prepetition secured creditors are generally entitled to post-petition proceeds on pre-petition collateral unless "the court, after notice and hearing and based on the equities of the case, orders otherwise." 11 U.S.C. § 552(b)(1). The equities of the case exception is designed to prevent an unjust increase in the collateral of secured creditors "at the estate's expense, and which thus depletes the fund available for general unsecured creditors." *See In re S & Z Int'l Mgmt, Inc.,* 10 B.R. 580, 582 n. 1 (Bankr. S.D. Fla. 1981).

58.    Given the fact-intensive, equitable nature of judicial powers under Section 552(b), courts have denied requests for Section 552(b) waivers as premature when the factual record has not been fully developed.  *See, e.g., In re Metaldyne Corp.,* No. 09-13412, 2009 WL 2883045, at *6 (Bankr. S.D.N.Y. June 23, 2009) (declining to waive equities of the case exception in connection with approval of a DIP facility and "declin[ing] to waive prospectively an argument that other parties in interest may make").  At this early stage in the proceedings, given the complexity of the Chapter 11 Cases, the Court should deny the Debtors' request to prospectively and prematurely waive the Section 552(b) exception and thereby provide interested parties, including the Committee, the opportunity to raise concerns at a later date.

59.    Lastly, the equitable doctrine of marshaling should be expressly preserved.  The Debtors' willingness to waive their rights to marshal collateral for the benefit of their unsecured creditors is premature.  If the marshalling of collateral in these Chapter 11 Cases may ultimately inure to the benefit of unsecured creditors, that remedy should not be foreclosed at this early juncture of these Chapter 11 Cases.   At this time, there is no justification for the broad scope of the marshaling waiver.

## **RESERVATION OF RIGHTS**

60.    The Committee expressly reserves all rights, claims, defenses, and remedies, including, without limitation, to supplement and amend this Objection, to raise further and other objections to the DIP Motion and the proposed form of Final Order, and to introduce evidence prior to or at any hearing regarding the DIP Motion in the event that the Committee's objections are not resolved prior to such hearing.

## **CONCLUSION**

61.    The Committee supports approval of a revised DIP Facility that allows the Debtors to make their own decisions throughout the Chapter 11 Cases without burdensome restrictions

from the DIP Lenders and, to that end, the Board needs to be reconstituted in order to ensure those decisions will be made impartially.

62.    Therefore, for the foregoing reasons, the Committee respectfully requests that the Court deny approval of the DIP Motion on a final basis, unless the Debtors and DIP Lenders appropriately address the issues raised in this Objection.

Dated:  November 28, 2022

**LOWENSTEIN SANDLER LLP**
Jeffrey L. Cohen, Esq.
Eric Chafetz, Esq.
Jordana L. Renert, Esq.
Lindsay H. Sklar, Esq.
1251 Avenue of the Americas
New York, New York 10020
Telephone: (212) 262-6700
Facsimile: (212) 262-7402
Email: jcohen@lowenstein.com
Email: echafetz@lowenstein.com
Email: jrenert@lowenstein.com
Email: lsklar@lowenstein.com
      -and-
Nicole Fulfree, Esq.
One Lowenstein Drive
Roseland, New Jersey 07068
Telephone: (973) 597-2502
Facsimile: (973) 597-2400
Email: nfulfree@lowenstein.com

**SEQUOR LAW, P.A.**
By: */s/ Leyza F. Blanco*
Leyza F. Blanco
Florida Bar No.: 104639
Juan J. Mendoza
Florida Bar No.: 113587
1111 Brickell Avenue, Suite 1250
Miami, FL 33131
Telephone: (305) 372-8282
Facsimile: (305) 372-8202
Email: lblanco@sequorlaw.com
Email: jmendoza@sequorlaw.com

*Proposed Counsel to the Official Committee of Unsecured Creditors*