UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION
www.flsb.uscourts.gov

In re:                                                  Case No.: 22-17842-PDR

VITAL PHARMACEUTICALS, INC., et al.,                    Chapter 11
                                                        *(Jointly Administered)*

                        Debtors.
_____/

**NOTICE OF FILING REPLACEMENT EXHIBIT B TO OFFICIAL COMMITTEE OF
UNSECURED CREDITORS' OBJECTION TO DEBTORS' EMERGENCY MOTION
FOR INTERIM AND FINAL ORDERS (I) APPROVING POSTPETITION FINANCING,
(II) AUTHORIZING USE OF CASH COLLATERAL, (III) GRANTING LIENS AND
PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (IV)
GRANTING ADEQUATE PROTECTION, (V) MODIFYING AUTOMATIC STAY, (VI)
SCHEDULING A FINAL HEARING, AND (VII) GRANTING RELATED RELIEF**

The Official Committee of Unsecured Creditors (the "Committee"), by and through its

undersigned proposed counsel, hereby files this Notice of Filing Replacement Exhibit B to the

*Official Committee of Unsecured Creditors' Objection to Debtors' Emergency Motion for Interim*

and *Final Orders (I) Approving Postpetition Financing, (II) Authorizing Use of Cash Collateral,*

*(III) Granting Liens and Providing Superpriority Administrative Expense Status, (IV) Granting*

*Adequate Protection, (V) Modifying Automatic Stay, (VI) Scheduling A Final Hearing, and (VII)*

*Granting Related Relief* (the "Objection") [DE 413], to replace Exhibit B attached to the

Objection, which was corrupted and/or damaged upon filing by CM/ECF system.

Date:   November 29, 2022              Respectfully submitted,
                                       SEQUOR LAW
                                       1111 Brickell Avenue, Suite 1250
                                       Miami, FL 33131
                                       lblanco@sequorlaw.com
                                       jmendoza@sequorlaw.com
                                       Telephone:    (305) 372-8282
                                       Facsimile:    (305) 372-8202

By:    /s/ Leyza F. Blanco

Leyza F. Blanco
Florida Bar No.: 104639
Juan J. Mendoza
Florida Bar No.: 113587

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was served on November 29, 2022, upon all interested parties registered to receive notice via this Court's CM/ECF electronic notification system.

/s/ Leyza F. Blanco

Leyza F. Blanco

**22-17842-PDR Notice will be electronically mailed to:**

Anne Aaronson on behalf of Creditor Crown Cork & Seal USA, Inc.
aaaronson@dilworthlaw.com, ctomlin@dilworthlaw.com

Thomas L Abrams on behalf of Creditor EASTGROUP Properties, L.P.
tabrams@tabramslaw.com, fcolumbo@tabramslaw.com

Scott Andron on behalf of Creditor Broward County
sandron@broward.org, swulfekuhle@broward.org

John A Anthony on behalf of Creditor Nevada Beverage Co
janthony@anthonyandpartners.com,
efilings@anthonyandpartners.com;euzonwanne@anthonyandpartners.com;sdavis@anthonyandpartners.com

Anthony J Aragona, III on behalf of Creditor Mitsubishi HC Capital America, Inc.
aja@devaronalaw.com

Marc P Barmat on behalf of Creditor The American Bottling Company
mbarmat@furrcohen.com,
rrivera@furrcohen.com;atty_furrcohen@bluestylus.com;staff1@furrcohen.com

Paul J. Battista, Esq on behalf of Interested Party Jack H. Owoc
pbattista@gjb-law.com, gjbecf@gjb-law.com;cscavone@gjb-law.com;gjbecf@ecf.courtdrive.com;vlambdin@gjb-law.com;jsardina@gjb-law.com;imalcolm@gjb.law;hburke@gjb-law.com

Eyal Berger, Esq. on behalf of Creditor Monster Energy Company
eyal.berger@akerman.com, jeanette.martinezgoldberg@akerman.com

Leyza F. Blanco, Esq. on behalf of Creditor Committee Creditor Committee
lblanco@sequorlaw.com, jdiaz@sequorlaw.com

Ronald D Bruckmann on behalf of Creditor Ardagh Metal Packaging USA Corp.
rbruckmann@shumaker.com, celgin@shumaker.com;dconaway@shumaker.com

Kevin Michael Capuzzi on behalf of Creditor Trinity Logistics, Inc.
kcapuzzi@beneschlaw.com, docket2@beneschlaw.com;lmolinaro@beneschlaw.com

Robert P. Charbonneau, Esq. on behalf of Creditor Stellar Group, Inc.
rpc@agentislaw.com,
nsocorro@agentislaw.com;bankruptcy@agentislaw.com;bankruptcy.ecc@ecf.courtdrive.com

Jesse R Cloyd on behalf of Creditor Stellar Group, Inc.
jrc@agentislaw.com,
bankruptcy@agentislaw.com;nsocorro@agentislaw.com;bankruptcy.ecc@ecf.courtdrive.com

David H Conaway, Esq on behalf of Creditor Ardagh Metal Packaging USA Corp.
dconaway@slk-law.com

Ralph W. Confreda, Jr on behalf of Creditor Balboa Capital Corporation
rconfreda@mcglinchey.com, alozada@mcglinchey.com

Philip W Crawford on behalf of Creditor EFL Global
pcrawford@gibbonslaw.com

Philip W Crawford on behalf of Creditor EFL Global Logistics Canada, Ltd.
pcrawford@gibbonslaw.com

Matthew G Davis on behalf of Creditor HACI Mechanical Contractors, Inc.
mdavis@pdtlegal.com, jdorta@pdtlegal.com

Ronald M Emanuel, Esq on behalf of Creditor U.S. Bank National Association d/b/a U.S. Bank
Equipment Finance
ron.emanuel@emzwlaw.com,
martha.rivera@emzwlaw.com;eservice@emzwlaw.com;cindy.carhartt@emzwlaw.com

G Steven Fender on behalf of Creditor Orange Bang, Inc.
steven.fender@fender-law.com, simone@fenderbollingpaiva.com

Keith W. Fendrick on behalf of Creditor Refresco Beverages US Inc
keith.fendrick@hklaw.com,
andrea.olson@hklaw.com;hapi@hklaw.com;brittany.jacobs@hklaw.com

Edward M Fitzgerald, Esq on behalf of Creditor XPO LOGISTICS, LLC
edward.fitzgerald@hklaw.com, tonya.berger@hklaw.com

Joseph D Frank on behalf of Creditor PepsiCo, Inc. together with its affiliates and subsidiaries
jfrank@fgllp.com,
mmatlock@fgllp.com;csmith@fgllp.com;jkleinman@fgllp.com;csucic@fgllp.com

Robert C Furr, Esq on behalf of Creditor The American Bottling Company
ltitus@furrcohen.com,
atty_furrcohen@bluestylus.com;cworkinger@furrcohen.com;staff1@furrcohen.com;furrrr84158@notify.bestcase.com

Michael I Goldberg, Esq on behalf of Creditor Monster Energy Company
michael.goldberg@akerman.com, charlene.cerda@akerman.com

Eric S. Golden, Esq. on behalf of Creditor ACAR Leasing Ltd., Inc. d/b/a GM Financial Leasing
egolden@burr.com, mlucca-cruz@burr.com;ccrumrine@burr.com

Eric S. Golden, Esq. on behalf of Creditor Americredit Financial Services, Inc. d/b/a GM Financial
egolden@burr.com, mlucca-cruz@burr.com;ccrumrine@burr.com

Jordi Guso, Esq. on behalf of Debtor Bang Energy Canada, Inc.
jguso@bergersingerman.com,
fsellers@bergersingerman.com;efile@bergersingerman.com;efile@ecf.inforuptcy.com

Jordi Guso, Esq. on behalf of Debtor JHO Intellectual Property Holdings, LLC
jguso@bergersingerman.com,
fsellers@bergersingerman.com;efile@bergersingerman.com;efile@ecf.inforuptcy.com

Jordi Guso, Esq. on behalf of Debtor JHO Real Estate Investment, LLC
jguso@bergersingerman.com,
fsellers@bergersingerman.com;efile@bergersingerman.com;efile@ecf.inforuptcy.com

Jordi Guso, Esq. on behalf of Debtor Quash Seltzer, LLC
jguso@bergersingerman.com,
fsellers@bergersingerman.com;efile@bergersingerman.com;efile@ecf.inforuptcy.com

Jordi Guso, Esq. on behalf of Debtor Rainbow Unicorn Bev LLC
jguso@bergersingerman.com,
fsellers@bergersingerman.com;efile@bergersingerman.com;efile@ecf.inforuptcy.com

Jordi Guso, Esq. on behalf of Debtor Vital Pharmaceuticals International Sales, Inc.
jguso@bergersingerman.com,
fsellers@bergersingerman.com;efile@bergersingerman.com;efile@ecf.inforuptcy.com

Jordi Guso, Esq. on behalf of Debtor Vital Pharmaceuticals, Inc.
jguso@bergersingerman.com,
fsellers@bergersingerman.com;efile@bergersingerman.com;efile@ecf.inforuptcy.com

Jordi Guso, Esq. on behalf of Plaintiff Bang Energy Canada, Inc.
jguso@bergersingerman.com,
fsellers@bergersingerman.com;efile@bergersingerman.com;efile@ecf.inforuptcy.com

Jordi Guso, Esq. on behalf of Plaintiff JHO Intellectual Property Holdings, LLC
jguso@bergersingerman.com,
fsellers@bergersingerman.com;efile@bergersingerman.com;efile@ecf.inforuptcy.com

Jordi Guso, Esq. on behalf of Plaintiff JHO Real Estate Investment, LLC
jguso@bergersingerman.com,
fsellers@bergersingerman.com;efile@bergersingerman.com;efile@ecf.inforuptcy.com

Jordi Guso, Esq. on behalf of Plaintiff Quash Seltzer, LLC
jguso@bergersingerman.com,
fsellers@bergersingerman.com;efile@bergersingerman.com;efile@ecf.inforuptcy.com

Jordi Guso, Esq. on behalf of Plaintiff Rainbow Unicorn Bev LLC
jguso@bergersingerman.com,
fsellers@bergersingerman.com;efile@bergersingerman.com;efile@ecf.inforuptcy.com

Jordi Guso, Esq. on behalf of Plaintiff Vital Pharmaceuticals International Sales, Inc.
jguso@bergersingerman.com,
fsellers@bergersingerman.com;efile@bergersingerman.com;efile@ecf.inforuptcy.com

Jordi Guso, Esq. on behalf of Plaintiff Vital Pharmaceuticals, Inc.
jguso@bergersingerman.com,
fsellers@bergersingerman.com;efile@bergersingerman.com;efile@ecf.inforuptcy.com

Aaron L Hammer on behalf of Creditor Marc Kesten
ahammer@hmblaw.com, ecfnotices@hmblaw.com

Andrea S. Hartley on behalf of Creditor Monster Energy Company
andrea.hartley@akerman.com, janet.salinas@akerman.com

Ross R Hartog on behalf of Creditor Faith Technologies Incorporated
rhartog@mrthlaw.com,
ecfnotices@mrthlaw.com;gruiz@mrthlaw.com;mrthbkc@gmail.com;lgener@mrthlaw.com;ycan
dia@mrthlaw.com;rhartog@ecf.courtdrive.com

Daniel Harvath on behalf of Creditor Brendan Abbott
dharvath@harvathlawgroup.com

Daniel Harvath on behalf of Creditor Peter Fischer
dharvath@harvathlawgroup.com

Craig I Kelley on behalf of Creditor Carolina Canners, Inc.
craig@kelleylawoffice.com,
cassandra@kelleylawoffice.com;bankruptcy@kelleylawoffice.com;scott@kelleylawoffice.com;k
elleycr75945@notify.bestcase.com

Craig I Kelley on behalf of Creditor Southeast Cold Fill, LLC
craig@kelleylawoffice.com,
cassandra@kelleylawoffice.com;bankruptcy@kelleylawoffice.com;scott@kelleylawoffice.com;k
elleycr75945@notify.bestcase.com

Scott D Knapp on behalf of Creditor Nelson Mullins Riley & Scarborough, LLP
scott.knapp@nelsonmullins.com, traci.lewis@nelsonmullins.com

Harris J. Koroglu on behalf of Creditor Truist Bank
hkoroglu@shutts.com, mcabo@shutts.com;bvelapoldi@shutts.com

Matthew F Kye on behalf of Creditor Mitsubishi HC Capital America, Inc.
mkye@kyelaw.com

Dennis J LeVine, Esq on behalf of Creditor LMR TRUCKING, INC.
Theresa.Byington@brockandscott.com, wbecf@brockandscott.com

Peter H Levitt, Esq on behalf of Creditor Truist Bank
plevitt@shutts-law.com, sboisvert@shutts.com

Corali Lopez-Castro, Esq on behalf of Creditor PepsiCo, Inc. together with its affiliates and
subsidiaries
clc@kttlaw.com, rcp@kttlaw.com

Jerry M Markowitz on behalf of Creditor Faith Technologies Incorporated
jmarkowitz@mrthlaw.com,
ycandia@mrthlaw.com,rrubio@mrthlaw.com,mrthbkc@gmail.com,gruiz@mrthlaw.com,marko
witzjr73991@notify.bestcase.com,jmarkowitz@ecf.courtdrive.com

David B Marks on behalf of Creditor Monster Energy Company
brett.marks@akerman.com, charlene.cerda@akerman.com

Juan J Mendoza on behalf of Creditor Committee Creditor Committee
jmendoza@sequorlaw.com, ngonzalez@sequorlaw.com

Fernando J Menendez on behalf of Creditor Committee Creditor Committee
fmenendez@sequorlaw.com, jdiaz@sequorlaw.com

Klaus Peter Muthig, I on behalf of Creditor Maricopa County Treasurer
muthigk@mcao.maricopa.gov

Michael Jordan Niles on behalf of Debtor Vital Pharmaceuticals, Inc.
mniles@bergersingerman.com,
efile@bergersingerman.com;efile@ecf.inforuptcy.com;zmorton@bergersingerman.com

Office of the US Trustee
USTPRegion21.MM.ECF@usdoj.gov

Jimmy D. Parrish on behalf of Creditor 1600FLL LLC
jparrish@bakerlaw.com, orlbankruptcy@bakerlaw.com;cmartin@bakerlaw.com

Hamid R. Rafatjoo on behalf of Creditor ALDA 4747 W. Buckeye LLC
hrafatjoo+1@raineslaw.com, bclark@raineslaw.com

Hamid R. Rafatjoo on behalf of Creditor CI421 4747 W. Buckeye LLC
hrafatjoo+1@raineslaw.com, bclark@raineslaw.com

Hamid R. Rafatjoo on behalf of Creditor MFP 4747 W. Buckeye LLC
hrafatjoo+1@raineslaw.com, bclark@raineslaw.com

Aliette D Rodz on behalf of Creditor Truist Bank
arodz@shutts.com

Mark S. Roher, Esq. on behalf of Creditor Jasmin Williams
mroher@markroherlaw.com, ECF.markroherlaw@gmail.com;ECF2.markroherlaw@gmail.com

Ezequiel Joseph Romero on behalf of Creditor Dairy Farmers of America, Inc.
romeroe@bryancave.com, zeke.romero30@gmail.com

Ezequiel Joseph Romero on behalf of Creditor Doehler USA, Inc.
romeroe@bryancave.com, zeke.romero30@gmail.com

Ezequiel Joseph Romero on behalf of Creditor Dohler Dahlenburg G.m.b.H
romeroe@bryancave.com, zeke.romero30@gmail.com

David Samole, Esq on behalf of Creditor PepsiCo, Inc. together with its affiliates and
subsidiaries
das@kttlaw.com, rcp@kttlaw.com;ycc@kttlaw.com

Michael D. Seese, Esq. on behalf of Creditor Driscoll, LLP
mseese@seeselaw.com, sseward@seeselaw.com

Andrew Sorkin on behalf of Debtor Vital Pharmaceuticals, Inc.

andrew.sorkin@lw.com, andrew-sorkin-3703@ecf.pacerpro.com;new-york-ma-2860@ecf.pacerpro.com;christopher.tarrant@lw.com

Annie Yang Stoops on behalf of Creditor Premium Beverage Company
annie.stoops@afslaw.com

Frank Terzo, Esq. on behalf of Creditor Nelson Mullins Riley & Scarborough, LLP
frank.terzo@nelsonmullins.com, francis.santelices@nelsonmullins.com

Christopher R Thompson on behalf of Creditor ACAR Leasing Ltd., Inc. d/b/a GM Financial Leasing
crthompson@burr.com, mlucca-cruz@burr.com;ccrumrine@burr.com

Christopher R Thompson on behalf of Creditor Americredit Financial Services, Inc. d/b/a GM Financial
crthompson@burr.com, mlucca-cruz@burr.com;ccrumrine@burr.com

Thomas W. Tierney on behalf of Creditor Pettit Kohn Ingrassia Lutz & Dolin
ttierney@rosswayswan.com, kkelly@rosswayswan.com

Michael W Ullman, Esq on behalf of Creditor The Hamilton Group (Delaware), Inc.
michael.ullman@uulaw.net,
jared.ullman@uulaw.net;diana.simon@uulaw.net;alexandra.wagener@uulaw.net;laura.lytle@uulaw.net

Jeramy D Webb on behalf of Debtor Vital Pharmaceuticals, Inc.
jeramy.webb@lw.com, new-york-ma-2860@ecf.pacerpro.com;jeramy-webb-1209@ecf.pacerpro.com

Aaron A Wernick on behalf of Interested Party Gekay Sales + Service Co., Inc.
awernick@wernicklaw.com,
awernick@ecf.courtdrive.com;crubin@wernicklaw.com;dkariotis@wernicklaw.com;mlaverriere@wernicklaw.com

J. Steven Wilkes on behalf of U.S. Trustee Office of the US Trustee
steven.wilkes@usdoj.gov

Stuart F Wilson-Patton on behalf of Creditor TN Dept of Revenue
stuart.wilson-patton@ag.tn.gov

# **<u>EXHIBIT B</u>**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION
www.flsb.uscourts.gov

| | |
|---|---|
| IN RE: | Chapter 11 |
| VITAL PHARMACEUTICALS, INC., *et al.*, | Case No. 22-27842 (PDR) |
| Debtors.[1] | (Jointly Administered) |

## DECLARATION OF BRENT C. WILLIAMS IN SUPPORT OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS' OBJECTION TO DEBTORS' EMERGENCY MOTION FOR INTERIM AND FINAL ORDERS (I) APPROVING POSTPETITION FINANCING, (II) AUTHORIZING USE OF CASH COLLATERAL, (III) GRANTING LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (IV) GRANTING ADEQUATE PROTECTION, (V) MODIFYING AUTOMATIC STAY, (VI) SCHEDULING A FINAL HEARING, AND (VII) GRANTING RELATED RELIEF

Under 28 U.S.C. § 1746, Brent C. Williams hereby declares as follows under the penalty of perjury:

1.      I am the Co-Head of the Capital Advisory Group at Lincoln Partners Advisors LLC ("Lincoln"), a financial advisory firm retained by the Official Committee of Unsecured Creditors (the "Committee") in these chapter 11 cases (the "Chapter 11 Cases"). Lincoln has expertise in operational and financial restructurings, mergers and acquisitions (M&A) and capital raising services to stakeholders in stressed and distressed situations.

2.      I submit this declaration ("Declaration") on behalf of the Committee and in support of its Objection to the Debtors' Emergency Motion for Interim and Final Orders (I)

---

[1] The address of the Debtors is 1600 N. Park Drive, Weston, FL 33326.  Tire last four digits of the Debtors' federal tax identification numbers are: (i) Vital Pharmaceuticals, Inc. (8430); (ii) Bang Energy Canada. Inc. (5454); (iii) JHO Intellectual Property Holdings, EEC (0010); (iv) JHO Real Estate Investment, EEC (9394); (v) Quash Seltzer, EEC (6501); (vi) Rainbow Unicom Bev EEC (2254); and (vii) Vital Pharmaceuticals International Sales, Inc. (8019).

Approving Postpetition Financing, (II) Authorizing Use of Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, (VI) Scheduling A Final Hearing, and (VII) Granting Related Relief [Docket No. 24] (the "DIP Motion").[2]

3.      Lincoln has been retained by the Committee as its financial advisor in these Chapter 11 Cases.  In connection with its engagement, Lincoln has been asked to (i) research and analyze the Debtor's governance structure and the relationships between Dr. Guillermo Escalante and Eric Hillman (together, the "Directors"), the Company, and John Owoc, and (b) review and analyze the proposed DIP Facility (defined below) and opine on the reasonableness of the proposed adequate protection.  Based on my review of the relevant research, my understanding of the available information and my experience, it is my opinion that (i) it appears that the Directors are, in fact, closely affiliated with the Company and with Mr. Owoc personally, and (ii) the adequate protection is not fair, reasonable, or in line with the market.

4.      Unless otherwise indicated, all facts set forth in this Declaration are based upon information learned from my review of relevant documents, information supplied by members of the Company's management, other members of Lincoln's engagement team or the Committee's other advisors, my personal knowledge gleaned during the course of my engagement with the Committee, or my opinion informed by my experience, knowledge, and information concerning the Company's operations,  financial affairs, and the proposed DIP Facility.

5.      If called upon to testify, I could and would testify competently to the facts set forth herein on that basis.

---

[2] Capitalized or referenced terms used but not defined herein shall have the meanings given to them in the Committee's DIP Objection.

6.      I am not being compensated for this testimony other than through payments received by Lincoln as a professional retained by the Committee; none of those payments are contingent upon the opinions or conclusions I reach, nor the outcome of this action.

I.      **Qualifications and Experience.**

7.      Lincoln's practice consists of senior financial, management consulting, accounting, and other professionals who specialize in providing restructuring, transaction advisory, litigation support, solvency, and valuation assistance and providing a focus on viable solutions that maximize value for companies and creditors, typically in distressed business settings.  Lincoln has acted as financial advisor, crisis manager, and corporate officer in middle market to large multinational restructurings across a wide array of industries.  Lincoln's services include forensic analysis, plan development and implementation, and advice on sale/merger transactions.

8.      In addition to numerous out-of-court restructuring situations, Lincoln and its professionals have been actively involved in major chapter 11 cases.  *See, e.g., In re Benevis Corp.*, No. 20-33918 (Bankr. S.D. Tex. Aug. 2, 2020), ECF No. 348 (order authorizing employment of Lincoln as investment banker to the debtors); *In re Pyxus Int'l, Inc.*, No. 20-11570 (Bankr. D. Del. June 15, 2020), ECF No. 373 (order authorizing employment of Lincoln as financial advisor to the official committee of equity security holders); *In re Valeritas Holdings, Inc.*, No. 20-10290 (Bankr. D. Del. Feb. 9, 2020), ECF No. 176 (order authorizing employment of Lincoln as investment banker to the debtors); *In re Dura Auto. Sys., LLC*, No. 19-12378 (Bankr. D. Del. Dec. 19, 2019), ECF No. 453 (order authorizing employment of Lincoln as financial advisor and investment banker to the official committee of unsecured creditors); *In re PG&E Corp.*, No. 19-30088  (Bankr. N.D. Cal. May 10, 2019), ECF No. 1976 (order authorizing employment of Lincoln as financial advisor to the official committee of tort claimants); *In re EO*

*Liquidating, LLC (f/k/a E. Outfitters)*, No. 17-10243 (Bankr. D. Del. Mar. 3, 2017), ECF No. 173 (order authorizing employment of Lincoln as investment banker to the Debtors); *In re CRS Reprocessing, LLC*, No. 17-32565 (Bankr. W.D. Ky. Aug. 9, 2017), ECF No. 137 (order authorizing employment of Lincoln as investment banker to the Debtors); *In re Visteon Corp., et al.*, No. 09-11786 (Bankr. D. Del. 2009) (order authorizing employment of Lincoln as investment banker to the official committee of unsecured creditors as co-advisor along with the committee's retained financial advisor).

9.      For over 25 years I have provided advisory on operational and financial restructurings, M&A and capital raising services to stakeholders in stressed and distressed situations.  I advise companies, lenders, creditors, directors, unions, and government agencies.  I am responsible for sourcing, structuring and executing debt and equity restructurings, recapitalizations, distressed capital raises and distressed sell-side and buy-side assignments.  In addition, I leverage extensive lender relationships to deliver strategic, bespoke financing alternatives for clients requiring structured or specialized financing solutions.

10.      I have been involved in numerous in- and out-of-court restructurings, including, among others, PG&E Corp., Wholesome Sweeteners, Smile America, Chassix Corp., SkyMall, AES Technologies, Allen's Food, Comprehensive Clinical Devices, ClearEdge Power, KV Pharmaceuticals, Real Mex Restaurants, Seahawk Drilling, Sexy Hair Concepts, Visteon Corp., MMFX Steel, SK Foods, Idearc. Corp., Philadelphia Newspapers, Dura Automotive, Citation Corp, Global Power Energy, Stelco Inc., Philip Services Corp., Supra Telecom, Touch America Inc., Focal Communications, and GenTek Inc.  I earned a Bachelor of Commerce (with honors) from Carleton University, and I am a certified public accountant.

11.     My curriculum vitae, attached hereto as **Exhibit A**, summarizes my qualifications and professional experience.

II.     **The DIP Facility Background**

A.     **The Company's Governance Structure**

12.     Historically, John Owoc (the founder and sole shareholder of the Company) had served as the sole director or member, as well as the Chief Executive Officer or managing member, as applicable, of the each of the Debtor entities. *See* DiDonato Decl. ¶ 23. Under the Prepetition Credit Agreement, the DIP Lenders required, as a condition precedent to funding the loans thereunder, (i) Mr. Owoc's expansion of the boards of directors or other equivalent governing body (collectively, the "Board") of each of the Debtor entities to include five directors, and (ii) the inclusion on the Board of a one-person restructuring committee (the "Restructuring Committee") with authority to, at a minimum, make recommendations to the Board regarding all aspects of the Chapter 11 Case. *See* DIP Credit Agreement § 3.1(b)(iii), Docket No. 24, Exhibit B.

13.     The DiDonato Declaration goes on to state that Mr. Owoc intended to expand the Board by adding Kathleen Cole (the Company's Chief Operating Officer) and constitute the Restructuring Committee comprised solely of Mr. Panagos (the Board's third member) to be charged with "overseeing the restructuring process." *See* DiDonato Decl. ¶ 23. Predictably, however, such oversight is limited to the Restructuring Committee's ability to merely make recommendations to the full board with respect to the restructuring process and the Chapter 11 Cases. *See* DiDonato Decl. ¶ 23.

