# FAITH TECHNOLOGIES INCORPORATED

# EXHIBIT "3"

<table>
<tr><td>

When recorded return to:

Robert F. Roos, Esq.
Lewis Roca Rothgerber Christie LLP
201 E. Washington Street, Suite 1200
Phoenix, Arizona 85004-2595
(602) 262-5779

</td><td>

OFFICIAL RECORDS OF
MARICOPA COUNTY RECORDER
STEPHEN RICHER
2022-0266676 03/24/22 04:49
PAPER RECORDING

0351934-265-2-2
mor gana

THIS SPACE RESERVED FOR RECORDING INFORMATION

</td></tr>
</table>

## MECHANIC'S AND MATERIALMAN'S LIEN

| | | |
|---|---|---|
| FAITH TECHNOLOGIES INCORPORATED., a Wisconsin corporation, | ) ) ) | **NOTICE AND CLAIM OF LIEN** |
| Claimant, | ) ) | |
| vs. | ) ) | |
| JHO Real Estate Investment, LLC, a Florida limited liability company, | ) ) ) | |
| Owner or Reputed Owner. | ) ) | |

---

| STATE OF WISCONSIN | ) |
|---|---|
| | )ss. |
| County of Winnebago | ) |

David Jahner, being first duly sworn, upon his oath deposes and says that:

1. I am the President of Faith Technologies Incorporated ("Claimant"), and have personal knowledge of the facts hereafter set forth. Claimant holds a valid license as a contractor pursuant to Arizona Revised Statutes, Title 32, Chapter 10, and was duly licensed as such at all times material to the facts stated herein.

2. Claimant furnished labor, materials, machinery, fixtures, equipment and tools for the construction of improvements on a certain parcel of land situated in Maricopa County, Arizona at 1635 South 43rd Avenue, Phoenix, Arizona 85009 (the "Subject Property") and sought to be

charged, together with the improvements thereon, with the lien hereby claimed. The legal description of the Subject Property is attached as Exhibit A and is incorporated by this reference.

3.    JHO Real Estate Investment, LLC, a Florida limited liability company ("Owner"), is the Owner or reputed Owner of the Subject Property.

4.    The name of the person by whom Claimant was employed is Stellar Group, Incorporated ("Agent"). Claimant entered into a written agreement (the "Contract") with the Agent on or about December 22, 2020, wherein Claimant agreed to furnish labor, professional services, materials, equipment, machinery, fixtures and tools for the building electrical work at Bang Energy Phoenix Can Manufacturing Facility located at the Subject Property. Under the Contract, Claimant was to be paid the Contract Sum in the amount of $3,926,196.00, subject to additions and deductions, as provided in the Contract. During performance of the Work on the Project, the Agent issued 10 change orders to Claimant in the combined amount of $2,048,932.95 increasing the total Subcontract amount to $5,975,128.95. The current sum due and owing to Claimant for work performed on the Subject Property pursuant to the Contract is $2,777,007.15 together with interest on this sum at the highest legal rate from the date due until paid in full. A true and correct copy of the Contract including all change orders documenting the Agent's agreement with and obligations to Claimant are attached as Exhibit B and incorporated by reference.

5.    Labor, materials, machinery, fixtures and tools were first furnished to the jobsite by Claimant under the Contract on or about January 26, 2021. Claimant ceased work on the Project on or about February 8, 2022, and Claimant is informed and believes that all work on the Project has now ceased. Based on the cessation of labor occurring on or after February 8, 2022, the Project is not yet completed under the provisions of A.R.S. § 33-993(C). Consequently, this lien is timely under applicable law.

6.    As of this date, the unpaid balance due and owing to Claimant under the Contract for work performed on the Project is $2,777,007.15. The total amount due and owing to Claimant for work performed on the Project under the Contract after deducting all just offsets and credits is $2,777,007.15, together with interest on that amount at the highest legal rate from the date due until paid. That amount is also the reasonable value of the labor, materials, machinery, fixtures and tools furnished by Claimant under the Contract for which Claimant has not been compensated.

7.    On or about February 12, 2021, Claimant served a preliminary 20-day notice as required by A.R.S. § 33-992.01 upon the Owner and Agent. The notice was given by certified mail, return receipt requested. A true and correct copy of the notice is attached hereto as Exhibit C and incorporated herein by reference.

8.    None of the parties returned the acknowledgement of receipt of the twenty-day notice to Claimant within thirty days from the date of mailing. Therefore, under A.R.S. § 33-992.02, proof of service of the twenty-day notice is made by the affidavit of Colleen Kirk which is attached as Exhibit D and incorporated here by reference. The affidavit recites: (a) the time,

place and manner of mailing; and (b) the names and addresses of the persons to whom copies of the notices were mailed.

9. Claimant claims a lien on the Subject Property and the structures and improvements thereon in the amount of $2,777,007.15 together with costs incurred recording this lien, and together with interest and attorneys' fees, pursuant to the laws of the state of Arizona relating to the liens of mechanics, materialmen, laborers and others. For the sums due under the Contract, and for the purpose of filing this lien, Claimant has made this notice and claim of lien, and delivers the original thereof to the County Recorder of Maricopa County, Arizona to be recorded as required by law, and causes duplicate copies to be served upon the Owner or Reputed Owner, if the Owner can be found in Maricopa County, Arizona.

FAITH TECHNOLOGIES, INCORPORATED, a
Wisconsin corporation authorized to transact
business in Arizona

By: _____
David Jahner
President

STATE OF WISCONSIN    )
                      )ss.
County of Winnebago   )

The foregoing instrument was subscribed, sworn to and acknowledged before me this 17 day of March, 2022, by David Jahner, President of Faith Technologies Incorporated, a Wisconsin corporation authorized to transact business in Arizona, on behalf of the corporation.

_____
NOTARY PUBLIC

My Commission Expires:

12-10-2024



3

# EXHIBIT A

## EXHIBIT A

## LEGAL DESCRIPTION

That portion of the Northwest quarter of Section 15, Township 1 North, Range 2 East of the Gila and Salt River Meridian, Maricopa County, Arizona, described as follows:

Beginning at the Northwest corner of the North half of the Southwest quarter of said Northwest quarter;

Thence South (assumed bearing for purposes of this description) along the West line of said section, a distance of 660.00 feet to a line that is parallel with and distant 1968.46 feet Southerly measured at right angles from the North line of said section;

Thence South 89 degrees 50 minutes East, along said parallel line, a distance of 1307.28 feet to a line that is parallel with and distant 10.00 feet Westerly, measured at right angle, from the East line of said Southwest quarter, last said parallel line being also the center line of an existing drill track;

Thence North 00 degrees 01 minutes West, along last said parallel line, a distance of 1095.68 feet to a point of CUSP;

Thence Southwesterly along a tangent curve concave Northwesterly having a radius of 642.43 feet, through a central angle of 05 degrees 43 minutes 29 seconds, an arc distance of 64.19 feet;

Thence South 05 degrees 42 minutes 29 seconds West, tangent to said curve, a distance 26.38 feet;

Thence Southwesterly and Westerly along a tangent curve to the right having a radius 382.24 feet, through a central angle of 84 degrees 27 minutes 31 seconds, an arc distance of 563.45 feet to a point of tangency in a line that is parallel with and distant 1308.46 feet Southerly, measured at right angles, from said North line;

Thence North 89 degrees 50 minutes West, along last said parallel line, a distance of 919.70 feet to the point of beginning.

EXCEPTING THEREFROM that portion of said property lying below a depth of 500.00 feet measured vertically from the contour of the surface thereof;

Provided, however, that said grantor, its successors and assigns, shall not have the right for any and all purposes to enter upon, into or through the surface of the portion of said property lying above 500.00 feet, measured vertically from the contour of the surface of said property, as reserved in Deed recorded in Docket 9581, Page 180 and also recorded in Docket 9590, Page 873; and

EXCEPT all rights retained by Southern Pacific Company, a Delaware corporation in Warranty Deed recorded in Docket 3976, Page 407 of official records of Maricopa County, Arizona.

# EXHIBIT B

DocuSign Envelope ID: 9F081A25-2D7C-4229-931A-00A5ACED7684

# SUBCONTRACT
## Stellar Group, Inc.
2900 Hartley Road
Jacksonville, FL 32257

| | |
|---|---|
| Subcontractor: Faith Technologies, Inc. | Project Name and Location: Bang Energy - Phoenix Can Manufacturing |
| 225 Main Street | 1635 South 43rd Avenue |
| Menasha Wisconsin 54952 | Phoenix Arizona 85009 |
| Attention: Terry Flaherty | Attention: Brian Edberg |
| Phone: (920) 738-1500 | Mobile: (904) 349-0840 |
| Fax: | E-Mail: bedberg@stellar.net |
| E-Mail: terry.flaherty@faithtechnologies.com | |

| Date | SC # | Project # | Contract Type | FOB | Schedule |
|---|---|---|---|---|---|
| 12/22/2020 | 23006976-SUB-09 | 23006976 | Lump Sum | Jobsite | Per Superintendent |

**Scope of Work: Building Electrical**

This Subcontract is made by and between Stellar Group, Incorporated, d/b/a Stellar, hereinafter referred to as Contractor, and the Subcontractor named above, at Jacksonville, Florida. In consideration of the mutual promises and undertakings set forth herein, Contractor and Subcontractor hereby agree to the terms and conditions set forth herein, including the Terms and Conditions attached hereto. Subcontractor agrees to perform and complete the following Work:

**A. Work:** Subcontractor agrees to perform and complete the scope of work generally as described in Exhibit A attached hereto and incorporated herein.

**B. Construction Progress Schedule:** Subcontractor agrees to complete the Work in strict accordance with the Construction Progress Schedule attached hereto as Exhibit B and incorporated herein.

**C. Contractor's Safety Requirements:** Subcontractor agrees to conform to Contractor's Request for Documentation, Bid Considerations, and Jobsite Safety Rules attached hereto as Exhibit C and incorporated herein.

**ALL FOR THE LUMP SUM OF**  $3,926,196.00
All licenses, permits, fees, taxes and insurance with Contractor named as additional insured included)

**Attachments:**
Exhibit-F-General Requirements.pdf, Exhibit-E---Stellar-Guide-for-Subcontractors-Usage-in-Procore.pdf, Exhibit-D-PHX VPX-Stellar DBIA_530___535 Cost_Plus_GMP 2020-07-28_Executed.pdf, 23006976 - Subcontract Attachments.pdf, Exhibit-C-JSP-Bang-Energy-Phoenix.pdf, Exhibit-H-Specifications dated 11.11.2020.pdf, 23006976 - Arizona Form 5005.pdf, 23006976 - Arizona Form 5000.pdf, Exhibit-B-06976-Bang PHX Can Manufacturing Schedule PRELIMINARY.pdf, Exhibit-A-23006976-Sub-09-Building Electrical.pdf, Exhibit-G-Drawing Log dated 10.23.2020.pdf, 23006976 - Subcontract Attachments.pdf

| FOR ACCOUNTING PURPOSES ONLY: | |
|---|---|
| Cost Code | Distributed Value |
| 26-2601 - 1760 | $1,584,520.00 |
| 26-2606 - 1760 | $226,012.00 |
| 26-2602 - 1760 | $230,260.00 |
| 26-2604 - 1760 | $573,119.00 |
| 26-2605 - 1760 | $1,302,285.00 |
| Total: | $3,926,196.00 |

**THIS SUBCONTRACT INCLUDES AND IS SUBJECT TO THE TERMS AND CONDITIONS ATTACHED HERETO AND INCORPORATED HEREIN.**

IN WITNESS WHEREOF, the Subcontractor and Contractor have executed this Subcontract on the date set forth above.

| FAITH TECHNOLOGIES, INC. | STELLAR GROUP, INCORPORATED |
|---|---|
| Subcontractor | Contractor |
| Signed and Dated: *Ron Rheinheimer* | Signed and Dated: |
| 1/20/2021 | 11:29 AM CST | |
| By: Terry Flaherty   Senior Vice President | By: Jonah Petoskey |
| Owner/Group Leadder | Senior Project Manager |

DocuSign Envelope ID: 9F081A25-2D7C-4229-931A-00A5ACED7684

# CONTRACT
## Stellar Group, Inc.

| | | | |
|---|---|---|---|
| **SC #:** | 23006976-SUB-09 | **Date:** | 12/22/2020 |
| **Subcontractor:** | Faith Technologies, Inc. | **Page:** | 2 of 6 |

## GENERAL NOTES

1. Subcontractor and any Sub-Subcontractors must possess and, at the time of execution of this Agreement, furnish a copy of a valid state Contractors license for the state where the Project is located and for the scope of Work described herein. This Subcontractor must certify and warrant and furnish proof that it is currently registered to do business and remit state sales and use tax in the state where the Project is located. Contractor reserves the right to Withhold payment until this Subcontractor furnishes such proof. It is the Subcontractors responsibility to obtain and keep in force proper licensing in accordance with the laws and statutes of the state where the Project is located and to otherwise comply with all applicable federal, state and local laws, ordinances and regulations. Any Sub-Subcontractor must also comply with these provisions, and Subcontractor shall expressly incorporate these provisions into any agreement in which the Subcontractor subcontracts any portion of the Work described herein.

2. Immediately upon execution of this Subcontract, Subcontractor shall furnish to the Contractor all certificates of insurance in accordance with Paragraph Six Insurance Requirements of the Terms and Conditions. Subcontractor must submit all certificates of insurance prior to performing any on this Project.

3. Subcontractor agrees to diligently pursue the Work and to meet the requirements set forth in the Construction Progress Schedule. In the event the Subcontractor delays the progress of the Work, he shall bear all costs of overtime, expediting and all special freight or other charges required to bring its progress to the level required. This Subcontractor may also be subject to damages or claims by the Contractor or other subcontractors brought about by Subcontractors negligence or its failure to adhere to the Construction Progress Schedule for any reason. Failure to comply with the Construction Progress Schedule may result in default under Paragraph Seven Default and Remedies of the Terms and Conditions.

4. Work hours shall be established by the Contractor and shall be followed by the Subcontractor. The Subcontractor must work during regular hours and will not be permitted to work at night and/or on weekends. All overtime work must be approved by the Project Superintendent. A representative of Contractor must be on site at all times work is being performed.

5. Subcontractor shall fully comply with the applicable employment verification procedures for all of its employees. Subcontractor certifies and warrants to Contractor that it maintains a I-9 compliance program for the express purpose of verifying lawful employment authorization to work in the United States for all of Subcontractors employees. The Subcontractor represents that it will follow all I-9 verification, reverification and updating procedures required by the Immigration Reform and Control Act of 1986 for all of Subcontractors employees on the Project. The Subcontractor further represents that it maintains a designated I-9 compliance officer who oversees the Subcontractors I-9 compliance procedures.

6. Subcontractor shall cooperate fully the instructions and directions of the Project Superintendent and shall coordinate its Work the work of other subcontractors.

7. Subcontractor shall perform all Work in a neat and professional manner and shall take great care not to damage any work already in place.

8. The Subcontractor shall furnish shop drawings and submittal data to the Contractor no later than weeks after receipt of this Subcontract. Subcontractor shall submit six copies plus the number to be returned to Subcontractor.

9. The Subcontractor shall furnish all layout and engineering in connection with its Work.

10. The Subcontractor shall clean-up all debris from its work on a daily basis. If, in the opinion of the Contractor, clean-up is not satisfactory, the Contractor, after giving reasonable notice to the Subcontractor, may clean up the premises at the cost and expense of the subcontractor and deduct such expense from payments due to the Subcontractor.

11. Subcontractor certifies and warrants That he is aware of all federal, state and local safety requirements and regulations pertaining to the Work, and Subcontractor shall perform its Work in strict compliance with such requirements and regulations. Subcontractor shall also comply with Contractors' safety regulations.

12. Subcontractor shall furnish Material Safety Data Sheets to the Contractor for material used in the Work and shall have same in its possession at the jobsite. Subcontractor shall pay any fines imposed for lack of the proper Material Safety Data Sheets.

13. Subcontractor shall comply with the code requirements of any governmental or regulatory body having jurisdiction over the Work. Subcontractor shall bring to the attention of the Contractor any discrepancy between the code requirements and the drawings or specifications.

14. Subcontractor shall be responsible for scheduling, deliveries and receiving of all materials and supplies required for the Work, The Contractor accepts no responsibility for unloading deliveries or the condition or quantity of any materials delivered in the Subcontractor's absence.

15. It is the Subcontractor's responsibility to store and protect its materials, tools and equipment. Contractor shall not be liable in the event that Subcontractors materials, tools or equipment are lost, stolen or damaged.

16. Subcontractor agrees to maintain as built documents and data applicable to the Work. Subcontractor shall provide these documents to the Contractor prior to release of retainage.

17. Payments shall be made in accordance with Paragraph Eight, Payment, of the Terms and Conditions attached to the Subcontract.

18. Prior to submittal of the first Requisition for Payment, Subcontractor shall submit a detailed Schedule of Values acceptable to the Contractor, for the purpose of approving work-in-place and/or materials suitably stored on site.

19. Prior to the final Requisition for Payment being processed, the Subcontractor shall submit to the Contractor, final lien waivers, final warranty, as-built drawings, copies of inspections and/or permits, three (3) hard copies and one (1) PDF copy of equipment operation and maintenance manuals and any other criteria required by the contract documents.

20. Subcontractor must use the Contractors 'Subcontractor Requisition for Payment' form for all payment requisitions, and the form must bear the Subcontractors original signature, notarized.

21. With every requisition for payment, Subcontractor must submit a validly executed Lien Waiver and, in the event that there is a payment bond on the project, a Waiver of Right to Claim Against the Bond, as a condition precedent to payment.

22. The Subcontractor shall execute IRS document W-9 and return it to the Contractor with the executed Subcontract. Contractors receipt of the executed W-9 is a condition precedent to payment.

23. Subcontractor hereby acknowledges that it has received contract drawings and specifications for the Work.

24. Modifications or alterations to this Subcontract are not valid without prior written approval of the Contractor.

25. Prior to execution of any extra or change in the work, Subcontractor must submit a claim for Change in the Work and a Project Manager, or other Project Executive, must issue a Subcontract Modification in accordance with Paragraph Three Changes in the Work of the Terms and Conditions. Contractor shall not compensate Subcontractor for such Work if the Subcontractors claim was not timely or the Contractor did not approve the claim and issue a Subcontract Modification. The Superintendent does not have authority to modify the Subcontract or to approve extra work or claims for Change in the Work.

26. Subcontractor shall not assign, in whole or in part assign or sublet this Subcontract or the proceeds due or to become due under this Subcontract Without the prior, express and written consent of the Contractor.

27. Subcontractor shall maintain accurate as-built drawings during construction, and upon request, Subcontractor shall submit the drawings to the Contractor for periodic review. Failure to maintain accurate as-built drawings during construction may result in default under Paragraph Seven Default and Remedies of the Terms and Conditions. Not later than Substantial Completion, the Subcontractor shall deliver one clean set of marked-up drawings to the Contractor for inclusion in the close-out documents with the Owner.

28. For each day the Subcontractor is on the jobsite, the Subcontractor shall submit a "Subcontractor's Daily Report" form, available at the Contractor's field office, to the Contractors Superintendent by 10.00 a.m. the following morning. Subcontractor's compliance with this provision is a condition precedent to payment.

29. Subcontractor shall pay all taxes, assessments and premiums under the federal Social Security Act, any applicable unemployment insurance, workers compensation, disability benefits, sales tax, use tax, business tax, personal property tax laws, or other applicable laws now or later in effect payable by reason of or in connection with any part of the Work. In the event that Subcontractor fails to comply with these laws and Contractor becomes liable for such taxes, assessment or premiums, Subcontractor shall indemnify and hold harmless the Contractor and/or the Owner from and against such liability that Contractor and/or the Owner may incur as a result of such failure.

30. Subcontractor is responsible for having an approved Subcontractor prequalification package on file prior to the issuance of a Subcontract.

DocuSign Envelope ID: 9F081A25-2D7C-4229-931A-00A5ACED7684

**_____ CONTRACT**
**Stellar Group, Inc.**

| | | | |
|---|---|---|---|
| **SC #:** | 23006976-SUB-09 | **Date:** | 12/22/2020 |
| **Subcontractor:** | Faith Technologies, Inc. | **Page:** | 3 of 6 |

## TERMS AND CONDITIONS

1.      GENERAL CONTRACT. Contractor has entered or will enter into a General Contract with the Owner for the Project described on the first page of this Subcontract. Contractor has made or will make copies of the General Contract available to the Subcontractor (with dollar amounts redacted). The Project, including Subcontractor's Work, is to be constructed in accordance with the terms and conditions of the General Contract, including drawings and specifications and general, supplemental and special conditions and other Contract Documents described therein. Subcontractor hereby assumes the same conditions and responsibilities with respect to the performance under this Subcontract that the Contractor assumes toward the Owner with respect to its performance under the General Contract. If the General Contract varies or conflicts with any provision of this Subcontract, including any modification hereof, this Subcontract shall govern. Subcontractor shall also be afforded all rights and remedies towards Contractor as Contractor has towards Owner as its contract with Owner conditioned upon Contractor's recovery from Owner

2.      SCOPE OF WORK. Subcontractor shall provide and pay for all labor, materials, services, tools, equipment and other things necessary to fully perform the Work set forth on the first page hereof, in cooperation with the other trades, in a good and workmanlike manner, and to the satisfaction and acceptance of Contractor and Owner or Owner's representative, which shall be final. Subcontractor has examined the premises and ascertained existing site conditions (including sub-surface conditions) and the nature and location of the Work thereon. All Work effected or governed by such site conditions or Work and services required for the thorough and satisfactory execution and completion of the work, whether indicated and specified or not, and regardless of quantity estimated, shall constitute a part of this Subcontract and be performed by Subcontractor without additional charge. Subcontractor expressly waives the right to make any claim arising out of minor variations in the actual condition of the premises from those conditions shown on the drawings and specifications.

3.      CHANGES IN THE WORK. Whenever the Contractor requests extra work, acceleration of work, compression of work or other changes requiring additional payments (collectively referred to herein as a Change in the Work) verbally or in writing directly or indirectly, Subcontractor shall present a written claim for compensation to the Contractor for such Change in the Work within ten (10) days of such request. Subcontractor hereby waives any claim for compensation not presented within ten (10) calendar days of the Change in the Work request. No dispute as to adjustment in the contract price due to Change in the Work shall excuse Subcontractor from proceeding within the original scope of Work or Change in the Work.

Subcontractor shall furnish a complete, itemized breakdown in sufficient detail to permit an analysis of all labor, material and equipment for any Change in the Work implemented at the direction of the Contractor and timely itemized in writing by Subcontractor.

In the event a Change in the Work affects the current Construction Progress Schedule, Subcontractor must include the claim for Change in the Work any request for time extension and justifications therefor.

It shall be a condition precedent to Subcontractors recovery of any compensation or damages for a Change in the Work of any type or any extension of time, whether requested (directly or indirectly, verbally or in writing) or caused by Contractor or others, that Subcontractor shall have made a specific written claim for such Change in the Work extension, compensations or damages within ten (10) days of the request or event giving rise to such Change in the Work or extension of time.

Claims for any such Change in the Work, extension, compensation or damages received after ten (10) days are hereby waived by the Subcontractor and shall not be considered by the Contractor.

4.      PERFORMANCE. Subcontractor acknowledges that TIME IS OF THE ESSENCE with respect to Contractors completing the Project pursuant to the General Contract, and that such completion is substantially dependent upon Subcontractor's performance of this Subcontract on or before the dates set forth in the Construction Progress Schedule and/or elsewhere herein. TIME IS OF THE ESSENCE IN THIS SUBCONTRACT. Subcontractor shall turn the Work over to the Contractor in good condition and free and clear of all claims and liens, and shall, at its expense, indemnify Contractor and defend all claims arising from its actions and omissions or those of its vendors, sub-subcontractors or second-tier subcontractors in its performance of this Subcontract. Subcontractor shall pay the cost of any bond necessary to remove any mechanic's lien from the Project arising out of the Work of Subcontractor. Subcontractor covenants, agrees and warrants that he shall not employ any labor which may interfere with labor harmony at the job site or with the introduction and storage of materials and execution of work by other subcontractors. If Subcontractor breaches this covenant and such breach causes a stoppage or slowdown of Work at the jobsite, Subcontractor shall be liable for damages suffered by Contractor caused by such delay in completing the Project, including any liquidated damages in the General Contract imposed on Contractor for failing to complete the Project on the completion date set forth therein. This job shall be run Merit Shop. Subcontractor shall comply with all laws, ordinances and regulations relating to the manner of doing the Work or to the supplying of materials, including, without limitation, laws, ordinances, rules, regulations and orders for the safety of persons and property, and Subcontractor shall provide safe working conditions for its employees and all other persons on the jobsite at all times. If Subcontractor discovers any errors, omissions or discrepancies in the drawings or specifications, the General Contractor this Subcontract, Subcontractor shall immediately notify Contractor in writing. Any Work affected by such discoveries which Subcontractor performs prior to notifying Contractor and obtaining Contractors authorization to proceed shall be performed at Subcontractors risk. Subcontractor acknowledges that it may be performing the Work in the same area where other subcontractors, Contractor or Owner may be working, and the performance of work by the others may temporarily affect the Subcontractors Work. Subcontractor agrees to fully cooperate with the others to ensure an expeditious completion of the interfaces. If Subcontractors Work depends on the proper execution of work by others, then prior to the execution of its Work, Subcontractor shall inspect such work and submit a written report to the Contractor describing any defects. Subcontractors failure to inspect and report any defects prior to commencing its Work constitutes acceptance of such work by Subcontractor. Subcontractor's failure to inspect and report any defects or other materials or equipment furnished by Owner or it the Subcontractors predecessor work. Subcontractor shall be entitled to seek additional time and/or compensation for the impacts suffered by it. For Owner caused delays. Subcontractor shall be entitled to additional time and/or compensation only to the extent Contractor is awarded and recovers same from Owner

5.      INDEMNITY. (a) Indemnity. (1) General Indemnification for Damages to Persons or Property. To the fullest extent permitted by law, Subcontractor shall defend, indemnify and hold harmless the Owner, its officers, directors, agents, and employees, and the Contractor, its officers, directors, agents, and employees; from and against claims, demands, payments, damages, losses and expenses arising from injury to or destruction of tangible property (other than the work itself), including loss of use resulting therefrom or accident, bodily injury, sickness, disease or death, or damage whatsoever to any person, firm or corporation, caused in whole or in part by any act, omission, negligence or default of the Owner or its officers, directors, agents, or employees; the Contractor or its officers, directors, agents, or employees, the Subcontractor or its officers, directors, agents, or employees, or any of the Subcontractors contractors, subcontractors, subcontractors, materialmen, suppliers, servants, agents, or licensees of any tier or their respective employees. For purposes of this Section 5(a) Subcontractor's obligation to indemnify hereunder shall not extend to the negligence of the Contractor Owner or their officers directors, agents or employees

Subcontractors indemnification of Contractor and/or Owner shall include all costs, reasonable attorneys' fees, expenses, interest and liabilities incurred in or about any such claim, action or proceeding brought thereon.

If by reason of such claims any party brings any claim, action or proceeding against Contractor and/or Owner, Subcontractor, if requested and upon notice from Contractor, shall defend the Contractor and Owner against such claim, action or proceeding at Subcontractor's expense by counsel satisfactory to Contractor and/or Owner.

In compliance with Florida Statute § 725.06, the indemnity obligation described in 5(a)(1) is limited to the greater of $1,000,000 or two times the total General Liability (including Umbrella Liability Policy) insurance limit required in Paragraph SIX, "•"insurance below, which amount the Parties agree bears a reasonable commercial relationship to the Subcontract and the risks associated with Subcontractor's performance thereunder.

The indemnity obligation described herein is intended to be consistent with the scope of indemnity obligations authorized by Florida Statute § 725.06, the provisions of which are incorporated herein by reference.

In the event any portion of the indemnity obligations described in the Contract is determined to be inconsistent with Florida Statute § 725.06, the provisions of Florida Statute § 725.06 shall control, it being the intention of the parties that Subcontractor shall indemnify Owner and Contractor, their officers, directors, agents, or employees to the fullest extent authorized by Florida law.

Additionally, the parties agree that the indemnity provisions herein are hereby incorporated into the project specifications or project bid documents, if any.



DocuSign Envelope ID: 9F081A25-2D7C-4229-931A-00A5ACED7684

# CONTRACT
## Stellar Group, Inc.

| SC #: | 23006976-SUB-09 | Date: | 12/22/2020 |
|---|---|---|---|
| Subcontractor: | Faith Technologies, Inc. | Page: | 4 of 6 |

(2) Indemnification for Economic Damages-Subcontractor's Labor Force. To the fullest extent permitted by law, the Subcontractor shall defend, indemnify and hold harmless the Owner, its officers, directors, agents, and employees; and the Contractor, its officers, directors, agents, and employees; from and against claims, demands, payments, damages, losses, premiums, fines and any other expenses arising from Subcontractor's, Subcontractor's contractor's, subcontractor's, sub-subcontractor's, or of any tier or their respective employee's or any other statutory employee of Contractor as defined in Florida Statutes, S 440.02, violation of any provision of Chapter 440, Florida Statutes (a/k/a 'Workers Compensation Law).

Subcontractors indemnification of Contractor and/or Owner shall include all costs, reasonable attorneys' fees, expenses, interest and liabilities incurred in or about any such claim, action or proceeding brought thereon. If by reason of such claims any party brings any claim, action or proceeding against Contractor and/or Owner, Subcontractor, if requested and upon notice from Contractor, shall defend the Contractor and/or Owner against such claim, action or proceeding at Subcontractor's expense by counsel satisfactory to Contractor and/or Owner.

(3) Indemnification for Damages Associated with Performance of the Contract Work. To the fullest extent permitted by law, Subcontractor shall defend, indemnify and hold harmless the Owner, its officers, directors, agents, and employees; and the Contractor, its officers, directors, agents, and employees, from and against claims, demands, payments, damages, losses and expenses arising from the conduct, management, or performance of the Work or the performance by Subcontractor under the terms of this Subcontract, including, but not limited to, any and all 3. claims arising from any condition of the Work due to any act, omission, negligence, breach or default on the part of Subcontractor in the performance of any obligation on its part to be performed pursuant to this Subcontract or liens relating to Subcontractors Work, regardless of who performs the Work, supplies materials, or asserts such lien.

Subcontractors indemnity of Contractor and Owner shall include all costs, reasonable attorneys' fees, expenses, interest and liabilities incurred in or about any such claim, action or proceeding brought thereon. If by reason of such claims any party brings any claim, action or proceeding against Contractor and/or Owner, Subcontractor, if requested and upon notice from Contractor, shall defend the Contractor and/or Owner against such claim, action or proceeding at Subcontractors expense by counsel satisfactory to Contractor and/or Owner.

6.     INSURANCE REQUIREMENTS. At Subcontractor's own expense and prior to commencing the Work, Subcontractor shall procure all insurance coverage as required hereunder and furnish Contractor with certificates of insurance, and copies of additional insured endorsements, executed by an authorized representative from an insurer duly licensed to transact business at the location of the jobsite.

Subcontractor shall maintain the required insurance coverage and provide current evidence of such coverage to the Contractor until the warranty period of the Subcontractors Work expires.

The insurance coverage as set forth below shall be issued from companies satisfactory to the Contractor and with an AM Best rating of not less than A- VII.

Securing and maintaining the insurance required hereunder is a condition precedent to payment. Furthermore, Subcontractor's failure to comply with the terms of this provision or its subparts shall constitute a default under Paragraph Seven Default and Remedies of the Terms and Conditions and, at Contractors option, Contractor may terminate this Subcontract for cause and/or purchase said insurance at Subcontractors expense.

(a) Commercial General and Umbrella Liability Insurance. If the estimated value of the Subcontract, including prospective change orders or modifications, is less than $2,000,000, the Subcontractor shall maintain commercial general liability (CGI) and, if necessary, umbrella insurance with a per project limit of not less than $2,000,000 each occurrence, subject to a general aggregate of not less than $2,000,000. If the estimated value of the Subcontract, including charge orders or modifications, exceeds $2,000,000, the Subcontractor shall maintain commercial general liability (CGL) and, if necessary, umbrella insurance with a per project limit of not less than the total estimated value of the Subcontract per occurrence, subject to a general aggregate of not less than said total. If at any time a Change in the Work causes the total value of the Subcontract to exceed the Subcontractors current commercial general liability (CGL) per project limit and/or umbrella insurance per project limit, the Subcontractor must obtain the proper coverage as required herein and provide evidence of such coverage to the Contractor. The general aggregate limit shall apply separately to this Subcontract. The CGL insurance shall be written on ISO occurrence form CG 00 01 (or a substitute form providing equivalent coverage). The coverage shall include liability arising from premises, operations, independent contractors, products-completed operations, personal injury & advertising injury, and liability assumed under an insured contract, including the tort liability of another assumed in a contract. The Subcontractor's CGL policy shall include Contractor as an additional insured for both ongoing and completed operations. The additional insured endorsements shall be written on ISO additional insured endorsement CG 20 10 07 04 (for ongoing operations) and CG 20 37 07 04 (for completed operations) (or substitute endorsements providing equivalent coverage) and attached to Subcontractors CGL, and to the commercial umbrella, if any. Subcontractor shall maintain ongoing CGL coverage for the products-completed operations hazard, including liability assumed under an insured contract, and the required additional insured coverage for the maximum period of time Subcontractor may be held legally liable for its work following substantial completion of the Work. Subcontractor shall maintain this coverage on ISO occurrence form CG 00 01 (or a substitute form providing equivalent coverage). Subcontractors CGL insurance shall apply as primary insurance with respect to any other insurance or self-insurance programs afforded to Contractor, and no endorsement or modification of the CGL shall make the coverage excess over other available insurance.

(b) Automobile and Umbrella Insurance. Subcontractor shall maintain automobile liability insurance and, if necessary, umbrella liability insurance with a limit of not less than $1,000,000 each accident. Such insurance shall cover liability arising out of 'any auto', including owned; hired, and non-owned autos. Coverage shall be written on ISO form CA 00 01, or a substitute form providing equivalent liability coverage. Stellar shall be added as an additional insured to the auto and umbrella policy

(c) Workers Compensation Insurance. Subcontractor shall maintain worker's compensation and employer's liability insurance. The worker's compensation coverage shall provide the statutory maximum limit of liability.

The employer's liability limits shall not be less than $1,000,000 each accident for bodily injury by accident or $1,000,000 each employee for bodily injury by disease.

(d) Pollution Liability Insurance. Pollution Liability insurance is required with a limit of no less than $1,000,000 This coverage must include damage caused by pollutants, which is any solid, liquid, gaseous or thermal irritant including mold and fungus, smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. This coverage must include completed operations. Any exception to this requirement will be determined by Stellar according to Exhibit A Scope of Work

(e) Professional Liability insurance. If Subcontractors scope of services includes design work or other professional services, then Subcontractor shall maintain insurance coverage for Subcontractors errors, omissions and other wrongful acts arising out of the professional services performed by Subcontractor. The limit of liability shall not be less than $1,000,000.

(f) Waiver of Subrogation. Subcontractor waives all rights against Contractor and its agents, officers, directors and employees for recovery of damages to the extent that any of the policies of insurance maintained pursuant to this Subcontract covers these damages.

(g) Sub-subcontractors Insurance. Subcontractor shall cause each Sub-subcontractor employed by Subcontractor to purchase and maintain insurance of the type specified in this agreement. When requested by Contractor, Subcontractor shall furnish to Contractor copies of certificates of insurance evidencing coverage for each Sub-subcontractor.

(h) No Representation of Coverage Adequacy. By requiring the insurance as set out in this Subcontract, Contractor does not represent that such coverage and limits will be adequate to protect Subcontractor, and Subcontractor acknowledges that its liability under the indemnities provided to the Contractor and/or Owner pursuant to this Subcontract is not limited to such coverage and limits.

7.     DEFAULT AND REMEDIES. (a) Should Subcontractor at any time fail to prosecute and complete the Work in accordance with the Construction Progress Schedule, as herein provided or as directed by Contractor; or fail to diligently and continuously perform its Work; or if, in the opinion of Contractor, the Work of Subcontractor cannot be completed in the time period required; or if Contractor is notified of Subcontractors failure to pay for any material or labor used on the Project, or in the event of a

DocuSign Envelope ID: 9F081A25-2D7C-4229-931A-00A5ACED7684

# CONTRACT
## Stellar Group, Inc.

| | | | | |
|---|---|---|---|---|
| **SC #:** | 23006976-SUB-09 | | **Date:** | 12/22/2020 |
| **Subcontractor:** | Faith Technologies, Inc. | | **Page:** | 5 of 6 |

strike or stoppage of Work resulting from a dispute involving or affecting the labor employed by Subcontractor or its sub-subcontractors; or if Subcontractor fails to perform any of the requirements of this Subcontract, then such event shall constitute a default hereunder and Contractor shall notify Subcontractor to correct such default and shall specify in such notice the action to be taken and the date by which the default shall be corrected (the "Notice of Default").

(b) If a default occurs and Subcontractor has not corrected the default on or before the date specified in the notice to the Subcontractor, Contractor may exercise any or all of the following remedies:

Contractor may immediately take any action necessary to correct such default, including without limitation the right to provide labor, overtime and materials, and may deduct the cost of correcting such default from any payment due or to become due to Subcontractor or recover such cost from Subcontractor if no sums are due or become due to Subcontractor.

The Contractor may terminate this Subcontract, take possession of Subcontractors materials, tools and equipment used in performing the Work, and employ another subcontractor or use the employees of Contractor to finish the remaining Work to be performed hereunder.

Contractor may deduct the costs of completing the remaining Work from the unpaid Subcontract Price and if the cost of completing the remaining Work exceeds the unpaid Subcontract Price, Subcontractor shall pay Contractor such excess cost, including, without limitation, overhead and attorneys' fees; and

The Contractor may exercise any remedy at law or in equity available as a result of Subcontractors default or non-performance under this Subcontract.

Contractor, in any such event, may also refrain from making any further payments to Subcontractor until the entire Project shall be fully finished and accepted by Owner at which time, if the unpaid balance of the amount to be paid under this Subcontract shall exceed the sum of the expense incurred by the Contractor in finishing the Work and the damage sustained by Contractor as a result of Subcontractors default, then such excess shall be paid by Contractor to Subcontractor, but if the sum of such expenses and damages shall exceed such unpaid balance, Subcontractor shall promptly pay the difference to the Contractor.

(c) Upon any default, Subcontractor shall pay to Contractor its attorneys' fees and court costs incurred in enforcing this Subcontract or seeking any remedies hereunder. Subcontractor shall pay all such fees and costs, whether or not suit is filed and in connection with any appeal and in connection with any bankruptcy or other insolvency proceeding.

(d) If Contractor does not terminate Subcontractors right to proceed, Subcontractor shall continue with the Work.

(e) If Owner is damaged by reason of any breach by Subcontractor of this Subcontract, then Subcontractor shall pay Owner such damages, together with all costs of collection including court costs and attorneys' fees.

*Except as set forth herein.*

(f) Subcontractor hereby knowingly and voluntarily waives all claims for damages due to delays, disruptions, constructive acceleration of work and similar economic losses and agrees that its sole and exclusive remedy for any such claims shall be an extension of the contract time provided that Subcontractor makes a written claim for such extension within ten (10) days of the event giving rise to the claim. *This section shall only apply if Subcontractor is in default under this Article 7 and does not bar Subcontractor from initiating a delay claim under other sections of the contract if it is not in contractual default*

(g) Proposed Setoff Clause - If at any time Subcontractor is indebted to Contractor under any other subcontract or for any other reason, Contract shall have the right to set off such indebtedness against any payments earned under this Subcontract. Additionally, if Subcontractor defaults on any other subcontract on this Project for any reason, such default shall also constitute a default under this Subcontract.

(h) Proposed Bankruptcy/Insolvency Clause - If Subcontractor should file for bankruptcy protection, otherwise become insolvent, or encounter financial difficulties which impair the ability of Subcontractor to perform its obligations under this Subcontract fully and efficiently, then Contractor may, upon written notice, terminate Subcontractors performance under this Subcontract for cause, and Subcontractor shall pay to Contractor the amount of loss or damage sustained by Contractor as a result of the termination.

8.    PAYMENT. (a) Subcontractor shall, prior to submission of its first requisition for payment, give Contractor the name, address and telephone number of every material supplier and sub-subcontractor furnishing materials and/or labor to Subcontractor for the Work covered herein.

If Contractor receives the Subcontractor's requisition for payment and all required lien waivers by the 22nd day of the month, Contractor shall process the requisition for payment by the 25th day of the following month or 5 days after receipt of payment from the Owner, whichever is greater. The amount of each such payment is always subject to the approval of Contractor. Subcontractor, at Contractors request, shall provide evidence that that the unpaid balance of the Subcontract Price, exclusive of Retainage, is at all times sufficient to complete Subcontractors remaining Work hereunder. All monthly payments are subject to a ten (10) percent Retainage. Contractor shall disburse Subcontractor's Retainage within sixty (60) days following completion and acceptance by the Owner of the entire Project of which Subcontractors Work is a part, however, Contractors receipt of the Retainage from Owner is an absolute condition precedent to disbursement of the Subcontractors Retainage. Retainage may be reduced to 5% upon completion

*Contractor's retainage is reduced by Owner*

*in accordance with the Prime Contract to the extent*

Subcontractor shall submit all requisitions for payments on the Contractors "Subcontractor Requisition for Payment" Form(s) under oath of an authorized agent of the Subcontractor. With each requisition for payment, Subcontractor must also submit a valid lien and/or bond waiver(s), on the Contractors form(s), from Subcontractor and each of its sub-subcontractors and suppliers. The waiver(s) must bear the original, notarized signature of an authorized agent of the entity waiving its bond and/or lien rights, and must cover the time period and the amount of all materials, labor and Work reflected in such requisition (including final lien and/or bond waivers with the final requisition for payment). Furthermore, if requested, Subcontractor shall submit evidence satisfactory to Contractor that all payroll, bills for materials and equipment, sales, use and business taxes, and all known indebtedness connected with Subcontractor's Work have been satisfied.

(b) Subcontractor shall defend and discharge any liens or claims arising from its performance or failure to perform under this Subcontract and shall indemnify and hold the Contractor and the Owner harmless from any losses, damages, costs, expenses and attorneys' fees relating to or resulting from mechanics' liens, equitable liens or payment bond claims arising by, through, or under Subcontractor.

Subcontractor shall make payment to sub-subcontractors and suppliers in an amount equal to the percentage of completion allowed to the Subcontractor on account of its Work. Subcontractor agrees that it shall only use sums received for its performance of this Subcontract for labor, services and material provided hereunder and shall not use such sums to satisfy Subcontractors obligations on other contracts.

Subcontractor agrees that Contractor may pay Subcontractor's material suppliers or Sub-Subcontractors with Subcontractor by joint checks at any time. Furthermore, Contractor may make direct payments to Subcontractor's material suppliers or Sub-Subcontractors, provided that Contractor has given Subcontractor seven (7) days prior written notice of intent to make such payment(s) and the amount of such payment(s)

(c) Notwithstanding anything to the contrary appearing herein or in any of the Contract Documents, (including but not limited to the General Contract between Owner and Contractor) either implicitly or explicitly, Subcontractor is not entitled to receive any progress payment or final payment prior to Contractors actual receipt of that payment from Owner, Subcontractor agrees that Contractors actual receipt of full payment from the Owner is a condition precedent to Contractor's obligation to pay Subcontractor and to the bringing of any action by Subcontractor against Contractor (and its surety, if any) relating to Contractors failure to make payment. Subcontractor further agrees that its full performance of this Subcontract shall not constitute an exception to the condition set forth in this paragraph. Subcontractor agrees that this provision also constitutes a condition precedent to any claim against any payment bond in effect on the Project. However, if Subcontractor does not receive progress payments, through no fault of its own within 7 days of the date payment should have been paid, Subcontractor is entitled to provide seven days advanced written notice of its intent to stop work

9.    SHOP DRAWINGS. Subcontractor shall review Shop Drawings for compliance with the Subcontract Documents and approve and submit to the Contractor all Shop Drawings required by the Subcontract Documents. Subcontractor shall submit Shop Drawings with reasonable promptness and in such sequence as to cause no delay in the Work or in the activities of Owner, Contractor or other subcontractors. Contractors review of the Subcontractor's submittals shall not (a) relieve Subcontractor of its obligations

DocuSign Envelope ID: 9F081A25-2D7C-4229-931A-00A5ACED7684

**CONTRACT**
**Stellar Group, Inc.**

| | | | |
|---|---|---|---|
| **SC #:** | 23006976-SUB-09 | **Date:** | 12/22/2020 |
| **Subcontractor:** | Faith Technologies, Inc. | **Page:** | 6 of 6 |

or release Subcontractor for any liability under the Subcontract Documents or any section hereof, (b) constitute Owners or Contractor's approval of Subcontractors safety precautions, construction means, methods, techniques, sequences or procedures, or (c) represent Contractor's determination of accuracy and completeness of details of the Work such as dimensions or qualities, or Contractors substance of instructions for installation or performance of equipment or systems, all of which remain the responsibility of Subcontractor as required by the Subcontract Documents.

10.    WARRANTY. Subcontractor warrants to the Contractor that all materials and equipment furnished under the Subcontract will be new unless otherwise specified and that all Work will be of good quality, free from faults and defects and in conformance with the Contract Documents. All Work not so conforming to these standards shall be considered defective. If required by the Contractor, the Subcontractor shall furnish satisfactory evidence as to the kind and quality of materials and equipment incorporated in the Project. Subcontractor shall warrant all materials and workmanship furnished or performed hereunder to be free of defects for a period of one year from date of acceptance by Owner of the entire Project unless otherwise specified herein and shall, at its expense, promptly replace, repair or correct any such defective materials or workmanship appearing within warranty period as set forth herein. Subcontractor shall submit and assign all factory warranties on equipment and materials installed by him and, at the option of Contractor, shall initiate an assignment to Contractor and/or assigns a service agreement with a local service agency covering all equipment, workmanship and materials so installed. The warranty provided in this paragraph and elsewhere in the Contract Documents is in addition to and not in limitation of any other warranty or remedy provided by law or required by the Contract Documents.

11.    IMMIGRATION LAWS COMPLIANCE. Subcontractor must fully comply with all employment verification procedures, including without limitation, complying with all I-9 verification, reverification and updating procedures as required by the Immigration Reform and Control Act of 1986, for all of its employees. Subcontractor certifies and warrants to Contractor that it maintains an I-9 compliance program for the express purpose of verifying lawful employment authorization to work in the United States for all of its employees. The Subcontractor further represents that it maintains a designated I-9 compliance officer who oversees the Subcontractors I-9 compliance procedures

12.    MISCELLANEOUS. Subcontractor shall remove from the premises, as directed by Contractor, all rubbish and surplus material which may accumulate from the prosecution of its Work.

Should Subcontractor fail to do so, Contractor may, at its option, remove same and deduct the cost of such removal from any amounts owed to Subcontractor and if the cost of such removal exceeds the unpaid Subcontract Price, Subcontractor shall pay Contractor such excess cost.

Notwithstanding anything contained herein to the contrary, Contractor may, without cause, terminate this Subcontract at any time upon written notice to the Subcontractor.

The Subcontractor shall not be entitled to anticipate a profit or damages for any termination by Contractor for its convenience.

This Subcontract contains the entire agreement between Contractor and Subcontractor.

All prior negotiations, representations and agreements with respect to this Subcontract not specifically incorporated herein are hereby cancelled

Owners substantial performance of the General Contract is a condition of Contractors obligation under this Subcontract.

If Owner becomes bankrupt or otherwise defaults in its payments to Contractor under the General Contract, and/or terminates the General Contract with or without cause, then, upon written notice thereof to Subcontractor, Contractor may terminate this Subcontract and will thereupon, subject to the conditions of paragraph 8(c) of this Subcontract, be liable to Subcontractor only for cost of Work actually performed by Subcontractor at the time of said notice (subject to the provisions of paragraph 8(c) hereof) and for no further compensation or damage.

Subcontractor shall protect its finished Work against damage by other trades and shall be liable for damage caused by him to the Work of others.

Subcontractor shall pay the cost of replacement or repair to the Work of other trades damaged by him or occasioned by its defective Work and should Subcontractor fail to do so, Contractor may, at its option, correct such defective Work and deduct the cost thereof from any amounts owed to Subcontractor and if the cost of such correction exceeds the unpaid Subcontract Price, Subcontractor shall pay to Contractor such excess cost.

Subcontractor is responsible for determining the location of and for any damage caused by him to any underground objects, including but not limited to sewer, water, gas, electric or telephone lines, cables, pipes and tunnels.

Subcontractor shall obtain and pay for all taxes, permits, licenses and official inspections made necessary by its Work and comply with all laws, ordinances and regulations relating thereto.

~~Except as set forth herein.~~
Subcontractor expressly understands and agrees that its only remedy for delays in the Work shall be for an extension of time for the number of days by which he has been delayed, as determined by Contractor and/or Owner, and that Subcontractor shall not be entitled to any recovery for losses, expenses or damages relating to such delays, however caused; provided, however, that no allowance for additional time shall be made for any cause unless a request for an extension is presented in writing to Contractor within ten (10) days after occurrence of the event giving rise to the delay.

Any claim not so presented within ten (10) days shall be deemed waived by the Subcontractor and shall not be considered.

It may be necessary for the Owner to occupy a portion of the Work which Subcontractor has either partially or fully completed prior to final inspection or acceptance by the Owner.

Such occupancy shall not relieve the Subcontractor of its guarantee of Work or modify the warranty period described above.
Faith shall be entitled to the same limitation of liability with respect to the Owner's claims against Stellar

The parties to this Subcontract agree that execution of this Subcontract was in Jacksonville, Duval County, Florida.

The laws of the State of Florida shall govern the construction, interpretation, enforcement and all other matters relating to this Subcontract and any amendments or modifications, and jurisdiction and venue for any litigation arising under this Subcontract lies exclusively with the appropriate court in Duval County, Florida to the exclusion of any other jurisdiction or venue.

Subcontractor waives the right to trial by jury on any issues relating to this Subcontract.

**FAITH TECHNOLOGIES, INC.**

Subcontractor

Signed and Dated: _Ron Rheinheimer_
1/20/2021 | 11:29 AM CST

By: Terry Flaherty   Senior Vice President
Owner/Group Leader

**STELLAR GROUP, INCORPORATED**

Contractor

Signed and Dated: _____

By: Jonah Petoskey
Senior Project Manager

DocuSign Envelope ID: F305ECDA-5537-4D9C-A0BC-7851A74417C4

# Exhibit A
# Building Electrical

**Attachment Faith Technologies, Inc. Subcontract # 23006976-SUB-09 dated 12/18/2020**

---

1. **Scope of Work**

   1.1 The undersigned Subcontractor, having become thoroughly familiar with the project documents provided and the local conditions affecting the performance and cost of the work, hereby agrees to provide all labor, materials, tools, equipment, freight, supervision, applicable taxes, insurance, services, permits, and miscellaneous incidentals as required to complete in every respect the work as described herein, in strict accordance with the Exhibits, General Notes, and Terms and Conditions of the Subcontract, the additional Subcontract support documents listed below, and all applicable federal, state, and local requirements.

   1.2 Henceforth, the word "provide" shall mean furnish and install.

   1.3 Henceforth, the phrase "as indicated" shall mean as indicated in the project documents.

   1.4 The Work to be performed under this Subcontract includes (but is not limited to) the following work:

   1.5 **Demolition**

      1.5.1. Demo and relocation of existing electrical as indicated on the drawings including but not limited to:

      *If the generators are not going in, this work may not need to be done.*

      1.5.1.1. Disconnecting ATS3 from PG-1 and connect to new PG-2.

      1.5.1.2. Disconnecting light fixtures and salvage for re-use.

   1.6 **Building Power and Distribution:**

      1.6.1.1. Provide all electrical gear and distribution equipment as indicated.

      1.6.1.2. Coordinate with power utility and relocate, intercept or install new underground electrical service conduit and feeders as required.

      1.6.1.3. Make all provisions to minimize shut-down time requirements for any work interrupting adjacent spaces by completing all possible installations prior to time of shut-down.

      1.6.1.4. Private utility locates included.

      1.6.1.5. Testing panelboards, switchboards, and transformers according to NETA Acceptance Testing Specifications A (ATS) for new equipment is included.

      1.6.1.6. Provide conduit, cable tray, wire, and devices for all systems as indicated.

DocuSign Envelope ID: F305ECDA-5537-4D9C-A0BC-7851A74417C4

**SUBCONTRACT CONTINUATION**

**Faith Technologies, Inc.**         Date: 12/18/2021
SC#: 23006976-SUB-09         Page: 2 of 7

---

1.6.1.7. Provide all supports and accessories required for all materials and equipment as indicated.

1.6.1.8. Provide power feeds for control cabinets for process equipment.

1.6.1.9. Provide control wiring for mechanical and utilities systems as indicated.

1.6.1.10. Provide power and disconnects for twelve (12) dock doors, levelers, restraints, and communication lighting as indicated. Control wiring by others.

1.6.1.11. Provide power and disconnects within five feet of control boxes for overhead coiling doors as indicated. Low voltage wiring by others.

1.6.1.12. Provide power, control wiring and disconnect for high speed roll up doors.

1.6.1.13. Provide start-up of equipment and coordinating any factory service/start-up/training provided with the equipment.

1.6.1.14. Provide testing for grounding, insulation resistance and continuity as indicated.

1.6.1.15. Provide all grounding as indicated.

1.6.1.16. VFD Disconnects by Utility Contract and are not included.

1.6.1.17. Provide fire caulking as indicated.

**1.7 Lighting**

1.7.1. Provide interior and exterior building lighting as indicated included but not limited to:

1.7.1.1. Fixture Types A, AE, B, B1, B1E, C, CE, D, F1, F1E, F2, F3, F3E, F4, F4E, X1 & X2.

1.7.2. Provide emergency lighting as indicated.

1.7.3. Provide switching and control as indicated.

1.7.4. Provide occupancy sensors as indicated.

**1.8 Fire Alarm**

1.8.1. Code compliant notifier system with complete design and installation:

1.8.1.1. Addressable

1.8.1.2. Voice Evacuation

1.8.1.3. Integrated with existing building system.

DocuSign Envelope ID: F305ECDA-5537-4D9C-A0BC-7851A74417C4

**SUBCONTRACT CONTINUATION**

**Faith Technologies, Inc.**
**SC#: 23006976-SUB-09**

Date: 12/18/2021
Page: 3 of 7

1.9     Telephone/Data

     1.9.1. Provide conduit and boxes as indicated.

1.10    Security Systems

     1.10.1. Provide conduit and boxes as indicated for security and cameras.

     1.10.2. All CCTV and door security equipment and wiring provided by others.

1.11    Generators & Transformers

     1.11.1. Generators not included in base contract.

     1.11.2. Provide transformers and precast pads. All concrete pads are to be by others per our Clarification document.

1.12    ALTERNATE WORK ACCEPTED IN CONTRACT NOT INCLUDED IN CURRENT DESIGN

     1.12.1. Deduct to use aluminum wires in lieu of copper from utility transformer to switchboard. – ($13,530.00)

     1.12.2. Deduct to use aluminum wires in lieu of copper from switchboard to distribution panels. – ($157,815.00)

1.13    ALTERNATE WORK NOT INCLUDED IN CONTRACT AT THIS TIME

     1.13.1. Add alternate to furnish and install (2) 2500 KVA Diesel generators- $1,522,326.00

     1.13.2. Deduct to reuse Owner supplied panels – ($15,279.00)

2.     Change Orders & Extra Work

   2.1    Maximum aggregate mark-up of overhead and profit for all change order work performed under this Subcontract shall be as follows:

     2.1.1. Overhead & Profit – 10%

3.     Contract Documents

   3.1    "Exhibit B" - Project Schedule dated 11/30/2020

   3.2    "Exhibit C" – Job Specific Safety Plan.

   3.3    "Exhibit D" – DBIA Owner Contract dated 02/04/2020

   3.4    "Exhibit E" – Stellar Guide for Subcontractors Usage in Procore

   3.5    "Exhibit F" – General Requirements

DocuSign Envelope ID: F305ECDA-5537-4D9C-A0BC-7851A74417C4

**SUBCONTRACT CONTINUATION**

**Faith Technologies, Inc.**                                    Date: **12/18/2021**
**SC#: 23006976-SUB-09**                                    Page: **4 of 7**

---

    3.6    "Exhibit G" – Facility Access and Site Utilization Plans

    3.7    "Exhibit H" – Drawing Log dated 10/23/2020

    3.8    "Exhibit I" – Specifications dated 11/11/2020

**4.**    **Personnel labor rates**

| Item | Description | Hourly Rate |
|------|-------------|-------------|
| Labor | | ST |
| 1 | Project Manager | $135.00/HR |
| 2 | Superintendent | $96.00/HR |
| 3 | Foreman | $85.00/HR |
| 4 | Electrician | $83.00/HR |
| 5 | Journeyman | $83.00/HR |
| 6 | Laborer | $68.00/HR |

**5.**    **Miscellaneous**

    5.1    All project collaboration, correspondence, communication, and documentation will be conducted using Procore. A "How To" guide for Subcontractors has been included within this Subcontractor for interaction with Stellar in the Procore system.  As a condition of this Subcontract, Procore shall be used throughout the duration of the project for the following items including but not limited to:

        5.1.1.  RFI's

        5.1.2.  Observations

        5.1.3.  Drawings

        5.1.4.  Commitments and Payment Requisitions

        5.1.5.  Submittals

        5.1.6.  Punch List

        5.1.7.  Specifications

        5.1.8.  Daily Log Entry

DocuSign Envelope ID: F305ECDA-5537-4D9C-A0BC-7851A74417C4

SUBCONTRACT CONTINUATION

Faith Technologies, Inc.  
SC#: 23006976-SUB-09

Date: 12/18/2021  
Page: 5 of 7

---

5.1.9.  All other documents and documentation pertaining to the project

5.2   The hours of operation for the project shall be five (5) days per week, forty (40) hours per week, eight (8) hours per day.  The site shall be available for work from the hours of 6:30 a.m. to 6:30 p.m., Monday through Friday.  This work shall be based upon the above listed hours. Different work schedules must be approved by the Stellar Project Manager and Superintendent.

5.3   Provide all training for new equipment and systems installed under this scope of work.  Prior to scheduled training session, a written agenda shall be issued for review.  A sign in sheet shall be submitted after completion of training.  One (1) hard copy of operation and maintenance manuals shall be available during the training session.

5.4   This scope of work will require multiple mobilizations as defined in the construction schedule. All costs for additional mobilizations as shown in the project schedule are specifically included in this subcontract unless noted otherwise.

5.5   Protection of all existing work is included.

5.6   Subcontractor shall store materials on elevated platforms, under cover and in a dry location, to prevent their deterioration or damage due to moisture, temperature changes, contaminants or other causes.

5.7   Make necessary repairs, in a manner acceptable to and approved by Contractor and Owner, including complete removal and replacement, as determined by the contractor of any work adjudged to be defective or nor conforming to the requirements of this Agreement, the Project Specifications, or standards of good and proper workmanship.

5.8   All deliveries will be scheduled with the Project Superintendent forty-eight (48) hours in advance.  The Project Superintendent will approve all deliveries to the site in advance. Unannounced or unscheduled deliveries are subject to being turned away at the expense of the company for which the delivery was intended for both shipping costs and schedule delays.

5.9   Jobsite cleanliness and housekeeping is included in this scope of work.  As noted in the General Notes of the Subcontract Agreement, the cost and expense to the subcontractor shall be defined as follows:

5.9.1.  Should the jobsite housekeeping performance be found to be unacceptable, one written warning will be issued to correct the state of jobsite cleanliness for the areas in which this subcontractor is working.  If the cleanliness deficiency is

DocuSign Envelope ID: F305ECDA-5537-4D9C-A0BC-7851A74417C4

**SUBCONTRACT CONTINUATION**

Faith Technologies, Inc.
SC#: 23006976-SUB-09

Date: 12/18/2021
Page: 6 of 7

not immediately corrected, Stellar will take action to correct the situation at a charge of $2,500.00 per day for violation of the jobsite housekeeping and cleanliness standard. If this subcontractor is found to be a repeat violator of this policy, Stellar may terminate the contract and pursue legal avenues for compensating any losses associated with the completion of the work.

5.10   Responsibility for unloading of materials, tools, or equipment is included in this scope of work unless specifically excluded herein. Should Stellar be asked to unload any deliveries, it shall be done at a cost of $2,500.00 per day and Stellar will require a written release of liability for any damages from the company requesting this service. Deliveries which cannot be unloaded by this method or which do not have personnel onsite to handle their own shipments may be turned away at their expense for both shipping costs and schedule delays.

5.11   This project is a renovation to an existing, functioning facility in full operation. Subcontractor shall take all required steps and shall do all things necessary to ensure that neither the Owner nor his operations are interfered with, disrupted, or disturbed in any way.

5.12   Subcontractor shall strictly limit his activities to the limits of the construction area. All parking, unloading and receiving, storage, fabrication, and other similar activities shall be confined to designated areas away from the existing facility. The existing facilities roadways and parking areas shall not be used by Subcontractor for these activities or for any others, except for where specifically identified by the Stellar Superintendent.

5.13   Subcontractor's employees shall not enter any portion of the existing facility, except as required to install the work of the project. Subcontractor's employees shall not be permitted to use the existing facility's toilet rooms, lunchroom, or break areas.

5.14   Subcontractor shall notify the project superintendent a minimum of two (2) weeks prior to any activities that may impact the Owner's operations. This work shall be coordinated to minimize the impact to the Owner and may be required to be performed during off hours and/or on extended and/or continuous shifts. Premium costs for this work shall not be subject to a modification of the subcontract.

5.15   All eating, drinking (other than water), smoking, and other tobacco use shall occur outside of the existing building in an area designated by the project superintendent. All trash shall be placed into the dumpsters provided by the Contactor and shall not be left inside or outside of the building.

DocuSign Envelope ID: F305ECDA-5537-4D9C-A0BC-7851A74417C4

**SUBCONTRACT CONTINUATION**

**Faith Technologies, Inc.**
**SC#: 23006976-SUB-09**

Date: **12/18/2021**
Page: **7 of 7**

5.16    Subcontractor shall use only electrically operated equipment or fuel-based equipment provided with air scrubbers, for work inside the existing facility unless specifically instructed otherwise.  Welding activities shall be limited to essential tasks such as welding of utility piping and held to a minimum indoors.  All welding activities must be properly protected and properly ventilated.

SUBCONTRACTOR ACKNOWLEDGES RECEIPT OF ALL CONTRACT DOCUMENTS NOTED ABOVE IN SECTION 3.

**Faith Technologies, Inc.**
Subcontractor

**STELLAR GROUP, INCORPORATED**
Contractor

By: _Ron Rheinheimer_

Terry Flaherty
1/4/2021  |  11:06 AM CST

By: _____
Jonah Petoskey, Sr. Project Manager

# Bang Phoenix - Can Manufacturing
## Phoenix, AZ
## Project #06976
## Preliminary Project Schedule



| ID | % Complete | Task Name | Duration | Start | Finish |
|---|---|---|---|---|---|
| 1 | 29% | 0.0 Bang Phoenix – Can Manufacturing | 264.5 days | Tue 7/28/20 | Tue 8/10/21 |
| 2 | 66% | 1.0 Project Development | 109 days | Tue 7/28/20 | Thu 12/31/20 |
| 3 | 66% | Budgeting & Contracting | 109 days | Tue 7/28/20 | Thu 12/31/20 |
| 4 | 100% | Execution of DBIA Documents | 5 days | Tue 7/28/20 | Mon 8/3/20 |
| 5 | 100% | Establish GMP Documents | 15 days | Thu 10/22/20 | Wed 11/11/20 |
| 6 | 100% | Price Permit Drawings For GMP | 20 days | Mon 11/2/20 | Mon 11/30/20 |
| 7 | 100% | Submit GMP Draft for Review | 0 days | Mon 11/30/20 | Mon 11/30/20 |
| 8 | 0% | GMP Draft Review and Update | 20 days | Mon 12/1/20 | Wed 12/30/20 |
| 9 | 0% | Acceptance of Final GMP | 1 day | Thu 12/31/20 | Thu 12/31/20 |
| 10 | 75% | 2.0 Design & Engineering | 264.5 days | Tue 7/28/20 | Tue 8/10/21 |
| 11 | 75% | Process Engineering | 123 days | Tue 8/4/20 | Thu 1/28/21 |
| 12 | 100% | Design Basis | 16 days | Tue 8/4/20 | Tue 8/25/20 |
| 16 | 85% | Process Design Development | 77 days | Wed 8/26/20 | Mon 12/14/20 |
| 17 | 100% | OEM Design Finalization | 60 days | Wed 8/26/20 | Wed 11/18/20 |
| 18 | 100% | Updated Design Basis (based on OEM Informatio | 55 days | Wed 8/26/20 | Wed 11/11/20 |
| 19 | 100% | Updated General Arrangement Layout | 50 days | Wed 8/26/20 | Wed 11/4/20 |
| 20 | 100% | Final Utility Matrix | 55 days | Wed 8/26/20 | Wed 11/11/20 |
| 21 | 50% | P&ID drawings | 40 days | Thu 10/15/20 | Thu 12/10/20 |
| 22 | 50% | Preliminary Utility Drop Drawings | 40 days | Thu 10/15/20 | Thu 12/10/20 |
| 23 | 0% | DD Owner Review and Approval | 2 days | Fri 12/11/20 | Mon 12/14/20 |
| 24 | 0% | Construction Drawings | 30 days | Tue 12/15/20 | Thu 1/28/21 |
| 28 | 83% | Building Design | 264.5 days | Tue 7/28/20 | Tue 8/10/21 |
| 29 | 100% | Schematic Design Phase | 64 days | Tue 7/28/20 | Mon 10/26/20 |
| 30 | 100% | Approved Layout & General Arrangement (GA) | 11 days | Tue 7/28/20 | Tue 8/11/20 |
| 31 | 100% | Confirm Primary Utilities with Utility Providers | 60 days | Tue 7/28/20 | Tue 10/20/20 |
| 36 | 100% | Design Kickoff Meeting | 3 days | Wed 8/12/20 | Fri 8/14/20 |
| 37 | 100% | Geotechnical Report | 20 days | Mon 8/17/20 | Mon 9/14/20 |
| 38 | 100% | Schematic Design Confirmation | 15 days | Mon 8/17/20 | Fri 9/4/20 |



Date: Mon 11/30/20

| | | | | |
|---|---|---|---|---|
| Task | | Inactive Task | | Manual Summary Rollup |
| Split | | Inactive Milestone | | Manual Summary |
| Milestone | | Inactive Summary | | Start-only |
| Summary | | Manual Task | | Finish-only |
| Project Summary | | Duration-only | | External Tasks |
| | | | | External Milestone |
| | | | | Deadline |
| | | | | Critical |
| | | | | Critical Split |
| | | | | Progress |
| | | | | Manual Progress |

Page 1







Bang Phoenix - Can Manufacturing
Phoenix, AZ
Project #06976
Preliminary Project Schedule

Page 3







**Bang Phoenix - Can Manufacturing**
Phoenix, AZ
Project #06976
Preliminary Project Schedule



| ID | % Complete | Task Name | Duration | Start | Finish |
|---|---|---|---|---|---|
| 170 | 0% | Material Delivery | 26 days | Thu 1/21/21 | Thu 2/25/21 |
| 171 | 5% | Electrical | 129 days | Tue 10/27/20 | Thu 4/29/21 |
| 172 | 100% | Bid Process | 21 days | Tue 10/27/20 | Tue 11/24/20 |
| 173 | 0% | Owner Review and Approval | 7 days | Wed 11/25/20 | Fri 12/4/20 |
| 174 | 0% | Award | 1 day | Mon 12/7/20 | Mon 12/7/20 |
| 175 | 0% | Submittals | 10 days | Tue 12/8/20 | Mon 12/21/20 |
| 176 | 0% | Submittal Review | 10 days | Tue 12/22/20 | Mon 1/7/21 |
| 177 | 0% | Material Delivery - Long Lead Items | 94 days | Wed 12/16/20 | Thu 4/29/21 |
| 178 | 0% | Primary Gear | 50 days | Fri 1/8/21 | Thu 3/18/21 |
| 179 | 0% | Secondary Transformers | 50 days | Fri 1/8/21 | Thu 3/18/21 |
| 180 | 0% | MCCs | 50 days | Fri 1/8/21 | Thu 3/18/21 |
| 181 | 0% | Panels | 50 days | Fri 1/8/21 | Thu 3/18/21 |
| 182 | 0% | Primary Transformer (4th Service by SRP) | 80 days | Wed 12/16/20 | Fri 4/9/21 |
| 183 | 6% | Generators | 16 wks | Fri 1/8/21 | Fri 4/29/21 |
| 184 | 6% | Utilities | 116 days | Mon 10/26/20 | Mon 4/12/21 |
| 185 | 43% | Price Confirmation - Stellar Mechanical | 30 days | Mon 10/26/20 | Tue 12/8/20 |
| 186 | 0% | Owner Review and Approval | 5 days | Tue 12/8/20 | Tue 12/15/20 |
| 187 | 0% | Award | 1 day | Wed 12/16/20 | Wed 12/16/20 |
| 188 | 0% | Submittals | 10 days | Wed 12/16/20 | Mon 1/4/21 |
| 189 | 0% | Submittal Review | 15 days | Mon 1/4/21 | Mon 1/18/21 |
| 190 | 0% | Material Delivery | 60 days | Mon 1/18/21 | Mon 4/12/21 |
| 191 | 0% | Long Lead Equipment | 60 days | Mon 1/18/21 | Mon 4/12/21 |
| 192 | 0% | UF & RO Systems | 60 days | Mon 1/18/21 | Mon 4/12/21 |
| 193 | 0% | Cooling Water System | 60 days | Mon 1/18/21 | Mon 4/12/21 |
| 194 | 11% | Mechanical / HVAC | 116 days | Tue 10/27/20 | Mon 4/13/21 |
| 195 | 43% | Price Confirmation - Stellar Mechanical | 30 days | Tue 10/27/20 | Tue 12/8/20 |
| 196 | 0% | Owner Review and Approval | 5 days | Wed 12/9/20 | Tue 12/15/20 |
| 197 | 0% | Award | 1 day | Wed 12/16/20 | Wed 12/16/20 |



Task
Split
Milestone
Summary
Project Summary
Inactive Task
Inactive Milestone
Inactive Summary
Manual Task
Duration-only
Manual Summary Rollup
Manual Summary
Start-only
Finish-only
External Tasks
External Milestone
Deadline
Critical
Critical Split
Progress
Manual Progress

Date: Mon 11/30/20

Page 6






Bang Phoenix - Can Manufacturing
Phoenix, AZ
Project #06976
Preliminary Project Schedule

| ID | % | Task Name | Duration | Start | Finish |
|---|---|---|---|---|---|
| 225 | 0% | Submittals | 10 days | Fri 12/18/20 | Wed 1/6/21 |
| 227 | 0% | Submittal Review | 10 days | Wed 1/6/21 | Wed 1/20/21 |
| 228 | 0% | Material Delivery | 40 days | Wed 1/20/21 | Wed 3/17/21 |
| 229 | 0% | Painting | 86 days | Tue 10/20/20 | Mon 2/22/21 |
| 235 | 0% | Sitework | 51 days | Tue 11/3/20 | Mon 3/7/21 |
| 240 | 0% | Fire Protection | 66 days | Tue 11/3/20 | Mon 2/8/21 |
| 245 | 22% | HM & Wood Doors | 93 days | Wed 10/21/20 | Fri 12/10/21 |
| 256 | 31% | 4.0 Meetings | 192.5 days | Mon 9/14/20 | Wed 4/14/21 |
| 257 | 100% | Demolition Pre-Bid Walk | 1 day | Mon 9/14/20 | Mon 9/14/20 |
| 258 | 100% | Field Staff Kick-Off Meeting | 1 day | Mon 10/5/20 | Mon 10/5/20 |
| 259 | 100% | Pre Demolition | 1 day | Fri 10/16/20 | Fri 10/16/20 |
| 260 | 100% | Pre Foundations / Trenches | 1 day | Mon 11/9/20 | Mon 11/9/20 |
| 261 | 0% | Pre Underground Plumbing | 1 day | Mon 11/9/20 | Mon 11/9/20 |
| 262 | 0% | Pre Concrete Slabs | 1 day | Fri 12/4/20 | Mon 12/7/20 |
| 263 | 0% | Pre Electrical | 1 day | Thu 2/18/21 | Fri 2/19/21 |
| 264 | 0% | Pre Utility Piping | 1 day | Thu 2/18/21 | Fri 2/19/21 |
| 265 | 0% | Pre Fire Suppression Systems | 1 day | Thu 2/18/21 | Fri 2/19/21 |
| 266 | 0% | Pre HVAC | 1 day | Thu 2/18/21 | Fri 2/19/21 |
| 267 | 0% | Pre Underground Utilities | 1 day | Tue 2/16/21 | Tue 2/16/21 |
| 268 | 0% | Pre Flooring & Interior Finishes | 1 day | Mon 1/18/21 | Tue 1/19/21 |
| 269 | 0% | Pre Platform Steel Erection | 1 day | Thu 2/11/21 | Thu 2/11/21 |
| 270 | 0% | Pre Roofing | 1 day | Mon 2/8/21 | Tue 2/9/21 |
| 271 | 0% | Pre Startup & Commissioning | 1 day | Tue 5/18/21 | Tue 5/18/21 |
| 272 | 0% | Pre Close Out | 1 day | Tue 6/15/21 | Wed 6/16/21 |
| 273 | 4% | 5.0 Construction | 216.5 days | Mon 10/5/20 | Tue 8/10/21 |
| 274 | 100% | Project Initiation | 5 days | Mon 10/5/20 | Fri 10/9/20 |
| 276 | 5% | Construction | 205.5 days | Tue 10/6/20 | Tue 7/27/21 |
| 277 | 0% | Site Work & Utilities | 39 days | Tue 3/2/21 | Fri 4/23/21 |

Date: Mon 11/30/20

| | | | |
|---|---|---|---|
| Task | | Inactive Task | |
| Split | | Inactive Milestone | |
| Milestone | ◆ | Inactive Summary | |
| Summary | | Manual Task | |
| Project Summary | | Duration-only | |

| | | | |
|---|---|---|---|
| Manual Summary Rollup | | External Milestone | ◆ |
| Manual Summary | | Deadline | ↓ |
| Start-only | | Critical | |
| Finish-only | | Critical Split | |
| External Tasks | | Progress | |
| | | Manual Progress | |

Page 8





Bang Phoenix - Can Manufacturing
Phoenix, AZ
Project #06976
Preliminary Project Schedule

| ID | % Complete | Task Name | Duration | Start | Finish |
|---|---|---|---|---|---|
| 278 | 0% | Process & Sanitary Waste Systems | 20 days | Tue 3/2/21 | Mon 3/29/21 |
| 279 | 0% | Underground Electrical | 15 days | Tue 3/2/21 | Mon 3/22/21 |
| 280 | 0% | Set Transformer for 4th Service | 1 day | Fri 4/23/21 | Fri 4/23/21 |
| 281 | 0% | Paving | 6 days | Tue 3/30/21 | Tue 4/6/21 |
| 282 | 100% | Building Rehabilitation | 61.5 days | Tue 10/6/20 | Thu 4/14/21 |
| 283 | 100% | Temporary Walls | 4 days | Tue 10/6/20 | Fri 10/9/20 |
| 284 | 100% | Layout for Demolition | 10 days | Mon 10/12/20 | Fri 10/23/20 |
| 285 | 100% | Concrete Demolition | 20 days | Mon 10/19/20 | Fri 11/13/20 |
| 286 | 50% | Excavation: Foundations / Pilings / Trenches | 15 days | Mon 11/23/20 | Thu 12/7/20 |
| 287 | 0% | Foundations Installation / Trenches & Covers | 30 days | Mon 11/16/20 | Thu 1/7/21 |
| 288 | 0% | U/G Plumbing | 15 days | Mon 12/21/20 | Mon 1/4/21 |
| 289 | 0% | Install Existing Dock Equipment | 11 days | Wed 12/16/20 | Mon 1/4/21 |
| 290 | 0% | AHU Temporary Relocation | 5 days | Mon 12/21/20 | Wed 12/30/20 |
| 291 | 0% | Production Areas (92,000 SF) | 130.5 days | Wed 11/25/20 | Wed 6/2/21 |
| 292 | 0% | Slab On Grade | 15 days | Wed 11/25/20 | Thu 12/17/20 |
| 293 | 0% | Joist Reinforcement | 14 days | Wed 12/16/20 | Thu 1/7/21 |
| 294 | 0% | Interior SMP Walls | 11 days | Fri 1/29/21 | Mon 2/15/21 |
| 295 | 0% | Dividing Wall (South to North) | 6 days | Fri 1/29/21 | Mon 2/8/21 |
| 296 | 0% | Interior Spaces | 5 days | Mon 2/8/21 | Mon 2/15/21 |
| 297 | 0% | Concrete Curbs | 15 days | Wed 2/3/21 | Wed 2/24/21 |
| 298 | 0% | Epoxy Flooring | 30 days | Mon 2/1/21 | Mon 3/15/21 |
| 299 | 0% | Unit 1&2 (Floor, Pits, & Trenches) | 15 days | Mon 2/1/21 | Mon 2/22/21 |
| 300 | 0% | Unit 3&4 (Floor, Pits, & Trenches) | 10 days | Mon 2/22/21 | Mon 3/8/21 |
| 301 | 0% | Interior Spaces | 5 days | Mon 3/8/21 | Mon 3/15/21 |
| 302 | 0% | Steel Equipment Platforms Erection | 59 days | Thu 2/4/21 | Tue 4/20/21 |
| 303 | 0% | Unit 2 Equipment Platforms (Cup and bright C... | 20 days | Thu 2/25/21 | Wed 3/24/21 |
| 304 | 0% | Unit 4 Equipment Platforms (Decorating) | 20 days | Thu 3/18/21 | Wed 4/14/21 |
| 305 | 0% | Unit 1 & 3 Equipment Platforms (Finished Can) | 25 days | Wed 4/14/21 | Tue 5/18/21 |



Date: Mon 11/30/20

| | | | | |
|---|---|---|---|---|
| Task | | Inactive Task | | External Milestone ◆ |
| Split | | Inactive Milestone ◆ | | Deadline |
| Milestone ◆ | | Inactive Summary | | Critical |
| Summary | | Manual Task | | Critical Split |
| Project Summary | | Duration-only | | Progress |
| External Tasks | | Manual Summary Rollup | | Manual Progress |
| External Milestone | | Manual Summary | | |
| | | Start-only | | |
| | | Finish-only | | |

Page 9



Bang Phoenix - Can Manufacturing
Phoenix, AZ
Project #06976
Preliminary Project Schedule

| ID | % Complete | Task Name | Duration | Start | Finish |
|---|---|---|---|---|---|
| 306 | 0% | MEPF Overhead Rough-In | 65 days | Wed 3/3/21 | Wed 6/2/21 |
| 307 | 0% | Doors | 10 days | Mon 3/15/21 | Mon 3/29/21 |
| 308 | 0% | Set HVAC Equipment | 20 days | Tue 4/13/21 | Mon 5/10/21 |
| 309 | 0% | Energize Electrical Gear (Based on SMP) | 0 days | Thu 4/29/21 | Thu 4/29/21 |
| 310 | 0% | MEPF Trim Out | 10 days | Fri 4/30/21 | Thu 5/13/21 |
| 311 | 0% | Finishes | 10 days | Fri 5/14/21 | Thu 5/27/21 |
| 312 | 0% | Utility Spaces (15,000 SF) | 118 days | Fri 12/18/20 | Tue 6/4/21 |
| 313 | 0% | Slab On Grade | 6 days | Fri 12/18/20 | Wed 12/30/20 |
| 314 | 0% | Joist Reinforcement (East to West) | 5 days | Thu 12/31/20 | Fri 1/8/21 |
| 315 | 0% | Dock Door Masonry Infills | 10 days | Thu 1/28/21 | Thu 2/11/21 |
| 316 | 0% | Interior Masonry Walls (East to West) | 15 days | Thu 1/28/21 | Thu 2/18/21 |
| 317 | 0% | IMP Walls (Floor to Ceiling) | 5 days | Mon 2/15/21 | Mon 2/22/21 |
| 318 | 0% | Concrete Lids for Fire Rated Rooms | 15 days | Thu 2/11/21 | Thu 3/4/21 |
| 319 | 0% | MEPF Overhead Rough-In | 25 days | Thu 3/4/21 | Thu 4/8/21 |
| 320 | 0% | Concrete Curbs and housekeeping pads | 4 days | Mon 2/22/21 | Fri 2/26/21 |
| 321 | 0% | Epoxy Flooring | 10 days | Fri 2/26/21 | Fri 3/12/21 |
| 322 | 0% | Rooms Ready for Equipment | 0 days | Fri 3/12/21 | Fri 3/12/21 |
| 323 | 0% | Set and Pipe Utility & Process Support Equipment | 61 days | Fri 3/12/21 | Tue 6/4/21 |
| 324 | 0% | Vacuum Pumps | 40 days | Fri 3/12/21 | Fri 5/7/21 |
| 325 | 0% | Bright Scrap Blower Equipment | 40 days | Fri 3/12/21 | Fri 5/7/21 |
| 326 | 0% | Automatic Back End OC Equipment | 40 days | Fri 3/12/21 | Fri 5/7/21 |
| 327 | 0% | Air Compressor and Dryer Equipment | 40 days | Fri 3/12/21 | Fri 5/7/21 |
| 328 | 0% | Hot Water System | 40 days | Fri 3/12/21 | Fri 5/7/21 |
| 329 | 0% | Boiler Equipment | 40 days | Fri 3/12/21 | Fri 5/7/21 |
| 330 | 0% | Waste Water System Equipment | 40 days | Fri 3/12/21 | Fri 5/7/21 |
| 331 | 0% | Baler Equipment and Platform | 40 days | Fri 3/12/21 | Fri 5/7/21 |
| 332 | 0% | UF & RO Systems | 40 days | Mon 4/12/21 | Tue 6/8/21 |
| 333 | 0% | Cooling Tower Equipment | 40 days | Mon 4/12/21 | Tue 6/9/21 |

| | | | |
|---|---|---|---|
| Task | | Inactive Task | | Manual Summary Rollup | | External Milestone | |
| Split | | Inactive Milestone | | Manual Summary | | Deadline | |
| Milestone | | Inactive Summary | | Start-only | | Critical | |
| Summary | | Manual Task | | Finish-only | | Critical Split | |
| Project Summary | | Duration-only | | External Tasks | | Progress | |
| | | | | | | Manual Progress | |

Date: Mon 11/30/20





Bang Phoenix - Can Manufacturing
Phoenix, AZ
Project #06976
Preliminary Project Schedule

Date: Mon 11/30/20



**Bang Phoenix - Can Manufacturing**
**Phoenix, AZ**
**Project #06976**
**Preliminary Project Schedule**

| ID | % Complete | Task Name | Duration | Start | Finish |
|---|---|---|---|---|---|
| 362 | 0% | Floor Mounted (Not under platform) | 0 days | Mon 3/8/21 | Mon 3/8/21 |
| 363 | 0% | Platform Mounted and Under Platform | 0 days | Tue 5/18/21 | Tue 5/18/21 |
| 364 | 0% | Equipment Install, Rigging, Mech, and Elec | 100 days | Mon 2/15/21 | Tue 7/13/21 |
| 365 | 0% | Equipment Commissioning & Training | 20 days | Tue 6/29/21 | Tue 7/27/21 |
| 366 | 0% | Equipment Ready for Production | 0 days | Tue 7/27/21 | Tue 7/27/21 |
| 367 | 0% | Project Closeout | 49.5 days | Wed 6/4/21 | Tue 8/10/21 |
| 368 | 0% | Building Equipment Commissioning / Training | 10 days | Wed 6/2/21 | Tue 6/15/21 |
| 369 | 0% | Inspections | 5 days | Wed 6/16/21 | Wed 6/23/21 |
| 370 | 0% | Substantial Completion / TCO | 0 days | Tue 6/29/21 | Tue 6/29/21 |
| 371 | 0% | First Walkthrough | 1 day | Tue 6/29/21 | Wed 6/30/21 |
| 372 | 0% | Punch-Out | 10 days | Wed 6/30/21 | Wed 7/14/21 |
| 373 | 0% | Cleaning | 4 days | Wed 7/14/21 | Tue 7/20/21 |
| 374 | 0% | Final Walkthrough | 5 days | Tue 7/20/21 | Tue 7/27/21 |
| 375 | 0% | Certificate of Occupancy | 0 days | Tue 7/27/21 | Tue 7/27/21 |
| 376 | 0% | Turnover | 0 days | Tue 7/27/21 | Tue 7/27/21 |
| 377 | 0% | Demobilization | 4 days | Tue 7/27/21 | Mon 8/2/21 |
| 378 | 0% | As-Builts | 30 days | Tue 6/29/21 | Tue 8/10/21 |

| | | | | |
|---|---|---|---|---|
| Task | | Inactive Task | | Manual Summary Rollup |
| Split | | Inactive Milestone | | Manual Summary |
| Milestone | | Inactive Summary | | Start-only |
| Summary | | Manual Task | | Finish-only |
| Project Summary | | Duration-only | | External Tasks |
| | | | | External Milestone |
| | | | | Deadline |
| | | | | Critical |
| | | | | Critical Split |
| | | | | Progress |
| | | | | Manual Progress |

Date: Mon 11/30/20

Page 12





*JOB SITE SAFETY PLAN*

*for*

**BANG ENERGY**

**Phoenix, Arizona**

*Trace Brazil*
Trace Brazil
EHS Director
VPz Pharma/Bang Energy

12 Oct 2020

Revision 1:  October 12, 2020
October 6, 2020

## Job Site Safety Plan *for:*   BANG ENERGY

### Phoenix, Arizona   Job # 23006976

## Table of Contents

| | |
|---|---|
| Corporate Safety Commitment | 4 |
| Jobsite Contact List | 5 |
| Safety Policy and Commitment | 6 |
| Safety Objectives | 6 |
| Safety Communication | 6 |
| JSSP Assignment of Responsibilities | 6 |
| JSSP Limitations | 7 |
| JSSP Compliance | 7 |
| Job Site Auditing, Hazard Abatement, and Follow-up | 7 |
| Accident/Incident Reporting and Investigations | 8 |
| Reporting Protocol | 8 |
| Safety Training | 9 |
| Safety Documentation | 10 |
| Records Retention | 10 |
| Hazard Reporting | 10 |
| Safe Plan of Action | 11 |
| Work Permits / Checklists / Plans | 11 |
| 1ˢᵗ Aid and Emergency Response | 12 |
| Public Safety | 12 |
| Safety Orientation | 12 |
| Site Access and Parking | 13 |
| Work Schedule and Meeting Requirements | 13 |
| Subcontractor Supervisor Safety Requirement | 14 |
| Subcontractor Safety Personnel Requirements | 14 |
| COVID-19 Protocols and Prevention Plan | 14 |
| Subcontractor Job Site Safety | 15 |
|     Subcontractor Responsibility and Accountability for Job Site Safety | 15 |
|     Subcontractor Safety Program and Training Requirements | 16 |
| Job Site Safety Compliance Program | 17 |
| Job Site First Aid and Bloodborne Pathogens | 19 |

### General Safety Requirements

| | |
|---|---|
| Stellar Job Site Rules | 20 |
| Administrative Requirements | 20 |
| General Health and Environmental Controls | 20 |
| Personal Protective Equipment (PPE) | 21 |
| Fire Protection and Prevention | 22 |
| Signs and Barricades | 22 |
| Material Handling, Storage and Disposal | 23 |
| Tools – Hand and Power | 24 |
| Welding and Cutting | 24 |
| Electrical Distribution and Equipment | 25 |
| Scaffolding, Stairways and Ladders | 26 |
| Fall Protection | 27 |
| Cranes, Hoists, Elevators, Conveyors | 28 |
| Mechanized Equipment Operation | 29 |
| Excavations | 29 |
| Concrete and Masonry Construction | 29 |
| Steel Erection | 30 |
| Demolition | 31 |

# Table of Contents

## Specific Safety Requirements

| | |
|---|---|
| Site Utilization Plan | 32 |
| Fall Protection | 33 |
| Fall Protection Static Load Requirements (per ANSI Z359 Fall Protection) | 34 |
| Warning Line Use as Fall Protection Method | 34 |
| Material Roof Access and Fall Protection | 35 |
| Roof Access | 35 |
| Roof/Floor Openings | 36 |
| Fall Protection While Setting and Installing Roof Top Equipment/Piping | 36 |
| Fall Protection on Elevated Interior Levels | 36 |
| Fall Protection in Aerial Lifts | 37 |
| Ladder Usage On Site | 37 |
| Use of Spotters | 37 |
| PPE Hazard Assessment | 39 |
| Carbon Monoxide and Gasoline, Diesel, and Propane Powered Equipment | 40 |
| Occupational Noise Exposure and Hearing Protection | 40 |
| Use of Lasers | 42 |
| Respiratory Protection and Silica Exposure Protection | 42 |
| Protection Against the Wind | 42 |
| Onsite Vehicles and Traffic | 43 |
| Stellar Hot Work Procedures | 43 |
| Stellar Confined Spaces / Permit Required Confined Spaces | 44 |
| Stellar Lockout/Tagout | 45 |
| Heavy / Critical Lifts | 46 |
| Heat Stress/Illness Precautions | 46 |
| Severe Weather, Emergency Procedures and Evacuation | 48 |
| Environmental Concerns | 49 |

## Forms

| | |
|---|---|
| Superintendent Daily Work Site Safety Audit | 50 |
| Safe Plan of Action (SPA) | 51 |
| Equipment Operator Qualification/Certification Log | 52 |
| Equipment/Machinery Daily Inspection Record | 53 |
| Heavy Lift/Critical Lift Plan | 54 |
| Cutting – Welding – Hot Work Permit | 55 |
| Confined Space Entry Permit | 56 |
| Lockout / Tagout Checklist | 58 |
| Exception to Policy for Exiting an Aerial Lift | 59 |
| Competent Persons Log (Weekly) | 60 |
| Visitor Safety Orientation and Release Form | 61 |
| Accident/Incident Report | 62 |
| Job Site Safety Rules | 67 |

# CORPORATE SAFETY COMMITMENT

7The personal safety and health of each Stellar employee, as well as subcontractor employees, any visitor to our sites, and any member of the general public affected by our work, is of the utmost importance. <u>**Safety is a Core Value of Stellar.**</u>

We believe that our employees are our most important resource and that their **safety at the worksite or in the office is our greatest responsibility.** The prevention of occupationally induced injuries and illnesses is of such consequence that it will be given precedence over operating productivity whenever necessary. Stellar management will provide all mechanical and physical facilities required for the personal safety and health of each employee. Every supervisor is responsible for the safety of those who work for him/her.

To be successful, this safety program must embody the proper attitude toward injury and illness prevention on the part of corporate and project management teams at all levels, from supervisors to individual employees. It also requires cooperation in all safety and health matters, not only between management, supervisors, and employees, but also between each employee and their fellow workers.

Our concern for safety and health of all human beings is daily, even hourly. We expect every person who conducts the affairs of Stellar, no matter in what capacity they function, to accept this concern and its responsibility. All employees are expected to use the safety equipment provided. Rules of conduct and rules of safety and health must be observed. Safety equipment cannot be abused or destroyed.

**Cooperation of all our employees in the observance of this policy will ensure safe-working conditions, will help result in accident-free performance and will work to our mutual advantage.** It will also assist in reducing workers' compensation costs and reduce jobsite down time, material loss and regulatory agency fines.

Management has the authority to procure the necessary resources to execute the objectives of our company's safety and health program. Stellar will hold managers, supervisors and employees accountable for meeting their responsibilities so that essential tasks will be performed.

# CORPORATE SAFETY OBJECTIVES

- Identify the risks involved in each activity we undertake and take all necessary steps to manage those risks to ensure a safe work process and environment.
- Ensure all personnel are properly trained and competent to do their work safely.
- Develop safe work methods and provide all necessary tools, machinery, equipment, and PPE.
- Maintain all tools, machinery, equipment, and PPE in good repair and operating condition.
- Comply with all federal, state, and local laws and regulations regarding safe and proper working conditions.
- Continually improve our safety efforts by evaluating, adopting, and utilizing best safety practices.
- Communicate with and engage our employees, encouraging them to always invest in themselves by working safely and in turn, positively influence those around them to also work safe.

This policy will be reviewed and updated on an annual basis.



Michael S. Santarone
CEO

4

## BANG ENERGY– PHOENIX

## JOB SITE CONTACT LIST

### BANG ENERGY:

| | | |
|---|---|---|
| **Engineering Manager:** | Alex Posada<br>alejandro.posada@bangenergy.com | (954) 809-5681 (cell) |
| **EHS Manager:** | Trace Brazil<br>tracy.brazil@bangenergy.com | (786) 742-9205 (cell) |
| **PEE/PM:** | Christopher Jones<br>christopher.jones@bangenergy.com | (786) 742-9810 (cell) |

### STELLAR FIELD:

| | | |
|---|---|---|
| **Job Site Superintendent:** | Brian Edberg<br>bedberg@stellar.net | (904) 349-0640 (cell) |
| **Process Superintendent:** | Mark Tosh<br>mtosh@stellar.net | (904) 568-7649 (cell) |
| **Assistant Superintendent:** | De'Angelo Robinson<br>drobinson@stellar.net | (904) 574-2712 (cell) |
| **Field Engineers:** | Kendall Kovacs<br>kkovacs@stellar.net | (904) 431-9848 (cell) |
| | Alfonso Tesorero<br>atesorero@stellar.net | (904) 426-5092 (cell) |
| **Field Safety Manager:** | Delano Ulibarri<br>dulibarri@stellar.net | (419) 277-2437 (cell) |

### STELLAR CORPORATE OFFICE:

| | | |
|---|---|---|
| **Senior Project Manager:** | Jonah Petosky<br>jpetosky@stellar.net | (904) 899-9865 (office)<br>(904) 497-2060 (cell) |
| **Assistant Project Manager:** | Chris Wood<br>cwood@stellar.net | (904) 899-9xxx (office)<br>(904) xxx-xxxx (cell) |
| **General Superintendent:** | John Moody<br>jmoody@stellar.net | (904) 899-9425 (office)<br>(904) 238-9787 (cell) |
| **V. P. – Risk Management:** | Phil Hinrichs<br>phinrichs@stellar.net | (904) 899-9265 (office)<br>(904) 614-3200 (cell) |
| **Director of Safety:** | Neil Ross<br>naross@stellar.net | (904) 899-9375 (office)<br>(904) 437-6751 (cell) |

# SAFETY ADMINISTRATIVE POLICIES AND PROCEDURES

## Stellar Safety Policy and Commitment

Stellar has an unprecedented concern for the safety of every employee and visitor on site. It is our desire to achieve a zero-accident level. Every employee is expected to maintain a high level of safety awareness and cooperate fully in helping to protect themselves and their co-workers. For this reason, we are dedicated to the principles and values of accident control.

We recognize that accidents can be controlled through an effective loss control program. Our goal is to develop and foster an attitude of safety toward everything we do. Accidents can lead to job dissatisfaction, loss of employee goodwill and interference with project schedules. By controlling accidents, we can eliminate these problems and in addition, minimize the losses associated with them.

An effective safety program does not happen by itself. It takes the support of everyone. Every supervisor is responsible for the safety of those who work for him. Enforcement of safety rules and regulations is the responsibility of every manager, supervisor, assistant supervisor and foreman.

## Safety Objectives

It is Stellar's intent to provide an incident and accident-free work place for all employees and clients. Our goals are to:

- Provide all required and/or reasonable safeguards to prevent work injuries.
- Maintain all equipment, tools and machines in good repair.
- Develop safe working methods and train employees to work safe.
- Comply with federal, state and local laws and regulations regarding safe and proper working conditions.

## Safety Communication

Good communication is essential to ensure effective implementation and maintenance of a safety plan. Information regarding this safety plan, safety regulations, safe operating procedures, or anything relating to safety on the job site will be communicated with employees via:

- Safety training sessions
- Weekly Job Site Safety Meetings
- Weekly Subcontractor Coordination Meetings
- Daily instructions and reminders from supervisors concerning safe work practices
- Corrective instructions from supervisors when necessary

## JSSP Assignment of Responsibilities

This JSSP has been prepared by Stellar, specifically for the Bang Energy project in Phoenix, Arizona.

6

As the General Contractor, Stellar will be viewed by OSHA as having responsibility for ensuring that a JSSP is in place and effectively implemented throughout the job site. As such, Stellar will hold each subcontractor responsible and accountable for maintaining and controlling safe conditions and behaviors within their area and scope of work. All Stellar employees and, by contract, all Stellar subcontractors and their employees working on site must comply with this JSSP as well as all other applicable safety regulations. For subcontractors who further subcontract their work to secondary/tertiary subcontractors, those subcontractors and their employees must also comply with this JSSP. Additionally, all subcontractors that further subcontract their work must inform Stellar management of their lower tier subcontractors.

Daily implementation, monitoring, and corrective actions required of this JSSP are the responsibility of:

- <u>Stellar Superintendent</u>: ensuring effective implementation by all subcontractors throughout job site
- <u>Stellar Asst. Superintendents/Field Engineers</u>: assist the Stellar superintendent in his duties
- <u>Subcontractor supervisors</u>: ensuring safe work practices/conditions throughout their scope of work
- <u>Foremen</u>: ensuring safe work practices/conditions are followed by all their crew members
- <u>Individual employees</u>: safe work practices and conditions are followed throughout their daily work
- <u>All personnel on site</u>: all near-misses, IDHL situations, incidents are reported immediately

***NOTE: As necessary, all personnel on site have the authority to stop work in an IDHL situation.***


## JSSP Limitations

This JSSP is based on CFR 29 Part 1926 construction standards and focuses on safety concerns pertinent to this job site. It is not intended to be all-inclusive. It highlights common safety practices and conditions where deficiencies often occur. In no way does the information provided herein relieve any contractor from compliance with federal, state, municipal or company regulations applicable to their work but not addressed in this plan. For specific safety regulation information, consult CFR 29 Part 1926 construction standards.


## JSSP Compliance

If there are questions concerning compliance with or clarification/interpretation of the information in this JSSP or if there are safety concerns not addressed in this JSSP, please call Stellar's Safety Department. They will gladly assist in answering your questions and meeting your safety responsibilities.


## Job Site Auditing, Hazard Abatement, and Follow-up

Any time Stellar's superintendent or other supervisory personnel are on site (including corporate representatives), they will be monitoring safety conditions.

1) Formal site surveys, using a checklist (copy attached), will be conducted bi-weekly by the Stellar superintendent, Assistant Superintendent, or Field Engineer. These checklists will be sent in to the Stellar Corporate Safety Department (they should not be sent in until any noted corrective actions have been taken).

2) Random site visits will be made by a representative of Stellar's Corporate Safety Department. A Site Visit Report will be filed by the representative indicating the audit results, subcontractor safety performance, and what corrective actions must be taken and followed-up on.

7

3) Any safety hazards or unsafe behaviors observed must be abated or corrected immediately as directed by Stellar's supervisory personnel. Failure to abate or correct hazards may result in dismissal from the job site. At no time may a worker work in an unsafe place unless the work is being done to correct a safety hazard and proper precautions have been taken.

4) Hazardous conditions that cannot be immediately abated must be barricaded off or otherwise isolated to prevent personnel exposure to the hazard.

5) All hazardous conditions/behaviors will be annotated on the superintendent's daily log, walk-around inspection sheet, or other appropriate document. The Stellar superintendent is responsible for following up to ensure the necessary corrective actions to abate the hazard have been taken. The corrective actions must also be annotated.

*NOTE: During all job site audits, beginning with the initial audit and continuing through all follow-on audits, whether scheduled or random, specific attention must be given to identifying and evaluating new hazards introduced to the site by the presence of new substances, materials, processes, procedures, or equipment brought on site by Stellar and/or subcontractors.*

## Accident/Incident Reporting and Investigations

All accidents/incidents, involving property damage or injuries, including "near misses" must be reported immediately to the Stellar job site superintendent or on-site safety manager. An investigation of the accident/incident must be conducted, and a written report completed and submitted to Stellar. The more serious an accident/injury is, the more in-depth the investigation must be. This is the responsibility of the crew supervisor, foreman or lead man. Subcontractors may use their own company reporting form for this purpose, or Stellar's Accident/Incident Report form (copy attached) may be used.

*NOTE: In the event of an accident or incident, all personnel involved, including subcontractor personnel, are required, as allowed by state and local laws, to have a drug screening within 24 hours of the accident/incident.*

To ensure the casual factors of the accident/incident are properly identified, **root cause analysis** must be used in the investigation process. Basic root cause analysis is written into the Stellar Accident/Incident Report form. For more serious accidents/incidents, more in-depth root cause analysis will be conducted by corporate safety personnel you will go to the site to oversee the investigation of the accident/incident.

## Reporting Protocol

The following personnel/offices shall be notified in the event of the following situations:

| Event | Person/Office to be notified | Notification method/timeframe |
|---|---|---|
| Near-miss (IDHL situation, unsafe behavior or condition, incident, etc.) | Subcontractor will notify Stellar superintendent/on-site safety manager/field office; Stellar will notify others as required | Personnel will notify their supervisor immediately; subcontractor will log the incident on daily subcontract log and submit it in the regular fashion to the Stellar job trailer. |

8

| Minor accident/incident resulting in a 1st aid only injury or minor property damage | Subcontractor will notify Stellar superintendent/on-site safety manager/field office; Stellar will notify others as required | Subcontractor will log the incident on daily subcontract log and submit it in the regular fashion to the Stellar job trailer; additionally, a verbal report shall be made within 2 hours. |
| --- | --- | --- |
| Accident/incident resulting in a recordable injury or significant property damage | Subcontractor will notify Stellar superintendent/on-site safety manager/field office; Stellar will notify others as required | Subcontractor will log the incident on daily subcontract log and submit it in the regular fashion to the Stellar job trailer; a verbal report shall be made within 2 hours. A written report must be submitted within 24 hours. |
| Catastrophic accident/incident resulting in a major injury requiring an ambulance, three or more personnel involved, or death | Subcontractor will notify Stellar superintendent/on-site safety manager/field office; Stellar will notify others as required | Subcontractor will log the incident on daily subcontract log and submit it in the regular fashion to the Stellar job trailer; a verbal report shall be made immediately. Additionally, if a death is involved, the employer (i.e., subcontractor) is responsible for notifying OSHA within 8 hours. A written report must be submitted within 24 hours. |

**NOTE**: When notifying Bang Energy management personnel of an accident, injury, or incident, the order of notification is:

- Safety related accident/injury:
  1. Trace Brazil (EHS Manager)
  2. Alex Posada (Engineering Manager)
  3. Chris Jones (PEE/PM)

- Other accident/injury:
  1. Alex Posada (Engineering Manager)
  2. Trace Brazil (EHS Manager)
  3. Chris Jones (PEE/PM).

When making a notification, if the person is not available, do not delay in contacting the next person in the reporting order. Leave a message and move on to the next person in the notification chain.

## Safety Training

Stellar provides safety training to its employees through video tape and/or online web-based training sessions including quizzes/tests to evaluate employees' understanding of the material.

Safety training is also provided as part of the job site Weekly Safety Meetings. These meetings are held at the same day/time each week as determined by Stellar's job site superintendent. All personnel on site, both Stellar and subcontractor employees, are required to attend and sign in. The superintendent will select meeting topics based on current job site activity. A pertinent Safety Data Sheet will also be discussed. Subcontractors will have an opportunity to discuss any additional safety issues related to their work or equipment being used.

Specialized safety training must be conducted as necessary for certain equipment and tool operators. This may include, but is not limited to: rough terrain forklifts; aerial lifts; boom trucks; powder actuated tools (e.g., nail guns), etc. Tool and equipment rental companies often offer the necessary training for operating their tools and equipment, and it is strongly recommended that their services in this regard be utilized.

Personnel designated as a "competent person" must be adequately trained in the area of construction activity they are overseeing as a competent person.

## Safety Documentation

***NOTE:*** *Documentation of all safety related training (e.g., equipment qualification/operator cards, certifications, competent person training, licenses, 1st aid/CPR, etc.) must be submitted to Stellar for verification and record retention.*

Standard documentation of on-site safety materials and efforts is maintained with the following documents:

- Job site bulletin board with all required federal, state, and Stellar labor law and safety posters
- Right-to-Know Center including HazCom Program and SDSs
- A copy of this JSSP
- Weekly Safety Meeting sign-in sheets
- Weekly Subcontractor Coordination Meeting minutes
- Safety video training attendance sheets and test results
- Copies of accident/incident reports

Additional documentation which must be provided Stellar's job site superintendent include copies of:

- Subcontractor's safety program or plan
- SDSs for any hazardous materials brought on site
- Certifications/licenses for operating equipment and machinery
- Subcontractor's Weekly Safety Meetings (if held in addition to Stellar's)

## Records Retention

All documentation (logs, training records, reports, etc.) will be maintained on site (hard copy or electronic data base) for ready access. In addition, all documentation will be scanned and emailed to the appropriate corporate offices (e.g., division office, risk management office, HR office) for electronic filing.

## Hazard Reporting

All workers on site are encouraged to <u>immediately</u> report any situation on site that they believe creates an unsafe or hazardous condition (a near-miss). Unsafe or hazardous conditions may be caused by physical conditions (missing guardrails, open holes, etc.) or by unsafe behaviors and actions (not tying off, standing on the top step of a ladder, etc.). Reports may be submitted by phone, in person, or in writing.

Reprisals against employees for reporting unsafe or hazardous working conditions are prohibited under regulatory and administrative procedures and may result in disciplinary action.

Follow these steps when reporting actual or potential unsafe or hazardous conditions:

1. If the unsafe or hazardous condition is an Immediate Danger to Health or Life (IDHL) situation, contact your nearest supervisory personnel so immediate action can be taken to correct the situation.

_NOTE: All personnel on site have the authority to stop work in an IDHL situation._

2. If it is not an IDHL situation, notify your supervisor of the nature, location, and your assessment of the potential harm of the unsafe or hazardous condition.

3. If you do not wish to discuss the unsafe or hazardous condition with your supervisor or are unsatisfied with the response or timeliness of action of your supervisor, contact a Stellar Group supervisor (foreman, assistant superintendent, or superintendent).

4. If you are unsatisfied with the response or timeliness of action from The Stellar Group's on-site management team, call Stellar's corporate office at 888-488-2901 and ask for someone in the Risk Management Department.

## Safe Plan of Action

In order to ensure that all members of a work crew fully understand the nature of their work, the tasks each crewmember must complete, and that they are thoroughly informed about the hazards involved in their work, each crew supervisor is required to fill out a Safe Plan of Action form (a copy is at the back of this safety plan) **and** verbally review it with all crew personnel prior to the crew beginning work, even if it is essentially the same day after day. The form should be used to inform all crewmembers of the work hazards present, what preventative safety measures they must take, including what PPE they must wear, and what work tools and equipment are necessary to do the work safely.

The Safe Plan of Action form should be completed daily for each crew assigned a task or more frequently if the work is completed and the crew is assigned a new task during the workday, or if a new shift or different crew begins work, or if the original work task changes and crew is exposed to new hazards.

## Work Permits / Checklists / Plans

Work permits / checklists / plans will be used for specific high-level risk construction activities to formalize safe work procedures and ensure all proper steps and precautions are taken to reduce and manage the risks associated with the activity. Work permits / checklists / plans will be required for:

- All heavy or critical crane lifts: i.e., any load over 2,000 lbs. or any load over 75% of crane capacity or a load that must swing over critical equipment (use *Heavy Lift / Critical Lift Plan*).
- At the discretion of the Stellar superintendent, the stage of building completion and/or location on site will determine the need for the use *Cutting–Welding–Hot Work Permits*. As the building becomes more enclosed, the permit will be more specific in location, duration, and size of area.
- Any permit required confined space work (use *Confined Space Permit*)
- Any work on energized systems: i.e., electrical, hydraulic/liquid, pneumatic (use *Lockout / Tagout Checklist*)

## 1st Aid and Emergency Response

All appropriate emergency telephone numbers will be posted in the job trailer near the telephone. Basic emergency service will be accessed by calling 911.

11

On-site medical (1st responder) support will include Stellar supervisory personnel who are trained in 1st Aid / CPR / AED use. However, providing medical response/assistance is strictly voluntary.

An appropriately sized and supplied 1st aid kit, including bodily fluid disposal kit, as well as an AED will be maintained in the job site trailer. The 1st aid kit will be kept adequately stocked by an outside vendor.

Nearby clinics and hospitals, as well as a panel of medical providers, will be posted (with directions) in the job trailer alongside the other emergency information postings.

## Public Safety

All necessary steps shall be taken by Stellar and all subcontractors to ensure the safety of the public. This may include, but is not limited to:

- Security fencing of the site
- Site access control and associated No Access / Construction Area / Keep Out signage
- Appropriate Danger, Warning, Caution, Notice signage
- Protective / covered walkways
- Detour / Sidewalk Closed signage as needed
- Ensuring all conditions within the footprint of the construction site are always in a safe condition, whether crews are on-site or off-site

Subcontractors creating potential or actual public safety issues are responsible for correcting or abating the situation with appropriate and adequate safety measures.

All public safety measures taken will be monitored daily to ensure they are properly maintained and remain effective.

## Safety Orientation

All personnel, including Stellar personnel, subcontractor personnel, temporary and day laborers, or other visitors will be required to go through a safety orientation prior to going out on site.

1. Construction personnel and non-construction personnel who will be on site routinely will go through Stellar's corporate site safety orientation (corporate video) followed by a site-specific safety orientation conducted by site supervisors or the site safety manager. Site specifics will include current job status and activities, high hazard areas, site facilities orientation (parking, break areas, safety meeting location, emergency action plan and evacuation rally points, owner safety rules and protocols, etc.).

   Upon completion of the site safety orientation personnel will be given a hard-hat sticker for their hard hat. No one may be working on site without completing the safety orientation and use of the hard hat stickers will facilitate enforcement of this policy.

   All subcontractor supervisors are responsible for coordinating with the on-site Stellar team to coordinate and schedule this training for their personnel – both for their initial crew and also any follow-on personnel arriving on site later in the schedule.

2. Visitor safety:

12

Prior to going out onto the construction site, all visitors will receive a safety orientation and be provided the proper PPE (hard hat, safety glasses, safety vest). They will be required to wear enclosed shoes (i.e., no open toes, sandals, clogs/mules, etc.) with hard soles.

*__NOTE__: Visitors will complete the Visitor Safety Orientation and Release form.*

When out on site, visitors must be escorted by a member of the Stellar construction management team, or a designated subcontractor representative.

In the event a visitor violates a safety rule, the escort will remind the visitor of the pertinent safety rule and proper compliance. If the visitor continues to violate the rule, the visit will be terminated, and the visitor escorted back to the job trailer. Continuation of the visit, or any future visits will be conditional on the visitor's acceptance of and compliance with all site safety rules.

Due to the continually changing conditions on a construction site, visitors will go through a visitor safety orientation each time they visit the site to ensure they are instructed on the current site conditions and hazards present.

## Site Access and Parking

In order to access the site with a vehicle, workers will need to have a parking pass. The parking pass will be issued at the completion of the Stellar Safety Orientation along with the Stellar hard hat sticker.

For those walking onto site, the Stellar Safety Orientation hard hat sticker will be sufficient for site access.

## Work Schedule and Meeting Requirements

The normal daily work schedule will be 6:00 a.m. to 5:30 p.m., Monday through Saturday. These hours will be modified as necessary by the Stellar superintendent to accommodate special construction activities, and circumstances. Any other deviation from these hours will need to be requested from the Stellar superintendent at least 72 hours in advance.

The following meetings will be held each week and attendance is MANDATORY:

1. **Weekly Safety Meeting**: every Tuesday at 7:00 a.m. sharp. Everyone on site must attend.

2. **Weekly Subcontractor Coordination Meeting**: every Wednesday at 1:00 p.m. sharp. A representative from each subcontractor must attend. The subcontractor representative MUST have decision making authority. Subcontractors are required to begin attending the meeting at least 2 weeks prior to their mobilization so they are up to date with the current status of the job upon their mobilization and Stellar can properly plan for and coordinate their arrival.

## Subcontractor Supervisor Safety Requirement

This requirement is effective on all subcontracts dated on or after October 1, 2020.

To ensure knowledgeable leadership regarding safety, each subcontractor crew superintendent, supervisor, foreman, or lead person will be required to have completed the OSHA 10-hour Construction course prior

13

to assuming leadership of their crew and scope of work on the project. Course completion must be within the past five years. Documentation of course completion must be submitted to Stellar. If primary subcontractors further subcontract to secondary or tertiary subcontractors, this same OSHA 10-hour Construction course completion (with documentation) also applies to the secondary/tertiary subcontractor crew supervisor.

## Subcontractor Safety Personnel Requirement

All subcontractors must designate a site safety coordinator/representative for their crew. That person will coordinate with Stellar's site safety coordinator and be the point of contact between Stellar and the subcontractor for any safety or safety related issues needing to be addressed, implemented, corrected, etc.

For subcontractor crews of less than 25 personnel, the safety coordinator/representative can function as a working member of the crew. For crews of 25 personnel or larger, a dedicated safety coordinator is required (see requirements below).

Regardless of crew size, if, in the sole judgment of Stellar's on-site management team, a subcontractor's work performance is deemed to be repeatedly unsafe, a full-time safety coordinator will be required. The safety coordinator <u>cannot</u> function as a working member of the crew but must be solely dedicated to ensuring all of his/her crew members work safely.

For subcontractors that must provide a full-time on-site safety coordinator, that person must meet the following minimum requirements:

- 30-hour construction OSHA card
- Current in 1st aid/CPR training
- 3-years' experience as an on-the-job safety supervisor/coordinator
- Necessary specialized competent person training depending on trade/scope of work (e.g., confined space, scaffolding, fall protection, excavation, etc.)
- Qualified lift/equipment operator (scissors, boom, etc.) for any lifts/equipment they will use

## COVID-19 Protocols and Prevention Plan

The following steps will be taken to prevent and control the spread of COVID-19 on Stellar job sites:

- Signage will be posted referencing CDC and Stellar guidelines and protocols at the entry point(s) to the job site for all personnel entering and working on site.
- All personnel must complete Stellar's form acknowledging they have not had any symptoms nor have not tested positive for COVID-19 within the last 10 days.
- If a person tests positive for COVID-19 and has visited the jobsite within the last 14 days, they will provide information to their supervisor and Stellar so appropriate contact tracing can occur.
- All personnel will have their temperature taken every day when coming on site (temperature must be below 100.4 degrees to be allowed access into the site).
- Masks must be worn at all times on site (with certain exceptions).
- Social distancing will take place during all meetings, both inside and outside.

As further information from the CDC is made available, Stellar's COVID-19 protocols will be updated to maintain compliance with CDC guidelines.

## SUBCONTRACTOR JOB SITE SAFETY

**Subcontractor Responsibility and Accountability for Job Site Safety**

Job site conditions and behaviors of workers affect on-the-job safety **every day**, and they are **everyone's** concern. While Stellar's job site superintendent is responsible for overall management of the safety program on site, it is not physically possible for him/her to be the sole monitor and enforcer of on-the-job safety during all work hours, everywhere on site. As such, it is the responsibility and assigned duty of each subcontractor (both contractually and as a matter of industry standard) to:

1.  Be thoroughly knowledgeable of all federal, state, and Stellar safety rules, regulations, policies, and industry standards associated with your craft and scope of work.

2.  Comply fully with all **federal, state, Stellar, own company, and facility owner** safety rules, regulations, policies and industry standards associated with your craft and scope of work.

3.  Ensure that all employees are **technically and physically** capable of carrying out their assigned work.

4.  Ensure your employees **have and use** all necessary personal protective equipment (PPE) and other safety equipment necessary to complete their assigned tasks safely and in accordance with all applicable safety rules, regulations, policies and standards.

5.  Ensure that Stellar's job site superintendent, all subcontractors, and any other personnel on site are made aware, immediately, of any hazards/danger areas created in conjunction with your scope of work.

6.  Ensure all necessary and adequate safeguards (e.g., barricades, guardrails, warning signs, etc.) are erected around hazardous conditions to prevent workers from exposure to the hazard.

7.  Ensure that any "work-in-progress" is **never** left unattended in an unsafe, unguarded, unmarked or unidentified condition when work crews leave the immediate area for **any** length of time (e.g., leaving momentarily to get materials, for a five minute break, for lunch, at the end of the day, etc.).

8.  Notify the Stellar superintendent of any hazardous situations created by other subcontractors so that the creating subcontractor can be directed to take necessary corrective action(s) as soon as possible.

9.  Provide the Stellar superintendent with safety data sheets (SDS) for all hazardous materials brought on site (SDS should arrive prior to, or at time of, delivery of materials).

10.  Attend Stellar's on site weekly safety meetings, ensuring **all** subcontractor personnel on site attend.

11.  Respond immediately, taking necessary corrective action when notified by Stellar's supervisory personnel or federal, state or other authority, of any unsafe conditions or behaviors.

12.  Report immediately, all accidents, injuries to personnel, and damage to property, and provide copies of all appropriate reports (e.g., first reports of injury, damage reports, police reports, etc.).

The construction site is a dynamic place, an ongoing process, with conditions continuously changing day to day, hour to hour, minute to minute. Ensuring that safe conditions are maintained is everyone's responsibility, all the time. **All subcontractors will be held accountable for meeting the above responsibilities. Failure to do so may result in dismissal from the job site.**

15

**Subcontractor Safety Program and Training Requirements**

1. Each subcontractor on a Stellar job site must have its own safety program designed to manage the hazards associated with their work on the site and reduce or limit the exposure of all workers to those hazards. Relying on the safety programs of other employers to protect your employees is insufficient and does not meet the requirements of OSHA.

2. Each subcontractor shall instruct their employees in the recognition and avoidance of unsafe conditions and in the regulations applicable to their work environment to control or eliminate any hazards or other exposure to illness or injury *(see Safety Training Documentation note on page 9)*.

Areas of training required by OSHA include:    - personal protective equipment;
                                                - material safety data sheets;
                                                - fire extinguishers.

Other typical areas of training required by OSHA may include, but are not limited to:

   - ladders;
   - scaffolds;
   - fall protection methods and systems;
   - excavations;
   - respirators;
   - lifting and material handling;
   - any specialized equipment or procedures applicable to your scope of work.

3. It is the responsibility of the individual subcontractor to initiate and maintain such programs as may be necessary to comply with 29 CFR 1926.20(b)(4). Specifically, each "employer shall permit only those employees qualified by training or experience to operate equipment and machinery." This applies to vehicles, heavy equipment, cranes, aerial lifts, power tools, powder actuated tools, welding machines and rigs, and other specialized tools and equipment. All forklift operators must have a _**certified**_ license.

_**NOTE**_: *Employees certified or qualified to operate equipment and machinery should be documented on the Equipment Operator Qualification/Certification Log form (at the end of this document).*

4. Each subcontractor shall provide "competent persons" on site as required by OSHA regulations *(see Safety Training Documentation note on page 9)*. Relying on the competent persons of other employers to ensure the protection of your employees is insufficient and does not meet the requirements of OSHA. Construction activities which require the presence of a competent person include, but are not limited to:

   - scaffolding erection, dismantling and use;
   - trenching and excavations;
   - fall protection methods and systems;
   - rigging of equipment for material handling;
   - operation of cranes and hoists;
   - demolition work;
   - use of ladders;
   - working with hazardous materials.

_**NOTE**_: *Competent Persons should be documented on the Competent Persons Log form (at the end of this document). This form should be updated weekly.*

16

## JOB SITE SAFETY COMPLIANCE PROGRAM

OSHA regulations, Stellar's job site safety rules, and owner safety policies are discussed at every construction coordination meeting and should be well known and understood by all personnel on site. In particular, job site safety rules are included with all subcontracts, posted at each job site, and discussed at job site weekly safety meetings. There is no reason why any on site personnel should not be familiar with job site safety rules, regulations and procedures.

The purpose of Stellar's Job Site Safety Violation Citations is to: 1) maximize compliance, by all on-site personnel, with OSHA regulations, Stellar job site safety rules and applicable owner safety policies; 2) provide a uniform enforcement and disciplinary program for personnel found violating safety rules; and 3) provide documentation of individual and subcontractor safety performance.

The procedures for the program are as follows:

♦ Whenever a safety violation is observed by Stellar's job site superintendent, project manager, safety director, general superintendent or other supervisory personnel, the violation <u>will</u> be documented using a safety violation citation form.

♦ Violations will be issued to individual workers for personal safety violations (i.e., the safety condition or behavior is under the control of the individual) or issued to a subcontractor for safety violations (i.e., conditions or behaviors) which are under the control of the subcontractor.

♦ The form is printed in triplicate. The white copy will be filed by Stellar's job site superintendent, the yellow copy will be forwarded to Stellar's safety director and the pink copy will be given to the individual or subcontractor.

♦ The disciplinary policy concerning safety violation citations is as follows:

   *For subcontractors/subcontractor personnel:*

   • *3 Personal violations* will result in permanent dismissal of the employee from job site.
   • *3 Subcontractor violations* will put the subcontractor on notice.
   • *3 Employees dismissed* (from the same subcontractor) from the job site for safety reasons will result in the subcontractor's contract being terminated for failure to comply with safety requirements as agreed in the subcontract.

   • *Any Immediate Danger to Life or Health (IDLH) situation* (e.g., working in an unprotected trench; working on a leading edge with no fall protection; etc.) will result in an *immediate suspension* of the work in progress and *removal of personnel* from hazardous conditions to evaluate the situation. Safety violations will be cited, and the conditions/behaviors corrected before work may resume.

   *For Stellar personnel:*

   • *3 Personal violations* will result in a week suspension from work without pay.
   • *3 Personal violations within any 12-month period* will result in termination of employment.

17



## Job Site Safety Violation

Job Site _____    Job # _____

Subcontractor in violation _____    Date _____

Employee(s) involved _____    Time _____

**Personal Violation:**

| | |
|---|---|
| / / | Not wearing hard hat |
| / / | Not wearing eye protection |
| / / | Not wearing safety shoes |
| / / | Not wearing proper attire |
| / / | Radio on the job |
| / / | Not using required PPE |
| / / | Not tying off/using fall protection |
| / / | Disregarding safety precaution/barrier |
| / / | Safety guard removed from tool |
| / / | Other (describe) _____ |

**Subcontractor Violation:**

| | |
|---|---|
| / / | Not attending safety meetings |
| / / | Not keeping work area(s) clean |
| / / | Fall protection system(s) not in use |
| / / | Improper gas can(s) on site |
| / / | Welding tanks improperly stored |
| / / | Damaged/worn electrical cord |
| / / | Hazardous conditions not barricaded |
| / / | Unsafe scaffolds (guardrails/planking) |
| / / | Unsafe trench (sloping or benching) |
| / / | Other (describe) _____ |

This is violation #_____ for this employee.      This is violation #_____ for your company.

**Disciplinary Policy:**

- *3 Personal violations* will result in permanent dismissal of the employee from job site.
- *3 Subcontractor violations* will put the subcontractor on notice.
- *3 Employees dismissed* (from the same subcontractor) from the job site for safety reasons will result in the subcontractor's contract being terminated for failure to comply with safety requirements as agreed in the subcontract.

- *Any Immediate Danger to Life or Health (IDLH) situation* (e.g., working in an unprotected trench; working on a leading edge with no fall protection; etc.) will result in an *immediate suspension* of the work in progress and *removal of personnel* from hazardous conditions to evaluate the situation. Safety violations will be cited, and the conditions/behaviors corrected before work may resume.

Stellar Representative    _____
                          *(signature)*

Employee/Subcontractor    _____
                          *(signature)*

*white original - job files    yellow copy – Stellar Safety    pink copy - employee/subcontractor*

18

## JOB SITE FIRST AID AND BLOODBORNE PATHOGENS

- A first aid kit, adequately sized and stocked (including a bodily fluid disposal kit), will be maintained in Stellar's job site trailer. While it is available for all personnel on site, individual subcontractors are encouraged to maintain their own first aid kit for their personnel.

- At least one Stellar supervisory personnel on site will be trained and certified in emergency first aid and CPR. Individual subcontractors are encouraged to have at least one of their onsite personnel also trained in emergency first aid and CPR.

- In the event of **minor injuries**, individuals should use appropriate first aid kit supplies and treat themselves with the assistance of others as necessary. *Do not let minor wounds go without treatment. Left untreated, they can become infected and turn from minor into serious conditions.*

- In the event of a **serious injury**, follow these emergency action procedures:

1. Survey the accident scene – How many are hurt? Is the situation still dangerous? etc.
2. Send someone to call emergency medical personnel; let Stellar's superintendent know
3. Stay calm and gain the victim's confidence
4. Assess the victim's condition: If the victim is unresponsive, check the level of consciousness with the ABC's: *Airway, Breathing, and Circulation*

   - See that the **airway** is clear – no foreign objects; tongue doesn't block airway
   - Check **breathing** with your ear pressed against the chest; listen for breathing
   - Monitor **circulation** – check the victim's pulse (regardless of breathing)

     *After checking the ABCs . . .*

   - Control bleeding by applying pressure where needed
   - Relieve shock by elevating the victim's legs 8-12" above the ground
   - Treat any "possible" fracture as a "definite" fracture; immobilize with splints
   - Perform rescue breathing/CPR as needed

- Exposure to human blood and other body fluids can pose health risks. Although exposure to human blood is not "reasonably anticipated" on the job site, in the event of an injury, it may occur. Because of the potential risks from coming into contact with contaminated blood and/or other fluids, it is safest to treat all human blood and bodily fluids as if they are contaminated with bloodborne pathogens (diseases).

**NOTE:** *Coming into contact with human blood (e.g., providing first aid assistance, clean-up of blood, etc.) is strictly voluntary for any Stellar employees or subcontractor employees.*

- If it becomes necessary to come into contact with blood or other bodily fluids (i.e., treat an injury or clean up afterwards), follow these precautions:

   - stop work in the vicinity and barricade it off to limit exposure to others
   - always wear latex gloves (available in the first aid kit)
   - bandage any cuts on your hands before putting on the gloves
   - remove gloves carefully so that no fluids contact bare skin
   - use gloves only once – dispose of them after use
   - wash your hands thoroughly afterwards

## GENERAL SAFETY REQUIREMENTS

**A.  Stellar Job Site Safety Rules**

- All Stellar and subcontractor employees on site are required to adhere to the twelve rules listed on Stellar's Job Site Safety Poster (copy attached).

**B.  Administrative Requirements**

- A job site bulletin board will be maintained at the Stellar job site trailer.  All required federal and state labor and worker compensation posters as well as Stellar policy and information posters will be posted.  The bulletin board will be accessible to all employees during normal working hours.

- Stellar is a Florida Certified Drug Free Work Place.  As such, all Stellar employees are drug tested at time of hire, after an accident and/or injury, and on a random basis.  Stellar strongly encourages all subcontractors to also work drug free.  In the case of an accident and/or injury to a subcontractor employee, that employee must be drug tested.

- A SDS binder will be maintained in the Stellar job site trailer.  All subcontractors must provide material safety data sheets for all hazardous substances they bring unto the job site.  This can be accomplished by providing either a company SDS binder or individual SDS copies for inclusion in the Stellar SDS binder.

- The Stellar superintendent will hold weekly safety meetings at a day and time determined by him.  **All subcontractor personnel on site** are required to attend.  The superintendent will select meeting topics based on current activity at the job site.  A SDS will also be discussed.  Subcontractors will be provided an opportunity to discuss any additional safety issues related to their work or equipment being used.

- All accidents/injuries must be reported immediately to the Stellar superintendent.  Copies of accident/injury reports must be forwarded to the Stellar superintendent in accordance with reporting protocol *(see page 8)*.

**C.  General Health and Environmental Controls**

- **Good "housekeeping" throughout the site is extremely important – this is particularly important in stairwells, hallways and passageways.** All subcontractors must clean up after themselves and properly dispose of scrap materials and debris.  **Clean up must occur daily.**

- **No glass containers** will be allowed on site.

- **No "Horseplay"** of any kind will be allowed on site.  Personnel engaging in horseplay will be dismissed form the site immediately.

- **Use of cell phones on site** must be limited to business calls for facilitation of construction related issues, except for emergency (business or personal) situations.  Personnel needing to use their cell phone must find a safe location on site, and must never use their phone while walking, working, or driving.

20

- **It is important to maintain a "pest free" job site.** All lunch/meal waste (including food, wrappers, etc.) must be cleaned up immediately to avoid the introduction of rodents, insects, or other pests on to the site. An adequate number of trash cans will be provided around the site.  **They must be used.**

- All exposed nails, screws, stiff wire or other sharp objects protruding from pieces of debris, concrete forms, etc. shall be removed, bent over, covered, or otherwise guarded to prevent puncture hazards.

- All debris, stripped forms, packing/shipping materials, etc. must be disposed of in dumpsters or collected into piles to eliminate all slip, trip and fall hazards.

- All areas where construction activity is occurring, including hallways and passageways used to access or transit between work areas, shall be provided (by either temporary or permanent lighting) with a minimum light level of 5-foot candles.

*<u>NOTE:</u> Stellar will endeavor to provide adequate lighting levels as part of our contract with the electrical subcontractor by means of temporary and/or permanent lighting. However, there may be periods of time due to construction phases, shut-downs, tie-ins, etc. where light levels may not be able to be maintained. In these situations, it remains the responsibility of each subcontractor to ensure adequate light levels that meet OSHA requirements are maintained for their crews' activities including transit to/from their work areas. This may require providing portable light stands and power source for each crew.*

- Each contractor is responsible for providing adequate drinking water, via bottled water or water in a container with a tap, for their employees.  The container must be sanitized prior to use, sealed closed, with seal dated and initialed.  The container integrity/cleanliness/water supply must be monitored throughout the day and as necessary re-sanitized, refilled, and re-sealed. A sufficient supply of sanitary cups, in a container, and a receptacle for disposing of used cups must also be provided.  The use of "common cups" is prohibited.

- Parking of privately-owned vehicles on site will be allowed only in areas designated by Stellar's on site superintendent.  No privately-owned vehicles will be allowed on the building slab or in the building without prior approval of Stellar's superintendent.

- Stellar will ensure adequate numbers of porta-lets are on site for the number of workers present.

- In the event of threatening or dangerous weather, all work conditions, particularly those exposed to the weather must be evaluated for safety considerations.  Stopping work and/or evacuating the site should not be delayed in the hope that the weather will pass by safely.

D.    **Personal Protective Equipment (PPE)**

- All personnel, when on site, are required to wear the following PPE:

- Hard hats;
- High visibility outer garment;
- Task appropriate gloves
- Safety-toed (steel, aluminum, or composite) work boots (minimum 6" high);
- Safety glasses (with side shields) or other approved eye protection.

- All employees shall also wear hearing protection, welding hoods, full body harnesses with shock absorbing lanyards/self-retracting lifeline, or other PPE when required to complete their work safely and/or meet the requirements of local, state and federal regulations.

21

- Subcontractors are responsible for providing and/or ensuring their employees have and wear all required PPE.

- Detailed PPE requirements are listed in the Specific Safety Requirements section of this plan.

***NOTE:*** *All PPE, including specialized PPE (e.g., welding hoods, harnesses/lanyards, etc.) must be inspected by the user prior to each use. All worn, damaged, or defective PPE must be tagged and taken out of service immediately, and not used.*

### E.    Fire Protection and Prevention

- An adequate number of fire extinguishers, rated no less than 2A, must be located throughout the construction area.  Travel distance to the nearest extinguisher should not exceed 100 ft.

***NOTE:*** *Stellar will provide fire extinguishers in common areas such as doorways, passageways, etc. Subcontractors are responsible for providing their own fire extinguishers required for their scope of work (e.g., for hot work, at fuel tanks, etc.).*

- Fire extinguishers shall be placed so that they are highly visible and accessible and not hidden by debris or materials.

- All fire extinguishers must have a current inspection and be fully charged.

***NOTE:*** *All mobile equipment (forklifts, aerial lifts, etc.) must have an appropriate fire extinguisher.*

- To prevent fire hazards from developing, debris piles shall be kept to a minimum and cleaned up on a daily basis.

- All gasoline and diesel fuel cans on site must be of the metal safety can type with self-closing cover and flame arrestor.

- Unless an onsite fuel tank, properly labeled with adequate spill containment measures taken, is provided, no more than one (1) day's gasoline/diesel fuel supply should be kept on site.

- No more than 25 gallons of flammable or combustible liquids shall be stored in a room outside of an approved storage cabinet.

### F.    Signs and Barricades

- The following signs (or similar signage) will be posted throughout the site:

  - Hard Hat Area
  - Eye Protection Required
  - Danger, Warning, Caution signs as necessary (e.g., around open trenches and excavations, at open electrical panels, etc.)

- All open trenches/excavations, exposed truck docks, etc. which do not require standard fall protection but still pose a fall hazard, shall be barricaded or roped-off with a warning line.

22

- All hazardous equipment or equipment installation areas shall be barricaded or roped-off with a warning line. Barricades should be 42" +/- 3" high.

- Red barricade tape is for use in situations where entry is prohibited or requires special permission. Red barricade tape must not be crossed without prior permission from the person/crew supervisor that erected the barricade tape.

- Yellow barricade tope with caution warnings is for use where entry is allowed as long as the necessary precautions are taken.

## G.    Material Handling, Storage and Disposal

**_NOTE:_** *Leaning of material (e.g., door frames, drywall, plywood, etc.) as a means of storage is <u>not allowed</u> unless the material is in a rack type storage unit specifically designed to hold the material.*

**_NOTE:_** *Materials that are delivered with packaging materials that stabilize and prevent displacement of the material (e.g., shrink wrap, binding straps, etc.) shall not be unpackaged until the material is to be used.*

- Unloading, placement and stockpiling of materials and supplies delivered to the site must be coordinated through Stellar's superintendent. Location of stockpiled material is of particular importance if crane operations will be involved in moving the material to its final position.

- Material storage below, next to, or near overhead power lines should be avoided and requires permission from Stellar's superintendent. If material is stored in these areas, minimum distances from the power lines (dependent on power line voltage) must be maintained during all phases of moving the material.

- All material storage shall be on stable, level ground and as necessary, placed on dunnage to help maintain cleanliness of the material.

- All material brought on site shall be stacked so that it is stable and does not pose a hazard from falling over. Stacks should be stepped back to increase stability and cylindrical objects must be chocked or banded to prevent rolling or shifting.

- All round/cylindrical objects and materials (e.g., pipes, rolls of roofing, duct work, etc.) must be chocked to prevent it from rolling.

**_NOTE:_** *Materials, equipment, tools, etc. stored on the roof of conexes must be kept to a minimum and must not exceed 110 lbs. per sq. ft. (reference ISO 1496 and the Container Safety Convention (CSC)). <u>Roof load capacity shall be posted on the exterior of the conex.</u>*

- Stockpiled material/supplies shall be located to not block passageways, exits, or site access ways.

- All chain falls, hoists, slings, hooks, shackles, chokers and rigging must be inspected prior to use. Any damaged equipment must not be used. All hooks must have a safety latch (except shakeout hooks).

- All slings must be padded or otherwise protected from the sharp edges of their loads.

- Do not leave unsecured or unattended suspended loads.

**_NOTE:_** *No personnel shall work under a suspended load of any kind.*

**H.    Tools - Hand and Power**

- All hand and power tools must be in safe condition for use.  The condition of all tools will be monitored on a daily basis as part of Stellar's daily job site auditing.  Any unsafe tool will be immediately removed from site or tagged out of service until properly repaired.

- All power tools designed to accommodate safety guards must be equipped with those guards before the tool can be used on site.  If guards have been removed, the tool cannot be used on site.

- All tools which are damaged and still on site must be tagged "DO NOT USE" until they are repaired or removed from the site.

- All powder actuated tools must only be used by trained personnel *(see Safety Training Documentation note on page 9)*.  Powder actuated tools may not be carried "loaded", must not be used around flammable vapors or combustible dust, and must be unloaded before returning it to the tool shed, trailer or toolbox.  All loads must be properly stored (not in tool) when not in use and disposed of after use.  When loaded, tools may not be put in storage (e.g., a tool or gang box).

*NOTE:  Loose clothing, rings, or other jewelry must not be worn around operating tools and machines or when using tools or machines.  Long sleeves must be kept buttoned.*

**I.    Welding and Cutting**

*NOTE:  All welding leads and cords must be kept off the floor to as great an extent as possible to minimize trip and fall hazards.  Cord trees, hooks, etc. should be used to keep welding leads and cords off the floor.*

- Welding tanks must be properly stored when not in use.  "Not in use" is defined as having the regulator and hoses removed.  Proper storage means valve caps are on and acetylene and oxygen tanks are separated by at least 20 feet.  Therefore, once the regulator and hoses are removed, the tanks must be properly stored.  Since acetylene and oxygen must be separated, the tanks cannot be left together in a welding cart -- one tank must be removed.

*NOTE:  Via letter of interpretation, OSHA has stated that compressed gas cylinders are not considered to be in storage if they will be used within the next 24 hours.  This is regardless of whether or not they have a hose and regulator on.   Therefore, welding tanks can be left together in welding carts overnight with or without hose and regulator.*

- All tanks must be secured in an upright position, whether full or empty.

- Prior to cutting into any lines (electrical, water, steam, etc.), positive steps must be taken to ensure the line is de-energized, unpressurized, or otherwise "dead" *(refer to the Cutting -- Welding - Hot Work Permit at the end of this plan)*.

- Welding blankets or other protection shall be used to prevent fire hazards and/or damage to surrounding materials from slag or sparks.

- A fire extinguisher will be readily available (within 25') at each welding site.

- Proper eye protection & protective clothing must be worn by personnel engaged in welding, cutting or grinding activities.  Welding screens shall be used as necessary to protect other workers from flash burns.

24

## J.      Electrical Distribution and Equipment

*NOTE: All welding leads and cords must be kept off the floor to as great an extent as possible to minimize trip and fall hazards. Cord trees, hooks, etc. should be used to keep welding leads and cords off the floor.*

- The use of ground fault circuit interrupters (GFCI) is essential to ensure electrical safety. When using any electrical power (from either temporary or permanent wiring) that is not GFCI protected, a GFCI "pigtail" must be added to the circuit.

*NOTE: The GFCI pigtail should be located at, or as close as possible to, the electrical outlet or source of power so that it protects as much of the circuit as possible.*

- All temporary electrical circuits provided, shall have GFCI type outlets or GFCI circuit breakers.

- All extension cords used on site must be of the three-wire type and shall be rated for heavy duty use (e.g., types S, ST, SO).

- Extension cords and power tool cords shall be inspected frequently for damage to the insulation, separation of the insulation from the plug end or grounding prongs missing. If any cord is damaged in these ways, it must be tagged "DO NOT USE", be made unavailable for use until it is properly repaired, or it must be removed from the site.

- The condition of all extension cords will be monitored on a daily basis as part of Stellar's daily job site auditing. Any unsafe extension cords will be immediately removed from site or tagged out of service until properly repaired.

- Any repairs made to electrical cords must provide insulation and weatherproofing equal to that of the original condition (e.g., an extension cord that has the outer insulation cut but all outer insulation is still present can be repaired with electrical tape; a cord that has been cut through, the wires spliced together and taped with electrical tape to provide insulation is <u>unacceptable</u>).

*NOTE: All repairs must be done by a qualified person trained in electrical repairs (e.g., journeyman electrician or equivalent).*

- Any electric panel which is opened and presents a hazard from inadvertent contact must be barricaded off or otherwise protected to limit access to it. All panels must be appropriately labeled "Hot"/"energized"/"live" or "cold"/"dead". Open electrical panels which are energized must not be left unattended. When workers leave the open panel area, the panel shall be closed and locked out to prevent any possibility of accidental electrocution.

- When de-energizing an electrical circuit to conduct work, a positive means of locking out (tagging out is not acceptable) the circuit must be used to prevent anyone else from inadvertently re-energizing it.

- The use of "job-made" electrical gang boxes is prohibited. Electrical parts may not be used for purposes which they were not designed for -- e.g., interior wall wiring cable used as extension cords; interior wall junction box (type with knockouts) used to make extension cord gang box; etc.).

- All temporary wiring must be located where it will not be subject to damage, must be supported every 10' minimum and must not lay on or run across the floor.

25

- All temporary lighting installed must be a minimum of 8' above the floor, all light bulbs must have protective cages, and lights cannot be suspended from their electric cords.

*NOTE: Brass shell, paper lined, or pin type lamp holders shall not be used for temporary lighting. Wire that has pin holes from previous temporary lamp holders or other damage shall not be used for temporary lighting.*

- Clearance, both vertical and horizontal, from overhead electrical lines must be maintained at all times. Clearance distances are dependent upon the voltage of the overhead lines and at a minimum must meet the requirements as outlined in CFR 29 Part 1926.403(i) and (j).

*NOTE: Special planning and precautions must be taken when storing materials, equipment, or machinery below, next to, or near overhead power lines. Permission to store materials, equipment, or machinery in these locations must be coordinated and approved by the on-site Stellar superintendent.*

## K.    Scaffolding, Stairways and Ladders

*NOTE: Each contractor whose employees use scaffolding must have a competent person on the job site who is trained to understand and enforce the scaffolding standard. The competent person must choose workers to erect/dismantle the scaffold train the workers and inspect the scaffolding daily or once per shift, whichever is most frequent. The competent person must determine safe access to the scaffolding, structural integrity, fall protection needs and mixing or modifications of scaffolding components.*

- All scaffolds must be inspected by the competent person daily and tag safe for use, or otherwise tagged out of service.

- All scaffolds in use with platforms greater than 6' above a lower level must have guardrails and toeboards installed on all open sides including scaffold ends. For any scaffold above 6' where guardrails are not feasible to be installed, use of the scaffold without guardrails must first be approved by Stellar.

- Scaffolds must be braced at locations to support both inner and outer legs.

- All planking must be of scaffold grade and be in good condition with no splits, cuts, loose knots, chips or breaks.

- Unstable objects (stacks of wood, concrete blocks, etc.) shall not be used to support scaffolds or platform units.

- Each platform on all working levels of scaffolds shall be fully planked or decked between the front uprights and the guardrail support in accordance with OSHA scaffold requirements. There may be a maximum gap of 1" between planks, except where a wider space is necessary due to scaffold construction, type, support member, or other obstruction.

- Each scaffold platform and walkway shall be at least 18 inches wide. Each end of a platform, unless cleated or otherwise restrained by hooks or equivalent means, shall extend over the centerline of its support at least 6 inches.

- The maximum distance from the front edge of all scaffold platforms to the face of the work may not exceed 14" except for:

- outrigger scaffolds where the distance may not exceed 3"
- plastering and lathing operations where the distance may not exceed 18"

- A safe access must be provided when scaffold platforms are more than 2 feet above or below a point of access.

- All stairways in use shall be kept free of demolition debris, building materials, tools, electrical cords, or other obstacles. Stair treads must be maintained in good condition.

- All stairs having four or more risers or rising more than 30" (whichever is less) shall have at least one handrail and one stair rail system along each unprotected side. Handrails must be between 30" and 37" from the surface of the tread edge to the top of the handrail.

**NOTE:** _Standard A-frame ladders (step ladders) are not allowed on site. In their place, "platform" or "podium" ladders should be used. Theses ladders have a platform integrated into the ladder frame so that when opened up for use, a working platform is created. When using a platform/podium ladder, no work is to be done while standing on the steps. Work must only be done while standing on the platform. Different size/height ladders may be necessary for your crew's activities._

- All ladders in use must be undamaged, rated for construction use, kept clean of dirt, oil and grease, and when in use, be properly tied-off and extended 36" above the landing area.

- Ladders which are damaged must be tagged "DO NOT USE", be made unavailable for use, or be removed from the job site.

- Step/platform ladders shall not be used as straight ladders.

- The top two steps of step ladders must not be used for standing or sitting.

- Anywhere there is a break in elevation of 19 inches or more shall have a stairway, ladder, ramp, sloped embankment or hoist at all points of personnel access.

- Maximum lengths of ladders are as follows:

|  |  |
|---|---|
| - Extension ladder | 44' |
| - Single cleat ladder | 30' |
| - Double cleat ladder | 24' |

- Minimum overlap on extension ladders is 10% of the working length of the ladder.

- To ensure that ladders are set-up at a proper climbing angle or pitch, the distance from the foot of the ladder to the base of what it is leaning against should be approximately 1' for every 4' of height.

**NOTE:** _Prior to using any ladder (either extension or step ladder), the employee using it must ensure it is set up correctly, including being tied off if required, and test its stability by stepping onto the bottom rung to ensure the ladder is stable and capable of supporting the employee's weight without tipping over or sliding out when the employee climbs up on it._

**L.    Fall Protection**

**NOTE:** _Fall protection for ladders and scaffolds are covered under Section K (beginning page 26) and for steel erection under Section Q (beginning page 30)._

- Wherever a fall potential of 6 feet or greater exists, fall protection must be provided by use of one of the following systems:

> - guardrails and toe-boards;
> - body harnesses and shock absorbing lanyards for tie-offs; or
> - safety monitor with warning line.

- Examples where fall protection may be required include roof edges, trench/excavation edges, pre-cast concrete erection, interior floor or mezzanine levels, door and window openings, truck docks, working in man-lifts, elevated catwalks, working on top of tanks, vessels or machinery, etc.

- All elements of a fall protection system (e.g., PFA, anchorage points, life lines, etc.), whether used as part of an arresting system or as a restraint system, must meet the static load requirements outlined in the chart under **Fall Protection Static Load Requirements** (per ANSI Z359 Fall Protection) in the Specific Safety Requirements section of this safety plan.

- When working in any articulating man lift (e.g., snorkel, boom, knuckle lift, etc.) or scissors lift, personnel must be tied-off with a full body harness with shock absorbing lanyard.

***NOTE:*** *In certain circumstances the basket of a lift may not be able to get high enough due to the presence of structural building members or overhead MEP or refrigeration piping, ductwork, etc. In these situations, personnel may have to exit the lift basket in order to access or reach their work. Exiting the lift basket while at height can only be done under the auspices of an approved Exception to policy for Exiting an Aerial Lift form (attached in the form section of this plan.).*

- All roof and floor openings with a minimum dimension of 2" or greater which present a fall potential greater than 6 feet must be protected or guarded at all times. They must have a cover secured in place and marked "Danger Hole – Do Not Remove" or have standard guardrails/toeboards around the hole.

## M.    Cranes, Hoists, Elevators, Conveyors

***NOTE:*** *No personnel shall work under a suspended load of any kind.*

- All manufacturer's specifications and limitations must be complied with.

- All cranes on site must have a record of annual inspections and an operating/service manual(s).

- Only designated personnel, with proper certification, will operate cranes. ***Employees qualified to operate equipment and machinery must be documented on the Operator Qualification Record form.***

- No part of a crane or its load must be operated within 10' of electric power lines.

- Swing arcs will be roped off or barricaded.

- Rated load capacity must be clearly marked and operating procedures posted by the operator.

- All equipment fitted with outriggers will have them properly extended when equipment is in use.

***NOTE:*** *All equipment and machinery must be inspected each day prior to its use. All inspections must be documented on the Equipment / Machinery Daily Inspection Record sheet.*

28

**N.**    **Mechanized Equipment Operation**

***NOTE:*** *No personnel shall work under a suspended load of any kind or raised equipment bucket.*

- Only designated personnel, qualified by training or experience may operate mechanized equipment. *Employees qualified to operate equipment and machinery must be documented on the Operator Qualification Record form.*

- As required by OSHA, all moving equipment with restricted rear visibility must either have an operating back-up alarm <u>or</u>, if there is no back-up alarm or it becomes inoperable, <u>a spotter must be used any time the equipment is engaged in backing operations</u>.

***NOTE:*** *In addition to the basic OSHA requirements, Stellar spotter requirements are considerably more extensive; see* Use of Spotters *paragraph in the Specific Safety Requirements of this safety plan.*

- Rated load capacity will be marked on the equipment and operating instructions clearly posted by operator's seat/position.

- Seat belts will be worn by operators in all equipment where seat belts are provided.

- No one may ride on any piece of equipment or vehicle except those intended to transport personnel. This includes riding on running boards, tow bars, top of a load, in equipment buckets, etc.

***NOTE:*** *All equipment and machinery must be inspected each day prior to its use. All inspections must be documented on the Equipment / Machinery Daily Inspection Record sheet.*

**O.**    **Excavations**

***NOTE:*** *No personnel shall work under a suspended load of any kind or raised equipment bucket.*

- The locations of underground utility lines must be determined before any contractors begin digging in an area. If contractors are at all <u>uncertain</u> about the location of a <u>possible</u> utility line, they are prohibited from even digging cautiously to avoid hitting it.

- All trenches 5' or more in depth must have sides shored, sloped or benched. Trenches 4' deep or greater must have an adequate means of access/egress (ladder, ramp or steps) at least every 25'.

- All spoil or other loads shall be retained at least 2' or more from the edge of the excavation.

***NOTE:*** *All excavations will be inspected daily by a competent person. In any excavation showing signs of collapse or cave-in, all work will cease immediately. Personnel will be evacuated until adequate precautions can be taken to make the excavation safe.*

**P.**    **Concrete and Masonry Construction**

***NOTE:*** *No personnel shall work under a suspended load of any kind.*

- No personnel shall work under a concrete bucket in use. Elevated concrete buckets shall be routed so that <u>no</u> employees are exposed to the hazard of falling concrete buckets.

29

- Employees applying mixtures using pneumatic hoses shall wear protective head/face equipment.

- Scaffolds used for masonry wall construction shall meet all scaffolding requirements.

- A limited access zone (for employees actually building the wall) shall be established on any side of a masonry wall which is not scaffolded or otherwise protected from falling. The limited access zone will be equal to the height of the wall plus 4 feet.

- Masonry walls over 8' tall must be adequately braced to prevent overturning or collapse.

- All exposed rebar which employees could fall onto or into, shall be guarded or covered by some means to eliminate impalement hazards.

*NOTE:  The typical orange, plastic "mushroom style" rebar caps commonly used on construction sites are not considered adequate impalement protection.  They only provide scratch and cut protection.  Only rebar caps which are designed to provide impalement protection should be use for such.*

*NOTE:  To ensure the prevention of silica over-exposure, all concrete and masonry saw cutting, chipping, grinding, or other activity with the potential to create concrete/masonry dust, must be done with equipment that uses an integrated water system to eliminate any dust created or vacuum/exhaust system that filters the silica dust created.  If these methods are not feasible, any dry cutting, chipping, grinding, etc. must first be approved by Stellar.  Any wearing of "dust masks" by workers must be on a voluntary basis and cannot be mandated as a method of silica exposure protection unless those employees meet all requirements of 29 CFR 1926.1153 including Appendix B.*

**Q.    Steel Erection**

*NOTE:  No personnel shall work under a suspended load of any kind.*

- Prior to the beginning of steel erection, the erector will be provided with written notifications of:

    - Certification of proper curing of concrete in footings, piers, etc. for steel columns
    - Any repairs, replacements, and/or modifications to anchor bolts
    - A safe site layout including pre-planning routes for hoisting loads

- Pre-planning of key erection elements will be coordinated with the erector.

- Each column will have a minimum of four (4) anchor bolts.  Any anchor bolts that have been modified in the field will be tested for proper strength prior to setting a column on it.

- All deckers must work in a controlled decking zone (CDZ).  Deckers, and connectors, in a CDZ must be protected at heights greater than 6 feet.

- Connectors working above 6 feet must wear fall arrest or restraint equipment and be able to be tied off or be provided another means of fall protection.

- Fall protection for all others engaged in steel erection at heights greater than 6 feet is required.

- Tag lines will be used to control all loads.

- Multiple lifts ("Christmas treeing") may only be done within the strict guidelines of OSHA regulations (CFR 29 Part 1926.753(e)).

- All specific procedures outlined in CFR 29 Subpart R, Steel Erection, must be strictly adhered to including:

> - structural steel assembly;
> - column anchorages;
> - setting columns, beams, open web joists; and
> - providing falling object protection.

- All sections of CFR 29 Subpart R also apply to Systems-engineered metal buildings, with the exception of column anchorage and open web steel joists requirements.

- Anyone "riding the ball" will be dismissed from the job site immediately and will not be allowed to work on site for the remainder of the job.

***NOTE: All steel workers exposed to fall hazards or that are engaged in special, high risk activities must be trained in hazard recognition and abatement of those hazards.***

**R.  Demolition**

***NOTE:  No personnel shall work under a suspended load of any kind or raised equipment bucket.***

- All aisle ways, stairwells, doorways, access/egress points and other traffic areas shall be kept free of debris to eliminate slip, trip and fall hazards. Debris shall be cleared out daily to prevent fire hazards, trip and fall hazards, and avoid restricting access into and out of work areas.

- When debris chutes are installed to facilitate clearing of debris, if the chute is greater than 45 degrees from horizontal, the chute must be entirely enclosed. The chute opening into which debris is dumped must be protected by a guardrail (if bottom of opening is less than 39 inched from the floor) to provide fall protection for employees.

- Masonry walls and other debris shall not be allowed to fall or accumulate to the point where the safe carrying capacity of the floor is exceeded.

## *"Adherence to all safety policies*
## *and procedures is a condition of employment*
## *on Stellar job sites."*

**Fall Protection**

***NOTE:  100% fall protection is required at all times when exposed to fall hazards of 6' or more.***

- Fall protection for any trade working on the roof or at height of 6' or greater will be the responsibility of each subcontractor involved and must meet OSHA 1926 Subpart M or Subpart R regulations as applicable.

- In any areas where there is a fall hazard potential of 6' or more, a fall protection system must be installed and/or utilized. Either a **guardrail system, a safety net system,** or a **personal fall arrest (PFA) system** functioning as either an **arresting device** or as a **restraining device,** with an appropriate anchorage point with an appropriate anchorage point (see Fall Protection Static Load Requirements section below).

***WARNING:  When using a PFA, DO NOT tie off to overhead electrical conduits, fire sprinkler piping, drain lines, process piping or other mechanical equipment incapable of providing necessary anchorage.***

- The recommended primary means of providing fall protection for trades working on the roof (other than those involved in roofing work) will be a warning line system placed a minimum of 15' back from each unprotected roof edge with a fall potential of six feet or greater.  When working on the roof surface within the area formed by the warning line (and/or other physical barrier – e.g., parapets, screening, etc.), additional fall protection will not be necessary.

- In any areas where work must be done outside of the warning line, a **personal fall arrest (PFA) system** functioning as either an **arresting device** or as a **restraining device,** with an appropriate anchorage point (see Fall Protection Static Load Requirements section below), will be required when working outside of the warning line, unless another fall protection system is in place.

- Fall protection for those workers involved in roofing work (patching/repair) will be the responsibility of each subcontractor involved and must meet OSHA 1926 Subpart M regulations for roofing work operations.  For any scope of roofing work where fall protection cannot be provided via one of the standard methods outlined by OSHA regulations, a **written fall protection plan** must be submitted by the subcontractor for Stellar's review prior to the start of any roofing work.

- For any scope of work where fall protection cannot be provided via one of the standard methods outlined by OSHA regulations, a **written fall protection plan** must be submitted by the subcontractor for Stellar's review and acceptance prior to the start of roof work.

- The written fall protection plan must address the specific method(s) to be used in providing fall protection and how the plan will be implemented.  The on-site superintendent or foreman for the subcontractor will be responsible for ensuring all roofing crewmembers comply with the plan.  **Full compliance with OSHA 1926 Subpart M is mandatory.**

- If allowed by OSHA standards and used, a **Safety Monitor** must:

> - be designated by the employer and be competent in the recognition of fall hazards;
> - be capable of detecting unsafe practices and warning workers of fall hazard dangers;
> - operate on the same section of roof as, and be able to see, the workers being monitored;
> - be close enough to work operations to communicate orally with workers; and
> - have **NO** other duties to distract from the monitoring function.

- When used, **Warning Lines** must:

33

- be erected around all sides of the work area and have access points connected to the
  work area by an access path formed by two warning lines;
- be at least 6 feet from the edge for roofing work (10 feet if mechanical equipment is being
  used) and 15 feet from the edge for all other trades
- consist of ropes, wires or chains and supporting stanchions erected as follows:

  - the rope, wire or chain must be flagged every 6 feet;  sag no lower than 34" and
    be no higher than 39";  and have a tensile strength of 500 lbs.
  - stanchions must be capable of resisting, without tipping over, a force of at least
    16 lbs. applied horizontally;
  - the line must be attached in such a way that pulling on one section of the line
    between stanchions will not result in slack being taken up in adjacent sections
    before the stanchion tips over.

## Fall Protection Static Load Requirements (per ANSI Z359 Fall Protection)

- All elements (e.g., lanyard, snap hook, anchorage point, D-ring, etc.) of a fall protection system
must meet the below static load requirements.

| System | Non-Certified | Certified |
|---|---|---|
| Fall Arrest Systems | 5,000 lbs. | 2 X maximum arresting force |
| Work Positioning Systems (i.e., support on an elevated vertical/inclined surface) | 3,000 lbs. | 2 X foreseeable force |
| Restraint & Travel Systems | 1,000 lbs. | 2 X foreseeable force |
| Rescue Systems | 3,000 lbs. | 5 X applied load |
| Horizontal Lifelines | | Must sustain at least two times the max. tension developed in the lifeline during fall arrest in the direction applied by lifeline forces |

- All fall protection systems will be considered as **Non-certified** unless documentation of system
certification is provided.

***NOTE:*** *A certified system is one which is designed, selected, and installed by qualified person(s).  It is a
system design which is documented by a process of testing or analysis by a nationally accepted engineering
methodology.*

## Warning Line Use As Fall Protection Method

- In specifically identified circumstances, the use of a warning line (6' back from the edge), in
combination with other measures as an alternative to conventional fall protection, is permitted for the
purpose of keeping employees away from an unprotected roof edge.  Those circumstances are:

  - Low-sloped roof work
  - Some leading edge work
  - Precast concrete erection
  - Residential construction

34

- Other than the above four instances, warning lines are not permitted by CFR 1926 Subpart M as an alternative to conventional fall protection. However, OSHA has determined that in the areas further back from the distances specified for the warning lines permitted under the fall protection standard, there is a point that is sufficiently far from the edge to warrant the use of a warning line.

- At 15 feet from the edge, a warning line, combined with effective work rules, can be expected to prevent workers from going past the line and approaching the edge. Also, at that distance, the failure of a barrier to restrain a worker from unintentionally crossing it would not place the worker in immediate risk of falling off the edge. Therefore, a warning line can be used if it meets the following criteria:

> - It is used 15 feet or more from the edge
> - The warning line meets or exceeds the requirements for warning lines in Subpart M
> - No work or work-related activity is to take place in the area between the warning line and the roof edge
> - Effective work rules prohibiting employees from going past the warning line have been implemented

- For any worker or trade (other than the four instances listed above), the use of warning lines as fall protection closer than 15 feet from the roof edge is not permitted as a substitute for conventional fall protection. Furthermore, when these workers or trades use a warning line system in accordance with the policy described above, the workers must use conventional fall protection when they are outside the protection of the 15' warning line system.

**Material Roof Access and Fall Protection**

- Material access to the roof may need to occur at multiple locations on the roof. Specific access points should be established as necessary for all trades to use.

- Along the roof edge where a warning line is used, the warning line should be configured with a removable section to allow for a specific loading zone at the roof edge. Fall protection for the personnel involved in unloading/loading materials in the area between the roof edge and the warning line must be provided by a personal fall arrest system functioning as either a fall arrest device or as a restraining device with appropriate anchorage point.

- Upon completion of the unloading/loading operations, the crew removing the warning line is responsible for ensuring that it is properly reinstalled to maintain the integrity of the warning line system.

- A temporary guardrail system (meeting OSHA standards) may also be erected to allow close approach to the roof edge. The guardrail must be erected from the near the edge the full 15' back to connect to the warning line. If the guardrail uses a gate or removable section for loading/unloading material, a PFA must be used while the gate is open or section of guardrail removed.

**Roof Access**

- Access to the roof will be provided via external scaffold stair tower. It will be located to provide the safest and most convenient access for all contractors on site.

- If an extension ladder is used for roof access, it must extend a minimum of 36" above the roof level and be tied-off or otherwise secured to prevent it from falling over. The ladder feet must be placed on an

even, level, and firm surface. Tools and supplies must not be carried while climbing up or down the ladder. Tools and supplies must be hoisted to, and lowered from, the roof by rope, lifts or other means.

- If a man lift (scissors or articulating) is used for roof access, the gate of the lift must be aligned with the roof edge and the floor of the basket must be level with the roof level for personnel to exit the basket through the gate directly onto the roof. A landing area on the roof must be created with warning lines forming a pathway leading directly away from the roof edge to the work area (formed by guardrails or other warning lines) at least 15' from the roof edge.

## Roof/Floor Openings

- Openings may be created in the roof at various locations for the removal/installation of mechanical equipment. Any of these holes which have a minimum dimension of 2" or greater must be covered immediately after being created. The holes will be covered or protected by one of the following methods:

> - the equipment to be installed;
> - a cover, secured in place and marked "Hole - Do Not Remove";
> - a standard guard rail and toeboards.

- All other holes, in any roof/floor section, meeting the above criteria must also be covered/guarded in a similar fashion. AT NO TIME WILL ANY HOLE BE LEFT UNCOVERED OR UNGUARDED.

## Fall Protection While Setting And Installing Roof Top Equipment And Piping

- The requirement to have fall protection for all personnel working 6' or more above a lower level will apply while setting and installing roof top equipment and piping.

- A large portion of the work involved in setting and installing the roof top equipment and piping can be safely done working from ladders (properly supported/tied off). For work which cannot be safely accomplished from a ladder, scaffold will be erected. All scaffold working levels must be fully planked and levels above 10' must have complete guardrails on all open sides and ends.

- Fall protection for situations where ladders or scaffolds cannot be used will require workers to use personal fall arrest systems with appropriate anchorages.

## Fall Protection On Elevated Interior Levels

- Elevated floors (2nd, 3rd, etc.), mezzanine levels, and interior roofs may have window and door openings or unprotected edges which present fall hazards.

- At any opening, unprotected edge, or other location where a fall potential of 6' or greater exists (including window openings with sill less than 39" above the floor level), a guardrail system will be erected.

- The guardrail system will consist of a top-rail capable of supporting 200# vertically or laterally, a mid-rail (unless the wall comes up 21" or more), and toeboard if personnel work or walk below the opening.

36

**Fall Protection in Aerial Lifts**

- All personnel working in any type of aerial lift, including scissors lift, must be tied off. This includes while working at height or driving the lift in an un-elevated position to move it around the site.

- Only the manufacturers' designed/engineered tie-off points in the lift basket should be used to tie-off. The top and mid rails of the basket guard rail must not be used as tie-off points.

**NOTE:** *Weight limitations (i.e., combined weight of personnel, tools, and materials) of the aerial lift must be strictly adhered to.*

**NOTE:** *In certain circumstances the basket of a lift may not be able to get high enough due to the presence of structural building members or overhead MEP or refrigeration piping, ductwork, etc. In these situations, personnel may have to exit the lift basket in order to access or reach their work. Exiting the lift basket while at height can only be done under the auspices of an approved Exception to Policy for Exiting an Aerial Lift form (attached in form section of plan).*

**Ladder Usage On Site**

- Standard A-frame ladders (step ladders) are not allowed on site. In their place, "platform" or "podium" ladders should be used. Theses ladders have a platform integrated into the ladder frame so that when opened up for use, a working platform is created.

**NOTE:** *When using a platform/podium ladder, no work is to be done while standing on the steps. Work must only be done while standing on the platform. Different size/height ladders may be necessary for your crew's activities.*

- Where an extension ladders is used, it must extend a minimum of 36" above the dismount level and be tied-off or otherwise secured to prevent it from falling or sliding over. The ladder feet must be placed on an even, level, and firm surface, and when possible, secured to prevent them from sliding.

- Three points of contact must be maintained while climbing or descending the ladder. To maintain three points of contact, tools and supplies must not be carried while climbing up or down the ladder. Tools and supplies must be hoisted to, and lowered from, the working level by rope, lifts or other means.

**Use of Spotters**

**NOTE:** *The use of spotters is intended to apply to ground (horizontal) movement of a piece of equipment for repositioning or traversing the job site. Spotting for the elevated (vertical/articulating) movement of the equipment for operational purposes is left to the equipment operator and associated crew members as necessary.*

- It is the responsibility of each mechanized equipment operator to ensure the safe operation of the equipment they are operating; confirming appropriate clearance from fixed objects, property and personnel. Many tasks and job conditions will warrant the need for a spotter. The required use of a spotter for a particular task or situation will be made at the discretion of the site superintendent or site safety manager.

- Mechanized equipment includes, but is not limited to: Forklifts, Aerial lifts, Boom lifts, Skid steer, Trencher, Loader, Excavator, etc.

37

- When mechanized equipment is to be used, it must be identified as part of the daily Safe Plan of Action (SPA) and whether or not a spotter is to be utilized with its use. If the need for a spotter is not identified as a control measure on the SPA, the site safety manager or superintendent must approve the non-use, exemption, or alternate control measure being utilized in lieu of a spotter.

- While the operator has overall responsibility for the safe operation of the mechanized equipment, the spotter, when used, is responsible for the safe traverse of the mechanized equipment, ensuring a safe path of travel while maintaining appropriate clearance from personnel, structures, and equipment. The spotter serves as an authority to observe and communicate to the mechanized equipment operator of any persons or property that are in close proximity, or in danger of being in the traversing path of the mechanized equipment. While not an all-inclusive list of responsibilities, the following serve as guidance and expectations of spotters. The spotter will:

- Walk and pre-assess the jobsite prior to the mechanized equipment traversing the jobsite. Pre-assessing the jobsite includes, but is not limited to:
  - Ground obstacles
  - Ground/soil conditions
  - Changes in elevation
  - Proximity of structures, utilities or other potential sources of property damage
  - Location and proximity of other personnel/activities to path of traverse
- Maintain his/her own safe distance from the mechanized equipment.
- Consistently position/reposition themselves in a manner that allows for them to view the traverse path of the mechanized equipment, observe all critical equipment movements, and maintain visual contact with the operator for utilization of hand signals as necessary.
- Establish a mode of communication which will be uninhibited between the operator of the mechanized equipment and the spotter.
- Maintain 100% communication with the operator. Communication can be achieved through: visual combined with voice/hand signals and/or 2-way radio.
- Consider jobsite conditions and noise levels to ensure communication can be / is maintained and uninterrupted throughout the traversing of the equipment.
- If hand signals are to be utilized, ensure that the spotter and the operator fully understand and agree upon the meanings of the hand signals to be utilized
- As needed, instruct the operator to halt traversing until the spotter gives appropriate acknowledgement that the area is clear.
- If the spotter determines it is unsafe, or the area is not sufficient in size for the mechanized equipment to traverse in, an alternative path or means to complete the work is to be determined.

- Examples of when a spotter may be deemed required/necessary:

- For equipment movement operations that are deemed in close proximity to any structural element or staging area.
- Moving aerial/boom lifts within a jobsite. Even when an employee is needing to move down an overhead pipeline or conduit run, even for a short distance, a spotter may be necessary to ensure clearance from personnel/equipment/property.
- Any movement of mechanized equipment within a closed/congested facility.
- Movement of a powered industrial truck/forklift on a jobsite to load/unload material. Even if this is a continuous task, a spotter may be required the entire time.

38

- Certain conditions and tasks are exempt from the spotter requirements; these exemptions will be granted by either the site superintendent or site safety manager. While not an all-inclusive list, the following conditions may warrant exemption from Stellar's spotter requirements:

> - Site surcharging activities where the area has been deemed clear of objects/personnel.
> - Earth moving activities, where primary jobsite activities contain multiple heavy mechanized equipment operators, where the use of a spotter may interfere with operations.
> - Open building pads with no obstructions, well-marked anchor bolts, stub-ups, excavations, etc.

- While the above conditions and examples are not all inclusive, the daily SPA will identify the use of mechanized equipment and the controls to be utilized. At the discretion of the site safety manager and superintendent, a spotter may be deemed necessary to prevent injuries and damage to property.

## PPE Hazard Assessment

- As outlined in the General Safety Requirements section of this plan, hard hats, eye protection, safety work boots with safety toe, hi-vis outer garment, and task appropriate gloves must be worn at all time while out on site. Long pants and shirts with minimum 4" sleeves are also considered PPE and must be worn at all times. Additional PPE will be dependent upon job specific tasks.

-Personal protective equipment (PPE) must be worn as necessary to prevent injury when involved in certain construction activities. The below chart assesses the injury potential and lists the required PPE which must be worn and/or utilized for typical construction activities.

| Construction activity | Potential hazards | Required PPE |
|---|---|---|
| Working at heights above 6 ft. (10 ft. on scaffolding; 15 ft. for steel erection) | Falls to lower levels | Full body harness with shock absorbing lanyard |
| Working in operating compressor rooms, other high noise areas | Hearing loss | Ear plugs or ear muffs |
| Working on ammonia piping, valves & controls (e.g. pump down, tie-ins, etc.) | Ammonia burns (skin), foreign objects in eye | Safety glasses, face shield, long sleeve shirt, gloves |
| Working with wet cement, concrete | Alkali burns (skin), foreign objects in eye | Rubber boots, safety glasses, face shield when operating pump hose |
| Sawing/drilling concrete, CMU, brick (dry) | Silica inhalation, foreign objects in eye, hearing loss | NIOSH rated particulate dust mask (APF 10 or greater), non-ventilated goggles, ear plugs or ear muffs |
| Sawing concrete, CMU, brick (wet) | Foreign objects in eye, hearing loss | Safety glasses, ear plugs or muffs |
| Using hand-held power drills, circular saws, hammer drills | Foreign objects in eye, hearing loss (if operating for long time periods), particulate inhalation | Safety glasses, ear plugs or muffs, NIOSH rated particulate dust mask as needed |
| Cutting, brazing, grinding | Foreign objects in eye, burns | Safety glasses, face shields, leather gloves |
| Welding (acetylene) | Slag burns, flash burns, fume inhalation | Welding hood with #5 shade or higher, leather gloves, respirator as needed |
| Welding (rig) | Slag burns, flash burns, fume inhalation | Welding hood with #10 shade or higher, leather gloves, respirator as needed |

| Handling, working with insulated metal panels | Lacerations to hands | Gloves with leather palms |
|---|---|---|
| Cutting insulated metal panels | Foreign objects in eye, hearing loss | Safety glasses, ear plugs or muffs, gloves with leather palms |
| Working with foam paks | Foreign objects in eye | Safety glasses |
| Painting (epoxy base) | Foreign objects in eye, paint fume burns (eyes, lungs) | NIOSH approved respirator, non-ventilated goggles |
| Painting (non-epoxy base) | Foreign objects in eye | Safety glasses |
| Material handling | Strains, sprains, twists | No PPE available – use mechanical means and/or get assistance |
| Clean up of blood | Exposure to blood borne pathogens | Latex gloves, face shield, apron |

- Any construction activity not listed above must be evaluated for potential hazards _prior_ to starting work to determine the necessary PPE required to avoid injury.

- Other PPE will be required as needed by the Superintendent.


**Carbon Monoxide and Gasoline, Diesel, and Propane Powered Equipment**

- Gasoline, diesel, and propane powered equipment all produce carbon monoxide (CO) as a byproduct of their operation. During early stages of construction, prior to the building becoming enclosed, the CO does not build up and pose a health hazard. The use of any gasoline, diesel, or propane powered equipment during this stage of construction is permitted.

- Upon substantial enclosure of the building, when the flow of fresh air into the building becomes restricted, the CO can build up and become a health hazard. Once the building is essentially enclosed and the volume of air inside cannot be exchanged at a quick enough rate, gasoline, diesel, and propane powered equipment should no longer be used inside. _Electrical equipment should be used instead._

- If electrical equipment cannot be substituted for the gasoline, diesel, or propane powered equipment, CO monitors must be placed in all areas where the CO can build up. These monitors should be set to sound an alarm if the CO reaches 35 ppm. If this level of CO is reached and the alarm sounds, all personnel must evacuate to fresh air until the level of CO is reduced to below 35 ppm.

- If work must continue in a CO contaminated space, those personnel who will work in that space must use a SCBA or air supplied respirator.


**Occupational Noise Exposure and Hearing Protection**

**_NOTE_**: _A variety of construction activities have noise levels above 85db, however, based on on-site monitoring and the constantly changing construction environment, Stellar construction sites do not create situations where personnel are exposed to sound levels above 85db on an 8-hour time-weighted average basis. Therefore, a Hearing Conservation Program is not necessary._

- Noise level monitoring of Stellar constructions sites has shown the following noise levels associated with typical construction activities:

| - Operating electric power tools: | approximately 100 db |
| - Operating gas-powered tools: | approximately 110 db |
| - Operating jackhammers: | approximately 110 db |
| - Cutting IMP panels: | approximately 110 db |
| - Working next to welding machine: | approximately  95 db |

- When engaged, or assisting, in any of the above activities, workers must wear some form of hearing protection that reduces the db level to below 90 db.

- Workers in the immediate vicinity of these activities must also wear hearing protection. To determine if you are in the immediate vicinity, use the "2 ft rule" – if you have to raise your voice to communicate with a person standing 2 feet away, you need hearing protection

- Additionally, whenever operating heavy equipment for long periods (i.e., the majority of the work day) hearing protection should be worn.

- Common forms of hearing protection typically provide the following noise reduction rates:

| - insertable foam earplugs: | 30 – 33 db* |
| - insertable soft plastic earplugs: | 24 – 27 db* |
| - over-the-ear ear muffs: | 20 – 30 db* |

- When choosing hearing protection, select appropriate type that reduces noise levels to < 90 db.

*Note:   For specific noise reduction rate, see manufacturer's information provided with hearing protection.

- Based on the monitoring of Stellar constructions sites for noise levels associated with typical construction activities and the noise reduction provided by the above mentioned typical forms of hearing protection, the following chart shows the *Permissible Exposure Limits* for construction personnel:

| Typical construction activity | Noise level with no hearing protection | Maximum length of exposure per day | Noise level with any of the above forms of hearing protection | Maximum length of exposure per day |
|---|---|---|---|---|
| Operating electric power tools | 100 dbs | 2 hours | 67 – 80 dbs | indefinite |
| Operating gas powered tools | 110 dbs | ½ hour | 77 – 90 dbs | 8 hours |
| Operating jackhammers | 110 dbs | ½ hour | 77 – 90 dbs | 8 hours |
| Cutting IMP panels | 110 dbs | ½ hour | 77 – 90 dbs | 8 hours |
| Working next to welding machine | 95 dbs | 4 hours | 62 – 75 dbs | indefinite |

- If the daily work schedule is greater than 8 hours, (e.g., 10-hour work day), the 8 hour maximum exposure time is still applicable and personnel must be assigned to duties where the noise exposure is below 85 dbs once the 8 hours maximum exposure level is reached.

41

**Use Of Lasers**

- Only qualified and trained personnel may install, adjust, and operate laser equipment.

- Maximum power output of lasers used on site must not exceed five (5) milliwatts.  If possible, laser unit(s) in operation should be set up above the heads of employees.

- Areas where lasers are used shall be posted with standard laser warning signs.

**Respiratory Protection and Silica Exposure Prevention**

***NOTE:  Prior to wearing a respirator (unless voluntarily wearing a "dust mask" type) the employee must be trained in respirator type, fit, use, limitations, emergency situations, wearing, fit checks, maintenance, and storage. Training must be done annually and the fit test is respirator specific and must be current.***

- To as great an extent as possible, all activities creating harmful vapors and dusts should be located so that the wind ventilates the area without blowing the vapors/dusts into areas where others are working.

- For protection against gases and vapors such as those created during certain welding processes, or dusts and particulates caused by dry cutting or grinding of concrete, concrete block and brick, engineering controls must be utilized if possible; otherwise an atmosphere-supplying respirator or an air-purifying respirator must be worn.

- Air-purifying respirators must meet the efficiency standards of NIOSH.  Approved respirators should be identified as having N100, N99, N95, R100, R99, R95, P100, P99, or P95 filters.

- Those personnel wearing respirators must be trained and the respirators must be fitted, worn and used in compliance with manufacturer's instructions and recommendations.

- To ensure the prevention of silica over-exposure, all concrete and masonry saw cutting, chipping, grinding, or other activity with the potential to create concrete/masonry dust, must be done with equipment that uses an integrated water system to eliminate any dust created or vacuum/exhaust system that filters the silica dust created.  If these methods are not feasible, a work plan for any dry cutting, chipping, grinding, etc. must be developed and then approved by Stellar.

- When cleaning/sweeping up inside the building, sweeping compound must be used to minimize and control the creation of any dust.

- Any wearing of "dust masks" by workers must be on a voluntary basis and cannot be mandated as a method of silica exposure protection unless those employees meet all requirements of 29 CFR 1926.1153 including Appendix B (see Note: above).

**Protection Against The Wind**

- Minimum supplies and materials will be kept on the roof in order to minimize the potential hazards of the wind blowing objects off the roof.

- All debris, scrap material and trash will be kept to a minimum and be removed from the roof daily. If possible, trash barrels or containers will be located on the roof for disposal of debris and scrap materials.

- All loose and bundled materials on the roof will be secured with cables, fasteners, ropes or other means necessary to firmly hold them on the roof.

- All loose bundled materials which are being used will have sand bags placed as ballast on all remaining materials, as individual material pieces are removed from the stack.

- During gusty winds, constant monitoring of material security will be done by all roof personnel.

## Onsite Vehicles and Traffic

- Onsite vehicles will be limited to contractor company vehicles, construction equipment and delivery vehicles. All personal vehicles must park in designated areas.

- For all vehicles driving on site, the speed limit will be 5 m.p.h.

## Stellar Hot Work Procedures

***NOTE:*** *Prior to conducting any type of hot work, all employees involved must be trained in hot work procedures – either the facility procedures or Stellar's procedures.*

***NOTE:*** *Once determined necessary by the Stellar superintendent and facility management, a Cutting – Welding – Hot Work Permit will be required for all cutting, welding, or hot work on site depending on location and/or stage of building completion.  Once permitting is in effect, as the building begins to be enclosed, the permit will become more specific in location, duration, and size of area.*

- When working in an operating plant or facility, the facility's hot work policy and procedures should be followed as required by plant personnel.  If no facility hot work policy and procedures exists, then Stellar's hot work policy and procedures should be used.

- Hot work consists of any spark and/or heat producing activity including welding, oxyacetylene cutting, grinding or soldering.

- Prior to starting any hot work activity, the area in which the work is to be done (including the area below) must be inspected, and any flammable liquids or combustible materials must first be appropriately cleaned up, flushed, moved, covered, or otherwise protected with fire resistant material.  If feasible, flammable liquids and/or combustible materials should be moved at least 35' away.

- Sparks, slag, and molten metal must be shielded or controlled to as great an extent as possible.

- If flammable liquids or combustible materials cannot be moved or adequately protected, a fire watch must be assigned.  Likewise, if it is likely that combustibles may be ignited on the opposite side of partitions, walls, ceilings or roofs by heat conduction, radiation, or sparks, a fire watch must be assigned (to both sides if necessary).

- Fire watches will have a fully charged fire extinguisher (of the appropriate type for the class of fire possible) and will remain at the site a minimum of 60 minutes after the completion of the hot work.

43

**Stellar Confined Spaces / Permit Required Confined Spaces Procedures**

***NOTE:*** *Prior to working in a confined space, all employees involved must be trained in confined space procedures – either the facility procedures or Stellar's procedures (the Confined Space Entry Permit must be completed). As necessary &/or depending on the type of confined space, required training must include recognition of confined spaces, confined space permits, confined space entrant, attendant, and/or rescuer.*

- When working in an operating plant or facility, the facility's confined space/permit confined space policy should be followed as required by plant personnel.  If no facility confined space/permit confined space policy exists, *or*, in situations where confined spaces are created during new construction, then Stellar's confined space/permit confined space policy should be used.

- A *confined space* is one which is:  1) large enough so that a worker can physically enter the space and perform work;  2) has limited or restricted means for entry or exit; and  3) is not designed for continuous employee occupancy.

***NOTE:***  *Construction excavations/trenches 5' and deeper can be considered confined spaces depending on the width and configuration of the excavation/trench.  Each excavation/trench is unique and must be evaluated by a competent person.  Excavations/trenches considered to be confined spaces must have their atmosphere tested prior to personnel entering the excavation/trench.*

- In addition to the above requirements, a *permit required confined space* also has one or more of the following:

    a. Contains or has a potential to contain a hazardous atmosphere;
    b. Contains a material that has the potential for engulfing an entrant;
    c. Has an internal configuration such that an entrant could be trapped or asphyxiated by inwardly converging walls or be a floor which slopes downward and tapers to a smaller cross-section; or
    d. Contains any other recognized serious safety or health hazard.

- All *permit required confined spaces* must be identified and marked with a danger sign.  In addition, the following procedures will apply:

- Training must be conducted prior to assigning permit space work.  All affected employees are to be instructed as to the duties and responsibilities, hazards and repercussions of entering a permit space.
- There must be sufficient personnel to include confined space entrants, attendants, and rescuers, as necessary
- Personnel involved must be trained in use of special equipment such as, SCBAs, air-line respirators, etc.
- Employees will not enter permit-required confined spaces without first obtaining a permit.
- A potential entrant into a permit-required confined space must first obtain a permit from an entry supervisor.
- Atmospheric testing to assure safe entry will be performed and documented on the permit.  If necessary, ventilation or other appropriate abatement techniques will be administered to the space throughout entry to assure safe atmospheric conditions.
- Lines of communication between entrants and attendants must remain in place anytime an entrant is in a confined space.

**Stellar Lockout/Tagout Procedures**

*__NOTE__:  Prior to working on a lockout/tagout piece of equipment or system, all employees involved must be trained in lockout/tagout procedures – either the facility procedures or Stellar's procedures.  Training must include recognition of the hazardous energy source, type and volume of the energy potential, and the methods and means of isolating and controlling it.*

*__NOTE__:  Regardless of which procedures are used, Stellar's Lockout/Tagout Checklist must be completed. If using the facility's procedures, and Stellar's procedures are more stringent in some areas, Stellar's procedures in those areas will supersede those of the facility and will be used.*

*__NOTE__: Stellar's Lockout/Tagout procedures only allow for the use of lockout devises accompanied by an appropriate tag for explanation, description, identification, etc.  __Tagout only is not acceptable__.*

    - When working in an operating plant or facility, the facility's lockout/tagout policy should be followed as required by plant personnel.  If no facility lockout/tagout policy exists, then Stellar's lockout/tagout policy should be used.

    - Lockout/tagout applies whenever service, maintenance or other work must be performed on or around any machine, equipment or other system where the worker or other personnel could be injured by the:

        - Unexpected start-up, actuation or energization of the machine, equipment or system; or
        - Release of stored energy.

    - Typical situations that will most likely require utilization of lockout/tagout include working on systems energized by either mechanical, electrical, hydraulic, and/or pneumatic energy.  These include, but are not limited to:

        - When a guard or other safety device must be removed or bypassed to clean, oil, or work on machinery or equipment with moving parts
        - When working on or repairing electrical circuits, panels, devices or systems that are connected to "hot" circuits
        - When working on or "tying" into pressurized gas lines or vessels

    - When it is necessary to utilize lockout/tagout, the following basic "six step procedure" must be followed:

        1. *Prepare for shutdown* – know the types and amounts of energy used, its hazards, and how to control it
        2. *Equipment shutdown* – use the operating controls and procedures to shut it down correctly
        3. *Equipment isolation* – be sure to isolate it from all its energy sources – secondary sources as well as main; do not pull electrical switches while under load; do not remove a fuse instead of disconnecting
        4. *Application of lockout/tagout devices* – apply locks and tags, as able, to energy-isolating devices; each employee must attach their own lock and tag; tags must have the worker's name on it
        5. *Control of stored energy* – after isolating energy supply, ensure stored energy is released; as necessary, install ground wires, relieve trapped pressure, release tension on springs, block movement of parts, block or brace against the force of gravity, bleed lines, drain/purge piping, block gas/liquid lines, etc.

6. *Equipment isolation verification* – ensure all danger areas are clear of personnel; verify disconnects can't be moved to the "on" position; try to start the equipment

- These procedures do not apply to cord and plug connected equipment when the plug has been removed from the receptacle and is under the supervision and control of the employee who is servicing or maintaining the equipment powered by that cord and plug.

- Once the work is complete, and the equipment/system is ready to be re-energized, ensure it is safe to do so:

- Remove all tools from the work area
- Be sure system is fully re-assembled
- Make sure everyone is clear of the equipment/area
- Remove the lockout/tagout device(s) – *each device must be removed by the person who put it on.*

## Heavy / Critical Crane Lifts

- All heavy or critical crane lifts must be well planned and coordinated with all personnel directly involved and with other trades that will be on site and may be exposed to the hazards presented by the lift.

- A heavy lift is a lift of 2,000 lbs. or greater; a critical lift is a lift utilizing 75% or more of the cranes capacity, given the weight and reach of the lift or a lift over critical equipment.

- All heavy or critical lifts should use the Heavy Lift / Critical Lift Plan form (or equivalent) located in the forms section of this plan when planning the lift.

## Heat Stress/Illness Precautions

- Employees working in hot conditions are susceptible to heat illness. Heat illness results from a combination of factors including temperature and humidity, radiant heat from the sun or other sources, air speed, and workload. Personal factors, such as age, weight, level of fitness, medical condition, use of medications and alcohol, and acclimatization affect how well an employee's body deals with excess heat. Heat illness can progress to heat stroke and be fatal, especially when emergency treatment is delayed.

**NOTE:** *All employees must receive heat illness awareness/prevention training prior to beginning work in hot conditions. This includes supervisors, regular/temporary employees, and newly hired employees.*

- Heat illness awareness and prevention training for employees must include the:

- environmental and personal risk factors for heat illness
- importance of frequent consumption of water
- importance of acclimatization to environmental conditions
- different types of heat illness including the common signs and symptoms of heat illness and the importance of beginning treatment immediately
- emergency procedures for responding to symptoms of heat illness

- Supervisors shall monitor weather conditions, workloads, and work activities and as necessary and if possible, modify work hours to cooler portions of the day, or otherwise add water/rest breaks.

46

- Critical temperatures for supervisors to monitor:

> - 85° F – provisions for shade (as close to the workers as possible) should be made.
> - 90° F – monitoring of water supplies should be increased to ensure an adequate and clean supply is maintained.
> - 95° F – the number and frequency of water and rest breaks should be increased.

- Provision of <u>water</u> and <u>access to shade</u> are critical in preventing heat stress/illness.

- Each contractor and subcontractor on site must ensure their employees have access to drinking water. This can be provided by a plumbed water supply, bottled water, or water cooler/container.

- If a plumbed water supply is not available, the quantity of water provided must be sufficient enough to provide <u>one quart of water per employee per hour</u> for the entire shift.

- As long as there is an <u>effective procedure to replenish the supply of water</u> during the day or shift, the total daily supply of water does not need to be brought on site at the beginning of the workday or shift. Each contractor and subcontractor is responsible for monitoring their supply of water on site and replenishing it as necessary to meet the quantity of water requirements for their crew.

- Supervisors, or their designee, should monitor the supply of water approximately every hour to ensure the supply and quality (cleanliness) of water is adequately maintained. The amount of time necessary to replenish the water supply must be taken into account when evaluating the remaining supply of water in order to ensure the water supply does not run out while waiting for replenishment.

- Supervisors, or their designee, when monitoring the water supply will remind all employees to drink water frequently and in sufficient amounts.

- The water supply should be located in a central place, accessible to all workers, and as close as possible to them.

- A sufficient supply of disposable/single use sanitary cups, in a container, and a receptacle for disposing of used cups must be provided. Or, employees may use their own cup, as desired, in order to take water with them to their work area. The use of "common cups" is prohibited.

- In the event an employee develops heat illness, begins to feel the onset of heat illness, or needs a preventative period of rest, a shaded area will be provided. The shaded area will be open to the air or provided with ventilation or cooling for a period of at least five minutes.

- Each contractor and subcontractor is responsible for providing or coordinating the provision of shaded areas for their employees.

- Examples of shaded areas that can be used include, but are not limited to: job trailers, roofed areas of the construction project, tool storage trailers (provided there is sufficient ventilation), work areas with tarps or temporary roofs over them, underneath shade trees.

- If necessary, umbrellas, canopies, or other portable structures will need to be brought on and set up on site to provide shade.

- If possible, work areas should be set up in shaded areas. The use of fans for additional ventilation and air flow is encouraged.

47

**Severe Weather, Emergency Procedures and Evacuation**

- Personnel rally points will be their (subcontractor) job trailers. Supervisors will then report to the Stellar job trailer (see Job Site Layout Plan).

- In the event of severe weather (thunderstorms, lightning, tornadoes, hurricanes, etc.), extra precautions must be taken to ensure the safety of all personnel and the security of all material and equipment on the job site. Depending on the severity of the situation, this may include all or some of the following:

> - site cleanup and removal of trash, debris and scrap material
> - tie-down and securing of building materials
> - locking up of equipment and tools
> - removal of materials, equipment and tools
> - suspension of work activity
> - evacuation of personnel

-Each individual subcontractor is responsible for ensuring the safety of their personnel and security of their materials, equipment and tools. The decision as to what precautionary measures are necessary and should be taken will also be the responsibility of each individual subcontractor, unless directed otherwise Stellar or Nestle. *All precautionary measures Stellar's job site superintendent has determined should be taken, must be taken by subcontractors.*

- In the event of <u>lightning</u> *(within 8 miles of the job site, and for a period of 30 minutes following the last lighting strike)*, personnel remaining on site shall:

> - seek shelter inside of buildings, job trailers or vehicles
> - avoid water, high ground, open spaces and standing near trees
> - avoid metal objects, metal fences, electrical wires, and machinery
> - turn of electrical tools, machinery and appliances
> - stay off of telephones and computers

- In the event of <u>tornadoes or windstorms</u>, personnel remaining on site shall:

> - seek shelter inside the reinforced areas of buildings
> - avoid water, high ground, open spaces and standing near trees
> - avoid areas where objects (tools, materials, equipment, etc,) can become flying projectiles
> - turn off electrical tools, machinery and appliances

- In the event of an <u>accident, injury, fire</u>, or other condition requiring emergency trained personnel, the following actions should be taken in this order:

> - call 911 or other emergency phone number or send someone to the job trailer to do so
> - evacuate personnel from the immediate area if necessary
> - render assistance to injured personnel if possible (without endangering other personnel)
> - inform Stellar's job site superintendent or send someone to do so
> - take action to prevent further injuries, damage, etc.

- *In the event of an emergency, all personnel must assemble with their supervisor at their, or as necessary, the Stellar job trailer to ensure that everyone is accounted for. Supervisors must then report to the status of their personnel to Stellar's superintendent.* At that time, the Stellar superintendent will determine appropriate actions to be taken, up to and including evacuation of the job site.

48

**Environmental Concerns**

- Protection of the environment, and protection of workers from the environment, must be taken into account during all phases of construction.

- Solid waste disposal shall be provided for materials according to types (e.g., concrete, wood/cardboard/paper, construction debris, glass, metal, general trash, etc.). This will necessarily require multiple dumpsters, containers, etc. properly labeled to ensure materials are properly disposed of.

- Sanitary waste disposal will be provided by a port-a-let contractor. An adequate number of port-a-lets will be located on site and serviced to maintain sanitary conditions.

- Liquid wastes (oils, solvents, etc.) must be disposed of in labeled containers (e.g., 55-gal drum) and when full, called by pick-up by a licensed HazMat contractor.

- Liquid wastes must not be mixed together and the flammability of liquid wastes must also be properly controlled.

- All fuel drums/tanks (if any) on site used for pumping fuel must be located in a bermed area lined with adequately thick plastic lining to contain any spills.

- Any liquid contaminant spill greater than 1 gallon must be reported to Stellar's superintendent and Stellar's Spill Containment Program utilized for response.

- The entire job site must be surveyed at the beginning of the job for hazardous plant (e.g., poison ivy, oak, sumac, etc.) and animal life (e.g., snakes, insects, etc.) that could pose hazards to workers on site. The workers should be made aware of any hazardous nature conditions during the safety orientation.

- No dogs, cats, or other pets shall be brought on the work site by employees.

*"Adherence to all safety policies*

*and procedures is a condition of employment*

*on Stellar job sites."*

49

## SUPERINTENDENT DAILY WORK SITE SAFETY AUDIT

**JOB SITE:** _____    **Job #:** _____

**Overall Site Audited:** ☐ Yes ☐ No – Specific Area(s) Audited: _____

**INSTRUCTIONS:** Each Stellar superintendent/foreman is responsible for completing a safety audit of active work areas on a daily basis. Completed Daily Work Site Safety Audit must be submitted to Stellar corporate.    Y=Yes, N= No, NA=Not applicable

### Site Work

| Y | N | NA | | Y | N | NA | |
|---|---|---|---|---|---|---|---|
| ☐ | ☐ | ☐ | SPA(s) communicated, understood and signed by each worker? | ☐ | ☐ | ☐ | All required permits obtained? |
| ☐ | ☐ | ☐ | SPA(s) turned into project supervision? | ☐ | ☐ | ☐ | Lock-Out/Tag-Out performed? |
| ☐ | ☐ | ☐ | Workers physically ready for work? | ☐ | ☐ | ☐ | All training completed for work to be performed? |
| ☐ | ☐ | ☐ | SDS Sheets obtained and available? | ☐ | ☐ | ☐ | Work areas sufficiently lighted and ventilated? |
| ☐ | ☐ | ☐ | All small / secondary containers labeled with contents? | ☐ | ☐ | ☐ | Worker access(es) to site in good condition? |

### Personal Protective Equipment

| Y | N | NA | | Y | N | NA | | Y | N | NA | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ☐ | ☐ | ☐ | HardHat suspension correct? | ☐ | ☐ | ☐ | Safety glasses with side shields? | ☐ | ☐ | ☐ | Safety-toed Boots worn? |
| ☐ | ☐ | ☐ | Face shields used as needed? | ☐ | ☐ | ☐ | Burning goggles worn? | ☐ | ☐ | ☐ | Welding hood and gloves? |
| ☐ | ☐ | ☐ | Task Gloves worn? | ☐ | ☐ | ☐ | Hearing Protection used? | ☐ | ☐ | ☐ | High Viz Shirt or Vests? |

### Fall Protection

| Y | N | NA | | Y | N | NA | | Y | N | NA | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ☐ | ☐ | ☐ | Guardrail systems checked? | ☐ | ☐ | ☐ | Harness and lanyards checked? | ☐ | ☐ | ☐ | Horizontal lifelines checked? |
| ☐ | ☐ | ☐ | Floor openings covered? | ☐ | ☐ | ☐ | Roof openings guarded? | ☐ | ☐ | ☐ | Wall openings guarded? |
| ☐ | ☐ | ☐ | Hole covers labeled & secure? | ☐ | ☐ | ☐ | Falling obj. protection present? | ☐ | ☐ | ☐ | Warning lines maintained? |

### Ladders and Scaffolding

| Y | N | NA | | Y | N | NA | | Y | N | NA | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ☐ | ☐ | ☐ | Ladders tied off/secured? | ☐ | ☐ | ☐ | Platform ladders used properly? | ☐ | ☐ | ☐ | Ladder extended three feet? |
| ☐ | ☐ | ☐ | Step ladders used fully open? | ☐ | ☐ | ☐ | Top 2 steps not used? | ☐ | ☐ | ☐ | Damaged ladders removed? |
| ☐ | ☐ | ☐ | Scaffolds inspected & tagged? | ☐ | ☐ | ☐ | Sections properly pinned? | ☐ | ☐ | ☐ | Components not damaged? |
| ☐ | ☐ | ☐ | Ladder access provided? | ☐ | ☐ | ☐ | Guardrails in place? | ☐ | ☐ | ☐ | Planking good / secured? |
| ☐ | ☐ | ☐ | Erected on sound footings? | ☐ | ☐ | ☐ | Scaffold feet nailed to mud sills? | ☐ | ☐ | ☐ | Tied to structure if needed? |

### Housekeeping

| Y | N | NA | | Y | N | NA | | Y | N | NA | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ☐ | ☐ | ☐ | Material stacked orderly? | ☐ | ☐ | ☐ | Trash cans provided & emptied? | ☐ | ☐ | ☐ | Debris removed daily? |
| ☐ | ☐ | ☐ | Cords and hoses off floor? | ☐ | ☐ | ☐ | Access & egress ways clear? | ☐ | ☐ | ☐ | Nails removed/bent over? |

### Hoisting and Rigging Equipment

| Y | N | NA | | Y | N | NA | | Y | N | NA | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ☐ | ☐ | ☐ | Daily crane inspection? | ☐ | ☐ | ☐ | Cranes set-up properly? | ☐ | ☐ | ☐ | Slings/chokers stored? |
| ☐ | ☐ | ☐ | Qualified rigger named? | ☐ | ☐ | ☐ | Safety latch on hook checked? | ☐ | ☐ | ☐ | Cranes flagged off? |
| ☐ | ☐ | ☐ | Slings/chokers inspected? | ☐ | ☐ | ☐ | Operator have CCO certification | ☐ | ☐ | ☐ | Lift zone designated? |

### Mobile Equipment

| Y | N | NA | | Y | N | NA | | Y | N | NA | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ☐ | ☐ | ☐ | Seatbelts used? | ☐ | ☐ | ☐ | Operators certified or trained? | ☐ | ☐ | ☐ | Equipment inspected? |
| ☐ | ☐ | ☐ | Backup alarms working? | ☐ | ☐ | ☐ | Spotters used when needed? | ☐ | ☐ | ☐ | ROPS present? |

### Excavations

| Y | N | NA | | Y | N | NA | | Y | N | NA | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ☐ | ☐ | ☐ | Competent person named? | ☐ | ☐ | ☐ | Shore/shield/slope/bench proper | ☐ | ☐ | ☐ | Excavation checked daily? |
| ☐ | ☐ | ☐ | Proper access/egress (every 25')? | ☐ | ☐ | ☐ | Spoil pile 2' from edge? | ☐ | ☐ | ☐ | Workers trained? |

### Fire Protection

| Y | N | NA | | Y | N | NA | | Y | N | NA | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ☐ | ☐ | ☐ | Fire Extinguishers provided and fully charged? | ☐ | ☐ | ☐ | No Smoking signs posted at /near flammable liquid/gas locations? | ☐ | ☐ | ☐ | Fire Extinguishers inspected monthly and tagged? |
| ☐ | ☐ | ☐ | Flammable liquids in safety cans? | ☐ | ☐ | ☐ | Hot work permit obtained / posted? | ☐ | ☐ | ☐ | LP/propane not stored inside? |
| ☐ | ☐ | ☐ | Flammables stored properly? | ☐ | ☐ | ☐ | Fire Watch assigned & trained? | ☐ | ☐ | ☐ | Temp. heaters set up properly? |

### Electrical

| Y | N | NA | | Y | N | NA | | Y | N | NA | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ☐ | ☐ | ☐ | Cords checked for damage? | ☐ | ☐ | ☐ | Ground pin intact on cords? | ☐ | ☐ | ☐ | GFCI provided & working? |
| ☐ | ☐ | ☐ | Terminal boxes have covers? | ☐ | ☐ | ☐ | Cords protected from pinch points? | ☐ | ☐ | ☐ | No openings in CB panel? |

### Masonry / Concrete

| Y | N | NA | | Y | N | NA | | Y | N | NA | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ☐ | ☐ | ☐ | CMU walls greater than 8' braced? | ☐ | ☐ | ☐ | Wet/dry cement handled properly? | ☐ | ☐ | ☐ | All rebar properly capped? |

### Welding / Cutting

| Y | N | NA | | Y | N | NA | | Y | N | NA | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ☐ | ☐ | ☐ | Gas cylinders properly stored? | ☐ | ☐ | ☐ | Hoses/cables in good condition? | ☐ | ☐ | ☐ | Welding screens used? |

### Hand and Power Tools

| Y | N | NA | | Y | N | NA | | Y | N | NA | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ☐ | ☐ | ☐ | Tools in good condition? | ☐ | ☐ | ☐ | Double insulated or 3 wire? | ☐ | ☐ | ☐ | Safety guards in place? |

### Comments and Corrective Action

| | | |
|---|---|---|
| | | |
| | | |

| AUDIT PERFORMED BY: | Division: | DATE: |
|---|---|---|
| | | |



# Safe Plan of Action

Stellar Job #: _____   Crew/Sub: _____   Date: _____

Work area: _____   Job Task: _____

| Job Steps | Potential Hazards | Safe Job Procedures |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| Lifting / Material Handling: | | |
| Surrounding job site conditions: | | |
| Environment – Heat / Cold / Other: | | |

Equipment to be used: _____

Operators trained / licensed / qualified ☐ Yes
Equipment inspected / good condition ☐ Yes

## PERSONAL PROTECTIVE EQUIPMENT (PPE) CHECKLIST (Check all PPE required):

**EYES & FACE**
☐ Safety glasses with side shields
☐ Chemical splash goggles
☐ Impact / Cutting goggles
☐ Full faceshield (worn over 1, 2, or 3)
☐ Welding hood
☐ Other _____

**FOOT**
☐ Hard toe shoes/boots
☐ Dielectric
☐ Rubber/ PVC/ Urethane
☐ Other _____

**RESPIRATORY PROTECTION**
☐ Dust / particulate / fume / mist mask
☐ Half face filter
☐ Full face filter
☐ Emergency escape pack
☐ Full face SCBA
☐ Other _____

**HEARING**
☐ Ear plugs
☐ Ear muffs
☐ Dual protection
☐ Other _____

**PROTECTIVE CLOTHING**
☐ Gloves (type: _____ )
☐ Nomex / FRC / NFPA 70 E
☐ Freezer Suit
☐ Tyvek suit
☐ Rain suits
☐ Other _____

**HEAD**
☐ Class G ( General ) Type I hardhat
☐ Class G ( General ) Type II hardhat
☐ Class E ( Electrical ) hardhat
☐ Class C ( Conductive ) hardhat

**List any other PPE not listed above:** _____

| | | | | |
|---|---|---|---|---|
| Hot work permit(s) required? | ☐ No | ☐ Yes – if yes, permit(s) obtained? | | ☐ Yes |
| Fire watch / spotter required? | ☐ No | ☐ Yes – if yes, fire watch / spotter assigned? | | ☐ Yes |
| Lock out / Tag out required? | ☐ No | ☐ Yes – if yes, LOTO performed by each worker involved? | | ☐ Yes |
| Confined space permit required? | ☐ No | ☐ Yes – if yes, permit(s) obtained / personnel involved trained? | | ☐ Yes |
| Fall protection required? | ☐ No | ☐ Yes – if yes, fall protection system in place / PPE available? | | ☐ Yes |
| Excavations involved? | ☐ No | ☐ Yes – if yes, competent person on site / excavation inspected? | | ☐ Yes |
| Scaffolds involved? | ☐ No | ☐ Yes – if yes, competent person on site / scaffold(s) inspected? | | ☐ Yes |

**DOES TASK PRESENT POTENTIAL EXPOSURE TO HAZARDOUS CHEMICALS?**   ☐ YES      ☐ NO

If yes, has the Material Safety Data Sheet for each hazardous chemical been reviewed?   ☐ YES      ☐ NO

List hazardous materials (MSDS) reviewed: _____

### TEAM MEMBER SIGNATURES

| Sign-In | Sign-Out |
|---|---|
| I understand the safety precautions and have the training to perform the work incident free | I have worked safely and have not been involved in an incident today |
| | |
| | |
| | |
| | |
| | |

Supervisor's Signature: _____   Date: _____

The signature and date above certifies the completion of the Hazard Assessment.



**Taking Solutions Further.**

## EQUIPMENT OPERATION QUALIFICATION / CERTIFICATION LOG

**Notes:**  1.  *Documentation of training must be provided to Stellar's on-site superintendent.*
2. *Personnel can be determined to be Qualified Operators through past experience, training, and /or personal observation.*
3. *All forklift operators must have a __certified__ license.*

Job site: _____

Subcontractor: _____

| Type Equip. | Qual. or Cert. Date | Expiration Date | Type Equip. | Qual. or Cert. Date | Expiration Date |
|---|---|---|---|---|---|

**Employee:** _____

☐ Rough terrain fork lift
☐ Scissor lift
☐ Front-end loader/backhoe
☐ Other: _____

☐ Straight mast fork lift
☐ Boom lift
☐ Bobcat
☐ Other: _____

**Employee:** _____

☐ Rough terrain fork lift
☐ Scissor lift
☐ Front-end loader/backhoe
☐ Other: _____

☐ Straight mast fork lift
☐ Boom lift
☐ Bobcat
☐ Other: _____

**Employee:** _____

☐ Rough terrain fork lift
☐ Scissor lift
☐ Front-end loader/backhoe
☐ Other: _____

☐ Straight mast fork lift
☐ Boom lift
☐ Bobcat
☐ Other: _____

**Employee:** _____

☐ Rough terrain fork lift
☐ Scissor lift
☐ Front-end loader/backhoe
☐ Other: _____

☐ Straight mast fork lift
☐ Boom lift
☐ Bobcat
☐ Other: _____

**Employee:** _____

☐ Rough terrain fork lift
☐ Scissor lift
☐ Front-end loader/backhoe
☐ Other: _____

☐ Straight mast fork lift
☐ Boom lift
☐ Bobcat
☐ Other: _____

Superintendent/Foreman Signature: _____   Date: _____

*Note:  Make additional copies of this form as necessary.*



# EQUIPMENT / MACHINERY DAILY INSPECTION RECORD

Job Site: _____   Job Number: _____

Department / Subcontractor: _____

Superintendent / Foreman / Operator: _____

*Procedures:*   1.   Use a separate inspection record for each type / piece of equipment / machinery.
2.   Conduct the inspection of the equipment / machinery each day prior to use.
3.   Correct all deficiencies prior to using the equipment / machinery.

Type of equipment/machinery _____

Manufacturer _____   Serial / ID # _____

|  | Monday | Tuesday | Wednesday | Thursday | Friday | Saturday | Sunday |
|---|---|---|---|---|---|---|---|
| **DATE:** | | | | | | | |
| Tires | | | | | | | |
| Fuel Level | | | | | | | |
| Safety Equipment | | | | | | | |
| Fluid Levels | | | | | | | |
| Hoses | | | | | | | |
| Belts | | | | | | | |
| Cables | | | | | | | |
| Screens | | | | | | | |
| Horn | | | | | | | |
| Backup Alarm | | | | | | | |
| Battery Charge | | | | | | | |
| Control Levers | | | | | | | |
| Gauges | | | | | | | |
| Brakes | | | | | | | |
| Controls | | | | | | | |
| Steering System | | | | | | | |
| Lift Controls | | | | | | | |
| Forks | | | | | | | |
| Mast | | | | | | | |
| Load Charts | | | | | | | |
| Fire Extinguisher | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| Inspector Initials | | | | | | | |

53



**stellar**
*Taking Solutions Further*

# Heavy Lift / Critical Lift Plan

1. A Heavy Lift is any load over 2,000 lbs.
2. A Critical Lift is any load over 75% of crane capacity or a load that must swing over critical equipment.

**PROJECT:** _____     **SUBCONTRACTOR:** _____

**1) LOCATION OF LIFT:** _____     Date: _____   Time: _____

**2) DISCRIPTION OF LOAD:** _____

| | | | |
|---|---|---|---|
| LOAD WEIGHT: | _____ | >>>>>> Load weight: | |
| BLOCK WT.: | _____ | How determined: | _____ |
| SPREADER WT.: | _____ | By whom: | _____ |
| RIGGING WT.: | _____ | | |
| JIB WT.: | _____ | | |
| JIB BALL WT.: | _____ | | |
| HOIST LINE WT.: | _____ | | |

**TOTAL LOAD** _____     Maximum Load Radius _____

Boom Angle _____

**3) CRANE:** Manufacturer: _____     Model No. _____

Annual Inspection Current   Yes  /  No     Serial No. _____

On Outriggers _____   On Crawlers – Extended _____
On Tires _____                   – Retracted _____

Counterweight _____   Boom Length _____   Jib Length _____
Lift will be on:   Boom _____   Jib _____   Parts of Line _____
Lift will be:   Over the Side _____   Over the End _____

**4) CRANE RATED CAPACITY:**   Rated Capacity: _____   Capacity at lift radius: _____

$$\text{Capacity Margin} = \frac{\text{Total Load}}{\text{Capacity at lift radius}} \times 100 = _____$$

**5) SITE CONDITIONS AND CRANE PATH:**   Soil conditions: _____

| | | | |
|---|---|---|---|
| Is crane path level and stable? | Yes / No | Has rigging been inspected prior to use? | Yes / No |
| Will tag lines be used? | Yes / No | Will blocking or crane mats be used? | Yes / No |
| Are there underground hazards? | Yes / No | Are there overhead or electrical hazards? | Yes / No |
| Are there fire/explosive hazards? | Yes / No | Will communications be by hand or radio? | Yes / No |
| Does FAA need notification? | Yes / No | Has swing arc/lift area been barricaded? | Yes / No |

Crane Operator: _____     Lift Supervisor: _____

Prepared by: _____     Date: _____



# Cutting – Welding – Hot Work Permit

**Complete this form and post it at the work area. Upon completion of work, return it to issuing supervisor.**

Date: _____  Time: _____  Area / Room: _____

Type metal: _____  Work to be done: _____

Work to be done by: _____

## 1. WORK AREA INSPECTION (to be completed by worker):

Before issuance of permit, the work area must be inspected, and the below check list completed.

| PRECAUTIONS (within 35 feet of work area) | Yes | No | N/A |
|---|---|---|---|
| 1. Floors swept clean of combustibles? | — | — | — |
| 2. If floor is combustible, wet down, cover with damp sand, metal or other non-combustible? | — | — | — |
| 3. Flammable/combustible liquids & materials removed or covered with flame-proof shield? | — | — | — |
| 4. If necessary, are any wall or floor openings covered? | — | — | — |
| 5. If necessary, are flame-proof shields suspended beneath overhead work to collect sparks? | — | — | — |
| **WORK ON WALLS OR CEILINGS** | | | |
| 1. Is construction type non-combustible and without combustible coverings present? | — | — | — |
| 2. If necessary, have combustibles been moved away from opposite side of wall? | — | — | — |
| **WORK ON ENCLOSED EQUIPMEMT (tanks, drums, ducts, dust collectors, etc.)** | | | |
| 1. Has equipment been cleaned of all combustibles? | — | — | — |
| 2. Have duct work or conveyors been shut down or protected? | — | — | — |
| 3. Have container been purged of any residual flammable vapors? | — | — | — |
| 4. Have pipes or connections been blanked or disconnected? | — | — | — |
| 5. Have you read and followed all cutting/welding requirements? | — | — | — |
| **LOCKOUT / TAGOUT** | | | |
| 1. Is there any equipment/machinery requiring LO/TO and if so, is it locked/tagged out? | — | — | — |
| **FIRE WATCH** | | | |
| 1. Will fire watch be provided during and 60 minutes after work? | — | — | — |
| 2. Will fire watches be posted above/below vertical openings or opposite sides of walls? | — | — | — |
| 3. Have fire watches been supplied with Type ____ portable fire extinguisher or fire hose or other relevant fire extinguishing media? | — | — | — |
| 4. Have fire watches been trained in use of equipment and emergency procedures? | — | — | — |

**NOTE:** If cutting or welding is suspended for a substantial period, close torch or gas valves, remove electrodes and disconnect from power source. *** The work area has been inspected & approved by the undersigned. ***

## 2. APPROVALS:

Checklist/Permit prepared by: (name) _____ (signature) _____

Safety Supervisor Approval: (name) _____ (signature) _____

Approval Date / Time: _____  Permit Expires Date / Time: _____

## 3. PERFORMANCE OF WORK:  Time Work Started: _____  Time Completed: _____

Fire Watch Assigned: (name) _____  Time Fire Watch Secured: _____

## 4. FINAL CHECK: Work area and adjacent areas to which sparks/heat might have spread (floors above/below, & opposite sides of walls) have been inspected after completion of work and found to be fire safe.

Safety Supervisor Approval:                          Permit Cleared:
(signature) _____                Date / Time: _____


**stellar**

## Confined Space Entry Permit

> Complete this form and post it at the work area. Upon completion of work, return it to issuing supervisor.

Date: _____    Time: _____    Confined Space Location: _____

Confined Space Type: _____    Work to be done: _____

Personnel: Supervisor: _____    Entrant(s): _____

　　　　　　Attendant(s): _____    Rescuer(s): _____

Potential hazards present: ___ Hazardous atmosphere　　___ Material that could engulf entrant
　　　　　　　　　　　　___ Asphyxiation　　　　　　___ Configuration that could entrap entrant
　　　　　　　　　　　　___ Other recognized serious safety/health hazard: _____

### PRE-ENTRY CHECKLIST

| | |
|---|---|
| Confined space hazards evaluated and determined? | Yes / No |
| All personnel involved trained and up-to-date for hazards present? | Yes / No |
| Lockout/tagout completed (pumps & lines blocked, electrical disconnected, etc)? | Yes / No / N/A |
| Ventilation in place? ( ___ mechanical and/or ___ natural) | Yes / No / N/A |
| Proper equipment available and in place?:　　Gas monitor | Yes / No / N/A |
| 　　　　　Safety harnesses and lifelines | Yes / No / N/A |
| 　　　　　Hoisting equipment | Yes / No / N/A |
| 　　　　　Communications equipment | Yes / No / N/A |
| 　　　　　Protective clothing | Yes / No / N/A |
| 　　　　　SCBA's | Yes / No / N/A |

Atmospheric check after lockout/tagout and ventilation (if necessary):

Time _____ Oxygen _____ % (>19.5%) Explosive _____ % LFL (<10%) Toxic _____ PPM (<10 ppm H2S)

Rescue procedure: _____

### ENTRY PERMIT

PERMIT VALID FROM:  Date & Time: _____    to   Date & Time: _____

| REQUIREMENTS COMPLETED: | | |
|---|---|---|
| | Pre-Entry Checklist | Yes / No |
| | Atmosphere tested | Yes / No / N/A |
| | Personnel duties reviewed | Yes / No |
| | Work procedures reviewed | Yes / No |
| | Rescue procedures reviewed | Yes / No |

**The confined space where the work is to be done has been evaluated by the undersigned. The Pre-Entry Checklist and Entry Permit requirements have been complete. Permission is granted to proceed with this work.**

CHECKLIST & PERMIT PREPARED BY: _____

SUPERVISOR AUTHORIZING ENTRY: _____    Date & Time: _____

56



**stellar**

## Lockout / Tagout Checklist

Complete this form and maintain it at the work area. Upon completion of work, return it to issuing supervisor.

Job area: _____    Date: _____    Time: _____

Company/subcontractor: _____    Supervisor: _____

1.  Equipment/machinery to be locked out: _____

2.  Names of affected employees (including non-crew members): _____
    _____
    _____

3.  Have all employees affected been notified that testing, servicing, or maintenance is required on the equipment/ machine and that the equipment/machine must be locked or tagged out to perform the work?

    ☐ YES – Proceed with next step    ☐ NO – Do not proceed until all affected employees have been notified.

4.  Type(s) and magnitude(s) of energy the equipment/machine utilizes (e.g., 480V electric; 200 psi steam; etc.):
    _____

5.  Nature of the hazards of the energy (e.g., electrocution; pressurized liquid/gas release; etc.):
    _____

6.  Methods for controlling the energy (e.g., on/off switch, valve, mechanical block, etc.):
    _____

7.  Is equipment/machine currently operating?    ☐ Yes – go to next step    ☐ No – go to step 9.

8.  If the equipment/machine is operating, shut it down by the normal stopping procedure.  Identify type(s) and location(s) of equipment/machine operating controls and normal stopping procedure: _____
    _____

9.  Is the equipment/machine shut down/inoperative?    ☐ Yes – go to next step    ☐ No – go back to step 8.

10. Identify the type(s) and location(s) of energy isolating devices for equipment/machine:
    _____

11. De-activate the energy isolating device(s) so that the equipment/machine is isolated from the energy source(s).

    a.  Energy isolating device(s) de-activated _____ (initial when completed)

57

12. Identify potential sources and types of stored or residual energy (e.g., capacitors, springs, elevated machine members, rotating flywheels, hydraulic systems, air, gas, steam or water pressure, etc.).

13. Identify method(s) for dissipating or restraining stored or residual energy (e.g., by grounding, blocking, bleed down, repositioning, etc.)

    a.   Residual or stored energy dissipated or restrained   _____   **(initial when completed)**

14. Identify method(s) of verifying the isolation of the equipment/machine (e.g., by operating the on/off switch or other normal operating control(s) or by testing to make certain the machine/equipment will not operate).

15. Check to determine personnel are clear of equipment and not exposed   _____   **(initial when completed)**

16. Isolation of equipment and disconnection from energy source verified   _____   **(initial when completed)**

17. Verify isolation of equipment/machine by trying to turn machine/equipment on. Operating control(s) returned to neutral or off position after verifying isolation of equipment   _____   **(initial when completed)**

## LOCKOUT / TAGOUT

18. Is the energy isolating device(s) capable of being locked out?   ☐ **Yes -- utilize lockout (with tag)**

    ☐ **No -- develop & submit specific plan how device/system will be isolated. <u>Tagout only is not acceptable</u>.**

19. **Lock out (with appropriate tag) the energy isolating device(s) with assigned individual lock(s).**

20. **Energy isolating device(s) locked (tagged) out; equipment/machine verified safe to work on.**

| | | | |
|---|---|---|---|
| Authorized supervisor: Print Name | Signature | Date | Time |

## UPON COMPLETION OF TESTING, SERVICING, OR MAINTENANCE

21. Equipment/machine and the immediate area checked to ensure that nonessential items have been removed and that the equipment/machine components are operationally intact   _____   **(initial when completed)**

22. Work area checked to ensure that all employees are safely positioned or removed from the area prior to re-energizing equipment/machine   _____   **(initial when completed)**

23. Verified that the operating controls are in off or neutral position   _____   **(initial when completed)**

24. Remove lockout (tagout) devices and reenergize equipment/machine   _____   **(initial when completed)**

25. Affected employees notified that the testing, servicing, or maintenance is completed; equipment/machine verified it is ready for use.

| | | | |
|---|---|---|---|
| Authorized supervisor: Print Name | Signature | Date | Time |



## Exception to Policy for Exiting an Aerial Lift

_____ **for** _____
*(Person requesting)*                                  *(Contractor name)*

has permission for the below named employees to exit an aerial lift at elevations exceeding six (6) feet.  This Exception to Policy is valid for one (1) shift only or one (1) week as indicated. A separate SPA is required for this action.  The regulations for compliance to this Exception to Policy are as follows:

- Employee must have a double lanyard or two single lanyards.
- Employee must remain tied off prior to exiting the basket.
- Basket shall be located no further than one (1) foot from the structural member that employee will be using for an exit point.
- Employee must have second lanyard secured to an adequate anchorage point prior to disconnecting the first lanyard.  Only then can a safe exit be accomplished.
- Whenever possible, employee will utilize the exit gate.  Otherwise, employee may use the handrail to facilitate the exiting from the lift basket as a last resort.

**Employee Name (Print)**

_____

_____

_____

_____

_____

_____

**This Exception is valid from approval date for:**     **One Shift** _____   **One week**_____

**Approval Date** _____

**Approval Authority for Stellar** _____



## COMPETENT PERSONS LOG (WEEKLY)

***NOTE:*** *The term "Competent Person" as used by OSHA refers to one who is designated by an employer to oversee certain potentially hazardous activities, is qualified to supervise such activities by virtue of training and/or experience, and has the authority to take corrective actions as necessary. List the Competent Person(s) from your company designated to oversee the activities in your scope of work requiring a competent person.*

**On-site competent persons will be required for the following activities:**

- Scaffolding erection, dismantling and use
- Trenching and excavations
- Fall protection methods and systems
- Rigging of equipment for material handling
- Operation of cranes and hoists
- Demolition work
- Use of ladders
- Working with hazardous materials

Subcontractor: _____    week of: _____

Scope of work: _____

| Competent person on site (print name) | Competent person activity |
|---|---|
| 1. _____ | _____ |
| 2. _____ | _____ |
| 3. _____ | _____ |
| 4. _____ | _____ |
| 5. _____ | _____ |
| 6. _____ | _____ |
| 7. _____ | _____ |
| 8. _____ | _____ |

Superintendent/Foreman Signature: _____    Date: _____

***Note:*** *Make additional copies of this form as necessary.*

60



Job Site: _____

**Initial each Item**

## Visitor Safety Orientation and Release Form

| 1 | Sign-in and out in Stellar field office. Stay with your authorized point-of-contact at all times. All directions, instructions, requests from your authorized POC must be followed. |
|---|---|
| 2 | All visitors are required to wear a hard hat, safety glasses w/ side shields, high-vis outer garment, hard soled safety toed boots/shoes, protective gloves, hearing protection (if needed). NO shorts or sneakers allowed. |
| 3 | Trades are actively working - be aware of the following hazards: noise, mist/fumes/dust, overhead hazards, taped/barricaded areas, stored materials, uneven walking/working surfaces, trip hazards, etc. Do not approach moving equipment or working crews. |
| 4 | Taped/barricaded areas: Red Danger tape – indicates a hazard or potential hazard that is immediate danger to life or health; DO NOT cross this barrier. Yellow Caution tape – indicates a hazard or potential hazard but entry is allowed if necessary precautions are taken. Your escort will provide necessary guidance. |
| 5 | Never stand under a live load (e.g., a crane lift, a forklift load, an excavator bucket, etc.). |
| 6 | Stay a reasonable distance (> 5') away from open electrical panel. |
| 7 | Emergency Evacuation Signal:  3 blasts of high-pitched whistle or phone call to your POC.  Evacuate to Stellar job site trailer and await further instructions. |
| 8 | If you observe any behavior or conditions you feel are unsafe, bring it/them to the attention of your POC immediately. |
| 9 | If you experience an injury, your authorized POC will contact Stellar immediately so we can ensure you receive proper First Aid or Medical Treatment, if necessary. |
| 10 | Follow all OSHA and site rules while conducting your visit on this site (your escort/POC will know the pertinent rules and provide necessary guidance). |
| 11 | Cameras and camera phones are not allowed for use on site without permission. |
| 12 | Cell phones are for business purposes only. If you must use a cell phone, stop what you are doing, find a safe place to conduct your business, and don't continue on until you are finished. NO talking or texting while walking. NO driving or operating equipment while using a cell phone. |
| 13 | Stellar reserves the right to remove anyone who is acting unsafely or in a manner that is counter-productive to the completion of this project. |
| 14 | The entire job site property speed limit is 5 mph unless otherwise marked. |

By my signature below I hereby release Stellar from any/all manner of claims, actions or causes because of bodily injury or damage to property that I may incur while on these premises.

Signature: _____

Printed Name: _____

Organization: _____

Point of Contact: _____

Date: _____

# Incident Report
### *(TYPE ALL INFORMATION)*

| ACCOUNT INFORMATION | |
|---|---|
| **stellar** *TAKING SOLUTIONS FURTHER* | **Project Name:** |
| | **Job No:** |

| INCIDENT TYPE |
|---|

**Check all applicable categories:**

**Type of Incident:**  Property Damage ☐  Pollution Incident ☐  1st Aid Injury ☐  Recordable Injury ☐  Notice Only ☐

**Personnel Involved:**  Stellar ☐  Subcontractor ☐  Supplier ☐  Vender ☐  Inspector ☐  Owner ☐  Visitor ☐

| CLAIM INFORMATION | |
|---|---|
| **Date/Time of Incident or Injury:** <br> ____/____/_____ _____ am ☐ / pm ☐ | **Date/Time Reported:** <br> ____/____/_____ _____ am ☐ / pm ☐ |
| **Employee's Name:** | **Last 4 of the Social Security Number:** xxx-xx- |

| Home Address: *(Street)* | | |
|---|---|---|
| *(City)* | *(State)* | *(Zip)* |

| Home/Cell Phone #: | Male ☐  Female ☐ | Date of Birth: |
|---|---|---|
| Occupation: | Division: | Years performing task: |
| Employment status: | Hire date: | Date began on Project: |
| Days worked / week: | Hours worked / day: | Hours worked / week: |
| Time began work: | Supervisors name & phone: | |

| State of hire: | Prior WC Claims:  Yes ☐  No ☐ | *(if yes, what year(s)/states):* |
|---|---|---|

| EMPLOYER INFORMATION (Subcontractor/Owner/Supplier/Vender) |
|---|

**Employee of:**  Stellar ☐  Subcontractor ☐  Supplier ☐  Vender ☐  Inspector ☐  Owner ☐  Visitor ☐

| Employer Name: |
|---|
| Contact: |

| Mailing Address: *(Street)* | | |
|---|---|---|
| *(City)* | *(State)* | *(Zip)* |

| Nature of Business: |
|---|

| INCIDENT INFORMATION |
|---|

| Did the Incident Occur at the Work/Project Location?    Yes ☐  No ☐ |
|---|
| **Exact Location:** *(ex. 2nd Floor Hallway)* _____ |
| **Accident Address:** *(Street)* _____ |

| *(City)* | *(State)* | *(Zip)* |
|---|---|---|

| Nature of Incident: |
|---|
| Full Description: |
| |
| |
| |
| Person Incident Reported to: |

| DRUG/ALCOHOL SCREENING |
|---|

| Note: Drug/Alcohol screen should be performed as soon as possible, but must be done within 24 hrs. of incident |
|---|
| Was Drug/Alcohol Screen Performed:   Yes ☐  No ☐  |  Were all personnel involved screened:   Yes ☐  No ☐ |
| Where was Drug/Alcohol screen performed: |

## INJURY INFORMATION

**Were there any injuries:**    Yes ☐ *(complete this section)*    No ☐ *(skip to next section)*

| **Is this Claim Work-Related?**    Yes ☐    No ☐ | **Type of Injury** *(cut, sprain, etc):* |
|---|---|

**Which Body Part(s) Injured** *(leg, arm, back, etc):*

**Part of the Body Location** *(right, upper, etc):*

**Initial Medical Treatment:**    No medical treatment ☐    On-site 1ˢᵗ Aid ☐    Urgent Care type facility ☐

Emergency Room (treated & released) ☐    Hospitalized (admitted overnight) ☐

Employee refused medical treatment ☐    Was employee advised they can seek medical treatment?    Yes ☐    No ☐

**Estimate of Injury Severity:**    Return to work full duty ☐    May return to work with restricted duty ☐

Lost time/taken off work ☐    ⇒ (first full day of lost time [date]:                                    )

**Medical Provider Contact Information  Name:**
**Address:** *(Street)*
*(City)*                                        *(State)*                          *(Zip)*
**Phone:**

**If Stellar employee, who took employee to Clinic/ER:**

## WITNESS INFORMATION

**Were There Any Witnesses?    Yes ☐    No ☐**

**If Yes: List Names and Contact Information:**

## SAFETY

| **Safeguard(s) Provided:    Yes ☐    No ☐** | **Safeguards Utilized:    Yes ☐    No ☐** |
|---|---|

**List all equipment/material used:**

**Did Equipment Malfunction? Yes ☐  No ☐**
    If yes, please explain:

**Identify Loss Causes:**

**Corrective action taken to prevent a similar occurrence:**

**Date corrective action to be completed by:**

## ADDITIONAL COMMENTS & INFORMATION

## REPORT PREPARED BY

| **Name:** | **Title:** |
|---|---|
| **Signature:** | **Phone:** |

## Incident Investigation Questions

| Incident Information |
|---|
| **What was the employee doing just before the incident occurred?** Provide a brief description of the incident. Include information about the specific job/task the Employee was performing and the goals of the task. |
| **What happened?** Provide a brief description of the consequences or outcomes of event. Include information about factors that contributed to its severity and/or factors that kept the situation from being worse. |
| **Where the event occurred?** Provide information about the exact location of the incident. Be as specific as possible. Include photos if possible. |
| **What was the injury or illness?** In plain language (non-medical terms) state the nature of the injury or illness. |
| **What object or substance directly harmed the employee?** State the type or kind of object or substance that harmed the employee. |
| **If property damage, what was damaged and what was the extent of damage?** List all items that were damaged and the extent of their damage. |
| **If known at this time - What was planned (vs. what actually happened)?** State what *should* have happened, that did not happen (not *why* it didn't happen). |

| Incident Investigation Questionnaire | Yes | No | N/A |
|---|---|---|---|
| **Related to Unsafe Acts** | | | |
| 1. Was the Employee performing a task which they were trained to do? If not, explain: | ☐ | ☐ | ☐ |
| 2. Was equipment used in accordance with manufacturer's requirements and/or procedures or training? If not explain: | ☐ | ☐ | ☐ |
| 3. Was required Personal Protective Equipment used? If not, explain: | ☐ | ☐ | ☐ |
| 4. Was required PPE used properly? If not, explain: | ☐ | ☐ | ☐ |
| 5. How often is the task that the Employee was performing at the time of injury take place? Circle the most appropriate answer: Constant   Multiple times per shift   Once per day   Once per week | ☐ | ☐ | ☐ |
| 6. Was the Employee using the tools and equipment required for the task? If not, explain: | ☐ | ☐ | ☐ |
| 7. Was "horseplay" involved? | ☐ | ☐ | ☐ |
| Other Unsafe Acts | | | |
| **Related to Unsafe Conditions** | | | |
| 1. Was the Employee in a hurry? If Yes, explain | ☐ | ☐ | ☐ |
| 2. Was the fatigue an issue? If yes, explain | ☐ | ☐ | ☐ |
| 3. Were guards in place on equipment? If not, explain: | ☐ | ☐ | ☐ |
| 4. Was communication (verbal or other) clear and easily understood? If not explain: | ☐ | ☐ | ☐ |
| 5. Was the Employees working surface slip resistant? If not, explain: | ☐ | ☐ | ☐ |
| 6. Was the Employee's working surface in good repair? | ☐ | ☐ | ☐ |
| 7. Was the Employee's footwear in good condition? | ☐ | ☐ | ☐ |
| 8. Did the lighting in the area contribute to the accident? | ☐ | ☐ | ☐ |
| 9. Did Housekeeping in the area contribute to the accident? | ☐ | ☐ | ☐ |
| 10. Were there additional conditions in the area that contributed to the accident? (Equipment/Material/Environment/Weather) If yes, explain: | ☐ | ☐ | ☐ |
| 11. Was equipment operationally ready per recommended maintenance and manufacturer's guidelines? | ☐ | ☐ | ☐ |
| 12. Did the design or layout of the work area contribute to the incident? If yes, explain: | ☐ | ☐ | ☐ |
| Other Unsafe Conditions | | | |

**Related to Supervision**

| | | | |
|---|---|---|---|
| 1. | Was the Employee performing an assigned or scheduled task? If not explain: | ☐ | ☐ | ☐ |
| 2. | Who assigned the task to the Employee? | ☐ | ☐ | ☐ |
| 3. | Was the task being performed, observed by a Supervisor at the time of the incident? | ☐ | ☐ | ☐ |
| 4. | Have other Employees been observed performing the task in the same manner? If yes, explain: | ☐ | ☐ | ☐ |
| 5. | Are there written procedures for the assigned task? | ☐ | ☐ | ☐ |
| 6. | Were the Supervisors aware of the PPE requirements for the task: If not, explain: | ☐ | ☐ | ☐ |
| 7. | Was appropriate training provided to accomplish this task? If not, explain: | ☐ | ☐ | ☐ |
| 8. | Has there been a Safety Walkthrough/Work-site inspection of this work area within the past month? If yes, When: | ☐ | ☐ | ☐ |
| 9. | Did the Supervisor follow appropriate hazard identification and/or follow-up procedures with a known problem? If not, explain: | ☐ | ☐ | ☐ |
| 10. | Did the Supervisor follow the required procedures as specified in training or procedures? If not, explain: | ☐ | ☐ | ☐ |
| 11. | If chemicals were involved was the SDS available? | ☐ | ☐ | ☐ |
| 12. | If chemicals were involved, was the Employee trained in their use? If not, explain: | ☐ | ☐ | ☐ |
| Other Leadership Influences | | | | |

**Related to the Organization**

| | | | |
|---|---|---|---|
| 1. | Was the required PPE made available at the time of the incident? If not, explain: | ☐ | ☐ | ☐ |
| 2. | Was there adequate equipment available at the time of the incident? If not, explain: | ☐ | ☐ | ☐ |
| 3. | Was there adequate staffing to perform the required task(s) or operation? If not, explain: | ☐ | ☐ | ☐ |
| 4. | Were there adequate Policies, Programs or other written instructions for the required task(s) or operation? If not explain: | ☐ | ☐ | ☐ |
| Other Organizational Influences | | | | |

**Additional Information**

| | | | |
|---|---|---|---|
| What was done immediately to correct the hazard(s) related to this incident: | ☐ | ☐ | ☐ |
| What was done (or should be done) to prevent this incident from occurring again? (Give details) | ☐ | ☐ | ☐ |
| Were photographs taken?  If yes, by whom: | ☐ | ☐ | ☐ |

| REPORT PREPARED BY | |
|---|---|
| Name: | Title: |
| Signature: | Phone: |



# JOBSITE SAFETY RULES

1.  HARD HATS, SAFETY TOED BOOTS, EYE PROTECTION, TASK APPROPRIATE GLOVES, & HIGH VISIBILITY OUTTER GARMENT WILL BE WORN AT ALL TIMES (TENNIS TYPE SHOES ARE <u>NOT</u> PERMITTED).

2.  SHIRTS WITH SLEEVES AND LONG PANTS WILL BE WORN <u>AT ALL TIMES</u> (SHORTS ARE NOT PERMITTED).

3.  PERSONAL PROTECTIVE EQUIPMENT WILL BE WORN WHEN NECESSARY (I.E., GOGGLES, WELDING HOOD, EAR PLUGS, ETC.).

4.  100% TIE-OFF IN ALL LIFTS WHILE IN SCISSOR AND BOOM LIFTS.

5.  NO RADIOS, PERSONAL MUSIC PLAYERS (IPOD, MP3, ETC.) ALLOWED.

6.  CELL PHONE USE ALLOWED ONLY IN SAFE AREAS; NO WALKING, WORKING, OR DRIVING WHILE USING A CELL PHONE.

7.  NO ALCOHOL, ILLICIT DRUGS, FIRE ARMS OR WEAPONS PERMITTED.

8.  SMOKING OR CHEWING OF TOBACCO PERMITTED ONLY IN AREAS DESIGNATED BY SUPERINTENDENT.

9.  EATING AREAS AND WORK AREAS WILL BE CLEANED DAILY AND MATERIALS STACKED/STORED SECURELY.  NO GLASS CONTAINERS ALLOWED ON SITE.

10. REPORT ALL ACCIDENTS, INJURIES AND HAZARDOUS CONDITIONS TO YOUR SUPERVISOR IMMEDIATELY.

11. ONLY TRAINED PERSONNEL WILL OPERATE POWER TOOLS, WELDING MACHINES, CUTTING TORCHES, AND HEAVY CONSTRUCTION EQUIPMENT.

12. ALL SAFETY POLICIES AND RULES OF THE PLANT OR FACILITY OWNER WILL BE COMPLIED WITH FULLY.

# SAFETY FIRST

Date: 7/28/2020



**D B I A**

DESIGN-BUILD
INSTITUTE OF AMERICA

# Standard Form of Agreement Between Owner and Design-Builder — Cost Plus Fee with an Option for a Guaranteed Maximum Price

*This document has important legal consequences. Consultation with
an attorney is recommended with respect to its completion or modification.*

This AGREEMENT is made as of the 28th day of July in the year of 2020, by and between the following parties, for services in connection with the Project identified below:

**OWNER:**
*(Name and address)*

Vital Pharmaceuticals, Inc.
1600 N. Park Drive
Weston, FL 33326

**DESIGN-BUILDER:**
*(Name and address)*

Stellar Group, Inc.
2900 Hartley Road
Jacksonville, FL 32257

**PROJECT:**
*(Include Project name and location
as it will appear in the Contract
Documents)*

Phoenix Can Manufacturing
1635 South 43rd Avenue
Phoenix, AZ 85009

In consideration of the mutual covenants and obligations contained herein, Owner and Design-Builder agree as set forth herein.

# Article 1
## Scope of Work

**1.1** Design-Builder shall perform all design and construction services, and provide all material, equipment, tools and labor, necessary to complete the Work described in and reasonably inferable from the Contract Documents.

# Article 2
## Contract Documents

**2.1** The Contract Documents are comprised of the following:

.1 All written modifications, amendments (including, as applicable, the GMP Exhibit referenced in Section 6.5.1.1 hereof or the GMP Proposal accepted by Owner in accordance with Section 6.5.2 hereof) and change orders to this Agreement issued in accordance with DBIA Document No. 535, *Standard Form of General Conditions of Contract Between Owner and Design-Builder* (1998 Edition) ("General Conditions of Contract");

.2 This Agreement, including all exhibits (but excluding, if applicable, the GMP Exhibit) and attachments;

.3 The General Conditions of Contract;

.4 Construction Documents prepared and approved in accordance with Section 2.4 of the General Conditions of Contract;

.5 Stellar Group Proposal revision 1 dated July 24, 2020 including the exceptions and clarifications set forth therein;

.6 The following other documents, if any *(List, for example, Unit Price Schedules, Design-Builder's allowances, Performance Standard Requirements, Owner's Permit List and any other document Owner and Design-Builder elect to make a Contract Document)*:

.7 Exhibit B -- Insurance Requirements

.8 Design-Builder Rate Sheet, a copy of which is attached to this Agreement as Exhibit C. The rates contained in this Rate Sheet will remain fixed for the duration of the project.

.9 Exhibit D -- Owner Permit List

# Article 3
## Interpretation and Intent

**3.1** The Contract Documents are intended to permit the parties to complete the Work and all obligations required by the Contract Documents within the Contract Time(s) for the Contract Price. The Contract Documents are intended to be complementary and interpreted in harmony so as to avoid conflict, with words and phrases interpreted in a manner consistent with construction and design industry standards. In the event of any inconsistency, conflict, or ambiguity between or among the Contract

DBIA Document No. 530 - Standard Form of Agreement Between
Owner and Design-Builder – Cost Plus Fee with an Option for a Guaranteed Maximum Price
© 1998 Design-Build Institute of America



Documents, the Contract Documents shall take precedence in the order in which they are listed in Section 2.1 hereof.

3.2 Terms, words and phrases used in the Contract Documents, including this Agreement, shall have the meanings given them in the General Conditions of Contract.

3.3 The Contract Documents form the entire agreement between Owner and Design-Builder and by incorporation herein are as fully binding on the parties as if repeated herein. No oral representations or other agreements have been made by the parties except as specifically stated in the Contract Documents.

## Article 4

## Ownership of Work Product

4.1 Work Product. All drawings, specifications and other documents and electronic data furnished by Design-Builder to Owner under this Agreement ("Work Product") are deemed to be instruments of service and Design-Builder shall retain the ownership and property interests therein, including the copyrights thereto.

4.2 Owner's Limited License Upon Payment in Full. Upon Owner's payment in full for all Work performed under the Contract Documents, Design-Builder shall grant Owner a limited license to use the Work Product in connection with Owner's occupancy of the Project, conditioned on Owner's express understanding that its use of the Work Product is at Owner's sole risk and without liability or legal exposure to Design-Builder or anyone working by or through Design-Builder, including Design Consultants of any tier (collectively the "Indemnified Parties").

4.3 Owner's License upon Owner's Termination for Convenience or Design-Builder's Election to Terminate. If Owner terminates this Agreement for its convenience as set forth in Article 8 hereof, or if Design-Builder elects to terminate this Agreement in accordance with Section 11.4 of the General Conditions of Contract, Design-Builder shall, upon Owner's payment in full of the undisputed amounts due Design-Builder under the Contract Documents, grant Owner an irrevocable, royalty-free, and transferable license to use the Work Product to complete the Project and subsequently occupy and use the Project, and Owner shall thereafter have the same rights as set forth in Section 4.2. However, if the Work Product is incomplete or the Owner alters or reuses it on any other project without the involvement of the Design-Builder the Design-Builder or anyone working by or through Design-Builder, including Design Consultants of any tier shall not be liable for such use, and Owner shall have the obligation to provide the indemnity set forth in Section 4.5 below.

4.4 Owner's Limited License Upon Design-Builder's Default. If this Agreement is terminated due to Design-Builder's default pursuant to Section 11.2 of the General Conditions of Contract and (i) it is determined that Design-Builder was in default and (ii) Owner has fully satisfied all of its obligations under the Contract Documents, Design-Builder shall grant Owner a limited license to use the Work Product in connection with Owner's completion and occupancy of the Project. This limited license is conditioned on Owner's express understanding that its use of the Work Product is at Owner's sole risk and without liability or legal exposure to any Indemnified Party.

4.5 Owner's Indemnification for Use of Work Product. If Owner uses the Work Product under any of the circumstances identified in this Article 4, Owner shall defend, indemnify and hold harmless the Indemnified Parties from and against any and all claims, damages, liabilities, losses and expenses, including attorneys' fees, arising out of or resulting from the use of the Work Product.

DBIA Document No. 530  •  Standard Form of Agreement Between
Owner and Design-Builder — Cost Plus Fee with an Option for a Guaranteed Maximum Price
© 1998 Design-Build Institute of America



## Article 5

## Contract Time

**5.1** **Date of Commencement.** The Work shall commence within five (5) days of Design-Builder's receipt of Owner's Notice to Proceed ("Date of Commencement") unless the parties mutually agree otherwise in writing.

.1 The "Date of Commencement" shall be dependent upon receipt of required permits and the execution of this Agreement.

**5.2** **Substantial Completion and Final Completion**

**5.2.1** Mutually agreed Substantial Completion of the Phased Work shall be established by the Guaranteed Maximum Price (GMP) proposal, to be submitted at a later date.

**5.2.2** Interim milestones and/or Substantial Completion of identified portions of the Work shall be achieved as follows:  *(Insert any interim milestones for portions of the Work with different scheduled dates for Substantial Completion)*

| | | |
|---|---|---|
| .1 | **Design Development 1 – (30% Issue)** | 8/28/2020 |
| .2 | **Design Development 2 – (60% Issue)** | 10/30/2020 |
| .3 | **Establish GMP Budget** | 11/11/2020 |
| .3 | Additional interim milestones and / or Substantial Completion Dates will be established by the GMP Proposal. | |

**5.2.3** Final Completion of the Work or identified portions of the Work shall be achieved as expeditiously as reasonably practicable.

**5.2.4** All of the dates set forth in this Article 5 ("Contract Time(s)") shall be subject to adjustment in accordance with the General Conditions of Contract.

**5.3** **Time is of the Essence.** Owner and Design-Builder mutually agree that time is of the essence with respect to the dates and times set forth in the Contract Documents.

**5.4** **Liquidated Damages.** Design-Builder understands that if Substantial Completion is not attained by the Scheduled Substantial Completion Date, Owner will suffer damages which are difficult to determine and accurately specify. Design-Builder agrees that if Substantial Completion is not attained by fourteen (14) days after the Scheduled Substantial Completion Date (the "LD Date"), Design-Builder shall pay Owner Five thousand  Dollars (\$ 5,000) as liquidated damages for each day that Substantial Completion extends beyond the LD Date capped at Half of the CM Fee  . The liquidated damages provided herein shall be in lieu of all liability for any and all extra costs, losses, expenses, claims, penalties and any other damages, whether special or consequential, and of whatsoever nature incurred by Owner which are occasioned by any delay in achieving Substantial Completion.  *(If a GMP is not established upon execution of this Agreement, the parties should consider setting liquidated damages after GMP negotiations. If liquidated damages are applicable to any dates set forth in Section 5.2.2 hereof, this Section 5.4 will need to be modified accordingly.)*

**5.5** **Omitted.**

**5.6 Adverse Weather.** Design-Builder has included normal working hours of forty (40) hours per week in the project schedule unless otherwise noted in GMP Proposal. Design-Builder has included one (1) adverse weather make-up day per week throughout the duration of on-site works for the Project (Saturdays). Should adverse weather occur in excess of one (1) day per week, an Extension of Time shall



be granted equal to the lost time and any additional days necessary to dry-out or de-muck the site. Unused adverse weather make-up days do not carry over from week to week.

## Article 6

## Contract Price

**6.1    Contract Price**

**6.1.1**    Owner shall pay Design-Builder in accordance with Article 6 of the General Conditions of Contract a contract price ("Contract Price") equal to Design-Builder's Fee (as defined in Section 6.2 hereof) plus the Cost of the Work (as defined in Section 6.3 hereof), subject to any GMP established in Section 6.5 hereof and any adjustments made in accordance with the General Conditions of Contract.

**6.1.2**    For the specific Work set forth below, Owner agrees to pay Design-Builder, as part of the Contract Price, on the following basis:

**6.2    Design-Builder's Fees and Insurance**

**6.2.1**    Design-Builder's Fee shall be:

> .1    The Construction Management Fee is included at ███████████ f the actual Cost of the Work.

**6.2.2**    Design-Builder's Fee will be adjusted as follows for any changes in the Work:  *(Insert financial arrangements for adjustments)*

> .1    Design Engineering Services will be adjusted for scope additions to the project via a lump sum amount or on a Time and Material basis per the Design-Builder's Rate Sheet included in Exhibit C to this Agreement, at Owner's option.

> .2    All administrative and engineering travel associated with the changes will be invoiced to the Owner at cost.

> .3    ████████████████████████████████████████

**6.2.3**    Design-Builder's Insurance shall be:

> .1    The costs for Project Insurance is included at ██████████████████████ ██████████████ f (1) the actual Cost of Work plus (2) the Construction Management Fee calculated pursuant to Section 6.2.1.1.

**6.3    Cost of the Work.** The term Cost of the Work shall mean costs reasonably incurred by Design-Builder in the proper performance of the Work. The Cost of the Work shall include only the following:

> .1    Wages of direct employees of Design-Builder performing the Work at the Site or, with Owner's agreement, at locations off the Site. Until the GMP is established, these costs shall be in accordance with the rates set forth in exhibit C to this Agreement.

.2    Wages or salaries of Design-Builder's supervisory and administrative personnel engaged in the performance of the Work and who are located at the Site or working off-Site to assist in the production or transportation of material and equipment necessary for the Work. Until the GMP is established, these costs shall be in accordance with the rates set forth in Design-Builder's Rate Sheet included in Exhibit C to this Agreement.

.3    Wages or salaries of Design-Builder's personnel stationed at Design-Builder's principal or branch offices, which might include the vice president, project developer, senior project manager, project manager, assistant project manager, administrative assistant and the project accountant. Until the GMP is established, these costs shall be in accordance with the rates set forth in Design-Builder's Rate Sheet included in Exhibit C to this Agreement.

.4    Costs incurred by Design-Builder for employee benefits, premiums, taxes, insurance, contributions and assessments required by law, collective bargaining agreements, or which are customarily paid by Design-Builder, to the extent such costs are based on wages and salaries paid to employees of Design-Builder covered under Sections 6.3.1 through 6.3.3 hereof. Until the GMP is established, these costs shall be in accordance with and included in the rates set forth in Design-Builder's Rate Sheet included in Exhibit C to this Agreement.

.5    The reasonable portion of the cost of travel, accommodations and meals for Design-Builder's personnel necessarily and directly incurred in connection with the performance of the Work.

.6    Payments properly made by Design-Builder to Subcontractors and Design Consultants for performance of portions of the Work, including any insurance and bond premiums incurred by Subcontractors and Design Consultants.

.7    Costs incurred by Design-Builder in repairing or correcting defective, damaged or nonconforming Work, provided that such defective, damaged or nonconforming Work was beyond the reasonable control of Design-Builder or those working by or through Design-Builder. If the costs associated with such defective, damaged or nonconforming Work are recoverable from Insurance, Subcontractors or Design Consultants, Design-Builder shall exercise best efforts to obtain recovery from the appropriate source and credit Owner if recovery is obtained.

.8    Costs, including deposits, transportation, inspection, testing, storage and handling, of materials, equipment and supplies incorporated or reasonably used in completing the Work.

.9    Costs less salvage value of materials, supplies, temporary facilities, machinery, equipment and hand tools not customarily owned by the workers that are not fully consumed in the performance of the Work and which remain the property of Design-Builder, including the costs of transporting, inspecting, testing, handling, installing, maintaining, dismantling and removing such items.

.10   Costs of removal of debris and waste from the Site.

DBIA Document No. 530  •  Standard Form of Agreement Between
Owner and Design-Builder — Cost Plus Fee with an Option for a Guaranteed Maximum Price
© 1998 Design-Build Institute of America

.11    The reasonable costs and expenses incurred in establishing, operating and demobilizing the Site office, including the cost of facsimile transmissions, long-distance telephone calls, postage and express delivery charges, telephone service, high speed internet service, photocopying, video and/or photographic services and reasonable petty cash expenses.

.12    Rental charges and the costs of transportation, installation, minor repairs and replacements, dismantling and removal of temporary facilities, machinery, equipment and hand tools not customarily owned by the workers, which are provided by Design-Builder at the Site, whether rented from Design-Builder or others, and incurred in the performance of the Work.

.13    Premiums for insurance and bonds required by this Agreement or the performance of the Work.

.14    All fuel and utility costs incurred in the performance of the Work.

.15    Sales, use or similar taxes, tariffs or duties incurred in the performance of the Work.

.16    Legal costs, court costs and costs of mediation and arbitration reasonably arising from Design-Builder's performance of the Work, provided such costs do not arise from disputes between Owner and Design-Builder and incurred after the consent of the Owner.

.17    Costs for permits, royalties, licenses, tests and inspections incurred by Design-Builder as a requirement of the Contract Documents.

.18    The cost of defending suits or claims for infringement of patent rights arising from the use of a particular design, process, or product required by Owner, paying legal judgments against Design-Builder resulting from such suits or claims, and paying settlements made with Owner's consent.

.19    Deposits which are lost, except to the extent caused by Design-Builder's negligence.

.20    Costs incurred in preventing damage, injury or loss in case of an emergency affecting the safety of persons and property.

.21    Other costs reasonably and properly incurred in the performance of the Work to the extent approved in writing by Owner.

.22    Design Engineering Services as written in Design-Builder's proposal revision 1 dated July 24, 2020 and included to this Agreement in Exhibit A. These services are defined and charged as follows:

      .1  Building and Infrastructure Design Engineering Service ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ not including travel and expenses, or Project insurance.

      .2  Process Design Engineering Service ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ not including travel and expenses, or Project insurance.

DBIA Document No. 530 • Standard Form of Agreement Between Owner and Design-Builder—Cost Plus Fee with an Option for a Guaranteed Maximum Price © 1998 Design-Build Institute of America

.23    Design-Builder's self-performed work and work performed by related companies to the Design-Builder (as noted below) ▓▓▓▓▓▓▓▓▓▓▓. These scopes of work will provide an open book estimate which will detail all cost, and show three (3) competitive bids for all major materials and equipment. Once the estimate has been reviewed and approved by Owner, the scope will become a lump sum cost and will be handled like all other trade contracts.

   .1    Design-Builder self-performed work including:

      .1    Thermal (roofing, insulation metal panel walls/ceilings, floor insulation and thermal doors),

   .2    Design-Builder related companies self-performing work:

      .1    Stellar Refrigeration Contracting - Refrigeration (equipment, skids, piping, etc.) for all areas 60° and lower.

      .2    Mechanical HVAC for all areas above 60°,

      .3    Utilities (Steam, air, water, etc.)

   .3    All other trades required, not listed above, will be subcontracted.

## 6.4    Non-Reimbursable Costs

The following shall be excluded from the Cost of the Work:

   .1    Compensation for Design-Builder's personnel stationed at Design-Builder's principal or branch offices, except as provided for in Sections 6.3.1, 6.3.2 and 6.3.3 hereof.

   .2    Overhead and general expenses, except as provided for in Section 6.3 hereof, or which may be recoverable for changes to the Work.

   .3    The cost of Design-Builder's capital used in the performance of the Work.

   .4    If the parties have agreed on a GMP, costs that would cause the GMP, as adjusted in accordance with the Contract Documents, to be exceeded.

*(The parties shall comply with the following Section 6.5 based upon whether the GMP is agreed upon before the execution of this Agreement or will be developed and agreed upon after execution of this Agreement. If the parties do not use a GMP, this Section 6.5 shall be deemed inapplicable and compensation to Design-Builder shall be based on those fees and costs identified in the balance of this Article 6.)*

## 6.5    The Guaranteed Maximum Price

DBIA Document No. 530  •  Standard Form of Agreement Between
Owner and Design-Builder -- Cost Plus Fee with an Option for a Guaranteed Maximum Price
© 1998 Design-Build Institute of America

**6.5.1  Omitted**

**6.5.1.1  Omitted**

**6.5.1.2  Omitted**

**6.5.2  GMP Established after Execution of this Agreement**

**6.5.2.1 GMP Proposal.** No later than four (4) weeks after the 60% design review with Owner, Design-Builder shall submit a GMP Proposal to Owner which shall include the following, unless the parties mutually agree otherwise:

 **.1** A proposed GMP, which shall be the sum of:

  **i.** Design-Builder's Fee as defined in Section 6.2.1 hereof;

  **ii.** If applicable, any prices established under Section 6.1.2 hereof; and

  **iii.** the estimated Cost of the Work as defined in Section 6.3 hereof, inclusive of any Design-Builder's Contingency defined as defined in Section 6.5.2.5 hereof.

 **.2** A list of the drawings and specifications, including all addenda, used as the basis for the GMP proposal;

 **.3** A list of the assumptions and clarifications made by Design-Builder in the preparation of the GMP Proposal, which list is intended to supplement the information contained in the drawings and specifications;

 **.4** The Scheduled Substantial Completion Date upon which the proposed GMP is based, to the extent said date has not already been established under Section 5.2 hereof, and a schedule upon which the Scheduled Substantial Completion Date is based;

 **.5** If applicable, a list of allowances and a statement of their basis;

 **.6** If applicable, a schedule of alternate prices;

 **.7** If applicable, a schedule of unit prices;

 **.8** If applicable, a statement of Additional Services; and

 **.9** The time limit for acceptance of the GMP Proposal.

**6.5.2.2 Review and Adjustment to GMP Proposal.** After submission of the GMP Proposal, Design-Builder and Owner shall meet to discuss and review the GMP Proposal. If Owner has any comments regarding the GMP Proposal, or finds any inconsistencies or inaccuracies in the information presented, it shall promptly give written notice to Design-Builder of such comments or findings. If appropriate, Design-Builder shall, upon receipt of Owner's notice, make appropriate adjustments to the GMP Proposal.

**6.5.2.3 Acceptance of GMP Proposal.** If Owner accepts the GMP Proposal, as may be amended by Design-Builder, the GMP and its basis shall be set forth in an amendment to this Agreement.

**6.5.2.4 Failure to Accept the GMP Proposal.** If Owner rejects the GMP Proposal, or fails to notify Design-Builder in writing on or before the date specified in the GMP Proposal that it accepts the GMP Proposal, the GMP Proposal shall be deemed withdrawn and of no effect. In such event, Owner and Design-Builder shall meet and confer as to how the Project will proceed, with Owner having the following options:

    .1    Owner may suggest modifications to the GMP Proposal, whereupon, if such modifications are accepted in writing by Design-Builder, the GMP Proposal shall be deemed accepted and the parties shall proceed in accordance with Section 6.5.2.3 above;

    .2    Owner may authorize Design-Builder to continue to proceed with the Work on the basis of reimbursement as provided in Section 6.1 hereof without a GMP, in which case all references in this Agreement to the GMP shall not be applicable; or

    .3    Owner may terminate this Agreement for convenience in accordance with Article 8 hereof.

If Owner fails to exercise any of the above options, Design-Builder shall have the right to (i) continue with the Work as if Owner had elected to proceed in accordance with Item .2 above, and be paid by Owner accordingly, unless and until Owner notifies it in writing to stop the Work, or (ii) suspend performance of Work in accordance with Section 11.3.1 of the General Conditions of Contract.

**6.5.2.5 Contingency.** The GMP may contain an agreed amount for the Design-Builder's contingency. The contingency is available for Design-Builder's exclusive use for costs that are incurred in performing the Work that are not included in a specific line item or the basis for a Change Order under the Contract Documents. The Design-Builder shall be entitled to payment for costs that are incurred in performing the Work that are not included in the Cost of the Work set forth in Section 6.3. By way of example, and not as a limitation, such costs include trade buy-out differentials, overtime, acceleration, costs in correcting defective, damaged or nonconforming Work, design errors or omissions and Subcontractor defaults. The Contingency is not available to Owner for any reason, including changes in scope or any other item which would enable Design-Builder to increase the GMP under the Contract Documents. Design-Builder shall provide Owner with notice of all anticipated charges against the Contingency. Any unspent Contingency at project final completion will be considered "Savings" and addressed as defined in section 6.5.3.

**6.5.3    Savings**

**6.5.3.1** If the sum of the actual Cost of the Work and Design-Builder's Fee and amounts paid as contingency items pursuant to Section 6.5.2.5 (and, if applicable, any prices established under Section 6.1.2 hereof) is less than the GMP, as such GMP may have been adjusted over the course of the Project, the difference ("Savings") shall be shared as follows:



**6.5.3.2** Savings shall be calculated and paid as part of Final Payment under Section 7.3 hereof, with the understanding that to the extent Design-Builder incurs costs after Final Completion which would have been payable to Design-Builder as a Cost of the Work, Design-Builder shall be entitled to payment from Owner for that portion of such costs that were distributed to Owner as Savings.

DBIA Document No. 530  •  Standard Form of Agreement Between
Owner and Design-Builder — Cost Plus Fee with an Option for a Guaranteed Maximum Price
© 1998 Design-Build Institute of America




## Article 7

## Procedure for Payment

**7.1     Progress Payments**

**7.1.1**    Design-Builder shall submit to Owner on the Twenty-Fifth (25th) day of each month, beginning with the first month after the Date of Commencement, Design-Builder's Application for Payment in accordance with Article 6 of the General Conditions of Contract.

**7.1.2**    Owner shall make payment within thirty (30) days after Owner's receipt of each properly submitted and accurate Application for Payment in accordance with Article 6 of the General Conditions of Contract, but in each case less the total of payments previously made, and less amounts properly withheld under Section 6.3 of the General Conditions of Contract.

**7.1.3**    If Design-Builder's Fee under Section 6.2.1 hereof is a fixed amount, the amount of Design-Builder's Fee to be included in Design-Builder's monthly Application for Payment and paid by Owner shall be proportional to the percentage of the Work completed, less payments previously made on account of Design-Builder's Fee.

**7.1.4**    Prior to commencement of construction, the Design-Builder may ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ The advanced amount is considered a mobilization and cash flow payment and is to be considered part of the overall GMP.  The payment under this Section 7.1.4 shall be credited against the subsequent Applications for Payment until the amount advanced is recouped.

**7.2     Retainage on Progress Payments**

**7.2.1**    Owner will retain Ten percent (10%) of each Application for Payment provided, however, that when fifty percent (50%) of the Work has been completed by Design-Builder, if there are no disputes or delays, Owner will not retain any additional amounts from Design-Builder's subsequent Applications for Payment.  Owner will also reasonably consider reducing retainage for Subcontractors completing their work early in the Project.

    **.1**    Retainage will not be held on: amounts covered by the General Conditions Amount, Design Engineering Services, Process Design Services, Process Equipment Purchases, Construction Management Fee and Project Insurances.

**7.2.2**    Upon Substantial Completion of the entire Work or, if applicable, any portion of the Work, pursuant to Section 6.6 of the General Conditions of Contract, Owner shall release to Design-Builder all retained amounts relating, as applicable, to the entire Work or completed portion of the Work, less an amount equal to the reasonable value of all remaining or incomplete items of Work as noted in the Certificate of Substantial Completion.

**7.3     Final Payment.**  Design-Builder shall submit its Final Application for Payment to Owner in accordance with Section 6.7 of the General Conditions of Contract.  Owner shall make payment on Design-Builder's properly submitted and accurate Final Application for Payment within thirty (30) days after Owner's receipt of the Final Application for Payment, provided that Design-Builder has satisfied the requirements for final payment set forth in Section 6.7.2 of the General Conditions of Contract.

**7.4**    ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

**7.5    Record Keeping and Finance Controls.**  Design-Builder acknowledges that this Agreement is to be administered on an "open book" arrangement relative to Costs of the Work.  Design-Builder shall keep full and detailed accounts and exercise such controls as may be necessary for proper financial management, using accounting and control systems in accordance with generally accepted accounting principles and as may be provided in the Contract Documents.  During the performance of the Work and for a period of three (3) years after Final Payment, Owner and Owner's accountants shall be afforded access from time to time, upon reasonable notice, to Design-Builder's records, books, correspondence, receipts, subcontracts, purchase orders, vouchers, memoranda and other data relating to the Work, all of which Design-Builder shall preserve for a period of three (3) years after Final Payment.

## Article 8

## Termination for Convenience

**8.1**    Upon ten (10) days' written notice to Design-Builder, Owner may, for its convenience and without cause, elect to terminate this Agreement.  In such event, Owner shall pay Design-Builder for the following:

    **.1**    All Work executed and for proven loss, cost or expense in connection with the Work in accordance with the terms of this Agreement; and

    **.2**    The reasonable costs and expenses attributable to such termination, including demobilization costs and amounts due in settlement of terminated contracts with Subcontractors and Design Consultants; and

    **.3**    The fair and reasonable sums for overhead and profit on the sum of Items .1 and .2 above.

**8.2**    Omitted.

    **.1**

**8.3**    If Owner terminates this Agreement pursuant to Section 8.1 above and proceeds to design and construct the Project through its employees, agents or third parties, Owner's rights to use the Work Product shall be as set forth in Article 4 hereof.

## Article 9

## Representatives of the Parties

**9.1    Owner's Representatives**

**9.1.1**    Owner designates the individual listed below as its Senior Representative ("Owner's Senior Representative"), which individual has the authority and responsibility for avoiding and resolving disputes under Section 10.2.3 of the General Conditions of Contract: *(identify individual's name, title, address and telephone number)*

DBIA Document No. 530  •  Standard Form of Agreement Between
Owner and Design-Builder — Cost Plus Fee with an Option for a Guaranteed Maximum Price
© 1998 Design-Build Institute of America



**9.1.2**   Owner designates the individual listed below as its Owner's Representative, which individual has the authority and responsibility set forth in Section 3.4 of the General Conditions of Contract: *(Identify individual's name, title, address and telephone numbers)*

## 9.2    Design-Builder's Representatives

**9.2.1**   Design-Builder designates the individual listed below as its Senior Representative ("Design-Builder's Senior Representative"), which individual has the authority and responsibility for avoiding and resolving disputes under Section 10.2.3 of the General Conditions of Contract: *(Identify individual's name, title, address and telephone numbers)*

Stellar Group, Inc.

Scott Mark
Sr. Vice President Food Manufacturing and Logistics
2900 Hartley Road
Jacksonville, FL 32257
Phone: 904-899-9448
Email: smark@stellar.net

**9.2.2**   Design-Builder designates the individuals listed below as its Design-Builder's Representative, which individual has the authority and responsibility set forth in Section 2.1.1 of the General Conditions of Contract: *(Identify individual's name, title, address and telephone numbers)*

Derek Bickerton
Project Developer
2900 Hartley Road
Jacksonville, FL 32257
Phone: 904-899-9242
Email: dbickerton@stellar.net

## Article 10

### Bonds and Insurance

**10.1    Insurance.  Design-Builder** shall procure in accordance with Article 5 of the General Conditions of Contract the insurance coverages set forth in the Exhibit B (Insurance Requirements) attached hereto:.

*(Attach Insurance Schedule indicating the required coverage, amount of required coverage, duration of coverage, required rating of insurance carriers and any other insurance requirements required of the parties)*

**10.2    Bonds and Other Performance Security.**   Payment and Performance Bonds are not required.

## Article 11

### Other Provisions

**11.1    Other provisions, if any, are as follows:** *(insert any additional provisions)*

**11.1.1** Notwithstanding anything to the contrary herein contained, both the price and the project schedule set forth herein or elsewhere in the contract documents are subject to, conditioned upon and shall be changed as a result of the direct or indirect impacts experienced due to the  COVID-19 or Corona virus. Such impacts include, but are not limited to, supply chain disruption, material shortage, labor shortage, price increases, governmental mandates, orders or directives, plant or facility closures, diminished output, disruption of the economy, permit delays or refusals, disruption of the financial system, and banking moratoriums. Contractor shall endeavor to notify the Owner from time to time of changes to the price and/or the project schedule due to any such impacts, and where appropriate, provide any available backup documentation.

In executing this Agreement, Owner and Design-Builder each individually represents that it has the necessary financial resources to fulfill its obligations under this Agreement, and each has the necessary corporate approvals to execute this Agreement, and perform the services described herein.

**OWNER:**                                               **DESIGN-BUILDER:**

*John H. Owens*                                          *Stellar Group, Inc.*
(Name of Owner)                                          (Name of Design-Builder)

*(Signature)*                                            *(Signature)*

*John H. Owens*                                          *Scott Mark*
(Printed Name)                                           (Printed Name)

*CEO & CSO*                                              *Sr. VP Food & Beverage*
(Title)                                                  (Title)

Date:  *7-28-2020*                                       Date:  *8-3-2020*

Caution:  You should sign an original DBIA document which has this caution printed in blue.  An original assures that changes will not be obscured as may occur when documents are reproduced.

**EXHIBIT E**

**INSURANCE REQUIREMENTS**

1. **Insurance Coverage of Stellar Group, Inc.** Stellar Group, Inc. ("Stellar") will maintain the insurance policies described in Schedule 1 attached hereto (collectively, the "Insurance Policies") for the duration agreed to by the parties in the Design Builder proposal or contract. If any of the Insurance Policies are canceled, renewal refused or materially changed, Stellar shall provide written notice to Owner within (10) days. Upon request by Owner, Stellar shall provide Owner with written evidence that the Insurance Policies are in force. Stellar shall name Owner as an additional insured under those Insurance Policies on Schedule 1 which indicate Owner is an additional insured.

2. **Builders' Risk Insurance.** Check one: ☐Owner ☐☒Stellar shall purchase and maintain in force builders' risk insurance for the Work. Such builders' risk insurance (the "Builders' Risk Insurance") shall:

(a) Be written in an amount at least equal to the initial contract sum as well as subsequent modifications of that sum.

(b) Name as insureds the Owner and Stellar, and contain a provision that the insurance will not be canceled or allowed to expire unless at least 10 days prior written notice has been given to Stellar and Owner

(c) Apply on a replacement cost basis and cover all risks of physical loss except those specifically excluded in the policy, but at a minimum cover the perils of fire, lightning, explosion, windstorm, hail, smoke, aircraft, vehicles, riot, civil commotion, theft, vandalism, malicious mischief, and collapse.

(d) Cover the portions of the Work that are intended for use at the construction site, but temporarily located away from the site or in transit to the site.

(e) Cover the cost of removing debris, including demolition as may be made legally necessary by the operation of any law, ordinance, or regulation.

If Stellar is responsible for purchasing and maintaining the Builders' Risk Insurance (as indicated above), Owner acknowledges and agrees that the Contract Sum does not include the amount of the premium of the Builders' Risk Insurance and Owner shall pay Stellar the amount of such premium in addition to the Contract Sum.

3. **Flood and Earthquake.** If either party desires to include under the Builders' Risk Insurance coverage for flood or earthquake, Owner and Stellar shall agree upon the price, scope and amount of deductibles of the supplemental coverage to be purchased. Otherwise, the Builders Risk Insurance will not cover damage caused by flood or earthquake, and any and all Losses (as defined herein) attributable to flood or earthquake shall be exclusively the responsibility of Owner.

4. **Coverage of Owner's Property.** If Owner desires to include under the Builders' Risk Insurance coverage for damage or losses (a) arising from or out of work performed by Owner or by separate contractors under Owner's control (the "Owner's Work") or (b) sustained to Owner's property, including, but not limited to materials, structures, machinery or equipment, located or stored by Owner at the Site (the "Owner's Property"), Owner and Stellar shall agree upon the price, scope and amount of deductibles of the supplemental coverage to be purchased. Otherwise, the Builders' Risk Insurance will not cover losses or damage relating to the Owner's Work or damages sustained to the Owner's Property, and any and all such losses or damage shall be exclusively the responsibility of Owner.

5. **Partial occupancy or use of the Work.** Owner shall not commence with the partial occupancy or use of the Work until the Builders' Risk Insurance underwriter (the "Underwriter") has provided written consent to Owner's partial occupancy or use. Owner and Stellar shall take reasonable steps to obtain such consent, but failure to do so will preclude coverage under the Builders' Risk Insurance. Unless otherwise provided by the Underwriter, any and all Losses sustained after Owner's occupancy or use of the Work shall be exclusively the responsibility of Owner.

6. **Builders' Risk Insurance Policy Period.** The Builders' Risk Insurance will be maintained in effect, unless otherwise provided for by written agreement, from the date construction activities begin until the earliest of the following dates:

(a) the date the Owner and Stellar agree that it shall be terminated;

(b) the date final payment, as provided for in the agreement, has been made or

(c) the date a certificate of occupancy is issued.

7. **Builders' Risk Insurance Deductible.** In the event a claim is made under the Builders' Risk Insurance, payment of any deductibles applicable to the Builders' Risk Insurance (the "Builders' Risk Deductibles") shall be the sole and exclusive responsibility of Owner. Payment of the Builders' Risk Deductibles shall be the sole responsibility of Stellar regardless of whether the Builders' Risk Insurance is procured by Owner or procured by Stellar. Stellar shall include an allowance in the GMP Amendment to cover these potential costs.

JAX\1035634_1

8. **Waiver of Subrogation.** Owner and Stellar waive all rights against each other and their officers, directors, agents, and employees for recovery from damages and injuries however caused to the extent they are covered by the Insurance Policies and the Builders' Risk Insurance or any other insurance applicable to the Work.

9. **Adequacy of Coverage.** Owner agrees that the maintenance of the Insurance Policies (and the Builders' Risk Insurance, if applicable) shall fulfill any and all of Stellar's obligations of insurance coverage. Owner agrees that the Insurance Policies (and the Builders' Risk Insurance, if applicable) are the only insurance policies maintained, and that are required to be maintained, by Stellar.

10. **Insurance As Sole Remedy.** Owner acknowledges the coverage limits of each of the Insurance Policies (and the Builders' Risk Insurance, if applicable) (the "Coverage Limits") and agrees that Stellar's obligation to Owner for any and all losses, damages or injuries arising from or out of the performance of the Work (each a "Loss" and collectively, "Losses") shall be limited to the Coverage Limits. Upon the occurrence of any Loss, Owner shall look solely to the Insurance Policies and the Builders' Risk Insurance for recovery for any Loss and Stellar shall not be responsible or liable for any Loss in excess of the Coverage Limits. Owner acknowledges that any and all Losses covered by the Insurance Policies or the Builders' Risk Insurance that are in excess of the Coverage Limits, including, but not limited to, payment of deductibles or losses relating to Owner's collateral operations, shall be exclusively the responsibility of Owner and not Stellar regardless of the cause of the Loss.

11. **Supplemental Insurance.** If Owner requires coverage in excess of the Coverage Limits, then Owner shall obtain such additional coverage or supplemental insurance.

12. **Owner's Insurance.** Owner shall procure the following insurance (collectively, the "Owner's Insurance Policies"): (a) Commercial general liability; (b) Automobile liability insurance; (c) Property insurance; (d) Business interruption insurance; (e) Workers' compensation and employers liability insurance; and (f) Other insurance required by applicable law, rule, regulation or ordinance.

Owner shall maintain the Owner's Insurance Policies in full force and effect for the duration as agreed to by the parties. None of the Owner's Insurance Policies (or the Builders' Risk Insurance, if applicable) will be canceled, renewal refused or materially changed unless at least ten (10) days prior written notice is given to Stellar by either Owner or the insurer. Owner shall provide Stellar with insurance certificates and endorsements naming Stellar as an additional insured for ongoing and completed operation and waiving rights of subrogation. **Owner's Property and Work.** Owner acknowledges that, unless Owner has obtained coverage under the Builders' Risk Insurance as described in Section 4 above, neither the Insurance Policies nor the Builders' Risk Insurance shall provide coverage for any losses relating to the Owner's Work or damages sustained to the Owner's Property. Owner acknowledges and agrees that, unless Owner obtains coverage under the Builders' Risk Insurance as described in Section 4 above, it shall be the sole and exclusive responsibility of Owner to pay for any such losses or damage to the Owner's Work or the Owner's Property.

Acknowledged and agreed by:

STELLAR GROUP, INC.

By: _____

Its: _____

Owner: _____

By: _____

Its: _____

# ACORD® CERTIFICATE OF LIABILITY INSURANCE

| DATE (MM/DD/YYYY) |
|---|
| 10/01/2019 |

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must have ADDITIONAL INSURED provisions or be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | CONTACT NAME: |
|---|---|
| MARSH USA, INC. | PHONE (A/C, No, Ext): | FAX (A/C, No): |
| TWO ALLIANCE CENTER | E-MAIL ADDRESS: | |
| 3560 LENOX ROAD, SUITE 2400 | | |
| ATLANTA, GA 30326 | INSURER(S) AFFORDING COVERAGE | NAIC # |
| 101372994—GAUX-19-20 | INSURER A : The Travelers Indemnity Company | 25658 |
| | INSURER B : | |
| INSURED | INSURER C : | |
| Stellar Group Inc. | INSURER D : The Charter Oak Fire Insurance Co. | 25615 |
| 2900 Hartley Rd | INSURER E : Travelers Property Casualty Company of America | 25674 |
| Jacksonville, FL 32257 | INSURER F : | |

## COVERAGES     CERTIFICATE NUMBER: ATL-004614042     REVISION NUMBER: 1

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSR | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| A | COMMERCIAL GENERAL LIABILITY | | | VTC2K-CO-8H1850A-19 | 10/01/2019 | 10/01/2020 | EACH OCCURRENCE | $ 1,000,000 |
| | ☐ CLAIMS-MADE ☒ OCCUR | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ 300,000 |
| | | | | | | | MED EXP (Any one person) | $ 5,000 |
| | | | | | | | PERSONAL & ADV INJURY | $ 1,000,000 |
| | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | | | GENERAL AGGREGATE | $ 2,000,000 |
| | ☒ POLICY ☐ PRO-JECT ☐ LOC | | | | | | PRODUCTS - COMP/OP AGG | $ 2,000,000 |
| | OTHER: | | | | | | | $ |
| B | AUTOMOBILE LIABILITY | | | VTJCAP-8H1350A-19 | 10/01/2019 | 10/01/2020 | COMBINED SINGLE LIMIT (Ea accident) | $ 1,000,000 |
| | ☒ ANY AUTO | | | | | | BODILY INJURY (Per person) | $ |
| | ☐ OWNED AUTOS ONLY ☐ SCHEDULED AUTOS | | | | | | BODILY INJURY (Per accident) | $ |
| | ☐ HIRED AUTOS ONLY ☐ NON-OWNED AUTOS ONLY | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| E | UMBRELLA LIAB ☒ OCCUR | | | VTSMJ-CUP-0P485427-TIL-19 | 10/01/2019 | 10/01/2020 | EACH OCCURRENCE | $ 5,000,000 |
| | EXCESS LIAB ☐ CLAIMS-MADE | | | | | | AGGREGATE | $ 5,000,000 |
| | ☐ DED ☐ RETENTION $ | | | | | | | $ |
| D E | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY Y / N ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? (Mandatory in NH) If yes, describe under DESCRIPTION OF OPERATIONS below | ☒ N | N/A | UB-8K16I300-19-26-R (AOS) UB-8K16I300-19-25-R (+Z & WI) | 10/01/2019 10/01/2019 | 10/01/2020 10/01/2020 | ☒ PER STATUTE ☐ OTHER | |
| | | | | | | | E.L. EACH ACCIDENT | $ 500,000 |
| | | | | | | | E.L. DISEASE - EA EMPLOYEE | $ 500,000 |
| | | | | | | | E.L. DISEASE - POLICY LIMIT | $ 500,000 |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)
Evidence of Insurance

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| Stellar Group Inc. 2900 Hartley Rd Jacksonville, FL 32257 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS. |
| | AUTHORIZED REPRESENTATIVE of Marsh USA Inc. Manashi Mukherjee *(signature)* |

© 1988-2016 ACORD CORPORATION. All rights reserved.

ACORD 25 (2016/03)     The ACORD name and logo are registered marks of ACORD

**EXHIBIT D**

**PERMIT RESPONSIBILITY LIST**

To Be finalized with GMP Proposal

smm

Date: 7/28/2020



**DBIA**

DESIGN-BUILD
INSTITUTE OF AMERICA

# Standard Form of General Conditions
# of Contract Between Owner and Design-Builder

*This document has important legal consequences. Consultation with
an attorney is recommended with respect to its completion or modification.*

## Table of Contents

Article 1:   General................................................................................................2

Article 2:   Design-Builder's Services and Responsibilities .............................2

Article 3:   Owner's Services and Responsibilities ...........................................6

Article 4:   Hazardous Conditions and Differing Site Conditions ...................7

Article 5:   Insurance and Bonds.......................................................................8

Article 6:   Payment...........................................................................................11

Article 7:   Indemnification ..............................................................................13

Article 8:   Time.................................................................................................15

Article 9:   Changes to the Contract Price and Time .......................................15

Article 10:  Contract Adjustments and Disputes ...............................................17

Article 11:  Stop Work and Termination for Cause ...........................................18

Article 12:  Miscellaneous.................................................................................20

# Article 1

## General

### 1.1 Mutual Obligations

**1.1.1** Owner and Design-Builder commit at all times to cooperate fully with each other, and proceed on the basis of trust and good faith, to permit each party to realize the benefits afforded under the Contract Documents.

### 1.2 Basic Definitions

**1.2.1** *Agreement* refers to the executed contract between Owner and Design-Builder under either DBIA Document No. 525, *Standard Form of Agreement Between Owner and Design-Builder c Lump Sum* (1998 Edition) or DBIA Document No. 530, *Standard Form of Agreement Between Owner and Design-Builder c Cost Plus Fee with an Option for a Guaranteed Maximum Price* (1998 Edition).

**1.2.2** *Day* or *Days* shall mean calender days unless otherwise specifically noted in the Contract Documents.

**1.2.3** *Design Consultant* is a qualified, licensed design professional who is not an employee of Design-Builder, but is retained by Design-Builder or employed or retained by anyone under contract with Design-Builder or Subcontractor, to furnish design services required under the Contract Documents.

**1.2.4** *Hazardous Conditions* are any materials, wastes, substances and chemicals deemed to be hazardous under applicable Legal Requirements, or the handling, storage, remediation, or disposal of which are regulated by applicable Legal Requirements.

**1.2.5** *General Conditions of Contract* refer to this DBIA Document No. 535, *Standard Form of General Conditions of Contract Between Owner and Design-Builder* (1998 Edition, as amended).

**1.2.6** *Legal Requirements* are all applicable federal, state and local laws, codes, ordinances, rules, regulations, orders and decrees of any government or quasi-government entity having jurisdiction over the Project or Site, the practices involved in the Project or Site, or any Work.

**1.2.7** *Owner's Project Criteria* are developed by or for Owner to describe Owner's program requirements and objectives for the Project, including use, space, price, time, site and expandability requirements, as well as submittal requirements and other requirements governing Design-Builder's performance of the Work. Owner's Project Criteria may include conceptual documents, design criteria, performance requirements and other Project-specific technical materials and requirements.

**1.2.8** *Site* is the land or premises on which the Project is located.

**1.2.9** *Subcontractor* is any person or entity retained by Design-Builder as an independent contractor to perform a portion of the Work and shall include materialmen and suppliers.

**1.2.10** *Sub-Subcontractor* is any person or entity retained by a Subcontractor as an independent contractor to perform any portion of a Subcontractor's Work and shall include materialmen and suppliers.

**1.2.11** *Substantial Completion* is the date on which the Work, or an agreed upon portion of the Work, is sufficiently complete so that Owner can occupy and use the Project or a portion thereof for its intended purposes.

**1.2.12** *Work* is comprised of all Design-Builder's design, construction and other services required by the Contract Documents, including procuring and furnishing all materials, equipment, services and labor reasonably inferable from the Contract Documents.

# Article 2

## Design-Builder's Services and Responsibilities

### 2.1 General Services

**2.1.1** Design-Builder's Representative shall be reasonably available to Owner and shall have the necessary expertise and experience required to supervise the Work. Design-Builder's Representative shall communicate regularly with Owner and shall be vested with the authority to act on behalf of Design-Builder. Design-Builder's

Representative may be replaced only with the mutual agreement of Owner and Design-Builder.

**2.1.2** Design-Builder shall provide Owner with a monthly status report detailing the progress of the Work, including whether (i) the Work is proceeding according to schedule, (ii) discrepancies, conflicts, or ambiguities exist in the Contract Documents that require resolution, (iii) health and safety issues exist in connection with the Work, and (iv) other items require resolution so as not to jeopardize Design-Builder's ability to complete the Work for the Contract Price and within the Contract Time(s).

**2.1.3** Design-Builder shall prepare and submit, at least three (3) days prior to the meeting contemplated by Section 2.1.4 hereof, a schedule for the execution of the Work for Owner's review and response. The schedule shall indicate the dates for the start and completion of the various stages of Work, including the dates when Owner information and approvals are required to enable Design-Builder to achieve the Contract Time(s). The schedule shall be revised as required by conditions and progress of the Work, but such revisions shall not relieve Design-Builder of its obligations to complete the Work within the Contract Time(s), as such dates may be adjusted in accordance with the Contract Documents. Owner's review of and response to the schedule shall not be construed as relieving Design-Builder of its complete and exclusive control over the means, methods, sequences and techniques for executing the Work.

**2.1.4** The parties will meet within seven (7) days after execution of the Agreement at Owner's principal place of business or any other location selected by Owner to discuss issues affecting the administration of the Work and to implement the necessary procedures, including those relating to submittals and payment, to facilitate the ability of the parties to perform their obligations under the Contract Documents.

**2.2    Design Professional Services**

**2.2.1** Design-Builder shall, consistent with applicable state licensing laws, provide through qualified, licensed design professionals employed by Design-Builder, or procured from qualified, independent licensed Design Consultants, the necessary design services, including architectural,

engineering and other design professional services, for the preparation of the required drawings, specifications and other design submittals to permit Design-Builder to complete the Work consistent with the Contract Documents. Nothing in the Contract Documents is intended or deemed to create any legal or contractual relationship between Owner and any Design Consultant.

**2.3    Standard of Care for Design Professional Services**

**2.3.1** The standard of care for all design professional services performed to execute the Work shall be the care and skill ordinarily used by members of the design profession practicing under similar conditions at the same time and locality of the Project. Notwithstanding the preceding sentence, if the parties agree upon specific performance standards for any aspect of the Work, which standards are to be set forth in an exhibit to the Agreement entitled "Performance Standard Requirements," the design professional services shall be performed to achieve such standards.

**2.4    Design Development Services**

**2.4.1** Design-Builder and Owner shall, consistent with any applicable provision of the Contract Documents, agree upon any interim design submissions that Owner may wish to review, which interim design submissions may include design criteria, drawings, diagrams and specifications setting forth the Project requirements. On or about the time of the scheduled submissions, Design-Builder and Owner shall meet and confer about the submissions, with Design-Builder identifying during such meetings, among other things, the evolution of the design and any significant changes or deviations from the Contract Documents, or, if applicable, previously submitted design submissions. Minutes of the meetings will be maintained by Design-Builder and provided to all attendees for review. Following the design review meeting, Owner shall review and approve the interim design submissions in a time that is consistent with the turnaround times set forth in Design-Builder's schedule.

**2.4.2** Design-Builder shall submit to Owner Construction Documents setting forth in detail

*SMM*

drawings and specifications describing the requirements for construction of the Work. The Construction Documents shall be consistent with the latest set of interim design submissions, as such submissions may have been modified in a design review meeting. The parties shall have a design review meeting to discuss, and Owner shall review and approve, the Construction Documents in accordance with the procedures set forth Section 2.4.1 above. Design-Builder shall proceed with construction in accordance with the approved Construction Documents and shall submit one set of approved Construction Documents to Owner prior to commencement of construction.

**2.4.3** Owner's review and approval of interim design submissions and the Construction Documents is for the purpose of mutually establishing a conformed set of Contract Documents compatible with the requirements of the Work. Neither Owner's review nor approval of any interim design submissions and Construction Documents shall be deemed to transfer any design liability from Design-Builder to Owner.

**2.4.4** To the extent not prohibited by the Contract Documents or Legal Requirements, Design-Builder may prepare interim design submissions and Construction Documents for a portion of the Work to permit construction to proceed on that portion of the Work prior to completion of the Construction Documents for the entire Work.

**2.5    Legal Requirements**

**2.5.1** Design-Builder shall perform the Work in accordance with all Legal Requirements and shall provide all notices applicable to the Work as required by the Legal Requirements.

**2.5.2** The Contract Price and/or Contract Time(s) shall be adjusted to compensate Design-Builder for the effects of any changes in the Legal Requirements enacted after the date of the Agreement affecting the performance of the Work, or if a Guaranteed Maximum Price is established after the date of the Agreement, the date the parties agree upon the Guaranteed Maximum Price. Such effects may include, without limitation, revisions Design-Builder is required to make to the Construction Documents because of changes in Legal Requirements.

**2.6    Government Approvals and Permits**

**2.6.1** Except as identified in an Owner's Permit List attached as an exhibit to the Agreement, Design-Builder shall obtain and pay for all necessary permits, approvals, licenses, government charges and inspection fees required for the prosecution of the Work by any government or quasi-government entity having jurisdiction over the Project.

**2.6.2** Design-Builder shall provide reasonable assistance to Owner in obtaining those permits, approvals and licenses that are Owner's responsibility.

**2.7    Design-Builder's Construction Phase Services**

**2.7.1** Unless otherwise provided in the Contract Documents to be the responsibility of Owner or a separate contractor, Design-Builder shall provide through itself or Subcontractors the necessary supervision, labor, inspection, testing, start-up, material, equipment, machinery, temporary utilities and other temporary facilities to permit Design-Builder to complete construction of the Project consistent with the Contract Documents.

**2.7.2** Design-Builder shall perform all construction activities efficiently and with the requisite expertise, skill and competence to satisfy the requirements of the Contract Documents. Design-Builder shall at all times exercise complete and exclusive control over the means, methods, sequences and techniques of construction.

**2.7.3** Design-Builder shall employ only Subcontractors who are duly licensed and qualified to perform the Work consistent with the Contract Documents. Owner may reasonably object to Design-Builder's selection of any Subcontractor, provided that the Contract Price and/or Contract Time(s) shall be adjusted to the extent that Owner's decision impacts Design-Builder's cost and/or time of performance.

**2.7.4** Design-Builder assumes responsibility to Owner for the proper performance of the Work of Subcontractors and any acts and omissions in connection with such performance. Nothing in the Contract Documents is intended or deemed to create any legal or contractual relationship

DBIA Document No. 535 • Standard Form of General Conditions of Contract Between Owner and Design-Builder © 1998 Design-Build Institute of America

*SMN* ク-

between Owner and any Subcontractor or Sub-Subcontractor, including but not limited to any third-party beneficiary rights.

**2.7.5** Design-Builder shall coordinate the activities of all Subcontractors. If Owner performs other work on the Project or at the Site with separate contractors under Owner's control, Design-Builder agrees to reasonably cooperate and coordinate its activities with those of such separate contractors so that the Project can be completed in an orderly and coordinated manner without unreasonable disruption.

**2.7.6** Design-Builder shall keep the Site reasonably free from debris, trash and construction wastes to permit Design-Builder to perform its construction services efficiently, safely and without interfering with the use of adjacent land areas. Upon Substantial Completion of the Work, or a portion of the Work, Design-Builder shall remove all debris, trash, construction wastes, materials, equipment, machinery and tools arising from the Work or applicable portions thereof to permit Owner to occupy the Project or a portion of the Project for its intended use.

**2.8     Design-Builder's Responsibility for Project Safety**

**2.8.1** Design-Builder recognizes the importance of performing the Work in a safe manner so as to prevent damage, injury or loss to (i) all individuals at the Site, whether working or visiting, (ii) the Work, including materials and equipment incorporated into the Work or stored on-Site or off-Site, and (iii) all other property at the Site or adjacent thereto. Design-Builder assumes responsibility for implementing and monitoring all safety precautions and programs related to the performance of the Work. Design-Builder shall, prior to commencing construction, designate a Safety Representative with the necessary qualifications and experience to supervise the implementation and monitoring of all safety precautions and programs related to the Work. Unless otherwise required by the Contract Documents, Design-Builder's Safety Representative shall be an individual stationed at the Site who may have responsibilities on the Project in addition to safety. The Safety Representative shall make routine daily inspections of the Site and shall hold weekly

safety meetings with Design-Builder's personnel, Subcontractors and others as applicable.

**2.8.2** Design-Builder and Subcontractors shall comply with all Legal Requirements relating to safety, as well as any Owner-specific safety requirements set forth in the Contract Documents, provided that such Owner-specific requirements do not violate any applicable Legal Requirement. Design-Builder will immediately report in writing any safety-related injury, loss, damage or accident arising from the Work to Owner's Representative and, to the extent mandated by Legal Requirements, to all government or quasi-government authorities having jurisdiction over safety-related matters involving the Project or the Work.

**2.8.3** Design-Builder's responsibility for safety under this Section 2.8 is not intended in any way to relieve Subcontractors and Sub-Subcontractors of their own contractual and legal obligations and responsibility for (i) complying with all Legal Requirements, including those related to health and safety matters, and (ii) taking all necessary measures to implement and monitor all safety precautions and programs to guard against injury, losses, damages or accidents resulting from their performance of the Work.

**2.9     Design-Builder's Warranty**

**2.9.1** Design-Builder warrants to Owner that the construction, including all materials and equipment furnished as part of the construction, shall be new unless otherwise specified in the Contract Documents, of good quality, in conformance with the Contract Documents and free of defects in materials and workmanship. Design-Builder's warranty obligation excludes defects caused by abuse, alterations, or failure to maintain the Work by persons other than Design-Builder or anyone for whose acts Design-Builder may be liable. Nothing in this warranty is intended to limit any manufacturer's warranty which provides Owner with greater warranty rights than set forth in this Section 2.9 or the Contract Documents. Design-Builder will provide Owner with all manufacturers' warranties upon Substantial Completion.

**2.10    Correction of Defective Work**

*SMM*

**2.10.1** Design-Builder agrees to correct any Work that is found to not be in conformance with the Contract Documents, including that part of the Work subject to Section 2.9 hereof, within a period of one year from the date of Substantial Completion of the Work or any portion of the Work, or within such longer period to the extent required by the Contract Documents.

**2.10.2** Design-Builder shall, within seven (7) days of receipt of written notice from Owner that the Work is not in conformance with the Contract Documents, take meaningful steps to commence correction of such nonconforming Work, including the correction, removal or replacement of the nonconforming Work and any damage caused to other parts of the Work affected by the nonconforming Work. If Design-Builder fails to commence the necessary steps within such seven (7) day period, Owner, in addition to any other remedies provided under the Contract Documents, may provide Design-Builder with written notice that Owner will commence correction of such nonconforming Work with its own forces. If Owner does perform such corrective Work, Design-Builder shall be responsible for all reasonable costs incurred by Owner in performing such correction. If the nonconforming Work creates an emergency requiring an immediate response, the seven (7) day periods identified herein shall be deemed inapplicable.

**2.10.3** The one year period referenced in Section 2.10.1 above applies only to Design-Builder's obligation to correct nonconforming Work and is not intended to constitute a period of limitations for any other rights or remedies Owner may have regarding Design-Builder's other obligations under the Contract Documents.

## Article 3

## Owner's Services and Responsibilities

**3.1** Duty to Cooperate

**3.1.1** Owner shall, throughout the performance of the Work, cooperate with Design-Builder and perform its responsibilities, obligations and services in a timely manner to facilitate Design-Builder's timely and efficient performance of the Work and so as not to delay or interfere with

Design-Builder's performance of its obligations under the Contract Documents.

**3.1.2** Owner shall provide timely reviews and approvals of interim design submissions and Construction Documents consistent with the turnaround times set forth in Design-Builder's schedule.

**3.2** Furnishing of Services and Information

**3.2.1** Unless expressly stated to the contrary in the Contract Documents, Owner shall provide, at its own cost and expense, for Design-Builder's information and use the following, all of which Design-Builder is entitled to rely upon in performing the Work:

   .1 Surveys describing the property, boundaries, topography and reference points for use during construction, including existing service and utility lines;

   .2 Geotechnical studies describing subsurface conditions, and other surveys describing other latent or concealed physical conditions at the Site;

   .3 Temporary and permanent easements, zoning and other requirements and encumbrances affecting land use, or necessary to permit the proper design and construction of the Project and enable Design-Builder to perform the Work;

   .4 A legal description of the Site;

   .5 To the extent available, as-built and record drawings of any existing structures at the Site; and

   .6 To the extent available, environmental studies, reports and impact statements describing the environmental conditions, including Hazardous Conditions, in existence at the Site.

**3.2.2** Owner is responsible for securing and executing all necessary agreements with adjacent

DBIA Document No. 535 • Standard Form of General Conditions of Contract Between Owner and Design-Builder
© 1998 Design-Build Institute of America

land or property owners that are necessary to enable Design-Builder to perform the Work. Owner is further responsible for all costs, including attorneys' fees, incurred in securing these necessary agreements.

### 3.3    Financial Information

3.3.1    At Design-Builder's request, Owner shall promptly furnish reasonable evidence satisfactory to Design-Builder that Owner has adequate funds available and committed to fulfill all of Owner's contractual obligations under the Contract Documents. If Owner fails to furnish such financial information in a timely manner, Design-Builder may stop Work under Section 11.3 hereof or exercise any other right permitted under the Contract Documents.

3.3.2    Design-Builder shall cooperate with the reasonable requirements of Owner's lenders or other financial sources. Notwithstanding the preceding sentence, after execution of the Agreement Design-Builder shall have no obligation to execute for Owner or Owner's lenders or other financial sources any documents or agreements that require Design-Builder to assume obligations or responsibilities greater than those existing obligations Design-Builder has under the Contract Documents.

### 3.4    Owner's Representative

3.4.1    Owner's Representative shall be responsible for providing Owner-supplied information and approvals in a timely manner to permit Design-Builder to fulfill its obligations under the Contract Documents. Owner's Representative shall also provide Design-Builder with prompt notice if it observes any failure on the part of Design-Builder to fulfill its contractual obligations, including any errors, omissions or defects in the performance of the Work.

### 3.5    Government Approvals and Permits

3.5.1    Owner shall obtain and pay for all necessary permits, approvals, licenses, government charges and inspection fees set forth in the Owner's Permit List attached as an exhibit to the Agreement.

3.5.2    Owner shall provide reasonable assistance to Design-Builder in obtaining those permits, approvals and licenses that are Design-Builder's responsibility.

### 3.6    Owner's Separate Contractors

3.6.1    Owner is responsible for all work performed on the Project or at the Site by separate contractors under Owner's control. Owner shall contractually require its separate contractors to cooperate with, and coordinate their activities so as not to interfere with, Design-Builder in order to enable Design-Builder to timely complete the Work consistent with the Contract Documents.

## Article 4

## Hazardous Conditions and Differing Site Conditions

### 4.1    Hazardous Conditions

4.1.1    Unless otherwise expressly provided in the Contract Documents to be part of the Work, Design-Builder is not responsible for any Hazardous Conditions encountered at the Site. Upon encountering any Hazardous Conditions, Design-Builder will stop Work immediately in the affected area and duly notify Owner and, if required by Legal Requirements, all government or quasi-government entities with jurisdiction over the Project or Site.

4.1.2    Upon receiving notice of the presence of suspected Hazardous Conditions, Owner shall take the necessary measures required to ensure that the Hazardous Conditions are remediated or rendered harmless. Such necessary measures shall include Owner retaining qualified independent experts to (i) ascertain whether Hazardous Conditions have actually been encountered, and, if they have been encountered, (ii) prescribe the remedial measures that Owner must take either to remove the Hazardous Conditions or render the Hazardous Conditions harmless.

4.1.3    Design-Builder shall be obligated to resume Work at the affected area of the Project only after Owner's expert provides it with written certification that (i) the Hazardous Conditions have been removed or rendered harmless and (ii) all necessary approvals have been obtained from

all government and quasi-government entities having jurisdiction over the Project or Site.

**4.1.4** Design-Builder will be entitled, in accordance with these General Conditions of Contract, to an adjustment in its Contract Price and/or Contract Time(s) to the extent Design-Builder's cost and/or time of performance have been adversely impacted by the presence of Hazardous Conditions.

**4.1.5** To the fullest extent permitted by law, Owner shall indemnify, defend and hold harmless Design-Builder, Design Consultants, Subcontractors, anyone employed directly or indirectly for any of them, and their officers, directors, employees and agents, from and against any and all claims, losses, damages, liabilities and expenses, including attorneys' fees and expenses, arising out of or resulting from the presence, removal or remediation of Hazardous Conditions at the Site, except to the extent such claims, losses, damages, liabilities or expenses are the result of Design-Builder's gross negligence or intentional misconduct, or the gross negligence or intentional misconduct of anyone for whose acts Design-Builder may be responsible.

**4.1.6** Notwithstanding the preceding provisions of this Section 4.1, Owner is not responsible for Hazardous Conditions introduced to the Site by Design-Builder, Subcontractors or anyone for whose acts they may be liable. Design-Builder shall indemnify, defend and hold harmless Owner and Owner's officers, directors, employees and agents from and against all claims, losses, damages, liabilities and expenses, including attorneys' fees and expenses, arising out of or resulting from those Hazardous Conditions introduced to the Site by Design-Builder, Subcontractors or anyone for whose acts they may be liable.

**4.2    Differing Site Conditions**

**4.2.1** Concealed or latent physical conditions or subsurface conditions at the Site that (i) materially differ from the conditions indicated in the Contract Documents or (ii) are of an unusual nature, differing materially from the conditions ordinarily encountered and generally recognized as inherent in the Work are collectively referred to herein as "Differing Site Conditions." If Design-Builder encounters a Differing Site Condition, Design-Builder will be entitled to an adjustment in the Contract Price and/or Contract Time(s) to the extent Design-Builder's cost and/or time of performance are adversely impacted by the Differing Site Condition.

**4.2.2** Upon encountering a Differing Site Condition, Design-Builder shall provide prompt written notice to Owner of such condition, which notice shall not be later than ten (10) days after such condition has been encountered. Design-Builder shall, to the extent reasonably possible, provide such notice before the Differing Site Condition has been substantially disturbed or altered.

## Article 5

## Insurance and Bonds

**5.1    Design-Builder's Insurance Requirements**

**5.1.1** Design-Builder is responsible for procuring and maintaining the insurance coverages set forth in the Agreement from insurance companies authorized to do business in the state in which the Project is located, and with a minimum rating set forth in the Agreement, for certain claims which may arise from or out of the performance of the Work and obligations under the Contract Documents (collectively, the "Insurance Policies").

**5.1.2** Design-Builder's liability insurance shall be written for the coverage amounts set forth in the Agreement and shall include completed operations insurance for the period of time set forth in the Agreement.

**5.1.3** Design-Builder's liability insurance shall specifically delete any design-build or similar exclusions that could compromise coverages

DBIA Document No. 535 • Standard Form of General Conditions of Contract Between Owner and Design-Builder
© 1998 Design-Build Institute of America

because of the design-build delivery of the Project.

8.1.4    To the extent Owner requires Design-Builder or any Design Consultant to provide professional liability insurance for claims arising from the negligent performance of design services by Design-Builder or the Design Consultant, the coverage limits, duration and other specifics of such insurance shall be as set forth in the Agreement.    Any professional liability shall specifically delete any design-build or similar exclusions that could compromise coverages because of the design-build delivery of the Project.    Such policies shall be provided prior to the commencement of any design services hereunder.

8.1.5    Prior to commencing any construction services hereunder, Design-Builder shall provide Owner with certificates evidencing that (i) all of the insurance Policies are in full force and in effect and will remain in effect for the duration required by the Contract Documents and (ii) none of the insurance Policies will be canceled, renewal refused, or materially changed unless at least ten (10) days prior written notice is given to Owner.

### 8.2    Builders' Risk Insurance

8.2.1    Check one:  [ ] Owner  [X] Design-Builder shall purchase and maintain in force builders' risk insurance for the Work. Such builders' risk insurance (the "Builders' Risk Insurance") shall:

.1    Be written in an amount at least equal to the initial contract sum as well as subsequent modifications of that sum.

.2    Name as insureds Owner and Design-Builder, and contain a provision that the insurance will not be canceled or allowed to expire unless at least ten (10) days prior written notice has been given to Design-Builder and Owner.

.3    Apply on a replacement cost basis and cover all risks of physical loss except those specifically excluded in the policy, but at a minimum cover the perils of fire, lightning, explosion, windstorm, hail, smoke, aircraft, vehicles, riot, civil commotion, theft, vandalism, malicious mischief, and collapse.

.4    Cover the portions of the Work that are intended for use at the Site, but temporarily located away from the Site or in transit to the Site.

.5    Cover the cost of removing debris, including demolition as may be made legally necessary by the operation of any law, ordinance or regulation.

8.2.2    If either party desires to include under the Builders' Risk Insurance coverage for flood or earthquake, Owner and Design-Builder shall agree upon the price, scope and amount of deductibles of the supplemental coverage to be purchased.    Otherwise, the Builders' Risk insurance will not cover damage caused by flood or earthquake, and any and all Losses (as defined herein) attributable to flood or earthquake shall be exclusively the responsibility of Owner.

8.2.3    If Owner desires to include under the Builders' Risk Insurance coverage for damage or losses (a) arising from or out of work performed by Owner or by separate contractors under Owner's control (the "Owner's Work") or (b) sustained to Owner's property, including, but not limited to materials, structures, machinery or equipment, located or stored by Owner at the Site (the "Owner's Property"), Owner and Design-Builder shall agree upon the price, scope and amount of deductibles of the supplemental coverage to be purchased.    Otherwise, the Builders' Risk Insurance will not cover losses or damage relating to the Owner's Work or damages sustained to the Owner's Property, and any and all such losses or damage shall be exclusively the responsibility of Owner.

8.2.4    Owner shall not commence with the partial occupancy or use of the Work until the requirements set forth in Section 6.6.3 have been satisfied.    Failure of Owner to fulfill such requirements prior to Owner's partial occupancy or use of the Work shall preclude Owner's coverage under the Builders' Risk Insurance. Unless otherwise provided by the Builders' Risk Insurance underwriter, any and all Losses sustained after Owner's occupancy or use of the Work shall be exclusively the responsibility of Owner.

8.2.5    The Builders' Risk Insurance will be maintained in effect, unless otherwise provided for by written agreement, from the date construction

activities begin until the earliest of the following dates:

    .1 the date the Owner and Design-Builder agree that it shall be terminated;

    .2 the date final payment, as provided for in the agreement, has been made or

    .3 the date a final certificate of occupancy is issued.

**5.2.6** In the event a claim is made under the Builders' Risk Insurance, payment of any deductibles applicable to the Builders' Risk Insurance (the "Builders' Risk Deductibles") shall be the sole and exclusive responsibility of Owner. Payment of the Builders' Risk Deductibles shall be the sole responsibility of Owner regardless of whether the Builders' Risk Insurance is procured by Owner or procured by Design-Builder.

**5.2.7** If Design-Builder is responsible for purchasing and maintaining the Builders' Risk Insurance (as indicated in Section 5.2.1 above), Owner acknowledges and agrees that the Contract Sum does not include the amount of the premium of the Builders' Risk Insurance and Owner shall pay Design-Builder the amount of such premium in addition to the Contract Sum.

**5.3** **Owner's Insurance**

**5.3.1** Owner shall procure and maintain from insurance companies authorized to do business in the state in which the Project is located (a) Commercial general liability; (b) Automobile liability Insurance; (c) Property Insurance; (d) Business Interruption Insurance; (e) Workers' compensation and employers liability Insurance; and (f) Other Insurance required by applicable law, rule, regulation or ordinance.

**5.3.2** The property Insurance procured by Owner shall be to the full insurable value of the Project, including professional fees, overtime premiums and all other expenses incurred to replace or repair the insured property. Such Insurance shall include as additional insureds the interests of Owner, Design-Builder, Design Consultants, Subcontractors and Sub-Subcontractors, and shall insure against the perils of fire and extended coverage, theft, vandalism, malicious mischief, collapse, flood, earthquake, debris removal and other perils or causes of loss

as called for in the Contract Documents. The property Insurance shall include physical loss or damage to the Work, including materials and equipment in transit, at the Site or at another location as may be indicated in Design-Builder's Application for Payment and approved by Owner.

**5.3.2** Prior to Design-Builder commencing any Work, Owner shall provide Design-Builder with certificates evidencing that (i) all Owner's insurance obligations required by the Contract Documents are in full force and in effect and will remain in effect until Design-Builder has completed all of the Work and has received final payment from Owner and (ii) no insurance coverage will be canceled, renewal refused, or materially changed unless at least ten (10) days prior written notice is given to Design-Builder. Owner's property insurance shall not lapse or be canceled if Owner occupies a portion of the Work pursuant to Section 6.6.3 hereof. Owner shall provide Design-Builder with the necessary endorsements from the insurance company prior to occupying a portion of the Work.

**5.3.3** Any loss covered under Owner's property insurance shall be adjusted with Owner and Design-Builder and made payable to both of them as trustees for the insureds as their interests may appear, subject to any applicable mortgage clause. All insurance proceeds received as a result of any loss will be placed in a separate account and distributed in accordance with such agreement as the interested parties may reach. Any disagreement concerning the distribution of any proceeds will be resolved in accordance with Article 10 hereof.

**5.3.4** Owner acknowledges that, unless Owner has obtained coverage under the Builders' Risk Insurance as described in Section 5.2.3 above, neither the Insurance Policies nor the Builders' Risk Insurance shall provide coverage for any losses relating to the Owner's Work or damages sustained to the Owner's Property. Owner acknowledges and agrees that, unless Owner obtains coverage under the Builders' Risk Insurance as described in Section 5.2.3 above, it shall be the sole and exclusive responsibility of Owner to pay for any such losses or damage to the Owner's Work or the Owner's Property.

DBIA Document No. 535 • Standard Form of General Conditions of Contract Between Owner and Design-Builder © 1998 Design-Build Institute of America

*SMM*

**5.4   Waiver of Subrogation; Deductibles; Adequacy of Coverage; Sole Remedy; Supplemental Insurance**

**5.4.1**   Owner and Design-Builder waive against each other and Owner's separate contractors, Design Consultants, Subcontractors, agents and employees of each and all of them, all damages covered by property Insurance provided herein, except such rights as they may have to the proceeds of such insurance. Design-Builder and Owner shall, where appropriate, require similar waivers of subrogation from Owner's separate contractors, Design Consultants and Subcontractors and shall require each of them to include similar waivers in their contracts.

**5.4.2**   Owner acknowledges and agrees the Contract Sum does not include the amount of the deductible on any insurance claim or insured loss and such amount shall be in addition to the Contract Sum. Accordingly, and notwithstanding any other term or provision in the Contract Documents, Owner shall be responsible for paying (i) the amount of any deductible for any insurance maintained by Owner or Contractor hereunder and any insurance required to be maintained by Contractor hereunder and (ii) the cost of any damages or loss up to the amount of the deductible for any insurance maintained by either Owner or Contractor hereunder or any insurance required to be maintained by contractor hereunder. If requested by Owner, Contractor will request from its insurer a reduction of the amount of the deductible prior to commencement of the Work and the cost or insurance premium increase caused by such reduction shall be paid by Owner as an automatic increase to the Contract Sum.

**5.4.3**   Owner agrees that the maintenance of the Insurance Policies (and the Builders' Risk Insurance, if applicable) shall fulfill any and all of Design-Builder's obligations of insurance coverage. Owner agrees that the Insurance Policies (and the Builders' Risk Insurance, if applicable) are the only insurance policies maintained, and that are required to be maintained, by Design-Builder.

**5.4.4**   Owner acknowledges the coverage limits of each of the Insurance Policies (and the Builders' Risk Insurance, if applicable) (the "Coverage Limits") and agrees that Design-Builder's obligation to Owner for any and all losses, damages or injuries arising from or out of the performance of the Work (each a "Loss" and collectively, "Losses") shall be limited to the Coverage Limits. Upon the occurrence of any Loss, Owner shall look solely to the insurance Policies and the Builders' Risk Insurance for recovery for any Loss and Design-Builder shall not be responsible or liable for any Loss in excess of the Coverage Limits. Owner acknowledges that any and all Losses covered by the Insurance Policies or the Builders' Risk Insurance that are in excess of the Coverage Limits, including, but not limited to, payment of deductibles or losses relating to Owner's collateral operations, shall be exclusively the responsibility of Owner and not Design-Builder regardless of the cause of the Loss.

**5.4.5**   If Owner requires coverage in excess of the Coverage Limits, then Owner shall obtain such additional coverage or supplemental insurance.

**5.5   Bonds and Other Performance Security**

If Owner requires Design-Builder to obtain performance and labor and material payment bonds, or other forms of performance security, the amount, form and other conditions of such security shall be as set forth in the Agreement.

## Article 6

## Payment

**6.1   Schedule of Values**

**6.1.1**   Within ten (10) days of execution of the Agreement or the approval of the GMP Proposal, Design-Builder shall submit for Owner's review and approval a schedule of values for all of the Work. The Schedule of Values will (i) subdivide the Work into its respective parts, (ii) include values for all items comprising the Work and (iii) serve as the basis for monthly progress payments made to Design-Builder throughout the Work.

## 6.2    Monthly Progress Payments

**6.2.1**    On or before the date established in the Agreement, Design-Builder shall submit for Owner's review and approval its Application for Payment requesting payment for all Work performed as of the date of the Application for Payment. The Application for Payment shall be accompanied by all supporting documentation required by the Contract Documents and/or established at the meeting required by Section 2.1.4 hereof.

**6.2.2**    The Application for Payment may request payment for equipment and materials not yet incorporated into the Project, provided that (i) Owner is satisfied that the equipment and materials are suitably stored at either the Site or another acceptable location, (ii) the equipment and materials are protected by suitable insurance and (iii) upon payment, Owner will receive the equipment and materials free and clear of all liens and encumbrances.

**6.2.3**    The Application for Payment shall constitute Design-Builder's representation that the Work has been performed consistent with the Contract Documents, has progressed to the point indicated in the Application for Payment, and that title to all Work will pass to Owner free and clear of all claims, liens, encumbrances, and security interests upon the incorporation of the Work into the Project, or upon Design-Builder's receipt of payment, whichever occurs earlier.

## 6.3    Withholding of Payments

**6.3.1**    On or before the date established in the Agreement, Owner shall pay Design-Builder all amounts properly due. If Owner determines that Design-Builder is not entitled to all or part of an Application for Payment, it will notify Design-Builder in writing at least five (5) days prior to the date payment is due. The notice shall indicate the specific amounts Owner intends to withhold, the reasons and contractual basis for the withholding, and the specific measures Design-Builder must take to rectify Owner's concerns. Design-Builder and Owner will attempt to resolve Owner's concerns prior to the date payment is due. If the parties cannot resolve such concerns, Design-Builder may pursue its rights under the Contract Documents, including those under Article 10 hereof.

**6.3.2**    Notwithstanding anything to the contrary in the Contract Documents, Owner shall pay Design-Builder all undisputed amounts in an Application for Payment within the times required by the Agreement.

## 6.4    Right to Stop Work and Interest

**6.4.1**    If Owner fails to pay Design-Builder any amount then becomes due, Design-Builder, in addition to all other remedies provided in the Contract Documents, may stop Work pursuant to Section 11.3 hereof.    All payments due and unpaid shall bear interest at the rate set forth in the Agreement.

## 6.5    Design-Builder's Payment Obligations

**6.5.1**    Design-Builder will pay Design Consultants and Subcontractors, in accordance with its contractual obligations to such parties, all the amounts Design-Builder has received from Owner on account of their work. Design-Builder will impose similar requirements on Design Consultants and Subcontractors to pay those parties with whom they have contracted. Design-Builder will indemnify and defend Owner against any claims for payment and mechanic's liens as set forth in Section 7.3 hereof.

## 6.6    Substantial Completion

**6.6.1**    Design-Builder shall notify Owner when it believes the Work, or to the extent permitted in the Contract Documents, a portion of the Work, is substantially complete.    Within five (5) days of Owner's receipt of Design-Builder's notice, Owner and Design-Builder will jointly inspect such Work to verify that it is substantially complete in accordance with the requirements of the Contract Documents.    If such Work is substantially complete, Owner shall prepare and issue a Certificate of Substantial Completion that will set forth (i) the date of Substantial Completion of the Work or portion thereof, (ii) the remaining items of Work that have to be completed before final payment, (iii) provisions (to the extent not already provided in the Contract Documents) establishing Owner's and Design-Builder's responsibility for the Project's security, maintenance, utilities and insurance pending final payment and (iv) an acknowledgment that warranties commence to run on the date of Substantial Completion, except

DBIA Document No. 535  •  Standard Form of General Conditions of Contract Between Owner and Design-Builder © 1998 Design-Build Institute of America

as may otherwise be noted in the Certificate of Substantial Completion.

**6.6.2** Upon Substantial Completion of the entire Work or, if applicable, any portion of the Work, Owner shall release to Design-Builder all retained amounts relating, as applicable, to the entire Work or completed portion of the Work, less an amount equal to one hundred fifty percent (150%) of the reasonable value of all remaining or incomplete items of Work as noted in the Certificate of Substantial Completion.

**6.6.3** Owner, at its option, may use a portion of the Work which has been determined to be substantially complete, provided, however, that (i) a Certificate of Substantial Completion has been issued for the portion of Work addressing the items set forth in Section 6.6.1 above, (ii) Design-Builder and Owner have obtained the consent of their sureties and insurers, and to the extent applicable, the appropriate government authorities having jurisdiction over the Project, and (iii) Owner and Design-Builder agree that Owner's use or occupancy will not interfere with Design-Builder's completion of the remaining Work.

**6.7    Final Payment**

**6.7.1** After receipt of a Final Application for Payment from Design-Builder, Owner shall make final payment by the time required in the Agreement, provided that Design-Builder has completed all of the Work in conformance with the Contract Documents.

**6.7.2** At the time of submission of its Final Application for Payment, Design-Builder shall provide the following information:

　　.1    Final conditional release liens outstanding or unsatisfied for labor, services, material, equipment, taxes or other items performed, furnished or incurred for or in connection with the Work which will in any way affect Owner's interests;

　　.2    a lien release executed by Design-Builder waiving, upon receipt of final payment by Design-Builder, all claims, except those claims previously made in writing to Owner

and remaining unsettled at the time of final payment;

　　.3    consent of Design-Builder's surety, if any, to final payment;

　　.4    all operating manuals, warranties and other deliverables required by the Contract Documents; and

**6.7.3** Upon making final[1] payment, Owner waives all claims against Design-Builder except claims relating to (i) Design-Builder's failure to satisfy its payment obligations, if such failure affects Owner's interests, (ii) Design-Builder's failure to complete the Work consistent with the Contract Documents, including defects appearing after Substantial Completion and (iii) the terms of any special warranties required by the Contract Documents. Nothing in this Section 6.7.3 shall be construed to relieve Design-Builder of any obligation under Sections 2.9 or 2.10 above.

## Article 7

## Indemnification

**7.1    Patent and Copyright Infringement**

**7.1.1** Design-Builder shall defend any action or proceeding brought against Owner based on any claim that the Work, or any part thereof, or the operation or use of the Work or any part thereof, constitutes infringement of any United States patent or copyright, now or hereafter issued. Owner shall give prompt written notice to Design-Builder of any such action or proceeding and will reasonably provide authority, information and assistance in the defense of same. Design-Builder shall indemnify and hold harmless Owner from and against all damages and costs, including but not limited to attorneys' fees and expenses awarded against Owner or Design-Builder in any such action or proceeding. Design-Builder agrees to keep Owner informed of all developments in the defense of such actions.

**7.1.2** If Owner is enjoined from the operation or use of the Work, or any part thereof, as the result of any patent or copyright suit, claim, or proceeding, Design-Builder shall at its sole expense take reasonable steps to procure the right to operate or use the Work. If Design-Builder

cannot so procure such right within a reasonable time, Design-Builder shall promptly, at Design-Builder's option and at Design-Builder's expense, (i) modify the Work so as to avoid infringement of any such patent or copyright or (ii) replace said Work with Work that does not infringe or violate any such patent or copyright.

**7.1.3** Sections 7.1.1 and 7.1.2 above shall not be applicable to any suit, claim or proceeding based on infringement or violation of a patent or copyright (i) relating solely to a particular process or product of a particular manufacturer specified by Owner and not offered or recommended by Design-Builder to Owner or (ii) arising from modifications to the Work by Owner or its agents after acceptance of the Work. If the suit, claim or proceeding is based upon events set forth in the preceding sentence, Owner shall defend, indemnify and hold harmless Design-Builder to the same extent Design-Builder is obligated to defend, indemnify and hold harmless Owner in Section 7.1.1 above.

**7.1.4** The obligations set forth in this Section 7.1 shall constitute the sole agreement between the parties relating to liability for infringement of violation of any patent or copyright.

**7.2     Tax Claim Indemnification**

**7.2.1** If, in accordance with Owner's direction, an exemption for all or part of the Work is claimed for taxes, Owner shall indemnify, defend and hold harmless Design-Builder from and against any liability, penalty, interest, fine, tax assessment, attorneys' fees or other expenses or costs incurred by Design-Builder as a result of any action taken by Design-Builder in accordance with Owner's express written directive.

**7.3     Payment Claim Indemnification**

**7.3.1** Providing that Owner is not in breach of its contractual obligation to make payments to Design-Builder for the Work, Design-Builder shall indemnify, defend and hold harmless Owner from any claims or mechanic's liens brought against Owner or against the Project as a result of the failure of Design-Builder, or those for whose acts it is responsible, to pay for any services, materials, labor, equipment, taxes or other items or obligations

furnished or incurred for or in connection with the Work. Within three (3) days of receiving written notice from Owner that such a claim or mechanic's lien has been filed, Design-Builder shall commence to take the steps necessary to discharge said claim or lien, including, if necessary, the furnishing of a mechanic's lien bond. If Design-Builder fails to do so, Owner will have the right to discharge the claim or lien and hold Design-Builder liable for costs and expenses incurred, including attorneys' fees.

**7.4     Design-Builder's General Indemnification**

**7.4.1** Design-Builder, to the fullest extent permitted by law, shall indemnify, hold harmless and defend Owner, its officers, directors, employees and agents from and against claims, losses, damages, liabilities, including attorneys' fees and expenses, for bodily injury, sickness or death, and property damage or destruction (other than to the Work itself) to the extent resulting from the negligent acts or omissions of Design-Builder, Design Consultants, Subcontractors, anyone employed directly or indirectly by any of them or anyone for whose acts any of them may be liable.

**7.4.2** If an employee of Design-Builder, Design Consultants, anyone employed directly or indirectly by any of them or anyone for whose acts any of them may be liable has a claim against Owner, its officers, directors, employees, or agents, Design-Builder's indemnity obligation set forth in Section 7.4.1 above shall not be limited by any limitation on the amount of damages, compensation or benefits payable by or for Design-Builder, Design Consultants, Subcontractors, or other entity under any employee benefit acts, including workers' compensation or disability acts.

**7.5     Owner's General Indemnification**

**7.5.1** Owner, to the fullest extent permitted by law, shall indemnify, hold harmless and defend Design-Builder and any of Design-Builder's officers, directors, employees, or agents from and against claims, losses, damages, liabilities, including attorneys' fees and expenses, for bodily injury, sickness or death, and property damage or destruction (other than to the Work itself) to the

DBIA Document No. 535 • Standard Form of General Conditions of Contract Between Owner and Design-Builder
© 1998 Design-Build Institute of America

extent resulting from the negligent acts or omissions of Owner's separate contractors or anyone for whose acts any of them may be liable.

## Article 8

## Time

**8.1    Obligation to Achieve the Contract Times**

**8.1.1**    Design-Builder agrees that it will commence performance of the Work and achieve the Contract Time(s) in accordance with Article 5 of the Agreement.

**8.2    Delays to the Work**

**8.2.1**    If Design-Builder is delayed in the performance of the Work due to acts, omissions, conditions, events, or circumstances beyond its control and due to no fault of its own or those for whom Design-Builder is responsible, the Contract Time(s) for performance shall be reasonably extended by Change Order.  By way of example, events that will entitle Design-Builder to an extension of the Contract Time(s) include acts or omissions of Owner or anyone under Owner's control (including separate contractors), changes in the Work, Differing Site Conditions, Hazardous Conditions, wars, floods, labor disputes, unusual delay in transportation, epidemics abroad earthquakes, adverse weather conditions not reasonably anticipated, and other acts of God.

**8.2.2**    In addition to Design-Builder's right to a time extension for those events set forth in Section 8.2.1 above, Design-Builder shall also be entitled to an equitable adjustment of the Contract Price.

## Article 9

## Changes to the Contract Price and Time

**9.1    Change Orders**

**9.1.1**    A Change Order is a written instrument issued after execution of the Agreement signed by Owner and Design-Builder, stating their agreement upon all of the following:

    .1    The scope of the change in the Work, if any;

    .2    The amount of the adjustment to the Contract Price, if any; and

    .3    The extent of the adjustment to the Contract Time(s), if any.

**9.1.2**    All changes in the Work authorized by applicable Change Order shall be performed under the applicable conditions of the Contract Documents.   Owner and Design-Builder shall negotiate in good faith and as expeditiously as possible the appropriate adjustments for such changes.

**9.1.3**    If Owner requests a proposal for a change in the Work from Design-Builder and subsequently elects not to proceed with the change, a Change Order shall be issued to reimburse Design-Builder for reasonable costs incurred for estimating services, design services and services involved in the preparation of proposed revisions to the Contract Documents.

**9.2    Work Change Directives**

**9.2.1**    A Work Change Directive is a written order prepared and signed by Owner, directing a change in the Work prior to agreement on an adjustment in the Contract Price and/or the Contract Time(s).

**9.2.2**    Owner and Design-Builder shall negotiate in good faith and as expeditiously as possible the appropriate adjustments for the Work Change Directive.   Upon reaching an agreement, the parties shall prepare and execute an appropriate Change Order reflecting the terms of the agreement.

*SMM*

## 9.3  Minor Changes in the Work

9.3.1  Minor changes in the Work do not involve an adjustment in the Contract Price and/or Contract Time(s) and do not materially and adversely effect the Work, including the design, quality, performance and workmanship required by the Contract Documents. Design-Builder may make minor changes in the Work consistent with the intent of the Contract Documents, provided, however that Design-Builder shall promptly inform Owner, in writing, of any such changes and record such changes on the documents maintained by Design-Builder.

## 9.4  Contract Price Adjustments

9.4.1  The increase or decrease in Contract Price resulting from a change in the Work shall be determined by one or more of the following methods:

.1  Unit prices set forth in the Agreement or as subsequently agreed to between the parties;

.2  A mutually accepted, lump sum, properly itemized and supported by sufficient substantiating data to permit evaluation by Owner;

.3  Costs, fees and any other markups set forth in the Agreement; and

.4  If an increase or decrease cannot be agreed to as set forth in items .1 through .3 above and Owner issues a Work Change Directive, the cost of the change of the Work shall be determined by the reasonable expense and savings in the performance of the Work resulting from the change, including a reasonable overhead and profit, as may be set forth in the Agreement. If the net result of both additions and deletions to the Work is an increase in the Contract Price, overhead and profit shall be calculated on the basis of the net increase to the Contract Price. If the net result of both additions and deletions to the Work is a decrease in the Contract Price, there shall be no overhead or profit

adjustment to the Contract Price. Design-Builder shall maintain a documented, itemized accounting evidencing the expenses and savings associated with such changes.

9.4.2  If unit prices are set forth in the Contract Documents or are subsequently agreed to by the parties, but application of such unit prices will cause substantial inequity to Owner or Design-Builder because of differences in the character or quantity of such unit items as originally contemplated, such unit prices shall be equitably adjusted.

9.4.3  If Owner and Design-Builder disagree upon whether Design-Builder is entitled to be paid for any services required by Owner, or if there are any other disagreements over the scope of Work or proposed changes to the Work, Owner and Design-Builder shall resolve the disagreement pursuant to Article 10 hereof. As part of the negotiation process, Design-Builder shall furnish Owner with a good faith estimate of the costs to perform the disputed services in accordance with Owner's interpretations. If the parties are unable to agree and Owner expects Design-Builder to perform the services in accordance with Owner's interpretations, Design-Builder shall proceed to perform the disputed services, conditioned upon Owner issuing a written order to Design-Builder (i) directing Design-Builder to proceed and (ii) specifying Owner's interpretation of the services that are to be performed. If this occurs, Design-Builder shall be entitled to submit in its Applications for Payment an amount equal to fifty percent (50%) of its reasonable estimated direct cost to perform the services, and Owner agrees to pay such amounts, with the express understanding that (i) such payment by Owner does not prejudice Owner's right to argue that it has no responsibility to pay for such services and (ii) receipt of such payment by Design-Builder does not prejudice Design-Builder's right to seek full payment of the disputed services if Owner's order is deemed to be a change to the Work.

## 9.4.4  Emergencies

9.4.1  In any emergency affecting the safety of persons and/or property, Design-Builder shall act, at its discretion, to prevent threatened damage, injury or loss. Any change in the Contract Price and/or Contract Time(s) on account of emergency

DBIA Document No. 535 • Standard Form of General Conditions of Contract Between Owner and Design-Builder © 1998 Design-Build Institute of America

work shall be determined as provided in this Article 9.

## Article 10
### Contract Adjustments and Disputes

**10.1    Requests for Contract Adjustments and Relief**

**10.1.1**  If either Design-Builder or Owner believes that it is entitled to relief against the other for any event arising out of or related to the Work or Project, such party shall provide written notice to the other party of the basis for its claim for relief. Such notice shall, if possible, be made prior to incurring any cost or expense and in accordance with any specific notice requirements contained in applicable sections of these General Conditions of Contract.  In the absence of any specific notice requirement, written notice shall be given within a reasonable time, not to exceed twenty-one (21) days, after the occurrence giving rise to the claim for relief or after the claiming party reasonably should have recognized the event or condition giving rise to the request, whichever is later.  Such notice shall include sufficient information to advise the other party of the circumstances giving rise to the claim for relief, the specific contractual adjustment or relief requested and the basis of such request.

**10.2    Dispute Avoidance and Resolution**

**10.2.1**  The parties are fully committed to working with each other throughout the Project and agree to communicate regularly with each other at all times so as to avoid or minimize disputes or disagreements.  If disputes or disagreements do arise, Design-Builder and Owner each commit to resolving such disputes or disagreements in an amicable, professional and expeditious manner so as to avoid unnecessary losses, delays and disruptions to the Work.

**10.2.2**  Design-Builder and Owner will first attempt to resolve disputes or disagreements at the field level through discussions between Design-Builder's Representative and Owner's Representative.

**10.2.3**  If a dispute or disagreement cannot be resolved through Design-Builder's Representative and Owner's Representative, Design-Builder's

Senior Representative and Owner's Senior Representative, upon the request of either party, shall meet as soon as conveniently possible, but in no case later than thirty (30) days after such a request is made, to attempt to resolve such dispute or disagreement.  Prior to any meetings between the Senior Representatives, the parties will exchange relevant information that will assist the parties in resolving their dispute or disagreement.

**10.2.4**  If after meeting the Senior Representatives determine that the dispute or disagreement cannot be resolved on terms satisfactory to both parties, the parties shall submit the dispute or disagreement to non-binding mediation.  The mediation shall be conducted by a mutually agreeable impartial mediator, or if the parties cannot so agree, a mediator designated by the American Arbitration Association ("AAA") pursuant to its Construction Industry Mediation Rules.  The mediation will be governed by and conducted pursuant to a mediation agreement negotiated by the parties or, if the parties cannot so agree, by procedures established by the mediator.

**10.3    Arbitration**

**10.3.1**  Any claims, disputes or controversies between the parties arising out of or relating to the Agreement, or the breach thereof, which have not been resolved in accordance with the procedures set forth in Section 10.2 above shall be decided by arbitration, before a panel of three (3) arbitrators, in accordance with the Construction Industry Arbitration Rules of the AAA then in effect, unless the parties mutually agree otherwise.  Such arbitration shall be conducted exclusively in Broward County, Florida.

**10.3.2**  The award of the arbitrator(s) shall be final and binding upon the parties without the right of appeal to the courts.  Judgment may be entered upon it in accordance with applicable law by any court having jurisdiction thereof.

**10.3.3**  Design-Builder and Owner expressly agree that any arbitration pursuant to this Section 10.3 may be joined or consolidated with any arbitration involving any other person or entity (i) necessary to resolve the claim, dispute or controversy, or (ii) substantially involved in or affected by such claim, dispute or controversy.

Both Design-Builder and Owner will include appropriate provisions in all contracts they execute with other parties in connection with the Project to require such joinder or consolidation.

**10.3.4** The prevailing party in any arbitration, or any other final, binding dispute proceeding upon which the parties may agree, shall be entitled to recover from the other party reasonable attorneys' fees and expenses incurred by the prevailing party, including fees and expenses incurred by or through the direction of in-house attorneys.

**10.4    Duty to Continue Performance**

**10.4.1** Unless provided to the contrary in the Contract Documents, Design-Builder shall continue to perform the Work and Owner shall continue to satisfy its payment obligations to Design-Builder, pending the final resolution of any dispute or disagreement between Design-Builder and Owner.

**10.5    CONSEQUENTIAL DAMAGES**

**10.5.1** NOTWITHSTANDING ANYTHING HEREIN TO THE CONTRARY (EXCEPT AS SET FORTH IN SECTION 10.5.2 BELOW), NEITHER DESIGN-BUILDER NOR OWNER SHALL BE LIABLE TO THE OTHER FOR ANY CONSEQUENTIAL LOSSES OR DAMAGES, WHETHER ARISING IN CONTRACT, WARRANTY, TORT (INCLUDING NEGLIGENCE), STRICT LIABILITY OR OTHERWISE, INCLUDING BUT NOT LIMITED TO LOSSES OF USE, PROFITS, BUSINESS, REPUTATION OR FINANCING.

**10.5.2** The consequential damages limitation set forth in Section 10.5.1 above is not intended to affect the payment of liquidated damages, if any, set forth in Article 5 of the Agreement, which both parties recognize has been established, in part, to reimburse Owner for some damages that might otherwise be deemed to be consequential.

## Article 11

## Stop Work and Termination for Cause

**11.1    Owner's Right to Stop Work**

**11.1.1** Owner may, without cause and for its convenience, order Design-Builder in writing to stop and suspend the Work. Such suspension shall not exceed sixty (60) consecutive days or aggregate more than ninety (90) days during the duration of the Project.

**11.1.2** Design-Builder is entitled to seek an adjustment of the Contract Price and/or Contract Time(s) if its cost or time to perform the Work has been adversely impacted by any suspension of stoppage of work by Owner without cause and for its convenience.

**11.2    Owner's Right to Perform and Terminate for Cause**

**11.2.1** If Design-Builder persistently fails to (i) provide a sufficient number of skilled workers, (ii) supply the materials required by the Contract Documents, (iii) comply with applicable Legal Requirements, (iv) timely pay, without cause, Design Consultants or Subcontractors, (v) prosecute the Work with promptness and diligence to ensure that the Work is completed by the Contract Time(s), as such times may be adjusted, or (vi) perform material obligations under the Contract Documents, then Owner, in addition to any other rights and remedies provided in the Contract Documents or by law, shall have the rights set forth in Sections 11.2.2 and 11.2.3 below.

**11.2.2** Upon the occurrence of an event set forth in Section 11.2.1 above, Owner may provide written notice to Design-Builder that it intends to terminate the Agreement unless the problem cited is cured, or commenced to be cured, within seven (7) days of Design-Builder's receipt of such notice. If Design-Builder fails to cure, or reasonably commence to cure, such problem, then Owner may give a second written notice to Design-Builder of its intent to terminate within an additional seven (7) day period. If Design-Builder, within such second seven (7) day period, fails to cure, or reasonably commence to cure, such problem, then Owner may declare the Agreement terminated for default by providing written notice to Design-Builder of such declaration.

**11.2.3** Upon declaring the Agreement terminated pursuant to Section 11.2.2 above, Owner may enter upon the premises and take possession, for the purpose of completing the Work, of all materials, equipment, scaffolds, tools, appliances and other items thereon, which have been

DBIA Document No. 535 • Standard Form of General Conditions
of Contract Between Owner and Design-Builder
© 1998 Design-Build Institute of America

purchased or provided for the performance of the Work, all of which Design-Builder hereby transfers, assigns and sets over to Owner for such purpose, and to employ any person or persons to complete the Work and provide all of the required labor, services, materials, equipment and other items. In the event of such termination, Design-Builder shall not be entitled to receive any further payments under the Contract Documents until the Work shall be finally completed in accordance with the Contract Documents. At such time, if the unpaid balance of the Contract Price exceeds the cost and expense incurred by Owner in completing the Work, such excess shall be paid by Owner to Design-Builder. Notwithstanding the preceding sentence, if the Agreement establishes a Guaranteed Maximum Price, Design-Builder will only be entitled to be paid for Work performed prior to its default. If Owner's cost and expense of completing the Work exceeds the unpaid balance of the Contract Price, then Design-Builder shall be obligated to pay the difference to Owner. Such costs and expense shall include not only the cost of completing the Work, but also losses, damages, costs and expense, including attorneys' fees and expenses, incurred by Owner in connection with the reprocurement and defense of claims arising from Design-Builder's default, subject to the waiver of consequential damages set forth in Section 10.5 hereof.

11.2.4 If Owner improperly terminates the Agreement for cause, the termination for cause will be converted to a termination for convenience in accordance with the provisions of Article 8 of the Agreement.

**11.3    Design-Builder's Right to Stop Work**

11.3.1 Design-Builder may, in addition to any other rights afforded under the Contract Documents or at law, stop work for the following reasons:

.1    Owner's failure to provide financial assurances as required under Section 3.3 hereof; or

.2    Owner's failure to pay amounts properly due under Design-Builder's Application for Payment.

11.3.2 Should any of the events set forth in Section 11.3.1 above occur, Design-Builder has

the right to provide Owner with written notice that Design-Builder will stop work unless said event is cured within seven (7) days from Owner's receipt of Design-Builder's notice. If Owner does not cure the problem within such seven (7) day period, Design-Builder may stop work. In such case, Design-Builder shall be entitled to make a claim for adjustment to the Contract Price and Contract Time(s) to the extent it has been adversely impacted by such stoppage.

**11.4    Design-Builder's Right to Terminate for Cause**

11.4.1 Design-Builder, in addition to any other rights and remedies provided in the Contract Documents or by law, may terminate the Agreement for cause for the following reasons:

.1    The Work has been stopped for more than sixty (60) consecutive days, or more than ninety (90) days during the duration of the Project, because of court order, any government authority having jurisdiction over the Work, or orders by Owner under Section 11.1.1 hereof, provided that such stoppages are not due to the acts or omissions of Design-Builder or anyone for whose acts Design-Builder may be responsible.

.2    Owner's failure to provide Design-Builder with any information, permits or approvals that are Owner's responsibility under the Contract Documents which result in the Work being stopped for more than sixty (60) consecutive days, or more than ninety (90) days during the duration of the Project, even though Owner has not ordered Design-Builder in writing to stop and suspend the Work pursuant to Section 11.1.1 hereof.

.3    Owner's failure to cure the problems set forth in Section 11.3.1 above after Design-Builder has stopped the Work.

11.4.2 Upon the occurrence of an event set forth in Section 11.4.1 above, Design-Builder may provide written notice to Owner that it intends to terminate the Agreement unless the problem cited

is cured, or commenced to be cured, within seven (7) days of Owner's receipt of such notice.  If Owner fails to cure, or reasonably commence to cure, such problem, then Design-Builder may give a second written notice to Owner of its intent to terminate within an additional seven (7) day period.  If Owner, within such second seven (7) day period, fails to cure, or reasonably commence to cure, such problem, then Design-Builder may declare the Agreement terminated for default by providing written notice to Owner of such declaration. In such case, Design-Builder shall be entitled to recover in the same manner as if Owner had terminated the Agreement for its convenience under Article 8 of the Agreement.

**11.5    Bankruptcy of Owner or Design-Builder**

**11.5.1** If either Owner or Design-Builder institutes or has instituted against it a case under the United States Bankruptcy Code (such party being referred to as the "Bankrupt Party"), such event may impair or frustrate the Bankrupt Party's ability to perform its obligations under the Contract Documents.  Accordingly, should such event occur:

.1    The Bankrupt Party, its trustee or other successor, shall furnish, upon request of the non-Bankrupt Party, adequate assurance of the ability of the Bankrupt Party to perform all future material obligations under the Contract Documents, which assurances shall be provided within ten (10) days after receiving notice of the request; and

.2    The Bankrupt Party shall file an appropriate action within the bankruptcy court to seek assumption or rejection of the Agreement within sixty (60) days of the institution of the bankruptcy filing and shall diligently prosecute such action.

If the Bankrupt Party fails to comply with its foregoing obligations, the non-Bankrupt Party shall be entitled to request the bankruptcy court to reject the Agreement, declare the Agreement terminated and pursue any other recourse available to the non-Bankrupt Party under this Article 11.

**11.5.2** The rights and remedies under Section 11.5.1 above shall not be deemed to limit the ability of the non-Bankrupt Party to seek any other rights and remedies provided by the Contract Documents or by law, including its ability to seek relief from any automatic stays under the United States Bankruptcy Code or the right of Design-Builder to stop Work under any applicable provision of these General Conditions of Contract.

## Article 12
## Miscellaneous

**12.1    Assignment**

**12.1.1** Neither Design-Builder nor Owner shall, without the written consent of the other assign, transfer or sublet any portion or part of the Work or the obligations required by the Contract Documents.

**12.2    Successorship**

**12.2.1** Design-Builder and Owner intend that the provisions of the Contract Documents are binding upon the parties, their employees, agents, heirs, successors and assigns.

**12.3    Governing Law**

**12.3.1** The Agreement and all Contract Documents shall be governed by the laws of the place of the Project, without giving effect to its conflict of law principles.

**12.4    Severability**

**12.4.1** If any provision or any part of a provision of the Contract Documents shall be finally determined to be superseded, invalid, illegal, or otherwise unenforceable pursuant to any applicable Legal Requirements, such determination shall not impair or otherwise affect the validity, legality, or enforceability of the remaining provision or parts of the provision of the Contract Documents, which shall remain in full force and effect as if the unenforceable provision or part were deleted.

**12.5    No Waiver**

DBIA Document No. 535  •  Standard Form of General Conditions of Contract Between Owner and Design-Builder
© 1998 Design-Build Institute of America

**12.5.1** The failure of either Design-Builder or Owner to insist, in any one or more instances, on the performance of any of the obligations required by the other under the Contract Documents shall not be construed as a waiver or relinquishment of such obligation or right with respect to future performance.

**12.6    Headings**

**12.6.1** The headings used in these General Conditions of Contract, or any other Contract Document, are for ease of reference only and shall not in any way be construed to limit or alter the meaning of any provision.

**12.7    Notice**

**12.7.1** Whenever the Contract Documents require that notice be provided to the other party, notice will be deemed to have been validly given (i) if delivered in person to the individual intended to receive such notice, (ii) four (4) days after being sent by registered or certified mail, postage prepaid to the address indicated in the Agreement or (iii) if transmitted by electronic mail, one business day after transmission of said electronic mail, provided that the electronic mail was received by the intended recipient.

**12.8    Amendments**

**12.8.1** The Contract Documents may not be changed, altered, or amended in any way except in writing signed by a duly authorized representative of each party.

**12.9    Confidential Information**

**12.9.1** Confidential Information is defined as information which is determined by the transmitting party to be of a confidential or proprietary nature and: (i) the transmitting party identifies as either confidential or proprietary; (ii) the transmitting party takes steps to maintain the confidential or proprietary nature of the information; and (iii) the document is not otherwise available in or considered to be in the public domain. The receiving party agrees to maintain the confidentiality of the Confidential Information and agrees to use the Confidential Information solely in connection with the Project.



STELLAR NET

## Stellar Guide for Subcontractors Usage in Procore

Welcome to the Project Team! Stellar utilizes Procore, an industry leading Project Management system, for all Projects. We know it can be challenging to learn new software. This guide has been created to provide you with several resources that will help you get the most out of Procore on Stellar projects and walk you through those resources to help you get started using Procore.

You will be receiving an invitation email to Procore, where you will be able to set up your password for system access and login (if you have not already). Once you have created your password and logged in, you will be able to begin collaborating on the Project in more ways than ever before.

**HIGHLY RECOMMENDED:** We suggest that you utilize Google Chrome as your Web Browser when using Procore. Internet Explorer has been known to have bugs and issues and does not function smoothly. You can download Google Chrome here: Download Google Chrome Here

**Objectives:**

1. Introduction to Procore's Training Certification for Subcontractors.
2. Define which tools are utilized by Subcontractors on Stellar projects.
3. Expectations on the usage of those tools on the Project.
4. How to get help.

## Procore Training Certification:

While it is not required, it is highly recommended that you take advantage of Procore's Certification program. The "Procore Certification for Subcontractors" course is designed to specifically train subcontractors on how to most effectively use Procore's construction management software platform. Learn the best practices of how to use each project management tool by going through our self-paced modules, which include training videos and quizzes.

Once you have logged in, you can access the Certification for Subcontractors by clicking this link:

http://learn.procore.com/subcontractor-certification

The training certification is the best way to learn the basic navigation and "how to's" for the tools that you will use on Stellar projects.

## Tools Utilized on Stellar Projects by Subcontractors

The tools listed below are utilized by Subcontractors on all Stellar Projects:

Home Screen                              Commitments
RFI's                                    Submittals
Observations                             Punch List
Drawings                                 Specifications

**Page 1 of 5**





STELLAR NET

**stellar** | TAKING SOLUTIONS **FURTHER**°

Documents

## Use of Tools by Subcontractors:

Listed below are the expected base functions to be used on Stellar and some additional recommendations with links to guides for further information:

1. **Home Screen**

   The home screen is where you will find Your Open Items for ease of access to the items that are in your "Ball in Court" (BIC).

### Project Home: My Open Items

User's can scroll to the My Open Items area. If you are not seeing an item in your My Open Items list, see Why are items assigned to me not showing up in My Open Items on the Project Home page?

**MY OPEN ITEMS**

| | Item Type | Details | Status | Due Date |
|---|---|---|---|---|
| 📋 | Submittals | #80.1: Automatic Entrances | Open | 06/01/15 |
| 📋 | Submittals | #78.0: Payment Markings | Open | 06/01/15 |
| 📋 | Submittals | #76.0: Painting & Coating | Open | 06/01/15 |

Back to Top

2. **Commitments**

   Your contract will be emailed to you through Procore. You will need to print out the contract, sign, and email back the scanned copy to the Stellar Project Manager (PM).

   On some projects, Payment requisitions are collected through Procore (check with your Stellar PM, to verify if your project is using the feature). You will still be required to attach your notarized Requisition for Payment and all lien release documents to your Procore payment requisition.

   How to submit a payment requisition:  Payment Requisitions

   Back to Top

3. **Requests for Information (RFI's)**

   Subcontractors have been given permissions to create their own RFI's in Procore for Stellar Projects. New RFI's are created only in draft mode and will be responded to and emailed back by the Stellar PM.

PLANNING I DESIGN I PRE-CONSTRUCTION I CONSTRUCTION I REFRIGERATION I MECHANICAL & UTILITY I BUILDING ENVELOPE I TOTAL OPERATIONS & MAINTENANCE

STELLAR.NET 

© Stellar 2014



**TAKING SOLUTIONS FURTHER**°

How to create an RFI:  Create an RFI

Back to Top

4.   Submittals

Subcontractors have been given permissions to enter their submittals directly into Procore for Stellar Projects.  Stellar will create and setup all submittals in the Project (please do not create your own submittals) and you will receive an email notification through Procore that a submittal requires your attention.  It is recommended to use the link in the notification email when uploading your submittals for easiest access.

How to "submit" a submittal:  Upload and Submit a Submittal

Back to Top

5.   Observations

During the project, there may be issues or conditions which require your immediate action to resolve.  These are referred to as "Observations" in Procore.  When an observation has been assigned to you, you will receive an email notification through Procore requiring your attention.  It is recommended to use the link in the notification email for easiest access to the observation, but you will also see it listed in "My Open Items" on the home page.

How to respond to an Observation:  Respond to an Observation

Back to Top

6.   Punch List

The Punch List tool is being used for three phases of punch out in Stellar Projects.

1.   Completion List.  This list is created prior to the Stellar running punch list to identify areas of work that require completion prior to the Stellar punch list being officially created.
2.   Pre-Punch List.  This is the Stellar punch list, which is created to resolve all punch list items as possible prior to the Owner punch list being created.
3.   Owner Punch List.  This punch list is created by the Owner and represents the final punch list items for a Project.

It is important to note that Punch Lists items of each phase may be entered intermittently during a project as a "running" punch list, with the intent of minimizing the total number of items in each of the punch list phases.  When a punch list item has been assigned to you, you will receive an email notification through Procore requiring your attention.  It is recommended to use the link in the notification email for easiest access to the punch list item, but you will also see it listed in "My Open Items" on the home page.

How to resolve a Punch List item:  Resolve a Punch List Item

Back to Top

PLANNING I DESIGN I PRE-CONSTRUCTION I CONSTRUCTION I REFRIGERATION I MECHANICAL & UTILITY I BUILDING ENVELOPE I TOTAL OPERATIONS & MAINTENANCE





STELLAR NET

## stellar | TAKING SOLUTIONS **FURTHER**°

7. <u>Drawings</u>

The project drawings are available in the Drawing tool. The drawing tool always defaults to the most current drawings, however all prior revisions are accessible. It is <u>**highly recommended**</u> that each Subcontractor's Project Manager and Field Superintendent / Lead Foremen, "subscribe" to the Drawing Tool. In doing so, you will be notified by email when new drawings are published and available. In addition, using the Procore Drawing Tool, you can compare the changes between any revisions that have been issued to clearly see what has been changed on drawings.

How to subscribe to the Drawing Log:   <u>Subscribe to the Drawings Log</u>
How to view the drawings:   <u>View Drawings</u>
How to download drawings:   <u>Download Drawings</u>
How to compare revisions:   <u>Compare Drawing Revisions</u>

<u>Back to Top</u>

8. <u>Specifications</u>

The project specifications are available in the Specifications Tool. The specifications tool always defaults to the most current specifications, however all prior revisions are accessible. It is <u>**highly recommended**</u> that each Subcontractor's Project Manager and Field Superintendent / Lead Foremen, "subscribe" to the Specification Tool. In doing so, you will be notified by email when new specifications are published and available. You subscribe to the Specifications Tool in the same manner in which you subscribe to the Drawings Tool.

How to view the Specifications:   <u>View Specifications</u>

<u>Back to Top</u>

9. <u>Documents</u>

The Documents Tool is used to provide access to project level documents to all team members and as a place where documents can be transmitted between Stellar and the Subcontractor. It is <u>**recommended**</u> that you <u>**"Track"**</u> these folders so that you are notified when new documents or versions of documents are uploaded. This operates in the same fashion as the "Subscribe" feature on Drawings. There are three documents folders that Subcontractors are to make use of:

- 04 Project Schedule. This folder is where the Project Schedule is stored and updated.
- 05 Safety. This folder is where general safety documentation will be stored for use by all team members.
- 06 Subcontractors – Vendors. This folder will contain a "sub-folder" for your company, which is a private folder. This will be where documents for your specific companies use will be transmitted to you if the size of the documents is too large for email. This is also where you can transmit documents to Stellar for the same reason.

The Documents Tool replaces the usage of other systems such as: Drop Box, Sharepoint, FTP sites, etc.

How to download files:   <u>Download Files</u>
How to track files and folders:   <u>Track a Folder or File</u>

PLANNING | DESIGN | PRE-CONSTRUCTION | CONSTRUCTION | REFRIGERATION | MECHANICAL & UTILITY | BUILDING ENVELOPE | TOTAL OPERATIONS & MAINTENANCE

 STELLAR NET 

© Stellar 2014



How to upload new files:  Upload Files into a Folder
How to upload new versions of existing files:  Upload a New Version of a File
How to view documents:  View a Document

Back to Top

## How to Get Help:

Should you need help in any area or function of Procore, below are resources at your disposal:

- For Project related questions:  Please contact your Stellar Project Manager.
- Procore Support Center website (**note**, you must log into Procore first):  https://support.procore.com
- For Procore related questions:
  - Support Center Phone Number:  1 (866) 477-6267 (toll free)
  - Support Center email:  support@procore.com
  - Live Chat:  How do I use Procore's live chat support?

PLANNING | DESIGN | PRE-CONSTRUCTION | CONSTRUCTION | REFRIGERATION | MECHANICAL & UTILITY | BUILDERS ENVELOPE | TOTAL OPERATIONS & MAINTENANCE       STELLAR.NET

## SECTION 010000 - GENERAL REQUIREMENTS

### PART 1 - TABLE OF CONTENTS

A.      Definitions for Purposes of this Contract Document

B.      General

C.      Area Use Limits

D.      Temporary Services

E.      Drawings & Specifications

F.      Shop Drawings, Data & Samples

G.      Substitutions

H.      Tests

I.      Progress Meetings

J.      Performance & Payment Bonds

K.      Contractor's Control

L.      Permits & Regulations

M.      Change in the Work

N.      Taxes

O.      Signs & Advertising

P.      Cutting & Patching

Q.      Inspection

R.      Site Safety

S.      Food Safety

T.      Site Access and Security

U.      Schedule




PART 2 - GENERAL REQUIREMENTS

A.    DEFINITIONS FOR PURPOSES OF THIS CONTRACT DOCUMENT

    1.    OWNER:

        Vital Pharmaceuticals, Inc.
        1635 South 43rd Avenue
        Phoenix, Arizona 85009

        a.    The Owner is the person or organization identified above.

        b.    The term Owner referred to throughout the Contract Documents means the Owner or his authorized representative.

    2.    ARCHITECT:

        Stellar Group, Incorporated
        2900 Hartley Road
        Jacksonville, Florida 32257

        a.    The term Architect is the person or organization identified above.

        b.    The term Architect referred to throughout the Contract Documents means Stellar Group, Inc., or their authorized representative.

    3.    ENGINEER:

        Civil, Structural, Mechanical, Plumbing and Electrical:

        Stellar Group, Incorporated
        2900 Hartley Road
        Jacksonville, Florida 32257

        a.    The Engineer is the organization(s) identified above.

        b.    The term Engineer referred to throughout the Contract Documents means Stellar Group, Inc. or their authorized representative.

    4.    CONTRACTOR:

        Stellar Group, Incorporated
        2900 Hartley Road
        Jacksonville, Florida 32257

        a.    The Contractor is the organization identified above.

        b.    The term Contractor referred to throughout the Contract Documents means Stellar Group, Inc., or their authorized representative.



5.    **SUBCONTRACTOR:**

    a.    A Subcontractor is a person or organization who has a direct contract with the Contractor to perform any of the Work at the site.

    b.    The term Subcontractor referred to throughout the Contract Documents means the Subcontractor or his authorized representative.

6.    **VENDOR:**

    a.    A vendor is a person or organization who has a direct contract with the Contractor or Subcontractor to Supply materials or equipment but not labor.

    b.    The term Vendor referred to throughout the Contract Documents means the Vendor or his authorized representative.

7.    **SHOP DRAWINGS & SAMPLES:**

    a.    Shop Drawings are drawings, diagrams, illustrations, schedules performance charts, brochures and other data which are prepared by the Contractor or any Subcontractor or Vendor and which illustrate some portion of the Work.

    b.    Samples are physical examples furnished by the Subcontractor or Vendor to illustrate material, equipment or workmanship, and to establish standards by which the Work will be judged.

    c.    The submission of shop drawings and samples for review by the Contractor, Architect, or Engineer is henceforth referred to as a "Submittal".

8.    **CONTRACT DOCUMENTS:**

    a.    The Contract Documents forming the General Contract consist of the Purchase Order or Subcontract issued by the Contractor, the Drawings, the Specifications, and all Modifications, Documents, Terms and Conditions listed on the Purchase Order or Subcontract and associated exhibits.

9.    **THE WORK:**

    a.    The term Work includes all labor necessary and all materials and equipment incorporated or to be incorporated to produce the construction required by the Contract Documents.

10.    **THE PROJECT:**

    a.    The Project is the total construction designed by the Architect and Engineer of which the Work performed under the Contract Documents



may be the whole or a part.

11. NIC

    a. The term NIC used throughout the Contract Documents means "not included in this Contract".

B. GENERAL

1. These General Requirements shall be considered as being part of each technical section of this specification and shall be adhered to in every respect. In case of conflict between these General Requirements and individual technical sections, the technical sections will take precedence.

2. For the convenience of reference and to facilitate the letting of contracts, the organization of these specifications into divisions and sections shall not control the division of work among Subcontractors or in establishing the extent of work to be performed by each trade. Each Subcontractor shall be responsible for the settlement of labor disputes within his contract to avoid delay in the performance of his work.

C. AREA USE LIMITS

1. The Subcontractors shall confine their tools, equipment, materials and the operations of his workmen to the limits indicated by law, ordinances, permits or directions of the Contractor and shall not unreasonably encumber the premises with said tools, equipment or materials.

2. The Subcontractors shall not load or permit any part of the structure to be loaded with a weight that will endanger its safety.

D. TEMPORARY SERVICES

1. Protection: Unless otherwise specified, the Contractor shall provide and maintain all temporary enclosures, coverings and protection of the building.

2. Water: The Contractor will provide a temporary water line from the nearest available source.

3. Telephone: The Contractor will maintain telephone for his own use. Each Subcontractor will furnish any telephone service for their own use.

4. Offices, Sheds, Toilets: The Contractor will provide a field office for his own use. Each Subcontractor will furnish all such facilities required for their own use. The Contractor will also provide suitable and adequate toilet facilities for all trades.

5. Electricity and Lights:

    a. Electric installations for temporary light and power will be provided



by the Electrical Subcontractor in accordance with the electrical section of these specifications.

b. Each Subcontractor requiring temporary light or power in his temporary buildings or elsewhere on the site outside of the building proper, shall make his own connections to the temporary service panelboard.

c. All Subcontractors requiring service for portable hand tools or localized lighting in excess of the general lighting or power outlets provided by the Electrical Subcontractor shall obtain same at their own expense from the outlets provided.

d. When permanent lighting and power has been placed in operation, temporary lights and power may be removed; however, at no time may any Subcontractor make connection to the permanent outlets for use of power tools.

e. At times during construction, the total electrical power available may be insufficient for the wants of all Subcontractors. The Contractor, in such case, will allocate the power use among the various Subcontractors.

E. DRAWINGS & SPECIFICATIONS

1. All drawings and specifications will be furnished through either 1) Stellar's construction management software of choice or, 2) via electronic media. All Subcontractors and Vendors are responsible for printing of documents for their own use.

2. The Subcontractor shall examine all drawings listed in either 1) Stellar's construction management software of choice or, 2) the drawing index before beginning the Work. Any doubt as to the meaning or scope of the Drawings and Specifications, or any other portion of the contract, may be clarified by submitting a request in writing for interpretation to the Contractor who will provide clarification. Absence of such request for clarification will imply a full understanding of the intent of the drawings and specifications.

3. The Drawings and Specifications are complementary and are intended to include all work necessary to the thorough and satisfactory completion of the Project. Any work not indicated in the Drawings, nor mentioned in the Specifications, but obviously and reasonably necessary to the proper conclusion of the Work, shall be deemed a part of the Contract.

4. The Drawings and Specifications may be updated during the course of the Project. It is the Subcontractor's responsibility to ensure that their work is performed according to the latest updated drawings. Whenever a Drawing/Specification revision is issued, a notification email will be sent to each Subcontractor / Vendor and either 1) the Drawing/Specification will be accessible through Stellar's construction management software of choice



(hyperlinked to the notification email) or, 2) a copy of the Drawing/Specification shall be posted to Stellar's construction management software platform for Subcontractor retrieval or 3) directly transmitted via electronic mail. Instructions for accessing Stellar's construction management software of choice, shall be known at time of project award.

F.    SUBMITTAL REQUIREMENTS

1.    The Subcontractor or Vendor shall provide the Contractor a complete Submittal with such promptness as to cause no delay in his work or in the work of any other Subcontractor, but in no case later than fourteen (14) calendar days after award of subcontract, service order, or purchase order. A complete Submittal includes all items required in the Contract Documents to complete the affected portion of the Work, including, but not limited to, product data, shop drawings, performance data, and test results.  Submittals will be sent by one of the following methods:

   a.    Preferred method:  Direct submission to Stellar's construction management software of choice.

   b.    Alternate method:  Submission via electronic delivery either by Electronic mail sent to the Contractor's Project Manager.

   c.    Samples, when submitted, can be physically delivered to Stellar's corporate headquarters as provided in Part 2-A.2 above.

2.    All returned Submittals will be sent via electronic mail or via Stellar's construction management software of choice (with notification email) should the documents be too large for email transmission.

3.    The Subcontractor shall examine each Submittal for compliance with the Contract Documents and shall indicate his approval thereupon that each Submittal does comply with the Contract Documents by stamp or in writing. Any deviations from the Contract Documents requirements must be noted at the time of submission.

4.    Submittals shall be specific so that compliance with the Contract Documents can be easily ascertained. Incorrect and/or incomplete Submittals will be rejected and the Subcontractor or Vendor will be required to resubmit prior to the start of the Work. Any Work begun or installed before approval of Submittal will be at the Subcontractor's own risk.

5.    By providing a Submittal, the Subcontractor thereby represents that he has determined and verified all field measurements, field construction criteria, materials, catalog numbers and similar data and that they have checked and coordinated the shop drawings, data or samples with the requirements of the Work and of the Contract Documents.

6.    The Contractor's / Architect's / Engineer's (C/A/E) review of Submittals shall not relieve the Subcontractor of the responsibility for any deviation from the



Contract Document Requirements unless they have explicitly informed the C/A/E in writing of such deviation at the time of the submission and the C/A/E has given written approval to the specific deviation. The C/A/E approval shall not relieve the Subcontractor or Vendor from responsibility for errors or omissions in the submissions.

7. The Subcontractors or Vendors shall promptly make any corrections required by the C/A/E and shall resubmit the corrected submissions, within five (5) business days, unless otherwise noted. The Subcontractor or Vendor shall direct specific attention in writing, or on resubmitted shop drawings, to revisions other than the corrections required by the C/A/E on previous submissions.

8. The Subcontractors or Vendors shall indicate the following on all Submittals, in the following order:

   a. Project number.

   b. Project name.

   c. Date of submission.

   d. Submittal number.

   e. Associated specification section(s).

   f. Identification of each sheet submitted by number in tabular format.

   g. Indication of full or partial Submittal.

   h. Identification of equipment, system or materials using the same symbols as used on the schedules, drawings or applicable paragraphs or sections of the specifications.

   i. Manufacturer's name.

   j. Subcontractor's name.

9. The Subcontractors or Vendors shall furnish for approval all samples requested by the C/A/E. The Work shall be in accordance with approved samples. If a sample is requested, it shall be the responsibility of the Subcontractor or Vendor to have the sample delivered to the C/A/E or to arrange for the C/A/E to examine it elsewhere. Failure to comply may be cause for rejection of the item.

G. SUBSTITUTIONS

   1. Proposed substitutions, or changes in products, materials, equipment, and construction from those provided in the Contract Documents, shall be requested in writing. The proposal shall contain not less than the following:



a.  Complete Submittal information including, product data, graphic information, performance data, test results, and warranty information.

b.  Narrative comparing proposed substitution with specified components.

c.  Comparison of cost between proposed substitution and specified components.

d.  Comparison of lead time between proposed substitution and specified components.

2.  If requested by the C/A/E, the Subcontractor shall also submit samples of both the specified materials, apparatus or appliance and the substitute. Should the substitute fail to conform to the requirements of the Contract Documents as determined by the C/A/E, the Subcontractor shall install the specific make of material, apparatus or appliance specified in the Contract Documents.

3.  Acceptance of substitution must be resolved prior to purchasing the products, materials, equipment, etc.

H.  TESTS

1.  If the Contract Documents, laws, ordinances, rules, regulations or orders of any public authority having jurisdiction require any Work to be inspected, tested or approved by the C/A/E, the Subcontractor shall give the C/A/E timely notice of its readiness and of the date arranged so the C/A/E may observe such inspection, testing or approval. The Subcontractor shall bear all cost of such inspections, tests and approvals. This paragraph does not apply to soils and concrete testing, which will be arranged and paid by the Contractor.

2.  Subcontractors, Vendors, etc., shall provide that all material required to be provided by their subcontract or purchase order shall not be hazardous, or contain hazardous components, as defined by the environmental authorities having jurisdiction. If required by the C/A/E, appropriate documentation substantiating this requirement shall be submitted.

I.  PROGRESS MEETINGS

1.  The Contractor will hold weekly progress meetings at the site. The time and occurrence will be established by the Contractor. Representatives of all Subcontractors working at the site, or scheduled to be working at the site will be required to attend. All representatives attending these meetings must have full authority to make decisions and commitments which will be binding upon his company in regard to scope of Work, schedules, manpower, or any other factors affecting the completion of his work.





2.      A Construction Coordination or project kick-off meeting will be held a few weeks after the start of construction. This meeting is mandatory for all subcontractors. The time and date of this meeting will be determined by the Contractor.

J.    **PERFORMANCE & PAYMENT BONDS**

1.      The Contractor shall have the right, prior to the signing of any Contract, to require any Subcontractor to furnish bond for performance of Contract and payment of all obligations arising thereunder. If such bond is required prior to submission of bids, it shall be paid by the Subcontractor; if subsequent thereto, it shall be paid for by the Owner or the Contractor, whichever requires the bond, and shall be considered an additional cost of the Work.

K.    **CONTRACTOR'S CONTROL**

1.      The Contractor reserves the rights to prohibit the use of any men, tools, supplies, materials or pieces of equipment which, in his opinion, will not produce work meeting the requirements of the Contract Documents. The Subcontractors shall be entitled to no extra compensation because of any such prohibitions or changes resulting therefrom.

2.      Each Subcontractor shall maintain adequate and consistent supervision of the work during its prosecution, all being satisfactory to the Contractor. Supervision of the work shall include a full time Superintendent and all assistants, as required. The superintendent shall not be changed (except with the consent of the Contractor) unless the superintendent proves to be unsatisfactory to the Subcontractor and ceases to be in his employ.  The superintendent shall represent the Subcontractor in his absence and all directions given to him shall be as binding as if given to the Subcontractor.

L.    **PERMITS & REGULATIONS**

1.      The Subcontractor is not responsible for the obtaining or paying of the building permit.

2.      Each Subcontractor shall give notices and pay all fees necessary or proper to be given or paid in connection with the performance of his contract and shall obtain and pay for all permits, licenses (except permanent easements) and all inspections and certificates of inspection required or made by any authority having jurisdiction over all or any part of his work. In the performance of the contract, the Subcontractor shall comply with all applicable Federal, State and Local Ordinances, Rules and Regulations, and all other codes and requirements having jurisdiction over such work. Any work performed or materials or equipment furnished which do not conform to the requirements of said laws, ordinances, rules and regulations shall be changed to conform thereto by the Subcontractor at his sole expense.

3.      Before the final payment is made by the Contractor, the Subcontractor shall deliver to the Contractor copies of all licenses, permits and certificates of




inspection, instruction manuals and guarantees as may be required.

4. Abbreviations and Acroynms: Code Agencies, Government Agencies and Industry Organizations: Where abbreviations and acronyms are used in Specifications and other Contract Documents, they shall mean the recognized name of the entities in the following list. This information is subject to change.

AAMA – American Architectural Manufacturers Association.
AASHTO – American Association of State Highway and Transportation Officials.
ACI – American Concrete Institute.
AEIC – Association of Edison Illuminating Companies, Inc.
AHRI – Air-Conditioning, Heating, and Refrigeration Institute (The).
AIA – American Institute of Architects.
AISC – American Institute of Steel Construction.
ANSI – American National Standards Institute.
ARI – American Refrigeration Institute; (See AHRI).
ASCE/SEI – American Society of Civil Engineers.
ASHRAE – American Society of Heating Refrigeration and Air-Conditioning Engineers.
ASME – ASME International (American Society of Mechanical Engineers).
ASTM – ASTM International.
AWWA – American Water Works Association.
AWI – Architectural Woodwork Institute.
AWS – American Welding Society.
BHMA – Builders Hardware Manufacturers Association.
BICSI – BICSI, Inc.
CRSI – Concrete Reinforcing Steel Institute.
DASMA – Door and Access Systems Manufacturers Association.
EPA – Environmental Protection Agency.
FM – FM Global.
IAS – International Accreditation Service.
ICC – International Code Council.
ICC-ES – ICC Evaluation Service, LLC.
ICEA – International Cable Engineers Association, Inc.
IEC – International Electrotechnical Commission.
IEEE – Institute of Electrical and Electronics Engineers, Inc. (The).
IES – Illuminating Engineering Society.
LPI – Lightning Protection Institute.
MFMA – Metal Framing Manufacturers Association, Inc.
MHIA – Material Handling Industry of America.
MSS – Manufacturers Standardization Society of The Valve and Fittings Industry, Inc.
NAAMM – National Association of Architectural Metal Manufacturers.
NECA – National Electrical Contractors Association.
NEMA – National Electrical Manufacturers Association.
NETA – InterNational Electrical Testing Association.
NFPA – National Fire Protection Association.
NRCA – National Roofing Contractors Association.
NSF – NSF International.
OSHA – Occupational Safety and Health Administration.
PCI – Precast/Prestressed Concrete Institute.
RCSC – Research Council on Structural Connections.



SCTE – Society of Cable Telecommunications Engineers.
SDI – Steel Deck Institute.
SDI – Steel Door Institute.
SJI – Steel Joist Institute.
SMACNA – Sheet Metal and Air-Conditioning Contractors' National Association.
SPRI – Single Ply Roofing Industry.
SSPC – SSPC: The Society for Protective Coatings.
TCA – Tilt-Up Concrete Association.
TIA – Telecommunications Industry Association (The).
TCNA – Tile Council of North America.
TMS – The Masonry Society.
UL – Underwriters Laboratories, Inc.
USDA – United States Department of Agriculture.

M.   CHANGE IN THE WORK

1.   The C/A/E reserve the right to require alterations in, additions to, or omissions from the work called for by this contract, and should any such alterations, additions or omissions be required, the same shall not make this contract void nor in any way affect the same, except that appropriate additions to or deductions from the contract price shall be made; provided, however, that unless otherwise provided in the contract documents, the Subcontractor shall not be entitled to any compensation for extra work unless orders therefore are given in writing duly executed by the Contractor and the amount of compensation for such extra work specified in such written orders.

2.   No such change or alteration or modification of this Contract or of the Work called for hereunder shall release or exonerate any surety or sureties, if required, on any bond given to secure the performance of this contract or any party thereof and/or to insure to the benefit of any and all persons performing labor upon or furnishing materials used or to be used on said Work.

3.   All changes in the work shall be addressed in accordance with the Terms and Conditions of the Contract Documents.

N.   TAXES

1.   The Subcontractor or Vendor agrees and states that the amount of all taxes now required or which may be required, including sales taxes, incident to performance of the contract, will be paid by the Subcontractor or Vendor. Subcontractor or Vendor acknowledges that should the Owner produce documentation supporting a tax exemption status of the project for which this scope of work includes, that these sales taxes may be eliminated from the contract.

O.   SIGNS & ADVERTISING

1.   The Subcontractor shall enforce the Contractor's instructions regarding signs, advertisements, fires and smoking. No advertising signs or name labels of any description shall be placed on or near the premises without



the Contractor's written consent thereto.

**P.    CUTTING & PATCHING**

1.    The Subcontractor shall do all cutting, fitting or patching of his work that may be required to make its several parts come together properly and fit it to receive or be received by work of other Subcontractors shown upon or reasonably implied by the drawings and specifications for the completed structure and shall do all that is necessary to accomplish the joining of said several parts in a neat and workmanlike manner to satisfaction of the C/A/E. Openings shall be done in such a manner as not to impair the appearance or structural integrity of the structure, including the deck and all load bearing walls or foundations and only with the approval of the C/A/E. Any reinforcement or other work shall be furnished and installed by the Subcontractor cutting the opening.  Escutcheons shall be installed by the subcontractor as applicable.

**Q.    INSPECTION**

1.    All materials and equipment are subject to periodic inspection by the C/A/E while the work is in progress, but approval of the work shall not release the warranty. The C/A/E failure to inspect the fabrication or installation of material or equipment shall not constitute a waiver by the C/A/E of the right to reject the material or equipment for defective workmanship or material.

**R.    SITE SAFETY**

1.    Weekly safety meetings will be conducted by the Contractor. All subcontractors must ensure that a representative is in attendance of every meeting.

2.    Each subcontractor shall be responsible for all hazards for which they create, in accordance with Owner, Stellar, OSHA, and local requirements.

3.    Any Subcontractor performing work on the roof will be required to provide protection of the roof membrane (plywood, carpet, blankets, etc.).  If the Subcontractor does not provide the necessary protection, then the Contractor will, and any costs incurred will be deducted from the Subcontractor's contract.

4.    Fire Safety is of the utmost concern.  It is the responsibility of each Subcontractor to provide a Fire Watch, Blankets, and Fire Extinguisher at every welding or acetylene cutting location. This requirement will be strictly enforced. Failure to comply will result in immediate dismissal from the site.

**S.    FOOD SAFETY (When applicable)**

1.    Subcontractor shall adhere to all food safety rules as described by the Owner's and Contractor's Food Safety Literature, as applicable. Employees will wear hairnets, smocks, beard nets, hard hats, eye protection, hearing



protection and all other required clothing accessories when working in areas of the existing plant. Food, beverages, tobacco products, chewing gum, and related shall not be permitted inside the existing plant at any time. Coordinate with Contractor's Superintendent for rules and requirements of the Owner's plant prior to employees arriving on the jobsite.

2.   Subcontractor personnel shall not enter areas of the plant that are in operation unless required by the scope of work. When necessary, pre-approval from the Contractor and Owner must be obtained.

T.   SITE ACCESS AND SECURITY

1.   All access to and from site shall be limited to designated locations and in accordance with the Owner's rules and regulations which will be provided prior to mobilization by this subcontractor.

2.   All subcontractors are responsible for maintaining clean roadways on a daily basis.

U.   SCHEDULE

1.   The Project Schedule may be modified or updated from time to time to reflect actual progress or changed conditions. Such modifications shall not be considered as grounds for increases in the Subcontractor's Contract Amount.

2.   Subcontractor shall submit a schedule of his work, showing the order, sequence, and anticipated duration of the various activities and including equipment and material procurement. Subcontractor shall periodically update this schedule to reflect actual progress and any revisions, which may have been made, and shall submit this revised schedule to the Contractor.

3.   Subcontractor shall immediately inform Contractor of any changes or problems regarding equipment or material deliveries or any other situation, which might impact scheduled performance, for which they are responsible.


(END OF SECTION 010000)



Printed on Tue Oct 27, 2020 at 09:55 am PDT

Job #: 23006976 Bang Energy - Phoenix Can Manufacturing
1635 South 43rd Avenue
Phoenix, Arizona 85009

**★ stellar**

Stellar

## Current Set

| Drawing No. | Description / Title | Revision | Drawing Date | Required Date |
|---|---|---|---|---|
| S0001 | STRUCTURAL GENERAL NOTES & INSPECTION SCHEDULE | B | 10/23/2020 | 05 (10/23/20) |
| S0002 | STRUCTURAL TYPICAL CONCRETE DETAILS | B | 10/23/2020 | 05 (10/23/20) |
| S1000 | OVERALL FOUNDATION & SLAB PLAN | B | 10/23/2020 | 05 (10/23/20) |
| S1010 | PARTIAL FOUNDATION PLAN (UNIT 1) | B | 10/23/2020 | 05 (10/23/20) |
| S1020 | PARTIAL FOUNDATION PLAN (UNIT 2) | B | 10/23/2020 | 05 (10/23/20) |
| S1021 | ENLARGED FOUNDATION & SLAB PLANS (UNIT 2) | B | 10/23/2020 | 03 (10/23/20) |
| S1022 | ENLARGED FOUNDATION & SLAB PLANS (UNIT 2 CONT.) | B | 10/23/2020 | 05 (10/23/20) |
| S1030 | PARTIAL FOUNDATION PLAN (UNIT 3) | B | 10/23/2020 | 05 (10/23/20) |
| S1031 | ENLARGED FOUNDATION & SLAB PLANS (UNIT 3) & DOCK | B | 10/23/2020 | 03 (10/23/20) |
| S1040 | PARTIAL FOUNDATION PLAN (UNIT 4) | B | 10/23/2020 | 05 (10/23/20) |
| S1200A | OVERALL PLATFORM FRAMING PLAN (LOWER LEVELS) | A | 10/23/2020 | 05 (10/23/20) |
| S1200B | OVERALL PLATFORM FRAMING PLAN (UPPER LEVELS) | A | 10/23/2020 | 05 (10/23/20) |
| S1210 | PARTIAL PLATFORM FRAMING PLAN (UNIT 1) | A | 10/23/2020 | 05 (10/23/20) |
| S1220 | PARTIAL PLATFORM FRAMING PLAN (UNIT 2) | A | 10/23/2020 | 05 (10/23/20) |
| S1230 | PARTIAL PLATFORM FRAMING PLAN (UNIT 3) | A | 10/23/2020 | 05 (10/23/20) |
| S1240 | PARTIAL PLATFORM FRAMING PLAN (UNIT 4) | A | 10/23/2020 | 03 (10/23/20) |
| S1300 | COOLING TOWER FRAMING PLAN & STRUCTURAL FRAMING DETAILS | A | 10/23/2020 | 05 (10/23/20) |
| S5001 | STRUCTURAL FOUNDATION DETAILS | B | 10/23/2020 | 05 (10/23/20) |
| S5002 | STRUCTURAL FOUNDATION DETAILS | B | 10/23/2020 | 05 (10/23/20) |
| S5003 | STRUCTURAL FOUNDATION DETAILS | B | 10/23/2020 | 05 (10/23/20) |
| A1100 | OVERALL FIRST FLOOR PLAN | A | 10/23/2020 | 05 (10/23/20) |
| A1110 | UNIT 1 PARTIAL FIRST FLOOR PLAN | A | 10/23/2020 | 05 (10/23/20) |
| A1120 | UNIT 2 PARTIAL FIRST FLOOR PLAN | A | 10/23/2020 | 05 (10/23/20) |
| A1130 | UNIT 3 PARTIAL FIRST FLOOR PLAN | A | 10/23/2020 | 05 (10/23/20) |
| A1140 | UNIT 4 PARTIAL FIRST FLOOR PLAN | A | 10/23/2020 | 05 (10/23/20) |
| A1200 | OVERALL LOWER EQUIPMENT PLATFORM & MEZZANINE PLAN | A | 10/23/2020 | 05 (10/23/20) |
| A1201 | ENLARGED LOWER EQUIPMENT PLATFORM | A | 10/23/2020 | 05 (10/23/20) |
| A1300 | OVERALL UPPER EQUIPMENT PLATFORM PLAN | A | 10/20/2020 | 03 (10/20/20) |
| A1310 | UNIT 1 PARTIAL UPPER EQUIPMENT PLATFORM PLAN | A | 10/23/2020 | 05 (10/23/20) |
| A1320 | UNIT 2 PARTIAL UPPER EQUIPMENT PLATFORM PLAN | A | 10/23/2020 | 05 (10/23/20) |
| A1330 | UNIT 3 PARTIAL UPPER EQUIPMENT PLATFORM PLAN | A | 10/23/2020 | 05 (10/23/20) |
| A1340 | UNIT 4 UPPER EQUIPMENT PLATFORM PLAN | A | 10/23/2020 | 05 (10/23/20) |
| A1400 | OVERALL ROOF PLAN | A | 10/23/2020 | 05 (10/23/20) |
| A2100 | OVERALL FIRST FLOOR REFLECTED CEILING PLAN | A | 10/23/2020 | 05 (10/23/20) |

**stellar**

| Drawing Number | Drawing Title | Revision | Drawing Date | Requested Date | Sent |
|---|---|---|---|---|---|
| A2110 | UNIT 1 PARTIAL FIRST FLOOR REFLECTED CEILING PLAN | A | 10/23/2020 | | 05 (10/23/20) |
| A2120 | UNIT 2 PARTIAL FIRST FLOOR REFLECTED CEILING PLAN | A | 10/23/2020 | | 05 (10/23/20) |
| A2130 | UNIT 3 PARTIAL FIRST FLOOR REFLECTED CEILING PLAN | A | 10/23/2020 | | 05 (10/23/20) |
| A2140 | UNIT 4 PARTIAL FIRST FLOOR REFLECTED CEILING PLAN | A | 10/23/2020 | | 05 (10/23/20) |
| A3101 | EXTERIOR ELEVATIONS | A | 10/23/2020 | | 05 (10/23/20) |
| A3102 | EXTERIOR ELEVATIONS | A | 10/23/2020 | | 05 (10/23/20) |
| A3201 | BUILDING SECTIONS | A | 10/23/2020 | | 05 (10/23/20) |
| A3202 | BUILDING SECTIONS | A | 10/23/2020 | | 05 (10/23/20) |
| A3311 | WALL SECTIONS | A | 10/23/2020 | | 05 (10/23/20) |
| A3312 | WALL SECTIONS | A | 10/23/2020 | | 05 (10/23/20) |
| A4001 | ENLARGED RESTROOM PLANS AND INTERIOR ELEVATIONS | A | 10/23/2020 | | 05 (10/23/20) |
| A4002 | ENLARGED PLANS AND INTERIOR ELEVATIONS | A | 10/23/2020 | | 05 (10/23/20) |
| A4003 | INTERIOR ELEVATIONS | A | 10/23/2020 | | 05 (10/23/20) |
| A4101 | UNIT 1 EXTERIOR STAIR PLANS AND SECTIONS | A | 10/23/2020 | | 05 (10/23/20) |
| A4102 | UNIT 2 STAIR PLANS AND SECTIONS | A | 10/23/2020 | | 05 (10/23/20) |
| A4104 | UNIT 4 PRODUCTION MEZZANINE STAIR PLANS AND SECTIONS | A | 10/23/2020 | | 05 (10/23/20) |
| A4201 | UNIT 1 RAMP/STAIR PLAN AND SECTIONS | A | 10/23/2020 | | 05 (10/23/20) |
| A4501 | HAZARDOUS MATERIAL STORAGES | A | 10/23/2020 | | 05 (10/23/20) |
| A5001 | EXTERIOR OPENING DETAILS | A | 10/23/2020 | | 05 (10/23/20) |
| A5002 | INTERIOR OPENING DETAILS | A | 10/23/2020 | | 05 (10/23/20) |
| A5003 | INSULATED METAL PANEL DETAILS | A | 10/23/2020 | | 05 (10/23/20) |
| A6001 | DOOR, WINDOW & ROOM FINISH SCHEDULE | A | 10/23/2020 | | 05 (10/23/20) |
| A7001 | FLOOR FINISH PLAN | A | 10/23/2020 | | 05 (10/23/20) |
| A7100 | OVERALL SLAB PLAN | A | 10/23/2020 | | 05 (10/23/20) |
| A7110 | UNIT 1 PARTIAL SLAB PLAN | A | 10/23/2020 | | 05 (10/23/20) |
| A7120 | UNIT 2 PARTIAL SLAB PLAN | A | 10/23/2020 | | 05 (10/23/20) |
| A7130 | UNIT 3 PARTIAL SLAB PLAN | A | 10/23/2020 | | 05 (10/23/20) |
| A7140 | UNIT 4 PARTIAL SLAB PLAN | A | 10/23/2020 | | 05 (10/23/20) |
| A7501 | BOLLARD, GUARD & CURB DETAILS | A | 10/23/2020 | | 05 (10/23/20) |
| AD1100 | OVERALL DEMOLITION FLOOR PLAN | C | 10/16/2020 | | 04 (10/16/20) |
| AD1110 | UNIT 1 PARTIAL DEMOLITION FLOOR PLAN | C | 10/16/2020 | | 04 (10/16/20) |
| AD1120 | UNIT 2 PARTIAL DEMOLITION FLOOR PLAN | C | 10/16/2020 | | 04 (10/16/20) |
| AD1130 | UNIT 3 PARTIAL DEMOLITION FLOOR PLAN | B | 10/06/2020 | | 03 (10/06/20) |
| AD1140 | UNIT 4 PARTIAL DEMOLITION FLOOR PLAN | C | 10/16/2020 | | 04 (10/16/20) |
| **Plumbing** | | | | | |
| P0001 | PLUMBING LEGEND, NOTES & SCHEDULES | B | 10/23/2020 | | 05 (10/23/20) |
| P1100 | OVERALL FIRST FLOOR PLUMBING PLAN | B | 10/23/2020 | | 05 (10/23/20) |
| P1110 | UNIT 1 PARTIAL PLAN - PLUMBING | B | 10/23/2020 | | 05 (10/23/20) |
| P1120 | UNIT 2 PARTIAL PLAN - PLUMBING | B | 10/23/2020 | | 05 (10/23/20) |

Printed on Tue Oct 27, 2020 at 09:55 am PDT

Job #: 23006976 Illang Energy - Phoenix Can Manufacturing
1635 South 43rd Avenue
Phoenix, Arizona 85009

Stellar

| Drawing No. | Drawing Title | Revision | Document Date | Received Date |
|---|---|---|---|---|
| P1130 | UNIT 3 PARTIAL PLAN - PLUMBING | B | 10/23/2020 | 05 (10/23/20) |
| P1140 | UNIT 4 PARTIAL PLAN - PLUMBING | B | 10/23/2020 | 05 (10/23/20) |
| P4001 | ENLARGED PLUMBING PLANS | B | 10/23/2020 | 05 (10/23/20) |
| P4002 | ENLARGED PLUMBING PLANS | B | 10/23/2020 | 05 (10/23/20) |
| P7001 | PLUMBING RISER DIAGRAMS | B | 10/23/2020 | 05 (10/23/20) |
| Electrical | | | | |
| E0001 | ELECTRICAL LEGEND, LUMINAIRE SCHEDULE & GENERAL NOTES | B | 10/23/2020 | 05 (10/23/20) |
| E0003 | ELECTRICAL ENVIRONMENTS PLAN | B | 10/23/2020 | 05 (10/23/20) |
| E1100 | ELECTRICAL LIGHTING - 1ST LEVEL PLATFORM | B | 10/23/2020 | 05 (10/23/20) |
| E1110 | FLOOR PLAN - UNIT 1 - LIGHTING | B | 10/23/2020 | 05 (10/23/20) |
| E1120 | FLOOR PLAN - UNIT 2 - LIGHTING | B | 10/23/2020 | 05 (10/23/20) |
| E1130 | FLOOR PLAN - UNIT 3 - LIGHTING | B | 10/23/2020 | 05 (10/23/20) |
| E1140 | FLOOR PLAN - UNIT 4 - LIGHTING | B | 10/23/2020 | 05 (10/23/20) |
| E1150 | FLOOR PLAN - UNIT 5 - LIGHTING | B | 10/23/2020 | 05 (10/23/20) |
| E1160 | FLOOR PLAN - UNIT 6 - LIGHTING | B | 10/23/2020 | 05 (10/23/20) |
| E1200 | ELECTRICAL LIGHTING - 2ND LEVEL PLATFORM | B | 10/23/2020 | 05 (10/23/20) |
| E2110 | FLOOR PLAN - UNIT - POWER | B | 10/23/2020 | 05 (10/23/20) |
| E2120 | FLOOR PLAN - UNIT 2 -POWER | B | 10/23/2020 | 05 (10/23/20) |
| E2130 | FLOOR PLAN - UNIT 3 - POWER | B | 10/23/2020 | 05 (10/23/20) |
| E2140 | FLOOR PLAN - UNIT 4 - POWER | B | 10/23/2020 | 05 (10/23/20) |
| E2150 | FLOOR PLAN - UNIT 5 - POWER | B | 10/23/2020 | 05 (10/23/20) |
| E2160 | FLOOR PLAN - UNIT 6 - POWER | B | 10/23/2020 | 05 (10/23/20) |
| E2200 | ELECTRICAL POWER - 2ND LEVEL PLATFORM | B | 10/23/2020 | 05 (10/23/20) |
| E2300 | ELECTRICAL POWER - 3RD PLATFORM LEVEL | B | 10/23/2020 | 05 (10/23/20) |
| E2400 | ELECTRICAL PARTIAL ROOF PLAN | A | 10/23/2020 | 05 (10/23/20) |
| E5001 | ELECTRICAL DETAILS | A | 10/23/2020 | 05 (10/23/20) |
| E6100 | MSB-1 AND MSB-2 ELECTRICAL SINGLE LINE DIAGRAM | B | 10/23/2020 | 05 (10/23/20) |
| E5000 | MSB-3 AND MSB-4 ELECTRICAL SINGLE LINE DIAGRAM | B | 10/23/2020 | 05 (10/23/20) |
| E6201 | PANEL SCHEDULES | A | 10/23/2020 | 05 (10/23/20) |
| E6202 | PANEL SCHEDULES | A | 10/23/2020 | 05 (10/23/20) |
| ED1001 | ELECTRICAL DEMOLITION PLAN | B | 10/23/2020 | 05 (10/23/20) |
| General | | | | |
| G0000 | COVER SHEET | A | 10/23/2020 | 05 (10/23/20) |
| G0001 | BUILDING CODE ANALYSIS | A | 10/23/2020 | 05 (10/23/20) |
| G1001 | FIRST FLOOR LIFE SAFETY PLAN | A | 10/23/2020 | 05 (10/23/20) |
| G3001 | ACCESSIBLE DETAILS | A | 10/23/2020 | 05 (10/23/20) |
| G3002 | ACCESSIBLE DETAILS | A | 10/23/2020 | 05 (10/23/20) |
| G5001 | WALL TYPES | A | 10/23/2020 | 05 (10/23/20) |

Page 3 of 5

Printed on Tue Oct 27, 2020 at 09:55 am PDT

Job #: 23006976 Bang Energy - Phoenix Can Manufacturing
1635 South 43rd Avenue
Phoenix, Arizona 85009



Stellar

| Drawing Number | Drawing Title | Revision | Drawing Date | Reviewed Date |
|---|---|---|---|---|
| M0001 | MECHANICAL LEGEND, NOTES & SCHEDULES | A | 10/23/2020 | 05 (10/23/20) |
| M0002 | MECHANICAL SCHEDULES | A | 10/23/2020 | 05 (10/23/20) |
| M0003 | MECHANICAL SCHEDULES | A | 10/23/2020 | 05 (10/23/20) |
| M0004 | MECHANICAL SCHEDULES | A | 10/23/2020 | 05 (10/23/20) |
| M1100 | MECHANICAL OVERALL FIRST FLOOR PLAN | A | 10/23/2020 | 05 (10/23/20) |
| M1110 | MECHANICAL PARTIAL FIRST FLOOR PLAN UNIT 1 | A | 10/23/2020 | 05 (10/23/20) |
| M1120 | MECHANICAL PARTIAL FIRST FLOOR PLAN UNIT 2 | A | 10/23/2020 | 05 (10/23/20) |
| M1130 | MECHANICAL PARTIAL FIRST FLOOR PLAN UNIT 3 | A | 10/23/2020 | 05 (10/23/20) |
| M1140 | MECHANICAL PARTIAL FIRST FLOOR PLAN UNIT 4 | A | 10/23/2020 | 05 (10/23/20) |
| M1400 | MECHANICAL OVERALL ROOF PLAN | A | 10/23/2020 | 05 (10/23/20) |
| M4001 | ENLARGED MECHANICAL VIEW | A | 10/23/2020 | 05 (10/23/20) |
| M5001 | MECHANICAL DETAILS | A | 10/23/2020 | 05 (10/23/20) |
| M5002 | MECHANICAL DETAILS | A | 10/23/2020 | 05 (10/23/20) |
| M5003 | MECHANICAL DETAILS | A | 10/23/2020 | 05 (10/23/20) |
| M9001 | HVAC CONTROLS | A | 10/23/2020 | 05 (10/23/20) |
| MD1100 | MECHANICAL OVERALL FIRST FLOOR RELOCATION PLAN | A | 10/23/2020 | 05 (10/23/20) |
| MD1400 | MECHANICAL OVERALL ROOFTOP RELOCATION PLAN | A | 10/23/2020 | 05 (10/23/20) |
| U0001 | UTILITY LEGEND, GENERAL NOTES & SCHEDULES | A | 10/23/2020 | 05 (10/23/20) |
| U0002 | UTILITY SCHEDULES | A | 10/23/2020 | 05 (10/23/20) |
| U0003 | UTILITY SCHEDULES | A | 10/23/2020 | 05 (10/23/20) |
| U1100 | OVERALL UTILITY FLOOR PLAN | A | 10/23/2020 | 05 (10/23/20) |
| U1110 | UNIT-1 UTILITY FLOOR PLAN | A | 10/23/2020 | 05 (10/23/20) |
| U1111 | ENLARGED SECTOR PLAN UNIT -1 (S1) | A | 10/23/2020 | 05 (10/23/20) |
| U1112 | ENLARGED SECTOR PLAN UNIT -1 (S2) | A | 10/23/2020 | 05 (10/23/20) |
| U1114 | ENLARGED SECTOR PLAN UNIT -1 (S4) | A | 10/23/2020 | 05 (10/23/20) |
| U1120 | UNIT-2 UTILITY FLOOR PLAN | A | 10/23/2020 | 05 (10/23/20) |
| U1121 | ENLARGED SECTOR PLAN | A | 10/23/2020 | 05 (10/23/20) |
| U1122 | ENLARGED SECTOR PLAN UNIT -2(S2) | A | 10/23/2020 | 05 (10/23/20) |
| U1123 | ENLARGED SECTOR PLAN UNIT -2(S3) | A | 10/23/2020 | 05 (10/23/20) |
| U1124 | ENLARGED SECTOR PLAN UNIT -2(S4) | A | 10/23/2020 | 05 (10/23/20) |
| U1130 | UNIT-3 UTILITY FLOOR PLAN | A | 10/23/2020 | 05 (10/23/20) |
| U1132 | ENLARGED SECTOR PLAN UNIT -3 (S2) | A | 10/23/2020 | 05 (10/23/20) |
| U1133 | ENLARGED SECTOR PLAN UNIT 3 (S3) | A | 10/23/2020 | 05 (10/23/20) |
| U1140 | UNIT-4 UTILITY FLOOR PLAN | A | 10/23/2020 | 05 (10/23/20) |
| U1141 | ENLARGED SECTOR PLAN UNIT -4 (S1) | A | 10/23/2020 | 05 (10/23/20) |
| U1142 | ENLARGED SECTOR PLAN UNIT -4 (S2) | A | 10/23/2020 | 05 (10/23/20) |
| U1143 | ENLARGED SECTOR PLAN UNIT -4 (S3) | A | 10/23/2020 | 05 (10/23/20) |
| U1144 | ENLARGED SECTOR PLAN UNIT -4 (S4) | A | 10/23/2020 | 05 (10/23/20) |

Stellar

Printed on Tue Oct 27, 2020 at 09:55 am PDT

Job #: 23006976 Bang Energy - Phoenix Can Manufacturing
1635 South 43rd Avenue
Phoenix, Arizona 85009

| Drawing # | Drawing Title | Revision | Drawing Date | Issued/Date |  |
|-----------|---------------|----------|--------------|-------------|--|
| U1400 | OVERALL ROOF UTILITY FLOOR PLAN | A | 10/23/2020 | 05 (10/23/20) | |
| U8001 | UTILITY CHILLED WATER SYSTEM DIAGRAM | A | 10/23/2020 | 05 (10/23/20) | |
| U8002 | UTILITY COOLING WATER SCHEMATIC | A | 10/23/2020 | 05 (10/23/20) | |

Printed on Thu Nov 19, 2020 at 07:31 am PST

Job #: 23006976 Bang Energy - Phoenix Can Manufacturing
1635 South 43rd Avenue
Phoenix, Arizona 85009

Stellar

# Current Specifications

| Number | Description | Required | Issued Date | Received Date | Set |
|---|---|---|---|---|---|
| **03 - Concrete** | | | | | |
| 033000 | Cast-In-Place Concrete | 1 | 11/1/20 | | 02 |
| **04 - Masonry** | | | | | |
| 042200 | Concrete Unit Masonry | 1 | 11/1/20 | | 02 |
| **05 - Steel** | | | | | |
| 051200 | Structural Steel Framing | 1 | 11/1/20 | | 02 |
| 052100 | Steel Joist Framing | 0 | | | None |
| 054000 | Cold-formed Metal Framing | 1 | 11/1/20 | | 02 |
| 055000 | Metal Fabrications | 1 | 11/1/20 | | 02 |
| 055116 | Metal Floor Plate Stairs | 1 | 11/1/20 | | 02 |
| 055119 | Metal Grating Stairs | 1 | 11/1/20 | | 02 |
| 055213 | Pipe and Tube Railings | 1 | 11/1/20 | | 02 |
| **06 - Wood, Plastics, and Composites** | | | | | |
| 061053 | Miscellaneous Rough Carpentry | 1 | 11/1/20 | | 02 |
| 064116 | Plastic-Laminate-Faced Architectural Cabinets | 1 | 11/1/20 | | 02 |
| **07 - Thermal and Moisture Protection** | | | | | |
| 072100 | Thermal Insulation | 1 | 11/1/20 | | 02 |
| 074213.01 | Insulated Metal Panels (IMP) | 1 | 11/1/20 | | 02 |
| 075423 | Thermoplastic Polyolefin (TPO) Roofing | 1 | 11/1/20 | | 02 |
| 076200 | Sheet Metal Flashing and Trim | 1 | 11/1/20 | | 02 |
| 078413 | Penetration Firestopping | 1 | 11/1/20 | | 02 |
| 078443 | Joint Firestopping | 1 | 11/1/20 | | 02 |
| 079200 | Joint Sealants | 1 | 11/1/20 | | 02 |
| **08 - Openings** | | | | | |
| 081113 | Hollow Metal Doors and Frames | 1 | 11/1/20 | | 02 |
| 081416 | Flush Wood Doors | 1 | 11/1/20 | | 02 |
| 083323 | Overhead Coiling Doors | 1 | 11/1/20 | | 02 |
| 083400 | Special Function Doors | 0 | | | None |
| 083413.01 | High Performance Industrial Doors | 1 | 11/1/20 | | 02 |
| 084113 | Aluminum-Framed Entrances and Storefronts | 1 | 11/1/20 | | 02 |
| 088000 | Glazing | 1 | 11/1/20 | | 02 |
| 088300 | Mirrors | 1 | 11/1/20 | | 02 |
| **09 - Finishes** | | | | | |
| 092216 | Non-Structural Metal Framing | 1 | 11/1/20 | | 02 |
| 092900 | Gypsum Board | 1 | 11/1/20 | | 02 |

Stellar

| Number | Description | Revision | Issued Date | Received Date | Set |
|---|---|---|---|---|---|
| 093013 | Ceramic Tiling | 1 | 11/1/20 | | 02 |
| 095113 | Acoustical Panel Ceilings | 1 | 11/1/20 | | 02 |
| 096513 | Resilient Base and Accessories | 1 | 11/1/20 | | 02 |
| 096723 | Resinous Flooring | 1 | 11/1/20 | | 02 |
| 096813 | Tile Carpeting | 1 | 11/1/20 | | 02 |
| 099113 | Exterior Painting | 1 | 11/1/20 | | 02 |
| 099123 | Interior Painting | 1 | 11/1/20 | | 02 |
| **10 - Specialties** | | | | | |
| 101423.13 | Room-Identification Signage | 1 | 11/1/20 | | 02 |
| 102113.19 | Plastic Toilet Compartments | 1 | 11/1/20 | | 02 |
| 102800 | Toilet Accessories | 1 | 11/1/20 | | 02 |
| 104413 | Fire Protection Cabinets | 1 | 11/1/20 | | 02 |
| 104416 | Fire Extinguishers | 1 | 11/1/20 | | 02 |
| 105113 | Metal Lockers | 1 | 11/1/20 | | 02 |
| **11 - Equipment** | | | | | |
| 111316 | Loading Dock Seals and Shelters | 1 | 11/1/20 | | 02 |
| 111319 | Stationary Loading Dock Equipment | 1 | 11/1/20 | | 02 |
| **12 - Furnishings** | | | | | |
| 123553.13 | Metal Laboratory Casework | 1 | 11/1/20 | | 02 |
| 123661.16 | Solid Surfacing Countertops | 1 | 11/1/20 | | 02 |
| **22 - Plumbing** | | | | | |
| 220513 | Common Motor Requirements for Plumbing and Utility Equipment | 1 | 11/1/20 | | 02 |
| 220516 | Expansion Fittings and Loops for Plumbing and Utility Piping | 1 | 11/1/20 | | 02 |
| 220517 | Sleeves and Sleeve Seals for Plumbing and Utility Piping | 1 | 11/1/20 | | 02 |
| 220518 | Escutcheons for Plumbing and Utility Piping | 1 | 11/1/20 | | 02 |
| 220519 | Meters and Gages for Plumbing and Utility Piping | 1 | 11/1/20 | | 02 |
| 220523.12 | Ball Valves for Plumbing and Utility Piping | 1 | 11/1/20 | | 02 |
| 220523.13 | Butterfly Valves for Plumbing and Utility Piping | 1 | 11/1/20 | | 02 |
| 220523.14 | Check Valves for Plumbing and Utility Piping | 1 | 11/1/20 | | 02 |
| 220523.15 | Gate Valves for Plumbing and Utility Piping | 1 | 11/1/20 | | 02 |
| 220529 | Hangers and Supports for Plumbing and Utility Piping and Equipment | 1 | 11/1/20 | | 02 |
| 220548 | Vibration and Seismic Controls for Plumbing and Utility Piping and Equipment | 1 | 11/1/20 | | 02 |
| 220548.13 | Vibration Controls for Plumbing and Utility Piping and Equipment | 1 | 11/1/20 | | 02 |
| 220553 | Identification for Plumbing Piping and Utility and Equipment | 1 | 11/1/20 | | 02 |
| 220716 | Plumbing and Utility Equipment Insulation | 1 | 11/1/20 | | 02 |
| 220719 | Plumbing and Utility Piping Insulation | 1 | 11/1/20 | | 02 |
| 220800 | Commissioning of Utility & Plumbing | 0 | 11/1/20 | | None |
| 221116 | Domestic Water Piping | 1 | 11/1/20 | | 02 |

Stellar

| Number | Description | Revision | Project Date | Required Date | Set |
|---|---|---|---|---|---|
| 221123 | Domestic Water Pumps | 1 | 11/1/20 | | 02 |
| 221316 | Sanitary Waste and Vent Piping | 1 | 11/1/20 | | 02 |
| 221319 | Sanitary Waste Piping Specialties | 1 | 11/1/20 | | 02 |
| 221319.13 | Sanitary Drains | 1 | 11/1/20 | | 02 |
| 221513 | General-Service Compressed-Air Piping | 1 | 11/1/20 | | 02 |
| 221519 | General-Service Packaged Air Compressors and Receivers | 1 | 11/1/20 | | 02 |
| 223100 | Domestic Water Softeners | 0 | | | None |
| 223300 | Electric, Domestic-Water Heaters | 1 | 11/1/20 | | 02 |
| 223400 | Fuel-Fired, Domestic-Water Heaters | 1 | 11/1/20 | | 02 |
| 223500 | Domestic Water Heat Exchangers | 0 | | | None |
| 224213.13 | Commercial Water Closets | 1 | 11/1/20 | | 02 |
| 224213.16 | Commercial Urinals | 1 | 11/1/20 | | 02 |
| 224216.13 | Commercial Lavatories | 1 | 11/1/20 | | 02 |
| 224216.16 | Commercial Sinks | 1 | 11/1/20 | | 02 |
| 224500 | Emergency Plumbing Fixtures | 1 | 11/1/20 | | 02 |
| 224716 | Electric Water Coolers | 1 | 11/1/20 | | 02 |
| 23 - Heating, Ventilating, and Air Conditioning (HVAC) | | | | | |
| 230130.51 | HVAC Air-Distribution System Cleaning | 1 | 11/1/20 | | 02 |
| 230513 | Common Motor Requirements for HVAC Equipment | 1 | 11/1/20 | | 02 |
| 230523.16 | Plug Valves for Utility Piping | 1 | 11/1/20 | | 02 |
| 230529 | Hangers and Supports for HVAC Equipment | 1 | 11/1/20 | | 02 |
| 230548.13 | Vibration Controls for HVAC | 1 | 11/1/20 | | 02 |
| 230553 | Identification for HVAC Equipment | 1 | 11/1/20 | | 02 |
| 230593 | Testing, Adjusting, and Balancing for HVAC and Utility Systems | 1 | 11/1/20 | | 02 |
| 230713 | Duct Insulation | 2 | 11/1/20 | | 02 |
| 230800 | Commissioning of HVAC | 1 | 11/1/20 | | 02 |
| 230923 | Direct Digital Control (DDC) System for HVAC | 1 | 11/1/20 | | 02 |
| 230923.12 | Control Dampers | 1 | 11/1/20 | | 02 |
| 231123 | Natural-Gas Piping | 1 | 11/1/20 | | 02 |
| 232113 | Hydronic Piping | 1 | 11/1/20 | | 02 |
| 232116 | Hydronic Piping Specialties | 1 | 11/1/20 | | 02 |
| 232123 | Pumps | 1 | 11/1/20 | | 02 |
| 232300 | Refrigerant Piping | 1 | 11/1/20 | | 02 |
| 233113 | Metal Ducts | 1 | 11/1/20 | | 02 |
| 233120 | Fixed Louvers | 1 | 11/1/20 | | 02 |
| 233300 | Air Duct Accessories | 1 | 11/1/20 | | 02 |
| 233346 | Flexible Ducts | 1 | 11/1/20 | | 02 |
| 233423 | HVAC Power Ventilators | 1 | 11/1/20 | | 02 |

**Stellar**

| Number | Description | Revision | Revised Date | Reviewed Date | Set |
|---|---|---|---|---|---|
| 233600 | Air Terminal Units | 1 | 11/11/20 | | 02 |
| 233723 | HVAC Gravity Ventilators | 1 | 11/11/20 | | 02 |
| 235100 | Breechings, Chimneys, and Stacks | 1 | 11/11/20 | | 02 |
| 235123 | Gas Vents | 1 | 11/11/20 | | 02 |
| 236426.13 | Air-Cooled, Rotary-Screw Water Chillers | 1 | 11/11/20 | | 02 |
| 237423.13 | Packaged, Direct-Fired, Outdoor, Heating-Only Makeup-Air Units | 1 | 11/11/20 | | 02 |
| 238126 | Split-System Air-Conditioners | 1 | 11/11/20 | | 02 |
| 238219 | Fan Coil Units | 1 | 11/11/20 | | 02 |
| **26 - Electrical** | | | | | |
| 260519 | Low-Voltage Electrical Power Conductors and Cables | 1 | 11/11/20 | | 02 |
| 260526 | Grounding and Bonding for Electrical Systems | 1 | 11/11/20 | | 02 |
| 260529 | Hangers and Supports for Electrical Systems | 1 | 11/11/20 | | 02 |
| 260533 | Raceway and Boxes for Electrical Systems | 1 | 11/11/20 | | 02 |
| 260536 | Cable Trays for Electrical Systems | 1 | 11/11/20 | | 02 |
| 260553 | Identification for Electrical Systems | 1 | 11/11/20 | | 02 |
| 260923 | Lighting Control Devices | 1 | 11/11/20 | | 02 |
| 262200 | Low-Voltage Transformers | 1 | 11/11/20 | | 02 |
| 262413 | Switchboards | 1 | 11/11/20 | | 02 |
| 262416 | Panelboards | 1 | 11/11/20 | | 02 |
| 262726 | Wiring Devices | 1 | 11/11/20 | | 02 |
| 262816 | Enclosed Switches and Circuit Breakers | 1 | 11/11/20 | | 02 |
| 262913 | Enclosed Controllers | 1 | 11/11/20 | | 02 |
| 263213 | Engine Generators | 2 | 11/11/20 | | 02 |
| 263600 | Transfer Switches | 2 | 11/11/20 | | 02 |
| 265119 | LED Interior Lighting | 1 | 11/11/20 | | 02 |
| **27 - Communications** | | | | | |
| 270528 | Pathways for Communications Systems | 1 | 11/11/20 | | 02 |
| **28 - Electronic Safety and Security** | | | | | |
| 284621.11 | Addressable Fire-Alarm Systems | 1 | 11/11/20 | | 02 |
| **32 - Sitework** | | | | | |
| 321313 | Concrete Paving | 0 | | | None |



**Arizona Department of Revenue**

**Arizona Form 5005**

**Contractor's Certificate**
**Prime Contracting and MRRA**

The purpose of this form is to provide a subcontractor with the validation required for prime contracting transaction privilege tax (TPT) exemption, and for exemption from liability for an amount equal to retail TPT on materials incorporated or fabricated into maintenance, repair, replacement or alteration (MRRA) projects. The form can be provided for a particular project, for a period of time, or until revoked. This certificate establishes liability for the prime contracting TPT and/or the amount equal to the retail TPT; therefore, it must be completed by the contractor assuming the liability. The asterisked (*) items must be completed; otherwise, the certificate is not valid. The Department may disregard this certificate pursuant to ARS § 42-5008.01 or ARS § 42-5075.E If the certificate is incomplete or erroneous. If disregarded, the subcontractor accepting the certificate will have the burden of proving (pursuant to ARS § 42-5008.01 or ARS § 42-5075.D), that it is not liable for the prime contracting TPT and/or the amount equal to the retail TPT.

**A. Contractor**

| * Name | * TPT License # | | |
|---|---|---|---|
| Stellar Group Incorporated | 07-370179-9 | | |
| * Address | City, Town or Post Office | State | ZIP Code |
| 2900 Hartley Road | Jacksonville | FL | 32257 |
| AZ Contractor License Number | Phone Number | | |
| ROC 253214 B-1 | (904) 260-2900 | | |

**B. Subcontractor**

| * Name | * TPT License # (if none, write "N/A - MRRA only") | | |
|---|---|---|---|
| * Address | City, Town or Post Office | State | ZIP Code |
| AZ Contractor License Number | Phone Number | | |

**C*. Type of Certificate (check one and provide requested information)**

☒ Single Project Certificate        **OR**        ☐ Blanket Certificate (check applicable box and fill in requested information).

     **\*PROJECT DESCRIPTION**
     Project #: 23006976

     ☐ Period From:_____
          Through:_____
     ☐ Until revoked
     ☐ Specific Exceptions:

     \*\* (For example; Building Permit #, Address, Subdivision, Book/Map/Parcel #s, and/or Legal Description)

I hereby certify that I have authority to sign this Certificate on behalf of Contractor. I understand that by executing this Certificate, Contractor is licensed for TPT purposes and is assuming the prime contracting TPT liability and/or the amount equal to retail TPT liability applicable to the above referenced project(s).

| | Jonah Petoskey |
|---|---|
| SIGNATURE | PRINT NAME |
| Sr. Project Manager | |
| TITLE | DATE SIGNED |

ADOR 10313 (6/15)   This Form Superseded All Other Form 5005's

# Contractor's Certificate Instructions

## GENERAL INSTRUCTIONS

In order to ensure the effectiveness of the Certificate, all required fields must be completed.

A. The "NAME", "ADDRESS", and "TPT LICENSE NUMBER" fields of the Contractor section must be completed. The contractor is the entity responsible for the tax.

B. The "NAME", "ADDRESS", and "TPT LICENSE" fields of the Subcontractor section must be complete.

C. Either the "Single Project Certificate" box or the "Blanket Certificate" box of the Type of Certificate section must be checked.

- If the Single Project Certificate box is checked, the "PROJECT DESCRIPTION" must be supplied. The project description must be sufficient to identify the location of the single project or the Certificate will be deemed incomplete by the Department of Revenue.

- If the Blanket Certificate box is checked, either the "From: Through:" box or the "Until revoked" box must be checked. If the "From: Through:" box is checked, the "From: Through:" dates must be provided. The "Specific Exceptions" box is optional and allows the "Prime Contractor" to exclude Specific projects or time periods from the Blanket Certificate if the "Specific Exceptions" is checked, details describing the excluded project(s) or the excluded time periods must be provided.

- The "SIGNATURE", "TITLE", "PRINT NAME" and "DATE SIGNED" FIELDS of the Signature section must be completed.

Failure to complete these fields as specified may result in the Arizona Department of Revenue disregarding the incomplete Certificate.

## RETROACTIVE EFFECT

If a Certificate is not signed contemporaneously to the commencement of a contracting project intended to be within the scope of the Certificate, the Department of Revenue will accept the certificate as evidence of the alleged facts. However, the person receiving the certificate may not receive the benefit of the certificate if the Department determines that any of the facts set forth in the certificate are inaccurate.

## ASSUMPTION OF PRIME CONTRACTING TPT LIABILITY

In most instances, the entity assuming the prime contracting transaction privilege tax liability for the prime contracting project(s) referenced in the Certificate will legally be the prime contractor for such project(s). However, in some instances such entity may not legally be the prime contractor for such project(s). If an entity is not the prime contractor for such project(s), the Certificate will nevertheless be effective and will subject such entity to the transaction privilege tax liability of the entity receiving the certificate.

# ACORD® CERTIFICATE OF LIABILITY INSURANCE

**DATE (MM/DD/YYYY)**
01/12/2017

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

**IMPORTANT:** If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | CONTACT John Smith | | |
|---|---|---|---|
| ABC Insurance Agency | PHONE (A/C, No, Ext): 407-555-5555 | | FAX (A/C, No): |
| 123 Main Street | E-MAIL ADDRESS: | | |
| Orlando, FL 31111 | INSURER(S) AFFORDING COVERAGE | | NAIC # |
| | INSURER A : A Insurance Company | | |
| INSURED | INSURER B : B Insurance Company | | |
| ACI Services, Inc. | INSURER C : C Insurance Company | | |
| 1000 Main Street | INSURER D : D Insurance Company | | |
| Orlando, FL 31111 | INSURER E : | | |
| | INSURER F : | | |

**COVERAGES**   **CERTIFICATE NUMBER:**    **REVISION NUMBER:**

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSR | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| A | **GENERAL LIABILITY**  [X] COMMERCIAL GENERAL LIABILITY  [ ] CLAIMS-MADE [X] OCCUR | Y | Y | A11111111 | 01/01/2017 | 01/01/2018 | EACH OCCURRENCE | $ 2,000,000 |
| | | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ 1,000,000 |
| | | | | | | | MED EXP (Any one person) | $ |
| | | | | | | | PERSONAL & ADV INJURY | $ 1,000,000 |
| | GEN'L AGGREGATE LIMIT APPLIES PER:  [ ] POLICY [X] PRO- JECT [ ] LOC | | | | | | GENERAL AGGREGATE | $ 2,000,000 |
| | | | | | | | PRODUCTS - COMP/OP AGG | $ 2,000,000 |
| | | | | | | | | $ |
| B | **AUTOMOBILE LIABILITY**  [X] ANY AUTO  [X] ALL OWNED AUTOS [ ] SCHEDULED AUTOS  [X] HIRED AUTOS [ ] NON-OWNED AUTOS | Y | Y | 55555454 | 12/15/2016 | 12/15/2017 | COMBINED SINGLE LIMIT (Ea accident) | $ 1,000,000 |
| | | | | | | | BODILY INJURY (Per person) | $ |
| | | | | | | | BODILY INJURY (Per accident) | $ |
| | | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | | $ |
| A | [X] UMBRELLA LIAB [X] OCCUR  [ ] EXCESS LIAB [ ] CLAIMS-MADE | | | ABC69954 TYUR | 01/01/2017 | 01/01/2018 | EACH OCCURRENCE | $ 1,000,000 |
| | [ ] DED [ ] RETENTION $ | | | | | | AGGREGATE | $ 1,000,000 |
| | | | | | | | | $ |
| C | **WORKERS COMPENSATION AND EMPLOYERS' LIABILITY**  ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED?  (Mandatory in NH)  If yes, describe under DESCRIPTION OF OPERATIONS below | N | Y | 154788884 | 01/01/2017 | 01/01/2018 | [X] WC STATU- TORY LIMITS [ ] OTH- ER | |
| | | N/A | | | | | E.L. EACH ACCIDENT | $ 1,000,000 |
| | | | | | | | E.L. DISEASE - EA EMPLOYEE | $ 1,000,000 |
| | | | | | | | E.L. DISEASE - POLICY LIMIT | $ 1,000,000 |
| D | Pollution Liability Professional Liability | | | PPU36RN789L45 | 12/31/2016 | 12/31/2017 | $1,000,000 Aggregate $1,000,000 Aggregate | |

**DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (Attach ACORD 101, Additional Remarks Schedule, if more space is required)**

All operations of the insured performed on behalf of the Certificate Holder (CH). Attached to this certificate are policy terms or endorsements providing all the following: (a) Additional insured status for CH and Project Owner arising out of both ongoing and completed operations; (b) Evidence that all insurers waive their rights of subrogation against CH and Project Owner; (c) Evidence the general liability coverage will apply on a primary and non-contributory basis.

Can use umbrella to meet General Liability limits, Auto, and Employers Liability requirements.

Insert project number, name and location description

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| Stellar Group Inc.  Attention:  2900 Hartley Road  Jacksonville  FL  32257 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS.  AUTHORIZED REPRESENTATIVE  John Smith |

© 1988-2010 ACORD CORPORATION. All rights reserved.

ACORD 25 (2010/05)    The ACORD name and logo are registered marks of ACORD

POLICY NUMBER: A11111111

COMMERCIAL GENERAL LIABILITY
CG 20 10 07 04

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# ADDITIONAL INSURED – OWNERS, LESSEES OR CONTRACTORS – SCHEDULED PERSON OR ORGANIZATION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**SCHEDULE**

| Name Of Additional Insured Person(s) Or Organization(s): | Location(s) Of Covered Operations |
|---|---|
| | All operations per written agreement/contract |

Information required to complete this Schedule, if not shown above, will be shown in the Declarations.

**A.** Section II – Who Is An Insured is amended to include as an additional insured the person(s) or organization(s) shown in the Schedule, but only with respect to liability for "bodily injury", "property damage" or "personal and advertising injury" caused, in whole or in part, by:

1. Your acts or omissions; or
2. The acts or omissions of those acting on your behalf;

in the performance of your ongoing operations for the additional insured(s) at the location(s) designated above.

**B.** With respect to the insurance afforded to these additional insureds, the following additional exclusions apply:

This insurance does not apply to "bodily injury" or "property damage" occurring after:

1. All work, including materials, parts or equipment furnished in connection with such work, on the project (other than service, maintenance or repairs) to be performed by or on behalf of the additional insured(s) at the location of the covered operations has been completed; or
2. That portion of "your work" out of which the injury or damage arises has been put to its intended use by any person or organization other than another contractor or subcontractor engaged in performing operations for a principal as a part of the same project.

CG 20 10 07 04

© ISO Properties, Inc., 2004

Page 1 of 1    □

POLICY NUMBER: A11111111

COMMERCIAL GENERAL LIABILITY
CG 20 37 07 04

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# ADDITIONAL INSURED – OWNERS, LESSEES OR CONTRACTORS – COMPLETED OPERATIONS

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**SCHEDULE**

| Name Of Additional Insured Person(s) Or Organization(s): | Location And Description Of Completed Operations |
|---|---|
| | All operations per contract or agreement |

Information required to complete this Schedule, if not shown above, will be shown in the Declarations.

Section II – Who Is An Insured is amended to include as an additional insured the person(s) or organization(s) shown in the Schedule, but only with respect to liability for "bodily injury" or "property damage" caused, in whole or in part, by "your work" at the location designated and described in the schedule of this endorsement performed for that additional insured and included in the "products-completed operations hazard".

© ISO Properties, Inc., 2004

POLICY NUMBER: 55555454

COMMERCIAL AUTO
CA 20 48 10 13

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# DESIGNATED INSURED FOR
# COVERED AUTOS LIABILITY COVERAGE

This endorsement modifies insurance provided under the following:

AUTO DEALERS COVERAGE FORM
BUSINESS AUTO COVERAGE FORM
MOTOR CARRIER COVERAGE FORM

With respect to coverage provided by this endorsement, the provisions of the Coverage Form apply unless modified by this endorsement.

This endorsement identifies person(s) or organization(s) who are "insureds" for Covered Autos Liability Coverage under the Who Is An Insured provision of the Coverage Form. This endorsement does not alter coverage provided in the Coverage Form.

This endorsement changes the policy effective on the inception date of the policy unless another date is indicated below.

| |
|---|
| **Named Insured:** |
| **Endorsement Effective Date:** |

**SCHEDULE**

| |
|---|
| **Name Of Person(s) Or Organization(s):** |
| |
| |
| |

Information required to complete this Schedule, if not shown above, will be shown in the Declarations.

Each person or organization shown in the Schedule is an "insured" for Covered Autos Liability Coverage, but only to the extent that person or organization qualifies as an "insured" under the Who Is An Insured provision contained in Paragraph A.1. of Section II – Covered Autos Liability Coverage in the Business Auto and Motor Carrier Coverage Forms and Paragraph D.2. of Section I – Covered Autos Coverages of the Auto Dealers Coverage Form.

 © Insurance Services Office, Inc., 2011

POLICY NUMBER: A11111111

COMMERCIAL GENERAL LIABILITY
CG 24 04 05 09

# WAIVER OF TRANSFER OF RIGHTS OF RECOVERY AGAINST OTHERS TO US

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

### SCHEDULE

| Name Of Person Or Organization: |
|---|
| PER WRITTEN CONTRACT |

Information required to complete this Schedule, if not shown above, will be shown in the Declarations.

The following is added to Paragraph 8. Transfer Of Rights Of Recovery Against Others To Us of Section IV – Conditions:

We waive any right of recovery we may have against the person or organization shown in the Schedule above because of payments we make for injury or damage arising out of your ongoing operations or "your work" done under a contract with that person or organization and included in the "products-completed operations hazard". This waiver applies only to the person or organization shown in the Schedule above.

© Insurance Services Office, Inc., 2008

POLICY NUMBER:

COMMERCIAL AUTO
CA 04 44 03 10

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# WAIVER OF TRANSFER OF RIGHTS OF RECOVERY AGAINST OTHERS TO US (WAIVER OF SUBROGATION)

This endorsement modifies insurance provided under the following:

BUSINESS AUTO COVERAGE FORM
BUSINESS AUTO PHYSICAL DAMAGE COVERAGE FORM
GARAGE COVERAGE FORM
MOTOR CARRIER COVERAGE FORM
TRUCKERS COVERAGE FORM

With respect to coverage provided by this endorsement, the provisions of the Coverage Form apply unless modified by the endorsement.

This endorsement changes the policy effective on the inception date of the policy unless another date is indicated below.

| |
|---|
| **Named Insured:** |
| **Endorsement Effective Date:** |

### SCHEDULE

| |
|---|
| **Name(s) Of Person(s) Or Organization(s):** |
| |
| |
| Information required to complete this Schedule, if not shown above, will be shown in the Declarations. |

**The Transfer Of Rights Of Recovery Against Others To Us Condition** does not apply to the person(s) or organization(s) shown in the Schedule, but only to the extent that subrogation is waived prior to the "accident" or the "loss" under a contract with that person or organization.

© Insurance Services Office, Inc., 2009

**WORKERS COMPENSATION AND EMPLOYERS LIABILITY INSURANCE POLICY**          WC 00 03 13

(Ed. 4-84)

## WAIVER OF OUR RIGHT TO RECOVER FROM OTHERS ENDORSEMENT

We have the right to recover our payments from anyone liable for an injury covered by this policy. We will not enforce our right against the person or organization named in the Schedule. (This agreement applies only to the extent that you perform work under a written contract that requires you to obtain this agreement from us.)

This agreement shall not operate directly or indirectly to benefit anyone not named in the Schedule.

Schedule

# SAMPLE

This endorsement changes the policy to which it is attached and is effective on the date issued unless otherwise stated.

(The information below is required only when this endorsement is issued subsequent to preparation of the policy.)

Endorsement                                   Effective Policy No. 15478884      Endorsement No.
Insured                                                                          Premium

Insurance Company                             Countersigned by_____

WC 00 03 13
(Ed. 4-84)

© 1983 National Council on Compensation Insurance.

Form **W-9**
(Rev. August 2013)
Department of the Treasury
Internal Revenue Service

**Request for Taxpayer
Identification Number and Certification**

**Give Form to the
requester. Do not
send to the IRS.**

Print or type / See Specific Instructions on page 2.

Name (as shown on your income tax return)

Business name/disregarded entity name, if different from above

Check appropriate box for federal tax classification:

☐ Individual/sole proprietor   ☐ C Corporation   ☐ S Corporation   ☐ Partnership   ☐ Trust/estate

☐ Limited liability company. Enter the tax classification (C=C corporation, S=S corporation, P=partnership) ▶ _____

☐ Other (see instructions) ▶

Exemptions (see instructions):

Exempt payee code (if any) _____

Exemption from FATCA reporting
code (if any) _____

Address (number, street, and apt. or suite no.)

Requester's name and address (optional)

City, state, and ZIP code

List account number(s) here (optional)

---

**Part I    Taxpayer Identification Number (TIN)**

Enter your TIN in the appropriate box. The TIN provided must match the name given on the "Name" line to avoid backup withholding. For individuals, this is your social security number (SSN). However, for a resident alien, sole proprietor, or disregarded entity, see the Part I instructions on page 3. For other entities, it is your employer identification number (EIN). If you do not have a number, see *How to get a TIN* on page 3.

Note. If the account is in more than one name, see the chart on page 4 for guidelines on whose number to enter.

Social security number

☐☐☐ - ☐☐ - ☐☐☐☐

Employer identification number

☐☐ - ☐☐☐☐☐☐☐

---

**Part II    Certification**

Under penalties of perjury, I certify that:

1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me), and

2. I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding, and

3. I am a U.S. citizen or other U.S. person (defined below), and

4. The FATCA code(s) entered on this form (if any) indicating that I am exempt from FATCA reporting is correct.

**Certification instructions.** You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return. For real estate transactions, item 2 does not apply. For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and generally, payments other than interest and dividends, you are not required to sign the certification, but you must provide your correct TIN. See the instructions on page 3.

**Sign
Here**

Signature of
U.S. person ▶

Date ▶

---

## General Instructions

Section references are to the Internal Revenue Code unless otherwise noted.

**Future developments.** The IRS has created a page on IRS.gov for information about Form W-9, at *www.irs.gov/w9*. Information about any future developments affecting Form W-9 (such as legislation enacted after we release it) will be posted on that page.

### Purpose of Form

A person who is required to file an information return with the IRS must obtain your correct taxpayer identification number (TIN) to report, for example, income paid to you, payments made to you in settlement of payment card and third party network transactions, real estate transactions, mortgage interest you paid, acquisition or abandonment of secured property, cancellation of debt, or contributions you made to an IRA.

Use Form W-9 only if you are a U.S. person (including a resident alien), to provide your correct TIN to the person requesting it (the requester) and, when applicable, to:

1. Certify that the TIN you are giving is correct (or you are waiting for a number to be issued),

2. Certify that you are not subject to backup withholding, or

3. Claim exemption from backup withholding if you are a U.S. exempt payee. If applicable, you are also certifying that as a U.S. person, your allocable share of any partnership income from a U.S. trade or business is not subject to the withholding tax on foreign partners' share of effectively connected income, and

4. Certify that FATCA code(s) entered on this form (if any) indicating that you are exempt from the FATCA reporting, is correct.

**Note.** If you are a U.S. person and a requester gives you a form other than Form W-9 to request your TIN, you must use the requester's form if it is substantially similar to this Form W-9.

**Definition of a U.S. person.** For federal tax purposes, you are considered a U.S. person if you are:

• An individual who is a U.S. citizen or U.S. resident alien,

• A partnership, corporation, company, or association created or organized in the United States or under the laws of the United States,

• An estate (other than a foreign estate), or

• A domestic trust (as defined in Regulations section 301.7701-7).

**Special rules for partnerships.** Partnerships that conduct a trade or business in the United States are generally required to pay a withholding tax under section 1446 on any foreign partners' share of effectively connected taxable income from such business. Further, in certain cases where a Form W-9 has not been received, the rules under section 1446 require a partnership to presume that a partner is a foreign person, and pay the section 1446 withholding tax. Therefore, if you are a U.S. person that is a partner in a partnership conducting a trade or business in the United States, provide Form W-9 to the partnership to establish your U.S. status and avoid section 1446 withholding on your share of partnership income.

Cat. No. 10231X

Form **W-9** (Rev. 8-2013)

In the cases below, the following person must give Form W-9 to the partnership for purposes of establishing its U.S. status and avoiding withholding on its allocable share of net income from the partnership conducting a trade or business in the United States.

• In the case of a disregarded entity with a U.S. owner, the U.S. owner of the disregarded entity and not the entity;

• In the case of a grantor trust with a U.S. grantor or other U.S. owner, generally, the U.S. grantor or other U.S. owner of the grantor trust and not the trust, and

• In the case of a U.S. trust (other than a grantor trust), the U.S. trust (other than a grantor trust) and not the beneficiaries of the trust.

**Foreign person.** If you are a foreign person or the U.S. branch of a foreign bank that has elected to be treated as a U.S. person, do not use Form W-9. Instead, use the appropriate Form W-8 or Form 8233 (see Publication 515, Withholding of Tax on Nonresident Aliens and Foreign Entities).

**Nonresident alien who becomes a resident alien.** Generally, only a nonresident alien individual may use the terms of a tax treaty to reduce or eliminate U.S. tax on certain types of income. However, most tax treaties contain a provision known as a "saving clause." Exceptions specified in the saving clause may permit an exemption from tax to continue for certain types of income even after the payee has otherwise become a U.S. resident alien for tax purposes.

If you are a U.S. resident alien who is relying on an exception contained in the saving clause of a tax treaty to claim an exemption from U.S. tax on certain types of income, you must attach a statement to Form W-9 that specifies the following five items:

1. The treaty country. Generally, this must be the same treaty under which you claimed exemption from tax as a nonresident alien.

2. The treaty article addressing the income.

3. The article number (or location) in the tax treaty that contains the saving clause and its exceptions.

4. The type and amount of income that qualifies for the exemption from tax.

5. Sufficient facts to justify the exemption from tax under the terms of the treaty article.

*Example.* Article 20 of the U.S.-China income tax treaty allows an exemption from tax for scholarship income received by a Chinese student temporarily present in the United States. Under U.S. law, this student will become a resident alien for tax purposes if his or her stay in the United States exceeds 5 calendar years. However, paragraph 2 of the first Protocol to the U.S.-China treaty (dated April 30, 1984) allows the provisions of Article 20 to continue to apply even after the Chinese student becomes a resident alien of the United States. A Chinese student who qualifies for this exception (under paragraph 2 of the first protocol) and is relying on this exception to claim an exemption from tax on his or her scholarship or fellowship income would attach to Form W-9 a statement that includes the information described above to support that exemption.

If you are a nonresident alien or a foreign entity, give the requester the appropriate completed Form W-8 or Form 8233.

**What is backup withholding?** Persons making certain payments to you must under certain conditions withhold and pay to the IRS a percentage of such payments. This is called "backup withholding." Payments that may be subject to backup withholding include interest, tax-exempt interest, dividends, broker and barter exchange transactions, rents, royalties, nonemployee pay, payments made in settlement of payment card and third party network transactions, and certain payments from fishing boat operators. Real estate transactions are not subject to backup withholding.

You will not be subject to backup withholding on payments you receive if you give the requester your correct TIN, make the proper certifications, and report all your taxable interest and dividends on your tax return.

**Payments you receive will be subject to backup withholding if:**

1. You do not furnish your TIN to the requester,

2. You do not certify your TIN when required (see the Part II instructions on page 3 for details),

3. The IRS tells the requester that you furnished an incorrect TIN,

4. The IRS tells you that you are subject to backup withholding because you did not report all your interest and dividends on your tax return (for reportable interest and dividends only), or

5. You do not certify to the requester that you are not subject to backup withholding under 4 above (for reportable interest and dividend accounts opened after 1983 only).

Certain payees and payments are exempt from backup withholding. See *Exempt payee code* on page 3 and the separate Instructions for the Requester of Form W-9 for more information.

Also see *Special rules for partnerships* on page 1.

**What is FATCA reporting?** The Foreign Account Tax Compliance Act (FATCA) requires a participating foreign financial institution to report all United States account holders that are specified United States persons. Certain payees are exempt from FATCA reporting. See *Exemption from FATCA reporting code* on page 3 and the Instructions for the Requester of Form W-9 for more information.

## Updating Your Information

You must provide updated information to any person to whom you claimed to be an exempt payee if you are no longer an exempt payee and anticipate receiving reportable payments in the future from this person. For example, you may need to provide updated information if you are a C corporation that elects to be an S corporation, or if you no longer are tax exempt. In addition, you must furnish a new Form W-9 if the name or TIN changes for the account, for example, if the grantor of a grantor trust dies.

## Penalties

**Failure to furnish TIN.** If you fail to furnish your correct TIN to a requester, you are subject to a penalty of $50 for each such failure unless your failure is due to reasonable cause and not to willful neglect.

**Civil penalty for false information with respect to withholding.** If you make a false statement with no reasonable basis that results in no backup withholding, you are subject to a $500 penalty.

**Criminal penalty for falsifying information.** Willfully falsifying certifications or affirmations may subject you to criminal penalties including fines and/or imprisonment.

**Misuse of TINs.** If the requester discloses or uses TINs in violation of federal law, the requester may be subject to civil and criminal penalties.

## Specific Instructions

### Name

If you are an individual, you must generally enter the name shown on your income tax return. However, if you have changed your last name, for instance, due to marriage without informing the Social Security Administration of the name change, enter your first name, the last name shown on your social security card, and your new last name.

If the account is in joint names, list first, and then circle, the name of the person or entity whose number you entered in Part I of the form.

**Sole proprietor.** Enter your individual name as shown on your income tax return on the "Name" line. You may enter your business, trade, or "doing business as (DBA)" name on the "Business name/disregarded entity name" line.

**Partnership, C Corporation, or S Corporation.** Enter the entity's name on the "Name" line and any business, trade, or "doing business as (DBA) name" on the "Business name/disregarded entity name" line.

**Disregarded entity.** For U.S. federal tax purposes, an entity that is disregarded as an entity separate from its owner is treated as a "disregarded entity." See Regulation section 301.7701-2(c)(2)(iii). Enter the owner's name on the "Name" line. The name of the entity entered on the "Name" line should never be a disregarded entity. The name on the "Name" line must be the name shown on the income tax return on which the income should be reported. For example, if a foreign LLC that is treated as a disregarded entity for U.S. federal tax purposes has a single owner that is a U.S. person, the U.S. owner's name is required to be provided on the "Name" line. If the direct owner of the entity is also a disregarded entity, enter the first owner that is not disregarded for federal tax purposes. Enter the disregarded entity's name on the "Business name/disregarded entity name" line. If the owner of the disregarded entity is a foreign person, the owner must complete an appropriate Form W-8 instead of a Form W-9. This is the case even if the foreign person has a U.S. TIN.

**Note.** Check the appropriate box for the U.S. federal tax classification of the person whose name is entered on the "Name" line (Individual/sole proprietor, Partnership, C Corporation, S Corporation, Trust/estate).

**Limited Liability Company (LLC).** If the person identified on the "Name" line is an LLC, check the "Limited liability company" box only and enter the appropriate code for the U.S. federal tax classification in the space provided. If you are an LLC that is treated as a partnership for U.S. federal tax purposes, enter "P" for partnership. If you are an LLC that has filed a Form 8832 or a Form 2553 to be taxed as a corporation, enter "C" for C corporation or "S" for S corporation, as appropriate. If you are an LLC that is disregarded as an entity separate from its owner under Regulation section 301.7701-3 (except for employment and excise tax), do not check the LLC box unless the owner of the LLC (required to be identified on the "Name" line) is another LLC that is not disregarded for U.S. federal tax purposes. If the LLC is disregarded as an entity separate from its owner, enter the appropriate tax classification of the owner identified on the "Name" line.

**Other entities.** Enter your business name as shown on required U.S. federal tax documents on the "Name" line. This name should match the name shown on the charter or other legal document creating the entity. You may enter any business, trade, or DBA name on the "Business name/disregarded entity name" line.

## Exemptions

If you are exempt from backup withholding and/or FATCA reporting, enter in the Exemptions box, any code(s) that may apply to you. See *Exempt payee code* and *Exemption from FATCA reporting code* on page 3.

Form W-9 (Rev. 8-2013)

Exempt payee code. Generally, individuals (including sole proprietors) are not exempt from backup withholding. Corporations are exempt from backup withholding for certain payments, such as interest and dividends. Corporations are not exempt from backup withholding for payments made in settlement of payment card or third party network transactions.

Note. If you are exempt from backup withholding, you should still complete this form to avoid possible erroneous backup withholding.

The following codes identify payees that are exempt from backup withholding:

1—An organization exempt from tax under section 501(a), any IRA, or a custodial account under section 403(b)(7) if the account satisfies the requirements of section 401(f)(2)

2—The United States or any of its agencies or instrumentalities

3—A state, the District of Columbia, a possession of the United States, or any of their political subdivisions or instrumentalities

4—A foreign government or any of its political subdivisions, agencies, or instrumentalities

5—A corporation

6—A dealer in securities or commodities required to register in the United States, the District of Columbia, or a possession of the United States

7—A futures commission merchant registered with the Commodity Futures Trading Commission

8—A real estate investment trust

9—An entity registered at all times during the tax year under the Investment Company Act of 1940

10—A common trust fund operated by a bank under section 584(a)

11—A financial institution

12—A middleman known in the investment community as a nominee or custodian

13—A trust exempt from tax under section 664 or described in section 4947

The following chart shows types of payments that may be exempt from backup withholding. The chart applies to the exempt payees listed above, 1 through 13.

| IF the payment is for . . . | THEN the payment is exempt for . . . |
|---|---|
| Interest and dividend payments | All exempt payees except for 7 |
| Broker transactions | Exempt payees 1 through 4 and 6 through 11 and all C corporations. S corporations must not enter an exempt payee code because they are exempt only for sales of noncovered securities acquired prior to 2012. |
| Barter exchange transactions and patronage dividends | Exempt payees 1 through 4 |
| Payments over $600 required to be reported and direct sales over $5,000[1] | Generally, exempt payees 1 through 5[2] |
| Payments made in settlement of payment card or third party network transactions | Exempt payees 1 through 4 |

[1] See Form 1099-MISC, Miscellaneous Income, and its instructions.

[2] However, the following payments made to a corporation and reportable on Form 1099-MISC are not exempt from backup withholding: medical and health care payments, attorneys' fees, gross proceeds paid to an attorney, and payments for services paid by a federal executive agency.

Exemption from FATCA reporting code. The following codes identify payees that are exempt from reporting under FATCA. These codes apply to persons submitting this form for accounts maintained outside of the United States by certain foreign financial institutions. Therefore, if you are only submitting this form for an account you hold in the United States, you may leave this field blank. Consult with the person requesting this form if you are uncertain if the financial institution is subject to these requirements.

A—An organization exempt from tax under section 501(a) or any individual retirement plan as defined in section 7701(a)(37)

B—The United States or any of its agencies or instrumentalities

C—A state, the District of Columbia, a possession of the United States, or any of their political subdivisions or instrumentalities

D—A corporation the stock of which is regularly traded on one or more established securities markets, as described in Reg. section 1.1472-1(c)(1)(i)

E—A corporation that is a member of the same expanded affiliated group as a corporation described in Reg. section 1.1472-1(c)(1)(i)

F—A dealer in securities, commodities, or derivative financial instruments (including notional principal contracts, futures, forwards, and options) that is registered as such under the laws of the United States or any state

G—A real estate investment trust

H—A regulated investment company as defined in section 851 or an entity registered at all times during the tax year under the Investment Company Act of 1940

I—A common trust fund as defined in section 584(a)

J—A bank as defined in section 581

K—A broker

L—A trust exempt from tax under section 664 or described in section 4947(a)(1)

M—A tax exempt trust under a section 403(b) plan or section 457(g) plan

## Part I. Taxpayer Identification Number (TIN)

Enter your TIN in the appropriate box. If you are a resident alien and you do not have and are not eligible to get an SSN, your TIN is your IRS Individual Taxpayer Identification Number (ITIN). Enter it in the social security number box. If you do not have an ITIN, see How to get a TIN below.

If you are a sole proprietor and you have an EIN, you may enter either your SSN or EIN. However, the IRS prefers that you use your SSN.

If you are a single-member LLC that is disregarded as an entity separate from its owner (see Limited Liability Company (LLC) on page 2), enter the owner's SSN (or EIN, if the owner has one). Do not enter the disregarded entity's EIN. If the LLC is classified as a corporation or partnership, enter the entity's EIN.

Note. See the chart on page 4 for further clarification of name and TIN combinations.

How to get a TIN. If you do not have a TIN, apply for one immediately. To apply for an SSN, get Form SS-5, Application for a Social Security Card, from your local Social Security Administration office or get this form online at www.ssa.gov. You may also get this form by calling 1-800-772-1213. Use Form W-7, Application for IRS Individual Taxpayer Identification Number, to apply for an ITIN, or Form SS-4, Application for Employer Identification Number, to apply for an EIN. You can apply for an EIN online by accessing the IRS website at www.irs.gov/businesses and clicking on Employer Identification Number (EIN) under Starting a Business. You can get Forms W-7 and SS-4 from the IRS by visiting IRS.gov or by calling 1-800-TAX-FORM (1-800-829-3676).

If you are asked to complete Form W-9 but do not have a TIN, apply for a TIN and write "Applied For" in the space for the TIN, sign and date the form, and give it to the requester. For interest and dividend payments, and certain payments made with respect to readily tradable instruments, generally you will have 60 days to get a TIN and give it to the requester before you are subject to backup withholding on payments. The 60-day rule does not apply to other types of payments. You will be subject to backup withholding on all such payments until you provide your TIN to the requester.

Note. Entering "Applied For" means that you have already applied for a TIN or that you intend to apply for one soon.

Caution: A disregarded U.S. entity that has a foreign owner must use the appropriate Form W-8.

## Part II. Certification

To establish to the withholding agent that you are a U.S. person, or resident alien, sign Form W-9. You may be requested to sign by the withholding agent even if items 1, 4, or 5 below indicate otherwise.

For a joint account, only the person whose TIN is shown in Part I should sign (when required). In the case of a disregarded entity, the person identified on the "Name" line must sign. Exempt payees, see Exempt payee code earlier.

Signature requirements. Complete the certification as indicated in items 1 through 5 below.

1. Interest, dividend, and barter exchange accounts opened before 1984 and broker accounts considered active during 1983. You must give your correct TIN, but you do not have to sign the certification.

2. Interest, dividend, and broker accounts opened after 1983 and broker accounts considered inactive during 1983. You must sign the certification or backup withholding will apply. If you are subject to backup withholding and you are merely providing your correct TIN to the requester, you must cross out item 2 in the certification before signing the form.

3. Real estate transactions. You must sign the certification. You may cross out item 2 of the certification.

4. Other payments. You must give your correct TIN, but you do not have to sign the certification unless you have been notified that you have previously given an incorrect TIN. "Other payments" include payments made in the course of the requester's trade or business for rents, royalties, goods (other than bills for merchandise), medical and health care services (including payments to corporations), payments to a nonemployee for services, payments made in settlement of payment card and third party network transactions, payments to certain fishing boat crew members and fishermen, and gross proceeds paid to attorneys (including payments to corporations).

5. Mortgage interest paid by you, acquisition or abandonment of secured property, cancellation of debt, qualified tuition program payments (under section 529), IRA, Coverdell ESA, Archer MSA or HSA contributions or distributions, and pension distributions. You must give your correct TIN, but you do not have to sign the certification.

Form W-9 (Rev. 8-2013)

## What Name and Number To Give the Requester

| For this type of account: | Give name and SSN of: |
|---|---|
| 1. Individual | The individual |
| 2. Two or more individuals (joint account) | The actual owner of the account or, if combined funds, the first individual on the account [1] |
| 3. Custodian account of a minor (Uniform Gift to Minors Act) | The minor [2] |
| 4. a. The usual revocable savings trust (grantor is also trustee) | The grantor-trustee [1] |
| b. So-called trust account that is not a legal or valid trust under state law | The actual owner [1] |
| 5. Sole proprietorship or disregarded entity owned by an individual | The owner [3] |
| 6. Grantor trust filing under Optional Form 1099 Filing Method 1 (see Regulation section 1.671-4(b)(2)(i)(A)) | The grantor* |

| For this type of account: | Give name and EIN of: |
|---|---|
| 7. Disregarded entity not owned by an individual | The owner |
| 8. A valid trust, estate, or pension trust | Legal entity [4] |
| 9. Corporation or LLC electing corporate status on Form 8832 or Form 2553 | The corporation |
| 10. Association, club, religious, charitable, educational, or other tax-exempt organization | The organization |
| 11. Partnership or multi-member LLC | The partnership |
| 12. A broker or registered nominee | The broker or nominee |
| 13. Account with the Department of Agriculture in the name of a public entity (such as a state or local government, school district, or prison) that receives agricultural program payments | The public entity |
| 14. Grantor trust filing under the Form 1041 Filing Method or the Optional Form 1099 Filing Method 2 (see Regulation section 1.671-4(b)(2)(i)(B)) | The trust |

[1] List first and circle the name of the person whose number you furnish. If only one person on a joint account has an SSN, that person's number must be furnished.

[2] Circle the minor's name and furnish the minor's SSN.

[3] You must show your individual name and you may also enter your business or "DBA" name on the "Business name/disregarded entity" name line. You may use either your SSN or EIN (if you have one), but the IRS encourages you to use your SSN.

[4] List first and circle the name of the trust, estate, or pension trust. (Do not furnish the TIN of the personal representative or trustee unless the legal entity itself is not designated in the account title.) Also see Special rules for partnerships on page 1.

*Note. Grantor also must provide a Form W-9 to trustee of trust.

Note. If no name is circled when more than one name is listed, the number will be considered to be that of the first name listed.

## Secure Your Tax Records from Identity Theft

Identity theft occurs when someone uses your personal information such as your name, social security number (SSN), or other identifying information, without your permission, to commit fraud or other crimes. An identity thief may use your SSN to get a job or may file a tax return using your SSN to receive a refund.

To reduce your risk:

• Protect your SSN,

• Ensure your employer is protecting your SSN, and

• Be careful when choosing a tax preparer.

If your tax records are affected by identity theft and you receive a notice from the IRS, respond right away to the name and phone number printed on the IRS notice or letter.

If your tax records are not currently affected by identity theft but you think you are at risk due to a lost or stolen purse or wallet, questionable credit card activity or credit report, contact the IRS Identity Theft Hotline at 1-800-908-4490 or submit Form 14039.

For more information, see Publication 4535, Identity Theft Prevention and Victim Assistance.

Victims of identity theft who are experiencing economic harm or a system problem, or are seeking help in resolving tax problems that have not been resolved through normal channels, may be eligible for Taxpayer Advocate Service (TAS) assistance. You can reach TAS by calling the TAS toll-free case intake line at 1-877-777-4778 or TTY/TDD 1-800-829-4059.

Protect yourself from suspicious emails or phishing schemes. Phishing is the creation and use of email and websites designed to mimic legitimate business emails and websites. The most common act is sending an email to a user falsely claiming to be an established legitimate enterprise in an attempt to scam the user into surrendering private information that will be used for identity theft.

The IRS does not initiate contacts with taxpayers via emails. Also, the IRS does not request personal detailed information through email or ask taxpayers for the PIN numbers, passwords, or similar secret access information for their credit card, bank, or other financial accounts.

If you receive an unsolicited email claiming to be from the IRS, forward this message to phishing@irs.gov. You may also report misuse of the IRS name, logo, or other IRS property to the Treasury Inspector General for Tax Administration at 1-800-366-4484. You can forward suspicious emails to the Federal Trade Commission at: spam@uce.gov or contact them at www.ftc.gov/idtheft or 1-877-IDTHEFT (1-877-438-4338).

Visit IRS.gov to learn more about identity theft and how to reduce your risk.

## Privacy Act Notice

Section 6109 of the Internal Revenue Code requires you to provide your correct TIN to persons (including federal agencies) who are required to file information returns with the IRS to report interest, dividends, or certain other income paid to you; mortgage interest you paid; the acquisition or abandonment of secured property; the cancellation of debt; or contributions you made to an IRA, Archer MSA, or HSA. The person collecting this form uses the information on the form to file information returns with the IRS, reporting the above information. Routine uses of this information include giving it to the Department of Justice for civil and criminal litigation and to cities, states, the District of Columbia, and U.S. commonwealths and possessions for use in administering their laws. The information also may be disclosed to other countries under a treaty, to federal and state agencies to enforce civil and criminal laws, or to federal law enforcement and intelligence agencies to combat terrorism. You must provide your TIN whether or not you are required to file a tax return. Under section 3406, payers must generally withhold a percentage of taxable interest, dividend, and certain other payments to a payee who does not give a TIN to the payer. Certain penalties may also apply for providing false or fraudulent information.

## PARTIAL RELEASE AND WAIVER OF LIEN

KNOW ALL MEN BY THESE PRESENTS, that the undersigned, _____ (company name), by its duly authorized agent, for and in consideration of payment in the amount of $_____, the receipt of which is hereby acknowledged, does hereby waive, release and relinquish any and all claims and demands including any lien or right to claim a lien for labor and materials furnished through _____, 20___ on the following described property:

        Bang Energy
        1635 South 43rd Ave
        Phoeniz, AZ 85009
        Project #23008976

This Partial Release and Waiver of Lien constitutes a full and complete discharge, release and waiver of any right to further payment and any mechanic's or materialmen's lien or right to lien for any and all work and labor done and performed or any and all materials or both, furnished to The Stellar Group for improvement of the above described property through _____, 20___.

The undersigned hereby represents and warrants that all labor and/or materials furnished or used on the above described property for which this Partial Release and Waiver of Lien is executed through _____, 20___ have been paid in full.

The undersigned recognizes and agrees this Partial Release and Waiver of Lien is given to induce The Stellar Group to make the payment described above and The Stellar Group will rely on the Partial Release and Waiver of Lien in making payment described above.

IN WITNESS THEREOF, the undersigned has caused this Partial Release and Waiver of Lien to be duly executed this _____ day of _____, 20___.

        COMPANY NAME _____

        _____
        BY:_____
                *(Signature)*
        ITS:_____
                *(Print Name)*
                *(Title)*

Witness:                           Witness:

_____    _____
Signature                            Signature

_____    _____
Printed Name                      Printed Name

SWORN TO AND SUBSCRIBED before me this _____ day of _____, 20____.

        Notary Public: _____
        State of _____
        My Commission Expires: _____

Personally Known ( )  Produced Identification ( )  Type of ID:_____



# Arizona Department of Revenue

**Arizona Form 5005**

## Contractor's Certificate
### Prime Contracting and MRRA

The purpose of this form is to provide a subcontractor with the validation required for prime contracting transaction privilege tax (TPT) exemption, and for exemption from liability for an amount equal to retail TPT on materials incorporated or fabricated into maintenance, repair, replacement or alteration (MRRA) projects. The form can be provided for a particular project, for a period of time, or until revoked. This certificate establishes liability for the prime contracting TPT and/or the amount equal to the retail TPT; therefore, it must be completed by the contractor assuming the liability. The asterisked (*) items must be completed; otherwise, the certificate is not valid. The Department may disregard this certificate pursuant to ARS § 42-5008.01 or ARS § 42-5075.E if the certificate is incomplete or erroneous. If disregarded, the subcontractor accepting the certificate will have the burden of proving (pursuant to ARS § 42-5008.01 or ARS § 42-5075.D), that it is not liable for the prime contracting TPT and/or the amount equal to the retail TPT.

## A. Contractor

| * Name | * TPT License # | | |
|---|---|---|---|
| Stellar Group Incorporated | 07-370179-9 | | |
| * Address | City, Town or Post Office | State | ZIP Code |
| 2900 Hartley Road | Jacksonville | FL | 32257 |
| AZ Contractor License Number | Phone Number | | |
| ROC 253214 B-1 | (904) 260-2900 | | |

## B. Subcontractor

| * Name | * TPT License # (if none, write "N/A - MRRA only") | | |
|---|---|---|---|
| | | | |
| * Address | City, Town or Post Office | State | ZIP Code |
| | | | |
| AZ Contractor License Number | Phone Number | | |
| | | | |

## C*. Type of Certificate (check one and provide requested information)

☒ Single Project Certificate

**OR**

☐ Blanket Certificate (check applicable box and fill in requested information).

*PROJECT DESCRIPTION

Project #: 23008976

Bang Energy - Phoenix Can Manufacturing
1635 South 43rd Avenue
Phoenix, Arizona 85009

☐ Period From: _____
  Through: _____

☐ Until revoked

☐ Specific Exceptions: _____

** (For example; Building Permit #, Address, Subdivision, Book/Map/Parcel #s, and/or Legal Description)

I hereby certify that I have authority to sign this Certificate on behalf of Contractor. I understand that by executing this Certificate, Contractor is licensed for TPT purposes and is assuming the prime contracting TPT liability and/or the amount equal to retail TPT liability applicable to the above referenced project(s).

_Priscilla J Ingram_
SIGNATURE

_Priscilla Ingram_
PRINT NAME

_Director of Accounting_
TITLE

11/23/2020
DATE SIGNED

ADOR 10013 (6/15)    This Form Superseded All Other Form 5005's

# Contractor's Certificate Instructions

## GENERAL INSTRUCTIONS

In order to ensure the effectiveness of the Certificate, all required fields must be completed.

A. The "NAME", "ADDRESS", and "TPT LICENSE NUMBER" fields of the Contractor section must be completed. The contractor is the entity responsible for the tax.

B. The "NAME", "ADDRESS", and "TPT LICENSE" fields of the Subcontractor section must be complete.

C. Either the "Single Project Certificate" box or the "Blanket Certificate" box of the Type of Certificate section must be checked.

- If the Single Project Certificate box is checked, the "PROJECT DESCRIPTION" must be supplied. The project description must be sufficient to identify the location of the single project or the Certificate will be deemed incomplete by the Department of Revenue.

- If the Blanket Certificate box is checked, either the "From: Through:" box or the "Until revoked" box must be checked. If the "From: Through:" box is checked, the "From: Through:" dates must be provided. The "Specific Exceptions" box is optional and allows the "Prime Contractor" to exclude Specific projects or time periods from the Blanket Certificate. If the "Specific Exceptions" is checked, details describing the excluded project(s) or the excluded time periods must be provided.

- The "SIGNATURE", "TITLE", "PRINT NAME" and "DATE SIGNED" FIELDS of the Signature section must be completed.

Failure to complete these fields as specified may result in the Arizona Department of Revenue disregarding the incomplete Certificate.

## RETROACTIVE EFFECT

If a Certificate is not signed contemporaneously to the commencement of a contracting project intended to be within the scope of the Certificate, the Department of Revenue will accept the certificate as evidence of the alleged facts. However, the person receiving the certificate may not receive the benefit of the certificate if the Department determines that any of the facts set forth in the certificate are inaccurate.

## ASSUMPTION OF PRIME CONTRACTING TPT LIABILITY

In most instances, the entity assuming the prime contracting transaction privilege tax liability for the prime contracting project(s) referenced in the Certificate will legally be the prime contractor for such project(s). However, in some instances such entity may not legally be the prime contractor for such project(s). If an entity is not the prime contractor for such project(s), the Certificate will nevertheless be effective and will subject such entity to the transaction privilege tax liability of the entity receiving the certificate.



**Arizona Form**
**5000**

## Transaction Privilege Tax Exemption Certificate

- Do not use Form 5000 to claim sale for resale. Use Form 5000A.
- Do not use Form 5000 if you are a non-TPT licensed contractor. Use Form 5000M.

This Certificate is prescribed by the Department of Revenue pursuant to A.R.S. § 42-5009. The purpose of the Certificate is to document and establish a basis for state and city tax deductions or exemptions. It is to be filled out completely by the purchaser and furnished to the vendor at the time of the sale. The vendor shall retain this Certificate for single transactions or for the specified period as indicated below. Incomplete Certificates are not considered to be accepted in good faith. Only one category of exemption may be claimed on a Certificate.

| A. Purchaser's Name and Address: | B. Check Applicable Box: |
|---|---|
| Name<br>**Stellar Group, Inc.** | ☐ Single Transaction Certificate |
| Address<br>**2900 Hartley Rd** | ☒ Period From **11/20/2020**    Through **11/19/2021** |
| City    State    ZIP Code<br>**Jacksonville**    **FL**    **32257** | *(You must choose specific dates for which the certificate will be valid. You are encouraged not to exceed a 12 month period. However, a certificate will be considered to be accepted in good faith for a period not to exceed 48 months if the vendor has documentation the TPT license is valid for each calendar year covered in the certificate.)* |
| Vendor's Name | |

### C. Choose one transaction type per Certificate:

| | |
|---|---|
| ☒ **Transactions with a Business** | ☐ **Transactions with Native Americans, Native American Businesses and Tribal Governments (See reason #12.)** |
| Arizona Transaction Privilege Tax (TPT) License Number<br>**07-370179-9** | Tribal Business License Number   OR   Tribal Number |
| SSN / EIN | Name of Tribe    Tribal Government<br>☐ |
| Other Tax License Number | ☐ **Transactions with a U.S. Government entity (See reasons #9 and #10.)** |
| If no license, provide reason: | ☐ **Transaction with a Foreign Diplomat (See reason #13.)** |
| Precise Nature of Purchaser's Business | |

### D. Reason for Exemption:

Check the box indicating one of the more common exemptions provided below, or use Box 14 or 15 to cite the appropriate authority for another exemption (deduction). Refer to *www.azdor.gov/Forms/TransactionPrivilegeTax.aspx* for a complete list of state and city exemptions (deductions) and the business classes (codes) under which the deductions apply.

☐ 1. Tangible personal property to be leased or rented in the ordinary course of the purchaser's licensed business.

☒ 2. Tangible personal property to be incorporated into a taxable contracting project, or a maintenance, repair, replacement or alteration project.

☐ 3. Food, drink, or condiments purchased by a restaurant business.

☐ 4. Pipes or valves four inches in diameter or greater to be used for transportation of oil, natural gas, artificial gas, water or coal slurry.

☐ 5. Railroad rolling stock, rails, ties, and signal control equipment.

☐ 6. Machinery or equipment used directly in the following business activities:
    ☐ Manufacturing, processing or fabricating.   ☐ Job printing.   ☐ Refining or metallurgical operations.
    ☐ Extraction of ores or minerals from the earth for commercial purposes.
    ☐ Extraction of, or drilling for, oil or gas from the earth for commercial purposes.

☐ 7. Other income producing capital assets. (Cities only.)

☐ 8. Food, drink or condiments for consumption within the premises of any prison, jail or other institution under the jurisdiction of the state department of corrections, the department of public safety, the department of juvenile corrections or a county sheriff. Food, drink, condiments or accessories purchased by a school district for consumption at a public school within the district during school hours.

☐ 9. Tangible personal property sold or leased directly to the United States Government or its departments or agencies by a manufacturer, modifier, assembler or repairer. (Retail, personal property rental and mining classifications only.)

☐10. Fifty percent of the gross proceeds or gross income from the sale of tangible personal property directly to the United States Government or its departments or agencies. (Retail classification only.)

ADOR 10308 (3/19)

Continued on page 2 →

| Your Name (as shown on page 1) | Arizona Transaction Privilege Tax License Number |
|---|---|
| Stellar Group, Inc. | 07-370179-9 |

☐ 11. Electricity, natural gas or liquefied petroleum gas sold to a qualified manufacturing or smelting business. A manufacturing or smelting business that claims this exemption authorizes the release by the vendor of the information required to be provided to the Department of Revenue pursuant to A.R.S. §42-5063(C)(6). (Utilities classification only.)

☐ 12. Sale or lease of tangible personal property to affiliated Native Americans if the solicitation for sale, signing of the contract, delivery of the goods and payment for the goods all occur on the reservation. NOTE: The vendor shall retain adequate documentation to substantiate the transaction.

☐ 13. Foreign diplomat.  NOTE:  Limited to authorization on the U.S. Department of State Diplomatic Tax Exemption Card.  The vendor shall retain a copy of the U.S. Department of State Diplomatic Tax Exemption Card and any other documentation issued by the U.S. Department of State.  Motor vehicle purchases or leases must be pre-authorized by the Office of Foreign Missions ("OFM").  See "Vehicle Tax Exemption" at www.state.gov/ofm/tax/

☐ 14.*Other Deduction: Cite the Arizona Revised Statutes authority for the deduction. A.R.S. § _____
   Description: |

☐ 15.*Other Cities Deduction: Cite the Model City Tax Code authority for the deduction. M.C.T.C § _____
   Description: |

*Refer to www.azdor.gov/TransactionPrivilegeTax(TPT)/RatesandDeductionCodes.aspx for a complete list of state and city exemptions (deductions) and the business classes (codes) under which the deductions apply.

**E. Describe the tangible personal property or service purchased or leased and its use below.**
   **(Use additional pages if needed.)**

**F. Certification**

A vendor that has reason to believe that this Certificate is not accurate or complete will not be relieved of the burden of proving entitlement to the exemption. A vendor that accepts a Certificate in good faith will be relieved of the burden of proof and the purchaser may be required to establish the accuracy of the claimed exemption. If the purchaser cannot establish the accuracy and completeness of the information provided in the Certificate, the purchaser is liable for an amount equal to the transaction privilege tax, penalty and interest which the vendor would have been required to pay if the vendor had not accepted the Certificate. Misuse of this Certificate will subject the purchaser to payment of the A.R.S. § 42-5009 amount equal to any tax, penalty or interest. Willful misuse of this Certificate will subject the purchaser to criminal penalties of a felony pursuant to A.R.S. § 42-1127(B).

I, (print full name) _Priscilla Ingram_____, hereby certify that these transactions are exempt from Arizona transaction privilege tax and that the information on this Certificate is true, accurate and complete. Further, if purchasing or leasing as an agent or officer, I certify that I am authorized to execute this Certificate on behalf of the purchaser named above.

| _Priscilla Ingram_ | 11/23/20 | _Director of Accounting_ |
|---|---|---|
| SIGNATURE OF PURCHASER | DATE | TITLE |

ADOR 10308 (3/19)                                                                                       Page 2 of 2

# SUBCONTRACT MODIFICATION
## Stellar Group, Inc.
2000 Hurley Road
Jacksonville, FL 32257

| | |
|---|---|
| **Subcontractor:** Faith Technologies, Inc.<br>225 Main Street<br>Menasha Wisconsin 54952 | **Project Name and Location:** Berg Energy - Phoenix Can Manufacturing<br>1836 South 43rd Avenue<br>Phoenix Arizona 85009 |
| **Attention:** David McCarthy | **Attention:** Brian Edberg |
| **Phone:** (920) 738-1500 | **Phone:** (904) 349-0840 |
| **Fax:** | **E-Mail:** bedberg@stellar.net |
| **E-Mail:** david.mccarthy@faithtechnologies.com | |

| Date | SC # | Project # | Contract Type | FOB | Schedule |
|---|---|---|---|---|---|
| 2/18/2021 | 23006976-SUB-09A | 23006976 | Lump Sum | Jobsite | Per Superintendent |

This Subcontract is made by and between Stellar Group, Incorporated, d/b/a Stellar, hereinafter referred to as "Contractor," and the Subcontractor named above, at Jacksonville, Florida. In consideration of the mutual promises and undertakings set forth herein, Contractor and Subcontractor hereby agree to the terms and conditions set forth herein, including the Terms and Conditions attached hereto. Subcontractor agrees to perform and complete the following Work:

Subcontract agrees to modify Subcontract No.: 23006976-SUB-09

| Item | Description | Net Amount |
|---|---|---|
| 1 | Provide underground conduit needed at coil handling unit per the IFS Drawings ENERGY-PHX-CH01-CH02. | $5,829.95 |

**Attachments:**

**FOR ACCOUNTING PURPOSES ONLY:**

| Cost Codes | Net Amount |
|---|---|
| 26-2605 - 1760 | $5,829.95 |

| | |
|---|---|
| **TOTAL AMOUNT OF THIS MODIFICATION** | **$5,829.95** |

(All licenses, taxes, permits, fees and insurance with Stellar named as additional insured included)

| | | |
|---|---|---|
| ORIGINAL SUBCONTRACT | ............................................................ | $3,926,196.00 |
| PREVIOUS MODIFICATION(S) | ............................................................ | $0.00 |
| THIS MODIFICATION | ............................................................ | $5,829.95 |
| REVISED SUBCONTRACT | ............................................................ | $3,932,025.95 |

This subcontract includes and is subject to the terms and conditions previously attached to the original subcontract.

IN WITNESS WHEREOF, the Subcontractor and Contractor have executed this Subcontract on the date set forth above.

**FAITH TECHNOLOGIES, INC.**
Subcontractor

*David McCarthy*    2/22/21

By: David McCarthy
Senior Project Manager

**STELLAR GROUP, INCORPORATED**
Contractor

By: Jonah Petoskey
Senior Project Manager

## SUBCONTRACT MODIFICATION
### Stellar Contracting, Inc.
**2900 Hartley Road**
**Jacksonville, FL 32257**

| | | |
|---|---|---|
| **Subcontractor:** | Faith Technologies, Inc. | **Project Name and Location:** Bang Energy - Phoenix Can Manufacturing |
| | 225 Main Street | 1635 South 43rd Avenue |
| | Menasha  Wisconsin 54952 | Phoenix Arizona 85009 |
| **Attention:** | David McCarthy | **Attention:** Chuck Harrison |
| **Phone:** | (920) 738-1500 | **Phone:** (904) 363-0163 |
| **Fax:** | | **E-Mail:** charrison@stellar.net |
| **E-Mail:** | david.mccarthy@faithtechnologies.com | |

| Date 9/30/2021 | SC # 23006976-SUB-09B | Project # 23006976 | Contract Type Lump Sum | FOB Jobsite | Schedule Per Superintendent |
|---|---|---|---|---|---|

This Subcontract is made by and between Stellar Group, Incorporated, d/b/a Stellar, hereinafter referred to as "Contractor," and the Subcontractor named above, at Jacksonville, Florida. In consideration of the mutual promises and undertakings set forth herein, Contractor and Subcontractor hereby agree to the terms and conditions set forth herein, including the Terms and Conditions attached hereto. Subcontractor agrees to perform and complete the following Work:

Subcontract agrees to modify Subcontract No.: 23006976-SUB-09

| Item | Description | Net Amount |
|---|---|---|
| 1 | Please review the revised schedule attached and provide details as list below. Provide detail for all impacts associated with the delay reflected in the updated schedule dated May 29, 2020. Confirm that you can meet the commitment required under your existing contract terms based on the revised schedule. If not please provide additional details. Provide detail for any additional costs associated with the delay if any. If you have any equipment in fabrication or storage, provide schedule or cost impacts associated with the equipment delivery or storage. Provide detail for any current cost you have that has not been billed and a date for when the costs will be billed. If you have any items onsite that need to be removed provide details of what needs to be removed and when it will be removed. Provide any other information that may be of concern regarding the revised project schedule. Material Costs Increase: $728,328.00 Lighting Package Increase: $105,696.00 Gear Package Increase: $100,941.00 Fire Alarm Package Increase: $24,178.00 New aluminum feeders to transformers deduct: -$11,094.00 New aluminum feeders to panels deduct: -$222,914.00 | $725,135.00 |
| 2 | SRP Bond | $4,056.00 |

**Attachments:**
06976- Bang PHX Can Manufacturing Preliminary Restart Schedule.pdf

**See SC #23006976-SUB-09B CE#46 Attachment**

**FOR ACCOUNTING PURPOSES ONLY:**

| Cost Codes | Net Amount |
|---|---|
| 26-2601 - 1760 | $725,135.00 |
| 26-2601 - 1760 | $4,056.00 |

| **TOTAL AMOUNT OF THIS MODIFICATION** | **$729,191.00** |
|---|---|
| (All licenses, taxes, permits, fees and insurance with Stellar named as additional insured included) | |

| ORIGINAL SUBCONTRACT | .......................................................... | $3,926,196.00 |
|---|---|---|
| PREVIOUS MODIFICATION(S) | .......................................................... | $5,829.95 |
| THIS MODIFICATION | .......................................................... | $729,191.00 |
| REVISED SUBCONTRACT | .......................................................... | $4,661,216.95 |

This subcontract includes and is subject to the terms and conditions previously attached to the original subcontract.

IN WITNESS WHEREOF, the Subcontractor and Contractor have executed this Subcontract on the date set forth above.

| **FAITH TECHNOLOGIES, INC.** | **STELLAR CONTRACTING, INC.** |
|---|---|
| Subcontractor | Contractor |
| *David Mccarthy*      10/14/21 | |
| By: David McCarthy | By: Gregory Ortego |
| Senior Project Manager | Project Manager |

SC #23006976-SUB-0 CE#046  Attachment

(1) **CE#046**      The attached schedule in CE#046 is not up to date based on the delivery of the electrical gear. Our estimated lead time for this gear is 24 weeks, this is putting us into February for delivery. Both parties understand that the schedule referenced in this contract is inaccurate and does not reflect a mutually agreed upon substantial completion date.  Until such time as a mutually agreeable schedule is developed, Subcontractor expressly disclaims any responsibility for liquidated damages or responsibility to meet the stated completion date.  The parties expressly anticipate that the scheduled completion date will be adjusted by change order from the Owner.  However, both parties understand and agree that a mutually agreeable schedule for the building and completion of the building is an express condition precedent to the occurrence of the process work, and until both pieces are properly coordinated and have a mutually agreed upon schedule associated with each piece of the Work, that Faith Technologies shall not be bound or liable for the liquidated damages identified in the Subcontract or which flow down from the Prime contract.


FAITH TECHNOLOGIES, INC.
Subcontractor

By: _____
Terry Flaherty, Group Leader

STELLAR GROUP, INCORPORATED
Contractor

By: _____
Greg Ortego Project Manager



**Bang Phoenix - Can Manufacturing**
**Phoenix, AZ**
**Project #06976**
**Preliminary Project Restart Schedule**

✦ stellar

| ID | % Complete | Task Name | Duration | Start | Finish |
|---|---|---|---|---|---|
| 1 | 42% | 0.0 Bang Phoenix - Can Manufacturing | 432 days | Tue 7/28/20 | Mon 4/4/22 |
| 2 | 33% | 1.0 Project Development | 393 days | Tue 7/28/20 | Mon 9/20/21 |
| 3 | 33% | Budgeting & Contracting | 283 days | Tue 7/28/20 | Mon 9/20/21 |
| 4 | 100% | Execution of DBIA Documents | 5 days | Tue 7/28/20 | Mon 8/3/20 |
| 5 | 100% | Establish GMP Documents | 13 days | Thu 10/22/20 | Wed 11/11/20 |
| 6 | 100% | Price Permit Drawings For GMP | 20 days | Mon 11/2/20 | Mon 11/30/20 |
| 7 | 100% | Submit GMP Draft for Review | 0 days | Mon 11/30/20 | Mon 11/30/20 |
| 8 | 100% | GMP Draft Review and Update | 24 days | Tue 12/1/20 | Wed 1/6/21 |
| 9 | 100% | Acceptance of Final GMP (GMP Withdrawn) | 0 days | Thu 1/7/21 | Wed 1/27/21 |
| 10 | 0% | Notice to Hold for 60 Days | 15 days | Thu 1/7/21 | Fri 2/12/21 |
| 11 | 0% | Notice to Re-Proceed | 0 days | Fri 2/12/21 | Tue 8/17/21 |
| 12 | 0% | Submit Revised GMP (Sub Pricing Confirmation) | 40 days | Mon 7/19/21 | Mon 7/19/21 |
| 13 | 0% | Revised GMP Draft Review and Update | 5 days | Tue 9/14/21 | Mon 9/20/21 |
| 14 | 0% | Acceptance of Final Revised GMP | 0 days | Mon 9/20/21 | Mon 9/20/21 |
| 15 | 71% | 2.0 Design & Engineering | 413 days | Tue 7/28/20 | Tue 3/8/22 |
| 16 | 88% | Process Equipment | 333 days | Tue 8/4/20 | Mon 11/22/21 |
| 17 | 100% | Design Basis | 15 days | Tue 8/4/20 | Tue 8/25/20 |
| 18 | 100% | Process Design Development | 77 days | Wed 9/30/20 | Mon 12/14/20 |
| 29 | 9% | Construction Drawings | 240 days | Tue 12/15/20 | Mon 11/22/21 |
| 30 | 100% | Installation Drawings | 20 days | Tue 12/15/20 | Thu 1/24/21 |
| 31 | 50% | Installation Specs | 41 days | Tue 12/15/20 | Fri 7/30/21 |
| 32 | 0% | Automation Schematic Drawings / Schedules | 90 days | Mon 7/19/21 | Mon 11/22/21 |
| 33 | 65% | Building Design | 413 days | Tue 7/28/20 | Tue 3/8/22 |
| 41 | 100% | Schematic Design Phase | 64 days | Tue 7/28/20 | Mon 10/26/20 |
| 47 | 100% | Building Design Development Phase | 43 days | Tue 9/15/20 | Thu 11/12/20 |
| 54 | 26% | Construction Document Phase | 166 days | Wed 12/16/20 | Fri 8/13/21 |
| 55 | 20% | Construction Document Phase | 20 days | Wed 12/16/20 | Fri 8/13/21 |
| 56 | 0% | Construction Issue | 0 days | Fri 8/13/21 | Fri 8/13/21 |

Legend:

| Task | | Inactive Task | | Manual Summary Rollup | | External Milestone | ◆ |
| Split | | Inactive Milestone | ◆ | Manual Summary | | Deadline | |
| Milestone | ◆ | Inactive Summary | | Start-only | ⌐ | Critical | |
| Summary | | Manual Task | | Finish-only | ⌐ | Critical Split | |
| Project Summary | | Duration-only | | External Tasks | | Progress | |

Date: Thu 7/15/21

1 of 11





Bang Phoenix - Can Manufacturing
Phoenix, AZ
Project #06976
Preliminary Project Restart Schedule

| ID | % Complete | Task Name | Duration | Start | Finish |
|---|---|---|---|---|---|
| 57 | 14% | Construction Administration Services | 336 days | Fri 11/13/20 | Tue 3/8/22 |
| 58 | 100% ✓ | Generate / Distribute Submittal Register | 15 days | Fri 11/13/20 | Fri 12/4/20 |
| 59 | 9% | Review & Approve Submittals | 255 days | Mon 12/7/20 | Mon 12/6/21 |
| 60 | 0% | Develop Site Inspection Schedule | 0 days | Fri 8/13/21 | Fri 8/13/21 |
| 61 | 0% | Issue Record Drawings | 0 days | Tue 3/8/22 | Tue 3/8/22 |
| 62 | 72% | Permitting | 244 days | Mon 8/17/20 | Fri 4/27/21 |
| 63 | 100% | Permitting Initiation | 21 days | Mon 8/17/20 | Tue 9/15/20 |
| 66 | 100% | Demolition | 24 days | Tue 9/15/20 | Fri 10/16/20 |
| 72 | 100% | Underground (UG) Permit | 8 days | Fri 10/9/20 | Wed 10/21/20 |
| 76 | 100% | Building Permit | 43 days | Wed 11/4/20 | Fri 1/8/21 |
| 82 | 63% | Deferred Permits | 223 days | Wed 10/14/20 | Fri 6/25/21 |
| 83 | 100% | Joist Reinforcement | 59 days | Wed 10/14/20 | Fri 1/8/21 |
| 87 | 69% | Site | 189 days | Tue 11/3/20 | Fri 7/30/21 |
| 88 | 100% ✓ | Design | 5 wks | Tue 11/3/20 | Tue 12/8/20 |
| 89 | 50% | Plans Review and Permit Issuance | 45 days | Wed 12/9/20 | Fri 7/30/21 |
| 90 | 59% | Fire Protection | 204 days | Tue 11/3/20 | Fri 6/20/21 |
| 91 | 75% | Design | 9 wks | Tue 11/3/20 | Fri 7/30/21 |
| 92 | 6% | Plans Review and Permit Issuance | 30 days | Mon 4/2/21 | Fri 5/20/21 |
| 93 | 6% | Fire Alarm | 15 days | Mon 7/19/21 | Fri 6/27/21 |
| 94 | 0% | Design | 15 days | Mon 7/19/21 | Fri 8/6/21 |
| 95 | 0% | Plans Review and Permit Issuance | 15 days | Mon 8/9/21 | Fri 8/27/21 |
| 96 | 43% | 3.0 Procurement | 316 days | Mon 9/14/20 | Wed 11/24/21 |
| 97 | 54% | Process | 242 days | Thu 10/8/20 | Mon 9/20/21 |
| 98 | 58% | Bid Process | 69 days | Thu 10/8/20 | Mon 1/18/21 |
| 99 | 100% ✓ | Generate RFP | 15 days | Thu 10/8/20 | Wed 10/28/20 |
| 100 | 100% ✓ | Bid Process | 15 days | Thu 10/29/20 | Wed 11/18/20ss |
| 101 | 100% ✓ | Owner Review and Approval | 11 days | Thu 11/19/20 | Fri 12/4/20 |
| 102 | 0% | Submittals | 10 days | Mon 7/19/21 | Fri 7/30/21 |

Date: Thu 7/15/21

2 of 11





Bang Phoenix - Can Manufacturing
Phoenix, AZ
Project #06976
Preliminary Project Restart Schedule

| ID | % Complete | Task Name | Duration | Start | Finish |
|---|---|---|---|---|---|
| 103 | 0% | Submittal Review | 10 days | Mon 8/2/21 | Fri 8/13/21 |
| 104 | 0% | Material Delivery | 10 days | Mon 8/16/21 | Fri 8/27/21 |
| 105 | 62% | Electrical | 69 days | Thu 10/8/20 | Mon 1/18/21 |
| 106 | 100% | Generate RFP | 15 days | Thu 10/8/20 | Wed 10/28/20 |
| 107 | 100% | Bid Process | 15 days | Thu 10/29/20 | Wed 11/18/20 |
| 108 | 100% | Owner Review and Approval | 11 days | Thu 11/19/20 | Thu 12/4/20 bs Review and Approval |
| 109 | 0% | Submittals | 5 days | Mon 7/19/21 | Fri 7/23/21 |
| 110 | 0% | Submittal Review | 10 days | Mon 7/26/21 | Fri 8/6/21 |
| 111 | 0% | Material Delivery | 10 days | Mon 8/9/21 | Fri 8/20/21 |
| 112 | 51% | Rigging & Setting | 79 days | Thu 10/8/20 | Mon 2/1/21 |
| 113 | 100% | Generate RFP | 15 days | Thu 10/8/20 | Wed 10/28/20 |
| 114 | 100% | Bid Process | 15 days | Thu 10/29/20 | Wed 11/18/20 bs |
| 115 | 100% | Owner Review and Approval | 11 days | Thu 11/19/20 | Fri 12/4/20 e Review and Approval |
| 116 | 0% | Submittals | 10 days | Mon 7/19/21 | Fri 7/30/21 |
| 117 | 0% | Submittal Review | 10 days | Mon 8/2/21 | Fri 8/13/21 |
| 118 | 0% | Material Delivery | 20 days | Mon 8/16/21 | Mon 9/13/21 |
| 119 | 49% | Controls & Automation | 69 days | Thu 10/8/20 | Mon 1/18/21 |
| 120 | 100% | Generate RFP | 15 days | Thu 10/8/20 | Wed 10/28/20 |
| 121 | 100% | Bid Process | 15 days | Thu 10/29/20 | Wed 11/18/20 bs |
| 122 | 100% | Owner Review and Approval | 11 days | Thu 11/19/20 | Fri 12/4/20 f Review and Approval |
| 123 | 0% | Submittals | 25 days | Mon 7/19/21 | Fri 8/20/21 |
| 124 | 0% | Submittal Review | 10 days | Mon 8/23/21 | Fri 9/3/21 |
| 125 | 0% | Material Delivery | 10 days | Tue 9/7/21 | Mon 9/20/21 |
| 126 | 41% | Building | 316 days | Mon 9/14/20 | Fri 12/3/21 |
| 127 | 100% | Demolition | 54 days | Mon 9/14/20 | Fri 10/7/20 |
| 131 | 100% | Concrete | 54 days | Fri 10/9/20 | Tue 12/29/20 |
| 138 | 100% | Rock Equipment | 33 days | Wed 10/21/20 | Tue 12/8/20 |
| 144 | 100% | Underground Plumbing | 67 days | Mon 10/12/20 | Tue 1/19/21 |

Date: Thu 7/15/21

3 of 11



Bang Phoenix - Can Manufacturing
Phoenix, AZ
Project #06976
Preliminary Project Restart Schedule



Bang Phoenix - Can Manufacturing
Phoenix, AZ
Project #06976
Preliminary Project Restart Schedule

| ID | % Complete | Task Name | Duration | Start | Finish |
|---|---|---|---|---|---|
| 203 | 100% | Owner Review and Approval | 4 days | Thu 12/17/20 | Wed 12/23/20 |
| 204 | 100% | Award | 6 days | Wed 12/23/20 | Tue 1/5/21 |
| 205 | 100% | Submittals | 15 days | Tue 1/5/21 | Tue 1/26/21 |
| 206 | 100% | Submittal Review | 3 days | Tue 1/26/21 | Fri 1/29/21 |
| 207 | 0% | Material Delivery | 40 days | Mon 7/19/21 | Mon 9/13/21 |
| 208 | 0% | Commercial Flooring | 72 days | Mon 7/19/21 | Wed 10/27/21 |
| 209 | 0% | Bang Approved Finishes | 10 days | Mon 7/19/21 | Fri 7/30/21 |
| 210 | 0% | Bid Process | 10 days | Mon 8/2/21 | Fri 8/13/21 |
| 211 | 0% | Award | 2 days | Mon 8/16/21 | Tue 8/17/21 |
| 212 | 0% | Submittals | 10 days | Wed 8/18/21 | Tue 8/31/21 |
| 213 | 0% | Submittal Review | 10 days | Wed 9/1/21 | Tue 9/14/21 |
| 214 | 0% | Material Delivery | 30 days | Thu 9/16/21 | Fri 10/27/21 |
| 215 | 0% | Utilities | 96 days | Mon 7/19/21 | Mon 12/27/21 |
| 216 | 0% | Post Hold Price Confirmation - Stellar Mechanical | 10 days | Mon 7/19/21 | Fri 7/30/21 |
| 217 | 0% | Owner Review and Approval | 5 days | Mon 8/2/21 | Fri 8/6/21 |
| 218 | 0% | Award | 1 day | Mon 8/9/21 | Mon 8/9/21 |
| 219 | 0% | Submittals | 10 days | Tue 8/10/21 | Mon 8/23/21 |
| 220 | 0% | Submittal Review | 10 days | Tue 8/24/21 | Tue 9/7/21 |
| 221 | 0% | Material Delivery | 15 days | Wed 9/8/21 | Tue 9/28/21 |
| 222 | 0% | Long Lead Equipment | 85 days | Mon 8/2/21 | Wed 12/1/21 |
| 223 | 0% | UF & RO Systems | 60 days | Wed 9/8/21 | Wed 12/1/21 |
| 224 | 0% | Cooling Water System | 60 days | Mon 8/2/21 | Mon 10/25/21 |
| 225 | 0% | Mechanical / HVAC | 96 days | Mon 7/19/21 | Wed 12/1/21 |
| 226 | 0% | Post Hold Price Confirmation - Stellar Mechanical | 10 days | Mon 7/19/21 | Fri 7/30/21 |
| 227 | 0% | Owner Review and Approval | 5 days | Mon 8/2/21 | Fri 8/6/21 |
| 228 | 0% | Award | 1 day | Mon 8/9/21 | Mon 8/9/21 |
| 229 | 0% | Submittals | 10 days | Tue 7/20/21 | Mon 8/2/21 |
| 230 | 0% | Submittal Review | 5 days | Tue 8/3/21 | Mon 8/9/21 |

Date: Thu 7/15/21

5 of 11



**Bang Phoenix - Can Manufacturing**
**Phoenix, AZ**
**Project #06976**
**Preliminary Project Restart Schedule**

stellar

| ID | % Complete | Task Name | Duration | Start | Finish |
|----|-----------|-----------|----------|-------|--------|
| 231 | 0% | Material Delivery | 80 days | Tue 8/10/21 | Wed 12/1/21 |
| 232 | 71% | Framing & Drywall | 212.5 days | Wed 10/21/20 | Fri 8/20/21 |
| 233 | 100% | Bid Process | 53 days | Wed 10/21/20 | Wed 1/6/21 |
| 234 | 100% | Award | 1 day | Wed 1/6/21 | Thu 1/7/21 |
| 235 | 100% | Submittals | 5 days | Thu 1/7/21 | Thu 1/14/21 |
| 236 | 100% | Submittal Review | 5 days | Thu 1/14/21 | Thu 1/21/21 |
| 237 | 0% | Material Delivery | 25 days | Mon 7/19/21 | Fri 8/20/21 |
| 238 | 18% | Fire Protection | 130 days | Wed 12/23/20 | Tue 9/21/21 |
| 239 | 100% | Bid Process | 10 days | Wed 12/23/20 | Fri 1/8/21 |
| 240 | 0% | Post Hold Price Confirmation | 10 days | Mon 7/19/21 | Fri 7/30/21 |
| 241 | 0% | Owner Review and Approval | 5 days | Mon 8/2/21 | Fri 8/6/21 |
| 242 | 0% | Award | 1 day | Mon 8/9/21 | Mon 8/9/21 |
| 243 | 0% | Submittals | 10 days | Tue 8/10/21 | Mon 8/23/21 |
| 244 | 0% | Submittal Review | 10 days | Tue 8/24/21 | Tue 9/7/21 |
| 245 | 0% | Material Delivery | 10 days | Wed 9/8/21 | Tue 9/21/21 |
| 246 | 64% | HM & Wood Doors | 231.5 days | Thu 10/15/20 | Mon 9/19/21 |
| 247 | 100% | Bid Process | 55 days | Thu 10/15/20 | Wed 1/6/21 |
| 248 | 100% | Award | 2 days | Wed 1/6/21 | Fri 1/8/21 |
| 249 | 100% | Submittals | 10 days | Fri 1/8/21 | Fri 1/22/21 |
| 250 | 100% | Submittal Review | 5 days | Fri 1/22/21 | Fri 1/29/21 |
| 251 | 0% | Storework | 40 days | Mon 7/19/21 | Mon 9/13/21 |
| 252 | 0% | Bid Process | 20 days | Mon 7/19/21 | Fri 8/13/21 |
| 253 | 0% | Owner Review and Approval | 5 days | Mon 8/16/21 | Fri 8/20/21 |
| 254 | 0% | Award | 1 day | Mon 8/23/21 | Mon 8/23/21 |
| 255 | 0% | Submittals | 10 days | Tue 8/24/21 | Tue 9/7/21 |
| 256 | 0% | Submittal Review | 10 days | Wed 9/8/21 | Tue 9/21/21 |
| 257 | 0% | Submittal Review | 10 days | Wed 9/9/21 | Tue 9/21/21 |
| 258 | 0% | Material Delivery | 20 days | Wed 9/22/21 | Tue 10/19/21 |

Date: Thu 7/15/21

Legend: Task, Split, Milestone, Summary, Project Summary, Inactive Task, Inactive Milestone, Inactive Summary, Manual Task, Duration-only, Manual Summary Rollup, Manual Summary, Start-only, Finish-only, External Tasks, External Milestone, Deadline, Critical, Critical Split, Progress, Manual Progress



Bang Phoenix - Can Manufacturing
Phoenix, AZ
Project #06976
Preliminary Project Restart Schedule





Bang Phoenix - Can Manufacturing
Phoenix, AZ
Project #06976
Preliminary Project Restart Schedule

| ID | % Complete | Indicator | Task Name | Duration | Start | Finish |
|---|---|---|---|---|---|---|
| 287 | 0% | | Re-Mobilize | 40 days | Mon 7/19/21 | Mon 9/13/21 |
| 288 | 16% | | Construction | 379 days | Tue 3/24/20 | Tue 8/29/22 |
| 289 | 0% | | Site Work & Utilities | 90 days | Wed 10/20/21 | Wed 12/1/21 |
| 290 | 0% | | Process & Sanitary Waste Systems | 20 days | Wed 10/20/21 | Tue 11/16/21 |
| 291 | 0% | | Underground Electrical | 15 days | Wed 10/20/21 | Tue 11/9/21 |
| 292 | 0% | | Set Transformer for 4th Service | 1 day | Wed 12/1/21 | Wed 12/1/21 |
| 293 | 0% | | Paving | 6 days | Wed 11/17/21 | Wed 11/24/21 |
| 294 | 94% | | Building Modifications | 249 days | Tue 10/6/20 | Mon 9/27/21 |
| 295 | 100% | ✓ | Temporary Walls | 4 days | Tue 10/6/20 | Fri 10/9/20 |
| 296 | 100% | ✓ | Layout for Demolition | 10 days | Mon 10/12/20 | Fri 10/23/20 |
| 297 | 100% | ✓ | Concrete Demolition | 20 days | Mon 10/19/20 | Fri 11/13/20 |
| 298 | 100% | ✓ | Excavation: Foundations / Pilings / Trenches | 15 days | Mon 11/16/20 | Mon 12/7/20 |
| 299 | 100% | ✓ | Foundations Installation / Trench & Pit Temp Handrail | 56 days | Mon 11/23/20 | Fri 2/12/21 |
| 300 | 100% | ✓ | U/G Plumbing Office Spaces | 20 days | Mon 1/18/21 | Fri 2/12/21 |
| 301 | 100% | ✓ | Install Existing Dock Equipment and Seals | 30 days | Mon 1/25/21 | Fri 3/5/21 |
| 302 | 100% | ✓ | AHU Temporary Relocation (Not including piping) | 3 days | Mon 1/25/21 | Wed 1/27/21 |
| 303 | 100% | ✓ | Remaining Foundations and Trench Covers | 10 days | Tue 9/14/21 | Mon 9/27/21 |
| 304 | 18% | | Production Areas (92,000 SF) | 266 days | Thu 12/24/21 | Tue 2/1/22 |
| 305 | 100% | ✓ | Slab On Grade | 10 days | Mon 3/1/21 | Fri 3/12/21 |
| 306 | 100% | ✓ | Joist Reinforcement | 13 days | Wed 1/27/21 | Fri 2/12/21 |
| 307 | 0% | ✓ | Relocate staged equipment | 22 days | Mon 7/19/21 | Tue 8/17/21 |
| 308 | 0% | | Ramp Demo | 5 days | Fri 9/17/21 | Thu 9/23/21 |
| 309 | 0% | | Remaining Pourbacks (Including Ramp & Slab at NE corn | 10 days | Fri 9/24/21 | Thu 10/7/21 |
| 310 | 55% | | Interior RMP Walls | 176 days | Thu 3/24/21 | Mon 9/27/21 |
| 311 | 100% | ✓ | Dividing Wall (South to North) | 12 days | Thu 3/24/21 | Fri 2/5/21 |
| 312 | 0% | | Interior Spaces | 10 days | Tue 9/14/21 | Mon 9/27/21 |
| 313 | 0% | | Concrete Curbs | 15 days | Tue 9/14/21 | Mon 10/4/21 |
| 314 | 0% | | Epoxy Flooring | 90 days | Tue 10/5/21 | Tue 10/18/21 |

Date: Thu 7/15/21

| Task | | Inactive Task | | Manual Summary Rollup | | External Milestone | ◆ |
|---|---|---|---|---|---|---|---|
| Split | | Inactive Milestone | | Manual Summary | | Deadline | |
| Milestone | ◆ | Inactive Summary | | Start-only | | Critical | |
| Summary | | Manual Task | | Finish-only | | Critical Split | |
| Project Summary | | Duration-only | | External Tasks | | Progress | |
| | | | | | | Manual Progress | |

8 of 11

Bang Phoenix - Can Manufacturing
Phoenix, AZ
Project #06976
Preliminary Project Restart Schedule





Date: Thu 7/15/21





Bang Phoenix - Can Manufacturing
Phoenix, AZ
Project #06976
Preliminary Project Restart Schedule

| ID | % Complete | Task Name | Duration | Start | Finish |
|---|---|---|---|---|---|
| 343 | 0% | Air Compressor and Dryer Equipment | 40 days | Tue 10/19/21 | Tue 12/14/21 |
| 344 | 0% | Hot Water System | 40 days | Tue 10/19/21 | Tue 12/14/21 |
| 345 | 0% | Boiler Equipment | 40 days | Tue 10/19/21 | Tue 12/14/21 |
| 346 | 0% | Cooling Tower Equipment | 20 days | Tue 10/26/21 | Mon 11/22/21 |
| 347 | 0% | Waste Water System Equipment | 40 days | Tue 10/19/21 | Tue 12/14/21 |
| 348 | 0% | Boiler Equipment and Platform | 40 days | Tue 10/19/21 | Tue 12/14/21 |
| 349 | 0% | UF & RO Systems | 20 days | Thu 12/2/21 | Wed 12/29/21 |
| 350 | 0% | RTO Equipment | 40 days | Wed 10/20/21 | Wed 12/15/21 |
| 351 | 0% | Bulk Liquor Storage Tanks | 20 days | Mon 5/9/21 | Fri 5/28/21 |
| 352 | 0% | MEP In-Wall Rough-In | 50 days | Tue 11/2/21 | Tue 1/11/22 |
| 353 | 0% | Set and wire Electrical Gear | 40 days | Tue 10/12/21 | Tue 12/7/21 |
| 354 | 10% | Welfare Spaces (8,000 SF) | 254 days | Wed 1/13/21 | Thu 1/6/22 |
| 355 | 100% | Dock Door Masonry Infills | 8 days | Wed 1/13/21 | Fri 1/22/21 |
| 356 | 100% | Slab On Grade | 2 days | Mon 2/15/21 | Tue 2/16/21 |
| 357 | 0% | Interior Wall Framing | 15 days | Mon 8/23/21 | Mon 9/13/21 |
| 358 | 0% | MEP Overhead and In-Wall Rough-In | 15 days | Wed 9/29/21 | Tue 10/19/21 |
| 359 | 0% | Drywall | 30 days | Wed 10/13/21 | Tue 10/26/21 |
| 360 | 0% | Painting - Prime Coat | 3 days | Wed 10/27/21 | Fri 10/29/21 |
| 361 | 0% | Painting - First Cost | 3 days | Mon 11/1/21 | Wed 11/3/21 |
| 362 | 0% | Acoustical Ceilings | 10 days | Thu 11/4/21 | Wed 11/17/21 |
| 363 | 0% | Flooring | 10 days | Thu 11/18/21 | Thu 12/2/21 |
| 364 | 0% | Millwork | 5 days | Fri 12/3/21 | Thu 12/9/21 |
| 365 | 0% | MEP Trim Out | 15 days | Fri 12/10/21 | Thu 12/30/21 |
| 366 | 0% | Punch-Out | 5 days | Fri 12/31/21 | Thu 1/6/22 |
| 367 | 0% | Process Equipment | 140 days | Mon 9/13/21 | Tue 3/29/22 |
| 368 | 0% | Areas Ready for Process Equipment Install | 90 days | Mon 9/13/21 | Tue 1/18/22 |
| 369 | 0% | Unit 1 Ready for Process Equipment | 20 days | Mon 9/13/21 | Mon 10/11/21 |
| 370 | 0% | Floor Mounted (Not under platform) | 0 days | Mon 9/13/21 | Mon 9/13/21 |

| Date: Thu 7/15/21 | | | | | | | |
|---|---|---|---|---|---|---|---|
| Task | | Inactive Task | | Manual Summary Rollup | | External Milestone | |
| Split | | Inactive Milestone | | Manual Summary | | Deadline | |
| Milestone | | Inactive Summary | | Start-only | | Critical | |
| Summary | | Manual Task | | Finish-only | | Critical Split | |
| Project Summary | | Duration-only | | External Tasks | | Progress | |
| | | | | | | | |
| | | | | Manual Progress | | | |

10 of 11





Bang Phoenix - Can Manufacturing
Phoenix, AZ
Project #08976
Preliminary Project Restart Schedule

| ID | % Complete | Task Name | Duration | Start | Finish |
|---|---|---|---|---|---|
| 371 | 0% | Platform Mounted and Under Platform | 0 days | Mon 10/11/21 | Mon 10/11/21 |
| 372 | 0% | Unit 4 Ready for Process Equipment | 30 days | Mon 9/27/21 | Mon 11/8/21 |
| 373 | 0% | Floor Mounted (Not under platform) | 0 days | Mon 9/27/21 | Mon 9/27/21 |
| 374 | 0% | Platform Mounted and Under Platform | 0 days | Mon 11/8/21 | Mon 11/8/21 |
| 375 | 0% | Unit 3 Ready for Process Equipment | 45 days | Mon 9/27/21 | Tue 11/30/21 |
| 376 | 0% | Floor Mounted (Not under platform) | 0 days | Mon 9/27/21 | Mon 9/27/21 |
| 377 | 0% | Platform Mounted and Under Platform | 0 days | Tue 11/30/21 | Tue 11/30/21 |
| 378 | 0% | Unit 1 Ready for Process Equipment | 80 days | Mon 9/27/21 | Tue 1/18/22 |
| 379 | 0% | Floor Mounted (Not under platform) | 0 days | Mon 9/27/21 | Mon 9/27/21 |
| 380 | 0% | Platform Mounted and Under Platform | 0 days | Tue 1/18/22 | Tue 1/18/22 |
| 381 | 0% | Equipment Install, Rigging, Mech, and Elec | 100 days | Tue 9/21/21 | Tue 2/8/22 |
| 382 | 0% | Equipment Commissioning & Training | 60 days | Wed 1/5/22 | Tue 3/29/22 |
| 383 | 0% | Equipment Ready for Production | 0 days | Tue 3/29/22 | Tue 3/29/22 |
| 384 | 0% | Project Closeout | 79 days | Wed 12/15/21 | Mon 4/4/22 |
| 385 | 0% | Building Utilities Equipment Commissioning / Training | 20 days | Wed 12/15/21 | Tue 1/11/22 |
| 386 | 0% | Building HVAC Equipment Commissioning / Training | 8 days | Thu 12/23/21 | Mon 1/3/22 |
| 387 | 0% | Inspections | 5 days | Fri 1/7/22 | Thu 1/13/22 |
| 388 | 0% | Substantial Completion / TCO | 0 days | Wed 1/26/22 | Wed 1/26/22 |
| 389 | 0% | First Walkthrough | 1 day | Wed 1/26/22 | Wed 1/26/22 |
| 390 | 0% | Punch-Out | 10 days | Wed 1/27/22 | Wed 2/9/22 |
| 391 | 0% | Cleaning | 4 days | Thu 2/10/22 | Tue 2/15/22 |
| 392 | 0% | Final Walkthrough | 5 days | Wed 2/16/22 | Tue 2/22/22 |
| 393 | 0% | Certificate of Occupancy | 0 days | Tue 3/29/22 | Tue 3/29/22 |
| 394 | 0% | Turnover | 0 days | Tue 3/29/22 | Tue 3/29/22 |
| 395 | 0% | Demobilization | 4 days | Wed 3/30/22 | Mon 4/4/22 |
| 396 | 0% | As-Builts | 30 days | Wed 1/26/22 | Tue 3/8/22 |

Date: Thu 7/15/21

11 of 11

# SUBCONTRACT MODIFICATION
## Stellar Contracting, Inc.
2900 Hartley Road
Jacksonville, FL 32257

| | | | | |
|---|---|---|---|---|
| **Subcontractor:** | Faith Technologies, Inc.<br>225 Main Street<br>Menasha  Wisconsin 54952 | | **Project Name and Location:** | Bang Energy - Phoenix Can Manufacturing<br>1635 South 43rd Avenue<br>Phoenix Arizona 85009 |
| **Attention:** | David McCarthy | | **Attention:** | Chuck Harrison |
| **Phone:** | (920) 738-1500 | | **Phone:** | (904) 383-0163 |
| **Fax:** | | | **E-Mail:** | charrison@stellar.net |
| **E-Mail:** | david.mccarthy@faithtechnologies.com | | | |

| Date<br>10/7/2021 | SC #<br>23006976-SUB-09C | Project #<br>23006976 | Contract Type<br>Lump Sum | FOB<br>Jobsite | Schedule<br>Per Superintendent |
|---|---|---|---|---|---|

This Subcontract is made by and between Stellar Group, Incorporated, d/b/a Stellar, hereinafter referred to as "Contractor," and the Subcontractor named above, at Jacksonville, Florida. In consideration of the mutual promises and undertakings set forth herein, Contractor and Subcontractor hereby agree to the terms and conditions set forth herein, including the Terms and Conditions attached hereto. Subcontractor agrees to perform and complete the following Work:

Subcontract agrees to modify Subcontract No.: 23006976-SUB-09

| Item | Description | Net Amount |
|---|---|---|
| 1 | SRP Scope of Work Offsite for Bang Energy per their request. | $470,314.00 |

**Attachments:**
SRP_Redline_Design_Customer Approval_T3248820RL01-14-21.pdf, T3263093-SurveyChecklist.pdf

**FOR ACCOUNTING PURPOSES ONLY:**

| Cost Codes | Net Amount |
|---|---|
| 26-2602 - 1760 | $470,314.00 |

**TOTAL AMOUNT OF THIS MODIFICATION** ................................................................ $470,314.00
(All licenses, taxes, permits, fees and insurance with Stellar named as additional insured included)

| | | |
|---|---|---|
| ORIGINAL SUBCONTRACT | ................................................................ | $3,926,196.00 |
| PREVIOUS MODIFICATION(S) | ................................................................ | $735,020.95 |
| THIS MODIFICATION | ................................................................ | $470,314.00 |
| REVISED SUBCONTRACT | ................................................................ | $5,131,530.95 |

This subcontract includes and is subject to the terms and conditions previously attached to the original subcontract.

IN WITNESS WHEREOF, the Subcontractor and Contractor have executed this Subcontract on the date set forth above.

**FAITH TECHNOLOGIES, INC.**
Subcontractor

*David Mccarthy*        10/26/2021

By: David McCarthy
Senior Project Manager

**STELLAR CONTRACTING, INC.**
Contractor

By: Gregory Ortego
Project Manager

## SRP SURVEY DIVISION INITIAL CHECKLIST

**CUSTOMER RESPONSIBILITIES**
(Customer refers to all customer or authorized representative)

Current Date  **02/03/21**

**PL #** — Property corners must be clearly marked and bear the valid registration number of an **Arizona Registered Land Surveyor** as shown on provided attachment.

**BS #** — Customer or authorized representative shall request and provide current **Blue Stake markings**, as shown on provided attachment.

_____ — Customer or authorized representative surveyor shall stake proposed **building lines**, as shown on provided attachment.

_____ — Customer or authorized representative surveyor shall stake proposed **curb lines**, as shown on provided attachment.

_____ — Customer or authorized representative surveyor shall stake proposed **sidewalks**, as shown on provided attachment.

_____ — Customer or authorized representative surveyor shall stake proposed **trash enclosure**, as shown on provided attachment.

**NOTE:** Surveyor to identify staked position of proposed facilities (building lines, curb lines, sidewalks and trash enclosure) with the corresponding control point identifier shown on provided attachment.

**OTHER CUSTOMER RESPONSIBILITIES**

_____

_____

**C #** — SRP Survey Responsibilities: [ Tie Existing Curb ]

**M #** — SRP Survey Responsibilities: [ Tie Existing Poles ]

**NOTE: It is not necessary to stake existing control; SRP Survey will tie existing control points.**

## Customer Agreement

☐  I, the customer or authorized representative, have read and agree to the conditions specified on this form and the attachments

Customer or authorized representative name (please print): _____

Customer or authorized representative signature: _____

Date: _____    SRP JOB NO.   [ T3263093 ]

# SUBCONTRACT MODIFICATION
## Stellar Contracting, Inc.
2900 Hartley Road
Jacksonville, FL 32257

| | | |
|---|---|---|
| Subcontractor: | Faith Technologies, Inc.<br>225 Main Street<br>Menasha  Wisconsin 54952 | |
| Attention: | David McCarthy | |
| Phone: | (920) 738-1500 | |
| Fax: | | |
| E-Mail: | david.mccarthy@faithtechnologies.com | |

| | |
|---|---|
| Project Name and Location: | Bang Energy - Phoenix Can Manufacturing<br>1635 South 43rd Avenue<br>Phoenix Arizona 85009 |
| Attention: | Chuck Harrison |
| Phone: | (904) 383-0163 |
| E-Mail: | charrison@stellar.net |

| Date<br>10/18/2021 | SC #<br>23006976-SUB-09D | Project #<br>23006976 | Contract Type<br>Lump Sum | FOB<br>Jobsite | Schedule<br>Per Superintendent |
|---|---|---|---|---|---|

This Subcontract is made by and between Stellar Group, Incorporated, d/b/a Stellar, hereinafter referred to as "Contractor," and the Subcontractor named above, at Jacksonville, Florida. In consideration of the mutual promises and undertakings set forth herein, Contractor and Subcontractor hereby agree to the terms and conditions set forth herein, including the Terms and Conditions attached hereto. Subcontractor agrees to perform and complete the following Work:

Subcontract agrees to modify Subcontract No.: 23006976-SUB-09

| Item | Description | Net Amount |
|---|---|---|
| 1 | Temp Power and Lighting Added for Building and Trailers | $38,485.00 |

**Attachments:**
Ban Energy Temporary power Change Order.pdf

**FOR ACCOUNTING PURPOSES ONLY:**

| Cost Codes | Net Amount |
|---|---|
| 01-0136 - 1750 | $38,485.00 |

| | |
|---|---|
| **TOTAL AMOUNT OF THIS MODIFICATION** | **$38,485.00** |
| (All licenses, taxes, permits, fees and insurance with Stellar named as additional insured included) | |
| ORIGINAL SUBCONTRACT | $3,926,196.00 |
| PREVIOUS MODIFICATION(S) | $1,205,334.95 |
| THIS MODIFICATION | $38,485.00 |
| REVISED SUBCONTRACT | $5,170,015.95 |

This subcontract includes and is subject to the terms and conditions previously attached to the original subcontract.

IN WITNESS WHEREOF, the Subcontractor and Contractor have executed this Subcontract on the date set forth above.

| FAITH TECHNOLOGIES, INC. | STELLAR CONTRACTING, INC. |
|---|---|
| Subcontractor | Contractor |
| *David Mccarthy*     10/26/2021 | |
| By: David McCarthy | By: Gregory Ortego |
| Senior Project Manager | Project Manager |



# PROPOSAL

To: Stellar

Att: Greg Ortego

Project Manager II

Phone: 1-904-577-9515

Date:       10/19/2021

Project Name:   Bang Energy Process

Location: Phoenix Arizona

Faith Technologies, Inc. is pleased to give you the following pricing for temporary lighting and power listed below. Our pricing includes the following items.

Scope of work

Power for two additional trailers.

- Furnish and install two 100-amp breakers in existing Siemens panels.
- Furnish and install conduit and wire from existing panel to trailer locations just outside of MSB-3 electric room location.
- All conduits outside will be IMC and trailer connections will be liquid tight.
- There will have to be a short outage to install the breakers.

Temporary lighting and power outlets interior.

- Furnish and install 120volt GFI outlets on each column. (25 Total)
- Furnish and install three 480volt 50-amp welding outlets. Spread evenly through building.
- Install temporary lighting over new office, breakroom, spares room, maintenance area and tool room. We will be using the lights that were removed for the temporary lighting.
- We will feeding all temporary power from the existing panels. ( ten 120 volt circuits and three 480volt 50 amp circuits)

Our pricing for the above scope of work is $38,485.36

If you have any questions or concerns, please feel free to contact David McCarthy at 1-912-660-3684.

Respectfully Submitted

David McCarthy / Senior Project Manager

Faith Technologies

# SUBCONTRACT MODIFICATION
## Stellar Contracting, Inc.
2900 Hartley Road
Jacksonville, FL 32257

| | | | |
|---|---|---|---|
| **Subcontractor:** | Faith Technologies, Inc.<br>225 Main Street<br>Menasha  Wisconsin 54952 | **Project Name and Location:** | Bang Energy – Phoenix Can Manufacturing<br>1635 South 43rd Avenue<br>Phoenix Arizona 85009 |
| **Attention:** | David McCarthy | **Attention:** | Chuck Harrison |
| **Phone:** | (920) 738-1500 | **Phone:** | (904) 383-0163 |
| **Fax:** | | **E-Mail:** | charrison@stellar.net |
| **E-Mail:** | david.mccarthy@faithtechnologies.com | | |

| Date<br>10/25/2021 | SC #<br>23006976-SUB-09E | Project #<br>23006976 | Contract Type<br>Lump Sum | FOB<br>Jobsite | Schedule<br>Per Superintendent |
|---|---|---|---|---|---|

This Subcontract is made by and between Stellar Group, Incorporated, d/b/a Stellar, hereinafter referred to as "Contractor," and the Subcontractor named above, at Jacksonville, Florida. In consideration of the mutual promises and undertakings set forth herein, Contractor and Subcontractor hereby agree to the terms and conditions set forth herein, including the Terms and Conditions attached hereto. Subcontractor agrees to perform and complete the following Work:

Subcontract agrees to modify Subcontract No.: 23006976-SUB-09

| Item | Description | Net Amount |
|---|---|---|
| 1 | Off Site SRP Scope of Work - increase | $68,642.00 |

**Attachments:**
23006976-Bang_Energy-Phoenix_Can_Manufacturing-SRP_Work-2021-10-19.pdf

**FOR ACCOUNTING PURPOSES ONLY:**

| Cost Codes | Net Amount |
|---|---|
| 26-2602 - 1760 | $68,642.00 |

| | |
|---|---|
| **TOTAL AMOUNT OF THIS MODIFICATION** | **$68,642.00** |
| (All licenses, taxes, permits, fees and insurance with Stellar named as additional insured included) | |
| **ORIGINAL SUBCONTRACT** | $3,926,196.00 |
| **PREVIOUS MODIFICATION(S)** | $1,243,819.95 |
| **THIS MODIFICATION** | $68,642.00 |
| **REVISED SUBCONTRACT** | $5,238,657.95 |

This subcontract includes and is subject to the terms and conditions previously attached to the original subcontract.

IN WITNESS WHEREOF, the Subcontractor and Contractor have executed this Subcontract on the date set forth above.

| | |
|---|---|
| **FAITH TECHNOLOGIES, INC.**<br>Subcontractor | **STELLAR CONTRACTING, INC.**<br>Contractor |
| *David Mccarthy*  10/26/2021 | |
| By: David McCarthy<br>Senior Project Manager | By: Gregory Ortego<br>Project Manager |



Stellar
2900 Hartley Road
Jacksonville, Florida 32257

Project: 23006976 Bang Energy - Phoenix Can
Manufacturing
1635 South 43rd Avenue
Phoenix, Arizona 85009

## RFI #: SRP Work

| | | | |
|---|---|---|---|
| **Status** | Closed on 10/07/21 | | |
| **To** | | **From** | David McCarthy (Faith Technologies, Inc.)<br>225 Main Street<br>Menasha , Wisconsin 54952 |
| **Date Initiated** | | **Due Date** | |
| **Location** | Off Site Work - SRP | **Project Stage** | |
| **Cost Impact** | Yes (Unknown) | **Schedule Impact** | Yes (Unknown) |
| **Spec Section** | | | |
| **Drawing Number** | Job No. T3263093,T3248820 | **Reference** | Price increase / Start date |
| **Linked Drawings** | | | |
| **Received From** | David McCarthy (Faith Technologies, Inc.) | | |
| **Copies To** | Derek Bickerton (Stellar Group, Inc.), Terry Flaherty (Faith Technologies, Inc.), Chuck Harrison (Stellar Group, Inc.), Rob Koldos (Faith Technologies, Inc.), Stephen Maldi (Faith Technologies, Inc.), Andrew McDevitt (Stellar Group, Inc.), Mark Nickel (Faith Technologies, Inc.), Gregory Ortego (Stellar Group, Inc.) | | |

## Activity

**Question**

**Question from David McCarthy Faith Technologies, Inc. on Wednesday, Oct 6, 2021 at 02:30 PM PDT**

Our subcontractor will be sending us a price increase on 10/7/21, They are telling us this work cannot start until January. We will be sending you the updated pricing on 10/7/21. This pricing is only being held for 15 days. Once this is submitted we need to get this change order fully executed so we can get our subcontractor locked in.

*Awaiting an Official Response*

# SUBCONTRACT MODIFICATION
## Stellar Group, Inc.
2900 Hartley Road
Jacksonville, FL 32257

| | | | | |
|---|---|---|---|---|
| Subcontractor: | Faith Technologies, Inc.<br>225 Main Street<br>Menasha Wisconsin 54952 | | Project Name and Location: | Bang Energy - Phoenix Can Manufacturing<br>1635 South 43rd Avenue<br>Phoenix Arizona 85009 |
| Attention: | David McCarthy | | Attention: | Chuck Harrison |
| Phone: | (920) 738-1500 | | Phone: | (904) 383-0163 |
| Fax: | | | E-Mail: | charrison@stellar.net |
| E-Mail: | david.mccarthy@faithtechnologies.com | | | |

| Date<br>11/17/2021 | SC #<br>23006976-SUB-09F | Project #<br>23006976 | Contract Type<br>Lump Sum | FOB<br>Jobsite | Schedule<br>Per Superintendent |
|---|---|---|---|---|---|

This Subcontract is made by and between Stellar Group, Incorporated, d/b/a Stellar, hereinafter referred to as "Contractor," and the Subcontractor named above, at Jacksonville, Florida. In consideration of the mutual promises and undertakings set forth herein, Contractor and Subcontractor hereby agree to the terms and conditions set forth herein, including the Terms and Conditions attached hereto. Subcontractor agrees to perform and complete the following Work:

Subcontract agrees to modify Subcontract No.: 23006976-SUB-09

| Item | Description | Net Amount |
|---|---|---|
| 1 | Changes to Electrical based on building and process design development and owner review comments from drawing set dated 10.30.2020 to 12.10.2020 | $54,827.00 |

**Attachments:**
FTI CO#002 Bang Energy CE#16 Rev1_2.pdf

**FOR ACCOUNTING PURPOSES ONLY:**

| Cost Codes | Net Amount |
|---|---|
| 26-2601 - 1760 | $54,827.00 |

**TOTAL AMOUNT OF THIS MODIFICATION**                                                            **$54,827.00**
(All licenses, taxes, permits, fees and insurance with Stellar named as additional insured included)

| | | |
|---|---|---|
| ORIGINAL SUBCONTRACT | .................................................................. | $3,926,196.00 |
| PREVIOUS MODIFICATION(S) | .................................................................. | $1,312,461.95 |
| THIS MODIFICATION | .................................................................. | $54,827.00 |
| REVISED SUBCONTRACT | .................................................................. | $5,293,484.95 |

**This subcontract includes and is subject to the terms and conditions previously attached to the original subcontract.**

IN WITNESS WHEREOF, the Subcontractor and Contractor have executed this Subcontract on the date set forth above.

| | |
|---|---|
| **FAITH TECHNOLOGIES, INC.**<br>Subcontractor | **STELLAR GROUP, INC.**<br>Contractor |
| *David Mccarthy*        11/18/2021 | |
| By: David McCarthy<br>Senior Project Manager | By: Gregory Ortego<br>Project Manager |



# FTI CHANGE PROPOSAL CO#002 REV1.2

To: Stellar

Att: Greg Ortego

Project Manager

Phone: 904-677-8518

Date: 7/29/2021

Project Name: Bang Energy

Location: Phoenix, AZ

Faith Technologies, Inc. is pleased to give you the following pricing for drawing set CE#16. Our pricing includes the following.

1. **Sheet A6001**

    1.1. Updated Door Schedule - Added High Impact and FRP Doors

    1.2. Updated (1) OHC to include 60 min fire shutter.  Fire alarm has included this in their change.

    1.3. 163C at C16 on sheet A1130 and E2130.

    1.4. 166B Sheet A1110 and E2110

2. **Sheet P0001**

    2.1. Added Electric Trap Primer (TP-1) (Captured in Plumbing Contract).  Sheet P1120 and E2120.  Add 120V connection.

3. **Sheet M0001**

    3.1. Revised Note 1.21 for Smoke Detectors Included for units over 2,000 CF.  Fire alarm has picked this up.

4. **Sheet M1120 & M1130**

    4.1. Added Smoke Detector Call Outs.  Fire alarm has picked this up.

5. **Sheet M9004**

    5.1. Added Smoke Detector Shutdown Notes.  Reviewed by fire alarm.

6. **Sheet E1120**

    6.1. Revised Lighting in Die Coolant Room and Chemical Storage.

7. **Sheet E1140**

    7.1. Revised Lighting in Bulk Lacquer Storage and Added Lighting in Inx Room.



8. **Sheet E1160**
   8.1. Revised Demo Lighting.

9. **Sheet E2110**
   9.1. Added Receptacle for Condensate Pump.

10. **Sheet E2120**
    10.1. Removed Disconnects and Relocated Panels by Chillers.
    10.2. Added Boiler Circuit.

11. **Sheet E2130**
    11.1. Added Power Locations for Docks.
    11.2. Added Condensate Pump Circuit.

12. **Sheet E2140**
    12.1. Added Condensate Pump Circuit.
    12.2. Added Inx Room Power Details.

13. **Sheet E6201 & E6202**
    13.1. Revised Panels 3LG1, 3LG2 and 3HG2.

14. **Sheet ED1001**
    14.1. Updated Fixture Demo Plan at Die Coolant and Chemical Storage Rooms.

Total for this work is ..................................................................................... $14,635.71

If you have any questions or concerns, please feel free to contact David McCarthy at 1-912-660-3684.

Respectfully Submitted
David McCarthy / Senior Project Manager
Faith Technologies

# SUBCONTRACT MODIFICATION
## Stellar Group, Inc.
2900 Hartley Road
Jacksonville, FL 32257

| | | | |
|---|---|---|---|
| **Subcontractor:** | Faith Technologies, Inc.<br>225 Main Street<br>Menasha  Wisconsin 54952 | **Project Name and Location:** | Bang Energy - Phoenix Can Manufacturing<br>1635 South 43rd Avenue<br>Phoenix Arizona 85009 |
| **Attention:** | David McCarthy | **Attention:** | Chuck Harrison |
| **Phone:** | (920) 738-1500 | **Phone:** | (904) 383-0163 |
| **Fax:** | | **E-Mail:** | charrison@stellar.net |
| **E-Mail:** | david.mccarthy@faithtechnologies.com | | |

| Date<br>11/17/2021 | SC #<br>23006976-SUB-09G | Project #<br>23006976 | Contract Type<br>Lump Sum | FOB<br>Jobsite | Schedule<br>Per Superintendent |
|---|---|---|---|---|---|

This Subcontract is made by and between Stellar Group, Incorporated, d/b/a Stellar, hereinafter referred to as "Contractor," and the Subcontractor named above, at Jacksonville, Florida. In consideration of the mutual promises and undertakings set forth herein, Contractor and Subcontractor hereby agree to the terms and conditions set forth herein, including the Terms and Conditions attached hereto. Subcontractor agrees to perform and complete the following Work:

Subcontract agrees to modify Subcontract No.: 23006976-SUB-09

| Item | Description | Net Amount |
|---|---|---|
| 1 | Changes to Wiring based on building and process design development and owner review comments from drawing set dated 12.11.2020 to 01.08.2021 | $15,108.00 |

**Attachments:**
FTI CO#003 Bang Energy CE#17 Rev1_2.pdf

| **FOR ACCOUNTING PURPOSES ONLY:** | |
|---|---|
| Cost Codes | Net Amount |
| 26-2605  -  1760 | $15,108.00 |

| | |
|---|---|
| **TOTAL AMOUNT OF THIS MODIFICATION** | **$15,108.00** |

(All licenses, taxes, permits, fees and insurance with Stellar named as additional insured included)

| | | |
|---|---|---|
| ORIGINAL SUBCONTRACT | ............................................................... | $3,926,196.00 |
| PREVIOUS MODIFICATION(S) | ............................................................... | $1,367,288.95 |
| THIS MODIFICATION | ............................................................... | $15,108.00 |
| REVISED SUBCONTRACT | ............................................................... | $5,308,592.95 |

**This subcontract includes and is subject to the terms and conditions previously attached to the original subcontract.**

IN WITNESS WHEREOF, the Subcontractor and Contractor have executed this Subcontract on the date set forth above.

**FAITH TECHNOLOGIES, INC.**
Subcontractor

*David Mccarthy*          11/18/2021

By: David McCarthy
Senior Project Manager

**STELLAR GROUP, INC.**
Contractor

By: Gregory Ortego
Project Manager



# FTI CHANGE PROPOSAL #003 REV1.2

To: Stellar
Att: ████████
████████
████████

Date:         ████████
Project Name: Bang Energy
Location:     Phoenix, AZ

Faith Technologies, Inc. is pleased to give you the following pricing for drawing set CE#17. Our pricing includes the following.

1. **Sheet M0004**
   1.1. Upsized EF-1 and added note 28 for minimum fan speed – No impact
   1.2. Revised Louver L-2A size – No impact
   1.3. Added Gravity Ventilator GIV-9 to schedule.

2. **Not included in CE#17 but related**
   2.1. Added Gravity Ventilator GIV-7
   2.2. Added Gravity Ventilator GIV-8

Total for this work is ................................................................................. ████████

If you have any questions or concerns, please feel free to contact David McCarthy at 1-912-660-3684.

Respectfully Submitted
David McCarthy / Senior Project Manager
Faith Technologies

## SUBCONTRACT MODIFICATION
### Stellar Group, Inc.
2900 Hartley Road
Jacksonville, FL 32257

| | | | |
|---|---|---|---|
| **Subcontractor:** | Faith Technologies, Inc.<br>225 Main Street<br>Menasha  Wisconsin 54952 | **Project Name and Location:** | Bang Energy - Phoenix Can Manufacturing<br>1635 South 43rd Avenue<br>Phoenix Arizona 85009 |
| **Attention:** | David McCarthy | **Attention:** | Chuck Harrison |
| **Phone:** | (920) 738-1500 | **Phone:** | (904) 383-0183 |
| **Fax:** | | **E-Mail:** | charrison@stellar.net |
| **E-Mail:** | david.mccarthy@faithtechnologies.com | | |

| Date | SC # | Project # | Contract Type | FOB | Schedule |
|---|---|---|---|---|---|
| 12/9/2021 | 23006976-SUB-09H | 23006976 | Lump Sum | Jobsite | Per Superintendent |

This Subcontract is made by and between Stellar Group, Incorporated, d/b/a Stellar, hereinafter referred to as "Contractor," and the Subcontractor named above, at Jacksonville, Florida. In consideration of the mutual promises and undertakings set forth herein, Contractor and Subcontractor hereby agree to the terms and conditions set forth herein, including the Terms and Conditions attached hereto. Subcontractor agrees to perform and complete the following Work:

Subcontract agrees to modify Subcontract No.: 23006976-SUB-09

| Item | Description | Net Amount |
|---|---|---|
| 1 | Changes associated with Drawing Revision #16 - issued 9/13/21. | $378,555.00 |

**Attachments:**
Rev 16 - Faith - COP - Phoenix Can Core and Shell Contract Amendment V1.0_CO 52 (1).pdf

| FOR ACCOUNTING PURPOSES ONLY: | |
|---|---|
| **Cost Codes** | **Net Amount** |
| 26-2601 - 1760 | $378,555.00 |

| **TOTAL AMOUNT OF THIS MODIFICATION** | | $378,555.00 |
|---|---|---|
| (All licenses, taxes, permits, fees and insurance with Stellar named as additional insured included) | | |

| | | |
|---|---|---|
| ORIGINAL SUBCONTRACT | ................................................................................................ | $3,926,196.00 |
| PREVIOUS MODIFICATION(S) | ................................................................................................ | $1,382,396.95 |
| THIS MODIFICATION | ................................................................................................ | $378,555.00 |
| REVISED SUBCONTRACT | ................................................................................................ | $5,687,147.95 |

This subcontract includes and is subject to the terms and conditions previously attached to the original subcontract.

IN WITNESS WHEREOF, the Subcontractor and Contractor have executed this Subcontract on the date set forth above.

**FAITH TECHNOLOGIES, INC.**
Subcontractor

*David Mccarthy*        12/9/21

By: David McCarthy
Senior Project Manager

**STELLAR GROUP, INC.**
Contractor


By: Gregory Ortego
Project Manager

CONTRACT AMENDMENT
PROPOSAL CO-52 V1.0



# PREPARED FOR

**STELLAR | BANG ENERGY CORE AND SHELL**
**SC#23006976-SUB-09**
**PROJECT #23006976**
**CO-052**

# 10/15/2021

## CONTACT

**David McCarthy | Senior Project Manager**
David.McCarthy@faithtechinc.com | 912.660.3684





## 1. PROJECT TEAM STRUCTURE

| KEY PERSONNEL CONTACT INFORMATION | | | |
|---|---|---|---|
| **Name** | **Office** | **Mobile** | **Email** |
| **Terry Flaherty-Group Leader** | 404.800.6208 | 920.427.7688 | terry.flaherty@faithtechnologies.com |
| **David McCarthy-Senior Project Manager*** | ---.---.---- | 912.660.3684 | david.mccarthy@faithtechnologies.com |
| **Rob Koldos-Senior Preconstruction Manager** | 920.785.7951 | 920.412.4738 | rob.koldos@faithtechnologies.com |

*Primary Contact During Construction

## 2. INFORMATION AND SUPPORT REQUIRED FROM STELLAR

2.1.  Timely decision will be required to be made to hold pricing.

## 3. CONTRACT ADJUSTMENT

Adjustments based on CO-052 – Bang PHX Can Manufacturing, and clouded construction set of drawings dated 9-13-2021 Pricing also includes ATS 4 and docking station.

**Total Increase for CO-052: $378,555.00**

Duration days and equipment pricing will need to be validated for electrical equipment lead times based on current market conditions and also based on contract amendment acceptance timing.  Further, delivery dates will be influenced by these decisions.  Current pricing is valid for 10 days.

## 4. CONSTRUCTION PROJECT SCHEDULE OVERVIEW

Both parties understand that the schedule referenced in this contract is inaccurate and does not reflect a mutually agreed upon substantial completion date.  Until such time as a mutually agreeable schedule is developed,  Subcontractor expressly disclaims any responsibility for liquidated damages or responsibility to meet the stated completion date.  The parties expressly anticipate that the scheduled completion date will be adjusted by change order from the Owner.  However, both parties understand and agree that a mutually agreeable schedule for the building and completion of the building is an express condition precedent to the occurrence of the process work, and until both pieces are properly coordinated and have a mutually agreed upon schedule associated with each piece of the Work, that Faith Technologies shall not be bound or liable for the liquidated damages identified in the Subcontract or which flow down from the Prime contract.

# SUBCONTRACT MODIFICATION
## Stellar Group, Inc.
2900 Hartley Road
Jacksonville, FL 32257

| | | | |
|---|---|---|---|
| Subcontractor: | Faith Technologies, Inc.<br>225 Main Street<br>Menasha  Wisconsin 54952 | Project Name and<br>Location: | Bang Energy - Phoenix Can Manufacturing<br>1635 South 43rd Avenue<br>Phoenix Arizona 85009 |
| Attention: | David McCarthy | Attention: | Chuck Harrison |
| Phone: | (920) 738-1500 | Phone: | (904) 383-0163 |
| Fax: | | E-Mail: | charrison@stellar.net |
| E-Mail: | david.mccarthy@faithtechnologies.com | | |

| Date<br>1/25/2022 | SC #<br>23006976-SUB-0N | Project #<br>23006976 | Contract Type<br>Lump Sum | FOB<br>Jobsite | Schedule<br>Per Superintendent |
|---|---|---|---|---|---|

This Subcontract is made by and between Stellar Group, Incorporated, d/b/a Stellar, hereinafter referred to as "Contractor," and the Subcontractor named above, at Jacksonville, Florida. In consideration of the mutual promises and undertakings set forth herein, Contractor and Subcontractor hereby agree to the terms and conditions set forth herein, including the Terms and Conditions attached hereto. Subcontractor agrees to perform and complete the following Work:

Subcontract agrees to modify Subcontract No.: 23006976-SUB-09

| Item | Description | Net Amount |
|---|---|---|
| 1 | Remove and Relocate Conduits on Tilt Panel Walls | $17,430.00 |

Attachments:
Ban Energy Removing and relocating conduits on exterior walls Change Order.pdf

**FOR ACCOUNTING PURPOSES ONLY:**

| Cost Codes | Net Amount |
|---|---|
| 26-2602 -  1760 | $17,430.00 |

| | |
|---|---|
| **TOTAL AMOUNT OF THIS MODIFICATION** | **$17,430.00** |
| (All licenses, taxes, permits, fees and Insurance with Stellar named as additional insured included) | |

| | | |
|---|---|---|
| ORIGINAL SUBCONTRACT | ................................................................ | $3,926,196.00 |
| PREVIOUS MODIFICATION(S) | ................................................................ | $1,760,951.95 |
| THIS MODIFICATION | ................................................................ | $17,430.00 |
| REVISED SUBCONTRACT | ................................................................ | $5,704,577.95 |

This subcontract includes and is subject to the terms and conditions previously attached to the original subcontract.

IN WITNESS WHEREOF, the Subcontractor and Contractor have executed this Subcontract on the date set forth above.

| FAITH TECHNOLOGIES, INC. | STELLAR GROUP, INC. |
|---|---|
| Subcontractor | Contractor |
| *David Mccarthy*    1/25/22 | |
| By: David McCarthy | By: Gregory Ortego |
| Senior Project Manager | Project Manager |



# PROPOSAL

**To: Stellar**
**Att: Greg Ortego**
**Project Manager II**

**Phone: 1-904-577-9515**

**Date:**        **12/6/2021**
**Project Name:   Bang Energy Process**
**Location: Phoenix Arizona**

Faith Technologies, Inc. is pleased to give you the following pricing for moving conduits on exterior walls where block walls and ceiling caps are being installed. Our pricing includes the following items.

Scope of work
   Removing conduits and no refeeding required.
- Demo conduit, wire, supports, boxes and devices on the exterior walls in rooms 184,190,193, 167 and 165.
- This was about 25 different conduits

   Removing conduits and rerouting circuits up through bar joist to new location.
- Receptacle circuits drops on east and south wall, refeed with new conduit and wire.
- Wall packs on east and south wall had to refeed with new conduit.
-

   Our pricing for the above scope of work is $17,430.00

If you have any questions or concerns, please feel free to contact David McCarthy at 1-912-660-3684.

**Respectfully Submitted**
**David McCarthy / Senior Project Manager**
**Faith Technologies**

**FAITHTECHNOLOGIES.COM**

# SUBCONTRACT MODIFICATION
## Stellar Group, Inc.
2900 Hartley Road
Jacksonville, FL 32257

| | | |
|---|---|---|
| **Subcontractor:** | Faith Technologies, Inc.<br>225 Main Street<br>Menasha  Wisconsin 54952 | **Project Name and**<br>**Location:** |
| **Attention:** | David McCarthy | |
| **Phone:** | (920) 738-1500 | |
| **Fax:** | | |
| **E-Mail:** | david.mccarthy@faithtechnologies.com | |

**Project Name and Location:** Bang Energy - Phoenix Can Manufacturing
1635 South 43rd Avenue
Phoenix Arizona 85009

**Attention:** Chuck Harrison
**Phone:** (904) 363-0163
**E-Mail:** charrison@stellar.net

| Date | SC # | Project # | Contract Type | FOB | Schedule |
|---|---|---|---|---|---|
| 3/1/2022 | 23006976-SUB-09J | 23006976 | Lump Sum | Jobsite | Per Superintendent |

This Subcontract is made by and between Stellar Group, Incorporated, d/b/a Stellar, hereinafter referred to as "Contractor," and the Subcontractor named above, at Jacksonville, Florida. In consideration of the mutual promises and undertakings set forth herein, Contractor and Subcontractor hereby agree to the terms and conditions set forth herein, including the Terms and Conditions attached hereto. Subcontractor agrees to perform and complete the following Work:

Subcontract agrees to modify Subcontract No.: 23006976-SUB-09

| Item | Description | Net Amount |
|---|---|---|
| 1 | Cancellation and Demobilization | $270,551.00 |

**Attachments:**
Ban Energy Cancelation and Demobilization Cost.pdf

**FOR ACCOUNTING PURPOSES ONLY:**

| Cost Codes | Net Amount |
|---|---|
| 26-2604 · 1760 | $270,551.00 |

**TOTAL AMOUNT OF THIS MODIFICATION** $270,551.00
(All licenses, taxes, permits, fees and insurance with Stellar named as additional insured included)

| | | |
|---|---|---|
| **ORIGINAL SUBCONTRACT** | ...................................................... | $3,926,196.00 |
| **PREVIOUS MODIFICATION(S)** | ...................................................... | $1,778,381.95 |
| **THIS MODIFICATION** | ...................................................... | $270,551.00 |
| **REVISED SUBCONTRACT** | ...................................................... | $5,975,128.95 |

This subcontract includes and is subject to the terms and conditions previously attached to the original subcontract.

IN WITNESS WHEREOF, the Subcontractor and Contractor have executed this Subcontract on the date set forth above.

| FAITH TECHNOLOGIES, INC. | STELLAR GROUP, INC. |
|---|---|
| Subcontractor | Contractor |
| *David Mccarthy*   3/1/22 | |
| By: David McCarthy | By: Gregory Ortego |
| Senior Project Manager | Project Manager |



# PROPOSAL

To: Stellar

Att: Greg Ortego

Project Manager II

Phone: 1-904-577-9515

Date:            2/23/2022

Project Name:  Bang Energy Process

Location: Phoenix Arizona

Faith Technologies, Inc. is pleased to give you the following pricing for the cancelation cost and demobilization cost. Our pricing includes the following items.

| | |
|---|---|
| Lighting cost | $82,265.00 |
| Fire Alarm | $17,548.15 |
| SRP | $15,000.00 |
| Total Energy | $8,740.00 |
| Demobilization | $146,998.00 |

| | |
|---|---|
| Total | 270,551.15 |

Our pricing for the above items is $270,551.15

If you have any questions or concerns, please feel free to contact David McCarthy at 1-912-660-3684.

Respectfully Submitted

David McCarthy / Senior Project Manager

Faith Technologies

# EXHIBIT C

MG ESQ[AZ(N11B112OW]B5
729 Miner Road
Cleveland OH 44143



USPS CERTIFIED MAIL

9214 8901 5273 7200 0014 8097 94

VITAL PHARMACEUTICALS INC. dba BANG ENERGY
1635 S. 43RD AVENUE
Phoenix AZ 85009

# ATTENTION

Please find the enclosed document.

## Distribution List

VITAL PHARMACEUTICALS INC. dba BANG ENERGY
1635 S. 43RD AVENUE
Phoenix AZ 85009

STELLAR GROUP INCORPORATED
2900 HARTLEY ROAD
Jacksonville FL 32257

STELLAR GROUP INCORPORATED
c/o Corporation Service Company
8825 N 23rd Avenue Suite 100
Phoenix AZ 85021

JHO REAL ESTATE INVESTMENT LLC
1600 N PARK DR
WESTON FL 33326

JHO Real Estate Investment LLC
C/O Corporate Creations Network INC
3260 N. Hayden Rd #210
Scottsdale AZ 85251

VITAL PHARMACEUTICALS INC. dba Bang Energy
c/o Corporate Creations Network Inc.
3260 N Hayden Road #210
Scottsdale AZ 85251

To Whom It May Concern:

The sending of the following Preliminary Notice is prescribed by the construction lien laws of ARIZONA. This is NOT a Lien but a statutory requirement and needs to be done as a matter of law.

The sending of this notice should not reflect on the creditworthiness of FAITH TECHNOLOGIES, INC.'s customer or any other party to the project nor does it indicate any expected problem in the payment of FAITH TECHNOLOGIES, INC.'s invoices.

Sincerely,

FAITH TECHNOLOGIES, INC.
225 MAIN STREET
MENASHA, WI 54952
Contact: MS. CONNIE BRETL
Telephone: (920) 751 - 9863

File (N118112) 2056301

**ARIZONA PRELIMINARY TWENTY DAY LIEN NOTICE**
PURSUANT TO A.R.S. SECTION 33-992
**IN ACCORDANCE WITH ARIZONA REVISED STATUTES SECTION 33-992.01, THIS IS NOT A LIEN. THIS IS NOT A REFLECTION ON THE INTEGRITY OF ANY CONTRACTOR OR SUBCONTRACTOR**

The name and address of the owner or reputed owner are:
VITAL PHARMACEUTICALS, INC. DBA BANG
ENERGY
1635 S. 43RD AVENUE
PHOENIX, AZ 85009

VITAL PHARMACEUTICALS, INC. DBA BANG
ENERGY
C/O CORPORATE CREATIONS NETWORK INC.
3260 N HAYDEN ROAD #210
SCOTTSDALE, AZ 85251

JHO REAL ESTATE INVESTMENT, LLC
1600 N PARK DR
WESTON, FL 33326

JHO REAL ESTATE INVESTMENT, LLC
C/O CORPORATE CREATIONS NETWORK INC.
3260 N HAYDEN ROAD #210
SCOTTSDALE, AZ 85251

The name and address of lessee or reputed leasehold interest is:

The name and address of the original contractor are:
STELLAR GROUP, INCORPORATED
2900 HARTLEY ROAD
JACKSONVILLE, FL 32257

STELLAR GROUP, INCORPORATED
C/O CORPORATION SERVICE COMPANY
8825 N 23RD AVENUE, SUITE 100
PHOENIX, AZ 85021

The name and address of any lender or reputed lender and or assigns are:

UNABLE TO DETERMINE. A REQUEST IS INCLUDED
HEREIN PER A.R.S. 33-992.01.

The name and address of the person with whom the claimant has contracted are:
STELLAR GROUP, INCORPORATED
2900 HARTLEY ROAD
JACKSONVILLE, FL 32257

The name and address of any surety company/agent are:

UNABLE TO DETERMINE. A REQUEST IS INCLUDED
HEREIN PER A.R.S. 33-992.01.

*We request a copy of the bond, if applicable.*

Date: FEBRUARY 12, 2021 (Notice #N118112)
This preliminary lien notice has been completed (Name and Address of Claimant):

For:
FAITH TECHNOLOGIES, INC.
225 MAIN STREET
MENASHA, WI 54952

By:
Michelle Gerred, Esq., #031678
PO Box 24101
Cleveland, OH 44124
(as limited agent for FAITH TECHNOLOGIES, INC.)



You are hereby notified that the Claimant has furnished or will furnish labor, professional services, materials, machinery, fixtures or tools of the following general description:

MATERIALS AND LABOR, ELECTRICAL
INSTALLATION

In the construction, alteration or repair of the building, structure or improvement located at:

BANG ENERGY PHX CAN MANUFACTURING
1635 S. 43RD AVENUE
PHOENIX, AZ 85009

And situated upon that certain lot(s) or parcel(s) of land in MARICOPA County, Arizona, described as follows:

1635 S. 43RD AVENUE
PHOENIX, AZ 85009

An estimate of the total price of the labor, professional services, materials, machinery, fixtures or tools furnished or to be furnished is:

$7,013,441.00

**NOTICE TO PROPERTY OWNER**

**If bills are not paid in full for the labor, professional services, materials, machinery, fixtures or tools furnished, or to be furnished, a mechanic's lien leading to the loss, through court foreclosure proceedings, of all or part of your property being improved may be placed against the property.  You may wish to protect yourself against this consequence by either:**

**1)  Requiring your contractor to furnish a conditional waiver and release pursuant to Arizona Revised Statutes section 33-1008, subsection D, paragraphs 1 and 3 signed by the person or firm giving you this notice before you make payment to your contractor.**

**2)  Requiring your contractor to furnish an unconditional waiver and release pursuant to Arizona Revised Statutes section 33-1008, subsection D, paragraphs 2 and 4, signed by the person or firm giving you this notice after you make payment to your contractor.**

**3) Using any other method or device that is appropriate under the circumstances.**

**Within ten days of the receipt of this preliminary twenty day notice the owner or other interested party is required to furnish all information necessary to correct any inaccuracies in the notice pursuant to Arizona Revised Statutes section 33-992.01, subsection I or lose as a defense any inaccuracy of that information.**

**Within ten days of the receipt of this preliminary twenty day notice if any payment bond has been recorded in compliance with Arizona Revised Statutes section 33-1003, the owner must provide a copy of the payment bond including the name and address of the surety company and bonding agent providing the payment bond to the person who has given the preliminary twenty day notice.  In the event that the owner or other interested party fails to provide the bond information within that ten day period, the claimant shall retain lien rights to the extent precluded or prejudiced from asserting a claim against the bond as a result of not timely receiving the bond information.**



DATED:          FEBRUARY 12, 2021

FAITH TECHNOLOGIES, INC.

By: _____
Michelle Gerred, Esq., #031678
(as limited agent for FAITH TECHNOLOGIES, INC.)

------------------------------------------------------------------------------------

**ACKNOWLEDGEMENT OF RECEIPT OF PRELIMINARY TWENTY-DAY NOTICE**

This acknowledges receipt on ___ / ___ / ___ (date) of a copy of the preliminary twenty-day notice at
_____ (address).  Date: ___ / ___ / ___ (date this
acknowledgment was executed)

_____
Signature of person acknowledging receipt, with title if acknowledgment is made on behalf of another person)

Please note:  Arizona Revised Statutes, Section 33-992.02, provides that the acknowledgment be returned to the person or firm sending the Preliminary Twenty Day Notice (Michelle Gerred, Esq.) within thirty days of receipt thereof.

(Our Ref. N118112 2056301)

MG ESQ[AZ[N118112GC]B5
729 Miner Road
Cleveland OH 44143



USPS CERTIFIED MAIL

9214 8901 5273 7200 0014 8098 00

**STELLAR GROUP INCORPORATED**
**2900 HARTLEY ROAD**
**Jacksonville FL 32257**

# ATTENTION

Please find the enclosed document.

## Distribution List

VITAL PHARMACEUTICALS INC. dba BANG ENERGY
1635 S. 43RD AVENUE
Phoenix AZ 85009

STELLAR GROUP INCORPORATED
c\o Corporation Service Company
8825 N 23rd Avenue Suite 100
Phoenix AZ 85021

JHO Real Estate Investment LLC
C\O Corporate Creations Network INC
3260 N. Hayden Rd #210
Scottsdale AZ 85251

STELLAR GROUP INCORPORATED
2900 HARTLEY ROAD
Jacksonville FL 32257

JHO REAL ESTATE INVESTMENT LLC
1600 N PARK DR
WESTON FL 33326

VITAL PHARMACEUTICALS INC. dba Bang Energy
c\o Corporate Creations Network Inc.
3260 N Hayden Road #210
Scottsdale AZ 85251



*To Whom It May Concern:*

*The sending of the following Preliminary Notice is prescribed by the construction lien laws of ARIZONA. This is NOT a Lien but a statutory requirement and needs to be done as a matter of law.*

*The sending of this notice should not reflect on the creditworthiness of FAITH TECHNOLOGIES, INC.'s customer or any other party to the project nor does it indicate any expected problem in the payment of FAITH TECHNOLOGIES, INC.'s invoices.*

*Sincerely,*

*FAITH TECHNOLOGIES, INC.*
*225 MAIN STREET*
*MENASHA, WI 54952*
*Contact:  MS. CONNIE BRETL*
*Telephone:  (920) 751 - 9863*

*File (N118112) 2056301*

**ARIZONA PRELIMINARY TWENTY DAY LIEN NOTICE**
PURSUANT TO A.R.S. SECTION 33-992
**IN ACCORDANCE WITH ARIZONA REVISED STATUTES SECTION 33-992.01, THIS IS NOT A LIEN. THIS IS NOT A REFLECTION ON THE INTEGRITY OF ANY CONTRACTOR OR SUBCONTRACTOR**

The name and address of the owner or reputed owner are:
VITAL PHARMACEUTICALS, INC. DBA BANG
ENERGY
1635 S. 43RD AVENUE
PHOENIX, AZ 85009

VITAL PHARMACEUTICALS, INC. DBA BANG
ENERGY
C/O CORPORATE CREATIONS NETWORK INC.
3260 N HAYDEN ROAD #210
SCOTTSDALE, AZ  85251

JHO REAL ESTATE INVESTMENT, LLC
1600 N PARK DR
WESTON, FL  33326

JHO REAL ESTATE INVESTMENT, LLC
C/O CORPORATE CREATIONS NETWORK INC.
3260 N HAYDEN ROAD #210
SCOTTSDALE, AZ  85251

The name and address of lessee or reputed leasehold interest is:

The name and address of the original contractor are:
STELLAR GROUP, INCORPORATED
2900 HARTLEY ROAD
JACKSONVILLE, FL  32257

STELLAR GROUP, INCORPORATED
C/O CORPORATION SERVICE COMPANY
8825 N 23RD AVENUE, SUITE 100
PHOENIX, AZ  85021

The name and address of any lender or reputed lender and or assigns are:

UNABLE TO DETERMINE. A REQUEST IS INCLUDED
HEREIN PER A.R.S. 33-992.01.

The name and address of the person with whom the claimant has contracted are:
STELLAR GROUP, INCORPORATED
2900 HARTLEY ROAD
JACKSONVILLE, FL 32257

The name and address of any surety company/agent are:

UNABLE TO DETERMINE. A REQUEST IS INCLUDED
HEREIN PER A.R.S. 33-992.01.

*We request a copy of the bond, if applicable.*

Date:  FEBRUARY 12, 2021 (Notice #N118112)
This preliminary lien notice has been completed (Name and Address of Claimant):

For:
FAITH TECHNOLOGIES, INC.
225 MAIN STREET
MENASHA, WI 54952

By:
Michelle Gerred, Esq., #031678
PO Box 24101
Cleveland, OH 44124
(as limited agent for FAITH TECHNOLOGIES, INC.)



You are hereby notified that the Claimant has furnished or will furnish labor, professional services, materials, machinery, fixtures or tools of the following general description:

MATERIALS AND LABOR, ELECTRICAL
INSTALLATION

In the construction, alteration or repair of the building, structure or improvement located at:

BANG ENERGY PHX CAN MANUFACTURING
1635 S. 43RD AVENUE
PHOENIX, AZ 85009

And situated upon that certain lot(s) or parcel(s) of land in MARICOPA County, Arizona, described as follows:

1635 S. 43RD AVENUE
PHOENIX, AZ 85009

An estimate of the total price of the labor, professional services, materials, machinery, fixtures or tools furnished or to be furnished is:

$7,013,441.00

**NOTICE TO PROPERTY OWNER**

If bills are not paid in full for the labor, professional services, materials, machinery, fixtures or tools furnished, or to be furnished, a mechanic's lien leading to the loss, through court foreclosure proceedings, of all or part of your property being improved may be placed against the property. You may wish to protect yourself against this consequence by either:

1) Requiring your contractor to furnish a conditional waiver and release pursuant to Arizona Revised Statutes section 33-1008, subsection D, paragraphs 1 and 3 signed by the person or firm giving you this notice before you make payment to your contractor.

2) Requiring your contractor to furnish an unconditional waiver and release pursuant to Arizona Revised Statutes section 33-1008, subsection D, paragraphs 2 and 4, signed by the person or firm giving you this notice after you make payment to your contractor.

3) Using any other method or device that is appropriate under the circumstances.

Within ten days of the receipt of this preliminary twenty day notice the owner or other interested party is required to furnish all information necessary to correct any inaccuracies in the notice pursuant to Arizona Revised Statutes section 33-992.01, subsection I or lose as a defense any inaccuracy of that information.

Within ten days of the receipt of this preliminary twenty day notice if any payment bond has been recorded in compliance with Arizona Revised Statutes section 33-1003, the owner must provide a copy of the payment bond including the name and address of the surety company and bonding agent providing the payment bond to the person who has given the preliminary twenty day notice. In the event that the owner or other interested party fails to provide the bond information within that ten day period, the claimant shall retain lien rights to the extent precluded or prejudiced from asserting a claim against the bond as a result of not timely receiving the bond information.

DATED:          FEBRUARY 12, 2021

FAITH TECHNOLOGIES, INC.

By: _____

Michelle Gerred, Esq., #031678
(as limited agent for FAITH TECHNOLOGIES, INC.)

-------------------------------------------------------------------------------

**ACKNOWLEDGEMENT OF RECEIPT OF PRELIMINARY TWENTY-DAY NOTICE**

This acknowledges receipt on ___ / ___ / ___ (date) of a copy of the preliminary twenty-day notice at
_____ (address). Date: ___/___/___ (date this acknowledgment was executed)

_____
Signature of person acknowledging receipt, with title if acknowledgment is made on behalf of another person)

Please note: Arizona Revised Statutes, Section 33-992.02, provides that the acknowledgment be returned to the person or firm sending the Preliminary Twenty Day Notice (Michelle Gerred, Esq.) within thirty days of receipt thereof.

(Our Ref. N118112 2056301)



MG ESQ[AZ(N118112S1]85
729 Miner Road
Cleveland OH 44143



**USPS CERTIFIED MAIL**

9214 8901 5273 7200 0014 8098 17

STELLAR GROUP INCORPORATED
c\o Corporation Service Company
8825 N 23rd Avenue Suite 100
Phoenix AZ 85021

# ATTENTION

Please find the enclosed document.

## Distribution List

VITAL PHARMACEUTICALS INC. dba BANG ENERGY
1635 S. 43RD AVENUE
Phoenix AZ 85009

STELLAR GROUP INCORPORATED
c\o Corporation Service Company
8825 N 23rd Avenue Suite 100
Phoenix AZ 85021

JHO Real Estate Investment LLC
C\O Corporate Creations Network INC
3260 N. Hayden Rd #210
Scottsdale AZ 85251

STELLAR GROUP INCORPORATED
2900 HARTLEY ROAD
Jacksonville FL 32257

JHO REAL ESTATE INVESTMENT LLC
1600 N PARK DR
WESTON FL 33326

VITAL PHARMACEUTICALS INC. dba Bang Energy
c\o Corporate Creations Network Inc.
3260 N Hayden Road #210
Scottsdale AZ 85251



*To Whom It May Concern:*

*The sending of the following Preliminary Notice is prescribed by the construction lien laws of ARIZONA. This is NOT a Lien but a statutory requirement and needs to be done as a matter of law.*

*The sending of this notice should not reflect on the creditworthiness of FAITH TECHNOLOGIES, INC.'s customer or any other party to the project nor does it indicate any expected problem in the payment of FAITH TECHNOLOGIES, INC.'s invoices.*

*Sincerely,*

*FAITH TECHNOLOGIES, INC.*
*225 MAIN STREET*
*MENASHA, WI 54952*
*Contact:  MS. CONNIE BRETL*
*Telephone:  (920) 751 - 9863*

*File (N118112) 2056301*

**ARIZONA PRELIMINARY TWENTY DAY LIEN NOTICE**
PURSUANT TO A.R.S. SECTION 33-992
**IN ACCORDANCE WITH ARIZONA REVISED STATUTES SECTION 33-992.01, THIS IS NOT A LIEN. THIS IS NOT A REFLECTION ON THE INTEGRITY OF ANY CONTRACTOR OR SUBCONTRACTOR**

The name and address of the owner or reputed owner are:
VITAL PHARMACEUTICALS, INC. DBA BANG
ENERGY
1635 S. 43RD AVENUE
PHOENIX, AZ 85009

VITAL PHARMACEUTICALS, INC. DBA BANG
ENERGY
C/O CORPORATE CREATIONS NETWORK INC.
3260 N HAYDEN ROAD #210
SCOTTSDALE, AZ 85251

JHO REAL ESTATE INVESTMENT, LLC
1600 N PARK DR
WESTON, FL 33326

JHO REAL ESTATE INVESTMENT, LLC
C/O CORPORATE CREATIONS NETWORK INC.
3260 N HAYDEN ROAD #210
SCOTTSDALE, AZ 85251

The name and address of lessee or reputed leasehold interest
is:

The name and address of the original contractor are:
STELLAR GROUP, INCORPORATED
2900 HARTLEY ROAD
JACKSONVILLE, FL 32257

STELLAR GROUP, INCORPORATED
C/O CORPORATION SERVICE COMPANY
8825 N 23RD AVENUE, SUITE 100
PHOENIX, AZ 85021

The name and address of any lender or reputed lender and or
assigns are:

UNABLE TO DETERMINE. A REQUEST IS INCLUDED
HEREIN PER A.R.S. 33-992.01.

The name and address of the person with whom the claimant
has contracted are:
STELLAR GROUP, INCORPORATED
2900 HARTLEY ROAD
JACKSONVILLE, FL 32257

The name and address of any surety company/agent are:

UNABLE TO DETERMINE. A REQUEST IS INCLUDED
HEREIN PER A.R.S. 33-992.01.

*We request a copy of the bond, if applicable.*

Date: FEBRUARY 12, 2021 (Notice #N118112)
This preliminary lien notice has been completed (Name and
Address of Claimant):

For:
FAITH TECHNOLOGIES, INC.
225 MAIN STREET
MENASHA, WI 54952

By:
Michelle Gerred, Esq., #031678
PO Box 24101
Cleveland, OH 44124
(as limited agent for FAITH TECHNOLOGIES, INC.)



You are hereby notified that the Claimant has furnished or will
furnish labor, professional services, materials, machinery,
fixtures or tools of the following general description:

MATERIALS AND LABOR, ELECTRICAL
INSTALLATION

In the construction, alteration or repair of the building,
structure or improvement located at:

BANG ENERGY PHX CAN MANUFACTURING
1635 S. 43RD AVENUE
PHOENIX, AZ 85009

And situated upon that certain lot(s) or parcel(s) of land in
MARICOPA County, Arizona, described as follows:

1635 S. 43RD AVENUE
PHOENIX, AZ 85009

An estimate of the total price of the labor, professional
services, materials, machinery, fixtures or tools furnished or to
be furnished is:

$7,013,441.00

**NOTICE TO PROPERTY OWNER**

If bills are not paid in full for the labor, professional services, materials, machinery, fixtures or tools furnished, or to be furnished, a mechanic's lien leading to the loss, through court foreclosure proceedings, of all or part of your property being improved may be placed against the property.  You may wish to protect yourself against this consequence by either:

1)  Requiring your contractor to furnish a conditional waiver and release pursuant to Arizona Revised Statutes section 33-1008, subsection D, paragraphs 1 and 3 signed by the person or firm giving you this notice before you make payment to your contractor.



2)  Requiring your contractor to furnish an unconditional waiver and release pursuant to Arizona Revised Statutes section 33-1008, subsection D, paragraphs 2 and 4, signed by the person or firm giving you this notice after you make payment to your contractor.

3)  Using any other method or device that is appropriate under the circumstances.

Within ten days of the receipt of this preliminary twenty day notice the owner or other interested party is required to furnish all information necessary to correct any inaccuracies in the notice pursuant to Arizona Revised Statutes section 33-992.01, subsection I or lose as a defense any inaccuracy of that information.

Within ten days of the receipt of this preliminary twenty day notice if any payment bond has been recorded in compliance with Arizona Revised Statutes section 33-1003, the owner must provide a copy of the payment bond including the name and address of the surety company and bonding agent providing the payment bond to the person who has given the preliminary twenty day notice.  In the event that the owner or other interested party fails to provide the bond information within that ten day period, the claimant shall retain lien rights to the extent precluded or prejudiced from asserting a claim against the bond as a result of not timely receiving the bond information.

DATED:         FEBRUARY 12, 2021

FAITH TECHNOLOGIES, INC.

By: _Michelle Gerred_

Michelle Gerred, Esq., #031678
(as limited agent for FAITH TECHNOLOGIES, INC.)
----------------------------------------------------------------

**ACKNOWLEDGEMENT OF RECEIPT OF PRELIMINARY TWENTY-DAY NOTICE**

This acknowledges receipt on ___ / ___ / ___ (date) of a copy of the preliminary twenty-day notice at
_____ (address).  Date:  ___/___/___ (date this acknowledgment was executed)

_____
Signature of person acknowledging receipt, with title if acknowledgment is made on behalf of another person

Please note:  Arizona Revised Statutes, Section 33-992.02, provides that the acknowledgment be returned to the person or firm sending the Preliminary Twenty Day Notice (Michelle Gerred, Esq.) within thirty days of receipt thereof.

(Our Ref. N118112 2056301)

MG ESQ[AZ(N118112S3]85
729 Miner Road
Cleveland OH 44143



**USPS CERTIFIED MAIL**

9214 8901 5273 7200 0014 8098 24

JHO REAL ESTATE INVESTMENT LLC
1600 N PARK DR
WESTON FL 33326

# ATTENTION

Please find the enclosed document.

## Distribution List

VITAL PHARMACEUTICALS INC. dba BANG ENERGY
1635 S. 43RD AVENUE
Phoenix AZ 85009

STELLAR GROUP INCORPORATED
2900 HARTLEY ROAD
Jacksonville FL 32257

STELLAR GROUP INCORPORATED
c\o Corporation Service Company
8825 N 23rd Avenue Suite 100
Phoenix AZ 85021

JHO REAL ESTATE INVESTMENT LLC
1600 N PARK DR
WESTON FL 33326

JHO Real Estate Investment LLC
C\O Corporate Creations Network INC
3260 N. Hayden Rd #210
Scottsdale AZ 85251

VITAL PHARMACEUTICALS INC. dba Bang Energy
c\o Corporate Creations Network Inc.
3260 N Hayden Road #210
Scottsdale AZ 85251



*To Whom It May Concern:*

*The sending of the following Preliminary Notice is prescribed by the construction lien laws of ARIZONA. <u>This is NOT a Lien</u> but a statutory requirement and needs to be done as a matter of law.*

*The sending of this notice should not reflect on the creditworthiness of FAITH TECHNOLOGIES, INC.'s customer or any other party to the project nor does it indicate any expected problem in the payment of FAITH TECHNOLOGIES, INC.'s invoices.*

*Sincerely,*

*FAITH TECHNOLOGIES, INC.*
*225 MAIN STREET*
*MENASHA, WI 54952*
*Contact:  MS. CONNIE BRETL*
*Telephone:  (920) 751 - 9863*

*File (N118112) 2056301*

**ARIZONA PRELIMINARY TWENTY DAY LIEN NOTICE**
PURSUANT TO A.R.S. SECTION 33-992
**IN ACCORDANCE WITH ARIZONA REVISED STATUTES SECTION 33-992.01, THIS IS NOT A LIEN. THIS IS NOT A REFLECTION ON THE INTEGRITY OF ANY CONTRACTOR OR SUBCONTRACTOR**

The name and address of the owner or reputed owner are:
VITAL PHARMACEUTICALS, INC. DBA BANG ENERGY
1635 S. 43RD AVENUE
PHOENIX, AZ 85009

VITAL PHARMACEUTICALS, INC. DBA BANG ENERGY
C/O CORPORATE CREATIONS NETWORK INC.
3260 N HAYDEN ROAD #210
SCOTTSDALE, AZ 85251

JHO REAL ESTATE INVESTMENT, LLC
1600 N PARK DR
WESTON, FL 33326

JHO REAL ESTATE INVESTMENT, LLC
C/O CORPORATE CREATIONS NETWORK INC.
3260 N HAYDEN ROAD #210
SCOTTSDALE, AZ 85251

The name and address of lessee or reputed leasehold interest is:

The name and address of the original contractor are:
STELLAR GROUP, INCORPORATED
2900 HARTLEY ROAD
JACKSONVILLE, FL 32257

STELLAR GROUP, INCORPORATED
C/O CORPORATION SERVICE COMPANY
8825 N 23RD AVENUE, SUITE 100
PHOENIX, AZ 85021

The name and address of any lender or reputed lender and or assigns are:

UNABLE TO DETERMINE. A REQUEST IS INCLUDED HEREIN PER A.R.S. 33-992.01.

The name and address of the person with whom the claimant has contracted are:
STELLAR GROUP, INCORPORATED
2900 HARTLEY ROAD
JACKSONVILLE, FL 32257

The name and address of any surety company/agent are:

UNABLE TO DETERMINE. A REQUEST IS INCLUDED HEREIN PER A.R.S. 33-992.01.

*We request a copy of the bond, if applicable.*

Date: FEBRUARY 12, 2021 (Notice #N118112)
This preliminary lien notice has been completed (Name and Address of Claimant):



For:
FAITH TECHNOLOGIES, INC.
225 MAIN STREET
MENASHA, WI 54952

By:
Michelle Gerred, Esq., #031678
PO Box 24101
Cleveland, OH 44124
(as limited agent for FAITH TECHNOLOGIES, INC.)

You are hereby notified that the Claimant has furnished or will furnish labor, professional services, materials, machinery, fixtures or tools of the following general description:

MATERIALS AND LABOR, ELECTRICAL INSTALLATION

In the construction, alteration or repair of the building, structure or improvement located at:

BANG ENERGY PHX CAN MANUFACTURING
1635 S. 43RD AVENUE
PHOENIX, AZ 85009

And situated upon that certain lot(s) or parcel(s) of land in MARICOPA County, Arizona, described as follows:

1635 S. 43RD AVENUE
PHOENIX, AZ 85009

An estimate of the total price of the labor, professional services, materials, machinery, fixtures or tools furnished or to be furnished is:

$7,013,441.00

**NOTICE TO PROPERTY OWNER**

If bills are not paid in full for the labor, professional services, materials, machinery, fixtures or tools furnished, or to be furnished, a mechanic's lien leading to the loss, through court foreclosure proceedings, of all or part of your property being improved may be placed against the property. You may wish to protect yourself against this consequence by either:

1) **Requiring your contractor to furnish a conditional waiver and release pursuant to Arizona Revised Statutes section 33-1008, subsection D, paragraphs 1 and 3 signed by the person or firm giving you this notice before you make payment to your contractor.**

2) **Requiring your contractor to furnish an unconditional waiver and release pursuant to Arizona Revised Statutes section 33-1008, subsection D, paragraphs 2 and 4, signed by the person or firm giving you this notice after you make payment to your contractor.**

3) **Using any other method or device that is appropriate under the circumstances.**

Within ten days of the receipt of this preliminary twenty day notice the owner or other interested party is required to furnish all information necessary to correct any inaccuracies in the notice pursuant to Arizona Revised Statutes section 33-992.01, subsection I or lose as a defense any inaccuracy of that information.

Within ten days of the receipt of this preliminary twenty day notice if any payment bond has been recorded in compliance with Arizona Revised Statutes section 33-1003, the owner must provide a copy of the payment bond including the name and address of the surety company and bonding agent providing the payment bond to the person who has given the preliminary twenty day notice. In the event that the owner or other interested party fails to provide the bond information within that ten day period, the claimant shall retain lien rights to the extent precluded or prejudiced from asserting a claim against the bond as a result of not timely receiving the bond information.

DATED:          FEBRUARY 12, 2021

FAITH TECHNOLOGIES, INC.

By: _Michelle Gerred_

Michelle Gerred, Esq., #031678
(as limited agent for FAITH TECHNOLOGIES, INC.)



------------------------------------------------------------------------

**ACKNOWLEDGEMENT OF RECEIPT OF PRELIMINARY TWENTY-DAY NOTICE**

This acknowledges receipt on ___ / ___ / ___ (date) of a copy of the preliminary twenty-day notice at
_____ (address). Date: ___ / ___ / ___ (date this acknowledgment was executed)

_____
Signature of person acknowledging receipt, with title if acknowledgment is made on behalf of another person

Please note: Arizona Revised Statutes, Section 33-992.02, provides that the acknowledgment be returned to the person or firm sending the Preliminary Twenty Day Notice (Michelle Gerred, Esq.) within thirty days of receipt thereof.

(Our Ref. N118112 2056301)

MG ESQ[AZ(N118112B2]B5
729 Miner Road
Cleveland OH 44143



**USPS CERTIFIED MAIL**

9214 8901 5273 7200 0014 8098 31

JHO Real Estate Investment LLC
C\O Corporate Creations Network INC
3260 N. Hayden Rd #210
Scottsdale AZ 85251

# ATTENTION

Please find the enclosed document.

## Distribution List

VITAL PHARMACEUTICALS INC. dba BANG ENERGY
1635 S. 43RD AVENUE
Phoenix AZ 85009

STELLAR GROUP INCORPORATED
c\o Corporation Service Company
8825 N 23rd Avenue Suite 100
Phoenix AZ 85021

JHO Real Estate Investment LLC
C\O Corporate Creations Network INC
3260 N. Hayden Rd #210
Scottsdale AZ 85251

STELLAR GROUP INCORPORATED
2900 HARTLEY ROAD
Jacksonville FL 32257

JHO REAL ESTATE INVESTMENT LLC
1600 N PARK DR
WESTON FL 33326

VITAL PHARMACEUTICALS INC. dba Bang Energy
c\o Corporate Creations Network Inc.
3260 N Hayden Road #210
Scottsdale AZ 85251



*To Whom It May Concern:*

*The sending of the following Preliminary Notice is prescribed by the construction lien laws of ARIZONA. <u>This is NOT a Lien</u> but a statutory requirement and needs to be done as a matter of law.*

*The sending of this notice should not reflect on the creditworthiness of FAITH TECHNOLOGIES, INC.'s customer or any other party to the project nor does it indicate any expected problem in the payment of FAITH TECHNOLOGIES, INC.'s invoices.*

*Sincerely,*

*FAITH TECHNOLOGIES, INC.*
*225 MAIN STREET*
*MENASHA, WI 54952*
*Contact:  MS. CONNIE BRETL*
*Telephone:  (920) 751 - 9863*

*File (N118112) 2056301*

**ARIZONA PRELIMINARY TWENTY DAY LIEN NOTICE**
PURSUANT TO A.R.S. SECTION 33-992
**IN ACCORDANCE WITH ARIZONA REVISED STATUTES SECTION 33-992.01, THIS IS NOT A LIEN.  THIS IS NOT A REFLECTION ON THE INTEGRITY OF ANY CONTRACTOR OR SUBCONTRACTOR**

The name and address of the owner or reputed owner are:
VITAL PHARMACEUTICALS, INC. DBA BANG ENERGY
1635 S. 43RD AVENUE
PHOENIX, AZ 85009

VITAL PHARMACEUTICALS, INC. DBA BANG ENERGY
C/O CORPORATE CREATIONS NETWORK INC.
3260 N HAYDEN ROAD #210
SCOTTSDALE, AZ  85251

JHO REAL ESTATE INVESTMENT, LLC
1600 N PARK DR
WESTON, FL  33326

JHO REAL ESTATE INVESTMENT, LLC
C/O CORPORATE CREATIONS NETWORK INC.
3260 N HAYDEN ROAD #210
SCOTTSDALE, AZ  85251

The name and address of lessee or reputed leasehold interest is:

The name and address of the original contractor are:
STELLAR GROUP, INCORPORATED
2900 HARTLEY ROAD
JACKSONVILLE, FL  32257

STELLAR GROUP, INCORPORATED
C/O CORPORATION SERVICE COMPANY
8825 N 23RD AVENUE, SUITE 100
PHOENIX, AZ  85021

The name and address of any lender or reputed lender and or assigns are:

UNABLE TO DETERMINE. A REQUEST IS INCLUDED HEREIN PER A.R.S. 33-992.01.

The name and address of the person with whom the claimant has contracted are:
STELLAR GROUP, INCORPORATED
2900 HARTLEY ROAD
JACKSONVILLE, FL 32257

The name and address of any surety company/agent are:

UNABLE TO DETERMINE. A REQUEST IS INCLUDED HEREIN PER A.R.S. 33-992.01.

*We request a copy of the bond, if applicable.*

Date:  FEBRUARY 12, 2021 (Notice #N118112)
This preliminary lien notice has been completed (Name and Address of Claimant):



For:
FAITH TECHNOLOGIES, INC.
225 MAIN STREET
MENASHA, WI 54952

By:
Michelle Gerred, Esq., #031678
PO Box 24101
Cleveland, OH 44124
(as limited agent for FAITH TECHNOLOGIES, INC.)

You are hereby notified that the Claimant has furnished or will furnish labor, professional services, materials, machinery, fixtures or tools of the following general description:

MATERIALS AND LABOR, ELECTRICAL INSTALLATION

In the construction, alteration or repair of the building, structure or improvement located at:

BANG ENERGY PHX CAN MANUFACTURING
1635 S. 43RD AVENUE
PHOENIX, AZ 85009

And situated upon that certain lot(s) or parcel(s) of land in MARICOPA County, Arizona, described as follows:

1635 S. 43RD AVENUE
PHOENIX, AZ 85009

An estimate of the total price of the labor, professional services, materials, machinery, fixtures or tools furnished or to be furnished is:

$7,013,441.00

**NOTICE TO PROPERTY OWNER**

If bills are not paid in full for the labor, professional services, materials, machinery, fixtures or tools furnished, or to be furnished, a mechanic's lien leading to the loss, through court foreclosure proceedings, of all or part of your property being improved may be placed against the property. You may wish to protect yourself against this consequence by either:

1) Requiring your contractor to furnish a conditional waiver and release pursuant to Arizona Revised Statutes section 33-1008, subsection D, paragraphs 1 and 3 signed by the person or firm giving you this notice before you make payment to your contractor.

2) Requiring your contractor to furnish an unconditional waiver and release pursuant to Arizona Revised Statutes section 33-1008, subsection D, paragraphs 2 and 4, signed by the person or firm giving you this notice after you make payment to your contractor.

3) Using any other method or device that is appropriate under the circumstances.

Within ten days of the receipt of this preliminary twenty day notice the owner or other interested party is required to furnish all information necessary to correct any inaccuracies in the notice pursuant to Arizona Revised Statutes section 33-992.01, subsection I or lose as a defense any inaccuracy of that information.

Within ten days of the receipt of this preliminary twenty day notice if any payment bond has been recorded in compliance with Arizona Revised Statutes section 33-1003, the owner must provide a copy of the payment bond including the name and address of the surety company and bonding agent providing the payment bond to the person who has given the preliminary twenty day notice. In the event that the owner or other interested party fails to provide the bond information within that ten day period, the claimant shall retain lien rights to the extent precluded or prejudiced from asserting a claim against the bond as a result of not timely receiving the bond information.

DATED:           FEBRUARY 12, 2021

FAITH TECHNOLOGIES, INC.

By: _____

Michelle Gerred, Esq., #031678
(as limited agent for FAITH TECHNOLOGIES, INC.)



-----------------------------------------------------------------------------

**ACKNOWLEDGEMENT OF RECEIPT OF PRELIMINARY TWENTY-DAY NOTICE**

This acknowledges receipt on ___ / ___ / ___ (date) of a copy of the preliminary twenty-day notice at _____ (address). Date: ___ / ___ / ___ (date this acknowledgment was executed)

_____
Signature of person acknowledging receipt, with title if acknowledgment is made on behalf of another person)

Please note: Arizona Revised Statutes, Section 33-992.02, provides that the acknowledgment be returned to the person or firm sending the Preliminary Twenty Day Notice (Michelle Gerred, Esq.) within thirty days of receipt thereof.

(Our Ref. N118112 2056301)

MG ESQ[AZ(N118112B3]B5
729 Miner Road
Cleveland OH 44143



USPS CERTIFIED MAIL

9214 8901 5273 7200 0014 8098 48



VITAL PHARMACEUTICALS INC. dba Bang Energy
c\o Corporate Creations Network Inc.
3260 N Hayden Road #210
Scottsdale AZ 85251

# ATTENTION

Please find the enclosed document.

## Distribution List

VITAL PHARMACEUTICALS INC. dba BANG ENERGY
1635 S. 43RD AVENUE
Phoenix AZ 85009

STELLAR GROUP INCORPORATED
c\o Corporation Service Company
8825 N 23rd Avenue Suite 100
Phoenix AZ 85021

JHO Real Estate Investment LLC
C\O Corporate Creations Network INC
3260 N. Hayden Rd #210
Scottsdale AZ 85251

STELLAR GROUP INCORPORATED
2900 HARTLEY ROAD
Jacksonville FL 32257

JHO REAL ESTATE INVESTMENT LLC
1600 N PARK DR
WESTON FL 33326

VITAL PHARMACEUTICALS INC. dba Bang Energy
c\o Corporate Creations Network Inc.
3260 N Hayden Road #210
Scottsdale AZ 85251



*To Whom It May Concern:*

*The sending of the following Preliminary Notice is prescribed by the construction lien laws of ARIZONA. <u>This is NOT a Lien</u> but a statutory requirement and needs to be done as a matter of law.*

*The sending of this notice should not reflect on the creditworthiness of FAITH TECHNOLOGIES, INC.'s customer or any other party to the project nor does it indicate any expected problem in the payment of FAITH TECHNOLOGIES, INC.'s invoices.*

*Sincerely,*

*FAITH TECHNOLOGIES, INC.*
*225 MAIN STREET*
*MENASHA, WI 54952*
*Contact: MS. CONNIE BRETL*
*Telephone: (920) 751 - 9863*

*File (N118112) 2056301*

**ARIZONA PRELIMINARY TWENTY DAY LIEN NOTICE**
PURSUANT TO A.R.S. SECTION 33-992
**IN ACCORDANCE WITH ARIZONA REVISED STATUTES SECTION 33-992.01, THIS IS NOT A LIEN.  THIS IS NOT A REFLECTION ON THE INTEGRITY OF ANY CONTRACTOR OR SUBCONTRACTOR**

The name and address of the owner or reputed owner are:
VITAL PHARMACEUTICALS, INC. DBA BANG
ENERGY
1635 S. 43RD AVENUE
PHOENIX, AZ 85009

VITAL PHARMACEUTICALS, INC. DBA BANG
ENERGY
C/O CORPORATE CREATIONS NETWORK INC.
3260 N HAYDEN ROAD #210
SCOTTSDALE, AZ  85251

JHO REAL ESTATE INVESTMENT, LLC
1600 N PARK DR
WESTON, FL  33326

JHO REAL ESTATE INVESTMENT, LLC
C/O CORPORATE CREATIONS NETWORK INC.
3260 N HAYDEN ROAD #210
SCOTTSDALE, AZ  85251

The name and address of lessee or reputed leasehold interest is:

The name and address of the original contractor are:
STELLAR GROUP, INCORPORATED
2900 HARTLEY ROAD
JACKSONVILLE, FL  32257

STELLAR GROUP, INCORPORATED
C/O CORPORATION SERVICE COMPANY
8825 N 23RD AVENUE, SUITE 100
PHOENIX, AZ  85021

The name and address of any lender or reputed lender and or assigns are:

UNABLE TO DETERMINE. A REQUEST IS INCLUDED
HEREIN PER A.R.S. 33-992.01.

The name and address of the person with whom the claimant has contracted are:
STELLAR GROUP, INCORPORATED
2900 HARTLEY ROAD
JACKSONVILLE, FL 32257

The name and address of any surety company/agent are:

UNABLE TO DETERMINE. A REQUEST IS INCLUDED
HEREIN PER A.R.S. 33-992.01.

*We request a copy of the bond, if applicable.*

Date:  FEBRUARY 12, 2021 (Notice #N118112)
This preliminary lien notice has been completed (Name and Address of Claimant):

For:
FAITH TECHNOLOGIES, INC.
225 MAIN STREET
MENASHA, WI 54952



By:
Michelle Gerred, Esq., #031678
PO Box 24101
Cleveland, OH 44124
(as limited agent for FAITH TECHNOLOGIES, INC.)

You are hereby notified that the Claimant has furnished or will furnish labor, professional services, materials, machinery, fixtures or tools of the following general description:

MATERIALS AND LABOR, ELECTRICAL
INSTALLATION

In the construction, alteration or repair of the building, structure or improvement located at:

BANG ENERGY PHX CAN MANUFACTURING
1635 S. 43RD AVENUE
PHOENIX, AZ 85009

And situated upon that certain lot(s) or parcel(s) of land in MARICOPA County, Arizona, described as follows:

1635 S. 43RD AVENUE
PHOENIX, AZ 85009

An estimate of the total price of the labor, professional services, materials, machinery, fixtures or tools furnished or to be furnished is:

$7,013,441.00

**NOTICE TO PROPERTY OWNER**

If bills are not paid in full for the labor, professional services, materials, machinery, fixtures or tools furnished, or to be furnished, a mechanic's lien leading to the loss, through court foreclosure proceedings, of all or part of your property being improved may be placed against the property. You may wish to protect yourself against this consequence by either:

1) Requiring your contractor to furnish a conditional waiver and release pursuant to Arizona Revised Statutes section 33-1008, subsection D, paragraphs 1 and 3 signed by the person or firm giving you this notice before you make payment to your contractor.

2) Requiring your contractor to furnish an unconditional waiver and release pursuant to Arizona Revised Statutes section 33-1008, subsection D, paragraphs 2 and 4, signed by the person or firm giving you this notice after you make payment to your contractor.

3) Using any other method or device that is appropriate under the circumstances.

Within ten days of the receipt of this preliminary twenty day notice the owner or other interested party is required to furnish all information necessary to correct any inaccuracies in the notice pursuant to Arizona Revised Statutes section 33-992.01, subsection I or lose as a defense any inaccuracy of that information.

Within ten days of the receipt of this preliminary twenty day notice if any payment bond has been recorded in compliance with Arizona Revised Statutes section 33-1003, the owner must provide a copy of the payment bond including the name and address of the surety company and bonding agent providing the payment bond to the person who has given the preliminary twenty day notice. In the event that the owner or other interested party fails to provide the bond information within that ten day period, the claimant shall retain lien rights to the extent precluded or prejudiced from asserting a claim against the bond as a result of not timely receiving the bond information.

DATED:        FEBRUARY 12, 2021

FAITH TECHNOLOGIES, INC.

By: _Michelle Gerred_ _____

Michelle Gerred, Esq., #031678
(as limited agent for FAITH TECHNOLOGIES, INC.)



----------------------------------------------------------------------------------------

**ACKNOWLEDGEMENT OF RECEIPT OF PRELIMINARY TWENTY-DAY NOTICE**

This acknowledges receipt on ___ / ___ / ___ (date) of a copy of the preliminary twenty-day notice at
_____ (address). Date: ___/___/___ (date this
acknowledgment was executed)

_____
Signature of person acknowledging receipt, with title if acknowledgment is made on behalf of another person)

Please note: Arizona Revised Statutes, Section 33-992.02, provides that the acknowledgment be returned to the person or firm sending the Preliminary Twenty Day Notice (Michelle Gerred, Esq.) within thirty days of receipt thereof.

(Our Ref. N118112 2056301)

# EXHIBIT D

## AFFIDAVIT AND PROOF OF MAILING OF PRELIMINARY TWENTY DAY NOTICE

### BY MAIL

STATE OF OHIO                )
                             ) ss.
COUNTY OF CUYAHOGA          )

Colleen Kirk, being first duly sworn upon his/her oath, deposes and says:

1.      I make this affidavit on my personal knowledge of the facts herein set forth.

2.      On February 12, 2021, pursuant to A.R.S. 33-992.01, I mailed a copy of the Arizona Preliminary Twenty Day Notice to:

Owner or Reputed Owner
VITAL PHARMACEUTICALS, INC. DBA BANG ENERGY
1635 S. 43RD AVENUE
PHOENIX, AZ 85009

VITAL PHARMACEUTICALS, INC. DBA BANG ENERGY
C/O CORPORATE CREATIONS NETWORK INC.
3260 N HAYDEN ROAD #210
SCOTTSDALE, AZ  85251

JHO REAL ESTATE INVESTMENT, LLC
1600 N PARK DR
WESTON, FL  33326

JHO REAL ESTATE INVESTMENT, LLC
C/O CORPORATE CREATIONS NETWORK INC.
3260 N HAYDEN ROAD #210
SCOTTSDALE, AZ  85251

by certified mail, return receipt requested.  A copy of the certified mail receipt is attached hereto as part of Exhibit C and incorporated herein by reference.

3.      I also mailed this same Notice by certified mail, return receipt requested, to the following entities:

Person with Whom Claimant has Contracted:
STELLAR GROUP, INCORPORATED
2900 HARTLEY ROAD
JACKSONVILLE, FL 32257

Project Original Contractor or Reputed Contractor
STELLAR GROUP, INCORPORATED
2900 HARTLEY ROAD
JACKSONVILLE, FL  32257

STELLAR GROUP, INCORPORATED
C/O CORPORATION SERVICE COMPANY
8825 N 23RD AVENUE, SUITE 100
PHOENIX, AZ  85021
by certified mail, return receipt requested.  A copy of the certified mail receipt is attached hereto as part of Exhibit C and incorporated herein by reference.

Dated this _16TH_ day of _March_, 2022

_Colleen Kirk_

By: Colleen Kirk

SUBSCRIBED AND SWORN to before me this 16 day of March 2022 by Colleen Kirk.

My Commission Expires:

_4-22-2023_

_Notary Public_

(Ref. N118112)

KEELY J. BINDAS
NOTARY PUBLIC
STATE OF OHIO
Recorded in
Cuyahoga County
My Comm. Exp. 4/22/2023

MG ESQ[AZ(N118112OW]B5
729 Miner Road
Cleveland OH 44143



USPS CERTIFIED MAIL

9214 8901 5273 7200 0014 8097 94



VITAL PHARMACEUTICALS INC. dba BANG ENERGY
1635 S. 43RD AVENUE
Phoenix AZ 85009

# ATTENTION

Please find the enclosed document.

## Distribution List

VITAL PHARMACEUTICALS INC. dba BANG ENERGY
1635 S. 43RD AVENUE
Phoenix AZ 85009

STELLAR GROUP INCORPORATED
2900 HARTLEY ROAD
Jacksonville FL 32257

STELLAR GROUP INCORPORATED
c/o Corporation Service Company
8825 N 23rd Avenue Suite 100
Phoenix AZ 85021

JHO REAL ESTATE INVESTMENT LLC
1600 N PARK DR
WESTON FL 33326

JHO Real Estate Investment LLC
C\O Corporate Creations Network INC
3260 N. Hayden Rd #210
Scottsdale AZ 85251

VITAL PHARMACEUTICALS INC. dba Bang Energy
c/o Corporate Creations Network Inc.
3260 N Hayden Road #210
Scottsdale AZ 85251

*To Whom It May Concern:*

*The sending of the following Preliminary Notice is prescribed by the construction lien laws of ARIZONA. This is NOT a Lien but a statutory requirement and needs to be done as a matter of law.*

*The sending of this notice should not reflect on the creditworthiness of FAITH TECHNOLOGIES, INC.'s customer or any other party to the project nor does it indicate any expected problem in the payment of FAITH TECHNOLOGIES, INC.'s invoices.*

*Sincerely,*

*FAITH TECHNOLOGIES, INC.*
*225 MAIN STREET*
*MENASHA, WI 54952*
*Contact: MS. CONNIE BRETL*
*Telephone: (920) 751 - 9863*

*File (N118112) 2056301*

**ARIZONA PRELIMINARY TWENTY DAY LIEN NOTICE**
PURSUANT TO A.R.S. SECTION 33-992
**IN ACCORDANCE WITH ARIZONA REVISED STATUTES SECTION 33-992.01, THIS IS NOT A LIEN.  THIS IS NOT A REFLECTION ON THE INTEGRITY OF ANY CONTRACTOR OR SUBCONTRACTOR**

The name and address of the owner or reputed owner are:
VITAL PHARMACEUTICALS, INC. DBA BANG
ENERGY
1635 S. 43RD AVENUE
PHOENIX, AZ 85009

VITAL PHARMACEUTICALS, INC. DBA BANG
ENERGY
C/O CORPORATE CREATIONS NETWORK INC.
3260 N HAYDEN ROAD #210
SCOTTSDALE, AZ  85251

JHO REAL ESTATE INVESTMENT, LLC
1600 N PARK DR
WESTON, FL  33326

JHO REAL ESTATE INVESTMENT, LLC
C/O CORPORATE CREATIONS NETWORK INC.
3260 N HAYDEN ROAD #210
SCOTTSDALE, AZ  85251

The name and address of lessee or reputed leasehold interest
is:

The name and address of the original contractor are:
STELLAR GROUP, INCORPORATED
2900 HARTLEY ROAD
JACKSONVILLE, FL  32257

STELLAR GROUP, INCORPORATED
C/O CORPORATION SERVICE COMPANY
8825 N 23RD AVENUE, SUITE 100
PHOENIX, AZ  85021

The name and address of any lender or reputed lender and or
assigns are:

UNABLE TO DETERMINE. A REQUEST IS INCLUDED
HEREIN PER A.R.S. 33-992.01.

The name and address of the person with whom the claimant
has contracted are:
STELLAR GROUP, INCORPORATED
2900 HARTLEY ROAD
JACKSONVILLE, FL 32257

The name and address of any surety company/agent are:

UNABLE TO DETERMINE. A REQUEST IS INCLUDED
HEREIN PER A.R.S. 33-992.01.

*We request a copy of the bond, if applicable.*

Date:  FEBRUARY 12, 2021 (Notice #N118112)
This preliminary lien notice has been completed (Name and
Address of Claimant):

For:
FAITH TECHNOLOGIES, INC.
225 MAIN STREET
MENASHA, WI 54952

By:
Michelle Gerred, Esq., #031678
PO Box 24101
Cleveland, OH 44124
(as limited agent for FAITH TECHNOLOGIES, INC.)



You are hereby notified that the Claimant has furnished or will
furnish labor, professional services, materials, machinery,
fixtures or tools of the following general description:

MATERIALS AND LABOR, ELECTRICAL
INSTALLATION

In the construction, alteration or repair of the building,
structure or improvement located at:

BANG ENERGY PHX CAN MANUFACTURING
1635 S. 43RD AVENUE
PHOENIX, AZ 85009

And situated upon that certain lot(s) or parcel(s) of land in
MARICOPA County, Arizona, described as follows:

1635 S. 43RD AVENUE
PHOENIX, AZ 85009

An estimate of the total price of the labor, professional
services, materials, machinery, fixtures or tools furnished or to
be furnished is:

$7,013,441.00

**NOTICE TO PROPERTY OWNER**

If bills are not paid in full for the labor, professional services, materials, machinery, fixtures or tools furnished, or to be furnished, a mechanic's lien leading to the loss, through court foreclosure proceedings, of all or part of your property being improved may be placed against the property.  You may wish to protect yourself against this consequence by either:

1)  Requiring your contractor to furnish a conditional waiver and release pursuant to Arizona Revised Statutes section 33-1008, subsection D, paragraphs 1 and 3 signed by the person or firm giving you this notice before you make payment to your contractor.

2)  Requiring your contractor to furnish an unconditional waiver and release pursuant to Arizona Revised Statutes section 33-1008, subsection D, paragraphs 2 and 4, signed by the person or firm giving you this notice after you make payment to your contractor.

3)  Using any other method or device that is appropriate under the circumstances.

Within ten days of the receipt of this preliminary twenty day notice the owner or other interested party is required to furnish all information necessary to correct any inaccuracies in the notice pursuant to Arizona Revised Statutes section 33-992.01, subsection I or lose as a defense any inaccuracy of that information.

Within ten days of the receipt of this preliminary twenty day notice if any payment bond has been recorded in compliance with Arizona Revised Statutes section 33-1003, the owner must provide a copy of the payment bond including the name and address of the surety company and bonding agent providing the payment bond to the person who has given this preliminary twenty day notice.  In the event that the owner or other interested party fails to provide the bond information within that ten day period, the claimant shall retain lien rights to the extent precluded or prejudiced from asserting a claim against the bond as a result of not timely receiving the bond information.

DATED:        FEBRUARY 12, 2021

FAITH TECHNOLOGIES, INC.

By: _____

Michelle Gerred, Esq., #031678
(as limited agent for FAITH TECHNOLOGIES, INC.)



- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**ACKNOWLEDGEMENT OF RECEIPT OF PRELIMINARY TWENTY-DAY NOTICE**

This acknowledges receipt on ___ / ___/ ___ (date) of a copy of the preliminary twenty-day notice at
_____ (address).  Date:  ___/___/___ (date this acknowledgment was executed)

_____
Signature of person acknowledging receipt, with title if acknowledgment is made on behalf of another person)

Please note:  Arizona Revised Statutes, Section 33-992.02, provides that the acknowledgment be returned to the person or firm sending the Preliminary Twenty Day Notice (Michelle Gerred, Esq.) within thirty days of receipt thereof.

(Our Ref. N118112 2056301)

MG ESQ[AZ(N118112GC]B5
729 Miner Road
Cleveland OH 44143



**USPS CERTIFIED MAIL**

9214 8901 5273 7200 0014 8098 00



STELLAR GROUP INCORPORATED
2900 HARTLEY ROAD
Jacksonville FL 32257

# ATTENTION

Please find the enclosed document.

## Distribution List

VITAL PHARMACEUTICALS INC. dba BANG ENERGY
1635 S. 43RD AVENUE
Phoenix AZ 85009

STELLAR GROUP INCORPORATED
2900 HARTLEY ROAD
Jacksonville FL 32257

STELLAR GROUP INCORPORATED
c\o Corporation Service Company
8825 N 23rd Avenue Suite 100
Phoenix AZ 85021

JHO REAL ESTATE INVESTMENT LLC
1600 N PARK DR
WESTON FL 33326

JHO Real Estate Investment LLC
C\O Corporate Creations Network INC
3260 N. Hayden Rd #210
Scottsdale AZ 85251

VITAL PHARMACEUTICALS INC. dba Bang Energy
c\o Corporate Creations Network Inc.
3260 N Hayden Road #210
Scottsdale AZ 85251

*To Whom It May Concern:*

*The sending of the following Preliminary Notice is prescribed by the construction lien laws of ARIZONA. This is NOT a Lien but a statutory requirement and needs to be done as a matter of law.*

*The sending of this notice should not reflect on the creditworthiness of FAITH TECHNOLOGIES, INC.'s customer or any other party to the project nor does it indicate any expected problem in the payment of FAITH TECHNOLOGIES, INC.'s invoices.*

*Sincerely,*

*FAITH TECHNOLOGIES, INC.*
*225 MAIN STREET*
*MENASHA, WI 54952*
*Contact: MS. CONNIE BRETL*
*Telephone: (920) 751 - 9863*

*File (N118112) 2056301*

**ARIZONA PRELIMINARY TWENTY DAY LIEN NOTICE**
PURSUANT TO A.R.S. SECTION 33-992
**IN ACCORDANCE WITH ARIZONA REVISED STATUTES SECTION 33-992.01, THIS IS NOT A LIEN. THIS IS NOT A REFLECTION ON THE INTEGRITY OF ANY CONTRACTOR OR SUBCONTRACTOR**

The name and address of the owner or reputed owner are:
VITAL PHARMACEUTICALS, INC. DBA BANG ENERGY
1635 S. 43RD AVENUE
PHOENIX, AZ 85009

VITAL PHARMACEUTICALS, INC. DBA BANG ENERGY
C/O CORPORATE CREATIONS NETWORK INC.
3260 N HAYDEN ROAD #210
SCOTTSDALE, AZ 85251

JHO REAL ESTATE INVESTMENT, LLC
1600 N PARK DR
WESTON, FL 33326

JHO REAL ESTATE INVESTMENT, LLC
C/O CORPORATE CREATIONS NETWORK INC.
3260 N HAYDEN ROAD #210
SCOTTSDALE, AZ 85251

The name and address of lessee or reputed leasehold interest is:

The name and address of the original contractor are:
STELLAR GROUP, INCORPORATED
2900 HARTLEY ROAD
JACKSONVILLE, FL 32257

STELLAR GROUP, INCORPORATED
C/O CORPORATION SERVICE COMPANY
8825 N 23RD AVENUE, SUITE 100
PHOENIX, AZ 85021

The name and address of any lender or reputed lender and or assigns are:

UNABLE TO DETERMINE. A REQUEST IS INCLUDED HEREIN PER A.R.S. 33-992.01.

The name and address of the person with whom the claimant has contracted are:
STELLAR GROUP, INCORPORATED
2900 HARTLEY ROAD
JACKSONVILLE, FL 32257

The name and address of any surety company/agent are:

UNABLE TO DETERMINE. A REQUEST IS INCLUDED HEREIN PER A.R.S. 33-992.01.

*We request a copy of the bond, if applicable.*

Date: FEBRUARY 12, 2021 (Notice #N118112)
This preliminary lien notice has been completed (Name and Address of Claimant):



For:
FAITH TECHNOLOGIES, INC.
225 MAIN STREET
MENASHA, WI 54952

By:
Michelle Gerred, Esq., #031678
PO Box 24101
Cleveland, OH 44124
(as limited agent for FAITH TECHNOLOGIES, INC.)

You are hereby notified that the Claimant has furnished or will furnish labor, professional services, materials, machinery, fixtures or tools of the following general description:

MATERIALS AND LABOR, ELECTRICAL INSTALLATION

In the construction, alteration or repair of the building, structure or improvement located at:

BANG ENERGY PHX CAN MANUFACTURING
1635 S. 43RD AVENUE
PHOENIX, AZ 85009

And situated upon that certain lot(s) or parcel(s) of land in MARICOPA County, Arizona, described as follows:

1635 S. 43RD AVENUE
PHOENIX, AZ 85009

An estimate of the total price of the labor, professional services, materials, machinery, fixtures or tools furnished or to be furnished is:

$7,013,441.00

**NOTICE TO PROPERTY OWNER**

If bills are not paid in full for the labor, professional services, materials, machinery, fixtures or tools furnished, or to be furnished, a mechanic's lien leading to the loss, through court foreclosure proceedings, of all or part of your property being improved may be placed against the property. You may wish to protect yourself against this consequence by either:

1) Requiring your contractor to furnish a conditional waiver and release pursuant to Arizona Revised Statutes section 33-1008, subsection D, paragraphs 1 and 3 signed by the person or firm giving you this notice before you make payment to your contractor.

2) Requiring your contractor to furnish an unconditional waiver and release pursuant to Arizona Revised Statutes section 33-1008, subsection D, paragraphs 2 and 4, signed by the person or firm giving you this notice after you make payment to your contractor.

3) Using any other method or device that is appropriate under the circumstances.

Within ten days of the receipt of this preliminary twenty day notice the owner or other interested party is required to furnish all information necessary to correct any inaccuracies in the notice pursuant to Arizona Revised Statutes section 33-992.01, subsection I or lose as a defense any inaccuracy of that information.

Within ten days of the receipt of this preliminary twenty day notice if any payment bond has been recorded in compliance with Arizona Revised Statutes section 33-1003, the owner must provide a copy of the payment bond including the name and address of the surety company and bonding agent providing the payment bond to the person who has given the preliminary twenty day notice. In the event that the owner or other interested party fails to provide the bond information within that ten day period, the claimant shall retain lien rights to the extent precluded or prejudiced from asserting a claim against the bond as a result of not timely receiving the bond information.

DATED:        FEBRUARY 12, 2021

FAITH TECHNOLOGIES, INC.

By: _____
Michelle Gerred, Esq., #031678
(as limited agent for FAITH TECHNOLOGIES, INC.)



• • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • •

**ACKNOWLEDGEMENT OF RECEIPT OF PRELIMINARY TWENTY-DAY NOTICE**

This acknowledges receipt on ___ / ___ / ____ (date) of a copy of the preliminary twenty-day notice at
_____ (address). Date:  ___/ ___/ ____ (date this
acknowledgment was executed)


_____
Signature of person acknowledging receipt, with title if acknowledgment is made on behalf of another person)

Please note: Arizona Revised Statutes, Section 33-992.02, provides that the acknowledgment be returned to the person or firm sending the Preliminary Twenty Day Notice (Michelle Gerred, Esq.) within thirty days of receipt thereof.

(Our Ref. N118112 2056301)

MG ESQ[AZ(N116112S1)85
729 Miner Road
Cleveland OH 44143



**USPS CERTIFIED MAIL**

9214 8901 5273 7200 0014 8098 17

STELLAR GROUP INCORPORATED
c\o Corporation Service Company
8825 N 23rd Avenue Suite 100
Phoenix AZ 85021

# ATTENTION

Please find the enclosed document.

## Distribution List

VITAL PHARMACEUTICALS INC. dba BANG ENERGY
1635 S. 43RD AVENUE
Phoenix AZ 85009

STELLAR GROUP INCORPORATED
c\o Corporation Service Company
8825 N 23rd Avenue Suite 100
Phoenix AZ 85021

JHO Real Estate Investment LLC
C\O Corporate Creations Network INC
3260 N. Hayden Rd #210
Scottsdale AZ 85251

STELLAR GROUP INCORPORATED
2900 HARTLEY ROAD
Jacksonville FL 32257

JHO REAL ESTATE INVESTMENT LLC
1600 N PARK DR
WESTON FL 33326

VITAL PHARMACEUTICALS INC. dba Bang Energy
c\o Corporate Creations Network Inc.
3260 N Hayden Road #210
Scottsdale AZ 85251



To Whom It May Concern:

The sending of the following Preliminary Notice is prescribed by the construction lien laws of ARIZONA. *This is NOT a Lien* but a statutory requirement and needs to be done as a matter of law.

The sending of this notice should not reflect on the creditworthiness of FAITH TECHNOLOGIES, INC.'s customer or any other party to the project nor does it indicate any expected problem in the payment of FAITH TECHNOLOGIES, INC.'s invoices.

Sincerely,

FAITH TECHNOLOGIES, INC.
225 MAIN STREET
MENASHA, WI 54952
Contact: MS. CONNIE BRETL
Telephone: (920) 751 - 9863

File (N118112) 2056301

**ARIZONA PRELIMINARY TWENTY DAY LIEN NOTICE**
PURSUANT TO A.R.S. SECTION 33-992
**IN ACCORDANCE WITH ARIZONA REVISED STATUTES SECTION 33-992.01, THIS IS NOT A LIEN. THIS IS NOT A REFLECTION ON THE INTEGRITY OF ANY CONTRACTOR OR SUBCONTRACTOR**

The name and address of the owner or reputed owner are:
VITAL PHARMACEUTICALS, INC. DBA BANG
ENERGY
1635 S. 43RD AVENUE
PHOENIX, AZ 85009

VITAL PHARMACEUTICALS, INC. DBA BANG
ENERGY
C/O CORPORATE CREATIONS NETWORK INC.
3260 N HAYDEN ROAD #210
SCOTTSDALE, AZ 85251

JHO REAL ESTATE INVESTMENT, LLC
1600 N PARK DR
WESTON, FL 33326

JHO REAL ESTATE INVESTMENT, LLC
C/O CORPORATE CREATIONS NETWORK INC.
3260 N HAYDEN ROAD #210
SCOTTSDALE, AZ 85251

The name and address of lessee or reputed leasehold interest is:

The name and address of the original contractor are:
STELLAR GROUP, INCORPORATED
2900 HARTLEY ROAD
JACKSONVILLE, FL 32257

STELLAR GROUP, INCORPORATED
C/O CORPORATION SERVICE COMPANY
8825 N 23RD AVENUE, SUITE 100
PHOENIX, AZ 85021

The name and address of any lender or reputed lender and or assigns are:

UNABLE TO DETERMINE. A REQUEST IS INCLUDED
HEREIN PER A.R.S. 33-992.01.

The name and address of the person with whom the claimant has contracted are:
STELLAR GROUP, INCORPORATED
2900 HARTLEY ROAD
JACKSONVILLE, FL 32257

The name and address of any surety company/agent are:

UNABLE TO DETERMINE. A REQUEST IS INCLUDED
HEREIN PER A.R.S. 33-992.01.

*We request a copy of the bond, if applicable.*

Date:  FEBRUARY 12, 2021 (Notice #N118112)
This preliminary lien notice has been completed (Name and
Address of Claimant):

For:
FAITH TECHNOLOGIES, INC.
225 MAIN STREET
MENASHA, WI 54952

By:
Michelle Gerred, Esq., #031678
PO Box 24101
Cleveland, OH 44124
(as limited agent for FAITH TECHNOLOGIES, INC.)



You are hereby notified that the Claimant has furnished or will
furnish labor, professional services, materials, machinery,
fixtures or tools of the following general description:

MATERIALS AND LABOR, ELECTRICAL
INSTALLATION

In the construction, alteration or repair of the building,
structure or improvement located at:

BANG ENERGY PHX CAN MANUFACTURING
1635 S. 43RD AVENUE
PHOENIX, AZ 85009

And situated upon that certain lot(s) or parcel(s) of land in
MARICOPA County, Arizona, described as follows:

1635 S. 43RD AVENUE
PHOENIX, AZ 85009

An estimate of the total price of the labor, professional
services, materials, machinery, fixtures or tools furnished or to
be furnished is:

$7,013,441.00

**NOTICE TO PROPERTY OWNER**

If bills are not paid in full for the labor, professional services, materials, machinery, fixtures or tools furnished, or to be furnished, a mechanic's lien leading to the loss, through court foreclosure proceedings, of all or part of your property being improved may be placed against the property.  You may wish to protect yourself against this consequence by either:

1)  Requiring your contractor to furnish a conditional waiver and release pursuant to Arizona Revised Statutes section 33-1008, subsection D, paragraphs 1 and 3 signed by the person or firm giving you this notice before you make payment to your contractor.

2)  Requiring your contractor to furnish an unconditional waiver and release pursuant to Arizona Revised Statutes section 33-1008, subsection D, paragraphs 2 and 4, signed by the person or firm giving you this notice after you make payment to your contractor.

3)  Using any other method or device that is appropriate under the circumstances.

Within ten days of the receipt of this preliminary twenty day notice the owner or other interested party is required to furnish all information necessary to correct any inaccuracies in the notice pursuant to Arizona Revised Statutes section 33-992.01, subsection I or lose as a defense any inaccuracy of that information.

Within ten days of the receipt of this preliminary twenty day notice if any payment bond has been recorded in compliance with Arizona Revised Statutes section 33-1003, the owner must provide a copy of the payment bond including the name and address of the surety company and bonding agent providing the payment bond to the person who has given the preliminary twenty day notice.  In the event that the owner or other interested party fails to provide the bond information within that ten day period, the claimant shall retain lien rights to the extent precluded or prejudiced from asserting a claim against the bond as a result of not timely receiving the bond information.

DATED:          FEBRUARY 12, 2021

FAITH TECHNOLOGIES, INC.

By: _Michelle Gerred_____
Michelle Gerred, Esq., #031678
(as limited agent for FAITH TECHNOLOGIES, INC.)

------------------------------------------------------------------

**ACKNOWLEDGEMENT OF RECEIPT OF PRELIMINARY TWENTY-DAY NOTICE**

This acknowledges receipt on ___ / ___ / ___ (date) of a copy of the preliminary twenty-day notice at
_____ (address).  Date:  ___/___/___ (date this
acknowledgment was executed)

_____
Signature of person acknowledging receipt, with title if acknowledgment is made on behalf of another person)

Please note:  Arizona Revised Statutes, Section 33-992.02, provides that the acknowledgment be returned to the person or firm sending the Preliminary Twenty Day Notice (Michelle Gerred, Esq.) within thirty days of receipt thereof.

(Our Ref. N118112 2056301)



MG ESQ[AZ(N118112S3]B5
729 Miner Road
Cleveland OH 44143



**USPS CERTIFIED MAIL**

9214 8901 5273 7200 0014 8098 24



JHO REAL ESTATE INVESTMENT LLC
1600 N PARK DR
WESTON FL 33326

# ATTENTION

Please find the enclosed document.

## Distribution List

VITAL PHARMACEUTICALS INC. dba BANG ENERGY
1635 S. 43RD AVENUE
Phoenix AZ 85009

STELLAR GROUP INCORPORATED
c\o Corporation Service Company
8825 N 23rd Avenue Suite 100
Phoenix AZ 85021

JHO Real Estate Investment LLC
C\O Corporate Creations Network INC
3260 N. Hayden Rd #210
Scottsdale AZ 85251

STELLAR GROUP INCORPORATED
2900 HARTLEY ROAD
Jacksonville FL 32257

JHO REAL ESTATE INVESTMENT LLC
1600 N PARK DR
WESTON FL 33326

VITAL PHARMACEUTICALS INC. dba Bang Energy
c\o Corporate Creations Network Inc.
3260 N Hayden Road #210
Scottsdale AZ 85251



*To Whom It May Concern:*

*The sending of the following Preliminary Notice is prescribed by the construction lien laws of ARIZONA. This is NOT a Lien but a statutory requirement and needs to be done as a matter of law.*

*The sending of this notice should not reflect on the creditworthiness of FAITH TECHNOLOGIES, INC.'s customer or any other party to the project nor does it indicate any expected problem in the payment of FAITH TECHNOLOGIES, INC.'s invoices.*

*Sincerely,*

*FAITH TECHNOLOGIES, INC.*
*225 MAIN STREET*
*MENASHA, WI 54952*
*Contact: MS. CONNIE BRETL*
*Telephone: (920) 751 - 9863*

*File (N118112) 2056301*

## ARIZONA PRELIMINARY TWENTY DAY LIEN NOTICE
### PURSUANT TO A.R.S. SECTION 33-992
**IN ACCORDANCE WITH ARIZONA REVISED STATUTES SECTION 33-992.01, THIS IS NOT A LIEN.  THIS IS NOT A REFLECTION ON THE INTEGRITY OF ANY CONTRACTOR OR SUBCONTRACTOR**

The name and address of the owner or reputed owner are:
VITAL PHARMACEUTICALS, INC. DBA BANG
ENERGY
1635 S. 43RD AVENUE
PHOENIX, AZ 85009

VITAL PHARMACEUTICALS, INC. DBA BANG
ENERGY
C/O CORPORATE CREATIONS NETWORK INC.
3260 N HAYDEN ROAD #210
SCOTTSDALE, AZ  85251

JHO REAL ESTATE INVESTMENT, LLC
1600 N PARK DR
WESTON, FL  33326

JHO REAL ESTATE INVESTMENT, LLC
C/O CORPORATE CREATIONS NETWORK INC.
3260 N HAYDEN ROAD #210
SCOTTSDALE, AZ  85251

The name and address of lessee or reputed leasehold interest is:

The name and address of the original contractor are:
STELLAR GROUP, INCORPORATED
2900 HARTLEY ROAD
JACKSONVILLE, FL  32257

STELLAR GROUP, INCORPORATED
C/O CORPORATION SERVICE COMPANY
8825 N 23RD AVENUE, SUITE 100
PHOENIX, AZ  85021

The name and address of any lender or reputed lender and or assigns are:

UNABLE TO DETERMINE. A REQUEST IS INCLUDED
HEREIN PER A.R.S. 33-992.01.

The name and address of the person with whom the claimant has contracted are:
STELLAR GROUP, INCORPORATED
2900 HARTLEY ROAD
JACKSONVILLE, FL 32257

The name and address of any surety company/agent are:

UNABLE TO DETERMINE. A REQUEST IS INCLUDED
HEREIN PER A.R.S. 33-992.01.

*We request a copy of the bond, if applicable.*

Date:  FEBRUARY 12, 2021 (Notice #N118112)
This preliminary lien notice has been completed (Name and Address of Claimant):

For:
FAITH TECHNOLOGIES, INC.
225 MAIN STREET
MENASHA, WI 54952

By:
Michelle Gerred, Esq., #031678
PO Box 24101
Cleveland, OH 44124
(as limited agent for FAITH TECHNOLOGIES, INC.)



You are hereby notified that the Claimant has furnished or will furnish labor, professional services, materials, machinery, fixtures or tools of the following general description:

MATERIALS AND LABOR, ELECTRICAL
INSTALLATION

In the construction, alteration or repair of the building, structure or improvement located at:

BANG ENERGY PHX CAN MANUFACTURING
1635 S. 43RD AVENUE
PHOENIX, AZ 85009

And situated upon that certain lot(s) or parcel(s) of land in MARICOPA County, Arizona, described as follows:

1635 S. 43RD AVENUE
PHOENIX, AZ 85009

An estimate of the total price of the labor, professional services, materials, machinery, fixtures or tools furnished or to be furnished is:

$7,013,441.00

## NOTICE TO PROPERTY OWNER

If bills are not paid in full for the labor, professional services, materials, machinery, fixtures or tools furnished, or to be furnished, a mechanic's lien leading to the loss, through court foreclosure proceedings, of all or part of your property being improved may be placed against the property.  You may wish to protect yourself against this consequence by either:

1)  Requiring your contractor to furnish a conditional waiver and release pursuant to Arizona Revised Statutes section 33-1008, subsection D, paragraphs 1 and 3 signed by the person or firm giving you this notice before you make payment to your contractor.

2)  Requiring your contractor to furnish an unconditional waiver and release pursuant to Arizona Revised Statutes section 33-1008, subsection D, paragraphs 2 and 4, signed by the person or firm giving you this notice after you make payment to your contractor.

3)  Using any other method or device that is appropriate under the circumstances.

Within ten days of the receipt of this preliminary twenty day notice the owner or other interested party is required to furnish all information necessary to correct any inaccuracies in the notice pursuant to Arizona Revised Statutes section 33-992.01, subsection I or lose as a defense any inaccuracy of that information.

Within ten days of the receipt of this preliminary twenty day notice if any payment bond has been recorded in compliance with Arizona Revised Statutes section 33-1003, the owner must provide a copy of the payment bond including the name and address of the surety company and bonding agent providing the payment bond to the person who has given the preliminary twenty day notice.  In the event that the owner or other interested party fails to provide the bond information within that ten day period, the claimant shall retain lien rights to the extent precluded or prejudiced from asserting a claim against the bond as a result of not timely receiving the bond information.

DATED:        FEBRUARY 12, 2021

FAITH TECHNOLOGIES, INC.

By: _Michelle Gerred_____

Michelle Gerred, Esq., #031678
(as limited agent for FAITH TECHNOLOGIES, INC.)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

## ACKNOWLEDGEMENT OF RECEIPT OF PRELIMINARY TWENTY-DAY NOTICE

This acknowledges receipt on ___ / ___ / ___ (date) of a copy of the preliminary twenty-day notice at
_____ (address).  Date:  ___/___/___ (date this
acknowledgment was executed)

_____
Signature of person acknowledging receipt, with title if acknowledgment is made on behalf of another person

Please note:  Arizona Revised Statutes, Section 33-992.02, provides that the acknowledgment be returned to the person or firm sending the Preliminary Twenty Day Notice (Michelle Gerred, Esq.) within thirty days of receipt thereof.

(Our Ref. N118112 2056301)



MG ESQ[AZ(N116112B2]85
729 Miner Road
Cleveland OH 44143



**USPS CERTIFIED MAIL**

9214 8901 5273 7200 0014 8098 31



JHO Real Estate Investment LLC
C\O Corporate Creations Network INC
3260 N. Hayden Rd #210
Scottsdale AZ 85251

# ATTENTION

Please find the enclosed document.

## Distribution List

VITAL PHARMACEUTICALS INC. dba BANG ENERGY
1635 S. 43RD AVENUE
Phoenix AZ 85009

STELLAR GROUP INCORPORATED
2900 HARTLEY ROAD
Jacksonville FL 32257

STELLAR GROUP INCORPORATED
c\o Corporation Service Company
8825 N 23rd Avenue Suite 100
Phoenix AZ 85021

JHO REAL ESTATE INVESTMENT LLC
1600 N PARK DR
WESTON FL 33326

JHO Real Estate Investment LLC
C\O Corporate Creations Network INC
3260 N. Hayden Rd #210
Scottsdale AZ 85251

VITAL PHARMACEUTICALS INC. dba Bang Energy
c\o Corporate Creations Network Inc.
3260 N Hayden Road #210
Scottsdale AZ 85251



*To Whom It May Concern:*

*The sending of the following Preliminary Notice is prescribed by the construction lien laws of ARIZONA. <u>This is NOT a Lien</u> but a statutory requirement and needs to be done as a matter of law.*

*The sending of this notice should not reflect on the creditworthiness of FAITH TECHNOLOGIES, INC.'s customer or any other party to the project nor does it indicate any expected problem in the payment of FAITH TECHNOLOGIES, INC.'s invoices.*

*Sincerely,*

*FAITH TECHNOLOGIES, INC.*
*225 MAIN STREET*
*MENASHA, WI 54952*
*Contact: MS. CONNIE BRETL*
*Telephone: (920) 751 - 9863*

*File (N118112) 2056301*

**ARIZONA PRELIMINARY TWENTY DAY LIEN NOTICE**
PURSUANT TO A.R.S. SECTION 33-992
**IN ACCORDANCE WITH ARIZONA REVISED STATUTES SECTION 33-992.01, THIS IS NOT A LIEN. THIS IS NOT A REFLECTION ON THE INTEGRITY OF ANY CONTRACTOR OR SUBCONTRACTOR**

The name and address of the owner or reputed owner are:
VITAL PHARMACEUTICALS, INC. DBA BANG ENERGY
1635 S. 43RD AVENUE
PHOENIX, AZ 85009

VITAL PHARMACEUTICALS, INC. DBA BANG ENERGY
C/O CORPORATE CREATIONS NETWORK INC.
3260 N HAYDEN ROAD #210
SCOTTSDALE, AZ 85251

JHO REAL ESTATE INVESTMENT, LLC
1600 N PARK DR
WESTON, FL 33326

JHO REAL ESTATE INVESTMENT, LLC
C/O CORPORATE CREATIONS NETWORK INC.
3260 N HAYDEN ROAD #210
SCOTTSDALE, AZ 85251

The name and address of lessee or reputed leasehold interest is:

The name and address of the original contractor are:
STELLAR GROUP, INCORPORATED
2900 HARTLEY ROAD
JACKSONVILLE, FL 32257

STELLAR GROUP, INCORPORATED
C/O CORPORATION SERVICE COMPANY
8825 N 23RD AVENUE, SUITE 100
PHOENIX, AZ 85021

The name and address of any lender or reputed lender and or assigns are:

UNABLE TO DETERMINE. A REQUEST IS INCLUDED HEREIN PER A.R.S. 33-992.01.

The name and address of the person with whom the claimant has contracted are:
STELLAR GROUP, INCORPORATED
2900 HARTLEY ROAD
JACKSONVILLE, FL 32257

The name and address of any surety company/agent are:

UNABLE TO DETERMINE. A REQUEST IS INCLUDED HEREIN PER A.R.S. 33-992.01.

*We request a copy of the bond, if applicable.*

Date: FEBRUARY 12, 2021 (Notice #N118112)
This preliminary lien notice has been completed (Name and Address of Claimant):

For:
FAITH TECHNOLOGIES, INC.
225 MAIN STREET
MENASHA, WI 54952

By:
Michelle Gerred, Esq., #031678
PO Box 24101
Cleveland, OH 44124
(as limited agent for FAITH TECHNOLOGIES, INC.)



You are hereby notified that the Claimant has furnished or will furnish labor, professional services, materials, machinery, fixtures or tools of the following general description:

MATERIALS AND LABOR, ELECTRICAL INSTALLATION

In the construction, alteration or repair of the building, structure or improvement located at:

BANG ENERGY PHX CAN MANUFACTURING
1635 S. 43RD AVENUE
PHOENIX, AZ 85009

And situated upon that certain lot(s) or parcel(s) of land in MARICOPA County, Arizona, described as follows:

1635 S. 43RD AVENUE
PHOENIX, AZ 85009

An estimate of the total price of the labor, professional services, materials, machinery, fixtures or tools furnished or to be furnished is:

$7,013,441.00

**NOTICE TO PROPERTY OWNER**

If bills are not paid in full for the labor, professional services, materials, machinery, fixtures or tools furnished, or to be furnished, a mechanic's lien leading to the loss, through court foreclosure proceedings, of all or part of your property being improved may be placed against the property. You may wish to protect yourself against this consequence by either:

1) Requiring your contractor to furnish a conditional waiver and release pursuant to Arizona Revised Statutes section 33-1008, subsection D, paragraphs 1 and 3 signed by the person or firm giving you this notice before you make payment to your contractor.

2) Requiring your contractor to furnish an unconditional waiver and release pursuant to Arizona Revised Statutes section 33-1008, subsection D, paragraphs 2 and 4, signed by the person or firm giving you this notice after you make payment to your contractor.

3) Using any other method or device that is appropriate under the circumstances.

Within ten days of the receipt of this preliminary twenty day notice the owner or other interested party is required to furnish all information necessary to correct any inaccuracies in the notice pursuant to Arizona Revised Statutes section 33-992.01, subsection I or lose as a defense any inaccuracy of that information.

Within ten days of the receipt of this preliminary twenty day notice if any payment bond has been recorded in compliance with Arizona Revised Statutes section 33-1003, the owner must provide a copy of the payment bond including the name and address of the surety company and bonding agent providing the payment bond to the person who has given the preliminary twenty day notice. In the event that the owner or other interested party fails to provide the bond information within that ten day period, the claimant shall retain lien rights to the extent precluded or prejudiced from asserting a claim against the bond as a result of not timely receiving the bond information.

DATED:        FEBRUARY 12, 2021

FAITH TECHNOLOGIES, INC.

By: _____

Michelle Gerred, Esq., #031678
(as limited agent for FAITH TECHNOLOGIES, INC.)

-------------------------------------------------------------------------------

**ACKNOWLEDGEMENT OF RECEIPT OF PRELIMINARY TWENTY-DAY NOTICE**

This acknowledges receipt on ___ / ___ / ___ (date) of a copy of the preliminary twenty-day notice at
_____ (address). Date: ___/___/___ (date this
acknowledgment was executed)

_____
Signature of person acknowledging receipt, with title if acknowledgment is made on behalf of another person)

Please note: Arizona Revised Statutes, Section 33-992.02, provides that the acknowledgment be returned to the person or firm sending the Preliminary Twenty Day Notice (Michelle Gerred, Esq.) within thirty days of receipt thereof.

(Our Ref. N118112 2056301)



MG ESQ[AZ(N118112B3]B5
729 Miner Road
Cleveland OH 44143



**USPS CERTIFIED MAIL**

9214 8901 5273 7200 0014 8098 48



VITAL PHARMACEUTICALS INC. dba Bang Energy
c\o Corporate Creations Network Inc.
3260 N Hayden Road #210
Scottsdale AZ 85251

# ATTENTION

Please find the enclosed document.

## Distribution List

VITAL PHARMACEUTICALS INC. dba BANG ENERGY
1635 S. 43RD AVENUE
Phoenix AZ 85009

STELLAR GROUP INCORPORATED
c\o Corporation Service Company
8825 N 23rd Avenue Suite 100
Phoenix AZ 85021

JHO Real Estate Investment LLC
C\O Corporate Creations Network INC
3260 N. Hayden Rd #210
Scottsdale AZ 85251

STELLAR GROUP INCORPORATED
2900 HARTLEY ROAD
Jacksonville FL 32257

JHO REAL ESTATE INVESTMENT LLC
1600 N PARK DR
WESTON FL 33326

VITAL PHARMACEUTICALS INC. dba Bang Energy
c\o Corporate Creations Network Inc.
3260 N Hayden Road #210
Scottsdale AZ 85251



*To Whom It May Concern:*

*The sending of the following Preliminary Notice is prescribed by the construction lien laws of ARIZONA. <u>This is NOT a Lien</u> but a statutory requirement and needs to be done as a matter of law.*

*The sending of this notice should not reflect on the creditworthiness of FAITH TECHNOLOGIES, INC.'s customer or any other party to the project nor does it indicate any expected problem in the payment of FAITH TECHNOLOGIES, INC.'s invoices.*

*Sincerely,*

*FAITH TECHNOLOGIES, INC.*
*225 MAIN STREET*
*MENASHA, WI 54952*
*Contact: MS. CONNIE BRETL*
*Telephone: (920) 751 - 9863*

*File (N118112) 2056301*

**ARIZONA PRELIMINARY TWENTY DAY LIEN NOTICE**
PURSUANT TO A.R.S. SECTION 33-992
**IN ACCORDANCE WITH ARIZONA REVISED STATUTES SECTION 33-992.01, THIS IS NOT A LIEN.  THIS IS NOT A REFLECTION ON THE INTEGRITY OF ANY CONTRACTOR OR SUBCONTRACTOR**

The name and address of the owner or reputed owner are:
VITAL PHARMACEUTICALS, INC. DBA BANG
ENERGY
1635 S. 43RD AVENUE
PHOENIX, AZ 85009

VITAL PHARMACEUTICALS, INC. DBA BANG
ENERGY
C/O CORPORATE CREATIONS NETWORK INC.
3260 N HAYDEN ROAD #210
SCOTTSDALE, AZ 85251

JHO REAL ESTATE INVESTMENT, LLC
1600 N PARK DR
WESTON, FL 33326

JHO REAL ESTATE INVESTMENT, LLC
C/O CORPORATE CREATIONS NETWORK INC.
3260 N HAYDEN ROAD #210
SCOTTSDALE, AZ 85251

The name and address of lessee or reputed leasehold interest
is:

The name and address of the original contractor are:
STELLAR GROUP, INCORPORATED
2900 HARTLEY ROAD
JACKSONVILLE, FL 32257

STELLAR GROUP, INCORPORATED
C/O CORPORATION SERVICE COMPANY
8825 N 23RD AVENUE, SUITE 100
PHOENIX, AZ 85021

The name and address of any lender or reputed lender and or
assigns are:

UNABLE TO DETERMINE. A REQUEST IS INCLUDED
HEREIN PER A.R.S. 33-992.01.

The name and address of the person with whom the claimant
has contracted are:
STELLAR GROUP, INCORPORATED
2900 HARTLEY ROAD
JACKSONVILLE, FL 32257

The name and address of any surety company/agent are:

UNABLE TO DETERMINE. A REQUEST IS INCLUDED
HEREIN PER A.R.S. 33-992.01.

*We request a copy of the bond, if applicable.*

Date:  FEBRUARY 12, 2021 (Notice #N118112)
This preliminary lien notice has been completed (Name and
Address of Claimant):

For:
FAITH TECHNOLOGIES, INC.
225 MAIN STREET
MENASHA, WI 54952

By:
Michelle Gerred, Esq., #031678
PO Box 24101
Cleveland, OH 44124
(as limited agent for FAITH TECHNOLOGIES, INC.)



You are hereby notified that the Claimant has furnished or will
furnish labor, professional services, materials, machinery,
fixtures or tools of the following general description:

MATERIALS AND LABOR, ELECTRICAL
INSTALLATION

In the construction, alteration or repair of the building,
structure or improvement located at:

BANG ENERGY PHX CAN MANUFACTURING
1635 S. 43RD AVENUE
PHOENIX, AZ 85009

And situated upon that certain lot(s) or parcel(s) of land in
MARICOPA County, Arizona, described as follows:

1635 S. 43RD AVENUE
PHOENIX, AZ 85009

An estimate of the total price of the labor, professional
services, materials, machinery, fixtures or tools furnished or to
be furnished is:

$7,013,441.00

**NOTICE TO PROPERTY OWNER**

If bills are not paid in full for the labor, professional services, materials, machinery, fixtures or tools furnished, or to be furnished, a mechanic's lien leading to the loss, through court foreclosure proceedings, of all or part of your property being improved may be placed against the property.  You may wish to protect yourself against this consequence by either:

1)  Requiring your contractor to furnish a conditional waiver and release pursuant to Arizona Revised Statutes section 33-1008, subsection D, paragraphs 1 and 3 signed by the person or firm giving you this notice before you make payment to your contractor.



2)  Requiring your contractor to furnish an unconditional waiver and release pursuant to Arizona Revised Statutes section 33-1008, subsection D, paragraphs 2 and 4, signed by the person or firm giving you this notice after you make payment to your contractor.

3)  Using any other method or device that is appropriate under the circumstances.

Within ten days of the receipt of this preliminary twenty day notice the owner or other interested party is required to furnish all information necessary to correct any inaccuracies in the notice pursuant to Arizona Revised Statutes section 33-992.01, subsection I or lose as a defense any inaccuracy of that information.

Within ten days of the receipt of this preliminary twenty day notice if any payment bond has been recorded in compliance with Arizona Revised Statutes section 33-1003, the owner must provide a copy of the payment bond including the name and address of the surety company and bonding agent providing the payment bond to the person who has given the preliminary twenty day notice.  In the event that the owner or other interested party fails to provide the bond information within that ten day period, the claimant shall retain lien rights to the extent precluded or prejudiced from asserting a claim against the bond as a result of not timely receiving the bond information.

DATED:        FEBRUARY 12, 2021

FAITH TECHNOLOGIES, INC.

By: _____

Michelle Gerred, Esq., #031678
(as limited agent for FAITH TECHNOLOGIES, INC.)

-------------------------------------------------------------------------------

**ACKNOWLEDGEMENT OF RECEIPT OF PRELIMINARY TWENTY-DAY NOTICE**

This acknowledges receipt on ___ / ___ / ___ (date) of a copy of the preliminary twenty-day notice at

_____ (address).  Date: ___/___/___ (date this
acknowledgment was executed)

_____
Signature of person acknowledging receipt, with title if acknowledgment is made on behalf of another person)

Please note:  Arizona Revised Statutes, Section 33-992.02, provides that the acknowledgment be returned to the person or firm sending the Preliminary Twenty Day Notice (Michelle Gerred, Esq.) within thirty days of receipt thereof.

(Our Ref. N118112 2056301)