UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION
www.flsb.uscourts.gov

| | |
|---|---|
| In re: | Chapter 11 Cases |
| VITAL PHARMACEUTICALS, INC., *et al.*, | Case No.: 22-17842-PDR |
| Debtors. | (Jointly Administered) |
| _____/ | |

**DECLARATION OF JOHN C. DIDONATO, CHIEF
TRANSFORMATION OFFICER, IN SUPPORT OF DEBTORS' MOTION FOR
ENTRY OF AN ORDER AUTHORIZING AND APPROVING A KEY EMPLOYEE
RETENTION PLAN**

Under 28 U.S.C. § 1746, John C. DiDonato hereby declares as follows under the penalty of perjury:

1.      I am the Chief Transformation Officer ("CTO") of Vital Pharmaceuticals, Inc. ("VPX") and the other debtors and debtors in possession (together with VPX, the "Company" or the "Debtors") in the above-captioned cases (collectively, the "Chapter 11 Cases").  As such, I am familiar with the Debtors' day-to-day operations, businesses, and financial affairs.

2.      In addition to my current role with the Debtors, I am a Managing Director of Huron Consulting Services LLC ("Huron") and Huron's Business Advisory Capability Leader.  Huron is an operationally focused consulting firm that specializes in, among other things, bankruptcy and restructuring consulting, interim management, and financial and operational consulting to financially distressed companies.  I have more than 30 years of experience counseling companies through operational turnarounds, capital raising, buy and sell side advisories, merger integrations, and other financial consulting and bankruptcy assignments in both out-of-court and in-court situations.  I have served more than 100 debtors, functioning for many as a chief restructuring strategist.  My expertise encompasses a wide range of industries, including logistics, distribution,

transformation, automotive suppliers, aerospace suppliers, engineering and construction, metals, equipment leasing, and retail.

      3.      Except as otherwise specified herein, all the facts set forth in this declaration (the "Declaration") are based upon my personal knowledge, my discussions with members of the Debtors' management team and the Debtors' other advisors, my review of relevant documents and information concerning the Debtors' operations, financial affairs, and restructuring initiatives, or my opinions based upon my experience and knowledge. If called as a witness, I could and would testify competently to the facts set forth in this Declaration. I am authorized to submit this Declaration on behalf of the Debtors.

      4.      I submit this Declaration in support of the relief requested in the *Debtors' Motion for Entry of an Order Authorizing and Approving a Key Employee Retention Plan* (the "Motion").[1]

## THE KERP

      5.      As set forth in the Motion, under my direction and control, the Debtors have identified a number of key employees (the "KERP Participants") who are critical to the continued operation of the Debtors' business and, importantly, the success of the Chapter 11 Cases. The Debtors seek authority to implement the KERP and make the KERP Payments thereunder.

      6.      The aggregate amount of the KERP Payments is $2,766,835.79, with individual KERP Payments ranging from approximately $7,154.17 to $56,200.04 per participant, and averaging approximately $18,323.42.

      7.      Subject to each KERP Participant's continued employment with the Debtors on the applicable payment date, the KERP Payments will be paid as follows:

---

[1] Capitalized terms used but not defined herein have the meanings ascribed to such terms in the Motion.

      (a)     upon entry of the Order, KERP Participants shall be paid 25% of their individual aggregate KERP Payment;

      (b)     on March 31, 2023, KERP Participants shall be paid an additional 25% of their individual aggregate KERP Payment; and

      (c)     on the earlier of (x) the effective date of a plan of reorganization, or (y) the closing of a sale transaction, KERP Participants shall be paid the remaining balance of their respective KERP Payment.

8.     The proposed KERP also provides that if a KERP Participant's employment is terminated by the Debtors without cause or due to the KERP Participant's death/disability, then the KERP Participant shall be entitled to a pro-rata portion of his/her respective KERP Payment based on the number of days worked from the prior KERP Retention Date. In the event a KERP Participant resigns from his/her employment or is terminated by the Debtors for cause, then the KERP Participant shall not be eligible for any unpaid portion of his/her KERP Payment. Furthermore, in the event that a KERP Participant resigns from his/her employment or is terminated by the Debtors for cause, the Debtors shall maintain the right to recoup and claw back the initial KERP Payment made upon entry of the Order from such KERP Participant. Finally, any unused funds (e.g., payments earmarked for a particular KERP Participant who voluntarily resigns) may, after notice and consultation with the Committee, be allocated towards another KERP Participant absent further relief and in the Debtors' sole discretion, *provided that*, in no event shall the aggregate cost of the KERP exceed $2,766,835.79.

