UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION
www.flsb.uscourts.gov

| | |
|---|---|
| IN RE: | Chapter 11 |
| VITAL PHARMACEUTICALS, INC., *et al.*, | Case No. 22-27842 (PDR) |
| Debtors.[1] | (Jointly Administered) |

**DECLARATION OF BRENT C. WILLIAMS IN SUPPORT OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS' OBJECTION TO DEBTORS' EMERGENCY MOTION FOR INTERIM AND FINAL ORDERS (I) APPROVING POSTPETITION FINANCING, (II) AUTHORIZING USE OF CASH COLLATERAL, (III) GRANTING LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (IV) GRANTING ADEQUATE PROTECTION, (V) MODIFYING AUTOMATIC STAY, (VI) SCHEDULING A FINAL HEARING, AND (VII) GRANTING RELATED RELIEF**

Under 28 U.S.C. § 1746, Brent C. Williams hereby declares as follows under the penalty of perjury:

1. I am the Co-Head of the Capital Advisory Group at Lincoln Partners Advisors LLC ("Lincoln"), a financial advisory firm retained by the Official Committee of Unsecured Creditors (the "Committee") in these chapter 11 cases (the "Chapter 11 Cases"). Lincoln has expertise in operational and financial restructurings, mergers and acquisitions (M&A) and capital raising services to stakeholders in stressed and distressed situations.

2. I submit this declaration ("Declaration") on behalf of the Committee and in support of its Objection to the Debtors' Emergency Motion for Interim and Final Orders (I)

---

[1] The address of the Debtors is 1600 N. Park Drive, Weston, FL 33326. Tire last four digits of the Debtors' federal tax identification numbers are: (i) Vital Pharmaceuticals, Inc. (8430); (ii) Bang Energy Canada. Inc. (5454); (iii) JHO Intellectual Property Holdings, EEC (0010); (iv) JHO Real Estate Investment, EEC (9394); (v) Quash Seltzer, EEC (6501); (vi) Rainbow Unicom Bev EEC (2254); and (vii) Vital Pharmaceuticals International Sales, Inc. (8019).

Approving Postpetition Financing, (II) Authorizing Use of Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, (VI) Scheduling A Final Hearing, and (VII) Granting Related Relief [Docket No. 24] (the "<u>DIP Motion</u>").[2]

3. Lincoln has been retained by the Committee as its financial advisor in these Chapter 11 Cases. In connection with its engagement, Lincoln has been asked to (i) research and analyze the Debtor's governance structure and the relationships between Dr. Guillermo Escalante and Eric Hillman (together, the "<u>Directors</u>"), the Company, and John Owoc, and (b) review and analyze the proposed DIP Facility (defined below) and opine on the reasonableness of the proposed adequate protection. Based on my review of the relevant research, my understanding of the available information and my experience, it is my opinion that (i) it appears that the Directors are, in fact, closely affiliated with the Company and with Mr. Owoc personally, and (ii) the adequate protection is not fair, reasonable, or in line with the market.

4. Unless otherwise indicated, all facts set forth in this Declaration are based upon information learned from my review of relevant documents, information supplied by members of the Company's management, other members of Lincoln's engagement team or the Committee's other advisors, my personal knowledge gleaned during the course of my engagement with the Committee, or my opinion informed by my experience, knowledge, and information concerning the Company's operations, financial affairs, and the proposed DIP Facility.

5. If called upon to testify, I could and would testify competently to the facts set forth herein on that basis.

---

[2] Capitalized or referenced terms used but not defined herein shall have the meanings given to them in the Committee's DIP Objection.

6. I am not being compensated for this testimony other than through payments received by Lincoln as a professional retained by the Committee; none of those payments are contingent upon the opinions or conclusions I reach, nor the outcome of this action.

## I. Qualifications and Experience.

7. Lincoln's practice consists of senior financial, management consulting, accounting, and other professionals who specialize in providing restructuring, transaction advisory, litigation support, solvency, and valuation assistance and providing a focus on viable solutions that maximize value for companies and creditors, typically in distressed business settings. Lincoln has acted as financial advisor, crisis manager, and corporate officer in middle market to large multinational restructurings across a wide array of industries. Lincoln's services include forensic analysis, plan development and implementation, and advice on sale/merger transactions.

