Page 1

1

2                  UNITED STATES BANKRUPTCY COURT

                    SOUTHERN DISTRICT OF FLORIDA

3

4

5    IN RE:                     CASE NO. 22-17842-PDR

6    VITAL PHARMACEUTICALS, INC.,

7              Debtor.

     _____/

8

9              ECF #358, 365, 366, 375, 408

10                   December 6, 2022

11             The above-entitled cause came on for hearing

12   before the Honorable Peter D. Russin, one of the Judges in

13   the UNITED STATES BANKRUPTCY COURT, in and for the

14   SOUTHERN DISTRICT OF FLORIDA, at 299 E. Broward Blvd.,

15   Fort Lauderdale, Broward County, Florida, on December 6,

16   2022, commencing at or about 10:00 a.m., and the following

17   proceedings were had.

18

19

20

21

22

23             Transcribed from a digital recording by:

                    Cheryl L. Jenkins, RPR, RMR

24

25

1
                    APPEARANCES VIA ZOOM:
2
3                    BERGER SINGERMAN, by
                     JORDI GUSO, Esquire
4                   MICHAEL NILES, Esquire
                           and
5                   LATHAM & WATKINS, by
                    ANDREW SORKIN, Esquire
6                  AMY QUARTAROLO, Esquire
                    HUGH MURTAGH, Esquire
7                 On behalf of the Debtor
8
                     AKERMAN, LLP, by
9              MICHAEL I. GOLDBERG, Esquire
                           and
10         PACHULSKI STANG ZIEHL & JONES, by
                 RICHARD PACHULSKI, Esquire
11               ROBERT FEINSTEIN, Esquire
               On behalf of Monster Energy
12
13                    SEQUOR LAW, by
                   LEYZA BLANCO, Esquire
14                         and
                  LOWENSTEIN SANDLER, by
15                 ERIC CHAFETZ, Esquire
                  JEFFREY COHEN, Esquire
16             On behalf of the Official
              Committee of Unsecured Creditors
17
18
           MARKOWITZ RINGEL TRUSTY & HARTOG, by
19               JERRY MARKOWITZ, Esquire
                           and
20                   LEWIS ROCA, by
                  ROBERT CHARLES, Esquire
21           On behalf of Faith Technologies
22
                    SHUTTS BOWEN, by
23                HARRIS KOROGLU, Esquire
                           and
24                MOORE & VAN ALLEN, by
                  LUIS LLUBERAS, Esquire
25             On behalf of Truist Bank

1
              CONTINUED APPEARANCES VIA ZOOM
2
3
          J. STEVEN WILKES, Trial Attorney
    GUY VAN BAALEN, Assistant United States Trustee
4
            Office of the U.S. Trustee
             Department of Justice
5
6
             FURR & COHEN, by
           ROBERT FURR, Esquire
7
                and
       GIBSON DUNN & CRUTCHER, by
8
         RUSS FALCONER, Esquire
        MATTHEW BOUSLOG, Esquire
9
     On behalf of American Bottling Company
10
11
        KOZYAK TROPIN THROCKMORTON, by
         DAVID SAMOLE, Esquire
12
                and
          FRANK/DECKER, by
13
       JOE FRANK KLEINMAN, Esquire
        On behalf of PepsiCo, Inc.
14
15
       FENDER BOLLING AND PAIVA, by
        G. STEVEN FENDER, Esquire
16
                and
          KTBS LAW, by
17
          NIR MAOZ, Esquire
      On behalf of Orange Bang, Inc.
18
19
             AGENTIS, by
        ROBERT CHARBONNEAU, Esquire
20
      On behalf of Stellar Group, Inc.
21
22
23
24
25

1              CONTINUED APPEARANCES VIA ZOOM

2                      ALSO PRESENT

3                     Brent Williams

4                     John D'Amico

5                      Marc Kesten

6        ECRO - Electronic Court Reporting Operator

7                   - - - - - - -

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  Good morning everybody.  Calling

2    Vital Pharmaceuticals, 22-17842.

3          We'll go through the appearance process, I

4    suppose, in the order that I see you all on the screen.

5    So let's start with Mr. Sorkin.

6          If your video is not on, I'm going to assume

7    you don't want to make an appearance.

8          Mr. Sorkin.

9          MR. SORKIN:  Thank you, your Honor.

10         For the record, Andrew Sorkin, Latham &

11   Watkins, on behalf of the debtors.  I'm joined this

12   morning by my colleagues Amy Quartarolo and Hugh Murtagh.

13         THE COURT:  Ms. Blanco.

14         MS. BLANCO:  Good morning, your Honor.

15   Leyza Blanco, of Sequor Law, on behalf of the committee,

16   as proposed local counsel to the committee.

17         THE COURT:  Mr. Goldberg.

18         MR. GOLDBERG:  Good morning, your Honor.

19   Michael Goldberg on behalf of Monster Energy Corp., and my

20   co-counsel of Pachulski Stang, will make their own

21   appearance shortly.

22         THE COURT:  Thank you.

23         Mr. Feinstein.

24         MR. FEINSTEIN:  Good morning, your Honor.

25   Robert Feinstein, Pachulski Stang Ziehl & Jones for

1    Monster Energy.

2                    THE COURT:  Mr. Cohen.

3                    MR. COHEN:  Good morning, your Honor.

4    Jeffrey Cohen, Lowenstein Sandler, proposed counsel for

5    the committee.

6                    With me as well is my partner, Eric Chafetz,

7    as well as a representative of Lincoln International, our

8    proposed financial advisor, Brent Williams, and a

9    representative of our proposed investment banker,

10   Miller Buckfire, John D'Amico.

11                   THE COURT:  Thank you.

12                   Mr. Samole.

13                   MR. SAMOLE:  Good morning, your Honor.

14   David Samole, of Kozyak Tropin & Throckmorton, on behalf

15   of -- local counsel for PepsiCo.

16                   Also here via Zoom is lead counsel for

17   PepsiCo, Joe Frank, of the Frank/Decker law firm.

18                   THE COURT:  Thank you.

19                   Mr. Wilkes, better camera, not so dark.

20                   MR. WILKES:  My apologies, your Honor, on

21   the camera.

22                   THE COURT:  No, no worries.

23                   MR. WILKES:  J. Steven Wilkes for the United

24   States Trustee.  Also appearing for the United

25   States Trustee is Assistant United States Trustee

1    Guy Van Baalen.  He may be on a blackout video though.

2                    THE COURT:  Okay.  Mr. Charbonneau.

3                    MR. CHARBONNEAU:  Good morning, your Honor.

4    Robert Charbonneau, with Agentis.  We're counsel for

5    Stellar Group.

6                    THE COURT:  Mr. Guso.

7                    MR. GUSO:  Sir, good morning, your Honor.

8    Jordi Guso, of Berger Singerman, along with the

9    Latham & Watkins firm.  We are counsel to the debtors.

10                    THE COURT:  Mr. Maoz.  Did I pronounce that

11    totally badly?  Sorry.

12                    MR. MAOZ:  You almost got it.  Good morning,

13    your Honor.  Nir Maoz, from KTBS Law, on behalf of

14    Orange Bang.  My co-counsel, Steven Fender, will make his

15    own appearance.

16                    THE COURT:  Thank you.

17                    Mr. Furr.

18                    MR. FURR:  Good morning, Judge.

19    Robert Furr, Furr Cohen, for American Bottling Company,

20    local counsel, and Russ Falconer will be on in a minute,

21    for American Bottling.

22                    THE COURT:  Thank you.

23                    Mr. Frank.

24                    (No verbal response.)

25                    THE COURT:  You're on mute.

1              MR. SAMOLE:  Your Honor, I did the

2    appearance for Mr. Frank.  He's of counsel for PepsiCo.

3              THE COURT:  All right.  Thank you,

4    Mr. Samole.

5              Mr. Lluberas.

6              MR. LLUBERAS:  Good morning, your Honor.

7    Luis Lluberas, L-l-u-b-e-r-a-s, of Moore & Van Allen,

8    counsel for Truist Bank, who is administrative agent under

9    the prepetition and postpetition credit facilities.

