UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION
www.flsb.uscourts.gov

In re:

VITAL PHARMACEUTICALS, INC., *et al.*,

Debtors.[1]

_____/

Chapter 11 Cases

Case No.: 22-17842-PDR

(Jointly Administered)

## DEBTORS' OBJECTION TO THE MOTION OF MONSTER ENERGY COMPANY, THE AMERICAN BOTTLING COMPANY, INC., SONY MUSIC ENTERTAINMENT, UMG RECORDINGS, INC. AND ORANGE BANG, INC. FOR AN ORDER PURSUANT TO 11 U.S.C. § 1102(a)(2) DIRECTING THE APPOINTMENT OF AN OFFICIAL COMMITTEE OF CREDITORS HOLDING NON-TRADE CLAIMS

The above-captioned debtors and debtors-in-possession (collectively, the "Debtors"), by and through their undersigned counsel, hereby file this objection (this "Objection") to the *Motion of Monster Energy Company, the American Bottling Company, Inc., Sony Music Entertainment, UMG Recordings, Inc. and Orange Bang, Inc. for an Order Pursuant to 11 U.S.C. § 1102(a)(2) Directing the Appointment of an Official Committee of Creditors Holding Non-Trade Claims* [Docket No. 408] (the "Motion").  In support of this Objection, the Debtors respectfully state as follows and also hereby join the *Prepetition Agent's and DIP Agent's Response to Joint Motion Directing the Appointment of an Official Committee of Creditors Holding Non-Trade Claims* [Docket No. 499] and the objection of the Official Committee of Unsecured Creditors to the Motion, filed concurrently herewith, to the extent the arguments therein are consistent with this Objection:

---

[1] The address of the Debtors is 1600 N. Park Drive, Weston, FL 33326.  The last four digits of the Debtors' federal tax identification numbers are: (i) Vital Pharmaceuticals, Inc. ("Vital Pharmaceuticals") (8430); (ii) Bang Energy Canada, Inc. (5454); (iii) JHO Intellectual Property Holdings, LLC (0010); (iv) JHO Real Estate Investment, LLC (9394); (v) Quash Seltzer, LLC ("Quash Seltzer") (6501); (vi) Rainbow Unicorn Bev LLC (2254); and (vii) Vital Pharmaceuticals International Sales, Inc. (8019).

## PRELIMINARY STATEMENT

1.      Appointment of a duplicate committee of general unsecured creditors is extraordinary relief.  It is unsupported by the legislative history of Section 1102, rejected in the vast majority of cases addressing the issue, and particularly inappropriate here.  The Debtors are unaware of any reported decision in which a court has ordered appointment of a separate "non-trade" committee to supplement a committee that already includes such non-trade creditors; and the Debtors would be shocked if any court has countenanced the "adequate representation" demands of movants who, like certain of the Movants here, are *refusing to sit on the existing, representative committee because they will not dominate it*.  Adequate representation does not mean committee domination, nor does it mean separate committees for special interests.  The purpose of a single committee of general unsecured creditors is to embrace varying interests and promote compromise within the committee.  Here, the existing Committee (as defined below) provides more than adequate, and appropriate, representation to all unsecured creditors.

2.      Moreover, even were there any concern that the Movants' interests would be disregarded on the Committee (and there is no such concern), the Movants are already adequately represented.  The Movants have appeared at every hearing, have actively participated in DIP discussions and objections, and have made clear through their current Motion that they are organized among themselves.

3.      The question is not the adequacy of the Movants' representation, rather who will pay for it.  But Section 1102 is not a fee-payment vehicle, and it provides no basis to require the Debtors to pay these expenses in addition to the fees of the two law firms, financial advisor, and investment banker already ably representing all general unsecured creditors.  If the Movants are able to demonstrate later that they have in fact made a contribution meaningfully beyond the

Committee's, then they can seek fees pursuant to Section 503(b).[2]  Now is not the time, and Section 1102 is not the place, for the Movants' true request.

## BACKGROUND

4.        On October 10, 2022 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

5.        The Debtors are operating their businesses and managing their affairs as debtors in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.[3]

6.        On November 1, 2022, the Office of the United States Trustee (the "UST") appointed a seven-member Official Committee of Unsecured Creditors (the "Original Committee"), consisting of (i) Stellar Group, Inc.; (ii) Archer Daniels Midland Co.; (iii) Trinity Logistics, Inc.; (iv) Ardagh Metal Packaging USA Corp.; (v) Crown Cork & Seal USA, Inc.; (vi) QuikTrip Corporation; and (vii) XPO Logistics, LLC.  *See* Docket No. 245.  No request has been made for the appointment of a trustee or examiner.

7.        On November 23, 2022, the UST filed a notice that it had reconstituted the Original Committee (as modified, the "Committee") by adding the following four additional members: (i) Warner Music Group Corp. ("Warner"); (ii) PepsiCo., Inc.; (iii) The American Bottling Co., Inc. ("ABC"); and (iv) Peter Fischer (as plaintiff in a putative class action).  *See* Docket No. 400.

8.        Despite having requested an additional committee to ensure its adequate representation, ABC notified the UST that it was not willing to serve on the Committee as reconstituted and tendered its resignation on November 27, 2022.  *See* Docket No. 408-7.

---

[2] The Debtors reserve all rights to oppose any motions for allowance of administrative expense claims pursuant to Section 503 of the Bankruptcy Code.

