**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION
www.flsb.uscourts.gov**

| | |
|---|---|
| IN RE: | Chapter 11 Case |
| VITAL PHARMACEUTICALS, INC., et al., | Case No. 22-17842 (PDR) |
| Debtors. ¹ | (Jointly Administered) |
| _____/ | |

**PREPETITION AGENT'S AND DIP
AGENT'S OMNIBUS RESPONSE TO OBJECTIONS TO DEBTORS'
EMERGENCY MOTION FOR INTERIM AND FINAL ORDERS (I)
APPROVING POSTPETITION FINANCING, (II) AUTHORIZING
THE USE OF CASH COLLATERAL, (III) GRANTING LIENS AND
PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (IV)
GRANTING ADEQUATE PROTECTION, (V) MODIFYING AUTOMATIC STAY,
(VI) SCHEDULING A FINAL HEARING, AND (VII) GRANTING RELATED RELIEF**

Truist Bank, in its capacities as Prepetition Agent,² on behalf of the Prepetition Lenders, and DIP Agent, on behalf of the DIP Lenders (collectively with the Prepetition Lenders, the "Lenders"), hereby files this omnibus response (this "Response") with respect to those certain objections filed by the Official Committee of Unsecured Creditors (the "Committee"),³ the United States Trustee (the "Trustee"),⁴ Monster Energy Corporation ("Monster"),⁵ and various other

---

[1] The address of the Debtors is 1600 N. Park Drive, Weston, FL 33326. The last four digits of the Debtors' federal tax identification numbers are: (i) Vital Pharmaceuticals, Inc. (8430); (ii) Bang Energy Canada, Inc. (5454); (iii) JHO Intellectual Property Holdings, LLC (0010); (iv) JHO Real Estate Investment, LLC (9394); (v) Quash Seltzer, LLC (6501); (vi) Rainbow Unicorn Bev LLC (2254); and (vii) Vital Pharmaceuticals International Sales, Inc. (8019).

[2] All capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the DIP Motion (as defined herein) or the Interim Order (as defined in the DIP Motion), as applicable.

[3] *See* ECF No. 413.

[4] *See* ECF No. 267.

[5] *See* ECF Nos. 411, 414 (Joinder filed by Orange Bang, Inc.), and 415 (Joinder filed by the American Bottling Company).

*(continued on next page)*

creditors of the Debtors, including the Arizona Objectors[6] (collectively with the Committee, the Trustee, and Monster, the "Objectors" and the pleadings the "Objections"), regarding the *Debtors' Emergency Motion for Interim and Final Orders (I) Approving Postpetition Financing, (II) Authorizing the Use of Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* [ECF No. 24] (the "DIP Motion"). In support of this Response, the DIP Agent and Prepetition Agent respectfully represents as follows:

## PRELIMINARY STATEMENT

1. In order to file it timely, the DIP Agent is filing this Response prior to full resolution vis-a-vis the Debtors of one remaining critical issue related to governance, as described more fully below.

2. The Lenders are the only parties willing to extend the additional $100 million in credit to the Debtors required to fund these Cases. The proposed DIP Facility, together with the Prepetition Lenders' consent to use of cash collateral, affords the Debtors critical working capital to pursue these Cases, including liquidity which will, among other things, (i) keep the Debtors current on all postpetition trade creditor payments (and maintain good relations with critical vendors owed prepetition amounts), (ii) fund an escrow for royalty payments for the benefit of Monster (as more fully described below), notwithstanding that the Debtors dispute such payments, (iii) fund amounts for anticipated professional fees and expenses for estate professionals, which are contemplated to exceed $33 million over the course of these Cases, and (iv) enable the Debtors

---

[6] *See* ECF Nos. 256 (Objection filed by Faith Technologies, Inc.), 259 (Joinder filed by HACI Mechanical Contractors, Inc.), and 412 (Objection filed by Stellar Group, Inc.). These Objectors are collectively referred to as the "Arizona Objectors".

to run a value-maximizing recapitalization and/or sale process. These are substantial benefits to the Debtors and their estates, and they justify the Debtors' business judgment to seek approval of the DIP Facility, as proposed to be modified herein.

3. Contrary to assertions in several of the Objections, the Lenders have not imposed unreasonable demands on the Debtors, the Debtors have not "surrendered" to the Lenders, and the primary purpose of the DIP Facility is not "to benefit or improve the position of a … secured creditor." The Lenders' support of the Debtors' efforts at achieving a value-maximizing process in these Cases is no doubt self-serving, based on the Lenders' assessment that supporting the Debtors and continuing to fund these Cases will enable the Lenders to achieve their goal to be paid in full in respect of their aggregate prepetition exposure of over $350 million. However, to attempt to portray this DIP Facility as one-sided, adhesive in nature, and only for the benefit of the Lenders is simply disingenuous.

