# **Debtors' Exhibit 7**

**Fill in this information to identify the case:**

Debtor _____ JHO Intellectual Property Holdings, LLC _____

United States Bankruptcy Court for the District of _____ Southern District of Florida _____

Case number _____ 22-17845 _____

## Official Form 410

# Proof of Claim

**04/22**

**Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.**

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy** (Form 309) **that you received.**

## Part 1:  Identify the Claim

| | |
|---|---|
| 1. **Who is the current creditor?** | Orange Bang, Inc. |
| | Name of the current creditor (the person or entity to be paid for this claim) |
| | Other names the creditor used with the debtor _____ |
| 2. **Has this claim been acquired from someone else?** | ☑ No<br>☐ Yes.  From whom? _____ |
| 3. **Where should notices and payments to the creditor be sent?**<br><br>Federal Rule of Bankruptcy Procedure (FRBP) 2002(g) | Where should notices to the creditor be sent? / Where should payments to the creditor be sent? (if different)<br><br>See Additional/Expanded Creditor Address(es) page:<br><br>Orange Bang, Inc. / Orange Bang, Inc.<br>Richard Stein / David Fox<br>13115 Telfair Ave. / 13115 Telfair Ave.<br>Sylmar, CA 91342 / Sylmar, CA 91342<br>USA / USA<br>**P:** 8188331000 / **P:** 8188331000<br>**E:** rstein3@gmail.com / **E:** terry.fox@orangebang.com<br><br>Uniform claim identifier for electronic payments in chapter 13 (if you use one):<br>— — — — — — — — — — — — — — — — — — — — — — — — — |
| 4. **Does this claim amend one already filed?** | ☑ No<br>☐ Yes.  Claim number on court claims registry (if known) _____   Filed on _____<br>MM/DD/YYYY |
| 5. **Do you know if anyone else has filed a proof of claim for this claim?** | ☑ No<br>☐ Yes.  Who made the earlier filing? _____ |

1195810252232846622000001

**Part 2:** Give Information About the Claim as of the Date the Case Was Filed

| | | |
|---|---|---|
| 6. | **Do you have any number you use to identify the debtor?** | ☑ No<br><br>☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: _____ |

| | | |
|---|---|---|
| 7. | **How much is a claim?** | $ 87,500,000.00      Does this amount include interest or other charges?<br><br>☑ No<br><br>☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A). |

| | | |
|---|---|---|
| 8. | **What is the basis of the claim?** | Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card<br>Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).<br>Limit disclosing information that is entitled to privacy, such as health care information.<br><br>Litigation claim (see Addendum) |

| | | |
|---|---|---|
| 9. | **Is all or part of the claim secured?** | ☑ No<br><br>☐ Yes. The claim is secured by a lien on property<br><br>**Nature of property**<br><br>☐ Real estate.    If the claim is secured by the debtor's principal residence, file a Mortgage Proof of Claim Attachment (Official Form 410-A)with this Proof of Claim.<br>☐ Motor vehicle.<br>☐ Other. Describe: _____<br><br>**Basis for perfection:** _____<br><br>Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)<br><br>**Value of property:** _____<br><br>**Amount of the claim that is secured:** _____<br><br>**Amount of the claim that is unsecured:** _____    (The sum of the secured and unsecured amounts should match the amount in line 7.)<br><br>**Amount necessary to cure any default as of the date of the petition:** _____<br><br>**Annual Interest Rate (when case was filed)** _____ %<br><br>☐ Fixed<br>☐ Variable |

| | | |
|---|---|---|
| 10. | **Is this claim based on a lease?** | ☑ No<br><br>☐ Yes. Amount necessary to cure any default as of the date of the petition.   $ _____ |

| | | |
|---|---|---|
| 11. | **Is this claim subject to a right of setoff?** | ☑ No<br><br>☐ Yes. Identify the property: _____ |

| 12. | **Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?** | | |
|---|---|---|---|
| | A Claim may be partly priority and partly nonpriority. For example, law limits the amount entitled to priority. | ☐ No | |
| | | ☑ Yes. Check one: | **Amount entitled to priority** |
| | | ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | _____ |
| | | ☐ Up to $3,350* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | _____ |
| | | ☐ Wages, salaries, or commissions (up to $15,150*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4) | _____ |
| | | ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | _____ |
| | | ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | _____ |
| | | ☑ Other. Specify subsection of 11 U.S.C. § 507(a)(2) that applies. | Undetermined |

*Amounts are subject to adjustment on 4/01/25 and every 3 years after that for cases begun on or after the date of adjustment.

## Part 3: Sign Below

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

Check the appropriate box

☑ I am the creditor.

☐ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this Proof of Claim serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt

I have examined the information in this Proof of Claim and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date & time    10/25/2022 at 03:10 pm PT
                           MM / DD / YYYY HH : MM

/s/Richard Stein
Signature

**Print the name of the person who is completing and signing this claim:**

| Name | Richard | Stein | |
|---|---|---|---|
| | First Name | Middle Name | Last Name |
| Title | Operations Manager | | |
| Company | Orange Bang, Inc. | | |
| | Identify the corporate servicer as the company if the authorized agent is a servicer | | |
| Address | 13115 Telfair Ave. | | |
| | Number | Street | |
| | Sylmar | CA | 91342 |
| | City | State | ZIP Code |
| Contact phone | 8188331000 | | |
| Email | rstein3@gmail.com | | |



**Additional/Expanded Creditor Address(es):**

**Notice Party**
KTBS Law LLP
Thomas Patterson
1801 Century Park East
26th Floor
Los Angeles, CA 90067
USA
Phone: 310-407-4035
Fax: 310-407-9090
tpatterson@ktbslaw.com

**Notice Party**
KTBS Law LLP
Nir Maoz
1801 Century Park East
26th Floor
Los Angeles, CA 90067
USA
Phone: 310-407-4010
Fax: 310-407-9090
nmaoz@ktbslaw.com

Stretto Corporate Restructuring
855.812.6112 inquiries@stretto.com
cases.stretto.com
Proof Of Claim                    Page 4

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION
www.flsb.uscourts.gov

IN RE:

VITAL PHARMACEUTICALS, INC., *et al.*,

Debtors.[1]

Chapter 11

Case No. 22-27842 (PDR)

(Jointly Administered)

---

**ADDENDUM TO PROOF OF CLAIM FILED BY ORANGE BANG, INC.**

This addendum ("Addendum") to the proof of claim (the "Proof of Claim") is hereby filed by Orange Bang, Inc. ("Orange Bang"). This Addendum and the documents referenced herein and attached hereto are an integral part of the Proof of Claim and incorporated by reference into the Proof of Claim for all purposes. Capitalized terms shall have the meanings ascribed herein.

**SUMMARY OF CLAIM**

1.  Background of Claim. The Claim (as defined below) consists of all amounts due and owing to Orange Bang by the Debtors Vital Pharmaceuticals, Inc. ("VPX Debtor") and JHO Intellectual Property Holdings, LLC ("JHO IP Debtor")[2] in connection with the following litigation (the "Litigation"): that certain judgment (the "Judgment") entered on September 29, 2022 by the Hon. Dale S. Fischer, U.S. District Judge for the Central District of California, adopting the final arbitration award (the "Final Award") issued on April 4, 2022 against VPX Debtor and JHO IP Debtor and in favor of Orange Bang and Monster Energy Company ("Monster"), in the case

---

[1] The address of the Debtors is 1600 N. Park Drive, Weston, FL 33326. The last four digits of the Debtors' federal tax identification numbers are: (i) Vital Pharmaceuticals, Inc. (8430); (ii) Bang Energy Canada. Inc. (5454); (iii) JHO Intellectual Property Holdings, EEC (0010); (iv) JHO Real Estate Investment, EEC (9394); (v) Quash Seltzer, EEC (6501); (vi) Rainbow Unicom Bev EEC (2254); and (vii) Vital Pharmaceuticals International Sales, Inc. (8019).

[2] VPX Debtor and JHO IP are joint and severally liable for the Claim.

styled as *Vital Pharmaceuticals, Inc. v. Orange Bang, Inc.*, Case No. 5:20-cv-01464. The

Judgment is attached hereto as **Exhibit A,** and the Final Award is attached hereto as **Exhibit B**.

2.    <u>Amount of Claim</u>. As of October 10, 2022, the total amount of the claim

was not less than **$87,500,000** (the "<u>Claim</u>"), including, without limitation:

a.    The following amounts set forth in the Judgment[3]:

i.    Made at VPX Debtor and JHO IP Debtor's voluntary election of remedies, a continuing royalty (the "<u>Royalty</u>") at the rate of 2.5% of VPX Debtor and JHO IP Debtor's net sales of BANG-branded products on a continuing basis for so long as VPX Debtor and JHO IP Debtor's make any use of the BANG marks due to the likelihood of the continuing breach of contract and trademark infringement. The amount of the Royalty portion of the Claim is one half of the 5% Royalty awarded to Monster and Orange Bang in the Judgment. The Royalty payment is due within 45 days after the close of each financial quarter. However, the first Royalty payment (which was due 45 days after July 1, 2022) is based on the amount of net sales that took place from September 20, 2021 to and including June 30, 2022 and bears interest at the legal rate of 10% from April 29, 2022. If VPX Debtor and JHO IP Debtor fail to pay the Royalty, after notice and a failure to cure within 14 days, a permanent injunction enjoining VPX Debtor and JHO IP Debtor from using the BANG trademark automatically takes effect without need for any further action by a court or arbitrator; and

ii.    $87,500,000, which represents one half of the $175,000,000 in damages awarded to Monster and Orange Bang for breach of contract and trademark infringement by VPX Debtor and JHO IP Debtor.

3.    Moreover, the Claim includes all contingent and unliquidated claims and

other amounts for which VPX Debtor and JHO IP Debtor are liable, including, without limitation,

exemplary damages, punitive damages, professional fees, costs, and expenses, pre- and post-

judgment interest, any claim for indemnification and contribution, and other charges, amounts and

costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing,

due, owing, or chargeable in respect of VPX Debtor's and JHO IP Debtor's obligations pursuant

---

[3] The amounts awarded in the Judgment are subject to separate agreements between Orange Bang and Monster, pursuant to which each party will receive a fifty (50) percent share of all amounts awarded after deducting attorney's fees and costs.

to the Litigation, including all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature. For example and without limitation, in the Litigation, Orange Bang has claims against VPX Debtor and JHO IP Debtor for attorney's fees and costs, including amounts incurred in connection with the enforcement of the Claim, and prejudgment interest from the date the Final Award was issued until the date the Judgment was entered.

## **RESERVATION OF RIGHTS**

4.       Orange Bang files this Proof of Claim with full reservation of rights with respect to the Litigation.

5.       The assertion of the Claim pursuant to this Proof of Claim is not intended as, and should not be deemed or construed as, a waiver of any position asserted by Orange Bang in the Litigation. Moreover, the assertion of the Claim pursuant to this Proof of Claim should not be construed as Orange Bang's consent to, or concession or admission of, any fact or legal conclusion in connection with the Litigation.

6.       Orange Bang files this Proof of Claim with full reservation of rights, including, without limitation, to amend, clarify, or supplement this Proof of Claim at any time, manner, and for any reason, including but not limited to, fixing or liquidating any claims stated herein, specifying claims for ongoing obligations of the Debtors that are not expressly described herein, or asserting any additional claims.

7.       Orange Bang reserves all of its procedural and substantive defenses and rights, including a right to a jury trial, with respect to any claim that may be asserted against it by the Debtors, their affiliates, any trustee for a particular Debtor's estate, any other party-interest in the above-captioned chapter 11 cases, or any other person or entity whatsoever.

8.     This Proof of Claim is filed without prejudice to and reserves the right to recover any fees (including reasonable attorneys' fees), expenses, and costs to which Orange Bang is or may be entitled in the Litigation and applicable law.

9.     Orange Bang has postpetition administrative expense claims against the Debtors for amounts to which they are entitled in connection with the Litigation and applicable law, including, without limitation, pursuant to sections 503 and 507 of the Bankruptcy Code, which amounts have been accruing and continue to accrue, such as, without limitation, the continuing Royalty awarded to Orange Bang in the Judgment. By filing this Proof of Claim, Orange Bang does not waive any of the postpetition administrative expense claims it has against the Debtors and all rights are expressly reserved in connection therewith.

10.     Orange Bang reserves all of its rights of setoff, recoupment, counterclaim or similar right or remedy, or to assert a constructive trust against assets or cash held by any of the Debtors, or any other right, cause of action, or claim, whether existing now or hereinafter arising, that it has or may have against the Debtors, or any other person or persons.

11.     In executing and filing this Proof of Claim, Orange Bang is not waiving in any manner or under any circumstances any defense, setoff, offset, recoupment, counterclaim, or similar right or remedy it may now have or at any time have against any Debtor or any other entity or person, or with respect to any legal or equitable proceeding now existing or hereafter commenced.

12.     The filing of this Proof of Claim shall not be deemed a waiver in any manner and is without prejudice to any request for relief from the automatic stay.

13.     The execution and filing of this Proof of Claim is not (i) a waiver or release of any of Orange Bang's rights against any entity or person liable for all or part of the Claim, (ii)

a consent by Orange Bang to the jurisdiction of this Court with respect to any proceeding commenced in these Chapter 11 cases against or otherwise involving Orange Bang other than to the extent required for the determination and allowance of this Proof of Claim, (iii) a waiver of Orange Bang's right to have any and all final orders in any and all non-core matters entered after *de novo* review by a United States District Court judge, or its respective right to a trial by jury in any proceeding as to any and all matters so triable, whether designated legal or private rights, or in any case or controversy or proceeding related thereto, notwithstanding the designation of such matters as "core proceedings" pursuant to section 157(b) of the Bankruptcy Code or otherwise, and whether such jury trial is pursuant to statute or the United States Constitution; (iv) a waiver of the right to withdraw the reference with respect to the subject matter of the Claim, any objection or other proceeding commenced with respect thereto or any other proceeding commenced in this case against or otherwise involving Orange Bang, (v) an election of remedy that waives or otherwise affects any other remedy, (vi) a waiver or release of any of Orange Bang's rights and remedies in connection with the Litigation and applicable law, (vii) a waiver of any right of action that Orange Bang has or may have against the Debtors or any other person or entity; and/or (viii) a waiver or release of any of Orange Bang's rights against any third party.

## **NOTICES**

14.    All notices to Orange Bang concerning this Proof of Claim should be sent to:

> Orange Bang, Inc.
> Attn:  Richard Stein
> 13115 Telfair Ave.
> Sylmar, California 91342
> rstein3@gmail.com

Copies of all notices to the Agent concerning this Proof of Claim should be sent to:

KTBS Law LLP
Attn:  Thomas E. Patterson and Nir Maoz
1801 Century Park East, 26th Floor
Los Angeles, California 90067
tpatterson@ktbslaw.com and nmaoz@ktbslaw.com

and

Knobbe Martens
Attn:  Steven J. Nataupsky and Hans Mayer
2040 Main Street
Irvine, California 92614
steven.nataupsky@knobbe.com and hans.mayer@knobbe.com

15.    The request for copies of notices to be sent to KTBS Law LLP and Knobbe

Martens will not be deemed authorization of either firm to accept service of process on behalf of

Orange Bang.

# EXHIBIT A

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| VITAL PHARMACEUTICALS, INC., et al.,<br>Plaintiffs,<br><br>v.<br><br>ORANGE BANG, INC., et al.,<br>Defendants. | EDCV 20-1464 DSF (SHKx)<br><br>JUDGMENT |

    The Court having denied Plaintiffs' motion to vacate arbitration award and granted Defendants' motion to confirm arbitration award,

    IT IS ORDERED AND ADJUDGED that judgment is entered in favor of Defendants and against Plaintiffs as set forth in the Final Arbitration Award entered by Bruce Isaacs, Arbitrator, on April 4, 2022, attached hereto as Exhibit A. The Final Arbitration Award shall have the same force and effect as a civil judgment rendered by this Court. Defendants are to recover costs of suit pursuant to a bill of costs filed in accordance with 28 U.S.C. § 1920.

Date: September 29, 2022

Dale S. Fischer
United States District Judge

# EXHIBIT B

Bruce Isaacs, Arbitrator

SIGNATURE RESOLUTION, LLC

633 W. 5th Street, Suite 1000

Los Angeles, CA 90071

bisaacs@signatureresoution.com

**AMERICAN ARBITRATION ASSOCIATION**

**COMMERCIAL ARBITRATION TRIBUNAL**

| | |
|---|---|
| ORANGE BANG, INC., a California corporation; and MONSTER ENERGY COMPANY, a Delaware corporation,<br><br>Claimants/Counter-Respondent,<br><br>vs.<br><br>VITAL PHARMACEUTICALS, INC., d/b/a VPX SPORTS, a Florida corporation,<br><br>Respondent/Counter-Claimant. | AAA CASE NO. 01-20-0005-6081<br><br>**FINAL ARBITRATION AWARD - PHASE I AND PHASE 2** |

**COUNSEL:**

John C. Hueston, Esq.

Moez M. Kaba, Esq.

Allison Libeu, Esq.

Sourabh Mishra, Esq.

Hueston Hennigan LLP

523 West 6th Street, Suite 400

Los Angeles, California 90014

(213) 788-4340

E-mail:

jhueston@hueston.com

mkaba@hueston.com

alibeu@hueston.com

smishra@hueston.com

Counsel for Claimant/Counter-Respondent Monster Energy Company

Steven J. Nataupsky, Esq.

Lynda Zadra-Symes, Esq.

Hans L. Mayer, Esq.

Yanna S. Bouris, Esq.

Matthew Bellinger, Esq.

Knobbe, Martens, Olson & Bear, LLP

2040 Main Street, Fourteenth Floor

Irvine, California 92614

(949) 760-0404

E-mail:

FINAL ARBITRATION AWARD – PHASE 1 AND PHASE 2

| 1 | steven.nataupsky@knobbe.com |
| 2 | lynda.zadrasymes@knobbe.com |
| 3 | hans.mayer@knobbe.com |
| 4 | yanna.bouris@knobbe.com |
| 5 | matt.bellinger@knobbe.com |
| 6 | |
| 7 | Counsel for Claimant/Counter-Respondent Orange Bang, Inc. |
| 8 | |
| 9 | David P. Muth, Esq. |
| 10 | Daniel M. Janssen, Esq. |
| 11 | Johanna M. Wilbert, Esq. |
| 12 | George W. Mykulak, Esq. |
| 13 | Patrick Proctor-Brown, Esq. |
| 14 | Quarles & Brady LLP |
| 15 | 411 East Wisconsin Avenue, Suite 2400 |
| 16 | Milwaukee, Wisconsin 53202 |
| 17 | (414) 277-5000 |
| 18 | E-mail: |
| 19 | david.muth@quarles.com |
| 20 | daniel.janssen@quarles.com |
| 21 | johanna.wilbert@quarles.com |
| 22 | patrick.proctor-brown@quarles.com |
| 23 | george.mykulak@quarles.com |
| 24 | |
| 25 | Gordon Rees Scully Mansukhani, LLP |
| 26 | 633 West Fifth Street |
| 27 | 52nd Floor |
| 28 | Los Angeles, CA. 90071 |

FINAL ARBITRATION AWARD – PHASE 1 AND PHASE 2

1  (213) 576-5024

2

3  Counsel for Respondent/Counterclaimant Vital Pharmaceuticals, Inc. d/b/a VPX Sports nka

4  Bang Energy and JHO Intellectual Property Holdings, LLC

5

6  **ARBITRATOR**:

7  Bruce Isaacs, Esq.

8  Signature Resolution

9  633 W. 5th St., Suite 1000

10  Los Angeles, CA 90071

11  (213) 622-1002

12  E-mail:

13  bisaacs@signatureresolution.com

14

15  **PLACE OF ARBITRATION:**

16  Zoom Platform (Arbitration Place, Virtual Bailiff), October 4-7 and 11-14, 2021

17

18  **DATE OF INTERIM ARBITRATION AWARD:**

19  January 6, 2022

20

21  **DATE OF FINAL ARBITRATION AWARD:**

22  April 4, 2022

23

24       The arbitrator, having been designated in accordance with the August 11, 2010 Settlement

25  Agreement (the "2010 Settlement Agreement"), and having been duly sworn, and after the

26  arbitration hearing conducted on October 4 – 7, and October 11 – 14, 2021, via Zoom, as

27  administered by a neutral third-party virtual bailiff, the Arbitration Place, and after hearing and

28  weighing the evidence, exhibits, demonstratives, testimony and arguments of the parties including,

DocuSign Envelope ID: 81BDD3B5-75D8-4AFF-8F98-11F5677257C

1  but not limited to, the closing arbitration briefs and proposed Interim Arbitration Awards submitted

2  by both sides on November 9, 2021 and the closing reply briefs submitted by both sides on

3  November 19, 2021 (including answers to various questions posed by the arbitrator by email after

4  the arbitration hearing), and having heard the initial portion of closing argument on October 14,

5  2021 and the final portion of closing argument on December 10, 2021 as to Phase 1 (following the

6  completion of all of the briefing as to Phase 1), and including, but not limited to, the closing briefs

7  submitted by both sides between January of 2022 and March of 2022 as to Phase 2 and as to a

8  motion to correct and/or clarify (the "Motion to Clarify") the Interim Arbitration Agreement, and

9  having heard final oral arguments as to Phase 2 and as to the Motion to Clarify on February 18,

10  2022 and March 17, 2022 (with significant briefing by both sides in between those dates), hereby

11  finds and issues this Final Arbitration Award - Phase 1 and Phase 2 as follows:

FINAL ARBITRATION AWARD – PHASE 1 AND PHASE 2

## I.    INTRODUCTION

Although a complicated, contentious and extremely well-litigated case by highly-skilled, courteous and professional attorneys, in many ways the case turns on some fundamental, yet crucial, questions:

- What were the objective intentions of the parties, Orange Bang, Inc. ("Orange Bang") and Vital Pharmaceuticals, Inc. dba VPX Sports, now known as Bang Energy ("VPX"), when they entered into the 2010 Settlement Agreement?

- Was the 2010 Settlement Agreement, in essence, a "you-stay-in-your-lane and I'll-stay-in-my-lane" trademark co-existence agreement?

- What exactly did the parties intend to mean by the terms "creatine-based" and "nutritionally fortified" in paragraph 7 of the 2010 Settlement Agreement?

- Is VPX's Bang ready-to-drink energy drink (the "BANG Energy RTD"), which accounts for almost all of VPX's approximately $2.26 billion of sales through September 19, 2021, 80% of which were sold at convenience stores, a paragraph 7 C product or a paragraph 7 D product?

- Did VPX abide by the 2010 Settlement Agreement, did VPX breach it, did VPX forget about it, fail to appreciate its terms or just chose to ignore it because the opportunity to generate astronomical revenues and profits was just too tempting?

- Did Monster Energy Company ("Monster"), by entering into the September 23, 2019 Assignment Agreement with Orange Bang (the "Assignment Agreement"), unlawfully "weaponize" the 2010 Settlement Agreement?

- Who is responsible, Orange Bang or VPX, for disclosing the key provisions of the 2010 Settlement Agreement, which arguably violated the confidentiality provision of paragraph 12 of the 2010 Settlement Agreement and what are the ramifications of such disclosure?

- Did Orange Bang improperly disclose to Monster a potential business vulnerability of VPX, VPX's "Achille's heel" so to speak, i.e., the "creatine-based" requirement and the marketing and sales restrictions of paragraph 7 previously negotiated by Orange Bang in

6

FINAL ARBITRATION AWARD – PHASE 1 AND PHASE 2

DocuSign Envelope ID: 81BDD3B5-75B84AFF-8F98-1AF5687767C

the 2010 Settlement Agreement to which VPX was required to adhere in certain

circumstances, allegedly causing damages to VPX?

- Did VPX breach the 2010 Settlement Agreement and/or infringe the BANG mark (defined below) and, if so, what monetary and non-monetary relief is available to Monster and Orange Bang, if any?

## II. THE UNDERLYING FACTS AND PROCEDURAL HISTORY AS ESTABLISHED BY THE DOCUMENTARY EVIDENCE AND THE TESTIMONY OF THE WITNESSES AND FINDINGS AND CONCLUSIONS RELATED THERETO

### A. Orange Bang's Orange Bang Drink, Its 1983 BANG Mark in Class 32 and Its Two Primary Channels of Sale

Beginning in 1971, David Fox, approximately 44 years of age at the time, and the President of Orange Bang, and probably inspired by the well-known success of Orange Julius in the Southern California market, built his business in an old-school manner. He worked on recipes in his kitchen, orange juice, non-fat milk, egg-whites and, yes, lots and lots of sugar, and used his young daughter and her friends as an informal focus group, in order to arrive at a marketable product, a whipped, frothy and sugar loaded orange-flavored drink sold out of a fountain dispenser. Fox then went door to door, the old fashion way, looking for customers and, in the process, built a relatively successful business with $6 million in sales in 2010 and nearly $200 million in sales during the 50 years between 1971 and 2021. While seeking to establish his business, Fox found two primary types of customers: (i) low and medium-priced restaurants, many of which served Mexican food; and (ii) convenience stores (including gas stations as time went on once gas stations started to add convenience stores to the gas-purchasing experience). Both of these types of retail customers offered fountain drinks for sale and that was, and is, crucial to Orange Bang's business model

1  because Orange Bang sold, and continues to sell, essentially all of its products, including its other

2  main product line "Ole"[1], via an Orange Bang (or Ole) fountain dispenser.

3        In 1983, Orange Bang applied for trademark protection for various marks including a word

4  mark for "Bang!" [date of first use in commerce September 8, 1971], with the exclamation mark,

5  and a word mark for "Bang" [date of first use in commerce August 3, 1973], without the

6  exclamation mark (collectively, the "BANG mark").  Orange Bang received trademark registrations

7  for the BANG Mark (and, in addition, for the word mark + a logo[2]) in 1983, in International Class

8  32 ("Class 32").  Class distinctions are not necessarily relevant to the likelihood of confusion

9  analysis for the purposes of trademark infringement actions.  *See McCarthy on Trademarks and*

10  *Unfair Competition ("McCarthy")*, Section 19:56 (5th ed. 2021).  Nevertheless, and as discussed

11  below, class distinctions were highly significant to the negotiation of the 2010 Settlement

12  Agreement.  Class 32 is critical in this regard because it not only includes non-alcoholic beverages,

13  Class 32 also includes fruit beverages and isotonic drinks (e.g., sports drinks like Gatorade).  Thus,

14  Class 32 includes *energy drinks* as well.  *See* Exhibit 100, Class Headings and Explanatory Notes

15  from the United States Patent and Trademark Office (the "PTO") (Exhibit 100 - 13, p. 12 of 17).  In

16  this respect, as of 1983, Orange Bang had established the exclusive right to market and sell Class

17  32 beverages under the BANG mark.  *See* Exhibit J-2.

18

19  **B. VPX's Bang Pre-Workout Nutritional supplement and its 2008 BANG! Mark in**

20      **Class 5**

21        In 1993, Jack Owoc ("Owoc"), a former science teacher, started a business known at that

22  time as Vital Pharmaceuticals, Inc.  dba VPX Sports ("VPX").  In 2019, VPX re-branded the entire

23  company which is now known as "Bang Energy".  For ease of reference, VPX / Bang Energy shall

24  be referred to in this Interim Arbitration Award as "VPX".  According to an early website dated as

25

26

27  [1] As Fox testified, the name for Orange Bang's other brand, "Ole", was inspired by Dodger fans shouting "Ole" during Fernando Valenzuela's rookie season in 1981.

28  [2] The BANG mark, a word mark, is certainly at issue in this case, while the BANG logo is not. VPX does argue, however, that the logos are distinguishing features which, in VPX's view, is a factor which militates against a finding of a likelihood of confusion in the marketplace.

of June 7, 2006, Owoc founded VPX in order "to produce the highest-grade sports *nutritional supplements* on the market . . . ." (Emphasis added.)  This early website touted the benefits of creatine (discussed at length below) and described VPX as the "Frontrunner in Sports Nutritional Pharmacology".  *See* Exhibit 2915.

In 2008, VPX released a product known as the Bang Pre-Workout ("Bang Pre-Workout"). Bang Pre-Workout was the first VPX product marketed and sold under the name "BANG!" VPX marketed and sold Bang Pre-Workout between 2008 and 2013.  *See* DDX 1003, at 36.  VPX marked and sold Bang Pre-Workout as a *nutritional supplement*.  The back side of the bottle contained a "Supplement Facts" panel, a panel of information about the supplement which is an indicator that the product was indeed sold as a *nutritional supplement*.  *See* Exhibit 2053.  The Bang Pre-Workout bottle itself declared in capital letters to would-be consumers that this product was the "WORLD'S ONLY STABLE LIQUID CREATINE!" *See* Exhibit 2053.  An early VPX website, dated as of December 4, 2008 according to the "way-back machine"[3], likewise described the product as the "world's only stable liquid creatine".  *See* Exhibit 84.  The back of the Bang Pre-Workout bottle listed a "Proprietary Blend" consisting of 13 ingredients, 5,842 milligrams ("mg") of some ingredients and 11,648 mg of other ingredients, which together comprised this *nutritional supplement* product (a product which was discontinued in 2013).  One of those thirteen ingredients listed on the back of the bottle was "Creatinol-O-Phosphate" ("COP").  The back of the Bang Pre-Workout bottle, however, did not break down the proportions of these 13 ingredients or indicate how much of the 5,842 mg and the 11,648 mg were comprised of COP. *See* Exhibit 2053.  According to the testimony elicited during the arbitration hearing, however, the Bang Pre-Workout bottle contained 5,102 mg of COP. *See* Monster / Orange Bang's Appendix A to their November 9, 2021 closing brief.

---

[3] The "Way-Back Machine" is an internet archive reference device which enables a user to "go back in time" to retrieve the contents of a website and see how it looked at a certain point in time in the past. The Way-Back Machine is named after the escapades of two time-traveling cartoon characters, Sherman and Peabody, who appeared in a regular segment of the show "The Adventures of Rocky and Bullwinkle and Friends", a cartoon show from the late 1950s and early to mid-1960s.

Whether or not COP is a form of creatine, whether or not a product containing COP is "creatine-based" and whether or not the fact that Bang Pre-Workout contained COP helps ascertain the true intent of the parties in entering into the 2010 Settlement Agreement are critically important issues, all of which are discussed at length below.

On December 9, 2008, VPX obtained a trademark registration for the mark "BANG" in International Class 5 ("Class 5"). *See* Exhibit 2468, p. 33. It is not entirely clear to the arbitrator how or why the PTO issued a trademark registration to VPX for a word mark "BANG" given Orange Bang's prior registration of the BANG mark, but, presumably, the PTO issued the trademark registration to VPX because the registration was issued for Class 5. Class 5 is for "pharmaceuticals" and for "dietary supplements for human beings (and animals)." *See* Exhibit 100 (Exhibit 100 - 4, p. 3 of 17). In short, Class 5 is for *nutritional supplements*, and Class 32, not Class 5, is for fruit juices, isotonic drinks and energy drinks. In this respect, as of December of 2008, VPX had received a trademark registration issued by the PTO which granted it the right to market and sell Class 5 *nutritional and dietary supplements* under the word "BANG."

**C. Orange Bang's 2009 Demand Letters and its 2009 Trademark Infringement Action**

In 2009, Orange Bang learned that VPX was marketing and selling a product under the name "BANG!". On February 2, 2009, Orange Bang sent a cease and desist letter to VPX. This first cease and desist letter stated, among other things, that Orange Bang believed there was a likelihood of confusion in the marketplace and why it held that belief, that it had not previously been aware of VPX's trademark application for the word BANG (an intent-to-use application according to Orange Bang's first cease and desist letter), Serial No. 77/247.655 (the "655 TM Application"), and that it had recently become aware that VPX was selling product under the name "BANG!" (with the exclamation mark). Orange Bang's first cease and desist letter, authored by its outside attorney Aaron Borrowman ("Borrowman"), who testified at length during the arbitration hearing, also stated that the purpose of the letter was to give "actual" notice to VPX (as opposed to mere constructive notice), demand that VPX cease and desist its alleged trademark infringement (or risk a claim for willful trademark infringement) and, if it failed to cease and desist, Orange Bang

1    would consider, among other remedies, filing a petition seeking cancellation of the 655 TM

2    Application.  *See* Exhibit 2059.

3        VPX did not respond to Orange Bang's first cease and desist letter.  Orange Bang then sent

4    a second cease and desist letter, this one dated March 3, 2009, to VPX.  *See* Exhibit 2059.  VPX

5    did respond to the second cease and desist letter.

6        On April 3, 2009, and on VPX / Redline letterhead[4], VPX's in-house General Counsel at

7    the time, Erica Stump, Esq.  ("Stump"), responded and stated on behalf of VPX her arguments as to

8    why there was no likelihood of confusion in the marketplace.  In addition, Stump stated that VPX's

9    BANG product (a reference to the Bang Pre-Workout *nutritional supplement* which was the only

10   VPX product on the market at the time which made use of the BANG mark) was a "creatine

11   containing sports drink" and was "consumed by athletes and work out enthusiasts interested in

12   building lean muscle mass." (Emphasis added.).  Stump further stated in her letter that VPX's

13   product was the "first drink containing a stable creatine in liquid form" and that the "retail outlets

14   of OB's products are gas stations and convenience stores" while VPX's Bang product was sold at

15   "GNC, Vitamin Shoppe, gyms, health clubs and other special nutritional types of stores" and

16   "advertise[d] . . . in health and fitness publications." Stump also explained how Bang Pre-Workout

17   contained creatine and she explained the physiological benefits of creatine, but she never made any

18   mention in her letter of the ingredient COP. *See* Exhibit 2560.

19       In this respect, in response to the second cease and desist letter, Stump confirmed that

20   Orange Bang was sold at convenience stores and that VPX's target audience for its Bang Pre-

21   Workout product consisted of athletes and work-out enthusiasts (mostly men, as her letter so states)

22   and that VPX's sales, at the time, took place within the nutritional and supplements sales channel

23   referred to in her letter.  In addition, in her response to the second demand letter, Stump explained

24   that the Bang Pre-Workout product contained creatine, in fact stable creatine in liquid form, and

25   she attached various pages from the VPX website at the time, pages from the website as it existed

26   as of April 3, 2009 (and without making use of the Way-Back Machine) to further emphasize that

27   _____

28   [4] In addition to selling product under the BANG mark, VPX also sold product under other brand
     names, one of which was / is "Redline."

the product contained creatine. These pages from the website likewise described Bang Pre-Workout as the "1st Stable Liquid Creatine!" and likewise emphasized the musclebuilding capabilities of the product. The April 3, 2009 letter from VPX to Orange Bang included as its last page a printout from the web site which did reference COP, among other ingredients, in small, hard to read print, but without any reference to or explanation of the meaning or the purported significance of COP. *See* Exhibit 2560, p. 4.

Thus, as of April 3, 2009, VPX had taken the position that: (i) Orange Bang and Bang Pre-Workout were very different products, one a sugar-loaded orange drink and the other a *nutritional supplement* which contained creatine and which delivered the benefits of creatine; (ii) Orange Bang and Bang Pre-Workout were sold in different sales channels, Orange Bang at gas stations and convenience stores, and Bang Pre-Workout in the nutritional and supplement sales channel; and (iii) Orange Bang's beverage and Bang Pre-Workout targeted different consumers in that Bang Pre-Workout focused on athletes and work-out enthusiasts who would not want a sugar-loaded orange drink like the whipped and frothy Orange Bang.

VPX did not call Stump as a witness to testify at the arbitration hearing. The arbitrator is entitled to, and hereby does, draw a negative inference from VPX's failure to call Stump as a testifying witness and the arbitrator therefore concludes that Stump's testimony would not have been helpful to VPX. Having said that, and as demonstrated in Section II.E below, the negotiation history of the 2010 Settlement Agreement is relatively clear, straightforward (although detailed) and mostly undisputed and the arbitrator would reach the same findings and conclusions as set forth in this Interim Arbitration Award even without drawing this negative inference as to Stump. However, it is not unimportant and it is noteworthy that VPX did not call Stump as a testifying witness. It should also be pointed out that Monster / Orange Bang did not call Stump as a testifying witness either, although it was not Monster's or Orange Bang's burden to do so.

**D. Orange Bang's 2009 Action for Trademark Infringement**

VPX did not stop marketing or selling Bang Pre-Workout under the name BANG! in response to the second cease and desist letter and, as a result, on September 9, 2009, Orange Bang

filed a trademark infringement action against VPX in the United States District Court for the Central District of California (the "2009 Trademark Infringement Action"). *See* Exhibit 2468. The filing of the 2009 Trademark Infringement Action commenced a settlement dialogue between one attorney for Orange Bang (Borrowman) and two attorneys for VPX which lasted many months and which culminated in the 2010 Settlement Agreement executed by the parties in August of 2010, approximately eleven months after the filing of the 2009 Trademark Infringement Action. *See* Exhibit J-11. The written and oral communications which took place between the parties during this eleven month period of time, and the context within which these communications took place, such as written and oral statements made directly by VPX to Orange Bang and statements made by VPX to its consumers via its labels, its website and its advertisements and marketing materials, are the objective facts and critical extrinsic evidence which help discern the meaning of the key contractual language at issue in this case and the intent of the parties when they entered into the 2010 Settlement Agreement. As explained in more detail below, the unspoken subjective intent of the parties, and post-litigation interpretations of the 2010 Settlement Agreement, are of minimal probative value, if any, and provide little or no beneficial insight to the arbitrator.

### E. The Parol Evidence Rule and the Negotiation, Drafting and Final Execution of the 2010 Settlement Agreement

The parol evidence rule in California is codified in California Civil Code Section 1856. The parol evidence rule is a rule of substantive law and has been articulated in the statute itself and in many case decisions. If the proposed extrinsic evidence seeks to contradict or vary the clear and unambiguous language of a written contract, then the parol evidence is not admissible. If, however, the proposed extrinsic evidence seeks to explain or supplement the language of a written contract, then the parol evidence is admissible. *Pacific Gas & Electric Co v. G.W. Thomas Drayage & Rigging*, 69 Cal.2d 33, 39-40 (1969); *Wolf v. Walt Disney Pictures & Television*, 162 Cal.App.4th 1107, 1126 (2008). Courts are instructed to provisionally receive all of the relevant parol evidence and then make a critical determination. If, upon provisional consideration of the parol evidence, the court determines that the written contract is reasonably susceptible to only one

1   interpretation, then the extrinsic evidence is rejected, not admissible and not further considered. If,

2   however, upon provisional consideration of the parol evidence, the court determines that the

3   written contract is reasonably susceptible to more than one interpretation because some of the

4   contract terms are ambiguous, then the extrinsic evidence is received into evidence and the court

5   then interprets the meaning and intent of the written agreement. *Wolf v. Superior Court*, 114

6   Cal.App.4th 1343, 1351 (2004) [affirming the two-step process in a dispute over the feature film

7   "Roger Rabbit"]; *Winet v. Price*, 4 Cal.App.4th 1159, 1165-1168 (1992) [affirming the two-step

8   process and specifically holding that unspoken subjective intent as reflected by a party's

9   "understanding" of an agreement is irrelevant, but outwardly expressed intentions and the

10   circumstances surrounding the formation of the contract are indeed relevant]; *Brown v. Goldstein*,

11   34 Cal.App.5th 418 (2019) [contract provisions relating to splitting the publisher's share of public

12   performance income as between the band "War" and its publisher / manager was reasonably

13   susceptible to more than one interpretation and, therefore, parol evidence must be received].[5]

14        The chronology of the objective communications (as opposed to the unspoken subjective

15   intent of non-percipient witnesses or post-litigation expert's "interpretations" of the 2010

16   Settlement Agreement) leading to the final version of the 2010 Settlement Agreement are crucial as

17   they reflect the discernable intent of the parties in entering into the 2010 Settlement Agreement in

18   general and they demonstrate the meaning, purpose and true intent of the parties in entering into

19   paragraph 7 of the 2010 Settlement Agreement in particular. This chronology is detailed, but

20   important and is as follows:

21        On February 2, 2009, Orange Bang sent VPX the first cease and desist letter which is

22   described above.

23        On March 3, 2009, Orange Bang sent VPX the second cease and desist letter which is also

24   described above.

25

26

27

28

---

[5] Although normally it is a determination for the court to interpret the intent and meaning of a written contract, even one reasonably susceptible to more than one meaning, in a jury trial, where the parol evidence is in conflict and the resolution of the contract requires an assessment of the credibility of the witnesses, the interpretation of the contract is for the jury, not the trial judge. *City of Hope National Medical Center v. Genetech, Inc.*, 43 Cal.4th 375, 395 (2008).

On April 3, 2009, VPX sent Orange Bang a formal response to the second cease and desist letter which is likewise described above. Importantly, in Stump's April 3, 2009 letter, she introduced the nomenclature that Bang Pre-Workout was a "creatine *containing*" product.

On September 9, 2009, Orange Bang filed the 2009 Trademark Infringement Action against VPX. This litigation proceeded forward for approximately four months before the parties were required to focus on the issue of a potential settlement. The Local Rules of the Central District at the time (and currently) required the parties to select a mediator and attend a mediation. Because of that requirement, settlement discussions became an essential topic which had to be addressed by legal counsel for each side.

On January 22, 2010, Orange Bang's attorney Borrowman sent a written settlement proposal to VPX's outside attorney Adam Thurston ("Thurston"). In his initial settlement proposal, Borrowman referenced his recent discussions with Thurston about the selection of a mediator and also referred back to VPX's April 3, 2009 letter and how it emphasized that the products in dispute were different products (an orange beverage v. a creatine-containing product to supply energy and build lean muscle mass) and which were intended for different target audiences (restaurant goers and convenience store / gas station consumers v. athletes and workout enthusiasts). Based on these differences as perceived by both sides, Borrowman proposed a concept by which VPX and Orange Bang would co-exist, i.e., both make use of the BANG mark, but do so in their own particular categories, sales channels or "lanes", so to speak. According to Borrowman's initial settlement concept, VPX would be *permitted* to continue to use the BANG mark but only on its existing nutritionally fortified, "*creatine-based"* beverage and, in addition, VPX would cancel or abandon its efforts to seek trademark protection in Class 32. (Emphasis added.)

**In this respect, in his January 22, 2010 initial settlement proposal, it was Borrowman who introduced the nomenclature that VPX would be permitted to make use of the BANG mark if its product was "*creatine-based*". *See* Exhibit 2571-1 to 2571-9. Based on common sense and plain English, it is beyond dispute that a "creatine-based" standard is a higher and more rigorous standard than a "creatine-containing" standard.** Although he did not testify

that he had direct conversations with Stump about the meaning of "creatine-based", Borrowman did testify at the arbitration that he believed that Bang Pre- Workout was a "creatine-based" product because of the representations which VPX made to him (and to VPX's consumers) by virtue of VPX's web site, marketing materials and product labels. *See* Borrowman Testimony, Arbitration Hearing Transcripts ("AHT"), p. 468:3 – 471:20.

On March 17, 2010, Thurston responded to Borrowman's settlement proposal of January 22, 2010. Thurston needed information. On behalf of VPX, Thurston sent Borrowman an email by which he requested that Orange Bang provide information and produce documents to show, among other things, the demographic composition of Orange Bang's customers, the amount of Orange Bang's sales at restaurants, at convenience stores, and at grocery stores, Orange Bang's efforts to sell Orange Bang in bottles, consumer surveys, etc. *See* Exhibit 2571-10 to 2571-11.

On March 25, 2010, Borrowman followed up with Thurston. Borrowman sent an email to Thurston in which he explained in further detail who Orange Bang's customers were at the time, who Orange Bang's competitors were (including Coca-Cola according to Orange Bang), the amount of sales by Orange Bang since 1990 ($118 million) and Orange Bang's past effort to bottle Orange Bang based on a small test run with an independent bottler, efforts which, according to Borrowman, were ongoing. At the end of this follow up email, Borrowman again inquired as to the status of VPX's response to Orange Bang's pending settlement offer pending since January 22, 2010. *See* Exhibit 2571-13 to 2571-14.

On April 6, 2010, Thurston emailed Borrowman to inform him that he will be discussing the settlement proposal with his client "tomorrow" and that he expected to be back to Borrowman in about a week's time. *See* Exhibit 2571-12.

On April 13, 2010, Borrowman followed up with Thurston. In his email, Borrowman again asked Thurston for a response to Orange Bang's pending settlement offer, a settlement offer, Borrowman argued, that would enable VPX to continue to market and sell its beverage "as it is now" and also enable VPX to retain its trademark registration in Class 5. *See* Exhibit 2571-12. On April 23, 2010, Thurston emailed Borrowman asking for additional time to confer with his client in order to respond to Orange Bang's pending settlement offer. *See* Exhibit 2571-15.

On May 13, 2010, VPX made a counter-offer to Orange Bang. Thurston sent a May 13, 2010 email to Borrowman with a 9 point proposal (and 9 numbered paragraphs) and specifically stated that he, Thurston, was still waiting to receive formal approval from VPX's CEO to present his counter-offer settlement proposal to Orange Bang. Point 1 of Thurston's counter-offer proposed that VPX may continue to use the BANG mark in association with its "existing nutritionally fortified, *creatine-based* beverage." Point 2 also make use of the "creatine-based" nomenclature, but point 3 did not. Point 6 proposed that Orange Bang shall *not* be permitted to "use the BANG mark in connection with isotonic drinks, sports drinks, nutritionally fortified supplement beverages, or dietary supplements." *See* Exhibit 2571-16 to 2517-17.

On May 14, 2010, the very next day, Thurston sent a prompt follow-up email to Borrowman advising him that the VPX CEO had now approved the settlement offer, thus giving him authority to present it to Orange Bang, **but with slight modifications to Point 1 and Point 2. Significantly, in Thurston's May 14, 2010 email, the "creatine-based" nomenclature was deleted from both Point 1 and Point 2.** The settlement proposal of Point 1 was revised so that VPX would be entitled to continue to use the BANG mark in association with "*any* existing nutritionally fortified beverage used to enhance performance", i.e., Thurston removed the requirement that the product be "creatine-based." (Emphasis added.) The proposal of Point 2 was similarly revised so that VPX would still be entitled to change the formula of its then-current product which made use of the BANG mark, the Bang Pre-Workout product, provided that it continued to be a "nutritionally fortified liquid beverage or other dietary supplement", again without any requirement that the product be "creatine-based."

**In short, VPX's April 3, 2009 letter introduced the concept of a "creatine containing" product and its May 14, 2010 counter-offer for settlement, its first substantive response to Orange Bang's pending settlement proposal, attempted to eliminate and *negotiate out* the use of the higher standard, the term "creatine-based."** *See* Exhibit 2571-18 to 2517-19.

On May 20, 2010, Borrowman sent a letter to Thurston with another settlement proposal. The first paragraph of the May 20, 2010 letter refers to a May 19, 2010 email message from Thurston asking Borrowman to put his most recent settlement offer in writing and the second

paragraph refers to a May 19, 2010 telephone conversation between the two attorneys in which Borrowman apparently articulated his revised settlement proposal to Thurston on the telephone. Thurston logically asked Borrowman to put his revised settlement offer in writing, and Borrowman did so by virtue of this May 20, 2010 letter, a revised settlement proposal which consistent of 10 points (and 10 numbered paragraphs).

Before he set forth the 10 point proposal, however, Borrowman made several substantive points in the opening paragraphs of his May 20, 2010 letter which are important in determining the objective intent of the parties. First, and significantly, Borrowman stated that "Orange Bang is willing to *allow* VPX to sell its currently-offered BANG nutritionally fortified, *creatine-based* beverage under the BANG mark and without restricting trade channels . . . ." (Emphasis added.) In this respect, Orange Bang's settlement proposal made it clear that it was willing to permit VPX to use the BANG mark on its currently offered product, Bang Pre-Workout under certain circumstances. *See* Exhibit 50; Borrowman Testimony, AHT, p. 488:19 – 489:22, 491:19 – 495:12. Orange Bang's revised settlement proposal of May 20, 2010 likewise made use of the "creatine-based" nomenclature and therefore moved away from VPX's earlier-introduced "creatine containing" language. **In other words, Borrowman, on behalf of Orange Bang, once again re-introduced the "creatine-based" language back into the settlement discussions and moved away from the lower standard of "creatine-containing".**

Second, Borrowman stated that Orange Bang would agree that VPX would be entitled to change the formula of its Bang Pre-Workout product so long as "it remains a nutritionally fortified, creatine-based beverage." Third, Borrowman stated that VPX would also be entitled to make use of the BANG mark in connection with other products, such as pills and capsules (and presumably other beverages), provided they too were "creatine-based, nutritionally fortified dietary supplements and nutritional products . . . ." Again, Orange Bang's May 20, 2010 letter set forth a settlement proposal based on the "creatine-based" language, and not on the "creatine containing" language first mentioned by VPX back on April 3, 2009 and, importantly, set forth a proposal for the specifically negotiated "lanes" in which VPX would be *permitted* to make use of the BANG mark. In other words, and as the negotiating history discussed in this section clearly demonstrates,

18

FINAL ARBITRATION AWARD – PHASE 1 AND PHASE 2

Orange Bang was communicating to VPX that, other than the permitted uses as proposed by Orange Bang, VPX would not be permitted to make use of the BANG mark in any other way.

Fourth, and importantly, prior to setting forth his 10 point proposal, Borrowman made it clear that Orange Bang would **not** agree to VPX's suggested language as set forth in the proposed Point 1 of VPX's May 14, 2010 settlement proposal that VPX be permitted to use the BANG mark in connection with "*any*" nutritionally fortified beverage or other dietary supplement. As Borrowman stated, this would give VPX the ability to create and sell a beverage "akin to an isotonic drink, sports drink, *energy drink* or the like." (Emphasis added.) **In this respect, Orange Bang made it clear that: (i) the term "any" was not acceptable; (ii) the creation of an energy drink was not acceptable; and (iii) VPX's proposed elimination of the term "creatine-based" was not acceptable.**

Fifth, and before setting forth his 10 point proposal, Borrowman stated that Orange Bang was even willing to permit VPX to make use of the BANG mark on products which are **not "creatine-based"** so long as those products are a nutritionally fortified beverage or a dietary supplement marketed and sold **only** "through vitamin and nutritional supplement online ore retail stores and gyms." (Emphasis added.) As Borrowman specifically stated in this revised settlement proposal of May 20, 2010, this would *preclude* sales by VPX at "*convenience stores*, restaurants, supermarkets, mass retailers (such as WalMart, Costco and the like)." (Emphasis added.) In this respect, Orange Bang was again proposing a co-existence agreement, an agreement where both parties would be entitled to continue to make use of the BANG mark in a harmonious fashion, and at the same time, so long as each party stayed in their own pre- negotiated categories, marketing and sales channels or "lanes" – Orange Bang with its orange- flavored drink in restaurants and convenience stores / gas stations, geared towards the general public, and VPX's BANG mark products in the nutritional and dietary supplements sales channel, geared towards athletes and work-out enthusiasts.

With respect to the 10 point settlement proposal in his May 20, 2010 letter, Borrowman proposed the following: Point 1 would permit VPX to continue to use the BANG mark on its existing "nutritionally fortified, creatine-based beverage." [This language becomes Paragraph 7 A

19

of the 2010 Settlement Agreement.]. Point 2 would permit VPX to make changes to its formula for its existing BANG mark product (Bang Pre-Workout) so long as the product remains a "nutritionally fortified, creatine-based beverage." [This language becomes Paragraph 7 B of the 2010 Settlement Agreement.]. Point 3 would permit VPX to make use of the BANG mark in connection with other "creatine-based, nutritionally fortified" dietary supplements and nutritional products, including pills and capsules. [This language becomes Paragraph 7 C of the 2010 Settlement Agreement.].

Point 4 would permit VPX to make use of the BANG mark in connection with products which are not "creatine-based", so long as those products are "nutritionally fortified" and "enhance performance" and so long as those products are "only marketed and sold through vitamin and nutritional supplement stores and gyms." [This language, later modified based on further negotiations between the parties (as discussed below), becomes the basis of Paragraph 7 D of the 2010 Settlement Agreement.]

Point 7 would foreclose Orange Bang from making use of the BANG mark in connection with "creatine-based" beverages, an attempt to define the "lane" which Orange Bang would have to stay out of in exchange for VPX staying in its defined "lane". [This language, later modified based on further negotiations between the parties, becomes the basis of Paragraph 7 J of the 2010 Settlement Agreement.].

The other points which comprised the 10 point proposal are less relevant to understanding the meaning of the terms "creatine-based" and "nutritionally fortified" in paragraph 7, but these other points likewise end up in the final version of the 2010 Settlement Agreement. Borrowman concluded his May 20, 2010 letter by requesting that Thurston provide a written response to this revised settlement proposal by May 24, 2010. *See* Exhibit 2571-20 to 2517-23.

On June 2, 2010, Borrowman sent an email to Thurston to follow up. Borrowman stated that he understood that VPX's in-house counsel had been at a conference and generally unavailable and asked Thurston to get back to him with a definite response. *See* Exhibit 2571-27. On June 8, 2010, Kalina Pagano ("Pagano"), VPX's in-house General Counsel at the time, reached out to Borrowman to set a conference call to work "towards a final resolution of this matter." *See* Exhibit

20

FINAL ARBITRATION AWARD – PHASE 1 AND PHASE 2

2571-25.  On June 15, 2010, Borrowman sent an email to Pagano following up on the status of the settlement proposal.  Pagano responded by stating that she was in the "process of finalizing our acceptance", but that she had encountered an issue [a Notice of Suspension as to one of VPX's marks due to one of Orange Bang's marks] which "needs to be addressed in our settlement agreement as well."  *See* Exhibit 2571-24.  On June 16, 2010, Pagano sent an email to Borrowman responding to his prior inquiry and advising him that she will get back to him with the trade channels information (which he had requested).  *See* Exhibit 2571-18 to 2517-28.

On June 21, 2010, Pagano sent an email to Borrowman in which she advised him which national sports nutrition chains VPX currently sells to, which national gym chains VPX currently sells to and the fact that VPX does sell nationally to some convenience stores.  On June 22, 2010, Borrowman thanked her for the information and asked her about drugstores like Walgreens and big retailers like Walmart.  On June 22, 2010, Pagano responded that VPX does not have product in Walgreens or in Walmart and that she will have information about the convenience stores tomorrow.  On June 23, 2010, the next day, Pagano advised Borrowman which convenience stores were selling VPX Bang product at the time (Chevron, Shell, Race Track, Quick Trip, Mobil, Sunoco and perhaps a few more).  Borrowman responded to Pagano that he will get back to her as soon as he can.  *See* Exhibit 2571-36 to 2517-38.

On June 30, 2010, Pagano sent an email to Borrowman stating that VPX **"will not have a problem of limiting BANG to sections where supplements and vitamins are separate from the general beverage areas."**  (Emphasis added.) In this respect, VPX expressed its agreement to the concept underlying paragraph 7 D of the 2010 Settlement Agreement pursuant to which VPX would be permitted to make use of the BANG mark on non-"creatine-based" products so long as those products were sold in the locations and sections where supplements and vitamins are sold, sections separate and apart from the general beverage areas.  *See* Exhibit 2571-40 to 2517-41.

Later in the day on June 30, 2010, Borrowman responded to Pagano and asked her to please base the settlement agreement on his May 20, 2010 letter and, in addition, to add the requirement that VPX limit its BANG products to the nutritional supplement section of stores, and not place them in the general beverage section – a reference to paragraph 7 D of the 2010 Settlement

21

FINAL ARBITRATION AWARD – PHASE 1 AND PHASE 2

1  Agreement which had not, as of yet, reached its final form.  Pagano responded with an email to

2  Borrowman stating that she will use his May 20th letter as the basis of her draft of the settlement

3  agreement including Borrowman's **"limitation on BANG's distribution."**  (Emphasis added.)

4  Pagano also responded to Borrowman by asking him for a statement in email form which will help

5  VPX lift the suspension of VPX's mark, a suspension which had been imposed in the TTAB

6  proceedings between the parties (presumably the suspension was imposed because of VPX's

7  similarity to Orange Bang's BANG mark).  Pagano stated that such an email will help her "prepare

8  the settlement agreement with better accuracy."  A few minutes later on June 30, 2010, Borrowman

9  responded to Pagano's email by suggesting in his email that the settlement agreement include a

10  reciprocal agreement by which both sides would grant Consents to Register to the other for any

11  pending or future trademark applications, so long as they (the Consents to Register) comply with

12  the terms of the (not yet finalized) settlement agreement – a reference to provisions which

13  ultimately become paragraphs 7 K and 7 L of the 2010 Settlement Agreement.  *See* Exhibit 2571-

14  36 to 2517-41.

15       **VPX, not Orange Bang,** then drafted the first draft of the 2010 Settlement Agreement.  On

16  July 14, 2010, Pagano emailed the first draft of the 2010 Settlement Agreement to Borrowman (the

17  "First Draft of the 2010 Settlement Agreement").  Paragraph III. A – III. C (under heading III.

18  entitled "Promises"), as drafted by Pagano, **made use of the "creatine-based" and "nutritionally**

19  **fortified" nomenclature.  It did not make use of the "creatine containing" language first**

20  **referenced in VPX's April 3, 2009 letter.  In this respect, VPX, in drafting the First Draft of**

21  **the 2010 Settlement Agreement, embraced the "creatine- based" language, the higher**

22  **standard which had been first introduced and proposed by Borrowman on behalf of Orange**

23  **Bang.**  The language of paragraphs III.  A – III.  C as set forth in the First Draft of the 2010

24  Settlement Agreement is the exact same language as the final, executed version of the 2010

25  Settlement Agreement.  In this respect, the "creatine-based" language as set forth in the First Draft

26  of the 2010 Settlement Agreement never changes over the time that the long-form settlement

27  agreement is negotiated and thus this exact language ends up in the final version of the 2010

28  Settlement Agreement.  *See* Exhibit 2572-36 and J-11.

**In other words:**

- **VPX first mentioned a "creatine containing" standard in its response to the second demand letter.**

- **Orange Bang responded with a "creatine-based" standard, an obviously higher and more exacting standard than a creatine containing standard.**

- **VPX responded by attempting to eliminate the "creatine-based" standard.**

- **Orange Bang responded by rejecting VPX's attempt to negotiate out the "creatine-based" standard and by insisting that the "creatine-based" language remain in the 2010 Settlement Agreement.**

- **VPX then drafted the First Draft of the 2010 Settlement Agreement, which embraced the higher "creatine-based" standard.**

- **The "creatine-based" language from the First Draft of the 2010 Settlement Agreement remained a part of the settlement agreement all the way through the final execution of the 2010 Settlement Agreement.**

- **The objective communications between the parties show significant discussion of the term "creatine", but zero discussion of the term "COP".**

As to paragraph III.  D, the First Draft of the 2010 Settlement Agreement as drafted by VPX provides that VPX shall be permitted to make use of the BANG mark in non-"creatine-based" products so long as they:  (i) are nutritionally fortified; (ii) enhance performance; and (iii) are only marketed and sold through "vitamin and nutritional supplement stores to include but not limited to GNC, Vitamin Shoppe, other specialty vitamin and nutrition stores, gyms and health clubs or to the vitamin and dietary supplement sections only of any convenience or other stores".  Much like paragraphs III. A to III. C, the language of paragraph III. D as set forth in the First Draft of the 2010 Settlement is the exact same language as the final, executed version of the 2010 Settlement Agreement.  In this respect, the marketing and sales restrictions imposed on VPX which are built into paragraph III. D as set for in the First Draft of the 2010 Settlement Agreement never changed over the time that the long-form settlement agreement was negotiated and thus this exact language

likewise ended up in the final version of the 2010 Settlement Agreement.  *See* Exhibit 2572-4 to 5 and J-11.

Although paragraphs III. A – III. D are not the topic of further negotiations between the parties, paragraph III. J is indeed further discussed, negotiated and revised as between Orange Bang and VPX.  Paragraph III. J of the First Draft of the 2010 Settlement Agreement provided that, in essence, Orange Bang will not drift into VPX's purported "lane" and stated, in this first draft, that "Orange Bang shall **not** use the BANG mark in connection with isotonic drinks [which are Class 32 drinks], sport drinks [which are also Class 32 drinks], nutritionally fortified supplement beverages [which are Class 5 beverages], or dietary supplements [which are Class 5 products]." *See* Exhibit 2572-6.  Also, the First Draft of the 2010 Settlement Agreement, **as drafted by VPX**, had a California choice of law provision, an arbitration provision and an attorney's fee provision (provisions which were not mentioned by Borrowman in either his January 22, 2010 initial proposal or in his May 20, 2010 revised proposal and thus these provisions originated from VPX). Exhibit 2572-10 to 11.

On July 21, 2010, Borrowman emailed a red-line of the First Draft of the 2010 Settlement Agreement to Pagano ("Borrowman's First Red-Line").  Borrowman's First Red-Line makes many revisions to the First Draft of the 2010 Settlement Agreement, but Borrowman does not make any changes to the language of paragraphs III. A – III. C, which are verbatim from his May 20, 2010 letter, nor does he make any changes to the language of paragraph III. D as drafted by VPX, although based on Borrowman's other comments to the draft of the settlement agreement, his comments changed the numbering of the paragraphs from III. A – III. D to paragraphs 7 A – 7 D which are a part of Section III entitled "Promises" (Section I is "Parties" and Section II is "Recitals").  *See* Exhibit 2572-14 to 19.  In short, paragraphs III. A – D became paragraphs 7 A – 7 D of the 2010 Settlement Agreement.

In Borrowman's First Red-Line, however, he did strike out paragraph III. J in its entirety, now numbered as paragraph 7.  J, and changed it to the first of the two paragraphs which reflected the reciprocal agreement to provide the Consents to Register.  In Borrowman's First Red-Line, he also made other changes including a strike-out of the global release provision (which had been

previously numbered as paragraph 7)[6] as well as a strike-out of the provision calling for the

knowing and voluntary waiver of *future* claims (which had been previously numbered as paragraph

8). *See* Exhibit 2572-19 to 22.

On July 28, 2010, after reviewing Borrowman's First Red-Line, Pagano revised the next

draft of the 2010 Settlement Agreement (the "Second Draft of the 2010 Settlement Agreement")

and sent it to Borrowman.  Paragraphs 7 A – 7 D remained untouched and without further revision.

VPX, however, restored Paragraph 7 J to precisely how it had been worded in the First Draft of the

2010 Settlement Agreement, language which had been previously rejected by Orange Bang.  VPX,

once again, proposed in paragraph 7 J that Orange Bang agree to not use the BANG mark in

connection with **isotonic drinks, sport drinks,** nutritionally fortified supplement beverages, or

dietary supplements.  The agreement to provide reciprocal Consents to Register was now reflected

in paragraphs 7 K and 7 L. *See* Exhibit 2572-30 to 32.

On August 3, 2010, Borrowman sent an email to Pagano pushing back on her proposed

language for paragraph 7 J, the paragraph which required Orange Bang to stay in its "lane" and

keep out of VPX's "lane" **and which sought to expand VPX's lane such that it would now**

**include various Class 32 products such as isotonic drinks and sports drinks (and thereby**

**energy drinks)**.  At first, Borrowman advised Pagano that Orange Bang wanted to delete the words

"nutritionally fortified" because, in Orange Bang's view, it described many of the juices that

Orange Bang was currently selling, juices which contain vitamins, milk, etc.  Borrowman, at first,

suggested alternate language for paragraph 7 J, "beverages containing supplements to enhance

performance", because that language, in his view, *more accurately described VPX's products* and

moved the contractual language away from products that Orange Bang made at the time or

products that Orange Bang might make in the future.

Then, however, also on August 3, 2010, and a mere 21 minutes later, Borrowman sent

another email to Pagano advising her that his client Orange Bang even had a problem with the

---

[6] Paragraph 6 of the 2010 Settlement Agreement was the only release provision in the agreement
and paragraph 6 was limited to a release of the claims relating to VPX's sole BANG mark product
at the time, Bang Pre-Workout, a release provision which would apply provided VPX was not
otherwise in breach of the 2010 Settlement Agreement.

FINAL ARBITRATION AWARD – PHASE 1 AND PHASE 2

language that Borrowman himself had suggested (the "beverages containing supplements to enhance performance" language) because "[b]everages such as Gatorade, other isotonic and sports drinks and **energy drinks** could fall into this definition." (Emphasis added.). **In other words, Borrowman, after again consulting with his client Orange Bang, wanted to make sure that the language of paragraph 7 J did not inadvertently allow VPX to drift into the "lane" which the parties had previously agreed was off limits to VPX, the isotonic drinks, sports drinks, and energy drinks "lane". Rather, the concept insisted upon by Borrowman was to keep VPX in the nutritional and dietary supplement "lane" while not restricting Orange Bang to a "lane" which would block its current or future products.** As Borrowman stated to Pagano in his email, these types of drinks fall into the category carved out for Orange Bang (and its competitors or, to put it another way, these types of drinks do not fall within the category carved out for VPX). Borrowman went on to state that Orange Bang had already agreed not to produce a beverage containing creatine (Paragraph 7 H) and that Orange Bang could not agree to VPX's proposed version of paragraph 7 J. As Borrowman stated, paragraph 7 J either needed to be redrafted or deleted. *See* Exhibit 2572-41 to 43.

On August 4, 2010, early in the morning at 8:32 a.m., Pagano sent an email to Borrowman. She confirmed receipt of his emails from the day before and she sent him another red-line, the only change to which was a revised Paragraph 7 J (the "August 4, 2010 Early Morning Red-Line"), together with a clean copy of the latest version of the 2010 Settlement Agreement. In explaining why she made her latest revision to paragraph 7 J, Pagano stated: *"***This will conform with our agreement that we VPX will stay in IC005"** [i.e., the nutritional and dietary supplement lane]. (Emphasis added.) In other words, Pagano stated to Borrowman in this email that she was making the change to paragraph 7 J to confirm VPX's agreement to stay in their "lane", the "lane" as reflected in Class 5. As the August 4, 2010 Early Morning Red-Line itself demonstrates, Pagano *herself* **deleted** the terms "isotonic drinks, sports drinks" from Paragraph 7 J and, at the same time, she **deleted** the words "nutritionally fortified supplement beverage" and **replaced** that language with the words "nutritional supplements in liquid form used to enhance performance". With these changes as drafted by Pagano, paragraph 7 J in the August 4, 2010 Early Morning Red-Line now

read as follows:  "Orange Bang shall not use the BANG mark in connection with nutritional supplements in liquid form used to enhance performance and/or dietary supplements."  *See* Exhibit 2572-45 to 50.

Nevertheless, Orange Bang still had issues with the language of Paragraph 7 J as proposed by VPX.  Paragraph 7 J was important because it described the "lane" which was off limits to Orange Bang, but, at the same time, it also described the "lane" which was open to VPX. Borrowman wanted to be careful and precise because he did not want paragraph 7 J to impede Orange Bang's current or future products or, at the same time, create too big of an opening for VPX.  Therefore, Orange Bang continued to negotiate the precise language of this paragraph 7 J lane.  On the afternoon of August 4, 2010, Borrowman and Pagano exchanged several emails as they attempted to iron out the final language of paragraph 7 J. *See* Exhibit 2572-59 to 62.

Finally, on August 4, 2010, at 3:58 pm (East Coast time), Pagano sent another red-line to Borrowman which reflected only one additional change, a change to paragraph 7 J (the "August 4, 2010 Afternoon Red-Line"), together with an execution copy of the 2010 Settlement Agreement. The August 4, 2010 Afternoon Red-Line reflected a proposed paragraph 7 J as follows:  "Orange Bang shall not use the BANG mark in connection with dietary supplements and/or nutritional supplements in liquid form used to enhance performance **of the kind that are primarily marketed and sold in gyms, health clubs, vitamin stores and nutritional supplement stores."**  (Emphasis added.).  *See* Exhibit 2572-61 and 2572-67.  This additional change to paragraph 7 J made paragraph 7 J more consistent with the marketing and sales restrictions placed on VPX by virtue of paragraph 7 D. This language, which carved out the "lane" into which Orange Bang was not permitted to drift, also clarified the "lane" in which VPX was required to stay.  Borrowman took extra care to prevent VPX from using paragraph 7 J as a way to expand its "lane" so as to permit Class 32 products such as isotonic drinks and sport drinks (and thereby energy drinks).  The version of paragraph 7 J set forth in the August 4, 2010 Afternoon Redline became the final version of paragraph 7 J in the 2010 Settlement Agreement.  *See* Exhibit J-11, page 5 of 11.

In this respect, Borrowman's pattern of negotiation demonstrates Orange Bang's intent to stay in its "lane," to carefully and methodically define VPX's "lane" and to prevent an unintended

expansion of VPX's "lane", despite VPX's repeated, but unsuccessful, efforts to expand that "lane" in an attempt to drift into Class 32 territory.  Richard Stein ("Stein"), Operational Manager of Orange Bang, reaffirmed this sentiment when he testified at the arbitration that the purpose of the 2010 Settlement Agreement " . . . was to keep VPX in their narrow lane of bodybuilding. . . or muscle building products and supplement products and Orange Bang to be sold everywhere else." Stein Testimony, AHT, p. 145:22 - 146:7.  VPX shared this mutual intent to reach a negotiated co-existence agreement, a "you-stay-in-your-lane and we-stay-in-our-lane" agreement as Eugene Bukovi ("Bukovi"), VPX's VP of Sales, and its Rule 30(b)(6) corporate designee as VPX's person most knowledgeable as to the meaning and intent of the 2010 Settlement Agreement, so testified when he admitted during the arbitration hearing that, in entering into the 2010 Settlement Agreement, VPX likewise was agreeing to stay in its "lane".  In particular, Bukovi testified as follows:

> Q:     What do you understand you could or couldn't do?

> A:     I understood that we're **a dietary supplement company**; that we could sell in the channels of trade that we currently sell into . . . [and] that we were not in the same space as Orange Bang . . .  **We were good as long as – long as we maintained our – our lanes.**"

(Emphasis added.)

Bukovi Testimony, AHT, p. 1969:7-22.

VPX itself concedes that the 2010 Settlement Agreement was expressly intended to be a "stay in your lane" trademark co-existence agreement as VPX states in it closing reply brief as follows:  "As an initial matter, VPX *agrees* that the [2010 Settlement] Agreement 'carves out' certain general lanes where OBI [Orange Bang] and VPX agreed they would not cross paths, could operate without fear of being sued for trademark infringement and maintain their respective registrations."  (Emphasis in the original.) *See* VPX's November 19, 2021 Response to Claimants' Joint Post-Hearing Brief, p. 18.

On August 9, 2010, Borrowman returned a signed copy of the 2010 Settlement Agreement to Pagano (with a copy to Thurston) as signed by Orange Bang and by Borrowman himself.  *See* Exhibit 2572-74.  On August 11, 2010, Pagano returned a signed copy of the 2010 Settlement

FINAL ARBITRATION AWARD – PHASE 1 AND PHASE 2

1    Agreement to Borrowman (also with a copy to Thurston) as signed by Jack Owoc ("J. Owoc"), the

2    CEO of VPX, and by Pagano herself. *See* Exhibit 2572-77.

3        The entire history of the negotiation of the 2010 Settlement Agreement shows that Orange

4    Bang and VPX had numerous objective communications about the term "creatine", but not once

5    did they have an **objective communication about the term "COP."**

6        VPX did not call Thurston or Pagano as a witness to testify at the arbitration hearing. The

7    arbitrator is entitled to, and hereby does, draw negative inferences from VPX's failure to call

8    Thurston or Pagano as a testifying witness and the arbitrator therefore concludes that Thurston's

9    and Pagano's testimony would not have been helpful to VPX. Having said that, and as

10   demonstrated in this Section II.E as set forth above, the negotiation history of the 2010 Settlement

11   Agreement is relatively clear, straightforward (although detailed) and mostly undisputed and the

12   arbitrator would reach the same findings and conclusions as set forth in this Interim Arbitration

13   Award even without drawing these negative inference as to Thurston and Pagano. However, it is

14   not unimportant and it is noteworthy that VPX did not call Thurston or Pagano as testifying

15   witnesses. It should also be pointed out that Monster / Orange Bang did not call Thurston or

16   Pagano as testifying witnesses either, although it was not Monster's or Orange Bang's burden to do

17   so.

18

19       **F. The Term "Creatine-Based" is Ambiguous, the VPX Marketing and Sales Restrictions**

20           **of Paragraph 7 D and VPX's Failure to Communicate the VPX Marketing and Sales**

21           **Restrictions to VPX's Own Employees, to VPX's Distributors or to VPX's Retailers**

22       Paragraph 7 is clear in several respects, but unquestionably ambiguous in other respects.

23       Paragraph 7 A is clear that VPX is permitted to use the BANG mark to sell the Bang Pre-

24   Workout product because, as the parties believed at the time, it was a "nutritionally fortified,

25   creatine-based" beverage.

26       Paragraph 7 B is clear that VPX is permitted to change the formula for its Bang Pre-

27   Workout product and then continue to use the BANG mark to sell the reformulated Bang Pre-

28

Workout product because, as the parties also believed at the time, it would likewise be a "nutritionally fortified, creatine-based" beverage.

Paragraph 7 C is clear that VPX is permitted to use the BANG mark to sell other dietary supplements and nutritional products, such as pills and capsules and presumably even other beverages, so long as they are "creatine-based, nutritionally fortified" products.

(In paragraphs 7 A and 7 B, the order of the wording is "nutritionally fortified" first and "creatine-based" second. In paragraph 7 C, the order of the wording is switched, with "creatine-based" first and "nutritionally fortified" second. The order of the words is not significant, but it is worth noting that the order of the words changes in this manner in the 2010 Settlement Agreement.)

Paragraph 7 D is clear that VPX is even permitted to sell non-"creatine-based" products so long as the non-"creatine-based" products: (i) are nutritionally fortified; (ii) enhance performance; and (iii) are "only *marketed* and sold through vitamin and nutritional supplement stores to include but not limited to GNC, Vitamin Shoppe, other specialty vitamin and nutrition stores, gyms and health clubs or to the vitamin and dietary supplement sections only of any convenience or other stores" **(the "VPX Marketing and Sales Restrictions")**.

Although paragraph 7 A through 7 D are clear enough as set forth above, the terms *within* these provisions are ambiguous and they are, without any question, reasonably susceptible to more than one interpretation. The terms "creatine-based" and "nutritionally fortified" are ambiguous terms which are not defined anywhere in the 2010 Settlement Agreement.

Accordingly, all of the above-referenced extrinsic evidence which, at first, was received into evidence on a provisional basis, is now formally received into evidence because the language of paragraph 7 is reasonably susceptible to more than one interpretation.

As has been evident since the inception of this case, Monster / Orange Bang, on the one hand, and VPX, on the other, have vastly different interpretations and arguments as to what is meant by the all-important term "creatine-based".

And for obvious reasons. If BANG Energy RTD is a "creatine-based" product, then BANG Energy RTD is a paragraph 7 C product and VPX has an absolute green-light to market it and sell it

(and other VPX "creatine-based" products) however it sees fit and without regard to, and without having to adhere to, the VPX Marketing and Sales Restrictions. **If, however, BANG Energy RTD is not a "creatine-based" product, then BANG Energy RTD is a paragraph 7 D product and VPX would have no right to sell it, and no right to even *market* it, unless VPX abides by, adheres to and complies with the VPX Marketing and Sales Restrictions (and this would apply to other VPX "non-creatine-based" products as well). And, if BANG Energy RTD is indeed a paragraph 7 D product, and if VPX then failed to comply with, or continues to disregard, the VPX Marketing and Sales Restrictions, then VPX is in breach of the 2010 Settlement Agreement. This all-important issue is discussed in further detail below in Section III, F.**

This dispute, whether or not BANG Energy RTD is a paragraph 7 C or a paragraph 7 D product, which turns on the meaning and intent of the term "creatine-based", is the core dispute in this case.

As an aside, although a great amount of time, energy, documents and testimony have been expended on the attempt to understand the meaning of the ambiguous term "nutritionally fortified", including but not limited to eliciting testimony from experts on FDA standards regarding when a food or beverage is entitled to claim that it is "nutritionally fortified" according to, or without regard to, FDA guidelines and regulations, and although the arbitrator discusses this issue to some extent below, the arbitrator believes that the inquiry into the meaning of "nutritionally fortified" is of minor consequence. The reason for this conclusion is because paragraphs 7 A – 7 C all make use of the language "nutritionally fortified, creatine-based" [paragraphs 7 A and 7 B] or "creatine-based, nutritionally fortified" [paragraph 7 C] and because of the way the comma is placed between these two terms, *both elements* are required in order to satisfy the terms of this contractual provisions at issue. In other words, paragraphs 7 A – 7 C are all written, in a substantive sense, as a conjunctive phrase, not as a disjunctive phrase, an "and" as opposed to an "or" and, therefore, in order to satisfy paragraphs 7 A – 7 C, both elements, both the "creatine-based" element and the "nutritionally fortified" element, must be satisfied in order to comply with the contract. Accordingly, the main focus in this Interim Arbitration Award shall be on the all-important term

"creatine-based" because if that contractual term in- and-of-itself is not satisfied, it does not then matter if the beverage or product is, or is not, "nutritionally fortified" given that both elements of the conjunctive phrase must be satisfied in order for a product to qualify as a paragraph 7 C product under the 2010 Settlement Agreement.

At the same time, as to paragraph 7 D, and even before reaching the question(s) of whether or not the product is "nutritionally fortified" which "enhances performance", the threshold question which again must be resolved *first* is whether or not the product is "creatine-based". This fact of construction likewise focuses the attention back to the fundamental issues of (i) what does "creatine-based" mean; and (ii) whether or not a product is indeed "creatine- based", and that explains why the subsidiary inquiry of whether or not a product is "nutritionally fortified" is of much lesser importance. In short, unless there is a prior finding that the BANG Energy RTD product, and VPX's other Bang-branded products, are indeed "creatine-based", there is no need to even reach the issue of whether or not the products are also "nutritionally fortified" or whether they "enhance performance".

Once the 2010 Settlement Agreement was fully executed by Orange Bang and VPX, what did VPX do with it? Did VPX take steps to ensure that the VPX Marketing and Sales Restrictions were carefully complied with and strictly followed?

One would assume that after the 2010 Settlement Agreement was fully executed, and given the importance of the VPX Marketing and Sales Restrictions, the existence and importance of the VPX Marketing and Sales Restrictions would be affirmatively communicated by the executives of VPX to VPX's employees and to VPX's customers / distributors / retailers, **but that was not the case.** VPX did essentially nothing in order to ensure compliance with the VPX Marketing and Sales Restrictions in paragraph 7 D of the 2010 Settlement Agreement. J. Owoc, VPX's CEO, testified that he never even read the 2010 Settlement Agreement (although the evidence referred to above demonstrates that he discussed it with this attorneys during the negotiations of the 2010 Settlement Agreement and although he signed it) and he never "advised any VPX employees in sales and marketing about VPX's obligations." J. Owoc Testimony, AHT, p. 1279:19-23, 1276:17 - 1277:16; Bukovi Testimony, AHT, p. 2108:15 - 2109:3 (same). VPX's other employees also

testified that they had never heard of the 2010 Settlement Agreement prior to this litigation. Meg Owoc ("M. Owoc") Testimony, AHT, p. 3493:7-21; Sweeney Testimony, AHT, p. 3105:13-20; Li Testimony, AHT, p. 1464:13-16.

Not only were the VPX marketing and sales department not told about the VPX Marketing and Sales Restrictions in the 2010 Settlement Agreement, the distributors and retailers were not told about the VPX Marketing and Sales Restrictions either. In fact as demonstrated by some of the sample distribution agreements entered into between VPX and selected distributors which were received into evidence during the arbitration, not only did VPX fail to inform these distributors of the VPX Marketing and Sales Restrictions, VPX, at least on some occasions, built in language in these distribution agreements which required the distributors to not only *disregard* the VPX Marketing and Sales Restrictions (restrictions of which the distributors were unaware), but required them to affirmatively distribute product in a manner which was *the exact opposite* of the VPX Marketing and Sales Restrictions (restrictions of which, once again, the distributors were unaware). For example, in paragraph 2.1 of the VPX's Distribution Agreement with Intermountain, VPX required this distributor to sell its products which, in fact, were non- "creatine-based" products in the general beverage sections of retail stores, a clear violation of the VPX Marketing and Sales Restrictions. *See* Exhibit 771, paragraph 2.1, p.2.

It is simply not possible for VPX to comply with the VPX Marketing and Sales Restrictions when it never bothered to communicate the existence of the VPX Marketing and Sales Restrictions to its own employees, to its own customers, to its own distributors (such as Pepsi, see *infra*) or to the all-important retailers.

**G. The 2010 to 2019 Time Period, the Introduction of BANG Energy RTD into the Marketplace in Late 2015 and VPX's Representations to the World About Creatine and Super Creatine**

VPX is correct that extremely powerful extrinsic evidence is course of dealing / course of performance evidence which shows how the parties behaved, vis-à-vis each other, after the parties entered into the 2010 Settlement Agreement. *See Brown v. Goldstein*, 34 Cal.App.5th 418, 436-

437 (2019) [course of dealing / course of performance where publisher actually paid publisher's share of public performance to the band, income it claimed later was not due to the band, is important parol evidence entitled to great weight]. VPX also asks the correct questions: when BANG Energy RTD was released to the marketplace in October of 2015, and became a smash hit beginning in 2018 and the first half of 2019 with astronomical sales in 2019 - 2021, where were you Orange Bang? Why weren't you complaining? Why did you sit back and say nothing and do nothing? Doesn't this show that VPX was indeed adhering to the 2010 Settlement Agreement? Doesn't this show that this lawsuit is just an attempt at a "money grab" by Orange Bang and Monster, and Monster's attempt to snuff out its chief competitor VPX? Doesn't this show that Orange Bang is guilty of laches and that its claims are time-barred by the four year statute of limitations for breach of contract in California?

However, Orange Bang has a simple, but convincing, answer to these all-important questions. Orange Bang said nothing and did nothing about BANG Energy RTD in 2015 to August of 2019 because it believed, as did most of the world of would-be consumers of this product, that BANG Energy RTD was indeed a "creatine-based" product. As Stein testified at the arbitration hearing, he did nothing because he believed that BANG Energy RTD was "creatine-based" and thus in compliance with the 2010 Settlement Agreement. *See* Stein Testimony; AHT, p. 165:16-166:6.

And why wouldn't Stein believe that? During this time period, October of 2015 to August of 2019, VPX broadcasted to the world of would-be consumers, via its product labels, via its advertising and marketing materials, via its social media campaign and via its website that BANG Energy RTD did indeed contain creatine. VPX not only broadcast to the world of would- be consumers that BANG Energy RTD contained creatine, but that it contained "super creatine" as well, and that its products would deliver the benefits of creatine to the consumer's body.[7] *See* Exhibits 1680 ["super creatine" on the can]; 608 ["super creatine" on the can and "Power up with BANG's brain & body-rocking fuel]; 2238 [same]; 917 [same]; 283, 245, 270 [social media posts

---

[7] Wouldn't a consumer reasonably believe that a product with super creatine would have more health benefits than a product that merely had creatine?

FINAL ARBITRATION AWARD – PHASE 1 AND PHASE 2

by bangenergy.ceo J. Owoc "#IceColdCreatine" juxtaposed with images of BANG Energy RTD or bang promotional items]; 673 [social media post by bangenergy.ceo J. Owoc describing the benefits and efficacy of super creatine]; 713 [press release quoting J. Owoc as he describes the new BANG Energy RTD Rainbow Unicorn with Super Creatine and the brain and brawn benefits of creatine]; 694 [VPX 2016 presentation to distributors which touts BANG Energy RTD as the world's first energy sports drink with water stable creatine, p. 14 and 21 showing the benefits of super creatine]; 352 [2016 social media post by bangenergy.ceo J. Owoc which states "#SuperCreatine – THE KEY TO EXPONENTIAL MUSCLE GROWTH", date established by J. Owoc's responsive comment " . . . May God's blessings chase you down in 2016!"]; 2581 [sales sheet used by VPX employees to emphasize the benefits of creatine]; and 169 [VPX patent covering CLL (defined below) and CLG (defined below) filed in 2010 and issued in 2013 which attempts to equate the benefits of creatine with the purported benefits of CLL and CLG.]

In short, VPX four-walled to the world that BANG Energy RTD contained an efficacious amount of creatine (super creatine no less) and would help produce the benefits of creatine in the human body and, therefore, it made perfect sense that during this period of time Orange Bang was **not** on notice of facts which would have led it to the conclusion that BANG Energy RTD was not, in actuality, "creatine-based" and that BANG Energy RTD was really a paragraph 7 D product, and not a paragraph 7 C product.  Orange Bang was legitimately ignorant of these facts, as were all VPX's would-be consumers, based on the representations VPX itself made to the marketplace singing the praises of its product which contained not just creatine, but super- creatine – raising the intended belief in the minds of the consuming public that drinking BANG Energy RTD would help deliver the benefits of creatine.  Orange Bang was ignorant of these facts, but, as discussed below, that all changed in mid-August of 2019.

**H. VPX's Brilliant and Highly Successful Marketing and Social Media Campaign for BANG Energy RTD and Its Other Bang Branded Products**

VPX has had enormous success.  As the billions of dollars of sales of BANG Energy RTD demonstrate, the sensational success of VPX is undeniable.  Some of that success may be

attributable to the quality and great taste of the BANG Energy RTD product, but a meaningful portion of that success is attributable to the brilliant marketing strategy of M. Owoc and her no. 2 Daisy Grunewald ("Grunewald"), the marketing executives of VPX, who built a social media and influencer marketing strategy which clicked with the under 30 crowd, a marketing strategy, however, that was based **almost entirely** upon making prevalent use of the brand name "Bang." The BANG mark was, and is, the centerpiece of VPX's marketing strategy which, based on the pervasive use of the BANG mark, has generated billions of dollars in sales.

To VPX's credit, VPX figured out that in order to stimulate significant sales, it had to reach young consumers, Gen Z and Millennials, who wanted the next "it" drink and that the way to reach these consumers was through a vigorous social media campaign targeted towards *the general population*, and not limited to the nutritional channel as required by paragraph 7 D for products which are not "creatine-based". Grunewald Testimony, AHT, p 1799:9 -12. And VPX did just that. However, this social media campaign likewise was based upon, and made prominent and continuous use of, the BANG mark. *See* J-55, p. 25, J-155, p. 24 and 29. And significantly, in its social marketing campaign and in its advertising and promotional activities which led to its financial break-through, VPX marketed its BANG products, especially BANG Energy RTD, as a "life-style" product, a marketing approach which did not comply with the VPX Marketing and Sales Restrictions. *See* Exhibits 1343, p. 1 and 8; 2460 ["ONLY lifestyle. NO workouts."], 2969, p. 16-17 ["lifestyle positioning" and "functioning positioning"]; Grunewald Testimony, AHT, p 1799:9-12. This marketing campaign was no longer limited to a nutritional and dietary supplement "lane" as required by paragraph 7 D of the 2010 Settlement Agreement pertaining to non-"creatine-based" products.

With respect to Instagram followers, VPX demonstrated how it had 100,000 followers at the end of 2017 and how that number grew to 2 million by the beginning of 2021. This is impressive, but those Instagram followers are followers of @**bang**energy. Again, VPX's undeniable success on social media is tied to the use of the BANG mark, the centerpiece of its social media campaign. *See* VPX Demonstrative DDX1009-1, which references Exhibits 5551, 5552, 5553, 5554 and 5555. Moreover, as M. Owoc and Grunewald both testified at the arbitration

36

hearing, VPX has hired over 1,000 influencers and those influencers, in turn, reach over 2.4 billion followers (see *infra*), all of whom promoted VPX products, but all of whom did that, and continue to do so, by promoting and making use of the BANG mark.  In short, VPX's social media, advertising and live event campaigns have been an overwhelming success and have stimulated massive sales of VPX Bang branded product, in particular BANG Energy RTD, **but all of these marketing and sales efforts are based upon the omnipotent use of the BANG mark.**

### I.  VPX Rebrands the Company from VPX to BANG Energy

As the success of BANG Energy RTD grew, VPX made the strategic and marketing decision in the first quarter of 2019 to change the name of VPX, to rebrand the entire company, as "Bang Energy".  VPX changed its social media accounts and its website to incorporate the BANG mark.  As VPX stated in an email about rebranding, "Born VPX, rebranded as Bang!", and this need to rebrand had taken on a sense of urgency for VPX, an unmovable deadline.  J. Owoc choose to call himself the "Bang CEO" and 99.8% of VPX products are sold under the BANG mark.  *See* Exhibits 2748, p. 3; 2749; J. Owoc Testimony, AHT 1339:7-22, 1402:11 – 1403:22; M. Owoc Testimony, AHT 3444:4 – 3445:10.  VPX even calls its customer base "Bangsters".  (*See infra.*).  As the sales of BANG Energy RTD grew, VPX continued to use the BANG mark in a comprehensive fashion.

### J.  VPX's 2018 – 2019 Release of its Bang Keto Coffee Product and Orange Bang's Response

In 2018, VPX released its BANG Keto Coffee product into the marketplace.  *See* DDX 1003 – VPX Product Timeline.  BANG Keto Coffee, a product currently on the market, has no creatine, nor does it purport to have any creatine, so it is obviously not "creatine-based", which makes it a paragraph 7 D product, and not a paragraph 7 C product.  Therefore, BANG Keto Coffee can only be marketed and sold in accordance with the VPX Marketing and Sales Restrictions.

On March 25, 2019, and following the release of the BANG Keto Coffee product into the marketplace, Borrowman, on behalf of Orange Bang, sent a cease and desist letter to VPX

(attention J. Owoc, CEO) regarding the BANG Keto Coffee drink (the "First Keto Coffee Cease and Desist Letter").  In the First Keto Coffee Cease and Desist Letter, Borrowman referred to the 2010 Settlement Agreement and the fact that Keto Coffee does not list creatine as an ingredient on the back of the can (indicating that it is an obvious paragraph 7 D product) and contended that it was being sold in the general beverage section of retail stores including at gas stations and convenience stores where Orange Bang also sold its products.  In the First Keto Coffee Cease and Desist Letter, Borrowman explained the precise requirements of paragraphs 7 A – 7 C, including the paragraph 7 C requirement that VPX could only use the BANG mark in connection with "creatine-based" products, and the restrictive requirements of paragraph 7 D, the grant of rights / permissions which enabled VPX to sell non-"creatine-based" products but only if they are nutritionally fortified, enhance performance and are marketed and sold through vitamin and nutritional supplement stores of the vitamin and dietary supplement sections of other stores.  *See* Exhibit J-64.

In this respect, the First Keto Coffee Cease and Desist Letter is of critical importance because this letter, although only directed to VPX at the time, focused upon the "creatine-based" limitation of paragraph 7 C and the VPX Marketing and Sales Restrictions of paragraph 7 D.  In short, the First Keto Coffee Cease and Desist Letter contained a description of the VPX Marketing and Sales Restrictions, strict limitations on its ability to conduct business, with which VPX was required to comply – extremely sensitive and valuable business information should it fall into the wrong hands and information which VPX should have been on guard to protect.

On August 2, 2019, after receiving no response to the First Keto Coffee Cease and Desist Letter, Borrowman sent a second cease and desist letter, again only to VPX, this one to VPX's then-General Counsel Marc Kesten ("Kesten") (the "Second Keto Coffee Cease and Desist Letter").  In the Second Keto Coffee Cease and Desist Letter, Borrowman referred to a prior VPX settlement offer which he had rejected and, in addition, he noted that "non-creatine-based beverages continued to be sold through unapproved channels" and how such sales were a breach of paragraph 7 D, a paragraph he had already described in the First Keto Coffee Cease and Desist Letter.  Borrowman again demanded that VPX cease and desist.  *See* Exhibit J 66, p. 54 of 54.

On August 9, 2019, VPX responded to the Second Keto Coffee Cease and Desist Letter. VPX did not respond by sending a letter or an email back to Orange Bang's counsel. Rather, it responded by filing a state court lawsuit for declaratory relief (the "2019 Declaratory Relief Action").

### K. VPX's 2019 Declaratory Relief Action, the Complaint Itself and the Crucial Attachments to the Complaint

In the 2019 Declaratory Relief Action, filed by Kesten, an in-house employee of VPX at the time, VPX filed a complaint for declaratory relief seeking a declaration from the court that the 2010 Settlement Agreement: (i) contained promises which are permissive rather than mandatory or prohibitive (essentially the same argument VPX has made in this arbitration); and (ii) was not intended to cover the BANG Keto Coffee product and, therefore, the VPX Marketing and Sale Restrictions did not apply to it. VPX's complaint in the 2019 Declaratory Relief Action was assigned to the Honorable Judge Stephen P. Pfahler of the Los Angeles Superior Court in California and it attached various exhibits, all of which became a part of the public record. VPX's 2019 Declaratory Relief Action attached the First Keto Coffee Cease and Desist Letter as Exhibit "B" and the Second Keto Coffee Cease and Desist Letter as Exhibit "C". *See* Exhibit J-66, p. 46 of 54 and p. 54 of 54. The complaint drafted and filed by Kesten in the 2019 Declaratory Relief Action also contained a footnote 1, a representation and warranty made by VPX to the court that " . . . VPX will file with the Court a copy of the [2010] Settlement Agreement."

VPX did not follow through on footnote 1 and VPX did not file the 2010 Settlement Agreement with the court either under seal or as a part of the public record. Nevertheless, VPX did, in fact, file the First Keto Coffee Demand Letter and the Second Keto Coffee Demand Letter as part of the public record and thus it was VPX, not Orange Bang, who disclosed to the world the key provisions of paragraph 7 of the 2010 Settlement Agreement including, but not limited to, the "creatine-based" requirement of paragraph 7 C and the VPX Marketing and Sales Restrictions of paragraph 7 D.

In short, it was VPX itself who exposed its own vulnerability, its own kryptonite so to speak, into the public record by attaching Exhibits B and C to the complaint in the 2019 Declaratory Relief Action. These disclosures, which exposed VPX's own Achille's Heel, the requirement that their products be "creatine-based" and the requirement that it adhere to the VPX Marketing and Sales Restrictions, was a self-inflicted wound by VPX and was not the result of a breach of the 2010 Settlement Agreement by Orange Bang.

During the arbitration, VPX conceded that BANG Keto Coffee was, and is, marketed and sold on-line and at VPX sponsored events and, most importantly, sold in the general beverage sections of retail outlets. In this respect, VPX has been, and currently is, marketing and selling BANG Keto Coffee in violation of the VPX Marketing and Sales Restrictions. These facts, and the legal conclusions which flow from them, at least as to BANG Keto Coffee, are not disputed by VPX.

**L. Fox and Stein Reach Out to Monster**

In August of 2019, after service of the 2019 Declaratory Relief Action on Orange Bang, Fox, Orange Bang's President, had a conversation with his no. 2, Stein. Stein told him that he had read an article in a trade publication about Monster having a dispute with VPX about creatine and that it might make sense for Orange Bang to reach out to Monster since they both were in litigation against VPX. Fox called Rodney Sacks ("Sacks"), the CEO of Monster, and spoke with one of Monster's in-house attorneys. Fox and Stein arranged a meeting with Sacks. In mid-August of 2019, Fox and Stein attended a meeting with Sacks and some of Monster's attorneys.

The arbitrator initially determined that the conversations and events of this August 2019 meeting were protected from disclosure because of the common interest doctrine. However, during the direct examination of Fox at the arbitration hearing, Monster's counsel elicited enough of the conversations from this meeting, albeit via an indirect means, that the arbitrator permitted VPX to fully cross-examine the Orange Bang witnesses and Sacks about this meeting, and VPX did so. During the arbitration hearing, the parties established that Orange Bang handed a copy of the 2010 Settlement Agreement to Monster at their first meeting. However, Orange Bang did so because the

First Keto Coffee Demand Letter and the Second Keto Coffee Demand Letter, the documents which described the "creatine-based" requirement of paragraph 7 C and the VPX Marketing and Sales Restrictions of paragraph 7 D, and which thereby revealed the crucial provisions of the 2010 Settlement Agreement, had already been made a part of the public record by VPX itself. Therefore, no liability attaches to Orange Bang for disclosing a document to Monster, the key provisions of which had already been disclosed to the general public by VPX itself.

Suffice it to say that Monster and its attorneys quickly grasped the significance of the 2010 Settlement Agreement and how it could "weaponize" it (to embrace, for the moment, the concept advocated by VPX). Monster already believed that VPX's most successful product, BANG Energy RTD, made material misrepresentations to consumers about creatine and "super creatine", as evidenced by the district court Lanham Act case which Monster had already filed against VPX (the "False Advertising Case"), and the 2010 Settlement Agreement contained a provision which precluded VPX from marketing or selling a non-"creatine-based" product in wide, general distribution. There is no doubt that Monster instantly recognized the strategic advantage that it might derive from joining forces with Orange Bang and seeking to enforce the 2010 Settlement Agreement and seeking to hold VPX to the VPX Marketing and Sales Restrictions of paragraph 7 D to which it had previously agreed – or seek substantial damages for VPX's breach of that provision.

Once Orange Bang attended this meeting with Monster in August of 2019, there is no doubt that Monster communicated to Orange Bang its [Monster's] belief that because BANG Energy RTD is devoid of creatine, it, therefore, could not possibly be "creatine-based". Thus, as of the August of 2019 meeting with Monster, Orange Bang was made aware of the facts giving rise to its claim that VPX was in breach of the 2010 Settlement Agreement and that VPX had failed to "stay in its lane" thus also giving rise to a claim for trademark infringement.[8]

---

[8] As McCarthy points out, a co-existence agreement, also known as a consent to use agreement, is essentially an agreement not to sue for trademark infringement so long as the junior user agrees to stay in its agreed-upon zone of use or, as in this case, the agreed-upon "lane." *McCarthy ,* Section 18:79.

1  Did Monster seek to "weaponize" the 2010 Settlement Agreement?  The answer to that

2  question is "of course".  But that is the wrong question.  The right question is: did Monster

3  *unlawfully* "weaponize" the 2010 Settlement Agreement?  That question and the answer to it are

4  discussed further in Section III, O. below.

5

6  **M. The September 23, 2019 Assignment Agreement**

7  After the mid-August meeting of 2019 referred to above, and after execution of a common

8  interest / joint defense agreement, Orange Bang and Monster negotiated an assignment agreement

9  which they signed on September 23, 2019 (the "Assignment Agreement").  By way of the

10  Assignment Agreement, Orange Bang and Monster agreed as follows:  (i) Orange Bang assigned

11  its breach of contract claim to Monster in exchange for 50% of the recovery, if any; (ii) Orange

12  Bang retained its trademark rights and its trademark related claims, but agreed to share 50% of any

13  recovery, if any, with Monster; (iii) Monster shall pay for all of the litigation fees and costs, but

14  Monster controls the litigation in all respects; (iv) Orange Bang shall adhere to certain restrictions

15  on its corporate governance so as to facilitate the litigation such as its agreement that it will not sell

16  the company or dispose of its trademark rights; and (v) Orange Bang shall continue to fully

17  perform its obligations to VPX under the 2010 Settlement Agreement.  *See* J-67.  VPX contends

18  that the Assignment Agreement is an unlawful restraint of trade which seeks to snuff out

19  competition.  *See* Section III, O. below in this regard.

20

21  **N.  The Proceedings of the State Court Declaratory Relief Action without Disclosure of**

22  **the Assignment Agreement**

23  VPX also contends that Orange Bang committed fraud because it never disclosed to VPX,

24  or to the court in the 2019 Declaratory Relief Action, the existence or the significance of the

25  Assignment Agreement or the fact that Monster was now involved in the proceedings and that

26  Monster had become a real party in interest in the litigation and, had Orange Bang done so, VPX

27  contends that it would never have agreed to dismiss the 2019 Declaratory Relief Action in favor of

28  this arbitration proceeding.

This argument is devoid of merit for a variety of reasons.  First, VPX had already agreed to an arbitration provision within the 2010 Settlement Agreement and the 2019 Declaratory Relief Action should never have been filed in the first place.  Second, the arbitration agreement within the 2010 Settlement Agreement was binding on VPX, binding on Orange Bang and binding on their assignees (and agents and successors) and, therefore, the arbitration agreement was binding on Monster, whether its identity had been disclosed or not disclosed.[9]  Third, even though the Assignment Agreement had already been signed and the assignment had already taken place, Orange Bang nevertheless remained a party to the 2010 Settlement Agreement, with the obligation to continue to perform all of its duties under that agreement, and Orange Bang remained a signatory to the arbitration provision within the 2010 Settlement Agreement and, therefore, Orange Bang remained a named party to the then-pending 2019 Declaratory Relief Action and remained a proper party to the arbitration proceedings to which the parties were in the process of stipulating.  Fourth, and perhaps most importantly, VPX was bound by the arbitration provision no matter what, whether the existence of Monster as a real party in interest was disclosed to VPX or whether the existence of Monster as a real party in interest was not disclosed to VPX, and even if VPX had withdrawn its agreement to stipulate to the arbitration, the court was still required to compel arbitration and, therefore, VPX has suffered no damages by agreeing to participate in an arbitration in which it was duty-bound to participate in any event.

**O.  The False Advertising Case**

The False Advertising Case is pending.  Monster sought a preliminary injunction in the False Advertising Case which was denied.  The district court made various rulings based on the information before it as of the time of the motion for the preliminary injunction was heard, information which may or may not change over time.  Discovery may help the chances of VPX.  Discovery may help the chances of Monster.

---

[9] Both Judge Fischer of the United States District Court for the Central District of California and the arbitrator have previously ruled that Monster falls within the ambit of the arbitration provisions. *See* Judge Fischer's November 30, 2020 Order.

FINAL ARBITRATION AWARD – PHASE 1 AND PHASE 2

VPX has objected to this arbitration because, in VPX's view, all Monster is doing is seeking a "second bite of the apple", a second chance to win the False Advertising Case which, VPX's contends, Monster is losing. But none of that matters. The issues before the arbitrator are different, separate and distinct from the issues before the district court in the False Advertising Case. In the False Advertising Case, the district court has to determine if VPX's advertising claims about creatine and super creatine are false or misleading to consumers. Those are not the issues before the arbitrator. The issues in this case turn on whether or not BANG Energy RTD, and VPX's other products which make use of the BANG mark, are "creatine- based" or not, whether that results in a breach of the 2010 Settlement Agreement or not and whether that rises to the level of trademark infringement or not. Yes, many of these issues are interwoven with the chemistry, biology and scientific expert issues related to creatine, but this arbitration is not a "second bite of the apple" because the issues here are not the false advertising issues which underlie the False Advertising Case. Rather, this case turns on contract and trademark infringement issues.

## P. The June 2020 Demand for Arbitration – the Claims and Counterclaims

In June of 2020, after the dismissal of the 2019 Declaratory Relief Action, an action which should never have been filed in the first place because of the applicability of the arbitration provision contained in the 2010 Settlement Agreement, and after a delay of some months, Monster and Orange Bang filed a Demand for Arbitration which initiated this arbitration and, in response, VPX filed its answer / denial and its counterclaims.

The Monster / Orange Bang claims are as follows:

| | |
|---|---|
| First Claim | Breach of Contract; |
| Second Claim | False Designation of Origin; |
| Third Claim | Trademark Infringement; |
| Fourth Claim | Unfair Competition – B & P Section 17200; and |
| Fifth Claim | Common Law Unfair Competition. |

The VPX counterclaims are as follows:

| | |
|---|---|
| First Claim | Declaratory Judgment (the right to use the Bang mark and VPX's Bang logo); |
| Second Claim | Declaratory Judgment (no infringement and no unfair competition); |
| Third Claim | Unfair Business Practices - B & P Section 17200; |
| Fourth Claim | Unreasonable Restraint of Trade (Section 16726); |
| Fifth Claim | Fraud; and |
| Sixth Claim | Breach of Contract (breach of the confidentiality provision, paragraph 12 of the 2010 Settlement Agreement). |

## III.   DISCUSSION, FURTHER FINDINGS AND CONCLUSIONS

### A.   The Meaning of "Creatine-Based"

The history and context of the negotiations of the 2010 Settlement Agreement establishes the following facts:

- VPX introduced the nomenclature of "creatine containing".
- Orange Bang rejected the "creatine containing" language.
- Orange Bang instead introduced the proposed contractual term of "creatine-based", an obviously higher standard than "creatine containing".
- VPX attempted, during the negotiations, to eliminate the term "creatine-based".
- Orange Bang refused to do away with the proposed contractual term "creatine-based".
- VPX attempted, during the negotiations, to broaden paragraph 7 J so as to enable VPX to market and sell Class 32 beverages like isotonic drinks, sport drinks and energy drinks.
- Orange Bang rejected VPX's attempt to broaden paragraph 7 J.

- VPX ultimately agreed to the narrow lanes upon which Orange Bang insisted.

- The parties ultimately agreed on the "creatine-based" language for paragraph 7 of the 2010 Settlement Agreement.

The common sense, common usage definition of something that is "creatine-based" (or, for example, something that is "carbon-based") is that there is a *substantial* amount or a *meaningful* amount of creatine (or carbon) in that something, whether that something be a product (or a human being in the case of carbon) or that creatine (or carbon) is a *fundamental* or *building-block* type of ingredient in that product (or person). The dictionary definition of "base" includes the following definitions: "a supporting part", "a foundation", "a basic or underlying element" and a "fundamental ingredient, a chief constituent". *See The American Heritage Dictionary of the English Language*, on-line edition.

There is case law which is helpful to discern the meaning and intent of "creatine-based" because these cases help explain what the term "based" or "based upon" means in analogous contexts. In *Kal Kan Foods, Inc. v. H.J. Heinz Co., L.P.*, 2003 WL 25784368, at *6 (C.D. Cal. 2003), the plaintiff Kal Kan filed a patent infringement case against Heinz over dog and cat treats. Plaintiff Kal Kan asserted various patent claims, one of which was a "lipid-based" component. Kal Kan contended that the term "lipid-based" component referred to a specific amount of lipids, at least 10% of lipids by weight. In contrast, Heinz contended that the term "lipid-based" should be construed in its ordinary sense, and the ordinary meaning meant that lipids just needed to be a *fundamenta*l part of the invention. Heinz argued that a proper construction of the patent was to simply conclude that the "lipid-based" requirement was satisfied so long as lipids comprised a fundamental part, or a "majority" of, the inner component of the dog and cat treats. The court looked to the dictionary definition of "base" which is: "a main ingredient, a supporting carrying ingredient" relying on *Webster's Ninth New Collegiate Dictionary* 133 (9th ed. 1990). Based on this definition, the court concluded that the ordinary meaning of a "lipid-based component" is one in which the main, supporting or carrying ingredient is lipids. **Applying this rationale to this case, and inserting the word "creatine" in place of the word "lipids", a "creatine-based" product is one in which the main, supporting or carrying ingredient is creatine.**

1      In addition, in *Kal Kan*, the court also ruled, as VPX points out on page 25 of its closing

2    reply brief, that the inner component of the dog and cat treat was deemed to be "lipid-based" if it

3    contains "the amount of lipids necessary to make the subject matter (i.e., inner component)

4    function in the way for which it was designed." *Id*. at *6. This holding helps Orange Bang and

5    Monster, not VPX. This holding suggests that a product should be deemed to be "creatine- based"

6    if it functions in the way it was designed to work, i.e., to provide the benefits of creatine to the

7    human body of the consumer. Thus, if a product **fails** to function in a way for which the product

8    was designed, i.e., if the product **fails** to provide the benefits of creatine, then the product cannot be

9    deemed to be "creatine-based." In short, *Kal Kan* is authoritative support for Orange Bang's /

10   Monster's "the proof is in the pudding test" (discussed below), i.e., if BANG Energy RTD provides

11   that benefits of creatine to the human body, then it can be concluded that BANG Energy RTD is a

12   "creatine-based" product. But, at the same time, if there is no evidence that BANG Energy RTD

13   does indeed provide the benefits of creatine to the human body, or worse, that it **fails** to provide the

14   benefits of creatine to the human body, then it cannot be deemed to be a "creatine-based" product

15   within the standards set by paragraph 7 of the 2010 Settlement Agreement.

16     If BANG Energy RTD does not meet this standard based on the efficacy of the product,

17   then it is not "creatine-based" and it becomes a paragraph 7 D product, and not a paragraph 7 C

18   product, in which case the product must comply with the VPX Marketing and Sales Restrictions or

19   liability for breach of contract and trademark infringement would attach.

20     In *Scheenstra v. California Dairies*, 213 Cal.App.4th 370 (2013), a dairy farmer brought a

21   breach of contract case against a dairy cooperative which had instituted a production quota program

22   which was designed to address a problem with an oversupply of milk. The dairy cooperative had

23   the right to institute the production quota because of a contract which the dairy farmer had signed, a

24   contract which enabled the cooperative to institute a quota "based upon" the historical production

25   of the dairy farmer. The dairy farmer claimed he was aggrieved by this quota system because he

26   received less payment for milk deliveries which exceeded the quota. The dairy farmer contended

27   that the dairy cooperative had set the quota far too low. The trial court found that the quota system

28   was not equitable because those dairy farmers with increasing milk production were penalized, they

had to bear a non-equitable share of the financial burden, as compared to those dairy farmers with declining milk production, who received a disproportionate financial benefit.

On appeal, the dairy cooperative argued that "based-upon" meant solely and exclusively, such that the quota formula could *only* be based on the historical production. In contrast, the dairy farmer argued that "based-upon" meant principal or fundamental, such that the quota formula could be based on the historical production as well as other equitable factors. The appellate court had to determine the meaning of "based upon" in relation to the historical production issue. The appellate court looked to the dictionary definition of the verb "base" and the noun "basis" and the court concluded that "based-upon" means a "*principal* component of anything: *fundamental* ingredient . . ." *See Webster's Third New International Dictionary, p. 182, col. 3.* (Emphasis added.) Therefore, the appellate court concluded that the quota "based- upon" historical production was within the meaning of the contract so long as historical production was a principal or fundamental factor, but with no requirement that it be the sole and exclusive factor. *Scheenstra*, at 400 – 401.

In short, in order for a product to be "creatine-based" within the meaning of paragraph 7 of the 2010 Settlement Agreement, creatine must be a fundamental, a main or a carrying ingredient in that product. In addition, and based upon common sense, if a product is marketed as "super creatine", then it must also contain creatine in a fundamental, a main or a carrying ingredient, or even more of that fundamental ingredient, and that fundamental ingredient must be in a meaningful amount and effective in delivering the benefits of creatine – or else why call it "super creatine".

BANG Energy RTD contains 25 mg (the caffeine version) or 100 mg (the caffeine free version) of Creatyl-L-Leucine ("CLL") which, supposedly, renders it "creatine-based".[10] Is that, in fact, the case? Thus, the key issue becomes whether or not the 25 mg (or 100 mg) of CLL contained in BANG Energy RTD is sufficient to satisfy the "creatine-based" standard set forth in paragraph 7 of the 2010 Settlement Agreement? This issue turns on two questions: (1) Is CLL creatine? (2) Even assuming for the sake of discussion that CLL is creatine, does BANG Energy

---

[10] The same issues, questions and answers that pertain to CLL apply to COP and creatyl-L-glutamine ("CLG") as well.

RTD and other Bang-branded product contain enough creatine so as to provide the benefits of creatine, in an efficacious manner, to the human body?

*If* the answers to these questions are "no" and "no", then the conclusion would be inescapable that a product containing 25 mg or 100 mg of CLL is not "creatine-based".  Or, to frame it another way, how could a product be "creatine-based" if it neither contains creatine nor bestows the benefits of creatine?  These two essential questions are not raised to *define* "creatine-based" or to interpret the language of paragraph 7 of the 2010 Settlement Agreement.  Rather, these two questions must be answered in order to determine whether or not, based on the science and expert opinion, the "creatine-based" standard **already built into** the 2010 Settlement Agreement by virtue of the negotiations between Orange Bang and VPX as described above has been satisfied, or not.

### B. Does CLL Satisfy the "Creatine-Based" Standard?

Creatine is made in the human body from protein and other types of food.  Creatine is an important compound because it brings energy to muscles, tissue and even the brain (and is transported via the blood stream).  In the human body, creatine replenishes ATP. ATP stands for Adenosine Triphosphate and is an energy carrying molecule found in cells in the human body.  As ATP is replenished, the energy supply in the human body increases.  However, the human body does not make enough creatine on its own and often the creatine "gas tank" runs low.  For that reason, some health conscious consumers take creatine supplements to fill up that creatine gas tank.

Is CLL, an ingredient of BANG Energy RTD product, marketed by VPX as "super creatine", actually a form of creatine?  And, if so, is there enough CLL in BANG Energy RTD to provide the benefits of creatine to the human body so as to qualify as a "creatine-based" product?

As stated above, the answers to these questions are mission critical and essentially case determinative.  Again, if BANG Energy RTD is "creatine-based", then it is a paragraph 7 C product which means that VPX would not be in violation of VPX's Marketing and Sales Restrictions and would not be in breach of the 2010 Settlement Agreement because, under paragraph 7 C, VPX is not subject to the VPX Marketing and Sales Restrictions.  If, however,

BANG Energy RTD is not "creatine-based", then it is a paragraph 7 D product and VPX would
have to comply with the VPX Marketing and Sales Restrictions or else it would be in breach of the
2010 Settlement Agreement.

VPX's emphatic view is that CLL is a new creatine compound, created by Dr. Li ("Li") in
the VPX lab, which VPX calls a derivative of creatine or creatine monohydrate ("CM"), the "pure"
form of creatine which is effective like the creatine that is created naturally within the human body
and, therefore, in VPX's view, CLL is both creatine and, in addition, a product containing CLL,
like BANG Energy RTD, is "creatine-based".

In contrast, Monster's and Orange Bang's emphatic view is that CLL is not creatine at all
because it: (1) lacks the complete creatine molecule (a pre-requisite according to the laws of
chemistry according to Monster's and Orange Bang's experts); and (2) does not raise blood or
tissue creatine levels and, even assuming for the sake of argument that CLL is a form of or a
derivative of creatine, there is not enough CLL in BANG Energy RTD to satisfy the "creatine-
based" requirement.  Monster and Orange Bang argue that a de minimis amount of CLL "pixie-
dusted" into BANG Energy RTD does not suffice.

Moreover, Monster and Orange Bang contend that the determination should be made based
on what is, in essence, a "the proof is in the pudding" type of test: is there any chemical or
biological evidence that CLL has the efficacy of creatine when it is ingested into the body?  If no,
then in Monster's and Orange Bang's view, it cannot possibly constitute creatine, let alone "super
creatine", the marketing term given to CLL by VPX to stimulate sales.  In other words, in
Monster's and Orange Bang's view, the "pixie dusted" amount of CLL in BANG Energy RTD
does not qualify BANG-branded product as "creatine-based" because CLL does not render an
efficacious result in the human body as a true creatine supplement does (or should do).

A great deal of time, effort, documents and testimony was expended during the eight days
of the arbitration hearing to address these two related chemistry / biology / scientific expert issues:
(i) Does CLL constitutes creatine?  (ii) Even assuming CLL is creatine, is there enough CLL in
BANG Energy RTD to deliver the benefits of creatine to the human body so as to determine

1    whether this energy drink is a "creatine-based" product falling within the ambit of paragraph 7 C or

2    whether it is not a "creatine-based" product falling within the ambit of paragraph 7 D?

3         At the arbitration hearing, both sides called various science experts to explain whether or

4    not CLL is creatine and whether or not a product with CLL meets the "creatine-based" standard set

5    forth in paragraph 7 of the 2010 Agreement.  With respect to the question of whether or not CLL is

6    creatine, VPX's expert, Guillermo Escalante ("Escalante")[11] and Monster / Orange Bang's expert,

7    Richard Kreider ("Kreider"), both agreed that the two key questions that need to be answered in

8    order to make that determination are:  (1) Does the compound contain the **full** creatine molecule?

9    (2) Does the compound increase the creatine levels in the body?  Kreider Testimony, AHT, pp.

10   977:17 - 979:10; Escalante Testimony, AHT, p. 3584:10-17.  With respect to the question of

11   whether or not a product is "creatine-based", Escalante testified that this determination likewise

12   turns on two questions (albeit related questions) and, as Escalante framed them:  (1) Does the

13   product have the creatine compound in it?  (2) Does the product have enough of the creatine

14   compound in it to elicit a positive response in the body?  Escalante Testimony, AHT, p. 3579:  8 –

15   3586:13.

16        Based on this nearly-identical framing essentially agreed to by both sides, Escalante made

17   some significant admissions, some of which can only be characterized as **stunning** and not helpful

18   in advancing VPX's position in this case as follows:

19   • Escalante did not testify that CLL is a form of creatine.  Rather, he testified that CLL is

20     *potentially* a form of creatine and that he, nor anybody else, has any evidence that CLL

21     has the same biological function as creatine.  Escalante Testimony, AHT, p. 3556:10 –

22     3559:3.

23

24

25

---

26   [11] Although Monster and Orange Bang elicited testimony indicating that Escalante may not be
     qualified or persuasive as an expert on the science issues raised in this case, and that he may be

27   tainted by bias issues because he has rendered services as an influencer / promoter on behalf of
     VPX (Escalante Testimony, AHT, p. 3535 - 3550 ), VPX nevertheless put Escalante forward as its

28   most important expert on issues relating to CLL, creatine and whether or not the "creatine-based"
     standard in the 2010 Settlement Agreement has been, or has not been, satisfied.

- Although Escalante testified that CLL, CLG and COP each have a "creatine backbone", he testified that just because something has a creatine backbone does not make it a form of creatine. Escalante Testimony, AHT, p. 3559:20 – 3560:23.

- Although Escalante testified that CLL may possibly be similar to a creatine precursor, he testified that a creatine precursor is not necessarily creatine. Escalante Testimony, AHT, p. 3560:25 – 3561:24.

- **Escalante testified that as of his June 2021 deposition, he did not consider COP to be a type of creatine.** Escalante Testimony, AHT, p. 3565: 7 – 22; 3566: 18 - 25.

- Escalante testified that as a scientist he would want to know if CLL works in the human body in order to determine if it is a creatine supplement. Escalante Testimony, AHT, p. 3569: 25 – 3570: 25.

- Escalante testified that he has not conducted any studies on CLL.[12] Escalante Testimony, AHT, p. 3571:2-18.

- **Escalante testified that based on the scientific studies conducted on CLL to date, there is no evidence to support the efficacy of CLL.** Escalante Testimony, AHT, p. 3575:3-19.

- **Escalante testified that if a compound (like CLL) does not** contain the full creatine molecule and does not **supplement the human body's creatine levels, it cannot be called a form of creatine.** Escalante Testimony, AHT, p. 3582:12-24.

- Escalante testified that he agrees that CLL contains only a part of the creatine molecule in its chemical structure (and that the same is true with respect to CLG and COP). Escalante Testimony, AHT, p. 3583:5-21.[13]

---

[12] Escalante also acknowledged that independent studies are valid even if they are paid for by VPX or by Monster or, in other words, the fact that studies have a sponsor who pays for them does not negatively affect the independent, scientific integrity of such a study. Escalante Testimony, AHT, p. 3573: 4 – 3575:2.
[13] The manufacturing flow-chart for CLL, the recipe followed to process and manufacture CLL, does not start with creatine and no creatine is added to the recipe along the way. *See* Exhibit 333, p. 21; Li Testimony, AHT, 1623:11-17. To reiterate the analogy raised during the arbitration hearing, if the recipe is for guacamole, but avocados are not used at the start, and avocadoes are not added at any time along the way, how can the end product still be guacamole?

- **Escalante testified that in order for a substance to be deemed creatine, it would need to increase muscle creatine levels in the human body.** Escalante Testimony, AHT, p. 3584:7-17.

- **Escalante testified that he cannot say that CLL increases muscle creatine levels.** Escalante Testimony, AHT, p. 3584:18 – 3585:4.

- Escalante testified that a product must contain 3 to 5 grams (3,000 to 5,000 milligrams) for Escalante to consider that product to be "creatine-based". Escalante Testimony, AHT, p. 3586:14 – 3587:21.

- **Escalante testified that** a nanogram[14] of CM is not enough, 1 mg of CM is not enough and **25 mg of CM is not enough to make a product "creatine-based".** Escalante Testimony, AHT, p. 3587:2-21.

- **Escalante admitted that his testimony about the amount of creatine needed to deliver a positive response in the human body applied to CM, not CLL, and that he did not have any evidence that CLL is as effective of CM.**[15] Escalante Testimony, AHT, p. 3587:22 – 3588:8.

- **Escalante testified that he has no evidence that CLL has the same biological function of creatine.** Escalante Testimony, AHT, p. 3591:21-24.

- **Escalante testified that** he agrees that when CM is ingested, blood plasma levels of creatine peak in about an hour, but admits that **he has no evidence that CLL increases blood creatine levels at all.** Escalante Testimony, AHT, p. 3591:25 – 3592:9.

- **Escalante testified that** although CM is beneficial to increase muscle mass, **he cannot say that CLL increases muscle levels of creatine because he has no evidence.** Escalante Testimony, AHT, p. 3593:7-15; 3621:24 – 3622:4.

---

[14] A nanogram is one billionth of a gram.
[15] Why not just put CM in BANG Energy RTD? As the testimony during the arbitration indicated, CM is not stable in water, it is costly and it doesn't taste good.

- **Escalante testified that he cannot say that CLL has the physiological or the psychological (beneficial) effects similar to CM because he has no evidence.** Escalante Testimony, AHT, p. 3593:24 – 3594:3.

- Escalante testified that he has no evidence that CLL is stored in the human body like creatine.  Escalante Testimony, AHT, p. 3594:4-7.

- Escalante testified that he himself would not drink BANG Energy RTD alone in order to get the benefits of creatine.  Escalante Testimony, AHT, p. 3594:17 – 3595:7.

- **Escalante testified, in what could be characterized as a dispositive admission, that based on current available evidence, and speaking as a scientist, it is not reasonable for VPX to advertise BANG Energy RTD as a source of creatine or for VPX to advertise CLL or super creatine as a source of creatine.**  Escalante Testimony, AHT, p. 3603:21 – 3604:3, 3604:21 – 3605:5.

In short, Escalante has admitted that there is zero evidence to support the contention that CLL delivers the efficacious benefits of creatine to the human body.  Accordingly, Escalante's own testimony thus demonstrates that BANG Energy RTD and the other VPX BANG related products comprised of CLL, CLG or COP are **not** "creatine-based" and do not meet the agreed- upon "creatine-based" standard set forth in paragraph 7 of the 2010 Settlement Agreement.[16]

VPX admits that four of its Bang-branded products (Bang MIXX, Bang Keto Coffee, Natural Bang, Bang Bar Pristine Protein) do not contain creatine at all and thus are paragraph 7 D products, not paragraph 7 C products.  *See* Exhibit J-119 at 15-16.  For the remaining seven Bang-branded products (BANG Energy RTD, Bang Energy Caffeine-Free, Bang Tea, Bang Shots, Bang

---

[16] The main thrust of Escalante's expert testimony was that although he freely admits that he has no evidence whatsoever that CLL is creatine or that the CLL contained in BANG Energy RTD or any other VPX Bang branded product delivers the benefits of creatine to the human body, there was no definitive evidence that it doesn't.  In other words, Escalante admits that there is no scientific evidence to show that CLL is efficacious in providing the benefits of creatine to the human body, but, in his view, that there is no scientific evidence that CLL is not efficacious in providing the benefits of creatine to the human body, i.e., no evidence either way.  Although the studies discussed below indicate that Escalante is incorrect in this regard, VPX's attempted straddle does not help it because Escalante has effectively admitted that there is no evidence whatsoever to support the argument that the CLL in BANG Energy RTD meets the "creatine-based" standard in the 2010 Settlement Agreement.

ThermIQ, Bang 357, and Bang Pre-Workout), VPX contends that they are "creatine- based" because they contain CLL, CLG or COP, a position rebutted in its entirety by VPX's own scientific expert Escalante.  *See* Exhibit J-119 at 15.

As Monster's / Orange Bang's expert Dr. Nathan Gianneschi ("Gianneschi") testified, CLL, CLG, and COP do not contain the creatine molecule.  *See* Gianneschi Testimony, AHT, p. 891:10-15 (CLL), p. 872:17-873:4 (CLG); Escalante Testimony, AHT, p. 3583:10-16 (CLL), 3562:9-15 (COP); Parang Testimony, AHT, p 3279:2-9 (CLL).  According to expert Gianneschi, because these compounds do not contain the creatine molecule, they are, as a matter of chemistry, not creatine.  Gianneschi Testimony, AHT, p. 890:4-12, 889:16-20.  In addition, these compounds are not creatine because they do not increase the body's creatine levels.  To do so, a molecule must first convert into creatine during digestion.  Kreider Testimony, AHT, at 959:5-10; Li Testimony, AHT, p. 1529:20 – 1530:3.  VPX admits that CLL does not convert into creatine in the human body.  J. Owoc Testimony, AHT, p. 1303:19-25 [admission]; Kreider Testimony, AHT, p. 994:25-995:8 [no evidence that it does]; Li Testimony, AHT, p. 1529:24- 1530:3 [must break down, no evidence that it does]; Exhibit 287 [CLL did not break down into creatine].  VPX's in-house study was unable to break CLL into free creatine, and VPX admits that CLL remains intact during digestion.  *See* Exhibits 287; 3101 at 45:10-14; Kreider Testimony, AHT, p. 1004:4-12.

Monster and Orange Bang commissioned four human and animal studies to assess whether CLL raises creatine levels and these studies showed the following:

- The KGK Science Study, which administered 5,000 mg of CM to Group 1 and 5,000 mg of CLL to Group 2, showed no measurable increase in creatine levels of the blood by virtue of CLL.  *See* Exhibit J-105.

- The Da Silva Study, which administered 4,000 mg of CM per day (the human equivalent of 12,000 to 16,000 mg per day) to one group of laboratory rats, and 6,500 mg of CLL per day (the human equivalent of 20,000 to 26,000 mg per day) to another group of laboratory rats, showed no measurable increase in creatine levels of rats in their blood, muscles or brain by virtue of CLL.  *See* Exhibit 1907, OBI-MON- VPX 00009687.

- The Ostojic Study, which administered 2,000 mg of CLL per day (the equivalent of 80 cans of BANG Energy RTD per day) showed no measurable increase in creatine levels in the muscles or the brain by virtue of CLL. *See* Exhibit J-110.

- The Burd Study, which administered 5,000 mg per day of a placebo to 1/3 of the subjects, 5,000 mg per day of CM to 1/3 of the subjects and 5,000 mg per day of CLL to 1/3 the subjects, 29 subjects in all over 14 days, showed no measurable increase in creatine levels in the muscles by virtue of CLL. *See* Exhibit J-112.

VPX itself commissioned a recent, but undated study which showed the following:

- The University of Western Florida Study, which administered 878.6 mg per day of CLL in rats for 7 days (the equivalent of 5,000 mg per day for a 154 lb. person), showed no measurable increase in creatine levels in the muscles, brain or heart of rates by virtue of CLL. *See* Exhibit J-80.

All of these studies, which were performed by highly-regarded researchers, although not peer-reviewed, demonstrate that, based on objective criteria, CLL does not increase creatine levels in the blood, tissue, muscles (or brain) and, therefore, CLL does not produce an efficacious response in the human body. Not surprisingly, J. Owoc does not have a high opinion of the well-respected scientists and Ph.Ds conducting studies on CLL and creatine (well respected by Escalante, Escalante Testimony, AHT, p. 3596:11-18; p. 3601:4-8) referring to them as "a bunch of little bitches." *See* Exhibit 3023; Escalante Testimony, AHT, p. 3601:4 – 3603:7.

Monster and Orange Bang engaged their expert Kreider to give opinions about these five studies (*see* Exhibit J-152 ¶¶ 129-144) and Kreider concluded that these studies and experts reached a shared conclusion: CLL does not increase creatine levels. Kreider Testimony, AHT, p. 1051:18 - 1052:11. VPX's commissioned research likewise found that CLL does not increase brain, heart, or muscle creatine levels. *See* Exhibit J-80, p. 13 - 14; Kreider Testimony, AHT, p. 1050:22-1051:15 [VPX's own study shows that CLL "doesn't work"]. VPX's own experts agreed with Kreider's conclusion that CLL does not create an efficacious effect in the human body like creatine. Parang Testimony, AHT, p 3357:22-3358:9 [VPX expert admitting he cannot say "that CLL effectuates in my body or absorbs in my body and creates the chemical benefits in my body

1   that my natural creatine does"]; Li Testimony, AHT, p. 1553:24-1554:2 (Li does not know whether

2   CLL has any effects on the body).

3          As Kreider testified, because CLL does not increase creatine levels in the body, it is not

4   creatine.  Kreider Testimony, AHT, pp. 987:12 - 988:16, 1036:10-19, 1051:18 - 1052:4.  Kreider

5   reached the same conclusions for CLG and COP—they are not creatine and do not provide the

6   benefits of creatine.  Kreider Testimony, AHT, p. 1155:23- 1156:21; *see* Exhibits J-105; J-110, p.

7   2; J-112, p. 12; Kreider Testimony, AHT, p. 988:18 - 989:4.

8          At the same time, the experts all agree that VPX's Bang-branded products do not have a

9   sufficient amount of purported creatine in them in any event.  Both sides agree that the minimum

10  effective daily dosage of creatine is 3,000-5,000 mg per day.  *See* Escalante Testimony described

11  above (AHT, p. 3585:17 - 3586:5); Kreider Testimony, AHT, p. 1066:10-23; *see* Exhibit 1876 at

12  151 [J. Owoc's book – 3,000 to 5,000 mg].  Although it is true that VPX included 5,102 mg of

13  COP in Bang Pre-Workout, which is above the effective dosage for creatine (if COP was creatine)

14  [J-54, p. 1; Kreider Testimony, AHT, p. 1071:11-20], the amount of purported creatine in all of

15  VPX's other Bang-branded products falls well below the 3,000 mg threshold.  There is only 25 mg

16  of CLL in a can of Bang Energy (*see* Exhibit J-125), Bang Tea (*see* Exhibit J-127) and Bang Shots

17  (*see* Exhibit 1955, p. 8); 50 mg of CLL in Bang ThermIQ (*see* Exhibit 1955, p. 8); 100 mg of CLL

18  in Bang Energy Caffeine Free (*see* Exhibit 1195, p. 5); and 10 mg of CLG in Bang 357 (*See*

19  Exhibit 1195, p. 1).  As Kreider testified, the amount of purported creatine in VPX's Bang branded

20  products is not sufficient to provide the benefits of creatine.  Kreider Testimony, AHT, p. 1072:11-

21  16; *see* Exhibits J-147 and J-125.  In this respect, VPX's Bang- branded products are not "creatine-

22  based" for the separate and independent reason that they contain only a trivial amount of purported

23  creatine that is far below the 3,000 mg threshold necessary to provide the benefits of creatine (even

24  assuming that CLL, CLG or COP delivers the benefits of creatine) and thus, based on this

25  additional rationale, these products cannot qualify as "creatine-based" products within the meaning

26  of paragraph 7 of the 2010 Settlement Agreement.

27

28

### C. VPX's Paragraph 7 A Argument

VPX argues that even though the lower standard of "creatine containing" was not adopted by the parties, and even though the higher standard of "creatine-based" was adopted by the parties in every draft of the 2010 Settlement Agreement including the final draft, the CLL found in BANG Energy RTD still satisfies the "creatine-based" standard because, as paragraph 7 A acknowledges, the Bang Pre-Workout product, which contained COP, met the "creatine- based" standard.  In other words, as VPX argues, if COP met the "creatine-based" standard for the purposes of Bang Pre-Workout, and CLL is essentially the same form of creatine as COP, then CLL must likewise meet the "creatine-based" standard for the purposes of BANG Energy RTD (and for other Bang branded products that contain either CLL, COP or CLG).

VPX's paragraph 7 A argument is unconvincing for several related reasons.

First, COP did not, in fact, meet the "creatine-based" standard.  Rather, in 2010, at the time of contracting, Orange Bang simply believed that the product known as Bang Pre-Workout, which was purportedly based on creatine and which purportedly delivered the benefits of creatine, met the "creatine-based" standard.  In 2010, Orange Bang assumed that Bang Pre- Workout was "creatine-based" because it believed the product contained creatine.  This assumption had nothing to do with COP. Orange Bang made no assumptions about COP. Rather, Orange Bang believed that Bang Pre-Workout met the "creatine-based" standard by virtue of:  (i) the express representations on the Bang Pre-Workout bottle about <u>creatine</u>; (ii) the express representations made by VPX to consumers on its website about <u>creatine</u>; (iii) representations made by VPX to Orange Bang as set forth in VPX's letter of April 3, 2009 about <u>creatine</u>; and (iv) the express representations made by VPX to Orange Bang during the negotiations of the 2010 Settlement Agreement to which Borrowman testified at the arbitration hearing about <u>creatine</u>, all of which led Orange Bang to justifiably form the impression that Bang Pre-Workout contained a *substantial* or *meaningful* amount of <u>creatine</u>, an assumption related solely to creatine and which had nothing to do with COP, and an assumption which has now been proven to be false.

Relatedly, and even more basic, Orange Bang had no understanding about COP whatsoever. Orange Bang did not even know what COP was at the time it entered into the 2010 Settlement

Agreement. And no consumer looking at the back of the Bang Pre-Workout bottle (Ex 112) would have known what COP was either. No witness testified that there was ever any pre-contract communication, oral or written, which focused on COP. No one at VPX said anything to Orange Bang about COP, not orally, not by letter and not by email. The topic never came up. Rather, the focus was on creatine as the April 3, 2009 letter from Stump to Borrowman so demonstrates. *See* Exhibit 2560. COP was just an ingredient listed on the back of the bottle with an unspecified mg allocation. *See* Exhibit 112. Exhibit 112 emphasized creatine, not COP. As Exhibit 112 stated back in 2010: "* BANG! is the world's only Clinically Proven Water- Stable **Creatine,** Patent Pending!" (Emphasis added.) The entire focus of the parties during the lengthy negotiations of the 2010 Settlement Agreement was on creatine, not COP. All Orange Bang knew at the time was what it had been told by VPX that Bang Pre-Workout was a product which supplied <u>creatine</u> to athletes and work out enthusiasts. VPX never made any mention that COP was a form of creatine.

At the same time, just because paragraph 7 A acknowledges that a product like Bang Pre-Workout, which contains 5,102 mg of COP, may arguably satisfy the "creatine-based" standard does not mean that a product like BANG Energy RTD, which contains only 25 mg or 100 mg of CLL, satisfies the "creatine-based" standard. As explained above, if COP (and CLL) do not have the creatine molecule, then arguably they are not creatine. But even if it could be argued that COP (and CLL) are forms of creatine, or derivatives of creatine, or forms of derivatives of creatine, even without the creatine molecule, if there is only a small quantity of CLL within the product, an amount much less than the mgs of COP in Bang Pre-Workout, and neither CLL nor COP acts like creatine within the human body, i.e., neither produces the efficacious benefits of creatine, then neither CLL nor COP can possibly satisfy the contractual requirement of a product which is "creatine-based".

In other words, there has already been a persuasive showing that 5,012 mgs of COP does not satisfy the "creatine-based" standard of paragraph 7. But even if it did, that does not mean that 25 or 100 mg of CLL satisfies the "creatine-based" standard. If a large quantity of COP does not do what a creatine supplement is supposed to do within the human body, then VPX cannot make a bootstrap argument that a product with a small quantity of CLL "automatically qualifies" as

1   "creatine-based" by virtue of the language of paragraph 7 A. As the expert testimony discussed

2   above demonstrates, a product which contains a small amount of CLL does not qualify as

3   "creatine-based", and it certainly should not be marketed as "super creatine" because such

4   marketing implies to the consumer a meaningful and effective dosage of creatine.

5   For these related reasons, VPX's paragraph 7 A argument fails.

6

7   **D. VPX's Permissive, Not Mandatory, Language Argument**

8   VPX argues that the language of paragraph 7 is "permissive", not "mandatory". In other

9   words, VPX argues that because there is no express prohibitory language in paragraph 7, VPX is

10  not prohibited in any way. According to VPX's interpretation of paragraph 7, it is free to make use

11  of the BANG mark however it wants to do so, without any restrictions whatsoever. Or, to put it

12  another way, what VPX is really arguing is that because there is no express "shut-down" language

13  (to make use of the vernacular for a moment) in paragraph 7 itself, VPX's "lane" is wide open and,

14  therefore, VPX is not "shut-down" in any way and VPX can market and sell BANG Energy RTD

15  (and other Bang branded products) any way it wants to do so whether or not BANG Energy RTD is

16  "creatine-based" and whether or not it is restricted by the language of paragraph 7 D.

17  This argument is likewise devoid of merit as the context of the negotiation history of the

18  2010 Settlement Agreement so demonstrates for at least four reasons.

19  First, the negotiation history and context clearly shows that although VPX first introduced

20  the lower "creatine containing" standard, Orange Bang pushed back for and insisted upon the

21  higher "creatine-based" standard and VPX ultimately relented on this point and agreed to adhere to

22  that higher standard. A "creatine containing" standard would have given VPX a broader "lane" and

23  less restrictions, but VPX willingly agreed to give in on that negotiation point. In this respect, VPX

24  agreed to an important restriction, a restriction which kept it in a narrower "lane".

25  Second, the negotiation history and context clearly shows that on May 14, 2010, VPX

26  attempted to delete the "creatine-based" standard altogether. Such a change, if it had been agreed

27  to by Orange Bang, would have also reduced the restrictions on VPX, given VPX far more latitude

28  and flexibility and would have enhanced the scope of VPX's "lane" which, of course, was the deal-

point which was being negotiated at the time. But Orange Bang would not agree. Orange Bang refused to eliminate the "creatine-based" standard and VPX ultimately acquiesced on this point as well. In this respect, VPX's second attempt to bargain away Orange Bang's consistent efforts to keep VPX in its narrow "lane" was unsuccessful in that Orange Bang refused to give in to VPX's requested changes during the negotiations. In short, Orange Bang persisted in its efforts to "shut down" VPX's attempts to expand its lane and VPX ultimately conceded on the point.

Third, the negotiation history and context clearly shows that the final negotiation of the contours of paragraph 7 J was a third attempt by VPX to open up its "lane" so that it could sell Class 32 product like isotonic drinks, sports drinks and energy drinks. Once again, VPX was attempting to reduce the restrictions imposed on it by paragraph 7 of the 2010 Settlement Agreement and prevent Orange Bang from narrowing VPX's lane. However, Orange Bang would not agree to VPX's requested changes and Orange Bang's efforts to "shut down" and "narrow in" VPX continued. Orange Bang resisted VPX's efforts to expand its "lane" by rejecting VPX's attempt to expand the scope of paragraph 7 J. VPX ultimately relented on this point as well, as the emails from Pagano in which she essentially admits that VPX shall "stay in its Class 5 lane", so demonstrate. In short, VPX stood down on this paragraph 7 J deal-point as well. In this respect, the negotiation of paragraph 7 J, the last step in the negotiations before the parties closed their deal and signed the 2010 Settlement Agreement, shows how Orange Bang was consistently negotiating to "shut-down" VPX, to prevent it from its attempts to expand the agreed-upon "lane" in which VPX had to stay, and this last minute negotiation also shows that VPX finally agreed to the narrow "lane" insisted upon by Orange Bang.

Finally, and as Borrowman testified during the arbitration, Orange Bang was the senior user with incontestable trademark rights to the BANG mark in Class 32, and VPX was the junior user with disputed trademark rights in Class 5 who had recently filed an Intent to Use Trademark Application for Class 32, trademark rights which Orange Bang was challenging in court and before the TTAB. Therefore, at this point in time, it was VPX who was at risk at being "shut-down" from making any use of the BANG mark altogether which is why Orange Bang had the leverage during the 2010 negotiations (and the "hypothetical" negotiations, see *infra*) and why VPX ultimately

1   agreed to Orange Bang's consistent efforts to keep VPX in a narrow lane.  As Borrowman testified

2   at the arbitration hearing, that is precisely why he used the word "allow" in his May 20, 2010

3   proposal, to define the "lane" which would be open to VPX, the lane where VPX would not be

4   "shut down".  **That was the whole point of the negotiations.**  *See* Exhibit 50; Borrowman

5   Testimony, AHT, p. 488:19 – 489:22, 491:19 – 495:12.

6         The entire history and context of the negotiation of the 2010 Settlement Agreement

7   demonstrates an intent, on the part of Orange Bang, to "shut-down" VPX and keep it in a narrow

8   "lane", and likewise demonstrate an intent, on the part of VPX, to agree to those restrictions,

9   despite its unsuccessful efforts, during the negotiations, to expand the scope of VPX's negotiated

10   "lane".  Accordingly, VPX's arguments that the 2010 Settlement Agreement is "permissive", does

11   not shut it down in any way, imposes no restrictions on it and does not confine it to a narrow "lane"

12   are rejected in their entirety by the arbitrator as unpersuasive given the negotiation history as

13   described above.

14

15     **E.  VPX's Statute of Limitations and Laches Argument**

16         In 2017 or 2018, VPX's sales of Bang products first rose to national prominence.  Stein

17   Testimony, AHT, p. 165:16-18.  VPX's Sweeny, who had been steeped in the energy drink

18   industry for over 20 years, testified that he did not become aware of the rise of BANG Energy RTD

19   until 2017 or 2018.  Sweeney Testimony, AHT, p. 3057:15 - 3058:6; *see* Exhibits 2922, p. 10;

20   5382, p. 101, Schedule 3.2.  Orange Bang testified that it first noticed BANG Energy RTD in stores

21   in 2018.  However, Orange Bang believed, based on VPX's ongoing advertising and marketing of

22   "creatine" and "super creatine" on the cans of BANG Energy RTD, that the products contained

23   creatine.  Stein Testimony, AHT, p. 165:16-166:6.  In 2019, Orange Bang first saw Bang Keto

24   Coffee, which did not purport to be "creatine-based".  Stein Testimony, AHT, p. 166:7-24, 169:7-

25   17, 170:2-8.  In March and August of 2019, Orange Bang sent VPX cease and desist letters

26   demanding that VPX stop violating the 2010 Settlement Agreement.  *See* Exhibit J-66, p. 45-54.

27         Monster's and Orange Bang's claims are not barred by the statute of limitations.  Monster's

28   contract claim and Orange Bang's trademark infringement and related claims have four-year

1    statutes of limitations.  *Gilkyson v. Disney Enters., Inc.*, 244 Cal. App. 4th 1336, 1341 (2016)

2    [breach of contract]; *Bauer Bros., LLC v. Nike, Inc.*, 159 F. Supp. 3d 1202, 1216 (S.D. Cal. 2016)

3    [trademark]; *Aryeh v. Canon Bus. Sols., Inc.*, 55 Cal. 4th 1185, 1192 (2013) [unfair competition].

4    Moreover, as the case law construing California law consistently holds, California law on the

5    statute of limitations is based on the discovery rule which "postpones accrual of a cause of action

6    until the plaintiff discovers, or has reason to discover, the cause of action."  *Aryeh,* 55 Cal. 4th at

7    1192; *Tortilla Factory, LLC v. Better Booch, LLC*, 2018 WL 6179491, at *4 (C.D. Cal. Nov. 26,

8    2018); *ANT v. McPartlin*, 2012 WL 13012472, at *6 (C.D. Cal. May 30, 2012).

9      The key question is: when did Orange Bang discover the facts, or when should have Orange

10   Bang discovered the facts, giving rise to its claims?  The evidence presented during the arbitration

11   hearing demonstrated that Orange Bang did not learn of the initial facts giving rise to its claims

12   until it first discovered the sales of Bang Keto Coffee in 2019 and then did not discover the facts

13   giving rise to its claim regarding the breach of the provisions of paragraph 7 of the 2010 Settlement

14   Agreement relating to the "creatine-based" standard and the VPX Marketing and Sales Restrictions

15   until it met with Monster in August of 2019, a claim which Orange Bang then assigned to Monster

16   as part of the Assignment Agreement.  Stein Testimony, AHT, p. 166:7-24, 169:7-17, 170:2-8.

17   Because the facts giving rise to the claims were discovered in 2019, Orange Bang's and Monster's

18   claims are not time barred, nor are they barred by laches.  And, as to laches, VPX has not suffered

19   any prejudice in any event because having to defend an arbitration with meritorious claims is not

20   prejudice as a matter of fact and law.

21

22   **F. VPX Breached, and Is Currently in Breach, of the 2010 Settlement Agreement, the**

23     **Breach of Contract Claim – Liability**

24     As set forth above, the arbitrator has determined that BANG Energy RTD and all of VPX's

25   Bang branded products which contain CLL, CLG or COP are not "creatine-based" products and,

26   therefore, they are not paragraph 7 C products, but rather paragraph 7 D products, which means that

27   the marketing and sales of these products must comply with the VPX Marketing and Sales

28

1  Restrictions.  Given that finding, the question then becomes: did VPX actually comply with the

2  VPX Marketing and Sales Restrictions, or not?

3       In order to comply with Section 7 D of the 2010 Settlement Agreement, VPX must market

4  (discussed below) and sell non-"creatine-based" products in specified trade channels which

5  includes vitamin shops, gyms, and health clubs and also includes grocery and convenience stores,

6  but only in the "vitamin and dietary supplement sections" of those stores **(the "Nutritional**

7  **Channel")**.  *See* Exhibit J-11, paragraph 7 D. The overwhelming and essentially uncontradicted

8  evidence at the arbitration hearing demonstrated that VPX has consistently sold BANG Energy

9  RTD and other VPX Bang branded products outside the Nutritional Channel.  As numerous

10  photographs, planograms and the testimony of the investigators demonstrated, VPX has placed its

11  BANG Energy RTD and its other Bang branded products in cold vaults, warm beverage aisles,

12  soda sections, snack sections, endcaps, and standalone displays where **general beverages** are sold,

13  and none of these locations comply with the VPX Marketing and Sales Restrictions of paragraph 7

14  D of the 2010 Settlement Agreement.  *See* Exhibits 1624; 1627 1631; 2267; 2463; 2464; J-114;

15  Bukovi Testimony, AHT, p. 2116:21 - 2117:16.

16       As Thomas Graybill ("Graybill") testified, Monster's and Orange Bang's investigator,

17  despite his many retail visits, BANG Energy RTD was "not once" located in the vitamin or

18  supplement section.  Graybill Testimony, AHT, p. 1693:25-1624:6.  According to the testimony of

19  Bukovi, VPX does not want consumers "to have to go into the diet nutrition area" to find BANG

20  Energy RTD, but instead wants BANG Energy RTD in the "registers and coolers where customers

21  can first walk in, grab a sandwich, [and then] grab a Bang."  Bukovi Testimony, AHT, p 2017:12-

22  19; 2015:13-23.  As Bukovi put it, "[C]old is sold", a reference to the importance of the cold vault

23  section of convenience stores which is a crucial location for VPX sales, but likewise a location that

24  does not comply with the VPX Marketing and Sales Restrictions of paragraph 7 D. *See* Exhibit

25  1382, p. 44:11-21.  Similarly, VPX's business records, including planograms and distribution

26  agreements, further demonstrate that VPX placed products for sale, and continues to place products

27  for sale, such as BANG Energy RTD and other Bang-branded products, outside the Nutritional

28

Channel.  *See* Exhibits 495; 1200; 1638, p. 224:21 - 225:18, 262:7-10; 808, p. 10; 868; 1191; 843, p. 1 and 4; 844, p. 1 and 5.

VPX sold products which made use of the BANG mark and VPX admitted that those products were sold outside the Nutritional Channel and, simply stated, such sales constitute a breach of paragraph 7 of the 2010 Settlement Agreement.  *See* Bukovi Testimony, AHT, p. 2063:23 - 2064:4 [Bang 357]; Exhibit 2447 [BANG Energy RTD, Bang Keto Coffee, Bang Tea, and Bang Shots]; Sweeney Testimony, AHT, p. 3045:7 - 3046:11 [Natural Bang]; 2930, p. 17 [Bang Mixx]; Bukovi Testimony, AHT, p. 2112:11-16 [Bang ThermIQ]; 1571 [Bang Bar Pristine Protein].  As Bukovi conceded, VPX "has not taken any steps whatsoever to ensure that VPX employees placed products in retail stores consistent with Section 7D of the Settlement Agreement."  Bukovi Testimony, AHT, p. 2112:11-16.  The evidence was essentially undisputed that VPX failed to adhere to the sales restrictions of paragraph 7 and these failures constitute a breach of paragraph 7 of the 2010 Settlement Agreement.

In addition, as the unequivocal language of paragraph 7 D makes clear, the bargained for restrictions on VPX while making use of the BANG mark not only apply to sales, but to marketing as well.  In other words, if VPX's marketing efforts extend beyond the Nutritional Channel, such marketing efforts likewise constitute an additional breach of paragraph 7 D. As the undisputed evidence again demonstrated, and as VPX's marketing personnel M. Owoc and Grunewald freely admit, VPX also markets BANG Energy RTD and its other Bang-branded products outside vitamin and dietary supplement channels, i.e., outside the Nutritional Channel, in that they specifically marketed their VPX products as *general* beverages targeted to *mainstream* consumers.  M. Owoc Testimony, AHT, p. 3460:15 - 3461:10 and 3455:7-18; Grunewald Testimony, AHT, p. 1799:9-12; *see* Exhibit J-124 at 119, 124, 128, 131-133.

As described above, VPX launched a brilliant social marketing campaign and VPX certainly is entitled to market its products on the internet and to hire influencers to stimulate sales.  However, because of the agreed upon restrictions set forth in paragraph 7 D and because paragraph 7 D established that the VPX Marketing and Sales Restrictions applied to both sales and *marketing*, VPX's marketing of its non-"creatine-based" products, like BANG Energy RTD, had to be limited

FINAL ARBITRATION AWARD – PHASE 1 AND PHASE 2

to the Nutritional Channel, limited to the athletes and workout enthusiasts, mostly men, because

that is what VPX represented to Orange Bang when the parties negotiated the contours of

paragraph 7 and that is what VPX agreed to when it entered into the 2010 Settlement Agreement.

*See* Exhibit J-11, paragraph 7 D; 2560.

VPX did not stay in its lane with regard to sales.  Nor did VPX stay in its lane with regard

to marketing.  As the evidence adduced at the arbitration hearing demonstrates, VPX shifted from a

particularized marketing strategy, a marketing strategy geared at its original niche target audience,

athletes and members of the muscle building community, to a general marketing strategy based on

a "life-style" brand and it did so in order to attract *mainstream* consumers.  VPX instructed its

influencers to promote VPX products as "lifestyle" products, not as "workout/high intensity sports"

products.  *See* Exhibit 1343, p. 8.  VPX advertising and its social media posts demonstrated that its

marketing was targeting mainstream consumers, not paragraph 7 D consumers.  *See* Exhibits J-155,

paragraphs 41-42, Figs. 22-23, paragraph 36, Fig. 16, paragraph 40, Fig. 21; 2505; 2496; 2501;

3075.  VPX obviously did this because such a marketing strategy was the pathway to a significant

increase in sales.  Although this business strategy made perfect business sense because it generated

impressive revenues for VPX, this marketing approach was nevertheless a breach of the marketing

restrictions built into paragraph 7 D.

Even sales of Bang Mixx violate paragraph 7 D. VPX is certainly free to manufacture and

distribute a hard seltzer beverage.  However, once it makes the business decision to call that

product *Bang* Mixx, once it decides to make use of the BANG mark to sell the hard seltzer, VPX

must comply with the VPX Marketing and Sales Restrictions of paragraph 7 D. VPX argues that

when it sells Bang Mixx it is selling an alcoholic beverage and therefore it must comply with state

laws which strictly regulate how and where it can sell such a beverage and that point is, of course, a

well-taken argument.  However, if VPX wants to comply with state law and other alcohol related

regulations, then VPX should have named its hard seltzer something other than Bang Mixx because

once it decides to make use of the BANG mark for its hard seltzer drink, it must comply with the

restrictions built into paragraph 7 D. The breach of contract with respect to Bang Mixx applies to

VPX and JHO Intellectual Property Holdings, LLC ("JHO"). As to Entourage and Quash, see Section III, P. below.

### G. "Nutritionally Fortified"

As stated above, and because the arbitrator has concluded that BANG Energy RTD and VPX's other Bang branded products do not satisfy the "creatine-based" standard as set forth in paragraph 7 of the 2010 Settlement Agreement, the arbitrator believes that there is no reason to reach or determine the issue of whether or not the products at issue were "nutritionally fortified", or not, or whether or not FDA regulations are, based on custom and practice, implied as part of the 2010 Settlement Agreement, or not.

Despite this finding, it is worth noting that the experts presented by both sides agreed on some fundamental facts. Both Cheeseman, the expert for Monster and Orange Bang, and Durkin, the expert for VPX, agreed that, pursuant to FDA standards, products which are carbonated or which contain alcohol can never be deemed to be "nutritionally fortified". Cheeseman Testimony, AHT, p. 2451:6 - 2452:10, 2453:12-21, 2454:16 - 2455:12; Durkin Testimony, AHT, p. 3686:18 - 3688:13; *see* Exhibit J-1 [21 CFR § 104.20(a)], p. 10; 1821, § B.2, p. at 7 [carbonated products], § B.4 (alcohol). BANG Energy RTD is a carbonated beverage (both the caffeinated and caffeine-free varieties). *See* Exhibit 917; J-154, paragraph 38; 1581, p.79:4-7; 1556, p. 296: 13-25. Bang Mixx, of course, contains alcohol.

### H. Monetary Damages for Breach of Contract

See Section III, J. below.

### I. VPX Is Liable for Trademark Infringement

In order to prevail on a claim for trademark infringement, Orange Bang must establish that: (1) it has a protected ownership interest in the BANG mark; and (2) VPX's use of the BANG mark is likely to cause consumer confusion. *Pom Wonderful LLC v. Hubbard*, 775 F.3d 1118, 1124-25

1   (9th Cir. 2014).[17]  Orange Bang easily established a protectible ownership interest in the BANG

2   mark by showing its incontestable trademark registrations for the BANG mark.  *See* Exhibit J-2.

3   Orange Bang also demonstrated that it, not VPX, made use of the BANG mark first or, to put it

4   another way, it is undisputed that VPX is not a "prior user" of the BANG mark and thus Orange

5   Bang is the "senior user" and VPX is the "junior user".  As the Ninth Circuit has held, federal

6   registration is prima facie evidence that the registrant, in this case Orange Bang, is the owner of the

7   BANG mark.  *Sengoku Works Ltd. v. RMC Int'l, Ltd.*, 96 F.3d 1217, 1219 (9th Cir. 1996).

8        The Ninth Circuit has articulated the test to determine a likelihood of confusion:  "whether

9   a 'reasonably prudent consumer' in the marketplace is likely to be confused as to the origin of the

10  good or service bearing one of the marks."  *Dreamworks Production Grp., Inc. v. SKG Studio* 142

11  F.3d 1127, 1129 (9th Cir. 1998).  In *AMF v. Sleekcraft Boats,* 599 F.2d 341 (9th Cir. 1979),

12  *abrogated on other grounds by Mattel Inc. v. Walking Mountain Prod.*, 353 F.3d 792,810, n 19 (9th

13  Cir. 2003), the Ninth Circuit set forth the eight-factor test which has been utilized in essentially

14  every trademark infringement case since 1979.  These eight factors (the "*Sleekcraft*" factors) that

15  determine whether a likelihood of confusion exists or not are:  (1) strength of the marks; (2)

16  relatedness of the goods; (3) similarity of the marks; (4) evidence of actual confusion; (5)

17  marketing channels; (6) degree of consumer care; (7) defendant's intent; and (8) likelihood of

18  expansion of the product lines.  *Id*. at 348-349.

19       The analysis and approach to trademark infringement cases changed somewhat in

20  *Dreamwerks* where Judge Kozinki authored the opinion about a Star Trek convention company

21

---

22  [17] As set forth above, Orange Bang has also asserted claims related to its trademark infringement
    claim, specifically a claim under the Lanham Act for false designation of origin, a state law claim

23  for common law unfair competition and a state law claim under California Business and
    Professions Code Section 17200.  The elements necessary to prove unfair competition and false

24  designation of origin are identical to the elements necessary to prove trademark infringement.
    *Pollution Denim & Co. v. Pollution Clothing Co.*, 2008 WL 11337644, at *5 (C.D. Cal. Dec. 31,

25  2008); *Sky Optic, Inc. v. Alibaba.Com, Inc.*, 163 F. Supp. 3d 755, 768 (C.D. Cal. 2015) [same
    elements as to California Business & Professions Code §17200].  Similarly, the Ninth Circuit has

26  consistently held that state common law claims for unfair competition and for violation of §17200
    are "substantially congruent" with claims under the Lanham Act.  Accordingly, the arbitrator's

27  conclusions, rulings and findings as to Orange Bang's trademark infringement apply with equal
    force to Orange Bang's claims for false designation of origin, state unfair competition and violation

28  of §17200.  This ruling does not imply any right to additional damages inasmuch as double
    recovery is not permitted – as discussed below.

1  known as Dreamwerks, the little known senior user, who sued the behemoth and well known

2  DreamWorks studio, the junior user, for trademark infringement.  In the *Dreamwerks* case of

3  "reverse confusion", where the junior user is commercially strong and casts a "long shadow", the

4  question becomes whether a reasonable consumer making use of the senior user's product (in that

5  case a consumer attending a Star Trek convention) might do so believing that the product is made

6  by, sponsored by, affiliated with or connected to the junior user.  To pose the reverse confusion

7  question as it applies to this case: would a reasonable consumer making a purchase at a

8  convenience store, purchasing an Orange Bang frothy drink from a fountain dispenser, believe that

9  this product is made by, sponsored by, affiliated with or connected to VPX?  In *Dreamwerks,* the

10  Ninth Circuit ruled that the three first *Sleekcraft* factors, (1) the strength of the mark; (2) the

11  relatedness of the goods; and (3) the similarity of the marks as to sound, appearance and meaning

12  are "pivotal" in a reverse confusion case.  In *Instant Media, Inc. v. Microsoft Corp.*, 2007 WL

13  2318948, at *7 (N.D. Cal. Aug. 13, 2007), the court likewise held that the first, second and third

14  *Sleekcraft* factors are of particular important in determining whether reverse confusion has

15  occurred.

16      In *Ironhawk Technologies, Inc. v. Dropbox, Inc.,* 2 F.4th 1150 (9th Cir. 2021), Ironhawk,

17  the senior user, had a 2004 registered trademark for "SmartSync" for computer software.

18  Beginning in 2017, Dropbox, the better known junior user, named a feature in its widely popular

19  cloud storage software "SmartSync".  Ironhawk sued for trademark infringement, as well as for

20  other claims including a state unfair competition claim and a section 17200 claim.  In addressing

21  this dispute, the Ninth Circuit summarized some important considerations relating to a reverse

22  confusion trademark infringement case which are worth emphasizing here as follows:

23      • Reverse confusion occurs when consumers dealing with the senior user, Orange

24          Bang, believe they are doing business with the commercially stronger junior user,

25          VPX.

26      • Reverse confusion occurs when an appreciable number of reasonable consumers,

27          who may not even know of the existence of the senior user [members of the younger

28          generation who are key customers of VPX may not have even heard of Orange

69

FINAL ARBITRATION AWARD – PHASE 1 AND PHASE 2

1    Bang], mistakenly believe that the senior user, Orange Bang, is the junior user,

2    VPX, or is, sponsored by, affiliated with or connected to the junior user.

3    • Reverse confusion occurs when the junior user, with its robust advertising and

4    promotional activities, "swamps" the senior user and, for that reason, in a reverse

5    confusion case, the main focus of the analysis is on the commercial strength of the

6    junior user which means that the greater the power of VPX's use of the BANG mark

7    (the result of its brilliant social marketing campaign and the engagement of

8    thousands of influencers who have billions of followers all of whom promoted the

9    BANG mark), the more likely it is to create confusion in the minds of Orange

10    Bang's customers, citing *Dreamwerks*, 142 F.3d at 1130, n 5.

11    • Although perceived affiliation with a popular, on the rise and well-known company

12    like VPX may, at first blush, seem beneficial to a senior user like Orange Bang,

13    reverse confusion can carry with it meaningful disadvantageous economic

14    consequences, such as: (i) the senior user may find itself in the position where its

15    corporate goodwill is now in the hands of the junior user; (ii) the senior user can

16    lose the value of its trademark, its product identity, corporate identity, control over

17    its goodwill and the ability to move into new markets; (iii) the senior user may be

18    foreclosed from expanding into related fields; and (iv) the senior user may lose its

19    business identity to a larger, more powerful junior user. *Ironhawk*, 2 F.4th at 1160.

20    In *Ironhawk*, the Ninth Circuit emphasized that before addressing the *Sleekcraft* factors, it is

21    necessary to define the relevant consumer market. *Id.* As discussed below in connection with the

22    fourth *Sleekcraft* factor, Orange Bang's survey expert, Kenneth Hollander ("Hollander"), not only

23    conducted a proper survey according to Ninth Circuit authority, but his survey made certain to, and

24    did, survey members of the appropriate relevant market including consumers who go to

25    convenience stores to make purchases.

26    Although the arbitrator will address each of the eight *Sleekcraft* factors, the main focus will

27    be on the first three factors, the "pivotal" factors as identified by the Ninth Circuit.

28

With respect to the first *Sleekcraft* factor, the strength of the mark factor, *Ironhawk* holds that the proper analysis is to evaluate the "conceptual strength" of the senior user's mark, in this case the conceptual strength of Orange Bang's BANG mark, and compare it to the commercial strength of the junior user, in this case the commercial strength of VPX's use of the BANG mark. *Ironhawk,* 2 F.4th at 1162. As the Ninth Circuit put it in *Walter v. Mattel, Inc.,* 210 F.3d 1108, 1111 n.2 (9th Cir. 2000): "[T]he inquiry focuses on the strength of the junior mark because the issue is whether the junior mark is so strong as to overtake the senior mark." In *Ironhawk*, the Ninth Circuit also clarified what it meant by "conceptual strength", and explained that it was referring to the hierarchy of trademark inherent distinctiveness (from strongest to weakest): (1) arbitrary or fanciful; (2) suggestive; (3) descriptive; and (4) generic. *Id.* 1162. In *Ironhawk*, the Ninth Circuit also ruled that "conceptual strength" could be established by: (i) the presumption of federal registration; and (ii) if the junior user itself considered the mark to be higher up on the trademark hierarchy than a descriptive mark, i.e., either arbitrary / fanciful or suggestive. *Ironhawk,* 2 F.4th at 1162 and n. 1. In this respect, if the BANG mark is regarded to be an arbitrary or fanciful mark, then, by virtue of the Ninth Circuit's definition, it is a commercially strong mark. Here, it is undisputed that Orange Bang's BANG mark has a federal trademark registration and, therefore, the presumption of inherent distinctiveness is established in Orange Bang's favor by virtue of that trademark registration. Even more importantly, VPX itself has taken the position that the BANG mark is an arbitrary or fanciful mark and, accordingly, VPX itself has established that Orange Bang's BANG mark is a conceptually strong mark. Bukovi Testimony, AHT, p. 1965:25 – 1966:8; *see* Exhibit 2936, paragraph 14. As to the other important consideration, the issue of the commercial strength of VPX's use of the BANG mark, it goes without saying that VPX's use of the BANG mark has achieved undeniable commercial strength by virtue of the enormous amount of sales which VPX has generated by making use of the BANG mark and because it has engaged in a significant advertising and social media marketing campaign centered upon the BANG mark that has allowed it to dwarf Orange Bang in the marketplace. *See* Exhibit J-155, ¶ 27 [VPX's marketing expenditures for 2019 totaled $29 million]; M. Owoc Testimony, AHT, p. 3443:16-23, 3455:7-18 [over 2.8 billion followers by virtue of their social

media accounts and the social media accounts of the influencers who VPX has engaged], 3457:4-11; J-155, ¶ 28, Fig. 8 [enormous reach of VPX's social media followers]; Grunewald Testimony, AHT, p. 1885:8-10. In 2020, VPX sold more than $740 million of BANG branded products, sales which took place out of more than 140,000 retail outlets. *See* Exhibit 2922, p. 7; J. Owoc Testimony, AHT, p. 1381: 8-19. Thus, Orange Bang has established the strength of the mark factor in both directions. Orange Bang (and VPX itself) have demonstrated that Orange Bang's use of the BANG mark is conceptionally strong [arbitrary or fanciful]. And, at the same time, Orange Bang (and VPX itself) have established that VPX's use of the BANG mark is commercially strong. Therefore, the first *Sleekcraft* factor cuts strongly in favor of Orange Bang.

With respect to the second *Sleekcraft* factor, the relatedness of the goods factor, *Pom Wonderful* is factually on point and legally significant. In *Pom Wonderful*, the Ninth Circuit ruled that the district court correctly found that fruit juice beverages and energy drinks are related goods because they are similar "in use and function" and sold to the same class of purchasers, even though the fruit juice was 100% juice and the energy drink was carbonated. The fact that both the Pom Wonderful fruit juice was pomegranate flavored and the energy drink at issue in that case was likewise pomegranate flavored was not a dispositive fact. As the Ninth Circuit reasoned in *Pom Wonderful*: "Fruit-juice beverages and fruit-flavored energy drinks are sufficiently complementary and related that a reasonable consumer could connect them and be confused regarding the source of the products." *Id*. at 1127. *See also Polar Corp. v. PepsiCo, Inc.*, 789 F.Supp.2d 219, 233 (D. Mass., 2011) ["slush" drinks and bottled water and sodas are related goods because consumers would reasonably conclude that a soda manufacturer would also produce a slush drink]. Here, Orange Bang sells a frothy orange drink and one-third of their sales take place at a convenience store (discussed more below with respect to the fifth *Sleekcraft* factor). VPX sells an energy drink, most notably BANG Energy RTD, and 80% of its sales take place at a convenience store. Both products are inexpensive, attractive to consumers who stop at a convenience store or a gas station and both compete for the same customers. Stein Testimony, AHT, p. 115:13-21 [approximately one-third of Orange Bang's current customers are convenience stores]; Bukovi Testimony, AHT, p. 2012:5 - 2013:12 (approximately 80 percent of BANG Energy RTD sales occur in convenience

1  stores). Stein, Sacks and Orange Bang's and Monster's marketing expert Richard George

2  ("George") all testified that VPX's energy drinks compete within the general beverage category

3  (the same category to which Orange Bang sells). Stein Testimony, AHT, p. 134:5-10; Sacks

4  Testimony, AHT, p. 2607:4-25 and 2625:16 - 2626:8; George Testimony, AHT, p. 2216:9 -

5  2217:10; J-155, Figs. 43-44, 52. It is just as easy to stop at a convenience store and grab a

6  sandwich and a Bang as it is to stop at a convenience store and grab a sandwich and an Orange

7  Bang. In fact, the arbitrator can easily envision a scenario where a family on a car vacation stops to

8  get gas and food at the convenience store which is now a part of a gas station. The adult driver

9  initially intends to grab a sandwich and a Bang (the caffeine will help with the driving), but the

10 kids want to grab a sandwich and an Orange Bang and the purchase decision of the children

11 influences the purchase decision of the parent who decides to go along with his or her kids and

12 have an Orange Bang as well. George Testimony, AHT, p. 2208:24 - 2209:16 and 2310:22 -

13 2311:17; Sacks Testimony, AHT, p. 2611:21 - 2612:17; Stein Testimony, AHT, p. 114:13-16. In

14 this respect, both the sugary Orange Bang and the sugarless and caffeine laden BANG Energy RTD

15 energy drink (and other Bang branded products sold by VPX) are similar in use and function and

16 therefore they are proximate / related goods pursuant to currently controlling Ninth Circuit

17 authority. In addition, and as an aside, the PTO formed an opinion that the products at issue in this

18 case were related goods because the PTO previously rejected one of VPX's applications for the

19 Bang! mark based on a finding that VPX's products are "highly related" to Orange Bang's products

20 (an opinion admittedly based on paperwork and not on a true study of the marketplace). *See*

21 Exhibit 141, p. 2. VPX's reliance on the InfoScout study, a thoroughly unconvincing document

22 and an unpersuasive argument (see discussion below) does not change this conclusion. As a result,

23 the second *Sleekcraft* factor cuts convincingly in favor of Orange Bang.

24       With respect to the third *Sleekcraft* factor, the similarity of the marks factor, the courts look

25 to an appearance, sound, and meaning test. *Ironhawk*, 2 F.4th at 1164; *Fortune Dynamic, Inc. v.*

26 *Victoria's Secret Stores Brand Mgmt., Inc.*, 618 F.3d 1025, 1032 (9th Cir 2010). With respect to

27 sound, the sound of the BANG mark is identical. With respect to meaning, the meaning of the

28 BANG mark is also identical. With respect to appearance, the use of the marks is somewhat

different in the marketplace because they have different accompanying logos, but both products appear in the marketplace with a prominent use of the word BANG.  Similarities have greater weight than differences.  *GoTo.com, Inc. v Walt Disney Co.*, 202 F.3d 1199, 1206 (9th Cir. 2000).  As the Ninth Circuit also stated in *GoTo.com,* the greater the similarity between the two marks, the greater the likelihood of confusion.  *Id.* Here, the sound and meaning are identical and the appearance, although not identical, is certainly similar, because both make use of the BANG mark by placing a strong emphasis on the word "Bang".  In fact, the PTO stated in an Office Action Letter in response to a trademark application by VPX that the use of the term "Bang" is the "dominant feature" of the use of the BANG mark and that the dominant feature is very significant in creating a commercial impression on consumers out in the marketplace.  As the PTO put it: "BANG is very significant in creating a commercial impression, the marks are highly similar in sound, appearance, meaning, and connotation."  *See* Exhibit 141, p. 2.  Thus, the third *Sleekcraft* factor cuts strongly in favor of Orange Bang.

Inasmuch as this is a reverse confusion case, and because the Ninth Circuit has indicated that the first three *Sleekcraft* factors discussed above are the "pivotal" ones, all three of which cut strongly or convincingly in favor of Orange Bang, the analysis of the three factors set forth above is already enough to conclude that VPX is liable for trademark infringement.  As discussed below, an analysis of the remaining *Sleekcraft* factors does not change this finding and, in fact, the other *Sleekcraft* factors likewise support the finding of trademark infringement against VPX and in favor of Orange Bang.

With respect to the fourth *Sleekcraft* factor, the actual confusion factor, and because it is often difficult to garner evidence of actual confusion, Ninth Circuit authority has held that it is not necessary to demonstrate actual confusion in order to prove a likelihood of confusion.  *Sleekcraft*, 599 F.2d at 353.  *Ironhawk*, 2 F.4th at 1165; *Playboy Enters., Inc. v. Netscape Commc'n Corp.*, 354 F.3d 1020, 1026 (2004).  In this case, however, Orange Bang and Monster have engaged an expert, Hollander, to conduct a survey, to gather survey evidence and to use that survey evidence to demonstrate actual confusion.  Survey evidence does suffice as persuasive evidence to establish actual confusion.  *Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt. Inc.,* 618 F.3d

1025, 1035 (9th Cir. 2010); *Mut. Of Omaha Ins. Co. v.* Novak, 836 F.2d 397, 400 (8th Cir. 1987). VPX is critical of Hollander's survey methodology because, according to VPX, Hollander made use of the "Squirt" methodology, a disfavored survey methodology, instead of the "Eveready" methodology, which is considered the gold standard for survey methodologies and, therefore, according to VPX, Hollander's survey is tainted by leading questions and of very little value or weight.[18]  Hollander testified at the arbitration hearing, somewhat emphatically, that he did not make use of the "Squirt" methodology for his survey, but rather made use of a "modified Squirt" methodology, a survey based on a product line-up in which the survey respondents are showed an array of branded products, one after the other, rotating the order of the products in the line-up so that no product had too much prominence in order to avoid bias, a methodology which is typically used when the survey respondents do not know of or have never heard of the senior user.  In this case, it is highly doubtful that younger survey respondents, who may be target buyers of BANG Energy RTD, have ever heard of the company Orange Bang or its Orange Bang beverage.  In *Active Sports Lifestyle USA LLC v. Old Navy, LLC*, 2013 WL 11239385 (C.D. Cal. 2013), the defendant in the trademark infringement action filed a motion in limine to exclude a survey conducted by the plaintiff's survey expert, who happened to be the same expert in this case -- Hollander.  In that case, Hollander make use of a "line-up protocol" with one product followed by another (in this case nearly all of the product cans of BANG Energy RTD are mostly black and thus Hollander made use of an appropriate survey stimulus shown to survey respondents) and several other products for control purposes (in this case Coke, Pepsi and Red Bull products were used as controls to simulate conditions that appear in the marketplace, particularly at a convenience store).  Hollander conducted the survey that way because the parties' marks were not that well known (no "top of the mind" recognition given that Orange Bang in this case lacks "top of the mind"

---

[18] In the "Eveready" format, the survey respondents do not know which mark is the senior user because it is assumed, because of the survey respondent's prior experience with the marketplace and because of the "top of the mind" strength of the senior user's product, that they will already know which mark is owned by the senior user.  In contrast, in the "Squirt" format, the survey presents the survey respondents with both conflicting marks and does inform the survey respondents which mark is owned by the senior user because this survey format does not assume that the survey respondents are familiar with the senior mark.  *See McCarthy, Sections* 32:173, 32:174.50 and 32:177.

recognition with survey respondents) and because the products were not sold side-by-side in the marketplace (here, both sides concede that the products were sold in the same convenience stores, not side-by-side, although there was some testimony that convenience stores are so small, especially in gas stations, that the products were physically close enough to each other to be treated as though they were sold side-by-side. George Testimony, AHT, p. 2210:16 – 2211: 20, 2152: 11-14). The defendant in *Active Sports Lifestyle* filed a motion in limine to exclude Hollander's testimony based on an improper survey methodology, but Judge Selna denied the motion in limine and ruled that Hollander's survey line-up methodology was proper and that his finding of 22% for the likelihood of confusion survey was admissible, citing *McCarthy,* 32:177 and *Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*, 618 F.3d 1025, 1037 (9th Cir. 2010). Here, in our case, it appears that Hollander made use of essentially the same survey methodology which was approved in *Active Sports Lifestyle*. Hollander surveyed the relevant market, potential purchasers at convenience stores, had a proper screening questionnaire, made use of proper controls, made use of an approved line-up format and submitted an unrebutted survey[19] which showed that 19.3% of survey respondents were confused. Hollander Testimony, AHT, p. 2427:25 - 2429:4; J-150 ¶¶ 56-61. Although the unrebutted 19.3% confusion rate is not an overwhelming percentage of consumer confusion, it is close to what Judge Selna allowed in *Active Sports Lifestyle* and it is very close to the percentage which Hollander characterized in his arbitration testimony, based on his expertise and years of experience, as "robust". *See also*, *Rosetta Stone Ltd. v. Google, Inc.*, 676 F.3d 144, 159 (4th Cir. 2012) (17% confusion rate is "clear evidence of actual confusion"); *Exxon Corp. v. Tex. Motor Exch. of Houston, Inc.*, 628 F.2d 500, 507 (5th Cir. 1980) (15% confusion rate sufficient). Thus, the fourth *Sleekcraft* factor cuts convincingly in favor of Orange Bang.

With respect to the fifth *Sleekcraft* factor, the marketing channels factor, the evidence is undisputed that the marketing channels converge because both parties sell products which make use of the BANG mark in convenience stores, including some of the same chains and store locations such as 7-Eleven and Circle K chains. George Testimony, AHT, p. 2284:24 - 2285:22,

---

[19] VPX's survey expert Mr. Wallace did not testify at the arbitration hearing to explain his survey. The arbitrator was not informed as to why Mr. Wallace was not called to testify.

DocuSign Envelope ID: 81DDD3B5-7BB2-4FF2-9E99-1415677257C

2290:6-17, 2171:12-19; *see* Exhibit 5324. As set forth above, Stein testified that one-third of Orange Bang sales take place at convenience stores and as Bukovi testified approximately 80% of BANG Energy RTD sales, VPX's biggest selling product by far, take place at convenience stores. As the Ninth Circuit ruled in *Pom Wonderful*, where sales channels converge and the parties' customer base overlap, the fifth *Sleekcraft* factor weighs in favor of the plaintiff. *Pom Wonderful*, 775 F.3d at 1130-31. Here, there is no dispute that Orange Bang and VPX compete for customers in convenience stores where a large percentage of both of their sales take place. Accordingly, the fifth *Sleekcraft* factor cuts strongly in favor of Orange Bang.

With respect to the sixth *Sleekcraft* factor, the degree of consumer care factor, it was convincingly established at the arbitration hearing that consumers comprising the relevant market at issue in this case "exercise a low degree of care and sophistication when selecting inexpensive, single-serve" drinks like "juices" and "energy drink[s]." *Pom Wonderful*, 775 F.3d at 1127; *Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1060 (9th Cir. 1999); George Testimony, AHT, p. 2206:24 - 2207:3, 2207:20 - 2208:9, 2209:24 - 2210:15; *see* Exhibit 1132. Monster's CEO Sacks also testified that convenience store purchases are "impulse" buys. Sacks Testimony, AHT, p. 2614:20 - 2615:20. In *Vital Pharms., Inc. v. PHD Mktg., Inc.*, 2020 WL 6545995, (C.D. Cal. 2020), VPX filed a trademark infringement case against a company which sold e-cigarettes. In the litigation, VPX's Bukovi submitted a declaration in which he stated that although VPX promotes a health conscious brand, its consumers are not necessarily health conscious in every instance or even in most instances, a declaration upon which the court specifically cited and relied.[20] In other words, it was VPX who argued that many, or most, of its consumers exercise a low degree of care in making the purchase decision. In that case, Judge Lew ruled that (i) where consumers exercise a lesser degree of care, there is a higher likelihood of confusion, citing *Network Automation, Inc. v. Advanced Sys. Concepts*, 638 F.3d 1137, 1152 (9th

---

[20] In addition, in the 2020 case of *Vital Pharms.*, VPX also argued that the BANG mark is an *arbitrary* mark, thus admitting that the BANG mark is conceptually strong for the purposes of the first *Sleekcraft* factor. *Vital Pharms., Inc. v. PHD Mktg., Inc.*, 2020 WL 6545995, at *3. Judge Lew did not decide that precise issue, ruling instead that the BANG mark is at least suggestive (i.e., more than descriptive). *Id.* at *4.

Cir. 2011); (ii) even if some of the consumers exercise greater care, that elevated standard of care is not applicable where only some of the customers may be more sophisticated; and (iii) because of the low price points of both the BANG Energy RTD and the defendant's e-cigarettes, consumers are more likely to exercise a lesser degree of care in making the purchase decision and, therefore, this factor weighed in favor of confusion. *Vital Pharms.*, at *6-7. In this respect, VPX took a position in that case which is inconsistent with the position it is currently taking on the sixth *Sleekcraft* factor. In short, given the low price point for an Orange Bang and for the BANG Energy RTD, the evidence demonstrates that the decision to purchase a beverage at a convenience store is a snap decision where the consumer does not spend a lot of time, energy or scrutiny in making that purchase decision and, thus, the sixth *Sleekcraft* factor cuts strongly in favor of Orange Bang.

With respect to the seventh *Sleekcraft* factor, the intent of the defendant factor, the Ninth Circuit has held that, in a reverse confusion case, if the infringer adopted the mark with actual or constructive knowledge of the senior user's trademark, or the infringer is at fault for not adequately respecting the rights of the senior user, then this factor will weigh in favor of the plaintiff. *Brookfield*, 174 F.3d at 1059; *Ironhawk*, 2 F.4th at 1167-1168; *McCarthy*, Section 23:10. Although there was no evidence presented that VPX *selected* the BANG mark with the intent of trading off of the goodwill of Orange Bang, there was plenty of convincing evidence presented of VPX's cavalier attitude about adhering to the VPX Marketing and Sales Restrictions of paragraph 7 D within the 2010 Settlement Agreement (which VPX obviously knew about because its CEO J. Owoc participated in its negotiation by having conversations [undisclosed conversations] with his attorneys and because he signed it after 11 months of negotiation) inasmuch as J. Owoc testified that he never told his marketing employees or his distributors, such as Pepsi, about the 2010 Settlement Agreement and his marketing and other employees testified that they were never told about these all-important restrictions either, demonstrating an intent of cavalier indifference about honoring the rights of the senior user as embodied in the 2010 Settlement agreement. *See* J. Owoc Testimony, AHT, p. 1279:19-23, 1276:17 - 1277:16; Bukovi Testimony, AHT, p. 2108:15 - 2109:3; M. Owoc Testimony, AHT, p. 3493:7-21; Sweeney Testimony, AHT, p. 3105:13-20; Li Testimony, AHT, p. 1464:13-16. The evidence also shows that VPX flooded the marketplace with

advertising (traditional advertising and social media promotional advertising) for its Bang branded products despite having actual or constructive knowledge of Orange Bang's superior rights to the BANG mark which shows a culpable disregard for the risks of reverse confusion, an intent which likewise satisfies this element of intent. *Marketquest Grp., Inc. v. BIC Corp.*, 862 F.3d 927, 934-935 (9th Cir. 2017); Bukovi Testimony, AHT, p. 2111:19 - 2112:16; M. Owoc Testimony, AHT, p. 3492:8 - 3495:6; Sweeney Testimony, AHT, p. 3105:5-22; J. Owoc Testimony, AHT, p. 1276:16 - 1280:19. As a result, the seventh *Sleekcraft* factor cuts convincingly in favor of Orange Bang.

With respect to the eighth *Sleekcraft* factor, the likelihood of expansion of the product lines factor, the evidence demonstrates, although certainly not overwhelming evidence, that VPX had already entered Orange Bang's market for general beverages and that Orange Bang had considered, and supposedly still is considering, expanding into canned products. Specifically, the testimony demonstrated that while VPX launches a new flavor of BANG Energy RTD every 90 days in order to stimulate sales, Orange Bang had explored the possibility of selling its Orange Bang beverage out of bottles rather than out of the fountain dispenser. Grunewald Testimony, AHT, p. 1872:7-16; Stein Testimony, AHT, p. 97:8 - 98:9, 101:7 - 114:12; Exhibit 2056. This testimony demonstrates at least some meaningful effort on the part of Orange Bang to expand its product line and, therefore, the eighth *Sleekcraft* factor cuts somewhat in favor of Orange Bang.

In *Brookfield Commc'ns, Inc. v. W. Coast. Ent. Corp.*, 174 F.3d 1036, 1058 (9th Cir. 1999), the Ninth Circuit found a "strong" likelihood of success on the merits for the purposes of a preliminary injunction where only three of the eight *Sleekcraft* factors were met. In *Pom Wonderful,* 7775 F.3d at 1132, the Ninth Circuit likewise found a clear likelihood of success on the merits for the purposes of a preliminary injunction where only five of the eight *Sleekcraft* factors were met. Here, as set forth above, the first three *Sleekcraft* factors, the most important factors in a reverse confusion case, all weigh strongly or convincingly in favor of Orange Bang. Moreover, all eight of the *Sleekcraft* factors weigh strongly or convincingly in favor of Orange Bang, with the possible exception of the eighth factor which weighs somewhat in favor of Orange Bang. Thus, based on the totality of the circumstances, the arbitrator concludes that Orange Bang has established a likelihood of confusion as between Orange Bang's "Orange Bang" product and the

VPX Bang branded products, in particular BANG Energy RTD. Accordingly, the arbitrator hereby finds that VPX is liable to Orange Bang for trademark infringement (and the other claims related to trademark infringement, *see* footnote 17 above).

### J. Monetary Damages for Breach of Contract and for Trademark Infringement – Three Potential Methodologies

According to VPX's damages expert Andrew Voth ("Voth"), there are three potential methodologies to consider for the calculation of damages for breach of contract and for trademark infringement in this case. The three methodologies are: (i) measure the diversion of sales / profits from Orange Bang to VPX; (ii) the calculation of a reasonable royalty; and (iii) a disgorgement of profits calculation which, according to Voth, must factor in an apportionment analysis. *See* Exhibit 5382; DDX1036.

#### (1) Diversion of Sales / Profits from Orange Bang to VPX

According to Voth's expert presentation on the issue of damages, the first methodology to consider is to measure the amount of Orange Bang's sales / profits which were diverted away from Orange Bang to the benefit of VPX. However, as Voth correctly points out, there is no evidence that any sales / profits bound for Orange Bang ended up with VPX. *See* DDX1036-3. For this reason, this first methodology addressed by Voth is not the appropriate measure of the damages suffered by Monster or Orange Bang in this case for the breach of the 2010 Agreement or trademark infringement referred to above.

#### (2) The Calculation of a Reasonable Royalty

The second methodology, which both Voth and Monster's / Orange Bang's expert John Plumpe ("Plumpe") agree is an appropriate damages methodology for both a breach of contract claim and for a trademark infringement claim, the reasonable royalty methodology, is indeed an appropriate measure of damages for this case. There is, however, conflicting case law on the monetary remedy of a reasonable royalty in a trademark infringement context and those cases are discussed at length below. Voth and Plumpe disagree on how to calculate the reasonable royalty in this case and, specifically, what a reasonable royalty rate would be and whether or not a cap should

80

FINAL ARBITRATION AWARD – PHASE 1 AND PHASE 2

1   be imposed on the reasonable royalty in an amount tied to the purported 2010 value of the BANG

2   mark, which is, in part, the reasonable royalty damages model as presented by Voth.  These

3   disagreements are also discussed below.

4          However, and importantly, both Voth and Plumpe agree on the starting point of the

5   calculations.  Both Voth and Plumpe agree on the amount of the total net sales generated by the

6   sale of products making use of the BANG mark since August 11, 2010, **$2.26 billion** according to

7   Voth and **$2.268 billion** according to Plumpe, virtually identical numbers.  *See* Voth Testimony,

8   AHT, p. 3860:5-18; Plumpe Testimony, AHT, p. 2861:6-25.  In addition, both Voth and Plumpe

9   agree on the amount of the net sales generated by the sale of products making use of the BANG

10  mark since August 11, 2010 outside the Nutritional Channel, **$2.03 billion** according to Voth and

11  **$2.04 billion** according to Plumpe, once again virtually identical numbers.  *See* Voth Testimony,

12  AHT, p. 3863:17 – 3864:2; Plumpe Testimony, AHT, p. 2869:19-22.  Simply stated, the two

13  expert's calculations as to the starting point for the royalty base (defined and discussed below), for

14  the purposes of calculating the amount of a reasonable royalty, are extremely close to each other.

15  In short, the experts essentially agree on these calculations.

16         However, before even addressing the reasonable royalty calculation as presented by Plumpe

17  and as presented (albeit differently) by Voth, a threshold question must be answered first.  Is a

18  reasonable royalty even a proper monetary remedy for a breach of contract claim under California

19  law and in a trademark infringement action under federal law?

20                **(3)   The Recovery of a Reasonable Royalty for the Breach of Contract Claim**

21         In *Artifex Software, Inc. v. Hancom, Inc.*, 2017 WL 4005508 (N.D. Cal. 2017), the district

22  court held that, under California law, a reasonable royalty may be awarded in a breach of contract

23  case.  In *Artifex*, the defendant made use of a computer software product pursuant to a "free" open

24  source license.  However, the license was only free under certain circumstances.  A party seeking to

25  use the computer software had three choices:  (1) enter into a commercial license and pay a license

26  fee; (2) use the computer software for free, pursuant to the free license, provided that the defendant

27  did not modify or distribute the computer software; or (3) use the computer software for free,

28  pursuant to the free license, and modify or distribute the computer software, but, if so, the user had

1   to make sure that the resulting modifications were themselves open source which required the user

2   to make the modified source code available to others at no charge.  The defendant allegedly

3   breached the free license agreement and the defendant Hancom filed a motion for partial summary

4   judgment as to the issue of damages, arguing that there could not possibly be any damages because

5   the license was itself a free license and, therefore, Artifex could not establish all of the requisite

6   elements for a claim for breach of contract.  In response to this motion for partial summary

7   judgment on the issue of damages, the district court ruled that an appropriate way to measure the

8   damages suffered by Artifex resulting from Hancom's breach of the free license agreement was to

9   determine the amount of a reasonable royalty that Artifex would have received had Hancom

10  entered into the commercial license (choice no. 1) to use the computer software at issue.  In

11  particular, the district court ruled that it could use the value of the commercial license as a basis for

12  the determination of damages and reasoned that a reasonable royalty may be used as the measure of

13  damages for the breach of a contract under California law.  *Id.* at *3.

14         In *Celeritas Technologies, Ltd. v. Rockwell International Corporation*, 150 F.3d 1354 (Fed.

15  Cir. 1998), the Federal Circuit reviewed a jury verdict on a trial heard in the Central District of

16  California before Judge Edward Rafeedie.  In *Celeritas Technologies*, the plaintiff Celeritas

17  invented a technology which increased the rate of data transmission over a cellular telephone

18  network.  Celeritas and Rockwell signed a non-disclosure agreement and, thereafter, the executives

19  of Celeritas met with Rockwell and disclosed the details of its new invention to Rockwell.

20  Rockwell later made use of the new invention, giving rise to a claim for breach of contract under

21  California law, in addition to patent infringement and misappropriation of trade secrets.  The jury

22  returned a verdict in favor of Celeritas and awarded over $57 million on the breach of contract

23  claim based upon a hypothetical license fee (on a paid-up, lump-sum basis, a common approach in

24  that industry at the time).  On appeal, Rockwell argued that the measure of damages, which was

25  based on a calculation of a reasonable royalty rate which was then applied to Rockwell's own

26  internal projections, was improper.  The Federal Circuit disagreed.  The Federal Circuit ruled that

27  Celeritas was undoubtedly harmed by Rockwell's conduct, that Celeritas had a reasonable

28  expectation that Rockwell would compensate it if Rockwell made use of the disclosed information

1   and that Rockwell really had two choices, use the technology or refrain from using the technology,

2   and because Rockwell did make use of the technology, the jury properly determined the amount of

3   the license fee that Rockwell would have paid had it not breached the non-disclosure agreement.  In

4   particular, the Federal Circuit approved of the methodology by which Celeritas' expert calculated a

5   reasonable royalty rate **by looking at other deals in the telephone modem business** as well as

6   past deals entered into by Celeritas itself and by multiplying that reasonable royalty rate by

7   Rockwell's own internal sales projections.  *Id.* at 1359.

8       In *Grail Semiconductor, Inc. v. Mitsubishi Elec. & Elecs USA, Inc.*, 225 Cal.App.4th 786,

9   795-796 (2014), Grail invented a new technology for a memory chip which greatly increased the

10  amount of storage capacity available on a chip. Grail executives met with Mitsubishi and other

11  companies to pitch the technology and everyone in attendance signed a non-disclosure agreement.

12  Grail later learned that Mitsubishi had incorporated its proprietary technology into a new memory

13  chip it was selling and Grail sued for various claims, including breach of contract for breach of the

14  non-disclosure agreement.  At trial, Grail's expert presented three different methodologies to

15  calculate Grail's damages.  The second methodology presented by Grail's expert, a Mr. Gemini,

16  was an approach by which he calculated a royalty that Mitsubishi would have paid for use of the

17  technology (the calculation of this second methodology was converted into a lump sum payment in

18  the amount of $203 million).  After the jury returned a verdict in the amount of $123 million, the

19  same amount as Mr. Gemini's first methodology, Mitsubishi filed a motion for a new trial on the

20  issue of damages.  The trial court granted the motion for a new trial and the appellate court

21  affirmed.  However, on appeal, the court ruled that Grail had indeed demonstrated all of the

22  elements necessary for a breach of contract claim, including the element of the fact of damages, but

23  that the jury applied the wrong measure of damages, the first methodology, by incorrectly placing a

24  value on the technology appropriated by Mitsubishi.  Rather, the appellate court ruled, the jury

25  should have determined the amount that Mitsubishi would have paid to license the technology.  The

26  appellate court specifically rejected Mitsubishi's argument that Grail's second measure of damages,

27  the amount of the royalty that Mitsubishi should have paid for the use of the technology, was based

28  on speculation and unfounded assumptions.  Instead, the appellate court ruled that a new trial was

1  necessary to establish the "amount [Mitsubishi] likely would have paid for a license to use or

2  transfer the technology." *Id.*

3       Thus, *Artifex, Celeritas* and *Grail* all stand for the proposition that the calculation of a

4  reasonable royalty is a proper measure of damages for a breach of contract claim under California

5  law. Accordingly, based on these cases, and based on testimony of the damages experts Plumpe

6  and Voth, discussed in detail below, the arbitrator hereby finds that the calculation of a reasonable

7  royalty, as further set forth below, is an appropriate methodology to measure the damages suffered

8  by Monster by virtue of VPX's breach of the 2010 Settlement Agreement.

9       **(4)    The Formula – the Royalty Base x the Reasonable Royalty Rate**

10       The classic approach for the determination of a reasonable royalty, which is based on patent

11  law, is to conduct a hypothetical negotiation pursuant to the Georgia-Pacific factors[21] and then

12  determine the royalty base, which represents the net sales generated by the infringement [or by the

13  breach of the contract], and multiply it by the reasonable royalty rate, which represents the amount

14  of damages owed to the aggrieved party. *Whitserve, LLC v. Computer Packages, Inc.*, 694 F.3d 10,

15  27 (Fed. Cir. 2012) [royalty rate found to be speculative, but defendant admitted that other

16  licensing deals provide a proper basis for the hypothetical negotiation assuming they are

17  appropriate comparables]. The Georgia-Pacific factors are "a reasoned economic framework for a

18  'hypothetical negotiation [which] attempts to ascertain the royalty upon which the parties would

19  have agreed had they successfully negotiated an agreement just before the infringement [breach]

20  began." *Whitserve*, 694 F.3d at 27.

21       **(5)    The Calculation of the Royalty Base – Breach of Contract**

22       Before determining a reasonable royalty rate for the purposes of the damages calculation for

23  the breach of contract claim, it is first necessary to determine the dollars to which the reasonable

24  royalty rate will apply, which is what the damages experts in this case referred to as the "royalty

25

26

---

[21] The Georgia-Pacific factors were first articulated in *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116 (S.D.N.Y. 1970). The Georgia-Pacific factors have been applied to hypothetical negotiations in trademark infringement actions. *Lumber Liquidators, Inc. v. Stone Mountain Carpet Mills, Inc.*, 2009 WL 5876245 (E.D. Vir. 2009) [three out of fifteen factors insufficient to arrive at a reasonable royalty].

base." The calculation of the royalty base for the breach of contract claim is similar to the calculation of the royalty base for the trademark infringement claim (discussed below), but there are some conceptual differences.

For example, the calculation of the royalty base for the breach of the 2010 Settlement Agreement is tied to the language and meaning of paragraph 7 D. Accordingly, net sales by VPX which do not violate the VPX Sales and Marketing Restrictions, i.e., sales made within the Nutritional Channel, were not a breach of the 2010 Settlement Agreement because such sales complied with paragraph 7 D and, therefore, those particular net sales, for the purposes of the breach of contract claim, should not be included in the calculation of the royalty base. For that reason, for the purposes of the royalty calculation for the breach of contract claim, the **$2.035 billion** amount, the **midpoint** between Voth's calculation and Plumpe's calculation, is the correct starting number for the royalty base. In addition, net sales made internationally are properly included within the royalty base for the breach of contract calculation because of the language and meaning of paragraph 17 of the 2010 Settlement Agreement which provides as follows: "<u>Scope of Agreement</u>. The terms of this Agreement apply to the actions and activities of the Parties *worldwide*." (Emphasis added.)[22] However, net sales of Bang Mixx, in the amount of $4.5 million through September 19, 2021[23], must be deducted out from the amount of the royalty base for the reasons set forth in Section III, P. below.

Thus, the calculation of the royalty base for the purposes of the breach of contract claim is as follows: **$2,030,500,000** ($2,035,000,000 - $4,500,000).

**(6)  The Recovery of a Reasonable Royalty in a Trademark Infringement Claim**

The monetary remedies for trademark infringement are set forth in 15 U.S.C. 1117(a) which provides, in pertinent part, as follows:

---

[22] Because the sales of Bang Pre-Workout were made within the Nutritional Channel and the VPX Marketing and Sales Restrictions were adhered to insofar as Bang Pre-Workout sales are concerned, these sale revenues are already excluded from the calculation of the royalty base for the breach of contract claim.

[23] Bang Mixx sales through September 19, 2021 were in the amount of $4.5 million. *See* Exhibit 2922, p. 7.

85

" . . . the plaintiff shall be entitled, . . . and subject to the principles of equity, to recover (1) **defendant's profits**, (2) **any damages sustained by the plaintiff, and** (3) the **costs** of the action. The **court shall assess such profits and damages** or cause the same to be assessed under its direction. If the court shall find that the amount of the recovery based on profits is **either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just**, according to the circumstances of the case. Such sum in either of the above circumstances shall constitute compensation and not a penalty. . . ."

(Emphasis added.)

Thus, the statute gives the trier of fact, in this case the arbitrator, extremely wide discretion to determine the amount of damages. As the Ninth Circuit held in *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1146 (9th Cir. 1997), the Lanham Act provides the court with considerable "discretion to fashion relief, including monetary relief, based on the totality of the circumstances." However, the question of whether or not an award of a reasonable royalty is an appropriate monetary remedy in a trademark infringement action is a surprisingly controversial topic with conflicting case law decisions going both ways.

In *Thrive Natural Care, Inc. v. Thrive Causemetics, Inc.*, 2021 WL 4813257 (C.D. Cal 2021), the plaintiff alleged trademark infringement by the defendant with respect to its registered mark "THRIVE". In a decision authored by Judge Anderson of the Central District of California in October of 2021, the court ruled that because there was no history of a prior licensing agreement between the plaintiff and the defendant and because the plaintiff did not have a past practice of licensing its mark to third parties, any hypothetical negotiation designed to determine a reasonable royalty would be impermissible speculation, citing the Ninth Circuit's decision in *M2 Software Inc. v. Viacom, Inc.*, 223 F.App'x 653, 655 (9th Cir. 2007).[24] As a result, Judge Anderson ruled that the

---

[24] In *M2 Software*, the Ninth Circuit specifically stated that it did not reach the issue of whether or not a reasonable royalty calculation is permissible in a trademark infringement action. "Because M2's only proposed methodology for estimating a reasonable royalty hinges on an accounting of Viacom's profits, its theory that it may impute royalties as a way of disgorging Viacom's allegedly (Continued...)

plaintiff's expert's damages model based on a reasonable royalty calculation was not admissible
and had to be excluded because the calculation was based on speculation and therefore lacked the
requisite "reasonable certainty".  Although the court disallowed the reasonable royalty calculation,
the court simultaneously ruled that, given the recent United States Supreme Court decision in
*Romag Fasteners, Inc. v. Fossil, Inc.*, 140 S.Ct.  1492 (2020) [holding that a showing of willfulness
is no longer required to award a disgorgement of profits in a trademark infringement case], a
disgorgement of profits is indeed available in a reverse confusion trademark infringement case *as a
matter of law.  Thrive Natural Care*, at * 5 – 6.

In *Pacific Packaging Concepts, Inc. v. Nutrisystem, Inc.*, 2021 WL 3130041 (C.D. Cal
2021), the plaintiff alleged trademark infringement by the defendant with respect to its registered
mark "Fresh Start".  In a decision authored by Judge Wright of the Central District of California in
July of 2021, the court ruled that because the plaintiff had no history of any prior licensing
agreements and because plaintiff had indicated that it would never license any of its marks, any
hypothetical negotiation designed to determine a reasonable royalty would likewise be
impermissible speculation.

In *Lodestar Anstalt v. Bacardi & Co.  Ltd.*, 2019 WL 8105378 (C.D. Cal 2019), in a reverse
confusion case, the plaintiff alleged trademark infringement against Bacardi with respect to its
registered mark "UNTAMED" used in connection with a line of rum.  In a decision authored by
Judge Snyder of the Central District of California in 2019, the court ruled that even though there
was one prior licensing agreement between the plaintiff and an affiliated third party (Avalon)
which set a 10% royalty rate, that license agreement was entered into with an affiliated party one
year after the litigation had commenced and that license agreement did not result in any actual
payments to the plaintiff and, therefore, any hypothetical negotiation designed to determine a

---

unjustly acquired profits likewise fails.  **Therefore we need not decide more generally whether
reasonable royalties can be a measure of a plaintiff's damages in a trademark case, as other
circuits have found appropriate in some cases."**  *Id.* 655.  As of 2013, the Ninth Circuit had not
had occasion to address this issue.  *QS Wholesale, Inc. v. World Marketing, Inc.*, 2013 WL
1953719 (C.D. Cal 2013), *3 - *4.  As the arbitrator understands it, the Ninth Circuit has still not
had occasion, as of yet, to reach and decide whether the recovery of a reasonable royalty is a proper
measure of damages in a trademark infringement case.  Thus, the decisions of the district court and
the decisions of other jurisdictions, which point in both directions, are the applicable guide posts.

87

reasonable royalty would be based merely on speculation.  As a result, Judge Snyder disregarded the royalty analysis of plaintiff's expert and granted partial summary in favor of Bacardi on Lodestar's claim of entitlement to a reasonable royalty.

Even in the case repeatedly cited by Monster / Orange Bang in this arbitration, *Lumber Liquidators, Inc. v. Stone Mountain Carpet Mills, Inc.*, 2009 WL 5876245 (E.D. Vir.  2009) in which the court appropriately applied the Georgia-Pacific factors to a trademark case, the court granted the *Daubert* motion and precluded the testimony of plaintiff's expert's reasonable royalty calculation on the grounds that the expert only analyzed three of the fifteen Georgia-Pacific factors and, therefore, the court concluded the reasonable royalty calculation was not sufficiently reliable.

On the other hand, there are a series of case decisions which reasoned that the reasonable royalty analysis was not speculative, did provide the requisite "reasonable certainty" necessary to uphold a damages award and was indeed reliable.  For example, in *Sands, Taylor & Wood v. The Quaker Oats Company*, 34 F. 3d 1340 (7th Cir. 1994), the plaintiff owned a registered slogan in the phrase "THIRST-AID" and Gatorade made use of the "GATORADE IS THIRST-AID" slogan for a national advertising campaign.  The trial court, in the first instance, rejected the award of a reasonable royalty.  On the first appeal, however, the Seventh Circuit reversed and ruled that, upon remand, the district court should calculate a reasonable royalty as the base-line for damages, a damages calculation that, according to the Seventh Circuit, should perhaps be enhanced over and above the reasonable royalty baseline amount.  On remand, as a part of the damages analysis, the trial court compared the proposed royalty rate with **the royalty rates for other royalty licenses**. Once the reasonable royalty had been established by the trial court, the question for the Seventh Circuit on the second appeal became whether or not the damages award should be further enhanced, as permitted by 15 U.S.C. 1117(a).  The Seventh Circuit posed the very same question which was raised by the district court which it quoted verbatim as follows:

> "Will the imposition of a hypothetical licensing royalty deter predatory conduct such as the defendant's?  I doubt it.  The royalty is nothing more than an approximation of what the defendant would have paid plaintiff had defendant acted lawfully.  "[An] infringer [has] nothing to lose, and everything to gain if [it] could count on paying only the normal, routine

royalty, noninfringers might have paid …[T]he infringer would be in a 'heads-I-win, tails-you-lose position.'" *Panduit Corp. v. Stahlin[Bros.] Fibre Works,* [575 F. 2d 1152, 1158 (6th Cir. 1978).]

The district court in *Sands* decided to double the amount of the hypothetical royalty in order to accomplish a deterrent effect on defendant's infringing conduct which, the Seventh Circuit noted, included a pervasive and prolonged use of the "Thirst-Aid" slogan, and so as to ensure that the plaintiff was not under-compensated on the reasonable royalty calculation.  Thus, on the second appeal to the Seventh Circuit, the issue became whether or not the doubling of the reasonable royalty was a permissible enhancement of the damages intended to effectuate deterrence, or whether it was an impermissible penalty in violation of the language of 15 U.S.C. 1117(a).  On the second appeal, the Seventh Circuit upheld the calculation of the reasonable royalty based on a hypothetical negotiation as an appropriate methodology to calculate the baseline damages.  In other words, the controversial question on the second appeal had to do with the enhancement of the damages, not the underlying calculation of the reasonable royalty based on the hypothetical negotiation.

In *Adidas America, Inc. v. Payless Shoesource, Inc.*, 2008 WL 4279812 (D. Ore.  2008), Adidas sued Payless Shoes for trademark infringement for selling footwear bearing two or four stripes in violation of Adidas' registration for a three stripe pattern for tennis shoes.  The jury returned a verdict of $137 million of Payless' profits plus a reasonable royalty of 7.78%.  Significantly, the court approved of the reasonable royalty calculation because it was consistent with royalty deals between Adidas and Payless Shoes, royalty deals between Payless Shoes and third parties and **royalty deals between third parties.**  *Id.* *12.  In this respect, the court in *Adidas America* considered other licensing deals, deals between third parties, in determining whether or not the reasonable royalty calculation was appropriate because these other licensing deals provided the requisite reasonable certainty.

In *QS Wholesale, Inc. v. World Marketing, Inc.*, 2013 WL 1953719 (C.D. Cal 2013), the plaintiff Quicksilver owned a registered trademark for VSTR and used it in connection with men's clothing while the defendant WMI had a pre-existing trademark for VISITOR also for men's

apparel.  Quicksilver planned to use the mark VISITOR to sell clothing in a marketing campaign
based on the surfer Kelly Slater, but then discovered the existence of the defendant's mark which
put a crimp in their marketing plans.  Quicksilver reached out to WMI and tried to purchase the
mark during elaborate negotiations, but the parties could not close a deal.  Although the parties had
discussions about the purchase of the mark, discussions that did not lead to a deal, the parties never
had discussions about a license of the mark.  As Quicksilver moved forward with its plans to
market the surf ware under the mark VSTR, VMI sent a cease and desist letter and Quicksilver, as
the plaintiff, filed a claim for declaratory relief seeking to establish non-infringement.  WMI
counterclaimed for trademark infringement.  Quicksilver's line of clothing under the mark VSTR
was not successful, yielding no profits and, based on this undisputed fact, Quicksilver filed a
motion for partial summary judgment on the grounds that there were no damages for WMI to
recover because there were no profits subject to disgorgement.  In response, WMI argued that
although it might be barred from recovering various categories of damages, it was not barred from
recovering a reasonable royalty.

In *QS Wholesale*, in a decision authored by Judge Carter of the Central District of
California, the court agreed with WMI.  Judge Carter ruled that even though there was no history of
a prior licensing agreement between Quicksilver and WMI and even though WMI did not have a
past practice of licensing its mark to  third parties, a hypothetical negotiation designed to determine
a reasonable royalty would still be permissible because WMI's expert was able to conduct an
analysis based on (i) the licensing agreements between similarly situated third parties; and (ii) the
past negotiations between the parties regarding a possible purchase of the trademark which,
according to WMI's expert, was analogous to the negotiation of a long term trademark licensing
agreement (even though no deal was actually ever reached).  This type of data was sufficient to
provide a basis for the expert to determine a reasonable royalty with the requisite reasonable
certainty, although Judge Carter characterized it as a "close question." *Id.* *3 - *4.  In reaching this
conclusion, Judge Carter found the requisite certainty and relied on *Adidas America* where the
court upheld a jury's reasonable royalty award based, in part, on royalty agreements with third
parties, even though the plaintiff did not have a previous licensing history with the defendant and

even though plaintiff conceded that it would not have licensed the mark to Payless Shoes under any circumstances.  *Id.* *4.  Judge Carter also indicated that it was important to his analysis that the "proposed royalty rates track similar licensing agreements in the clothing industry deals examined by WMI's expert."  *Id.* *5.  *See also Monster Energy Company v Integrated Supply Network, LLC,* 2018 WL 3361062 (C.D. Cal. 2018) [Judge Marshall rules that a reasonable royalty calculation based on a hypothetical negotiation is not precluded as a matter of law just because there is no prior negotiations between the parties.]

Interestingly, in *Lodestar*, where the reasonable royalty analysis was disallowed, Judge Snyder make a point of citing Judge Carter's decision in *QS Wholesale* and she quoted a particular passage that made it clear that the reasonable royalty analysis is a form of calculating damages for *lost profits*, an element of damages specifically authorized by 15 U.S.C. 1117(a).  In her decision in *Lodestar*, Judge Snyder stated as follows in quoting the passage from Judge Carter:  "Reasonable royalties 'are **a form of damages for lost profits**, since they focus on the licensing fees that were never paid by an infringer using a party's mark, and like other modes of calculating lost profits, they need to be proved with 'reasonable certainty."  *Lodestar*, at *13.  (Emphasis added.)

If the reasonable royalty analysis under trademark infringement law is a species of lost profits, it is instructive to look to the law of lost profits under California law.  Does California law allow a plaintiff to present a damages model based on comparable deals from other businesses?  The answer to this question is "yes".  In *Kid's Universe v. In2Labs*, 95 Cal.App.4th 870 (2002), a case cited with approval in numerous other case decisions, the court held that:

> When the operation of an unestablished business is prevented, as here, **prospective profits may be shown in various ways**.  The <u>Restatement Second of Contracts, section 352</u>, comment b, at page 146 provides, "[I]f the business is a new one or if it is a speculative one ..., damages may be established with reasonable certainty with the aid of **expert testimony, economic and financial data, market surveys and analyses, business records of similar enterprises**, and the like."  Similarly, the <u>Restatement Second of Torts, section 912</u>, comment d at page 483 states, "When the tortfeasor has prevented the beginning of a new business ... all factors relevant to the likelihood of the success or lack of success of the

business or transaction that are reasonably provable are to be considered, including general business conditions and **the degree of success of similar enterprises**."

Our Courts of Appeal have held, consistent with the Restatement Second of Torts, that **the experience of similar businesses is one way to prove prospective profits**.  (*Resort Video, Ltd. v. Laser Video, Inc., supra,* 35 Cal.App.4th at p. 1699 [plaintiff did not introduce any evidence of "operating histories of **comparable businesses**"]; *Berge v. International Harvester Co., supra,* 142 Cal.App.3d at p. 163 [**a plaintiff can rely on "data from other enterprises" operating under "similar conditions**"]; *Gerwin v. Southeastern Cal. Assn. of Seventh Day Adventists, supra,* 14 Cal.App.3d at p. 222 [plaintiff did not introduce evidence of "operating history of **comparable businesses** in the locality"]

*Kid's Universe*, at 884 – 885.

(Emphasis added.)

Thus, according to the law of lost profits in California, and given that the award of a reasonable royalty is a form of lost profits according to Judge Snyder of the Central District of California, when a party is seeking to recover damages for lost profits, it is appropriate to look to the financial transactions of *other similar business* in order to build a *non-speculative* damages model, so long as the other deals upon which the damages model are based are appropriate comparables.

In this respect, as *Sands, Adidas America, QS* and Judge Snyder's quotation of Judge Carter's rationale all suggest, a reasonable royalty calculation **based on other comparable deals in the beverage industry can indeed be a non-speculative methodology to determine a reasonable royalty so long as the "comparables" are, in fact, appropriate deals on which to determine the royalty rate**.  Here, in this arbitration, both Plumpe and Voth essentially concede this fact because both of them present a reasonable royalty calculation based on other deals in the beverage industry, and both of them analyze the Georgia-Pacific factors in arriving at a reasonable royalty calculation.  Although the two damages experts reach very different conclusions in terms of the amount of the reasonable royalty which should be paid by VPX to Orange Bang / Monster in this case, they both agree that a reasonable royalty is an appropriate methodology to measure

1   damages for both the breach of contract claim and the trademark infringement claim (see

2   discussion and cites below).

3        Accordingly, and although the resolution of this particular issue is a "close question", to

4   quote Judge Carter, even the cases which ruled that the reasonable royalty calculation was too

5   speculative still acknowledged the rule that typically a reasonable royalty calculation does indeed

6   provide the requisite non-speculative "reasonable certainty" in instances where there is a prior

7   licensing relationship between the parties or where the parties had entered into an existing license

8   and the licensee holds over or somehow exceeds the scope of the license.

9        As a practical matter, both of those purported requirements are arguably present in this case.

10  Although the 2010 Settlement Agreement is a co-existence agreement between Orange Bang and

11  VPX, and not a licensing agreement because it does not transfer rights or provide for quality

12  control procedures, it is still the grant of consent or permission to VPX to make use of the BANG

13  mark in certain circumstances, on a royalty free basis, and an agreement not to sue VPX for

14  trademark infringement so long as VPX stayed in its "lane", which it did not do.  Although it is true

15  the 2010 Settlement Agreement makes no mention of a royalty rate, and therefore is unhelpful in

16  fixing a reasonable royalty rate based on a pre-negotiated number as between Orange Bang and

17  VPX, it is still a correct statement to point out that these parties did, in fact, have a pre-existing

18  negotiation history about the zones of use in which the two of them would co-exist.  This pre-

19  existing negotiation history demonstrates that Orange Bang was indeed willing to *allow* VPX to use

20  the BANG mark, so long as VPX stayed in its lane (and Orange Bang stayed out of VPX's

21  nutritional supplement lane), and VPX was willing to accept the limited zone of use so long as it

22  could do so on a royalty-free basis and thereby avoid a trademark infringement claim.

23       At a minimum, the 2010 Settlement Agreement demonstrates that the parties were indeed

24  capable of making a deal.  If they were able to make a deal where VPX had to remain in its narrow

25  lane in exchange for the benefit of having to pay no royalty, then it follows that if VPX had asked

26  for a broad grant of rights, in perpetuity, in exchange for the payment of some royalty, Orange

27  Bang would have agreed and the parties would have been able to close a deal.  They closed a deal

28  before.  Their prior agreement, the 2010 Settlement Agreement, shows the parties are capable of

1    making a deal.  Again, the 2010 Settlement Agreement makes no mention of a royalty rate, but the

2    price for the licensing fee, the reasonable royalty rate for a broader grant of rights, although not

3    agreed to by virtue of direct negotiations between Orange Bang and VPX, can be easily established

4    by analyzing the comparable licensing deals entered into by third parties in the beverage industry

5    which, at the same time, helps inform a hypothetical negotiation which is permitted by making use

6    of the Georgia-Pacific factors.  As discussed below, both Plumpe and Voth analyzed these

7    comparables in order to establish a reasonable royalty.

8         Therefore, the arbitrator hereby concludes that comparable deals in the beverage industry

9    (discussed in detail below) do provide a reliable basis on which to determine a reasonable royalty

10   with the requisite reasonable certainty for the purposes of a trademark infringement claim.

11              **(7)    The Calculation of the Royalty Base for the Trademark Infringement**

12        As mentioned above, the calculation of the royalty base for the trademark infringement

13   claim is similar to the calculation of the royalty base for the breach of contract claim, but there are

14   some conceptual differences.  For example, the calculation of the royalty base for the trademark

15   infringement claim is based entirely on the hypothetical negotiation between Orange Bang and

16   VPX and therefore the contours of paragraph 7, the carve-out of net sales within the Nutritional

17   Channel which did comply with the VPX Marketing and Sales Restrictions, would not come into

18   play because the parties are striking a brand new deal, with a much broader grant of rights, so as to

19   allow VPX to make pervasive use of the BANG mark in perpetuity.  Thus, there would not be a

20   deduction in the calculation of the royalty base as a result of net sales made within the Nutritional

21   Channel or a deduction for net sales of Bang Pre-Workout[25] because the new licensing agreement

22   between Orange Bang and VPX resulting from the hypothetical negotiation would be for a broad

23   license in favor of VPX seeking the all-inclusive and perpetual use of the BANG mark which it

24

25   _____

26   [25] Although it is true that paragraph 6 of the 2010 Settlement Agreement effectuated a release with respect to the Bang Pre-Workout product which, at first blush, would require the net sales of Bang Pre-Workout to be deducted in order to calculate the royalty base for the trademark infringement

27   claim, that limited release should not be given effect because, once again, in the hypothetical negotiation between Orange Bang and VPX, they would be making a fresh deal, a comprehensive

28   deal.  Therefore, the Bang Pre-Workout net sales are included in the royalty base for the purposes of calculating the reasonable royalty damages for the trademark infringement claim.

94

FINAL ARBITRATION AWARD – PHASE 1 AND PHASE 2

needed, and continues to need, in order to support VPX's ubiquitous marketing and sales activities

relating to BANG Energy RTD, sales which accelerated dramatically in the 2018 – 2021 time

period.  At the same time, because the trademark infringement claim would be limited to the

territorial boundaries of the United States, international net sales should be excluded and should not

be a part of the royalty base for the purposes of a trademark infringement claim.  Likewise, as set

forth above, net sales of Bang Mixx must likewise be deducted out from the amount of the royalty

base for the reasons set forth in Section III, P. below.

Thus, the calculation of the royalty base for the purposes of the trademark infringement

claim is as follows:

| | |
|---|---|
| Net Sales – Total, (Voth – Plumpe midpoint) | $ 2,264,000,000 |
| Deduction for International Net Sales | $   (13,210,185)[26] |
| Deduction for BANG MIXX | $    (4,500,000)[27] |
| **Royalty Base for TM Infringement** | **$ 2,246,289,815** |

### (8)   The Georgia-Pacific Factors

With respect to the 15 Georgia-Pacific factors relating to a hypothetical negotiation between

Orange Bang and VPX, the arbitrator hereby finds as follows:

With respect to the first factor, the royalty rates received by Orange Bang from prior

licenses of the BANG mark, it is undisputed that there are no such prior licenses and certainly no

prior licenses that earned Orange Bang any licensing revenues.  Having said that, the 2010

Settlement Agreement is nevertheless an agreement between Orange Bang and VPX pursuant to

which Orange Bang allowed VPX to make use of the BANG mark, on a royalty-free basis, so long

as VPX complied with paragraphs 7 A – 7 D, a requirement which VPX breached.

With respect to the second factor, the royalty rates actually paid by VPX to license

trademarks, no evidence was presented that VPX ever paid any third party any "running royalty"

(i.e., a continuing, on-going royalty tied to net sales) or a lump sum license fee or any other fee to

license a trademark.  Nor did VPX ever pay Orange Bang any running royalty or a lump sum

---

[26] *See* Exhibit 5418, Schedule 3.1 (amended).
[27] *See* Exhibit 2922, p. 7.

FINAL ARBITRATION AWARD – PHASE 1 AND PHASE 2

1  license fee or any other fee to license a trademark.  But again, the 2010 Settlement Agreement is an

2  agreement between Orange Bang and VPX pursuant to which Orange Bang allowed VPX to make

3  use of the BANG mark, on a royalty-free basis, so long as VPX complied with paragraphs 7 A – 7

4  D, a requirement which VPX breached.

5         With respect to third and seventh factors, the nature and scope of the license and the

6  duration and terms of the license, VPX would need to bargain for a very broad grant of rights

7  which would enable VPX to make use of the BANG mark in a pervasive and all-encompassing

8  way.  VPX would need to be unencumbered by the "creatine-based" requirement of paragraph 7 A

9  – 7 C and VPX would also need to be relieved of the VPX Marketing and Sales Restrictions of

10 paragraph 7 D. VPX would need to be able to make use of the BANG mark on BANG Energy RTD

11 (as well as other Bang branded products) and sell them in any type of retail outlet and in any

12 location within a store and not be limited to the Nutritional Channel for the purpose of making

13 sales as well as for the purposes of marketing.  VPX would need the right to move forward with its

14 massive social marketing campaign on the internet and at events which make use of the BANG

15 mark and which helped stimulate the massive growth and profit of VPX, which VPX would not be

16 allowed to move forward with because of the VPX Marketing and Sales Restrictions of paragraph 7

17 D.  VPX would need to acquire the right to rebrand its entire company as Bang Energy.  Thus,

18 VPX would need an extremely broad grant of rights resulting from the hypothetical negotiation and

19 VPX would need a grant of rights unencumbered as to time, i.e., it would need to be a perpetual

20 license.  VPX would also need the grant of an exclusive license, exclusive as to the rest of the

21 world, but not exclusive as to Orange Bang.  In other words, Orange Bang would still be entitled to

22 make use of its own BANG mark, but VPX would need to negotiate a strong license which would

23 prevent any other third party from making use of the BANG mark in any other way.  In addition,

24 because VPX has had success in selling VPX products in international territories, VPX would need

25 to negotiate a license agreement where VPX would have the right to trademark the BANG mark in

26 foreign territories and Orange Bang would have to give up its right to do so.

27         With respect to fourth factor, Orang Bang's licensing policies, it is undisputed that Orange

28 Bang was willing to enter into a co-existence agreement with VPX because it, in fact, did so.

Although the 2010 Settlement Agreement was not technically a licensing agreement, Orange Bang did grant certain permissions to VPX and Orange Bang did give up its right to sue for trademark infringement in exchange for VPX's promise to honor paragraphs 7 A – 7 D, a promise which VPX breached.  In addition, based on the testimony elicited from Orange Bang during the arbitration, Orange Bang has had a long history of enforcing its trademark rights by sending cease and desist letters and even commencing litigation at times to protect the integrity of the BANG mark.

With respect to the fifth factor, the commercial relationship between Orange Bang and VPX, and as explained above with respect to the fifth *Sleekcraft* factor, although Orange Bang and VPX, to some degree, target different types of consumers, Orange Bang and VPX are still competitors (and arguably side-by-side competitors) to the extent that they both sell their beverage products in an overlapping sales channel.  As stated above, Orange Bang sells its Orange Bang fountain drink at convenience stores and gas stations while, at the same time, 94% of VPX's massive sales are sales of BANG Energy RTD and 80% of those sales take place in convenience stores.

With respect to sixth, eighth, ninth, tenth and eleventh factors, the special value of the BANG mark to VPX, the profitability of the VPX products which make use of the BANG mark, the advantages to VPX of the BANG Mark over prior marks like Redline, the benefits to VPX for using the BANG mark and the extent to which VPX has used the BANG mark, these closely-related factors are of huge importance, especially if the Book of Wisdom, the right to make use of 20/20 hindsight as part of the hypothetical negotiation of the royalty rate, is factored into the analysis, and these factors demonstrate precisely why VPX has little leverage in the hypothetical negotiation and why it really has no choice but to close a deal with Orange Bang, even if the licensing deal and the royalty rate are less than ideal from VPX's point of view.  The reason for this is because of how significantly VPX has invested in the BANG mark.  VPX has spent hundreds of millions of dollars promoting the BANG mark (sunk costs), implementing a highly effective but expensive social marketing campaign which is centered around the BANG mark and has rebranded its entire company as "Bang Energy".  Its web presence is now based on the BANG mark, its domain name is based on the BANG mark and J. Owoc is now known as the BANG CEO, as his

Instagram handle now demonstrates.  And consumers of BANG Energy RTD are affectionately known as "Bangsters".  VPX may argue that Orange Bang should have spoken up between 2010 and 2019 and, had Orange Bang done so, it would have promoted a different tradename, a trademark other than the BANG mark.  However, as demonstrated above, Orange Bang did not speak up during the 2010 to 2019 time period because, as it understood the facts, the products released by VPX during that time period, including BANG Energy RTD, were indeed "creatine-based" products as VPX told the world with its marketing and sales campaigns and, therefore, according to VPX, their products did not violate the 2010 Settlement Agreement or the VPX Marketing and Sales Restrictions.  As it turned out, and unbeknownst to Orange Bang at the time, these products released by VPX during this nine year time period of time, including BANG Energy RTD, were not, and are not, "creatine-based" as explained above.  Moreover, the products released by VPX which are branded with the BANG mark, especially BANG Energy RTD, have been, and still are, wildly successful.  The amount of net sales enjoyed by VPX has been impressive, highly profitable and trending upwards.  In short, VPX is highly dependent on having the right to make use of the BANG mark.  In many ways it has no choice but to close a deal with Orange Bang as a part of the hypothetical negotiation.  Orange Bang, not VPX, has the leverage and the bargaining power in the hypothetical negotiation, especially if the Book of Wisdom is factored into the hypothetical negotiation (see below).

With respect to seventh factor, the duration of the use of the BANG mark and the terms of the license, VPX, because of its enormous financial investment in the BANG mark, needs a perpetual grant of rights unlimited by time or territory.  This likewise confers much bargaining power on to Orange Bang in the hypothetical negotiation.  VPX needs to make this deal, especially given the $117 million in past marketing costs, sunk costs spent promoting the BANG mark, which it cannot recapture.  As to the further terms of the license, see the paragraph above as to sixth, eighth, ninth, tenth and eleventh factors.

With respect to the twelfth and fourteenth factors, customary royalties within the beverage industry, both Plumpe and Voth have performed in-depth analyses of these comparables in order to

determine a reasonable royalty rate.  These comparables, and the opinions of these qualified experts, are discussed in detail in the next section below.

With respect to the thirteenth factor, the apportionment calculation, the allocable portion of profits earned by the sale of VPX product which are attributable to the use of the BANG mark as opposed to "other factors", the arbitrator believes that this thirteenth factor, although very important to the disgorgement of profits analysis discussed below, is of minimal importance in a hypothetical negotiation to establish a reasonable royalty rate because, as demonstrated below in the Fox-Owoc mock dialogues which are illustrative of the hypothetical negotiation (one without and one with the Book of Wisdom), participants negotiating a "real-world" licensing deal will not, as a practical matter, address the apportionment of profits analysis during their discussions.  Rather, the parties certainly would push back on each other as to what the royalty rate should be, and the licensor would undoubtedly insist on a higher rate while the licensee would hold strong for a lower rate.  However, the arbitrator believes that the hypothetical negotiation would turn on what is a fair royalty rate in the industry, based on other comparable deals and, more importantly, which party has the true leverage in the hypothetical negotiation.  The apportionment of profits analysis does indeed arise in trademark (and copyright) infringement litigation, but it is doubtful that it is a real topic of discussion between principals or attorneys negotiating a licensing agreement.  Rather, topics like price, term, scope, use of the mark and quality control are the more basic provisions to be addressed during the hypothetical negotiation.

In addressing the apportionment factor, Voth cites to the InfoScout research report, Exhibit 5091, to suggest that BANG Energy RTD's profits are not attributable to the BANG mark but instead are attributable to other factors.  *See* Exhibit 5382, p. 82, paragraph 172.  However, the InfoScout research report is a thoroughly unconvincing document because it surveyed the wrong relevant market, mostly women, when most of the purchasers of the BANG Energy RTD are men, and surveyed the wrong market venues, conducting the interviews at supermarkets while most of the purchases of BANG Energy RTD [80% of them] take place at convenience stores.  Voth's reliance on InfoScout is unconvincing.

With respect to fifteenth factor, the final step in reaching the reasonable royalty rate based on the hypothetical negotiation, see below.

### (9) The Twelfth and Fourteenth Factors – Comparable Licensing Agreements in the Beverage Industry and the Opinions of Plumpe and Voth

Both Plumpe and Voth analyzed licensing agreements entered into between third parties in the beverage industry in order to determine a range of reasonable royalty rates.

Plumpe analyzed a 2004 license agreement by which Masterfoods, the owner of trademarks in Milky Way, Starbursts and 3 Musketeers, undeniably famous marks, licensed to Bravo Foods the right to make use of these trademarks on milk flavored products. The grant of rights was on a non-exclusive basis, which would normally reduce the amount of the royalty paid, but still the royalty rate started at a low of 5% and increased to as high of 7%. The royalty base was tied to net sales. In addition, the licensor negotiated a minimum guarantee ($375,000 year 1, $1 million year 2 and $1.5 million year 3) that the licensee had to pay, even if the net sales were insufficient to earn out the minimum guarantee. *See* Exhibit J-153, p. 93, Tab 8. Although the Milky Way, Starbursts and 3 Musketeers trademarks are more well-known than Orange Bang's BANG mark, this other licensing deal in the beverage industry is an appropriate comparable especially given the fact that VPX would have been seeking pervasive use of the BANG mark in the hypothetical negotiation as compared to the far more limited use, a milk product only, contemplated by this comparable deal.

Plumpe also analyzed a 2003 license agreement by which MD Enterprises, the owner of the trademark in MoonPie, a somewhat well-known brand, but far less well-known than Milky Way, Starbursts and 3 Musketeers, licensed to Bravo Foods the right to make use of the MoonPie trademark also on a milk flavored product. The grant of rights was on an exclusive basis, exclusive insofar as the product and the Territory (the United States) were concerned. Although a grant of an exclusive license would normally increase the royalty rate paid by the licensee, in this instance it is hard to envision that there were other companies out there vying for the right to sell milk products based on the MoonPie scooter pie. Nevertheless, the licensee negotiated a more modest royalty rate (more modest than the Milky Way deal referred to above) that started at a low of 2% and increased to a high of 3%. The royalty base was tied to a percentage of the wholesale price of the

product, with some pre-negotiated deductions.  In addition, the licensee was able to conclude this licensing deal without the requirement of having to pay any minimum guarantee at all.  *See* Exhibit J-153, p. 93, Tab 8.  Although the MoonPie brand is slightly more well-known than Orange Bang's BANG mark, this other licensing deal in the beverage industry is likewise an appropriate comparable especially given the fact that VPX would have been seeking pervasive use of the BANG mark in the hypothetical negotiation as compared to the far more limited use, a milk product, only contemplated by this comparable deal.

Plumpe also analyzed a 2003 license agreement by which Tanning Research Laboratories, the owner of the trademark in Hawaiian Tropics sun products, likewise a relatively well-known mark, licensed to American Water Star the right to make use of the Hawaiian Tropics trademark on a flavored water product.  The grant of rights was on an exclusive basis insofar as the product and the Territory (the United States and Canada) was concerned.  The license agreement called for a royalty rate of 4%.  The royalty base was tied to invoice sales (net of shipping and sales taxes).  In addition, the licensor negotiated a modest minimum guarantee that the licensee had to pay, even if the sales were insufficient to earn out the minimum guarantee.  *See* Exhibit J-153, p. 93, Tab 8. Although the Hawaiian Tropics trademark is also somewhat more well-known than Orange Bang's BANG mark, this other licensing deal in the beverage industry is likewise an appropriate comparable especially given the fact that VPX would have been seeking pervasive use of the BANG mark in the hypothetical negotiation as compared to the far more limited use, a water flavored product only, contemplated by this comparable deal.

Plumpe likewise concluded that these other licensing agreements were appropriate comparables as contemplated by the twelfth factor of the Georgia-Pacific factors and, based on the royalty range of 2% to 7%, determined the mid-point of this range, 4.5%, and concluded that a reasonable royalty rate for the Orange Bang – VPX hypothetical negotiation is 4.5%, although Monster and Orange Bang argue for the upper range, as high as 7%, in their post-arbitration closing brief.  Even Voth, according to Orange Bang and Monster, calculated the midpoint of a reasonable royalty at 4%, yielding a royalty payment of $81.2 million to $90.4 million payable to Orange Bang, depending upon the royalty base and assuming Voth's 4% midpoint.  *See* Voth Testimony,

AHT, p. 3932:14 – 3934:1.  However, this calculation is based on his supposed midpoint of 4% and without regard to Voth's cap. Voth's ultimate opinion is that a reasonable royalty is 1%, capped at $2.3 million which is his calculation of the aggregate value of Orange Bang's BANG mark as of 2010.

In reaching his conclusions, Plumpe excluded the "Throwdown" licensing agreement as an appropriate comparable because there was an equity purchase component to that deal.[28]  In the "Throwdown" licensing agreement, Throwdown Industries, the owner of the trademark in Throwdown, a pre-existing sports performance drink with a historical track record of sales, licensed to Dethrone Royalty the right to make use of the Throwdown trademark on non- alcoholic, sports performance drinks.  The grant of rights was on an exclusive basis, which would normally increase the amount of the royalty paid, and as part of this deal the licensee not only agreed to pay a royalty rate of 10%, the licensee also agreed to pay the licensor over 5 million shares of stock in the licensee, further agreed to spend at least 10% of net revenues on marketing and also agreed to pay a relatively modest minimum guarantee.  The royalty base was tied to net sales.  *See* Exhibit J-153, p. 93, Tab 8.  Although the Throwdown licensing agreement was not a standard licensing deal because of the equity payment component and the minimum marketing spend requirement and, therefore, not an ideal comparable, it is nevertheless instructive to demonstrate where the Throwdown licensing agreement would fall within Plumpe's reasonable royalty range if it was included in the analysis.  Obviously, the inclusion of the Throwdown licensing agreement would have increased Plumpe's midpoint calculation.  However, in order to err on the side of being conservative Plumpe testified, he did not include the Throwdown licensing agreement in the analysis.

After analyzing these comparables in the beverage industry, and in an attempt to corroborate his findings, Plumpe consulted a reference guide, the 2018 Edition of Licensing Royalty Rates by Battersby and Grimes, which likewise surveyed various industries to determine the range of royalty rates for trademark licensing agreements entered into between willing licensors

---

[28] *See* Plumpe Testimony, AHT, p. 2893:6–9.

1   and willing licensees which verified the following royalties in the beverage industry: soft drinks

2   3% to 7%, sports drinks 5% and fruit drinks 3% - 7%, all of which yield an average reasonable

3   royalty rate of 5%. *See* Exhibit J-153, p. 40, n 160–161.

4       Voth also conducted an analysis of these same third party licensing deals, plus others, and

5   challenged Plumpe's conclusions, by asserting various contrary opinions. For example, with

6   respect to the Musketeers, Starbursts and Milky Way brands, Voth contends that these marks are

7   far more well-known than Orange Bang's BANG mark (household names according to Voth), they

8   have been around for many years (Milky Way since 1923, 3 Musketeers since 1932 and Starbursts

9   since 1967), are the subject of national advertising campaigns and they generate sizeable sales as

10  compared to Orange Bang. *See* Exhibit 5382, p. 61 – 63. Similarly, with respect to the MoonPie

11  brand, Voth again contends that MoonPie is more well-known than Orange Bang's BANG mark,

12  has been around since the 1950s, had higher sales, a higher rate of growth and a more effective

13  advertising campaign. *See* Exhibit 5382, p. 60 – 61. Likewise, with respect to the Hawaiian

14  Tropics brand, the licensing agreement involved a more well-known brand, with national and more

15  effective advertising and far more significant sales than Orange Bang.

16      All of these factors as pointed out by Voth are valid and correct and, as he argues, should

17  justify a reduction in the royalty rate in his view. However, the scope of these licenses granted by

18  the licensors, for the use in a single milk product or, for flavored water beverages, or for sports

19  drinks in the case of the Throwdown brand, are far different and far more limited than the

20  ubiquitous and perpetual use of the BANG mark for which VPX would have to bargain in the

21  hypothetical negotiation with Orange Bang. Therefore, the third-party licenses analyzed by

22  Plumpe referred to above, and their range of reasonable royalty rates, are deemed to be appropriate

23  comparables for the purposes of the twelfth factor of the Georgia-Pacific factors.[29]

24

---

25  [29] Voth also referred to other licensing agreements in the beverage industry. However, Plumpe

26  excluded these licensing agreements from his analysis because: (1) The Diabetes Research Institute trademark licensing agreement (with a royalty rate of .25%) was not so much a license to

27  use a mark as a brand, but rather the right to place a logo on the packaging of the product to indicate that the beverage had the approval of the Diabetes Research Institute, much like a good-

28  housekeeping seal of approval. (2) The Hooters trademark licensing agreement (with a royalty rate
                                 (Continued...)

Perhaps the most significant reason for discounting the opinion of Voth, however, is Voth's attempt to cap the amount payable as a reasonable royalty at $2.3 million, the purported value of Orange Bang's BANG mark (according to Voth) as of 2010. Or, to put it another way, Voth offers the opinion that the payment of the lump sum amount would fully compensate Orange Bang for the past damages that Orange Bang suffered for not receiving the income stream for VPX's pervasive use of the BANG mark between 2010 and the present date. But what is the basis or justification for a cap on a running royalty? There is none. The cap does not take into consideration the unjust benefit derived by VPX. Rather, the cap is nothing more than a post-litigation contrivance designed to create an argument to reduce the reasonable royalty damages calculation by an amount in excess of $100 million. As Voth himself admitted in response to questions on direct-examination by VPX's counsel, it is **not** common **in the real world** for a trademark licensing agreement to have a lump sum payment as a cap, but rather, a lump sum payment as a cap is a way to resolve a dispute in litigation so that parties who do not want to have anything to do with each other may go their separate ways. *See* Voth Testimony, AHT, p. 3848:14 - 3849:2. Voth further admitted on cross-examination that none of the seven agreements he considered as comparables for the reasonable royalty analysis contained a royalty cap. *See* Voth Testimony, AHT, p. 3903:24 – 3904:6. Voth also conceded on cross-examination that he cannot recall any trademark litigation case where the reasonable royalty was capped or where he offered an opinion that the royalty damages should be capped at the value (the purported value) of the trademark at issue. *See* Voth Testimony, AHT, p. 3906:19 – 3907:3 and 3907:22 – 3908:9. Finally, in response to a line of

---

of 6%) was for the license of alcoholic beverages and 99% of VPX sales have been for non-alcoholic beverages. (3) The il Classico trademark licensing agreement (with a royalty rate of 2%) was for the license of coffee beans and coffee grounds, not beverages. (4) The Marley trademark licensing agreement (with a royalty rate of 3%) was for the license of coffee beans, mugs and related merchandise, not beverages. *See* Plumpe Testimony, AHT, p. 2874 – 2900. As Plumpe also testified, however, if these other additional licensing agreements, other than the seal of approval deal of the Diabetes Research Institute, were treated as comparables and were included in his analysis, the range of royalty rates would not change and would still result in a mid-point of 4.5% and the inclusion of these other deals would not change his opinion. *See* Plumpe Testimony, AHT, p. 2899:19 – 2900:6. Voth likewise agrees with this opinion. *See* Voth Testimony, AHT, p. 3912:15 – 3913:2. Voth also looked at additional deals, but they were not trademark licensing agreements. Rather, they were acquisition agreements where one of the assets acquired was a trademark. *See* Voth Testimony, AHT, p. 3898:14-20.

1   questioning by the arbitrator, Voth explained that the imposition of a cap as a lump sum payment is
2   really a form of a buy-out transaction, a fully paid-up licensing transaction by which Orange Bang
3   would receive only $2.3 million to recompense it for the unjust enrichment earned by VPX in
4   failing to honor the VPX Marketing and Sales Restrictions as set forth in the 2010 Settlement
5   Agreement *and* for infringing Orange Bang's BANG mark in a pervasive way.  And, on top of that,
6   according to Voth, VPX, having fully paid its $2.3 million licensing fee / buyout price, would be
7   entitled to make use of Orange Bang's BANG mark however it wanted to do so, with no
8   restrictions at all, and forever, with no limitations as to time.  *See* Voth Testimony, AHT, p. 3940:3
9   – 3941:7.  According to Voth, after payment of the $2.3 million licensing fee / buyout price, VPX
10  could use the BANG mark any way it wanted to, with impunity and in perpetuity.

11          Such a result would undermine the policy objectives of the Lanham Act, the integrity of
12  contracts and would not achieve an equitable result with respect to the facts of this case.  Voth's
13  $2.3 million cap / lump-sum licensing fee / buy-out price is thoroughly unconvincing and is hereby
14  rejected by the arbitrator.

15          **(10)  The Hypothetical Negotiation Between Fox and Owoc in 2009 - 2010,**
16                  **without the Book of Wisdom**

17          Based on the above, the arbitrator envisions the hypothetical negotiation between Fox of
18  Orange Bang and Owoc of VPX as of the time of the first infringement in 2009 - 2010, without the
19  benefit of the Book of Wisdom[30], would have taken place (or would take place) in the following
20  manner:

21

22  _____

23  [30] The Book of Wisdom is a legal convention that permits a court to consider events that transpired
    after the date of the hypothetical negotiation.  The Book of Wisdom is a concept which emanates
    from the United States Supreme Court case of *Sinclair Refining Co. v. Jenkins Petroleum Process*
24  *Co.,* 289 U.S. 689 (1933) where the Court permitted the use of 20-20 hindsight to help calculate the
    damages resulting from the breach of a contract to assign a patent.  In order to address the problem
25  of uncertain prophecies which may arise as part of the after-the-fact valuation for the lost use of
    intellectual property (in that case the use of a patentable invention), Justice Cordozo stated for the
26  Court: " . . .  [B]ut a different situation is presented if years have gone by before the evidence is
    offered [11 years in this case between August 11, 2010 and October 4, 2021, the first day of the
27  arbitration hearing].  Experience is then available to correct the uncertain prophecy.  Here is a book
    of wisdom that courts may not neglect.  We find no rule of law that sets a clasp upon its pages, and
28  forbids us to look within."  Even VPX's expert Voth has, in other cases, relied on the Book of
    Wisdom to arrive at a reasonable royalty rate.

DocuSign Envelope ID: 81DDB3B5-7509-4A55-8598-A1FF6677357C

| | | |
|---|---|---|
| 1 | Owoc: | I got your lawsuit. I think your lawsuit is full of it, but we should work this out. |
| 2 | Fox: | I'm willing to work this out, but I've been using the BANG mark since the early |
| 3 | | 1970s and I've owned the trademark since the early 1980s. The BANG mark is vital |
| 4 | | to the success of my business. |
| 5 | Owoc: | My target-customers are very different from yours. I sell to athletes and workout |
| 6 | | enthusiasts. I sell out of nutritional and supplement stores like the Vitamin Shoppe |
| 7 | | and GNC. I don't sell out of restaurants and I don't currently sell out of |
| 8 | | convenience stores or gas stations, like you do. |
| 9 | Fox: | Are you willing to limit your use of my BANG mark to just the nutritional and |
| 10 | | dietary supplement category? |
| 11 | Owoc: | At first, I thought I was willing to limit my use to that narrow category. I thought I |
| 12 | | was willing to work out a deal with you where I stay in my lane and you stay in your |
| 13 | | lane, and work out a free deal, a deal for no payment, no license fee or no royalty |
| 14 | | payment, but now that I think about it, I want to go big with the use of the name |
| 15 | | BANG. I want very broad use. I have a vision, and I want to use the BANG mark |
| 16 | | in a very pervasive way. I do not want to be limited to nutritional stores or to the |
| 17 | | dietary and supplements sections of stores. I want to be able to sell my product |
| 18 | | anyway I choose, at convenience stores, at gas stations, at supermarkets, anywhere. |
| 19 | | And I need the right to use the name forever, no limitations on time. Are you |
| 20 | | willing to make a deal like that? |
| 21 | Fox: | I don't know. You are asking for a lot. All of my customers know me by the |
| 22 | | BANG mark and I think it will be confusing if there are two companies out called |
| 23 | | BANG, especially if we are both going to sell at the same place like convenience |
| 24 | | stores and gas stations. I'm open to a deal, but the royalty rate will need to be pretty |
| 25 | | high. I would need a 10% royalty, 10% of your BANG mark sales. |
| 26 | Owoc: | No way. 10% is way too high. Besides, my products are going to be very different |
| 27 | | from yours even if they are both sold in convenience stores. Your product has lots |
| 28 | | of sugar. I'm planning on products with no sugar at all. The most I'm willing to |

106

FINAL ARBITRATION AWARD – PHASE 1 AND PHASE 2

DocuSign Envelope ID: 81DDD385-75D9-4A55-9599-41FF6677257C

| 1 | | pay as a royalty is 1%. |
|---|---|---|
| 2 | Fox: | It's not worth it to me to give up my company name and identity for a 1% royalty. |
| 3 | | And what would 1% even pay me?  What are your BANG sales as of now? |
| 4 | Owoc: | Our BANG sales as of now are about $155,000 per year.[31] |
| 5 | Fox: | So you are offering me $1,550 per year for the use of my corporate name?  I cannot |
| 6 | | make a deal like that.  Like I said, I'm only going to give up the exclusive use of my |
| 7 | | corporate name for a meaningful royalty.  Even a 7.5% royalty is not worth it, that |
| 8 | | would only be $11,625 per year.  Still not worth it for that amount. |
| 9 | Owoc: | I'm not offering you $1,550 per year.  I'm not offering you $11,625 per year.  What |
| 10 | | I am offering you is a percentage of my future BANG sales, a running royalty, a |
| 11 | | continuing royalty, a payment each year and every year.  The amount of the |
| 12 | | payment would be tied to the amount of my BANG sales.  I expect to sell millions |
| 13 | | of dollars of product.  The BANG name is very catchy and I plan to make terrific |
| 14 | | products which young consumers will buy in droves.  I expect your running royalty |
| 15 | | will be worth way more than those amounts in future years and in each year. |
| 16 | Fox: | Maybe so, Jack, but it's just not worth it to me. |
| 17 | Owoc: | I would be willing to go as high as 2.5%, but no more than that. |
| 18 | Fox: | Still not worth it to me at 2.5%.  Based on your current sales, that would only get me |
| 19 | | a royalty of $3,875.  I'm not going to give up the goodwill of my business I have |
| 20 | | sweated and toiled to earn for that small amount. |
| 21 | Owoc: | Well I can't go any higher than 2.5%, that's my final and best offer.  If I went any |
| 22 | | higher than that and I hit it big, and I do plan to hit it big, then I would have to be |
| 23 | | paying you way too much. |
| 24 | Fox: | If we made a deal and you had to pay me "way too much", you would be the |
| 25 | | happiest person in the world. |
| 26 | Owoc: | What do you mean by that? |
| 27 | | |

[31] Voth concedes that VPX's sales of Bang Pre-Workout in 2010 were approximately $155,000.
*See* Exhibit 5418 (Voth Schedule 3.1); *see also* Voth Testimony, AHT, p. 3932:3-6.

| | | |
|---|---|---|
| 1 | Fox: | I mean, if you are paying me a big number as a continuing royalty, that would mean, |
| 2 | | by definition, that you are raking in the bucks, that you would be making a killing |
| 3 | | off of your products and my name. So what would you care if you paid me a lot of |
| 4 | | money for the use of my name in the future, it would only cost you a lot of money if |
| 5 | | you yourself were making a ton of money. So, like I said, if you are paying me big |
| 6 | | money, that means that you would be making even bigger money, and you would be |
| 7 | | the happiest person in the world. So I'm not willing to do it unless it's a fair royalty |
| 8 | | rate for the use of my name which you plan to use in a comprehensive fashion which |
| 9 | | will probably have the result of wiping my own company name off the face of the |
| 10 | | earth. |
| 11 | Owoc: | I understand your point that I'm only going to be paying you big money if I'm |
| 12 | | making even bigger money, but no way 7.5% is going to happen. That's too good |
| 13 | | of a deal for you. The most I will pay for a running royalty, tied to net sales, is 3%, |
| 14 | | not a penny more. |
| 15 | Fox: | Jack, if a fair deal happens, that's fine. If it doesn't happen, that's fine too. You |
| 16 | | want to use my trademark. You want to use my BANG name in a very unlimited |
| 17 | | fashion, forever, in perpetuity, with no time limit, with no limits as to class or |
| 18 | | category, in the same locations as me, both in the USA and internationally, and your |
| 19 | | use could wipe me off the map. My bottom line is 5%. |
| 20 | Owoc: | Still too high. But I will tell you what, if you will agree to go down to 4%, I will go |
| 21 | | up to 4%. Do we have a deal? |
| 22 | Fox: | Yes, I'm willing to close at a 4% running royalty, tied to net sales. But I need a |
| 23 | | minimum guarantee, a meaningful minimum guarantee. |
| 24 | Owoc: | No way, I'm not guaranteeing you nothing. And, since you brought it up, I want a |
| 25 | | cap on the amount I have to pay you. |
| 26 | Fox: | No, no cap. If you aren't going to go with a minimum guarantee, there shouldn't be |
| 27 | | any cap either. Whatever the 4% of net sales turns out to be, whether high or low, |
| 28 | | that's the number. So, do we have a deal at 4% of net sales, no minimum guarantee |

1    and no cap?

2   Owoc:    Yes, deal, done.

3   Fox:    Done.

4       **(11)  The Hypothetical Negotiation Between Fox and Owoc in 2009 - 2010, with**

5              **the Book of Wisdom**

6       However, with the Book of Wisdom, the hypothetical negotiation would be different.

7  Because of the spectacular success of BANG Energy RTD and huge amount of sunk costs and

8  marketing dollars already invested by VPX to build the brand BANG, VPX cannot go backwards.

9  It cannot abandon the undeniable success of the BANG mark.  VPX would have no choice but to

10  close the deal with Orange Bang.  This gives Orange Bang enhanced leverage.

11       Accordingly, the arbitrator envisions the hypothetical negotiation between Fox of Orange

12  Bang and Owoc of VPX, with the benefit of the Book of Wisdom, would have taken place (or

13  would take place) in the following manner:

14  Owoc:    I got your lawsuit.  I think your lawsuit is full of it, but we should work this out.

15  Fox:    I'm willing to work this out, but I've been using the BANG mark since the early

16          1970s and I've owned the trademark since the early 1980s.  The BANG mark is vital

17          to the success of my business.

18  Owoc:    My target-customers are very different from yours.  I sell to athletes and workout

19          enthusiasts.  I sell out of nutritional and supplement stores like the Vitamin Shoppe

20          and GNC.  I don't sell out of restaurants and I don't currently sell out of

21          convenience stores or gas stations, like you do.

22  Fox:    Are you willing to limit your use of my BANG mark to just the nutritional and

23          dietary supplement category?

24  Owoc:    At first, I thought I was willing to limit my use to that narrow category.  I thought I

25          was willing to work out a deal with you where I stay in my lane and you stay in your

26          lane, and work out a free deal, a deal for no payment, no license fee or no royalty

27          payment, but now that I think about it, I want to go big with the use of the name

28          BANG.  I want very broad use.  I have a vision, and I want to use the BANG mark

1  in a very pervasive way.  I do not want to be limited to nutritional stores or to the
2  dietary and supplements sections of stores.  I want to be able to sell my product
3  anyway I choose, at convenience stores, at gas stations, at supermarkets, anywhere.
4  And I need the right to use the name forever, no limitations on time.  Are you
5  willing to make a deal like that?

6  Fox:  I don't know.  You are asking for a lot.  All of my customers know me by the
7  BANG mark and I think it will be confusing if there are two companies out called
8  BANG, especially if we are both going to sell at the same place like convenience
9  stores and gas stations.  I'm open to a deal, but the royalty rate will need to be pretty
10  high.  I would need a 10% royalty, 10% of your BANG mark sales.

11  Owoc:  No way.  10% is way too high.  Besides, my products are going to be very different
12  from yours even if they are both sold in convenience stores.  Your product has lots
13  of sugar.  I'm planning on products with no sugar at all.  The most I'm willing to
14  pay as a royalty is 1%.

15  Fox:  It's not worth it to me to give up my company name and identity for a 1% royalty.
16  And what would 1% even pay me?  What are your BANG sales as of now?

17  Owoc:  Our BANG sales as of now are about $155,000 per year.[32]

18  Fox:  So you are offering me $1,550 per year for the use of my corporate name?  I cannot
19  make a deal like that.  Like I said, I'm only going to give up the exclusive use of my
20  corporate name for a meaningful royalty.  Even a 7.5% royalty is not worth it, that
21  would only be $11,625 per year.  Still not worth it for that amount.

22  Owoc:  I'm not offering you $1,550 per year.  I'm not offering you $11,625 per year.  What
23  I am offering you is a percentage of my future BANG sales, a running royalty, a
24  continuing royalty, a payment each year and every year.  The amount of the
25  payment would be tied to the amount of my BANG sales.  I expect to sell millions
26  of dollars of product.  The BANG name is very catchy and I plan to make terrific

27  ───────────────

28  [32] Voth concedes that VPX's sales of Bang Pre-Workout in 2010 were approximately $155,000.
*See* Exhibit 5418 (Voth Schedule 3.1); *see also* Voth Testimony, AHT, p. 3932:3-6.

| | | |
|---|---|---|
| 1 | | products which young consumers will buy in droves. I expect your running royalty |
| 2 | | will be worth way more than those amounts in future years and in each year. |
| 3 | Fox: | Maybe so, Jack, but it's just not worth it to me. |
| 4 | Owoc: | I would be willing to go as high as 2.5%, but no more than that. |
| 5 | Fox: | Still not worth it to me at 2.5%. Based on your current sales, that would only get me |
| 6 | | a royalty of $3,875. I'm not going to give up the goodwill of my business I have |
| 7 | | sweated and toiled to earn for that small amount. |
| 8 | Owoc: | Well I can't go any higher than 2.5%, that's my final and best offer. If I went any |
| 9 | | higher than that and I hit it big, and I do plan to hit it big, then I would have to be |
| 10 | | paying you way too much. |
| 11 | Fox: | If we made a deal and you had to pay me "way too much", you would be the |
| 12 | | happiest person in the world. |
| 13 | Owoc: | What do you mean by that? |
| 14 | Fox: | I mean, if you are paying me a big number as a continuing royalty, that would mean, |
| 15 | | by definition, that you are raking in the bucks, that you would be making a killing |
| 16 | | off of your products and my name. So what would you care if you paid me a lot of |
| 17 | | money for the use of my name in the future, it would only cost you a lot of money if |
| 18 | | you yourself were making a ton of money. So, like I said, if you are paying me big |
| 19 | | money, that means that you would be making even bigger money, and you would be |
| 20 | | the happiest person in the world. So I'm not willing to do it unless it's a fair royalty |
| 21 | | rate for the use of my name which you plan to use in a comprehensive fashion which |
| 22 | | will probably have the result of wiping my own company name off the face of the |
| 23 | | earth. |
| 24 | Owoc: | I understand your point that I'm only going to be paying you big money if I'm |
| 25 | | making even bigger money, but no way 7.5% is going to happen. That's too good |
| 26 | | of a deal for you. The most I will pay for a running royalty, tied to net sales, is 3%, |
| 27 | | not a penny more. |
| 28 | Fox: | Forgive me for being a Monday morning quarterback, but your sales of BANG |

Energy RTD have been off the charts. You have made billions of dollars of sales and you will make billions of dollars more in the future. You have spent enormous sums of money building your brand based on the BANG mark. In fact, your company is now re-branded as Bang Energy. Your website address and all of your social media accounts make use of the BANG mark. Even your customers are called "Bangsters". You are in too deep. You have to close this deal. If you don't, and you are forced to re-brand, it will literally cost you hundreds of millions of dollars. And why bother? You are on a huge roll. You are doing fantastic. Your company is killing it. Your sales are through the roof and your marketing strategy, based on the BANG mark, is brilliant. You are only paying me a percentage of net sales and, again, if that turns out to be a very large number for me that means that it is an astronomical number for you. You should want to turn this into a win-win for both of us. You need this deal. I need you to pay me a running royalty of 7.5%, but to make the deal happen, I will lower my number to 7%, but that's it.

Owoc: You are over-playing your hand. I am not afraid to rebrand. Yes, it will cost me some meaningful money to do so, but less than I will have to pay you. The most I will pay is a running royalty of 5% of net sales. Nothing more than that.

Fox: Jack, you have a great thing going. Your company, Bang Energy, is on fire. You are rich beyond your wildest dreams. But the bottom line is you need the BANG mark. I don't think you can walk away from this deal.

Owoc: Sorry, 5% is my final and best offer. I'm at the end of my line.

Fox: Jack, if a fair deal happens, that's fine. If it doesn't happen, that's fine too. You want to use my trademark. You want to use my BANG name in a very unlimited fashion, forever, in perpetuity, with no time limit, with no limits as to class or category, in the same locations as me, both in the USA and internationally, and your use could wipe me off the map. You have used the BANG mark in a pervasive way and you have turned your efforts into a huge sum of money. You have hit a grand slam with your products, your marketing and my name. I think we both know you

| | |
|---|---|
| 1 | | need my name. My bottom line is 7%. That is the end of the line for me. |
| 2 | Owoc: | Still too high. But I will tell you what, if you will agree to go down to 6%, I will go |
| 3 | | up to 6%. Do we have a deal? |
| 4 | Fox: | Yes, I'm willing to close at a 6% running royalty, tied to net sales. But I need a |
| 5 | | minimum guarantee, a meaningful minimum guarantee. |
| 6 | Owoc: | No way, I'm not guaranteeing you nothing. And, since you brought it up, I want a |
| 7 | | cap on the amount I have to pay you. |
| 8 | Fox: | No, no cap. If you aren't going to go with a minimum guarantee, there shouldn't be |
| 9 | | any cap either. Whatever the 6% of net sales turns out to be, whether high or low, |
| 10 | | that's the number. So, do we have a deal at 6% of net sales, no minimum guarantee |
| 11 | | and no cap? |
| 12 | Owoc: | Yes, deal, done. |
| 13 | Fox: | Done. |

**(12) Factor 15 – the Final Conclusion on the Royalty Rate Based on the Hypothetical Negotiation**

In this respect, the reasonable royalty rate for the running royalty resulting from the hypothetical negotiation without the benefit of the Book of Wisdom is 4%, with no minimum guarantee and no cap. At the same time, the reasonable royalty rate for the running royalty resulting from the hypothetical negotiation with the benefit of the Book of Wisdom is 6%, with no minimum guarantee and no cap. Accordingly, based on the applicable Georgia-Pacific factors, the comparable deals in the beverage industry, the corroborating source of Battersby and Grimes and the two hypothetical negotiation scenarios referred to above, the arbitrator hereby finds that the reasonable royalty rate for the running royalty resulting from the hypothetical negotiation is hereby adjudicated to be 5% (the mid-point between the two hypothetical negotiations), with no minimum guarantee and no cap.

Orange Bang / Monster are entitled to receive a reasonable royalty for the pervasive use of the BANG mark by VPX from August 11, 2010 to September 19, 2021 (the date through which Plumpe calculated the royalty base). Orange Bang has been denied the opportunity to receive this

revenue stream, the lost licensing income which should have flowed to Orange Bang from an licensing agreement with VPX based on a reasonable royalty.

With respect to the breach of contract claim, the royalty base, as calculated above, is **$2,030,500,000** ($2,035,000,000 – $4,500,000 for Bang Mixx).      **$2,030,500,000** x the reasonable royalty rate of **5%** = **$101,525,000**.  Thus, the measure of damages for the breach of contract claim based on the reasonable royalty methodology is **$101,525,000**.

With respect to the trademark infringement claim, the royalty base, as calculated above, is **$2,246,289,815** (which likewise already includes a deduction of $4,500,000 for Bang Mixx). **$2,246,289,815** x the reasonable royalty rate of **5%** = **$112,314,490.75**.  Thus, the measure of damages for the trademark infringement claim based on the reasonable royalty methodology is **$112,314,490.75**.

**K. Disgorgement of Profits and Apportionment**

Disgorgement of profits is an appropriate remedy for both a breach of contract claim under California law and for a trademark infringement claim under federal law.  Under California law, disgorgement of profits is recoverable to recompense a plaintiff for a defendant's unjust enrichment.  Where a defendant obtained a benefit that it might not have otherwise obtained, or the plaintiff did not get the benefit of its bargain, a plaintiff is entitled to a disgorgement of profits as damages for unjust enrichment As the court stated in *Artifex*:  ". . . to the extent Plaintiff seeks unjust enrichment or disgorgement as a measure of damages, this too is proper under California law." *Id*. at *3 - *4.

In *Foster Poultry Farms, Inc. v. SunTrust Bank*, 377 F. App'x 665,669 (9th Cir. 2010), the Ninth Circuit likewise articulated the rule that under California law, disgorgement of improperly obtained profits is an appropriate remedy for breach of a contract.  In *Foster Poultry,* the court ruled that a constructive trust on profits from a book was an appropriate remedy for breach of a contract where the plaintiff's harm from the breach was unquantifiable, but defendant's unjust gains were the result of the breach.

In *Young v. Wideawake Death Row Entertainment, Inc.*, 2011 WL 13371881 (C.D. Cal 2011), Andre Young aka Dr. Dre sued Death Row for various federal and state law claims.

Judge Snyder dismissed most of the federal claims, but the breach of contract claim under California law moved forward.  Dr. Dre contended that he had bargained for the right to control the distribution of certain songs in the written contract and that Death Row had violated that right and generated revenues and profits by doing so.  Dr. Dre contended that he was entitled to a constructive trust over the revenues and disgorgement of the profits as a monetary remedy for Death Row's breach of the contract.  Death Row argued that Dr. Dre was not entitled to disgorgement of profits for several reasons, especially since the contract limited his recovery to only an action at law for actual damages which arguably precluded an equitable remedy like disgorgement of profits.  Death Row filed a motion in limine to preclude the recovery of a disgorgement of profits as a remedy.  In *denying* the motion in limine, Judge Snyder relied on California Civil Code 3300, which protects the benefit of the bargain, the differential between what Dr. Dre received and what he should have received or expected to receive, as well as the reasoning of *Foster Poultry* and *Ajaxo*, in ruling that disgorgement of profits is indeed an appropriate remedy in Dr. Dre's breach of contract case under California law.

Even Voth agrees that disgorgement of profits (with apportionment) is an appropriate remedy for a breach of contract claim.  Voth Testimony, AHT, p. 3880:8–23.

With respect to a trademark infringement claim, there can be no question that disgorgement of profits is an appropriate monetary remedy given that the clear language of the statute, Section 1117(a)(1), as quoted above, specifically enumerates "defendant's profits" as an element of monetary recovery.  Many Ninth Circuit cases have held that a plaintiff may recover a disgorgement of profits in a trademark infringement case.  *See Jerry's Famous Deli, Inc. v. Papanicolaou*, 383 F.3d 998, 1004-1005 (9th Cir 1994).  In *Playboy Enterprises, Inc. v. Baccarat Clothing, Inc.*, 692 F.2d 1272, 1274 (9th Cir. 1982), the Ninth Circuit held that a disgorgement of profits is an appropriate remedy in a trademark infringement action (in that case, a counterfeit action) in order to prevent unjust enrichment of the infringing party.  In addition, the Ninth Circuit reasoned that the policy considerations underlying this rule are intended to make sure that

violations of the Lanham Act remain unprofitable to the infringer and to implement deterrence so as to disincentivize future infringers . *See also Maier Brewing Co. v. Fleischmann Distilling Corp.*, 390 F.2d 117 (9th Cir. 1968), discussed in more detail below.

In addition, as stated above, the United States Supreme Court recently held in *Romag* that a showing of willfulness is no longer required in order to recover a disgorgement of profits in a trademark infringement case and the Court also held that a defendant's mental state is a highly important consideration in determining whether or not to award a disgorgement of profits. *Romag* , 140 S.Ct. at 1497. In a pre-*Romag* ruling, an "aura of indifference to plaintiff's rights" has been held to meet the standard for the requisite mental state sufficient to award a disgorgement of profits remedy. *Philip Morris USA Inc. v. Liu*, 489 F.Supp.2d 1119, 1123 (C.D. Cal 2007). Here, VPX demonstrated at the least an "aura of indifference" by virtue of the undisputed fact that J. Owoc never bothered to tell his own marketing employees (even his wife M. Owoc), his own science employees (Li), his distributors or his retailers about the existence or the importance of the VPX Marketing and Sales Restrictions.

Even VPX has conceded in its post arbitration closing briefs that disgorgement of profits is an appropriate remedy in a trademark infringement case to recompense a plaintiff for unjust enrichment. *See* VPX's closing brief submitted on November 19, 2021, p. 44 and VPX's answer to the arbitrator's post-hearing question no. 3 where VPX acknowledged that disgorgement is appropriate in instances of unjust enrichment citing *Maier*, at 123 – 124 and *Stone Creek, Inc. v Omnia Italian Design, Inc.*, 808 Fed.App'x 459, 460-461 (9th Cir. 2020) [in a pre-*Romag* ruling, the Ninth Circuit affirmed the district court's exercise of discretion not to award profits because profits were not attributable to the infringement and to render such an award would constitute a windfall]. In addition, Voth himself agrees that disgorgement is an appropriate remedy for a trademark infringement claim. *See* Voth Testimony, AHP, p. 3880:11-15.

According to Voth's expert presentation, the disgorgement of profits determination requires a calculation of gross receipts as the starting point, followed by a calculation of deductible expenses which must be subtracted from the gross receipts in order to determine the amount of the remaining profits potentially subject to disgorgement. As Voth explained in response to questions

from the arbitrator, this calculation can be determined by examining net sales, costs of goods sold, other operating expenses and the resulting incremental profit margin and convert those calculations to a percentage basis. According to Voth, Plumpe did not conduct the disgorgement of profits calculation in the correct manner. Plumpe determined the amount of gross receipts from the sale of products which made use of the BANG mark, both including and excluding the Nutritional Channel (the paragraph 7 D channel), and then subtracted out *only* the cost of goods sold ("COGS"). But Plumpe stopped there. He did not deduct out any other expenses. According to Plumpe, the amount of profits subject to disgorgement is simply gross receipts – COGS. According to Voth, however, this calculation is incorrect because Plumpe failed to deduct all sorts of additional expenses, such as the $117.3 million of marketing expenses spent by VPX.

According to Voth, when the calculation is done correctly, and the computation starts with gross receipts from the sale of products which make use of the BANG mark, and then subtract COGS, and then subtracts various other expenses as well, the result, according to Voth's calculation, **is a 21% profit margin**. *See* Exhibit 5382, paragraphs 70-72, Schedule 2.1; DDX 1036-6. As mentioned above, Voth calculated VPX BANG mark related sales, including sales within the Nutritional Channel, at $2.26 billion. This number is reduced to $2,255,500,000 once the Bang Mixx sales are also subtracted out of the calculation. $2,255,500,000 x .21 (for 21%) is approximately **$ 473.5 million in profits potentially subject to disgorgement**, according to Voth. Voth also calculated VPX BANG mark related sales, excluding sales within the Nutritional Channel, at $2.03 billion. This number is likewise reduced to $2,025,500,000 once the Bang Mixx sales are also subtracted out of the calculation. $2,025,500,000 x .21 (for 21%) is approximately **$425 million in profits potentially subject to disgorgement**, according to Voth. *See* Voth Testimony, AHT, p. 3879:9-25.

However, Voth's analysis of the disgorgement of profits calculation does not stop there. According to Voth, once he determines the amount of profits potentially subject to disgorgement, it is then necessary to conduct an apportionment analysis because only the profits attributable to the use of the BANG mark are subject to disgorgement while profits attributable to "other factors" are not subject to disgorgement. Based on Ninth Circuit precedent, as discussed below, Voth is

117

FINAL ARBITRATION AWARD – PHASE 1 AND PHASE 2

1   correct. An apportionment analysis is indeed required in this case. However, the arbitrator

2   disagrees with Voth's apportionment analysis and, at the same time, the arbitrator disagrees with

3   Monster's and Orange Bang's argument that (i) *all* of the profits from BANG mark products, such

4   as BANG Energy RTD, are attributable to the use of the BANG mark; and (ii) VPX has failed to

5   prove that some of the sales at issue are "demonstrably" not attributable to the use of the BANG

6   mark and, therefore, no apportionment of profits is appropriate at all.

7          In short, the arbitrator disagrees with both VPX, on the one hand, and with Monster and

8   Orange Bang, on the other, on how to appropriately calculate the disgorgement of profits remedy in

9   this case. Monster's and Orange Bang's view on apportionment and Voth's suggested approach on

10  how to conduct the apportionment analysis are discussed in further detail below.

11         However, before reaching the apportionment analysis, and assuming that Voth's 21% gross

12  profit calculation is correct, as Monster and Orange Bang concede it is correct on p. 30 of their

13  closing reply brief submitted on November 19, 2021, it is first necessary to determine whether or

14  not the $473.5 million profit calculation as computed by Voth (total profits from BANG mark

15  sales, including profits from within the Nutritional Channel, potentially subject to disgorgement)

16  and the $425 million profit calculation as computed by Voth (total profits from BANG mark sales,

17  excluding the profits from the Nutritional Channel, potentially subject to disgorgement) needs to

18  include any "add-backs" to account for an over-deduction of expenses by Voth. On cross-

19  examination, Voth conceded that he deducted expenses associated with VPX products which are

20  *not* at issue in this case (i.e., products which did not make use of the BANG mark). *See* Voth

21  Testimony, AHT, p. 3871:12–18; p. 3872:15 – 3873:2. In addition, on cross-examination, Voth

22  conceded that he deducted depreciation and amortization of certain assets, such as private jets and

23  cars, which were also used by VPX executives for personal purposes (disguised compensation or

24  disguised benefits so to speak). *See* Voth Testimony, AHT, p. 3877:10 – 3878:16. Based on this

25  testimony, the arbitrator concludes that Voth over-calculated expenses, to some extent, but,

26  nevertheless, the amount of profits calculated by Voth which are subject to disgorgement needs to

27  be increased somewhat to account for these excess expenses, which should not have been included

28

in the calculation in the first place. These "add-backs" will then help establish the correct amount of profits potentially subject to disgorgement, prior to apportionment.

Under the Lanham Act and specifically under Section 1117(a), the arbitrator is vested with the discretion to increase the profit award based on equitable considerations. *Fifty-Six Hope Road Music, Ltd. V. A.V.E.L.A., Inc.*, 778 F.3d 1059, 1077 (9th Cir. 2015). **Therefore, based on Voth's testimony and on equitable considerations, the arbitrator concludes that expenses were over-calculated by Voth by approximately 5% to 7.5% and that the amount of the "add-backs", i.e., the under-calculation of the amount of the profits subject to disgorgement, prior to apportionment, increases the total profits subject to disgorgement from $473.5 million to $500 million for the calculation including the Nutritional Channel and from $425 million to $450 million for the calculation excluding the Nutritional Channel. Again, this is the amount of profit, adjusted, subject to disgorgement,** *before* **a proper apportionment analysis (as discussed below).**

Before addressing the all-important issue of apportionment, it is necessary to discuss controlling law because Monster and Orange Bang, on the one hand, and VPX, on the other, have a very different view of the law on the issue of disgorgement of profits and on the issue of apportionment.

In 1968, the Ninth Circuit had to determine if a disgorgement of profits remedy was only available to a plaintiff where there had been a diversion of sales away from the plaintiff for the benefit of the defendant, a defendant who was a direct competitor (or how else could there be a diversion of sales?). In *Maier Brewing Company v. Fleischmann Distilling Corp.*, 390 F.2d 117 (9th Cir. 1968), the Ninth Circuit ruled that there were two different theories by which a plaintiff is entitled to recover a disgorgement of profits. The first theory is where there is a diversion of sales away from the plaintiff to the benefit of the defendant and, in that instance, the plaintiff and defendant do need to be direct competitors. According to the second theory, however, there is no requirement for a diversion of sales, rather unjust enrichment is a sufficient justification in-and- of-itself and, in that instance, the plaintiff and the defendant do not need to be direct competitors. Both of these theories advance the policy considerations underlying the Lanham Act as reflected by

1    its legislative history.  In particular, the Ninth Circuit specifically held that (i) the recovery of a

2    disgorgement of profits in a case of unjust enrichment properly serves the policies of the Lanham

3    Act; and (ii) in a case based on unjust enrichment there is no requirement of direct competition

4    between the plaintiff and the defendant.  *Id*. at 121 – 123.

5           VPX argues that a disgorgement of profits is recoverable only if Orange Bang and VPX are

6    direct competitors.  First, that is not the law according to Section 1117(a), nor is that the law

7    according to *Maier* as described above.  Second, the rule that a plaintiff and defendant must be

8    direct competitors in order to warrant disgorgement of profits applies only when the theory of

9    disgorgement is based on a theory that VPX diverted sales away from Orange Bang, and not on a

10   theory of unjust enrichment, which is not the case here.  *Maier* at 121 - 123*; Spin Master, Ltd.*

11   *Zobmondo Ent., LLC,* 944 F. Supp. 2d 830, 839 (C.D. Cal. 2012), *abrogated on other grounds by*

12   *Romag at 1497.*  Third, even if that was the law, and it is not, as set forth above, Orange Bang and

13   VPX are indeed direct competitors in the sense that they both sell related goods, a fruit juice drink

14   and an energy drink are related goods as *Pom Wonderful* so holds, 775 F.3d at 1127, and they both

15   sell them in over-lapping trade channels, in convenience stores and gas stations where Orange

16   Bang sells one-third of its product and VPX sells 80% of BANG Energy RTD which is, by far, its

17   biggest seller.

18          Fourth, and most importantly, VPX itself concedes, as it must, that a disgorgement of

19   profits monetary remedy is available in the case of unjust enrichment on page 44 of its closing

20   reply brief submitted on November 19, 2021 where it cites *Maier* for the proposition that a

21   disgorgement of profits award needs to be based on principles of equity and requires the trademark

22   owner to prove direct competition ***or*** unjust enrichment.

23          At the same time, VPX's reliance on *Promex, LLC v. Hernandez,* 781 F.Supp.2d 1013

24   (C.D. Cal. 2011) is misplaced.  In *Promex*, Judge Wright, following a bench trial, ruled that the

25   plaintiff could not recover lost profits for the defendant's breach of contract not to make use of a

26   similar tradename for an anti-itch skin cream.  But *Promex* is a lost profits case, not a disgorgement

27   of profits case based on unjust enrichment.  Judge Wright relied on the rock-solid rule that lost

28   profits need to be proved with reasonable certainty and cannot be based on speculation.  The court

ruled that plaintiff's attempt in that case to prove *its* lost profits by looking to a measure of defendants' profits was too speculative. Because *Promex* is a lost profits case, and not a disgorgement of profits case based on unjust enrichment, it does not help VPX's argument that a disgorgement of profits is inappropriate in the circumstances of Orange Bang's and Monster's case against VPX.

Ninth Circuit law relating to the disgorgement of profits analysis is correctly encapsulated in Model Jury Instruction 15.29 and is summarized as follows:

- A plaintiff is entitled to recover a disgorgement of profits, but only those profits which are attributable to the infringement. *See also Lindy Pen Company, Inc., v. Bic Pen Corporation*, 982 F.2d 1400, 1408 (9th Cir. 1993).

- The formula for an award of profits is gross revenue – all expenses.

- Gross revenue includes all gross receipts from the sale of product which makes use of the infringed mark, in this case the BANG mark.

- The plaintiff's only burden of proof is to prove a defendant's gross revenue (aka gross receipts), and to do so by a preponderance of the evidence.

- It then becomes defendant's burden to prove deductible expenses incurred in producing the product which makes use of the infringed mark, in this case the BANG mark, and to do so by a preponderance of the evidence.

- It is also defendant's burden to prove the portion of profits attributable to "other factors", factors other than the use of the infringed mark, in this case the BANG mark, and to do so by a preponderance of the evidence.

- If the trier of fact is able to determine that some of the profit is attributable to "other factors", rather than attributable to the use of the infringed mark, in this case the BANG mark, then the trier of fact should award the total profit attributable to the infringement.

- If, however, the trier of fact is unable to determine that some of the profit is attributable to "other factors", rather than attributable to the use of the infringed

1    mark, in this case the BANG mark, then the trier of fact should award all of the total
2    profit as attributable to the infringement.

3    In this respect, and with respect to the all-important issue of apportionment, Monster and
4    Orange Bang have correctly cited controlling law that it is VPX's burden to prove that its profits
5    are "demonstrably" not attributable to the use of the BANG mark. *Mishawaka Rubber & Woolen*
6    *Mfg. Co. v. S.S. Kresge Co.*, 316 U.S. 203, 206-207 (1942)[33]; *Nintendo of America, Inc. v. Dragon*
7    *Pac. Int'l*, 40 F.3d 1007, 1012 (9th Cir. 1994). In *Nintendo*, the defendant sold video game
8    cartridges and advertised them as Nintendo products. The video game cartridges contained a
9    copyrighted video game created by Nintendo which made up only one-third of the cartridge, so
10   defendant's expert opined that the disgorgement of profits should be cut to one-third. While
11   pending before the district court, the trier of fact found this apportionment theory flawed and
12   unconvincing because the video game cartridges were advertised as having Nintendo games, not as
13   having one-third of Nintendo games. The Ninth Circuit agreed with this analysis and reaffirmed
14   the rule that when infringing and non-infringing elements of a work cannot be separated out, and if
15   a defendant fails to meet its burden of proof on the apportionment issue, then *all* of the defendant's
16   profits should be deemed to be attributable to the infringement in which case the plaintiff is entitled
17   to a disgorgement of all of the profits.

18   Thus, according to controlling case law, if VPX fails to make the requisite showing and
19   demonstrate that the profits are attributable to "other factors", factors other than the use of the
20   BANG mark, then *all* of the profits at issue are presumed to be attributable to the infringing (or
21   breaching) conduct of the defendant and, as a result, *all* of the profits are subject to disgorgement.

22   At the other end of this extreme is VPX's analysis that essentially *none* of the profits are
23   attributable to the use of the BANG mark. VPX simultaneously argues that according to Voth's
24   expert report and his analysis, once the amount of profits potentially subject to disgorgement is
25   determined, a further calculation is required, an apportionment calculation, because a determination

26

27   [33] The United States Supreme Court recognized this rule may result in a windfall to the plaintiff,
     but the Court observed that it would prefer a windfall over a "windfall to the
28   wrongdoer." *Id.* at 207. As Justice Frankfurter put it: the burden to show that the profits are
     attributable to other factors "is upon the poacher." *Id.* at 206.

122

FINAL ARBITRATION AWARD – PHASE 1 AND PHASE 2

1    must be made as to which profits are attributable to the infringing (or breaching) conduct as

2    opposed to the profits which are attributable to "other factors".  Voth is correct that this additional

3    calculation, the apportionment calculation, is required in a trademark infringement case (and in the

4    claim for the breach of the co-existence agreement, the 2010 Settlement Agreement) because the

5    profits attributable to the infringing conduct, the use of the BANG mark, are recoverable while the

6    profits attributable to "other factors", such as profits attributable solely to a brilliant social

7    marketing campaign or attributable to the effective use of thousands of influencers with billions of

8    "followers" are not.  *Lindy Pen Company, Inc., v. Bic Pen Corporation*, 982 F.2d 1400, 1408 (9th

9    Cir. 1993), *abrogated on other grounds by SunEarth, Inc. Sun Earth Solar Power Co.,* 839 F. 3d

10   1179 (9th Cir. 2016).

11   　　　　In this regard, VPX argues, by way of Voth's expert opinion, that only 1% to 2% of the

12   profits are attributable to the BANG mark, based on an inappropriate reliance on the unpersuasive

13   InfoScout analysis (discussed below), and that this amount should be capped at $2.3 million

14   (discussed above) which is Voth's analysis of what the BANG mark was worth *to Orange Bang* as

15   of 2010.  However, in *Philips North America LLC v. Summit Imaging Inc.,* 2021 WL 2118400

16   (W.D.  Wash.  2021) the court held that Voth's expert opinion was excluded via a motion in limine

17   because Voth's methodology focused upon and analyzed the wrong issue.  Voth's opinion was

18   excluded in *Philips* because his labor apportionment analysis (which comprised of a ratio based on

19   timekeeping records of plaintiff's employees) incorrectly focused on the purported injury *to*

20   *plaintiff*.  Instead, as the court ruled, it should have been focused on measuring the unjust

21   enrichment which inured to the benefit *of the defendant*.  As the court held:

22   　　　　"Taken cumulatively, Mr. Voth's apportionment analysis is unreliable.  Mr. Voth's

23   　　　　apportionment methodology is not sufficiently 'tied to the goal of estimating the profits that

24   　　　　[the defendant] actually earned due to its use of the allegedly infringing [material],' see

25   　　　　*Oracle,* 2016 WL 1743154, at *3, and there are additional concerns regarding his

26   　　　　underlying data.  Accordingly, the court excludes this portion of Mr. Voth's expert

27   　　　　testimony.  *See Est. of Barabin*, 740 F.3d at 463."

28   　　　　*Philips,* 2021 WL 2118400, at *10.

(Emphasis added.)

This is not to say that Voth's expert opinion is excluded in the instant case. None of his expert opinion is excluded and all of his expert opinion is received into evidence. Rather, the point here is that Voth's expert opinion is not persuasive in this case because he focused on the wrong issue, he focused on the purported damage to Orange Bang instead of focusing on the unjust enrichment reaped by VPX (and JHO).

However, the notion that *all* of the profits are attributable to the BANG mark and that no other factor is responsible for VPX's financial success or enormous profits is simply not credible. As explained below, the BANG mark played a huge part in VPX's financial success, but some of the profits are indeed attributable to other factors and it is not that difficult to separate out and apportion profits, although, admittedly, it is somewhat of a qualitative judgment call and cannot be done with quantitative precision.

Voth articulates nine factors which, according to VPX, lead to a conclusion that a very small percentage of the profits are attributable to the use of the BANG mark. These nine factors, however, are not convincing. They are discussed below.

Voth's first factor which argues for a low apportionment is that VPX's product sales which made use of the BANG mark did not explode until the 2018 to 2021 time period.[34] According to Voth, if the rapid acceleration of sales was attributable to the use of the BANG name / the BANG mark, the break-through in sales should have started years earlier, for example in 2008 when VPX first started to use the BANG mark. However, the lion's share of these significant sales took place after a social media blitz based on the BANG mark and after VPX rebranded its company to Bang Energy in the first quarter of 2019. As J. Owoc himself stated in a March 6, 2019 email, "DEFINITION DRIVES DESTINY. Born VPX Rebranded as Bang!" The March 6, 2019 email string refers to an overall rebranding of the company to Bang Energy including a change in the email address to make use of the word "bang", a change in the web sites, a change in the cans themselves, a change in the signage, a change in the business cards ("only Bang") and this email

---

[34] *See* Voth's Schedule 3.1 of his expert report, Exhibit 5382.

1   even makes use of the word "omnipresence" to describe the rebranding of the company. *See*
2   Exhibit 2749.  J. Owoc himself testified that he chose to call himself the "Bang CEO" as his handle
3   on social media (imploring Mr. Hueston, during the arbitration hearing, to get a "handle" on
4   matters).  J. Owoc even testified that although he had many brand names to choose from (e.g.,
5   "Redline"), he chose the name "Bang" and 99.8 percent of his sales are the sale of products which
6   make use of the name "Bang". *See* J. Owoc Testimony, AHT, p. 1402:11 - 1403:22.  Bukovi,
7   VPX's no. 2, and M. Owoc, J. Owoc's wife and the head of VPX's marketing department, both
8   testified similarly.  In explaining VPX's significant sales of Bang branded products, Bukovi
9   testified that VPX has moved into the beverage mainstream. *See* Bukovi Testimony, AHT, p.
10  1987:21 – 1988:2.  M. Owoc testified that VPX changed its name to Bang Energy, that VPX
11  changed its website to bangenergy.com, that VPX changed its Instagram handle to bangenergy, that
12  J. Owoc changed his Instagram handle to bangenergy.ceo and that VPX now refers to its customers
13  as "Bangsters".  M. Owoc Testimony, AHT, p. 3444:4 – 3445:10.  Even Sweeney, the relatively
14  new marketing executive for VPX with his 20+ years of experience in marketing in the energy
15  drink sector, testified that he had not heard of VPX or BANG Energy RTD until the 2017 or 2018
16  time period and he also testified that when he joined VPX in September of 2019, VPX (then known
17  as Bang Energy) was the fastest growing beverage company. *See* Sweeney Testimony, AHT, p.
18  3056:15 – 3058:6.  Therefore, it is just as easy to conclude that the significant sales to which Voth
19  refers are attributable to the BANG mark centric social media campaign and the rebranding of the
20  company from VPX to Bang Energy, all of which were based on the pervasive use of the BANG
21  mark.

22      Voth's second factor which argues for a low apportionment is the fact that VPX spent $117
23  million in marketing and advertising.  This is true.  VPX did spend $117.3 million in marketing and
24  advertising. *See* Exhibit 5382, Schedule 2.1; DDX1036-12; Voth Testimony, AHT, p. 3800:12–23.
25  However, VPX spent this vast amount of advertising promoting the BANG name and the BANG
26  mark.  In *Neurovision Medical Products, Inc v. Nuvasive, Inc.*, 2014 WL 12544830 (C.D. Cal
27  2014), the jury awarded the plaintiff $30 million in disgorged profits.  After the trial, Judge Fischer
28  of the district court for the Central District of California (the same Judge Fischer who issued her

November 30, 2020 ruling in this case) considered the pending Rule 50 motion for judgment as a matter of law filed by the defendant and ruled that the Rule 50 motion was denied and the jury's verdict was affirmed.  As to the issue of apportionment, Judge Fischer reasoned that (i) profits due to the market appeal of plaintiff's trademark symbol, like the market appeal of the BANG mark here, are attributable to the infringement **even if that market value was not created by the plaintiff, citing the United States Supreme Court decision in *Mishawaka Rubber*, at 206**; and (ii) because defendant's president testified that the plaintiff's trademark was the "centerpiece" of defendant's marketing strategy, just like the BANG mark was the centerpiece of VPX's marketing strategy (as discussed in further detail below), a "significant portion" of defendant's profits was due to its use of the plaintiff's mark.  Judge Fischer also emphasized the presumption (the rebuttable presumption) that defendants' profits are the result of the infringing activity.  *Id*. at *10.  Although it is true that VPX created a brilliant and effective advertising and social media campaign which stimulated tremendous sales by young consumers, it cannot be denied that the "centerpiece" of that advertising and social media campaign was the use of the BANG mark.

Voth's third factor which argues for a low apportionment is the fact that VPX built a nationwide distribution network and his fourth factor which argues for a low apportionment is the fact that VPX pioneered the "performance energy" submarket.  Both those facts may be true, but, again, VPX built its nationwide distribution network *based on the BANG mark* and pioneered all of its markets and sub-markets including, but not limited to, the "performance energy" submarket *based on the BANG mark*.  VPX could have built its nationwide distribution network or the "performance energy" submarket based on another tradename, such as Redline, but it did not do that.  Rather, VPX made the business decision that the BANG mark added value, despite the VPX Marketing and Sales Restrictions which it ignored, and therefore VPX must live with the consequences of the business decision it made.

Voth's fifth factor which argues for a low apportionment is the fact that VPX hired thousands of influencers who, in turn, brought billions of followers who became fans of and followers of the brand.  But what is the brand that they (they being the billions of followers) followed (and currently follow)?  They followed (and continue to follow) the Bang Energy brand.

The followed (and purchased in droves) the BANG Energy RTD (and they continue to follow it). They went to (and go to) the website which has the word "bang" in the domain name. They follow (and continue to follow) social media accounts which make use of the word "bang" and which promote the BANG mark. They, the "Bangsters", even followed (and continue to follow) their "bang" CEO, J. Owoc. This factor, like all of the other factors mentioned above, does not cut in favor of VPX's argument for a low apportionment. Rather, this factor alone screams out for a meaningful apportionment.

Voth's sixth factor which argues for a low apportionment is the fact that, according to VPX, there is no evidence of any confusion and his seventh factor which argues for a low apportionment is the fact that VPX's sales and Orange Bang's sales do not impact each other and that there is no "customer substitution" or, to put it another way, there is no diversion of sales away from Orange Bang and to the benefit of VPX. Whether or not there is any confusion, whether it be actual confusion or a likelihood of confusion, that issue is addressed above and that issue goes to liability more so than to damages and apportionment. As to whether or not there is customer substitution, that issue pertains to Voth's damages methodology no. 1, measuring the diversion of sales away from Orange Bang to VPX. The arbitrator agrees with Voth, as stated above, that there has been no diversion of sales and no customer substitution. But this is not a diversion of sales case. This is a disgorgement of profits attributable to the trademark infringement and the breach of the 2010 Settlement Agreement based on unjust enrichment and the customer substitution / diversion of sales analysis is irrelevant to the issue of apportionment when attempting to calculate an appropriate disgorgement amount to recompense for VPX's unjust enrichment.

Voth's eighth factor which argues for a low apportionment is the fact that the InfoScout analysis showed only a 1% to 2% apportionment, according to Voth and VPX. However, as stated above in the Georgia-Pacific analysis of the thirteenth factor, the InfoScout research report is a thoroughly unconvincing document because it surveyed the wrong relevant market, mostly women when most of the purchasers of the BANG Energy RTD are men and surveyed the wrong market venues, at supermarkets while most of the purchases of the BANG Energy RTD [80% of them] take place at convenience stores.

1   Voth's ninth factor which argues for a low apportionment is the fact that Voth calculated

2   that Orange Bang's BANG mark only had a value of $2.3 million, according to Voth, as of 2010

3   and, therefore, this should be a cap on the amount of profits attributable to the infringement.  But

4   this analysis suffers from the same flaw as *Philips*.  By way of this factor, Voth is measuring, or is

5   attempting to measure, the damages from the point of view of Orange Bang.  But that is an

6   incorrect analysis according to the case law as discussed above.  Rather, Voth should be focusing

7   on the unjust enrichment amount reaped by VPX as the court so held in *Philips*.  VPX's reliance on

8   *Trovan, Ltd. v. Pfizer, Inc.*, 2000 WL 709149 (C.D. Cal. 2000) is misplaced.  VPX cites *Trovan* in

9   support of Voth's argument that a cap of $2.3 million should be imposed on Orange Bang's

10  damages in order to prevent a windfall.  In *Trovan*, the court quoted *McCarthy* 30:84 in which the

11  noted trademark scholar made a comment about an inappropriate windfall awarded to help

12  resuscitate an infringed mark and restore the company's business reputation.  However, the quote

13  from *McCarthy* was in a corrective advertising context and *Trovan* was a case where the court was

14  attempting to determine an appropriate award of compensatory damages.  *Trovan* is not a case

15  about disgorgement of profits based on unjust enrichment.  Thus, Voth's failure to focus on the

16  correct inquiry in this ninth factor does not convincingly justify a low apportionment.

17  But perhaps most telling testimony as to the issue of apportionment came from Bukovi

18  himself who candidly admitted that the BANG mark is "highly valuable", that "Bang features

19  prominently on VPX's Bang products" and that it would be harmful to VPX if VPX could "no

20  longer put the word 'Bang' on drinks."  *See* Bukovi Testimony, AHT, p. 2036:4-14.

21  The bottom line on apportionment is that VPX made pervasive, prominent and omnipotent

22  use of the BANG mark in order to generate astronomical revenues and profits and VPX did so

23  without having the legal right to make use of the BANG mark because its products, in particular

24  BANG Energy RTD, were not, and are not, "creatine-based" and therefore the VPX Marketing and

25  Sales Restrictions of paragraph 7 D applied, and still apply, and VPX failed to adhere to them,

26  failed to appreciate the significance of them and even failed to communicate the existence of them

27  to their own marketing department, to their own sales department, to their own science department,

28  to their own employees, to their distributors and to their retailers.  This pervasive use of the BANG

1  mark does not justify a low apportionment. Rather, it warrants a meaningful apportionment
2  percentage.

3       Are Monster and Orange Bang entitled to recover 100% of VPX's profits based on the
4  theory that all of those profits are attributable to the use of the BANG mark? No, of course not. Is
5  VPX correct that only 1% to 2% of VPX's profits, capped at $2.3 million, are attributable to VPX's
6  use of the BANG mark? Certainly not. **Based on the evidence presented at the arbitration**
7  **hearing, much of which is in actuality undisputed, the arbitrator concludes that VPX made**
8  **pervasive use of the BANG mark in order to stimulate impressive revenues and profits from**
9  **the sale of BANG branded products, most notably BANG Energy RTD, and because of this**
10 **nearly omnipotent use of the BANG mark, which has unjustly enriched VPX, an appropriate**
11 **apportionment of profits to be disgorged from VPX/JHO to Monster and Orange Bang is**
12 **35%.**

13      Based on an apportionment of 35%, the calculation of Monster's and Orange Bang's
14 disgorgement of profits remedy is as follows:

15      •  for breach of contract (based on a calculation of apportioned profits subject to
16        disgorgement which excludes net sales which adhered to the VPX Marketing and
17        Sales Restrictions, i.e., excluding sales made within the Nutritional Channel), the
18        amount of **$157.5 million (35% of the breach of contract royalty base calculated**
19        **above)**.

20      •  for trademark infringement (based on a calculation of apportioned profits subject to
21        disgorgement which includes net sales whether they complied with the VPX
22        Marketing and Sales Restrictions or not, i.e., including net sales within the
23        Nutritional Channel), the amount of **$175 million (35% of the trademark**
24        **infringement royalty base calculated above)**.

25

26

27

28

**L. Are Orange Bang and Monster Entitled to Recover Both a Reasonable Royalty and a Disgorgement of Profits Attributable to the Infringement?**

No.

Recovery of both plaintiff's lost profits (of which there are none in this case, other than Orange Bang's lost royalty income, as discussed above) plus disgorgement of defendant's profits is considered to be an inappropriate double recovery under the Lanham Act. *Nintendo,* 40 F.3d at 1010. Here, however, the issue is somewhat different. The issue is not whether Monster and Orange Bang can recover both Orange Bang's lost profits and a disgorgement of VPX's profits attributable to the infringement. Rather, the issue in this case is whether or not Monster and Orange Bang can recover both a reasonable royalty and a disgorgement of VPX's profits attributable to the infringement and whether an award of both monetary remedies would constitute double recovery given the policy objectives of the Lanham Act to institutionalize deterrence, but avoid the imposition of a penalty.

**However, since Monster and Orange Bang both agree that they do not seek both a reasonable royalty and a disgorgement of profits attributable to the infringement, but instead seek only one monetary award for the past breach of contract or the past infringement of trademark in whatever is the higher amount, there is no need for the arbitrator to address and decide the issue identified above. Rather, the arbitrator has calculated the award for (1) a reasonable royalty for breach of contract, which excludes sales which adhered to the VPX Marketing and Sales Restrictions, i.e., sales within the Nutritional Channel are excluded, in the amount of $101,525,000; (2) a reasonable royalty for trademark infringement, which includes sales whether they complied with the VPX Marketing and Sales Restrictions or not, i.e., whether or not the sales were within or outside of the Nutritional Channel, in the amount of $112,314,490.75; (3) a disgorgement of apportioned profits for breach of contract, which excludes sales which adhered to the VPX Marketing and Sales Restrictions, i.e., sales within the Nutritional Channel are excluded, in the amount of $157.5 million; or (4) a disgorgement of apportioned profits for trademark infringement, which includes all domestic sales whether they complied with the VPX Marketing and Sales Restrictions or not, i.e., whether or not the**

sales were within or outside of the Nutritional Channel, in the amount of $175 million. The arbitrator agrees that Monster and Orange Bang can only recover one of these amounts in order to remedy the past violations, but in the highest amount of the four calculations, which in this case is the amount of $175 million, due and payable by VPX (and by JHO to the extent applicable, see footnote 36 *infra)* to Orange Bang and Monster no later than April 29, 2022.

These findings are summarized in section IV below.[35]

### M. Damages for the Past and Injunctive Relief, with Geographic Limitations, for the Future or, in the Alternative, an Ongoing Reasonable Royalty of 5% of Future Net Sales

Monster seeks specific performance of paragraph 7 of the 2010 Settlement Agreement in connection with its breach of contract claim and Orange Bang and Monster both seek a permanent injunction to prevent future acts of trademark infringement in connection with Orange Bang's trademark infringement claim and in connection with Monster's breach of contract / specific performance claim. The practical effect of both of these two equitable remedies, injunctive relief to prevent the risk of future harm for trademark infringement and specific performance and injunctive relief to prevent the risk of future harm for breach of the 2010 Settlement Agreement moving forward, are identical and both turn, in this instance, on the crucial element of whether or not Orange Bang and Monster each have an inadequate remedy at law, a crucial element which is common to both the claims for the equitable remedy of injunctive relief and for the equitable remedy of specific performance. Accordingly, the arbitrator will focus on both the equitable remedy of injunctive relief which addresses the risk of potential future harm resulting from trademark infringement as well as the equitable remedies of specific performance and injunctive relief which address the risk of potential harm resulting from a breach of contract in the future.

---

[35] The effect of the elections by the parties on the recovery of attorney's fees is discussed below. See findings, determinations and conclusions relating to Phase 2 issues as discussed in Section III, Q. below.

1    Section 1116(a) of the Lanham Act vests the arbitrator with the discretion to issue a

2    permanent injunction based on equitable principles.  In addition, the revised Section 1116(a)

3    codifies the rule that a plaintiff seeking an injunction is entitled to a rebuttable presumption of

4    irreparable injury upon a finding of trademark infringement, a finding which has now been made in

5    this case as set forth above.  Under the Lanham Act, Orange Bang is entitled to injunctive relief if it

6    has established that "(1) it has suffered irreparable injury; (2) its remedies available at law, such as

7    monetary damages, are inadequate; (3) an injunction is warranted after considering the balance of

8    hardships as between the parties; and (4) the public interest would not be disserved by a permanent

9    injunction." *eBay, Inc. v. MercExchange, LLC,* 547 U.S. 388, 391 (2006); *Reno Air Racing Ass'n v.*

10   *McCord,* 452 F.3d 1126,1137 (9th Cir. 2006).

11   As to the first element, irreparable harm is presumed by Section 1116(a).  VPX has elicited

12   no convincing evidence to rebut this presumption.  Moreover, evidence that Orange Bang has lost

13   control over its business reputation and has suffered damages to its goodwill occasioned by VPX's

14   pervasive use of the BANG mark likewise constitutes irreparable injury.  *Herb Reed Enters., LLC*

15   *v. Fla Entm't Mgmt,* 736 F.3d 1239, 1250 (9th Cir. 2013).

16   As to the second element, in *Century 21 Real Estate Corporation v. Sandlin*, 846 F.2d 1175,

17   1180 (9th Cir. 1988), the Ninth Circuit held that in a trademark infringement case, the injury

18   caused by a defendant's continuous infringement, i.e., the risk of future infringement, satisfies the

19   "no adequate remedy at law" requirement.  *Sandlin* has been recently cited with approval in *Mikuni*

20   *Ginko, Ltd. v. Feng Chen Buffet, Inc.,* 2020 WL 2128646, at *5 (C.D. Cal. 2020) [injunctive relief

21   appropriate in trademark infringement case because there is no adequate remedy at law for

22   continuing infringement]; *Comphy Co., Inc. v. Comfy Sheet*, 2021 WL 5051929, at *8 (C.D. Cal.

23   2021) [same, in a November of 2021 ruling by Judge Wright].  There is no indication that VPX will

24   stop its infringing activity or abide by the VPX Marketing and Sales Restrictions set forth in

25   paragraph 7 D of the 2010 Settlement Agreement.  *Pollution Denim & Co. v. Pollution Clothing*

26   *Co.,* 2008 WL 11337644, at *7 (C.D. Cal. 2008).  In this respect, the risk that VPX will continue to

27   infringe Orange Bang's trademark rights in the future demonstrates that Orange Bang has no

28   adequate remedy at law.

As to the third element, the balance of hardships tips in favor of Orange Bang because VPX will suffer no hardship if it is simply required to comply with trademark law or required to honor its own 2010 Settlement Agreement. *Deckers Outdoor Corp. v. Ozwear Connection Pty Ltd,* 2014 WL 4679001, at *3 (C.D. Cal. 2014).

As to the fourth element, the public interest would not be disserved by the issuance of a permanent injunction because the public has an interest in avoiding confusion between two companies, in this case the confusion between Orange Bang and VPX. *Internet Specialties West, Inc. v. Milon-DiGiorgio Enters., Inc.*, 559 F.3d 985,993 n5 (9th Cir. 2009). Similarly, the public interest is not disserved when a party like VPX is required to comply with trademark law or required to comply with a contractual agreement that it freely entered into on a voluntary basis as part of a calculated business decision it made based on legal advice.

The case of *Tamarind Lithography Workshop, Inc. v. Sanders*, 143 Cal.App.3d 571 (1983) is instructive both with respect to specific performance and with respect to the election of remedies issue as to past compensatory damages v. future potential harm, discussed in more detail below. In *Tamarind*, Sanders asserted claims that Tamarind breached a contract to accord him screen credit as the writer, director and producer of a film on lithography. The jury awarded him $25,000 in damages and Sanders thereafter moved the court for equitable relief, for an injunction, to prevent Tamarind from exhibiting the film in the future unless Sanders received his screen credit. The trial court denied this request on the grounds that Sanders could not satisfy the inadequate remedy at law element because he had already been awarded monetary damages. The appellate court, however, reversed and ruled that the injunction was no longer the issue because "specific performance as requested by Sanders will solve the problem." *Id. at* 575. The court reasoned that the $25,000 jury award recompensed Sanders for his *past* harm, but that this monetary award did not address his potential *future* injuries. In particular, the court held that the harm resulting from future exhibitions of the film might be deemed to be a continuous breach of contract and therefore create the danger of an untold number of lawsuits and that this finding satisfied the element of an inadequate remedy as a matter of law (and, as stated above, an element crucial to the determination

1  of both the permanent injunction equitable remedy and the specific performance equitable remedy)

2  and, therefore, the award of the equitable remedy of specific performance was appropriate.  *Id.*

3       In *Tamarind*, the court also set forth the requisite elements in order to establish the

4  equitable remedy of specific performance as follows:  "(1) the inadequacy of the legal remedy; (2)

5  an underlying contract is both reasonable and supported by adequate consideration; (3) the

6  existence of a mutuality of remedies; (4) contractual terms which are sufficiently definite to enable

7  the court to know what it is to enforce; and (5) a substantial similarity of the requested performance

8  to that promised in the contract."  *See also Real Estate Analytics, LLC v. Vallas*, 160 Cal.App.4[th]

9  463, 472 (2008).

10       The first element set forth above is satisfied in this case because, like in *Tamarind*, if VPX

11  does not comply with the Marketing and Sales Restrictions of paragraph 7 in the future, such a

12  failure creates the risk of an untold number of lawsuits in the future.  The second, third and four

13  elements set forth above are all satisfied by virtue of the prior findings by the arbitrator, set forth

14  above in this Final Arbitration Award, that Monster demonstrated all of the elements necessary to

15  prevail on the breach of contract claim, the express findings that form the ruling that VPX breached

16  the 2010 Settlement Agreement.  The fifth element set forth above is likewise satisfied because the

17  performance requested by an award of specific performance is essentially the same performance as

18  promised by VPX in paragraphs 7 and 17 of the 2010 Settlement Agreement.  Accordingly, an

19  award of the equitable remedy of specific performance, much like the award of the equitable

20  remedy of the permanent injunction, is appropriate in this case.

21       In addition, and pursuant to AAA Rule 47(a) and under California law, and as separate,

22  independent and distinct rationales for the award of the equitable remedy of specific performance,

23  the arbitrator is vested with equitable discretion to fashion an appropriate remedy.  As stated above,

24  the purpose of a permanent injunction (as set forth below) and specific performance in this instance

25  is to prevent future trademark infringement *and* to prevent a future breach of the 2010 Settlement

26  Agreement.  With respect to the latter consideration, the arbitrator hereby finds that the requisite

27  elements for specific performance have been satisfied and that an award of specific performance

28

1   will help ensure that VPX complies with the 2010 Settlement Agreement and, in particular

2   paragraphs 7 and 17, in the future.

3        Accordingly, effective April 1, 2022, VPX, as well as its related entity JHO (already

4   determined to be a de facto party to these proceedings by Judge Fischer),[36] are permanently

5   enjoined from making use of the BANG mark as follows:

6        1.     Subject to the further geographic limitations set forth in paragraph 3 below, VPX

7   and JHO and the Categories of Persons Bound (defined below) shall cease making any use of the

8   BANG mark, or the word "Bang", "BANG", "Bang!", "bang", or "BANG!", or any confusingly

9   similar variations thereof, however spelled, whether capitalized, abbreviated, singular or plural,

10  printed or stylized, alone or in combination with any other letters, words, phrases, or designs, on

11  any current or future product (whether a beverage or otherwise), on any product container, on any

12  product packaging, on any email address, on any letterhead, on any business card, on any other

13  form of communication, on any website, on any social media account, on any traditional media, on

14  any social media advertisement or promotion, on any point of sale advertisement, on or at any

15  promotional event or on or in any other corporate capacity, unless the marketing, promotional,

16  advertising or sales activity for any of VPX's products is directed only to the Nutritional Channel.

17  The term "Nutritional Channel" shall mean and refer to the marketing and sales channel which

18  comports with the VPX Marketing and Sales Restrictions of paragraph 7 D of the 2010 Settlement

19  Agreement which provides: " . . . so long as the beverage or dietary supplement is only marketed

20  and sold through vitamin and nutritional supplement stores to include but not limited to GNC,

21  Vitamin Shoppe, other specialty vitamin and nutritional stores, gyms and health clubs or to the

22  vitamin and dietary supplement sections only of any convenience or other stores."

23

24  _____

25  [36] See Exhibit 2924, Judge Fischer's November 30, 2020 ruling, p. 11. Judge Fischer did not rule
    on the issue of whether or not JHO was a necessary or indispensable party to these arbitration
    proceedings. Judge Fischer's ruling went further than that singular ruling. Judge Fischer

26  specifically ruled that JHO, as a successor in interest to VPX per paragraph 14 of the 2010
    Settlement Agreement, is a part of this arbitration and bound by the arbitrator's ruling. Thus, Judge

27  Fischer has confirmed that the arbitrator has the jurisdiction to extend the Permanent Injunction
    against VPX to bind JHO as well. Similarly, any order requiring payment by VPX likewise

28  requires JHO to make the payment to the extent that JHO is the payor or the recipient of any funds
    due and owing to Orange Bang and Monster.

2.     Subject to the further geographic limitations set forth in paragraph 3 below, VPX and JHO and the Categories of Persons Bound shall immediately cease selling the following products, which are not "creatine-based", under the BANG mark:  (a) Bang 357; (b) BANG Energy RTD (both the caffeinated and non-caffeinated versions); (c) Natural Bang aka BANG Natural; (d) Bang Shots; (e) Bang Keto-Coffee; (f) Bang Tea; (g) Bang ThermIQ; (h) Bang Pristine Protein Bar; and (i) Bang Mixx, but only to the extent that product is marketed or sold by VPX or JHO or the Categories of Persons Bound as opposed to Entourage or Quash[37], unless the marketing, promotional, advertising or sales activity for these VPX products is directed only to the Nutritional Channel.[38]

3.     As a express limitation on the permitted uses of the BANG mark described in paragraphs 1 and 2, and in addition to the relief ordered in paragraphs 1 and 2 above, the Arbitrator finds that an injunction tailored domestically to the twelve states of the United States where Orange Bang sells its products is appropriate.  Accordingly, VPX and JHO and the Categories of Persons Bound are permanently enjoined from any use of the BANG mark (even in the manner permitted by paragraphs 1 and 2 above) in the twelve states where Orange Bang sells its products and those states are:  California, Nevada, Oregon, Washington, Arizona, New Mexico, Hawaii, Idaho, Utah, Texas, Illinois and New York.[39]  In this respect, although VPX and JHO and the Categories of Persons Bound cannot make any use of the Bang Mark in the twelve states referred to above, VPX and JHO and the Categories of Persons Bound may make use of the Bang Mark elsewhere (i.e., in the other 38 states of the United States and internationally) so long as their marketing and sales activities comply with the Marketing and Sales Restrictions of paragraph 7 and the other provisions of the 2010 Settlement Agreement.

Paragraphs 1 – 3 above shall be referred to as the "Permanent Injunction."  The terms of paragraphs 1 and 2 of the Permanent Injunction shall apply to VPX and JHO, as well as any of their

---

[37] As explained in Section III, P., the injunction is not issued against Entourage or Quash.
[38] Although no evidence was presented with respect to the BANG Creatine Bar, according to VPX's Exhibit "A" submitted on November 9, 2021, the BANG Creatine Bar contains CM and, therefore, the arbitrator assumes for present purposes that the BANG Creatine Bar is a "creatine-based" product and thus a paragraph 7 C product, and not a paragraph 7 D product.
[39] Stein Testimony, AHT, p. 116:19 - 117:4.

136

FINAL ARBITRATION AWARD – PHASE 1 AND PHASE 2

1   officers, agents, servants, employees, attorneys, successors, and assigns, and all those persons or

2   entities acting in active concert or participation with them (the "Categories of Persons Bound").

3   Fed. R. Civ. P. 65(d)(2); Exhibit J-11 ¶ 14.  The terms of paragraph 3 of the Permanent Injunction

4   shall likewise apply to VPX and JHO and the Categories of Persons Bound.  Fed. R. Civ. P.

5   65(d)(2).  As further discussed below, some of the issues raised by the Motion to Clarify are the

6   scope of the Permanent Injunction and what categories of persons and entities are likewise bound

7   by the Permanent Injunction.  The rationale for the arbitrator's rulings as to these issues is

8   discussed below.

9

10   **N. The Motion to Clarify**

11       In late January of 2022, after the Interim Arbitration Award was served on the parties,

12   Monster and Orange Bang submitted the Motion to Clarify by which they requested that the

13   arbitrator correct and/or clarify various "unclear" issues addressed in the Interim Arbitration

14   Award.  Monster and Orange Bang submitted several written briefs in support of the Motion to

15   Clarify, which included an email response setting forth Monster's and Orange Bang's positions on

16   particular questions raised by the arbitrator with respect to the Motion to Clarify.  VPX likewise

17   submitted several written briefs in opposition to the Motion to Clarify, which also included an

18   email response setting forth VPX's positions on particular questions raised by the arbitrator with

19   respect to the Motion to Clarify and, in so doing, VPX itself essentially requested clarification of

20   several issues addressed in the Interim Arbitration Award as well.  At the same time, in its

21   opposition papers to the Motion to Clarify, VPX argued that the arbitrator had no power or

22   jurisdiction to clarify the Interim Arbitration Award because, according to VPX, to do so would

23   violate AAA Rule 50.

24       Before addressing the Rule 50 issue, the issue of whether or not the arbitrator has the power

25   and jurisdiction to correct and/or clarify any "unclear" portions of the Interim Arbitration Award, it

26   is first necessary to again explain the fundamental purpose, objectives and intent of the Interim

27   Arbitration Award.  The arbitrator found VPX liable on the trademark infringement related claims,

28   claims which inured to the benefit of Orange Bang because of an agreement made between Orange

Bang and Monster as set forth in the Assignment Agreement. The arbitrator also found VPX liable on the breach of contract/specific performance claim, a claim which inured to the benefit of Monster because of the Assignment Agreement.

Based on these findings of liability in favor of Orange Bang with respect to the trademark related claims and in favor of Monster with respect to the contract claim, the arbitrator concluded that it was necessary to make four different calculations in order to determine the amount of compensatory damages due and owing to Orange Bang for the *past* trademark infringement up to and including September 19, 2021, the date through which Orange Bang's and Monster's expert based his computations (the "Past Period of Time") and the amount of compensatory damages due and owing to Monster for the *past* breach of contract for the Past Period of Time. These four calculations are: (1) reasonable royalty – trademark infringement; (2) disgorgement of profits – trademark infringement; (3) reasonably royalty – breach of contract; and (4) disgorgement of profits – breach of contract. Although the arbitrator made an express finding of liability in favor of Orange Bang on the trademark claim and in favor of Monster on the contract claim as to Past Period of Time, in order to avoid a potential problem with double recovery, and in order to ensure that there was no "double-dipping" as to the award of compensatory damages as to the Past Period of Time, the arbitrator gave Orange Bang and Monster an election as to which of these four calculations they wanted to select, an election that they had to exercise on or before January 31, 2022 (the "Orange Bang / Monster Election").

Orange Bang and Monster timely exercised the Orange Bang / Monster Election and, not surprisingly, they elected for the highest award, the disgorgement of profits award for trademark infringement in the amount of $175 million. According to VPX as argued in connection with the Motion to Clarify and in connection with the Phase 2 issues, the election of remedies by Orange Bang and Monster resulting from the Orange Bang / Monster Election as to the Past Time Period had significant legal implications. VPX's contentions regarding the election of remedies are discussed below.

As a threshold issue arising prior to the discussion of VPX's election of remedies argument, VPX contends that AAA Rule 50 prevents the arbitrator from addressing the issues raised by

Orange Bang and Monster by way of the Motion to Clarify. VPX contends that the arbitrator may only correct clerical, typographical or computational errors. VPX may be correct in this assertion *if* the Interim Arbitration Award was a Final Arbitration Award and if the arbitrator specifically intended it to be, and expressly stated that it was a "final" award (such as this Final Arbitration Award). However, as the controlling case law makes clear, VPX is incorrect in its assertion with respect to the Interim Arbitration Award because it specifically states that it is not a Final Arbitration Award and it specifically states that the arbitrator did *not* intend it to be the final word on the adjudication of issues. As the Interim Arbitration Award specifically states on the final page of the Interim Arbitration Award, page 149:

> "Any *further determinations* to be made at *any additional hearing*, *including* any Phase 2 determinations, *shall be embodied in a Final Award*, which shall also incorporate the contents of this Interim Arbitration Award. The arbitrator does *not intend* this Interim Arbitration Award to be *subject to review*, either pursuant to 9 U.S.C. Sections 9 and 10 or California Code of Civil Procedure Sections 1284 and 1285 or otherwise. This Interim Arbitration Award shall remain in full force and effect in favor of Monster and Orange Bang and against VPX and JHO *until such time* as a Final Arbitration Award is rendered." (Emphasis added.)

In addition, the case law construing AAA Rule 50 demonstrates that an arbitrator is free to clarify his or her rulings set forth in an "interim" arbitration award. In *Bosack v. Soward*, 586 F.3d 1096, 1102-03, (9th Cir. 2009), the Ninth Circuit held, in a case of first impression, that neither prior Rule 46 of the AAA rules (the predecessor to Rule 50 of the AAA rules) nor the doctrine of *functus officio* prevented the arbitrator from revising an interim arbitration award unless the award was intended to be final and unless the arbitrator expressly stated that the award was indeed "final".[40] In footnote 1 of *Bosack*, the Ninth Circuit made it clear that even if the subsequent

---

[40]  As stated in *Bosack* at 1103 and in *Wakeman v. Aqua2 Acquisition, Inc.*, 2011 WL 666028, at * 4 (D. Minn, 2011), the doctrine of *functus officio* precludes an arbitrator from re-adjudicating an issue which he or she has previously and finally adjudicated. Or, to put it another way, once the doctrine of *functus officio* attaches, the arbitrator no longer has jurisdiction to re-determine an issue already determined in the form of a "final" award. However, the doctrine of *functus officio* in this case does not yet apply and has not yet attached.

arbitration award was deemed to be a modification, because the interim arbitration award was not "final", any modification of it was permissible. Similarly, in *Markel Am. Ins. Co. v. Internet Brands, Inc.*, 2017 WL 10433914, at *5-6 (2017), the district court held, following *Bosack*, that an arbitration award, especially an "interim" arbitration award, by definition, is not intended to be final unless it specifically states that it is "final". Here, the Interim Arbitration Award is labeled "Interim" and page 149 makes it clear that there was no intent to make it "final". *See also McClatchy Newspapers v. Central Valley Typographical Union No.* 46, 868 F.2d 731, 734, n1 (9th Cir. 1982) ["[A]n arbitrator can . . . clarify an ambiguity in the award" even after an award is final.]

In short, AAA Rule 50 applies to the Final Arbitration Award. It does not apply to the Interim Arbitration Award issued on January 6, 2022. Therefore, and because of the arbitrator's expressed intent with regard to the Interim Arbitration Award as reflected on page 149, the arbitrator has the power and the jurisdiction to "clarify" or even modify any of the rulings set forth in the Interim Arbitrator Award as reflected in this Final Arbitration Award.

## O. VPX's Election of Remedies Argument

As mentioned above, VPX contends that the Orange Bang / Monster Election effectuated a trademark election of remedies which prevents Monster from recovering breach of contract remedies. VPX has couched this election of remedies argument in many different ways. For example, VPX has simultaneously asserted arguments that because of the Orange Bang / Monster Election, Monster is precluded (i) from its breach of contract claim as to compensatory damages during the Past Time Period; (ii) from obtaining specific performance as to future harm; (iii) from demonstrating irreparable harm; (iv) from benefiting from a permanent injunction; (v) from enforcing the "lane restrictions" of paragraph 7 of the 2010 Settlement Agreement moving forward; (vi) from benefiting from the 5% continuing royalty (discussed below); (vii) from recovering any type of contract remedy because of estoppel; (viii) from recovering any type of contract remedy because of abandonment; (ix) from recovering any type of contract remedy because of a de facto voluntary dismissal; (x) from recovering any type of contract remedy because of waiver; (xi) from recovering any type of contract remedy because the contract-related issues are now moot; (xii)

1   from recovering any type of contract remedy because of inconsistent remedies; (xiii) from

2   recovering any type of contract remedy because of a failure of proof; (xiv) from recovering any

3   type of contract remedy because Monster and Orange Bang are two distinct entities and not a single

4   plaintiff; and (xv) from attaining the status of a prevailing party as it relates to the recovery of

5   attorney's fees and costs; among other arguments including, but not limited to, VPX's argument

6   that the Orange Bang / Monster Election wipes away, negates and repudiates the 2010 Settlement

7   Agreement altogether.  Despite these different labels, descriptions and characterizations of these

8   various legal theories, as the arbitrator understands it, and as counsel for VPX essentially

9   confirmed during the March 17, 2022 hearing, VPX is really making the same basic argument

10  many times over – namely that the Orange Bang / Monster Election by which Orange Bang opted

11  for the trademark remedy precludes Monster from recovering  any type of breach of contract

12  remedy, even for the future time period (collectively, "VPX's Election of Remedies Argument").

13          VPX's Election of Remedies Argument, however, fails from a fundamental flaw in its

14  reasoning.  As the Interim Arbitration Award and this Final Arbitration Award demonstrate, the

15  Orange Bang / Monster Election elected the trademark – disgorgement of profits calculation for the

16  *Past* Time Period.  And, again, the arbitrator requested that Orange Bang and Monster formally

17  make this election in order to ensure that there was no double recovery as to compensatory

18  damages for the Past Time Period.  In this respect, the Orange Bang / Monster Election therefore

19  addresses the issue of *past* harm, but it does not speak to the issue of potential future harm arising

20  from future trademark infringement or the future harm arising from a breach of the 2010 Settlement

21  Agreement should VPX fail to adhere to the Marketing and Sales Restrictions of paragraph 7.

22  These are potential future harms which are separate, independent and distinct from the

23  compensatory damages awarded in this Final Arbitration Award to recompense Orange Bang for

24  the trademark infringement which took place during the Past Time Period.[41]

25

26  ─────────────────────
    [41]  Although based on Alabama contract law, the reasoning of *American Farm Bureau Federation*
27  *v. Alabama Farmers Federation*, 935 F.Supp. 1533 (M.D. Ala. 1996) is persuasive.  In *American*
    *Farm*, the defendant continued to use the "Farm Bureau" mark after the sell-off period agreed upon
28  by the parties in a pre-existing settlement agreement had expired, thus constituting both a
                                                                                    (Continued...)

Case decisions under both California state law and under federal law support this conclusion. In *Guttinger v. Calaveras Cement Company*, 160 Cal.App.2d 460 (1958), the plaintiff, an adjoining landowner, sued a defendant, a cement plant, which caused dust and chemicals to land on plaintiff's property. The plaintiff was awarded injunctive relief. Later, in a second action, and after the nuisance continued, the plaintiff sought monetary damages. The defendant argued that plaintiff's claim was barred for a variety of reasons, including because of plaintiff's prior election of remedies. The defendant argued that the plaintiff was estopped from seeking monetary damages in the second action. The court disagreed and ruled that the plaintiff's prior election for injunctive relief was merely an additional remedy and that it did not preclude a separate and distinct remedy for monetary damages relating to this later time period. In *Cargill v. Sears Petroleum & Transport Corp.*, 2004 WL 3507329 (NDNY 2004), the plaintiff prevailed on a claim for damages before a jury on a contract claim and on a patent infringement claim. The court (applying Minnesota state law) determined that plaintiff was entitled to recover monetary damages as well as the equitable remedy of specification performance. The defendant argued that the equitable remedy was barred because of plaintiff's prior election of remedies. The court disagreed because the claim for monetary damages were intended to remedy past loses, but the claim for monetary damages did not cover the time period in the future. As the court restated the controlling rule of law: "Election of remedies has no application where a party has different remedies for the enforcement of different and distinct rights or redress of different and distinct wrongs." *Id* at *13.

In short, the Orange Bang / Monster Election pertained to past compensatory damages arising during the Past Period of Time and thus had no bearing on the rights of either Orange Bang or Monster to prevent the separate, independent and distinct types of harm in the form of trademark

---

trademark infringement and a breach of contract. The court awarded both monetary relief for trademark infringement under the Lanham Act with respect to the past damages, as well as specific performance (under Alabama law) and injunctive relief in order to address defendant's future conduct so as to ensure compliance with the previously negotiated settlement agreement. *Id*. at 1545-1546 and 1552-1554. Similarly, whether or not the Orange Bang / Monster Election was an election of remedies as to the *Past* Time Period, it did not effectuate an election of remedies as to the potential harm which would result from future trademark infringements or from future breaches of contract, *both* of which are the basis for injunctive relief and the latter of which is the basis for specific performance,

1    infringement or breach of contract which may arise in the future.  As discussed above, both

2    injunctive relief and specific performance turn on the all-important element of an inadequate

3    remedy at law, the "practical effect" element referred to above, and, in many respects, the entire

4    purpose of the Permanent Injunction in the first instance is to ensure compliance with the 2010

5    Settlement Agreement.  In this respect, the award of compensatory damages based on trademark

6    infringement during the Past Time Period and the award of equitable remedies based on *both*

7    trademark infringement and breach of contract arising in the future are **not** inconsistent remedies.

8    Accordingly, VPX's Election of Remedies Argument is not well taken and is hereby rejected.

9

10        **P.  Confusingly Similar Marks**

11        As the language of the Permanent Injunction sets forth above demonstrates, the Permanent

12   Injunction extends to confusingly similar marks.  Ninth Circuit case law requires this result, as

13   VPX concedes in its February 25, 2022 reply brief (p. 11).  In *GoTo.com, Inc. v. Walt Disney Co.*,

14   202 F.3d 1199, 1211 (9th Cir. 2000), the Ninth Circuit affirmed the district court's grant of a

15   permanent injunction which prohibited the defendant from using the mark at issue as well as

16   "confusingly similar variations" of the mark.  *See also Theorem, Inc. v. Citrusbyte, LLC*, 2021 WL

17   6206964, at *1 (C.D. Cal. 2021) [granting injunction which prohibits defendant from using mark

18   "however spelled, whether capitalized, abbreviated, singular or plural, printed or stylized, and

19   whether used in caption, text, orally or otherwise, or any mark or logo which is confusingly

20   similar."]  Thus, clarifying guidance to the parties in this Final Arbitration Award is especially

21   appropriate in this case given Orange Bang's stated concern that VPX may move forward with the

22   use of a "Bangg" mark, apparently based on VPX's belief that the usage of the "Bangg" mark is

23   not confusingly similar to the Bang Mark.  Ninth Circuit authority has made it clear that a

24   purported trademark infringer "must keep a fair distance from the margin line" and minimal

25   changes to a mark do not circumvent the confusingly similar standard for the usage of marks.

26   *Wolfard Glassblowing Co. v. Vanbragt*, 118 F.3d 1320, 1323 (9th Cir. 1997), quoting *McCarthy on*

27   *Trademarks*, Section 30.13 (1996).

28

VPX contends that this clarification is not appropriate and will actually increase confusion as to what VPX and JHO and Categories of Persons Bound can and cannot do. VPX likewise argues that the line between use of the mark and the use of a confusingly similar mark is not sufficiently clear or defined. The arbitrator disagrees with VPX in this regard. VPX knows the line – it cannot make use of the Bang Mark or a mark confusingly similar to the Bang Mark. Should any dispute arise, however, VPX and JHO and Categories of Persons Bound are fully protected because if one of them believes that its usage has not crossed the line, and Orange Bang and Monster believe that their usage has indeed crossed the line, the issue can be fully litigated and adjudicated in a subsequent proceeding, if need be. In other words, if a dispute arises in the future as between Orange Bang and Monster, on the one hand, and VPX, JHO and Categories of Persons Bound, on the other, as to the scope of the Permanent Injunction or whether a particular use is confusingly similar or not, both sides are fully protected because in a subsequent proceeding both sides will have a full and fair opportunity to be heard on the issues which means that VPX's due process right will be safeguarded by way of the subsequent proceeding and both sides will be entitled to whatever remedies are deemed appropriate and awarded in the subsequent proceeding.

It was the arbitrator's intention to make it clear in the Interim Arbitration Award that the Permanent Injunction extended to confusingly similar marks, but the arbitrator did not make it clear enough and, therefore, the arbitrator does so now in the Final Arbitration Agreement. In short, the Permanent Injunction enjoins VPX and JHO and Categories of Persons Bound from making use of the Bang Mark or marks confusingly similar to the Bang Mark on Bang-branded products. Moreover, if the arbitrator failed to take the opportunity to clarify potential ambiguities or loopholes in the Permanent Injunction, such a failure to clarify not only increases the likelihood of future disputes, the failure to clarify also inadvertently creates a disincentive for VPX and JHO and Categories of Persons Bound to comply with the 5% continuing royalty discussed below, the equitable remedy which, hopefully, renders the need for the Permanent Injunction unnecessary in the first place. And, again, as discussed specifically below, the issues of the scope of the Permanent Injunction and the issue of a confusingly similar mark only arise if VPX and/or JHO fail to pay the 5% continuing royalty.

**Q. Categories of Persons Bound By the Permanent Injunction**

In conformity with Rule 65(d) of the Federal Rules of Civil Procedure, the arbitrator hereby clarifies that the Permanent Injunction is binding upon VPX, upon JHO and upon any of their Categories of Persons Bound.

First, corporate entities like VPX and JHO operate through living and breathing people and therefore all of these Categories of Persons Bound should be bound by the Permanent Injunction, otherwise the Permanent Injunction is an empty basket which provides no practical protection and does not serve its intended purposes.  Second, this clarification conforms with the intent of the parties as expressly stated in paragraph 14 of the 2010 Settlement Agreement which provides that it is binding upon ". . . agents, servants and employees, their successors, predecessors and assigns and each of them . . . ."  *See* Ex. J-11, paragraph 14.

Third, there is no danger that this clarification runs afoul of the holding in *Benaroya v. Willis,* 23 Cal.App.4th 462 (2018) because this Final Arbitration Award does not make any adjudication as whether or not any particular person potentially falling within the Categories of Persons Bound is in fact bound by the Permanent Injunction or whether or not the particular person potentially falling with the Categories of Persons Bound is actually bound by the arbitration provision within the 2010 Settlement Agreement (e.g., is alleged violator "Jones" really an "agent" of VPX such that he or she is bound by the Permanent Injunction?  Is alleged violator "Jones" in fact bound by the arbitration provision in the 2010 Settlement Agreement?)  Those types of determinations are to be made by a court at the appropriate time in a subsequent proceeding, if need be, because, as VPX points out and as *Benaroya* so holds, the arbitrator does not have jurisdiction to make such binding specific adjudications, unless and until a court first decides whether or not the arbitration provision in the 2010 Settlement Agreement is binding upon the alleged violator of the Permanent Injunction.  But making those specific adjudications, which the arbitrator is not making by way of this Final Arbitration Award, is far different from clarifying the scope and intent of the Permanent Injunction.  Again, VPX and JHO and Categories of Persons Bound are fully protected on these potentially disputed issues because each of them retains the opportunity to be heard and the right to show that the particular alleged non-signatory violator(s) are not bound by

1    the Permanent Injunction and/or bound by the arbitration provision in the 2010 Settlement

2    Agreement because, in their view, they do not fall within the Categories of Persons Bound.

3          In addition to *Benaroya*, other case law supports this conclusion. Although VPX cites

4    *Comedy Club, Inc. v. Improv West Associates*, 553 F.3d 1277 (9th Cir.), the *Comedy Club* case

5    actually supports the argument of Monster and Orange Bang with respect to the Categories of

6    Persons Bound issue. In *Comedy Club*, the arbitrator had issued an injunction in favor of plaintiff

7    and plaintiff argued that cousins of former spouses and non-party grandmothers were likewise

8    bound by the injunction which, as a practical matter, enforced a covenant not to compete against

9    them and prevented them from opening a rival comedy club. The Ninth Circuit first affirmed the

10   rule set forth in FRCP 65(d) and reasoned that the injunction should extend not only to the parties,

11   but to "their officers, agents, servants, employees, and attorneys and [upon] those persons in active

12   concert of participation with them" as well. However, this particular injunction went too far. The

13   Ninth Circuit ruled that binding relatives of former spouses and even grandparents, all of whom

14   were non-parties to the arbitration provision at issue, was improper because to do so would foist an

15   unlawful covenant not to compete upon them in violation of California Business and Professions

16   Code Section 16600. *Id* 1287. In this respect, *Comedy Club* supports Monster's and Orange

17   Bang's position on this issue because it reaffirms the rule of FRCP 65(d), but the case also

18   demonstrates an instance where an injunction went too far in attempting to bind non-signatures

19   who should not be bound, which is not the case here.

20         In short, the arbitrator hereby clarifies the scope and intent of the Permanent Injunction and

21   reaffirms that VPX is free, at the appropriate time if need be in a subsequent proceeding, to

22   adjudicate the open and undecided issues of whether the particular non-signatory person or entity at

23   issue falls within the Categories of Persons Bound, or not, or whether they are bound by the

24   arbitration provision within the 2010 Settlement Agreement, or not. The opportunity to be heard in

25   a subsequent proceeding will protect VPX's due process rights in this regard.

26

27

28

### R. A Clarification of the Geographical Limits of the Permanent Injunction

As stated many time above, the purpose and intent of the Permanent Injunction (and/or the 5% continuing royalty discussed below) is threefold: (i) to ensure that there are no future acts of trademark infringement; (ii) to ensure that there are no further acts of breach of contract; and (iii) to [hopefully] avoid future disputes between the parties. Thus, one of the stated objectives underlying the imposition of the Permanent Injunction is to enforce specific performance of the 2010 Settlement Agreement (or the payment of the 5% continuing royalty in lieu thereof) in order to eliminate future disputes between the parties and hopefully implement a non-combative, commercial relationship between them moving forward. With these purposes, intents and objectives in mind, the question then becomes what precisely is the scope of the Permanent Injunction? Based upon the briefing of both sides in connection with the Motion to Clarify, it is obvious that the two sides have different interpretations of the scope of the Permanent Injunction and, therefore, clarification by way of this Final Arbitration Award is essential.

Thus, for the purposes of clarification, the arbitrator reiterates that the most efficient way to accomplish the objectives of the Preliminary Injunction is to enjoin the conduct of VPX and JHO and the Categories of Persons Bound altogether insofar as the Bang Mark is concerned in the 12 states of the United States in which Orange Bang also does business, but only enjoin the conduct of VPX and JHO and the Categories of Persons Bound insofar as the Bang Mark is concerned elsewhere (in the 38 other states of the United States and in the international territories) to the extent such conduct fails to comply with the 2010 Settlement Agreement, in particular paragraph 7 thereof. In other words, and in order to restate the last portion of the proceeding sentence differently (and in a further effort to clarify the scope of the Permanent Injunction), VPX and JHO and Categories of Persons Bound are entitled to make use of the Bang Mark in the 38 states of the United States and internationally, but only provided each of them complies with the Sales and Marketing Restrictions of paragraph 7 D of the 2010 Settlement Agreement.

**S.**     **The 5% Continuing Royalty in Lieu of the Permanent Injunction and the VPX 5% Continuing Royalty Election**

In its closing brief and in its [Proposed] Interim Arbitration Award, Orange Bang and Monster have affirmatively requested the award of a continuing royalty in order to recompense Orange Bang for VPX's continuing trademark infringement in the future and in order to recompense Monster for VPX's continuing violation of the VPX Marketing and Sales Restrictions of Paragraph 7 D in the future as an alternative to the issuance of the Permanent Injunction against VPX and JHO and Categories of Persons Bound. The arbitrator requested that the parties on both sides brief the issue so that the arbitrator could determine whether or not he has the equitable discretion to award such a future remedy. The arbitrator determines, for several reasons, that it is within his equitable discretion to issue such an award of a continuing royalty payable in the future. First, 1117(a) itself grants the court, or in this case the arbitrator, wide discretion to use equitable principles to fashion an appropriate remedy in a trademark infringement case. *See also Southland Sod*, 108 F.3d at 1146; *QS Wholesale, Inc. v. Rox Volleyball, Inc.,* 2015 WL 4484219, at *6 (C.D. Cal. 2015); AAA Rule 47(a). In *Apple, Inc. v. Samsung Elecs. Co., Ltd.*, 2014 WL 6687122, after a jury verdict in favor of Apple in a patent case, Apple filed a motion seeking an ongoing royalty in the future. The court, exercising its equitable powers under patent law, granted the motion because: (i) Apple was entitled to be compensated for future infringement; and (ii) without the imposition of ongoing royalties in the future, there was an increased risk of successive lawsuits and duplicative litigation.

Here, the equitable discretion authorized by the statute under trademark law is analogous to the equitable discretion authorized under patent law. Likewise, the same policy concerns apply. If VPX / JHO are not ordered to pay an ongoing royalty in the future, or the Permanent Injunction is not in place, then there is a strong risk that trademark infringement will continue and future, duplicative litigation will ensue. VPX's reliance on *A&H Sportswear Co. v. Victoria's Secret Stores, Inc.*, 166 F.3d 197, 208 (3rd Cir. 1999) is misplaced because this award of a continuing royalty in the future would not be an inappropriate compulsory license.

At the same time, and as stated repeatedly herein, the arbitrator intends to award equitable remedies which ensure compliance with the provisions of the 2010 Settlement Agreement and which prevent both future trademark infringements and future breaches of contract.  Therefore, the award of specific performance and the issuance of the Permanent Injunction or, in lieu of the Permanent Injunction, the payment of a 5% reasonable royalty to prevent future harm, both accomplish these objectives.  As set forth above, the arbitrator has the discretion to award such equitable remedies pursuant to the Lanham Act.  In addition, the arbitrator has the express authority to award such equitable remedies pursuant to AAA Rule 47(a) which provides that "[t]he arbitrator may grant *any* remedy or relief that the arbitrator deems just and equitable . . . including . . . specific performance of a contract."  Similarly, California law likewise empowers the arbitrator to fashion appropriate equitable relief.  *Advanced Micro Devices, Inc. v. Intel Corporation*, 9 Cal.3d 362 (1994).

In *Advanced Micro Devices*, Advanced Micro Devices ("AMD") and Intel entered into an agreement to exchange certain technology and information relating to computer chips that each side was developing in order to protect both side's access to an open marketplace.  The arbitrator found that Intel breached the agreement and, based on the finding of breach, the arbitrator fashioned a equitable remedy – the grant of a permanent, royalty-free license in favor of AMD which enabled it to make use of Intel's computer chip technology.  The trial grant granted a motion to confirm the arbitration award, but the court of appeal reversed.  However, the California Supreme Court reversed the court of appeal and specifically upheld an arbitrator's power in an arbitration matter to fashion an equitable remedy.  The Court, relying on AAA Rule 43, the predecessor to current AAA Rule 47, articulated the rule of law that unless the agreement of the parties expressly restricts the arbitrator's right to fashion an equitable remedy, and so long as the equitable remedy is rationally derived from the contract and the breach, then the arbitrator has the authority and discretion to fashion equitable relief which he or she considers to be just and fair under the circumstances existing at the time of the arbitration.  *Id*. at 383.

Here, the 2010 Settlement Agreement does not contain any restrictions on an arbitrator's authority or discretion to fashion and award an equitable remedy.  In addition, the award of specific

149

FINAL ARBITRATION AWARD – PHASE 1 AND PHASE 2

performance, expressly authorized by Rule 47(a), and the award of the Permanent Injunction and, in lieu thereof, the award of the 5% continuing royalty, both of which are intended to prevent future trademark infringements *and* future violations of the 2010 Settlement Agreement (a co-existence agreement which itself is a covenant not to sue for trademark infringement so long as the parties stay in their agreed upon "lanes") are therefore rationally derived from and related to the contract, the 2010 Settlement Agreement, and the potential breach thereof. Accordingly, pursuant to federal law, AAA Rule 47(a) and California law, the arbitrator has the authority and discretion to fashion and award equitable relief including, but not limited to, the award of the 5% continuing royalty described below.

The arbitrator is **not** imposing a compulsory license on a "resisting" Orange Bang. Rather, the arbitrator is granting a compulsory license to a "requesting" Orange Bang, imposed on VPX, a party found to be liable for trademark infringement and found to be liable for breach of the 2010 Settlement Agreement who, at its election, has elected to avoid the corporate realities and meaningful expense of re-branding that may be the practical result of the Permanent Injunction as discussed in more detail below.

Accordingly, in lieu of the issuance of the Permanent Injunction as set forth in paragraphs 1 – 3 above, if VPX and JHO pay Orange Bang (as to the trademark infringement claim) and Monster (as to the breach of contract claim for which it seeks specific performance in the future) an amount equal to 5% of "Net Sales"[42] generated from the sales of Bang branded products, including BANG Energy RTD, each quarter beginning July 1, 2022, and payment is made as set forth in this paragraph, then the Permanent Injunction referred to above shall be stayed, and shall not go into effect, so long as VPX and JHO continues to pay the 5% of Net Sales to Orange Bang and Monster each quarter.

Each payment shall be made within 45 days after the close of a financial quarter (on a calendar basis, i.e., March 31, June 30, September 30 and December 31 of each year) and each payment shall be accompanied by a quarterly accounting statement reflecting the amount of Net

---

[42] Defined below.

Sales generated from the sale of Bang branded products within the preceding financial quarter.  By way of example, the payment due 45 days after September 30, 2022 for the financial quarter ending September 30, 2022 shall be based on the amount of Net Sales generated from the sale of Bang branded products, including BANG Energy RTD, which took place from July 1, 2022 to and including September 30, 2022.  This will be the pattern of payment and accounting for each financial quarter for so long as VPX makes any use of the BANG mark, with one exception: the first payment, due 45 days after July 1, 2022, shall be based on the amount of Net Sales generated from the sale of Bang branded products, including BANG Energy RTD, which took place from September 20, 2021 to and including June 30, 2022 and shall bear interest thereon at the legal rate of 10% from the date of April 29, 2022 (if this amount is paid on or before April 29, 2022, the payment shall not bear interest).[43]

As set forth in the Interim Arbitration Award, and as set forth in this Final Arbitration Award, if VPX elects to pay this 5% future royalty payment in lieu of the issuance of the Permanent Injunction (the "VPX 5% Continuing Royalty Election"), the effect of which would be to stay enforcement of the issued Permanent Injunction for so long as VPX and JHO continue to make payment, then VPX shall issue quarterly accounting statements together with the quarterly payments made payable to Orange Bang and Monster and Orange Bang and Monster shall be entitled to exercise audit and inspection rights with respect thereto as further enumerated below. The Interim Arbitration Award also explained that in order to exercise the VPX 5% Continuing Royalty Election, VPX shall give written notice, via email, to the attorneys for Monster and Orange Bang on or before January 31, 2022, with a copy to the arbitrator.

On January 31, 2022, VPX did just that -- VPX exercised the VPX 5% Continuing Royalty Election.  VPX was under no compulsion to do so.  Rather, VPX made the informed business decision to opt for the VPX 5% Continuing Royalty Election.  During the briefing relating to the Motion to Clarify, and in response to Monster's and Orange Bang's argument that the definition of Net Sales (discussed below) should include foreign sales, VPX took the position that the definition

---

[43] The Plumpe damages report only went through September 19, 2021.

of Net Sales should exclude foreign sales and VPX's argument in this regard may have raised the inference that had VPX known that foreign sales may be included in the definition of Net Sales, then, perhaps, VPX would not have exercised the VPX 5% Continuing Royalty Election.

Because of this implication, and during the briefing of the Motion to Clarify, and before issuing any ruling in connection with the Motion to Clarify, the arbitrator sought clarification from VPX. The arbitrator inquired of VPX whether, assuming that foreign sales are indeed included within the definition of Net Sales, it wanted to withdraw the VPX 5% Continuing Royalty Election. Specifically, the arbitrator inquired of VPX whether it wanted a "do-over" on the VPX 5% Continuing Royalty Election. VPX responded to the arbitrator's inquiry by stating in its closing brief with respect to Phase 2 issues and with respect to the Motion to Clarify that it "is not presently seeking a 'do-over' of its election." *See* "Respondent's Final Submission of Phase II Issues" submitted on March 9, 2022, p. 8.[44] In this respect, VPX has clarified to the arbitrator that the VPX 5% Continuing Royalty Election remains in full force and effect.

### T.     The Definition of "Net Sales" and the Audit Procedures

To the extent that the arbitrator has used both the defined terms "net revenues" and "net sales", the arbitrator has used those two terms interchangeably throughout this Final Arbitration Award and has attempted to clarify this issue by making use of the term "Net Sales" for the sake of uniformity. For the avoidance of any doubt, both of those terms are defined as follows: the revenues generated from worldwide sales (also known as "Gross Revenues" or "Gross Receipts"), regardless of channel, of the Bang-branded products identified in paragraph 2 of the Permanent Injunction including, but not limited to, Bang Energy RTD, minus "returns". This formula, the Gross Revenues – "returns" formula, must be calculated in accordance with Generally Accepted Accounting Principles ("GAAP"). This formula for Net Sales is essentially the definition that VPX's damages and accounting expert, Voth, and Monster's and Orange Bang's damages and

---

[44]  VPX did, at this time, reserve all rights, as it has done in all of its submissions which post-date the issuance of the January 6, 2022 Interim Arbitration Award.

1  accounting expert, Plumpe, used when calculating VPX's net sales in this case.  Voth Testimony,

2  AHT, pp. 3787: - 3788:5; Plumpe Testimony, AHT, p. 2968:8-16.[45]

3       In addition, this definition of Net Sales is consistent with how these terms are defined in the

4  comparable industry license agreements relevant to this case.  *See* Exhibit J-004 at 2; Exhibit J-005

5  at 5; Exhibit CEx. 58 at 74.  It also comports with how other cases have defined these terms.  *See,*

6  *e.g.*, *Enough for Everyone, Inc. v. Provo Craft & Novelty, Inc.*, 2012 WL 12884643, at *5 (C.D.

7  Cal. Aug. 21, 2012) (defining "net sales price" as "the price invoiced by [the defendant] to its

8  customers less credits and returns"); *Scotty of Cal., Inc. v. Evenflo Co., Inc.*, 2006 WL 8455622, at

9  *1 (S.D. Cal. July 27, 2006) (defining "Net Sales Price" as "[t]he price charged for Licensed

10  Articles . . . and not returned as defective, less such quantity, trade and cash discounts, allowances

11  for freight, and taxes as are specified on the invoices.").

12       In an effort to clarify whether foreign sales are included in or excluded from the definition

13  of Net Sales, the arbitrator hereby rules that the definition of Net Sales does include foreign sales.

14  The definition of Net Sales includes foreign sales because the equitable remedy of the Permanent

15  Injunction, or the equitable remedy of the 5% continuing royalty awarded in lieu of the Permanent

16  Injunction, has been awarded to address *both* the risk of future trademark infringement and the risk

17  of future breaches of contract.  To put it another way, the 5% continuing royalty now payable

18  because of the VPX 5% Continuing Royalty Election is the mechanism designed to ensure

19  compliance with the 2010 Settlement Agreement and to obviate future accounting and payment

20  disputes between the parties.  This equitable remedy is both a trademark remedy and a contract

21

22  [45]  According to Voth and Plumpe, the formula for net sales is: gross revenues minus returns minus

23  "on invoice-type" adjustments or "accounting adjustments" (collectively, "additional accounting adjustments").  During the briefing of the Motion to Clarify, the arbitrator asked VPX to clarify what is meant by the term "additional accounting adjustments".  The arbitrator made this specific

24  request during the February 18, 2022 hearing on Phase 2 matters and on the Motion to Clarify and the arbitrator did so in order to avoid future disputes between the parties over the calculation of Net

25  Sales moving forward.  Despite this specific request for further information and despite the opportunity to clarify a potential further deduction which would be applied to the definition of Net

26  Sales, VPX did not supply the requested information or seize upon the opportunity to clarify (again, so as to avoid future disputes over the 5% continuing royalty calculation which may expose

27  VPX's purported confidential information to its competitors Monster and Orange Bang). Accordingly, the arbitrator has no alternative but to rule that the only appropriate category of

28  deductions with respect to the Net Sales of Bang-branded products which make use of the Bang mark is the category of "returns", and not the category of "accounting adjustments".

153

FINAL ARBITRATION AWARD – PHASE 1 AND PHASE 2

remedy.  Since it is both, it must implicate Paragraph 17 of the 2010 Settlement Agreement which expressly makes use of the term "worldwide".  The one sentence paragraph 17 provides as follows: "The terms of this Agreement apply to the actions and activities of the Parties worldwide.".  Therefore, foreign sales must be included in the calculation of the 5% continuing royalty moving forward, and this is the correct result even though a trademark remedy is limited to the territorial boundaries of the United States.  Again, this is because these alternative equitable remedies are based not only on future trademark claims, but on future contract claims as well.

As set forth above, in order to comply with the 5% continuing royalty, VPX is required to make quarterly payments based on Net Sales and to provide quarterly accounting statements (and the VPX Verification Document referred to below) to Monster and Orange Bang at the same time.  Monster and Orange Bang retain audit and inspection rights, as further described below.  During the briefing on the Motion to Clarify, both sides have indicated a need for further clarification of how the audit and inspection procedures would work because, as VPX correctly points out, both Monster and Orange Bang are competitors of VPX and VPX has legitimate concerns that Monster and Orange Bang will have access to VPX's confidential, proprietary and/or financial information.  At the same time, Monster and Orange Bang have indicated that they may need to verify that the quarterly accountings relating to the 5% continuing royalty are accurate and that the proper amounts have been paid.  Accordingly, and based on the legitimate concerns of both sides, and with the hope of avoiding disputes between the parties in the future, the audit and inspection procedures with respect to the 5% continuing royalty shall be as follows:

- In addition to the quarterly accounting statements and the quarterly payments which accompany the quarterly accounting statements, VPX shall provide, each quarter, and at the same time as the quarterly accounting statement and the quarterly payment, a document which sets for the calculation of the amount of Net Sales for the prior quarterly accounting period and which also verifies the amount of Net Sales and attests thereto (the "VPX Verification Document").
- Within 14 days of the receipt of the VPX Verification Document, Orange Bang and Monster shall have the right to object to the calculations or other data or

information set forth in the VPX Verification Document and Orange Bang and Monster must provide a statement of reasons which form the bases of their objections (the "Orange Bang / Monster Objections").

- Within 14 days of the receipt of the Orange Bang / Monster Objections, VPX, on the one hand, and Orange Bang, on the other, shall meet and confer in good faith in an attempt to resolve all issue relating to the VPX Verification Document and the Orange Bang / Monster Objections.

- If VPX and Orange Bang and Monster are unable to resolve all issues during this meet and confer procedure, Orange Bang and Monster shall be entitled to exercise their audit rights and move forward with an audit. The audit shall be performed by a firm of independent accountants (the "Auditor") during normal business hours. The Auditor shall be a team from a nationally recognized accounting firm selected by Orange Bang and Monster and the Auditor shall have no existing or prior business relationship with either VPX or with Orange Bang or Monster within the preceding five years (except that the Auditor, if hired to conduct the first audit, if any, shall also be entitled to conduct successive audits contemplated by this Final Arbitration Award, if any).

- Following an unsuccessful meet and confer, Orange Bang and Monster shall be limited to only one audit per year, but that audit may address any outstanding issues and any unresolved VPX Verification Document and/or any Orange Bang / Monster Objections pending during the preceding one year time period.

- The Auditor shall be required to execute and abide by the current Confidentiality Order in full force and effect as between the parties and the Auditor shall be entitled to review VPX's confidential documents, including financial documents, necessary to conduct the audit ("Confidential Financial Documents"). Although the Auditor shall be entitled to have access to and inspect Confidential Financial Documents in order to conduct the audit, neither Orange Bang nor Monster shall be entitled to have any access to or inspect the Confidential Financial Documents.

FINAL ARBITRATION AWARD – PHASE 1 AND PHASE 2

- The Auditor shall only report to Orange Bang and Monster the results of the audit. In this respect, the Auditor shall only report to Orange Bang and Monster whether the VPX Verification Documents are correct or not, whether the Orange Bang / Monster Objections are well taken or not and the percentage amount of any variance as between the amount reported to be due and owning by VPX for the preceding quarterly accounting period and the amount that should have been reported by VPX (the "Variance"). An exact copy of the Auditor's reports shall be provided to Orange Bang and Monster and to VPX. The Auditor shall not be permitted to share any of the Confidential Financial Documents with Orange Bang or with Monster.

- If the amount of the Variance is less than 2.5%, then Orange Bang and Monster shall be jointly and severally liable for any and all costs of the audit due and owing to the Auditor. If the amount of the Variance is more than 5%, then VPX shall be liable for any and all costs of the audit due and owing to the Auditor. If the amount of the Variance is between 2.5% and 5%, then VPX shall be liable for 50% of any and all costs of the audit due and owing to the Auditor and Orange Bang and Monster shall be jointly and severally liable for other 50%.

- The audit report of the Auditor shall be deemed to be conclusive, incontestable and binding upon VPX and upon Orange Bang and Monster.

- If Orange Bang and Monster do not commence an audit following a VPX Verification Document within 24 months of the issuance of the VPX Verification Document, then the VPX Verification Document and the accompanying quarterly accounting statement shall be deemed to be conclusive, incontestable and binding upon Orange Bang and Monster, in which case Orange Bang and Monster shall have no further right to object to any accounting practice relating thereto even if that accounting practice becomes the subject of dispute between the parties in connection with a subsequent VPX Verification Document applicable to later accounting periods.

FINAL ARBITRATION AWARD – PHASE 1 AND PHASE 2

**U.      The Scope of the Permanent Injunction – A Reminder**

As has been discussed at the hearings regarding the Motion to Clarify and Phase 2, and as mentioned by both sides in their papers in connection with the Motion to Clarify, all of the issues relating to the scope and contours of the Permanent Injunction only arise *if* VPX fails to pay the 5% continuing royalty moving forward.  Now that VPX has made and reaffirmed the VPX 5% Continuing Royalty Election, and assuming VPX honors its obligations to pay and properly account to Orange Bang and Monster in connection therewith, all issues and potential disputes relating to the Permanent Injunction are of no moment.  In short, the 5% continuing royalty is an equitable remedy designed to avoid future trademark infringement and institutionalize compliance with the 2010 Settlement Agreement and thereby avoid breach of contract and/or accounting disputes between the parties in the future.

Notwithstanding the foregoing, if VPX fails to pay the 5% continuing royalty, then, after written notice and a failure to cure within fourteen (14) days, the Permanent Injunction shall automatically take effect without the need for any further action by a court or by an arbitrator.

**V.      VPX's Counterclaims**

VPX's first claim for declaratory relief fails because there is no definite, concrete, actual and existing controversy between VPX, on the one hand, and Orange Bang and Monster, on the other, regarding the validity of VPX's trademark registrations.  *Stickrath v. Globalstar, Inc.*, 2008 WL 2050990, at *6 (N.D. Cal. May 13, 2008) [a declaratory judgment may issue only "where there is an 'actual controversy' between the parties that is 'definite and concrete'"].  Rather, the controversy here is about paragraph 7 of the 2010 Settlement Agreement and to the extent VPX seeks a declaration about what it can and cannot do with the BANG mark by virtue of the "creatine-based" requirement of paragraph 7 C and the VPX Marketing and Sales Restrictions of paragraph 7, those questions are fully addressed and adjudicated by way of this Interim Arbitration Award as set forth herein.

Similarly, VPX's second claim for declaratory relief fails because it duplicates Orange Bang's and Monster's trademark infringement and unfair competition claims and this Interim

1  Arbitration Award fully addresses, analyzes and adjudicates those claims. *Riot Games Merch., Inc.*
2  *v. Tri-Force Sales, LLC*, 2015 WL 13344626, at *3 - *4 (C.D. Cal. Dec. 1, 2015) [counterclaims
3  for declaratory relief that duplicate a plaintiff's claims fail].

4       VPX's third claim for unfair business practices and VPX's fourth claim for unreasonable
5  restraint of trade fail for the reasons set forth in Section III, O. below.

6       VPX's fifth claim for fraud fails because of the factual findings set forth in Section II, N.
7  above. In this respect, VPX failed to present any evidence to establish any of the elements
8  necessary to establish fraud. *Lazar v. Superior Ct.*, 12 Cal.4th 631, 638 (1996) [setting forth the
9  elements for fraud, deceit and promissory fraud].

10      VPX's sixth claim for breach of contract fails because of the factual findings set forth in
11  Section II, K. above. Previously, the parties entered into a stipulation to bifurcate these
12  proceedings so that the issue of VPX's alleged damages resulting from the alleged breach by
13  Orange Bang of the confidentiality provision in paragraph 12 of the 2010 Settlement Agreement in
14  the amount of $2.6 million, the attorney's fees allegedly incurred by VPX by virtue of the alleged
15  breach of paragraph 12 ("VPX's Damages Claim), was deferred to Phase 2. In connection with
16  VPX's Damages Claim, Orange Bang and Monster had demanded production of VPX's billing
17  statements in order to verify the $2.6 million damages claim which itself raised protracted issues
18  about document production and redaction of attorney-client communications and work product
19  immunity entries referenced in the billing statements (the "VPX Billing Statements Issues"). As
20  set forth in Section II, K. above, the arbitrator has already determined that, as to the issue of
21  liability, Orange Bang did not breach paragraph 12 (or any other paragraph) of the 2010 Settlement
22  Agreement because it was VPX itself, not Orange Bang, who disclosed the key provisions of
23  paragraph 7 by attaching Orange Bang's demand letters to the 2019 Declaratory Relief Action and
24  making the contents of those key documents a part of the public record. *Figur v. United States*,
25  662 F. Supp. 515, 517-18 (N.D. Cal. 1987) ("By its very nature, information in the public record is
26  not confidential, and once disclosed to the public, cannot regain its confidentiality.").

27
28

1    Inasmuch as VPX's sixth claim has been adjudicated adversely to VPX, VPX's Damages

2    Claim and the VPX Billing Statements Issue are moot and they are no longer at issue in Phase 2 of

3    these proceedings.

4

5    **W. The "Weaponization" of the 2010 Settlement Agreement, Unfair Business Practices,**

6    **Unlawful Restraints on Trade and Unclean Hands**

7    VPX's continuing theme throughout this litigation has been, and is, that Monster, by virtue

8    of the Assignment Agreement between Orange Bang and Monster, has "weaponized" paragraph 7

9    of the 2010 Settlement Agreement.  In particular, VPX contends that this "weaponization"

10   constitutes an unfair business practice and an unlawful restraint on trade under California law, a

11   violation of the Cartwright Act (Business and Professions Code Sections 16720 and 16726),

12   because the Assignment Agreement created an unlawful combination of capital, skills or acts as

13   between Monster and Orange Bang, an unlawful trust, which has destroyed, or will destroy,

14   competition in the energy drink industry and thus demonstrates Monster's and Orange Bang's

15   unclean hands.  In *Morrison v. Viacom, Inc.*, 66 Cal.App.4th 534, 541(1998), the court discussed

16   Sections 16720 and 16726 and ruled that the Cartwright Act is limited to *unreasonable* restraints

17   on trade.

18   VPX argues that the Assignment Agreement facilitated the "weaponization" of the 2010

19   Settlement Agreement and that such conduct constitutes an unfair business practice, an unlawful

20   restraint of trade and a demonstration of Monster's and Orange Bang's unclean hands.  These

21   arguments are devoid of merit.  Neither Monster nor Orange Bang prevented VPX from competing

22   in the energy drink marketplace (BANG Energy RTD) or in the hard seltzer marketplace (Bang

23   Mixx).  VPX had, and has, the absolute right to compete in those marketplaces.  VPX could have

24   freely and completely competed in the energy drink market or in the hard seltzer market under a

25   different trade name.  It could have competed under a thousand different trade names, Redline for

26   example.  The trade restraint on VPX (and on JHO) was, and is, that they cannot make use of the

27   BANG mark unless VPX fully complies with the voluntarily agreed-upon restraints set forth in

28   paragraph 7 of the 2010 Settlement Agreement.  The agreed- upon business restraint, as a matter of

1  fact, is not an *unfair* business practice or an *unreasonable* restraint of trade. It is undeniably a *fair*

2  business practice and an eminently *reasonable* restraint of trade. There is nothing inherently or

3  legally unreasonable about holding a party, in this case VPX, to a bargained for co-existence

4  agreement, with built in "lane" restrictions, which VPX entered into voluntarily after an 11 month

5  negotiation (fully detailed above) and with the advice of counsel. In other words, VPX had, and

6  has, the unrestrained ability to compete in the marketplace, it just cannot do so by making use of

7  the BANG mark unless it abides by the VPX Marketing and Sales Restrictions set forth in the 2010

8  Settlement Agreement which it fully negotiated, signed and then ignored.

9       Just like the Beatles who owned the Apple trademark via its Apple records label who

10  entered into a co-existence agreement with Apple computer on the condition that Apple computer

11  stay out of the Beatles "lane", the music lane, that agreement certainly imposed a restraint of trade

12  on Apple computer. Apple could no longer go into the music industry. But this was not an

13  unreasonable restraint of trade. Rather, it was a reasonable restraint of trade because Apple

14  computer fully agreed to it.[46] The same is true here. Yes, VPX agreed to some pretty harsh

15  restrictions in paragraph 7 of the 2010 Settlement Agreement, but it is not an unreasonable or an

16  unlawful restraint of trade for Orange Bang and Monster to require VPX to honor an agreement,

17  and the restrictions set forth therein, which VPX entered into voluntarily for its own business

18  purposes. Merely enforcing a contractually binding promise that VPX made to Orange Bang on

19  how it would market and sell its products is not an anti-competitive or unlawful restraint of trade or

20  an example of unclean hands.

21       In *William Inglis & Sons Baking Co. v. ITT Continental Baking Co., Inc.*, 668 F.2d 1014

22  (9th Cir. 1981), a manufacturer of bread who went out of business sued other bakers for anti-trust

23  violations. The Ninth Circuit was confronted with the issue as to whether or not the defendant's

24  avowed purpose to snuff out the competition satisfied the specific intent element necessary for an

25  anti-trust violation as an unreasonable restraint of trade. The Ninth Circuit ruled that even an intent

26  to vanquish a rival was not sufficient because, to so hold, would itself impair competition in the

27

28  [46] And Apple computer famously violated that agreed-upon zone of use when it invented iTunes and, as a result, entered into the music "lane" which it had agreed was off limits to it.

1    marketplace.  As the Ninth Circuit reasoned:  "Direct evidence of intent to vanquish a rival in an

2    honest competitive struggle cannot help to establish an antitrust violation." *Id.* at 1028.  In this

3    respect, even if Monster's and Orange Bang's true motivation was to vanquish VPX, by seeking to

4    enforce the very promises that VPX voluntarily made to Orange Bang, Monster and Orange Bang

5    were engaged in an honest competitive struggle (albeit aggressive, if not blood- thirsty) which did

6    not rise to the level of an anti-trust violation or an unlawful restraint of trade.

7         In *Fibreboard Paper Prod. Corp. v. E Bay Union of Machinists, Loc. 1304, United*

8    *Steelworkers of Am., AFL-CIO*, 227 Cal.App.2d 675, 727 (1964), the court ruled that a party has

9    unclean hands if that party violated "conscience, good faith or other equitable principles."[47]

10   Conduct by Monster and Orange Bang which requires VPX to honor its own agreement does not

11   mean that Monster or Orange Bang has unclean hands which would preclude their right to invoke

12   equitable (or legal) relief.

13        In short, and to paraphrase an often-cited quote: one person's "weaponization" is another

14   person's "enforcement".  In other words, it is all about point of view and perception.  What VPX

15   perceives as "weaponization", Monster and Orange Bang perceive as "enforcement."  The

16   arbitrator agrees with Monster and Orange Bang.  It is not a violation of the Cartwright Act to

17   require VPX to honor the VPX Marketing and Sales Restrictions set forth in paragraph 7 of the

18   2010 Settlement Agreement, an arm's length agreement it entered into freely, voluntarily, for its

19   own particular business reasons and with the advice of counsel.

20        Judge Fischer of the United States District Court for the Central District of California

21   agreed with this analysis in her November 30, 2020 ruling compelling this arbitration.  VPX argued

22   that the Assignment Agreement was improper and that the assignment was invalid because it

23   "thwarts fair competition."  Judge Fischer noted that VPX supported this argument by citing two

24   cases [*ANI Pharms., Inc. v. Cabaret Biotech Ltd.,* No. 19 Civ.  5409, 2020 WL 1989400, at *4

25   (S.D.N.Y.  Apr.  26, 2020) (citing *Farmland Irr.,* 48 Cal.2d at 222)] which held that an assignment

26

27   ────────────────

28   [47] *See also Blain v. Doctor's Co.*, 222 Cal.App.3d 1048 (1990) [setting forth the three prong test for
     when the unclean hands doctrine applies, requires nexus between the alleged misconduct and the
     claimed injuries].

agreement is improper if it prevents the non-assigning party from obtaining the performance it expected. Judge Fischer rejected this restraint of trade argument raised by VPX and, in so doing, Judge Fischer commented that she could not discern what performance VPX did not receive which it expected to receive. According to Judge Fischer, VPX apparently did not expect Orange Bang to actually seek to enforce its rights under the 2010 Settlement Agreement, the very rights which Monster and Orange Bang seek to enforce by way of this arbitration action, and that act of enforcing a contract by way of an assignment agreement does not thwart fair competition. As Judge Fischer put it:

> "The Court cannot discern what different 'performance [VPX] expected' other than that they did not expect OBI [Orange Bang] to actually enforce the rights of the contract and Monster now is. **The Court declines to protect this expectation. If Plaintiffs [VPX and JHO] did not want to be held to the [2010] Settlement Agreement, they should not have signed it."**

Exhibit 2924, Judge Fischer's November 30, 2020 Ruling, p. 8.

(Emphasis added.)

## X. JHO, Quash and Entourage

As set forth above, and as Judge Fischer has previously held, JHO is a proper party to this arbitration, the arbitrator has jurisdiction over JHO and JHO is bound by this Initial Arbitration Award. In other words, a judicial determination that a non-signatory, JHO, is bound by this arbitration has already been made by Judge Fischer. *See Benaroya v. Willis*, 23 Cal.App.5th 462, 468 (2018); *Sandquist v. Lebo Automotive, Inc.,* 1 Cal.5th 233, 252 (2016).

Monster and Orange Bang contend that the arbitrator likewise has jurisdiction over Quash and Entourage, which pertains to the hard seltzer product known as Bang Mixx, because of the alter ego doctrine. In *Hasse v. Hapke*, 227 Cal.App.4th 107, 155 – 157 (2014), the court reiterated the two elements which must be demonstrated in order to establish alter ego: (1) a unity of interest and ownership between the corporate entities at issue, VPX, on the one hand, and Quash and Entourage, on the other, in this instance; and (2) an inequitable result if the purported separateness

of the entities is not disregarded.  In *Hasse*, the court also listed various factors which should be

considered in order to determine if the two requisite elements have been satisfied:

- the commingling of funds [no, no evidence presented that VPX commingled funds
  with Quash or Entourage];

- liability of one entity for the debts of the other [no, no evidence presented that VPX
  assumed liability for the debts of Quash or Entourage];

- identical equitable ownership [yes, convincing evidence presented that VPX and
  Quash / Entourage had identical equitable ownership since the evidence showed that
  J. Owoc owned 100% of VPX (and 100% of JHO), 100% of Quash and 100% of
  Entourage];

- use of the same offices and employees [yes, convincing evidence presented that
  VPX shared offices and employees with Quash / Entourage];

- the use of one corporate entity to conduct the affairs of the other [yes, convincing
  evidence presented that Quash and Entourage are a mere shell through which VPX
  is conducting its alcohol business, the sale of the hard seltzer Bang Mixx];

- inadequate capitalization [no, no evidence presented regarding the initial or ongoing
  capitalization of Quash or Entourage];

- disregard of the corporate formalities [yes, convincing evidence of disregard of
  corporate formalities as demonstrated by the highly-convenient and highly-
  suspicious chain of title documents created by VPX days prior to the
  commencement of the arbitration hearing (discussed in more detail below)];

- lack of segregation of corporate records [yes, convincing evidence of a lack of
  segregation of corporate records as demonstrated by the highly-convenient and
  highly-suspicious chain of title documents created by VPX days prior to the
  commencement of the arbitration hearing (discussed in more detail below)]; and

- identical directors and officers [yes, convincing evidence of identical directors and
  officers as demonstrated by the fact that J. Owoc controls every entity because of his
  100% ownership of each entity].

On September 22, 2021, less than two weeks before the arbitration hearing commenced, JHO and Entourage signed their own trademark co-existence agreement in which they declared in a recital that there is no likelihood of confusion between Entourage's use of its Bang marks and JHO's use of its Bang marks.[48] VPX's general counsel, Greg Metzger ("Metzger"), signed the document on behalf of both Entourage and on behalf of Quash as the authorized representative of each IP holding company. No articulated monetary consideration was paid for this acknowledgement of co-existence. *See* Exhibit 5472. On September 29, 2021, literally 3 business day before the arbitration hearing commenced, Entourage signed a license agreement by which it licensed to Quash the Bang trademark rights it had registered for use on Bang Mixx. VPX's general counsel Metzger again signed the document on behalf of Entourage as the authorized representative of the company and J. Owoc, the 100% owner of VPX, signed on behalf of Quash. Again, no articulated monetary consideration was paid for this grant of rights. *See* Exhibit 5525.

Monster and Orange Bang have filed a post-arbitration hearing Offer of Proof regarding the deposition testimony of Francis Massabki ("Massabki") and a motion requesting that such testimony be received into evidence. The arbitrator hereby grants Monster's and Orange Bang's motion and the Massabki deposition testimony is received into evidence. However, despite this ruling, for the reasons explained below, the arbitrator nevertheless concludes that he does not have jurisdiction over Quash or Entourage and that this Initial Arbitration Award is not binding on Quash or Entourage.

Neither Quash nor Entourage were never named as parties to this arbitration. There has never been a judicial determination made as to whether Quash or Entourage, non-signatories to the arbitration agreement, should be compelled to arbitrate claims asserted against them by Monster and Orange Bang. Neither Quash nor Entourage has had the opportunity to put on a defense to this arbitration or even a defense to the alter ego claims. Perhaps Quash and Entourage are the alter

---

[48] JHO itself obtained its initial grant of rights regarding the Bang tradename from VPX via a 2017 assignment. JHO then licensed back the rights to make use of the Bang tradename to VPX. Because JHO's Bang rights derive from a grant of rights from VPX, and because JHO is a successor-in-interest to VPX in this regard, JHO's Bang rights are likewise subject to the 2010 Settlement Agreement.

1   egos of VPX, and perhaps not, and perhaps they are agents, or even successors, within the meaning

2   of paragraph 14 of the 2010 Settlement Agreement, and perhaps not, but they should still have the

3   due process right to be heard on these issues and that decision needs to be made by a court, not by

4   the arbitrator.  In *Benaroya*, the court ruled that an arbitrator's finding of alter ego against a non-

5   signatory to the arbitration agreement had to be vacated because the initial determination of

6   whether or not the alter ego defendant was subject to the arbitration had to be determined by the

7   court, not by the arbitrator.  *Id*. at 465 – 468.  Accordingly, the arbitrator hereby rules that he does

8   not have jurisdiction over Quash or Entourage.  Monster and Orange Bang may, or may not, have

9   further rights against Quash and Entourage, but that determination must be made, in the first

10   instance, by the trial court, not by the arbitrator.

11

12   **Y. The Determination of the Prevailing Parties Issue for the Purposes of the Entitlement**

13       **to Attorney's Fees and Costs and the Amount of Attorney's Fees and Costs**

14          Monster and Orange Bang are the prevailing parties.  They are entitled to recover their costs

15   as a matter of right and as a matter of law.  CCP Section 1032(b); 15 U.S.C. Section 1117(a)(3);

16   paragraph 18 of the 2010 Settlement Agreement.  In particular, the fourth sentence of paragraph 18

17   expressly entitles the prevailing party to recover "experts witnesses fees, costs and expenses

18   connected with presenting their case."   The word "connected with" is a broad concept and shows a

19   mutual intent of the parties to the 2010 Settlement Agreement to recover a wide variety of costs

20   associated with litigation, including experts fees which is not typically an item of cost recovery

21   under Section 1033.5 of the California Code of Civil Procedure ("CCP") [assuming the non-

22   applicable of Section 998 of the CCP].

23          In addition, both Monster and Orange Bang are prevailing parties for the purposes of

24   recovery of attorney's fees as follows:

25

26

27

28

**Paragraph 18, the Attorney's Fees Provisions in the 2010 Settlement Agreement**

As the case law under California law[49] discussed below provides, where there is a narrow attorney's fee provision, a party prevailing on only a contract claim can be deemed to be the "prevailing party" for the purposes of the recovery of attorney's fees.  However, if the attorney's fee provision at issue is a broad attorney's fee provision, then a party who prevails on a contract claim and/or on a non-contract claim is still deemed to be the "prevailing party" for the purposes of the recovery of attorney's fees.

In 1998, in *Santisas v. Goodin*, 17 Cal.4th 599 (1998), the California Supreme Court addressed the issue of the recovery of attorney's fees based on a broad attorney's fee provision. In *Santisas*, the parties had a dispute over a real estate purchase agreement.  Santisas sued asserting a contract claim and various non-contract claims including a claim for negligence and various fraud related claims.  The contract at issue had a broad attorney's fee provision which stated that "in the event legal action is instituted by the Broker(s), or any party to this agreement, or **arising out of** the execution of this agreement or the sale, or to collect commissions, the prevailing party shall be entitled to receive from the other party a reasonable attorney fee to be determined by the court in which such action is brought."  (Emphasis added.)  One of the issues before the Court was whether or not the attorney's fee provision at issue was broad enough to encompass both contract claims and tort claims.  The Court concluded that the attorney's fee provision was indeed broad enough to allow recovery of attorney's fees relating to the non-contract claims and held as follows:

> On its face, the provision embraces all claims, both tort and breach of contract, in plaintiffs' complaint because all of the claims "arising out of the execution of th[e] agreement or the sale."  (See *Lerner v. Ward* (1993) 13 Cal.App.4th 155, 160-161, 16 CalRptr.2d 486.).
> Plaintiffs do not argue otherwise.  If a contractual attorney fee provision is **phrased broadly enough**, as this one is, it may support an award of attorney fees to the prevailing party in an action alleging **both contract and tort claims**: "[P]arties may validly agree that the prevailing party will be awarded attorney fees incurred in any litigation between

---

[49]  Paragraph 21 of the 2010 Settlement Agreement, the choice of law provision, provides for the application of California law.

themselves, **whether such litigation sounds in tort or in contract**.” (*Xuereb v. Marcus &
Millichap, Inc.* (1992) 3 Cal.App.4th 1338, 1341, 5 Cal.Rptr.2d 154.)

(Emphasis added.)

*Santisas*, at 608.

*See also Cruz v. Ayromloo*, 155 Cal.App.4th 1270, 1276-1277 (2007) [broad attorney’s fee
provision contemplated the recovery of attorney’s for all claims in the civil action, whether based
on contract or tort, “in connection” with the lease at issue]. [50]

Thus, the question arises as to whether or not the attorney’s fee provision set forth in
paragraph 18a of the 2010 Settlement Agreement is a “broad” attorney’s fee provision.  It is.  The
first sentence of paragraph of 18a is written with broad language and encompasses “[*a]ny* Claim *or
controversy arising out of or related to* the Action, *this Agreement or any breach thereof . . . .*”
(Emphasis added.)  The fourth sentence of paragraph 18a of the 2010 Settlement Agreement
provides that “t]he prevailing Party [which now includes Monster by virtue of the Assignment
Agreement] shall be entitled to recover from the non-prevailing Party [VPX] its reasonable
attorney’s fees . . . connected with presenting their case.”  Again, the “connected with” language is
likewise a “broad” concept and reflective of a mutual intent to include non-contract claims within
the ambit of the attorney’s fee provision.

Thus, the party who prevailed on the non-contract claim, in this case Orange Bang, is a
“prevailing party” because paragraph 18a is a broad attorney fee provision which encompasses the
trademark-related claims.  At the same time, the party who prevailed on the contract claim, in this
case Monster, is likewise a prevailing party because: (i) it prevailed on its contract claim as to the

---

[50]  In 1995, in *Hsu v. Abbara*, 9 Cal.4th 863 (1995), the California Supreme Court addressed the
issue of the recovery of attorney’s fees solely in a breach of contract context under California Civil
Code Section 1717.  Although the facts of *Hsu* are not directly on point, the discussion of the
policy objectives underlying the award of attorney’s fees under California law are instructive.  In
*Hsu*, the Court ruled that a defendant who prevailed on the sole cause of action for breach of
contract must be determined to be the prevailing party because that defendant had undeniable
litigation success, a “simple, unqualified win”, and undoubtedly obtained their litigation objectives,
even though Section 1717 of the CCP vests the court with discretion in other circumstances to
determine that there is no prevailing party at all.  In this respect, *Hsu* stands for the proposition that
the court should take into account litigation success and whether or not the objectives of the
litigation have been achieved in determining whether to award attorney’s fees.

1   Past Time Period to the extent of $157.5 million (an amount it does not receive because of the

2   Orange Bang / Monster Election designed to prevent double recovery, but still demonstrating that

3   Monster did prevail and achieve its litigation objectives); (ii) it prevailed on its contract claim as to

4   the future time period by virtue of the award of the equitable remedies of specific performance and

5   the Permanent Injunction and the 5% continuing royalty awarded in lieu of the Permanent

6   Injunction resulting from the VPX 5% Continuing Royalty Election; (iii) it prevailed on a claim to

7   receive a reasonable royalty during the time period of September 20, 2021 through June 30, 2022;

8   and (iv) it was the sole prevailing party insofar as VPX's counterclaim alleging breach of the

9   confidentiality provision of the 2010 Settlement Agreement is concerned.  The arbitrator need not

10  reach the paragraph 18b issue, the "second" attorney's fees provision in paragraph 18, because the

11  arbitrator has now ruled that paragraph 18a provides a basis for the recovery of attorney's fees by

12  the prevailing parties, Orange Bang and Monster.

13          VPX Election of Remedy Argument, which is discussed and rejected above, does not

14  change this conclusion or this result.[51]

15          **AAA Rule 47(d)**

16          AAA Rule 47(d) empowers the arbitrator to award attorney's and interest if all sides have

17  requested such an award or if the recovery of attorney's fees is authorized by the arbitration

18  agreement.  As set forth above, paragraph 18a of the 2010 Settlement Agreement contains a broad

19  attorney's fee provision and therefore the second portion of Rule 47(d) is satisfied.  In addition, and

20  as a separate, independent and distinct basis for the award of attorney's fees, both sides requested

21  an award of attorney's fees in their pleadings.  VPX requested an award of attorney's fees in both

22  Respondent's Revised Answering Statement and Counterclaims dated December 11, 2020,

23

24

---

[51]  In *Simulados Software, Ltd. v. Photon Infotech Priv., Ltd.*, 2020 WL 2994126, at *3 (N.D. Cal. 2020), the attorney's fee provision was broad and covered both contract and tort claims.  The plaintiff prevailed at a jury trial on both claims.  The court, however, concerned about the potential for a duplication of damages, awarded the plaintiff recovery under the fraud claim, but not under the contract claim, because the fraud recovery was not subject to a "cap" like the contract award.  The court held that the plaintiff was nevertheless entitled to recover its attorney's fees because the fraud claim was still a claim based "on the contract" under Section 1717 of the CCP, even though the court had already limited the plaintiff's recovery to the fraud claim, and disallowed it to recover under the contract claim, in order to avoid a double recovery of damages.

1 paragraph 4 of its prayer, and in Respondent's Second Revised Answering Statement and

2 Counterclaims undated, paragraph 5 of its prayer. Therefore, the initial portion of Rule 47(d) is

3 likewise satisfied which provides a separate, independent and distinct basis for the award of the

4 attorney's fees set forth below.

5        **The "Exceptional Case" Standard Under Trademark Law**

6        Because paragraph 18a, the broad attorney's fee provision at issue, and AAA Rule 47(d)

7 each provide a separate basis for the award of attorney's fees, there is no need to reach or determine

8 the issue of whether or not this matter satisfies the "exceptional case" standard for the award of

9 attorney's fees under the Lanham Act.

10

11     **Z. The Amount of Costs and Attorney's Fees**

12        Although VPX has numerous arguments with respect to the entitlement and amount of

13 attorney's fees, it has not offered any argument with respect to the entitlement or the amount of

14 costs. Even if VPX had done so, Orange Bang and Monster are entitled to costs as a matter of right

15 and Orange Bang and Monster have made a sufficient showing as to the entitlement and the amount

16 of costs. Accordingly, VPX is obligated to pay Orange Bang's and Monster's costs in the amounts

17 as follows:

| | |
|---|---|
| 18   $1,576,796.33 | litigation expenses and costs, including experts, for |
| 19 | Monster and Orange Bang[52] |
| 20   $   15,450.00 | Claimants' share of Arbitration Place – virtual bailiff |
| 21   $  104,943.82 | Claimants' share of transcripts and videos |
| 22   $   86,625.00 | Square up of $102,800 AAA administrative fees[53] |
| 23   $  234,843.75 | 50% of the arbitrator's compensation ($469,687.50)[54] |

24 _____

25

26 [52] Pursuant to the Declarations of Libeu paragraph 18 and Nataupsky paragraph 13, this category

27 of costs includes expert witness fees, graphics vendor, e-discovery, investigation, court reporter, hotel costs during trial, printing cots, interpreter cots, messenger costs and subpoena costs.

[53] The $102,800 in AAA administrative fees and the square up computation were calculated by

28 the AAA.

[54] The $469,687.50 arbitrator's compensation was also calculated by the AAA.

$2,018,658.90          total (collectively, the "Award of Costs")

The Award of Costs is due and payable as of April 29, 2022 and shall bear interest at the legal rate of 10% thereafter.

**The Amount of Attorney's Fees**

**All** of the attorneys involved in this case have demonstrated outstanding litigation skills, diligence and, for the most part, professional judgment[55] which places all of them in the very top of the top tier. In addition to its contention that Orange Bang and Monster are not entitled to the recovery of attorney's fees, VPX has also argued that the amount of attorney's requested by Orange Bang and Monster exceeds a "reasonable" amount. VPX contends that the amount of Orange Bang's and Monster's attorney's fees should be reduced because their hourly rates are not reasonable; their trial fellows billed for administrative and secretarial work; they engaged in block-billing; they overstaffed the case; and they split claims as between Orange Bang and Monster.

With respect to the issue of hourly rates, and based upon the showings made by both sides and based upon the case law cited by the parties, the arbitrator finds that all of the Orange Bang and Monster hourly rates, some of which were already discounted to some extent, are reasonable based upon the Southern California market for trial attorneys in the top tier of their profession and therefore these hourly rates shall not be reduced.

With respect to VPX's claim that trial fellows billed for administrative and secretarial work, a review of the billing statements shows that is not the case. Although the trial fellows are apparently not attorneys, their work was not ministerial or "purely clerical". Just because they are not law school graduates does not mean that the services they rendered to this litigation effort does not require thinking, analysis and judgment. For instance, internet research, document review and analysis, finding valuable evidence on-line or in the public record, analyzing which documents to pull in order to prepare for depositions, for document productions, for direct and cross examinations, maintenance of the e-discovery platforms and finding, locating and reviewing

---

[55] Query whether the proposed footnote 40 of VPX's March 17, 2022 proposed redline of the Interim Arbitration Award, which proposes to reduce the award of compensatory damages in an estimated amount of at least $50 million in a single stroke, falls within the latter category?

1  documents on the "Relativity" document software (something most law partners themselves cannot

2  do) are examples of valuable contributions made by the trial fellows to this case (on both sides).

3  The arbitrator has reviewed the billing entries for Kristen Mather, Benjamin Matsalla and Taylor

4  Thomas and their billing descriptions indicate that the work performed by them was classic

5  paralegal work.[56]  Therefore, it is appropriate for any of the law firms to bill for the time and effort

6  reflected in these paralegal-like legal services, all of which are inherently valuable to the litigation

7  effort and all of which reduce the amount of billable time which would otherwise be incurred, and

8  billed, by the attorneys themselves (thus creating a "savings" for the client).  The arbitrator finds

9  that the billing entries of the trial fellows are legitimate time and there is no need for a reduction of

10  the legal fees based on these line items.

11  Block-billing is a mixed bag, and often misunderstood.  Many clients, and courts, view

12  block-billing as an unfortunate practice by which attorneys "pad" their time.  According to this

13  view, attorneys over-state the amount of billing time spent on particular legal tasks which are then

14  "blocked-billed" so as to disguise the inappropriate time charges.  As a result, many courts object

15  to a pattern of block-billing and insist upon a significant percentage reduction of the aggregate

16  amount of legal fees charged by the attorneys who engage in block-billing.  In contrast, many

17  attorneys view the objection to block-billing as a device used by clients and other payors of legal

18  bills to artificially negotiate down legal fees.  In this respect, block-billing is often used as an

19  excuse to not pay the attorneys the amount of a billing statement for which they are arguably

20  entitled to get paid in full.  Perhaps both of these extremes have some semblance of truth to them.

21  In this case, VPX contends that Orange Bang and Monster are guilty of making use of the

22  practice of block-billing and, therefore, according to VPX, Orange Bang's and Monster's

23  attorneys' fees should be reduced in a material way.  As an example of its point of view, VPX

24  refers to the October 5, 2021 billing entries for Attorney Zadra-Symes ("Zadra-Symes") and

25  

26  [56]  VPX refers to Benjamin Matsalla's billing entry of July 1, 2021 as an example of a charge for the mere photocopying of documents because the billing entry makes use of the word "re-

27  production", a fancy word for photocopying.  However, a review of the Benjamin Matsalla billing entries on June 29, 2021, the billing date before the July 1, 2022 billing entry, shows that Monster

28  had received recent document productions from third parties, the University of West Florida and Market Tracks, documents that need to be "re-produced" to VPX, to the extent requested by VPX.

Attorney Bellinger ("Bellinger"), both of whom billed an 8.00 hour day for attending the arbitration evidentiary hearing on that date (the second day of the arbitration evidentiary hearing) and both of whom billed additional tasks on that day as well [Zadra-Symes prepared Ken Hollander (expert) and reviewed correspondence and Bellinger reviewed correspondence with opposing counsel and arbitrator regarding disputed issues], tasks which they both block-billed on that day.

These are curious examples raised by VPX. According to the transcript of the October 5, 2021 arbitration evidentiary hearing, the proceedings on that day commenced at 9:00 am and ended at 7:15 pm. Therefore, an attorney who attended the hearing on that day, and did other tasks as well, would be justified in billing at least 11.25 hours on October 5, 2021. Yet both Zadra-Symes and Bellinger billed only 8.00 hours that day and, on top of that, they both provided *additional* information on other tasks billed that day, albeit in a block-billed format. Perhaps Zadra-Symes and Bellinger did not attend the full hearing on October 5, 2021, but there is nothing to indicate in any way that their time was "padded", contrived or inaccurate on that day. The arbitrator, in looking at the billing statements, did notice billing entries which were block-billed. However, there is nothing in the record to indicate that these block-billed billing entries were anything other than legitimate legal time spent on a wide variety of legal tasks.

Often times, block-billing is not the result of dishonest or even lazy billing practices, but rather is the result of the practical reality of being a trial attorney or a para-legal in high stakes litigation. By way of illustration, it is not uncommon for attorneys or paralegals to not only work an 8.00 hour day, but even a 12.00 day or even a 16.00 hour day. If that attorney or paralegal wanted to avoid block billing, and specifically break down each particularized task that he or she is doing that day (of which there could be 25 – 50 individualized tasks), the attorney or paralegal could do just that, but that specificity takes time, effort and scrupulous discipline, perhaps as much time as two to three additional hours per day just to accomplish the billing function and the maintenance of specific, line-item time sheets. The practical reality of this fact is that an attorney's or paralegal's very long litigation day, let's say a 12.00 hour day, becomes a 14.00 hour or a 15.00 hour day. For this reason, many attorneys and paralegals are "guilty" of a form of block-billing, not because of any dishonest motivations, but because of the sheer enormity of tracking each

1 individualized task.  In short, the arbitrator sees block-billing in this case, but does not see any

2 evidence or indication that the legal time is padded, inflated or inaccurate.  For these reasons,

3 VPX's request to reduce the amount of legal fees based on block-billing is denied and Orange

4 Bang's and Monster's legal fees shall not be reduced on this basis.

5       With respect to the issues of over-staffing and too many hours spent on this litigation, the

6 arbitrator has mixed reactions.  While it is true that Monster and Orange Bang often had 13

7 attorneys working on this case between them, it is also true that VPX often had 12 attorneys (and

8 arguably 16 according to Monster's and Orange Bang's reply brief on attorneys' fees and costs, p.

9 30] working on this case.  In fact, during the arbitration evidentiary hearing, there were times when

10 there were as many as 48 "participants" attending the arbitration on Zoom, counting attorneys,

11 client representatives, paralegals, experts, etc.  According to Monster and Orange Bang, the amount

12 in controversy was $1.48 billion according to their pre-arbitration briefs and VPX often argued that

13 this was a "bet the company" case, thus indicating that both sides were justified with a very large

14 expenditure of resources, effort and attorney/paralegal (and expert) time.  Having stated that, it

15 does appear that at times the amount of staffing was somewhat over-zealous, but not overly so.

16 Therefore, based upon the showings made by both sides, the arbitrator finds that Monster's and

17 Orange Bang's aggregate attorney's fees should be reduced by 2.5%.  In this respect, 97.5% of the

18 aggregate attorney's fees requested by Monster and Orange Bang, the amount of $7,466,446.55, is

19 reduced to $7,279,785 and that is the amount hereby awarded by the arbitrator as the award of

20 Monster's and Orange Bang's attorney's fees (the "Award of Attorney's Fees").

21       With respect to the issue of claim splitting, the arbitrator views this argument as another

22 restatement of VPX's Election of Remedies Argument which has been addressed and rejected

23 above.

24

25

26

27

28

**IV.    SUMMARY OF FINDINGS OF THE FINAL ARBITRATION AWARD – PHASE 1 AND PHASE 2**

**A. Material Findings Regarding Liability and the Award of Monetary Relief**

The Arbitrator hereby summarizes his key findings and award as follows:

- VPX breached paragraph 7 of the 2010 Settlement Agreement.
- VPX is currently in breach of paragraph 7 of the 2010 Settlement Agreement.
- With respect to VPX's past breach of the 2010 Settlement Agreement, Monster is entitled to recover damages from VPX and JHO through September 19, 2021 as follows:
    - a reasonable royalty in the amount of 5% of net sales of BANG branded products in the amount of **$101,525,000**; or
    - a disgorgement of profits attributable to the breach of paragraph 7 in the amount of $**157.5 million**.
- VPX is liable for trademark infringement by virtue of Orange Bang's and Monster's proving the elements necessary to demonstrate a likelihood of confusion in the relevant market with a sufficient amount of consumers with respect to the use of the BANG mark.
- There is no indication that VPX will stop its infringing activity, or abide by the VPX Marketing and Sales Restrictions set forth in paragraph 7 D of the 2010 Settlement Agreement, in the future.
- As an alternative to their breach of contract damages, and with respect to VPX's trademark infringement, Orange Bang is entitled to recover past damages from VPX and JHO through September 19, 2021 as follows:
    - a reasonable royalty in the amount of 5% of net sales of BANG branded products in the amount of **$112,314,490.75**; or
    - a disgorgement of profits attributable to the infringement of the BANG mark in the amount of **$175 million**.

- Of the four calculations of the monetary recovery referred to above, and in order to avoid double recovery for compensatory damages as to the Past Period of Time, only one of the calculations is recoverable as the monetary award, at the election of Monster and Orange Bang[57], and it is recoverable from and against VPX and JHO, jointly and severally.

**B. The Equitable Remedies of the Permanent Injunction and Specific Performance and the Election of the 5% Continuing Royalty in Lieu of the Permanent Injunction as to the Time Period Following the Arbitration**

The Arbitrator hereby finds and awards as follows:

- Because of the likelihood of a continuing breach of paragraph 7 of the 2010 Settlement Agreement and the continuing infringement of Orange Bang's BANG mark and because Orange Bang has proven the elements necessary for the issuance of the Permanent Injunction, and because the elements for specific performance have been satisfied, permanent injunctive relief is appropriate to ensure compliance with the 2010 Settlement Agreement, to prevent future violations of the 2010 Settlement Agreement and to prevent future trademark infringements of the Bang mark.

- VPX and JHO are hereby permanently enjoined as set forth in Section III, M. above. The Permanent Injunction is hereby issued, but stayed until April 29, 2022.

- In lieu of the issuance of the above Permanent Injunction, and based upon the VPX 5% Continuing Royalty Election, **VPX and JHO shall pay Orange Bang and Monster a royalty at the rate of 5%** of VPX's Net Sales (as defined above) derived from the sale of Bang branded products, including BANG Energy RTD, **on an ongoing, continuing basis in the future** as set forth above and for so long as VPX or JHO make any use of the BANG mark.

---

[57] As described above, on January 31, 2022, Orange Bang and Monster served notice of the Orange Bang / Monster Election.

**C. The Award of Costs and Attorney's Fees**

In addition to the award of compensatory damages and the award of the equitable remedies as set forth above, VPX and JHO are each jointly and severally liable to pay Monster and Orange **$2,018,658.90** for the Award of Costs and **$7,279,785** for the Award of Attorney's Fees, for a total award for costs and attorney's fees in the amount of **$9,298,443.90** (collectively, the "Award of Costs and Attorney's Fees").

**V.   CONFIDENTIALITY OF THE FINAL ARBITRATION AWARD AND THE SURVIVAL OF THE 2010 SETTLEMENT AGREEMENT**

VPX contends that the Interim Arbitration Award and the Final Arbitration Award are both confidential and may not be disclosed to third parties.  In contrast, Monster and Orange Bang contend that the Interim Arbitration Award and the Final Arbitration Award are not confidential and may be disclosed to third parties, such as for the purposes of regulatory disclosures.  Monster and Orange Bang have apparently designated portions of the Interim Arbitration Award which they are willing to treat as confidential and they invite the arbitrator to weigh in on such designations. The arbitrator respectfully declines the invitation.

VPX has purported to cite cases which stand for the proposition that, given the rulings of the arbitrator as reflected in this Final Arbitration Agreement, the 2010 Settlement Agreement is thus deemed void and unenforceable.  In contrast, Monster and Orange Bang have cited authorities which stand for the proposition that the 2010 Settlement Agreement survives the issuance of the Final Arbitration Award and remains in full force and effect and, if violated in the future, Monster should be entitled to enforce it.  California Civil Code Section 1047 provides that where there is a breach of reoccurring obligations which give rise to a new cause of action, a plaintiff is permitted to bring a successive action.[58]

---

[58] In *Yates v. Kuhl*, 130 Cal.App.2d 536, 539-540 (1955), the plaintiff filed a first action against a defendant who interfered with plaintiff's right to obtain available water.  Plaintiff was awarded injunctive relief.  In the second action, the plaintiff sought monetary damages for the denial of water in a later time period.  The defendant claimed that because of plaintiff's prior election of

(Continued...)

1  The arbitrator clarifies that he believes that the authorities cited by Monster and Orange

2  Bang in this regard correctly state the law. This is especially true in this case where the

3  fundamental purpose of the equitable remedies of specific performance and the issuance of the

4  Permanent Injunction (now stayed by virtue of the VPX 5% Continuing Royalty Election) is to

5  ensure compliance with the 2010 Settlement Agreement. To rule otherwise would make the

6  issuance of the equitable remedies an empty gesture and would grant an unintended license to VPX

7  to infringe the Bang mark and/or ignore the 2010 Settlement Agreement in the future without any

8  consequences or financial downside. Such a result would negate the purpose and intent of this

9  Final Arbitration Award. Accordingly, the arbitration hereby reaffirms that the 2010 Settlement

10  Agreement survives the issuance of the Final Arbitration Award and remains in full force and

11  effect.

12

13  **VI.   THE ARBITRATOR'S INTENT REGARDING THE FINALITY OF THE FINAL**

14  **ARGITRATION AWARD**

15  This Final Arbitration Award is a full and final adjudication of all claims which were, or

16  which could have been, submitted to the arbitrator by any and all of the parties in connection with

17  this arbitration. All claims not expressly adjudicated, determined or resolved by way of this

18  arbitration or as set forth in this Final Arbitration Award are denied. The arbitrator intends this

19  Final Arbitration Award to be the final expression of his conclusions, adjudications and awards

20  raised in this arbitration.

21

22  **Dated:** April 4, 2022

23  **By:   Bruce Isaacs, Arbitrator**

24  /Bruce Isaacs/

25

26

27

28  remedies, the plaintiff was barred from seeking damages in the second action. The court ruled, however, that plaintiff was not barred and that the remedies were not inconsistent because the damages arose in a later period of time which gives rise to a new cause of action.

177

FINAL ARBITRATION AWARD – PHASE 1 AND PHASE 2