# Debtors' Exhibit 8

# PROOF OF CLAIM

### UNITED STATES BANKRUPTCY COURT
### SOUTHERN DISTRICT OF FLORIDA
### FORT LAUDERDALE DIVISION
### www.flsb.uscourts.gov

| Name of Debtors | Case Numbers: |
|---|---|
| **VITAL PHARMACEUTICALS, INC.,** *et al.* | **22-17842-PDR**<br>**22-17844-PDR**<br>**22-17845-PDR**<br>**22-17847-PDR**<br>**22-17848-PDR**<br>**22-17849-PDR**<br>**22-17950-PDR** |
| | (Jointly Administered) |

Indicate Debtor against which you assert a claim by checking the appropriate box below.

## (Check only one Debtor per claim form)

| Name of Debtor | Case Number |
|---|---|
| ☐ Vital Pharmaceuticals, Inc. | Case No. 22-17842-PDR |
| ☐ Bang Energy Canada, Inc. | Case No. 22-17844-PDR |
| ☒ JHO Intellectual Property Holdings, LLC | Case No. 22-17845-PDR |
| ☐ JHO Real Estate Investment, LLC | Case No. 22-17847-PDR |
| ☐ Quash Seltzer, LLC | Case No. 22-17848-PDR |
| ☐ Rainbow Unicorn Bev LLC | Case No. 22-17849-PDR |
| ☐ Vital Pharmaceuticals International Sales, Inc. | Case No. 22-17850-PDR |



1196110262230000000027

Official Form 410

## Date Stamp Copy Returned

# Proof of Claim

04/22

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. Do not send original documents; they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.

## Part 1:   Identify the Claim

| | | |
|---|---|---|
| 1. **Who is the current creditor?** | Monster Energy Company <br> Name of the current creditor (the person or entity to be paid for this claim) <br><br> Other names the creditor used with the debtor _____ | |
| 2. **Has this claim been acquired from someone else?** | ☒ No <br> ☐ Yes. From whom? _____ | |
| 3. **Where should notices and payments to the creditor be sent?** <br> Federal Rule of Bankruptcy Procedure (FRBP) 2002(g) | **Where should notices to the creditor be sent?** <br><br> Aaron Sonnhalter <br> Monster Energy Company <br> Name <br><br> 1 Monster Way <br> Number        Street <br><br> Corona                    CA            92879 <br> City                State            ZIP Code <br> Contact phone 951-817-6064 <br><br> Contact email   Aaron.Sonnhalter@Monsterenergy.com <br><br> Teddy M. Kapur, Esq. <br> Pachulski Stang Ziehl & Jones LLP <br> Name <br><br> 10100 Santa Monica Boulevard, Suite 1300 <br> Number        Street <br><br> Los Angeles, CA   90067 <br> City                State            ZIP Code <br> Contact phone:  310-277-6910 <br> Contact email:   tkapur@pszjlaw.com <br><br> Uniform claim identifier for electronic payments in chapter 13 (if you use one): <br> __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ | **Where should payments to the creditor be sent?** (if different) <br><br> Aaron Sonnhalter <br> Monster Energy Company <br> Name <br><br> 1 Monster Way <br> Number        Street <br><br> Corona                    CA            92879 <br> City                State            ZIP Code <br> Contact phone   951-817-6064 <br><br> Contact email   Aaron.Sonnhalter@Monsterenergy.com |

STRETTO

OCT 2 6 2022

RECEIVED

| | | |
|---|---|---|
| 4. **Does this claim amend one already filed?** | ☒ No <br> ☐ Yes. Claim number on court claims registry (if known) _____ | Filed on _____ <br> MM  / DD    / YYYY |
| 5. **Do you know if anyone else has filed a proof of claim for this claim?** | ☒ No <br> ☐ Yes. Who made the earlier filing? _____ | |

## Part 2: Give Information About the Claim as of the Date the Case Was Filed

**6. Do you have any number you use to identify the debtor?**

☒ No

☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____ ____ ____ ____

**7. How much is the claim?**

$ Not less than $96,799,516.35 . Does this amount include interest or other charges?

☐ No

☒ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

Litigation Claim (See supporting addendum and exhibits attached hereto)

**9. Is all or part of the claim secured?**

☒ No

☐ Yes. The claim is secured by a lien on property.

**Nature of property:**

☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*

☐ Motor vehicle

☐ Other. Describe: _____

**Basis for perfection:** _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

Value of property: $ _____

Amount of the claim that is secured: $ _____

Amount of the claim that is unsecured: $ _____ (The sum of the secured and unsecured amounts should match the amount in line 7.)

Amount necessary to cure any default as of the date of the petition: $ _____

Annual Interest Rate (when case was filed) _____ %

☐ Fixed

☐ Variable

**10. Is this claim based on a lease?**

☒ No

☐ Yes. Amount necessary to cure any default as of the date of the petition. $ _____

**11. Is this claim subject to a right of setoff?**

☒ No

☐ Yes. Identify the property: _____

| 12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)? | ☐ No | |
|---|---|---|
| | ☒ Yes. Check one: | **Amount entitled to priority** |

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

| | |
|---|---|
| ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $ _____ |
| ☐ Up to $3,350* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $ _____ |
| ☐ Wages, salaries, or commissions (up to $15,150*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $ _____ |
| ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $ _____ |
| ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $ _____ |
| ☒ Other. Specify subsection of 11 U.S.C. § 507(a)(2) that applies. | $ Undetermined |

* Amounts are subject to adjustment on 4/01/25 and every 3 years after that for cases begun on or after the date of adjustment.

---

## Part 3:  Sign Below

The person completing this proof of claim must sign and date it. FRBP 9011(b).

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Check the appropriate box:

☒ I am the creditor.

☐ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date  10/25/2022
                    MM / DD / YYYY

Signature

Print the name of the person who is completing and signing this claim:

| Name | Aaron | | Sonnhalter |
|---|---|---|---|
| | First name | Middle name | Last name |
| Title | Senior Vice President | | |
| Company | Monster Energy Company | | |
| | Identify the corporate servicer as the company if the authorized agent is a servicer. | | |
| Address | 1 Monster Way | | |
| | Number        Street | | |
| | Corona | CA | 92879 |
| | City | State | ZIP Code |
| Contact phone | 951-817-6064 | Email | Aaron.Sonnhalter@Monsterenergy.com |



LAW OFFICES
LIMITED LIABILITY PARTNERSHIP

LOS ANGELES, CA
SAN FRANCISCO, CA
WILMINGTON, DE
NEW YORK, NY
COSTA MESA, CA

10100 SANTA MONICA BLVD.
13th FLOOR
LOS ANGELES
CALIFORNIA 90067

**TELEPHONE: 310/277 6910**
FACSIMILE: 310/201 0760

**SAN FRANCISCO**
150 CALIFORNIA STREET
15th FLOOR
SAN FRANCISCO
CALIFORNIA 94111-4500

**TELEPHONE: 415/263 7000**
FACSIMILE: 415/263 7010

**DELAWARE**
919 NORTH MARKET STREET
17th FLOOR
P.O. BOX 8705
WILMINGTON
DELAWARE 19899-8705

**TELEPHONE: 302/652 4100**
FACSIMILE: 302/652 4400

**NEW YORK**
780 THIRD AVENUE
34th FLOOR
NEW YORK
NEW YORK 10017-2024

**TELEPHONE: 212/561 7700**
FACSIMILE: 212/561 7777

**TEXAS**
440 LOUISIANA STREET
SUITE 900
HOUSTON
TEXAS 77002

**TELEPHONE: 713/691 9385**
FACSIMILE: 713/691 9407

WEB www.pszjlaw.com

## Via Federal Express

TO: Vital Pharmaceuticals, Inc., et al.
Claims Processing
c/o Stretto
410 Exchange, Suite 100
Irvine, CA 92602

FROM: Teddy M. Kapur

DATE: October 25, 2022

**ENCLOSED:** Proof of Claim for Monster Energy Company in JHO Intellectual Property Holdings, LLC, Case No. 22-17845-PDR.

☐ FOR YOUR INFORMATION
☐ PLEASE REVIEW AND COMMENT
☐ PLEASE HANDLE
☐ FOR YOUR FILES
☒ **OTHER:** Please file the enclosed POC and return a conformed copy in the self-addressed stamped envelope provided.

DOCS_LA:345856.1 57536/00001

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION
www.flsb.uscourts.gov

| IN RE: | Chapter 11 |
| --- | --- |
| VITAL PHARMACEUTICALS, INC., *et al.*, | Case No. 22-27842 (PDR) |
| Debtors.[1] | (Jointly Administered) |

## ADDENDUM TO PROOF OF CLAIM FILED BY MONSTER ENERGY COMPANY

This addendum ("Addendum") to the proof of claim (the "Proof of Claim") is hereby filed by Monster Energy Company ("Monster"). This Addendum and the documents referenced herein and attached hereto are an integral part of the Proof of Claim and incorporated by reference into the Proof of Claim for all purposes. Capitalized terms shall have the meanings ascribed herein.

### SUMMARY OF CLAIM

1.    Background of Claim. The Claim (as defined below) consists of all amounts due and owing to Monster by the Debtors Vital Pharmaceuticals, Inc. ("VPX Debtor") and JHO Intellectual Property Holdings, LLC ("JHO IP Debtor")[2] in connection with the following litigation (the "Litigation"): that certain judgment (the "Judgment") entered on September 29, 2022 by the Hon. Dale S. Fischer, U.S. District Judge for the Central District of California, adopting the final arbitration award (the "Final Award") issued on April 4, 2022 against VPX Debtor and JHO IP Debtor and in favor of Orange Bang and Monster Energy Company ("Monster"), in the case

---

[1] The address of the Debtors is 1600 N. Park Drive, Weston, FL 33326. The last four digits of the Debtors' federal tax identification numbers are: (i) Vital Pharmaceuticals, Inc. (8430); (ii) Bang Energy Canada, Inc. (5454); (iii) JHO Intellectual Property Holdings, EEC (0010); (iv) JHO Real Estate Investment, EEC (9394); (v) Quash Seltzer, EEC (6501); (vi) Rainbow Unicom Bev EEC (2254); and (vii) Vital Pharmaceuticals International Sales, Inc. (8019).

[2] VPX Debtor and JHO IP are joint and severally liable for the Claim.

DOCS_LA:345839.2 68700/001

styled as *Vital Pharmaceuticals, Inc. v. Orange Bang, Inc.*, Case No. 5:20-cv-01464. The

Judgment is attached hereto as **Exhibit A,** and the Final Award is attached hereto as **Exhibit B**.

        2.     Amount of Claim. As of October 10, 2022, the total amount of the claim

was not less than **$96,799,516.35** (the "Claim"), including, without limitation:

    a.    The following amounts set forth in the Judgment[3]:

        i.   Made at VPX Debtor and JHO IP Debtor's voluntary election of remedies, a
           continuing royalty (the "Royalty") at the rate of 2.5% of VPX Debtor and JHO
           IP Debtor's net sales of BANG-branded products on a continuing basis for so
           long as VPX Debtor and JHO IP Debtor's make any use of the BANG marks
           due to the likelihood of the continuing breach of contract and trademark
           infringement. The amount of the Royalty portion of the Claim is one half of the
           5% Royalty awarded to Monster and Orange Bang in the Judgment. The
           Royalty payment is due within 45 days after the close of each financial quarter.
           However, the first Royalty payment (which was due 45 days after July 1, 2022)
           is based on the amount of net sales that took place from September 20, 2021 to
           and including June 30, 2022 and bears interest at the legal rate of 10% from
           April 29, 2022. If VPX Debtor and JHO IP Debtor fail to pay the Royalty, after
           notice and a failure to cure within 14 days, a permanent injunction enjoining
           VPX Debtor and JHO IP Debtor from using the BANG trademark
           automatically takes effect without need for any further action by a court or
           arbitrator;

       ii.   $87,500,000, which represents one half of the $175,000,000 in damages
           awarded to Monster and Orange Bang for breach of contract and trademark
           infringement by VPX Debtor and JHO IP Debtor;

      iii.   $9,298,443.90, comprised of $7,279,785 in attorney's fees and $2,018,658.90
           in costs, which were awarded to Monster and Orange Bang from VPX Debtor
           and JHO IP Debtor. The award of costs bears interest at the legal rate of 10%
           from April 29, 2022; and

      iv.   $1,072.45 as costs of suit filed as a Bill of Costs of Monster and Orange Bang
           and due from VPX Debtor and JHO IP Debtor.

        3.     Moreover, in addition, the Claim includes all contingent and unliquidated

---

[3] The amounts awarded in the Judgment are subject to separate agreements between Orange Bang and Monster, pursuant to which each party will receive a fifty (50) percent share of all amounts awarded after deducting attorney's fees and costs.

claims and other amounts for which VPX Debtor and JHO IP Debtor are liable, including, without limitation, exemplary damages, punitive damages, professional fees, costs, and expenses, pre- and post-judgment interest, any claim for indemnification and contribution, and other charges, amounts and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing, or chargeable in respect of VPX Debtor's and JHO IP Debtor's obligations pursuant to the Litigation, including all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature. For example and without limitation, in the Litigation, Monster has claims against VPX Debtor and JHO IP Debtor for attorney's fees and costs, including amounts incurred in connection with the enforcement of the Claim, and prejudgment interest from the date the Final Award was issued until the date the Judgment was entered.

## **RESERVATION OF RIGHTS**

4.      Monster files this Proof of Claim with full reservation of rights with respect to the Litigation.

5.      The assertion of the Claim pursuant to this Proof of Claim is not intended as, and should not be deemed or construed as, a waiver of any position asserted by Monster in the Litigation. Moreover, the assertion of the Claim pursuant to this Proof of Claim should not be construed as Monster's consent to, or concession or admission of, any fact or legal conclusion in connection with the Litigation.

6.      Monster files this Proof of Claim with full reservation of rights, including, without limitation, to amend, clarify, or supplement this Proof of Claim at any time, manner, and for any reason, including but not limited to, fixing or liquidating any claims stated herein, specifying claims for ongoing obligations of the Debtors that are not expressly described herein,

DOCS_LA:345839.2 68700/001                    3

or asserting any additional claims.

7.      Monster reserves all of its procedural and substantive defenses and rights, including a right to a jury trial, with respect to any claim that may be asserted against it by the Debtors, their affiliates, any trustee for a particular Debtor's estate, any other party-interest in the above-captioned chapter 11 cases, or any other person or entity whatsoever.

8.      This Proof of Claim is filed without prejudice to and reserves the right to recover any fees (including reasonable attorneys' fees), expenses, and costs to which Monster is or may be entitled in the Litigation and applicable law.

9.      Monster has postpetition administrative expense claims against the Debtors for amounts to which they are entitled in connection with the Litigation and applicable law, including, without limitation, pursuant to sections 503 and 507 of the Bankruptcy Code, which amounts have been accruing and continue to accrue, such as, without limitation, the continuing Royalty awarded to Monster in the Judgment. By filing this Proof of Claim, Monster does not waive any of the postpetition administrative expense claims it has against the Debtors and all rights are expressly reserved in connection therewith.

10.     Monster reserves all of its rights of setoff, recoupment, counterclaim or similar right or remedy, or to assert a constructive trust against assets or cash held by any of the Debtors, or any other right, cause of action, or claim, whether existing now or hereinafter arising, that it has or may have against the Debtors, or any other person or persons.

11.     In executing and filing this Proof of Claim, Monster is not waiving in any manner or under any circumstances any defense, setoff, offset, recoupment, counterclaim, or similar right or remedy it may now have or at any time have against any Debtor or any other entity or person, or with respect to any legal or equitable proceeding now existing or hereafter

commenced.

12.    The filing of this Proof of Claim shall not be deemed a waiver in any manner and is without prejudice to any request for relief from the automatic stay.

13.    The execution and filing of this Proof of Claim is not (i) a waiver or release of any of Monster's rights against any entity or person liable for all or part of the Claim, (ii) a consent by Monster to the jurisdiction of this Court with respect to any proceeding commenced in these Chapter 11 cases against or otherwise involving Monster other than to the extent required for the determination and allowance of this Proof of Claim, (iii) a waiver of Monster's right to have any and all final orders in any and all non-core matters entered after *de novo* review by a United States District Court judge, or its respective right to a trial by jury in any proceeding as to any and all matters so triable, whether designated legal or private rights, or in any case or controversy or proceeding related thereto, notwithstanding the designation of such matters as "core proceedings" pursuant to section 157(b) of the Bankruptcy Code or otherwise, and whether such jury trial is pursuant to statute or the United States Constitution; (iv) a waiver of the right to withdraw the reference with respect to the subject matter of the Claim, any objection or other proceeding commenced with respect thereto or any other proceeding commenced in this case against or otherwise involving Monster, (v) an election of remedy that waives or otherwise affects any other remedy, (vi) a waiver or release of any of Monster's rights and remedies in connection with the Litigation and applicable law, (vii) a waiver of any right of action that Monster has or may have against the Debtors or any other person or entity; and/or (viii) a waiver or release of any of Monster's rights against any third party.

## NOTICES

14.    All notices to Monster concerning this Proof of Claim should be sent to:

Monster Energy Company
Attn: Aaron Sonnhalter
1 Monster Way
Corona, California 92879
Aaron.Sonnhalter@monsterenergy.com

Copies of all notices to the Agent concerning this Proof of Claim should be sent to:

Pachulski Stang Ziehl & Jones LLP
Attn: Teddy Kapur
10100 Santa Monica Blvd., Suite 1300
Los Angeles, California 90067
tkapur@pszjlaw.com

and

Hueston Hennigan LLP
Attn: Allison Libeu
620 Newport Center Drive, Suite 1300
Newport Beach, California 92660
alibeu@hueston.com

15.    The request for copies of notices to be sent to Pachulski Stang Ziehl & Jones

LLP and Hueston Hennigan LLP will not be deemed authorization of either firm to accept service

of process on behalf of Monster.

# EXHIBIT A

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

VITAL PHARMACEUTICALS,
INC., et al.,
       Plaintiffs,

v.

ORANGE BANG, INC., et al.,
       Defendants.

EDCV 20-1464 DSF (SHKx)

JUDGMENT

The Court having denied Plaintiffs' motion to vacate arbitration
award and granted Defendants' motion to confirm arbitration award,

IT IS ORDERED AND ADJUDGED that judgment is entered in
favor of Defendants and against Plaintiffs as set forth in the Final
Arbitration Award entered by Bruce Isaacs, Arbitrator, on April 4,
2022, attached hereto as Exhibit A. The Final Arbitration Award shall
have the same force and effect as a civil judgment rendered by this
Court. Defendants are to recover costs of suit pursuant to a bill of costs
filed in accordance with 28 U.S.C. § 1920.

Date: September 29, 2022

Dale S. Fischer
United States District Judge

# EXHIBIT B

1 | Bruce Isaacs, Arbitrator

2 | SIGNATURE RESOLUTION, LLC

3 | 633 W. 5th Street, Suite 1000

4 | Los Angeles, CA 90071

5 | bisaacs@signatureresoution.com

6

7

8

9 | **AMERICAN ARBITRATION ASSOCIATION**

10

11 | **COMMERCIAL ARBITRATION TRIBUNAL**

12

| | |
|---|---|
| 13  ORANGE BANG, INC., a California | AAA CASE NO. 01-20-0005-6081 |
| 14  corporation; and MONSTER ENERGY | |
| 15  COMPANY, a Delaware corporation, | **FINAL ARBITRATION AWARD -** |
| 16 | **PHASE I AND PHASE 2** |
| 17     Claimants/Counter-Respondent, | |
| 18 | |
| 19         vs. | |
| 20 | |
| 21  VITAL PHARMACEUTICALS, INC., d/b/a | |
| 22  VPX SPORTS, a Florida corporation, | |
| 23 | |
| 24     Respondent/Counter-Claimant. | |
| 25 | |

26

27

28

1
FINAL ARBITRATION AWARD – PHASE 1 AND PHASE 2

1  **COUNSEL:**

2

3  John C. Hueston, Esq.

4  Moez M. Kaba, Esq.

5  Allison Libeu, Esq.

6  Sourabh Mishra, Esq.

7  Hueston Hennigan LLP

8  523 West 6th Street, Suite 400

9  Los Angeles, California 90014

10  (213) 788-4340

11  E-mail:

12  jhueston@hueston.com

13  mkaba@hueston.com

14  alibeu@hueston.com

15  smishra@hueston.com

16

17  Counsel for Claimant/Counter-Respondent Monster Energy Company

18

19  Steven J. Nataupsky, Esq.

20  Lynda Zadra-Symes, Esq.

21  Hans L. Mayer, Esq.

22  Yanna S. Bouris, Esq.

23  Matthew Bellinger, Esq.

24  Knobbe, Martens, Olson & Bear, LLP

25  2040 Main Street, Fourteenth Floor

26  Irvine, California 92614

27  (949) 760-0404

28  E-mail:

2
FINAL ARBITRATION AWARD – PHASE 1 AND PHASE 2

1 | steven.nataupsky@knobbe.com

2 | lynda.zadrasymes@knobbe.com

3 | hans.mayer@knobbe.com

4 | yanna.bouris@knobbe.com

5 | matt.bellinger@knobbe.com

6 |

7 | Counsel for Claimant/Counter-Respondent Orange Bang, Inc.

8 |

9 | David P. Muth, Esq.

10 | Daniel M. Janssen, Esq.

11 | Johanna M. Wilbert, Esq.

12 | George W. Mykulak, Esq.

13 | Patrick Proctor-Brown, Esq.

14 | Quarles & Brady LLP

15 | 411 East Wisconsin Avenue, Suite 2400

16 | Milwaukee, Wisconsin 53202

17 | (414) 277-5000

18 | E-mail:

19 | david.muth@quarles.com

20 | daniel.janssen@quarles.com

21 | johanna.wilbert@quarles.com

22 | patrick.proctor-brown@quarles.com

23 | george.mykulak@quarles.com

24 |

25 | Gordon Rees Scully Mansukhani, LLP

26 | 633 West Fifth Street

27 | 52nd Floor

28 | Los Angeles, CA. 90071

FINAL ARBITRATION AWARD – PHASE 1 AND PHASE 2

Case 22-17842-PDR   Doc 522-8   Filed 12/14/22   Page 19 of 111

DocuSign Envelope ID: 8BD3D3B6758B4A5FE9E41FFC65726TC
Case 5:20-cv-01464-DSF-SHK   Document 126-2   Filed 09/23/22   Page 4 of 177   Page ID
#:5391

1   (213) 576-5024

2

3   Counsel for Respondent/Counterclaimant Vital Pharmaceuticals, Inc. d/b/a VPX Sports nka

4   Bang Energy and JHO Intellectual Property Holdings, LLC

5

6   **ARBITRATOR**:

7   Bruce Isaacs, Esq.

8   Signature Resolution

9   633 W. 5th St., Suite 1000

10  Los Angeles, CA 90071

11  (213) 622-1002

12  E-mail:

13  bisaacs@signatureresolution.com

14

15  **PLACE OF ARBITRATION:**

16  Zoom Platform (Arbitration Place, Virtual Bailiff), October 4-7 and 11-14, 2021

17

18  **DATE OF INTERIM ARBITRATION AWARD:**

19  January 6, 2022

20

21  **DATE OF FINAL ARBITRATION AWARD:**

22  April 4, 2022

23

24      The arbitrator, having been designated in accordance with the August 11, 2010 Settlement

25  Agreement (the "2010 Settlement Agreement"), and having been duly sworn, and after the

26  arbitration hearing conducted on October 4 – 7, and October 11 – 14, 2021, via Zoom, as

27  administered by a neutral third-party virtual bailiff, the Arbitration Place, and after hearing and

28  weighing the evidence, exhibits, demonstratives, testimony and arguments of the parties including,

4

FINAL ARBITRATION AWARD – PHASE 1 AND PHASE 2

1  but not limited to, the closing arbitration briefs and proposed Interim Arbitration Awards submitted

2  by both sides on November 9, 2021 and the closing reply briefs submitted by both sides on

3  November 19, 2021 (including answers to various questions posed by the arbitrator by email after

4  the arbitration hearing), and having heard the initial portion of closing argument on October 14,

5  2021 and the final portion of closing argument on December 10, 2021 as to Phase 1 (following the

6  completion of all of the briefing as to Phase 1), and including, but not limited to, the closing briefs

7  submitted by both sides between January of 2022 and March of 2022 as to Phase 2 and as to a

8  motion to correct and/or clarify (the "Motion to Clarify") the Interim Arbitration Agreement, and

9  having heard final oral arguments as to Phase 2 and as to the Motion to Clarify on February 18,

10  2022 and March 17, 2022 (with significant briefing by both sides in between those dates), hereby

11  finds and issues this Final Arbitration Award - Phase 1 and Phase 2 as follows:

12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

5
FINAL ARBITRATION AWARD – PHASE 1 AND PHASE 2

Case 22-17842-PDR  Doc 522-8  Filed 12/14/22  Page 21 of 111

DocuSign Envelope ID: 81BDD3B6-75DB-4A5E-8E08-1HFC6572E7CF
Case 5:20-cv-01464-DSF-SHK  Document 126-2  Filed 09/23/22  Page 6 of 177  Page ID
#:5393

I.      **INTRODUCTION**

Although a complicated, contentious and extremely well-litigated case by highly-skilled, courteous and professional attorneys, in many ways the case turns on some fundamental, yet crucial, questions:

- What were the objective intentions of the parties, Orange Bang, Inc. ("Orange Bang") and Vital Pharmaceuticals, Inc. dba VPX Sports, now known as Bang Energy ("VPX"), when they entered into the 2010 Settlement Agreement?

- Was the 2010 Settlement Agreement, in essence, a "you-stay-in-your-lane and I'll-stay-in-my-lane" trademark co-existence agreement?

- What exactly did the parties intend to mean by the terms "creatine-based" and "nutritionally fortified" in paragraph 7 of the 2010 Settlement Agreement?

- Is VPX's Bang ready-to-drink energy drink (the "BANG Energy RTD"), which accounts for almost all of VPX's approximately $2.26 billion of sales through September 19, 2021, 80% of which were sold at convenience stores, a paragraph 7 C product or a paragraph 7 D product?

- Did VPX abide by the 2010 Settlement Agreement, did VPX breach it, did VPX forget about it, fail to appreciate its terms or just chose to ignore it because the opportunity to generate astronomical revenues and profits was just too tempting?

- Did Monster Energy Company ("Monster"), by entering into the September 23, 2019 Assignment Agreement with Orange Bang (the "Assignment Agreement"), unlawfully "weaponize" the 2010 Settlement Agreement?

- Who is responsible, Orange Bang or VPX, for disclosing the key provisions of the 2010 Settlement Agreement, which arguably violated the confidentiality provision of paragraph 12 of the 2010 Settlement Agreement and what are the ramifications of such disclosure?

- Did Orange Bang improperly disclose to Monster a potential business vulnerability of VPX, VPX's "Achille's heel" so to speak, i.e., the "creatine-based" requirement and the marketing and sales restrictions of paragraph 7 previously negotiated by Orange Bang in

6
FINAL ARBITRATION AWARD – PHASE 1 AND PHASE 2

Case 22-17842-PDR    Doc 522-8    Filed 12/14/22    Page 22 of 111

DocuSign Envelope ID: 81BDD3B6 7DB4 4A5F 8E08 4 H F C6572E7C
Case 5:20-cv-01464-DSF-SHK    Document 126-2    Filed 09/23/22    Page 7 of 177    Page ID
#:5394

1        the 2010 Settlement Agreement to which VPX was required to adhere in certain

2        circumstances, allegedly causing damages to VPX?

3        • Did VPX breach the 2010 Settlement Agreement and/or infringe the BANG mark

4        (defined below) and, if so, what monetary and non-monetary relief is available to

5        Monster and Orange Bang, if any?

6

7    **II.    THE UNDERLYING FACTS AND PROCEDURAL HISTORY AS ESTABLISHED**

8    **BY THE DOCUMENTARY EVIDENCE AND THE TESTIMONY OF THE**

9    **WITNESSES AND FINDINGS AND CONCLUSIONS RELATED THERETO**

10

11   **A. Orange Bang's Orange Bang Drink, Its 1983 BANG Mark in Class 32 and Its Two**

12   **Primary Channels of Sale**

13       Beginning in 1971, David Fox, approximately 44 years of age at the time, and the President

14   of Orange Bang, and probably inspired by the well-known success of Orange Julius in the Southern

15   California market, built his business in an old-school manner. He worked on recipes in his kitchen,

16   orange juice, non-fat milk, egg-whites and, yes, lots and lots of sugar, and used his young daughter

17   and her friends as an informal focus group, in order to arrive at a marketable product, a whipped,

18   frothy and sugar loaded orange-flavored drink sold out of a fountain dispenser. Fox then went door

19   to door, the old fashion way, looking for customers and, in the process, built a relatively successful

20   business with $6 million in sales in 2010 and nearly $200 million in sales during the 50 years

21   between 1971 and 2021. While seeking to establish his business, Fox found two primary types of

22   customers: (i) low and medium-priced restaurants, many of which served Mexican food; and (ii)

23   convenience stores (including gas stations as time went on once gas stations started to add

24   convenience stores to the gas-purchasing experience). Both of these types of retail customers

25   offered fountain drinks for sale and that was, and is, crucial to Orange Bang's business model

26

27

28

1 because Orange Bang sold, and continues to sell, essentially all of its products, including its other
2 main product line "Ole"[1], via an Orange Bang (or Ole) fountain dispenser.

3   In 1983, Orange Bang applied for trademark protection for various marks including a word
4 mark for "Bang!" [date of first use in commerce September 8, 1971], with the exclamation mark,
5 and a word mark for "Bang" [date of first use in commerce August 3, 1973], without the
6 exclamation mark (collectively, the "BANG mark"). Orange Bang received trademark registrations
7 for the BANG Mark (and, in addition, for the word mark + a logo[2]) in 1983, in International Class
8 32 ("Class 32"). Class distinctions are not necessarily relevant to the likelihood of confusion
9 analysis for the purposes of trademark infringement actions. *See McCarthy on Trademarks and*
10 *Unfair Competition ("McCarthy")*, Section 19:56 (5th ed. 2021). Nevertheless, and as discussed
11 below, class distinctions were highly significant to the negotiation of the 2010 Settlement
12 Agreement. Class 32 is critical in this regard because it not only includes non-alcoholic beverages,
13 Class 32 also includes fruit beverages and isotonic drinks (e.g., sports drinks like Gatorade). Thus,
14 Class 32 includes *energy drinks* as well. *See* Exhibit 100, Class Headings and Explanatory Notes
15 from the United States Patent and Trademark Office (the "PTO") (Exhibit 100 - 13, p. 12 of 17). In
16 this respect, as of 1983, Orange Bang had established the exclusive right to market and sell Class
17 32 beverages under the BANG mark. *See* Exhibit J-2.

