1    Although the 2010 Settlement Agreement was not technically a licensing agreement, Orange Bang

2    did grant certain permissions to VPX and Orange Bang did give up its right to sue for trademark

3    infringement in exchange for VPX's promise to honor paragraphs 7 A – 7 D, a promise which VPX

4    breached.  In addition, based on the testimony elicited from Orange Bang during the arbitration,

5    Orange Bang has had a long history of enforcing its trademark rights by sending cease and desist

6    letters and even commencing litigation at times to protect the integrity of the BANG mark.

7           With respect to the fifth factor, the commercial relationship between Orange Bang and

8    VPX, and as explained above with respect to the fifth *Sleekcraft* factor, although Orange Bang and

9    VPX, to some degree, target different types of consumers, Orange Bang and VPX are still

10    competitors (and arguably side-by-side competitors) to the extent that they both sell their beverage

11    products in an overlapping sales channel.  As stated above, Orange Bang sells its Orange Bang

12    fountain drink at convenience stores and gas stations while, at the same time, 94% of VPX's

13    massive sales are sales of BANG Energy RTD and 80% of those sales take place in convenience

14    stores.

15           With respect to sixth, eighth, ninth, tenth and eleventh factors, the special value of the

16    BANG mark to VPX, the profitability of the VPX products which make use of the BANG mark,

17    the advantages to VPX of the BANG Mark over prior marks like Redline, the benefits to VPX for

18    using the BANG mark and the extent to which VPX has used the BANG mark, these closely-

19    related factors are of huge importance, especially if the Book of Wisdom, the right to make use of

20    20/20 hindsight as part of the hypothetical negotiation of the royalty rate, is factored into the

21    analysis, and these factors demonstrate precisely why VPX has little leverage in the hypothetical

22    negotiation and why it really has no choice but to close a deal with Orange Bang, even if the

23    licensing deal and the royalty rate are less than ideal from VPX's point of view.  The reason for this

24    is because of how significantly VPX has invested in the BANG mark.  VPX has spent hundreds of

25    millions of dollars promoting the BANG mark (sunk costs), implementing a highly effective but

26    expensive social marketing campaign which is centered around the BANG mark and has rebranded

27    its entire company as "Bang Energy".  Its web presence is now based on the BANG mark, its

28    domain name is based on the BANG mark and J. Owoc is now known as the BANG CEO, as his

Case 22-17842-PDR   Doc 523-1   Filed 12/14/22   Page 2 of 81

DocuSign Envelope ID: 2FDDD3B67AEB84A5E8E80-1KFC67225TD
Case 5:20-cv-01464-DSF-SHK   Document 126-2   Filed 09/23/22   Page 98 of 177   Page ID
#:5485

1 Instagram handle now demonstrates. And consumers of BANG Energy RTD are affectionately
2 known as "Bangsters". VPX may argue that Orange Bang should have spoken up between 2010
3 and 2019 and, had Orange Bang done so, it would have promoted a different tradename, a
4 trademark other than the BANG mark. However, as demonstrated above, Orange Bang did not
5 speak up during the 2010 to 2019 time period because, as it understood the facts, the products
6 released by VPX during that time period, including BANG Energy RTD, were indeed "creatine-
7 based" products as VPX told the world with its marketing and sales campaigns and, therefore,
8 according to VPX, their products did not violate the 2010 Settlement Agreement or the VPX
9 Marketing and Sales Restrictions. As it turned out, and unbeknownst to Orange Bang at the time,
10 these products released by VPX during this nine year time period of time, including BANG Energy
11 RTD, were not, and are not, "creatine-based" as explained above. Moreover, the products released
12 by VPX which are branded with the BANG mark, especially BANG Energy RTD, have been, and
13 still are, wildly successful. The amount of net sales enjoyed by VPX has been impressive, highly
14 profitable and trending upwards. In short, VPX is highly dependent on having the right to make
15 use of the BANG mark. In many ways it has no choice but to close a deal with Orange Bang as a
16 part of the hypothetical negotiation. Orange Bang, not VPX, has the leverage and the bargaining
17 power in the hypothetical negotiation, especially if the Book of Wisdom is factored into the
18 hypothetical negotiation (see below).

19      With respect to seventh factor, the duration of the use of the BANG mark and the terms of
20 the license, VPX, because of its enormous financial investment in the BANG mark, needs a
21 perpetual grant of rights unlimited by time or territory. This likewise confers much bargaining
22 power on to Orange Bang in the hypothetical negotiation. VPX needs to make this deal, especially
23 given the $117 million in past marketing costs, sunk costs spent promoting the BANG mark, which
24 it cannot recapture. As to the further terms of the license, see the paragraph above as to sixth,
25 eighth, ninth, tenth and eleventh factors.

26      With respect to the twelfth and fourteenth factors, customary royalties within the beverage
27 industry, both Plumpe and Voth have performed in-depth analyses of these comparables in order to

28

1  determine a reasonable royalty rate. These comparables, and the opinions of these qualified
2  experts, are discussed in detail in the next section below.

3      With respect to the thirteenth factor, the apportionment calculation, the allocable portion of
4  profits earned by the sale of VPX product which are attributable to the use of the BANG mark as
5  opposed to "other factors", the arbitrator believes that this thirteenth factor, although very
6  important to the disgorgement of profits analysis discussed below, is of minimal importance in a
7  hypothetical negotiation to establish a reasonable royalty rate because, as demonstrated below in
8  the Fox-Owoc mock dialogues which are illustrative of the hypothetical negotiation (one without
9  and one with the Book of Wisdom), participants negotiating a "real-world" licensing deal will not,
10 as a practical matter, address the apportionment of profits analysis during their discussions. Rather,
11 the parties certainly would push back on each other as to what the royalty rate should be, and the
12 licensor would undoubtedly insist on a higher rate while the licensee would hold strong for a lower
13 rate. However, the arbitrator believes that the hypothetical negotiation would turn on what is a fair
14 royalty rate in the industry, based on other comparable deals and, more importantly, which party
15 has the true leverage in the hypothetical negotiation. The apportionment of profits analysis does
16 indeed arise in trademark (and copyright) infringement litigation, but it is doubtful that it is a real
17 topic of discussion between principals or attorneys negotiating a licensing agreement. Rather,
18 topics like price, term, scope, use of the mark and quality control are the more basic provisions to
19 be addressed during the hypothetical negotiation.

20     In addressing the apportionment factor, Voth cites to the InfoScout research report, Exhibit
21 5091, to suggest that BANG Energy RTD's profits are not attributable to the BANG mark but
22 instead are attributable to other factors. *See* Exhibit 5382, p. 82, paragraph 172. However, the
23 InfoScout research report is a thoroughly unconvincing document because it surveyed the wrong
24 relevant market, mostly women, when most of the purchasers of the BANG Energy RTD are men,
25 and surveyed the wrong market venues, conducting the interviews at supermarkets while most of
26 the purchases of BANG Energy RTD [80% of them] take place at convenience stores. Voth's
27 reliance on InfoScout is unconvincing.

28

Case 22-17842-PDR    Doc 523-1    Filed 12/14/22    Page 4 of 81

DocuSign Envelope ID: 91DDD361-25D8-4DEE-8F59-A1FE672757D5
Case 5:20-cv-01464-DSF-SHK    Document 126-2    Filed 09/23/22    Page 100 of 177    Page ID #:5487

1    With respect to fifteenth factor, the final step in reaching the reasonable royalty rate based
2  on the hypothetical negotiation, see below.

3    **(9)    The Twelfth and Fourteenth Factors – Comparable Licensing Agreements**
4    **in the Beverage Industry and the Opinions of Plumpe and Voth**

5    Both Plumpe and Voth analyzed licensing agreements entered into between third parties in
6  the beverage industry in order to determine a range of reasonable royalty rates.

7    Plumpe analyzed a 2004 license agreement by which Masterfoods, the owner of trademarks
8  in Milky Way, Starbursts and 3 Musketeers, undeniably famous marks, licensed to Bravo Foods the
9  right to make use of these trademarks on milk flavored products.  The grant of rights was on a non-
10  exclusive basis, which would normally reduce the amount of the royalty paid, but still the royalty
11  rate started at a low of 5% and increased to as high of 7%.  The royalty base was tied to net sales.
12  In addition, the licensor negotiated a minimum guarantee ($375,000 year 1, $1 million year 2 and
13  $1.5 million year 3) that the licensee had to pay, even if the net sales were insufficient to earn out
14  the minimum guarantee.  *See* Exhibit J-153, p. 93, Tab 8.  Although the Milky Way, Starbursts and
15  3 Musketeers trademarks are more well-known than Orange Bang's BANG mark, this other
16  licensing deal in the beverage industry is an appropriate comparable especially given the fact that
17  VPX would have been seeking pervasive use of the BANG mark in the hypothetical negotiation as
18  compared to the far more limited use, a milk product only, contemplated by this comparable deal.

19    Plumpe also analyzed a 2003 license agreement by which MD Enterprises, the owner of the
20  trademark in MoonPie, a somewhat well-known brand, but far less well-known than Milky Way,
21  Starbursts and 3 Musketeers, licensed to Bravo Foods the right to make use of the MoonPie
22  trademark also on a milk flavored product.  The grant of rights was on an exclusive basis, exclusive
23  insofar as the product and the Territory (the United States) were concerned.  Although a grant of an
24  exclusive license would normally increase the royalty rate paid by the licensee, in this instance it is
25  hard to envision that there were other companies out there vying for the right to sell milk products
26  based on the MoonPie scooter pie.  Nevertheless, the licensee negotiated a more modest royalty
27  rate (more modest than the Milky Way deal referred to above) that started at a low of 2% and
28  increased to a high of 3%.  The royalty base was tied to a percentage of the wholesale price of the

100
FINAL ARBITRATION AWARD – PHASE 1 AND PHASE 2

1    product, with some pre-negotiated deductions. In addition, the licensee was able to conclude this
2    licensing deal without the requirement of having to pay any minimum guarantee at all. *See* Exhibit
3    J-153, p. 93, Tab 8. Although the MoonPie brand is slightly more well-known than Orange Bang's
4    BANG mark, this other licensing deal in the beverage industry is likewise an appropriate
5    comparable especially given the fact that VPX would have been seeking pervasive use of the
6    BANG mark in the hypothetical negotiation as compared to the far more limited use, a milk
7    product, only contemplated by this comparable deal.

8        Plumpe also analyzed a 2003 license agreement by which Tanning Research Laboratories,
9    the owner of the trademark in Hawaiian Tropics sun products, likewise a relatively well-known
10   mark, licensed to American Water Star the right to make use of the Hawaiian Tropics trademark on
11   a flavored water product. The grant of rights was on an exclusive basis insofar as the product and
12   the Territory (the United States and Canada) was concerned. The license agreement called for a
13   royalty rate of 4%. The royalty base was tied to invoice sales (net of shipping and sales taxes). In
14   addition, the licensor negotiated a modest minimum guarantee that the licensee had to pay, even if
15   the sales were insufficient to earn out the minimum guarantee. *See* Exhibit J-153, p. 93, Tab 8.
16   Although the Hawaiian Tropics trademark is also somewhat more well-known than Orange Bang's
17   BANG mark, this other licensing deal in the beverage industry is likewise an appropriate
18   comparable especially given the fact that VPX would have been seeking pervasive use of the
19   BANG mark in the hypothetical negotiation as compared to the far more limited use, a water
20   flavored product only, contemplated by this comparable deal.

21       Plumpe likewise concluded that these other licensing agreements were appropriate
22   comparables as contemplated by the twelfth factor of the Georgia-Pacific factors and, based on the
23   royalty range of 2% to 7%, determined the mid-point of this range, 4.5%, and concluded that a
24   reasonable royalty rate for the Orange Bang – VPX hypothetical negotiation is 4.5%, although
25   Monster and Orange Bang argue for the upper range, as high as 7%, in their post-arbitration closing
26   brief. Even Voth, according to Orange Bang and Monster, calculated the midpoint of a reasonable
27   royalty at 4%, yielding a royalty payment of $81.2 million to $90.4 million payable to Orange
28   Bang, depending upon the royalty base and assuming Voth's 4% midpoint. *See* Voth Testimony,

Case 22-17842-PDR Doc 523-1 Filed 12/14/22 Page 6 of 81

DocuSign Envelope ID: 91DDD3E5-2E08-4DEE-8E59-1F6E67725AF8 Case 5:20-cv-01464-DSF-SHK Document 126-2 Filed 09/23/22 Page 102 of 177 Page ID #:5489

1  AHT, p. 3932:14 – 3934:1. However, this calculation is based on his supposed midpoint of 4% and
2  without regard to Voth's cap. Voth's ultimate opinion is that a reasonable royalty is 1%, capped at
3  $2.3 million which is his calculation of the aggregate value of Orange Bang's BANG mark as of
4  2010.

5      In reaching his conclusions, Plumpe excluded the "Throwdown" licensing agreement as an
6  appropriate comparable because there was an equity purchase component to that deal.[28] In the
7  "Throwdown" licensing agreement, Throwdown Industries, the owner of the trademark in
8  Throwdown, a pre-existing sports performance drink with a historical track record of sales,
9  licensed to Dethrone Royalty the right to make use of the Throwdown trademark on non- alcoholic,
10 sports performance drinks. The grant of rights was on an exclusive basis, which would normally
11 increase the amount of the royalty paid, and as part of this deal the licensee not only agreed to pay a
12 royalty rate of 10%, the licensee also agreed to pay the licensor over 5 million shares of stock in the
13 licensee, further agreed to spend at least 10% of net revenues on marketing and also agreed to pay a
14 relatively modest minimum guarantee. The royalty base was tied to net sales. *See* Exhibit J-153, p.
15 93, Tab 8. Although the Throwdown licensing agreement was not a standard licensing deal
16 because of the equity payment component and the minimum marketing spend requirement and,
17 therefore, not an ideal comparable, it is nevertheless instructive to demonstrate where the
18 Throwdown licensing agreement would fall within Plumpe's reasonable royalty range if it was
19 included in the analysis. Obviously, the inclusion of the Throwdown licensing agreement would
20 have increased Plumpe's midpoint calculation. However, in order to err on the side of being
21 conservative Plumpe testified, he did not include the Throwdown licensing agreement in the
22 analysis.

23     After analyzing these comparables in the beverage industry, and in an attempt to
24 corroborate his findings, Plumpe consulted a reference guide, the 2018 Edition of Licensing
25 Royalty Rates by Battersby and Grimes, which likewise surveyed various industries to determine
26 the range of royalty rates for trademark licensing agreements entered into between willing licensors

27

28
[28] *See* Plumpe Testimony, AHT, p. 2893:6–9.

1  and willing licensees which verified the following royalties in the beverage industry: soft drinks

2  3% to 7%, sports drinks 5% and fruit drinks 3% - 7%, all of which yield an average reasonable

3  royalty rate of 5%. *See* Exhibit J-153, p. 40, n 160–161.

4      Voth also conducted an analysis of these same third party licensing deals, plus others, and

5  challenged Plumpe's conclusions, by asserting various contrary opinions. For example, with

6  respect to the Musketeers, Starbursts and Milky Way brands, Voth contends that these marks are

7  far more well-known than Orange Bang's BANG mark (household names according to Voth), they

8  have been around for many years (Milky Way since 1923, 3 Musketeers since 1932 and Starbursts

9  since 1967), are the subject of national advertising campaigns and they generate sizeable sales as

10  compared to Orange Bang. *See* Exhibit 5382, p. 61 – 63. Similarly, with respect to the MoonPie

11  brand, Voth again contends that MoonPie is more well-known than Orange Bang's BANG mark,

12  has been around since the 1950s, had higher sales, a higher rate of growth and a more effective

13  advertising campaign. *See* Exhibit 5382, p. 60 – 61. Likewise, with respect to the Hawaiian

14  Tropics brand, the licensing agreement involved a more well-known brand, with national and more

15  effective advertising and far more significant sales than Orange Bang.

16      All of these factors as pointed out by Voth are valid and correct and, as he argues, should

17  justify a reduction in the royalty rate in his view. However, the scope of these licenses granted by

18  the licensors, for the use in a single milk product or, for flavored water beverages, or for sports

19  drinks in the case of the Throwdown brand, are far different and far more limited than the

20  ubiquitous and perpetual use of the BANG mark for which VPX would have to bargain in the

21  hypothetical negotiation with Orange Bang. Therefore, the third-party licenses analyzed by

22  Plumpe referred to above, and their range of reasonable royalty rates, are deemed to be appropriate

23  comparables for the purposes of the twelfth factor of the Georgia-Pacific factors.[29]

24

25  [29] Voth also referred to other licensing agreements in the beverage industry. However, Plumpe

26  excluded these licensing agreements from his analysis because: (1) The Diabetes Research
Institute trademark licensing agreement (with a royalty rate of .25%) was not so much a license to

27  use a mark as a brand, but rather the right to place a logo on the packaging of the product to
indicate that the beverage had the approval of the Diabetes Research Institute, much like a good-

28  housekeeping seal of approval. (2) The Hooters trademark licensing agreement (with a royalty rate
(Continued...)

Case 22-17842-PDR   Doc 523-1   Filed 12/14/22   Page 8 of 81

DocuSign Envelope ID: 91DD39E-17E06-4EE8-8F38-1F667725F6 Case 5:20-cv-01464-DSF-SHK   Document 126-2   Filed 09/23/22   Page 104 of 177   Page ID #:5491

1    Perhaps the most significant reason for discounting the opinion of Voth, however, is Voth's

2 attempt to cap the amount payable as a reasonable royalty at $2.3 million, the purported value of

3 Orange Bang's BANG mark (according to Voth) as of 2010. Or, to put it another way, Voth offers

4 the opinion that the payment of the lump sum amount would fully compensate Orange Bang for the

5 past damages that Orange Bang suffered for not receiving the income stream for VPX's pervasive

6 use of the BANG mark between 2010 and the present date. But what is the basis or justification for

7 a cap on a running royalty? There is none. The cap does not take into consideration the unjust

8 benefit derived by VPX. Rather, the cap is nothing more than a post-litigation contrivance

9 designed to create an argument to reduce the reasonable royalty damages calculation by an amount

10 in excess of $100 million. As Voth himself admitted in response to questions on direct-

11 examination by VPX's counsel, it is **not** common **in the real world** for a trademark licensing

12 agreement to have a lump sum payment as a cap, but rather, a lump sum payment as a cap is a way

13 to resolve a dispute in litigation so that parties who do not want to have anything to do with each

14 other may go their separate ways. *See* Voth Testimony, AHT, p. 3848:14 - 3849:2. Voth further

15 admitted on cross-examination that none of the seven agreements he considered as comparables for

16 the reasonable royalty analysis contained a royalty cap. *See* Voth Testimony, AHT, p. 3903:24 –

17 3904:6. Voth also conceded on cross-examination that he cannot recall any trademark litigation

18 case where the reasonable royalty was capped or where he offered an opinion that the royalty

19 damages should be capped at the value (the purported value) of the trademark at issue. *See* Voth

20 Testimony, AHT, p. 3906:19 – 3907:3 and 3907:22 – 3908:9. Finally, in response to a line of

21

22
of 6%) was for the license of alcoholic beverages and 99% of VPX sales have been for non-
23 alcoholic beverages. (3) The il Classico trademark licensing agreement (with a royalty rate of 2%)
was for the license of coffee beans and coffee grounds, not beverages. (4) The Marley trademark
24 licensing agreement (with a royalty rate of 3%) was for the license of coffee beans, mugs and
related merchandise, not beverages. *See* Plumpe Testimony, AHT, p. 2874 – 2900. As Plumpe
25 also testified, however, if these other additional licensing agreements, other than the seal of
approval deal of the Diabetes Research Institute, were treated as comparables and were included in
26 his analysis, the range of royalty rates would not change and would still result in a mid-point of
4.5% and the inclusion of these other deals would not change his opinion. *See* Plumpe Testimony,
27 AHT, p. 2899:19 – 2900:6. Voth likewise agrees with this opinion. *See* Voth Testimony, AHT, p.
3912:15 – 3913:2. Voth also looked at additional deals, but they were not trademark licensing
28 agreements. Rather, they were acquisition agreements where one of the assets acquired was a
trademark. *See* Voth Testimony, AHT, p. 3898:14-20.

Case 22-17842-PDR   Doc 523-1   Filed 12/14/22   Page 9 of 81

DocuSign Envelope ID: A1DD3861-28D8-4D5F-8E5B-41F66272512C
Case 3:20-cv-01464-DSF-SHK   Document 126-2   Filed 09/23/22   Page 105 of 177   Page ID
#:5492

1 | questioning by the arbitrator, Voth explained that the imposition of a cap as a lump sum payment is

2 | really a form of a buy-out transaction, a fully paid-up licensing transaction by which Orange Bang

3 | would receive only \$2.3 million to recompense it for the unjust enrichment earned by VPX in

4 | failing to honor the VPX Marketing and Sales Restrictions as set forth in the 2010 Settlement

5 | Agreement *and* for infringing Orange Bang's BANG mark in a pervasive way. And, on top of that,

6 | according to Voth, VPX, having fully paid its \$2.3 million licensing fee / buyout price, would be

7 | entitled to make use of Orange Bang's BANG mark however it wanted to do so, with no

8 | restrictions at all, and forever, with no limitations as to time. *See* Voth Testimony, AHT, p. 3940:3

9 | – 3941:7. According to Voth, after payment of the \$2.3 million licensing fee / buyout price, VPX

10 | could use the BANG mark any way it wanted to, with impunity and in perpetuity.

11 | Such a result would undermine the policy objectives of the Lanham Act, the integrity of

12 | contracts and would not achieve an equitable result with respect to the facts of this case. Voth's

13 | \$2.3 million cap / lump-sum licensing fee / buy-out price is thoroughly unconvincing and is hereby

14 | rejected by the arbitrator.

15 | **(10) The Hypothetical Negotiation Between Fox and Owoc in 2009 - 2010,**

16 | **without the Book of Wisdom**

17 | Based on the above, the arbitrator envisions the hypothetical negotiation between Fox of

18 | Orange Bang and Owoc of VPX as of the time of the first infringement in 2009 - 2010, without the

19 | benefit of the Book of Wisdom[30], would have taken place (or would take place) in the following

20 | manner:

21 |

22 |

23 | [30] The Book of Wisdom is a legal convention that permits a court to consider events that transpired after the date of the hypothetical negotiation. The Book of Wisdom is a concept which emanates from the United States Supreme Court case of *Sinclair Refining Co. v. Jenkins Petroleum Process*

24 | *Co.,* 289 U.S. 689 (1933) where the Court permitted the use of 20-20 hindsight to help calculate the damages resulting from the breach of a contract to assign a patent. In order to address the problem

25 | of uncertain prophecies which may arise as part of the after-the-fact valuation for the lost use of intellectual property (in that case the use of a patentable invention), Justice Cordozo stated for the

26 | Court: " . . . [B]ut a different situation is presented if years have gone by before the evidence is offered [11 years in this case between August 11, 2010 and October 4, 2021, the first day of the

27 | arbitration hearing]. Experience is then available to correct the uncertain prophecy. Here is a book of wisdom that courts may not neglect. We find no rule of law that sets a clasp upon its pages, and

28 | forbids us to look within." Even VPX's expert Voth has, in other cases, relied on the Book of Wisdom to arrive at a reasonable royalty rate.

