# Debtors' Exhibit 16

**Fill in this information to identify the case:**

Debtor _____Vital Pharmaceuticals International Sales, Inc._____

United States Bankruptcy Court for the District of _____Southern District of Florida_____

Case number _____22-17850_____

Official Form 410

# Proof of Claim

04/22

**Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.**

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed.** That date is on the notice of bankruptcy (Form 309) **that you received.**

## Part 1:   Identify the Claim

| | |
|---|---|
| 1. **Who is the current creditor?** | The American Bottling Company |
| | Name of the current creditor (the person or entity to be paid for this claim) |
| | Other names the creditor used with the debtor  ABC; Keurig Dr Pepper Inc.; KDP |

| | |
|---|---|
| 2. **Has this claim been acquired from someone else?** | ☑ No |
| | ☐ Yes.  From whom? _____ |

| | | |
|---|---|---|
| 3. **Where should notices and payments to the creditor be sent?** | Where should notices to the creditor be sent? | Where should payments to the creditor be sent? (if different) |
| Federal Rule of Bankruptcy Procedure (FRBP) 2002(g) | The American Bottling Company<br>Russ Falconer<br>2001 Ross Avenue Suite 2100<br>Dallas, Texas 75201<br>United States<br>**P:** 214-698-3170<br>**E:** RFalconer@gibsondunn.com | The American Bottling Company<br>Stephen Cole<br>6425 Hall of Fame Ln.<br>Frisco, Texas 75034<br>United States<br>**P:** 469-404-8943<br>**E:** Stephen.Cole@kdrp.com |

Uniform claim identifier for electronic payments in chapter 13 (if you use one):

— — — — — — — — — — — — — — — — — — — — — — — — —

| | |
|---|---|
| 4. **Does this claim amend one already filed?** | ☑ No |
| | ☐ Yes.  Claim number on court claims registry (if known) _____  Filed on _____<br>MM/DD/YYYY |

| | |
|---|---|
| 5. **Do you know if anyone else has filed a proof of claim for this claim?** | ☑ No |
| | ☐ Yes.  Who made the earlier filing? _____ |

Official Form 410

**Part 2:** Give Information About the Claim as of the Date the Case Was Filed

---

6. **Do you have any number you use to identify the debtor?**

   ☑ No

   ☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: _____

---

7. **How much is a claim?**   225,100,000 plus ICF

   Does this amount include interest or other charges?

   ☐ No

   ☑ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

---

8. **What is the basis of the claim?**

   Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card
   Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).
   Limit disclosing information that is entitled to privacy, such as health care information.

   Breach of contract (see attached rider)

---

9. **Is all or part of the claim secured?**

   ☑ No

   ☐ Yes. The claim is secured by a lien on property

   **Nature of property**

   ☐ Real estate.   If the claim is secured by the debtor's principal residence, file a Mortgage Proof of Claim Attachment (Official Form 410-A) with this Proof of Claim.

   ☐ Motor vehicle.

   ☐ Other. Describe: _____

   **Basis for perfection:** _____

   Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

   **Value of property:** _____

   **Amount of the claim that is secured:** _____

   **Amount of the claim that is unsecured:** _____   (The sum of the secured and unsecured amounts should match the amount in line 7.)

   **Amount necessary to cure any default as of the date of the petition:** _____

   **Annual Interest Rate (when case was filed)** _____ %

   ☐ Fixed

   ☐ Variable

---

10. **Is this claim based on a lease?**

    ☑ No

    ☐ Yes. Amount necessary to cure any default as of the date of the petition.   $ _____

---

11. **Is this claim subject to a right of setoff?**

    ☑ No

    ☐ Yes. Identify the property: _____

| 12. | **Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?** | ☑ No | |
| --- | --- | --- | --- |
| | | ☐ Yes. Check one: | Amount entitled to priority |
| | A Claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | _____ |
| | | ☐ Up to $3,350* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | _____ |
| | | ☐ Wages, salaries, or commissions (up to $15,150*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4) | _____ |
| | | ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | _____ |
| | | ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | _____ |
| | | ☐ Other. Specify subsection of 11 U.S.C. § 507(a)() that applies. | _____ |

*Amounts are subject to adjustment on 4/01/25 and every 3 years after that for cases begun on or after the date of adjustment.

## Part 3: Sign Below

| | |
| --- | --- |
| **The person completing this proof of claim must sign and date it. FRBP 9011(b).** | Check the appropriate box |
| | ☐ I am the creditor. |
| If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is | ☑ I am the creditor's attorney or authorized agent. |
| | ☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004. |
| **A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.** | ☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005. |

I understand that an authorized signature on this Proof of Claim serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt

I have examined the information in this Proof of Claim and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date & time    <u>10/26/2022 at 05:45 pm PT</u>
                            MM / DD / YYYY HH : MM

<u>/s/Stephen McClain Cole</u>
Signature

**Print the name of the person who is completing and signing this claim:**

| | | | | |
| --- | --- | --- | --- | --- |
| Name | Stephen | McClain | Cole | |
| | First Name | Middle Name | Last Name | |
| Title | Senior Counsel - Litigation | | | |
| Company | Keurig Dr Pepper Inc. | | | |
| | Identify the corporate servicer as the company if the authorized agent is a servicer | | | |
| Address | 6425 Hall of Fame Ln. | | | |
| | Number | Street | | |
| | Frisco | TX | 75034 | |
| | City | State | ZIP Code | |
| Contact phone | | | | |
| Email | Stephen.Cole@kdrp.com | | | |

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
FT. LAUDERDALE DIVISION
www.flsb.uscourts.gov

In re:

VITAL PHARMACEUTICALS, INC., *et al.*,

Debtors.[1]

_____/

Chapter 11 Cases

Case No.:  22-17842-PDR

(Jointly Administered)

## RIDER TO PROOF OF CLAIM FILED BY
## THE AMERICAN BOTTLING COMPANY

1.    The American Bottling Company ("**ABC**") hereby files this rider (the "**Rider**") to its proof of claim (the "**Proof of Claim**").  This Rider and its attachments form an integral part of the Proof of Claim.

2.    As set forth in the attached First Amended Complaint (Exhibit 1) filed in the District of Delaware (Case No. 1:20-cv-01268-TMH) (the "**District of Delaware Action**"), ABC asserts a claim against Vital Pharmaceuticals, Inc. ("**VPX**") for breach of contract arising out of VPX's breach of a written contract manufacturing agreement, effective October 9, 2017, and amended in April 2019 (the "**Contract**") between ABC and VPX.  The Contract is attached as Exhibit 2.

3.    As explained in the First Amended Complaint, the Contract contains a "take or pay" provision under which VPX agreed to pay ABC for a specified amount of product each year through December 31, 2024, irrespective of whether VPX took delivery of that product (the "**Minimum Annual Purchase Requirement**").  However, in 2019, VPX failed to satisfy the Minimum Annual Purchase Requirement and, in 2020, VPX prematurely and wrongfully terminated the Contract.  As a result, VPX is liable to ABC for the damages ABC has suffered, including the money owed to ABC through December 31, 2024.  Such damages are in an amount of not less than $225.1 million plus applicable interest, attorneys' fees, and costs.

