UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION
www.flsb.uscourts.gov

| | |
|---|---|
| In re: | Chapter 11 Cases |
| VITAL PHARMACEUTICALS, INC., *et al.*,[1] | Case No. 22-17842 (PDR) |
| | (Jointly Administered) |
| Debtors. | |
| _____/ | |

**SECOND SUPPLEMENTAL DECLARATION OF HOMER PARKHILL IN SUPPORT OF DIP FINANCING**

I, Homer Parkhill, hereby declare under penalty of perjury as follows:

1. I am a Co-Head of Restructuring and Partner of Rothschild & Co US Inc. ("Rothschild & Co"), an investment banking firm with its principal office at 1251 Avenue of the Americas, New York, New York 10020.

2. I submit this second supplemental declaration (this "Second Supplemental DIP Declaration") in further support of the *Debtors' Emergency Motion for Interim and Final Orders (I) Approving Postpetition Financing, (II) Authorizing Use of Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* [Docket No. 24] (the "Motion") and the *Debtors' Omnibus Reply to Objections to Debtors' Emergency Motion for Interim and Final Orders (I) Approving Postpetition Financing, (II) Authorizing Use of Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, (VI) Scheduling*

---

[1] The address of the Debtors is 1600 N. Park Drive, Weston, FL 33326. The last four digits of the Debtors' federal tax identification numbers are: (i) Vital Pharmaceuticals, Inc. (8430); (ii) Bang Energy Canada, Inc. (5454); (iii) JHO Intellectual Property Holdings, LLC (0010); (iv) JHO Real Estate Investment, LLC (9394); (v) Quash Seltzer, LLC (6501); (vi) Rainbow Unicorn Bev LLC (2254); and (vii) Vital Pharmaceuticals International Sales, Inc. (8019).

*a Final Hearing, and (VII) Granting Related Relief* [Docket No. 515] (the "Reply"), and as a supplement to the *Declaration of Homer Parkhill in Support of DIP Financing* [Docket No. 25] filed on October 10, 2022 (the "Initial DIP Declaration") and the *Supplemental Declaration of Homer Parkhill in Support of DIP Financing* [Docket No. 388] filed on November 21, 2022 (the "Supplemental DIP Declaration").[2]

3. Rothschild & Co has been engaged by the above-captioned debtors and debtors in possession (collectively, the "Debtors") to provide investment banking services in connection with restructuring, financing, and strategic initiatives since April 2022. I refer the Court to the Initial DIP Declaration, for detailed information about Rothschild & Co's expertise and involvement with the Debtors, and my personal expertise and work with the Debtors leading up to the chapter 11 filing.

4. Except as otherwise indicated, the statements in this Second Supplemental DIP Declaration are based on (a) my personal knowledge, belief, or opinion; (b) information I have received from the Debtors' employees or advisors and/or employees of Rothschild & Co working directly with me or under my supervision, direction, or control; or (c) the Debtors' records maintained in the ordinary course of their business. I am not being specifically compensated for this testimony other than through payments that Rothschild & Co received in its capacity as a professional retained by the Debtors; none of those payments are specifically payable on account of this testimony. I am authorized by the Debtors to submit this Second Supplemental DIP Declaration and, if I were called upon to testify, I could and would testify competently to the facts set forth herein.

**Negotiations With The DIP Lenders Since The Petition Date**

5. Since the Petition Date, negotiations concerning the DIP Facility have continued between and among the DIP Lenders, the Debtors, and various stakeholders in these Chapter 11

---

[2] Capitalized terms used but not defined herein have the meanings given to them in the Motion, the Initial DIP Declaration, the Supplemental DIP Declaration, or the Reply.

Cases, including the Committee. Through these negotiations, the DIP Lenders agreed to make significant, additional postpetition concessions and accommodations in an effort to address various issues and objections raised, including the following:

    (a)    decreasing the size of the Roll Up from a maximum of approximately $355 million to $235 million;

    (b)    placing certain limitations on the DIP Collateral and the assets to which DIP Superpriority Claims will have recourse;

    (c)    reducing the estate's liability for the Prepetition Secured Lenders' Adequate Protection Payments;

    (d)    turning over to Debtors of certain non-Debtor real estate sale proceeds to compensate the Debtors for postpetition intercompany funding;

    (e)    extending the maturity date;

    (f)    extensions of the Transaction Milestone (and related milestones) as well as certain consultation rights for the Committee in connection with the milestones;

    (g)    increasing in the Committee's investigation budget;

    (h)    extending the Challenge Period for all parties in interest; and

    (i)    granting the Committee standing to pursue certain lien challenges.

