

PACHULSKI
STANG
ZIEHL
JONES

LAW OFFICES
LIMITED LIABILITY PARTNERSHIP

LOS ANGELES, CA
SAN FRANCISCO, CA
WILMINGTON, DE
NEW YORK, NY
HOUSTON, TX

10100 SANTA MONICA BLVD.
13th FLOOR
LOS ANGELES
CALIFORNIA 90067-4003

**TELEPHONE: 310.277.6910**
FACSIMILE: 310.201.0760

**SAN FRANCISCO**
ONE SANSOME STREET
34th FLOOR, SUITE 3430
SAN FRANCISCO
CALIFORNIA  94104

**TELEPHONE: 415.263.7000**
FACSIMILE: 415.263.7010

**DELAWARE**
919 NORTH MARKET STREET
17th FLOOR
P.O. BOX 8705
WILMINGTON
DELAWARE 19899-8705

**TELEPHONE: 302.652.4100**
FACSIMILE: 302.652.4400

**NEW YORK**
780 THIRD AVENUE
34th FLOOR
NEW YORK
NEW YORK 10017-2024

**TELEPHONE: 212.561.7700**
FACSIMILE: 212.561.7777

**TEXAS**
440 LOUISIANA STREET
SUITE 900
HOUSTON
TEXAS 77002-1062

**TELEPHONE: 713.691.9385**
FACSIMILE: 713.691.9407

WEB: www.pszjlaw.com

Richard M. Pachulski

November 8, 2022

310/772-2342
rpachulski@pszjlaw.com

<u>VIA ELECTRONIC MAIL AND U.S. MAIL</u>

Mary Ida Townson, Esq.
U.S. Department of Justice
Office of the U.S. Trustee, Region 21
501 East Polk Street, Suite 1200
Tampa, FL 33602
<u>MaryIda.Townson@usdoj.gov</u>

Guy A. Van Baalen, Esq.
U.S. Department of Justice
Office of the U.S. Trustee
Middle and Southern Districts of Florida
501 E. Polk Street, Suite 1200
Tampa, FL 33602
<u>Guy.A.VanBaalen@usdoj.gov</u>

Heidi A. Feinman, Esq.
U.S. Department of Justice
Office of the U.S. Trustee
51 SW First Avenue, #1204
Miami, FL  33130
<u>Heidi.A.Feinman@usdoj.gov</u>

J. Steven Wilkes, Esq.
U.S. Department of Justice
Office of the U.S. Trustee, Region 21
501 East Polk Street, Suite 1200
Tampa, FL 33602
<u>Steven.Wilkes@usdoj.gov</u>

> Re:   **In re Vital Pharmaceuticals, Inc.**
> **No. 22-bk-17842-PDR (and jointly administered cases)**

Gentlepersons:

   This office represents Monster Energy Company ("*Monster*") in these jointly-administered chapter 11 cases (the "*Bankruptcy Cases*")

DOCS_LA:346002.9 57536/00001



PACHULSKI

STANG

ZIEHL

JONES

LAW OFFICES

November 8, 2022
Page 2

for Vital Pharmaceuticals, Inc. and its debtor affiliates (collectively, the "*Debtors*"). This office represents only Monster and has no intent or interest in representing a committee in these Bankruptcy Cases.

While this office represents Monster, we also write at the request of Orange Bang, Inc. ("*Orange Bang*"), the American Bottling Company ("*ABC*"), UMG Recordings, Inc. ("*UMG*"), and Sony Music Entertainment ("*Sony*"), all of which either have pending litigation claims (ABC, UMG and Sony), judgments and/or jury verdicts (Monster and Orange Bang). These include some of the largest claims in these Bankruptcy Cases,[1] dwarfing the $44 million in aggregate claims held by the seven trade creditors appointed pursuant to your *Notice of Appointment of Official Unsecured Creditors Committee In and Over the Jointly Administered Chapter 11 Cases* (D.N. 245) (the "*Committee*").[2]

Monster is by far the largest creditor of the Debtors, holding an unsecured claim in the filed amount of not less than $389,739,257 (the "*Monster Claim*"). As set forth in the Monster Claim, the components are: (1) a judgment in the aggregate amount of approximately $97 million on contract, trademark infringement and related claims, entered by the U.S. District Court for the Central District of California (the "*Judgment*"), and (2) false advertising, contract infringement, trade secret violations and related claims in a separate action, also in the Central District of California, on which a jury verdict has been issued that would result in a judgment of approximately $293 million (the "*Jury Verdict*"). The Judgment is on appeal, and the Bankruptcy Cases were filed before judgment was entered on the Jury Verdict.

