UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION
www.flsb.uscourts.gov

| | |
|---|---|
| IN RE: | Chapter 11 |
| VITAL PHARMACEUTICALS, INC., *et al.*, | Case No. 22-17842 (PDR) |
| Debtors.[1] | (Jointly Administered) |

**REPLY OF MONSTER ENERGY COMPANY, THE AMERICAN BOTTLING COMPANY, INC., SONY MUSIC ENTERTAINMENT, UMG RECORDINGS, INC. AND ORANGE BANG, INC. IN FURTHER SUPPORT OF THE MOTION FOR AN ORDER PURSUANT TO 11 U.S.C. § 1102(a)(2) DIRECTING THE APPOINTMENT OF AN OFFICIAL COMMITTEE OF CREDITORS HOLDING NON-TRADE CLAIMS**

Monster Energy Company ("Monster Energy"), Orange Bang Inc. ("Orange Bang"), The American Bottling Company, Inc. ("ABC"), Sony Music Entertainment ("Sony") and UMG Recordings, Inc. ("UMG") (collectively, "Movants"), by and through undersigned counsel, hereby respond as follows to the objections of the (i) United States Trustee for Region 21 (the "U.S. Trustee Objection") [ECF 502], (ii) debtor Vital Pharmaceuticals, Inc. ("VPX") and its co-debtors (together with VPX, the "Debtors") [ECF 501] (the "Debtors Objection"), (iii) the Official Committee of Unsecured Creditors ("OCC") [ECF 500] (the "OCC Objection"), and (iv) Truist Bank, in its capacity as Prepetition Agent and DIP Agent (the "DIP Agent," and together with the U.S. Trustee, the Debtors and the OCC, the "Objectors") [ECF 499] (the "DIP Agent Objection," together with the US Trustee Objection, the Debtors Objection and the OCC Objection, the

---

[1] The address of the Debtors is 1600 N. Park Drive, Weston, FL 33326. Tire last four digits of the Debtors' federal tax identification numbers are: (i) Vital Pharmaceuticals, Inc. (8430); (ii) Bang Energy Canada. Inc. (5454); (iii) JHO Intellectual Property Holdings, EEC (0010); (iv) JHO Real Estate Investment, EEC (9394); (v) Quash Seltzer, EEC (6501); (vi) Rainbow Unicorn Bev EEC (2254); and (vii) Vital Pharmaceuticals International Sales, Inc. (8019).

"Objections") to the *Motion of Monster Energy Company, The American Bottling Company, Inc.,*
*Sony Music Entertainment, UMG Recordings, Inc. and Orange Bang, Inc. for an Order Pursuant*
*to 11 U.S.C. § 1102(A)(2) Directing the Appointment of an Official Committee Of Creditors*
*Holding Non-Trade Claims* (the "Motion"),[2] and respectfully state as follows:

## PRELIMINARY STATEMENT

1.      As demonstrated in the motion, the Debtors filed these cases in the immediate
aftermath of major defeat in the endless litigation engendered by the reckless business practices
and intentional misconduct of its founder, Chief Executive Officer, and sole shareholder, Jack
Owoc.  Just prior to the Petition Date, Monster Energy prevailed in two actions stemming from
the Debtors' history of false advertising, trademark infringement, and other willful and malicious
misconduct by the Debtors and Mr. Owoc.  On September 29, 2022, in two separate matters,
(i) Monster Energy was awarded a $293 million jury verdict against VPX and Mr. Owoc in
*Monster Energy Company v. Vital Pharmaceuticals, Inc. et al.*, Case No. 5:18-cv-1882 (C.D. Cal.)
(the "False Advertising Lawsuit"); and (ii) Judge Dale S. Fischer entered a final judgment
confirming an arbitration award of $185 million in favor of Monster Energy and Orange Bang
against VPX in Vital Pharmaceuticals, Inc. v. Orange Bang, Inc., Case No. 5:20-cv-1464-DSF-
SHK (C.D. Cal.) (the "Arbitration Action").  The Debtors admit that they filed these cases
specifically to stave off enforcement of these awards.[3]

2.      But this is just the tip of the iceberg as to Debtors' non-trade claims.  Six of the
seven largest scheduled unsecured claims in these cases are held by non-trade claimants.  By
themselves, the six largest non-trade claims total at least $853 million in filed claims, an amount

---

[2] Capitalized terms used and not otherwise defined herein have the meaning ascribed to them in the Motion.

[3] *Declaration of John C. DiDonato in Support of Chapter 11 Petitions and First Day Pleadings* [ECF 26]
("DiDonato Dec.") ¶ 37.

about twelve times the total amount of trade claims in these cases.  And although the non-trade claims comprise by far the largest members of the Debtors' unsecured creditor constituency, the non-trade claimants were intentionally excluded from the OCC.

3.      The key issue before this Court is whether the non-trade claimants are adequately represented by the OCC or whether this case warrants the appointment of an additional committee to represent those interests.  A simple review of the key facts demonstrates that the non-trade claimants are not adequately represented in this case and that this is one of the cases warranting appointment of an additional committee to represent their interests.

4.      *First*, according to the Debtors' schedules, the total amount of all general unsecured claims is $1,166,249,194 and the scheduled litigation claims are $541,878,524.  Reviewing the claims filed to date, the amount of litigation claims are $1,904,943,610.64.  Thus, the litigation claims represent **75%** of the total amount of the general unsecured claims.[4]  Movants Monster Energy, Orange Bang, and ABC filed claims in the amount of $799,138,773.70, or 42% of the total of filed litigation claims.

5.      Additionally, the Debtors in their first day declaration claim to have only $83 million in outstanding trade payables as of the Petition Date, $14 million of which may be paid as critical vendors.[5]  There can be no legitimate question that the amount of the litigation claims, including $100s of millions in litigation claims already reduced to judgment, vastly exceeds the trade claims in this case that are currently the super-majority of the OCC.  The OCC makes a weak attempt to downplay this differential stressing that three of those trade claims are not "currently"

---

[4] $1,904,943,610.64 divided by $2,529,314,280 (total scheduled -$1,166,249,194 + difference scheduled and filed litigation claims – $1,363,065,086) total unsecured claims.  The information was gathered based on a review of the Debtors' filed schedules and of the filed claims at https://cases.stretto.com/VitalPharmaceuticals/filed-claims/ on December 14, 2022.

