# EXHIBIT A

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION
www.flsb.uscourts.gov

In re:

VITAL PHARMACEUTICALS, INC., *et al.*,

Debtors.[1]

_____/

Chapter 11 Cases

Case No. 22-17842 (PDR)
(Joint Administration Pending)

## DECLARATION OF JOHN C. DIDONATO IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS

Under 28 U.S.C. § 1746, John C. DiDonato hereby declares as follows under the penalty of perjury:

1.  I am the Chief Transformation Officer of Vital Pharmaceuticals, Inc. ("VPX") and the other debtors and debtors in possession (together with VPX, the "Company" or the "Debtors") in the above-captioned cases (collectively, the "Chapter 11 Cases"). I am authorized by each of the Debtors to submit this declaration (the "First Day Declaration") on behalf of the Debtors.

2.  In addition to being the Debtors' Chief Transformation Officer, I am a Managing Director of Huron Consulting Services LLC ("Huron") and Huron's Business Advisory Capability Leader. Huron is an operationally focused consulting firm that specializes in, among other things, bankruptcy and restructuring consulting, interim management, and financial and operational consulting to financially distressed companies. I have more than 30 years of experience counseling companies through operational turnarounds, capital raising, buy and sell side advisories, merger integrations, and other financial consulting and bankruptcy assignments in both out-of-court and

_____

[1] The address of the Debtors is 1600 N. Park Drive, Weston, FL 33326. The last four digits of the Debtors' federal tax identification numbers are: (i) Vital Pharmaceuticals, Inc. (8430); (ii) Bang Energy Canada, Inc. (5454); (iii) JHO Intellectual Property Holdings, LLC (0010); (iv) JHO Real Estate Investment, LLC (9394); (v) Quash Seltzer, LLC (6501); (vi) Rainbow Unicorn Bev LLC (2254); and (vii) Vital Pharmaceuticals International Sales, Inc. (8019).

in-court situations.  I have served more than 100 debtors, functioning for many as a chief restructuring strategist.  My expertise encompasses a wide range of industries, including logistics, distribution, transformation, automotive suppliers, aerospace suppliers, engineering and construction, metals, equipment leasing, and retail.

3.      Since my appointment as the Chief Transformation Officer on September 6, 2022, I have become familiar with the Debtors' financial affairs and business operations.  In addition, I have been responsible for overseeing the Debtors' preparations for these Chapter 11 Cases, their business plans, and the procurement of debtor-in-possession financing.  I have further familiarized myself with the Debtors' day-to-day operations, organizational structure, and books and records by reviewing key financial documents and engaging in discussions with other members of the Debtors' management team and the Huron professionals providing financial advisory services to the Debtors.  Except as otherwise stated in this First Day Declaration, the statements set forth herein are based on (a) my personal knowledge or opinion derived from my experience, (b) information that I have received from the Debtors' advisors or employees and/or the Huron professionals working directly with me or under my supervision, direction, or control, and/or (c) my review of relevant documents.  Any references to the Bankruptcy Code (as defined below), the chapter 11 process, and related legal matters herein reflect my understanding of such matters based on the explanations and advice counsel to the Debtors has provided.  If called upon, I would testify competently to the facts set forth in this First Day Declaration.

4.      On October 10, 2022 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief in the United States Bankruptcy Court for the Southern District of Florida (the "Court").  The Debtors will continue to operate their businesses and manage their properties as debtors in possession.

5.      I submit this First Day Declaration on behalf of the Debtors in support of their (a) voluntary petitions for relief that they filed under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code") and (b) "first-day" pleadings, which the Debtors are filing concurrently herewith (collectively, the "First Day Pleadings").  The Debtors seek the relief set forth in the First Day Pleadings to minimize the adverse effects of the commencement of these Chapter 11 Cases on their businesses.  I have reviewed the Debtors' petitions and the other First Day Pleadings or have otherwise had their contents explained to me, and it is my belief that the relief sought therein is essential to ensure the uninterrupted operation of the Debtors' businesses and to successfully maximize the value of the Debtors' estates.

6.      To familiarize the Court with the Debtors, their businesses, the circumstances leading to the commencement of these Chapter 11 Cases, the objectives of such cases, and the relief the Debtors are seeking in the First Day Pleadings, this First Day Declaration includes the following information:

- Part I provides an overview of the Company's business;
- Part II provides an overview of the Company's prepetition capital structure and indebtedness;
- Part III describes certain prepetition litigation in which the Company was involved;
- Part IV provides an overview of the circumstances leading to the commencement of these Chapter 11 Cases, the objectives of these Chapter 11 Cases, and the means for implementing such objectives; and
- Part V introduces the various First Day Pleadings and sets forth my belief that the relief sought therein is crucial to the Debtors' business.

## I.      THE COMPANY'S BUSINESS

### A.      Business Overview

7.      Established in 1993 and headquartered in Weston, Florida, the Company is a frontrunner in sports nutrition and a pioneer in the performance energy drink industry.  The

Company produces novel and great tasting beverages without sugar, calories, carbohydrates, or artificial flavors, and with caffeine, electrolytes, and other performance ingredients.

8.    The Company's leading product is Bang energy drink ("Bang"), which was launched by the Company in 2012 and was the fastest growing beverage in the U.S. non-alcoholic beverage sector in 2018.  Bang is the third best-selling energy drink in the United States as measured by retail sales and market share data, in each case, as of April 2022.

9.    The Company historically has been profitable.  As illustrated in the chart below, from 2016 to 2019, the Company demonstrated significant enterprise growth and received increased customer demand for the Company's products.  In 2019, prior to its distribution network transition (further described below), the Debtors achieved approximately $1.2 billion in retail sales, approximately $626 million in net revenue, and approximately $175 million in earnings before interest, taxes, depreciation, and amortization, and had a 184% compound annual growth rate from 2017 to 2019.



| | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022E |
|---|---|---|---|---|---|---|---|
| Net Sales | $47.1 | $77.7 | $285.6 | $626.2 | $700.8 | $715.2 | $525.2 |
| EBITDA [1] | $9.4 | $17.5 | $83.7 | $175.1 | $127.3 | $25.5 | $(73.5) |

[1] Before income and expenses related to Pepsi distribution transition and separation

10.     A chart illustrating the Company's corporate organizational structure, as of the date hereof, is attached hereto as **Exhibit A**.  A summary of the operations and purpose for each Debtor can be found in the following table:

| Debtor | Description |
|---|---|
| Vital Pharmaceuticals, Inc. | Operating company of the Debtors' non-alcohol-based beverages, including Bang, and party to the Debtors' distribution agreements. |
| Bang Energy Canada, Inc. | Holding company for a non-Debtor foreign entity doing business in Canada (Bang Energy Canada, ULC). |
| JHO Intellectual Property Holdings, LLC | Owner of the intellectual property rights used in connection with the Debtors' beverage business. |
| JHO Real Estate Investment, LLC | Owner of the Debtors' manufacturing facility in Phoenix, Arizona. |
| Quash Seltzer, LLC | Operating company that manufactures and distributes the Debtors' alcoholic seltzer. |
| Rainbow Unicorn Bev, LLC | Inactive entity with no operations, entities, or employees. |
| Vital Pharmaceuticals International Sales, Inc. | Inactive entity with no operations, entities, or employees; a domestic corporation previously formed to export U.S. products. |

**B.     Business Operations**

11.     Since inception, the Company and its non-Debtor affiliates have invested approximately $437 million into various manufacturing and distribution facilities across the United States, with plans to expand further into international markets.  For example, the Debtors' Phoenix facility, where most Bang products are manufactured, has a footprint of over 394,000 square feet and can manufacture 4.8 million twelve-pack cases of Bang every month with demonstrated efficiencies, capable of producing 3,600 cans per minute.

12.     In addition to the Phoenix facility, certain of the non-Debtor affiliates lease or own manufacturing, distribution, and storage facilities in Florida, California, Georgia, North Carolina,

Texas, Arizona, and Canada, which have a combined footprint of approximately two million square feet.

13. Bang is available in all 50 states and internationally, and is distributed through a large network of mainstream retailers and suppliers throughout the United States, Canada, Latin America, Europe, and Australia. The Company's distribution network is critical to its success and is discussed further below.

14. The Company performs substantially all research and development in its Florida laboratories. As of September 30, 2022, the product development and quality control team consists of more than thirty employees who are dedicated to improving the current product portfolio, creating new product offerings for existing customers, and developing markets across the globe. The Company takes pride in manufacturing and perfecting upon its own unique flavors and vigorously tests its products until they are ready for launch.

C. Marketing Strategy

15. The Company deploys a unique marketing strategy utilizing (a) digital marketing, including social media (*e.g.*, TikTok, Facebook, Instagram, and YouTube), (b) influencers and brand ambassadors, and (c) in-store promotion. Taken together, the Company's marketing strategy has resulted in the Company becoming a dominant brand on social media, with over 4 million followers across its various social media accounts. As of September 30, 2022, the Company works with approximately 1,000 influencers. In total, the Company's marketing efforts on social media reach approximately 1.3 billion followers through the Company's contracted influencers and brand ambassadors.

16. The Company's marketing strategy is geared towards promoting fitness and performance for energy drink consumers. The Company hosts and sponsors music festivals, sporting events, concerts, and trade shows around the world to connect with customers at live

gatherings and events. In addition, the Company introduces its products through sampling and unique giveaways and utilizes unique packaging and vibrant displays to make its products stand out in stores. Due to the marketing strategy described above, the Company has historically been able to achieve such significant success and rapid growth in a competitive market. As set forth below, the Company hopes and expects to resume its upward trajectory with the benefit of its transition to a network of valued distributors through the chapter 11 process.

D. **The Company's Distribution Network and Transition**

17. The Company's distribution network is critical to the sales of its products and overall business strategy. Indeed, maintaining and building its distribution network is and will remain the core focus of the Company in these cases, and the Company strongly believes that any value-maximizing outcome in these cases is dependent upon that distribution network remaining intact throughout the Chapter 11 Cases and beyond. As detailed below, the Company has spent the last several months carefully building out their network of distributors, and that network is now positioned for success and represents one of the Company's most valuable assets on a go-forward basis.

18. Historically, the Company relied on a decentralized network of regional distributors to put its products in the hands of the ultimate consumers. In April 2020, to both centralize and expand its distribution footprint and achieve further growth, VPX changed paths and entered into an exclusive distribution agreement (the "Pepsi Distribution Agreement") with PepsiCo, Inc. ("Pepsi"), which encompassed the distribution of "BANG-branded Licensed Products" (as defined in the Pepsi Distribution Agreement).

19. On October 23, 2020, the Company terminated the Pepsi Distribution Agreement due to its view that Pepsi's strategies were suboptimal and the parties' varying expectations and

visions. Following the termination, various legal proceedings ensued.[2] While the legal proceedings were pending, VPX and Pepsi engaged in constructive dialogue toward a comprehensive settlement. On June 21, 2022, VPX and Pepsi entered into that certain confidential settlement agreement and release of all claims (the "Pepsi Settlement"), under which VPX and Pepsi agreed to, among other things, the dismissal of the Existing Legal Matters (as defined in the Pepsi Settlement), the termination of the Pepsi Distribution Agreement, and entered into certain post-termination transition arrangements. In accordance with resolution of the Existing Legal Matters, Pepsi continued to distribute products for VPX into 2022. In 2021, Pepsi's distribution accounted for approximately 81.6% of VPX's sales.

20. Since entering the Pepsi Settlement and through the summer and early fall of 2022, the Company has been in the process of transitioning to a decentralized distribution network, which consists of (a) a best-in-class regional independent distributors, many of which distributed VPX's products prior to VPX's entry into the Pepsi Distribution Agreement, and (b) in-house direct store delivery ("DSD") using existing Company-owned distribution fleet. This transition includes (a) expanding the territory and coverage of independent distributors that distributed the Company's Bang products including, during the period in which VPX was transitioning distribution *to* Pepsi (approximately 80% of which distributors are independent bottlers that have a license to distribute products on behalf of Anheuser-Busch Inc. and Molson Coors Beverage

---

[2] Such legal proceedings are defined as "Existing Legal Matters" in the Pepsi Settlement Agreement and means, collectively: *PepsiCo, Inc. v. Vital Pharmaceuticals, Inc.*, Case 01-20-0015-8060, American Arbitration Association (filed November 23, 2020); *Vital Pharmaceuticals, Inc. v. PepsiCo, Inc.*, Case No. 0:20-cv-62415-RAR (S.D. Fla., filed November 25, 2020); *Quash Seltzer, LLC v. PepsiCo, Inc.*, No. 21-CV-60191-RAR (S.D. Fla., filed January 26, 2021); *PepsiCo, Inc. v. Vital Pharmaceuticals, Inc.*, No. 0:22-cv-60805-RAR (S.D. Fla., filed April 27, 2022); *JHO Intellectual Property Holdings, LLC, Elite IP Holdings, LLC, and Vital Pharmaceuticals, Inc., v. PepsiCo, Inc.*, No. 2:22-cv-00353 (D. Ari., filed January 28, 2022); *Vital Pharmaceuticals, Inc. v. PepsiCo, Inc.*, No. 2:22-cv-00593 (D. Ari., filed April 11, 2022); and *Vital Pharmaceuticals, Inc. v. PepsiCo, Inc.*, No. 2:22-cv-00591 (D. Ari., filed April 11, 2022).

Company); (b) adding independent distributors that previously had been part of VPX's distribution network prior to VPX's relationship with Pepsi, but had not served as independent distributors during the period when the Pepsi Distribution Agreement was in effect; (c) adding additional independent distributors that had not previously distributed the Bang products; and (d) reestablishing the DSD network. New distributors (which are not under a pre-existing distribution agreement with VPX) are typically required to sign an Exclusive Distribution Agreement (each, an "EDA" and collectively, the "EDAs"), provide an initial purchase order, and maintain a mutually agreed upon minimum supply of product. Other terms of the EDAs, including commitments on the part of the distributor to achieve certain performance levels/distribution volumes, are negotiated with each distributor and may vary.

21.     As of the Petition Date, VPX has made significant progress in its transition to its new distribution network, which is expected to consist of 269 independent distributors. As of October 3, 2022, 227 of such independent distributors (which cover 92.3% of the overall distribution volume) are now under contract (whether through an EDA or a legacy agreement), 149 of such distributors have outstanding accounts receivable with VPX, and 105 of such distributors are already actively distributing VPX's products. The transition is expected to be substantially complete by mid-November 2022, after which point Pepsi will no longer distribute VPX products. This fall, the Company also will be negotiating for shelf space with major national retail outlets in order to maximize the performance of the best-in-class distribution network.

22.     VPX is highly optimistic about the performance of the new distribution network. Put simply, the implementation of the new distribution network is expected to return the Company to the trajectory of rapid growth it was on as recently as 2019 (prior to VPX's entry into the Pepsi Distribution Agreement).

### E.    Corporate Governance

23.    Historically, John H. Owoc, the founder and sole shareholder of the Company, had served as the sole director or member, as well as the Chief Executive Officer or managing member, as applicable, of the each of the Debtor entities.  In the months leading up to these Chapter 11 Cases and in order to facilitate a value-maximizing restructuring process, Mr. Owoc retained well-qualified restructuring advisors and authorized a number of changes to the Debtors' governance structure.  *First*, as set forth above, on September 6, 2022, Mr. Owoc appointed me as the Chief Transformation Officer of each of the Debtors, with a mandate to support, manage, and oversee the Company's restructuring activities.  *Second*, Mr. Owoc intends to expand the size of the board of directors of each of the Debtor entities to include five directors, consisting of (a) two Company executives, Mr. Owoc and Kathleen Cole (who serves as the Company's Chief Operating Officer); (b) two members unaffiliated with the Company, Dr. Guillermo Escalante and Eric Hillman, each of whom has deep knowledge of the industry and/or the Debtors' products; and (c) Steve Panagos, a veteran restructuring advisor with extensive experience serving as an independent director for companies undergoing in-court or out-of-court restructurings.  *Third*, each board will constitute a restructuring committee comprised solely of Mr. Panagos (the "Restructuring Committee"), which will be charged with overseeing the restructuring process and making recommendations to the full board with respect to the restructuring process and these Chapter 11 Cases.

24.    The Debtors believe they will benefit from the diverse perspectives and expertise of the five board members, as well as the specialized experience and expertise of the Restructuring Committee, as the Debtors transition into Chapter 11 and look to maximize the value of the Debtors' bankruptcy estates for the benefit of all stakeholders.  Moreover, the formation of the Restructuring Committee will enable Mr. Owoc, Ms. Cole, and the Debtors' management team to focus on continuing to run a top-tier energy drink company and core operational initiatives (*i.e.*,

product development, manufacturing, distribution, and marketing) while retaining the ability to make informed decisions about the course of the Debtors' restructuring with the advice of an experienced restructuring professional.

## II.  PREPETITION CAPITAL STRUCTURE

### A.  Revolving Credit Facility and Term Loans

25.  VPX, as borrower, certain subsidiaries and affiliates of VPX (collectively, with VPX, the "Prepetition Loan Parties"), as guarantors, the lenders from time to time party thereto (the "Secured Lenders"), and Truist Bank, as administrative agent (the "Prepetition Agent" and, together with the Secured Lenders, the "Prepetition Secured Parties"), are parties to the *Amended and Restated Revolving Credit and Term Loan Agreement*, dated as of August 14, 2020, (as amended, modified, or supplemented from time to time, the "Prepetition Credit Agreement").  The Prepetition Credit Agreement provides two separate credit facilities, each maturing on August 14, 2025: (a) a revolving credit facility (the "Prepetition Revolving Credit Facility"), and (b) a term loan A (the "Prepetition Term Loan" and, together with the Prepetition Revolving Credit Facility and all other obligations arising under the Prepetition Credit Agreement, the "Prepetition Loans").  As of the Petition Date, the aggregate outstanding principal of the Prepetition Loans was approximately $344.2 million, consisting of: (a) approximately $240.0 million in outstanding principal of the Prepetition Revolving Credit Facility, and (b) approximately $104.2 million in outstanding principal of the Prepetition Term Loan.  As set forth below, the Company has been in default under the Prepetition Credit Agreement for, among other things, failure to satisfy certain financial maintenance covenants since March 2022.  The Prepetition Secured Parties agreed to forbear from exercising their rights and remedies in respect of those defaults pursuant to five forbearance agreements entered into with the Company and advanced critical funding (totaling approximately $60 million) to the Company.

26.     In connection with the Prepetition Credit Agreement, the parties executed the *Amended and Restated Security and Pledge Agreement*, dated as of August 14, 2020 (as amended, supplemented or otherwise modified from time to time, the "<u>Prepetition Security Agreement</u>"). Under the Prepetition Security Agreement, the Prepetition Loans are secured by first-priority liens on the Collateral (as defined therein, the "<u>Prepetition Collateral</u>"), which includes substantially all of the assets of the Debtors.

**B.     Unsecured Debt**

27.     The Debtors have no funded unsecured debt and incur trade debt in connection with the operation of their businesses.  In the ordinary course, the Debtors also incur trade debt with certain vendors and suppliers in connection with the operation of their businesses.  As of the Petition Date, the Debtors have approximately $83 million in trade payables outstanding, excluding their obligations under the Customer Programs (described below).[3]

28.     In addition, the Debtors have other disputed and/or contingent liabilities related to litigation, pension, and employee obligations, certain of which are described herein.  The OBI Judgment and the FAA Verdict (each as defined and described below) are two of the most significant litigation liabilities.

**III.     <u>NOTABLE PREPETITION LITIGATION</u>**

29.     As of the Petition Date, the Debtors are party to approximately 63 disputes that are in active litigation or are the subject of threatened litigation.  Certain material litigation disputes are described below.

---

[3] This sum excludes amounts charged by customers (*i.e.*, retailers) in connection with the execution of the Debtors' programs and promotions with respect to the Debtors' products (such as "buy one, get one free"), which amounts are assessed against the Debtors at a later date following the sale.

### A.    Orange Bang/Monster Arbitration

30.    In 2009, Orange Bang, Inc. ("OBI"), a closely-held business that owns the ORANGE BANG trademark, brought a trademark infringement action against VPX in the United States District Court for the Central District of California, alleging that a then-existing pre-workout supplement product branded BANG was infringing OBI's fountain whipped beverage product branded ORANGE BANG. In 2010, VPX and OBI resolved that lawsuit pursuant to a confidential settlement agreement (the "OBI Settlement Agreement") under which (among other terms): (i) VPX was permitted to use the BANG trademark regardless of trade channel for products that meet certain criteria, and (ii) VPX was permitted to use the BANG trademark within specified trade channels for products that meet other criteria. The OBI Settlement Agreement included an arbitration provision.

31.    In late September 2019, unbeknownst to VPX at the time, OBI assigned to Monster Energy Company ("Monster") all of its rights and interest in the OBI Settlement Agreement, while purporting to retain all rights and interest in the BANG trademark.

32.    On June 16, 2020, Monster and OBI served a joint demand for arbitration upon VPX, wherein Monster asserted breach of contract claims as assignee of the OBI Settlement Agreement and OBI asserted trademark infringement claims as the continued holder of the BANG trademark.

33.    On July 23, 2020, VPX and JHO Intellectual Property Holdings, LLC ("JHO"), which is the owner of the BANG trademark and VPX's licensor, commenced a federal action against OBI and Monster in the District Court for the Central District of California, captioned *Vital Pharms., Inc. and JHO Intellectual Prop. Holdings, LLC v. Orange Bang, Inc. and Monster Energy Co.*, Case No. 5:20-cv-1464 (the "OBI District Court Action"), seeking a judicial determination that the claims OBI and Monster had asserted in their demand for arbitration were

not subject to arbitration. Monster and OBI counter-moved to compel arbitration. On November 30, 2020, the District Court for the Central District of California ordered VPX and JHO to submit to arbitration.

34.     Following a two-week arbitration hearing in October 2021, on January 6, 2022, the arbitrator issued an interim arbitration award in favor of Monster and OBI and against VPX and JHO, pursuant to which Monster and OBI jointly elected (i) a $175 million disgorgement of profits award on OBI's trademark infringement claim, and (ii) certain injunctive relief providing for a royalty payment equal to 5% of net sales of BANG-branded beverages in lieu of VPX's discontinuing its use of the "BANG" mark (the "Interim Arbitration Award"). Thereafter, Monster and OBI requested that the arbitrator also award attorneys' fees and injunctive relief substantially beyond that granted in the Interim Arbitration Award. On April 4, 2022, the arbitrator issued a final award, which provided: (i) approximately $9.3 million in fees and costs, in addition to the $175 million disgorgement award that Monster and OBI had elected, and (ii) granted injunctive relief substantially beyond that granted in the Interim Arbitration Award (the "Final Arbitration Award").

