

**ORDERED in the Southern District of Florida on December 27, 2022.**



**Peter D. Russin, Judge**
**United States Bankruptcy Court**

---

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FORT LAUDERDALE DIVISION**

In re:

Vital Pharmaceuticals, Inc., et al.,                    Case No. 22-17842-PDR

     Debtors.                                        Chapter 11
                                                        (Jointly Administered)

_____/

**ORDER DENYING**
**<u>JOINT MOTION TO APPOINT CREDITORS COMMITTEE</u>**

Monster Energy ("Monster"), Orange Bang ("Orange"), The American Bottling Company ("ABC"), Sony Music Entertainment ("Sony"), and UMG Recordings ("UMG") (together, "Movants") filed their *Joint Motion to Appoint Creditors Committee* (Doc. 408) seeking the appointment of a second unsecured creditors committee pursuant to § 1102(a)(2) (the "Motion"). Numerous interested parties

objected to the Motion including the Debtors,[1] the Committee,[2] the U.S. Trustee,[3] and Truist Bank (the "Objectors").[4] The Court conducted an evidentiary hearing on the Motion on December 19, 2022. For the reasons that follow, the Motion is **DENIED**.

## JURISDICTION AND VENUE

The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1334(b). The Court has statutory authority to hear and determine this case under 28 U.S.C. §157(b)(2)(A) and the general order of reference from the United States District Court for the Southern District of Florida. S.D. Fla. Local Rule 87.2(a). Venue is proper under 28 U.S.C. § 1408.

## BACKGROUND[5]

Debtors (the "Debtors" or the "Company") are in the beverage industry and produce, among other products, the Bang energy drink. Prior to the filing of this jointly administered Chapter 11 case, the Debtors were involved in a significant number of disputes which were the subject of either active or threatened litigation. The Debtors assert in the *Declaration of John C. DiDonato in Support of Chapter 11 Petitions*[6] that notable litigation matters included (i) arbitration with Orange[7]

---

[1] (Doc. 501).

[2] (Doc. 500).

[3] (Docs. 466 and 502).

[4] (Doc. 499).

[5] This Order constitutes the Court's findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052.

[6] (Doc. 26).

[7] (Doc. 26 at 14).

ultimately resulting in Orange obtaining a $175 million disgorgement of profits award on its trademark infringement claim and a royalty payment equal to 5% of net sales of BANG-branded beverages plus $9.3 million in fees and costs and other relief (the "OBI Judgment"), which the Debtor appealed; and (ii) litigation by Monster for false advertising,[8] alleged trade secret misappropriation, alleged violation of the Federal Computer Fraud and Abuse Act, and alleged interference with Monster contracts for retail shelf space, pursuant to which a jury awarded Monster approximately $293 million in damages (the "FAA Verdict"), which Debtor intends to appeal.

Mr. DiDonato further explains that this bankruptcy case was filed in order to (a) obtain "breathing room" from pending litigation, including the OBI Judgment and FAA Verdict, as well as consequences of pending defaults under the Prepetition Credit Agreement; (b) obtain an essential infusion of liquidity totaling $100 million to help stabilize the Company's operations at a critical juncture in the Company's business cycle (i.e., on the precipice of launching its new distribution network) through the DIP Facility; and (c) pursue a recapitalization, a replacement financing, or other transaction that will result in the payment in full of the Company's outstanding obligations under the Prepetition Credit Agreement and position the Company for success upon its emergence from chapter 11.[9]

---

[8] (Doc. 26 at 15).

[9] (Doc. 26 at 16).

