Page 1

1                    UNITED STATES BANKRUPTCY COURT

                       SOUTHERN DISTRICT OF FLORIDA

2

3

4    IN RE:                        CASE NO. 22-17842-PDR

5    VITAL PHARMACEUTICALS, INC.,

6                    Debtor.

     _____/

7

8                        ECF #171, 408

9                     December 19, 2022

10                   The above-entitled cause came on for hearing

11   before the Honorable Peter D. Russin, one of the Judges in

12   the UNITED STATES BANKRUPTCY COURT, in and for the

13   SOUTHERN DISTRICT OF FLORIDA, at 299 E. Broward Blvd.,

14   Fort Lauderdale, Broward County, Florida, on December 19,

15   2022, commencing at or about 10:00 a.m., and the following

16   proceedings were had.

17

18

19

20

21

22              Transcribed from a digital recording by:

                     Cheryl L. Jenkins, RPR, RMR

23

24

25

Page 2

1

**APPEARANCES:**

2

3                    BERGER SINGERMAN, by
                    JORDI GUSO, Esquire
4                            and
                  LATHAM & WATKINS, by
5                  ANDREW SORKIN, Esquire
                  HUGH MURTAGH, Esquire
6               On behalf of the Debtor
7

                    AKERMAN, LLP, by
8             MICHAEL I. GOLDBERG, Esquire
                  EYAL BERGER, Esquire
9                          and
           PACHULSKI STANG ZIEHL & JONES, by
10              RICHARD PACHULSKI, Esquire
                ROBERT FEINSTEIN, Esquire
11           On behalf of Monster Energy
12

                    SEQUOR LAW, by
13                LEYZA BLANCO, Esquire
                          and
14              LOWENSTEIN SANDLER, by
                ERIC CHAFETZ, Esquire
15              ERICA MANNIX, Esquire
                JEFFREY COHEN, Esquire
16            On behalf of the Official
            Committee of Unsecured Creditors
17

18                  SHUTTS BOWEN, by
            HARRIS KOROGLU, Esquire (via Zoom)
19                         and
                MOORE & VAN ALLEN, by
20              LUIS LLUBERAS, Esquire
                COLE RICHINS, Esquire
21            On behalf of Truist Bank
22

        J. STEVEN WILKES, Trial Attorney (via Zoom)
23   GUY VAN BAALEN, Assistant United States Trustee (via Zoom)
                Office of the U.S. Trustee
24                Department of Justice
25

Page 3

1
                        CONTINUED APPEARANCES
2
3                        FURR & COHEN, by
                        ROBERT FURR, Esquire
4                              and
                   GIBSON DUNN & CRUTCHER, by
5                        RUSS FALCONER, Esquire
             On behalf of American Bottling Company
6
7                   FENDER BOLLING AND PAIVA, by
                     G. STEVEN FENDER, Esquire
8                              and
                           KTBS LAW, by
9               TOM PATTERSON, Esquire (via Zoom)
                    NIR MAOZ, Esquire (via Zoom)
10                 On behalf of Orange Bang, Inc.
11
                        PRYOR CASHMAN, by
12                   SETH LIEBERMAN, Esquire
                     SAMEER ALIFARAG, Esquire
13              On behalf of UMG Recordings, Inc.
                   and Sony Music Entertainment
14
15                GENOVESE JOBLOVE & BATTISTA, by
                  PAUL BATTISTA, Esquire (via Zoom)
16                   On behalf of Jack Owoc
17                        ALSO PRESENT
18           ECRO - Electronic Court Reporting Operator
19                      - - - - - - -
20
21
22
23
24
25

Page 4

1

2                              EXHIBITS

3                                        Page

Monster's Exhibits 8-12          34

4   Monster's Exhibits 14-26         34

Monster's Exhibit 4             123

5   Debtors' Exhibits 1-19          40

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                  THE COURT:  All right.  Vital
 2   Pharmaceuticals, 22-17842.  Who wishes to make their
 3   appearance?
 4                  MR. GUSO:  Good morning, your Honor.
 5   Jordi Guso, of Berger Singerman, along with the
 6   Latham & Watkins firm, we are co-counsel to the debtors.
 7                  I'm joined at counsel table this morning,
 8   your Honor, by Hugh Murtagh, from the Latham & Watkins
 9   firm.  Your Honor, Mr. Sorkin will also be joining us.
10   He's been slightly delayed concluding a meeting of the
11   debtors board of directors via Zoom, and so, your Honor,
12   under the circumstances I'd ask the Court to defer the
13   status until Mr. Sorkin joins us, if that's acceptable to
14   you.
15                  THE COURT:  Sure.  Any idea of timing?
16                  MR. GUSO:  He will be here, hopefully,
17   Judge, within the next 30 minutes or so.  So if it's all
18   right with the Court, perhaps we take up the second
19   committee motion, and then Mr. Sorkin can provide the
20   status update to the Court.
21                  THE COURT:  Okay.  That's fine with me,
22   sure.
23                  Appearances, any others?  Don't be bashful,
24   you can form a line.
25                  MR. LLUBERAS:  Good morning, your Honor.
```

1   Luis Lluberas, L-l-u-b-e-r-a-s, of Moore & Van Allen,

2   counsel to Truist Bank, who is the administrative agent

3   for both the prepetition and postpetition credit

4   facilities.

5           I'm joined today with my partner,

6   Cole Richins, who has been admitted pro hac vice, like I

7   am, and our affiliated co-counsel, Shutts & Bowen,

8   Mr. Harris Koroglu should be on Zoom as well.

9           Good morning, your Honor.

10           THE COURT:  Good morning to you.

11           Mr. Furr.

12           MR. FURR:  Judge, Robert Furr, Furr & Cohen,

13   for American Bottling Company, and Russ Falconer, of

14   Gibson Dunn, who is pro hac vice, and is here also.

15           THE COURT:  Great.  Thank you, Mr. Furr.

16   That's American Bottling Company, you said?

17           MR. FURR:  Yes, sir.

18           THE COURT:  Thank you.

19           MR. COHEN:  Good morning, your Honor.

20   Jeffrey Cohen, Lowenstein Sandler, on behalf of the

21   creditors' committee.  With me from Lowenstein Sandler, my

22   colleagues Eric Chafetz and Erica Mannix, and our

23   co-counsel, Leyza Blanco, as well.

24           Your Honor, after you take appearances, I

25   understand the debtors would like to handle the status

Page 7

```
 1    conference later on, but if you would be open to some
 2    preliminary remarks from the committee, we would
 3    appreciate that time.
 4                THE COURT:  Okay.  Thank you.
 5                MR. FENDER:  Thank you.  Good morning,
 6    your Honor.  This is Steven Fender, I'm here for Orange
 7    Bang, Inc., and lead counsel, who has been admitted
 8    pro hac, is on Zoom, and will be making their own
 9    appearance.
10                THE COURT:  All right.  Thank you,
11    Mr. Fender.
12                MR. GOLDBERG:  Good morning, your Honor.
13    Mike Goldberg, on behalf of Monster Energy.  With me is
14    Eyal Berger, from my office, and we are co-counsel with
15    the Pachulski Stang firm, who will be making their own
16    appearances.
17                THE COURT:  Thank you, Mr. Goldberg.
18                MR. PACHULSKI:  Good morning, your Honor.
19    Richard Pachulski, of Pachulski Stang Ziehl & Jones.  I'm
20    also here with my partner Rob Feinstein, and we're here on
21    behalf of Monster Energy Company.
22                THE COURT:  Welcome.
23                MR. PACHULSKI:  Thank you so much,
24    your Honor, and I understand Mr. Cohen would like to start
25    before us in terms of his status, and we're more than
```

1    happy to cede the podium to him before we start the

2    argument on the second committee.

3                    THE COURT:  All right.  Thank you.

4                    MR. PACHULSKI:  Thank you.

5                    THE COURT:  Mr. Cohen.

6                    If you all notice that Mr. Sorkin pops up --

7    I'm not staring at Zoom, so just let me know and we can

8    see if we need to pivot.

9                    Go ahead.

10                   MR. COHEN:  Good morning, your Honor.  First

11   of all, thanks for giving me the opportunity for my first

12   in-person appearance since COVID.

13                   THE COURT:  Well, I sort of view it as a

14   vast improvement in weather, so, you know --

15                   MR. COHEN:  I will wholly agree with that.

16   It's freezing in New York but, your Honor, I thought we

17   would be remiss to jump into a motion --

18                   THE COURT:  Let me ask, was there any -- you

19   know, I forgot to do this.  Is there anybody on Zoom who

20   wants to make an appearance?  Mr. Wilkes?

21                   MR. WILKES:  Thank you, your Honor.

22                   THE COURT:  Let's start with you, I'm sorry.

23                   MR. WILKES:  Yes.

24                   THE COURT:  You know, this is the problem

25   with hybrid.

```
 1                    Anyway, Mr. Wilkes.
 2                    MR. WILKES:  Thank you, your Honor.
 3   J. Steven Wilkes for the United States Trustee, Region 21,
 4   also appearing for the United States Trustee is the
 5   Assistant United States Trustee Guy Van Baalen.  We are
 6   both on Zoom, your Honor.
 7                    THE COURT:  Thank you.
 8                    Mr. Battista.
 9                    MR. BATTISTA:  Good morning, Judge.
10   Paul Battista on behalf of Jack Owoc, O-w-o-c.
11                    THE COURT:  Mr. Van Baalen, I just heard
12   that.
13                    Mr. Patterson.
14                    MR. PATTERSON:  Good morning, your Honor.
15   Tom Patterson and Nir Maoz for Orange Bang in Los Angeles.
16   We've been admitted pro hac vice.  Good morning.
17                    THE COURT:  Good morning.  Mr. Maoz.
18                    MR. MAOZ:  I believe Tom just made my
19   appearance, but --
20                    THE COURT:  All right.
21                    MR. MAOZ:  -- Nir Maoz on behalf of Orange
22   Bang.
23                    THE COURT:  Thank you.
24                    Mr. Lieberman.
25                    MR. LIEBERMAN:  Good morning, your Honor.
```

1    Can you hear me okay?

2              THE COURT:  I think you've got a little echo

3    there, but thank you.

4              Mr. Koroglu.

5              MR. KOROGLU:  Good morning, your Honor.

6    Harris Koroglu for Truist Bank.

7              THE COURT:  Thank you.

8              And, Mr. Alifarag.

9              (No verbal response.)

10             THE COURT:  You're on mute.

11             MR. ALIFARAG:  Good morning, your Honor.

12   Can you hear me?

13             THE COURT:  Yes.

14             MR. ALIFARAG:  I am also here as counsel to

15   Sony and UMG Partners, with my colleague Seth Lieberman,

16   your Honor.

17             THE COURT:  Great.  Anyone else?

18             (No verbal response.)

19             THE COURT:  All right.

20             MR. GUSO:  Your Honor, consistent with my

21   remarks when I made my appearance (inaudible) --

22             THE COURT:  Ah, so you want to wait for

23   Mr. Cohen to address the Court.  All right.  So that

24   leaves us with what to do.

25             MR. GUSO:  Second, the motion (inaudible) --

```
 1                    THE COURT:  Ah, okay, all right, that's fine
 2   unless, Mr. Cohen, you have some issue that relates to
 3   that?
 4                    MR. COHEN:  I have plenty of issues,
 5   your Honor, but one that I do want to discuss --
 6                    THE COURT:  Not getting into personal
 7   issues.
 8                    MR. COHEN:  Exactly, exactly.
 9                    30 seconds, and then your Honor can decide
10   whether it's worth having the discussion before the
11   motion.
12                    THE COURT:  Mr. Guso, any problem with that,
13   since I don't know what it's about, so it's hard for me to
14   say whether to allow it or not.
15                    MR. GUSO:  (Inaudible) 30 second
16   (inaudible) --
17                    THE COURT:  All right, then you time him,
18   I'm not going to do it.  Go ahead, Mr. --
19                    MR. COHEN:  I'm a New Yorker, I can speak
20   fast.
21                    THE COURT:  Okay.
22                    MR. COHEN:  Your Honor, it seems a little
23   premature to deal with a motion to appoint a second
24   committee if we're unsure whether the case can proceed.
25                    The case is currently unfunded.  I did not
```

```
 1    attend the motion to sell vehicles the other day because I
 2    didn't realize the debtor would be giving an update on the
 3    status of the DIP, and we adjourned the DIP from today,
 4    but there are really strong reasons as to why the DIP was
 5    adjourned, and I'm not sure your Honor has been fully
 6    apprised of those reasons.
 7                     The debtor --
 8                     THE COURT:  My only information so far has
 9    been that the -- at least three of the constituents were
10    trying to work things out.  Mr. Guso, that's what I
11    understand from the last hearing.
12                     MR. GUSO:  Yes, sir.
13                     THE COURT:  That doesn't necessarily mean
14    that all will agree to whatever resolution that might be,
15    but that was my understanding, and so we moved it to
16    January 10th.
17                     MR. COHEN:  And I'm not before --
18                     MR. GUSO:  With the agreement of the
19    parties, your Honor.
20                     MR. COHEN:  I'm not before you to try to
21    negotiate in open court, but I am before your Honor to
22    tell you that's not exactly what's going on, and it's
23    reached a critical point where I think it's unfair for the
24    Court to not know what's going on in the case.
25                     THE COURT:  All right.  Well, let me ask you
```

1    this, if the case is not -- obviously to determine whether

2    the case is going to proceed or not is a much larger

3    question regardless of what may be going on with the

4    issues associated with the debtor and the financing.

5                    It's at least a strong possibility that the

6    case will continue in some form, and in that regard a

7    second committee -- the issue of the second committee is

8    still relevant.  So I don't necessarily understand why not

9    to proceed with the motion.  Is there a --

10                   MR. COHEN:  We are prepared to proceed with

11   the motion.

12                   For context, your Honor, we, including

13   counsel for the movants and counsel for the lenders,

14   believe that your Honor should have updated information to

15   just understand the status and, frankly, paralysis of the

16   case before we enter into what we perceive to be perhaps a

17   full day argument on issues, we are all ready and prepared

18   to proceed on, but we all come here with knowledge that

19   your Honor doesn't have and, frankly, collectively,

20   thought it was unfair for your Honor to not know what's

21   going on.

22                   THE COURT:  All right.  Well, I definitely

23   appreciate your concern with the unfairness of the

24   situation on behalf of the Court, and that's -- I think I

25   have too little information not to proceed, and I

Page 14

```
 1    understand why you are being cautious here.
 2                    Let me -- why don't we just, it seems to me
 3    that we should just proceed and see how things are going.
 4    It may be that Mr. Sorkin is at a board meeting that
 5    changes the landscape considerably.  I mean, he's at a
 6    board meeting in this case, so maybe that's relevant,
 7    maybe it isn't, and I just don't want to waste the time,
 8    because if we end up trying the case, the sooner we get at
 9    it --
10                    MR. COHEN:  I a hundred percent agree,
11    your Honor.  To me it's coincidental, or strategic to
12    schedule the board meeting at the very time we're supposed
13    to be before your Honor.
14                    MR. GUSO:  That's not fair, your Honor.
15    It's not strategic --
16                    MR. COHEN:  It's --
17                    MR. GUSO:  I can represent to the Court it's
18    not strategic.
19                    THE COURT:  I understand, and -- I
20    understand the perspective.  I don't know one way or the
21    other, and certainly can't decide that issue based on
22    what's before me.
23                    So, why don't we just leave all that aside
24    for the moment.  It may be that Mr. Sorkin makes himself
25    available in the middle of all of this, and it may be
```

```
1    appropriate to take a break and hear what Mr. Sorkin has

2    to say by way of status, and then we can decide where to

3    go from there.

4              MR. COHEN:  I appreciate that, your Honor.

5              MR. GUSO:  (Inaudible.)

6              THE COURT:  All right.  Okay.  So, yes, go

7    ahead, Mr. Guso.

8              MR. GUSO:  No, I said thank you.

9              THE COURT:  All right.  So the movants, I

10   assume, Mr. Pachulski, you will go first.  I don't know

11   what your plan was, but it seems to me that perhaps some

12   oral argument, by way of opening, if you will, might be

13   appropriate, if that's something you're interested in.

14             The Court has read all of the papers very

15   carefully.  The Court has snuck a little peek at the

16   exhibits, but hasn't spent a lot of time on the exhibits,

17   but if you think it appropriate, I'd like to hear from you

18   on whether an opening makes sense.

19             MR. PACHULSKI:  Your Honor, I actually think

20   it's going to be opening and closing, to be frank, because

21   there aren't going to be any witnesses, to my knowledge,

22   and the exhibits speak for themselves, your Honor will

23   determine which ones to be entered into evidence.

24             I would --

25             THE COURT:  We'll go through the process of
```

1   introducing them --

2           MR. PACHULSKI:  I'm going to go through the

3   process.

4           THE COURT:  -- of course.

5           MR. PACHULSKI:  In fact, I'd like to start

6   with that process, and ask that certain (sic) be admitted

7   immediately.

8           I do want to make a point, because I think

9   it's only fair to your Honor to understand it, and I'm not

10  looking to take away from what Mr. Cohen was going to say,

11  but we have a certain --

12          THE COURT:  We're happy that everyone is

13  being fair to me.

14          MR. PACHULSKI:  Yes.

15          THE COURT:  It's great.

16          MR. PACHULSKI:  But what was happening here,

17  and it seems a little strategic to me, is that we've been

18  here for 20 days, since Ms. Cole, which I'll get into,

19  resigned.  The lenders have demanded a governance change,

20  the debtors have refused the governance change, and I

21  think what Mr. Cohen was going to ask, but, of course, we

22  understand counsel for the debtor, waiting for, I feel

23  like I'm in a Perry Mason episode, is going to show up and

24  magically say the governance has been resolved, of course

25  hasn't shared that with anybody, and because of that, I

Page 17

```
 1   think, and again, not to take away from Mr. Cohen, because
 2   I prefer him to go through it, to say if we don't have
 3   something resolved, then January 10th should either be the
 4   DIP hearing go forward, or a motion to appoint a trustee,
 5   because we are in a very scary position in this case, and
 6   I'll go through it in the discussion of the second
 7   committee, but I think it was important for context,
 8   your Honor, to understand what actually Mr. Cohen was
 9   going to say.
10              And I don't think it's fair to say we're
11   going to wait for Mr. Sorkin to do a status conference.
12   He's known this hearing was happening, and the board
13   apparently has not been changed, we know that.  We don't
14   even know if it gets changed, if it's going to be
15   satisfactory to the lenders, to the committee, to the
16   other constituents in the case, which is part of why we
17   want a second committee.  I think the fact that we're
18   here, and Mr. Sorkin is not, dealing with the board,
19   speaks volumes.  So I wanted to put it in context before I
20   started.
21              THE COURT:  Well, let me just tell you
22   what's bouncing around in my head, and maybe it, you know,
23   makes sense, maybe it doesn't.
24              But, you know, the term "discretion" is the
25   greater part of valor.  It seems to me that may be
```

1   applicable here.

2                        What I am most worried about is what I don't

3   know.  And what I can't know, and what I don't know, and

4   what I can't know is what's going on in that board meeting

5   right now, and so my concern, frankly, is getting into a

6   subject matter that may impact what -- either negatively

7   or positively, what goes on in that board meeting without

8   even knowing what's happening.

9                        So, and while you all may be able to share

10  some information that you know anecdotally or directly,

11  that doesn't mean that that information may not change

12  during the very board meeting that's going on right now.

13  So that's my fear, and sometimes, you know, doing less

14  makes sense, and I sort of feel like doing less right now

15  makes sense until we can hear from Mr. Sorkin.

16                       Again, I don't want to make a fundamental

17  decision here that simply by having a conversation might

18  lead to the very result that, you know, that either party

19  would want or not want, that's my biggest concern.

20                       MR. PACHULSKI:  So, if I can just comment,

21  and, your Honor, whatever -- obviously your Honor is going

22  to make that determination.

23                       It really doesn't matter what Mr. Sorkin

24  says when he comes back, not that it's not significant for

25  everybody.  We filed the motion initially assuming that

1    there was a governance change, that governance was what it
2    was, okay?
3                    THE COURT:  Uh-huh.
4                    MR. PACHULSKI:  The lenders have made their
5    determination, rightfully, that there should be a massive
6    governance change.
7                    We, frankly, think it should be much greater
8    than the lenders do, but that's neither here nor there,
9    but whether or not Mr. Sorkin comes back and says there is
10   no governance change, which is what we showed up to today,
11   or says magically there is a governance change, the motion
12   is still going to go forward.  The --
13                   THE COURT:  But governance has nothing to do
14   with the outcome of that motion.
15                   MR. PACHULSKI:  Correct, that's why it does
16   not -- well, it does not -- it does deal somewhat to
17   adequate representation, but whether or not, your Honor --
18                   THE COURT:  The debtor, by definition, is
19   not on the committee, so how would it?
20                   MR. PACHULSKI:  Excuse me?
21                   THE COURT:  The debtor, by definition, is
22   not on the committee, so how would it?
23                   MR. PACHULSKI:  The facts of the case make
24   it somewhat relevant.  The debtor obviously is not on the
25   committee, but it's more -- when you look at the criteria

1   set out, whether you look at In Re:  Budd, or Winn Dixie,

2   or whichever determination, there is a set of criteria,

3   and the nature of the case, the uniqueness of the case,

4   the transparency of the case, those are all factors, but

5   again, your Honor, I don't think it makes any difference

6   with respect to what the debtors' determination is.

7                 So, I'm prepared to go forward now.  The

8   debtor will come in, they will do a status conference, but

9   I don't think it's going to make a difference in terms of

10  your ruling on the second committee.

11                If your Honor thinks differently, then we

12  should take a break, but --

13                THE COURT:  I don't think so either, and

14  that's why I'm prepared to go forward with your motion

15  starting right now.

16                MR. PACHULSKI:  Okay, as am I.

17                THE COURT:  In fact, you know, it may be

18  that the result of whatever is going on in the board

19  meeting, and whatever follows from that, you know, if

20  there is a second committee, the second committee would

21  want to participate in what happens next, it seems to me

22  even more so, and if there is no second committee, it's

23  merely because I found that it wasn't appropriate to have

24  one.

25                If that changes, I suppose, because of

1   what's going on in this board meeting, I guess that's a

2   point that can be made later on in this hearing, after we

3   hear from Mr. Sorkin, if you think that's relevant.

4                 So, I say we forge ahead.

5                 MR. PACHULSKI:  Okay.  I misunderstood

6   your Honor.  I thought for some reason you may want to

7   take a break to hear the status, but I agree with

8   your Honor that it's not going to --

9                 THE COURT:  Okay.

10                MR. PACHULSKI:  -- make a difference one way

11  or the other.

12                THE COURT:  Other than Mr. Cohen, does

13  anyone disagree?

14                (No verbal response.)

15                THE COURT:  Okay.  All right.  Go ahead

16  then, you want to start introducing evidence, or how do

17  you want to proceed?

18                MR. PACHULSKI:  Your Honor, I would, at this

19  point, and this is for Monster's part of the presentation,

20  I would ask for the admission into evidence of all of the

21  documents that have been referenced in the joint movants'

22  exhibit register.

23                THE COURT:  Which is at Docket Entry 52 --

24                MR. PACHULSKI:  At 521, your Honor.

25                THE COURT:  521.  Okay.  I'm just pulling

1    that up.

2                All right.  So this is the joint movants'

3    exhibit register, and you're seeking the admission of all

4    of those documents.

5                Does anyone have any objections?

6                MR. MURTAGH:  Yes, your Honor.  Hugh Murtagh

7    on behalf of the debtors.

8                THE COURT:  Mr. Murtagh, do me a favor, if

9    you can approach, just either -- if your mic is on, great,

10   but it's hard --

11               MR. MURTAGH:  Can you hear me now?

12               THE COURT:  It's hard to lean down.  If you

13   want to approach, that's even better.

14               MR. MURTAGH:  I'll leave space at the

15   podium, this is fine for me if it's fine for you.

16               THE COURT:  Okay.  Sure.

17               MR. MURTAGH:  Okay.

18               THE COURT:  Sure.

19               MR. MURTAGH:  Your Honor, the debtors object

20   to the admission of Items 1 through 7, that's

21   correspondence with the U.S. Trustee regarding appointment

22   of the committee on the basis of relevance.

23               Everybody here, I think, has agreed that the

24   Court's determination on this matter is de novo.  It's not

25   based on what the trustee did or did not do.  There is no

1    possible relevance to those documents.

2                    THE COURT:  Thank you, Mr. Murtagh.

3                    So that is sort of consistent,

4    Mr. Pachulski, with what you and I talked about at the

5    last hearing, which was that I, I guess, would determine

6    whether there is currently adequate representation, and

7    whatever the U.S. Trustee's Office did or did not do, or

8    whatever went into their decision as to how to

9    reconstitute the committee, or why, doesn't change the

10   fact that the committee is made up of the members as they

11   sit today, and that either it's adequate representation or

12   it isn't.  Do you have a different view?

13                   MR. PACHULSKI:  Your Honor, I don't.

14   Ironically I was going to ask for the -- before, I was

15   going to ask for the admission of Exhibits 8 through 24,

16   to begin with.  I do want to make one comment, though,

17   your Honor, and your Honor will make the determination.

18   So 8 through 24, apparently there is no dispute.

19                   THE COURT:  Is that true?

20                   MR. MURTAGH:  I'm sorry.  Your Honor, I

21   forgot to mention, or was going to withhold until now,

22   mentioning I think Document 13 is a letter of resignation

23   from Ms. Cole.  I believe that my objection on that is

24   relevance and hearsay.

25                   MR. PACHULSKI:  Your Honor, the reason that

1    that is being provided is because --

2              THE COURT:  Well, before we go there, we're

3    good on 1 through 7, right, not be introduced?

4              MR. PACHULSKI:  The only one that we would

5    consider, your Honor, is the letter from the U.S. Trustee

6    saying that they were inclined to appoint a second

7    committee.  We think that is relevant to the determination

8    the U.S. Trustee actually had issues, that would be the

9    only one that I believe would be relevant, assuming

10   your Honor has -- agrees that we have de novo review,

11   which I think the cases are pretty clear on.

12             THE COURT:  All right.  So I'm going to

13   reserve on that until I've read it, understand it, and

14   argument can be made whether it's relevant at the time you

15   wish to discuss it.

16             I guess during your argument you can seek to

17   -- when you get to that point, you can tell me why it's

18   relevant and what the issues are.

19             I can see that.  I mean, I can understand

20   that if the U.S. Trustee's Office thought a second

21   committee might be necessary for one reason or another,

22   that that might suggest that at least the U.S. Trustee's

23   Office might have thought at one point that there was

24   inadequate representation.  It doesn't change the fact

25   that I still am the ultimate arbiter of that issue as the

1   committee sits today.  So, I'm not sure it's relevant, but

2   I can understand why it, as opposed to the others, might

3   have some relevancy.  So, I'm just going to reserve on

4   that for now, but the others are not being introduced --

5   the others that are not --

6               MR. PACHULSKI:  I think that would have come

7   in the -- would be Exhibit 4 -- I'm sorry, let me just

8   make sure.  It's Exhibit 5.

9               THE COURT:  Exhibit 5 are emails between

10  certain movants and the --

11              MR. PACHULSKI:  Yes.

12              THE COURT:  -- United States Trustee's

13  Office dated November 21st and 22nd.

14              MR. PACHULSKI:  I believe it's within that

15  group of emails, but it's one specific email.

16              THE COURT:  All right.  So we'll reserve on

17  that one specific email.  The others are not being

18  introduced, and we'll get deeper into the weeds on that in

19  a moment, or at the right time.  So Exhibits 1 through 4,

20  and 6 and 7 not being introduced.  All others are not

21  objected to, other than 13, is that right, Mr. Murtagh?

22              MR. MURTAGH:  On behalf of the debtors, yes,

23  your Honor.

24              THE COURT:  Does anyone else have any

25  objections to any of the exhibits?

Page 26

1              MR. COHEN:  Your Honor, Jeffrey Cohen on

2    behalf of the committee.

3              This might be semantics, your Honor, but

4    Number 8 seems perhaps to be precedential, if the movants

5    seem to cite it as precedent, but I don't see how a case

6    management order from another bankruptcy case would be

7    evidentiary.

8              THE COURT:  I agree with that, unless you

9    have some other reason for introducing it.

10             MR. PACHULSKI:  Your Honor, the point is,

11   I'll be going into an analysis of the -- of many of the

12   18 cases ironically that the committee cites as to when

13   committees weren't formed.  Nine of these are equity

14   committees.

15             The particular case that we're talking

16   about, which I guess is referred to as RMS Titanic, which

17   is out of the Jacksonville Division, is an equity

18   committee that was appointed.  It's not precedent, in the

19   traditional sense, but the case was extremely small.

20             THE COURT:  But what's the evidentiary --

21             MR. PACHULSKI:  The evidentiary is they say

22   that there is a cost issue associated with appointing a

23   second committee, and in the Jacksonville case --

24             THE COURT:  But that's legal argument.

25             MR. PACHULSKI:  Well --

```
 1                    THE COURT:  It's not evidence.

 2                    MR. PACHULSKI:  Well, we're just --

 3                    THE COURT:  The case itself, the order

 4    itself is not evidence.

 5                    MR. PACHULSKI:  Well, the order itself is

 6    the fact that there is -- was a committee appointed in the

 7    case, which the fact -- the very facts are that the assets

 8    were no more than 36 million, and the debt was in the

 9    neighborhood of 15 million.

10                    THE COURT:  But it's still not evidence.

11    What's the evidence?  How is it evidence?

12                    MR. PACHULSKI:  Well, it's evidence as to a

13    particular -- relating to the cost issue that's been made

14    such a big deal of, your Honor.

15                    THE COURT:  It's another court's view of how

16    to analyze the cost issue, but it's not evidence.

17                    MR. PACHULSKI:  Okay.  Your Honor, as I

18    said, I think it's relevant to today's hearing.

19                    THE COURT:  Oh, maybe -- I'm not saying I

20    won't consider it --

21                    MR. PACHULSKI:  Okay.

22                    THE COURT:  -- all day long.  I mean, you

23    know, you have another example of a case by another court

24    that might be relevant to the legal argument, I'm happy to

25    read it.
```

1                    MR. PACHULSKI:  Well --

2                    THE COURT:  I just don't -- it's just not

3       evidence.

4                    MR. PACHULSKI:  Well, I guess, unless

5       Mr. Cohen says otherwise, he cited 18 cases that I'm now

6       going to respond to.

7                    THE COURT:  They're not evidence either.

8                    MR. PACHULSKI:  Okay.  That's fine.

9                    THE COURT:  That's just for legal argument.

10                   MR. PACHULSKI:  Okay.

11                   THE COURT:  Is that your point --

12                   MR. PACHULSKI:  So I will use --

13                   THE COURT:  -- Mr. Cohen?

14                   MR. PACHULSKI:  I will use it for legal

15      argument.

16                   MR. COHEN:  It is my point, your Honor, and

17      I just want to supplement, I skipped over 9, 8 and 9 are

18      connected.  They're both in the same case but, yes,

19      your Honor, to the extent --

20                   THE COURT:  Well, let's put it this way, I'm

21      going to take judicial notice of the existence of 8 and 9,

22      and anything else you think that's not quite evidence but

23      you want me to take judicial notice of.  To the extent

24      that it's a pleading in another court, that's more in line

25      with how it would be introduced or admitted as, you know,

1    as judicial notice, and then you all can argue to your

2    heart's content over what those things mean.

3                    MR. PACHULSKI:  Okay.

4                    THE COURT:  All right.  What else, anything

5    else other than 13?

6                    (No verbal response.)

7                    THE COURT:  Nope.

8                    Okay.  So, 13, tell me about 13 again.

9    What's the issue there, Mr. Murtagh?

10                   MR. MURTAGH:  Yes, your Honor, Number 13 is

11   a letter of resignation from one of the debtor's officers.

12   It is completely irrelevant to today's hearing.  It's also

13   hearsay.

14                   THE COURT:  All right.  So how is it

15   relevant, and why is it not hearsay?

16                   MR. PACHULSKI:  Your Honor, one of the --

17   what we're trying to determine, to demonstrate --

18                   THE COURT:  But what does it say?  I don't

19   even know what it says.

20                   MR. PACHULSKI:  Oh, it says that Ms. Cole

21   has resigned because she does not believe she could -- who

22   was appointed as the -- and this is part of the problem,

23   your Honor, in terms of the lack of knowledge.  Right at

24   the time that the case was filed, Ms. Cole was appointed

25   as the chief operating officer of the debtors, probably

1    the number two position.

2                    In less than 60 days from the time she was

3    appointed, she has, without dispute, submitted a letter of

4    resignation.  In and of itself it would not be a problem,

5    but the fact of the matter is she says she cannot comply

6    with her fiduciary duties because of the directives that

7    are provided.

8                    One of the issues, one of the criteria is

9    what are the debtors' motives, what are the movants'

10   motives in seeking the appointment of a second committee?

11   The motive is when you get a letter like Ms. Cole's, which

12   is completely relevant in terms of your Honor's

13   determination as to why there is a need for a second

14   committee, to investigate issues like this.

15                   We have, for your information, your Honor,

16   we have sought -- we got this letter from the debtor.  We

17   did not get it independently.  It took a week, but we got

18   it.

19                   THE COURT:  You got it through discovery, or

20   you just asked for it and --

21                   MR. PACHULSKI:  Well, we asked for it a

22   first time, it was refused, and then we sent a second --

23   and then we sent -- when the lenders and the debtors

24   wanted to see what our position was on the DIP, even

25   though the governance issue was not resolved, we said

1    without certain facts, including a copy of the letter of

2    resignation.  The debtors finally gave it to us, those are

3    the absolute facts.

4                    We have, we have now sought an examination

5    of Ms. Cole.  My recollection, I may be a bit off, is that

6    the documents are required to be produced by, I think,

7    December 29th or December 30th, and her examination is

8    scheduled for January 4th.  We have not had a reach-out by

9    Ms. Cole, but we think it's critically relevant, and as to

10   receiving it, why, our motives are to seek a second

11   committee.

12                    There is -- the debtor may not like the

13   letter, but it does exist, and it came from them, not from

14   us.

15                    THE COURT:  All right.  Do me a favor, I'm

16   trying to pull it up, and I -- I see your exhibit

17   register.  Where are your exhibits, what docket entry?  I

18   see the debtors' exhibits are at 22 through 24.

19                    MR. BERGER:  Judge, it's electronic, because

20   we had some --

21                    THE COURT:  Yeah, yeah.

22                    MR. BERGER:  -- issues with PACER, it's at

23   531 through 533.

24                    THE COURT:  Ah.

25                    MR. BERGER:  But we also gave the Court a

1   second copy of our --

2                    THE COURT:  Yes, on a thumb drive, which my

3   Mac does not support.  So I'm happy to do it

4   electronically, so all good, Mr. Berger.  Let me just grab

5   it.

6                    MR. BERGER:  Specifically, Judge, it's

7   531-13.

8                    THE COURT:  Great.

9                    This is the "Dear Jack" letter?

10                   MR. PACHULSKI:  Yes, I believe so, Dear

11  Jack.

12                   THE COURT:  You guys got that, Dr. John?

13  No?

14                   All right.  I mean, it seems, again, that

15  this letter suggests that whatever authority to make

16  decisions Ms. Cole thought she had, they were either taken

17  from her, or that presumption was incorrect, and she

18  didn't think she could fulfill her fiduciary obligations

19  without whatever authority she is saying she does not

20  have.

21                   So your point with respect to the relevance

22  to the second committee motion is what again?

23                   MR. PACHULSKI:  The relevance, your Honor,

24  is -- I'll go through, is that the various movants, who do

25  not have any transparency, believe they need a second

```
 1   committee to investigate, and the committee may be doing
 2   it, we have no idea, there is no transparency here in
 3   terms of that type of issue.  The committee has had
 4   conversations with us, but we believe that in terms of
 5   what is going on with management, that it is relevant in
 6   terms of whether or not a second committee.
 7                 If everything was hunky dory, and we had a
 8   year and a half or two years, like cases like Enron, it
 9   would be a very different fact pattern, but we have a
10   limited time, with some very concerning management issues,
11   your Honor.
12                 THE COURT:  All right.  Well, it seems to me
13   that there is no reason to believe that the existing
14   committee isn't taking an interest in the corporate
15   governance issues as well as this letter.  So it's not
16   obviously relevant to me.  It might, I guess, be relevant,
17   but I don't, I don't see a prong or a factor under the
18   need to appoint a second committee that would involve an
19   issue that could easily be dealt with by the existing
20   committee as well.
21                 I do see that it goes to your issue of
22   wanting information, direct information that you're not
23   getting, and that you can argue more fully.
24                 So, for now I'm going to reserve ruling on
25   its relevance, and as you get into your argument we can
```

```
 1   get more into that.  So, I'm not going to rule at this
 2   point whether to sustain that objection.  I just want to
 3   hear more about it in the context of your argument.
 4                  MR. PACHULSKI:  That's fine, your Honor.
 5                  With that, your Honor, I think you reserved
 6   on -- you've allowed all the others into evidence.
 7                  THE COURT:  Well, let me be very clear so
 8   that somebody taking score can make sure that the record
 9   becomes clear by the filing of this document, the exhibit
10   register, with the categories appropriately marked so that
11   there is a solid record of this, not that it's not on the
12   record, but it's in the docket.
13                  So Exhibit Number 1, 2, 3, 5, 6 and 7 are
14   not introduced, correct?
15                  MR. PACHULSKI:  At this point, not from
16   Monster Energy's perspective, your Honor.
17                  THE COURT:  Okay, and Exhibit Number 4, I'm
18   reserving on for now.  Exhibit 8, 9, 10, 11, 12 and 14
19   through 26 are admitted, some of which I'm simply taking
20   judicial notice of because they're pleadings, as opposed
21   to them being necessarily evidentiary, but they're
22   admitted, and I'm reserving on 13.
23                  Is that where we are?
24                  MR. PACHULSKI:  Yeah, I think, your Honor,
25   that it's -- that we're not seeking, and maybe -- and my
```

1   colleague just reminded me, it's, I think, Exhibit 5 that

2   you're holding off on, your Honor, you're not admitting

3   Exhibit 4 for now.

4                    (Thereupon, Monster Exhibits 8 through 12

5            and 14 through 16 were admitted into evidence.)

6                    THE COURT:  Ah, okay, thank you for that

7   correction.  Yes, you're right.

8                    MR. PACHULSKI:  Exhibit 4 was from the

9   U.S. Trustee --

10                   THE COURT:  Okay.

11                   MR. PACHULSKI:  -- a letter that we had sent

12  them collectively, really from counsel for ABC, as we

13  refer to them.  It's the response back from the United

14  States Trustee letter.

15                   THE COURT:  So, to be clear, 4 is not being

16  admitted, or not being introduced, and 5 I'm reserving on.

17                   MR. PACHULSKI:  Correct, your Honor.

18                   THE COURT:  Okay.  All right.  Do we want to

19  get into the other parties' exhibits first, or do we want

20  to get into argument first?

21                   MR. PACHULSKI:  We might as well get into --

22  I thought we --

23                   THE COURT:  Well, let me ask you this, are

24  you resting on your case?  That --

25                   MR. PACHULSKI:  No --

1           THE COURT:  -- seems to be next?

2           MR. PACHULSKI:  -- I'm going to be arguing,

3    your Honor.  I just don't --

4           THE COURT:  No, no, you can argue, but are

5    you resting in terms of your evidence?

6           MR. PACHULSKI:  In terms of our evidence,

7    and again, I'm not holding this with respect to the other

8    movants, your Honor, but with respect to the evidence that

9    Monster Energy is going to provide, we're going to rely on

10   those, on the exhibits that we have provided, your Honor.

11          THE COURT:  Okay.  So Monster rests?

12          MR. PACHULSKI:  Monster rests in terms of

13   the evidence.

14          THE COURT:  Okay.  Thank you.

15          Who are the other movants that are

16   represented here today?  And do you have other evidence to

17   present?

18          MR. PATTERSON:  Your Honor, Tom Patterson

19   for Orange Bang.  Orange Bang also rests.

20          THE COURT:  And you're resting on the same

21   exhibits that have been presented to the Court, is that

22   right?

23          MR. PATTERSON:  That's correct, your Honor.

24          THE COURT:  Okay.  Thank you.

25          MR. FALCONER:  Good morning, your Honor.

1    Russ Falconer for the American Bottling Company.

2                    We had filed a set of factual stipulations

3    yesterday afternoon, which was later than we had hoped,

4    but as early as we could get it done.  I don't know if we

5    need to move those into evidence or not, but those were

6    agreed to.  I think --

7                    THE COURT:  We definitely want to cover

8    them, because I have not paid much attention, if any, to

9    them, so we definitely want to go over that, and since

10   there are stipulations, there are stipulations.  You know,

11   are they evidence?  I would call them evidence, because

12   they're stipulated evidence, so it's fine.

13                   MR. FALCONER:  The only note on that, we did

14   not hear from the U.S. Trustee's Office whether they were

15   amenable to the stipulations.  I think they just --

16                   THE COURT:  Who are the stipulations between

17   then?

18                   MR. FALCONER:  Between all the movants, and

19   I think everyone who has opposed the motion except for the

20   United States Trustee's Office.

21                   THE COURT:  Ah, okay.  All right.  Let me

22   ask Mr. Wilkes, have you taken a look at those

23   stipulations?

24                   MR. WILKES:  We have, your Honor.

25   J. Steven Wilkes for the United States Trustee.

1              The majority of the stipulations can be

2    agreed into, and I will go through that later when I get

3    the floor, but there is no need to go through line by line

4    right now for the, I want to say, 56 line items of

5    stipulations.  I'll give you the list that the United

6    States Trustee may have an objection to.

7              THE COURT:  Okay.  So there are mostly

8    stipulations, as opposed to stipulations.

9              MR. FALCONER:  It sounds like it.  Thank

10   you.

11             THE COURT:  Princess Bride?  No?

12             Okay.  Anyway.

13             MR. FALCONER:  We will be interested to hear

14   from Mr. Wilkes, because we were not stipulating to

15   relevance, we were just stipulating to the existence,

16   but --

17             THE COURT:  All right.  So we'll get to the

18   stipulations, but that's basically all of the movants'

19   evidence at this point, correct?

20             MR. PACHULSKI:  I believe that's correct.  I

21   didn't know if you -- just to clean things, for

22   housekeeping issues, whether or not your Honor was

23   interested in getting all of the exhibits in from all the

24   movants but, if not, we're prepared to proceed.

25             THE COURT:  Well, there is the movants,

1   which I think we've already covered.

2                    MR. PACHULSKI:  Correct.

3                    THE COURT:  So are you asking about the

4   objecting parties then?

5                    MR. PACHULSKI:  The objecting parties.

6                    THE COURT:  Yes, I want to cover that first,

7   because everything else is argument, correct?

8                    MR. PACHULSKI:  I think that is correct,

9   your Honor, it will make life easier, I think.

10                    THE COURT:  Yeah.

11                    MR. PACHULSKI:  But it's your Honor's call,

12   obviously.

13                    THE COURT:  No, let's do that, let's pretend

14   this is a trial where movant has the burden and goes

15   first, and introduces its evidence, and then the burden

16   shifts over to the objecting parties, and they introduce

17   their evidence, and then I suppose, I don't know about

18   rebuttal evidence, but I guess we'll have to deal with

19   that.

20                    Okay.  So who will be speaking?

21   Mr. Murtagh, right?

22                    MR. MURTAGH:  Thank you, your Honor.  I

23   don't have to crouch anymore.

24                    THE COURT:  Right, well, that's -- you know,

25   by the way, if there is a discomfort in being at the

1    podium because of COVID and various other strange things

2    going on, just say so, and what we can do is just make

3    sure that distance is maintained, because bending, I would

4    have, you know, been in traction if I were bending over

5    like you.

6                   MR. MURTAGH:  I just didn't want to --

7                   THE COURT:  There is no need --

8                   MR. MURTAGH:  -- crowd anyone.

9                   THE COURT:  -- no need to do it.  Okay.

10                  MR. MURTAGH:  Again, for the record, it's

11   Hugh Murtagh, from Latham & Watkins on behalf of the

12   debtors.

13                  THE COURT:  There was a day, there was a

14   day, literally, when counsel would be at the podium and

15   elbowing each other.  So, that's happened.  So, that would

16   not be good, but it's happened, anyway --

17                  MR. MURTAGH:  We may get there yet, but --

18                  THE COURT:  Well, let's hope not.

19                  MR. MURTAGH:  -- it's early in the day.

20                  THE COURT:  Let's hope not.

21                  All right.  So what am I looking at now?

22                  MR. MURTAGH:  Your Honor, you are looking at

23   the exhibit register of the debtors, this is Document 520.

24                  THE COURT:  Okay.  520, give me a second.

25   Sorry, give me one second.

Page 41

1                    All right.  So you have 21 exhibits.  Tell
2       me about it.
3                    MR. MURTAGH:  Yes, your Honor.  We would ask
4       to admit Items 1 through 19, which are individual
5       exhibits, and 20, exhibits introduced by any other party.
6       A number of these were just admitted in the movants' case
7       in chief, but to the extent that we need to bring them
8       back in to rely upon them, we would move, again, to have
9       all these admitted.
10                   THE COURT:  All right.  1 through 19, and
11      then 20 and 21 are other exhibits that are rebuttal
12      exhibits, okay.
13                   MR. MURTAGH:  Yes, your Honor.
14                   THE COURT:  Okay.  Anyone object to 1
15      through 19?
16                   (No verbal response.)
17                   THE COURT:  All right.  Hearing no
18      objection, then those documents will be admitted.
19                   MR. MURTAGH:  Thank you, your Honor.
20                   (Thereupon, Debtors' Exhibits 1 through 19
21          were admitted into evidence.)
22                   THE COURT:  Who else has exhibits to
23      introduce, does the committee?
24                   MR. COHEN:  Your Honor, Jeffrey Cohen on
25      behalf of the committee.

1                    We do not have exhibits to introduce.

2      However, I just did want to alert your Honor, I'll be

3      using a visual aid for demonstrative purposes during my

4      presentation, but we are not seeking to submit it as

5      evidence.

6                    THE COURT:  Okay.  All right.

7                    MR. MURTAGH:  Sorry, likewise, your Honor,

8      with respect to demonstratives for the debtors.

9                    THE COURT:  Okay.  Any objection -- well, I

10     guess you could object to the use of a particular

11     demonstrative when it's sought to be used, but --

12                   MR. PACHULSKI:  We haven't seen it.

13                   THE COURT:  -- if you haven't seen it, you

14     can't object to it, I guess, at this point.

15                   MR. MURTAGH:  Well, it would be nice if we

16     were able to see it.

17                   THE COURT:  Well, I'm not sure there is an

18     obligation to share demonstrative exhibits, or

19     demonstrative aids in advance.  It's a bench trial, so

20     don't worry, Mr. Pachulski, if you have a legitimate

21     objection, I can ignore it, if it gets to that point.

22                   MR. PACHULSKI:  I've gotten used to being

23     ignored in this case, your Honor.

24                   THE COURT:  Well, I hope not by me.

25                   MR. PACHULSKI:  No, no, not by you,

Page 43

```
 1    your Honor, but there are other parties, which is why
 2    we're here for the request for the second committee.
 3    You've been outstanding, your Honor.
 4                    THE COURT:  The beginning of his argument,
 5    why he needs a second committee, because he's tired of
 6    being ignored.
 7                    MR. PACHULSKI:  Yeah.  Well, that's part of
 8    it, but not completely.
 9                    THE COURT:  Fair enough.
10                    MR. PACHULSKI:  So, your Honor, I want to
11    spend a moment, because I think it's important to get the
12    context, and it's actually one of the criteria, what are
13    the movants' motives, of why are we fighting so hard?
14                    In my firm's history, at least my personal
15    involvement in cases, I've never sought the appointment of
16    a second committee, and if my firm has done it, you
17    probably can count it on less than one hand over the
18    almost 40 years our firm has been in existence.  So, we
19    take this very seriously.
20                    This isn't something we just run into court
21    every time we don't like a committee.  Our firm has
22    respected, in the past 20 years alone, over 250
23    committees.  So we understand how the committee process
24    works.
25                    Now, so why are we fighting so hard?  Some
```

Page 44

```
 1    of the issues in this case that you don't see in other

 2    cases, your Honor, particularly in the cases that

 3    Mr. Cohen cited, of the 18 which I'll get into in greater

 4    detail in just a bit, but this case has five to five and a

 5    half months to make.  Originally there were seven months.

 6    Over two of those months are now gone where nothing has

 7    taken place, effectively.

 8              THE COURT:  It has five to five and a half

 9    months to make what?

10              MR. PACHULSKI:  To not be in default, and be

11    subject to, effectively, a lender default, where we have

12    no ability to potentially fund the case.  That doesn't

13    happened in the other cases that your Honor will see.

14              So, if something doesn't happen in the

15    next --

16              THE COURT:  Well, I mean, I'm not sure that

17    doesn't happen in other cases.  I mean, in the cases that

18    have been before me, the lender is always sort of saying

19    you've got to get this done by X date, or this done by X

20    date, or I'll be pulling my funding, so that's not --

21              MR. PACHULSKI:  I'm not --

22              THE COURT:  -- that's not new.

23              MR. PACHULSKI:  I'm not being clear,

24    your Honor.  It happens all the time, particularly in

25    retail cases.
```

Page 45

1            Okay.  It doesn't happen in any of the cases

2    that have been cited for appointment of a second

3    committee.

4            THE COURT:  Okay.

5            MR. PACHULSKI:  Because in those cases, the

6    judges in many cases say, we will evaluate if what your

7    concern is actually comes about.  We don't have that

8    ability in this case.

9            THE COURT:  Why is that?  Explain that a

10   little bit --

11           MR. PACHULSKI:  Because --

12           THE COURT:  -- more clearly.

13           MR. PACHULSKI:  -- we will -- because the

14   debtor has been given three and a half months to find an

15   investor.  If they find an investor -- two of those months

16   have now passed, give or take.  That's what the original

17   DIP said.  I don't know what the final DIP is going to

18   say, and after that there has to be a sale process.  So,

19   there is no time to get organized and come back to

20   your Honor in three months and say, oh, now it's time to

21   give us a committee, and we can try to figure this out.

22           THE COURT:  Yeah, but doesn't that

23   presuppose the notion that there is no committee, as

24   opposed to --

25           MR. PACHULSKI:  No.

1            THE COURT:  -- a second committee?

2            And the reason I'm asking that is because in

3    that five and a half months, we have a committee.  If the

4    Court determines that there is adequate representation of

5    the creditors in that committee, then why isn't the

6    existence of that committee sufficient to analyze, or, on

7    a moment's notice, within that five and a half months,

8    bring before the Court whatever issue may be leading to

9    tanking this company or otherwise?

10           MR. PACHULSKI:  Because, your Honor, we

11   can't take the risk that a second committee won't be

12   appointed, and we can't take the risk that the committee

13   will actually do the things that we think should be done.

14   They have their own views on it, your Honor, and to show

15   up in two or three months with very little time left,

16   we're not going to do any more.  We will have -- the, at

17   least Monster, and I think some of the other movants, are

18   going to have no choice but to start to do litigation,

19   just like we did --

20           THE COURT:  Why --

21           MR. PACHULSKI:  -- with Ms. Cole.

22           THE COURT:  How do I get past the

23   speculative nature of that argument?

24           MR. PACHULSKI:  Your Honor, it's not

25   speculative.  That's reality.  I mean, the reality in this

1  case, your Honor -- if the view is that a single committee

2  can always do its job, then there would have been no need

3  in the cases we've cited to have a second committee --

4            THE COURT:  Well --

5            MR. PACHULSKI:  -- because it's a --

6            THE COURT:  -- I was --

7            MR. PACHULSKI:  -- theoretical.

8            THE COURT:  Here is how I'm looking at it,

9  I'm not looking at it necessarily that the -- I'm looking

10 at it that, as we sit here right now there is no reason to

11 believe that the committee hasn't, to now, done their job,

12 and won't do their job into the future.

13            The question then becomes what is their job?

14 And if their job doesn't comport with the movants' goals,

15 then that's an issue that we can talk about further, but

16 I'm not -- it's still speculative to suggest that the

17 committee, to the extent they have done their job to date,

18 or there is no evidence that they haven't, will not do

19 their job in the future.

20            MR. PACHULSKI:  We have no idea, your Honor.

21            THE COURT:  Well, that's the whole point of

22 the term "speculation".

23            MR. PACHULSKI:  Well --

24            THE COURT:  Nobody has any idea.

25            MR. PACHULSKI:  Well, but if that's the

1   case, your Honor, then let's just get rid of 1102(a)(2).

2                   THE COURT:  Why is that?

3                   MR. PACHULSKI:  Because what's the point of

4   having the -- their job is to be fiduciaries.  But in many

5   of those cases, their job -- they will find -- there will

6   be a negotiation where the debtor will want to deal with

7   the committee, and they will simply agree to pay the trade

8   a hundred cents on the dollar, and they will pay the

9   others less, and they'll take the position that they're

10  critical to the reorganization of the debtor, and we will

11  then get to fight about the separate classification.  It

12  may never happened.  It might happen.

13                  THE COURT:  Whose burden is it today?

14                  MR. PACHULSKI:  Your Honor, that's actually

15  unclear.  I know Winn Dixie says it's our burden, but it's

16  our -- I'm not sure that's actually correct when you have

17  a de novo review.  Your Honor is making the determination

18  as to whether it is.  So, we're bringing before you what

19  we think are the facts and why it's important.

20                  THE COURT:  But it all stems from adequate

21  representation, correct?

22                  MR. PACHULSKI:  It all takes from adequate

23  representation, and the position is, your Honor, which is

24  different than any case your Honor will see, is, number

25  one, by the statements and schedules, the litigation

1    claimants represent 75 to 95 percent of all the dollars.

2    So they have a clear blocking position.

3                   And, number two, the case has to make,

4    within the next five to five and a half months.  Those two

5    facts alone are important to understand why it's critical

6    to have a second committee in this case, because let's

7    deal with -- let's assume that the committee does

8    everything it's supposed to do.  You will not have a

9    consensual deal without a second committee negotiating

10   because we have no trans -- they can do, this committee --

11   Mr. Cohen is a very talented lawyer, our firm has dealt

12   with him for years, could do the greatest job in the

13   world, but if at the end of the day we see that the

14   principal has been released, and the trade gets a hundred

15   cents, and the process with respect to the buyers is

16   giving an advantage to going forward with creditors, then

17   there will be a massive objection in this case --

18                   THE COURT:  Yeah.

19                   MR. PACHULSKI:  -- and this case will not be

20   able to make it with the limited time it has.

21                   So one of the key --

22                   THE COURT:  Why can't -- yes, there will be

23   a massive objection, and I assume you mean by the movants

24   or some --

25                   MR. PACHULSKI:  Or some subset.

1                THE COURT:  -- subset of them, but that's

2    what I do for a living, is to resolve those objections,

3    and I do that on a fairly short timeframe, if necessary.

4                So, yeah, I agree with you that the

5    committee could do a perfect job, and you may not -- your

6    constituency may not agree, your client or the movants may

7    not agree and, yes, the next step would be to object to

8    whatever it is that's presented to the Court.

9                MR. PACHULSKI:  Well, then if you take a

10   look at cases like Hill Stores, which they cite, which

11   basically says the goal is to get a negotiated deal, you

12   won't have a negotiated deal, your Honor.  We should just

13   prepare right now --

14               THE COURT:  So, let me ask you this --

15               MR. PACHULSKI:  -- for a contested case.

16               THE COURT:  -- and I've thought about this a

17   lot, Mr. Pachulski, what is it -- would it make sense, or

18   is it to be presumed that the committee would negotiate

19   with the debtor, and not approach the movants or some

20   subset of those movants hoping that -- knowing that there

21   is likely going to be an objection, because I think they

22   can fairly gauge your perspective, to the extent whatever

23   deal they do does not comport with what they think your

24   motivation is.  Or what your client's interests are, why

25   wouldn't they approach you to discuss negotiations?

1          MR. PACHULSKI:  Because they will approach

2    us, as usually happens, when the debtor and they have made

3    the deal, and they will come to us -- they're not going to

4    bring us under the -- Mr. Cohen can say it, but I've done

5    this for 42 years, I know how it works.

6          THE COURT:  Okay.  So let me ask a different

7    question then, let me ask it differently, because you're

8    right, you're right.

9          In a settlement -- you may be right, I don't

10   know that for sure.  In fact, I would hope to the

11   contrary, because you've been doing it for 42 years, and

12   you know that the best cases are those where everyone

13   negotiates with everyone, and tries to reach a consensual

14   deal.

15         And, in fact, the committee, as a fiduciary

16   of all unsecured creditors, including your clients,

17   arguably have a duty to try to come see you, and sit you

18   down, and see if they can cut a deal, but let's -- even if

19   that doesn't happen, even if that doesn't happen, doesn't

20   the process require whatever deal the committee does with

21   the debtor, and I'm playing devil's advocate, and I know

22   I'm -- this is a hot bench, and I know I'm giving you a

23   hard time, but at the end of the day --

24         MR. PACHULSKI:  I'm used to it, your Honor,

25   don't worry.

1          THE COURT:  I am sure you are.

2          But at the end of the day, it's unlikely

3    that it would be sufficient under Rule 9019 to have

4    approved any deal they do.  It's going to be subject to

5    confirmation of a plan, and as part of confirmation of a

6    plan, or most of it will be, you have whatever protections

7    you have, the ability to object, the ability to vote

8    against the plan, and that's been proposed, and to do all

9    of those things that the Code provides that protects

10   creditors, especially creditors that have arguably a large

11   claim and, therefore, at some level a blocking position,

12   that might require cramdown and things of that sort.

13          So, why aren't those protections in place

14   sufficient to avoid the appointment of a second committee?

15          MR. PACHULSKI:  Because you don't have

16   sufficient time, your Honor, and there are a variety of

17   issues that by the time people approach us, we will have

18   no choice that before there is a plan that is proposed, we

19   will have to do investigations, someone will, and we will

20   object that we were not included in the process.

21          For instance, if there are releases of the

22   principals, or a deal with the principal, if there is a

23   release which happens in most of the cases, of avoidance

24   actions, we will have no idea -- we'll have no

25   transparency, and the debtor and the committee will simply

Page 53

1    say, here it is, Monster, and here it is, ABC, and here it

2    is, Orange Bang, this is what we're going to do and here

3    is why, and then we're going to -- and it doesn't take

4    overnight, it takes longer than overnight to be able to do

5    that kind of analysis.

6              And here is one of the biggest issues that's

7    going to come up in this case, your Honor, the movants --

8    and it's just so on its head, your Honor, that the

9    committee has limited players, and 75 to 95 percent of the

10   dollar amount have been effectively excluded in this case,

11   and a lot of that is going to have to be -- and I

12   understand your Honor takes a lot of time, and is very

13   thoughtful, but there will be massive litigation over the

14   estimation of claims for voting purposes.

15             If you had a second committee, the goal

16   would be to resolve those specific issues, because the

17   debtor, undoubtedly, and I've been through this before

18   because I've dealt with enough cases that had major

19   litigation claims, will seek estimation hearings for

20   voting purpose.  That takes time.  ABC's claims are very

21   complicated.  So, you're going to -- your Honor will have

22   to determine for voting purposes what it's going to be.

23             The point, the biggest point, your Honor, of

24   all of this, of getting a second committee, because of the

25   limited time, and because of the dollar amount of these

Page 54

1   claimants, is the ability to negotiate a resolution before

2   the debtors and the committee come to us and say, okay,

3   we've come up with this framework, this is what we're

4   going to do with the principal, this is what we're going

5   to do with respect to estimation, this is what we're going

6   to do with avoidance actions, which will simply release

7   them, which is not unusual, we're going to give more to

8   the trade, because we think they're more valuable than you

9   guys are.

10          Okay.  That's going to be -- and we're going

11  to look around and say, oh, I guess we better do some

12  discovery now.  We're going to have a train wreck,

13  your Honor.

14          It's not how cases -- your Honor talks about

15  how cases work.  What happens in most cases why they work?

16  You have the debtor, you have the committee, you have the

17  lenders, and in most of the large cases you have a uniform

18  group of ad hoc bondholders.  They're based on a single or

19  multiple indentures, and they all have the same rights.

20  Okay, and the indenture may actually get an investment

21  banker or a financial advisor so it can work.

22          In this case, people who wanted nothing to

23  do with VPX were dragged in because of trademark

24  infringement, and copyright infringement, and false

25  advertising, are now being told you're adequately

1     represented, go hire an FA, go hire an IB.

2                    Some of the players are just going to walk,

3     because the system has failed them, and they can't -- or

4     they can't afford it, and so what we're basically being

5     told, your Honor, is just wait for the committee, wait for

6     the debtors, don't cut a deal, they'll bring you in to try

7     to work with you, and if you really have time, if you have

8     a problem, litigate.

9                    We don't have a plan in place, your Honor.

10    We're going to have no time to deal with this.

11                   So, and I'm being -- and I'm not being glib,

12    I'm being serious, your Honor, if this case does not

13    dictate a second committee, I really believe 1102(a)(2)

14    should go away, because there is no point to it, because

15    that means you can have five to five and a half months,

16    and you can have 75 to 95 percent of the claims, with a

17    blocking position, where the trade's interest of a going

18    concern business is so different than people who just want

19    to get paid, who had nothing to do with it, it's

20    completely analogous, your Honor, to the cases we've

21    cited, which are the mass tort cases.

22                   Why should there be one committee -- two

23    committees in those cases then, what's the point?  There

24    is no difference.  They're just unsecured creditors.

25                   THE COURT:  Explain that to me, how is it

1    the same?

2                  MR. PACHULSKI:  How is --

3                  THE COURT:  How are those mass tort claim

4    cases, where there is a second committee, the same as the

5    litigation claimant's position?

6                  MR. PACHULSKI:  Because we basically are the

7    mass tort claimants in that case, and then you have the

8    trade claimants.  There is nothing unique, and it's

9    actually somewhat offensive the United States Trustee, in

10   trying to explain it, says that it relates to somehow --

11   and I can give you the exact quote, your Honor, but

12   somehow youth protection.

13                 Well, our firm has done well over 80 percent

14   of the committee's side of abuse cases, and they include

15   Weinstein, which was not for children, it was U.S.A.

16   Gymnastics, which was, and the dioceses cases, and the Boy

17   Scouts, and the fact is, Takata is no different, that

18   wasn't an abuse case.

19                 THE COURT:  Well, let's change it a little

20   bit to -- I do, I do recognize that abuse cases do take on

21   a little bit of a different feeling to them, if you will,

22   for lack of a better term.

23                 Are there cases out there -- I want to

24   address two points.  Are there cases out there that are

25   commercially based claimants that are not -- or that are

```
 1    sufficiently dissimilar to trade creditors that you can
 2    point me to, where a second committee was appointed?
 3               MR. PACHULSKI:  Sure.
 4               THE COURT:  And, second, in this case there
 5    were non-trade creditors appointed to this committee,
 6    there were five of them, as I understand it, although
 7    there was an argument that actually, if you look at the
 8    actual claims, it might be a majority of non-trade
 9    creditors on the committee, but let's ignore that for a
10    moment, and tell me why in this case, if there are 5 of
11    the 11, I know two resigned, don't know why that happened,
12    but we can talk about that in a minute, but let's say
13    there were 5 out of 11 on the committee, is it simply that
14    you don't have majority, because that seems to be the
15    argument, whereas it would still require, even without a
16    majority, some negotiation, or at least that's what has
17    been negotiated at the committee level, to anticipate the
18    issues you're talking about, and resolve those issues, and
19    negotiate those issues with the debtor, and if during that
20    process it became clear that the trade creditors were not
21    doing their fiduciary duty, based purely on their numbers,
22    and controlling the committee in that way.
23               And, by the way, the opposite could be
24    argued if you -- if the non-trade creditors had control,
25    that you wouldn't be doing your fiduciary duty, wouldn't
```

Page 58

1    that be something that might then lead to a motion to

2    appoint a second committee, but with some level of

3    evidence to support that burden?  So those two questions,

4    and I know that I went on for a little bit, but explain to

5    me, give me a good example of a commercially based case,

6    not an abuse case, not a mass tort case, if you will,

7    where a second committee was appointed, what the facts of

8    that case were, and then address the composition of the

9    committee as it stands.

10            MR. PACHULSKI:  Okay.  Your Honor, let's

11   step aside from the abuse cases.  Companies like

12   Mallinckrodt, and Purdue, and Takata, these were

13   manufacturing entities, where they produced opioids, or

14   they produced airbags, completely commercial enterprises,

15   had separate trade committees and victim committees,

16   because in litigation you're a victim, all three of them

17   have separate committees that the United States Trustee

18   had appointed.

19            Now, in none of those cases -- because it's

20   the same, your Honor, they could have just put the -- and,

21   by the way, while Boy Scouts is an abuse case, it's an

22   operating business.  It's a little different than the

23   dioceses cases, or --

24            THE COURT:  Well, all of these are, at some

25   level, operating businesses.  So --

1          MR. PACHULSKI:  Well, but Mallinckrodt --
2   the Boy Scouts were not in the business of committing
3   abuse.  Now, there are some survivors who would dispute
4   that, but for purposes of today, the Boy Scouts were not
5   in that business.
6          Mallinckrodt, Purdue, Takata were in the
7   very business that created the harm, and continue in
8   business, and modifying their business proposal.
9          VPX, like it or not, was in the business of
10  selling drinks that, allegations of copyright
11  infringement, trademark infringement, false advertising,
12  in its own way, it is a mass tort case.  It's exactly like
13  Takata, Purdue and Mallinckrodt, where the U.S. Trustee
14  appointed two committees.
15          Now, why didn't they?  It's exactly what we
16  have here.  You have the claimants, the tort claimants.
17  In that case they actually bought the vehicle, a vehicle
18  that had a Takata airbag in it, but they -- most times
19  they're indifferent if the entity survives, just like --
20          THE COURT:  Who is indifferent if the entity
21  survives?
22          MR. PACHULSKI:  The tort claimant,
23  indifferent.  The trade creditors want it to survive.  The
24  tort claimants are completely indifferent.  In some cases
25  they probably want the company not to survive.

Page 60

1              THE COURT:  How do I know that?

2              MR. PACHULSKI:  Excuse me?

3              THE COURT:  How do I know that?  How are you

4    able to tell me that as a fact?

5              MR. PACHULSKI:  Well, your Honor, I think

6    it's pure logic.  I mean --

7              THE COURT:  Why --

8              MR. PACHULSKI:  -- why do they --

9              THE COURT:  If the company survives and can

10   pay more by virtue of being in business --

11             MR. PACHULSKI:  In most of those cases they

12   have a pot, in each of those cases there is a pot,

13   your Honor, traditionally in those cases --

14             THE COURT:  Isn't that pot funded by

15   continuing in business?

16             MR. PACHULSKI:  In many cases they are not.

17             THE COURT:  But some they are.

18             MR. PACHULSKI:  Well, some they are and some

19   they're not, and that could be a negotiation here, just

20   like it's a negotiation there, but the facts are the --

21             THE COURT:  So the corollary of your

22   argument --

23             MR. PACHULSKI:  Your Honor, if you're right,

24   then they should all be on one committee.  Why shouldn't

25   the tort claimants be on the same committee as the trade

1      creditors if they all have the same interests?

2                   THE COURT:  Well, I think it's the opposite.

3      I'm saying you don't have to have the same interest to be

4      on the same committee and, in fact, some of the cases

5      argue that it's best, committees work best when there is a

6      divergence of interests of members of a committee, because

7      within the committee context, those members are forced to

8      negotiate a resolution that's in the best interest of the

9      estate.

10                  What you're -- the corollary of what you're

11     telling me is that your clients, or the movants' clients

12     are indifferent as to the outcome of this case, or are you

13     saying that the business surviving is not in the interest

14     of the movants --

15                  MR. PACHULSKI:  No.

16                  THE COURT:  -- but it is in the trade

17     creditors?

18                  MR. PACHULSKI:  Well, your Honor, it's

19     absolutely in the -- I don't think anybody that I know of

20     wants it destroyed.  There are two types of -- and this is

21     the same with respect to tort claimants in other cases,

22     they're either indifferent, or they think it would be good

23     to have it continue for one reason or another, okay?

24     So --

25                  THE COURT:  Well, aren't there also cases in

Page 62

1    which they would prefer to see the debtor go out of

2    business --

3                    MR. PACHULSKI:  Your Honor --

4                    THE COURT:  -- like the example where there

5    is a competitor involved.

6                    MR. PACHULSKI:  Well, that might or might

7    not be, but here is the irony, your Honor, the United

8    States Trustee appoints competitors to cases all the

9    time --

10                    THE COURT:  True.

11                    MR. PACHULSKI:  -- to committees all the

12    time.  In the Regal Cinema case, the Cineworld case down

13    in Texas, the largest creditor is a competitor, a direct

14    competitor.  So, there are mechanisms to avoid that.

15                    Now, your Honor, I'm going to -- let's

16    assume you're making that comment to Monster, because

17    Monster has been the bogeyman in this case, okay?

18                    THE COURT:  I'm certainly not viewing

19    Monster as the bogeyman in this case.

20                    MR. PACHULSKI:  Well, the debtor does.

21                    THE COURT:  In fact -- perhaps, but Monster

22    stands before the Court with a judgment, with a court

23    having found that the debtor, for lack of a better term,

24    did bad things that resulted in a very large judgment,

25    et cetera.  So I don't view it that way at all.

1          I'm trying to view this as a court should

2     view it, which is that every party before me has their own

3     interests, and their own goals, and got here as a result

4     of whatever some other court found the facts to be, if

5     those facts have been found to date.  So that's how I view

6     it.

7              MR. PACHULSKI:  Okay.  So let me be

8     transparent, your Honor, with you, which is not something

9     others have shared with me, Monster wants its claim paid.

10    This debtor surviving in some form is most likely to get

11    it paid.

12              But even more than that, your Honor, while

13    Monster may be a theoretical competitor, but is multiple

14    the size of VPX.

15              Monster participates in a 5 percent royalty.

16    Monster did not have to agree to that royalty as part of

17    the arbitration.  They did because it was in their

18    interest to see VPX survive.

19              Monster is one of the lead movants --

20              THE COURT:  Was it a settlement or was it by

21    virtue of an arbitral award?

22              MR. PACHULSKI:  It was by virtue of a

23    determination made when the arbiter was going to issue an

24    injunction, and Monster agreed.

25              THE COURT:  Made by the arbitrators?

Page 64

```
 1                MR. PACHULSKI:  Well, but the arbitrator
 2    didn't order the 5 percent, your Honor.
 3                THE COURT:  So that was an agreement of the
 4    parties?
 5                MR. PACHULSKI:  Yes.
 6                THE COURT:  Okay.
 7                MR. PACHULSKI:  That was an agreement of the
 8    parties, it was not ordered.
 9                THE COURT:  Well, doesn't that go to the
10    fact that Monster may very well be happy with the trade
11    creditors on the committee negotiating for the survival of
12    this company because you get your 5 percent?
13                MR. PACHULSKI:  No, it's not, your Honor,
14    when we don't -- and we're not sure what the deal will be
15    with the principal to get the maximum recovery, what we
16    don't know is what will happen with the avoidance actions,
17    what we don't know is how a plan is going to be done with
18    -- through the estimation process.
19                THE COURT:  But that's every case.  You've
20    just described literally every Chapter 11.
21                MR. PACHULSKI:  No.  Your Honor, that's
22    fine, but in every Chapter 11, I have not seen that 75 to
23    95 percent are not on the committee, you don't see that,
24    your Honor.
25                What happens is you look at a case like
```

1    Enron, where there -- where a committee wasn't formed.

2    Enron's energy merchants represented 20 percent of that

3    committee.  They were a fragment of the debtor's business.

4    They were certainly not 20 percent.  So the Court

5    determined not to appoint a separate energy merchants

6    committee.

7                    And, additionally, your Honor, what that

8    case had that this case does not have, is it had an

9    examiner.  The court felt it was important that the

10   examiner was going to provide transparency in that case.

11                   We don't have -- what your Honor is

12   basically saying is, let the committee do their job, you

13   should hope for the best, and if it doesn't work out, come

14   back for a second committee in two or three months, when

15   we have no trans -- the committee, your Honor, has every

16   day, you heard it on December 6th, they're talking to the

17   debtor every day about what's going on, the debtors'

18   financial advisor or investment banker as to what is going

19   on with respect to the sale process, to the investor

20   process.

21                   The movants have -- while they have 75 to

22   95 percent of the debt, they have zero transparency into

23   that process.  So what are we going to have to do?

24                   THE COURT:  Well, let me -- I'm sorry,

25   finish that.

Page 66

1              MR. PACHULSKI:  So all I was going to say

2    is, we will have no choice but to do the discovery to find

3    out what is going on, because we've had calls with the

4    debtor, and we get the little information that they're

5    prepared to give us, which we always institute the call,

6    and it's getting pretty tiresome.

7              So we've been waiting two months to do any

8    form of discovery, other than Kathy Cole, because it was

9    so horrendous to see the COO resign, and accuse the debtor

10   of restricting her ability to comply with fiduciary

11   duties, it's the only discovery we've done.

12             We can't -- the movants, and many of them

13   will just disappear because they can't afford it, or

14   they're not interested because they don't think the system

15   is going to work, we're going to have to go out and start

16   doing that discovery, and that is not going to save this

17   estate money.

18             THE COURT:  All right.  So let me ask -- so

19   now you're sort of focused on the amount of the claims,

20   okay.  You seem to be focused on the amount of the claims

21   being disproportionate with respect to the movants -- the

22   total movant claimant amounts versus those that are on the

23   committee.

24             In looking at the list, there is -- what is

25   Warner Music Group's estimated claim?  Because it doesn't

1    have an amount.

2                   MR. PACHULSKI:  I think -- well, they

3    were --

4                   THE COURT:  It's a judgment, so what's the

5    judgment amount?

6                   MR. PACHULSKI:  I don't know that Warner

7    Music has a judgment.  If they do, I'm not aware.

8    Your Honor, I haven't had much contact with Warner Music.

9    I do know their counsel well, but --

10                  THE COURT:  Has Warner filed a proof of

11   claim?

12                  MR. PACHULSKI:  I don't know that they have.

13   If it's not in the exhibits, then to my knowledge they

14   have not.

15                  MR. COHEN:  Your Honor, they have not filed

16   a proof of claim yet.

17                  MR. PACHULSKI:  We do not know, and they

18   don't have the judgment.  I know it's on a copyright

19   infringement.

20                  THE COURT:  And we don't know what their

21   claim is in the complaint that they filed, for example?

22                  MR. COHEN:  Your Honor, I can give you that

23   information.  It's 28,050,000.

24                  THE COURT:  Okay, and the -- let's see, and

25   American Bottling Company is one of the movants, correct?

1           MR. PACHULSKI:  Correct.

2           THE COURT:  And American Bottling Company's

3    claim is how much?

4           MR. PACHULSKI:  They filed a proof of claim,

5    I think in the approximate amount of 225 million.

6           THE COURT:  Okay, and that $225 million

7    would have been representative on the committee had

8    American Bottling not resigned, and they are in line with

9    the motivations, or their interests are aligned with the

10   other movants, correct?

11          MR. PACHULSKI:  Correct, your Honor.  They

12   did not -- they were very disturbed, and you'll have to

13   ask them directly, but my understanding, secondhand, is

14   they were very disturbed by the process, and do not

15   believe that their interests will be well represented by

16   the committee --

17          THE COURT:  Well, and that's --

18          MR. PACHULSKI:  -- and decided to resign.

19          THE COURT:  -- because they don't control

20   it.  As I understand it, it's because they are not in a

21   controlling position on the committee, is that right?

22          MR. PACHULSKI:  You would have to ask them,

23   but if I were --

24          THE COURT:  Well, I think that's what the

25   papers said.

1                    MR. PACHULSKI:  Yes, if Monster would not

2   have been a minority -- your Honor, based on how this case

3   took place, where you had no say in some of the major

4   issues, like retention of professionals, and whether there

5   should or should not be an investment banker and the like,

6   coming in after the fact, while Monster would have, for

7   instance, and I'll just make it Monster, I'm not going to

8   make it about ABC.  Would Monster have been willing to be

9   on the committee at this point, that is not worthwhile.

10  We do not believe --

11                    THE COURT:  Why?

12                    MR. PACHULSKI:  Because we think we will be

13  a minority vote, because --

14                    THE COURT:  Well, who says you have to have

15  control?  Why is control the issue?

16                    MR. PACHULSKI:  Your Honor, we do not

17  believe --

18                    THE COURT:  Doesn't control suggest that --

19  by requiring control, it's even different than just

20  control, generally.  By requiring control, in order to

21  believe that being on the committee is worthwhile, does

22  that not suggest exactly what you are believing the trade

23  creditors would be doing wrong because they control?

24                    Doesn't everyone have a fiduciary duty when

25  they sit on a committee --

1              MR. PACHULSKI:  They --

2              THE COURT:  -- for all creditors --

3              MR. PACHULSKI:  They have --

4              THE COURT:  -- regardless of their

5    self-interests?

6              MR. PACHULSKI:  They have fiduciary duties,

7    but as the case law says, you have to take into account

8    that they are going to look out for their own interests,

9    and they're not required not to.

10             So, your Honor --

11             THE COURT:  Not required not to in the case.

12   That doesn't mean within the context of the committee

13   they're not required to fulfill their fiduciary duty.

14             And if their fiduciary duty is owed to all

15   unsecured creditors, it seems to me your argument that you

16   are required to be in control, for you to believe that the

17   committee will function properly, that that suggests that

18   it is -- it is your self-interests that should win the day

19   because you're the largest creditor.

20             MR. PACHULSKI:  No, your Honor, that's not

21   true.

22             THE COURT:  Okay.

23             MR. PACHULSKI:  We were prepared to sit on a

24   committee, probably one that would have had -- where we

25   might have been a minority.  We weren't selected.  Seven

```
 1    trade creditors were selected in that case, your Honor,
 2    and we had no say as to counsel, we had no say as to any
 3    of the professionals who were critical.
 4              We actually do have fundamental
 5    disagreements with some of what the committee has done to
 6    date.  We are very -- we are the ones who had to seek to
 7    understand Ms. Cole, what happened with Ms. Cole.  No one
 8    seemed to be that concerned, after knowing what the
 9    debtors' history is, in terms of its various claims,
10    litigation claims.
11              Well, yes, we have concerns, your Honor, but
12    am I going to go and have -- you know, you're going to
13    say, well, that's their opinion.  They have a right to
14    their opinion, and you have a right to your opinion.
15              We disagree with some of the things the
16    committee has not done.  In light of that -- and they
17    would disagree with us, which is why you want the two
18    groups to have representation so they can negotiate with
19    each other, which is exactly, your Honor, what happens in
20    all of the mass tort cases, which is whether you look at
21    the non-abuse cases, like Takata, Purdue, Mallinckrodt, or
22    you look at the abuse cases, because under your theory,
23    your Honor, there is zero reason --
24              THE COURT:  I'm asking rhetorical questions.
25              MR. PACHULSKI:  Well, no, no --
```

1           THE COURT:  It's not my theory, but go

2     ahead.

3           MR. PACHULSKI:  Well, but under -- if the

4     view is the minority, that it's okay to always be a

5     minority, and you have fiduciary duties, then the abuse

6     claimants should be with the trade creditors, and the

7     opioid claimants should be with the trade creditors, and

8     the airbag parties should be with the trade, why not?  Why

9     not just -- but because their interests are not aligned,

10    and ABC might not have -- may have viewed it as, we think

11    the fiduciary duties of the litigation claimants are

12    different than the fiduciary duty of the trade claimants,

13    and that because of that we're uncomfortable sitting on

14    that committee, but you'd have to ask them.

15          I know I would have been concerned, based on

16    what happened, based on the U.S. Trustee.  Your Honor,

17    I've never seen where the U.S. Trustee -- where anyone

18    would have appointed seven trade that total 48 million out

19    of approximately 80 million, when you have over a billion

20    of other claims, it's not -- I've never -- maybe it's

21    somewhere else in the country, but it's not --

22          THE COURT:  Well, that was what originally

23    happened, but it was reconstituted to include --

24          MR. PACHULSKI:  Well, it was reconstituted

25    to try -- the U.S. Trustee did not reconstitute it because

1    they were suddenly overwhelmed with --

2                    THE COURT:  No, you complained and they

3    reconstituted it.

4                    MR. PACHULSKI:  We complained, they said

5    they were going to reconstitute -- they were going to

6    appoint a second committee.  They never contact us to say

7    why they didn't, even though they said they were going to

8    contact us the next day, and they don't contact -- this is

9    the part I find just incredible, they don't contact any of

10   the four parties they're going to add to that committee to

11   see if they're still interested, and then they complain --

12   they tell ABC, let's use them because Warner had nothing

13   to do with any of this, they just -- they had no

14   conversations with Warner, they don't know what their

15   claim is, other than what the complaint says, and I'll bet

16   dollars to donuts that they didn't look at the complaint,

17   but they had to, like, pick somebody.

18                    So, doesn't it seem odd, your Honor, that

19   they get a form, they don't call the person on the form

20   initially, they don't call the person on the form when

21   they're appointing the second committee, and then they're

22   outraged that Warner doesn't want to sit on the committee,

23   and ABC, who wanted to be on, and thought there was going

24   to be a second committee where they could comply with

25   their fiduciary duties, and get the benefits of 1103 of

1  the Bankruptcy Code, in which the debtor now has to

2  cooperate with the committee, they decided we're not

3  interested.

4           MR. MURTAGH:  Your Honor, on behalf of the

5  debtors, that entire disposition is based on evidence that

6  was excluded.

7           THE COURT:  I understand, and I'm not --

8           MR. PACHULSKI:  I'm not sure --

9           THE COURT:  And again it doesn't change --

10          MR. PACHULSKI:  -- what was excluded.

11          THE COURT:  It doesn't change the adequate

12  representation issue, which is the issue before the Court,

13  but I guess what I need to understand is what happens,

14  let's say there is a second committee appointed, are you

15  expecting to be on that committee?

16          MR. PACHULSKI:  We would like to be, but

17  based on how the U.S. Trustee has seen us, we wouldn't be

18  surprised if they exclude us.

19          THE COURT:  And if you're not, you're asking

20  for a third committee?

21          MR. PACHULSKI:  No, if they're not, then we

22  believe that -- first of all, we think the U.S. Trustee

23  should absolutely put us on, but if they decide not to, we

24  would work with the second committee to try to get a

25  resolution of this case.  We're not going to seek a third

1    committee.

2              Now, I'd have to take a look --

3              THE COURT:  And who would be on that -- in

4    order to satisfy the adequate representations concern that

5    you have, the second committee, for you to be satisfied,

6    must include similarly situated creditors with large

7    claims, is that a fair statement?

8              MR. PACHULSKI:  I think that would be a fair

9    -- you know, people who are -- or at least people who have

10   been subject to, you know, whether they claim defamation,

11   which one creditor did, or copyright infringement, or

12   trademark infringement, or false advertising, but they're

13   a litigation claimant.

14             THE COURT:  And who is available with a

15   large enough claim to be on that committee so that the

16   result would be one that you find acceptable?

17             MR. PACHULSKI:  Assuming we're excluded?

18             THE COURT:  Assuming you're excluded.

19             MR. PACHULSKI:  We would find acceptable the

20   other four movants.  We'd actually find acceptable Warner

21   Brothers.

22             THE COURT:  Well, let's go through them, who

23   are they, and what are their claims?

24             MR. PACHULSKI:  ABC, which is 225 million.

25             THE COURT:  And ABC was on the committee but

1    resigned, right?

2                    MR. PACHULSKI:  Correct.

3                    THE COURT:  Okay.  I just want to make sure

4    that's who that is, 225 million, yep.

5                    MR. PACHULSKI:  Orange Bang.

6                    THE COURT:  And their claim arose as a

7    result of what again?

8                    MR. PACHULSKI:  They would have to -- they

9    -- I wouldn't even pretend to go through --

10                   THE COURT:  Well, but if it's a mass

11   tort-like claim --

12                   MR. PACHULSKI:  I mean, it's --

13                   THE COURT:  -- what is it?

14                   MR. PACHULSKI:  It's --

15                   THE COURT:  Isn't that important for your

16   argument?

17                   MR. PACHULSKI:  No, your Honor, it's not a

18   claim -- it's not a trade claim, it's not a continuing

19   relationship.

20                   MR. MURTAGH:  Your Honor, objection --

21                   THE COURT:  But it's still got to be --

22                   MR. MURTAGH:  -- that's just inaccurate.

23                   THE COURT:  -- a mass tort-type claim.

24                   Anyway --

25                   MR. MURTAGH:  That's inaccurate, your Honor.

1    Sorry to rise, but it's a breach of contract claim for a

2    failure to make a minimum purchase requirement.  It could

3    not be more trade.

4                   THE COURT:  Okay.  All right.

5                   MR. PACHULSKI:  Well, if --

6                   THE COURT:  Okay.  So would you disagree

7    with that?

8                   MR. PACHULSKI:  I --

9                   THE COURT:  You just don't know.

10                  MR. PACHULSKI:  No, I think whether it's a

11   breach of contract claim, or it's a tort claim, it's a

12   massive claim that is not represented on the committee.

13                  THE COURT:  In terms of size.

14                  MR. PACHULSKI:  Yes, size is a big deal when

15   you have blocking positions, correct.

16                  THE COURT:  Okay.  All right.  Who else

17   would you think needs to be on the committee?

18                  MR. PACHULSKI:  Well, I think Orange Bang,

19   who has a claim in excess of a hundred million, which was

20   a trademark infringement.

21                  THE COURT:  Okay.  So that's more in line

22   with the type of mass tort, and I don't --

23                  MR. PACHULSKI:  Okay.

24                  THE COURT:  We're using this mass tort

25   concept, but you're just --

Page 78

1          MR. PACHULSKI:  Well --

2          THE COURT:  It's just an analogy.

3          MR. PACHULSKI:  Your Honor, it's something

4   else.  In many cases it's an involuntary creditor, that's

5   what a mass tort creditor is.  It's an involuntary --

6   Monster was an involuntary creditor.

7               You are a hundred percent correct, mass

8   tort, everyone has made one size fits all.

9          THE COURT:  Yes.

10         MR. PACHULSKI:  Mass tort creditors, and the

11  creditors that I'm talking about were involuntary

12  creditors, that's the better way of doing it.

13              ABC did not get into the business of having

14  its contract breached.  Orange Bang did not get into --

15         THE COURT:  Well, nobody gets into the

16  business of having their --

17         MR. PACHULSKI:  Well --

18         THE COURT:  -- contract breached.

19         MR. PACHULSKI:  -- but that's an involuntary

20  creditor, breach of contract claim.

21         THE COURT:  Then everybody is an involuntary

22  creditor.  Nobody gets into the business --

23         MR. PACHULSKI:  Because it's --

24         THE COURT:  -- of being a trade creditor and

25  not getting paid.

1          MR. PACHULSKI:  No, no, but that's very

2    different than having a continuing relationship with a

3    debtor and not, it really is, your Honor.

4          THE COURT:  Okay.  All right.  Mr. Cohen.

5          MR. COHEN:  I'm sorry, your Honor, and

6    please let me know if my interruptions are unwelcome, but

7    I just thought we were getting the facts --

8          THE COURT:  Somebody will let you know, it

9    may be me, it may not be, but go ahead.

10          MR. COHEN:  The facts on the claims that

11   your Honor was asking a question about, Orange Bang is

12   actually a breach of contract.  The parties in 2010 agreed

13   on who could use the trademarks in which lanes, for lack

14   of a better term, one can use it in beverage, one can use

15   it in nutrition.  So 10 years later --

16          THE COURT:  So it may have been a legitimate

17   dispute, but it's still a trademark infringement claim?

18          MR. COHEN:  It's still a trademark

19   infringement claim based on a breach of contract.

20          MR. PACHULSKI:  Well --

21          THE COURT:  Okay.  Well, meaning there was a

22   business relationship between the two parties, and that

23   was breached, but it was still an infringement on trade.

24   Okay.

25          MR. PACHULSKI:  Yes, and the breach of

Page 80

1    contract --

2                    THE COURT:  Who else should be on the

3    committee?

4                    MR. PACHULSKI:  Well, it should be Warner

5    Brothers, Sony, and Universal, who each have copyright

6    claims.

7                    THE COURT:  All right.  Well, Warner

8    Brothers was on the committee and resigned.

9                    MR. PACHULSKI:  Because they did not believe

10   they'd be fairly -- and, again, your Honor --

11                   THE COURT:  How large is Warner Brothers'

12   claim?

13                   MR. PACHULSKI:  I think what was said is

14   28 million.

15                   THE COURT:  Okay, and what were the others,

16   Sony?

17                   MR. PACHULSKI:  Sony and Universal, similar

18   type of claims.

19                   THE COURT:  Okay.  Similar size?

20                   MR. PACHULSKI:  Similar type.  The size is

21   probably in the --

22                   THE COURT:  (Inaudible) again?

23                   MR. PACHULSKI:  Copyright infringement.

24                   THE COURT:  Copyright infringement.

25                   MR. PACHULSKI:  Using their music without

Page 81

1   authority.

2                    THE COURT:  I see.  Okay, but similar size?

3                    MR. PACHULSKI:  Yep.

4                    THE COURT:  Okay.  So it's not all about

5   size, it's also about type?

6                    MR. PACHULSKI:  Well, your Honor, if you're

7   going to look at size, you've taken out Monster, who had

8   -- and that's why it makes no sense, who has a claim in

9   excess of -- of approximately $400 million.

10                   THE COURT:  Okay.  So let me ask you this --

11                   MR. PACHULSKI:  But you've taken us out of

12  there.

13                   THE COURT:  Now that two have resigned, is

14  it possible, and I can certainly ask Mr. Wilkes this

15  question, is it possible that those two would be replaced

16  by folks that -- and I can't order the appointment of any

17  particular creditor, as everyone well knows, but they

18  would be replaced, there is a committee of 11, two have

19  resigned, that makes room for two others.  If a larger,

20  similarly situated claimant was added to the committee to

21  replace those two, or two of them were, would that change

22  the dynamics from your perspective?

23                   MR. PACHULSKI:  No.

24                   THE COURT:  Why not?

25                   MR. PACHULSKI:  Because it's done two months

```
 1    into the case, and Monster would have no choice, as I
 2    suspect some of the others might, to start down a process
 3    where we're not going to be included.  I mean, the idea --
 4                    THE COURT:  Well, but --
 5                    MR. PACHULSKI:  I mean, just because
 6    we're --
 7                    THE COURT:  -- a second committee is already
 8    two months into the case.  The timing is what it is no
 9    matter what with a second committee.
10                    MR. PACHULSKI:  Well, but if we were put on
11    initially, we would have had a say in a lot of what's
12    taken place over the past seven weeks.  We've had nothing,
13    so we basically inherit what has already happened,
14    your Honor.  I don't know --
15                    THE COURT:  It's a committee.
16                    MR. PACHULSKI:  It's a committee where the
17    minority is now put on it, where they -- where, at the end
18    of the day, there have already been decisions made that
19    that minority will have to accept.
20                    I wouldn't go on a -- let me be clear,
21    your Honor.  I could never recommend to a client that --
22    let alone Monster, that you get to go on a committee, that
23    for seven weeks decisions have been made, and now you have
24    a fiduciary duty to comply with those decisions.  I
25    wouldn't do it.
```

1            THE COURT:  There are no decisions that can
2    be reconsidered?

3            MR. PACHULSKI:  It's a minority.  Why would
4    they -- I mean, your Honor, this is the real world.  Real
5    world is, why would the others say, oh, let's assume ABC
6    and Warner Brothers, just to use two examples, said we're
7    going to go back on this committee.  Oh, well, now that
8    you guys are here, we're just going to reconsider
9    everything.  It's not going to happen, it's not how these
10   cases work, your Honor.  I've represented plenty of
11   committees.

12           THE COURT:  So let's go down the road where
13   a new committee is appointed, or a second committee is
14   appointed, what happens with those matters that have
15   already been agreed to before the Court maybe approved?
16   I'm not even sure what those are, because everything has
17   been on a somewhat interim basis, and any objections to
18   final relief, you know, have been asserted.  So, what
19   changes?

20           MR. PACHULSKI:  Your Honor, there are
21   changes in terms of what are being pursued, but before
22   you, there has been nothing that has occurred in this
23   case, other than the first day motions, and some fairly
24   routine motions.  We don't even have a DIP left for two
25   months, your Honor.  So the committee, the new committee

Page 84

1    would start investigating, and would probably meet with

2    the old committee and say we -- this is very scary, we

3    have a governance problem, but that's not the only

4    problem, we have five to five and a half months when we

5    will be in default, let's come up with an alternative

6    plan.  That's what we would -- that's what I -- and,

7    again, I'm never going to be committee counsel.  So I'm

8    just telling you what I would recommend if we were on it,

9    or if we weren't on it, because --

10                    THE COURT:  Alternative plan to what?

11   What's -- and I haven't seen a plan.

12                    MR. PACHULSKI:  Well, anything, at least

13   some plan because there isn't any.  Right now we're all

14   waiting to see if Mr. Owoc can get his investors, at which

15   point, if he does, and he retains a single share of stock,

16   there is likely to be objections by many of the parties.

17                    THE COURT:  Many of the parties?

18                    MR. PACHULSKI:  Yes, ones that have blocking

19   positions.

20                    THE COURT:  That would already object,

21   whether they're on a committee or not?

22                    MR. PACHULSKI:  No, we would try to -- well,

23   I don't know what they would do if they were on a

24   committee, that I don't know.  We would hope that --

25                    THE COURT:  But they will block nonetheless?

1                    MR. PACHULSKI:  Well, I would hope that the

2    committee counsel would work with the debtor and the other

3    committee to kind of come up with a resolution, as

4    compared to giving us a fait accompli.

5                    Your Honor, I've been in plenty of cases

6    where I've represented clients where we are given a

7    fait accompli, and they said if you don't really like it,

8    then you can object, and if that -- if everybody in this

9    case thinks that's going to be worthwhile here, then we

10   are going to have chaos, and this case will fail, and it

11   will be very sad, but that's what will happen.

12                   THE COURT:  All right.  So how do you see

13   this case being successful?  What's the road to success

14   here?

15                   MR. PACHULSKI:  I think the road to success

16   is if there is a second committee that is well represented

17   by the involuntary creditors, non-trade creditors,

18   whatever, that they immediately get the professionals, and

19   they immediately get the rights under 1103, and they get

20   to hire professionals, and they get to work to a process,

21   and they're not always on the defensive, because right

22   now, your Honor, we're totally on the defensive, and we

23   have to go on the offensive whether we like it or not, and

24   that's not what we want to do.

25                   THE COURT:  Okay.  Understood.

1                I'm out of questions, so what do you got?

2                MR. PACHULSKI:  I mean --

3                THE COURT:  Anything else you want --

4                MR. PACHULSKI:  -- your Honor, I have a

5    hunch you're not out of questions, but if you'd like, I'm

6    more than happy to go through the presentation, or --

7                THE COURT:  No, whatever, this is your case,

8    so you do what you think is necessary.

9                MR. PACHULSKI:  Okay.  I'll try to make a

10   lot of it quick, your Honor, because I think it's

11   important, and I was going to start --

12               THE COURT:  And you don't have to make it

13   quick.  You make it as you -- we have the whole day and no

14   witnesses to call so --

15               MR. PACHULSKI:  Okay.  Well --

16               THE COURT:  -- you do what you think is

17   necessary.

18               MR. PACHULSKI:  -- I'll go through a bunch

19   of this, but I think some of them I've answered the

20   questions.

21               So --

22               THE COURT:  Let me just ask, any word from

23   Mr. Sorkin?

24               MR. GUSO:  He's on his way, your Honor.

25               THE COURT:  On his way to Zoom?

1                    MR. GUSO:  No, your Honor.

2                    THE COURT:  Oh, here, personally, okay.

3                    MR. GUSO:  He's walking over as we speak.

4                    THE COURT:  I understand.  Okay.

5                    MR. PACHULSKI:  Okay.

6                    THE COURT:  Go ahead.

7                    MR. PACHULSKI:  So, you Honor, as I've said,

8    I think the big -- one of the biggest problems in this

9    case is we have limited time, because we will be in

10   default in five to five and a half months, which is

11   different than most of the other cases.

12                   We also, your Honor, are not -- the major

13   creditors, the ones who have the most, do not have the

14   transparency.  If I look at Page 11, and going -- I'm

15   sorry, Pages 10, going on 11, of the, of the committee

16   papers, they say --

17                   THE COURT:  I'm sorry, can you give me the

18   docket entry?  Sorry.

19                   MR. PACHULSKI:  It's Docket Entry 500, and

20   if you look at Page -- beginning at very bottom of

21   Page 10, and Romanette iii, the committee, for instance,

22   says that they are collaborating with the debtors to

23   implement a workable and value, maximizing sale and/or

24   capital raise process.

25                   The --

Page 88

1                    THE COURT:  As opposed to what?

2                    What's missing --

3                    MR. PACHULSKI:  As opposed to --

4                    THE COURT:  -- from that?

5                    MR. PACHULSKI:  As opposed to we don't.  We

6     have zero transparency into that process.  It's the most

7     important thing in this --

8                    THE COURT:  As opposed to your not working

9     with the debtor to work on those same things --

10                    MR. PACHULSKI:  They're not --

11                    THE COURT:  -- or what's your point?

12                    MR. PACHULSKI:  We don't have an investment

13    banker, your Honor.  We have nobody who can assist us, and

14    the debtor hasn't voluntarily -- the debtor has never come

15    to us and said, hey, you should know what's going on here.

16    Anything we do is like pulling teeth.  You know, they'll

17    answer our questions if we directly ask them, but there is

18    nobody on our side who has, frankly, the competence to

19    understand what that process is, whereas you heard on

20    December 6th, your Honor, that the committee actually has

21    daily communication, their investment banker has daily

22    communications.

23                    THE COURT:  So let me ask you this, if --

24    and this is important to me to understand from a

25    logistical perspective, if you had a representative

Page 89

1    creditor that you feel represents the interests of the

2    non-trade creditors, for lack of a better term, on the

3    committee, and that -- is that committee member permitted

4    to discuss with you, as an example, or your client, as an

5    example, at least some of the things that are going on at

6    the committee level, or is it -- or is there

7    confidentiality to the point where you can't even pursue

8    discovery and receive that information?

9                    MR. PACHULSKI:  Well, we can pursue

10   discovery, but there is confidentiality, and my partner,

11   Mr. Feinstein, speaks to Mr. Cohen on occasion, but I

12   don't think any -- I would never -- let me put it this

13   way, your Honor, I would never let a committee member

14   speak directly to a non-committee member about issues that

15   may be sensitive.  It just, it would be irresponsible,

16   frankly.

17                    THE COURT:  And if there was an NDA or

18   confidentiality agreement signed with those receiving that

19   information, other than, frankly, bringing it before the

20   Court, I don't know how limited that would be, but -- so

21   it wouldn't be out in the marketplace, would that help

22   resolve that issue?

23                    MR. PACHULSKI:  Not necessarily, your Honor,

24   because they'd be -- the problem is they're giving us the

25   information that they deem is relevant, as compared to us

1    getting the information directly, and --

2              THE COURT:  But the committee -- I'm talking

3    about a committee member that is aligned with your types,

4    the types of claims that you think represent your

5    constituency, or the constituency you think needs to be

6    represented, shared that information.

7              MR. PACHULSKI:  Your Honor, in the practical

8    world, the committee representatives give a summary of

9    what's going on.  We would want to have the same

10   transparency into the process a committee member who signs

11   -- let's assume someone would allow their client to tell

12   us what's going on.  The client only knows what the

13   committee tells them.  The client isn't having the

14   conversations every day with the, with the IB for the

15   other side.

16             So, we would -- it's what's happening now,

17   your Honor.  We're basically -- we ask a question, we're

18   given an answer, or they say we can't tell you.  So all

19   that we're going to get is, let's just, let's just have a

20   mock conversation.

21             We call up one of the committee members who

22   is allowed to tell us, what's going on?  Oh, we're told by

23   the IB that they've spoken to 20 people.  Well, who are

24   those people?  Well, they really didn't go into detail

25   about those people, I can get back to you, but then I have

1    to find out what I can tell you.

2               Well, like, what's --

3               THE COURT:  What if the conversation were,

4    well, you signed an NDA, here is the list?

5               MR. PACHULSKI:  Your Honor, I think that

6    there have -- I don't know what the level of transparency

7    the committee is getting is, but typically we would want

8    our IB, in some cases, to be able to speak to some of the

9    potential buyers to see what their real interest is.

10              THE COURT:  As opposed to leaving it to the

11   investment bankers?  Why would that --

12              MR. PACHULSKI:  Oh, we would leave it to an

13   investment banker that we would hire.  I mean, you're

14   correct, your Honor, what we would have is an investment

15   banker or a financial advisor, because we would try to

16   deal with the costs, and if we could, find a financial

17   advisor who could do both roles.  So the financial advisor

18   would be telling us what's going on.

19              By the way, your Honor, we could get all

20   this information, but there is a reason people hire

21   investment bankers, which is to distill the relevance,

22   because the financial advisor could say, these nine people

23   are not -- they're never going to buy, we can tell you

24   from history.  We don't know anything.  It's garbage in,

25   garbage out for us because we don't have -- everyone says

1   we have adequate representation, we have really talented

2   lawyers.  I'm not a banker, your Honor.  Monster doesn't

3   have a banker.  As far as I know ABC doesn't have a

4   banker.  Orange Bang doesn't have a banker.

5                 So, even if we took your hypothetical,

6   your Honor, and we got this information, what are we going

7   to do with it when we can't evaluate it because we don't

8   have someone who is --

9                 THE COURT:  I get it, you have to rely upon

10  the committee --

11                MR. PACHULSKI:  Which --

12                THE COURT:  -- and its adequate

13  representation, and which I know you object to, in dealing

14  with their own investment banker to distill that

15  information.  So, I get that.

16                All right.

17                MR. PACHULSKI:  Well, let's take it even a

18  step further, your Honor.  We're four months down the

19  road, or five months down the road, we only have two

20  months left.  The committee makes a determination that

21  they think it's horrific, but they don't have a choice

22  because there is so little time left.

23                We haven't been involved in that process to

24  see if maybe we could have done something, then it's too

25  -- I've had plenty of cases, your Honor, where it was too

1    late, you are up against the wall.

2                    THE COURT:  But what makes you believe that

3    your group is any better capable of hiring a different

4    investment banker that would not make it too late when

5    you've got the debtor and the committee both having -- no

6    objections, by the way, no one objected to the investment

7    bankers, both have investment bankers, and it's been told

8    to me, at least, that they are working together, not

9    against one another, to try to achieve a result here.

10                   So why should I believe that by appointing a

11   second committee, and that second committee appointing yet

12   a third investment banker, that somehow that will avoid

13   the timing disaster that you're suggestion is right around

14   the corner?

15                   MR. PACHULSKI:  Great question, your Honor.

16   So now we're five months in, with two months left.  We

17   will -- and now they say we made a deal, this is the best

18   we could do.  We are going to have to spend a fortune on

19   discovery to figure out whether, for instance, Mr. Owoc

20   undermined the process, because right now we could figure

21   out whether or not things are going on, our banker could

22   tell us, we think that they're not getting the

23   information.

24                   THE COURT:  Why would the existing committee

25   allow Mr. Owoc to undermine the process?

1            MR. PACHULSKI:  They may not know it.  They

2  may not know it.  Our banker may have more information.

3            THE COURT:  Why do you believe you'll know

4  it?

5            MR. PACHULSKI:  But, your Honor, here is

6  the --

7            THE COURT:  Why does the second committee

8  know it, but the first committee doesn't know it?

9            MR. PACHULSKI:  It might be right, we may

10 all know it if we had a second committee, but we don't

11 know without having a second committee.  We're going to

12 have to assume the worst, because now we have a really bad

13 deal.  So now we're going to have to do -- we're going to

14 have to start the discovery now to avoid a really bad

15 deal, because we don't have committee lawyers and

16 committee advisors to tell us, Mr. Pachulski/Monster, this

17 is the best that the committee -- under your hypothetical,

18 your Honor, I'll take it at face, the committee and the

19 debtor have done everything they can, this is the best,

20 you're wasting your time, otherwise we've now gotten a

21 really bad deal.  We now have to prepare for that.  We

22 have to spend three months, and doing all the due

23 diligence we can, and all the litigation we can, to make

24 sure we're not in that spot in three months.

25            So, the question is what do we do today, do

1    we just rely on the committee?  We just say, okay,

2    committee, we hope you do the right thing?

3                    THE COURT:  Well, no, I think what the case

4    law would say is that the committee does what the

5    committee does.  The committee has a fiduciary duty to all

6    creditors that are within the unsecured class, that the

7    committee will do what it does with its investment banker,

8    which is theoretically speaking closely with the debtors'

9    investment banker and the debtor, and will come up with

10   hopefully a consensual plan, that may not be consensual

11   with all creditors, including your client, but will

12   propose something, and then, yeah, at that point, at that

13   point you will find yourself in a position where you

14   either have to object, using the rights that exist under

15   the Bankruptcy Code already, and, yeah, you may have to

16   hire an expert and spend money, no question, and, yeah,

17   you may have to do it very quickly.

18                    But at the end of the day all facts will be

19   before you, because they will be before the Court, and

20   this adversarial circumstance plays itself out.  A lot of

21   times that adversarial circumstance results in everybody

22   getting in a room, you expressing your objection, and the

23   deal changing, maybe.

24                    Maybe it's too little too late because the

25   lender is sitting there saying, well, I'm pulling the plug

1    in three days, that's also a possibility, but the power

2    that you have as a very large unsecured creditor suggests

3    to me, at least, that under the Bankruptcy Code you would

4    have a high-level blocking position that they have to take

5    seriously.

6              MR. PACHULSKI:  Well --

7              THE COURT:  Do you disagree with that?

8              MR. PACHULSKI:  Well, I don't -- I agree

9    with you that they should take it seriously, but I haven't

10   seen it to date, and I think --

11             THE COURT:  Maybe there is nothing to see to

12   date.

13             MR. PACHULSKI:  Well, your Honor, we should

14   see where we are in the sale, or the restructuring

15   process.  We have zero transparency.

16             Even if it's nothing, we don't have it.  So

17   what we're going to have to do, your Honor, and we've

18   waited two months, is instead of having a committee --

19   it's very binary, because -- and your Honor says that

20   there is a --

21             THE COURT:  You mean you either have a

22   committee or you don't --

23             MR. PACHULSKI:  No, it's very --

24             THE COURT:  -- or what --

25             MR. PACHULSKI:  It's either we get a

```
 1    committee and get real professionals to work with the
 2    committee and the debtor to try to come to a resolution or
 3    we have no choice but to protect our interests, and try to
 4    do the discovery, which people don't want us to do, and
 5    have tried to head us off on in some respects, and we will
 6    simply have to do the discovery to protect ourselves.  So
 7    when there is finally a deal, we know what the claims look
 8    like against Mr. Owoc, we know what the claims look like
 9    via an analysis of the avoidance actions, we know what the
10    sale processes look like, we know what other plan issues
11    are out there.  We have to do that now, because what
12    Monster will not do, with a $400 million judgment, I don't
13    know what ABC will do, or Orange Bang, we're not going to
14    sit around and get butchered at the end --
15              THE COURT:  Okay.  So --
16              MR. PACHULSKI:  -- because the process
17    failed.
18              THE COURT:  So your point there is that that
19    would create a chaotic circumstance.  Okay.  Is that what
20    your point is?
21              MR. PACHULSKI:  I am saying if you do not
22    create a --
23              THE COURT:  That's the binary situation --
24              MR. PACHULSKI:  The binary situation --
25              THE COURT:  -- you either get a committee,
```

Page 98

1    and everybody works together, hopefully, to a result --

2                     MR. PACHULSKI:  Yes.

3                     THE COURT:  -- or the alternative is no

4    second committee and all hell breaks loose?

5                     MR. PACHULSKI:  I believe, and again,

6    your Honor, as I said, I'm trying to be -- and everyone

7    will say, well, that's Mr. Pachulski being aggressive, or

8    this or that, yes, it is very binary in my view.

9                     THE COURT:  So let's talk about the "all

10   hell breaks loose" concept, and those are my words, I

11   agree, but that's how I'm interpreting what you're saying.

12                    MR. PACHULSKI:  No, I say chaotic is exactly

13   it.

14                    THE COURT:  Okay.  In that circumstance,

15   what would normally happen, and correct me if I'm wrong,

16   is you would send out Rule 2004 discovery, right, unless

17   there is a contested matter --

18                    MR. PACHULSKI:  Right.

19                    THE COURT:  -- in which case it would be

20   7030 discovery.  You would ask for documents.  You would

21   ask possibly to take the deposition, or 2004 Examination

22   of maybe the investment banker that's in charge, maybe the

23   debtors' principal, or the debtors' -- a representative of

24   the debtors' board, somebody.  They would then file

25   motions for protection saying, yeah, they can have this

1   discovery, but it's got to be -- there has got to be a

2   confidentiality agreement.  I'm hoping that, frankly,

3   counsel would work together to --

4                MR. PACHULSKI:  We'd sign that.

5                THE COURT:  -- resolve those issues --

6                MR. PACHULSKI:  Not a problem.

7                THE COURT:  -- in a heartbeat, where it goes

8   nowhere, the information goes nowhere except before this

9   Court, with locked doors and, you know, no recordings and

10  -- I guess recordings, but nobody able to see it that

11  might harm the estate.  So, what's wrong with that?

12               MR. PACHULSKI:  Well, what's wrong with it

13  is it's costly, it's unnecessary because --

14               THE COURT:  How much does a second committee

15  cost?

16               MR. PACHULSKI:  Well, your Honor, here is

17  where it's costly.  It's not in terms of the dollars.

18  It's the likelihood of cutting a deal, because, by the

19  way, based on the confidentiality, I'm not going to be

20  able to -- I'm not sharing it with everybody else.

21               THE COURT:  Who is everybody else?

22               MR. PACHULSKI:  ABC.

23               THE COURT:  Whoever signs a confidentiality

24  agreement would get to see it.

25               MR. PACHULSKI:  Your Honor, if your Honor

1    believes that it's better for us to have -- that it's
2    fair, that it's fair, that the party that controls 75 to
3    95 percent of the debt has to go through litigation to get
4    the information --
5                    THE COURT:  Well, discovery is not
6    litigation, per se.  I mean, I guess it's litigation, but
7    it's not --
8                    MR. PACHULSKI:  Well, that we have to do our
9    own discovery, that it's better for this case to get
10   heightened anger in a case that already has people who
11   think that they have been violated.
12                   THE COURT:  I'm not saying it's better.  I'm
13   weighing that chaotic scenario, that hasn't been shown to
14   me to be particularly chaotic, it's just the normal course
15   of things, but that chaotic scenario, to the cost benefit
16   analysis that goes on with the appointing a second
17   committee, that's the binary choice you're giving me.
18                   MR. PACHULSKI:  Let's deal with --
19                   THE COURT:  So, I'm weighing those two
20   things in that binary choice.
21                   MR. PACHULSKI:  I will tell you, based on my
22   experience, based on that binary choice --
23                   THE COURT:  Yeah.
24                   MR. PACHULSKI:  -- the odds of getting an
25   overall deal are dramatically less likely when it's an

1   adversarial, we don't have to use litigation, an

2   adversarial situation, as compared to getting a committee

3   whose goal is clearly to try to get information and to

4   build a consensus.

5              THE COURT:  Is that the goal, though?  How

6   do I know that?

7              MR. PACHULSKI:  Well --

8              THE COURT:  Because you're saying that the

9   -- that that committee will be composed of folks that

10  require control to pursue their own self-interests.

11             MR. PACHULSKI:  No, they believe that

12  because they have the vast majority of the claims, that

13  they should have the greater voice in the creditor body.

14             THE COURT:  So why should that lead me to

15  believe that the goal would be to build consensus?

16             MR. PACHULSKI:  Well, to date, your Honor,

17  if our goal wasn't to build consensus, we would not file

18  the motion for the second committee, and we would have

19  started down the discovery path.

20             We thought that this would be heard well

21  earlier, and while it's not, you know, relevant, we told

22  the U.S. Trustee we wanted to file it earlier, and we

23  actually did not want to be provacative and file the

24  motion after they told us they were going to end up with a

25  second committee.  So we didn't file the motion.  So we've

1    been holding off doing anything because we wanted a second

2    committee to try to get information in a thoughtful way

3    under 1103, which committees get that other parties don't.

4                    So, your Honor, if we wanted to have the

5    litigation war, and we wanted to try to bring down the

6    company, I assure you, we have the lawyers, and Monster

7    has the resources, the others may not, to do that, and

8    it's not what we want to do.

9                    THE COURT:  Okay.  All right.  Keep going.

10                   MR. PACHULSKI:  So, your Honor, why else do

11   we want to -- why else do we want -- is it so important to

12   us?

13                   Aside from getting transparency, whether

14   it's accurate or inaccurate, and I have no idea because we

15   haven't taken the deposition, here is what we have, we

16   have a company that had massive litigation prepetition.

17   We have a company in one action, while they're very

18   concerned about our costs, spent seven and a half million

19   dollars in 12 weeks to lose a massive piece of litigation,

20   seven and a half million dollars.

21                   THE COURT:  To what are you referring?

22                   MR. PACHULSKI:  To the Monster litigation,

23   they spent, in 12 weeks, seven and a half million, as

24   reflected in their statements and schedules, $625,000 a

25   week to Quarles & Brady.  I have no idea what was spent

1   before that, but it's clear in the statements and

2   schedules that they spent that.  They spent millions

3   litigating trademark infringement, breach of contract,

4   copyright infringement, defamation, pretty unusual for a

5   company, even as big as this one, and then to add insult

6   to injury, Kathy Cole submits a letter of resignation, it

7   may be accurate, it may be inaccurate, we haven't taken

8   her deposition.  Nobody else rushed to take her

9   deposition, nobody else, as far as I can tell, rushed to

10  even interview her, no one interviewed her.  She left.

11              THE COURT:  So the whole point of this is

12  what, that the committee is not doing their job?

13              MR. PACHULSKI:  I don't know.

14              THE COURT:  Tell me --

15              MR. PACHULSKI:  No one seems to --

16              THE COURT:  -- what's the relevance of this

17  argument?

18              MR. PACHULSKI:  Maybe I'm the only one, and

19  Monster are the only ones, and the movants are the only

20  ones, but I would think if someone got that letter, they

21  would have been much more engaged than it has been to

22  date, we are the only ones who sought to take her

23  examination.

24              THE COURT:  The point being what?

25              MR. PACHULSKI:  The point being is that if

1   you look at the history of this debtor, which is very

2   disconcerting --

3                   THE COURT:  How does a second committee

4   change -- what would have happened differently if a second

5   committee had been --

6                   MR. PACHULSKI:  We would have imm -- when we

7   got that, we would have asked the debtor to immediately

8   give us access, or to engage us with her, which did not

9   happen.

10                  My guess is counsel would have said, let's

11  figure out what is going on here, this is very troubling.

12                  THE COURT:  Okay.  Is there any reason to

13  believe that the existing committee did not do that?

14                  MR. PACHULSKI:  We have reason to believe

15  that they have not spoken to Ms. Cole, and we have reason

16  to believe that -- and we know that they did not seek

17  discovery.  We know that, that's all factual, because

18  we're the only ones who did it.

19                  THE COURT:  Mr. Cohen has risen.

20                  MR. COHEN:  Your Honor, I mean, there has

21  been a lot of speculation, but if we're actually saying

22  they have reason to believe we didn't do something

23  specific, at this point I would like some evidence,

24  because it's getting to borderline offensive.

25                  We have no --

1              THE COURT:  Understood.

2              MR. PACHULSKI:  We have no, we have no

3     information --

4              THE COURT:  You don't have information

5     either way.

6              MR. PACHULSKI:  Well, we have information

7     that Mr. Cohen would have preferred us just interview her,

8     that we have no access.  Since people are talking about

9     trustee motions, we thought it was important to get her

10    deposition, but I can tell you, because I was on the call,

11    if Mr. Cohen wants to make an issue, that he thought it

12    would be better if we just interviewed her, and we felt

13    that it was not appropriate, based on where this company

14    is, with claims of fiduciary duty, that we just have an

15    interview.

16             THE COURT:  Okay.

17             MR. COHEN:  I'm sorry, your Honor.  I mean,

18    it's interesting to hear Mr. Pachulski testify from the

19    stand --

20             THE COURT:  Okay.

21             MR. COHEN:  -- but it's an inaccurate

22    characterization of the conversation.

23             THE COURT:  Fair enough.  Fair enough.

24             MR. PACHULSKI:  We have several people here

25    who were a part of it, so --

1          THE COURT:  All right.  Continue.

2          MR. PACHULSKI:  Thank you, your Honor.

3          Your Honor, I know you've made mention of,

4    that we can just come back.  We don't think that that's

5    realistic, and at this point we know what we don't have,

6    we don't have Section 1103 protections, we don't have a

7    lot of time left.  We don't have -- we have serious

8    concerns about management and the transparency of the

9    process.

10         And at this point, to just sit around and

11   wait to hear what the committee is going to do, or hear

12   what the debtor is going to do, is really not going to

13   work, which is why we're here today, your Honor.  The

14   bottom line is that we need the committee to start the

15   process so we can avoid a fight at the end if at all

16   possible.

17         Now, let's go through some of the very basic

18   facts we have here, your Honor.  We have, Mr. DiDonato,

19   whose exhibit, I believe, is Exhibit 10 to the joint

20   motion, who says clearly that this case, which is the same

21   as the other -- the other tort-related, breach-related,

22   whatever you want to call them, is that it was filed

23   because of those cases, that was the primary reason it was

24   filed, is because Monster had just gotten a judgment.

25   Monster and Orange Bang got judgments, different courts on

1    the same day, had to file, no supersedes.

2              The banks had been working --

3              THE COURT:  Well, my understanding was that

4    the case management, or the declaration in support of

5    first day motions, et cetera, basically said that there

6    were three reasons, and one of which was to borrow money.

7              MR. PACHULSKI:  Well, that's interesting,

8    your Honor, it does say to borrow money, but during the

9    prior eight months they had borrowed $60 million.

10             THE COURT:  In preparation for filing the

11   11?

12             MR. PACHULSKI:  It's not clear that it was

13   in preparation, your Honor.  They could have filed much

14   sooner.

15             THE COURT:  I think the roll, the request

16   for the rollup suggests that that was all funding work

17   necessary to prepare for the bankruptcy.

18             MR. PACHULSKI:  Your Honor --

19             THE COURT:  Maybe I had that wrong, but --

20             MR. PACHULSKI:  -- we can all speculate, and

21   people can say what they do, but I have -- maybe I -- and

22   most of my practice is debtor, is the company side.  I

23   can't remember the last time a lender was willing to give

24   me $60 million for a distressed company out of court.  It

25   could have happened in this case, but DiDonato was very

1    clear that that precipitated the filing when it did.

2                    THE COURT:  I'm not challenging the notion

3    that the entry of these large judgments didn't have

4    something to do with the filing and, in fact, that's

5    admitted to by the debtor, but it certainly -- maybe that

6    resulted in the need for the funding, et cetera,

7    et cetera.

8                    MR. PACHULSKI:  Yeah, I mean, look --

9                    THE COURT:  All right.  We don't need to

10   speculate.

11                   MR. PACHULSKI:  Right, I'm just saying what

12   was in his declaration is the -- the amount of litigation

13   precipitated the filing.

14                   Now, maybe --

15                   THE COURT:  And we're here, so here we are.

16                   MR. PACHULSKI:  Okay.  That's fact one.

17                   And, fact two, in terms of investigating,

18   which we have no idea, because we don't have the

19   transparency into process, we know today, which is highly

20   unusual for a case this size, that there is no DIP, final

21   DIP because of governance issues, okay?

22                   THE COURT:  Okay.

23                   MR. PACHULSKI:  We know that the lenders,

24   who originally agreed to the framework of the directors,

25   now because of Ms. Cole resigning, they must have been, to

1   some degree, bothered by it, because they're now

2   requesting a different governance provision.

3                   THE COURT:  The evidence was always a -- a

4   change in governance was always a condition to the

5   financing, as I understand it.

6                   MR. PACHULSKI:  No, your Honor, but they

7   accepted the governance that was then in place.

8                   THE COURT:  True.

9                   MR. PACHULSKI:  Okay, and then --

10                   THE COURT:  Okay.

11                   MR. PACHULSKI:  They had Mr. Owoc, they had

12   two individuals that had strong affiliations with

13   Mr. Owoc, but were, in their view, independent in their

14   definition.  They had Ms. Cole and they had Mr. Panagos

15   (phonetic), okay.

16                   They have no Ms. Cole anymore, but we've

17   been advised that her board seat has been replaced.  So in

18   theory we should be done, because no one disagrees,

19   apparently --

20                   THE COURT:  I guess we'll hear more about

21   where we are on that, okay.

22                   MR. PACHULSKI:  But because of -- and this

23   is why I think it's relevant, because of Ms. Cole

24   resigning, they now want a truly independent majority, as

25   compared to what I call --

Page 110

1                     THE COURT:  "They" the lender want --

2                     MR. PACHULSKI:  The lenders, I apologize,

3       the lenders want a true independent, as compared to the

4       pretend independent that we had --

5                     THE COURT:  Independent of Mr. Owoc?

6                     MR. PACHULSKI:  Independent of Mr. Owoc.

7                     THE COURT:  Okay.

8                     MR. PACHULSKI:  They want three independent

9       of Mr. Owoc.

10                    THE COURT:  Okay.

11                    MR. PACHULSKI:  So, that's changed.  That

12      wasn't the -- because in theory we would have gone

13      forward --

14                    THE COURT:  How does that relate to the need

15      for a second committee?

16                    MR. PACHULSKI:  Because we need to

17      investigate what is going on with the governance issue to

18      go forward, in some respects, so that we can either

19      support or try to come in and fix a potential --

20                    THE COURT:  Are you unable to investigate it

21      independently of being on a committee?

22                    MR. PACHULSKI:  Well, we could spend a lot

23      of money doing litigation, which is what we've tried -- A,

24      I don't think it's fair that the creditors whose money --

25      at the end of the day, your Honor, it's going to be the

1    creditors' money to spend for this case, they control 75

2    to 95 percent.  So at the end of the day, even if this is

3    a sale, the vast majority of the proceeds are going to go

4    to the litigation claimants, that's a reality.

5                   So, we're saying we would rather the money

6    be spent on a second committee so, A, you have a unified

7    group to speak, because it's important to have that kind

8    of voice and, B, if there is going to be discovery, it's

9    going to be by one party and not multiple parties.

10                   THE COURT:  Okay.  So that goes to the cost

11   benefit factor --

12                   MR. PACHULSKI:  Yes, that goes to the cost

13   benefit --

14                   THE COURT:  -- associates with Winn Dixie,

15   okay.

16                   MR. PACHULSKI:  Okay, then we also know that

17   -- what we do know is, and if your Honor looks at

18   Page 11 --

19                   THE COURT:  Yes.

20                   MR. PACHULSKI:  -- of the trustee's

21   response, which --

22                   THE COURT:  Oh, a different document, okay.

23                   MR. PACHULSKI:  A different one, your Honor,

24   sorry about that.

25                   THE COURT:  Which number is that?  The

Page 112

1    response --

2                    MR. PACHULSKI:  It's Page --

3                    THE COURT:  -- 502?

4                    MR. PAGE:  Page 11, it's 502, it's at the

5    bottom of Page 11.

6                    THE COURT:  Okay.

7                    MR. PACHULSKI:  Now, what the U.S. Trustee

8    says, and this, I think, is as of November 18th, is that

9    the debtors have not proposed, nor provided significant

10   detail about any exit strategy in its papers filed to date

11   or its testimony at the Meetings of Creditors.

12                   Now, we don't know whether -- what they're

13   doing in that respect.  We don't know if they're just

14   waiting with respect to finding an investor, because the

15   -- because the lenders are allowing them to do it, because

16   the lenders --

17                   THE COURT:  It could be lots of things.  The

18   point is we don't know.

19                   MR. PACHULSKI:  We don't know.

20                   THE COURT:  Okay.

21                   MR. PACHULSKI:  Just like everything else,

22   we don't know, we don't know.

23                   Yes, we could do discovery, and we could --

24                   THE COURT:  And how does a second committee

25   change that?

1                    MR. PACHULSKI:  The second committee would

2    actually have a meeting with -- we would ask for --

3    typically we would have asked for a meeting with the

4    financial advisors, who we've never dealt with, or the

5    investment banker, who we've never dealt with, or the

6    debtors' board, who we've never dealt with.

7                    THE COURT:  That, again, goes to the 1103

8    information issue?

9                    MR. PACHULSKI:  It's the 1103 information,

10   your Honor, correct.

11                   THE COURT:  Okay.

12                   MR. PACHULSKI:  Which, again --

13                   THE COURT:  And what if they don't know?

14                   MR. PACHULSKI:  Then at least we'd know.  I

15   mean, one of two things --

16                   THE COURT:  Then you'd know they don't know.

17                   MR. PACHULSKI:  If they say we have no idea,

18   or if they say --

19                   THE COURT:  It's still percolating, we

20   haven't made any decisions, you know.

21                   MR. PACHULSKI:  We're waiting until we find

22   an investor, then he would try to work with the committee

23   to say, this is going to end badly if we do it, if we wait

24   until the debtor finds somebody, because Mr. Owoc -- what

25   we know is Mr. Owoc in 20 days has not allowed a

1     governance change.  Mr. Owoc isn't necessarily going to

2     allow a plan to be put in place, or a bid procedure to be

3     put in place sooner than it has to, because he wants to

4     control the company going forward, which I think is

5     impossible, frankly, but he may not.

6                    THE COURT:  That's all conjecture, we don't

7     know that.

8                    MR. PACHULSKI:  We don't know that, but I

9     know what I know.

10                   THE COURT:  But we don't know, that's the

11    problem under 1103.

12                   MR. PACHULSKI:  The problem under 1103 --

13    the problem is under 1103 we do not.

14                   THE COURT:  Okay.

15                   MR. PACHULSKI:  Okay.  So, then what else do

16    we know?

17                   Okay.  We know that the U.S. Trustee said,

18    see, there are 2,400 claimants, that's a really good

19    thing, but here is how the 2,400 breaks down, if you look

20    at the schedules, we've done the analysis, your Honor.

21                   Of those 2,445 claims, 1,767 of those claims

22    are customer claims, the vast majority, over 75 percent.

23    That is -- and they add up to $1,228,000.

24                   The trade creditors, which is the next

25    largest --

```
 1                    THE COURT:  (Inaudible) or something, what
 2      are we are talking about, what do you mean customer
 3      claims, what kind of claims are they?
 4                    MR. PACHULSKI:  Well, apparently, for
 5      instance, they had buy one, get a second free.
 6                    THE COURT:  Oh, so it's just a person going
 7      to a convenience store and having the right to a second
 8      drink?
 9                    MR. PACHULSKI:  That's -- there may be other
10      customer claims, but if you look at --
11                    THE COURT:  Okay.
12                    MR. PACHULSKI:  -- but if you look at the --
13                    THE COURT:  But they're small in -- they're
14      large in number, but small in amount?
15                    MR. PACHULSKI:  It's $40.  We saw a claim
16      for 3 cents.  I'm not sure how you get a 3 cent claim, but
17      apparently you do, but you don't have --
18                    THE COURT:  Three cents is 3 cents.
19                    MR. PACHULSKI:  It's 3 cents, but I don't
20      know how you get there, but again, that's not information
21      I need, just to be clear.
22                    THE COURT:  Understood, okay.
23                    MR. PACHULSKI:  Okay.
24                    THE COURT:  That's not the 1103 information
25      you're dying to get?
```

1              MR. PACHULSKI:  It's 1103 that we're dying

2    to get, and the -- it's actually to the transparency and

3    viability that we think we're entitled to.

4              THE COURT:  I totally understand it, I was

5    being factious, go ahead.

6              MR. PACHULSKI:  No, you're not, I didn't see

7    you as being facetious, your Honor.  You're just being

8    honest.

9              There are 554 claims that are the trade

10   claims that add up to about 88 million.  It's somewhere

11   between 83 and 88, and the reason I don't know is

12   Mr. DiDonato's first day declaration says one thing, the

13   schedules say another.  We have not tried to match it, the

14   $5 million, which is a lot of money.

15             THE COURT:  Not for government work, as we

16   put it.

17             Go ahead.

18             MR. PACHULSKI:  It's enough for anyone's

19   work, except in a case that has over a billion of claims,

20   that's not moving the needle much.

21             THE COURT:  Okay.

22             MR. PACHULSKI:  And then you have, for

23   instance, 61 claims of employee related, which is 48,000.

24   So the vast majority are customer claims, trade claims, in

25   terms of number.

```
 1                    THE COURT:  What's left?

 2                    MR. PACHULSKI:  What's left are basically

 3    litigation claims, intercompany claims.  It's really --

 4                    THE COURT:  Well, if you remove the

 5    intercompany claims, what's left?

 6                    MR. PACHULSKI:  There are -- I think there

 7    are 15 intercompany claims, because I would assume, I

 8    didn't analyze them, it just says intercompany claim and a

 9    dollar amount, but it's probably one debtor has loaned

10    money --

11                    THE COURT:  Those are insiders, they don't

12    vote.  I mean, it's not really --

13                    MR. PACHULSKI:  It's not an issue.

14                    THE COURT:  So put that aside.  What's left?

15                    MR. PACHULSKI:  The vast majority, the big

16    dollars are the litigation and --

17                    THE COURT:  What do they amount to?

18                    MR. PACHULSKI:  It amounts to, I think that

19    they scheduled about 600 million in one category, and

20    about $500 million in another category.

21                    THE COURT:  All right.  So it's basically 5

22    or 600 million, compared to 88 million, compared to about

23    a million seven?

24                    MR. PACHULSKI:  Correct, your Honor.

25                    THE COURT:  Okay.  So --
```

1              MR. PACHULSKI:  And, in fact, I think it's

2    -- by any definition it's probably closer to the billion.

3    I know there are two -- again, I'm looking at statements

4    and schedules, so you can -- it doesn't have a --

5              THE COURT:  The disparity is sufficient

6    enough for your argument, is what you're saying.

7              MR. PACHULSKI:  It's a huge disparity, and

8    it's probably closer to a billion, when you look at the

9    various categories.

10             THE COURT:  Okay, and that relates to the

11   need for a second committee because of size?

12             MR. PACHULSKI:  Well, because of size, and

13   because of the likelihood you will have to deal with those

14   -- it's not just size.  Size is a big issue, your Honor,

15   but it's also that to get a deal done in this case, you're

16   going to have to deal with this group, it's what Hills

17   Store says, it's fine that many times the cases say you

18   have enough participants in the committee to avoid it,

19   because nobody has a blocking position, your Honor.

20             THE COURT:  No one on the committee has a

21   blocking --

22             MR. PACHULSKI:  Well, no one has on

23   committee a blocking position and, frankly, in many cases

24   no one has a blocking position, but in this case, those

25   creditors have a clear blocking position.

1                    THE COURT:  Meaning, not control of the

2    committee, but a blocking position in the case because of

3    the size of their claim?

4                    MR. PACHULSKI:  Correct, and so --

5                    THE COURT:  So, I guess what I'm trying --

6    well, how does that relate to the need to appoint a second

7    committee?  You're not advocating here today that

8    creditors' committees ought to be appointed with one

9    committee for the largest group of claims, another

10   committee for medium-size group of claims --

11                   MR. PACHULSKI:  No.

12                   THE COURT:  -- and another committee for the

13   small claims, right, you're not arguing that?

14                   MR. PACHULSKI:  I am not.

15                   THE COURT:  That would be absurd, right?

16                   MR. PACHULSKI:  Right, I'm not arguing that.

17                   THE COURT:  So what you're arguing is that

18   the existing committee doesn't have adequate

19   representation because no one on that committee -- let's

20   just assume no one resigned, okay, just for sake of

21   discussion, no one on that committee had a large enough

22   claim to be in a blocking position so that its position

23   needed to be considered in the overall negotiations within

24   the committee as to what positions the committee took?

25                   MR. PACHULSKI:  I think that's fair, but

Page 120

```
 1    it's more than that, your Honor, it's that the group -- in
 2    most of the cases when you have multiple participants on a
 3    committee, none of the members of the group, even outside,
 4    so let's assume you had the energy merchants committee,
 5    they wanted an energy merchants committee, the energy
 6    merchants could not block a plan.
 7                   So, the Court said having 20 percent is
 8    probably more than you're entitled to, so you should just
 9    give up the idea.
10                   In this case the involuntary creditors, the
11    non-trade creditors, actually have that blocking position.
12    So, the committee can negotiate all they want.
13                   THE COURT:  Would it solve the problem, at
14    least this problem, not all of your problems, but would it
15    solve this problem if there were a member of the committee
16    that had, either a blocking position, or it was aligned
17    with the interest of another creditor that had a blocking
18    position?
19                   MR. PACHULSKI:  I --
20                   THE COURT:  In other words, I can see a
21    $225 million creditor sitting around the committee table
22    saying -- or on Zoom, saying, you know, with my vote, and
23    Monster's vote, you're never going to get this plan
24    confirmed, so you may as well negotiate on different
25    terms.  I mean, something like that.  I'm not sure that
```

Page 121

1    conversation would actually happen.

2              MR. PACHULSKI:  The problem is --

3              THE COURT:  This is all somewhat

4    speculative, but does that solve at least this problem?

5              MR. PACHULSKI:  No, because the committee

6    would argue that that one creditor -- the committee --

7              THE COURT:  The committee can outvote that

8    one creditor on the committee, I get that --

9              MR. PACHULSKI:  Oh, I understand that.

10             THE COURT:  -- but --

11             MR. PACHULSKI:  But the response should be,

12   we don't really have to listen to you because your claim

13   hasn't become final.

14             The irony is Monster and Orange Bang --

15             THE COURT:  That's not what I'm saying, your

16   claim is final.

17             MR. PACHULSKI:  Well, our --

18             THE COURT:  So all I'm saying is --

19             MR. PACHULSKI:  ABC is --

20             THE COURT:  I know you're not on the

21   committee, but I'm saying ABC would say, you know Monster

22   is going to do X, Y, Z, they do have a blocking position,

23   I agree with what Monster would do X, Y, Z, it's not

24   consistent with what you all are voting for and agreeing

25   to, so you need to take us seriously, and you need to get

Page 122

1  our input and decide this issue on a more --

2              MR. PACHULSKI:  I don't think that one

3  member representing the interests of a lot of different

4  litigation creditors would be able to even remotely bind

5  or say --

6              THE COURT:  Not bind, just to deliver the

7  reality of the case to the conference room negotiating

8  table.

9              MR. PACHULSKI:  And they say, okay, great,

10 that's your position, we are voting you down.

11             THE COURT:  Or they say, you're right, they

12 have a blocking position, we better reconsider.

13             MR. PACHULSKI:  They could.  I doubt it, but

14 at least if you have another committee, you know that

15 they're going to try to negotiate on behalf of the group,

16 as compared to hoping that one out of 11 members is going

17 to be able to convince the majority of the other 10 to go

18 with them.

19             THE COURT:  I see.

20             MR. PACHULSKI:  That's -- I mean, we don't

21 know that.

22             THE COURT:  I mean, that's sort of the

23 reality of how committees work, but anyway.

24             MR. PACHULSKI:  Well, how committees work is

25 the majority rules, and --

Page 123

1                    THE COURT:  True, too.

2                    MR. PACHULSKI:  -- how the plan works is the

3      majority doesn't rule.

4                    THE COURT:  Except that majority won't rule

5      if it's destined to be unsuccessful by not considering a

6      large creditor's potential block of whatever they're

7      trying to get accomplished.

8                    MR. PACHULSKI:  But, your Honor, the problem

9      is, if you -- and I, unfortunately, saw this in a case,

10     the party that was blocked -- and I don't know what

11     Monster will do, and I don't think they will, because I

12     would ask them not to, but the parties who are blocked,

13     and are forced with their back against the wall, without

14     information, are not going to just say, yes, I'd love to

15     sit down with you and see how we can do this, after you

16     have done everything in your power to keep us out of the

17     process, that's the real world, your Honor, and that's the

18     real world I had to live with in a case, where one of the

19     parties did not feel that they were being treated fairly.

20                    THE COURT:  I got you.

21                    All right.  So wrap up a bit, if you can, in

22     5 or 10 minutes, is that possible?

23                    MR. PACHULSKI:  You know, your Honor, I will

24     skip -- I going to -- well, I was quickly going to explain

25     the 18 cases that were filed, because 9 were equity cases,

Page 124

1    of which they were hopelessly out of the money.  The only

2    one that was even close --

3                    THE COURT:  Those cases don't mean a hill of

4    beans to me --

5                    MR. PACHULSKI:  Okay.

6                    THE COURT:  -- quite honestly.

7                    What matters to me, just to skip ahead a

8    little bit, is trying to see a case where the precedent

9    and the reasoning behind the case, where there was either

10   equating to the mass tort concept that you're talking

11   about, or how it is that this case suggests that there are

12   different elements at play here that you don't see in

13   other types of cases, that's really what I'm coming down

14   to, and at the end of the day, again, it's all about the

15   adequate representation analysis.  So --

16                   MR. PACHULSKI:  Well, your Honor, I can

17   either go through the standards, or talk about the -- but

18   there are a lot of standards.  So in 5, 10 minutes, I

19   wouldn't be able to do it, but here is -- let's just deal

20   with this reality, your Honor, we know there are other

21   cases that have appointed two committees without a fight.

22   We know that happened, and based on a number of the

23   questions you had, your Honor, it would have been fine

24   that one of them had a majority, and the other didn't, and

25   you just move forward.  There is no reason, different than

1    what you've been arguing, that the U.S. Trustee should

2    have appointed separate committees, whether it's abuse, or

3    opioids, or the rest, you could have just put trade, and

4    make them live with the non-trade, you could have just

5    done that.

6                   The one case that has been fought --

7                   THE COURT:  Meaning trade committee living

8    with a non-trade committee?

9                   MR. PACHULSKI:  Well, basically five members

10   of one and four members of the other, and that's just how

11   it is, you could have done that.

12                  THE COURT:  And that would have been okay

13   with you?

14                  MR. PACHULSKI:  No, it would have been

15   absolutely wrong.

16                  THE COURT:  Okay.

17                  MR. PACHULSKI:  My point is --

18                  THE COURT:  Isn't that what the U.S.

19   Trustee's Office did?

20                  MR. PACHULSKI:  It's -- what they did is

21   exactly what they didn't do in the cases I've cited you

22   to.  They first put none of the litigation claimants, and

23   then --

24                  THE COURT:  In the cases that you've cited

25   me to, what did they do?

1              MR. PACHULSKI:  The Takatas, and the

2    Purdues, and the Mallinckrodts, and the Boy Scouts --

3              THE COURT:  Two committees.

4              MR. PACHULSKI:  -- every one of them had two

5    committees.  We gave you a list in our pleadings, I

6    think --

7              THE COURT:  We've already gone through why

8    those committees are analogous, or those cases are

9    analogous to this one.

10             MR. PACHULSKI:  Right, and the one that goes

11   through, I think, in detail, and I know that the two --

12   that the U.S. Trustee and the debtor have tried to

13   distinguish, the Diocese of New Orleans case, which is

14   dramatically smaller than this one, made the determination

15   to get a second committee because the judge recognized

16   that the interests are different, even though the claims

17   are the same.

18             Now, the U.S. Trustee comes up with --

19             THE COURT:  Meaning the claims are the same,

20   in terms of priority, as general unsecured --

21             MR. PACHULSKI:  In terms of priority.

22             THE COURT:  -- claims.

23             MR. PACHULSKI:  No different.

24             THE COURT:  But the interests are different

25   in that trade creditors have a very different, a very

1    different outlook, potentially, or very different

2    interests than injury claims --

3                    MR. PACHULSKI:  Well, as someone who has

4    dealt with --

5                    THE COURT:  -- or abuse claims.  Is that

6    right, is that what the decision --

7                    MR. PACHULSKI:  Yeah, I mean, the decision

8    is the trade creditor just wanted to survive, they wanted

9    to get their money.

10                    THE COURT:  Doing business and get their

11    money.

12                    MR. PACHULSKI:  And the survivors want the

13    highest possible return, and are completely indifferent

14    whether the Diocese of New Orleans survives.

15                    THE COURT:  Right.

16                    MR. PACHULSKI:  And that's what we have

17    here.

18                    THE COURT:  And you're equating yourself to

19    the abuse committee, whereas the trade creditors are the

20    trade creditors here?

21                    MR. PACHULSKI:  Right, that's exactly what

22    we have.

23                    THE COURT:  All right.

24                    MR. PACHULSKI:  And what's different,

25    your Honor, is there was no distinguishing -- it's the

1   size of that case.  The distinguishing factor here that

2   makes it even more significant is the amount, because you

3   can say, well --

4                   THE COURT:  You're saying it's two things,

5   it's the amount, and I thought you also argued that it's

6   also how these claims arose by virtue of --

7                   MR. PACHULSKI:  Correct, it's the amount.

8                   THE COURT:  -- acts by the debtor, for lack

9   of a better term.

10                  MR. PACHULSKI:  Well, there is a lot going

11  on here, your Honor.  It's -- and this is why I think this

12  case is stronger than New Orleans, it's the amount, it's

13  how the claims arose, it's the limited amount of time

14  left, it's the -- because in those cases you could have

15  just seen how it worked out, there was no -- the New

16  Orleans case, your Honor, I think was filed in 2020, and

17  is still going on.  So, that's not an option here.

18                  So when you look at all of the factors, and

19  you didn't have -- as far as I know you had --

20                  THE COURT:  There is not an operating

21  business that's going to fail if they don't get funding,

22  in the Archdiocese case.

23                  MR. PACHULSKI:  It is not going to fail.  I

24  mean, I don't know, I doubt it.  I mean, there have been

25  arguments in some of the cases, your Honor, that they will

Page 129

1  fail because they will not be able to come up with the

2  money, and they will not get contributions.  So the

3  survival of the diocese is never an absolute.  I have no

4  reason to believe the Diocese of New Orleans will not

5  survive, but you had 34 abuse claimants when the case was

6  filed, ironically, almost the same as the litigation

7  claimants, but the litigation claimants have much larger

8  claims, and you have $91 million of trade, that's the

9  irony here, those numbers are about the same, but the size

10 of the institution is dramatically less, and that case was

11 very clear.

12          Now, the debtor says, well, the debtor was

13 in favor of it.  Well, that's not an adequate

14 representation theory.  The debtor didn't like what the

15 abuse claimants were doing, they could have just gone to

16 the trade and said set up an ad hoc, but they didn't in

17 that case, they supported it, and then the U.S. Trustee

18 tries to distinguish it because somehow definitionally an

19 abuse case is different, but so are opioid cases, and so

20 are airbag cases, and so are other types of tort cases, so

21 are asbestos cases.  All of them are differences, but in

22 many of those, like WR Grace, that had two committees.

23          So, your Honor, I don't -- what I don't

24 think is analogous are those 18 cases.  I can distinguish

25 every single one of those.  The ones that are analogous

Page 130

1    are where the U.S. Trustee has actually appointed two

2    committees, or the New Orleans case where the judge said

3    very clearly, I could appoint a second committee, I could

4    just add people, but I'm not going to do that, because I

5    think these --

6                    THE COURT:  Add people to an existing

7    committee?

8                    MR. PACHULSKI:  Correct.  She made that

9    determination that she was not going to add to the

10   existing committee.  She decided that she was going to

11   simply appoint a second committee, which kind of -- and in

12   this case, your Honor, when you talk about it, because of

13   the timeframe, again, we're talking about the size, we're

14   talking about the different -- how the claims arose, but

15   it's also -- we strongly believe, other people may not,

16   that because of what Hill Store says, it's the greatest

17   likelihood to get a consensual deal.

18                   THE COURT:  I get it.  All right.

19                   MR. PACHULSKI:  I can go through more, but

20   I've taken too much of your time already, your Honor.

21                   THE COURT:  I understand.

22                   MR. PACHULSKI:  Thank you.

23                   THE COURT:  All right.  Thank you.

24                   So we've got a couple of choices.  It's

25   lunchtime, past lunchtime.  We can take a break and get

Page 131

1    some food.  We can hear from Mr. Sorkin.  I don't know how

2    long the status report would be, or what follows from that

3    status report in terms of discussion, but I could limit

4    you to just report, as Mr. Guso suggested you would, after

5    this corporate governance meeting, or board meeting, or we

6    could just take a break and come back and the committee

7    can put on their case, and the debtor, et cetera.

8                    MR. SORKIN:  Your Honor, for the record --

9                    THE COURT:  Why don't you come up here?

10                   MR. SORKIN:  For the record, Andrew Sorkin,

11   Latham & Watkins, on behalf of the debtors.

12                   I think it would be my preference,

13   your Honor, if we could take the lunch break.  I could

14   confer with the lenders and other case constituents, and

15   provide the update to them, get their feedback, and then

16   when we go back on the record, I'm happy to share the

17   update with the Court as well.

18                   THE COURT:  Okay.  Fair enough.

19                   Yes, Mr. Pachulski.

20                   MR. PACHULSKI:  Your Honor, maybe I've

21   gotten used to this, I guess, but I do think it would be

22   -- I don't know what Mr. Sorkin is going to say,

23   obviously, and I think it might be helpful for some of the

24   parties to know it so that we don't come back here --

25                   THE COURT:  I think that's what he's

1   suggesting.

2              Mr. Sorkin, are you leaving anyone out, or

3   are you basically going to -- you said constituents of the

4   case, I assumed you mean --

5              MR. SORKIN:  Yes, I'm not looking to exclude

6   Mr. Pachulski.

7              MR. PACHULSKI:  Again, I thought it would be

8   nice for the Court to hear, but we can meet outside --

9              THE COURT:  Well, it's going to be nice for

10  the Court to hear unless it's something the Court

11  shouldn't hear because it prevents, once out of the

12  genie's bottle, being put back in.  So as my father was

13  very fond of saying, you can say anything, but you can

14  never unsay it.

15             So, maybe it's best that you all talk.

16             MR. PACHULSKI:  Either way, your Honor.

17             THE COURT:  Okay.  Well, you know what,

18  let's let our stomachs dictate the outcome here.  So we're

19  going to take a break for lunch.  You all can eat, you all

20  can talk, you all can do neither, I'll leave it to you

21  all.

22             Let's be back at -- you tell me.

23             MR. GUSO:  1:30, your Honor?

24             THE COURT:  1:30 works for the Court.  Does

25  it work for everybody else?

 1                    (No verbal response.)

 2                    THE COURT:  Okay.  All right.

 3                    What's that?

 4                    UNIDENTIFIED:  Should we leave our things in

 5     the courtroom?

 6                    THE COURT:  I don't have the -- it's way

 7     above my pay grade.

 8                    (Thereupon, a lunch recess was had, after

 9     which the following proceedings were had:)

10                    THE COURT:  My camera does not seem to be

11     working.  For some reason my camera is not working, I

12     don't know why.

13                    All right, Mr. Sorkin.

14                    MR. SORKIN:  Good afternoon, your Honor.

15     For the record, Andrew Sorkin, Latham & Watkins, on behalf

16     of the debtors.

17                    I did want to provide the update that

18     Mr. Guso promised at the beginning of the day --

19                    THE COURT:  Okay.

20                    MR. SORKIN:  -- which I just shared with our

21     stakeholders over lunch.

22                    I'm pleased to report we did have a

23     breakthrough on the governance issue this morning.  That

24     followed a series of meetings with our restructuring

25     committee, and the full board over the last few days.

Page 134

1           This morning, at around 10:30, the board

2    unanimously approved a resolution to accept the terms of

3    the DIP as proposed by the lenders, including with respect

4    to governance, and let me be a little more specific about

5    what that means.

6           First, the board, and this includes Mr. Owoc

7    himself, which is important because he's the only person

8    as sole shareholder who can actually remove a director,

9    agreed that the board composition will change, so that it

10   includes one additional independent director that's

11   acceptable to the lenders.  That director will replace one

12   of, Mr. Hillman or Dr. Escalante, and will serve alongside

13   Mr. Dickinson and Mr. Panagos.

14           Who that director will be remains to be

15   determined.  We will be working expeditiously this week

16   with the lenders in an effort to try to get that person

17   selected and on board hopefully as soon as the end of this

18   week.

19           So the net effect of this change to the

20   board, just to be absolutely clear, is that the new board,

21   after giving effect to this change, would consist of

22   Mr. Panagos, Mr. Dickinson, the new independent director,

23   Mr. Owoc, and one of Dr. Escalante or Mr. Hillman.

24           There is a second bucket of changes that the

25   board also approved this morning.  Those relate to the

1    scope of the mandate that Mr. DiDonato has as the debtor's

2    chief transformation officer.

3                    First, the CTO, Mr. DiDonato, would report

4    directly to the restructuring committee rather than

5    Mr. Owoc as CEO, and would serve at the pleasure of the

6    restructuring committee.

7                    THE COURT:  Who does the restructuring

8    committee consist of?

9                    MR. SORKIN:  Mr. Panagos --

10                   THE COURT:  Okay.

11                   MR. SORKIN:  -- at the moment.

12                   THE COURT:  Okay.

13                   MR. SORKIN:  Second, the scope of authority

14   that Mr. DiDonato has as chief transformation officer will

15   be formalized, both as a matter of internal corporate

16   governance, and for purposes of the DIP credit agreement,

17   so that it includes, at a minimum, oversight of all of the

18   company's treasury and cash management functions, as well

19   as things like approval of restructuring expenses and the

20   review of same.  So professional fees and the like.

21                   Third, if that scope of authority is

22   narrowed at any point, or if Mr. DiDonato is terminated or

23   resigns, that will be an event of default under the DIP.

24                   So those are the terms --

25                   THE COURT:  Narrowed by the board, or how

1    could it be narrowed?

2                    MR. SORKIN:  It could be narrowed by the

3    restructuring committee.  So Mr. Panagos, as the sole

4    member of that committee, at this point, or the board

5    acting as a whole.

6                    THE COURT:  Okay.

7                    MR. SORKIN:  So those are the changes,

8    your Honor.  We, and Mr. Owoc understand the need to

9    resolve the few open issues that remain very promptly.

10   Those open issues are selecting the new director, and

11   perhaps some wordsmithing around the CTO changes that I

12   just described for purposes of the credit documents.

13                   There is an understanding among all of our

14   board members that the new director needs to be

15   independent of the company, and of Mr. Owoc, at least as

16   of the time of their appointment.

17                   THE COURT:  The board as a whole selects

18   that new director?

19                   MR. SORKIN:  The board can appoint the new

20   director.  Mr. Owoc can also do it as shareholder, but in

21   this case, you know, the board will sign off on the

22   identity of the proposed new director.

23                   THE COURT:  Okay.  So it's within the

24   board's ability to determine and make sure that that

25   director is independent of Mr. Owoc?

1                    MR. SORKIN:  Yes, yes, and the lenders have

2        a say, too, of course.

3                    THE COURT:  Okay.

4                    MR. SORKIN:  This director will need to be

5        acceptable to them, including with respect to his or her

6        independence.

7                    THE COURT:  Okay.

8                    MR. SORKIN:  So with those approvals, and

9        the broader issues now resolved, we do believe we will be

10       back on track with our DIP, and prepared to go forward

11       with a final hearing on January 10th.

12                   THE COURT:  Okay.

13                   MR. SORKIN:  And that really concludes the

14       update, your Honor, subject to any questions you may have.

15       I don't know if others want to be heard.

16                   THE COURT:  Okay.  I have no further

17       questions.

18                   Does anyone else wish to be heard?

19                   Your lender is coming up.

20                   MR. LLUBERAS:  Yes, good afternoon,

21       your Honor.  Luis Lluberas on behalf of Truist Bank.

22                   Obviously we heard these developments in

23       real time like the rest of the constituencies in court.

24                   On behalf of Truist Bank we're cautiously

25       optimistic that this will resolve the impasse that we've

Page 138

1    been at.  The lenders stand ready, willing, and able to

2    provide the DIP financing on the modified terms, as noted

3    in the pleadings that were filed last week, subject to the

4    governance items being resolved.

5              So we will also work expeditiously with the

6    debtors to make sure that all of the wordsmithing changes

7    and appropriate language in both the final DIP order and

8    the DIP credit agreement are acceptable to the lenders,

9    and we certainly welcome the opportunity to collaborate

10   with the debtors to make sure that this yet to be named

11   third independent person is reasonably acceptable to the

12   lenders based on the standard of independence and

13   un-affiliation to Mr. Owoc.

14             THE COURT:  And, Mr. Sorkin, you may have to

15   answer this as well, but so what's the process, in

16   consideration of a January 10th currently contested

17   matter, it seems to me there is some timing issues with

18   respect to finalizing the documents, providing notice to

19   the various constituencies in this case well in advance of

20   the January 10th, we've got the holidays.  Tell me, what's

21   the plan.  Not the bankruptcy plan, but what's the plan to

22   be ready for the January 10th hearing?

23             MR. SORKIN:  I think we can be prepared in

24   any event to file revised documents this week, which is, I

25   think by my count we're still three weeks away, roughly,

1    from that.

2              THE COURT:  Which means filed, signed,

3    agreed to between debtor and lender, and then that -- and

4    those would be the documents for consideration at the

5    January 10th hearing, correct?  Is that --

6              MR. SORKIN:  Correct.

7              THE COURT:  -- what you mean?

8              MR. SORKIN:  Yes, it is what I mean.  I

9    mean, there may be another iteration, depending on if

10   other issues get resolved with other constituents who have

11   pending objections, that's still going on in the

12   background as well.

13             But, yes, I mean a set of documents that

14   includes the changes I just described, we can get on file

15   as soon as this week, and I don't think it necessarily

16   depends on identification of the new independent director.

17             THE COURT:  Okay.  All right.

18             MR. LLUBERAS:  I concur with that,

19   your Honor, just for clarity.

20             THE COURT:  Okay.  All right.  Great.  Thank

21   you.

22             MR. LLUBERAS:  Thank you.

23             THE COURT:  Does anyone else wish to be

24   heard?  Mr. Cohen.

25             MR. COHEN:  Good afternoon, your Honor.  For

1    the record Jeff Cohen on behalf of the committee.

2              Your Honor, I guess unlike counsel for

3    Truist, who is cautiously optimistic, I'd say the

4    committee is just cautious.  There is a lack of trust,

5    unfortunately, between the committee and the

6    decision-making of Mr. Owoc.  In our experience Mr. Owoc

7    has a propensity to change his mind.  We hope that's not

8    the case here, but as Mr. Sorkin and Mr. Lluberas just

9    said, the committee also objected to governance in our DIP

10   objection, which we filed it seems like a very long time

11   ago.  Part of our objection was objecting to the

12   independence of Dr. Escalante and Mr. Hillman.  So we will

13   take a keen interest not only in who is replacing them,

14   but which one of them is replaced.

15             So, I do think the devil is in the details

16   here.  It's unfortunate that the debtors only talked about

17   reaching consensus with the lenders.  We think this is a

18   good opportunity for them to engage with the committee and

19   all constituents, rather than making an agreement with the

20   lenders and have to turn around and negotiate with us, but

21   that's their decision.  So we await their decision.

22             We did submit a list of potential

23   independent directors to them I think five or six weeks

24   ago.  They are independent of us, the committee, and

25   independent of the debtors, and independent of Mr. Owoc.

1    We vetted that list with Monster Energy.  Monster Energy

2    gave us additional names.

3                We think it's advisable for them to choose

4    from those two lists, but really we just want someone

5    that's independent, and we want them to replace the right

6    person.

7                So it is a good update, but we're cautious

8    as to whether it actually happens, and we hope it does.

9                THE COURT:  All right.  Thank you.

10               Mr. Feinstein.

11               MR. FEINSTEIN:  Thank you, your Honor.  For

12   the record Robert Feinstein, Pachulski Stang Ziehl &

13   Jones, counsel for Monster Energy.  Your Honor, I'm

14   handling the DIP, which is why I rise.

15               So, I'd like to put some definition on this,

16   just so that we have -- we have a pending objection.  We'd

17   like an opportunity to react to the new regime, the new

18   documents and so forth, and what we were told in the

19   hallway, I guess, is that, you know, we'll know -- right

20   now we don't know which of the two directors, Hillman or

21   Escalante, are resigning, and we don't know who the new

22   director is going to be, and we need to know that soon,

23   and we need to know the other terms and conditions, and to

24   see it in writing soon, for us to have enough reaction

25   time before a January 10th hearing.

Page 142

1            And then there is the matter of the budget.
2    We were told last week that there would be a new budget
3    forthcoming, to be attached to the final DIP, that we'd
4    get it last Thursday, and we didn't.
5            It's obviously a critically important
6    document, and among other things, Monster has a -- you
7    know, there is a 5 percent royalty that should be in the
8    budget.  We've objected to a surcharge waiver if it's not.
9            So just as a matter of fairness and orderly
10   proceeding, your Honor, we'd like to have some sense of
11   when these things are going to happen because it's big and
12   amorphous, and I kind of harken back to the first day
13   hearing, I recall Mr. Sorkin getting to the podium and
14   saying, we intend to add independent directors, but it
15   hadn't been done by that date.
16           So statement of intention is very different
17   than actual, you know, action, right?  So we would
18   encourage the debtors to either say it's going to happen
19   by a certain date, or for your Honor to tell them all
20   these things have to be -- you know, have to happen, and
21   be reflected in documents on the docket by a certain date
22   to give parties adequate notice and opportunity to digest
23   those, and to react to those in the context of the final
24   DIP hearing.
25           THE COURT:  So, you're adding to my initial

1   question in terms of things that need to be presented in

2   advance of the January 10th hearing, not only to the

3   finalization and filing of the documents, but also to the

4   selection of the new director.  Anything else beyond that?

5                   MR. FEINSTEIN:  Well, in the same breath,

6   which of the two --

7                   THE COURT:  And who --

8                   MR. FEINSTEIN:  -- directors are departing.

9                   THE COURT:  Right.  You'll know --

10                  MR. FEINSTEIN:  Yes.

11                  THE COURT:  Okay.  I hear you.  All right.

12                  MR. FEINSTEIN:  Right, and the budget, which

13  is critically --

14                  THE COURT:  And the budget.

15                  MR. FEINSTEIN:  -- important.

16                  THE COURT:  So let me ask that, Mr. Sorkin.

17                  And, again, my interest here is not

18  inconsistent with Monster's, but maybe for a different

19  reason.  I just want everyone to be prepared for

20  January 10th, and not find out on, or slightly before

21  January 10th that there is a good reason to continue the

22  hearing, if that's not in the interest of the estate.

23                  So, what is the plan with respect to

24  providing the new budget, as well as timing for who is

25  being replaced, and who that person is?

1                    MR. SORKIN:  So.  The new budget,

2      your Honor, will be attached to the final DIP order --

3                    THE COURT:  Well --

4                    MR. SORKIN:  -- which --

5                    THE COURT:  -- the final DIP order, which --

6                    MR. SORKIN:  Which will be filed no later

7      than the end of this week --

8                    THE COURT:  Ah, okay.

9                    MR. SORKIN:  -- which was the proposal I

10     made before.  If your Honor would like to impose a --

11                    THE COURT:  It was a proposed --

12                    MR. SORKIN:  -- tighter deadline we will

13     work to that.

14                    THE COURT:  It's a proposed final DIP order

15     that includes the new budget at the end of the week, okay.

16                    MR. SORKIN:  Correct, yeah.

17                    THE COURT:  And what about the determination

18     of who is leaving the board and who is replacing that

19     person?

20                    MR. SORKIN:  That one is a little harder to

21     commit to a hard deadline.  As I indicated in the update,

22     the objective is to get that done this week.

23                    THE COURT:  Okay.

24                    MR. SORKIN:  I should note that I think, and

25     this is not to suggest that we don't intend to discuss

1    these matters with the committee and other constituents,

2    but ultimately this is primarily the lenders' issue.

3    Because this is a gating item for access to the DIP,

4    right?  The other constituents have raised this in

5    connection --

6            THE COURT:  If no money, there is nothing

7    further to talk about.

8            MR. SORKIN:  Correct, and I know that the

9    other constituents have raised this issue in connection

10   with their DIP objections, but so long as our governance

11   structure is acceptable to the lenders, such that they

12   will move forward with this DIP facility, I'm not sure

13   that those objections are actually germane to the DIP

14   relief.

15           THE COURT:  Okay.  I understand your

16   position.  Again, I'm not going to dictate how the debtors

17   negotiate with the various constituencies, and you've made

18   that decision, and that's fine, as long as we get to a

19   point on January 10th where everybody is ready to proceed,

20   and that's what's important to me so that I can -- if it

21   continues to be contested, I can make a decision.

22           All right.  Mr. Feinstein, does that timing,

23   although not completely committed to with respect to who

24   is leaving the board, and who is replacing that person,

25   could that work from your perspective?

1                    MR. FEINSTEIN:  In an ideal world,

2    your Honor, we'd have all the information --

3                    THE COURT:  Actually you just don't get on

4    the record if you're not in the mic.

5                    MR. FEINSTEIN:  It might be better.

6                    THE COURT:  And I'm hanging on every word.

7                    MR. FEINSTEIN:  Thank you, your Honor.

8                    In an ideal world, your Honor, we would have

9    all these decisions finalized and reported to the parties

10   in interest this week, including the change in directors,

11   because right now the board is still dominated by Owoc and

12   his friends, unless and until this change happens, and I

13   don't know, something could come up this week, and this

14   board, we'd still be functioning on it.

15                   So it can't drift into the future.  There

16   really should be closure to this.  We do think it's

17   germane to our objection, and your Honor has heard the

18   word "trustee" more than once and, you know, the

19   governance is a much larger concern, beyond having to have

20   it resolved to access financing.  How this case operates

21   going forward is critically important to Monster, who has,

22   without security, the largest single claim in the entire

23   case.  So we're very focused on governance, and when it's

24   going to happen, and how the case is going to run, because

25   lurking in the background is a trustee motion, if it's not

1  satisfactory.

2              THE COURT:  Well, every time a

3  debtor-in-possession walks out of a courtroom still a

4  debtor-in-possession is a good day.  So I think everybody

5  understands the threat of a trustee, and you worry about a

6  threat of a trustee from the day you file.  So, I get

7  that.  I'm sure Mr. Sorkin gets that.  There is no motion

8  filed at this point, but your point, I'm sure, has been

9  heard and received by Mr. Sorkin.

10             All right.  So we don't live in an ideal

11 world.  I don't know that we've ever lived in an ideal

12 world but, Mr. Sorkin, it is nice to have that goal.  So

13 I'll leave it to you all.  I'm going to leave this where

14 it is right now, we're going to get back to the committee

15 issue, and I will look forward to seeing you all on the

16 10th, and bringing some closure to this issue.

17             MR. FEINSTEIN:  Thank you.

18             MR. SORKIN:  Thank you, your Honor.

19             THE COURT:  All right.  Thank you.

20             All right.  So, when we were last together,

21 about an hour ago, I think, Mr. Pachulski, you had ended

22 your argument and closed your -- or ended your case,

23 rested your case, is that right?

24             MR. PACHULSKI:  Correct, your Honor, and we

25 may (inaudible) number of people, but at this point I

Page 148

```
 1   would turn it over to counsel for ABC.
 2              THE COURT:  Ah, okay.
 3              MR. PACHULSKI:  We still have others who I
 4   know want to speak.
 5              THE COURT:  All right.  Who does want to
 6   speak with respect to the movants in support of the
 7   motion?  Let me just get a list so I can make sure I
 8   understand that.
 9              MR. FALCONER:  Russ Falconer for ABC.  We'd
10   like to be heard, your Honor.
11              THE COURT:  Other than Mr. Falconer, does
12   anyone else wish to be heard today?
13              MR. PATTERSON:  Your Honor, Tom Patterson
14   (inaudible) --
15              THE COURT:  Mr. Patterson, you've got a mic
16   problem.  We heard a few words, but then you went out.
17   Still can't hear you.  Still -- yep.
18              MR. MAOZ:  Your Honor, I'll fill in for
19   Mr. Patterson.
20              Orange Bang would like to speak after ABC
21   has a chance to address the Court.
22              THE COURT:  Okay.  All right.  So that we
23   don't spend a lot of time going over old ground, or ground
24   that I've already heard, Mr. Falconer, we'll start with
25   you.  Just keep in mind to bring something new to the
```

1   table, all right?

2            MR. MAOZ:  Your Honor, if I may.  I don't

3   know if Mr. Lieberman was trying to say he, too, was going

4   to speak.  I'm not sure, but he's (inaudible) --

5            THE COURT:  Mr. Lieberman, I thought, was

6   being taken over by --

7            MR. MAOZ:  No, that was Mr. Patterson.

8            THE COURT:  Oh, I see.  Mr. Lieberman, I

9   can't hear you either.  So this is why people need to show

10  up in court, because you're relying --

11           MR. PATTERSON:  Your Honor --

12           THE COURT:  -- on technology.

13           MR. PATTERSON:  Can I be heard now,

14  your Honor?  It's Tom Patterson speaking.

15           THE COURT:  Yes.

16           MR. PATTERSON:  Yes, your Honor, I apologize

17  for that technological glitch, but Orange Bang would like

18  to be heard in support of the motion.

19           THE COURT:  All right.  Thank you.

20           Mr. Lieberman, how about you?  You're still

21  not able to be heard.

22           Mr. Alifarag, do you want to speak in the

23  meantime?

24           MR. ALIFARAG:  Yes, I'll just cover for

25  Mr. Lieberman in the meantime.  Sony and UMG would also

Page 150

1    like to speak in support of the motion.

2                    THE COURT:  Okay.  Anyone else?

3                    (No verbal response.)

4                    THE COURT:  All right.  Again, let's keep it

5    fresh.

6                    MR. FALCONER:  Absolutely.

7                    THE COURT:  Mr. Falconer.

8                    MR. FALCONER:  Thank you, your Honor, and

9    I'll be as fresh and brief as I can.

10                    I think we'll hear plenty this afternoon

11   about what the parties disagree on, so I thought I would

12   start with something I think we all agree on, which is

13   what we all want here is to see this case succeed, to see

14   a plan confirmed quickly, expeditiously, and consensually,

15   ideally.

16                    And the bottom line in support of our motion

17   for the second committee is that we think the appointment

18   of a second committee to represent the non-trade creditors

19   gives the Court in this case their best path to that

20   consensual outcome.

21                    Mr. Pachulski covered some of the reasons

22   for that this morning, but the information sharing that

23   comes with an official committee, getting some large

24   stakeholders with strong views involved early in the

25   negotiations, when they have a time to, you know, have

1   their voices heard, shape the formation of a hopefully

2   consensual plan, getting all us, you know, the noisy group

3   here all are going to be heard this afternoon, unified

4   behind a single voice, I think there are a lot of benefits

5   for efficiency and consensus that would come with the

6   formation of that second committee.

7              The question I wanted to address to start

8   was one your Honor asked Mr. Pachulski this morning, or

9   maybe intimated, without asking outright, which is, ABC

10  and one of the other movants were appointed to the

11  committee by the U.S. Trustee's Office, and in our view I

12  think that appointment acknowledged a problem, a

13  legitimate problem, and just provided a solution that was

14  more window dressing than actual.  This is -- and now this

15  is -- I'm going to discuss a little bit Exhibit 5, which

16  is one the Court has reserved its judgment about

17  admissibility, but we had some pretty extensive

18  back-and-forth with the U.S. Trustee's Office, some calls,

19  some letters, which resulted in the U.S. Trustee's Office

20  saying, after due consideration we are inclined to appoint

21  a second committee, and we think that's an important

22  admission from the trustee's office that there were some

23  serious flaws in the way the committee was formed the

24  first time around.

25              The appointment of a second committee would

1    have addressed those flaws in a meaningful way.  Adding a

2    few creditors, the non-trade creditors to the already

3    formed committee, that had already hired professionals,

4    already elected a chair, already adopted its by-laws, you

5    know, the train had left the station, and we were just

6    going to be pulled along behind it, on a committee that

7    ultimately did not give litigation creditors a meaningful

8    voice on the committee in relation to their posture in the

9    case.

10              Now that's the standard for adequate

11   representation from the New Orleans case, the Dow Corning

12   case from Michigan, that's the question the Court has been

13   rightfully focused on today, do the non-trade creditors

14   have a voice on the committee in proportion to their

15   posture in the case?

16              And as Mr. Pachulski covered, you know, very

17   well, our posture in the case is a dominant posture.  I

18   mean, our anticipation is that there will not be residual

19   value for equity left over when this case is done.  In a

20   very real sense, the unsecured creditors in this case, the

21   value that's in this company redounds to our benefit.

22              And for this large group of creditors, by my

23   count the seven largest litigation creditors have filed

24   proofs of claim that total almost $1.8 billion, for those

25   creditors not to be represented at all on the initial

Page 153

1    committee, and then to have, you know, a small voice on a

2    much larger committee that was dominated in more ways than

3    one by trade creditors, does not constitute adequate

4    representation for purposes of 1102(a)(2).

5                   THE COURT:  Are there cases that discuss the

6    fact that proportionality, in terms of the amount of

7    claims, is necessary to achieve adequate representation?

8                   MR. FALCONER:  Not exact proportionality,

9    your Honor, but, I mean, starting with the language --

10                  THE COURT:  In fact, I saw -- I think Hill

11   even says that there is no requirement whatsoever that the

12   committee mirror the creditor body.

13                  MR. FALCONER:  Right, it should -- but the

14   committee should give groups of creditors, distinct

15   groups, with potentially or actually distinct interests,

16   which I think we do have here, a voice on that committee,

17   and a role in the committee in proportion to their role in

18   the case, and so --

19                  THE COURT:  Well, what case says that?

20                  MR. FALCONER:  That's the New Orleans

21   Archdiocese case, and I think that case, it's a case out

22   of Michigan, I think it's Dow Corning, that originated

23   that, you know, in relation to their posture in the case,

24   the idea that if we had a committee here that was

25   60 percent litigation creditors versus 95 percent, which

1   is about what they are by value, I don't think anybody

2   would be here complaining that, hey, the percentages don't

3   line up just right, but where you have a case that is

4   upwards of 95 percent by value non-trade creditors, and an

5   initial committee that has no -- there is a hundred

6   percent trade creditors, a couple have --

7               THE COURT:  Well, we're not talking about an

8   initial committee here.

9               MR. FALCONER:  Right.

10              THE COURT:  We're talking about an

11  11 person, an 11-member committee, two of whom have

12  resigned, but whose places still exist to be filled by

13  someone that is of consistent position, I guess, legally,

14  or however you wish to describe it.  So we're talking

15  about an 11-person committee.

16              I'm a little bit thrown by the idea that the

17  fact that the second -- that the reconstituted committee

18  was reconstituted at a point after which by-laws were

19  already adopted.  It doesn't seem to me that those by-laws

20  couldn't be reconsidered, but I don't want to get into the

21  innerworkings of the committee.

22              I also would find it unusual that the

23  by-laws would be out of the ordinary, if you will,

24  one-person-one-vote-type thing.  I'm not exactly sure what

25  else they would provide, but it seems to me that if you

Page 155

```
 1    have a significant objection to the by-laws, that could be
 2    raised at the committee level.
 3                    So I guess I'm just trying to understand
 4    what the -- why the timing matters, because nothing
 5    significant really happened in the case, at least before
 6    the Court, other than essentially uncontested first days,
 7    that's all that's really happened in the case, at least
 8    from my perspective, unless you think I'm missing
 9    something.
10                    I'm not suggesting there haven't been
11    significant negotiations and discussions in the
12    background, and that happens in every case, but nothing
13    has made it before me as a result of those discussions.
14                    So, I just want to make sure I least
15    eliminate, if I can, the timing issue.  Why shouldn't I
16    eliminate the timing issue as an issue?
17                    MR. FALCONER:  Well, I think the timing
18    issue is a hard one to eliminate, in that adequate
19    representation is a requirement of the Code at all times
20    throughout the case.
21                    So, moving forward with a committee that, as
22    initially constituted, you have a tacit admission from the
23    U.S. Trustee's Office, was not adequately representative
24    of the creditor body.  They tried to fix it by appointing
25    a few more members --
```

1          THE COURT:  What was the time difference

2     between when the committee was -- the initial committee

3     was formed, and then reconstituted?  I know when the

4     notices are, but --

5          MR. FALCONER:  I don't have that in front of

6     me.  I want to ballpark it at about three weeks, but I can

7     double-check that and get you an exact figure if that

8     would be helpful.

9          THE COURT:  Okay, and do --

10          MR. FALCONER:  That's my memory.

11          THE COURT:  -- you believe that those three

12    weeks somehow made a critical difference in the case?

13          MR. FALCONER:  No, your Honor, I may have

14    misunderstood your question.  I thought your Honor was

15    asking about the timing question in terms of, you know,

16    we're having a motion to appoint the committee now, and

17    some of the discussion with Mr. Pachulski this morning was

18    why do I need to do this now?  Not a lot of significant

19    events have happened in the case yet.

20          THE COURT:  Well, let me be clear, once the

21    -- an argument can be made that once the committee was

22    reconstituted, even if it was on a three-week delay, that

23    the fact that members of that committee then resigned does

24    not mean that there wasn't adequate protection on that

25    committee, because if there was there was.

1              And if it was possible to resign as the

2    basis for appointing a second committee, everybody would

3    do that, and that's certainly not a precedent that I would

4    like to set here in this case.  So, I don't know that

5    that's going to carry much weight with me, and so what I

6    -- again, let's go back to the timing issue.  Assuming I

7    find that the reconstituted committee provided adequate

8    representation, and I'm not in any way finding that yet,

9    and maybe never, what issue would there be with respect to

10   timing then, if their by-laws are likely fairly typical,

11   and nothing major happened in the case, what am I missing?

12              MR. FALCONER:  Let me -- I will answer the

13   question.  I just want to briefly step back and say that's

14   our fundamental objection, is even the reconstituted

15   committee does not provide adequate representation.

16              THE COURT:  Agreed, I understand that's your

17   objection.

18              MR. FALCONER:  Right.

19              THE COURT:  And that's not going away, and I

20   need to rule on that, no question.

21              MR. FALCONER:  I can't speak for my

22   co-movants, but in a world where that finding, the Court

23   has made that finding, that the reconstituted committee

24   provides adequate representation, which obviously we

25   dispute, I don't think we would hang our hat on (a)(2) or

1    three-week delay of saying there was some incurable

2    problem arising out of that time period.

3                    THE COURT:  Okay.  All right.

4                    MR. FALCONER:  So, you know, just to be

5    clear, that's one of the main reasons why ABC chose to

6    resign from the committee, is our view was even as

7    reconstituted it continued to fail to provide adequate

8    representation.

9                    THE COURT:  I get that, and it's a point

10   made by virtue of the resignation, I understand.

11                   But, again, you know, resigning, and then

12   claiming because they resigned there was inadequate

13   representation, is a little like killing your parents and

14   claiming you're an orphan.  So, I'm not sure that works,

15   but.

16                   MR. FALCONER:  Yeah, we would agree,

17   certainly, you know, a creditor couldn't try to game the

18   system in the way that your Honor just described,

19   otherwise we would have adequate representation but we

20   resigned so we don't.

21                   Our view, full-throatedly, is even with ABC

22   and Warner on the committee, the committee did not

23   adequately represent the interest of --

24                   THE COURT:  Understood.

25                   MR. FALCONER:  -- the trade creditors.

1              THE COURT:  Okay.  All right.

2              MR. FALCONER:  All right, and I will just

3    make one final point on the cost question that has come up

4    a couple of times.

5              I think there is a reason why cost is listed

6    as a factor in the Winn Dixie case, and the other cases

7    where it can cut in either direction on the appointment of

8    a committee.  Even though appointing a second committee is

9    always going to cost more, right, one is always cheaper

10   than two, but it's a factor to be considered, in part

11   because, is it going to be money well spent?  You know, is

12   that second committee going to bring interest and

13   incentives to the table that the first committee may lack,

14   where you've got almost $2 billion in litigation claims

15   here, and under $100 million of trade claims?  I think

16   that's pretty clearly the case, and it's also a cost

17   analysis that shouldn't be performed in a vacuum.  It's

18   not just the cost of committee versus no cost.

19             The cost from a second committee would be

20   offset by litigation not pursued, discovery not pursued,

21   you know, contested confirmation not necessary.  There are

22   costs to appointing a second committee that would be

23   avoided that I think should factor into that cost analysis

24   as well.

25             So I think the preliminary concerns that

1    we've seen in the papers from the objectors to the motion,

2    cost and delay, I think ultimately both of those factors

3    cut in favor of appointing a second committee here.

4                    THE COURT:  Okay.  Understood.  Thank you.

5                    MR. FALCONER:  Thank you, your Honor.

6                    THE COURT:  All right.  So, who --

7    Mr. Lieberman -- Mr. Patterson, do you wish to be heard?

8                    MR. PATTERSON:  Thank you, your Honor.  I

9    appreciate the opportunity to speak to you today.

10                   I wanted to start by, just, there was a

11   little bit of a misunderstanding with regard to Orange

12   Bang and the business relationship it had with Vital

13   Pharmaceuticals, and I just wanted to start there and

14   maybe have the Court appreciate a little bit who Orange

15   Bang is.

16                   Orange Bang is a company with $200 million

17   in sales, and when I say that, I don't mean that's its

18   annual sales.  I mean that's what its sales have been

19   going back to 1971, and that was reported in the judgment,

20   and the arbitrator's decision that is before the Court in

21   the exhibit that represents the proof of claim of Orange

22   Bang.  It is a very small company.

23                   It's a small company with a founder that put

24   together a product that he sold literally store to store,

25   small restaurants or convenience stores, over a number of

1  years, and he owned a name as part of that, and at some

2  point in the aughts, 2008, '9, '7, Vital Pharmaceuticals

3  impinged on that name, and there was a settlement

4  agreement under which, in effect, Orange Bang allowed

5  Vital Pharmaceuticals to use the Bang name in what were, I

6  think, called certain lanes, and I'm going to get out of

7  my lane if I get any more technical with regard to that,

8  because I understand there are various categories of

9  product that received different levels of approval, or

10  have to be characterized in a certain way under various

11  applicable laws.

12            But in any event, there was a division, and

13  what happened was is that Vital Pharmaceuticals didn't

14  respect that division, and so there was a second

15  litigation, and that litigation gave rise to the judgment,

16  of which Orange Bang holds somewhere around 80 or

17  $90 million, and that is why we are here today, but Orange

18  Bang is not a company that can afford to hire an

19  investment bank, or a financial advisor, or do any of

20  those things to protect its interests.  It is looking to a

21  committee to protect its interests.

22            And Orange Bang's view is that a committee

23  that is dominated by those who have a direct stake or

24  interest in dealing with the company on an ongoing basis

25  is not a committee that it trusts will protect its

1    interests.

2              We've heard a lot about fiduciary duties,

3    your Honor, and what we know from representing committees,

4    and being on committees, is that the fiduciary duty of a

5    committee member can be sort of broadly construed, and

6    when we saw that a committee member owes a fiduciary duty

7    to every creditor, that doesn't constrain a committee

8    member or a committee from placing the interests of trade

9    creditors over and above those who have more of an

10   interest in financial recovery on account of their

11   existing claim, and that can occur in a number of ways,

12   and I think one of the ways it can occur, and one of the

13   reasons why a second committee is important, your Honor,

14   is because choices narrow over time.  There may be a

15   number of possible transactions that are considered, or

16   that are possible, or plausible, or available, but in the

17   negotiation process that the committee, the lenders, and

18   the debtors will engage in, those choices will narrow, and

19   various possibilities will be thrown out or discarded, and

20   others will be focused on.

21             So we don't know whether or not, for

22   example, the committee, the lenders, and the debtors will

23   agree that only a plan that has the current principals

24   having a significant economic role in the ongoing entity,

25   that that's the only plan that they will consider, that's

Page 163

1   the only kind of transaction that they will consider, or

2   that while there are other plausible transactions that

3   exclude that, all of the best ones include that, because

4   that's where their priority is, and that is a perfectly

5   reasonable position for them to take, but it's not a

6   reasonable position to take in a case where the

7   predominant amount of the creditor body doesn't share that

8   same interest.

9          And so for us, your Honor, I thought it was

10  kind of funny when someone mentioned this morning that

11  this motion is premature, because we don't know there is a

12  problem, and I know what we'll hear next, is that if the

13  motion is denied and we bring it in the future, it will be

14  too late.  So really it's premature until it's too late.

15         The time to head this problem off is now,

16  when we know that the discussions will start in earnest

17  with regard to what the structure of a plan transaction

18  is, and various creditor constituents, the secured

19  creditors, the trade creditors, the principal, the debtor

20  and so forth, they will all bring different priorities to

21  that, and it is important in a successful case to forge a

22  consensus.

23         Your Honor, I was on vacation, and this will

24  let you know how sad my life is, but I read

25  Professor Douglas Baird Book on Bankruptcy while I was on

1  vacation, and it's a little book of just a few chapters,

2  but it was, for me -- and I know Professor Baird from

3  years ago at the University of Chicago in the mid-'80s,

4  but it's a remarkable insight, and I guess we all have it

5  sort of at our base, but I'd never seen it articulated

6  academically, which is that if you go back to the history

7  of bankruptcy, the railroad receiverships that Cravath

8  Swaine & Moore did, you know, the credit management cases

9  of the '30s and '40s and so forth, the mark of successful

10  bankruptcy cases, the restructurings, is that people are

11  talking, and that everybody is included in those

12  discussions, and so whether it's absolute priority, or

13  relative priority, or squeeze out, or cramdown, the

14  pathology is when significant creditor bodies are excluded

15  from the process.

16             And so for us, your Honor, I think

17  historically, and in my own experience, it's a very, very

18  significant and important event to formalize the

19  negotiation and structures that are going to take place

20  that will formulate our plan.

21             So, that is the reason why when Monster

22  approached us and said, do you believe that a second

23  committee is appropriate, would Orange Bang support it?

24  And we had the discussion with our clients, that's why

25  Orange Bang is very, very supportive of this motion, and

1    believes it's critical to having a successful case.

2                    Now, I know that we have litigation rights

3    that protect us, but I will say this, I have never

4    litigated myself to a transaction.  I have negotiated to a

5    transaction, and the idea that we are going to simply stop

6    a transaction by objecting to it by virtue of our blocking

7    position, or by virtue of some other pathology that might

8    exist with respect to it, quite candidly, is

9    professionally unattractive to me, your Honor.

10                    I think the purpose of a second committee,

11   from my point of view, is to force those who are as Rich

12   -- Mr. Pachulski described in the involuntary creditors,

13   the coalition of the involuntary, I guess you could call

14   it, is, in effect, to compel a consensus among those

15   creditors with respect to an approach, and be one of the

16   legs of the stool that can prop up this reorganization,

17   and bring their insights, consensus, and support to

18   hopefully a consensual resolution.

19                    If that's not the way it goes, then Orange

20   Bang will do what it has to do to protect its interests,

21   that is very unattractive to me, it's unattractive to

22   Orange Bang, and we would vastly prefer a mechanism that

23   gives this predominant part of the creditor body a formal

24   role in negotiating the resolution of this case.

25                    I'm happy to answer any questions that the

1    Court has, and I hope you appreciate our point of view.

2              THE COURT:  Certainly.

3              Mr. Patterson, let me ask you, what is the

4    nature of your claim?  You have a judgment for how much,

5    and what is the ongoing -- what ongoing rights do you

6    have?  For example, do you have an interest in a

7    percentage of the revenue, or what's the --

8              MR. PATTERSON:  Yes, yes, your Honor.  So, I

9    think there was some discussion of this this morning,

10   about how -- so, Orange Bang has a 50 percent interest in

11   the judgment that is itself about $180-odd million.  So

12   our proof of claim, I think, was for around eight seven

13   and a half million dollars, and it was not less than,

14   because it --

15             THE COURT:  And the balance of the judgment

16   was assigned to Monster?

17             MR. PATTERSON:  That's correct, your Honor.

18             THE COURT:  Okay.

19             MR. PATTERSON:  And then -- and a right to a

20   35 percent royalty, which would, again, be split with

21   Monster on an ongoing basis, and there was something that

22   I think was a little unclear in the discussion this

23   morning that I wanted to clear up.

24             The arbitrator's decision, and again, if

25   your Honor is interested, it's attached to the proof of

Page 167

1    claim that we filed, the arbitrator's decision gave Vital

2    Pharmaceuticals an election, and there were some options

3    that it could choose from, and the option that Vital

4    Pharmaceuticals chose was to pay a royalty on an ongoing

5    basis, and I won't get into the details of what the other

6    alternatives were, but obviously they were less attractive

7    to the company than paying the royalty.

8                    THE COURT:  All right.  Thank you, and do I

9    have to now refer to Mr. Pachulski as rich Mr. Pachulski?

10                   (Laughter.)

11                   MR. PACHULSKI:  Your Honor -- (inaudible.)

12                   THE COURT:  All right.  Thank you,

13   Mr. Patterson.

14                   MR. PATTERSON:  Thank you so much,

15   your Honor.

16                   THE COURT:  Mr. Lieberman, have you fixed

17   your technical problems?

18                   MR. LIEBERMAN:  I think so, your Honor.  Can

19   you hear me okay?

20                   THE COURT:  By the way, you called in,

21   right?  That's how you fixed it?

22                   MR. LIEBERMAN:  Yes, your Honor.

23                   THE COURT:  Always the best way to go, call

24   in if you're on Zoom.

25                   All right.  Mr. Lieberman, who do you

1    represent?

2                    MR. LIEBERMAN:  Thank you, your Honor,

3    Apologies for the technical difficulties.  This is

4    Seth Lieberman of Pryor Cashman, LLP.  I represent UMG

5    Recordings, Inc., as well as Sony Music Entertainment.  We

6    are two of the co-movants with respect to this second

7    committee.

8                    Your Honor, I want to be extremely brief

9    here, as I think my co-movants have already covered most

10   of the ground that was either laid out in the underlying

11   motion and/or responsive to your Honor's questions.

12                   I did want to, instead, highlight two

13   answers to questions that I think were raised by

14   your Honor earlier today, in hoping that I can help with

15   respect to any outstanding factual issues.

16                   The first was there was a question raised by

17   the Court regarding the amount of my clients' claims, as

18   well as the nature of those claims.  Those are based in

19   copyright infringement actions that are ongoing.  They

20   were commenced prepetition in separate actions in District

21   Court in Florida.  Proofs of claim were either filed on

22   Friday, or over the weekend, or as we speak.  I believe

23   that UMG's proof of claim is around $22 million, Sony's is

24   approximately 37, $38 million.  Again, those will be

25   detailed in the proofs of claim as well as the addenda.

1            The second fact, your Honor, that I just

2    wanted to highlight to the Court, I believe your Honor

3    asked Mr. Pachulski about some examples of committees out

4    there, maybe in the non-victim space, where a second

5    committee was formed.

6            Your Honor, I represented the chair of the

7    unsecured creditors' committee in the Caesar's bankruptcy

8    cases, which was a case that was highlighted in our moving

9    papers.

10           In that case the United States Trustee

11   decided to form a second committee in that case.  Again,

12   we're not talking about a victims case, it was another

13   committee made up of second lien creditors, as well as

14   their indenture trustees, again, not exactly analogous to

15   what we're dealing with here, but one in which we're not

16   dealing with victims either.

17           I can't explain what the United

18   States Trustee mindset was behind that.  I don't work for

19   that office, but I do know that they decided in that case

20   that a second committee would be helpful, and I think for

21   many of the reasons that my co-movants have laid out

22   today, a second committee would be equally helpful here.

23           With that, your Honor, I know you still have

24   a number of parties to hear from today, so I just wanted

25   to make those two factual clarifications on the record.

```
 1                    THE COURT:  All right.  Thank you,
 2    Mr. Lieberman.
 3                    Anyone else --
 4                    MR. LIEBERMAN:  Thank you.
 5                    THE COURT:  -- on the side of movants who
 6    wish to be heard.
 7                    (No verbal response.)
 8                    THE COURT:  All right.  So, Mr. Murtagh or
 9    Mr. Cohen, what's the order of presentation?
10                    MR. COHEN:  Your Honor, I think we
11    discussed, the committee will start.
12                    THE COURT:  Okay.
13                    MR. COHEN:  Your Honor, if you'd just give
14    us a minute to set up the technology --
15                    THE COURT:  Yes.
16                    MR. COHEN:  -- and hand out our visual aid?
17                    THE COURT:  Sure, you can approach.
18                    Yes.  All right.  Mr. Cohen, it looks like
19    you've got the floor, and the technology is working.
20                    MR. COHEN:  Great.  Thank you, your Honor.
21    Again, for the record, Jeffrey Cohen, Lowenstein Sandler
22    on behalf of the committee.
23                    Your Honor, today's kind of a weird day in
24    representing the official committee.  It feels like, you
25    know, if you remember being a child and sitting in the
```

1    same room as your parents, and they're talking about you,

2    but not talking to you.  It kind of feels that way for us

3    today, a lot of the speculation about the things we will

4    eventually do wrong, a lot of speculation about the things

5    we have already done wrong, and no one has actually asked

6    us.

7              THE COURT:  I'm surprised you didn't say,

8    you know, I'm right here.

9              MR. COHEN:  I tried that.  It never worked.

10             THE COURT:  It never worked?

11             MR. COHEN:  I didn't think it would work

12   with you either.

13             So what I thought I would do, your Honor, is

14   recenter the conversation on the facts, okay?  Your Honor

15   is already familiar with the different elements of the

16   movants' argument, I had planned to regurgitate that, I

17   don't think that's necessary.

18             So what we've done, your Honor, is prepared

19   this visual aid.  This is the chart that appeared in our

20   objection.  It is revised to reflect the facts included in

21   the stipulation of facts agreed to by the parties.

22             Okay.  So to the extent the stipulation

23   references a proof of claim, the number from the proof of

24   claim has been imbedded in the chart, and we've created

25   five different slides, and we've categorized the claims,

Page 172

1    because if we're going to talk about adequate

2    representation, I want to show you what the representation

3    is, and who we think they represent, class -- you know,

4    from a class perspective.  So hopefully, your Honor finds

5    this as helpful as we think, at least we intend to.

6              On slide one, your Honor, you'll see that

7    the first seven members are circled or bracketed in blue.

8    Those are our initial committee members.  The four below

9    it are the four members added as part of the

10   reconstitution.

11             Now earlier today Mr. Pachulski kept using

12   the range of 70 --

13             THE COURT:  What do I have to do?  The audio

14   went mute?  Oh, is that a "me issue" or a "machine issue"

15   or --

16             MR. COHEN:  I remember my parents doing that

17   to me, too.

18             THE COURT:  If I only had the power to do

19   that to my children, man, things might have gone very

20   differently.

21             Oh, audio is back, just got a message.

22   Okay.  So how about now, Casey, Grace?  Maybe they can't

23   hear us to answer, and it's out.

24             Okay.  So HDMI doesn't work, or the audio

25   doesn't work when HDMI is being used.  You may have to

Page 173

1    deal with your audio, my audio, it's always me.

2                    All right.  I think it's the HDMI.

3                    Why don't you take that off, just so I can

4    express that.  Turn that off for a second.

5                    Grace and Casey, we think it's using the

6    HDMI that's the problem.  Yes, it's back.  Okay.  So

7    that's clearly the problem, is using the HDMI.

8                    So does everyone have the handout?  Because

9    if we don't need the HDMI, that's the way to go.  Does

10   everybody -- anybody need it that doesn't have it?

11                   I guess my only other concern would be those

12   that are on Zoom would not have the benefit of it.  Is my

13   Zoom even on?  Yeah, hold on a second.

14                   Is there anyone on Zoom that requires the

15   use of the charts that are being used by Mr. Cohen?  Speak

16   now or forever hold your peace.

17                   (No verbal response.)

18                   THE COURT:  All right.  So I think we're

19   good.  Hold on.

20                   Okay.  So my law clerks won't have the

21   benefit of the visuals.

22                   MS. BLANCO:  We can send it to the Court,

23   and the Court can share screen for the folks on video, if

24   you would prefer that.  I'm on Wi-Fi so I can do that.

25                   THE COURT:  Can't you all -- you all can't

Page 174

```
 1    share screen from -- or you guys aren't on Zoom.
 2                    MS. BLANCO:  Only you are.
 3                    THE COURT:  Yes.  Okay.
 4                    MS. BLANCO:  I can share with (inaudible) --
 5                    THE COURT:  Yes, no, if you could send it to
 6    my law clerks, and they can share screen, that would be
 7    great.
 8                    MS. BLANCO:  Where should I send it, Judge?
 9    I'm ready.
10                    THE COURT:  Hold on a second.
11                    Any thoughts on where to send it so you can
12    share screen, let me know.
13                    Okay.  So it's Grace -- how long is it going
14    to take you to get on Zoom from there?  Okay.
15                    MS. BLANCO:  My Outlook is taking a minute
16    to open, but Grace --
17                    MR. MURTAGH:  Your Honor, for the debtors,
18    we'll have the same issue, except exacerbated by the fact
19    that I don't have printouts for everybody.  I don't know
20    if it makes -- I can do it without -- so everybody is just
21    on the same page.
22                    THE COURT:  Send to Ms. Figuroa, and she
23    will share.
24                    MR. COHEN:  Okay, and the slides also, they
25    drop in the points as they're made, so they're not static
```

```
 1    slides.  Generally I think that helps focus the
 2    presentation moment by moment.
 3                    I can see if I can get on Zoom while we're
 4    talking --
 5                    THE COURT:  Yeah.
 6                    MR. COHEN:  -- to see if we can do that,
 7    otherwise I was going to say, we can see if another
 8    interface works for computers and doesn't cut out audio.
 9                    THE COURT:  I am all game for whatever
10    works, so I think it's probably best if you want to
11    control it, that you get on Zoom, or figure out a separate
12    interface.
13                    MR. COHEN:  Let me try that, your Honor.
14                    THE COURT:  Okay.  You need to get rid of
15    your Teams and all that on your desktop if you're going to
16    share screen.  I don't want them to see how our sausage is
17    made.
18                    Oh, really?  What's that?  Yes, if you need
19    to go back to your office, do that, just be careful to
20    only show what's -- oh, you are able to do it, okay.
21                    MR. COHEN:  I think it's --
22                    THE COURT:  We're working on it.
23                    This is why I said come to court before so
24    we can work out the bugs, or come to court so we don't
25    have to work out the bugs.
```

Page 176

1                    What's that?  No, yeah, so that's another
2      thing we need to get Tony -- yeah.
3                    For all the upside, there is clearly some
4      downside.
5                    MS. BLANCO:  Judge, are you okay with ours?
6                    THE COURT:  I'm not sure.
7                    MS. BLANCO:  (Inaudible.)
8                    THE COURT:  I'm not sure, she's working --
9      Grace is working on it.
10                   I mean, it is better if you all control it,
11     just because it's your presentation, but --
12                   MS. BLANCO:  It's only four pages, Judge.
13                   THE COURT:  Yes, I'm just saying, I don't
14     want to sit second chair to your trial team.
15                   It's not working?  Oh, there you go.  Can
16     you share?  Yes, right there, and pick the -- yep, hold
17     on.  Please wait as content sharing is loading, look at
18     that.
19                   All right.  So now we need to see if Casey
20     can still hear us.  Casey, can you hear us?  Well, let's
21     see if anybody on Zoom --
22                   UNIDENTIFIED:  Yes, I can hear you.
23                   THE COURT:  Perfect.  Okay.  All right.  I
24     think we figured it out.
25                   MR. COHEN:  Okay.  Are we done icing the

1  kicker?

2              (Laughter.)

3              THE COURT:  I'm trying to figure out who the

4  kicker is.

5              Go for it.

6              MR. COHEN:  Are you ready?

7              THE COURT:  Yes.

8              MR. COHEN:  Thank you.

9              Your Honor, I'm just going to pick up where

10  we left off.  I don't know where the sound went off, but

11  what I was about to say --

12              THE COURT:  I think start from the top.

13              MR. COHEN:  Okay.  I'll start from the top

14  of the chart.  I'll skip my introductory remarks.

15              So what your Honor can see is this is the

16  reconstituted committee.  I think we're in agreement, at

17  least the committee and your Honor, it seems, that it is

18  the reconstituted committee that we are assessing, whether

19  that body adequately represents the movants and the

20  creditor body at large.

21              So what you can see, your Honor, is the

22  first seven creditors are bracketed in blue, that is the

23  originally appointed committee.

24              The four members bracketed in green are your

25  four new members, effective two days before Thanksgiving,

```
 1   which constitutes the reconstituted committee.

 2              Earlier today Mr. Pachulski often used the

 3   range of 75 to 95 percent of the claims are litigation

 4   based, and are the class of creditors that the movants

 5   believe they represent.

 6              Your Honor, when looking at the

 7   reconstituted committee, you can see that the claim size

 8   is not insignificant.

 9              Now, people can quibble about whether or not

10   certain of these claims have been liquidated or not.  I

11   can tell you that Pepsi claim is fully liquidated.  It's

12   based on a settlement agreement.  The class representative

13   claim is the amount they assert in their proof of claim.

14   Obviously that may ultimately be subject to, you know --

15              THE COURT:  Tell me about "class

16   representative", what does that mean?

17              MR. COHEN:  It is a plaintiff seeking to

18   represent a class that has not yet been certified,

19   alleging false advertising from a consumer perspective.

20              THE COURT:  Ah, so --

21              MR. COHEN:  It's the same --

22              THE COURT:  -- is this the 1.7 million of

23   3 cent claims or that Mr. Pachulski was --

24              MR. COHEN:  No, I think this is --

25              THE COURT:  Is it different?
```

1                    MR. COHEN:  Those are actually perhaps

2       promotional items.

3                    THE COURT:  So this is a different class?

4                    MR. COHEN:  Let's approach it from a

5       different way, the Monster Energy claim has two main

6       components, trademark infringement, which they share with

7       Orange Bang, and then a separate action of false

8       advertising against the debtors for using the term "super

9       creatine", and some other components that are unique to

10      Monster Energy.

11                   This class action alleges the same false

12      advertising that consumers purchased a product thinking it

13      had creatine in it and it doesn't.

14                   THE COURT:  I got you.  Okay.

15                   MR. COHEN:  So, if you look at this, and

16      again including American Bottling Company -- by the way,

17      your Honor, the two members that resigned never spoke to

18      us, never attended a meeting.  We emailed them, sent them

19      a copy of the by-laws, never responded to our emails,

20      never commented on the by-laws, never sent us the

21      resignation letters.

22                   So, we did try to bring them into the tent.

23      We did give them an opportunity to comment on the by-laws,

24      alas we are where we are, but for the purposes of this

25      chart we are including them, as I think we should, and you

Page 180

1    can see with the count -- with the claim of ABC, and the

2    claim of Warner, Warner being very much the same, if not

3    exactly similar, to Sony at UMG, it's the same allegation,

4    copyright infringement of using their music in videos on

5    social media, if you include all of them on the proofs of

6    claim, again, some creditors have yet to file a proof of

7    claim, we're approaching $700 million.

8                    The scheduled claims --

9                    THE COURT:  So your point there is that if

10   the Court was required to -- or considered the amount of

11   the claims as being relevant, and I'm not suggesting, not

12   that that's relevant, I need to think about that, but then

13   if I'm going to choose the claims in terms of determining

14   how much, I wouldn't include the debtors' view,

15   necessarily, I would include the amount of the claim, as

16   asserted by the creditor itself that's on the committee.

17                   MR. COHEN:  What we tried to do here,

18   your Honor, if you look at Pepsi, for example, their

19   dollar amount arises from a settlement agreement, so it's

20   a fixed number.  The debtors properly scheduled that

21   claim.

22                   Pepsi may not file a proof of claim if they

23   agree with how it was scheduled.

24                   THE COURT:  Well, in the absence of an

25   alternative --

Page 181

1                    MR. COHEN:  Right.

2                    THE COURT:  -- then you would include the

3      scheduled claim, but if there were two amounts --

4                    MR. COHEN:  The claim would supersede the

5      scheduled claim, for purposes of this chart.

6                    THE COURT:  Then that's the law, is that

7      right --

8                    MR. COHEN:  Yes.

9                    THE COURT:  -- until objected to?

10                   MR. COHEN:  Yes.

11                   THE COURT:  All right.

12                   MR. COHEN:  For purposes of this chart, as

13     we were preparing it over the weekend, and the bar date is

14     in an hour and a half, some claims had yet to be filed, or

15     may still be filed.  So we just tried to give your Honor

16     the best picture we could, but I can't imagine the numbers

17     are going to go down from the scheduled amounts.  Clearly

18     they've gone up from 170 million to almost 700 million.

19                   THE COURT:  Okay.

20                   MR. COHEN:  My main point, your Honor, is

21     the argument of the tail wagging the dog, right, that the

22     committee doesn't represent the creditor body at large,

23     $700 million certainly sounds like it represents the

24     creditor body at large.

25                   The three columns to the right, your Honor,

Page 182

```
 1    I think we can better go through one by one, and we do

 2    that breaking them out in the subsequent slides.

 3                    So, if you switch to slide two, your Honor,

 4    this slide focuses on which claims --

 5                    THE COURT:  Switch to the next slide,

 6    please.

 7                    MR. COHEN:  It's this one, yeah.

 8                    MR. PACHULSKI:  I apologize, your Honor, but

 9    there is no evidence (inaudible) as part of the chart in

10    the last categories.  They put it in their pleadings --

11                    THE COURT:  Hold on.  So is the first chart,

12    let's go back to the first chart for a second so I

13    understand what you're saying.

14                    MR. PACHULSKI:  Litigation-based claims

15    against the debtors, and currently doing business with the

16    debtors (inaudible) --

17                    MR. COHEN:  Litigation-based claims is in

18    the stipulation of facts, which we negotiated over the

19    weekend.

20                    MR. PACHULSKI:  We've attached to the proofs

21    of claims that some of these do not -- we have no idea on

22    the proof of claim that they're doing business

23    (inaudible) --

24                    THE COURT:  Well, so far the only facts that

25    the Court is considering are the facts associated with the
```

1    column that says proof of claim amount, and the column

2    that says scheduled claim amount, and the math that's been

3    done on the end.

4                    And, Mr. Pachulski, you do need to speak

5    into a mic, I'm sorry.

6                    MR. PACHULSKI:  I apologize, your Honor.

7                    THE COURT:  Yes.

8                    MR. PACHULSKI:  So, we have proof of claims

9    that are in evidence, we can rely on that.

10                    THE COURT:  So you agree that the "proof of

11    claim amounts" column that adds up to 688,138,110.85 is

12    not something you object to.

13                    MR. PACHULSKI:  I mean, I will explain why

14    that's inaccurate, but I don't object to them putting it

15    there because there is a proof of claim that says that

16    amount.

17                    THE COURT:  And you also don't disagree that

18    the scheduled claim amount column is reflective of what's

19    in the schedules?

20                    MR. PACHULSKI:  Correct.

21                    THE COURT:  Okay, so what you object to are

22    the three other columns that follow?

23                    MR. PACHULSKI:  Well, I'm not even sure

24    about the third one, trade-based claims against the

25    debtors.  I mean, I guess that's -- we can debate that,

Page 184

```
 1   but with respect to, for instance, the last "currently
 2   doing business with debtors", even "litigation-based
 3   claims against the debtors", without more information,
 4   there is no evidence in the record.
 5               THE COURT:  All right.  Well, I'm not
 6   admitting these columns as facts.
 7               MR. PACHULSKI:  Okay.  Well --
 8               THE COURT:  Okay, and the only facts are
 9   that which was stipulated to -- those that were stipulated
10   to, and the two columns are based on things that I can
11   take judicial notice of.
12               MR. PACHULSKI:  Yes, those --
13               THE COURT:  But evidentiarily, all I'm
14   saying is, don't worry about the other three columns,
15   we'll hear what Mr. Cohen has to say, and how he supports
16   whether those are facts that the Court should consider or
17   not --
18               MR. PACHULSKI:  Okay.
19               THE COURT:  -- okay?
20               MR. PACHULSKI:  Thank you, your Honor.
21               THE COURT:  Yes.
22               MR. PACHULSKI:  I appreciate it.
23               MR. COHEN:  Your Honor, Docket Number 547 is
24   a stipulation of facts regarding the hearing between the
25   movants, the creditors' committee, the debtors, and the
```

1    lenders.  The U.S. Trustee was not a party.  It was

2    negotiated over the course of the last week.  I think it

3    was filed yesterday.  For example, Paragraph 10 on Page 3,

4    Stellar Group.

5                   THE COURT:  What's the docket number again?

6                   MR. COHEN:  547.

7                   THE COURT:  Let me find that, because I'm

8    not sure we saw it yesterday, obviously, or today.  Like I

9    said earlier -- hold on a second.  547, you said?

10                  MR. COHEN:  Yes, your Honor.

11                  THE COURT:  All right.  What page?

12                  MR. COHEN:  For example, your Honor, Page 3.

13                  THE COURT:  Yep.

14                  MR. COHEN:  Fact 10, which relates to the

15   Stellar Group, Line 2, it identifies, the debtors in the

16   schedule list this claim as trade AP-operating.

17                  THE COURT:  Okay.

18                  MR. COHEN:  I can go down each one of them,

19   but I attest to your Honor that this stipulation provides

20   a designation of trade or litigation for each of the

21   claims listed on the chart.

22                  THE COURT:  And that, and that's not only in

23   the stipulation, but that stipulation is also based on how

24   the debtors --

25                  MR. COHEN:  Either the schedules --

1           THE COURT:  -- scheduled the claims?

2           MR. COHEN:  -- or the proof of claim.

3           THE COURT:  All right.  Mr. Pachulski.

4           MR. PACHULSKI:  Your Honor --

5           THE COURT:  And the Court is taking judicial

6  notice of the schedules, taking judicial notice of the

7  proofs of claim, taking judicial notice of the things that

8  are stated about those claims in the schedules.

9           MR. PACHULSKI:  Okay.  So the fact is,

10  your Honor -- let's start from the back, currently doing

11  business with the debtors --

12          THE COURT:  We're not -- we haven't -- I

13  don't think Mr. Cohen has addressed that yet.

14          MR. PACHULSKI:  I'd have to look at each --

15          THE COURT:  So let's not talk about

16  something that's not on the table.

17          MR. PACHULSKI:  -- one of these.  I don't

18  believe that there is a dispute, trade-base claims against

19  the debtors, with respect to the first seven.  I do not

20  know that that designation has been included with the

21  bottom four.

22          THE COURT:  Well, let's find out.

23          MR. PACHULSKI:  Okay.

24          THE COURT:  Mr. Cohen says it was --

25          MR. PACHULSKI:  Okay.

1          THE COURT:  -- in the stipulation, is that

2    right, Mr. Cohen, with respect to the bottom four, Pepsi,

3    class representative Warner and ABC?

4          MR. COHEN:  Your Honor, Page 5.

5          THE COURT:  So it's in the stipulation on

6    Page 5?  And I'm looking at it.  It does say that Warner

7    is a litigation claim.

8          MR. COHEN:  It says American Bottling is a

9    litigation claimant --

10          THE COURT:  Right, American Bottling.

11          MR. COHEN:  -- and Dave is negotiating this

12   with Mr. Pachulski, he's had plenty of time to review it.

13          MR. PACHULSKI:  Well, but, your Honor, this

14   is what's so deceptive about it.  You do have to read the

15   full paragraph.

16          THE COURT:  Okay.

17          MR. PACHULSKI:  So, it gives the impression

18   that there is a trade claim -- that "trade" seems to be

19   the big deal, trade claims -- trade-based claims against

20   the debtors.  It's a $3 million claim against the other

21   222 million of litigation claims, and they filed the --

22   and Pepsi, in no way does it say it's a trade claim.  It

23   says it's a settlement agreement, that's what Paragraph 32

24   says.

25          MR. COHEN:  Your Honor, respectfully, if

1    Mr. Pachulski would like an opportunity to rebut, I think

2    he has that time.

3                MR. PACHULSKI:  Well --

4                MR. COHEN:  We listened to him for two

5    hours.

6                THE COURT:  Okay.  Fair enough.  Here is

7    where I'm going to leave it, here is where I'm going to

8    leave it, the stipulation says what the stipulation says.

9                MR. COHEN:  Agreed.

10               THE COURT:  And that's all I'm accepting, is

11    what the stipulation says.

12               MR. PACHULSKI:  That's fine, your Honor.

13               Just for the record, your Honor, Mr. Cohen

14    did have objections, so this is not -- I'm just trying to

15    get the record clear.

16               THE COURT:  All good.  Despite what my

17    children say, I have a lot of patience, don't worry.

18               MR. COHEN:  Back to slide two, your Honor.

19               THE COURT:  Okay.

20               MR. COHEN:  Slide two illustrates precisely

21    what the movants have said, that the original committee

22    was precisely trade-based.

23               As reconstituted, with the addition of four

24    members, we even acknowledge that two of the four that

25    arguably could have been considered litigation, also have

1    a trade element to them, right?  The Pepsi claim,

2    your Honor, was --

3                  THE COURT:  Pepsi and ABC.

4                  MR. COHEN:  Correct.  Pepsi was a failed

5    distribution agreement.  The parties reached a settlement

6    agreement on how to part ways with each other.  ABC, which

7    we discussed earlier, the proof of claim is a breach of

8    contract action for the debtor failing to make a minimum

9    purchase requirement from an agreement between the

10   parties.  So even though they litigated about it,

11   your Honor, we are giving the benefit of the doubt, and

12   identifying them as trade-based, and as a result we

13   reached nine of eleven, our trade-based claims.

14                  On slide three, your Honor, again, some of

15   these claims we identify as litigation as well, right, if

16   it was trade-based, but there was a litigation related to

17   it, we've also listed them on the litigation slide, and

18   contrary to what the movants argue, litigation claims are

19   actually the majority of our committee, six of the eleven

20   have litigation aspects to their claims, two of the

21   original committee members, and the four that were added.

22                  THE COURT:  All right.  Let me, at the risk

23   of interrupting, I apologize, but I think that the way the

24   argument evolved, if you will, was that it's more about

25   the creditors being victims, I think that's the term that

1   Mr. Pachulski tried -- or argued, and tried to equate to

2   the victim concept in the Archdiocese of New Orleans case,

3   and other similar cases.

4               So if you had to reconstitute the chart as

5   -- and you're the committee, so you have no -- you're not

6   the debtor, so you don't have to be careful with how you

7   view things, would that change anything?

8               MR. COHEN:  So, first I don't like using the

9   word "victims", it's a disturbing analogy to compare

10  commercial litigation parties to sexual abuse victims.

11              THE COURT:  Well, let me be very clear, I am

12  certainly not doing that in any way whatsoever, but I

13  think how I'm interpreting the argument that Mr. Pachulski

14  made, is that it's almost as though it's bad commercial

15  behavior that created a victim, and Mr. Pachulski, you can

16  correct me when it's your turn to speak again, but I'm

17  just sort of internally saying to myself, what he really

18  means, he's not trying to compare abuse victims either,

19  and I don't think anybody in good conscience would do

20  that.

21              MR. COHEN:  Well, it matters, it does --

22  sorry to interrupt, your Honor, there is a distinction,

23  and I'll get to that.

24              THE COURT:  Yes, but just so you understand

25  how I'm receiving the information or the argument, it's

Page 191

1    that it's just bad business behavior that created a

2    victim.

3                    MR. COHEN:  In that case, your Honor, all

4    11.  There is not a single creditor on this list that I

5    wanted to be owed money.

6                    THE COURT:  All right.  Let me --

7                    MR. COHEN:  They all did business with the

8    company.

9                    THE COURT:  -- refine it further.

10                    MR. COHEN:  Yes.

11                    THE COURT:  It's not only about being owed

12    money, and what I'm trying to do is put Mr. Pachulski's

13    argument in the best light possible, in terms of how I'm

14    receiving it --

15                    MR. COHEN:  Uh-huh.

16                    THE COURT:  -- so that I understand what my

17    task is, and my task is to decide adequate representation

18    here, and it is, it is somewhat -- it does resonate at

19    some level with the Court that some of these claims arose

20    because there are a number of them, and the numbers are

21    very large, as a result of, not bad business behavior

22    because you didn't pay someone, bad business behavior

23    because you took something of theirs, you used something

24    of theirs without permission, you -- it's not the level of

25    theft, but it's trademark infringement, you infringed on

Page 192

1   someone's rights, that's how I'm interpreting the

2   argument.

3                   MR. COHEN:  So using that definition,

4   your Honor, I will acknowledge that Sony, Universal Music

5   and Warner would fall into that category.

6                   THE COURT:  Okay.  So three out of the

7   eleven.

8                   MR. COHEN:  The debtor did business with

9   American Bottling Company.

10                   The debtor, in 2010, reached a "stay in your

11   lane" agreement with Orange Bang.  In 2019 Monster bought

12   an interest in Orange Bang's ability to assert claims

13   against the debtor.  So Monster voluntarily put themselves

14   in that plaintiff position.

15                   So, I will acknowledge the record labels for

16   whom Mr. Owoc used their music on social media, they had

17   no prior relationship to VPX, they would be, quote,

18   unquote, victims in this situation.

19                   THE COURT:  Well, we're not really even

20   talking about Orange Bang and Monster here.  We're really

21   talking about only the members of the --

22                   MR. COHEN:  Your Honor --

23                   THE COURT:  -- reconstituted committee.

24                   MR. COHEN:  -- I can't hear you over the

25   table.

```
 1                    THE COURT:  Yes, gentlemen, if you could
 2    keep it down?
 3                    Okay.  So, I'm going by -- on the
 4    reconstituted committee, you have three out of the eleven
 5    that you would argue fall within the victim concept.
 6                    MR. COHEN:  Sony and Universal are part of
 7    the movants.
 8                    THE COURT:  Okay.
 9                    MR. COHEN:  On the reconstituted
10    committee --
11                    THE COURT:  Oh, I see.
12                    MR. COHEN:  -- it would be Warner Brothers,
13    and perhaps the class representatives, right, these are
14    consumers that bought a product and did not want to be
15    subject to false advertising.  So I would leave that in
16    that column as well, but Pepsi had a commercial
17    arrangement with the company, American Bottling Company
18    had a commercial arrangement with the company.
19                    THE COURT:  Okay.  All right.
20                    MR. COHEN:  So, your Honor, the takeaway
21    from this slide is that litigation claims are not in
22    minority, as alleged by the movants, they actually have
23    the controlling voice on the committee.
24                    On slide four, and the reason why we bring
25    up slide four, your Honor, is much like Mr. Pachulski's
```

1    two-hour presentation, their reply was full of

2    speculation, right?  There motion made a distinction

3    between themselves, as litigants, and parties that will

4    continue to do business with the company, and their vision

5    was those aren't aligned.

6              Well, in the reply, after having

7    acknowledged that they are probably the largest continuing

8    business relationship with the 5 percent ongoing royalty,

9    they pivoted and said, oh, they may not be doing business

10   with them now, but they will.

11             Your Honor, that is based in no fact

12   whatsoever.  This slide presents to you the current

13   snapshot of who is doing business with the company and who

14   is not, and you can see, your Honor, four of the eleven

15   committee members are currently doing business with the

16   company.

17             THE COURT:  What's the factual predicate for

18   knowing, for asserting that they're doing business?

19             MR. COHEN:  Your Honor, we all elected to

20   not do discovery.  I will represent to you that I have

21   spoken with each of my committee members, and it's based

22   on their representation.

23             MR. PACHULSKI:  Objection, hearsay.  I've

24   already gotten that objection.

25             THE COURT:  All right.  I have to sustain

1   that, I think it's an out of court statement --

2                   MR. COHEN:  I was answering your question.

3                   THE COURT:  -- offered to prove the truth of

4   the matter, so I will sustain that objection.

5                   MR. COHEN:  Your Honor, clearly the debtor

6   needs the support, if it's going to survive in any form,

7   of their trade partners.

8                   The fact that they are, were, or will be a

9   trade partner does not imply the decisions they will make.

10                  Committee members sit on a committee as

11  fiduciaries, and will make the right decision at the right

12  time.  To speculate that they will make the wrong decision

13  solely in their self-interest is, at a minimum,

14  speculation, and at maximum offensive to each of those

15  committee members.

16                  THE COURT:  And what about the argument of

17  timing, which is, as I understand it, sure, but by the

18  time we find out they're acting in their own self-interest

19  in breach of their fiduciary duty, it will be too late in

20  this case?

21                  MR. COHEN:  So, one, your Honor pointed out

22  three weeks went by between the appointment of the

23  original committee and of the reconstituted committee.

24                  As your Honor also pointed out, we haven't

25  even had a final DIP hearing yet.  The committee has

1    reached a draft final DIP order with the lenders and the

2    debtors, with the exception of governance issue.  That

3    draft DIP order has been provided to Monster Energy.  So

4    they're not in the dark on those issues.

5              We also provided to them the agreed upon

6    term sheet that summarized those agreements, they're not

7    in the dark on those issues.

8              Also, your Honor, it's clear the movants

9    have figured out a way to organize.  They have gotten

10   together and filed a joint motion.  It hasn't prejudiced

11   them at all in waiting for a determination as to whether a

12   second committee will be formed, or waiting for the

13   U.S. Trustee's determination on whether to reconstitute a

14   committee, or appoint a second committee.  They're all

15   sophisticated, they all have counsel, they figured out a

16   way to find each other.

17             Okay.  In the event they want to stay

18   together, the Bankruptcy Code provides a mechanism for

19   them to seek substantial contribution if they can prove

20   it.

21             So, the time delay, yes, your Honor, we have

22   had a ton of discussions behind the scenes about what the

23   sale process should look like.  If you look at the DIP

24   objection of Monster Energy, the DIP objection of the

25   committee, we both sought an extension of the sale period,

1    we both sought to delay milestones, we both sought to have

2    a governance change.  They were very similar pleadings.

3    Those issues have not even been resolved yet.  So I don't

4    think their voice has been muted.

5                Okay.  The other argument that they're the

6    only party in town that's serving discovery, your Honor,

7    they can second-guess the way in which my firm represents

8    committees, or the way this committee is behaving, or

9    making their decisions known to the public, that is just a

10   difference of opinion on how to represent your client.

11   That does not imply you're not doing it properly.

12               Okay.  This committee is doing everything

13   they can to achieve their goal at the quickest and most

14   cost-efficient way possible.

15               They filed 2004 notices.  They won't find

16   out the circumstances of Ms. Cole's resignation until some

17   time in January.  We believe the way we've handled it,

18   we've learned all we need to learn on that issue.

19               Now, it's part of our investigation, and I'm

20   not at liberty to discuss it in public, it wouldn't be

21   fair because our investigation is not complete, but let it

22   be known, we did not take that lightly, we've dove into

23   it.  When I asked them if they had even tried to contact

24   Ms. Cole --

25               THE COURT:  "Them" meaning Monster?

1                    MR. COHEN:  The movants.

2                    THE COURT:  The movants.

3                    MR. COHEN:  Sorry, your Honor.  When I asked

4    the movants had they even tried to contact Ms. Cole, that

5    was not me suggesting that they do it by interview instead

6    of a deposition.  It's why wait until January?  If you're

7    that concerned, let's figure it out.  To me that is the

8    quickest way to consensus, that is the quickest way to

9    keeping this case on track.

10                    If what you really want to do is just throw

11   issues at a wall, the more miles you get out of that issue

12   is by not solving that issue quickly, let it linger out

13   there, let it linger out there until January or February,

14   so at every motion you can worry about Ms. Cole's

15   resignation and not know the answer.  We know the answer,

16   we're satisfied with the answer, and we will further

17   investigate if we have to, but that does not imply we or

18   the committee are not doing their job.

19                    Your Honor, the last slide, slide five, and

20   I do want to make one correction, next to Stellar there

21   should not be an asterisk there, I think that was a

22   carryover from slide one, where we used that as a defined

23   term.

24                    What I tried to do here, what we tried to do

25   here is categorize by color, on the left side, the

1    reconstituted committee, and then categorized the movants

2    by color, so you can quickly see, do the movants fit into

3    a category represented by a member of the committee, okay?

4    And you can see that the purple designation, litigation

5    claims, are represented, and again, not giving credit to

6    Pepsi or ABC, and ABC calls themselves a litigation claim,

7    they are represented by the class action and by Warner

8    Music, and Sony/UMG are directly similar to Warner Music,

9    separate companies, but identical claims.

10                THE COURT:  And when you say "litigation

11   claims", can we use the term victim in purple, does purple

12   -- does victim work as we've discussed it?

13                MR. COHEN:  Pursuant to your Honor's

14   definition, yes.  Pursuant to the definition of

15   involuntary litigation claimant, I, frankly, didn't

16   understand that, or understood what that means, but

17   according to your Honor's definition, yes.

18                THE COURT:  Okay.  So that means that the

19   movants are essentially -- four of the five movants are

20   represented by the class representative in Warner and ABC,

21   and --

22                MR. COHEN:  Would have been represented by

23   themselves.

24                THE COURT:  Represented by themselves, yes.

25                MR. COHEN:  And by Pepsi.  So ABC is a

Page 200

1    subsidiary of Keurig Dr. Pepper, your Honor, so number

2    three largest beverage provider in the world, Pepsi,

3    number one or number two.  So, you can also argue that

4    Pepsi is a pretty good representation of American Bottling

5    Company.

6                    THE COURT:  Okay.

7                    MR. COHEN:  Okay.  So I feel like we skipped

8    over that aspect of the issue this morning, your Honor is

9    actually looking if they're adequately represented, and I

10   think this slide demonstrates that for your Honor.

11                   Sorry, your Honor, I'm just going over my

12   remaining remarks to see if I can --

13                   THE COURT:  Sure.

14                   MR. COHEN:  -- shorten this and leave some

15   time --

16                   THE COURT:  Take your time.

17                   MR. COHEN:  -- for the debtors, and the

18   lenders, and the U.S. Trustee.

19                   Your Honor, so I had other remarks prepared,

20   but I do think -- I don't want to overcomplicate this.  I

21   actually don't think it's a complicated issue.  I think

22   the movants made a request of the U.S. Trustee's Office.

23   The U.S. Trustee Office, in response to that request,

24   reconstituted the committee.  The reconstituted committee

25   -- by the way, your Honor, an 11-person committee,

1    11-member committee is not your ordinary size.  Right, the

2    U.S. Trustee went out of their way to accommodate their

3    request.

4                    It is our belief that the reconstituted

5    committee absolutely adequately represents the creditor

6    body.  It is our belief that the committee has operated

7    improper exercise of their fiduciary duty to date.

8    Your Honor, I've personally represented over 100

9    committees.  I have seen no inappropriate behavior.

10                   Do you want that groan on the record?

11                   MR. FEINSTEIN:  Yeah, I'm going to object to

12   this --

13                   THE COURT:  42 years, 200 committees.

14                   MR. FEINSTEIN:  I'm happy to talk about my

15   committee experience as well, but counsel is just

16   testifying --

17                   MR. COHEN:  42 years.

18                   THE COURT:  Mr. Feinstein, I can promise you

19   that although I very much respect the lawyers in this

20   room, and the experience of the lawyers in this room, none

21   of the anecdotal statements make a darn bit of difference

22   to me.  This is about this committee, the formation of

23   this -- not the formation, but whether this committee

24   adequately represents the claims of their constituents,

25   and the movants, and that's all I'm thinking about, okay?

Page 202

1    So you need not worry.

2                    MR. FEINSTEIN:  But counsel is making

3    observations about the committee being represented in this

4    case, not (inaudible) about other cases.

5                    THE COURT:  All right.

6                    MR. FEINSTEIN:  I just --

7                    THE COURT:  Well --

8                    MR. FEINSTEIN:  It's just, it's testimony.

9                    THE COURT:  -- I hear you, but again, it's

10   really -- it's not having much impact on me, if any.

11                   MR. COHEN:  Your Honor, one piece I haven't

12   addressed is the allegations of lack of transparency, and

13   Mr. Pachulski mentioned that his colleague and I,

14   Mr. Feinstein, speak on occasion.

15                   Okay.  Since he introduced that fact, I'd

16   like to rebut that.  I think Mr. Feinstein will agree we

17   speak at least three to five times a week, sometimes three

18   to five times a day.  We actually spoke with them before

19   the committee even hired an FA or banker, asked them if

20   they thought the committee should hire a banker.  We

21   shared with them the terms of the DIP solution settlement.

22   They had it well before your Honor, your Honor hasn't seen

23   it yet, they've had it for two weeks.

24                   THE COURT:  I'm always the last to hear.

25                   MR. COHEN:  I feel really bad for you,

1    your Honor.

2                    THE COURT:  No, you should feel good for me.

3                    (Laughter.)

4                    MR. COHEN:  Anyway, my point is, your Honor,

5    the committee certainly is not freezing out Monster Energy

6    or any of the movants.  We always try to involve creditors

7    that were not appointed to the committee.  We didn't make

8    that decision.  So we always interact with larger

9    creditors because we recognize their value.

10                    THE COURT:  Mr. Feinstein is going to have a

11   heart attack in a second with these arguments.

12                    MR. COHEN:  That would --

13                    THE COURT:  Let me just make it very easy.

14   Mr. Cohen is at some level responding to statements made

15   by the movants' counsel, but again, I'm giving very

16   little, if any, weight to those statements by both.  I am

17   laser-focused on the standard that I'm going to apply, or

18   must apply to this issue, and that standard involved,

19   again, whether the committee, as constituted, provides

20   adequate representation to the constituents of that

21   committee, that's what I'm focused on.  I know the

22   difference between facts and statements that are not

23   facts, and so I just want to assure you all, but I also

24   don't mind, you know, lawyers are going to make arguments,

25   and I'm not going to get too much in the way of that,

Page 204

1    unless it gets really way out of bounds.

2                      MR. COHEN:  Thank you, your Honor.

3                      One last point I want to address.

4    Your Honor raised the question, but I'm not sure I fully

5    answered it, on comparing this case to the mass tort

6    cases.  There is a difference there, the Bankruptcy Code

7    does not give your Honor jurisdiction to resolve personal

8    injury claims.  So it matters, the mass tort victim

9    committees, the claims are different, right, and many of

10   them are treated by setting up trusts in a plan

11   specifically because of that.  These are all commercial

12   claims.

13                     THE COURT:  Well, help me then.  Distinguish

14   the -- I don't know if you're aware of the memorandum

15   opinion and order in the Roman Catholic Church or the

16   Archdiocese of New Orleans case that Mr. Pachulski spent

17   some time arguing.  Distinguish that case from this one,

18   and the rulings by the judge in that case.

19                     I mean, you know, it's certainly a

20   well-reasoned 28-page opinion by Judge Grabill.  I have

21   not studied it fully, but I have read it through, and it's

22   interesting, her decision to not reconstitute the

23   committee, or to add additional seats to the committee,

24   and instead appoint second committee, you know, she took

25   an interesting approach, and so what is your view of that?

1                     MR. COHEN:  Your Honor, again, at the risk

2      of sharing anecdotes, when you are dealing with creditors

3      of that nature -- okay, I represented a committee member

4      on the Enron committee, Mr. Lieberman talked about

5      representing the chair on the Caesar's committee.  I

6      represented a member on the Enron committee.

7                     The Enron committee originally had employees

8      on the committee.

9                     Subsequent to that appointment, the

10     U.S. Trustee decided to take the employees off of that

11     committee and form a separate employee committee.

12                    THE COURT:  Well, here, in the New Orleans

13     case --

14                    MR. COHEN:  It's the reverse.

15                    THE COURT:  -- there were no, there were not

16     trade or business commercial creditors on the committee,

17     and rather than reconstitute, a second committee was

18     created.

19                    MR. COHEN:  Yes, I understand it's the

20     reverse, but the analogy is the same.  There is a very

21     large social work aspect to representing committees of

22     members who have been personally injured.  Okay.  It is an

23     incredibly sensitive subject.  No one knows that more than

24     Mr. Pachulski, who represents a lot of committees in the

25     diocese case.

1              To put creditors of that nature on the same

2    governing body, as injured corporations, is a very hard

3    interplay on committee calls.  Some of the decisions you

4    make with commercial counterparties can come across as

5    very abrupt or cold to someone who has been sexually

6    abused, lost their retirement plan, has a husband with a

7    brain tumor and doesn't have health insurance anymore.  It

8    is a different type of creditor, whether or not it is a

9    different priority of creditor.

10             So I do think while none of that is in the

11   Code, your Honor, I think it's just reality that you have

12   to handle those creditors differently, and to give them

13   their day in court, and for them to be heard, they need to

14   be heard on their own.

15             THE COURT:  Okay.  Understood.

16             MR. COHEN:  Your Honor, unless you have any

17   questions, I know Mr. Murtagh is going to --

18             THE COURT:  Well --

19             MR. COHEN:  -- supplement my presentation.

20             THE COURT:  -- you know, I thought that

21   Mr. Patterson made some interesting points, and, you know,

22   I am certainly a big fan of everyone, all constituents

23   needing to talk to reach a consensual plan, or at least to

24   minimize the issues in dispute, and I guess my question, I

25   have a little bit of concern, because I'm literally

```
 1    inviting you to tell me how the committee is operating,

 2    which I really don't want to do.

 3                      MR. COHEN:  I'm not going to tell you

 4    anyway.

 5                      THE COURT:  Yeah, but, you know, the

 6    Subchapter V experience has been a really interesting one,

 7    to have a Subchapter V Trustee appointed, whose sole

 8    purpose is to bring kumbaya to the case as much as

 9    possible, has really worked.

10                      MR. COHEN:  Yeah.

11                      THE COURT:  I mean, it works incredibly

12    well, and of course those are smaller dollar amounts and,

13    you know, there are a lot of other issues that give that

14    trustee more power, if you will, than perhaps a case like

15    this, but it is obviously integral to the likely results

16    of the case when constituents are talking versus when

17    they're not.

18                      When a party is invited to the table, and

19    when that party is invited to the table and when they're

20    not.  So I'm not even going to ask a question, I'm just

21    going to let that sit there.

22                      All right.  So, anything else?

23                      MR. COHEN:  I don't think so, your Honor.  I

24    can make something up, but that's not a valuable use of

25    our time.
```

1          THE COURT:  No, agreed with that.

2          All right.  Mr. Murtagh, what technological

3    help do you need first?  Let's figure out that problem.

4          Nobody warned me about this before I applied

5    to be a judge.

6          MR. MURTAGH:  Well, your Honor, let's try

7    this.  I think I'm on Zoom here.  I can see myself

8    sideways.

9          THE COURT:  How do you look?

10          MR. MURTAGH:  My hair is always grayer than

11    I thought it was.

12          THE COURT:  I would take that all day long

13    and twice on Sunday.  So would Feinstein, so would Guso,

14    who else?  So would Cohen.

15          MR. MURTAGH:  And I didn't realize I moved

16    so much like a robot, but I think that's the buffering.

17          THE COURT:  World's smallest violin.

18          MR. MURTAGH:  Understood, your Honor.

19          I will try to share my screen, and we'll see

20    if people can still hear me, and if people in the

21    courtroom can see the screen, then I think we're good to

22    go, and I'll just control it from here.

23          THE COURT:  All right.  Hit it.

24          MR. MURTAGH:  Okay.  Well, I see the slide

25    is a little bit small, but it's on the screen.  Can I ask

Page 209

1    if people are able to hear the Court still?

2                   THE COURT:  Mr. Weiner, can you hear us?

3                   MR. WEINER:  Yes, I can hear you all.

4                   THE COURT:  Beautiful.

5                   MR. MURTAGH:  Okay.  Thank you, your Honor.

6                   So, the presentation here really has two

7    pieces.  Okay.  I really only want to talk about two

8    things, and I think it addresses a number of the questions

9    your Honor has had.  The first is context, and the context

10   for the movants' request, your Honor, is that the relief

11   they seek in this case is extraordinary, and it's

12   effectively unprecedented in any case remotely similar to

13   the one before your Honor.

14                   The second point, your Honor, is --

15                   THE COURT:  Unprecedented, a very overused

16   term these days, tell me what you mean by that.

17                   MR. MURTAGH:  I mean, your Honor, that --

18   and I can flip forward on this in a moment, but the

19   movants put before your Honor roughly 10 cases in their

20   reply that they say support the creation of a second

21   creditors' committee.  Nine of those cases, your Honor,

22   are appointments by the U.S. Trustee.  They're not cases

23   in which a court --

24                   THE COURT:  They weren't contested, in which

25   a court made a ruling.

Page 210

1          MR. MURTAGH:  And to the best of my

2    knowledge, the court didn't make any ruling.

3          THE COURT:  I see.

4          MR. MURTAGH:  They're not under 1102(a)(2),

5    they have no guidance for your Honor, and we've talked

6    about a number of them in the course of the day,

7    your Honor, and as you've recognized, that in those nine

8    cases, you have some of the biggest mass tort cases to

9    come through Chapter 11, and also a certain number of

10   abuse cases, and the distinction between those cases on

11   their substance in this case has been amply explored, but

12   in terms of the precedent, your Honor, they're not

13   precedent, they're black boxes in terms of your guidance

14   to you because they're not court decisions, they're not

15   under 1102(a)(2).

16          THE COURT:  Understood.

17          MR. MURTAGH:  And so let me just flip to

18   that, your Honor.  I'll make a stop here.

19          What precedent tells us is that a second

20   committee is extraordinary relief.  I think that's clear

21   in the legislative history.  The legislative history

22   reads, quote, the bill requires that there be a committee

23   of unsecured creditors.  The bill also provides for

24   additional committees when such additional committees are

25   needed to represent various other interests in the case,

Page 211

1    including secured creditors, subordinated creditors, and

2    equity security holders.  There is no mention of

3    duplication of unsecured creditors' committee.  There is a

4    request that there always be one.

5                    And the case law picks that up, In Re:

6    Beker Industries, quote, any additional committee should

7    be composed of creditors that are equity security holders

8    representative of classes as a whole, as opposed to

9    dissident factions of particular classes, and as a result,

10   your Honor, a second committee is a, quote, unquote,

11   extraordinary remedy that courts are reluctant to grant,

12   and that's ResCap.  So the legislative history of the case

13   law says this is extraordinary.

14                   Now, to get to where you started,

15   your Honor, do the movants offer relevant precedent?  Why

16   do I say it's unprecedented?  The cases cited by the

17   movants with a second committee, I counted 10 in the

18   reply.  Cases in which the Court appointed a committee

19   under 1102(a)(2), I counted one, and that's the

20   Archdiocese of New Orleans, and we'll come back to that in

21   a moment, your Honor, because I know you were interested

22   in distinguishing it.

23                   Now --

24                   THE COURT:  Well, I'm interested in its

25   application.

1              MR. MURTAGH:  Yes, your Honor.  I didn't

2   mean to say you were interested in having it distinguished

3   away, but to analyze side by side with what we have here.

4              The number of cases in which the court

5   appointed a second committee when creditors of the

6   movants'-type were already on the committee, that's zero,

7   and cases in which the court appointed a second committee

8   when movants refused to sit on the existing committee, and

9   then argued they were not adequately represented, that's

10  also zero.

11             So, that leaves the Archdiocese of New

12  Orleans case as movants only precedent for the request

13  that they bring before your Honor.

14             This, your Honor, is not like Archdiocese.

15  So let's talk about the factors that were relevant in

16  Archdiocese, your Honor.

17             The first is that the case included a highly

18  specialized creditor subset.  Now, I don't want to belabor

19  that point.  I think the committee just explored that in

20  eloquent detail.

21             I would contrast that with here, your Honor.

22  I know we spent a lot of time trying to get underneath the

23  nature of the commercial claims here, and they can be

24  characterized in a number of ways.

25             First, of course they're all general

1    unsecured claims.  Second, these are all commercial claims

2    of one sort or another, business to business that the

3    movants have.

4              Now some of them are based allegedly on bad

5    acts by the debtors, and some of them are not.  Even the

6    ones that are based allegedly on bad acts by the debtors,

7    the movants have admitted that some of them, even though

8    they would view that as being different from trade claims,

9    actually have an alignment of interest in trade claims

10   because they enjoy a royalty in a go-forward business.

11             So the very distinction that the movants say

12   exist, speculate will exist when it's time to formulate a

13   plan or a sale, i.e., that trade creditors will want a

14   go-forward business, and litigation claimants will want a

15   sale, that very distinction, of course it's all

16   speculation.  Even if it's accurate, your Honor, some of

17   the movants are aligned in interests, it doesn't matter if

18   you call them involuntary, it doesn't matter if you call

19   them litigants, they're interested in the same thing, and

20   that's seeing the business succeed on a go-forward basis.

21             THE COURT:  So, it's not important to you,

22   or at least to your argument that Monster, in particular,

23   with a 5 percent royalty going forward, or Orange Bang,

24   with a 5 percent royalty going forward, be on the

25   committee.

1                    Your point is that the members of the

2    committee that have an interest in the business surviving,

3    and continuing to do business, does align with that

4    5 percent royalty interest?

5                    MR. MURTAGH:  Precisely, your Honor.

6                    THE COURT:  Okay, because I don't see any

7    members of the committee that are the, quote, victim

8    concept, and have a 5 percent royalty interest going

9    forward, as presently constituted.

10                   MR. MURTAGH:  That's right, your Honor.  My

11   point is just the point that you made.

12                   THE COURT:  That they're represented?

13                   MR. MURTAGH:  Right, your Honor.

14                   Now, second, in Archdiocese, I think

15   probably the driving concern that I see in that case is

16   that the committee was entirely the highly specialized

17   subset.  When the Court was looking at the situation, it

18   was a six-member committee, comprising entirely of alleged

19   victims of sexual abuse at the hands of priests, and

20   nobody else.

21                   THE COURT:  There had been --

22                   MR. MURTAGH:  Yes, your Honor.

23                   THE COURT:  -- other members, and I didn't

24   understand the opinion, and maybe it didn't mention it, as

25   to why those members were no longer on the committee,

1    but --

2                    MR. MURTAGH:  There was one other member,

3    your Honor, it was a bondholder, or successor trustee.

4                    THE COURT:  Oh, a bondholder, yes, TMI.

5                    MR. MURTAGH:  As part of an agreement that

6    is not entirely documented in the opinion, that bondholder

7    trustee agreed to resign from the committee, and it left

8    only six.

9                    THE COURT:  Got you.

10                   MR. MURTAGH:  And so then there were none

11   other then the survivors, your Honor.

12                   Here, that's clearly not the case for

13   reasons we've discussed.  This committee, as constituted

14   now, has 11 members.  A number of them have litigation

15   claims, as well as trade claims.  Certain of them believe

16   that they were wronged by the debtors, in addition to

17   having trade claims.  This is not a situation where --

18   nobody can stand before your Honor and say there is not a

19   single member of this committee that does not possess a

20   litigation claim, that is not in some ways involuntary,

21   that does not accuse the debtors of bad acts in some way.

22   That representation is on the committee, and as we just

23   discussed, even those who may not believe that they were

24   wronged in some way share a commonality of interest in

25   what the business should look like, and that it should

1    succeed.  So that doesn't exist here.

2                    Third, I guess almost as importantly, maybe

3    more importantly, there was evidence in the record that

4    the committee had been unable to do anything other than

5    pursue the interests of the survivors.  The court noted

6    that in response to a bar date motion.  The committee

7    sought extensive discovery, seeking to investigate more

8    bad acts, more priests for their litigation, that the

9    committee did not object to lift stay motions when their

10   own constituents sought to continue their cases out of

11   court, and that the committee, in fact, tried to dismiss

12   the whole case, which is a pretty unusual action for a

13   committee to take.

14                   It forced the court to conclude that without

15   casting judgment upon those survivors, that they had been

16   wholly consumed by pursuing their interests, in seeing

17   their litigations to judgment.  That was record evidence

18   in the case.

19                   THE COURT:  Did the court find that they had

20   been breaching their fiduciary duty to the creditor body?

21                   MR. MURTAGH:  Your --

22                   THE COURT:  I don't recall seeing that.

23                   MR. MURTAGH:  It did not, your Honor.

24                   THE COURT:  But it wasn't an issue before

25   the court, it was merely adequate representation?

Page 217

1                    MR. MURTAGH:  Yes, your Honor.

2                    THE COURT:  Okay.

3                    MR. MURTAGH:  Here, your Honor, after

4     almost --

5                    THE COURT:  The reason I ask that is there

6     is no evidence here of a present breach of fiduciary duty.

7                    MR. MURTAGH:  No, your Honor.

8                    THE COURT:  To the extent that there was

9     evidence there of a breach of fiduciary duty, that would

10    distinguish that case from this one, but I don't think the

11    case ever got that far.

12                   MR. MURTAGH:  It did not, your Honor.

13                   THE COURT:  Okay.

14                   MR. MURTAGH:  The point for present purposes

15    is that there was a record with evidence showing, rather

16    than speculating, that, in fact, the committee had been

17    unable to fully embrace the interests of all general

18    unsecured creditors, which was understandable under the

19    circumstances.

20                   Here, your Honor, after a full day of

21    hearing, and all the evidence that's been put in, there is

22    no evidence at all that this committee has failed to

23    represent all general unsecured creditors, and it's the

24    movants' burden, which we'll get to, to bring that before

25    your Honor, and they've brought nothing.

1              And the last, your Honor, is a slightly more

2    atmospheric point, but in the case, the Archdiocese case,

3    the debtors supported the second committee.

4              The U.S. Trustee and the existing committee

5    lodged objections initially, but in the court's view,

6    effectively, did not prosecute them at the hearing.  So

7    this was something, I think, simply that the debtor

8    supported, I'm sure that was important to the Court, the

9    Court mentioned it.  The objections, by the time the

10   hearing got underway, were essentially gone.

11             Your Honor knows that's not the case here.

12   The debtors object, the committee objects, the

13   U.S. Trustee may have something to say as well.  It is

14   highly disputed here, you Honor.

15             So this is why the only case that they've

16   brought before your Honor for what they're asking you to

17   do is completely inapplicable, and when you take that out,

18   your Honor, they haven't brought you a single case, and

19   your Honor asked the question, and Mr. Pachulski didn't

20   have an answer, is there another case like this, with

21   commercial claims where there were two committees?  The

22   answer is, no, your Honor, it doesn't exist.  So that's

23   the context.

24             So with that context, the question is, is

25   this the case to expand that extraordinary remedy into

Page 219

1    what is essentially never before explored territory for

2    that remedy, and all we need to do to answer that question

3    is to analyze the Winn Dixie factors that your Honor

4    highlighted at the last hearing on this, and we'll see

5    that was movants haven't met their burden to demonstrate

6    that any of them favors appointing a second committee.

7                  So, again, your Honor, I said this before,

8    and Mr. Pachulski said he wasn't sure, this is the

9    movants' burden.  Under 1102(a)(2), they are bringing the

10   request to appoint a second committee because it's

11   necessary to assure adequate representation.  That's their

12   request, it's their burden.  This is a high standard.

13                  This is a quote from Eastman Kodak, a high

14   standard, far more onerous than if the statute merely

15   provided the committee may be useful or appropriate.  So

16   it's their burden, high standard.

17                  Movants failed to demonstrate that Winn

18   Dixie supports this all.  So let's get into Winn Dixie.

19                  The nature of the case, the movants'

20   position is essentially this, the case was only filed to

21   address litigation.  Litigation claims are a supermajority

22   by value, and the litigation claims and trade claims have

23   necessarily divergent interests .  Your Honor, those

24   assertions are wrong as a matter of fact, and irrelevant

25   as a matter of law.

1                    So on the evidence, was the case only filed

2       to address litigation, and your Honor mentioned this

3       before, the evidence in the record is that the case was

4       filed for multiple reasons.  The stipulation, agreed

5       stipulation of facts in Paragraphs 48 and 49 talk about,

6       yes, there was a litigation overhang, a need to address

7       litigation.  There was also a need to address an impending

8       default under the credit agreement, there was a need to

9       raise liquidity, there was a need to reposition the

10      business, in the debtor's view, at a point of -- an

11      inflection point for the launch of a new distribution

12      line.

13                   THE COURT:  But, Mr. Murtagh, would you -- I

14      guess you can't really agree with me, but certainly the

15      litigation claims played a significant role in the filing

16      of this case.

17                   MR. MURTAGH:  Yes, your Honor.

18                   THE COURT:  And certainly -- you say it's a

19      litigation overhang, but it's a pretty significant one.

20      You've got a, what is it, $400 million judgment that's

21      been entered in favor of Monster and other, exceeding

22      that, or bringing that total higher, without which it's

23      very possible the debtor would not have filed bankruptcy,

24      it would have resolved its issues outside of court.

25                   MR. MURTAGH:  With regard to the last part

1    of the statement, I don't know, your Honor.  I agree with

2    your Honor that there was significant judgments that were

3    a significant precipitating factor in the filing of the

4    cases.

5              THE COURT:  And it's also probably fair to

6    conclude that there is an unusually large number of cases

7    involving the debtor's business practices being somewhat

8    questionable leading to significant debt, is that a fair

9    statement?

10             MR. MURTAGH:  Your Honor, I don't know if

11   that's a fair statement.  It was the movants' burden to

12   bring before you a demonstration that what this case is

13   unusual in the profile of the litigation.  There has been

14   no comparison made, or brought before your Honor to any

15   other suite of cases, or matrix of cases.

16             In my experience, your Honor, Chapter 11

17   cases, including large complex Chapter 11 cases often are

18   precipitated by a litigation event.

19             THE COURT:  True, that is a true statement.

20             I guess, my -- I guess in looking at the

21   nature of the case, my thought process was simple, which

22   is that this case is a little bit different.  I don't know

23   that it's sufficiently different to support the

24   appointment of a second committee, but it is a little bit

25   different because there are a number of creditors whose

Page 222

1    claims do arise from what courts have found, some courts

2    have found, or arbitrators have found, to be wrongful

3    business practices, not failure to pay, but using someone

4    else's property, using someone else's trademark, falsely

5    advertising, things of that sort that, you know, do bring

6    into question the operational aspects of this company, and

7    whether, you know, they were appropriate, and so it does

8    make this case, the nature of the case a little bit

9    different.

10                 MR. MURTAGH:  Well, your Honor, I would

11   agree that there may be -- let's assume there are in this

12   case more claims of that nature being put before

13   your Honor, especially at an early stage.

14                 I would not agree, and I'd offer your Honor

15   that it doesn't make the nature of the case unusual.  The

16   claims, whether they be based on non-payment, a bad

17   business practice, a copyright infringement, a trademark

18   infringement, the bottom line, your Honor, is that these

19   are either commercial breach claims, or commercial tort

20   claims.

21                 THE COURT:  It's still a business, and

22   they're still business claims.

23                 MR. MURTAGH:  Exactly, your Honor.

24                 THE COURT:  I see.

25                 MR. MURTAGH:  These are not -- there is

Page 223

1    nothing particularly unusual about these claimants

2    vis-a-vis each other, and we'll get to the --

3                    THE COURT:  And there is no published

4    decision that suggests that the nature of these claims,

5    and how they arose supports a second committee.

6                    MR. MURTAGH:  None, your Honor.

7                    THE COURT:  All right.

8                    MR. MURTAGH:  Our litigation claims are

9    supermajority by value.  This is an evolving -- this is

10   evolving, your Honor.  I think Mr. Pachulski said it was

11   75 to 95 percent.  I don't know what the basis for that

12   is.

13                   As the committee noted, the bar date has not

14   yet occurred.  I know claim deadlines have a way of making

15   people file claims.  The profile of claims may have

16   changed drastically between 9:00 a.m. today and 5:00 p.m.

17   What we do have is the schedules.

18                   The movants admit that the --

19                   THE COURT:  The proof of claims that have

20   been filed to date.

21                   MR. MURTAGH:  The proofs of claims filed to

22   date, your Honor, yes.

23                   But in terms of what's a complete apples to

24   apples comparison that I can offer your Honor, if we look

25   at the schedules, and what the movants reference is that

Page 224

1    the litigation claims are actually half, by their count,

2    of the scheduled value of scheduled claims, and that's a

3    reply at Paragraph 4.

4                   Now, again, I noted, your Honor, already

5    that --

6                   THE COURT:  I'm sorry, that's in whose

7    reply?

8                   MR. MURTAGH:  That is in the movants' reply

9    at Paragraph 4.

10                  THE COURT:  Okay.

11                  MR. MURTAGH:  They're relying on proofs of

12   claim before the close of the bar date.  We don't know

13   what that will show.  Will it show that there are suddenly

14   a billion dollars of trade claims filed, or what they

15   would call trade claims filed?  Unlikely, but again, it's

16   a hard thing to rely on when the record there isn't

17   closed, and it's their burden to bring to you the fact of

18   the matter.

19                  Now, even if ultimately a supermajority by

20   value, they're a small minority in number, which they

21   admit, right?  The schedules say, disclose 47

22   litigation-based claims by my count, 556 trade-based

23   claims by my count, and 1,700 customer credit claims but

24   my count.

25                  I don't know what will happen with this

1   customer claims, whether proofs of claim will be filed,

2   whether they'll be treated separately.

3              The point is vis-a-vis litigation claimants

4   and trade claimants, they may believe that they've got a

5   corner on the market on value, but they're in a minority

6   by any count on numerosity.

7              THE COURT:  True, but the debtor does need

8   both numerosity and value to vote for a plan to make it

9   consensual --

10             MR. MURTAGH:  Absolutely, your Honor.

11             THE COURT:  -- otherwise you're looking at

12  cramdown, and they're looking at disparate treatment, or

13  unfair discrimination as an issue, and things of that

14  sort.  So, it does make sense, given the size of the

15  claims, that they would be -- they would have a seat at

16  the table, if you will.

17             MR. MURTAGH:  Absolutely, your Honor.

18             THE COURT:  And the question then becomes,

19  how do they get that seat at the table?  Do they -- is it

20  -- does it -- is it necessitated by creating a second

21  committee, which seems to be their argument.  So that

22  under 1103 they're getting the information, and folks are

23  required to talk to them, as opposed to voluntarily

24  talking to them.

25             MR. MURTAGH:  Right, absolutely.  The

Page 226

1  question before your court is are their interests

2  adequately represented?  And a lot of the discussion today

3  seemed like hypothesizing in the absence of a committee,

4  but there is a committee, and the question is, are they

5  adequately represented, both on that committee, and also

6  by their ability to participate in the case.

7              THE COURT:  Well, I will tell you, though,

8  it does concern me a little bit that the debtor,

9  naturally, and it makes perfect sense to be having very

10 close conversations with the lender as a gatekeeping

11 function, as Mr. Sorkin described, without the lender I'm

12 not sure this case goes anywhere, but not to have included

13 the committee in that conversation is a little concerning.

14             Only -- and I say that only because the

15 committee sitting at the table certainly needs to be

16 talked to, and certainly the debtor, arguably, in order to

17 have a consensual case, should involve the committee, and

18 I'm just wondering how far that extends, is the debtor,

19 you know, appropriately taking into consideration all of

20 the constituencies of this case in trying to reach a

21 consensual plan, and (inaudible) can explain why, perhaps,

22 that hasn't happened yet, it's early, got to get over the

23 lender hump before it's worth talking to anybody else, so

24 I get all of that, but from an observational perspective,

25 it does seem to me that this case does require everyone

1    talking to each other, or we are going to have some very

2    significant disputes at the confirmation level, trustee

3    appointment motions, things that have been alluded to here

4    today, that will cost this estate a considerable amount of

5    money.

6              And when you weigh that against the cost of

7    a second committee, if a second committee will avoid some

8    of that, because they're at the table, they're required to

9    be at the table under 1103, it depends on how expansive

10   you read 1103, but it is an argument that resonated at

11   some level with me, whether it's enough to get to the

12   point of appointing a second committee, I'm not sure.

13   What is your view of that?

14             MR. MURTAGH:  Well, your Honor, two things.

15   I mean, I think, first, what I hear your Honor saying is

16   you're concerned that the debtors may not have engaged in

17   enough consensus building, inclusion in information

18   sharing to date, and to the extent that is true, we'll do

19   better, your Honor.  Absolutely our goal is to have

20   consensus among all of the stakeholders, and that's one

21   thing right off the bat, absolutely, completely agreed.

22             The second thing, your Honor, is I'm not

23   sure it's actually relevant to the formation of a second

24   committee.  If the issue is that the debtors need to do a

25   better job with the existing committee, then the debtors

Page 228

1   will do that, but they -- I'm not being flippant,

2   your Honor, the debtors equally could have done an

3   insufficient job with two committees, five committees or

4   ten committees, but it's up to the debtors to make sure

5   that the people who need to be heard from and spoken to

6   are heard from and spoken to.

7              But multiplying committees would not

8   actually avoid that problem.  It would be up to the

9   debtors to make sure that we deliver, and we will,

10  your Honor.

11             Finally, your Honor, on this slide, I think

12  we've maybe beaten this to death, but the litigation,

13  quote, unquote, litigation and, quote, unquote, trade

14  claims, do not necessarily have divergent interests.

15             What's the evidence that's been presented on

16  this?  What's the evidence in the record, contrast to

17  Archdiocese, there is no evidence in the record that they

18  have divergent interests, or that their interests will be

19  forced to diverge through the case -- through the plan

20  process.  It's just a guess about what this case will look

21  like, which is speculation and, frankly, as we discussed,

22  your Honor, even to the degree that the case evolves in a

23  waiver or decision, is to be made between the business

24  going forward and a sale of the business, the interests of

25  both are avowedly already on the committee.

1                    THE COURT:  And the sale concept, and no one

2      has addressed the issue, and maybe it's not possible at

3      this point, seems as though it would be a sale of a going

4      concern, not a sale in pieces, necessarily, and I say that

5      because it doesn't really matter who is governing or owns

6      the debtor, from the perspective of a creditor who wishes

7      to continue to do business with that debtor if the debtor

8      is sold as a going concern, and it doesn't necessarily

9      play into the hands of creditors who might like to see the

10     demise of the debtor, from a competitive perspective, if

11     the debtor is going to be sold as a going concern in any

12     event.

13                    So, I'm just really not -- it's premature,

14     it seems to me, from that perspective, to be able to

15     determine whether there is adequate representation if the

16     possibilities are endless with respect to how this case is

17     ultimately concluded.

18                    MR. MURTAGH:  The debtors agree with that

19     assessment, your Honor.  That's --

20                    THE COURT:  But what do you say about the

21     timing, though?  What if we find out a month from now, or

22     two months from now that there is an angling towards doing

23     something that perhaps isn't in the best interest, does

24     Mr. Feinstein and Mr. Pachulski's argument that it's going

25     to be too little too late resonate with the debtor?

Page 230

1    Because it may be a little too little or a little too

2    late.

3                     MR. MURTAGH:  Well, again, two responses,

4    your Honor.

5                     Just, to the extent that the worry is that

6    later on -- later on it will be too late for these movants

7    to undertake an investigation, or discovery in support of

8    objections they have, then that's something that the

9    movants, who are here represented by able counsel, will

10   have to decide how to navigate from this moment to that

11   moment.

12                    The fact that the timing is tight is not

13   actually relevant to the adequacy of the representation

14   they're receiving from the committee under tight

15   circumstances.

16                    Just because disputes may arise later

17   doesn't mean that the representation will be inadequate

18   later.  If, in fact, two or three months from now, which

19   we don't think will happen, there is credible evidence to

20   be put before your Honor that the committee is not seeking

21   to maximize value for all unsecured creditors, generally,

22   that they somehow have been captured by a special

23   interest, then it absolutely will not be too late to

24   constitute a committee to prosecute the interests that are

25   allegedly not being prosecuted.  There is no -- I have

1    heard no reason why forming a committee later will be

2    insufficient.  If it means that they need to move quickly,

3    that they need to be given access to documents they

4    haven't had before, I guarantee you it will be done.

5                  Now, if the concern is what I heard, which

6    is that these movants feel that they may be caught

7    flatfooted later on, movants are capable of planning for

8    that now, they're already seeking discovery.  If they need

9    to seek more in good faith, the Bankruptcy Code gives them

10   the tools to do that.  They're not hamstrung, they're not

11   unable to pursue those things now.

12                  To close out the nature of the case in

13   point, your Honor, the case law, which I believe

14   your Honor referenced earlier, the alleged importance and

15   size of the litigation claims is not particularly

16   relevant, because representation must be adequate, not

17   proportionate.  A quotation to that effect from ResCap,

18   adequate representation does not require proportionate

19   representation of distinct creditor groups on a committee

20   of unsecured creditors.  The determinative factor is

21   whether the official committee is serving their interests

22   as unsecured creditors.

23                  The same from Enron, the issue is not

24   whether the creditors' committee is an exact replica of

25   the creditor body, but whether representation of various

Page 232

1    creditor types is adequate.

2              Again, your Honor, the movants have offered

3    no evidence, no evidence on their burden that the existing

4    committee has failed to represent their interests, however

5    large they may be.  So that's the first factor,

6    your Honor, that's the nature of the case.

7              The second factor in Winn Dixie is benefit

8    to the administration.  Here the movants assert that a

9    second committee can be a single point of contact and a

10   unified voice, but necessarily, your Honor, a second

11   committee will create two voices, both for unsecured

12   creditors.

13             Adding -- in the words of the existing case

14   law, adding committees is likely to Balkanize proceedings,

15   intensify conflict, and weaken the impetus to compromise,

16   that's Mirant, Enron, and Sharon Steel, respectively.

17             Movants are very eager to say that work

18   needs to be done to make sure that the interests are

19   negotiated, differing interests are negotiated, but that

20   is meant to happen within the context of a committee,

21   that's what a single committee is meant to do, and their

22   interests, as we've discussed, are being represented

23   within that committee.  Creating a second committee is

24   just an avenue for discord, not for a unified voice.

25             THE COURT:  Well, it's an avenue for discord

1    if there is adequate representation.

2                    MR. MURTAGH:  Yes, your Honor, and that --

3    again, it goes back to whether this committee adequately

4    represents them.  There is no -- if there is adequate

5    representation, there is no benefit to creating a second

6    committee for more representation.

7                    THE COURT:  Right.

8                    MR. MURTAGH:  The final point on this, in

9    terms of benefitting the administration and having their

10   voices heard, nothing precludes the movants from

11   continuing to coordinate as a unified voice.  They allege

12   that they are 42 percent of these types of claims by

13   value.  They're sitting here with some of the most

14   prominent bankruptcy practitioners in the country.

15                   If they believe there is a part of this

16   case, or portions of this case where they need to be heard

17   specifically, they know how to do it.  They did it in the

18   DIP, and they did it here, and we'll get to this factor,

19   but they're not going to stop, your Honor, they're not

20   going anywhere.

21                   If they feel that there is some special

22   reason they need to be heard, just as anybody on the

23   committee could if they had a special interest separate

24   from their obligations as fiduciaries on the committee,

25   those members could be heard separately, too.  Nothing

Page 234

1    prevents them from continuing to coordinate, to be here,

2    and to raise what they view as important issues to the

3    Court.

4                    So, a second committee is not going to make

5    them any more present than they already are.  It just

6    means that the debtors are going to pay for it, and that

7    brings me to cost, your Honor.

8                    The movants assert, with no explanation or

9    support, that the costs will be manageable, and they also

10   assert that not paying their fees is unfair.

11                   There is no evidence presented on what they

12   will -- what a committee would charge.  We know that the

13   existing committee has four teams of retained

14   professionals, and we know that the movants believe that a

15   second committee should duplicate at least some of those,

16   including a need for financial advisor, certainly counsel,

17   we heard talk of an investment banker, too.

18                   There would likely be, based on what we've

19   heard today, and what's in the record, a full duplication

20   of retained advisors for a second committee, that would be

21   a third investment banker, and a duplication of everything

22   else.

23                   Those costs are, I think it's fair to say,

24   likely to be at least doubled, just in the ordinary

25   course, even assuming that the second committee doesn't

1   generate more expense through discord and litigation.

2                  Finally, with regard to unfairness --

3                  THE COURT:  What about the argument that it

4   might save money, because they've got a seat at the table,

5   and everybody has to talk to them, and it may build

6   consensus.  I think that's the argument that I heard.

7                  MR. MURTAGH:  The argument being that it may

8   be cheaper to have a committee formed now than to have

9   them raise expensive litigation and objections later, is

10  that the idea?

11                 THE COURT:  That's part of it, as well as

12  starting to build consensus earlier in the case, and

13  avoiding those types of disputes, of course, is part of

14  that as well.

15                 MR. MURTAGH:  Well, first, your Honor, with

16  regard to consensus, again, I'd go back to the previous

17  slide, the place for consensus is within the existing

18  committee.

19                 If your Honor concludes that there is some

20  -- again, there is no evidence, but if your Honor

21  concluded that there were no representation on the

22  committee, that would be a concern, but there is no

23  evidence of that.

24                 The committee is the place for that

25  consensus to be built, within the walls of the committee.

1    The place -- the way to do that is not to create a second

2    committee that's funded by the debtors with a blank check

3    to raise disputes.

4                    THE COURT:  Well, it's not a blank check.

5                    MR. MURTAGH:  You're right, your Honor, I

6    overstated it.

7                    THE COURT:  So if anybody thinks you have a

8    blank check --

9                    MR. MURTAGH:  I withdraw that.

10                   To have a -- whose legitimate, whose

11   reasonable and documented fees are paid out of the estate,

12   that is likely to be a recipe for discord and expense.

13                   Now, how does that compare to the

14   speculation that there will be more expenses generated

15   because these movants will need to file a bunch of

16   objections and litigate?  One, presumably they would be

17   doing it on their own dime.  So the cost to the estate

18   would only be the incremental cost to the estate to

19   respond, unlikely to be anywhere near the cost of funding

20   the committee, just as a matter of logic, your Honor.

21                   Second, it goes in a bit of a circle, right?

22   If the point is, we'll just have to be very active later,

23   they're just demonstrating to your Honor that they're

24   going to participate in the case without having a second

25   committee.

1                    With regard to unfairness, your Honor, the

2       last point on this, the movants -- to the degree movants

3       do make a substantial contribution, they're not

4       foreclosed, they can come back to your Honor under

5       503(b)(9) and say they made a substantial contribution,

6       and seek to be reimbursed.  1102 is not a vehicle to get

7       fees paid for making a contribution.  There is another

8       code section for that, and of course it's retrospective,

9       but it's there.  There is no unfairness in forcing the

10      movants to meed the standards of the Code to get their

11      fees paid.

12                   The next Winn Dixie factor, movants'

13      interests are represented.  Here, movants assert that

14      they're not represented on the existing committee because,

15      A, the litigation and trade claimant interests are

16      necessarily different and, B, the committee does not

17      represent litigation claimants unless they control it.

18                   In terms of divergent interests, I know

19      we've gone over this, so I'll go past it quickly.  No

20      evidence that interests have diverged, no evidence that

21      the committee has failed to consider diverging interests,

22      if any, there is just no evidence of it.

23                   Committee composition, there is, again, no

24      requirement that the committee be proportionate in its

25      representation, that's ResCap, Enron and others.

1          By my count, I know we've sort of
2     reclassified claims over the course of the day, and I
3     haven't edited the slide deck, I counted four of nine
4     members on the committee -- I'm sorry, it should be, with
5     two resignations, four of nine members on the committee
6     with litigation claims.
7          I don't mean to belabor this, because we've
8     sliced them up several different ways.  The point is,
9     their interests, movants with their interests, and movants
10    with their types of claims are on this committee.
11         Again, to reiterate, divergent interests
12    should work together on one committee, that's Enron,
13    Sharon Steel.
14         The fifth factor, your Honor, movants'
15    position is not unique.  Movants here assert that they
16    are, quote, far from unique among the trade creditors,
17    unquote.  That's true, your Honor, but that's not the
18    question.  The question is not whether the movants are
19    unique.  It's whether non-trade creditors are unique among
20    general unsecured creditors.
21         In the words of Winn Dixie, is their
22    position so unusual that they require a separate
23    committee?  For reasons we've exhausted the answer is, no,
24    your Honor.  This is nothing like Archdiocese.  These are
25    businesses with commercial claims of one sort or another.

Page 239

1                    I skipped ahead of myself.  At bottom,

2     your Honor, both have unsecured claims, and have the same

3     interest as every other unsecured creditor, which is

4     maximizing the value of the debtors' estates.

5                    The final factor, your Honor, I've previewed

6     this extensively, will the movants participate without a

7     second committee?

8                    The movants assert here that even if they

9     can participate without a committee, that other trade

10    creditors may not, but the question is not whether every

11    such creditor will participate, it's whether the interests

12    will continue to have a separate voice, right?

13                   So in Winn Dixie the court concludes that

14    the movants can continue to participate through an ad hoc

15    committee or on an individual basis.

16                   It's clear that the movants are already

17    forming, or operating as a de facto ad hoc committee by

18    representing, by their math, 42 percent of their types of

19    claims, by value, coordinating their strategy, and

20    benefitting from nationally recognized bankruptcy counsel.

21    I mean, you have in this half of the courtroom an ad hoc

22    committee in all but name, your Honor, and they have

23    represented that they're not going anywhere.

24                   In the words of Enron, clearly the movants

25    have taken, and continue to take an active role in these

Page 240

```
1    cases.  So the last Winn Dixie factor also argues against
2    a second committee.
3                    And that's it, your Honor, two points, one,
4    the context behind this is there is literally no precedent
5    for a second committee in a case anything like this, and
6    even if one were interested in exploring that sort of
7    expedition here, when you go through the Winn Dixie
8    factors, every single one of them is against them.
9                    THE COURT:  Thank you, Mr. Murtagh.
10                   MR. MURTAGH:  Thank you.
11                   THE COURT:  So, I think the only party we
12   haven't heard from is the United States Trustee's Office.
13                   Could you, Mr. Murtagh, stop sharing?
14                   MR. MURTAGH:  Yes, your Honor.
15                   THE COURT:  Maybe I could force that, I
16   don't know.
17                   Okay.  So, Mr. Wilkes.
18                   MR. WILKES:  Thank you, your Honor.
19   J. Steven Wilkes for the United States Trustee.
20                   Can the parties in the courtroom hear me?
21                   THE COURT:  We can.
22                   MR. WILKES:  Thank you, your Honor.  May it
23   please the Court.  J. Steven Wilkes, trial attorney for
24   the United States Department of Justice, United States
25   Trustee, Region 21, Mary Ida Townson.
```

1              First, the United States Trustee takes

2    objection to, and does not waive any objection to the

3    myriad of speculative discourse, innuendo, or factual

4    contentions presented by the movants that are not borne

5    out by the record evidence presented to this Court.

6              To the record evidence, your Honor, the

7    United States Trustee has no objection to the stipulated

8    facts but for the stipulations 50 through 56.  Stipulating

9    to those proposed facts would provide a back door to the

10   admission of the movants' Exhibits 1 through 4, and 6

11   through 7.

12             THE COURT:  Hold on one second.  Help me

13   with that.  Where is that?  Hold on.  I'm looking at the

14   stipulation.  What paragraphs?

15             MR. WILKES:  Stipulations 50 through 56,

16   your Honor.

17             THE COURT:  All right.  Let me get a sense

18   of what those are.  Hold on.

19             MR. WILKES:  These go to the formation of

20   the committee and the reconstitution of the committee.

21             THE COURT:  All right.  So to the extent

22   that any of those, of the exhibits to which this

23   stipulation refers in those paragraphs, were not sought to

24   be introduced, and were not admitted, then those

25   stipulations will not be considered by the Court.

Page 242

1                    Anyone object to that?

2                    (No verbal response.)

3                    THE COURT:  No one is objecting.  So, got

4      it.  Thank you.

5                    MR. WILKES:  Thank you, your Honor.

6                    For the Court's review under 1102(a)(2), the

7      congressional language is of importance here.  Starting

8      back with 1102(a)(1), Congress specifically spoke of a

9      formation of a committee of creditors holding unsecured

10     claims, and then spoke to the discretionary additional

11     committee of equity security holders and other creditors.

12                   Congress' chief concern in the formation of

13     additional committee appointments is whether it appears

14     that different classes of debt may be treated differently

15     under a plan, and need representation through the

16     appointment of additional committees to represent

17     different classes of debt.

18                   This goes to the cases of Archdiocese of

19     New York, Cedars, and RMS Titanic, which is the movants'

20     Exhibits 8 and 9.

21                   In Cedars, your Honor, the United

22     States Trustee appointed an additional committee of

23     creditors holding second lien and indenture claims.  Those

24     claimants appear to be different classes of debt than

25     creditors holding unsecured claims, even though,

1    your Honor, after lien litigation those claimants may well

2    end up with nothing more than general unsecured claims

3    were a plan confirmed.

4                    Likewise, in RMS Titanic the United

5    States Trustee appointed a committee of equity security

6    holders, a group of creditors Congress specifically

7    identified in discretionary committee formations under

8    both subsections 1102(a)(1) and 1102(a)(2), but here the

9    movants and the segregated committee, that consist of

10   nothing more than general unsecured creditor claims --

11   excuse me, but here the movants and the segregated

12   committee would consist of nothing more than general

13   unsecured claims no matter how the sausage is pressed.

14                    In Archdiocese --

15                    THE COURT:  But when it refers to class,

16   does that mean potential classes within a plan -- a

17   potential plan of reorganization, or does it mean class,

18   in terms of priority of claim, meaning all unsecured

19   creditors are at the same level of priority?

20                    MR. WILKES:  When they speak of class,

21   your Honor, it generally goes to the class permitted under

22   plan formation, though there are certain priority

23   creditors who are prohibited from being -- to being

24   classed, such as the Internal Revenue Service.  So

25   "classes" is a moving target in a sense, but it generally

Page 244

1   goes to the type of classes seen in a plan, not the type

2   of claim you hold.

3           THE COURT:  Understood.

4           MR. WILKES:  The Court has spoke a lot about

5   the Archdiocese of New Orleans.  Let permit -- permit me

6   to give you a little bit more on Archdiocese.

7           The United States Trustee removed a member

8   of the official committee in Archdiocese on October 8,

9   2020.  That's --

10          THE COURT:  TMI Trust.

11          MR. WILKES:  Correct.

12          Roughly 20 days later, the motion to appoint

13  -- for the Court to direct the appointment of a second

14  committee was filed on October the 28th, 2020.  The United

15  States Trustee -- it's unclear by Archdiocese of New

16  Orleans, whether the United States Trustee considered

17  reconstituting the committee, or considered appointing a

18  second committee, because the motion was primed before the

19  Court at that time.

20          But what's interesting out of Archdiocese is

21  that the United States Trustee removed the member of the

22  committee, not that committee members voluntarily

23  resigned.

24          Here, in response to requests by creditors

25  holding unsecured claims, the United States Trustee

Page 245

1    reconstituted the committee from seven members to eleven

2    members, bringing all types of creditors holding unsecured

3    claims to the committee table.

4                    As an example, in this case, your Honor, the

5    official committee is composed of second lien claimants,

6    trade creditors, litigation creditors, consumer class

7    action, settlement agreement creditors, and even

8    competitors, at least until certain members resigned.

9                    Congress knew how to speak about unsecured

10   creditors, and elected not to use that language when it

11   was speaking of appointing discretionary committees under

12   both 1102(a)(1), as well as 1102(a)(2).  That is because

13   general unsecured creditors do not present any different

14   classes of debt, which was the, which was the chief

15   concern of Congress in committee formation.

16                   THE COURT:  But you would agree with me,

17   though, that in the Archdiocese case, the abuse victims'

18   claims are unsecured creditors, just as the trade creditor

19   claims are, right?

20                   MR. WILKES:  That is correct, but as

21   Mr. Cohen alerted the Court, there is a distinction.  The

22   trade creditors --

23                   THE COURT:  There is a distinction, but my

24   -- I just want to make sure you're not arguing that

25   1102(a), by not -- (a)(2), by not including the term

Page 246

1   "unsecured creditors", you're not arguing that it,

2   therefore, prohibits a second unsecured creditor

3   committee, are you?

4                 MR. WILKES:  No.

5                 THE COURT:  Okay.

6                 MR. WILKES:  The United States Trustee is

7   not arguing that specific statement.  The United States

8   Trustee is enlightening the issue that Congress identified

9   other additional creditors, and also gave an identifier

10  of, such as, equity security holders.

11                Like Mr. Cohen stated, the tort claimants in

12  Archdiocese, and in Boy Scouts, and other cases, are

13  specifically unique from general unsecured creditors, in

14  that this Court doesn't have full jurisdiction to

15  adjudicate their rights and interests.

16                Here, the movants do not stand in that same

17  unique posture as a tort claimant.  They stand in the

18  posture of -- in light of several of these, as Mr. Cohen

19  stated, these aren't tort claims, these are business

20  failure claims.  There was an agreement, there was a

21  breach of that agreement, and there was litigation.  There

22  was an extension, there was a failure to comply, and there

23  was litigation.

24                Here Congress intended a heightened burden

25  in 1102(a)(2) to be necessary to assure adequate

Page 247

1    representation.  That is a different discretionary

2    standard than what is seen by Congress in 1102(a)(1)'s

3    language using "deems appropriate".

4                    The Code does not define the word

5    "necessary".  Websters defines "necessary" to mean

6    absolutely needed or inescapable.  Changing that word,

7    this Court must then determine whether a segregated

8    committee of creditors holding general unsecured claims is

9    inescapable in this case.

10                   There is no separate classification afforded

11   to these movants under statute or public policy, and

12   further, these movants cannot demonstrate which creditors

13   holding unsecured claims would be segregated into their

14   own separate but equal committee of creditors holding

15   unsecured claims.

16                   As the debtor's counsel stated, this isn't

17   -- this wouldn't result in one unsecured creditors'

18   committee, this would result in two unsecured creditors'

19   committees arguing different points -- different sides of

20   the same point against both Truist, the debtors, and any

21   other party in interest that they determine needed to be

22   litigated.

23                   These movants are asking this Court to

24   legally condone segregation of creditors that hold

25   unsecured claims that they cannot even define.  The

1  movants have presented no evidence establishing

2  segregation constitutes equal protection under the law to

3  them or to the general unsecured creditor class.

4            The constituents of the official committee

5  is made up of all types of unsecured claims, and the

6  movants have presented no evidence that the committee has

7  not assured them adequate representation of all creditors

8  holding unsecured claims.

9            THE COURT:  Mr. Wilkes, let me ask you a

10  question.  Two members --

11            MR. WILKES:  Yes, your Honor.

12            THE COURT:  -- of the committee resigned.

13  What happens, at the United States Trustee's level, with

14  respect to those vacancies?

15            MR. WILKES:  With respect to those

16  vacancies, normally the United States Trustee will confer

17  with the parties in interest and determine whether or not

18  to add additional members --

19            THE COURT:  You mean fill the vacancy?

20            MR. WILKES:  -- to the official committee --

21            THE COURT:  You would just fill the

22  vacancies?

23            MR. WILKES:  -- to fill the vacancies,

24  your Honor.

25            THE COURT:  Okay.

1            MR. WILKES:  That has not occurred here due

2   to the litigation posture under 1102 at this present

3   stage.

4            Unlike Archdiocese, your Honor, the United

5   States Trustee has not removed any appointed member to the

6   official committee.  Certain parties have decided --

7            THE COURT:  Let me ask you a follow-up

8   question.

9            MR. WILKES:  Yes, your Honor.

10            THE COURT:  Is it your view that the Court

11   may not order the United States Trustee's Office to fill

12   those vacancies with the type of creditor argued by

13   Monster, or the movants, that is underrepresented or not

14   represented in that committee?

15            MR. WILKES:  In 1986, after standing up the

16   United States Trustee program, Congress specifically

17   amended 1102 to remove the Court's jurisdiction to order

18   the appointment of a member or to change the size of the

19   membership.

20            THE COURT:  I'm not asking that.  I wouldn't

21   order you to appoint a specific creditor.  Rather, do you

22   feel that it's within the Court's power to order the

23   United States Trustee's Office to fill the two vacancies

24   with creditors with certain types of claims?

25            And I'm only asking because -- and I'm not

Page 250

1    suggestion -- my question should not suggest that I am

2    determining that the present makeup of the committee

3    affords inadequate representation.

4              I'm simply asking from a procedural

5    perspective, and jurisdictionally, actually, what the

6    U.S. Trustee's perspective is on what 1102 allows the

7    Court to do.

8              MR. WILKES:  As to the type of members,

9    1102(a)(4) provides that the Court may order the United

10   States Trustee to enlarge the membership to include a

11   small business concern.  Beyond that --

12             THE COURT:  But what about filling the

13   vacancies with certain types of records?

14             MR. WILKES:  There again, with the -- with

15   the Congress 1986 amendment to 1102, the jurisdiction, or

16   the administrative function of committee formation, and

17   who can sit on the committee, is one that is left to the

18   United States Trustee, that's evidenced by 1102(a)(2),

19   which is what is before us today, it's not -- Congress

20   does not provide that the Court can direct the appointment

21   of certain members to the second committee if this Court

22   determines that a second committee is --

23             THE COURT:  That's not my question.  I

24   understand that.

25             So let me ask one other follow-up question,

Page 251

1   what is the U.S. Trustee's Office intent with respect to

2   the vacancies that currently exist going forward?

3                    MR. WILKES:  After this litigation is

4   resolved, the United States Trustee's intent, as with any

5   vacancy on any committee, would be to reach out to the

6   constituencies and see whether an additional member needs

7   to be recon -- if the committee needs to be reconstituted

8   to fill those vacancies, or if the committee is still in a

9   position to adequately represent the creditors holding

10  unsecured claims, and because this --

11                   THE COURT:  And was this --

12                   MR. WILKES:  -- litigation is ongoing

13  presently, that conversation with the constituencies have

14  not occurred.

15                   THE COURT:  I understand, and was this

16  committee reconstituted by the United States Trustee's

17  Office in order to provide broader representation of the

18  unsecured creditors, namely the litigation claimants, as

19  they've been described?

20                   I mean, I understood that from your papers.

21                   MR. WILKES:  The United States Trustee --

22                   THE COURT:  I thought that from the papers.

23                   MR. WILKES:  Right.

24                   THE COURT:  So, I'm just asking you to

25  confirm that.

1              MR. WILKES:  Understood, your Honor.

2              The United States Trustee took in the

3    information that was provided by certain creditors who had

4    contacted the United States Trustee, and made the decision

5    to reconstitute the committee in light of the statements

6    made by those, and in review of the overall case at the

7    time.

8              THE COURT:  Okay.  All right.  Continue, I'm

9    sorry.

10             MR. WILKES:  That's okay, your Honor.

11             By the voluntary resignation of the -- from

12   the official committee, if that is condoned by this Court,

13   to garner a foundational position for a second committee,

14   this will form a slippery slope for any committee member

15   dissatisfied with being a fiduciary for all creditors

16   holding unsecured claims, to whether they could simply

17   resign from the official committee, and ask to be -- ask

18   for a segregated committee to be formed.

19             That is present in this case, your Honor,

20   where two similarly situated movants, although one of them

21   is not a movant, resigned from the committee after

22   reconstitution.

23             Segregating creditors holding unsecured

24   claims will have a detrimental effect not only upon the

25   estate as a whole, but it will also have a detrimental

Page 253

1     effect on all creditors holding unsecured claims.

2                    The impact of segregation is greater when it

3     is sanctioned by the United States Trustee, or by the

4     Court, which is why we got into the discussion as to how

5     the Archdiocese second committee of tort victims is

6     different.

7                    Segregation under sanction of law deprives

8     all general unsecured creditors of the benefits that they

9     would have received had they been part of a fully

10    integrated official committee.

11                   The United States Trustee provided a fully

12    integrated official committee when she reconstituted the

13    official committee on November the 23rd, 2022, and in

14    response to a statement made by -- give me one second,

15    your Honor, my apologies.

16                   In response to a statement made by Orange

17    Bang in support of a second committee, the purpose of the

18    second committee is to force a consensus among creditors,

19    but that's not really a complete statement in this case

20    because the second committee of general unsecured

21    creditors would be a set of creditors who no longer want

22    to hold a fiduciary duty to creditors holding general

23    unsecured claims, and they do not want the official

24    committee to have any fiduciary obligation unto them.

25    This, again, turns the fiduciary law on its head.

1                 And with that, your Honor, the United

2       States Trustee would recommend against exercising the

3       Court's discretion, and enter an order denying the motion,

4       and not requiring the United States Trustee to appoint a

5       second committee of creditors holding unsecured claims.

6                 Thank you.

7                 THE COURT:  Thank you, Mr. Wilkes.

8                 All right.  So I want to hear from,

9       certainly lender's counsel.  Let me make sure I

10      understand, though, isn't there an exhibit that's hanging

11      out there that we haven't resolved?

12                MR. PACHULSKI:  Exhibit 13, I believe,

13      your Honor.

14                THE COURT:  And what was that exhibit?

15                MR. PACHULSKI:  The Kathy Cole resignation

16      letter, I believe, is outstanding, and I think there was

17      also one exhibit, which was part of -- was a subset of

18      Exhibit 5.

19                THE COURT:  Which is one of the emails with

20      the United States Trustee.

21                MR. PACHULSKI:  The email from the

22      U.S. Trustee to, I don't know if all the movants, or a

23      subset of the movants, clearly to Mr. Falconer, in which

24      they stated their inclination was to appoint second

25      committee.

1           THE COURT:  Ah, okay, so, I'm going to admit

2    the inclination email for whatever -- it's not hearsay,

3    because it was shared with a number of people, and no one

4    is contesting the fact that that happened.  It doesn't get

5    into -- does the email get into any reasoning as to why

6    that inclination existed?

7           MR. PACHULSKI:  No.  In terms of --

8           THE COURT:  An explanation in the email

9    itself?

10          MR. PACHULSKI:  No, it just states that --

11   my recollection is it states that -- it was very shortly

12   after receiving a letter, which was Exhibit 4, and it

13   basically stated that the U.S. Trustee was inclined to

14   appoint second committee, and that they would contact the

15   group by phone the next day.

16          THE COURT:  All right.

17          MR. PACHULSKI:  That's all it says.

18          THE COURT:  So because it's a relevance

19   objection, I'm going to allow it, I'm going to admit it,

20   and just -- and I would give it the weight that the Court

21   believes that is appropriate.

22          (Thereupon, Exhibit 4 was admitted into

23      evidence.)

24          THE COURT:  And the other exhibit was,

25   again, Exhibit 13, which was what?

1          MR. PACHULSKI:  It was the resignation

2    letter, and it was not admitted for the truth, in terms of

3    hearsay.  It was based on -- their objection was also

4    relevance, and the view was, in terms of the motive of the

5    movants, which has been put in play, that their concern

6    about management, and potential breaches of fiduciary duty

7    is an additional reason that they believe that a --

8          THE COURT:  A second committee would be

9    beneficial?

10         MR. PACHULSKI:  Correct, your Honor.

11         THE COURT:  All right.  So I'm finding that

12   that exhibit is not relevant, and the reason I'm finding

13   that is only because the fact of the resignation is known

14   to everyone in the courtroom, and it is an out of court

15   statement, to the extent the truth of the reason why the

16   resignation occurred happened, that would be hearsay, and

17   so without that witness here to be asked questions about

18   why she resigned, it seems to me inappropriate to admit

19   that document.

20         But the Court understands the arguments

21   associated with the fact that there is a corporate

22   governance issue, perhaps exacerbated, or evidenced by the

23   fact of the resignation, but where that will play into the

24   ultimate resolution of this matter, I'm not quite sure

25   still about the relevance, but I'm not going to admit that

1    document.  All right.

2                    MR. LLUBERAS:  Your Honor.  Thank you.  Luis

3    Lluberas, L-l-u-b-e-r-a-s, on behalf of Truist Bank, who

4    is the administrative agent for both the prepetition and

5    postpetition credit facilities.

6                    THE COURT:  Thank you, Mr. Lluberas.

7                    MR. LLUBERAS:  Thank you, sir.

8                    Your Honor, I'm just up here to make sure

9    that we're not accused of not prosecuting our objection.

10   Your Honor has had a long day, hearing from everyone in

11   this courtroom, and I think the easiest way to summarize

12   Truist Bank's position is "what they said", and by "they"

13   I mean the committee, the debtors, and the U.S. Trustee as

14   well.

15                   As your Honor would have seen from our

16   pleading, we're very focused on one topic, that's near and

17   dear to our constituency's heart, and that is the funding

18   of this case, whether it's through new postpetition

19   financing dollars, which we hope to resolve as the update

20   you heard today, we'll be working in earnest on that, or

21   the use of the cash collateral, which the prepetition

22   agent has a lien on substantially all assets, including

23   cash collateral.

24                   So our objection was very much focused on

25   the fact that the granting of this request is going to

Page 258

1    impose a significant material burden on the estate.

2                    There has been a lot of assumptions and

3    speculation from the movants as to reasons why to do it,

4    or what could happen or, you know, help us now before it

5    gets too bad, but none of that had evidence, or very

6    little of that had evidence, but there is a little bit of

7    irony, in that there is certainty in a few respects in

8    what we heard today.  The first is, at a baseline level,

9    the appointment of a second committee absolutely increases

10   the cost to the estate.  The movants have admitted that

11   there would be at least national and local counsel,

12   financial advisor, and most likely an investment banker to

13   duplicate the work of the existing committee.

14                   And dove-detailed to that, I think,

15   your Honor, the best evidence of that unnecessary

16   duplication is the one substantive set of pleadings that

17   has been before your Honor, apart from this motion and the

18   objection, and that is the very critical point of

19   postpetition financing, and the record is very clear,

20   your Honor has seen the pleadings, that the cogent, and

21   ultimately persuasive in certain respects, objections of

22   the committee that have resulted in the debtors and the

23   lenders trying to find consensus in this case, and getting

24   to an amended DIP facility that we will put before

25   your Honor in early 2023, I hope, the same objections,

1    substantive objections that were raised by the committee

2    were raised by the movants.  It's almost unitary in their

3    argument, and thankfully the Court -- excuse me, the

4    estate doesn't have to expend double the burden in terms

5    of having those same arguments.

6              As your Honor will hear on January 10th, is

7    there is going to be a specific budget.  Ideally we have

8    the full $100 million DIP financing available to the

9    debtors.  The debtors will provide a budget that will show

10   the forecast of this case to get to conclusion, and what

11   your Honor will see, and I'm happy to represent at this

12   point, is that effectively every nickel in that budget is

13   already spoken for, without having a second committee, and

14   there is a significant burden that would not be -- a

15   monetary burden that really there is just, there is just

16   no room for it at this point.

17             The movants can continue to coordinate, as

18   they have, and rather than fee shift to the estate, they

19   certainly can pick and choose their battles in which they

20   maybe add something extra for which under 503(b) they may

21   be entitled to substantial contribution, and pick their

22   battles accordingly, rather than put a set sum on the

23   estate.

24             Your Honor, it was interesting to hear

25   your Honor inquire of the U.S. Trustee about whether there

1    is a consensual way to resolve the dispute.

2                    THE COURT:  Is that what I was doing?

3                    MR. LLUBERAS:  Well, I think your Honor was

4    asking the question that I have, which is, you know,

5    ultimately there are two open seats, and there are clearly

6    several movants that desire to have their voice heard.  So

7    hopefully there is an opportunity for those movants to

8    perhaps find their way on the existing committee, and

9    rather than add to a significant burden on the estate by

10   having a separate committee that may be at odds with the

11   existing committee, that there would be consensus within

12   the four walls of the committee room, the virtual

13   committee room, and coming out of that there would be one

14   unitary voice that would be able to shift alliances with

15   the debtors and the lenders as needed, depending on the

16   topics as they come up.

17                   So, thank you, your Honor, for listening to

18   all of us today, and I appreciate your Honor taking an

19   opportunity to let me just articulate very briefly our

20   concerns about costs.

21                   THE COURT:  My pleasure, Mr. Lluberas.

22   Thank you for your thoughts.

23                   All right.  I suppose that this side of the

24   room is resting, fair statement?

25                   (No verbal response.)

Page 261

```
 1                    THE COURT:  Okay.  So now this side of the
 2      room.  Anything further in reply, rebuttal?
 3                    MR. PACHULSKI:  Yes, your Honor, if I may.
 4                    THE COURT:  Sure.
 5                    MR. PACHULSKI:  Thank you, your Honor.
 6                    THE COURT:  Anybody want to take a break?
 7      Are we all good to go?
 8                    MR. PACHULSKI:  That's -- whatever
 9      your Honor would like to do, we'll -- we have a lot of
10      information.  I'm going to do the best I can to go through
11      it.
12                    THE COURT:  All right, and what do you think
13      your timing is?
14                    MR. PACHULSKI:  In terms of how long?
15                    THE COURT:  Uh-huh.
16                    MR. PACHULSKI:  Well, your Honor, one of the
17      issues, if your Honor recalls, I said I'll dispense with
18      the Winn Dixie and related issues, but based on the fact
19      of what the debtor decided to do, I at least have to go
20      through those factors and respond to some of them.
21                    THE COURT:  Is there anything beyond what's
22      in your papers?
23                    MR. PACHULSKI:  I think specifically it's a
24      combination of dealing with In Re:  Budd and Winn Dixie,
25      your Honor, and I think explaining it --
```

Page 262

1                    THE COURT:  All right.

2                    MR. PACHULSKI:  -- would be helpful.

3                    THE COURT:  Okay.

4                    MR. PACHULSKI:  And if you'd like I'm

5      happy to --

6                    THE COURT:  How much time do you think you

7      need?

8                    MR. PACHULSKI:  I'm hoping to get it done

9      within 30 minutes.

10                   THE COURT:  Within 30 minutes, the whole

11     argument, the whole --

12                   MR. PACHULSKI:  The whole thing, your Honor.

13                   THE COURT:  Okay.  All right.

14                   MR. PACHULSKI:  I mean, I'm going to do my

15     best.

16                   THE COURT:  So let's do this, let's take

17     five minutes, which equates to about seven and a half to

18     ten minutes in lawyer time, and we'll be back.

19                   (Thereupon, a recess was had, after which

20     the following proceedings were had:)

21                   THE COURT:  (Recording started) -- critical,

22     so -- or maybe they are, but I've denied it, so it doesn't

23     matter at that point.  So, that's my plan.

24                   If you are all nice to me and we don't have

25     to get together tomorrow, which it seems like we won't,

Page 263

1    right, then I can work on this tomorrow.  So, there you

2    go.

3                  MR. PACHULSKI:  So, your Honor, I want to

4    start based on, I try to read the room, I've done this

5    long enough, and there is an issue where you think, well,

6    maybe the U.S. Trustee could just reconstitute and --

7                  THE COURT:  No, no, no, no.

8                  MR. PACHULSKI:  Well, maybe --

9                  THE COURT:  I'm really not.  I threw that --

10   I asked those questions because I truly did not know what

11   the process was at that point, and I actually have a

12   concern that if two folks resigned, that that resignation

13   may make this committee, as reconstituted, arguably not

14   representative, or adequately representative, but I'm not

15   concluding that and, you know, I just wanted to make sure

16   that there was certainly the option for the U.S. Trustee

17   to do that, and that if that happens, it happens.  If it

18   doesn't, then I suppose I'll hear from people if they

19   don't like that fact.

20                  MR. PACHULSKI:  I appreciate that,

21   your Honor.

22                  THE COURT:  If I deny the motion.

23                  MR. PACHULSKI:  Yes, of course, I get it.

24                  I'm not going to go through all the colored

25   provisions of the presentation, but I think there is a

1   part that's very important here, and it shows why there

2   is, let's just say a serious concern with how the

3   committee was initially formed, and how it was actually

4   reconstituted, and not just the process, but exactly how

5   it was done initially, and then the reconstitution.

6               So, number one, one of the members of the

7   committee is no longer there, because instead of putting a

8   Monster, and Orange Bang, and ABC, any of the others, they

9   decided to put a creditor on that was a critical vendor.

10  So one of the seven is gone of the original seven, and

11  that's reflected in the paperwork in the presentation

12  which says, voluntarily resigned from committee upon or

13  after reconstitution, but our understanding is they were a

14  critical vendor, about $464,000.  So somehow that claimant

15  was going to look out for the interests of all the

16  creditors, which again, they looked out for their own

17  interests, and good for them, they got paid.

18              The second, which is even more distributing,

19  okay --

20              THE COURT:  But so now it's --

21              MR. PACHULSKI:  Now it's --

22              THE COURT:  There are eight members of the

23  committee, the six and the two.

24              MR. PACHULSKI:  It's the six and the two, I

25  guess.  It's the six and the two.

Page 265

```
 1                    THE COURT:  Is that -- does anybody disagree
 2   with that, that that's the -- Mr. Cohen, you would know.
 3                    MR. COHEN:  That's right, your Honor, they
 4   resigned last week.
 5                    THE COURT:  Okay.  So, it's six and two, and
 6   is --
 7                    MR. COHEN:  Well, it's eight.
 8                    THE COURT:  It's eight.
 9                    MR. COHEN:  Yes.
10                    THE COURT:  I'm just going by what -- you're
11   blue and you're green, but that's a vacant position that
12   can be filled?
13                    MR. COHEN:  Correct, they initially directly
14   notified the U.S. Trustee's Office, and the U.S. Trustee
15   advised us.
16                    THE COURT:  Okay.
17                    MR. COHEN:  So the U.S. Trustee is aware.
18                    THE COURT:  I understand.  All right.  So
19   you get 30 seconds extra, go ahead.
20                    MR. PACHULSKI:  But that wasn't the -- it's
21   okay, your Honor, whatever.
22                    The other thing that is most disturbing
23   is --
24                    THE COURT:  Well, why is it disturbing that
25   they withdrew?  I mean, they --
```

Page 266

1               MR. PACHULSKI:  No, no, that's not.  The
2       next part is.

3               THE COURT:  Oh, okay.

4               MR. PACHULSKI:  Okay.  The part that's most
5       disturbing is the U.S. Trustee, who evaded your question
6       about, what did you think about, it was just, we did it,
7       number one, did not contact any of the parties why they
8       weren't going to form a second committee, but that's their
9       prerogative, or whether those parties would sit, because
10      when I provide a solicitation form, that means for the
11      committee.  At this point if you want to solicit because
12      you're going to reconstitute after things have taken
13      place, that's a different ball game, which --

14              THE COURT:  Meaning, meaning there should
15      have been a re-solicitation?

16              MR. PACHULSKI:  There either should have
17      been a re-solicitation, or at least contacting those
18      parties if they were interested, but instead --

19              THE COURT:  Why is that important?  And if
20      they provided an initial interest, why should the
21      U.S. Trustee's Office assume that they no longer have an
22      interest?

23              MR. PACHULSKI:  Because it's fairly common
24      that --

25              THE COURT:  Why does it matter about

Page 267

1    adequate representation today?

2                    MR. PACHULSKI:  Okay.  It doesn't, but let

3    me get to the part that does --

4                    THE COURT:  Okay.

5                    MR. PACHULSKI:  -- clearly relate to

6    adequate representation.

7                    I can tell you on behalf of Monster, every

8    one else has to speak for themselves, that a lot has been

9    made in the dollars of $688 million, okay, the proof of

10   claim amounts.

11                   The claim representative, there are some

12   facts you should know on $401 million, okay.  Number one,

13   the class has not been certified.  Number two, there was a

14   motion to strike the class allegations on July 20th by the

15   debtor.  The complaint is almost a mirror of the Monster

16   complaint, but for customers.  The class representative

17   that theoretically will be negotiating on the litigation

18   claimants' behalf has a claim, from what we could gather,

19   of $8.99.

20                   In my career I have not --

21                   THE COURT:  I can't -- that's not a fact.  I

22   don't know that.

23                   MR. PACHULSKI:  But --

24                   THE COURT:  I don't --

25                   MR. PACHULSKI:  Well, you do.

Page 268

1          THE COURT:  But I don't, I have a

2    $401 million claim that's been filed, that's a fact.

3          MR. PACHULSKI:  Not, but if you looked at

4    the complaint, if you looked at the proof of claim,

5    your Honor --

6          THE COURT:  It's not before me.

7          MR. PACHULSKI:  No, it is.

8          THE COURT:  Well, the proof of claim is

9    but --

10          MR. PACHULSKI:  It's part --

11          THE COURT:  -- not the complaint.

12          MR. PACHULSKI:  No, no.

13          THE COURT:  Is the complaint there?

14          MR. PACHULSKI:  No, I think they attached

15    it.

16          THE COURT:  Is it attached?  Okay.

17          MR. PACHULSKI:  Yes, it's attached,

18    your Honor.

19          THE COURT:  All right, and what does it say?

20          MR. PACHULSKI:  The fact of the matter is,

21    they are not certified, and the claimant says he bought a

22    can of the product in Missouri.  I know that only because

23    I looked at the exhibit to the --

24          THE COURT:  Well, he bought a can of the

25    product in Missouri, but he represents a class of

1    theoretically millions of people that bought the same

2    thing.

3                    MR. PACHULSKI:  He doesn't, it's not

4    certified.

5                    THE COURT:  I know it's not certified.

6                    MR. PACHULSKI:  But, your Honor,

7    realistically --

8                    THE COURT:  So, hold on, let's play this

9    out.

10                   Your point is that that proof of claim does

11   not represent a valid claim and, therefore, that person is

12   likely not to remain on the committee --

13                   MR. PACHULSKI:  That's --

14                   THE COURT:  -- and, therefore, is likely

15   going to need to be replaced, if he's replaced at all, he

16   or she, or is your point something else?

17                   MR. PACHULSKI:  It is something else,

18   your Honor.

19                   THE COURT:  What is it?

20                   MR. PACHULSKI:  If you put on nine

21   litigation claimants that had claims of $8.99, we --

22   Monster and the other movants are not likely to rely on

23   their judgment in making -- in being a negotiation among

24   the parties.

25                   The people who are brought into cases,

Page 270

1    your Honor, and are put on committees should have a real

2    interest in what is happening, and an $8.99 creditor, who

3    has not been certified, where the matter has been stayed

4    because of the bankruptcy, is not a legitimate member of a

5    committee, it's that simple.

6               And the U.S. Trustee, rather than try to

7    work with people -- now, we also made it clear on a call

8    on November 18th, we wanted a second committee, we did not

9    want it reconstituted.

10              Your Honor may be correct, that maybe you

11   don't have to re-solicit, but if the parties on that call,

12   when he says -- when the U.S. Trustee says, are you

13   willing to have it reconstituted, and the answer is no,

14   based on the committee you have formed, I do believe you

15   need to go back to the parties and say, do you still want

16   to sit on the committee, because we told you we didn't.  I

17   just, I don't -- so I can just make you sit and now

18   everyone is arguing that --

19              THE COURT:  Well, nobody can make you sit,

20   but the reconstitution of the committee, from my

21   understanding what Mr. Wilkes is arguing, created four

22   additional spots.

23              MR. PACHULSKI:  If two of them say we don't

24   want to reconstitute a committee, we want a second

25   committee, you don't just put them on and say we put them

1   on because they originally solicited, and so we --

2                   MR. WILKES:  Objection, your Honor.

3                   MR. PACHULSKI:  So it continues forever.  It

4   just --

5                   THE COURT:  All right.  Mr. Wilkes, just

6   hold your thoughts.

7                   MR. PACHULSKI:  I don't understand --

8                   MR. WILKES:  Thank you.

9                   MR. PACHULSKI:  -- how that happens,

10  your Honor.

11                  So, I solicit -- I put a solicitation form.

12  You pick a committee of seven that we think is not

13  representative.  We ask for a second committee.  We tell

14  you we don't want a reconstituted committee, but a second

15  committee, and you don't make a telephone call to figure

16  out if those people want to sit, and then in court you

17  argue that it shows they don't want to comply with

18  fiduciary duties, that's what Mr. Wilkes said.

19                  THE COURT:  Okay.  I understand.

20                  MR. PACHULSKI:  Now, the other thing I want

21  to point out, your Honor, because you asked the question,

22  I'm not sure it's also dispositive, but it's a very fair

23  question, which is show me some cases.

24                  Okay.  There are no cases on these facts.

25  The closest you're going to get is one, which is the New

```
1     Orleans case.  If you look at the --
2                    THE COURT:  We have raging agreement on that
3     point.
4                    MR. PACHULSKI:  Okay.
5                    THE COURT:  That's good.
6                    MR. PACHULSKI:  If you have 18 cases that
7     say you're not on the committee, that we're not going to
8     form committees, and you look at the underlying facts,
9     none of them are even remotely similar to this case.  The
10    closest is Dana Corp., which had asbestos claimants, which
11    had -- was 3 percent under the case.  So --
12                   THE COURT:  3 percent of the total claims
13    were asbestos --
14                   MR. PACHULSKI:  Total claims --
15                   THE COURT:  -- claims?
16                   MR. PACHULSKI:  -- in the case, was Dana
17    Corp.
18                   Now, here is the interesting fact,
19    your Honor, that nobody has cited, and I've had to look at
20    the case again.  TMI was on the committee.  There is no
21    information in the decision, the judge said, I'll look at
22    the circumstances another day.  Like TMI, got off the
23    committee, it's not that they were kicked off, as far as I
24    could tell from the decision, it's not even that they
25    stepped down, but they were just gone, there was a notice
```

1   of reconstitution, and then they filed a motion for a

2   second committee.  It's exactly --

3                  THE COURT:  TMI did, or the --

4                  MR. PACHULSKI:  TMI did.

5                  THE COURT:  -- trade creditors?

6                  TMI did.

7                  MR. PACHULSKI:  TMI did.

8                  THE COURT:  Okay.

9                  MR. PACHULSKI:  TMI steps off, I have no

10  information why they stepped off.

11                  THE COURT:  Well, so you're saying that it

12  parallels this case because there was a voluntarily --

13  voluntary -- well, maybe voluntary, maybe they were

14  removed, but the fact is they were no longer on the

15  committee, and then that same party asked for a second

16  committee, which is similar --

17                  MR. PACHULSKI:  The same party asked for a

18  second committee --

19                  THE COURT:  -- to what we have here.

20                  MR. PACHULSKI:  -- and if they were removed,

21  which seems odd, I would find it hard to believe the judge

22  wouldn't have had a concern about that issue, but it

23  doesn't matter, it's not what happened.  It's, they

24  stepped off -- and by the way, the decision is very clear,

25  your Honor, that the committee had no disagreements.

1              THE COURT:  What do you mean "the committee

2   had no disagreements"?

3              MR. PACHULSKI:  The committee, with TMI,

4   when TMI was on it, had no disagreements other than TMI

5   had to abstain from its settlement, which the committee

6   objected to, because there was a specific settlement with

7   respect to TMI.

8              THE COURT:  So the point being what, isn't

9   that -- because one could interpret that --

10             MR. PACHULSKI:  No, no.

11             THE COURT:  -- as suggesting that it works

12  fine to have very different constituencies on the same

13  committee.

14             MR. PACHULSKI:  No, the argument has been,

15  well, maybe you need to do if you just cannot agree at

16  all.

17             TMI was on a committee that seemed to get

18  along.  TMI stepped off that committee.  TMI files a

19  motion for a second committee, and the court, rather than

20  saying, well, you stepped off and now you want me to form

21  a new committee, as compared to ABC and Warner, who said,

22  I'm not really interested in this.  They affirmatively sat

23  on it, got off the committee.

24             THE COURT:  So your point is that the Court

25  should not place too much emphasis on the notion that ABC,

1  having resigned, and then to ask for a second committee,

2  you know, isn't dispositive of the issue, and --

3              MR. PACHULSKI:  Well, it's more significant

4  than that, your Honor, because the other side is almost

5  saying ABC should be treated almost as if they're on the

6  committee, even though they're not, for purposes of

7  determining adequate representation, and the fact is they

8  cannot be considered for purposes of adequate

9  representation because the judge certainly didn't do it in

10  New Orleans.

11              THE COURT:  I see.

12              MR. PACHULSKI:  It's very different, because

13  the issue --

14              THE COURT:  But if you look at only the

15  eight creditors that are currently on the committee, which

16  is what the Court is -- you're saying what the Court --

17              MR. PACHULSKI:  Correct.

18              THE COURT:  -- should do.

19              The question then becomes whether those

20  eight creditors provide adequate representation.

21              MR. PACHULSKI:  Of which the evidence is

22  that all of them were trade, other than the claims

23  representative, because Warner is now off this committee,

24  and the claim representative has a claim that is

25  uncertified for $8.99, and that, we believe, is not a

1   representative committee, your Honor.  We're not convinced

2   -- we don't -- I know it doesn't matter, your Honor, and

3   there is just a --

4               THE COURT:  What about Pepsi?

5               MR. PACHULSKI:  Well, Pepsi had an

6   agreement, and they're one creditor, and I have tremendous

7   respect for Pepsi.

8               THE COURT:  Do you view them in your victim

9   category or not?

10              MR. PACHULSKI:  Your Honor, they apparently

11  had a distribution agreement that was breached, I think a

12  $115 million claim.  It looks more like a -- it straddles

13  the line, frankly.

14              THE COURT:  It certainly required

15  litigation.

16              MR. PACHULSKI:  Well, I think they settled

17  it without litigation.

18              THE COURT:  They ended up with a judgment.

19  Huh?

20              MR. PACHULSKI:  I think they settled without

21  litigation, but I could be wrong.

22              THE COURT:  Okay.  They may have settled

23  without litigation, but does it fall within the type of

24  behavior by this debtor that you view victimized a

25  creditor?

```
1                    MR. PACHULSKI:  I think they're -- I'm not
2    going to deny that what happened to Pepsi, they were
3    victimized, but it could have just been an overriding
4    dispute between the two, that I don't know.  I know what
5    the case -- because, again, the proof of claim only says
6    so much.  So I can only learn so much from that.
7                    THE COURT:  Well, is it fair to say, though,
8    that Pepsi is -- because they don't have an ongoing
9    business relationship with this debtor, is that true?
10                   MR. PACHULSKI:  My understanding is they do
11   not -- well, I believe they are evolving out of that
12   relationship.  That was --
13                   THE COURT:  Okay.
14                   MR. PACHULSKI:  -- I think, part of the
15   agreement.
16                   THE COURT:  But the goal, the ultimate
17   result will be --
18                   MR. PACHULSKI:  Yes.
19                   THE COURT:  -- that they are no longer --
20                   MR. PACHULSKI:  Correct.
21                   THE COURT:  -- distributing for this debtor?
22                   MR. PACHULSKI:  Correct.
23                   THE COURT:  So, therefore, they just want
24   money --
25                   MR. PACHULSKI:  They just want --
```

1            THE COURT:  -- theoretically.

2            MR. PACHULSKI:  Right, we have --

3            THE COURT:  Just as Monster may just want

4   money, or other similarly situated litigation claimants

5   may just want money, as opposed to -- and however best to

6   get that money, whether it means the debtor continues to

7   operate or not, is less the issue than it is the amount

8   and when it's going to get paid?

9            MR. PACHULSKI:  To have one significant

10  creditor out of eight that, frankly, we think should be on

11  a second committee, and they were ones that we had

12  proposed to be on a second committee, so I want to be

13  transparent with your Honor about that.

14            And because we thought based on the size of

15  their claim, that they being on this committee alone was

16  not going to work, that it was not going to give the

17  comfort to the Monsters, and the Orange Bangs, and the

18  ABCs, and the Warners, et cetera, that we think they

19  deserve based on the size of the claim --

20            THE COURT:  Okay.

21            MR. PACHULSKI:  -- okay?

22            THE COURT:  Yep.

23            MR. PACHULSKI:  Now, your Honor, a lot has

24  been said about, you know, extraordinary, this, that and

25  the other thing.  It is rare, we can always define it, but

Page 279

```
 1    we believe that even in the Enron case that was cited in
 2    the debtors' presentation, makes it clear it's de novo,
 3    you basically have to decide, is this the kind of
 4    committee that you think is representative.
 5                   THE COURT:  Thanks a lot.
 6                   MR. PACHULSKI:  Well, your Honor, that's --
 7                   THE COURT:  No, I'm kidding, it's all good.
 8                   MR. PACHULSKI:  So I want to quickly go
 9    through, until you tell me I'm done --
10                   THE COURT:  The clock is going to tell you
11    you're done, but go ahead.
12                   MR. PACHULSKI:  Yes, the clock will tell me
13    -- is the various factors that have been cited by the
14    debtor in In Re:  Budd, by the decision in Winn Dixie,
15    some of them don't apply easily.  We know what happened in
16    Winn Dixie, it was a plan participant that had a very
17    unique situation.  So, the criteria are more important
18    than the facts of that case, to be frank.
19                   THE COURT:  Right, okay, I don't disagree
20    with that.
21                   MR. PACHULSKI:  Okay.  So in terms of the
22    nature of the case, the first issue there --
23                   THE COURT:  They're factors, and they're
24    nonexclusive factors.
25                   MR. PACHULSKI:  Correct, and you're right,
```

Page 280

1       it says it's totally case by case.

2                       THE COURT:  Yes.

3                       MR. PACHULSKI:  So I'll quickly go through

4       the various factors.

5                       The first one, nature of the case, and there

6       the cases examine whether the groups of creditors have a

7       meaningful voice.

8                       Using the determination in this case, the

9       only one who has a meaningful voice at all, that looks

10      anything like the rest of the litigation claimants is

11      Pepsi, whether they're a litigation claimant or not, they

12      don't do business anymore, they have a massive claim, but

13      that's presently one out of eight.  So they have, in

14      essence, twelve and a half percent, when the schedules,

15      any way you look at it, without even the proof of claims,

16      you have claims that are eight, ten, twelve times the

17      amount of the trade debt in the case.

18                      So if you look at that, I don't believe

19      there is a meaningful voice that's been provided to the

20      litigation claimants in this particular case.

21                      THE COURT:  So Pepsi alone is not a

22      meaningful voice?

23                      MR. PACHULSKI:  No, Pepsi alone -- in most

24      of the cases that compare -- well, compare, there was one

25      that had a landlord committee, and they said, well, you

1   had 26 percent of the committee, but you had 33 percent of

2   the claims, having one party on, that's twelve and a half

3   percent of a committee, in a -- you know, a single

4   minority --

5               THE COURT:  But I haven't seen any of the

6   cases that do that kind of weighing, or that kind of

7   percentage --

8               MR. PACHULSKI:  But --

9               THE COURT:  -- or size of claims.  In fact,

10  the cases that have been quoted back to me, including the

11  ones that Mr. Murtagh quoted, were fairly clear, that you

12  don't -- they don't need to mimic the creditor body.

13              MR. PACHULSKI:  I totally agree, your Honor,

14  that is exactly what they say, and I agree that, having

15  represented my fair share of committees, without defining

16  how many that is, but the cases that rejected -- this is

17  the irony, some of the cases that rejected did it based on

18  the percent that you had on the committee versus the

19  percent that you -- so even though they said it's not an

20  issue, they made it an issue, just to be clear --

21              THE COURT:  Okay, I mean --

22              MR. PACHULSKI:  -- not that it's relevant,

23  but that's why I mention it, but in this case, good, bad

24  or indifferent, one out of eight, speaking for 75 percent,

25  it doesn't have to be proportionate but it has to be close

Page 282

1    enough that the other parties can rely that --

2                    THE COURT:  Who said, where is the reliance,

3    where does that factor come in?  I don't see that anywhere

4    in the case law.

5                    MR. PACHULSKI:  Well, the fiduciary duty

6    factor doesn't come in either, but that's fine.

7                    THE COURT:  Well, no, the fiduciary --

8                    MR. PACHULSKI:  But you have to --

9                    THE COURT:  Hold on.  The fiduciary duty is

10   not a factor.  It overlays the entire issue, the way I

11   view it is that it overlays the entire issue, and much of

12   your argument presumes that a fiduciary duty will not be

13   complied with, just like -- just like your

14   counterargument, the counterargument is that it will be

15   complied with.  So -- but it's still, a fiduciary duty

16   overlays the entire question here.

17                   MR. PACHULSKI:  I want to be clear,

18   your Honor, I'm not -- you know, there were no fiduciary

19   duties violated in the New Orleans case.  I'm not --

20   Mr. Cohen is not going to -- not going to violate his

21   fiduciary duty, I have no doubt.  It's --

22                   THE COURT:  Well, it's the members of his

23   committee.  I'm not concerned about Mr. Cohen.

24                   MR. PACHULSKI:  Well, their view is we're

25   complying with our fiduciary duty.  Fiduciary duty is not

1   black and white, your Honor.  It's clearly, you get three

2   or four alternatives, they look at it and say the trade

3   creditors --

4                THE COURT:  No, that's not how I understand

5   you arguing this, and maybe I have a misunderstanding of

6   your argument.

7                But your argument in your papers has been,

8   that you -- that the trade creditors, by virtue of

9   controlling the committee, will work in their own

10  self-interest, which is divergent from the litigation

11  claimants' interests.

12               MR. PACHULSKI:  Their interests --

13               THE COURT:  Hold on, hold on.

14               MR. PACHULSKI:  -- are different.

15               THE COURT:  Wait, wait, wait, wait, wait.

16               MR. PACHULSKI:  Okay.

17               THE COURT:  That presumes, that argument

18  presumes, that has been argued by your opposition, that

19  argument presumes that the creditors, number one, will

20  work in their own self-interest, which in and of itself,

21  to the extent it is not in the best interest of their

22  constituents, arguably is a violation of their fiduciary

23  duty.

24               So your argument presumes in advance, or has

25  been argued to me, that the trade creditors will

Page 284

1    ultimately breach their fiduciary duty.

2                    MR. PACHULSKI:  No, it's not, your Honor.

3    You're presuming that if I gave someone a law test, that I

4    can give them five things and they would say their

5    fiduciary duties -- there is one right answer.

6                    What we're saying is that in considering

7    issues, they will consider issues based partly on who they

8    represent -- who they are.

9                    THE COURT:  Okay.

10                   MR. PACHULSKI:  I've represented plenty of

11   committees, your Honor, and if I went and said you must

12   think about every single creditor, and don't think about

13   yourself, it's not realistic.

14                   Now what's realistic is I've had committees

15   where I know, I couldn't prove it, that the CEO of the

16   company called the trade creditor and said if you do not

17   vote a certain way, I will not do business with you

18   anymore.

19                   THE COURT:  Well, I don't have those facts.

20   So --

21                   MR. PACHULSKI:  Okay, and I agree, but I

22   don't have --

23                   THE COURT:  And I can't presume that's going

24   to happen.

25                   MR. PACHULSKI:  I don't have to show --

Page 285

1    there is no case that says I have to show a breach of a

2    fiduciary duty.  I have to show whether or not there is

3    adequate representation, and having one of eight is not

4    adequate representation.

5                    In fact, one of the major factors,

6    your Honor, is whether an additional committee would

7    provide a benefit.  Everyone seems to say, no, it won't.

8    It's the only way to get a consensual deal in this case.

9                    Everyone just presumes we're just going to

10   have an ad hoc group, and everyone is going to go pay for

11   -- who have made no money in many cases off of this

12   debtor, as compared to some of the trade, but that we're

13   just going to write checks for investment bankers and the

14   rest of it, you will -- they will be negotiating with

15   different litigation claimants.  There will be no control

16   over this.  That's the chaos that will happen in this

17   case, your Honor, independent of a fiduciary duty issue,

18   because having one out of eight players that have

19   something remotely looking like a litigation claim is not

20   adequate representation.  So if you don't have that

21   committee, there will be a lack of trust, and you will

22   just have litigation.

23                   And so let's look at the -- the irony is,

24   the most interesting brief that was filed was by the

25   lender group.  The lender group wanted to look at two

Page 286

1    issues, delay.  Well, your Honor, there will be delay if

2    we have to show up in two or three months and litigate

3    everything because we weren't part of the process.  So we

4    think delay goes in favor of a second committee, because

5    there is delay -- there will be no delay if we do it now

6    as compared to waiting around and seeing what happens, and

7    being in the midst of litigation.

8              The cost issue, your Honor, the ability to

9    potentially cut a deal far outweighs the cost issue, which

10   we don't even know how much more it will be, because if we

11   have to litigate, and we're taking depositions of parties,

12   and the debtor has to produce documents, and the lenders

13   and the committee have to participate in that, that's not

14   going to be cheap either.

15             So we're trying to find a mechanism that

16   will be more likely to create a consensual deal.  That is

17   the key, and we do not -- and that's part of the factor in

18   determining adequate representation, will there be a

19   benefit of another committee?  And in this case there

20   would be, and the cost issue is overblown, since the vast

21   majority of the cost is going to be on the parties like

22   Monster and Orange Bang, who already have judgments of

23   approximately $500 million.  ABC, who will likely get a

24   judgment, there has been a copyright infringement with at

25   least three entities, and so you're just going to have

1    massive litigation, your Honor.

2                 I just strongly believe that the additional

3    committee is going to bring massive value to this case,

4    and we're all going to look back and say why didn't we do

5    that, because now we're just in litigation hell.

6                 And so the U.S. Trustee reconstituting all

7    they want isn't going to work here when they've put on

8    creditors of $8.99, that's just the reality here, and the

9    New Orleans case, though people are trying to distinguish

10   it, is not distinguishable from this case, including the

11   fact that the member that filed the motion actually was no

12   longer on the committee, and had been there for some

13   period of time.

14                Now, again, I did say it before, and I'll

15   just repeat it in terms of what can be the benefit is,

16   there is going to have to be work with respect to

17   evaluating claims with respect to the principals, there

18   will have to be work to determine whether there are

19   avoidance actions in this case.  There will have to be

20   some mechanism of a consensual plan to have an estimation

21   process.  There will have to be a debate as to what the

22   future liquidation or litigation trust is going to look

23   like.

24                And for the parties, who are the litigation

25   claimants, to be brought in after the fact, where we say

Page 288

1    here is the term sheet, I hope it works for you, is not

2    going to be very helpful, because that is how most of

3    these cases go and, frankly --

4                    THE COURT:  You don't know for sure that's

5    how this is going to go.

6                    MR. PACHULSKI:  I don't know, but here is

7    what I know for sure, that there will be very limited time

8    to get a plan confirmed in this case.

9                    THE COURT:  How do I deal with the

10   speculative nature of your arguments?

11                   MR. PACHULSKI:  Your Honor, it's not

12   speculative because the cases -- what your Honor has to

13   determine, because Hill Store says it, is it more likely

14   to have one committee to negotiate a resolution of this

15   case, or to have two committees?  In fact, the judge in

16   the New Orleans case effectively said that.

17                   THE COURT:  Where?  I have the opinion in

18   front of me.

19                   MR. PACHULSKI:  I would look at Page 10 of

20   at least the opinion I have, your Honor, under conclusions

21   of law.

22                   THE COURT:  Okay.  I got conclusions of law,

23   A, what's section?

24                   MR. PACHULSKI:  Yes, which says the 1978

25   Bankruptcy Reform Act envisioned the possibility of the

Page 289

1    constitution of more than one committee in a Chapter 11

2    reorganization case, and proposed committee to serve as,

3    quote, negotiating bodies for the classes of creditors

4    that they represent.

5              That is the reason --

6              THE COURT:  Do you think that you're

7    similarly situated creditors would be required to be in a

8    separate class under a plan?

9              MR. PACHULSKI:  I think, based on my

10   experience, I think it is very likely they'll be in a

11   separate class, that is because --

12             THE COURT:  As a gerrymandering effort, or

13   because they are not similarly situated, and cannot be in

14   the same class as trade creditors?

15             MR. PACHULSKI:  No, they can -- well, I've

16   seen cases -- there is a case out of the 9th Circuit that

17   says you can't separately classify because it's a

18   litigation claimant, but I'm not --

19             THE COURT:  Oh, the statute says you can

20   only classify similarly situated creditors in the same

21   class.  It doesn't say you can't separately classify them.

22             MR. PACHULSKI:  Right, and I think that --

23             THE COURT:  The case law has developed on

24   gerrymandering and all of that, but that's not in the

25   Code.

Page 290

```
 1                    MR. PACHULSKI:  But as you will
 2    traditionally find, there will be two issues that are very
 3    important to trade committees, okay, one is --
 4                    THE COURT:  Continuing doing business.
 5                    MR. PACHULSKI:  Well, there are really
 6    three, one is continuing doing business, one is, in many
 7    cases, because they're smaller creditors, that they expect
 8    a higher distribution, particularly in the largest cases
 9    you --
10                    THE COURT:  Meaning class or whatever, in a
11    convenience class, or something along those lines?
12                    MR. PACHULSKI:  Just separately on the basis
13    of the In Re:  Wolfe cases that basically say they're
14    needed for the successful reorganization, okay --
15                    THE COURT:  Okay.
16                    MR. PACHULSKI:  -- that's the second.
17                    And the third is they want the avoidance
18    actions to go away, which we understand because of the
19    trade committees we represent.  Those will be issues that
20    will have to be negotiated, that are matters similar
21    between the non-trade and the trade.
22                    THE COURT:  All right.  So you've got to
23    wrap up.
24                    MR. PACHULSKI:  Your Honor, I've -- look,
25    I've given it my best shot.
```

```
 1                    THE COURT:  You have.  Listen, the arguments
 2      on both sides --
 3                    MR. PACHULSKI:  And, look, we think --
 4                    THE COURT:  -- have been well briefed and
 5      well argued for sure.
 6                    MR. PACHULSKI:  -- this is a case --
 7                    THE COURT:  We've beaten the horse to death.
 8                    MR. PACHULSKI:  The horse has been beaten to
 9      death.  I don't think that reconstituting, again, is an
10      alternative, and I understand that isn't your Honor's
11      position, but the United States Trustee doesn't seem to be
12      interested in this.
13                    And, again, I'm not even convinced Monster
14      will get on it, but I think it's important, even if
15      Monster doesn't get on it, that we have a second committee
16      that will look out for interests that Monster, and others
17      who might or might not be on it, can look to as dealing
18      with their issues, and simply not having a very small --
19      one member out of eight, that are looking out for their
20      issues.
21                    THE COURT:  Okay.  Thank you for that.
22                    MR. PACHULSKI:  Thank you, your Honor.
23                    THE COURT:  All right.
24                    MR. MURTAGH:  Your Honor, may I make one
25      correction?
```

Page 292

1           THE COURT:  Mr. Murtagh.

2           MR. MURTAGH:  It's 30 seconds.

3           THE COURT:  Yes.

4           MR. MURTAGH:  Because it may not be in the

5  record.  In the case yourself -- itself, your Honor, the

6  record of the TMI withdrawal from the committee is

7  docketed through their motion.  They were pulled off the

8  committee by the United States Trustee, apparently against

9  their will.  They moved either to be reappointed with

10  additional creditors, or to have a separate committee

11  appointed.

12           THE COURT:  So, you wish for me to take

13  judicial notice of that.

14           MR. MURTAGH:  That's --

15           THE COURT:  And what am I taking judicial

16  notice of?

17           MR. MURTAGH:  That is their motion at

18  Document 546 in the Archdiocese case, and I only offer it

19  for clarification because I misinterpreted what the case

20  actually said about the disposition of TMI.

21           THE COURT:  Okay.

22           MR. MURTAGH:  I could not find it from the

23  decision, your Honor.

24           THE COURT:  Yeah, I didn't see it either,

25  but -- okay.  All right.  So, no need to get together

Page 293

1  tomorrow, correct?  Everybody agree with that?

2            (No verbal response.)

3            THE COURT:  Okay.  Anything else?

4            (No verbal response.)

5            THE COURT:  All right.  Drive safely

6  everybody, and thank you again for really the excellent

7  legal work.  I really appreciate it.

8            MR. PACHULSKI:  Thank you, your Honor.

9

10

11

12            (Thereupon, the hearing was concluded.)

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 294

## CERTIFICATION

STATE OF FLORIDA        :

COUNTY OF MIAMI-DADE    :

        I, Cheryl L. Jenkins, RPR, RMR, Shorthand Reporter and Notary Public in and for the State of Florida at Large, do hereby certify that the foregoing proceedings were transcribed by me from a digital recording held on the date and from the place as stated in the caption hereto on Page 1 to the best of my ability.

        WITNESS my hand this 28th day of December, 2022.


_____

CHERYL L. JENKINS, RPR, RMR

Court Reporter and Notary Public

in and for the State of Florida at Large

Commission #HH 170910

December 27, 2025