# Debtors' Exhibit 15

## FIFTH FORBEARANCE AGREEMENT

THIS FIFTH FORBEARANCE AGREEMENT (this "Agreement"), dated as of September 15, 2022, is entered into by and among VITAL PHARMACEUTICALS, INC., a Florida corporation (the "Borrower"), the Guarantors party hereto, the Lenders party hereto, TRUIST BANK, in its capacity as administrative agent for the Lenders (the "Administrative Agent"), Swingline Lender, and Issuing Bank, and JOHN H. OWOC, an individual resident of the State of Florida (the "Owner Pledgor").

## RECITALS

WHEREAS, the Borrower, the Guarantors from time to time party thereto, the Lenders from time to time party thereto, the Administrative Agent, the Swingline Lender, and the Issuing Bank are parties to that certain Amended and Restated Revolving Credit and Term Loan Agreement dated as of August 14, 2020 (as amended by that certain First Amendment to Amended and Restated Revolving Credit and Term Loan Agreement dated as of June 15, 2021, that certain Second Amendment to Amended and Restated Revolving Credit and Term Loan Agreement dated as of June 30, 2021, that certain Third Amendment to Amended and Restated Revolving Credit and Term Loan Agreement dated as of December 31, 2021, that certain Third Forbearance and Fourth Amendment to Amended and Restated Revolving Credit and Term Loan Agreement, dated as of June 30, 2022, and that certain Fourth Forbearance and Fifth Amendment to Amended and Restated Revolving Credit and Term Loan Agreement dated as of August 8, 2022 (the "Fourth Forbearance"), and as further amended, modified, extended, restated, replaced, or supplemented in writing from time to time, the "Credit Agreement").

WHEREAS, pursuant to the Owner Pledge Agreement, the Owner Pledgor has pledged certain assets to the Administrative Agent to secure the Secured Obligations (as defined therein).

WHEREAS, the "Forbearance Period" as defined in the Fourth Forbearance expired according to its terms at 11:59 p.m. (Eastern time) on September 2, 2022.

WHEREAS, the Loan Parties have informed the Administrative Agent and the Lenders that certain Events of Default have occurred and are continuing as described in Part A of Schedule 1 attached hereto (collectively, the "Existing Events of Default").

WHEREAS, the Loan Parties have also informed the Administrative Agent and the Lenders that certain Defaults and Events of Default are anticipated to occur as described in Part B of Schedule 1 attached hereto (collectively, the "Anticipated Events of Default" and together with the Existing Events of Default, the "Acknowledged Events of Default").

WHEREAS, the Loan Parties and the Owner Pledgor have requested that the Administrative Agent and the Lenders agree to forbear from exercising their rights and remedies arising under the Loan Documents and applicable Laws as a result of the Acknowledged Events of Default during the Forbearance Period.

WHEREAS, the Administrative Agent and the Lenders have agreed to do so, but only pursuant to the terms and conditions set forth herein.

<u>AGREEMENT</u>

NOW, THEREFORE, in consideration of these premises and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

1.    <u>Definitions</u>. Capitalized terms used herein but not otherwise defined herein shall have the meanings provided to such terms in the Credit Agreement. As used in this Agreement, the following terms shall have the meanings set forth below:

"<u>Acknowledged Events of Default</u>" has the meaning set forth in the Recitals.

"<u>Administrative Agent</u>" has the meaning set forth in the preamble to this Agreement.

"<u>Administrative Agent's Financial Advisor</u>" has the meaning set forth in <u>Section 14</u>.

"<u>Anticipated Events of Default</u>" has the meaning set forth in the Recitals.

"<u>Bankruptcy Code</u>" means title 11 of the United States Code, Section 101 et seq.

"<u>Borrower</u>" has the meaning set forth in the preamble to this Agreement.

"<u>Cash Flow Forecast</u>" has the meaning set forth in <u>Section 12(a)</u>.

"<u>Credit Agreement</u>" has the meaning set forth in the Recitals.

"<u>CTO</u>" has the meaning set forth in <u>Section 9</u>.

"<u>CTO Scope</u>" has the meaning set forth in <u>Section 9</u>.

"<u>DIP Budget</u>" means a budget for the Loan Parties' liquidity and financing needs, as applicable, in the event that one or more of the Loan Parties avails itself of any Debtor Relief Law.

"<u>DIP Financing Solicitation Process</u>" has the meaning set forth in Section 8(a).

"<u>Effective Date</u>" has the meaning set forth in <u>Section 18</u>.

"<u>Existing Events of Default</u>" has the meaning set forth in the Recitals.

"<u>Forbearance Fee</u>" has the meaning set forth in <u>Section 4</u>.

"<u>Forbearance Period</u>" means the period from the Effective Date to (but excluding) the earliest date that a Forbearance Termination Event occurs.

