# **Debtors' Exhibit 23**

# ACCOUNT CONTROL AGREEMENT

This ACCOUNT CONTROL AGREEMENT (the "Agreement") is entered into as of April 28, 2022, by and among Quash Seltzer, LLC, ("Customer"), Truist Bank, as administrative agent and collateral agent ("Creditor"), and **THE HUNTINGTON NATIONAL BANK**, a national banking association ("Bank").

Creditor is the administrative agent and collateral agent under that certain Amended and Restated Revolving Credit and Term Loan Agreement dated as of August 14, 2020 (as amended, modified, extended, restated, replaced, or supplemented in writing from time to time, the "Credit Agreement"), by and among, *inter alia*, Vital Pharmaceuticals, Inc., as the borrower, Customer as a guarantor party thereto, the financial institutions party from time to time thereto as lenders, and Creditor.

## STATEMENT OF FACTS

Customer has opened with Bank a depository account, being account no. 01893771079 (the "**Account**"). Customer has granted to Creditor a security interest in the Account, all cash, instruments, checks, and other items of value of the Customer now or hereafter paid, deposited, credited, or held in the Account, and all additions thereto and substitutions and proceeds thereof (including the Account, collectively, the "**Collateral**") pursuant to a separate pledge and security agreement and other documents executed in connection therewith (as amended, supplemented, replaced or otherwise modified from time to time, the "**Loan Documents**") between Customer and Creditor. This Agreement does not create Creditor's security interest. The parties are entering into this Agreement to perfect Creditor's security interest in and to the Collateral and to specify certain rights and duties of the parties with respect to the Account. In consideration of the mutual covenants herein as well as other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1. **Reserved**

2. **Bank's Representations**

Bank represents and warrants to Creditor and to Customer that:

   (a) Bank maintains the Account.

   (b) The Account is a "deposit account" as defined in the Uniform Commercial Code as adopted in the State of Ohio.

   (c) Bank does not know of any (i) claim to or interest in the Account, except for claims and interests of the parties referred to in this Agreement or (ii) currently effective agreement with any person under which Bank may be obligated to comply with any Account Related Order (as defined below) originated by a person other than Creditor or Customer.

   (d) Bank agrees to perform its obligations under this Agreement in a manner consistent with the quality provided when Bank performs similar services for its own account.

3. **Notice of Security Interest**

Customer, Creditor, and Bank are entering into this Agreement to perfect, and to confirm the priority of, Creditor's security interest in the Collateral. Bank acknowledges that this Agreement constitutes

written notification to Bank of Creditor's security interest in the Collateral. Bank agrees to promptly make all necessary entries or notations in its books and records to reflect Creditor's security interest in the Collateral. Bank acknowledges that Creditor has control over the Account, and all cash and instruments contained therein from time to time. Nothing contained in this Agreement shall create any agency, fiduciary, joint venture or partnership relationship between or among Customer, Creditor, and Bank.

4. **Control of Account**

This Agreement shall constitute an authenticated record that Bank will comply with instructions originated by Creditor directing disposition of any property in the Account without further consent by Customer and, by executing this Agreement, Bank acknowledges Creditor's security interest in and control of the Account for the purposes of perfecting Creditor's security interest in the Account in accordance with Sections 9-104, 9-312(b) and 9- 314 of the Uniform Commercial Code as adopted by the State of New York.

5. **Control by Creditor**

Bank will comply with all instructions it receives with respect to any property in the Account (each an "**Account Related Order**") originated by Creditor without further consent by Customer. Customer hereby acknowledges Creditor's right to originate such Account Related Orders. Any and all such Account Related Orders from Creditor to Bank shall be delivered to Bank in writing.

6. **Reserved**

7. **Customer's Rights in Account**

Bank may comply with Account Related Orders originated by Customer unless (i) such Account Related Orders are contrary to any Account Related Order received from Creditor or (ii) Creditor has delivered to Bank a Notice of Exclusive Control, pursuant to Section 8 hereafter.

