# Debtors' Exhibit 5

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION
www.flsb.uscourts.gov

| | |
|---|---|
| In re: | Chapter 11 Cases |
| VITAL PHARMACEUTICALS, INC., *et al*., | Case No. 22-17842 (PDR) |
| | (Jointly Administered) |
| Debtors.[1] | |
| _____/ | |

**DEBTORS' OMNIBUS REPLY TO OBJECTIONS TO DEBTORS' EMERGENCY
MOTION FOR INTERIM AND FINAL ORDERS (I) APPROVING POSTPETITION
FINANCING, (II) AUTHORIZING USE OF CASH COLLATERAL, (III) GRANTING
LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS,
(IV) GRANTING ADEQUATE PROTECTION, (V) MODIFYING AUTOMATIC STAY,
(VI) SCHEDULING A FINAL HEARING, AND (VII) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors-in-possession (collectively, the "Debtors")

submit this omnibus reply (this "Reply") in support of the *Debtors' Emergency Motion for Interim*

*and Final Orders (I) Approving Postpetition Financing, (II) Authorizing Use of Cash Collateral,*

*(III) Granting Liens and Providing Superpriority Administrative Expense Status, (IV) Granting*

*Adequate Protection, (V) Modifying Automatic Stay, (VI) Scheduling a Final Hearing, and*

*(VII) Granting Related Relief* [ECF No. 24] (the "Motion")[2] and in response to the nine objections

and joinders thereto (the "Objections"),[3] and respectfully represent as follows:

---

[1]     The address of the Debtors is 1600 N. Park Drive, Weston, FL 33326.  The last four digits of the Debtors' federal
tax identification numbers are: (i) Vital Pharmaceuticals, Inc. (8430); (ii) Bang Energy Canada, Inc. (5454);
(iii) JHO Intellectual Property Holdings, LLC (0010); (iv) JHO Real Estate Investment, LLC (9394); (v) Quash
Seltzer, LLC (6501); (vi) Rainbow Unicorn Bev LLC (2254); and (vii) Vital Pharmaceuticals International Sales,
Inc. (8019).

[2]     Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Motion or the DIP
Credit Agreement, as applicable.

[3]     The "Objections" are, collectively: (i) the objection of the Maricopa County Treasurer ("Maricopa County") [ECF
No. 220] (the "Maricopa County Objection"); (ii) the objection of Faith Technologies, Inc. ("FTI") [ECF No.
256] (the "FTI Objection"); (iii) the objection of HACI Mechanical Contractors, Inc. ("HACI") [ECF No. 259]
(the "HACI Objection"); (iv) the objection of the United States Trustee (the "U.S. Trustee") [ECF No. 267] (the
"UST Objection"); (v) the objection of Monster Energy Company ("Monster") [ECF No. 411] (the "Monster
Objection"); (vi) the objection of the Official Committee of Unsecured Creditors (the "Committee") [ECF No.
413] (the "Committee Objection"); (vii) the objection of Stellar Group, Inc. ("Stellar") [ECF No. 412] (the "Stellar
Objection"); (viii) the joinder by Orange Bang, Inc. ("Orange Bang") to the Monster Objection [ECF No. 414]

## PRELIMINARY STATEMENT

1.     Notwithstanding the Objections, there does not appear to be any meaningful dispute that: (i) the Debtors require the DIP Facility and the use of cash collateral thereunder to operate their business, fund these chapter 11 cases, and, ultimately, maximize the value of their bankruptcy estates; (ii) there is no better or alternative postpetition financing available to the Debtors to accomplish those (or any other) objectives, whether on an unsecured, junior secured, or priming lien basis; and (iii) the terms of the DIP Facility were bargained for in good faith and at arms' length.

2.     Rather than challenge any of the foregoing, the Objections take issue with individual terms of the DIP Facility, such as the Roll Up, the case milestones, the waiver of the estates' surcharge rights under section 506(c) of the Bankruptcy Code, and others.  The Objections brush aside the fact that each of these terms are part of a larger, comprehensive bargain struck among the Debtors, the DIP Lenders and the Prepetition Secured Parties that secures $100 million of new money financing for the Debtors.  While the Debtors would have welcomed $100 million of unsecured, "no-strings-attached" financing, that option was (and is) unavailable.

3.     It would not be realistic to expect this lender group (or any other) to forgo commonplace and appropriate protections for postpetition lenders of the sort contained in the DIP Facility.  The DIP Lenders have nevertheless agreed to numerous concessions during ***both*** prepetition and postpetition negotiations with the Debtors and other parties in interest, including the objecting parties.  Such concessions, which, are subject to resolution of the Governance Changes (as defined below) include (among others): a $120 million reduction in the maximum

---

("Orange Bang Joinder"); and (ix) the joinder by the American Bottling Company ("American Bottling") to the Monster Objection [ECF No. 415] (the "American Bottling Joinder").  Contemporaneously filed herewith, is a table summarizing all formal and informal objections received by the Debtors and their responses thereto, including those objections that have been consensually addressed and resolved (such table, the "Summary Objection Chart").

11816326-1

amount of the Roll Up, limitations on the lenders' liens on and recourse to certain litigation claims, extended milestones and DIP maturity, and an extension of the challenge period and increase in the committee investigation budget, are set forth in the proposed final DIP order filed contemporaneously herewith (the "Final Order")[4] and are described in paragraph 14, below.

4.     These compromises resolve the Committee's Objection to the *terms* of the DIP Facility, though the Committee's governance-related objections remain open.  Accordingly, the terms of the DIP Facility (excepting governance) now enjoy the support of ***both*** estate fiduciaries.  Given the significant overlap between the issues raised in the Committee Objection and the Objections filed by Monster and the U.S. Trustee (*e.g.*, the Roll Up, 506(c)/equities of case waivers, the DIP Lenders' and Prepetition Lenders' recourse to litigation claims), the Debtors are hopeful that the proposed resolution of the Committee Objection creates an opportunity to build additional consensus in advance of the hearing on entry of the Final Order.  Additionally, as discussed in greater detail below, the Debtors and DIP Lenders have agreed to enhance the protections offered to the Arizona Mechanics' Lienholders under the Final Order in a manner that should leave no doubt that such lienholders are receiving adequate protection.  Whether or not these concessions yield unanimous agreement, however, it is clear that the terms of the DIP Facility – particularly as modified by the proposed Final Order – are fair and reasonable and otherwise satisfy the requirements of the Bankruptcy Code.

5.     Finally, as previewed at the December 6 hearing, the DIP Lenders have requested changes to the Debtors' boards (the "Board") as well as certain other modifications to the Debtors' governance framework, including: (i) appointment of a replacement director deemed independent by the DIP Lenders to fill the vacancy left by Ms. Cole on the Board; (ii) replacement of one of

---

[4]     A redline of the proposed Final Order against the Interim Order (defined below) entered by the Court is filed contemporaneously herewith.

two Board members (either Dr. Escalante or Mr. Hillman) with a new director deemed independent by the DIP Lenders; and (iii) formalization of the scope of authority of, and reporting structure applicable to, the Debtors' Chief Transformation Officer, John DiDonato ((i)-(iii) collectively, the "Governance Changes").[5]   While certain of these issues have been addressed – specifically agreement with respect to the Debtors' appointment of Mr. Robert Dickinson as the replacement director for Ms. Cole – the Debtors are still considering the remaining governance-related issues and continue to engage in discussions with the DIP Lenders with respect to all open points.  In such discussions with the Debtors, the DIP Lenders have made clear that they will not provide funds under the DIP Facility absent a resolution on all of the Governance Changes requested by the DIP Lenders, and the parties are hopeful that a resolution will be reached prior to the final hearing on the DIP Facility.[6]

## BACKGROUND

**A.    General Background**

6.      On October 10, 2022 (the "Petition Date"), the Debtors filed the Motion.

7.      On November 1, 2022, the Office of the U.S. Trustee appointed the Committee.[7]

8.      On October 14, 2022, the Court entered the *Interim Order (I) Approving Postpetition Financing, (II) Authorizing Use of Cash Collateral, (III) Granting Liens and Providing, Superpriority Administrative Expense Status, (IV) Granting Adequate Protection,*

---

[5]    Hr'g Tr. at 11:11-16, In re Vital Pharmaceuticals, Inc., No. 22-17842 (PDR) (Bankr. S.D. Fla. Dec. 6, 2022) (Debtors' counsel stating that "[f]ollowing Ms. Cole's departure, the lenders indicated to us that they would require certain changes to the governance requirements in our DIP facility in order to be comfortable proceeding with the DIP, that included accommodations that were designed to address, and ideally resolve the outstanding DIP objections.").

