1                UNITED STATES BANKRUPTCY COURT

                  SOUTHERN DISTRICT OF FLORIDA

2

3

4    IN RE:                        CASE NO. 22-17842-PDR

5    VITAL PHARMACEUTICALS, INC.,

6                   Debtor.

     _____/

7

8                       ECF #24, 603

9                     January 10, 2023

10               The above-entitled cause came on for hearing

11   before the Honorable Peter D. Russin, one of the Judges in

12   the UNITED STATES BANKRUPTCY COURT, in and for the

13   SOUTHERN DISTRICT OF FLORIDA, at 299 E. Broward Blvd.,

14   Fort Lauderdale, Broward County, Florida, on January 10,

15   2023, commencing at or about 1:30 p.m., and the following

16   proceedings were had.

17

18

19

20

21

22

23             Transcribed from a digital recording by:

                  Cheryl L. Jenkins, RPR, RMR

24

25

```
 1
                         APPEARANCES:
 2
 3                     BERGER SINGERMAN, by
                        JORDI GUSO, Esquire
 4                             and
                       LATHAM & WATKINS, by
 5                     ANDREW SORKIN, Esquire
                      AMY QUARTAROLO, Esquire
 6                    On behalf of the Debtor
 7
                        AKERMAN, LLP, by
 8                     EYAL BERGER, Esquire
                              and
 9           PACHULSKI STANG ZIEHL & JONES, by
                     ROBERT FEINSTEIN, Esquire
10            IRA KHARASCH, Esquire (via Zoom)
              TEDDY KAPUR, Esquire (via Zoom)
11             On behalf of Monster Energy
12
                         SEQUOR LAW, by
13                   LEYZA BLANCO, Esquire
                              and
14                  LOWENSTEIN SANDLER, by
                     ERIC CHAFETZ, Esquire
15                   ERICA MANNIX, Esquire
                    JEFFREY COHEN, Esquire
16             On behalf of the Official
             Committee of Unsecured Creditors
17
18                     SHUTTS BOWEN, by
                    HARRIS KOROGLU, Esquire
19                            and
                     MOORE & VAN ALLEN, by
20                   LUIS LLUBERAS, Esquire
             STEPHEN GRUENDEL, Esquire (via Zoom)
21             On behalf of Truist Bank
22
           J. STEVEN WILKES, Trial Attorney (via Zoom)
23                 Office of the U.S. Trustee
                    Department of Justice
24
25
```

1

CONTINUED APPEARANCES

2

3                    FURR & COHEN, by
           MARC BARMAT, Esquire (via Zoom)
4        On behalf of American Bottling Company

5

              FENDER BOLLING AND PAIVA, by
6                G. STEVEN FENDER, Esquire
             On behalf of Orange Bang, Inc.

7

8            GENOVESE JOBLOVE & BATTISTA, by
             PAUL BATTISTA, Esquire (via Zoom)
9                On behalf of Jack Owoc

10

           QUINTAIROS PRIETO WOOD & BOYER, by
11           ARTHUR NEIWIRTH, Esquire (via Zoom)
                             and
12           SCOTT REYNOLDS, Esquire (via Zoom)
         On behalf of Hardrock Concrete Placement Co.

13

14              PASKERT DIVERS THOMPSON, by
           ANNA ALSTON MERRITT, Esquire (via Zoom)
15       On behalf of HACI Mechanical Contractors, Inc.

16

                   TIFFANY & BOSCO, by
17           CHRISTOPHER KAUP, Esquire (via Zoom)
                 On behalf of Nexus Steel

18

19                    LEWIS ROCA, by
                   ROB CHARLES, Esquire
20       On behalf of Faith Technologies, Incorporated

21

                        AGENTIS, by
22             ROBERT CHARBONNEAU, Esquire
                 On behalf of Stellar Group

23

24

25

Page 4

1

CONTINUED APPEARANCES

2

3                          ALSO PRESENT
4                   HOMER PARKHILL, Rothchild
5                    SEAN PARKHURST, Huron
6                    JOHN DiDONATO, Huron
7                  JADE SILVER, Truist Bank
8                 JAN NAIFEH, FTI Consulting
9               MORGAN McCASKEY, FTI Consulting
10        ECRO - Electronic Court Reporting Operator
11                     - - - - - - -
12                        EXHIBITS
13                                               Page

Exhibit 1                                          33
14   Exhibit 2                                     34
     Exhibit 4                                     35
15   Exhibit 6                                     35
     Exhibit 7                                     36
16   Exhibit 8                                     36
     Exhibit 9                                     36
17   Exhibit 10                                    37
     Exhibit 12                                    37
18   Exhibit 13                                    38
     Exhibit 14                                    38
19   Exhibit 15                                    38
     Exhibit 16                                    39
20   Exhibit 17                                    39
     Exhibit 18                                    39
21   Exhibit 19                                    39
     Exhibit 20                                    40
22   Exhibit 21                                    40
     Exhibit 22                                    40
23   Exhibit 23                                    41
     Exhibit 24                                    41

24

25

Page 5

```
 1                    THE COURT:  All right.  Vital
 2    Pharmaceuticals, 22-17842.  Mr. Guso.
 3                    MR. GUSO:  Yes, sir.  May it please the
 4    Court.  Good afternoon, your Honor.
 5                    THE COURT:  I hope you have something easier
 6    for me today.
 7                    MR. GUSO:  I do, my appearance.
 8                    THE COURT:  If anybody has any ideas about
 9    this issue, I'd love to hear them.
10                    Anyway, go ahead.
11                    MR. GUSO:  Thank you, your Honor.
12    Jordi Guso, of Berger Singerman, your Honor, along with
13    the Latham & Watkins firm.  We are co-counsel to the
14    debtors.
15                    Your Honor, if I may, in the courtroom with
16    us this afternoon, seated immediately behind counsel
17    table, from your right to left, is Homer Parkhill, from
18    Rothchild, the debtors' investment banker.  To his right,
19    your Honor, is Sean Parkhurst, from Huron Consulting, and
20    to Mr. Parkhurst's right is John DiDonato, also from
21    Huron, and the debtors' chief transformation officer.
22                    THE COURT:  All right.  Thank you.
23                    Who else?  Don't be bashful.
24                    MR. NEIWIRTH:  Good morning, your Honor.
25    Arthur Neiwirth, on behalf of Hardrock Concrete Placement
```

1    Company, Inc., one of the mechanic lienholders.  Also with

2    me today on the line is Scott Reynolds, Arizona counsel

3    for Hardrock.

4                    THE COURT:  All right.  Thank you,

5    Mr. Neiwirth.

6                    Let's hold off on Zoom appearances until we

7    get through the courtroom, and then we'll go to Zoom.

8                    MR. LLUBERAS:  Good afternoon, your Honor,

9    Luis Lluberas, L-l-u-b-e-r-a-s, of Moore & Van Allen, on

10   behalf of Truist Bank, who is the administrative agent for

11   both the prepetition credit facility and the postpetition

12   credit facility.

13                   Today, your Honor, in the courtroom is my

14   co-counsel, Harris Koroglu, from the Shutts Bowen law

15   firm, and then my other co-counsel of Moore & Van Allen,

16   Steve Gruendel, is also on Zoom.

17                   I do have just three introductions in the

18   back, your Honor, and I'll ask them to stand.

19   Ms. Jade Silver, from Truist Bank, is here today,

20   Ms. Jan Naifeh, from FTI Consulting, who is the financial

21   advisor to Truist, as well as Ms. Morgan McCaskey.

22                   Thank you, your Honor.

23                   THE COURT:  All right.  Thank you.

24                   Mr. Sorkin.

25                   MR. SORKIN:  Good afternoon, your Honor.

1   Andrew Sorkin, of Latham & Watkins, on behalf of the

2   debtors.  I'm joined today by my colleague,

3   Amy Quartarolo, also of Latham.

4                   THE COURT:  Thank you.

5                   MR. FEINSTEIN:  Good afternoon, your Honor.

6   Robert Feinstein, Pachulski Stang Ziehl & Jones, appearing

7   for Monster Energy.  Our co-counsel, Eyal Berger, from

8   Akerman, is in the courtroom, and my partner,

9   Ira Kharasch, is on the Zoom screen now appropriately.

10                  Thank you.

11                  THE COURT:  Thank you, Mr. Feinstein.

12                  MS. BLANCO:  Good afternoon, your Honor.

13  Leyza Blanco, of Sequor Law, on behalf the Official

14  Committee of Unsecured Creditors, and today with me I'm

15  joined by my co-counsel from Lowenstein Sandler, Jeff,

16  I'm sorry, Cohen, Jeff Cohen, Erica Mannix and

17  Eric Chafetz.

18                  THE COURT:  Thank you.

19                  MR. FENDER:  Good afternoon, your Honor.

20  I'm Steven Fender, I'm here for Orange Bang, Inc.

21                  THE COURT:  Thank you, Mr. Fender.

22                  MR. BARMAT:  Good afternoon, your Honor.

23  Marc Barmat, local counsel for American Bottling Company.

24                  THE COURT:  Thank you, Mr. Barmat.

25                  All right.  Let's go to Zoom.  Mr. Wilkes.

1              MR. WILKES:  Good afternoon, your Honor.

2    J. Steven Wilkes for the United States Trustee, Region 21.

3              THE COURT:  And Mr. Reynolds.

4              MR. REYNOLDS:  Good morning -- good

5    afternoon, your Honor.  Scott Reynolds for Hardrock

6    Concrete Placement Company.

7              THE COURT:  Ms. Merritt.

8              MS. MERRITT:  Yes, good afternoon,

9    your Honor.  Alston Merritt on behalf of -- or, with

10   Paskert Divers Thompson, on behalf of creditor HACI

11   Mechanical Contractors, Inc.

12             THE COURT:  Thank you.

13             Mr. Charbonneau.

14             MR. CHARBONNEAU:  Good afternoon,

15   your Honor.  Bob Charbonneau on behalf of Stellar Group.

16             THE COURT:  Thank you.

17             Mr. Battista.

18             MR. BATTISTA:  Good afternoon, Judge.  I'm

19   Paul Battista, and I represent Jack Owoc, O-w-o-c.

20             THE COURT:  Thank you.  Mr. Kaup.

21             MR. KAUP:  Good afternoon, your Honor.

22   Christopher R. Kaup, of Tiffany & Bosco, I represent Nexus

23   Steel --

24             THE COURT:  Thank you.

25             MR. KAUP:  -- a mechanics lienholder.

```
 1                    THE COURT:  All right.  Thank you.
 2                    Mr. Charles, and you're on mute.
 3                    MR. CHARLES:  Thank you, your Honor.
 4   Rob Charles, Lewis Roca, on behalf of Faith Technologies,
 5   Incorporated.
 6                    THE COURT:  Thank you.
 7                    We heard from Mr. Neiwirth.
 8                    Mr. Kharasch.
 9                    MR. KHARASCH:  Good morning, your Honor.
10   Ira Kharasch, of Pachulski Stang, on behalf of Monster
11   Energy.
12                    THE COURT:  Thank you.
13                    And Mr. Kapur.
14                    MR. KAPUR:  Yes, Teddy Kapur, also from
15   Pachulski Stang Ziehl & Jones, on behalf of Monster Energy
16   Company.
17                    THE COURT:  All right.  Any other
18   appearances?
19                    (No verbal response.)
20                    THE COURT:  Okay.  So, we have a motion to
21   compromise controversy, and we have the DIP financing
22   motion today.
23                    Mr. Sorkin.
24                    MR. SORKIN:  Again, for the record,
25   Andrew Sorkin on behalf of the debtors.
```

1              That's correct, your Honor, and I would say

2    at this point those two matters are very closely

3    intertwined.  So I would suggest as part of my DIP

4    presentation, I will also address the royalty escrow

5    motion with Monster.

6              THE COURT:  Thank you.

7              MR. SORKIN:  Your Honor, we are here at long

8    last seeking final approval of our DIP facility, and I

9    think I have some good news this afternoon, which is that

10   all but one of the objections to entry of the final order

11   have been resolved.  That includes the objections of the

12   committee, of Monster, which was joined by American

13   Bottling and Orange Bang, before objecting Arizona

14   mechanics lienholders, those were Faith Technologies,

15   HACI, Stellar, and Hardrock Concrete, as well as the

16   Maricopa County Treasurer.  We were also able to resolve

17   informal comments and objections received from Broward

18   County, as well as CHUBB.

19              So that leaves as the only outstanding

20   objection, the objection of the United States Trustee that

21   was filed at Docket Number 267, and I understand

22   Mr. Wilkes will be pressing that objection today with

23   respect to the rollup and 506(c) waiver specifically.

24              We filed a further revised DIP order last

25   night that reflects the most recent resolutions.  Those

```
1    were with the Arizona mechanics lienholders, Monster,

2    Orange Bang, and American Bottling, and that was at

3    Docket 624.

4              Prior to that we filed amended DIP documents

5    to reflect the committee's settlement on December 23rd at

6    Docket Number 575.

7              Your Honor, I think at Wednesday's, last

8    Wednesday's conference, I previewed the resolution of the

9    governance issues with the committee and the DIP lenders.

10   Those changes, I'm pleased to report, have now been

11   implemented through corporate resolutions and amendments

12   to our Articles of Incorporation that were adopted by the

13   board and the company shareholder, Mr. Owoc.

14             There is also a paragraph in the proposed

15   final DIP order, it's Paragraph 62 that memorializes that

16   governance arrangement, and gives the committee comfort

17   that the estate has the ability to enforce that

18   resolution, it's not just a DIP lender matter.

19             Unless your Honor would prefer otherwise, I

20   do think it would be helpful if I provide an overview of

21   the other concessions and accommodations that have been

22   made along the way to accommodate the objectors, and the

23   corresponding modifications to the DIP documents.  As I

24   walk through I'll point you to the correct paragraph in

25   the DIP order or provision --
```

1          THE COURT:  So I should pull the DIP order

2   to --

3          MR. SORKIN:  Yes.

4          THE COURT:  -- follow along --

5          MR. SORKIN:  And that's Docket 624.

6          THE COURT:  -- process?

7          All right.  Let me just get there.  All

8   right.  I have that.

9          MR. SORKIN:  So let me start with the

10  rollup.  As your Honor knows, numerous parties objected to

11  the initial proposed rollup, which was structured in part

12  as a deemed rollup, and in part as a creeping rollup, but

13  in the end what it contemplated was the possibility of

14  rolling up the entirety of the prepetition debt, which was

15  about $355 million.

16          We received objections from various parties,

17  arguing that the proposed rollup was off market, that it

18  harmed unsecured creditors, that it may not be authorized

19  by the Bankruptcy Code in the first place, and generally

20  that it was not fair terms.

