UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION
www.flsb.uscourts.gov

| | |
|---|---|
| IN RE: | Chapter 11 |
| VITAL PHARMACEUTICALS, INC., *et al.*, | Case No. 22-17842 (PDR) |
| Debtors.[1] | (Jointly Administered) |

**OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO THE DEBTORS' MOTION TO QUASH AND FOR PROTECTIVE ORDER AS TO OFFICIAL COMMITTEE OF UNSECURED CREDITORS' RULE 2004 NOTICES**

### Expedited Hearing Request

For the reasons set forth below, the Committee at this time needs and is entitled to information from individuals and entities (both insider and otherwise) with knowledge of the Debtors' assets and financial condition and who are involved in certain Suspect Transactions[2] revealed in the Committee's ongoing analysis of the Debtors' books and records. Based on the Committee's investigation to date, the Suspect Transactions underlie valuable causes of action belonging to the Debtors' estates that could inure to the benefit of unsecured creditors. In part because the Debtors are unable to provide complete financial information necessary for the Committee to evaluate the Suspect Transactions, the Committee issued the 2004 Notices to the Third Parties. The Third Parties' earliest deadline to produce information responsive to the 2004 Notices was February 13, 2023. We have requested that this matter be considered on an expedited basis because direct, immediate, and substantial harm will occur to the detriment of the bankruptcy estates and unsecured creditors if the Committee cannot obtain the information sought in the 2004 Notices, which are necessary and not unduly burdensome. Delaying the Third Parties' obligations to

---

[1]  The address of the Debtors is 1600 N. Park Drive, Weston, FL 33326. The last four digits of the Debtors' federal tax identification numbers are: (i) Vital Pharmaceuticals, Inc. ("VPX") (8430); (ii) Bang Energy Canada. Inc. (5454); (iii) JHO Intellectual Property Holdings, LLC ("JHO") (0010); (iv) JHO Real Estate Investment, LLC (9394); (v) Quash Seltzer, LLC (6501); (vi) Rainbow Unicorn Bev LLC (2254); and (vii) Vital Pharmaceuticals International Sales, Inc. (8019).

[2]  Capitalized terms not defined in this Expedited Hearing Request have the meaning ascribed to them in this Objection or in the Motion.

comply with the 2004 Notices will adversely affect the Sale Process by preventing prospective purchasers from valuing causes of action belonging to the Debtors' estates before the relevant sale milestones occur, thus slowing down the Sale Process and potentially minimizing the value of the assets. Likewise, delaying compliance with the 2004 Notices will substantially harm the Debtors' ability to reorganize because any roadblock to understanding the magnitude of liability that the Debtors will invariably seek to extinguish through third-party releases in a plan will likewise delay confirmation.

The Committee requested that the Court set this matter for hearing on February 23, 2023. Hearing this matter on that date—as opposed to the March 9, 2023 hearing date set by the Court [Docket No. 788]—not only avoids further delaying the Third Parties' document production obligations under the 2004 Notices, but is efficient for the Court and all parties as other matters are already scheduled to be heard on February 23, 2023.

The Official Committee of Unsecured Creditors (the "Committee") appointed in the chapter 11 cases (the "Chapter 11 Cases") of the above-captioned debtors and debtors-in-possession (the "Debtors"), by and through its undersigned counsel, submits this objection (the "Objection") to the *Debtors' Motion to Quash and for Protective Order as to Official Committee of Unsecured Creditors' Rule 2004 Notices* [Docket No. 786] (the "Motion"). In support of this Objection, the Committee relies on the *Declaration of Brent C. Williams in Support of the Objection of the Official Committee of Unsecured Creditors to Debtors' Motion to Quash and for Protective Order as to Official Committee of Unsecured Creditors' Rule 2004 Notices* (the "Williams Declaration") filed concurrently herewith and respectfully states as follows:

## PRELIMINARY STATEMENT[3]

1.      The Committee is required by the Federal Rules of Civil Procedure (the "Federal

---

[3] Capitalized terms not defined in this Preliminary Statement have the meaning ascribed to them in this Objection or in the Motion.

Rules") and Federal Rules of Bankruptcy Procedure (the "Rules") to timely and meaningfully investigate individuals and entities with knowledge of the Debtors' assets and financial condition and that are involved in certain Suspect Transactions revealed in the Committee's ongoing analysis of the Debtors' books and records (collectively, the "Books"). While the Committee has undertaken good faith efforts to obtain information informally through the Debtors, the information obtained from these efforts to date has raised serious concerns about: (i) the Debtors' prepetition history of routine transfers to or for the benefit of insider[4] third parties without corresponding value being provided to the company; and (ii) the reliability and veracity of the Books. To be clear, there is no question that Debtors' counsel and other advisors tried to provide the Committee with the material it seeks; however, despite this cooperation, the Books do not accurately document the Suspect Transactions. Accordingly, the Committee must (a) question the Debtors' employees and other third parties about the transactions, including how they were accounted for, and (b) obtain records in possession of Third Parties who benefited from and/or participated in executing the Suspect Transactions. The Committee had no choice but to make formal discovery requests on the Third Parties involved in, or knowledgeable about, these Suspect Transactions to fulfill its statutory duties.

2.     The Committee seeks this critical information against the backdrop of certain sale milestones described in the Final DIP Order,[5] including:

- March 13, 2023: Deadline for Debtors to either (a) deliver to the DIP lender fully executed commitment papers for an Acceptable Financing (as defined in the Final DIP Order), or (b) accomplish certain requirements in the Sale Process (as defined in the Final DIP Order), including obtaining an order approving the bid procedures motion and filing a motion seeking approval of a stalking horse and related protections.

---

[4] Terms not defined herein but otherwise defined by chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") section 101 shall have the meanings ascribed to them in the Bankruptcy Code. *See* 11 U.S.C. § 101.

[5] *See* Docket No. 638, ¶ 46.

- April 19, 2023:  Deadline for Debtors to have held an auction, if pursuing the Sale Process.

- May 17, 2023:  Deadline to close on an Acceptable Financing transaction (as defined in the Final DIP Order).

3.     The Committee and the Debtors agree that the success of the Sale Process is critical, cannot be delayed, and is in the interest of all parties.  However, the Debtors are wrong that the Committee's 2004 Notices interfere with the Sale Process.  For the reasons described herein, not only do the 2004 Notices impose minimal, if any, burden on the Debtors (who are not targets of these requests), but the Committee expects the results of the 2004 Notices to confirm that the estates hold valuable claims arising from the Suspect Transactions, which a purchaser may want to buy or a post-confirmation fiduciary may want to pursue for the benefit of unsecured creditors.

