Page 1

1                    UNITED STATES BANKRUPTCY COURT
                      SOUTHERN DISTRICT OF FLORIDA
2

3

4      IN RE:                          CASE NO. 22-17842-PDR

5      VITAL PHARMACEUTICALS, INC.,

6                    Debtor.
       _____/
7

8                          ECF #511, 546, 633

9                          February 9, 2023

10                    The above-entitled cause came on for hearing

11     before the Honorable Peter D. Russin, one of the Judges in

12     the UNITED STATES BANKRUPTCY COURT, in and for the

13     SOUTHERN DISTRICT OF FLORIDA, at 299 E. Broward Blvd.,

14     Fort Lauderdale, Broward County, Florida, on February 9,

15     2023, commencing at or about 1:30 p.m., and the following

16     proceedings were had.

17

18

19

20

21

22                    Transcribed from a digital recording by:
                       Cheryl L. Jenkins, RPR, RMR
23

24

25

Page 2

1

APPEARANCES:

2

3                    BERGER SINGERMAN, by
                    JORDI GUSO, Esquire
4                          and
                    LATHAM & WATKINS, by
5            ELIZABETH MORRIS, Esquire (via Zoom)
                 On behalf of the Debtor
6

7                    QUARLES & BRADY, by
              ANDY BEILFUSS, Esquire (via Zoom)
8         CHRISTOPHER COMBEST, Esquire (via Zoom)
              DANIEL JANSSEN, Esquire (via Zoom)
9             DAVE MUTH, Esquire (via Zoom)
         Special Counsel on behalf of the Debtor
10

11                    SEQUOR LAW, by
                 LEYZA BLANCO, Esquire
12                        and
                 LOWENSTEIN SANDLER, by
13            ERIC CHAFETZ, Esquire (via Zoom)
             ARIELLE ADLER, Esquire (via Zoom)
14               On behalf of the Official
             Committee of Unsecured Creditors
15

16                    AKERMAN, LLP, by
                 EYAL BERGER, Esquire
17                        and
             PACHULSKI STANG ZIEHL & JONES, by
18            ROBERT FEINSTEIN, Esquire (via Zoom)
              TEDDY KAPUR, Esquire (via Zoom)
19               On behalf of Monster Energy
20

         J. STEVEN WILKES, Trial Attorney (via Zoom)
21                Office of the U.S. Trustee
                   Department of Justice
22

23                    MARK ROHER, Esquire
                          and
24            SAMY HARMOUSH, Esquire (via Zoom)
               On behalf of Jasmin Williams

25

Page 3

1

2                        **ALSO PRESENT**

3                    JOHN DiDONATO

4              DAVID LEVINE, Esquire

5      ECRO - Electronic Court Reporting Operator

6                  - - - - - - -

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  Okay.  So calling Vital

2    Pharmaceuticals 22-17842.  Mr. Guso.

3          I don't know if there are appearances to be

4    made on Zoom.  I'll get to that in a moment, but go ahead.

5          MR. GUSO:  Yes, sir.  May it please the

6    Court.  Good afternoon, your Honor.  Jordi Guso, G-u-s-o,

7    Berger Singerman.  We are co-counsel to the debtors.

8          I'm joined at counsel table, your Honor,

9    this afternoon by John DiDonato, who is the debtors' chief

10   transformation officer, Ms. Elizabeth Morris, our

11   co-counsel from Latham & Watkins, and to her right,

12   your Honor, is David Levine, one of the proposed special

13   counsel the debtors seek authority to retain today.

14         THE COURT:  Great, welcome.

15         Ms. Blanco.

16         MS. BLANCO:  Good afternoon, your Honor.

17   Leyza Blanco, of Sequor Law, on behalf of the Official

18   Committee of Unsecured Creditors, and with me today are

19   Eric Chafetz and Ms. Arielle Adler, from Lowenstein

20   Sandler, our co-counsel for the committee.

21         THE COURT:  Thank you.

22         Mr. Berger.

23         MR. BERGER:  Good afternoon, your Honor.

24   Eyal Berger, B-e-r-g-e-r, on behalf of Monster Energy

25   Company.

```
 1                  THE COURT:  Thank you.
 2                  And on Zoom, Mr. Harmoush, is that right?
 3                  MR. HARMOUSH:  Good afternoon, your Honor.
 4      Samy Harmoush, counsel for plaintiffs, and aggrieved
 5      members and class members in the California action, Jasmin
 6      Williams, et al. --
 7                  THE COURT:  Thank you.
 8                  MR. HARMOUSH:  -- versus Vital
 9      Pharmaceuticals.
10                  THE COURT:  Okay.  Thank you.
11                  Ah, Mr. Roher.
12                  MR. ROHER:  Yes, hi.  Good afternoon, Judge.
13      It's nice to see you in person.  This almost reminds me of
14      2019 today.
15                  THE COURT:  Yeah, a little time capsule.
16      Okay.
17                  MR. ROHER:  But, yes, Mark Roher, R-o-h-e-r,
18      local counsel for Ms. Jasmin Williams, and you just heard
19      Mr. Harmoush is on the Zoom as well.
20                  THE COURT:  Thank you.
21                  Anyone -- oh, so you were sitting over
22      there, that's why I didn't see you, because of this big
23      silly screen I have.
24                  MR. ROHER:  I was behind your screen, Judge.
25                  THE COURT:  Yes.
```

Page 6

```
 1              MR. ROHER:  I'm like a ninja.
 2              THE COURT:  Yeah, there you go.
 3              Mr. Wilkes.
 4              MR. WILKES:  Good afternoon, your Honor.
 5  J. Steven Wilkes for the United States Trustee, Region 21.
 6              THE COURT:  So what is it about the day that
 7  dictates the wearing of the American flag tie?  Sometimes
 8  I see you with it, sometimes I don't.  It's just when you
 9  wake up in the morning?
10              MR. WILKES:  Well, no, actually all of the
11  ties I wear reflect that.  You may not see the bottom of
12  the tie, on certain occasions, but every single tie I have
13  reflects that, and on Fridays, although I'm wearing a red
14  shirt today, it is always a red shirt.
15              THE COURT:  Gotcha, it's like Tiger Woods on
16  Sundays, I like it.
17              All right.  Mr. Combest.
18              MR. COMBEST:  Thank you, your Honor.  Good
19  afternoon, and I'll note that the ties I wear depend on
20  what have stains on them and what don't.
21              THE COURT:  You can get away with a lot more
22  on Zoom.
23              MR. COMBEST:  Certainly true, and also with
24  a pattern.
25              I'm an attorney at Quarles & Brady,
```

Page 7

1    your Honor.  Our application for retention is being

2    considered today.  So I am here with my colleagues,

3    Dan Janssen and Dave Muth, and my partner Andrew Beilfuss,

4    who is the declarant in support of our application.

5              We don't intend to participate unless there

6    are questions for us.

7              THE COURT:  All right.

8              MR. COMBEST:  But I wanted the Court to know

9    that we were available.

10             THE COURT:  Great.  Thank you all.

11             Mr. Feinstein.

12             MR. FEINSTEIN:  Good afternoon, your Honor.

13   Robert Feinstein, Pachulski Stang Ziehl & Jones,

14   co-counsel for Monster Energy.  I believe my partner,

15   Teddy Kapur, is on the line as well.

16             Thank you.

17             THE COURT:  All right.  So I think that

18   covers everybody.

19             Anybody else wish to make an appearance?

20             (No verbal response.)

21             THE COURT:  All right.  So, that's actually

22   the first matter.  Although, Mr. Guso, I don't know if you

23   want to take things in a different order.

24             MR. GUSO:  Your Honor, it might be best to

25   take up the stay relief --

1                    THE COURT:  So here is the thing that as I
2      was practicing I always sort of wondered why it was so
3      important that you not start talking until you get to the
4      podium.  Now that I'm on this side of the bench, I get it
5      now, because nobody can hear you.
6                    MR. GUSO:  Let's start over.  My apologies.
7                    THE COURT:  No, it's okay.  It's just, I
8      never got used to it either.  I always started talking on
9      my way up, but anyway, go ahead.
10                    MR. GUSO:  Your Honor, it might be most
11     efficient to take up the Williams stay relief motion
12     first --
13                    THE COURT:  Okay.
14                    MR. GUSO:  -- as that matter is likely to be
15     shorter than the other matters.
16                    THE COURT:  All right, and that involves --
17                    MR. GUSO:  Ms. Morris will be --
18                    THE COURT:  -- the California litigation?
19                    MR. GUSO:  Yes, sir, and Ms. Morris will be
20     presenting the debtors' objection, your Honor.
21                    THE COURT:  Okay.  Great.
22                    MR. ROHER:  Mr. Guso, that's very kind of
23     you, because I will get to eat lunch soon hopefully.
24                    THE COURT:  All right.  So, are you handling
25     this argument?

1              MR. ROHER:  Yes, Judge.  I'm handling the

2  argument.

3              Mr. Harmoush is just on Zoom in case there

4  is any, you know, procedural questions or issues in terms

5  of what's gone on, or what hasn't gone on in the state

6  court action but, Judge --

7              THE COURT:  And this is Docket Entry 546,

8  right.  Okay.  Go ahead.

9              MR. ROHER:  Yes, Judge.

10             I'm not going to regurgitate the motion.

11  Simply, it's a class action lawsuit with regards to

12  California labor law matters.

13             Just by way of background, I originally

14  filed a Rule 2004 document request, and served it upon the

15  debtor.  The debtor responded, basically saying I'm not

16  entitled to anything because of this pending litigation

17  because --

18             THE COURT:  Arguing that 2004 doesn't apply,

19  trying to get discovery in a pending litigation matter.

20             MR. ROHER:  Correct.  We're trying to under

21  -- you know, we're trying to understand.  Primarily we

22  need to know -- we need documents to figure out what our

23  claim is, the value of our claim, but there is a couple of

24  issues that have arisen recently that I'd like to address

25  as well, but in terms of -- you know, basically it's our

Page 10

1    position, Judge, that the stay should be lifted to

2    continue the California litigation through judgment, and

3    liquidate the claim, otherwise you're going to have to

4    liquidate the claim.

5                    And, frankly, our argument is that the

6    California court, where the matter has been pending for a

7    couple of years, is better situated to handle these

8    matters, and that's the cause that we've alleged, Judge.

9                    So I told you about the request for 2004

10   documents that we basically candidly were denied, and now

11   the debtors oppose stay relief saying that there is no --

12   we haven't alleged sufficient cause.

13                   For another --

14                   THE COURT:  Was the 2004 issue litigated and

15   I ruled, or --

16                   MR. ROHER:  No, Judge, no, you didn't,

17   because --

18                   THE COURT:  But they just didn't respond to

19   your --

20                   MR. ROHER:  Well, they responded with a

21   letter to me saying why we're not entitled to the

22   documents.

23                   THE COURT:  Okay, but no motion for

24   protection was filed, or anything like that?

25                   MR. ROHER:  No, no.

```
 1                  THE COURT:  Okay.
 2                  MR. ROHER:  And I'm, like, okay, fine, let's
 3   just go get stay relief and, frankly, that's what
 4   Mr. Harmoush suggested that I do originally, and I
 5   probably should have just listened to him, even though
 6   he's not a bankruptcy lawyer, he suggested I just go for
 7   stay relief.  I'm, like, why don't we just get the
 8   documents and -- but anyway --
 9                  THE COURT:  All right.  I understand, but
10   you chose to -- and you're here now on the stay relief
11   motion.
12                  MR. ROHER:  Yes, and for the record, Judge,
13   the stay relief motion was filed on December 18, 2022.
14   The claims bar date was December 19th, 2022.
15                  We neglected to file a proof of claim.
16   Today, for the first time, I had a phone call with
17   debtors' counsel, and they're taking the position that
18   we're not entitled to seek any relief because we don't
19   have a proof of claim on file.
20                  I don't think that's relevant, but in the
21   event that you think it's relevant, Judge, that -- I'm not
22   trying to make their argument, but what I understand their
23   argument, it's almost like a lack of standing, or lack of
24   rights to pursue stay relief at this point, but I'd just
25   point out, Judge, that there was, prior to the expiration
```

1    of the claims bar date, as I mentioned, there was a

2    Rule 2004 document request, there was the motion for stay

3    relief that was filed prior to the expiration of the

4    claims bar date.  So I think, based on -- I've had this --

5                    THE COURT:  Informal proof of claim.

6                    MR. ROHER:  Exactly, Judge.

7                    THE COURT:  Okay.

8                    MR. ROHER:  So if you want -- if you think

9    it's necessary for me to jump through the hoops, Judge,

10   I --

11                   THE COURT:  I don't know, that's not before

12   me.  All that's before me today is a stay relief motion.

13   I'm not ruling whether you filed an informal proof of

14   claim, or whether that should be considered an informal

15   proof of claim, or that a late filed claim, or no filed

16   claim removes standing, I'm not ruling on any of that yet.

