1          UNITED STATES BANKRUPTCY COURT
            SOUTHERN DISTRICT OF FLORIDA
2

3

4    IN RE:                    CASE NO. 22-17842-PDR

5    VITAL PHARMACEUTICALS, INC.,

6              Debtor.
     _____/

7

8                   ECF #773, 775

9               February 15, 2023

10              The above-entitled cause came on for hearing

11   before the Honorable Peter D. Russin, one of the Judges in

12   the UNITED STATES BANKRUPTCY COURT, in and for the

13   SOUTHERN DISTRICT OF FLORIDA, at 299 E. Broward Blvd.,

14   Fort Lauderdale, Broward County, Florida, on February 15,

15   2023, commencing at or about 1:30 p.m., and the following

16   proceedings were had.

17

18

19

20

21

22          Transcribed from a digital recording by:
               Cheryl L. Jenkins, RPR, RMR
23

24

25

Page 2

1
                          APPEARANCES:
2
3                    BERGER SINGERMAN, by
                     SAMUEL CAPUANO, Esquire
4                            and
                     LATHAM & WATKINS, by
5                  AMY QUARTAROLO, Esquire
                   On behalf of the Debtor
6
7
                      SEQUOR LAW, by
8            LEYZA BLANCO, Esquire (via Zoom)
                          and
9              LOWENSTEIN SANDLER, by
             ERIC CHAFETZ, Esquire (via Zoom)
10           RACHEL MAIMIN, Esquire (via Zoom)
                On behalf of the Official
11           Committee of Unsecured Creditors
12
                      AKERMAN, LLP, by
13              MICHAEL GOLDBERG, Esquire
                   EYAL BERGER, Esquire
14            On behalf of Monster Energy
15
      J. STEVEN WILKES, Trial Attorney (via Zoom)
16                Office of the U.S. Trustee
                  Department of Justice
17
18                    ALSO PRESENT
19       ECRO - Electronic Court Reporting Operator
20                - - - - - - -
21
22
23
24
25

```
 1                    THE COURT:  Good afternoon everybody.  Vital
 2   Pharmaceuticals 22-17842.
 3                    Appearances, and we'll start in the
 4   courtroom.
 5                    MR. CAPUANO:  Good afternoon, your Honor.
 6                    THE COURT:  You may either -- you've got to
 7   either push the green button or approach.
 8                    MR. CAPUANO:  Good afternoon, your Honor.
 9   Samuel Capuano, co-counsel for the debtors, at Berger
10   Singerman, with Latham & Watkins.  Here with me today is
11   Amy Quartarolo, from Latham & Watkins.
12                    ECRO:  (Inaudible.)
13                    THE COURT:  Yes, let's do that.
14                    MR. CAPUANO:  C-a-p-u-a-n-o.
15                    MS. QUARTAROLO:  And I won't burden him with
16   spelling my last name.  My last name is spelled Q-u-a --
17                    ECRO:  (Inaudible.)
18                    MS. QUARTAROLO:  That's a good one, too.
19   Amy, A-m-y, last name is Q-u-a-r-t-a-r-o-l-o, with
20   Latham & Watkins.
21                    THE COURT:  Quartarolo.
22                    MS. QUARTAROLO:  Quartarolo.
23                    THE COURT:  Quartarolo.
24                    MS. QUARTAROLO:  Don't look at it, just say
25   it.
```

1          THE COURT:  Yes, Quartarolo, exactly.

2          Mr. Goldberg.

3          MR. GOLDBERG:  Good afternoon, your Honor.

4     Mike Goldberg, with me is Eyal Berger, and we are

5     co-counsel with the Pachulski Stang firm, representing

6     Monster Energy.

7          THE COURT:  Okay.  Welcome.

8          And on Zoom, Ms. Blanco.

9          MS. BLANCO:  Good afternoon, your Honor.

10    Leyza Blanco of Sequor Law, on behalf of the Official

11    Committee of Unsecured Creditors.

12         Also joining me is our co-counsel from

13    Lowenstein Sandler, Eric Chafetz and Rachel Maimin.

14         THE COURT:  Thank you.  Welcome.

15         And that's it, right?  Anyone else wish to

16    make an appearance.  Mr. Wilkes.

17         MR. WILKES:  Your Honor, apologies for the

18    delay.  J. Steven Wilkes for the United States Trustee,

19    Region 21.

20         THE COURT:  All right.  Any other

21    appearances?

22         (No verbal response.)

23         THE COURT:  Okay.  So, two motions for

24    protective order, Docket Entry 773 and 775.  Who will be

25    arguing?

1                    All right.  Ms. Quart -- Quartarolo -- what?

2                    MS. QUARTAROLO:  Quartarolo.

3                    THE COURT:  Quartarolo.

4                    MS. QUARTAROLO:  There you go.

5                    THE COURT:  Quartarolo, right, you've got to

6    sort of be quick about it --

7                    MS. QUARTAROLO:  Right.

8                    THE COURT:  -- because you get stuck --

9                    MS. QUARTAROLO:  The faster you say it --

10                   THE COURT:  -- in the middle.

11                   MS. QUARTAROLO:  -- the easier it is.

12                   THE COURT:  Yeah.  Quartarolo.  All right.

13   Ms. Quartarolo.

14                   MS. QUARTAROLO:  Good afternoon, your Honor.

15   For the record, Amy Quartarolo, of Latham & Watkins, on

16   behalf of the debtors.

17                   First, I want to thank your Honor for making

18   time to hear these discovery matters on an expedited

19   basis.

20                   We are here, as you know, on two motions for

21   protective order, one related to a, I would say a

22   confidentiality and protective order to govern discovery

23   in the case.

24                   If it is okay with your Honor, I'd like to

25   take that first, because I think that we have a proposed

1   resolution there.

2               THE COURT:  I would never stand in the way

3   of that.

4               MS. QUARTAROLO:  Excellent.

5               So just for the record, that is Docket

6   Number 775.  We filed the motion because we understood

7   that there was an outstanding issue that Monster had

8   specifically with regard to the language that we included

9   about usage of discovery in these Chapter 11 cases and

10  other matters, and Monster did not file an objection to

11  our motion.

12              I conferred with Mr. Goldberg prior to the

13  hearing today, and based on those discussions, we

14  understand that they're no longer pressing that issue at

15  this time, and that they are --

16              THE COURT:  So the proposed confidentiality

17  order that you submitted had acceptable language in it?

18              MS. QUARTAROLO:  That they are not pressing

19  that issue, or objecting to entry of an order that

20  contains that language.  You know, just for the record,

21  that language is important to the debtors because we

22  believe it provides appropriate guardrails in terms of

23  what discovery in these Chapter 11 cases it is to be used

24  for, and so we would ask that the protective order be

25  entered, including that language.

1                    What I do think needs to happen, including

2       because we left certain cross-reference -- paragraph

3       cross-references, is --

4                         THE COURT:  Yeah, I got a little confused in

5       the middle there, because there was one reference to a

6       paragraph, the persons described in Paragraph X, and I

7       don't know what the paragraph is --

8                         MS. QUARTAROLO:  Right, and I think --

9                         THE COURT:  -- or who those persons are, and

10      I have a couple of other little questions, but just in my

11      role in resolving disputes going forward, but anyway, go

12      ahead.

13                        MS. QUARTAROLO:  Yes, and happy to walk

14      through any of those changes.

15                    I have written down what I think those

16      paragraph references should be.  We just wanted to

17      preserve some optionality in case things moved around.

18                        THE COURT:  Okay.

19                        MS. QUARTAROLO:  And there is one additional

20      language change, or addition that the committee wanted,

21      and we're fine with.  So --

22                        THE COURT:  Which you're going to go through

23      with me or --

24                        MS. QUARTAROLO:  So, I'm happy to do a --

25                        THE COURT:  Okay.

Page 8

```
 1                MS. QUARTAROLO:  -- page turn and walk
 2   though that with you.
 3                THE COURT:  All right.  Well, first, let's
 4   hear from Mr. Goldberg to see if what Ms. Quartarolo says
 5   is accurate.
 6                MR. GOLDBERG:  Yes, your Honor, that's
 7   accurate.  At this point in time Monster has made a
 8   determination that we don't have to fight the battle and
 9   waste the Court's time.  If something arises later that we
10   believe is a smoking gun, and we want to use it elsewhere,
11   we'll bring it back to the Court, but we are willing to
12   abide by a protective order at this time.
13                THE COURT:  All right, and the language is
14   acceptable as stated?
15                MR. GOLDBERG:  Well, I haven't seen the
16   revisions, your Honor, so I'd ask --
17                THE COURT:  Okay.
18                MR. GOLDBERG:  And my counsel has not, so I
19   would ask if perhaps after this hearing the full proposed
20   order can be submitted, and myself and my co-counsel can
21   go through it, and then sign off on it.
22                THE COURT:  I think that's appropriate.  The
23   only issue that I always fear, after a hearing is over,
24   and you're starting to review language in the proposed
25   order, is that you still have a disagreement, and then we
```

1    end up back here again.

2                    MR. GOLDBERG:  Your Honor, I don't think

3    that's going to be an issue.