B.     **Adequate Protection**

14.     The proposed DIP Financing consists of a $455 million DIP facility from the Debtors' Prepetition Lenders (the "DIP Facility"), of which $100 million is new-money and

$354,770,201.56 worth of Prepetition Facility Obligations is rolled up into postpetition DIP Obligations (the "Roll-Up"). The Roll-Up consists of: (i) a prepetition advance of approximately $60 million from the Prepetition Lenders to the Debtors and (ii) a "creeping" rollup where the Debtors would pay down the Prepetition Obligations with postpetition collections and draw on the DIP Facility for liquidity

15.     Under the proposed DIP Facility, the Debtors seek to provide adequate protection in the form of superpriority administrative expense claims and liens (excluding all proceeds or property recovered in connection with the Prepetition Avoidance Actions), as well as the monthly payment of postpetition accrued interest and fees. Specifically, the adequate protection package includes monthly payments to the Prepetition Agent in an amount equal to the interest accrued on or after the Petition Date under the Prepetition Credit Agreement for such month at the Default Rate (as defined therein) as the applicable reference rate and giving effect to any future increases in the applicable rate of interest after the Petition Date as set forth in the Prepetition Credit Agreement. Accordingly, although at the time of the filing of the DIP Motion, the applicable margin for purposes of adequate protection was 8.50%, such rate increases by 50 bps per month. *See* Interim DIP Order, ¶ 11–15, Docket No. 24; *see also* DIP Credit Agreement, § 2.14.

### III.     The Relationship Between the Company, Mr. Owoc, and the Directors

16.     In order to determine the extent of any preexisting relationships between the Company, Mr. Owoc, and the Directors, the Lincoln team reviewed various social media platforms such as, Instagram, Facebook, Twitter, Tik Tok and YouTube. Lincoln checked to see if Bang Energy or Jack Owoc accounts (on the related platform) were following an account related to the Directors and if they were tagged in any posts or mentioned in any comments. Lastly, Lincoln conducted key word searches on Google to find any incremental information.

17.     Based on my review of the relevant research and my understanding of the available information, the facts set forth below indicate that the Directors are, in fact, closely affiliated with the Company and with Mr. Owoc personally.

18.     Dr. Guillermo Escalante.  The Company has a history of paying Dr. Escalante personally for various services.  In connection with the trial and arbitration involving Orange Bang, Inc. ("OBI") and Monster Energy Company ("Monster"), which resulted in, *inter alia*, a $175 million disgorgement award in favor of Monster and OBI (*see* DiDonato Decl. at ¶ 34), the arbitrator noted that the Company paid Dr. Escalante to act as "its most important expert" on the question of whether the product at issue was "creatine-based"—a claim that was adjudicated during the litigations to be specious.[3]  Indeed, in those litigations, both OBI and Monster raised similar concerns about Dr. Escalante's ability to act as an unbiased and untainted "expert." Specifically, OBI and Monster raised issues of bias because Dr. Escalante had rendered services to the Company as an influencer and promoter of the Company's products.[4]  He also testified that he previously served as an "expert" on creatine on behalf of the Company in another matter.[5]  In addition, Dr. Escalante has posted on multiple occasions on social media extolling the Company, including making claims found by the arbitrator or court to be false.[6]

19.     In addition to his work testifying for and promoting the Company, Dr. Escalante is also, evidently, a paid consultant to the Company.  In August 2020, Dr. Escalante, with various other authors, published an article on the effects of certain of the Company's

---

[3] *See Orange Bang, Inc. and Monster Energy Co. v. Vital Pharms., Inc.,* AAA No. 01-20-0005-6081, Final Arb. Award Phase 1 and Phase 2 at 51 n. 11 (Commercial Arbitration Tribunal), a true and correct copy is attached hereto as **Exhibit B**.

[4] *See* Exhibit B at 51 n. 11.

[5] *See* Trial Tr. at 176:22–25, Sept. 20, 2022, *Monster Energy Co. v. Vital Pharms., Inc., et al.*, No. EDCV18-1882 (C.D. Cal.), relevant portions of the true and correct copy are attached hereto as **Exhibit F**.

[6] True and correct copies of Dr. Escalante's social media posts are attached hereto as **Exhibit C**.

products.[7]  The article expressly admits that Dr. Escalante is a paid consultant and has served as a "scientific consultant" for the Company.[8]  Mr. Owoc is well-aware of this; he has posted to his Instagram account about Dr. Escalante and a "study" he purportedly performed on the Company's products.[9]  Indeed, at the recent trial on September 20, 2022, Dr. Escalante himself testified that he had worked as a consultant for the Company on "an on-and-off basis" for three years.[10]

20.    Eric Hillman.  Mr. Hillman served as Chief Executive Officer of Europa Sports Partners, LLC ("Europa").  It is undisputed that Europa has acted—and may still be acting as—a major distributor of the Company's Bang energy drinks.[11]  It is unclear from publicly available information whether Mr. Hillman is still employed at Europa. Mr. Hillman also has a personal relationship with Mr. Owoc.  During a trial in 2020 involving the Company, Monster, and Reign Beverage Company, LLC, Mr. Owoc testified that Mr. Hillman is "a buddy of [his who] owns Europa Sports, which is the biggest sports nutrition distributor in the world.  We've done probably hundreds of millions of dollars with them."[12]  Mr. Owoc also listed Mr. Hillman as a personal reference on his application for the Company's liquor license in Georgia in August 2021.[13]  And, like Dr. Escalante, Mr. Hillman has promoted the Company on social media on multiple occasions, repeating claims found to be false during the litigations, and engaging in public

---

[7] *See* Patrick S. Harty, et al, *Effects of Bang® Keto Coffee Energy Drink on Metabolism and Exercise Performance in Resistance-Trained Adults: A Randomized, Double-blind, Placebo- controlled, Crossover Study*, J. of the Int'l Society of Sports Nutrition (2020), a true and correct copy is attached hereto as **Exhibit D**.

[8] *See* Exhibit D.

[9] *See* Jack Owoc (@bangenergy.ceo), INSTAGRAM, https://www.instagram.com/bangenergy.ceo (Sept. 29, 2020), true and correct copies of Mr. Owoc's social media posts are attached hereto as **Exhibit E**.

[10] *See* Exhibit F at 175:6–14.

[11] *See Imran v. Vital Pharms., Inc.*, No. 18-cv-05758, 2019 WL 1509180, at *4 (N.D. Cal. Apr. 5, 2019), attached hereto as **Exhibit G**.

[12] *See* Trial Tr. at 1050:13–15, Sept. 1, 2020, *Monster Energy Co. and Reign Beverage Co., LLC*, No. 19-60809-CIV (S.D. Fla.), relevant portions of the true and correct copy are attached hereto as **Exhibit H**.

[13] *See Agenda Item Rep.*, Item No. 21-417 (Aug. 12, 2021), a true and correct copy is attached hereto as **Exhibit I**.

conversations on social media with Mr. Owoc in support of the Company, during one of which Mr. Owoc discusses going to Mr. Hillman's home.[14]

IV.    **The Adequate Protection Interest Payments are Excessive**

21.    While the Committee recognizes that providing adequate protection is necessary to provide the DIP Lenders with the same level of protection they would have had in the absence of any postpetition financing, certain aspects of the adequate protection sought by the DIP Motion protection disproportionately enrich the DIP Lenders to the detriment of the Debtors' estates and other stakeholders.

22.    Specifically, the interest payable to the DIP Lenders and DIP Agent under the DIP Facility are excessive.  Notably, the adequate protection fees that were added into the Prepetition Credit Agreement through the fifth amendment just prior the commencement of the Chapter 11 Cases, provides for a "ticking" interest rate on the prepetition debt that increases 50 basis points each month.  This interest compounds into an extra $1.3 million payment to the DIP Lenders through the projected end of the seven months of DIP Financing, and provides relief not ordinarily found in other adequate protection packages.  If less of the prepetition amount is rolled-up, the ticking fee results in extra interest to the DIP Lenders of approximately $3.0 million. Because of this 50 basis points increase every month, by May 2023, the interest rate of the prepetition debt is estimated to be 19.10% compared to that of the DIP at 12.86%.

---

[14] *See* Jack Owoc (@bangenergy.ceo), INSTAGRAM, https://www.instagram.com/bangenergy.ceo (July 17, 2016), Exhibit E at 2.

## V.    <u>Conclusions</u>

23.    Based on my review of the relevant research, my understanding of the available information and my experience, it is my opinion that (i) it appears that the Directors are closely affiliated with the Company and with Mr. Owoc personally, and (ii) the adequate protection payments are not fair or reasonable.

Dated: November 28, 2022
        New York, New York

*Brent C. Williams*
Brent C. Williams

# **EXHIBIT A**

# Biographical Information for Brent C. Williams, CA, CPA

Brent Williams has over 25 years of experience with both operational and financial restructurings, M&A activity and capital raising. His expertise has been gained in an unusually broad span of industries domestically and internationally. Since 2017, Mr. Williams has been the Co-Head of the Capital Advisory Group of Lincoln International. Prior to this role he was of Head of Restructuring for Teneo. Previously, he was a Managing Director with Duff & Phelps Securities LLC (f/n/a Chanin Capital Partners, "Chanin") (May 2001 to April 2005, July 2006 to September 2013). Lincoln International is a investment bank providing the following financial services: Financial Restructurings, Mergers and Acquisitions, Corporate Finance and Private Placements, Valuations, and Fairness & Solvency Opinions. From April 2005 to July 2006, Mr. Williams was a Managing Director at Saybrook Capital, the hedge fund and financial advisory firm.

Mr. Williams has been involved in restructuring, M&A and capital raising assignments in United States, Canada, Mexico, Sweden, U.K., Germany, France and Eastern Europe. He has a wealth of in-depth knowledge about complicated business situations, including operating companies in Chapter 11 and Canadian bankruptcy proceedings. He has directed or participated in an extensive range of successful consulting assignments, including troubled company turnarounds, operational and financial restructurings, M&A and capital raising. Mr. Williams has advised in over $30 billion of M&A activity, $150 billion of restructured debt and $40 billion of capital raising.

*The balance of this document is a detailed description of Mr. Williams' business experience and accomplishments.*

Mr. Williams has been involved in such matters as: PG&E Corp., Wholesome Sweetners, Smile America, Chassix Corp., Skymall, AES Technologies, Allen's Food, Comprehensive Clinical Devices, ClearEdge Power, KV Pharmaceuticals, Real Mex Restaurants, Seahawk Drilling, Sexy Hair Concepts, Visteon Corp., MMFX Steel, SK Foods, Idearc. Corp., Philadelphia Newspapers, Dura Automotive, Citation Corp, Global Power Energy, Stelco Inc., Philips Services Corp., Supra Telecom, Touch America Inc., Focal Communications, and Gentek Inc.

Mr. Williams is responsible for the planning, execution and management of a number of client engagements involving the following initiatives:

- Development and implementation of debt and equity restructurings, recapitalization and strategic business plans, including capital raising.
- Preparation of business viability reviews as well as debt and equity valuations, used in assessing strategic alternatives.
- Development and implementation of recovery and exit strategies in an effort to maximize recoveries and/or returns for certain stakeholders such as bond and equity holders.
- Actively involved in deal flow generation and human resource matters.

Prior to Lincoln International, Teneo and Duff and Phelps, Mr. Williams was a director at the New York office of Zolfo Cooper, LLC where he developed and implemented financial and operational restructuring plans in turnaround and distressed situations, in addition to the preparation of debt and equity valuations. He was involved in the following assignments; American Medical Response, a wholly owned subsidiary of Laidlaw Inc., Corrections Corporation of America, Claridge Casino and Hotel, Harnischfeger Industries and Apex Global Internet Services.

Prior to joining Zolfo Cooper LLC (1999 - 2001), Mr. Williams was a Vice President at a boutique Canadian restructuring firm located in Ontario, Canada (1997 – 1999) and a Senior Manager at KPMG Inc.(1991 – 1997), where he was responsible for planning and executing financial and operational restructurings, and receivership/bankruptcy engagements.

Mr. Williams has a Bachelor of Science degree (honors) in Business Administration from Carleton University. He is a current member of the Canadian Institute of Charter Accountants ("CPA"), a Certified Public Accountant and was a practicing Trustee in Bankruptcy in the Province of Ontario. Member of FINRA, Series 7, 24, 63. Served on the Board of a public company and has been Plan Trustee of multi-million dollar estates.

# PAST ENGAGEMENTS

| **Company** | **Industry** |
|---|---|
| Confidential | E-Commerce |
| Confidential | Medical Services |
| Confidential | Food Services |
| PG&E Corp | Utility |
| Wholesome Sweetners | Consumer Discretionary |
| CRS Technologies | Infrastructure |
| KNEX | Consumer Discretionary |
| Confidential | Consumer Discretionary |
| BioNitrogen | CleanTech IP |
| Patriot Coal | Mining |
| Chassix Corp. | Automotive Parts |
| AES Technologies | Auto Diagnostics |
| Skymall, Arizona | Online Retail |
| ClearEdge Power, California | Fuel Cells |
| Confidential, US | Mining |
| Allens Food, Arkansas | Agri/Food Processing |
| Comprehensive Clinical Dev. Florida | Life Sciences and Services |
| Omtron, North Carolina | Packaged Foods and Meats |
| KV Pharmaceuticals, St. Louis, MO | Pharmaceuticals |
| Real Mex Restaurants, CA | Restaurants |
| Confidential, Canada | Industrial Machinery |
| HearUSA, FL | Healthcare Facilities |
| Seahawk Drilling, Houston, TX | Oil and Gas Drilling |
| Sexy Hair Concepts, CA | Personal Products |
| Visteon Corp., Van Buren, Michigan | Automotive Parts |
| Truvo Corp., Belgium | Print Directory/Media |
| MMFX Steel, Welland, Ontario | Steel Producer |
| EnviroSolutions, DC | Waste Management |
| Confidential | Distribution |
| Eclipse Aviation, New Mexico | Light Aircraft |
| SK Foods, Monterrey, CA | Food Processing/Dist. |
| Idearc. Corp | Print Directory/Media |

| | |
|---|---|
| Philadelphia Newspapers, PA | Print Media |
| BHM Technologies, Michigan | Automotive Parts |
| Motor Coach Industries, Chicago, IL | Motor Coach Manu. |
| Intermet Corp., Michigan | Automotive Parts |
| Confidential | Retail Distribution |
| Dura Automotive Rochester Hills, Michigan | Automotive Parts |
| Confidential | Gaming |
| Confidential | Homebuilder |
| Pac-West Telecom, California | Telecom |
| Neoplan, Denver Colorado | Parts Supplier |
| Global Power, Tulsa, Oklahoma | Engineering and Construction |
| Galvex Holdings, Tallin Estonia | Steel Producer |
| Anchor Glass, Tampa, Florida | Glass Manufacturer |
| Citation Corp., Birmingham, Alabama | Automotive Parts Manu. |
| Stelco Inc., Hamilton, Ontario | Steel Producer |
| LSG Skychefs Dallas, Texas | Food Distribution/Airline |
| Protection One. Dallas, Texas | Home Security |
| Corban Communications, Dallas, Texas | Telecom |
| Kvarner USA Inc., Houston, Texas | EC/Oil and Gas |
| Supra Telecom, Miami, Florida | Telecom |
| ATX Communications (corecomm) | Telecom |
| Cable and Wireless, USA | Telecom |
| Touch America Inc., Butte Montana | Telecom |
| Philips Services Corp., Houston Texas | Environmental/Metals |
| Encompass Services, Houston Texas | Engineering and Construction |
| Focal Communications, Chicago Ill. | Telecom Company |
| Protexa Construction, Mont. Mexico | EC/Oil and Gas |
| Gentek Inc., Par. New Jersey | Manufacturing |
| Song Networks, Stockholm, Sweden | Telecom Company |
| Comdisco Inc., Rosemont, Illinois | Technology/Leasing Company |
| IT Group Inc., Pittsburgh, Penn. | Engineering and Construction |
| Washington Group Int. Inc., Boise, Idaho | Engineering and Construction |
| American Medical Response, Denver, CO | Medical Services |
| Corrections Corporation of America, Nashville | Privately Run Prisons |
| Harnischfeger Industries, Milwaukee, Wisc. | Mining and Excavation Equip. |
| STS/Asche Transportation, Shannon, Ill | Trucking Company |
| Apex Global Internet Services, Bethesda, Md | Telecom Company |
| Claridge Casino and Hotel, Atlantic City, NJ | Casino and Gaming |

| | |
|---|---|
| Plaintree Systems, US/Canada | Data Switches |
| Active Systems Integration Inc, Princeton, NJ | Network Management Software |
| Cary Peripherals Inc, Nepean, Canada | Computer Peripherals |
| Wackid Radio, Ottawa, Canada | Electronics Retail |
| Loeb Inc, Montreal, Canada | Grocery Chain |
| Kinalea Homes, Kingston, Canada | Residential Home Builder |
| Dedicated Technology Corp., US/Canada | Digital Video Compression |
| Confederation Life, Toronto, Canada | Insurance Company |
| Northern Trust Company, Toronto, Canada | Trust Company |
| National Defence Credit Union, Ottawa | Credit Union |

# **EXHIBIT B**

DocuSign Envelope ID: 84BDD3B5-7509-4AEE-9E99-14FC957237C

1  Bruce Isaacs, Arbitrator

2  SIGNATURE RESOLUTION, LLC

3  633 W. 5th Street, Suite 1000

4  Los Angeles, CA 90071

5  bisaacs@signatureresoution.com

6

7

8

9  **AMERICAN ARBITRATION ASSOCIATION**

10

11  **COMMERCIAL ARBITRATION TRIBUNAL**

12

13  ORANGE BANG, INC., a California                AAA CASE NO. 01-20-0005-6081

14  corporation; and MONSTER ENERGY

15  COMPANY, a Delaware corporation,              **FINAL ARBITRATION AWARD -**

16                                                **PHASE I AND PHASE 2**

17          Claimants/Counter-Respondent,

18

19                       vs.

20

21  VITAL PHARMACEUTICALS, INC., d/b/a

22  VPX SPORTS, a Florida corporation,

23

24          Respondent/Counter-Claimant.

25

26

27

28

1  whether this energy drink is a "creatine-based" product falling within the ambit of paragraph 7 C or

2  whether it is not a "creatine-based" product falling within the ambit of paragraph 7 D?

3       At the arbitration hearing, both sides called various science experts to explain whether or

4  not CLL is creatine and whether or not a product with CLL meets the "creatine-based" standard set

5  forth in paragraph 7 of the 2010 Agreement.  With respect to the question of whether or not CLL is

6  creatine, VPX's expert, Guillermo Escalante ("Escalante")[11] and Monster / Orange Bang's expert,

7  Richard Kreider ("Kreider"), both agreed that the two key questions that need to be answered in

8  order to make that determination are:  (1) Does the compound contain the **full** creatine molecule?

9  (2) Does the compound increase the creatine levels in the body?  Kreider Testimony, AHT, pp.

10  977:17 - 979:10; Escalante Testimony, AHT, p. 3584:10-17.  With respect to the question of

11  whether or not a product is "creatine-based", Escalante testified that this determination likewise

12  turns on two questions (albeit related questions) and, as Escalante framed them:  (1) Does the

13  product have the creatine compound in it? (2) Does the product have enough of the creatine

14  compound in it to elicit a positive response in the body?  Escalante Testimony, AHT, p. 3579:  8 –

15  3586:13.

16       Based on this nearly-identical framing essentially agreed to by both sides, Escalante made

17  some significant admissions, some of which can only be characterized as **stunning** and not helpful

18  in advancing VPX's position in this case as follows:

19     •  Escalante did not testify that CLL is a form of creatine.  Rather, he testified that ████

20  ████████████████████████████████████████████

21  ████████████████████████ Escalante Testimony, AHT, p. 3556:10 –

22  3559:3.

23

24

25

_____

26  [11] Although Monster and Orange Bang elicited testimony indicating that Escalante may not be qualified or persuasive as an expert on the science issues raised in this case, and that he may be

27  tainted by bias issues because he has rendered services as an influencer / promoter on behalf of VPX (Escalante Testimony, AHT, p. 3535 - 3550 ), VPX nevertheless put Escalante forward as its

28  most important expert on issues relating to CLL, creatine and whether or not the "creatine-based" standard in the 2010 Settlement Agreement has been, or has not been, satisfied.

- Although Escalante testified that ███████████████████████████ he testified that ███████████████████████████████████ ████████ Escalante Testimony, AHT, p. 3559:20 – 3560:23.

- Although Escalante testified that █████████████████████████████ he testified that █████████████████████████████ Escalante Testimony, AHT, p. 3560:25 – 3561:24.

- **Escalante testified that as of his June 2021 deposition, he did not consider COP to be a type of creatine.** Escalante Testimony, AHT, p. 3565: 7 – 22; 3566: 18 - 25.

- Escalante testified that as a scientist he would want to know if CLL works in the human body in order to determine if it is a creatine supplement. Escalante Testimony, AHT, p. 3569: 25 – 3570: 25.

- Escalante testified that he has not conducted any studies on CLL.[12] Escalante Testimony, AHT, p. 3571:2-18.

- **Escalante testified that based on the scientific studies conducted on CLL to date, there is no evidence to support the efficacy of CLL.** Escalante Testimony, AHT, p. 3575:3-19.

- **Escalante testified that** ██████████████████████████████ ██████████████████████████████████████████ ████████████████████ Escalante Testimony, AHT, p. 3582:12-24.

- Escalante testified that he agrees that ███████████████████████ ███████████████████████████████████████ Escalante Testimony, AHT, p. 3583:5-21.[13]

---

[12] Escalante also acknowledged that independent studies are valid even if they are paid for by VPX or by Monster or, in other words, the fact that studies have a sponsor who pays for them does not negatively affect the independent, scientific integrity of such a study. Escalante Testimony, AHT, p. 3573: 4 – 3575:2.

[13] The manufacturing flow-chart for CLL, the recipe followed to process and manufacture CLL, ████████████████████████████████████ *See* Exhibit 333, p. 21; Li Testimony, AHT, 1623:11-17. To re terate t e ana ogy ra se   ur ng the arbitration hearing, if the recipe is for guacamole, but avocados are not used at the start, and avocadoes are not added at any time along the way, how can the end product still be guacamole?

FINAL ARBITRATION AWARD – PHASE 1 AND PHASE 2

# **EXHIBIT C**

Instagram post regarding scientific study in support of Bang



Date: August 10, 2020

Instagram post on August 16, 2019 regarding monthly shipment from Bang and consulting for the Company



Date: August 16, 2019

Instagram post advertising new Bang Energy flavor, while defending Bang in the comments



Date: April 5, 2019

3

Instagram post advertising Bang and stating own discount code



Date: January 18, 2019

# <u>EXHIBIT D</u>

Harty et al. Journal of the International Society of Sports Nutrition    (2020) 17:45
https://doi.org/10.1186/s12970-020-00374-5

Journal of the International
Society of Sports Nutrition

**RESEARCH ARTICLE**                                                              **Open Access**

# Effects of Bang® Keto Coffee Energy Drink on Metabolism and Exercise Performance in Resistance-Trained Adults: A Randomized, Double-blind, Placebo-controlled, Crossover Study



Patrick S. Harty[1], Matthew T. Stratton[1], Guillermo Escalante[2], Christian Rodriguez[1], Jacob R. Dellinger[1], Abegale D. Williams[1], Sarah J. White[1], Robert W. Smith[1], Baylor A. Johnson[1], Mark B. Sanders[1] and Grant M. Tinsley[1]*

## Abstract

**Background:** Energy drinks are often consumed by the general population, as well as by active individuals seeking to enhance exercise performance and augment training adaptations. However, limited information is available regarding the efficacy of these products. Thus, the purpose of this study was to determine the effects of a commercially available caffeine- and protein-containing energy drink on metabolism and muscular performance.

**Methods:** Sixteen resistance-trained males ($n = 8$; mean ± SD; age: 22.4 ± 4.9 years; body mass: 78.8 ± 14.0 kg; body fat: 15.3 ± 6.4%) and females ($n = 8$; age: 24.5 ± 4.8 years; body mass: 67.5 ± 11.9 kg; body fat: 26.6 ± 7.1%) participated in this randomized, double-blind, placebo-controlled, crossover study. Following a familiarization visit, participants completed two identical visits to the laboratory separated by 5–10 days, each of which consisted of indirect calorimetry energy expenditure (EE) assessments before and after consumption of the beverage (Bang® Keto Coffee; 130 kcal, 300 mg caffeine, 20 g protein) or placebo (30 kcal, 11 mg caffeine, 1 g protein) as well as after exercise testing. In addition, participants' subjective feelings of energy, fatigue, and focus as well as muscular performance (leg press one-repetition maximum and repetitions to fatigue, maximal isometric and isokinetic squat testing) were assessed. Multiple repeated measures ANOVAs with Tukey *post-hoc* tests were used to analyze data. Estimates of effect size were quantified via partial eta squared ($\eta_P^2$) and Hedge's g.

*(Continued on next page)*

---

* Correspondence: grant.tinsley@ttu.edu
[1]Energy Balance & Body Composition Laboratory, Department of Kinesiology & Sport Management, Texas Tech University, Lubbock, TX 79424, USA
Full list of author information is available at the end of the article



© The Author(s). 2020 **Open Access** This article is licensed under a Creative Commons Attribution 4.0 International License, which permits use, sharing, adaptation, distribution and reproduction in any medium or format, as long as you give appropriate credit to the original author(s) and the source, provide a link to the Creative Commons licence, and indicate if changes were made. The images or other third party material in this article are included in the article's Creative Commons licence, unless indicated otherwise in a credit line to the material. If material is not included in the article's Creative Commons licence and your intended use is not permitted by statutory regulation or exceeds the permitted use, you will need to obtain permission directly from the copyright holder. To view a copy of this licence, visit http://creativecommons.org/licenses/by/4.0/. The Creative Commons Public Domain Dedication waiver (http://creativecommons.org/publicdomain/zero/1.0/) applies to the data made available in this article, unless otherwise stated in a credit line to the data.

Case 22-17842-PDR    Doc 421    Filed 11/29/22    Page 36 of 114

Harty et al. Journal of the International Society of Sports Nutrition    (2020) 17:45    Page 2 of 13

(Continued from previous page)

**Results:** A significant interaction effect was identified for EE ($p < 0.001$, $\eta_P^2 = 0.52$) but not respiratory exchange ratio ($p = 0.17$, $\eta_P^2 = 0.11$). Following consumption of the beverage, EE was 0.77 kcal·min$^{-1}$ greater than placebo at the post-beverage time point ($p < 0.001$) and 0.37 kcal·min$^{-1}$ greater than placebo at the post-exercise time point ($p = 0.011$). However, no between-condition differences were detected for any subjective or muscular performance outcomes.