9.     The Debtors and their advisors, under my direction, worked diligently to narrowly tailor the KERP size and structure in line with the stated goals of the KERP of retaining and incentivizing the KERP Participants. As part of that effort, I compared the Debtors' proposed KERP to similar plans approved in comparable bankruptcy cases. Attached hereto as **Annex 1** is a chart showing the comparable plans I reviewed and indicating where the Debtors' proposed KERP falls within this range. Based on this information, I believe that the payments under the

proposed KERP are consistent with and well within the "market" for similar key employee retention plans approved in other chapter 11 cases based on revenue, employee count and asset value. Specifically, the revenue of the comparable companies for which retention plans were analyzed ranged from $2.1 billion to approximately $221.7 million, with an average revenue of approximately $813 million. The Debtors' revenue of approximately $728 million falls within one standard deviation of such average revenue. With respect to the cost of the retention plans analyzed as a percentage of the applicable company's revenue, the percentages for the comparable companies ranged from 1.28% to 0.02%, with an average of 0.24%. The cost of the Debtors' proposed KERP as a percentage of the Debtors' revenue is 0.38%, which is also within one standard deviation of the comparable retention plans. As such, I believe the proposed KERP is well within the range of reasonableness for comparable retention plans.

## THE KERP PARTICIPANTS

10.     The KERP Participants are comprised of approximately 151 non-senior management personnel currently employed by the Debtors. Working along with other members of the Debtors' management and their advisors, we selected the KERP Participants based on their status as critical, non-insider, hard-to-replace employees who are not members of senior management.

11.     The KERP Participants are employed across nearly all the Debtors' business divisions, including, finance, operations, supply chain, IT, legal, and others. The KERP Participants have also developed valuable institutional knowledge regarding the Debtors' ongoing business operations, and many have longstanding relationships with the Debtors' vendors and customers that would be difficult and expensive to replace. I believe that preserving this institutional knowledge and these relationships is crucial to the efficient administration of the

Debtors' operations, the preservation of the value of the Debtors' estates, and, ultimately, the successful administration of the Chapter 11 Cases.

12.      It is my understanding that none of the KERP Participants is an "insider" as such term is defined in section 101(31) of the Bankruptcy Code. *First*, none of the KERP Participants has discretionary control over any substantial budgetary amounts or the ability to dictate company policy. *Second*, although certain of the KERP Participants hold a title of "manager" or "director," such employees must obtain approval from senior management before taking any action with respect to the disposition of significant assets. *Third*, none of the KERP Participants is an officer, member of the Debtors' board of directors, or participates in the Debtors' corporate governance. *Finally*, none of the KERP Participants had any input on any aspect of the KERP or its ultimate formulation.  In addition, it is my understanding that none of the KERP Participants are related to Jack Owoc, the founder and chief executive officer of the Debtors.

## THE NEED FOR THE KERP

13.      The Debtors seek to implement the KERP to motivate the KERP Participants to remain employees with the Debtors during the Chapter 11 Cases and to ensure that the Debtors do not continue to suffer further employee attrition and turnover, thus negatively impacting the Debtors' operations and the value of their estates.

14.      The Debtors have incurred significant employee losses both prior to and following the Petition Date.  Specifically, a significant number of the Debtors' employees departed in the months leading up to the Petition Date, demonstrating perceived uncertainty among the Debtors' employees regarding their job security leading up to the commencement of the Chapter 11 Cases.[2]

---

[2] Certain of these departures were voluntary, others occurred in connection with an internal restructuring initiative that was implemented by the Debtors in July and August of 2022.

Furthermore, since the Petition Date, an additional 41 employees have voluntarily resigned from their employment with the Debtors, representing over 3% of the Debtors' overall workforce of 1,105 employees as of the Petition Date. The collective impact of these pre- and post-petition departures has led to a high degree of uncertainty among the Debtors' employees, which has, in turn, impacted overall employee morale and productivity.

15.     Further impacting morale and potentially compromising retention on a go-forward basis, all of the KERP Participants have been called upon to undertake supplementary responsibilities in connection with the Chapter 11 Cases. These additional duties have impacted KERP Participants across nearly all departments. For example:

- KERP Participants in the finance, sales, operations, and legal departments have been called upon to address concerns raised by the Debtors' customers and distributors relating to the Debtors' bankruptcy cases and the impact the cases may have on their ongoing relationship with the Debtors.