8. In addition to numerous out-of-court restructuring situations, Lincoln and its professionals have been actively involved in major chapter 11 cases. *See, e.g., In re Benevis Corp.*, No. 20-33918 (Bankr. S.D. Tex. Aug. 2, 2020), ECF No. 348 (order authorizing employment of Lincoln as investment banker to the debtors); *In re Pyxus Int'l, Inc.*, No. 20-11570 (Bankr. D. Del. June 15, 2020), ECF No. 373 (order authorizing employment of Lincoln as financial advisor to the official committee of equity security holders); *In re Valeritas Holdings, Inc.*, No. 20-10290 (Bankr. D. Del. Feb. 9, 2020), ECF No. 176 (order authorizing employment of Lincoln as investment banker to the debtors); *In re Dura Auto. Sys., LLC*, No. 19-12378 (Bankr. D. Del. Dec. 19, 2019), ECF No. 453 (order authorizing employment of Lincoln as financial advisor and investment banker to the official committee of unsecured creditors); *In re PG&E Corp.*, No. 19-30088 (Bankr. N.D. Cal. May 10, 2019), ECF No. 1976 (order authorizing employment of Lincoln as financial advisor to the official committee of tort claimants); *In re EO*

*Liquidating, LLC (f/k/a E. Outfitters)*, No. 17-10243 (Bankr. D. Del. Mar. 3, 2017), ECF No. 173 (order authorizing employment of Lincoln as investment banker to the Debtors); *In re CRS Reprocessing, LLC*, No. 17-32565 (Bankr. W.D. Ky. Aug. 9, 2017), ECF No. 137 (order authorizing employment of Lincoln as investment banker to the Debtors); *In re Visteon Corp., et al.*, No. 09-11786 (Bankr. D. Del. 2009) (order authorizing employment of Lincoln as investment banker to the official committee of unsecured creditors as co-advisor along with the committee's retained financial advisor).

9. For over 25 years I have provided advisory on operational and financial restructurings, M&A and capital raising services to stakeholders in stressed and distressed situations. I advise companies, lenders, creditors, directors, unions, and government agencies. I am responsible for sourcing, structuring and executing debt and equity restructurings, recapitalizations, distressed capital raises and distressed sell-side and buy-side assignments. In addition, I leverage extensive lender relationships to deliver strategic, bespoke financing alternatives for clients requiring structured or specialized financing solutions.

10. I have been involved in numerous in- and out-of-court restructurings, including, among others, PG&E Corp., Wholesome Sweeteners, Smile America, Chassix Corp., SkyMall, AES Technologies, Allen's Food, Comprehensive Clinical Devices, ClearEdge Power, KV Pharmaceuticals, Real Mex Restaurants, Seahawk Drilling, Sexy Hair Concepts, Visteon Corp., MMFX Steel, SK Foods, Idearc. Corp., Philadelphia Newspapers, Dura Automotive, Citation Corp, Global Power Energy, Stelco Inc., Philip Services Corp., Supra Telecom, Touch America Inc., Focal Communications, and GenTek Inc. I earned a Bachelor of Commerce (with honors) from Carleton University, and I am a certified public accountant.

11. My curriculum vitae, attached hereto as **Exhibit A**, summarizes my qualifications and professional experience.

## II. The DIP Facility Background

### A. The Company's Governance Structure

12. Historically, John Owoc (the founder and sole shareholder of the Company) had served as the sole director or member, as well as the Chief Executive Officer or managing member, as applicable, of the each of the Debtor entities. *See* DiDonato Decl. ¶ 23. Under the Prepetition Credit Agreement, the DIP Lenders required, as a condition precedent to funding the loans thereunder, (i) Mr. Owoc's expansion of the boards of directors or other equivalent governing body (collectively, the "Board") of each of the Debtor entities to include five directors, and (ii) the inclusion on the Board of a one-person restructuring committee (the "Restructuring Committee") with authority to, at a minimum, make recommendations to the Board regarding all aspects of the Chapter 11 Case. *See* DIP Credit Agreement § 3.1(b)(iii), Docket No. 24, Exhibit B.

13. The DiDonato Declaration goes on to state that Mr. Owoc intended to expand the Board by adding Kathleen Cole (the Company's Chief Operating Officer) and constitute the Restructuring Committee comprised solely of Mr. Panagos (the Board's third member) to be charged with "overseeing the restructuring process." *See* DiDonato Decl. ¶ 23. Predictably, however, such oversight is limited to the Restructuring Committee's ability to merely make recommendations to the full board with respect to the restructuring process and the Chapter 11 Cases. *See* DiDonato Decl. ¶ 23.