10             This morning I have with me local counsel,

11   Harris Koroglu, K-o-r-o-g-l-u, of the Shutts & Bowen firm.

12             THE COURT:  Thank you.

13             Mr. Falconer.

14             MR. FALCONER:  Good morning, your Honor.

15   Russ Falconer, with Gibson Dunn & Crutcher, we're counsel

16   to the American Bottling Company, and I'm here with my

17   colleague, Matt Bouslog this morning.

18             THE COURT:  All right.  Mr. Fender, I think

19   you've already appeared, but go ahead.

20             MR. FENDER:  Yes, your Honor.  This is

21   Steven Fender, for Orange Bang, Inc.

22             THE COURT:  Thank you.

23             Mr. Chafetz, I think you're already in.

24             Mr. Murtagh.

25             MR. MURTAGH:  Good morning, your Honor.  I'm

Page 9

1  Hugh Murtagh, from Latham & Watkins, on behalf of the

2  debtors, and my pro hac vice application is pending.

3            THE COURT:  Thank you.

4            Mr. Kesten.

5            MR. KESTEN:  Your Honor, Marc Kesten,

6  appearing as an individual creditor in this matter.

7            THE COURT:  All right.  Thank you.

8            Mr. Pachulski.

9            MR. PACHULSKI:  Thank you, your Honor.

10  Hopefully you can hear me.  I had to get off and get back

11  on because there was a problem with my mic.

12            THE COURT:  We can hear you.

13            MR. PACHULSKI:  Richard Pachulski -- thank

14  you so much, your Honor.

15            Richard Pachulski, of Pachulski Stang

16  Ziehl & Jones on behalf of Monster Beverage, I'm here with

17  my partner, Robert Feinstein.

18            THE COURT:  All right.  Thank you.

19            I see no other folks with their cameras on.

20  So we'll move on, unless someone wishes to make another

21  appearance.  Anyone?

22            (No verbal response.)

23            THE COURT:  All right.  So, it seems to me

24  that the order in which we should do these are likely the

25  applications, 358, 365 and 366 and 375, and then we can

1   move on to 408.  Does that make sense, or does anyone wish

2   to handle this in a different order?

3                   (No verbal response.)

4                   THE COURT:  All right.  So --

5                   MR. SORKIN:  Your Honor?

6                   THE COURT:  Go ahead.

7                   MR. SORKIN:  Sorry.

8                   THE COURT:  Go ahead, Mr. Sorkin.

9                   MR. SORKIN:  Your Honor, Andrew Sorkin on

10  behalf of the debtors.

11                  I totally agree with the order.  If it

12  pleases the Court, I'd like to begin just by providing an

13  update on recent events.

14                  THE COURT:  That would please the Court.

15                  MR. SORKIN:  Thank you, your Honor.

16                  So as your Honor is aware, we were supposed

17  to be here today for our final DIP hearing.  The parties

18  have agreed to consensually adjourn that hearing until

19  December 19th.

20                  That adjournment affords us time not only to

21  continue working through the remaining DIP objections, but

22  also to address certain open issues with the lenders that

23  arose late last week, that include the -- sorry, and those

24  issues include the resignation of Kathleen Cole, who had

25  briefly served as Vital's chief operating officer.  She

1    was also a member of the board of each of the debtors.

2                    From a management perspective, Ms. Cole's

3    COO position was newly created, so her resignation

4    restored the status quo, in terms of the management

5    structure that the company had prior to her joining the

6    company.

7                    However, it did leave a vacancy on the

8    board, that we are required under our DIP credit agreement

9    to fill within seven days.  That seven-day period expired

10   midnight on Friday.

11                   Following Ms. Cole's departure, the lenders

12   indicated to us that they would require certain changes to

13   the governance requirements in our DIP facility in order

14   to be comfortable proceeding with the DIP, that included

15   accommodations that were designed to address, and ideally

16   resolve the outstanding DIP objections.

17                   So in light of that request, we decided it

18   would be prudent to adjourn the hearing to allow for

19   discussions with the lenders on those topics, and that's

20   where we stand today.

21                   THE COURT:  So I assume Ms. Cole was not

22   replaced, is that right?

23                   MR. SORKIN:  She has not been replaced.

24                   THE COURT:  Okay.

25                   MR. SORKIN:  So since last Thursday,

1    your Honor, we have been involved in ongoing discussions

2    with the lenders concerning their requests.  I'd also

3    note, and I'm sure your Honor is aware, that other parties

4    had raised concerns about the debtor's governance

5    structure in connection with their DIP objections, and I

6    think in some sense the discussions with the lenders may

7    address issues that are raised by those objections as

8    well.

9              We're putting the additional two weeks that

10   we have before the final hearing to good use, and our hope

11   is that we appear before your Honor on December 19th with

12   the proposed stip that makes everyone happy, or at a

13   minimum, significantly narrows the scope of the disputes

14   for that hearing.

15             Just changing gears a bit, your Honor, I

16   know one of the items on today's agenda is a status

17   conference on the motion that was filed by Monster and

18   other litigation creditors for appointment of a second

19   creditors' committee, and understanding that's not our

20   motion, I did want to preview that I believe that there is

21   alignment, at least among the debtors, the committee, and

22   Monster on a schedule for that hearing.  That schedule

23   contemplates no discovery being conducted in connection

24   with the motion.

25             It would culminate with the merits hearing

1    on December 19th.  Opposition papers would be due on

2    December 12th, and a reply brief filed by the movants

3    later in the week.

4               I'll reserve further commentary on that

5    until we hear from Monster and the other movants on that

6    matter, since it is their motion, when we get to the

7    status conference.

8               THE COURT:  All right.

9               MR. SORKIN:  So, your Honor, that's the

10   update I wanted to provide.

11              THE COURT:  So you're suggesting, though,

12   that -- and just think about this until we get to that

13   point in the hearing, but that the 19th would be populated

14   by both matters, the DIP financing and the motion at 408,

15   filed by Monster, for an additional committee, is that

16   right?

17              MR. SORKIN:  That's correct, your Honor.  I

18   mean, it would be our hope that the DIP hearing, to the

19   extent still contested, could be streamlined with proposed

20   stipulations of fact and the like, and that the

21   evidentiary portion could be limited in nature.

22              THE COURT:  Okay.

23              MR. SORKIN:  So we do think it's feasible to

24   go forward with both matters on that date.

25              THE COURT:  Lawyers always think it's

Page 14

1   feasible, and then it takes twice as much time as they

2   guess.  You know, but why should this case be any

3   different?  But hopefully you're right, we'll see.

4                  All right.  So that's fine.  Does anyone

5   else wish to be heard on these matters before we get to

6   the applications?

7                  (No verbal response.)

8                  THE COURT:  Okay.  All right.  So,

9   Ms. Blanco, I think this is the application to employ

10  Lowenstein Sandler, which was filed by your firm, Docket

11  Entry 358, which I have of course reviewed, but tell me

12  about it.

13                 MS. BLANCO:  Yes, your Honor.  I believe

14  Mr. Chafetz is on as well, and I believe he's taking the

15  lead on the application for Lowenstein this morning.

16                 THE COURT:  Of course, that's fine.

17  Mr. Chafetz.

18                 MR. CHAFETZ:  Yes, your Honor.  Thank you.

19  Eric Chafetz appearing as proposed counsel for the

20  official committee of unsecured creditors.

21                 We obviously filed our retention

22  application.  We have yet -- we have not received any

23  formal or informal objections to said application, and

24  would respectfully request that the Court enter it,

25  obviously, subject to any questions that the Court may

1    have.

2                    THE COURT:  All right.  I noted that there

3    was an agreement with respect to a discount of fees of

4    10 percent.  I don't know whether that's being taken in

5    terms of the rate upfront, or whether you just add up the

6    bill at the end of the day and subtract 10 percent.  How

7    is that working?