[3] For a detailed description of the Debtors and their operations, the Debtors respectfully refer the Court and parties in interest to the *Declaration of John C. DiDonato in Support of Chapter 11 Petitions and First Day Pleadings* [Docket No. 10] (the "First Day Declaration"), which is incorporated herein by reference.

9.      The Movants averred that Warner similarly was "not inclined to sit on [a Committee] in which non-trade creditors are in the minority."    Motion ¶ 5.    The UST later confirmed that Warner had resigned.  *See United States Preliminary Objection to the Motion to Direct The United States Trustee to Appoint a Second Official Committee of Unsecured Creditors* [Docket No. 466] (the "UST Preliminary Objection") at n. 2.

10.      On November 27, 2022, Monster Energy Company ("Monster Energy"), Orange Bang Inc. ("Orange Bang"), ABC, Sony Music Entertainment ("Sony"), and UMG Recordings, Inc. ("UMG" and together with Monster Energy, Orange Bang, ABC, Sony, the "Movants") filed the Motion, seeking appointment of an official committee of non-trade creditors ("Non-Trade Creditors' Committee").

11.      The UST filed the UST Preliminary Objection on December 2, 2022, and as of the date hereof, has declined to exercise her statutory discretion to appoint any additional official committees.

12.      On December 6, 2022, the Court held a preliminary hearing/status conference on the Motion.

13.      On December 9, 2022, the Court entered the *Order Setting Final Hearing and Briefing Schedule with Respect to Motion of Monster Energy Company, The American Bottling Company, Inc., Sony Music Entertainment, UMG Recordings, Inc. and Orange Bang, Inc. for an Order Pursuant to 11 U.S.C. § 1102(a)(2) Directing the Appointment of an Official Committee of Creditors Holding Non-Trade Claims* [Docket No. 490] which, among other things, scheduled the final hearing on the Motion for December 19 and/or 20, 2022.

<u>**ARGUMENT**</u>

**I.      The Movants Have Failed to Meet Their Burden That a Second Committee Is Necessary to Adequately Represent Their Interests**

14.      Section 1102(a)(2) of the Bankruptcy Code provides that "[o]n request of a party in interest," the court may order the appointment of a second creditors' committee "if necessary to assure adequate representation of creditors." 11 U.S.C. § 1102(a)(2). Because Section 1102(a)(1) expressly gives the UST the power to decide whether to appoint a second creditors' committee in the first instance, a court's decision to overrule the UST's discretionary power and order the appointment of another committee under Section 1102(a)(2) "is an extraordinary remedy that courts are reluctant to grant." *In re Residential Capital, Inc.*, 480 B.R. 550, 557 (Bankr. S.D.N.Y. 2012) (citing *In re Dana Corp.*, 344 B.R. 35, 38 (Bankr. S.D.N.Y. 2006)); *see also In re Enron Corp.*, 279 B.R. 671, 685 (Bankr. S.D.N.Y. 2002) ("[O]rdering the appointment of additional committees, particularly given that the matter is often first reviewed and addressed by the U.S. Trustee, is an extraordinary remedy.").

15.      In addition, the relevant case law clarifies that Section 1102(a)(2) actually requires the court to decide two issues: "First, the court must determine whether the appointment of an additional committee is necessary to assure the movants are adequately represented. Second, if the answer to the first question is yes, then the court must decide whether it should exercise its discretion and order the appointment." *Enron*, 279 B.R. at 685.

16.      The Bankruptcy Code does not provide a required approach to answering these questions, and "courts have considered many and diverse factors." *In re Budd Co.*, 512 B.R. 910, 913 (Bankr. N.D. Ill. 2014). Factors considered by courts include:

(1)      the nature of the case;

(2)      whether an additional committee would provide a benefit to the overall administration to the estate;

(3)     the costs, including the retention of experts other than attorneys, which would result from the appointment of an additional committee;

(4)     whether the movant's interests are already being represented;

(5)     whether movant's position is unique; and

(6)     the movant's ability participate in the case without an official committee;

*See Winn-Dixie*, 326 B.R. 853, 857 (Bankr. M.D. Fla. 2005) (citing *Enron*, 279 B.R. at 685). No single factor is dispositive, "and the amount of weight that the court should place on each factor may depend on the circumstances of the particular Chapter 11 case." *See In re Kalvar Microfilm*, 159 B.R. 599, 600-01 (Bankr. D. Del. 1996).

17.     Finally, "the burden of demonstrating the need for adequate representation under [Section 1102(a)(2)] is borne, in the first instance, by the party seeking appointment." *Albero v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 68 B.R. 155, 158 (S.D.N.Y. 1986); *see also Winn-Dixie*, 362 B.R. at 857.

18.     The Movants have failed to meet their burden of establishing that a Non-Trade Creditors' Committee is necessary to adequately represent the interests of non-trade creditors like the Movants, which is "a high standard that is far more onerous than if the statute merely provided that a committee be useful or appropriate." *In re Eastman Kodak Co.*, No. 12-10202 ALG, 2012 WL 2501071 at *2 (Bankr. S.D.N.Y. 2012).

**A.     The Nature of the Case Does Not Support Appointment of an Additional Committee**

19.     The Movants essentially argue that they are entitled to an additional committee representing only their interests because (a) their "interests are fundamentally not in alignment" with the interests of trade claimants, and (b) their non-trade claims "dwarf the trade claims" of the

other Committee members.  Motion ¶¶ 43-44.  This argument misconstrues the purpose of an unsecured creditors' committee.