4. In fact, the Lenders have a demonstrated history of supporting and working cooperatively with the Debtors (and their non-Debtor affiliates) that stretches back eight months prior to the Petition Date and through several heavily negotiated forbearance agreements. During that period, the Lenders extended more than $60 million in additional credit to the Debtors and certain of their non-Debtor affiliates—funds that the Debtors used to make critical payments to vendors and employees, among others—notwithstanding the existence of multiple events of default under the Prepetition Credit Agreement.

5. This spirit of support and cooperation continued as the Lenders and the Debtors began negotiating the DIP Facility. Through the DIP Facility, the Lenders are willing to provide up to an additional $100 million to enable the Debtors to produce a value-maximizing outcome to these Cases. Over the course of negotiating the initial form of the DIP Facility with the Debtors,

the Lenders made several key concessions. As noted in the Parkhill Declaration, through long, protracted, and at times combative negotiations, the Lenders agreed to double the amount of new money available to the Debtors from the $49 million the Lenders initially proposed to the $100 million sought now, and expanded the timeline for the Debtors to complete their recapitalization and/or sale process from the four months the Lenders initially proposed to the seven months sought now. The terms of the proposed DIP Facility are reasonable and justified, and yet more so in light of the accommodations the Lenders are prepared to support now to address the outstanding Objections.

6. Contrary to the implication that the Lenders are seeking every possible advantage available to them, and in an attempt to resolve the Objections consensually, the Lenders have agreed to make a series of additional accommodations to assuage the concerns of the Objectors with respect to certain requirements previously contemplated as conditions to the DIP Facility. Such accommodations are described below in Part I of this Response and have been communicated separately to the Debtors and to the relevant Objector(s) in an effort to address the outstanding issues consensually.

7. The Lenders believe that such accommodations, subject to a resolution regarding the governance of the Debtors discussed more fully below, have resolved the Committee's objection. However, notwithstanding such proposed accommodations and the fact that the DIP Facility represents the only new money available to the Debtors to fund these Cases, certain of the Objectors remain unwilling as of the filing of this Response to withdraw their objections.

8. The Lenders' willingness to extend additional funds pursuant to the proposed DIP Facility (as modified below) is conditioned upon the Debtors implementing certain changes to their internal governance structure that is responsive to both objections from Monster and the

Committee and a subsequent request from the Lenders. Such changes include: (a) the appointment of two (2) new independent directors to the board of directors, such that outside independent directors (that are confirmed as acceptable to the Debtors, the Committee, and the Lenders) comprise three (3) of the five (5) board seats; and (b) John C. DiDonato, in his capacity as Chief Transformation Officer of the Debtors, (i) being vested with specific authority reasonably acceptable to the Lenders, (ii) reporting to the Restructuring Committee, and (iii) remaining in such capacity, absent incapacity or death, during the pendency of the Cases unless the Lenders otherwise consent. The Lenders have informed the Debtors of their expectation that these changes be made as a precondition to further funding of the DIP Facility. As of the filing of this Response, the Debtors have not implemented such changes (but may yet do so before the upcoming hearing on the DIP Motion). These are significant and important accommodations that should create stability for the Debtors through the cases and enable a more cooperative and collaborative path forward.

9. As described in Part II of this Response, the issues that remain after such concessions implicate fundamental expectations of the Lenders in committing to the proposed DIP Facility. The Lenders' positions on these remaining issues are fully justified and reasonable under the Bankruptcy Code and applicable law.

I. **RESPONSE TO SPECIFIC OBJECTIONS.**

10. The chart below summarizes what the Lenders propose to address the various issues raised in the Objections. Such accommodations adequately address substantially all the concerns raised in the Objections.

| Objection (Objectors) | Proposal |
|---|---|
| The amount or the factor of the Roll Up is excessive (Committee, Monster, Trustee, and Arizona Objectors) | Reduce the Roll Up to a $235,000,000 roll up immediately upon entry of the Final Order and eliminating the creeping roll up concept entirely. The roll up (versus no roll up at all) results in additional interest savings to the Debtors in the amount of approximately $4,000,000. Eliminating the |