18

19   **B. VPX's Bang Pre-Workout Nutritional supplement and its 2008 BANG! Mark in**
20    **Class 5**

21   In 1993, Jack Owoc ("Owoc"), a former science teacher, started a business known at that
22 time as Vital Pharmaceuticals, Inc. dba VPX Sports ("VPX"). In 2019, VPX re-branded the entire
23 company which is now known as "Bang Energy". For ease of reference, VPX / Bang Energy shall
24 be referred to in this Interim Arbitration Award as "VPX". According to an early website dated as

25

26

27 [1] As Fox testified, the name for Orange Bang's other brand, "Ole", was inspired by Dodger fans shouting "Ole" during Fernando Valenzuela's rookie season in 1981.
28 [2] The BANG mark, a word mark, is certainly at issue in this case, while the BANG logo is not. VPX does argue, however, that the logos are distinguishing features which, in VPX's view, is a factor which militates against a finding of a likelihood of confusion in the marketplace.

8

1  of June 7, 2006, Owoc founded VPX in order "to produce the highest-grade sports *nutritional*
2  *supplements* on the market . . . ." (Emphasis added.)  This early website touted the benefits of
3  creatine (discussed at length below) and described VPX as the "Frontrunner in Sports Nutritional
4  Pharmacology".  *See* Exhibit 2915.

5       In 2008, VPX released a product known as the Bang Pre-Workout ("Bang Pre-Workout").
6  Bang Pre-Workout was the first VPX product marketed and sold under the name "BANG!" VPX
7  marketed and sold Bang Pre-Workout between 2008 and 2013.  *See* DDX 1003, at 36.  VPX
8  marked and sold Bang Pre-Workout as a *nutritional supplement*.  The back side of the bottle
9  contained a "Supplement Facts" panel, a panel of information about the supplement which is an
10 indicator that the product was indeed sold as a *nutritional supplement*.  *See* Exhibit 2053.  The
11 Bang Pre-Workout bottle itself declared in capital letters to would-be consumers that this product
12 was the "WORLD'S ONLY STABLE LIQUID CREATINE!" *See* Exhibit 2053.  An early VPX
13 website, dated as of December 4, 2008 according to the "way-back machine"[3], likewise described
14 the product as the "world's only stable liquid creatine".  *See* Exhibit 84.  The back of the Bang Pre-
15 Workout bottle listed a "Proprietary Blend" consisting of 13 ingredients, 5,842 milligrams ("mg")
16 of some ingredients and 11,648 mg of other ingredients, which together comprised this *nutritional*
17 *supplement* product (a product which was discontinued in 2013).  One of those thirteen ingredients
18 listed on the back of the bottle was "Creatinol-O-Phosphate" ("COP").  The back of the Bang Pre-
19 Workout bottle, however, did not break down the proportions of these 13 ingredients or indicate
20 how much of the 5,842 mg and the 11,648 mg were comprised of COP.  *See* Exhibit 2053.
21 According to the testimony elicited during the arbitration hearing, however, the Bang Pre-Workout
22 bottle contained 5,102 mg of COP. *See* Monster / Orange Bang's Appendix A to their November 9,
23 2021 closing brief.

24

25
_____

26 [3] The "Way-Back Machine" is an internet archive reference device which enables a user to "go
   back in time" to retrieve the contents of a website and see how it looked at a certain point in time in
27 the past. The Way-Back Machine is named after the escapades of two time-traveling cartoon
   characters, Sherman and Peabody, who appeared in a regular segment of the show "The
28 Adventures of Rocky and Bullwinkle and Friends", a cartoon show from the late 1950s and early to
   mid-1960s.

9

Case 22-17842-PDR   Doc 522-8   Filed 12/14/22   Page 25 of 111

DocuSign Envelope ID: 3DDD3B6-7EB9-4AFE-8E89-FC673257
Case 5:20-cv-01464-DSF-SHK   Document 126-2   Filed 09/23/22   Page 10 of 177   Page ID
#:5397

1    Whether or not COP is a form of creatine, whether or not a product containing COP is
2  "creatine-based" and whether or not the fact that Bang Pre-Workout contained COP helps ascertain
3  the true intent of the parties in entering into the 2010 Settlement Agreement are critically important
4  issues, all of which are discussed at length below.

5    On December 9, 2008, VPX obtained a trademark registration for the mark "BANG" in
6  International Class 5 ("Class 5"). *See* Exhibit 2468, p. 33. It is not entirely clear to the arbitrator
7  how or why the PTO issued a trademark registration to VPX for a word mark "BANG" given
8  Orange Bang's prior registration of the BANG mark, but, presumably, the PTO issued the
9  trademark registration to VPX because the registration was issued for Class 5. Class 5 is for
10  "pharmaceuticals" and for "dietary supplements for human beings (and animals)." *See* Exhibit 100
11  (Exhibit 100 - 4, p. 3 of 17). In short, Class 5 is for *nutritional supplements*, and Class 32, not
12  Class 5, is for fruit juices, isotonic drinks and energy drinks. In this respect, as of December of
13  2008, VPX had received a trademark registration issued by the PTO which granted it the right to
14  market and sell Class 5 *nutritional and dietary supplements* under the word "BANG."

15

16  **C. Orange Bang's 2009 Demand Letters and its 2009 Trademark Infringement Action**

17    In 2009, Orange Bang learned that VPX was marketing and selling a product under the
18  name "BANG!". On February 2, 2009, Orange Bang sent a cease and desist letter to VPX. This
19  first cease and desist letter stated, among other things, that Orange Bang believed there was a
20  likelihood of confusion in the marketplace and why it held that belief, that it had not previously
21  been aware of VPX's trademark application for the word BANG (an intent-to-use application
22  according to Orange Bang's first cease and desist letter), Serial No. 77/247.655 (the "655 TM
23  Application"), and that it had recently become aware that VPX was selling product under the name
24  "BANG!" (with the exclamation mark). Orange Bang's first cease and desist letter, authored by its
25  outside attorney Aaron Borrowman ("Borrowman"), who testified at length during the arbitration
26  hearing, also stated that the purpose of the letter was to give "actual" notice to VPX (as opposed to
27  mere constructive notice), demand that VPX cease and desist its alleged trademark infringement (or
28  risk a claim for willful trademark infringement) and, if it failed to cease and desist, Orange Bang

1 would consider, among other remedies, filing a petition seeking cancellation of the 655 TM

2 Application. *See* Exhibit 2059.

3        VPX did not respond to Orange Bang's first cease and desist letter. Orange Bang then sent

4 a second cease and desist letter, this one dated March 3, 2009, to VPX. *See* Exhibit 2059. VPX

5 did respond to the second cease and desist letter.

6        On April 3, 2009, and on VPX / Redline letterhead[4], VPX's in-house General Counsel at

7 the time, Erica Stump, Esq. ("Stump"), responded and stated on behalf of VPX her arguments as to

8 why there was no likelihood of confusion in the marketplace. In addition, Stump stated that VPX's

9 BANG product (a reference to the Bang Pre-Workout *nutritional supplement* which was the only

10 VPX product on the market at the time which made use of the BANG mark) was a "creatine

11 containing sports drink" and was "consumed by athletes and work out enthusiasts interested in

12 building lean muscle mass." (Emphasis added.). Stump further stated in her letter that VPX's

13 product was the "first drink containing a stable creatine in liquid form" and that the "retail outlets

14 of OB's products are gas stations and convenience stores" while VPX's Bang product was sold at

15 "GNC, Vitamin Shoppe, gyms, health clubs and other special nutritional types of stores" and

16 "advertise[d] . . . in health and fitness publications." Stump also explained how Bang Pre-Workout

17 contained creatine and she explained the physiological benefits of creatine, but she never made any

18 mention in her letter of the ingredient COP. *See* Exhibit 2560.

19        In this respect, in response to the second cease and desist letter, Stump confirmed that

20 Orange Bang was sold at convenience stores and that VPX's target audience for its Bang Pre-

21 Workout product consisted of athletes and work-out enthusiasts (mostly men, as her letter so states)

22 and that VPX's sales, at the time, took place within the nutritional and supplements sales channel

23 referred to in her letter. In addition, in her response to the second demand letter, Stump explained

24 that the Bang Pre-Workout product contained creatine, in fact stable creatine in liquid form, and

25 she attached various pages from the VPX website at the time, pages from the website as it existed

26 as of April 3, 2009 (and without making use of the Way-Back Machine) to further emphasize that

27

---

28 [4] In addition to selling product under the BANG mark, VPX also sold product under other brand names, one of which was / is "Redline."

FINAL ARBITRATION AWARD – PHASE 1 AND PHASE 2

Case 22-17842-PDR    Doc 522-8    Filed 12/14/22    Page 27 of 111

DocuSign Envelope ID: 81DD03B6-74B9-4A5E-8E89-1KFC67257C
Case 5:20-cv-01464-DSF-SHK   Document 126-2   Filed 09/23/22   Page 12 of 177   Page ID
#:5399

1  the product contained creatine. These pages from the website likewise described Bang Pre-

2  Workout as the "1st Stable Liquid Creatine!" and likewise emphasized the musclebuilding

3  capabilities of the product. The April 3, 2009 letter from VPX to Orange Bang included as its last

4  page a printout from the web site which did reference COP, among other ingredients, in small, hard

5  to read print, but without any reference to or explanation of the meaning or the purported

6  significance of COP. *See* Exhibit 2560, p. 4.

7         Thus, as of April 3, 2009, VPX had taken the position that: (i) Orange Bang and Bang Pre-

8  Workout were very different products, one a sugar-loaded orange drink and the other a *nutritional*

9  *supplement* which contained creatine and which delivered the benefits of creatine; (ii) Orange Bang

10 and Bang Pre-Workout were sold in different sales channels, Orange Bang at gas stations and

11 convenience stores, and Bang Pre-Workout in the nutritional and supplement sales channel; and

12 (iii) Orange Bang's beverage and Bang Pre-Workout targeted different consumers in that Bang Pre-

13 Workout focused on athletes and work-out enthusiasts who would not want a sugar-loaded orange

14 drink like the whipped and frothy Orange Bang.

15        VPX did not call Stump as a witness to testify at the arbitration hearing. The arbitrator is

16 entitled to, and hereby does, draw a negative inference from VPX's failure to call Stump as a

17 testifying witness and the arbitrator therefore concludes that Stump's testimony would not have

18 been helpful to VPX. Having said that, and as demonstrated in Section II.E below, the negotiation

19 history of the 2010 Settlement Agreement is relatively clear, straightforward (although detailed)

20 and mostly undisputed and the arbitrator would reach the same findings and conclusions as set

21 forth in this Interim Arbitration Award even without drawing this negative inference as to Stump.

22 However, it is not unimportant and it is noteworthy that VPX did not call Stump as a testifying

23 witness. It should also be pointed out that Monster / Orange Bang did not call Stump as a testifying

24 witness either, although it was not Monster's or Orange Bang's burden to do so.

25

26 **D. Orange Bang's 2009 Action for Trademark Infringement**

27        VPX did not stop marketing or selling Bang Pre-Workout under the name BANG! in

28 response to the second cease and desist letter and, as a result, on September 9, 2009, Orange Bang

1 filed a trademark infringement action against VPX in the United States District Court for the

2 Central District of California (the "2009 Trademark Infringement Action"). *See* Exhibit 2468. The

3 filing of the 2009 Trademark Infringement Action commenced a settlement dialogue between one

4 attorney for Orange Bang (Borrowman) and two attorneys for VPX which lasted many months and

5 which culminated in the 2010 Settlement Agreement executed by the parties in August of 2010,

6 approximately eleven months after the filing of the 2009 Trademark Infringement Action. *See*

7 Exhibit J-11. The written and oral communications which took place between the parties during

8 this eleven month period of time, and the context within which these communications took place,

9 such as written and oral statements made directly by VPX to Orange Bang and statements made by

10 VPX to its consumers via its labels, its website and its advertisements and marketing materials, are

11 the objective facts and critical extrinsic evidence which help discern the meaning of the key

12 contractual language at issue in this case and the intent of the parties when they entered into the

13 2010 Settlement Agreement. As explained in more detail below, the unspoken subjective intent of

14 the parties, and post-litigation interpretations of the 2010 Settlement Agreement, are of minimal

15 probative value, if any, and provide little or no beneficial insight to the arbitrator.

16

17 **E. The Parol Evidence Rule and the Negotiation, Drafting and Final Execution of the**

18 **2010 Settlement Agreement**

19        The parol evidence rule in California is codified in California Civil Code Section 1856.

20 The parol evidence rule is a rule of substantive law and has been articulated in the statute itself and

21 in many case decisions. If the proposed extrinsic evidence seeks to contradict or vary the clear and

22 unambiguous language of a written contract, then the parol evidence is not admissible. If,

23 however, the proposed extrinsic evidence seeks to explain or supplement the language of a written

24 contract, then the parol evidence is admissible. *Pacific Gas & Electric Co v. G.W. Thomas*

25 *Drayage & Rigging*, 69 Cal.2d 33, 39-40 (1969); *Wolf v. Walt Disney Pictures & Television*, 162

26 Cal.App.4th 1107, 1126 (2008). Courts are instructed to provisionally receive all of the relevant

27 parol evidence and then make a critical determination. If, upon provisional consideration of the

28 parol evidence, the court determines that the written contract is reasonably susceptible to only one

1 interpretation, then the extrinsic evidence is rejected, not admissible and not further considered. If,

2 however, upon provisional consideration of the parol evidence, the court determines that the

3 written contract is reasonably susceptible to more than one interpretation because some of the

4 contract terms are ambiguous, then the extrinsic evidence is received into evidence and the court

5 then interprets the meaning and intent of the written agreement. *Wolf v. Superior Court*, 114

6 Cal.App.4th 1343, 1351 (2004) [affirming the two-step process in a dispute over the feature film

7 "Roger Rabbit"]; *Winet v. Price*, 4 Cal.App.4th 1159, 1165-1168 (1992) [affirming the two-step

8 process and specifically holding that unspoken subjective intent as reflected by a party's

9 "understanding" of an agreement is irrelevant, but outwardly expressed intentions and the

10 circumstances surrounding the formation of the contract are indeed relevant]; *Brown v. Goldstein*,

11 34 Cal.App.5th 418 (2019) [contract provisions relating to splitting the publisher's share of public

12 performance income as between the band "War" and its publisher / manager was reasonably

13 susceptible to more than one interpretation and, therefore, parol evidence must be received].[5]

14 The chronology of the objective communications (as opposed to the unspoken subjective

15 intent of non-percipient witnesses or post-litigation expert's "interpretations" of the 2010

16 Settlement Agreement) leading to the final version of the 2010 Settlement Agreement are crucial as

17 they reflect the discernable intent of the parties in entering into the 2010 Settlement Agreement in

18 general and they demonstrate the meaning, purpose and true intent of the parties in entering into

19 paragraph 7 of the 2010 Settlement Agreement in particular. This chronology is detailed, but

20 important and is as follows:

21 On February 2, 2009, Orange Bang sent VPX the first cease and desist letter which is

22 described above.

23 On March 3, 2009, Orange Bang sent VPX the second cease and desist letter which is also

24 described above.

25

26
_____

27 [5] Although normally it is a determination for the court to interpret the intent and meaning of a
written contract, even one reasonably susceptible to more than one meaning, in a jury trial, where
the parol evidence is in conflict and the resolution of the contract requires an assessment of the

28 credibility of the witnesses, the interpretation of the contract is for the jury, not the trial judge. *City
of Hope National Medical Center v. Genetech, Inc.*, 43 Cal.4th 375, 395 (2008).

14

FINAL ARBITRATION AWARD – PHASE 1 AND PHASE 2

1    On April 3, 2009, VPX sent Orange Bang a formal response to the second cease and desist

2 letter which is likewise described above. Importantly, in Stump's April 3, 2009 letter, she

3 introduced the nomenclature that Bang Pre-Workout was a "creatine *containing*" product.

4    On September 9, 2009, Orange Bang filed the 2009 Trademark Infringement Action against

5 VPX. This litigation proceeded forward for approximately four months before the parties were

6 required to focus on the issue of a potential settlement. The Local Rules of the Central District at

7 the time (and currently) required the parties to select a mediator and attend a mediation. Because

8 of that requirement, settlement discussions became an essential topic which had to be addressed by

9 legal counsel for each side.

10    On January 22, 2010, Orange Bang's attorney Borrowman sent a written settlement

11 proposal to VPX's outside attorney Adam Thurston ("Thurston"). In his initial settlement

12 proposal, Borrowman referenced his recent discussions with Thurston about the selection of a

13 mediator and also referred back to VPX's April 3, 2009 letter and how it emphasized that the

14 products in dispute were different products (an orange beverage v. a creatine-containing product to

15 supply energy and build lean muscle mass) and which were intended for different target audiences

16 (restaurant goers and convenience store / gas station consumers v. athletes and workout

17 enthusiasts). Based on these differences as perceived by both sides, Borrowman proposed a

18 concept by which VPX and Orange Bang would co-exist, i.e., both make use of the BANG mark,

19 but do so in their own particular categories, sales channels or "lanes", so to speak. According to

20 Borrowman's initial settlement concept, VPX would be *permitted* to continue to use the BANG

21 mark but only on its existing nutritionally fortified, "*creatine-based*" beverage and, in addition,

22 VPX would cancel or abandon its efforts to seek trademark protection in Class 32. (Emphasis

23 added.)

24    **In this respect, in his January 22, 2010 initial settlement proposal, it was Borrowman**

25 **who introduced the nomenclature that VPX would be permitted to make use of the BANG**

26 **mark if its product was "*creatine-based*".** *See* **Exhibit 2571-1 to 2571-9. Based on common**

27 **sense and plain English, it is beyond dispute that a "creatine-based" standard is a higher and**

28 **more rigorous standard than a "creatine-containing" standard.** Although he did not testify

15
FINAL ARBITRATION AWARD – PHASE 1 AND PHASE 2

1  that he had direct conversations with Stump about the meaning of "creatine-based", Borrowman
2  did testify at the arbitration that he believed that Bang Pre- Workout was a "creatine-based"
3  product because of the representations which VPX made to him (and to VPX's consumers) by
4  virtue of VPX's web site, marketing materials and product labels. *See* Borrowman Testimony,
5  Arbitration Hearing Transcripts ("AHT"), p. 468:3 – 471:20.

6  On March 17, 2010, Thurston responded to Borrowman's settlement proposal of January
7  22, 2010. Thurston needed information. On behalf of VPX, Thurston sent Borrowman an email by
8  which he requested that Orange Bang provide information and produce documents to show, among
9  other things, the demographic composition of Orange Bang's customers, the amount of Orange
10  Bang's sales at restaurants, at convenience stores, and at grocery stores, Orange Bang's efforts to
11  sell Orange Bang in bottles, consumer surveys, etc. *See* Exhibit 2571-10 to 2571-11.

12  On March 25, 2010, Borrowman followed up with Thurston. Borrowman sent an email to
13  Thurston in which he explained in further detail who Orange Bang's customers were at the time,
14  who Orange Bang's competitors were (including Coca-Cola according to Orange Bang), the
15  amount of sales by Orange Bang since 1990 ($118 million) and Orange Bang's past effort to bottle
16  Orange Bang based on a small test run with an independent bottler, efforts which, according to
17  Borrowman, were ongoing. At the end of this follow up email, Borrowman again inquired as to the
18  status of VPX's response to Orange Bang's pending settlement offer pending since January 22,
19  2010. *See* Exhibit 2571-13 to 2571-14.

20  On April 6, 2010, Thurston emailed Borrowman to inform him that he will be discussing
21  the settlement proposal with his client "tomorrow" and that he expected to be back to Borrowman
22  in about a week's time. *See* Exhibit 2571-12.

23  On April 13, 2010, Borrowman followed up with Thurston. In his email, Borrowman again
24  asked Thurston for a response to Orange Bang's pending settlement offer, a settlement offer,
25  Borrowman argued, that would enable VPX to continue to market and sell its beverage "as it is
26  now" and also enable VPX to retain its trademark registration in Class 5. *See* Exhibit 2571-12. On
27  April 23, 2010, Thurston emailed Borrowman asking for additional time to confer with his client in
28  order to respond to Orange Bang's pending settlement offer. *See* Exhibit 2571-15.

16
FINAL ARBITRATION AWARD – PHASE 1 AND PHASE 2

1     On May 13, 2010, VPX made a counter-offer to Orange Bang. Thurston sent a May 13,
2  2010 email to Borrowman with a 9 point proposal (and 9 numbered paragraphs) and specifically
3  stated that he, Thurston, was still waiting to receive formal approval from VPX's CEO to present
4  his counter-offer settlement proposal to Orange Bang. Point 1 of Thurston's counter-offer
5  proposed that VPX may continue to use the BANG mark in association with its "existing
6  nutritionally fortified, *creatine-based* beverage." Point 2 also make use of the "creatine-based"
7  nomenclature, but point 3 did not. Point 6 proposed that Orange Bang shall *not* be permitted to
8  "use the BANG mark in connection with isotonic drinks, sports drinks, nutritionally fortified
9  supplement beverages, or dietary supplements." *See* Exhibit 2571-16 to 2517-17.

10    On May 14, 2010, the very next day, Thurston sent a prompt follow-up email to
11  Borrowman advising him that the VPX CEO had now approved the settlement offer, thus giving
12  him authority to present it to Orange Bang, **but with slight modifications to Point 1 and Point 2.**
13  **Significantly, in Thurston's May 14, 2010 email, the "creatine-based" nomenclature was**
14  **deleted from both Point 1 and Point 2.** The settlement proposal of Point 1 was revised so that
15  VPX would be entitled to continue to use the BANG mark in association with "*any* existing
16  nutritionally fortified beverage used to enhance performance", i.e., Thurston removed the
17  requirement that the product be "creatine-based." (Emphasis added.) The proposal of Point 2 was
18  similarly revised so that VPX would still be entitled to change the formula of its then-current
19  product which made use of the BANG mark, the Bang Pre-Workout product, provided that it
20  continued to be a "nutritionally fortified liquid beverage or other dietary supplement", again
21  without any requirement that the product be "creatine-based."

22    **In short, VPX's April 3, 2009 letter introduced the concept of a "creatine containing"**
23  **product and its May 14, 2010 counter-offer for settlement, its first substantive response to**
24  **Orange Bang's pending settlement proposal, attempted to eliminate and *negotiate out* the use**
25  **of the higher standard, the term "creatine-based."** *See* Exhibit 2571-18 to 2517-19.

26    On May 20, 2010, Borrowman sent a letter to Thurston with another settlement proposal.
27  The first paragraph of the May 20, 2010 letter refers to a May 19, 2010 email message from
28  Thurston asking Borrowman to put his most recent settlement offer in writing and the second

Case 22-17842-PDR    Doc 522-8    Filed 12/14/22    Page 33 of 111

DocuSign Envelope ID: 2FDDD3B6-74B9-4E5E-8EE9-1KFC67257517
Case 2:20-cv-01464-DSF-SHK    Document 126-2    Filed 09/23/22    Page 18 of 177    Page ID #:5405

1  paragraph refers to a May 19, 2010 telephone conversation between the two attorneys in which
2  Borrowman apparently articulated his revised settlement proposal to Thurston on the telephone.
3  Thurston logically asked Borrowman to put his revised settlement offer in writing, and Borrowman
4  did so by virtue of this May 20, 2010 letter, a revised settlement proposal which consistent of 10
5  points (and 10 numbered paragraphs).

6        Before he set forth the 10 point proposal, however, Borrowman made several substantive
7  points in the opening paragraphs of his May 20, 2010 letter which are important in determining the
8  objective intent of the parties. First, and significantly, Borrowman stated that "Orange Bang is
9  willing to *allow* VPX to sell its currently-offered BANG nutritionally fortified, *creatine-based*
10 beverage under the BANG mark and without restricting trade channels . . . ." (Emphasis added.) In
11 this respect, Orange Bang's settlement proposal made it clear that it was willing to permit VPX to
12 use the BANG mark on its currently offered product, Bang Pre-Workout under certain
13 circumstances. *See* Exhibit 50; Borrowman Testimony, AHT, p. 488:19 – 489:22, 491:19 –
14 495:12. Orange Bang's revised settlement proposal of May 20, 2010 likewise made use of the
15 "creatine-based" nomenclature and therefore moved away from VPX's earlier-introduced "creatine
16 containing" language. **In other words, Borrowman, on behalf of Orange Bang, once again re-**
17 **introduced the "creatine-based" language back into the settlement discussions and moved**
18 **away from the lower standard of "creatine-containing".**

19        Second, Borrowman stated that Orange Bang would agree that VPX would be entitled to
20 change the formula of its Bang Pre-Workout product so long as "it remains a nutritionally fortified,
21 creatine-based beverage." Third, Borrowman stated that VPX would also be entitled to make use
22 of the BANG mark in connection with other products, such as pills and capsules (and presumably
23 other beverages), provided they too were "creatine-based, nutritionally fortified dietary
24 supplements and nutritional products . . . ." Again, Orange Bang's May 20, 2010 letter set forth a
25 settlement proposal based on the "creatine-based" language, and not on the "creatine containing"
26 language first mentioned by VPX back on April 3, 2009 and, importantly, set forth a proposal for
27 the specifically negotiated "lanes" in which VPX would be *permitted* to make use of the BANG
28 mark. In other words, and as the negotiating history discussed in this section clearly demonstrates,

18

FINAL ARBITRATION AWARD – PHASE 1 AND PHASE 2

1 Orange Bang was communicating to VPX that, other than the permitted uses as proposed by
2 Orange Bang, VPX would not be permitted to make use of the BANG mark in any other way.

3 Fourth, and importantly, prior to setting forth his 10 point proposal, Borrowman made it
4 clear that Orange Bang would **not** agree to VPX's suggested language as set forth in the proposed
5 Point 1 of VPX's May 14, 2010 settlement proposal that VPX be permitted to use the BANG mark
6 in connection with "*any*" nutritionally fortified beverage or other dietary supplement. As
7 Borrowman stated, this would give VPX the ability to create and sell a beverage "akin to an
8 isotonic drink, sports drink, *energy drink* or the like." (Emphasis added.) **In this respect, Orange**
9 **Bang made it clear that: (i) the term "any" was not acceptable; (ii) the creation of an energy**
10 **drink was not acceptable; and (iii) VPX's proposed elimination of the term "creatine-based"**
11 **was not acceptable.**

12 Fifth, and before setting forth his 10 point proposal, Borrowman stated that Orange Bang
13 was even willing to permit VPX to make use of the BANG mark on products which are **not**
14 **"creatine-based"** so long as those products are a nutritionally fortified beverage or a dietary
15 supplement marketed and sold **only** "through vitamin and nutritional supplement online ore retail
16 stores and gyms." (Emphasis added.) As Borrowman specifically stated in this revised settlement
17 proposal of May 20, 2010, this would *preclude* sales by VPX at "*convenience stores*, restaurants,
18 supermarkets, mass retailers (such as WalMart, Costco and the like)." (Emphasis added.) In this
19 respect, Orange Bang was again proposing a co-existence agreement, an agreement where both
20 parties would be entitled to continue to make use of the BANG mark in a harmonious fashion, and
21 at the same time, so long as each party stayed in their own pre- negotiated categories, marketing
22 and sales channels or "lanes" – Orange Bang with its orange- flavored drink in restaurants and
23 convenience stores / gas stations, geared towards the general public, and VPX's BANG mark
24 products in the nutritional and dietary supplements sales channel, geared towards athletes and
25 work-out enthusiasts.

26 With respect to the 10 point settlement proposal in his May 20, 2010 letter, Borrowman
27 proposed the following: Point 1 would permit VPX to continue to use the BANG mark on its
28 existing "nutritionally fortified, creatine-based beverage." [This language becomes Paragraph 7 A

Case 22-17842-PDR   Doc 522-8   Filed 12/14/22   Page 35 of 111

DocuSign Envelope ID: 8FDDD3B6-7EB9-4EEE-8E80-1KFC67725FDCase 5:20-cv-01464-DSF-SHK   Document 126-2   Filed 09/23/22   Page 20 of 177   Page ID #:5407

1    of the 2010 Settlement Agreement.]. Point 2 would permit VPX to make changes to its formula for

2    its existing BANG mark product (Bang Pre-Workout) so long as the product remains a

3    "nutritionally fortified, creatine-based beverage." [This language becomes Paragraph 7 B of the

4    2010 Settlement Agreement.]. Point 3 would permit VPX to make use of the BANG mark in

5    connection with other "creatine-based, nutritionally fortified" dietary supplements and nutritional

6    products, including pills and capsules. [This language becomes Paragraph 7 C of the 2010

7    Settlement Agreement.].

8         Point 4 would permit VPX to make use of the BANG mark in connection with products

9    which are not "creatine-based", so long as those products are "nutritionally fortified" and "enhance

10   performance" and so long as those products are "only marketed and sold through vitamin and

11   nutritional supplement stores and gyms." [This language, later modified based on further

12   negotiations between the parties (as discussed below), becomes the basis of Paragraph 7 D of the

13   2010 Settlement Agreement.]

14        Point 7 would foreclose Orange Bang from making use of the BANG mark in connection

15   with "creatine-based" beverages, an attempt to define the "lane" which Orange Bang would have to

16   stay out of in exchange for VPX staying in its defined "lane". [This language, later modified based

17   on further negotiations between the parties, becomes the basis of Paragraph 7 J of the 2010

18   Settlement Agreement.].

19        The other points which comprised the 10 point proposal are less relevant to understanding

20   the meaning of the terms "creatine-based" and "nutritionally fortified" in paragraph 7, but these

21   other points likewise end up in the final version of the 2010 Settlement Agreement. Borrowman

22   concluded his May 20, 2010 letter by requesting that Thurston provide a written response to this

23   revised settlement proposal by May 24, 2010. *See* Exhibit 2571-20 to 2517-23.

24        On June 2, 2010, Borrowman sent an email to Thurston to follow up. Borrowman stated

25   that he understood that VPX's in-house counsel had been at a conference and generally unavailable

26   and asked Thurston to get back to him with a definite response. *See* Exhibit 2571-27. On June 8,

27   2010, Kalina Pagano ("Pagano"), VPX's in-house General Counsel at the time, reached out to

28   Borrowman to set a conference call to work "towards a final resolution of this matter." *See* Exhibit

20
FINAL ARBITRATION AWARD – PHASE 1 AND PHASE 2

1   2571-25. On June 15, 2010, Borrowman sent an email to Pagano following up on the status of the
2   settlement proposal. Pagano responded by stating that she was in the "process of finalizing our
3   acceptance", but that she had encountered an issue [a Notice of Suspension as to one of VPX's
4   marks due to one of Orange Bang's marks] which "needs to be addressed in our settlement
5   agreement as well." *See* Exhibit 2571-24. On June 16, 2010, Pagano sent an email to Borrowman
6   responding to his prior inquiry and advising him that she will get back to him with the trade
7   channels information (which he had requested). *See* Exhibit 2571-18 to 2517-28.