Case 22-17842-PDR Doc 523-1 Filed 12/14/22 Page 10 of 81

DocuSign Envelope ID: 31DDD381-25D9-4DEF-8E59-A1F0677257FE Case 5:20-cv-01464-DSF-SHK Document 126-2 Filed 09/23/22 Page 106 of 177 Page ID #:5493

| 1 | Owoc: | I got your lawsuit. I think your lawsuit is full of it, but we should work this out. |
|---|---|---|
| 2 | Fox: | I'm willing to work this out, but I've been using the BANG mark since the early |
| 3 | | 1970s and I've owned the trademark since the early 1980s. The BANG mark is vital |
| 4 | | to the success of my business. |
| 5 | Owoc: | My target-customers are very different from yours. I sell to athletes and workout |
| 6 | | enthusiasts. I sell out of nutritional and supplement stores like the Vitamin Shoppe |
| 7 | | and GNC. I don't sell out of restaurants and I don't currently sell out of |
| 8 | | convenience stores or gas stations, like you do. |
| 9 | Fox: | Are you willing to limit your use of my BANG mark to just the nutritional and |
| 10 | | dietary supplement category? |
| 11 | Owoc: | At first, I thought I was willing to limit my use to that narrow category. I thought I |
| 12 | | was willing to work out a deal with you where I stay in my lane and you stay in your |
| 13 | | lane, and work out a free deal, a deal for no payment, no license fee or no royalty |
| 14 | | payment, but now that I think about it, I want to go big with the use of the name |
| 15 | | BANG. I want very broad use. I have a vision, and I want to use the BANG mark |
| 16 | | in a very pervasive way. I do not want to be limited to nutritional stores or to the |
| 17 | | dietary and supplements sections of stores. I want to be able to sell my product |
| 18 | | anyway I choose, at convenience stores, at gas stations, at supermarkets, anywhere. |
| 19 | | And I need the right to use the name forever, no limitations on time. Are you |
| 20 | | willing to make a deal like that? |
| 21 | Fox: | I don't know. You are asking for a lot. All of my customers know me by the |
| 22 | | BANG mark and I think it will be confusing if there are two companies out called |
| 23 | | BANG, especially if we are both going to sell at the same place like convenience |
| 24 | | stores and gas stations. I'm open to a deal, but the royalty rate will need to be pretty |
| 25 | | high. I would need a 10% royalty, 10% of your BANG mark sales. |
| 26 | Owoc: | No way. 10% is way too high. Besides, my products are going to be very different |
| 27 | | from yours even if they are both sold in convenience stores. Your product has lots |
| 28 | | of sugar. I'm planning on products with no sugar at all. The most I'm willing to |

106
FINAL ARBITRATION AWARD – PHASE 1 AND PHASE 2

Case 22-17842-PDR   Doc 523-1   Filed 12/14/22   Page 11 of 81

DocuSign Envelope ID: 91DD39F5-35D8-4D5F-8F69-1F667725F5C1
Case 5:20-cv-01464-DSF-SHK   Document 126-2   Filed 09/23/22   Page 107 of 177   Page ID
#:5494

| 1 | | pay as a royalty is 1%. |
|---|---|---|
| 2 | Fox: | It's not worth it to me to give up my company name and identity for a 1% royalty. |
| 3 | | And what would 1% even pay me? What are your BANG sales as of now? |
| 4 | Owoc: | Our BANG sales as of now are about $155,000 per year.[31] |
| 5 | Fox: | So you are offering me $1,550 per year for the use of my corporate name? I cannot |
| 6 | | make a deal like that. Like I said, I'm only going to give up the exclusive use of my |
| 7 | | corporate name for a meaningful royalty. Even a 7.5% royalty is not worth it, that |
| 8 | | would only be $11,625 per year. Still not worth it for that amount. |
| 9 | Owoc: | I'm not offering you $1,550 per year. I'm not offering you $11,625 per year. What |
| 10 | | I am offering you is a percentage of my future BANG sales, a running royalty, a |
| 11 | | continuing royalty, a payment each year and every year. The amount of the |
| 12 | | payment would be tied to the amount of my BANG sales. I expect to sell millions |
| 13 | | of dollars of product. The BANG name is very catchy and I plan to make terrific |
| 14 | | products which young consumers will buy in droves. I expect your running royalty |
| 15 | | will be worth way more than those amounts in future years and in each year. |
| 16 | Fox: | Maybe so, Jack, but it's just not worth it to me. |
| 17 | Owoc: | I would be willing to go as high as 2.5%, but no more than that. |
| 18 | Fox: | Still not worth it to me at 2.5%. Based on your current sales, that would only get me |
| 19 | | a royalty of $3,875. I'm not going to give up the goodwill of my business I have |
| 20 | | sweated and toiled to earn for that small amount. |
| 21 | Owoc: | Well I can't go any higher than 2.5%, that's my final and best offer. If I went any |
| 22 | | higher than that and I hit it big, and I do plan to hit it big, then I would have to be |
| 23 | | paying you way too much. |
| 24 | Fox: | If we made a deal and you had to pay me "way too much", you would be the |
| 25 | | happiest person in the world. |
| 26 | Owoc: | What do you mean by that? |

---

28  [31] Voth concedes that VPX's sales of Bang Pre-Workout in 2010 were approximately $155,000.
*See* Exhibit 5418 (Voth Schedule 3.1); *see also* Voth Testimony, AHT, p. 3932:3-6.

FINAL ARBITRATION AWARD – PHASE 1 AND PHASE 2

| | | |
|---|---|---|
| 1 | Fox: | I mean, if you are paying me a big number as a continuing royalty, that would mean, |
| 2 | | by definition, that you are raking in the bucks, that you would be making a killing |
| 3 | | off of your products and my name. So what would you care if you paid me a lot of |
| 4 | | money for the use of my name in the future, it would only cost you a lot of money if |
| 5 | | you yourself were making a ton of money. So, like I said, if you are paying me big |
| 6 | | money, that means that you would be making even bigger money, and you would be |
| 7 | | the happiest person in the world. So I'm not willing to do it unless it's a fair royalty |
| 8 | | rate for the use of my name which you plan to use in a comprehensive fashion which |
| 9 | | will probably have the result of wiping my own company name off the face of the |
| 10 | | earth. |
| 11 | Owoc: | I understand your point that I'm only going to be paying you big money if I'm |
| 12 | | making even bigger money, but no way 7.5% is going to happen. That's too good |
| 13 | | of a deal for you. The most I will pay for a running royalty, tied to net sales, is 3%, |
| 14 | | not a penny more. |
| 15 | Fox: | Jack, if a fair deal happens, that's fine. If it doesn't happen, that's fine too. You |
| 16 | | want to use my trademark. You want to use my BANG name in a very unlimited |
| 17 | | fashion, forever, in perpetuity, with no time limit, with no limits as to class or |
| 18 | | category, in the same locations as me, both in the USA and internationally, and your |
| 19 | | use could wipe me off the map. My bottom line is 5%. |
| 20 | Owoc: | Still too high. But I will tell you what, if you will agree to go down to 4%, I will go |
| 21 | | up to 4%. Do we have a deal? |
| 22 | Fox: | Yes, I'm willing to close at a 4% running royalty, tied to net sales. But I need a |
| 23 | | minimum guarantee, a meaningful minimum guarantee. |
| 24 | Owoc: | No way, I'm not guaranteeing you nothing. And, since you brought it up, I want a |
| 25 | | cap on the amount I have to pay you. |
| 26 | Fox: | No, no cap. If you aren't going to go with a minimum guarantee, there shouldn't be |
| 27 | | any cap either. Whatever the 4% of net sales turns out to be, whether high or low, |
| 28 | | that's the number. So, do we have a deal at 4% of net sales, no minimum guarantee |

| | | |
|---|---|---|
| 1 | | and no cap? |
| 2 | Owoc: | Yes, deal, done. |
| 3 | Fox: | Done. |

4           **(11) The Hypothetical Negotiation Between Fox and Owoc in 2009 - 2010, with**

5                 **the Book of Wisdom**

6     However, with the Book of Wisdom, the hypothetical negotiation would be different.

7 Because of the spectacular success of BANG Energy RTD and huge amount of sunk costs and

8 marketing dollars already invested by VPX to build the brand BANG, VPX cannot go backwards.

9 It cannot abandon the undeniable success of the BANG mark. VPX would have no choice but to

10 close the deal with Orange Bang. This gives Orange Bang enhanced leverage.

11     Accordingly, the arbitrator envisions the hypothetical negotiation between Fox of Orange

12 Bang and Owoc of VPX, with the benefit of the Book of Wisdom, would have taken place (or

13 would take place) in the following manner:

14 Owoc:   I got your lawsuit. I think your lawsuit is full of it, but we should work this out.

15 Fox:      I'm willing to work this out, but I've been using the BANG mark since the early

16               1970s and I've owned the trademark since the early 1980s. The BANG mark is vital

17               to the success of my business.

18 Owoc:   My target-customers are very different from yours. I sell to athletes and workout

19               enthusiasts. I sell out of nutritional and supplement stores like the Vitamin Shoppe

20               and GNC. I don't sell out of restaurants and I don't currently sell out of

21               convenience stores or gas stations, like you do.

22 Fox:      Are you willing to limit your use of my BANG mark to just the nutritional and

23               dietary supplement category?

24 Owoc:   At first, I thought I was willing to limit my use to that narrow category. I thought I

25               was willing to work out a deal with you where I stay in my lane and you stay in your

26               lane, and work out a free deal, a deal for no payment, no license fee or no royalty

27               payment, but now that I think about it, I want to go big with the use of the name

28               BANG. I want very broad use. I have a vision, and I want to use the BANG mark

Case 22-17842-PDR Doc 523-1 Filed 12/14/22 Page 14 of 81

DocuSign Envelope ID: 31DD0391-4508-4DEF-8F59-1F66727677
Case 5:20-cv-01464-DSF-SHK Document 126-2 Filed 09/23/22 Page 110 of 177 Page ID
#:5497

| | | |
|---|---|---|
| 1 | | in a very pervasive way. I do not want to be limited to nutritional stores or to the |
| 2 | | dietary and supplements sections of stores. I want to be able to sell my product |
| 3 | | anyway I choose, at convenience stores, at gas stations, at supermarkets, anywhere. |
| 4 | | And I need the right to use the name forever, no limitations on time. Are you |
| 5 | | willing to make a deal like that? |
| 6 | Fox: | I don't know. You are asking for a lot. All of my customers know me by the |
| 7 | | BANG mark and I think it will be confusing if there are two companies out called |
| 8 | | BANG, especially if we are both going to sell at the same place like convenience |
| 9 | | stores and gas stations. I'm open to a deal, but the royalty rate will need to be pretty |
| 10 | | high. I would need a 10% royalty, 10% of your BANG mark sales. |
| 11 | Owoc: | No way. 10% is way too high. Besides, my products are going to be very different |
| 12 | | from yours even if they are both sold in convenience stores. Your product has lots |
| 13 | | of sugar. I'm planning on products with no sugar at all. The most I'm willing to |
| 14 | | pay as a royalty is 1%. |
| 15 | Fox: | It's not worth it to me to give up my company name and identity for a 1% royalty. |
| 16 | | And what would 1% even pay me? What are your BANG sales as of now? |
| 17 | Owoc: | Our BANG sales as of now are about $155,000 per year.[32] |
| 18 | Fox: | So you are offering me $1,550 per year for the use of my corporate name? I cannot |
| 19 | | make a deal like that. Like I said, I'm only going to give up the exclusive use of my |
| 20 | | corporate name for a meaningful royalty. Even a 7.5% royalty is not worth it, that |
| 21 | | would only be $11,625 per year. Still not worth it for that amount. |
| 22 | Owoc: | I'm not offering you $1,550 per year. I'm not offering you $11,625 per year. What |
| 23 | | I am offering you is a percentage of my future BANG sales, a running royalty, a |
| 24 | | continuing royalty, a payment each year and every year. The amount of the |
| 25 | | payment would be tied to the amount of my BANG sales. I expect to sell millions |
| 26 | | of dollars of product. The BANG name is very catchy and I plan to make terrific |

---

28  [32] Voth concedes that VPX's sales of Bang Pre-Workout in 2010 were approximately $155,000. *See* Exhibit 5418 (Voth Schedule 3.1); *see also* Voth Testimony, AHT, p. 3932:3-6.

110

FINAL ARBITRATION AWARD – PHASE 1 AND PHASE 2

| | | |
|---|---|---|
| 1 | | products which young consumers will buy in droves.  I expect your running royalty |
| 2 | | will be worth way more than those amounts in future years and in each year. |
| 3 | Fox: | Maybe so, Jack, but it's just not worth it to me. |
| 4 | Owoc: | I would be willing to go as high as 2.5%, but no more than that. |
| 5 | Fox: | Still not worth it to me at 2.5%.  Based on your current sales, that would only get me |
| 6 | | a royalty of $3,875.  I'm not going to give up the goodwill of my business I have |
| 7 | | sweated and toiled to earn for that small amount. |
| 8 | Owoc: | Well I can't go any higher than 2.5%, that's my final and best offer.  If I went any |
| 9 | | higher than that and I hit it big, and I do plan to hit it big, then I would have to be |
| 10 | | paying you way too much. |
| 11 | Fox: | If we made a deal and you had to pay me "way too much", you would be the |
| 12 | | happiest person in the world. |
| 13 | Owoc: | What do you mean by that? |
| 14 | Fox: | I mean, if you are paying me a big number as a continuing royalty, that would mean, |
| 15 | | by definition, that you are raking in the bucks, that you would be making a killing |
| 16 | | off of your products and my name.  So what would you care if you paid me a lot of |
| 17 | | money for the use of my name in the future, it would only cost you a lot of money if |
| 18 | | you yourself were making a ton of money.  So, like I said, if you are paying me big |
| 19 | | money, that means that you would be making even bigger money, and you would be |
| 20 | | the happiest person in the world.  So I'm not willing to do it unless it's a fair royalty |
| 21 | | rate for the use of my name which you plan to use in a comprehensive fashion which |
| 22 | | will probably have the result of wiping my own company name off the face of the |
| 23 | | earth. |
| 24 | Owoc: | I understand your point that I'm only going to be paying you big money if I'm |
| 25 | | making even bigger money, but no way 7.5% is going to happen.  That's too good |
| 26 | | of a deal for you.  The most I will pay for a running royalty, tied to net sales, is 3%, |
| 27 | | not a penny more. |
| 28 | Fox: | Forgive me for being a Monday morning quarterback, but your sales of BANG |

Case 22-17842-PDR   Doc 523-1   Filed 12/14/22   Page 16 of 81

DocuSign Envelope ID: 9DDD3BF-2508-4DEF-8E98-17F667257FC   Case 9:20-cv-01464-DSF-SHK 1F Document 126-2   Filed 09/23/22   Page 112 of 177   Page ID #:5499

|   |   |   |
|---|---|---|
| 1 | | Energy RTD have been off the charts. You have made billions of dollars of sales |
| 2 | | and you will make billions of dollars more in the future. You have spent enormous |
| 3 | | sums of money building your brand based on the BANG mark. In fact, your |
| 4 | | company is now re-branded as Bang Energy. Your website address and all of your |
| 5 | | social media accounts make use of the BANG mark. Even your customers are |
| 6 | | called "Bangsters". You are in too deep. You have to close this deal. If you don't, |
| 7 | | and you are forced to re-brand, it will literally cost you hundreds of millions of |
| 8 | | dollars. And why bother? You are on a huge roll. You are doing fantastic. Your |
| 9 | | company is killing it. Your sales are through the roof and your marketing strategy, |
| 10 | | based on the BANG mark, is brilliant. You are only paying me a percentage of net |
| 11 | | sales and, again, if that turns out to be a very large number for me that means that it |
| 12 | | is an astronomical number for you. You should want to turn this into a win-win for |
| 13 | | both of us. You need this deal. I need you to pay me a running royalty of 7.5%, but |
| 14 | | to make the deal happen, I will lower my number to 7%, but that's it. |
| 15 | Owoc: | You are over-playing your hand. I am not afraid to rebrand. Yes, it will cost me |
| 16 | | some meaningful money to do so, but less than I will have to pay you. The most I |
| 17 | | will pay is a running royalty of 5% of net sales. Nothing more than that. |
| 18 | Fox: | Jack, you have a great thing going. Your company, Bang Energy, is on fire. You |
| 19 | | are rich beyond your wildest dreams. But the bottom line is you need the BANG |
| 20 | | mark. I don't think you can walk away from this deal. |
| 21 | Owoc: | Sorry, 5% is my final and best offer. I'm at the end of my line. |
| 22 | Fox: | Jack, if a fair deal happens, that's fine. If it doesn't happen, that's fine too. You |
| 23 | | want to use my trademark. You want to use my BANG name in a very unlimited |
| 24 | | fashion, forever, in perpetuity, with no time limit, with no limits as to class or |
| 25 | | category, in the same locations as me, both in the USA and internationally, and your |
| 26 | | use could wipe me off the map. You have used the BANG mark in a pervasive way |
| 27 | | and you have turned your efforts into a huge sum of money. You have hit a grand |
| 28 | | slam with your products, your marketing and my name. I think we both know you |

| | | |
|---|---|---|
| 1 | | need my name. My bottom line is 7%. That is the end of the line for me. |
| 2 | Owoc: | Still too high. But I will tell you what, if you will agree to go down to 6%, I will go |
| 3 | | up to 6%. Do we have a deal? |
| 4 | Fox: | Yes, I'm willing to close at a 6% running royalty, tied to net sales. But I need a |
| 5 | | minimum guarantee, a meaningful minimum guarantee. |
| 6 | Owoc: | No way, I'm not guaranteeing you nothing. And, since you brought it up, I want a |
| 7 | | cap on the amount I have to pay you. |
| 8 | Fox: | No, no cap. If you aren't going to go with a minimum guarantee, there shouldn't be |
| 9 | | any cap either. Whatever the 6% of net sales turns out to be, whether high or low, |
| 10 | | that's the number. So, do we have a deal at 6% of net sales, no minimum guarantee |
| 11 | | and no cap? |
| 12 | Owoc: | Yes, deal, done. |
| 13 | Fox: | Done. |

14 **(12) Factor 15 – the Final Conclusion on the Royalty Rate Based on the**

15 **Hypothetical Negotiation**

16    In this respect, the reasonable royalty rate for the running royalty resulting from the

17 hypothetical negotiation without the benefit of the Book of Wisdom is 4%, with no minimum

18 guarantee and no cap. At the same time, the reasonable royalty rate for the running royalty resulting

19 from the hypothetical negotiation with the benefit of the Book of Wisdom is 6%, with no minimum

20 guarantee and no cap. Accordingly, based on the applicable Georgia-Pacific factors, the

21 comparable deals in the beverage industry, the corroborating source of Battersby and Grimes and

22 the two hypothetical negotiation scenarios referred to above, the arbitrator hereby finds that the

23 reasonable royalty rate for the running royalty resulting from the hypothetical negotiation is hereby

24 adjudicated to be 5% (the mid-point between the two hypothetical negotiations), with no minimum

25 guarantee and no cap.

26    Orange Bang / Monster are entitled to receive a reasonable royalty for the pervasive use of

27 the BANG mark by VPX from August 11, 2010 to September 19, 2021 (the date through which

28 Plumpe calculated the royalty base). Orange Bang has been denied the opportunity to receive this

Case 22-17842-PDR   Doc 523-1   Filed 12/14/22   Page 18 of 81

DocuSign Envelope ID: 41DD3B1-2E08-4DEF-8E98-41F6672575C
Case 5:20-cv-01464-DSF-SHK   Document 126-2   Filed 09/23/22   Page 114 of 177   Page ID
#:5501

1   revenue stream, the lost licensing income which should have flowed to Orange Bang from an

2   licensing agreement with VPX based on a reasonable royalty.

3        With respect to the breach of contract claim, the royalty base, as calculated above, is

4   **$2,030,500,000** ($2,035,000,000 – $4,500,000 for Bang Mixx).    **$2,030,500,000** x the

5   reasonable royalty rate of **5% = $101,525,000**.  Thus, the measure of damages for the breach of

6   contract claim based on the reasonable royalty methodology is **$101,525,000**.

7        With respect to the trademark infringement claim, the royalty base, as calculated above, is

8   **$2,246,289,815** (which likewise already includes a deduction of $4,500,000 for Bang Mixx).

9   **$2,246,289,815** x the reasonable royalty rate of **5% = $112,314,490.75**.  Thus, the measure of

10  damages for the trademark infringement claim based on the reasonable royalty methodology is

11  **$112,314,490.75**.

12

### K. Disgorgement of Profits and Apportionment

14       Disgorgement of profits is an appropriate remedy for both a breach of contract claim under

15  California law and for a trademark infringement claim under federal law.  Under California law,

16  disgorgement of profits is recoverable to recompense a plaintiff for a defendant's unjust

17  enrichment.  Where a defendant obtained a benefit that it might not have otherwise obtained, or the

18  plaintiff did not get the benefit of its bargain, a plaintiff is entitled to a disgorgement of profits as

19  damages for unjust enrichment As the court stated in *Artifex*: ". . . to the extent Plaintiff seeks

20  unjust enrichment or disgorgement as a measure of damages, this too is proper under California

21  law." *Id*. at *3 - *4.

22       In *Foster Poultry Farms, Inc. v. SunTrust Bank*, 377 F. App'x 665,669 (9th Cir. 2010), the

23  Ninth Circuit likewise articulated the rule that under California law, disgorgement of improperly

24  obtained profits is an appropriate remedy for breach of a contract.  In *Foster Poultry,* the court

25  ruled that a constructive trust on profits from a book was an appropriate remedy for breach of a

26  contract where the plaintiff's harm from the breach was unquantifiable, but defendant's unjust

27  gains were the result of the breach.

28

1    In *Young v. Wideawake Death Row Entertainment, Inc.*, 2011 WL 13371881 (C.D. Cal
2  2011), Andre Young aka Dr. Dre sued Death Row for various federal and state law claims.

3    Judge Snyder dismissed most of the federal claims, but the breach of contract claim under
4  California law moved forward. Dr. Dre contended that he had bargained for the right to control the
5  distribution of certain songs in the written contract and that Death Row had violated that right and
6  generated revenues and profits by doing so. Dr. Dre contended that he was entitled to a
7  constructive trust over the revenues and disgorgement of the profits as a monetary remedy for
8  Death Row's breach of the contract. Death Row argued that Dr. Dre was not entitled to
9  disgorgement of profits for several reasons, especially since the contract limited his recovery to
10  only an action at law for actual damages which arguably precluded an equitable remedy like
11  disgorgement of profits. Death Row filed a motion in limine to preclude the recovery of a
12  disgorgement of profits as a remedy. In *denying* the motion in limine, Judge Snyder relied on
13  California Civil Code 3300, which protects the benefit of the bargain, the differential between what
14  Dr. Dre received and what he should have received or expected to receive, as well as the reasoning
15  of *Foster Poultry* and *Ajaxo*, in ruling that disgorgement of profits is indeed an appropriate remedy
16  in Dr. Dre's breach of contract case under California law.

17    Even Voth agrees that disgorgement of profits (with apportionment) is an appropriate
18  remedy for a breach of contract claim. Voth Testimony, AHT, p. 3880:8–23.

19    With respect to a trademark infringement claim, there can be no question that disgorgement
20  of profits is an appropriate monetary remedy given that the clear language of the statute, Section
21  1117(a)(1), as quoted above, specifically enumerates "defendant's profits" as an element of
22  monetary recovery. Many Ninth Circuit cases have held that a plaintiff may recover a
23  disgorgement of profits in a trademark infringement case. *See Jerry's Famous Deli, Inc. v.*
24  *Papanicolaou*, 383 F.3d 998, 1004-1005 (9th Cir 1994). In *Playboy Enterprises, Inc. v. Baccarat*
25  *Clothing, Inc.,* 692 F.2d 1272, 1274 (9th Cir. 1982), the Ninth Circuit held that a disgorgement of
26  profits is an appropriate remedy in a trademark infringement action (in that case, a counterfeit
27  action) in order to prevent unjust enrichment of the infringing party. In addition, the Ninth Circuit
28  reasoned that the policy considerations underlying this rule are intended to make sure that

1  violations of the Lanham Act remain unprofitable to the infringer and to implement deterrence so
2  as to disincentivize future infringers . *See also Maier Brewing Co. v. Fleischmann Distilling Corp.*,
3  390 F.2d 117 (9th Cir. 1968), discussed in more detail below.

4  In addition, as stated above, the United States Supreme Court recently held in *Romag* that a
5  showing of willfulness is no longer required in order to recover a disgorgement of profits in a
6  trademark infringement case and the Court also held that a defendant's mental state is a highly
7  important consideration in determining whether or not to award a disgorgement of profits. *Romag* ,
8  140 S.Ct. at 1497. In a pre-*Romag* ruling, an "aura of indifference to plaintiff's rights" has been
9  held to meet the standard for the requisite mental state sufficient to award a disgorgement of profits
10  remedy. *Philip Morris USA Inc. v. Liu*, 489 F.Supp.2d 1119, 1123 (C.D. Cal 2007). Here, VPX
11  demonstrated at the least an "aura of indifference" by virtue of the undisputed fact that J. Owoc
12  never bothered to tell his own marketing employees (even his wife M. Owoc), his own science
13  employees (Li), his distributors or his retailers about the existence or the importance of the VPX
14  Marketing and Sales Restrictions.