4.    VPX is the party to the Contract and the named defendant in the District of Delaware Action.  On information and belief, Bang Energy Canada, Inc., JHO Intellectual Property Holdings, LLC, JHO Real Estate Investment, LLC, Quash Seltzer, LLC, Rainbow Unicorn Bev LLC, Vital Pharmaceuticals International Sales, Inc., and other affiliates of VPX are or may be liable on the claim on an alter ego, reverse-veil-piercing, or similar basis.  ABC therefore asserts a claim against each such entity on the same terms and for the full amount of the Proof of Claim described here, as needed for complete satisfaction of ABC's claim.

---

[1] The address of the Debtors is 1600 N. Park Drive, Weston, FL 33326. The last four digits of the Debtors' federal tax identification numbers are: (i) Vital Pharmaceuticals, Inc. (8430); (ii) Bang Energy Canada, Inc. (5454); (iii) JHO Intellectual Property Holdings, LLC (0010); (iv) JHO Real Estate Investment, LLC (9394); (v) Quash Seltzer, LLC (6501); (vi) Rainbow Unicorn Bev LLC (2254); and (vii) Vital Pharmaceuticals International Sales, Inc. (8019).

5.    The filing of the Proof of Claim does not constitute consent by ABC to the jurisdiction of the Bankruptcy Court with respect to any proceeding commenced in the chapter 11 cases against or otherwise involving ABC.  ABC expressly reserves its rights to (i) amend or supplement the Proof of Claim, (ii) file additional proofs of claim, (iii) seek relief from stay to pursue the District of Delaware Action, and (iv) seek withdrawal of the reference with regard to the Proof of Claim and all issues related to the District of Delaware Action.

# Exhibit 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| THE AMERICAN BOTTLING COMPANY | CIVIL ACTION |
| Plaintiff, | Case No.: 1:20-cv-01268-RGA |
| vs. | |
| VITAL PHARMACEUTICALS, INC. d/b/a VPX/REDLINE, | |
| Defendant | |

## PLAINTIFF'S FIRST AMENDED COMPLAINT

NOW COMES Plaintiff, The American Bottling Company ("Plaintiff" or "ABC"), and files this, its First Amended Complaint against Vital Pharmaceuticals, Inc. d/b/a VPX/Redline ("Defendant" or "VPX"), the Defendant herein (with Defendant's written consent to do so under FRCP 15(a)(2)), and, in support of the same, respectfully states as follows:

## I.  SUMMARY

1.      This is a breach of contract action arising out of VPX's breach of a written Contract Manufacturing Agreement, effective October 9, 2017, which was amended in April 2019 (the "Contract"). Under the Contract, ABC agreed to manufacture canned beverages for VPX, and VPX agreed to pay ABC for those products. In addition, VPX agreed to purchase a specified minimum number of cases each year through December 31, 2024 (the "Minimum Annual Purchase Requirement"). However, in 2019 VPX failed to satisfy the Minimum Annual Purchase Requirement and owes ABC over $11 million for the shortfall.  After VPX failed to satisfy the Minimum Annual Purchase Requirement, VPX began making excuses for its failure

to honor the Contract, including wrongfully invoking the Contract's force majeure clause. Finally, attempting to escape its contractual obligations to ABC, VPX wrongfully terminated the Contract.  As a result, VPX is liable to ABC for the damages ABC has suffered, including the money owed to ABC through the end of the Contract on December 31, 2024.

## II.      PARTIES

2.      Plaintiff, ABC, is a corporation formed under the laws of the State of Delaware having its principal place of business at 5301 Legacy Drive, Plano, Texas 75204.

3.      Defendant, VPX, is a corporation incorporated under the laws of the State of Florida having its principal place of business at 1600 N. Park Drive, Weston, Florida 33326. VPX has appeared and answered herein.

## III.      JURISDICTION AND VENUE

4.      This Court is the proper venue to hear these claims because the Contract expressly provides that any action arising under the Contract shall be heard by a court in Delaware.

5.      This Court has subject matter jurisdiction to hear these claims because the parties are diverse and the amount in controversy exceeds $75,000.

6.      The Court has personal jurisdiction over VPX because the Contract expressly provides that any action arising out of the Contract shall be heard by a court in Delaware, and Defendant has voluntarily removed the above-styled lawsuit to this Court and answered.

## IV.   FACTS

### A.   The Terms of the Contract

7.     Under the Contract, VPX was required to fulfill the Minimum Annual Purchase Requirement each year from 2019 through 2024.  In the event VPX failed to fulfill its Minimum Annual Purchase Requirement for any given year, VPX expressly agreed to pay the "then-current price" for the shortfall for that year.

### B.   VPX Breached the Contract

8.     In 2019, VPX failed to meet the Minimum Annual Purchase Requirement.   In fact, VPX's volume shortfall for 2019 was 5,393,094 cases. As a result, VPX owes ABC $11,711,262.00 for 2019.  On January 3, 2020, VPX was notified that it owed money for the 2019 shortfall, but VPX failed and refused to pay the amount due.

9.     In addition, VPX owes ABC for goods and services purchased but not paid for from January 1, 2020 through the date of filing.

### C.   VPX  Begins Making Excuses And Wrongfully Invokes *Force Majeure*

10.     After entering into the Contract, VPX completed acquisition of a manufacturing plant in Phoenix, Arizona capable of bottling its product.   Additionally, VPX has recently undertaken steps to build a plant in Georgia with similar capabilities.

11.     In 2019, when its manufacturing plant in Phoenix was close to completion, VPX began complaining that ABC was not fulfilling an alleged specification for dissolved oxygen ("DO") in the product. VPX's complaint was without merit because the Contract did not include a DO specification. Following discussions between VPX and ABC, ABC offered to amend the

Contract to include the DO specification sought by VPX and revise the remainder of the future Minimum Annual Purchase Requirements to allow VPX to spread the amount due for the 2019 shortfall over the remainder of the Contract. ABC prepared and presented to VPX an amendment to the Contract incorporating these changes, which VPX refused to sign despite several negotiations with ABC where it suggested it was in agreement.

12. In a further attempt to avoid its contractual obligations, on or about June 5, 2020, VPX notified ABC in writing that VPX was cancelling any production requests for July 2020 and attempted to justify the cancellation by invoking the Contract's *force majeure* provision.

13. On June 19, 2020, ABC advised VPX that there was no event of *force majeure* and that ABC expected VPX to perform under the Contract.

### D.     <u>VPX Wrongfully Terminated the Contract to Avoid its Contractual Obligations</u>

14. On July 27, 2020, in yet another blatant attempt to avoid paying the 2019 shortfall, to avoid fulfilling its contractual obligations, VPX sent ABC a written notice of default (the "Notice") and declared its intention to terminate the Contract. The matters set forth in the Notice were nothing more than excuses to try to avoid payment under the Contract and exit the Contract early—prior to the stated expiration of December 31, 2024.

15. On August 4, 2020, ABC responded to VPX's Notice and pointed out that the matters set forth therein were frivolous, did not amount to breaches of the Contract, and/or that they had long since been cured (the "Response").