    6.    These concessions make the terms of the DIP Facility proposed in the Final Order (the "Revised DIP Facility") even more favorable to the Debtors and their estates, and were the product of arm's length, good faith bargaining. I believe the terms of the DIP Facility, as modified, remain fair and reasonable, and that the lender protections contained in the DIP Facility are commonplace in cases of this size and complexity. I continue to believe that granting the Debtors access to the Revised DIP Facility is in the best interests of, and will be value maximizing for the estates. I also

continue to believe that the Debtors have a good business reason for entering into the DIP Facility and doing so would be a sound exercise of judgment.

**The DIP Facility Remains The Only Viable Financing Option For The Debtors**

7.     As explained in the Initial DIP Declaration and Supplemental DIP Declaration, despite diligent outreach efforts, the Debtors received no debtor-in-possession financing proposals prior to the Petition Date other than the DIP Facility.  As of the dates on which I submitted the Initial DIP Declaration and the Supplemental DIP Declaration, I believed, and I continue to believe today, that there are no other viable postpetition financing options available to the Debtors on terms more favorable than the DIP Facility and as revised, the Revised DIP Facility.

8.     Based on my experience, if there are additional parties interested in making an alternative DIP financing proposal, then they would come forward following the filing of a motion seeking approval of DIP financing.  However, since the Petition Date, Rothschild & Co has not received any indications of interest or competing proposals for DIP financing.  In addition, Rothschild & Co has not identified any potential lenders beyond those already contacted in the prepetition marketing process that may be interested in providing DIP financing at this time. Accordingly, no alternatives to the Revised DIP Facility on any terms much less better terms have emerged since the Petition Date.

9.     The Revised DIP Facility is the Debtors' only viable option for DIP Financing. Because it is critical to continued operations of the Debtors' business for the reasons addressed in my prior declarations, I continue to believe that entry of the Final Order is necessary to enhance the value of the Debtors' estates and is an exercise of their good business judgement.

**The Milestones are Appropriate**

10.     As a result of hard-fought negotiations between and among the Debtors, the DIP Lenders, and other stakeholders, including the Committee, the DIP Lenders have agreed to additional

concessions with respect to, among other things, the Transaction Milestones, as reflected in the Revised DIP Facility.

11. The initial milestones required the Debtors, by January 23, 2023, to either (x) deliver fully-executed and bona fide commitment papers with the financial wherewithal to consummate the transaction, in respect of a credit facility, equity investment, or other investment or financing, or (y) have filed a bid procedures motion in form and content reasonably acceptable to the DIP Agent and the Prepetition Agent seeking authority to (A) designate a "stalking horse" reasonably acceptable to the DIP Agent and the Prepetition Agent, (B) establish bidding procedures and (C) set a date for an auction within 75 days thereafter (such motion, the "Bid Procedures Motion"). The Revised DIP Facility extends the deadline to obtain such acceptable financing or designate a stalking horse bid to March 13, 2023.

12. In addition, the Revised DIP Facility includes the following additional interim milestones: (i) January 13, 2023 as the deadline to have received at least one indication of interest regarding commitments for an Acceptable Financing, (ii) January 27, 2023 as the deadline for the Debtors to have filed a bid procedures motion, (iii) February 28, 2023 as the deadline to have held a hearing on the bid procedures motion, (iv) April 19, 2023 as the deadline to have held an auction (if the Debtors pursue the Sale Transaction), and (v) May 17, 2023 as the deadline to have consummated an Acceptable Financing or Sale Transaction.

13. The revised milestones reflect an important compromise among the Debtors, the DIP Lenders, the Prepetition Secured Parties, and the Committee. Specifically, extension of the Transaction Milestone and the outside maturity date provides the Debtors with additional time to conduct a thorough investment banking process. In addition, the inclusion of additional interim milestones as well as additional consultation rights to the Committee with respect to those milestones provides parties in interest and specifically the Committee with greater visibility and certainty during

the marketing and financing process, as does the inclusion to additional reporting requirements to the Committee.