Other non-trade claims include: (1) Orange Bang, in the amount of not less than $87.5 million represented in the Judgment referred to above[3]; (2) PepsiCo, scheduled in the amount of $115 million based upon a settlement agreement with the Debtors; (3) Doehler USA, Inc. ("*Doehler*"), scheduled in the amount of $22 million based upon a

---

[1] In addition to each of the claimants represented in this letter, five of the six largest creditors in these Bankruptcy Cases applied to serve on the Unsecured Creditor Committee. None were selected.

[2] One of the appointed trade creditors, Archer Daniels Midland Co., has no scheduled or filed claim at all.

[3] Orange Bang is scheduled in the Debtors' Top 30 Creditor List as having a claim of $214,757,614.74, but Orange Bang filed a proof of claim reflecting a claim of not less than $87.5 million.



settlement agreement with the Debtors; (4) Dairy Farmers, in a scheduled amount of $14 million; and (5) ABC, scheduled in the amount of approximately $17.68 million, but which filed a proof of claim for not less than $225.1 million. (Hereinafter, with the Monster Claim, the "*Non-Trade Claims*"). Such Non-Trade Claims[4] assert claims of at least $853 million, an amount about twelve (12) times the amount of the trade creditors in this case. We further understand that there are other non-trade claims, including upwards of sixty (60) additional litigation claims.

We would appreciate an opportunity to discuss with you *(1)* the rationale for appointing only trade creditors to the Committee, effectively disenfranchising the group of creditors with the dominant claims, and *(2)* the formation of a separate committee for non-trade claimants in order to ensure that these unsecured creditors also have an official voice in these proceedings.

To anticipate and hopefully facilitate points of discussion, we offer the following distillation of our position:

*First*, the Committee as presently constituted does not satisfy section 1102 of the Bankruptcy Code.  Under section 1102, the Committee must be representative of the interests of all unsecured creditors, and section 1102 specifically provides that additional committees can be appointed or membership of a committee may be changed if "change is necessary to ensure adequate representation of creditors". Section 1102(a)(2) and (4). The law is clear on this. "What the Bankruptcy Code requires is that conflicting groups of creditors have a voice through adequate representation on a Committee." *In re Hills Stores Co*., 137 B.R. 4, 7 (Bankr. S.D.N.Y. 1992) (citing *In re McLean Indus., Inc*., 70 B.R. 852, 860 (Bankr. S.D.N.Y. 1987)). There is no exclusion for litigation claims, tort claims, very large claims, contingent claims (and the Non-Trade Claims are hardly speculative in any event), or claims of competitors. *See* 7 *Collier on Bankruptcy* P. 1102.02[2][a][ii] (notes omitted) (discussing the requirement that litigation claims receive committee representation). As *Collier* further provides, "a committee should reflect membership from different categories in order to be representative of the interests of creditors." *Id.*

---

[4] Certain creditors such as Doehler may have hybrid claims that include settlement-related claims and claims based on trade relations with the Debtors.



Section 1102(b)(1) emphasizes the paramount importance of the size of a claim in achieving adequate representation of creditors by expressly providing that a committee "**shall** ordinarily consist of the persons, willing to serve, that hold the seven largest claims…." Section 1102(b)(1) (emphasis added). The current constitution of the Committee—which includes only one of the seven largest unsecured creditors listed on Form 204 (*see* ECF 2)—turns section 1102(b)(1) on its head. Not only do the Non-Trade Claims set forth above constitute 6 out of the 7 largest creditors in the Debtors' List of the 30 Largest Unsecured Creditors, but they aggregate well over twelve (12) times the total claims of the other creditors in the Debtors' List of 30 Largest Unsecured Creditors, which list includes the creditors on the Committee.