[5] DiDonato Dec. ¶¶ 27, 107-109.

doing business with the Debtors.[6]  But that is of no moment as there is nothing preventing them from resuming such business or working to restructure the Debtors such that they will want to resume such business with a reorganized debtor.

6.      *Second*, the character of the litigation claims are distinct from the claims of trade creditors.  The trade creditors chose to do business with the Debtors and while some may have litigation claims in connection with their trade claims, those litigation claims likely revolve around regular course of business payment disputes or other disputes unique to their ongoing business relationships with the Debtors; as such those creditors will be motivated to reestablish business relationships with the debtor.  That is fundamentally different from the non-trade claimants, who like the tort victims in the *Archdiocese of New Orleans*[7] bankruptcy, are involuntary creditors of the Debtors because of torts and/or contractual breaches committed against them by the Debtors.

7.      Moreover, certain of the non-trade claimants are victims of the Debtors' and Mr. Owoc's ongoing post-petition misconduct.  In the False Advertising Lawsuit, for example, the jury awarded Monster nine-figures in damages after finding that Defendants engaged in willful and deliberate false advertising under the Lanham Act by claiming that "Super Creatine" is creatine and that their BANG energy drink contains creatine.  Since filing the petition for Chapter 11 protection, the Debtors have done nothing to curb their false advertising.  Among other things, the Debtors continue to sell their BANG energy drink with "Super Creatine" prominently displayed on the top of every can.  The Debtors still highlight Super Creatine in advertisements for BANG— including in a recent Black Friday promotion on their website and in emails to consumers. Mr. Owoc has twice posted a video on social media, claiming that "Super Creatine" is creatine and

---

[6] OCC Objection ¶ 20.

[7] *In re Roman Catholic Church of the Archdiocese of New Orleans*, No. 20-10846, 2021 Bankr. LEXIS 302, at *36 (Bankr. E.D. La. Feb. 8, 2021) ("*Archdiocese of New Orleans*").

that BANG contains creatine (even though the jury found both claims to be false). The Debtors and Mrs. Owoc's post-petition misconduct not only subjects the Debtors to significant administrative expense claims but also imposes ongoing harms on the non-trade claimants that is distinct from the trade creditors.

8. *Finally*, the litigation claims are the claims that the Debtors filed these cases to address.[8] This case is not like the typical case relating to a restructuring of the Debtors' business operations and management to restructure a troubled operational balance sheet, but are more akin to the types of cases such as the *Archdiocese of New Orleans, Pacific Gas & Electric*, *A.H. Robins*, *Boy Scouts of America*, *Diocese of Spokane*, *Dow Corning*, *Federal Mogul*, *Mallinckrodt*, *Takata*, and *W.R. Grace*, which debtors file to address a rising flood of litigation claims.[9]

9. Examining these facts, it is clear that the litigation claimants are entitled to adequate representation through an official committee – adequate representation that cannot come from a committee primarily made up of trade creditors with only a couple of token litigation claimants. While the Objectors engage in much hand-wringing regarding the additional expense,[10] in light of the amount of the litigation claims in the case, the cost of an additional committee—like the costs of the existing committee—will primarily be borne by the litigation claimants given that such claimants hold the vast majority of the claims and so those creditors are uniquely positioned to decide whether the cost of their participation in an official capacity is worthwhile.

---

[8] *See* DiDonato Dec. ¶¶ 34, 47 (Debtors lacked funds sufficient to pay required supersedeas bond to stay enforcement of OBI Judgment).

[9] Archdiocese of New Orleans  (trade committee appointed where UCC was tort claimants); Pacific Gas & Electric (tort claimants); A.H. Robins (tort claimants); Boy Scouts of America (tort claimants); Diocese of Spokane (litigant and non-litigant committees); Dow Corning (tort claimants); Federal Mogul (tort claimants); Mallinckrodt (opioid-related creditors); Takata (PI claimants), and W.R. Grace (tort claimants).

[10] *See* Debtors Objection ¶¶ 28–31; U.S. Trustee Objection at 11; OCC Objection ¶ 29–31; Prepetition Agent Objection ¶¶ 9–10.

10.     Critically, the Objectors nowhere come to terms with the fundamental divergence of interests between trade creditors and litigant creditors, as recognized in the decisions cited in the Motion, and as a matter of logic.  Trade creditors whose claims are not already paid in full as critical vendors, in cases such as this where their claims are overwhelmed by non-trade claims, will logically conclude that a prospective post-confirmation trade-vendor relationship offers value far greater than anything they might recover on their bankruptcy claims.  Their interests are in keeping the debtor alive so they have a customer when the debtor exits chapter 11, and in keeping the debtor's management happy so they are not replaced.  Trigger issues will of course include opposing a debtor's plan or directing committee professionals to investigate claims against insiders.  On the other hand, large non-trade creditors in a case like this are solely motivated by maximizing a recovery on their claims – one of the primary policy goals of chapter 11.

11.     The Objectors further respond with the proposition that representation by the OCC is adequate as to all creditors because the vendor claimants, notwithstanding their distinct type of claims, have fiduciary responsibilities to all creditors.[11]  But that is legally untenable.[12]  The fiduciary duty of creditors on a committee is limited as "[c]ommittee members must have some latitude to conduct their own business affairs, make business decisions, pursue business opportunities and the like, without fearing that they must disclose and justify every business choice that they make which could conceivably have an effect on other members of the committee."[13]

---

[11] *See* Debtors Objection ¶¶ 26–27, 33; U.S. Trustee Objection at 5–6; OCC Objection ¶ 30.