35.     On April 29, 2022, VPX and JHO moved to vacate the Final Arbitration Award in the OBI District Court Action. OBI and Monster opposed that motion and moved to confirm the award. On June 30, 2022, the District Court for the Central District of California denied the motion to vacate the Final Arbitration Award and granted the motion to confirm the award.

36.     On July 28, 2022, VPX and JHO initiated an appeal of the order confirming the Final Arbitration Award to the United States Court of Appeals for the Ninth Circuit (the "OBI Appeal").

37.     On September 29, 2022, the District Court for the Central District of California entered a final judgment incorporating its confirmation of the Final Arbitration Award (the "OBI Judgment"), the appeal from which VPX and JHO expect will be consolidated with the previously-filed OBI Appeal.  VPX does not have the financial ability to post a *supersedeas* bond in an amount sufficient to stay enforcement of the OBI Judgment.  Accordingly, chapter 11 protection, including the protection of the automatic stay, is integral to the Debtors' ability to protect their business and estate assets while the OBI Appeal is pending.

### B.     Monster's False Advertising Lawsuit Against VPX

38.     On September 4, 2018, Monster initiated a lawsuit against VPX and its CEO, John H. Owoc, in the District Court for the Central District of California, captioned *Monster Energy Co. v. Vital Pharms., Inc. and John H. Owoc.*, Case No. 5:18-cv-1882.  The lawsuit included claims for false advertising, alleged trade secret misappropriation, alleged violation of the Federal Computer Fraud and Abuse Act,  and alleged interference with Monster contracts for retail shelf space.

39.     A jury trial was conducted in the action, and on September 29, 2022, the jury delivered a verdict in favor of Monster and against VPX and Mr. Owoc and awarded approximately $293 million in damages to Monster.  Post-verdict motion practice is contemplated, at which time the District Court for the Central District of California may consider whether the jury award will be enhanced, reduced, or set aside.  I understand that VPX and Mr. Owoc intend to appeal from any adverse judgment entered against them.

### C.     VPX's False Advertising Action Against Monster

40.     On August 31, 2022, VPX brought a lawsuit against Monster and its Chief Executive Officer, Rodney Sacks, in the United States District Court for the Southern District of Florida, captioned *Vital Pharms., Inc. v. Monster Energy Co. and Rodney Sacks*, Case No. 0:22-

cv-61621. I understand that, in that lawsuit, VPX asserts claims for false advertising and unfair competition, and seeks lost profits, disgorgement of Monster's profits, and injunctive relief.

## IV. KEY EVENTS LEADING TO COMMENCEMENT OF, AND THE COMPANY'S OBJECTIVES IN, THESE CHAPTER 11 CASES

41. The Company commenced these cases in order to (a) obtain "breathing room" from pending litigation, including the OBI Judgment and FAA Verdict, as well as consequences of pending defaults under the Prepetition Credit Agreement; (b) obtain an essential infusion of liquidity totaling $100 million to help stabilize the Company's operations at a critical juncture in the Company's business cycle (i.e., on the precipice of launching its new distribution network) through the DIP Facility (as defined and described below); and (c) pursue a recapitalization, a replacement financing, or other transaction that will result in the payment in full of the Company's outstanding obligations under the Prepetition Credit Agreement and position the Company for success upon its emergence from chapter 11.

42. Since March 2022, the Company has been in default under the Prepetition Credit Agreement because of, among other things, failure to satisfy certain financial maintenance covenants. From March 2022 through September 30, 2022, the Prepetition Secured Parties agreed to forbear from exercising their rights and remedies in respect of those defaults pursuant to five forbearance agreements entered into with the Company. Since June 2022, the Secured Lenders have also advanced critical funding (totaling approximately $60 million) to the Company to enable it to continue operations, transition away from its distribution arrangement with Pepsi and to its new best-in-class distribution network, pursue a capital raise process, and engage in contingency planning around a potential filing. At all times since June 2022, the Secured Lenders have made clear that such accommodations were to assist the Company in achieving their desired outcome: repayment in full of the obligations owed to them.

43. Beginning in late June 2022, the Debtors' management, together with the assistance of their advisors (in particular, Rothschild & Co US Inc. ("Rothschild & Co"), the Company's proposed investment banker who was engaged in April 2022), commenced a robust financing process in pursuit of a capital raise transaction and other alternative transactions designed to (a) refinance the prepetition lenders, (b) generate sufficient liquidity for the Company's operations and capital expenditures, and (c) if necessary, to post a *supersedeas* bond in connection with Ninth Circuit Appeal. However, a feasible transaction that would achieve the Company's objectives did not materialize in the capital raise process due to, among other factors, uncertainty regarding the Debtors' then-nascent distribution network transition, concerns about potential contingent liabilities related to outstanding litigation, as well as increasingly challenging macroeconomic factors more generally.

44. Although the Company remained in discussions regarding potential financing transactions with numerous parties as of the Petition Date, in connection with the most recent forbearance, the Secured Lenders indicated that they would not continue to forbear past September 30, or advance additional funding outside of chapter 11. The Secured Lenders did, however, offer to provide sufficient funding for a chapter 11 process through the proposed facility under the DIP Credit Agreement, and afford the Company an opportunity to continue their efforts to recapitalize their balance sheet and refinance or otherwise repay the obligations under the Prepetition Credit Facility. To avail themselves of this opportunity and mitigate the jeopardy to VPX's assets following entry of the OBI Judgment and FAA Verdict, the Company commenced these Chapter 11 Cases.

## V.     FACTS SUPPORTING RELIEF SOUGHT IN FIRST DAY PLEADINGS[4]

45.     In furtherance of the objective of preserving value for all stakeholders, the Debtors have sought approval of the First Day Pleadings and related orders (the "Proposed Orders"), and respectfully request that the Court consider entering the Proposed Orders granting the First Day Pleadings.  For the avoidance of doubt, the Debtors seek authority, but not direction, to pay amounts or satisfy obligations with respect to the relief requested in those of the First Day Pleadings for which such authority is sought.  The First Day Pleadings include:

### A.     Administrative and Procedural Pleadings

a.     *Debtors' Ex Parte Motion for Joint Administration* (the "Joint Administration Motion")

46.     The Debtors believe that the joint administration of these cases will promote efficiency.  The Debtors anticipate that a significant portion of the activity during these cases and most hearings will be substantially identical for all of the Debtors resulting in duplicative pleadings repeatedly being filed should joint administration be denied.  Consequently, joint administration would reduce costs and facilitate the economical, efficient, and convenient administration of the Debtors' estates.

47.     The Debtors submit that the rights of the creditors of each of the Debtors will not be adversely affected by joint administration of these Chapter 11 Cases.  I am advised that the Debtors filed the Joint Administration Motion on an *ex parte* basis as contemplated by Local Rule 1015-1(B)(2)(a).  I believe the entry of an order approving joint administration of the Debtors' Chapter 11 Cases is in the best interests of the estates and their creditors.

---

[4] Unless otherwise defined herein, all capitalized terms in this Part V shall have the meanings ascribed to them in the applicable First Day Pleadings.

      b.     *Debtors' Ex Parte Motion for Authorization to File Consolidated Chapter 11 Case Management Summary* (the "<u>Case Management Summary Motion</u>")

48.     I am advised that, ordinarily, each Debtor is required to file its own Case Management Summary. It would be unduly burdensome for each Debtor to separately file a Case Management Summary. Much, if not all, of the information contained in the Case Management Summary is duplicative for many of the Debtors and the filing of a consolidated Case Management Summary is more efficient. I believe a Consolidated Case Management Summary will provide the Court and parties-in-interest with accurate and sufficiently detailed information and, as such, no creditor or party-in-interest will be prejudiced if the Court grants this relief.

      c.     *Debtors' Motion For Entry Of An Order Authorizing The Debtors To File A Consolidated Creditor Matrix And Consolidated List Of The Top Thirty Unsecured Creditors* (the "<u>Consolidated Top-30 Motion</u>")

49.     The Debtors have filed the Consolidated Top-30 Motion requesting authority to file a single, consolidated list of the creditors who hold the 30 largest unsecured claims. Given the affiliated nature of the Debtors, I believe that permitting them to maintain and submit a single consolidated Top 30 List, *in lieu* of filing a separate list of the top 20 unsecured creditors for each of the seven Debtors, is warranted. The Debtors operate as an integrated business with common ownership and control. The Debtors share financial and operational systems and also share many of the same creditors. Accordingly, I believe that requiring the Debtors to maintain separate Top 20 Lists for each of the seven Debtors would likely result in redundant duplicative mailings, adding unnecessary administrative expense to the Debtors' estates. Further, filing a single consolidated Top 30 List will facilitate the U.S. Trustee's review of creditors' claims and aid in its determination of whether to appoint, and whom to appoint to, a single creditors' committee in these cases. Accordingly, I believe that the approval of the Consolidated Top-30 Motion is warranted.

      d.     *Debtors' Emergency Motion for Approval of Form of Notice of Commencement of Cases and Proofs of Claims* (the "<u>Case Commencement Motion</u>")

50.     I am advised that because the Debtors have filed an application to retain Stretto, Inc. as the Debtors' noticing, claims and balloting agent, the Debtors are required to file the Case Commencement Motion requesting approval of (i) the form of the commencement of the Chapter 11 Cases, (ii) bar dates for filing proofs of claim, (iii) the form of proof of claim, (iv) the procedures for filing proofs of claim, and (v) approval of the publication notice of the Chapter 11 Cases and bar dates.

51.     I am advised that the Debtors have been working closely with the Clerk of the Court with respect to developing and finalizing the form of the notice of the commencement of the Chapter 11 Cases and the form of proof of claim.  The Debtors believe that the cooperative and efficient approach between and among Stretto, Inc., the Debtors, and the Clerk of the Court has conserved the Debtors' limited resources and will also benefit the creditors of the Debtors by establishing clear guidelines with respect to the noticing of the commencement of the cases and the preparation and filing of proofs of claim.

      e.     *Debtors' Emergency Application for Approval, on an Interim and Final Basis, of the Employment of Jordi Guso and the Law Firm of Berger Singerman LLP as Local Counsel for Debtors-in-Possession, Effective as of the Petition Date* (the "<u>BSLLP Retention Application</u>")

52.     The Debtors seek authority to retain, on an interim basis, Jordi Guso and the law firm of Berger Singerman LLP ("<u>BSLLP</u>") as co-counsel *nunc pro tunc* to the Petition Date. As detailed in the BSLLP Application, the Debtors understand that Mr. Guso and BSLLP have extensive experience representing chapter 11 debtors in this district (and other districts across the country) and that they are well-qualified to serve as co-counsel to the Debtors.  The Debtors believe

it is in their best interests, and those of those of their creditors, that Mr. Guso and BSLLP be retained to serve as the Debtor's bankruptcy co-counsel in their Chapter 11 Cases.

53.     BSLLP has provided the Debtors with a prospective budget and staffing plan to ensure that BSLLP's staffing with respect to the representation of the Debtors is appropriate to meet the Debtors' needs and expectations during the Chapter 11 Cases.  Based on the Debtors' review of the budget and staffing plan and my discussions with Mr. Guso, I believe that the budget and staffing plan are consistent with the Debtors' needs.  Accordingly, I have approved the budget and staffing plan.

54.     I understand that, except to the extent disclosed in the *Declaration of Jordi Guso on Behalf of Berger Singerman LLP, as Proposed Co-Counsel for the Debtors-In-Possession, Nunc Pro Tunc to the Petition Date*, affirmed by Mr. Guso and attached to the BSLLP Application as Exhibit A, neither Mr. Guso nor BSLLP has any connection with the Debtors' creditors or other parties in interest or their respective attorneys.  Counsel has informed me that corporations and limited liability companies like the Debtors may not appear in a Florida or federal court pro se, and that only a licensed attorney may appear on their behalf.  Because there is myriad relief that must be sought from the Court immediately, the Debtors will suffer immediate and irreparable harm if they are unable to obtain the services of counsel before a final hearing on the application for approval of counsel's employment can be convened.  For example, the Debtors require the Court's approval of debtor-in-possession financing to continue to operate and various "first day" operational motions.  Without access to the financing, the Debtors will be unable to operate and maximize value for the benefit of their estates.  Therefore, I believe that only with the granting of interim approval of counsel's employment will such immediate and irreparable injury be avoided.

In that regard, counsel advises that this relief has been granted in numerous chapter 11 cases in this District.

   f. *Debtors' Emergency Application for Approval, on an Interim and Final Basis, of the Employment of Latham & Watkins LLP as Co-Counsel for Debtors-In-Possession, Effective as of the Petition Date* (the "L&W Retention Application")

55. The Debtors also seek authority to retain the law firm of Latham & Watkins LLP ("L&W") as general bankruptcy co-counsel to the debtors and debtors-in-possession effective as of the Petition Date.  In my capacity as Chief Transformation Officer, I (along with the other members of the Debtors' management team and the Huron professionals) am involved in the Debtors' retention and supervision of certain outside professional services firms, including the professionals proposed to be retained in the Chapter 11 Cases.  For the following reasons and as detailed in the L&W Retention Application, I support the Debtors' retention of L&W as restructuring counsel.

56. The Debtors seek to ensure that bankruptcy professionals are subject to the same client-driven market forces, scrutiny, and accountability as professionals in non-bankruptcy engagements.  I understand that, before selecting L&W to serve as their attorneys in the Chapter 11 Cases, the Debtors conducted an extensive review of potential bankruptcy counsel in order to select a firm well-suited to address the complex issues that may arise during the course of these Chapter 11 Cases.

57. In the course of that review process, I understand that the Debtors considered and evaluated a number of law firms and assessed potential counsel based on their expertise in the relevant and complex legal issues and in similar proceedings.  Ultimately, the Debtors selected L&W on the basis of L&W's past work for and experience with the Debtors, including L&W's

prior work on, among other matters, financing, corporate, and restructuring matters, and its extensive experience with and knowledge of complex chapter 11 proceedings.

58.     Since June 2022, L&W has advised the Debtors with respect to various restructuring and contingency planning issues, including both potential in-court and out-of-court strategies, as well as a variety of non-restructuring matters. As a result, L&W has become familiar with the Debtors' businesses and capital structure, and many of the legal issues that the Company may face during the pendency of the Chapter 11 Cases. For this reason, as well as L&W's extensive experience in complex corporate reorganizations, I believe that L&W is both well-qualified and uniquely able to represent the Debtors in the Chapter 11 Cases. Thus, I support the Debtors' decision to continue to retain L&W as the Debtors' bankruptcy co-counsel during the Chapter 11 Cases.

59.     With respect to L&W's compensation, prior to the commencement of the Chapter 11 Cases, L&W and the Company discussed, and the Company approved, L&W's standard billing rates and the material terms of the engagement. Based on the Debtors' evaluation of other law firms prior to retaining L&W and my experiences, I can confirm that L&W's rates and terms are comparable to those of other comparably skilled professionals. Additionally, L&W has informed the Debtors that its rates for bankruptcy representations are comparable to the rates it charges for non-bankruptcy representations.

60.     I along with the other members of the Debtors' management team are responsible for reviewing the invoices submitted by L&W and can confirm that the rates L&W charged the Debtors in the prepetition period are consistent with the rates L&W will charge the Debtors in the postpetition period.

61.     L&W has also provided the Debtors with a prospective budget and staffing plan to ensure that L&W's staffing with respect to the representation of the Debtors is appropriate to meet the Debtors' needs and expectations during the Chapter 11 Cases.  Based on the Debtors' review of the budget and staffing plan and my discussions with L&W, I believe that the budget and staffing plan are consistent with the Debtors' needs.  Accordingly, I have approved the budget and staffing plan.

62.     I understand that, except to the extent disclosed in the *Declaration of Andrew Sorkin, on Behalf of Latham & Watkins LLP as Proposed Co-Counsel for Debtors-In-Possession, Effective as of the Petition Date*, affirmed by Andrew Sorkin, a partner at L&W, and filed contemporaneously herewith, the partners, counsel, and associates of L&W (a) do not have any connection with any of the Debtors, their affiliates, their creditors, any other party in interest, the United States Trustee for the Southern District of Florida or any person employed in the office of the same, or any judge in the United States Bankruptcy Court for the Southern District of Florida or any person employed in the offices of the same; (b) are "disinterested persons," as that term is defined in section 101(14) of the Bankruptcy Code, as modified by section 1107(b) of the Bankruptcy Code; and (c) do not hold or represent any interest adverse to the Debtors' estates.

63.     Because the Debtors seek various relief that must be sought immediately from the Court, and L&W has been and will continue to be instrumental in pursuing such relief, the Debtors will suffer immediate and irreparable harm if they are unable to obtain the services of L&W before a final hearing on the L&W Retention Application can be convened.  For example, the Debtors require the Court's approval of debtor-in-possession financing to continue to operate and various "first day" operational motions.  Without access to the financing, the Debtors will be unable to operate and maximize value for the benefit of their estates.  Therefore, I believe that only with the

granting of interim approval of counsel's employment will such immediate and irreparable injury be avoided. In that regard, counsel advises that this relief has been granted in numerous chapter 11 cases in this and other districts in Florida, including large chapter 11 cases.

64. Accordingly, in the exercise of my business judgment, I believe it is in the best interests of the Debtors, their estates, and creditors to retain L&W as the Debtors' general bankruptcy co-counsel.

> g. *Debtors' Application, Pursuant to Section 363(b) of the Bankruptcy Code, for Authority to Employ and Retain, on an Interim and Final Basis, Huron Consulting Services LLC to Provide the Services of a Chief Transformation Officer, Effective as of the Petition Date* (the "Huron Retention Application")

65. The Debtors seek authority to retain Huron on an interim basis, *nunc pro tunc* to the Petition Date, pursuant to sections 105(a) and 363(b) of the Bankruptcy Code to provide my services as Chief Transformation Officer as well as the services of additional Huron personnel to assist me in the discharge of my duties to the Debtors, as set forth in the engagement letter attached as Exhibit B to the Huron Retention Application. I have significant experience in providing advisory services to companies undergoing a financial restructuring, including in chapter 11 bankruptcy cases.

66. The Debtors initially retained Huron as a financial advisor on August 15, 2022 to provide contingency planning services. On September 15, 2022, effective as of September 6, 2022, Huron's scope of services was expanded to include managing workstreams related to the Company's restructuring initiatives. In that capacity, Huron has reviewed the financial and operating performance of the Debtors, reviewed and helped manage the Debtors' operating budgets and liquidity, and advised the Debtors in regard to their restructuring initiatives. The continued post-petition retention of Huron is in the best interests of the Debtors and will enhance

their ability to (a) operate and meet their administrative obligations in these cases, and (b) preserve and maximize the value of their assets.

67. Due to Huron's extensive experience in restructuring matters, and in light of the prepetition work done for the Debtors by Huron, the Debtors will suffer immediate and irreparable harm if they are unable to obtain the services of Huron effective as of the Petition Date.

68. Except to the extent in my declaration in support of the *Huron Retention Application*, neither Huron nor I have any connection with the Debtors' creditors or other parties in interest or their respective attorneys.

        h.    *Debtors' Application for Entry of Interim and Final Orders Under 11 U.S.C. §§ 327 and 328(A) Authorizing the Employment and Retention of Rothschild & Co US Inc. as Investment Bankers for the Debtors, Effective as of the Petition Date* (the "<u>Rothschild & Co Retention Application</u>")

69. The Debtors have filed an application to employ Rothschild & Co US, Inc. ("<u>Rothschild & Co</u>") as the investment bankers to the Debtors to provide the following services: (a) advise the Debtors with respect to a potential minority investment, sale, merger or other business/strategic combination involving the Debtors; (b) assist the Debtors in identifying possible counterparties for a potential M&A Transaction (as defined in the engagement letter attached as Exhibit B to the Rothschild & Co Retention Application (the "<u>Rothschild Engagement Letter</u>"); (c) assist the Debtors in their assessment of the financial aspects of a M&A Transaction and, if the Debtors determine to pursue a M&A Transaction, in the development of a plan for accomplishing such M&A Transaction; (d) assist the Debtors in raising new debt or equity financing in connection with a New Capital Raise (as defined in the Rothschild Engagement Letter); (e) assist the Debtors in making internal and external presentations concerning the financial aspects of any proposed Transaction (as defined in the Rothschild Engagement Letter), as appropriate; (f) advise and assist the Debtors in the development and implementation of a process intended to generate bidders for

a sale pursuant to Section 363 of the Bankruptcy Code; (g) advise and assist the Debtors in connection with any case or cases commenced by or against the Debtors, whether individually or on a consolidated basis, under title 11 of the Bankruptcy Code and if requested by the Debtors, participating in hearings before the Court in which such cases are commenced and providing relevant testimony with respect to the matters described herein and issues arising in connection with any proposed plan of reorganization; (h) review and analyze any proposals the Debtors receive from third parties in connection with a transaction during the restructuring process, including, without limitation, any proposals for debtors-in-possession financing, mergers and acquisitions or other strategic alternatives, as appropriate; (i) assist or participate in negotiations with the parties in interest, including, without limitation, any current or prospective creditors of, holders of equity in, or claimants against the Debtors and/or their respective representatives in connection with a transaction during the restructuring process; and (j) provide such other investment banking and financial advisory services as the Debtors and Rothschild & Co may from time to time agree.

70.     As set forth in the Rothschild & Co Retention Application, Rothschild & Co has extensive experience in providing investment banking and financial restructuring services to debtors, their boards of directors, and various secured and unsecured classes of creditors in chapter 11 cases and other restructurings.  Rothschild & Co's business reorganization professionals have served as financial and strategic advisors in numerous high-profile bankruptcies and restructurings, providing services to debtors, creditors' committees, and other constituencies in numerous cases, as set forth in the Rothschild & Co Retention Application.  Moreover, Rothschild & Co has intimate familiarity with the Debtors' operations and capital structure through its prepetition services to the Debtors.

71.     Due to Rothschild & Co's extensive experience in restructuring matters, and in light of the prepetition work done for the Debtors by Rothschild & Co, the Debtors will suffer immediate and irreparable harm if they are unable to obtain the services of Rothschild & Co effective as of the Petition Date.