On November 1, 2022, the U.S. Trustee appointed an Official Unsecured Creditors Committee, consisting of seven members[10] all of whom are alleged by Movants to be trade creditors who did not adequately represent the interests of non-trade creditors, including themselves. Specifically, Movants assert that each of their claims and many others arose from litigation against the Debtors and are therefore distinct from trade creditor claims. After receiving this type of feedback, the U.S. Trustee reconstituted the Committee to include the following 11 creditors:

| # | Original Committee Members | Claim Origin | Proof of Claim (In Millions) |
|---|---|---|---|
| 1 | Stellar Group, Inc. | Trade and Litigation Claims | Not Yet Filed (Scheduled $18.88) |
| 2 | Archer Daniels Midland Co. | Trade Creditor | $1.14 |
| 3 | Trinity Logistics, Inc. | Trade Creditor | $5.74 |
| 4 | Ardagh Metal Packaging USA Corp. | Trade and Litigation Claims | $11.39 |
| 5 | Crown Cork & Seal USA, Inc. | Trade Creditor | $13.76 |
| 6 | QuikTrip Corporation | Trade Creditor | Not Yet Filed (Scheduled $0.46) |
| 7 | XPO Logistics, L.L.C. | Trade Creditor | $1.94 |
| | **Members Added to Reconstituted Committee** | **Claim Origin** | **Proof of Claim (In Millions)** |
| 8 | Warner Music Group Corp (Resigned) | Litigation Creditor | $28 |
| 9 | PepsiCo., Inc. | Litigation Creditor | Not Yet Filed (Scheduled $115) |
| 10 | The American Bottling Co., Inc. ("ABC") (Resigned) | Trade and Litigation Claims | $225 |

---

[10] (Doc. 245).

| 11 | Harvath Law Group, L.L.C. | Litigation Creditor (Uncertified Consumer Class Action claims) | $400 |
|----|---------------------------|----------------------------------------------------------------|------|

After their appointment, two members, Warner and ABC, resigned from the Committee, citing the fact that non-trade creditors were in the minority.[11] Those Movants who were not appointed to the Committee assert the following Litigation Claims[12]:

- Monster Energy:            $389.74 Million
- Orange Bang:               $87 Million
- Sony Music Entertainment:  $35.5 Million
- UMG Recordings:            $22.15 Million

## ANALYSIS

Movants seek the appointment of a second committee under 11 U.S.C. §1102(a)(2), which provides:

> On request of a party in interest, the court may order the appointment of additional committees of creditors or of equity security holders if necessary to assure adequate representation of creditors or of equity security holders. The United States trustee shall appoint any such committee.

The "burden of demonstrating the need for adequate representation under [§ 1102(a)(2)] is borne, in the first instance, by the party seeking appointment." *Albero v. Johns-Manville Corp. (In re Johns-Manville Corp.),* 68 B.R. 155, 158 (S.D.N.Y. 1986). The appointment of an additional committee under § 1102 is an extraordinary remedy. *In re Winn-Dixie Stores, Inc.,* 326 B.R. 853, 858 (Bankr. M.D. Fla. 2005); *In*

---

[11] (Doc. 408 ¶ 5).

[12] (Doc. 408 ¶ 2).

*re Residential Capital, Inc.,* 480 B.R. 550, 557 (Bankr. S.D.N.Y. 2012); *In re Enron Corp.,* 279 B.R. 671, 685 (Bankr. S.D.N.Y. 2002) ("Ordering the appointment of additional committees, particularly given that the matter is often first reviewed and addressed by the U.S. Trustee, is an extraordinary remedy.").

Movants' main argument as to the Committee's inadequacy of representation is summarized by the following excerpts from the Motion:[13]

> ABC has declined its appointment to a Committee in which non-trade creditors would be in the minority [and likewise] Warner Music, a litigation claimant [ ] has indicated that, like ABC, it is not inclined to sit on a committee in which non-trade creditors are in the minority. . . .

> It remains a complete mystery to Movants why trade creditors with comparatively small claims would control the Committee, while the creditors with far larger claims whose support is necessary if there is to be any consensus in these cases have a subordinate role . . . .

> Movants strongly believe that the appointment of a separate Non- Trade Creditors' Committee is appropriate here. The interests of trade creditors are likely to fundamentally diverge from those of non-trade creditors in these cases … Trade creditors place value on the continuation of their business relationships with the Debtors, whereas non-trade creditors will likely favor whichever exit transaction generates maximum proceeds. . . .

> The U.S. Trustee's reconstitution of the Committee to add four non-trade creditors would not resolve this conflict, as the non-trade creditors would simply be outvoted both as to official positions and to such smaller but vital decisions as the agenda and nature of services to be performed by retained professionals.