"<u>Forbearance Termination Event</u>" means the earliest of the following to occur: (a) any Event of Default other than an Event of Default constituting an Acknowledged Event of Default; (b) any Default other than a Default constituting an Acknowledged Event of Default that continues unremedied for a period of seven (7) days after written (which may be by email) notice thereof by the Administrative Agent to the Borrower; (c) the breach by any Loan Party or the Owner Pledgor of any covenant or provision of this Agreement; (d) the failure of the Borrower to deliver to the Administrative Agent a fully executed copy of the Sheridan Letter of Intent as soon as practicable

after the Effective Date, and in any case no later than 11:59 p.m. (Eastern time) on September 20, 2022; and (e) 11:59 p.m. (Eastern time) on September 30, 2022.

"<u>Fourth Forbearance</u>" has the meaning set forth in the Recitals.

"<u>Fourth Forbearance Fee</u>" means the Forbearance Fee (as defined in the Fourth Forbearance).

"<u>IB Scope</u>" has the meaning set forth in <u>Section 8(a)</u>.

"<u>Interim Maximum Amount</u>" means $240,000,000.

"<u>Investment Banker</u>" has the meaning set forth in <u>Section 8(a)</u>.

"<u>Owner Pledgor</u>" has the meaning set forth in the preamble to this Agreement.

"<u>Released Party</u>" has the meaning set forth in <u>Section 21</u>.

"<u>Sheridan Letter of Intent</u>" means a letter of intent for the sale of the real property owned by Sheridan Real Estate Investment A, LLC located at 20311 Sheridan Street, Pembroke Pines, Florida (Building A) for a purchase price of not less than $60,000,000 and otherwise containing terms satisfactory to the Administrative Agent.

2.    <u>Estoppel</u>. Each Loan Party and the Owner Pledgor each hereby acknowledges and agrees that, as of the close of business on September 14, 2022, (a) the aggregate outstanding principal amount of the Revolving Loans was $231,000,000.00, (b) the aggregate outstanding principal amount of the Term Loans was $104,190,218.45, (c) the aggregate outstanding principal amount of the Swingline Loans was $0.00,(d) the LC Exposure was $0.00, and (e) the earned and unpaid amount of the Fourth Forbearance Fee was $3,641,902.18, each of which constitutes a valid and subsisting obligation of each Loan Party, jointly and severally, owed to the Lenders that is not subject to any credits, offsets, defenses, claims, counterclaims, or adjustments of any kind (and, in the case of the Fourth Forbearance Fee and for the avoidance of doubt, is no longer subject to a partial waiver and cancellation).

3.    <u>Consent, Acknowledgement and Reaffirmation</u>. Each Loan Party and the Owner Pledgor each hereby: (a) acknowledges that (i) the Existing Events of Default have occurred and have not been waived, (ii) the Anticipated Events of Default are expected to occur and have not been waived, (iii) no Acknowledged Event of Default is being waived pursuant to this Agreement, and (iv) Default Interest that has accrued on all Obligations is not being waived pursuant to this Agreement and is (or shall be) due and payable in the ordinary course pursuant to the Credit Agreement; (b) acknowledges and consents to this Agreement and the terms and provisions hereof; (c) reaffirms the covenants and agreements contained in each Loan Document to which such Person is party, including, in each case, as such covenants and agreements may be modified by this Agreement and the transactions contemplated hereby; (d) reaffirms that each of the Liens created and granted in or pursuant to the Loan Documents in favor of the Administrative Agent for the benefit of the holders of the Obligations is valid and subsisting, and acknowledges and agrees that this Agreement shall in no manner impair or otherwise adversely affect such Liens; and (e) confirms that each Loan Document to which such Person is a party is and shall continue to be in full force and effect and the same is hereby ratified and confirmed in all respects.

4.    <u>Forbearance Fee</u>. In consideration of the written consent of the Lenders that have delivered a duly executed signature page to this Agreement to the Administrative Agent by 12:00 p.m. (Eastern time) on the Effective Date (or such later time as may be agreed to by the Borrower and the Administrative Agent)

(each a "<u>Consenting Lender</u>" and collectively, the "<u>Consenting Lenders</u>"), the Borrower shall pay to the Administrative Agent, for the Consenting Lenders on a *pro rata* basis, a forbearance fee (the "<u>Forbearance Fee</u>") in an amount equal to fifteen basis points (0.15%) times the sum of (a) the outstanding principal balance of the Term Loans as of the Effective Date held by the Consenting Lenders plus (b) the amount of the Revolving Commitments as of the Effective Date held by the Consenting Lenders. The Forbearance Fee shall be fully earned and non-refundable as of the Effective Date and shall be due and payable upon the occurrence of a Forbearance Termination Event.

5.    <u>Forbearance</u>.