8. **Rights and Duties After Default**

    (a) After Bank receives from Creditor a notice, substantially in the form attached hereto as <u>Exhibit A</u> (a "**Notice of Exclusive Control**"), Bank agrees (i) not to comply with Account Related Orders originated by Customer or any other person, and (ii) to comply with all Account Related Orders originated by Creditor, to dispose of the Collateral as and to the extent directed by Creditor, and to pay over to Creditor all cash Collateral and proceeds without any setoff or deduction, except as authorized under Sections 13 and 14 hereof. The foregoing instructions may only be modified or rescinded by Creditor or its designee. Bank shall have a reasonable period of time, not to exceed 2 Business Days, to act upon such Notice of Exclusive Control and cease following instructions of Customer. As used in this Agreement, "Business Day" means any day other than a Saturday, a Sunday, or a legal holiday, on which national banks are open for business, and receipt by Bank of actual notice to Bank means receipt by or notification to the officer(s) of the Bank who are listed in Section 11 hereof.

    (b) Customer agrees that if Customer receives a copy of the Notice of Exclusive Control, Customer shall not give any Account Related Orders to Bank, whether or not such Notice of Exclusive Control has been implemented by Bank; provided that Creditor shall have no obligation to send a copy of such Notice of Exclusive Control to Customer as a condition to the effectiveness of such Notice of Exclusive Control.

(c) If Bank receives a Notice of Exclusive Control from Creditor, all pre-authorized ACH withdrawals, transfers, or other items previously authorized by Customer will be terminated, unless Bank receives written notice from Creditor that such transactions may continue.

(d) Bank shall have no duty or responsibility whatsoever to inquire into or determine (i) whether any such Notice of Exclusive Control is proper or in accordance with the Loan Documents, or (ii) whether any application by Creditor of funds from the Account is in accordance with the Loan Documents.

**9. Priority of Creditor's Security Interest**

Bank subordinates in favor of Creditor any security interest, lien, or right of setoff it may have, now or in the future, against the Account or property in the Account, until termination of this Agreement, except that Bank will retain its prior lien on property in the Account to secure payment of normal bank charges and fees for the Account and dishonored items as provided in Sections 13 and 14.

**10. Statement and Other Information**

Upon Creditor's request (which request must be in writing, but need be made only once and not on a recurring basis), Bank shall send to Creditor copies of all the regular monthly account statements provided to Customer and such other information relating to the Account as shall be reasonably requested by Creditor, and a copy of all notices and statements required to be sent to Customer pursuant to any agreement governing or related to the Account. If a product or service is made available by Bank to Customer, Customer agrees to provide Creditor with online screen access to daily activity in the Account, whether by internet access or otherwise. Customer hereby authorizes the release of such information, notices, and statements to Creditor. Customer and Creditor agree that the costs and expenses incurred by Bank to comply with the foregoing are "Fees" as such term is defined in Section 13 hereof.

**11. Notice**

A statement, notice, confirmation, or other communication to a party under this Agreement will be in writing or made by telecommunications devices capable of creating a written record. The statement, notice, or confirmation will be sent to the party's address set forth below or to such other address as the party may notify the other parties, and will be effective (a) when delivered by hand or by nationally recognized overnight carrier, or (b) when delivered or the first attempted delivery on a Business Day when sent by mail, certified mail, return receipt requested, and postage prepaid.

|                     |                                        |
|---------------------|----------------------------------------|
| Address for Customer: | 20311 Sheridan Street                |
|                     | Pembroke Pines, Florida 33332          |
|                     | Attn: Office of General Counsel        |
|                     |                                        |
| With a copy to:     | Greenberg Traurig, LLP                 |
|                     | 3333 Piedmont Road                     |
|                     | Atlanta, GA 30326                      |
|                     | Attn: Jeffrey Smith, Esq.              |