[6]    The Debtors will endeavor to file a status update on the docket prior to the final hearing on the DIP Facility to the extent that there is one to provide.

[7]    The U.S. Trustee reconstituted the Committee on November 23, 2022.  *See* ECF Nos. 408-7.

*(V) Modifying Automatic Stay, (VI)Scheduling a Final Hearing, and (VII) Granting Related Relief* [ECF No. 122] (the "Interim Order") approving the Motion on an interim basis.

9.      The Debtors continue to the manage and operate their businesses and properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

**B.    Factual Support**

10.     On the Petition Date the Debtors filed the *Declaration of Homer Parkhill in Support of DIP Financing* [ECF. No. 25] (the "Initial Parkhill Declaration").

11.     On November 21, 2022 the Debtors filed the *Supplemental Declaration of Homer Parkhill in Support of DIP Financing* [ECF. No. 388] (the "First Supplemental Parkhill Declaration").

12.     Contemporaneously herewith, the Debtors filed (i) the *Second Supplemental Declaration of Homer Parkhill in Support of DIP Financing* (the "Second Supplemental Parkhill Declaration"), and (ii) and the *Declaration of John C. DiDonato in Support of DIP Financing* (the "DiDonato Declaration").

13.     The facts in support of approval of the Final Order are set forth in (i) the Motion, (ii) the Initial Parkhill Declaration, (iii) the First Supplemental Parkhill Declaration, (iv) the Second Supplemental Parkhill Declaration, and (v) the DiDonato Declaration (collectively, (ii)-(v), the "Declarations"). Each Declaration is incorporated herein by reference. The Debtors reserve all rights to supplement the factual record in support of the Motion with additional testimony and evidence at the final hearing with respect to the Motion.

**C.    DIP Lender Concessions Since Interim Hearing**

14.     The Debtors and DIP Lenders have been in discussions with the Committee and other objectors throughout the period between the Interim Hearing and the final hearing in an effort

11816326-1

to resolve and/or narrow the issues raised in the Objections.  As a result of those discussions, the

DIP Lenders have agreed to a number of concessions, including the following:

- **Reducing and modifying the Roll Up**.  The Roll Up, originally set to cover up to a maximum amount of approximately \$355 million in outstanding Prepetition Obligations, is now proposed to be \$235 million.  The Roll Up will also "deem" such \$235 million of outstanding rolled-up Prepetition Obligations to be repaid by \$235 million of DIP Obligations upon entry of the Final Order, and will no longer contain the "creeping" component.[8]

- **Placing limitations on the DIP Collateral**.

  - The DIP Liens securing the **non**-Roll Up portion of the DIP Facility (*i.e.,* up to \$100 million) will be secured by the DIP Collateral (which excludes, for the avoidance of doubt, Prepetition Avoidance Actions[9] and their proceeds).  With respect to such collateral, the DIP Agent and the DIP Lenders have agreed to seek recourse ***first*** from DIP Collateral **not** constituting Commercial Tort Claims (as defined in the Uniform Commercial Code as enacted by the State of New York) against insiders or affiliates (as such terms are defined in section 101 of the Bankruptcy Code) before exhausting all avenues of recovering from other DIP Collateral.[10]

  - The DIP Liens securing the Roll Up portion of the DIP Facility (*i.e.*, \$235 million) will continue not to attach to Prepetition Avoidance Actions or their proceeds, and will also **not** attach to  (i) claims and causes of action available to the Debtors or their estates under sections 549 and 550 of the Bankruptcy Code (to the extent that such avoidance actions arise under section 549 of the Bankruptcy Code), against insiders, affiliates, or any other person or entity (as such terms are defined in section 101 of the Bankruptcy Code), and (ii) Commercial Tort Claims that do not already constitute Prepetition Collateral.[11]

- **Placing Limitations on the DIP Superpriority Claim**.

  - The DIP Superpriority Claim related to the DIP Obligations constituting the **non**-Roll Up portion of the DIP Obligations (*i.e.,* up to \$100 million) will **not have recourse to** proceeds or property recovered in connection with claims and causes of action available to the Debtors or their estates through the exercise of the powers granted by section 547 of the Bankruptcy Code (against insiders, affiliates, or any other person or entity (as such terms are

---

[8]   *See* Final Order ¶ 15(iii).

[9]   "Prepetition Avoidance Actions" are defined in the Final Order as: claims and causes of action available to the Debtors or their estates through the exercise of the powers granted by sections 544, 545, 547, 548, 550 (other than with respect to any applicability to section 549) and 553 of the Bankruptcy Code.

[10]   *See* Final Order ¶ 61(a)(i).

[11]   *See* Final Order ¶ 61(a)(ii).

defined in section 101 of the Bankruptcy Code)) and section 550 of the Bankruptcy Code (with respect to any applicability to section 547) of the Bankruptcy Code.[12]

- o The DIP Superpriority Claim related to the DIP Obligations constituting the Roll Up portion of the DIP Facility (*i.e.,* $235 million) will **not have recourse to** proceeds or property recovered in connection with the pursuit of (i) Prepetition Avoidance Actions, (ii) claims and causes of action available to the Debtors or their estates under sections 549 and 550 (that do not arise under section 549 of the Bankruptcy Code) of the Bankruptcy Code against insiders, affiliates, or any other person or entity (as such terms are defined in section 101 of the Bankruptcy Code), and (iii) Commercial Tort Claims that do not already constitute Prepetition Collateral.[13]

- **Reduction of the Prepetition Secured Lenders' Adequate Protection Payments**.  Subject to the passage of the Challenge Period without a Challenge by the Committee, the escalating interest rate in connection with the Prepetition Obligations, on which the cash adequate protection payments payable on the non-Rolled Up Prepetition Obligations are based, will be subject to a cap not to exceed a certain "Agreed Rate"[14]—which is *less* than the contractual rate of interest to which the Prepetition Lenders would otherwise be entitled.[15]  The Final Order would preserve the Prepetition Lenders' ability to recover any accrued interest in excess from the cap from non-Debtor assets, and, subject to general unsecured creditors receiving certain minimum recoveries, estate assets.

- **Turnover to Debtors of certain non-Debtor real estate sale proceeds**.  Upon the sale of real property owned by non-Debtor affiliates that constitute collateral for the Prepetition Obligations, the Prepetition Agent shall deliver to the Debtors cash proceeds equal to the actual and documented amount of postpetition costs and expenses funded to the applicable non-Debtor affiliate by the estates.  The remaining proceeds shall be applied to the Prepetition Obligations, net of reasonable and documented closing costs, expenses, and taxes.[16]

---

[12] *See* Final Order ¶ 61(b)(i).  For clarity and the avoidance of doubt, The DIP Superpriority Claim related to the DIP Obligations constituting the **non-**Roll Up portion of the DIP Obligations (*i.e.,* up to $100 million) **will** have recourse to Prepetition Avoidance Actions *other than* Prepetition Avoidance Actions pursuant to sections 547 (against insiders, affiliates, or any other person or entity (as such terms are defined in section 101 of the Bankruptcy Code)) and 550 of the Bankruptcy Code (with respect to any applicability to section 547) of the Bankruptcy Code.

[13] *See* Final Order ¶ 61(b)(ii).

[14] The "Agreed Rate" means the Base Rate (as defined in the Prepetition Credit Agreement) (currently 7%, which will continue to float) plus the applicable spread (6.5% as of December 1, which will be fixed without any future escalation upon entry of a Final Order), plus the default rate of 2%, but in any event not less than 15% in total.

[15] *See* Final Order ¶ 61(c).

[16] *See* Final Order ¶ 61(d).