21          To resolve those concerns, the rollup has

22  been modified and reduced to a deemed rollup of

23  $235 million, so 120 million less than the maximum rollup

24  initially proposed, among other concessions that I'll get

25  to in a moment.

1          THE COURT:  So there is no creeping?

2          MR. SORKIN:  No creeping.

3          THE COURT:  And essentially upon the

4     approval of the loan, and the funding of the loan, the

5     prepetition amount of 235 gets paid off?

6          MR. SORKIN:  Yes, exactly.

7          THE COURT:  Okay.

8          MR. SORKIN:  Exactly.

9          And that change is reflected both in

10    Paragraph 15, Romanette (iii) of the final DIP order, as

11    well as in the appropriate definitions in the credit

12    agreement, there is a definition of rollup amount there.

13         THE COURT:  You're not going to make me read

14    those, are you?

15         MR. SORKIN:  No, no, no, your Honor.  You

16    can just take my word for it.

17         The United States Trustee, as I mentioned,

18    is still objecting to the rollup, and I'll come back to

19    that when we get to argument.

20         THE COURT:  I understand.

21         MR. SORKIN:  Moving on, I think the next

22    issue related to the lenders' recourse to litigation

23    claims.  Monster, the committee and the U.S. Trustee all

24    challenged the debtor's original grant of a superpriority

25    DIP claim and adequate protection claims that had recourse

```
1    to the proceeds of avoidance actions and certain other
2    litigation claims.
3                    Through the negotiation the parties agreed
4    to limit the DIP liens and the superpriority claims
5    recourse to those claims.  For one thing, and I think this
6    is very important, the obligations in respect of the
7    rollup DIP loans will not have any recourse to the
8    proceeds of avoidance actions, or any commercial tort
9    claims that weren't already their prepetition collateral.
10   So the lenders wouldn't be getting, through the rollup,
11   access to any litigation proceeds that they wouldn't have
12   been entitled to on account of their prepetition debt.
13                   Separately, the DIP lenders made
14   accommodations with respect --
15                   THE COURT:  Has it been determined the
16   extent of that lien, or that's to be determined at some
17   point in the future, if it's challenged?
18                   MR. SORKIN:  The extent of the lien on?
19                   THE COURT:  On these avoidance -- on the
20   prepetition claims.
21                   MR. SORKIN:  That would be subject to
22   challenge, yes.
23                   THE COURT:  Okay.
24                   MR. SORKIN:  The DIP lender separately
25   agreed to limit their rights in respect of the new money
```

1    as well.  They won't have recourse to preference actions

2    on account of that money, those will be preserved for the

3    benefit of unsecured creditors.

4                    And, second, they will also marshal away,

5    basically use efforts to recover from other sources before

6    seeking recovery on commercial tort claims against the

7    debtors' insiders or affiliates, and those changes are

8    reflected in Paragraph 61(a) and (b) of the final order.

9                    THE COURT:  So they have to exhaust their

10   primary collateral first before they have an interest in

11   the outcome of those causes of action?

12                    MR. SORKIN:  Correct.  I mean, I want to be

13   precise, so I just want to look at the language in case

14   there is a standard of effort attached, but --

15                    THE COURT:  Which --

16                    MR. SORKIN:  That's correct, your Honor,

17   they have to exhaust all other avenues of recovery

18   before --

19                    THE COURT:  And do they also -- does the

20   lender also receive an administrative expense priority?

21                    MR. SORKIN:  They do, but that's limited in

22   the same fashion as --

23                    THE COURT:  The same fashion, okay, because

24   that was one of the objections, as I recall.

25                    MR. SORKIN:  So, moving on, I think the next

1   category of resolutions related to the adequate protection

2   payments that the lenders were receiving.  The committee

3   had challenged those as excessive.  In response, the

4   parties agreed to modify the interest rate on which those

5   payments are based, so that once the committee's challenge

6   period passes, the rate is subject to a cap, and that cap

7   is defined in the order as the, quote, agreed rate.  It's

8   a little bit of a complicated concept, so let me try to

9   explain it, and I'm sure Mr. Lluberas or Mr. Cohen will

10  kick me if I'm wrong.

11              Right now the interest on the prepetition

12  debt, which is paid as adequate protection, accrues at the

13  base rate, which at the moment is based on Truist's prime

14  rate, or around seven and a half percent, plus an

15  applicable margin that's currently 7 percent, plus

16  2 percent default interest.

17              That applicable margin, the 7 percent, has

18  been a subject through further increases equal to 50 basis

19  points per month pursuant to the prepetition credit

20  agreement as amended by one of our forbearance agreements.

21  So right now the all-in rate on the prepetition debt is

22  sixteen and a half percent.

23              What this agreed rate does is it locks in

24  the current 7 percent margin at the time the DIP order is

25  entered, and stops the 50 basis point per month

1  escalations.  That's subject to it being triggered, of

2  course.  As I mentioned, the challenge period has to

3  expire without a committee challenge, but if and when that

4  happens, the rate that is currently in effect will be the

5  cap on the interest rate that's used for purposes of

6  calculating the lenders' adequate protection and

7  entitlement to interest, generally, with two exceptions,

8  they can recover from two other sources.

9                One is from proceeds of nondebtor assets

10  that also serve as their collateral under the prepetition

11  credit agreement, and the second is under a plan in this

12  case, that provides at least a 20 percent recovery to

13  general unsecured creditors.

14                THE COURT:  So if it was locked in today, it

15  would be at 16.5?

16                MR. SORKIN:  Correct.

17                THE COURT:  Okay, and depending on how long

18  it takes to get to that point, where the challenge period

19  is completed, that might go up?

20                MR. SORKIN:  It could, yes.

21                THE COURT:  Okay.

22                MR. SORKIN:  That's correct.

23                Just for reference, your Honor, that's in

24  61(c) in the final DIP order.

25                THE COURT:  Okay.

1              MR. SORKIN:  Next, there was an agreement

2    between the lenders and the committee with respect to

3    proceeds of sales of those nondebtor real estate assets I

4    just mentioned.  Those assets, which are in Georgia,

5    Nevada, and here in Florida, serve as collateral for the

6    prepetition debt.

7              Under the historical arrangements between

8    debtor, Vital Pharmaceuticals, which we call VPX for

9    short, and the entities that hold those assets, Vital

10   covers certain tax, and upkeep, and maintenance costs for

11   the properties.  As part of the settlement with the

12   committee, the lenders have agreed that upon the sale of

13   those properties, cash proceeds would return to the estate

14   in the amount of any postpetition funding.  That change is

15   in 61(d).

16             THE COURT:  All right.  Thank you.

17             MR. SORKIN:  Moving on to the milestones,

18   Monster and the committee had both objected to the

19   milestones in the DIP, in the overall case timeline as

20   being too short.  As part of the comprehensive resolution

21   of those objections, the maturity date of the DIP has been

22   extended by two weeks, from May 10th to May 24th.  That

23   change is in Paragraph 61(e) of the final DIP order, and

24   the definition of DIP facility maturity date in the credit

25   agreement.

1               Also what we've been referring to as the

2      major transaction milestone, that's the deadline for the

3      debtors to deliver either fully executed commitment papers

4      for a financing transaction, or designated a stalking

5      horse bidder for a sale, that's moved from January 23rd to

6      March 13th, so almost an additional two months.  That

7      change is in Paragraph 46(d) of the final DIP order, and

8      in Section 5.18 of the credit agreement.

9               The committee had raised other concerns

10     surrounding the process, and additional milestones were

11     added in response to those concerns, including deadlines

12     for the debtors to receive indications of interest.  That

13     deadline is coming up this Friday, January 13th, file a

14     bid procedures motion, have a hearing on the bid

15     procedures motion, obtain approval to designate the

16     stalking horse bidder, to hold an auction, and to

17     consummate the ultimate transaction, whether that's a

18     financing or sale.  Those changes are reflected in

19     Paragraphs 46(a) through (g) of the final DIP order, and

20     the same Section 5.18.

21               THE COURT:  So what are those time periods?

22               MR. SORKIN:  I figured you might ask,

23     your Honor.

24               So, as I mentioned, it's January 13th for

25     the --

Page 20

1              THE COURT:  To plan my life, so -- you know.

2              MR. SORKIN:  It's January 13th for the

3    receipt of at least one indication of interest,

4    January 27th for the filing of the bid procedures motion,

5    February 28th is the deadline to have held the hearing on

6    the bid procedures motion, March 31st to obtain approval

7    of a stalking horse, April 19th is the deadline to hold an

8    auction if the sale is pursued, and May 17th as the

9    deadline to consummate the transaction.

10             THE COURT:  Okay.

11             MR. SORKIN:  Then there are a set of issues

12   relating to challenge rights and investigation budgets and

13   the like.  With respect to the investigation budget,

14   that's been increased from 50,000 to 100,000 for the

15   committee, that's in Paragraph 38 of the final DIP order.

16             Monster and the committee also objected to

17   the length of the challenge period, arguing it was too

18   short, and in Monster's case, arguing that it should be

19   extended to the same date for all parties.  There was such

20   an extension granted to January 16th, from December 28th,

21   and that applies to all parties in interest, that's in

22   Paragraph 40(a).

23             Finally, in this set of issues, the lenders

24   agreed to grant the committee automatic standing to pursue

25   lien challenges, and that's in Paragraph 40(c).

Page 21

```
1                   So, those are all the committee
2    settlement-related resolutions, I think all of which were
3    reflected in --
4                   THE COURT:  So that standing issue, it would
5    have normally required the committee to have made demand
6    upon the debtor, the debtor to refuse, and then the
7    committee to seek that standing, but you're going directly
8    to --
9                   MR. SORKIN:  Correct, they would have had to
10   file a motion and receive standing --
11                  THE COURT:  Okay.
12                  MR. SORKIN:  -- to pursue the claim from the
13   Court, and that's not being required with respect to that
14   subset of challenges.
15                  THE COURT:  Understood.
16                  MR. SORKIN:  I'll move on now to the other
17   resolutions that were reached more recently, and I want to
18   start with Monster, and in particular the resolution
19   relating to the 5 percent royalty that Monster and Orange
20   Bang were awarded in the Orange Bang arbitration.
21                  As I mentioned --
22                  THE COURT:  The compromise that's set for
23   hearing today?
24                  MR. SORKIN:  Correct, and it's been modified
25   further in full resolution of Monster and Orange Bang's
```

Page 22

1    DIP objection as well.  So I'll just walk through all of

2    that.

3                    As I mentioned, that's why these two matters

4    are now, you know, kind of inextricably intertwined.  We

5    will ask still for a separate order to be entered in

6    respect of the Monster arrangement.

7                    THE COURT:  Good, because the clerk's office

8    would likely require that, but go ahead.

9                    MR. SORKIN:  Good to hear, your Honor.

10                   As you know, on January 4th, last Wednesday,

11   we filed a joint motion at Docket 603 to approve an

12   agreement under which we would escrow the 5 percent

13   royalty to the extent that it accrues postpetition.  That

14   agreement was primarily designed to avoid an immediate

15   dispute about Monster's entitlements in respect of that

16   royalty under the arbitration award, which could have

17   included issues around seeking injunction relief --

18   injunctive relief, and payment even of the prepetition

19   royalties, but it also tied into Monster's DIP objection

20   insofar as that objection expressed concern about granting

21   the lenders a surcharge waiver, without ensuring that

22   provision was made for its royalty payments.

23                   The arrangement that we proposed last

24   Wednesday contemplated funding into a true escrow outside

25   of the estate, the royalty that accrues from and after the

Page 23

1  petition date based on net sales.  That escrow gets funded

2  semimonthly based on actual net sales for the first

3  funding, and then based on estimated net sales of $800,000

4  for each of the semimonthly funding periods.  Those

5  estimates get trued up to actual sales in hindsight on a

6  monthly basis starting in February.

7              In connection with that, the agreement

8  incorporates the reconciliation procedures that were

9  already contemplated by the arbitration award, to the

10  extent that there is a dispute about what actuals were.

11              So it was originally formulated, aside from

12  the potential return of over-funded amounts to the debtor

13  through that true-up process, the funds would have

14  remained in escrow until further court order, but now, in

15  resolution of Monster's DIP objection, we've agreed that

16  Monster can receive out of escrow the quarterly royalty

17  payments to which they would have been entitled under the

18  arbitration award, which come due 45 days after the end of

19  every calendar quarter.

20              So, just as an example, your Honor, the

21  first such payment on account of postpetition royalties

22  would come due on February 14th, 45 days after the end of

23  2-4-2022.  The rest of the arrangement, besides that

24  tweak, will stay in place, with some relatively modest

25  modifications to the language in the term sheet, that were

Page 24

1    negotiated over the weekend with Monster, the commitment,

2    and the lenders, and those are what's reflected in the

3    revised term sheet we filed yesterday, at Docket

4    Number 625.

5                    THE COURT:  And if there is a dispute, where

6    is that heard?

7                    MR. SORKIN:  If there is a dispute, I think

8    we'd be coming to your Honor.

9                    THE COURT:  Okay, and this is -- but the

10   fund is not property of the estate, but there is a

11   revisionary interest --

12                   MR. SORKIN:  That's correct.

13                   THE COURT:  -- as I understand it.

14                   And how is that revisionary interest

15   executed?  What happens --

16                   MR. SORKIN:  I think --

17                   THE COURT:  -- physically?

18                   MR. SORKIN:  I think we -- the contemplation

19   is that the revisionary interest, other than in respect of

20   the true-up procedure that's already there, our

21   revisionary interest would kick in to the extent that we

22   prevail on appeal, and there is a final and non-appealable

23   judgment in our favor, such that whatever we funded into

24   escrow is determined by another court to be ours.