4.     The Debtors cannot consummate a sale that maximizes the value of the estates without understanding what these claims are worth.  It is a mystery, then, why the Debtors seek to stymie the Committee's efforts to understand and value them.  This is especially curious here, where it appears that neither the Debtors' restructuring committee nor any other representative of the Debtors is investigating the Suspect Transactions.  By waiting until shortly before or after the sale to commence an investigation, an opportunity to maximize estate value will already have been lost.  Likewise, the Debtors cannot wait until after their May 8, 2023 deadline to file a plan within the exclusivity period,[6] much less delay confirmation, to investigate the viability and value of these claims.

5.     Specifically, the Debtors seek to excuse eighteen Third Parties—most of whom are insiders—from complying with the 2004 Notices.  As a threshold matter, the Debtors lack

---

[6] *See* Docket No. 744, ¶ 3.

standing to move to quash the 2004 Notices.  In an attempt to distract the Court from this critical deficiency, the Debtors raise a number of meritless arguments the Court should reject, including that discovery is premature and will impede the Sale Process, and that the 2004 Notices seek information that should be sought directly from the Debtors rather than the Third Parties.

6.        For instance, the Debtors protest that the discovery sought from Third Parties will somehow prevent the Debtors from running a successful Sale Process.  This argument should be rejected out of hand.  Just last week, the Debtors obtained the Court's approval, over the Committee's objection, to retain special counsel to continue prosecuting or defending five separate prepetition litigations.  In one of the prepetition litigations, the Debtors have specifically refused to stay discovery actually directed at them.[7]  And, the Debtors intend to seek the Court's approval in the coming weeks to retain at least two more special counsel to prosecute two additional prepetition appeals.  In essence the Debtors seek to have it both ways. They argue that it is in the best interest of the estates to expend significant resources necessary to make "incremental progress"[8] in the prepetition litigations—certain of which were one of the main drivers of the Chapter 11 Cases, and where the conduct underlying the litigation could itself give rise to valuable estate causes of action.  At the same time, though, the Debtors claim to be profoundly burdened if certain of their employees and non-employee Third Parties respond to the Committee's discovery—even though it is intended to recover valuable assets of the estates for the benefit of all creditors by obtaining additional information about, and seeking to recover damages arising from, the Suspect Transactions.

---

[7] *See generally Plaintiff Pharmaceutical, Inc.'s Response in Opposition to Defendants' Expedited Motion to Stay Discovery, Vital Pharmaceuticals, Inc. v. Monster Beverage Corporation*, Case No. 22-cv-61621 (S.D. Fla. Jan. 13, 2023), Docket No. 47.

[8] *See Debtors' Omnibus Reply to Omnibus Objection to the Official Committee of Unsecured Creditors to the Debtors' Pending Applications to Retain Special Counsel*, Docket No. 765, ¶ 11.

7.      For these reasons and those detailed below, the Committee is entitled to the necessary financial and operational information sought in the 2004 Notices.  The Committee cannot conduct a meaningful and robust investigation without discovery directed at these Third Parties.  And there is no time to waste.  Sale of substantially all of the Debtors' assets and plan confirmation are two of the most significant opportunities to maximize value of the Debtors' estates, and they are quickly approaching.  The Committee needs time to understand the Suspect Transactions in order to make the most of these milestones.  The Committee has amply shown "good cause" for the issuance of the 2004 Notices under Rule 2004.  The Motion should be denied.

## FACTUAL BACKGROUND

### A.  The Chapter 11 Cases

8.      On October 10, 2022 (the "Petition Date"), the Debtors each filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of Florida (the "Court") commencing these Chapter 11 Cases.  No trustee or examiner has been appointed in the Chapter 11 Cases.

9.      The Debtors continue to manage and operate their businesses as debtors in possession under sections 1107 and 1108 of the Bankruptcy Code.

10.     On November 1, 2022, the Office of the United States Trustee appointed the Committee pursuant to section 1102(a)(1) of the Bankruptcy Code [Docket No. 245], which membership was reconstituted on November 23, 2022 [Docket No. 400].

11.     On November 2, 2022, the Committee selected Lowenstein Sandler LLP ("Lowenstein") to serve as its lead counsel.  On November 4, 2022, the Committee selected Lincoln Partners Advisors LLC ("Lincoln" and, together with Lowenstein, the "Committee's

Professionals") as its financial advisor, Sequor Law, P.A. as its local counsel, and Miller Buckfire & Co., LLC as its investment banker.  [*See* Docket Nos. 485, 487, 488, and 491].

12.    On November 11, 2022, the Debtors filed their *Statement of Financial Affairs*, including that of Debtor Vital Pharmaceuticals, Inc. [Docket No. 325] (the "SOFA").  In response to multiple prompts in the SOFA, including item number 30 addressing "payments, distributions, or withdrawals credited or given to insiders" that requires, among other things, the "name and address of recipient", the Debtors filed *Exhibit SOFA 4* [Docket No. 325 at pp. 48–67] ("SOFA 4"), that purportedly lists "payments or other transfers of property made within 1 year before filing this case that benefited any insider".  Among the insider payments/transfers listed by the Debtors on SOFA 4 are *ninety-seven* transfers related to John H. Owoc ("Jack"), a majority of which are described as "distributions."  *See* SOFA 4 at 53–55.  Tellingly, SOFA 4 does not indicate whether Jack or another individual or entity was the ***recipient*** of these "distributions" from the Debtors.  Based on the Committee's investigation to date, the Books contradict any assertion that these distributions were, in fact, actually made directly to Jack.

13.    Information regarding the Debtors' history, business operations, capital structure, secured indebtedness, and the events leading up to the commencement of the Chapter 11 Cases are contained in the *Declaration of John C. DiDonato in Support of Chapter 11 Petitions and First Day Pleadings* [Docket No. 26] (the "First Day Declaration").

**B.  Informal Discovery**

14.    In an effort to avoid formal discovery, beginning in November 2022, the Committee served four sets of informal requests for information on the Debtors on: (i) November 3, 2022; (ii) November 11, 2022; (iii) December 19, 2022; and (iv) January 27, 2023 (collectively, the "Informal Requests").

15.    While Debtors' counsel has been cooperative and receptive to the Committee's

Informal Requests, many documents requested have yet to be produced—including a majority of the requested Communications (defined below) that is further described in paragraph 17. For example, since the Committee's fourth set of Informal Requests that were served over two weeks ago, the Debtors have produced documents responsive to only one of the forty-two Informal Requests.