17   I don't know that I need to.  So let's just keep going

18   down the road of stay relief and we'll see where that

19   takes us.

20                   MR. ROHER:  Well, Judge, I really don't have

21   anything to add.

22                   THE COURT:  It's just, it's all about, it's

23   all about liquidating the claim, and the best place to do

24   that in your view is California since California law

25   applies, and that's where this case has been.

Page 13

1           MR. ROHER:  And the plaintiffs are there,
2    the witnesses are there.
3           THE COURT:  And any idea, what number of
4    plaintiffs are there?
5           MR. ROHER:  Mr. Harmoush can answer --
6           THE COURT:  Is it a class action that's not
7    yet been satisfied?  Or what's the -- tell me more about
8    the litigation.
9           MR. HARMOUSH:  Your Honor, at the outset of
10   the litigation, plaintiff is entitled to the names of all
11   of the members, and we don't even have a roster of
12   employees at issue, so I can't even give you a number, is
13   how strongly this case has been forestalled at the local
14   level, until we were essentially sandbagged here, with the
15   federal bankruptcy petition.
16          THE COURT:  And how long will it take to
17   liquidate this claim, should stay relief be granted?  I
18   assume years, is that a fair statement?
19          MR. HARMOUSH:  I don't think so, your Honor.
20   I mean, we had a framework in place for a mediation.
21   Opposing counsel was ready to produce documents, and on
22   the eve of a motion -- a status conference, we got this
23   stay motion, and they said, sorry, there is nothing you're
24   going to get until you get the motion for stay --
25          THE COURT:  Well, let me ask it differently.

Page 14

```
 1              I get mediation may, of course, shortcut
 2   things in litigation, it often does if the parties reach
 3   an agreement, that's part of the idea behind mediation,
 4   but in the absence --
 5              MR. HARMOUSH:  Sure.
 6              THE COURT:  -- of mediation, which, of
 7   course, the Court certainly cannot count on, how long,
 8   generally, does this type of litigation take to get to a
 9   point where judgment is entered one way or the other?
10              MR. HARMOUSH:  Sure, your Honor.
11              Well, the favorable thing is that we have
12   the status conference that was recently vacated, and
13   that's in the other case, it was a status conference
14   coming up on the 14th.
15              To be fair, these cases, if discovery is
16   issued, to get to trial from this point would take at
17   least, I think, a year and a half to two years, given the
18   Court's calendar.
19              We won't anticipate that these cases go to
20   trial, they rarely do, they almost always settle and,
21   again, that framework was in place for a settlement, and a
22   mediation to take place where, you know, with judicial
23   approval, if a settlement is reached in mediation, we're
24   talking about six to nine months before administration of
25   fees, or at least obtaining a figure that we can all go
```

1    home with.

2                    THE COURT:  Okay.  All right.  So that gives

3    me some timeframe, and the type of claim that would result

4    from this litigation would be a claim for -- it's

5    overtime, or what's the general issue?

6                    MR. HARMOUSH:  We're talking about unpaid

7    wages, penalties for breaks, unpaid rest breaks, meal and

8    rest breaks --

9                    THE COURT:  Okay.

10                    MR. HARMOUSH:  -- and overtime.

11                    THE COURT:  All right, and those claims

12   would essentially be employment-related claims that may

13   fall within some priority, potentially, I suppose, but --

14   all right.  So let me ask you, Mr. Roher, from the

15   bankruptcy perspective, had you filed a proof of claim,

16   even if it was subject to, of course, liquidation of the

17   claim, that claim would essentially be allowed until

18   objected to, right?

19                    MR. ROHER:  Right, and it would be in an

20   unliquidated amount.  I couldn't possibly put any --

21                    THE COURT:  I understand, I understand that,

22   it would be in an unliquidated amount, you'd reserve your

23   rights.

24                    MR. ROHER:  Yes.

25                    THE COURT:  The debtor would likely object

Page 16

1   at some point, and then you'd likely have to come before

2   me if you wanted to vote on the plan to estimate the claim

3   for voting purposes.

4               MR. ROHER:  Yes.

5               THE COURT:  And than I'd have to understand

6   whether the Court has jurisdiction to do that, which I

7   probably do, because it's not a personal injury claim, but

8   that would otherwise be the process.  I'm trying to

9   compare that process versus giving stay relief, and you

10  going back to California and litigating for a year and a

11  half, in terms of how it might effect the administration

12  of the estate, because it seems to me that that's the

13  ultimate issue, is that a fair statement?

14              MR. ROHER:  Well, yes, I think the claim

15  needs to be liquidated at some point, and California is

16  the better place to do that, and when the --

17              THE COURT:  Not if it takes a year and a

18  half.  I mean, let's play this out.

19              MR. ROHER:  Okay.

20              THE COURT:  If a plan gets filed before the

21  year and a half is up, and you don't have a liquidated

22  claim, how are you in any better condition --

23              MR. ROHER:  Well, I'll --

24              THE COURT:  -- than you would be --

25              MR. ROHER:  At least we'd have the

1    discovery.

2              THE COURT:  -- you know, if I don't grant

3    stay relief?

4              MR. ROHER:  At least we'd have the

5    discovery, Judge.  We'd have the discovery so we can --

6              THE COURT:  Well, you chose 2004, that

7    doesn't necessarily mean -- well, I don't know about the

8    discovery because that's a separate issue.

9              MR. ROHER:  Well, you just heard from

10   Mr. Harmoush, we don't even know, you know, all the

11   employees that could comprise the class.

12             THE COURT:  Yeah.

13             MR. ROHER:  So, we're kind of in --

14             THE COURT:  All right.

15             MR. ROHER:  -- kind of like the standstill

16   mode, and we'd like to move it along and, you know, I have

17   no idea what the debtor plans to do with this type, with

18   this type of claim.  I'm not sure if there are any other

19   type of these -- these types of employment-related claims,

20   you know, I don't know, but I would think they're going to

21   have to be addressed in a plan, whenever that's going to

22   be filed, and I have no idea what the status is.

23             I haven't been following this case, but, you

24   know, I think the debtor would like to just sweep this

25   under the rug and act as if it's not an issue, but it has

1    to be addressed, Judge, and if it's a matter of, again,

2    getting back to the informal proof of claim, I can file

3    the claim, and file the motion to allow it, but I think

4    it's just kind of --

5                    THE COURT:  I'm leaving that up to you.

6    That, procedurally, is outside of my --

7                    MR. ROHER:  Well, the only reason I raise it

8    is because that's what the debtor --

9                    THE COURT:  -- job description.

10                    MR. ROHER:  I understand.

11                    The only reason I'm just talking about it is

12    because the debtor brought that up, brought this up this

13    morning.

14                    THE COURT:  I get it.

15                    All right.  Anything else?

16                    MR. ROHER:  No.  If you don't have any other

17    questions, no.

18                    THE COURT:  All right.  Thank you.

19                    Counsel, remind me of your name, I'm sorry.

20                    MS. MORRIS:  Now that I'm at the podium and

21    the microphone, my name is Elizabeth Morris, with

22    Latham & Watkins on behalf of debtor.

23                    THE COURT:  Thank you, Ms. Morris.

24                    All right.  So, go ahead and make your

25    argument, and I may pepper you with questions, maybe not,

1    I don't know, we'll see.

2                    MS. MORRIS:  Of course, your Honor.  Thank

3    you.

4                    Yes, we're here to address what is now

5    plaintiff's second attempt to misuse the bankruptcy

6    process in an attempt to prosecute the underlying state

7    court action.

8                    As noted, first, Ms. Williams served a 2004

9    notice seeking discovery in these bankruptcy cases in

10   connection with the same underlying litigation.  We

11   responded by letter, letting her know that that was an

12   improper use of 2004.  We heard nothing more from

13   Ms. Williams or her counsel until the filing of the lift

14   stay motion.

15                   THE COURT:  Remind me of who Ms. Williams

16   is.

17                   MS. MORRIS:  Ms. Williams is the plaintiff

18   in the underlying state court action --

19                   THE COURT:  Oh, that's the plaintiff.

20                   MS. MORRIS:  -- and the movant here.

21                   THE COURT:  You mean her counsel.

22                   MS. MORRIS:  Right, yes --

23                   THE COURT:  Okay, I get it --

24                   MS. MORRIS:  -- we responded to --

25                   THE COURT:  -- you're just naming the party.

Page 20

1    Okay.  Fair enough.

2                    MS. MORRIS:  Sorry, your Honor.

3                    THE COURT:  No, it's okay.  It's fine.

4                    MS. MORRIS:  So now Ms. Williams is seeking

5    to lift the automatic stay.  We find this motion to be

6    wholly unsupported and meritless, not only because there

7    is no cause articulated to lift the stay, but because

8    there is no claim upon which to seek stay relief.

9                    We did have that conversation with

10   Ms. Williams' counsel earlier.  No claim has been filed,

11   and so there is no claim to pursue.

12                   THE COURT:  There is a claim, there is just

13   no proof of claim --

14                   MS. MORRIS:  No proof of claim filed.

15                   THE COURT:  -- that's been filed.

16                   And what do the schedules provide, anything

17   with respect to this pending litigation?  It was pending

18   before the bankruptcy was filed, correct?

19                   MS. MORRIS:  It was.

20                   THE COURT:  Was anything included in the

21   schedules?

22                   MS. MORRIS:  It was included in the

23   schedules, designated as unliquidated, and contingent, and

24   disputed.

25                   THE COURT:  Okay.  All right, which would

Page 21

```
 1   require a proof of claim, okay.  All right, and no proof
 2   of claim was filed.
 3              All right.  What about this concept of an
 4   informal proof of claim by virtue of the filing of the
 5   motion for stay relief that lays out a description of the
 6   claim, but obviously doesn't liquidate it, because that
 7   seems to be their problem, they can't liquidate it at this
 8   point?
 9              MS. MORRIS:  I don't have a response to that
10   at this time.  That was not put in any of the papers
11   relating to this motion.  The first that I had heard that
12   argument was when Ms. Williams' counsel was at the podium
13   here, and if they proceed to file a proof of claim, or
14   seek relief from the Court to be able to do so, and rely
15   on that argument, we would respond accordingly.
16              THE COURT:  Okay.  So that's another
17   procedural possibility.
18              Okay.  All right, and case law on this, I
19   mean, I guess ultimately my -- I guess what I'm sort of
20   focused on is the practical concern here that if -- and it
21   is jumping the gun, and I don't know how I'd rule,
22   frankly, but if there were a claim allowed, if you will,
23   even if late filed, and that claim is unliquidated, for
24   arguably good reason, I mean, they don't have the
25   information so they don't know what the class is made up
```

Page 22

1    of, or how many creditors exist, and what their claims may

2    be, what generally would be the process at that point?

3                    I mean, the debtor would -- there is a claim

4    out there, the debtor would object, the debtor would need

5    to either -- or at least the plaintiff would need to

6    estimate the claim for voting purposes.  If they did that,

7    what do you propose the process to be then if that were

8    the case?

9                    MS. MORRIS:  My expectation is that that

10   would be dealt with during the claims allowance process,

11   but that does not provide cause to lift the stay under the

12   case law.  There are three factors to consider as to

13   whether there is good cause to lift the stay.  Those

14   factors are, one, whether the debtor has acted in bad

15   faith.

16                    Two, the hardship --

17                    THE COURT:  There is no allegation of bad

18   faith that I've seen.

19                    MS. MORRIS:  There is no allegation of bad

20   faith that I'm aware of.

21                    THE COURT:  Okay.

22                    MS. MORRIS:  The hardships imposed on the

23   parties with an eye towards the overall goals of the

24   Bankruptcy Code.

25                    THE COURT:  Well, that's sort of what I'm

Page 23

1    getting to.

2              MS. MORRIS:  Yes, and I think with respect

3    to that factor, there is -- first of all, it's

4    Ms. Williams' burden under the case law, it's black letter

5    law that it's the movant's burden to establish cause, and

6    there has been no evidence put forth that it would not be

7    a burden on the debtors.

8              We heard some from Ms. Williams' counsel in

9    the underlying state court action.  We don't have the

10   debtors' counsel in the underlying state court action on

11   the line today.  I don't take of any of the statements and

12   argument before to be evidence.  There has been no

13   evidence put forth as to lack of burden on the debtors,

14   and it can hardly be disputed that there would be a burden

15   on the debtors if the stay was lifted.

16              The discovery would be --

17              THE COURT:  (Inaudible.)

18              MS. MORRIS:  I'm sorry, what's that?

19              THE COURT:  The pending litigation --

20              MS. MORRIS:  The pending lit --

21              THE COURT:  -- and the discovery, and all

22   that goes with it.

23              MS. MORRIS:  Exactly, it would be a

24   distraction on management, drain resources, and take away

25   from the overall goal of the company being focused on

1    maximizing value.