4                    THE COURT:  Okay.

5                    MR. GOLDBERG:  I really don't.

6                    THE COURT:  All right.  Terrific.

7                    MR. GOLDBERG:  Thank you.

8                    MS. QUARTAROLO:  So, I guess --

9                    THE COURT:  So let me ask a couple --

10                   MS. QUARTAROLO:  Yes.

11                   THE COURT:  -- of questions first.

12                   MS. QUARTAROLO:  Absolutely.

13                   THE COURT:  And, again, this involves my

14   role in resolving disputes going forward.  There is one

15   part that discusses discovery material produced formally

16   or informally as part of these Chapter 11 cases may be

17   used only in connection with these Chapter 11 cases.

18                   MS. QUARTAROLO:  That's Paragraph 2,

19   your Honor.

20                   THE COURT:  I don't know the paragraph

21   number --

22                   MS. QUARTAROLO:  That's okay.

23                   THE COURT:  -- I'm sorry.

24                   MS. QUARTAROLO:  Okay.  I believe that's

25   Paragraph 2.

1              THE COURT:  But so if, as Mr. Goldberg

2    stated a moment ago, he finds some smoking gun and he

3    wants to use it in some other court, what's the

4    anticipated process there?

5              MS. QUARTAROLO:  Well, I think they would

6    need to bring that, they could bring it to us informally,

7    and we could, obviously, consensually agree that

8    information could be used outside of the scope of the

9    order.  I think the protective order provides that

10   anyways.

11             THE COURT:  Oh, it does?  All right.

12   Because the language I was thinking about was that --

13   again, you're right, consistent with what I was thinking

14   was that Mr. Goldberg, or his client would submit the

15   information to you all, ask to use it, describe in what

16   context, I guess if they think they can disclose that,

17   it's up to them.  You would either decide yes or no, and

18   if the answer is, no, and Mr. Goldberg's client wants to

19   press the issue, they file a motion before me for relief

20   from the confidentiality order or protective order?

21             MS. QUARTAROLO:  I think that's exactly -- I

22   mean, stylistically, however that motion would be titled,

23   I think that that's what we would envision if the parties

24   couldn't work something out themselves, that that would

25   come before your Honor.

Page 11

```
 1                    THE COURT:  And 10 years from now, when this
 2       case is long closed, but you all are still litigating with
 3       each other, God forbid, and that happens, I'm not -- there
 4       is no expectation I would retain jurisdiction to deal with
 5       that, or is there?
 6                    MS. QUARTAROLO:  You know, that's --
 7                    THE COURT:  I'm using an extreme example,
 8       but --
 9                    MS. QUARTAROLO:  Yeah.
10                    THE COURT:  -- you know, I just want to make
11       sure I understand what the Court is getting into here.
12                    MS. QUARTAROLO:  So, I think that's a -- I
13       don't know exactly the language in here, and I can look
14       for it, that deals with jurisdiction, or if there is any.
15                    THE COURT:  Just make sure it ends when
16       jurisdiction over this case ends.
17                    MS. QUARTAROLO:  Yes, and that's actually
18       where I was going, was I think that that could be dealt
19       with if there is, you know, a case closure order at some
20       point.
21                    THE COURT:  Yeah.
22                    MS. QUARTAROLO:  And that would provide the
23       parameters of any continuing jurisdiction beyond that
24       date.
25                    THE COURT:  Okay.  All right.  So that was
```

1    one issue.

2                   The other issue I had was that there was a

3    reference to submitting a letter to the Court objecting to

4    the designation, and seeking its removal.

5                   We don't do things by letter here.

6                   MS. QUARTAROLO:  Would you prefer that to be

7    replaced --

8                   THE COURT:  I just wanted to point that out.

9                   MS. QUARTAROLO:  -- with a motion?

10                   THE COURT:  It would be by motion --

11                   MS. QUARTAROLO:  Yeah.

12                   THE COURT:  -- yeah.

13                   MS. QUARTAROLO:  We can --

14                   THE COURT:  So just make that change.  I

15   guess that comes from, I guess, New York, you all do

16   things by letter?

17                   MS. QUARTAROLO:  I'm not from New York.

18                   THE COURT:  Oh, where are you from?  I'm

19   sorry.

20                   MS. QUARTAROLO:  Los Angeles.

21                   THE COURT:  Oh, from Los Angeles.

22                   MS. QUARTAROLO:  But --

23                   THE COURT:  Are things done by letter in

24   Los Angeles?

25                   MS. QUARTAROLO:  -- you know, some courts

1   do, some courts don't, but I obviously want to respect

2   your Honor's procedures.

3                   THE COURT:  Yes, I mean, I think the notion

4   of doing things by letter has never really been accepted

5   here, because it's not public record, and it gets awkward

6   when you receive direct letters.  It may not be an

7   ex parte communication, just because you may serve the

8   other side, but it's still not on the docket, and then we

9   have to go through a process to put it on the docket.  So,

10  it's just better to file motions.

11                  MS. QUARTAROLO:  No, that's fine, we will do

12  as your Honor would like, and happy to replace letter with

13  motion.

14                  THE COURT:  Okay.  Great.

15                  All right.  Well, that's all I had, and I

16  think you wanted to follow up with what the committee

17  language may have been.

18                  MS. QUARTAROLO:  Yes, and I think just --

19  and I'm sure Mr. Chafetz will correct me if I get this

20  wrong, but it's in Paragraph 1, about halfway down, there

21  is a parenthetical that currently says, including by an

22  estate representative, and it continues with the list, and

23  they want the official committee of unsecured creditors to

24  be added to that list so that it is clear that it can be

25  -- if there is any contested motions, adversary

1  proceedings, that they are permitted, explicitly

2  permitted --

3              THE COURT:  Okay.

4              MS. QUARTAROLO:  -- which we don't have any

5  issue with.

6              THE COURT:  Mr. Chafetz, is that right?

7              MR. CHAFETZ:  Yes, your Honor.  Eric Chafetz

8  appearing on behalf of the Official Committee of Unsecured

9  Creditors.

10              Yep, that's an accurate recitation of what

11  our agreement is.

12              THE COURT:  So that's on Page 3 of the

13  order.  Is that right, Page 3?

14              MS. QUARTAROLO:  Correct, about halfway down

15  Paragraph 1, in the parenthetical that says -- it starts,

16  "including by".

17              THE COURT:  Ah, the estate representatives,

18  successor to one or more of the estates, including but not

19  limited to liquidating trustee, liquidating -- well, it

20  says a liquidating trustee, liquidation trustee, I'm not

21  sure what the difference between those two things is, plan

22  administrator, or other similarly situated fiduciary, and

23  the committee, essentially.

24              MS. QUARTAROLO:  It will either be inserted

25  at the beginning of that list, or at the end, but I'm sure

1    we'll get there.

2                    THE COURT:  All right.

3                    MS. QUARTAROLO:  So what we would propose

4    doing is, with the limited comments that your Honor has

5    given, those comments from the committee, and the internal

6    paragraph references, we would distribute a proposed final

7    order to all of the parties with whom we were dealing with

8    in the first instance.  Assuming we get sign-off promptly,

9    we will submit it, work it out to submit that to

10   your Honor for signature.

11                   THE COURT:  All right.  Great.

12                   MS. QUARTAROLO:  Okay.  Thank you.

13                   THE COURT:  So that covers that.

14                   MS. QUARTAROLO:  So that covers that.

15                   THE COURT:  773 now.

16                   MS. QUARTAROLO:  Yes.  So, this is a motion

17   for protective order in connection with Rule 2004

18   discovery directed to Kathleen Cole.

19                   As I believe the Court is aware, Ms. Cole is

20   the former chief operating officer of the debtors.  She

21   served in that position for approximately seven weeks,

22   until she departed the company on December 1st of 2022.

23                   Monster initially sought to take discovery

24   of Ms. Cole pursuant to Rule 2004, and that notice was

25   served initially in mid-December.  There were several

1    follow-on notices from other parties that wanted to make

2    sure that they were included.

3                    It was our understanding, we weren't

4    involved in the discussions, but our understanding based

5    on what was posted on the docket, that that examination

6    was put off twice.

7                    So initially it was noticed, December 14th

8    was the initial filing, then it was continued twice, and

9    at the time that we filed our motion, it was scheduled for

10   February 16th, which is tomorrow.

11                   My understanding, based on --

12                   THE COURT:  You all agreed to move it a

13   week, I think --

14                   MS. QUARTAROLO:  Correct, you got it.

15                   THE COURT:  -- to give you a little bit more

16   time.

17                   MS. QUARTAROLO:  Yes, so now it's

18   February 28th.

19                   As we explained in our motion, we reached

20   out to Ms. Cole's counsel, when she retained counsel, and

21   we wanted to make sure that the debtors' privilege was

22   maintained over anything that she might have in her

23   possession.  So we worked with Ms. Cole's counsel once

24   they had gathered documents.

25                   And, you know, I understand the position

1    that she is in, and that frankly her counsel is in, which

2    is, there is -- the documents are what they are, and they

3    don't want to be in a position where they're failing to

4    produce documents, and so --

5                    THE COURT:  But they don't want to disclose

6    privileged information --

7                    MS. QUARTAROLO:  Right.

8                    THE COURT:  -- right?

9                    MS. QUARTAROLO:  And I think they feel, I

10    don't want to speak for them, but I think they feel

11    uncomfortable with making calls about what information is

12    or isn't confidential or privileged.

13                    THE COURT:  And they shouldn't.

14                    MS. QUARTAROLO:  Right.

15                    THE COURT:  They should submit that to those

16    that own the privilege.