**Conclusions:** The results of this study suggest that consumption of the energy drink had minimal effects on lower-body muscular performance and subjective factors in the context of a laboratory setting. However, the beverage was found to significantly increase energy expenditure compared to placebo immediately following ingestion as well as during the recovery period after an exercise bout, suggesting that active individuals may improve acute metabolic outcomes via consumption of a caffeine- and protein-containing energy drink.

**Trial registration:** This trial was prospectively registered at ClinicalTrials.gov (Identifier: NCT04180787; Registered 29 November 2019).

**Keywords:** Energy drinks, Metabolism, Caffeine, Protein, Performance

## Introduction

Energy drinks and related caffeine-containing energy products are often consumed by the general population, adolescents, and individuals seeking to enhance exercise performance, augment training adaptations, and assist with weight loss [1–3]. These products typically contain caffeine and a blend of additional ingredients such as taurine, guarana, amino acids, and B-vitamins which are purported to improve energy levels, metabolism, and exercise performance [4]. However, it is important to note that the majority of the acute performance and metabolic benefits of energy drinks appear to be mediated by their caffeine and/or carbohydrate content [4]. To date, several investigations have assessed the efficacy of energy drinks and related products to improve muscular strength and power [5, 6], muscular endurance [7], behavioral alertness [8], and sport-specific performance [9], with generally-positive results [10]. In some cases, researchers are faced with significant challenges when attempting to quantify the ergogenic potential of a given energy product, as energy drink labels will often list many ingredients in "proprietary blends," with exact amounts not provided [4]. Even when proprietary blends are not employed, the wide diversity of products on the market indicates that targeted research should be conducted to determine the actual efficacy of commercially available formulations.

A variety of investigations have demonstrated that the consumption of caffeine-containing energy drinks may acutely increase metabolic rate [11–13], which could potentially result in preferential changes in body composition over time with prolonged use [14]. Similar short-term metabolic effects have also been noted following the acute consumption of supplemental protein prior to an exercise session [15–17]. For example, Wingfield and colleagues [16] examined the metabolic impact of supplemental protein ingestion prior to aerobic

exercise, high-intensity interval training, and resistance training. Compared to a calorie-matched carbohydrate condition, protein ingestion resulted in greater energy expenditure and a lower respiratory exchange ratio, suggesting increased fat oxidation and/or decreased exogenous carbohydrate oxidation, during the hour following exercise. Similarly, Gieske et al. [15] demonstrated that participants who consumed whey protein or casein protein prior to 30 min of moderate-intensity treadmill exercise had significantly greater within-group changes in energy expenditure following exercise compared to those who consumed a calorie-matched carbohydrate solution or a non-caloric control. Taken together, these results suggest that caffeine-containing products may provide beneficial metabolic effects, particularly when consumed in conjunction with other dietary agents such as additional protein.

Currently, more information is needed to determine the combined effect of acute protein intake and caffeinated energy drink consumption prior to an exercise bout on metabolic outcomes before and after the bout. Similarly, further information is required to determine the effectiveness of a caffeine and protein-containing energy drink on isometric, isokinetic, and isotonic measures of muscular performance. Many individuals also consume energy drinks to increase feelings of energy and reduce subjective fatigue, although there are limitations to estimating the real-world impact of energy drinks on these outcomes in the laboratory setting. Importantly, as females have traditionally been underrepresented in sports science research [18], it is also critical to examine the aforementioned outcomes in both males and females. Thus, the goal of the present study was to quantify the acute ergogenic and metabolic effects of a commercially available caffeine and protein-containing energy drink in resistance-trained males and females. A secondary purpose of this investigation was to quantify changes in

participant ratings of perceived energy, fatigue, and focus following consumption of the beverages. It was hypothesized that acute ingestion of the energy drink would improve muscular performance and result in significantly elevated measures of resting metabolic rate.

## Methods

### Overview

This randomized, double-blind, placebo-controlled, crossover study consisted of three visits to the laboratory. During an initial screening and familiarization visit, participants were informed of the study requirements, completed a written informed consent document, and underwent preliminary assessment of height, weight, and body composition via bioelectrical impedance analysis. In addition, each participant was familiarized with the performance tests that would be completed throughout the study. After completion of the screening visit, all participants underwent two morning testing sessions, each separated by 5–10 days. During each testing visit, participants reported to the laboratory after an overnight (≥ eight-hour) fast from all calorie-containing foods and fluids and an eight-hour abstention from caffeine, nicotine, and alcohol. In addition, participants were instructed to abstain from intense lower-body resistance exercise for at least 48 h prior to each testing session, and to completely abstain from all exercise for at least 24 h prior to each session. Upon arrival, participants underwent body weight assessment and completed a 24-h dietary recall to allow for replication of dietary intake on the day prior to the session. Following completion of the dietary recall, participants completed three visual analog scales (VAS) rating their feelings of energy, fatigue, and focus and then underwent a baseline resting metabolic rate (RMR) assessment via indirect calorimetry. Next, participants consumed either the energy drink or placebo in a randomized and double-blind fashion. Additional VAS measurements were collected before and after ingestion. After 10 min of supine rest, participants underwent a second RMR assessment and then completed a fourth VAS questionnaire. Following the questionnaire, participants performed a five-minute standardized warmup consisting of bodyweight squats, lunges, and low-to-moderate effort squat jumps. Next, participants performed three maximal isometric squats at 150 and 120 degrees of knee extension using a

mechanized squat device (Exerbotics eSq, Tulsa, OK). Following the isometric testing, participants performed a three-repetition, maximal isokinetic squat protocol to assess maximal eccentric and concentric force production, followed by a fifth VAS questionnaire. Participants then performed one-repetition maximum (1RM) testing and repetitions to fatigue on an angled leg press, using a load equivalent to 2x body mass for males, and 1.5x body mass for females. After completing the repetitions to fatigue, the participants then repeated the isometric and isokinetic squat testing protocols, followed by another VAS questionnaire. Immediately thereafter, participants were positioned to undergo a final RMR assessment, which commenced 5 min after completion of the VAS questionnaire. Following the final RMR assessment, a final VAS questionnaire was completed. An overview of data collection procedures is provided in Fig. 1. Five to ten days after completing the first testing session, participants reported to the lab and completed an identical testing protocol with the alternate beverage condition. This study was approved by the Texas Tech University Institutional Review Board (IRB00000276), and all participants signed the approved consent document prior to participation. This trial was prospectively registered on clinicaltrials.gov (protocol ID: NCT04180787; registered 29 November 2019).

### Participants

Sixteen resistance-trained adults (8 M, 8F; Table 1) were recruited to participate in this study. All participants were required to be between the ages of 18–40, generally healthy (defined as an absence of any disease or medical condition which could potentially be negatively affected by consumption of the product), and regular caffeine consumers (defined as consumption of at least 200 mg·day$^{-1}$). In addition, all participants were required to be resistance-trained, defined as completing three or more resistance training sessions per week for at least 1 year and including at least weekly lower body training through a multi-joint exercise such as the squat or leg press. Exclusion criteria included taking any prescription medication which would make participation unsafe or influence study outcomes, an inability to complete lower-body resistance exercise due to injury or medical condition, allergy to any of the ingredients in the energy drink or placebo, self-reported caffeine sensitivity



**Fig. 1** Testing Session Overview. ASA24: Self-administered dietary recall; BM: Body mass assessment; EE Assessment: Energy expenditure assessment; VAS: Visual analog scale

Case 22-17842-PDR    Doc 421    Filed 11/29/22    Page 38 of 114

Harty et al. Journal of the International Society of Sports Nutrition    (2020) 17:45    Page 4 of 13

**Table 1** Participant Characteristics

|  |  | Mean ± SD |
|---|---|---|
| Age (years) | Males (n = 8) | 22.4 ± 4.9 |
|  | Females (n = 8) | 24.5 ± 4.8 |
|  | **Total (N = 16)** | **23.4 ± 4.8** |
| Height (cm) | Males (n = 8) | 175.2 ± 7.9 |
|  | Females (n = 8) | 166.2 ± 6.2 |
|  | **Total (N = 16)** | **170.7 ± 8.3** |
| Body Mass (kg) | Males (n = 8) | 78.8 ± 14.0 |
|  | Females (n = 8) | 67.5 ± 11.9 |
|  | **Total (N = 16)** | **73.1 ± 13.8** |
| Body Fat (%) | Males (n = 8) | 15.3 ± 6.4 |
|  | Females (n = 8) | 26.6 ± 7.1 |
|  | **Total (N = 16)** | **21.0 ± 8.8** |

characterized by unwanted side effects, pregnancy or active breastfeeding, and self-reported claustrophobia.

## Procedures
### Body composition assessment
Body composition was assessed during the initial screening visit via bioelectrical impedance analysis using a free-standing, eight-point multifrequency bioelectrical impedance device (Inbody 770, Inbody USA, Cerritos, CA). Participants removed their shoes and socks and wore light athletic clothing while undergoing the assessment.

### Energy expenditure assessment
Energy expenditure (EE) and respiratory exchange ratio (RER) were assessed via indirect calorimetry (ParvoMedics TrueOne 2400, ParvoMedics, Sandy, UT). Prior to each research visit, daily gas flow and gas analyzer calibrations were performed per manufacturer guidelines. During each resting metabolic rate assessment, participants reclined in a supine position with a clear plastic hood and drape placed over their shoulders and were instructed to remain motionless but awake throughout the duration of the test. If desired, a blanket was provided to participants during the test. All assessments were conducted in the same climate-controlled laboratory with the lights dimmed. Prior to the initial EE assessment, participants rested for 20 min followed by at least 10 min of expired gas collection, with the first 5 min of the test discarded according to the recommendations of Fullmer and colleagues [19]. The initial resting EE assessment was continued until the coefficient of variation (CV) for EE values was less than 10% and the CVs for measured VO2 and VCO2 were less than 5% for a period of five consecutive minutes. The five-minute period which met these criteria was recorded. During the pre-exercise and post-exercise metabolic assessments, expired gases were collected continuously for

30 min to better capture the acute variation in metabolic outcomes due to the thermic effect of food, acute thermogenic effects of caffeine, and excess post-exercise oxygen consumption. Following ingestion of the energy drink or placebo, participants rested in the supine position for 10 min prior to the pre-exercise EE assessment. After completing the final performance assessments, a period of up to 5 min of supine rest was also implemented prior to the post-exercise EE assessment. The observed CVs for EE in the three assessments were: 2.7 ± 0.9% (pre-beverage), 5.3 ± 2.6% (post-beverage), and 7.5 ± 2.5% (post-exercise). Due to the likelihood that monitoring EE assessments could potentially compromise the blinding of research personnel, a single researcher who was not directly involved in muscular performance testing monitored all EE assessments.

### Isometric and isokinetic testing
Isometric and isokinetic performance tests were conducted using a mechanized squat device (Exerbotics eSq, Tulsa, OK). Prior to starting the testing battery, participants completed a five-minute warm up consisting of bodyweight air squats, alternating lunges, and jump squats. Upon completion of the warm up, participants removed their shoes and stood in a self-selected foot position on the squat platform, which was noted and replicated at all subsequent testing sessions. During the tests, participants stood in an upright position with the pads of the squat device resting on the upper trapezius. Maximal isometric force production tests were conducted at 150 and 120 degrees of knee extension. During each isometric test, participants performed two practice warmup attempts, one at approximately 50% of maximal effort and one at approximately 75% of maximal effort, followed by two maximal isometric squat attempts for which the participant was instructed to push as hard and as fast as possible. Following the isometric assessments, participants completed a three-repetition maximal isokinetic force production test, with a range of motion from 90 degrees to 150 degrees of knee extension. Each repetition consisted of a four-second eccentric phase followed by a four-second concentric phase, with brief pauses at the 90 degree and 150-degree positions. Participants were instructed to perform the first repetition at approximately 50% effort, and this repetition was not included in data analysis. The remaining two repetitions were performed with maximal effort, and participants were provided with strong verbal encouragement throughout all muscular performance assessments. Force data during the isometric and isokinetic tests was sampled from a load cell at 1 kHz (MP1150WSW, Biopac Systems Inc., Santa Barbara, CA) and later processed using a custom software program (LabVIEW Version 11.0, National Instruments, Austin, TX). All analyses

Case 22-17842-PDR    Doc 421    Filed 11/29/22    Page 39 of 114

Harty et al. Journal of the International Society of Sports Nutrition    (2020) 17:45    Page 5 of 13

were conducted using a scaled and filtered force signal (low-pass filtered with a 10-Hz cutoff, zero-phase lag, fourth-order Butterworth filter). To determine isometric peak force, the highest 500 ms epoch was identified and quantified. In addition, peak rate of force development ($RFD_{peak}$), early rate of force development ($RFD_{50}$; i.e., RFD in the first 50 ms), and late rate of force development ($RFD_{200}$; i.e., RFD in the first 200 ms) were determined. The initiation of force production for RFD variables was determined using the automated method, with the onset specified as 1% of the maximal force produced. To quantify isokinetic peak force, the highest mean 25 ms epochs for concentric and eccentric portions of the repetition were identified. These values obtained from the second and third repetitions of the three-repetition test were averaged for analysis. The reliability of these procedures in our laboratory has previously been described [20].

### Isotonic testing

Lower-body strength was also evaluated via angled leg press 1RM testing. Immediately after completion of the initial isometric and isokinetic testing protocols, participants performed a leg press warmup protocol according to the recommendations set forth by the National Strength and Conditioning Association [21]. In short, a set of eight-ten repetitions was performed at 40–60% perceived 1RM, followed by a set of three-five repetitions at 60–80% perceived 1RM, followed by a set of two-three repetitions with an additional 10–20% 1RM added. After completing the warmup sequence, participants performed up to five attempts, with 3 min of rest between attempts, until a 1RM was determined. After 3 min of rest following the final 1RM attempt, participants performed maximal leg press repetitions to fatigue using a load equivalent to 2x body mass for males, and 1.5x body mass for females. The load used for repetitions to fatigue was standardized during both testing sessions. Participants were allowed to perform repetitions at a self-selected cadence but were instructed not to pause between repetitions; the test was terminated if participants were unable to comply with this instruction. For all repetitions, participants were required to achieve a ~ 90-degree knee angle before initiating the concentric portion of the movement. Failure to meet this requirement resulted in a repetition being considered invalid. To promote further standardization, participants were instructed to wear the same footwear during each testing session, and their foot positions were recorded and replicated during all leg press attempts. All testing was performed on a plate-loaded angled leg press machine (EliteFTS™ Leg Press) under direct researcher supervision.

### Subjective measures

Subjective ratings of energy, fatigue, and focus were collected at seven time points during each visit: upon arrival to the laboratory, immediately prior to beverage ingestion, immediately post-ingestion, immediately prior to isometric/isokinetic testing, immediately prior to leg press testing, immediately after leg press testing, immediately after the second bout of isometric/isokinetic testing, and immediately after the final metabolic assessment. During each time point, participants completed visual analog scales (VAS) administered via electronic application on a tablet (VasQ). All visual analog scales were grounded, with relevant descriptors on either extreme of the line but no additional markings on the line itself. All VAS scores were expressed in a score ranging from 0 to 100, with zero being the minimum score and 100 being the maximal score.

### Beverage ingestion

During each testing session, participants ingested either a commercially available, caffeine- and protein-containing energy drink (Bang® Keto Coffee, Hazelnut flavor) or a flavor and volume-matched placebo in a randomized, placebo-controlled, counter-balanced, cross-over fashion. Randomization of the beverage ingestion order was performed using the *randomizeBE* software package in R and was counterbalanced within each sex. Each beverage was mixed with ice and given to the participants in an opaque shaker bottle, and participants were instructed to drink their assigned beverage within 5 min without commenting on its flavor or texture for the duration of the visit. Both the energy drink and flavor-matched placebo were provided by the manufacturer in unmarked cans with the exception of "A" and "B" labels. The manufacturer's laboratory producing the beverages also provided the nutritional facts of the energy drink and placebo beverages. The energy drink contained approximately 130 kcal, 2 g fat, 5 g carbohydrate, 20 g protein, and 300 mg caffeine and was identical to the commercially available version sold in stores, while the placebo contained approximately 30 kcal, 1 g fat, 7 g carbohydrate, 1 g protein, and 11 mg caffeine and contained decaffeinated flavoring used in the commercial product. The full ingredient list for the energy drink was: coffee, protein blend (milk protein concentrate, whey protein isolate), natural and artificial flavors, cellulose cell, Straight 8® (caprylic triglyceride), cellulose gum, mono and diglycerides, sodium tripolyphosphate, sweet cream, carrageenan, caffeine, BCAAs (L-leucine, L-isoleucine, L-valine), and sucralose. The placebo beverage contained the same flavoring agents along with decaffeinated coffee in order to match the taste of the energy drink.

Harty et al. Journal of the International Society of Sports Nutrition    (2020) 17:45    Page 6 of 13

### Dietary recall

Participants were asked to follow the same self-selected dietary intake for the single day prior to each testing visit. Each participant completed the Automated 24-h Dietary Assessment Tool (ASA24®) [22] upon arrival to the lab in order to assist with recalling the previous day's diet. ASA24® is a web-browser based tool provided by the National Cancer Institute that utilizes an automated multiple-pass method to collect detailed dietary information. A copy of the previous day's dietary recall was provided to each participant after the first testing visit for replication prior to the second visit. For standardization purposes, ASA24® was performed at the beginning of both testing visits.

### Statistical analysis

Analysis of variance (ANOVA) with repeated measures was used to examine potential changes in outcome variables across time. The prevalence of missing data ranged from 0 to 6%, with the primary reason for missing data being technical failure of a device. Multiple imputation with 100 iterations was performed using the *mice* package [23] in order to estimate the missing values and preserve the full sample size for each outcome variable. ANOVA was performed using the *afex* package [24], and $\eta_p^2$ effect sizes were generated. Normality of residuals was assessed by visual examination of quantile-quantile plots. Data that were not normally distributed were transformed using the *BestNormalize* package [25]. In the event of sphericity violations, Greenhouse-Geisser corrections were employed. Follow up for significant effects was performed using pairwise comparisons with Tukey adjustment via the *emmeans* package [26]. Although ANOVA procedures and follow up pairwise comparisons were based on transformed data when appropriate due to normality violations, raw data are presented in the figures to aid interpretability. Leg press variables were analyzed using paired-samples t-tests. Statistical significance was accepted at $p \leq 0.05$, although raw data and effect sizes are displayed to facilitate holistic interpretation of results. Data were analyzed using R (v. 3.6.1) [27]. All data analysis was conducted and finalized prior to unblinding of beverage conditions.

## Results

Following the initial screening process, 19 individuals were deemed eligible for participation, signed the informed consent document, and began the study. Three participants withdrew from the study (one due to onset of minor illness unrelated to the study, and two due to scheduling conflicts). Sixteen participants (8 males, 8 females) completed all aspects of data collection. Participant demographics are presented in Table 1.

### Indirect Calorimetry

#### Energy expenditure

Main effects for condition ($p < 0.001$, $\eta_p^2 = 0.68$) and time ($p < 0.001$, $\eta_p^2 = 0.81$) were identified for EE, as well as a significant condition by time interaction ($p < 0.001$, $\eta_p^2 = 0.52$; Fig. 2a). In the placebo condition, EE did not increase significantly from pre-beverage to post-beverage ($p = 0.24$). However, EE increased by approximately 0.34 kcal·min$^{-1}$ from post-beverage to post-exercise ($p = 0.025$). Additionally, post-exercise EE was approximately 0.58 kcal·min$^{-1}$ higher than the baseline (pre-beverage) EE ($p < 0.001$).

Following consumption of the energy drink, EE increased approximately 1.10 kcal·min$^{-1}$ from pre-beverage to post-beverage ($p < 0.001$) and remained elevated by approximately 1.04 kcal·min$^{-1}$ at post-exercise ($p < 0.001$). However, there was no difference between post-beverage and post-exercise ($p = 0.96$). There were no baseline differences in EE between the energy drink or placebo conditions. EE following consumption of the energy drink was 0.77 kcal·min$^{-1}$ greater than placebo at the post-beverage time point ($p < 0.001$) and 0.37 kcal·min$^{-1}$ greater than placebo at the post-exercise time point ($p = 0.011$).

#### Respiratory exchange ratio

Significant main effects for time ($p < 0.001$, $\eta_p^2 = 0.63$) but not condition ($p = 0.28$, $\eta_p^2 = 0.07$) were identified for respiratory exchange ratio (Fig. 2b). A significant condition by time interaction was not identified for RER ($p = 0.17$, $\eta_p^2 = 0.11$). Tukey post-hoc comparisons showed that RER was significantly lower at the post-exercise time point compared to pre-beverage ($p < 0.001$) and post-beverage ($p < 0.001$) with both conditions combined.

### Muscular performance

#### Isokinetic testing

A trend for a significant main effect of attempt ($p = 0.07$, $\eta_p^2 = 0.20$) but not condition ($p = 0.88$, $\eta_p^2 = 0.00$) was identified for concentric force production during isokinetic testing (Fig. 3a). However, a significant interaction effect was not identified ($p = 0.20$, $\eta_p^2 = 0.11$). Effect size analysis showed a negligible effect of condition on either concentric attempt (g = 0.04 and 0.05, respectively). No significant main ($p > 0.07$) or interaction ($p = 0.71$, $\eta_p^2 = 0.01$) effects were found for eccentric force production during isokinetic testing (Fig. 3b). Additionally, negligible impact of condition was observed on eccentric force production during either the first (g = 0.03) or second attempts (g = 0.07).

Case 22-17842-PDR    Doc 421    Filed 11/29/22    Page 41 of 114

Harty et al. Journal of the International Society of Sports Nutrition    (2020) 17:45    Page 7 of 13



**Fig. 2** Metabolism. Changes in resting metabolic rate (RMR; panel **a**) and respiratory exchange ratio (RER; panel **b**), assessed via indirect calorimetry, are displayed. For RMR, a significant condition by time interaction was observed using ANOVA with repeated measures. Subsequently, Tukey post-hoc comparisons were performed. Asterisks indicate significant differences between conditions at the specified time point, while E and PL indicate significant differences in the energy drink or placebo conditions, respectively, relative to the pre-beverage value. For RER, a significant main effect for time was observed. T indicates a significant difference from the pre-beverage time point in both groups combined. Error bars indicate the 95% confidence intervals for within-subjects SE due to the repeated-measures design of this study [24, 28]

## Isometric testing

A trend for a main effect of condition ($p = 0.07$, $\eta_P^2 = 0.19$) and a significant main effect for time ($p < 0.001$, $\eta_P^2 = 0.65$) were identified for isometric force production at 120 degrees of knee extension (Fig. 3c). However, a significant interaction effect was not identified ($p = 0.49$, $\eta_P^2 = 0.03$). Follow-up analysis showed that Attempt 2 was approximately 148 N less than Attempt 1 with both conditions combined. Effect size analysis of the impact of condition on peak force production showed a negligible effect in favor of the energy drink condition during attempt 1 ($g = 0.11$) and a small effect in favor of the energy drink condition during the second attempt ($g = 0.30$).

No significant main ($p > 0.17$) or interaction ($p = 0.89$, $\eta_P^2 = 0.00$) effects were found for peak rate of force production during isometric testing (Fig. 3e). However, effect size analysis of the impact of condition on peak rate of force production at 120 degrees showed a

small effect in favor of the energy drink during attempt 1 ($g = 0.23$) and attempt 2 ($g = 0.30$). Similarly, no significant main ($p > 0.28$) or interaction ($p > 0.16$) effects were found for $RFD_{50}$ or $RFD_{200}$ at 120 degrees extension.

No significant main ($p > 0.08$) or interaction ($p = 0.29$, $\eta_P^2 = 0.07$) effects were found for maximal isometric force production at 150 degrees of knee extension (Fig. 3d). Effect size analysis of the impact of condition on peak force production showed a negligible effect in favor of the energy drink during attempt 1 ($g = 0.13$) and a negligible effect in favor of placebo during the second attempt ($g = 0.05$).

A main effect for time ($p = 0.028$, $\eta_P^2 = 0.28$) but not condition ($p = 0.85$, $\eta_P^2 = 0.00$) was found for peak rate of force production during isometric testing at 150 degrees (Fig. 3f). No significant interaction effect was identified ($p = 0.24$, $\eta_P^2 = 0.09$). Effect size analysis of the impact of condition on peak rate of force production at 150 degrees showed a negligible effect in favor of the energy drink condition during attempt 1 ($g = 0.13$) and a negligible effect in favor of

Harty *et al. Journal of the International Society of Sports Nutrition*    (2020) 17:45

Page 8 of 13



**Fig. 3** Squat Performance. Values for isokinetic and isometric performance on the mechanized squat device are displayed, with both time points occurring after beverage ingestion. Pre-RE tests were performed following the second indirect calorimetry assessment and prior to the resistance exercise (RE) testing, while post-RE tests occurred immediately after RE (leg press) testing. Values are displayed for peak concentric force ($PF_{CON}$; panel **a**), peak eccentric force ($PF_{ECC}$; panel **b**), peak isometric force at the 120-degree knee angle ($PF_{ISO120}$; panel **c**), peak isometric force at the 150-degree knee angle ($PF_{ISO150}$; panel **d**), peak rate of force development at the 120-degree knee angle ($RFD_{120}$; panel **e**), and peak rate of force development at the 150-degree knee angle ($RFD_{150}$; panel **f**). Data were analyzed using ANOVA with repeated measures, along with Tukey post-hoc comparisons. A main effect of time was present for $PF_{ISO120}$ ($p < 0.001$, $\eta_p^2 = 0.65$), along with a trend for a main effect of condition ($p = 0.07$, $\eta_p^2 = 0.19$). Additionally, a main effect of time was present for $RFD_{150}$ ($p = 0.028$, $\eta_p^2 = 0.28$). Error bars indicate the 95% confidence intervals for within-subjects SE due to the repeated-measures design of this study [24, 28]

placebo during attempt 2 (g = 0.05). Similarly, no significant main ($p > 0.11$) or interaction ($p > 0.54$) effects were found for $RFD_{50}$ at 150 degrees extension. A main effect of time ($p = 0.002$, $\eta_p^2 = 0.49$) but not condition was found for $RFD_{200}$ at 150 degrees extension, though no significant interaction was identified ($p = 0.98$, $\eta_p^2 = 0.00$). Follow up

indicated that $RFD_{200}$ was lower at the second attempt as compared to the first.

### Leg press
Significant differences in leg press one-repetition maximum ($p = 0.46$, g = 0.01) or repetitions to fatigue ($p =$

Harty et al. Journal of the International Society of Sports Nutrition (2020) 17:45

0.24, g = 0.06) were not identified between conditions (Fig. 4).