- KERP Participants in the finance, operations, supply chain, IT, legal, human resources, and warehouse divisions have been called upon to inform suppliers and other key vendors of the Debtors' bankruptcy cases and to allay any concerns these suppliers and vendors may have as to their ongoing relationship with the Debtors.

- KERP Participants in the finance, legal, operations and supply chain departments have been asked to negotiate with the Debtors' suppliers and vendors to ensure the continued provisions of critical goods and services necessary to sustain Debtors' business during the Chapter 11 Cases.

- KERP Participants in nearly all departments, including legal, finance, IT, supply chain, warehouse, human resources and operations, have been asked to compile and

analyze financial data in order to comply with the Debtors' various reporting obligations under the Bankruptcy Code, as well as to analyze hundreds of contracts and leases with, among others, customers, distributors, and landlords to determine whether such contracts or leases should be assumed or rejected in the Chapter 11 Cases.

16.     Thus, the workloads of all KERP Participants have been directly impacted by these Chapter 11 Cases.

17.     Absent approval of the KERP, I believe the Debtors will continue to see additional and significant employee turnover during the pendency of the Chapter 11 Cases, including from those individuals identified as KERP Participants, who may opt to depart their employment in the face of the additional workload and perceived uncertainty as a result of the Chapter 11 Cases. Further employee losses would detrimentally impact the Debtors' restructuring efforts, strain the Debtors' limited resources even further, and could impact the value of the estates.  In sum, I believe the KERP (a) will motivate and retain the KERP Participants throughout the Chapter 11 Cases, (b) provides the KERP Participants with market-level retention payments for companies in chapter 11, and (c) helps ensure that the Debtors' anticipated business needs will be met during the pendency of the Chapter 11 Cases, preserving value for all stakeholders.

## CONCLUSION

18.    Based on the foregoing, my experience, and the terms and provisions of the KERP, I believe that the KERP is reasonable, appropriately designed, and narrowly-tailored to incentivize the KERP Participants for the benefit of the Debtors, their stakeholders, and the successful administration of these Chapter 11 Cases.

Dated: November 14, 2022.