### B. Adequate Protection

14. The proposed DIP Financing consists of a $455 million DIP facility from the Debtors' Prepetition Lenders (the "DIP Facility"), of which $100 million is new-money and

-5-

$354,770,201.56 worth of Prepetition Facility Obligations is rolled up into postpetition DIP Obligations (the "Roll-Up"). The Roll-Up consists of: (i) a prepetition advance of approximately $60 million from the Prepetition Lenders to the Debtors and (ii) a "creeping" rollup where the Debtors would pay down the Prepetition Obligations with postpetition collections and draw on the DIP Facility for liquidity

15. Under the proposed DIP Facility, the Debtors seek to provide adequate protection in the form of superpriority administrative expense claims and liens (excluding all proceeds or property recovered in connection with the Prepetition Avoidance Actions), as well as the monthly payment of postpetition accrued interest and fees. Specifically, the adequate protection package includes monthly payments to the Prepetition Agent in an amount equal to the interest accrued on or after the Petition Date under the Prepetition Credit Agreement for such month at the Default Rate (as defined therein) as the applicable reference rate and giving effect to any future increases in the applicable rate of interest after the Petition Date as set forth in the Prepetition Credit Agreement. Accordingly, although at the time of the filing of the DIP Motion, the applicable margin for purposes of adequate protection was 8.50%, such rate increases by 50 bps per month. *See* Interim DIP Order, ¶ 11–15, Docket No. 24; *see also* DIP Credit Agreement, § 2.14.

### III. The Relationship Between the Company, Mr. Owoc, and the Directors

16. In order to determine the extent of any preexisting relationships between the Company, Mr. Owoc, and the Directors, the Lincoln team reviewed various social media platforms such as, Instagram, Facebook, Twitter, Tik Tok and YouTube. Lincoln checked to see if Bang Energy or Jack Owoc accounts (on the related platform) were following an account related to the Directors and if they were tagged in any posts or mentioned in any comments. Lastly, Lincoln conducted key word searches on Google to find any incremental information.

17. Based on my review of the relevant research and my understanding of the available information, the facts set forth below indicate that the Directors are, in fact, closely affiliated with the Company and with Mr. Owoc personally.

18. <u>Dr. Guillermo Escalante.</u>  The Company has a history of paying Dr. Escalante personally for various services.  In connection with the trial and arbitration involving Orange Bang, Inc. ("<u>OBI</u>") and Monster Energy Company ("<u>Monster</u>"), which resulted in, *inter alia*, a $175 million disgorgement award in favor of Monster and OBI (*see* DiDonato Decl. at ¶ 34), the arbitrator noted that the Company paid Dr. Escalante to act as "its most important expert" on the question of whether the product at issue was "creatine-based"—a claim that was adjudicated during the litigations to be specious.[3]  Indeed, in those litigations, both OBI and Monster raised similar concerns about Dr. Escalante's ability to act as an unbiased and untainted "expert." Specifically, OBI and Monster raised issues of bias because Dr. Escalante had rendered services to the Company as an influencer and promoter of the Company's products.[4]  He also testified that he previously served as an "expert" on creatine on behalf of the Company in another matter.[5]  In addition, Dr. Escalante has posted on multiple occasions on social media extolling the Company, including making claims found by the arbitrator or court to be false.[6]

19. In addition to his work testifying for and promoting the Company, Dr. Escalante is also, evidently, a paid consultant to the Company.  In August 2020, Dr. Escalante, with various other authors, published an article on the effects of certain of the Company's

---

[3] *See Orange Bang, Inc. and Monster Energy Co. v. Vital Pharms., Inc.,* AAA No. 01-20-0005-6081, Final Arb. Award Phase 1 and Phase 2 at 51 n. 11 (Commercial Arbitration Tribunal), a true and correct copy is attached hereto as **Exhibit B**.

[4] *See* Exhibit B at 51 n. 11.

[5] *See* Trial Tr. at 176:22–25, Sept. 20, 2022, *Monster Energy Co. v. Vital Pharms., Inc., et al.*, No. EDCV18-1882 (C.D. Cal.), relevant portions of the true and correct copy are attached hereto as **Exhibit F**.