8                    MR. CHAFETZ:  I think it's the latter,

9    your Honor.  We are providing across the board a

10   10 percent discount.  So, a simple example, if our fees

11   are $100 for a given month, we'd be billing the committee

12   $90.

13                   THE COURT:  All right, understood.

14                   Mr. Wilkes, any comments from the United

15   States Trustee's Office?

16                   MR. WILKES:  Thank you, your Honor.

17   J. Steven Wilkes for the United States Trustee.

18                   No comments at this time, no objection to

19   the application to employ.

20                   THE COURT:  All right.  Anyone else wish to

21   be heard?

22                   (No verbal response.)

23                   THE COURT:  All right.  The Court will grant

24   the application and, Mr. Chafetz, I will look forward to

25   receiving an order, but from your firm or Ms. Blanco's?

1           MR. CHAFETZ:  Most likely Ms. Blanco's firm,

2    but I'll get with her after this hearing.

3           THE COURT:  All right.  Okay.  We're going

4    to put down Ms. Blanco, just so that we know we have

5    somebody to call to make sure that we get the order

6    because, although in this case I have no doubt it will be

7    timely submitted, but you have no idea what it takes to

8    chase down some of these orders.

9           But anyway, all right --

10          MR. CHAFETZ:  Yes, sir.

11          THE COURT:  -- the next matter -- -

12          MS. BLANCO:  Your Honor, I can be

13   responsible for all the orders from the committee's side,

14   for the submission of those orders.

15          THE COURT:  All right.  Great.  Thank you,

16   Ms. Blanco.

17          All right.  The next application is 366,

18   Mr. Chafetz.

19          MR. CHAFETZ:  Yes, your Honor.  366 is --

20   pardon me.

21          MS. BLANCO:  366 is the Lincoln Partners

22   Advisors, LLC --

23          THE COURT:  Yes, Lincoln.

24          MS. BLANCO:  -- application.

25          MR. CHAFETZ:  Yes, your Honor.  Lincoln

1   Advisors is the proposed financial advisor for the

2   official committee of unsecured creditors.

3                  As I indicated in connection with

4   Lowenstein's application, we have not received any

5   informal or formal objections.

6                  Brent Williams, of Lincoln, is on if the

7   Court or any other parties in interest have questions, but

8   we'd respectfully ask for that retention application to be

9   approved as well.

10                  THE COURT:  All right, I noted, obviously,

11  the 10 percent discount as well from Lincoln, and I also

12  noted that the effort that's going to be made, of course,

13  to avoid duplication of effort, et cetera.  So I have no

14  further comments or questions.

15                  Does anyone else wish to be heard?

16                  (No verbal response.)

17                  THE COURT:  All right, then the Court will

18  grant that application as well, and it's on Ms. Blanco to

19  get me an order.

20                  MR. CHAFETZ:  Sure.

21                  MS. BLANCO:  It is, your Honor.  Thank you.

22                  THE COURT:  All right.  The next matter is

23  375, which is the application to employ Miller Buckfire.

24                  MR. CHAFETZ:  Yes, your Honor.  Again,

25  Eric Chafetz on behalf of the official committee of

```
 1   unsecured creditors.

 2               We have not received any formal or informal

 3   objections from any parties in interest with respect to

 4   Miller Buckfire's retention application, and we'd

 5   respectfully request that the Court approve that retention

 6   application.  If the Court, or any parties in interest

 7   have any questions, John D'Amico, of Miller Buckfire, is

 8   on the Zoom to answer any questions that any parties may

 9   have.

10               THE COURT:  All right.  So I have a somewhat

11   fundamental question.  I'm not exactly sure I understand

12   how the investment banking firm for the committee is going

13   to conduct its work when the estate has an investment

14   banking firm employed, and I noted that there is a

15   $2.5 million deferred fee payable upon consumption -- or

16   consummation of any transaction, which suggests that there

17   might be dueling transaction tracks here, which I'm a bit

18   concerned about.

19               So how is that supposed to work?

20               MR. CHAFETZ:  Your Honor, I'll defer to

21   Mr. D'Amico to provide some background with respect to the

22   fee structure for Miller Buckfire, but I don't necessarily

23   think there is going to be dueling transactions here.

24               Our understanding is that Miller Buckfire is

25   working hand in hand with Rothchild to monitor the sale
```

1   process.

2              Without getting into too many details, I

3   know Miller Buckfire proposed numerous other potential

4   parties who may be interested in a (inaudible) here, that

5   Rothchild had not initially reached out to, and has been

6   working hand in hand on a daily basis with Rothchild to

7   address open business plan issues, and other sales process

8   related issues, but I will allow Mr. D'Amico to provide

9   some additional color.

10             THE COURT:  All right.  Thank you.

11             Mr. D'Amico.

12             MR. D'AMICO:  Yes, thank you, Eric, and,

13   hello, Judge.

14             So, as Eric alluded to, Miller Buckfire has

15   been extremely active in connection with all matters

16   related to this case since our selection by the committee

17   as its investment banker.

18             We have been working collaboratively with

19   Rothchild, and the other debtor's advisors, as well as the

20   advisors to the DIP lenders, in terms of the process the

21   debtors are running with regard to financing alternatives,

22   with regard to M&A alternatives, and really all case

23   alternatives going forward.

24             So, you know, this -- you know, our role

25   here is very much complimentary to Rothchild, to make sure

Page 20

1    that any process here that is conducted by Rothchild is as

2    robust as possible.

3                    As Eric alluded to, when you already have

4    included a number of other parties in the process, that

5    could be, you know, potential acquirers or other, you

6    know, financing sources, and so, you know, our role here

7    is very much complementary to Rothchild, ensuring that the

8    process here maximizes value for all stakeholders in

9    connection with the case.

10                    And then in doing so, you know, we've

11   outlined scope and services between us and Lincoln

12   Financial to ensure that there is no overlap on the

13   committee's side.  So, you know, there is complete

14   alignment with regard to work streams on the committee

15   advisor side.

16                    THE COURT:  All right.  Okay.  That helps.

17   I'm just -- you know, just concerned with respect to

18   communications out to the marketplace, and where those are

19   originating from, and whether that might cause confusion,

20   et cetera.

21                    But if you all are working closely together,

22   and you're certainly more adept at dealing with those

23   kinds of issues than I could even imagine, so I'll leave

24   that to you.

25                    And let me just hear from anyone else who

Page 21

1    wishes to comment on this application.   Anyone?

2                     (No verbal response.)

3                     THE COURT:   All right.   The Court will grant

4    the application then and, again, Ms. Blanco, we'll look

5    forward to receiving an order from you on that

6    application.

7                     MS. BLANCO:   Very well.   Thank you,

8    your Honor.

9                     THE COURT:   All right.   So that leaves 408.

10   So, first, let me -- which is the joint motion to appoint

11   the creditors' committee holding non-trade claims, filed

12   by various parties.

13                     MS. BLANCO:   Your Honor, if I may?

14                     THE COURT:   Yes.

15                     MS. BLANCO:   If I may, before we go to 408,

16   could we take our application, which is Docket Entry 365?

17                     THE COURT:   Oh, did I skip that?   I'm sorry.

18                     MS. BLANCO:   Yes.   That's okay, your Honor.

19   That is the application for Sequor Law's --

20                     THE COURT:   Well, I can't get --

21                     MS. BLANCO:   -- proposed retention.

22                     THE COURT:   I can't get the orders from you

23   unless you're approved.   So, go ahead.

24                     MS. BLANCO:   Thank you, your Honor.

25                     This is our application as proposed

1   committee counsel, as co-counsel to the Lowenstein Sandler

2   firm, which the Court just approved.  Our rate structure

3   is such that it proposes rates through the end of this

4   year, between 540 to $790 an hour, and proposes an

5   anticipated increase of $45 across the board to our rates

6   come January 1st.  This is market for our industry here in

7   the Southern District of Florida, and we have received no

8   objections to our retention.