20.     As an initial matter, overwhelming authority provides that adequate representation exists even where the creditors' committee members represent unsecured constituencies with diverging interests.  *See In re Beker Indus. Corp.*, 55 B.R. 945, 948-49 (Bankr. S.D.N.Y. 1985) ("[Any additional] committees should be composed of creditors or equity security ***holders representative of classes as a whole as opposed to dissident factions of particular classes.***").  In fact, it is "universally recognized that intercreditor conflicts inhere in any committee."  *In re Sharon Steel Corp.*, 100 B.R. 767, 777 (Bankr. W.D. Pa. 1989).  Rather than render a particular category of unsecured creditors inadequately represented, the existence of diverging interests *enhances* the function of a creditors' committee "as a catalyst for negotiation and compromise between the parties in the reorganization process."  *In re Hills Stores Co.*, 137 B.R. 4, 6 (Bankr. S.D.N.Y. 1992).  Courts also recognize that an additional committee often undermines this purpose, especially where the additional committee is meant "to satisfy one group of creditors, a group that already has representation on the Creditors' Committee, only to create further discord, litigation and delay."  *Enron*, 279 B.R. at 688.

21.     The Movants ask the Court to do exactly what *Beker* (which the Movants cite) instructs ***not*** to do: create two committees that are representative of dissident factions of the general unsecured claims.  The Movants appear to suggest that their claims, which they admit or do not deny are general unsecured claims,[4] belong in a different class from trade claims, which are also general unsecured claims.  Motion ¶ 43. But other than offering premature speculation at the outset

---

[4] *See* Proofs of Claim of The American Bottling Company [Claim Nos. 30, 31, 32, 33, 34, 35, 36]; Proofs of Claim of Monster Energy Company [Claim Nos. 28, 29]; Proofs of Claim of Orange Bang, Inc. [Claim Nos. 10, 11]; Scheduled Claim of Sony Music Entertainment [Schedule No. 2411991]; Scheduled Claim of UMG Recordings [Schedule No. 2412001].

of these cases that the Debtors will classify their claims differently under a proposed plan, the Movants fail to cite any authority for the proposition that their claims and the trade claims are, or ever will be, in different classes. *Id.* ¶ 45. In fact, the same legislative history cited by the Movants indicates that Congress's intention when drafting Section 1102(a) was for a single creditors' committee representing the whole body of unsecured creditors to constitute adequate representation for unsecured claimholders, with additional committees contemplated for entirely different constituencies:

> There will be at least one committee in each case. Because unsecured creditors are normally the largest body of creditors and most in need of representation, the bill requires that there be a committee of unsecured creditors . . . the bill also provides for additional committees, with status equal to that of the unsecured creditors' committee, when such additional committees are needed to represent various other interests in this case, including secured creditors, subordinated creditors, and equity security holders.

H.R. REP. No. 95-595, at 235–36 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6195.

22.    In addition, the Movants argue that because the value of their claims "dwarf" the value of trade claims, they lack adequate representation and therefore are entitled to appointment to an additional official committee. This argument is unavailing. Courts have emphasized that adequate representation does not require proportionate representation. Indeed, "[t]he issue is not whether the Creditors' Committee is an ***exact replica*** of the creditor body, but whether representation of various creditor types is adequate." *Enron*, 279 B.R. at 690 (emphasis added); *see also In re Residential Capital, LLC*, 480 B.R. at 559 ("[A]dequate representation ***does not require proportionate representation*** of distinct groups of creditors on a committee of unsecured creditors. The determinative factor is whether the official committee is serving their interests as unsecured creditors.") (emphasis added). Indeed, courts have made it clear that claimants cannot argue inadequate representation on the grounds that they "are effectively rendered impotent to

protect their interests without a majority voice." *Hills*, 137 B.R. at 7. But this is precisely what the Movants argue here. The fact that the Movants "may not be able to protect all their interests and achieve *all* their goals is not paramount, as the ultimate aim is to strike a proper balance between the parties such that an effective and viable reorganization of the debtor may be accomplished." *Hills*, 137 B.R. at 7.

23.    The Committee has already been appointed, including certain of the Movants, and it has a fiduciary duty to represent the interests of all of the unsecured creditors. *See In re Garden Ridge Corp.*, 2005 WL 523129, at *3 (Bankr. D. Del. Mar. 2, 2005); *Residential Capital*, 480 B.R. at 559. Nothing in this case justifies the creation of an additional committee, and doing so would likely "intensify conflict and lead to further complication." *Enron*, 279 B.R. at the 688; *see also Mirant Americas Energy Marketing, L.P. v. Official Comm. of Secured Creditors (In re Enron Corp.)*, No. 02-6274, 2003 WL 22327118, at *8 (S.D.N.Y. Oct. 10, 2003) ("A rule of decision based purely on whether separate 'classes' of creditors have differing interests would lead to the unnecessary proliferation of committees at an astronomical cost to the bankruptcy estates.") (internal quotes omitted). That is particularly true where, as here, the effort to appoint the additional committee is led by a strategic competitor of the Debtors, Monster Energy, whose history with the Debtors leaves no doubt about its preference for competition in the courtroom instead of the marketplace.[5]

---

[5] *See* Redacted Final Arbitration Award, *Vital Pharms., Inc. and JHO Intellectual Prop. Holdings, LLC v. Orange Bang, Inc. and Monster Energy Co.*, C.D. Cal., Case No. 5:20-cv-1464, Docket No. 732-1, (excerpts of which are attached hereto as Exhibit A at 40 ("Fox, Orange Bang's President . . . called Rodney Sacks ('Sacks'), the CEO of Monster, and spoke with one of Monster's in-house attorneys. Fox and Stein [Fox's number two] arranged a meeting with Sacks. In mid-August of 2019, Fox and Stein attended a meeting with Sacks and some of Monster's attorneys."); at 41 ("Suffice it to say that Monster and its attorneys quickly grasped the significance of the 2010 Settlement Agreement [between VPX and Orange Bang] and how it could 'weaponize' it").