5

| Objection (Objectors) | Proposal |
|---|---|
|  | creeping roll up and moving to an immediate roll up results in additional interest savings to the Debtors in the amount of approximately $400,000. |
| DIP Liens should not attach to unencumbered assets (Monster and the Committee) | The collateral package for the DIP Facility would be revised as follows:<br><br>• The portion of the DIP Facility not constituting the Roll Up (up to $100,000,000) would be secured by all assets of the Debtors and their estates (a.k.a. the DIP Collateral);[7] <u>provided</u>, that the DIP Agent and the DIP Lenders would **not** seek recovery from Commercial Tort Claims[8] against insiders or affiliates (as such terms are defined in section 101 of the Bankruptcy Code) before exhausting all avenues of recovery from other DIP Collateral.<br><br>• The portion of the DIP Facility constituting the Roll Up would be secured by the DIP Collateral **but excluding** (a) claims and causes of action available to the Debtors or their estates through the exercise of the powers granted by sections 549 and 550 (with respect to any applicability to section 549) of the Bankruptcy Code against insiders, affiliates, or any other person or entity (as such terms are defined in section 101 of the Bankruptcy Code), and (b) Commercial Tort Claims that do not already constitute Prepetition Collateral. |
| DIP Superiority claim should not extend to funds derived from Avoidance Actions and postpetition Commercial Tort Claims (Monster, the Trustee, and the Committee) | The DIP Superpriority Claim would be revised as follows:<br><br>• The DIP Superpriority Claim for the portion of the DIP Facility not constituting the Roll Up (up to $100,000,000) would be payable from and have recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof, including, without limitation, any proceeds or property recovered in connection with the pursuit of Prepetition Avoidance Actions **other than** claims and causes of action available to the Debtors or their estates through the exercise of the powers granted by section 547 (against insiders, affiliates, or any other person or entity (as such terms are defined in section 101 of the Bankruptcy Code)) and section 550 (with respect to any applicability to section 547) of the Bankruptcy Code.<br><br>• The DIP Superpriority Claim for the portion of the DIP Facility constituting the Roll Up would be payable from and have recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof, **but excluding** any proceeds or property recovered in connection with the pursuit of (a) Prepetition Avoidance Actions, (b) claims and causes of action available to the Debtors or their estates through the exercise of the powers granted by sections 549 and 550 (with respect to any applicability to section 549) of the Bankruptcy Code against insiders, affiliates, or any other person or entity (as such terms are defined in section 101 |

---

[7] For clarity and the avoidance of doubt, the term "DIP Collateral" specifically excludes Prepetition Avoidance Action from the DIP Collateral.

[8] As used herein "Commercial Tort Claims" has the meaning provided in the Uniform Commercial Code as enacted by the State of New York.

6

| Objection (Objectors) | Proposal |
|---|---|
|  | of the Bankruptcy Code), or (c) Commercial Tort Claims that do not already constitute Prepetition Collateral. |
| The case timeline and milestones are overly compressed (Committee and Monster) | Adopt revised milestones, including the following:<br><br>• **January 13, 2023**: Deadline for Debtors to have received at least one indication of interest regarding commitments for an Approved Financing (as defined in the DIP Credit Agreement after giving effect to the amendment filed contemporaneously herewith) and/or an acquisition of all or substantially all of the Debtors' assets.<br><br>• **January 27, 2023**: Deadline for the Debtors to have filed a bid procedures motion in form and substance reasonably acceptable to the DIP Agent seeking authority to establish bidding procedures and set a date for an auction to occur no later than April 19, 2023 (if necessary) (such motion, the "Bid Procedures Motion").<br><br>• **February 28, 2023**: Deadline for Debtors to have held a hearing on the Bid Procedures Motion.<br><br>• **March 13, 2023**: Deadline for the Debtors to either (a) deliver to the DIP Agent and Prepetition Agent fully-executed and bona fide commitment papers (in form and substance reasonably acceptable to the DIP Agent after consultation with the Committee), from a third party investor (or group of investors) that the DIP Agent determines, in its reasonable discretion has the financial wherewithal to consummate the transaction, in respect of a credit facility, equity investment, or other investment or financing that would, upon closing (and in any event prior to the Facility Termination Date under and as defined in the DIP Facility), provide for the payment in full in cash of the DIP Obligations and Prepetition Obligations (any such credit facility, equity investment, or other investment or financing, an "Acceptable Financing") or (b) (i) obtain an order in form and substance reasonably acceptable to the DIP Agent and the Committee approving the Bid Procedures Motion and setting an auction date of no later than April 19, 2023, (ii) designate a "stalking horse" reasonably acceptable to the DIP Agent and the Prepetition Agent, and (iii) file a motion seeking approval of a "stalking horse" and related protections in form and substance reasonably acceptable to the DIP Agent and the Prepetition Agent after consultation with the Committee (the process contemplated by this clause (b), the "Sale Process").<br><br>• **March 31, 2023**: Deadline for the Debtors to have obtained approval after a hearing to designate a "stalking horse" reasonably acceptable to the DIP Agent and the Prepetition Agent after consultation with the Committee (if the Debtors are pursuing the Sale Process).<br><br>• **April 19, 2023**: Deadline for the Debtors to have held an auction (if the Debtors are pursuing the Sale Process, and if necessary). |