8        On June 21, 2010, Pagano sent an email to Borrowman in which she advised him which
9   national sports nutrition chains VPX currently sells to, which national gym chains VPX currently
10  sells to and the fact that VPX does sell nationally to some convenience stores. On June 22, 2010,
11  Borrowman thanked her for the information and asked her about drugstores like Walgreens and big
12  retailers like Walmart. On June 22, 2010, Pagano responded that VPX does not have product in
13  Walgreens or in Walmart and that she will have information about the convenience stores
14  tomorrow. On June 23, 2010, the next day, Pagano advised Borrowman which convenience stores
15  were selling VPX Bang product at the time (Chevron, Shell, Race Track, Quick Trip, Mobil,
16  Sunoco and perhaps a few more). Borrowman responded to Pagano that he will get back to her as
17  soon as he can. *See* Exhibit 2571-36 to 2517-38.

18       On June 30, 2010, Pagano sent an email to Borrowman stating that VPX **"will not have a**
19  **problem of limiting BANG to sections where supplements and vitamins are separate from the**
20  **general beverage areas."** (Emphasis added.) In this respect, VPX expressed its agreement to the
21  concept underlying paragraph 7 D of the 2010 Settlement Agreement pursuant to which VPX
22  would be permitted to make use of the BANG mark on non-"creatine-based" products so long as
23  those products were sold in the locations and sections where supplements and vitamins are sold,
24  sections separate and apart from the general beverage areas. *See* Exhibit 2571-40 to 2517-41.

25       Later in the day on June 30, 2010, Borrowman responded to Pagano and asked her to please
26  base the settlement agreement on his May 20, 2010 letter and, in addition, to add the requirement
27  that VPX limit its BANG products to the nutritional supplement section of stores, and not place
28  them in the general beverage section – a reference to paragraph 7 D of the 2010 Settlement

21
FINAL ARBITRATION AWARD – PHASE 1 AND PHASE 2

1  Agreement which had not, as of yet, reached its final form. Pagano responded with an email to

2  Borrowman stating that she will use his May 20th letter as the basis of her draft of the settlement

3  agreement including Borrowman's **"limitation on BANG's distribution."** (Emphasis added.)

4  Pagano also responded to Borrowman by asking him for a statement in email form which will help

5  VPX lift the suspension of VPX's mark, a suspension which had been imposed in the TTAB

6  proceedings between the parties (presumably the suspension was imposed because of VPX's

7  similarity to Orange Bang's BANG mark). Pagano stated that such an email will help her "prepare

8  the settlement agreement with better accuracy." A few minutes later on June 30, 2010, Borrowman

9  responded to Pagano's email by suggesting in his email that the settlement agreement include a

10  reciprocal agreement by which both sides would grant Consents to Register to the other for any

11  pending or future trademark applications, so long as they (the Consents to Register) comply with

12  the terms of the (not yet finalized) settlement agreement – a reference to provisions which

13  ultimately become paragraphs 7 K and 7 L of the 2010 Settlement Agreement. *See* Exhibit 2571-

14  36 to 2517-41.

15     **VPX, not Orange Bang,** then drafted the first draft of the 2010 Settlement Agreement. On

16  July 14, 2010, Pagano emailed the first draft of the 2010 Settlement Agreement to Borrowman (the

17  "First Draft of the 2010 Settlement Agreement"). Paragraph III. A – III. C (under heading III.

18  entitled "Promises"), as drafted by Pagano, **made use of the "creatine-based" and "nutritionally**

19  **fortified" nomenclature. It did not make use of the "creatine containing" language first**

20  **referenced in VPX's April 3, 2009 letter. In this respect, VPX, in drafting the First Draft of**

21  **the 2010 Settlement Agreement, embraced the "creatine- based" language, the higher**

22  **standard which had been first introduced and proposed by Borrowman on behalf of Orange**

23  **Bang.** The language of paragraphs III. A – III. C as set forth in the First Draft of the 2010

24  Settlement Agreement is the exact same language as the final, executed version of the 2010

25  Settlement Agreement. In this respect, the "creatine-based" language as set forth in the First Draft

26  of the 2010 Settlement Agreement never changes over the time that the long-form settlement

27  agreement is negotiated and thus this exact language ends up in the final version of the 2010

28  Settlement Agreement. *See* Exhibit 2572-36 and J-11.

In other words:

- **VPX first mentioned a "creatine containing" standard in its response to the second demand letter.**

- **Orange Bang responded with a "creatine-based" standard, an obviously higher and more exacting standard than a creatine containing standard.**

- **VPX responded by attempting to eliminate the "creatine-based" standard.**

- **Orange Bang responded by rejecting VPX's attempt to negotiate out the "creatine-based" standard and by insisting that the "creatine-based" language remain in the 2010 Settlement Agreement.**

- **VPX then drafted the First Draft of the 2010 Settlement Agreement, which embraced the higher "creatine-based" standard.**

- **The "creatine-based" language from the First Draft of the 2010 Settlement Agreement remained a part of the settlement agreement all the way through the final execution of the 2010 Settlement Agreement.**

- **The objective communications between the parties show significant discussion of the term "creatine", but zero discussion of the term "COP".**

As to paragraph III. D, the First Draft of the 2010 Settlement Agreement as drafted by VPX provides that VPX shall be permitted to make use of the BANG mark in non-"creatine-based" products so long as they: (i) are nutritionally fortified; (ii) enhance performance; and (iii) are only marketed and sold through "vitamin and nutritional supplement stores to include but not limited to GNC, Vitamin Shoppe, other specialty vitamin and nutrition stores, gyms and health clubs or to the vitamin and dietary supplement sections only of any convenience or other stores". Much like paragraphs III. A to III. C, the language of paragraph III. D as set forth in the First Draft of the 2010 Settlement is the exact same language as the final, executed version of the 2010 Settlement Agreement. In this respect, the marketing and sales restrictions imposed on VPX which are built into paragraph III. D as set for in the First Draft of the 2010 Settlement Agreement never changed over the time that the long-form settlement agreement was negotiated and thus this exact language

Case 22-17842-PDR   Doc 522-8   Filed 12/14/22   Page 39 of 111

DocuSign Envelope ID: 81DDD3B6-74B9-4FE6-BE8A-1KFC67765F5
Case 5:20-cv-01464-DSF-SHK   Document 126-2   Filed 09/23/22   Page 24 of 177   Page ID
#:5411

1  likewise ended up in the final version of the 2010 Settlement Agreement. *See* Exhibit 2572-4 to 5
2  and J-11.

3        Although paragraphs III. A – III. D are not the topic of further negotiations between the
4  parties, paragraph III. J is indeed further discussed, negotiated and revised as between Orange Bang
5  and VPX. Paragraph III. J of the First Draft of the 2010 Settlement Agreement provided that, in
6  essence, Orange Bang will not drift into VPX's purported "lane" and stated, in this first draft, that
7  "Orange Bang shall **not** use the BANG mark in connection with isotonic drinks [which are Class
8  32 drinks], sport drinks [which are also Class 32 drinks], nutritionally fortified supplement
9  beverages [which are Class 5 beverages], or dietary supplements [which are Class 5 products]."
10 *See* Exhibit 2572-6. Also, the First Draft of the 2010 Settlement Agreement, **as drafted by VPX**,
11 had a California choice of law provision, an arbitration provision and an attorney's fee provision
12 (provisions which were not mentioned by Borrowman in either his January 22, 2010 initial
13 proposal or in his May 20, 2010 revised proposal and thus these provisions originated from VPX).
14 Exhibit 2572-10 to 11.

15       On July 21, 2010, Borrowman emailed a red-line of the First Draft of the 2010 Settlement
16 Agreement to Pagano ("Borrowman's First Red-Line"). Borrowman's First Red-Line makes many
17 revisions to the First Draft of the 2010 Settlement Agreement, but Borrowman does not make any
18 changes to the language of paragraphs III. A – III. C, which are verbatim from his May 20, 2010
19 letter, nor does he make any changes to the language of paragraph III. D as drafted by VPX,
20 although based on Borrowman's other comments to the draft of the settlement agreement, his
21 comments changed the numbering of the paragraphs from III. A – III. D to paragraphs 7 A – 7 D
22 which are a part of Section III entitled "Promises" (Section I is "Parties" and Section II is
23 "Recitals"). *See* Exhibit 2572-14 to 19. In short, paragraphs III. A – D became paragraphs 7 A – 7
24 D of the 2010 Settlement Agreement.

25       In Borrowman's First Red-Line, however, he did strike out paragraph III. J in its entirety,
26 now numbered as paragraph 7. J, and changed it to the first of the two paragraphs which reflected
27 the reciprocal agreement to provide the Consents to Register. In Borrowman's First Red-Line, he
28 also made other changes including a strike-out of the global release provision (which had been

24
FINAL ARBITRATION AWARD – PHASE 1 AND PHASE 2

1  previously numbered as paragraph 7)[6] as well as a strike-out of the provision calling for the

2  knowing and voluntary waiver of *future* claims (which had been previously numbered as paragraph

3  8). *See* Exhibit 2572-19 to 22.

4  On July 28, 2010, after reviewing Borrowman's First Red-Line, Pagano revised the next

5  draft of the 2010 Settlement Agreement (the "Second Draft of the 2010 Settlement Agreement")

6  and sent it to Borrowman. Paragraphs 7 A – 7 D remained untouched and without further revision.

7  VPX, however, restored Paragraph 7 J to precisely how it had been worded in the First Draft of the

8  2010 Settlement Agreement, language which had been previously rejected by Orange Bang.  VPX,

9  once again, proposed in paragraph 7 J that Orange Bang agree to not use the BANG mark in

10  connection with **isotonic drinks, sport drinks,** nutritionally fortified supplement beverages, or

11  dietary supplements.  The agreement to provide reciprocal Consents to Register was now reflected

12  in paragraphs 7 K and 7 L. *See* Exhibit 2572-30 to 32.

13  On August 3, 2010, Borrowman sent an email to Pagano pushing back on her proposed

14  language for paragraph 7 J, the paragraph which required Orange Bang to stay in its "lane" and

15  keep out of VPX's "lane" **and which sought to expand VPX's lane such that it would now**

16  **include various Class 32 products such as isotonic drinks and sports drinks (and thereby**

17  **energy drinks)**. At first, Borrowman advised Pagano that Orange Bang wanted to delete the words

18  "nutritionally fortified" because, in Orange Bang's view, it described many of the juices that

19  Orange Bang was currently selling, juices which contain vitamins, milk, etc.  Borrowman, at first,

20  suggested alternate language for paragraph 7 J, "beverages containing supplements to enhance

21  performance", because that language, in his view, *more accurately described VPX's products* and

22  moved the contractual language away from products that Orange Bang made at the time or

23  products that Orange Bang might make in the future.

24  Then, however, also on August 3, 2010, and a mere 21 minutes later, Borrowman sent

25  another email to Pagano advising her that his client Orange Bang even had a problem with the

26

27  [6] Paragraph 6 of the 2010 Settlement Agreement was the only release provision in the agreement
and paragraph 6 was limited to a release of the claims relating to VPX's sole BANG mark product
28  at the time, Bang Pre-Workout, a release provision which would apply provided VPX was not
otherwise in breach of the 2010 Settlement Agreement.

Case 22-17842-PDR   Doc 522-8   Filed 12/14/22   Page 41 of 111

DocuSign Envelope ID: 3DDD3B6-74B9-4A5E-8E89-1KFC6724517
Case 5:20-cv-01464-DSF-SHK   Document 126-2   Filed 09/23/22   Page 26 of 177   Page ID
#:5413

1   language that Borrowman himself had suggested (the "beverages containing supplements to

2   enhance performance" language) because "[b]everages such as Gatorade, other isotonic and sports

3   drinks and **energy drinks** could fall into this definition." (Emphasis added.). **In other words,**

4   **Borrowman, after again consulting with his client Orange Bang, wanted to make sure that**

5   **the language of paragraph 7 J did not inadvertently allow VPX to drift into the "lane" which**

6   **the parties had previously agreed was off limits to VPX, the isotonic drinks, sports drinks,**

7   **and energy drinks "lane". Rather, the concept insisted upon by Borrowman was to keep**

8   **VPX in the nutritional and dietary supplement "lane" while not restricting Orange Bang to a**

9   **"lane" which would block its current or future products.** As Borrowman stated to Pagano in

10  his email, these types of drinks fall into the category carved out for Orange Bang (and its

11  competitors or, to put it another way, these types of drinks do not fall within the category carved

12  out for VPX). Borrowman went on to state that Orange Bang had already agreed not to produce a

13  beverage containing creatine (Paragraph 7 H) and that Orange Bang could not agree to VPX's

14  proposed version of paragraph 7 J. As Borrowman stated, paragraph 7 J either needed to be

15  redrafted or deleted. *See* Exhibit 2572-41 to 43.

16      On August 4, 2010, early in the morning at 8:32 a.m., Pagano sent an email to Borrowman.

17  She confirmed receipt of his emails from the day before and she sent him another red-line, the only

18  change to which was a revised Paragraph 7 J (the "August 4, 2010 Early Morning Red-Line"),

19  together with a clean copy of the latest version of the 2010 Settlement Agreement. In explaining

20  why she made her latest revision to paragraph 7 J, Pagano stated: "**This will conform with our**

21  **agreement that we VPX will stay in IC005"** [i.e., the nutritional and dietary supplement lane].

22  (Emphasis added.) In other words, Pagano stated to Borrowman in this email that she was making

23  the change to paragraph 7 J to confirm VPX's agreement to stay in their "lane", the "lane" as

24  reflected in Class 5. As the August 4, 2010 Early Morning Red-Line itself demonstrates, Pagano

25  *herself* **deleted** the terms "isotonic drinks, sports drinks" from Paragraph 7 J and, at the same time,

26  she **deleted** the words "nutritionally fortified supplement beverage" and **replaced** that language

27  with the words "nutritional supplements in liquid form used to enhance performance". With these

28  changes as drafted by Pagano, paragraph 7 J in the August 4, 2010 Early Morning Red-Line now

26

FINAL ARBITRATION AWARD – PHASE 1 AND PHASE 2

1   read as follows: "Orange Bang shall not use the BANG mark in connection with nutritional
2   supplements in liquid form used to enhance performance and/or dietary supplements." *See* Exhibit
3   2572-45 to 50.

4   Nevertheless, Orange Bang still had issues with the language of Paragraph 7 J as proposed
5   by VPX. Paragraph 7 J was important because it described the "lane" which was off limits to
6   Orange Bang, but, at the same time, it also described the "lane" which was open to VPX.
7   Borrowman wanted to be careful and precise because he did not want paragraph 7 J to impede
8   Orange Bang's current or future products or, at the same time, create too big of an opening for
9   VPX. Therefore, Orange Bang continued to negotiate the precise language of this paragraph 7 J
10  lane. On the afternoon of August 4, 2010, Borrowman and Pagano exchanged several emails as
11  they attempted to iron out the final language of paragraph 7 J. *See* Exhibit 2572-59 to 62.

12  Finally, on August 4, 2010, at 3:58 pm (East Coast time), Pagano sent another red-line to
13  Borrowman which reflected only one additional change, a change to paragraph 7 J (the "August 4,
14  2010 Afternoon Red-Line"), together with an execution copy of the 2010 Settlement Agreement.
15  The August 4, 2010 Afternoon Red-Line reflected a proposed paragraph 7 J as follows: "Orange
16  Bang shall not use the BANG mark in connection with dietary supplements and/or nutritional
17  supplements in liquid form used to enhance performance **of the kind that are primarily marketed**
18  **and sold in gyms, health clubs, vitamin stores and nutritional supplement stores."** (Emphasis
19  added.). *See* Exhibit 2572-61 and 2572-67. This additional change to paragraph 7 J made
20  paragraph 7 J more consistent with the marketing and sales restrictions placed on VPX by virtue of
21  paragraph 7 D. This language, which carved out the "lane" into which Orange Bang was not
22  permitted to drift, also clarified the "lane" in which VPX was required to stay. Borrowman took
23  extra care to prevent VPX from using paragraph 7 J as a way to expand its "lane" so as to permit
24  Class 32 products such as isotonic drinks and sport drinks (and thereby energy drinks). The
25  version of paragraph 7 J set forth in the August 4, 2010 Afternoon Redline became the final version
26  of paragraph 7 J in the 2010 Settlement Agreement. *See* Exhibit J-11, page 5 of 11.

27  In this respect, Borrowman's pattern of negotiation demonstrates Orange Bang's intent to
28  stay in its "lane," to carefully and methodically define VPX's "lane" and to prevent an unintended

27
FINAL ARBITRATION AWARD – PHASE 1 AND PHASE 2

Case 22-17842-PDR   Doc 522-8   Filed 12/14/22   Page 43 of 111

DocuSign Envelope ID: 8FDDD3B67EB944EE8FEED1KFC6722517
Case 5:20-cv-01464-DSF-SHK   Document 126-2   Filed 09/23/22   Page 28 of 177   Page ID
#:5415

1  expansion of VPX's "lane", despite VPX's repeated, but unsuccessful, efforts to expand that "lane"

2  in an attempt to drift into Class 32 territory.  Richard Stein ("Stein"), Operational Manager of

3  Orange Bang, reaffirmed this sentiment when he testified at the arbitration that the purpose of the

4  2010 Settlement Agreement " . . . was to keep VPX in their narrow lane of bodybuilding. . . or

5  muscle building products and supplement products and Orange Bang to be sold everywhere else."

6  Stein Testimony, AHT, p. 145:22 - 146:7.  VPX shared this mutual intent to reach a negotiated co-

7  existence agreement, a "you-stay-in-your-lane and we-stay-in-our-lane" agreement as Eugene

8  Bukovi ("Bukovi"), VPX's VP of Sales, and its Rule 30(b)(6) corporate designee as VPX's person

9  most knowledgeable as to the meaning and intent of the 2010 Settlement Agreement, so testified

10  when he admitted during the arbitration hearing that, in entering into the 2010 Settlement

11  Agreement, VPX likewise was agreeing to stay in its "lane".  In particular, Bukovi testified as

12  follows:

13      Q:      What do you understand you could or couldn't do?

14      A:      I understood that we're **a dietary supplement company**; that we could sell in the

15  channels of trade that we currently sell into . . . [and] that we were not in the same space as Orange

16  Bang . . . **We were good as long as – long as we maintained our – our lanes.**"

17      (Emphasis added.)

18      Bukovi Testimony, AHT, p. 1969:7-22.

19      VPX itself concedes that the 2010 Settlement Agreement was expressly intended to be a

20  "stay in your lane" trademark co-existence agreement as VPX states in it closing reply brief as

21  follows: "As an initial matter, VPX *agrees* that the [2010 Settlement] Agreement 'carves out'

22  certain general lanes where OBI [Orange Bang] and VPX agreed they would not cross paths, could

23  operate without fear of being sued for trademark infringement and maintain their respective

24  registrations."  (Emphasis in the original.) *See* VPX's November 19, 2021 Response to Claimants'

25  Joint Post-Hearing Brief, p. 18.

26      On August 9, 2010, Borrowman returned a signed copy of the 2010 Settlement Agreement

27  to Pagano (with a copy to Thurston) as signed by Orange Bang and by Borrowman himself. *See*

28  Exhibit 2572-74. On August 11, 2010, Pagano returned a signed copy of the 2010 Settlement

28
FINAL ARBITRATION AWARD – PHASE 1 AND PHASE 2

1  Agreement to Borrowman (also with a copy to Thurston) as signed by Jack Owoc ("J. Owoc"), the
2  CEO of VPX, and by Pagano herself. *See* Exhibit 2572-77.

3      The entire history of the negotiation of the 2010 Settlement Agreement shows that Orange
4  Bang and VPX had numerous objective communications about the term "creatine", but not once
5  did they have an **objective communication about the term "COP."**

6      VPX did not call Thurston or Pagano as a witness to testify at the arbitration hearing. The
7  arbitrator is entitled to, and hereby does, draw negative inferences from VPX's failure to call
8  Thurston or Pagano as a testifying witness and the arbitrator therefore concludes that Thurston's
9  and Pagano's testimony would not have been helpful to VPX. Having said that, and as
10 demonstrated in this Section II.E as set forth above, the negotiation history of the 2010 Settlement
11 Agreement is relatively clear, straightforward (although detailed) and mostly undisputed and the
12 arbitrator would reach the same findings and conclusions as set forth in this Interim Arbitration
13 Award even without drawing these negative inference as to Thurston and Pagano. However, it is
14 not unimportant and it is noteworthy that VPX did not call Thurston or Pagano as testifying
15 witnesses. It should also be pointed out that Monster / Orange Bang did not call Thurston or
16 Pagano as testifying witnesses either, although it was not Monster's or Orange Bang's burden to do
17 so.

18

19 **F. The Term "Creatine-Based" is Ambiguous, the VPX Marketing and Sales Restrictions**
20 **of Paragraph 7 D and VPX's Failure to Communicate the VPX Marketing and Sales**
21 **Restrictions to VPX's Own Employees, to VPX's Distributors or to VPX's Retailers**
22     Paragraph 7 is clear in several respects, but unquestionably ambiguous in other respects.
23     Paragraph 7 A is clear that VPX is permitted to use the BANG mark to sell the Bang Pre-
24 Workout product because, as the parties believed at the time, it was a "nutritionally fortified,
25 creatine-based" beverage.

26     Paragraph 7 B is clear that VPX is permitted to change the formula for its Bang Pre-
27 Workout product and then continue to use the BANG mark to sell the reformulated Bang Pre-
28

29
FINAL ARBITRATION AWARD – PHASE 1 AND PHASE 2

1 Workout product because, as the parties also believed at the time, it would likewise be a
2 "nutritionally fortified, creatine-based" beverage.

3       Paragraph 7 C is clear that VPX is permitted to use the BANG mark to sell other dietary
4 supplements and nutritional products, such as pills and capsules and presumably even other
5 beverages, so long as they are "creatine-based, nutritionally fortified" products.

6       (In paragraphs 7 A and 7 B, the order of the wording is "nutritionally fortified" first and
7 "creatine-based" second. In paragraph 7 C, the order of the wording is switched, with "creatine-
8 based" first and "nutritionally fortified" second. The order of the words is not significant, but it is
9 worth noting that the order of the words changes in this manner in the 2010 Settlement
10 Agreement.)

11       Paragraph 7 D is clear that VPX is even permitted to sell non-"creatine-based" products so
12 long as the non-"creatine-based" products: (i) are nutritionally fortified; (ii) enhance performance;
13 and (iii) are "only *marketed* and sold through vitamin and nutritional supplement stores to include
14 but not limited to GNC, Vitamin Shoppe, other specialty vitamin and nutrition stores, gyms and
15 health clubs or to the vitamin and dietary supplement sections only of any convenience or other
16 stores" **(the "VPX Marketing and Sales Restrictions")**.

17       Although paragraph 7 A through 7 D are clear enough as set forth above, the terms *within*
18 these provisions are ambiguous and they are, without any question, reasonably susceptible to more
19 than one interpretation. The terms "creatine-based" and "nutritionally fortified" are ambiguous
20 terms which are not defined anywhere in the 2010 Settlement Agreement.

21       Accordingly, all of the above-referenced extrinsic evidence which, at first, was received
22 into evidence on a provisional basis, is now formally received into evidence because the language
23 of paragraph 7 is reasonably susceptible to more than one interpretation.

24       As has been evident since the inception of this case, Monster / Orange Bang, on the one
25 hand, and VPX, on the other, have vastly different interpretations and arguments as to what is
26 meant by the all-important term "creatine-based".

27       And for obvious reasons. If BANG Energy RTD is a "creatine-based" product, then BANG
28 Energy RTD is a paragraph 7 C product and VPX has an absolute green-light to market it and sell it

1   (and other VPX "creatine-based" products) however it sees fit and without regard to, and without
2   having to adhere to, the VPX Marketing and Sales Restrictions. **If, however, BANG Energy RTD**
3   **is not a "creatine-based" product, then BANG Energy RTD is a paragraph 7 D product and**
4   **VPX would have no right to sell it, and no right to even *market* it, unless VPX abides by,**
5   **adheres to and complies with the VPX Marketing and Sales Restrictions (and this would**
6   **apply to other VPX "non-creatine-based" products as well). And, if BANG Energy RTD is**
7   **indeed a paragraph 7 D product, and if VPX then failed to comply with, or continues to**
8   **disregard, the VPX Marketing and Sales Restrictions, then VPX is in breach of the 2010**
9   **Settlement Agreement. This all-important issue is discussed in further detail below in Section**
10  **III, F.**

11          This dispute, whether or not BANG Energy RTD is a paragraph 7 C or a paragraph 7 D
12  product, which turns on the meaning and intent of the term "creatine-based", is the core dispute in
13  this case.

14          As an aside, although a great amount of time, energy, documents and testimony have been
15  expended on the attempt to understand the meaning of the ambiguous term "nutritionally fortified",
16  including but not limited to eliciting testimony from experts on FDA standards regarding when a
17  food or beverage is entitled to claim that it is "nutritionally fortified" according to, or without
18  regard to, FDA guidelines and regulations, and although the arbitrator discusses this issue to some
19  extent below, the arbitrator believes that the inquiry into the meaning of "nutritionally fortified" is
20  of minor consequence. The reason for this conclusion is because paragraphs 7 A – 7 C all make
21  use of the language "nutritionally fortified, creatine-based" [paragraphs 7 A and 7 B] or "creatine-
22  based, nutritionally fortified" [paragraph 7 C] and because of the way the comma is placed between
23  these two terms, *both elements* are required in order to satisfy the terms of this contractual
24  provisions at issue. In other words, paragraphs 7 A – 7 C are all written, in a substantive sense, as
25  a conjunctive phrase, not as a disjunctive phrase, an "and" as opposed to an "or" and, therefore, in
26  order to satisfy paragraphs 7 A – 7 C, both elements, both the "creatine-based" element and the
27  "nutritionally fortified" element, must be satisfied in order to comply with the contract.
28  Accordingly, the main focus in this Interim Arbitration Award shall be on the all-important term

31
FINAL ARBITRATION AWARD – PHASE 1 AND PHASE 2

Case 22-17842-PDR   Doc 522-8   Filed 12/14/22   Page 47 of 111

DocuSign Envelope ID: 3DDD3B61-7BB3-4AFE-8E89-1KFC6772517C
Case 5:20-cv-01464-DSF-SHK   Document 126-2   Filed 09/23/22   Page 32 of 177   Page ID
#:5419

1   "creatine-based" because if that contractual term in- and-of-itself is not satisfied, it does not then

2   matter if the beverage or product is, or is not, "nutritionally fortified" given that both elements of

3   the conjunctive phrase must be satisfied in order for a product to qualify as a paragraph 7 C product

4   under the 2010 Settlement Agreement.

5        At the same time, as to paragraph 7 D, and even before reaching the question(s) of whether

6   or not the product is "nutritionally fortified" which "enhances performance", the threshold question

7   which again must be resolved *first* is whether or not the product is "creatine-based". This fact of

8   construction likewise focuses the attention back to the fundamental issues of (i) what does

9   "creatine-based" mean; and (ii) whether or not a product is indeed "creatine- based", and that

10  explains why the subsidiary inquiry of whether or not a product is "nutritionally fortified" is of

11  much lesser importance. In short, unless there is a prior finding that the BANG Energy RTD

12  product, and VPX's other Bang-branded products, are indeed "creatine-based", there is no need to

13  even reach the issue of whether or not the products are also "nutritionally fortified" or whether they

14  "enhance performance".

15       Once the 2010 Settlement Agreement was fully executed by Orange Bang and VPX, what

16  did VPX do with it? Did VPX take steps to ensure that the VPX Marketing and Sales Restrictions

17  were carefully complied with and strictly followed?

18       One would assume that after the 2010 Settlement Agreement was fully executed, and given

19  the importance of the VPX Marketing and Sales Restrictions, the existence and importance of the

20  VPX Marketing and Sales Restrictions would be affirmatively communicated by the executives of

21  VPX to VPX's employees and to VPX's customers / distributors / retailers, **but that was not the**

22  **case.** VPX did essentially nothing in order to ensure compliance with the VPX Marketing and

23  Sales Restrictions in paragraph 7 D of the 2010 Settlement Agreement. J. Owoc, VPX's CEO,

24  testified that he never even read the 2010 Settlement Agreement (although the evidence referred to

25  above demonstrates that he discussed it with this attorneys during the negotiations of the 2010

26  Settlement Agreement and although he signed it) and he never "advised any VPX employees in

27  sales and marketing about VPX's obligations." J. Owoc Testimony, AHT, p. 1279:19-23, 1276:17

28  - 1277:16; Bukovi Testimony, AHT, p. 2108:15 - 2109:3 (same). VPX's other employees also

1  testified that they had never heard of the 2010 Settlement Agreement prior to this litigation. Meg
2  Owoc ("M. Owoc") Testimony, AHT, p. 3493:7-21; Sweeney Testimony, AHT, p. 3105:13-20; Li
3  Testimony, AHT, p. 1464:13-16.

4      Not only were the VPX marketing and sales department not told about the VPX Marketing
5  and Sales Restrictions in the 2010 Settlement Agreement, the distributors and retailers were not
6  told about the VPX Marketing and Sales Restrictions either. In fact as demonstrated by some of
7  the sample distribution agreements entered into between VPX and selected distributors which were
8  received into evidence during the arbitration, not only did VPX fail to inform these distributors of
9  the VPX Marketing and Sales Restrictions, VPX, at least on some occasions, built in language in
10  these distribution agreements which required the distributors to not only *disregard* the VPX
11  Marketing and Sales Restrictions (restrictions of which the distributors were unaware), but required
12  them to affirmatively distribute product in a manner which was *the exact opposite* of the VPX
13  Marketing and Sales Restrictions (restrictions of which, once again, the distributors were unaware).
14  For example, in paragraph 2.1 of the VPX's Distribution Agreement with Intermountain, VPX
15  required this distributor to sell its products which, in fact, were non- "creatine-based" products in
16  the general beverage sections of retail stores, a clear violation of the VPX Marketing and Sales
17  Restrictions. *See* Exhibit 771, paragraph 2.1, p.2.

18      It is simply not possible for VPX to comply with the VPX Marketing and Sales Restrictions
19  when it never bothered to communicate the existence of the VPX Marketing and Sales Restrictions
20  to its own employees, to its own customers, to its own distributors (such as Pepsi, see *infra*) or to
21  the all-important retailers.