15  Even VPX has conceded in its post arbitration closing briefs that disgorgement of profits is
16  an appropriate remedy in a trademark infringement case to recompense a plaintiff for unjust
17  enrichment. *See* VPX's closing brief submitted on November 19, 2021, p. 44 and VPX's answer to
18  the arbitrator's post-hearing question no. 3 where VPX acknowledged that disgorgement is
19  appropriate in instances of unjust enrichment citing *Maier*, at 123 – 124 and *Stone Creek, Inc. v*
20  *Omnia Italian Design, Inc.*, 808 Fed.App'x 459, 460-461 (9th Cir. 2020) [in a pre-*Romag* ruling,
21  the Ninth Circuit affirmed the district court's exercise of discretion not to award profits because
22  profits were not attributable to the infringement and to render such an award would constitute a
23  windfall]. In addition, Voth himself agrees that disgorgement is an appropriate remedy for a
24  trademark infringement claim. *See* Voth Testimony, AHP, p. 3880:11-15.

25  According to Voth's expert presentation, the disgorgement of profits determination requires
26  a calculation of gross receipts as the starting point, followed by a calculation of deductible
27  expenses which must be subtracted from the gross receipts in order to determine the amount of the
28  remaining profits potentially subject to disgorgement. As Voth explained in response to questions

116
FINAL ARBITRATION AWARD – PHASE 1 AND PHASE 2

1 from the arbitrator, this calculation can be determined by examining net sales, costs of goods sold,

2 other operating expenses and the resulting incremental profit margin and convert those calculations

3 to a percentage basis. According to Voth, Plumpe did not conduct the disgorgement of profits

4 calculation in the correct manner. Plumpe determined the amount of gross receipts from the sale of

5 products which made use of the BANG mark, both including and excluding the Nutritional

6 Channel (the paragraph 7 D channel), and then subtracted out *only* the cost of goods sold

7 ("COGS"). But Plumpe stopped there. He did not deduct out any other expenses. According to

8 Plumpe, the amount of profits subject to disgorgement is simply gross receipts – COGS.

9 According to Voth, however, this calculation is incorrect because Plumpe failed to deduct all sorts

10 of additional expenses, such as the $117.3 million of marketing expenses spent by VPX.

11       According to Voth, when the calculation is done correctly, and the computation starts with

12 gross receipts from the sale of products which make use of the BANG mark, and then subtract

13 COGS, and then subtracts various other expenses as well, the result, according to Voth's

14 calculation, **is a 21% profit margin**. *See* Exhibit 5382, paragraphs 70-72, Schedule 2.1; DDX

15 1036-6. As mentioned above, Voth calculated VPX BANG mark related sales, including sales

16 within the Nutritional Channel, at $2.26 billion. This number is reduced to $2,255,500,000 once

17 the Bang Mixx sales are also subtracted out of the calculation. $2,255,500,000 x .21 (for 21%) is

18 approximately **$ 473.5 million in profits potentially subject to disgorgement**, according to Voth.

19 Voth also calculated VPX BANG mark related sales, excluding sales within the Nutritional

20 Channel, at $2.03 billion. This number is likewise reduced to $2,025,500,000 once the Bang Mixx

21 sales are also subtracted out of the calculation. $2,025,500,000 x .21 (for 21%) is approximately

22 **$425 million in profits potentially subject to disgorgement**, according to Voth. *See* Voth

23 Testimony, AHT, p. 3879:9-25.

24       However, Voth's analysis of the disgorgement of profits calculation does not stop there.

25 According to Voth, once he determines the amount of profits potentially subject to disgorgement, it

26 is then necessary to conduct an apportionment analysis because only the profits attributable to the

27 use of the BANG mark are subject to disgorgement while profits attributable to "other factors" are

28 not subject to disgorgement. Based on Ninth Circuit precedent, as discussed below, Voth is

1  correct. An apportionment analysis is indeed required in this case. However, the arbitrator

2  disagrees with Voth's apportionment analysis and, at the same time, the arbitrator disagrees with

3  Monster's and Orange Bang's argument that (i) *all* of the profits from BANG mark products, such

4  as BANG Energy RTD, are attributable to the use of the BANG mark; and (ii) VPX has failed to

5  prove that some of the sales at issue are "demonstrably" not attributable to the use of the BANG

6  mark and, therefore, no apportionment of profits is appropriate at all.

7          In short, the arbitrator disagrees with both VPX, on the one hand, and with Monster and

8  Orange Bang, on the other, on how to appropriately calculate the disgorgement of profits remedy in

9  this case. Monster's and Orange Bang's view on apportionment and Voth's suggested approach on

10  how to conduct the apportionment analysis are discussed in further detail below.

11          However, before reaching the apportionment analysis, and assuming that Voth's 21% gross

12  profit calculation is correct, as Monster and Orange Bang concede it is correct on p. 30 of their

13  closing reply brief submitted on November 19, 2021, it is first necessary to determine whether or

14  not the \$473.5 million profit calculation as computed by Voth (total profits from BANG mark

15  sales, including profits from within the Nutritional Channel, potentially subject to disgorgement)

16  and the \$425 million profit calculation as computed by Voth (total profits from BANG mark sales,

17  excluding the profits from the Nutritional Channel, potentially subject to disgorgement) needs to

18  include any "add-backs" to account for an over-deduction of expenses by Voth. On cross-

19  examination, Voth conceded that he deducted expenses associated with VPX products which are

20  *not* at issue in this case (i.e., products which did not make use of the BANG mark). *See* Voth

21  Testimony, AHT, p. 3871:12–18; p. 3872:15 – 3873:2. In addition, on cross-examination, Voth

22  conceded that he deducted depreciation and amortization of certain assets, such as private jets and

23  cars, which were also used by VPX executives for personal purposes (disguised compensation or

24  disguised benefits so to speak). *See* Voth Testimony, AHT, p. 3877:10 – 3878:16. Based on this

25  testimony, the arbitrator concludes that Voth over-calculated expenses, to some extent, but,

26  nevertheless, the amount of profits calculated by Voth which are subject to disgorgement needs to

27  be increased somewhat to account for these excess expenses, which should not have been included

28

1  in the calculation in the first place.  These "add-backs" will then help establish the correct amount
2  of profits potentially subject to disgorgement, prior to apportionment.

3       Under the Lanham Act and specifically under Section 1117(a), the arbitrator is vested with
4  the discretion to increase the profit award based on equitable considerations.  *Fifty-Six Hope Road*
5  *Music, Ltd. V. A.V.E.L.A., Inc.*, 778 F.3d 1059, 1077 (9th Cir. 2015).  **Therefore, based on Voth's**
6  **testimony and on equitable considerations, the arbitrator concludes that expenses were over-**
7  **calculated by Voth by approximately 5% to 7.5% and that the amount of the "add-backs",**
8  **i.e., the under-calculation of the amount of the profits subject to disgorgement, prior to**
9  **apportionment, increases the total profits subject to disgorgement from \$473.5 million to**
10 **\$500 million for the calculation including the Nutritional Channel and from \$425 million to**
11 **\$450 million for the calculation excluding the Nutritional Channel.  Again, this is the amount**
12 **of profit, adjusted, subject to disgorgement, *before* a proper apportionment analysis (as**
13 **discussed below).**

14      Before addressing the all-important issue of apportionment, it is necessary to discuss
15 controlling law because Monster and Orange Bang, on the one hand, and VPX, on the other, have a
16 very different view of the law on the issue of disgorgement of profits and on the issue of
17 apportionment.

18      In 1968, the Ninth Circuit had to determine if a disgorgement of profits remedy was only
19 available to a plaintiff where there had been a diversion of sales away from the plaintiff for the
20 benefit of the defendant, a defendant who was a direct competitor (or how else could there be a
21 diversion of sales?).  In *Maier Brewing Company v. Fleischmann Distilling Corp.*, 390 F.2d 117
22 (9th Cir. 1968), the Ninth Circuit ruled that there were two different theories by which a plaintiff is
23 entitled to recover a disgorgement of profits.  The first theory is where there is a diversion of sales
24 away from the plaintiff to the benefit of the defendant and, in that instance, the plaintiff and
25 defendant do need to be direct competitors.  According to the second theory, however, there is no
26 requirement for a diversion of sales, rather unjust enrichment is a sufficient justification in-and- of-
27 itself and, in that instance, the plaintiff and the defendant do not need to be direct competitors.
28 Both of these theories advance the policy considerations underlying the Lanham Act as reflected by

119
FINAL ARBITRATION AWARD – PHASE 1 AND PHASE 2

Case 22-17842-PDR Doc 523-1 Filed 12/14/22 Page 24 of 81

DocuSign Envelope ID: 24DD385-23D8-4D5F-8F5B-1F66772657 Case 5:20-cv-01464-DSF-SHK Document 126-2 Filed 09/23/22 Page 120 of 177 Page ID #:5507

1 its legislative history. In particular, the Ninth Circuit specifically held that (i) the recovery of a
2 disgorgement of profits in a case of unjust enrichment properly serves the policies of the Lanham
3 Act; and (ii) in a case based on unjust enrichment there is no requirement of direct competition
4 between the plaintiff and the defendant. *Id.* at 121 – 123.

5      VPX argues that a disgorgement of profits is recoverable only if Orange Bang and VPX are
6 direct competitors. First, that is not the law according to Section 1117(a), nor is that the law
7 according to *Maier* as described above. Second, the rule that a plaintiff and defendant must be
8 direct competitors in order to warrant disgorgement of profits applies only when the theory of
9 disgorgement is based on a theory that VPX diverted sales away from Orange Bang, and not on a
10 theory of unjust enrichment, which is not the case here. *Maier* at 121 - 123; *Spin Master, Ltd.*
11 *Zobmondo Ent., LLC,* 944 F. Supp. 2d 830, 839 (C.D. Cal. 2012), *abrogated on other grounds by*
12 *Romag at 1497.* Third, even if that was the law, and it is not, as set forth above, Orange Bang and
13 VPX are indeed direct competitors in the sense that they both sell related goods, a fruit juice drink
14 and an energy drink are related goods as *Pom Wonderful* so holds, 775 F.3d at 1127, and they both
15 sell them in over-lapping trade channels, in convenience stores and gas stations where Orange
16 Bang sells one-third of its product and VPX sells 80% of BANG Energy RTD which is, by far, its
17 biggest seller.

18      Fourth, and most importantly, VPX itself concedes, as it must, that a disgorgement of
19 profits monetary remedy is available in the case of unjust enrichment on page 44 of its closing
20 reply brief submitted on November 19, 2021 where it cites *Maier* for the proposition that a
21 disgorgement of profits award needs to be based on principles of equity and requires the trademark
22 owner to prove direct competition **or** unjust enrichment.

23      At the same time, VPX's reliance on *Promex, LLC v. Hernandez,* 781 F.Supp.2d 1013
24 (C.D. Cal. 2011) is misplaced. In *Promex,* Judge Wright, following a bench trial, ruled that the
25 plaintiff could not recover lost profits for the defendant's breach of contract not to make use of a
26 similar tradename for an anti-itch skin cream. But *Promex* is a lost profits case, not a disgorgement
27 of profits case based on unjust enrichment. Judge Wright relied on the rock-solid rule that lost
28 profits need to be proved with reasonable certainty and cannot be based on speculation. The court

1  ruled that plaintiff's attempt in that case to prove *its* lost profits by looking to a measure of

2  defendants' profits was too speculative. Because *Promex* is a lost profits case, and not a

3  disgorgement of profits case based on unjust enrichment, it does not help VPX's argument that a

4  disgorgement of profits is inappropriate in the circumstances of Orange Bang's and Monster's case

5  against VPX.

6      Ninth Circuit law relating to the disgorgement of profits analysis is correctly encapsulated

7  in Model Jury Instruction 15.29 and is summarized as follows:

8      • A plaintiff is entitled to recover a disgorgement of profits, but only those profits

9        which are attributable to the infringement. *See also Lindy Pen Company, Inc., v. Bic*

10       *Pen Corporation*, 982 F.2d 1400, 1408 (9th Cir. 1993).

11     • The formula for an award of profits is gross revenue – all expenses.

12     • Gross revenue includes all gross receipts from the sale of product which makes use

13       of the infringed mark, in this case the BANG mark.

14     • The plaintiff's only burden of proof is to prove a defendant's gross revenue (aka

15       gross receipts), and to do so by a preponderance of the evidence.

16     • It then becomes defendant's burden to prove deductible expenses incurred in

17       producing the product which makes use of the infringed mark, in this case the

18       BANG mark, and to do so by a preponderance of the evidence.

19     • It is also defendant's burden to prove the portion of profits attributable to "other

20       factors", factors other than the use of the infringed mark, in this case the BANG

21       mark, and to do so by a preponderance of the evidence.

22     • If the trier of fact is able to determine that some of the profit is attributable to "other

23       factors", rather than attributable to the use of the infringed mark, in this case the

24       BANG mark, then the trier of fact should award the total profit attributable to the

25       infringement.

26     • If, however, the trier of fact is unable to determine that some of the profit is

27       attributable to "other factors", rather than attributable to the use of the infringed

28

Case 22-17842-PDR   Doc 523-1   Filed 12/14/22   Page 26 of 81

DocuSign Envelope ID: 31DD3E61-7EDB-4DEE-8F88-K1F667725D96
Case 5:20-cv-01464-DSF-SHK   Document 126-2   Filed 09/23/22   Page 122 of 177   Page ID
#:5509

1               mark, in this case the BANG mark, then the trier of fact should award all of the total

2               profit as attributable to the infringement.

3           In this respect, and with respect to the all-important issue of apportionment, Monster and

4   Orange Bang have correctly cited controlling law that it is VPX's burden to prove that its profits

5   are "demonstrably" not attributable to the use of the BANG mark. *Mishawaka Rubber & Woolen*

6   *Mfg. Co. v. S.S. Kresge Co.*, 316 U.S. 203, 206-207 (1942)[33]; *Nintendo of America, Inc. v. Dragon*

7   *Pac. Int'l*, 40 F.3d 1007, 1012 (9th Cir. 1994). In *Nintendo*, the defendant sold video game

8   cartridges and advertised them as Nintendo products. The video game cartridges contained a

9   copyrighted video game created by Nintendo which made up only one-third of the cartridge, so

10  defendant's expert opined that the disgorgement of profits should be cut to one-third. While

11  pending before the district court, the trier of fact found this apportionment theory flawed and

12  unconvincing because the video game cartridges were advertised as having Nintendo games, not as

13  having one-third of Nintendo games. The Ninth Circuit agreed with this analysis and reaffirmed

14  the rule that when infringing and non-infringing elements of a work cannot be separated out, and if

15  a defendant fails to meet its burden of proof on the apportionment issue, then *all* of the defendant's

16  profits should be deemed to be attributable to the infringement in which case the plaintiff is entitled

17  to a disgorgement of all of the profits.

18          Thus, according to controlling case law, if VPX fails to make the requisite showing and

19  demonstrate that the profits are attributable to "other factors", factors other than the use of the

20  BANG mark, then *all* of the profits at issue are presumed to be attributable to the infringing (or

21  breaching) conduct of the defendant and, as a result, *all* of the profits are subject to disgorgement.

22          At the other end of this extreme is VPX's analysis that essentially *none* of the profits are

23  attributable to the use of the BANG mark. VPX simultaneously argues that according to Voth's

24  expert report and his analysis, once the amount of profits potentially subject to disgorgement is

25  determined, a further calculation is required, an apportionment calculation, because a determination

26  _____

27  [33] The United States Supreme Court recognized this rule may result in a windfall to the plaintiff,
    but the Court observed that it would prefer a windfall to the plaintiff over a "windfall to the
28  wrongdoer." *Id.* at 207. As Justice Frankfurter put it: the burden to show that the profits are
    attributable to other factors "is upon the poacher." *Id.* at 206.

                                                122

                    FINAL ARBITRATION AWARD – PHASE 1 AND PHASE 2

1  must be made as to which profits are attributable to the infringing (or breaching) conduct as

2  opposed to the profits which are attributable to "other factors". Voth is correct that this additional

3  calculation, the apportionment calculation, is required in a trademark infringement case (and in the

4  claim for the breach of the co-existence agreement, the 2010 Settlement Agreement) because the

5  profits attributable to the infringing conduct, the use of the BANG mark, are recoverable while the

6  profits attributable to "other factors", such as profits attributable solely to a brilliant social

7  marketing campaign or attributable to the effective use of thousands of influencers with billions of

8  "followers" are not. *Lindy Pen Company, Inc., v. Bic Pen Corporation*, 982 F.2d 1400, 1408 (9th

9  Cir. 1993), *abrogated on other grounds by SunEarth, Inc. Sun Earth Solar Power Co.,* 839 F. 3d

10  1179 (9th Cir. 2016).

11      In this regard, VPX argues, by way of Voth's expert opinion, that only 1% to 2% of the

12  profits are attributable to the BANG mark, based on an inappropriate reliance on the unpersuasive

13  InfoScout analysis (discussed below), and that this amount should be capped at \$2.3 million

14  (discussed above) which is Voth's analysis of what the BANG mark was worth *to Orange Bang* as

15  of 2010. However, in *Philips North America LLC v. Summit Imaging Inc.,* 2021 WL 2118400

16  (W.D. Wash. 2021) the court held that Voth's expert opinion was excluded via a motion in limine

17  because Voth's methodology focused upon and analyzed the wrong issue. Voth's opinion was

18  excluded in *Philips* because his labor apportionment analysis (which comprised of a ratio based on

19  timekeeping records of plaintiff's employees) incorrectly focused on the purported injury *to*

20  *plaintiff.* Instead, as the court ruled, it should have been focused on measuring the unjust

21  enrichment which inured to the benefit *of the defendant.* As the court held:

22      "Taken cumulatively, Mr. Voth's apportionment analysis is unreliable. Mr. Voth's

23      apportionment methodology is not sufficiently 'tied to the goal of estimating the profits that

24      [the defendant] actually earned due to its use of the allegedly infringing [material],' see

25      *Oracle,* 2016 WL 1743154, at *3, and there are additional concerns regarding his

26      underlying data. Accordingly, the court excludes this portion of Mr. Voth's expert

27      testimony. *See Est. of Barabin*, 740 F.3d at 463."

28  *Philips,* 2021 WL 2118400, at *10.

1    (Emphasis added.)

2         This is not to say that Voth's expert opinion is excluded in the instant case. None of his
3    expert opinion is excluded and all of his expert opinion is received into evidence. Rather, the point
4    here is that Voth's expert opinion is not persuasive in this case because he focused on the wrong
5    issue, he focused on the purported damage to Orange Bang instead of focusing on the unjust
6    enrichment reaped by VPX (and JHO).

7         However, the notion that *all* of the profits are attributable to the BANG mark and that no
8    other factor is responsible for VPX's financial success or enormous profits is simply not credible.
9    As explained below, the BANG mark played a huge part in VPX's financial success, but some of
10   the profits are indeed attributable to other factors and it is not that difficult to separate out and
11   apportion profits, although, admittedly, it is somewhat of a qualitative judgment call and cannot be
12   done with quantitative precision.

13        Voth articulates nine factors which, according to VPX, lead to a conclusion that a very
14   small percentage of the profits are attributable to the use of the BANG mark. These nine factors,
15   however, are not convincing. They are discussed below.

16        Voth's first factor which argues for a low apportionment is that VPX's product sales which
17   made use of the BANG mark did not explode until the 2018 to 2021 time period.[34] According to
18   Voth, if the rapid acceleration of sales was attributable to the use of the BANG name / the BANG
19   mark, the break-through in sales should have started years earlier, for example in 2008 when VPX
20   first started to use the BANG mark. However, the lion's share of these significant sales took place
21   after a social media blitz based on the BANG mark and after VPX rebranded its company to Bang
22   Energy in the first quarter of 2019. As J. Owoc himself stated in a March 6, 2019 email,
23   "DEFINITION DRIVES DESTINY. Born VPX Rebranded as Bang!" The March 6, 2019 email
24   string refers to an overall rebranding of the company to Bang Energy including a change in the
25   email address to make use of the word "bang", a change in the web sites, a change in the cans
26   themselves, a change in the signage, a change in the business cards ("only Bang") and this email

27

28   ───────────────
     [34] *See* Voth's Schedule 3.1 of his expert report, Exhibit 5382.
                                         124
                    FINAL ARBITRATION AWARD – PHASE 1 AND PHASE 2

1  even makes use of the word "omnipresence" to describe the rebranding of the company. *See*
2  Exhibit 2749. J. Owoc himself testified that he chose to call himself the "Bang CEO" as his handle
3  on social media (imploring Mr. Hueston, during the arbitration hearing, to get a "handle" on
4  matters). J. Owoc even testified that although he had many brand names to choose from (e.g.,
5  "Redline"), he chose the name "Bang" and 99.8 percent of his sales are the sale of products which
6  make use of the name "Bang". *See* J. Owoc Testimony, AHT, p. 1402:11 - 1403:22. Bukovi,
7  VPX's no. 2, and M. Owoc, J. Owoc's wife and the head of VPX's marketing department, both
8  testified similarly. In explaining VPX's significant sales of Bang branded products, Bukovi
9  testified that VPX has moved into the beverage mainstream. *See* Bukovi Testimony, AHT, p.
10 1987:21 – 1988:2. M. Owoc testified that VPX changed its name to Bang Energy, that VPX
11 changed its website to bangenergy.com, that VPX changed its Instagram handle to bangenergy, that
12 J. Owoc changed his Instagram handle to bangenergy.ceo and that VPX now refers to its customers
13 as "Bangsters". M. Owoc Testimony, AHT, p. 3444:4 – 3445:10. Even Sweeney, the relatively
14 new marketing executive for VPX with his 20+ years of experience in marketing in the energy
15 drink sector, testified that he had not heard of VPX or BANG Energy RTD until the 2017 or 2018
16 time period and he also testified that when he joined VPX in September of 2019, VPX (then known
17 as Bang Energy) was the fastest growing beverage company. *See* Sweeney Testimony, AHT, p.
18 3056:15 – 3058:6. Therefore, it is just as easy to conclude that the significant sales to which Voth
19 refers are attributable to the BANG mark centric social media campaign and the rebranding of the
20 company from VPX to Bang Energy, all of which were based on the pervasive use of the BANG
21 mark.

22      Voth's second factor which argues for a low apportionment is the fact that VPX spent $117
23 million in marketing and advertising. This is true. VPX did spend $117.3 million in marketing and
24 advertising. *See* Exhibit 5382, Schedule 2.1; DDX1036-12; Voth Testimony, AHT, p. 3800:12–23.
25 However, VPX spent this vast amount of advertising promoting the BANG name and the BANG
26 mark. In *Neurovision Medical Products, Inc v. Nuvasive, Inc.*, 2014 WL 12544830 (C.D. Cal
27 2014), the jury awarded the plaintiff $30 million in disgorged profits. After the trial, Judge Fischer
28 of the district court for the Central District of California (the same Judge Fischer who issued her

1 November 30, 2020 ruling in this case) considered the pending Rule 50 motion for judgment as a
2 matter of law filed by the defendant and ruled that the Rule 50 motion was denied and the jury's
3 verdict was affirmed. As to the issue of apportionment, Judge Fischer reasoned that (i) profits due
4 to the market appeal of plaintiff's trademark symbol, like the market appeal of the BANG mark
5 here, are attributable to the infringement **even if that market value was not created by the**
6 **plaintiff, citing the United States Supreme Court decision in *Mishawaka Rubber*, at 206**; and
7 (ii) because defendant's president testified that the plaintiff's trademark was the "centerpiece" of
8 defendant's marketing strategy, just like the BANG mark was the centerpiece of VPX's marketing
9 strategy (as discussed in further detail below), a "significant portion" of defendant's profits was
10 due to its use of the plaintiff's mark. Judge Fischer also emphasized the presumption (the
11 rebuttable presumption) that defendants' profits are the result of the infringing activity. *Id.* at *10.
12 Although it is true that VPX created a brilliant and effective advertising and social media campaign
13 which stimulated tremendous sales by young consumers, it cannot be denied that the "centerpiece"
14 of that advertising and social media campaign was the use of the BANG mark.