16. ABC never received a reply to its Response and VPX never sent ABC a written notice of termination of the Contract. Nevertheless, in VPX's Answer to Plaintiff's Original

Complaint, Affirmative Defenses, Counterclaim, and Jury Demand, VPX asserts that it terminated the Contract on or about July 27, 2020. [Defendant's Answer, ¶ 12; Defendant's Counterclaim, ¶¶ 7, 11].

17.     As a result of VPX's wrongful termination of the Contract, ABC is entitled to recover the amounts it would have been paid under the Contract through December 31, 2024.

## COUNT 1: BREACH OF CONTRACT

18.     ABC incorporates by reference all allegations contained in the paragraphs above as if fully set forth herein.

19.     The Contract is an enforceable agreement.  VPX's failure to satisfy the Minimum Annual Purchase Requirement in 2019 was a breach of the Contract.  Moreover, VPX's attempted invocation of *force majeure* for the month of July 2020 was wrongful and of no effect because *force majeure* did not apply.  Additionally, VPX's premature termination of the Contract is wrongful and constitutes a breach or anticipatory repudiation of the Contract.

20.     VPX's breach and unlawful termination of the Contract has caused damage to ABC.  In particular, VPX is liable to ABC for VPX's failure to satisfy the Minimum Annual Purchase Requirement, plus all other money VPX should have paid ABC, through December 31, 2024.

21.     All conditions precedent to ABC's recovery have been fully performed or occurred or have been waived.

## **PRAYER**

WHEREFORE, ABC respectfully requests that the Defendant herein answer within the time required, and that, upon a final hearing hereof, ABC recover a judgment from VPX as follows:

        a.      Actual damages;

        b.      Pre-Judgment interest at the maximum rate permissible under the law;

        c.      Post-Judgment interest at the maximum rate permissible under the law;

        d.      Court costs;

        e.      ABC's reasonable and necessary attorneys' fees; and

        f.      Such other and further relief, both general and specific, to which ABC may show itself justly entitled.

SWARTZ CAMPBELL LLC

*/s/ Joseph S. Naylor*
Joseph S. Naylor, Esquire (Bar ID No. 3886)
300 Delaware Avenue, Suite 1410
Wilmington, DE 19801
(302) 656-5935
jnaylor@swartzcampbell.com

-and-
Richard A. Illmer
State Bar No. 10388350
Rick.Illmer@huschblackwell.com
HUSCH BLACKWELL LLP
1900 N. Pearl Street, Suite 1800
Dallas, Texas 75201
Telephone:   (214) 999-6100
Facsimile:   (214) 999-6170

ATTORNEYS FOR PLAINTIFF THE
AMERICAN BOTTLING COMPANY

November 20, 2020

Exhibit 2

# CONTRACT MANUFACTURING AGREEMENT

**THIS CONTRACT MANUFACTURING AGREEMENT** (the "Agreement") is made and entered into on **October 9, 2017** (the "Effective Date"), by and between **The American Bottling Company, Inc.**, a corporation incorporated under the laws of the State of Delaware, having an office at 5301 Legacy Drive., Plano, Texas 75024 (herein after the "Company") and **Vital Pharmaceuticals, Inc., d/b/a VPX/Redline**, a corporation incorporated under the laws of the **Florida**, having an office at **1600 North Park Drive, Weston, Florida 33326** (hereinafter called the "Customer").

**WHEREAS**, the Customer wishes the Company to produce and bottle flavored and/or non-flavored, carbonated or non-carbonated beverage products under the Customer's trade names or trademarks;

**WHEREAS**, the Company is engaged in the business of producing beverage products; and

**WHEREAS**, the parties hereto are desirous of entering into this Agreement pursuant to which the Company shall produce the "Products" as hereinafter defined in accordance with proprietary and confidential specifications to be supplied by the Customer, all in accordance with the terms and conditions set forth in this Agreement.

**NOW, THEREFORE**, in consideration of the promises, covenants, and agreements herein contained, the parties, intending to be legally bound, hereby agree as follows:

## 1. Definitions.

1.1    In this Agreement, unless something in the subject matter or context is inconsistent therewith:

        a.    **"Bottling Facility"** means the manufacturing and/or warehouse facilities operated by the Company and used for the production of Products as specifically listed in Schedule "A".

        b.    **"Commencement Date"** means the Effective Date as set forth above.

        c.    **"Finished Case Goods"** means Products produced and made ready for delivery pursuant to this Agreement in case configurations agreed by the parties.

        d.    **"Ingredients"** means sweeteners, preservatives, acidulates, $CO_2$, flavor components, supplements, extracts, water, and all other components that are combined to produce the Products.



- 1 -

DPS
LEGAL

e.  **"Packaging Materials"** means bottles, caps, labels, cartons, shrink film, trays and all other components used to package the Products.

f.  **"Production Run"** means an order by the Customer for a continuous production of a scheduled quantity of Product size, flavor and package.

g.  **"Products"** means flavored and non-flavored, carbonated and non-carbonated, beverages sold under the trademarks and brand names of the Customer, as specified on **Schedule C** hereto.

h.  **"Product Specifications"** means Product specifications provided to the Company by the Customer.

i.  **"Schedule"** means any of the schedules and/or exhibits designated by letters, e.g., **Schedule A**, which are attached to and incorporated herein by reference.  The Schedules may be modified from time to time by the mutual written consent of the parties.

j.  **"Term"** means the period(s) of time set forth in Section 2.0 hereof.

## 2.  Term.

The Term of this Agreement shall be three (3) years commencing on the Commencement Date and ending on September 1, 2020, subject to termination as provided herein.  This Agreement shall automatically renew for successive one (1) year terms after the initial Term unless either party has notified the other of its desire to terminate in accordance with the provisions herein.   Either party may terminate this Agreement during the Term or any renewal term, upon ninety (90) days' written notice to the other party.

## 3.  Storage.

No storage is available in Company's Bottling Facilities.  Products shall be made and shipped as specified in **Schedule B**.

## 4.  Packaging Material and Ingredients.

4.1    The Customer shall provide the branded and proprietary Ingredients and Packaging Materials needed for the bottling of the Products as set forth on **Schedule C**. The Customer is responsible for the cost, accuracy, and legal and regulatory compliance of all printed materials, including without limitation, labels and cans. The Company shall provide all unbranded Ingredients and Packaging Materials at the cost set forth in **Schedule C**.  The Customer shall make available to and order in for the Company prior to the start of any Production Run all Ingredients and Packaging Materials required to be provided by the Customer and needed for each Production Run, within the time frame designated, in writing, by the planner at the Bottling Facility.



(6/2013)

- 2 -

DPS
LEGAL

4.2     Customer warrants and represents that its purchase and provision of Ingredients and Packaging Materials are compliant with the Food Safety Modernization Act ("FSMA") and shall defend, indemnify and hold Company harmless from claims, actions, and losses of any kind including reasonable attorneys' fees, arising directly or indirectly from the breach or alleged breach of this warranty and representation.

4.3     At the expiration or termination of this Agreement, the Customer shall make arrangements for the removal of its branded Ingredients and Packaging Materials from the Bottling Facility within 10 business days.