14.     Based on my experience, the updated Transaction Milestone and overall timetable required in the Revised DIP Facility is sufficient to run a value-maximizing investment banking process for the Debtors.

## The Roll Up

15.     As I explained in my Initial DIP Declaration, the Roll Up was, and remains, a necessary inducement for the Prepetition Secured Lenders to provide a DIP Facility. The Roll Up is the product of extensive pre- and post-petition negotiations among the Debtors, the DIP Lenders, the Prepetition Secured Parties, and the Committee, and its inclusion in the DIP Facility represents a sound exercise of the Debtors' business judgement.

16.     In prepetition negotiations with the Debtors, the Prepetition Secured Lenders agreed to provide a longer "bridge" to a value-maximizing transaction by extending the DIP Facility maturity date from their original proposal of four months to seven months, and increasing the size of the DIP Facility from $49 million in new money to $100 million in new money. In exchange, the DIP Lenders demanded protection against their DIP Facility being used to bridge to a "cram up" plan. That protection came in the form of an increased Roll Up, which was, and is, a fair, reasonable, and mutually beneficial arrangement for the Debtors and the DIP Lenders.

17.     Following the Petition Date, the Debtors, the DIP Lenders, the Prepetition Secured Parties, and the Committee engaged in further negotiations with the respect to the Roll Up that resulted in further concessions from the DIP Lenders. Among the changes to the Roll Up in the Revised DIP Facility is a reduction in the maximum amount the Roll Up from approximately $355 million in outstanding Prepetition Obligations to $235 million. In addition, the "creeping" structure of the Initial Roll Up has been replaced with a "deemed" roll up upon entry of the Final

Order that allows the Debtors to realize the benefit of the reduced interest rate on the rolled-up prepetition debt sooner than they otherwise would. The Roll Up, as contemplated in the Revised DIP Facility, was subject to substantial negotiation between and among the Debtors, the DIP Lenders, the Prepetition Secured Parties, and the Committee, and represents a compromise acceptable to key constituents and the Debtors while ensuring that the Debtors obtain access much needed liquidity during these Chapter 11 Cases.

18. Moreover, the current "roll up ratio" in the Revised DIP Facility of 2.35:1 represents a significant reduction from the 3.55:1 ratio under the original DIP Facility. My team and I also reviewed the sixteen (16) precedent DIP facilities that included a roll up of prepetition debt as presented in Exhibit 2 of the *Declaration of John D'Amico in Support of the Official Committee of Unsecured Creditors' Objection to Debtors' Emergency Motion for Interim and Final Orders (I) Approving Postpetition Financing, (II) Authorizing Use of Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* [Docket No. 413-4] (the "UCC Comparables"). While, in my opinion, there are limitations in assessing discrete terms of a DIP, such as a roll up, in isolation of the broader terms, it is notable that five of the sixteen cases included in the UCC Comparables feature roll up ratios that exceed the 2.35:1 roll up ratio of the Revised DIP Facility and the roll up is approximately **70% below** the highest roll up ratio presented in the UCC Comparables. Thus, it is my opinion and belief that the "roll up ratio" is both reasonable and not out of line with the market.

## Conclusion

19. In the absence of the Revised DIP Facility, the Debtors expect to experience a liquidity crisis that would cause the Debtors to be unable to fund their working capital, payroll obligations, supplier payments, overhead costs, or make other essential payments for the continued management,

operation, and preservation of their businesses over the pendency of these proceedings. Such a crisis could derail the Debtors' reorganization efforts and endanger the Debtors' ability to maximize value all parties in interest. Access to the Revised DIP Facility is the best, and only, viable option for financing through these Chapter 11 Cases, and will help preserve the value of the Debtors' businesses and assets to the benefit of the Debtors as well as their creditors.

*[Remainder of page left intentionally blank.]*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: December 14, 2022

By: */s/ Homer Parkhill*
Homer Parkhill
Co-Head of Restructuring, Partner
Rothschild & Co US Inc.