Mr. Wilkes, in his email of November 4, essentially creates a new factor for determining whether a creditor should be on a committee, which is whether that creditor can afford to retain its own counsel to represent its interests. However, such a factor is completely inconsistent with the express provisions of section 1102 of the Bankruptcy Code, the commentary and case law interpreting section 1102, as well as how other U.S. Trustee offices implement section 1102. Moreover, it is clear that Mr. Wilkes did not apply such a test to the creditors that were appointed to the Committee here given that five of its seven members have retained their own counsel to represent their interests and one of the other two members has a market capitalization of about **$53 billion**, which easily allows it to afford its own counsel. And it is common for many creditors to retain counsel not only before a committee is formed, but to allow such counsel to represent them on the committee.

Committees also retain financial advisors and investment bankers which are critical in significant cases to assess the options for how the case can ultimately be resolved, including whether a sale or reorganization is appropriate, whether a sale is being properly conducted, the valuation of the debtors' business if an internal reorganization is pursued, and whether fraudulent conveyances have been made by the debtors. By being excluded from a committee because a creditor is represented by bankruptcy counsel, that creditor is excluded from the participation with a critical statutory committee that not only has the significant advantage of having access to other professionals that are conducting such critical analyses, but speaks with a powerful voice before the Court, and which committee is being



PACHULSKI

STANG

ZIEHL

JONES

LAW OFFICES

November 8, 2022
Page 5

provided with critical information by the debtors. Without having such necessary information and professional services of a financial advisor and investment banker that will be provided to a committee, the non-trade creditors will be forced to commence separate discovery to obtain this information, resulting in substantial costs to the estate and non-trade creditors, and will also cause the non-trade creditors to incur the costs of retaining other such professionals.

*Second*, in a case such as this, where the non-trade claims overwhelm the trade claims, separate committees are necessary to achieve the goal of adequate representation of the interests of all creditors. Trade creditors in a case like this are oftentimes not motivated at all by what recovery they are going to get out of the estate as they know their claims are swamped by the non-trade claims and at best they will only get pennies on the dollar. Rather, such trade creditors are motivated by simply keeping the debtor alive so that they have a customer when the debtor exits chapter 11, and to keep the debtors' management happy so that the debtor does not replace that trade creditor with another vendor. Debtors are very aware of the leverage they hold over such trade creditors, and it is not uncommon for a debtor to threaten a trade creditor with replacing it with another vendor if the trade creditor "rocks the boat" by opposing a particular plan of reorganization, or by directing committee professionals to investigate insiders for fraudulent conveyances. Thus, a committee comprised entirely of trade creditors like the one in this case defeats the fundamental purpose of a committee, which is to adequately represent the interests of all creditors. On the other hand, large non-trade creditors in a case like this are solely motivated by maximizing a recovery on their claims, which is in fact one of the primary policy goals of chapter 11; they are not susceptible to threats of a debtor to terminate them from doing business together.

We believe that in these circumstances, given that non-trade claimants are entitled to representation, and the vast discrepancy between the amounts of trade claims and other claims, the most appropriate means of ensuring the meaningful representation of all creditors is the appointment of a separate committee of non-trade claimants. The stark reality is that in this case it is the interests and sizeable claims of the non-trade creditors in comparison to the trade creditors that will impact the outcome of these cases, including the ability to impact the outcome of the voting requirements for confirmation of a plan, and it is the interests of the non-trade creditors



November 8, 2022
Page 6

that will be most impacted by the distributions that will ultimately be paid to creditors. As noted above, not only does the existing Committee of trade creditors fail to have any representation of the non-trade creditors, such Committee is made up of creditors who have very divergent interests in the outcome of these cases. A separate committee will ensure that the non-trade creditors have an equal seat at the table among both the constituents and the Court, and will thus increase the chances that these cases come to a faster and more efficient conclusion. Also, providing the non-trade creditors with a separate committee dramatically increases the likelihood that a consensus will be struck among the creditors who clearly hold well over two-thirds of the claims, rather than cause the non-trade creditors separately seeking information to determine what actions are in the best interests of the creditor body, delaying the confirmation of any plan. All of these considerations point in the same direction: under the particular circumstances of this case, appointment of a separate committee will help ensure the just, speedy, and inexpensive determination of these jointly administered cases. *See* Fed. R. Bankr. P. 1001.