[12] "Although courts are uniform in their opinion that the members of a creditors committee owe a fiduciary duty to the class that the committee represents, the extent of that duty is not well defined."  *Krafsur v. UOP (In re El Paso Refinery, L.P.)*, 196 B.R. 58, 74 (Bankr. W.D. Tex. 1996).

[13] *Id.* at 74; *see also Rickel & Assocs. Inc. v. Smith (In re Rickel & Assocs.)*, 272 B.R. 74, 100 (Bankr. S.D.N.Y. 2002) (holding that "[a] lthough Committee members owe fiduciary duties, they are hybrids who serve more than one master. Every member of the Committee is, by definition, a creditor. Thus, he is competition with every other creditor for a piece of a shrinking pie. He may assert his rights as a creditor to the detriment of the creditor body as a whole without running afoul of his fiduciary obligations.").

6

The *Krafsur* court further recognized that for creditors continuing to do business with the debtor that in a choice between the creditor's interest and the committee's that it would be "too harsh and unrealistic" to require that the duty to the committee always prevail.[14]

12.    Were it the rule that representation was adequate by dint of a creditor's fiduciary duty, it would not matter who sits on a committee, either as to what type of claim they hold or its size.  The statute's direction that there be "adequate representation" and its guidance that the seven largest creditors willing to serve should ordinarily be selected would both be rendered meaningless.  A rule that any one type of claimholder can provide adequate committee representation to all types of claimholders would run flatly contrary to all manner of judicial and treatise authority cited in the Motion, and the legislative history of section 1102(a)(2), which indicates that courts may direct the appointment of additional committees when "the debtor proposes to affect several classes of debt or equity holders."  H.R. Rep. No. 95-595, at 401, reprinted in 1978 U.S.C.C.A.N. at 6357.  Any plan proposed by the Debtors will almost certainly attempt to carve up creditors into subgroups with competing interests, with divergent treatment of non-trade creditors and regarding provisions such as plan releases and injunctions.

13.    Similarly, the facile response of the Objectors that the Movants can adequately represent their interest without an official committee[15] ignores the simple truth that committee representation matters.  Notwithstanding that the amount of litigation claims dwarfs the other unsecured claims, the litigation claimants have effectively been excluded from meaningful representation on the OCC and effectively kept out of the tent containing the critical information necessary to work toward resolving this case either through a plan or a sale.  This is ironic, when

---

[14] *Krafsur,* 196 B.R. at 75.

[15] *See* Debtors Objection ¶ 39; U.S. Trustee Objection at 10–11; OCC Objection ¶ 34; Prepetition Agent Objection ¶¶ 7-8.

the reason that the case filed was to address the unsustainable litigation claims, not to reorganize operations to address claims of trade creditors and ongoing operations.

14.     Failing to provide these creditors with adequate representation on the OCC and suggesting that they must fight for their participation is inefficient and more expensive than providing them an official committee able to gain access to information without expensive and time-consuming discovery and, hopefully, to reach the consensus that can avoid costly and time-consuming litigation over a plan or sale.

## ARGUMENT

### I.     THE APPOINTMENT OF A SEPARATE NON-TRADE COMMITTEE IS WARRANTED

#### A.  The U.S. Trustee's Appointment of the OCC

15.     This is not a review of the U.S. Trustee's decisions, under any standard.  Section 1102(a)(2) of the Bankruptcy Code and cases decided thereunder are clear that the Court decides on a clean slate whether an additional committee is "necessary to assure adequate representation of creditors."  The statute does **not** provide for any assessment of whether the U.S. Trustee's appointments were proper or within her discretion, only whether they resulted in an adequately representative committee.[16]     Although limited discovery revealed that the U.S. Trustee communicated only with the Debtors and not their creditors concerning who would sit on the OCC, after which the U.S. Trustee gave sole control of the OCC to the Debtors' smallest and most

---

[16] *In re Shorebank Corp.*, 467 B.R. 156, 161-62 (Bankr. N.D. Ill. 2012) ("[T]here is no 'standard of review' . . . The plain language of the statute . . . calls for an independent determination . . . ."); *In re Enron Corp.*, 279 B.R. 671, 684 (Bankr. S.D.N.Y. 2002) (holding that the issue is decided de novo, and "the court must arrive at its own judgment") (citations omitted); *In re Oneida Ltd.*, Case No. 06-10489 (ALG), 2006 Bankr. LEXIS 780, at *3 (Bankr. S.D.N.Y. May 4, 2006) (same); *In re McLean Industries, Inc.*, 70 B.R. 852, 856 (Bankr. S.D.N.Y. 1987) ("The legislative history belies the U.S. Trustee's and the Committee's claim that Congress sought to limit the Court's role to a review of a determination by a U.S. trustee.").  Here, in any event, the U.S. Trustee never stated the basis of the decision, and thus there are not any determinations to review under any standard other than *de novo*.

malleable creditor constituency, the Court is not called upon to assess that process.[17]

16.      The claims held by the unsecured creditors currently appointed to the OCC are not remotely representative of the claims against the Debtors, and are not representative of the types of claims held by the Debtors' largest creditors.  The original appointments by the U.S. Trustee were exclusively vendors holding claims that, with one exception, were not even among the seven largest unsecured claims.  Not one was among the litigation claims that placed the Debtors in bankruptcy, that are exponentially larger than the trade claims, that have interests that conflict with those of the Debtors' vendors, and that are vital to any consensual resolution of these cases.

17.      As discussed in the Motion,[18] Movants raised this issue with the U.S. Trustee who initially agreed with the Movants that an additional committee should be appointed,[19] but then changed course and attempted to reconstitute the OCC in a manner that did not actually correct the gross imbalance of creditor interests and the lack of adequate representation of the litigation claimants.