72.     I understand that, except to the extent disclosed in *the Declaration of Homer Parkhill in Support of the Application for Entry of Interim and Final Orders Authorizing the Employment and Retention of Rothschild & Co US Inc. as Investment Bankers for the Debtors, Effective as of the Petition Date*, affirmed by Homer Parkhill and attached to the Rothschild & Co Retention Application as Exhibit A, Rothschild & Co has no connection with the Debtors' creditors or other parties in interest or their respective attorneys that would cause it not to be disinterested.

73.     The Debtors retained Rothschild & Co on April 8, 2022.  Rothschild is intimately familiar with the Debtors' operations and capital structure.  Rothschild is well qualified to serve as the Debtors' investment banker.

      i.     *Debtors' Emergency Application for Entry of Order Authorizing Debtors to Employ and Retain Stretto, Inc., as Notice, Claims and Solicitation Agent, Effective as of the Petition Date* (the "Stretto Retention Application")

74.     The Debtors seek approval of its agreement with Stretto, Inc. ("Stretto") and appointment of Stretto as notice, claims, and solicitation agent of the Court (the "Claims and Noticing Agent").  I am advised that Stretto has substantial experience in noticing, claims administration, solicitation, balloting, and facilitating other administrative aspects of chapter 11 cases.  I am further advised that Stretto has substantial experience in cases of this size and complexity, and has acted as the official notice, claims, and balloting agent in many large bankruptcy cases pending in this and other districts nationwide as set forth in the Stretto Retention Application.  The approval of the Debtors' agreement with Stretto and Stretto's appointment as

the Claims and Noticing Agent will facilitate the orderly and efficient management of the Chapter 11 Cases.

75.     I understand that, except to the extent disclosed in the *Declaration of Sheryl Betance in Support of the Debtors Emergency Application for Entry of Order Authorizing Debtors to Employ and Retain Stretto, Inc., as Notice, Claims and Solicitation Agent, Effective as of the Petition Date*, affirmed by Sheryl Betance and attached to the Stretto Retention Application as Exhibit A, neither Ms. Betance nor Stretto has any connection with the Debtors' creditors or other parties in interest or their respective attorneys.

76.     I am advised that given the number of creditors and notice parties involved in these Chapter 11 Cases, retention of the Claims and Noticing Agent is required.  Stretto has substantial experience and has been authorized to serve as Claims Noticing Agent in other cases in this District.

### B.     Business Operation Motions

a.      *Debtors' Emergency Motion for Interim and Final Orders (I) Approving Postpetition Financing, (II) Authorizing Use of Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* (the "DIP Motion")

77.     By the DIP Motion, the Debtors seek approval of the proposed DIP facility (the "DIP Facility") in the amount of approximately $455 million, which amount is composed of the sum of (a) $100 million of new money (of which $34 million would be immediately accessible by the Debtors upon entry of the proposed Interim Order) for the continued operation of their business during the pendency of the Chapter 11 Cases, plus (b) approximately $355 million of additional commitments, subject to entry of a final order, including approximately $71 million in outstanding obligations under the Prepetition Credit Agreement that would be deemed to be DIP Obligations

pursuant to the final order, and the remainder in increased "new money" commitments that will become available as remaining obligations under the Prepetition Credit Agreement are paid down from postpetition receipts (*i.e.*, a "creeping roll-up"). I have reviewed the DIP Motion and DIP documentation and the terms of the DIP Credit Agreement as listed in the DIP Motion are accurate to the best of my knowledge.

78.     I, along with my colleagues, have worked tirelessly to familiarize myself with the Debtors' day-to-day operations, business affairs, financial performance, books and records, and restructuring efforts. As part of the Debtors' evaluation of their liquidity position, we worked closely with the Debtors' management and other advisors to review, analyze, and assist in the development of the Debtors' 13-week cash flow forecast and prepare a budget describing projected operating cash flow and disbursements of the Debtors over the next 13 weeks (the "Approved Budget"), and engage in negotiations with the DIP lenders concerning the Approved Budget. The Approved Budget, attached as Exhibit A to the proposed Interim Order would provide an appropriate amount of postpetition financing to allow the Debtors to operate in the ordinary course and administer these Chapter 11 Cases.

79.     Based on my and my team's analysis of the Debtors' current cash position and needs, I believe that the Debtors require an immediate capital infusion in the form of the DIP Facility in order to operate their business postpetition and to preserve the Debtors' estates as going concerns. As the Debtors' financial forecasts and the Approved Budget reveal, I believe that the Debtors are unable to generate sufficient levels of operating cash flow in the ordinary course of business to cover their operating and capital costs and the projected costs of these Chapter 11 Cases absent immediate funding.

80.     Specifically, the Debtors require the funding available from the DIP Facility in order to, among other things, fund working capital, meet payroll obligations, pay suppliers, cover overhead costs, make adequate protection payments, make payments to critical vendors and shippers, and make any other payments that are essential for the continued management, operation, and preservation of the Debtors' business.  The ability to make these payments when due is essential to the continued operation of the Debtors' business during the pendency of these Chapter 11 Cases.  Specifically, during the first 30 days of the cases, the Debtors need access to $34 million in the DIP Facility to pay, among other obligations, key payments contemplated by the Interim DIP Budget.  I believe that all such expenses are critical to the Debtors' business and that the Debtors' failure to make such payments will result in immediate and irreparable harm to the Debtors and their estates.

81.     If the Debtors cannot quickly access the DIP Facility, based on the Debtors' financial forecasts and the Approved Budget, the Debtors will not be able to operate their business in the ordinary course until the hearing on the Final Order (as defined in the DIP Motion).  In turn, this would negatively impact the Debtors' revenue, jeopardize the Debtors' stakeholders' confidence in the Debtors' business, and harm the value of the Debtors' estates to the detriment of all stakeholders.  Based on the Debtors' financial forecasts and the Approved Budget, the liquidity provided by the DIP Facility should allow the Debtors to implement their business plan while they focus on a refinancing process to pay their prepetition lenders in full.

82.     Additionally, as set forth more fully in the DIP Credit Agreement, the proceeds of the DIP Facility will also be used (a) for working capital and other general corporate purposes of the Debtors, including the payment of professional fees and expenses and other administrative expenses in the Chapter 11 Cases, (b) in the case of the Roll Up, to repay the Prepetition Agent,

on behalf of the Prepetition Lenders, certain of the Obligations arising under (and as defined in) the Prepetition Credit Agreement (the "Prepetition Obligations"), (c) to pay the reasonable fees and expenses of the Administrative Agent and the Prepetition Agent (including reasonable fees and expenses of counsel and financial advisors), and (d) to pay claims in respect of certain prepetition creditors, which may include, without limitation, employees and taxing authorities; in each case, in accordance with the Approved Budget, subject to permitted variances.

83. Accordingly, I believe that absent immediate access to the DIP Facility and Cash Collateral, the Debtors could (a) face a severe interruption of their businesses; (b) lose the support of key constituencies, including the Debtors' workforce, key marketing partners, and customers; and (c) be forced to modify their operations in a significant and adverse manner. To avoid those outcomes, it is imperative that the Debtors have access to the DIP Facility from the outset of these cases in order to signal to the Debtors' stakeholders, including their employees, marketing partners, vendors, and customers, that despite the filing the outlook for the Debtors and their stakeholders is strong, and that they have the liquidity necessary to meet their obligations in the ordinary course until the business is able to emerge from the chapter 11 process. For all these reasons, I believe that access to the proposed DIP financing is a necessity.

84. Moreover, immediate access to both the DIP Facility and Cash Collateral is the stabilizing assumption upon which the Approved Budget, attached as Exhibit A to the Interim Order, is based. Without such access, the Debtors could (a) lose the confidence and cooperation of employees and key business partners, including creditors, vendors, and customers; (b) face a detrimental interruption of their business; and (c) be forced to modify business operations in significant and adverse manners, all of which could detrimentally affect the Debtors' ability to

maximize the value of the estates. In contrast, access to the proposed DIP Facility will send a clear signal to the market that the Debtors' operations are stable and "business as usual" will continue.

85. In short, without immediate access to both the DIP Facility and Cash Collateral, the Debtors' liquidity situation will be bleak. The Debtors would in all likelihood face a liquidity crisis and run out of cash more quickly than the Approved Budget projects and the erosion of confidence concerning the Debtors' ongoing operations would be significant and irreparably harm the Debtors' estates.

      b.    *Debtors' Emergency Motion for Order (I) Authorizing Debtors to Pay (A) Certain Prepetition Employee Obligations and (B) Prepetition Withholding Obligations, (II) Authorizing the Debtors to Maintain Employee Benefit Programs, and (III) Directing Banks to Honor Related Prepetition Transfers* (the "<u>Employee Wages Motion</u>")

86. The Debtors seek the relief requested in the Employee Wages Motion because any delay in paying employee compensation or deductions in honoring employee benefits will destroy the Debtors' relationships with their employees and independent contractors irreparably impair employee morale at the very time when the dedication, confidence, and cooperation of these employees are most critical. As a result of the commencement of these cases, and in the absence of an order of the Court providing otherwise, VPX, as the only Debtor with employees (the "<u>Employer Debtor</u>") will be prohibited from paying or otherwise satisfying its Prepetition Employment Obligations. To maintain employee morale at this critical time for the Employer Debtor, and to minimize the personal hardship the employees would suffer if Prepetition Employment Obligations are not paid when due, the Employer Debtor seeks authority to honor such obligations in the exercise of its business judgment.

87. The Debtors face the imminent risk that their operations may be severely impaired if the Debtors are not immediately granted authority to make the payments and honor the obligations described in the Employee Wages Motion. The support of employees and independent

contractors for the Debtors' reorganization efforts is crucial to the success of those efforts, particularly given the unique knowledge of the employees regarding the Debtors' product lines, customers, and operations.

<blockquote>
c.    *Debtors' Emergency Motion for Entry of Interim and Final Orders (A) Authorizing the Debtors to Continue to (I) Maintain Their Cash Management System, (II) Honor Certain Prepetition Obligations Related Thereto, (III) Use Existing Business Forms, and (IV) Perform Intercompany Transactions, and (B) Granting Related Relief (the "*<u>Cash Management Motion</u>*")*
</blockquote>

88.    By the Cash Management Motion, the Debtors seek entry of interim and final orders: (a) authorizing the Debtors to continue to (i) maintain their cash management system, (ii) honor certain prepetition obligations related thereto, (iii) use existing business forms, and (iv) perform certain intercompany transactions, and (b) granting related relief.

89.    I understand from counsel that the U.S. Trustee has established certain operating guidelines for debtors-in-possession in order to supervise the administration of chapter 11 cases. These guidelines require chapter 11 debtors to, among other things, close all existing bank accounts and open new debtor-in-possession bank accounts, establish one debtor-in-possession bank account for all estate monies required for the payment of taxes (including payroll taxes), maintain a separate debtor-in-possession bank account for cash collateral, and obtain checks for all debtor-in-possession accounts that bear the designation "debtor-in-possession," the bankruptcy case number, and the type of account. These requirements are designed to provide a clear line of demarcation between prepetition and postpetition transactions and operations and to prevent the inadvertent postpetition payment of prepetition claims. In the Cash Management Motion, the Debtors seek a waiver of these requirements so that its operations are not further disrupted by the need to alter the cash management system.

90.    Prior to the Petition Date, in the ordinary course of business, the Debtors maintained an integrated, centralized cash management system (the "Cash Management System").  The Cash Management System is comparable to the centralized cash management systems used by similarly-situated companies to manage the cash of operating units in a cost-effective, efficient manner.  The Debtors use the Cash Management System in the ordinary course of their businesses to collect, transfer, and disburse funds generated from their operations and to facilitate cash monitoring, forecasting, and reporting.  I am aware that the Debtors' treasurer maintains daily oversight over the Cash Management System and utilizes cash management controls for entering, processing, and releasing funds, including in connection with Intercompany Transactions, and the Debtors' accounting department regularly reconciles the Debtors' books and records to ensure that all transfers are accounted for properly.

91.    The Cash Management System is summarized on Exhibit 1 to the proposed interim order for the Cash Management Motion and consists of ten Debtor-owned and controlled bank accounts (each, a "Bank Account" and, collectively, the "Bank Accounts") with the following banking institutions (collectively, the "Cash Management Banks"):

(a)    Two Bank Accounts maintained at Truist Bank;

(b)    One Bank Account maintained at Citizens Bank, N.A.;

(c)    Three Bank Accounts maintained at PNC Bank, N.A.;

(d)    One Bank Account maintained at Bank of America, N.A.;

(e)    One Bank Account maintained at HSBC Bank USA, National Association;

(f)    One Bank Account maintained at PayPal; and

(g)    One Bank Account maintained at The Huntington National Bank.

92.    I understand that four of the seven Cash Management Banks are designated as authorized depositories by the U.S. Trustee, under the U.S. Trustee Guidelines, and that all but one

of the Cash Management Banks are insured by the Federal Deposit Insurance Corporation ("FDIC"). The value of the funds in the Bank Account at PayPal, the Cash Management Bank that is not FDIC-insured, is de minimis.

93.     I believe that requiring the Debtors to adopt a new, segmented cash management system during these Chapter 11 Cases would be expensive, burdensome, and unnecessarily disruptive to the Debtors' operations. The Cash Management System provides the Debtors with the ability to efficiently track and report the location and amount of funds, which, in turn, allows the Debtors to track and control such funds, ensure cash availability, and reduce administrative costs through a method of coordinating the collection and movement of funds. I believe that any disruption of the Cash Management System (or requiring the Debtors to adopt a new, segmented cash management system) will have a negative effect on the Debtors' restructuring efforts and needlessly reduce the value of the Debtors' business enterprise. By contrast, maintaining the current Cash Management System will facilitate the Debtors' transition into chapter 11 by, among other things, minimizing delays in paying postpetition debts and eliminating administrative inefficiencies. I believe maintaining the current Cash Management System will allow the Debtors and their management to focus on their daily responsibilities.

94.     In the ordinary course of their business, the Debtors have historically engaged in routine business relationships with each other and with their non-Debtor affiliates (such ordinary course transactions, the "Intercompany Transaction"), which result in intercompany receivables and payables. As funds are disbursed throughout the Cash Management System and as business is transacted between a Debtor and another Debtor or between a Debtor and its non-Debtor affiliate, there may be intercompany balances owing by a Debtor to another Debtor or non-Debtor affiliate. This flow of funds is carefully tracked and diligently recorded. My understanding is that

the Intercompany Transactions are critical to the Debtors' business, and, among other things, support the operations of the Debtors' core beverage business on a daily basis.

95.     Specifically, the Intercompany Transactions fund the operations of certain foreign non-Debtor affiliates (the "Foreign Non-Debtor Affiliates").  I understand that the Debtors believe that financially supporting the growth and development of the Foreign Non-Debtor Affiliates is critical to the Debtors' strategy to grow sales in important foreign markets that will, in turn, maximize the enterprise value of the Debtors' business as a whole.  I believe that the Intercompany Transactions are an essential component of the Debtors' operations, and that any interruption would severely disrupt their operations and result in harm to the Debtors' estates and their stakeholders.  My understanding is that the Intercompany Transactions are comparable to those of other companies.

96.     The Debtors lease real property, including warehouses, from certain non-Debtor affiliates (the "Non-Debtor Landlords").  The Debtors pay expenses (including tax, upkeep, and maintenance) for which they are obligated under such leases directly to third parties from the PNC Bank Concentration Account and the Truist Concentration Account.  The real property leased from the Landlord Non-Debtor Affiliates is used in the ordinary course of the Debtors' businesses.

97.     Accordingly, the Debtors request that they be authorized to, among other things, continue to maintain their Cash Management System, honor certain prepetition and postpetition obligations related thereto, and perform Intercompany Transactions in the ordinary course of business in accordance with prepetition practices.

      d.     *Debtors' Emergency Motion for Order Authorizing Debtors to Pay Prepetition Sales, Use, Trust Fund, Property, and Other Taxes and Similar Obligations* (the "Tax Motion")

98.     By the Tax Motion, the Debtors seek an order: (i) authorizing, but not directing, the Debtors: (a) to pay, in the Debtors' sole discretion, prepetition sales, use, trust fund, property, and

other taxes and similar obligations, as detailed herein, in the ordinary course of the Debtors'
businesses; and (b) (i) to seek a refund of any taxes that have been already paid by the Debtors that
the Debtors determine, in the exercise of their business judgment, should not have been paid, and
(ii) authorizing the Debtors to set aside, in a segregated account, funds to pay any taxes that have
not yet been paid by the Debtors but which the Debtors dispute, until a final determination is made
as to whether the Debtors are obligated to pay the alleged tax, and (iii) authorizing financial
institutions to receive, process, honor and pay all related checks and electronic payment requests,
solely to the extent the Debtors have sufficient funds standing to their credit with such financial
institutions, and such financial institutions may rely on the representations of the Debtors as to
which checks are issued and authorized or wire transfers are made and authorized to be paid in
accordance with the Tax Motion without any duty of further inquiry and without liability for
following the Debtors' instructions.

99.     I understand that in the ordinary course of operating their businesses, the Debtors
(a) incur certain sales, use, and trust fund property taxes (collectively, the "Taxes"), and (b) are
charged amounts for fees and other similar charges and assessments by various licensing
authorities (collectively, the "Fees").  The Debtors remit the Taxes and Fees to various federal,
state, and local taxing, licensing and other governmental authorities (collectively, the
"Authorities") on a periodic basis (whether monthly, quarterly, or yearly) that are established for
each particular Tax or Fee.

100.     I understand that, as of the Petition Date, the Debtors estimate that they owe the
various Authorities approximately $2,717,000.00 in prepetition Taxes and Fees, as described in
detail on Exhibit A to the Tax Motion.  As of the Petition Date, it is estimated that there are
approximately $850,000.00 of sales and use taxes owed to various taxing authorities.  Exhibit "A"

to the Tax Motion reflects two-line items indicating the taxing authority as "various" because the Debtors operate and sell products throughout the United States and do not know the exact amount of sales and use taxes owed or which authority the taxes are owed to until these taxes are reconciled. In the ordinary course of business, the Debtors reconcile these sales and use taxes owed and pay the various authorities at the end of the following month. Notwithstanding, the Debtors dispute approximately $1.5 million of these Taxes which represent the sales and use tax allegedly owed in several states. The majority of the Debtors' sales are through distributors where a sales tax is not required. There was a discrepancy in the sales and use tax returns that were filed in the respective states that resulted in the assessment of use and sales taxes in several states, which the Debtors believe they would not otherwise owe. The Debtors' global tax manager is working with the various state taxing agencies to file amendments to the sales and use tax returns which should result in the Debtors owing significantly less sales and use taxes. Through the Tax Motion, the Debtors seek only the authorization to pay the Authorities the prepetition amounts described in the Tax Motion in the ordinary course, and only to the extent that the liabilities are assessed against the Debtors on a final basis.

101.     I understand that many of the Taxes and Fees collected prepetition are not property of the Debtors' estates, and therefore, must be remitted to the Authorities and that even if certain prepetition Taxes and Fees are not considered to be the property of the Debtors' estates, they may give rise to priority claims by the Authorities. Moreover, I believe that if the Taxes and Fees are not paid, it is possible that some, if not all, of the Authorities may, pursuant to section 362(b)(9) of the Bankruptcy Code, cause the Debtors to be audited and subjected to various administrative proceedings. Such audits and administrative proceedings and the accompanying disruption in

business activities would materially and adversely affect the Debtors' reorganization efforts and unnecessarily divert the Debtors' attention away from these cases.

102.    Accordingly, the Debtors request that they be authorized, but not directed, to pay the Taxes and Fees to the relevant Authorities in the ordinary course of business.  Nothing in the Tax Motion, however, shall preclude the Debtors from contesting, in their sole discretion, the validity and amount of any Taxes or Fees under bankruptcy or non-bankruptcy law.

      e.    *Debtors' Emergency Motion for Authorization to (I) Continue to Administer Insurance Policies and Related Agreements; and (II) Honor Certain Obligations in Respect Thereof* (the "Insurance Motion")

103.    By the Insurance Motion, the Debtors seek authority, in their reasonable business judgment, to (i) continue to administer the insurance policies described herein (collectively, the "Insurance Policies"); and (ii) continue to pay certain claims, deductibles and/or premiums if and to the extent any may become due and payable according to the terms of the Insurance Policies. The Debtors further request authority to pay certain amounts as they come due under the Insurance Policies in the ordinary course of their businesses, if and to the extent such amounts become due.

104.    I believe that it is essential for the Debtors to maintain the Insurance Policies.  As set forth in the Insurance Motion, such policies provide a comprehensive range of coverage for the Debtors.  If the Insurance Policies are allowed to lapse, the Debtors will be exposed to substantial liability for any damages resulting to persons or property of the Debtors and others, and the Debtors would have to bear the costs and expenses of defense litigation.  Moreover, I understand that maintenance of the Insurance Policies is mandatory under the United States Trustee guidelines and various state and federal laws.

105.    I believe that the Debtors' continued operations and restructuring efforts require that the Insurance Policies be maintained on an ongoing and uninterrupted basis.  In maintaining those obligations, it is crucial that the administrative fees paid to providers and the premiums paid

for the Insurance Policies, to the extent applicable, are continued and maintained by the Debtors. For example, I believe that the risk that eligible claimants will not receive payments with respect to employment-related injuries may have a devastating effect on the financial well-being and morale of the employees, and their willingness to remain in the Debtors' employ. Departures by employees at this critical time may result in a severe disruption of the Debtors' businesses to the detriment of all parties in interest.

106.     To the extent that any of the Insurance Policies may be deemed executory contracts, I understand that the Debtors do not at this time seek authority to assume these contracts. The Debtors request only authorization to continue the programs, pay certain claims in accordance with the programs, and pay such premiums and administrative expenses, if and to the extent such payments are required of the Debtors, as may be necessary to keep the Insurance Policies in force.

f.      *Debtors' Emergency Motion for an Order Authorizing Payment of Prepetition Claims of Critical Vendors* (the "Critical Vendors Motion")

107.     By the Critical Vendors Motion, the Debtors seek authority to pay the prepetition claims of certain vendors that are critical to the Debtors' businesses. I believe that the Critical Vendors are essential to the Debtors' business operations as they provide goods and services to the Debtors that are necessary to the ongoing business operations, as they provide goods and services to the Debtors that are necessary to the ongoing business operations. Certain of the Critical Vendors are vendors that are the sole source provider of products used in the Debtors' business operations. Due to market constraints, relationship issues and other challenges, these Critical Vendors are the Debtors' only supplier options. In addition, certain of the Critical Vendors provide specific ingredients required for the Debtors' products. The Debtors and their research and development team have spent years developing specifications that have been adopted, tested, and perfected over time with these Critical Vendors. Further, the ingredients that these Critical

Vendors supply provide the Debtors with a competitive advantage.  Shifting to other vendors would be very challenging and time consuming as it would require the Debtors' research and development team to start over with new vendors which would take 60 to 90 days and cause significant disruption in production.  Further, certain of the Critical Vendors are utilized by the Debtors for all of their east coast domestic production, as well as all Canadian production.  Due to the production facility in Phoenix being offline as a result of a fire, the Debtors rely upon these Critical Vendors to assist in maintaining competitive pricing and continued production.  Shifting to other vendors could take approximately 60 days causing a disruption in the Debtors' operations while jeopardizing quality of the Debtors' products.