The Objectors disagree with the Movants' arguments on both factual and legal grounds.

I.    <u>The Fiduciary Duty of a Committee and its Members.</u>

---

[13] (Doc. 408 ¶¶ 5-8).

The analysis must begin with an understanding of the roll of a committee and its members. It is well settled and widely accepted that a creditor's committee and its members have a fiduciary duty to the creditors they represent. *In re Mesta Machine Co.*, 67 Bankr. 151, 153-158 (Bankr. W.D. Pa. 1986); *see also Shaw & Levine v. Guld & Western Industries, Inc. (In the matter of Bohack Corp.),* 607 F.2d 258, 262 n.4 (2d Cir. 1979) ("The committee owes a fiduciary duty to the creditors and must guide its actions so as to safeguard as much as possible the rights of minority as well as majority creditors."); *Johns-Manville Sales Corp. v. Doan (In re Johns Manville Corp.*), 26 B.R. 919, 925 (Bankr. S.D.N.Y. 1983) ("Conflicts of interest on the part of the representative persons or committees are . . . not to be tolerated."); *In re Celotex Corp.*, 123 B.R. 917, 920 (Bankr. M.D. Fla. 1991). A member of a creditors' committee should not be removed unless there is specific evidence that the member has breached or is likely to breach a fiduciary duty to the class of creditors represented by that member. *In re Seaescape Cruises, Ltd.*, 131 B.R. 241, 243 (Bankr. S.D. Fla. 1991)*; see also Woods v. City Nat'l Bank & Trust Co.*, 312 U.S. 262, 267 (1941).

Movants argue that the Trade Creditor members, in violation of their fiduciary duty, will out vote the Litigation Creditor members because their interest is to maintain a future business relationship with the Debtors, which may be contrary to the Litigation Creditors' interests that may be better served by some other result. The argument, though, is fundamentally flawed. Movants presented no evidence that a specific resolution of this case will be in the best interest of the unsecured creditor constituents. At this point, no one can say whether reorganization, a sale as a going

concern or liquidation of the Debtors will be best. The Debtors and the Committee have hired separate sets of financial advisors and investment bankers who seem to be working together to resolve that question.

Movants also presented no evidence that the members with the supposed divergent interests will vote as a block or that those votes will be contrary to the best interests of the unsecured creditors, in breach of their fiduciary duty. This is not surprising since nothing the Committee has done thus far in the case (although it is early days) suggests any such breach.  Without evidence, Movants' argument is premised on the mere supposition that the Trade Creditors will always act in their self-interest which in turn necessarily assumes that self-interest conflicts with their fiduciary duty. The Court cannot rely upon supposition.

At the Hearing, Movants argued that time is of the essence to appoint an additional committee because waiting until some harm actually occurs will be too late given certain timing concerns and deadlines relating to the terms of the DIP financing. But the Court cannot entertain arguments premised only upon speculative future wrongdoing, without evidentiary support that it is likely to occur. Movants offered no such evidence.

II.    <u>The Trade and Litigation Creditors Are Not Sufficiently Distinct.</u>

Movants rely heavily on the opinion of the U.S. Bankruptcy Court for the Eastern District of Louisiana in *In re Roman Catholic Church of the Archdiocese of New Orleans,* No. 20-10846, 2021 WL 454220 (Bankr. E.D. La. Feb. 8, 2021), as precedent for the notion that Litigation Creditors and Trade Creditors are sufficiently

distinct, just as sexual abuse victims and commercial creditors are sufficiently distinct to warrant the appointment of a second committee. The Court disagrees with the premise that *Archdiocese* and this case are analogous or that *Archdiocese* even stands for the proposition Movants advance.

In *Archdiocese,* the court appointed a second committee finding inadequate representation for commercial creditors where the committee was comprised of only sexual abuse victims after the one commercial creditor (TMI) was removed. *Id.* at 13. In contrast, the Committee, as reconstituted, consists of eleven members, at least five of whom are Litigation Creditors. Even considering the Committee's present make up, due to resignations, there are still at least two Litigation Creditor members. Pepsi is scheduled as having a $115,000,000 Litigation Claim and, although disputed at the Hearing, Harvath Law Group represents an uncertified class with asserted Litigation Claims.