(a)    *Forbearance.* Subject to the terms and conditions set forth herein, the Administrative Agent and the Lenders shall, during the Forbearance Period, forbear from exercising any and all of the rights and remedies available to them under the Loan Documents and applicable Laws, but only to the extent that such rights and remedies arise exclusively as a result of the existence of the Acknowledged Events of Default; <u>provided</u>, <u>however</u>, that (i) the Administrative Agent and the Lenders shall be free to exercise any or all of their rights and remedies arising on account of the Acknowledged Events of Default at any time upon or after the occurrence of a Forbearance Termination Event and (ii) except as set forth in <u>Section 5(c)</u>, the Acknowledged Events of Default shall continue to exist and apply for all purposes and provisions under the Loan Documents, including those provisions, conditions, requirements, rights, and obligations that are dependent upon the absence of any Default or Event of Default. For the avoidance of doubt: (A) during the Forbearance Period Default Interest shall continue to accrue on all Obligations; and (B) this Agreement shall not constitute the Administrative Agent's or any Lender's agreement or consent to the terms of that certain settlement agreement dated as of June 21, 2022, and entered into by and among Borrower, Quash Seltzer, LLC, JHO Intellectual Property Holdings, LLC, Elite IP Holdings, LLC and PepsiCo, Inc. or a waiver of any Default or Event of Default that may arise, if any, from such agreement.

(b)    *Forbearance Period*. Nothing set forth herein or contemplated hereby is intended to constitute an agreement by the Administrative Agent or any Lender to forbear from exercising any of the rights or remedies available to the Administrative Agent and the Lenders under the Loan Documents or applicable Laws (all of which rights and remedies are hereby expressly reserved by the Administrative Agent and the Lenders) upon or after the occurrence of a Forbearance Termination Event.

(c)    *Credit Events; Conversion/Continuation*. Notwithstanding anything to the contrary contained in the Credit Agreement, during the Forbearance Period, the Swingline Lender, the Issuing Bank, and the Lenders shall honor requests for Credit Events, in each case to the extent that (A) all conditions precedent to the funding of any Credit Event set forth in the Credit Agreement are satisfied (other than any requirement or representation in the Credit Agreement relating solely to the occurrence and continued existence of the Acknowledged Events of Default) and (B) after giving effect to any Credit Event (I) the Aggregate Revolving Credit Exposure shall not exceed the Interim Maximum Amount, (II) the Revolving Credit Exposure of any Lender shall not exceed such Lender's Revolving Commitment, and (III) with respect to any extension of any Letter of Credit, the aggregate LC Exposure shall not exceed the aggregate LC Commitment. For the avoidance of doubt, the Borrower shall not have (y) the ability to borrow, continue, and convert into SOFR Loans or (z) the option to borrow, convert or continue from one Type of Loan to another Type of Loan. Notwithstanding anything in the Credit Agreement to the contrary, each Notice of Revolving Borrowing, Notice of Swingline Borrowing, or Letter of Credit Application that the Borrower delivers during the Forbearance Period shall include a representation and warranty that

no Forbearance Termination Event has occurred or would occur from the honoring of the request set forth therein.

6.    <u>Deferral of Fourth Forbearance Fee</u>. Notwithstanding anything to the contrary contained in the Fourth Forbearance, the Fourth Forbearance Fee shall be due and payable upon the occurrence of a Forbearance Termination Event as defined herein.

7.    [<u>Reserved</u>.]

8.    <u>Investment Banking Process</u>.

(a)    *Investment Banker.* At all times during the Forbearance Period the Loan Parties shall continue to retain a recognized third-party investment banker reasonably acceptable to the Required Lenders and the Loan Parties (the "<u>Investment Banker</u>"), it being acknowledged and agreed that Rothschild & Co is acceptable to the Required Lenders and the Loan Parties. The Loan Parties shall be responsible for the fees and expenses incurred in connection with the engagement of the Investment Banker. The scope of the Investment Banker's engagement shall include, among other things, assisting the Loan Parties in soliciting bids for post-petition financing pursuant to Section 364 of the Bankruptcy Code (the "<u>DIP Financing Solicitation Process</u>") and be otherwise on terms reasonably acceptable to the Required Lenders and the Loan Parties (the "<u>IB Scope</u>"). The Investment Banker shall report to the Chief Executive Officer of the Borrower and work with the CTO and other management for the purpose of carrying out the IB Scope. Any material change, limitation, or revision to the IB Scope without the prior written consent of the Required Lenders, which consent shall not be unreasonably withheld, conditioned, or delayed, shall constitute an immediate Forbearance Termination Event; <u>provided</u>, that, notwithstanding the foregoing the Loan Parties may broaden the IB Scope without the consent of the Required Lenders. During the Forbearance Period, the Loan Parties shall be prohibited from terminating the Investment Banker's engagement without the prior written consent of the Required Lenders, which shall not be unreasonably withheld, conditioned, or delayed and shall not be required if the Investment Banker is replaced with another Investment Banker whose identity and scope of engagement are reasonably acceptable to the Required Lenders within five (5) Business Days of such termination.