|                      |                                                         |
|----------------------|---------------------------------------------------------|
| Address for Bank:    | The Huntington National Bank                            |
|                      | Deposit Account Control Agreements (MA1350)             |
|                      | 17 South High Street                                    |
|                      | Columbus, OH 43215                                      |
|                      | Email: DepositAccountControlAgreements@huntington.com   |
| With a copy to:      | The Huntington National Bank                            |
|                      | 2445 84th St. SW (WMIBC2)                               |
|                      | Byron Center, MI  49315                                 |
|                      | Attn:  Nate Drews                                       |
|                      | Email:  nate.drews@huntington.com                       |
| Address for Creditor: |                                                        |
|                      | 303 Peachtree St., N.E. / 25th Floor                    |
|                      | Atlanta, Georgia 30308                                  |
|                      | Attn:  Agency Services Manager                          |
| With a copy to:      | Moore & Van Allen PLLC                                  |
|                      | 100 North Tryon Street, Suite 4700                      |
|                      | Charlotte, NC                                           |
|                      | Attn:  Luis Lluberas                                    |

**12. Third Party Claims; Legal Process**

(a) During the term of this Agreement, Bank will not enter into any agreement with any person, other than Creditor, pursuant to which Bank will be obligated to comply with instructions from such person as to the disposition of any funds in the Account. Nor will Bank agree with any third party that Bank will comply with Account Related Orders originated by any third party. Bank will use reasonable efforts promptly to notify Creditor and Customer if any other person claims that (a) it has a property interest in property in the Account and/or (b) that it is a violation of that person's rights for anyone else to hold, transfer, or deal with the Collateral.

(b) If the Bank receives or has actual notice of any claim, notice, legal process, garnishment, or court order relating to the Account, and to the extent not otherwise prohibited by law or court or administrative order, Bank will notify Creditor and Customer of such receipt. Creditor and Customer understand and agree that Bank will comply with any such legal process, legal notice, or court order it receives if Bank determines, in its sole discretion, that such legal process, legal notice, or court order is legally binding on Bank. For purposes of this Section 12(b), receipt by Bank or notice to Bank means receipt by or notification to an officer of Bank who is responsible for the Account.

**13. Fees.**

All of Bank's service charges, overdraft and returned item fees, transfer fees, account maintenance fees and expenses under any Account Agreements (as hereafter defined) ("**Fees**") shall be charged by Bank when due against the funds on deposit in the Account at such time, or if there are insufficient funds, against any other account of Customer. To the extent funds on deposit in the Account (or any other account of Customer) are insufficient to cover Fees then due, Customer shall pay the balance of such Fees within 15 days after demand therefor. Such fees shall include without limitation, an account implementation fee of $ 600   per Account due at the time this Agreement is executed, and a monthly account servicing fee of $ 175 per month, per Account. After a Notice of Exclusive Control is received by Bank, then the monthly blocked account servicing fee shall increase to $ 350 per Account. The monthly account servicing fee is subject to change in Bank's discretion. Any new or changed Fees will take effect with the next account analysis or statement period after Bank sends notice to Customer that a change in Fees has occurred, unless some other effective date is set forth in such notice.

**14. Uncollected Funds.**

If (a) any checks or other receipts deposited in the Account are returned unpaid or otherwise dishonored for any reason, (b) there are overdrafts on the Account, (c) automated clearing house, wire transfer or other electronic entries for deposit into the Account are returned or otherwise dishonored, or (d) claims of breach of the UCC's transfer or presentment warranties are made against Bank in connection with items deposited to the Account (the items described in clauses (a) through (d) are collectively referred to as "Returned Sums"), Bank shall charge Returned Sums when returned, plus any applicable Fees, against funds on deposit in the Account at such time, or if there are insufficient funds, against any other account of Customer. To the extent funds on deposit in the Account (or any other account of Customer) are insufficient to cover such Returned Sums and Fees, Customer shall pay the balance of such Returned Sums and Fees within 15 days after demand therefor. If however, (i) the funds on deposit in the Account (or any other account of Customer) are insufficient to cover the Returned Sums and Fees then due, (ii) Customer does not pay the amount of such Returned Sums and Fees within 15 days after demand therefore, or Bank is enjoined, stayed or prohibited by operation of law from making demand on Customer, (iii) Creditor received the proceeds of any of the Returned Sums pursuant to an Account Related Order from Creditor, and (iv) Creditor received Bank's demand for reimbursement of the Returned Sums within 60 days after Creditor received the proceeds of said Returned Sums, then Creditor shall pay to Bank the amount of such Returned Sums so paid to Creditor within 30 days after receipt of written demand from Bank. Customer shall reimburse Creditor for any amounts so paid.