- **Extension of the maturity date**.  The DIP Facility maturity date will be extended by two weeks, from May 10, 2023 to May 24, 2023.[17]

- **Extension of the Transaction Milestone**.  The deadline for the Debtors to (i) obtain Acceptable Financing, or (ii) if the Debtors pursue a Sale Transaction, (a) obtain an order approving a bid procedures motion and setting an auction date, (b) designate a "stalking horse," and (c) file a motion seeking approval of the "stalking horse" and related protections will be extended from January 23, 2023 to March 13, 2023.[18]

- **Inclusion of additional milestones**.  The following additional interim milestones have been imposed upon the Debtors: (i) January 13, 2023 as the deadline to have received at least one indication of interest regarding commitments for an Acceptable Financing, (ii) January 27, 2023 as the deadline for the Debtors to have filed a bid procedures motion, (iii) February 28, 2023 as the deadline to have held a hearing on the bid procedures motion, (iv) March 31, 2023 as the deadline to have obtained approval after a hearing to designate a "stalking horse", (v) April 19, 2023 as the deadline to have held an auction (if the Debtors pursue the Sale Transaction), and (vi) May 17, 2023 as the deadline to have consummated an Acceptable Financing or Sale Transaction.[19]

- **Increasing the Committee's investigation budget**.  The Committee's budget to investigate potential Challenges will increase from $50,000 to $100,000.[20]

- **Extending the Challenge Period**.  The Challenge Period for *all* parties in interest will be extended from December 31, 2022 to January 16, 2023 (subject to automatic tolling for filing a standing motion in accordance with the terms agreed to with Monster at the Interim Hearing and memorialized in ¶ 40(b) of the Interim Order).[21]

- **Granting the Committee standing to pursue a Challenge**.  The Committee will be granted automatic standing to Challenge the nature, extent, or priority of liens securing the Prepetition Obligations.[22]

### D.    Corporate Governance

15.    Following discussions with the DIP Lenders, the Debtors have implemented certain

changes to the Board composition by filling the vacancy left by Ms. Cole with a new independent

---

[17]    *See* Final Order ¶ 61(e).

[18]    *See* Final Order ¶ 46(d).

[19]    *See* Final Order ¶ 46(a)-(g).

[20]    *See* Final Order ¶ 38.

[21]    *See* Final Order ¶ 40(a).

[22]    *See* Final Order ¶ 40(c).

11816326-1

director, Mr. Robert Dickinson, the former President & CEO of Carnival Cruise Lines.  Other

Governance Changes requested by the DIP Lenders include: replacing Dr. Escalante or Mr.

Hillman with a director deemed independent by the DIP Lenders, and formalizing the scope of

authority of, and reporting structure applicable to, the Debtors' Chief Transformation Officer, John

DiDonato, as well as treating the Chief Transformation Officer as a "key man" whose resignation

or termination would trigger a default.  The Debtors continue to engage in discussions with the

DIP Lenders with respect to all the Governance Changes, and are hopeful that a resolution will be

reached prior to the final hearing on the Motion.

## REPLY

A.    **The DIP Facility Represents an Exercise of Sound Business Judgment and Is
      In the Best Interests of the Debtors' Estates and Stakeholders.**

16.     The Debtors have established, and no Objection has challenged, that the Debtors

have satisfied the standards required to access postpetition financing on a superpriority, priming

lien basis under sections 364(c) and 364(d) of the Bankruptcy Code.[23]  Once the requirements of

section 364 of the Bankruptcy Code have been met, the debtor must show that the terms of the

proposed postpetition financing are appropriate under the circumstances.  *See e.g., Bland v.

Farmworker Creditors*, 308 B.R. 109, 113 (S.D. Ga. 2003) ("courts require the debtor basically to

show why 'super-priority' financing is a good idea.").  A debtor may meet this burden by

demonstrating satisfaction of a variety of factors, including, without limitation: (i) that the

proposed financing is an exercise of the debtor's sound and reasonable business judgment, (ii) that

no alternative financing is available, (iii) that the proposed financing is necessary to the continued

operation of the debtor's business and the preservation of the debtor's estate, (iv) that the proposed

financing is in best interest of the estate and its creditors, and (v) that the financing agreement was

---

[23]    *See* Motion ¶ 29; Initial Parkhill Decl. ¶¶ 14, 27.

11816326-1

negotiated in good faith and at arms' length between debtor and proposed lender. *Id*. at 113–14 (citing *In re Farmland Indus., Inc.,* 294 B.R. 855, 880 (Bankr.W.D.Mo.2003)); *see also In re W. Pac. Airlines, Inc.*, 223 B.R. 567, 572 (Bankr. D. Colo. 1997) ("the Debtor has the burden of proof on four issues: first, that the proposed financing is an exercise of sound and reasonable business judgment; second, that no alternative financing is available on any other basis; third, that the financing is in the best interests of the estate and its creditors; and, as a corollary to the first three points, that no better offers, bids, or timely proposals are before the Court.").

17.     The Objections provide no basis to find that entry into the DIP Facility is not fair, reasonable and appropriate under the circumstances.  The record demonstrates (i) that the DIP Facility remains the Debtors' ***only*** available financing option,[24] (ii) that the Debtors and DIP Lenders negotiated the terms of the DIP Facility in good faith and at arms' length, both prior to and following the Petition Date,[25] and (iii) that access to the DIP Facility is essential for the Debtors' continued operations and the preservation of their estates.[26]  Not a single Objection challenges these facts.  No objecting party has come forth with evidence of an alternative financing proposal, questioned the nature or propriety of the Debtors' negotiations with respect to the DIP Facility, or disputed the Debtors' need to access liquidity under the DIP Facility.

18.     The Objections also provide no basis to determine that the DIP Facility is not in the best interests of the Debtors, their estates, and their stakeholders.  In fact, the record demonstrates the contrary: approval of the DIP Facility will undeniably benefit the Debtors and their stakeholders.[27]  Absent access to the DIP Facility, the Debtors would have insufficient liquidity to satisfy obligations essential to their operations during these proceedings, including, but not limited

---

[24]   *See* Initial Parkhill Decl. ¶¶ 13-14; First Supp. Parkhill Decl. ¶¶ 5-6, 8.

[25]   *See* Initial Parkhill Decl. ¶¶ 15-17; Second Supp. Parkhill Decl. ¶ 6.

[26]   *See* Initial Parkhill Decl. ¶¶ 7, 19; First Suppl. Parkhill Decl. ¶ 7; DiDonato Dec. ¶ 6.

[27]   *See* First Suppl. Parkhill Decl. ¶¶ 7-8; DiDonato Decl. ¶¶ 7, 9.

to, working capital obligations, payroll expenses, the key employee retention plan, supplier and vendor invoices, professional fees, and overhead costs.[28]  Failure to secure postpetition financing would also needlessly cause a liquidity crisis that could have a detrimental interruption on the business, derail the Debtors' reorganization efforts, and endanger the Debtors' ability maximize value for all parties in interest.[29]  Barring approval of the DIP Facility, the Debtors could also lose the confidence and cooperation of their employees and key business partners, including creditors, vendors, and customers, and be forced to modify business operations in significant and adverse manners.[30]  In contrast, access to the DIP Facility provides a signal to the Debtors' vendors, customers, employees and the larger market that the Debtors have the ability to meet their ordinary course obligations during the pendency of these cases, and such a signal mitigates against the uncertainty caused by these proceedings.[31]  Accordingly, entry into the DIP Facility preserves the value of the Debtors' businesses and assets and therefore benefits the Debtors as well as their stakeholders.[32]

### B. The Remaining, Non-Governance Related Objections to Individual DIP Facility Terms Do Not Provide Sufficient Basis to Disregard the Debtors' Judgement to Enter into the DIP Facility.

19.     The Objections filed by the Committee, Monster, and the U.S. Trustee challenge certain discrete DIP Facility provisions, including: (i) the Roll Up, (ii) the milestones, (iii) the size and nature of adequate protection provided to the DIP Lenders, (iv) the proposed challenge period and investigation budget, and (v) the waivers of the estates' surcharge rights under section 506(c) of the Bankruptcy Code, the "equities of the case" doctrine, and of the Debtors' marshaling

---

[28]    *See* First Suppl. Parkhill Decl. ¶ 7; DiDonato Decl. ¶ 7.

[29]    S*ee* DiDonato Decl. ¶ 10,11.

[30]    *See* First Suppl. Parkhill Decl. ¶¶ 7-8; DiDonato Decl. ¶¶ 8-9.

[31]    *See* Initial Parkhill Decl. ¶ 19.

[32]    *See* Second Suppl. Parkhill Decl. ¶ 14; DiDonato Decl. ¶ 11.