25                   THE COURT:  So that would revert -- those

Page 25

```
1    funds would revert.  Anything paid to Monster in the
2    interim, what happens there?
3                  MR. SORKIN:  Presumably whatever court is
4    addressing the final disposition of the Orange Bang
5    litigation, would also --
6                  THE COURT:  So if that litigation is not
7    removed, then it just goes to the appellate process, and
8    whatever rights are occasioned as a result of the
9    appellate result would be dealt with by the court where
10   the litigation sits today?
11                 MR. SORKIN:  That's exactly the
12   contemplation --
13                 THE COURT:  Okay.
14                 MR. SORKIN:  -- your Honor.
15                 THE COURT:  Okay.
16                 MR. SORKIN:  So I described this arrangement
17   as a ceasefire, and it is terminable by either side, but I
18   think it still has a real benefit to the estate.
19                 THE COURT:  Terminable at will at any point?
20                 MR. SORKIN:  At will, yes, yes.
21                 THE COURT:  Okay, and what happens -- how
22   does that happen, and what happens then?
23                 MR. SORKIN:  So if it's terminated at
24   will --
25                 THE COURT:  Maybe I shouldn't ask.
```

Page 26

```
 1                    MR. SORKIN:  Well, yes, the short answer is
 2     a big old dispute probably in front of your Honor, but I
 3     think the question you're really getting at is the
 4     amount --
 5                    THE COURT:  Well, would it be in front of me
 6     only as a result -- is it in front of me because there is
 7     a reservation of jurisdiction to enforce this order, or is
 8     it in front of me because you will -- the debtor will
 9     promptly remove the action?
10                    MR. SORKIN:  It's not that the debtor would
11     promptly remove the action.  I guess I'm making an
12     assumption, and I could let Mr. Feinstein speak for
13     himself that the way --
14                    THE COURT:  I'll tell you what my sixth
15     grade teacher told me about assumptions, but anyway, go
16     ahead.
17                    MR. SORKIN:  I'm assuming there would
18     probably, in the first instance, be a dispute about
19     whether Monster should be entitled to stay relief to
20     enforce the injunction on account of non-payment of the
21     royalty, and that would be a dispute that your Honor would
22     hear.
23                    THE COURT:  Okay.  Well, don't terminate,
24     nobody terminate, keep the status quo.
25                    MR. SORKIN:  So in terms of the benefits,
```

1    first and foremost, it defers that dispute, which could

2    have included a request by Monster, you know, not only to

3    be paid their postpetition royalties, but also prepetition

4    and/or to enforce the preliminary injunction that the

5    royalty was used in lieu of.

6              Second, it also resolves Monster's objection

7    to the 506(c) surcharge waiver, and the DIP, more broadly,

8    and, third, I just note that, you know, all rights are

9    reserved here.  It's not -- this isn't an arrangement

10   that's going to result in Monster getting some, you know,

11   recovery in excess of what they might otherwise be

12   entitled to.  Under the arbitration award, all of our

13   rights and applicable law are preserved.

14             So the motion hasn't been objected to, the

15   form is acceptable to the committee, and we're hopeful

16   your Honor will approve that motion in the event that the

17   DIP is also approved, since we do need the DIP to fund our

18   escrow.

19             THE COURT:  But the settlement, I should not

20   enter an order approving the settlement without an order

21   approving the DIP?

22             MR. SORKIN:  Yes, from our standpoint, I

23   mean, it becomes impossible for us to honor our

24   obligations under the settlement without access to the

25   DIP.

1          THE COURT:  Understood.  Okay.

2          MR. SORKIN:  The second piece of the

3  resolution with Monster, Orange Bang and American

4  Bottling, that relates to information rights, and we've

5  agreed, as part of the DIP order, to provide those three

6  parties, as well as Sony and Universal Music, with whom

7  they've been coordinating, for example, in connection with

8  the motion to appoint a second committee, that your Honor

9  heard in December, certain information that we provide to

10  the creditors' committee, and these are things like budget

11  updates, variance reporting, and notices of amendments.

12          THE COURT:  1103-type information?

13          MR. SORKIN:  Yeah, exactly, notices of

14  amendments or termination of the DIP as well.  We also

15  agreed to afford them some access, and we -- I'll be blunt

16  about it, we had some concern about it, but we agreed to

17  provide some access to certain information about the

18  ongoing marketing process, on a professional-eyes only

19  basis, as well, to those parties, including access to our

20  investment banker.  Those changes are reflected in the

21  order kind of throughout.  The pincites I have are

22  Paragraphs 17, 18, 28, Romanette (ii), (xlvi) and (lxiii),

23  and between those two issues, the treatment of the

24  royalty, and Monster and its joining parties' information

25  rights, I believe that fully resolves the objections of

1    Monster, Orange Bang, and American Bottling.

2                    Lastly, we have the American -- sorry, the

3    Arizona mechanics lienholders, and that was also recently

4    finalized.  That group, as I mentioned at the outset,

5    includes Faith Technologies, HACI, Stellar, and Hardrock

6    Concrete, all of whom raised in one form or another

7    concerns about adequate protection of their mechanics

8    liens, notwithstanding that under the interim order we had

9    granted them a pretty standard adequate protection

10   package, consisting of replacement liens and superpriority

11   claims.

12                   We first attempted to address those concerns

13   by adding language to the DIP order that essentially

14   preserved the current priority position of the Arizona

15   mechanics lienholders, whatever it may be, in full.  More

16   specifically what that language provides, and it's in

17   Paragraph 5 --

18                   THE COURT:  Whatever it was as of the

19   petition date?

20                   MR. SORKIN:  Correct.

21                   THE COURT:  Okay.

22                   MR. SORKIN:  So they wouldn't be behind a

23   dollar more of senior secured debt, if they're behind any,

24   immediately after giving effect to the DIP than they were

25   immediately before giving effect to the DIP.

1              We also carved them out of the marshalling

2     waivers.  So all parties' rights with respect to whether

3     the lenders should be marshalling from other sources of

4     recovery, before seeking recovery from the proceeds of the

5     disposition of the Arizona facility, those arguments are

6     all preserved for another day.

7              To finalize the resolution, we agreed to

8     certain other clarifying changes throughout the order, and

9     to treat the action that was commenced prepetition in

10    Arizona concerning the relative priority of mechanic

11    holder's liens, as well as Truist's liens, the bank's

12    liens, as a timely filed challenge.  So they don't need to

13    worry about filing something else to contest the priority

14    stipulations in the final DIP order before the challenge

15    deadline, and all of that is reflected in Paragraph 40(d).

16             So those are all the resolutions,

17    your Honor, and we're left with, as I mentioned, the

18    U.S. Trustee's objection on the rollup and the 506(c)

19    surcharge waiver, and I think before I proceed with

20    argument on that, I'd just like to make sure we establish

21    our evidentiary record for purposes of today's hearing.

22             THE COURT:  Okay.

23             MR. SORKIN:  First, we would be seeking the

24    admission of three declarations from Homer Parkhill, a

25    partner of Rothchild & Company, who is the debtor's

1    investment banker, in support of the DIP.

2              THE COURT:  You've -- just let me make sure

3    I catch up with you.

4              You filed debtors' exhibits.  What are the

5    docket entry numbers of those exhibits, 618, 19 and 20?

6              MR. SORKIN:  Yes, that's correct.

7              THE COURT:  Okay, and are you seeking to

8    introduce Exhibits 1 through 24?

9              MR. SORKIN:  Yes, I was going to get --

10             THE COURT:  There might be a simpler way of

11   doing this, I'm just asking.

12             MR. SORKIN:  Yes, I was going to ask for the

13   admission of the declarations first, and then the balance

14   of the exhibits, but if we want to go straight to --

15             THE COURT:  All right.  So, let me first --

16   and all of the evidence you're seeking to admit is within

17   1 through 24?  There is not separately filed declarations

18   that you're going to be seeking to admit?

19             MR. SORKIN:  Correct.

20             THE COURT:  Okay, even though they are --

21   they may be separately filed, they're also included within

22   the exhibits?

23             MR. SORKIN:  Exactly, your Honor.

24             THE COURT:  Okay, and let me just pull up

25   the exhibit register, which I assume is -- the exhibit

1   index, is what you called it, I guess.  All right.  No,

2   exhibit register.

3                  All right.  So I have the exhibit register,

4   which is at Docket Entry 618, right?

5                  MR. SORKIN:  Uh-huh.

6                  THE COURT:  All right.  So, you're going to

7   -- why don't you just take me through that, and then we

8   can do "admit", "not introduced", "refused", see if there

9   are any objections, and that might be the simpler way to

10  do it.

11                 MR. SORKIN:  For what it's worth,

12  your Honor, we did reach out to all objectors in advance

13  and asked if anybody objected, and nobody responded that

14  they had any objection.  Obviously, I know your Honor --

15                 THE COURT:  There was an objection deadline

16  in the order to exhibits?

17                 MR. SORKIN:  My colleagues are shaking their

18  head no, so --

19                 THE COURT:  Maybe there should be.

20                 Anyway, all right, okay, but there isn't, so

21  let's go through the process, and we'll see if anybody

22  objects.

23                 I don't mean to throw you off your game,

24  Mr. Sorkin.  I'm just trying to keep it organized per the

25  docket.  And, again, I'll ask you to please file whatever

1    the resulting exhibit register is with the checkmarks on

2    each exhibit, admitted, refused, or not introduced.

3                    MR. SORKIN:  Sure.

4                    THE COURT:  Okay.

5                    MR. SORKIN:  So starting with Exhibit 1,

6    this, again, is Docket Number 618.

7                    THE COURT:  I haven't seen a binder in a

8    long time.

9                    (Laughter.)

10                   MR. SORKIN:  I guess we're old-school,

11   your Honor.

12                   THE COURT:  God, I hated those things.

13                   Anyway, go ahead.

14                   MR. SORKIN:  Exhibit Number 1 is the DIP

15   motion itself, filed on October 10th, 2022.

16                   THE COURT:  Well, the Court will take

17   judicial notice of that, that's easy.  Okay.

18                   MR. SORKIN:  The second --

19                   THE COURT:  Any objections?

20                   (No verbal response.)

21                   THE COURT:  No.  Okay.  Admitted.

22                   (Exhibit 1 was admitted into evidence.)

23                   MR. SORKIN:  The second exhibit is the

24   declaration of Mr. Parkhill, filed on October 10th, at

25   Docket Number 25.

1                    THE COURT:  All right.  So that is a proffer

2    of Mr. Parkhill's testimony for today.

3                    Does anyone object to the proffer of that

4    testimony?  Mr. Parkhill is here --

5                    MR. SORKIN:  He is.

6                    THE COURT:  -- alive and well, prepared to

7    testify.  Does anyone wish to cross-examine him?

8                    (No verbal response.)

9                    THE COURT:  All right.  So we'll accept that

10   proffer and admit that declaration.

11                   (Exhibit 2 was admitted into evidence.)

12                   MR. SORKIN:  The same thing for the

13   declaration of Mr. DiDonato.

14                   THE COURT:  Also October 10th, 2022, is that

15   right?

16                   MR. SORKIN:  Your Honor, I'm not seeking

17   admission of that for purposes of today.  That's his

18   first-day declaration.  We actually didn't plan to seek

19   admission of that.  That's an error.

20                   THE COURT:  Okay.  That would fall under

21   "not introduced".

22                   MR. SORKIN:  Making my check mark now.

23                   THE COURT:  Exactly.

24                   MR. SORKIN:  The fourth is the supplemental

25   declaration of Mr. Parkhill, filed on November 21st at

1   Docket Number 388.

2                  THE COURT:  All right.  The same proffer,

3   the same cross-examination request.  Any objections?  Any

4   requests?

5                  (No verbal response.)

6                  THE COURT:  Okay.  That will be admitted.

7                  (Exhibit 4 was admitted into evidence.)

8                  MR. SORKIN:  The 5th is our reply, which I

9   assume, like the motion, you would take judicial notice.

10                  THE COURT:  Judicial notice, sure.

11                  MR. SORKIN:  The sixth is the amended second

12   supplemental declaration of Mr. Parkhill in support of the

13   DIP, filed on December 21st at Docket Number 563.

14                  THE COURT:  The same with respect to the

15   proffer and cross-examination.

16                  All right.  That's admitted.

17                  (Exhibit 6 was admitted into evidence.)

18                  MR. SORKIN:  The seventh is the amended

19   declaration of Mr. DiDonato, who is also in the courtroom

20   this afternoon in support of the DIP, filed on January 6th

21   at Docket 617.

22                  THE COURT:  Any objection to the proffer or

23   wish to cross-examination -- to cross-examine?

24                  (No verbal response.)

25                  THE COURT:  All right.  Admitted.

Page 36

1          (Exhibit 7 was admitted into evidence.)

2          MR. SORKIN:  The eighth is the transcript of

3    the first-day hearing on October 13th.  I assume that's

4    another item you can take judicial notice of.

5          THE COURT:  Well, to the extent that -- I

6    don't remember what's in the transcript, but to the extent

7    that there is testimony, or anything of that nature, then

8    it's beyond judicial notice, but any objection?

9          (No verbal response.)

10         THE COURT:  That will be admitted.

11         (Exhibit 8 was admitted into evidence.)

12         MR. SORKIN:  The ninth is --

13         THE COURT:  I'm not converting not

14   admissible information in that transcript into admissible

15   information necessarily, unless there is something

16   specific you're asking for.

17         MR. SORKIN:  We're not, your Honor,

18   understood.

19         The same for transcript of the November 9th,

20   2022 hearing, that's Number 9.

21         THE COURT:  Okay.  The same ruling unless

22   there is an objection?

23         (No verbal response.)

24         THE COURT:  All right.

25         (Exhibit 9 was admitted into evidence.)

Page 37

```
 1                    MR. SORKIN:  Exhibit 10 is the DIP credit
 2   agreement itself as of October 26th, 2022.
 3                    THE COURT:  So tell me about that, that's a
 4   document that's been fully executed, subject to Court
 5   approval, or what is that?
 6                    MR. SORKIN:  That was the DIP credit
 7   agreement, it was fully executed upon your entry of the --
 8                    THE COURT:  Interim order.
 9                    MR. SORKIN:  -- interim DIP order.
10                    THE COURT:  Okay.  Any objection?
11                    (No verbal response.)
12                    THE COURT:  All right.  Admitted.
13                    (Exhibit 10 was admitted into evidence.)
14                    MR. SORKIN:  11 is the approved DIP budget.
15   I believe it was attached to the interim order.
16                    THE COURT:  All right.  I think that's
17   already on the record, but --
18                    MR. SORKIN:  We have another DIP budget
19   update of November 12th, which I believe is also in the
20   record.
21                    THE COURT:  Okay.  Any objections?
22                    (No verbal response.)
23                    THE COURT:  No?  All right.  Admitted.
24                    (Exhibit 12 was admitted into evidence.)
25                    MR. SORKIN:  Exhibit 13 is our third
```

Page 38

1   forbearance agreement with the prepetition lenders, dated

2   as of June 30th, 2022.

3                   THE COURT:  So that's a prepetition

4   agreement?

5                   MR. SORKIN:  Correct.

6                   THE COURT:  Okay.  Anyone object to the

7   admission of that document?

8                   (No verbal response.)

9                   THE COURT:  All right.  Admitted.

10                   (Exhibit 13 was admitted into evidence.)

11                   MR. SORKIN:  14 is the fourth forbearance

12   agreement with the lenders dated as of August 8th.

13                   THE COURT:  Any objections?

14                   (No verbal response.)

15                   THE COURT:  Admitted.

16                   (Exhibit 14 was admitted into evidence.)