16.    The Debtors simply cannot provide much of the information the Committee needs, and the Debtors have, on multiple instances, admitted as much. In fact, for certain critical inquiries, Debtors' counsel told counsel to the Committee to seek the information from the Third Parties because the Debtors do not have it. For example, they use Jack as both a sword and a shield. Debtors' counsel previously stated that it does not have access to information concerning funds that appear to have been received by insider-owned-and-managed entities listed in the Books, as well as the reason for certain "distributions" purportedly received by Jack, and that the Committee should seek such information directly from Jack. Now, the Debtors claim that Jack is too busy running the businesses and dealing with the Sale Process to respond to Rule 2004 discovery.

17.    Further, the Debtors' responses to the Informal Requests are inadequate. For example, of forty Informal Requests specifically requesting Communications,[9] the Debtors have produced a mere handful of e-mails relating to a *de minimis* number of the Informal Requests. No text messages, voicemails, or instant messages have been produced to date, which typically contain some of the most key communications. Either the Debtors do not have possession of

---

[9]    As defined in the Informal Requests, "Communications" means any writing or any oral conversation of any kind or character, including, by way of example and without limitation, e-mails, instant messages, text messages, voicemail or messages, personal conversations, telephone conversations, letters, meetings, memoranda, telegraphic communications or transmittals of Documents, and all Documents concerning such writing or such oral conversation.

responsive Communications—which is unlikely, as they probably have not searched for them, or they are in the Debtors' possession, but the Debtors have not produced them.

18.     As another example, in response to an Informal Request, the Debtors provided the Committee with a list of entities affiliated with Jack and his family members.  However, the Committee's investigation revealed that this insider-entity list was incomplete: a major problem since the Committee's investigation to date suggests that Jack used insider entities to funnel money out of the Debtors.

19.     The obstacles the Committee has encountered in the informal discovery process with the Debtors has revealed that Debtors' counsel is simply unable, despite good faith efforts, to provide a complete and transparent picture of the Debtors' financial health and historical transactions, which the Committee is required—and has the right—to investigate.

20.     In fact, the Debtors produced documents that distorted the Debtors' prepetition transactions and reflected inconsistent information that was not reconcilable against the Books and SOFA 4.  The Debtors' documents containing transactions from October 2019 through the Petition Date[10] were nearly impossible to comprehend because the general ledger was produced in fragments and required frequent and repeated consultation—much of which led to little progress, but significant delay—between Lincoln and the Debtors' financial advisor, Huron Consulting Services LLC ("Huron").  *See* Williams Declaration, ¶¶ 7–13.  After five calls with Huron on the subject and over 180 hours spent analyzing the Books, Lincoln was still unable to decipher details of the transactions and determine, among other things: (i) whether there were duplicates; (ii) why certain journal entries were entered manually; (iii) whether certain general

---

[10]   The Committee's Professionals have requested the Books, including general ledger documents, containing transactions for the period of January 2018 through October 2019 (the "Additional Transaction Data").  Debtors' counsel and Huron (defined below) have indicated that the Additional Transaction Data is forthcoming.

ledger documents constituted the complete native file;[11] and (iv) the actual nature of many transactions. *See* Williams Declaration, ¶¶ 9 and 11. In fact, Lincoln remains unable to assess the credibility or the accuracy of the Books based on the documents produced to date especially due to the rampant inconsistencies with SOFA 4. *See* Williams Declaration, ¶ 13. This is not because Huron or Debtors' counsel purposefully produced incomprehensible information; evidently these are the documents and information that Debtors' management provided to them.

21.     What the Committee's Professionals were able to distill, however, are over 200 transactions from October 2019 through the Petition Date that resulted in the transfer of tens of millions of dollars out of the estates and appear to have no relation to the Debtors' businesses and day-to-day operations (the "Suspect Transactions").[12]  The documents containing historical transactions suggest that these funds were funneled to a bevy of third parties, such as Jack's family members or entities controlled by his family members, and then subsequently accounted for in the Books as "distributions" at some later date, presumably in order to escape the scrutiny they would provoke if accurately described. These so-called "distributions" are among the Suspect Transactions the Committee is actively investigating. One of many major problems is that certain payments included in a so-called "supplier" file also constitute Suspect Transactions, *e.g.*, significant transfers for the benefit of Third Parties, and only the beneficiaries and/or recipients of the "supplier" payments—not the Debtors—possess the key evidence needed by the Committee to understand and potentially take action to seek the return of the payments to the estates. Hence

---

[11]  The Committee's Professionals identified inconsistencies in the presentation of transactions between certain documents purportedly from the general ledger, including missing data that identifies the individual responsible for entering each journal entry, which prompted an Informal Request for the complete native files for the various general ledger documents that has yet to be resolved.

[12]  The vast majority of Suspect Transactions occurred prepetition and appear to predate the Debtors' retention of bankruptcy counsel and Huron and have nothing to do with the Debtors' day-to-day ordinary course operations.

the 2004 Notices (defined below).

22.     Compounding the issue of the unintelligible Books, the Debtors designated a majority, if not all, of the documents containing the historical transactions as Professionals'-Eyes-Only ("PEO").  *See* Williams Declaration, ¶ 8.  As a result of the overbroad PEO designations, the Committee's Professionals have been unable to provide the Committee with meaningful updates on the investigation as is typical in chapter 11 cases, nor issue formal discovery to certain insider third parties identified in the PEO-designated documents.[13]

23.     Although the Committee disagrees with a majority of the Debtors' PEO designations, especially because the information is historical and has nothing to do with the Debtors' go-forward operations, the broad descriptions below (i) respect the propriety of the PEO information and (ii) provide examples of the inconsistencies and/or inaccuracies associated with prepetition transactions in the Books:

- "Distributions" listed on SOFA 4 do not accurately list recipients' names and addresses;
- "Distributions" listed on the SOFA 4 do not accurately list the amounts of each transaction;
- Transactions listed as supplier payments to third parties on one document appear as "Distributions" on another; and
- Multi-million dollar transactions related to residential and commercial real property, some of which are owned by the entities to whom the 2004 Notices (defined below) are directed, when the Debtors are not in the business of buying and/or selling real property.

24.     As a threshold matter, this is concerning because SOFA 4, which was signed under oath and filed on the Court's docket, is materially wrong and has not been amended.  In any event, given the inaccuracies contained in Court filings, the only way the Committee can meaningfully

---

[13]  Based on the Debtors' PEO designations, the Committee redacted various requests in the 2004 Notices to Third Parties in order to avoid potentially disclosing PEO information, a painstaking exercise that cost the estates resources that could have been deployed more usefully elsewhere.  To date, numerous third parties implicated by the Suspect Transactions have **not** been subpoenaed as the PEO designation issue remains outstanding.

analyze these transactions is by: (i) obtaining source data which is in the possession of various third parties; and (ii) examining the individuals who were responsible for maintaining the Books. This time-consuming process, not usually necessary in most cases where the SOFA is accurate and the debtor's books and records are relatively clear and consistent with the SOFA, is why the Committee filed and served the 2004 Notices now rather than waiting until some unidentified later date.