2                    THE COURT:  Okay.

3                    MS. MORRIS:  And in terms of balancing those

4    hardships, the only --

5                    THE COURT:  That's the third factor, or

6    what's --

7                    MS. MORRIS:  No, still with the second

8    factor.

9                    THE COURT:  Okay.

10                   MS. MORRIS:  Just on the -- to the contrary,

11   the only argument we've heard from Ms. Williams as to the

12   prejudice to her, is potentially the delay of a couple

13   months to be able to litigate the claim once the stay is

14   lifted upon completion of the cases.

15                   THE COURT:  I see.  Okay.

16                   MS. MORRIS:  And the third factor is the

17   status of the underlying action, which here leans in favor

18   of not lifting the stay, it is in its --

19                   THE COURT:  Infancy.

20                   MS. MORRIS:  -- infancy, there has been no

21   discovery.

22                   THE COURT:  If it were close to trial, if

23   discovery had been completed, things of that sort, to put

24   it on the other side of the spectrum, then that might be a

25   factor in favor of lifting the stay, just to let it

1    finish, so we'd have a liquidated claim.

2                    MS. MORRIS:  That's correct, your Honor, but

3    that is not the case here.  So, from our perspective all

4    three factors weigh in favor of denying the motion to lift

5    the stay.

6                    THE COURT:  All right.  Thank you.

7                    Any response, Mr. Roher?

8                    MR. ROHER:  No, Judge.

9                    THE COURT:  All right.  So, the Court is

10   going to deny the motion without prejudice.

11                   The fact that there has been no proof of

12   claim filed is certainly a significant issue.  I can't

13   rule today, because it's not in front of me, whether the

14   motion qualifies as an informal proof of claim.  The case

15   is in its infancy in California.  It's not as though

16   granting stay relief will advance the cause of liquidating

17   the claim within a period of time that would assist in the

18   administration of the estate because, by Mr. Harmoush's,

19   frankly, correct estimate, and candid estimate, it would

20   take a year and a half.

21                   I would imagine, based on the way this case

22   is going, in a year and a half we'll be long past

23   confirmation, at least I would imagine so, or would hope

24   so, but in the meantime, that does not mean, Mr. Roher,

25   that you can't take other actions to try to have your

Page 26

```
 1   claim allowed, even if late, and then from there the
 2   bankruptcy system, with claims having been filed, and
 3   objected to, and estimation processes can occur, and where
 4   you would get your discovery, I'm going to leave that to
 5   you, but I don't think it's impossible to get your
 6   discovery sitting here today.  So I just don't think stay
 7   relief is the answer.
 8               So I'm going to deny the motion without
 9   prejudice, and if there comes a time throughout that
10   process, that stay relief might make more sense, of course
11   you can re-file it, but there are other actions you might
12   wish to take, and I'll leave it to you to determine what
13   those are.
14               So, I'll ask then for a -- Ms. Morris, I
15   don't know if you would submit the order, or Mr. Guso's
16   office, but just a simple order denying the motion without
17   prejudice for the reasons stated on the record.
18               All right.  So whose name do I put down on
19   my notes as to who is submitting the order?
20               MR. GUSO:  Guso is (inaudible) --
21               THE COURT:  Okay.  Guso it is.
22               All right.  What's next?
23               MR. ROHER:  May I be excused, your Honor?
24               THE COURT:  Yes, Mr. Roher, sure.
25               MR. GUSO:  Your Honor, I believe there is
```

1    four other matters, all of which are applications for

2    retention of counsel.

3                    THE COURT:  Okay.

4                    MR. GUSO:  And, your Honor, if I may, as a

5    preliminary matter, as I reported to the Court the last

6    time we were before you on these matters, some of these

7    matters, on January 26th, in connection with the Court's

8    approval of the final DIP financing arrangements between

9    the debtors and Truist, as agent, and the other lender or

10   parties thereto, the debtor has implemented changes to

11   their corporate governance structure.

12                   To address the concerns raised by the DIP

13   lenders, the committee and other parties in interest,

14   those changes, your Honor, included the appointment of an

15   additional independent director for the debtors,

16   Mr. Steven Gray, to serve on the board resulting in the

17   board having three independent directors, Mr. Gray,

18   Mr. Steven Panagos, and Mr. Bob Dickinson.

19                   The other two members of the board,

20   your Honor, Mr. Eric Hillman, he used to run a business in

21   a similar industry called Europa, and Mr. Owoc, of course,

22   is the hundred percent shareholder of the debtor.

23                   Your Honor, the retention applications that

24   are before the Court today were actually filed in

25   December, before the board was reconstituted.

1              THE COURT:  The objections, as well.

2              MR. GUSO:  And the objections, as well,

3    your Honor, although one has been supplemented since, the

4    day before yesterday.

5              Your Honor, Mr. DiDonato is present in the

6    courtroom, and if called to the stand, he would testify

7    that the reconstituted board considered each of the

8    applications that is before the Court de novo, and the

9    reconstituted board of directors unanimously voted to

10   direct management to continue to prosecute approval of the

11   applications, as amended, which I will explain,

12   your Honor, when I get to each of them.

13             Your Honor, secondly, from the date of the

14   committee's retention of its professional in the case, the

15   debtors have worked collaboratively with the committee's

16   professionals to resolve objections, informal comments or

17   concerns of the committee with respect to all matters that

18   have come before the Court, and that holds true,

19   your Honor, with respect to the matters that are before

20   you today, although today the applications that are before

21   the Court are the first matters as to which the debtors

22   and the committee have been unable to reach complete

23   resolution, and at bottom, your Honor --

24             THE COURT:  You mean there is partial

25   resolution?

1                   MR. GUSO:  There is.

2                   THE COURT:  Okay.  That's good.

3                   MR. GUSO:  At bottom, your Honor, the

4    debtors believe in the exercise of their business

5    judgment, that retention of the professionals that are

6    subject to the applications that are before the Court is

7    in the best interest of the estate, the debtor -- excuse

8    me, the debtors and their estates.

9                   When the debtors negotiated the budget that

10   underlies the DIP financing arrangements, the debtors

11   included a line item for nonbankruptcy-related litigation.

12   The debtors, with the consent of the lenders, and

13   thereafter the committee, each of whom approved the

14   budget, your Honor, allocated a total of $1.8 million for

15   nonbankruptcy-related litigation expenses through May

16   of 2023, when the DIP budget -- excuse me, the DIP loan

17   matures and becomes due and payable.

18                  The debtors did so with the expectation that

19   there would be a need to continue certain litigation

20   outside of this forum, including concluding the

21   post-verdict motion practice in the Monster litigation

22   that's pending in the Central District of California, as

23   to which the Court has entered an order approving the

24   stipulation lifting the automatic stay, and permitting the

25   parties to proceed with post-verdict motion practice

Page 30

1    there.

2                    THE COURT:  And that, counsel is already

3    retained in that case?

4                    MR. GUSO:  No, sir.

5                    THE COURT:  Or this --

6                    MR. GUSO:  That's one of the matters,

7    Quarles --

8                    THE COURT:  Counsel would be retained --

9                    MR. GUSO:  Yes, yes, sir.

10                   THE COURT:  -- here for that purpose?

11                   MR. GUSO:  Yes, sir.

12                   THE COURT:  So you're floating out there

13   without counsel right now?

14                   MR. GUSO:  Your Honor, Quarles & Brady has

15   not abandoned the debtors, and is involved in the

16   representation.

17                   THE COURT:  So that's part of why the

18   retroactive approval --

19                   MR. GUSO:  Yes, sir.

20                   THE COURT:  -- is necessary?

21                   MR. GUSO:  Which I will address as well in

22   my remarks, your Honor.

23                   THE COURT:  Okay.

24                   MR. GUSO:  And the appeal of the Orange Bang

25   judgment to the 9th Circuit Court of Appeals.

Page 31

```
 1                THE COURT:  So, let me -- let's stop there.
 2    So those are two matters, and because that was part of
 3    what I was trying to get my hands around, is what
 4    litigation is really being prosecuted here, and the stay
 5    relief, the matter for which I granted stay relief, that's
 6    certainly one where you need counsel, and I don't know how
 7    you get stay relief, but then not allow the debtor to
 8    retain counsel, that's a tough one, and I assume they're
 9    not asking for that.
10                MR. GUSO:  They're not, Judge, and I think
11    that's one of the resolutions that we've reached.
12                THE COURT:  And it certainly seems that an
13    appeal of a judgment before the 9th Circuit can certainly
14    benefit the estate, potentially, depending on the outcome.
15    I don't know what the merits, or demerits are of that
16    appeal, and I'm not sure I'm in a position to, you know,
17    challenge the debtors' business judgment on that point.
18                So those two matters seem to be fairly easy.
19    The only question is who should counsel be, which it's
20    certainly appropriate that the debtor be able to choose
21    them, and what limitations should be placed on that
22    counsel, if any.  So -- and whether you need three law
23    firms, or one law firm, or two law firms.  All right.  So,
24    those are two matters.
25                If there are other matters --
```

Page 32

1              MR. GUSO:  Yes.

2              THE COURT:  -- discrete matters, I need to

3    understand them better.  So help me with that, Mr. Guso --

4              MR. GUSO:  We're going to go through that,

5    Judge.

6              THE COURT:  -- as we go along.

7              MR. GUSO:  We're going to go through that.

8    As to each of the applications I will do that precisely,

9    your Honor.

10             THE COURT:  Okay.  Good.

11             MR. GUSO:  And I also will -- I've alerted

12   them, the committee, obviously, Judge, but there is a

13   recent development, as recent as Tuesday evening, that was

14   memorialized yesterday, that I'll advise the Court about

15   as well.

16             THE COURT:  Understood.

17             MR. GUSO:  Your Honor, at bottom, the

18   committee, in its objections, suggest that all the

19   litigation, aside from the Monster litigation, should be

20   put off until the marketing process is completed and --

21             THE COURT:  What do you mean aside from,

22   what is the Monster litigation?

23             MR. GUSO:  The Monster -- I apologize.

24             THE COURT:  Which I gave stay relief?

25             MR. GUSO:  Yes, sir.

1              THE COURT:  Okay.  Got it.

2              MR. GUSO:  I apologize.  Let me be more

3    precise.

4              THE COURT:  No, no, it's good.  I just need

5    to use those defined terms.  Okay.  Fair enough.

6              MR. GUSO:  Thank you.

7              It should be put off until the marketing

8    process for the debtor is completed, your Honor, and the

9    debtors disagree.

10              The debtors believe that the OBI appeal, the

11    Orange Bang appeal that is currently at the 9th Circuit,

12    final resolution of the appeal in the PHD Marketing case,

13    and PHD Marketing, your Honor, the debtors have a judgment

14    for ten and a half million dollars based on infringement

15    claims entered by the Central District of California.

16              THE COURT:  Against?

17              MR. GUSO:  PHD Marketing is the defendant.

18              THE COURT:  PHD Marketing, okay.

19              MR. GUSO:  Yes, sir.

20              PHD Marketing has appealed to the

21    9th Circuit.  The 9th Circuit entered a standard order

22    directing the parties to mediate, and that mediation

23    process is ongoing and, in fact, your Honor, PHD Marketing

24    had tendered a settlement proposal --

25              THE COURT:  Your argument for that --

Page 34

1                    MR. GUSO:  -- to the debtors.

2                    THE COURT:  -- is it might produce money for

3       the estate.  So certainly it's in the best --

4                    MR. GUSO:  Right.

5                    THE COURT:  -- interest of the estate --

6                    MR. GUSO:  Correct, Judge.

7                    THE COURT:  -- to pursue that.

8                    Is that being objected to?

9                    MR. GUSO:  I don't believe so.

10                    THE COURT:  Okay.  All right.  So we've got

11      the OBI arbitration appeal, we've got the Monster

12      litigation, for which I gave stay relief --

13                    MR. GUSO:  Yes, sir.

14                    THE COURT:  -- and we've got the PHD

15      judgment collection effort --

16                    MR. GUSO:  Right.

17                    THE COURT:  -- essentially?

18                    MR. GUSO:  Correct, Judge.

19                    THE COURT:  Okay.  What else, or keep going,

20      I don't mean to throw you off your track.

21                    MR. GUSO:  No, Judge, I'm happy to respond

22      to the Court's questions.

23                    THE COURT:  Okay.

24                    MR. GUSO:  Your Honor, staying with

25      Quarles & Brady, there are two other matters for which the

1   debtors will seek to employ Quarles & Brady.

2          THE COURT:  And Quarles & Brady is involved

3   in all three of the ones we just mentioned?

4          MR. GUSO:  Quarles & Brady is involved in

5   all three of the ones that we just mentioned.