17                    MS. QUARTAROLO:  Right, and so that's

18    exactly what we did, and we worked with them in the first

19    instance, and then when we saw that there was information

20    in what she had taken with her from the company, that --

21    you know, and this is subject to an NDA, and it's broader

22    than just privilege concerns, from the debtors'

23    perspective, and so we initially raised those concerns

24    informally with Monster, and ultimately were unable to

25    work them out, and to have a clarified or refined scope of

1    the 2004 request, and so we were forced to bring the

2    motion.

3                    Since the motion was brought, I understand

4    that your Honor -- I wasn't at the hearing last Thursday,

5    but I understand that your Honor made some informal

6    comments on the record.  I don't know if that prompted

7    Monster to reach out to us.

8                    THE COURT:  It was as simple as, it seems to

9    me the reasons why Ms. Cole left, and the corporate

10   governance issues that might be attendant to those

11   reasons, are probably fair game, and I questioned

12   Monster's counsel with respect to the fact that if they

13   agree that the scope is limited to those types of issues,

14   why are we having the motion for protective order?

15                    They generally agreed, and then I think

16   hopefully something happened after that, where maybe you

17   all got a little closer.

18                    MS. QUARTAROLO:  So, the answer is, yes, I

19   think we're closer.

20                    So, we met and conferred last Friday, and

21   over the weekend, and while they initially had articulated

22   the terms of her employment, and the reasons for her

23   departure, both from the board and from the company, as

24   the stated purpose of the 2004 Exam, and we came to a

25   ground agreement on those topics.

Page 19

1                However, I think what they don't get quite
2  right in their opposition, is that they say that we've
3  added add -- tried to add additional language excluding
4  confidentiality, excluding confidential information, and I
5  don't think that that's exactly right, because --
6                THE COURT:  I'm not even sure what that
7  means.
8                MS. QUARTAROLO:  Right.
9                THE COURT:  Meaning whatever is within the
10  agreed upon scope, if that information is also
11  confidential, it's out of the scope?
12                MS. QUARTAROLO:  So, that was not our
13  intent, and let me --
14                THE COURT:  Ah, okay, but that was the
15  interpretation.
16                MS. QUARTAROLO:  I think that's where --
17                THE COURT:  Okay.
18                MS. QUARTAROLO:  -- we have a bit of a
19  disagreement.
20                So, the specific categories that they wanted
21  added are corporate governance, I would say generally,
22  just corporate governance, and misconduct or
23  mismanagement, and --
24                THE COURT:  Well, I have it as the debtors'
25  hiring of Ms. Cole, the terms of Ms. Cole's employment

1    with the debtors, the duties of Ms. Cole's employment with

2    the debtors, the corporate governance of the debtors, the

3    conduct by the debtors that Ms. Cole considers to be

4    misconduct for -- by or mismanagement of the debtors, any

5    complaints or allegations of misconduct by or

6    mismanagement of the debtors, and the succession of

7    Ms. Cole's employment with the debtors, including the

8    reasons for the succession of Ms. Cole's employment,

9    that's what I understood you all sort of got to.

10                   MS. QUARTAROLO:  Well, no.

11                   THE COURT:  Or they agreed would be the

12    scope.

13                   MS. QUARTAROLO:  That was their proposal,

14    and the concern that we expressed in response to that

15    proposal is the additional categories they added, which

16    are corporate governance, and misconduct/mismanagement.

17    Those -- I think it's broken into three categories, but

18    that's generally where they sit.

19                   The problem is that those are quite broad,

20    and open to interpretation, and we don't want to have them

21    backdoor in the reason -- information that initially

22    motivated our filing of the motion for protective order,

23    which is Monster is a competitor, so I think things are

24    differently situated, and we're in -- the debtors are in

25    the midst of a marketing and sale process, and so what we

1    tried to work on with them, was to see if there could be

2    some added language clarifying that things like pricing,

3    sales information, confidential business strategy, those

4    things would be --

5                    THE COURT:  Ah, so if the mismanagement

6    issue relates to pricing and things that go to the heart

7    of the business itself, as opposed to -- or the operations

8    of the business itself, as opposed to the corporate

9    governance issue, then you're concerned that that's

10   outside, at least, the initial intended scope?

11                   MS. QUARTAROLO:  Yes, and, you know, even

12   jumping to corporate governance, corporate governance

13   could be interpreted quite broadly, and --

14                   THE COURT:  Well, just so you know, the way

15   I interpret it, and maybe I'm wrong, you know, is that

16   it's basically how decisions are made.

17                   MS. QUARTAROLO:  And I have no --

18                   THE COURT:  I mean --

19                   MS. QUARTAROLO:  This is where I have a bit

20   of a distinction that I feel like I need to draw between

21   documents and testimony.

22                   I think these issues are not going to be an

23   issue when it comes to testimony, because they are going

24   to be able to ask her, without limitation, whether she

25   thought something was misconduct, whether she thought

1    something was mismanagement, whether she had any issues

2    with corporate governance structure or changes.

3              I can tell you, to the extent they're using

4    this, which they have represented to us, to determine

5    whether a trustee motion would be appropriate, I don't

6    understand how anything Ms. Cole could have to say about

7    corporate governance is relevant to a trustee motion at

8    this point in time because --

9              THE COURT:  Well, that's not for any of us

10   to decide at this point because we don't know what it is,

11   but --

12             MS. QUARTAROLO:  Understood, but she's now

13   been gone from the company longer than she was at the

14   company, and the company has undertaken a wholesale

15   restructuring of its corporate governance, and --

16             THE COURT:  Well, that would be your defense

17   to such a motion, it seems to me, and I'm not encouraging

18   a motion.  I'm only saying that I think we're flying a

19   little blind here, because we don't know what Ms. Cole

20   would say, and we don't know whether what she would say

21   would be supportive of any kind of relief that might be

22   sought by any party, including Monster.  So, I'm not sure

23   how we can be prophylactic about this, because it's sort

24   of an open subject.

25             MS. QUARTAROLO:  And that's where -- that's,

Page 23

1    I guess I'm coming back to my distinction between

2    documents and testimony, because I think it's easy enough

3    to navigate around issues about specific sales figures,

4    specific pricing, when you're talking about testimony.

5              I have an issue with it when you're talking

6    about documents because the fact of the matter --

7              THE COURT:  The reason testimony is

8    different is because you can just, you can just mark that

9    part of the transcript and keep it confidential from third

10   parties hearing it, or what --

11             MS. QUARTAROLO:  Well --

12             THE COURT:  Why is it different?

13             MS. QUARTAROLO:  Because I think that

14   confidentiality is easier to navigate in terms of

15   testimony.  I also think that when you're talking about

16   testimony, and you're asking questions, it comes out in

17   more general terms, and she is unlikely to testify as to,

18   yes, this was the specific pricing that we charge, or this

19   was the margin, or these are the five vendors that I used,

20   whereas the reason behind the motion is Ms. Cole was only

21   at the company for seven weeks.  She took copious notes of

22   meetings during those times, and not surprisingly, you

23   know, the meetings that a chief operating officer would

24   have precisely the types of information that we're

25   concerned with getting out, both to Monster, as a

1   competitor, regardless of confidentiality issues, and more

2   broadly, coming back to the fact that we're undertaking,

3   and are currently in the midst of a marketing and sale

4   process.

5             And so because those topics, I don't think

6   go to the heart of the reason and the stated purpose for

7   the examination, we wanted it to be clear, and that's why

8   we proposed, like, for the avoidance of doubt, you know,

9   they're not seeking, and even if we want to limit it to

10  documents, but I think it is relevant, you know, it could

11  be relevant to both, that they're not seeking, you know,

12  pricing, sales information, that type of information that

13  is exactly sort of the heightened concern we have, both

14  with regard to the party that's requesting it, and with

15  regard to the fact that the circumstances, you know, under

16  which the debtor finds itself in terms of the sale

17  process.

18            So if they want to proceed --

19            THE COURT:  Did you propose language?

20            MS. QUARTAROLO:  I did.

21            THE COURT:  And what was the response?

22            MS. QUARTAROLO:  No, and I --

23            THE COURT:  Okay, and have I seen that

24  proposed language?

25            MS. QUARTAROLO:  It is in -- if you look at

Page 25

1    their opposition, which is Docket 792 --

2              THE COURT:  Hold on one second, I have to go

3    through a little process here.  Let me pull up the

4    document.  What docket entry?

5              MS. QUARTAROLO:  792.

6              THE COURT:  792.

7              MS. QUARTAROLO:  And then Exhibit 2 to their

8    opposition is an email exchange, and I can point you to

9    the precise language.

10             THE COURT:  All right.  Point me to the --

11             MS. QUARTAROLO:  Okay.  So on Page 13 of 15

12   on the PDF --

13             THE COURT:  Yep.

14             MS. QUARTAROLO:  -- the email that is from

15   me, in the middle of the page, dated Saturday,

16   February 11th at 10:18 a.m.

17             THE COURT:  Glad to see you're working on

18   weekends, yep.

19             MS. QUARTAROLO:  Trying to narrow the

20   issues, your Honor.

21             So there is --

22             THE COURT:  The avoidance of doubt language?

23             MS. QUARTAROLO:  Yes.

24             THE COURT:  Okay.

25             MS. QUARTAROLO:  And Monster's counsel came

Page 26

1   back and said that that language was not acceptable.  We

2   said, you know, we have this concern, if there is some

3   alternate language that you would be more comfortable

4   with, please propose it, and they did not do so.