## Subjective measures

Significant main effects of time were found for subjective measures of Energy ($p = 0.008$, $\eta_p^2 = 0.26$), Fatigue ($p = 0.004$, $\eta_p^2 = 0.29$), and Focus ($p = 0.001$, $\eta_p^2 = 0.29$). No significant main effects of condition ($p > 0.086$) or interaction effects ($p > 0.010$) were identified for any of the three subjective outcomes (Fig. 5).

## Discussion

The purpose of this investigation was to assess acute changes in force production, muscular endurance, and metabolism following consumption of a commercially available caffeine- and protein-containing energy drink. The results of this study suggest that in the context of a laboratory environment, consumption of the energy drink had minimal effect on lower body muscular performance measures, including maximal force production, muscular strength, endurance, and rate of force

development. Similarly, consumption of the energy drink was not found to influence subjective ratings of energy, fatigue, or focus. However, the energy drink was found to significantly increase energy expenditure immediately following ingestion, as well as during the recovery period after a strenuous bout of exercise, as compared to a placebo containing negligible quantities of caffeine and protein. Finally, consumption of the energy drink had no demonstrable effect on RER, suggesting that changes in substrate utilization resulting from consumption were likely minimal.

In contrast to several previous studies, analysis of the performance data collected during this investigation revealed no significant between-condition differences for leg press one-repetition maximum, leg press repetitions to fatigue, eccentric or concentric force production during isokinetic testing, maximal isometric force production at 120 and 150 degrees of knee extension, and RFD characteristics at both 120 and 150 degrees of knee extension. Because caffeine has been shown to be the primary mediator of the acute ergogenic effects of energy drinks [4], the results of the present study may be



**Fig. 4** Leg Press Performance. Paired-samples t-tests were performed to examine group-level differences in leg press 1-repetition maximum (1RM; panel **a**) and repetitions to failure (panel **c**). No differences between conditions were observed. Error bars indicate SD, and individual responses are displayed in (panels **b** and **d**)

Harty *et al. Journal of the International Society of Sports Nutrition*    (2020) 17:45



**Fig. 5** Subjective Variables. Subject evaluations of energy (**a**), fatigue (**b**) and focus (**c**), evaluated via digital analog scale, are displayed. Data were analyzed via ANOVA with repeated measures, and main effects of time were observed for all three variables. Results of Tukey post-hoc comparisons are displayed, with shared letters indicating no difference between time points. Error bars indicate the 95% confidence intervals for within-subjects SE due to the repeated-measures design of this study [24, 28]

explained by the amount of caffeine consumed by participants prior to performance testing or the specific performance outcomes examined. To date, the majority of investigations showing beneficial effects of caffeine consumption on measures of strength or power have employed doses of at least 5–6 mg·kg$^{-1}$ [29], with 6 mg·kg$^{-1}$ being the most common [30]. However, other research has indicated an unclear relationship between the dose of caffeine, ranging from 2 to 6 mg·kg$^{-1}$, and lower-body muscular strength and endurance [31].

Based on mean bodyweight, the male and female participants in the present study received acute doses of approximately 3.8 mg·kg$^{-1}$ and 4.4 mg·kg$^{-1}$, respectively. Interestingly, the null results of the present study align with an earlier investigation with similar performance outcomes conducted by our lab group [32]. Like the present investigation, no definitive improvements in isokinetic squat performance relative to placebo were identified when participants were provided a pre-workout supplement containing 300 mg (4.0 mg·kg$^{-1}$) and 225

Case 22-17842-PDR    Doc 421    Filed 11/29/22    Page 45 of 114

Harty *et al. Journal of the International Society of Sports Nutrition*    (2020) 17:45    Page 11 of 13

mg (3.6 mg·kg$^{-1}$) of caffeine for males and females, respectively. In summary, it is possible that a greater acute dose of caffeine may be necessary for ergogenic effects to be detected using the performance outcomes employed in the present study or that caffeine has limited ergogenic value in the particular context of this study. While the participants in the present study were habitual caffeine consumers, it is unclear if this would influence the ergogenic effects of caffeine on resistance exercise [29]. Importantly, the notable differences between the laboratory and free-living settings should also be considered, particularly given the strong encouragement provided by researchers during all performance testing in the present study.

As hypothesized, EE was significantly increased immediately following ingestion of the caffeine and protein-containing energy drink, and remained elevated above baseline following the exercise bout. However, significant between-condition differences in RER were not detected, indicating that the proportions of carbohydrate and fat being oxidized were not measurably affected by consumption of the energy drink or placebo. However, the difference in protein content of the energy drink and placebo beverage, as well as the differential caffeine content, should be taken into consideration when interpreting these values. Importantly, EE in the energy drink condition was found to be approximately 0.77 kcal·min$^{-1}$ higher than placebo during the post-beverage time period, and approximately 0.37 kcal·min$^{-1}$ higher than placebo during the post-exercise time period. These results align with the findings of previous studies which reported significant elevations in EE following consumption of caffeine-containing energy drinks [11–13] as well as those which administered supplemental protein prior to exercise [15–17]. Several physiological mechanisms are responsible for these results. In addition to the well-documented thermogenic effects of caffeine [33, 34], it is highly likely that the whey and milk protein found in the product also contributed to the acute increases in metabolic rate observed by the present investigation. Because protein requires more energy to digest, absorb, and utilize compared to carbohydrates or fats [35], postprandial dietary thermogenesis has been shown to be higher following consumption of protein-rich foods compared to lower-protein controls [36]. However, without caffeine and protein-matched placebo conditions, it is not possible to accurately estimate the relative thermogenic contributions of each component of the energy drink used in the present study. Similarly, because the energy drink and placebo conditions utilized in the present study differed in energy content by ∼ 100 kcal, some degree of the between-condition differences in

EE should be attributed to the additional caloric content of the energy drink per se [36]. This limitation of the present investigation prevents the direct evaluation of different ingredients and macronutrient profiles on acute metabolic outcomes. As such, the practical applications of the present investigation pertain primarily to consuming vs. not consuming a caffeine- and protein-containing beverage for energy expenditure and resistance exercise performance outcomes. This could be relevant to those intentionally training with low carbohydrate availability and considering whether to exercise in a fasted state as compared to after an ingestion of a caffeinated, low-carbohydrate, high-protein beverage.

## Conclusions

The present investigation demonstrated that the acute consumption of a caffeine and protein-containing energy drink resulted in significantly increased resting and post-exercise energy expenditure compared to placebo, though some degree of this effect should be attributed to caloric differences between conditions per se. The energy drink was not found to influence respiratory exchange ratio or participants' subjective ratings of fatigue, energy, and focus. Similarly, the energy drink exerted minimal effects on maximal force production, muscular endurance, and rate of force development compared to placebo within the context of this study. These results suggest that active individuals may improve acute metabolic outcomes both before and after exercise via consumption of a caffeine- and protein-containing energy drink. Additional information is needed regarding the effects of similar interventions on upper-body muscular performance as well as measures of sport-specific performance. Future investigations could include energy-matched conditions as well as protein and caffeine-matched placebo conditions to determine the direct contribution of caffeine and macronutrient composition on acute metabolic outcomes.

## Abbreviations
1RM: One-repetition maximum; ANOVA: Analysis of variance; ASA24®: Automated Self-Administered 24-Hour Dietary Assessment Tool; CV: Coefficient of variation; EE: Energy expenditure; RER: Respiratory exchange ratio; VAS: Visual analog scale

## Acknowledgements
The authors would like to acknowledge Dr. Ty Palmer for contributing the LabView program used to analyze the force data in the present work.

## Authors' contributions
GMT, GE, PSH, and MTS designed the study. PSH, MTS, CR, JRD, ADW, SJW, RWS, BAJ, and MS performed data collection under the direction of GMT. GMT performed all statistical analyses. PSH and GMT wrote the initial manuscript draft. All authors reviewed and approved the final version of the manuscript.

Case 22-17842-PDR    Doc 421    Filed 11/29/22    Page 46 of 114

Harty et al. Journal of the International Society of Sports Nutrition        (2020) 17:45        Page 12 of 13

## Funding
This project was funded by Vital Pharmaceuticals (award number A20–0134 at Texas Tech University; PI: Grant Tinsley, paid consultant: Guillermo Escalante). The sponsor provided input regarding which energy drink product was used in the study and the broad variables of interest (i.e., metabolism and exercise performance). The specific study protocol and outcome variables were determined by the researchers. The sponsor provided the coded energy drinks and placebo beverages and maintained the blinding codes. The sponsor played no role in data collection or analysis, and all data were analyzed prior to unblinding of conditions. The sponsor reviewed the manuscript for patentable material but played no role in the writing or revision of the content in this manuscript.

## Availability of data and materials
The datasets used during the current study are available from the corresponding author upon reasonable request.

## Ethics approval and consent to participate
This study was approved by the Texas Tech University Institutional Review Board (IRB00000276). All participants signed the approved consent document prior to participation.

## Consent for publication
Not applicable.

## Competing interests
Guillermo Escalante has served as a scientific consultant for VPX (Vital Pharmaceuticals) sports nutrition. The remaining authors declare that they have no competing interests.

## Author details
[1]Energy Balance & Body Composition Laboratory, Department of Kinesiology & Sport Management, Texas Tech University, Lubbock, TX 79424, USA. [2]California State University, San Bernardino, California, USA.

Received: 25 May 2020 Accepted: 18 August 2020
Published online: 24 August 2020

## References
1.  Kreider RB. Current perspectives of caffeinated energy drinks on exercise performance and safety assessment. Nutr Diet Suppl. 2018;10:35.
2.  Hoyte C, Albert D, Heard K. The use of energy drinks, dietary supplements, and prescription medications by United States college students to enhance athletic performance. J Community Health. 2013;38(3):575–80.
3.  Schwarz NA, McKinley-Barnard SK, Blahnik ZJ. Effect of bang(R) pre-workout master blaster(R) combined with four weeks of resistance training on lean body mass, maximal strength, mircoRNA expression, and serum IGF-1 in men: a randomized, double-blind, placebo-controlled trial. J Int Soc Sports Nutr. 2019;16(1):54.
4.  Campbell B, Wilborn C, La Bounty P, Taylor L, Nelson MT, Greenwood M, et al. International Society of Sports Nutrition position stand: energy drinks. J Int Soc Sports Nutr. 2013;10(1):1.
5.  Del Coso J, Salinero JJ, González-Millán C, Abián-Vicén J, Pérez-González B. Dose response effects of a caffeine-containing energy drink on muscle performance: a repeated measures design. J Int Soc Sports Nutr. 2012;9(1):21.
6.  Schwarz Na P, McKinley-Barnard SP. Acute Oral ingestion of a multi-ingredient Preworkout supplement increases exercise performance and alters Postexercise hormone responses: a randomized crossover, double-blinded, placebo-controlled trial. J Dietary Suppl. 2020;17(2):211–26.
7.  Forbes SC, Candow DG, Little JP, Magnus C, Chilibeck PD. Effect of red bull energy drink on repeated Wingate cycle performance and bench-press muscle endurance. Int J Sport Nutr Exerc Metab. 2007;17(5):433–44.
8.  Antonio J, Kenyon M, Horn C, Jiannine L, Carson C, Ellerbroek A, et al. The Effects of an Energy Drink on Psychomotor Vigilance in Trained Individuals. J Funct Morphol Kinesiol. 2019;4(3):47.
9.  Del Coso J, Muñoz-Fernández VE, Muñoz G, Fernández-Elías VE, Ortega JF, Hamouti N, et al. Effects of a caffeine-containing energy drink on simulated soccer performance. PLoS One. 2012;7(2):e31380.
10. Souza DB, Del Coso J, Casonatto J, Polito MD. Acute effects of caffeine-containing energy drinks on physical performance: a systematic review and meta-analysis. Eur J Nutr. 2017;56(1):13–27.
11. Dalbo VJ, Roberts MD, Stout JR, Kerksick CM. Acute effects of ingesting a commercial thermogenic drink on changes in energy expenditure and markers of lipolysis. J Int Soc Sports Nutr. 2008;5:6.
12. Bloomer RJ, Canale RE, Blankenship MM, Hammond KG, Fisher-Wellman KH, Schilling BK. Effect of the dietary supplement meltdown on catecholamine secretion, markers of lipolysis, and metabolic rate in men and women: a randomized, placebo controlled, cross-over study. Lipids Health Dis. 2009; 8(1):32.
13. Mendel RW, Hofheins JE. Metabolic responses to the acute ingestion of two commercially available carbonated beverages: a pilot study. J Int Soc Sports Nutr. 2007;4(1):7.
14. Roberts MD, Dalbo VJ, Hassell SE, Stout JR, Kerksick CM. Efficacy and safety of a popular thermogenic drink after 28 days of ingestion. J Int Soc Sports Nutr. 2008;5(1):19.
15. Gieske BT, Stecker RA, Smith CR, Witherbee KE, Harty PS, Wildman R, et al. Metabolic impact of protein feeding prior to moderate-intensity treadmill exercise in a fasted state: a pilot study. J Int Soc Sports Nutr. 2018;15(1):56.
16. Wingfield HL, Smith-Ryan AE, Melvin MN, Roelofs EJ, Trexler ET, Hackney AC, et al. The acute effect of exercise modality and nutrition manipulations on post-exercise resting energy expenditure and respiratory exchange ratio in women: a randomized trial. Sports Med Open. 2015;1(1):11.
17. Hackney K, Bruenger A, Lemmer J. Timing protein intake increases energy expenditure 24 h after resistance training. Med Sci Sports Exerc. 2010;42(5): 998–1003.
18. Costello JT, Bieuzen F, Bleakley CM. Where are all the female participants in sports and exercise medicine research? Eur J Sport Sci. 2014;14(8):847–51.
19. Fullmer S, Benson-Davies S, Earthman CP, Frankenfield DC, Gradwell E, Lee PS, et al. Evidence analysis library review of best practices for performing indirect calorimetry in healthy and non-critically ill individuals. J Acad Nutr Diet. 2015;115(9):1417–46.e2.
20. Stock MS, Luera MJ. Consistency of peak and mean concentric and eccentric force using a novel squat testing device. J Appl Biomech. 2014; 30(2):322–5.
21. Haff G, Triplett NT, National S, Conditioning A. Essentials of strength training and conditioning; 2016.
22. Subar AF, Kirkpatrick SI, Mittl B, Zimmerman TP, Thompson FE, Bingley C, et al. The automated self-administered 24-hour dietary recall (ASA24): a resource for researchers, clinicians, and educators from the National Cancer Institute. J Acad Nutr Diet. 2012;112(8):1134–7.
23. Buuren Sv, Groothuis-Oudshoorn K. mice: Multivariate Imputation by Chained Equations in R. J Stat Softw. 2011;45(3):1–67.
24. Singmann H, Bolker B, Westfall J, Aust F, Ben-Shachar MS. afex: Analysis of Factorial Experiments 2020; 2020.
25. Peterson RA, Cavanaugh JE. Ordered quantile normalization: a semiparametric transformation built for the cross-validation era. J Appl Stat. 2019:1–16.
26. Lenth R. emmeans: Estimated Marginal Means, aka Least-Squares Means 2020; 2020.
27. Team RC. R: A Language and Environment for Statistical Computing. Vienna: R Foundation for Statistical Computing; 2019.
28. Cousineau D, O'Brien F. Error bars in within-subject designs: a comment on Baguley (2012). Behav Res Methods. 2014;46(4):1149–51.
29. Grgic J, Mikulic P, Schoenfeld BJ, Bishop DJ, Pedisic Z. The Influence of Caffeine Supplementation on Resistance Exercise: A Review. Sports Med (Auckland, NZ). 2019;49(1):17–30.
30. Grgic J, Grgic I, Pickering C, Schoenfeld BJ, Bishop DJ, Pedisic Z. Wake up and smell the coffee: caffeine supplementation and exercise performance—an umbrella review of 21 published meta-analyses. Br J Sports Med. 2019;54(11):681–8.
31. Grgic J, Sabol F, Venier S, Mikulic I, Bratkovic N, Schoenfeld BJ, et al. What dose of caffeine to use: acute effects of 3 doses of caffeine on muscle endurance and strength. Int J Sports Physiol Perform. 2019:1–8. https://doi.org/10.1123/ijspp.2019-0433.
32. Tinsley GM, Hamm MA, Hurtado AK, Cross AG, Pineda JG, Martin AY, et al. Effects of two pre-workout supplements on concentric and eccentric force production during lower body resistance exercise in males and females: a counterbalanced, double-blind, placebo-controlled trial. J Int Soc Sports Nutr. 2017;14:46.

33. Arnaud MJ. The pharmacology of caffeine. Prog Drug Res. 1987;31:273–313.
34. Belza A, Toubro S, Astrup A. The effect of caffeine, green tea and tyrosine on thermogenesis and energy intake. Eur J Clin Nutr. 2009;63(1):57–64.
35. Acheson KJ, Blondel-Lubrano A, Oguey-Araymon S, Beaumont M, Emady-Azar S, Ammon-Zufferey C, et al. Protein choices targeting thermogenesis and metabolism. Am J Clin Nutr. 2011;93(3):525–34.
36. Westerterp KR. Diet induced thermogenesis. Nutr Metab. 2004;1(1):5.

## Publisher's Note

Springer Nature remains neutral with regard to jurisdictional claims in published maps and institutional affiliations.

**Ready to submit your research?  Choose BMC and benefit from:**

• fast, convenient online submission
• thorough peer review by experienced researchers in your field
• rapid publication on acceptance
• support for research data, including large and complex data types
• gold Open Access which fosters wider collaboration and increased citations
• maximum visibility for your research: over 100M website views per year

**At BMC, research is always in progress.**

**Learn more** biomedcentral.com/submissions



# **<u>EXHIBIT E</u>**

Instagram post referencing Dr. Escalante's study he purportedly performed on the Bang Keto coffee product line



Date: September 29, 2020

Jack Owoc tagged Eric Hillman in an Instagram post promoting Bang.  Jack comments on the post to another Instagram user:  "Meet me [Jack] at Hillman's [house] later this week!"



Date: July 17, 2016

# EXHIBIT F

1              UNITED STATES DISTRICT COURT

2             CENTRAL DISTRICT OF CALIFORNIA

3        HONORABLE JESUS G. BERNAL, JUDGE PRESIDING

4   MONSTER ENERGY COMPNAY,            )
                                       )
5                                      )
                                       )
6                      Plaintiff,      )
                                       )
7                                      )
                                       )
8           Vs.                        )   No. EDCV18-1882-JGB
                                       )
9                                      )
                                       )
10  VITAL PHARMACEUTICALS, INC., ET    )
    AL.,                               )
11                                     )
                                       )
12                                     )
                       Defendants.     )
13                                     )
    _____

14

15

16          REPORTER'S TRANSCRIPT OF PROCEEDINGS

17                  JURY TRIAL, DAY 16

18                    P.M. SESSION

19                 RIVERSIDE, CALIFORNIA

20            TUESDAY, SEPTEMBER 20, 2022

21

22

23          MIRIAM V. BAIRD, CSR 11893, CCRA
          OFFICIAL U.S. DISTRICT COURT REPORTER
24              350 WEST FIRST STREET
                   FOURTH FLOOR
25          LOS ANGELES, CALIFORNIA 90012
               MVB11893@aol.com

Q.   I'm well.  Thank you.  You're a professor at Cal State
University San Bernardino, correct?

A.   Yes.

Q.   And specifically, you're a professor in the kinesiology
department, right?

A.   Yes.

Q.   And in addition to being a professor, sir, you have been
working for at least three years as a consultant to Vital
Pharmaceuticals, correct?

A.   On an on-and-off basis, yes.

Q.   In fact, since at least 2018 Vital Pharmaceuticals, the
defendant in this case, has paid you as a consultant to work
on editing, for example, Mr. Owoc's still unpublished book,
correct?

A.   Yes.

Q.   Even as recently as just this year, you've been paid by
Vital Pharmaceuticals for your work, correct?

A.   Not for a consulting capacity.  Just for -- for cases.

Q.   Fair enough.  So for cases Vital Pharmaceuticals has
paid you even this year for your work for them, correct?

A.   I'm trying to think if I received payment in 2022.

Q.   Why don't I try it this way.  You have at least billed
them for work that you have done for them even this year,
correct?

A.   I think the last work I did that I billed them for was

1    actually in 2021.

2    Q.    Fair enough.  As a consultant for Vital Pharmaceuticals,

3    among other things you have provided feedback on the portions

4    of Mr. Owoc's still unpublished book related to Creatine,

02:37PM  5    right?

6    A.    Can you repeat the question, please.

7    Q.    Sure.  As a consultant for Vital Pharmaceuticals, you

8    have provided feedback on the portions of Mr. Owoc's still

9    unpublished book that related to Creatine, for example,

02:37PM  10   right?

11              MR. MUTH:  Your Honor, objection.  This topic is

12   out of bounds, given the motion in limine on the book.

13              THE COURT:  Proceed.  Get on with it, Mr. Kaba.

14              MR. KABA:  Yes.

02:38PM  15   BY MR. KABA:

16   Q.    Is that correct, sir?

17   A.    You're asking specifically just about the book?

18   Q.    You know what?  Let me move on.  You've also in addition

19   to being a consultant for Vital Pharmaceuticals, you've

02:38PM  20   received free supplements from Bang Energy, right?

21   A.    In the past I have but not recently.

22   Q.    And you've -- in other cases, sir, you've actually been

23   an expert for Vital Pharmaceuticals on the topic of Creatine,

24   right?

02:38PM  25   A.    Yes.  I have been an expert on another case.

# **<u>EXHIBIT G</u>**

2019 WL 1509180
Only the Westlaw citation is currently available.
United States District Court, N.D. California.

Ismail IMRAN, et al., Plaintiffs,
v.
VITAL PHARMACEUTICALS, INC., Defendant.
Kuumba Madison, Plaintiff,
v.
Vital Pharmaceuticals, Inc., Defendant.

Case No. 18-cv-05758-JST, Case No. 18-cv-06300-JST
|
Signed 04/05/2019

**Attorneys and Law Firms**

Reuben D. Nathan, Nathan & Associates, APC, Newport Beach, CA, Joel Dashiell Smith, Lawrence Timothy Fisher, Bursor & Fisher, P.A., Walnut Creek, CA, for Plaintiff Ismail Imran.

Lawrence Timothy Fisher, Joel Dashiell Smith, Bursor & Fisher, P.A., Walnut Creek, CA, Reuben D. Nathan, Nathan & Associates, APC, Newport Beach, CA, for Plaintiff Zach Hess.

Michael D. Kanach, Holly L.K. Heffner, Gordon Rees Scully Mansukhani LLP, San Francisco, CA, M. D. Scully, Timothy K. Branson, Gordon Rees Scully Mansukhani, LLP, San Diego, CA, for Defendant.

**ORDER DENYING MOTIONS TO TRANSFER AND GRANTING MOTION TO CONSOLIDATE**

Re: ECF Nos. 33, 34, 43

Re: ECF Nos. 37, 40

JON S. TIGAR, United States District Judge

**\*1** Before the Court are motions to transfer filed by Defendant Vital Pharmaceuticals, Inc., d/b/a VPX Sports ("VPX") in two related cases, *Imran v. Vital Pharmaceuticals, Inc. ("Imran")*, 18-cv-05758-JST (N.D. Cal.), ECF No. 34, and *Madison v. Vital Pharmaceuticals, Inc. ("Madison")*, 18-cv-06300-JST (N.D. Cal.), ECF No. 40. Plaintiffs in both

cases have filed a joint motion to consolidate the two cases and to appoint interim class counsel. *Imran*, ECF No. 43. For the reasons that follow, the Court will deny the motions to transfer, grant the motion to consolidate, and deny without prejudice the motion to appoint interim class counsel.

## I. BACKGROUND

### A. Parties and Claims

In their operative first amended complaint, the *Imran* Plaintiffs, Ismail Imran and Zach Hess, allege that VPX misrepresented the contents and effects of its line of BANG energy drinks. First Amended Complaint ("*Imran* FAC"), *Imran*, ECF No. 13 ¶¶ 1-10. Based on these representations, Plaintiffs assert putative class claims for (1) violations of California's Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750, *et seq.*; (2) violations of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, *et seq.*; violations of California's False Advertising Law ("FAL"), Cal. Bus. & Prof. Code §§ 17500, *et seq.*; (4) deceptive acts or practices under New York law, N.Y. Gen. Bus. Law § 349; (5) false advertising under New York law, N.Y. Gen. Bus. Law § 350; (6) breach of express warranty; (7) unjust enrichment; and (8) fraud. *Id.* ¶¶ 54-107.

Plaintiff Kuumba Madison likewise alleges that VPX's marketing of the BANG drinks is deceptive and false. Complaint ("*Madison* Compl."), *Madison*, ECF No. 1 ¶¶ 9-28. Like the *Imran* Plaintiffs, Madison also brings putative class claims for (1) violations of the UCL; (2) violations of the FAL; (3) violations of the CLRA; and (4) breach of express warranty. *Id.* ¶¶ 53-89. In addition, Madison asserts claims for breach of the implied warranty of merchantability and for a declaratory judgment. *Id.* ¶¶ 90-104.

### B. Procedural History

The parties have identified *Imran* and *Madison* as two out of five false advertising class actions brought regarding BANG energy drinks. The *Imran* action was filed first, on September 19, 2018. *Imran*, ECF No. 1.

On October 12, 2018, Plaintiff Terrell Barker filed a similar putative class action in the Northern District of Illinois. *Barker v. Vita Pharmaceuticals, Inc.*, No. 18-cv-06898 (N.D. Ill.), ECF No. 1.

Three days later, on October 15, 2018, attorneys from those same three firms representing Barker filed the *Madison* action in this district. *Madison*, ECF No. 1 at 30-31.

Two more actions were subsequently filed in the Southern District of Florida. *St. Fort-Nwabuku v. Vital Pharmaceuticals, Inc.*, was filed on November 19, 2018. *St. Fort-Nwabuku*, No. 18-cv-62823-RNS (S.D. Fla.), ECF No. 1. *Nguyen v. Vital Pharmaceuticals, Inc.*, was filed January 30, 2019. *Nguyen*, No. 19-cv-60261-DPG (S.D. Fla.), ECF No. 1. [1]

**\*2** On November 26, 2018, the Court granted Madison's motion to relate the two cases. *Imran*, ECF No. 22. VPX then filed motions to transfer *Imran*, *Barker*, and *Madison* to the Southern District of Florida. *Imran*, ECF No. 34; *Barker*, ECF Nos. 37, 38; *Madison*, ECF No. 40. Barker voluntarily dismissed his claims without filing an opposition to the transfer motion. *Barker*, ECF Nos. 40, 41.