/s/ *John C. DiDonato*
John C. DiDonato
Chief Transformation Officer

**Annex 1**

**KERP Comparables**

| Company | Industry | Bankruptcy Filing Date | Eligible Employees | Total KERP Payments | Average KERP Payment Per Eligible Employee | Annual Revenue Amount | Total KERP (% of Annual Revenue) | Debtor Assets Amount | Total KERP (% of Assets) |
|---|---|---|---|---|---|---|---|---|---|
| Celsius Network | Financial Services | 7/13/2022 | 62 | $ 2,760,000 | $ 44,516.1 | $ 800,000,000 | 0.35% | $ 4,310,000,000 | 0.06% |
| Town Sports International LLC | Fitness and Sports Clubs | 9/14/2020 | 135 | $ 1,500,000 | $ 11,111.1 | $ 434,261,294 | 0.35% | $ 106,454,879 | 1.41% |
| RTW Retailwinds, Inc. | Retail | 7/13/2020 | 18 | $ 625,000 | $ 34,722.2 | $ 826,990,000 | 0.08% | $ 411,984,000 | 0.15% |
| Tuesday Morning Corporation | Retail | 5/27/2020 | 48 | $ 887,510 | $ 18,489.8 | $ 1,006,844,346 | 0.09% | $ 587,571,093 | 0.15% |
| The McClatchy Company | Media | 2/13/2020 | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| Fairway Group Holdings, Corp. | Consumer Staples | 1/23/2020 | 27 | $ 1,152,781 | $ 42,695.6 | $ 643,300,000 | 0.18% | $ 158,867,000 | 0.73% |
| Celadon Group, Inc | Transportation | 12/8/2019 | 43 | $ 736,093 | $ 17,118.4 | N/A | N/A | $ 427,000,000 | 0.17% |
| Legacy Reserves Inc. | Oil & Gas | 6/18/2019 | 32 | $ 1,435,184 | $ 44,849.5 | $ 554,861,000 | 0.26% | $ 1,474,931,000 | 0.10% |
| FTD Companies, Inc. | Consumer Discretionary | 6/3/2019 | 68 | $ 1,930,000 | $ 28,382.4 | $ 1,014,244,000 | 0.19% | $ 312,700,000 | 0.62% |
| Bristow Group Inc | Oil & Gas | 5/11/2019 | 84 | $ 2,845,708 | $ 33,877.5 | $ 221,676,000 | 1.28% | $ 764,863,000 | 0.37% |
| Cloud Peak Energy, Inc. | Oil & Gas | 5/10/2019 | 54 | $ 1,236,748 | $ 22,902.7 | $ 832,405,000 | 0.15% | $ 928,656,000 | 0.13% |
| PHI, Inc. | Transportation | 3/12/2019 | 52 | $ 3,466,647 | $ 66,666.3 | $ 325,978,098 | 1.06% | $ 1,314,227,772 | 0.26% |
| Aceto Corporation | Chemicals | 2/20/2019 | 26 | $ 4,910,000 | $ 188,846.2 | $ 682,970,000 | 0.72% | $ 753,159,000 | 0.65% |
| Charlotte Russe Holding, Inc. | Retail | 2/3/2019 | 32 | $ 630,518 | $ 19,703.7 | $ 795,500,000 | 0.08% | N/A | N/A |
| Gymboree Group, Inc. | Consumer Discretionary | 1/17/2019 | 17 | $ 650,000 | $ 38,235.3 | $ 785,294,118 | 0.08% | $ 303,409,091 | 0.21% |
| Welded Construction, L.P. | Construction / Oil & Gas | 10/22/2018 | 69 | $ 1,172,000 | $ 16,985.5 | $ 835,070,240 | 0.14% | $ 3,268,969 | 35.85% |
| Brookstone Inc (2018) | Retail | 8/2/2018 | 25 | $ 392,023 | $ 15,680.9 | $ 264,000,000 | 0.15% | N/A | N/A |
| AcuSport Corporation | Consumer Products | 5/1/2018 | 40 | $ 444,191 | $ 11,104.8 | N/A | N/A | $ 30,946,067 | 1.44% |
| Nine West Holdings, Inc. | Retail | 4/6/2018 | 51 | $ 655,000 | $ 12,843.1 | $ 1,770,000,000 | 0.04% | $ 354,400,000 | 0.18% |
| Claire's Stores, Inc. | Consumer Discretionary | 3/19/2018 | 29 | $ 998,231 | $ 34,421.8 | $ 1,337,610,000 | 0.07% | $ 2,000,723,000 | 0.05% |
| Appvion, Inc. | Industrial Products | 10/1/2017 | 42 | $ 1,000,000 | $ 23,809.5 | $ 529,700,000 | 0.19% | $ 381,000,000 | 0.26% |
| Ignite Restaurant Group, Inc. | Restaurant, Food & Beverage | 6/6/2017 | 27 | $ 306,000 | $ 11,333.3 | $ 492,044,000 | 0.06% | $ 207,371,000 | 0.15% |
| Marsh Supermarkets, LLC | Retail | 5/11/2017 | 16 | $ 160,228 | $ 10,014.3 | $ 727,117,398 | 0.02% | $ 94,665,608 | 0.17% |
| Ciber, Inc. | IT Services | 4/9/2017 | 17 | $ 407,891 | $ 23,993.6 | $ 610,000,000 | 0.07% | $ 334,327,000 | 0.12% |
| Gordmans Stores, Inc. | Consumer Discretionary | 3/13/2017 | 21 | $ 120,000 | $ 5,714.3 | $ 610,500,000 | 0.02% | $ 274,000,000 | 0.04% |
| Gander Mountain Company, Inc. | Consumer Discretionary | 3/10/2017 | 37 | $ 2,545,000 | $ 68,783.8 | $ 1,323,000,000 | 0.19% | $ 928,221,117 | 0.27% |
| RadioShack Corporation | Retail | 2/5/2015 | 30 | $ 1,000,000 | $ 33,333.3 | $ 2,100,000,000 | 0.05% | $ 1,200,300,000 | 0.08% |

**Benchmarks**

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| *Median* | | | | $ | $ 23,901.6 | $ 756,205,758 | 0.14% | $ 396,492,000 | 0.18% |
| *Mean* | | | | $ | $ 33,851 | $ 813,473,562 | 0.24% | $ 735,960,233 | 1.82% |
| *Standard Deviation* | | | | $ | $ 34,904 | $ 438,026,257 | 0.32% | $ 895,208,140 | 7.11% |
| *One Standard Deviation Below Average* | | | | $ | $ (1,053) | $ 375,447,305 | -0.07% | $ (159,247,907) | -5.29% |
| *One Standard Deviation Above Average* | | | | $ | $ 68,755 | $ 1,251,499,819 | 0.56% | $ 1,631,168,373 | 8.93% |

**Debtors' KERP Proposal**

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Vital Pharmaceuticals, Inc. | Food and Beverage | 10/10/2022 | 151 | $ 2,766,836 | $ 18,323.4 | $ 728,296,049 | 0.38% | $ 649,215,639 | 0.43% |