[6] True and correct copies of Dr. Escalante's social media posts are attached hereto as **Exhibit C**.

products.[7] The article expressly admits that Dr. Escalante is a paid consultant and has served as a "scientific consultant" for the Company.[8] Mr. Owoc is well-aware of this; he has posted to his Instagram account about Dr. Escalante and a "study" he purportedly performed on the Company's products.[9] Indeed, at the recent trial on September 20, 2022, Dr. Escalante himself testified that he had worked as a consultant for the Company on "an on-and-off basis" for three years.[10]

20.  Eric Hillman.  Mr. Hillman served as Chief Executive Officer of Europa Sports Partners, LLC ("Europa").  It is undisputed that Europa has acted—and may still be acting as—a major distributor of the Company's Bang energy drinks.[11]  It is unclear from publicly available information whether Mr. Hillman is still employed at Europa. Mr. Hillman also has a personal relationship with Mr. Owoc.  During a trial in 2020 involving the Company, Monster, and Reign Beverage Company, LLC, Mr. Owoc testified that Mr. Hillman is "a buddy of [his who] owns Europa Sports, which is the biggest sports nutrition distributor in the world.  We've done probably hundreds of millions of dollars with them."[12] Mr. Owoc also listed Mr. Hillman as a personal reference on his application for the Company's liquor license in Georgia in August 2021.[13]  And, like Dr. Escalante, Mr. Hillman has promoted the Company on social media on multiple occasions, repeating claims found to be false during the litigations, and engaging in public

---

[7] *See* Patrick S. Harty, et al, *Effects of Bang® Keto Coffee Energy Drink on Metabolism and Exercise Performance in Resistance-Trained Adults: A Randomized, Double-blind, Placebo- controlled, Crossover Study*, J. of the Int'l Society of Sports Nutrition (2020), a true and correct copy is attached hereto as **Exhibit D**.

[8] *See* Exhibit D.

[9] *See* Jack Owoc (@bangenergy.ceo), INSTAGRAM, https://www.instagram.com/bangenergy.ceo (Sept. 29, 2020), true and correct copies of Mr. Owoc's social media posts are attached hereto as **Exhibit E**.

[10] *See* Exhibit F at 175:6–14.

[11] *See Imran v. Vital Pharms., Inc.*, No. 18-cv-05758, 2019 WL 1509180, at *4 (N.D. Cal. Apr. 5, 2019), attached hereto as **Exhibit G**.

[12]  *See* Trial Tr. at 1050:13–15, Sept. 1, 2020, *Monster Energy Co. and Reign Beverage Co., LLC*, No. 19-60809-CIV (S.D. Fla.), relevant portions of the true and correct copy are attached hereto as **Exhibit H**.

[13] *See Agenda Item Rep.*, Item No. 21-417 (Aug. 12, 2021), a true and correct copy is attached hereto as **Exhibit I**.

conversations on social media with Mr. Owoc in support of the Company, during one of which Mr. Owoc discusses going to Mr. Hillman's home.[14]

### IV. The Adequate Protection Interest Payments are Excessive

21. While the Committee recognizes that providing adequate protection is necessary to provide the DIP Lenders with the same level of protection they would have had in the absence of any postpetition financing, certain aspects of the adequate protection sought by the DIP Motion protection disproportionately enrich the DIP Lenders to the detriment of the Debtors' estates and other stakeholders.

22. Specifically, the interest payable to the DIP Lenders and DIP Agent under the DIP Facility are excessive. Notably, the adequate protection fees that were added into the Prepetition Credit Agreement through the fifth amendment just prior the commencement of the Chapter 11 Cases, provides for a "ticking" interest rate on the prepetition debt that increases 50 basis points each month. This interest compounds into an extra $1.3 million payment to the DIP Lenders through the projected end of the seven months of DIP Financing, and provides relief not ordinarily found in other adequate protection packages. If less of the prepetition amount is rolled-up, the ticking fee results in extra interest to the DIP Lenders of approximately $3.0 million. Because of this 50 basis points increase every month, by May 2023, the interest rate of the prepetition debt is estimated to be 19.10% compared to that of the DIP at 12.86%.

---

[14] *See* Jack Owoc (@bangenergy.ceo), INSTAGRAM, https://www.instagram.com/bangenergy.ceo (July 17, 2016), Exhibit E at 2.

## V. Conclusions

23. Based on my review of the relevant research, my understanding of the available information and my experience, it is my opinion that (i) it appears that the Directors are closely affiliated with the Company and with Mr. Owoc personally, and (ii) the adequate protection payments are not fair or reasonable.

Dated: November 28, 2022
      New York, New York

*Brent C. Williams*
Brent C. Williams

-10-