9                    THE COURT:  All right.  Thank you,

10  Ms. Blanco.

11                   Anyone wish to be heard on the Sequor Law

12  application?

13                   (No verbal response.)

14                   THE COURT:  All right.  Hearing none, then

15  the Court will also grant that application and,

16  Ms. Blanco, so that's four you owe me, and I'll look

17  forward to receiving those.  Thank you.

18                   MS. BLANCO:  Very well, your Honor.  Thank

19  you.

20                   THE COURT:  All right.  Now on to 408, and

21  Mr. Sorkin suggested that you-all have agreed to a

22  scheduling order.  So let me hear about that, who is going

23  to be addressing this issue on behalf of the movant?

24                   MR. PACHULSKI:  Your Honor, I believe I'll

25  start.  It's, again, Richard Pachulski, of Pachulski Stang

1   Ziehl & Jones, on behalf of Monster Energy Corporation.

2              I want to make a couple of things clear with

3   respect to that, and then if I could respond to the

4   questions I think your Honor laid out on Thursday -- at a

5   Thursday hearing.  I know this wasn't on the calendar, but

6   I understand a variety of issues.

7              With respect to the specific issue as to the

8   timing, and it's somewhat directed to some of the other

9   issues your Honor resolved, until this past Friday, the --

10  at least Monster, I don't know about the others, had

11  decided to move forward with some form of discovery, and

12  as it turned out, with the COO having resigned, and with

13  the -- what is not, what your Honor may not be aware of,

14  and we pushed to find out, and I'll get into that, with

15  the general counsel having resigned effective

16  December 16th, we are unwilling to take a risk of moving

17  the hearing.

18             We believe that the discovery would have

19  been very limited, but again, getting a second committee,

20  and having the timing of it heard, is more significant

21  than whatever discovery we may get, and we figured that we

22  would -- that we would use other sources, we would go

23  outside of this proceeding, of this matter, in terms of

24  trying to determine what happened in this case, because we

25  find it, to be honest, your Honor, somewhat mystifying.

1           So, that's --

2           THE COURT:  Well, but, Mr. Pachulski,

3   though, you don't necessarily need a committee in the

4   short term to conduct that dis -- whatever discovery

5   Monster thinks is necessary here, you can do so on

6   Monster's own accord, no?

7           MR. PACHULSKI:  Your Honor, the problem is,

8   and one of the things, in terms of -- one of the issues

9   that your Honor raised was the urgency.  We have no

10  transparency to anything.  We have no transparency as to

11  the business.  We have no transparency to the operations,

12  or the financial issues.  We have no transparency to the

13  governance issues because, when we've asked the debtor,

14  the debtor said go to the lenders and hear it from them.

15  So we have no idea.

16          We have spoken to lenders.  We're not sure

17  what the governance issues are and, frankly, we have no

18  transparency on the sale process.  Mr. D'Amico speaks to

19  the debtor's advisor every day.  We have no transparency

20  on that.

21          So, we can do some discovery.  We actually

22  -- your Honor, it's a fair point, we asked Mr. Sorkin

23  yesterday, because we are very concerned, two out of the

24  three (inaudible) are gone, and I'll address that in a

25  second, but in this particular situation, we have -- we

1    have no idea what's going on, so we asked Mr. Sorkin if we

2    could see the resignation letter from Ms. Cole.  He states

3    it wasn't a position that existed before the bankruptcy,

4    that's accurate, but someone made the decision that it was

5    important to have a chief operating officer, which would

6    be pretty traditional for a case this size, but we were

7    told we could not see that.

8                    So now we are going to have to find

9    Ms. Cole, and we will have to do discovery, but that's one

10   of many issues, your Honor.  So, not getting a committee,

11   and one of the other urgencies, which I think is deeply

12   concerning in this case, is looking at the --

13                   THE COURT:  So, let me -- I don't mean to

14   interrupt you, how does --

15                   MR. PACHULSKI:  Sure, go ahead.  Go ahead,

16   your Honor.

17                   THE COURT:  How does having the second

18   committee -- first of all, you understand I'm not in a

19   position to require, even if the committee is created, to

20   appoint any particular party to a committee, but even if

21   the committee existed, how does that change the dynamic

22   you are concerned about and described to the Court today?

23                   MR. PACHULSKI:  Well, I think the debtor

24   would then have no choice but to deal with it.  We

25   wouldn't have five, or six, or seven parties having to do

1  discovery.  We would have a single committee counsel doing

2  it.  We'd have a financial advisor, like Mr. D'Amico, who

3  would be coordinating with the committee -- with the

4  debtors.  We don't have any -- none of us, to my

5  knowledge, have a financial advisor.

6         The clients have been willing to pay for

7  other professionals, but we're basically told we can go

8  and try to figure it out ourselves and pay for other

9  professionals.

10         Monster, in this case, your Honor, is

11  already owed approximately $400 million.  We're multiples

12  of the trade creditors, and we're, frankly, multiples of

13  the members of the committee, but we don't have any access

14  to the information, your Honor, and I do think that under

15  how the process works, committees do get access that

16  individual creditors do not.  Simply put, that's -- and

17  that's what happened in this case, your Honor, because we

18  don't have any -- we haven't received any of it --

19         THE COURT:  Okay.

20         MR. PACHULSKI:  -- and so -- I'm sorry,

21  your Honor, please.

22         THE COURT:  Okay.  I was just going to

23  suggest, why don't we, why don't we sort of side step the

24  merits for a moment.  I just want to understand, are you

25  building up to explaining to me what the schedule is

1    likely to be, or what the parties have agreed to, or are

2    we into the merits argument?  Because I want to make

3    sure --

4                    MR. PACHULSKI:  No, your Honor, we have --

5                    THE COURT:  -- that we keep this on track.

6                    MR. PACHULSKI:  Our position is that we

7    would have preferred to do discovery, but if there is any

8    risk of the matter being continued beyond the

9    December 19th date, then we would live with December 19th.

10   The responsive pleadings to the motion would be

11   December 12th, and any reply any of the movants have would

12   be on December 16th.

13                    THE COURT:  All right.  Well, I have no way

14   of gauging the risk associated with discovery causing a

15   delay of that hearing on the 19th.  So is that statement

16   directed at the Court, or are you throwing it out there to

17   Mr. Sorkin to find out whether there would be a delay

18   occasioned by discovery, or what's the purpose of that

19   statement?

20                    MR. PACHULSKI:  Well, the statement,

21   your Honor, is we've been told by, at least the United

22   States Trustee, which we're in this position because we

23   tried to cooperate with the United States Trustee, that

24   they would object to the hearing going forward on

25   December 19th if we sought discovery.

```
 1              THE COURT:  I see.  All right.
 2              MR. PACHULSKI:  I believe that may be right
 3    from Mr. Sorkin, too, but I know it's right from
 4    Mr. Wilkes.
 5              THE COURT:  All right, then let me ask
 6    Mr. Wilkes.  I have no problem proceeding on the 19th.  My
 7    biggest concern, frankly, is the concern I suggested to
 8    Mr. Sorkin, that the 19th is -- unless the DIP motion is
 9    streamlined, and God willing it will be, that would be
10    great, I don't see the 19th as necessarily having -- or
11    providing us enough time to do both of -- two contested
12    matters, if they remain contested.  That alone may end up
13    pushing one of those matters from the 19th.
14              Of course, you know, I only get to these
15    things after everyone else knows everything about the
16    case, I find out about it afterwards.  So I don't know
17    what's going to happen on the 19th, but tell me your
18    position with respect to proceeding on the 19th, and what
19    discovery may or may not do to that hearing.
20              MR. WILKES:  Thank you, your Honor.
21    J. Steven Wilkes for the United States Trustee, Region 21.
22              As was laid out in the preliminary
23    objection, your Honor, the United States Trustee sees this
24    action under 1102(a)(2) to be an action seeking an entry
25    of an order directing the United States Trustee to appoint
```

1   a second committee of general unsecured creditors.