### B.    An Additional Committee Would Not Provide a Benefit to the Overall Administration of the Estate

24.    The Movants argue that an additional committee would "help drive these cases toward a consensual resolution" because, in so many words, it would allow the non-trade claimants to participate in these cases as a single entity, by (a) "giving the Debtors a single point of contact and other outreach," (b) "avoiding a flurry of non-trade creditor filings on certain contested issues on which each creditor would feel compelled to be heard to protect their rights," and (c) it would give the non-trade creditors both the opportunity and the incentive to arrive at consensus and speak with a unified voice." *See* Motion ¶ 47.  This argument fails for a number of reasons.

25.    To begin, the Committee already serves the purpose of representing the general unsecured claimants, including the non-trade claimants.  Thus, rather than giving the Debtors "a single point of contact," the Debtors would have *two* points of contact for general unsecured creditors.  In addition, appointing a second committee, which may or may not include the Movants, does nothing to guarantee that these Movants or other individual non-trade claimants will not feel compelled to protect their interests independently.  Moreover, the Movants currently comprise *five* non-trade claimants, each of which has acted in concert in filing the Motion (instead of five separate motions), and three of which acted together in objecting to the Debtors' DIP facility on a final basis.[6]  Nothing stands in the way of the Movants' continuing to coordinate their participation as a "single point of contact" for their views.

26.    Most importantly, the "unified voice" argument advanced by the Movants fails because it completely ignores all of the other general unsecured creditors that are in the same class

---

[6] *See Objection of Monster Energy Company to Debtors' Emergency Motion for Interim and Final Orders (I) Approving Postpetition Financing, (II) Authorizing Use of Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* [Docket No. 411] (joined by Orange Bang at Docket No. 414 and ABC at Docket No. 415).

as the Movants. Instead of simplifying the administration of the estates, an additional committee would make reaching a consensus in these cases *more difficult*. *See Enron*, 279 B.R. at 688 ("***Adding additional committees would likely intensify conflict* . . . .**") (emphasis added); *Sharon Steel*, 100 B..R. at 79 ("***The formation of a separate committee will not eliminate inherent tensions; indeed, it will only weaken the impetus to compromise*.**") (emphasis added). Put simply, the Movants argue that all parties in interest will be better off by making it easier for non-trade claimants to reach consensus, while disregarding the increased difficulty for such claimants to reach consensus with the remaining general unsecured creditors. *See Mirant*, 2003 WL 22327118, at *8 ("Because creditors would be balkanized into several independent committees, each furthering the interests of only certain groups, the consultation and balancing of interests necessary for a successful negotiation of a reorganization plan would be severely hampered.").

27.    As courts have nearly universally recognized, the proper place to resolve conflicting creditor views is within a single committee that owes a fiduciary duty to all general unsecured creditors. *See Enron*, 100 B.R. at 688 ("With one body having a fiduciary duty to all unsecured creditors, the parties are placed on an even ground in their commonality as unsecured creditors with a goal toward maximizing recovery."); *Sharon Steel*, 100 B.R. at 779 ("[T]his case will succeed or fail to the extent members of the Official Committee adjust their differences within the framework of the existent Official Committee."); *Hills*, 137 B.R. at 7 ("As in most Chapter 11 cases, there will be common interests among various groups of unsecured creditors. The inclusion of such groups within one committee may facilitate the consensual resolution of the conflicting priorities among the holders of unsecured claims and thereby facilitate the negotiation of a consensual plan."). The correct unified voice already exists in these cases—the existing Committee.

11

C.    **The Costs, Including the Retention of Experts Other than Attorneys, That Would Result from the Appointment of an Additional Committee Would Unduly Burden the Debtors' Estates**

28.    Regarding the substantial cost entailed by appointment of a duplicate committee, the Movants argue that (a) cost on its own is not dispositive of whether a second committee should be appointed, and (b) it would be unfair for the Movants' fees and expenses not to be funded by the Debtors' estates in the same way that the fees and expenses of the Debtors and the Committee are being paid. *See* Motion. ¶ 50-51.

29.    Although not dispositive on its own, the cost of a duplicate committee is a serious concern. *See Winn-Dixie*, 326 B.R. at 857-58 ("The Court finds that the additional costs . . . militate against the appointment of an additional committee."). Indeed, the Movants do not dispute that an additional committee would saddle the estates with additional costs; rather they opine that such costs will be "manageable." Motion ¶ 51. Simply stating that the costs will be "manageable" can hardly be enough to weigh in the Movants' favor, especially where the Movants' bear the burden of proving that an additional committee is necessary. *See Winn-Dixie*, 326 B.R. at 857 ("The party seeking the appointment of an additional committee bears the burden of proving it is not adequately represented.").