| Objection (Objectors) | Proposal |
|---|---|
| | - **May 17, 2023**: Deadline for the Debtors to have closed on an Acceptable Financing or consummated Sale Transaction (as defined in the DIP Credit Agreement after giving effect to the amendment filed contemporaneously herewith). |
| Adequate protection payments are unreasonable in light of the high prepetition interest rate (Committee). | Subject to the passage of the Challenge Period (to be January 16, 2023) without a challenge by the Committee, adequate protection in the form of cash payment of interest in respect of the Prepetition Obligations remaining after the Roll Up (estimated to be approximately $120,000,000) would be capped at the Agreed Rate (as defined below); provided, that, (a) interest would continue to accrue on the outstanding balance of the Prepetition Obligations at the Default Rate (as defined in the Prepetition Credit Agreement) at the applicable reference rate and giving effect, for avoidance of doubt, to any future increases in the applicable rate of interest after the Petition Date to the extent provided for under the Prepetition Credit Agreement, and (b) interest accrued in respect of the outstanding balance of the Prepetition Obligations in excess of the Agreed Rate may be paid (i) without restriction from Prepetition Collateral that does not constitute assets of the Debtors' estates, including from the proceeds of any such Prepetition Collateral, in accordance with the terms of the Prepetition Credit Agreement and (ii) in full upon the occurrence of a GUC Recovery Event (as defined below).<br><br>The term "Agreed Rate" means the sum of (a) Base Rate (as defined in the Prepetition Credit Agreement), subject to a 0.75% per annum floor,[9] plus (b) 6.50% per annum,[10] plus (c) 2.00% per annum (in accordance with section 2.13(d) of the Prepetition Credit Agreement); provided, that the Agreed Rate would never be less than fifteen percent (15%) per annum.<br><br>The term "GUC Recovery Event" means the distribution to holders of general unsecured claims of value in excess of twenty percent (20%) (including cash in such amount or treatment with a value of twenty percent (20%) pursuant to a plan of reorganization or liquidation). |
| Governance structure of the Debtors is inadequate (Committee and Monster)<br><br>**Note**: This summary reflects the Lenders' proposal and has not been implemented or agreed to by the Debtors as of the filing of this Response** | Board of directors or other equivalent governing body of the Debtors to continue to be composed of five (5) individuals, three (3) of whom are unaffiliated with John Henry Owoc and the Debtors (other than in respect of service on such board or other equivalent governing body) and reasonably acceptable to the Required Lenders (as defined in the DIP Credit Agreement), but would be reconstituted to include John Henry Owoc, Bob Dickinson, Steven G. Panagos (with Steven G. Panagos as the sole member of the Restructuring Committee), one of Dr. Guillermo Escalante or Eric Hillman, and a new director that would replace either Dr. Escalante or Mr. Hillman.[11] |

---

[9] The Base Rate (as defined in the Prepetition Credit Agreement) as of the date hereof is 7.00% per annum, which concept will remain a variable component of the Agreed Rate in accordance with the Prepetition Credit Agreement.

[10] This amount is the Applicable Margin (as defined in the Prepetition Credit Agreement) as in effect as of the date of entry of the Final Order (without giving effect to any future escalators occurring after entry of the Final Order that would otherwise apply pursuant to the Prepetition Credit Agreement).

[11] The DIP Lenders consider Messrs. Dickinson and Panagos (but not Dr. Escalante nor Mr. Hillman) to be unaffiliated with John Henry Owoc and the Debtors, and reasonably acceptable.

| Objection (Objectors) | Proposal |
|---|---|
|  | Chief Transformation Officer to be vested with specific authority and report to the Restructuring Committee of the Debtors' board of directors or other equivalent governing body. The removal or resignation of the Chief Transformation Officer would constitute an immediate Event of Default under and as defined in the DIP Credit Agreement. |
| Amount budgeted for the Committee to investigate the Prepetition Agent's liens is insufficient (Committee) | Adopt the Committee's request to increase the budget provided for the Committee's lien investigation from $50,000 to $100,000. |
| The challenge period during which the Prepetition Agent's liens may be challenged is too short (Monster and Committee) | Adopt the Committee's request to extend the Challenge Period to January 16, 2023, with such extension available to all parties-in-interest; provided, that the Committee would endeavor in good faith to identify to the Prepetition Agent any potential claims in respect of the Prepetition Facility on or before December 31, 2022.<br><br>Stipulate to automatic standing solely for the Committee, solely for challenges to nature, extent, or priority of liens securing the Prepetition Obligations<br><br>Other parties-in-interest would be required to seek standing before asserting any challenge; provided, that a challenge period would be tolled for any party-in-interest moving for standing prior to the expiration of the challenge period (as provided for in the Interim Order). |
| Maturity date is too soon and does not provide adequate time for the Cases (Monster) | Extension of outside maturity date by two (2) weeks to May 24, 2023, subject to confirmation reasonably acceptable to the DIP Agent that any additional cost of the Cases is supported by availability under the DIP Facility or cash collateral. |
| 506(c) surcharge waiver while not paying Monster its postpetition royalties (Monster) | Agree to permit the Debtors to escrow funds semi-monthly on account of royalties accruing postpetition under the Monster/OBI arbitration award, based on estimated net sales (on which the royalty is calculated/based), with such estimate subject to true-up mechanics to reflect the applicable Debtors' actual net sales over the postpetition period, with such funds to be escrowed for the benefit of Monster, subject to the Debtors' reversionary interest in such funds (if any). |
| Waivers of Section 506(c) of the Bankruptcy Code, the "Equities of the Case" exception to Section 552 of the Bankruptcy Code, and marshaling are inappropriate (Committee, the Trustee, and Monster) | Waivers are appropriate under these circumstances and should be granted, as further discussed in Part II of this Response below, except with respect to the Arizona Mechanics' Lienholders in a limited respect described further below in this summary. |
| Proceeds from the sales of non-estate assets (N/A)[12] | Contemporaneously with the consummation of the consensual sale of any parcel of real estate owned by a Landlord Non-Debtor Affiliate, the Prepetition Agent would deliver or cause to be delivered to the Debtors cash proceeds in an aggregate amount equal to the actual and documented costs |