22

23  **G. The 2010 to 2019 Time Period, the Introduction of BANG Energy RTD into the**
24  **Marketplace in Late 2015 and VPX's Representations to the World About Creatine**
25  **and Super Creatine**

26      VPX is correct that extremely powerful extrinsic evidence is course of dealing / course of
27  performance evidence which shows how the parties behaved, vis-à-vis each other, after the parties
28  entered into the 2010 Settlement Agreement. *See Brown v. Goldstein*, 34 Cal.App.5th 418, 436-

33
FINAL ARBITRATION AWARD – PHASE 1 AND PHASE 2

1   437 (2019) [course of dealing / course of performance where publisher actually paid publisher's
2   share of public performance to the band, income it claimed later was not due to the band, is
3   important parol evidence entitled to great weight]. VPX also asks the correct questions: when
4   BANG Energy RTD was released to the marketplace in October of 2015, and became a smash hit
5   beginning in 2018 and the first half of 2019 with astronomical sales in 2019 - 2021, where were
6   you Orange Bang? Why weren't you complaining? Why did you sit back and say nothing and do
7   nothing? Doesn't this show that VPX was indeed adhering to the 2010 Settlement Agreement?
8   Doesn't this show that this lawsuit is just an attempt at a "money grab" by Orange Bang and
9   Monster, and Monster's attempt to snuff out its chief competitor VPX? Doesn't this show that
10  Orange Bang is guilty of laches and that its claims are time-barred by the four year statute of
11  limitations for breach of contract in California?

12      However, Orange Bang has a simple, but convincing, answer to these all-important
13  questions. Orange Bang said nothing and did nothing about BANG Energy RTD in 2015 to August
14  of 2019 because it believed, as did most of the world of would-be consumers of this product, that
15  BANG Energy RTD was indeed a "creatine-based" product. As Stein testified at the arbitration
16  hearing, he did nothing because he believed that BANG Energy RTD was "creatine-based" and
17  thus in compliance with the 2010 Settlement Agreement. *See* Stein Testimony; AHT, p. 165:16-
18  166:6.

19      And why wouldn't Stein believe that? During this time period, October of 2015 to August
20  of 2019, VPX broadcasted to the world of would-be consumers, via its product labels, via its
21  advertising and marketing materials, via its social media campaign and via its website that BANG
22  Energy RTD did indeed contain creatine. VPX not only broadcast to the world of would- be
23  consumers that BANG Energy RTD contained creatine, but that it contained "super creatine" as
24  well, and that its products would deliver the benefits of creatine to the consumer's body.[7] *See*
25  Exhibits 1680 ["super creatine" on the can]; 608 ["super creatine" on the can and "Power up with
26  BANG's brain & body-rocking fuel]; 2238 [same]; 917 [same]; 283, 245, 270 [social media posts

27  _____

28  [7] Wouldn't a consumer reasonably believe that a product with super creatine would have more
    health benefits than a product that merely had creatine?

1 by bangenergy.ceo J. Owoc "#IceColdCreatine" juxtaposed with images of BANG Energy RTD or

2 bang promotional items]; 673 [social media post by bangenergy.ceo J. Owoc describing the

3 benefits and efficacy of super creatine]; 713 [press release quoting J. Owoc as he describes the new

4 BANG Energy RTD Rainbow Unicorn with Super Creatine and the brain and brawn benefits of

5 creatine]; 694 [VPX 2016 presentation to distributors which touts BANG Energy RTD as the

6 world's first energy sports drink with water stable creatine, p. 14 and 21 showing the benefits of

7 super creatine]; 352 [2016 social media post by bangenergy.ceo J. Owoc which states

8 "#SuperCreatine – THE KEY TO EXPONENTIAL MUSCLE GROWTH", date established by J.

9 Owoc's responsive comment " . . . May God's blessings chase you down in 2016!"]; 2581 [sales

10 sheet used by VPX employees to emphasize the benefits of creatine]; and 169 [VPX patent

11 covering CLL (defined below) and CLG (defined below) filed in 2010 and issued in 2013 which

12 attempts to equate the benefits of creatine with the purported benefits of CLL and CLG].

13        In short, VPX four-walled to the world that BANG Energy RTD contained an efficacious

14 amount of creatine (super creatine no less) and would help produce the benefits of creatine in the

15 human body and, therefore, it made perfect sense that during this period of time Orange Bang was

16 **not** on notice of facts which would have led it to the conclusion that BANG Energy RTD was not,

17 in actuality, "creatine-based" and that BANG Energy RTD was really a paragraph 7 D product, and

18 not a paragraph 7 C product. Orange Bang was legitimately ignorant of these facts, as were all

19 VPX's would-be consumers, based on the representations VPX itself made to the marketplace

20 singing the praises of its product which contained not just creatine, but super- creatine – raising the

21 intended belief in the minds of the consuming public that drinking BANG Energy RTD would help

22 deliver the benefits of creatine. Orange Bang was ignorant of these facts, but, as discussed below,

23 that all changed in mid-August of 2019.

24

25   **H.  VPX's Brilliant and Highly Successful Marketing and Social Media Campaign for**

26   **BANG Energy RTD and Its Other Bang Branded Products**

27        VPX has had enormous success. As the billions of dollars of sales of BANG Energy RTD

28 demonstrate, the sensational success of VPX is undeniable. Some of that success may be

Case 22-17842-PDR Doc 522-8 Filed 12/14/22 Page 51 of 111

DocuSign Envelope ID: 81DDD3B5-74B9-4EE8-8E89-1KFC67265D
Case 5:20-cv-01464-DSF-SHK Document 126-2 Filed 09/23/22 Page 36 of 177 Page ID
#:5423

1 attributable to the quality and great taste of the BANG Energy RTD product, but a meaningful
2 portion of that success is attributable to the brilliant marketing strategy of M. Owoc and her no. 2
3 Daisy Grunewald ("Grunewald"), the marketing executives of VPX, who built a social media and
4 influencer marketing strategy which clicked with the under 30 crowd, a marketing strategy,
5 however, that was based **almost entirely** upon making prevalent use of the brand name "Bang."
6 The BANG mark was, and is, the centerpiece of VPX's marketing strategy which, based on the
7 pervasive use of the BANG mark, has generated billions of dollars in sales.

8      To VPX's credit, VPX figured out that in order to stimulate significant sales, it had to reach
9 young consumers, Gen Z and Millennials, who wanted the next "it" drink and that the way to reach
10 these consumers was through a vigorous social media campaign targeted towards *the general*
11 *population*, and not limited to the nutritional channel as required by paragraph 7 D for products
12 which are not "creatine-based". Grunewald Testimony, AHT, p 1799:9 -12. And VPX did just
13 that. However, this social media campaign likewise was based upon, and made prominent and
14 continuous use of, the BANG mark. *See* J-55, p. 25, J-155, p. 24 and 29. And significantly, in its
15 social marketing campaign and in its advertising and promotional activities which led to its
16 financial break-through, VPX marketed its BANG products, especially BANG Energy RTD, as a
17 "life-style" product, a marketing approach which did not comply with the VPX Marketing and
18 Sales Restrictions. *See* Exhibits 1343, p. 1 and 8; 2460 ["ONLY lifestyle. NO workouts."], 2969,
19 p. 16-17 ["lifestyle positioning" and "functioning positioning"]; Grunewald Testimony, AHT, p
20 1799:9-12. This marketing campaign was no longer limited to a nutritional and dietary supplement
21 "lane" as required by paragraph 7 D of the 2010 Settlement Agreement pertaining to non-"creatine-
22 based" products.

23      With respect to Instagram followers, VPX demonstrated how it had 100,000 followers at
24 the end of 2017 and how that number grew to 2 million by the beginning of 2021. This is
25 impressive, but those Instagram followers are followers of @**bang**energy. Again, VPX's
26 undeniable success on social media is tied to the use of the BANG mark, the centerpiece of its
27 social media campaign. *See* VPX Demonstrative DDX1009-1, which references Exhibits 5551,
28 5552, 5553, 5554 and 5555. Moreover, as M. Owoc and Grunewald both testified at the arbitration

36
FINAL ARBITRATION AWARD – PHASE 1 AND PHASE 2

1 hearing, VPX has hired over 1,000 influencers and those influencers, in turn, reach over 2.4 billion
2 followers (see *infra*), all of whom promoted VPX products, but all of whom did that, and continue
3 to do so, by promoting and making use of the BANG mark. In short, VPX's social media,
4 advertising and live event campaigns have been an overwhelming success and have stimulated
5 massive sales of VPX Bang branded product, in particular BANG Energy RTD, **but all of these**
6 **marketing and sales efforts are based upon the omnipotent use of the BANG mark.**

7

8 **I. VPX Rebrands the Company from VPX to BANG Energy**

9 As the success of BANG Energy RTD grew, VPX made the strategic and marketing
10 decision in the first quarter of 2019 to change the name of VPX, to rebrand the entire company, as
11 "Bang Energy". VPX changed its social media accounts and its website to incorporate the BANG
12 mark. As VPX stated in an email about rebranding, "Born VPX, rebranded as Bang!", and this
13 need to rebrand had taken on a sense of urgency for VPX, an unmovable deadline. J. Owoc choose
14 to call himself the "Bang CEO" and 99.8% of VPX products are sold under the BANG mark. *See*
15 Exhibits 2748, p. 3; 2749; J. Owoc Testimony, AHT 1339:7-22, 1402:11 – 1403:22; M. Owoc
16 Testimony, AHT 3444:4 – 3445:10. VPX even calls its customer base "Bangsters". *(See infra.)*.
17 As the sales of BANG Energy RTD grew, VPX continued to use the BANG mark in a
18 comprehensive fashion.

19

20 **J. VPX's 2018 – 2019 Release of its Bang Keto Coffee Product and Orange Bang's**
21 **Response**

22 In 2018, VPX released its BANG Keto Coffee product into the marketplace. *See* DDX
23 1003 – VPX Product Timeline. BANG Keto Coffee, a product currently on the market, has no
24 creatine, nor does it purport to have any creatine, so it is obviously not "creatine-based", which
25 makes it a paragraph 7 D product, and not a paragraph 7 C product. Therefore, BANG Keto Coffee
26 can only be marketed and sold in accordance with the VPX Marketing and Sales Restrictions.
27 On March 25, 2019, and following the release of the BANG Keto Coffee product into the
28 marketplace, Borrowman, on behalf of Orange Bang, sent a cease and desist letter to VPX

37
FINAL ARBITRATION AWARD – PHASE 1 AND PHASE 2

Case 22-17842-PDR   Doc 522-8   Filed 12/14/22   Page 53 of 111

DocuSign Envelope ID: 3PP036748944FE8EE9-1KFC67235F
Case 5:20-cv-01464-DSF-SHK   Document 126-2   Filed 09/23/22   Page 38 of 177   Page ID
#:5425

1  (attention J. Owoc, CEO) regarding the BANG Keto Coffee drink (the "First Keto Coffee Cease
2  and Desist Letter"). In the First Keto Coffee Cease and Desist Letter, Borrowman referred to the
3  2010 Settlement Agreement and the fact that Keto Coffee does not list creatine as an ingredient on
4  the back of the can (indicating that it is an obvious paragraph 7 D product) and contended that it
5  was being sold in the general beverage section of retail stores including at gas stations and
6  convenience stores where Orange Bang also sold its products. In the First Keto Coffee Cease and
7  Desist Letter, Borrowman explained the precise requirements of paragraphs 7 A – 7 C, including
8  the paragraph 7 C requirement that VPX could only use the BANG mark in connection with
9  "creatine-based" products, and the restrictive requirements of paragraph 7 D, the grant of rights /
10 permissions which enabled VPX to sell non-"creatine-based" products but only if they are
11 nutritionally fortified, enhance performance and are marketed and sold through vitamin and
12 nutritional supplement stores of the vitamin and dietary supplement sections of other stores. *See*
13 Exhibit J-64.

14      In this respect, the First Keto Coffee Cease and Desist Letter is of critical importance
15 because this letter, although only directed to VPX at the time, focused upon the "creatine-based"
16 limitation of paragraph 7 C and the VPX Marketing and Sales Restrictions of paragraph 7 D. In
17 short, the First Keto Coffee Cease and Desist Letter contained a description of the VPX Marketing
18 and Sales Restrictions, strict limitations on its ability to conduct business, with which VPX was
19 required to comply – extremely sensitive and valuable business information should it fall into the
20 wrong hands and information which VPX should have been on guard to protect.

21      On August 2, 2019, after receiving no response to the First Keto Coffee Cease and Desist
22 Letter, Borrowman sent a second cease and desist letter, again only to VPX, this one to VPX's
23 then-General Counsel Marc Kesten ("Kesten") (the "Second Keto Coffee Cease and Desist
24 Letter"). In the Second Keto Coffee Cease and Desist Letter, Borrowman referred to a prior VPX
25 settlement offer which he had rejected and, in addition, he noted that "non-creatine-based
26 beverages continued to be sold through unapproved channels" and how such sales were a breach of
27 paragraph 7 D, a paragraph he had already described in the First Keto Coffee Cease and Desist
28 Letter. Borrowman again demanded that VPX cease and desist. *See* Exhibit J 66, p. 54 of 54.

38
FINAL ARBITRATION AWARD – PHASE 1 AND PHASE 2

1    On August 9, 2019, VPX responded to the Second Keto Coffee Cease and Desist Letter.
2   VPX did not respond by sending a letter or an email back to Orange Bang's counsel. Rather, it
3   responded by filing a state court lawsuit for declaratory relief (the "2019 Declaratory Relief
4   Action").

5

6   **K. VPX's 2019 Declaratory Relief Action, the Complaint Itself and the Crucial**
7   **Attachments to the Complaint**

8    In the 2019 Declaratory Relief Action, filed by Kesten, an in-house employee of VPX at the
9   time, VPX filed a complaint for declaratory relief seeking a declaration from the court that the 2010
10   Settlement Agreement: (i) contained promises which are permissive rather than mandatory or
11   prohibitive (essentially the same argument VPX has made in this arbitration); and (ii) was not
12   intended to cover the BANG Keto Coffee product and, therefore, the VPX Marketing and Sale
13   Restrictions did not apply to it. VPX's complaint in the 2019 Declaratory Relief Action was
14   assigned to the Honorable Judge Stephen P. Pfahler of the Los Angeles Superior Court in
15   California and it attached various exhibits, all of which became a part of the public record. VPX's
16   2019 Declaratory Relief Action attached the First Keto Coffee Cease and Desist Letter as Exhibit
17   "B" and the Second Keto Coffee Cease and Desist Letter as Exhibit "C". *See* Exhibit J-66, p. 46 of
18   54 and p. 54 of 54. The complaint drafted and filed by Kesten in the 2019 Declaratory Relief
19   Action also contained a footnote 1, a representation and warranty made by VPX to the court that
20   " . . . VPX will file with the Court a copy of the [2010] Settlement Agreement."

21    VPX did not follow through on footnote 1 and VPX did not file the 2010 Settlement
22   Agreement with the court either under seal or as a part of the public record. Nevertheless, VPX
23   did, in fact, file the First Keto Coffee Demand Letter and the Second Keto Coffee Demand Letter
24   as part of the public record and thus it was VPX, not Orange Bang, who disclosed to the world the
25   key provisions of paragraph 7 of the 2010 Settlement Agreement including, but not limited to, the
26   "creatine-based" requirement of paragraph 7 C and the VPX Marketing and Sales Restrictions of
27   paragraph 7 D.

28

1        In short, it was VPX itself who exposed its own vulnerability, its own kryptonite so to

2 speak, into the public record by attaching Exhibits B and C to the complaint in the 2019

3 Declaratory Relief Action. These disclosures, which exposed VPX's own Achille's Heel, the

4 requirement that their products be "creatine-based" and the requirement that it adhere to the VPX

5 Marketing and Sales Restrictions, was a self-inflicted wound by VPX and was not the result of a

6 breach of the 2010 Settlement Agreement by Orange Bang.

7        During the arbitration, VPX conceded that BANG Keto Coffee was, and is, marketed and

8 sold on-line and at VPX sponsored events and, most importantly, sold in the general beverage

9 sections of retail outlets. In this respect, VPX has been, and currently is, marketing and selling

10 BANG Keto Coffee in violation of the VPX Marketing and Sales Restrictions. These facts, and the

11 legal conclusions which flow from them, at least as to BANG Keto Coffee, are not disputed by

12 VPX.

13

14   **L. Fox and Stein Reach Out to Monster**

15        In August of 2019, after service of the 2019 Declaratory Relief Action on Orange Bang,

16 Fox, Orange Bang's President, had a conversation with his no. 2, Stein. Stein told him that he had

17 read an article in a trade publication about Monster having a dispute with VPX about creatine and

18 that it might make sense for Orange Bang to reach out to Monster since they both were in litigation

19 against VPX. Fox called Rodney Sacks ("Sacks"), the CEO of Monster, and spoke with one of

20 Monster's in-house attorneys. Fox and Stein arranged a meeting with Sacks. In mid-August of

21 2019, Fox and Stein attended a meeting with Sacks and some of Monster's attorneys.

22        The arbitrator initially determined that the conversations and events of this August 2019

23 meeting were protected from disclosure because of the common interest doctrine. However, during

24 the direct examination of Fox at the arbitration hearing, Monster's counsel elicited enough of the

25 conversations from this meeting, albeit via an indirect means, that the arbitrator permitted VPX to

26 fully cross-examine the Orange Bang witnesses and Sacks about this meeting, and VPX did so.

27 During the arbitration hearing, the parties established that Orange Bang handed a copy of the 2010

28 Settlement Agreement to Monster at their first meeting. However, Orange Bang did so because the

1   First Keto Coffee Demand Letter and the Second Keto Coffee Demand Letter, the documents

2   which described the "creatine-based" requirement of paragraph 7 C and the VPX Marketing and

3   Sales Restrictions of paragraph 7 D, and which thereby revealed the crucial provisions of the 2010

4   Settlement Agreement, had already been made a part of the public record by VPX itself. Therefore,

5   no liability attaches to Orange Bang for disclosing a document to Monster, the key provisions of

6   which had already been disclosed to the general public by VPX itself.

7          Suffice it to say that Monster and its attorneys quickly grasped the significance of the 2010

8   Settlement Agreement and how it could "weaponize" it (to embrace, for the moment, the concept

9   advocated by VPX). Monster already believed that VPX's most successful product, BANG Energy

10  RTD, made material misrepresentations to consumers about creatine and "super creatine", as

11  evidenced by the district court Lanham Act case which Monster had already filed against VPX (the

12  "False Advertising Case"), and the 2010 Settlement Agreement contained a provision which

13  precluded VPX from marketing or selling a non-"creatine-based" product in wide, general

14  distribution. There is no doubt that Monster instantly recognized the strategic advantage that it

15  might derive from joining forces with Orange Bang and seeking to enforce the 2010 Settlement

16  Agreement and seeking to hold VPX to the VPX Marketing and Sales Restrictions of paragraph 7

17  D to which it had previously agreed – or seek substantial damages for VPX's breach of that

18  provision.

19         Once Orange Bang attended this meeting with Monster in August of 2019, there is no doubt

20  that Monster communicated to Orange Bang its [Monster's] belief that because BANG Energy

21  RTD is devoid of creatine, it, therefore, could not possibly be "creatine-based". Thus, as of the

22  August of 2019 meeting with Monster, Orange Bang was made aware of the facts giving rise to its

23  claim that VPX was in breach of the 2010 Settlement Agreement and that VPX had failed to "stay

24  in its lane" thus also giving rise to a claim for trademark infringement.[8]

25

26

---

27  [8] As McCarthy points out, a co-existence agreement, also known as a consent to use agreement, is
    essentially an agreement not to sue for trademark infringement so long as the junior user agrees to
28  stay in its agreed-upon zone of use or, as in this case, the agreed-upon "lane." *McCarthy*, Section
    18:79.

1    Did Monster seek to "weaponize" the 2010 Settlement Agreement? The answer to that
2    question is "of course". But that is the wrong question. The right question is: did Monster
3    *unlawfully* "weaponize" the 2010 Settlement Agreement? That question and the answer to it are
4    discussed further in Section III, O. below.

5

6    **M. The September 23, 2019 Assignment Agreement**

7    After the mid-August meeting of 2019 referred to above, and after execution of a common
8    interest / joint defense agreement, Orange Bang and Monster negotiated an assignment agreement
9    which they signed on September 23, 2019 (the "Assignment Agreement"). By way of the
10   Assignment Agreement, Orange Bang and Monster agreed as follows: (i) Orange Bang assigned
11   its breach of contract claim to Monster in exchange for 50% of the recovery, if any; (ii) Orange
12   Bang retained its trademark rights and its trademark related claims, but agreed to share 50% of any
13   recovery, if any, with Monster; (iii) Monster shall pay for all of the litigation fees and costs, but
14   Monster controls the litigation in all respects; (iv) Orange Bang shall adhere to certain restrictions
15   on its corporate governance so as to facilitate the litigation such as its agreement that it will not sell
16   the company or dispose of its trademark rights; and (v) Orange Bang shall continue to fully
17   perform its obligations to VPX under the 2010 Settlement Agreement. *See* J-67. VPX contends
18   that the Assignment Agreement is an unlawful restraint of trade which seeks to snuff out
19   competition. *See* Section III, O. below in this regard.

20

21   **N. The Proceedings of the State Court Declaratory Relief Action without Disclosure of**
22   **the Assignment Agreement**

23   VPX also contends that Orange Bang committed fraud because it never disclosed to VPX,
24   or to the court in the 2019 Declaratory Relief Action, the existence or the significance of the
25   Assignment Agreement or the fact that Monster was now involved in the proceedings and that
26   Monster had become a real party in interest in the litigation and, had Orange Bang done so, VPX
27   contends that it would never have agreed to dismiss the 2019 Declaratory Relief Action in favor of
28   this arbitration proceeding.

1    This argument is devoid of merit for a variety of reasons. First, VPX had already agreed to
2  an arbitration provision within the 2010 Settlement Agreement and the 2019 Declaratory Relief
3  Action should never have been filed in the first place. Second, the arbitration agreement within the
4  2010 Settlement Agreement was binding on VPX, binding on Orange Bang and binding on their
5  assignees (and agents and successors) and, therefore, the arbitration agreement was binding on
6  Monster, whether its identity had been disclosed or not disclosed.[9] Third, even though the
7  Assignment Agreement had already been signed and the assignment had already taken place,
8  Orange Bang nevertheless remained a party to the 2010 Settlement Agreement, with the obligation
9  to continue to perform all of its duties under that agreement, and Orange Bang remained a
10  signatory to the arbitration provision within the 2010 Settlement Agreement and, therefore, Orange
11  Bang remained a named party to the then-pending 2019 Declaratory Relief Action and remained a
12  proper party to the arbitration proceedings to which the parties were in the process of stipulating.
13  Fourth, and perhaps most importantly, VPX was bound by the arbitration provision no matter what,
14  whether the existence of Monster as a real party in interest was disclosed to VPX or whether the
15  existence of Monster as a real party in interest was not disclosed to VPX, and even if VPX had
16  withdrawn its agreement to stipulate to the arbitration, the court was still required to compel
17  arbitration and, therefore, VPX has suffered no damages by agreeing to participate in an arbitration
18  in which it was duty-bound to participate in any event.

19

20  **O. The False Advertising Case**

21    The False Advertising Case is pending. Monster sought a preliminary injunction in the
22  False Advertising Case which was denied. The district court made various rulings based on the
23  information before it as of the time of the motion for the preliminary injunction was heard,
24  information which may or may not change over time. Discovery may help the chances of VPX.
25  Discovery may help the chances of Monster.

26

27

28  [9] Both Judge Fischer of the United States District Court for the Central District of California and
the arbitrator have previously ruled that Monster falls within the ambit of the arbitration provisions.
*See* Judge Fischer's November 30, 2020 Order.

Case 22-17842-PDR   Doc 522-8   Filed 12/14/22   Page 59 of 111

DocuSign Envelope ID: 2FDDD3B5-74B9-4FFF-BEB9-1KFC67225E7   Case 5:20-cv-01464-DSF-SHK   Document 126-2   Filed 09/23/22   Page 44 of 177   Page ID
#:5431

1       VPX has objected to this arbitration because, in VPX's view, all Monster is doing is
2   seeking a "second bite of the apple", a second chance to win the False Advertising Case which,
3   VPX's contends, Monster is losing. But none of that matters. The issues before the arbitrator are
4   different, separate and distinct from the issues before the district court in the False Advertising
5   Case. In the False Advertising Case, the district court has to determine if VPX's advertising claims
6   about creatine and super creatine are false or misleading to consumers. Those are not the issues
7   before the arbitrator. The issues in this case turn on whether or not BANG Energy RTD, and
8   VPX's other products which make use of the BANG mark, are "creatine- based" or not, whether
9   that results in a breach of the 2010 Settlement Agreement or not and whether that rises to the level
10  of trademark infringement or not. Yes, many of these issues are interwoven with the chemistry,
11  biology and scientific expert issues related to creatine, but this arbitration is not a "second bite of
12  the apple" because the issues here are not the false advertising issues which underlie the False
13  Advertising Case. Rather, this case turns on contract and trademark infringement issues.

14

15      **P. The June 2020 Demand for Arbitration – the Claims and Counterclaims**

16      In June of 2020, after the dismissal of the 2019 Declaratory Relief Action, an action which
17  should never have been filed in the first place because of the applicability of the arbitration
18  provision contained in the 2010 Settlement Agreement, and after a delay of some months, Monster
19  and Orange Bang filed a Demand for Arbitration which initiated this arbitration and, in response,
20  VPX filed its answer / denial and its counterclaims.

21      The Monster / Orange Bang claims are as follows:

22  First Claim                     Breach of Contract;

23  Second Claim                    False Designation of Origin;

24  Third Claim                     Trademark Infringement;

25  Fourth Claim                    Unfair Competition – B & P Section 17200; and

26  Fifth Claim                     Common Law Unfair Competition.

27

28

44
FINAL ARBITRATION AWARD – PHASE 1 AND PHASE 2

1    The VPX counterclaims are as follows:

2    First Claim                    Declaratory Judgment (the right to use the Bang mark

3                                   and VPX's Bang logo);

4    Second Claim                   Declaratory Judgment (no infringement and no unfair

5                                   competition);

6    Third Claim                    Unfair Business Practices - B & P Section 17200;

7    Fourth Claim                   Unreasonable Restraint of Trade (Section 16726);

8    Fifth Claim                    Fraud; and

9    Sixth Claim                    Breach of Contract (breach of the confidentiality

10                                  provision, paragraph 12 of the 2010 Settlement

11                                  Agreement).

12

13   **III.    DISCUSSION, FURTHER FINDINGS AND CONCLUSIONS**

14

15   **A. The Meaning of "Creatine-Based"**

16   The history and context of the negotiations of the 2010 Settlement Agreement establishes

17   the following facts:

18       • VPX introduced the nomenclature of "creatine containing".

19       • Orange Bang rejected the "creatine containing" language.

20       • Orange Bang instead introduced the proposed contractual term of "creatine-based",

21          an obviously higher standard than "creatine containing".

22       • VPX attempted, during the negotiations, to eliminate the term "creatine-based".

23       • Orange Bang refused to do away with the proposed contractual term "creatine-

24          based".

25       • VPX attempted, during the negotiations, to broaden paragraph 7 J so as to enable

26          VPX to market and sell Class 32 beverages like isotonic drinks, sport drinks and

27          energy drinks.

28       • Orange Bang rejected VPX's attempt to broaden paragraph 7 J.

45
FINAL ARBITRATION AWARD – PHASE 1 AND PHASE 2

1        • VPX ultimately agreed to the narrow lanes upon which Orange Bang insisted.

2        • The parties ultimately agreed on the "creatine-based" language for paragraph 7 of

3            the 2010 Settlement Agreement.

4        The common sense, common usage definition of something that is "creatine-based" (or, for

5   example, something that is "carbon-based") is that there is a *substantial* amount or a *meaningful*

6   amount of creatine (or carbon) in that something, whether that something be a product (or a human

7   being in the case of carbon) or that creatine (or carbon) is a *fundamental* or *building-block* type of

8   ingredient in that product (or person). The dictionary definition of "base" includes the following

9   definitions: "a supporting part", "a foundation", "a basic or underlying element" and a

10  "fundamental ingredient, a chief constituent". *See The American Heritage Dictionary of the*

11  *English Language*, on-line edition.

12       There is case law which is helpful to discern the meaning and intent of "creatine-based"

13  because these cases help explain what the term "based" or "based upon" means in analogous

14  contexts. In *Kal Kan Foods, Inc. v. H.J. Heinz Co., L.P.*, 2003 WL 25784368, at *6 (C.D. Cal.

15  2003), the plaintiff Kal Kan filed a patent infringement case against Heinz over dog and cat treats.

16  Plaintiff Kal Kan asserted various patent claims, one of which was a "lipid-based" component. Kal

17  Kan contended that the term "lipid-based" component referred to a specific amount of lipids, at

18  least 10% of lipids by weight. In contrast, Heinz contended that the term "lipid-based" should be

19  construed in its ordinary sense, and the ordinary meaning meant that lipids just needed to be a

20  *fundamental* part of the invention. Heinz argued that a proper construction of the patent was to

21  simply conclude that the "lipid-based" requirement was satisfied so long as lipids comprised a

22  fundamental part, or a "majority" of, the inner component of the dog and cat treats. The court

23  looked to the dictionary definition of "base" which is: "a main ingredient, a supporting carrying

24  ingredient" relying on *Webster's Ninth New Collegiate Dictionary* 133 (9th ed. 1990). Based on

25  this definition, the court concluded that the ordinary meaning of a "lipid-based component" is one

26  in which the main, supporting or carrying ingredient is lipids. **Applying this rationale to this**

27  **case, and inserting the word "creatine" in place of the word "lipids", a "creatine-based"**

28  **product is one in which the main, supporting or carrying ingredient is creatine.**

1   In addition, in *Kal Kan*, the court also ruled, as VPX points out on page 25 of its closing
2 reply brief, that the inner component of the dog and cat treat was deemed to be "lipid-based" if it
3 contains "the amount of lipids necessary to make the subject matter (i.e., inner component)
4 function in the way for which it was designed." *Id*. at *6. This holding helps Orange Bang and
5 Monster, not VPX. This holding suggests that a product should be deemed to be "creatine- based"
6 if it functions in the way it was designed to work, i.e., to provide the benefits of creatine to the
7 human body of the consumer. Thus, if a product **fails** to function in a way for which the product
8 was designed, i.e., if the product **fails** to provide the benefits of creatine, then the product cannot be
9 deemed to be "creatine-based." In short, *Kal Kan* is authoritative support for Orange Bang's /
10 Monster's "the proof is in the pudding test" (discussed below), i.e., if BANG Energy RTD provides
11 that benefits of creatine to the human body, then it can be concluded that BANG Energy RTD is a
12 "creatine-based" product. But, at the same time, if there is no evidence that BANG Energy RTD
13 does indeed provide the benefits of creatine to the human body, or worse, that it **fails** to provide the
14 benefits of creatine to the human body, then it cannot be deemed to be a "creatine-based" product
15 within the standards set by paragraph 7 of the 2010 Settlement Agreement.