15 Voth's third factor which argues for a low apportionment is the fact that VPX built a
16 nationwide distribution network and his fourth factor which argues for a low apportionment is the
17 fact that VPX pioneered the "performance energy" submarket. Both those facts may be true, but,
18 again, VPX built its nationwide distribution network *based on the BANG mark* and pioneered all of
19 its markets and sub-markets including, but not limited to, the "performance energy" submarket
20 *based on the BANG mark*. VPX could have built its nationwide distribution network or the
21 "performance energy" submarket based on another tradename, such as Redline, but it did not do
22 that. Rather, VPX made the business decision that the BANG mark added value, despite the VPX
23 Marketing and Sales Restrictions which it ignored, and therefore VPX must live with the
24 consequences of the business decision it made.

25 Voth's fifth factor which argues for a low apportionment is the fact that VPX hired
26 thousands of influencers who, in turn, brought billions of followers who became fans of and
27 followers of the brand. But what is the brand that they (they being the billions of followers)
28 followed (and currently follow)? They followed (and continue to follow) the Bang Energy brand.

1   The followed (and purchased in droves) the BANG Energy RTD (and they continue to follow it).
2   They went to (and go to) the website which has the word "bang" in the domain name. They follow
3   (and continue to follow) social media accounts which make use of the word "bang" and which
4   promote the BANG mark. They, the "Bangsters", even followed (and continue to follow) their
5   "bang" CEO, J. Owoc. This factor, like all of the other factors mentioned above, does not cut in
6   favor of VPX's argument for a low apportionment. Rather, this factor alone screams out for a
7   meaningful apportionment.

8       Voth's sixth factor which argues for a low apportionment is the fact that, according to VPX,
9   there is no evidence of any confusion and his seventh factor which argues for a low apportionment
10  is the fact that VPX's sales and Orange Bang's sales do not impact each other and that there is no
11  "customer substitution" or, to put it another way, there is no diversion of sales away from Orange
12  Bang and to the benefit of VPX. Whether or not there is any confusion, whether it be actual
13  confusion or a likelihood of confusion, that issue is addressed above and that issue goes to liability
14  more so than to damages and apportionment. As to whether or not there is customer substitution,
15  that issue pertains to Voth's damages methodology no. 1, measuring the diversion of sales away
16  from Orange Bang to VPX. The arbitrator agrees with Voth, as stated above, that there has been no
17  diversion of sales and no customer substitution. But this is not a diversion of sales case. This is a
18  disgorgement of profits attributable to the trademark infringement and the breach of the 2010
19  Settlement Agreement based on unjust enrichment and the customer substitution / diversion of
20  sales analysis is irrelevant to the issue of apportionment when attempting to calculate an
21  appropriate disgorgement amount to recompense for VPX's unjust enrichment.

22      Voth's eighth factor which argues for a low apportionment is the fact that the InfoScout
23  analysis showed only a 1% to 2% apportionment, according to Voth and VPX. However, as stated
24  above in the Georgia-Pacific analysis of the thirteenth factor, the InfoScout research report is a
25  thoroughly unconvincing document because it surveyed the wrong relevant market, mostly women
26  when most of the purchasers of the BANG Energy RTD are men and surveyed the wrong market
27  venues, at supermarkets while most of the purchases of the BANG Energy RTD [80% of them]
28  take place at convenience stores.

Case 22-17842-PDR    Doc 523-1    Filed 12/14/22    Page 32 of 81

DocuSign Envelope ID: 91DDD3B1-23D8-4DEF-8E98-1B1F667725F7    Case 5:20-cv-01464-DSF-SHK    Document 126-2    Filed 09/23/22    Page 128 of 177    Page ID
#:5515

1    Voth's ninth factor which argues for a low apportionment is the fact that Voth calculated

2 that Orange Bang's BANG mark only had a value of $2.3 million, according to Voth, as of 2010

3 and, therefore, this should be a cap on the amount of profits attributable to the infringement. But

4 this analysis suffers from the same flaw as *Philips*. By way of this factor, Voth is measuring, or is

5 attempting to measure, the damages from the point of view of Orange Bang. But that is an

6 incorrect analysis according to the case law as discussed above. Rather, Voth should be focusing

7 on the unjust enrichment amount reaped by VPX as the court so held in *Philips*. VPX's reliance on

8 *Trovan, Ltd. v. Pfizer, Inc.*, 2000 WL 709149 (C.D. Cal. 2000) is misplaced. VPX cites *Trovan* in

9 support of Voth's argument that a cap of $2.3 million should be imposed on Orange Bang's

10 damages in order to prevent a windfall. In *Trovan*, the court quoted *McCarthy* 30:84 in which the

11 noted trademark scholar made a comment about an inappropriate windfall awarded to help

12 resuscitate an infringed mark and restore the company's business reputation. However, the quote

13 from *McCarthy* was in a corrective advertising context and *Trovan* was a case where the court was

14 attempting to determine an appropriate award of compensatory damages. *Trovan* is not a case

15 about disgorgement of profits based on unjust enrichment. Thus, Voth's failure to focus on the

16 correct inquiry in this ninth factor does not convincingly justify a low apportionment.

17    But perhaps most telling testimony as to the issue of apportionment came from Bukovi

18 himself who candidly admitted that the BANG mark is "highly valuable", that "Bang features

19 prominently on VPX's Bang products" and that it would be harmful to VPX if VPX could "no

20 longer put the word 'Bang' on drinks." *See* Bukovi Testimony, AHT, p. 2036:4-14.

21    The bottom line on apportionment is that VPX made pervasive, prominent and omnipotent

22 use of the BANG mark in order to generate astronomical revenues and profits and VPX did so

23 without having the legal right to make use of the BANG mark because its products, in particular

24 BANG Energy RTD, were not, and are not, "creatine-based" and therefore the VPX Marketing and

25 Sales Restrictions of paragraph 7 D applied, and still apply, and VPX failed to adhere to them,

26 failed to appreciate the significance of them and even failed to communicate the existence of them

27 to their own marketing department, to their own sales department, to their own science department,

28 to their own employees, to their distributors and to their retailers. This pervasive use of the BANG

128
FINAL ARBITRATION AWARD – PHASE 1 AND PHASE 2

1   mark does not justify a low apportionment. Rather, it warrants a meaningful apportionment

2   percentage.

3         Are Monster and Orange Bang entitled to recover 100% of VPX's profits based on the

4   theory that all of those profits are attributable to the use of the BANG mark? No, of course not. Is

5   VPX correct that only 1% to 2% of VPX's profits, capped at $2.3 million, are attributable to VPX's

6   use of the BANG mark? Certainly not. **Based on the evidence presented at the arbitration**

7   **hearing, much of which is in actuality undisputed, the arbitrator concludes that VPX made**

8   **pervasive use of the BANG mark in order to stimulate impressive revenues and profits from**

9   **the sale of BANG branded products, most notably BANG Energy RTD, and because of this**

10   **nearly omnipotent use of the BANG mark, which has unjustly enriched VPX, an appropriate**

11   **apportionment of profits to be disgorged from VPX/JHO to Monster and Orange Bang is**

12   **35%.**

13         Based on an apportionment of 35%, the calculation of Monster's and Orange Bang's

14   disgorgement of profits remedy is as follows:

15          •  for breach of contract (based on a calculation of apportioned profits subject to

16              disgorgement which excludes net sales which adhered to the VPX Marketing and

17              Sales Restrictions, i.e., excluding sales made within the Nutritional Channel), the

18              amount of **$157.5 million (35% of the breach of contract royalty base calculated**

19              **above)**.

20          •  for trademark infringement (based on a calculation of apportioned profits subject to

21              disgorgement which includes net sales whether they complied with the VPX

22              Marketing and Sales Restrictions or not, i.e., including net sales within the

23              Nutritional Channel), the amount of **$175 million (35% of the trademark**

24              **infringement royalty base calculated above)**.

25

26

27

28

Case 22-17842-PDR    Doc 523-1    Filed 12/14/22    Page 34 of 81
DocuSign Envelope ID: 4DDD385-7E08-4D5F-8F98-1F66272672F Case 5:20-cv-01464-DSF-SHK   Document 126-2    Filed 09/23/22    Page 130 of 177   Page ID #:5517

1   **L. Are Orange Bang and Monster Entitled to Recover Both a Reasonable Royalty and a**
2   **Disgorgement of Profits Attributable to the Infringement?**

3   No.

4   Recovery of both plaintiff's lost profits (of which there are none in this case, other than
5   Orange Bang's lost royalty income, as discussed above) plus disgorgement of defendant's profits is
6   considered to be an inappropriate double recovery under the Lanham Act. *Nintendo,* 40 F.3d at
7   1010. Here, however, the issue is somewhat different. The issue is not whether Monster and
8   Orange Bang can recover both Orange Bang's lost profits and a disgorgement of VPX's profits
9   attributable to the infringement. Rather, the issue in this case is whether or not Monster and
10  Orange Bang can recover both a reasonable royalty and a disgorgement of VPX's profits
11  attributable to the infringement and whether an award of both monetary remedies would constitute
12  double recovery given the policy objectives of the Lanham Act to institutionalize deterrence, but
13  avoid the imposition of a penalty.

14  **However, since Monster and Orange Bang both agree that they do not seek both a**
15  **reasonable royalty and a disgorgement of profits attributable to the infringement, but instead**
16  **seek only one monetary award for the past breach of contract or the past infringement of**
17  **trademark in whatever is the higher amount, there is no need for the arbitrator to address**
18  **and decide the issue identified above. Rather, the arbitrator has calculated the award for (1)**
19  **a reasonable royalty for breach of contract, which excludes sales which adhered to the VPX**
20  **Marketing and Sales Restrictions, i.e., sales within the Nutritional Channel are excluded, in**
21  **the amount of $101,525,000; (2) a reasonable royalty for trademark infringement, which**
22  **includes sales whether they complied with the VPX Marketing and Sales Restrictions or not,**
23  **i.e., whether or not the sales were within or outside of the Nutritional Channel, in the amount**
24  **of $112,314,490.75; (3) a disgorgement of apportioned profits for breach of contract, which**
25  **excludes sales which adhered to the VPX Marketing and Sales Restrictions, i.e., sales within**
26  **the Nutritional Channel are excluded, in the amount of $157.5 million; or (4) a disgorgement**
27  **of apportioned profits for trademark infringement, which includes all domestic sales whether**
28  **they complied with the VPX Marketing and Sales Restrictions or not, i.e., whether or not the**

130
FINAL ARBITRATION AWARD – PHASE 1 AND PHASE 2

Case 22-17842-PDR Doc 523-1 Filed 12/14/22 Page 35 of 81

DocuSign Envelope ID: 91DD2361-73D8-4D5F-85981-21F66772750
Case 5:20-cv-01464-DSF-SHK Document 126-2 Filed 09/23/22 Page 131 of 177 Page ID
#:5518

1  sales were within or outside of the Nutritional Channel, in the amount of $175 million. The

2  arbitrator agrees that Monster and Orange Bang can only recover one of these amounts in

3  order to remedy the past violations, but in the highest amount of the four calculations, which

4  in this case is the amount of $175 million, due and payable by VPX (and by JHO to the extent

5  applicable, see footnote 36 *infra)* to Orange Bang and Monster no later than April 29, 2022.

6     These findings are summarized in section IV below.[35]

7

8  **M. Damages for the Past and Injunctive Relief, with Geographic Limitations, for the**

9     **Future or, in the Alternative, an Ongoing Reasonable Royalty of 5% of Future Net**

10    **Sales**

11    Monster seeks specific performance of paragraph 7 of the 2010 Settlement Agreement in

12  connection with its breach of contract claim and Orange Bang and Monster both seek a permanent

13  injunction to prevent future acts of trademark infringement in connection with Orange Bang's

14  trademark infringement claim and in connection with Monster's breach of contract / specific

15  performance claim. The practical effect of both of these two equitable remedies, injunctive relief to

16  prevent the risk of future harm for trademark infringement and specific performance and injunctive

17  relief to prevent the risk of future harm for breach of the 2010 Settlement Agreement moving

18  forward, are identical and both turn, in this instance, on the crucial element of whether or not

19  Orange Bang and Monster each have an inadequate remedy at law, a crucial element which is

20  common to both the claims for the equitable remedy of injunctive relief and for the equitable

21  remedy of specific performance. Accordingly, the arbitrator will focus on both the equitable

22  remedy of injunctive relief which addresses the risk of potential future harm resulting from

23  trademark infringement as well as the equitable remedies of specific performance and injunctive

24  relief which address the risk of potential harm resulting from a breach of contract in the future.

25

26

27

---

[35] The effect of the elections by the parties on the recovery of attorney's fees is discussed below.
28  See findings, determinations and conclusions relating to Phase 2 issues as discussed in Section III,
    Q. below.

Case 22-17842-PDR   Doc 523-1   Filed 12/14/22   Page 36 of 81

DocuSign Envelope ID: 9A0DD395-2F08-405F-8F50-1F6E672572C   Case 5:20-cv-01464-DSF-SHK   Document 126-2   Filed 09/23/22   Page 132 of 177   Page ID #:5519

1    Section 1116(a) of the Lanham Act vests the arbitrator with the discretion to issue a

2  permanent injunction based on equitable principles. In addition, the revised Section 1116(a)

3  codifies the rule that a plaintiff seeking an injunction is entitled to a rebuttable presumption of

4  irreparable injury upon a finding of trademark infringement, a finding which has now been made in

5  this case as set forth above. Under the Lanham Act, Orange Bang is entitled to injunctive relief if it

6  has established that "(1) it has suffered irreparable injury; (2) its remedies available at law, such as

7  monetary damages, are inadequate; (3) an injunction is warranted after considering the balance of

8  hardships as between the parties; and (4) the public interest would not be disserved by a permanent

9  injunction." *eBay, Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006); *Reno Air Racing Ass'n v.*

10  *McCord*, 452 F.3d 1126,1137 (9th Cir. 2006).

11    As to the first element, irreparable harm is presumed by Section 1116(a). VPX has elicited

12  no convincing evidence to rebut this presumption. Moreover, evidence that Orange Bang has lost

13  control over its business reputation and has suffered damages to its goodwill occasioned by VPX's

14  pervasive use of the BANG mark likewise constitutes irreparable injury. *Herb Reed Enters., LLC*

15  *v. Fla Entm't Mgmt,* 736 F.3d 1239, 1250 (9th Cir. 2013).

16    As to the second element, in *Century 21 Real Estate Corporation v. Sandlin*, 846 F.2d 1175,

17  1180 (9th Cir. 1988), the Ninth Circuit held that in a trademark infringement case, the injury

18  caused by a defendant's continuous infringement, i.e., the risk of future infringement, satisfies the

19  "no adequate remedy at law" requirement. *Sandlin* has been recently cited with approval in *Mikuni*

20  *Ginko, Ltd. v. Feng Chen Buffet, Inc.,* 2020 WL 2128646, at *5 (C.D. Cal. 2020) [injunctive relief

21  appropriate in trademark infringement case because there is no adequate remedy at law for

22  continuing infringement]; *Comphy Co., Inc. v. Comfy Sheet*, 2021 WL 5051929, at *8 (C.D. Cal.

23  2021) [same, in a November of 2021 ruling by Judge Wright]. There is no indication that VPX will

24  stop its infringing activity or abide by the VPX Marketing and Sales Restrictions set forth in

25  paragraph 7 D of the 2010 Settlement Agreement. *Pollution Denim & Co. v. Pollution Clothing*

26  *Co.,* 2008 WL 11337644, at *7 (C.D. Cal. 2008). In this respect, the risk that VPX will continue to

27  infringe Orange Bang's trademark rights in the future demonstrates that Orange Bang has no

28  adequate remedy at law.

1      As to the third element, the balance of hardships tips in favor of Orange Bang because VPX

2 will suffer no hardship if it is simply required to comply with trademark law or required to honor

3 its own 2010 Settlement Agreement. *Deckers Outdoor Corp. v. Ozwear Connection Pty Ltd,* 2014

4 WL 4679001, at *3 (C.D. Cal. 2014).

5      As to the fourth element, the public interest would not be disserved by the issuance of a

6 permanent injunction because the public has an interest in avoiding confusion between two

7 companies, in this case the confusion between Orange Bang and VPX. *Internet Specialties West,*

8 *Inc. v. Milon-DiGiorgio Enters., Inc.*, 559 F.3d 985,993 n5 (9th Cir. 2009). Similarly, the public

9 interest is not disserved when a party like VPX is required to comply with trademark law or

10 required to comply with a contractual agreement that it freely entered into on a voluntary basis as

11 part of a calculated business decision it made based on legal advice.

12      The case of *Tamarind Lithography Workshop, Inc. v. Sanders*, 143 Cal.App.3d 571 (1983)

13 is instructive both with respect to specific performance and with respect to the election of remedies

14 issue as to past compensatory damages v. future potential harm, discussed in more detail below. In

15 *Tamarind,* Sanders asserted claims that Tamarind breached a contract to accord him screen credit

16 as the writer, director and producer of a film on lithography. The jury awarded him $25,000 in

17 damages and Sanders thereafter moved the court for equitable relief, for an injunction, to prevent

18 Tamarind from exhibiting the film in the future unless Sanders received his screen credit. The trial

19 court denied this request on the grounds that Sanders could not satisfy the inadequate remedy at

20 law element because he had already been awarded monetary damages. The appellate court,

21 however, reversed and ruled that the injunction was no longer the issue because "specific

22 performance as requested by Sanders will solve the problem." *Id. at* 575. The court reasoned that

23 the $25,000 jury award recompensed Sanders for his *past* harm, but that this monetary award did

24 not address his potential *future* injuries. In particular, the court held that the harm resulting from

25 future exhibitions of the film might be deemed to be a continuous breach of contract and therefore

26 create the danger of an untold number of lawsuits and that this finding satisfied the element of an

27 inadequate remedy as a matter of law (and, as stated above, an element crucial to the determination

28

1  of both the permanent injunction equitable remedy and the specific performance equitable remedy)

2  and, therefore, the award of the equitable remedy of specific performance was appropriate. *Id.*

3       In *Tamarind*, the court also set forth the requisite elements in order to establish the

4  equitable remedy of specific performance as follows: "(1) the inadequacy of the legal remedy; (2)

5  an underlying contract is both reasonable and supported by adequate consideration; (3) the

6  existence of a mutuality of remedies; (4) contractual terms which are sufficiently definite to enable

7  the court to know what it is to enforce; and (5) a substantial similarity of the requested performance

8  to that promised in the contract." *See also Real Estate Analytics, LLC v. Vallas*, 160 Cal.App.4th

9  463, 472 (2008).

10      The first element set forth above is satisfied in this case because, like in *Tamarind*, if VPX

11 does not comply with the Marketing and Sales Restrictions of paragraph 7 in the future, such a

12 failure creates the risk of an untold number of lawsuits in the future. The second, third and four

13 elements set forth above are all satisfied by virtue of the prior findings by the arbitrator, set forth

14 above in this Final Arbitration Award, that Monster demonstrated all of the elements necessary to

15 prevail on the breach of contract claim, the express findings that form the ruling that VPX breached

16 the 2010 Settlement Agreement. The fifth element set forth above is likewise satisfied because the

17 performance requested by an award of specific performance is essentially the same performance as

18 promised by VPX in paragraphs 7 and 17 of the 2010 Settlement Agreement. Accordingly, an

19 award of the equitable remedy of specific performance, much like the award of the equitable

20 remedy of the permanent injunction, is appropriate in this case.

21      In addition, and pursuant to AAA Rule 47(a) and under California law, and as separate,

22 independent and distinct rationales for the award of the equitable remedy of specific performance,

23 the arbitrator is vested with equitable discretion to fashion an appropriate remedy. As stated above,

24 the purpose of a permanent injunction (as set forth below) and specific performance in this instance

25 is to prevent future trademark infringement *and* to prevent a future breach of the 2010 Settlement

26 Agreement. With respect to the latter consideration, the arbitrator hereby finds that the requisite

27 elements for specific performance have been satisfied and that an award of specific performance

28

1   will help ensure that VPX complies with the 2010 Settlement Agreement and, in particular

2   paragraphs 7 and 17, in the future.

3       Accordingly, effective April 1, 2022, VPX, as well as its related entity JHO (already

4   determined to be a de facto party to these proceedings by Judge Fischer),[36] are permanently

5   enjoined from making use of the BANG mark as follows:

6       1.      Subject to the further geographic limitations set forth in paragraph 3 below, VPX

7   and JHO and the Categories of Persons Bound (defined below) shall cease making any use of the

8   BANG mark, or the word "Bang", "BANG", "Bang!", "bang", or "BANG!", or any confusingly

9   similar variations thereof, however spelled, whether capitalized, abbreviated, singular or plural,

10  printed or stylized, alone or in combination with any other letters, words, phrases, or designs, on

11  any current or future product (whether a beverage or otherwise), on any product container, on any

12  product packaging, on any email address, on any letterhead, on any business card, on any other

13  form of communication, on any website, on any social media account, on any traditional media, on

14  any social media advertisement or promotion, on any point of sale advertisement, on or at any

15  promotional event or on or in any other corporate capacity, unless the marketing, promotional,

16  advertising or sales activity for any of VPX's products is directed only to the Nutritional Channel.

17  The term "Nutritional Channel" shall mean and refer to the marketing and sales channel which

18  comports with the VPX Marketing and Sales Restrictions of paragraph 7 D of the 2010 Settlement

19  Agreement which provides: " . . . so long as the beverage or dietary supplement is only marketed

20  and sold through vitamin and nutritional supplement stores to include but not limited to GNC,

21  Vitamin Shoppe, other specialty vitamin and nutritional stores, gyms and health clubs or to the

22  vitamin and dietary supplement sections only of any convenience or other stores."

23

24

25  [36] See Exhibit 2924, Judge Fischer's November 30, 2020 ruling, p. 11. Judge Fischer did not rule
    on the issue of whether or not JHO was a necessary or indispensable party to these arbitration
    proceedings. Judge Fischer's ruling went further than that singular ruling. Judge Fischer
26  specifically ruled that JHO, as a successor in interest to VPX per paragraph 14 of the 2010
    Settlement Agreement, is a part of this arbitration and bound by the arbitrator's ruling. Thus, Judge
27  Fischer has confirmed that the arbitrator has the jurisdiction to extend the Permanent Injunction
    against VPX to bind JHO as well. Similarly, any order requiring payment by VPX likewise
28  requires JHO to make the payment to the extent that JHO is the payor or the recipient of any funds
    due and owing to Orange Bang and Monster.

2.     Subject to the further geographic limitations set forth in paragraph 3 below, VPX and JHO and the Categories of Persons Bound shall immediately cease selling the following products, which are not "creative-based", under the BANG mark: (a) Bang 357; (b) BANG Energy RTD (both the caffeinated and non-caffeinated versions); (c) Natural Bang aka BANG Natural; (d) Bang Shots; (e) Bang Keto-Coffee; (f) Bang Tea; (g) Bang ThermIQ; (h) Bang Pristine Protein Bar; and (i) Bang Mixx, but only to the extent that product is marketed or sold by VPX or JHO or the Categories of Persons Bound as opposed to Entourage or Quash[37], unless the marketing, promotional, advertising or sales activity for these VPX products is directed only to the Nutritional Channel.[38]

3.     As a express limitation on the permitted uses of the BANG mark described in paragraphs 1 and 2, and in addition to the relief ordered in paragraphs 1 and 2 above, the Arbitrator finds that an injunction tailored domestically to the twelve states of the United States where Orange Bang sells its products is appropriate. Accordingly, VPX and JHO and the Categories of Persons Bound are permanently enjoined from any use of the BANG mark (even in the manner permitted by paragraphs 1 and 2 above) in the twelve states where Orange Bang sells its products and those states are: California, Nevada, Oregon, Washington, Arizona, New Mexico, Hawaii, Idaho, Utah, Texas, Illinois and New York.[39] In this respect, although VPX and JHO and the Categories of Persons Bound cannot make any use of the Bang Mark in the twelve states referred to above, VPX and JHO and the Categories of Persons Bound may make use of the Bang Mark elsewhere (i.e., in the other 38 states of the United States and internationally) so long as their marketing and sales activities comply with the Marketing and Sales Restrictions of paragraph 7 and the other provisions of the 2010 Settlement Agreement.