### 5.  Quality Standards and Specifications.

5.1     The Company shall produce, package, store, and ship Product in accordance with Good Manufacturing Practice requirements set forth in regulations promulgated under the Federal Food, Drug & Cosmetic Act (the "FFDC Act") (collectively, "GMPs"), and in compliance with the Product Specifications, quality control standards and coding systems supplied by the Customer.  The Company shall not substitute any Ingredients or modify any Product formulation(s) without the prior written consent of the Customer. All Products, Ingredients, and Packaging Materials supplied by the Company shall conform to Product Specifications.     The Company shall implement any change, modification or amendment ("Amendment") to the Product Specifications as the Customer may from time to time request, in writing, provided that any such Amendment does not alter the Company's costs or require the Company to invest in equipment additions or alterations.  Such Amendments shall not be effective unless delivered in writing and signed by a duly authorized officer of the Company and shall allow the Company reasonable time to meet any modifications or revisions.  Amendments that would increase the Company's cost of performance or require equipment additions or alterations must be mutually agreed to in writing by a duly authorized officer of the Customer and Company before the Company implements such Amendment(s).

5.2     The Company warrants that the Company's Bottling Facilities currently have and, at all times during the Term of this Agreement, shall have a documented Hazard Analysis and Critical Control Points ("HACCP") program as required by applicable U.S. regulations. Company further warrants that all critical control points as specified by the HACCP program will be monitored at regularly scheduled intervals and such monitoring will be appropriately documented.  All Company employees shall be adequately trained to properly monitor, manage, report and document all HACCP-related activities as established by the Company from time to time.

5.3     The Company shall prepare and maintain quality control records and reports for Product produced hereunder as set forth in the Company's quality control procedures and standards and shall also furnish to the Customer, a reasonable number of samples from each production run of Product as requested by the Customer for quality control purposes.  The Company shall, at all times, make available to the Customer all such quality control records and reports for the Products within a reasonable time frame upon receiving the Customer's written request.


(6/2/13)

- 3 -

DPS
LEGAL

5.4    Prior to commencement of, and at any time during, production, packaging, storage, and/or shipping operations, the Customer shall have the right, upon reasonable notice, to send one or more of its authorized employees or representatives to observe and inspect, during regular business hours, operations used to produce, package, and store Product and related documentation and records pertaining to the production of the Products.

## 6. Maximum Loss Allowance.

6.1    Subject to the limitations contained in Sections 6.2 and 6.3 herein, in producing Products, the Company shall be allowed its actual documented losses, not to exceed the percentage loss allowance of three percent (3%) for Ingredients and Packaging Materials and one-half percent (.5%) for Finish Case Goods (breakage/shrinkage). The Customer shall have the right at any time during the term of this Agreement to reasonably request an audit of any losses claimed by the Company. Each such audit shall be conducted by the Company or Customer, at the Customer's choosing and at the Customer's initial cost. If audit results exceed the loss allowance(s) specified above, the Company shall pay or reimburse the Customer for claims above the Loss Allowances(s) and the Company shall pay or reimburse the Customer for the costs and expenses of such audit within a reasonable time frame

6.2    If Ingredients of unacceptable quality, based on the Company's standards or any applicable laws and regulations, are received from the Customer (or ordered by the Customer) and rejected by the Company, the Company shall immediately notify and report to the Customer the quantity of the rejected Ingredients and the Customer shall deduct that amount in calculating the Company's losses subject to the loss allowances specified in Section 6.1. The Customer is then responsible for the reasonable disposal cost of the unacceptable Ingredients and any and claims against its ingredient and packaging suppliers.

6.3    Loss allowances may be modified in the event the Customer changes any Product Specification.

## 7. Production Schedule.

7.1    Prior to the sixth (6th) day of each month during the Term of this Agreement, the Customer shall provide to the Company's Demand Planner, Supply Chain, by fax or e-mail, a forecast of the production requirements for Products during the next calendar month. The forecast shall include Product quantities by flavor, package and size.

7.2    The Customer shall provide purchase orders for production of Product by package and flavor as set forth in **Schedule C**.

7.3    Production Runs shall be scheduled within fifteen (15) days from the date a purchase order is received from the Customer. The Customer agrees that the Company, in its sole discretion, may change the production schedule upon five (5) business days written notice to the Customer, however, the Company will not delay a Production Run more than ten (10) days. All Production Runs must conform to the


(6/20/13)

- 4 -

Company's minimum run quantities set forth in **Schedule C**, unless otherwise agreed to by the Company in writing. Time is of the Essence.

7.4     On or before November of each year of the Term of this Agreement, the Customer shall give the Company a twelve (12) month estimated forecast for Products by package and flavor for the Company to use solely for planning purposes. The Customer will use its best commercial efforts to update such forecast on a quarterly basis.

7.6     At the initial Production Run, the Customer shall have its representative present during batching and production in order to minimize the impact of errors resulting from Customer's formulations or inaccurate specifications. Company shall not be liable for losses resulting from formulations or inaccurate specifications provided by Customer, its agents, representatives or flavor house.

8.  **Pallets.**

Company agrees to provide pallets as set forth in **Schedule D**.

9.  **Payment of Fees.**

9.1     In consideration of the services provided by the Company under this Agreement, the Customer shall pay to the Company the fees set out in **Schedule C**.

9.2     **Schedule C** includes, as a component of the total purchase price of Product, a charge for Ingredients and Packaging Materials provided by the Company.  Ingredients or Packaging Materials not specified on **Schedule C** shall be purchased by the Customer, and supplied to the Company for the production of Product.

9.3     Fees for the production of Products shall be billed by the Company when Products are produced and shall be payable thirty (30) days from the date of the Customer's receipt of the invoice.

9.4     The fees referred to herein are exclusive of all federal, state, and local sales, goods, and services and similar taxes which shall be the responsibility of the Customer.

9.5     The Customer shall be solely responsible for collecting and remitting applicable bottle deposits required by local or state laws including, but not limited to the California Redemption Value ("CRV").  As a result, the Company shall not charge the Customer a bottle deposit or CRV under this Agreement.  the Customer also shall be responsible for container redemption and disposal.  The Customer indemnifies the Company from and agrees to reimburse the Company for any actual charge, fee or penalty incurred due to the Customer's failure to comply with any local or state bottle deposit law.

9.6     Upon thirty (30) days prior written notice, the Company may pass through and otherwise charge the Customer for any documented cost increases for raw materials or labor or increases that result from changes to the Product Specifications.  Further, upon thirty (30) days prior written notice, if any law or regulation is enacted or imposed

(6/2013)

- 5 -

DPS
LEGAL

anywhere, the effect of which is to impose upon or to cause the Company to incur any cost or expense with respect to Products or the performance of the Company services (which did not exist on the date of this Agreement) with respect to testing or other quality assurance requirements, container deposits, used or empty container collection, container recycling or disposal, beverage or package labeling requirements, any tax or duty in the nature of any excise tax or otherwise, the Company shall be entitled to increase the price of Products by an amount sufficient and in such manner and to such extent that none of the burden of such costs or expenses is borne by the Company.

9.7    Equipment purchased in total or in part by the Customer for the purpose of producing Products shall be handled in the manner set forth on **Schedule E**.