Please note that we have conferred with counsel for Doehler. Doehler supports the request herein for a separate committee but declined to join this letter directly given issues unique to Doehler and its claims.

The legal foundation for the appointment of an additional committee was discussed thoroughly by the bankruptcy court in the recent case of *In re Roman Catholic Church of the Archdiocese of New Orleans*, No.: 20-10846, 2021 Bankr. LEXIS 302 *; 2021 WL 454220 (Bankr. E.D. La. Feb. 8, 2021). Finding that a committee of abuse claimants did not adequately represent the interests of commercial creditors, the court exercised its discretion under section 1102(a)(2) of the Bankruptcy Code to appoint an additional committee of commercial creditors, since it was not convinced that the appointment of additional members to the existing committee would have provided commercial creditors with a meaningful voice.

The U.S. Trustee has the authority to form multiple committees to ensure adequate representation, and the bankruptcy courts have authority under sections 1102(a)(2) and (a)(4) to order either the appointment of additional committees or changes to the membership of a committee if it determines such action is necessary to ensure "adequate representation" of creditors or equity security holders. *Id.* at



PACHULSKI
STANG
ZIEHL
JONES

LAW OFFICES

November 8, 2022
Page 7

*30-31. The 1978 Bankruptcy Reform Act envisioned the possibility of the constitution of more than one committee in a chapter 11 reorganization case and proposed committees to serve as "negotiating bodies for the classes of creditors that they represent." H.R. REP. 95-595, at 104 (1977), reprinted in 1978 U.S.C.C.A.N. 5963, 6065. "As such, it is important that they be representative of their respective classes." *Id*. *In re Roman Catholic Church*, 2021 Bankr. LEXIS 302 at *27-28.

"[F]or a creditor group to be adequately represented by a committee, the interests of that group must 'have a meaningful voice on the committee in relation to their posture in the case.'" *In re Roman Catholic Church*, 2021 Bankr. LEXIS 302 at *32-33 (*citing In re Dow Corning Corp.*, 194 B.R. 121, 141 (Bankr. E.D. Mich. 1996), *rev'd on other grounds*, 212 B.R. 258 (E.D. Mich. 1997)). So, for example, the Roman Catholic Church court found that the interests of commercial creditors and abuse claimants were sufficiently in conflict to warrant separate committees in order to ensure adequate representation of each:

> Congress intended unsecured commercial creditors to be represented in the reorganization process through the unsecured creditors' committee. Although the Abuse Claimants in this case, at times, may share interests with commercial creditors, their interests often differ from the issues facing other creditors. . . .

> Given the nature of this particular case, the Court is not convinced that the appointment of additional members to the existing Committee would provide commercial creditors with a meaningful voice. Moreover, separate committees are commonly appointed to represent important constituencies and to provide dynamic tension in negotiations with the debtor and other parties in interest in the reorganization process.

*Id*. at *47-48.

Accordingly, we submit that the U.S. Trustee should appoint a committee of non-trade claimants to ensure meaningful representation of the interests of both trade creditors and non-trade claimants (which otherwise would have to be appointed to a reconstituted committee).



PACHULSKI

STANG

ZIEHL

JONES

LAW OFFICES

November 8, 2022
Page 8


     As we anticipate that without the formation of a non-trade committee this matter will be determined by the Court, we further request the opportunity to review any correspondence or documents provided to the U.S. Trustee's Office by the Debtors and their representatives with respect to the makeup of a committee, in order to be able to respond to any allegations that may have been made by the Debtors, and the forms and any correspondence from each creditor who sought appointment as a committee member. Please advise if you will provide access to this information, and if so, when.

     Again, we would very much appreciate an opportunity to discuss these issues at your earliest opportunity.

     Very truly yours,

     PACHULSKI STANG ZIEHL &
     JONES LLP

     Richard M. Pachulski


cc:

Michael Goldberg, Esq., Counsel for Monster Energy Company
Robert Furr, Esq. and Matthew G. Bouslog, Esq., Counsel for the
    American Bottling Company
Tom Patterson, Esq., Counsel for Orange Bang, Inc.
Seth H. Lieberman, Esq., Counsel for UMG Recordings, Inc. and Sony
    Music Entertainment