### B.  The Reconstituted OCC Grossly Disproportionately Represents Trade Claims

18.      The "reconstituted" OCC does nothing to improve the adequacy of representation of the litigation claims.  It now includes two additional "litigation" creditors:  Pepsico, which has a settlement agreement with the Debtors based on a breach of contract, and a class action claim representative for a lawsuit that was recently filed and is contingent and unliquidated.[20]  Two other litigant claimants, Movant ABC who has a filed claim of not less than $225,100,000 and Warner

---

[17] For the same reason, the Motion does not implicate Bankruptcy Rule 2020, which involves the review of U.S. Trustee actions or inactions.  Relatedly, the Motion also does not seek to direct the U.S. Trustee to appoint Monster Energy, even though the nominal rationale for excluding the Debtors' largest creditor – that it is able to participate in the case without committee membership – has no basis in law or national practice.

[18] *See* Motion ¶¶ 13–26 (discussion of history of the appointment of the OCC).

[19] *See* Ex. A to the Motion (e-mail from U.S. Trustee's office of November 21, 2022).

[20] By contrast, the Movants assert at least $788,980,084 in litigation claims, $731,330,084 of which are the subject of existing judgments.

who has a filed litigation claim of $28,050,000,[21] declined their appointments because they were concerned about participating on an unrepresentative committee on which their voice would remain a small minority, subordinate on all issues to creditors with far smaller vendor claims.[22]

19.    While the courts may not require that representation be precisely proportionate, adequate representation for a committee does mean those with the most at stake require a meaningful voice not diluted by a grossly disproportionate minority with divergent interests.  As the court in *Hills Stores* observed:

> While bankruptcy courts have generally been reluctant to appoint separate committees of unsecured creditors notwithstanding the diverse and sometimes conflicting interests of creditors, a case which is sufficiently large and complex may strongly indicate the need for additional committees representing different interest. The potential added cost is not sufficient in itself to deprive the creditors of the formation of an additional committee if one is otherwise appropriate.[23]

20.    "[F]or a creditor group to be adequately represented by a committee, the interests of that group must 'have a *meaningful* voice on the committee in relation to their posture in the case.'"[24]  A committee must "adequately represent the various creditor types" even though the committee is not required to reflect "the precise composition of the creditor body."[25]

21.    The only guidance provided in the statute to the U.S. Trustee in the appointment of committees, and the guidance disregarded by the U.S. Trustee in this case, is that the seven largest creditors willing to serve should be the creditors appointed to the committee. 11 U.S.C.

---

[21] None of whom were asked by the U.S. Trustee in advance whether they would be willing to serve.

[22] *See* Motion ¶ 5.

[23] *In re Hills Stores Co.*, 137 B.R. 4, 6 (Bankr. S.D.N.Y. 1992) (citations omitted) (rejecting the need for an additional committee in the case of a single debtor where bondholders represented 35% of the creditor body and were 27% of the committee and also had significant roles on subcommittees of the committee).

[24] *Archdiocese of New Orleans* 2021 Bankr. LEXIS 302, at *32–33 (citing *In re Dow Corning Corp.*, 194 B.R. 121,141 (Bankr. E.D. Mich. 1996), *rev'd on other grounds*, 212 B.R. 258 (E.D. Mich. 1997)).

[25] *In re Park W. Circle Realty, LLC*, No. 10-12965 (AJG), 2010 Bankr. LEXIS 2463, at *11 (Bankr. S.D.N.Y. Aug. 11, 2010) (citations omitted).

§ 1102(b)(1). Even with its reconstitution of the OCC, the U.S. Trustee ignored this guidance. While the U.S. Trustee focuses in its Objection on there being 2,445 claims on the VPX Schedule of unsecured claims, the U.S. Trustee ignores the importance of the amounts of claims in the conduct and administration of the case and that *nearly 75%* of such claims are *under $1000* and many are under $100 or even scheduled at less than a dollar. The U.S. Trustee's constitution of the OCC disregards the necessity for those with the largest stake in the outcome to have a meaningful voice.

## II.    THE OBJECTIONS ARE WITHOUT MERIT

22.    The Objections focus on similar themes:

    a.  The OCC adequately represents the interests of the litigation claimants as "adequate representation" does not require precise proportionality and the OCC members owe a fiduciary duty to all unsecured creditors;[26] and

    b.  The cost and expense of an additional committee are not warranted as the Movants can represent their interests without an official committee.[27]

### A.  The OCC Does Not Adequately Represent the Interests of the Non-Trade Claimants

23.    Despite the protests to the contrary, the OCC does not adequately represent the interests of the litigation claimants. While the representation on a committee may not need to be precisely proportionate, in this case, the representation of different types of creditors is so grossly disproportionate as to eviscerate the voice of the litigation claimants.

24.    As discussed above, and at length in the Motion, litigation claims account for the overwhelming amount of general unsecured claims. The OCC has seven members holding trade

---

[26] *See* Debtors Objection ¶¶ 19–23; U.S. Trustee Objection at 8–9; OCC Objection ¶ 21–24.

[27] *See* Debtors Objection ¶¶ 28–31; U.S. Trustee Objection at 11; OCC Objection ¶ 29–31; Prepetition Agent Objection ¶¶ 9–10.

claims representing $44 million dollars out of the over $1 billion dollars of claims scheduled.[28]
The two remaining members hold litigation related claims of $500[29] million dollars (and the largest
of those is a class action claimant asserting a $400 million claim for a speculative litigation claim),
yet those claimants represent only 28% of any OCC vote.  While the OCC points out that each
creditor only gets one vote, they ignore that with the vote on the plan, the amount of the claims
voting matters too.

25.     There is simply no way to rationalize this minuscule representation on the OCC
with adequate representation within the meaning of the statute.

26.     As the *Archdiocese of New Orleans* court observed:   "[H]ere, the committee
structure is 'upside down.' The Committee is comprised of special interests, but traditional,
unsecured commercial interests go unrepresented."[30]  This case presents the mirror image problem
of having the traditional commercial interests represented but ignoring the special and distinct
interests of the litigation claimants.  While the Debtors attempt to distinguish *Archdiocese of New
Orleans*,[31] on this basis, the logic of *Archdiocese of New Orleans* applies equally here where the
situation is simply reversed.