108.    Lastly, certain of the Critical Vendors are vital to the Debtors' promotional, endorsement, advertising, and marketing efforts.  These Critical Vendors provide specialized and unique services for, or on behalf of, the Debtors.  These services include creation and posting of bespoke content on social media platforms, and participation in photoshoots, video-shoots, demos, fitness shows, professional events, industry expos, and trade shows (collectively, "Special Events").  As consideration for such services, these Critical Vendors receive monetary payments depending on the social media platform(s) at issue, number of followers that each such critical vendor possesses, and frequency of that vendor's posting; hourly payments for Special Events; in-kind payments consisting of the Debtors' products; and/or commission payments for sales of the Debtors' products generated online.  These Critical Vendors cannot be readily replaced with a new set of random vendors with separate and distinct individualities, talents, follower communities, and audience demographics.  The Debtors have spent years, significant costs, and significant effort and other internal resources developing its network of these Critical Vendors.  This network of Critical Vendors is industry-leading, and has helped create a brand image for the Debtors that is

known globally. Based on the Debtors' estimate, approximately $350,000 in prepetition claims is owed to these influencers in the aggregate. It is imperative that the Debtors remain current with these vendors because the influencers' large number of social media followers and their vast networks help foster deep connections between consumers and the brand and positively affect sales.

109.    I believe that if payment of the claims of the Critical Vendors, the amounts of which are set forth on Exhibit A to the Critical Vendor Motion (collectively, the "<u>Critical Vendor Claims</u>"), are not paid, the Critical Vendors will terminate the services they provide to the Debtors and operations of the Debtors' business will be jeopardized to the detriment of all creditors. Most if not all of the Debtors' business operations are dependent upon the Critical Vendors. Accordingly, I believe that interrupting the business relationship of the Debtors, on the one hand, and the Critical Vendors, on the other hand, if not fatal to the Debtors' efforts to reorganization, will severely impair that effort to the detriment of the Debtors' estates and the creditors thereof. The Debtors believe that payment of the Critical Vendor Claims is fair and reasonable for the services provided.

       g.    *Debtors' Emergency Motion for Order Authorizing the Payment of Certain Pre-Petition Claims of, and Honoring Certain Contracts With Shippers and Warehousemen* (the "<u>Shippers Motion</u>")

110.    By the Shippers Motion, the Debtors seek entry of an order authorizing, but not directing the Debtors to pay, in their sole discretion and in the ordinary course of business, as and when due, certain pre-petition claims of the Shippers; provided, however, that honoring, performing, or exercising of such rights and obligations shall not give rise to administrative claims solely as a result of the entry of an order providing such authorization and shall not be deemed an assumption of any contract.

111.    I believe that an integral part of the Debtors' operations is the use of domestic shippers, packers and warehousemen (collectively, the "Shippers") to pack, ship and deliver a variety of products through established national distribution networks (payments for which services, including any related taxes, are collectively referred to herein as "Shipping Charges"). A list of the Shippers and the amounts owed each as of the Petition Date is attached as Exhibit A to the Shippers Motion.

112.    The Debtors employ several different Shippers throughout the United States.  As reflected on Exhibit A to the Shippers Motion, as of the Petition Date, the Debtors owe approximately $6 million.

113.    I understand that under applicable state law, the Shippers may have a lien on goods in their possession that secure the charges or expenses incurred in connection with the transportation of such goods.  In addition, I understand that, pursuant to section 363(e) of the Bankruptcy Code, Shippers, as bailees, may be entitled to adequate protection for a valid possessory lien.

114.    In the event that, as of the Petition Date, the Shippers have outstanding invoices for goods transported or stored prior to the Petition Date, I believe that the Shippers will likely argue that they have possessory liens for transportation or storage costs, and may refuse to deliver or release those goods held in their possession until their invoices are paid and their liens are redeemed.  I believe that the Shippers may further be unwilling to release the goods in their possession to which they may be entitled to liens since this may result in their claims against the Debtors becoming unsecured.

115.    Moreover, even absent a perfected lien, I believe that a Shipper's refusal to deliver the Debtors' goods and supplies would severely disrupt the Debtors' operations and cause the

Debtors to lose revenue, future business, and goodwill. Indeed, I believe that the Debtors have established an excellent reputation in the industry for meeting delivery schedules and must maintain this reputation in order to maintain their customer base and strengthen the value of the Debtors' businesses.

      h.     *Debtors' Emergency Motion Pursuant to Sections 105(A), 363, 1107 and 1108 of the Bankruptcy Code for an Order (A) Authorizing, but Not Directing, the Debtors to (I) Maintain and Administer Customer Programs, and (II) to Honor or Pay Certain Prepetition Obligations to Their Customers in the Ordinary Course of Business; and (B) Granting Certain Related Relief* (the "<u>Customer Program Motion</u>")

116.     The success and viability of the Debtors' business is dependent upon the loyalty and confidence of their Customers. The continued support of this constituency is absolutely essential to the survival of the Debtors' business and to maximize the value of their estates. These obligations include those arising in connection certain Trade Promotions, Slotting Allowances, and Other Customer Programs. The Debtors operate in a highly competitive market for energy drinks and dietary supplements, including products purchased for resale, where alternate suppliers of similar products are available to the same demographic that consumes the Debtors' Customer Products. This competition makes retaining the Debtors' relationship with their Customers extremely important. Any delay in honoring or paying various Customer Obligations, as set forth in the Customer Program Motion, will severely and irreparably impair the Debtors' customer relations at a time when the loyalty and support of their customers is extremely critical. By contrast, honoring these prepetition obligations will require limited expenditure of estate funds and will assist the Debtors in preserving their key customer (retail) relationships to the benefit of all stakeholders.

117.     The Debtors' Customer Programs include the following:

a. **Trade Promotions:** The Debtors provide programs where Customers are offered incentives to increase purchase volumes and for specific in-store execution (collectively, the "Trade Promotions"). Customers participating in these Trade Promotions offer Consumers reduced prices, specifically advertise the Debtors' Customer Products in marketing campaigns, erect specific displays, or otherwise feature the Debtors' products to Consumers. In return, the Debtors provide the Customers with price reductions or cash rebates for the Customer Products sold.

b. **Slotting Allowances:** Where permitted, the Debtors incur costs associated with purchasing shelf space in retail locations ("Slotting Allowances"). In many instances, due to the competition in the energy drink and dietary supplement industry, payment of the Slotting Allowance is required in order to have an established presence in the Customers' retail establishments.

c. **Other Customer Programs:** In addition to the foregoing, from time to time, the Debtors may participate in various marketing or other Customer Programs, which can include weekly ad circulars, product samples, cooler placements, free-fills or event sponsorship (either promotional or charitable) for Consumers or Customers.

118. Accordingly, to preserve the value of their estates and customer satisfaction, I believe that the Debtors must be permitted, in the Debtors' sole discretion, to continue honoring and/or paying all Customer Obligations without interruption or modification. In addition, to provide necessary assurances to the Debtors' customers on a going forward basis, the Debtors request authority, in their sole discretion, to continue honoring or paying all obligations to customers that arise from and after the Petition Date in the ordinary course of the Debtors' business. In light of the foregoing, I believe that the honoring and the payment of all Customer

Obligations as requested by the Debtors is essential to the preservation of value, represents a sound exercise of the Debtors' business judgment, and is in the best interests of the Debtors' estates and their creditors.

      i.     *Debtors' Emergency Motion For (A) The Authority To Pay Prepetition Obligations Owing To Foreign Vendors, Service Providers And Governments And (B) To Honor And Continue paying Foreign Vendors In The Ordinary Course Of Business (the "<u>Foreign Vendor Motion</u>")*

119.    By the Foreign Vendor Motion, the Debtors seek entry of an order (a) authorizing the Debtors to pay the prepetition claims of certain foreign vendors and service providers that are critical to the operation of the Debtors' businesses (the "<u>Foreign Vendors</u>"); (b) to honor and continue paying foreign vendors, service providers and governments in the ordinary course of business, and (c) granting certain related relief. The Debtors are in the process of expanding their market territory in certain international markets. To support this endeavor, the Debtors created four (4) foreign entities: i) Bang Energy B.V.; ii) Bang Energy Canada, ULC; iii) Bang Energy Chile SPA; and iv) Bang Energy Pty LTD (Australia) (each a "<u>Foreign Entity</u>," and collectively, the "<u>Foreign Entities</u>") to serve as an extension of the Debtors in their specific foreign markets. Each Foreign Entity is owned 100% by Vital Pharmaceuticals, Inc.

120.    These Foreign Entities and their Foreign Vendors are necessary to preserve the Debtors' critical relationships in these new foreign markets and to expand the Debtors' market share. Without expanding their market and reaching additional international consumers, the profitability of the Debtors' products and its entire enterprise would be reduced. It is essential, therefore, that the Debtors maintain the Foreign Entities' operations throughout the Debtors' reorganization.

121.    The Debtors rely on these Foreign Vendors to supply various goods and services and deliver their products to foreign retailers for sale to consumers. Many of the Foreign Vendors

who supply and deliver these essential goods and products may argue that they are not subject to the jurisdiction of this Court or the provisions of the Bankruptcy Code that would otherwise protect the Debtors' assets and business operations from the disruption that would be caused by vendors undertaking collection efforts against the Debtors or their assets.

122.    There is a risk that Foreign Vendors could sue the Debtors in foreign courts and attempt to recover prepetition amounts owed to them if these claims remain unpaid.  The Debtors would have no practical ability to remedy this situation (absent payment of amounts sought) and their business operations would be irreparably harmed to the detriment of their estate and their creditors.

123.    The Debtors are making every effort to avoid interruptions in their supply chain and the adverse effects that even a temporary disruption in the supply chain could have on their business in order to maximize the value of their assets.  In connection therewith, the Debtors must have the ability to continue to fund the Foreign Vendors on an uninterrupted basis.

124.    The Debtors have reviewed the actual obligations incurred year to date for or related to Foreign Claims and estimate that the amount owed to Foreign Vendors on the Petition Date does not exceed $3 million for the Debtors.  Beyond identifying the Foreign Vendors and  amounts due each Foreign Vendor, Exhibit A (the "Foreign Vendor Claims") to the Foreign Vendor Motion also includes a description of the goods or services provided to the Debtors and Foreign Entities by each of the Foreign Vendors.

125.    I believe that if payment of the Foreign Vendor Claims is not made, the Foreign Vendors will terminate the services they provide to the Foreign Entities and the Debtors and operations of the Debtors' business will be jeopardized to the detriment of their estates and their

creditors. Most if not all of the Debtors' foreign business operations are dependent upon the Foreign Vendors.

## VI.   CONCLUSION

126.    I have reviewed each of the First Day Pleadings, Proposed Orders, and exhibits thereto (or have otherwise had their contents explained to me), and the facts set forth therein are true and correct to the best of my knowledge, information, and belief.  Moreover, I believe that the relief sought in each of the First Day Pleadings (a) is vital to enabling the Debtors to make the transition to, and operate in, Chapter 11 with minimal interruptions and disruptions to the Debtors' businesses or loss of productivity or value; (b) is necessary preserve valuable relationships with customers, trade vendors and other creditors; and (c) constitutes a critical element in the Debtors' ability to successfully maximize value for the benefit of their estates.

I declare under penalty of perjury that the foregoing is true and correct to the best of my information, knowledge, and belief.

Dated: October 10, 2022
       Miami, Florida

John C. DiDonato
Chief Transformation Officer

# **Exhibit A**

## **Organizational Structure**

**Key**

- Debtor Entity
- Non-Debtor entity that is party to the Prepetition Credit Agreement
- Non-Debtor entity whose equity is pledged for the Prepetition Loans. (Such entities are not obligors under the Prepetition Credit Agreement and their assets have not been pledged thereunder).

John H. Owoc
100% Owner

Vital Pharmaceuticals International Sales, Inc (Delaware)

Vital Pharmaceuticals, Inc. (Florida)

Bang Energy Canada, Inc. (Florida)

Bang Energy Canada, ULC (Canada)

Bang Jets, LLC (Florida)

Bang Energy Mexico S. DE R.L. de C.V. (Mexico)

Bang Energy B.V. (Netherlands)

Bang Energy (Australia) Pty Ltd. (Australia)

Bang Energy VPX Sports Ecuador S.A.S. (Ecuador)

Energy Peru, LLC (Florida)

1%    99%

Bang Energy Peru S.A.C. (Peru)

Bang Energy Costa Rica LTDA (Costa Rica)

Bang Energy Brazil LTDA (Brazil)

Bang Energy Chile SPA (Chile)

Bang Energy Colombia SAS (Colombia)

JHO Intellectual Property Holdings, LLC (Florida)

Entourage IP Holdings, LLC (Florida)

Cognitive IP Holdings, LLC (Florida)

JHO GA-1 Investment, LLC (Florida)

JHO NV-1 Investment, LLC (Florida)

JHO Real Estate Investment, LLC (Florida)

Sheridan Real Estate Investment A, LLC (Florida)

Sheridan Real Estate Investment B, LLC (Florida)

Sheridan Real Estate Investment C, LLC (Florida)

Quash Seltzer, LLC (Florida)

Bang Foods, LLC (Florida)

Energy Train, LLC (Florida)

VPX Swim and Sports Gear, LLC (Florida)

Candemonium, LLC (Florida)

Stoked Seltzer, LLC (Florida)

Bang Energy Family, LLC (Florida)

Bang Gyms, LLC (Florida)

Bang Vapes, LLC (Florida)

Bang Energy International, LLC (Florida)

The Fixx, LLC (Florida)

Stoked Brands, LLC (Florida)

Ultra Experiences, LLC (Florida)

Rainbow Unicorn Bev, LLC (Florida)

Birth Right, LLC (Florida)

Captain Crunch Fishing, LLC (Florida)

Fun Energy, LLC (Florida)

Stoked LLC, LLC (Delaware)

Stoked of Delaware, LLC (Arizona)

Stoked of Delaware, LLC (Florida)

# EXHIBIT B

**From:** Wilkes, Steven (USTP) <Steven.Wilkes@usdoj.gov>
**Sent:** Friday, November 4, 2022 9:32 AM
**To:** Robert Furr <rfurr@furrcohen.com>
**Cc:** Goldberg, Michael (Ptnr-Ftl) <michael.goldberg@akerman.com>
**Subject:** In re Vital Pharmaceuticals, Inc., 0:22-bk-17842-PDR, et al

**[External to Akerman]**

Dear Messrs. Goldberg and Furr,

Thank you for your submitting your clients' inquiry and request for a second official committee. We understand that the inquiry and request is on the behest of your clients, American Bottling and Monster, and not all Litigation Creditors. Before we can submit your clients' request to and discuss it with the United States Trustee for Region 21, we would ask that you provide additional information.

We would like to know what Monster and American Bottling believe a second official committee would bring to these jointly administered cases that the first official committee is unable to provide. Likewise, please elaborate as to how having both American Bottling and Monster appointed to a second official committee would enhance their involvement in these jointly administered cases that could not otherwise be achieved with their current legal representation. Further, given the fact that American Bottling and Monster are ably represented as creditors and litigants, please explain why the cases are impaired by not having a second official committee. Also, please explain how having a second official committee would ensure the just, speedy, and inexpensive determination in these jointly administered cases as required under F.R.B.P. 1001. Finally, please provide anything else Monster and American Bottling believe the United States trustee should take into account in weighing and deliberating upon their request for a second official committee.

Look forward to hearing from you on this. I remain,



**J. Steven Wilkes**
**Trial Attorney**

U.S. Department of Justice
Office of the U.S. Trustee for Region 21
501 East Polk Street, Suite 1200

Tel:  813-228-2173
Fax: 813-228-2303
Cell: 202-360-7726
Steven.Wilkes@usdoj.gov

Tampa, FL 33602

**From:** Robert Furr <rfurr@furrcohen.com>
**Sent:** Thursday, November 3, 2022 1:39 PM
**To:** Wilkes, Steven (USTP) <Steven.Wilkes@usdoj.gov>
**Cc:** michael.goldberg@akerman.com
**Subject:** [EXTERNAL] Vital

Steven,

Michael Goldberg, counsel to Monster, and I, counsel to American Bottling, called you yesterday to discuss the committee just formed and to request that the UST form a second committee of Litigation Creditors.  The total debt represented by the new UCC is about $80m;   the litigation creditors control almost $1billion in claims.   A plan  cannot be confirmed in the case without our agreement, and we think a second committee would be very useful to give a voice to our positions and concerns so that the case can move forward smoothly.

Please call  Michael and I to Discuss.

Michael's cell is 954-770-8800 and my numbers are below.

**Robert C. Furr**
**FurrCohen**
**2255 Glades Rd. Suite 419A**
**Boca Raton, Fla. 33431**
**Main   561-395-0500**
**Direct 561-417-1563**
**Cell     561-866-6976**

# EXHIBIT C



PACHULSKI
STANG
ZIEHL
JONES

LAW OFFICES
LIMITED LIABILITY PARTNERSHIP

LOS ANGELES, CA
SAN FRANCISCO, CA
WILMINGTON, DE
NEW YORK, NY
HOUSTON, TX

10100 SANTA MONICA BLVD.
13th FLOOR
LOS ANGELES
CALIFORNIA 90067-4003

**TELEPHONE: 310.277.6910**
FACSIMILE: 310.201.0760

**SAN FRANCISCO**
ONE SANSOME STREET
34th FLOOR, SUITE 3430
SAN FRANCISCO
CALIFORNIA  94104

**TELEPHONE: 415.263.7000**
FACSIMILE: 415.263.7010

**DELAWARE**
919 NORTH MARKET STREET
17th FLOOR
P.O. BOX 8705
WILMINGTON
DELAWARE 19899-8705

**TELEPHONE: 302.652.4100**
FACSIMILE: 302.652.4400

**NEW YORK**
780 THIRD AVENUE
34th FLOOR
NEW YORK
NEW YORK 10017-2024

**TELEPHONE: 212.561.7700**
FACSIMILE: 212.561.7777

**TEXAS**
440 LOUISIANA STREET
SUITE 900
HOUSTON
TEXAS 77002-1062

**TELEPHONE: 713.691.9385**
FACSIMILE: 713.691.9407

WEB: www.pszjlaw.com

Richard M. Pachulski

November 8, 2022

310/772-2342
rpachulski@pszjlaw.com

VIA ELECTRONIC MAIL AND U.S. MAIL

Mary Ida Townson, Esq.
U.S. Department of Justice
Office of the U.S. Trustee, Region 21
501 East Polk Street, Suite 1200
Tampa, FL 33602
MaryIda.Townson@usdoj.gov

Guy A. Van Baalen, Esq.
U.S. Department of Justice
Office of the U.S. Trustee
Middle and Southern Districts of Florida
501 E. Polk Street, Suite 1200
Tampa, FL 33602
Guy.A.VanBaalen@usdoj.gov

Heidi A. Feinman, Esq.
U.S. Department of Justice
Office of the U.S. Trustee
51 SW First Avenue, #1204
Miami, FL  33130
Heidi.A.Feinman@usdoj.gov

J. Steven Wilkes, Esq.
U.S. Department of Justice
Office of the U.S. Trustee, Region 21
501 East Polk Street, Suite 1200
Tampa, FL 33602
Steven.Wilkes@usdoj.gov

     **Re:**    **In re Vital Pharmaceuticals, Inc.**
            **No. 22-bk-17842-PDR (and jointly administered cases)**

Gentlepersons:

      This office represents Monster Energy Company ("*Monster*") in these jointly-administered chapter 11 cases (the "*Bankruptcy Cases*")

DOCS_LA:346002.9 57536/00001



for Vital Pharmaceuticals, Inc. and its debtor affiliates (collectively, the "*Debtors*"). This office represents only Monster and has no intent or interest in representing a committee in these Bankruptcy Cases.

While this office represents Monster, we also write at the request of Orange Bang, Inc. ("*Orange Bang*"), the American Bottling Company ("*ABC*"), UMG Recordings, Inc. ("*UMG*"), and Sony Music Entertainment ("*Sony*"), all of which either have pending litigation claims (ABC, UMG and Sony), judgments and/or jury verdicts (Monster and Orange Bang). These include some of the largest claims in these Bankruptcy Cases,[1] dwarfing the $44 million in aggregate claims held by the seven trade creditors appointed pursuant to your *Notice of Appointment of Official Unsecured Creditors Committee In and Over the Jointly Administered Chapter 11 Cases* (D.N. 245) (the "*Committee*").[2]

Monster is by far the largest creditor of the Debtors, holding an unsecured claim in the filed amount of not less than $389,739,257 (the "*Monster Claim*"). As set forth in the Monster Claim, the components are: (1) a judgment in the aggregate amount of approximately $97 million on contract, trademark infringement and related claims, entered by the U.S. District Court for the Central District of California (the "*Judgment*"), and (2) false advertising, contract infringement, trade secret violations and related claims in a separate action, also in the Central District of California, on which a jury verdict has been issued that would result in a judgment of approximately $293 million (the "*Jury Verdict*"). The Judgment is on appeal, and the Bankruptcy Cases were filed before judgment was entered on the Jury Verdict.

Other non-trade claims include: (1) Orange Bang, in the amount of not less than $87.5 million represented in the Judgment referred to above[3]; (2) PepsiCo, scheduled in the amount of $115 million based upon a settlement agreement with the Debtors; (3) Doehler USA, Inc. ("*Doehler*"), scheduled in the amount of $22 million based upon a

---

[1] In addition to each of the claimants represented in this letter, five of the six largest creditors in these Bankruptcy Cases applied to serve on the Unsecured Creditor Committee. None were selected.

[2] One of the appointed trade creditors, Archer Daniels Midland Co., has no scheduled or filed claim at all.

[3] Orange Bang is scheduled in the Debtors' Top 30 Creditor List as having a claim of $214,757,614.74, but Orange Bang filed a proof of claim reflecting a claim of not less than $87.5 million.