In *Archdiocese*, there was no dispute that sexual abuse victims with no commercial business relationship with the debtor are quite distinct from creditors whose claims arise in the commercial context. *Id.* at 12 Here, it is difficult to cleanly distinguish Trade Creditors from Litigation Creditors. The Committee asserted, for example, that certain of the Trade Creditors' claims may include Litigation Claims (Stellar and Ardagh) and that certain Litigation Creditors (Monster and Orange) may have an interest in the Debtors' continuing in business because they have a right to a 5% royalty. In other words, attempting to predict a particular commercial creditor's motivation is a dubious exercise.

Further, in *Archdiocese*, the court's main concern was not that the abuse claimant members of the committee could not perform their fiduciary duties due to conflicting interests. In fact, the court presumed they would. Rather, the court's concern was that the committee included *only* abuse claimants and had *no* members who shared the interests of the commercial creditors. It was this lack of even a single commercial creditor which led to the determination that the moving creditor, who had been removed from the committee, lacked adequate representation.

> The Court does not question or discount the capacity of individual Survivor Members to advocate for more than one set of interests, but the fact is that the interests of abuse claimants and standard commercial creditors are different. . . . The question for this Court is whether requiring the six Survivor Members to wear multiple hats can satisfy the requirements for adequate representation here, particularly **when there is not even one member of the Committee holding a commercial claim to provide that perspective to the group.**

*Id.* at 12 (emphasis added).

"Nowhere does the Code mandate that a committee must faithfully reproduce the exact complexion of the creditor body." *In re Hills Stores Co.*, 137 B.R. 4, 7 (Bankr. S.D.N.Y. 1992); *cf. In re Dana Corp.*, 344 B.R. 35, 38-39 (Bankr. S.D.N.Y. 2006); *but see also In re Garden Ridge Corp.*, 2005 WL 523129, at *3 (Bankr. D. Del. Mar. 2, 2005) (holding that adequate representation does not require a "proportionate representation of distinct groups of creditors."). The only requirement is that the committee afford "adequate representation" to a given group of creditors. "A determination of whether one group of creditors has adequate representation on a committee will entail a balancing of that group's interest against the interest of other groups on the committee." *In re Dow Corning Corp.*, 194 B.R. 121, 142 (Bankr. E.D.

Mich. 1996). "This, of course, cannot be done unless the various groups of creditors and their interests are known." *Id.*

Movants argue that the interests of Trade Creditors are known, and they are allegedly only interested in continuing to do business with the Debtor and will prioritize doing so. The record, however, does not support this. There may be instances where trade creditors would prioritize continued business with the debtor, but there may also be circumstances in which trade creditors would receive a better payout from liquidating a debtor. Movants offered no evidence of any action by the Committee or its individual members suggesting any priority and certainly none that would be contrary to the Movant's best interests. Even if any such evidence existed, conflicting interests can be adequately represented "through a single committee as long as the diverse interests of the various creditor groups are represented on and have participated in the committee." *Mirant Ams. Energy Mktg., L.P. v. Official Comm. Of Unsecured Creditors of Enron Corp.*, No. 02-CV-6274, 2003 WL 22327118, at *7 (S.D.N.Y. Oct. 10, 2003); see also *In re Sharon Steel Corp.*, 100 B.R. 767, 778-779 (Bankr. W.D. Pa. 1989); *In re Beker Indus. Corp.,* 55 B.R. 945, 948-49 (Bankr. S.D.N.Y. 1985).

In this case a diverse set of interests is in fact represented by the Committee which includes at least two Litigation Creditors. The mere fact that the Committee does not perfectly mirror the unsecured creditor body, or that the Litigation Creditors may potentially be outvoted by the Trade Creditors does not mean they are not

adequately represented. *See, e.g., In re Residential Cap., LLC*, 480 B.R. 550, 559 (Bankr. S.D.N.Y. 2012).