(b)    *Investment Banking Process Materials.* The Loan Parties shall (i) provide, or cause the Investment Banker to provide, access at all times to the Administrative Agent and its professionals to the data room related to the DIP Financing Solicitation Process and (ii) deliver to the Administrative Agent for distribution to the Lenders copies of the following documents and information with respect to the DIP Financing Solicitation Process (which documents and information shall be subject to the confidentiality obligations set forth in Section 11.11 of the Credit Agreement), as promptly as practicable after such information or documents are received or produced by the Loan Parties, the Owner Pledgor, or the Investment Banker: (A) the marketing materials distributed to any interested third party in connection with the DIP Financing Solicitation Process; and (B) on September 23, 2022, a list of all interested third parties that have entered into non-disclosure agreements with the Loan Parties in respect of the DIP Financing Solicitation Process and written summaries describing the proposed amount of post-petition financing to be provided to the Loan Parties.

9.    <u>Chief Transaction Officer</u>. At all times during the Forbearance Period the Loan Parties shall continue to retain a Chief Transaction Officer (the "<u>CTO</u>") reasonably acceptable to the Required Lenders and the Loan Parties, it being acknowledged and agreed that John C. DiDonato, on behalf of Huron Consulting Services LLC, is acceptable to the Required Lenders and the Loan Parties. The Loan Parties shall be responsible for the fees and expenses incurred in connection with the engagement of the CTO. The

scope of the CTO's engagement shall be as set forth on <u>Schedule 2</u> hereto (the "<u>CTO Scope</u>"). The CTO shall report to the Chief Executive Officer of the Borrower and work with management for the purpose of carrying out the CTO Scope. Any material change, limitation, or revision to CTO Scope without the prior written consent of the Required Lenders, which consent shall not be unreasonably withheld, conditioned, or delayed, shall constitute an immediate Forbearance Termination Event; <u>provided</u>, that, notwithstanding the foregoing the Loan Parties may broaden the CTO Scope without the consent of the Required Lenders. During the Forbearance Period, the Loan Parties shall be prohibited from terminating the CTO's engagement without the prior written consent of the Required Lenders, which shall not be unreasonably withheld, conditioned, or delayed and shall not be required if the CTO is replaced with another CTO whose identity and scope of engagement are reasonably acceptable to the Required Lenders within five (5) Business Days of such termination.

10.     [<u>Reserved</u>.]

11.     <u>Bankruptcy Preparation</u>. The Loan Parties shall: (a) at all times during the Forbearance Period continue to retain nationally recognized legal counsel with sufficient experience representing debtors under chapter 11 of the Bankruptcy Code to capably represent the Loan Parties in connection with a matter of this complexity, it being understood that the Loan Parties' retention of Latham & Watkins LLP, as the Loan Parties' lead counsel, and Berger Singerman LLP, as the Loan Parties' local counsel, shall satisfy this requirement; and (b) cause their professionals to reasonably cooperate with the Administrative Agent and its professionals regarding the preparation of pleadings and other documents evidencing or related to post-petition financing from the Lenders or a subset thereof on a secured, priming basis pursuant to Section 364 of the Bankruptcy Code and use of cash collateral pursuant to Section 363 of the Bankruptcy Code.

12.     <u>Additional Reporting During Forbearance Period</u>. In addition to all existing reporting requirements under the Credit Agreement and the other Loan Documents, during the Forbearance Period, the Loan Parties shall deliver to the Administrative Agent, for distribution to the Lenders, in each case in form and detail reasonably satisfactory to the Administrative Agent:

(a)     every fourth Thursday, a rolling 13-week forecast of cash flows for the Loan Parties and their Subsidiaries on a consolidated basis as of the last day of the immediately preceding week (each a "<u>Cash Flow Forecast</u>");

(b)     on or before 11:00 a.m. Eastern time on the second Business Day of each week: (i) the then current cash balance calculations as of the last Business Day of the immediately preceding week;

(c)     every Thursday, (i) a variance report showing a comparison of the previous week's actual cash flows for the Loan Parties and their Subsidiaries (on a consolidated basis) to the most recently previously delivered Cash Flow Forecast in both dollar and percentage units, together with a written explanation of any variance (positive or negative) for any line item that exceeds ten percent (10%), and (ii) a report of (A) the previous week's sales volume, itemized by brand, (B) the number of executed distribution agreements that have been distributed together with the corresponding aggregate percentage that such number represents of the amount of distributors that the Loan Parties identified to be part of their new, independent distribution network, and (C) the month-to-date secured sales orders;

(d)     [reserved]; and

(e)     promptly following the Administrative Agent's request therefor, (i) information regarding the Loan Parties' establishment or expansion of any distribution network that replaces

the distribution network established with PepsiCo, Inc., and (ii) such other information regarding the results of operations, business affairs, and financial condition of any or all of the Loan Parties and Subsidiaries.

13.    Periodic Updates. During the Forbearance Period, the Loan Parties shall make certain representatives of the Loan Parties and their advisors (including, without limitation, the Investment Banker and the CTO), as reasonably requested by the Administrative Agent, available to the Administrative Agent and the Lenders for periodic conference calls to be held on a bi-weekly basis, or more frequently as reasonably requested by the Administrative Agent.