**15. Exculpation of Bank; Indemnity**

(a) Customer and Creditor agree that Bank shall have no liability to either of them for any loss or damage that either or both may claim to have suffered or incurred, either directly or indirectly, by reason of this Agreement or any transaction or service contemplated by the provisions hereof, unless occasioned by the bad faith, gross negligence, willful misconduct, or criminal acts or omissions of Bank. Nor shall Bank be liable for losses or delays resulting from computer malfunction, interruption of communication facilities, labor difficulties, or other causes beyond Bank's reasonable control.

(b) Customer will hold harmless, indemnify, and defend Bank, and its affiliates, successors, assigns, officers, directors, employees, and agents, against losses, liabilities, claims, litigation, demands, suits, costs, disbursements, or expenses incurred as a result of the assertion of any claim by any person or entity arising out of or otherwise arising from or in connection with or related to this Agreement, including reasonable attorneys' fees and disbursements, except to the extent the losses, liabilities,

claims, litigation, demands, suits, costs, disbursements, or expenses are a direct result of Bank's bad faith, gross negligence, willful misconduct or criminal acts or omissions.

(c) Creditor will hold harmless, indemnify, and defend Bank, and its affiliates, successors, assigns, officers, directors, employees, and agents, against losses, liabilities, claims, litigation, demands, suits, costs, disbursements, or expenses arising out of Account Related Orders given by Creditor to Bank under this Agreement or actions taken by Bank in compliance with Account Related Orders originated by Creditor, or otherwise following written instructions of Creditor hereunder, including reasonable attorneys' fees and disbursements, except to the extent the losses, liabilities, claims, litigation, demands, suits, costs, disbursements, or expenses are a direct result of Bank's bad faith, gross negligence, willful misconduct, or criminal acts or omissions. In the event of an assignment of Creditor's rights under this Agreement to the Secretary of Housing and Urban Development ("**HUD**") or the Federal Housing Commissioner ("**FHA**"), neither HUD nor FHA shall have any indemnification obligations under this Agreement.

(d) Customer will indemnify Creditor, and its officers, directors, employees, and agents against claims, liabilities, and expenses arising out of Creditor's indemnity of Bank set forth in the immediately preceding sentence, including reasonable attorney fees and disbursements, except to the extent the losses, liabilities, claims, litigation, demands, suits, costs, disbursements, or expenses are a direct result of Creditor's breach of any of the Loan Documents, or its bad faith, gross negligence, willful misconduct, or criminal acts or omissions.

(e) Notwithstanding the foregoing, in no event shall (i) Bank be liable for special, incidental, punitive or consequential loss or damage of any kind, including, without limitation, lost profits (whether or not Bank has been advised of the possibility of such loss or damage), and (ii) Creditor be liable for special, incidental, punitive or consequential loss or damage of any kind, including without limitation, lost profit (whether or not Creditor has been advised of the possibility of such loss or damage).

(f) Bank may charge all such amounts due under this Section 15 against funds on deposit in any account of Customer other than the Account and the Account defined in the Deposit Account Instruction and Services Agreement, dated of even date herewith, by and among Bank, Customer and Creditor. To the extent funds on deposit in such other accounts of Customer are insufficient to cover such amounts, Customer shall pay the balance of such amounts within 15 days after demand therefor.

(g) Bank may rely and shall be protected in acting or refraining from acting upon any written notice (including, but not limited to, electronically confirmed facsimiles of such notice) believed by it to be genuine and to have been signed or presented by the proper party or parties.

(h) This Agreement does not create any duty or obligation of Bank except for those expressly set forth in this Agreement.

(i) No warranties, express or implied, of any nature whatsoever are made by Bank in connection with the services to be provided under this Agreement.