11816326-1

rights.[33]

20.     As an initial matter, and as set forth in Summary Objection Chart, filed contemporaneously herewith, the Debtors believe that they have settled or otherwise addressed and resolved each of the above-noted objections by making additional modifications to the DIP Facility, such that the only remaining objections (except for the governance issues discussed herein) are: (i) the U.S. Trustee's and Monster's objections to the Roll Up, (ii) Monster's objections to the milestone provisions, (iii) the U.S. Trustee's and Monster's objections (as applicable) to the section 506(c) of the Bankruptcy Code, "equities of the case", and marshalling waivers, (iv) the U.S. Trustee's and Monster's objections to the granting of liens on, or superpriority claims with recourse to proceeds of certain litigation claims, and (v) the Arizona Mechanics' Lienholders' adequate protection-based objections.  Each of these objections should be overruled for the reasons set forth below.

### 1.     The Roll Up, as Modified, Is Fair and Reasonable Under the Circumstances.

21.     The Roll Up is the product of extensive pre- and post-petition negotiations among the Debtors, the DIP Lenders, the Prepetition Secured Parties, and the Committee, and its inclusion in the DIP Facility represents a sound exercise of the Debtors' business judgment.

22.     The Roll Up as originally set forth in the Motion (the "Initial Roll Up") was the result of good-faith, prepetition negotiations among the Debtors and the Prepetition Secured Parties.[34]  The Initial Roll Up was a necessary inducement for the Prepetition Secured Parties to provide the Debtors with access to postpetition financing in sufficient size and tenor and to consent to the Debtors' use of the Prepetition Secured Parties' Cash Collateral during the pendency of these

---

[33]   *See* Comm. Obj. *passim*, Monster Obj. *passim*, UST Obj. *passim*.

[34]   *See* Initial Parkhill Decl. ¶ 26.

cases.[35]  In addition, the Initial Roll Up provided an economic benefit to the Debtors by allowing for the repayment of prepetition debt on more favorable terms than previously available.[36]

23.     Following the Petition Date, the Debtors, the DIP Lenders, the Prepetition Secured Parties, and the Committee engaged in further negotiations with the respect to the Roll Up, ultimately agreeing upon the terms contained in the Final Order.[37]  Through that negotiation, the terms of the Roll Up improved, from the estate's perspective.  Specifically, the Prepetition Secured Parties and DIP Lenders agreed to reduce the Roll Up from a maximum amount of approximately $355 million in outstanding Prepetition Obligations to $235 million in exchange for the Committee's support for the DIP Facility, and toggled from a "creeping" roll up structure to a "deemed" roll up upon entry of the Final Order that allows the Debtors to realize the benefit of the reduced interest rate on the rolled-up prepetition debt sooner than they otherwise would.[38]

24.     Having now been subject to several rounds of negotiation with multiple parties, it is clear that the Roll Up is a highly negotiated term that is essential to the DIP Lenders' willingness to provide the Debtors with access to the $100 million of new money DIP financing and cash collateral.[39]  With this context in mind, the Court should overrule any unresolved objections to the Roll Up asserted by the U.S. Trustee and Monster.  Nevertheless, the Debtors will respond to the specific arguments raised in the Objections below.

25.     **First**, to the extent that the U.S. Trustee takes the position that *all* roll up arrangements result in impermissible cross-collateralization and are therefore prohibited under

---

[35]   *See* Initial Parkhill Decl. ¶ 26.

[36]   *See* Initial Parkhill Decl. ¶ 26.

[37]   *See* Final Order ¶ 15.

[38]   *See* Second Suppl. Parkhill Decl. ¶ 16.

[39]   *See* Second Suppl. Parkhill Decl. ¶ 15.

11816326-1

applicable law, such position is misguided.[40]   The U.S. Trustee cites *In re Saybrook Mfg. Co., Inc.*, 963 F.2d 1490 (11th Cir. 1992), in which the 11th Circuit held that the granting of liens on previously unencumbered assets to secure an **undersecured** prepetition loan constituted unauthorized cross-collateralization under section 364 of the Bankruptcy Code.   *Id.* at 1491, 1496.[41]   However, roll ups are not necessarily tantamount to cross-collateralization, particularly where the prepetition liens subject to the roll up attach to substantially all of the debtors' assets. In such cases, roll ups can be construed as a repayment, from DIP proceeds, of a prepetition secured claim – a relatively common occurrence, particularly where there is an economic benefit to the estate from doing so.   *See e.g. In re Capmark Fin. Grp., Inc.*, 438 B.R. 471, 510-11 (Bankr. D. Del. 2010) ("[P]repetition secured claims can be paid off through a 'roll-up,'" and "[t]here is no per se rule against paying pre-petition secured claims outside of a plan of reorganization."). Moreover, bankruptcy courts within the 11th Circuit (including after *Saybrook*) and elsewhere have approved numerous debtor-in-possession facilities featuring roll ups of prepetition debt that were justified under the circumstances, demonstrating that the U.S. Trustee's absolutist position is at odds with current chapter 11 practice.[42]   Indeed, this Court has observed that roll ups are not inappropriate in and of themselves.   *See* Hr'g Tr. at 68:7-11, *In re Tamarac 1022, LLC*, No. 20-23346 (PDR) (Bankr. S.D. Fla. Dec. 9, 2020) ("I don't have a problem with the rollup as a rollup

---

[40]   *See* UST Objection ¶¶ 11-17.

[41]   *See* UST Objection ¶ 13.

[42]   *See e.g.*, *In re Tamarac 10200, LLC*, No. 20-23346-BKC-PDR (Bankr. S.D. Fla. Dec. 31, 2020); *In re 24 Hour Fitness Worldwide, Inc.*, No. 20-11558 (KBO) (Bankr. D. Del. Aug. 3, 2020); *In re Northeast Gas Generation, LLC*, No. 20-11597 (MFW) (Bankr. D. Del. July 17, 2020); *In re McDermott International, Inc.*, No. 20-30336 (DRJ) (Bankr. S.D. Tex. Feb. 24, 2020); *In re Bumble Bee Parent, Inc.*, No. 19-12502 (LSS) (Bankr. D. Del. Dec. 19, 2019); *In re Sheridan Holding Company II, LLC*, No. 19-35198 (MI) (Bankr. S.D. Tex. Oct. 21, 2019); *In re Vanguard Natural Resources, Inc.*, No. 19-31786 (DRJ) (Bankr. S.D. Tex. Apr. 30, 2019); In re Z Gallerie, LLC, No. 19-10488 (LSS) (Bankr. D. Del. Apr. 9, 2019); *In re CTI Foods, LLC*, No. 19-10497 (CSS) (Bankr. D. Del. Apr. 5, 2019); *In re Charlotte Russe Holding, Inc.*, No. 19-10210 (LSS) (Bankr. D. Del. Mar. 7, 2019); *In re The Bon-Ton Stores, Inc.*, No. 18-10248 (Bankr. D. Del. Mar. 12, 2018); *In re Ameriforge Group Inc.*, No. 17-32660 (DRJ) (Bankr. S.D. Tex. May 22, 2017); *In re Chassix Holdings, Inc.*, No. 15-10578 (Bankr. S.D.N.Y. Apr. 10, 2015); *In re Carpenter Contractors of America, Inc., d/b/a R&D Theil*, No. 10-B-42604-RBR (Bankr. S.D. Fla. Apr. 6, 2011).

[. . . .] I've been in cases where entire loans have been rolled up as well.").

26.     **Second**, evaluation of a roll up requires consideration of the impact of the roll up on the bankruptcy estate, including the potential to enhance the prepetition lender's collateral package at the expense of unsecured creditors.  *See e.g., Bayside Capital Inc. v. TPC Group Inc.,* Adv. Pro. No. 22-50372 (CTG), 2022 WL 2498751, at *11 (Bankr. D. Del. July 7, 2022) ("[R]olling up that debt (and thereby granting it administrative claim status in the bankruptcy case) has relatively little effect on other creditors.  If the value of the collateral would, in any event, go first to pay the [prepetition noteholders][. . .]"); *see also* Hr'g Tr. at 58:1-7, *In re Tamarac 1022, LLC* ("My concern is [. . .] what impact this roll up will have on the administrative level claim, and whether that administrative level claim is secured by the proceeds of the avoidance actions, or would partake in the proceeds of the avoidance actions before unsecured creditors would be able to participate in those.").