17                   MR. SORKIN:  15 is the fifth forbearance

18   agreement, dated as of September 15th.

19                   THE COURT:  Any objections?

20                   (No verbal response.)

21                   THE COURT:  Admitted.

22                   (Exhibit 15 was admitted into evidence.)

23                   MR. SORKIN:  16 is the notice of revolving

24   borrowing as of June 30th, 2022.

25                   THE COURT:  Any objections?

1                    (No verbal response.)

2                    THE COURT:  Admitted.

3                    (Exhibit 16 was admitted into evidence.)

4                    MR. SORKIN:  17 is the notice of revolving

5    borrowing, dated as of August 5th.

6                    THE COURT:  Any objections?

7                    (No verbal response.)

8                    THE COURT:  Admitted.

9                    (Exhibit 17 was admitted into evidence.)

10                   MR. SORKIN:  18 is a notice of revolving

11   borrowing, dated as of August 18th.

12                   THE COURT:  Any objections?

13                   (No verbal response.)

14                   THE COURT:  Admitted.

15                   (Exhibit 18 was admitted into evidence.)

16                   MR. SORKIN:  19 is a notice of revolving

17   borrowing, dated September 14th.

18                   THE COURT:  Any objections?

19                   (No verbal response.)

20                   THE COURT:  Admitted.

21                   (Exhibit 19 was admitted into evidence.)

22                   MR. SORKIN:  20 are the UCCs that were filed

23   in favor of the lenders under the prepetition facility.

24                   THE COURT:  All right.  Any objections?

25                   (No verbal response.)

Page 40

```
 1                   THE COURT:  Admitted.
 2                   (Exhibit 20 was admitted into evidence.)
 3                   MR. SORKIN:  21 is a deed of trust in
 4  respect of the Arizona manufacturing facility, dated as of
 5  December 14th, 2020.
 6                   THE COURT:  All right.  There is an extra
 7  two in there, just --
 8                   MR. SORKIN:  I see that.
 9                   THE COURT:  Because I didn't know whether it
10  would be 20 or 22, but if it's 20, that makes much more
11  sense.
12                   Any objections?
13                   (No verbal response.)
14                   THE COURT:  Admitted.
15                   (Exhibit 21 was admitted into evidence.)
16                   MR. SORKIN:  22 is a deposit account control
17  agreement, dated as of March 14th, 2022.
18                   THE COURT:  Any objections?
19                   (No verbal response.)
20                   THE COURT:  Admitted.
21                   (Exhibit 22 was admitted into evidence.)
22                   MR. SORKIN:  23 is also an account control
23  agreement, dated as of April 28th, 2022.
24                   THE COURT:  Any objections?
25                   (No verbal response.)
```

```
 1                    THE COURT:  Admitted.
 2                    (Exhibit 23 was admitted into evidence.)
 3                    MR. SORKIN:  And 24 is the updated DIP
 4      budget, as of January 6th.
 5                    THE COURT:  Any objections?
 6                    (No verbal response.)
 7                    THE COURT:  Admitted.
 8                    (Exhibit 24 was admitted into evidence.)
 9                    MR. SORKIN:  And I don't understand any
10      other parties to be introducing exhibits today, so I think
11      that wraps it up.
12                    THE COURT:  All right.  So, it seems to me,
13      the first question is whether anybody objects to the
14      settlement arrangement, the motion to compromise
15      controversy, which is at Docket Entry -- let me just look
16      at that -- 603, and then assuming that that's approved
17      contingent upon the DIP financing arrangement being
18      approved, we would go to the U.S. Trustee's objections to
19      DIP financing, unless anyone wishes to speak in favor of
20      the compromise or the DIP financing motion before we get
21      there, unless you had some other --
22                    MR. SORKIN:  No, I'm happy to proceed with
23      argument on the two open issues, if that's what your Honor
24      would prefer.
25                    THE COURT:  Well, first, anyone wish to be
```

Page 42

```
 1   heard on the -- on any matter that's been heard so far?
 2   I'm trying to finish everything we can, and then focus on
 3   what remains disputed.
 4               MR. COHEN:  Your Honor, before I ask to be
 5   heard, maybe I can just consult with Mr. Sorkin, and he
 6   can make clarifying remarks, rather than on behalf of the
 7   committee, me, intervening.
 8               THE COURT:  All in favor of that, Mr. Cohen.
 9               MR. SORKIN:  Mr. Cohen requested that I walk
10   through the terms of the governance resolution on the
11   record of today's hearing --
12               THE COURT:  Okay.
13               MR. SORKIN:  -- and I'm happy to do so.
14               THE COURT:  Sure.
15               MR. SORKIN:  So, your Honor, in terms of
16   board composition, the board now consists of three
17   members, each of whom has been deemed independent by the
18   lenders and the committee, that is Mr. Panagos,
19   Mr. Dickinson and Mr. Gray.  Mr. Owoc and Mr. Hillman
20   remain on the board.  As I mentioned, I believe at our
21   last status conference, Dr. Escalante had resigned from
22   the board on December 29th.
23               THE COURT:  So, it's a five-member board?
24               MR. SORKIN:  It is a five-member board.
25               We've agreed to modify certain provisions in
```

1   the organizational documents so that now only the board

2   has the power to make further changes to its own

3   composition, and the shareholder can't do so unilaterally.

4                    Additionally, in the event that the board

5   votes to remove a director, it will need to be for cause,

6   and if a vacancy arises in one of the three seats that the

7   committee and lenders have agreed are currently occupied

8   by the independent directors, it will be filed by another

9   independent director.

10                   We've modified the quorum requirements in

11  our by-laws and operating agreements to require at least

12  two of the directors or managers deemed independent to be

13  present at any board meeting, or for the board to take

14  action.

15                   The other set of governance changes that I

16  described at the last status conference relate to the role

17  of Mr. DiDonato as chief transformation officer, including

18  that he will now report directly to Mr. Panagos, as the

19  sole member of the restructuring committee, and serve at

20  the pleasure of the restructuring committee.  He'll have

21  formal oversight over the debtors' treasury and cash

22  management functions, purchasing functions, and will

23  review all restructuring-related expenses and fees.

24                   The DIP documents themselves also now

25  provide that it's an event of default if his scope of

1    authority is narrowed at any point, or if he is

2    terminated, or resigns, and as I mentioned earlier in my

3    presentation, certain of these arrangements are also baked

4    into the DIP order at Paragraph 62.

5                    THE COURT:  All right.  Thank you.

6                    Anyone else wish to be heard?

7                    Mr. Feinstein.

8                    MR. FEINSTEIN:  Good afternoon again,

9    your Honor.  Robert Feinstein for Monster Energy.

10                   So, your Honor, first I want to express

11   Monster Energy's support for the resolutions that were

12   achieved, we're pleased that we could get there, and it

13   addresses many of Monster's concerns, certainly the

14   escrow, and the release from escrow fully addresses the

15   506(c) surcharge issue.  I know the U.S. Trustee still

16   wants to press it, but that was the predicate for our

17   objection and it's been resolved.

18                   And the information sharing, I just wanted

19   to talk about that briefly, because we felt that this was

20   an appropriate ask, and constructive for the case, to get

21   Monster, Orange Bang, ABC, and Sony, and Universal Music

22   under the tent, because we think it will benefit the case

23   going forward as we enter the sale process.  So, that

24   was --

25                   THE COURT:  That was my fault.

1          MR. FEINSTEIN:  Nobody's fault, your Honor.

2          We managed to achieve on our own what we

3   couldn't through the Court and the U.S. Trustee's Office,

4   which is to get a seat at the table, and we think that

5   will help the case.

6          THE COURT:  Somehow I knew that was going to

7   happen, but, okay, go ahead.

8          MR. FEINSTEIN:  So, I did want to address --

9   and having weekly meetings with that ad hoc group and

10  Rothchild I think will be extremely valuable as well, and

11  that's also baked into the order.

12          I did want to address several things that

13  came up during your colloquy with Mr. Sorkin, and one or

14  two things I think I need to slightly correct.

15          First, your Honor asked whether the royalty

16  dispute could end up in front of you, and I think in a

17  narrow sense, the -- any dispute over the amount to be

18  funded into the escrow, you'll see in Paragraph 10 of the

19  term sheet, is to be addressed to your Honor, but

20  ultimately the matter is before the 9th Circuit in terms

21  of the underlying arbitration award, and as Mr. Sorkin

22  noted, that Court, I think, will dictate what would ever

23  happen to the funds in the escrow, et cetera, if there is

24  a reversal, and I don't think --

25          THE COURT:  Well, that --

1                    MR. FEINSTEIN:  -- that could be removed to

2     this Court, because removal is for state court actions, it

3     would really be a reference to this Court.  Ultimately

4     it's going to be up to --

5                    THE COURT:  Fair enough.

6                    MR. FEINSTEIN:  -- the 9th Circuit to decide

7     what's going to happen, or the California District Court,

8     unless one of those courts say come back here.

9                    THE COURT:  And that was precisely the

10    genesis of my question, because the last thing I would

11    want to do is step on the jurisdictional toes of either

12    the 9th Circuit or the lower court, improvidently, and,

13    frankly, it makes sense that I can enforce my own order,

14    which is an agreement of the parties, if that enforcement

15    is limited to the terms of that order --

16                   MR. FEINSTEIN:  Right.

17                   THE COURT:  -- essentially.

18                   MR. FEINSTEIN:  And it related --

19                   THE COURT:  And that's what you're saying?

20                   MR. FEINSTEIN:  Yes, exactly.

21                   THE COURT:  All right.

22                   MR. FEINSTEIN:  That, and the other matter

23    where the Court might become involved, your Honor asked

24    what happens if the agreement is terminated and the

25    payments aren't made.  The short answer is bad things, but

Page 47

1    the longer answer is that if the agreement is terminated,

2    and Monster is no longer paid the quarterly royalties, it

3    would have the right to serve a notice letter, and then

4    enforce the injunction, and that would require stay

5    relief, so we would come to your Honor if that would ever

6    happen.  Like you, we hope that never happens.

7                THE COURT:  Which, again, was what I was

8    getting to, what can I expect from a default procedural

9    perspective, and how it might involve me, and so that's

10   helpful.  Thank you.

11               MR. FEINSTEIN:  A couple of other things,

12   your Honor.  Just to kind of complete the record,

13   your Honor asked, can I approve 601, which was the motion

14   to approve -- 601 is modified by 625 on the docket, which

15   is the amended Exhibit B, which incorporates --

16               THE COURT:  601?

17               MR. FEINSTEIN:  I think that's --

18               THE COURT:  603 is the joint motion --

19               MR. FEINSTEIN:  603.

20               THE COURT:  -- to compromise.

21               MR. FEINSTEIN:  I apologize, 603.

22               So, 625 is the amended Exhibit B to the term

23   sheet, which -- or to the motion, that embodies the

24   settlement with the committee and others, so there is new

25   language in there, and that's obviously --

```
 1                    THE COURT:  So it's 603 and 625 that I would
 2     be approving, you're saying?
 3                    MR. FEINSTEIN:  That's right, your Honor.
 4     Thank you.
 5                    THE COURT:  Okay.  Yep, I have that, all
 6     right.
 7                    MR. FEINSTEIN:  Okay.  Two last things,
 8     your Honor, I'll say it as a committee lawyer, I don't
 9     think the committee needs to be granted standing to object
10     to claims or liens, because 502 says any party in interest
11     can do that.
12                    THE COURT:  Okay.
13                    MR. FEINSTEIN:  And maybe we'll test that
14     out in the future, because my last point, your Honor, is I
15     was advised during the hearing that our firm was selected
16     as counsel to the committee in the FedNat Holding case
17     before your Honor.  So you'll be seeing more of our --
18                    THE COURT:  Okay.
19                    MR. FEINSTEIN:  -- colleagues.
20                    Thank you.
21                    THE COURT:  Well, I've enjoyed it so far.
22     So, looking forward to that.
23                    MR. FEINSTEIN:  Thank you, your Honor.
24     That's all I had.
25                    THE COURT:  Thank you, Mr. Feinstein.
```

```
 1              Mr. Lluberas.

 2              MR. LLUBERAS:  Yes, your Honor.  For the

 3   record, Luis Lluberas on behalf of Truist Bank.

 4              I think, your Honor, if I may just take five

 5   minutes before we get into the legal argument, which I

 6   believe Mr. Sorkin and Mr. Wilkes will cover that topic

 7   thoroughly, I just wanted to sort of make a few brief

 8   remarks, just identifying for your Honor that where we are

 9   today, and I'm very pleased about it, is that every

10   objector with an economic interest in this situation has

11   consensually resolved the DIP, and on behalf of the

12   administrative agent, and the lenders, you know, we want

13   to express gratitude, or I want to express gratitude on

14   their behalf for all of the parties' efforts, you know,

15   all of them are represented in the courtroom and Zoom,

16   both prepetition, well before we got to your Honor on

17   October 10th, and postpetition, to get us here and present

18   your Honor with a very comprehensive, thorough,

19   unfortunately it's long, but it covers every issue that

20   all of us could think about, that presents a very viable

21   path forward here, as your Honor heard from Mr. Sorkin

22   articulating the milestones that are fast approaching.

23              Just to be very clear, for the record,

24   your Honor, my client, and the constituency for which it

25   serves as administrative agent, are prepared to provide
```

Page 50

```
 1    the financing that's being requested on a final basis,
 2    which is, as the evidence shows, the only financing
 3    available to fund these cases.
 4              We're hopeful that the provision of that
 5    financing, and the time period that's been afforded, will
 6    allow the debtors to successfully conclude a value
 7    maximizing outcome for the entirety of the estate.
 8              Your Honor, the protections that are
 9    proposed to be granted to the DIP lenders, including the
10    rollup and the 506(c) surcharge, among other items that
11    are in the order as it's been modified, are an essentially
12    inducement to the DIP lenders' provision of these
13    necessary funds.
14              Critically, your Honor, I do want to say
15    that the lenders' approach has not been, in this case,
16    either prepetition or postpetition, to make a land grab.
17    It has been to assist the debtors --
18              THE COURT:  A collateral grab.
19              MR. LLUBERAS:  Correct, yes, a collateral
20    grab would be the right phrase, not the colloquial phrase.
21              Critically, however, the debtors' deal with
22    the prepetition lenders, and now the same subset, as the
23    postpetition lenders, has always been that at the end of
24    this process, the lenders would be paid off, whether it's
25    through a refinancing or a sale, and the rollup
```

Page 51

```
 1    effectuates the benefit of that bargain, to essentially
 2    allow the debtors -- excuse me, the lenders to exit stage
 3    left at whatever the end of this process might be.  So
 4    that's been a critical component for my client and the
 5    constituency for which it serves as administrative agent.
 6                    THE COURT:  If you're going to lend more
 7    money, you want to know that --
 8                    MR. LLUBERAS:  Correct.
 9                    THE COURT:  -- it's going to be there, and
10    paid to you --
11                    MR. LLUBERAS:  Correct, your Honor.
12                    THE COURT:  -- first.
13                    MR. LLUBERAS:  That's right, your Honor.
14                    THE COURT:  I get it.
15                    MR. LLUBERAS:  And of course we think that
16    that money is worthwhile in this effort.  So we just want
17    to make sure that at the end of the day we're waving
18    goodbye to whatever is remaining at the end.
19                    We are, of course, very supportive of the
20    debtors' requested relief as modified, and for the record,
21    your Honor, we're also supportive of the royalty escrow,
22    as modified under 603 and 625 on the docket.
23                    I'd be happy to answer any questions, but I
24    just wanted to make that comment for the record.
25                    THE COURT:  Thank you, Mr. Lluberas.
```

1              MR. LLUBERAS:  Thank you, your Honor.

2              THE COURT:  Anyone else?  Mr. Cohen.

3              MR. COHEN:  Good afternoon, your Honor.

4    Jeffrey Cohen, Lowenstein Sandler, on behalf of the

5    committee.