### C. The 2004 Notices

25.     On January 26, 2023, the Committee filed *Notices of Videotaped Rule 2004 Examination Duces Tecum* and *Subpoenas for Rule 2004 Examination* [Docket Nos. 684–97] (as amended and supplemented, the "Initial 2004 Notices") on fourteen third parties directly and/or indirectly related to the Suspect Transactions (the "Initial Third Parties") including:

- Jack Owoc – Chief Executive Officer, Chief Science Officer, director, sole member/manager, and sole shareholder of the Debtors [Docket No. 684];
- Jonathan W. ("Jon") Owoc – Jack's son, sole member/manager of several limited liability companies (the "JWO LLCs") that are also Initial Third Parties [Docket Nos. 685 and 702];
- Megan Owoc – Jack's wife, Senior Director of Marketing of the Debtors [Docket No. 686];
- Desiree Bolanos – Jack's former secretary who appears to no longer be employed by the Debtors [Docket No. 687];
- Krista Owoc – Jack's niece and Debtors' employee [Docket No. 688];
- Elite Island, LLC – a limited liability company managed and owned by Jack (the "JHO LLC") [Docket No. 689];
- 3 Pelican Dr LLC – a JWO LLC [Docket Nos. 690 and 699];
- Zachary Owoc – Jack's nephew and Debtors' employee [Docket No. 691];
- Ryan Owoc – Jack's nephew and Debtors' employee [Docket No. 692];
- JWO Real Estate Investment I, LLC – a JWO LLC [Docket Nos. 693, 704, and 720];
- JWO Real Estate Investment II LLC – a JWO LLC [Docket Nos. 694 and 719];

- JW Owoc Enterprises, LLC – a JWO LLC [Docket Nos. 695 and 703];
- 167 Spyglass LN LLC – a JWO LLC [Docket Nos. 696 and 701]; and
- 120 Spyglass LN LLC – a JWO LLC [Docket Nos. 697 and 700].

26.    After further review of the Suspect Transactions and documents produced by the Debtors, on February 7, 2023, the Committee filed *Notices of Videotaped Rule 2004 Examination Duces Tecum* and *Subpoenas for Rule 2004 Examination* [Docket Nos. 761–64] (together with the Initial 2004 Notices, the "2004 Notices") on four additional third parties directly and/or indirectly related to the Suspect Transactions (together with the Initial Third Parties, the "Third Parties") including:

- Eugene Bukovi – Debtors' Vice President of Sales [Docket No. 761];
- Fritz Tilus – Debtors' Director of Financial Operations [Docket No. 762];
- Greg Robbins – Debtors' Senior Vice President of Finance [Docket No. 763]; and
- Zurama Sury Rodriguez – Debtors' Vice President of Finance [Docket No. 764].

27.    At present, fourteen of the 2004 Notices have been served.  The 2004 Notices to the following Third Parties have not yet been served: Zurama Sury Rodriguez; Ryan Owoc; Zachary Owoc; and Desiree Bolanos.  Notably, some of these individuals are believed to be employed by the Debtors and still have not agreed to service by email, causing delay that makes the 2004 Notices even more pressing.

**D.  The Motion**

28.    On February 10, 2023, the Debtors filed the Motion seeking (i) to quash the Committee's 2004 Notices and (ii) a protective order as to the 2004 Notices.  First, the Debtors assert that responding to the 2004 Notices will "unduly burden" the Debtors because several of the 2004 Notices are directed to Debtors' key employees, many of whom are involved in the sales process.  Motion, ¶¶ 21–22.  The Debtors emphasize that, because the DIP Agreement outlines

various milestones for the Sale Process, which are to occur in March and April and the Debtors are ultimately required to consummate a sale of substantially all of the Debtors' assets or otherwise close on an Acceptable Financing transaction on or before May 17, 2023, there is no need to engage in discovery under Rule 2004 at this juncture. *Id.*, ¶¶ 21–22, 25. In essence, the Debtors request that the Court postpone the Rule 2004 discovery to "some later, less burdensome date" that has not been identified. *Id.*, ¶ 4. Second, the Debtors assert that the 2004 Notices seek information that is maintained by the Debtors and should be sought from them, rather than the Third Parties. *Id.*, ¶¶ 27–29.

29.     For the reasons set forth herein, these arguments are a transparent attempt to hamper the Committee's investigation. Significantly, the Debtors do not have standing to assert that they are burdened by discovery directed to ***third parties***. And even if such an argument were proper—which it is not—the Debtors failed to satisfy the standard for a motion to quash or a protective order on the merits. The Motion would needlessly delay the Committee's important work for several months, until it is too late because the underlying causes of action could be sold or released under a plan without being fully vetted by any estate fiduciary.

## **OBJECTION**

30.     The Debtors seek an order quashing the Committee's 2004 Notices directed to the Third Parties and otherwise limiting the discovery sought by the Committee. The Court should deny the Motion because the Debtors lack standing to seek such relief and, alternatively, because the Committee has amply established "good cause" for the 2004 Notices.

### **A. The Debtors Lack Standing to Quash the 2004 Notices**

31.     The Debtors have not demonstrated–nor can they–that they have standing to quash the 2004 Notices directed to the Third Parties. Federal Rule 45 protects "***subpoena recipient[s]*** by requiring the issuer to 'take reasonable steps to avoid imposing undue burden or expense on ***a***

***person subject to the subpoena.***'" *Jordan v. Comm'r, Miss. Dep't of Corr.*, 947 F.3d 1322, 1329 (11th Cir. 2020) (emphasis added) (quoting Fed. R. Civ. P. 45(d)(1)).  Only the individual or entity subject to the subpoena has standing to quash it – unless the party moving to quash can show that it has a personal right or privilege implicated by the subpoena.  *In re Petroforte Brasiliero de Petroleo Ltda.*, 530 B.R. 503, 513–14 (Bankr. S.D. Fla. 2015) ("In the Eleventh Circuit, standing exists if a party alleges a 'personal right or privilege' with respect to a subpoena.") (citations omitted); *In re Patel*, Case No. 16-65074-LRC, 2017 WL 377943, at *1 (Bankr. N.D. Ga. Jan. 26, 2017) ("A party may only move to quash a subpoena issued against a third party if that party is seeking to protect a personal privilege or right"); *see also* § 2459 Subpoena for the Production of Documents and Things—Quashing or Modifying a Subpoena, 9A Fed. Prac. & Proc. Civ. § 2459 (3d ed.) ("Ordinarily a party has no standing to seek to quash a subpoena issued to someone who is not a party to the action, unless the objecting party claims some personal right or privilege with regard to the documents sought").  The Debtors have not made any attempt to demonstrate that they have "a personal privilege or right" threatened by the 2004 Notices, nor could they.