6          THE COURT:  Okay.  Got it.

7          MR. GUSO:  There is a case called W&G,

8   your Honor, which is an appeal by the debtors of an

9   adverse ruling by the Wisconsin state court.  The

10  retention as to that matter, your Honor, would be limited

11  to seek a stay of the appeal, or to extend the briefing

12  schedule so that none of the parties have to take material

13  action in the case while this case is pending.

14          The debtors --

15          THE COURT:  That's a judgment against the

16  debtor?

17          MR. GUSO:  It's a judgment against the

18  debtor that the debtor is appealing.

19          THE COURT:  So how is -- if it's a judgment

20  against the debtor, isn't the appeal already stayed --

21          MR. GUSO:  The Court --

22          THE COURT:  -- by the automatic stay?

23          MR. GUSO:  The Court has -- well, Judge, it

24  is.  I think the Court has discretion, the debtor has the

25  discretion to prosecute the appeal --

Page 36

1          THE COURT:  True.

2          MR. GUSO:  -- since it is the appellant.

3          THE COURT:  Okay.

4          MR. GUSO:  The limited -- at bottom,

5    your Honor, the retention would be limited to make sure

6    that that case remains stayed.

7          THE COURT:  So you want a comfort order

8    telling the Wisconsin court that to the extent you don't

9    think the automatic stay applies because the debtor is the

10   one appealing --

11         MR. GUSO:  That we need --

12         THE COURT:  -- the Court says you're wrong?

13         MR. GUSO:  Correct, correct.

14         THE COURT:  All right.  So that seems

15   relatively small.

16         MR. GUSO:  Benign.

17         THE COURT:  Okay.

18         MR. GUSO:  It's very benign.

19         THE COURT:  Okay.

20         MR. GUSO:  The last matter, that does not

21   involve Quarles & Brady, your Honor, is the proposed

22   representation of Sanchez -- the Sanchez Levine firm,

23   Mr. Levine's firm here, to prosecute two cases against

24   Monster that are pending in the Southern District of

25   Florida, one before Judge Altonaga, one before

1    Judge Altman.

2                    Presently, both of those are stayed.  The

3    debtors believe -- they're stayed for procedural purposes,

4    unrelated to the automatic stay.

5                    THE COURT:  Not the automatic stay?

6                    MR. GUSO:  Not the automatic stay.

7                    THE COURT:  Okay.

8                    MR. GUSO:  Right.

9                    Your Honor, the debtors believe that those

10   claims have substantial merit, and it makes appropriate

11   sense for the debtors to invest the incremental funding

12   that would be required to get the cases moving with

13   Mr. Levine.

14                   THE COURT:  And that's the case that Monster

15   focuses on -- or the cases that Monster focuses on --

16                   MR. GUSO:  Right.

17                   THE COURT:  -- that would be a -- that, in

18   Monster's view, would be a complete waste of money because

19   they're meritless, et cetera?

20                   MR. GUSO:  Correct, Judge.

21                   THE COURT:  And can you share a little bit

22   about what those cases are about?

23                   MR. GUSO:  Here is my understanding of them,

24   Judge.  The 2019 case is a claim brought by the debtor,

25   Vital Pharmaceuticals, against Monster, a marketing firm

```
1    that we understand Monster retained, and others, including
2    social influencers, to run a smear campaign against Vital
3    Pharmaceutical and --
4              THE COURT:  And that's why they wouldn't --
5              MR. GUSO:  -- its products.
6              THE COURT:  -- have been counterclaims, or
7    litigation claims involved in the pending lit -- or the
8    litigation that resulted in the Monster judgment?
9              MR. GUSO:  Unrelated claims, correct, Judge.
10             THE COURT:  Unrelated.
11             MR. GUSO:  Unrelated claims.
12             THE COURT:  Okay.
13             MR. GUSO:  My understanding, your Honor, is
14   that jurisdictional discovery proceeded in that case, and
15   then thereafter it was stayed by Judge Altonaga.
16             Mr. Levine --
17             THE COURT:  Why was it stayed?
18             MR. GUSO:  Now I'm beyond the limits of my
19   knowledge, your Honor.  I would defer to Mr. Levine, if he
20   wishes to address the Court in terms of the --
21             THE COURT:  You know what, I would love to
22   hear from you, but let's just hold off for a second until
23   we focus on the other issues, all right?
24             MR. GUSO:  So those are, those are the cases
25   as to which the debtor seeks special counsel.
```

```
 1                    THE COURT:  And on that matter, Mr. DiDonato
 2    would theoretically be important to your argument here
 3    today to support the business judgment of the debtor, and
 4    arguably how it came about to make sure that the influence
 5    that Monster complains about, and the committee complains
 6    about of Mr. Owoc, is --
 7                    MR. GUSO:  Not at play.
 8                    THE COURT:  -- managed --
 9                    MR. GUSO:  Correct.
10                    THE COURT:  -- if you will, for lack of a
11    better term?
12                    MR. GUSO:  Yes, Judge.
13                    THE COURT:  Okay.
14                    MR. GUSO:  And we're prepared to put him on,
15    to the extent necessary.
16                    THE COURT:  Okay.  Understood.
17                    MR. GUSO:  All right.  So, Judge, let me, if
18    I may --
19                    THE COURT:  That's it, that's the universe
20    of the litigation claim.
21                    MR. GUSO:  That's the universe of the
22    litigation.
23                    THE COURT:  Okay.
24                    MR. GUSO:  And then I can address each of
25    the applications, if I may?
```

Page 40

1                    THE COURT:  Go for it.

2                    MR. GUSO:  Okay.  Judge, let's take up then,

3       if we can, the debtors' application to employ Mr. Beilfuss

4       and Quarles & Brady, which is Docket Entry 511.

5                    And, your Honor, pursuant to this

6       application, the debtors seek authority to employ

7       Mr. Beilfuss, of Quarles & Brady, as special litigation

8       counsel with respect to several litigation matters, in

9       what are called general corporate matters.

10                    An example of a general corporate matter,

11       your Honor, is the debtor tenders a distribution agreement

12       to a proposed distributor.  The distributor marks it up

13       and sends back comments.  The debtor will forward those

14       comments, on occasion, to Quarles & Brady, review them,

15       come to --

16                    THE COURT:  Transactional.

17                    MR. GUSO:  Typical general corporate

18       matters, and it's very hard, your Honor, for the debtor to

19       estimate the fees that would be expended on a monthly

20       basis in this category, because it's episodic, it's not

21       regularly conducted.

22                    THE COURT:  Yes.

23                    MR. GUSO:  Okay.  So --

24                    THE COURT:  Has there been an objection?  I

25       don't --

1              MR. GUSO:  I don't believe there has, Judge,
2     but, again, I'll defer to Mr. Chafetz.
3              THE COURT:  Okay.
4              MR. GUSO:  So, Judge, what matters do we
5     seek -- as to what matters do we seek to employ
6     Quarles & Brady?
7              The Monster case, where Monster is the
8     plaintiff, and as to which the Court has granted stay
9     relief pending in the Central District of California, so
10    that the parties can engage in post-verdict motion
11    practice, and have the claim reduced to judgment.
12             We sought, your Honor, to employ
13    Quarles & Brady for purposes of pursuing the Orange Bang
14    appeal before the 9th Circuit.  I mentioned there was a
15    recent development, and if the Court will let me put a pin
16    in that one, I will come back to it.
17             THE COURT:  Okay.
18             MR. GUSO:  Third, your Honor, is the PHD
19    Marketing appeal.
20             THE COURT:  There is a positive judgment in
21    favor of the debtor.
22             MR. GUSO:  Correct, Judge, and the parties
23    are engaged in mediation as we speak.
24             Fourth, your Honor, the Webb & Gersten case,
25    that I mentioned in Wisconsin, solely to get it stayed,

1   and the last matter is the general corporate matters that

2   I described to the Court.

3                   THE COURT:  Okay.

4                   MR. GUSO:  Your Honor, with respect to the

5   litigation matters that I described, the debtors have

6   agreed to provide the committee periodic updates regarding

7   the status of those matters, but will not include the

8   disclosure of privileged information.

9                   THE COURT:  It makes sense.

10                  MR. GUSO:  Right.

11                  Your Honor, any additional services beyond

12  those that I've described in my remarks to the Court, and

13  that will be referenced in the order, assuming the Court

14  is inclined to grant the application, shall be subject to

15  a further application, notice and a hearing before

16  your Honor.  So if we ask Quarles & Brady to undertake

17  additional representation, we'll come back before you.

18                  Your Honor, Quarles & Brady has agreed to

19  abide by the procedures set forth in your Honor's

20  compensation procedures order, which is Docket Entry 503,

21  has agreed to bill on an hourly basis, at a reduced hourly

22  rate, your Honor, that was heavily negotiated, a blended

23  hourly rate of $495 per partner, $395 for associates, and

24  $295 for paralegals.

25                  Your Honor, Quarles & Brady and the debtors

1    have agreed that they will agree on a reasonable budget,

2    depending on the scope of the services.

3                      And, your Honor, Quarles & Brady lastly has

4    agreed --

5                      THE COURT:  And that budget would be within

6    the million eight that was --

7                      MR. GUSO:  The million eight, right, Judge.

8                      How the million eight is allocated,

9    your Honor, is privileged and confidential.  We don't want

10   our adversaries to know how much has been dedicated to

11   each particular case.

12                     THE COURT:  Okay.

13                     MR. GUSO:  Your Honor, and Quarles & Brady

14   has agreed to use good faith, commercially reasonable

15   efforts to avoid duplication of services with other of the

16   debtors' professionals.

17                     Your Honor, at the committee's request,

18   Quarles & Brady has agreed to retain its claim against the

19   debtors solely for purposes of receiving a distribution,

20   and not for any other purpose, like --

21                     THE COURT:  Help me with that, how much is

22   the claim?  It arose prepetition?

23                     MR. GUSO:  Unpaid prepetition fees,

24   approximately $1.4 million, your Honor.

25                     THE COURT:  And they are not holding a

Page 44

1    retainer?  Or I thought I read --

2                    MR. GUSO:  The retainer, as best we can

3    tell, your Honor, was exhausted prepetition.

4                    THE COURT:  Okay.

5                    MR. GUSO:  Quarles & Brady has been

6    representing the debtor for quite some time.

7                    THE COURT:  And as special counsel, the

8    disinterestedness requirements are lessened, if you will.

9                    MR. GUSO:  Right, Judge.

10                   THE COURT:  So your view is that that ought

11   to be allowed, and it's just for distribution purposes,

12   and it doesn't create any kind of disinterestedness

13   problem.

14                   MR. GUSO:  Correct, your Honor.

15   Disinterestedness is not implicated --

16                   THE COURT:  In fact, it might incentivize

17   them to do a better job, not that you wouldn't do a good

18   job anyway, but anyway, I get it.

19                   MR. GUSO:  And disinterested, your Honor --

20   disinterestedness is not, in our view, implicated by

21   327(e).

22                   THE COURT:  Yes.

23                   MR. GUSO:  It's a 327(a) requirement.

24                   THE COURT:  I think the case law says that

25   it's --

Page 45

1              MR. GUSO:  They don't have an interest

2    adverse to the estate.

3              THE COURT:  Yes, it's still an issue.  It's

4    just --

5              MR. GUSO:  Correct.

6              THE COURT:  -- it's a lesser standard.

7              MR. GUSO:  Correct.

8              And as we were discussing earlier,

9    your Honor, the application does ask that the retention be

10   effective as of the petition date, because Quarles & Brady

11   continued to work and discharge its obligations to the

12   debtors, notwithstanding that the terms of its

13   postpetition retention by the debtors had not been

14   finalized.

15             Prepetition Quarles & Brady was representing

16   the debtors on an alternative fee arrangement, that was a

17   fixed weekly fee.  Obviously those economic terms came to

18   an end when the cases were filed.

19             THE COURT:  Sure.

20             MR. GUSO:  The debtors and Quarles & Brady

21   engaged in extensive negotiations regarding the terms of

22   the postpetition retention and, in fact, your Honor,

23   Mr. Owoc signed the amended engagement letter on

24   December 9th, almost 60 days after the cases were filed,

25   and the application that's before you today was actually

1    filed on December 14th.

2              And, your Honor, in these circumstances we

3    submit that --

4              THE COURT:  How much postpetition work has

5    been done?  In other words, what fees are arguably due at

6    this point?

7              MR. GUSO:  Your Honor, in the -- and this is

8    as of the end of January, January 24th, in the Monster

9    case that is pending before the Central District of

10   California, it's approximately $180,000.  In the Orange

11   Bang appeal, approximately $37,200, and in the other

12   matters, which includes PHD Marketing, WG, the general

13   corporate matters, another $186,000.

14             THE COURT:  Okay.  So the court matters are

15   not -- I mean, they're substantial.

16             MR. GUSO:  Correct, Judge, but that included

17   the appeal before the parties --

18             THE COURT:  The appeal.

19             MR. GUSO:  -- submitted to mediation,

20   et cetera.