5               THE COURT:  I see.  Okay.  All right, but

6   you are prepared to live with that as part of a protective

7   order, along with the scope that I described earlier, that

8   I'd understood the start of the discussions to be, that,

9   plus your language, avoidance of doubt, would solve the

10  issue?

11              MS. QUARTAROLO:  Yes, your Honor.

12              THE COURT:  Okay.  All right.  Mr. Goldberg,

13  let me ask you first to tell me what it is you're really

14  looking for.  What is it, what is it that's within that

15  description of the information that I read earlier --

16  first tell me that's accurate, that's an accurate

17  description of the scope that Monster is looking for.

18              MR. GOLDBERG:  Yes, in our opposition

19  papers?

20              THE COURT:  Yes.

21              MR. GOLDBERG:  Yes.

22              THE COURT:  Well, the debtors' hiring of

23  Ms. Cole, the terms of employment, employment with the

24  debtors, corporate governance, conduct of the debtors that

25  she thought might be misconduct or mismanagement of the

1    debtors, any complaints or allegations of misconduct,

2    et cetera, that paragraph.

3                    MR. GOLDBERG:  That scope is accurate,

4    your Honor.

5                    THE COURT:  Okay.  So if that's accurate,

6    where is it within that scope that pricing, sales, and

7    distribution information, and business strategy would be

8    relevant?

9                    MR. GOLDBERG:  Your Honor, and I don't mean

10   -- I'm not avoiding your question, but I'm going to get

11   there, if I could just tell you how we got here, and then

12   you'll understand a little bit more.

13                   THE COURT:  Okay.  I didn't mean to skip --

14                   MR. GOLDBERG:  No problem.

15                   THE COURT:  -- your argument.  I'm just

16   trying to get to the heart of it.

17                   MR. GOLDBERG:  I know you are, but I only

18   have about two minutes of --

19                   THE COURT:  Okay.

20                   MR. GOLDBERG:  -- how we got here and

21   framing the issue.

22                   You know, in preparing for this, and I

23   apologize, I think the Court knows me for many years, and

24   knows that I don't typically take up time, wasting court

25   time with discovery issues.

1                    THE COURT:  No, no, no.

2                    MR. GOLDBERG:  In fact, I was thinking the

3    last time I was involved in a discovery dispute, I was

4    arguing against Danny Bakst, in front of Judge Hyman in

5    Fort Lauderdale, that's how long ago it was.

6                    THE COURT:  Ms. Quartarolo, Danny Bakst was

7    a fixture in this community.  He was a trustee, he was a

8    lawyer for a trustee -- for himself and other trustees,

9    and he used to -- you'd go to West Palm Beach, and this

10   was back in 1990, '89, probably before that, because

11   that's when I became a lawyer, so, you know, I don't know

12   before that, but you'd go to West Palm Beach, and

13   Mr. Bakst would have his own table, it was literally his

14   table in a courtroom, it was a little tiny courtroom, with

15   a really ugly yellow rug, but he'd have this big table,

16   sort of like that table right there, and he would have all

17   of his cases, and these piles of paper, and Judge Britton

18   would basically start the proceedings, leave the

19   courtroom, go back into his Chambers, and say let me know,

20   Mr. Bakst, when you need me.  Okay.  That was Mr. Bakst.

21   He was a force to be reckoned with.

22                    MR. GOLDBERG:  You and I --

23                    THE COURT:  Mr. Goldberg's point is that

24   that was so long ago that, you know, he doesn't, I guess,

25   get involved in discovery disputes.  He lets other lawyers

1    at his firm do that.

2                    But, anyway, go ahead, Mr. Goldberg.

3                    MR. GOLDBERG:  Exactly.

4                    I think it's important to understand how

5    Monster is here today and its position, your Honor.  I

6    know you know this, but it just bears repeating.

7                    We are the largest creditor in this case.

8    We're owed well north of 400 million.  Based on a jury

9    decision that found willful and deliberate violations of

10   the Lanham Act, willful and deliberate, and they hit not

11   just Vital, but they hit Mr. Owoc for $271 million,

12   personally.  Okay.  So we're here with a little bit of

13   history, which is important to frame the issues, and we

14   will be --

15                   THE COURT:  Except that judgment doesn't

16   give you access to their pricing, sales, and

17   distribution information.

18                   MR. GOLDBERG:  Well, I'm going to get there,

19   your Honor, I'm going to get there.

20                   And Monster will be the creditor that's most

21   affected in this case, whether it's successful or not,

22   because we're not secured, and we have the largest claim,

23   although all the creditors will be affected, and

24   basically, your Honor, we believe where there is smoke,

25   there may be fire, and shortly after this case commenced,

Page 30

1    Mr. Feinstein received an email, an anonymous email, we

2    discounted it tremendously, saying that the CEO -- the COO

3    was about to be ousted, and the debtor was in the process

4    of fabricating and falsifying documents, and emails, and

5    manipulating forecasts, and sales numbers, and we have the

6    email, and we can present it to the Court.  It's

7    anonymous.

8              We took it, we looked at it, we let the

9    committee know about it, but in the end we stuck it in a

10   drawer because it was anonymous, and nobody -- if somebody

11   was not willing to put their name on it, it was something

12   that we were not going to go to bat on.

13             THE COURT:  Very clear from the record --

14   for the record, I'm giving that zero weight, zero.

15             MR. GOLDBERG:  I understand.

16             THE COURT:  It's not evidence, it's

17   meaningless to me.

18             MR. GOLDBERG:  I understand, but after that,

19   pretty soon after that Ms. Cole resigned, and in a pretty

20   extraordinary resignation letter, she basically -- not

21   basically, she says that she cannot follow the directives

22   being given to her without breaching her fiduciary duty.

23   This is a very reputable person, who was COO, and under

24   the proverbial tent of this company, basically saying --

25   or not basically -- saying, I can't follow the corporate

Page 31

```
 1    directives without breaching my fiduciary duty and,
 2    therefore, I'm resigning, and the excerpts of that, you
 3    can see we have on Page 3 to 4 of our opposition.
 4                So at this point, the anonymous letter that
 5    we discounted -- but the actual fact that Ms. Cole's
 6    letter, which is very powerful, and very un-normal in a
 7    resignation letter, led us to believe that we needed to
 8    investigate.
 9                So, we issued a 2004 Examination to
10    Ms. Cole, and we're told she had 320 pages of documents
11    responsive to our request of notes, and over the -- we
12    notified it, the debtor --
13                THE COURT:  Well, let me go back for a
14    second, though.  You made a statement that I'm not sure is
15    completely accurate, unless I'm --
16                MR. GOLDBERG:  The last line of that
17    excerpt, your Honor.
18                THE COURT:  Well, what it says is, given
19    your recent changes in removing my authority to make
20    decisions, and lead -- and led my position of chief
21    operating officer and as board member, I am unable to
22    fulfill my fiduciary responsibilities, that to me suggests
23    that she just --
24                MR. GOLDBERG:  Continuing on, your Honor --
25                THE COURT:  She just didn't have the power.
```

Page 32

1            Okay.  I'm just going sort of, you know,

2    paragraph by paragraph, or line by line.

3            Therefore, with a heavy heart I must resign

4    from my positions as COO/board member effective

5    immediately.  As part of the governance process and my

6    fiduciary responsibilities, I must maintain duty of care,

7    duty of loyalty, and duty of obedience.  I am unable to

8    perform these responsibilities given the recent

9    directives.

10           So, I guess you can read that, in terms of

11   directives, potentially as meaning --

12           MR. GOLDBERG:  Your Honor, that's exactly

13   how --

14           THE COURT:  -- directed to do something that

15   -- to breach her duty, you could read it that way, I

16   suppose.

17           MR. GOLDBERG:  That's exactly how I read it,

18   your Honor.  I mean, I'm --

19           THE COURT:  I'm not saying that's what she

20   meant, but I guess you could read it that way.  All right.

21   Well --

22           MR. GOLDBERG:  But it's enough to

23   investigate.