As for *Imran* and *Madison*, the Court continued the hearings on the respective motions to the same date. *Madison*, ECF No. 42. Pursuant to the schedule set by the Court, the *Imran* and *Madison* Plaintiffs then filed a motion to consolidate the two cases and to appoint interim lead class counsel. *Imran*, ECF No. 43.

All three motions have now been fully briefed. The Court addresses them in turn. [2]

## II. JURISDICTION

Based on Plaintiffs' uncontested plausible allegations, the Court has subject matter jurisdiction over these actions under the Class Action Fairness Act of 2005 ("CAFA") because the putative class includes at least 100 members, the parties and class members are minimally diverse, and the amount in controversy exceeds $ 5,000,000. 28 U.S.C. § 1332(d).

## III. MOTIONS TO TRANSFER

### A. Legal Standard

"For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." 28 U.S.C. § 1404(a). The purpose of § 1404(a) is to "prevent the waste of time, energy and money and to protect litigants, witnesses and the public against unnecessary inconvenience and expense." *Van Dusen v. Barrack*, 376 U.S. 612, 616 (1964) (internal quotation marks and citation omitted). A motion for transfer lies within the broad discretion of the district court and must be determined on an individualized basis. *See Jones v. GNC Franchising, Inc.*, 211 F.3d 495, 498 (9th Cir. 2000) ("Under § 1404(a), the district court has discretion 'to adjudicate motions for transfer according to an individualized, case-by-case consideration of convenience and fairness.' " (quoting *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 29 (1988) ) ).

Courts considering transfer must engage in a two-step analysis. First, courts determine whether the action could have been brought in the target district. *Hoffman v. Blaski*, 363 U.S. 335, 343-44 (1960). Second, courts "weigh in the balance a number of case-specific factors" to undertake an "individualized, case-by-case consideration of convenience and fairness." *Stewart Org.*, 487 U.S. at 29 (second quoting *Van Dusen*, 376 U.S. at 616). The factors the Court should consider include:

> (1) plaintiff's choice of forum, (2) convenience of the parties, (3) convenience of the witnesses, (4) ease of access to the evidence, (5) familiarity of each forum with the applicable law, (6) feasibility of consolidation of other claims, (7) any local interest in the controversy, and (8) the relative court congestion and time of trial in each forum.

*Williams v. Bowman*, 157 F. Supp. 2d 1103, 1106 (N.D. Cal. 2001); *see also Jones*, 211 F.3d at 498-99. The moving party bears the burden of showing that the transferee district is the more appropriate forum for the action. *Jones*, 211 F.3d at 499.

### B. Discussion

Imran v. Vital Pharmaceuticals, Inc., Not Reported in Fed. Supp. (2019)

Case 22-17842-PDR    Doc 421    Filed 11/29/22    Page 58 of 114

### 1. *Madison*

#### a. Venue in the Target District

**\*3**  Transfer is permissible only if this action could have been brought in the Southern District of Florida. "A district court is one in which an action could have been brought originally if (1) it has subject matter jurisdiction; (2) defendants would have been subject to personal jurisdiction; and (3) venue would have been proper." *Duffy v. Facebook, Inc.*, No. 16-CV-06764-JSC, 2017 WL 1739109, at \*3 (N.D. Cal. May 4, 2017) (citing *Hoffman*, 363 U.S. at 343).

Here, VPX argues, and Madison does not dispute, that this action could originally have been brought in the Southern District of Florida. *Madison*, ECF No. 40 at 10-11; *Madison*, ECF No. 46 at 6. Proper venue and personal jurisdiction exist in that district because VPX maintains its corporate headquarters in Weston, Florida. *See* 28 U.S.C. § 1391(c)(2); *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 924 (2011). Accordingly, the Court finds that this case could have been brought in the Southern District of Florida.

#### b. Plaintiff's Choice of Forum

Madison has elected to file his lawsuit in the Northern District of California. Ordinarily, "[t]he defendant must make a strong showing of inconvenience to warrant upsetting the plaintiff's choice of forum." *Decker Coal Co. v. Commonwealth Edison Co.*, 805 F.2d 834, 843 (9th Cir. 1986). When, as here, "an individual brings a derivative suit or represents a class, the named plaintiff's choice of forum is given less weight." *Lou v. Belzberg*, 834 F.2d 730, 739 (9th Cir. 1987). Nevertheless, because the named plaintiff resides in the Northern District of California and some of the operative events occurred in this district, Madison's "choice of forum is [still] entitled to deference, even though this factor is accorded less weight in a class action context." *Reyes v. Bakery & Confectionery Union & Indus. Int'l Pension Fund*, No. 14-CV-05596-JST, 2015 WL 1738269, at \*3 (N.D. Cal. Apr. 9, 2015); *cf. Lucas v. Daiichi Sankyo Co.*, No. C 11-0772 CW, 2011 WL 2020443, at \*3 (N.D. Cal. May 24, 2011) ("Lucas's choice of forum in this action is entitled to reduced

deference because he seeks to represent a class and he has filed his complaint in a district *outside of the district in which he is domiciled*." (emphasis added) (citing *Lou*, 834 F.2d at 739) ). Such deference is warranted because Madison is "currently the only plaintiff[ ]" in his case and "even if a nationwide class were certified," he "would still bear a fiduciary responsibility to lead the class." *Van Slyke v. Capital One Bank*, 503 F. Supp. 2d 1353, 1363 (N.D. Cal. 2007).

VPX argues that, although Madison resides in this district, the forum otherwise has little connection to the operative facts of this litigation. *Madison*, ECF No. 40 at 14. In determining the appropriate amount of deference to accord plaintiff's choice of forum, courts must consider the extent of the parties' contacts with the chosen forum, including contacts relating to the plaintiff's cause of action." *Hendricks v. StarKist Co.*, No. 13-CV-729 YGR, 2014 WL 1245880, at \*3 (N.D. Cal. Mar. 25, 2014). VPX contends that Madison's forum choice deserves less weight because Madison allegedly purchased BANG from a website, http://www.vitaminshoppe.com, and much of VPX's purportedly false advertising occurred online as well. *Madison* Compl. ¶¶ 7, 11, 14-15, 17-19. The Court does not find the online nature of Madison's purchase material to determining the weight of his chosen forum. Although it is unclear whether Madison completed his purchase from within this district or viewed VPX's advertising from here, there is also no indication that Madison's choice to sue in his home forum is an attempt to avoid a different district where those events took place. *Cf. Hendricks*, 2014 WL 1245880, at \*3 ("The fact that a plaintiff lives in the transferor district and purchased the product at issue there suggests that plaintiff is not forum shopping.").

**\*4**  VPX also emphasizes that its nationwide marketing creates similar contacts with every district and that it has more substantial contacts with the Southern District of Florida. *Madison*, ECF No. 40 at 14-15. These facts do not negate VPX's contacts with this forum. *See Hendricks*, 2014 WL 1245880, at \*4 (explaining that courts "consider the parties' contacts with the forum, not whether those contacts are unique or whether the parties have contacts with other forums") (quoting *In re Ferrero Litig.*, 768 F. Supp. 2d 1074, 1080 (S.D. Cal. 2011) ).

Accordingly, while the weight of Madison's choice of forum is somewhat lessened by the factors noted above, the Court still gives it substantial deference.

### c. Convenience of Parties

Section 1404(a) provides for transfer to a more convenient forum, "not to a forum likely to prove equally convenient or inconvenient." *Adobe Sys. Inc. v. Childers*, No. 5:10-cv-03571-JF/HRL, 2011 WL 566812, at *9 (N.D. Cal. Feb. 14, 2011) (quoting *Van Dusen*, 376 U.S. at 646). Transfer "should not be granted if the effect is simply to shift the inconvenience to the plaintiff." *Id.* (citing *Decker Coal*, 805 F.2d at 843). "Defendants must show that the balance of conveniences weighs heavily in favor of transfer in order to overcome the strong presumption in favor of plaintiff's choice of forum." *Id.*

VPX stresses that it will be burdensome to litigate in this district because its South Florida-based CEO John Owoc's "absence from the company to travel to and participate in litigation in Northern California will cause considerable disruption to [VPX's] business operations." *Imran*, ECF No. 34-3 ¶ 4. But transfer to Florida would simply shift the cross-country travel burden to Madison. *See Adobe Sys.*, 2011 WL 566812, at *9. Contrary to VPX's assertions, the Court does not require particularized evidence to credit Madison's representation that cross-country travel would create an equivalent burden for him. *See Van Slyke*, 503 F. Supp. 2d at 1363 (assessing convenience to parties based on distance without extensive review of financial condition).

The Court therefore concludes that this factor is neutral.

### d. Convenience of Witnesses

"The convenience of the witnesses, particularly non-party witnesses, is often the most important factor" in ruling on a motion to transfer venue under § 1404(a). *Grossman v. Johnson & Johnson*, No. 14-CV-03557-VC, 2015 WL 1743116, at *1 (N.D. Cal. Apr. 13, 2015) (citing *Florens Container v. Cho Yang Shipping*, 245 F. Supp. 2d 1086, 1092 (N.D. Cal. 2002) ). To evaluate this factor, "courts must consider not only the number of witnesses, but also the nature and quality of their testimony." *United States ex rel. Tutanes-Luster v. Broker Sols., Inc.*, No. 17-CV-04384-JST, 2019 WL 1024962, at *6 (N.D. Cal. Mar. 4, 2019) (quoting *Metz*

*v. U.S. Life Ins. Co.*, 674 F. Supp. 2d 1141, 1147 (C.D. Cal. 2009) ). Furthermore, when "establishing inconvenience to witnesses, the moving party must name the witnesses, state their location, and explain their testimony and its relevance." *Hendricks*, 2014 WL 1245880, at *3 (quoting *Costco Wholesale Corp. v. Liberty Mut. Ins. Co.*, 472 F. Supp. 2d 1183, 1193 (S.D. Cal. 2007) ).

VPX asserts that "all current VPX employees with knowledge potentially relevant to the material allegations" in this litigation reside in Florida. *Imran*, ECF No. 34-2 ¶ 5. Further, VPX identifies four material non-party witnesses, three of whom reside in Florida: (1) Peter Cinieri, VPX's former CFO; (2) Chantal Salas, VPX's former Marketing Coordinator; and (3) Nora Higuera, VPX's former Research & Development Senior Food Scientist. *Id.* ¶ 6. In addition, Eric Hillman, the CEO of a major distributor of BANG energy drinks, lives in North Carolina. *Id.*

**\*5**  Madison has agreed to conduct depositions where these witnesses reside. *Madison*, ECF No. 46 at 11. This "creates less of a burden on defendants to litigate in the Northern District because defendants' witnesses would only have to travel for trial." *Lax v. Toyota Motor Corp.*, 65 F. Supp. 3d 772, 779 (N.D. Cal. 2014). Moreover, as to the employee witnesses, their convenience is "entitled to little weight because litigants are able to compel their employees to testify at trial, regardless of forum." *Bakhtiar v. Info. Res., Inc.*, No. 17-CV-04559-JST, 2018 WL 1014616, at *3 (N.D. Cal. Feb. 22, 2018) (quoting *Lax*, 65 F. Supp. 3d at 779). The Court nonetheless acknowledges that VPX's witnesses will incur burdens in attending trial and the identified non-party witnesses will be outside the range of the Court's trial subpoena power, although the three former VPX employees would be subject to subpoena in the Southern District of Florida. *See Cedillo v. Transcor Am., LLC*, No. C 08-00941, 2013 WL 4565826, at *3 (N.D. Cal. Aug. 27, 2013); Fed. R. Civ. P. 45(c)(1). [3]

Accordingly, this factor weighs slightly in favor of transfer.

### e. Ease of Access to Evidence

Courts generally do not regard "the transportation of documents ... as a burden because of technological advances in document storage and retrieval." *Hendricks*, 2014 WL

Case 22-17842-PDR    Doc 421    Filed 11/29/22    Page 60 of 114

Imran v. Vital Pharmaceuticals, Inc., Not Reported in Fed. Supp. (2019)

1245880, at *4 (citing *Van Slyke*, 503 F. Supp. 2d at 1362). While this diminishes the weight of this factor in the transfer determination, ease of access to the evidence remains a factor to consider. *Roe v. Intellicorp Records, Inc.*, No. 12-CV-0256-YGR, 2012 WL 3727323, at *3 (N.D. Cal. Aug. 27, 2012) (citing *Patent Mgmt. Found., LLC v. Analog Devices, Inc.*, Case No. C-10-3620 SBA, 2011 WL 197831, at *4 (N.D. Cal. Jan. 20, 2011) ).

VPX represents that all of its records are maintained at its South Florida headquarters, including documents not available in electronic format. *Imran*, ECF No. 34-2 ¶ 4. Moreover, VPX posits, this litigation will require on-site access to its warehouse and laboratory, which are likewise in South Florida. *Id.* ¶¶ 9-10.

Madison's only answer is to argue that this factor deserves no weight due to the ease of electronic transfer. *Madison*, ECF No. 46 at 13. But although "[c]ourts in this district have expressed different views on the continuing relevance of this factor," this Court has not dispensed with this factor altogether. *Bakhtiar*, 2018 WL 1014616, at *4; *see also Broker Sols., Inc.*, 2019 WL 1024962, at *6 ("Although the ease of electronic discovery reduces the importance of this factor, 'costs of litigation can still be substantially lessened if the venue is in the district in which most of the documentary evidence is stored.' ") (quoting *Park v. Dole Fresh Vegetables, Inc.*, 964 F. Supp. 2d 1088, 1095 (N.D. Cal. 2013) ). Madison also does not address the potential need for onsite access to VPX's facilities.

Under these circumstances, this factor also weighs slightly in favor of transfer.

**f. Familiarity of Each Forum with Governing Law**

With one exception, Madison's claims arise under California law. [4] "While federal courts in [other districts] are fully capable of applying California law, this Court is more familiar with California law." *Bakhtiar*, 2018 WL 1014616, at *4. VPX contends that the Court's familiarity with the governing law will not be particularly useful in this case because the dispositive issues will be predominantly factual. *Madison*, ECF No. 40 at 20-21. At this stage, the Court cannot conclude that VPX's prediction is likely correct.

**\*6** Therefore, this factor weighs slightly against transfer.

**g. Any Local Interest in Controversy**

In evaluating the interests of justice, a court may consider the "local interest in having localized controversies decided at home." *Decker Coal*, 805 F.2d at 843 (quoting *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 241 n.6 (1981) ).

Here, both districts have some local interest in deciding this case. As VPX points out, Southern District courts have an interest in curbing fraudulent practices by "a business that is headquartered in that district and that employs residents of that district." *Pierce-Nunes v. Toshiba Am. Info. Sys., Inc.*, No. 14-CV-00796-JST, 2014 WL 4674666, at *6 (N.D. Cal. Sept. 15, 2014) (citing *Bloom v. Express Servs. Inc.*, No. C 11-00009 CRB, 2011 WL 1481402, at *5 (N.D. Cal. Apr. 19, 2011) ). But this district has a countervailing interest in protecting local residents from those practices. *See Alul v. Am. Honda Motor Co., Inc.*, No. 16-CV-04384-JST, 2016 WL 7116934, at *5 (N.D. Cal. Dec. 7, 2016) (distinguishing *Pierce-Nunes* because "none of the named plaintiffs lived or purchased the allegedly defective products in the Northern District"). Moreover, VPX overstates the nationwide nature of Madison's claims. All of his claims for damages are brought under California law on behalf of a putative class of California consumers. *See Madison* Compl. at 18-27. As compared to the Southern District of Florida, this Court is a more appropriate venue for adjudication of these claims.

Accordingly, this factor weighs against transfer.

**h. Relative Court Congestion**

"The real issue is not whether a dismissal will reduce a court's congestion but whether a trial may be speedier in another court because of its less crowded docket." *Gates Learjet Corp. v. Jensen*, 743 F.2d 1325, 1337 (9th Cir. 1984); *Hendricks*, 2014 WL 1245880, at *6. The Court grants VPX's request for judicial notice, ECF No. 40 at 20 n.14, of statistics showing that the median time from filing to disposition for civil cases was 3.9 months in the Southern District of Florida for the 12-month period ending September 30, 2018, compared to 7.2 months in this district. *See* U.S. District Courts – Federal Court Management Statistics – Comparison Within Circuit (Sept. 30, 2018), https://www.uscourts.gov/

file/24854/download (accessed Mar. 21, 2019). Similarly, civil cases went from filing to trial in 16.5 months in the Southern District of Florida and 30.9 months in this district over that same period. *See id.* The Southern District does, however, have a higher weighted caseload per judge. *See id.* (showing 721 weighted filings per judge in the Southern District of Florida and 622 weighted filings per judge in the Northern District of California during this period).

Thus, while the Southern District appears to have a marginally more crowded docket, its cases have also moved faster. The Court therefore concludes that this factor weighs slightly in favor of transfer.

### i. Feasibility of Consolidation

Finally, noting that two similar cases − *Fort-Nwabuku* and *Nguyen* − are currently pending in the Southern District of Florida, VPX urges the Court to transfer *Madison* and *Imram* so that all four cases may be consolidated. ECF No. 40 at 11-13. Stressing the benefits to judicial efficiency, VPX contends that the possibility of consolidation is entitled to conclusive weight. *Id.* Madison counters that some judicial efficiency may still be gained by granting the *Madison* and *Imram* Plaintiffs' motion to consolidate those two cases before this Court. ECF No. 46 at 14. Moreover, Madison notes, *Imran* and *Madison* were filed before both Florida cases. *Id.*

**\*7** As a general rule, "[t]he feasibility of consolidation is a significant factor in a transfer decision, although even the pendency of an action in another district is important because of the positive effects it might have in possible consolidation of discovery and convenience to witnesses and parties." *A. J. Indus., Inc. v. U.S. Dist. Court for Cent. Dist. of Cal.*, 503 F.2d 384, 389 (9th Cir. 1974) (citing *Van Dusen*, 376 U.S. 612). Nevertheless, several factors here convince the Court that possible consolidation in the Southern District of Florida does not warrant upsetting Plaintiffs' choice of forum. [5]

First, the Ninth Circuit has explained that "[n]ormally sound judicial administration would indicate that when two identical actions are filed in courts of concurrent jurisdiction, the court which first acquired jurisdiction should try the lawsuit and no purpose would be served by proceeding with a second action." *Pacesetter Sys., Inc. v. Medtronic, Inc.*, 678 F.2d 93, 95 (9th Cir. 1982); *see also R.R. St. & Co.*

*Inc. v. Transp. Ins. Co.*, 656 F.3d 966, 976 (9th Cir. 2011) (noting that "courts generally give preference to the first-filed case among concurrent federal court proceedings"). As VPX notes, the "classic formulation" of this first-to-file doctrine "permits a district court to decline jurisdiction over a matter if a complaint has already been filed in another district."

*Church of Scientology of Cal. v. U.S. Dep't of Army*, 611 F.2d 738, 749 (9th Cir. 1979), *overruled on other grounds by Animal Legal Def. Fund v. U.S. Food & Drug Admin.*, 836 F.3d 987 (9th Cir. 2016); *see also Z-Line Designs, Inc. v. Bell'O Int'l, LLC*, 218 F.R.D. 663, 665 (N.D. Cal. 2003) ("The 'first to file' rule allows a district court to transfer, stay or dismiss an action when a similar complaint has been filed in another federal court."). "Normally, when 'cases involving the same parties and issues have been filed in two different districts,' it is 'the *second* district court' that exercises its 'discretion to transfer, stay, or dismiss the *second* case in the interest of efficiency and judicial economy' " *Nat'l Union Fire Ins. Co. of Pittsburgh v. Payless Shoesource, Inc.*, No. C-11-1892 EMC, 2012 WL 3277222, at \*7 (N.D. Cal. Aug. 9, 2012) (emphasis in original) (quoting *Cedars-Sinai Med. Ctr. v. Shalala*, 125 F.3d 765, 769 (9th Cir. 1997) ). Thus, a typical "first-to-file" argument to transfer, stay, or dismiss would be made to the *Fort-Nwabuku* and *Nguyen* courts. VPX has not raised that argument there, nor have the *Madison* or *Imran* Plaintiffs attempted to intervene to do so.

But it does not follow, as VPX suggests, that the first-filed court should ignore those considerations in ruling on a motion to transfer. Rather, "the court with the first-filed action ... should normally weigh the balance of convenience and any other factors that might create an exception to the first-to-file rule." *Juniper Networks, Inc. v. Mosaid Techs. Inc.*, No. C 11-6264 PJH, 2012 WL 1029572, at \*2 (N.D. Cal. Mar. 26, 2012) (citing *Alltrade, Inc. v. Uniweld Prod., Inc.*, 946 F.2d 622, 628 (9th Cir. 1991) ); *see also Pacesetter*, 678 F.2d at 96 ("[N]ormally the [convenience] argument should be addressed to the court in the first-filed action."); *Power Integrations, Inc. v. ON Semiconductor Corp.*, No. 16-CV-06371-BLF, 2017 WL 1065334, at \*3 (N.D. Cal. Mar. 21, 2017) (second-filed court staying action to await first-filed court's disposition of motion to transfer). In other words, the Court should apply the default preference for the first-filed forum, *see Pacesetter*, 678 F.2d at 95, and grant transfer only if the normal § 1404(a) factors reveal that a later-filed forum is clearly more convenient. [6] Accordingly,

possible consolidation in the Southern District of Florida is not independently dispositive of this motion.

**\*8**  Second, the Court observes that, at this juncture, transfer to Florida is not the exclusive means available to realize the efficiency gains of consolidation. This is not a case where the later-filed court has denied transfer, and the "the only feasible solution is to grant" transfer to that district. *Henry v. Home Depot U.S.A., Inc.*, No. 14-CV-04858-JST, 2016 WL 4538365, at \*5 (N.D. Cal. Aug. 31, 2016). Nor are the Florida actions further along, which would weigh in favor of transfer.

*Cadenasso v. Metro. Life Ins. Co.*, No. 13-CV-05491-JST, 2014 WL 1510853, at \*7-8 (N.D. Cal. Apr. 15, 2014) (reasoning that the case pending in the transferee district was "far more advanced than this case, as the parties have already engaged in extensive discovery and are preparing for trial");

*see also Intersearch Worldwide, Ltd. v. Intersearch Grp., Inc.*, 544 F. Supp. 2d 949, 963 (N.D. Cal. 2008) (recognizing "an exception to the first-to-file rule, where a second-filed matter has proceeded far beyond a first-filed matter"). Like these cases, both Florida cases are still in their infancy. There has been no substantive motion practice and VPX has not responded to the operative complaint in either case. *See Fort-Nwabuku*, ECF No. 22 (granting extension until April 15, 2019, to respond); *Nguyen*, ECF No. 9 (same). Neither the *Fort-Nwabuku* court nor the *Nguyen* court have addressed the question of the appropriate forum; indeed, consolidation has not been raised in either case. Finally, even if the actions are not consolidated in one forum for all purposes, multi-district coordination remains an option. *See* 28 U.S.C. § 1407. [7]

In sum, the factors favoring transfer do not outweigh Madison's choice of forum and the benefits of retaining his California law claims. Nor has VPX provided a convincing reason to deviate from the preference for the first-filed forum. Accordingly, the Court denies VPX's motion to transfer venue in *Madison*.

### 2. Imran

Given that the Court denies the motion to transfer *Madison* and concludes that consolidation with *Imran* is appropriate, a separate § 1404(a) analysis for *Imran* appears unnecessary. Moreover, in light of the similarities between the two actions, the analysis for most factors is precisely the same. The Court nonetheless briefly addresses arguments VPX raises that are unique to *Imran*.

VPX offers additional reasons why the *Imran* Plaintiffs' choice of forum deserves less weight. First, VPX notes that Imran resides in the Eastern District of California, while Hess resides in the Southern District of New York. *Imran*, ECF No. 34 at 20; *Imran* FAC ¶¶ 17, 21. But Imran purchased VPX's products in this district, *Imran* FAC ¶ 17, which also entitles his forum choice to deference. *See Alul*, 2016 WL 7116934, at \*2. And while Hess resides in New York, "[t]he fact that not all the named Plaintiffs have a connection to this district 'does not undermine the weight to be given plaintiffs' choice of forum.' " *Id.* at \*3 (quoting *Lax*, 65 F. Supp. 3d at 778). The analysis might perhaps be different in the absence of Madison as a plaintiff, but those are not the facts in this consolidated case.

Second, VPX suggests that Plaintiffs' counsel filed in this district to avoid an unfavorable ruling in *Karhu v. Vital Pharmaceuticals, Inc.*, where a Southern District of Florida court denied class certification in a different action against VPX involving "a dietary supplement called VPX Meltdown Fat Incinerator." No. 13-60768-CIV, 2014 WL 815253, at \*1 (S.D. Fla. Mar. 3, 2014), *aff'd*, 621 F. App'x 945 (11th Cir. 2015). Deeming this "forum-shopping," VPX argues that Plaintiffs' choice of forum merits no deference. *Imran*, ECF No. 34 at 21-22. The Court agrees that "[w]here forum-shopping is evident ... courts should disregard plaintiff's choice of forum." *Alul, Inc.*, 2016 WL 7116934, at \*3 (quoting *Foster v. Nationwide Mut. Ins. Co.*, No. C 07-04928 SI, 2007 WL 4410408, at \*2 (N.D. Cal. Dec. 14, 2007) ). But "[a]ttempting to achieve tactical advantage in the choice of a forum ... is a perfectly legitimate goal in an adversarial system of justice, so long as Plaintiffs are not trying to escap[e] a prior unfavorable ruling in [their] own case." *Id.* (second and third alterations in original) (internal quotation marks and citation omitted). Choosing a different forum for this case, which does not relate to the same product at issue in *Karhu*, does not raise an inference that Plaintiffs are avoiding an unfavorable ruling in their *own* case.

**\*9**  Finally, while VPX emphasizes that *Imran* includes a New York plaintiff and New York causes of action, *Imran*, ECF No. 34 at 30, these facts do not significantly weaken the California interests involved. Nor do they make a stronger case for Florida's interest in the controversy.

Imran v. Vital Pharmaceuticals, Inc., Not Reported in Fed. Supp. (2019)

Case 22-17842-PDR    Doc 421    Filed 11/29/22    Page 63 of 114

Accordingly, the Court also denies VPX's motion to transfer venue in *Imran*.


## IV. MOTION TO CONSOLIDATE

### A. Legal Standard

Rule 42(a) provides that a court may consolidate cases which "involve a common question of law or fact." Fed. R. Civ. P. 42(a). The "district court has broad discretion under this rule to consolidate cases pending in the same district." *Investors Research Co. v. U.S. Dist. Court for Cent. Dist. of Cal.*, 877 F.2d 777, 777 (9th Cir. 1989). "In determining whether or not to consolidate cases, the Court should 'weigh the interest of judicial convenience against the potential for delay, confusion and prejudice.' " *Zhu v. UCBH Holdings, Inc.*, 682 F. Supp. 2d 1049, 1052 (N.D. Cal. 2010) (quoting *Sw. Marine, Inc. v. Triple A Machine Shop, Inc.*, 720 F. Supp. 805, 806-07 (N.D. Cal. 1989) ).