2               That being said, there is very limited, if

3   any, discovery necessary by the parties.  As the Court

4   stated last week, the issues arising under 1102(a)(2) do

5   not go into corporate governance, do not go into

6   transparency, and it is true that if the motion as pleaded

7   proceeds under a contested matter, then as pleaded the

8   motion is contesting the actions, or failure to act by the

9   United States Trustee, a federal agency officer.

10              So, that will entail discovery, and

11  potentially actions for protective orders by the agency

12  that is being sought discovery.

13              If it is the movant's position that this is

14  not a 2020 action against the United States Trustee, but

15  they still want to have discovery against other parties,

16  that can be clarified in the order setting the hearing for

17  whatever date.

18              The Court is correct, that holding both this

19  contested matter, or the hearing, on a full trial on the

20  merits under 1102(a)(2), as well as the DIP cash

21  collateral and financing facility hearings, may consume

22  all of the 19th, if not overflow into another day.

23              Not wanting to argue the movants' motion, it

24  would probably be in the best interest of all parties that

25  this motion be heard on the 19th, and whatever needs to

Page 30

1    overflow on to whatever the next day is available to the

2    Court, would be the cash collateral and DIP financing

3    facility motion, rather than the chicken -- which one came

4    first, the chicken or the egg.

5                    If this Court is inclined to grant the

6    motion, then it probably needs to be granted before the

7    DIP facility trial, but if the Court is not inclined to

8    grant the motion, then the parties that moved for that,

9    under 1102(a)(2), need to know that also coming into the

10   DIP financing facility motion.

11                   Thank you, your Honor.

12                   THE COURT:  All right.  Mr. Sorkin, what is

13   you're perspective on this?  And I will tell you, you

14   know, I hesitate to throw this out there, but I am sort of

15   available on the 20th.  So, if you need two days, I guess

16   we could make that possible.

17                   And honestly what's happening in Chambers is

18   we're getting a little bit of furniture replacement, which

19   requires the computers to be taken down, but I can

20   probably delay that.  But anyway, you know, I hesitate to

21   offer it, but it is available if it's necessary.

22                   My biggest concern, frankly, is that we get

23   all of this done in a timely fashion for the benefit of

24   all involved, for the benefit of the estate, and of course

25   that's my job, is to be available if I can be, and I am.

1              So tell me your thoughts on that then, how

2    does that change the equation, if at all?

3              MR. SORKIN:  For the record, Andrew Sorkin

4    on behalf of the debtors.

5              Your Honor just answered my first question,

6    which was whether the 20th might be available to the

7    extent needed for one or the other of these hearings.

8              In terms of the sequencing issues that

9    Mr. Wilkes just raised, we would suggest that the DIP

10   hearing proceed first.  That hearing concerns financing

11   that's critical to the maintenance of these estates, and

12   for what it's worth, I believe, at least some, if not all

13   of the movants are already actively engaged in litigation

14   over that relief.

15             So, I believe we can go forward on the 19th,

16   particularly if you have the 20th available as well,

17   beginning with the DIP hearing, which as I mentioned at

18   the outset of today's hearing, I hope can be streamlined

19   by the parties working together on stipulations of fact,

20   and otherwise limiting the factual issues that are in

21   dispute for that hearing, and then we can proceed with the

22   committee appointment motion afterwards.

23             THE COURT:  All right.  So let me go back

24   for a moment.  I've done a lot of work on the motion, and

25   I am -- you know, I do have some views, subject, of

1   course, to further argument.

2                    I guess my first question would be,

3   Mr. Pachulski, what is it, what discovery is going to be

4   relevant, in your view, to your presentation in support of

5   the motion whatever it's heard, whether it be the 19th, or

6   the 20th, or whatever date, what discovery do you believe

7   is relevant, and under what standard are you suggesting

8   that discovery is relevant?

9                    MR. PACHULSKI:  Your Honor, we believe

10  discovery is relevant, and we've asked the United

11  States Trustee to cooperate with us, is with respect to

12  the initial formation of the committee, and what was

13  presented to the United States Trustee in determining that

14  there should be seven trade members, with claims of

15  approximately 45 to 48 million, as compared to some group

16  of the 63 litigation creditors, none of which were

17  initially put on.

18                    So we were looking for discovery with

19  respect to what was presented to the United States Trustee

20  in writing, that's what it would have been, but again, our

21  view is, we don't think that would take very much time.

22  It's very limited, and in a perfect world, that's what we

23  would have sought to get, because I think your Honor has

24  the right to know what the U.S. Trustee's thinking was,

25  not just orally.

1           But we had two situations come up here,

2    your Honor, one is no trade was -- I'm sorry, no

3    litigation claimants or non-trade creditors, including

4    landlords, were put on the committee in the initial, in

5    the initial formation, and then, secondly, the non-trade

6    creditors were advised on November 21st that there was --

7    the inclination of the United States Trustee was to form a

8    second committee, and we would speak the next day, and the

9    next we knew, two days later, a reconstitution took place,

10   of which the four people put on that committee were never

11   even contacted by the United States Trustee.

12           So, to be honest, your Honor, we'd like to

13   understand what the United States Trustee was doing, and

14   who was communicating with them that would have caused the

15   initial formation the way it was, and then the

16   reconstitution when they said they were inclined to

17   appoint a second committee --

18           THE COURT:  And that --

19           MR. PACHULSKI:  -- and I think it's fair --

20           THE COURT:  Understood, and tell me about

21   what that goes to, in terms of the standard the Court has

22   to apply to determining this issue.  I'm looking at

23   1102(a).  I think everyone agrees that it's very clear

24   that the United States Trustee appoint any such committee,

25   meaning that the Court has no say over who was on a

Page 34

1    committee.  The most I could do, if anything, would be to,

2    I guess, require the United States Trustee to reconstitute

3    the committee, but again, even if I ordered that, the

4    United States Trustee's Office would have the ultimate say

5    in how to do so, and I'm not even sure I have the

6    authority to do that.

7              But I'm also looking at 1102, and it says

8    that the -- let's see, the United States Trustee shall

9    appoint a committee of creditors holding unsecured claims,

10   and may appoint additional committees of creditors or of

11   equity secured holders as the United States Trustee deems

12   appropriate.

13             So it seems to be in the purview of the

14   United States Trustee to determine that issue, and I

15   haven't seen any case law that that necessarily suggests

16   otherwise.

17             It does provide in Paragraph (a)(4) that on

18   request of a party in interest, and after notice and a

19   hearing, the Court may order the United States Trustee to

20   change the membership of a committee appointed under the

21   subsection if the Court determines that the change is

22   necessary to ensure adequate representation of creditors

23   or equity security holders, and I can also order -- the

24   Court may order the United States Trustee to increase the

25   number of members of a committee, but that seems to relate

1    more to small business concerns.

2              So, I guess what I need to understand is

3    even if you were to discover evidence you felt led to poor

4    decisionmaking on behalf of the U.S. Trustee's Office, and

5    I'm not suggesting there was poor decisionmaking, I'm just

6    saying even if you found discovery that suggested that,

7    how does that -- how would you use that in the hearing to

8    con -- and what remedy would you seek for that from the

9    Court?

10             MR. PACHULSKI:  Well, your Honor, what we're

11   seeking, the remedy we're seeking is really not based on

12   1102(a)(4).  It's based on 1102(a)(2).  We're seeking the

13   appointment of a second committee.

14             We don't believe the first committee is

15   representative, and we don't believe that adding the four,

16   of which two have not -- have agreed -- have stated they

17   will not be on the committee, because they don't believe,

18   from my understanding -- one of them I didn't even know

19   had submitted a -- had submitted a form, which was Warner

20   Music, because they don't believe that it's

21   representative.

22             So, the issue, and this is where your Honor

23   can absolutely order the appointment of a second

24   committee, just as has been done in other cases, including

25   recently in the Diocese of New Orleans, but the issue,

1    your Honor, is we tried to figure out in terms of

2    demonstrating that there is not adequate representation of

3    what went into the U.S. Trustee's formation.