30.    To the contrary, the existing record alone makes clear that such "manageable" costs would be highly burdensome. The existing Committee is already represented by four separate professional advisor teams: (i) Lowenstein Sandler LLP (as lead counsel); (ii) Sequor Law, P.A. (as local counsel); (iii) Lincoln Partners Advisors LLC (as financial advisor); and (iv) Miller Buckfire & Co., LLC (as investment banker). The Non-Trade Creditors' Committee, if appointed, will undoubtedly retain its own matching set of professionals, as the Movants admitted. *See* December 6, 2022 Hr'g Tr. at 26:2-3 ("We'd have a financial advisor, like Mr. D'Amico, who would be coordinating with the committee") (attached hereto as Exhibit B). Given Movants'

position that the existing Committee does not speak for non-trade creditors at all, these new advisors will need to duplicate, for their own committee, the work of the four advisor teams already working for the existing Committee. The advisors will be doubled, the work will be doubled, and the fees will likely be doubled as well. Such additional professional fees undoubtedly reduce potential recovery to general unsecured creditors without clear benefits, because the Committee has adequately represented the interests of all unsecured creditors.

31.    No more persuasive is the Movants' argument that "they are not being treated fairly" unless they have "their own committee funded the same way" as the Committee. *See* Motion ¶ 51. The Movants provide *no* authority for the proposition that concerns over additional costs should be ignored because it would simply be "unfair" if the Debtors' estates did not reimburse an ad hoc group's professional fees. Indeed, nothing in the Bankruptcy Code entitles the Movants to recover legal fees for their choice to participate in these cases outside of the Committee's representation of their interests, and any purported appeal to fairness does not serve as a legitimate basis for appointing an additional official committee. In any event, if fees are the real issue, which it seems they are, the Movants may (at the appropriate time and in accordance with the appropriate procedure) seek to recover their professional fees under Section 503(b). *See Enron*, 279 B.R. at 694 ("Their ability to be compensated has not been foreclosed, and the Movants may file an appropriate application for administrative expense payment for substantial contribution to the estate pursuant to 11 U.S.C. § 503(b) at an appropriate time.").

32.    In addition, duplication of the existing Committee, the dilution of its powers by the appointment of an additional committee, and the specter of additional conflict and disputes will inevitably complicate the administration of these Chapter 11 Cases, and will prolong the process by which the Debtors and their stakeholders build consensus and arrive at a consensual value-

maximizing outcome. *See Mirant*, 2003 WL 22327118, at *8 ("A rule of decision based purely on whether separate 'classes' of creditors have differing interests would lead to the unnecessary proliferation of committees at an astronomical cost to the bankruptcy estates."). Appointment of an additional committee will not merely require the Debtors' estates to pay the same costs twice; it will incur further costs as a result of the ensuing complication and discord. Accordingly, the cost factor and process efficiency weigh against the appointment of a Non-Trade Creditors' Committee.

### D.    The Movants' Interests Are Already Being Represented

33.    In an attempt to show inadequate representation, the Movants cite a single case in which a court directed appointment of an additional committee of unsecured commercial creditors: *In re Roman Catholic Church of the Archdiocese of New Orleans*, No.: 20-10846, 2021 WL 454220 (Bankr. E.D. La. Feb. 8, 2021). The outcome in *Archdiocese* was highly dependent on circumstances unique to that case, the most critical of which are (i) the committee exclusively comprised representatives of a highly specialized group—alleged victims of sexual abuse, *see id.*. at *7; (ii) as is unsurprising given the context, the original committee's activities prior to consideration of the request to appoint the second committee made clear that the original committee was particularly focused on the interests of abuse claimants, leaving commercial creditor concerns unrepresented in the committee, *see id.* at *14; and (iii) the debtor supported the appointment of the second committee, *see id.* at *1. As a result of those circumstances, the *Archdiocese* court concluded that "[t]he Committee is comprised of special interests, but traditional, unsecured commercial interests go unrepresented." *Id.* at *14 .

34.    The circumstances here are vastly different: (i) the Committee includes non-trade creditors (and would include more if ABC and Warner had not refused to participate); (ii) there is no evidence that the Committee, even before its reconstitution, focused solely on the interests of a

single specialized group; and (iii) the Debtors—indeed everyone other than the Movants—oppose the Motion.  Not only is the Movants' reliance on *Archdiocese* is misplaced, *Archdiocese* is the exception that proves the rule.

35.    In a misguided effort to artificially distinguish between trade and non-trade creditors, the Movants contend that "[t]rade creditors will want to continue their business relationships with the Debtors, whereas non-trade creditors may favor whichever exit transaction generates maximum proceeds."  Motion ¶ 44.  This unsupported speculation does not begin to meet Movant's burden under Section 1102(a)(2).  It is too early to know what plan of reorganization will ultimately take shape, or which aspects of a plan differently situated creditors will believe benefit them.  Non-trade claimants may equally favor a plan pursuant to which the Debtors maintain all productive trade relationships; trade claimants could equally support a sale; and many other interests will be weighed.  Moreover, the only evidence in the record of these Cases demonstrates the Committee speaking with a single voice for benefit of both allegedly divergent positions—e.g., sale versus reorganization.  *See, e.g., Official Committee of Unsecured Creditors' Objection to Debtors' Emergency Motion for Interim and Final Orders (I) Approving Postpetition Financing, (II) Authorizing Use of Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* [Docket No. 413]  ¶ 1 ("[T]he Committee cannot consent to a DIP Facility that is prejudicial to unsecured creditors and weakens the likelihood of the Company's successful sale or reorganization.").  Speculation aside, the Movants have not demonstrated, and there is not (to the Debtors' knowledge), a single incident where the Committee advocated the interests of trade creditors but refused to represent the non-trade creditors.