---

[12] This topic is not responsive to any specific objection but is identified here to confirm a material term of the Committee's support.

| Objection (Objectors) | Proposal |
|---|---|
| | and expenses the Debtors funded to or on behalf of such Landlord Non-Debtor Affiliate in respect of such parcel since the Petition Date. |
| Priming of Arizona Objectors' liens on the Arizona Real Property is not appropriate absent adequate protection (Arizona Objectors) | The aggregate amount secured by liens senior to the liens of the Arizona Objectors on the Arizona Real Property in respect of both the DIP Facility and the Prepetition Obligations shall not exceed the aggregate amount of the Prepetition Obligations as of the Petition Date secured by liens senior to the liens of the Arizona Objectors on the Arizona Real Property. (Said differently, no additional debt would "prime" the Arizona Objectors' liens on the Arizona Real Property.)<br><br>The Arizona Mechanics' Lienholders would retain their ability (if any) to assert the equitable doctrine of "marshaling" or any other similar doctrine solely with respect to the DIP Agent's exercise of remedies against the Arizona Real Property, and the DIP Agent's ability to exercise remedies against the Arizona Real Property and otherwise contest the application of any such doctrine(s) would be expressly reserved. |

## II. REMAINING CONTESTED ISSUES

11. The Lenders believe that the resolutions proposed above reflect accommodations from the Lenders and/or the Debtors (except with respect to the Debtors' governance, which as of the filing of this Response has not been resolved) that have resolved the objections of the Committee (other than with respect to the Debtors' governance) and should be sufficient to resolve the objections by Monster and the Arizona Objectors. The few issues on which the Lenders are unwilling to make further accommodations and therefore for which there remain outstanding objections, and the Lenders' perspectives on such issues, are addressed further below.

   A. *A DIP Roll-Up Amount of $235 Million is Reasonable in the Market and Under Caselaw and Should be Approved.*

12. Contrary to the suggestions of certain remaining Objectors, "roll ups" are a regular feature of lending agreements in the DIP financing environment for chapter 11 cases of the size and complexity of these Cases, and they are regularly approved by Bankruptcy Courts in this circuit and others. *See, e.g., In re Mission Coal Co., LLC*, No. 18-04177-11 (TOM) [Docket No. 300] (Bankr. N.D. Ala. Nov. 20, 2018) (approving $201 million DIP facility with

$147 million roll-up); *In re 24 Hour Fitness Worldwide, Inc., et al,* No. 20-11558 (KBO) [Docket No. 652] (Bankr. Del. Aug, 3, 2020) (approving $500 million DIP facility with $250 million roll-up); *American Commercial Lines Inc., et al.*, No. 20-30982 (MI) [Docket No. 202] (Bankr. S.D. Tex. March 5, 2020) (approving $690 million DIP facility with a $553 million roll-up); *Armstrong Flooring, Inc., et al.*, No. 22-10426 (MFW) [Docket No. 311] (Bankr. Del. June 7, 2022) (approving $127 million DIP facility with a $103 million roll up); *Ascena Retail Group, Inc., et al.*, No. 20-33113 (KRH) [Docket No. 587] (Bankr. E.D. Va. Sep. 10, 2020) (approving $712 million DIP facility with a $495 million roll up); *GNC Holdings, Inc., et al.*, No. 20-11662 (KBO) [Docket No. 502] (Bankr. Del. July 21, 2020) (approving $475 million DIP facility with a $375 million roll up); *Briggs & Stratton Corporation, et al.*, No. 20-43597-339 [Docket No. 526] (Bankr. E.D. Mo. Aug. 20, 2020) (approving $678 million DIP facility with a $326 million roll up); *Tailored Brands, Inc., et al.*, No. 20-33900 (MI) [Docket No. 512] (Bankr. S.D. Tex. Sep. 2, 2020) (approving $500 million DIP facility with a $398 million roll up).