16   If BANG Energy RTD does not meet this standard based on the efficacy of the product,
17 then it is not "creatine-based" and it becomes a paragraph 7 D product, and not a paragraph 7 C
18 product, in which case the product must comply with the VPX Marketing and Sales Restrictions or
19 liability for breach of contract and trademark infringement would attach.

20   In *Scheenstra v. California Dairies*, 213 Cal.App.4th 370 (2013), a dairy farmer brought a
21 breach of contract case against a dairy cooperative which had instituted a production quota program
22 which was designed to address a problem with an oversupply of milk. The dairy cooperative had
23 the right to institute the production quota because of a contract which the dairy farmer had signed, a
24 contract which enabled the cooperative to institute a quota "based upon" the historical production
25 of the dairy farmer. The dairy farmer claimed he was aggrieved by this quota system because he
26 received less payment for milk deliveries which exceeded the quota. The dairy farmer contended
27 that the dairy cooperative had set the quota far too low. The trial court found that the quota system
28 was not equitable because those dairy farmers with increasing milk production were penalized, they

1  had to bear a non-equitable share of the financial burden, as compared to those dairy farmers with
2  declining milk production, who received a disproportionate financial benefit.

3       On appeal, the dairy cooperative argued that "based-upon" meant solely and exclusively,
4  such that the quota formula could *only* be based on the historical production. In contrast, the dairy
5  farmer argued that "based-upon" meant principal or fundamental, such that the quota formula could
6  be based on the historical production as well as other equitable factors. The appellate court had to
7  determine the meaning of "based upon" in relation to the historical production issue. The appellate
8  court looked to the dictionary definition of the verb "base" and the noun "basis" and the court
9  concluded that "based-upon" means a "*principal* component of anything: *fundamental* ingredient
10 . . ." *See Webster's Third New International Dictionary, p. 182, col. 3.* (Emphasis added.)
11 Therefore, the appellate court concluded that the quota "based- upon" historical production was
12 within the meaning of the contract so long as historical production was a principal or fundamental
13 factor, but with no requirement that it be the sole and exclusive factor. *Scheenstra,* at 400 – 401.

14      In short, in order for a product to be "creatine-based" within the meaning of paragraph 7 of
15 the 2010 Settlement Agreement, creatine must be a fundamental, a main or a carrying ingredient in
16 that product. In addition, and based upon common sense, if a product is marketed as "super
17 creatine", then it must also contain creatine in a fundamental, a main or a carrying ingredient, or
18 even more of that fundamental ingredient, and that fundamental ingredient must be in a meaningful
19 amount and effective in delivering the benefits of creatine – or else why call it "super creatine".

20      BANG Energy RTD contains 25 mg (the caffeine version) or 100 mg (the caffeine free
21 version) of Creatyl-L-Leucine ("CLL") which, supposedly, renders it "creatine-based".[10]  Is that, in
22 fact, the case? Thus, the key issue becomes whether or not the 25 mg (or 100 mg) of CLL
23 contained in BANG Energy RTD is sufficient to satisfy the "creatine-based" standard set forth in
24 paragraph 7 of the 2010 Settlement Agreement? This issue turns on two questions: (1) Is CLL
25 creatine? (2) Even assuming for the sake of discussion that CLL is creatine, does BANG Energy

26

27

28 [10] The same issues, questions and answers that pertain to CLL apply to COP and creatyl-L-glutamine ("CLG") as well.

48

1   RTD and other Bang-branded product contain enough creatine so as to provide the benefits of
2   creatine, in an efficacious manner, to the human body?

3           *If* the answers to these questions are "no" and "no", then the conclusion would be
4   inescapable that a product containing 25 mg or 100 mg of CLL is not "creatine-based". Or, to
5   frame it another way, how could a product be "creatine-based" if it neither contains creatine nor
6   bestows the benefits of creatine? These two essential questions are not raised to *define* "creatine-
7   based" or to interpret the language of paragraph 7 of the 2010 Settlement Agreement. Rather, these
8   two questions must be answered in order to determine whether or not, based on the science and
9   expert opinion, the "creatine-based" standard **already built into** the 2010 Settlement Agreement by
10  virtue of the negotiations between Orange Bang and VPX as described above has been satisfied, or
11  not.

12

13          **B.  Does CLL Satisfy the "Creatine-Based" Standard?**

14          Creatine is made in the human body from protein and other types of food. Creatine is an
15  important compound because it brings energy to muscles, tissue and even the brain (and is
16  transported via the blood stream). In the human body, creatine replenishes ATP. ATP stands for
17  Adenosine Triphosphate and is an energy carrying molecule found in cells in the human body. As
18  ATP is replenished, the energy supply in the human body increases. However, the human body
19  does not make enough creatine on its own and often the creatine "gas tank" runs low. For that
20  reason, some health conscious consumers take creatine supplements to fill up that creatine gas tank.

21          Is CLL, an ingredient of BANG Energy RTD product, marketed by VPX as "super
22  creatine", actually a form of creatine? And, if so, is there enough CLL in BANG Energy RTD to
23  provide the benefits of creatine to the human body so as to qualify as a "creatine-based" product?

24          As stated above, the answers to these questions are mission critical and essentially case
25  determinative. Again, if BANG Energy RTD is "creatine-based", then it is a paragraph 7 C
26  product which means that VPX would not be in violation of VPX's Marketing and Sales
27  Restrictions and would not be in breach of the 2010 Settlement Agreement because, under
28  paragraph 7 C, VPX is not subject to the VPX Marketing and Sales Restrictions. If, however,

Case 22-17842-PDR   Doc 522-8   Filed 12/14/22   Page 65 of 111

DocuSign Envelope ID: 2FDDD3B5-74B9-4EE8-8E89-1KFC67755A
Case 5:20-cv-01464-DSF-SHK   Document 126-2   Filed 09/23/22   Page 50 of 177   Page ID
#:5437

1   BANG Energy RTD is not "creatine-based", then it is a paragraph 7 D product and VPX would
2   have to comply with the VPX Marketing and Sales Restrictions or else it would be in breach of the
3   2010 Settlement Agreement.

4        VPX's emphatic view is that CLL is a new creatine compound, created by Dr. Li ("Li") in
5   the VPX lab, which VPX calls a derivative of creatine or creatine monohydrate ("CM"), the "pure"
6   form of creatine which is effective like the creatine that is created naturally within the human body
7   and, therefore, in VPX's view, CLL is both creatine and, in addition, a product containing CLL,
8   like BANG Energy RTD, is "creatine-based".

9        In contrast, Monster's and Orange Bang's emphatic view is that CLL is not creatine at all
10  because it: (1) lacks the complete creatine molecule (a pre-requisite according to the laws of
11  chemistry according to Monster's and Orange Bang's experts); and (2) does not raise blood or
12  tissue creatine levels and, even assuming for the sake of argument that CLL is a form of or a
13  derivative of creatine, there is not enough CLL in BANG Energy RTD to satisfy the "creatine-
14  based" requirement.  Monster and Orange Bang argue that a de minimis amount of CLL "pixie-
15  dusted" into BANG Energy RTD does not suffice.

16       Moreover, Monster and Orange Bang contend that the determination should be made based
17  on what is, in essence, a "the proof is in the pudding" type of test: is there any chemical or
18  biological evidence that CLL has the efficacy of creatine when it is ingested into the body?  If no,
19  then in Monster's and Orange Bang's view, it cannot possibly constitute creatine, let alone "super
20  creatine", the marketing term given to CLL by VPX to stimulate sales.  In other words, in
21  Monster's and Orange Bang's view, the "pixie dusted" amount of CLL in BANG Energy RTD
22  does not qualify BANG-branded product as "creatine-based" because CLL does not render an
23  efficacious result in the human body as a true creatine supplement does (or should do).

24       A great deal of time, effort, documents and testimony was expended during the eight days
25  of the arbitration hearing to address these two related chemistry / biology / scientific expert issues:
26  (i) Does CLL constitutes creatine? (ii) Even assuming CLL is creatine, is there enough CLL in
27  BANG Energy RTD to deliver the benefits of creatine to the human body so as to determine

28

1   whether this energy drink is a "creatine-based" product falling within the ambit of paragraph 7 C or

2   whether it is not a "creatine-based" product falling within the ambit of paragraph 7 D?

3        At the arbitration hearing, both sides called various science experts to explain whether or

4   not CLL is creatine and whether or not a product with CLL meets the "creatine-based" standard set

5   forth in paragraph 7 of the 2010 Agreement. With respect to the question of whether or not CLL is

6   creatine, VPX's expert, Guillermo Escalante ("Escalante")[11] and Monster / Orange Bang's expert,

7   Richard Kreider ("Kreider"), both agreed that the two key questions that need to be answered in

8   order to make that determination are: (1) Does the compound contain the **full** creatine molecule?

9   (2) Does the compound increase the creatine levels in the body? Kreider Testimony, AHT, pp.

10  977:17 - 979:10; Escalante Testimony, AHT, p. 3584:10-17. With respect to the question of

11  whether or not a product is "creatine-based", Escalante testified that this determination likewise

12  turns on two questions (albeit related questions) and, as Escalante framed them: (1) Does the

13  product have the creatine compound in it? (2) Does the product have enough of the creatine

14  compound in it to elicit a positive response in the body? Escalante Testimony, AHT, p. 3579: 8 –

15  3586:13.

16       Based on this nearly-identical framing essentially agreed to by both sides, Escalante made

17  some significant admissions, some of which can only be characterized as **stunning** and not helpful

18  in advancing VPX's position in this case as follows:

19  • Escalante did not testify that CLL is a form of creatine. Rather, he testified that CLL is

20     *potentially* a form of creatine and that he, nor anybody else, has any evidence that CLL

21     has the same biological function as creatine. Escalante Testimony, AHT, p. 3556:10 –

22     3559:3.

23

24

25

---

26  [11] Although Monster and Orange Bang elicited testimony indicating that Escalante may not be
   qualified or persuasive as an expert on the science issues raised in this case, and that he may be
27  tainted by bias issues because he has rendered services as an influencer / promoter on behalf of
   VPX (Escalante Testimony, AHT, p. 3535 - 3550 ), VPX nevertheless put Escalante forward as its
28  most important expert on issues relating to CLL, creatine and whether or not the "creatine-based"
   standard in the 2010 Settlement Agreement has been, or has not been, satisfied.

51

FINAL ARBITRATION AWARD – PHASE 1 AND PHASE 2

Case 22-17842-PDR   Doc 522-8   Filed 12/14/22   Page 67 of 111

DocuSign Envelope ID: 2FDDD3B5-74B9-4FEE-8EE9-1KFC6772E5D Case 5:20-cv-01464-DSF-SHK   Document 126-2   Filed 09/23/22   Page 52 of 177   Page ID #:5439

1      •   Although Escalante testified that CLL, CLG and COP each have a "creatine backbone",

2         he testified that just because something has a creatine backbone does not make it a form

3         of creatine.  Escalante Testimony, AHT, p. 3559:20 – 3560:23.

4      •   Although Escalante testified that CLL may possibly be similar to a creatine precursor,

5         he testified that a creatine precursor is not necessarily creatine.  Escalante Testimony,

6         AHT, p. 3560:25 – 3561:24.

7      •   **Escalante testified that as of his June 2021 deposition, he did not consider COP to**

8         **be a type of creatine.**  Escalante Testimony, AHT, p. 3565:  7 – 22; 3566:  18 - 25.

9      •   Escalante testified that as a scientist he would want to know if CLL works in the human

10       body in order to determine if it is a creatine supplement.  Escalante Testimony, AHT, p.

11       3569:  25 – 3570:  25.

12      •   Escalante testified that he has not conducted any studies on CLL.[12]  Escalante

13       Testimony, AHT, p. 3571:2-18.

14      •   **Escalante testified that based on the scientific studies conducted on CLL to date,**

15       **there is no evidence to support the efficacy of CLL.**  Escalante Testimony, AHT, p.

16       3575:3-19.

17      •   **Escalante testified that if a compound (like CLL) does not** contain the full creatine

18       molecule and does not **supplement the human body's creatine levels, it cannot be**

19       **called a form of creatine.**  Escalante Testimony, AHT, p. 3582:12-24.

20      •   Escalante testified that he agrees that CLL contains only a part of the creatine molecule

21       in its chemical structure (and that the same is true with respect to CLG and COP).

22       Escalante Testimony, AHT, p. 3583:5-21.[13]

---

[12] Escalante also acknowledged that independent studies are valid even if they are paid for by VPX or by Monster or, in other words, the fact that studies have a sponsor who pays for them does not negatively affect the independent, scientific integrity of such a study.  Escalante Testimony, AHT, p. 3573:  4 – 3575:2.

[13] The manufacturing flow-chart for CLL, the recipe followed to process and manufacture CLL, does not start with creatine and no creatine is added to the recipe along the way.  *See* Exhibit 333, p. 21; Li Testimony, AHT, 1623:11-17.  To reiterate the analogy raised during the arbitration hearing, if the recipe is for guacamole, but avocados are not used at the start, and avocadoes are not added at any time along the way, how can the end product still be guacamole?

52

- **Escalante testified that in order for a substance to be deemed creatine, it would need to increase muscle creatine levels in the human body.** Escalante Testimony, AHT, p. 3584:7-17.

- **Escalante testified that he cannot say that CLL increases muscle creatine levels.** Escalante Testimony, AHT, p. 3584:18 – 3585:4.

- Escalante testified that a product must contain 3 to 5 grams (3,000 to 5,000 milligrams) for Escalante to consider that product to be "creatine-based". Escalante Testimony, AHT, p. 3586:14 – 3587:21.

- **Escalante testified that** a nanogram[14] of CM is not enough, 1 mg of CM is not enough **and 25 mg of CM is not enough to make a product "creatine-based".** Escalante Testimony, AHT, p. 3587:2-21.

- **Escalante admitted that his testimony about the amount of creatine needed to deliver a positive response in the human body applied to CM, not CLL, and that he did not have any evidence that CLL is as effective of CM.**[15] Escalante Testimony, AHT, p. 3587:22 – 3588:8.

- **Escalante testified that he has no evidence that CLL has the same biological function of creatine.** Escalante Testimony, AHT, p. 3591:21-24.

- **Escalante testified that** he agrees that when CM is ingested, blood plasma levels of creatine peak in about an hour, but admits that **he has no evidence that CLL increases blood creatine levels at all.** Escalante Testimony, AHT, p. 3591:25 – 3592:9.

- **Escalante testified that** although CM is beneficial to increase muscle mass, **he cannot say that CLL increases muscle levels of creatine because he has no evidence.** Escalante Testimony, AHT, p. 3593:7-15; 3621:24 – 3622:4.

---

[14] A nanogram is one billionth of a gram.
[15] Why not just put CM in BANG Energy RTD? As the testimony during the arbitration indicated, CM is not stable in water, it is costly and it doesn't taste good.

1    • **Escalante testified that he cannot say that CLL has the physiological or the**

2    **psychological (beneficial) effects similar to CM because he has no evidence.**

3    Escalante Testimony, AHT, p. 3593:24 – 3594:3.

4    • Escalante testified that he has no evidence that CLL is stored in the human body like

5    creatine. Escalante Testimony, AHT, p. 3594:4-7.

6    • Escalante testified that he himself would not drink BANG Energy RTD alone in order to

7    get the benefits of creatine. Escalante Testimony, AHT, p. 3594:17 – 3595:7.

8    • **Escalante testified, in what could be characterized as a dispositive admission, that**

9    **based on current available evidence, and speaking as a scientist, it is not**

10   **reasonable for VPX to advertise BANG Energy RTD as a source of creatine or for**

11   **VPX to advertise CLL or super creatine as a source of creatine.** Escalante

12   Testimony, AHT, p. 3603:21 – 3604:3, 3604:21 – 3605:5.

13   In short, Escalante has admitted that there is zero evidence to support the contention that

14   CLL delivers the efficacious benefits of creatine to the human body. Accordingly, Escalante's own

15   testimony thus demonstrates that BANG Energy RTD and the other VPX BANG related products

16   comprised of CLL, CLG or COP are **not** "creatine-based" and do not meet the agreed- upon

17   "creatine-based" standard set forth in paragraph 7 of the 2010 Settlement Agreement.[16]

18   VPX admits that four of its Bang-branded products (Bang MIXX, Bang Keto Coffee,

19   Natural Bang, Bang Bar Pristine Protein) do not contain creatine at all and thus are paragraph 7 D

20   products, not paragraph 7 C products. *See* Exhibit J-119 at 15-16. For the remaining seven Bang-

21   branded products (BANG Energy RTD, Bang Energy Caffeine-Free, Bang Tea, Bang Shots, Bang

22

23

---

24   [16] The main thrust of Escalante's expert testimony was that although he freely admits that he has no
     evidence whatsoever that CLL is creatine or that the CLL contained in BANG Energy RTD or any
     other VPX Bang branded product delivers the benefits of creatine to the human body, there was no

25   definitive evidence that it doesn't. In other words, Escalante admits that there is no scientific
     evidence to show that CLL is efficacious in providing the benefits of creatine to the human body,

26   but, in his view, that there is no scientific evidence that CLL is not efficacious in providing the
     benefits of creatine to the human body, i.e., no evidence either way. Although the studies

27   discussed below indicate that Escalante is incorrect in this regard, VPX's attempted straddle does
     not help it because Escalante has effectively admitted that there is no evidence whatsoever to

28   support the argument that the CLL in BANG Energy RTD meets the "creatine-based" standard in
     the 2010 Settlement Agreement.

1  ThermIQ, Bang 357, and Bang Pre-Workout), VPX contends that they are "creatine- based"
2  because they contain CLL, CLG or COP, a position rebutted in its entirety by VPX's own scientific
3  expert Escalante. *See* Exhibit J-119 at 15.

4      As Monster's / Orange Bang's expert Dr. Nathan Gianneschi ("Gianneschi") testified, CLL,
5  CLG, and COP do not contain the creatine molecule. *See* Gianneschi Testimony, AHT, p. 891:10-
6  15 (CLL), p. 872:17-873:4 (CLG); Escalante Testimony, AHT, p. 3583:10-16 (CLL), 3562:9-15
7  (COP); Parang Testimony, AHT, p 3279:2-9 (CLL). According to expert Gianneschi, because
8  these compounds do not contain the creatine molecule, they are, as a matter of chemistry, not
9  creatine. Gianneschi Testimony, AHT, p. 890:4-12, 889:16-20. In addition, these compounds are
10  not creatine because they do not increase the body's creatine levels. To do so, a molecule must
11  first convert into creatine during digestion. Kreider Testimony, AHT, at 959:5-10; Li Testimony,
12  AHT, p. 1529:20 – 1530:3. VPX admits that CLL does not convert into creatine in the human
13  body. J. Owoc Testimony, AHT, p. 1303:19-25 [admission]; Kreider Testimony, AHT, p. 994:25-
14  995:8 [no evidence that it does]; Li Testimony, AHT, p. 1529:24- 1530:3 [must break down, no
15  evidence that it does]; Exhibit 287 [CLL did not break down into creatine]. VPX's in-house study
16  was unable to break CLL into free creatine, and VPX admits that CLL remains intact during
17  digestion. *See* Exhibits 287; 3101 at 45:10-14; Kreider Testimony, AHT, p. 1004:4-12.

18      Monster and Orange Bang commissioned four human and animal studies to assess whether
19  CLL raises creatine levels and these studies showed the following:

20         • The KGK Science Study, which administered 5,000 mg of CM to Group 1 and
21            5,000 mg of CLL to Group 2, showed no measurable increase in creatine levels of
22            the blood by virtue of CLL. *See* Exhibit J-105.

23         • The Da Silva Study, which administered 4,000 mg of CM per day (the human
24            equivalent of 12,000 to 16,000 mg per day) to one group of laboratory rats, and
25            6,500 mg of CLL per day (the human equivalent of 20,000 to 26,000 mg per day) to
26            another group of laboratory rats, showed no measurable increase in creatine levels
27            of rats in their blood, muscles or brain by virtue of CLL. *See* Exhibit 1907, OBI-
28            MON- VPX 00009687.

1          • The Ostojic Study, which administered 2,000 mg of CLL per day (the equivalent of

2          80 cans of BANG Energy RTD per day) showed no measurable increase in creatine

3          levels in the muscles or the brain by virtue of CLL. *See* Exhibit J-110.

4          • The Burd Study, which administered 5,000 mg per day of a placebo to 1/3 of the

5          subjects, 5,000 mg per day of CM to 1/3 of the subjects and 5,000 mg per day of

6          CLL to 1/3 the subjects, 29 subjects in all over 14 days, showed no measurable

7          increase in creatine levels in the muscles by virtue of CLL. *See* Exhibit J-112.

8    VPX itself commissioned a recent, but undated study which showed the following:

9          • The University of Western Florida Study, which administered 878.6 mg per day of

10          CLL in rats for 7 days (the equivalent of 5,000 mg per day for a 154 lb. person),

11          showed no measurable increase in creatine levels in the muscles, brain or heart of

12          rates by virtue of CLL. *See* Exhibit J-80.

13    All of these studies, which were performed by highly-regarded researchers, although not

14 peer-reviewed, demonstrate that, based on objective criteria, CLL does not increase creatine levels

15 in the blood, tissue, muscles (or brain) and, therefore, CLL does not produce an efficacious

16 response in the human body. Not surprisingly, J. Owoc does not have a high opinion of the well-

17 respected scientists and Ph.Ds conducting studies on CLL and creatine (well respected by

18 Escalante, Escalante Testimony, AHT, p. 3596:11-18; p. 3601:4-8) referring to them as "a bunch of

19 little bitches." *See* Exhibit 3023; Escalante Testimony, AHT, p. 3601:4 – 3603:7.

20    Monster and Orange Bang engaged their expert Kreider to give opinions about these five

21 studies (*see* Exhibit J-152 ¶¶ 129-144) and Kreider concluded that these studies and experts

22 reached a shared conclusion: CLL does not increase creatine levels. Kreider Testimony, AHT, p.

23 1051:18 - 1052:11. VPX's commissioned research likewise found that CLL does not increase

24 brain, heart, or muscle creatine levels. *See* Exhibit J-80, p. 13 - 14; Kreider Testimony, AHT, p.

25 1050:22-1051:15 [VPX's own study shows that CLL "doesn't work"]. VPX's own experts agreed

26 with Kreider's conclusion that CLL does not create an efficacious effect in the human body like

27 creatine. Parang Testimony, AHT, p 3357:22-3358:9 [VPX expert admitting he cannot say "that

28 CLL effectuates in my body or absorbs in my body and creates the chemical benefits in my body

1  that my natural creatine does"]; Li Testimony, AHT, p. 1553:24-1554:2 (Li does not know whether
2  CLL has any effects on the body).

3          As Kreider testified, because CLL does not increase creatine levels in the body, it is not
4  creatine. Kreider Testimony, AHT, pp. 987:12 - 988:16, 1036:10-19, 1051:18 - 1052:4. Kreider
5  reached the same conclusions for CLG and COP—they are not creatine and do not provide the
6  benefits of creatine. Kreider Testimony, AHT, p. 1155:23- 1156:21; *see* Exhibits J-105; J-110, p.
7  2; J-112, p. 12; Kreider Testimony, AHT, p. 988:18 - 989:4.

8          At the same time, the experts all agree that VPX's Bang-branded products do not have a
9  sufficient amount of purported creatine in them in any event. Both sides agree that the minimum
10 effective daily dosage of creatine is 3,000-5,000 mg per day. *See* Escalante Testimony described
11 above (AHT, p. 3585:17 - 3586:5); Kreider Testimony, AHT, p. 1066:10-23; *see* Exhibit 1876 at
12 151 [J. Owoc's book – 3,000 to 5,000 mg]. Although it is true that VPX included 5,102 mg of
13 COP in Bang Pre-Workout, which is above the effective dosage for creatine (if COP was creatine)
14 [J-54, p. 1; Kreider Testimony, AHT, p. 1071:11-20], the amount of purported creatine in all of
15 VPX's other Bang-branded products falls well below the 3,000 mg threshold. There is only 25 mg
16 of CLL in a can of Bang Energy (*see* Exhibit J-125), Bang Tea (*see* Exhibit J-127) and Bang Shots
17 (*see* Exhibit 1955, p. 8); 50 mg of CLL in Bang ThermIQ (*see* Exhibit 1955, p. 8); 100 mg of CLL
18 in Bang Energy Caffeine Free (*see* Exhibit 1195, p. 5); and 10 mg of CLG in Bang 357 (*See*
19 Exhibit 1195, p. 1). As Kreider testified, the amount of purported creatine in VPX's Bang branded
20 products is not sufficient to provide the benefits of creatine. Kreider Testimony, AHT, p. 1072:11-
21 16; *see* Exhibits J-147 and J-125. In this respect, VPX's Bang- branded products are not "creatine-
22 based" for the separate and independent reason that they contain only a trivial amount of purported
23 creatine that is far below the 3,000 mg threshold necessary to provide the benefits of creatine (even
24 assuming that CLL, CLG or COP delivers the benefits of creatine) and thus, based on this
25 additional rationale, these products cannot qualify as "creatine-based" products within the meaning
26 of paragraph 7 of the 2010 Settlement Agreement.

27
28

**C. VPX's Paragraph 7 A Argument**

VPX argues that even though the lower standard of "creatine containing" was not adopted by the parties, and even though the higher standard of "creatine-based" was adopted by the parties in every draft of the 2010 Settlement Agreement including the final draft, the CLL found in BANG Energy RTD still satisfies the "creatine-based" standard because, as paragraph 7 A acknowledges, the Bang Pre-Workout product, which contained COP, met the "creatine- based" standard. In other words, as VPX argues, if COP met the "creatine-based" standard for the purposes of Bang Pre-Workout, and CLL is essentially the same form of creatine as COP, then CLL must likewise meet the "creatine-based" standard for the purposes of BANG Energy RTD (and for other Bang branded products that contain either CLL, COP or CLG).

VPX's paragraph 7 A argument is unconvincing for several related reasons.

First, COP did not, in fact, meet the "creatine-based" standard. Rather, in 2010, at the time of contracting, Orange Bang simply believed that the product known as Bang Pre-Workout, which was purportedly based on creatine and which purportedly delivered the benefits of creatine, met the "creatine-based" standard. In 2010, Orange Bang assumed that Bang Pre- Workout was "creatine-based" because it believed the product contained creatine. This assumption had nothing to do with COP. Orange Bang made no assumptions about COP. Rather, Orange Bang believed that Bang Pre-Workout met the "creatine-based" standard by virtue of: (i) the express representations on the Bang Pre-Workout bottle about creatine; (ii) the express representations made by VPX to consumers on its website about creatine; (iii) representations made by VPX to Orange Bang as set forth in VPX's letter of April 3, 2009 about creatine; and (iv) the express representations made by VPX to Orange Bang during the negotiations of the 2010 Settlement Agreement to which Borrowman testified at the arbitration hearing about creatine, all of which led Orange Bang to justifiably form the impression that Bang Pre-Workout contained a *substantial* or *meaningful* amount of creatine, an assumption related solely to creatine and which had nothing to do with COP, and an assumption which has now been proven to be false.

Relatedly, and even more basic, Orange Bang had no understanding about COP whatsoever. Orange Bang did not even know what COP was at the time it entered into the 2010 Settlement

58
FINAL ARBITRATION AWARD – PHASE 1 AND PHASE 2

1   Agreement. And no consumer looking at the back of the Bang Pre-Workout bottle (Ex 112) would
2   have known what COP was either. No witness testified that there was ever any pre-contract
3   communication, oral or written, which focused on COP. No one at VPX said anything to Orange
4   Bang about COP, not orally, not by letter and not by email. The topic never came up. Rather, the
5   focus was on creatine as the April 3, 2009 letter from Stump to Borrowman so demonstrates. *See*
6   Exhibit 2560. COP was just an ingredient listed on the back of the bottle with an unspecified mg
7   allocation. *See* Exhibit 112. Exhibit 112 emphasized creatine, not COP. As Exhibit 112 stated
8   back in 2010: "* BANG! is the world's only Clinically Proven Water- Stable **Creatine,** Patent
9   Pending!" (Emphasis added.) The entire focus of the parties during the lengthy negotiations of the
10  2010 Settlement Agreement was on creatine, not COP. All Orange Bang knew at the time was what
11  it had been told by VPX that Bang Pre-Workout was a product which supplied creatine to athletes
12  and work out enthusiasts. VPX never made any mention that COP was a form of creatine.

13      At the same time, just because paragraph 7 A acknowledges that a product like Bang Pre-
14  Workout, which contains 5,102 mg of COP, may arguably satisfy the "creatine-based" standard
15  does not mean that a product like BANG Energy RTD, which contains only 25 mg or 100 mg of
16  CLL, satisfies the "creatine-based" standard. As explained above, if COP (and CLL) do not have
17  the creatine molecule, then arguably they are not creatine. But even if it could be argued that COP
18  (and CLL) are forms of creatine, or derivatives of creatine, or forms of derivatives of creatine, even
19  without the creatine molecule, if there is only a small quantity of CLL within the product, an
20  amount much less than the mgs of COP in Bang Pre-Workout, and neither CLL nor COP acts like
21  creatine within the human body, i.e., neither produces the efficacious benefits of creatine, then
22  neither CLL nor COP can possibly satisfy the contractual requirement of a product which is
23  "creatine-based".

24      In other words, there has already been a persuasive showing that 5,012 mgs of COP does
25  not satisfy the "creatine-based" standard of paragraph 7. But even if it did, that does not mean that
26  25 or 100 mg of CLL satisfies the "creatine-based" standard. If a large quantity of COP does not
27  do what a creatine supplement is supposed to do within the human body, then VPX cannot make a
28  bootstrap argument that a product with a small quantity of CLL "automatically qualifies" as

Case 22-17842-PDR   Doc 522-8   Filed 12/14/22   Page 75 of 111

DocuSign Envelope ID: 2FDD3B677EB944EF8E6A4KFC672517Case 5:20-cv-01464-DSF-SHK   Document 126-2   Filed 09/23/22   Page 60 of 177   Page ID
#:5447

1  "creatine-based" by virtue of the language of paragraph 7 A. As the expert testimony discussed

2  above demonstrates, a product which contains a small amount of CLL does not qualify as

3  "creatine-based", and it certainly should not be marketed as "super creatine" because such

4  marketing implies to the consumer a meaningful and effective dosage of creatine.

5      For these related reasons, VPX's paragraph 7 A argument fails.

6

7  **D. VPX's Permissive, Not Mandatory, Language Argument**

8      VPX argues that the language of paragraph 7 is "permissive", not "mandatory". In other

9  words, VPX argues that because there is no express prohibitory language in paragraph 7, VPX is

10 not prohibited in any way. According to VPX's interpretation of paragraph 7, it is free to make use

11 of the BANG mark however it wants to do so, without any restrictions whatsoever. Or, to put it

12 another way, what VPX is really arguing is that because there is no express "shut-down" language

13 (to make use of the vernacular for a moment) in paragraph 7 itself, VPX's "lane" is wide open and,

14 therefore, VPX is not "shut-down" in any way and VPX can market and sell BANG Energy RTD

15 (and other Bang branded products) any way it wants to do so whether or not BANG Energy RTD is

16 "creatine-based" and whether or not it is restricted by the language of paragraph 7 D.