Paragraphs 1 – 3 above shall be referred to as the "Permanent Injunction." The terms of paragraphs 1 and 2 of the Permanent Injunction shall apply to VPX and JHO, as well as any of their

[37] As explained in Section III, P., the injunction is not issued against Entourage or Quash.
[38] Although no evidence was presented with respect to the BANG Creatine Bar, according to VPX's Exhibit "A" submitted on November 9, 2021, the BANG Creatine Bar contains CM and, therefore, the arbitrator assumes for present purposes that the BANG Creatine Bar is a "creatine-based" product and thus a paragraph 7 C product, and not a paragraph 7 D product.
[39] Stein Testimony, AHT, p. 116:19 - 117:4.

136
FINAL ARBITRATION AWARD – PHASE 1 AND PHASE 2

1  officers, agents, servants, employees, attorneys, successors, and assigns, and all those persons or

2  entities acting in active concert or participation with them (the "Categories of Persons Bound").

3  Fed. R. Civ. P. 65(d)(2); Exhibit J-11 ¶ 14. The terms of paragraph 3 of the Permanent Injunction

4  shall likewise apply to VPX and JHO and the Categories of Persons Bound. Fed. R. Civ. P.

5  65(d)(2). As further discussed below, some of the issues raised by the Motion to Clarify are the

6  scope of the Permanent Injunction and what categories of persons and entities are likewise bound

7  by the Permanent Injunction. The rationale for the arbitrator's rulings as to these issues is

8  discussed below.

9

10  **N. The Motion to Clarify**

11         In late January of 2022, after the Interim Arbitration Award was served on the parties,

12  Monster and Orange Bang submitted the Motion to Clarify by which they requested that the

13  arbitrator correct and/or clarify various "unclear" issues addressed in the Interim Arbitration

14  Award. Monster and Orange Bang submitted several written briefs in support of the Motion to

15  Clarify, which included an email response setting forth Monster's and Orange Bang's positions on

16  particular questions raised by the arbitrator with respect to the Motion to Clarify. VPX likewise

17  submitted several written briefs in opposition to the Motion to Clarify, which also included an

18  email response setting forth VPX's positions on particular questions raised by the arbitrator with

19  respect to the Motion to Clarify and, in so doing, VPX itself essentially requested clarification of

20  several issues addressed in the Interim Arbitration Award as well. At the same time, in its

21  opposition papers to the Motion to Clarify, VPX argued that the arbitrator had no power or

22  jurisdiction to clarify the Interim Arbitration Award because, according to VPX, to do so would

23  violate AAA Rule 50.

24         Before addressing the Rule 50 issue, the issue of whether or not the arbitrator has the power

25  and jurisdiction to correct and/or clarify any "unclear" portions of the Interim Arbitration Award, it

26  is first necessary to again explain the fundamental purpose, objectives and intent of the Interim

27  Arbitration Award. The arbitrator found VPX liable on the trademark infringement related claims,

28  claims which inured to the benefit of Orange Bang because of an agreement made between Orange

1  Bang and Monster as set forth in the Assignment Agreement. The arbitrator also found VPX liable
2  on the breach of contract/specific performance claim, a claim which inured to the benefit of
3  Monster because of the Assignment Agreement.

4      Based on these findings of liability in favor of Orange Bang with respect to the trademark
5  related claims and in favor of Monster with respect to the contract claim, the arbitrator concluded
6  that it was necessary to make four different calculations in order to determine the amount of
7  compensatory damages due and owing to Orange Bang for the *past* trademark infringement up to
8  and including September 19, 2021, the date through which Orange Bang's and Monster's expert
9  based his computations (the "Past Period of Time") and the amount of compensatory damages due
10  and owing to Monster for the *past* breach of contract for the Past Period of Time. These four
11  calculations are: (1) reasonable royalty – trademark infringement; (2) disgorgement of profits –
12  trademark infringement; (3) reasonably royalty – breach of contract; and (4) disgorgement of
13  profits – breach of contract. Although the arbitrator made an express finding of liability in favor of
14  Orange Bang on the trademark claim and in favor of Monster on the contract claim as to Past
15  Period of Time, in order to avoid a potential problem with double recovery, and in order to ensure
16  that there was no "double-dipping" as to the award of compensatory damages as to the Past Period
17  of Time, the arbitrator gave Orange Bang and Monster an election as to which of these four
18  calculations they wanted to select, an election that they had to exercise on or before January 31,
19  2022 (the "Orange Bang / Monster Election").

20      Orange Bang and Monster timely exercised the Orange Bang / Monster Election and, not
21  surprisingly, they elected for the highest award, the disgorgement of profits award for trademark
22  infringement in the amount of $175 million. According to VPX as argued in connection with the
23  Motion to Clarify and in connection with the Phase 2 issues, the election of remedies by Orange
24  Bang and Monster resulting from the Orange Bang / Monster Election as to the Past Time Period
25  had significant legal implications. VPX's contentions regarding the election of remedies are
26  discussed below.

27      As a threshold issue arising prior to the discussion of VPX's election of remedies argument,
28  VPX contends that AAA Rule 50 prevents the arbitrator from addressing the issues raised by

138
FINAL ARBITRATION AWARD – PHASE 1 AND PHASE 2

1  Orange Bang and Monster by way of the Motion to Clarify. VPX contends that the arbitrator may
2  only correct clerical, typographical or computational errors. VPX may be correct in this assertion *if*
3  the Interim Arbitration Award was a Final Arbitration Award and if the arbitrator specifically
4  intended it to be, and expressly stated that it was a "final" award (such as this Final Arbitration
5  Award). However, as the controlling case law makes clear, VPX is incorrect in its assertion with
6  respect to the Interim Arbitration Award because it specifically states that it is not a Final
7  Arbitration Award and it specifically states that the arbitrator did *not* intend it to be the final word
8  on the adjudication of issues. As the Interim Arbitration Award specifically states on the final page
9  of the Interim Arbitration Award, page 149:

10  "Any *further determinations* to be made at *any additional hearing*, *including* any Phase 2
11  determinations, *shall be embodied in a Final Award*, which shall also incorporate the
12  contents of this Interim Arbitration Award. The arbitrator does *not intend* this Interim
13  Arbitration Award to be *subject to review*, either pursuant to 9 U.S.C. Sections 9 and 10 or
14  California Code of Civil Procedure Sections 1284 and 1285 or otherwise. This Interim
15  Arbitration Award shall remain in full force and effect in favor of Monster and Orange
16  Bang and against VPX and JHO *until such time* as a Final Arbitration Award is rendered."
17  (Emphasis added.)

18  In addition, the case law construing AAA Rule 50 demonstrates that an arbitrator is free to
19  clarify his or her rulings set forth in an "interim" arbitration award. In *Bosack v. Soward*, 586 F.3d
20  1096, 1102-03, (9th Cir. 2009), the Ninth Circuit held, in a case of first impression, that neither
21  prior Rule 46 of the AAA rules (the predecessor to Rule 50 of the AAA rules) nor the doctrine of
22  *functus officio* prevented the arbitrator from revising an interim arbitration award unless the award
23  was intended to be final and unless the arbitrator expressly stated that the award was indeed
24  "final".[40] In footnote 1 of *Bosack*, the Ninth Circuit made it clear that even if the subsequent
25

___

26  [40]  As stated in *Bosack* at 1103 and in *Wakeman v. Aqua2 Acquisition, Inc.*, 2011 WL 666028, at *
    4 (D. Minn, 2011), the doctrine of *functus officio* precludes an arbitrator from re-adjudicating an
27  issue which he or she has previously and finally adjudicated. Or, to put it another way, once the
    doctrine of *functus officio* attaches, the arbitrator no longer has jurisdiction to re-determine an issue
28  already determined in the form of a "final" award. However, the doctrine of *functus officio* in this
    case does not yet apply and has not yet attached.

139
FINAL ARBITRATION AWARD – PHASE 1 AND PHASE 2

1 arbitration award was deemed to be a modification, because the interim arbitration award was not

2 "final", any modification of it was permissible. Similarly, in *Markel Am. Ins. Co. v. Internet*

3 *Brands, Inc.*, 2017 WL 10433914, at *5-6 (2017), the district court held, following *Bosack*, that an

4 arbitration award, especially an "interim" arbitration award, by definition, is not intended to be

5 final unless it specifically states that it is "final". Here, the Interim Arbitration Award is labeled

6 "Interim" and page 149 makes it clear that there was no intent to make it "final". *See also*

7 *McClatchy Newspapers v. Central Valley Typographical Union No.* 46, 868 F.2d 731, 734, n1 (9th

8 Cir. 1982) ["[A]n arbitrator can . . . clarify an ambiguity in the award" even after an award is final.]

9 In short, AAA Rule 50 applies to the Final Arbitration Award. It does not apply to the

10 Interim Arbitration Award issued on January 6, 2022. Therefore, and because of the arbitrator's

11 expressed intent with regard to the Interim Arbitration Award as reflected on page 149, the

12 arbitrator has the power and the jurisdiction to "clarify" or even modify any of the rulings set forth

13 in the Interim Arbitrator Award as reflected in this Final Arbitration Award.

14

15 **O. VPX's Election of Remedies Argument**

16 As mentioned above, VPX contends that the Orange Bang / Monster Election effectuated a

17 trademark election of remedies which prevents Monster from recovering breach of contract

18 remedies. VPX has couched this election of remedies argument in many different ways. For

19 example, VPX has simultaneously asserted arguments that because of the Orange Bang / Monster

20 Election, Monster is precluded (i) from its breach of contract claim as to compensatory damages

21 during the Past Time Period; (ii) from obtaining specific performance as to future harm; (iii) from

22 demonstrating irreparable harm; (iv) from benefiting from a permanent injunction; (v) from

23 enforcing the "lane restrictions" of paragraph 7 of the 2010 Settlement Agreement moving forward;

24 (vi) from benefiting from the 5% continuing royalty (discussed below); (vii) from recovering any

25 type of contract remedy because of estoppel; (viii) from recovering any type of contract remedy

26 because of abandonment; (ix) from recovering any type of contract remedy because of a de facto

27 voluntary dismissal; (x) from recovering any type of contract remedy because of waiver; (xi) from

28 recovering any type of contract remedy because the contract-related issues are now moot; (xii)

1   from recovering any type of contract remedy because of inconsistent remedies; (xiii) from

2   recovering any type of contract remedy because of a failure of proof; (xiv) from recovering any

3   type of contract remedy because Monster and Orange Bang are two distinct entities and not a single

4   plaintiff; and (xv) from attaining the status of a prevailing party as it relates to the recovery of

5   attorney's fees and costs; among other arguments including, but not limited to, VPX's argument

6   that the Orange Bang / Monster Election wipes away, negates and repudiates the 2010 Settlement

7   Agreement altogether.  Despite these different labels, descriptions and characterizations of these

8   various legal theories, as the arbitrator understands it, and as counsel for VPX essentially

9   confirmed during the March 17, 2022 hearing, VPX is really making the same basic argument

10   many times over – namely that the Orange Bang / Monster Election by which Orange Bang opted

11   for the trademark remedy precludes Monster from recovering  any type of breach of contract

12   remedy, even for the future time period (collectively, "VPX's Election of Remedies Argument").

13        VPX's Election of Remedies Argument, however, fails from a fundamental flaw in its

14   reasoning.  As the Interim Arbitration Award and this Final Arbitration Award demonstrate, the

15   Orange Bang / Monster Election elected the trademark – disgorgement of profits calculation for the

16   *Past* Time Period.  And, again, the arbitrator requested that Orange Bang and Monster formally

17   make this election in order to ensure that there was no double recovery as to compensatory

18   damages for the Past Time Period.  In this respect, the Orange Bang / Monster Election therefore

19   addresses the issue of *past* harm, but it does not speak to the issue of potential future harm arising

20   from future trademark infringement or the future harm arising from a breach of the 2010 Settlement

21   Agreement should VPX fail to adhere to the Marketing and Sales Restrictions of paragraph 7.

22   These are potential future harms which are separate, independent and distinct from the

23   compensatory damages awarded in this Final Arbitration Award to recompense Orange Bang for

24   the trademark infringement which took place during the Past Time Period.[41]

25

26   [41] Although based on Alabama contract law, the reasoning of *American Farm Bureau Federation*
27   *v. Alabama Farmers Federation*, 935 F.Supp. 1533 (M.D. Ala. 1996) is persuasive.  In *American Farm*, the defendant continued to use the "Farm Bureau" mark after the sell-off period agreed upon
28   by the parties in a pre-existing settlement agreement had expired, thus constituting both a
(Continued...)

141

1      Case decisions under both California state law and under federal law support this

2   conclusion. In *Guttinger v. Calaveras Cement Company*, 160 Cal.App.2d 460 (1958), the plaintiff,

3   an adjoining landowner, sued a defendant, a cement plant, which caused dust and chemicals to land

4   on plaintiff's property. The plaintiff was awarded injunctive relief. Later, in a second action, and

5   after the nuisance continued, the plaintiff sought monetary damages. The defendant argued that

6   plaintiff's claim was barred for a variety of reasons, including because of plaintiff's prior election

7   of remedies. The defendant argued that the plaintiff was estopped from seeking monetary damages

8   in the second action. The court disagreed and ruled that the plaintiff's prior election for injunctive

9   relief was merely an additional remedy and that it did not preclude a separate and distinct remedy

10  for monetary damages relating to this later time period. In *Cargill v. Sears Petroleum & Transport*

11  *Corp.*, 2004 WL 3507329 (NDNY 2004), the plaintiff prevailed on a claim for damages before a

12  jury on a contract claim and on a patent infringement claim. The court (applying Minnesota state

13  law) determined that plaintiff was entitled to recover monetary damages as well as the equitable

14  remedy of specification performance. The defendant argued that the equitable remedy was barred

15  because of plaintiff's prior election of remedies. The court disagreed because the claim for

16  monetary damages were intended to remedy past loses, but the claim for monetary damages did not

17  cover the time period in the future. As the court restated the controlling rule of law: "Election of

18  remedies has no application where a party has different remedies for the enforcement of different

19  and distinct rights or redress of different and distinct wrongs." *Id* at *13.

20     In short, the Orange Bang / Monster Election pertained to past compensatory damages

21  arising during the Past Period of Time and thus had no bearing on the rights of either Orange Bang

22  or Monster to prevent the separate, independent and distinct types of harm in the form of trademark

23

24

25  trademark infringement and a breach of contract. The court awarded both monetary relief for
    trademark infringement under the Lanham Act with respect to the past damages, as well as specific
    performance (under Alabama law) and injunctive relief in order to address defendant's future

26  conduct so as to ensure compliance with the previously negotiated settlement agreement. *Id.* at
    1545-1546 and 1552-1554. Similarly, whether or not the Orange Bang / Monster Election was an

27  election of remedies as to the *Past* Time Period, it did not effectuate an election of remedies as to
    the potential harm which would result from future trademark infringements or from future breaches

28  of contract, *both* of which are the basis for injunctive relief and the latter of which is the basis for
    specific performance,

                                        142

                    FINAL ARBITRATION AWARD – PHASE 1 AND PHASE 2

1   infringement or breach of contract which may arise in the future. As discussed above, both

2   injunctive relief and specific performance turn on the all-important element of an inadequate

3   remedy at law, the "practical effect" element referred to above, and, in many respects, the entire

4   purpose of the Permanent Injunction in the first instance is to ensure compliance with the 2010

5   Settlement Agreement. In this respect, the award of compensatory damages based on trademark

6   infringement during the Past Time Period and the award of equitable remedies based on *both*

7   trademark infringement and breach of contract arising in the future are **not** inconsistent remedies.

8   Accordingly, VPX's Election of Remedies Argument is not well taken and is hereby rejected.

9

10  **P. Confusingly Similar Marks**

11      As the language of the Permanent Injunction sets forth above demonstrates, the Permanent

12  Injunction extends to confusingly similar marks. Ninth Circuit case law requires this result, as

13  VPX concedes in its February 25, 2022 reply brief (p. 11). In *GoTo.com, Inc. v. Walt Disney Co*.,

14  202 F.3d 1199, 1211 (9th Cir. 2000), the Ninth Circuit affirmed the district court's grant of a

15  permanent injunction which prohibited the defendant from using the mark at issue as well as

16  "confusingly similar variations" of the mark. *See also Theorem, Inc. v. Citrusbyte, LLC*, 2021 WL

17  6206964, at *1 (C.D. Cal. 2021) [granting injunction which prohibits defendant from using mark

18  "however spelled, whether capitalized, abbreviated, singular or plural, printed or stylized, and

19  whether used in caption, text, orally or otherwise, or any mark or logo which is confusingly

20  similar."] Thus, clarifying guidance to the parties in this Final Arbitration Award is especially

21  appropriate in this case given Orange Bang's stated concern that VPX may move forward with the

22  use of a "Bangg" mark, apparently based on VPX's belief that the usage of the "Bangg" mark is

23  not confusingly similar to the Bang Mark. Ninth Circuit authority has made it clear that a

24  purported trademark infringer "must keep a fair distance from the margin line" and minimal

25  changes to a mark do not circumvent the confusingly similar standard for the usage of marks.

26  *Wolfard Glassblowing Co. v. Vanbragt*, 118 F.3d 1320, 1323 (9th Cir. 1997), quoting *McCarthy on*

27  *Trademarks*, Section 30.13 (1996).

28

Case 22-17842-PDR   Doc 523-1   Filed 12/14/22   Page 48 of 81

DocuSign Envelope ID: 21DDD396-4808-445F-8F99-121F6677267F Case 2:20-cv-01464-DSF-SHK   Document 126-2   Filed 09/23/22   Page 144 of 177   Page ID #:5531

1   VPX contends that this clarification is not appropriate and will actually increase confusion
2   as to what VPX and JHO and Categories of Persons Bound can and cannot do.  VPX likewise
3   argues that the line between use of the mark and the use of a confusingly similar mark is not
4   sufficiently clear or defined.  The arbitrator disagrees with VPX in this regard.  VPX knows the
5   line – it cannot make use of the Bang Mark or a mark confusingly similar to the Bang Mark.
6   Should any dispute arise, however, VPX and JHO and Categories of Persons Bound are fully
7   protected because if one of them believes that its usage has not crossed the line, and Orange Bang
8   and Monster believe that their usage has indeed crossed the line, the issue can be fully litigated and
9   adjudicated in a subsequent proceeding, if need be.  In other words, if a dispute arises in the future
10  as between Orange Bang and Monster, on the one hand, and VPX, JHO and Categories of Persons
11  Bound, on the other, as to the scope of the Permanent Injunction or whether a particular use is
12  confusingly similar or not, both sides are fully protected because in a subsequent proceeding both
13  sides will have a full and fair opportunity to be heard on the issues which means that VPX's due
14  process right will be safeguarded by way of the subsequent proceeding and both sides will be
15  entitled to whatever remedies are deemed appropriate and awarded in the subsequent proceeding.

16  It was the arbitrator's intention to make it clear in the Interim Arbitration Award that the
17  Permanent Injunction extended to confusingly similar marks, but the arbitrator did not make it clear
18  enough and, therefore, the arbitrator does so now in the Final Arbitration Agreement.  In short, the
19  Permanent Injunction enjoins VPX and JHO and Categories of Persons Bound from making use of
20  the Bang Mark or marks confusingly similar to the Bang Mark on Bang-branded products.
21  Moreover, if the arbitrator failed to take the opportunity to clarify potential ambiguities or
22  loopholes in the Permanent Injunction, such a failure to clarify not only increases the likelihood of
23  future disputes, the failure to clarify also inadvertently creates a disincentive for VPX and JHO and
24  Categories of Persons Bound to comply with the 5% continuing royalty discussed below, the
25  equitable remedy which, hopefully, renders the need for the Permanent Injunction unnecessary in
26  the first place.  And, again, as discussed specifically below, the issues of the scope of the
27  Permanent Injunction and the issue of a confusingly similar mark only arise if VPX and/or JHO fail
28  to pay the 5% continuing royalty.

1     **Q. Categories of Persons Bound By the Permanent Injunction**

2          In conformity with Rule 65(d) of the Federal Rules of Civil Procedure, the arbitrator hereby

3 clarifies that the Permanent Injunction is binding upon VPX, upon JHO and upon any of their

4 Categories of Persons Bound.

5          First, corporate entities like VPX and JHO operate through living and breathing people and

6 therefore all of these Categories of Persons Bound should be bound by the Permanent Injunction,

7 otherwise the Permanent Injunction is an empty basket which provides no practical protection and

8 does not serve its intended purposes. Second, this clarification conforms with the intent of the

9 parties as expressly stated in paragraph 14 of the 2010 Settlement Agreement which provides that it

10 is binding upon ". . . agents, servants and employees, their successors, predecessors and assigns and

11 each of them . . . ." *See* Ex. J-11, paragraph 14.

12          Third, there is no danger that this clarification runs afoul of the holding in *Benaroya v.*

13 *Willis,* 23 Cal.App.4th 462 (2018) because this Final Arbitration Award does not make any

14 adjudication as whether or not any particular person potentially falling within the Categories of

15 Persons Bound is in fact bound by the Permanent Injunction or whether or not the particular person

16 potentially falling with the Categories of Persons Bound is actually bound by the arbitration

17 provision within the 2010 Settlement Agreement (e.g., is alleged violator "Jones" really an "agent"

18 of VPX such that he or she is bound by the Permanent Injunction? Is alleged violator "Jones" in

19 fact bound by the arbitration provision in the 2010 Settlement Agreement?) Those types of

20 determinations are to be made by a court at the appropriate time in a subsequent proceeding, if need

21 be, because, as VPX points out and as *Benaroya* so holds, the arbitrator does not have jurisdiction

22 to make such binding specific adjudications, unless and until a court first decides whether or not

23 the arbitration provision in the 2010 Settlement Agreement is binding upon the alleged violator of

24 the Permanent Injunction. But making those specific adjudications, which the arbitrator is not

25 making by way of this Final Arbitration Award, is far different from clarifying the scope and intent

26 of the Permanent Injunction. Again, VPX and JHO and Categories of Persons Bound are fully

27 protected on these potentially disputed issues because each of them retains the opportunity to be

28 heard and the right to show that the particular alleged non-signatory violator(s) are not bound by

1   the Permanent Injunction and/or bound by the arbitration provision in the 2010 Settlement

2   Agreement because, in their view, they do not fall within the Categories of Persons Bound.

3        In addition to *Benaroya*, other case law supports this conclusion. Although VPX cites

4   *Comedy Club, Inc. v. Improv West Associates*, 553 F.3d 1277 (9th Cir.), the *Comedy Club* case

5   actually supports the argument of Monster and Orange Bang with respect to the Categories of

6   Persons Bound issue. In *Comedy Club*, the arbitrator had issued an injunction in favor of plaintiff

7   and plaintiff argued that cousins of former spouses and non-party grandmothers were likewise

8   bound by the injunction which, as a practical matter, enforced a covenant not to compete against

9   them and prevented them from opening a rival comedy club. The Ninth Circuit first affirmed the

10   rule set forth in FRCP 65(d) and reasoned that the injunction should extend not only to the parties,

11   but to "their officers, agents, servants, employees, and attorneys and [upon] those persons in active

12   concert of participation with them" as well. However, this particular injunction went too far. The

13   Ninth Circuit ruled that binding relatives of former spouses and even grandparents, all of whom

14   were non-parties to the arbitration provision at issue, was improper because to do so would foist an

15   unlawful covenant not to compete upon them in violation of California Business and Professions

16   Code Section 16600. *Id* 1287. In this respect, *Comedy Club* supports Monster's and Orange

17   Bang's position on this issue because it reaffirms the rule of FRCP 65(d), but the case also

18   demonstrates an instance where an injunction went too far in attempting to bind non-signatures

19   who should not be bound, which is not the case here.