**10. Warranties and Representation.**

10.1    The Company hereby covenants, represents and warrants to the Customer that:

    a.    It is a limited liability partnership duly organized and validly existing under the laws of the State of Delaware.

    b.    It has all necessary corporate power, authority and capacity and is properly authorized and licensed to enter into this Agreement and to perform its obligations hereunder. The execution and delivery of this Agreement and the performance of the transactions contemplated hereby have been duly authorized by it.

    c.    The Company warrants that all Products shall be produced, bottled and stored in compliance with all applicable federal, state and local laws and regulations, including but not limited to, the Federal Food, Drug and Cosmetic Act of 1938, as amended, in force and as they may be amended from time to time. This warranty shall not include obligations of the Customer.

    d.    It has and during the term of this Agreement shall maintain all applicable licenses and permits required.

10.2    The Company makes no other warranty or representation, other than those specified in Section 10.1 above, of any express or implied, including without limitation, warranties of merchantability and fitness for a particular purpose.

10.3    The Customer hereby covenants, represents and warrants to the Company that:

    a.    It is a corporation duly organized and validly existing under the laws of the State of Florida.

    b.    It has all necessary corporate power, authority and capacity and is properly authorized and licensed to enter into this Agreement and to perform its obligations hereunder. The execution and delivery of



(8/2013)

- 6 -

DPS
LEGAL

this Agreement and the performance of the transactions contemplated hereby have been duly authorized by it.

c.   All Ingredients and Packaging Materials supplied by the Customer to the Company by itself or through third parties, or those that the Customer is specially requiring the Company to purchase and any formula, specifications or instructions, for production of Products, complies with all federal, state, and local laws and regulations in force, and as they may be amended from time to time, including but not limited to, the Federal Food, Drug and Cosmetic Act.

d.   It has and during the term of this Agreement shall maintain all applicable licenses and permits required.

e.   It is the owner of the trademarks and all other intellectual property used in connection with Products and the Company's use of such trademarks and the intellectual property will not infringe or violate the rights of any third party.

f.   The Customer acknowledges that in providing services hereunder, the Company is operating in the US and following applicable US laws and regulations and takes no responsibility for ensuring that its services provided herein comply with any laws other than those of the US.  To the extent that the Customer wishes to export products to foreign jurisdictions, the Customer warrants that it will ensure that all formulations, specifications, labels and instructions meet the applicable legal requirements in such foreign jurisdiction.  This includes without limitation any products that are transshipped to a foreign jurisdiction.

## 11. Confidentiality, Trademarks, etc.

11.1   At all times during the term of this Agreement and thereafter, the parties agree not to disclose to anyone outside of the Company or the Customer, nor use for any purpose other than in connection with the performance of the services pursuant to the Agreement, or unless prior written consent is obtained, (a) any confidential information, proprietary information or trade secrets of the other party, including, without limitation concepts, Product Specifications, formulas, techniques, methods, systems, designs, pricing, sales projections, production volumes, research, computer programs, discoveries, ideas, development or experimental work, (b) any information the parties have received from others which they are obligated to treat as confidential or proprietary, and (c) confidential or proprietary information which is circulated within the Company or the Customer via its internal mail system or otherwise (collectively, the "Confidential Information").  The obligation not to use or disclose any of the Confidential Information shall not apply to any information that is or becomes public knowledge in the industry, through no fault of the Company or the Customer, and that may be utilized by the public without any direct or indirect obligation to the Company or the Customer;



(6/2/13)

- 7 -

DPS
LEGAL

provided, that the termination of the obligation for non-use or non-disclosure by reason of such information becoming public shall be only from the date such information becomes public knowledge.

11.2 The Customer agrees that all business records and documents, including, but not limited to, notes, manuals, photographs or the like, and any copies thereof, provided to the Customer or kept or made by the Customer relating to the business of the Company shall remain the property of the Company. The Customer agrees that upon termination of this Agreement, the Customer shall immediately cease using and surrender and deliver to the Company all of the property and other materials in its possession, or in the possession of any person or entity under its control, that relate, directly or indirectly, to any Confidential Information or to the business of the Company, including without limitation, all personal notes, drawings, manuals, documents, photographs, videos, and computer disks and software and any copies thereof. The Customer's counsel may retain relevant copies of any of the above information for its files.

11.3 The Company agrees business records and documents, including, but not limited to, notes, manuals, photographs or the like, and any copies thereof, provided to the Company or kept or made by the Company relating to the business of the Customer shall remain the property of the Customer. The Company agrees that upon termination of this Agreement, the Company shall immediately cease using and surrender and deliver to the Customer, or destroy, all of the property and other materials in its possession, or in the possession of any person or entity under its control, that relate, directly or indirectly, to any Confidential Information or to the business of the Customer, including without limitation, all personal notes, drawings, manuals, documents, photographs, videos, and computer disks and software and any copies thereof.

11.4 All trademarks, trade names and all trade secrets, technical know-how, Product Specifications, formulas, standards, procedures, new product ideas, manufacturing processes, techniques, methods, systems, designs, computer programs, and the like (collectively the "Proprietary Information") owned by the Customer shall at all times be and remain the exclusive property of the Customer, and this Agreement shall not in any manner constitute a license of the Company to use the trademarks, trade names, trade secrets or Proprietary Information of the Customer, except to the extent required to satisfy its obligations under this Agreement.

11.5 The Company further agrees for itself and its officers, directors, agents, associates and any related parties, that it will not use any Confidential Information provided to it by the Customer in an effort to compete, or induce others to compete, against the Company's Products being produced under this Agreement.

## 12. Indemnification, Damages, Insurance and Recalls.

12.1 The Company agrees to defend, indemnify, and hold harmless the Customer, its parent, subsidiaries and affiliates and their officers, directors, shareholders and employees, from and against liability, loss or damage, cost or expense including court costs and reasonable attorney fees (collectively, in this paragraph, called "Losses")


(6/2013)

- 8 -

DPS
LEGAL

resulting from (i) a complaint, demand, claim or other legal action by a consumer, customer or governmental agency alleging a violation of laws or regulations, illness, injury, death or damage as a result of the defective manufacture of Product, except that the Company shall not be responsible for complaints, demands, claims or other legal action to the extent they originate from specifications, formulas, manufacturing processes, Ingredients or Packaging Materials provided by the Customer or its suppliers, or (ii) any act or failure to act by the Company or its employees, which act or failure to act is in violation of the Company's obligations under this Agreement; provided however that in no event shall the Company be liable under this paragraph for Losses resulting from the negligence or willful or reckless misconduct of the Customer or its employees, agents or representatives or the Customer's failure to perform its obligations under this Agreement.  The Company shall, at its option, direct the defense, investigation, settlement or payment of claims, complaints, demands or legal action. The Company shall promptly notify the Customer of any such complaint, demand, claim or legal action.