27.     The *Archdiocese of New Orleans* court recognized that while the trade claimants

---

[28] *See* OCC Objection ¶ 9.  The OCC also tries to downplay the continuing interest of certain of the OCC members in continuing business with the Debtors. *Id.* ¶ 20. However, the mere fact that such OCC members are not currently doing business does not mean that their interests may ultimately be in doing business with the Debtors' successor be that a reorganized debtor or as a result of the sale of the business.  Additionally, the OCC argues that two of the OCC members also hold litigation claims as part of their claims against the Debtors.  *Id.*  In light of the nature of these creditors' trade claims, such litigation is likely to be directly related to the business they do with the debtor such as regular-course-of-business payment disputes and not in the nature of tort or breach of contract as with the majority of other litigation claimants (including that at least one member seems to be seeking payment of an administrative claim), and, in any event, given the small amount of these claims, they can hardly be said to be truly representative of litigation claims when compared to those of the largest creditors in these cases.

[29] The total amount, however, of filed claims to date of creditors scheduled as having litigation claims is $1,452,940,411.

[30] *Archdiocese of New Orleans*, 2021 Bankr. LEXIS 302, at *46–47.

[31] *See* Debtor Objection ¶¶ 33–34.

share some interests with litigation claimants those interests are likely to diverge in a manner that

requires separate representation:

> Congress intended unsecured commercial creditors to be represented in the reorganization process through the unsecured creditors' committee. Although the Abuse Claimants in this case, at times, *may share interests with commercial creditors, their interests often differ from the issues facing other creditors*. . . . Given the nature of this particular case, *the Court is not convinced that the appointment of additional members to the existing Committee would provide commercial creditors with a meaningful voice*. Moreover, separate committees are commonly appointed to represent important constituencies and to provide dynamic tension in negotiations with the debtor and other parties in interest in the reorganization process.[32]

28.    As discussed at length in the Motion, the interests of the litigation claimants clearly

diverge from those of the trade claimants.[33]  The litigation claimants should not have to wait for

the OCC to pursue a course of action not in the interests of the litigation claimants (or fail to pursue

a course of action that is in their interests) before demonstrating their lack of representation.  Such

an approach would be counter to the efficient administration leading to unnecessary litigation and

delay.

29.    For example, Movants learned that on December 1, 2022, Katherine Cole resigned

as Chief Operating Officer and a member of the Board of Directors, after having served in those

capacities for less than two months.  Despite repeated requests, Movants did not receive a copy of

that letter for another two weeks.  In her letter, Ms. Cole states that she writes the following:

> Given your recent changes and removing my authority to make decisions and lead in my position of Chief Operating Officer and as board member, I am unable to fulfill my fiduciary responsibilities. Therefore, with a heavy heart, I must resign from my positions as COO/Board Member effective immediately. As part of the governance process and my fiduciary responsibilities I must

---

[32] *Archdiocese of New Orleans*, 2021 Bankr. LEXIS 302, at *47–48.

[33] Motion ¶¶ 3-4, 7, 34–35, 44.

> maintain duty of care, duty of loyalty and duty of obedience. I am
> unable to perform these responsibilities given the recent directives.[34]

30.     Ms. Cole's letter obviously raises very concerning issues about the Debtors' continuing operations and Mr. Owoc's activities, yet there is no transparency to the Movants as to what is actually happening and no immediate means for them to investigate.  The OCC did not receive a copy of the letter until after Movants insisted on receiving one.  Moreover, Movants thought it appropriate to investigate this matter expeditiously and thoroughly and immediately serve a rule 2004 discovery notice on Ms. Cole given the gravity of the statements in her resignation letter.  This type of situation highlights the critical need for the litigation claimants to have an official committee with the power to examine matters of immediate concern to the majority of the creditors and ensure their adequate representation.

31.     Litigation claimants, like the tort claimants in *Archdiocese of New Orleans* and numerous other cases where separate committees of litigation claimants have been appointed,[35] are involuntary creditors of debtors who injured them, not trade claimants voluntarily doing business with a debtor and waiting for payment or litigating regular-course-of-business payment disputes.  The voice of this overwhelming majority of the claims in this case needs adequate representation for the very purposes of efficiency and case management.  The time for their voices to be heard is not, as the OCC suggests, when it is time to vote for a plan, but during the development of that plan so the plan can be confirmable.  The idea that it is acceptable to effectively exclude these creditors from the process because they can ultimately vote to reject a plan or object to a proposed sale is the opposite of having a properly administered bankruptcy case.

---

[34] The December 1, 2022 letter from Ms. Cole is attached hereto as Exhibit 1.
[35] *See supra* n.9.

### B. The Costs of an Additional Committee Do Not Outweigh the Need for Adequate Representation

32.     The Objectors all complain about the additional expense of another official committee.  The Objectors ignore that, given the overwhelming amount of litigation claims compared to the trade claims, it is the litigation claimants who will be the ones bearing the vast majority of that expense and so are in the best position to judge whether such expense is in their interests.

33.     As numerous courts have noted, cost alone should not be a driving factor in depriving a constituency of adequate representation.[36]

34.     Additionally, as noted above and in the Motion, in light of the amount of the litigation claims, here the efficient and cost-effective administration of the estate dictates that there should be a second committee.  Excluding the largest stakeholders from the process of developing a plan or sale, including denying them access to information, leads to more expense and delay as the unrepresented creditors must pursue discovery or objections relating to a plan or sale and may ultimately refuse to vote for a plan leaving it unconfirmable and worthless following the expense and time in its development and solicitation.

35.     The mere fact that some of the litigation claimants have the wherewithal to retain counsel to represent their own interests hardly justifies excluding them from being a meaningful part of the process.  It is not the standard for committee appointment that a creditor not otherwise be able to represent its own interests.  Rather, as pointed out in the Objections, the members of the committee have a fiduciary duty to represent the interests of all similarly situated creditors, and it

---

[36] *See, e.g.*, *In re Hills Stores Co.*, 137 B.R. at 6 (citing *In re McLean Indus., Inc.*, 70 B.R. at 860) (stating that "[t]he potential added cost is not sufficient in itself to deprive the creditors of the formation of an additional committee if one is otherwise appropriate"); *In re Texaco, Inc.*, 79 B.R. 560, 566 (Bankr. S.D.N.Y. 1987) ("[A] price tag should not be placed on adequate representation.").

is the interests of all of those creditors that need to be heard, not just those of individual creditors with their own interests. Additionally, committee members have access to financial information and other data necessary to evaluate a debtor's business and reorganization opportunities that is not generally available to other parties in interest except through a formal discovery process and litigation.