PACHULSKI
STANG
ZIEHL
JONES

LAW OFFICES

November 8, 2022
Page 3

settlement agreement with the Debtors; (4) Dairy Farmers, in a scheduled amount of $14 million; and (5) ABC, scheduled in the amount of approximately $17.68 million, but which filed a proof of claim for not less than $225.1 million. (Hereinafter, with the Monster Claim, the "*Non-Trade Claims*"). Such Non-Trade Claims[4] assert claims of at least $853 million, an amount about twelve (12) times the amount of the trade creditors in this case. We further understand that there are other non-trade claims, including upwards of sixty (60) additional litigation claims.

We would appreciate an opportunity to discuss with you *(1)* the rationale for appointing only trade creditors to the Committee, effectively disenfranchising the group of creditors with the dominant claims, and *(2)* the formation of a separate committee for non-trade claimants in order to ensure that these unsecured creditors also have an official voice in these proceedings.

To anticipate and hopefully facilitate points of discussion, we offer the following distillation of our position:

*First*, the Committee as presently constituted does not satisfy section 1102 of the Bankruptcy Code. Under section 1102, the Committee must be representative of the interests of all unsecured creditors, and section 1102 specifically provides that additional committees can be appointed or membership of a committee may be changed if "change is necessary to ensure adequate representation of creditors". Section 1102(a)(2) and (4). The law is clear on this. "What the Bankruptcy Code requires is that conflicting groups of creditors have a voice through adequate representation on a Committee." *In re Hills Stores Co*., 137 B.R. 4, 7 (Bankr. S.D.N.Y. 1992) (citing *In re McLean Indus., Inc*., 70 B.R. 852, 860 (Bankr. S.D.N.Y. 1987)). There is no exclusion for litigation claims, tort claims, very large claims, contingent claims (and the Non-Trade Claims are hardly speculative in any event), or claims of competitors. *See* 7 *Collier on Bankruptcy* P. 1102.02[2][a][ii] (notes omitted) (discussing the requirement that litigation claims receive committee representation). As *Collier* further provides, "a committee should reflect membership from different categories in order to be representative of the interests of creditors." *Id.*

---

[4] Certain creditors such as Doehler may have hybrid claims that include settlement-related claims and claims based on trade relations with the Debtors.



PACHULSKI
STANG
ZIEHL
JONES

LAW OFFICES

November 8, 2022
Page 4


        Section 1102(b)(1) emphasizes the paramount importance of
the size of a claim in achieving adequate representation of creditors by
expressly providing that a committee "**shall** ordinarily consist of the
persons, willing to serve, that hold the seven largest claims…." Section
1102(b)(1) (emphasis added). The current constitution of the
Committee—which includes only one of the seven largest unsecured
creditors listed on Form 204 (*see* ECF 2)—turns section 1102(b)(1) on
its head. Not only do the Non-Trade Claims set forth above constitute 6
out of the 7 largest creditors in the Debtors' List of the 30 Largest
Unsecured Creditors, but they aggregate well over twelve (12) times
the total claims of the other creditors in the Debtors' List of 30 Largest
Unsecured Creditors, which list includes the creditors on the
Committee.

        Mr. Wilkes, in his email of November 4, essentially creates a
new factor for determining whether a creditor should be on a
committee, which is whether that creditor can afford to retain its own
counsel to represent its interests. However, such a factor is completely
inconsistent with the express provisions of section 1102 of the
Bankruptcy Code, the commentary and case law interpreting section
1102, as well as how other U.S. Trustee offices implement section
1102. Moreover, it is clear that Mr. Wilkes did not apply such a test to
the creditors that were appointed to the Committee here given that five
of its seven members have retained their own counsel to represent their
interests and one of the other two members has a market capitalization
of about **$53 billion**, which easily allows it to afford its own counsel.
And it is common for many creditors to retain counsel not only before
a committee is formed, but to allow such counsel to represent them on
the committee.

        Committees also retain financial advisors and investment
bankers which are critical in significant cases to assess the options for
how the case can ultimately be resolved, including whether a sale or
reorganization is appropriate, whether a sale is being properly
conducted, the valuation of the debtors' business if an internal
reorganization is pursued, and whether fraudulent conveyances have
been made by the debtors. By being excluded from a committee
because a creditor is represented by bankruptcy counsel, that creditor is
excluded from the participation with a critical statutory committee that
not only has the significant advantage of having access to other
professionals that are conducting such critical analyses, but speaks with
a powerful voice before the Court, and which committee is being



November 8, 2022
Page 5

provided with critical information by the debtors. Without having such necessary information and professional services of a financial advisor and investment banker that will be provided to a committee, the non-trade creditors will be forced to commence separate discovery to obtain this information, resulting in substantial costs to the estate and non-trade creditors, and will also cause the non-trade creditors to incur the costs of retaining other such professionals.

*Second*, in a case such as this, where the non-trade claims overwhelm the trade claims, separate committees are necessary to achieve the goal of adequate representation of the interests of all creditors. Trade creditors in a case like this are oftentimes not motivated at all by what recovery they are going to get out of the estate as they know their claims are swamped by the non-trade claims and at best they will only get pennies on the dollar. Rather, such trade creditors are motivated by simply keeping the debtor alive so that they have a customer when the debtor exits chapter 11, and to keep the debtors' management happy so that the debtor does not replace that trade creditor with another vendor. Debtors are very aware of the leverage they hold over such trade creditors, and it is not uncommon for a debtor to threaten a trade creditor with replacing it with another vendor if the trade creditor "rocks the boat" by opposing a particular plan of reorganization, or by directing committee professionals to investigate insiders for fraudulent conveyances. Thus, a committee comprised entirely of trade creditors like the one in this case defeats the fundamental purpose of a committee, which is to adequately represent the interests of all creditors. On the other hand, large non-trade creditors in a case like this are solely motivated by maximizing a recovery on their claims, which is in fact one of the primary policy goals of chapter 11; they are not susceptible to threats of a debtor to terminate them from doing business together.

We believe that in these circumstances, given that non-trade claimants are entitled to representation, and the vast discrepancy between the amounts of trade claims and other claims, the most appropriate means of ensuring the meaningful representation of all creditors is the appointment of a separate committee of non-trade claimants. The stark reality is that in this case it is the interests and sizeable claims of the non-trade creditors in comparison to the trade creditors that will impact the outcome of these cases, including the ability to impact the outcome of the voting requirements for confirmation of a plan, and it is the interests of the non-trade creditors



November 8, 2022
Page 6

that will be most impacted by the distributions that will ultimately be paid to creditors. As noted above, not only does the existing Committee of trade creditors fail to have any representation of the non-trade creditors, such Committee is made up of creditors who have very divergent interests in the outcome of these cases. A separate committee will ensure that the non-trade creditors have an equal seat at the table among both the constituents and the Court, and will thus increase the chances that these cases come to a faster and more efficient conclusion. Also, providing the non-trade creditors with a separate committee dramatically increases the likelihood that a consensus will be struck among the creditors who clearly hold well over two-thirds of the claims, rather than cause the non-trade creditors separately seeking information to determine what actions are in the best interests of the creditor body, delaying the confirmation of any plan. All of these considerations point in the same direction: under the particular circumstances of this case, appointment of a separate committee will help ensure the just, speedy, and inexpensive determination of these jointly administered cases. *See* Fed. R. Bankr. P. 1001.

Please note that we have conferred with counsel for Doehler. Doehler supports the request herein for a separate committee but declined to join this letter directly given issues unique to Doehler and its claims.

The legal foundation for the appointment of an additional committee was discussed thoroughly by the bankruptcy court in the recent case of *In re Roman Catholic Church of the Archdiocese of New Orleans*, No.: 20-10846, 2021 Bankr. LEXIS 302 *; 2021 WL 454220 (Bankr. E.D. La. Feb. 8, 2021). Finding that a committee of abuse claimants did not adequately represent the interests of commercial creditors, the court exercised its discretion under section 1102(a)(2) of the Bankruptcy Code to appoint an additional committee of commercial creditors, since it was not convinced that the appointment of additional members to the existing committee would have provided commercial creditors with a meaningful voice.

The U.S. Trustee has the authority to form multiple committees to ensure adequate representation, and the bankruptcy courts have authority under sections 1102(a)(2) and (a)(4) to order either the appointment of additional committees or changes to the membership of a committee if it determines such action is necessary to ensure "adequate representation" of creditors or equity security holders. *Id.* at



PACHULSKI
STANG
ZIEHL
JONES

LAW OFFICES

November 8, 2022
Page 7

*30-31. The 1978 Bankruptcy Reform Act envisioned the possibility of the constitution of more than one committee in a chapter 11 reorganization case and proposed committees to serve as "negotiating bodies for the classes of creditors that they represent." H.R. REP. 95-595, at 104 (1977), reprinted in 1978 U.S.C.C.A.N. 5963, 6065. "As such, it is important that they be representative of their respective classes." *Id*. *In re Roman Catholic Church*, 2021 Bankr. LEXIS 302 at *27-28.

"[F]or a creditor group to be adequately represented by a committee, the interests of that group must 'have a meaningful voice on the committee in relation to their posture in the case.'" *In re Roman Catholic Church*, 2021 Bankr. LEXIS 302 at *32-33 (*citing In re Dow Corning Corp*., 194 B.R. 121, 141 (Bankr. E.D. Mich. 1996), *rev'd on other grounds*, 212 B.R. 258 (E.D. Mich. 1997)). So, for example, the Roman Catholic Church court found that the interests of commercial creditors and abuse claimants were sufficiently in conflict to warrant separate committees in order to ensure adequate representation of each:

Congress intended unsecured commercial creditors to be represented in the reorganization process through the unsecured creditors' committee. Although the Abuse Claimants in this case, at times, may share interests with commercial creditors, their interests often differ from the issues facing other creditors. . . .

Given the nature of this particular case, the Court is not convinced that the appointment of additional members to the existing Committee would provide commercial creditors with a meaningful voice. Moreover, separate committees are commonly appointed to represent important constituencies and to provide dynamic tension in negotiations with the debtor and other parties in interest in the reorganization process.

*Id*. at *47-48.

Accordingly, we submit that the U.S. Trustee should appoint a committee of non-trade claimants to ensure meaningful representation of the interests of both trade creditors and non-trade claimants (which otherwise would have to be appointed to a reconstituted committee).



PACHULSKI

STANG

ZIEHL

JONES

LAW OFFICES

November 8, 2022
Page 8


        As we anticipate that without the formation of a non-trade
committee this matter will be determined by the Court, we further
request the opportunity to review any correspondence or documents
provided to the U.S. Trustee's Office by the Debtors and their
representatives with respect to the makeup of a committee, in order to
be able to respond to any allegations that may have been made by the
Debtors, and the forms and any correspondence from each creditor who
sought appointment as a committee member. Please advise if you will
provide access to this information, and if so, when.

        Again, we would very much appreciate an opportunity to
discuss these issues at your earliest opportunity.

                        Very truly yours,

                        PACHULSKI STANG ZIEHL &
                        JONES LLP

                        Richard M. Pachulski


cc:

Michael Goldberg, Esq., Counsel for Monster Energy Company
Robert Furr, Esq. and Matthew G. Bouslog, Esq., Counsel for the
        American Bottling Company
Tom Patterson, Esq., Counsel for Orange Bang, Inc.
Seth H. Lieberman, Esq., Counsel for UMG Recordings, Inc. and Sony
        Music Entertainment

**EXHIBIT D**

**From:** Richard Pachulski
**Sent:** Monday, November 14, 2022 12:33 PM
**To:** 'Wilkes, Steven (USTP)' <Steven.Wilkes@usdoj.gov>
**Cc:** Michael Goldberg <michael.goldberg@akerman.com>; Robert Furr <rfurr@furrcohen.com>; 'Bouslog, Matthew G.' <MBouslog@gibsondunn.com>; Thomas Patterson <tpatterson@ktbslaw.com>; Seth H. Lieberman <slieberman@pryorcashman.com>; Teddy M. Kapur <tkapur@pszjlaw.com>; Ira Kharasch <ikharasch@pszjlaw.com>; Robert Feinstein <rfeinstein@pszjlaw.com>; Feinman, Heidi (USTP) <Heidi.A.Feinman@usdoj.gov>; Van Baalen, Guy A (USTP) <Guy.A.VanBaalen@usdoj.gov>
**Subject:** FW: PSZJ Nov 8 Lettr to UST re VPX UCC.pdf

Dear Mr. Wilkes:

Because of Veterans Day and the weekend I decided to wait to respond to your November 9 e-mail since I was well aware that your office was closed during the 3 days. I do want to respond to some of what you say below before I provide Monster's bottom line:

1.  As you will note from my e-mail, I did not ask for a call on Veterans Day, but rather said waiting 10 days was unfair. I do want to note my appreciation for your service in the military, and those who came before and after you, since I am a first generation product of 2 Holocaust survivors who, without the engagement of the American military in World War II, would likely not have survived and been welcomed in this Country after the war. As a result, my parents, and my brother and I, along with others, experienced the American dream;

2.  While I understand the weather concerns and issues in Florida, and other people's commitments, knowing the concerns that many of the non-trade creditors have in this case, I would have hoped that accommodations could have been made for a ZOOM or a regular call well before this coming Thursday; and

3.  You note that the DIP Hearing and objection deadline have been moved and Monster has already filed an opposition to that Motion, and that others have not yet objected or joined. First, Monster is likely to enhance its objection since, as you are well aware, Monster and

other creditors had about 24 hours to file an objection to the interim DIP. Second, we have been in contact with some of the non-trade creditors, who I anticipate will be filing their own objections or joining in Monster's objection. Of course a lot of time and money would be saved by non-trade creditors if a second committee were formed for those creditors who are likely owed at least $1 billion, but right now that does not exist, to the disappointment of many of the non-trade creditors who have to now separately expend large sums to oppose the DIP Motion after incurring large claims that the Debtors will likely not satisfy anywhere near in full.

The above said, Monster proposes the following:

1.   I actually have a long-standing commitment that I cannot change on Thursday from 3:00 pm – 5:30pm Eastern. While I have other commitments on Thursday and Friday, I will make arrangements to change any of them to be on this ZOOM call. Please provide some available times on Thursday and Friday so I can coordinate with others who would need to participate;

2.   For informational purposes, and to provide a minimum of 14 days notice before the December 6 hearing, if a second committee is not formed before November 22, Monster and likely others will be filing a motion for the Court to order the formation of a second committee. We had hoped to have an earlier call for 2 particular purposes:

   A.   So that we could possibly save the cost of preparing the second committee formation motion, but now that we cannot have the call before this coming Thursday or Friday, that savings is not an option, even if the UST agrees to the formation of a second committee sometime after our call. Monster and the others who would like to join such a motion need sufficient time to prepare a comprehensive motion; and

   B.   Monster would have preferred having the Motion heard prior to the December 6 hearing so even if the UST did not form a second committee, the Judge might very well have done so at an earlier hearing, resulting in several large creditors not having to individually and, unfairly, having to spend their separate funds to attack a DIP that has various provisions that are not in non-trade creditors' interests. Unfortunately to accommodate the UST the non-trade creditors will have to have the hearing on December 6 along with an evidentiary DIP hearing.

3.   The UST did not include the creditors when the UST likely spoke to the Debtors' representatives before forming a Committee without including any of the 6 largest creditors. Monster will not participate if the UST intends to include the Debtors' representatives on the call. Monster would consider having an additional call, including with the Debtors' representatives, if the UST thinks that is appropriate after our initial call. We are still very surprised you copied them on our e-mail chain without my consent as the originator of the initial e-mail. I also again request that the Debtors not receive the November 8 Letter from the UST without our consent; and

4.   I would also appreciate an answer whether the UST will provide the documents we

requested in the November 8 Letter, so we can advise the Court, if necessary, of our efforts to be fully prepared for any motion to appoint a second committee.

Looking forward to your response.

Regards,

Richard M. Pachulski

# EXHIBIT E

# GIBSON DUNN

Gibson, Dunn & Crutcher LLP

2001 Ross Avenue
Dallas, TX  75201
Tel 214.698.3100
www.gibsondunn.com

Russell H. Falconer
Direct: +1 214.698.3170
Fax: +1 214.571.2958
RFalconer@gibsondunn.com

November 21, 2022

*Via e-mail*

Guy A. Van Baalen, Esq.
U.S. Department of Justice Office of the U.S. Trustee
Middle and Southern Districts of Florida 501 E. Polk Street, Suite 1200
Tampa, FL 33602
Guy.A.VanBaalen@usdoj.gov

Heidi A. Feinman, Esq.
U.S. Department of Justice Office of the U.S. Trustee 51
SW First Avenue, #1204
Miami, FL  33130
Heidi.A.Feinman@usdoj.gov

J. Steven Wilkes, Esq.
U.S. Department of Justice
Office of the U.S. Trustee, Region 21 501 East Polk Street, Suite 1200
Tampa, FL 33602
Steven.Wilkes@usdoj.gov

**Re: *In re Vital Pharmaceuticals, Inc. et al.*, Case No. 22-bk-17842-PDR**

Dear Mr. Van Baalen, Ms. Feinman, and Mr. Wilkes:

Thank you for taking the time to speak with us on Friday about the possibility of appointing an official committee of non-trade creditors in the above-captioned chapter 11 cases.  I am submitting this letter on behalf of my client, the American Bottling Company, which has asserted a large, non-trade claim against Vital Pharmaceuticals, Inc. and its affiliated debtors (collectively, the "Debtors").  I also write at the request of the following parties that participated in our call Friday and hold non-trade claims against some or all of the Debtors: Doehler USA, Inc.; Monster Energy Company; Orange Bang, Inc.; PepsiCo, Inc.; Sony Music Entertainment; and UMG Recordings, Inc.  We believe that the seven parties who have joined in sending this letter would work well together as the members of an official committee of non-trade creditors.

As we explained during our call on Friday, we believe that appointing an official committee of non-trade creditors would serve the interest of steering these cases to a speedy, efficient, and cost-effective resolution—an interest shared by the Court, the Debtors, your office, and the signatories to this letter.[1]  Given the size of the claims held by the largest non-trade

---

[1] As we also discussed on Friday, the non-trade creditors are also concerned that the official committee of unsecured creditors as presently constituted is not representative of the larger

Beijing · Brussels · Century City · Dallas · Denver · Dubai · Frankfurt · Hong Kong · Houston · London · Los Angeles · Munich
New York · Orange County · Palo Alto · Paris · San Francisco · São Paulo · Singapore · Washington, D.C.

DOCS_NY:46764.2 57536/00001

**GIBSON DUNN**

J. Steven Wilkes
U.S. Department of Justice
November 21, 2022
Page 2

creditors, there can be no consensual resolution in these chapter 11 cases without the support of the non-trade creditors. And appointing an official committee would help drive these cases toward a consensual resolution in a variety of ways. It would give the Debtors a single point of contact for plan negotiations and other outreach. It would avoid a flurry of non-trade-creditor filings on certain contested issues on which each creditor would feel compelled to be heard to protect their rights. And perhaps most importantly, it would give the non-trade creditors both the opportunity and the incentive to arrive at consensus and speak with a unified voice. In light of these benefits, it should come as no surprise that we are aware of at least 15 cases in which the Office of the United States Trustee appointed two official committees cases where the facts warranted it.[2]

Our reason for submitting this letter is to address the concern we heard the U.S. Trustee express during our call on Friday regarding the manner in which a non-trade creditors' committee would handle confidential business information of the Debtors given that one or more potential members of that committee could be considered competitors of the Debtors.

This situation—where a member of an official creditors' committee is a competitor of the debtor—is not uncommon in large bankruptcy cases. As a result, there are established procedures, often embodied in a committee's bylaws or a formal confidentiality agreement, to preclude a debtor's confidential business information from being disclosed to a competitor who sits on the committee. Those procedures are known to be effective, and we have every confidence they would be effective here.

Below is an illustrative list of some of the tools and procedures that could potentially be employed to address concerns around disclosure of the Debtors' confidential business information to potential competitors:

1. **Committee Bylaws**: Creditors' committees routinely implement bylaws specifically designed to protect the confidentiality of sensitive business information of the debtors received by the committee. These bylaw provisions commonly, among other things: (a) prohibit committee members from disclosing, or using outside the bankruptcy, any

---

creditor body and therefore does not meet the objectives of section 1102(b)(1) of the Bankruptcy Code.

[2] While by no means an exhaustive list, we note that two official committees were appointed in the following cases: Archdiocese of New Orleans; A.H. Robins; Boy Scouts of America; Caesar's Entertainment Operating Company, Inc.; Diocese of Spokane; Dow Corning; Federal Mogul; Kmart I; Lamonts Apparel; Mallinckrodt; Mariner Health; Orange County; Revco Drug Stores; Takata and W.R. Grace.

## GIBSON DUNN

J. Steven Wilkes
U.S. Department of Justice
November 21, 2022
Page 3

confidential business information they receive from the debtor; (b) give the debtor the ability to enforce the bylaws' confidentiality obligations; and (c) provide that in the event a conflict of interest arises for a committee member, the member must disclose the conflict and recuse from committee participation and certain information may be withheld from committee members as appropriate. *See* Exhibit 1 (sample bylaw provisions). It is standard practice for official creditors' committees to adopt bylaws containing provisions like these that prevent the disclosure of the debtor's confidential business information.[3]

2. **Nondisclosure Agreement ("NDA") or Protective Order**: In addition, or as an alternative, committee members could be required, as a condition of their appointment to the official committee, to sign an NDA—or agree to be bound by a stipulated protective order to be entered by the Court—that prohibited the dissemination or disclosure of any sensitive documents, spreadsheets, or other materials the Debtors provided to the committee, which the Debtors could stamp as confidential to designate as covered by the NDA. For especially sensitive materials, the NDA or protective order could allow the Debtors to mark the materials as "Professionals' Eyes Only" so that the materials would not be disclosed to employees of the committee members. *See* Exhibit 2 (sample NDA); Exhibit 3 (sample protective order).[4]

3. **Software Tools**: Finally, software tools are also available that limit the ability to forward or otherwise disseminate confidential material. For example, for PDF documents, Adobe allows users to restrict document access to unique digital user ID and password combinations, so that only specified users are able to open and view the

---

[3] The following is a non-exhaustive sampling of nearly a dozen cases filed within the last three years in which a creditors' committee adopted the bylaw provisions reflected in Exhibit 1: *Altera Infrastructure, L.P.*, Case No. 22-9013 (S.D. Tex.); *Ascena Retail Group*, Case No. 20-33113 (E.D. Va.); *Chinos Holdings, LLC (J Crew)*, Case No. 20-32181 (E.D. Va.); *Cinemex USA Real Estate Holdings, USA*, Case No. 20-14696 (S.D. Fla.); *Cineworld Group, plc*, Case No. 22-90168 (S.D. Tex.); *Corsicana Bedding, LLC*, Case No. 22-90016 (N.D. Tex.); *Neiman Marcus LTD LLC*, Case No. 20-32519 (S.D. Tex.); *Rockall Energy Holdings, LLC*, Case No. 22-90000 (N.D. Tex.); *Sungard A.S. New Holdings, LLC*, Case No. 22-90018 (S.D. Tex.); *Tailored Brands, Inc.*, Case No. 20-33916 (S.D. Tex.); *Whiting Petroleum Corp.*, Case No. 20-32021 (S.D. Tex.).