Finally, the court in *Archdiocese* relied on a robust record of the committee's actions, clearly evidencing the actions taken and the opinions and interests of the members. *In re Roman Catholic Church of the Archdiocese of New Orleans,* 2021 WL 454220 at 11. Here, the Committee is still in its infancy, having been formed only weeks ago, and there is no record to support that the Committee has or will act in contravention of its fiduciary duties. Additionally, there is nothing to indicate that "[t]rade creditors place value on the continuation of their business relationships with the Debtors, whereas non-trade creditors will likely favor whichever exit transaction generates maximum proceeds," as suggested by the Movants.[14] The primary purpose of a committee is to maximize recovery for its creditor constituents. *See In re Nationwide Sports Distributors, Inc.*, 227 B.R. 455, 463 (Bankr. E.D. Pa. 1998) (citation omitted). While "[s]ome members [of a committee] may favor liquidation; others may favor continuation of the business in order to preserve jobs or the viability of an important customer." *Mirant Ams. Energy Mktg., L.P. v. Official Comm. Of Unsecured Creditors of Enron Corp.*, No. 02-CV-6274, 2003 WL 22327118, at *7 (S.D.N.Y. Oct. 10, 2003). Without support in the record to indicate the Committee members' positions, it is pure speculation that Trade Creditor interests "fundamentally diverge from those of non-trade creditors in these cases."[15]

[14] (Doc. 408 ¶ 7).

[15] (Doc. 408 ¶ 7).

III.    The *Winn-Dixie* Factors.

In analyzing the appropriateness of appointing an additional committee, courts throughout the country[16] have engaged in a form of cost benefit analysis. The Court considers the factors set out in *In re Winn-Dixie Stores*, 326 B.R. at 858, among others, instructive.

### A. The Nature of the Case.

Although this is a larger than average Chapter 11 case, it does not involve issues that are radically more complicated than other cases. Movants argue this case stems from the Debtors' inappropriate business practices which therefore may result in a divergence of interests between Trade Creditors and Litigation Creditors. But the nature of this case does not compel a finding that those interests are wholly incompatible. Movants argue that trade creditors have an interest in preserving the Debtors' going concern, and while that may be true, it is not such a polarizing interest irreconcilable with the duty of the Committee members to maximize the value of the payout to the unsecured class. In addition, the argument ignores the fact that the Movants themselves, or at least Monster and Orange have an interest in the Debtors continuing as a going concern so that they receive their 5% royalty.

### B. The Benefit to the Administration of the Estate.

---

[16] *See generally In re Celsius Network LLC*, 2022 Bankr. LEXIS 3010 (Bankr. S.D.N.Y. Oct. 24, 2022) (requesting Equity Holders had not met their burden to demonstrate factors such as balance of costs and benefits to estate, and the complexity of the Chapter 11 Case did not weigh in favor of appointing another committee); *In re Wang Laboratories, Inc.*, 149 B.R. 1, 2 (Bankr. D. Mass. 1992) (addressing the issue of adequate representation by considering the following non-exclusive factors: (1) the number of parties represented by the Committee; (2) the complexity of the case; and (3) whether the cost of the additional committee significantly outweighs the concern for adequate representation); *see, e.g., In re Shorebank,* 467 B.R. 156, 162-63 (Bankr. N.D. Ill. 2012); *In re Nat'l R.V. Holdings, Inc.,* 390 B.R. 690, 692 (Bankr. C.D. Cal. 2008).

While there may be advantages to the individual creditors who are appointed to a second committee, such as having their legal fees paid by the estate, Movants failed to demonstrate any clear benefit to the administration of the estate. Movants argue that the formation of a second committee will expedite matters as they will be able to share information and avoid duplicative discovery given the rights provided in § 1103. However, they have not articulated a reason that they would be unable to simply cooperate among themselves to streamline their efforts in these bankruptcy proceedings, including discovery. Movants are well organized, ably represented, and actively participating in this case. Each has counsel, and Movants, as exemplified by the joint Motion, have conclusively demonstrated their ability to advocate for their common interests with a single voice. There is no basis to argue that because a particular Movant is not on the Committee (and therefore may not have as direct access to information through § 1103) that the cure for that perceived ill is to appoint a second committee. That concept would lead to a proliferation of committees as creditors wait and hope that the U.S. Trustee appoints to a separate committee those who may make this argument.