14.    Administrative Agent's Financial Advisor. The Administrative Agent, through its counsel, has retained FTI Consulting, Inc. (the "Administrative Agent's Financial Advisor") to monitor the Loan Parties' financial and operational performance. During the Forbearance Period, the Loan Parties shall cooperate in good faith with the Administrative Agent's Financial Advisor and provide the Administrative Agent's Financial Advisor with reasonable access to the Loan Parties' facilities, books and records, officers and consultants (including, without limitation, the Investment Banker and the CTO) and to any information reasonably necessary for the Administrative Agent's Financial Advisor to perform the services within the scope of its engagement.

15.    [Reserved.]

16.    Fees and Expenses. Without in any way limiting the obligations of the Loan Parties and the Owner Pledgor under the Loan Documents, including without limitation Section 11.3 of the Credit Agreement, the Loan Parties shall, within ten (10) Business Days after written demand therefor, reimburse the Administrative Agent for all of its documented and invoiced out-of-pocket fees and expenses reasonably incurred in connection with this Agreement, the Credit Agreement, and the other Loan Documents (including, without limitation, the documented and invoiced fees and out-of-pocket expenses of (a) Moore & Van Allen PLLC, as lead counsel to the Administrative Agent, (b) Shutts & Bowen LLP, as local counsel to the Administrative Agent, and (c) the Administrative Agent's Financial Advisor).

17.    [Reserved.]

18.    Conditions Precedent. This Agreement shall be effective on the date (the "Effective Date") that each of the following conditions have been satisfied as determined by the Administrative Agent in its reasonable discretion, or waived by the Required Lenders in their sole discretion:

(a)    *Executed Agreement*. The Administrative Agent shall have received a copy of this Agreement duly executed by each of the Loan Parties, the Owner Pledgor, the Lenders constituting the Required Lenders, the Lenders constituting the Required Revolving Lenders, and the Administrative Agent.

(b)    *Officer's Certificate, Authorizing Resolutions, and Incumbencies.* The Administrative Agent shall have received certificates of resolutions or other action, incumbency certificates, and/or other certificates of the Secretary, Assistant Secretary, or other appropriate officer (or member or manager, as the case may be, in the case of limited liability companies) acceptable to the Administrative Agent, of each Loan Party, dated as of the Effective Date, addressing the matters set forth in Section 3.1(b)(i) of the Credit Agreement, in each case updated to reflect the transactions contemplated by this Agreement and in form reasonably satisfactory to the Administrative Agent; provided, that to the extent none of the foregoing has changed since they were most recently delivered to the Administrative Agent for a Loan Party, then such Loan Party may deliver a customary, short-form "bring down" certificate.

(c)     *Administrative Agent's Fees and Expenses*. The Administrative Agent shall have received: (i) all reasonable, documented, and invoiced fees payable to the Administrative Agent or any Affiliate thereof as agreed between the Administrative Agent and the Borrower; and (ii) reimbursement from the Loan Parties for all documented and invoiced out-of-pocket fees and expenses reasonably incurred in connection with this Agreement, the Credit Agreement, and the other Loan Documents (including, without limitation, the documented and invoiced fees and out-of-pocket expenses of Moore & Van Allen PLLC, as lead counsel to the Administrative Agent, Shutts & Bowen LLP, as local counsel to the Administrative Agent, and the Administrative Agent's Financial Advisor) through the Effective Date to the extent invoiced to the Loan Parties at least one (1) Business Day prior to the Effective Date, except to the extent otherwise agreed by the Administrative Agent.

(d)     *Payment of Accrued Interest*. The Administrative Agent shall have received payment of all interest accrued in respect of the Loans that is due and payable as of the Effective Date.

(e)     *DIP Budget*. The Administrative Agent shall have received a DIP Budget, which shall be in form and detail reasonably acceptable to the Administrative Agent's Financial Advisor.

(f)     *Loan Parties' Professionals*. The Administrative Agent shall have received evidence reasonably satisfactory to it that the Loan Parties have paid the accrued and unpaid expenses of the Loan Parties' professionals (including, without limitation, Latham & Watkins LLP, Berger Singerman LLP, the CTO, and the Investment Banker) incurred through the Effective Date and funded retainers to each such professional in an estimated amount sufficient to permit each such professional to remain a "disinterested person" as contemplated by the Bankruptcy Code upon the Loan Parties' commencement of proceedings under chapter 11 of the Bankruptcy Code.

(g)     *Investment Banker Certification*. The Administrative Agent shall have received (i) a written certification in form reasonably acceptable to the Administrative Agent that the Investment Banker has commenced the DIP Financing Solicitation Process and (ii) the marketing materials prepared as of the Effective Date for distribution to any interested third party in connection with the DIP Financing Solicitation Process.

(h)     *Intellectual Property Matters*. The Administrative Agent shall have received such information, filings with the U.S. Copyright Office or the U.S. Patent and Trademark Office, and other documents as the Administrative Agent may reasonably request at least one (1) Business Day in advance of the Effective Date regarding intellectual property constituting Collateral.