16. **Termination; Survival**

(a) Creditor may terminate this Agreement by written notice to Bank and Customer. Bank may terminate this Agreement on 30 days prior written notice to Creditor and Customer. However, Bank may (1) terminate this Agreement upon 14 days prior written notice to Creditor and Customer in the circumstances described in Section 23 and (2) immediately terminate this Agreement or close the Account if required to do so under any statute, rule, regulation, or any order or process binding upon it, in its sole discretion.

    (i) If Bank terminates this Agreement pursuant to this Section 16(a), or Creditor terminates this Agreement pursuant to this Section 16(a) and Creditor has previously issued a Notice of Exclusive Control pursuant to Section 8, then the Account will be closed, and an official check issued to Creditor and mailed to the address set forth in Section 11.

    (ii) If Creditor terminates this Agreement pursuant to this Section 16(a) and no Notice of Exclusive Control has been issued pursuant to Section 8 then (A) Creditor shall have no further right to direct the disposition of funds in the Account, and (B) Customer shall continue to have access to and direct the disposition of funds in the Account until the Account is closed by Customer.

(b) If Creditor notifies Bank that Creditor's security interest in the Account has terminated, this Agreement will immediately terminate and Creditor shall have no further right to direct the disposition of funds in the Account.

(c) Customer may not terminate this Agreement without the prior written consent of Creditor.

(d) Section 15, "Exculpation of Bank; Indemnity," will survive termination of this Agreement.

**17. Bankruptcy**

If Bank at any time receives notice of the commencement of a bankruptcy case or other insolvency or liquidation proceeding by or against Customer, Bank will continue to comply with its obligations under this Agreement, except to the extent that any action required of Bank under this Agreement is prohibited under applicable bankruptcy laws or regulations, or is stayed pursuant to the automatic stay imposed under the United States Bankruptcy Code or by order of any court or agency, all as determined by Bank in its sole discretion.

**18. Governing Law**

This Agreement has been delivered to and accepted by Creditor and will be deemed to be made in the State of New York. This Agreement shall be governed by, and construed and interpreted in accordance with the law of, the State of New York, except for its conflict of law principles.

**19. Interpleader**

If at any time Bank, in good faith, is in doubt as to the action it should take under this Agreement, Bank shall have the right, at Customer's expense, to commence an interpleader action in the appropriate United States District Court in the State of New York and to take no further action except in accordance

with joint instructions from Creditor and Customer or in accordance with the final order of the court in such action.

### 20. Amendments

This Agreement can be modified or amended only by written agreement of all of the parties hereto evidencing such modification or amendment.

### 21. Severability

If any provision of this Agreement shall be determined by a court of competent jurisdiction to be invalid, unenforceable, or illegal, as written, that provision shall be interpreted so as to achieve, to the extent permitted by applicable law, the purposes intended by the original provision, and the remaining provisions of this Agreement shall continue intact. In addition, any such determination shall not apply in any circumstance, or to any party, not controlled by such determination.

### 22. Complete Agreement

The parties hereto acknowledge that each has read this Agreement, understands it, and agrees to be bound by its terms. The parties further agree that this Agreement and any modifications to it, and all account agreements, wire transfer agreements, electronic payment authorization agreements, lockbox agreements, and other agreements now or hereafter related to the Account or to services provided by Bank in connection therewith (collectively, the "**Account Agreements**"), constitute the complete and exclusive expression of the terms of the agreement between the parties, supersede all other proposals whether oral or written, understandings, representations, conditions, warranties, covenants, and all other communications between the parties relating to the subject matter of this Agreement. In the event of any conflict between this Agreement (or any portion thereof) and any Account Agreement, the terms of this Agreement shall prevail. Except as set forth in the preceding sentence, the terms of any such Account Agreements shall remain in full force and effect.

### 23. Successors and Assigns

This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns, but Customer shall not be entitled to assign or delegate any of its rights or duties hereunder without first obtaining the express prior written consent of Creditor and Bank. Notwithstanding the foregoing, if any assignee of Creditor (including HUD and FHA) should refuse to accept the terms and conditions (including, without limitation, the duty to indemnify Bank) of this Agreement, Bank shall have the right to terminate this Agreement on 14 days prior written notice to Creditor and Customer. In the event Bank elects to terminate this Agreement pursuant to the foregoing sentence, the terms of Section 16(a)(i) shall govern.