27.     The Roll Up does not constitute such a disfavored "collateral grab" by the DIP Lenders.  The Prepetition Liens already encumber substantially all of the Debtors' assets – a fact to which the Debtors, after conducting due diligence, stipulated in the Interim Order and Final Order.[43]  The Debtors recognize that their stipulations are not binding on other, non-Debtor parties in interest, and remain subject to Challenge under the Final Order.[44]  However, if a successful Challenge results in a determination that there were meaningful gaps in the Prepetition Secured Parties' prepetition collateral package, then the Final Order affords the Court the flexibility to fashion an appropriate remedy to redress any prejudice to unsecured creditors that might have

---

[43]     *See* Interim Order ¶ E(iii); Final Order ¶ E(iii).

[44]     *See* Final Order ¶ 40.

occurred due to the Roll Up.[45]  If no such Challenge prevails, then the Prepetition Secured Parties will not have improved their collateral position at all through the Roll Up.  This is particularly true in light of the DIP Lenders' agreement to exclude the only potentially meaningful unencumbered assets in the Debtors' bankruptcy estates (*i.e.,* proceeds of Prepetition Avoidance Actions and Commercial Tort Claims on which the Prepetition Secured Parties did not previously have perfected liens) from the scope of the DIP Liens and the DIP Superpriority Claims securing the rolled up portion of the DIP Obligations.[46]

28.     Far from being an effort to improve their collateral position, the DIP Lenders' insistence on the Roll Up reflects their consistent objective (and demand) throughout the forbearance period: to have their loans repaid in full, in cash.  In prepetition negotiations with the Debtors, the Prepetition Secured Lenders agreed to provide a longer "bridge" to a value-maximizing transaction by extending the DIP Facility maturity date from their original proposal of four months to seven months, and increasing the size of the DIP Facility from $49 million in new money to $100 million in new money.  In exchange, the DIP Lenders demanded protection against their DIP Facility being used to bridge to a "cram up" plan.  That protection came in the form of an increased Roll Up, which was and is a fair, reasonable, and ultimately a mutually beneficial arrangement for the Debtors and the DIP Lenders.

29.     ***Third***, the Roll Up benefits the Debtors and their estates by providing substantial savings due to the fact that the DIP Loans bear interest at a lower rate (1-month SOFR + 8.50% or Base Rate + 7.50%) than the Prepetition Loans (Base Rate + 6.50% + 2.00%, and not less than 15% in any event), which interest would accrue postpetition on the Prepetition Loans at the

---

[45]  *See* Final Order ¶ 33.  The inclusion of this provision in the Final Order should also alleviate the concerns raised by Monster that the Roll Up will have the effect of providing the rolled up portion of the DIP Obligations with "unavoidable liens" over existing collateral.  *See* Monster Obj. ¶ 20.

[46]  *See* Final Order ¶ 5 (definition of DIP Collateral, which excludes Prepetition Avoidance Actions).

contract rate to the extent they remained outstanding. *See First United Sec. Bank v. Garner (In re Garner)*, 663 F.3d 1218, 1220 (11th Cir. 2011) ("There is no dispute that interest accumulated between filing the bankruptcy petition and confirmation of the bankruptcy plan is calculated at the contract rate under Section 506(b)."); 11 U.S.C. § 506(b).

30.     ***Finally***, Monster asserts that the ratio of rolled up debt to new money financing (*i.e.*, the "roll up ratio") is off-market and therefore objectionable.[47]   Notably, the current roll up ratio is 2.35:1, a significant reduction from the 3.55:1 ratio under the original DIP Facility.   But in any event, the Debtors submit that the roll up ratio is not determinative as to the fairness or reasonableness of the Roll Up or the broader terms of the DIP Facility.   The roll up ratio reveals little about the actual impact of the Roll Up on the Debtors' estates and stakeholders, which is a central consideration in evaluating the DIP Facility terms.   *See Bland v. Farmworker Creditors*, 308 B.R. at 113-14.   Nonetheless, the DIP Facility's roll up ratio is far from unprecedented.   Courts in numerous recent cases have approved roll ups with ratios of this size or larger.[48]   Indeed, five of the sixteen cases relied upon in the declaration filed in support of the Committee's now-resolved Objection featured higher roll-up ratios than the DIP Facility, as currently proposed.   Accordingly, to the extent relevant, the roll up ratio under the DIP Facility does not support a conclusion that

---

[47]   *See* Monster Obj. ¶¶ 21, 23.

[48]   *See e.g. In re Phoenix Servs. Topco LLC*, No. 22-10906 (MFW) (Bankr. D. Del. Nov. 2, 2022) (authorizing postpetition financing with 3-to-1 roll-up of $150 million in prepetition loans and $50 million in new money); *Strike, LLC*, No. 21-90054 (DRJ) (Bankr. S.D. Tex. Jan. 4, 2022) (authorizing postpetition financing with 3.3-to-1 roll-up of $86.6 million in prepetition loans and $26 million in new money); *In re Nine Point Energy Holdings, Inc.*, No. 21-10570 (MFW) (Bankr. D. Del. Apr. 12, 2021) (authorizing postpetition financing with 3-to-1 roll-up of $59 million in prepetition loans and $20 million in new money); *In re Tailored Brands, Inc.,* No. 20-33916 (MI) (Bankr. S.D. Tex. Sept. 2, 2020) (authorizing postpetition financing with 3.9-to-1 roll-up of $398 million in prepetition loans and $102 million in new money); *In re GNC Holdings, Inc.*, No. 20-11662 (KBO) (Bankr. D. Del. July 21, 2020) (authorizing postpetition financing with 3.8-to-1 roll-up of $375 million in prepetition loans and $100 million in new money); *In re Colt Defense LLC*, Case No. 15-11296 (LSS) (Bankr. D. Del. July 10, 2015) (authorizing postpetition financing with 5.5-to-1 roll-up of $55 million in prepetition loans and $10 million in new money).

the Roll Up falls outside the bounds of reasonableness and is a provision required by the DIP

Lenders if the Debtors want to obtain access to the DIP Facility.

### 2. The Milestones are Appropriate and Sufficient.

31.     As a result of further negotiations among the Debtors, the DIP Lenders, and the

Committee, the parties have agreed to modify the milestone and maturity provisions in the DIP

Facility to afford the Debtors more runway to conduct their investment banking and marketing

process.

32.     The revised milestones are set forth in the table below:

| Milestone | Original Date | Modified Date |
|---|---|---|
| Deadline to receive indication of interest regarding acceptable financing and/or an acquisition of all or substantially all of the Debtors' assets | N/A | January 13, 2023 |
| Deadline to file bid procedures motion in form and substance reasonably acceptable to the DIP Agent (the "Bid Procedures Motion"). | January 23, 2023 | January 27, 2023 |
| Deadline for hearing on the Bid Procedures Motion | February 22, 2023 | February 28, 2023 |
| Transaction Milestone Deadline | January 23, 2023 | March 13, 2023 |
| Deadline to designate a "stalking horse" reasonably acceptable to the DIP Agent and the Prepetition Agent (if the Debtors are pursuing the Sale Process) | N/A | March 31, 2023 |
| Deadline to have held an auction (if necessary) | April 8, 2023 | April 19, 2023 |
| DIP Outside Maturity Date | May 10, 2023 | May 24, 2023 |

33.     The revised milestones reflect a further compromise among the Debtors, the DIP

Lenders, the Prepetition Secured Parties, and the Committee.  Specifically, the extensions of the

Transaction Milestone and the outside maturity date give the Debtors additional time to complete

a thorough investment banking process,[49] and one that is significantly longer than in other cases

---

[49]     *See* Second Suppl. Parkhill Decl. ¶ 13.

featuring DIP milestones.[50]  In addition to the milestone extensions, the Final Order provides the Committee with certain consultation rights in connection with the marketing process.[51]   In particular, the Committee has consultation rights with respect to (i) the form and substance of the certification to be delivered to the DIP Agent relating to the January 13 indication of interest milestone;[52] (ii) (a) the form and substance of bona fide commitment papers to be delivered to the DIP Agent and (b) the motion to designate a "staking horse", in each case, relating to the March 13 Transaction Milestone;[53] and (iii) the form and substance of the order approving the designation of a "stalking horse" prior to the March 31 milestone.[54]

34.     Moreover, the inclusion of the additional interim milestones provides other parties in interest with greater visibility and certainty during the marketing and financing process.[55]  Thus, to the extent Monster is alleging that the milestones, as originally composed, lacked sufficient structure and could lead to a forced sale or an otherwise value destructive transaction, the additional clarity and extended deadlines set forth in the proposed Final Order should sufficiently address such concerns.[56]

### 3.    The Waivers of the Section 506(c) Surcharge Claims, the "Equities of the Case" Doctrine, and Marshaling Rights Represent a Sound Exercise of Business Judgement.