6              Your Honor, I'm not going to repeat all of

7    the summary of detail that Mr. Sorkin provided.  I had

8    remarks prepared.  Your Honor may have noticed we filed a

9    statement in support last night which listed the

10   highlights of those agreements, not only with us and the

11   lenders, but the committee and the debtors with regard to

12   governance issues.

13             So in lieu of reciting those summaries

14   again, I just wanted to thank the lenders and the debtors

15   for participating in what sometimes was hard-fought

16   negotiations, but could not have been more professional,

17   and courteous, and respectful, and we appreciate that.

18             THE COURT:  Thank you for that, Mr. Cohen.

19             Anybody else?

20             (No verbal response.)

21             THE COURT:  All right.  So, any objections

22   to the compromise, I suppose is the next step, or did we

23   want to rule on everything at the end?  Mr. Sorkin, what's

24   your thought there?

25             I mean, you claim that they're inextricably

Page 53

1    intertwined, and I see that, but I could approve the

2    compromise conditioned upon approval of the DIP.

3                    MR. SORKIN:  I think that approach would

4    work, your Honor, but we do need both.

5                    THE COURT:  Okay.  I mean, I view the

6    compromise, maybe incorrectly, I know you want both, as

7    terms that are really not embedded within the UST

8    objection, per se, other than the 506(c) issue at some

9    level.

10                   So let me hear, actually, from Mr. Wilkes on

11   that.  Mr. Wilkes, how do you -- what do you think is the

12   best way to proceed?  Do you object to the terms of the

13   compromise, other than the 506(c) issue?

14                   MR. WILKES:  Thank you, your Honor.

15   J. Steven Wilkes for the United States Trustee.

16                   The United States Trustee does not object to

17   the terms of the compromise, but for any -- and not

18   meaning this in a derogatory way, any backdoor rollup

19   approval or 506(c) waiver approval.

20                   So, to the extent --

21                   THE COURT:  I see.

22                   MR. WILKES:  -- that it can be a clean

23   approval, subject to your ruling on DIP financing, the

24   United States Trustee has no objection to the compromise.

25                   THE COURT:  All right.  So I'm going to

Page 54

```
 1    conditionally approve -- does anyone else wish to be heard
 2    on that before I --
 3                     (No verbal response.)
 4                     THE COURT:  All right.  I'm going to
 5    conditionally approve 603, as amended by 625 -- is that
 6    right, 625, I think it is.
 7                     MR. SORKIN:  Correct.
 8                     THE COURT:  And then Mr. Wilkes' objections
 9    with respect to the DIP financing arrangement are
10    preserved, and we'll hear those.  So I think now we're
11    just left with that issue -- with those issues, correct?
12                     MR. SORKIN:  I agree, your Honor.
13                     THE COURT:  Okay.
14                     MR. SORKIN:  I'm happy to start with the
15    rollup issue, and --
16                     THE COURT:  All right.  Well, Mr. Wilkes is
17    the objecting party, but you want to put on your legal
18    case in support of it.  Mr. Wilkes, do you have a problem
19    with that order of things?
20                     MR. WILKES:  No, your Honor.
21                     THE COURT:  Okay.  All right.  So let me
22    just get to some of my notes on this, just to make sure
23    I'm following along appropriately.
24                     All right.  Go ahead, Mr. Sorkin, and try to
25    tell me what you think is left to be argued, and let's hit
```

1    those issues specifically, and I don't think I'm going to

2    want to go back and forth.  I think it's only two issues.

3                    MR. SORKIN:  Correct.

4                    THE COURT:  All right.  So, go ahead.

5                    MR. SORKIN:  So starting with the rollup,

6    and the other issue, your Honor, is the 506(c) waiver, but

7    starting with the rollup, I wanted to hit two points.  You

8    know, I'm not necessarily sure the second one is in

9    contention, but I think it's helpful to do anyway.

10                   The first is can your Honor approve a

11   rollup.  Obviously, we believe that rollups are not

12   prohibited under 11th Circuit law, under Saybrook or

13   otherwise, but I was also going to touch on why we believe

14   the rollup is appropriate in this case under these

15   circumstances.

16                   Let me start with the first issue, which is,

17   I think, at the heart of Mr. Wilkes' objection.  We do not

18   believe Saybrook's prohibition on cross-collateralization

19   is applicable here.  I think there is an important legal

20   distinction between cross-collateralization and rollups.

21   Rollups, effectively, repay or refinance prepetition debt

22   with DIP debt.  Cross-collateralization just takes the

23   prepetition debt and gives it new collateral, and I don't

24   think that's a distinction without a difference from a

25   Code standpoint.  If you look at Saybrook closely, the

Page 56

1    crux of the holding was really that there was no basis

2    under the Bankruptcy Code, and specifically Section 364,

3    or the Court's equitable powers under 105, to approve

4    cross-collateralization.

5              I think in contrast to that, there is a very

6    clear statutory basis to pay prepetition debt off under a

7    plan, and that's Section 363(b), which of course

8    authorizes use of estate property outside the ordinary

9    course of business, and that's been used, we do it all the

10   time at first-day hearings, right, to approve payments of

11   unsecured claims outside of a plan, without any assurance

12   that other unsecured creditors will receive the same

13   recovery.

14              THE COURT:  I.e., critical vendors.

15              MR. SORKIN:  Correct, exactly, exactly.

16              And I think it's important to note here, we

17   aren't simply taking an old loan and giving it new

18   collateral.  We have a new credit facility, with its own

19   terms, and its own economics, and those economics include

20   a reduced interest rate relative to the current rate on

21   the prepetition debt, that sixteen and a half percent that

22   I described earlier, it means the rollup effectively saves

23   the estate money, and this happens in other contexts even

24   outside of rollups, where you have an oversecured lender,

25   you pay off their prepetition debt in order to get the

Page 57

```
 1   benefit of the interest savings under the refinanced
 2   facility.
 3               The second point, I just want to touch on
 4   the concurring opinion from Judge Jordan in the
 5   11th Circuit, in Stanford, in 2021, which I think makes
 6   pretty clear that, at least in his view, Saybrook does not
 7   speak to rollups.
 8               That case, as you might recall, involved a
 9   credit bid from prepetition lenders, that it advanced
10   1 million postpetition, and had 12 million rolled up, I
11   would note, that's a 12 to 1 rollup ratio.
12               The issue at the heart of that appeal --
13               THE COURT:  Are you going to compare that to
14   your new --
15               MR. SORKIN:  My --
16               THE COURT:  -- ratio?
17               MR. SORKIN:  -- 2.35 to 1, it looks pretty
18   -- 2.35 to 1 looks pretty good.
19               The issue at the heart of the appeal was
20   whether that sale was moot under 363(m), but that
21   concurrence focused primarily on the rollup financing,
22   which Judge Jordan did describe as formally distinct, but
23   functionally similar to cross-collateralization, that the
24   11th Circuit had found impermissible in Saybrook.
25               But he didn't go so far as to suggest that
```

1    he thought the 11th Circuit would find rollups to be

2    altogether impermissible.

3                    THE COURT:  No, he just raised it as

4    something that needs to be thoroughly analyzed, and then

5    he compared it to the supreme court case that suggests

6    that it might be permissible.

7                    MR. SORKIN:  That's exactly right.  I mean,

8    he kind of noted the arguments on both sides under the

9    current state of the law, including that under Jevic, the

10   supreme court seemed to approve of even priority violating

11   distributions, where they served significant code-related

12   objectives, and I would submit that, you know, securing

13   DIP financing is one of those important code-related

14   objectives.

15                   So, I think it's pretty clear that in his

16   view Saybrook didn't answer the question, it certainly

17   didn't say that rollup DIP financing was impermissible.

18                   Finally, I'll just note our reply brief

19   includes a cite to several cases approving rollups, two of

20   which are from courts in this circuit, post-Saybrook,

21   including your Honor's own ruling in Unipharma, a couple

22   of years ago.  The other case was In Re:  Carpenter

23   Contractors of America, from 2011, that was Judge Ray's

24   decision.

25                   THE COURT:  Yeah, there is just not much

1   discussion legally in those decisions, and while a history

2   of courts approving something is somewhat helpful, it's

3   not altogether instructive when you've got an objection

4   that goes to the heart of the legality of the issue

5   itself.

6               MR. SORKIN:  Understood.

7               THE COURT:  But I hear you.

8               MR. SORKIN:  That is why it was the final

9   point on my argument about why your Honor can do it, but

10  it just goes to show --

11              THE COURT:  Law students studying, always

12  lead with your good argument, is that what you're telling

13  us, your best argument, and end with your worst?

14              MR. SORKIN:  I wouldn't say it's my worst

15  argument, but I knew your Honor would be, you know,

16  interested in interpreting both the Stanford and Saybrook

17  opinions, and I wanted to get that part out of the way

18  first.

19              THE COURT:  It's a fascinating issue, I have

20  to tell you.  I mean, it's -- some could view it as a

21  lawyer's dodge, if you will, to get around the

22  cross-collateralization problem, and others could draw,

23  you know, a legal distinction between those two types of

24  mechanisms for financing.  So, I get it, it's a very

25  interesting issue.

1           But go ahead.

2           MR. SORKIN:  Sure.  I think at this point I

3    would turn to the second part of my argument, which is why

4    we believe this rollup is appropriate here, and I think

5    you just heard some of the reasons from Mr. Lluberas, and

6    I think it's helpful to start with how we got to this

7    point.

8           I mean, this rollup has gone through

9    multiple rounds of negotiations.  Valuable concessions

10   have been extracted by the debtors, the committee, and

11   other objectors at every turn, and I think Mr. Parkhill's

12   declarations summarize it all very well, but I'll just

13   recap it really briefly.

14           What we started with here was a DIP that

15   offered $49 million of new money, with a four-month

16   maturity.  It would have come with a smaller rollup

17   attached, one that only rolled up the 70 million or so of

18   prepetition obligations that arose from the lenders

19   continuing to fund after we went into default in

20   March 2022.

21           The company believed it needed more time and

22   more money to run a value-maximizing process in this

23   bankruptcy case, and the lenders gave us both, they

24   extended the maturity from four to seven months, they more

25   than doubled the amount of new money under the facility,

1   from 49 million to 100 million, and that rollup, as

2   Mr. Parkhill noted in his declaration, was the price of

3   that accommodation.  The lenders were extending us a

4   bridge.  They wanted to be sure that they were not

5   bridging to a cram-up plan, which as you heard from

6   Mr. Lluberas, you know, they have been very clear

7   throughout, that their objective here is simply payment in

8   full in cash.  So they didn't want to give us more time,

9   only to have us come back at the end of the case and

10  attempt to cram them up.  That was a worthwhile trade-off

11  from the estate's standpoint.

12              Then we filed for bankruptcy.  We had a

13  committee appointed.  The rollup was a target of several

14  objections.  Many of them argued that the rollup was

15  simply too large relative to the new money, and that led

16  to a second round of negotiations among the lenders and

17  both of the estate fiduciaries, as is common in the

18  lead-up to a final DIP hearing, and it's through those

19  negotiations, and despite the fact that we had no -- we

20  still had no alternative DIP financing available, the

21  lenders still made additional concessions, including

22  reducing the rollup by 120 million, and their agreement

23  that the rollup wouldn't have recourse to any litigation

24  claims on which the prepetition debt didn't have liens or

25  otherwise have recourse.

Page 62

```
 1              So, I think we have a very clear record here
 2    that this rollup was heavily negotiated, and that the
 3    estate fiduciaries, in particular, drove as hard a bargain
 4    as possible.
 5              In the end we believe this rollup has
 6    benefits that far outweigh any detrimental consequences to
 7    the estate.  Those benefits are substantial.  First and
 8    foremost, it was a necessary inducement, as you just
 9    heard, to the lenders' willingness to provide the
10    100 million of new money financing that this estate
11    unquestionably needs, and for which there is no other
12    source, and to get us the case timeline that we thought
13    was necessary to maximize value.
14              Second, the rollup saves the estate money,
15    it's a topic I've touched on a couple of times now,
16    because the interest rate on the DIP is lower than the
17    prepetition rate, so we're effectively paying back --
18              THE COURT:  What was the prepetition rate?
19              MR. SORKIN:  The prepetition rate, as it
20    sits here today, is sixteen and a half percent.  I believe
21    the --
22              THE COURT:  So it just caps it at that,
23    assuming the challenge is resolved prior to another half
24    point increase, I guess.
25              MR. SORKIN:  Well, 235 million of that
```

1  prepetition debt would be immediately rolled up, and we

2  would start paying the DIP rate, which I think as of today

3  is in the 12 to 13 percent.

4          THE COURT:  Ah, okay, so that's lower than

5  the sixteen and a half, obviously, okay.

6          MR. SORKIN:  On that debt immediately, the

7  other 120 million or so of prepetition debt would remain

8  outstanding, and would continue to accrue at that higher

9  rate.  So, all to say, there is a very tangible benefit

10 here for the estate, assuming the lenders are oversecured,

11 which we expect the marketing process to show.

12          THE COURT:  Let me ask you, and I'm asking

13 you to admit here, what do you view the detriments to be?

14 I mean, some of what I've seen, or what I've tried to

15 understand, is that the lender had a blanket lien on

16 essentially everything prepetition, correct?

17          MR. SORKIN:  Correct.

18          THE COURT:  To the extent that its cash

19 collateral was to be used postpetition, it would get a

20 replacement lien?