32.     A debtor has standing to object to a third-party subpoena where the subpoena seeks information protected under the attorney-client or work product privilege, or where the debtor alleges a violation of the applicable procedural rules.  *See, e.g.*, *Patel*, 2017 WL 377943, at *1 n.2 ("A party may only move to quash a subpoena issued against a third party if that party is seeking to protect a personal privilege or right.  Absent that, a court cannot quash a subpoena sent to a non-party on the motion of a party.").  In addition, a party has standing if it can show that the notice requirements under Federal Rule 45 are not followed.  *See In re Willingham*, 493 B.R. 628, 633 (Bankr. M.D. Fla. 2013) (noting that "[i]n general, a party does not have standing to challenge

the issuance of a third-party subpoena," but finding that party had standing to challenge subpoena where the issuing party failed to comply with the notice requirements of Federal Rule 45). Absent such a showing, a debtor does not have standing to quash non-party subpoenas. *In re Carvalho*, Case No. 15-00646, 2016 WL 5173212, at *1 (Bankr. D.D.C. Sept. 20, 2016) ("The defendant debtor has no standing to challenge the February 28th subpoena issued to the Bank of America in regards to bank records of both the defendant and Elite. A party generally has no standing to seek to quash a subpoena issued to a non-party person or entity.").

33.     The Debtors do not even attempt to meet their burden to demonstrate that the 2004 Notices to the Third Parties seek confidential or privileged information and, therefore, have no standing to quash the subpoenas. Instead, the Debtors assert, without any elaboration, that the "Debtors and their advisors will need to be involved with aspects of such production, including through any review for privilege or confidentiality and in deposition preparation." Motion, ¶ 23. This does not come close to the necessary showing that the documents to be produced are privileged. *C.f., Patel*, 2017 WL 377943, at *1 n.2 (finding that the debtor lacked standing to quash any of the subpoenas "because the [d]ebtor did not assert that the documents to be produced are privileged or otherwise contain private or confidential matter[.]").

34.     Moreover, to the extent the Debtors voluntarily choose to undertake the burden of such a review for privilege or confidentiality or deposition preparation, they cannot then assert that it imposes an unfair burden on them. As the Debtors have accurately observed, the Committee has sent certain requests to both the Third Parties and to the Debtors related to the same topics.[14] The Debtors have represented to the Committee that they are continuing to respond

---

[14] The fact that the Committee has propounded certain of the same requests that appear in the 2004 Notices to the Debtors is not a basis to quash the 2004 Notices. As a threshold matter, the Debtors' information is not reliable. *See generally* Williams Declaration. And at least one court in this Circuit has found that, even under Federal Rule 26's more protective standard, relevant documents within the scope of discovery should be produced by the target of a

to the Committee's informal discovery and have neither objected to, nor sought to delay, those consensual discovery obligations.  To the extent the Debtors choose to review the Third-Party productions for privilege or confidentiality, there is inevitably going to be overlap with the Debtors' documents, which can be reasonably expected to be more voluminous than the Third Party's response to the same request.  Since the most recent request from the Committee to the Debtors has been pending for more than two weeks, the Debtors are presumably already reviewing and producing many of the relevant documents.  Engaging in a voluntary, limited review of the Third-Party productions for confidentiality and privilege would involve a marginal burden on the Debtors, if anything.

35.     Aside from the fleeting reference to the privilege and confidentiality review, the primary argument the Debtors offer in support of the Motion is the purported burden on the Debtors during the Sale Process because several of the noticed Third Parties are Debtor-employees.  To the extent such a burden exists, it is not outweighed by the need for the Rule 2004 discovery now and will not harm or delay the Sale Process.

36.     The Debtors also fail to acknowledge that *eight* of the 2004 Notices are directed to individuals or entities not employed by the Debtors.  [*See* Docket Nos. 685 and 702 (Jon Owoc); Docket Nos. 693, 704, and 720 (JWO Real Estate Investment I, LLC); Docket Nos. 694, 719 (JWO Real Estate Investment II, LLC); Docket Nos. 696 and 701 (167 Spyglass LN LLC); Docket No. 695 and 703 (JW Owoc Enterprises, LLC); Docket Nos. 697 and 700 (120 Spyglass

---

subpoena even if those documents were previously produced to the requestor by another party in the case. *See Regions Bank v. MDG Lake Trafford, LLC,* Adv. Pro. No. 9:14-ap-402-FMD, 2018 WL 11205795, at *2 (Bankr. M.D. Fla. Mar. 20, 2018) (holding that the trustee was entitled to the production of documents sought from a third party over an objector's argument that the objector already produced the same documents to the trustee).  Moreover, and importantly, the 2004 Notices seek both the production of documents from, and the examination of, the Third Parties. Just because the Committee has asked for the same categories of documents from the Debtors and certain Third Parties does not mean that the Committee should also be precluded from deposing those Third Parties.

Ln LLC); and Docket No. 687 (Desiree Bolanos)].[15] Even if this Court is inclined to find that the Debtors have standing to move to quash the 2004 Notices directed to current Debtor-employees, the Debtors have no basis to challenge the 2004 Notices directed to non-employees—particularly those who happen to be insiders transacting with the Debtors under suspicious circumstances.

37.    The Committee has complied with all of the notice requirements of Federal Rule 45 (and Rule 2004) and the Debtors have not alleged—and cannot allege—that they have standing due to a procedural defect.

**B. The 2004 Notices are Warranted and Necessary Now for the Committee's Investigation**

38.    Even if this Court determines that the Debtors have standing to file the Motion, which it should not, there is no basis to quash the 2004 Notices. The crux of the discovery sought by the Committee is the repeated, large—*i.e.,* often multi-million dollar—transactions with insider third parties that, despite being included in the Books, appear unrelated to Debtors' businesses. Investigating such Suspicious Transactions is one of a committee's core functions especially where it appears that neither the Debtors' restructuring committee nor any other Debtor representative is investigating the Suspect Transactions themselves, and the rules provide the primary way to conduct this investigation: Rule 2004.[16]

39.    Rule 2004 provides that, "[o]n motion of any party in interest, the court may order the examination of any entity." Fed. R. Bankr. P. 2004(a). The scope of such an examination may relate to the "acts, conduct, or property or to the liabilities and financial condition of the

---

[15] As a courtesy, the Committee has already agreed to adjourn the return date for the subpoenas directed at Jon Owoc and his related entities for twenty-one days, at the request of Jon Owoc's recently retained counsel. Given that Jon Owoc has already received an adjournment—and is not an employee of the Debtors so presumably is not participating in the Sale Process—no further adjournment is warranted even under the Debtors' own logic.