21             THE COURT:  Understood, okay.

22             MR. GUSO:  So, I asked you to put a pin --

23   if I could put a pin, rather, on the Orange Bang appeal.

24             Your Honor, at a board meeting Tuesday

25   evening, the Haynes & Boone law firm, and the Faulkner

Page 47

```
 1   firm, which are subject to separate applications before
 2   you, to be retained in connection with the Orange Bang
 3   appeal, advised the debtors that they would be willing to
 4   undertake the representation of the debtors in connection
 5   with the Orange Bang appeal on a fixed fee.
 6                   THE COURT:  Okay.
 7                   MR. GUSO:  Which is less than what the
 8   debtors had budgeted for the prosecution of the appeal,
 9   the million eight they had allocated --
10                   THE COURT:  Oh, yep.
11                   MR. GUSO:  -- to the Orange Bang appeal.
12                   THE COURT:  It's your partner that's causing
13   the commotion back there.  So if you've got an issue with
14   it, take it up with him.
15                   MR. GUSO:  Today is no different than any
16   other day, Judge.  He's always causing a commotion.
17                   THE COURT:  Fair enough.
18                   MR. GUSO:  Your Honor, and yesterday the
19   Haynes & Boone firm, and Faulkner ADR Law delivered a
20   proposed engagement letter to the debtors, containing the
21   terms of that representation.
22                   The debtors wish to proceed under that
23   arrangement.  Obviously that is different than the --
24                   THE COURT:  And that has not been filed with
25   the Court yet --
```

1              MR. GUSO:  Judge --

2              THE COURT:  -- so I don't know what it is.

3              MR. GUSO:  -- this literally came in

4    yesterday.

5              THE COURT:  Okay.  All right.

6              MR. GUSO:  So what we'd like to do today

7    with respect to Quarles & Brady is have them retained for

8    purposes of the matters we discussed, other than the

9    Orange Bang appeal.  To be clear, the Monster litigation

10   in the Central District of California, where the Court has

11   lifted the staff, the PHD Marketing appeal, where the

12   parties are subject to mediation, the Webb & Gersten

13   appeal, where the parties are seeking a stay, and for

14   general litigation matters.

15              What we'd like to do with respect to the

16   request to retain Quarles & Brady for the OBI appeal, is

17   to defer it, your Honor.  We would like to amend the

18   applications to retain Haynes & Boone, and Faulkner Law,

19   to disclose the terms of the fixed fee arrangement.  We

20   would pursue that retention under 327 and 328, with full

21   disclosure to the committee and the U.S. Trustee, and come

22   back before the Court and consider that at the next

23   hearing.

24              THE COURT:  So that would be considered at a

25   time, the Quarles & Brady application, that portion of it,

Page 49

1   that will be continued to the same time, would allow the

2   Court to consider the retention of all three in

3   consideration of the fact that all three are seeking to be

4   retained --

5            MR. GUSO:  Correct, Judge.

6            THE COURT:  -- and might address the

7   objections associated with whether three law firms are

8   needed for that matter?

9            MR. GUSO:  Correct, Judge.

10           THE COURT:  Okay.

11           MR. GUSO:  But by the same token, we also

12  don't want to risk that, if for some reason, the Court is

13  not inclined to approve the fixed fee arrangement, we

14  don't want to lose access to Quarles & Brady under the

15  terms of the hourly rate.  So we want to be able to pivot

16  one way or the other --

17           THE COURT:  Understood.

18           MR. GUSO:  -- okay?

19           THE COURT:  Okay.  All right.

20           MR. GUSO:  That's what I have on

21  Quarles & Brady, your Honor, and I'm happy to yield the

22  podium, or answer any questions the Court may have, and

23  then we can take up the remaining applications.

24           THE COURT:  Okay.  So I'm good so far.

25           Mr. Chafetz, are you going to be addressing

Page 50

1    any objections then, or --

2                    MR. CHAFETZ:  I guess -- Eric Chafetz on

3    behalf of the Official Committee of Unsecured Creditors.

4                    I guess my question for your Honor is, do

5    you want us to kind of bifurcate this?  Do you want me to

6    respond to Quarles & Brady, and then we can deal with

7    Sanchez Levine, or --

8                    THE COURT:  Well, let's do the -- what I

9    think is an easy part, I think that deferring the

10   Quarles & Brady application, along with the other two,

11   with respect to the appeal, seems rather easy, that's just

12   a deferring of those matters.  Any issue with that?

13                   MR. CHAFETZ:  No, your Honor.  Conceptually,

14   no, we don't have an issue with this.  We literally

15   learned about this a few hours ago, and we're --

16                   THE COURT:  Yes.

17                   MR. CHAFETZ:  -- still processing all of

18   this.

19                   We have taken the view that the debtors'

20   entire postpetition litigation strategy is really a

21   package deal, and we're trying to, to the best --

22                   THE COURT:  A package deal, in terms of --

23   how does that apply here?

24                   MR. CHAFETZ:  There is a budget for 1.7 or

25   $1.8 million, whatever that number is.

1           THE COURT:  Right.

2           MR. CHAFETZ:  From the committee's

3    perspective, and I'll get into this a little bit later,

4    our view is that the vast majority of that litigation does

5    not necessarily have to go forward now.  We believe, and I

6    guess I'll respond to a few points that counsel

7    indicated --

8           THE COURT:  Well, does this relate to the

9    deferral, the deferred matter, or --

10          MR. CHAFETZ:  I think it relates --

11          THE COURT:  I guess as a package deal, your

12   concern is really about the overall million eight.

13          MR. CHAFETZ:  Yes, the overall million

14   eight.

15          THE COURT:  Well, if it helps you any, it

16   seems to me that while there is a budget for a million

17   eight, any fee application would have to stand on its own

18   and be supported by the work that was done.  Fees would

19   have to be reasonable in order to be granted, and would be

20   subject to objections.  So I'm not sure the budgeted

21   amount necessarily is dispositive of whether these firms

22   ought to be retained for this work.

23          MR. CHAFETZ:  No, I think, your Honor,

24   obviously everybody is entitled to review the relevant fee

25   applications once they are filed for reasonableness.

1              I think, for purposes of right now, we're

2       fine with the deferring the OBI appeal retentions, but

3       reserving our rights, obviously we want to see the order,

4       we want to understand if Quarles & Brady, and they are on

5       the line right now, if they intend on walking away from

6       the OBI appeal, whether they're going to make some type of

7       counteroffer in response to the terms that Faulkner and

8       Haynes & Boone offered.

9              Like I said, we literally learned about this

10      a few hours ago and, admittedly, my remarks are kind of

11      turned upside down.

12             THE COURT:  Yeah, no, I get it, and I know

13      that is up in the air, and it hopefully will be resolved

14      between now and then.

15             MR. CHAFETZ:  So we're fine deferring on all

16      of that.  I'll take Mr. Guso's representation to heart,

17      that if they think that the overall cost associated with

18      the appeal, based on the proposed flat fee arrangement,

19      will save money for the estate, we're all for that.

20             THE COURT:  Okay.  Sure.

21             MR. CHAFETZ:  Subject, obviously, to every

22      party in interest's rights to object to the reasonableness

23      of fees.

24             So, for those -- that one issue, that OBI

25      appeal, we're fine just moving forward with that, and see

Page 53

1   what --

2                  THE COURT:  And I assume consistent with

3   prior to communications, the debtor will reach out to the

4   committee and lay all of that out, and hopefully you come

5   to an agreement --

6                  MR. CHAFETZ:  Yes, no --

7                  THE COURT:  -- fair statement, Mr. Guso?

8                  MR. GUSO:  Yes, absolutely.

9                  THE COURT:  Okay.  Thank you.

10                 MR. CHAFETZ:  No, that's fine, and then I

11  can cede the podium to Mr. Guso, or I can respond to --

12                 THE COURT:  I've heard enough from Mr. Guso.

13  I want to hear from you.

14                 MR. CHAFETZ:  And I guess you get to deal

15  with his partner right after this.  So, I guess you're

16  lucky.

17                 THE COURT:  I do.

18                 MR. CHAFETZ:  I can deal with, or just

19  respond to --

20                 THE COURT:  Well, I mean, let me tell you

21  the way I look at it, and obviously I've only heard from

22  Mr. Guso, but I have had the benefit of the objections of

23  both Monster and the committee, but it seems to me the way

24  that the matters have been described, and we can take them

25  one at a time, is that stay relief was granted with

Page 54

1    respect to the Monster litigation.  That litigation is

2    ongoing, and Quarles & Brady is necessary -- or counsel is

3    necessary to be part of that litigation, and it's geared

4    towards postjudgment matters that may have some impact on

5    the liability of the debtor for the benefit of the estate,

6    may not, but I don't think it's prosecuting claims against

7    Monster, that's a separate litigation.

8                     So, what's the issue with that litigation?

9                     MR. CHAFETZ:  So there is -- we want to see

10   whatever the final order is, but one of the issues that

11   was raised by Quarles & Brady's retention application was

12   the contemplation of a potential 9th Circuit appeal after

13   the judgment process, but I think Mr. Guso, and he can

14   clarify, but I believe he indicated that he would come

15   back to court, the debtors would come back to court --

16                     THE COURT:  Yeah, that's not part of this

17   application.

18                     MR. CHAFETZ:  -- if they --

19                     THE COURT:  At least it wasn't described,

20   and I assume it's not part of it.

21                     MR. GUSO:  It's not, correct, Judge, and

22   it's in the form --

23                     THE COURT:  Okay.  So we don't have to talk

24   about that.

25                     MR. CHAFETZ:  Yes, so we're fine with that.

1                    THE COURT:  Okay, but from what I've

2     described, or what Mr. Guso described, that I probably

3     less eloquently described, the Monster litigation is

4     ongoing, and the debtor needs counsel.

5                    MR. CHAFETZ:  That's --

6                    THE COURT:  Fair statement?

7                    MR. CHAFETZ:  That's a fair --

8                    THE COURT:  So no issue there.

9                    MR. CHAFETZ:  -- representation.

10                    THE COURT:  Okay.

11                    MR. CHAFETZ:  If we knew what we knew now

12    about the, quote, unquote, package I referred to before,

13    we may have taken a different position on the stay relief

14    motion that was in November/December, obviously much

15    earlier in the case, but --

16                    THE COURT:  No, I understand.

17                    MR. CHAFETZ:  -- that ship has sailed, it is

18    what it is.

19                    THE COURT:  Okay.  All right.  Fair enough.

20                    MR. CHAFETZ:  I can tell you --

21                    THE COURT:  Then there is --

22                    MR. CHAFETZ:  PHD Marketing.

23                    THE COURT:  -- the PHD Marketing, that's a

24    positive judgment in favor of the debtor.

25                    MR. CHAFETZ:  We're all for that.

1          THE COURT:  Okay.  Great, we're making a lot

2   of progress here.

3          The Wisconsin appeal?

4          MR. CHAFETZ:  As long as what Mr. Guso

5   described to your Honor, that it's solely limited to

6   staying the appeal, or extending the briefing schedule,

7   the committee has no issue with that.

8          THE COURT:  In fact, it's beneficial to the

9   estate, and would limit costs, if any.

10          MR. CHAFETZ:  Yes, I think that's correct,

11   your Honor.

12          THE COURT:  At least to make sure that the

13   Wisconsin court doesn't do things in violation of the

14   stay, arguably, and then you've got to unwind all of that.

15   So, it makes sense to prophylactically make sure that

16   they're not doing things they shouldn't be doing, and then

17   there was one -- the one other matter, that's not the OBI

18   appeal, which is -- am I missing one?

19          MR. GUSO:  General.

20          MR. CHAFETZ:  Corporate.

21          THE COURT:  Oh, corporate general, general

22   corporate.

23          MR. CHAFETZ:  And just conceptually we're

24   fine with obviously the debtors using the most reasonably

25   priced counsel to address any corporate issues that come

Page 57

1    up.

2                    We've tried to get an understanding of the

3    scope of that and, as Mr. Guso, I think, adequately

4    described, it kind of is, it comes up when it comes up.

5                    THE COURT:  Yes.

6                    MR. CHAFETZ:  So, it's hard to predict, but

7    we are fine with them moving forward on that.

8                    I guess --

9                    THE COURT:  It sounds like we have raging

10   agreement here, no?

11                   MR. CHAFETZ:  Yes, I guess one point that

12   Mr. Guso raised, and I don't know the best way to deal

13   with it, if the debtors do decide to move forward with the

14   retention of Faulkner and Haynes & Boon on the OBI appeal,

15   I think Mr. Guso described about $37,000 of fees that were

16   incurred by Quarles & Brady on that.  We don't --

17                   THE COURT:  Although we'll take that up --

18                   MR. CHAFETZ:  We'll reserve our rights --

19                   THE COURT:  -- on the deferral.

20                   MR. CHAFETZ:  Yes, at the relevant time, but

21   that's just --

22                   THE COURT:  And what about the rest of the

23   claim not being disqualifying?