24           THE COURT:  Yeah, yeah.  No, I understand.

25           MR. GOLDBERG:  It raises the issue.  So we

```
 1    issued the 2004 Examination, and we were working with the
 2    debtor, and in trying to get a resolution, we reached one
 3    resolution on one motion today, but the debtor, as
 4    Ms. Quartarolo, and I hope I pronounced that right,
 5    intended to, wanted to, and insisted that we put language
 6    in her email, and I appreciate her pointing it out, the,
 7    quote, for the avoidance of doubt, the debtors'
 8    confidential and proprietary business information,
 9    including, but not limited to, pricing, sales information,
10    distribution information, and business strategy is not
11    subject to this subpoena.  Therefore, this limitation that
12    they're trying to unilaterally put in, that is nowhere in
13    2004, which gives us the right to investigate the conduct,
14    allows them to unilaterally say, oh, you know, this is a
15    strategy issue, or this is a, you know, business issue.
16                    Your Honor, I'll be very clear, we don't
17    care about pricing information, we don't care about
18    strategy, business strategy or anything, but when we do
19    care about it, is when it's involving misconduct, and by
20    them inserting this in here, and they are allowed -- so,
21    for instance, let's say the business strategy that
22    Ms. Cole resigned over was something to continue false
23    advertising, and building up admin claims in the case, and
24    torts, or anticompetitive pricing or something, something
25    that fits within their category, but it's wrongful
```

Page 34

1  conduct, there is nothing under 2004, or anything that
2  unilaterally gives them the right to say we're withholding
3  that, and be the sole arbiter of that, and be the one to
4  declare that and say, hey, we're withholding that.
5            Now, we were using pretty early, early on in
6  this hearing the term "privilege" and "confidential" very
7  loosely, combining.  They're different things, as the
8  Court is aware.
9            THE COURT:  No, they're -- I wasn't using
10 them --
11            MR. GOLDBERG:  Not you, not you, counsel
12 was.
13            THE COURT:  Okay.
14            MR. GOLDBERG:  We don't want privileged
15 information.  If there is privileged information,
16 attorney/client, we're not seeking that.  We don't care
17 about pricing.  They can withhold all the pricing
18 documents, and all the secret formula documents they want,
19 but when that's combined, and shows wrongdoing on behalf
20 of this debtor, if it is combined, and shows wrongdoing on
21 behalf of this debtor, we're entitled to that.  There is
22 nothing in the rule, or anything that says they can
23 unilaterally decide to say I'm withholding that.
24            THE COURT:  All right.  So how do you, how
25 do you propose then -- well, let me be clear about a

Page 35

1    couple of things.  First, I do believe that creditors,

2    interested parties, have a right to broad 2004 discovery,

3    I don't think anyone here would disagree with that, or on

4    Zoom, and I think the law is fairly clear, some have

5    described it literally as a potential fishing expedition.

6              So, I think this is being conducted as less

7    than a fishing expedition.  I think that you're seeking

8    documents that have been made -- or seeking information

9    that has been made relevant to this case by virtue of the

10   corporate governance issues that have floated around the

11   case, none of which I really know directly about, but

12   corporate governance seems to have been an issue.  It's an

13   issue that the lender pointed out.  It was certainly a

14   condition to the DIP financing.  It's certainly an issue,

15   or it's been made to be a potential issue with respect to

16   Mr. Owoc's involvement versus the independent directors.

17   So all of these things, none of this is new, it's out

18   there.

19             Okay.  I also can see that when a board

20   member resigns, and the COO resigns under the

21   circumstances described in her letter, which are somewhat

22   vague, but understandably would want to be investigated,

23   that that presents a fair ground of discovery under

24   Rule 2004.  Again, I don't think I'm saying anything that

25   anyone disagrees with.

```
 1                    By the same token, I agree with debtors'
 2     counsel that there is clearly information that a
 3     competitor should not have, and that is, you know,
 4     trade-type secrets that aren't available, and should be
 5     kept confidential, and should not be disclosed to a
 6     competitor like Monster.
 7                    So, I guess the question really to me is one
 8     more of process than anything else.
 9                    MR. GOLDBERG:  I have suggestions.
10                    THE COURT:  Great.  What's your suggestion?
11                    MR. GOLDBERG:  Well, the first thing is if
12     you look in our opposition, at the revised requests, we
13     tailored that to Ms. Cole, basically saying that she
14     should produce the documents that she considers to
15     evidence the misconduct.  So, if she has pricing
16     information that she doesn't think -- in her notes, that
17     she doesn't think --
18                    THE COURT:  In other words, you're saying,
19     Ms. Cole, you have said that you resigned -- you're
20     calling it misconduct.  Ms. Cole has not called it
21     misconduct.  Ms. Cole has called it the reasons why she
22     resigned.
23                    MR. GOLDBERG:  Yeah, we're not calling it.
24     We're just asking if she has anything that evidences it,
25     but, yes.
```

1          THE COURT:  Well, I think you can ask her

2    why she resigned, and what documents she has that supports

3    her decision to resign.

4          MR. GOLDBERG:  Correct.

5          THE COURT:  I think that, first, then needs

6    to go to someone, the debtor, to determine whether those

7    documents do disclose what they may consider to be

8    confidential trade secret-type information, or the

9    information that falls within the "for avoidance of doubt"

10   paragraph, and if they do, then I'm not sure where it goes

11   from there.  I mean, as the Judge, I could look at it in

12   camera, perhaps the committee may be a bit more neutral,

13   they could look at it, I don't know.

14         MR. GOLDBERG:  We'd prefer the Court to look

15   at it.

16         THE COURT:  Okay.  All right.

17         MR. GOLDBERG:  In fairness, your Honor, if

18   you want to go back to the formation of the second

19   committee motion, one of the reasons, when you applied the

20   Winn Dixie factors and denied the motion, you said Monster

21   is capable, and represented by counsel, and in all

22   fairness, we're trying to exercise those rights, and then

23   we feel a little bit like our hands are being tied behind

24   our back.

25         THE COURT:  Well, but that doesn't mean that

```
 1   while you can exercise those rights, you get access to
 2   information that you otherwise wouldn't under the
 3   circumstances in which you're a competitor of the debtor.
 4                MR. GOLDBERG:  Your Honor, if information
 5   shows misconduct, there is no legitimate business strategy
 6   that can be justified by --
 7                THE COURT:  I'm not suggesting it does.  I
 8   just want to understand --
 9                MR. GOLDBERG:  We're not seeking anything,
10   we're not seeking anything other than documents that show
11   misconduct.
12                THE COURT:  All right.  Okay.  I hear what
13   you're saying.
14                So the way I've always understood it to
15   occur, and when I was practicing the way, you know, my
16   recollection of those types of events, was submitting the
17   documents to the Judge for determination in camera before
18   you get to see them.
19                MR. GOLDBERG:  So, your Honor, that
20   procedure would be fine.  They have already said what --
21   they've seen the documents, they've posed their
22   objections.  I would suggest, first of all, again, if it's
23   privileged, give us a privilege log, pull it, we don't
24   care, but if it's something they say that is, this is
25   pricing, your Honor, but it may show -- and it should be
```

1    immune, I have no problem with the Court seeing that,

2    seeing those documents, and if the Court determines, well,

3    this is pricing, but it does show misconduct, or this is,

4    I don't know, I can't even think of what a pricing

5    misconduct would be, unless it's some antitrust, which we

6    don't really care, but we would want to know if it's

7    misconduct, but if there is something -- I mean, some of

8    the categories they're doing are business strategy,

9    anything could be business strategy.

10                   You could -- actually your business

11   strategy, the Court knows very well, I deal in Ponzi

12   schemes.  The business strategy could be to commit a Ponzi

13   scheme.  Well, that's wrongful conduct.  I'm not saying,

14   I'm just using that by way of an example.

15                   So, we would have no problem if the Court

16   were to look at those documents, and if the Court

17   determined, you know, this can go to a trustee motion, or

18   misconduct or something, it should be produced, we'd be

19   fine with that, your Honor.

20                   THE COURT:  Okay.  All right.

21                   MR. GOLDBERG:  The other thing, we also

22   stipulated there is confidentiality agreements in place.

23   This is not, again, us looking for the secret sauce, or

24   somehow trying to get their pricing in some

25   anticompetitive maneuver, not the case at all, but we have

Page 40

1    every right under 2004, and the Court, in your private

2    practice, if misconduct is alleged, we think there is

3    enough smoke there that we should be looking at this, that

4    we should have the right to do an examination, and we're

5    not seeking the truly confidential proprietary

6    information.  This is purely, and that's why we redid the

7    request to say, in Ms. Cole's position, anything that she

8    considers, notes, anything she considers to be misconduct,

9    and that's why we put that in there to give them that

10   protection.

11                   And the last thing I would just respond is

12   2004 does not distinguish between documents and testimony.

13   It's an examination.

14                   THE COURT:  So you're leaving it up to

15   Ms. Cole to decide what she thinks is misconduct, or may

16   be misconduct, or what's the language exactly?  Do you

17   have some place to point me?

18                   MR. GOLDBERG:  Well, the language is set

19   forth in the revised thing, and it says --

20                   THE COURT:  Revised, what thing?

21                   MR. GOLDBERG:  Our revised opposition paper,

22   I'm sorry.  Thing, I can't believe I used that word.

23                   THE COURT:  Thing.

24                   MR. GOLDBERG:  In the revised opposition

25   paper, 792, your Honor.

1           THE COURT:  792.

2           MR. GOLDBERG:  Yeah, and you read it

3   earlier.  Filing, court filing 792, at Page 4 and 5.

4           THE COURT:  Hold on.  I'm not -- am I in

5   792?  I am in 792, yes.  So what page, 4 of 5?

6           MR. GOLDBERG:  Yes, Page 4 and 5, we have on

7   the bottom Page 4, revised Request Number 1.

8           THE COURT:  So all documents,

9   communications...

10          MR. GOLDBERG:  That you consider to be

11  misconduct.  So, essentially we've gone to Ms. Cole

12  policing her own notes, but not the debtor unilaterally

13  putting this unilateral thing that --

14          THE COURT:  Let's just play this out.  I

15  just need to understand the process.

16          So, you would provide these revised requests

17  to Ms. Cole.  Ms. Cole would then go through her documents

18  and try to comply with those requests, pointing out those

19  documents that fall within those requests.

20          The documents then go to her counsel, I

21  assume, first.

22          MR. GOLDBERG:  Right.

23          THE COURT:  They would then, I guess, work

24  with her, and they would decide together, essentially,

25  what would be produced.