### B. Discussion

Given that the *Imran* and *Madison* Plaintiffs have moved to consolidate, *Imran*, ECF No. 43, and VPX argues that the cases should be transferred to Florida for consolidation, there is no dispute that consolidation is appropriate. In light of the overlapping nature of the factual allegations and the legal claims, the Court agrees as well. *See Azpeitia v. Tesoro Ref. & Mktg. Co. LLC*, No. 17-CV-00123-JST, 2017 WL 4071368, at *2 (N.D. Cal. Sept. 14, 2017) (finding consolidation appropriate where "[b]oth actions share the same proposed class, the same legal claims for the same class period, the same Defendants, and nearly identical factual allegations").

VPX's only argument in opposition to this motion is that consolidation is premature until the Court resolves the motions to transfer. *Imran*, ECF No. 47 at 3-5. Because that point is now moot, the Court grants the motion to consolidate.


## V. MOTION TO APPOINT CLASS COUNSEL

### A. Legal Standard

Rule 23(g)(3) provides that "[t]he court may designate interim counsel to act on behalf of a putative class before determining whether to certify the action as a class action." Fed. R. Civ. P. 23(g). This rule "authorizes [a] court to designate interim counsel during the pre-certification period if necessary to protect the interests of the putative class." *Wang v. OCZ Technology Grp., Inc.*, Case No. C 11-01415 PSG, 2011

WL 13156817, at *2 (N.D. Cal. June 29, 2011) (quoting Fed. R. Civ. P. 23(g)(2)(A) advisory committee's note to 2003 amendment). "[D]esignation of interim counsel clarifies responsibility for protecting the interests of the class during precertification activities, such as making and responding to motions, conducting any necessary discovery, moving for class certification, and negotiating settlement." Manual for Complex Litig., § 21.11 (4th ed. 2004).

Federal Rule of Civil Procedure 23(g)(1)(A) requires that courts consider the following factors in appointing class counsel: "(i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class." The Court looks to those factors in designating interim class counsel as well. *See Parkinson v. Hyundai Motor Am.*, 2006 WL 2289801, at *2 (C.D. Cal. Aug. 7, 2006) ("Rule 23(g) provides criteria to consider when appointing class counsel, without distinguishing interim counsel. Presumably, the same factors apply[.]"); *In re Air Cargo Shipping Serv. Antitrust Litig.*, 240 F.R.D. 56, 57 (E.D.N.Y. 2006) ("[I]t appears to be generally accepted that the considerations set out in Rule 23(g)(1)(C), which governs appointment of class counsel once a class is certified, apply equally to the designation of interim class counsel before certification.").


### B. Discussion

**\*10** Plaintiffs propose that the Court appoint three firms as co-interim class counsel. *Imran*, ECF No. 43 at 5. Two firms, Nathan & Associates and Bursor & Fisher, P.A., currently represent Imran and Hess. The third, Barbat, Mansour & Suciu PLLC, is one of four firms representing Madison. The Court concludes that approval of this proposal is premature.

First, Plaintiffs do not indicate that these appointments are required to resolve "any rivalry between the [involved] firms, nor any uncertainty as to their respective roles." *In re Nest Labs Litig.*, 2014 WL 12878556, at *2. "Counsel here have never alleged that they considered competing with one another, and it appears to the court that counsel intended to cooperate with one another from the start of the case, rendering appointment of interim class counsel unnecessary." *In re Seagate Tech. LLC Litig.*, No. 16-CV-00523-RMW,

Imran v. Vital Pharmaceuticals, Inc., Not Reported in Fed. Supp. (2019)

Case 22-17842-PDR    Doc 421    Filed 11/29/22    Page 64 of 114

2016 WL 3401989, at \*3 (N.D. Cal. June 21, 2016). The Court also does not see why appointing three of the six firms involved in these actions will result in significant efficiency gains.

Second, Plaintiffs suggest that appointment is necessary because "there is 'uncertainty' about who is acting on behalf of the putative class because this action has spawned two copycat cases in Florida." *Imran*, ECF No. 43 at 7. But Plaintiffs have not demonstrated that appointing interim counsel in the consolidated action before this Court – where the *Fort-Nwabuku* and *Nguyen* firms have not had an opportunity to weigh in – is the appropriate vehicle for eliminating this uncertainty. *See Burns v. Navistar, Inc.*, No. 10CV2295-LAB (BGS), 2011 WL 13071147, at \*2 (S.D. Cal. Feb. 24, 2011) (denying appointment of interim counsel based on action pending in another district and explaining that "[i]n any event, the solution isn't for this Court to announce that only Plaintiff and The Katriel Firm have authority to speak on behalf of a putative class of California plaintiffs"). Indeed, courts have recognized that the "typical situation requiring appointment of interim class counsel is one 'where a large number of putative class actions have been consolidated or otherwise are pending in a single court.' " *In re Nest Labs Litig.*, No. 14-CV-01363-BLF, 2014 WL 12878556, at \*1 (N.D. Cal. Aug. 18, 2014) (quoting *Donaldson v. Pharmacia Pension Plan*, No. CIV. 06-3-GPM, 2006 WL 1308582, at \*1 (S.D. Ill. May 10, 2006) ). Accordingly, it may be premature to appoint interim counsel based on "actions pending in other districts [that] are not yet before this Court." *Nutz for Candy v. Ganz, Inc.*, No. C 08-2873 JSW, 2008 WL 4332532, at \*2 (N.D. Cal. Sept. 19, 2008).[8] As explained above, it remains to be seen how the Florida actions will develop, and whether they will continue to proceed

simultaneously in a different court. For example, the Florida court may decide to transfer those actions to this district under the first-to-file rule. *E.g., Lianne Yao v. Ulta Beauty Inc.*, No. 18-22213-CIV, 2018 WL 4208324, at \*4 (S.D. Fla. Aug. 8, 2018); *Laskaris v. Fifth Third Bank*, 962 F. Supp. 2d 1297, 1299 (S.D. Fla. 2013).

**\*11** Finally, if the Court were to appoint interim lead counsel, it would be unlikely to appoint three different firms for that role. *See Kristin Haley v. Macy's, Inc.*, No. 15-CV-06033-HSG, 2016 WL 4676617, at \*3 (N.D. Cal. Sept. 7, 2016) (declining to appoint as interim co-lead counsel "three firms represent[ing] counsel for three of the four consolidated cases"); *In re Nest Labs Litig.*, 2014 WL 12878556, at \*2 (explaining that, in the absence of inter-firm conflict, "greater efficiency and clarity can only be realized if the Court appoints *one* firm as interim class counsel").

The Court therefore denies Plaintiffs' motion to appoint interim counsel.

## CONCLUSION

In sum, the Court denies VPX's motions to transfer, grants Plaintiffs' motion to consolidate, and denies without prejudice Plaintiffs' motion to appoint interim class counsel.

**IT IS SO ORDERED.**

### All Citations

Not Reported in Fed. Supp., 2019 WL 1509180

## Footnotes

1    In addition, one of Vital Pharmaceutical's competitors, ThermoLife International, LLC, has filed a case in the District of Arizona asserting that those same misrepresentations violate the Lanham Act. *ThermoLife Int'l, LLC v. Vital Pharmaceuticals, Inc.*, 18-cv-03233-SPL (D. Ariz.), ECF No. 1.

2    VPX also filed administrative motions to stay proceedings pending resolution of its motions to transfer. *Imran*, ECF No. 33; *Madison*, ECF No. 37. The Court DENIES the motions as moot.

Imran v. Vital Pharmaceuticals, Inc., Not Reported in Fed. Supp. (2019)

Case 22-17842-PDR    Doc 421    Filed 11/29/22    Page 65 of 114

3    Although VPX characterizes North Carolina as "nearby," ECF No. 47 at 16, there is no evidence that the Southern District of Florida is "within 100 miles of where [Hillman] resides, is employed, or regularly transacts business in person." Fed. R. Civ. P. 45(c)(1)(A).

4    Madison brings one claim for declaratory relief on behalf of a nationwide class. *Madison* Compl. ¶¶ 97-104.

5    The Court considers *Madison* and *Imran* together for the purposes of this factor because, as explained below, it concludes that consolidation of these two actions is appropriate.

6    VPX does not contend that any other exceptions to the first-to-file rule apply. *See* Alltrade, 946 F.2d at 628 (discussing bad faith, anticipatory suit, and forum-shopping exceptions).

7    By contrast, in *Hawkins v. Gerber Products Co.*, on which VPX repeatedly relies, five actions, including the first-filed action, had already been consolidated in the transferee district. 924 F. Supp. 2d 1208, 1213 (S.D. Cal. 2013). In addition, the Judicial Panel on Multidistrict Litigation had declined to centralize the various cases. *Id.* at 1212.

8    At the hearing, the *Imran* Plaintiffs' counsel identified the *In re 5-Hour Energy Marketing* case as an example where appointment of interim lead counsel was appropriate even though similar cases were pending in more than one district. That case does not assist Plaintiffs: while *In re 5-Hour Energy Marketing* involved 16 cases that *originated* from different districts, all of the cases had been consolidated for pretrial purposes before Judge Gutierrez by the Judicial Panel on Multidistrict Litigation. *In re 5-Hour Energy Mktg. v. Innovation Ventures, LLC,* No. CV134001PSGPLAX, 2013 WL 12134144, at *1 (C.D. Cal. Nov. 8, 2013). Thus, at the time of Judge Gutierrez's order appointing interim lead counsel, all the cases were before him.

---

**End of Document**    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT H

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA

FORT LAUDERDALE DIVISION

CASE NO. 19-60809-CIV-RKA


VITAL PHARMACEUTICALS, INC.,    . Fort Lauderdale, Florida
                                     .
Plaintiff/Counterclaim-Defendant, .
                                     . September 1, 2020
                 v.           . 12:45 p.m.
                                     .
MONSTER ENERGY COMPANY,          .
ET AL.,                          .
                                     .
Defendant/Counterclaimants.   .
. . . . . . . . . . . . . . . . . .
MONSTER ENERGY COMPANY AND    .
REIGN BEVERAGE COMPANY, LLC,   .
                                     .
      Crossclaimants,        .
                                     .
           v.            .
                                     .
JHO INTELLECTUAL PROPERTY      .
HOLDINGS, LLC,               .
                                     .
      Crossclaim-Defendant.   .
. . . . . . . . . . . . . . . . . .


                        - - - - -

Transcript of Trial Proceedings had

before the Honorable Roy K. Altman,

United States District Judge.

                  - - - - -
                   VOLUME 5
                  - - - - -


Proceedings recorded by mechanical stenography, transcript
produced by computer.

J. OWOC - DIRECT/SIACHOS

1  Q.  All right.  What is a purple guava pear?

2  A.  There is no such thing.

3  Q.  Who --

4  A.  On all of our drinks, there is pretty much no such thing as

5  the flavor that exists on the can.  Again, differentiate,

6  innovate, and all these principles that we follow.

7  Q.  All right.  Why did you create a drink called "Purple Guava

8  Pear"?

9  A.  Uhm, kind of a weird story, but it -- well, we made this

10  flavor combination -- all of our flavors, by the way, are

11  flavor combinations that never existed before.  Super

12  innovative.

13       So, a buddy of mine owns Europa Sports, which is the

14  biggest sports nutrition distributor in the world.  We've done

15  probably hundreds of millions of dollars with them.  And their

16  color is purple, and we had this really cool guava pear color

17  flavor.  And it sounded weird, but it tasted -- the taste is

18  mind-blowing.  So, I sent it to him, and I said, Look, this

19  could be your exclusive flavor.  They were all mad.  They

20  wouldn't even try it because of the name.

21       So, it was the last thing left on their desk, they

22  tried it and raved about it.  And their color is a purple, so I

23  just threw in purple in the front.

24       We even have shoes that are made, Bang shoes, with big

25  B logo that have the Purple Guava Pear color.  And that's how

# EXHIBIT I

# DOUGLASVILLE
## GEORGIA

# AGENDA ITEM REPORT

**Item Number:**    21-417

**Meeting:**    08-12-2021 - City Council Legislative Work Session

**Staff Contact:**    Stephanie Tucker, Accounting Specialist

---

**Consider a request for the alcoholic beverages license for The Wholesale Malt Beverage Distributor and The Malt Beverage Manufacturer License at the following establishment:**
**Proposed Licensee:**    **Quash Seltzer, LLC.**
**D/B/A:**    **MIXX**
**Location:**    **7705 Staples Drive**
**Proposed Agent Outlet Manager:**    **Robert Miller**
**The required fees have been paid into the Finance Department.**

---

**Attachments:**

Quash Seltzer -MIXX-redacted

**Recommendation(s):**

Hold a public hearing (only at LWS)

**Budget Impact:**

Is this an Agreement or Contract:  N/A

**If YES, check one:**    ☐ Original Agreement
☐ Change Order, Change Order #

**Is it budgeted?** N/A

**If so, what Account #?**

# Interoffice Memorandum

Date:       July 19, 2021

To:         Chief Sparks/PD Records

From:       Stephanie Tucker/Finance Department

Ref:        Request for the alcoholic beverages license

Application received from Quash Seltzer, LLC. d/b/a/ MIXX. Hold a public hearing to consider the new application for the alcoholic beverages license for the Wholesale Malt Beverage Distributor and the Malt Beverage Manufacturer License at the following establishment. The required fees have been paid into the finance department.

Proposed Licensee:          Quash Seltzer, LLC.

D/B/A:                      MIXX

Location:                   7705 Staples Drive

Proposed Agent Outlet Manager    Robert Miller

Council Meetings Scheduled as follows:

August 12, 2021 @ 6:00 pm
August 16, 2021 @ 6:00 pm


**THE REQUIRED INVESTIGATION HAS BEEN CONDUCTED AND THE APPLICATION FOR AN AGENT/OUTLET MANAGER IS HEREBY:**

**APPROVED** _____✓               **DENIED** _____

_____               8-2-21
**CHIEF OF POLICE**                    **DATE**

*City of Douglasville*

**APPLICATION FOR LICENSE TO:** (Check Applicable Category)

**CONSUMPTION ON PREMISES ONLY:**          **WHOLESALE DISTRUBUTOR:**          **RETAIL PACKAGE ONLY:**

_____ Sell Spirituous Liquors          _____ ✓ Malt Beverages          _____ Sell Spirituous Liquors
_____ Sell Wine & Malt Beverages          _____ Spirituous Liquors          _____ Sell Wine & Malt
Beverages
_____ Live Entertainment

_____ ✓ MALT BEVERAGE MANUFACTURER          _____ BREWPUB

**BUSINESS ESTABLISHMENT:**    [ ] Restaurant-Dining          [ ] Retail          [✓ Other _____

Trade Name (Print Actual Business Name): __Mixx__

Location of Business: __7705 Staples Dr__          Phone #: _____

| Question | Yes | No | N/A |
|---|---|---|---|
| 1. Is certified survey attached? (REQUIRED FOR RETAIL PACKAGE ONLY) Zoning Code: | | | ✓ |
| 2. Is property zoned? | ✓ | | |
| 3. Overall review/explanation of alcohol application, applicant initials on checklist? | ✓ | | |
| 4. Occupational tax registration application completed? | ✓ | | |
| a.    Will business have a minimum of 25 seating capacity? | | | ✓ |
| 5. Residency requirements met? | | | |
| a.    Resident of Georgia [ 10 ] years. | ✓ | | |
| b.    United States citizen? If no, provide permanent resident card #: | | | |
| 6. Has applicant submitted an application within the previous 6 months? | | ✓ | |
| 7. Is applicant at least 21 years of age? | ✓ | | |
| 8. Does business establishment have a drive-in window? | | ✓ | |
| 9. Is business establishment any of the following? More than any 3 listed? [ ] YES [ ] NO [ ] N/A Billiard Hall; pool room; theatre; skating rink; health spa or video game establishment. | | ✓ | |
| 10. Does applicant hold another alcohol license in the same category? | | ✓ | |
| 11. Does establishment have a percentage lease? | | ✓ | |

Fees Received: $ __1250.00__    Fees Include:    [ ] $5,000.00 S/L    Whd esblt    [ ] $250.00 Admin
[ ✓ ] $500.00 B/W    [ ] $250.00 Ad
[ ] $250.00 Live Ent.    [ ✓ ] $1,000.00 ~~Brewpub~~ Manufacturer

Douglas County Sentinel:    Date of 1st ad: __Aug-5-2021__    Date of 2nd ad: __Aug 10 2021__

Council Meetings:    Legislative: __August 12-21__    Regular: __Aug -16-2021__



# DOUGLASVILLE
## — GEORGIA —

### Alcohol License Application Checklist

**All pages of application must be typed or neatly and clearly printed. Each page must contain all necessary attachments, and fees must be in the form of a cashier's check(s).**
**Zoning Dept.: 678-449-3054        Business License: 678-449-3078        Alcohol License: 678-449-3244**

- Application (City of Douglasville)

**Contact the State Department of Revenue: 877-423-6711 for application requirements. To download application & information visit the State Department website: gtc.dor.ga.gov to apply online. Applications only accepted online.**

**Please note:** State Department license is contingent upon City of Douglasville alcohol beverage license approval. Pending approval from City council, the City of Douglasville will issue a copy of your alcoholic beverage license so that you may present it to the State Department. Upon State approval, and temporary state license issuance, the City of Douglasville will issue the original alcoholic beverage license for your business.

*Required documents:*

| Business | Agent Outlet Manager | Individuals w/20% or more ownership |
|---|---|---|
| Ownership (articles) if applicable | Clear, color photocopy of Georgia Driver's License/I.D./w/current address | Clear, color photocopy of Georgia Driver's License/I.D./w/current address |
| Complete Occupational tax Registration Application | | List of residence addresses for previous seven years & five personal references. |
| Retail Package Only: surveyor's Certificate | Complete application | Please copy pages 6-14 of the application and fill out for each individual that owns 20% or more of the establishment. |
| | Attended 2 scheduled council meetings | |

***Portions of the license fees are refundable in the event the application is denied; the background investigation fee(s) and advertisement fees are non-refundable.***

| | |
|---|---|
| $5,000.00 | Spirituous Liquors-Consumption on Premises or Retail Package |
| $500.00 | Wine & Malt Beverages-Consumption on Premises/Retail Package |
| $250.00 | Live Entertainment |
| $1,000.00 | Brewpub |
| $250.00 | Police Investigation Report for Agent Outlet and each person with 20% or more ownership in the business. |
| $250.00 | Sign/Advertisement |

- Overall review/explanation of alcohol application for consumption on premises only    _____ AOM initials

1



## DOUGLASVILLE
### — GEORGIA —

To:      Robert Miller
_____
(Name of Applicant)

You are hereby required to appear at one or more council meetings or hearings regarding the City's consideration of your application. You must be present in the Council Chamber of the Douglasville Conference Center, at 6700 Church Street, Douglasville, Georgia, on:

| | Thursday | 08-12-2021 | At | 6:00 | p.m. |
|---|---|---|---|---|---|
| | (Day) | (Date) | | (Time) | |

| And also on: | Monday | 08-16-2021 | At | 6:00 | p.m. |
|---|---|---|---|---|---|
| | (Day) | (Date) | | (Time) | |

In connection with your application for:  Request for the alcoholic beverages license for the manufacturer of wine and malt beverages.

**_Failure to attend may result in denial of your application._**

Delivered this _02_ day of ____August 2021_

☐    By E- Mail: addressed to:  ___robert.miller@bangenergy.com___

                                                    (City Staff Signature)

☐    By Hand, and received by  _Robert Miller_
                                    (Signature of Applicant)



**DOUGLASVILLE**
— • - GEORGIA — • -

## APPLICATION FOR AGENT/OUTLET MANAGER

Application is being made for the following business for the active agent/outlet manger:

**BUSINESS ESTABLISHMENT:**

Actual Business Name: Quash Seltzer, LLC / MIXX

Owner/Licensee: Quash Seltzer, LLC

Location of Business: 7705 Staples Drive, Lithia Springs, GA 30122     Phone #: 954-732-1451

TYPE OF LICENSE: (Check Applicable Category)     Alternate #: 954-829-4285

| CONSUMPTION ON PREMISES ONLY: | WHOLESALE DISTRUBUTOR: | RETAIL PACKAGE ONLY: |
|---|---|---|
| ☐ Sell Spirituous Liquors | ☑ Malt Beverages | ☐ Sell Spirituous Liquors |
| ☐ Sell Wine & Malt Beverages | ☐ Spirituous Liquors | ☐ Sell Wine & Malt Beverages |
| ☐ Live Entertainment | | |
| | ☑ MALT BEVERAGE MANUFACTURER | ☐ BREWPUB |

**INFORMATION ABOUT THE APPLICANT:**

(1) Full Name of Applicant ROBERT GARY MILLER JR.

(2) Full Name of Spouse, including maiden name CATHERINE SUE MILLER

(3) Are you a citizen of the USA? ☑ Yes ☐ No

If no, give green card number & provide a copy: _____

(4) Date of Birth: ▮▮▮ 1968     Place of Birth: JACKSON MICHIGAN

(5) Home Address: ▮▮▮▮▮▮▮▮▮▮

     Street #    Street Name    Apt #    City    State    Zip Code

Resident of Georgia: ☑ Yes ☐ No     Number of Years 10

Current County of Residence: HALL     Number of Years 10

(6) Give name, address, and date of birth of ALL children, stepchildren, adopted children, and foster children:

| | DOB | Relationship |
|---|---|---|
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |

(7) Occupation for the past seven years in chronological order. State name of company, immediate supervisor and dates of employment.

| Company | Supervisor | Dates |
|---|---|---|
| BANG ENERGY | GENE BUKOVI | 4-19-21-CURRENT |

**4**



DOUGLASVILLE
——·- ———— GEORGIA ———— ·-——

ZF INDUSTRIES _____    VARIOUS _____    1/4/94-3/25/2021

(8) Has the applicant ever been convicted or entered a plea of nolo contender within five years
immediately prior to the filing of this application of any felony or misdemeanor? ☐ Yes ☑ No
If the answer is yes, fill in below:

Date          Offense          Location (city/state)          Disposition

_____    _____    _____    _____
_____    _____    _____    _____

(9) Do you, your spouse, or any business partner have any financial interest in any wholesale liquor
business? If so, give details: NO _____

(10) Have you, your spouse or any business partner received any financial aid or assistance to include
land, fixtures, or equipment from any manufacturer or wholesale or alcoholic beverage, if yes,
explain: NO _____

(11) State whether you're an owner, licensee, or agent on any other alcoholic beverage license in
any other jurisdiction. If yes, give name and address of business; and name and address if
licensee: N/A _____

(12) Have you ever applied for any alcoholic beverage license and been?
☐ Denied ☐ Suspended ☐ Revoked  If yes, give name and address if licensee: ____
NO

(13) Do you, your spouse, any family member, or business partner have an interest on any liquor
stores? ☐ Yes ☑ No If yes, provide the name(s) of interested party(ies), and name any
location of all liquor stores.

_____    _____
_____    _____

(14) Are you or any member of your family, or business partner, the owner, lessee, and sub leaser of
any real estate which is occupied by a retail store? If so, give the location, information to any
lease or rental agreement, amounts of rents received and to whom rented or leased: _____
~~NO~~ _____

(15) Have you ever filed bankruptcy? NO ____ If yes, explain: _____

(16) Have you read and understood the City of Douglasville Ordinances, State Laws, and Regulations
governing the operation of this type of business? ☑ Yes ☐ No

(17) Do you agree to abide by such ordinances, laws and regulations? ☑ Yes ☐ No

*** If additional space is needed to fully complete answers on the application, additional
sheets may be attached. Each entry should be numbered to correspond with the question
number. ***

5



# DOUGLASVILLE
### — · — GEORGIA — · —

## Police Department Investigation Report

INVESTIGATION CONDUCTED FOR: Quash Seltzer, LLC

Name: Robert Gary Miller Jr.                                    Aliases: _____

Date of Birth: ____ 968        SSN #: _____        Sex: Male   Race: Caucasian   Citizenship: US Citizen

Telephone #: 954-732-1451                          Position: Operations Manager

**PRESENT RESIDENCE ADDRESS:**                          Do Not Write In Space Below:

_____

Street #    Street Name
Gainesville                    GA              30506
City                          State           Zip Code
December 2013 - Current
Dates at this address
**PREVIOUS RESIDENCE ADDRESS:**

_____
Street #    Street Name

_____
City                          State           Zip Code

Dates at this address

LIST RESIDENCE ADDRESS FOR PREVIOUS SEVEN

YEARS, IF NEEDED ATTACH A SEPARATE SHEET.

Have you ever been arrested or convicted of a felony?

[  ] Yes  [✓] No   If yes, explain; _____

Type of Business: Beverage manufacturer          Business Address: 7705 Staples Driver, Lithia Springs, GA 30122

About Location: (answer yes or no)  No  Owned  No  Rented  Yes  Leased

List any members or member of your immediate family or any other person or person's who shall have an interest in such alcoholic lease for which this application is made:

_____    _____    _____
Name                      Address                          Phone #
Attach names, addresses, and daytime (8-5pm) phone numbers of five personal references of applicant. (Not former employers or relatives); include length of time each has known applicant.

I hereby authorize the City of Douglasville Police Department to receive any criminal history record information pertaining to me, which may be in files of any State or Local Criminal Justice Agency in Georgia.

_____                          7/16/21
Signature                                      Date

**6**





## GCIC Criminal History Consent Form

I hereby authorize the Douglasville Police Department or any other Federal, State or Local agency to conduct an investigation on the criminal history record of criminal history pertaining to the undersigned which may be found in the files of any Federal, State or Local Criminal Justice Agency as maintained by the Georgia Bureau of Investigation's Georgia Crime Information Center or similar agency.

ROBERT GARY MILLER JR.
Full name-print

███████████████ GAINESVILLE GA. 30506
Address

MALE    WHITE    1968    ████████████
Sex      Race      Date of Birth      Social Security Number

_Signature_

-----------------------------------------------------------------
DO NOT WRITE BELOW THIS LINE- FOR OFFICIAL USE ONLY

Meets Criteria ☑        Has Not Met Criteria ☐

Search conducted by: _Stephenie Tucker_ Date: _8-2-2021_

*************************************************************
Signed before me the _2_ day of _August_, 202_1_ BY: _____
Copy of identification attached.

SEAL                        Notary Public, State of Georgia

13

Robert Miller References

Brian Krauss Director of Logistics-  Known for 2months very responsible, serious business person.