4              We know that there were communications

5    initially with the debtor.  We have no idea what the

6    debtor said to them.  We have no idea what anyone else

7    said to them.  We believe it would have been in writing,

8    and one point I really want to make very clear,

9    your Honor, because it's nowhere in our papers, and

10   Mr. Wilkes has created a narrative that really isn't true.

11             Monster Energy has no interest in filing a

12   motion that demands they be put on a committee.  We

13   understand what the Code says, and at the end of the day,

14   if your Honor orders a second committee, I don't know who

15   is going to be on it.

16             Monster is looking for, along with the other

17   four movants, that a committee be formed to look out for

18   the interests of the non-trade creditors.

19             The U.S. Trustee, we would hope, would put

20   on a creditor that probably has a blocking position in

21   this case to try to get a consensual arrangement done, but

22   that's their call.

23             Now, we then have a right, under 1102(a)(4),

24   to come back to your Honor, but we're not -- Mr. Wilkes

25   has jumped to an argument that we have not made.  We are

1    making -- clearly under 1102(a)(2), asking your Honor,

2    which your Honor has absolute authority, to order the

3    appointment of a second committee.

4              What happened in the Diocese of New Orleans

5    case, is the judge in that case considered either

6    reconstituting, or appointing a second committee, and

7    ordered the United States Trustee to appoint a second

8    committee, in that case, of trade creditors, because there

9    were abuse victims that had their own committee.

10             So, we're not asking anything that's outside

11   the purview, but I do think it's important to determine

12   adequate representation, to determine why the United

13   States Trustee, in the first instance, determined to

14   appoint a committee with only one of the seven largest

15   creditors, none of which were non-trade, then stated to

16   our group that they were going to appoint a second

17   committee, and then completely pivoted, without contacting

18   us, two days later, which, frankly, your Honor, is why we

19   don't have an earlier hearing.

20             The United States Trustee knew exactly what

21   we were doing.  We had a pleading prepared, that would

22   have been filed on November 22nd, right before

23   Thanksgiving, and the United States Trustee -- and we did

24   not file it as an accommodation to the United

25   States Trustee, we did not want to be provacative.

1          So notwithstanding the fact that it was

2    ready, notwithstanding the fact that we told the United

3    States Trustee, they then, a day after, had reconstituted

4    the committee, and now we had to scramble over

5    Thanksgiving weekend to prepare a new motion.

6          So that's the history of what happened here,

7    your Honor.  This isn't a simple, they put four trade and

8    three non-trade, and now we're going to do discovery.

9          I will tell your Honor, I've practiced for

10   42 years.  I've never seen a formation done anything like

11   this, where you don't appoint people, whose clearly the

12   interest of over a billion dollars of claims, and then you

13   tell us you're going to appoint, and then you don't.

14          Now, there may be nothing there, it may be

15   all a mirage, or there could be something insidious, and

16   that's what we were looking for, so you Honor understood

17   in making a determination on adequate representation,

18   because obviously your Honor is going to take into account

19   what the U.S. -- why the U.S. Trustee did what it did.

20          THE COURT:  All right.  So, in applying

21   1102(a)(2), what are the factors that you think apply?

22   We've taken a look at Winn Dixie stores, which has a

23   number of factors, and they seem to be somewhat

24   representative of the case law out there.

25          I just want to make sure that at least the

1  Court understands what standard the movant thinks applies.

2          Do you agree that --

3          MR. PACHULSKI:  I mean, your Honor --

4          THE COURT:  -- Winn Dixie, the six

5  standards, or the six elements, or factors that are

6  described in that case, are the ones that the Court needs

7  to focus on?

8          MR. PACHULSKI:  I think those are-- I think

9  different courts have applied pretty much the same,

10  your Honor.  They've looked at it differently.

11          I do think that the key issue is whether or

12  not the voting right that the -- that the members of that

13  committee are representative of the interests, and whether

14  or not their vote will really count, particularly if they

15  are a minority, but that's how it's been collapsed, but

16  your Honor is correct, that if you look at the six fact --

17  that you would look at the six factors, some are more

18  important then others.

19          Obviously very few courts, to my knowledge,

20  have said, well, because parties are represented by

21  counsel, they can't be on the committee.  Obviously, in

22  this particular case --

23          THE COURT:  Well, it's not a bar, it's a

24  factor.  It's not a bar to being a member of a committee,

25  but it's a factor to be considered, whether they can

Page 40

1    adequately be represented outside the committee.  That's

2    how I read it.  Do I read that wrong?

3                    MR. PACHULSKI:  No, I think that's correct,

4    your Honor, and I think whether or not -- you know, one of

5    the factors is obviously whether a second committee would

6    be beneficial to the case, and we think that --

7                    THE COURT:  Yeah, it's the standard cost

8    benefit analysis, and I would want to get into, of course,

9    at some point what the benefits are to the estate, but,

10   okay, so you've answered my question, just in that the

11   Winn Dixie factors seem to be the factors that most courts

12   at least allude to, if not apply, and would guide the

13   Court on this issue.

14                   So let me turn to Mr. Wilkes.  If discovery

15   is served upon the U.S. Trustee's Office, you stated

16   earlier that it would likely be met with a motion for

17   protection.

18                   You've heard Mr. Pachulski's description of

19   what he believes occurred, and what discovery he's

20   seeking, or may seek with respect to what occurred.

21                   Tell me why that discovery would be

22   unavailable, or you would seek protection, or why it

23   wouldn't be a relatively simple thing to produce that

24   information.

25                   MR. WILKES:  Thank you, your Honor.

Page 41

1    J. Steven Wilkes for the United States Trustee.

2              Just because discovery may be interesting,

3    doesn't mean that the seeker of the discovery is entitled

4    to it.  The United States Trustee is an official of the

5    Department of Justice, and a member of the United States

6    of America's Executive Branch, has specific privileges

7    available to her.

8              But second, your Honor, and this is most

9    important to 1102(a)(2)'s analysis, and this is where the

10   Court was at initially before Mr. Pachulski went into what

11   he wants to see, 1102(a)(2) doesn't deal with whether or

12   not the original committee, or any additional committees

13   that the United States Trustee discretionarily appointed,

14   or discretionarily did not appoint.

15             1102(a)(2) goes to the Court's ability under

16   the facts of the case to direct the appointment of an

17   additional creditors' committee.  A (inaudible) on that,

18   your Honor, is a committee appointment in Chapter 9.  The

19   United States Trustee does not solicit for committees in

20   Chapter 9, nor does anything regarding committee formation

21   in Chapter 9, until a party in interest moves the Court

22   under 1102(a)(2) for an order directing the United

23   States Trustee to appoint, which time the United

24   States Trustee responds to that order, and appoints a

25   committee in Chapter 9.

1          If it's quintessential there, that what the

2    United States Trustee did or did not do in Chapter 9, it's

3    the same here.  What the United States Trustee did or did

4    not do under 1102(a)(1) is not material to this Court in

5    determining whether to direct the appointment under

6    1102(a)(2), but you have -- and any time that (a)(1),

7    (a)(2), or even (a)(3) is -- and (a)(4) are invoked, the

8    Court needs to look at 1102(d), as to what are the

9    requirements for those members sitting.

10          Here the movants want a second general

11   unsecured creditors' committee to represent, not the

12   general unsecured creditors as a whole, because that's

13   what the official committee is doing.  They want to have a

14   committee represent a distinct and specialized class of

15   general unsecured creditors that is not supported by the

16   Code, and is not supported by public policy.

17          The movants cited to the New Orleans

18   Archdiocese case as an example of when a specialized

19   general unsecured creditors' committee may be appointed

20   under 1102(a)(2).

21          Abuse victims is a public policy concern for

22   the Court.  General unsecured creditors holding a judgment

23   claim or an arbitration award, or are in litigation, or

24   may be competitors of the debtor, are not specialized

25   classes in Title 11, and not a public policy concern.