36.    Again, the purpose, indeed the duty, of a single committee of general unsecured creditors is to embrace and reconcile the very differences that Movants assert exist. *See Official Unsecured Creditors' Comm. v. Stern (In re SPM Mfg. Corp.)*, 984 F.2d 1305, 1317 (1st Cir. 1993) ("No two creditors have identical interests . . . and the Code implicitly recognized that fact by providing a procedural framework for handling the various divergent interest of the parties to a bankruptcy."); *Enron*, 100 B.R. at 688 ("With one body having a fiduciary duty to all unsecured creditors, the parties are placed on an even ground in their commonality as unsecured creditors with a goal toward maximizing recovery."); *Sharon Steel*, 100 B.R. at 779 ("[T]his case will succeed or fail to the extent members of the Official Committee adjust their differences within the framework of the existing Official Committee."). Any other rule would lead to "the unnecessary proliferation of committees at an astronomical cost to the bankruptcy estates," *Mirant*, 2003 WL 22327118, at *8. To the extent the trade versus non-trade distinction gives rise to any differing views, the existing Committee will discharge its duty, reconcile those differences, and speak with a unified voice.

37.    Finally, the Committee, as reconstituted, includes non-trade claimants—and would include even more if ABC and Warner had not refused to participate in a committee they did not dominate. As reconstituted on November 23 and before ABC's and Warner's resignations, non-trade creditors occupied four of eleven seats. Even after those tactical resignations, non-trade creditors occupy two of nine seats.[7] Even assuming non-trade claimants require seats on the

---

[7] The trade versus non-trade distinction on which the Movants relied is misleading. In fact, five out of the nine members on the reconstituted Committee (*i.e.*, Trinity, Ardagh, XPO, Pepsi, and Peter Fischer) are not currently doing business with the Debtors, and four out of the nine members (*i.e.*, Stellar, Ardagh, Pepsi, and Peter Fischer) are in pending litigation with the Debtors. Thus, in the Movants' words, four or five of the current Committee members, like the Movants as non-trade creditors, may not "want to continue their business relationships with the Debtors" and may "favor whichever exit transaction generates maximum proceeds." Motion ¶ 44. The Committee more than adequately represents the Movants' interests.

Committee for their interests to be recognized, they have those seats. *See Sharon Steel*, 100 B.R. at 778-79 ("[A]dequate representation exists through a single committee as long as the diverse interests of the various creditor groups are represented on and have participated in that committee.").

### E.    The Movants' Position Is Not Sufficiently Unique to Warrant Appointment of a Second Committee

38.    In support of their request for the appointment of a Non-Trade Creditors' Committee, the Movants assert that the "Movants may have the largest of the non-trade claims against the Debtors, but their position is far from unique among the non-trade creditors." Motion ¶ 55. However, the question is not whether Movants are different from other non-trade creditors, the question is whether trade creditors are different from other general unsecured creditors. *See Winn-Dixie*, 326 B.R. at 858 (querying whether "Plan Participants' position is so unusual as to warrant appointment of an additional creditors' committee"). Here, as in *Winn-Dixie*, trade creditors "have unsecured claims, [and therefore] have the same interest as every other unsecured creditor, maximizing the value of the Debtors' estates." *Id.*; *see also In re Agway, Inc.*, 297 B.R. 371, 374 (Bankr. N.D.N.Y. 2003) (denying a request under Section 1102 of the Bankruptcy Code for appointment of a separate creditors committee to represent the interests of retirees); *In re Mansfield Ferrous Castings, Inc.*, 96 B.R. 779, 781 (Bankr. N.D. Ohio 1988) (finding that employees' unique status as both creditors and equity holders warranted the creation of a separate employee committee but indicating that "if the Employees' status was solely as creditors, the [creditors committee] would be able to adequately represent them"). The courts in the cases cited by the Movants did not direct appointment of committees of non-trade creditors, much less rely upon the distinction between trade and non-trade creditors.

**F.     The Movants Have Demonstrated Their Ability to Participate in the Case Without Appointment of a Second Committee**

39.    The Movants, as a de facto ad hoc group of non-trade creditors, are well organized, ably represented, and actively participating in these Chapter 11 Cases.  Counsel to each of the Movants has filed notice of appearance, counsel to at least one of the Movants has appeared at every hearing, and the Movants have filed objections to several of the Debtors' key motions.  *See Preliminary Objection of Monster Energy Company to Debtors' Emergency Motion for Interim and Final Orders (I) Approving Postpetition Financing, (II) Authorizing Use of Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, (Vi) Scheduling a Final Hearing, and (VII) Granting Related Relief* [Docket No. 87] (filed by Monster Energy); *Objection of Monster Energy Company to Debtors' Emergency Motion for Interim and Final Orders (I) Approving Postpetition Financing, (II) Authorizing Use of Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* [Docket No. 411] (filed by Monster Energy and joined by Orange Bang at Docket No. 414 and by ABC at Docket No. 415).[8]   In addition, the Movants, through the present Motion, conclusively demonstrate their ability to organize and advocate for their common interests as a single body.  In short, "each of Movants is represented by competent counsel.  Furthermore, their voices have been

---

[8] The notices of appearance filed by the Movants can be found at Docket Nos. (i) 82, 83, 93 (Monster Energy); (ii) 252, 398 (Orange Bang); (iii) 166, 167 (ABC); (iv) 433 (Sony); and (v) 432 (UMG).  And the pro hac vice motions filed on behalf of the Movants' counsel can be found at Docket Nos. (i) 84, 89, 91, 92, 135, 136 (Monster Energy); (ii) 253, 254 (Orange Bang); (iii) 170, 171 (ABC); (iv) 434, 435, 473, 474 (Sony); and (v) 434, 435 (UMG).