13. The real question raised by the Objections is not whether roll ups are permissible, but rather how much prepetition debt it is permissible to roll up in a given case. On this issue, caselaw provides no clear amount that is out-of-bounds. While it is correct that roll ups have been approved with a ratio of "roll up" to "new money" (the "Roll Up Factor") of 1.0 to 1.0 (as cited by Monster in its objection), such ratio is far from a ceiling. In its Objection (which the Lenders believe has since been resolved as to all issues bar the Debtors' governance structure), the Committee acknowledged that the mean and median Roll Up Factor in cases of a similar size and complexity to these Cases are 1.8 to 1.0 and 1.9 to 1.0, respectively. Committee Objection ¶ 34. However, bankruptcy courts have approved roll ups with a Roll Up Factor of greater than 3.0 to 1.0. *See American Commercial Lines Inc., et al.*, No. 20-30982 (MI) [Docket No. 202]

(Bankr. S.D. Tex. March 5, 2020) (approving Roll Up Factor of 4.0 to 1.00); *Tailored Brands, Inc., et al.*, No. 20-33900 (MI) [Docket No. 512] (Bankr. S.D. Tex. Sep. 2, 2020) (approving Roll Up Factor of 3.9 to 1.00); *GNC Holdings, Inc., et al.*, No. 20-11662 (KBO) [Docket No. 502] (Bankr. Del. July 21, 2020) (approving Roll Up Factor of 3.9 to 1.00); *Pier 1 Important, Inc., et al.*, No. 20-30805 (KRH) [Docket No. 342] (Bankr. E.D. Va. March 13, 2020) (approving Roll Up Factor of 3.8 to 1.00); *Armstrong Flooring, Inc., et al.*, No. 22-10426 (MFW) [Docket No. 311] (Bankr. Del. June 7, 2022) (approving Roll Up Factor of 4.3 to 1.00).

14. The $235 million Roll Up sought by the Lenders (reduced as reflected herein), reflects a Roll Up Factor of 2.35 to 1.00. For illustrative purposes, a review of debtor-in-possession financing arraignments approved by Bankruptcy Courts since January 1, 2020, with a total facility amount of between $250 million and $750 million, is attached hereto as Exhibit A. This study demonstrates that the mean Roll Up Factor in these recent, similarly situated cases was 2.0 to 1.0, with certain approved Roll Up Factors ranging as high as 4.0 to 1.0. In light of the data presented on Exhibit A, the proposed Roll Up, particularly as revised, is well within the bounds of market acceptability, is justified under existing caselaw, and should be approved because it represents a critical component of comprehensive terms for postpetition financing that is both the only financing available and appropriate under the circumstances.

15. The proposed modified Roll Up seeks to refinance $235,000,000, comprised of certain fees and interest accrued as of the Petition Date plus an amount equal to approximately 94% of the outstanding principal amount under the Prepetition Revolving Credit Facility. Roll ups of up to 100% of the prepetition revolving credit exposure are quite common in the DIP financing market and regularly approved. *See Ascena Retail Group, Inc., et al.*, No. 20-33113 (KRH) [Docket No. 587] (Bankr. E.D. Va. Sep. 10, 2020) (approving a roll-up of 100% of the prepetition

revolving exposure)*; American Commercial Lines Inc., et al.*, No. 20-30982 (MI) [Docket No. 202] (Bankr. S.D. Tex. March 5, 2020) (same); *In re 24 Hour Fitness Worldwide, Inc., et al,* No. 20-11558 (KBO) [Docket No. 652] (Bankr. Del. Aug, 3, 2020) (same); *Tailored Brands, Inc., et al.,* No. 20-33900 (MI) [Docket No. 512] (Bankr. S.D. Tex. Sep. 2, 2020) (same)*; GNC Holdings, Inc., et al.,* No. 20-11662 (KBO) [Docket No. 502] (Bankr. Del. July 21, 2020) (same)*; Centric Brands., Inc., et al.,* No. 20-22637 (SHL) [Docket No. 220] (Bankr. S.D. N.Y. June 22, 2020) (same)*; Lakeland Tours, LLC, et al.,* No. 20-11647 (JLG) [Docket No. 95] (Bankr. S.D. N.Y. Aug. 6, 2020) (same); *see also* Exhibit A.

16.     In addition to being legally justified, the proposed modified Roll Up has been and remains a critical component of the DIP Facility because it serves as a mechanism to enforce the Debtors' commitment to refinance the Lenders in full in cash.  The Lenders' willingness to continue to extend credit to the Debtors and non-Debtor affiliates on a prepetition basis after defaults first existed was wholly conditioned on the Debtors' commitment to refinance the Lenders by certain agreed dates.  That commitment by the Debtors led to the contractual interest rate structure (with escalating interest rates) that exists under the Prepetition Credit Agreement, which serves as a disincentive for the Debtors to reinstate such debt pursuant to a plan that lacked the support of the Lenders.  Similarly, the Lenders' willingness to increase both (i) the amount of new money available for the Debtors (from $49,000,000 to $100,000,000) under the DIP Facility and (ii) the amount of time to pursue the proposed recapitalization and/or sale process (from four months to seven months) was conditioned on the Debtors' commitments to comply with milestones contemplated here—including a plan process that would repay the Lenders in full.  The primary mechanism that the Lenders and Debtors structured to enforce the Debtors' refinancing

commitment is the Roll Up structure contemplated by the DIP Facility, particularly because post-petition financing must be paid in full upon consummation of a plan of reorganization.