17     This argument is likewise devoid of merit as the context of the negotiation history of the

18 2010 Settlement Agreement so demonstrates for at least four reasons.

19     First, the negotiation history and context clearly shows that although VPX first introduced

20 the lower "creatine containing" standard, Orange Bang pushed back for and insisted upon the

21 higher "creatine-based" standard and VPX ultimately relented on this point and agreed to adhere to

22 that higher standard. A "creatine containing" standard would have given VPX a broader "lane" and

23 less restrictions, but VPX willingly agreed to give in on that negotiation point. In this respect, VPX

24 agreed to an important restriction, a restriction which kept it in a narrower "lane".

25     Second, the negotiation history and context clearly shows that on May 14, 2010, VPX

26 attempted to delete the "creatine-based" standard altogether. Such a change, if it had been agreed

27 to by Orange Bang, would have also reduced the restrictions on VPX, given VPX far more latitude

28 and flexibility and would have enhanced the scope of VPX's "lane" which, of course, was the deal-

1  point which was being negotiated at the time. But Orange Bang would not agree. Orange Bang
2  refused to eliminate the "creatine-based" standard and VPX ultimately acquiesced on this point as
3  well. In this respect, VPX's second attempt to bargain away Orange Bang's consistent efforts to
4  keep VPX in its narrow "lane" was unsuccessful in that Orange Bang refused to give in to VPX's
5  requested changes during the negotiations. In short, Orange Bang persisted in its efforts to "shut
6  down" VPX's attempts to expand its lane and VPX ultimately conceded on the point.

7      Third, the negotiation history and context clearly shows that the final negotiation of the
8  contours of paragraph 7 J was a third attempt by VPX to open up its "lane" so that it could sell
9  Class 32 product like isotonic drinks, sports drinks and energy drinks. Once again, VPX was
10  attempting to reduce the restrictions imposed on it by paragraph 7 of the 2010 Settlement
11  Agreement and prevent Orange Bang from narrowing VPX's lane. However, Orange Bang would
12  not agree to VPX's requested changes and Orange Bang's efforts to "shut down" and "narrow in"
13  VPX continued. Orange Bang resisted VPX's efforts to expand its "lane" by rejecting VPX's
14  attempt to expand the scope of paragraph 7 J. VPX ultimately relented on this point as well, as the
15  emails from Pagano in which she essentially admits that VPX shall "stay in its Class 5 lane", so
16  demonstrate. In short, VPX stood down on this paragraph 7 J deal-point as well. In this respect,
17  the negotiation of paragraph 7 J, the last step in the negotiations before the parties closed their deal
18  and signed the 2010 Settlement Agreement, shows how Orange Bang was consistently negotiating
19  to "shut-down" VPX, to prevent it from its attempts to expand the agreed-upon "lane" in which
20  VPX had to stay, and this last minute negotiation also shows that VPX finally agreed to the narrow
21  "lane" insisted upon by Orange Bang.

22      Finally, and as Borrowman testified during the arbitration, Orange Bang was the senior user
23  with incontestable trademark rights to the BANG mark in Class 32, and VPX was the junior user
24  with disputed trademark rights in Class 5 who had recently filed an Intent to Use Trademark
25  Application for Class 32, trademark rights which Orange Bang was challenging in court and before
26  the TTAB. Therefore, at this point in time, it was VPX who was at risk at being "shut-down" from
27  making any use of the BANG mark altogether which is why Orange Bang had the leverage during
28  the 2010 negotiations (and the "hypothetical" negotiations, see *infra*) and why VPX ultimately

Case 22-17842-PDR   Doc 522-8   Filed 12/14/22   Page 77 of 111

DocuSign Envelope ID: 8FDD03B6-74B9-4E5E-8E89-1KFC6772517
Case 5:20-cv-01464-DSF-SHK   Document 126-2   Filed 09/23/22   Page 62 of 177   Page ID
#:5449

1  agreed to Orange Bang's consistent efforts to keep VPX in a narrow lane.  As Borrowman testified

2  at the arbitration hearing, that is precisely why he used the word "allow" in his May 20, 2010

3  proposal, to define the "lane" which would be open to VPX, the lane where VPX would not be

4  "shut down".  **That was the whole point of the negotiations.**  *See* Exhibit 50; Borrowman

5  Testimony, AHT, p. 488:19 – 489:22, 491:19 – 495:12.

6       The entire history and context of the negotiation of the 2010 Settlement Agreement

7  demonstrates an intent, on the part of Orange Bang, to "shut-down" VPX and keep it in a narrow

8  "lane", and likewise demonstrate an intent, on the part of VPX, to agree to those restrictions,

9  despite its unsuccessful efforts, during the negotiations, to expand the scope of VPX's negotiated

10  "lane".  Accordingly, VPX's arguments that the 2010 Settlement Agreement is "permissive", does

11  not shut it down in any way, imposes no restrictions on it and does not confine it to a narrow "lane"

12  are rejected in their entirety by the arbitrator as unpersuasive given the negotiation history as

13  described above.

14

15  ### E. VPX's Statute of Limitations and Laches Argument

16       In 2017 or 2018, VPX's sales of Bang products first rose to national prominence.  Stein

17  Testimony, AHT, p. 165:16-18.  VPX's Sweeny, who had been steeped in the energy drink

18  industry for over 20 years, testified that he did not become aware of the rise of BANG Energy RTD

19  until 2017 or 2018.  Sweeney Testimony, AHT, p. 3057:15 - 3058:6; *see* Exhibits 2922, p. 10;

20  5382, p. 101, Schedule 3.2.  Orange Bang testified that it first noticed BANG Energy RTD in stores

21  in 2018.  However, Orange Bang believed, based on VPX's ongoing advertising and marketing of

22  "creatine" and "super creatine" on the cans of BANG Energy RTD, that the products contained

23  creatine.  Stein Testimony, AHT, p. 165:16-166:6.  In 2019, Orange Bang first saw Bang Keto

24  Coffee, which did not purport to be "creatine-based".  Stein Testimony, AHT, p. 166:7-24, 169:7-

25  17, 170:2-8.  In March and August of 2019, Orange Bang sent VPX cease and desist letters

26  demanding that VPX stop violating the 2010 Settlement Agreement.  *See* Exhibit J-66, p. 45-54.

27       Monster's and Orange Bang's claims are not barred by the statute of limitations.  Monster's

28  contract claim and Orange Bang's trademark infringement and related claims have four-year

62
FINAL ARBITRATION AWARD – PHASE 1 AND PHASE 2

Case 22-17842-PDR    Doc 522-8    Filed 12/14/22    Page 78 of 111

DocuSign Envelope ID: 9FDD386-74B9-4AF5-8E89-1KFC67375C
Case 5:20-cv-01464-DSF-SHK    Document 126-2    Filed 09/23/22    Page 63 of 177    Page ID
#:5450

1  statutes of limitations. *Gilkyson v. Disney Enters., Inc.*, 244 Cal. App. 4th 1336, 1341 (2016)

2  [breach of contract]; *Bauer Bros., LLC v. Nike, Inc.*, 159 F. Supp. 3d 1202, 1216 (S.D. Cal. 2016)

3  [trademark]; *Aryeh v. Canon Bus. Sols., Inc.*, 55 Cal. 4th 1185, 1192 (2013) [unfair competition].

4  Moreover, as the case law construing California law consistently holds, California law on the

5  statute of limitations is based on the discovery rule which "postpones accrual of a cause of action

6  until the plaintiff discovers, or has reason to discover, the cause of action." *Aryeh,* 55 Cal. 4th at

7  1192; *Tortilla Factory, LLC v. Better Booch, LLC*, 2018 WL 6179491, at *4 (C.D. Cal. Nov. 26,

8  2018); *ANT v. McPartlin*, 2012 WL 13012472, at *6 (C.D. Cal. May 30, 2012).

9       The key question is: when did Orange Bang discover the facts, or when should have Orange

10  Bang discovered the facts, giving rise to its claims?  The evidence presented during the arbitration

11  hearing demonstrated that Orange Bang did not learn of the initial facts giving rise to its claims

12  until it first discovered the sales of Bang Keto Coffee in 2019 and then did not discover the facts

13  giving rise to its claim regarding the breach of the provisions of paragraph 7 of the 2010 Settlement

14  Agreement relating to the "creatine-based" standard and the VPX Marketing and Sales Restrictions

15  until it met with Monster in August of 2019, a claim which Orange Bang then assigned to Monster

16  as part of the Assignment Agreement. Stein Testimony, AHT, p. 166:7-24, 169:7-17, 170:2-8.

17  Because the facts giving rise to the claims were discovered in 2019, Orange Bang's and Monster's

18  claims are not time barred, nor are they barred by laches.  And, as to laches, VPX has not suffered

19  any prejudice in any event because having to defend an arbitration with meritorious claims is not

20  prejudice as a matter of fact and law.

21

22  **F.  VPX Breached, and Is Currently in Breach, of the 2010 Settlement Agreement, the**

23      **Breach of Contract Claim – Liability**

24       As set forth above, the arbitrator has determined that BANG Energy RTD and all of VPX's

25  Bang branded products which contain CLL, CLG or COP are not "creatine-based" products and,

26  therefore, they are not paragraph 7 C products, but rather paragraph 7 D products, which means that

27  the marketing and sales of these products must comply with the VPX Marketing and Sales

28

1  Restrictions. Given that finding, the question then becomes: did VPX actually comply with the

2  VPX Marketing and Sales Restrictions, or not?

3        In order to comply with Section 7 D of the 2010 Settlement Agreement, VPX must market

4  (discussed below) and sell non-"creatine-based" products in specified trade channels which

5  includes vitamin shops, gyms, and health clubs and also includes grocery and convenience stores,

6  but only in the "vitamin and dietary supplement sections" of those stores **(the "Nutritional**

7  **Channel")**. *See* Exhibit J-11, paragraph 7 D. The overwhelming and essentially uncontradicted

8  evidence at the arbitration hearing demonstrated that VPX has consistently sold BANG Energy

9  RTD and other VPX Bang branded products outside the Nutritional Channel. As numerous

10  photographs, planograms and the testimony of the investigators demonstrated, VPX has placed its

11  BANG Energy RTD and its other Bang branded products in cold vaults, warm beverage aisles,

12  soda sections, snack sections, endcaps, and standalone displays where **general beverages** are sold,

13  and none of these locations comply with the VPX Marketing and Sales Restrictions of paragraph 7

14  D of the 2010 Settlement Agreement. *See* Exhibits 1624; 1627 1631; 2267; 2463; 2464; J-114;

15  Bukovi Testimony, AHT, p. 2116:21 - 2117:16.

16        As Thomas Graybill ("Graybill") testified, Monster's and Orange Bang's investigator,

17  despite his many retail visits, BANG Energy RTD was "not once" located in the vitamin or

18  supplement section. Graybill Testimony, AHT, p. 1693:25-1624:6. According to the testimony of

19  Bukovi, VPX does not want consumers "to have to go into the diet nutrition area" to find BANG

20  Energy RTD, but instead wants BANG Energy RTD in the "registers and coolers where customers

21  can first walk in, grab a sandwich, [and then] grab a Bang." Bukovi Testimony, AHT, p 2017:12-

22  19; 2015:13-23. As Bukovi put it, "[C]old is sold", a reference to the importance of the cold vault

23  section of convenience stores which is a crucial location for VPX sales, but likewise a location that

24  does not comply with the VPX Marketing and Sales Restrictions of paragraph 7 D. *See* Exhibit

25  1382, p. 44:11-21. Similarly, VPX's business records, including planograms and distribution

26  agreements, further demonstrate that VPX placed products for sale, and continues to place products

27  for sale, such as BANG Energy RTD and other Bang-branded products, outside the Nutritional

28

1 | Channel. *See* Exhibits 495; 1200; 1638, p. 224:21 - 225:18, 262:7-10; 808, p. 10; 868; 1191; 843,

2 | p. 1 and 4; 844, p. 1 and 5.

3 |       VPX sold products which made use of the BANG mark and VPX admitted that those

4 | products were sold outside the Nutritional Channel and, simply stated, such sales constitute a

5 | breach of paragraph 7 of the 2010 Settlement Agreement. *See* Bukovi Testimony, AHT, p.

6 | 2063:23 - 2064:4 [Bang 357]; Exhibit 2447 [BANG Energy RTD, Bang Keto Coffee, Bang Tea,

7 | and Bang Shots]; Sweeney Testimony, AHT, p. 3045:7 - 3046:11 [Natural Bang]; 2930, p. 17

8 | [Bang Mixx]; Bukovi Testimony, AHT, p. 2112:11-16 [Bang ThermIQ]; 1571 [Bang Bar Pristine

9 | Protein]. As Bukovi conceded, VPX "has not taken any steps whatsoever to ensure that VPX

10 | employees placed products in retail stores consistent with Section 7D of the Settlement

11 | Agreement." Bukovi Testimony, AHT, p. 2112:11-16. The evidence was essentially undisputed

12 | that VPX failed to adhere to the sales restrictions of paragraph 7 and these failures constitute a

13 | breach of paragraph 7 of the 2010 Settlement Agreement.

14 |       In addition, as the unequivocal language of paragraph 7 D makes clear, the bargained for

15 | restrictions on VPX while making use of the BANG mark not only apply to sales, but to marketing

16 | as well. In other words, if VPX's marketing efforts extend beyond the Nutritional Channel, such

17 | marketing efforts likewise constitute an additional breach of paragraph 7 D. As the undisputed

18 | evidence again demonstrated, and as VPX's marketing personnel M. Owoc and Grunewald freely

19 | admit, VPX also markets BANG Energy RTD and its other Bang-branded products outside vitamin

20 | and dietary supplement channels, i.e., outside the Nutritional Channel, in that they specifically

21 | marketed their VPX products as *general* beverages targeted to *mainstream* consumers. M. Owoc

22 | Testimony, AHT, p. 3460:15 - 3461:10 and 3455:7-18; Grunewald Testimony, AHT, p. 1799:9-12;

23 | *see* Exhibit J-124 at 119, 124, 128, 131-133.

24 |       As described above, VPX launched a brilliant social marketing campaign and VPX

25 | certainly is entitled to market its products on the internet and to hire influencers to stimulate sales.

26 | However, because of the agreed upon restrictions set forth in paragraph 7 D and because paragraph

27 | 7 D established that the VPX Marketing and Sales Restrictions applied to both sales and *marketing*,

28 | VPX's marketing of its non-"creatine-based" products, like BANG Energy RTD, had to be limited

1  to the Nutritional Channel, limited to the athletes and workout enthusiasts, mostly men, because
2  that is what VPX represented to Orange Bang when the parties negotiated the contours of
3  paragraph 7 and that is what VPX agreed to when it entered into the 2010 Settlement Agreement.
4  *See* Exhibit J-11, paragraph 7 D; 2560.

5      VPX did not stay in its lane with regard to sales. Nor did VPX stay in its lane with regard
6  to marketing. As the evidence adduced at the arbitration hearing demonstrates, VPX shifted from a
7  particularized marketing strategy, a marketing strategy geared at its original niche target audience,
8  athletes and members of the muscle building community, to a general marketing strategy based on
9  a "life-style" brand and it did so in order to attract *mainstream* consumers. VPX instructed its
10  influencers to promote VPX products as "lifestyle" products, not as "workout/high intensity sports"
11  products. *See* Exhibit 1343, p. 8. VPX advertising and its social media posts demonstrated that its
12  marketing was targeting mainstream consumers, not paragraph 7 D consumers. *See* Exhibits J-155,
13  paragraphs 41-42, Figs. 22-23, paragraph 36, Fig. 16, paragraph 40, Fig. 21; 2505; 2496; 2501;
14  3075. VPX obviously did this because such a marketing strategy was the pathway to a significant
15  increase in sales. Although this business strategy made perfect business sense because it generated
16  impressive revenues for VPX, this marketing approach was nevertheless a breach of the marketing
17  restrictions built into paragraph 7 D.

18      Even sales of Bang Mixx violate paragraph 7 D. VPX is certainly free to manufacture and
19  distribute a hard seltzer beverage. However, once it makes the business decision to call that
20  product *Bang* Mixx, once it decides to make use of the BANG mark to sell the hard seltzer, VPX
21  must comply with the VPX Marketing and Sales Restrictions of paragraph 7 D. VPX argues that
22  when it sells Bang Mixx it is selling an alcoholic beverage and therefore it must comply with state
23  laws which strictly regulate how and where it can sell such a beverage and that point is, of course, a
24  well-taken argument. However, if VPX wants to comply with state law and other alcohol related
25  regulations, then VPX should have named its hard seltzer something other than Bang Mixx because
26  once it decides to make use of the BANG mark for its hard seltzer drink, it must comply with the
27  restrictions built into paragraph 7 D. The breach of contract with respect to Bang Mixx applies to
28

1  VPX and JHO Intellectual Property Holdings, LLC ("JHO"). As to Entourage and Quash, see
2  Section III, P. below.

3

4  **G. "Nutritionally Fortified"**

5       As stated above, and because the arbitrator has concluded that BANG Energy RTD and
6  VPX's other Bang branded products do not satisfy the "creatine-based" standard as set forth in
7  paragraph 7 of the 2010 Settlement Agreement, the arbitrator believes that there is no reason to
8  reach or determine the issue of whether or not the products at issue were "nutritionally fortified", or
9  not, or whether or not FDA regulations are, based on custom and practice, implied as part of the
10 2010 Settlement Agreement, or not.

11      Despite this finding, it is worth noting that the experts presented by both sides agreed on
12 some fundamental facts. Both Cheeseman, the expert for Monster and Orange Bang, and Durkin,
13 the expert for VPX, agreed that, pursuant to FDA standards, products which are carbonated or
14 which contain alcohol can never be deemed to be "nutritionally fortified". Cheeseman Testimony,
15 AHT, p. 2451:6 - 2452:10, 2453:12-21, 2454:16 - 2455:12; Durkin Testimony, AHT, p. 3686:18 -
16 3688:13; *see* Exhibit J-1 [21 CFR § 104.20(a)], p. 10; 1821, § B.2, p. at 7 [carbonated products],
17 § B.4 (alcohol). BANG Energy RTD is a carbonated beverage (both the caffeinated and caffeine-
18 free varieties). *See* Exhibit 917; J-154, paragraph 38; 1581, p.79:4-7; 1556, p. 296:  13-25.  Bang
19 Mixx, of course, contains alcohol.

20

21 **H. Monetary Damages for Breach of Contract**

22      See Section III, J. below.

23

24 **I.  VPX Is Liable for Trademark Infringement**

25      In order to prevail on a claim for trademark infringement, Orange Bang must establish that:
26 (1) it has a protected ownership interest in the BANG mark; and (2) VPX's use of the BANG mark
27 is likely to cause consumer confusion. *Pom Wonderful LLC v. Hubbard*, 775 F.3d 1118, 1124-25

28

1   (9th Cir. 2014).[17]  Orange Bang easily established a protectible ownership interest in the BANG

2   mark by showing its incontestable trademark registrations for the BANG mark.  *See* Exhibit J-2.

3   Orange Bang also demonstrated that it, not VPX, made use of the BANG mark first or, to put it

4   another way, it is undisputed that VPX is not a "prior user" of the BANG mark and thus Orange

5   Bang is the "senior user" and VPX is the "junior user".  As the Ninth Circuit has held, federal

6   registration is prima facie evidence that the registrant, in this case Orange Bang, is the owner of the

7   BANG mark.  *Sengoku Works Ltd. v. RMC Int'l, Ltd.*, 96 F.3d 1217, 1219 (9th Cir. 1996).

8            The Ninth Circuit has articulated the test to determine a likelihood of confusion:  "whether

9   a 'reasonably prudent consumer' in the marketplace is likely to be confused as to the origin of the

10  good or service bearing one of the marks."  *Dreamworks Production Grp., Inc. v. SKG Studio* 142

11  F.3d 1127, 1129 (9th Cir. 1998).  In *AMF v. Sleekcraft Boats,* 599 F.2d 341 (9th Cir. 1979),

12  *abrogated on other grounds by Mattel Inc. v. Walking Mountain Prod.*, 353 F.3d 792,810, n 19 (9th

13  Cir. 2003), the Ninth Circuit set forth the eight-factor test which has been utilized in essentially

14  every trademark infringement case since 1979.  These eight factors (the "*Sleekcraft*" factors) that

15  determine whether a likelihood of confusion exists or not are:  (1) strength of the marks; (2)

16  relatedness of the goods; (3) similarity of the marks; (4) evidence of actual confusion; (5)

17  marketing channels; (6) degree of consumer care; (7) defendant's intent; and (8) likelihood of

18  expansion of the product lines.  *Id.* at 348-349.

19           The analysis and approach to trademark infringement cases changed somewhat in

20  *Dreamwerks* where Judge Kozinki authored the opinion about a Star Trek convention company

21  _____

22  [17] As set forth above, Orange Bang has also asserted claims related to its trademark infringement
    claim, specifically a claim under the Lanham Act for false designation of origin, a state law claim
23  for common law unfair competition and a state law claim under California Business and
    Professions Code Section 17200.  The elements necessary to prove unfair competition and false
24  designation of origin are identical to the elements necessary to prove trademark infringement.
    *Pollution Denim & Co. v. Pollution Clothing Co.*, 2008 WL 11337644, at *5 (C.D. Cal. Dec. 31,
25  2008); *Sky Optic, Inc. v. Alibaba.Com, Inc.*, 163 F. Supp. 3d 755, 768 (C.D. Cal. 2015) [same
    elements as to California Business & Professions Code §17200].  Similarly, the Ninth Circuit has
26  consistently held that state common law claims for unfair competition and for violation of §17200
    are "substantially congruent" with claims under the Lanham Act.  Accordingly, the arbitrator's
27  conclusions, rulings and findings as to Orange Bang's trademark infringement apply with equal
    force to Orange Bang's claims for false designation of origin, state unfair competition and violation
28  of §17200.  This ruling does not imply any right to additional damages inasmuch as double
    recovery is not permitted – as discussed below.

                                        68

1 known as Dreamwerks, the little known senior user, who sued the behemoth and well known
2 DreamWorks studio, the junior user, for trademark infringement. In the *Dreamwerks* case of
3 "reverse confusion", where the junior user is commercially strong and casts a "long shadow", the
4 question becomes whether a reasonable consumer making use of the senior user's product (in that
5 case a consumer attending a Star Trek convention) might do so believing that the product is made
6 by, sponsored by, affiliated with or connected to the junior user. To pose the reverse confusion
7 question as it applies to this case: would a reasonable consumer making a purchase at a
8 convenience store, purchasing an Orange Bang frothy drink from a fountain dispenser, believe that
9 this product is made by, sponsored by, affiliated with or connected to VPX? In *Dreamwerks,* the
10 Ninth Circuit ruled that the three first *Sleekcraft* factors, (1) the strength of the mark; (2) the
11 relatedness of the goods; and (3) the similarity of the marks as to sound, appearance and meaning
12 are "pivotal" in a reverse confusion case. In *Instant Media, Inc. v. Microsoft Corp.*, 2007 WL
13 2318948, at *7 (N.D. Cal. Aug. 13, 2007), the court likewise held that the first, second and third
14 *Sleekcraft* factors are of particular important in determining whether reverse confusion has
15 occurred.

16     In *Ironhawk Technologies, Inc. v. Dropbox, Inc.,* 2 F.4th 1150 (9th Cir. 2021), Ironhawk,
17 the senior user, had a 2004 registered trademark for "SmartSync" for computer software.
18 Beginning in 2017, Dropbox, the better known junior user, named a feature in its widely popular
19 cloud storage software "SmartSync". Ironhawk sued for trademark infringement, as well as for
20 other claims including a state unfair competition claim and a section 17200 claim. In addressing
21 this dispute, the Ninth Circuit summarized some important considerations relating to a reverse
22 confusion trademark infringement case which are worth emphasizing here as follows:

23     • Reverse confusion occurs when consumers dealing with the senior user, Orange
24       Bang, believe they are doing business with the commercially stronger junior user,
25       VPX.
26     • Reverse confusion occurs when an appreciable number of reasonable consumers,
27       who may not even know of the existence of the senior user [members of the younger
28       generation who are key customers of VPX may not have even heard of Orange

| | |
|---|---|
| 1 | Bang], mistakenly believe that the senior user, Orange Bang, is the junior user, |
| 2 | VPX, or is, sponsored by, affiliated with or connected to the junior user. |
| 3 | • Reverse confusion occurs when the junior user, with its robust advertising and |
| 4 | promotional activities, "swamps" the senior user and, for that reason, in a reverse |
| 5 | confusion case, the main focus of the analysis is on the commercial strength of the |
| 6 | junior user which means that the greater the power of VPX's use of the BANG mark |
| 7 | (the result of its brilliant social marketing campaign and the engagement of |
| 8 | thousands of influencers who have billions of followers all of whom promoted the |
| 9 | BANG mark), the more likely it is to create confusion in the minds of Orange |
| 10 | Bang's customers, citing *Dreamwerks*, 142 F.3d at 1130, n 5. |
| 11 | • Although perceived affiliation with a popular, on the rise and well-known company |
| 12 | like VPX may, at first blush, seem beneficial to a senior user like Orange Bang, |
| 13 | reverse confusion can carry with it meaningful disadvantageous economic |
| 14 | consequences, such as: (i) the senior user may find itself in the position where its |
| 15 | corporate goodwill is now in the hands of the junior user; (ii) the senior user can |
| 16 | lose the value of its trademark, its product identity, corporate identity, control over |
| 17 | its goodwill and the ability to move into new markets; (iii) the senior user may be |
| 18 | foreclosed from expanding into related fields; and (iv) the senior user may lose its |
| 19 | business identity to a larger, more powerful junior user. *Ironhawk*, 2 F.4th at 1160. |

In *Ironhawk*, the Ninth Circuit emphasized that before addressing the *Sleekcraft* factors, it is necessary to define the relevant consumer market. *Id.* As discussed below in connection with the fourth *Sleekcraft* factor, Orange Bang's survey expert, Kenneth Hollander ("Hollander"), not only conducted a proper survey according to Ninth Circuit authority, but his survey made certain to, and did, survey members of the appropriate relevant market including consumers who go to convenience stores to make purchases.

Although the arbitrator will address each of the eight *Sleekcraft* factors, the main focus will be on the first three factors, the "pivotal" factors as identified by the Ninth Circuit.

1      With respect to the first *Sleekcraft* factor, the strength of the mark factor, *Ironhawk* holds
2  that the proper analysis is to evaluate the "conceptual strength" of the senior user's mark, in this
3  case the conceptual strength of Orange Bang's BANG mark, and compare it to the commercial
4  strength of the junior user, in this case the commercial strength of VPX's use of the BANG mark.
5  *Ironhawk,* 2 F.4th at 1162. As the Ninth Circuit put it in *Walter v. Mattel, Inc.,* 210 F.3d 1108,
6  1111 n.2 (9th Cir. 2000): "[T]he inquiry focuses on the strength of the junior mark because the
7  issue is whether the junior mark is so strong as to overtake the senior mark." In *Ironhawk*, the
8  Ninth Circuit also clarified what it meant by "conceptual strength", and explained that it was
9  referring to the hierarchy of trademark inherent distinctiveness (from strongest to weakest):
10  (1) arbitrary or fanciful; (2) suggestive; (3) descriptive; and (4) generic. *Id.* 1162. In *Ironhawk*, the
11  Ninth Circuit also ruled that "conceptual strength" could be established by: (i) the presumption of
12  federal registration; and (ii) if the junior user itself considered the mark to be higher up on the
13  trademark hierarchy than a descriptive mark, i.e., either arbitrary / fanciful or suggestive.
14  *Ironhawk,* 2 F.4th at 1162 and n. 1. In this respect, if the BANG mark is regarded to be an
15  arbitrary or fanciful mark, then, by virtue of the Ninth Circuit's definition, it is a commercially
16  strong mark. Here, it is undisputed that Orange Bang's BANG mark has a federal trademark
17  registration and, therefore, the presumption of inherent distinctiveness is established in Orange
18  Bang's favor by virtue of that trademark registration. Even more importantly, VPX itself has taken
19  the position that the BANG mark is an arbitrary or fanciful mark and, accordingly, VPX itself has
20  established that Orange Bang's BANG mark is a conceptually strong mark. Bukovi Testimony,
21  AHT, p. 1965:25 – 1966:8; *see* Exhibit 2936, paragraph 14. As to the other important
22  consideration, the issue of the commercial strength of VPX's use of the BANG mark, it goes
23  without saying that VPX's use of the BANG mark has achieved undeniable commercial strength by
24  virtue of the enormous amount of sales which VPX has generated by making use of the BANG
25  mark and because it has engaged in a significant advertising and social media marketing campaign
26  centered upon the BANG mark that has allowed it to dwarf Orange Bang in the marketplace. *See*
27  Exhibit J-155, ¶ 27 [VPX's marketing expenditures for 2019 totaled \$29 million]; M. Owoc
28  Testimony, AHT, p. 3443:16-23, 3455:7-18 [over 2.8 billion followers by virtue of their social

Case 22-17842-PDR   Doc 522-8   Filed 12/14/22   Page 87 of 111

DocuSign Envelope ID: 81DDD3B617EB94A5E4E89-1KFC6972257 C
Case 5:20-cv-01464-DSF-SHK   Document 126-2   Filed 09/23/22   Page 72 of 177   Page ID
#:5459

1   media accounts and the social media accounts of the influencers who VPX has engaged], 3457:4-
2   11; J-155, ¶ 28, Fig. 8 [enormous reach of VPX's social media followers]; Grunewald Testimony,
3   AHT, p. 1885:8-10. In 2020, VPX sold more than $740 million of BANG branded products, sales
4   which took place out of more than 140,000 retail outlets. *See* Exhibit 2922, p. 7; J. Owoc
5   Testimony, AHT, p. 1381: 8-19. Thus, Orange Bang has established the strength of the mark
6   factor in both directions. Orange Bang (and VPX itself) have demonstrated that Orange Bang's use
7   of the BANG mark is conceptionally strong [arbitrary or fanciful]. And, at the same time, Orange
8   Bang (and VPX itself) have established that VPX's use of the BANG mark is commercially strong.
9   Therefore, the first *Sleekcraft* factor cuts strongly in favor of Orange Bang.