20        In short, the arbitrator hereby clarifies the scope and intent of the Permanent Injunction and

21   reaffirms that VPX is free, at the appropriate time if need be in a subsequent proceeding, to

22   adjudicate the open and undecided issues of whether the particular non-signatory person or entity at

23   issue falls within the Categories of Persons Bound, or not, or whether they are bound by the

24   arbitration provision within the 2010 Settlement Agreement, or not. The opportunity to be heard in

25   a subsequent proceeding will protect VPX's due process rights in this regard.

26

27

28

1     **R.  A Clarification of the Geographical Limits of the Permanent Injunction**

2        As stated many time above, the purpose and intent of the Permanent Injunction (and/or the

3 5% continuing royalty discussed below) is threefold: (i) to ensure that there are no future acts of

4 trademark infringement; (ii) to ensure that there are no further acts of breach of contract; and (iii) to

5 [hopefully] avoid future disputes between the parties.  Thus, one of the stated objectives underlying

6 the imposition of the Permanent Injunction is to enforce specific performance of the 2010

7 Settlement Agreement (or the payment of the 5% continuing royalty in lieu thereof) in order to

8 eliminate future disputes between the parties and hopefully implement a non-combative,

9 commercial relationship between them moving forward.  With these purposes, intents and

10 objectives in mind, the question then becomes what precisely is the scope of the Permanent

11 Injunction?  Based upon the briefing of both sides in connection with the Motion to Clarify, it is

12 obvious that the two sides have different interpretations of the scope of the Permanent Injunction

13 and, therefore, clarification by way of this Final Arbitration Award is essential.

14        Thus, for the purposes of clarification, the arbitrator reiterates that the most efficient way to

15 accomplish the objectives of the Preliminary Injunction is to enjoin the conduct of VPX and JHO

16 and the Categories of Persons Bound altogether insofar as the Bang Mark is concerned in the 12

17 states of the United States in which Orange Bang also does business, but only enjoin the conduct of

18 VPX and JHO and the Categories of Persons Bound insofar as the Bang Mark is concerned

19 elsewhere (in the 38 other states of the United States and in the international territories) to the

20 extent such conduct fails to comply with the 2010 Settlement Agreement, in particular paragraph 7

21 thereof.  In other words, and in order to restate the last portion of the proceeding sentence

22 differently (and in a further effort to clarify the scope of the Permanent Injunction), VPX and JHO

23 and Categories of Persons Bound are entitled to make use of the Bang Mark in the 38 states of the

24 United States and internationally, but only provided each of them complies with the Sales and

25 Marketing Restrictions of paragraph 7 D of the 2010 Settlement Agreement.

26

27

28

Case 22-17842-PDR   Doc 523-1   Filed 12/14/22   Page 52 of 81

DocuSign Envelope ID: 34DD30E5-2808-40EF-8E98-1F66272572... Case 5:20-cv-01464-DSF-SHK   Document 126-2   Filed 09/23/22   Page 148 of 177   Page ID #:5535

S.     **The 5% Continuing Royalty in Lieu of the Permanent Injunction and the VPX 5% Continuing Royalty Election**

In its closing brief and in its [Proposed] Interim Arbitration Award, Orange Bang and Monster have affirmatively requested the award of a continuing royalty in order to recompense Orange Bang for VPX's continuing trademark infringement in the future and in order to recompense Monster for VPX's continuing violation of the VPX Marketing and Sales Restrictions of Paragraph 7 D in the future as an alternative to the issuance of the Permanent Injunction against VPX and JHO and Categories of Persons Bound. The arbitrator requested that the parties on both sides brief the issue so that the arbitrator could determine whether or not he has the equitable discretion to award such a future remedy. The arbitrator determines, for several reasons, that it is within his equitable discretion to issue such an award of a continuing royalty payable in the future. First, 1117(a) itself grants the court, or in this case the arbitrator, wide discretion to use equitable principles to fashion an appropriate remedy in a trademark infringement case. *See also Southland Sod*, 108 F.3d at 1146; *QS Wholesale, Inc. v. Rox Volleyball, Inc.*, 2015 WL 4484219, at *6 (C.D. Cal. 2015); AAA Rule 47(a). In *Apple, Inc. v. Samsung Elecs. Co., Ltd.*, 2014 WL 6687122, after a jury verdict in favor of Apple in a patent case, Apple filed a motion seeking an ongoing royalty in the future. The court, exercising its equitable powers under patent law, granted the motion because: (i) Apple was entitled to be compensated for future infringement; and (ii) without the imposition of ongoing royalties in the future, there was an increased risk of successive lawsuits and duplicative litigation.

Here, the equitable discretion authorized by the statute under trademark law is analogous to the equitable discretion authorized under patent law. Likewise, the same policy concerns apply. If VPX / JHO are not ordered to pay an ongoing royalty in the future, or the Permanent Injunction is not in place, then there is a strong risk that trademark infringement will continue and future, duplicative litigation will ensue. VPX's reliance on *A&H Sportswear Co. v. Victoria's Secret Stores, Inc.*, 166 F.3d 197, 208 (3rd Cir. 1999) is misplaced because this award of a continuing royalty in the future would not be an inappropriate compulsory license.

1    At the same time, and as stated repeatedly herein, the arbitrator intends to award equitable
2  remedies which ensure compliance with the provisions of the 2010 Settlement Agreement and
3  which prevent both future trademark infringements and future breaches of contract. Therefore, the
4  award of specific performance and the issuance of the Permanent Injunction or, in lieu of the
5  Permanent Injunction, the payment of a 5% reasonable royalty to prevent future harm, both
6  accomplish these objectives. As set forth above, the arbitrator has the discretion to award such
7  equitable remedies pursuant to the Lanham Act. In addition, the arbitrator has the express authority
8  to award such equitable remedies pursuant to AAA Rule 47(a) which provides that "[t]he arbitrator
9  may grant *any* remedy or relief that the arbitrator deems just and equitable . . . including . . .
10  specific performance of a contract." Similarly, California law likewise empowers the arbitrator to
11  fashion appropriate equitable relief. *Advanced Micro Devices, Inc. v. Intel Corporation*, 9 Cal.3d
12  362 (1994).

13    In *Advanced Micro Devices*, Advanced Micro Devices ("AMD") and Intel entered into an
14  agreement to exchange certain technology and information relating to computer chips that each side
15  was developing in order to protect both side's access to an open marketplace. The arbitrator found
16  that Intel breached the agreement and, based on the finding of breach, the arbitrator fashioned a
17  equitable remedy – the grant of a permanent, royalty-free license in favor of AMD which enabled it
18  to make use of Intel's computer chip technology. The trial grant granted a motion to confirm the
19  arbitration award, but the court of appeal reversed. However, the California Supreme Court
20  reversed the court of appeal and specifically upheld an arbitrator's power in an arbitration matter to
21  fashion an equitable remedy. The Court, relying on AAA Rule 43, the predecessor to current AAA
22  Rule 47, articulated the rule of law that unless the agreement of the parties expressly restricts the
23  arbitrator's right to fashion an equitable remedy, and so long as the equitable remedy is rationally
24  derived from the contract and the breach, then the arbitrator has the authority and discretion to
25  fashion equitable relief which he or she considers to be just and fair under the circumstances
26  existing at the time of the arbitration. *Id.* at 383.

27    Here, the 2010 Settlement Agreement does not contain any restrictions on an arbitrator's
28  authority or discretion to fashion and award an equitable remedy. In addition, the award of specific

1  performance, expressly authorized by Rule 47(a), and the award of the Permanent Injunction and,

2  in lieu thereof, the award of the 5% continuing royalty, both of which are intended to prevent future

3  trademark infringements *and* future violations of the 2010 Settlement Agreement (a co-existence

4  agreement which itself is a covenant not to sue for trademark infringement so long as the parties

5  stay in their agreed upon "lanes") are therefore rationally derived from and related to the contract,

6  the 2010 Settlement Agreement, and the potential breach thereof.  Accordingly, pursuant to federal

7  law, AAA Rule 47(a) and California law, the arbitrator has the authority and discretion to fashion

8  and award equitable relief including, but not limited to, the award of the 5% continuing royalty

9  described below.

10    The arbitrator is **not** imposing a compulsory license on a "resisting" Orange Bang.  Rather,

11  the arbitrator is granting a compulsory license to a "requesting" Orange Bang, imposed on VPX, a

12  party found to be liable for trademark infringement and found to be liable for breach of the 2010

13  Settlement Agreement who, at its election, has elected to avoid the corporate realities and

14  meaningful expense of re-branding that may be the practical result of the Permanent Injunction as

15  discussed in more detail below.

16    Accordingly, in lieu of the issuance of the Permanent Injunction as set forth in paragraphs

17  1 – 3 above, if VPX and JHO pay Orange Bang (as to the trademark infringement claim) and

18  Monster (as to the breach of contract claim for which it seeks specific performance in the future) an

19  amount equal to 5% of "Net Sales"[42] generated from the sales of Bang branded products, including

20  BANG Energy RTD, each quarter beginning July 1, 2022, and payment is made as set forth in this

21  paragraph, then the Permanent Injunction referred to above shall be stayed, and shall not go into

22  effect, so long as VPX and JHO continues to pay the 5% of Net Sales to Orange Bang and Monster

23  each quarter.

24    Each payment shall be made within 45 days after the close of a financial quarter (on a

25  calendar basis, i.e., March 31, June 30, September 30 and December 31 of each year) and each

26  payment shall be accompanied by a quarterly accounting statement reflecting the amount of Net

27

28
―――――――――――
[42]  Defined below.

150
FINAL ARBITRATION AWARD – PHASE 1 AND PHASE 2

1   Sales generated from the sale of Bang branded products within the preceding financial quarter. By

2   way of example, the payment due 45 days after September 30, 2022 for the financial quarter ending

3   September 30, 2022 shall be based on the amount of Net Sales generated from the sale of Bang

4   branded products, including BANG Energy RTD, which took place from July 1, 2022 to and

5   including September 30, 2022.  This will be the pattern of payment and accounting for each

6   financial quarter for so long as VPX makes any use of the BANG mark, with one exception: the

7   first payment, due 45 days after July 1, 2022, shall be based on the amount of Net Sales generated

8   from the sale of Bang branded products, including BANG Energy RTD, which took place from

9   September 20, 2021 to and including June 30, 2022 and shall bear interest thereon at the legal rate

10  of 10% from the date of April 29, 2022 (if this amount is paid on or before April 29, 2022, the

11  payment shall not bear interest).[43]

12      As set forth in the Interim Arbitration Award, and as set forth in this Final Arbitration

13  Award, if VPX elects to pay this 5% future royalty payment in lieu of the issuance of the

14  Permanent Injunction (the "VPX 5% Continuing Royalty Election"), the effect of which would be

15  to stay enforcement of the issued Permanent Injunction for so long as VPX and JHO continue to

16  make payment, then VPX shall issue quarterly accounting statements together with the quarterly

17  payments made payable to Orange Bang and Monster and Orange Bang and Monster shall be

18  entitled to exercise audit and inspection rights with respect thereto as further enumerated below.

19  The Interim Arbitration Award also explained that in order to exercise the VPX 5% Continuing

20  Royalty Election, VPX shall give written notice, via email, to the attorneys for Monster and Orange

21  Bang on or before January 31, 2022, with a copy to the arbitrator.

22      On January 31, 2022, VPX did just that -- VPX exercised the VPX 5% Continuing Royalty

23  Election.  VPX was under no compulsion to do so.  Rather, VPX made the informed business

24  decision to opt for the VPX 5% Continuing Royalty Election.  During the briefing relating to the

25  Motion to Clarify, and in response to Monster's and Orange Bang's argument that the definition of

26  Net Sales (discussed below) should include foreign sales, VPX took the position that the definition

27

28
   _____
   [43] The Plumpe damages report only went through September 19, 2021.
                                         151
   FINAL ARBITRATION AWARD – PHASE 1 AND PHASE 2

1 of Net Sales should exclude foreign sales and VPX's argument in this regard may have raised the
2 inference that had VPX known that foreign sales may be included in the definition of Net Sales,
3 then, perhaps, VPX would not have exercised the VPX 5% Continuing Royalty Election.

4     Because of this implication, and during the briefing of the Motion to Clarify, and before
5 issuing any ruling in connection with the Motion to Clarify, the arbitrator sought clarification from
6 VPX. The arbitrator inquired of VPX whether, assuming that foreign sales are indeed included
7 within the definition of Net Sales, it wanted to withdraw the VPX 5% Continuing Royalty Election.
8 Specifically, the arbitrator inquired of VPX whether it wanted a "do-over" on the VPX 5%
9 Continuing Royalty Election. VPX responded to the arbitrator's inquiry by stating in its closing
10 brief with respect to Phase 2 issues and with respect to the Motion to Clarify that it "is not
11 presently seeking a 'do-over' of its election." *See* "Respondent's Final Submission of Phase II
12 Issues" submitted on March 9, 2022, p. 8.[44] In this respect, VPX has clarified to the arbitrator that
13 the VPX 5% Continuing Royalty Election remains in full force and effect.

14

15     **T.**     **The Definition of "Net Sales" and the Audit Procedures**

16     To the extent that the arbitrator has used both the defined terms "net revenues" and "net
17 sales", the arbitrator has used those two terms interchangeably throughout this Final Arbitration
18 Award and has attempted to clarify this issue by making use of the term "Net Sales" for the sake of
19 uniformity. For the avoidance of any doubt, both of those terms are defined as follows: the
20 revenues generated from worldwide sales (also known as "Gross Revenues" or "Gross Receipts"),
21 regardless of channel, of the Bang-branded products identified in paragraph 2 of the Permanent
22 Injunction including, but not limited to, Bang Energy RTD, minus "returns". This formula, the
23 Gross Revenues – "returns" formula, must be calculated in accordance with Generally Accepted
24 Accounting Principles ("GAAP"). This formula for Net Sales is essentially the definition that
25 VPX's damages and accounting expert, Voth, and Monster's and Orange Bang's damages and
26

27

28 [44] VPX did, at this time, reserve all rights, as it has done in all of its submissions which post-date
the issuance of the January 6, 2022 Interim Arbitration Award.
152
FINAL ARBITRATION AWARD – PHASE 1 AND PHASE 2

1 accounting expert, Plumpe, used when calculating VPX's net sales in this case. Voth Testimony,

2 AHT, pp. 3787: - 3788:5; Plumpe Testimony, AHT, p. 2968:8-16.[45]

3      In addition, this definition of Net Sales is consistent with how these terms are defined in the

4 comparable industry license agreements relevant to this case. *See* Exhibit J-004 at 2; Exhibit J-005

5 at 5; Exhibit CEx. 58 at 74. It also comports with how other cases have defined these terms. *See,*

6 *e.g., Enough for Everyone, Inc. v. Provo Craft & Novelty, Inc.*, 2012 WL 12884643, at *5 (C.D.

7 Cal. Aug. 21, 2012) (defining "net sales price" as "the price invoiced by [the defendant] to its

8 customers less credits and returns"); *Scotty of Cal., Inc. v. Evenflo Co., Inc.*, 2006 WL 8455622, at

9 *1 (S.D. Cal. July 27, 2006) (defining "Net Sales Price" as "[t]he price charged for Licensed

10 Articles . . . and not returned as defective, less such quantity, trade and cash discounts, allowances

11 for freight, and taxes as are specified on the invoices.").

12      In an effort to clarify whether foreign sales are included in or excluded from the definition

13 of Net Sales, the arbitrator hereby rules that the definition of Net Sales does include foreign sales.

14 The definition of Net Sales includes foreign sales because the equitable remedy of the Permanent

15 Injunction, or the equitable remedy of the 5% continuing royalty awarded in lieu of the Permanent

16 Injunction, has been awarded to address *both* the risk of future trademark infringement and the risk

17 of future breaches of contract. To put it another way, the 5% continuing royalty now payable

18 because of the VPX 5% Continuing Royalty Election is the mechanism designed to ensure

19 compliance with the 2010 Settlement Agreement and to obviate future accounting and payment

20 disputes between the parties. This equitable remedy is both a trademark remedy and a contract

21

---

22 [45] According to Voth and Plumpe, the formula for net sales is: gross revenues minus returns minus "on invoice-type" adjustments or "accounting adjustments" (collectively, "additional accounting
23 adjustments"). During the briefing of the Motion to Clarify, the arbitrator asked VPX to clarify what is meant by the term "additional accounting adjustments". The arbitrator made this specific
24 request during the February 18, 2022 hearing on Phase 2 matters and on the Motion to Clarify and the arbitrator did so in order to avoid future disputes between the parties over the calculation of Net
25 Sales moving forward. Despite this specific request for further information and despite the opportunity to clarify a potential further deduction which would be applied to the definition of Net
26 Sales, VPX did not supply the requested information or seize upon the opportunity to clarify (again, so as to avoid future disputes over the 5% continuing royalty calculation which may expose
27 VPX's purported confidential information to its competitors Monster and Orange Bang). Accordingly, the arbitrator has no alternative but to rule that the only appropriate category of
28 deductions with respect to the Net Sales of Bang-branded products which make use of the Bang mark is the category of "returns", and not the category of "accounting adjustments".

Case 22-17842-PDR Doc 523-1 Filed 12/14/22 Page 58 of 81

DocuSign Envelope ID: 24DD0365-73D8-4D5F-8F90-41FC672757 Case 5:20-cv-01464-DSF-SHK Document 126-2 Filed 09/23/22 Page 154 of 177 Page ID #:5541

1  remedy. Since it is both, it must implicate Paragraph 17 of the 2010 Settlement Agreement which
2  expressly makes use of the term "worldwide". The one sentence paragraph 17 provides as follows:
3  "The terms of this Agreement apply to the actions and activities of the Parties worldwide.".
4  Therefore, foreign sales must be included in the calculation of the 5% continuing royalty moving
5  forward, and this is the correct result even though a trademark remedy is limited to the territorial
6  boundaries of the United States. Again, this is because these alternative equitable remedies are
7  based not only on future trademark claims, but on future contract claims as well.

8       As set forth above, in order to comply with the 5% continuing royalty, VPX is required to
9  make quarterly payments based on Net Sales and to provide quarterly accounting statements (and
10 the VPX Verification Document referred to below) to Monster and Orange Bang at the same time.
11 Monster and Orange Bang retain audit and inspection rights, as further described below. During
12 the briefing on the Motion to Clarify, both sides have indicated a need for further clarification of
13 how the audit and inspection procedures would work because, as VPX correctly points out, both
14 Monster and Orange Bang are competitors of VPX and VPX has legitimate concerns that Monster
15 and Orange Bang will have access to VPX's confidential, proprietary and/or financial information.
16 At the same time, Monster and Orange Bang have indicated that they may need to verify that the
17 quarterly accountings relating to the 5% continuing royalty are accurate and that the proper
18 amounts have been paid. Accordingly, and based on the legitimate concerns of both sides, and
19 with the hope of avoiding disputes between the parties in the future, the audit and inspection
20 procedures with respect to the 5% continuing royalty shall be as follows:

21       • In addition to the quarterly accounting statements and the quarterly payments
22         which accompany the quarterly accounting statements, VPX shall provide, each
23         quarter, and at the same time as the quarterly accounting statement and the
24         quarterly payment, a document which sets for the calculation of the amount of Net
25         Sales for the prior quarterly accounting period and which also verifies the amount
26         of Net Sales and attests thereto (the "VPX Verification Document").

27       • Within 14 days of the receipt of the VPX Verification Document, Orange Bang and
28         Monster shall have the right to object to the calculations or other data or

| | |
|---|---|
| 1 | information set forth in the VPX Verification Document and Orange Bang and |
| 2 | Monster must provide a statement of reasons which form the bases of their |
| 3 | objections (the "Orange Bang / Monster Objections"). |
| 4 | • Within 14 days of the receipt of the Orange Bang / Monster Objections, VPX, on |
| 5 | the one hand, and Orange Bang, on the other, shall meet and confer in good faith in |
| 6 | an attempt to resolve all issue relating to the VPX Verification Document and the |
| 7 | Orange Bang / Monster Objections. |
| 8 | • If VPX and Orange Bang and Monster are unable to resolve all issues during this |
| 9 | meet and confer procedure, Orange Bang and Monster shall be entitled to exercise |
| 10 | their audit rights and move forward with an audit. The audit shall be performed by |
| 11 | a firm of independent accountants (the "Auditor") during normal business hours. |
| 12 | The Auditor shall be a team from a nationally recognized accounting firm selected |
| 13 | by Orange Bang and Monster and the Auditor shall have no existing or prior |
| 14 | business relationship with either VPX or with Orange Bang or Monster within the |
| 15 | preceding five years (except that the Auditor, if hired to conduct the first audit, if |
| 16 | any, shall also be entitled to conduct successive audits contemplated by this Final |
| 17 | Arbitration Award, if any). |
| 18 | • Following an unsuccessful meet and confer, Orange Bang and Monster shall be |
| 19 | limited to only one audit per year, but that audit may address any outstanding |
| 20 | issues and any unresolved VPX Verification Document and/or any Orange Bang / |
| 21 | Monster Objections pending during the preceding one year time period. |
| 22 | • The Auditor shall be required to execute and abide by the current Confidentiality |
| 23 | Order in full force and effect as between the parties and the Auditor shall be |
| 24 | entitled to review VPX's confidential documents, including financial documents, |
| 25 | necessary to conduct the audit ("Confidential Financial Documents"). Although |
| 26 | the Auditor shall be entitled to have access to and inspect Confidential Financial |
| 27 | Documents in order to conduct the audit, neither Orange Bang nor Monster shall be |
| 28 | entitled to have any access to or inspect the Confidential Financial Documents. |

- The Auditor shall only report to Orange Bang and Monster the results of the audit. In this respect, the Auditor shall only report to Orange Bang and Monster whether the VPX Verification Documents are correct or not, whether the Orange Bang / Monster Objections are well taken or not and the percentage amount of any variance as between the amount reported to be due and owning by VPX for the preceding quarterly accounting period and the amount that should have been reported by VPX (the "Variance"). An exact copy of the Auditor's reports shall be provided to Orange Bang and Monster and to VPX. The Auditor shall not be permitted to share any of the Confidential Financial Documents with Orange Bang or with Monster.

- If the amount of the Variance is less than 2.5%, then Orange Bang and Monster shall be jointly and severally liable for any and all costs of the audit due and owing to the Auditor. If the amount of the Variance is more than 5%, then VPX shall be liable for any and all costs of the audit due and owing to the Auditor. If the amount of the Variance is between 2.5% and 5%, then VPX shall be liable for 50% of any and all costs of the audit due and owing to the Auditor and Orange Bang and Monster shall be jointly and severally liable for other 50%.

- The audit report of the Auditor shall be deemed to be conclusive, incontestable and binding upon VPX and upon Orange Bang and Monster.

- If Orange Bang and Monster do not commence an audit following a VPX Verification Document within 24 months of the issuance of the VPX Verification Document, then the VPX Verification Document and the accompanying quarterly accounting statement shall be deemed to be conclusive, incontestable and binding upon Orange Bang and Monster, in which case Orange Bang and Monster shall have no further right to object to any accounting practice relating thereto even if that accounting practice becomes the subject of dispute between the parties in connection with a subsequent VPX Verification Document applicable to later accounting periods.

1          **U.     The Scope of the Permanent Injunction – A Reminder**

2          As has been discussed at the hearings regarding the Motion to Clarify and Phase 2, and as

3   mentioned by both sides in their papers in connection with the Motion to Clarify, all of the issues

4   relating to the scope and contours of the Permanent Injunction only arise *if* VPX fails to pay the 5%

5   continuing royalty moving forward.  Now that VPX has made and reaffirmed the VPX 5%

6   Continuing Royalty Election, and assuming VPX honors its obligations to pay and properly

7   account to Orange Bang and Monster in connection therewith, all issues and potential disputes

8   relating to the Permanent Injunction are of no moment.  In short, the 5% continuing royalty is an

9   equitable remedy designed to avoid future trademark infringement and institutionalize compliance

10  with the 2010 Settlement Agreement and thereby avoid breach of contract and/or accounting

11  disputes between the parties in the future.