12.2   The Customer agrees to defend, indemnify, and hold harmless the Company, its parent, subsidiary and affiliates and their directors, shareholders and employees, against any and all Losses of whatsoever nature and by whomsoever asserted arising out of, resulting from or in any way connected with (i) a complaint, demand, claim or other legal action by a consumer, customer or governmental agency alleging a violation of laws or regulations, illness, injury, death or damage as the result of the sale, consumption or use of any Product, except to the extent that any such complaints, demands, claims or other legal actions result from any act or failure to act by the Company or its employees which act or failure to act is in violation of the Company's obligations under this Agreement, (ii) any act or failure to act by the Customer or its employees which act or failure to act is in violation of the Customer's obligations under this Agreement; provided however that in no event shall the Customer be liable under this paragraph for Losses resulting from the negligence or willful or reckless misconduct of the Company or its employees, agents or representatives or the Company's failure to perform its obligations under this Agreement.  The Customer shall, at its option, direct the defense, investigation, settlement or payment of claims, complaints, demands or legal action.  The Customer shall promptly notify the Company of any such complaint, demand, claim or legal action.

12.3   Notwithstanding any other term or condition of this Agreement, neither party shall be liable to the other for any indirect, punitive, special or consequential losses or damages arising out of or in connection with this Agreement.

12.4   Each of the parties hereto shall maintain and keep in full force and effect Comprehensive General Liability Insurance in reference to their respective obligations and liabilities hereunder including coverage for personal injury, product liability and contractual liability insuring it and the other party and their officers, directors and employees as additional insureds in the amount of five million dollars ($5,000,000) in aggregate.  The Company shall additionally maintain and keep in full force and effect insurance sufficient to provide coverage for the loss of the Customer's Ingredients, Packaging Materials, Finished Case Goods, and other personal property stored or used



(6/2013)

- 9 -

DPS
LEGAL

at the Bottling Facility. It is further stipulated that each party shall furnish the other with evidence of such insurance in the form of a certificate issued by an insurance carrier. These certificates must provide that there shall be no change in the areas of vendor liability or our contractual assumptions or reduction of the above referenced limits or cancellations of the insurance unless thirty (30) days prior written notice of such change is given to the party to whom the certificate is addressed.

12.5  In the event (a) any government authority issues a request, directive or order that Products be recalled, or (b) a court of competent jurisdiction orders such a recall, or (c) the Company reasonably determines after consultation with the Customer that Products should be recalled, the parties shall take all appropriate corrective actions. In the event that such recall results from defective manufacture of the Products by the Company, the Company shall be responsible for all expenses of the recall. In the event that such recall results from any Ingredients, Packaging Material, specifications, instructions or formulas provided by the Customer, the Customer shall be responsible for all expenses related to the recall. For the purposes of this Agreement, the expenses of recall shall include, without limitation, the expenses of notification and destruction or return of the recalled Products and the Customer 's cost for Products recalled but not the expense or service fee associated with sales representatives' or management's time which shall be borne by the Customer.

### 13. Default and Termination.

13.1  In the event that either party hereto fails to comply with any of its obligations hereunder, becomes insolvent or goes into liquidation or has a receiver appointed to any of its assets, then such party shall be in default and upon receipt of written notice from the non-defaulting party, the defaulting party shall have fifteen (15) days in which to cure a monetary default or thirty (30) days in which to cure a non-monetary default provided, however, that if a party is in default because it becomes insolvent or goes into liquidation or has a receiver appointed to any of its assets, it shall have sixty (60) days in which to cure. If a default is not timely cured, the non-defaulting party shall have the option to terminate this Agreement effective immediately upon written notice to the defaulting party. The defaulting party shall be fully liable for all monies owed by the defaulting party under this Agreement.

13.2  In the event this Agreement is terminated, the Customer shall pay within fifteen (15) business days to the Company amounts owed for any Finished Case Goods, Ingredients, Packaging Materials, and any other substances, which the Company purchased to meet any Product forecast provided by the Customer to the Company pursuant to Section 7 herein. The Company shall have the right to take title, possess, and sell all or any part of the Raw Materials and Ingredients to offset any monies owed by the Customer after giving fifteen (15) business days prior written notice to the Chief Executive Officer and also the Office of the General Counsel of the Customer.

### 14. Notice.

(6/2013)

- 10 -

14.1    Any notice required or permitted to be given hereunder shall be in writing and may be given by serving personally or mailing the same by registered mail, postage pre-paid, return receipt requested or, by sending the same by facsimile, and such notice shall be sufficiently given by the Customer to the Company, if addressed to:

Louis Darrouzet
National Account Executive -- Contract Manufacturing
American Bottling Company
5301 Legacy Drive
Plano, TX 75024
(972) 673-4773 (O)
(469) 907-9249 (F)
Louis.Darrouzet@dpsg.com


To the Customer, if addressed to:

Eugene Bukovi
EVP Sales
Vital Pharmaceuticals, Inc., d/b/a Redline/VPX
1600 North Park Drive
Weston, Florida 33326
(954)-641-0570 x 259
Gene.Bukovi@vpxsports.com

with a copy to:

Office of the General Counsel
Vital Pharmaceuticals, Inc., d/b/a Redline/VPX
1600 North Park Drive
Weston, Florida 33326
(954)-641-0570 x 293
Legal@vpxsports.com

Any such notice shall be deemed to have been received on the date on which it is delivered if served personally or by facsimile with confirmation or other similar form of communication or on the fifth (5th) business day following mailing, if sent by registered mail or by a reputable courier service, with tracking, (e.g., FedEx, UPS, DHL, etc.), unless there is an interruption of postal service in which case it shall be deemed to have been received on the fifth (5th) business day following resumption of postage service.

## 15. Assignment.

15.1    The Customer shall not transfer or assign this Agreement or any interest in this Agreement, either voluntarily or by operation of law or otherwise, without the prior



(6/2013)

- 11 -

DPS
LEGAL

written consent of the Company, such consent shall not be unreasonably withheld or delayed.

### 16. Force Majeure.

16.1    Failure of either party to perform any of its obligations under this Agreement as a result of causes beyond its reasonable control, including but not limited to, strikes, labor disputes, suits, fire, acts of God, acts or orders of any government relating to civil disturbances or war, shall not constitute default or breach of this Agreement, except with respect to the payment of Fees hereunder for services provided.  If an act of Force Majeure continues for a period of 60 consecutive days or more, the Customer shall have the right to terminate this Agreement.

### 17. No Waiver.

17.1    The failure of either party to assert any right hereunder or to insist upon compliance with any term or condition of this Agreement shall not constitute a waiver of that right or excuse the subsequent performance or non-performance of any such term or condition by the other party or constitute a waiver of either party's right to demand exact compliance with the terms of this Agreement.

### 18. Independent Contractors.

18.1    The parties hereto acknowledge and confirm that in performing their obligations under this Agreement, each is acting as an independent contractor and they are not and shall not be considered as joint ventures, partners, agents, franchisers/franchisees, or employers/employees of each other and neither shall have the power to bind or obligate the other or contract in the other's name.

### 19. Entire Agreement.

19.1    This Agreement and the Schedules and Exhibits hereto sets forth the entire agreement and understanding between the parties and supersedes all prior agreements and understanding between them with respect to the subject matter hereof and no representations, inducements, promise or agreement, oral or otherwise, not embodied herein, shall be of any force or effect.

### 20. Applicable Law.

20.1    This Agreement shall be governed and construed under the laws of the State of Delaware.  Any legal action, suit or proceeding arising out of or related to this Agreement, including the interpretation thereof, or any of the transactions contemplated hereby or disputes relating hereto shall be heard in a court of competent jurisdiction in the state of Delaware.