36.    Unfortunately, the Objections are replete with suggestions that the Movants are seeking only to protect their individual pecuniary interests. As noted above, notwithstanding their fiduciary duties to all creditors, the individual members of the creditors committee may pursue their own pecuniary interests without violating those duties. The Movants are seeking a committee to represent the interests of all similarly situated claimants and understand their fiduciary duties just as they understand the limitations of those duties of the trade creditors currently on the OCC.

**C.  The Objection of the U.S. Trustee**

37.    In its very defensive objection, the U.S. Trustee goes to inappropriate lengths to paint the Movants somehow as bad actors seeking a "separate insular committee."

38.    In fact, the opposite is true. A committee of non-trade claimants would represent the interests of the overwhelming majority of claims—75% by amount. The rather incredible truth is that the U.S. Trustee has inexplicably ignored the guidance of section 1102 and appointed an "insular" committee focused on interests of a tiny minority of the claims.

39.    The Movants are each involuntary creditors who want to maximize the recovery of all similarly situated creditors.

40.    Orange Bang is a creditor listed on the Schedules as holding disputed non-trade claims of $244,791,311.79 against VPX. Orange Bang has filed proofs of claim for unsecured claims against each of VPX and JHO Intellectual Property Holdings, LLC in the amount of not less than $87,500,000.00. *See* Claim Nos. 10, 11. The claim of Orange Bang relates to false

advertising, trademark infringement, and other allegations.  The claim is based on a final judgment confirming an arbitration award in favor of Monster Energy and Orange Bang in *Vital Pharmaceuticals, Inc. v. Orange Bang, Inc.*, Case No. 5:20-cv-1464 (C.D. Cal.).[37]

41.    Monster Energy is a creditor listed on the Schedules as holding a disputed non-trade claim of $292,939,761.00 against VPX.  Monster Energy has filed a proof of claim for an unsecured claim against JHO Intellectual Property Holdings, LLC in the amount of not less than $96,799,516.35.  *See* Claim No. 28.  Monster Energy has also filed a proof of claim for an unsecured claim against VPX in the amount of not less than $389,739,257.35.  *See* Claim No. 29.  The claim of Monster Energy against JHO Intellectual Property Holdings, LLC relates to false advertising, trademark infringement, and other allegations, and it is based on a final judgment confirming an arbitration award in favor of Monster Energy and Orange Bang in *Vital Pharmaceuticals, Inc. v. Orange Bang, Inc.*, Case No. 5:20-cv-1464 (C.D. Cal.).  The claim of Monster Energy against VPX relates to false advertising, trademark infringement, and other allegations, and it is based on a jury verdict in favor of Monster Energy in *Monster Energy Company v. Vital Pharmaceuticals, Inc. et al.*, Case No. 5:18-cv-1882 (C.D. Cal.).

42.    ABC is a creditor listed on the Schedules as holding a disputed non-trade claim of $17,681,149.10 against VPX and a non-disputed trade claim in the amount of $3,262.05 against

---

[37] Purporting to quote the Final Arbitration Award, Debtors erroneously assert that Monster "weaponized" the Settlement Agreement between VPX and Orange Bang.  Debtors Objection ¶ 23 & n.5.  The full quote, which Debtors misleadingly excerpt, makes plain that the arbitrator was characterizing VPX's own allegations.  *See* Final Arbitration Award, Ex. B to Debtors' Exhibit Register (ECF 522), at 41 ("Suffice it to say that Monster and its attorneys quickly grasped the significance of the 2010 Settlement Agreement and how it could 'weaponize' it **(to embrace, for the moment, the concept advocated by VPX)**.") (emphasis added).  In later sections of the award, the arbitrator explicitly rejected VPX's characterization, finding that Monster did nothing more than require VPX to honor its Settlement Agreement with Orange Bang.  *See id.* at 161 ("What VPX perceives as 'weaponization', Monster and Orange Bang perceive as 'enforcement.'  The arbitrator agrees with Monster and Orange Bang.  It is not a violation of the Cartwright Act to require VPX to honor . . . the 2010 Settlement Agreement, an arm's length agreement it entered into freely, voluntarily, for its own particular business reasons and with the advice of counsel.").

VPX.  ABC has filed a proof of claim for an unsecured claim against each of the Debtors in the amount of not less than $225,100,000.00.  *See* Claim Nos. 30–36.  The claim of ABC relates to breach of contract and other allegations based on evidence uncovered in a discovery process that was on the verge of completion—with trial to follow only a few months later—when the Debtors filed the chapter 11 cases.  The amount of the claim remains subject to litigation.

43.    Sony is a creditor listed on the schedule as holding a non-trade claim of an undetermined amount against VPX.  Sony has not filed a proof of claim to date but asserts that it and its affiliated record labels have claims against VPX of not less than $35,500,000.  Sony and VPX are parties, among others, to that certain prepetition litigation entitled *Sony Music Entertainment; Sony Music Entertainment US* Latin *LLC; Zomba Recording LLC; Arista Music; Arista Records LLC; LaFace Records LLC; Records Label, LLC; and Volcano Entertainment III LLC v. Vital Pharmaceuticals, Inc. d/b/a Bang Energy and Jack Owoc, an Individual*, currently pending in the United States District Court for the Southern District of Florida (such litigation, the "Sony Copyright Action").  In the First Amended Complaint in the Sony Copyright Action, Sony and its co-Plaintiffs (collectively, the "Sony Plaintiffs") asserted causes of action against VPX and its Chief Executive Officer, Jack Owoc ("Owoc" and, together with VPX in their capacities as defendants in the Sony Copyright Action, the "Sony Copyright Action Defendants")), for the direct and secondary copyright infringement of various sound recordings that are owned or otherwise controlled by Sony Plaintiffs, in violation of the Copyright Act, 17 U.S.C. §§ 106 and 501.  Prepetition, the District Court granted the Sony Plaintiffs summary judgment as to the issue of liability on their claims (i) against the Sony Copyright Action Defendants for direct copyright infringement; and (ii) against VPX for vicarious copyright infringement.