[4] Exhibits 1, 2, and 3 are examples intended to illustrate the types of bylaws and agreements that could be employed in these chapter 11 cases. In the event an official committee of non-trade creditors is formed, the members of that committee will negotiate and adopt any appropriate bylaws and agreements.

**GIBSON DUNN**

J. Steven Wilkes
U.S. Department of Justice
November 21, 2022
Page 4

document. Digital rights management software can create similar controls for non-PDF-format documents.

These are tried-and-true procedures with a track record of effectively protecting the confidentiality of trade secrets and other confidential business information in bankruptcies and many other commercial contexts, including civil litigation, M&A due diligence, and internal investigations. Employing some combination of these measures here should be more than sufficient to address any concerns the U.S. Trustee and the Debtors might have around confidentiality in these chapter 11 cases.

If the U.S. Trustee has any other concerns around appointing a non-trade creditors' committee that these procedures would not address, please let us know; we would be happy to speak with the U.S. Trustee again today or tomorrow. We are committed to being pragmatic and solutions-oriented, and we are confident we can work together with the U.S. Trustee to craft a workable structure for an official committee of non-trade creditors. Thank you for your consideration. We look forward to your prompt response.

Sincerely,


Russell H. Falconer

CC:   Robert Furr, Marc Barmat, and Matt Bouslog (American Bottling Company)
      Jarret Hitchings and Ezequiel Romero (Doehler USA)
      Richard Pachulski, Robert Feinstein, and Michael Goldberg (Monster Energy)
      Thomas Patterson (Orange Bang)
      Joseph Frank and Corali Lopez-Castro (PepsiCo)
      Seth Lieberman (Sony Music Entertainment and UMG Recordings)

# EXHIBIT 1

**Sample Bylaws**

**ARTICLE VIII**
**CONFLICTS OF INTEREST**

A. If any matter under consideration by the Committee may or appears to involve a conflict of interest with any Member serving on the Committee, the Member with the potential or actual conflicting interest shall: (i) disclose to the Committee the existence of any potential conflict of which it has knowledge, (ii) recuse itself from the discussion of such matter at the meeting unless, by majority vote of the Committee (after receiving advice of Committee Counsel and less the vote of the Member(s) having the apparent conflict of interest), the Member is permitted to remain at such meeting, and (iii) abstain from voting on the matter being considered by the Committee unless a majority of the remaining Members of the Committee (after receiving advice of Committee Counsel) determines such abstention is unnecessary. The existence of a potential conflict of interest may be raised by any Member or Committee Counsel and shall be determined by the affirmative vote of a majority in number of Members of the Committee present at a given meeting (less the vote of the Member(s) having the apparent conflict of interest and the vote of any other Member who appears to be, in the judgment of Committee Counsel, subject to the same conflict of interest).

B. Any Member subject to an alleged conflict of interest shall be provided with a reasonable opportunity to be heard and to provide non-conflicted Members with additional information and/or refute any allegations of its alleged conflict of interest prior to any Committee vote regarding such Conflicted Person's alleged conflict of interest. The issue of whether a conflict of interest exists as to a particular Member, a Member's professional, or group of Members will be determined on an individual basis and each Member or professional shall have the opportunity to be heard and have the Committee vote in connection with its alleged conflict of interest. For the purpose of a vote under this Article VIII.B to exclude a particular Member or a Member's professional from a meeting, that Member shall not be counted for a quorum and shall not be entitled to vote on whether or not a conflict of interest exists. Consistent with the foregoing, the Member having a conflict of interest shall not have access to summaries, analyses, reports or work product prepared by the professionals of the Committee with respect to the matter in which the conflict of interest exists, except to the extent determined to be appropriate under the circumstances in the discretion of the Committee (after receiving advice of Committee Counsel); provided, however, that best efforts will be made to share redacted versions of the foregoing materials when possible, upon the request of such Member having a conflict. Notwithstanding the foregoing, by majority vote of the Members (after receiving advice of Committee Counsel) not subject to such conflict then present, the Committee can elect to allow any Member alleged to have a conflict of interest to discuss with the Committee its views on the merits of the matter itself.

C. If the Committee decides an issue without notice of a conflict of interest and at a later time a conflict of interest is disclosed or determined, the Committee, by a majority vote of Members not subject to such conflict and who are present at any subsequent meeting, may deem the Committee's earlier decision to be null and void, or may take such other action as such majority deems necessary or appropriate.

D. Each Member of the Committee retains the right to appear in the Chapter 11 Cases of the Debtors in respect of its own interests and to take a position different from that of the Committee, provided, however, that except as provided herein no Member shall purport to represent or speak for the Committee in connection therewith. Nothing contained in these Bylaws shall (i) prevent any Member from exercising or seeking to enforce or protect any of its rights as an individual creditor or other party-in-interest or (ii) otherwise affect the ability of any Member to act in its capacity as an individual creditor or other party-in-interest as it may deem appropriate, whether or not such actions are opposed by the Committee.

E. A Member affiliated with an entity subject to or having a request for relief pending in the Court shall disclose the same to all Members before discussion and voting on all topics related to the request.

## ARTICLE IX
## CONFIDENTIALITY OF INFORMATION

A. Each Member of the Committee is aware of the fiduciary duty that it has to all unsecured creditors of the Debtors and agrees that it will act in accordance with such duty in dealing with confidential information. All matters discussed at Committee meetings (whether or not memorialized in any minutes thereof), not generally available to the public, are confidential and, except as otherwise permitted herein or required by applicable law or court order, shall not be disclosed to any person not in attendance at such meeting, other than Members not in attendance or professionals retained by the Members or the Committee.

B. Except as provided in the following sentence, all confidential or proprietary information provided by the Debtors or any professionals employed by the Debtors to the Committee or any professionals employed by the Committee ("Confidential Information"), shall also be deemed Confidential Information and not be disclosed to third parties. Notwithstanding the foregoing, Confidential Information shall not include any information which (i) at the time of disclosure by the Debtors or thereafter is generally available to the public other than by a person bound by these provisions acting in contravention of these provisions or other confidentiality agreement with the Debtors; (ii) was available to the Committee on a non-confidential basis from a source other than the Debtors, provided that such source was not bound by a confidentiality agreement with the Debtors respecting such information; or (iii) has been independently acquired by the Committee, provided that any source of such information was not bound by a confidentiality agreement or arrangement with the Debtors. The Members recognize the Debtors' ability to designate, in good faith and in writing, certain sensitive and/or proprietary information as being restricted Confidential Information that shall only be disclosed to the Committee's professionals and will not be disclosed to the Members. Any dispute on what is Confidential Information, including, but not limited to, the designation of "professional eyes only", shall be subject to judicial review if the Debtors and the Committee are unable to agree upon the designation, provided that the disputed material filed must be filed under seal.

C. Notwithstanding paragraphs A and B, above, all Confidential Information in the possession of or known to Members of the Committee may be disclosed: (i) to other Members;

(ii) each Member, including such Member's primary and alternative representatives; (iii) to any professionals retained by a Member, provided that any recipients are advised of and agree to be bound by all confidential obligations of these Bylaws; and (iv) where required by law, rule, process or where demanded by any regulatory authority, to third parties, provided confidentiality agreements acceptable to the Debtors are duly executed with such parties, or approval of the Court or other court of competent jurisdiction is obtained after notice as is appropriate in the particular circumstances is provided to the Debtors, as applicable. Notwithstanding the foregoing, Confidential Information may also be disclosed without notice or other requirements where the disclosure is made in connection with a routine audit or examination of a Member by a regulator or auditor, in each case, that does not specifically target or reference the Debtors.

D. In the event of a resignation or removal of a Member of the Committee, upon request of the Committee or the Debtors, such Member shall promptly return to Committee Counsel or destroy any non-public or confidential materials (including copies thereof) received by the Member in its capacity and in the course of its tenure as a Member of the Committee.
Notwithstanding the resignation or removal of a Member, such Member shall continue to be bound by the confidentiality provisions of these Bylaws. Notwithstanding the foregoing, a Member of the Committee and its counsel may retain copies of the Confidential Information to the extent such Member of the Committee or its counsel reasonably believes it is required to retain a copy of the Confidential Information under applicable law, for legal or regulatory purposes, or to satisfy internal compliance policies and procedures. For the avoidance of doubt, Members of the Committee and their counsel shall not be required to return, destroy, or expunge any Confidential Information located on backup servers and similar devices except in the ordinary course of business provided that any such Member of the Committee and their counsel shall not access or use such Confidential Information unless required by law to do so; provided further that any such materials so retained shall be held subject to the terms of Article IX of these Bylaws.

# EXHIBIT 2

## CONFIDENTIALITY AGREEMENT

This Confidentiality Agreement ("**Agreement**") is made as of November __, 2022, by and among Vital Pharmaceuticals, Inc. and/or its subsidiaries, affiliates or divisions (collectively, the "**Company**") and the members of the Official Committee of Non-Trade Creditors (the "**NCC**") appointed in *In re Vital Pharmaceuticals, Inc., et al.,* Case No. 22-17842 (PDR) (Jointly Administered) (collectively, the "**Bankruptcy Case**") in the United States Bankruptcy Court for the Southern District of Florida (the "**Bankruptcy Court**"), [insert NCC Advisor] (collectively, the "**NCC Advisors**," and together with the NCC members, each a "**Recipient**" and collectively, the "**Recipients**"). For purposes of this Agreement, Company and Recipients are referred to herein as the "**Parties**."

**WHEREAS**, for purposes of discussions and/or the exchange of information relating to the Bankruptcy Case, the Company may, in its sole discretion, disclose to Recipients certain information about the Company, its operations, lines of business, or industry that is non-public, confidential and/or proprietary in nature, whether or not delivered before, on or after the date of this Agreement and regardless of the manner or form in which it is obtained, including without limitation all written, oral and electronic communications, and whether or not such information is marked "confidential," "proprietary," or other similar type mark, together with any notes, analyses, compilations, studies, interpretations, documents or records containing, referring, relating to, based upon or derived from such information, in whole or in part (collectively, the "**Confidential Information**").

**NOW, THEREFORE**, for the exclusive purpose of establishing the agreements of the Parties governing such disclosure, receipt, custody, and use of Confidential Information, and in consideration of the covenants and conditions set forth herein, it is agreed as follows:

1.     As a condition to each Recipient receiving any Confidential Information, Recipient agrees to treat as confidential any and all Confidential Information that is furnished by or on behalf of the Company to Recipient or its directors, officers, employees, partners, independent contractors, subcontractors, agents, advisors, representatives and affiliates (including, without limitation, attorneys, accountants, consultants and any representatives of such advisors) (collectively, the "**Representatives**").

2.     The term "Confidential Information" does not include information that the Recipient can show by competent proof (i) is or becomes available to the public other than as a result of a direct or indirect disclosure by a Recipient or its Representatives; (ii) was within a Recipient's possession on a non-confidential basis prior to its being furnished to you by or on behalf of the Company; (iii) is received from a source other than the Company or any of its Representatives; or (iv) is disclosed by Recipient or any of its Representatives with the Company's prior written consent (including by email), provided such consent must be provided by the Chief Transformation Officer of the Company, his designee (which designee will be disclosed to Recipient prior to any such request for consent), or the Company's counsel (a "**Company Consent**"). As used in this Agreement, the term "person" shall be interpreted broadly to include, without limitation, any individual, corporation, trust, group, limited liability company, partnership, or other entity.

3.      Recipient agrees that the Confidential Information will be used solely in connection with its duties as a member of the NCC, or in the course of its representation of the NCC, in connection with the Bankruptcy Case and evaluation thereof, and that such information will be kept strictly confidential and will not be disclosed by Recipient or any of its Representatives to any third parties, in any manner whatsoever, directly or indirectly, in whole or in part, except to the extent that such disclosure or use (i) is made to its Representatives who need to know or use such information in connection with the Bankruptcy Case and evaluation thereof (it being understood that such Representatives shall have been advised of the confidential nature of the Confidential Information and this Agreement, provided with a copy of this Agreement and agree in writing to act in accordance with its terms to the same extent as if they were parties hereto); (ii) is approved in writing through a Company Consent; (iii) is made to the NCC or a member thereof (or another advisor to the NCC) that has executed, and remains bound by, a confidentiality agreement with the Company in connection with the Bankruptcy Case; or (iv) is required by applicable law, regulation or stock exchange requirements, or by legal or regulatory process; provided that Recipient will, to the extent permitted by applicable law or regulation, provide the Company with prompt written notice of the existence, terms and circumstances surrounding such request or requirement so that the Company may seek, at the Company's expense, a protective order or other appropriate remedy and Recipient and its Representatives will cooperate with the Company's efforts to obtain the same.  With respect to clause (iv), if, absent the entry of such a protective order or other remedy, Recipient or such Representative is, in the advice of counsel (including in-house counsel), legally required to disclose Confidential Information, Recipient or such Representative will disclose only that portion of the Confidential Information that Recipient or such Representative is legally required to disclose, based on the advice of its counsel (including in-house counsel), and will  exercise commercially reasonable efforts to obtain assurance that confidential treatment will be accorded to the Confidential Information that is being disclosed. Recipient shall ensure that each of its Representatives who are either provided with Confidential Information, or otherwise have access to such Confidential Information, understands the confidential nature of the Confidential Information.  Prior to disclosing Confidential Information to a Representative, Recipients shall obtain written agreement (which provides that the Company is express third party beneficiary of such agreement) from the Representative to be bound by the confidentiality and use terms of this Agreement.  Moreover, Confidential Information shared with NCC Advisors identified as "**For Professional Eyes Only**" (or other substantially identical demarcation) at the time of disclosure (including in writing in the case of any written disclosure) will not be made available to any members of the NCC who have executed a non-disclosure agreement without Company Consent or written consent (including by email) pursuant to Section 4 of this Agreement.  To the extent that Recipient or its Representatives are subject to examination by a regulatory or self-regulatory authority, bank examiner, or auditor, notice to the Company shall not be required where disclosure is in connection with an audit or examination or a blanket document request that does not reference the Company or this Agreement.

4.      All of Recipient's and its Representatives' communications regarding requests for information pursuant to this letter agreement must be directed to [insert], or, solely with respect to information regarding the process to market and sell the Company's assets and the virtual data room in connection therewith, [insert].  Neither Recipient nor its Representatives will initiate or maintain contact with the Company, its representatives, or its former employees

(who have been employed with the Company within the last twelve (12) months prior to the date hereof) regarding the business, operations, prospects or finances of the Company, except with the express permission of the Company. For the avoidance of doubt, the foregoing does not in any way limit the NCC's or the NCC Advisors' ability to investigate potential claims or conduct discovery under applicable law.

5.     Within ten (10) business days after being so requested in writing (email being sufficient) by the Company, Recipient shall, and shall cause its Representatives to, return to the Company or destroy, at Recipient's election, all Confidential Information, without retaining any copies, summaries, or extracts thereof. In the event of such request to return or destroy Confidential Information, all documents, analyses, compilations, studies, or other materials prepared by Recipient or its Representatives that contain or reflect Confidential Information shall be destroyed and no copy thereof shall be retained (such destruction to be confirmed in writing by a duly authorized representative of Recipient). Any Confidential Information that is not returned or destroyed, including without limitation, any oral Confidential Information, shall remain subject to the confidentiality obligations set forth in this Agreement. Notwithstanding the foregoing, Recipient and its Representatives may retain in its legal files an archival copy of the Confidential Information (and any materials prepared by Recipient or its Representatives to the extent based on or containing Confidential Information) solely for monitoring its and their obligations hereunder or as has been archived by Recipient's standard backup processes and systems or as required by applicable law, rule, or regulation or Recipients' document retention policies and procedures, provided that any such copies or files shall be stored in a manner that prevents unauthorized access or use of Confidential Information.

6.     It is understood and agreed that money damages would not be a sufficient remedy for any breach or threatened breach of this Agreement and that the Company shall be entitled to specific performance and injunctive or other equitable relief as a remedy for any such breach or threatened breach. Such remedy or remedies shall not, however, be deemed to be the exclusive remedy or remedies for breach or threatened breach of this Agreement but shall be in addition to all other remedies available at law or equity to the Company.

7.     Unless extended in writing by mutual agreement of the Parties, each of the obligations under this Agreement with respect to Confidential Information shall terminate eighteen (18) months from the earliest of (x) the substantial consummation of a chapter 11 plan in the Bankruptcy Case, (y) the date on which the Bankruptcy Case is dismissed, or (z) the conversion of the Bankruptcy Case to a case under chapter 7 of the Bankruptcy Code, except that, for any Confidential Information that is a trade secret as defined by applicable law in any jurisdiction, Recipient's obligations under this Agreement will remain in effect until that information loses its trade secret status under such applicable law.

8.     Recipient acknowledges, on behalf of itself and its Representatives, that neither the Company nor its Representatives makes any representations or warranties, express or implied, as to the accuracy or completeness of the Confidential Information, that neither the Company nor its Representatives shall have any liability whatsoever to Recipient or its Representatives or any other person as a result of the use of the Confidential Information or any errors therein or omissions therefrom by virtue of this Agreement.

9.      This Agreement is for the benefit of each of Recipient and the Company and is governed by the laws of the State of Delaware without regard to any conflict of laws principles thereof.  Any action brought in connection with this Agreement shall be brought in the Bankruptcy Court, and the Parties hereby irrevocably consent to the jurisdiction of such courts and waive any objections as to venue or inconvenient forum.

10.      This Agreement may not be assigned by Recipient without the prior written consent of the Company.  This Agreement sets forth the entire agreement between the Parties as to the subject matter hereof, and none of the terms of this Agreement may be amended except in a writing signed by each of the Parties.  No failure or delay by a Party in exercising any right hereunder or any partial exercise thereof shall operate as a waiver thereof or preclude any other or further exercise of any right hereunder.  The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provisions of this Agreement, which shall remain in full force and effect.

11.      This Agreement may be executed and transmitted by PDF via email and in counterparts, each of which shall constitute one and the same agreement.

[*Signature Pages Follow*]

IN WITNESS WHEREOF, the Company and Recipient have executed this Agreement as of the date first written above.

**VITAL PHARMACEUTICALS, INC, ET AL.**

By: _____
Name:
Title:

**COMMITTEE ADVISORS:**

**[ADVISOR]**

By: _____
Name:
Title:

**COMMITTEE MEMBERS:**

**THE AMERICAN BOTTLING COMPANY**

By: _____
Name:
Title:

**MONSTER ENERGY COMPANY**

By: _____
Name:
Title:

**[MEMBER]**

By: _____
Name:
Title:

*[Signature Page–Non-Trade Creditors' Committee NDA]*

# EXHIBIT 3

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| THE AMERICAN BOTTLING COMPANY, INC., | CIVIL ACTION |
| Plaintiff, | Case No.: 1:20-cv-01268-TMH |
| vs. | |
| VITAL PHARMACEUTICALS, INC. d/b/a VPX/REDLINE, | |
| Defendant. | |

## AMENDED STIPULATED PROTECTIVE ORDER PURSUANT TO FED. R. CIV. P. 26(c)

This Stipulated Protective Order ("**Protective Order**") is made by and between The American Bottling Company Inc. ("**ABC'**), and Vital Pharmaceuticals, Inc. ("**VPX**"). Each of ABC and VPX is a "Party" under this Protective Order and together they constitute the "Parties."

WHEREAS, the Parties desire that certain information and documents provided in connection with this litigation, which may contain information considered by one or more of the Parties to be proprietary and/or confidential, be subject to a confidentiality agreement and protective order; and,

WHEREAS, the Parties to this action believe that good cause exists for entry of this Protective Order under Fed. R. Civ. P. 26(c) to prevent unnecessary disclosure or dissemination of confidential documents and information of the Parties, their affiliates and/or third parties, and to ensure that documents and information exchanged be limited to use for purposes of this action only; and,

WHEREAS, the Parties hereby request that the Court enter this Protective Order in this lawsuit, and as it appears to the Court that discovery in the above-captioned action is likely to involve the disclosure of confidential information,

**IT IS HEREBY ORDERED** as follows:

1.      Any Party to this litigation and any third party may designate as "Confidential" and subject to this Protective Order any information, document, thing, or portion of any document or thing ("**Material**"), believed to be unknown or unavailable to the public:  (a) that contains trade secrets, competitively sensitive technical, marketing, financial, sales, or other confidential business information; (b) that contains private or confidential personal information; (c) that contains information received in confidence from third parties; or (d) which the producing party otherwise believes in good faith to be entitled to protection under Rule 26(c)(l)(G) of the Federal Rules of Civil Procedure. Any party to this litigation or third party covered by this Protective Order who produces or discloses any Confidential Material (including without limitation any information, document, thing, interrogatory answer, admission, pleading, or testimony) shall mark that Material with the following or similar legend: "CONFIDENTIAL" or "CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER."

2.      Any party to this litigation and any third party may designate as "Attorneys' Eyes Only" and subject to this Protective Order any Material, believed to be unknown or unavailable to the public, that contains highly sensitive business or personal information, the disclosure of which is highly likely to cause significant harm to an individual or to the business or competitive position of the designating party.  Any party to this litigation or third party covered by this Protective Order who produces or discloses any Attorneys' Eyes Only Material (including without limitation any information, document, thing, interrogatory answer, admission, pleading,

or testimony) shall mark that Material with the following or similar legend: "ATTORNEYS' EYES ONLY" or "ATTORNEYS' EYES ONLY - SUBJECT TO PROTECTIVE ORDER."

3.    Any party, third party, person, or entity providing Material in connection with this litigation is referred to as a "**Producing Party**."  Any party, third party, person, or entity receiving Material in connection with this litigation is referred to as a "**Receiving Party**."