C. <u>The Cost to the Estate</u>.

Movants argue that the Debtors have a sizeable market share and continue to operate and generate income and can afford to pay for an additional committee's expenses. But that does not mean that an additional committee should be appointed. In fact, the inclusion of this factor only highlights that the Court is to weigh the cost against the benefit to the estate. No one disputes that the appointment of a second

14

committee will result in a significant cost to the Debtors. An additional committee will seek to retain yet a third set of professionals including counsel, financial advisors, and investment bankers. The Court is loath to add yet another layer of administrative expense without a clear of the countervailing benefit.

Movants argue this case will be over in approximately five months if a "deal" is not reached because that is the extent of the funding available if the DIP financing is approved on a final basis.  A second committee's access pursuant to § 1103 would promote open lines of communication with the Debtors and the original Committee in this critical early stage of the case, which may result in a consensual plan or a less contentious case, thereby saving the estate money. Without it, and to avoid a bad deal being made by the Committee with the Debtors, which will be presented as a *fait accompli,* Movants argue they will have no choice but to immediately begin asserting their estimated $750,000,000 in claims as a blocking position inevitably leading to litigation chaos and great additional expense.

But again, the argument is purely speculative and, if wrong, leaves only the certainty of the expense of a third set of professionals. The speculative nature of the argument is highlighted by the very blocking positing Movants assert which should theoretically motivate the Debtors and the Committee to include Movants in deliberations over major issues in the case including a plan. While that too may be a hopeful speculation, in the absence of collaboration, the Debtors and Committee would risk having to engage in cramdown and other adversarial approaches to confirm a plan which Movants do not support. In other words, that blocking position

15

gate swings both ways and to suggest one direction is more likely than the other is purely speculative since no evidence was presented indicating which way the wind blows.

### D. <u>Adequacy of the Movants' Current Representation</u>.

Movants interests as Litigation Creditors, to the extent meaningfully different from Trade Creditors, are already fairly represented by having been offered five out of eleven seats on the Committee. The fact that two of the creditors resigned because they could not "control" the Committee[17] suggests that rather than seek a result that was in the best interest of the unsecured creditor constituents, the intention was to force their will upon the Committee—the very fear they have of the Trade Creditor members. The difference is that the Trade Creditors have not demanded control, perhaps because they have it, but perhaps because it is not relevant to the exercise of their fiduciary duty.  Indeed, all members of the Committee have a fiduciary duty to the constituency they represent so "control" of the Committee should in theory be irrelevant.

The fact that two of the five Litigation Creditors, including one of the Movants, decided to resign and therefore the Committee is even further out of balance is not a relevant factor under the statute, and as previously stated, the case law (including *Archdiocese*) suggests otherwise. The U.S. Trustee is free to replace those who resigned with other Litigation Creditors and perhaps she will consider doing so.

---

[17] (Doc. 408 ¶ 5).

Regardless, the Court cannot countenance appointing a second committee as the cure for this self-inflicted wound.

### E.  The Uniqueness of Movants' Position.

As alleged in the Motion, there are some 63 claims that stem from litigation with the Debtors, and so Movants, although possessing some of the largest claims, are distinctly not in a unique position in this case. Furthermore, the nature of their position as high-dollar-value Litigation Creditors does not necessitate a second committee to adequately represent their interests. While the size of a claim may suggest the creditor has more at stake, that fact alone does not make a creditor's position sufficiently unique. If that were the case one could argue that large claim creditors' committees should be created along with medium and small claim committees. That concept would again lead to a proliferation of committees and is neither logical nor supported by the Bankruptcy Code.

### F.  The Ability of Movants to Participate in the Case.

Movants are more than capable of participating in this bankruptcy on their own and are capable of collaborating to ease their burden if they wish, and they can do so outside the context of a committee, free of the fiduciary duty that accompanies that role.

## CONCLUSION

Accordingly, the Court **ORDERS:**

The Motion to Appoint Creditors Committee (Doc. 408) is **DENIED**.

### # # #

*Copies to Michael Goldberg, Esq. who is directed to serve this Order on all interested parties.*