19.     <u>Representations of Loan Parties</u>. Each Loan Party represents and warrants to the Administrative Agent and the Lenders as follows:

(a)     Such Loan Party has the requisite power and authority and has taken all necessary action to authorize the execution, delivery, and performance of this Agreement in accordance with its terms.

(b)     This Agreement has been duly executed and delivered by such Loan Party and the Owner Pledgor and is the legally valid and binding obligation of such Person, enforceable against such Person in accordance with its respective terms, except as may be limited by Debtor Relief Laws or by equitable principles relating to enforceability.

(c)      The execution, delivery, and performance by such Loan Party and the Owner Pledgor of this Agreement and the consummation of the transactions contemplated by this Agreement do not and will not require, as a condition to the effectiveness thereof, any registration with, consent, or approval of, or notice to, or other action to, with, or by, any Governmental Authority except for (i) filings necessary to perfect, and/or maintain the perfection of, the Liens created under the Loan Documents or (ii) filings, recordings, or consents where failure to obtain or make could not reasonably be expected to have a Material Adverse Effect.

(d)      After giving effect to this Agreement: (i) the representations and warranties of the Loan Parties set forth in the Loan Documents (other than the representations and warranties set forth in Section 4.6 (solely as it relates to the Existing Events of Default) of the Credit Agreement) are true and correct in all material respects (but without duplication of any existing materiality qualifiers) on and as of the Effective Date to the same extent as though made on and as of such date except to the extent such representations and warranties specifically relate to an earlier date (in which case they are true, accurate and complete in all material respects (but without duplication of any existing materiality qualifiers) as of such earlier date); and (ii) no Default or Event of Default (other than any Existing Event of Default) exists on and as of the Effective Date.

(e)      The parties executing this Agreement as Guarantors include each Person that is required pursuant to Section 5.13 of the Credit Agreement to become a Loan Party as of the date hereof.

If any representation and warranty set forth in this Section is incorrect in any material respect, then such incorrect representation and warranty shall constitute a new and immediate Forbearance Termination Event without regard to any otherwise applicable notice, cure, or grace period.

20.      <u>Representations of the Owner Pledgor</u>. The Owner Pledgor represents and warrants to the Administrative Agent and the Lenders as follows:

(a)      This Agreement has been duly executed and delivered by the Owner Pledgor and is the legally valid and binding obligation of such Person, enforceable against such Person in accordance with its respective terms, except as may be limited by Debtor Relief Laws or by equitable principles relating to enforceability.

(b)      He is (i) a natural person, (ii) of the age of majority, (iii) a citizen of the United States, (iv) a resident of the State of Florida, (v) legally competent to enter into this Agreement, and (vi) sophisticated in business matters.

(c)      After giving effect to this Agreement, the representations and warranties of the Owner Pledgor set forth in the Owner Pledge Agreement are true and correct in all material respects (but without duplication of any existing materiality qualifiers) on and as of the Effective Date to the same extent as though made on and as of such date except to the extent such representations and warranties specifically relate to an earlier date (in which case they are true, accurate and complete in all material respects (but without duplication of any existing materiality qualifiers) as of such earlier date).

If any representation and warranty set forth in this Section is incorrect in any material respect, then such incorrect representation and warranty shall constitute a new and immediate Forbearance Termination Event without regard to any otherwise applicable notice, cure, or grace period.

21.    <u>Release</u>. Each Loan Party and the Owner Pledgor each hereby releases and forever discharges the Administrative Agent, the Swingline Lender, the Issuing Bank, each Lender, and each of their respective predecessors, successors, assigns, and Related Parties (each and every of the foregoing, a "<u>Released Party</u>") from any and all claims, counterclaims, demands, damages, debts, suits, liabilities, actions, and causes of action of any nature whatsoever, in each case through the Effective Date, whether arising at law or in equity, whether known or unknown, whether liability be direct or indirect, whether liquidated or unliquidated, whether absolute or contingent, whether foreseen or unforeseen, and whether or not heretofore asserted, which any Loan Party or the Owner Pledgor may have or claim to have against any Released Party.

22.    <u>No Actions, Claims</u>. Each Loan Party and the Owner Pledgor each hereby represents, warrants, acknowledges, and confirms that such Person has no knowledge of any action, cause of action, claim, demand, damage, or liability of whatever kind or nature, in law or in equity, against any Released Party arising from any action by such Person, or failure of such Person to act, in any way on or prior to the date hereof.

23.    <u>Incorporation of Agreement</u>. Except as specifically modified herein, the terms of the Loan Documents shall remain in full force and effect. The execution, delivery, and effectiveness of this Agreement shall not operate as a waiver of any right, power, or remedy of the Administrative Agent or the Lenders under the Loan Documents or constitute a waiver or amendment of any provision of the Loan Documents. The breach of any covenant or provision of this Agreement shall constitute an immediate Forbearance Termination Event and this Agreement shall constitute a Loan Document.