### 24. Waiver of Jury Trial

EACH PARTY ACKNOWLEDGES THAT, AS TO ANY AND ALL DISPUTES THAT MAY ARISE BETWEEN ANY OF THE PARTIES REGARDING THIS AGREEMENT, THE COMMERCIAL NATURE OF THE TRANSACTIONS OUT OF WHICH THIS AGREEMENT ARISES MAKES SUCH DISPUTE UNSUITABLE FOR TRIAL BY JURY. ACCORDINGLY, EACH PARTY HEREBY WAIVES ANY RIGHT TO TRIAL BY JURY AS TO ANY AND ALL DISPUTES THAT MAY ARISE RELATING TO THIS AGREEMENT.

### 25. Counterparts

   This Agreement may be executed in any number of counterparts, each of which shall be an original and all of which taken together shall constitute one and the same Agreement. Delivery of an executed signature page counterpart to this Agreement via telecopier facsimile transmission or other similar method of electronic transmission shall be effective as if it were delivery of a manually delivered, original, executed counterpart thereof.

        [Signatures on following page]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first above written.

**Quash Seltzer, LLC** _____ ("Customer")

By _____

Name John H. Owoc

Title: CEO/CSO

**Truist Bank, as administrative agent and collateral agent** ("Creditor")

By _____

Name:_____

Title:_____

**THE HUNTINGTON NATIONAL BANK** ("Bank")

By _____

Name:_____

Title:_____

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first above written.

**Quash Seltzer, LLC**   ("Customer")

By _____
Name:_____
Title:_____

**Truist Bank, as administrative agent and collateral agent** ("Creditor")

By _/s/ Jade Silver_____
Name:_Jade Silver_____
Title:_Senior Vice President_

**THE HUNTINGTON NATIONAL BANK**   ("Bank")

By _____
Name:_____
Title:_____

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first above written.

**Quash Seltzer, LLC** ("Customer")

By _____

Name: _____

Title: _____

**Truist Bank, as administrative agent and collateral agent** ("Creditor")

By _____

Name: _____

Title: _____

**THE HUNTINGTON NATIONAL BANK** ("Bank")

By _*[signature]*_____

Name: Nathan Drews

Title: Financial Recovery Rep.

Exhibit A

Truist Bank
Agency Services
303 Peachtree St., N.E. / 25th Floor
Atlanta, Georgia 30308
[Date]

Re:   Notice of Exclusive Control
      Account Holder: Quash Seltzer, LLC
      Account No. 1893771079 (the "Account")

To:   The Huntington National Bank Deposit Account Control Agreements (HC0740) 41 South High Street Columbus, OH 43287 DepositAccountControlAgreements@huntington.com

      This is to notify The Huntington National Bank ("**Bank**") that pursuant to Section 8 of the Account Control Agreement dated as of _____, by and among Bank, Customer, and Creditor (the "**Agreement**" and all capitalized terms in this letter having the meaning ascribed to such terms in the Agreement unless otherwise defined herein), the Collateral is now under the exclusive control of Creditor and Bank is instructed to refuse to accept any Account Related Orders from Customer regarding the Account unless consented to in writing by an officer of Creditor. All future instructions and Account Related Orders regarding the Account shall be given solely by an officer of Creditor. Effective as of the date hereof, Bank shall, on the last Business Day of each week hereafter, by standing order wire transfer, or via the ACH system, transfer to the following account, or such other account as designated by Creditor from time to time by written notice to Bank, all amounts constituting available funds on deposit in the Account in excess of any fees then due and owing to Bank pursuant to the Agreement:

      Recipient Bank Name: _____
      Address: _____
      _____
      ABA No. _____
      Account Name: _____
      Account No.: _____

Creditor represents and warrants to Bank that this Notice of Exclusive Control is lawful and authorized by the Loan Documents between Customer and Creditor.

Sincerely,

Truist Bank,
as administrative and collateral agent