35.     The Committee, Monster, and the U.S. Trustee each objected to the waivers of

---

[50]   *See, e.g., Liberty Power Holdings, LLC*, No. 21-13797-SMG (Bankr. S.D. Fla. May 27, 2021) (approving milestone of 45 days from petition date for entry of bid procedures motion and 82 days thereafter for auction); *In re Tamarac 10200, LLC,* No. 20-23346-PDR (Bankr. S.D. Fla. Dec. 31, 2020) (approving milestone of 25 days from petition date for entry of bid procedures order and 19 days thereafter for auction); *In re Land Res., LLC,* No. 08-10159-ABB (Bankr. S.D. Fla. Dec. 22, 2008) (approving milestone of 50 days from the petition date for entry of bid procedures order and 34 days thereafter for consummation of sale).

[51]   *See* Final Order ¶ 46(a), (d) and (e).

[52]   *See* Final Order ¶ 46(a).

[53]   *See* Final Order ¶ 46(d).

[54]   *See* Final Order ¶ 46(e).

[55]   *See* Second Suppl. Parkhill Decl. ¶ 13.

[56]   *See* Monster Objection ¶ 19.

11816326-1

(i) the estates' surcharge rights under section 506(b) of the Bankruptcy Code, and (ii) the "equities of the case" doctrine under section 522(b) of the Bankruptcy Code. The Committee has agreed to no longer pursue these objections as part of the comprehensive settlement reached with the Debtors and DIP Lenders. And the Objections of Monster and the U.S. Trustee should be overruled, as the Debtors' decision to waive these estate claims constitutes an exercise of sound business judgment. Furthermore, such waivers are commonplace in the market and appropriate under the circumstances of these chapter 11 cases.[57]

36.  ***Section 506(c) Waiver***. Section 506(c) of the Bankruptcy Code permits a debtor to recover from a secured creditor's collateral the cost of preserving or disposing of such collateral. The Supreme Court has made clear that rights under section 506(c) of the Bankruptcy Code belong to the debtor and its estate and are not available to any other party in interest. *See Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6, 120 S. Ct. 1942, 1947, 147 L. Ed. 2d 1 (2000) ("The question thus becomes whether it is a proper inference that the trustee is the only party empowered to invoke the provision. We have little difficulty answering yes."). As the rights under section 506(b) of the Bankruptcy Code belong to the Debtors' estates, the decision to waive such rights falls squarely within the exercise of the Debtors' business judgment.[58]

37.  The primary rationale for applying section 506(c) of the Bankruptcy Code – to prevent a windfall to a secured creditor by allowing unencumbered assets to be used during the pendency of the case for the secured creditor's benefit – does not exist here. *See e.g. In re JKJ Chevrolet, Inc.*, 26 F.3d 481, 483 (4th Cir. 1994) ("The purpose of this provision is to prevent a windfall to a secured creditor at the expense of the estate."). The Prepetition Agent, for the benefit

---

[57]  *See* Second Suppl. Parkhill Decl. ¶ 9.

[58]  *See, e.g., In re It'Sugar FL I LLC, et al.*, No. 20-20259-RAM (Bankr. S.D. Fla. Nov. 19, 2020) (approving 506(c) waiver); *In re Quorum Health Corp.*, No. 20- 10766 (KBO) (Bankr. D. Del. May 6, 2020) (same); *In re Just One More Restaurant, Inc., et al.*, No. 9:19-bk-1947-MDM (Bankr. M.D. Fla. Feb. 26, 2020) (same).

of the other Prepetition Secured Parties, holds, valid, perfected liens on substantially all of the Debtors' assets.[59]  Either, as the Debtors believe, the Prepetition Secured Parties and DIP Secured Parties are, and will remain, oversecured (in which case the secured parties are not the residual beneficiaries of the Debtors' efforts in administering these cases); or, they are undersecured, in which case the costs of administering the Debtors' bankruptcy proceedings, including the payment of administrative expenses, would be borne solely by the Prepetition Secured Parties, the DIP Agent, and DIP Lenders by virtue of their agreement to extend DIP financing and permit the use of their Cash Collateral for these purposes (in accordance with the Approved Budget), as well as to fund the Carve-Out upon the occurrence of an event of default and foreclosure.  The negotiated Carve-Out ensures that, even in a worst case scenario, the Debtors will be able to cover the costs of these cases, including professional fees accruing prior to the Carve-Out being triggered and wind-down professional fees up to $2.5 million.[60]

38.     Accordingly, the Prepetition Secured Parties and DIP Lenders have already agreed to "pay the freight" of these cases; their request that they not be surcharged ***again*** is reasonable. Bankruptcy courts, in this district and elsewhere, frequently approve 506(c) waivers as appropriate when, as here, a secured creditor has agreed to the use of its cash collateral to pay administrative expenses and to subordinate its liens to a carve out for professional fees and other administrative expenses, as the Prepetition Secured Parties, DIP Agent, and DIP Lenders have done.  *See, e.g.*, *In re It'Sugar FL I LLC, et al.*, No. 20-20259-RAM (Bankr. S.D. Fla. Nov. 19, 2020); *In re Quorum Health Corp.*, No. 20- 10766 (KBO) (Bankr. D. Del. May 6, 2020); *In re Just One More Restaurant, Inc., et al.*, No. 9:19-bk-1947-MDM (Bankr. M.D. Fla. Feb. 26, 2020).

---

[59]   *See* Interim Order ¶ E(iii); Final Order ¶E(iii).

[60]   *See* Final Order ¶ 37.

39.     With respect to Monster's concerns about the payment of a perpetual royalty payment equal to 5% of net sales of Bang-branded beverages (the "Ongoing Royalties"), the DiDonato Declaration makes clear that the Approved Budget contains sufficient funding, in the "Other" line item, to pay such amounts if and when it becomes necessary (and the Debtors reserve the right to dispute that immediate payment of such amounts *is* necessary or appropriate).[61] Additionally, in an effort to resolve these issues and eliminate any concerns about the Debtors' ability to honor Ongoing Royalties, the Debtors have indicated their willingness to escrow postpetition Ongoing Royalties as they accrue (on a bi-weekly basis), and discussions with Monster concerning such proposal are ongoing as of the filing of this Reply.[62]

40.     ***Section 552(b) "Equities of the Case" Waiver***.  Objections to the "equities of the case" waiver should likewise be overruled, given that the Prepetition Secured Parties are funding the expenses of these cases through DIP financing and consenting to the use of their cash collateral. Under section 552(b) of the Bankruptcy Code a secured creditor's prepetition security interest in the proceeds of collateral generally extends to such proceeds acquired postpetition, however, there is a limited exception to the extent that the "equities of the case" require.  *See* 11 U.S.C. § 552(b).

41.     As noted above, the Prepetition Agent, for the benefit of the other Prepetition Secured Parties, has liens on substantially all of the Debtors' assets, and the administration of the Debtors' cases is being funded entirely by the Prepetition Secured Parties' Cash Collateral and the DIP financing being provided by the DIP Lenders.[63]   Any appreciation in the value of the Prepetition Secured Parties' collateral from the Debtors' postpetition operations, therefore, will necessarily result from the use of the Prepetition Secured Parties' existing collateral.  Therefore, it

---

[61]    *See* DiDonato Decl. ¶ 5.

[62]    *See* DiDonato Decl. ¶ 5.

[63]    *See* Interim Order ¶ E(iii); Final Order ¶ E(iii).

22

is difficult from the Debtors' standpoint to envision any circumstance in which the "equities of the case" would warrant cutting off the Prepetition Secured Parties' continuing interest in the proceeds of their collateral, and the Debtors acted well within the bounds of their business judgment in agreeing to waive such arguments.