21          MR. SORKIN:  Uh-huh.

22          THE COURT:  To the extent its inventory was

23 used, to the extent any of its collateral was --

24 prepetition collateral was used postpetition, it would get

25 a replacement lien?

1          MR. SORKIN:  Uh-huh.

2          THE COURT:  And that's standard use of cash

3    terms that you would expect in any bankruptcy case.

4          MR. SORKIN:  Uh-huh.

5          THE COURT:  So, I guess if -- what is

6    unencumbered that would not fall within a replacement lien

7    other than the causes of action, which you've already

8    described as being -- taking a subordinate position,

9    what's left that the lender would get from this rollup,

10   that it wouldn't otherwise get?  That's what I'm -- I

11   couldn't quite figure out.

12         MR. SORKIN:  In my mind, it is limited to

13   those causes of action, and they have now agreed, as part

14   of the resolution with the committee, that these rolled up

15   loans won't have recourse to those assets in any event.

16         THE COURT:  So there is no new collateral

17   sitting out there that may or -- may come into the estate,

18   that the lender is going to benefit from, that the lender

19   would not have benefitted from anyway as a replacement

20   lien, unless somehow the debtor is just building up a ton

21   of inventory, or collecting on a ton of accounts

22   receivable, or I'm not quite sure how it would even

23   happen.

24         MR. SORKIN:  Correct.  I mean, there is a

25   cycle here, right?  We have inventory, it is sold, that

Page 65

```
 1   generates receivables.  The receivables are collected, and
 2   we get more cash.  The cash creates more inventory.  In
 3   the end, all of that is a cycle of, you know, where each
 4   step of the way, it's the lenders' collateral under 552(b)
 5   as proceeds of their prepetition collateral.
 6                   THE COURT:  And/or replacement lien for
 7   their --
 8                   MR. SORKIN:  Correct.
 9                   THE COURT:  Okay.  All right.  Maybe -- I
10   assume Mr. -- or maybe Mr. Wilkes will have a different
11   view of that, I don't know, but I didn't see in any of the
12   papers a clear description of what the detriment would be
13   to the estate from this, and that was what generated my
14   question.
15                   MR. SORKIN:  And I think, you know, there
16   is --
17                   THE COURT:  Other than the causes of action
18   as collateral.
19                   MR. SORKIN:  Correct, correct, and to be
20   candid about it, we lose the ability -- the flexibility to
21   seek to cram the lenders up under a plan, but as I
22   explained, we thought that was a worthwhile trade-off for
23   the extension of the maturity date, and the additional
24   money.
25                   THE COURT:  And, frankly, in this district,
```

1    the U.S. Trustee's Office has a very clear policy on not

2    permitting avoidance actions to be collateral for

3    postpetition financing.  I don't know that that's really

4    ever been challenged.  Maybe it has been.  I'm not sure

5    what the origin of that is, but I think most lenders and

6    debtors go into negotiations understanding that that is

7    going to be challenged by the U.S. Trustee's Office in

8    every case, if that's what's provided.

9              So, anyway, that's not a new issue around

10   here at least.  I don't know if it is in our

11   jurisdictions, but here that's pretty standard.  All

12   right.

13             MR. SORKIN:  Just one other point I wanted

14   to flag for your Honor, that we included essentially a

15   safety valve in the proposed final DIP order, right, that

16   says if the rollup, which is a payment on account of the

17   lenders' prepetition secured debt, results in the payment

18   of any unsecured or undersecured debt --

19             THE COURT:  I saw that.

20             MR. SORKIN:  -- it's capable of being

21   unwound.  So we think that there is really no risk of harm

22   to the estate from this rollup at the end of the day, and

23   that the concerns that were present in Saybrook and the

24   other cross-collateralization cases, just don't apply.

25             THE COURT:  Okay.  Understood.

Page 67

1          MR. SORKIN:  Unless you have any other

2     questions on that, I can move on to the 506(c) issue.

3          THE COURT:  Go ahead.

4          MR. SORKIN:  Just a couple of points here,

5     your Honor.  I think first the precedent is clear that the

6     right to surcharge under 506(c) is our right, and our

7     right alone, that's the Hartford Underwriters case, from

8     the supreme court in 2000, and that it follows from that

9     that we, in our business judgment, as the

10     debtors-in-possession, can waive that right, in addition

11     -- as we did here, in exchange for valuable financing.

12          As your Honor knows, it's commonplace for

13     debtors to do so, and we cited, again, numerous cases from

14     this district and others approving 506(c) --

15          THE COURT:  You know, it's commonplace, not

16     so much in an interim order, obviously, until a committee

17     gets appointed and can take on that banner on behalf of

18     the estate, where the debtor may not have the leverage to

19     do that, but on a final basis, it's fairly commonplace,

20     unless, again, the committee is here to object.  So, at

21     least that's been my experience, but, go ahead.

22          MR. SORKIN:  Yeah, I agree, your Honor.  I

23     understand that 506(c) waivers are not customarily granted

24     at the interim stage.  Everybody wants the committee to

25     have an opportunity to weigh in.  Here they did, and they

1     are supportive of a final order that includes that waiver.

2                   THE COURT:  And it also goes hand-in-hand

3     with the challenge concept, because if the committee

4     decides not to challenge, then theoretically the 506(c)

5     issue isn't particularly interesting, or valuable, or --

6     but I don't -- I mean, I don't know if there is going to

7     be a challenge here, I guess we won't know that until

8     later in January, is that right?

9                   MR. SORKIN:  Yeah, it's coming up fast.  I

10    believe the deadline is next Monday.  I don't know what

11    discussions may be going on behind the curtain about

12    potential challenges, but the deadline is Monday.

13                  I think the U.S. Trustee here is taking the

14    position that a 506(c) waiver can never be permissible

15    because the decision to surcharge is a fiduciary function

16    that can't be contracted away.

17                  I think what that argument ignores is that

18    obtaining critical funding for the case, and negotiating

19    the terms of that funding, is also a fiduciary function,

20    and in order to get the financing that we need today, it

21    was necessary to give up a right that we might otherwise

22    avail ourselves of down the line, similar to what we did

23    with the rollup, and the, you know, theoretical

24    possibility of cramming up the lenders.  In this case it

25    was the right to surcharge their collateral under 506(c)

Page 69

1    and, you know, I think the debtors made the right decision

2    where, you know, this term was necessary to obtain the

3    financing, that we need to run this case to a

4    value-maximizing conclusion, and we're dealing with a

5    relatively customary term that's not objected to by any

6    other party.

7              We think the 506(c) waiver is appropriate

8    here.  I think the general trade-off is that where the DIP

9    lender is providing funding for the anticipated

10   administrative expenses of the cases, and agrees to

11   subordinate its claims and liens to a carveout, as the

12   lenders have done here, they shouldn't be surcharged twice

13   on the back end.

14             You know, as your Honor has observed, the

15   sources of funding for these cases are the DIP financing

16   and the cash collateral that belongs to the lenders, and

17   they've agreed that that financing and cash collateral can

18   be used to fund the expenses of these cases in accordance

19   with an agreed budget, that Mr. DiDonato, as our chief

20   transformation officer, has confirmed is adequate to

21   satisfy the reasonably anticipated administrative expenses

22   in the ordinary course of these cases.

23             They've also agreed to subordinate their

24   liens and claims to a carveout for professional fees in

25   the event that the DIP, or cash collateral termination

```
 1   event, that would include all fees that are ultimately

 2   allowed by the Court, and incurred prior to trigger date,

 3   two and a half million dollars more in fees after the

 4   trigger date, as well as transaction fee that would be

 5   payable, if it becomes payable, to the debtors' investment

 6   banker, Rothchild.

 7               So, given all of that, we think the lenders

 8   have paid the freight here, and they've fairly requested

 9   not to be surcharged on the back end, and we think the

10   506(c) waiver is appropriate for those reasons.

11               THE COURT:  All right.  Thank you,

12   Mr. Sorkin.

13               All right.  Mr. Wilkes, I don't want to

14   stifle your argument, but I do want you to focus on a

15   particular issue, and that is the distinction between

16   cross-collateralization and a rollup that Mr. Sorkin

17   identified and, frankly, that's identified in the case law

18   that he's discussed, and then, of course, the 506(c)

19   issue, what is the basis for arguing that 506(c) can never

20   be waived or contracted away.

21               So, go ahead and argue how you wish, but

22   those are the two issues that I am focused on, and perhaps

23   you can get me focused on another issue.

24               MR. WILKES:  Thank you, your Honor.

25   J. Steven Wilkes for the United States Trustee.  I will
```

```
 1   try to give you my argument succinctly, and if I don't end

 2   up focusing on the particular two issues that you raised,

 3   please feel free to question me openly afterwards.

 4              THE COURT:  You know I will.

 5              MR. WILKES:  Thank you, your Honor.  May it

 6   please the Court.

 7              The United States Trustee objects to two

 8   provisions of the DIP lending facility, the rollup

 9   provision and 506(c)'s waiver provision.

10              These two prepetition contractual terms are

11   meant to apply were a subsequent bankruptcy case filing to

12   occur, but were there no bankruptcy filing, these

13   contractual terms would have been meaningless and without

14   effect.

15              The contracting parties seek a reasonable

16   result from this Court, bringing prepetition debt into the

17   bankruptcy estate's house, calling it postpetition

18   lending, and then prohibiting the estate fiduciary from

19   potentially surcharging the creditor.

20              Just as the present congressionally enacted

21   Bankruptcy Code fails to provide a bankruptcy court with

22   authority to surcharge a debtor's exemptions, or change

23   the priority provisions of the Bankruptcy Code through a

24   restructured dismissal, the Bankruptcy Code provides the

25   bankruptcy court with no authority to change a prepetition
```

```
1    debt into postpetition superpriority administrative
2    expense obligations, statutory postpetition lending
3    protections under 363, 364, 365 and 503.
4              THE COURT:  But is that --
5              MR. WILKES:  To the contrary --
6              THE COURT:  But is that what's happening
7    here?  It's been argued to me that really what's been
8    happening -- what is happening here is that new money is
9    being loaned postpetition, and will be used, to the extent
10   of $235 million, to pay $235 million of a prepetition
11   secured debt which is different than what you've
12   described, isn't it?
13             MR. WILKES:  It is only different in the
14   paper chain.  It is not different in reality, and the
15   interesting thing there, your Honor, is the postpetition
16   lending facility is $100 million of new money.
17             The $235 million rollup changes prepetition
18   lending to postpetition administrative expense, rendering
19   that transfer of debt from prepetition to postpetition,
20   free from a cramdown challenge by a plan proponent under
21   1129 and 1141.
22             Congress has provided --
23             THE COURT:  Won't the very lender, though,
24   that -- wouldn't the debtor be the one that would pursue
25   the cramdown against the very lender that the debtor is in
```

Page 73

1    agreement with?  So how is the cramdown --

2                    MR. WILKES:  Not true, your Honor.

3                    THE COURT:  Okay.  Explain that then.

4                    MR. WILKES:  The debtor operates presently

5    as a debtor-in-possession, and has exclusivity rights.

6    Those exclusivity rights to file a plan and disclosure

7    statement may cease to be their exclusive rights.

8    Likewise, the debtor-in-possession may cease being the

9    debtor-in-possession, and a Chapter 11 trustee --

10                   THE COURT:  So in a committee plan -- so

11   you're saying in a committee plan, the committee may seek

12   to cramdown, and that --

13                   MR. WILKES:  Or Monster, or any other

14   creditor who wants to file a plan.

15                   THE COURT:  I see, okay.

16                   MR. WILKES:  The only person standing before

17   you today, your Honor, who is prohibited from filing a

18   plan, if exclusivity is breached, is the United States

19   Trustee.

20                   THE COURT:  Is there anything, though, that

21   prohibits the payment of a prepetition secured claim using

22   postpetition funds, whether borrowed or otherwise?

23                   MR. WILKES:  The priority status, and the

24   fact that the petition date creates cleavage between the

25   time requires court approval for a debtor to pay off a

```
 1    preexisting prepetition debt prior to plan confirmation.
 2                    THE COURT:  And what's the standard for the
 3    Court to approve such a transaction?
 4                    MR. WILKES:  Such a transaction as that
 5    would be generally under 363, unless they're having to
 6    incur debt, and raise debt --
 7                    THE COURT:  Then it's 364.
 8                    MR. WILKES:  -- to pay off prepetition debt,
 9    that would be 364.
10                    THE COURT:  But it can be done with the
11    proper --
12                    MR. WILKES:  It can be --
13                    THE COURT:  -- showing?
14                    MR. WILKES:  Correct, it can be done, but it
15    changes the nature of the entity.
16                    THE COURT:  What do you mean by the "nature
17    of the entity"?  The nature of the transaction?  I
18    didn't --
19                    MR. WILKES:  Correct.
20                    THE COURT:  -- understand that.
21                    MR. WILKES:  The nature of the transaction
22    is changed because there, similar to the debtors' motion
23    to pay prepetition wages, those are prepetition debtors --
24    creditors, who aren't entitled until plan confirmation,
25    normally, to receive payment, the parties agree to permit
```

1    those creditors to be paid early.

2                    THE COURT:  Which the Court often routinely

3    grants, because losing those employees would be far worse

4    than paying them outside the ordinary -- or outside the

5    priority scheme of the Bankruptcy Code.

6                    So, that's the type of showing, and here

7    what do you -- do you object to, or feel the showing isn't

8    sufficient to support the payment of this prepetition

9    secured claim through postpetition funds, given the

10   benefits that the estate will receive, versus what seems

11   to be very few, if any, detriments.

12                   MR. WILKES:  The difference is the

13   negotiating ability of the prepetition lender being the

14   postpetition lender, also, ensuring that he is -- that it

15   is being paid its prepetition debt by postpetition money

16   that's not really postpetition funding.

17                   THE COURT:  Meaning, just because it's a

18   journal entry, it's not dollars advanced, it's just a

19   journal entry, is your point?

20                   MR. WILKES:  Correct, and also in the

21   example, using the prepetition employees, they weren't in

22   a negotiating position.  True, they could have walked

23   away from their jobs if they weren't getting paid, but

24   they had no money in the barrel -- on the barrelhead to

25   say pay us now or else.  They weren't forcing their

1    position.

2                    THE COURT:  Didn't they?  Isn't their threat

3    to walk on the barrelhead, I mean, effectively?

4                    MR. WILKES:  Well, no, your Honor.  In an

5    at-will employment state, the threat to walk is in

6    existence at any time.

7                    THE COURT:  Well, it's not the threat to

8    walk because they can -- they couldn't otherwise legally

9    walk.  They could walk, I agree.  It's the negative effect

10   on the debtor that that would have, and the use of that

11   leverage by that employee to get paid what they're owed

12   prepetition.