[16] Even if the limitations on discovery under the Federal Rules, applicable pursuant to Rule 7026, apply to the 2004 Notices, information about these Suspect Transactions is also clearly discoverable under those broad discovery rules.

debtor, or to any matter which may affect the administration of the debtor's estate, or to the debtor's right to a discharge." Fed. R. Bankr. P. 2004(b). "The scope of a Rule 2004 examination is exceptionally broad and . . . [e]xaminations under Rule 2004 are allowed for the purpose of discovering assets and unearthing frauds and have been compared to a fishing expedition." *In re Gaddy*, 851 F. App'x 996, 1004 n.6 (11th Cir. 2021) (quotations omitted); *see also In re No Rust Rebar, Inc.*, Case No. 21-12188 (PDR), 2022 WL 17365810, at *2 (Bankr. S.D. Fla. Dec. 1, 2022).[17] Emphasizing the broad purpose of Rule 2004, courts generally allow examination of any third parties shown to have had dealings with the debtor. *See, e.g.*, *In re Correra*, 589 B.R. 76, 108 (Bankr. N.D. Tex. 2018); *In re Youk-See*, 450 B.R. 312, 319 (Bankr. D. Mass. 2011); *c.f. In re Sanomedics, Inc.*, 583 B.R. 796, 797 (Bankr. S.D. Fla. 2018) ("Creditors normally have a right to conduct Rule 2004 examinations of third parties who possess documents and information relevant to the administration of a bankruptcy case.").

40.    The "party seeking to conduct a 2004 examination has the burden of showing good cause for the examination which it seeks." *In re Millennium Lab Holdings II, LLC*, 562 B.R. 614, 627 (Bankr. D. Del. 2016); *see also No Rust Rebar*, 2022 WL 17365810, at *2. "Good cause can be established by showing that the 'discovery is needed to establish a claim or that denial of the Rule 2004 discovery would cause undue hardship or injustice.'" *No Rust Rebar*, 2022 WL 17365810, at *2 (quoting *In re Defoor Centre, LLC*, 634 B.R. 630, 640 (Bankr. M.D. Fla. 2021)).

41.    Good cause to conduct Rule 2004 examinations exists even if the examining party has access to some documents and information related to its investigation of estate assets,

---

[17]  While this Court granted the motion to quash in *No Rust Rebar*, the Court found that the creditor's Rule 2004 subpoena (unlike the 2004 Notices in these cases) was (i) not seeking to establish a claim for the benefit of the estate; and (ii) sought discovery for their own benefit. *No Rust Rebar*, 2022 WL 17365810, at *4. This Court did, however, recognize that legitimate goals of Rule 2004 include discovering assets, analyzing transactions, and exposing any unlawful or improper conduct. *Id.* at *2.

especially if those documents are insufficient to fully determine the existence or viability of potential claims and defenses. *Millennium*, 562 B.R. at 627–28 ("The fact that the Trustee already has access to certain documents and information of the Debtors does not detract from the Trustee's testimony that the documents already in his purview are not sufficient to demonstrate the scope of the Trustee's viable claims. As such, the Trustee has demonstrated good cause warranting granting of the Trustee's Rule 2004 Motion on behalf of the Corporate Trust."). Here, the Debtors' information is so unreliable that the Committee has no meaningful access to the requested information. *See generally* Williams Declaration.

42.     Contrary to the Debtors' assertion, access to Rule 2004 discovery is not limited by Federal Rule 26. In fact, courts routinely recognize that the scope of a Rule 2004 examination is *broader* than the scope of discovery under Federal Rule 26. *See, e.g., Correra*, 589 B.R. at 108–09 (Rule 2004 discovery "affords few of the procedural safeguards that an examination under Rule 26 of the Federal Rules of Civil Procedure does"); *In re Enron Corp. Secs., Derivative & "ERISA" Litig.*, Case No. MDL-1446, 2005 WL 3504860, at *10 (S.D. Tex. Dec. 22, 2005) (a Rule 2004 "examinee does not enjoy the protections usually provided by the Federal Rules of Civil Procedure"). Courts have even described Rule 2004 approvingly as a "fishing expedition," "exploratory and groping," and akin to an "inquisition." *See, e.g., No Rust Rebar*, 2022 WL 17365810, at *2; *In re Pan American Hosp. Corp.*, Case Nos. 04-11819, 04-11820, 2005 WL 2445907, at *2 (Bankr. S.D. Fla. Feb. 25, 2005) (citations omitted). Here, where the 2004 Notices are narrowly tailored to assist the Committee in understanding the Suspect Transactions, there is no "fishing expedition"—even though one is otherwise permissible—but rather a surgical and necessary inquiry.

43.     Rule 2004 may be used, as here, to discover and evaluate the existence of estate

assets. *See, e.g., In re Coffee Cupboard, Inc.*, 128 B.R. 509, 514 (Bankr. E.D.N.Y. 1991) ("The purpose of a Rule 2004 examination is 'to show the condition of the estate and to enable the Court to discover its extent and whereabouts, and to come into possession of it, [such] that the rights of the creditor may be preserved.'"). Assets include, without limitation, potential causes of action belonging to a debtor's estate. *See, e.g., In re Table Talk, Inc.*, 51 B.R. 143, 146 (Bankr. D. Mass. 1985); *In re Bennett Funding Grp., Inc.*, 203 B.R. 24, 28 (Bankr. N.D.N.Y. 1996) (recognizing Rule 2004 "is properly used as a pre-litigation device to determine whether there are grounds to bring an action").

44.    In addition, the scope of the investigation necessitating a Rule 2004 examination need not be fully understood or detailed at the time it is commenced. *See, e.g., In re Sheetz*, 452 B.R. 746, 750 (Bankr. N.D. Ind. 2011) (rejecting argument that party seeking examination "failed to provide enough specific information concerning the discrepancies she wants to investigate" because "Rule 2004 can properly be a fishing expedition and upon setting out for such an expedition one does not usually limit the fish one sets out to catch" rather "[i]t is perfectly permissible to troll for whatever might bite."); *In re Mirant Corp.*, 326 B.R. 354, 357 (Bankr. N.D. Tex. 2005) ("Discovery [under Rule 2004] now, not later, may be critical to ensure that no viable cause of action is lost, for while it may be certain [that] suit will be filed against [a party], that does not mean all possible claims . . . have been identified.").