24                   MR. CHAFETZ:  Yes.

25                   THE COURT:  No issue there?

Page 58

1                    MR. CHAFETZ:  Oh, no.

2                    THE COURT:  As to Quarles & Brady's claim.

3                    MR. CHAFETZ:  No, we don't have an issue

4    with that, especially with the resolution we reached with

5    respect to solely -- the treatment in the case going

6    forward.

7                    THE COURT:  Very agreeable, Mr. Guso.  I

8    don't see what the problem is.  All right.

9                    MR. CHAFETZ:  Yeah, we haven't got to the

10   more challenging part, in my view, so, yes, your Honor.

11                   THE COURT:  Good.  All right, but we're

12   there.  All right.  So that covers everything for

13   Quarles & Brady that has not been deferred, right?

14                   MR. CHAFETZ:  I think that's right.

15                   THE COURT:  Okay.

16                   MR. CHAFETZ:  Obviously we reserve our right

17   to review the --

18                   THE COURT:  I've got to still hear from

19   Monster, but, yeah.

20                   MR. CHAFETZ:  We reserve our rights to

21   review the amended order.

22                   THE COURT:  Okay.

23                   MR. CHAFETZ:  I think Monster's objections

24   really dealt with Sanchez Levine.  I don't want to put

25   words in their mouth.

Page 59

1                    THE COURT:  Ah, okay.

2                    MR. CHAFETZ:  But, yeah, I think that's

3    accurate, your Honor.

4                    THE COURT:  Okay.  Great.

5                    Okay.  Mr. Berger, is that right, that

6    Monster has no issue with where we are with

7    Quarles & Brady?

8                    MR. BERGER:  Yes, your Honor, ours was

9    limited to Sanchez Levine.

10                   THE COURT:  Okay.  All right.  So, you win.

11                   MR. GUSO:  I'll take that all day long.

12                   THE COURT:  All right.  So get me an order,

13   and I assume you'll be specific --

14                   MR. GUSO:  Yes, or course.

15                   THE COURT:  -- in what the limitations are

16   that you've described here today.

17                   MR. GUSO:  In fact, we've previewed a draft

18   of the order with Mr. Chafetz' colleague, Ms. Renert, so

19   we'll make sure --

20                   THE COURT:  Okay.  All right.  So where does

21   that take us?  Because the other two --

22                   MR. GUSO:  That takes us --

23                   THE COURT:  -- applications have now been

24   deferred, right?  You're going to get me an order

25   continuing the hearing --

Page 60

1                    MR. GUSO:  Yes, sir.

2                    THE COURT:  -- on that, plus what's left on

3       Quarles & Brady.

4                    MR. GUSO:  Right.

5                    THE COURT:  And you'll talk to Ms. Weldon

6       about when that will be, or do you want to talk about that

7       now?

8                    MR. GUSO:  I think, your Honor, we're back

9       before you on a limited basis on the 15th in connection

10      with two motions for protective order, and thereafter on

11      the 23rd.  It probably makes sense to come back on the

12      23rd.

13                   THE COURT:  To give yourself a little more

14      time?

15                   MR. GUSO:  Yes, sir.

16                   THE COURT:  Okay.

17                   MR. GUSO:  It will give us an opportunity to

18      visit with the committee.

19                   THE COURT:  Whatever the time is on the

20      23rd, go ahead and add it to that docket --

21                   MR. GUSO:  Thank you, Judge.

22                   THE COURT:  -- okay?

23                   MR. GUSO:  Okay.

24                   THE COURT:  Great.

25                   So, what's -- all right.  So, is there

Page 61

1    anything -- is that everything for today?

2                    MR. GUSO:  No, sir.  The last one is the

3    Sanchez Levine application --

4                    THE COURT:  Ah, Sanchez Levine.

5                    MR. GUSO:  -- Docket Entry 633.

6                    THE COURT:  Let me get there.  Hold on one

7    second.

8                    Also, remind me to have a little chat about

9    the motions, the emergency motions that were recently

10   filed, I think relating to Ms. Cole's testimony, or

11   examination.

12                   MR. GUSO:  Sure.

13                   THE COURT:  So, I just want to -- I may want

14   to spend a couple of minutes on that, although we have a

15   full courtroom.

16                   All right.  So tell me about Sanchez

17   Fischer.

18                   MR. GUSO:  Sanchez Levine Fischer, yes, sir.

19                   THE COURT:  Sanchez Levine Fischer.

20                   MR. GUSO:  Sure, your Honor, again Mr.

21   Levine is --

22                   THE COURT:  Sanchez Fischer Levine.

23                   MR. GUSO:  Sanchez Fischer Levine.

24                   MR. LEVINE:  Yes, your Honor.

25                   THE COURT:  Okay.

Page 62

1                    MR. GUSO:  Yes, thank you.

2                    Your Honor, again, the debtors seek to

3       retain the Sanchez Fischer Levine firm, as I mentioned in

4       my opening remarks, in connection with two cases that the

5       debtors have pending in the Southern District of Florida

6       against Monster Energy and others.  One is the 2019 case,

7       which I've come to learn is commonly referred to as the

8       smear campaign case, and the other, your Honor, is one

9       that was filed in 2022, asserting claims for violation of

10      the Lanham Act.

11                   Your Honor, pursuant to this application,

12      the debtors seek authority to employ Mr. Levine's firm

13      pursuant to the terms of the engagement letter dated

14      August 7th, 2022.

15                   In both of these cases, your Honor, VPX, or

16      Vital Pharmaceuticals, seeks to recover lost profits,

17      disgorgement of Monster's profit, and injunctive relief,

18      your Honor, as described in Mr. DiDonato's declaration in

19      support of the first day papers, which is Docket Entry 26,

20      at Paragraph 40.

21                   Obviously, your Honor, as the plaintiff,

22      these cases are not subject to the automatic stay.

23                   I will say, your Honor, again as to this

24      one, the debtors attempted to work proactively with the

25      committee to address any issues or concerns with regard to

Page 63

1    the cases and, in fact, on January 3rd the committee

2    informed the debtors that, subject to addressing specific

3    comments on the proposed retention order, the committee

4    was not inclined to oppose the retention of Mr. Levine's

5    firm in the prosecution of the cases.

6              That said, your Honor, we are where we are

7    today and, your Honor, the cases tell us that --

8              THE COURT:  Well, meaning, that said, we are

9    where we are today, that means that Mr. Chafetz is not

10   here objecting to those applications, subject, again, to

11   reviewing the order, and the objections are limited to

12   Monster, is that --

13             MR. GUSO:  Regrettably, your Honor, no, the

14   committee has now taken the position that their view is

15   that the posture of the cases has changed, that in their

16   view the debtors are advancing exclusively a sale process.

17   The debtors disagree with that, and that given the

18   pendency of that process, your Honor, the litigation

19   should continue to be abated, and the purchaser --

20             THE COURT:  Okay.  So what's the downside to

21   abating the litigation?

22             MR. GUSO:  Your Honor, the debtors believe

23   that these claims have merit.  We start with the framework

24   of Section 327(e), which is the basis for the relief we

25   seek today.

1          That statute, your Honor, and the cases

2     interpreting it, tell us that, for purposes of evaluating

3     retention of special counsel for a debtor, the Court looks

4     at three things.  First, your Honor, the employment must

5     be for a specific purpose, clearly that's satisfied here,

6     Mr. Levine is not going to be involved in the

7     administration of the case.  He and his firm will be

8     involved solely in connection with the prosecution of

9     these claims.

10               THE COURT:  Two discrete litigation claims?

11               MR. GUSO:  Yes, sir.

12               Second, your Honor, the proposed counsel

13     cannot hold any interest adverse to the estate as to the

14     matters for which it is to be retained, no indication that

15     Mr. Levine or his firm hold an adverse interest to the

16     estate.

17               THE COURT:  Haven't seen any --

18               MR. GUSO:  And the third, you know, is must

19     show that the employment is in the best interest of the

20     debtors' estate.

21               THE COURT:  That's where the game --

22               MR. GUSO:  That's --

23               THE COURT:  -- is being played here.

24               MR. GUSO:  Right.

25               So as to this last point, your Honor, the

Page 65

1    debtors reasonably believe that the cases have substantial

2    value.

3                    If the debtors prevail on the Lanham Act

4    claims, the debtors may recover lost profits, disgorgement

5    of Monster's profits, and injunctive relief.

6                    Monster is the second largest player in the

7    energy drink sector.  It controls 30 percent of the

8    market.

9                    While discovery has not yet started,

10   your Honor, it's reasonable to conclude that if the debtor

11   prevails on these claims, they will have substantial

12   value, perhaps in the hundreds of millions of dollars,

13   conversely to what we saw in the Monster litigation

14   against the debtor prepetition.

15                   Your Honor, the total budget available for

16   nonbankruptcy litigation, as I told the Court through May,

17   is approximately $1.8 million, and while it's

18   inappropriate to disclose how much of the total budget has

19   been allocated amongst the different professionals,

20   including to Mr. Levine and his firm, although certainly

21   that has been disclosed to Mr. Levine, and there is an

22   agreement on that point, the board believes, the

23   independent board of directors, your Honor, believes based

24   on their best informed judgment, that the incremental

25   investment to prosecute the cases now is worthwhile given

Page 66

1    the range of recoveries that may be available to the

2    debtors if they prevail on the claims.

3                    THE COURT:  And what's the source of that

4    belief, consultation with Mr. Levine, or how did that come

5    about?

6                    MR. GUSO:  Communications with Mr. Levine

7    through the debtors' corporate general counsel,

8    your Honor, Mr. Greg Metzger, and presentations that were

9    made to the board of directors, and to Mr. DiDonato, in

10   his capacity as the chief transformation officer of the

11   debtors.

12                   THE COURT:  And if called to testify,

13   Mr. DiDonato would testify that this was an independent

14   business judgment, separate and apart from anything

15   Mr. Owoc may seek personally, or whatever personal

16   interest he may have, et cetera?

17                   MR. GUSO:  Unquestionably, your Honor, he

18   would.

19                   And, in fact, Mr. Owoc isn't even a

20   plaintiff in this case, your Honor.  These are claims

21   solely by Vital Pharmaceuticals, evaluated --

22                   THE COURT:  No, but he may -- the allegation

23   has been that Mr. Owoc is being vindictive in having the

24   debtor pursue this litigation, and so my -- I'm just

25   asking the question, and I wouldn't expect you to answer

Page 67

1   anything differently but --

2                   MR. GUSO:  Sure.

3                   THE COURT:  -- I assume Mr. DiDonato would

4   testify as you've stated.

5                   But then again, Mr. DiDonato has a fiduciary

6   obligation and a duty to make sure that, in fact, business

7   decisions are being made appropriately for this debtor,

8   especially in the face of these objections relating to

9   Mr. Owoc may or may not want from a vindictive

10  perspective.

11                  I'm not finding that, I'm just saying that

12  that's what the objections are, and I just want to make

13  sure that that decision process, at least in

14  Mr. DiDonato's -- from his perspective, as the testifying

15  witness, would support the notion that these are sound

16  business decisions.

17                  MR. GUSO:  He would, your Honor, and lastly,

18  your Honor, this is -- interestingly enough, this is the

19  same point that Monster makes in its objection.

20                  Monster doesn't oppose the retention of

21  counsel, but Monster forecasts quite clearly that it

22  intends to object to any compensation that Mr. Levine or

23  his firm may seek in connection with the representation of

24  the debtors in these cases.

25                  And so, your Honor, that's entirely ripe,

1    that is the approach, because the committee and all of

2    parties in interest will have an opportunity to review,

3    and if appropriate, object to the fees of the

4    professionals, not only -- by the way, not only --

5                    THE COURT:  That's a given.

6                    MR. GUSO:  -- Mr. Levine, right?

7                    THE COURT:  Yeah.

8                    MR. GUSO:  And so, your Honor, under the

9    circumstances where we have those safeguards, those

10   guardrails, we suggest that, your Honor, retention of the

11   Mr. Levine and his firm for this purpose is in the best

12   interest of the estate.

13                   THE COURT:  Okay.  Thank you.

14                   Mr. Chafetz, and then, I don't know,

15   Mr. Berger, if you're arguing, or if Mr. Feinstein, or I

16   don't remember who is -- let's hear from Mr. Chafetz

17   first, and then we'll go to Monster.

18                   MR. CHAFETZ:  Thank you, your Honor.

19   Eric Chafetz, again, for the --

20                   THE COURT:  So, as I understand the

21   situation, is these litigation claims may be worth

22   significant money.  The business judgment has been

23   exercised appropriately, according to Mr. DiDonato, and,

24   of course, objections to fees are reserved, as they always

25   are.

1              So, where does that leave us with the

2    committee?