Page 42

```
 1                    The production would then be to
 2      Ms. Quartarolo --
 3                    MS. QUARTAROLO:  Yes.
 4                    THE COURT:  -- or debtors' counsel,
 5      generally.  The debtor would then review those documents
 6      to determine what would be produced, or what the debtor
 7      did not think needed to be protected, if you will, or did
 8      not fall within the protection, or confidentiality
 9      provisions of the order --
10                    MR. GOLDBERG:  Correct.
11                    THE COURT:  -- that I enter.  They would
12      then, though, to the extent that they feel some should be
13      protected, they would mark those and file a motion under
14      seal, including the documents, and would make a separate
15      argument within that motion as to the specific documents,
16      and what portions of them, or which documents should not
17      be produced, and what reasons.  You would not have the
18      ability to respond, because that would be revealing the
19      information.
20                    MR. GOLDBERG:  We would have to leave it up
21      to the Court to make a determination.
22                    THE COURT:  You'd have to leave it up to me,
23      and then I would make a determination based on what was
24      provided.
25                    MR. GOLDBERG:  Yes, and you would see --
```

Page 43

1                    THE COURT:  No other party would have access

2      to it, including the United States Trustee's Office,

3      including the committee, et cetera.  It would be just the

4      debtor submitting to the Court.

5                    MR. GOLDBERG:  Listen, I don't care if the

6      U.S.T. wants access to it, it's not our position to say

7      not -- to say no.  I just know that Monster wouldn't,

8      because they're alleging we're a competitor and we

9      shouldn't have access.

10                   THE COURT:  All right, and whatever other

11     party may have access to the information, including the

12     United States Trustee's Office, they would be the subject

13     also of a confidentiality order?

14                   MR. GOLDBERG:  Yeah, I mean, technically the

15     committee is not a competitor, if they got access --

16                   THE COURT:  That's why I said the committee,

17     potentially.

18                   MR. GOLDBERG:  Yeah, I mean, it may be, I

19     don't know, I haven't really had a chance to consider this

20     process.  It sounds sort of reasonable to me.

21                   THE COURT:  Okay.

22                   MR. GOLDBERG:  If we need a --

23                   THE COURT:  Well, if you have an alternative

24     process -- I mean, I can't believe I just invited myself

25     to review a whole bunch of documents and determine things

Page 44

1    in camera, but call it, you know, being only on the bench

2    for two and a half years.  You know, but anyway, if there

3    is another process, I'm all ears.

4              MR. GOLDBERG:  Well, the other process is

5    they produce it subject to confidentiality and protective

6    orders that --

7              THE COURT:  And trust you won't violate it.

8              MR. GOLDBERG:  And trust, with hammers

9    behind that, that if we go and use their pricing thing,

10   that, you know, they'll have the full faith of

11   Judge Russin behind them for us violating your order --

12             THE COURT:  Okay.

13             MR. GOLDBERG:  -- which is the typical way

14   it's done, and we're happy to do that, but what we're not

15   content with, is them unilaterally saying --

16             THE COURT:  No, I get it.

17             MR. GOLDBERG:  Making the decision and

18   saying, no, we're not going to do it, with nobody being

19   able to review it, and us not knowing what we didn't get.

20   That just is not a workable thing under 2004 or any

21   litigation I've ever been involved in.

22             THE COURT:  Okay.  Understood.  Anything

23   else?

24             MR. GOLDBERG:  Not unless the Court has any

25   other questions.

Page 45

```
1                    THE COURT:  All right.  Before I hear from
2      Ms. Quartarolo again, does anyone else wish to be heard on
3      this issue?
4                         (No verbal response.)
5                    THE COURT:  No, okay.
6                    MR. GOLDBERG:  May I?  I apologize.
7                    Mr. Berger gave me a good suggestion.  The
8      other solution, first, is make it attorneys' eyes only,
9      and let the attorneys work it out.
10                   THE COURT:  You mean Monster's attorneys.
11                   MR. GOLDBERG:  Monster's attorneys, and I
12     think the Court knows that the Pachulski firm, or the
13     Akerman firm are not going to do anything that's going to
14     get our bar license in trouble, and if that is a more
15     workable solution than having the Court involved in the
16     situation --
17                   THE COURT:  So the attorneys get to see it,
18     and if the attorneys feel --
19                   MR. GOLDBERG:  Have a dispute.
20                   THE COURT:  Then you would bring it before
21     the Court, or how would that happen?
22                   MR. GOLDBERG:  Well, I assume we would be
23     able to work that out, possibly, and if we can't, then
24     we'd bring it before the Court.
25                   THE COURT:  All right.  So let's make a
```

Page 46

1    deal, Ms. Quartarolo, you've got three curtains, or three

2    doors.  Behind door number one --

3                    MS. QUARTAROLO:  Understood.

4                    THE COURT:  Okay.

5                    MS. QUARTAROLO:  I think I have the lay of

6    the land.

7                    THE COURT:  Although you're probably too

8    young to know the Let's Make a Deal show, but anyway --

9                    MS. QUARTAROLO:  Not at all.

10                   THE COURT:  Okay.

11                   MS. QUARTAROLO:  I get it.

12                   So, attorneys' eyes only, that door is not

13   for us.  I don't think that adequately protects the

14   information, including because Monster's litigation

15   counsel has now appeared in the bankruptcy case, and so I

16   just don't think that that's a workable solution at this

17   point.

18                   THE COURT:  Well, just come to the podium,

19   I'm sorry.

20                   MR. GOLDBERG:  I think if it helps make door

21   number one more presentable --

22                   THE COURT:  You would limit the lawyers that

23   see --

24                   MR. GOLDBERG:  -- we'd limit the lawyers to

25   the Pachulski firm, and the Akerman firm on that, just for

Page 47

1    purposes of the lawyers' eyes only --

2                    THE COURT:  Okay.

3                    MR. GOLDBERG:  -- if that helps.

4                    MS. QUARTAROLO:  It might help a bit, but I

5    don't think that gets us all the way there.  I think, as I

6    was listening to this --

7                    THE COURT:  By the way, you don't have to

8    pick one of those doors.  If you think they should all be

9    thrown out, just tell me.

10                   MS. QUARTAROLO:  Understood, understood.

11                       One of the things, and I just want to make

12   this clear for the record, I think your Honor understands,

13   the debtors are not trying to get in the way of Ms. Cole

14   being examined.

15                       What we're trying to do is put appropriate

16   guardrails on it, and make clear that it's for a stated

17   purpose, and whatever that stated purpose is, they're

18   allowed to investigate, but what they're not allowed to do

19   is backdoor information that we think that they shouldn't

20   be --

21                   THE COURT:  I think we're sort of past that

22   issue, because I think that where the rubber meets the

23   road here is what part of what Ms. Cole would testify

24   might be misconduct --

25                   MS. QUARTAROLO:  Right.

1              THE COURT:  -- but might also reveal --

2              MS. QUARTAROLO:  And so how do we

3    navigate --

4              THE COURT:  -- (inaudible) information.

5              MS. QUARTAROLO:  -- those together?

6              THE COURT:  Right.

7              MS. QUARTAROLO:  And I think in that regard,

8    the one correction I wanted to make for the record is the

9    debtors are not making these determinations.  Ms. Cole and

10   her counsel are making these determinations.

11             The only thing we're making the

12   determination is as to the debtors' privilege.  As to the

13   other issues, we raised them in a motion for protective

14   order, that's why we're here today.

15             So it's not that we are unilateral, as

16   Mr. Goldberg said, deciding what is and isn't responsive

17   to these requests.  The narrowed request, that were just

18   narrowed over the weekend, I shared them with Ms. Cole's

19   counsel, because I understood that they had not, but I

20   don't think that she's gone back through her production

21   and reviewed them with these more limited or clarified

22   requests in mind.

23             It could be that she decides, because she's

24   going to be the decider of this, that nothing in her notes

25   relates to misconduct, and so it may be that there is

1    nothing that's put before your Honor for her review.

2                    THE COURT:  It's hopeful, okay.

3                    MS. QUARTAROLO:  Right, but if there is

4    something in her notes that she believes are responsive to

5    these requests, as clarified, then I think the procedure

6    that would be workable would be for her to provide those,

7    that subset of the documents that she's previously

8    gathered to the debtors.  If we decide that there is

9    anything in there that we would object to on this

10   confidentiality ground, then that should be presented to

11   your Honor, but it's not like anyone would be asking you

12   to review 340 pages of handwritten notes.

13                   THE COURT:  Okay.

14                   MS. QUARTAROLO:  So, I think -- I don't know

15   if that was door number one or door number two.

16                   THE COURT:  I don't remember.

17                   MS. QUARTAROLO:  But I think that that's

18   probably the solution here, is to have these clarified

19   requests put before Ms. Cole, have her decide what is

20   responsive and is not responsive, and if something is

21   responsive, we can fight about that subset then, and have

22   your Honor call balls and strikes.

23                   THE COURT:  Okay, and when I call the balls

24   and strikes, there might be circumstances in which it may

25   be -- it should be subject to production, but certain

Page 50

1    parts of it need to be redacted because it might still

2    show, or arguably show some misconduct, but you don't need

3    to know the details.

4                    MS. QUARTAROLO:  The specific numbers, for

5    example.

6                    THE COURT:  Right, for example there is a

7    spreadsheet attached, but the language in the cover sheet

8    to the spreadsheet might reveal something, but you didn't

9    need the spreadsheet.