███████████████ Suwanee, Ga. 30024

Jeff Weidner Known for 8 years -  Good person , trustworthy, Military very true to word

████████████ Norcross, Ga. 30093

Jim Maclean Know for 9 years – Good Guy, We have a good Business relationship Family man, Would qualify for the license.

████████████ Pembroke NC 28372

Anne Cochran know for 8 years , Straight forward person, gets things done. Just a good guy

█████████ Flowery Branch Ga. 30542

Rich Niemeier known for 8 years – Very Dependable family man good person yes would qualify for license.

█████████ lowery Branch Ga. 30542

# Interoffice Memorandum

Date:        July 19, 2021

To:          Chief Sparks/PD Records

From:        Stephanie Tucker/Finance Department

Ref:         Request for the alcoholic beverages license

Application received from Quash Seltzer, LLC. d/b/a/ MIXX. Hold a public hearing to consider the new application for the alcoholic beverages license for the Wholesale Malt Beverage Distributor and the Malt Beverage Manufacturer License at the following establishment. The required fees have been paid into the finance department.

Proposed Licensee:          Quash Seltzer, LLC.

D/B/A:                       MIXX

Location:                    7705 Staples Drive

Owner                        John Owoc

Council Meetings Scheduled as follows:

August 12,2021@ 6:00pm
August 16,2021@ 6:00pm

**THE REQUIRED INVESTIGATION HAS BEEN CONDUCTED AND THE APPLICATION FOR AN AGENT/OUTLET MANAGER IS HEREBY:**

**APPROVED** _____          **DENIED** _____

_____          _8-2-21_____
**CHIEF OF POLICE**               **DATE**



Year 2021

1. **APPLICATION FOR LICENSE TO:** (Check Applicable Category)

**CONSUMPTION ON PREMISES ONLY:**
- [ ] Sell Spirituous Liquors
- [ ] Sell Wine & Malt Beverages
- [ ] Live Entertainment

**WHOLESALE DISTRUBUTOR:**
- [✓] Malt Beverages
- [ ] Spirituous Liquors

**RETAIL PACKAGE ONLY:**
- [ ] Sell Spirituous Liquors
- [ ] Sell Wine & Malt Beverages

- [✓] MALT BEVERAGE MANUFACTURER
- [ ] BREWPUB

2. **BUSINESS ESTABLISHMENT: (Please Print)**
   a. Trade Name (Actual Business Name): MIXX
   b. Owner/Licensee: Quash Seltzer, LLC
   c. Location of Business: 7705 Staples Drive, Lithia Springs, GA 30122  Phone #: 954-732-1451
   d. Square Footage of the building: 200,000 square feet.    Secondary #: 800-345-7773
   e. Is this establishment [✓] Existing    [ ] To be Built    Smoking [ ]    Non-smoking [✓]

3. **DISTANCE REQUIREMENT RETAIL PACKAGE ONLY:**
   a. Is the business within 600 feet of a college or school campus? [ ] Yes  [ ] No
   b. Is the business within 300 feet of a church? [ ] Yes  [ ] No
   c. For retail package sale of spirituous liquors, is this location at least 2,500 feet of any other retail package store for selling spirituous liquors? [ ] Yes  [ ] No

IF THIS IS AN ORIGINAL APPLICATION, A CERTIFIED SURVEY MUST BE SUBMITTED SHOWING DISTANCE REQUIREMENTS. (REQUIRED FOR RETAIL PACKAGE ONLY)

4. **CONSUMPTION ON PREMISES ONLY:**
   a. Will the business have a minimum of 25 seating capacity, not including bar stools?
      [ ] Yes  [ ] No
      For Office Use Only _____ (Building/ Fire Ins. Sign off)
      _____ (Comments)

5. **AGENT OUTLET MANAGER**
   a. If the license is granted, who will be the active manager of the business?
      Robert Miller
      *Full Name*

6. **OWNERSHIP OF BUSINESS PROPERTY:**
   a. Do you own the property? No _____ Date of Purchase: _____
      Seller's Name: _____ Purchase Price: _____
   b. Is property rented? Yes _____ Agent or Owner: JHO GA-1 Investment, LLC
   c. Manner, which rent is determined? _____
   d. Amount paid per month? $79,167.00 _____ Semi-Annually _____ Annually _____
   e. Submit document such as lease agreement, etc. [✓] Yes  [ ] No

2



DOUGLASVILLE
—·—————— GEORGIA ————— ·—

f.  How is the proposed location zoned? (Contact Zoning Dept. 678-449-3054) _L - l_____

7.  IS THIS BUISNESS A SOLE PROPRIETOR, PARTNERSHIP, OR CORPORATION? No_____
    a.  **If operating as a corporation, list all of the officers and directors, (separate page if**
        **needed), and attach copy of the Articles of Incorporation or certificate of good standing.**
        Name and Office                     Address                     DOB

        _____    _____   _____

        If operating as a corporation, list the stockholder and the amount of interest of each
        stockholder.

        _____ ____%    _____ ____%
        _____ ____%    _____ ____%
        _____ ____%    _____ ____%

    b.  If operating as a partnership, list the following information and provide a copy of
        partnership agreement
        Name and Office                     Address                     DOB

        _____    _____   _____ ____%
        _____    _____   _____ ____%
        When and where was the partnership organized? _____

    c.  List any other individual or firms owing any interest or receiving any funds from the
        operation of this business.
        Name                                Address

        _____    _____
        _____    _____
        _____    _____

        *** If additional space is needed to fully complete answers on the application, additional
        sheets may be attached. Each entry should be numbered to correspond with the question
        number. ***

3



## DOUGLASVILLE
- · - GEORGIA - · -

## Police Department Investigation Report

INVESTIGATION CONDUCTED FOR: Quash Seltzer, LLC

Name: John Henry Owoc                                Aliases: Jack Owoc

Date of Birth: ___ 1961        SSN #: _____        Sex: Male    Race: Caucasian    Citizenship: United States of America

Telephone #: 954-732-1451                            Position: Managing Member

PRESENT RESIDENCE ADDRESS:                                    Do Not Write In Space Below:

_____

Street #  Street Name
Southwest Ranches         FL          33331
City                      State       Zip Code
February 2019 - Current
Dates at this address
PREVIOUS RESIDENCE ADDRESS:

_____

Street #  Street Name
Davie                     FL          33325
City                      State       Zip Code
July 2001 - January 2019
Dates at this address

LIST RESIDENCE ADDRESS FOR PREVIOUS SEVEN

YEARS, IF NEEDED ATTACH A SEPARATE SHEET.

Have you ever been arrested or convicted of a felony?

☐ Yes  ☑ No   If yes, explain; _____

Type of Business: Beverage Manufacturer          Business Address: 7705 Staples Drive, Lithia Springs, GA 30122

About Location: (answer yes or no) _____ Owned _____ Rented  X  Leased

List any members or members of your immediate family or any other person or person's who shall have an interest in such alcoholic lease for which this application is made:

_____          _____          _____
Name                     Address                  Phone #
Attach names, addresses, and daytime (8-5pm) phone numbers of five personal references of applicant. (Not former employers or relatives); include length of time each has known applicant.

I hereby authorize the City of Douglasville Police Department to receive any criminal history record information pertaining to me, which may be in files of any State or Local Criminal Justice Agency in Georgia.

_____                                        6/9/2021
Signature                                              Date

6





**DOUGLASVILLE**
-·-——— GEORGIA ———-·-

Year 2021

INFORMATION ABOUT THE APPLICANT- This application and the Police Department Investigation Report to be completed by ALL individual stockholders owning 20 percent or more of the corporate stock. Refer to Sec. 10-1. Definitions (Please make additional copies of each form as needed.)

a. Full Name of Applicant _John Henry Owoc_

b. Full Name of Spouse, including maiden name _Megan Elizabeth Miller Owoc_

c. Are you a Citizen of the USA? [✓] Yes [ ] No

If no, give green card number & provide a copy: _____

d. Date of Birth: ███ 1961     Place of Birth: _McKeesport, Pennsylvania_

e. Home Address: ████████ Southwest Ranches, FL 33331

　　　　Street #　　Street Name　　Apt#　　City　　State　　Zip

Resident of Georgia: [ ] Yes [✓] No　　Number of Years _____

Current County of Residence: _Broward_　　Number of Years _25 years_

f. Give name, address, date of birth, and SSN of ALL children, stepchildren, adopted children, and foster children:

_____ DOB _____ Relationship _____

_____ DOB _____ Relationship _____

_____ DOB _____ Relationship _____

_____ DOB _____ Relationship _____

g. Has the applicant, spouse, or any individual having any interest either as owner, partner or stockholder ever been convicted or entered a plea of nolo contender within five years immediately prior to the filling of this application for any felony or misdemeanor?

[ ] Yes [✓] No If the answer is YES, fill in below:

| DATE | PERSON CHARGED | OFFENSE | LOCATION (City/State) | DISPOSITION |
|------|----------------|---------|----------------------|-------------|
|      |                |         |                      |             |
|      |                |         |                      |             |
|      |                |         |                      |             |

h. Occupation for the past seven years in chronological order. State name of company and immediate supervisors and dates of employment.

| COMPANY | SUPERVISOR | DATES |
|---------|-----------|-------|
| Vital Pharmaceuticals Inc. d/b/a Bang Energy | John H. Owoc / CEO & CSO | May 1996 - Current |
|         |            |       |
|         |            |       |

i. Do you, your spouse, any partner, or stockholder have any financial interest in any wholesale liquor business? If so, give details: _No._

j. Has the applicant or spouse received any financial aid assistance to include land, fixtures, or equipment from any manufacturer or wholesaler of alcoholic beverages? If yes, explain: _No._

7



k. List any persons, corporation, partnerships or associations, who presently receive or will receive financial gain from the operations of this business (Financial gain or payment of gain from any interest in the land or fixtures- to include juke boxes, cigarette machines, etc. – building, stock, and other asset of the proposed operation under the license). If yes, explain: _____

l. In the event any corporation is listed as receiving an interest or income from this operation, show the names of the officers and directors of said corporation: ___N/A___

m. State whether or not applicant, partner, corporation officer, or stockholder holds and alcoholic beverage license in any other jurisdiction. If answer is YES, give name and address of business and name and address of licensee: ___None.___

n. Has any of the above ever applied for an alcoholic beverage license and been:
_____ Denied _____ Suspended _____ Revoked  If yes, give name and address of applicant:

| Name | Address | City | State | Zip |
|------|---------|------|-------|-----|

o. Do you, your spouse, or any of the other owners, partners, or stockholders have an interest in any liquor stores? ☐ Yes ☑ No If yes, provide the name(s) of the interested party, and name of location of all liquor stores and give details: _____

p. Are you or any member of your family, the owner, leaser, sub-leaser, or any real estate, which is occupied by a retail liquor store? If so, give the location, to any lease or rental agreement, amounts of rents received, and to whom rented or leased: No.

q. Do you propose to operate this store solely as a package store? If not, explain: _N/A_

r. Are you or any member of your family the executor or administrator of beneficiary or heir of any estate having any interest in a retail liquor store? If so, give the location, amount of interest and your capacity with the estate: _No._

s. Are your or any member of your family the beneficiary or trustee of any trust fund having any interest in a retail liquor store? If so, give the location, amount of interest and your capacity with the estate: _No._

t. Has your interest or the interest of your partner, corporation member, or stockholder in this establishment been assigned, pledged, or hypothecated to any person, firm, or corporation, or has any agreement been entered into whereby your interest or the interest of a partner,

8



corporation member, or stockholder is to be assigned, pledged, or sold in part or in whole to any person, firm, or corporation? If yes, explain: ___No.___

u. Have you, any partner, corporation member, or stock holder ever filled bankruptcy?
   ☐ Yes ☑ No if yes, explain: _____

v. List below the names and addresses of any person's, firms, or corporations, which either have or will advance monies to you or to any partner, corporation member, or stockholder to assist in financing your investment in this enterprise. Also note if the party was related to applicant.

| Name & Address | Amount of Loan | Relationship |
|---|---|---|
|  |  |  |

w. Are you familiar with the City of Douglasville Ordinances, State Laws, and Regulations governing the operations of this type of business? ☑ Yes ☐ No

x. Do you agree to abide by such ordinances, laws and regulations? ☑ Yes ☐ No

9

STATE OF FLORIDA

COUNTY OF Broward

I, John Henry Owoc , being duly sworn according to law do swear that the facts and information stated by me in the above and foregoing answers to questions are true, and no false or fraudulent statements is made herein and such answers are made in order to procure the granting of such a license.

John H. Owoc

Printed Name of Applicant

Signature of Applicant

If person other than Applicant is filling out this application, complete the information below:

Printed name

Signature

Address

City/ State

Witness as to above signature(s):

Printed Name of Witness

Gabrielle McKean

Signature of Witness

Sworn to and subscribed before me this ___9___ day of __JUNE__ , 20 _21_ :

State of Florida County of Broward

Notary Public

Commission Expires : 12/5/2024

(seal)

ALEX RODRIGUEZ
Notary Public - State of Florida
Commission # HH 72710
My Comm. Expires Dec 15, 2024
Bonded through National Notary Assn.

10



## GCIC Criminal History Consent Form

I hereby authorize the Douglasville Police Department or any other Federal, State or Local agency to conduct an investigation on the criminal history record of criminal history pertaining to the undersigned which may be found in the files of any Federal, State or Local Criminal Justice Agency as maintained by the Georgia Bureau of Investigation's Georgia Crime Information Center or similar agency.

John Henry Owoc
_____
Full name-print

_____ FL 33331
_____
Address

Male          Caucasian          1961
_____
Sex          Race          Date of Birth          Social Security Number

_____
Signature

----------------------------------------------------------------

DO NOT WRITE BELOW THIS LINE- FOR OFFICIAL USE ONLY

Meets Criteria ☑          Has Not Met Criteria ☐

Search conducted by: _____ Date: 8-1-2021

***************************************************

Signed before me the ___1___ day of _____ 20___ BY: _____
Copy of identification attached.

SEAL          Notary Public, State of Georgia

13



DOUGLASVILLE
— · — GEORGIA — · —

STATE OF FLORIDA

COUNTY OF Broward

I, John Henry Owoc_____, have submitted fingerprints to the Georgia Bureau of Investigation (GBI) through GAPS in compliance with O.C.G.A 3-3-2, being duly sworn according to law do swear that the facts and information stated by me in the above and foregoing answers to questions are true, and no false or fraudulent statements is made herein and such answers were made in order to procure the granting of such a license.

John H. Owoc
_____    _____
Printed Name of Applicant                Signature of Applicant

If person other than Applicant is filling out this application, complete the information below:

_____    _____
Printed Name                             Signature

                                         _____
                                         Address

                                         _____
                                         City/State

Witness as to above signature(s):

Gabrielle McKean
_____    _____
Printed Name of Witness                  Signature of Witness

Javliin Duran
_____    _____
Printed Name of Witness                  Signature of Witness

Sworn to and subscribed before me this _____9_____ day of ___JUNE___, 20_21_;

_____    State of _FL_____ County of _Broward_____
Notary Public

                                         Commission Expires: _12/15/2024_____

(Seal)

ALEX RODRIGUEZ
Notary Public · State of Florida
Commission # HH 72710
My Comm. Expires Dec 15, 2024
Bonded through National Notary Assn.

14

Below are the references for John H. Owoc:

1. Keith Arnold    left Message

   Charlotte, NC 28202

2. Shaun Blogg  - Known for 8 years, Dependable, he knows a lot about business. Yes he would qualify.

   West Palm Beach, FL 33401

3. Gregg Metzger   Known for 18 years, He is a very straight forward man, very good business man, and Yes he would qualify for the license

   Weston, FL 33326

4. Frank Massabki -Known for 2 years – Passionate, Driven, Successful hard working person and 100% yes would qualify.

   Miami Beach, FL 33141

5. Eric Hillman 
   North Carolina 28273

# Douglas County Sentinel

## Licensee: Quash Seltzer , LLC.
## D/B/A:  MIXX

Date of 1st advertisement
August 5th 2021

Date of 2nd advertisement
August 10th 2021

## PUBLIC HEARING

The City of Douglasville will hold a public hearing on August 12, 2021, at 6:00 pm, in the Council Chambers at Douglasville Conference Center, 6700 Church Street, Douglasville, Georgia 30134, to consider the application for Quash Seltzer, LLC. d/b/a: MIXX. Hold a public hearing to consider a request for the alcoholic beverages license for Wholesale Malt Beverage Distributor and The Malt Beverage Manufacturer License at the following establishment:

Proposed Licensee: Quash Seltzer, LLC
D/B/A: MIXX
Location: 7705 Staples Drive
Proposed Agent Outlet Manager: Robert Miller

## PUBLIC HEARING

The City of Douglasville will hold a public hearing on August 12, 2021, at 6:00 pm, in the Council Chambers at Douglasville Conference Center, 6700 Church Street, Douglasville, Georgia 30134, to consider the application for Quash Seltzer, LLC. d/b/a: MIXX. Hold a public hearing to consider a request for the alcoholic beverages license for Wholesale Malt Beverage Distributor and The Malt Beverage Manufacturer License at the following establishment:
Proposed Licensee: Quash Seltzer, LLC
D/B/A: MIXX
Location: 7705 Staples Drive
Proposed Agent Outlet Manager: Robert Miller



| City of Douglasville | Receipt: | 50546 | 07/08/21 |

City of Douglasville
PO Box 219
Douglasville. GA 30133-0219

**Cashier:** tuckers

**Received Of:** QUASH SELTZER, LLC/MIXX
QUASH SELTZER, LLC
7705 STAPLES DR
LITHIA SPRINGS GA 30122

**The sum of:** 1,250.04

| | | | |
|---|---|---|---|
| BL | 00054216 | | 500.04 |
| BL | 00054217 | | 750.00 |
| | | Total | 1,250.04 |

| TENDERED: | MONEY ORDER | 19-279717240 | 250.04 |
|---|---|---|---|
| | MONEY ORDER | 19279717239 | 500.00 |
| | MONEY ORDER | 19-279717238 | 500.00 |

Signed: _____



| | | City of Douglasville | | Receipt: 51032 | 07/23/21 |
|---|---|---|---|---|---|
| | | PO Box 219 | | | |
| | | Douglasville, GA 30133-0219 | | | |
| | | Cashier: | tuckers | | |
| | | Received Of: | QUASH SELTZER, LLC/MIXX | | |
| | | | QUASH SELTZER, LLC | | |
| | | | 7705 STAPLES DR | | |
| | | | LITHIA SPRINGS GA 30122 | | |
| | | The sum of: | | 249.98 | |

| BL | 00054242 | | | | 249.98 |
|---|---|---|---|---|---|
| | | | | Total | 249.98 |

TENDERED:          MONEY ORDER     19-296456494          249.98

Signed: _____



# CITY OF DOUGLASVILLE

6695 Church St. | Douglasville GA 30134
Robin Common | 678.449.3078 | P.O. Box 219 Douglasville GA 30133

## OCCUPATIONAL TAX CERTIFICATE

**Business Name:** QUASH SELTZER, LLC/MIXX

**Owner:** QUASH SELTZER, LLC

**Address:** 7705 STAPLES DR
LITHIA SPRINGS, GA 30122

**Issue Date:** 06/18/2021

**Comment(s):**

**Restriction(s):**

**License No:** 2021-13146          **EXPIRES:   12/31/2021**

**Class:** COMMERCIAL BUSINESS

*Kari Calla*

Karin Callan | Finance Director
**LICENSING ONLY**

**THIS LICENSE SHALL BE DISPLAYED IN A CONSPICOUS PLACE UPON THE
LICENSED PREMISES**

**Mail To:**    QUASH SELTZER, LLC/MIXX
20311 SHERIDAN STREET
ATTN: BUSINESS LICENSING
PEMBROKE PINES FL, 33082

Quash Seltzer, LLC
7705 Staples Drive, Lithia Springs, Georgia

## LEASE

This Lease made as of this ___1___ day of March, 2021, between JHO GA-1 INVESTMENT, LLC, a Florida limited liability company, located at 1600 North Park Drive, Weston, Florida 33326 (hereinafter referred to as "Landlord"), and QUASH SELTZER, LLC, a Florida limited liability company located at 20311 Sheridan Street, Pembroke Pines, Florida 33332 (hereinafter referred to as "Tenant").

Landlord hereby leases to Tenant, and Tenant hereby leases from Landlord, the "Leased Premises" (as defined below), on the following terms and conditions:

### 1. PREMISES.

The premises leased by Tenant hereunder shall be approximately 200,000 square feet of real property and improvements at 7705 Staples Drive, Lithia Springs, Georgia (the "Leased Premises").

### 2. TERM.

The initial term of this Lease (the "Lease Term") shall be sixty (60) months from the Lease Commencement date, commencing on March 1, 2021, and ending on March 1, 2026.

### 3. POSSESSION AND TENANT IMPROVEMENTS

(a)     Tenant may take possession of the Leased Premises as of the Lease execution date so long as Tenant has evidence of insurance as specified subsequently in this Lease and so long as Tenant is in compliance with all applicable building and occupancy regulations. Tenant is also responsible for obtaining a Certificate of Occupancy. Tenant is responsible for paying all utilities from the date Tenant takes possession of the Leased Premises. Beginning on March 1, 2021, Tenant shall be responsible for payment of real estate taxes, property insurance, and common area maintenance (CAM) for the Leased Premises.

### 4. RENTAL.

(a)     During the Lease Term, Tenant agrees to pay, and Landlord agrees to accept as Base Rent for the Leased Premises, seventy nine thousand and one hundred sixty seven dollars ($79,167.00) per month, in advance, by the first day of each month of the Lease Term, plus CAM.

Quash Seltzer, LLC
7705 Staples Drive, Lithia Springs, Georgia

(b)    Tenant agrees to deposit zero dollars ($0.00) with Landlord as a security deposit ("Security Deposit") at the signing of this Lease. The Security Deposit shall be held by Landlord in a non-interest-bearing bank account pursuant to Florida Statute § 83.49 and may be applied to losses proven by Landlord to have been proximately caused by Tenant's failure to abide by the terms of this Lease. At the conclusion of the Lease, if there are no damages for which Tenant is responsible, and if Tenant is not in default on any part of the Lease, the Security Deposit will be returned within 15 days following termination or expiration of the Lease. Rent not received by the 5th day of the month shall be subject to a late payment charge equal to 5% of any unpaid rent owed hereunder.

(c)    Landlord shall also reasonably estimate in advance the amounts Tenant shall owe for real estate taxes, and property insurance required to be maintained by Landlord, as set forth in Section 25(a) of the Lease ("Insurance"), for any full or partial calendar year of the Lease Term. Tenant shall pay such estimated amounts on a monthly basis, on or before the first day of each calendar month, beginning on April 1, 2021. Landlord, upon request from Tenant, shall provide a written statement (the "Statement") to Tenant showing the amount of actual taxes and insurance for the foregoing calendar year (or portion thereof, as the case may be), along with copies of the applicable invoice and contract from the insurance company and tax bills from the taxing authority. If the Statement shows that Tenant's estimated payments made to Landlord during the previous calendar year (or portion thereof) were less than Tenant's actual obligations for taxes and insurance for the previous year (or portion thereof), then Tenant shall pay the difference within 30 days of delivery of the Statement. If the Statement shows that Tenant's estimated payments exceeded Tenant's actual obligations for taxes and insurance, Tenant shall receive a credit for the difference against payments of rent next due. If the Lease Term shall have expired and no further rent shall be due, then Landlord shall refund the difference within 30 days of delivery of the Statement.

5.    **RENEWAL.**

Unless Tenant gives written notice to Landlord at least 120 days prior to the expiration of the then-current Lease Term (or Renewal Term, as the case may be), of its intention not to renew this Lease, then the Lease shall automatically be extended for one period of five (5) years. The rental rate of each renewal period, beginning with the first one, will be equal to the rental rate of the prior period plus an additional 2.5%.

6.    **USES.**

(a)    The Tenant shall use the Leased Premises for office, brewery production, showroom, and warehousing activities reasonably correlated to the operation of Tenant's business, and for no other purpose without written consent of the Landlord, which shall not be unreasonably withheld or delayed. Tenant will not do or permit anything to be done on the

2

Quash Seltzer, LLC
7705 Staples Drive, Lithia Springs, Georgia

Leased Premises which shall result in cancellation of insurance, or which shall in any way conflict with any applicable laws, statutes, ordinances, and governmental rules relating to Tenant's use of the Leased Premises.

(b)     In consideration of existing and future legislation concerning the handling, storage, use, and disposition of dangerous/hazardous chemicals and materials, Tenant and Landlord acknowledge the risks and liabilities associated with same and agree to the following: Tenant shall determine what laws, regulations and ordinances regarding the handling, storage, use and disposition of dangerous/hazardous chemicals and materials apply to Tenant's business with respect to the Leased Premises. Tenant shall take all reasonably necessary steps, including any inspections, tests or studies, as required by such laws to cause prompt and ongoing compliance therewith. Tenant agrees to notify Landlord and the appropriate authorities in accordance with the requirements of any applicable Environmental Laws of any material spills or improper discharges of any dangerous/hazardous chemicals and materials. Further, in addition to and in further support of any compliance with any other hold harmless and indemnification obligations expressly set forth herein, Tenant acknowledges and assumes total responsibility for any and all dangerous/hazardous chemicals and materials it may handle, store, use and dispose of in or about the Leased Premises. Such responsibility shall include, but not be limited to, medical costs and personal injury awards (compensatory and/or punitive), environmental clean-ups required by any governmental authority having jurisdiction thereof and related costs, governmental fines, indirect and/or consequential damages and losses including without limitation the loss of rents from third party tenants of Landlord, against Landlord and/or Tenant resulting from Tenant's willful and/or negligent handling, storage, use, disposition of dangerous/hazardous chemicals and materials, and/or Tenant's noncompliance with applicable law. Tenant shall, upon governmental request or upon Landlord's reasonable request, disclose the type and quantity of dangerous/hazardous chemicals and materials Tenant is/has handled, stored, used, disposed of or intends to handle, store, use or dispose of in or about the Leased Premises.

7.     **SERVICES.**

Commencing on the Possession Date and during the Lease Term (and any Renewal Term), Tenant shall be responsible for all utilities for the Leased Premises and trash removal. Tenant shall not permit the accumulation of trash or refuse matter on the Leased Premises or anywhere in or near the Leased Premises. If Tenant refuses or neglects to remove accumulation of trash or refuse matter to Landlord's reasonable satisfaction, Landlord may arrange for such removal upon prior written notice to Tenant, the cost of which, plus 5% for administrative and overhead costs, shall be payable as additional rent, within ten (10) days of invoice date.