1           So, yes, the end answer to your question,

2    your Honor, the United States Trustee would likely be

3    filing not only a motion to invoke Part 7 of the rules, so

4    that they can be applied to this, to the contested matter

5    if the Court determines that a contested matter is pending

6    here, and it is pending under 2020, also a motion for more

7    definite statement, because the allegations and inferences

8    raised in the motion do not address the duties, the breach

9    thereof, if any, the actions, inactions, or omissions of

10   the United States Trustee, so a more definite statement

11   would be needed, and then the discovery needed under

12   1102(a)(1), which isn't applicable to 1102(a)(2), would be

13   met largely with probably motions for protective order, or

14   other actions under the Tewey (phonetic) regulations, to

15   control what access parties have to the deliberative

16   processes of the United States government.

17           Thank you, your Honor.

18           THE COURT:  Thank you, Mr. Wilkes.

19           So, Mr. Pachulski, I have to say, Mr. Wilkes

20   makes a simple but strong point, in that the discovery

21   that you seek really does not go to any of the factors in

22   the Court's determination of whether to appoint an

23   additional committee under 1102(a)(2), because it doesn't

24   matter why or how the committee was appointed under

25   (a)(2), you're seeking an additional committee, unless

1   you're seeking to argue that because it was unfairly

2   appointed under (a)(1), you need the second committee.  Is

3   that the argument, or -- because I don't see how (a)(1),

4   or the result of (a)(1) has anything to do, or how that

5   was arrived at, has anything to do with (a)(2) relief.

6            MR. PACHULSKI:  Your Honor, I do think it's

7   -- again, as I said, I'm going to end up in court over two

8   weeks over protective orders and the like, which is one

9   reason we had said we were willing to go forward without

10  it, but I disagree with Mr. Wilkes.

11           As he said, there are facts that went into

12  his determination of who to put on that committee, and if

13  he took in account facts that would -- for instance, let's

14  use one of the examples he used, the competitors.  If he

15  decided it was, yes, we may have needed people who are

16  competitors because they have the biggest claims, that's

17  not an appropriate determination as to what is adequate

18  representation, your Honor.

19           Because, for instance, in a case that our

20  firm is involved in, which is the Regal Cinema Cineworld

21  case, Cinemax, which is a competitor, was put in.

22           One of the things that Mr. Wilkes told us

23  is, isn't it a problem that there are competitors, and we

24  -- if your Honor -- and it's obvious your Honor has taken

25  a hard look at the motion, that there are exhibits where

1    we worked over the weekend to get them a letter that

2    explained the mechanisms to avoid that.

3                    Now, we believe that that is one of the

4    major reasons why people were not put on the committee,

5    but if the United States Trustee made determinations that

6    putting a competitor on, where there would have been

7    protections, versus not putting them on, that's important

8    to making a determination as to whether or not it is

9    adequate representation.  That is the mechanism is how to

10   we got here.

11                   So, I'm not at this point, your Honor, going

12   under 1102(a)(1), I made that pretty clear, but I still

13   think it's relevant to how the United States Trustee made

14   the determination, because this is what's going to happen,

15   your Honor, they're going to show up and file a pleading

16   that says, this is why we did what we did, okay?  And

17   that's fine, if that's actually what happened, but without

18   seeing the documents, and what people sent to them,

19   particularly what the debtor sent -- the debtor wants

20   nothing to do with Monster, they want to pretend that our

21   $400 million doesn't exist.  They want to pretend that

22   ABC, who may have a $225 million-plus claim, that they

23   don't exist.

24                   The problem is, your Honor, we all exist,

25   but the --

1              THE COURT:  Well, let's --

2              MR. PACHULSKI:  -- fact of the matter is,

3    Mr. Wilkes, we don't believe, took that into account, and

4    the Court has a right to know that in determining whether

5    to appoint a second committee under 1102(a)(2).

6              Now, again, your Honor, I'm prepared to

7    argue it otherwise, because I don't want to spend two

8    weeks fighting over discovery.

9              THE COURT:  Fair enough, fair enough, fair

10   enough, and let me give you some comfort in that regard.

11   The way I see (a)(2), and it says, just to be clear, at a

12   request of a party in interest, the Court may order the

13   appointment of additional committees of creditors, or of

14   equity security holders if necessary to assure adequate

15   representation of creditors.

16             To me that means the Court is to make a

17   determination as to whether a second committee is

18   necessary to assure adequate representation of

19   creditors.

20             I don't care, frankly, how Mr. Wilkes, or

21   the United States Trustee's Office came to its own

22   conclusion as to what was adequate representation of

23   creditors.  That becomes my decision under (a)(2) based on

24   whatever information the movant supplies to the Court.  It

25   becomes irrelevant what Mr. Wilkes' decision was or how he

1    made it.

2                    I think, frankly, you'd likely prefer that

3    the Court have control over whether there is -- whether

4    there is adequate representation of creditors on the

5    existing committee, because it becomes up to me, and I'm a

6    neutral, and I'm not suggesting Mr. Wilkes isn't somewhat

7    neutral as well, but I am certainly neutral, and so I

8    don't see, even if you were to parade a bunch of documents

9    in front of the Court that suggests clear discrimination

10   on behalf of the U.S. Trustee's Office, I don't think it

11   matters.  I think I take at the con -- how the committee

12   is presently constituted, and that committee either

13   adequately represents the creditors' interest or it

14   doesn't, and if it doesn't, then I have the authority to

15   require the appointment of a second committee that

16   hopefully would result in adequate representation of

17   creditors, but again, the United States Trustee still gets

18   to appoint that committee, but I can require that

19   creation.

20                   So, isn't that a fair way of looking at the

21   statute, which would somewhat make the discovery, if not

22   entirely make the discovery you seek of the U.S. Trustee's

23   Office irrelevant?

24                   MR. PACHULSKI:  Your Honor, based on your

25   recitation as to how you read 1102(a)(2), which frankly I

1    agree with you, I have no concerns, and I'm prepared to go

2    forward without the discovery.

3                    THE COURT:  All right.  Fair enough.

4                    MR. PACHULSKI:  I don't know if any --

5    your Honor, I don't want to speak for everyone.

6                    As I said, we're one of five who filed this.

7    We don't necessarily agree on everything, which is why I

8    think it's good to have a committee, so that people can

9    work to build a consensus.  I don't know if anybody has a

10   disagreement with that.  I know Mr. Falconer had his mic

11   off, and he's been -- and he's a critical party here

12   because, not only is he a movant, but he was appointed on

13   the reconstituted committee, and turned down that

14   appointment.  I don't know if he wants to say anything,

15   but I totally understand what your Honor has said

16   vis-a-vis 1102(a)(2), and I have no objection to moving

17   forward without the discovery based on your views of the

18   issue, your Honor.

19                    THE COURT:  All right.  Thank you,

20   Mr. Pachulski.

21                    Mr. Falconer.

22                    MR. FALCONER:  Thank you, your Honor, for

23   the American Bottling Company, a couple of preliminary

24   points.

25                    One is we agree with Mr. Pachulski that

1   we're more concerned with the timing here, and avoiding

2   any unnecessary delay.  Our view that the discovery

3   would be helpful to the Court.  We can do it -- we

4   think it can be done pretty quickly, but if the Court

5   thinks it would not be helpful, we're fine proceeding

6   without it.

7                THE COURT:  Well, you heard, Mr. Falconer,

8   why I think it was likely irrelevant.  Do you agree or

9   disagree with that perspective on 1102(a)(2)?

10               MR. FALCONER:  We agree with the reading of

11   1102(a)(2), that the critical inquiry is adequacy of

12   representation.

13               The discovery that we're seeking, I think,

14   could speak to that, not from the perspective of why the

15   U.S. Trustee did what it did, but from the perspective of

16   the debtor, and from the official committee, the views

17   they expressed to the United States Trustee, which we

18   believe were in opposition to the formation of a second

19   committee, those communications between the debtor and

20   U.S. Trustee, and the UCC and the U.S. Trustee, speak to

21   some of the factors, the Winn Dixie factors, such as are

22   the non-trade creditors' interests already being

23   represented, or is our position unique?