heard and have provided an impetus to several actions taken in these cases.  Clearly the Movants

have taken and can continue to take an active role in these cases."  *Enron*, 279 B.R. at 693.[9]

40.    The Movants go one step further and characterize their Motion as an attempt to

represent the interests of all non-trade creditors, purportedly enabling those creditors to participate

in these Chapter 11 Cases.  *See* Motion ¶ 56 (Exclusion from committee membership "based upon

the active participation of existing counsel and [non-trade creditors'] substantial interests in the

outcome of these cases . . . is both legally and conceptually infirm and even if valid, would apply

only to the very largest of the non-trade creditors, not to all of the claimants in the 63 disputes in

which the Debtors are involved").  Such characterization, however, is belied by the absence of any

joinders to the Motion as of the time this Objection is filed, especially when "Monster Energy is

informed and believes that its request for the appointment of a Non-Trade Creditors' Committee

will be joined by other similarly situated."  Motion ¶ 55.  Indeed, no other non-trade creditors

should be willing to serve on such committee only to be dominated by the Movants.

---

[9] The Movants' reliance on *In re Park W. Circle Realty, LLC*, No. 10-12965 (AJG), 2010 WL 3219531 (Bankr. S.D.N.Y. Aug. 11, 2010) is misplaced.  The Movants acknowledge that in *Park* the court "found that although the single largest creditor could participate on its own, the committee would benefit from that creditor's involvement." Motion. ¶ 57.  The question there was whether the court should direct the U.S. Trustee to appoint a particular creditor to the lone creditors' committee under Section 1102(a)(4)—not whether a second committee should be appointed under Section 1102(a)(2) simply because an unsecured creditor had a large claim.  *Park*, 2010 WL 3219531, at *1. Thus, the issue in *Park* was completely different from the issue before this Court now.

## CONCLUSION

41.    Based upon the foregoing, the Debtors respectfully request that the Motion be denied in its entirety and that the Court grant such other and further relief as may be appropriate under the circumstances.

Dated:    December 12, 2022
            Miami, Florida

Respectfully submitted,

*/s/ Jordi Guso*

Jordi Guso
**BERGER SINGERMAN LLP**
1450 Brickell Avenue, Suite 1900
Miami, FL 33131
Telephone:   (305) 755-9500
Email:   jguso@bergersingerman.com

George A. Davis (admitted *pro hac vice*)
Hugh K. Murtagh (admitted *pro hac vice*)
Tianjiao ("TJ") Li (admitted *pro hac vice*)
Brian S. Rosen (admitted *pro hac vice*)
Jonathan J. Weichselbaum (admitted *pro hac vice*)
**LATHAM & WATKINS LLP**
1271 Avenue of the Americas
New York, NY 10020
Telephone:   (212) 906-1200
Email:   george.davis@lw.com
       hugh.murtagh@lw.com
       tj.li@lw.com
       brian.rosen@lw.com
       jon.weichselbaum@lw.com

- and -

Andrew D. Sorkin (admitted *pro hac vice*)
**LATHAM & WATKINS LLP**
555 Eleventh Street, NW, Suite 1000
Washington, D.C. 2004
Telephone:   (202) 637-2200
Email:   andrew.sorkin@lw.com

**<u>Exhibit A</u>**

Excerpts of Redacted Final Arbitration Award

1  Bruce Isaacs, Arbitrator

2  SIGNATURE RESOLUTION, LLC

3  633 W. 5th Street, Suite 1000

4  Los Angeles, CA 90071

5  bisaacs@signatureresoution.com

6

7

8

9              **AMERICAN ARBITRATION ASSOCIATION**

10

11              **COMMERCIAL ARBITRATION TRIBUNAL**

12

13  ORANGE BANG, INC., a California          AAA CASE NO. 01-20-0005-6081

14  corporation; and MONSTER ENERGY

15  COMPANY, a Delaware corporation,         **FINAL ARBITRATION AWARD -**

16                                           **PHASE I AND PHASE 2**

17          Claimants/Counter-Respondent,

18

19                  vs.

20

21  VITAL PHARMACEUTICALS, INC., d/b/a

22  VPX SPORTS, a Florida corporation,

23

24          Respondent/Counter-Claimant.

25

26

27

28

FINAL ARBITRATION AWARD – PHASE 1 AND PHASE 2

1    In short, it was VPX itself who exposed its own vulnerability, its own kryptonite so to

2  speak, into the public record by attaching Exhibits B and C to the complaint in the 2019

3  Declaratory Relief Action.  These disclosures, which exposed VPX's own Achille's Heel, the

4  requirement that their products be "creatine-based" and the requirement that it adhere to the VPX

5  Marketing and Sales Restrictions, was a self-inflicted wound by VPX and was not the result of a

6  breach of the 2010 Settlement Agreement by Orange Bang.

7    During the arbitration, VPX conceded that BANG Keto Coffee was, and is, marketed and

8  sold on-line and at VPX sponsored events and, most importantly, sold in the general beverage

9  sections of retail outlets.  In this respect, VPX has been, and currently is, marketing and selling

10  BANG Keto Coffee in violation of the VPX Marketing and Sales Restrictions.  These facts, and the

11  legal conclusions which flow from them, at least as to BANG Keto Coffee, are not disputed by

12  VPX.

13

14    **L.  Fox and Stein Reach Out to Monster**

15    In August of 2019, after service of the 2019 Declaratory Relief Action on Orange Bang,

16  Fox, Orange Bang's President, had a conversation with his no. 2, Stein.  Stein told him that he had

17  read an article in a trade publication about Monster having a dispute with VPX about creatine and

18  that it might make sense for Orange Bang to reach out to Monster since they both were in litigation

19  against VPX.  Fox called Rodney Sacks ("Sacks"), the CEO of Monster, and spoke with one of

20  Monster's in-house attorneys.  Fox and Stein arranged a meeting with Sacks.  In mid-August of

21  2019, Fox and Stein attended a meeting with Sacks and some of Monster's attorneys.