17. Further, any Objections to the Roll Up based on the argument that the Roll Up would enable the Prepetition Lenders to gain access to collateral that did not constitute collateral under the Prepetition Collateral—most notably the Avoidance Actions and Commercial Tort Claims—are further undercut by the Lenders' accommodations described above. *See* Monster Objection ¶ 22-24. These accommodations directly address this issue by expressly providing that Avoidance Actions would not secure the DIP Facility at all, and Commercial Tort Claims (other than those that already constitute Prepetition Collateral) would not secure the Roll Up portion of the DIP Facility. Simply put, the DIP Facility is not a "land grab" by the Lenders designed to improve their collateral position.

18. Finally, the Lenders note that, because the interest rate under the DIP Facility is lower than the interest rate under the Prepetition Credit Agreement, the $235 million Roll Up (versus no Roll Up at all) is projected save the Debtors approximately $4,000,000 in interest expense (the differential between the interest rate under the Prepetition Credit Agreement and the interest rate for the Roll Up under the DIP Facility) between now and the anticipated DIP Facility Maturity Date in May 2023.[13]

B. *506(c) Waiver Is Routinely Granted and Appropriate.*

19. Courts in this circuit and others regularly waive Section 506(c) in postpetition financing and cash collateral orders, and waiver of such right is appropriate under these circumstances. *See, e.g., In re Adinath Corp. and Simply Fashion Stores, Ltd.*, No. 15-16885

---

[13] This savings may be reduced by the further accommodation by the Lenders' to cap the interest rate in respect of the Prepetition Credit Agreement which is payable in cash by the Debtors (at the rate in effect upon entry of the Final Order, so as to not give effect to continuing escalators in such rate) in certain circumstances, as described in the Table in Part II hereof.

(LMI) [Docket No. 196] at 20 (Bankr. S.D. Fla. May 6, 2015) (waving Section 506(c) rights); *In re Black News Channel*, LLC, No. 4:22-bk-40087-KKS [Docket No. 252] at 13-14 (Bankr. N.D. Fla. May 31, 2022) (same); *In re TPC Group Inc.*, No. 22-10493 (CTG) [Docket No. 566] at 23 (Bankr. D. Del. August 2, 2022) (same); *In re McDermott Int'l, Inc.*, No. 20-30336 (DRJ) [Docket No. 146] at 5 (Bankr. S.D. Tex. Jan. 23, 2020) (same); *In re Sanchez Energy Corp.*, No. 19-34508 (MI) [Docket No. 144] at 5 (Bankr. S.D. Tex. Aug. 15, 2019) (same). Further, the rights contained in Section 506(c) are held by the Debtors in these Cases, and thus the right to surcharge under Section 506(c) is the Debtors' exclusive right to waive. *See* 11 U.S.C. § 506(c); 11 U.S.C. § 1107(a).

20. Moreover, Monster's specific objection on this point—that a 506(c) waiver is inappropriate if the Approved Budget does not reflect the payment of Monster and Orange Bang, Inc.'s 5% postpetition royalties—has been rendered moot by including an escrow of such royalties in the updated Approved Budget.

  *C.*   *552(b), "Equities of the Case" Exception Waiver Is Also Routinely Granted and Appropriate.*

21. Courts frequently permit waivers of the "equities of the case" exception to Section 552(b) when postpetition lenders consensually subordinate their liens to a professional fee carve-out, as the DIP Lenders have done here. *See, e.g., Hr'g Tr. 58-59, In re Hostess Brands, Inc.*, Case No. 13-2223 (Bankr. S.D.N.Y. Feb. 2, 2012) (secured creditors' "willingness to provide for a carve-out upfront as opposed to letting the professionals hang on that point" was a sufficient "tradeoff" to justify Section 552(b) waiver).

22. Further, courts have recognized that the "equities of the case" exception is not applicable when the preservation of estate value relies on postpetition financing. *See, e.g.*, *In re*

*Muma Servs., Inc.*, 322 B.R. 541, 558-59 (Bankr. D. Del. 2005) ("equities of the case" exception did not apply where debtor required postpetition financing and use of cash collateral to operate).