10         With respect to the second *Sleekcraft* factor, the relatedness of the goods factor, *Pom*
11   *Wonderful* is factually on point and legally significant. In *Pom Wonderful*, the Ninth Circuit ruled
12   that the district court correctly found that fruit juice beverages and energy drinks are related goods
13   because they are similar "in use and function" and sold to the same class of purchasers, even
14   though the fruit juice was 100% juice and the energy drink was carbonated. The fact that both the
15   Pom Wonderful fruit juice was pomegranate flavored and the energy drink at issue in that case was
16   likewise pomegranate flavored was not a dispositive fact. As the Ninth Circuit reasoned in *Pom*
17   *Wonderful*: "Fruit-juice beverages and fruit-flavored energy drinks are sufficiently complementary
18   and related that a reasonable consumer could connect them and be confused regarding the source of
19   the products." *Id.* at 1127. *See also Polar Corp. v. PepsiCo, Inc.*, 789 F.Supp.2d 219, 233 (D.
20   Mass., 2011) ["slush" drinks and bottled water and sodas are related goods because consumers
21   would reasonably conclude that a soda manufacturer would also produce a slush drink]. Here,
22   Orange Bang sells a frothy orange drink and one-third of their sales take place at a convenience
23   store (discussed more below with respect to the fifth *Sleekcraft* factor). VPX sells an energy drink,
24   most notably BANG Energy RTD, and 80% of its sales take place at a convenience store. Both
25   products are inexpensive, attractive to consumers who stop at a convenience store or a gas station
26   and both compete for the same customers. Stein Testimony, AHT, p. 115:13-21 [approximately
27   one-third of Orange Bang's current customers are convenience stores]; Bukovi Testimony, AHT, p.
28   2012:5 - 2013:12 (approximately 80 percent of BANG Energy RTD sales occur in convenience

1   stores). Stein, Sacks and Orange Bang's and Monster's marketing expert Richard George

2   ("George") all testified that VPX's energy drinks compete within the general beverage category

3   (the same category to which Orange Bang sells). Stein Testimony, AHT, p. 134:5-10; Sacks

4   Testimony, AHT, p. 2607:4-25 and 2625:16 - 2626:8; George Testimony, AHT, p. 2216:9 -

5   2217:10; J-155, Figs. 43-44, 52. It is just as easy to stop at a convenience store and grab a

6   sandwich and a Bang as it is to stop at a convenience store and grab a sandwich and an Orange

7   Bang. In fact, the arbitrator can easily envision a scenario where a family on a car vacation stops to

8   get gas and food at the convenience store which is now a part of a gas station. The adult driver

9   initially intends to grab a sandwich and a Bang (the caffeine will help with the driving), but the

10  kids want to grab a sandwich and an Orange Bang and the purchase decision of the children

11  influences the purchase decision of the parent who decides to go along with his or her kids and

12  have an Orange Bang as well. George Testimony, AHT, p. 2208:24 - 2209:16 and 2310:22 -

13  2311:17; Sacks Testimony, AHT, p. 2611:21 - 2612:17; Stein Testimony, AHT, p. 114:13-16. In

14  this respect, both the sugary Orange Bang and the sugarless and caffeine laden BANG Energy RTD

15  energy drink (and other Bang branded products sold by VPX) are similar in use and function and

16  therefore they are proximate / related goods pursuant to currently controlling Ninth Circuit

17  authority. In addition, and as an aside, the PTO formed an opinion that the products at issue in this

18  case were related goods because the PTO previously rejected one of VPX's applications for the

19  Bang! mark based on a finding that VPX's products are "highly related" to Orange Bang's products

20  (an opinion admittedly based on paperwork and not on a true study of the marketplace). *See*

21  Exhibit 141, p. 2. VPX's reliance on the InfoScout study, a thoroughly unconvincing document

22  and an unpersuasive argument (see discussion below) does not change this conclusion. As a result,

23  the second *Sleekcraft* factor cuts convincingly in favor of Orange Bang.

24         With respect to the third *Sleekcraft* factor, the similarity of the marks factor, the courts look

25  to an appearance, sound, and meaning test. *Ironhawk*, 2 F.4th at 1164; *Fortune Dynamic, Inc. v.*

26  *Victoria's Secret Stores Brand Mgmt., Inc.*, 618 F.3d 1025, 1032 (9th Cir 2010). With respect to

27  sound, the sound of the BANG mark is identical. With respect to meaning, the meaning of the

28  BANG mark is also identical. With respect to appearance, the use of the marks is somewhat

Case 22-17842-PDR Doc 522-8 Filed 12/14/22 Page 89 of 111

DocuSign Envelope ID: 3DDD3B5-7FB3-4AEF-8E89-1KFC6732F7
Case 5:20-cv-01464-DSF-SHK Document 126-2 Filed 09/23/22 Page 74 of 177 Page ID
#:5461

1  different in the marketplace because they have different accompanying logos, but both products
2  appear in the marketplace with a prominent use of the word BANG. Similarities have greater
3  weight than differences. *GoTo.com, Inc. v Walt Disney Co.*, 202 F.3d 1199, 1206 (9th Cir. 2000).
4  As the Ninth Circuit also stated in *GoTo.com,* the greater the similarity between the two marks, the
5  greater the likelihood of confusion. *Id.* Here, the sound and meaning are identical and the
6  appearance, although not identical, is certainly similar, because both make use of the BANG mark
7  by placing a strong emphasis on the word "Bang". In fact, the PTO stated in an Office Action
8  Letter in response to a trademark application by VPX that the use of the term "Bang" is the
9  "dominant feature" of the use of the BANG mark and that the dominant feature is very significant
10 in creating a commercial impression on consumers out in the marketplace. As the PTO put it:
11 "BANG is very significant in creating a commercial impression, the marks are highly similar in
12 sound, appearance, meaning, and connotation." *See* Exhibit 141, p. 2. Thus, the third *Sleekcraft*
13 factor cuts strongly in favor of Orange Bang.

14          Inasmuch as this is a reverse confusion case, and because the Ninth Circuit has indicated
15 that the first three *Sleekcraft* factors discussed above are the "pivotal" ones, all three of which cut
16 strongly or convincingly in favor of Orange Bang, the analysis of the three factors set forth above is
17 already enough to conclude that VPX is liable for trademark infringement. As discussed below, an
18 analysis of the remaining *Sleekcraft* factors does not change this finding and, in fact, the other
19 *Sleekcraft* factors likewise support the finding of trademark infringement against VPX and in favor
20 of Orange Bang.

21          With respect to the fourth *Sleekcraft* factor, the actual confusion factor, and because it is
22 often difficult to garner evidence of actual confusion, Ninth Circuit authority has held that it is not
23 necessary to demonstrate actual confusion in order to prove a likelihood of confusion. *Sleekcraft*,
24 599 F.2d at 353. *Ironhawk*, 2 F.4th at 1165; *Playboy Enters., Inc. v. Netscape Commc'n Corp*., 354
25 F.3d 1020, 1026 (2004). In this case, however, Orange Bang and Monster have engaged an expert,
26 Hollander, to conduct a survey, to gather survey evidence and to use that survey evidence to
27 demonstrate actual confusion. Survey evidence does suffice as persuasive evidence to establish
28 actual confusion. *Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt. Inc.,* 618 F.3d

1025, 1035 (9th Cir. 2010); *Mut. Of Omaha Ins. Co. v.* Novak, 836 F.2d 397, 400 (8th Cir. 1987).
VPX is critical of Hollander's survey methodology because, according to VPX, Hollander made
use of the "Squirt" methodology, a disfavored survey methodology, instead of the "Eveready"
methodology, which is considered the gold standard for survey methodologies and, therefore,
according to VPX, Hollander's survey is tainted by leading questions and of very little value or
weight.[18] Hollander testified at the arbitration hearing, somewhat emphatically, that he did not
make use of the "Squirt" methodology for his survey, but rather made use of a "modified Squirt"
methodology, a survey based on a product line-up in which the survey respondents are showed an
array of branded products, one after the other, rotating the order of the products in the line-up so
that no product had too much prominence in order to avoid bias, a methodology which is typically
used when the survey respondents do not know of or have never heard of the senior user. In this
case, it is highly doubtful that younger survey respondents, who may be target buyers of BANG
Energy RTD, have ever heard of the company Orange Bang or its Orange Bang beverage. In
*Active Sports Lifestyle USA LLC v. Old Navy, LLC*, 2013 WL 11239385 (C.D. Cal. 2013), the
defendant in the trademark infringement action filed a motion in limine to exclude a survey
conducted by the plaintiff's survey expert, who happened to be the same expert in this case --
Hollander. In that case, Hollander make use of a "line-up protocol" with one product followed by
another (in this case nearly all of the product cans of BANG Energy RTD are mostly black and thus
Hollander made use of an appropriate survey stimulus shown to survey respondents) and several
other products for control purposes (in this case Coke, Pepsi and Red Bull products were used as
controls to simulate conditions that appear in the marketplace, particularly at a convenience store).
Hollander conducted the survey that way because the parties' marks were not that well known (no
"top of the mind" recognition given that Orange Bang in this case lacks "top of the mind"

[18] In the "Eveready" format, the survey respondents do not know which mark is the senior user
because it is assumed, because of the survey respondent's prior experience with the marketplace
and because of the "top of the mind" strength of the senior user's product, that they will already
know which mark is owned by the senior user. In contrast, in the "Squirt" format, the survey
presents the survey respondents with both conflicting marks and does inform the survey
respondents which mark is owned by the senior user because this survey format does not assume
that the survey respondents are familiar with the senior mark. *See McCarthy, Sections* 32:173,
32:174.50 and 32:177.

75
FINAL ARBITRATION AWARD – PHASE 1 AND PHASE 2

Case 22-17842-PDR   Doc 522-8   Filed 12/14/22   Page 91 of 111

DocuSign Envelope ID: 8DDD3B57-7489-4655-8E89-1KFC6772570
Case 5:20-cv-01464-DSF-SHK   Document 126-2   Filed 09/23/22   Page 76 of 177   Page ID
#:5463

1  recognition with survey respondents) and because the products were not sold side-by-side in the
2  marketplace (here, both sides concede that the products were sold in the same convenience stores,
3  not side-by-side, although there was some testimony that convenience stores are so small,
4  especially in gas stations, that the products were physically close enough to each other to be treated
5  as though they were sold side-by-side. George Testimony, AHT, p. 2210:16 – 2211: 20, 2152:
6  11-14). The defendant in *Active Sports Lifestyle* filed a motion in limine to exclude Hollander's
7  testimony based on an improper survey methodology, but Judge Selna denied the motion in limine
8  and ruled that Hollander's survey line-up methodology was proper and that his finding of 22% for
9  the likelihood of confusion survey was admissible, citing *McCarthy,* 32:177 and *Fortune Dynamic,*
10  *Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*, 618 F.3d 1025, 1037 (9th Cir. 2010). Here, in
11  our case, it appears that Hollander made use of essentially the same survey methodology which was
12  approved in *Active Sports Lifestyle*. Hollander surveyed the relevant market, potential purchasers
13  at convenience stores, had a proper screening questionnaire, made use of proper controls, made use
14  of an approved line-up format and submitted an unrebutted survey[19] which showed that 19.3% of
15  survey respondents were confused. Hollander Testimony, AHT, p. 2427:25 - 2429:4; J-150 ¶¶ 56-
16  61. Although the unrebutted 19.3% confusion rate is not an overwhelming percentage of consumer
17  confusion, it is close to what Judge Selna allowed in *Active Sports Lifestyle* and it is very close to
18  the percentage which Hollander characterized in his arbitration testimony, based on his expertise
19  and years of experience, as "robust". *See also, Rosetta Stone Ltd. v. Google, Inc.*, 676 F.3d 144,
20  159 (4th Cir. 2012) (17% confusion rate is "clear evidence of actual confusion"); *Exxon Corp. v.
21  Tex. Motor Exch. of Houston, Inc.*, 628 F.2d 500, 507 (5th Cir. 1980) (15% confusion rate
22  sufficient). Thus, the fourth *Sleekcraft* factor cuts convincingly in favor of Orange Bang.

23  With respect to the fifth *Sleekcraft* factor, the marketing channels factor, the evidence is
24  undisputed that the marketing channels converge because both parties sell products which make
25  use of the BANG mark in convenience stores, including some of the same chains and store
26  locations such as 7-Eleven and Circle K chains. George Testimony, AHT, p. 2284:24 - 2285:22,

27

28  [19] VPX's survey expert Mr. Wallace did not testify at the arbitration hearing to explain his survey.
    The arbitrator was not informed as to why Mr. Wallace was not called to testify.

1 | 2290:6-17, 2171:12-19; *see* Exhibit 5324.  As set forth above, Stein testified that one-third of
2 | Orange Bang sales take place at convenience stores and as Bukovi testified approximately 80% of
3 | BANG Energy RTD sales, VPX's biggest selling product by far, take place at convenience stores.
4 | As the Ninth Circuit ruled in *Pom Wonderful*, where sales channels converge and the parties'
5 | customer base overlap, the fifth *Sleekcraft* factor weighs in favor of the plaintiff.  *Pom Wonderful*,
6 | 775 F.3d at 1130-31.  Here, there is no dispute that Orange Bang and VPX compete for customers
7 | in convenience stores where a large percentage of both of their sales take place.  Accordingly, the
8 | fifth *Sleekcraft* factor cuts strongly in favor of Orange Bang.

9 | With respect to the sixth *Sleekcraft* factor, the degree of consumer care factor, it was
10 | convincingly established at the arbitration hearing that consumers comprising the relevant market
11 | at issue in this case "exercise a low degree of care and sophistication when selecting inexpensive,
12 | single-serve" drinks like "juices" and "energy drink[s]."  *Pom Wonderful*, 775 F.3d at 1127;
13 | *Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1060 (9th Cir. 1999); George
14 | Testimony, AHT, p. 2206:24 - 2207:3, 2207:20 - 2208:9, 2209:24 - 2210:15; *see* Exhibit 1132.
15 | Monster's CEO Sacks also testified that convenience store purchases are "impulse" buys.  Sacks
16 | Testimony, AHT, p. 2614:20 - 2615:20.  In *Vital Pharms., Inc. v. PHD Mktg., Inc.,* 2020 WL
17 | 6545995, (C.D. Cal. 2020), VPX filed a trademark infringement case against a company which
18 | sold e-cigarettes.  In the litigation, VPX's Bukovi submitted a declaration in which he stated that
19 | although VPX promotes a health conscious brand, its consumers are not necessarily health
20 | conscious in every instance or even in most instances, a declaration upon which the court
21 | specifically cited and relied.[20]  In other words, it was VPX who argued that many, or most, of its
22 | consumers exercise a low degree of care in making the purchase decision.  In that case, Judge Lew
23 | ruled that (i) where consumers exercise a lesser degree of care, there is a higher likelihood of
24 | confusion, citing *Network Automation, Inc. v. Advanced Sys. Concepts*, 638 F.3d 1137, 1152 (9th

---

[20] In addition, in the 2020 case of *Vital Pharms.*, VPX also argued that the BANG mark is an
*arbitrary* mark, thus admitting that the BANG mark is conceptually strong for the purposes of the
first *Sleekcraft* factor.  *Vital Pharms., Inc. v. PHD Mktg., Inc.,* 2020 WL 6545995, at *3.  Judge
Lew did not decide that precise issue, ruling instead that the BANG mark is at least suggestive (i.e.,
more than descriptive).  *Id.* at *4.

77

FINAL ARBITRATION AWARD – PHASE 1 AND PHASE 2

1   Cir. 2011); (ii) even if some of the consumers exercise greater care, that elevated standard of care is
2   not applicable where only some of the customers may be more sophisticated; and (iii) because of
3   the low price points of both the BANG Energy RTD and the defendant's e-cigarettes, consumers
4   are more likely to exercise a lesser degree of care in making the purchase decision and, therefore,
5   this factor weighed in favor of confusion. *Vital Pharms.*, at *6-7. In this respect, VPX took a
6   position in that case which is inconsistent with the position it is currently taking on the sixth
7   *Sleekcraft* factor. In short, given the low price point for an Orange Bang and for the BANG Energy
8   RTD, the evidence demonstrates that the decision to purchase a beverage at a convenience store is a
9   snap decision where the consumer does not spend a lot of time, energy or scrutiny in making that
10  purchase decision and, thus, the sixth *Sleekcraft* factor cuts strongly in favor of Orange Bang.

11          With respect to the seventh *Sleekcraft* factor, the intent of the defendant factor, the Ninth
12  Circuit has held that, in a reverse confusion case, if the infringer adopted the mark with actual or
13  constructive knowledge of the senior user's trademark, or the infringer is at fault for not adequately
14  respecting the rights of the senior user, then this factor will weigh in favor of the plaintiff.
15  *Brookfield*, 174 F.3d at 1059; *Ironhawk*, 2 F.4th at 1167-1168; *McCarthy*, Section 23:10. Although
16  there was no evidence presented that VPX *selected* the BANG mark with the intent of trading off
17  of the goodwill of Orange Bang, there was plenty of convincing evidence presented of VPX's
18  cavalier attitude about adhering to the VPX Marketing and Sales Restrictions of paragraph 7 D
19  within the 2010 Settlement Agreement (which VPX obviously knew about because its CEO J.
20  Owoc participated in its negotiation by having conversations [undisclosed conversations] with his
21  attorneys and because he signed it after 11 months of negotiation) inasmuch as J. Owoc testified
22  that he never told his marketing employees or his distributors, such as Pepsi, about the 2010
23  Settlement Agreement and his marketing and other employees testified that they were never told
24  about these all-important restrictions either, demonstrating an intent of cavalier indifference about
25  honoring the rights of the senior user as embodied in the 2010 Settlement agreement. *See* J. Owoc
26  Testimony, AHT, p. 1279:19-23, 1276:17 - 1277:16; Bukovi Testimony, AHT, p. 2108:15 -
27  2109:3; M. Owoc Testimony, AHT, p. 3493:7-21; Sweeney Testimony, AHT, p. 3105:13-20; Li
28  Testimony, AHT, p. 1464:13-16. The evidence also shows that VPX flooded the marketplace with

1  advertising (traditional advertising and social media promotional advertising) for its Bang branded
2  products despite having actual or constructive knowledge of Orange Bang's superior rights to the
3  BANG mark which shows a culpable disregard for the risks of reverse confusion, an intent which
4  likewise satisfies this element of intent. *Marketquest Grp., Inc. v. BIC Corp.*, 862 F.3d 927, 934-
5  935 (9th Cir. 2017); Bukovi Testimony, AHT, p. 2111:19 - 2112:16; M. Owoc Testimony, AHT, p.
6  3492:8 - 3495:6; Sweeney Testimony, AHT, p. 3105:5-22; J. Owoc Testimony, AHT, p. 1276:16 -
7  1280:19.  As a result, the seventh *Sleekcraft* factor cuts convincingly in favor of Orange Bang.

8          With respect to the eighth *Sleekcraft* factor, the likelihood of expansion of the product lines
9  factor, the evidence demonstrates, although certainly not overwhelming evidence, that VPX had
10 already entered Orange Bang's market for general beverages and that Orange Bang had considered,
11 and supposedly still is considering, expanding into canned products.  Specifically, the testimony
12 demonstrated that while VPX launches a new flavor of BANG Energy RTD every 90 days in order
13 to stimulate sales, Orange Bang had explored the possibility of selling its Orange Bang beverage
14 out of bottles rather than out of the fountain dispenser.  Grunewald Testimony, AHT, p. 1872:7-16;
15 Stein Testimony, AHT, p. 97:8 - 98:9, 101:7 - 114:12; Exhibit 2056.  This testimony demonstrates
16 at least some meaningful effort on the part of Orange Bang to expand its product line and,
17 therefore, the eighth *Sleekcraft* factor cuts somewhat in favor of Orange Bang.

18         In *Brookfield Commc'ns, Inc. v. W. Coast. Ent. Corp.*, 174 F.3d 1036, 1058 (9th Cir.
19 1999), the Ninth Circuit found a "strong" likelihood of success on the merits for the purposes of a
20 preliminary injunction where only three of the eight *Sleekcraft* factors were met.  In *Pom
21 Wonderful*, 7775 F.3d at 1132, the Ninth Circuit likewise found a clear likelihood of success on the
22 merits for the purposes of a preliminary injunction where only five of the eight *Sleekcraft* factors
23 were met.  Here, as set forth above, the first three *Sleekcraft* factors, the most important factors in a
24 reverse confusion case, all weigh strongly or convincingly in favor of Orange Bang.  Moreover, all
25 eight of the *Sleekcraft* factors weigh strongly or convincingly in favor of Orange Bang, with the
26 possible exception of the eighth factor which weighs somewhat in favor of Orange Bang.  Thus,
27 based on the totality of the circumstances, the arbitrator concludes that Orange Bang has
28 established a likelihood of confusion as between Orange Bang's "Orange Bang" product and the

VPX Bang branded products, in particular BANG Energy RTD. Accordingly, the arbitrator hereby finds that VPX is liable to Orange Bang for trademark infringement (and the other claims related to trademark infringement, *see* footnote 17 above).

**J. Monetary Damages for Breach of Contract and for Trademark Infringement – Three Potential Methodologies**

According to VPX's damages expert Andrew Voth ("Voth"), there are three potential methodologies to consider for the calculation of damages for breach of contract and for trademark infringement in this case. The three methodologies are: (i) measure the diversion of sales / profits from Orange Bang to VPX; (ii) the calculation of a reasonable royalty; and (iii) a disgorgement of profits calculation which, according to Voth, must factor in an apportionment analysis. *See* Exhibit 5382; DDX1036.

**(1) Diversion of Sales / Profits from Orange Bang to VPX**

According to Voth's expert presentation on the issue of damages, the first methodology to consider is to measure the amount of Orange Bang's sales / profits which were diverted away from Orange Bang to the benefit of VPX. However, as Voth correctly points out, there is no evidence that any sales / profits bound for Orange Bang ended up with VPX. *See* DDX1036-3. For this reason, this first methodology addressed by Voth is not the appropriate measure of the damages suffered by Monster or Orange Bang in this case for the breach of the 2010 Agreement or trademark infringement referred to above.

**(2) The Calculation of a Reasonable Royalty**

The second methodology, which both Voth and Monster's / Orange Bang's expert John Plumpe ("Plumpe") agree is an appropriate damages methodology for both a breach of contract claim and for a trademark infringement claim, the reasonable royalty methodology, is indeed an appropriate measure of damages for this case. There is, however, conflicting case law on the monetary remedy of a reasonable royalty in a trademark infringement context and those cases are discussed at length below. Voth and Plumpe disagree on how to calculate the reasonable royalty in this case and, specifically, what a reasonable royalty rate would be and whether or not a cap should

1   be imposed on the reasonable royalty in an amount tied to the purported 2010 value of the BANG

2   mark, which is, in part, the reasonable royalty damages model as presented by Voth. These

3   disagreements are also discussed below.

4          However, and importantly, both Voth and Plumpe agree on the starting point of the

5   calculations. Both Voth and Plumpe agree on the amount of the total net sales generated by the

6   sale of products making use of the BANG mark since August 11, 2010, **$2.26 billion** according to

7   Voth and **$2.268 billion** according to Plumpe, virtually identical numbers. *See* Voth Testimony,

8   AHT, p. 3860:5-18; Plumpe Testimony, AHT, p. 2861:6-25. In addition, both Voth and Plumpe

9   agree on the amount of the net sales generated by the sale of products making use of the BANG

10  mark since August 11, 2010 outside the Nutritional Channel, **$2.03 billion** according to Voth and

11  **$2.04 billion** according to Plumpe, once again virtually identical numbers. *See* Voth Testimony,

12  AHT, p. 3863:17 – 3864:2; Plumpe Testimony, AHT, p. 2869:19-22. Simply stated, the two

13  expert's calculations as to the starting point for the royalty base (defined and discussed below), for

14  the purposes of calculating the amount of a reasonable royalty, are extremely close to each other.

15  In short, the experts essentially agree on these calculations.

16         However, before even addressing the reasonable royalty calculation as presented by Plumpe

17  and as presented (albeit differently) by Voth, a threshold question must be answered first. Is a

18  reasonable royalty even a proper monetary remedy for a breach of contract claim under California

19  law and in a trademark infringement action under federal law?

20         **(3)    The Recovery of a Reasonable Royalty for the Breach of Contract Claim**

21         In *Artifex Software, Inc. v. Hancom, Inc.*, 2017 WL 4005508 (N.D. Cal. 2017), the district

22  court held that, under California law, a reasonable royalty may be awarded in a breach of contract

23  case. In *Artifex*, the defendant made use of a computer software product pursuant to a "free" open

24  source license. However, the license was only free under certain circumstances. A party seeking to

25  use the computer software had three choices: (1) enter into a commercial license and pay a license

26  fee; (2) use the computer software for free, pursuant to the free license, provided that the defendant

27  did not modify or distribute the computer software; or (3) use the computer software for free,

28  pursuant to the free license, and modify or distribute the computer software, but, if so, the user had

Case 22-17842-PDR   Doc 522-8   Filed 12/14/22   Page 97 of 111

DocuSign Envelope ID: 3FDD3B6-74B9-4EF8-BE89-1KFC67257C
Case 5:20-cv-01484-DSF-SHK   Document 126-2   Filed 09/23/22   Page 82 of 177   Page ID
#:5469

1  to make sure that the resulting modifications were themselves open source which required the user
2  to make the modified source code available to others at no charge. The defendant allegedly
3  breached the free license agreement and the defendant Hancom filed a motion for partial summary
4  judgment as to the issue of damages, arguing that there could not possibly be any damages because
5  the license was itself a free license and, therefore, Artifex could not establish all of the requisite
6  elements for a claim for breach of contract. In response to this motion for partial summary
7  judgment on the issue of damages, the district court ruled that an appropriate way to measure the
8  damages suffered by Artifex resulting from Hancom's breach of the free license agreement was to
9  determine the amount of a reasonable royalty that Artifex would have received had Hancom
10 entered into the commercial license (choice no. 1) to use the computer software at issue. In
11 particular, the district court ruled that it could use the value of the commercial license as a basis for
12 the determination of damages and reasoned that a reasonable royalty may be used as the measure of
13 damages for the breach of a contract under California law. *Id.* at *3.

14     In *Celeritas Technologies, Ltd. v. Rockwell International Corporation*, 150 F.3d 1354 (Fed.
15 Cir. 1998), the Federal Circuit reviewed a jury verdict on a trial heard in the Central District of
16 California before Judge Edward Rafeedie. In *Celeritas Technologies*, the plaintiff Celeritas
17 invented a technology which increased the rate of data transmission over a cellular telephone
18 network. Celeritas and Rockwell signed a non-disclosure agreement and, thereafter, the executives
19 of Celeritas met with Rockwell and disclosed the details of its new invention to Rockwell.
20 Rockwell later made use of the new invention, giving rise to a claim for breach of contract under
21 California law, in addition to patent infringement and misappropriation of trade secrets. The jury
22 returned a verdict in favor of Celeritas and awarded over $57 million on the breach of contract
23 claim based upon a hypothetical license fee (on a paid-up, lump-sum basis, a common approach in
24 that industry at the time). On appeal, Rockwell argued that the measure of damages, which was
25 based on a calculation of a reasonable royalty rate which was then applied to Rockwell's own
26 internal projections, was improper. The Federal Circuit disagreed. The Federal Circuit ruled that
27 Celeritas was undoubtedly harmed by Rockwell's conduct, that Celeritas had a reasonable
28 expectation that Rockwell would compensate it if Rockwell made use of the disclosed information

1 and that Rockwell really had two choices, use the technology or refrain from using the technology,
2 and because Rockwell did make use of the technology, the jury properly determined the amount of
3 the license fee that Rockwell would have paid had it not breached the non-disclosure agreement. In
4 particular, the Federal Circuit approved of the methodology by which Celeritas' expert calculated a
5 reasonable royalty rate **by looking at other deals in the telephone modem business** as well as
6 past deals entered into by Celeritas itself and by multiplying that reasonable royalty rate by
7 Rockwell's own internal sales projections. *Id.* at 1359.

8      In *Grail Semiconductor, Inc. v. Mitsubishi Elec. & Elecs USA, Inc.*, 225 Cal.App.4th 786,
9 795-796 (2014), Grail invented a new technology for a memory chip which greatly increased the
10 amount of storage capacity available on a chip. Grail executives met with Mitsubishi and other
11 companies to pitch the technology and everyone in attendance signed a non-disclosure agreement.
12 Grail later learned that Mitsubishi had incorporated its proprietary technology into a new memory
13 chip it was selling and Grail sued for various claims, including breach of contract for breach of the
14 non-disclosure agreement. At trial, Grail's expert presented three different methodologies to
15 calculate Grail's damages. The second methodology presented by Grail's expert, a Mr. Gemini,
16 was an approach by which he calculated a royalty that Mitsubishi would have paid for use of the
17 technology (the calculation of this second methodology was converted into a lump sum payment in
18 the amount of $203 million). After the jury returned a verdict in the amount of $123 million, the
19 same amount as Mr. Gemini's first methodology, Mitsubishi filed a motion for a new trial on the
20 issue of damages. The trial court granted the motion for a new trial and the appellate court
21 affirmed. However, on appeal, the court ruled that Grail had indeed demonstrated all of the
22 elements necessary for a breach of contract claim, including the element of the fact of damages, but
23 that the jury applied the wrong measure of damages, the first methodology, by incorrectly placing a
24 value on the technology appropriated by Mitsubishi. Rather, the appellate court ruled, the jury
25 should have determined the amount that Mitsubishi would have paid to license the technology. The
26 appellate court specifically rejected Mitsubishi's argument that Grail's second measure of damages,
27 the amount of the royalty that Mitsubishi should have paid for the use of the technology, was based
28 on speculation and unfounded assumptions. Instead, the appellate court ruled that a new trial was

83
FINAL ARBITRATION AWARD – PHASE 1 AND PHASE 2

1   necessary to establish the "amount [Mitsubishi] likely would have paid for a license to use or
2   transfer the technology." *Id.*

3   Thus, *Artifex, Celeritas* and *Grail* all stand for the proposition that the calculation of a
4   reasonable royalty is a proper measure of damages for a breach of contract claim under California
5   law. Accordingly, based on these cases, and based on testimony of the damages experts Plumpe
6   and Voth, discussed in detail below, the arbitrator hereby finds that the calculation of a reasonable
7   royalty, as further set forth below, is an appropriate methodology to measure the damages suffered
8   by Monster by virtue of VPX's breach of the 2010 Settlement Agreement.

9   **(4)   The Formula – the Royalty Base x the Reasonable Royalty Rate**

10   The classic approach for the determination of a reasonable royalty, which is based on patent
11   law, is to conduct a hypothetical negotiation pursuant to the Georgia-Pacific factors[21] and then
12   determine the royalty base, which represents the net sales generated by the infringement [or by the
13   breach of the contract], and multiply it by the reasonable royalty rate, which represents the amount
14   of damages owed to the aggrieved party. *Whitserve, LLC v. Computer Packages, Inc.*, 694 F.3d 10,
15   27 (Fed. Cir. 2012) [royalty rate found to be speculative, but defendant admitted that other
16   licensing deals provide a proper basis for the hypothetical negotiation assuming they are
17   appropriate comparables]. The Georgia-Pacific factors are "a reasoned economic framework for a
18   'hypothetical negotiation [which] attempts to ascertain the royalty upon which the parties would
19   have agreed had they successfully negotiated an agreement just before the infringement [breach]
20   began." *Whitserve*, 694 F.3d at 27.