12          Notwithstanding the foregoing, if VPX fails to pay the 5% continuing royalty, then, after

13  written notice and a failure to cure within fourteen (14) days, the Permanent Injunction shall

14  automatically take effect without the need for any further action by a court or by an arbitrator.

15

16          **V.     VPX's Counterclaims**

17          VPX's first claim for declaratory relief fails because there is no definite, concrete, actual

18  and existing controversy between VPX, on the one hand, and Orange Bang and Monster, on the

19  other, regarding the validity of VPX's trademark registrations.  *Stickrath v. Globalstar, Inc.*, 2008

20  WL 2050990, at *6 (N.D. Cal. May 13, 2008) [a declaratory judgment may issue only "where there

21  is an 'actual controversy' between the parties that is 'definite and concrete'"].  Rather, the

22  controversy here is about paragraph 7 of the 2010 Settlement Agreement and to the extent VPX

23  seeks a declaration about what it can and cannot do with the BANG mark by virtue of the

24  "creatine-based" requirement of paragraph 7 C and the VPX Marketing and Sales Restrictions of

25  paragraph 7, those questions are fully addressed and adjudicated by way of this Interim Arbitration

26  Award as set forth herein.

27          Similarly, VPX's second claim for declaratory relief fails because it duplicates Orange

28  Bang's and Monster's trademark infringement and unfair competition claims and this Interim

                                              157
                        FINAL ARBITRATION AWARD – PHASE 1 AND PHASE 2

Case 22-17842-PDR   Doc 523-1   Filed 12/14/22   Page 62 of 81

DocuSign Envelope ID: 91DD035-15D8-4DEF-8F99-1F66677567
Case 5:20-cv-01464-DSF-SHK   Document 126-2   Filed 09/23/22   Page 158 of 177   Page ID
#:5545

1  Arbitration Award fully addresses, analyzes and adjudicates those claims. *Riot Games Merch., Inc.*
2  *v. Tri-Force Sales, LLC*, 2015 WL 13344626, at \*3 - \*4 (C.D. Cal. Dec. 1, 2015) [counterclaims
3  for declaratory relief that duplicate a plaintiff's claims fail].

4      VPX's third claim for unfair business practices and VPX's fourth claim for unreasonable
5  restraint of trade fail for the reasons set forth in Section III, O. below.

6      VPX's fifth claim for fraud fails because of the factual findings set forth in Section II, N.
7  above. In this respect, VPX failed to present any evidence to establish any of the elements
8  necessary to establish fraud. *Lazar v. Superior Ct.*, 12 Cal.4th 631, 638 (1996) [setting forth the
9  elements for fraud, deceit and promissory fraud].

10     VPX's sixth claim for breach of contract fails because of the factual findings set forth in
11  Section II, K. above. Previously, the parties entered into a stipulation to bifurcate these
12  proceedings so that the issue of VPX's alleged damages resulting from the alleged breach by
13  Orange Bang of the confidentiality provision in paragraph 12 of the 2010 Settlement Agreement in
14  the amount of \$2.6 million, the attorney's fees allegedly incurred by VPX by virtue of the alleged
15  breach of paragraph 12 ("VPX's Damages Claim), was deferred to Phase 2. In connection with
16  VPX's Damages Claim, Orange Bang and Monster had demanded production of VPX's billing
17  statements in order to verify the \$2.6 million damages claim which itself raised protracted issues
18  about document production and redaction of attorney-client communications and work product
19  immunity entries referenced in the billing statements (the "VPX Billing Statements Issues"). As
20  set forth in Section II, K. above, the arbitrator has already determined that, as to the issue of
21  liability, Orange Bang did not breach paragraph 12 (or any other paragraph) of the 2010 Settlement
22  Agreement because it was VPX itself, not Orange Bang, who disclosed the key provisions of
23  paragraph 7 by attaching Orange Bang's demand letters to the 2019 Declaratory Relief Action and
24  making the contents of those key documents a part of the public record. *Figur v. United States*,
25  662 F. Supp. 515, 517-18 (N.D. Cal. 1987) ("By its very nature, information in the public record is
26  not confidential, and once disclosed to the public, cannot regain its confidentiality.").

27
28

Case 22-17842-PDR   Doc 523-1   Filed 12/14/22   Page 63 of 81

DocuSign Envelope ID: 91DD23E5-3508-4D5F-8F59-A1F66727571C
Case 5:20-cv-01464-DSF-SHK   Document 126-2   Filed 09/23/22   Page 159 of 177   Page ID
#:5546

1      Inasmuch as VPX's sixth claim has been adjudicated adversely to VPX, VPX's Damages

2  Claim and the VPX Billing Statements Issue are moot and they are no longer at issue in Phase 2 of

3  these proceedings.

4

5      **W. The "Weaponization" of the 2010 Settlement Agreement, Unfair Business Practices,**

6         **Unlawful Restraints on Trade and Unclean Hands**

7      VPX's continuing theme throughout this litigation has been, and is, that Monster, by virtue

8  of the Assignment Agreement between Orange Bang and Monster, has "weaponized" paragraph 7

9  of the 2010 Settlement Agreement.  In particular, VPX contends that this "weaponization"

10  constitutes an unfair business practice and an unlawful restraint on trade under California law, a

11  violation of the Cartwright Act (Business and Professions Code Sections 16720 and 16726),

12  because the Assignment Agreement created an unlawful combination of capital, skills or acts as

13  between Monster and Orange Bang, an unlawful trust, which has destroyed, or will destroy,

14  competition in the energy drink industry and thus demonstrates Monster's and Orange Bang's

15  unclean hands.  In *Morrison v. Viacom, Inc.*, 66 Cal.App.4th 534, 541(1998), the court discussed

16  Sections 16720 and 16726 and ruled that the Cartwright Act is limited to *unreasonable* restraints

17  on trade.

18      VPX argues that the Assignment Agreement facilitated the "weaponization" of the 2010

19  Settlement Agreement and that such conduct constitutes an unfair business practice, an unlawful

20  restraint of trade and a demonstration of Monster's and Orange Bang's unclean hands.  These

21  arguments are devoid of merit.  Neither Monster nor Orange Bang prevented VPX from competing

22  in the energy drink marketplace (BANG Energy RTD) or in the hard seltzer marketplace (Bang

23  Mixx).  VPX had, and has, the absolute right to compete in those marketplaces.  VPX could have

24  freely and completely competed in the energy drink market or in the hard seltzer market under a

25  different trade name.  It could have competed under a thousand different trade names, Redline for

26  example.  The trade restraint on VPX (and on JHO) was, and is, that they cannot make use of the

27  BANG mark unless VPX fully complies with the voluntarily agreed-upon restraints set forth in

28  paragraph 7 of the 2010 Settlement Agreement.  The agreed- upon business restraint, as a matter of

159
FINAL ARBITRATION AWARD – PHASE 1 AND PHASE 2

1  fact, is not an *unfair* business practice or an *unreasonable* restraint of trade. It is undeniably a *fair*
2  business practice and an eminently *reasonable* restraint of trade. There is nothing inherently or
3  legally unreasonable about holding a party, in this case VPX, to a bargained for co-existence
4  agreement, with built in "lane" restrictions, which VPX entered into voluntarily after an 11 month
5  negotiation (fully detailed above) and with the advice of counsel. In other words, VPX had, and
6  has, the unrestrained ability to compete in the marketplace, it just cannot do so by making use of
7  the BANG mark unless it abides by the VPX Marketing and Sales Restrictions set forth in the 2010
8  Settlement Agreement which it fully negotiated, signed and then ignored.

9        Just like the Beatles who owned the Apple trademark via its Apple records label who
10 entered into a co-existence agreement with Apple computer on the condition that Apple computer
11 stay out of the Beatles "lane", the music lane, that agreement certainly imposed a restraint of trade
12 on Apple computer. Apple could no longer go into the music industry. But this was not an
13 unreasonable restraint of trade. Rather, it was a reasonable restraint of trade because Apple
14 computer fully agreed to it.[46]  The same is true here. Yes, VPX agreed to some pretty harsh
15 restrictions in paragraph 7 of the 2010 Settlement Agreement, but it is not an unreasonable or an
16 unlawful restraint of trade for Orange Bang and Monster to require VPX to honor an agreement,
17 and the restrictions set forth therein, which VPX entered into voluntarily for its own business
18 purposes. Merely enforcing a contractually binding promise that VPX made to Orange Bang on
19 how it would market and sell its products is not an anti-competitive or unlawful restraint of trade or
20 an example of unclean hands.

21       In *William Inglis & Sons Baking Co. v. ITT Continental Baking Co., Inc.*, 668 F.2d 1014
22 (9th Cir. 1981), a manufacturer of bread who went out of business sued other bakers for anti-trust
23 violations. The Ninth Circuit was confronted with the issue as to whether or not the defendant's
24 avowed purpose to snuff out the competition satisfied the specific intent element necessary for an
25 anti-trust violation as an unreasonable restraint of trade. The Ninth Circuit ruled that even an intent
26 to vanquish a rival was not sufficient because, to so hold, would itself impair competition in the

27

28 [46] And Apple computer famously violated that agreed-upon zone of use when it invented iTunes
   and, as a result, entered into the music "lane" which it had agreed was off limits to it.
                                              160

Case 22-17842-PDR   Doc 523-1   Filed 12/14/22   Page 65 of 81

DocuSign Envelope ID: 0DD3951-26D8-1D5F-8F5B-1F66272CID Case 5:20-cv-01464-DSF-SHK Document 126-2   Filed 09/23/22   Page 161 of 177   Page ID #:5548

1  marketplace. As the Ninth Circuit reasoned: "Direct evidence of intent to vanquish a rival in an
2  honest competitive struggle cannot help to establish an antitrust violation." *Id.* at 1028. In this
3  respect, even if Monster's and Orange Bang's true motivation was to vanquish VPX, by seeking to
4  enforce the very promises that VPX voluntarily made to Orange Bang, Monster and Orange Bang
5  were engaged in an honest competitive struggle (albeit aggressive, if not blood- thirsty) which did
6  not rise to the level of an anti-trust violation or an unlawful restraint of trade.

7       In *Fibreboard Paper Prod. Corp. v. E Bay Union of Machinists, Loc. 1304, United*
8  *Steelworkers of Am., AFL-CIO,* 227 Cal.App.2d 675, 727 (1964), the court ruled that a party has
9  unclean hands if that party violated "conscience, good faith or other equitable principles."[47]
10 Conduct by Monster and Orange Bang which requires VPX to honor its own agreement does not
11 mean that Monster or Orange Bang has unclean hands which would preclude their right to invoke
12 equitable (or legal) relief.

13      In short, and to paraphrase an often-cited quote: one person's "weaponization" is another
14 person's "enforcement". In other words, it is all about point of view and perception. What VPX
15 perceives as "weaponization", Monster and Orange Bang perceive as "enforcement." The
16 arbitrator agrees with Monster and Orange Bang. It is not a violation of the Cartwright Act to
17 require VPX to honor the VPX Marketing and Sales Restrictions set forth in paragraph 7 of the
18 2010 Settlement Agreement, an arm's length agreement it entered into freely, voluntarily, for its
19 own particular business reasons and with the advice of counsel.

20      Judge Fischer of the United States District Court for the Central District of California
21 agreed with this analysis in her November 30, 2020 ruling compelling this arbitration. VPX argued
22 that the Assignment Agreement was improper and that the assignment was invalid because it
23 "thwarts fair competition." Judge Fischer noted that VPX supported this argument by citing two
24 cases [*ANI Pharms., Inc. v. Cabaret Biotech Ltd.,* No. 19 Civ. 5409, 2020 WL 1989400, at *4
25 (S.D.N.Y. Apr. 26, 2020) (citing *Farmland Irr.,* 48 Cal.2d at 222)] which held that an assignment
26

27
---
[47] *See also Blain v. Doctor's Co.*, 222 Cal.App.3d 1048 (1990) [setting forth the three prong test for
28 when the unclean hands doctrine applies, requires nexus between the alleged misconduct and the
claimed injuries].

Case 22-17842-PDR    Doc 523-1    Filed 12/14/22    Page 66 of 81

DocuSign Envelope ID: 84DD0385-35D8-4D5F-8F98-12 1F6572570
Case 5:20-cv-01464-DSF-SHK   Document 126-2   Filed 09/23/22   Page 162 of 177   Page ID
#:5549

1  agreement is improper if it prevents the non-assigning party from obtaining the performance it

2  expected. Judge Fischer rejected this restraint of trade argument raised by VPX and, in so doing,

3  Judge Fischer commented that she could not discern what performance VPX did not receive which

4  it expected to receive. According to Judge Fischer, VPX apparently did not expect Orange Bang to

5  actually seek to enforce its rights under the 2010 Settlement Agreement, the very rights which

6  Monster and Orange Bang seek to enforce by way of this arbitration action, and that act of

7  enforcing a contract by way of an assignment agreement does not thwart fair competition. As

8  Judge Fischer put it:

9      "The Court cannot discern what different 'performance [VPX] expected' other than that

10     they did not expect OBI [Orange Bang] to actually enforce the rights of the contract and

11     Monster now is. **The Court declines to protect this expectation. If Plaintiffs [VPX and**

12     **JHO] did not want to be held to the [2010] Settlement Agreement, they should not**

13     **have signed it."**

14     Exhibit 2924, Judge Fischer's November 30, 2020 Ruling, p. 8.

15     (Emphasis added.)

16

17  ## X.  JHO, Quash and Entourage

18     As set forth above, and as Judge Fischer has previously held, JHO is a proper party to this

19  arbitration, the arbitrator has jurisdiction over JHO and JHO is bound by this Initial Arbitration

20  Award. In other words, a judicial determination that a non-signatory, JHO, is bound by this

21  arbitration has already been made by Judge Fischer. *See Benaroya v. Willis,* 23 Cal.App.5th 462,

22  468 (2018); *Sandquist v. Lebo Automotive, Inc.,* 1 Cal.5th 233, 252 (2016).

23     Monster and Orange Bang contend that the arbitrator likewise has jurisdiction over Quash

24  and Entourage, which pertains to the hard seltzer product known as Bang Mixx, because of the alter

25  ego doctrine. In *Hasse v. Hapke,* 227 Cal.App.4th 107, 155 – 157 (2014), the court reiterated the

26  two elements which must be demonstrated in order to establish alter ego: (1) a unity of interest and

27  ownership between the corporate entities at issue, VPX, on the one hand, and Quash and

28  Entourage, on the other, in this instance; and (2) an inequitable result if the purported separateness

162
FINAL ARBITRATION AWARD – PHASE 1 AND PHASE 2

1  of the entities is not disregarded.  In *Hasse*, the court also listed various factors which should be

2  considered in order to determine if the two requisite elements have been satisfied:

3       • the commingling of funds [no, no evidence presented that VPX commingled funds

4        with Quash or Entourage];

5       • liability of one entity for the debts of the other [no, no evidence presented that VPX

6        assumed liability for the debts of Quash or Entourage];

7       • identical equitable ownership [yes, convincing evidence presented that VPX and

8        Quash / Entourage had identical equitable ownership since the evidence showed that

9        J. Owoc owned 100% of VPX (and 100% of JHO), 100% of Quash and 100% of

10        Entourage];

11       • use of the same offices and employees [yes, convincing evidence presented that

12        VPX shared offices and employees with Quash / Entourage];

13       • the use of one corporate entity to conduct the affairs of the other [yes, convincing

14        evidence presented that Quash and Entourage are a mere shell through which VPX

15        is conducting its alcohol business, the sale of the hard seltzer Bang Mixx];

16       • inadequate capitalization [no, no evidence presented regarding the initial or ongoing

17        capitalization of Quash or Entourage];

18       • disregard of the corporate formalities [yes, convincing evidence of disregard of

19        corporate formalities as demonstrated by the highly-convenient and highly-

20        suspicious chain of title documents created by VPX days prior to the

21        commencement of the arbitration hearing (discussed in more detail below)];

22       • lack of segregation of corporate records [yes, convincing evidence of a lack of

23        segregation of corporate records as demonstrated by the highly-convenient and

24        highly-suspicious chain of title documents created by VPX days prior to the

25        commencement of the arbitration hearing (discussed in more detail below)]; and

26       • identical directors and officers [yes, convincing evidence of identical directors and

27        officers as demonstrated by the fact that J. Owoc controls every entity because of his

28        100% ownership of each entity].

1   On September 22, 2021, less than two weeks before the arbitration hearing commenced,

2 JHO and Entourage signed their own trademark co-existence agreement in which they declared in a

3 recital that there is no likelihood of confusion between Entourage's use of its Bang marks and

4 JHO's use of its Bang marks.[48] VPX's general counsel, Greg Metzger ("Metzger"), signed the

5 document on behalf of both Entourage and on behalf of Quash as the authorized representative of

6 each IP holding company. No articulated monetary consideration was paid for this

7 acknowledgement of co-existence. *See* Exhibit 5472. On September 29, 2021, literally 3 business

8 day before the arbitration hearing commenced, Entourage signed a license agreement by which it

9 licensed to Quash the Bang trademark rights it had registered for use on Bang Mixx. VPX's

10 general counsel Metzger again signed the document on behalf of Entourage as the authorized

11 representative of the company and J. Owoc, the 100% owner of VPX, signed on behalf of Quash.

12 Again, no articulated monetary consideration was paid for this grant of rights. *See* Exhibit 5525.

13   Monster and Orange Bang have filed a post-arbitration hearing Offer of Proof regarding the

14 deposition testimony of Francis Massabki ("Massabki") and a motion requesting that such

15 testimony be received into evidence. The arbitrator hereby grants Monster's and Orange Bang's

16 motion and the Massabki deposition testimony is received into evidence. However, despite this

17 ruling, for the reasons explained below, the arbitrator nevertheless concludes that he does not have

18 jurisdiction over Quash or Entourage and that this Initial Arbitration Award is not binding on

19 Quash or Entourage.

20   Neither Quash nor Entourage were never named as parties to this arbitration. There has

21 never been a judicial determination made as to whether Quash or Entourage, non-signatories to the

22 arbitration agreement, should be compelled to arbitrate claims asserted against them by Monster

23 and Orange Bang. Neither Quash nor Entourage has had the opportunity to put on a defense to this

24 arbitration or even a defense to the alter ego claims. Perhaps Quash and Entourage are the alter

---

[48] JHO itself obtained its initial grant of rights regarding the Bang tradename from VPX via a 2017
27 assignment. JHO then licensed back the rights to make use of the Bang tradename to VPX.
Because JHO's Bang rights derive from a grant of rights from VPX, and because JHO is a
28 successor-in-interest to VPX in this regard, JHO's Bang rights are likewise subject to the 2010
Settlement Agreement.

1  egos of VPX, and perhaps not, and perhaps they are agents, or even successors, within the meaning
2  of paragraph 14 of the 2010 Settlement Agreement, and perhaps not, but they should still have the
3  due process right to be heard on these issues and that decision needs to be made by a court, not by
4  the arbitrator.  In *Benaroya*, the court ruled that an arbitrator's finding of alter ego against a non-
5  signatory to the arbitration agreement had to be vacated because the initial determination of
6  whether or not the alter ego defendant was subject to the arbitration had to be determined by the
7  court, not by the arbitrator.  *Id.* at 465 – 468.  Accordingly, the arbitrator hereby rules that he does
8  not have jurisdiction over Quash or Entourage.  Monster and Orange Bang may, or may not, have
9  further rights against Quash and Entourage, but that determination must be made, in the first
10 instance, by the trial court, not by the arbitrator.

11

12    **Y. The Determination of the Prevailing Parties Issue for the Purposes of the Entitlement**
13    **to Attorney's Fees and Costs and the Amount of Attorney's Fees and Costs**

14    Monster and Orange Bang are the prevailing parties.  They are entitled to recover their costs
15 as a matter of right and as a matter of law.  CCP Section 1032(b); 15 U.S.C. Section 1117(a)(3);
16 paragraph 18 of the 2010 Settlement Agreement.  In particular, the fourth sentence of paragraph 18
17 expressly entitles the prevailing party to recover "experts witnesses fees, costs and expenses
18 connected with presenting their case."  The word "connected with" is a broad concept and shows a
19 mutual intent of the parties to the 2010 Settlement Agreement to recover a wide variety of costs
20 associated with litigation, including experts fees which is not typically an item of cost recovery
21 under Section 1033.5 of the California Code of Civil Procedure ("CCP") [assuming the non-
22 applicable of Section 998 of the CCP].

23    In addition, both Monster and Orange Bang are prevailing parties for the purposes of
24 recovery of attorney's fees as follows:

25

26

27

28

**Paragraph 18, the Attorney's Fees Provisions in the 2010 Settlement Agreement**

As the case law under California law[49] discussed below provides, where there is a narrow attorney's fee provision, a party prevailing on only a contract claim can be deemed to be the "prevailing party" for the purposes of the recovery of attorney's fees. However, if the attorney's fee provision at issue is a broad attorney's fee provision, then a party who prevails on a contract claim and/or on a non-contract claim is still deemed to be the "prevailing party" for the purposes of the recovery of attorney's fees.

In 1998, in *Santisas v. Goodin*, 17 Cal.4th 599 (1998), the California Supreme Court addressed the issue of the recovery of attorney's fees based on a broad attorney's fee provision. In *Santisas*, the parties had a dispute over a real estate purchase agreement. Santisas sued asserting a contract claim and various non-contract claims including a claim for negligence and various fraud related claims. The contract at issue had a broad attorney's fee provision which stated that "in the event legal action is instituted by the Broker(s), or any party to this agreement, or **arising out of** the execution of this agreement or the sale, or to collect commissions, the prevailing party shall be entitled to receive from the other party a reasonable attorney fee to be determined by the court in which such action is brought." (Emphasis added.) One of the issues before the Court was whether or not the attorney's fee provision at issue was broad enough to encompass both contract claims and tort claims. The Court concluded that the attorney's fee provision was indeed broad enough to allow recovery of attorney's fees relating to the non-contract claims and held as follows:

> On its face, the provision embraces all claims, both tort and breach of contract, in plaintiffs' complaint because all of the claims "arising out of the execution of th[e] agreement or the sale." (See *Lerner v. Ward* (1993) 13 Cal.App.4th 155, 160-161, 16 CalRptr.2d 486.). Plaintiffs do not argue otherwise. If a contractual attorney fee provision is **phrased broadly enough**, as this one is, it may support an award of attorney fees to the prevailing party in an action alleging **both contract and tort claims**: "[P]arties may validly agree that the prevailing party will be awarded attorney fees incurred in any litigation between

---

49 Paragraph 21 of the 2010 Settlement Agreement, the choice of law provision, provides for the application of California law.

1    themselves, **whether such litigation sounds in tort or in contract**." (*Xuereb v. Marcus &*

2    *Millichap, Inc.* (1992) 3 Cal.App.4th 1338, 1341, 5 Cal.Rptr.2d 154.)

3    (Emphasis added.)

4    *Santisas*, at 608.

5    *See also Cruz v. Ayromloo*, 155 Cal.App.4th 1270, 1276-1277 (2007) [broad attorney's fee

6    provision contemplated the recovery of attorney's for all claims in the civil action, whether based

7    on contract or tort, "in connection" with the lease at issue]. [50]

8         Thus, the question arises as to whether or not the attorney's fee provision set forth in

9    paragraph 18a of the 2010 Settlement Agreement is a "broad" attorney's fee provision. It is. The

10   first sentence of paragraph of 18a is written with broad language and encompasses "[*a]ny* Claim *or*

11   controversy *arising out of or related to* the Action, *this Agreement or any breach thereof* . . . ."

12   (Emphasis added.) The fourth sentence of paragraph 18a of the 2010 Settlement Agreement

13   provides that "t]he prevailing Party [which now includes Monster by virtue of the Assignment

14   Agreement] shall be entitled to recover from the non-prevailing Party [VPX] its reasonable

15   attorney's fees . . . connected with presenting their case." Again, the "connected with" language is

16   likewise a "broad" concept and reflective of a mutual intent to include non-contract claims within

17   the ambit of the attorney's fee provision.