### 21.    Survival of Warranties and Indemnifications.



(6/2013)                                    - 12 -                                    DPS
LEGAL

21.1   The warranties, representations, guarantees, and indemnifications contained herein shall continue in full force and effect notwithstanding any expiration or other termination of the Agreement.

## 22.   Counterparts.

22.1   This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one agreement.

IN WITNESS WHEREOF, this Agreement has been executed by the parties hereto as of the date and year first above written.

**American Bottling Company**

Signature:

Print Name:        Louis Darrouzet

Title:             National Account Executive - Contract Manufacturing

Date:              ~~September 1st, 2017~~
                   October 9, 2017

**Vital Pharmaceuticals, Inc., d/b/a VPX/Redline**

Signature:

Print Name:        John H. Owoc

Title:             Chief Executive Officer

Date:              September 9, 2017
                   Oct,

(6/2013)

DPS
LEGAL

## Schedule A
## Company Production Facility Locations

**Victorville Plant**

18180 Gateway Dr.
Victorville, CA 92394
Plant Manager: Tim Hakimi
(760) 269-4548
Timothy.Hakimi@dpsg.com



DPS
LEGAL

### Schedule B
### Warehouse Storage Fees

No storage is available in the Company's Bottling Facilities. Products shall be made and shipped



### Schedule C
### Ingredients, Packaging Materials and Pack Fees for Production

| BANG 16OZ LS12 (Volume 2,000,000 Cases) | | | | | Plant | Victorville |
|---|---|---|---|---|---|---|
| Material Description | Material # | UOM | DFSG Provided | Customer Provided | | |
| 16OZ CANS | 60002480 | EA | X | | | X |
| END 202 LOE STATE | 70013893 | EA | | X | | |
| TRAY 16OZ CAN 12 COUNT | 70002700 | EA | | X | | |
| SHRINK FILM 21*2 MIL | 70001616 | LB | X | | | |
| YIELD LOSS MATERIALS | | | X | | | X |
| | | TOTAL DPSG MATERIALS | | | | $1.16 |
| | BANG ENERGY INGREDIENTS | | | | | |
| BANG ENERGY CONCENTRATE | | | | X | | |
| CAFFIENE ANHYDROUS | | | X | | | X |
| CITRIC ACID ANHYDROUS | | | X | | | X |
| POTASSIUM CITRATE MONOHYDRATE | | | X | | | X |
| | | TOTAL DPSG INGREDIENTS | | | | $0.00 |
| | LABOR, OVERHEAD & TOLLING FEE | | | | | $1.44 |
| | DPSG FOB PRICE 12PK CASE | | | | | $2.60 |

- Purchase Orders must be confirmed with the DR PEPPER SNAPPLE GROUP facility Customer Service Manager no less than 15 business days in advance of production.

- Payment Terms are net 30 days.

- Manufacturing Details

    o DPSG will assume full responsibility for the cost and procurement of materials and ingredients identified in the above I&M report

    o Vital Pharmaceuticals will assume full responsibility for the cost and procurement of specified materials and ingredients detailed in the I&M report

- Estimated Annual Forecast
    o 12- 16oz LS BANG Energy         ~2,000,000 Cases annually
        ▪ 12 Flavors



DPS
LEGAL

**Schedule C**
**Ingredients, Packaging Materials and Pack Fees for Production**
**(Cont.)**

- Minimum Production
  - 12 - 16OZ LS BANG Energy Cans        ~3,800 12 Unit Cases per flavor

    - 2,000,000 / 52 weeks = ~38,461 12 Unit Cases per week

- DR PEPPER SNAPPLE GROUP reserves the right to produce product based on facility-specific minimum run criteria and facility capability and capacities. Final and exact production volumes per flavor will be based on flavor-specific batching protocol and yields as specified by the actual formulas.

- All pricing quotes are dead net. As is customary with DR PEPPER SNAPPLE GROUP Co-Pack agreements, the following conditions apply:

  - DR PEPPER SNAPPLE GROUP will not provide funding for the following:
    - Creative expenses
    - Plate expenses



**Schedule D**
**Pallets**

The following pallet charge will be assessed to each invoice with a credit issued when the pallets are returned.  The Customer also has the option of providing pallets.

- 40" X 48" Heat treated pallets          $14.50/pallet

- 40" X 48" Wood                                  $7.00/pallet

- Co-packing/Tolling fee includes pallet loading into freight forwarding trucks at the Company's docks.  The Company will not hand load into containers.

- Tolling fee does not include any shipping/packing materials.

- The Company is not responsible for damaged or shorted Product once loaded and the carrier leaves the Company property. Despite the foregoing, the Company shall be responsible for all damages and losses incurred by the Company resulting solely from negligent packaging of the Product(s) by the Company prior to leaving the Company property.



DPS
LEGAL

**Schedule E**
**Equipment Purchased**

**NA**



DPS
LEGAL

## FIRST AMENDMENT TO CONTRACT MANUFACTURING AGREEMENT

**This First Amendment** ("First Amendment") is attached hereto and made a part of the Contract Manufacturing Agreement by and between **The American Bottling Company, Inc.,** a corporation incorporated under the laws of the State of Delaware, having an office at 5301 Legacy Drive, Plano, Texas 75024 (hereinafter the "Company"), and **Vital Pharmaceuticals, Inc., d/b/a VPX/Redline**, a corporation incorporated under the laws of the State of Florida, having an office at 1600 North Park Drive, Weston, Florida 33326 (hereinafter the "Customer") made by the parties on October 9, 2017 (the "Agreement").

WHEREAS, the parties wish to amend the Agreement to include annual purchase requirements and extend the Term of the Agreement.

NOW THEREFORE, the Agreement shall be amended as follows:

1. Section 2 of the Agreement shall be deleted in its entirety and replaced with the following:

   "The Term of this Agreement shall commence on the Commencement Date and end on December 31, 2024 ("Initial Term"), subject to termination as provided herein. Customer may renew this Agreement for additional, consecutive one-year terms after the Initial Term on the same terms and conditions set forth herein and with same the Annual Purchase Requirement for calendar years ending 2020 – 2024 (see Schedule F), so long as Customer provides Company with at least 90 days advance written notice prior to end of the Initial Term or then-existing renewal term."

2. A new Section 9.8 shall be added to the Agreement after Section 9.7 as follows:

   "The Customer commits to purchase from the Company, subject to the terms and conditions of this Agreement, a specified minimum volume of Products on an annual basis (the "Annual Purchase Requirement") as set forth in Schedule F. Notwithstanding a Force Majeure event, if the Customer does not achieve the Annual Purchase Requirement in any given calendar year during the Term, , the Company shall issue an invoice for such shortage remaining from the Annual Purchase Requirement within thirty (30) days after each calendar year of the Term. Customer shall pay such invoice within 30 days of receipt. The price to be charged shall be the then-current price for the Products. In the event of a Force Majeure, only the actual amount of Product that was scheduled to be forgiven during the period of the Force Majeure and could not be produced as a result of the Force Majeure, shall be eliminated from the Annual Purchase Requirement for the year in question.  For example, if 70,000 cases of Product were to be produced during a Force Majeure event, the Annual Purchase Requirement shall only be reduced by 70,000 for said year."