44.    UMG is a creditor listed on the schedule as holding a non-trade claim of an

undetermined amount against VPX.  UMG has not filed a proof of claim to date but asserts that it and its affiliated record and music publishing companies have claims against VPX of not less than $22,150,000.  UMG and VPX are parties, among others, to that certain prepetition litigation entitled *UMG Recordings, Inc.; Capitol Records, LLC; Universal Music Corp.; Universal Music – Z Tunes LLC; Universal Musica, Inc.; PolyGram Publishing, Inc.; Songs of Universal, Inc.; and Universal Music – MGB NA LLC  v. Vital Pharmaceuticals, Inc. d/b/a Bang Energy; and Jack Owoc, an individual*, currently pending in the United States District Court for the Southern District of Florida (such litigation, the "UMG Copyright Action").  Pursuant to the Complaint and Demand for Jury Trial filed by UMG and its co-Plaintiffs (collectively, the "UMG Plaintiffs") in the UMG Copyright Action, the UMG Plaintiffs asserted causes of action against VPX and Owoc (collectively, in their capacity as defendants in the UMG Copyright Action, the "UMG Copyright Action Defendants") for the infringement of various sound recordings and musical compositions that are owned or otherwise controlled by the UMG Plaintiffs, in violation of the Copyright Act, 17 U.S.C. §§ 106 and 501.  Prepetition, the District Court granted the UMG Plaintiffs (1) partial summary judgment as to the issue of liability on their claims against the UMG Copyright Action Defendants for direct infringement; and (2) partial summary judgment on their claims for vicarious copyright infringement.

45.     The U.S. Trustee also attempts to discredit certain Movants making allegations that certain of the Movants made misrepresentations to it in connection with the appointment process.  These allegations have no legitimate basis.

46.     One of these allegations is that two of the Movants sought to appoint proxies which somehow suggests a "secret" agenda of those Movants.[38]  However, those Movants, Sony and

---

[38] U.S. Trustee Objection at 11.

UMG, merely added the names of attorneys as proxies on their form as a precaution in case their attendance was needed, but it is the intention of those clients themselves to be active on any committee.  There was no "secret" agenda and nothing to be considered an "anathema" to the process.  Indeed, it is surprising, and perhaps evidence of its defensive posture, that the U.S. Trustee would attempt to call out such a common practice in these situations as something nefarious.

47.    The second of these allegations is that Movant Monster Energy somehow misrepresented whether it had priority claims.[39]  In filling out the committee questionnaire, Monster Energy was focused on whether it was asserting any pre-petition priority claim and so indicated no on the questionnaire.  Monster Energy may have post-petition claims for royalty payments, and wanted to be sure those were preserved in its proof of claim.  This does not differ from a trade creditor doing business post-petition with a debtor that may seek payment of its administrative claims for the debtor's failure to pay for post-petition services.  One of the OCC members has sought payment of such administrative claims.[40]  The U.S. Trustee uses this in its objection to impugn Monster Energy, but before making its allegation, the U.S. Trustee did not even ask Monster Energy whether there was a basis for the alleged "discrepancy."  Unfortunately, in its effort to justify its own errors, the U.S. Trustee attempts to discredit the Movants with unreasonable accusations.

48.    The third allegation by the U.S. Trustee is that ABC asserted "litigation claims in all seven jointly administered cases," which the U.S. Trustee alleges was "[c]ontrary to the express

---

[39] *Id.* at 13.

[40] *Motion for Relief from the Automatic Stay, and Alternatively, for Adequate Protection, and for Allowance of an Administrative Claim* [ECF 330] (motion filed by OCC member Ardagh Metal Packaging USA Corp.).  The U.S. Trustee also suggests a similar issue with ABC who the U.S. Trustee appointed to the OCC.

representations ABC made in its written response to the committee solicitation questionnaire."[41] The U.S. Trustee, however, fails to substantiate this allegation or otherwise explain the relevance. In fact, the U.S. Trustee questionnaire does *not* ask whether a creditor holds a claim against more than one debtor, and ABC made no "express representations" in its response to the questionnaire. Moreover, the U.S. Trustee never raised any issue with ABC before filing its objection, and apparently was not previously bothered by the fact that ABC filed claims against each Debtor when it appointed ABC as a member of the OCC, which occurred almost one month after ABC filed its proofs of claim.

49.     *Finally*, the U.S. Trustee and other Objectors complain that three of the litigation claimants that the U.S. Trustee attempted to appoint to the OCC to correct its initial error and provide some representation to the litigation claimants refused to serve.  However, that litigation claimants refused to permit the U.S. Trustee to compound its initial error by appointing a few litigation claimants to the OCC but continuing to leave the litigation claimants grossly disproportionately out-voiced merely demonstrates the importance to these claimants of having meaningful, adequate representation and not giving the illusion that such meaningful and adequate representation exists when it does not.

50.     This case warrants the appointment of an additional official committee to represent the interests of the hundreds of millions of dollars of non-trade claims.

## CONCLUSION

51.     For all of the foregoing reasons and for all of the reasons set forth in the Motion, the Movants respectfully request that the Court issue an order directing the appointment of the proposed Non-Trade Creditors' Committee.

---

[41] U.S. Trustee Objection at p. 3.