4.    Confidential Material subject to this Protective Order may be used for purposes of this litigation only, and, except by prior written agreement of the Parties or by order of the Court, Confidential Material and the contents thereof shall not be disclosed, directly or indirectly, by the Receiving Party to anyone other than:

a.    Outside counsel (defined herein as any attorney at the parties' outside law firms) for the Parties;

b.    In-house counsel for the Parties, provided that (1) in-house counsel is involved in this litigation; and (2) in-house counsel signs a non-disclosure agreement in the form attached hereto as Exhibit A and agrees to be bound by the terms of this Protective Order;

c.    Outside experts or consultants retained by outside counsel for purposes of this litigation, provided they have signed a non-disclosure agreement in the form attached hereto as Exhibit A and agree to be bound by the terms of this Protective Order;

d.    Secretarial, paralegal, clerical, duplicating, and data processing personnel of the foregoing;

e.    The court and court personnel;

f.    Any deponent may be shown or examined on any Confidential Material (1) if it appears that the witness (a) authored or received a copy of it, (b) was involved in the subject matter described therein, (c) is employed by the Party who produced the Confidential

10

Material, or (d) if the Producing Party consents to such disclosure, and (2) provided that the witness signs a non-disclosure agreement in the form attached hereto as Exhibit A and agrees to be bound by the terms of this Protective Order;

g.      Vendors retained by or for the Parties to assist in preparing for pretrial discovery, trial and/or hearings including but not limited to court reporters, litigation support personnel, jury consultants, individuals to prepare demonstrative and audiovisual aids for use in the courtroom, in depositions, or in mock jury sessions, as well as their staff, stenographic, and clerical employees whose duties and responsibilities require access to such Material; and

h.      The Parties' executives who are required to participate in decisions regarding this litigation, provided they have signed a non-disclosure agreement in the form attached hereto as Exhibit A and agree to be bound by the terms of this Protective Order.

5.      Attorneys' Eyes Only Material subject to this Protective Order may be used for purposes of this litigation only, and, except by prior written agreement of the Parties or by order of the Court, Attorneys' Eyes Only Material and the contents thereof shall not be disclosed, directly or indirectly, by the Receiving Party to anyone other than:

a.      Outside counsel (defined herein as any attorney at the parties' outside law firms) for the Parties;

b.      In-house counsel for the Parties, provided that (1) in-house counsel is involved in this litigation; and (2) in-house counsel signs a non-disclosure agreement in the form attached hereto as Exhibit A and agrees to be bound by the terms of this Protective Order;

c.      Outside experts or consultants retained by outside counsel for purposes of this litigation, provided they have signed a non-disclosure agreement in the form attached hereto as Exhibit A and agree to be bound by the terms of this Protective Order;

d.      Secretarial, paralegal, clerical, duplicating, and data processing personnel of the foregoing;

e.      The court and court personnel;

f.      A deponent may be shown or examined on Attorneys' Eyes Only Material (1) only if it appears that the witness authored or received a copy of it, or if the Producing Party consents to such disclosure, and (2) provided that the witness signs a non-disclosure agreement in the form attached hereto as Exhibit A and agrees to be bound by the terms of this Protective Order; and

g.      Vendors retained by or for the Parties to assist in preparing for pretrial discovery, trial and/or hearings including but not limited to court reporters, litigation support personnel, jury consultants, individuals to prepare demonstrative and audiovisual aids for use in the courtroom, in depositions, or in mock jury sessions, as well as their staff, stenographic, and clerical employees whose duties and responsibilities require access to such Material.

6.      Attorneys' Eyes Only Material subject to this Protective Order that is designated "ATTORNEYS' EYES ONLY, OUTSIDE COUNSEL ONLY" may be used for purposes of this litigation only, and, except by prior written agreement of the Parties or by order of the Court, Attorneys' Eyes Only Material designated "ATTORNEYS' EYES ONLY, OUTSIDE COUNSEL ONLY" and the contents thereof shall not be disclosed, directly or indirectly, by the Receiving Party to anyone, including any in-house person (e.g., in-house counsel or the secretarial or administrative staff thereof), other than:

a.      Outside counsel (defined herein as any attorney at the parties' outside law firms) for the Parties;

12

b.      Outside experts or consultants retained by outside counsel for purposes of this litigation, provided they have signed a non-disclosure agreement in the form attached hereto as Exhibit A and agree to be bound by the terms of this Protective Order;

c.      Secretarial, paralegal, clerical, duplicating, and data processing personnel of the foregoing;

d.      The court and court personnel;

e.      A deponent may be shown or examined on Attorneys' Eyes Only, Outside Counsel Only Material (1) only if it appears that the witness authored or received a copy of it, or if the Producing Party consents to such disclosure, and (2) provided that the witness signs a non-disclosure agreement in the form attached hereto as Exhibit A and agrees to be bound by the terms of this Protective Order; and

f.      Vendors retained by or for the Parties to assist in preparing for pretrial discovery, trial and/or hearings including but not limited to court reporters, litigation support personnel, jury consultants, individuals to prepare demonstrative and audiovisual aids for use in the courtroom, in depositions, or in mock jury sessions, as well as their staff, stenographic, and clerical employees whose duties and responsibilities require access to such Material.

7.      If Confidential Material and/or Attorneys' Eyes Only Material are to be used during the deposition of a non-party witness, and disclosure of such Material is otherwise permissible under this Protective Order, the deponent shall be given a copy of this Protective Order, shall be informed on the record of the terms of this Protective Order, and shall agree to be bound by the terms of this Protective Order by signing the non-disclosure agreement attached hereto as Exhibit A.  In the event a non-party witness refuses to agree to be bound by this Protective Order, Confidential Material and Attorneys' Eyes Only Material shall not be revealed

to the non-party witness without the consent of all parties to this Protective Order or by leave of Court.

8.    Attendance at depositions at which Confidential Material or Attorneys' Eyes Only Material are identified, discussed or disclosed shall be limited to those persons who are authorized to receive such Material under the terms of this Protective Order.  If any person not entitled to receive such Material is in attendance at a deposition, a party at its request may have that individual excluded from the room in which the deposition is taking place for the duration of time in which the Material is being discussed.

9.    Nothing in this Protective Order shall bar or otherwise restrict an attorney who is a qualified recipient of Confidential Material or Attorneys' Eyes Only Material, from rendering advice to his or her client with respect to this action, and in the course thereof, from generally relying upon his or her examination of Confidential Material or Attorneys' Eyes Only Material. In rendering such advice or in otherwise communicating with the client, the attorney shall not disclose the specific content of any Confidential Material or Attorneys' Eyes Only Material of another person or party where such disclosure would not otherwise be permitted under the terms of this Protective Order.

10.    Information shall be designated as "Confidential" or "Attorneys' Eyes Only" in the following manner:

a.    In the case of Material reduced to paper form, the designation shall be made by placing the legend "CONFIDENTIAL", "CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER", "ATTORNEYS' EYES ONLY", "ATTORNEYS' EYES ONLY, OUTSIDE COUNSEL ONLY", or "ATTORNEYS' EYES ONLY - SUBJECT TO PROTECTIVE ORDER" on the Material in a manner sufficient to identify the Material as

14

entitled to confidential treatment in this action.  A Producing Party shall designate such Material as Confidential or Attorneys' Eyes Only at or before the time of production.

       b.     Material produced or provided on a computer disk, data tape or other medium that has not been reduced to paper form may be designated as Confidential Material or Attorneys' Eyes Only Material by informing counsel for the parties to this action in writing that the computer disk, data tape or other medium contains Confidential Material or Attorneys' Eyes Only Material.  To the extent practical, such physical medium should also be appropriately labeled as "CONFIDENTIAL", "CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER", "ATTORNEYS' EYES ONLY", "ATTORNEYS' EYES ONLY, OUTSIDE COUNSEL ONLY", or "ATTORNEYS' EYES ONLY - SUBJECT TO PROTECTIVE ORDER". The Receiving Party receiving such Material under this Paragraph 7(b) shall then be responsible for appropriately labeling any printed version(s) of the Material which the Receiving Party creates after receiving the information in electronic format.

       c.     In the case of deposition testimony, any Party or third party may designate Material disclosed during a deposition as Confidential Material or Attorneys' Eyes Only Material either by identifying on the record at the deposition the Material that is to be treated as Confidential Material or Attorneys' Eyes Only Material or by marking the portions of the deposition record to be designated as Confidential Material or Attorneys' Eyes Only Material within thirty (30) days after receipt of the transcript.  When the deponent and the attending parties do not agree to waive the reading, correcting, and signing of the transcript, all information disclosed during a deposition shall be treated as Confidential Material before the expiration of the 30-day period unless otherwise agreed by the Parties.  This 30-day period may be extended by agreement of the Parties.  If any deposition testimony or any document or information used

15

during the course of a deposition is designated as Confidential Material or Attorneys' Eyes Only Material, each page of the deposition record reflecting such material shall be marked by the court reporter as "CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER" or "ATTORNEYS' EYES ONLY - SUBJECT TO PROTECTIVE ORDER", or "ATTORNEYS' EYES ONLY, OUTSIDE COUNSEL ONLY - SUBJECT TO PROTECTIVE ORDER", and the first page of the deposition record shall be marked by the court reporter in a manner that makes it readily apparent that the deposition record contains Confidential Material or Attorneys' Eyes Only Material.

11.    A party other than the Producing Party may designate Material as Confidential Material or Attorneys' Eyes Only Material by giving written notice to all Parties to this action within thirty (30) days of the date on which, exercising reasonable diligence, that designating party becomes aware of production.   All Parties shall then stamp or otherwise mark the designated documents as Confidential or Attorneys' Eyes Only pursuant to this Protective Order.

12.    If counsel for a Party receiving Material designated as Confidential or Attorneys' Eyes Only objects to that designation in whole or in part, counsel for the objecting party shall serve on the designating party a written objection describing with particularity the Material in question and stating the grounds for objection. Counsel for the designating party shall respond to the objection in writing within fourteen (14) days, and shall state with particularity the grounds for asserting that the Material is properly designated. Counsel shall confer in good faith in an effort to resolve the dispute.  If the dispute cannot be resolved by agreement within ten (10) business days, the objecting party may present the dispute to the Court consistent with Paragraph 3(g) of the Court's Scheduling Order.  If the objecting party does not present the dispute to the Court, then the Material shall remain as designated.  Any Material which has been

16

designated as Confidential Material or Attorneys' Eyes Only Material, but which is subject to a dispute as to its proper designation, shall be treated as it has been designated pending resolution of the dispute.

13.     Any party who wishes to file with the Court documents, pleadings, motions or other papers containing, affixing, or reflecting Confidential Material or Attorneys' Eyes Only Material (hereafter "Court Documents") shall be responsible for filing a motion to impound or seal such Court Documents (or the portions containing Confidential Material or Attorneys' Eyes Only Material). Should the motion to impound or seal not be resolved by the date the Court Documents are scheduled to be filed with the Court, the filing party shall serve the other party with the Court Documents on the day they are scheduled to be filed with the Court and, in lieu of filing such Court Documents (or the portions thereof containing Confidential Material or Attorneys' Eyes Only Material), will file instead a certificate of service.  The Court Documents (or portions thereof containing any Confidential Material or Attorneys' Eyes Only Material) will then be filed with the Court after the Court has resolved the motion to impound or seal.

14.     Any party wishing to disclose Confidential Material or Attorneys' Eyes Only Material during trial or at any hearing in this litigation may do so only as directed by the Court after giving notice to the Producing Party.

15.     To the extent consistent with applicable law, the inadvertent or unintentional disclosure of Confidential Material or Attorneys' Eyes Only Material that should have been designated as such shall not be deemed to waive a Party's claim of confidentiality, in whole or in part, either as to the specific Material disclosed or to other Material concerning the same or related subject matter.  Inadvertent or unintentional disclosures may be rectified by written notification to counsel for all Parties receiving the Material that the Material should have been

designated Confidential or Attorneys' Eyes Only. Such notice shall constitute a designation of the Material as Confidential or Attorneys' Eyes Only under this Protective Order.

16.     Inadvertent production of documents, tangible things, or information subject to the attorney client privilege or work product immunity shall not constitute a waiver of such privilege. After receiving notice from the Producing Party that documents, tangible things, or information subject to the attorney client privilege or work product immunity have been inadvertently produced, the Receiving Party shall not review, copy or disseminate such documents or information.  The Receiving Party shall return such documents or information and any copies to the Producing Party immediately.  However, nothing herein restricts the right of the Receiving Party to challenge the Producing Party's claim of privilege if appropriate within a reasonable time after receiving notice of the inadvertent or mistaken disclosure, but the Receiving Party shall not assert the fact or circumstances of the inadvertent production as a ground for the challenge.

17.     This Protective Order does not deprive any party of its right to object to discovery by any other party or on any otherwise permitted ground. This Protective Order is entered without prejudice to the right of any party to move the court for modification of or relief from any of its terms.

18.     This Protective Order survives the termination of this litigation and remains in full force and effect unless modified by order of the Court or by written stipulation of the Parties filed with the Court.

19.     Upon receipt of any subpoena from a third party seeking disclosure or production of Material which has been designated as Confidential Material or Attorneys' Eyes Only Material subject to this Protective Order, the party or person receiving the subpoena shall

(a) provide prompt written notice of such subpoena to the party whose designated Confidential Material or Attorneys' Eyes Only Material has been subpoenaed so that the designating party may contest such subpoena and (b) promptly serve objections to the subpoena pursuant to Rule 45 of the Federal Rules of Civil Procedure, or pursuant to the applicable state rule of civil procedure, on the ground that the Material is covered by this Protective Order. The designating party whose Material is covered by the subpoena shall cooperate in good faith with the recipient of the subpoena in the preparation and filing of the objections under this paragraph.

20.   <u>Other Proceedings</u>.  By entering this Protective Order and limiting the disclosure of information in this case, this Court does not intend to preclude another court from finding that information may be relevant and subject to disclosure in another case.  Any person or party subject to this Protective Order who becomes subject to a motion to disclose another party's information designated Confidential or Attorneys Eyes Only pursuant to this Protective Order shall promptly notify that party of the motion so that party may have an opportunity to appear and be heard on whether that information should be disclosed.  At the conclusion of this action, by final dismissal, judgment or settlement, with all time to appeal having expired, all Confidential Material and Attorneys' Eyes Only Material covered by this Protective Order, and all copies of same, shall be returned by the Receiving Party to the Producing Party, or shall be destroyed, and counsel of record shall certify in writing within sixty (60) days of the conclusion of the action that such Material has been returned or destroyed**.**  After the conclusion of the action, each consultant or expert retained by counsel for the Parties who received Confidential Material or Attorneys' Eyes Only Material may retain such documents as are needed for professional liability purposes, but shall otherwise return such Material or certify in writing that such Material has been destroyed. Notwithstanding this requirement to return or destroy

documents, outside counsel may retain (1) attorney work product, and (2) a complete set of all documents filed with the Court including those filed under seal. Any retained documents containing or referring to Confidential Material or Attorneys' Eyes Only Material shall continue to be protected under this Order. Documents filed with the Court shall be deleted from the Electronic Case Filing (ECF) System only upon order of the Court.

SO, ORDERED, this __15___ day of December, 2021.


/s/ Todd M. Hughes
_____
Todd M. Hughes Judge Presiding

20

Dated: December 14, 2021

Respectfully submitted,

By: */s/ Joseph S. Naylor*
Joseph S. Naylor, Esquire (Bar ID No. 3886)
**Swartz Campbell, LLC**
300 Delaware Avenue, Suite 1410
Wilmington, Delaware 19801
Telephone: (302) 656-5935
jnaylor@swartzcampbell.com

-and-

Richard A. Illmer
State Bar No. 10388350
Rick.Illmer@huschblackwell.com
B. Ryan Weger
State Bar No. 24110519
Ryan.Weger@huschblackwell.com
**HUSCH BLACKWELL LLP**
1900 Pearl Street, Suite 1800
Dallas, Texas 75201
(241) 999-6100 (Telephone)
(241) 999-6170 (Facsimile)

**ATTORNEYS FOR PLAINTIFF THE
AMERICAN BOTTLING COMPANY**

Dated: December 14, 2021

By: */s/ Paul A. Logan*
Paul A. Logan, Esquire
Attorney I.D. No. 3339
**POST & SCHELL, P.C.**
300 Delaware Avenue
Suite 1380
Wilmington, DE 19801
Phone (302) 251-8856
Cell: (215) 287-9196
PLogan@PostSchell.com

**QUARLES & BRADY LLP**
David E. Worthen (*pro hac vice*)
Jonathan P. Labukas (*pro hac vice*)
1701 Pennsylvania Avenue NW, Suite 700
Washington, DC 20006
Phone: (202) 780-2662
David.Worthen@quarles.com
Jonathan.Labukas@quarles.com

Gregory T. Everts (*pro hac vice*)
33 East Main Street, Suite 900
Madison, WI 53703
(608) 230-2460
gregory.everts@quarles.com

Jeffrey Spoerk (*pro hac vice*)
411 East Wisconsin Avenue, Suite 2400
Milwaukee, WI 53202
(414) 277-5337
Jeff.Spoerk@quarles.com

Mark Bina (*pro hac vice*)
300 N. LaSalle Street, Suite 4000
Chicago, IL 60654
(312) 715-5051
Mark.Bina@quarles.com

**ATTORNEYS FOR DEFENDANT VITAL
PHARMACEUTICALS, INC. D/B/A
VPX/REDLINE**

**EXHIBIT A**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| THE AMERICAN BOTTLING COMPANY, INC., | CIVIL ACTION |
| Plaintiff, | Case No.: 1:20-cv-01268-TMH |
| vs. | |
| VITAL PHARMACEUTICALS, INC. d/b/a VPX/REDLINE, | |
| Defendant. | |

I hereby certify (i) I understand discovery material, Confidential Material, or Attorneys' Eyes Only Material are being provided to me pursuant to the terms and restrictions of the Stipulated Protective Order Pursuant to Fed. R. Civ. P. 26(c) (the "**Protective Order**") entered by the United States District Court for the District of Delaware (the "**Court**") in this action, and (ii) I have read said Protective Order.  I further certify I understand the terms of the Protective Order, I agree to be fully bound by the Protective Order, and I hereby submit to the jurisdiction of the Court for purposes of enforcement of the Protective Order. I understand a violation of the Protective Order may be punishable by contempt of Court.

Dated: _____

Signature: _____

Name: _____

Address: _____

_____

# EXHIBIT F

**From:** Wilkes, Steven (USTP) [mailto:Steven.Wilkes@usdoj.gov]
**Sent:** Monday, November 21, 2022 1:52 PM
**To:** Falconer, Russ <RFalconer@gibsondunn.com>
**Cc:** rfurr@furrcohen.com; mbarmat@furrcohen.com; Bouslog, Matthew G. <MBouslog@gibsondunn.com>; Jarret Hitchings <jarret.hitchings@bclplaw.com>; Ezequiel Romero <ezequiel.romero@bclplaw.com>; Van Baalen, Guy A (USTP) <Guy.A.VanBaalen@usdoj.gov>; Richard Pachulski <rpachulski@pszjlaw.com>; Michael Goldberg <michael.goldberg@akerman.com>; Robert Feinstein <rfeinstein@pszjlaw.com>; Feinman, Heidi (USTP) <Heidi.A.Feinman@usdoj.gov>; Thomas Patterson <tpatterson@ktbslaw.com>; Joseph D. Frank <jfrank@fgllp.com>; clc@kttlaw.com; Seth H. Lieberman <slieberman@pryorcashman.com>
**Subject:** RE: Vital Pharmaceuticals, et al, 22-17842-PDR

Dear Mr. Falconer,

This correspondence confirms receipt of your letter emanating from our tele-video conference call of Friday. After due deliberation, the U.S. trustee is inclined to appoint a second, non-trade creditor committee in the above captioned case.

To that end, we would like to have a further call tomorrow to discuss the implementation of that committee. I will be in contact with you tomorrow morning to set up that call. I remain,

Sincerely,



**J. Steven Wilkes**
**Trial Attorney**

U.S. Department of Justice
Office of the U.S. Trustee for Region 21
501 East Polk Street, Suite 1200
Tampa, FL 33602

Tel:  813-228-2173
Fax: 813-228-2303
Cell: 202-360-7726
Steven.Wilkes@usdoj.gov

**From:** Falconer, Russ <RFalconer@gibsondunn.com>
**Sent:** Monday, November 21, 2022 4:16 PM
**To:** Wilkes, Steven (USTP) <Steven.Wilkes@usdoj.gov>; Van Baalen, Guy A (USTP) <Guy.A.VanBaalen@usdoj.gov>; Feinman, Heidi (USTP) <Heidi.A.Feinman@usdoj.gov>
**Cc:** rfurr@furrcohen.com; mbarmat@furrcohen.com; Bouslog, Matthew G. <MBouslog@gibsondunn.com>; Jarret Hitchings <jarret.hitchings@bclplaw.com>; Ezequiel Romero <ezequiel.romero@bclplaw.com>; rpachulski@pszjlaw.com; michael.goldberg@akerman.com; rfeinstein@pszjlaw.com; tpatterson@ktbslaw.com;

jfrank@fgllp.com; clc@kttlaw.com; Lieberman, Seth H. <SLieberman@PRYORCASHMAN.com>
**Subject:** [EXTERNAL] RE: Vital Pharmaceuticals, et al

All:

Further to our call on Friday, please see the attached correspondence.

Thanks,

**Russ Falconer**

GIBSON DUNN

Gibson, Dunn & Crutcher LLP
2001 Ross Avenue Suite 2100, Dallas, TX 75201
Tel  214.698.3170 • Cell  214.803.5487
RFalconer@gibsondunn.com • www.gibsondunn.com

-----Original Appointment-----
**From:** Wilkes, Steven (USTP) <Steven.Wilkes@usdoj.gov>
**Sent:** Wednesday, November 16, 2022 8:06 AM
**To:** Wilkes, Steven (USTP); Van Baalen, Guy A (USTP); Feinman, Heidi (USTP); rpachulski@pszjlaw.com;
michael.goldberg@akerman.com; rfurr@furrcohen.com; Bouslog, Matthew G.; tpatterson@ktbslaw.com;
slieberman@pryorcashman.com; tkapur@pszjlaw.com; ikharasch@pszjlaw.com; rfeinstein@pszjlaw.com;
jfrank@fgllp.com; clc@kttlaw.com; das@kttlaw.com; romeroe@bryancave.com; steven.fender@fender-law.com;
mbarmat@furrcohen.com; salifarag@pryorcashman.com
**Subject:** Vital Pharmaceuticals, et al - Meeting Requested by Monster
**When:** Friday, November 18, 2022 10:30 AM-11:30 AM (UTC-05:00) Eastern Time (US & Canada).
**Where:** Video-Tele-Conference

[WARNING: External Email]

_____

# Microsoft Teams meeting

**Join on your computer, mobile app or room device**
Click here to join the meeting

**Or call in (audio only)**
+1 202-235-7900,,83543899#   United States, Washington

Phone Conference ID: 835 438 99#
Find a local number | Reset PIN

Learn More | Meeting options

_____

This message may contain confidential and privileged information for the sole use of the intended recipient. Any review, disclosure, distribution by others or forwarding without express permission is strictly prohibited. If it has been sent to you in error, please reply to advise the sender of the error and then immediately delete this message.