24.    <u>No Third-Party Beneficiaries</u>. This Agreement and the rights and benefits hereof shall inure to the benefit of each of the parties hereto and their respective successors and assigns, and the obligations hereof shall be binding upon the Loan Parties and the Owner Pledgor (as the case may be). No other Person shall have or be entitled to assert rights or benefits under this Agreement, other than any non-party Released Party with respect to <u>Section 21</u> and <u>Section 22</u> hereof (which Persons are intended to be third party beneficiaries of this Agreement).

25.    <u>Entirety</u>. This Agreement, the Credit Agreement, and the other Loan Documents embody the entire agreement among the parties hereto and supersede all prior agreements and understandings, oral or written, if any, relating to the subject matter hereof. This Agreement, the Credit Agreement, and the other Loan Documents represent the final agreement between the parties and may not be contradicted by evidence of prior, contemporaneous, or subsequent oral agreements of the parties.

26.    <u>Counterparts</u>. This Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. Delivery of an executed counterpart of a signature page of this Agreement by telecopy or other electronic imaging means (*e.g.*, "pdf" or "tif" format) shall be effective as delivery of a manually executed counterpart of this Agreement.

27.    <u>Governing Law; Jurisdiction; Consent to Service of Process; Waiver of Jury Trial</u>. The governing law, jurisdiction, consent to service of process, and waiver of jury trial provisions contained in Sections 11.5 and 11.6 of the Credit Agreement are hereby incorporated by reference *mutatis mutandis*.

28.    <u>Further Assurances</u>. Each of the parties hereto agrees to execute and deliver, or to cause to be executed and delivered, all such instruments as may reasonably be requested to effectuate the intent and purposes, and to carry out the terms, of this Agreement.

29.    <u>Miscellaneous</u>. Section headings in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose. Wherever possible, each provision of this Agreement shall be interpreted in such a manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under applicable law, then such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement. Except as otherwise provided in this Agreement, if any provision contained in this Agreement conflicts with, or is inconsistent with, any provision in any Loan Document, then the provision contained in this Agreement shall govern and control.

[*Remainder of page intentionally left blank.*]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the date first above written.

BORROWER:

VITAL PHARMACEUTICALS, INC.,
a Florida corporation

By:_____
Name:  John H. Owoc
Title:    President, Chief Scientific Officer & Chief Executive Officer

GUARANTORS:

BANG ENERGY CANADA, INC.,
a Florida corporation
JHO INTELLECTUAL PROPERTY HOLDINGS, LLC,
a Florida limited liability company
JHO GA-1 INVESTMENT, LLC,
a Florida limited liability company
JHO NV-1 INVESTMENT, LLC,
a Florida limited liability company
JHO REAL ESTATE INVESTMENT, LLC,
a Florida limited liability company
QUASH SELTZER, LLC,
a Florida limited liability company
SHERIDAN REAL ESTATE INVESTMENT A, LLC,
a Florida limited liability company
SHERIDAN REAL ESTATE INVESTMENT B, LLC,
a Florida limited liability company
SHERIDAN REAL ESTATE INVESTMENT C, LLC,
a Florida limited liability company
VITAL PHARMACEUTICALS INTERNATIONAL SALES, INC.,
a Delaware corporation
RAINBOW UNICORN BEV LLC,
a Florida limited liability company

By:_____
Name:  John H. Owoc
Title:    President, Chief Scientific Officer & Chief Executive Officer

OWNER PLEDGOR:

JOHN H. OWOC,
an individual resident of the State of Florida

_____

ADMINISTRATIVE AGENT:                    TRUIST BANK,
                                         as Administrative Agent

                                         By: _____
                                         Name:  Jade Silver
                                         Title:    Senior Vice President

LENDERS:                              TRUIST BANK,
                                      as a Lender, as Swingline Lender, and as Issuing Bank

                                      By:_____
                                      Name:  Jade Silver
                                      Title:    Senior Vice President