42.     Like the section 506(c) waiver, waivers of the "equities of the case" exception are commonplace in favor of lenders who have agreed to fund the expenses of chapter 11 cases.  *See, e.g.*, *In re Tamarac 10200, LLC*, No. 20-23346-BKC-PDR (Bankr. S.D. Fla. Dec. 31, 2020) (approving a section 506(c) waiver coupled with a professional fee carve out and an equities of the case waiver); *In re It'Sugar FL I LLC, et al.,* No. 20-20259-RAM (Bankr. S.D. Fla. Nov. 19, 2020) (same); *In re Maguire Group Holdings, Inc*., No. 11- 39347-BKC-RAM (Bankr. S.D. Fla. Oct. 27, 2011) (same)*; In re Carpenter Contractors of America, Inc., d/b/a R&D Theil,* No. 10-B-42604-RBR (Bankr. S.D. Fla. Apr. 6, 2011) (same).

### 4.     The Waivers of Estate Marshaling Rights Are Appropriate.

43.     Monster opposes the waiver of the equitable doctrine of marshaling contained in the Final Order.[64]  As a threshold matter, courts generally find that "unsecured creditors cannot invoke the equitable doctrine of marshaling."  *See e.g. In re Advanced Mktg. Servs., Inc.*, 360 B.R. 421, 427 (Bankr. D. Del. 2007) (holding that an unsecured creditor could not direct secured lenders to satisfy their claim using different collateral because marshalling is a protection for junior secured creditors); *In re Arlco, Inc.*, 239 B.R. 261, 274 (Bankr. S.D.N.Y. 1999) (stating that "[a]n unsecured creditor has no standing to invoke the doctrine").

44.     While it is true that courts have held that an ***unsecured creditors' committee*** may have derivative standing to invoke the doctrine of marshaling on behalf of a debtor's estate, and therefore to object to its waiver in a postpetition financing package, the same is not true of

---

[64]     *See* Committee Obj. ¶ 59; Monster Obj. ¶ 32.

individual unsecured creditors, such as Monster.  And the cases cited in the Monster Objection do not demonstrate otherwise.  In *America's Hobby*, the court analyzed whether the official committee of unsecured creditors (not an unsecured creditor itself) had standing to invoke marshaling.  *See In re Am.'s Hobby Ctr., Inc.*, 223 B.R. 275, 282 (Bankr. S.D.N.Y. 1998).  Similarly, in *In re Bame*, the court approved a Chapter 7 trustee's request to require taxing authorities to look to certain collateral to satisfy their liens prior to receiving distributions from the estates (which ultimately did benefit unsecured creditors), but the marshaling doctrine was not invoked by unsecured creditors themselves.  *See In re Bame*, 279 B.R. 833, 836 (B.A.P. 8th Cir. 2002).  In sum, the cases cited by Monster, at best, show that the Committee may have standing to object to the waiver of the doctrine of marshaling, but not that Monster would.  Lastly, the benefits provided to the Debtors' estates and stakeholders under the DIP Facility outweigh any claims on account of marshaling, which would make it difficult for Monster to meet the standard to provide a committee with standing.  *See In re Am.'s Hobby Ctr., Inc.*, 223 B.R. 275, 282 (Bankr. S.D.N.Y. 1998) ("(i) whether the 'committee presents a colorable claim or claims for relief that on appropriate proof would support a recovery [. . . ] and (ii) whether an action asserting such claim[s] is likely to benefit the reorganization estate.") (quoting *In re STN Enterprises*, 779 F.2d 901, 904–05 (2d Cir. 1985) (internal quotations omitted)).

45.     Furthermore, even assuming that Monster could obtain derivative standing to assert marshaling rights of the estate standing in the shoes of a hypothetical lien creditor, the Debtors retained the discretion to agree to the marshaling waiver in exchange for the ample benefits they derive from the DIP Facility.  *See* Hr'g Tr. 92:22–93:11, *In re MPM Silicones, LLC et al.*, Case No. 14-22503 (Bankr. S.D.N.Y. May 27, 2014) (Docket No. 270) (approving a no-marshaling provision in a cash collateral order and commenting that "[g]enerally speaking, this is the debtor's right to negotiate or secured creditors' right to insist on").  Unsurprisingly, courts in this

jurisdiction regularly approve waivers of the equitable doctrine of marshalling.  *See, e.g.*, *In re Tamarac 10200, LLC*, No. 20-23346-BKC-PDR (Bankr. S.D. Fla. Dec. 31, 2020); *In re Liberty Power Holdings, LLC*, No. 21-13797-BKC-SMG (Bankr. S.D. Fla. May 27, 2021); *In re American Purchasing Servs., LLC*, No. 20-23495-BKC-SMG (Bankr. S.D. Fla. Dec. 16, 2020); *In re TooJay's Mgmt LLC*, No. 20-14792-BKC-EBK (Bankr. S.D. Fla. June 26, 2020); *Land Resource, LLC, et al.*; Case No. 6:08-bk-10159-ABB (same).

46.     Finally, as part of the overall resolution of the Committee Objection, the DIP Lenders have agreed to certain exclusions from the marshaling waiver (as well as exclusions from their collateral package and assets from which their superpriority claims can be recovered) that should address, at least in part, the concerns raised by Monster.  Specifically, the DIP Lenders have agreed to (i) carve out previously unencumbered litigation claims from the assets to which they have recourse on account of the Roll Up portion of the DIP Obligations loans, and (ii) on DIP Obligations constituting the ***non***-Roll Up portion of the DIP Obligations (*i.e.,* up to $100 million), the DIP Lenders have agreed to exhaust "all avenues of recovery from other DIP Collateral" before recovering from Commercial Tort Claims against insiders or affiliates of the Debtors.[65]   The Debtors submit that the marshaling waiver is appropriate, especially in light of the foregoing concessions.

### 5.     The DIP Lenders and Prepetition Lenders Can Have Recourse to the Proceeds of Litigation Claims.

47.     The U.S. Trustee and Monster challenge the Debtors' original grant of a DIP Superpriority Claim with recourse to the proceeds of Prepetition Avoidance Actions, and Monster also takes issue with the DIP Lenders and Prepetition Lenders having recourse to other potential

---

[65]   *See* Final Order ¶ 61(a).

litigation claims, asserting that the Court should not allow an "end-run" around a potentially meaningful source of recovery for unsecured creditors.[66]

48.     However, avoidance actions and other causes of action are estate assets that may be used in accordance with the Debtors' business judgment for the benefit of their estates – including to obtain postpetition financing or provide adequate protection.  *See e.g.*, *Trans World Airlines*, 163 B.R. 964, 972 (Bankr. D. Del. 1994) ("Section 550(a) requires a benefit to the "estate," not to creditors. "Estate" is a broader term than "creditors."  And there is no requirement that an avoidance action recovery be distributed (or "committed") in whole or in part to creditors."); *In re AppliedTheory Corp.*, Case No. 02-11868 (REG), 2008 WL 1869770, at *1 (Bankr. S.D.N.Y. Apr. 24, 2008) ("Of course [proceeds from avoidance actions] started out unencumbered.  But those assets can thereafter be encumbered (or made available to satisfy superpriority claims), if necessary to provide adequate protection.").  Here, the Debtors *do* benefit from providing these assets as a potential source of recovery because doing so was necessary to obtain the financing offered under the DIP Facility, which is essential to the Debtors' ability to preserve their business, pay the costs of these cases, and maximize value for all stakeholders.[67]

49.     It is not unreasonable for lenders to insist on incremental collateral to support incremental financing – here, that incremental financing is the $100 million of new money DIP financing.  And because substantially all of the Debtors' assets are encumbered by the Prepetition Liens, and accordingly, the only "incremental collateral" recovery for the DIP Lenders (or the Prepetition Secured Parties on account of their adequate protection claims) are proceeds of Avoidance Actions and other litigation claims that were not subject to the Prepetition Liens. Notably, the DIP Lenders' recourse to such claims as a source of recovery is limited, under the

---

[66]     *See* UST Objection ¶ 26; Monster Objection ¶ 28.

[67]     *See* Initial Parkhill Dec. ¶ 20.