13                   MR. WILKES:  But that leverage exists every

14   day regardless of there being a petition.

15                   THE COURT:  True, except that the code

16   prohibits it without court approval, paying a prepetition

17   claim, and that's where my discretion comes in, or the

18   Bankruptcy Court's discretion comes in, if the benefits

19   outweigh the detriments, which goes back --

20                   MR. WILKES:  Correct.

21                   THE COURT:  -- to my original question, what

22   are the detriments here, and do the benefits outweigh the

23   detriments?

24                   I mean, we are getting -- the estate is

25   getting $100 million of new money.  Arguably it's

Page 77

1    $335 million of new money, and I understand the journal

2    entry concept, but does it -- I mean, if $335 million were

3    transferred to an account, and 235 million of it went

4    back, and it wasn't a journal entry, would that make some

5    kind of difference in this scenario?  It's still a benefit

6    versus detriment analysis, because, as you said earlier,

7    the code doesn't prohibit it under certain circumstances.

8    Is that a fair statement?

9              MR. WILKES:  That's a fair statement, that

10   the payment of prepetition debt isn't, per se, prohibited

11   under Title 11.

12             THE COURT:  It's not cross-collateralization

13   under Saybrook.  Do you agree with that?

14             MR. WILKES:  That it is not

15   cross-collateralization under Saybrook.  It is extremely

16   similar to Saybrook.

17             THE COURT:  Okay.  It is similar, but it is

18   different.

19             MR. WILKES:  Just as Saybrook -- just as

20   the 11th Circuit stated in Saybrook, by the express terms

21   of Sections 364(c) and (d), they apply only to future,

22   i.e., postpetition extensions of credit.  They do not

23   authorize the granting of liens to secure prepetition

24   loans.

25             THE COURT:  But, again, that's not what's

1    happening here.

2                    MR. WILKES:  That's not what's happening

3    here.  The contracting parties are asking this Court to

4    have a prepetition debt, by journal entry, transmogrified

5    into a postpetition financing agreement, being given

6    administrative expense claims status, superpriority

7    administrative expense claims status, senior liens, junior

8    liens on unencumbered property that has been --

9                    THE COURT:  Except that's all -- isn't that

10   all authorized by 364 under the proper conditions?

11                   MR. WILKES:  It's authorized under 364 if

12   the event being sought to be approved occurs postpetition.

13   The lending agreement was signed prepetition.  The loan

14   funding was funded prepetition, and the obligation to

15   repay arose prepetition, and now the contracting parties

16   are coming before this Court and saying, no, your Honor,

17   let's disregard all that prepetition activity, and let's

18   all wink-wink and nod-nod and say this all occurred

19   postpetition.

20                   That's why the United States Trustee used

21   the word transmogrified, because it doesn't normally

22   occur.  It's not cross-collateralization, because that's

23   not the issue.

24                   It is very similar to

25   cross-collateralization, and it is very -- it is an

1    extraordinary remedy if it's available to the Court.  The

2    United States Trustee does not believe that Congress

3    afforded parties that ability under 364.

4                    THE COURT:  Let me make sure I understand.

5    Are you arguing that because the loan, the postpetition

6    DIP financing arrangement was negotiated and agreed to

7    prepetition, that it cannot be approved postpetition, even

8    though the loan is being effectuated postpetition?

9                    MR. WILKES:  No, the United States Trustee

10   is not going that far --

11                   THE COURT:  Okay.

12                   MR. WILKES:  -- into the weeds.

13                   The two issues that were negotiated

14   prepetition that run afoul of congressional enactment are

15   the rollup and the 506(c) waiver.

16                   THE COURT:  Okay.

17                   MR. WILKES:  The United States Trustee isn't

18   getting into, the debtor and its lenders can't negotiate a

19   contract.  It just can't negotiate a contract prepetition

20   that would be in violation of the Bankruptcy Code and the

21   rules.

22                   THE COURT:  All right.  So we still end up

23   analyzing whether, in fact, it's violative of the

24   Bankruptcy Code and rules.  So we're still in the same

25   place?

Page 80

1              MR. WILKES:  Correct.

2              THE COURT:  Okay.  All right.

3              MR. WILKES:  Although the contracting

4  parties are before the Court seeking a practical result,

5  that result is contrary to the Bankruptcy Code and rules.

6  Further, it impunes the integrity of the bankruptcy

7  system, as well as a separation of powers between the

8  legislative branch and the judicial branch.

9              Were this bankruptcy court to condone such

10  practice, it would create a slippery slope in financing.

11  First, in debtor-in-possession financing, but then it

12  would -- then these very provisions would meander their

13  way into all forms of lending facilities that were always,

14  at least prior to this Court's ruling, just a prepetition

15  debt, never intended to receive administrative expense

16  claim statutes, much less superpriority administrative

17  expense claim status, and never intended to be free from

18  cramdown in a plan.

19              Permitting a rollup opens the door to these

20  types of provisions across the whole of the financing

21  market, just like unenforceable unilateral provisions and

22  lending contracts that state bankruptcy is an event of

23  default, so, too, may these provisions begin to be seen in

24  standard lending contracts.

25              The contracting parties cannot provide

1    statutory citation specifically authorizing the court to

2    transmogrify --

3                    THE COURT:  Let me go back to your last

4    point.

5                    You're saying that if I permit this, then

6    lenders will ask for 506(c) waivers and DIP financing

7    arrangements that -- or that would require a rollup as

8    part of the loan documents that are -- that start from the

9    -- that are, I'm sorry, the original loan documents,

10   that's what you're concerned about, just like lenders

11   demand a provision that the filing of a bankruptcy is a

12   default under the loan?

13                   MR. WILKES:  They will start moving

14   backwards, your Honor, to the original set of documents.

15   It won't be just --

16                   THE COURT:  And if they did that, let's say

17   they did that -- I've never seen that, but perhaps that

18   could happen, would a bankruptcy court be obligated to

19   enforce that, if it's violative of 506(c), because the --

20   again, it's the benefit to the estate issue, or violative

21   of 364?

22                   MR. WILKES:  There again, your Honor, if

23   this Court rules that these provisions are applicable and

24   approvable, then it creates the slippery slope of

25   binding --

1              THE COURT:  I'm trying to picture that.  So,

2    a lender and a debtor enter into a loan agreement.  The

3    loan agreement provides for a 506(c) waiver, prepetition,

4    a 506(c) waiver, and then the parties come before the

5    Court on really anything, a 506 argument, and then the

6    lender raises the prepetition loan document and says, no,

7    506(c) has already been waived?  That's essentially what

8    you're concerned about?

9              MR. WILKES:  The same as a loan document

10   that provides that bankruptcy is an event of default, or

11   that the automatic stay doesn't arise if a subsequent

12   bankruptcy case is filed after the loan documents.

13             THE COURT:  Okay.  Well, I would deny that

14   argument if anybody made it here, but maybe I'd be wrong,

15   but anyway, go ahead.

16             MR. WILKES:  The postpetition waiver of

17   506(c) raises different issues because you're now looking

18   at contracting away statutory fiduciary obligations.  The

19   debtors call them a statutory right.  The United

20   States Trustee looks at fiduciary obligations, not as a

21   fiduciary right, but as a fiduciary obligation, and

22   federal law provides the bankruptcy court with no

23   authority to enforce a prepetition contract between the

24   lender and a debtor that contracts away the estate

25   fiduciary's obligations and duties under the Bankruptcy

Page 83

1  Code and rules.  It doesn't matter that in the end the

2  debtor will be clothed with a moniker of being a

3  debtor-in-possession, the estate fiduciary.

4          They are -- they were not so clothed with

5  those fiduciary obligations prepetition when they

6  negotiated away the 506(c) waiver.

7          THE COURT:  All right.  So I want to explore

8  this fiduciary issue.  Is there case law that suggests

9  that 506(c) is a fiduciary obligation of the trustee or

10  debtor-in-possession?  In reading 506(c) it just says the

11  trustee may recover from property securing an allowed

12  secured claim the reasonable and necessary cost and

13  expenses.  In other words, if the trustee felt that it was

14  -- or the debtor-in-possession felt that it was in the

15  estate's interest to pursue it, they could.  Where does

16  the fiduciary duty arise from 506(c)?

17          MR. WILKES:  The estate fiduciary has an

18  obligation out of 704 to protect the property of the

19  estate.  In both the Western District of New York and the

20  Western District of Michigan held, and this is at the

21  United States Trustee's objection Footnote 7, Page 5, both

22  held that 506(c) waivers were inappropriate because they

23  were waiving away the estate fiduciary's obligation to

24  preserve the estate assets for proper disposal.

25          THE COURT:  Was that case under similar

Page 84

```
 1   circumstances, where that 506(c) waiver was fully
 2   negotiated, and then noticed to all parties, and
 3   theoretically, if approved today, approved by the Court,
 4   or was it some other 506(c) waiver that was seeking to be
 5   enforced?
 6               MR. WILKES:  I'm not that familiar with the
 7   Colad Group, which is 324 BR 208, bankruptcy, Western
 8   District of New York, so I cannot state on that one, but
 9   the appeal from McAlpine versus Comerica Bank - Detroit,
10   In Re:  Brown Brothers, Incorporated, at 136 BR 470,
11   pincite 474, out of the Western District of Michigan in
12   1991, held that the Chapter 11 debtor's waiver of 506(c)
13   was not enforceable to the Chapter 7 trustee in light of
14   the congressional mandate that a trustee have authority to
15   use a portion of secured collateral for its preservation
16   or proper disposal.
17               THE COURT:  So 506(c) can never, there can
18   never be a waiver of a 506(c) right within the Chapter 11
19   for fear that the case would get converted to a 7 and the
20   trustee would lose that right?
21               MR. WILKES:  Either converted to a
22   Chapter 7, and the Chapter 7 trustee loses the right, the
23   Chapter 11 trustee, if appointed, and the
24   debtor-in-possession, dispossessed, loses that right, or
25   if the debtor-in-possession, exercising its estate
```

1    fiduciary obligations, sees the need to surcharge for

2    protecting secured collateral.

3                    Here the estate fiduciary, before it became

4    an estate fiduciary, said I don't want to do that job, I

5    don't want to protect, and I don't want to surcharge.

6                    THE COURT:  But it was still ultimately

7    subject to Court approval.  So, even if it occurred

8    prepetition, and I don't know that there is evidence in

9    there that it occurred prepetition, but even if it did,

10   it's still subject to Court approval, and still the same

11   criteria for approval applies, does it not?

12                   MR. WILKES:  And that is what's before this

13   Court --

14                   THE COURT:  Right.

15                   MR. WILKES:  -- is are you going to approve

16   a 506(c) waiver for --

17                   THE COURT:  Right, so again I go back to if

18   the detriments are outweighed by the -- you know, by the

19   benefits to the estate, is there something that you're

20   arguing still prohibits me from approving that waiver?

21                   MR. WILKES:  If the Court is inclined to

22   approve a waiver of fiduciary obligations, what fiduciary

23   obligations are not waivable?

24                   THE COURT:  Well, I wouldn't view it as a

25   fiduciary obligation.  I would view it as a negotiated

Page 86

1    waiver in exchange for benefits to the estate, that's how

2    I view it, and I will take a look at the footnote that you

3    referenced with respect to that case law that suggests

4    that it's a fiduciary obligation that can't be waived, but

5    what you're asking me to do, essentially, Mr. Wilkes, is

6    to undo, I don't know, one of the most age-old

7    negotiations that occurs in a Chapter 11 case, you know,

8    certainly in the thirty -- heck, I hate to admit it,

9    30-plus, 33-plus years I've been doing this, and I would

10   have to imagine in the many years you've been doing this,

11   you see this in every Chapter 11 case where there is DIP

12   financing.

13            So, you're essentially saying that all of

14   that was a fiduciary obligation of the

15   debtor-in-possession that should not have been approved

16   because it could not be waived, even by agreement --

17            MR. WILKES:  Thank you, your Honor.

18            THE COURT:  -- is that what you're saying?

19            MR. WILKES:  Thank you, your Honor.

20            THE COURT:  That is what you're saying?

21            MR. WILKES:  Yes, sir.

22            THE COURT:  Okay.  All right.

23            MR. WILKES:  It's the same thing that was

24   argued before the Supreme Court when Chapter 7 trustees

25   wanted to continue to surcharge debtor's exemptions, and

Page 87

1    the Supreme Court said there is no statutory authority for
2    a bankruptcy judge to surcharge exemptions.

3                    THE COURT:   Okay.   I don't know that it's
4    the same thing, but I understand the argument.   All
5    right.

6                    MR. WILKES:   Thank you, your Honor.

7                    THE COURT:   What else?   That's everything?
8    Okay.   I just want to make sure, that's all of your
9    arguments, Mr. Wilkes?   I don't want to cut you off.

10                   MR. WILKES:   In closing, the United States
11   Trustee states Congress enacted statutes directly on
12   point, 363, 364, 365, 503, and 506.   Although contracting
13   parties present this Court with their practical wants and
14   desires of this DIP facility, Section 105(a) does not
15   constitute a roving commission to do equity for a
16   Bankruptcy Court to create the substantive rights that
17   Congress did not afford the parties.   To disregard the
18   petition and the cleavage date would strip bankruptcy code
19   provision of (inaudible) and to waive statutory fiduciary
20   obligations due to agreements between contracting parties
21   would turn fiduciary law on its head.

22                   For these reasons, your Honor, this
23   honorable Court should disapprove the DIP lending facility
24   and send the contracting parties back to the drawing board
25   to see what this Court my approve within the constraints

Page 88

1   of Title 11, United States Code, as presently enacted by

2   Congress.

3                   Thank you.

4                   THE COURT:  All right.  Thank you very much,

5   Mr. Wilkes.

6                   Does anyone wish to be heard in response or

7   otherwise?

8                   MR. SORKIN:  Your Honor, I don't need to be

9   heard in rebuttal unless you have specific questions for

10  me based on Mr. Wilkes' argument.

11                  THE COURT:  I do not.

12                  Anyone else?

13                  (No verbal response.)

14                  THE COURT:  All right.  Hearing none, the

15  Court is going to take a recess.  Give me a few minutes,

16  and let me just try to collect my thoughts.

17                  All right.  Thank you.

18                  (Thereupon, a recess was had, after which

19  the following proceedings were had:)

20                  THE COURT:  All right.  Let me just get this

21  going.  It's not going.

22                  All right.  Is Mr. Wilkes there as well?

23                  MR. WILKES:  Yes, your Honor.

24                  THE COURT:  Okay.  All right.  I'm just

25  waiting for my law clerk to get online.  Sorry.