45.    A thorough Rule 2004 examination of documents and information in the hands of the Third Parties is necessary *now* in these Chapter 11 Cases for several reasons, including to permit the Committee to fairly assess the existence and viability of claims that could inure to the benefit of unsecured creditors. *See In re Bounds*, 443 B.R. 729, 732 (Bankr. W.D. Tex. 2010) (Rule 2004 discovery is "aimed at discovering evidence upon which future causes of action may

be based.") (emphasis added and citation omitted).  The Committee must have this information now for the estates to eventually benefit from the causes of action during the Sale Process and inevitable confirmation process.

      (i)      <u>The 2004 Notices Are Integral to Investigating the Suspect Transactions</u>

46.     The Committee's 2004 Notice document requests are primarily directed to Third Parties implicated by the transactions and conduct under investigation—including the Suspect Transactions.  Because the funds at issue were sometimes transferred to an intermediary third party or conveniently recorded as a "distribution" to Jack, the Debtors' documentation and information ends there.  *See generally* Williams Declaration.  The Debtors expect the Committee to accept, without scrutiny, that any transfer of value from the Company to a third party seemingly unrelated to the Debtors' businesses is a "distribution to Jack" and therefore not subject to further investigation and analysis by the Committee, even where, as here, the Suspect Transactions amount to tens of millions of dollars.  Instead, it is crucial for the Third Parties to immediately produce documents within their control and provide testimony within their personal knowledge related to the transfers at issue in the 2004 Notices so the Committee can determine, among other things, (i) whether the purported "distributions" were considered distributions at the time they were made, or whether that was a *post hoc* justification for the transfers; (ii) whether the Debtors received any consideration in return for the transfers, (iii) whether the transfers in any way related to the Debtors' businesses, and (iv) if the funds transferred are property of the Debtors' estates. This is the only way the Committee will timely determine if the transfers were lawful "distributions" or improper payments disguised as such, as the evidence suggests.

47.     To be clear, the Debtors' claim that the Committee is only investigating avoidance actions under sections 547, 548, and 549 of the Bankruptcy Code is wrong; these causes of action

make up only a subset of the potential claims that the investigation has uncovered to date.  Based on the Suspect Transactions and other transfers and conduct under investigation by the Committee, there are likely additional causes of action against the Third Parties belonging to the estates (the "Additional Claims").  To evaluate the potential Additional Claims, the Committee needs information and documentation that only the Third Parties can provide.  For example, a breach of fiduciary duty claim requires, among other things, a showing of willful or intentional conduct of a third party.  This is not something the Debtors alone can provide through informal discovery.

    (ii)    <u>The 2004 Notices Will Not Delay or Impede the Sale Process</u>

48.    The Debtors' argument that "*eleven* of their key employees are unable to dedicate sufficient time, energy, and focus" on the business operations and participation in the sale and marketing process is disingenuous at best.  [Motion, ¶ 22 (emphasis in original)].  It is hardly novel for chapter 11 debtors to participate in a sale and marketing process while a committee contemporaneously pursues its investigation, including Rule 2004 discovery.  In fact, in many cases, the debtor and committee conduct concurrent investigations.

49.    First, there is no support for the Debtors' suggestion that "distraction" from an employee's work, whether concerning the Debtors' business operations or the reorganization process, is a sufficient basis to delay Rule 2004 discovery.  If that were true, no employee of a debtor could ever be required to respond to Rule 2004 discovery because resources and time would necessarily be diverted from operations and/or the bankruptcy case to respond to discovery.  In fact, no debtor would need to comply with discovery requests for the same reasons.  Chapter 11 cases would be perpetually delayed.  The Debtors have provided no authority for such an absurd result.  The recipients of the 2004 Notices can and must multitask under grave circumstances like a bankruptcy.

50.     Equally baseless is any suggestion that "playing an integral role in the sale process" is sufficient to immunize an employee from compliance with Rule 2004 discovery.  What would be inequitable is to shield Jack's prepetition conduct from the Committee's investigation simply because he retains influence over the Debtors' business operations and the Sale Process; his very public and ongoing role makes it all the more important that his transactions with the company withstand scrutiny for fraud or self-dealing. Not only did Jack initially force the Committee to make formal service of a prior subpoena at his home rather than accept service by email as a courtesy and to conserve money for the estates, but he seems to spend significant time on other pursuits, including rampantly posting on Instagram and YouTube about topics like the highest rated restaurants in Delray Beach, Florida, and various other ruminations having nothing to do with the Debtors' business.  Jack's counsel's recent withdrawal will undoubtedly lead to further delay in addition to the delay caused by the filing of the Motion.

51.     Lastly, even if the Court were inclined to give any weight to the level of an employee's participation in the Sale Process in the analysis of undue burden—which it should not—the Debtors' wholesale request to quash all 2004 Notices is certainly inappropriate as to many of the employees they seek to protect.  For example, the Debtors cannot seriously argue that Jack, President and CEO, and his nephew, Zachary Owoc, Field Support Specialist,[18] are both so integral to the Debtors' business operations and Sale Process that their "distraction" results in an undue burden on the Debtors.  This is probably why the Debtors use vague phrases about "key employees" being unable to dedicate sufficient time, energy, and focus on the Debtors' business operations and the sale and marketing process rather than to identify specific individuals who simply cannot make time to respond to basic information requests and sit for but a day-long

---

[18]  The Committee does not know what duties and responsibilities this position entails, but it presumably is less complicated and time-consuming than those of a Chief Executive Officer and Chief Science Officer.

deposition. The Debtors do not even attempt to analyze recipients of the 2004 Notices with particularity; that is because the recipients are all capable of doing their job and responding to the 2004 Notices.

        (iii)    The 2004 Notices to Third Parties Pose No Additional Burden on the Debtors Who are Already Responding to Informal Discovery

52.      Again seeking to have their cake and eat it too, the Debtors simultaneously assert that compliance with the 2004 Notices will "impose significant burden on the Debtors" and that "the notices seek information more appropriately obtained from the Debtors." [*Compare* Motion, at 8–10 *with* Motion, at 12–13]. Either the Third Parties have the relevant information, in which case they must produce it, or the Third Parties do not possess responsive documents, in which case the Third Parties can respond to the 2004 Notices as such. The 2004 Notices do not impact the Debtors and cannot unduly burden them unless the Debtors voluntarily undertake some burden in connection with the 2004 Notices (*e.g.,* a review for privilege or attorney work product); if they choose to do so, then they cannot complain about it. Indeed, the Suspect Transactions are all historical and likely unrelated to the Debtors' businesses, making a valid claim of privilege unlikely.

53.      In any event, eight of the 2004 Notices are directed to individuals or entities **not** employed by the Debtors. Critically, the 2004 Notices directed to Jon Owoc and the JWO LLCs primarily seek an accounting of funds received from the Debtors, information that would not be (or at least, should not be) in the Debtors' custody or control.