3              MR. CHAFETZ:  So, I guess from our

4    perspective, under 327(e), the standard is not necessarily

5    the business judgment standard, they have to show that

6    there may be a benefit to the estate.

7              Although it's not before your Honor right

8    now, we're not taking a position on the merits of these

9    cases.  We just think that the status of these cases

10   warrants holding off, at a minimum, of retaining these

11   professionals now, because really, at most, and the

12   debtors admit this in, I believe it's Paragraph 11 of

13   their reply, that there is only going to be incremental

14   progress, and I'll go through the exact procedural posture

15   of both the 2019 and 2022 cases.

16             THE COURT:  I would imagine that if they're

17   fairly early in the proceedings, that we're not getting to

18   a judgment between now and May.

19             MR. CHAFETZ:  Yes, exactly, and May 17th is

20   a key date, that's just implicitly recognized, your Honor,

21   by then there is --

22             THE COURT:  Recognize it because of the

23   pleadings, but, yeah.

24             MR. CHAFETZ:  Yes.  Well, there is going to

25   be either a sale, or a capital raise, and it's the

Page 70

1    committee's view of the world that --

2              THE COURT:  But, by the same token, not a

3    lot of money is going to be spent between now and then

4    either theoretically.

5              MR. CHAFETZ:  I think that's all relative.

6    Any dollars that go out the door, arguably is one dollar

7    less than what my constituency is entitled to.

8              THE COURT:  Well, but what if the debtor, in

9    the debtors' business judgment, views some tactical or

10   strategic advantage to pursuing this litigation against,

11   you know, one of their largest creditors?  I mean, am I

12   supposed to replace your --

13             MR. CHAFETZ:  No, I totally understand that,

14   your Honor.

15             THE COURT:  Or the committee replace your

16   business judgment --

17             MR. CHAFETZ:  No.

18             THE COURT:  -- with theirs.  I mean --

19             MR. CHAFETZ:  I totally understand the

20   business judgment.

21             THE COURT:  -- that's where I'm having

22   trouble here.

23             MR. CHAFETZ:  No, I totally understand that.

24             I also think you have to look to whether or

25   not there is actually going to be a benefit to the estate

1    here, and in --

2                    THE COURT:  Well, in the face of them, of

3    the movant saying that these are potentially very valuable

4    claims, I agree that perhaps in the next four months, or

5    five months the benefit would be hard to establish because

6    it won't result in a judgment, can't result in a judgment,

7    but --

8                    MR. CHAFETZ:  I don't even know if this is

9    going to result in an actual complaint where Monster could

10   theoretically file a motion to dismiss another -- and I'll

11   go into this in a second, another potential sanctions

12   motion that was just mooted because of a status conference

13   that just occurred in the 2022 action.

14                   Let me -- I'm going to go through quickly as

15   to where the 2019 --

16                   THE COURT:  Okay.

17                   MR. CHAFETZ:  -- and '22 actions actually

18   stand, and maybe it will influence your Honor's thinking

19   because when we had a discussion, Mr. Guso indicated that

20   on January 3rd we were -- we, as the committee, were okay

21   with moving forward.

22                   Everything I'm going to talk about right

23   now, and I can say on January 3rd I literally wasn't on

24   the call, my colleagues were, and I can tell you that they

25   have an entirely different recollection as to what

Page 72

1   happened during that call, and everything I'm going to

2   tell you about right now, about what happened in the 2022

3   case is not something that was conveyed to them that could

4   even potential possibly happen during that call.

5                   So, on January 6th of this year --

6                   THE COURT:  You know, to be honest, I don't

7   really care what happened on January 3rd.  I care about

8   the committee's view today.

9                   MR. CHAFETZ:  Yeah, no, and that's kind of

10  what I'm going to right now.

11                  THE COURT:  Okay.  All right.

12                  MR. CHAFETZ:  I'm just trying to give you

13  the lay of the procedural land, and what can actually be

14  accomplished between now and May.

15                  THE COURT:  Okay.

16                  MR. CHAFETZ:  And on January 6th, Monster

17  filed a motion to stay discovery in the 2022 action, and

18  the debtors didn't consent to that.

19                  On January 10th, in response to a pending

20  motion to dismiss that Monster had previously filed, VPX

21  filed an amended complaint, which dropped Monster's CEO

22  from the action, and alleged only a narrower subset of

23  claims, including the Lanham Act, the Florida Deceptive

24  and Unfair Trade Practices Act and the Common Law Unfair

25  Competition Claims.

Page 73

1                  On January 11th of 2023, due to this amended

2    complaint, the district court denied Monster's motion to

3    dismiss and motion to stay discovery as moot.

4                  Most likely if another complaint gets on

5    file even by May, I'm not sure if that's going to happen.

6    I don't want to put words in Monster's mouth, but most

7    likely they're going to be filing another motion to

8    dismiss.

9                  On January 12th, Monster filed a motion for

10   sanctions against VPX and Greg Metzger for a handful of

11   different theories.

12                 On January 20th VPX filed a motion to extend

13   time to respond to that motion for sanctions.

14                 On January 24th there was a status

15   conference held in the 2022 action, and in that case the

16   district court stayed and closed the 2022 action for

17   60 days.

18                 So at the earliest --

19                 THE COURT:  What was the reason for the

20   stay?

21                 MR. CHAFETZ:  To give --

22                 THE COURT:  I was going to ask Mr. Levine

23   that, but --

24                 MR. CHAFETZ:  Yes, my understanding, and if

25   I get this wrong, I'm not a litigator, and someone will

Page 74

1    obviously clarify, is to give the debtors additional time

2    in the 2019 case to convince the Court that they should be

3    able to file an amended claim -- amended complaint in that

4    case, to move forward in that, and our understanding is

5    that nothing has happened in the 2019 case for over two

6    and a half years.

7              So the judge, during that status conference,

8    expressed -- I'm trying to think about the best word,

9    expressed -- wasn't very convinced that the judge in the

10   2019 case was going to allow the debtors to file an

11   amended complaint.

12             THE COURT:  That would be the Judge Altman

13   case?

14             MR. CHAFETZ:  Exactly, yes, your Honor.

15             So really the bottom line is, because of the

16   60-day stay, at the earliest, probably on March 27th,

17   which is two weeks after we know if there is going to be a

18   capital raise, or a sales transaction here, in two weeks

19   before -- if this goes down the sale path, the stalking

20   horse has to be identified, the furthest the debtors are

21   going to get at that time is to potentially be able to

22   have the right to file an amended complaint in the 2019

23   case.

24             That means, if we are talking about the

25   infancy of the litigation, that's as much in the infancy

Page 75

1    as I could possible think about, and this comes from the

2    fact that a complaint was filed in 2019, and nothing

3    occurred for two and a half years.

4              And I can't speak for Monster.  Monster has

5    obviously taken the position that the 2022 complaint is a

6    copycat of the 2019 complaint.

7              THE COURT:  But, again, let's say that's all

8    true, and I certainly have no reason to doubt it, I assume

9    if I called upon Mr. Levine to address the Court, he would

10   say with great confidence that they would be able to amend

11   the complaint, and it's going to avoid -- and they're

12   going to avoid dismissal, et cetera, et cetera, and the

13   business judgment that's been expressed to me is that the

14   debtor believes, with independent directors exercising

15   appropriate business judgment, that it is, for whatever

16   reason, a benefit to the estate to proceed.

17             I can imagine reasons that it would be, I

18   can imagine reasons that it won't be, for example, if

19   they're subject to sanctions and it could be a negative

20   thing, but I guess my problem is that I don't really

21   understand how I can even challenge the debtors' business

22   judgment for the same reason you're arguing, that not a

23   whole lot is going to happen in any event except to

24   progress, at least a little bit, and maybe send the

25   message to Monster, if that's the debtors' purpose, and I

1  don't know this, I'm just coming up with examples, that

2  this case is going forward, and take that for what it's

3  worth, and if you think that's a risk to you, great.  If

4  you don't, okay, but we think it's important to proceed.

5              MR. CHAFETZ:  I --

6              THE COURT:  I mean, how do I --

7              MR. CHAFETZ:  No, I --

8              THE COURT:  How do I balance all of that?

9              MR. CHAFETZ:  No, I totally understand,

10  your Honor, and I guess our view of the world is that this

11  exact exercise that you just described, relying on the

12  debtors' business judgment, is going to have to happen

13  again over the next few months, and we think that either a

14  purchaser, who may or may not decide that there is value

15  in these claims, they'll have to make the determination as

16  to whether they want to buy them as part of a sale,

17  assuming it goes down --

18              THE COURT:  Do you think something can

19  happen with that litigation that would convince a buyer

20  not to buy?

21              MR. CHAFETZ:  Not specifically that -- the

22  buyer could buy, or the buyer could leave it behind in the

23  estate.

24              THE COURT:  Right.

25              MR. CHAFETZ:  And then if the buyer leaves

1    it behind in the estate, then a third-party fiduciary,

2    assuming that a liquidating plan, or a plan of

3    reorganization is filed, is going to have to make a new

4    and independent decision as to whether or not --

5                    THE COURT:  But that's going to happen --

6                    MR. CHAFETZ:  -- these claims can be

7    pursued.

8                    THE COURT:  -- whether the case goes forward

9    or not.

10                   MR. CHAFETZ:  I agree, and it's our view,

11   from the committee's perspective, based on the fact that

12   -- the timing of the filing of the 2019 complaint, which

13   is admittedly not in front of your Honor, but it's on the

14   docket, so you can probably take judicial notice of it, is

15   the date that Mr. Owoc was supposed to testify in the

16   false advertising case, was literally the date that the

17   2019 complaint was filed.

18                   Like, we don't think that's -- we do --

19                   THE COURT:  Yeah, I get it.  I just -- those

20   kinds of facts, it's very hard for me to incorporate them

21   into my thinking, because there may be a whole set of

22   other facts that, you know, from a timing perspective,

23   that work in favor of the debtor, but it still boils down

24   to me denying what independent business judgment the

25   debtor, through Mr. DiDonato, is saying exists to go

Page 78

1    forward, and that's -- I haven't heard anything yet --

2                    MR. CHAFETZ:  No, I understand.

3                    THE COURT:  -- overcome that.

4                    MR. CHAFETZ:  I understand, your Honor, I

5    understand that you have to rely on the debtors' business

6    judgment.

7                    But to be fair, I don't think under

8    Section 327(e), and we cite this in In Re:  Abross

9    (phonetic), in Paragraph 12 of our objection, that the

10   debtors need to establish that the appointment will be in

11   the best interest of the estate.

12                   So, putting aside --

13                   THE COURT:  Well, that's what they're

14   telling me, through their business judgment, it's in the

15   best interest of the estate --

16                   MR. CHAFETZ:  I --

17                   THE COURT:  -- because they're very valuable

18   claims, that's literally what they've said --

19                   MR. CHAFETZ:  No, and I --

20                   THE COURT:  -- and I'm not sure, how do I --

21                   MR. CHAFETZ:  No, I understand, your Honor.

22                   Because of all the issues that Mr. Guso

23   described vis-a-vis with the corporate governance, and all

24   the changes that had to be made in this case to get to

25   where we are --

1            THE COURT:  But they've been made.

2            MR. CHAFETZ:  To get to where we are today.

3   There is --

4            THE COURT:  Bravo to you, and bravo to

5   others that the lender, involved in doing that, they've

6   been made, and this decision was, it was reconsidered

7   post-corporate governance changes, as I understand it, and

8   the decision was still made to go forward.

9            MR. CHAFETZ:  Well, and it was our request

10  that that board reconsider, and more power to them.  We

11  just don't, we don't agree with them.  We think that the

12  board, because of whom they're dealing with in some of the

13  bigger decisions they're going to have to make later on in

14  these cases, their calculus and their thought process is

15  not necessarily the same calculus and thought process the

16  committee would have under these circumstances, and that

17  may be fine, but in our view there is no harm to the

18  debtor whatsoever in waiting for a few months to determine

19  whether or not any monies, theoretically speaking, could

20  go to --

21            THE COURT:  Well, is the standard to avoid

22  harm, or -- is the standard that there is no harm, or is

23  the standard, what the business judgment of the debtor is?

24            And the business judgment of the debtor is

25  not to simply avoid -- or that it can't hurt to sit back.

Page 80

1    The business judgment of the debtor seems to be that there

2    is value in not sitting back, and going forward.

3                    MR. CHAFETZ:  We obviously don't see the

4    value in going forward now.  I don't want to foreclose on

5    the fact that there may be value that a purchaser, or a

6    third party, an independent fiduciary post-confirmation

7    sees in these claims.  We just don't think, based on --

8                    THE COURT:  Yeah, I get it.

9                    MR. CHAFETZ:  Based on the acrimonious

10   relationship between the debtors and Monster, that these

11   claims should be pursued now, and trust me, we haven't

12   agreed with Monster on a lot of things in this cases --

13                    THE COURT:  No, listen, I value the

14   committee's view.  It gives balance to cases like this.