10                   MS. QUARTAROLO:  Right.

11                   THE COURT:  I'm just trying to imagine what

12   else might be in there that -- so it would be up to the

13   Court to make those decisions.

14                   MS. QUARTAROLO:  I think, based on our

15   discussion on the record today, and the grounds that we've

16   set forth in the motion, and if your Honor decides that

17   there is something in what is determined to be responsive,

18   that should nevertheless be redacted, then we would be

19   comfortable with your Honor making that decision.

20                   THE COURT:  All right, and what about

21   others, what others could see it?

22                   And here is part of my concern, I don't like

23   the notion of communications effectively through motions

24   and orders simply being between me and one party, that

25   concerns me.  It's not really considered ex parte, but

Page 51

1    it's sort of ex parte, because no one else is seeing it,

2    and while it's sealed and on the record, if no one else

3    sees it, it's ineffective for notice purposes and for

4    public disclosure purposes.

5                    Is there anyone else the debtor would feel

6    comfortable also reviewing these documents?

7                    MS. QUARTAROLO:  In a --

8                    THE COURT:  Really just reviewing your

9    motion and the attachments, really.

10                   MS. QUARTAROLO:  I mean, we certainly have

11   no issue with the U.S. Trustee receiving access, you know,

12   I think, in terms of the watchdog function, that would --

13                   THE COURT:  And making arguments in response

14   to yours?

15                   MS. QUARTAROLO:  I think that would be

16   appropriate.

17                   THE COURT:  Okay.  Anyone else?  The

18   committee?

19                   MS. QUARTAROLO:  I think the concern is that

20   while the committee is an independent entity and, frankly,

21   may separately have -- I don't know what the information

22   is, so we're talking hypotheticals.

23                   THE COURT:  Right.

24                   MS. QUARTAROLO:  I guess my concern is that

25   if there is something that the Court to be redacted --

Page 52

1    that should be redacted, does that mean that even the

2    committee shouldn't have access to it?

3                    THE COURT:  Well, they would have access to

4    it, they would just -- it would just be subject to the

5    confidentiality provisions, and I don't remember exactly

6    who's on the committee, but certainly Monster is not on,

7    Orange is not on.  Anybody -- I think there is one

8    significant litigation claimant that really probably has

9    no interest in the information, I would imagine from a

10   proprietary information perspective, but still would be

11   subject to confidentiality, it would be subject to really

12   their lawyers' eyes only.

13                   MS. QUARTAROLO:  Yeah, I think if it's

14   attorneys' eyes only, I think that's probably workable.

15                   THE COURT:  Okay, and again, I'm just trying

16   to guard against the debtor and the Court being the only

17   communicating parties here, that just doesn't sound right

18   to me.

19                   MS. QUARTAROLO:  No, understood, understood,

20   and I think that that process -- I guess I'm hopeful that

21   that process is very limited.

22                   THE COURT:  Me, too.

23                   MS. QUARTAROLO:  Yeah, I'm sure.  So I think

24   that that is workable.  So it would be, just to reiterate,

25   if I can --

Page 53

1          THE COURT:  Yes.

2          MS. QUARTAROLO:  -- the revised request

3    would be provided to Ms. Cole and her counsel, they will

4    determine what is responsive and is not responsive, which,

5    again, includes her personal judgment call, that would be

6    provided to the debtors, we would then determine --

7          THE COURT:  Although that's not unusual,

8    that's always the case, isn't it?

9          MS. QUARTAROLO:  Yes, yes, absolutely, but

10   particularly here, where it's framed explicitly from her

11   perspective, so that it's not open --

12         THE COURT:  Okay.

13         MS. QUARTAROLO:  -- to interpretation or

14   misinterpretation.

15         THE COURT:  Right.

16         MS. QUARTAROLO:  And if we have an issue, we

17   will bring it to your Honor.

18         THE COURT:  With a motion explaining the

19   documents, and the particular nature of the documents that

20   is concerning, and why.

21         MS. QUARTAROLO:  And we will provide that to

22   both the United States Trustee's Office, and to the

23   Official Committee of Unsecured Creditors on an attorneys'

24   eyes only basis.

25         THE COURT:  Right, that sounds right.

Page 54

1          MS. QUARTAROLO:  That is acceptable to the

2     debtors.

3          THE COURT:  Okay.  Mr. Goldberg, your

4     thoughts, now that we've sort of honed in on the process.

5          MR. GOLDBERG:  That sounds workable to me.

6     I wish I had the opportunity to consult with co-counsel on

7     it.

8          THE COURT:  You do.  I mean, if you need to

9     take --

10         MR. GOLDBERG:  If I can take a two-minute

11    break?

12         THE COURT:  -- a recess, sure.

13         And by the way, the other thing I want you

14    to all think about it timing.  I understand that the

15    2004 Examination is on the 28th, right?

16         MR. GOLDBERG:  Yeah, we need to be moving on

17    this pretty quickly.

18         THE COURT:  So, yeah, I would expect, and

19    hope to get the motion by -- today is the 15th.  I guess

20    Ms. Cole would need a few days, so maybe give her until

21    Friday.  Is that too quick, or are the documents fairly

22    limited?

23         Just come to the podium, I'm sorry.  It's

24    just, we don't -- your voice doesn't get recorded unless

25    you're up here.

Page 55

1              MS. QUARTAROLO:  Thank you, your Honor.

2              I think that that's probably fine.

3              THE COURT:  Okay.

4              MS. QUARTAROLO:  On behalf of the debtors --

5              THE COURT:  It could be rolling, like, if

6    she's not quite finished on the 17th, she can roll it to

7    the 20th, although that's President's Day, you know.

8              MS. QUARTAROLO:  I just, the only thing is I

9    don't want to speak on behalf of Ms. Cole and her counsel.

10             THE COURT:  Why don't you make that phone

11   call?

12             MS. QUARTAROLO:  Yes.

13             THE COURT:  Okay, and then you would then

14   have anything in front of you by the 20th, and would need

15   to get a motion to me, served on the parties we've

16   discussed, within a couple of days?

17             MS. QUARTAROLO:  That's fine.

18             THE COURT:  That would be the 22nd, and that

19   would give me until Monday -- really, if I could do it by

20   Friday, I will.

21             Part of my problem -- well, I'm going to be

22   out of town at the ABI Paskay conference in Tampa, but --

23   so that takes me out -- although I will not have gotten

24   your motion yet, until Wednesday, probably.  So, then

25   Thursday I have motion calendar, and then Friday I have

Page 56

```
 1   some time, but -- so I'll try to get it out by Friday, but
 2   is Monday going to be too late, if that's when you hear
 3   for the first time, Mr. Goldberg, what you're allowed to
 4   use and not use?
 5                  MR. GOLDBERG:  Your Honor, I asked
 6   Mr. Berger to --
 7                  THE COURT:  Come up.  Sorry.
 8                  MR. GOLDBERG:  I apologize.
 9                  Your Honor, I asked Mr. Berger to step
10   outside and call Mr. Feinstein on the phone --
11                  THE COURT:  Okay.
12                  MR. GOLDBERG:  -- to see if this is
13   acceptable.
14                  THE COURT:  Okay.  All right.  Great.  So
15   we'll take a recess, now that we've talked a little bit
16   about timing, and just let Ms. Weldon know when you're
17   ready and she'll get me, okay?
18                  MR. GOLDBERG:  Thank you.
19                  MS. QUARTAROLO:  Thank you, your Honor.
20                  THE COURT:  All right.  Thank you.
21                  (Thereupon, a recess was had, after which
22          the following proceedings were had:)
23                  THE COURT:  Be seated.  Are we on?  All
24   right.
25                  MR. GOLDBERG:  Thank you, your Honor, for
```

1    the time.

2                    THE COURT:  Of course.

3                    MR. GOLDBERG:  I spoke with co-counsel, and

4    this is generally acceptable to us.  We had -- we're going

5    to ask for the little box in front of door number whatever

6    as well, and I think it's agreeable in my conversation

7    with counsel.  This works for us.  We would ask, though,

8    that any non -- in interest of time, that any

9    non-objectionable documents be produced --

10                   THE COURT:  Oh, I thought that was assumed,

11   but --

12                   MR. GOLDBERG:  Well, I just --

13                   THE COURT:  -- yes.

14                   MR. GOLDBERG:  We're going to draft an order

15   and submit it.

16                   THE COURT:  Okay.

17                   MR. GOLDBERG:  And I just want to have that

18   on the record, and there was no issue with that.  So it

19   may have gotten to everybody but me.

20                   THE COURT:  Okay.

21                   MR. GOLDBERG:  So the NDA and any

22   non-objectionable documents would be produced.

23                   The other thing we would like, if possible,

24   is that when they submit documents to the Court, if we

25   could also get -- they can redact whatever they think is

Page 58

1    objectionable, just redact it out, but if we can get a

2    redacted version of those documents, to the extent it's

3    possible to redact the document, perhaps the whole --

4                    THE COURT:  You may just get a whole big

5    black piece of paper, but --

6                    MR. GOLDBERG:  Well, then we don't want

7    that, but if it's able to be redacted with the

8    confidential information --

9                    THE COURT:  But not the motion itself,

10   because the motion, by necessity --

11                   MR. GOLDBERG:  Not the motion, that's --

12                   THE COURT:  -- would have to reveal

13   information.