8.     **OUTSIDE STORAGE.**

Tenant shall not store any waste materials, supplies or product outside of the Building or

3

2e97e89c3b

Quash Seltzer, LLC
7705 Staples Drive, Lithia Springs, Georgia

surrounding property.

### 9.    SIGNAGE.

Tenant shall have the right to display a business sign on the Premises in conformity with any pertinent regulations of the municipality in which the Leased Premises are located, and after Landlord has approved the design thereof. Tenant agrees to follow all applicable city codes concerning signage and, upon expiration of this Lease, shall return the Building façade and monument sign to its condition at the commencement of this Lease, wear and tear and casualty excepted.

### 10.    MAINTENANCE AND REPAIR.

(a)    Landlord represents and warrants to Tenant that the electrical and mechanical systems, fire protection, alarm system, and heating and air conditioning systems at the Leased Premises have been fully inspected and shall be in good working order and condition on the date Tenant takes possession of the Leased Premises.

(b)    Commencing on the Possession Date and during the Lease Term, Tenant shall commit no act of waste and shall keep the Leased Premises and the mechanical systems in good condition and repair, at its own expense, except for damage by fire, acts of God or the elements or damage which the Landlord is required to repair hereunder. Tenant will also be responsible for maintenance to the heating and air conditioning systems, and the floor of the Leased Premises. Landlord will maintain the yard and lawn areas as part of CAM. Landlord may inspect the Leased Premises from time to time and during normal business hours to determine whether Tenant is in compliance with maintenance and repair duties as set forth herein so long as 48 hours advanced written notice is provided to Tenant. Landlord may give Tenant written notice of any repairs that it reasonably and in good faith determines are needed. If Landlord delivers such a notice, Tenant shall complete the repairs as soon as reasonably practicable and be subject to a follow-up inspection. If Tenant fails to make the repairs within a reasonable period of time, Landlord may arrange to have them made after giving further written notice to Tenant, the cost of which, plus 10% for administrative and overhead costs, shall be payable as additional rent, within 30 days of invoice date. On the last day of the Lease Term or Renewal Term hereof, Tenant will surrender the Leased Premises to Landlord in as good condition as they were at the beginning of the Lease Term, excepting reasonable wear and tear, obsolescence and damage by fire, acts of God or the elements or damage which the Landlord is required to repair hereunder.

4

Quash Seltzer, LLC
7705 Staples Drive, Lithia Springs, Georgia

(c)     Landlord, at its sole expense, will maintain in good order and repair all structural portions of the Leased Premises, including the foundation, Building structure, roof and exterior walls, unless such repairs directly result from the misuse of the Leased Premises by or negligence on the part of the Tenant, its agents or employees, and are not covered by insurance, in which event Tenant will be responsible for such repairs.

## 11.    ALTERATIONS, FIXTURES, AND PERSONAL PROPERTY.

(a)     Tenant may, from time to time at its own expense and upon notice to Landlord, make such alterations, improvements, repairs, and additions to and upon the Leased Premises and install thereon such fixtures, equipment, furniture and property as it may consider advisable for the conduct or operation of its business, provided that (i) all work shall be done in a good and workmanlike manner and in accordance with all the other provisions of this Lease and all applicable building and fire codes, (ii) the structural integrity of the Building shall not be impaired, (iii) Tenant shall first submit to Landlord complete plans and specifications for any alterations, additions or improvements to the Leased Premises, and (iv) Tenant shall first obtain Landlord's written consent to make such alterations, improvements or additions including Landlord's approval of the plans and specifications therefor. Landlord agrees that it will not unreasonably withhold, condition, or delay consent to the making of such alterations, improvements or additions, so long as the structural integrity of the Building is not impaired thereby. If the Leased Premises shall at any time during the Lease Term become subject to any mechanic's, laborer's or materialmen's lien based upon the furnishing of material or labor to Tenant on the Leased Premises, Tenant shall cause the same, at Tenant's expense, to be discharged within thirty 30 days after notice thereof, unless the lien is then being litigated in good faith by Tenant, in which case Tenant shall indemnify and hold Landlord harmless from and against any such lien and shall secure Landlord by posting a bond or other cash deposit with Landlord in the amount of such lien to Landlord's satisfaction.

(b)     All improvements made by Tenant to the Leased Premises which are still attached to the Leased Premises so that they cannot be removed without material injury to the Leased Premises, shall become the property of Landlord upon installation. Not later than the last day of the Lease Term (including any Renewal Term), Tenant shall, at Tenant's expense, remove all of Tenant's personal property and those improvements made by Tenant which have not become the property of Landlord, and repair all damages done by or in connection with installation or removal of said property improvements, and surrender the Leased Premises in as good condition as they were at the beginning of the Lease Term, reasonable wear and tear and casualty excepted. All property of Tenant remaining on the Leased Premises after the last day of the Lease Term or Renewal Term shall be conclusively deemed abandoned and may be removed by Landlord. Tenant shall reimburse Landlord for the cost of such removal.

5

Quash Seltzer, LLC
7705 Staples Drive, Lithia Springs, Georgia

12.     **ASSIGNMENT AND SUBLEASING.**

The Tenant shall not transfer, mortgage, pledge or encumber this Lease or any interest therein. Tenant shall be permitted to sublease the Leased Premises. Tenant is only allowed to assign Lease if Tenant's business is sold to a third-party purchaser that meets Landlord's typical qualifications for tenancy.

13.     **RIGHT OF ENTRY.**

The Landlord shall have the right to enter the Leased Premises, for the purpose of inspecting the physical condition of the Leased Premises or making repairs required or permitted herein, provided that such entry shall not interfere with the business of the Tenant and Landlord provides Tenant with at least 48 hours advanced written notice of such plans to enter. Landlord shall also have the right to exhibit the Leased Premises to prospective purchasers and, during the last six (6) months of the Lease Term or Renewal Term, to prospective tenants. All such rights of entry shall be subject to the security regulations of the Tenant, shall be upon reasonable prior notice to Tenant, and shall be at reasonable times. Tenant shall not unreasonably interfere with Landlord's right of entry on the basis of security or otherwise.

14.     **QUIET ENJOYMENT.**

The Landlord shall put Tenant in possession of the Leased Premises and the appurtenances thereof at the beginning of the term hereof and the Tenant, upon paying the rent and observing the other covenants and conditions herein, shall peaceably and quietly hold and enjoy the Leased Premises during the Lease Term and any extension thereof. The Landlord shall warrant and defend the Tenant in the enjoyment and peaceful possession of the Leased Premises during the Lease Term and any extensions thereof.

15.     **HOLDING OVER.**

If the Tenant remains in the Leased Premises beyond the expiration of this Lease, the tenancy shall continue as a tenancy from month to month on all the terms and conditions set forth in this Lease except duration and rent. Rent shall increase 25% on an annual basis.

16.     **SUCCESSORS.**

This Lease shall inure to the benefit of and be binding upon the parties hereto, their respective heirs, administrators, executors, representatives, successors and assigns.

6

Quash Seltzer, LLC
7705 Staples Drive, Lithia Springs, Georgia

17.    **INTENDED USE OF PREMISES.**

In the event that any governmental agencies should determine and so notify the Landlord and Tenant that the Leased Premises are not properly zoned or constructed to meet the intended use and operations of the Tenant, then either party shall have the right to terminate this Lease effective with the date of such notice.

18.    **REGULATORY COMPLIANCE.**

(a)    Tenant shall comply with all applicable federal, state and local laws, regulations, administrative rulings, orders and ordinances pertaining to the occupancy and use of the Leased Premises in the conduct of Tenant's business, including but not limited to the Americans with Disabilities Act ("ADA") and all applicable environmental laws and regulations, including those relating to hazardous substances. The term "Environmental Laws" shall include, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act, as amended 42 U.S.C. section 9601 et seq. and the Resource Conservation and Recovery Act, 42 U.S.C. section 6901 et seq., as amended from time to time, and any similar federal, state and local laws and ordinances and the regulations and rules implementing such statutes, laws and ordinances. Landlord represents that at the time of possession by Tenant, the Leased Premises shall be in compliance with all applicable laws, including but not limited to ADA regulations, except to the extent the Leased Premises are exempt due to the age of the Building.

(b)    If Tenant undertakes any modifications to the Leased Premises during the Lease Term that cause the Leased Premises not to be in compliance with the ADA or lose its exempt status under the ADA, Tenant shall be responsible for bringing the Leased Premises into compliance therewith.

(c)    Neither the Tenant nor any agent or party acting at the direction of or with the consent of the Tenant shall treat, store, or dispose of any "hazardous substance," as defined in the environmental laws referenced above, or petroleum or crude oil on or from the Leased Premises.

(d)    Tenant shall fully and promptly pay, perform, discharge, defend, indemnify and hold harmless Landlord from and against any and all claims, orders, demands, causes of actions, proceedings, judgments or suits and all liabilities, losses, costs or expenses (including, without limitation, technical consultant fees, court costs, expenses actually paid by Landlord to third parties and reasonable legal fees incurred by Landlord) and damages arising out of or as a result of (i) the "release" by Tenant, its employees, agents, or contractors, of any "hazardous substance" as those terms are defined in the Environmental Laws referenced above, or petroleum (including crude oil or any refraction thereof) into, on or from the Leased Premises, or (ii) the existence of any "hazardous substances" or petroleum at, on or in the Leased Premises or neighboring properties caused or placed therein by Tenant, its employees, agents, or

7

Quash Seltzer, LLC
7705 Staples Drive, Lithia Springs, Georgia

contractors other than in accordance with the terms of this Lease. The remedies set forth in this section are in addition to and not in limitation of any other rights and remedies of Landlord contained in this Lease, or at law or in equity.

19. **NOTICES.**

In every case, when under the provisions of this Lease, it shall be necessary or desirable for the Tenant or the Landlord to serve any notice or demand on the other, such notice or demand shall be served personally or by registered or certified mail or by nationally recognized courier service (such as Federal Express) for overnight delivery, addressed to the Landlord or Tenant at its address on page one (1) hereof, until otherwise directed in writing by the Landlord or Tenant, as applicable.

20. **TENANT'S DEFAULT.**

(a) The Landlord shall have the right to terminate this Lease or to terminate Tenant's right of possession without terminating this Lease in the event that:

(i) Any single monthly rent per rental year is not paid within three (3) days after the due date thereof and continues to remain unpaid for a period of five (5) business days after written (email) notice of such nonpayment is given by the Landlord to Tenant.

(ii) Tenant fails to correct or cure any material breach of or default under any representation, warranty, covenant or other agreement of the Tenant contained in this Lease, except with respect to nonpayment of rent, within 30 days after Landlord has notified Tenant in writing of any such breach thereof (provided that if such cure cannot be completed within such 30-day period, Tenant will not be in default so long as Tenant commences to cure such failure within such 30-day period and thereafter diligently pursues such cure to completion).

(iii) A proceeding is commenced to declare Tenant bankrupt or insolvent or any assignment of Tenant's property is made for the benefit of creditors, or a receiver or trustee is appointed for Tenant or Tenant's property or business, and such proceeding is not dismissed or such a receiver/trustee is not removed within a period of ninety (90) days thereafter.

(b) In the event of Tenant's default under Section 21 (a) above, Landlord shall have the right to:

(i) exercise the right to "lock out" Tenant until such time as payments are current; or

8

Quash Seltzer, LLC
7705 Staples Drive, Lithia Springs, Georgia

(ii)    immediately re-enter and take possession of the Leased Premises without terminating this Lease, in which case the Tenant shall continue to be liable for rents due hereunder as and when they become due and payable; or

(iii)    declare this Lease to be terminated, in which event this Lease, all rights of the Tenant, and all duties of the Landlord shall immediately cease and terminate, and the Landlord may possess and enjoy the Leased Premises as though this Lease had never been made, without prejudice, however, to any and all rights of action against the Tenant the Landlord may have to recover the present value of the net rent (the rent provided for hereunder net of the rent obtained by Landlord by re-letting the Leased Premises) (which rent, for the entire balance of the Lease Term, shall become immediately due and owing to the Landlord), damages, or breach of covenant, in respect to which the Tenant shall remain and continue liable notwithstanding such termination.

(c)    Forbearance by Landlord to enforce any remedy upon any default by Tenant will not constitute a waiver of such default. The failure of Landlord to insist at any time upon the strict performance of any covenant or agreement or to exercise any option, right, power or remedy contained in this Lease will not be construed as a waiver or a relinquishment thereof for the future. The remedies set forth in this Section are in addition to and not in limitation of any other rights and remedies of Landlord contained in this Lease, or at law or in equity.

(d)    Notwithstanding anything to the contrary herein, in the event of a default and resulting termination of this Lease and surrender of possession of the Leased Premises, Landlord shall use commercially reasonable, good faith efforts to mitigate its damages by attempting to re-let the Leased Premises, for such term or terms and on such terms and conditions as Landlord, in its reasonable discretion, may determine, and recover from Tenant all costs and expenses reasonably incurred in connection with any such re-letting.

21.    **EMINENT DOMAIN - CONDEMNATION.**

In the event the Leased Premises or any part thereof shall be taken in an eminent domain proceeding, the following provisions shall be controlling:

(a)    If the whole of the Leased Premises shall be acquired or condemned by eminent domain for any public or quasi-public use or purpose ("Condemned"), then and in that event the Lease Term shall cease and terminate from the date of title vesting in such condemning authority and Tenant shall have no claim against Landlord for the value of any unexpired Lease Term, except that any compensation specifically and independently awarded to Tenant for loss of business or goodwill or for its personal property shall be the property of Tenant.

(b)    If any part of the Leased Premises shall be condemned and such partial

9

7705 Staples Drive, Lithia Springs, Georgia

condemnation prevents or renders the Leased Premises not suitable for the continued conduct of Tenant's business, then and in such event Tenant shall have the right to terminate this Lease by delivering a written notice of cancellation to Landlord within 30 days after Tenant shall have received notice from Landlord of such condemnation, whereupon this Lease shall cease and terminate as of the date of such notice of cancellation.

(c)     In the event of any condemnation or taking as hereinbefore provided, either whole or partial, Tenant shall not be entitled to any part of the award as damages or otherwise for such condemnation and Landlord is to receive the full amount of such award, the Tenant hereby expressly waiving any right or claim to any part thereof: except that Tenant shall be entitled to receive and retain any amounts which may be specifically awarded to it in such condemnation proceedings because of the taking of its trade fixtures and for relocation expenses. It is understood that in the event of the termination of this Lease as aforesaid, neither Landlord nor Tenant shall have any claim against the other for the value of any unexpired term of this Lease and Tenant shall have no right or claim to any part of the award on account thereof.

(d)     If this Lease remains in full force and effect, on the date of the taking, the monthly rent shall be reduced by an amount that is in the same ratio to the monthly rent as the value of the portion of the Leased Premises taken bears to the total value of the Leased Premises immediately before the date of taking and Landlord will restore the Building to an architecturally complete unit to the extent of available condemnation proceeds.

(e)     Rent shall be abated or reduced during the period from the date of the taking until the completion of any restoration, but all other obligations of the Tenant under this Lease shall remain in full force and effect. The abatement or reduction of rent shall be based on the extent to which the restoration interferes with the Tenant's use of the Leased Premises.

(f)     Each of Landlord and Tenant may, at its option, seek or challenge in any administrative or judicial proceeding the condemnation award to which it believes it is entitled to the extent provided hereunder and under applicable law. In the event either Landlord or Tenant elects to initiate or participate in any such proceeding, each agrees that it shall be solely responsible for its own costs and expenses incurred in connection therewith (including without limitation its attorneys' fees), and that neither shall be responsible for any portion of the other's costs and expenses.

22.   **TAXES.**

Tenant shall pay before delinquency all taxes, assessments, license fees, and other charges ("Taxes") that are levied and assessed against the Tenant's personal property installed or located in or on the Leased Premises, and that become payable during the Lease Term. Landlord will promptly pay all real estate taxes and assessments as they become due and be reimbursed by Tenant for Tenant's proportionate share thereof, as set forth in Section 4 hereof.

10

7705 Staples Drive, Lithia Springs. Georgia

### 23.   DAMAGE OR DESTRUCTION.

(a)   If, during the Lease Term, the Leased Premises are totally or partially destroyed from any cause, rendering the Leased Premises totally or partially inaccessible or unusable, either party may elect to terminate this Lease, but if neither party terminates the Lease, Landlord shall restore the Leased Premises to its condition immediately before such damage or destruction and this Lease shall continue in full force and effect. If the existing laws do not permit the restoration, either party may terminate this Lease immediately by giving written notice to the other.

(b)   If the Lease is not terminated, in case of damage or destruction, there shall be an abatement or reduction of rent from the date of destruction to the date of substantial completion of restoration, based on the extent to which the destruction interferes with Tenant's use of the Leased Premises.

### 24.   INSURANCE.

(a)   Landlord shall maintain an insurance policy for the duration of the Lease Term and any renewals that may be granted to Tenant, insuring the Leased Premises against loss or damage by fire with extended coverage endorsement in an amount not less than one hundred percent (100%) of the full replacement insurable value as determined from time to time. The term "full replacement insurable value" shall mean actual replacement costs (exclusive of the costs of excavation, foundations, and footings below the basement floor) without deduction for physical depreciation. Such insurance shall be issued by financially responsible insurers, duly authorized to do business in the State of Florida. Tenant shall reimburse Landlord for the cost of such insurance, as set forth in Section 4 hereof.

(b)   Tenant shall carry General Comprehensive Liability Insurance against claims for personal injury, death or property damage occurring upon, in or about the Leased Premises or as a result of Tenant's activities on the Leased Premises. The limit of such insurance shall not be less than $1,000,000.00 combined single limit in respect to injury or death to a single person or occurrence, and shall not be less than $1,000,000.00 in respect to all property damage arising out of one occurrence. Such policies shall name Landlord as additional Insured, and certificates thereof shall be provided to Landlord upon delivery of possession of the Leased Premises to Tenant and as reasonably requested thereafter. Such policies shall provide that no cancellation or material change shall become effective until at least thirty (30) days after notice to Landlord of such cancellation or material change. Tenant agrees to notify Landlord in writing thirty (30) days prior to the date any material adverse change in or any nonrenewal of such policies is to become effective.

(c)   Tenant and Landlord, for themselves and all others claiming under them, including any insurer, waive all rights including rights of subrogation against the other for loss, damage, or liability resulting from a risk which is insured against by either party.

11

7705 Staples Drive, Lithia Springs, Georgia

provided that such release of liability and waiver of the right of subrogation shall not be operative in any case where the effect thereof is to invalidate such insurance coverage. To the extent necessary, the parties shall obtain consents to such waiver from insurers.

25.    **INDEMNIFICATION.**

Tenant agrees to indemnify and save harmless Landlord from any and all claims, orders, demands, causes of actions, proceedings, judgments or suits and all liabilities, losses, costs and expenses (including without limitation, technical consultant fees, court costs, expenses paid to third parties and reasonable legal fees) and damages (i) arising out of Tenant's material breach of any of its obligations under this Lease, or (ii) for personal injury or property damage that may be made against the Landlord which arise out of Tenant's use of the Leased Premises, unless such claim is due to the negligence, misconduct, or fraudulent or wrongful acts of Landlord, its officers, agents, employees, servants or representatives. The remedies set forth in this section are in addition to and not in limitation of any other rights and remedies of Landlord contained in this Lease, or at law or in equity.

26.    **SEVERABILITY.**

In case any one or more of the provisions contained in this Lease shall for any reason be held by a court of competent jurisdiction to be invalid, illegal, or unenforceable in any respect, such invalidity, or unenforceability shall not affect any other provision thereof, and this Lease shall be construed as if such invalid, illegal, or unenforceable provision had never been contained herein.

27.    **GOVERNING LAW.**

All matters affecting the interpretation of this Lease and all rights of the parties hereunder shall be governed by the laws of the State of Florida, except such provisions of the law of the State of Georgia as may not be abrogated by contract.

28.    **RECORDATION.**

It is the intention of the parties that this Lease shall not be recorded. The parties at the request of either party forthwith shall execute a "Memorandum of Lease" containing dates of commencement and expiration of the Lease Term, and Tenant's renewal rights, and otherwise in a recordable form. Such Memorandum of Lease may be recorded by either party.

29.    **ESTOPPEL CERTIFICATES.**

Tenant and Landlord each agree that Tenant or Landlord, as applicable (the "responding party"), at any time upon no less than 30 days prior written notice from the other party hereto (the "requesting party"), shall execute and deliver to the requesting party a statement in writing certifying that this Lease is not modified and is in full force and effect (or, if modified, stating

12

7705 Staples Drive, Lithia Springs, Georgia

the nature of such modification and certifying that this Lease, as modified, is in full force and effect); certifying the date to which the rent and other charges are paid in advance, if any; and acknowledging that the responding party has no knowledge of any uncured defaults on the part of the requesting party (or specifying such defaults, if any). Any statement made pursuant to this provision may be conclusively relied upon by any prospective purchaser or encumbrancer of the Leased Premises or any other person who may reasonably request such a statement.

30. **ENTIRE AGREEMENT**.

This Lease, including all exhibits and attachments hereto, contains the entire agreement of the parties hereto with respect to the subject matter hereof, supersedes any and all prior agreements with respect thereto, and may not be changed, modified or amended except by an agreement in writing signed by both Landlord and Tenant. Any waiver by any party of any of its rights under this Lease or of any breach of this Lease shall not constitute a waiver of any other rights or of any other or future breach.

31. **COUNTERPARTS.**

This Lease may be executed in two or more counterparts, each of which shall be an original and together shall constitute one and the same instrument. A signed copy of this Lease may be delivered by either of the parties by facsimile or electronic transmission, and such execution and delivery shall be considered valid, binding and effective for all purposes.

**IN WITNESS WHEREOF**, the parties have hereunto set their hands in duplicate.

LANDLORD:    JHO GA-T INVESTMENT, LLC

By: _____
John H. Owoc, Managing Member

**TENANT:** QUASH SELTZER, LLC

By: _____
John H. Owoc, Managing Member

13



# State of Florida

## Department of State

I certify from the records of this office that QUASH SELTZER, LLC, is a limited liability company organized under the laws of the State of Florida, filed on August 4, 2020, effective August 4, 2020.

The document number of this company is L20000224976.

I further certify that said company has paid all fees due this office through December 31, 2020, and its status is active.

Authentication Code: 120A00014675-080520-L20000224976-1/1



Given under my hand and the Great Seal of the State of Florida, at Tallahassee, the Capital, this the Fifth day of August, 2020

*Secretary of State*

850-617-6381          ` 8/5/2020 2:08:56 PM  PAGE   2/002   Fax Server
                             RECEIVED 08/05/2020 13:28



FLORIDA DEPARTMENT OF STATE
Division of Corporations

August 5, 2020

QUASH SELTZER, LLC
1600 NORTH PARK DRIVE
WESTON, FL  33326

The Articles of Organization for QUASH SELTZER, LLC were filed on
August 4, 2020, effective August 4, 2020, and assigned document number
L20000224976.  Please refer to this number whenever corresponding with
this office.

The certification you requested is enclosed.  To be official, the
certification for a certified copy must be attached to the original
document number that was electronically submitted and filed under FAX
audit number H20000260681.

To maintain "active" status with the Division of Corporations, an annual
report must be filed yearly between January 1st and May 1st beginning in
the year following the file date or effective date indicated above.  If
the annual report is not filed by May 1st, a $400 late fee will be added.
It is your responsibility to remember to file your annual report in a
timely manner.

A Federal Employer Identification Number (FEI/EIN) will be required when
this report is filed.  Apply today with the IRS online at:

https://sa.www4.irs.gov/modiein/individual/index.jsp.

Please be aware if the limited liability company address changes, it is
the responsibility of the limited liability to notify this office.

Should you have any questions regarding this matter, please contact this
office at the address given below.

DANIEL L O'KEEFE
Regulatory Specialist II
New Filing Section
Division of Corporations          Letter Number: 120A00014675

P.O BOX 6327 – Tallahassee, Florida 32314

# ARTICLES OF ORGANIZATION

## Article I. Name

The name of this Florida limited liability company is:

Quash Seltzer, LLC

## Article II. Address

The street address of the Company's initial principal office is:

Quash Seltzer, LLC
1600 North Park Drive
Weston FL 33326

The mailing address of the Company's initial principal office is:

Quash Seltzer, LLC
1600 North Park Drive
Weston FL 33326

## Article III. Registered Agent

The name and street address of the Company's registered agent is:

Corporate Creations Network Inc.
801 US Highway 1
North Palm Beach FL 33408

## Article IV. Transferability of Membership Interests

No members shall have the right to assign their membership interests in the Company without the written agreement of all of the membership interests, unless otherwise provided in the Company's Operating Agreement. If the assignment is not approved by all of the membership interests, the assignee shall have no right to become a member, to participate in the management of the Company, or to exercise any other rights or powers of a member. The assignee shall merely be entitled to receive the share of profits and other distributions and the allocation of income, gain, loss deduction, credit or similar item to which the assignor was entitled, to the extent assigned.

Corporate Creations International
801 US Highway 1
North Palm Beach FL 33408
(561) 694-8107

Copyright © 1993-2020 CC

## Article V. Distribution of Profits

Unless otherwise provided in the Company's Operating Agreement, there shall not be any distribution of profits unless each separate distribution is approved by the affirmative vote of members who own more than 50% of the voting interest in the Company. The voting members shall have complete discretion on when and if to approve any distribution of profits.

## Article VI. Management

This will be a member-managed company. The name and address of each member is:

John H. Owoc
1600 North Park Drive
Weston FL 33326

## Article VII. Company Existence

The Company's existence shall begin effective as of August 4, 2020.

The undersigned authorized representative of a member executed these Articles of Organization on 8/4/2020.

CORPORATE CREATIONS INTERNATIONAL
Diana Serra Vice President
Carlos M Alvarez, Attorney-in-Fact

Corporate Creations International
801 US Highway 1
North Palm Beach FL 33408
(561) 694-8107

Copyright © 1993-2020 CC

## STATEMENT OF REGISTERED AGENT

LIMITED LIABILITY COMPANY:
Quash Seltzer, LLC


REGISTERED AGENT/OFFICE:
Corporate Creations Network Inc.
801 US Highway 1
North Palm Beach FL 33408
UNITED STATES


I agree to act as registered agent to accept service of process for the company named above at the place designated in this Statement. I agree to comply with the provisions of all statutes relating to the proper and complete performance of the registered agent duties. I am familiar with and accept the obligations of the registered agent position.

_____
CORPORATE CREATIONS NETWORK INC.
Carlos M Alvarez, Special Secretary
Date: August 4, 2020.




Corporate Creations International
801 US Highway 1
North Palm Beach FL 33408
(561) 694-8107


Copyright © 1993-2020 CC