24               What the UCC had to say about us and our

25   claims I think can speak directly to those factors.  What

1    the debtor said to the U.S. Trustee about why we believe

2    they oppose the formation of a second committee, I think

3    would go to the second factor, whether the second

4    committee would provide a benefit to the administration of

5    the estate.

6              So, I think there is potential --

7              THE COURT:  Although those are factors, you

8    are -- you have the burden, frankly, of proving to the

9    Court your position, regardless of what the opinion of the

10   debtor is, or what the opinion of the U.S. Trustee's

11   Office is, correct?

12             MR. FALCONER:  I don't want to speak out of

13   turn on the burden of proof question, I would defer to

14   what we said in our papers on that, and we're prepared to

15   carry that burden with or without the discovery we sought

16   here.  We had sought -- again, that's information that we

17   can't provide the Court, that we thought could be helpful

18   to the Court in making that assessment of adequacy of

19   representation, but if the Court does not feel like that

20   information would be helpful, we're in a hundred percent

21   agreement with Mr. Pachulski, we're fine proceeding

22   without it.

23             THE COURT:  All right.

24             MR. FALCONER:  But that's the benefit we

25   think it would provide.

1              THE COURT:  All right.  Does anyone else --

2    Mr. Pachulski mentioned five potential folks who wanted to

3    speak on this.  God, I hope not, but anyone else want to

4    be heard on this?

5              (No verbal response.)

6              THE COURT:  All right.  Good.

7              Here is my, here is my bottom line, I'm not

8    ruling one way or the other on whether discovery is

9    appropriate or inappropriate, that's not before me today

10   on any particular motion, or motion for protection or

11   otherwise.

12             I've expressed my views on it, on the

13   matter.  I've not ruled, but I've expressed my views on

14   the matter.

15             If the movants are prioritizing timing over

16   discovery, we go forward on the 19th, I'm happy to do that

17   on the schedule that's been described to me by Mr. Sorkin,

18   not a problem.  I have made the 20th available to the

19   extent that it's necessary for this matter instead of

20   going first before the DIP motion.  I'm also not going

21   to decide what's more important to this estate, whether

22   it's the DIP motion or the motion to appoint the

23   committee, you all can talk about that leading up to the

24   19th or 20th.

25             What I need to know for today is whether I'm

1    entering an order, which I'm happy to do, scheduling this

2    matter for the 19th or the 20th, with the scheduling

3    that's been described in terms of briefing.  Does anyone

4    disagree that that order should be entered as described by

5    Mr. Sorkin?

6               (No verbal response.)

7               THE COURT:  Okay.  So, I'm hearing none.

8    So, I'm going to enter that order.  Mr. Sorkin, please

9    provide that to me --

10              MR. SORKIN:  Yes, sir.

11              THE COURT:  -- or have Mr. Guso's office

12    provide that to me.

13              And the second question is --

14              MR. SORKIN:  We will do so.

15              THE COURT:  -- do you want me to reserve the

16    20th to make sure that we have two days available to

17    decide all these issues should they remain in conflict, as

18    opposed to just leaving the 19th available?  And I'll hear

19    from Mr. Sorkin first.  I assume your answer is yes, but

20    anyway.

21              MR. SORKIN:  I was going to say, I think

22    that would be the safest thing to do, your Honor, though

23    it would still be our goal to wrap everything up on the

24    19th.

25              THE COURT:  All right.  Does anyone disagree

1    with that?

2                    (No verbal response.)

3                    THE COURT:  All right.  So, what I'm going

4    to do now is I'm going to -- I'm going to -- let's have

5    the order provided with respect to setting aside the 20th,

6    so both of these matters would be set on the 19th and

7    20th, I'm not going to decide which order.  You all can

8    talk about that, and you can present that to me, either

9    prior to the hearing, if you think an additional hearing

10   on that order is necessary, because that's a whole other

11   discussion that, quite frankly, I don't know that it

12   makes a lot of sense to go through right now, especially

13   if you all can agree, and we'll just set them both for two

14   days of evidentiary hearing, on both the 19th and the

15   20th, and I'll need an order on the DIP as well,

16   continuing it unless that -- I guess it's just a matter of

17   extending it from the 19th to the 19th and the 20th, but I

18   think it probably makes sense to enter an order doing

19   that.

20                    Mr. Sorkin.

21                    MR. SORKIN:  Yes, your Honor, you did enter

22   the order adjourning that hearing to the 19th already, but

23   given today's developments, that probably makes sense to

24   extend it to the 20th as well.

25                    THE COURT:  All right.  So, I'll get an

```
 1    order on 408 as well with those deadlines that you've

 2    described.  All right.  Great.

 3                 So, my only hesitation at this point, quite

 4    frankly, is that I've done a lot of preparation for the

 5    hearing that's coming up.

 6                 Let me ask you, is there any chance of a

 7    resolution of this matter in terms of appointing a second

 8    committee on a consensual basis?  And feel free to tell me

 9    the answer is no, if the answer is no.  No is -- I used to

10    tell my kids, no is a complete sentence, even though it

11    never was a complete sentence, I had to explain myself

12    over and over again, but we all have that with our kids,

13    but anyway, is it possible that this matter can be

14    resolved consensually?  And, again, feel free to tell me

15    if the answer is no.

16                 Mr. Wilkes.

17                 MR. FALCONER:  Your Honor --

18                 THE COURT:  Or, Mr. Falconer, go ahead.

19                 MR. FALCONER:  Apologies, your Honor.

20                 We did speak with Mr. Wilkes and his

21    colleagues in the U.S. Trustee's Office this morning just

22    on that question, to try to see if there is a path to an

23    agreed resolution, and at this point it does not look like

24    there is.  I think we're at a pretty firm impasse on

25    whether a second committee is necessary.
```

1          THE COURT:  All right.  Mr. Wilkes, you

2   agree with that, I assume?

3          MR. WILKES:  Thank you, your Honor

4   J. Steven Wilkes for the United States Trustee.

5          We did speak this morning, not at length,

6   but in full answer to their questions, and Mr. Falconer is

7   correct, under 1101(a)(1), the United States Trustee does

8   not see that a second committee, a discretionary second

9   committee is required in this case.

10          THE COURT:  All right.  Fair enough.  All

11  right.  So, is there anything else you all wish to discuss

12  today?  Because I think we're where we are.  Anything else

13  we need to go over?

14          MR. SORKIN:  Nothing on my end, your Honor,

15  and thank you for accommodating us today, and with your

16  schedule in the coming weeks.

17          THE COURT:  All right.  Not a problem, then

18  we will see you all on the 19th and 20th, and I'll look

19  forward to receiving those orders, I guess from Mr. Guso's

20  office, is that right, Mr. Guso?

21          MR. GUSO:  Yes, your Honor, we will upload

22  the orders.

23          THE COURT:  All right.  Thank you all very

24  much, and I'll see you then.

25          MR. PACHULSKI:  Thank you so much,

1   your Honor.

2                   MR. FALCONER:   Thank you, your Honor.

3                   MR. SORKIN:   Thank you, your Honor.

4

5

6

7                   (Thereupon, the hearing was concluded.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 57

1

2

3                              CERTIFICATION

4

5    STATE OF FLORIDA        :

6    COUNTY OF MIAMI-DADE   :

7

8              I, Cheryl L. Jenkins, RPR, RMR, Shorthand

9    Reporter and Notary Public in and for the State of Florida

10   at Large, do hereby certify that the foregoing proceedings

11   were transcribed by me from a digital recording held on

12   the date and from the place as stated in the caption

13   hereto on Page 1 to the best of my ability.

14             WITNESS my hand this 8th day of

15   December, 2022.

16

17

18        _____

19             CHERYL L. JENKINS, RPR, RMR

20             Court Reporter and Notary Public

           in and for the State of Florida at Large

21               Commission #HH 170910

                 December 27, 2025

22

23

24

25