22    The arbitrator initially determined that the conversations and events of this August 2019

23  meeting were protected from disclosure because of the common interest doctrine.  However, during

24  the direct examination of Fox at the arbitration hearing, Monster's counsel elicited enough of the

25  conversations from this meeting, albeit via an indirect means, that the arbitrator permitted VPX to

26  fully cross-examine the Orange Bang witnesses and Sacks about this meeting, and VPX did so.

27  During the arbitration hearing, the parties established that Orange Bang handed a copy of the 2010

28  Settlement Agreement to Monster at their first meeting.  However, Orange Bang did so because the

1    First Keto Coffee Demand Letter and the Second Keto Coffee Demand Letter, the documents

2    which described the "creatine-based" requirement of paragraph 7 C and the VPX Marketing and

3    Sales Restrictions of paragraph 7 D, and which thereby revealed the crucial provisions of the 2010

4    Settlement Agreement, had already been made a part of the public record by VPX itself.  Therefore,

5    no liability attaches to Orange Bang for disclosing a document to Monster, the key provisions of

6    which had already been disclosed to the general public by VPX itself.

7         Suffice it to say that Monster and its attorneys quickly grasped the significance of the 2010

8    Settlement Agreement and how it could "weaponize" it (to embrace, for the moment, the concept

9    advocated by VPX).  Monster already believed that VPX's most successful product, BANG Energy

10   RTD, made material misrepresentations to consumers about creatine and "super creatine", as

11   evidenced by the district court Lanham Act case which Monster had already filed against VPX (the

12   "False Advertising Case"), and the 2010 Settlement Agreement contained a provision which

13   precluded VPX from marketing or selling a non-"creatine-based" product in wide, general

14   distribution.  There is no doubt that Monster instantly recognized the strategic advantage that it

15   might derive from joining forces with Orange Bang and seeking to enforce the 2010 Settlement

16   Agreement and seeking to hold VPX to the VPX Marketing and Sales Restrictions of paragraph 7

17   D to which it had previously agreed – or seek substantial damages for VPX's breach of that

18   provision.

19        Once Orange Bang attended this meeting with Monster in August of 2019, there is no doubt

20   that Monster communicated to Orange Bang its [Monster's] belief that because BANG Energy

21   RTD is devoid of creatine, it, therefore, could not possibly be "creatine-based".  Thus, as of the

22   August of 2019 meeting with Monster, Orange Bang was made aware of the facts giving rise to its

23   claim that VPX was in breach of the 2010 Settlement Agreement and that VPX had failed to "stay

24   in its lane" thus also giving rise to a claim for trademark infringement.[8]

25

26   _____

27   [8] As McCarthy points out, a co-existence agreement, also known as a consent to use agreement, is
     essentially an agreement not to sue for trademark infringement so long as the junior user agrees to
28   stay in its agreed-upon zone of use or, as in this case, the agreed-upon "lane." *McCarthy*, Section
     18:79.

**<u>Exhibit B</u>**

Excerpts of December 6, 2022 Hr'g Tr.

Page 1

1

2                    UNITED STATES BANKRUPTCY COURT

                      SOUTHERN DISTRICT OF FLORIDA

3

4

5    IN RE:                      CASE NO. 22-17842-PDR

6    VITAL PHARMACEUTICALS, INC.,

7                  Debtor.

     _____/

8

9                 ECF #358, 365, 366, 375, 408

10                      December 6, 2022

11                 The above-entitled cause came on for hearing

12   before the Honorable Peter D. Russin, one of the Judges in

13   the UNITED STATES BANKRUPTCY COURT, in and for the

14   SOUTHERN DISTRICT OF FLORIDA, at 299 E. Broward Blvd.,

15   Fort Lauderdale, Broward County, Florida, on December 6,

16   2022, commencing at or about 10:00 a.m., and the following

17   proceedings were had.

18

19

20

21

22

23            Transcribed from a digital recording by:

                   Cheryl L. Jenkins, RPR, RMR

24

25

Page 26

1    discovery.  We would have a single committee counsel doing

2    it.  We'd have a financial advisor, like Mr. D'Amico, who

3    would be coordinating with the committee -- with the

4    debtors.  We don't have any -- none of us, to my

5    knowledge, have a financial advisor.

6              The clients have been willing to pay for

7    other professionals, but we're basically told we can go

8    and try to figure it out ourselves and pay for other

9    professionals.

10             Monster, in this case, your Honor, is

11   already owed approximately $400 million.  We're multiples

12   of the trade creditors, and we're, frankly, multiples of

13   the members of the committee, but we don't have any access

14   to the information, your Honor, and I do think that under

15   how the process works, committees do get access that

16   individual creditors do not.  Simply put, that's -- and

17   that's what happened in this case, your Honor, because we

18   don't have any -- we haven't received any of it --

19             THE COURT:  Okay.

20             MR. PACHULSKI:  -- and so -- I'm sorry,

21   your Honor, please.

22             THE COURT:  Okay.  I was just going to

23   suggest, why don't we, why don't we sort of side step the

24   merits for a moment.  I just want to understand, are you

25   building up to explaining to me what the schedule is