23. Bankruptcy courts in this circuit and others regularly approve postpetition financing orders with waivers of the "equities of the case" exception to Section 552(b). *See, e.g., In re Black News Channel*, LLC, No. 4:22-bk-40087-KKS [Docket No. 252] at 17 (Bankr. N.D. Fla. May 31, 2022) (holding that the prepetition lender and DIP lender were entitled to the full rights and benefits of Section 552(b)); *In re TPC Group Inc.*, No. 22-10493 (CTG) [Docket No. 566] at 23 (Bankr. D. Del. August 2, 2022) (holding that the prepetition lender and DIP lender were entitled to the full rights and benefits of Section 552(b) and expressly waiving the "equities of the case exception"); *In re McDermott Int'l, Inc*., No. 20-30336 (DRJ) [Docket No. 146] at 5 (Bankr. S.D. Tex. Jan. 23, 2020) (waiving Section 552(b) "equities of the case" exception); *In re Sanchez Energy Corp.*, No. 19-34508 (MI) [Docket No. 144] at 5 (Bankr. S.D. Tex. Aug. 15, 2019) (same).

24. The Lenders' insistence on such waivers is both customary and justified, and their inclusion in any Final Order is a reasonable condition to providing the requested DIP Facility.

### III. ARIZONA OBJECTORS AND ADEQUATE PROTECTION

25. Finally, the Lenders (with the Debtors) have agreed to certain accommodations to the adequate protection package for the Arizona Objectors. Specifically, the Lenders have agreed, in addition to the adequate protection liens and claims proposed originally in respect of the Arizona Objectors on account of their mechanics liens on the Arizona Real Property, to (x) expressly limit the amount of indebtedness under the DIP Facility secured by the priming DIP Liens on the Arizona Real Property such that the maximum amount of indebtedness that is senior to the Arizona Objectors' liens on the Arizona Real Property (between both the DIP Facility and the Prepetition Credit Agreement) is *no more than* the amount of indebtedness under the Prepetition Credit

Agreement that is currently senior to the Arizona Objectors' liens, and (y) preserve the ability (if any) of the Arizona Objectors to seek the equitable remedy of marshalling in respect of the DIP Facility (and for avoidance of doubt the ability of the DIP Agent (on behalf of the DIP Lenders) to oppose such remedy).

26. Such accommodations preserve the status quo for the Arizona Objectors and, as such, should resolve their objections. However, as of the filing of this Response, the Arizona Objectors have not confirmed these accommodations are sufficient to resolve their objections.

## IV. GOVERNANCE ITEMS

27. The Debtors' internal governance structure is a critical component of the Lenders' willingness to continue to extend credit to the Debtors pursuant to the DIP Facility (as to be modified). Absent the Debtors' implementation of the changes described above, the Lenders are not willing to provide additional extensions of credit to the Debtors. The Lenders remain hopeful that the Debtors will implement such changes promptly, and are ready to provide further credit to the Debtors pursuant to the DIP Facility (as proposed to be modified) once such changes are implemented.

*[Remainder of this page has been intentionally left blank]*

## **CONCLUSION**

**WHEREFORE**, the DIP Agent, on behalf of the DIP Lenders, and the Prepetition Agent, on behalf of the Prepetition Lenders respectfully request that the Court grant the relief requested herein and such other and further relief as it deems just and proper.

Dated: December 14, 2022                                  Respectfully submitted,

                                                                             */s/ Harris J. Koroglu*

| | |
|---|---|
| Luis M. Lluberas (admitted Pro Hac Vice) | Peter H. Levitt |
| Stephen E. Gruendel (admitted Pro Hac Vice) | Florida Bar No. 650978 |
| Cole Richins (admitted Pro Hac Vice) | Aliette D. Rodz |
| **MOORE & VAN ALLEN PLLC**[14] | Florida Bar No. 173592 |
| 100 North Tryon Street, Suite 4700 | Harris J. Koroglu |
| Charlotte, NC 28202-4003 | Florida Bar No. 32597 |
| Telephone: (704) 331-1000 | **SHUTTS & BOWEN LLP** |
| Facsimile: (704) 378-1989 | 200 South Biscayne Blvd., Ste. 4100, |
| E-mail: luislluberas@mvalaw.com | Miami, FL 33131 |
|        stevegruendel@mvalaw.com | Telephone: (305) 415-9447 |
|        colerichins@mvalaw.com | Facsimile: (305) 415-9847 |
| | E-mail: plevitt@shutts.com |
| |        arodz@shutts.com |
| |        hkoroglu@shutts.com |

*Counsel for Truist Bank*

---

[14] The undesigned attorneys are appearing *pro hac vice* in this matter pursuant to court orders dated as follows: (i) Luis M. Lluberas, October 10, 2022 [ECF No. 38]; (ii) Stephen E. Gruendel, October 10, 2022 [ECF No. 39]; and (iii) Cole B. Richins, October 10, 2022 [ECF No. 40]

**CERTIFICATE OF SERVICE**

I hereby certify that on December 14, 2022, a true and correct copy of the foregoing has been served via ECF on all parties receiving electronic notice in this case.

*/s/ Harris J. Koroglu*
Harris J. Koroglu