21   **(5)   The Calculation of the Royalty Base – Breach of Contract**

22   Before determining a reasonable royalty rate for the purposes of the damages calculation for
23   the breach of contract claim, it is first necessary to determine the dollars to which the reasonable
24   royalty rate will apply, which is what the damages experts in this case referred to as the "royalty

25

26
___
[21] The Georgia-Pacific factors were first articulated in *Georgia-Pacific Corp. v. U.S. Plywood*
27   *Corp.*, 318 F. Supp. 1116 (S.D.N.Y. 1970). The Georgia-Pacific factors have been applied to
hypothetical negotiations in trademark infringement actions. *Lumber Liquidators, Inc. v. Stone*
28   *Mountain Carpet Mills, Inc.*, 2009 WL 5876245 (E.D. Vir. 2009) [three out of fifteen factors
insufficient to arrive at a reasonable royalty].

84

FINAL ARBITRATION AWARD – PHASE 1 AND PHASE 2

1  base." The calculation of the royalty base for the breach of contract claim is similar to the

2  calculation of the royalty base for the trademark infringement claim (discussed below), but there

3  are some conceptual differences.

4      For example, the calculation of the royalty base for the breach of the 2010 Settlement

5  Agreement is tied to the language and meaning of paragraph 7 D. Accordingly, net sales by VPX

6  which do not violate the VPX Sales and Marketing Restrictions, i.e., sales made within the

7  Nutritional Channel, were not a breach of the 2010 Settlement Agreement because such sales

8  complied with paragraph 7 D and, therefore, those particular net sales, for the purposes of the

9  breach of contract claim, should not be included in the calculation of the royalty base. For that

10  reason, for the purposes of the royalty calculation for the breach of contract claim, the **$2.035**

11  **billion** amount, the **midpoint** between Voth's calculation and Plumpe's calculation, is the correct

12  starting number for the royalty base. In addition, net sales made internationally are properly

13  included within the royalty base for the breach of contract calculation because of the language and

14  meaning of paragraph 17 of the 2010 Settlement Agreement which provides as follows: "Scope of

15  Agreement. The terms of this Agreement apply to the actions and activities of the Parties

16  *worldwide*." (Emphasis added.)[22] However, net sales of Bang Mixx, in the amount of $4.5 million

17  through September 19, 2021[23], must be deducted out from the amount of the royalty base for the

18  reasons set forth in Section III, P. below.

19      Thus, the calculation of the royalty base for the purposes of the breach of contract claim is

20  as follows: **$2,030,500,000** ($2,035,000,000 - $4,500,000).

21          **(6)    The Recovery of a Reasonable Royalty in a Trademark Infringement**

22                  **Claim**

23      The monetary remedies for trademark infringement are set forth in 15 U.S.C. 1117(a) which

24  provides, in pertinent part, as follows:

25

26  [22] Because the sales of Bang Pre-Workout were made within the Nutritional Channel and the VPX
    Marketing and Sales Restrictions were adhered to insofar as Bang Pre-Workout sales are

27  concerned, these sale revenues are already excluded from the calculation of the royalty base for the
    breach of contract claim.

28  [23] Bang Mixx sales through September 19, 2021 were in the amount of $4.5 million. *See* Exhibit
    2922, p. 7.

                                                    85
                        FINAL ARBITRATION AWARD – PHASE 1 AND PHASE 2

Case 22-17842-PDR   Doc 522-8   Filed 12/14/22   Page 101 of 111

DocuSign Envelope ID: 2D0D3B6-74894-4EE-8E89-1KFC672517
Case 5:20-cv-01464-DSF-SHK   Document 126-2   Filed 09/23/22   Page 86 of 177   Page ID
#:5473

1  " . . . the plaintiff shall be entitled, . . . and subject to the principles of equity, to recover (1)

2  **defendant's profits**, (2) **any damages sustained by the plaintiff, and** (3) the **costs** of the

3  action. The **court shall assess such profits and damages** or cause the same to be assessed

4  under its direction.    If the court shall find that the amount of the recovery based on profits

5  is **either inadequate or excessive the court may in its discretion enter judgment for**

6  **such sum as the court shall find to be just**, according to the circumstances of the case.

7  Such sum in either of the above circumstances shall constitute compensation and not a

8  penalty. . . ."

9  (Emphasis added.)

10  Thus, the statute gives the trier of fact, in this case the arbitrator, extremely wide discretion to

11  determine the amount of damages. As the Ninth Circuit held in *Southland Sod Farms v. Stover*

12  *Seed Co.*, 108 F.3d 1134, 1146 (9th Cir. 1997), the Lanham Act provides the court with

13  considerable "discretion to fashion relief, including monetary relief, based on the totality of the

14  circumstances." However, the question of whether or not an award of a reasonable royalty is an

15  appropriate monetary remedy in a trademark infringement action is a surprisingly controversial

16  topic with conflicting case law decisions going both ways.

17      In *Thrive Natural Care, Inc. v. Thrive Causemetics, Inc.*, 2021 WL 4813257 (C.D. Cal

18  2021), the plaintiff alleged trademark infringement by the defendant with respect to its registered

19  mark "THRIVE". In a decision authored by Judge Anderson of the Central District of California in

20  October of 2021, the court ruled that because there was no history of a prior licensing agreement

21  between the plaintiff and the defendant and because the plaintiff did not have a past practice of

22  licensing its mark to third parties, any hypothetical negotiation designed to determine a reasonable

23  royalty would be impermissible speculation, citing the Ninth Circuit's decision in *M2 Software Inc.*

24  *v. Viacom, Inc.*, 223 F.App'x 653, 655 (9th Cir. 2007).[24]  As a result, Judge Anderson ruled that the

25

26  [24] In *M2 Software*, the Ninth Circuit specifically stated that it did not reach the issue of whether or
    not a reasonable royalty calculation is permissible in a trademark infringement action. "Because
27  M2's only proposed methodology for estimating a reasonable royalty hinges on an accounting of
    Viacom's profits, its theory that it may impute royalties as a way of disgorging Viacom's allegedly
28  (Continued...)

1 plaintiff's expert's damages model based on a reasonable royalty calculation was not admissible

2 and had to be excluded because the calculation was based on speculation and therefore lacked the

3 requisite "reasonable certainty". Although the court disallowed the reasonable royalty calculation,

4 the court simultaneously ruled that, given the recent United States Supreme Court decision in

5 *Romag Fasteners, Inc. v. Fossil, Inc.*, 140 S.Ct. 1492 (2020) [holding that a showing of willfulness

6 is no longer required to award a disgorgement of profits in a trademark infringement case], a

7 disgorgement of profits is indeed available in a reverse confusion trademark infringement case *as a*

8 *matter of law. Thrive Natural Care*, at * 5 – 6.

9    In *Pacific Packaging Concepts, Inc. v. Nutrisystem, Inc.*, 2021 WL 3130041 (C.D. Cal

10 2021), the plaintiff alleged trademark infringement by the defendant with respect to its registered

11 mark "Fresh Start". In a decision authored by Judge Wright of the Central District of California in

12 July of 2021, the court ruled that because the plaintiff had no history of any prior licensing

13 agreements and because plaintiff had indicated that it would never license any of its marks, any

14 hypothetical negotiation designed to determine a reasonable royalty would likewise be

15 impermissible speculation.

16    In *Lodestar Anstalt v. Bacardi & Co. Ltd.*, 2019 WL 8105378 (C.D. Cal 2019), in a reverse

17 confusion case, the plaintiff alleged trademark infringement against Bacardi with respect to its

18 registered mark "UNTAMED" used in connection with a line of rum. In a decision authored by

19 Judge Snyder of the Central District of California in 2019, the court ruled that even though there

20 was one prior licensing agreement between the plaintiff and an affiliated third party (Avalon)

21 which set a 10% royalty rate, that license agreement was entered into with an affiliated party one

22 year after the litigation had commenced and that license agreement did not result in any actual

23 payments to the plaintiff and, therefore, any hypothetical negotiation designed to determine a

24 _____

25 unjustly acquired profits likewise fails. **Therefore we need not decide more generally whether
   reasonable royalties can be a measure of a plaintiff's damages in a trademark case, as other**
26 **circuits have found appropriate in some cases.**" *Id.* 655. As of 2013, the Ninth Circuit had not
   had occasion to address this issue. *QS Wholesale, Inc. v. World Marketing, Inc.*, 2013 WL
27 1953719 (C.D. Cal 2013), *3 - *4. As the arbitrator understands it, the Ninth Circuit has still not
   had occasion, as of yet, to reach and decide whether the recovery of a reasonable royalty is a proper
28 measure of damages in a trademark infringement case. Thus, the decisions of the district court and
   the decisions of other jurisdictions, which point in both directions, are the applicable guide posts.

87

FINAL ARBITRATION AWARD – PHASE 1 AND PHASE 2

1  reasonable royalty would be based merely on speculation. As a result, Judge Snyder disregarded
2  the royalty analysis of plaintiff's expert and granted partial summary in favor of Bacardi on
3  Lodestar's claim of entitlement to a reasonable royalty.

4       Even in the case repeatedly cited by Monster / Orange Bang in this arbitration, *Lumber
5  Liquidators, Inc. v. Stone Mountain Carpet Mills, Inc.*, 2009 WL 5876245 (E.D. Vir. 2009) in
6  which the court appropriately applied the Georgia-Pacific factors to a trademark case, the court
7  granted the *Daubert* motion and precluded the testimony of plaintiff's expert's reasonable royalty
8  calculation on the grounds that the expert only analyzed three of the fifteen Georgia-Pacific factors
9  and, therefore, the court concluded the reasonable royalty calculation was not sufficiently reliable.

10      On the other hand, there are a series of case decisions which reasoned that the reasonable
11  royalty analysis was not speculative, did provide the requisite "reasonable certainty" necessary to
12  uphold a damages award and was indeed reliable. For example, in *Sands, Taylor & Wood v. The
13  Quaker Oats Company*, 34 F. 3d 1340 (7th Cir. 1994), the plaintiff owned a registered slogan in the
14  phrase "THIRST-AID" and Gatorade made use of the "GATORADE IS THIRST-AID" slogan for
15  a national advertising campaign. The trial court, in the first instance, rejected the award of a
16  reasonable royalty. On the first appeal, however, the Seventh Circuit reversed and ruled that, upon
17  remand, the district court should calculate a reasonable royalty as the base-line for damages, a
18  damages calculation that, according to the Seventh Circuit, should perhaps be enhanced over and
19  above the reasonable royalty baseline amount. On remand, as a part of the damages analysis, the
20  trial court compared the proposed royalty rate with **the royalty rates for other royalty licenses**.
21  Once the reasonable royalty had been established by the trial court, the question for the Seventh
22  Circuit on the second appeal became whether or not the damages award should be further
23  enhanced, as permitted by 15 U.S.C. 1117(a). The Seventh Circuit posed the very same question
24  which was raised by the district court which it quoted verbatim as follows:

25      "Will the imposition of a hypothetical licensing royalty deter predatory conduct such as the
26      defendant's? I doubt it. The royalty is nothing more than an approximation of what the
27      defendant would have paid plaintiff had defendant acted lawfully. "[An] infringer [has]
28      nothing to lose, and everything to gain if [it] could count on paying only the normal, routine

88
FINAL ARBITRATION AWARD – PHASE 1 AND PHASE 2

1    royalty, noninfringers might have paid …[T]he infringer would be in a 'heads-I-win, tails-

2    you-lose position.'" *Panduit Corp. v. Stahlin[Bros.] Fibre Works,* [575 F. 2d 1152, 1158

3    (6th Cir. 1978)."

4    The district court in *Sands* decided to double the amount of the hypothetical royalty in order

5  to accomplish a deterrent effect on defendant's infringing conduct which, the Seventh Circuit

6  noted, included a pervasive and prolonged use of the "Thirst-Aid" slogan, and so as to ensure that

7  the plaintiff was not under-compensated on the reasonable royalty calculation. Thus, on the second

8  appeal to the Seventh Circuit, the issue became whether or not the doubling of the reasonable

9  royalty was a permissible enhancement of the damages intended to effectuate deterrence, or

10 whether it was an impermissible penalty in violation of the language of 15 U.S.C. 1117(a). On the

11 second appeal, the Seventh Circuit upheld the calculation of the reasonable royalty based on a

12 hypothetical negotiation as an appropriate methodology to calculate the baseline damages.  In other

13 words, the controversial question on the second appeal had to do with the enhancement of the

14 damages, not the underlying calculation of the reasonable royalty based on the hypothetical

15 negotiation.

16    In *Adidas America, Inc. v. Payless Shoesource, Inc.*, 2008 WL 4279812 (D. Ore. 2008),

17 Adidas sued Payless Shoes for trademark infringement for selling footwear bearing two or four

18 stripes in violation of Adidas' registration for a three stripe pattern for tennis shoes. The jury

19 returned a verdict of $137 million of Payless' profits plus a reasonable royalty of 7.78%.

20 Significantly, the court approved of the reasonable royalty calculation because it was consistent

21 with royalty deals between Adidas and Payless Shoes, royalty deals between Payless Shoes and

22 third parties and **royalty deals between third parties.** *Id.* *12.  In this respect, the court in *Adidas*

23 *America* considered other licensing deals, deals between third parties, in determining whether or

24 not the reasonable royalty calculation was appropriate because these other licensing deals provided

25 the requisite reasonable certainty.

26    In *QS Wholesale, Inc. v. World Marketing, Inc.*, 2013 WL 1953719 (C.D. Cal 2013), the

27 plaintiff Quicksilver owned a registered trademark for VSTR and used it in connection with men's

28 clothing while the defendant WMI had a pre-existing trademark for VISITOR also for men's

89
FINAL ARBITRATION AWARD – PHASE 1 AND PHASE 2

Case 22-17842-PDR Doc 522-8 Filed 12/14/22 Page 105 of 111

DocuSign Envelope ID: 8FDD03B5-74B9-4FEE-8EE9-KFC6772570
Case 5:20-cv-01464-DSF-SHK Document 126-2 Filed 09/23/22 Page 90 of 177 Page ID
#:5477

1 apparel. Quicksilver planned to use the mark VISITOR to sell clothing in a marketing campaign
2 based on the surfer Kelly Slater, but then discovered the existence of the defendant's mark which
3 put a crimp in their marketing plans. Quicksilver reached out to WMI and tried to purchase the
4 mark during elaborate negotiations, but the parties could not close a deal. Although the parties had
5 discussions about the purchase of the mark, discussions that did not lead to a deal, the parties never
6 had discussions about a license of the mark. As Quicksilver moved forward with its plans to
7 market the surf ware under the mark VSTR, VMI sent a cease and desist letter and Quicksilver, as
8 the plaintiff, filed a claim for declaratory relief seeking to establish non-infringement. WMI
9 counterclaimed for trademark infringement. Quicksilver's line of clothing under the mark VSTR
10 was not successful, yielding no profits and, based on this undisputed fact, Quicksilver filed a
11 motion for partial summary judgment on the grounds that there were no damages for WMI to
12 recover because there were no profits subject to disgorgement. In response, WMI argued that
13 although it might be barred from recovering various categories of damages, it was not barred from
14 recovering a reasonable royalty.

15     In *QS Wholesale*, in a decision authored by Judge Carter of the Central District of
16 California, the court agreed with WMI. Judge Carter ruled that even though there was no history of
17 a prior licensing agreement between Quicksilver and WMI and even though WMI did not have a
18 past practice of licensing its mark to third parties, a hypothetical negotiation designed to determine
19 a reasonable royalty would still be permissible because WMI's expert was able to conduct an
20 analysis based on (i) the licensing agreements between similarly situated third parties; and (ii) the
21 past negotiations between the parties regarding a possible purchase of the trademark which,
22 according to WMI's expert, was analogous to the negotiation of a long term trademark licensing
23 agreement (even though no deal was actually ever reached). This type of data was sufficient to
24 provide a basis for the expert to determine a reasonable royalty with the requisite reasonable
25 certainty, although Judge Carter characterized it as a "close question." *Id.* *3 - *4. In reaching this
26 conclusion, Judge Carter found the requisite certainty and relied on *Adidas America* where the
27 court upheld a jury's reasonable royalty award based, in part, on royalty agreements with third
28 parties, even though the plaintiff did not have a previous licensing history with the defendant and

90

FINAL ARBITRATION AWARD – PHASE 1 AND PHASE 2

1 even though plaintiff conceded that it would not have licensed the mark to Payless Shoes under any
2 circumstances. *Id.* \*4. Judge Carter also indicated that it was important to his analysis that the
3 "proposed royalty rates track similar licensing agreements in the clothing industry deals examined
4 by WMI's expert." *Id.* \*5. *See also Monster Energy Company v Integrated Supply Network, LLC,*
5 2018 WL 3361062 (C.D. Cal. 2018) [Judge Marshall rules that a reasonable royalty calculation
6 based on a hypothetical negotiation is not precluded as a matter of law just because there is no prior
7 negotiations between the parties.]

8      Interestingly, in *Lodestar*, where the reasonable royalty analysis was disallowed, Judge
9 Snyder make a point of citing Judge Carter's decision in *QS Wholesale* and she quoted a particular
10 passage that made it clear that the reasonable royalty analysis is a form of calculating damages for
11 *lost profits*, an element of damages specifically authorized by 15 U.S.C. 1117(a). In her decision in
12 *Lodestar*, Judge Snyder stated as follows in quoting the passage from Judge Carter: "Reasonable
13 royalties 'are **a form of damages for lost profits**, since they focus on the licensing fees that were
14 never paid by an infringer using a party's mark, and like other modes of calculating lost profits,
15 they need to be proved with 'reasonable certainty." *Lodestar*, at \*13. (Emphasis added.)

16      If the reasonable royalty analysis under trademark infringement law is a species of lost
17 profits, it is instructive to look to the law of lost profits under California law. Does California law
18 allow a plaintiff to present a damages model based on comparable deals from other businesses?
19 The answer to this question is "yes". In *Kid's Universe v. In2Labs*, 95 Cal.App.4th 870 (2002), a
20 case cited with approval in numerous other case decisions, the court held that:

21      When the operation of an unestablished business is prevented, as here, **prospective profits**
22      **may be shown in various ways**. The Restatement Second of Contracts, section 352,
23      comment b, at page 146 provides, "[I]f the business is a new one or if it is a speculative one
24      ..., damages may be established with reasonable certainty with the aid of **expert testimony,**
25      **economic and financial data, market surveys and analyses, business records of similar**
26      **enterprises**, and the like." Similarly, the Restatement Second of Torts, section 912,
27      comment d at page 483 states, "When the tortfeasor has prevented the beginning of a new
28      business ... all factors relevant to the likelihood of the success or lack of success of the

1   business or transaction that are reasonably provable are to be considered, including general

2   business conditions and **the degree of success of similar enterprises**."

3   Our Courts of Appeal have held, consistent with the Restatement Second of Torts, that **the**

4   **experience of similar businesses is one way to prove prospective profits**. (*Resort Video,*

5   *Ltd. v. Laser Video, Inc., supra,* 35 Cal.App.4th at p. 1699 [plaintiff did not introduce any

6   evidence of "operating histories of **comparable businesses**"]; *Berge v. International*

7   *Harvester Co., supra,* 142 Cal.App.3d at p. 163 **[a plaintiff can rely on "data from other**

8   **enterprises" operating under "similar conditions"**]; *Gerwin v. Southeastern Cal. Assn. of*

9   *Seventh Day Adventists, supra,* 14 Cal.App.3d at p. 222 [plaintiff did not introduce evidence

10   of "operating history of **comparable businesses** in the locality"]

11   *Kid's Universe*, at 884 – 885.

12   (Emphasis added.)

13   Thus, according to the law of lost profits in California, and given that the award of a reasonable

14   royalty is a form of lost profits according to Judge Snyder of the Central District of California,

15   when a party is seeking to recover damages for lost profits, it is appropriate to look to the financial

16   transactions of *other similar business* in order to build a *non-speculative* damages model, so long as

17   the other deals upon which the damages model are based are appropriate comparables.

18   In this respect, as *Sands, Adidas America, QS* and Judge Snyder's quotation of Judge

19   Carter's rationale all suggest, a reasonable royalty calculation **based on other comparable deals**

20   **in the beverage industry can indeed be a non-speculative methodology to determine a**

21   **reasonable royalty so long as the "comparables" are, in fact, appropriate deals on which to**

22   **determine the royalty rate**. Here, in this arbitration, both Plumpe and Voth essentially concede

23   this fact because both of them present a reasonable royalty calculation based on other deals in the

24   beverage industry, and both of them analyze the Georgia-Pacific factors in arriving at a reasonable

25   royalty calculation. Although the two damages experts reach very different conclusions in terms of

26   the amount of the reasonable royalty which should be paid by VPX to Orange Bang / Monster in

27   this case, they both agree that a reasonable royalty is an appropriate methodology to measure

28

92
FINAL ARBITRATION AWARD – PHASE 1 AND PHASE 2

1  damages for both the breach of contract claim and the trademark infringement claim (see
2  discussion and cites below).

3        Accordingly, and although the resolution of this particular issue is a "close question", to
4  quote Judge Carter, even the cases which ruled that the reasonable royalty calculation was too
5  speculative still acknowledged the rule that typically a reasonable royalty calculation does indeed
6  provide the requisite non-speculative "reasonable certainty" in instances where there is a prior
7  licensing relationship between the parties or where the parties had entered into an existing license
8  and the licensee holds over or somehow exceeds the scope of the license.

9        As a practical matter, both of those purported requirements are arguably present in this case.
10  Although the 2010 Settlement Agreement is a co-existence agreement between Orange Bang and
11  VPX, and not a licensing agreement because it does not transfer rights or provide for quality
12  control procedures, it is still the grant of consent or permission to VPX to make use of the BANG
13  mark in certain circumstances, on a royalty free basis, and an agreement not to sue VPX for
14  trademark infringement so long as VPX stayed in its "lane", which it did not do.  Although it is true
15  the 2010 Settlement Agreement makes no mention of a royalty rate, and therefore is unhelpful in
16  fixing a reasonable royalty rate based on a pre-negotiated number as between Orange Bang and
17  VPX, it is still a correct statement to point out that these parties did, in fact, have a pre-existing
18  negotiation history about the zones of use in which the two of them would co-exist.  This pre-
19  existing negotiation history demonstrates that Orange Bang was indeed willing to *allow* VPX to use
20  the BANG mark, so long as VPX stayed in its lane (and Orange Bang stayed out of VPX's
21  nutritional supplement lane), and VPX was willing to accept the limited zone of use so long as it
22  could do so on a royalty-free basis and thereby avoid a trademark infringement claim.

23        At a minimum, the 2010 Settlement Agreement demonstrates that the parties were indeed
24  capable of making a deal.  If they were able to make a deal where VPX had to remain in its narrow
25  lane in exchange for the benefit of having to pay no royalty, then it follows that if VPX had asked
26  for a broad grant of rights, in perpetuity, in exchange for the payment of some royalty, Orange
27  Bang would have agreed and the parties would have been able to close a deal.  They closed a deal
28  before.  Their prior agreement, the 2010 Settlement Agreement, shows the parties are capable of

93

Case 22-17842-PDR    Doc 522-8    Filed 12/14/22    Page 109 of 111

DocuSign Envelope ID: 8FDDD3B5-74B9-4F55-8E89-1KFC67225F17
Case 5:20-cv-01464-DSF-SHK   Document 126-2   Filed 09/23/22   Page 94 of 177   Page ID
#:5481

1  making a deal. Again, the 2010 Settlement Agreement makes no mention of a royalty rate, but the
2  price for the licensing fee, the reasonable royalty rate for a broader grant of rights, although not
3  agreed to by virtue of direct negotiations between Orange Bang and VPX, can be easily established
4  by analyzing the comparable licensing deals entered into by third parties in the beverage industry
5  which, at the same time, helps inform a hypothetical negotiation which is permitted by making use
6  of the Georgia-Pacific factors. As discussed below, both Plumpe and Voth analyzed these
7  comparables in order to establish a reasonable royalty.

8        Therefore, the arbitrator hereby concludes that comparable deals in the beverage industry
9  (discussed in detail below) do provide a reliable basis on which to determine a reasonable royalty
10  with the requisite reasonable certainty for the purposes of a trademark infringement claim.

11        **(7)   The Calculation of the Royalty Base for the Trademark Infringement**

12        As mentioned above, the calculation of the royalty base for the trademark infringement
13  claim is similar to the calculation of the royalty base for the breach of contract claim, but there are
14  some conceptual differences. For example, the calculation of the royalty base for the trademark
15  infringement claim is based entirely on the hypothetical negotiation between Orange Bang and
16  VPX and therefore the contours of paragraph 7, the carve-out of net sales within the Nutritional
17  Channel which did comply with the VPX Marketing and Sales Restrictions, would not come into
18  play because the parties are striking a brand new deal, with a much broader grant of rights, so as to
19  allow VPX to make pervasive use of the BANG mark in perpetuity. Thus, there would not be a
20  deduction in the calculation of the royalty base as a result of net sales made within the Nutritional
21  Channel or a deduction for net sales of Bang Pre-Workout[25] because the new licensing agreement
22  between Orange Bang and VPX resulting from the hypothetical negotiation would be for a broad
23  license in favor of VPX seeking the all-inclusive and perpetual use of the BANG mark which it

24

25  _____
26  [25] Although it is true that paragraph 6 of the 2010 Settlement Agreement effectuated a release with
    respect to the Bang Pre-Workout product which, at first blush, would require the net sales of Bang
    Pre-Workout to be deducted in order to calculate the royalty base for the trademark infringement
27  claim, that limited release should not be given effect because, once again, in the hypothetical
    negotiation between Orange Bang and VPX, they would be making a fresh deal, a comprehensive
28  deal. Therefore, the Bang Pre-Workout net sales are included in the royalty base for the purposes
    of calculating the reasonable royalty damages for the trademark infringement claim.

94

FINAL ARBITRATION AWARD – PHASE 1 AND PHASE 2

1  needed, and continues to need, in order to support VPX's ubiquitous marketing and sales activities

2  relating to BANG Energy RTD, sales which accelerated dramatically in the 2018 – 2021 time

3  period. At the same time, because the trademark infringement claim would be limited to the

4  territorial boundaries of the United States, international net sales should be excluded and should not

5  be a part of the royalty base for the purposes of a trademark infringement claim. Likewise, as set

6  forth above, net sales of Bang Mixx must likewise be deducted out from the amount of the royalty

7  base for the reasons set forth in Section III, P. below.

8      Thus, the calculation of the royalty base for the purposes of the trademark infringement

9  claim is as follows:

| | |
|---|---|
| 10  Net Sales – Total, (Voth – Plumpe midpoint) | \$ 2,264,000,000 |
| 11  Deduction for International Net Sales | \$    $(13,210,185)^{26}$ |
| 12  Deduction for BANG MIXX | \$      $(4,500,000)^{27}$ |
| 13  Royalty Base for TM Infringement | **\$ 2,246,289,815** |

14      **(8)   The Georgia-Pacific Factors**

15      With respect to the 15 Georgia-Pacific factors relating to a hypothetical negotiation between

16  Orange Bang and VPX, the arbitrator hereby finds as follows:

17      With respect to the first factor, the royalty rates received by Orange Bang from prior

18  licenses of the BANG mark, it is undisputed that there are no such prior licenses and certainly no

19  prior licenses that earned Orange Bang any licensing revenues. Having said that, the 2010

20  Settlement Agreement is nevertheless an agreement between Orange Bang and VPX pursuant to

21  which Orange Bang allowed VPX to make use of the BANG mark, on a royalty-free basis, so long

22  as VPX complied with paragraphs 7 A – 7 D, a requirement which VPX breached.

23      With respect to the second factor, the royalty rates actually paid by VPX to license

24  trademarks, no evidence was presented that VPX ever paid any third party any "running royalty"

25  (i.e., a continuing, on-going royalty tied to net sales) or a lump sum license fee or any other fee to

26  license a trademark. Nor did VPX ever pay Orange Bang any running royalty or a lump sum

27

28  [26] *See* Exhibit 5418, Schedule 3.1 (amended).
[27] *See* Exhibit 2922, p. 7.

FINAL ARBITRATION AWARD – PHASE 1 AND PHASE 2

1  license fee or any other fee to license a trademark. But again, the 2010 Settlement Agreement is an
2  agreement between Orange Bang and VPX pursuant to which Orange Bang allowed VPX to make
3  use of the BANG mark, on a royalty-free basis, so long as VPX complied with paragraphs 7 A – 7
4  D, a requirement which VPX breached.

5       With respect to third and seventh factors, the nature and scope of the license and the
6  duration and terms of the license, VPX would need to bargain for a very broad grant of rights
7  which would enable VPX to make use of the BANG mark in a pervasive and all-encompassing
8  way. VPX would need to be unencumbered by the "creatine-based" requirement of paragraph 7 A
9  – 7 C and VPX would also need to be relieved of the VPX Marketing and Sales Restrictions of
10 paragraph 7 D. VPX would need to be able to make use of the BANG mark on BANG Energy RTD
11 (as well as other Bang branded products) and sell them in any type of retail outlet and in any
12 location within a store and not be limited to the Nutritional Channel for the purpose of making
13 sales as well as for the purposes of marketing. VPX would need the right to move forward with its
14 massive social marketing campaign on the internet and at events which make use of the BANG
15 mark and which helped stimulate the massive growth and profit of VPX, which VPX would not be
16 allowed to move forward with because of the VPX Marketing and Sales Restrictions of paragraph 7
17 D. VPX would need to acquire the right to rebrand its entire company as Bang Energy. Thus,
18 VPX would need an extremely broad grant of rights resulting from the hypothetical negotiation and
19 VPX would need a grant of rights unencumbered as to time, i.e., it would need to be a perpetual
20 license. VPX would also need the grant of an exclusive license, exclusive as to the rest of the
21 world, but not exclusive as to Orange Bang. In other words, Orange Bang would still be entitled to
22 make use of its own BANG mark, but VPX would need to negotiate a strong license which would
23 prevent any other third party from making use of the BANG mark in any other way. In addition,
24 because VPX has had success in selling VPX products in international territories, VPX would need
25 to negotiate a license agreement where VPX would have the right to trademark the BANG mark in
26 foreign territories and Orange Bang would have to give up its right to do so.

27      With respect to fourth factor, Orang Bang's licensing policies, it is undisputed that Orange
28 Bang was willing to enter into a co-existence agreement with VPX because it, in fact, did so.