18        Thus, the party who prevailed on the non-contract claim, in this case Orange Bang, is a

19   "prevailing party" because paragraph 18a is a broad attorney fee provision which encompasses the

20   trademark-related claims. At the same time, the party who prevailed on the contract claim, in this

21   case Monster, is likewise a prevailing party because: (i) it prevailed on its contract claim as to the

22

23

---

24   [50] In 1995, in *Hsu v. Abbara*, 9 Cal.4th 863 (1995), the California Supreme Court addressed the
     issue of the recovery of attorney's fees solely in a breach of contract context under California Civil
     Code Section 1717. Although the facts of *Hsu* are not directly on point, the discussion of the
25   policy objectives underlying the award of attorney's fees under California law are instructive. In
     *Hsu*, the Court ruled that a defendant who prevailed on the sole cause of action for breach of
26   contract must be determined to be the prevailing party because that defendant had undeniable
     litigation success, a "simple, unqualified win", and undoubtedly obtained their litigation objectives,
27   even though Section 1717 of the CCP vests the court with discretion in other circumstances to
     determine that there is no prevailing party at all. In this respect, *Hsu* stands for the proposition that
28   the court should take into account litigation success and whether or not the objectives of the
     litigation have been achieved in determining whether to award attorney's fees.

Case 22-17842-PDR   Doc 523-1   Filed 12/14/22   Page 72 of 81

DocuSign Envelope ID: ADDD365-27E08-4DEF-8F99-1F667725D
Case 2:20-cv-01464-DSF-SHK  Document 126-2   Filed 09/23/22   Page 168 of 177   Page ID
#:5555

1   Past Time Period to the extent of $157.5 million (an amount it does not receive because of the

2   Orange Bang / Monster Election designed to prevent double recovery, but still demonstrating that

3   Monster did prevail and achieve its litigation objectives); (ii) it prevailed on its contract claim as to

4   the future time period by virtue of the award of the equitable remedies of specific performance and

5   the Permanent Injunction and the 5% continuing royalty awarded in lieu of the Permanent

6   Injunction resulting from the VPX 5% Continuing Royalty Election; (iii) it prevailed on a claim to

7   receive a reasonable royalty during the time period of September 20, 2021 through June 30, 2022;

8   and (iv) it was the sole prevailing party insofar as VPX's counterclaim alleging breach of the

9   confidentiality provision of the 2010 Settlement Agreement is concerned.  The arbitrator need not

10  reach the paragraph 18b issue, the "second" attorney's fees provision in paragraph 18, because the

11  arbitrator has now ruled that paragraph 18a provides a basis for the recovery of attorney's fees by

12  the prevailing parties, Orange Bang and Monster.

13       VPX Election of Remedy Argument, which is discussed and rejected above, does not

14  change this conclusion or this result.[51]

15       **AAA Rule 47(d)**

16       AAA Rule 47(d) empowers the arbitrator to award attorney's and interest if all sides have

17  requested such an award or if the recovery of attorney's fees is authorized by the arbitration

18  agreement.  As set forth above, paragraph 18a of the 2010 Settlement Agreement contains a broad

19  attorney's fee provision and therefore the second portion of Rule 47(d) is satisfied.  In addition, and

20  as a separate, independent and distinct basis for the award of attorney's fees, both sides requested

21  an award of attorney's fees in their pleadings.  VPX requested an award of attorney's fees in both

22  Respondent's Revised Answering Statement and Counterclaims dated December 11, 2020,

23

24  _____

[51] In *Simulados Software, Ltd. v. Photon Infotech Priv., Ltd.*, 2020 WL 2994126, at *3 (N.D. Cal.
25  2020), the attorney's fee provision was broad and covered both contract and tort claims.  The
     plaintiff prevailed at a jury trial on both claims.  The court, however, concerned about the potential
26  for a duplication of damages, awarded the plaintiff recovery under the fraud claim, but not under
     the contract claim, because the fraud recovery was not subject to a "cap" like the contract award.
27  The court held that the plaintiff was nevertheless entitled to recover its attorney's fees because the
     fraud claim was still a claim based "on the contract" under Section 1717 of the CCP, even though
28  the court had already limited the plaintiff's recovery to the fraud claim, and disallowed it to recover
     under the contract claim, in order to avoid a double recovery of damages.

1 | paragraph 4 of its prayer, and in Respondent's Second Revised Answering Statement and
2 | Counterclaims undated, paragraph 5 of its prayer. Therefore, the initial portion of Rule 47(d) is
3 | likewise satisfied which provides a separate, independent and distinct basis for the award of the
4 | attorney's fees set forth below.

5 | **The "Exceptional Case" Standard Under Trademark Law**

6 | Because paragraph 18a, the broad attorney's fee provision at issue, and AAA Rule 47(d)
7 | each provide a separate basis for the award of attorney's fees, there is no need to reach or determine
8 | the issue of whether or not this matter satisfies the "exceptional case" standard for the award of
9 | attorney's fees under the Lanham Act.

10 |

11 | **Z. The Amount of Costs and Attorney's Fees**

12 | Although VPX has numerous arguments with respect to the entitlement and amount of
13 | attorney's fees, it has not offered any argument with respect to the entitlement or the amount of
14 | costs. Even if VPX had done so, Orange Bang and Monster are entitled to costs as a matter of right
15 | and Orange Bang and Monster have made a sufficient showing as to the entitlement and the amount
16 | of costs. Accordingly, VPX is obligated to pay Orange Bang's and Monster's costs in the amounts
17 | as follows:

| 18 | $1,576,796.33 | litigation expenses and costs, including experts, for |
| --- | --- | --- |
| 19 | | Monster and Orange Bang[52] |
| 20 | $    15,450.00 | Claimants' share of Arbitration Place – virtual bailiff |
| 21 | $  104,943.82 | Claimants' share of transcripts and videos |
| 22 | $    86,625.00 | Square up of $102,800 AAA administrative fees[53] |
| 23 | $  234,843.75 | 50% of the arbitrator's compensation ($469,687.50)[54] |

24 |

25 |

---

26 | [52] Pursuant to the Declarations of Libeu paragraph 18 and Nataupsky paragraph 13, this category
of costs includes expert witness fees, graphics vendor, e-discovery, investigation, court reporter,
27 | hotel costs during trial, printing cots, interpreter cots, messenger costs and subpoena costs.
[53] The $102,800 in AAA administrative fees and the square up computation were calculated by
28 | the AAA.
[54] The $469,687.50 arbitrator's compensation was also calculated by the AAA.

Case 22-17842-PDR   Doc 523-1   Filed 12/14/22   Page 74 of 81

DocuSign Envelope ID: 31DD0385-15D8-4D5F-85F9-1F6727257EE7
Case 5:20-cv-01464-DSF-SHK   Document 126-2   Filed 09/23/22   Page 170 of 177   Page ID
#:5557

1      **$2,018,658.90**               **total** (collectively, the "Award of Costs")

2 The Award of Costs is due and payable as of April 29, 2022 and shall bear interest at the legal rate

3 of 10% thereafter.

4      **The Amount of Attorney's Fees**

5      **All** of the attorneys involved in this case have demonstrated outstanding litigation skills,

6 diligence and, for the most part, professional judgment[55] which places all of them in the very top of

7 the top tier. In addition to its contention that Orange Bang and Monster are not entitled to the

8 recovery of attorney's fees, VPX has also argued that the amount of attorney's requested by Orange

9 Bang and Monster exceeds a "reasonable" amount. VPX contends that the amount of Orange

10 Bang's and Monster's attorney's fees should be reduced because their hourly rates are not

11 reasonable; their trial fellows billed for administrative and secretarial work; they engaged in block-

12 billing; they overstaffed the case; and they split claims as between Orange Bang and Monster.

13      With respect to the issue of hourly rates, and based upon the showings made by both sides

14 and based upon the case law cited by the parties, the arbitrator finds that all of the Orange Bang and

15 Monster hourly rates, some of which were already discounted to some extent, are reasonable based

16 upon the Southern California market for trial attorneys in the top tier of their profession and

17 therefore these hourly rates shall not be reduced.

18      With respect to VPX's claim that trial fellows billed for administrative and secretarial work,

19 a review of the billing statements shows that is not the case. Although the trial fellows are

20 apparently not attorneys, their work was not ministerial or "purely clerical". Just because they are

21 not law school graduates does not mean that the services they rendered to this litigation effort does

22 not require thinking, analysis and judgment. For instance, internet research, document review and

23 analysis, finding valuable evidence on-line or in the public record, analyzing which documents to

24 pull in order to prepare for depositions, for document productions, for direct and cross

25 examinations, maintenance of the e-discovery platforms and finding, locating and reviewing

26

27

---

28 [55] Query whether the proposed footnote 40 of VPX's March 17, 2022 proposed redline of the Interim Arbitration Award, which proposes to reduce the award of compensatory damages in an estimated amount of at least $50 million in a single stroke, falls within the latter category?

1 documents on the "Relativity" document software (something most law partners themselves cannot
2 do) are examples of valuable contributions made by the trial fellows to this case (on both sides).
3 The arbitrator has reviewed the billing entries for Kristen Mather, Benjamin Matsalla and Taylor
4 Thomas and their billing descriptions indicate that the work performed by them was classic
5 paralegal work.[56] Therefore, it is appropriate for any of the law firms to bill for the time and effort
6 reflected in these paralegal-like legal services, all of which are inherently valuable to the litigation
7 effort and all of which reduce the amount of billable time which would otherwise be incurred, and
8 billed, by the attorneys themselves (thus creating a "savings" for the client). The arbitrator finds
9 that the billing entries of the trial fellows are legitimate time and there is no need for a reduction of
10 the legal fees based on these line items.

11     Block-billing is a mixed bag, and often misunderstood. Many clients, and courts, view
12 block-billing as an unfortunate practice by which attorneys "pad" their time. According to this
13 view, attorneys over-state the amount of billing time spent on particular legal tasks which are then
14 "blocked-billed" so as to disguise the inappropriate time charges. As a result, many courts object
15 to a pattern of block-billing and insist upon a significant percentage reduction of the aggregate
16 amount of legal fees charged by the attorneys who engage in block-billing. In contrast, many
17 attorneys view the objection to block-billing as a device used by clients and other payors of legal
18 bills to artificially negotiate down legal fees. In this respect, block-billing is often used as an
19 excuse to not pay the attorneys the amount of a billing statement for which they are arguably
20 entitled to get paid in full. Perhaps both of these extremes have some semblance of truth to them.

21     In this case, VPX contends that Orange Bang and Monster are guilty of making use of the
22 practice of block-billing and, therefore, according to VPX, Orange Bang's and Monster's
23 attorneys' fees should be reduced in a material way. As an example of its point of view, VPX
24 refers to the October 5, 2021 billing entries for Attorney Zadra-Symes ("Zadra-Symes") and

25 _____

26 [56] VPX refers to Benjamin Matsalla's billing entry of July 1, 2021 as an example of a charge for
the mere photocopying of documents because the billing entry makes use of the word "re-
27 production", a fancy word for photocopying. However, a review of the Benjamin Matsalla billing
entries on June 29, 2021, the billing date before the July 1, 2022 billing entry, shows that Monster
28 had received recent document productions from third parties, the University of West Florida and
Market Tracks, documents that need to be "re-produced" to VPX, to the extent requested by VPX.
171

FINAL ARBITRATION AWARD – PHASE 1 AND PHASE 2

1  Attorney Bellinger ("Bellinger"), both of whom billed an 8.00 hour day for attending the arbitration
2  evidentiary hearing on that date (the second day of the arbitration evidentiary hearing) and both of
3  whom billed additional tasks on that day as well [Zadra-Symes prepared Ken Hollander (expert)
4  and reviewed correspondence and Bellinger reviewed correspondence with opposing counsel and
5  arbitrator regarding disputed issues], tasks which they both block-billed on that day.

6        These are curious examples raised by VPX. According to the transcript of the October 5,
7  2021 arbitration evidentiary hearing, the proceedings on that day commenced at 9:00 am and ended
8  at 7:15 pm. Therefore, an attorney who attended the hearing on that day, and did other tasks as
9  well, would be justified in billing at least 11.25 hours on October 5, 2021. Yet both Zadra-Symes
10  and Bellinger billed only 8.00 hours that day and, on top of that, they both provided *additional*
11  information on other tasks billed that day, albeit in a block-billed format. Perhaps Zadra-Symes
12  and Bellinger did not attend the full hearing on October 5, 2021, but there is nothing to indicate in
13  any way that their time was "padded", contrived or inaccurate on that day. The arbitrator, in
14  looking at the billing statements, did notice billing entries which were block-billed. However,
15  there is nothing in the record to indicate that these block-billed billing entries were anything other
16  than legitimate legal time spent on a wide variety of legal tasks.

17        Often times, block-billing is not the result of dishonest or even lazy billing practices, but
18  rather is the result of the practical reality of being a trial attorney or a para-legal in high stakes
19  litigation. By way of illustration, it is not uncommon for attorneys or paralegals to not only work
20  an 8.00 hour day, but even a 12.00 day or even a 16.00 hour day. If that attorney or paralegal
21  wanted to avoid block billing, and specifically break down each particularized task that he or she is
22  doing that day (of which there could be 25 – 50 individualized tasks), the attorney or paralegal
23  could do just that, but that specificity takes time, effort and scrupulous discipline, perhaps as much
24  time as two to three additional hours per day just to accomplish the billing function and the
25  maintenance of specific, line-item time sheets. The practical reality of this fact is that an attorney's
26  or paralegal's very long litigation day, let's say a 12.00 hour day, becomes a 14.00 hour or a 15.00
27  hour day. For this reason, many attorneys and paralegals are "guilty" of a form of block-billing,
28  not because of any dishonest motivations, but because of the sheer enormity of tracking each

1 individualized task. In short, the arbitrator sees block-billing in this case, but does not see any
2 evidence or indication that the legal time is padded, inflated or inaccurate. For these reasons,
3 VPX's request to reduce the amount of legal fees based on block-billing is denied and Orange
4 Bang's and Monster's legal fees shall not be reduced on this basis.

5 With respect to the issues of over-staffing and too many hours spent on this litigation, the
6 arbitrator has mixed reactions. While it is true that Monster and Orange Bang often had 13
7 attorneys working on this case between them, it is also true that VPX often had 12 attorneys (and
8 arguably 16 according to Monster's and Orange Bang's reply brief on attorneys' fees and costs, p.
9 30] working on this case. In fact, during the arbitration evidentiary hearing, there were times when
10 there were as many as 48 "participants" attending the arbitration on Zoom, counting attorneys,
11 client representatives, paralegals, experts, etc. According to Monster and Orange Bang, the amount
12 in controversy was $1.48 billion according to their pre-arbitration briefs and VPX often argued that
13 this was a "bet the company" case, thus indicating that both sides were justified with a very large
14 expenditure of resources, effort and attorney/paralegal (and expert) time. Having stated that, it
15 does appear that at times the amount of staffing was somewhat over-zealous, but not overly so.
16 Therefore, based upon the showings made by both sides, the arbitrator finds that Monster's and
17 Orange Bang's aggregate attorney's fees should be reduced by 2.5%. In this respect, 97.5% of the
18 aggregate attorney's fees requested by Monster and Orange Bang, the amount of $7,466,446.55, is
19 reduced to $7,279,785 and that is the amount hereby awarded by the arbitrator as the award of
20 Monster's and Orange Bang's attorney's fees (the "Award of Attorney's Fees").

21 With respect to the issue of claim splitting, the arbitrator views this argument as another
22 restatement of VPX's Election of Remedies Argument which has been addressed and rejected
23 above.

24
25
26
27
28

DocuSign Envelope ID: A1DDD365-25D8-4D5F-8F59-A1F66727570

**IV.  SUMMARY OF FINDINGS OF THE FINAL ARBITRATION AWARD – PHASE 1 AND PHASE 2**

**A. Material Findings Regarding Liability and the Award of Monetary Relief**

The Arbitrator hereby summarizes his key findings and award as follows:

- VPX breached paragraph 7 of the 2010 Settlement Agreement.

- VPX is currently in breach of paragraph 7 of the 2010 Settlement Agreement.

- With respect to VPX's past breach of the 2010 Settlement Agreement, Monster is entitled to recover damages from VPX and JHO through September 19, 2021 as follows:

  - a reasonable royalty in the amount of 5% of net sales of BANG branded products in the amount of **$101,525,000**; or

  - a disgorgement of profits attributable to the breach of paragraph 7 in the amount of **$157.5 million**.

- VPX is liable for trademark infringement by virtue of Orange Bang's and Monster's proving the elements necessary to demonstrate a likelihood of confusion in the relevant market with a sufficient amount of consumers with respect to the use of the BANG mark.

- There is no indication that VPX will stop its infringing activity, or abide by the VPX Marketing and Sales Restrictions set forth in paragraph 7 D of the 2010 Settlement Agreement, in the future.

- As an alternative to their breach of contract damages, and with respect to VPX's trademark infringement, Orange Bang is entitled to recover past damages from VPX and JHO through September 19, 2021 as follows:

  - a reasonable royalty in the amount of 5% of net sales of BANG branded products in the amount of **$112,314,490.75**; or

  - a disgorgement of profits attributable to the infringement of the BANG mark in the amount of **$175 million**.

Case 22-17842-PDR   Doc 523-1   Filed 12/14/22   Page 79 of 81

DocuSign Envelope ID: 1DD03B5-7B28-D5F-8E5B-1F66727576
Case 5:20-cv-01464-DSF-SHK   Document 126-2   Filed 09/23/22   Page 175 of 177   Page ID
#:5562

1 • Of the four calculations of the monetary recovery referred to above, and in order to

2 avoid double recovery for compensatory damages as to the Past Period of Time,

3 only one of the calculations is recoverable as the monetary award, at the election of

4 Monster and Orange Bang[57], and it is recoverable from and against VPX and JHO,

5 jointly and severally.

6

7 **B. The Equitable Remedies of the Permanent Injunction and Specific Performance and**

8 **the Election of the 5% Continuing Royalty in Lieu of the Permanent Injunction as to**

9 **the Time Period Following the Arbitration**

10 The Arbitrator hereby finds and awards as follows:

11 • Because of the likelihood of a continuing breach of paragraph 7 of the 2010

12 Settlement Agreement and the continuing infringement of Orange Bang's BANG

13 mark and because Orange Bang has proven the elements necessary for the issuance

14 of the Permanent Injunction, and because the elements for specific performance

15 have been satisfied, permanent injunctive relief is appropriate to ensure compliance

16 with the 2010 Settlement Agreement, to prevent future violations of the 2010

17 Settlement Agreement and to prevent future trademark infringements of the Bang

18 mark.

19 • VPX and JHO are hereby permanently enjoined as set forth in Section III, M. above.

20 The Permanent Injunction is hereby issued, but stayed until April 29, 2022.

21 • In lieu of the issuance of the above Permanent Injunction, and based upon the VPX

22 5% Continuing Royalty Election, **VPX and JHO shall pay Orange Bang and**

23 **Monster a royalty at the rate of 5%** of VPX's Net Sales (as defined above)

24 derived from the sale of Bang branded products, including BANG Energy RTD, **on**

25 **an ongoing, continuing basis in the future** as set forth above and for so long as

26 VPX or JHO make any use of the BANG mark.

27

28 [57] As described above, on January 31, 2022, Orange Bang and Monster served notice of the Orange
Bang / Monster Election.

Case 22-17842-PDR    Doc 523-1    Filed 12/14/22    Page 80 of 81

DocuSign Envelope ID: 91DDD395-25D8-4DEF-8F68-1F667725FC
Case 5:20-cv-01464-DSF-SHK   Document 126-2   Filed 09/23/22   Page 176 of 177   Page ID
#:5563

1    **C. The Award of Costs and Attorney's Fees**

2          In addition to the award of compensatory damages and the award of the equitable remedies

3    as set forth above, VPX and JHO are each jointly and severally liable to pay Monster and Orange

4    **$2,018,658.90** for the Award of Costs and **$7,279,785** for the Award of Attorney's Fees, for a total

5    award for costs and attorney's fees in the amount of **$9,298,443.90** (collectively, the "Award of

6    Costs and Attorney's Fees").

7

8    **V.      CONFIDENTIALITY OF THE FINAL ARBITRATION AWARD AND THE**

9    **SURVIVAL OF THE 2010 SETTLEMENT AGREEMENT**

10         VPX contends that the Interim Arbitration Award and the Final Arbitration Award are both

11   confidential and may not be disclosed to third parties.  In contrast, Monster and Orange Bang

12   contend that the Interim Arbitration Award and the Final Arbitration Award are not confidential

13   and may be disclosed to third parties, such as for the purposes of regulatory disclosures.  Monster

14   and Orange Bang have apparently designated portions of the Interim Arbitration Award which they

15   are willing to treat as confidential and they invite the arbitrator to weigh in on such designations.

16   The arbitrator respectfully declines the invitation.

17         VPX has purported to cite cases which stand for the proposition that, given the rulings of

18   the arbitrator as reflected in this Final Arbitration Agreement, the 2010 Settlement Agreement is

19   thus deemed void and unenforceable.  In contrast, Monster and Orange Bang have cited authorities

20   which stand for the proposition that the 2010 Settlement Agreement survives the issuance of the

21   Final Arbitration Award and remains in full force and effect and, if violated in the future, Monster

22   should be entitled to enforce it.  California Civil Code Section 1047 provides that where there is a

23   breach of reoccurring obligations which give rise to a new cause of action, a plaintiff is permitted

24   to bring a successive action.[58]

25

26   [58] In *Yates v. Kuhl*, 130 Cal.App.2d 536, 539-540 (1955), the plaintiff filed a first action against a
27   defendant who interfered with plaintiff's right to obtain available water.  Plaintiff was awarded
     injunctive relief.  In the second action, the plaintiff sought monetary damages for the denial of
28   water in a later time period.  The defendant claimed that because of plaintiff's prior election of
                                                                                          (Continued...)

FINAL ARBITRATION AWARD – PHASE 1 AND PHASE 2

Case 22-17842-PDR  Doc 523-1  Filed 12/14/22  Page 81 of 81

DocuSign Envelope ID: 90DD0365-7BD8-4D5F-8F80-A1F667274FC Case 5:20-cv-01464-DSF-SHK  Document 126-2  Filed 09/23/22  Page 177 of 177  Page ID
#:5564

1      The arbitrator clarifies that he believes that the authorities cited by Monster and Orange

2  Bang in this regard correctly state the law. This is especially true in this case where the

3  fundamental purpose of the equitable remedies of specific performance and the issuance of the

4  Permanent Injunction (now stayed by virtue of the VPX 5% Continuing Royalty Election) is to

5  ensure compliance with the 2010 Settlement Agreement. To rule otherwise would make the

6  issuance of the equitable remedies an empty gesture and would grant an unintended license to VPX

7  to infringe the Bang mark and/or ignore the 2010 Settlement Agreement in the future without any

8  consequences or financial downside. Such a result would negate the purpose and intent of this

9  Final Arbitration Award. Accordingly, the arbitration hereby reaffirms that the 2010 Settlement

10  Agreement survives the issuance of the Final Arbitration Award and remains in full force and

11  effect.

12

13  **VI.    THE ARBITRATOR'S INTENT REGARDING THE FINALITY OF THE FINAL**

14        **ARGITRATION AWARD**

15      This Final Arbitration Award is a full and final adjudication of all claims which were, or

16  which could have been, submitted to the arbitrator by any and all of the parties in connection with

17  this arbitration. All claims not expressly adjudicated, determined or resolved by way of this

18  arbitration or as set forth in this Final Arbitration Award are denied. The arbitrator intends this

19  Final Arbitration Award to be the final expression of his conclusions, adjudications and awards

20  raised in this arbitration.

21

22  **Dated:** April 4, 2022

23  **By:    Bruce Isaacs, Arbitrator**

24      /Bruce Isaacs/

25

26  DocuSigned by:
    *Bruce Isaacs*

27  C92DCEFC7CC049C
remedies, the plaintiff was barred from seeking damages in the second action. The court ruled,

28  however, that plaintiff was not barred and that the remedies were not inconsistent because the
damages arose in a later period of time which gives rise to a new cause of action.

FINAL ARBITRATION AWARD – PHASE 1 AND PHASE 2