3. A new Section 9.9 shall be added to the Agreement after new Section 9.8 as follows:

   "Should Company fail to produce and/or deliver conforming Product, with the exception of the occurrence of a Force Majeure event specified in Section 16 of this Agreement or causes resulting from Customer's own acts or omissions,  Company shall be required to pay a late charge equal to $0.10 per case for each case undelivered in any calendar year.

When determining Company's fulfillment of Customer's orders with respect to this provision, Company shall have the ability to manufacture at any facility and so long as the orders are fulfilled at any time during the calendar year to meet Customer's order requirements.  In no event will Company be responsible for payments on cases that are in excess of the Annual Purchase Requirement."

4.   Section 11.4 of the Agreement shall be deleted in its entirety and replaced with the following:

"All trademarks, trade names, and trade secrets, technology, technical know-how, discoveries, Product Specifications, formulas, standards, procedures, new product ideas, manufacturing processes, techniques, methods, systems, designs, pricing, business and marketing plans and concepts, data, compilations, computer programs, and the like (collectively the "Proprietary Information") owned by the Customer and provided to Company pursuant to this Agreement shall, at all times, be and remain the exclusive property of the Customer, and this Agreement shall not in any manner constitute a license of the Company to use the trademarks, trade names, trade secrets or Proprietary Information of the Customer, except to the extent required to satisfy its obligations under this Agreement. Company further agrees that it shall not attempt to directly or indirectly commercialize the Products, nor shall Company directly or indirectly, by itself or through a third party, identify or attempt to reverse-engineer the Products."

5.   **Schedule A** of the Agreement shall be deleted in its entirety and replaced with the **Schedule A** attached hereto.

6.   A new **Schedule F** (attached hereto) shall be added to the Agreement.

7.   S other terms and conditions of the Agreement shall remain in full force and effect.

8.   This First Amendment shall be effective as of February ___, 2019.

By signing below, the parties hereto have agreed to amend the Agreement in accordance herewith.

THE AMERICAN BOTTLING COMPANY, INC.

By: _____
Title: President DSD, Keurig Dr Pepper

Date signed: _____4-17-2019_____

VITAL PHARMACEUTICALS, INC., D/B/A VPX/REDLINE

By: _____
Title: _____

Date signed: 4-17-2019

## SCHEDULE A

### Company Production Facility Locations

**Victorville Plant**

18180 Gateway Dr.
Victorville, CA 92394
Plant Manager: Trent Boldra
Phone: 832-707-8153
Email: Trent.boldra@dpsg.com

**Jacksonville Plant**

6045 Bowdendale Ave,
Jacksonville, FL 32216
Plant Manager: Ed Fitzpatrick
Phone: 904-759-8584
Email: ed.fitzpatrick@dpsg.com

**Irving Plant**

2304 Century Center Blvd
Irving, TX 75062
Plant Manager: Shawn Davies
Phone: 972-721-8101
Email: Shawn.davies@dpsg.com

**Louisville Plant**

6207 Strawberry Lane
Louisville, KY 40214
Plant Manager: Tony Haberer
Phone: 214-681-7969
Email: Tony.haberer@dpsg.com

**Sacramento Plant**

2670 Land Avenue
Sacramento, CA 95815
Plant Manager: John Ewing
Phone: 916-642-7721
Email: John.ewing@dpsg.com

**Houston Plant**

2304 Holly Hall
Houston, TX 77054
Plant Manager: Douglas Crosswhite
Phone: 346-762-9697
Email: Douglas.Crosswhite@dpsg.com

**Miami Plant**

5900 NW 72nd Ave
Miami, FL 33166
Plant Manager: Bruno Garcia
Phone: 210-885-7675
Email:Bruno.garcia@dpsg.com

## SCHEDULE F

### Annual Purchase Requirements

I.    For the calendar year ending 2019, the Annual Purchase Requirement shall be 18.79 million cases of Product.  For the calendar years ending 2020-2024, the Annual Purchase Requirement for each individual year shall be 27.54 million cases of Product. The anticipated contract annual run rates are set forth below:

| Plant | Pack Size | 2019 Annual Total | 2020 Annual Total | 2021 Annual Total | 2022 Annual Total | 2023 Annual Total | 2024 Annual Total |
|---|---|---|---|---|---|---|---|
| Victorville[1] | 12 Pack | 7,800,000 | 9,600,000 | 9,600,000 | 9,600,000 | 9,600,000 | 9,600,000 |
| Jacksonville | 12 Pack | 6,480,000 | 6,300,000 | 6,300,000 | 6,300,000 | 6,300,000 | 6,300,000 |
| - | 4 Pack | 240,000 | 240,000 | 240,000 | 240,000 | 240,000 | 240,000 |
| Irving[2] | 24 Pack | 900,000 | 1,200,000 | 1,200,000 | 1,200,000 | 1,200,000 | 1,200,000 |
| Louisville[3] | 12 Pack | 400,000 | 1,200,000 | 1,200,000 | 1,200,000 | 1,200,000 | 1,200,000 |
| - | 24 Pack | - | - | - | - | - | - |
| Sacramento[4] | 12 Pack | 800,000 | 2,100,000 | 2,100,000 | 2,100,000 | 2,100,000 | 2,100,000 |
| Miami[4] | 12 Pack | 970,000 | 2,100,000 | 2,100,000 | 2,100,000 | 2,100,000 | 2,100,000 |
| Houston[5] | 12 Pack | 1,200,000 | 4,800,000 | 4,800,000 | 4,800,000 | 4,800,000 | 4,800,000 |
| Total | | 18,790,000 | 27,540,000 | 27,540,000 | 27,540,000 | 27,540,000 | 27,540,000 |

I.    The anticipated 2019-2024 monthly run rates are set forth below:

| Plant | Pack Size | 2019 Monthly Rates | 2020-2024 Monthly Rates |
|---|---|---|---|
| Victorville | 12 Pack | 600,000 | 800,000 |
| Jacksonville | 12 Pack | 525,000 | 525,000 |
| - | 4 Pack | 20,000 | 20,000 |
| Irving | 24 Pack | 100,000 | 100,000 |
| Louisville | 12 Pack | 100,000 | 100,000 |
| - | 24 Pack | - | - |
| Sacramento | 12 Pack | 175,000 | 175,000 |
| Miami | 12 Pack | 175,000 | 175,000 |
| Houston | 12 Pack | 400,000 | 400,000 |
| Total | | 2,100,000 | 2,295,000 |

---

[1] The 12 pack production will increase from 600,000 to 800,000 in late 2019.
[2] The 24 pack production will commence in April of 2019.
[3] The 12 pack production will increase to 100,000 starting in September of 2019.
[4] The 12 pack production will increase to 175,000 starting in August of 2019.
[5] The 12 pack production will increase to 400,000 starting in October of 2019.

Minimum Annual Purchase Requirements are based on the pack counts set out above.  To the extent that there is conversion in any of these pack counts, conversion will be based on a 12 pack case as follows:

1 (LS 24pk) = 2 (LS 12PK)
1 (4pk x 6) = 2.5 (LS 12PK)
1 (4pk x 6) = 1.25 (LS 24PK)