Dated:  December 16, 2022        **AKERMAN LLP**

    /s/ *Michael I. Goldberg*
Michael I. Goldberg
Florida Bar No. 886602
Eyal Berger
Florida Bar No. 11069
201 East Las Olas Boulevard, Suite 1800
Fort Lauderdale, FL 33301
T: (954) 463-2700 /F: (954) 463-2224
michael.goldberg@akerman.com
eyal.berger@akerman.com

-and-

**PACHULSKI STANG ZIEHL & JONES LLP**[42]
Richard M. Pachulski (pro hac vice)
Ira D. Kharasch (pro hac vice)
Robert J. Feinstein (pro hac vice)
Teddy M. Kapur (pro hac vice)
Steven W. Golden (pro hac vice)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067-4003
T: (310) 277-6910 /F: (310) 201-0760
rpachulski@pszjlaw.com
ikharasch@pszjlaw.com
rfeinstein@pszjlaw.com
tkapur@pszjlaw.com
sgolden@pszjlaw.com

*Counsel to Monster Energy Company*

**FENDER, BOLLING AND PAIVA, P.A.**

/s/ *G. Steven Fender*
G. Steven Fender, Esq.
Fla. Bar No. 060992
P.O. Box 1545

---

[42] Michael I. Goldberg hereby certifies that the undersigned attorneys are appearing *pro hac vice* in this matter pursuant to court orders dated as follows: (i) Teddy M. Kapur, October 14, 2022 [ECF 103]; (ii) Robert J. Feinstein, October 17, 2022  [ECF 133]; (iii) Steven Golden, October 17, 2022 [ECF No. 134]; (iv) Richard M. Pachulski, October 18, 2022 [ECF 158] ; and (v) Ira D. Kharasch, October 18, 2022 [ECF 159].

Ft. Lauderdale, FL 33302
T: (407) 810-2458
steven.fender@fender-law.com

-and-

**KTBS LAW LLP**[43]
Thomas E. Patterson, Esq. (pro hac vice)
Nir Maoz (pro hac vice)
1801 Century Park East
Twenty Sixth Floor
Los Angeles, CA 90067
T: (310) 407-4000
F: (310) 407-9090
tpatterson@ktbslaw.com
nmaoz@ktbslaw.com

*Counsel to Orange Bang, Inc.*

**FURR AND COHEN, P.A.**

/s/ *Marc P. Barmat*
Marc P. Barmat
Florida Bar No. 22365
Robert C. Furr
Florida Bar No. 210854
2255 Glades Road, Suite 419A
Boca Raton, FL 33431
Telephone: (561) 395-0500
Facsimile: (561) 338-7532
mbarmat@furrcohen.com
rfurr@furrcohen.com

-and-

**GIBSON, DUNN & CRUTCHER LLP**[44]
Russell H. Falconer (*pro hac vice*)
2001 Ross Ave., Suite 2100
Dallas, TX 75201-2923
Telephone: (214) 698-3100

---

[43] G. Steven Fender hereby certifies that the undersigned attorneys are appearing *pro hac vice* in this matter pursuant to court orders dated as follows: (i) Thomas E. Patterson, November 8, 2022 [ECF 269]; (ii) Nir Maoz, November 8, 2022 [ECF 270].

[44] Marc P. Barmat hereby certifies that the undersigned attorneys are appearing *pro hac vice* in this matter pursuant to court orders dated as follows: (i) Mathew G. Bouslog, October 20, 2022 [ECF 181]; (ii) Russell H. Falconer, October 20, 2022 [ECF 182].

Facsimile: (214) 571-2936
rfalconer@gibsondunn.com
Matthew G. Bouslog (*pro hac vice*)
3161 Michelson Drive
Irvine, CA 92612-4412
Telephone: (949) 451-4030
Facsimile: (949) 475-4640
mbouslog@gibsondunn.com

*Counsel to American Bottling Company*


**PRYOR CASHMAN LLP**

*/s/ James G. Sammataro*
James G. Sammataro
Florida Bar No. 520292
Brendan Everman
Florida Bar No. 68702
255 Alhambra Circle, 8th Floor
Miami, Florida 33134
Telephone:  (212) 421-4100
Facsimile:  (212) 326-0806
Email:        jsammataro@pryorcashman.com
                   beverman@pryorcashman.com

- and –

**PRYOR CASHMAN LLP**

Seth H. Lieberman (*pro hac vice* forthcoming)
David C. Rose (*pro hac vice* forthcoming)
Stephanie P. Chery (*pro hac vice* forthcoming)
Sameer M. Alifarag (*pro hac vice* forthcoming)
7 Times Square, 40th Floor
New York, NY 10036-6596
Telephone:  (212) 421-4100
Facsimile:   (212) 326-0806
Email:        slieberman@pryorcashman.com
                   drose@pryorcashman.com
                   schery@pryorcashman.com
                   salifarag@pryorcashman.com

*Counsel to Sony Music Entertainment and UMG Recordings, Inc.*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the forgoing was served via CM/ECF

Notice of Electronic Filings to all parties registered to receive electronic noticing in this case on

December 16, 2022.

Respectfully submitted,

By:  /s/ *Michael I. Goldberg*
Michael I. Goldberg, Esq.
Florida Bar No. 886602
michael.goldberg@akerman.com
**AKERMAN LLP**
201 East Las Olas Blvd., Suite 1800
Fort Lauderdale, FL  33301-2999
Tel: 954-463-2700
Fax: 954-463-2224

Exhibit 1

December 1st, 2022

Jack,

I want to thank you for the opportunity to be part of such an exciting organization with so much potential for long term success.  During my time at Vital Pharmaceuticals, I've led a group of incredibly talented and dedicated professionals through the Chapter 11- Bankruptcy process and ongoing culture change.

Given your recent changes and removing my authority to make decisions and lead in my position of Chief Operating Officer and as board member, I am unable to fulfill my fiduciary responsibilities. Therefore, with a heavy heart, I must resign from my positions as COO/Board Member effective immediately. As part of the governance process and my fiduciary responsibilities I must maintain duty of care, duty of loyalty and duty of obedience. I am unable to perform these responsibilities given the recent directives.

Wishing you and the entire organization a successful future in all endeavors.

Regards,

Kathy Cole