Please see our website at https://www.gibsondunn.com/ for information regarding the firm and/or our privacy policy.

# EXHIBIT G

**From:** Wilkes, Steven (USTP) [mailto:Steven.Wilkes@usdoj.gov]
**Sent:** Tuesday, November 22, 2022 11:14 AM
**To:** Falconer, Russ <RFalconer@gibsondunn.com>
**Cc:** rfurr@furrcohen.com; mbarmat@furrcohen.com; Bouslog, Matthew G. <MBouslog@gibsondunn.com>; Jarret Hitchings <jarret.hitchings@bclplaw.com>; Ezequiel Romero <ezequiel.romero@bclplaw.com>; Van Baalen, Guy A (USTP) <Guy.A.VanBaalen@usdoj.gov>; Richard Pachulski <rpachulski@pszjlaw.com>; Michael Goldberg <michael.goldberg@akerman.com>; Robert Feinstein <rfeinstein@pszjlaw.com>; Feinman, Heidi (USTP) <Heidi.A.Feinman@usdoj.gov>; Thomas Patterson <tpatterson@ktbslaw.com>; Joseph D. Frank <jfrank@fgllp.com>; clc@kttlaw.com; Seth H. Lieberman <slieberman@pryorcashman.com>
**Subject:** RE: Vital Pharmaceuticals, et al, 22-17842-PDR

Dear Mr. Falconer,

We are finalizing our deliberations and conversations and will revert shortly. Thank you for your patience. I remain,

Sincerely,



**J. Steven Wilkes**
**Trial Attorney**

U.S. Department of Justice
Office of the U.S. Trustee for Region 21
501 East Polk Street, Suite 1200
Tampa, FL 33602

Tel: 813-228-2173
Fax: 813-228-2303
Cell: 202-360-7726
Steven.Wilkes@usdoj.gov

**From:** Falconer, Russ <RFalconer@gibsondunn.com>
**Sent:** Tuesday, November 22, 2022 1:42 PM
**To:** Wilkes, Steven (USTP) <Steven.Wilkes@usdoj.gov>
**Cc:** rfurr@furrcohen.com; mbarmat@furrcohen.com; Bouslog, Matthew G. <MBouslog@gibsondunn.com>; Jarret Hitchings <jarret.hitchings@bclplaw.com>; Ezequiel Romero <ezequiel.romero@bclplaw.com>; Van Baalen, Guy A (USTP) <Guy.A.VanBaalen@usdoj.gov>; rpachulski@pszjlaw.com; michael.goldberg@akerman.com; rfeinstein@pszjlaw.com; Feinman, Heidi (USTP) <Heidi.A.Feinman@usdoj.gov>; tpatterson@ktbslaw.com; jfrank@fgllp.com; clc@kttlaw.com; Lieberman, Seth H. <SLieberman@PRYORCASHMAN.com>
**Subject:** [EXTERNAL] RE: Vital Pharmaceuticals, et al, 22-17842-PDR

Mr. Wilkes:

Following up on our discussion yesterday, please let us know if your office would still like to set up a call this afternoon to discuss the implementation of the non-trade creditors' committee. We will make ourselves available at your convenience.

Thanks very much,
Russ


**Russ Falconer**

### GIBSON DUNN

Gibson, Dunn & Crutcher LLP
2001 Ross Avenue Suite 2100, Dallas, TX 75201
Tel 214.698.3170 • Cell 214.803.5487
RFalconer@gibsondunn.com • www.gibsondunn.com

---

**From:** Falconer, Russ
**Sent:** Monday, November 21, 2022 3:59 PM
**To:** 'Wilkes, Steven (USTP)' <Steven.Wilkes@usdoj.gov>
**Cc:** rfurr@furrcohen.com; mbarmat@furrcohen.com; Bouslog, Matthew G. <MBouslog@gibsondunn.com>; Jarret Hitchings <jarret.hitchings@bclplaw.com>; Ezequiel Romero <ezequiel.romero@bclplaw.com>; Van Baalen, Guy A (USTP) <Guy.A.VanBaalen@usdoj.gov>; rpachulski@pszjlaw.com; michael.goldberg@akerman.com; rfeinstein@pszjlaw.com; Feinman, Heidi (USTP) <Heidi.A.Feinman@usdoj.gov>; tpatterson@ktbslaw.com; jfrank@fgllp.com; clc@kttlaw.com; Lieberman, Seth H. <SLieberman@PRYORCASHMAN.com>
**Subject:** RE: Vital Pharmaceuticals, et al, 22-17842-PDR

Mr. Wilkes:

Thanks very much. We are pleased to hear it and look forward to working with your office on next steps. We'll look for your e-mail in the morning.

Best,

**Russ Falconer**

### GIBSON DUNN

Gibson, Dunn & Crutcher LLP
2001 Ross Avenue Suite 2100, Dallas, TX 75201
Tel 214.698.3170 • Cell 214.803.5487
RFalconer@gibsondunn.com • www.gibsondunn.com

---

**From:** Wilkes, Steven (USTP) <Steven.Wilkes@usdoj.gov>
**Sent:** Monday, November 21, 2022 3:52 PM
**To:** Falconer, Russ <RFalconer@gibsondunn.com>
**Cc:** rfurr@furrcohen.com; mbarmat@furrcohen.com; Bouslog, Matthew G. <MBouslog@gibsondunn.com>; Jarret Hitchings <jarret.hitchings@bclplaw.com>; Ezequiel Romero <ezequiel.romero@bclplaw.com>; Van Baalen, Guy A (USTP) <Guy.A.VanBaalen@usdoj.gov>; rpachulski@pszjlaw.com; michael.goldberg@akerman.com;

rfeinstein@pszjlaw.com; Feinman, Heidi (USTP) <Heidi.A.Feinman@usdoj.gov>; tpatterson@ktbslaw.com;
jfrank@fgllp.com; clc@kttlaw.com; Lieberman, Seth H. <SLieberman@PRYORCASHMAN.com>
**Subject:** RE: Vital Pharmaceuticals, et al, 22-17842-PDR

**[WARNING: External Email]**

Dear Mr. Falconer,

This correspondence confirms receipt of your letter emanating from our tele-video conference
call of Friday. After due deliberation, the U.S. trustee is inclined to appoint a second, non-trade
creditor committee in the above captioned case.

To that end, we would like to have a further call tomorrow to discuss the implementation of that
committee. I will be in contact with you tomorrow morning to set up that call. I remain,

Sincerely,



**J. Steven Wilkes**
**Trial Attorney**

U.S. Department of Justice
Office of the U.S. Trustee for Region 21          Tel: 813-228-2173
501 East Polk Street, Suite 1200                  Fax: 813-228-2303
Tampa, FL 33602                                   Cell: 202-360-7726
                                                  Steven.Wilkes@usdoj.gov

**From:** Falconer, Russ <RFalconer@gibsondunn.com>
**Sent:** Monday, November 21, 2022 4:16 PM
**To:** Wilkes, Steven (USTP) <Steven.Wilkes@usdoj.gov>; Van Baalen, Guy A (USTP) <Guy.A.VanBaalen@usdoj.gov>;
Feinman, Heidi (USTP) <Heidi.A.Feinman@usdoj.gov>
**Cc:** rfurr@furrcohen.com; mbarmat@furrcohen.com; Bouslog, Matthew G. <MBouslog@gibsondunn.com>; Jarret
Hitchings <jarret.hitchings@bclplaw.com>; Ezequiel Romero <ezequiel.romero@bclplaw.com>;
rpachulski@pszjlaw.com; michael.goldberg@akerman.com; rfeinstein@pszjlaw.com; tpatterson@ktbslaw.com;
jfrank@fgllp.com; clc@kttlaw.com; Lieberman, Seth H. <SLieberman@PRYORCASHMAN.com>
**Subject:** [EXTERNAL] RE: Vital Pharmaceuticals, et al

All:

Further to our call on Friday, please see the attached correspondence.

Thanks,

**Russ Falconer**

GIBSON DUNN

Gibson, Dunn & Crutcher LLP
2001 Ross Avenue Suite 2100, Dallas, TX 75201
Tel 214.698.3170 • Cell 214.803.5487
RFalconer@gibsondunn.com • www.gibsondunn.com

-----Original Appointment-----
**From:** Wilkes, Steven (USTP) <Steven.Wilkes@usdoj.gov>
**Sent:** Wednesday, November 16, 2022 8:06 AM
**To:** Wilkes, Steven (USTP); Van Baalen, Guy A (USTP); Feinman, Heidi (USTP); rpachulski@pszjlaw.com;
michael.goldberg@akerman.com; rfurr@furrcohen.com; Bouslog, Matthew G.; tpatterson@ktbslaw.com;
slieberman@pryorcashman.com; tkapur@pszjlaw.com; ikharasch@pszjlaw.com; rfeinstein@pszjlaw.com;
jfrank@fgllp.com; clc@kttlaw.com; das@kttlaw.com; romeroe@bryancave.com; steven.fender@fender-law.com;
mbarmat@furrcohen.com; salifarag@pryorcashman.com
**Subject:** Vital Pharmaceuticals, et al - Meeting Requested by Monster
**When:** Friday, November 18, 2022 10:30 AM-11:30 AM (UTC-05:00) Eastern Time (US & Canada).
**Where:** Video-Tele-Conference

**[WARNING: External Email]**

# Microsoft Teams meeting

**Join on your computer, mobile app or room device**
Click here to join the meeting

**Or call in (audio only)**
+1 202-235-7900,,83543899# United States, Washington

Phone Conference ID: 835 438 99#
Find a local number | Reset PIN

Learn More | Meeting options

This message may contain confidential and privileged information for the sole use of the intended recipient. Any review, disclosure, distribution by others or forwarding without express permission is strictly prohibited. If it has been sent to you in error, please reply to advise the sender of the error and then immediately delete this message.

Please see our website at https://www.gibsondunn.com/ for information regarding the firm and/or our privacy policy.

This message may contain confidential and privileged information for the sole use of the intended recipient. Any review, disclosure, distribution by others or forwarding without express permission is strictly prohibited. If it has been sent to you in error, please reply to advise the sender of the error and then immediately delete this message.

Please see our website at https://www.gibsondunn.com/ for information regarding the firm and/or our privacy policy.

# EXHIBIT H

**From:** Wilkes, Steven (USTP) [mailto:Steven.Wilkes@usdoj.gov]
**Sent:** Wednesday, November 23, 2022 6:57 AM
**To:** Falconer, Russ <RFalconer@gibsondunn.com>
**Cc:** rfurr@furrcohen.com; mbarmat@furrcohen.com; Bouslog, Matthew G. <MBouslog@gibsondunn.com>; Jarret Hitchings <jarret.hitchings@bclplaw.com>; Ezequiel Romero <ezequiel.romero@bclplaw.com>; Van Baalen, Guy A (USTP) <Guy.A.VanBaalen@usdoj.gov>; Richard Pachulski <rpachulski@pszjlaw.com>; Michael Goldberg <michael.goldberg@akerman.com>; Robert Feinstein <rfeinstein@pszjlaw.com>; Feinman, Heidi (USTP) <Heidi.A.Feinman@usdoj.gov>; Thomas Patterson <tpatterson@ktbslaw.com>; Joseph D. Frank <jfrank@fgllp.com>; clc@kttlaw.com; Seth H. Lieberman <slieberman@pryorcashman.com>; cameronkelly@quinnemanuel.com; pattytomasco@quinnemanuel.com; gweiner@sidley.com; dharvath@harvathlawgroup.com; Leyza F. Blanco Esq. (lblanco@sequorlaw.com) <lblanco@sequorlaw.com>; jguso@bergersingerman.com; Jeramy Webb Esq. (Jeramy.Webb@lw.com) <jeramy.webb@lw.com>; Jeffrey Cohen <jcohen@lowenstein.com>
**Subject:** RE: Vital Pharmaceuticals, et al, 22-17842-PDR

Dear Mr. Falconer and all Others,

On behalf of the United States Trustee for Region 21, we wanted to thank you for sharing your thoughts and concerns last Friday that culminated in your Monday letter. As you are aware, Counsel for Monster unequivocally requested that neither the estate fiduciaries nor the Official Committee of Unsecured Creditors ("Committee") be present at that tele-video meeting. After conducting due diligence and hearing from these parties, the U.S. trustee has determined it would be in the best interests of the estate and creditors to not appoint a second committee but rather reconstitute the Committee. This reconstitution will best afford the differing subsets of unsecured creditors appropriate representation on the Committee.

To that end, in addition to those unsecured creditors already appointed, the following unsecured creditors will also be appointed to the reconstituted Committee:

Matt Blum, Director, Warner Music Group;
W. Conrad Ragan, Finance Director, PepsiCo, Inc.;
Stephen Cole, Senior Counsel, The American Bottling Co., Inc.; and
Peter Fischer, c/o Daniel F. Harvath, putative class action plaintiff.

You will receive CM/ECF notice of filing of the reconstituted appointment shortly. Have a Happy Thanksgiving. I remain,



**J. Steven Wilkes**
**Trial Attorney**

U.S. Department of Justice
Office of the U.S. Trustee for Region 21
501 East Polk Street, Suite 1200
Tampa, FL 33602

Tel:  813-228-2173
Fax: 813-228-2303
Cell: 202-360-7726
Steven.Wilkes@usdoj.gov

# EXHIBIT I

**From:** Richard Pachulski
**Sent:** Sunday, November 27, 2022 11:50 PM
**To:** 'Wilkes, Steven (USTP)' <Steven.Wilkes@usdoj.gov>
**Cc:** 'Falconer, Russ' <RFalconer@gibsondunn.com>; Robert Furr <rfurr@furrcohen.com>; Marc Barmat <mbarmat@furrcohen.com>; Bouslog, Matthew G. <MBouslog@gibsondunn.com>; Van Baalen, Guy A (USTP) <Guy.A.VanBaalen@usdoj.gov>; Michael Goldberg <michael.goldberg@akerman.com>; Robert Feinstein <rfeinstein@pszjlaw.com>; Feinman, Heidi (USTP) <Heidi.A.Feinman@usdoj.gov>; Thomas Patterson <tpatterson@ktbslaw.com>; Nir Maoz <NMaoz@ktbslaw.com>; gweiner@sidley.com; sam.newman@sidley.com; Ira Kharasch <ikharasch@pszjlaw.com>; Teddy M. Kapur <tkapur@pszjlaw.com>; Jorgens, Emily <EJorgens@gibsondunn.com>; Alifarag, Sameer M. <SAlifarag@PRYORCASHMAN.com>; Seth H. Lieberman <slieberman@pryorcashman.com>
**Subject:** FW: Vital Pharmaceuticals, et al, 22-17842-PDR

Dear Mr. Wilkes:

   As you may know by now, Monster Energy Company, The American Bottling Company ('ABC'), Sony Music Entertainment, UMG Recordings, Inc., and Orange Bang, Inc. (collectively, the Movants'), have filed a motion for an order directing the appointment of an official committee of creditors holding non-trade claims (the 'Motion'.) As you will also note from the Motion, ABC has turned down the appointment to the presently reconstituted Committee (the 'OCC') and Warner Music Group has informed the Movants that it is not inclined to accept the appointment, but will make a final decision as soon as tomorrow. We understand that PepsiCo, Inc. has or will accept the appointment and further understand that Peter Fischer has not yet accepted or rejected the appointment.

   I first want to make some observations to correct and supplement the record you describe below, and then provide the Movants' ask:

   1. You state below that we specifically asked for the OCC to be excluded from our discussion on November 18. Please provide me with that request, because I do not recall making such a request, or anyone else making that request. You neither asked for them to be involved, not copied them on any e-mail until this past Wednesday's e-mail. I typically would not have made an issue of the incorrect statement, but our firm works with Mr. Cohen and his firm extensively in other cases, and have been speaking to him regarding this case. I believe the record should be very clear because I don't want an untruth to affect my, and others in our firm's, relationship with Mr. Cohen and his colleagues;

2.   In my e-mail confirming the November 18 videoconference and, again, during that conference, I advised your colleagues and you that if a second committee was not formed by November 22, or that you advised us that it would be formed, the Movants or a subset thereof would be filing the Motion (so the filing could be on regular notice.) Instead, the following took place:

1.   On Monday, November 21, and almost immediately after you received the letter from Mr. Falconer addressing the two (2) issues you asked during the November 18 videoconference be addressed in a letter (causing one to believe that the UST had been seriously considering after our videoconference whether to appoint a second committee prior to your receipt of the letter), you responded by e-mail that the UST was inclined to appoint the second committee;

2.   When no one had heard from you on November 22, Mr. Falconer reached out to you and asked if there would be a call that day as you stated there would be in your November 21 e-mail, and you stated in your November 22 e-mail that there would be no call on that Tuesday as you were doing more due diligence. No suggestion at all that the UST's 'inclination' had changed. As a showing of good faith believing that the UST was also acting in good faith, the Movants delayed filing the Motion;

3.   Unexpectedly, and without any prior notice, the UST appointed four (4) new members of a reconstituted Committee on Wednesday, November 23. Not only was such a Committee reconstituted without placing the Debtors' largest creditors on the reconstituted Committee, my understanding is none of those four (4) creditors was even spoken to determine their interest in sitting as a minority on a reconstituted Committee; and

4.   While you state that I asked that the OCC (incorrect) and the Debtors' professionals not participate in our videoconference, I was very clear in my November 14 e-mail to you that if you felt after our videoconference that it would be useful to have another call, including with the Debtors' professionals, we had no objection to such a call. I truly do not understand if you were inclined to appoint the second committee and then the UST changed direction, that the Movants did not receive the courtesy of a call to explain the change of direction and/or to ask additional questions (whether or not including the OCC and/or the Debtors' professionals on such a call), or at least transmitting an e-mail to the group explaining the reasons for the UST's change of direction.

The above said, the ask is very simple: the Movants do not believe the OCC is in any way representative, particularly with ABC declining the appointment to the OCC, and possibly Warner Music Group also declining the appointment. The Movants comprise approximately $750 million in claims (approximately five (5) times the claims of the OCC) and, without whose support of a Plan, the Plan is not confirmable. Reconstituting the OCC again will not solve the lack of representation on the OCC of non-trade creditors, particularly when the major non-trade creditors are not on the OCC, the non-trade creditors on the OCC have a minority voice, and that minority has had to date no

involvement in major decisions, such as the retention of OCC professionals and a going forward plan of action. Considering the present facts Movants again request the appointment of a non-trade committee. While the UST has the discretion to appoint whom it deems appropriate for any such committee, the Movants recommend that the UST appoint the 7 non-trade creditors reflected in Mr. Falconer's November 21 letter, and add Warner Music Group and Mr. Fischer.

    The Movants are prepared to again speak to the UST's representatives if the UST believes that such a discussion would be beneficial to resolve the pending Motion.

Regards,

Richard M. Pachulski

---

**From:** Wilkes, Steven (USTP) [mailto:Steven.Wilkes@usdoj.gov]
**Sent:** Wednesday, November 23, 2022 6:57 AM
**To:** Falconer, Russ <RFalconer@gibsondunn.com>
**Cc:** rfurr@furrcohen.com; mbarmat@furrcohen.com; Bouslog, Matthew G. <MBouslog@gibsondunn.com>; Jarret Hitchings <jarret.hitchings@bclplaw.com>; Ezequiel Romero <ezequiel.romero@bclplaw.com>; Van Baalen, Guy A (USTP) <Guy.A.VanBaalen@usdoj.gov>; Richard Pachulski <rpachulski@pszjlaw.com>; Michael Goldberg <michael.goldberg@akerman.com>; Robert Feinstein <rfeinstein@pszjlaw.com>; Feinman, Heidi (USTP) <Heidi.A.Feinman@usdoj.gov>; Thomas Patterson <tpatterson@ktbslaw.com>; Joseph D. Frank <jfrank@fgllp.com>; clc@kttlaw.com; Seth H. Lieberman <slieberman@pryorcashman.com>; cameronkelly@quinnemanuel.com; pattytomasco@quinnemanuel.com; gweiner@sidley.com; dharvath@harvathlawgroup.com; Leyza F. Blanco Esq. (lblanco@sequorlaw.com) <lblanco@sequorlaw.com>; jguso@bergersingerman.com; Jeramy Webb Esq. (Jeramy.Webb@lw.com) <jeramy.webb@lw.com>; Jeffrey Cohen <jcohen@lowenstein.com>
**Subject:** RE: Vital Pharmaceuticals, et al, 22-17842-PDR

Dear Mr. Falconer and all Others,

On behalf of the United States Trustee for Region 21, we wanted to thank you for sharing your thoughts and concerns last Friday that culminated in your Monday letter. As you are aware, Counsel for Monster unequivocally requested that neither the estate fiduciaries nor the Official Committee of Unsecured Creditors ("Committee") be present at that tele-video meeting. After conducting due diligence and hearing from these parties, the U.S. trustee has determined it would be in the best interests of the estate and creditors to not appoint a second committee but rather reconstitute the Committee. This reconstitution will best afford the differing subsets of unsecured creditors appropriate representation on the Committee.

To that end, in addition to those unsecured creditors already appointed, the

following unsecured creditors will also be appointed to the reconstituted Committee:

Matt Blum, Director, Warner Music Group;
W. Conrad Ragan, Finance Director, PepsiCo, Inc.;
Stephen Cole, Senior Counsel, The American Bottling Co., Inc.; and
Peter Fischer, c/o Daniel F. Harvath, putative class action plaintiff.

You will receive CM/ECF notice of filing of the reconstituted appointment shortly. Have a Happy Thanksgiving. I remain,



**J. Steven Wilkes**
**Trial Attorney**

U.S. Department of Justice
Office of the U.S. Trustee for Region 21
501 East Polk Street, Suite 1200
Tampa, FL 33602

Tel:  813-228-2173
Fax: 813-228-2303
Cell: 202-360-7726
Steven.Wilkes@usdoj.gov