COBANK, ACB,
as a Lender

By: _____
Name:  Janet Downs
Title:  Lead Special Assets Officer

AGCOUNTRY FARM CREDIT SERVICES, FLCA,
as a Lender

By: _____

Name:  Lisa Caswell
Title:    Vice President

FARM CREDIT BANK OF TEXAS,
as a Lender

By: _____
Name: Alan Robinson
Title:  Managing Director

CITIZENS BANK, N.A.,
as a Lender

By:_____
Name: Seth McIntyre
Title: Assistant Vice President

COMPEER FINANCIAL, PCA,
as a Lender

By: _____

Name: Kevin Buente
Title: Principal Credit Officer

SYNOVUS BANK,
as a Lender

By: _____
Name:  John M. Quarles, Jr.
Title:  Senior Special Credits Officer

FEDERAL AGRICULTURAL MORTGAGE
CORPORATION,
as a Lender


By: _____
Name:  Kyle Weaver
Title:   Managing Director

THE HUNTINGTON NATIONAL BANK,
as a Lender

By: *Cameron Hinojosa*
Name: Cameron Hinojosa
Title: Vice President

GREENSTONE FARM CREDIT SERVICES, FLCA, as a Lender

By: *Mark Strebel*
Name: Mark Strebel
Title: Vice President of Risk Assets

COMERICA BANK,
as a Lender

By: _____
Name:
Title:    CYNTHIA B. JONES
          VICE PRESIDENT

HSBC BANK USA, N.A.,
as a Lender

By: _____
Name:  Rino Falsone
Title:    Vice President

UNITED COMMUNITY BANK d/b/a SEASIDE
BANK AND TRUST,
as a Lender

By: _____

Name: J. Brett Brown

Title: Sr. Vice President

**<u>SCHEDULE 1</u>**

**<u>Acknowledged Events of Default</u>**

#### A.  Existing Events of Default

1.  Certain Events of Default have occurred and are continuing under Section 8.1(d) of the Credit Agreement as a result of:

    a.  the Loan Parties' failure to comply with the Combined Total Leverage Ratio covenant set forth in Section 6.1 of the Credit Agreement for the Fiscal Quarters ended December 31, 2021, March 31, 2022, and June 30, 2022;

    b.  the Loan Parties' failure to comply with the Combined Fixed Charge Coverage Ratio covenant set forth in Section 6.2 of the Credit Agreement for the Fiscal Quarters ended December 31, 2021, March 31, 2022, and June 30, 2022;

    c.  the Loan Parties' failure to comply with Section 5.1(a) of the Credit Agreement with respect to the annual audited report for the Fiscal Year ended December 31, 2021 for the Loan Parties and Subsidiaries as a result of such report and opinion of the Loan Parties' independent public accounting firm not being unqualified as to "going concern" or like qualification or scope of such audit; and

    d.  the Loan Parties' failure to provide notice under Section 5.2(a)(i) of the Credit Agreement in connection with the occurrence of any of the other Acknowledged Events of Default.

#### B.  Anticipated Events of Default

1.  An Event of Default may occur under Sections 8.1(c), 8.1(d) and/or 8.1(k)(i) of the Credit Agreement as a result of Monster Energy Company (or other Person acting on its behalf or on behalf of any of its Affiliates) recording a judgment against the Borrower by a Commercial Arbitration Tribunal of the America Arbitration Association in Orange Bang, Inc. and Monster Energy Company v. Vital Pharmaceuticals, Inc d/b/a VPX Sports (Case No. 01-20-0005-6081) with any applicable Governmental Authority, which may (i) constitute a Lien on the assets of the Loan Parties that is not a Permitted Encumbrance or otherwise permitted by Section 7.2 of the Credit Agreement, and/or (ii) constitute enforcement proceedings in respect of a judgment against a Loan Party.

*[Remainder of page intentionally left blank; end of <u>Schedule I</u>.]*

## SCHEDULE 2

## CTO Scope

The Chief Transaction Officer at the Borrower shall report directly to the Borrower's Chief Executive Officer, shall collaborate primarily with the Borrower's Senior Vice President of Finance, and shall be responsible for the following tasks:

1.    Manage those workstreams that relate to the Loan Parties' restructuring initiatives.

2.    Liaise with and serve as principal contact with:
    a.    The Administrative Agent and the Lenders and significant creditors concerning financial and operational matters that relate to the restructuring activities only.
    b.    The Loan Parties' stakeholders for information requests.

3.    Support and/or manage the preparation and maintenance of:
    a.    Debtor in Possession ("DIP") cash flow budget.
    b.    Liquidity and related cash flow forecasting.
    c.    Financial projections.

4.    Provide the Loan Parties approved enhancements to the financial projections based on the review and discussions with the Investment Banker.

5.    Support and/or manage the Loan Parties' cash disbursement process, controls, and protocols.

6.    Support and/or manage initiatives to enhance liquidity by developing and implementing the plan(s) to:
    a.    Enhance lease and trade payment terms.
    b.    Optimize near-term staffing and resulting payroll cost.
    c.    Other cost savings and performance improvement initiatives.

7.    Support and/or manage the Loan Parties' bankruptcy preplanning and post-bankruptcy management workstreams including:
    a.    Preparation of schedules including executory contracts and other matters as required by the bankruptcy court and US Trustee.
    b.    DIP financing sizing, budgeting, and variance reporting.
    c.    First-day motions and orders, monthly operating reports ("MORs"), and other reporting and analysis requirement.
    d.    Select accounting matters.

8.    Assist in facilitating information flow related to the capital markets processes with the Loan Parties' advisors, including the Investment Banker.

9.    Direct negotiations with significant creditors, including without limitation, the Administrative Agent and the Administrative Agent's advisors and other holders of secured debt.

10.    Communicate directly with and provide information as reasonably requested by the Administrative Agent in connection with its existing credit facilities.

11.     Provide such other services as are customarily provided in connection with the analysis and negotiation of a restructuring initiative, as mutually agreed upon in writing between the CTO and the Loan Parties.

[*Remainder of page intentionally left blank; end of <u>Schedule 2</u>.*]