26

Final Order, to the claims in respect of ***new money financing*** only.  Claims based on the Roll Up portion of the DIP Obligations will not have access to any litigation claims (or proceeds thereof) that were not already subject to valid and perfected prepetition liens.[68]  In addition, the DIP Lenders have agreed to carve out from the assets available to satisfy their ***new money*** claims preference actions arising under section 547 of the Bankruptcy Code,[69] and agreed not to seek recovery from Commercial Tort Claims against insiders or affiliates of the Debtors until all other avenues of recovery from the DIP Collateral are exhausted.[70]  These concessions – which were the subject of good faith, arms' length, bargaining between the DIP Lenders and the estate fiduciaries – should allay any concerns about the fairness of allowing the DIP Lenders to recover from litigation claims, to the extent necessary. [71]

50.     Likewise, the Prepetition Secured Parties' recourse to litigation claims on account of their statutory entitlement to adequate protection should not be objectionable.  Such recoveries would be limited solely to those amounts necessary to compensate the Prepetition Secured Parties for ***actual*** diminution in the value of their interests in the Prepetition Collateral arising from the imposition of the automatic stay, the Debtors' continued use of the Prepetition Collateral, or the incurrence of DIP financing.[72]  Notably, even if the Final Order did not grant the Prepetition Secured Parties such recourse to litigation claim proceeds, the Bankruptcy Code would provide it by operation of section 507(b) if there were otherwise a failure of adequate protection.[73]  Granting

---

[68]  *See* Final Order ¶¶ 61(a), (b); *see also* Final Order ¶¶ 5, 61 n.10 (definition of "DIP Collateral" excludes Prepetition Avoidance Actions).

[69]  *See* Final Order ¶ 61(b).

[70]  *See* Final Order ¶ 61(a).

[71]  *See* Second Suppl. Parkhill Dec. ¶ 6.

[72]  *See* Final Order ¶ I(ii).

[73]  *See* 11 U.S.C. § 507(b) (granting secured creditors who have been granted adequate protection superpriority administrative expense claims "hav[ing] priority over every other claim allowable under [section 507(a)(2)]," without limiting the source of recovery on such claim).

such recourse as part of a consensual adequate protection package is no less appropriate.[74]

### 6. Arizona Mechanics' Lienholders' Adequate Protection-Based Objections Should be Overruled.

51. The Arizona Mechanics' Lienholders argue that their interests in the Arizona Real Property against which they have asserted mechanics' liens (the "Mechanics' Liens") are not being adequately protected in connection with the DIP Facility, but this is not the case. To the extent that the Mechanics' Liens are valid, properly perfected, non-avoidable, and senior in priority as a matter of law to the Prepetition Liens, the Interim Order and proposed Final Order preserve that senior priority. The Final Order does not permit valid prepetition liens senior in priority to the Prepetition Liens to be primed by the Prepetition Liens, DIP Liens, the Carve-Out, or anything else.[75] The definition of Prepetition Prior Lien in the Final Order memorializes this concept, as it encompasses all "liens that are valid, properly perfected (before the Petition Date or in accordance with section 546 of the Bankruptcy Code), non-avoidable, and senior in priority as a matter of law to the Prepetition Liens."[76] Thus, to the extent the Mechanics' Liens are Prepetition Prior Liens, they will remain senior in priority to the Prepetition Liens, the DIP Liens, the Adequate Protection Liens, and the Carve-Out.

52. In the Final Order, the DIP Lenders have since agreed that *even if the Mechanics' Liens are junior* to the Prepetition Liens, the Arizona Mechanics' Lienholders' existing priority

---

[74] In addition, the cases Monster cites to for the proposition that courts routinely exclude commercial tort claims from the scope of adequate protections liens and superpriority claims, are cases that involved consensual DIP financing orders where the debtor and lenders agreed to carve out such claims. *See, e.g., In re Aralez Pharmaceuticals US Inc.*, Case No. 18-12425 (MG), Docket No. 98 (Bankr. S.D.N.Y. Sept. 14, 2018) (consensual DIP financing order); *In re The Weinstein Company Holdings LLC*, Case No. 18-10601 (MFW), Docket No. 267 (Bankr. D. Del. Apr. 19, 2018) (same); *In re Gymboree Group, Inc.*, Case No. 19-30258 (KLP), Docket No. 348 (Bankr. E.D. Va. Feb. 15, 2019) (same); *In re Frank Theatres Bayonne/South Cove, LLC*, Case No. 18-34808 (SLM), Docket No. 212 at ¶ 3(b)-(c) (Bankr. D. N.J. Jan. 28, 2019) (same); *In re Promise Healthcare Group, LLC*, Case No. 18-12491 (CSS), Docket No. 218 (Bankr. D. Del. Dec. 4, 2018) (same); *In re SFX Entertainment, Inc.*, Case No. 16-10238 (MFW), Docket No. 203 (Bankr. D. Del. Mar. 8, 2016) (same).

[75] *See* Final Order ¶¶ 6, 37(i).

[76] *See* Final Order ¶ E(iv).

11816326-1

in their collateral will be fully preserved, and the total value of DIP Liens *and* Prepetition Liens, in the aggregate, shall not exceed the total amount of Prepetition Obligations already secured by the Prepetition Liens (*i.e.*, $354,770,201.56).[77]  Accordingly, there can be no Diminution in Value of the Mechanics' Liens resulting from the priming DIP Liens, as a definitional matter.  Moreover, as set forth in the DiDonato Declaration, the Debtors continue to pay expenses necessary to maintain the value of the Arizona real property that is allegedly subject to the Mechanics' Liens (including taxes, utilities, and insurance) and, therefore, the Debtors submit that the Arizona Mechanics' Lienholders are adequately protected from any diminution in value that could potentially result from the imposition of the stay and/or the Debtors' continued use of the property.[78]  And finally, as a backstop, the Arizona Mechanics' Lienholders will continue to receive replacement liens and superpriority claims for any Diminution in Value they do, in fact, suffer – giving the Arizona Mechanics' Lienholders access to value in respect of such adequate protection claims that they do not enjoy today.  Accordingly, it is beyond doubt that the adequate protection offered to the Arizona Mechanics' Lienholders under the Final Order is sufficient.

53.    Separately, in discussions with the Debtors, the Arizona Mechanics Lienholders expressed a desire to preserve marshaling rights against the Prepetition Secured Parties and DIP Secured Parties (in its Objection, Stellar does raise this issue in passing, but otherwise none of the Arizona Mechanics' Lienholders raised this in their filed Objections).  In an effort to resolve the Arizona Mechanics' Lienholders' Objections, the Debtors, DIP Lenders, and Prepetition Lenders have agreed to preserve such arguments (and the lenders' defenses thereto) notwithstanding the marshaling waiver that is otherwise proposed to be granted under the Final Order.[79]

---

[77]    *See* Final Order ¶ 5.

[78]    *See* DiDonato Decl. ¶ 15.

[79]    *See* Final Order ¶ 47.

54.    In light of the foregoing changes, the Debtors submit that, to the extent not resolved consensually, the Arizona Mechanics Lienholders' objections should be overruled.

## **CONCLUSION**

55.    For these reasons, the Debtors respectively requests that the Court deny the Objections in their entirety and enter the Final Order in the form submitted for entry.

Dated:   December 14, 2022
        Miami, Florida

George A. Davis (admitted *pro hac vice*)
Tianjiao ("TJ") Li (admitted *pro hac vice*)
Brian S. Rosen (admitted *pro hac vice*)
Jonathan J. Weichselbaum (admitted *pro hac vice*)
**LATHAM & WATKINS LLP**
1271 Avenue of the Americas
New York, NY 10020
Telephone:  (212) 906-1200
Email:  george.davis@lw.com
        tj.li@lw.com
        brian.rosen@lw.com
        jon.weichselbaum@lw.com

– and –

Andrew D. Sorkin (admitted *pro hac vice*)
**LATHAM & WATKINS LLP**
555 Eleventh Street, NW, Suite 1000
Washington, D.C. 2004
Telephone:  (202) 637-2200
Email:  andrew.sorkin@lw.com

– and –

Whit Morley (admitted *pro hac vice*)
**LATHAM & WATKINS LLP**
330 North Wabash Avenue, Suite 2800
Chicago, IL 60611
Telephone: (312) 876-7700
Email:  whit.morley@lw.com

Respectfully submitted,

*/s/ Jordi Guso*
Jordi Guso
Michael J. Niles
**BERGER SINGERMAN LLP**
1450 Brickell Avenue, Suite 1900
Miami, FL 33131
Telephone:  (305) 755-9500
Email:  jguso@bergersingerman.com
Email:  mniles@bergersingerman.com

*Co-Counsel for the Debtors*

30

11816326-1