1           Everyone having a good New Year's so far?

2           MR. SORKIN:  Yes, your Honor.

3           THE COURT:  That's good to hear.  Can't beat

4   the weather, so for all of you who flew in, you're

5   welcome.

6           (Laughter.)

7           THE COURT:  It's not working?

8           Okay.  All right.  So the Court begins by

9   considering whether a rollup is impermissible by the Code,

10  as contested by the United States Trustee.

11          The United States Trustee argues that the

12  rollup constitutes cross-collateralization, which the

13  11th Circuit held is not authorized by Section 364 in the

14  matter of Saybrook Manufacturing Company, and so let me go

15  through that, although I think Mr. Wilkes somewhat

16  conceded that there is a distinction, but I think

17  Mr. Wilkes' main argument is that it's a distinction

18  without a difference.

19          Cross-collateralization involves securing

20  prepetition debt with pre and postpetition collateral, as

21  part of a postpetition financing arrangement, and that's

22  Saybrook at 1491.

23          In Saybrook the 11th Circuit noted that

24  cross-collateralization is not specifically mentioned in

25  the Bankruptcy Code, and concluded that

Page 90

1    cross-collateralization is inconsistent with bankruptcy

2    law for two reasons.  First, cross-collateralization is

3    not authorized as a method of postpetition financing under

4    Section 364 and, second, cross-collateralization is beyond

5    the scope of the Bankruptcy Court's inherent equitable

6    power because it is directly contrary to the fundamental

7    priority scheme of the Bankruptcy Code, and that's at

8    1495, Saybrook.

9              As to the first reason, the 11th Circuit

10   noted the language of Section 364(c) and (d), that states

11   that the court may authorize the obtaining of credit, or

12   the occurring of debt, and concluded that by their express

13   terms, Sections 364(c) and (d) apply only to future

14   postpetition extensions of credit.  They do not authorize

15   the granting of liens to secure prepetition loans.

16             Given that cross-collateralization is not

17   authorized by Section 364, the 11th Circuit turned to the

18   second reason, addressing the practice being permitted

19   under the Court's general equitable power, and explained

20   that the Court's equitable power is not unlimited.

21             The 11th Circuit quoted the following, the

22   Bankruptcy Court has the ability to deviate from the rules

23   of priority and distribution set forth in the Code in the

24   interest of justice and equity.  The Court cannot use this

25   flexibility, however, merely to establish a ranking of

1    priorities within priorities.

2              Creditors within a given class are to be

3    treated equally, and bankruptcy courts may not create

4    their own rules of superpriority within a single class.

5              So, while cross-collateralization is

6    undoubtedly not authorized, the 11th Circuit has not yet

7    addressed whether rollups are similarly not authorized,

8    and as cited by both debtors and objecting parties, courts

9    in this district and circuit, as well as others, have

10   approved rollups in many instances.

11             The Court notes that there is, in fact, a

12   subtle distinction, though, between

13   cross-collateralization and rollups.

14             In a rollup, the prepetition debt is paid by

15   a postpetition advance as part of a DIP loan.  In a rollup

16   mechanism, such as the one contemplated in this case, the

17   debtor uses proceeds from the DIP loan to immediately

18   repay all or part of the prepetition debt.

19             As per the debtors' proposal in this case,

20   the rollup will deem the rolled up prepetition obligation

21   to be repaid by $235 million of DIP obligations upon

22   entry of the final order, and this is where Mr. Wilkes

23   suggests that it's simply a journal entry and not a real

24   loan.

25             Well, the Court finds, frankly, that these

1    are funds that could be advanced, could be deposited into

2    an account, could be applied to the existing loan, or it

3    could be resolved by a journal entry, or whatever

4    accounting mechanism, but that doesn't change the fact

5    that the lender and the debtor, without other parties that

6    may be impacted objecting, or at this point -- or at least

7    at this point they're agreeing and not objecting, are

8    deeming it to be an advance, a postpetition advance to pay

9    a prepetition obligation.

10             While rollups and cross-collateralization

11   effectively both give the DIP lenders' prepetition claim a

12   better position over claims of other prepetition

13   creditors, they do so through importantly different

14   mechanisms.  Through rollups prepetition debt becomes

15   postpetition debt, secured by postpetition assets, i.e.,

16   the postpetition DIP loan pays off the prepetition debt,

17   but it is this postpetition DIP debt that is being secured

18   by postpetition assets.

19             Differently, cross-collateralized

20   prepetition debt does not become postpetition debt, but

21   instead retains its prepetition character, only now

22   secured by postpetition assets.

23             Thus, where the 11th Circuit held that

24   cross-collateralization is not authorized by Section 364

25   because that section only applies to future, i.e.,

Page 93

1   postpetition extensions of credit, and through

2   cross-collateralization, the extension of credit being

3   secured by postpetition assets is prepetition, with

4   rollups the extension of credit being secured by

5   postpetition assets is incurred postpetition and,

6   therefore, not necessarily unauthorized.

7              As the debtors argue, rollups are not

8   necessarily tantamount to cross-collateralization,

9   particularly where the prepetition liens subject to the

10  rollup attach to substantially all of the debtor's assets.

11  In such cases, rollups can be construed as a repayment

12  from DIP proceeds of a prepetition secured claim, a

13  relatively common occurrence, particularly where there is

14  an economic benefit to the estate from doing so.

15             As support for this proposition, the debtors

16  cite to In Re:  Capmark, 438 BR 471, out of the Bankruptcy

17  Court of the District of Delaware 2010.  The court in

18  Capmark found that there is no, per se, rule against

19  paying prepetition secured claims outside of a plan of

20  reorganization.  Indeed, such payments are routinely made

21  in a number of different contexts, for example,

22  postpetition refinancing of uneconomical secured debt,

23  secured -- I'm sorry, secured debt through a DIP loan may

24  be authorized by Section 363(b) of the Bankruptcy Code as

25  a use of estate property outside the ordinary course of

Page 94

1    business.

2              Similarly, prepetition secured claims can be

3    paid off through a rollup.  Most simply a rollup is the

4    payment of a prepetition debt with the proceeds of a

5    postpetition loan.  In both a refinancing and a rollup the

6    prepetition secured claim is paid through the issuance of

7    new debt rather than from unencumbered cash.

8              For present purposes, however, there is no

9    difference, the point is that a prepetition secured claim

10   can be paid outside of a plan of reorganization, and

11   that's a quote out of the Capmark case.

12             Courts in this and other circuits have found

13   that Section 363(b) allows such satisfaction savings of

14   prepetition debt, for instance, in the case of paying

15   critical vendors, since the payments enable a successful

16   reorganization, citing to Tropical Sportswear, 320 BR 15,

17   Bankruptcy, Middle District of Florida, 2005, which cites

18   to K-mart, at 359 F.3d 866, 7th Circuit 2004.

19             However, because payment of critical vendors

20   results in disparate treatment of unsecured claims, courts

21   scrutinize such requests, and read and use

22   Section 363(b)(1) to do the least damage possible to

23   priorities established by contract, and by other parts

24   of the Bankruptcy Code, also citing to Tropical

25   Sportswear.

1        For instance, the Court in Tropical

2   Sportswear found that the payment of critical vendors

3   should be approved only upon an evidentiary showing that

4   the payments were necessary to the debtor's

5   reorganization, that a sound business reason justified the

6   payments, in that the vendors would refuse to do business

7   with the debtor absent the payments, and that the

8   disfavored creditors would not be harmed by the payments,

9   Tropical Sportswear at 17.

10        And also see Fultonville Metal Products, 330

11  BR 305, Bankruptcy, Middle District of Florida, 2005, this

12  court simply considered this type of analysis when

13  approving the debtor's emergency motion for an order

14  authorizing payment of prepetition claim to critical

15  vendors at Docket Entry 13 and 112.

16        So, if rollups are not, per se,

17  cross-collateralization, and as such are not clearly

18  prohibited by the Code, but instead a satisfaction of a

19  prepetition debt with postpetition debt, the rollup is, to

20  some extent, a priority violation scheme, which in some

21  prudent instances may be allowed by the court.

22        To this point the Supreme Court recognized

23  in Jevic, 137 Supreme Court 973, 2017, that courts

24  approved interim distributions that violate ordinary

25  priority rules, where the priority-violating distributions

Page 96

1    serve significant Bankruptcy Code-related objectives,

2    stating, quote, courts, for example, have approved

3    critical vendor orders that allow payment of essential

4    suppliers' prepetition invoices, and rollups that allow

5    lenders who continue financing the debtor to be paid first

6    on their prepetition claims.  In doing so, these courts

7    have usually found that the distributions at issue would

8    enable a successful reorganization, and make even the

9    disfavored creditors better off.

10                   The Supreme Court differentiated those from

11   a priority violating distributions scheme in which there

12   is no significant offsetting bankruptcy-related

13   justification, such as one where it does not preserve the

14   debtor as a going concern, it does not make the disfavored

15   creditors better off, it does not promote the possibility

16   of a confirmed plan, it does not help to restore the

17   status quo ante, and it does not protect Reliance

18   interests, and that's a quote out of Jevic.

19                   Seeing that rollups are not, per se,

20   unauthorized by language of the Code, as

21   cross-collateralization schemes are, and moreover, haven't

22   clearly been determined to be so by any court, at least

23   that the Court is aware of, and are, instead, to some

24   extent, permissible as priority violating distribution

25   schemes, that may serve significant Bankruptcy

1   Code-related objectives, the Court considers the heart of

2   the issue of why the rollup in this case may be

3   problematic, that DIP lenders are improving their

4   collateral position through the rollup to the detriment of

5   unsecured creditors, or at least that's the argument.

6          If approved, the rolled up prepetition debt,

7   now qualified as postpetition debt, after effective

8   repayment, would enjoy a significantly improved position

9   over the collateral securing all the other creditors'

10  claims and, therefore, the DIP lenders would potentially

11  enjoy a much improved prospect of repayment of its

12  prepetition claims.  Thus, the DIP lender would be better

13  off in their position, as the argument goes, to the

14  detriment of the unsecured creditors, that would otherwise

15  receive an equal distribution of the collateral to the DIP

16  lenders for all prepetition claims.

17         But in theory and practice, this is only

18  true if the prepetition debt being rolled up is

19  undersecured.  If the prepetition debt is instead fully

20  secured, there is little impact on unsecured creditors

21  because the DIP lenders' prepetition claims would be paid

22  off first anyway, to the extent that prepetition debt

23  constitutes secured debt .

24         For example, here we had a colloquy with

25  respect to the fact that the lender is given replacement

1    liens to the extent its prepetition collateral is being

2    sold, or used, and the proceeds used by the debtor

3    postpetition, and on a similar note the debtors argue that

4    in actuality the rollup does not constitute a collateral

5    grab by the DIP lenders because their prepetition liens

6    already encumber substantially all of the debtors' assets,

7    as the debtors have stipulated after conducting due

8    diligence.

9                    The debtors state that if a successful

10   challenge by another party results in a determination that

11   there was some meaningful gap in the DIP lenders'

12   prepetition collateral package, encumbering substantially

13   all of the debtors' assets, and I'll quote, then the final

14   order affords the Court the flexibility to fashion an

15   appropriate remedy to address any prejudice to unsecured

16   creditors that might have occurred due to the rollup, end

17   quote, but, and I'll quote again, if such challenge

18   prevails, then the prepetition secured parties will not

19   have improved their collateral position at all through the

20   rollup.  This is particularly true in light of the DIP

21   lenders' agreement to exclude the only potential

22   meaningful unencumbered assets in the debtors' bankruptcy

23   estates, i.e., proceeds of prepetition avoidance actions

24   and commercial tort claims on which the prepetition

25   secured parties did not previously have perfected liens

1   from the scope of the DIP liens and the DIP superpriority

2   claims securing the rolled up portion of the DIP

3   obligations.

4              Without the rollup necessarily improving the

5   collateral position of the DIP lenders, and in

6   consideration of the sections of the Code that would

7   otherwise authorize, or rather not authorize such a

8   mechanism, the Court determines that the rollup, as

9   contemplated, is not, per se, impermissible, and instead

10  finds that DIP financing agreement as a whole, evaluating

11  its different components, specifically as objected to by

12  the objecting parties, which have now been resolved, is

13  approved pursuant to Section 364(c) because the benefits

14  to the estate far exceeds the detriment and, in fact, no

15  party, including the United States Trustee, was able to

16  articulate any detriments.

17             The Court finds that the proposed financing

18  complies with Section 364(c), and under Section 364(d) the

19  Court authorizes postpetition financing on the terms

20  proposed.  So the Court overrules the United States

21  Trustee's objection also to the 506(c) waiver.

22             The Court finds that the

23  debtor-in-possession does not violate its fiduciary duty

24  by agreeing to the waiver, which here was fully

25  negotiated, subject to objection and approval by the

```
1    Court, and the Court finds the waiver appropriate given
2    the significant benefits to the -- of the DIP financing,
3    and the lack of an articulated detriment to the estate.
4              So that is my ruling.  I assume that you're
5    going to send me an 800-page DIP financing order,
6    hopefully it's shorter than that, and in that order if you
7    could revise it to simply say that all objections were
8    resolved amicably other than the United States Trustee
9    objections, that those objections were fully argued
10   before the Court, and for the reasons stated on the
11   record the Court overrules the United States Trustee's
12   objections.
13             All right, and that should resolve this
14   issue once and for all, subject to whatever may come
15   next.
16             All right.  Is there anything else we need
17   to do here today?
18             MR. SORKIN:  No, your Honor.  Thank you.
19             THE COURT:  All right.  Thank you all very
20   much, and by the way, congratulations.  I know that this
21   was a very difficult negotiation, hard-fought, it took a
22   while, but, you know, sitting here as a bankruptcy judge,
23   this is exactly how things are supposed to play out in a
24   successful reorganization.
25             So, hopefully you all will continue working
```

1  together, and resolving your differences, and we'll see

2  where that takes us.

3                    Thank you all.

4

5                    (Thereupon, the hearing was concluded.)

1

2

3                         CERTIFICATION

4

5    STATE OF FLORIDA        :

6    COUNTY OF MIAMI-DADE   :

7

8              I, Cheryl L. Jenkins, RPR, RMR, Shorthand

9    Reporter and Notary Public in and for the State of Florida

10   at Large, do hereby certify that the foregoing proceedings

11   were taken before me at the date and place as stated in

12   the caption hereto on page 1; that the foregoing

13   computer-aided transcription is a true record of my

14   stenographic notes taken at said proceedings.

15              WITNESS my hand this 31st day of

16   January, 2023.

17

18

19   _____

20              CHERYL L. JENKINS, RPR, RMR

21         Court Reporter and Notary Public

          in and for the State of Florida at Large

22              Commission #HH 170910

               December 27, 2025

23

24

25