54.      The cases on which the Debtors rely for the proposition that Rule 2004 discovery is more burdensome and costly on the Debtors than it will be beneficial to the Committees are also largely inapposite. [*See* Motion ¶ 20 (citing *In re Texaco Inc.*, 79 B.R. 551, 553 (Bankr. S.D.N.Y. 1987); *In re MF Global Inc.*, 2013 WL 74580, at * 1 (Bankr. S.D.N.Y. Jan. 8, 2013);

and *In re Hammond*, 140 B.R. 197, 201 (S.D. Ohio 1992))]. As the court noted in *Hammond*, it is only in "[i]n *rare* cases, the debtor's interest may so greatly outweigh those of the examiner that the examination should be quashed." 140 B.R. at 201 (emphasis added) (reversing bankruptcy court's decision to quash Rule 2004 subpoenas to where debtor failed to demonstrate that the Rule 2004 examination was intended to abuse or harass the debtor). In *MF Global*, the court denied a motion for Rule 2004 discovery based on the pending proceeding rule, and not due to the potential burden on the debtor. 2013 WL 74580, at *2.

55.    The only case relied on by the Debtors where the court found that the sought-after discovery was unduly burdensome is *Texaco*, which is easily distinguishable in several respects. There, Penzoil, a judgment creditor, sought additional discovery from a debtor beyond the discovery that the debtor had separately provided the unsecured creditors committee. *Texaco*, 79 B.R. at 553. Penzoil sought ten different categories of discovery from all of the debtors and their subsidiaries, as well as depositions of eight of the debtors' officers, including the "Chairman, chief executive officer, chief financial officer, general counsel, deputy treasurer, deputy general counsel, a senior vice president, a vice president and senior vice president," and reserved the right to depose additional employees if needed. *Id*. at 554–56. The court found that, "in light of the fact that Texaco [was] furnishing financial information to the General Unsecured Creditors' Committee, the Industry Committee, the Shareholders' Committee and to the accountants for these Committees, and that Texaco will also be required to furnish information to investment advisors who have recently been authorized to be retained by these Committees," it was necessary to limit the scope of Penzoil's discovery. *Id*. at 553. To that end, the court limited, but did not entirely foreclose on, Penzoil's document discovery and instead limited the scope of Penzoil's discovery to deposing three of the debtor's officers. *Id*. at 556. *Texaco* does not support the delay

that the Debtors seek here because the documents are sought from third parties, *not the Debtors*. Indeed, nine of the Third Parties are not even current employees of the Debtors.  Moreover, the Debtors, unlike the debtor in *Texaco*, are not currently in the midst of formal discovery on several fronts, with different committees.  In fact, as stated above, it appears that none of the Debtors' representatives is conducting a similar investigation of the Suspect Transactions.

56.    Further, the Debtors cannot claim that the 2004 Notices would truly burden them. To the extent the Debtors are in possession of documents responsive to the 2004 Notices, as already discussed, these *same requests* were made on an informal basis to the Debtors and the Committee understands the Debtors are working to produce them.  If the Debtors already indicated they do not have possession of documents responsive to a request also made to a Third Party, the Debtors have no reason to undertake any additional work in connection with the 2004 Notices—unless the Debtors now have responsive documents that for some reason they did not produce in response to the Committee's Informal Requests.

**C.  The Debtors Fail to Meet Their Burden for a Protective Order**

57.    To the extent Rule 7026(c) should be considered in determining whether a protective order is appropriate in connection with Rule 2004 discovery, the burden is on the party seeking the protective order to demonstrate good cause for its issuance.  *See Sierra Equity Grp. v. White Oak Equity Partners, LLC*, 672 F. Supp. 2d 1369, 1370–71 (S.D. Fla. 2009).  A "court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." Fed. R. Civ. P. 26(c)(1); *Sunshine Shredding, LLC v. Proshred Franchising Corp.*, Case No. 11-22432-MC, 2011 WL 4591935, at *2 (S.D. Fla. Sept. 30, 2011).  "Good cause" calls for a "sound basis or legitimate need" to limit discovery of the subject information.  *See In re Alexander Grant & Co. Litigation,* 820 F.2d 352, 356 (11th Cir.

1987); *Sierra Equity*, 672 F. Supp. 2d at 1370–71.

58.    For the same reasons the Committee has demonstrated good cause for the discovery it seeks through the 2004 Notices, the Debtors cannot carry their burden to demonstrate good cause for a protective order.  Nor is the fact that the Debtors may assert privilege over certain documents produced by the Third Parties good cause for issuance of a protective order.  *See Matter of M4 Enterprises, Inc.*, 190 B.R. 471, 476 n.7 (Bankr. N.D. Ga. 1995) ("Rather than justifying a protective order, however, these privileged matters should form the basis of an objection to specific questions in the course of the examination."); *In re Kelton Motors, Inc.,* 130 B.R. 183, 184–85 (Bankr. D. Vt. 1991) ("[a]lthough the Trustee may object to questions during the deposition that are indeed protected by the work product doctrine, Trustee's defensive posture [in seeking a protective order] is premature").  For the reasons already described herein, the Committee is entitled to this information now and any delay will result in substantial harm to the estates given the impending sale milestones.

## CONCLUSION

**WHEREFORE**, the Committee respectfully requests that the Court (i) deny the relief requested in the Motion and (ii) grant such other and further relief as the Court deems just and proper.

Dated:  February 16, 2023

**LOWENSTEIN SANDLER LLP**

Jeffrey L. Cohen, Esq.
Eric Chafetz, Esq.
Jordana L. Renert, Esq.
Lindsay H. Sklar, Esq.
1251 Avenue of the Americas
New York, New York 10020
Telephone: (212) 262-6700
Facsimile: (212) 262-7402
Email: jcohen@lowenstein.com
Email: echafetz@lowenstein.com

Email: jrenert@lowenstein.com
Email: lsklar@lowenstein.com
     -and-
Nicole Fulfree, Esq.
Arielle B. Adler, Esq.
Erica G. Mannix, Esq.
One Lowenstein Drive
Roseland, New Jersey 07068
Telephone: (973) 597-2502
Facsimile: (973) 597-2400
Email: nfulfree@lowenstein.com
Email: aadler@lowenstein.com
Email: emannix@lowenstein.com

**SEQUOR LAW, P.A.**

By: */s/ Leyza F. Blanco*
       Leyza F. Blanco
       Florida Bar No.: 104639
       Juan J. Mendoza
       Florida Bar No.: 113587
       1111 Brickell Avenue, Suite 1250
       Miami, FL 33131
       Telephone: (305) 372-8282
       Facsimile: (305) 372-8202
       Email: lblanco@sequorlaw.com
       Email: jmendoza@sequorlaw.com

       *Counsel to the Official Committee of*
       *Unsecured Creditors*