15   It's very important, because you're not in the throes of

16   litigation, as Monster is, and the debtor is with Monster,

17   it's very valuable to me, and it should be valuable to the

18   process, no question about it.

19                    But I'm -- in weighing the business judgment

20   of the debtor against your argument that it won't hurt the

21   debtor not to go forward, it seems to me, in that

22   balancing, the business judgment of the debtor should win

23   because, you know, that's what's important to the debtors'

24   strategy for whatever reasons, and I don't want to get

25   into those reasons, I don't think it's appropriate for me

Page 81

1    to get into those reasons, but I don't -- I just don't

2    see, well, it can't hurt to stop, as being a better

3    argument than the business judgment of the debtor is, we

4    need to go forward.

5                    MR. CHAFETZ:  No, I understand that, and

6    even if I were to seek to cross-examine Mr. DiDonato,

7    there is no way he's going to --

8                    THE COURT:  He almost can't.

9                    MR. CHAFETZ:  No.

10                   THE COURT:  Yeah.

11                   MR. CHAFETZ:  Yeah, so we're between a rock

12   and a hard place here.  We want to -

13                   THE COURT:  I'm right there with you, if it

14   helps you any.

15                   MR. CHAFETZ:  We want to let our serious

16   concern about the debtors -- really, to be fair, their

17   entire litigation strategy post-confirmation, we were able

18   to narrow some of the issues, as Mr. Guso described.

19                   THE COURT:  Yes.

20                   MR. CHAFETZ:  But we just think that they're

21   -- and your Honor is going to rule on how your Honor wants

22   to rule, that this is just not something irrespective of

23   whether it's in the debtors' business judgment that should

24   be pursued right now.

25                   THE COURT:  I hear you.

Page 82

1                  Okay.  Thank you.

2                  Mr. Feinstein, or Mr. Berger?

3                  MR. FEINSTEIN:  I'd like to handle it, if I

4    could, your Honor?

5                  THE COURT:  Of course.

6                  MR. FEINSTEIN:  First, thank you for

7    allowing me to speak by Zoom, in light of the Court's

8    recent rule changes.

9                  So, you Honor --

10                 THE COURT:  You're missing a big party here,

11   Mr. Feinstein.

12                 Go ahead.

13                 MR. FEINSTEIN:  So, as has been noted,

14   your Honor, Monster did not object to the retention, but

15   we are signaling that we will object to any request for

16   fees in pursuit of these Florida litigations, because

17   they're meritless, they're vexatious.

18                 THE COURT:  But that's not -- I don't want

19   to cut you off, but that's not for today, right?

20                 MR. FEINSTEIN:  I understand that,

21   your Honor, but I do want to at least make a couple of

22   quick points about why it's so meritless.  There was a

23   2019 lawsuit that was dormant for three years, and

24   effectively closed, and this was brought in 2022, and as

25   counsel noted, there is a motion to dismiss the complaint,

Page 83

1    followed by another complaint, and then a sanctions

2    motion.

3                So, we think the sanctions motion is

4    something we should bring to the attention of the Court,

5    which is why we spelled it out in our pleading, and I

6    guess I'll say this, your Honor, to the extent that the

7    debtors' boards' business judgment is informed by counsel,

8    by Mr. Levine, that they should consider the conduct of

9    that litigation, and consider the source, and the other

10   thing I'll say to Mr. DiDonato and the board, your Honor,

11   is there is no in terrorem effect in this lawsuit

12   vis-a-vis Monster.

13               Monster has judgments totalling now nearly a

14   half a billion dollars.  This is a garbage lawsuit that

15   was brought for retaliatory reasons, and it's vexatious.

16   It's not going to move the needle in any effort to resolve

17   matters between Monster the VPX, ever.

18               So, I'll leave it at that, your Honor.

19               I do have litigation counsel on the line if

20   you have further questions about the underlying

21   litigation --

22               THE COURT:  No.

23               MR. FEINSTEIN:  But we'll stand on that,

24   your Honor.

25               Thank you.

Page 84

```
1                    THE COURT:  All right.  Okay.  I appreciate
2      that.
3                    All right.  So, Mr. Guso, let me just ask
4      you, I assume that if you needed to call Mr. DiDonato or
5      Mr. Levine with respect to this sanctions issue, what
6      would Mr. DiDonato or Mr. Levine say about that?
7                    MR. GUSO:  Mr. Levine, because he's
8      intimately familiar with it, Judge --
9                    THE COURT:  Is he a subject matter of the
10     sanctions?
11                   MR. GUSO:  No.
12                   THE COURT:  Okay.
13                   MR. GUSO:  The initial complaint,
14     your Honor, was filed by one of the in-house lawyers at
15     VPX.  Mr. Levine has sought to amend the complaint.
16                   The order abating the 2022 complaint, filed
17     by VPX in-house originally, your Honor, denies all pending
18     motions, including the sanctions motion.
19                   So, presently there is no sanctions motion
20     pending.  A review of the docket will confirm that.
21                   THE COURT:  But the risk of sanctions, and
22     the fact that the 2019 case has been dormant for as long
23     as it's been dormant, and all of the things that you've
24     heard argued by Mr. Chafetz, as well as Mr. Feinstein, as
25     well as what's in the papers, would Mr. DiDonato testify
```

Page 85

1    that he has considered, and the board has considered all

2    of those factors in deciding whether to proceed?

3                    MR. GUSO:  The board has considered,

4    your Honor, the recommendation of counsel, and has elected

5    to proceed.

6                    THE COURT:  Including all of the -- in

7    consideration of all the things that we've heard here

8    today?

9                    MR. GUSO:  I won't get into what counsel has

10   told the board, your Honor.

11                   THE COURT:  Okay.

12                   MR. GUSO:  That would be, in my view,

13   privileged.

14                   THE COURT:  Fair enough.

15                   MR. GUSO:  But it has considered the advice

16   of counsel.

17                   THE COURT:  Okay.  All right.  So, the Court

18   is going to grant the application, and honestly, and I'm

19   sorry this took so long, but this has been pending for a

20   considerable amount of time, and we needed to get this

21   resolved today.

22                   The parties had reached a -- the extent to

23   which they could have resolved these matters, and at the

24   end of the day, I don't feel the Court is able to replace,

25   or challenge the debtors' business judgment, which by all

Page 86

1    accounts seems to have been an independent determination,

2    independent of whatever influence Mr. Owoc may have on the

3    process, in favor of the option of doing nothing, which

4    the debtor has clearly chosen not to do, for whatever

5    reasons that it chose not to do it.

6              So to me it boils down to the business

7    judgment of the debtor, and I've heard nothing here today,

8    and I understand Mr. Feinstein's comments, you know, I get

9    it, but again, his -- the objection of Monster seems to be

10   really to the fees, and if Mr. Levine is willing to go

11   forward in the face of that very clear anticipated

12   objection to his fees, hallelujah for Mr. Levine.

13             But at the end of the day, I just don't see

14   how I can overcome, or the challenge overcomes the

15   business judgment of the debtors.

16             So, for that reason the motion, or the

17   application is granted, and I'll look forward to

18   receiving --

19             MR. GUSO:  Thank you, your Honor.

20             THE COURT:  -- an order from you.

21             MR. GUSO:  And to the Court's point, I think

22   this is -- the risk here is with Mr. Levine.

23             THE COURT:  You know --

24             MR. GUSO:  He's stepping into --

25             THE COURT:  -- you won, Mr. Guso.

Page 87

1              MR. GUSO:  -- the case --

2              THE COURT:  All right.  So, is there -- is

3    that everything for -- oh, okay, so let's talk about the

4    final matter, and I don't want to spend much time, you

5    know, because we're keeping a lot of people waiting.

6              At the end of the day, let me just get to

7    the motion for protective order.  You know, when did I set

8    this?

9              MR. GUSO:  The 15th, your Honor, and I'm

10   grateful to you --

11             THE COURT:  The 15th.

12             MR. GUSO:  -- for setting it on the

13   15th --

14             THE COURT:  Which is --

15             MR. GUSO:  -- because Ms. Cole's

16   examination --

17             THE COURT:  Is on the 16th.

18             MR. GUSO:  -- is on the 16th.

19             THE COURT:  I didn't set it on the 14th,

20   as you requested, but I think the 15th should be

21   sufficient.

22             MR. GUSO:  Right.

23             THE COURT:  I guess what I'm really wanting

24   to understand is how much time do you think that's going

25   to take?  Are you expecting -- I don't know, I think it's

Page 88

1    non-evidentiary.

2                    MR. GUSO:  It's non-evidentiary, your Honor.

3    It's pure legal argument --

4                    THE COURT:  Okay.

5                    MR. GUSO:  -- as to the two motions.

6                    THE COURT:  And is there any chance of

7    resolving it?

8                    MR. GUSO:  I have not --

9                    MR. FEINSTEIN:  There could be, your Honor,

10   if I could weigh in?  Apologies.

11                   THE COURT:  Sure.

12                   MR. FEINSTEIN:  We've been talking to each

13   other pretty constantly over the last four or five days.

14   We'd like to continue that, and we would try to resolve

15   it before the 15th.  If we can't, then we'll see

16   your Honor.

17                   I do want to note, because the deposition

18   was scheduled for the 16th, that it would be impossible,

19   if the matter were resolved in any manner on the 15th, to

20   actually then receive the documents and prepare for a

21   deposition the next morning.

22                   So we reached out to counsel for the

23   witness about arranging a new date, and counsel has

24   indicated February 28th is a workable date for the

25   witness.

1            So on that basis, you know, like I said,

2    your Honor, we will contact the debtors and continue to

3    try to work this out --

4            THE COURT:  Okay.

5            MR. FEINSTEIN:  -- and if we can't, we'll

6    see you on the 15th, otherwise --

7            THE COURT:  I mean, just as a general

8    matter, in reading the papers and, of course, I haven't

9    heard your response, Mr. Feinstein, yet, and I don't think

10   anything has been filed, of course, but, you know, it

11   seems to me that the corporate governance issue, the

12   circumstances of why this board member resigned may have

13   been overcome by the corporate governance changes, and may

14   not have been overcome by the corporate governance

15   changes, but it seems to me that that general subject

16   matter is not out of bounds.

17           I think beyond that subject matter, though,

18   Mr. Feinstein -- that was addressed to Mr. Guso, but

19   beyond that subject matter, Mr. Feinstein, I was having a

20   hard time understanding why anything else might be

21   relevant.  So just be prepared for that, because I'm not

22   understanding it.

23           I do get the corporate governance issue,

24   and where that might lead, if it has not been resolved

25   by the new appointments, et cetera, but, you know, that

Page 90

1    was just -- I'm sharing my thinking so that you all can

2    have that going into whatever discussions you're going to

3    have.

4                    MR. GUSO:  Yes, sir.

5                    MR. FEINSTEIN:  Your Honor, we'll address

6    this in responsive papers, but Monster didn't seek this

7    deposition to find trade secrets, or formulas, or

8    strategies.

9                    THE COURT:  Well, I got the sense that the

10   debtor just --

11                   MR. FEINSTEIN:  (Inaudible.)

12                   THE COURT:  I got the sense that the debtor

13   was just wanting you to commit to that, so --

14                   MR. FEINSTEIN:  Well --

15                   THE COURT:  -- you know.

16                   MR. FEINSTEIN:  -- it's, I guess, a little

17   more nuanced than that, but like I said, I hope we can

18   work it out, your Honor.

19                   THE COURT:  Me too, because I hate discovery

20   disputes.

21                   MR. FEINSTEIN:  I don't know a judge who

22   enjoys them.

23                   THE COURT:  All right.

24                   MR. FEINSTEIN:  Thank you.

25                   THE COURT:  All right.  So that concludes

Page 91

1    Vital, and we'll see you then on the 15th.

2                    MR. GUSO:  The 15th, yes, sir.  Thank you,

3    Judge.

4                    THE COURT:  Thank you all.

5

6

7

8                    (Thereupon, the hearing was concluded.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 92

1
2
3                        CERTIFICATION
4
5    STATE OF FLORIDA        :
6    COUNTY OF MIAMI-DADE    :
7
8              I, Cheryl L. Jenkins, RPR, RMR, Shorthand
9    Reporter and Notary Public in and for the State of Florida
10   at Large, do hereby certify that the foregoing proceedings
11   were transcribed by me from a digital recording held on
12   the date and from the place as stated in the caption
13   hereto on Page 1 to the best of my ability.
14              WITNESS my hand this 16th day of
15   February, 2023.
16
17
18              _____
19              CHERYL L. JENKINS, RPR, RMR
20              Court Reporter and Notary Public
              in and for the State of Florida at Large
21                Commission #HH 170910
                  December 27, 2025
22
23
24
25