14                   MR. GOLDBERG:  Correct, that's going to be

15   unredacted, we won't get that, that will go to the Court,

16   to be the arbiter of whether that is produceable or not.

17                   THE COURT:  I'm not sure what that does,

18   what's the point of that?

19                   MR. GOLDBERG:  It allows us, during the time

20   that this process plays out, to at least get up to speed,

21   and if there is any non-objectionable information in a

22   document that has, let's say, 95 percent of the document

23   is --

24                   THE COURT:  But the document would need to

25   be otherwise produceable.  In other words, it would be --

Page 59

```
 1                    MR. GOLDBERG:  Correct.
 2                    THE COURT:  It would have to fall within
 3       the --
 4                    MR. GOLDBERG:  Correct.
 5                    THE COURT:  So, if there is part of the
 6       document that just does not fall within the scope at all,
 7       and the only portion of the document that does fall within
 8       the scope is completely redacted, is that something you
 9       would expect to see?
10                    MR. GOLDBERG:  Well, if it's non-responsive,
11       probably not, but if it's otherwise responsive except
12       for --
13                    THE COURT:  Certain portions.
14                    MR. GOLDBERG:  -- you know, certain
15       portions, we would like them to redact out those portions,
16       while you're determining if those portions are
17       produceable, so at least we have that so that we don't
18       have to put off the 28th, because we need to get this
19       thing going.
20                    THE COURT:  Yes, no, this is all geared to
21       try to avoid delay.
22                    MR. GOLDBERG:  We appreciate it, and we'll
23       do our best to -- so that hopefully at the end if we do
24       get a document or two -- listen, let's face it, this could
25       all be an exercise in futility.  There may not be anything
```

1    --

2              THE COURT:  Yeah.

3              MR. GOLDBERG:  -- that comes, but at least

4    we'll get ourselves in position, and prepared as quickly

5    as possible.

6              THE COURT:  Okay.  All right.

7    Ms. Quartarolo, let me know what your thoughts are on

8    production, but redacted production.

9              MS. QUARTAROLO:  Yes, just briefly,

10   your Honor.  Amy Quartarolo on behalf of the debtors.

11             I think this got clarified in your

12   discussion with Mr. Goldberg, but it would be something

13   that is responsive, and which is not the subject of our

14   motion.  We don't have --

15             THE COURT:  Well, no, no, I think it's

16   something that a portion of which may be the subject of

17   your motion, which would be redacted, the balance of which

18   would be -- would fall within the scope, but not subject

19   to your motion, which would be unredacted.

20             MS. QUARTAROLO:  Yes.

21             THE COURT:  And instead of waiting to

22   produce that document because there is some redacted

23   material, or some --

24             MS. QUARTAROLO:  It would be produced and

25   redacted.

```
 1                    THE COURT:  It would be produced so that
 2      they can get started.
 3                    MS. QUARTAROLO:  We have no issue with that.
 4                    THE COURT:  Okay.
 5                    MS. QUARTAROLO:  And we will work with them
 6      on the language so that we may make that clear.
 7                    THE COURT:  Okay.
 8                    MS. QUARTAROLO:  I did -- I was able to
 9      reach Ms. Cole's counsel during the break.  He
10      understands, generally, where we've arrived, and is
11      obviously willing to work with all of the parties to make
12      sure that this gets done promptly.
13                    I can represent that he told me that he
14      would try to get us as much as he could on Friday, but
15      wasn't sure if he'd get us everything.  So we'll just work
16      with this on a rolling basis, and --
17                    THE COURT:  Yeah, the only thing that can't
18      really be -- well, I guess you could roll motions if you
19      wanted to, and file multiple motions, but I don't know
20      that that's --
21                    MS. QUARTAROLO:  I don't --
22                    THE COURT:  -- efficient.
23                    MS. QUARTAROLO:  We will try to make this as
24      efficient as possible.
25                    THE COURT:  Yeah, and what's the gentleman
```

Page 62

1   -- who is the person that you spoke with?

2                   MS. QUARTAROLO:  Scott Zulick.

3                   THE COURT:  Okay.  All right.  So, are

4   you all going to be able to work together and get an

5   order prepared that's consistent with what we've all

6   discussed?

7                   MR. GOLDBERG:  Absolutely, your Honor.

8                   THE COURT:  Say that closer to the mic, and

9   on the record.

10                  MR. GOLDBERG:  I'm raising my right hand.

11  Absolutely.

12                  THE COURT:  All right.  Great.

13                  MS. QUARTAROLO:  Thank you, your Honor.

14                  THE COURT:  Okay.  Terrific, and was that

15  everything?

16                  MS. QUARTAROLO:  I think that's everything.

17  So we will, on the protective and confidentiality order,

18  we'll circulate that to the parties.  We will work with

19  Monster's counsel on the form of order for this current

20  exercise relating to Kathy Cole.

21                  THE COURT:  Okay.  I was just checking to

22  see if I had any other notes and I don't.

23                  Okay.  All right.  Great.  Well, thank you

24  all, and I can't wait.

25                  MS. QUARTAROLO:  Thank you, your Honor.

Page 63

```
 1                    MR. CHAFETZ:  Your Honor?
 2                    THE COURT:  Yes.
 3                    MR. CHAFETZ:  Can I just bring up one
 4    housekeeping matter --
 5                    THE COURT:  Yes.
 6                    MR. CHAFETZ:  -- to just put something on
 7    your (inaudible) --
 8                    THE COURT:  Yes.
 9                    MR. CHAFETZ:  You may be aware that the
10    debtors filed a motion at Docket 786 to quash certain
11    2004 subpoenas that the committee served.
12                    THE COURT:  I wish I was aware as you
13    thought I was but --
14                    MR. CHAFETZ:  Okay.
15                    THE COURT:  -- no, I'm not aware of those
16    motions.
17                    MR. CHAFETZ:  Okay.  Totally understood.
18                    That motion has been set for a hearing on
19    March 9th, and that's under Docket Number 788.
20                    We are going to be filing an objection to
21    that motion in the next day or so, and we are going to be
22    seeking a slightly earlier hearing, most likely on
23    February 23rd, where there is already an existing hearing
24    before your Honor, but we wanted to just give you the
25    heads-up that it's coming down the pike, just so everybody
```

Page 64

1    is aware, and nobody is surprised.

2                    THE COURT:  Okay.  All right.  Thank you for

3    that, I appreciate it.

4                    Does anybody else wish to be heard on that

5    heads-up?

6                    (No verbal response.)

7                    THE COURT:  No?

8                    MS. BLANCO:  Your Honor, the reason for that

9    request is that some of the scheduled depositions that are

10   subject of the motion are coming up, and the March 9th

11   date gets us beyond those, so that is the reason for the

12   request.

13                   THE COURT:  That certainly seems to make

14   sense.  Okay.  So, you all will just notice it, or are you

15   asking for hearing now?

16                   MR. CHAFETZ:  We were going to include in

17   our objection, I think pursuant to the Local Rules, but if

18   your Honor is amenable to scheduling it now, that's fine

19   as well, either way.

20                   THE COURT:  All right.  So, because it's

21   already set for hearing, somebody needs to file a motion,

22   and if nobody objects, and I assume I would hear from

23   whoever objected now, if no one is objecting, you can do

24   it ex parte and just reset it for that afternoon, 2:30,

25   right?

Page 65

```
 1                    MR. CHAFETZ:  Yes, your Honor, I think
 2       that's right.
 3                    THE COURT:  Okay.  So go ahead and file
 4       that motion, in order to have an order entered that resets
 5       that hearing, since it's already been set for hearing,
 6       okay?
 7                    MS. BLANCO:  Your Honor, so the Court wants
 8       a separate motion to reschedule -- asking the Court to
 9       reschedule that hearing specifically?
10                    THE COURT:  Yes, not part of your objection,
11       because it will get lost in the objection.
12                    MS. BLANCO:  Understood.
13                    THE COURT:  Hold on one second.  So a motion
14       to shorten notice -- yeah, but I'm not sure a motion to
15       quash necessarily requires 26 day's notice.  So I don't
16       think they need that.
17                    Just include in the order that the Court is
18       finding, that given the agreement of the parties, that
19       notice is sufficient to have the hearing on the
20       February 23rd date at 2:30, okay --
21                    MR. CHAFETZ:  Yes, your Honor.
22                    THE COURT:  -- instead of on March 9th, all
23       right?
24                    Okay.  Anything else?
25                    MS. BLANCO:  Thank you, your Honor.
```

1                    THE COURT:  Great.  Have a nice day
2       everybody.   Thank you all.
3
4
5
6                    (Thereupon, the hearing was concluded.)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 67

1

2

3                          CERTIFICATION

4

5    STATE OF FLORIDA        :

6    COUNTY OF MIAMI-DADE   :

7

8                 I, Cheryl L. Jenkins, RPR, RMR, Shorthand

9    Reporter and Notary Public in and for the State of Florida

10   at Large, do hereby certify that the foregoing proceedings

11   were transcribed by me from a digital recording held on

12   the date and from the place as stated in the caption

13   hereto on Page 1 to the best of my ability.

14                 WITNESS my hand this 22nd day of

15   February, 2023.

16

17

18                 _____

19                 CHERYL L. JENKINS, RPR, RMR

20                 Court Reporter and Notary Public
                  in and for the State of Florida at Large
21                      Commission #HH 170910
                       December 27, 2025

22

23

24

25