Page 1

1                  UNITED STATES BANKRUPTCY COURT
                    SOUTHERN DISTRICT OF FLORIDA
2

3

4    IN RE:                        CASE NO. 22-17842-PDR

5    VITAL PHARMACEUTICALS, INC.,

6              Debtor.
     _____/
7

8                      ECF #511, 707, 709

9                      February 23, 2023

10             The above-entitled cause came on for hearing

11   before the Honorable Peter D. Russin, one of the Judges in

12   the UNITED STATES BANKRUPTCY COURT, in and for the

13   SOUTHERN DISTRICT OF FLORIDA, at 299 E. Broward Blvd.,

14   Fort Lauderdale, Broward County, Florida, on February 23,

15   2023, commencing at or about 2:00 p.m., and the following

16   proceedings were had.

17

18

19

20

21

22

23

24             Transcribed from a digital recording by:
                    Cheryl L. Jenkins, RPR, RMR
25

1

APPEARANCES:

2

3              BERGER SINGERMAN, by
                JORDI GUSO, Esquire
4                      and
              LATHAM & WATKINS, by
5              ANDREW SORKIN, Esquire
              AMY QUARTAROLO, Esquire
6          HUGH MURTAGH, Esquire (via Zoom)
              On behalf of the Debtor

7

              QUARLES & BRADY, by
8        CHRISTOPHER COMBEST, Esquire (via Zoom)
          Special Counsel on behalf of the Debtor

9

              SEQUOR LAW, by
10             JUAN MENDOZA, Esquire
                      and
11             LOWENSTEIN SANDLER, by
                ERICA MANNIX, Esquire
12         JORDANA RENERT, Esquire (via Zoom)
              On behalf of the Official
13         Committee of Unsecured Creditors
14                AKERMAN, LLP, by
              MICHAEL GOLDBERG, Esquire
15              EYAL BERGER, Esquire
                      and
16        PACHULSKI STANG ZIEHL & JONES, by
          RICHARD PACHULSKI, Esquire (via Zoom)
17          On behalf of Monster Energy
18     J. STEVEN WILKES, Trial Attorney (via Zoom)
              Office of the U.S. Trustee
19              Department of Justice
20           SQUIRE PATTON BOGGS, by
              MARK SALZBERG, Esquire
21          On behalf of KJ Can Singapore
22               ALSO PRESENT
23      ECRO - Electronic Court Reporting Operator
24              - - - - - - -
25

```
 1                    THE COURT:  All right.  We're three minutes
 2      early.
 3                    It seems like there are quite a few people
 4      here, Mr. Guso.  So, we can probably start with
 5      appearances a little bit early.
 6                    So let me call Vital Pharmaceuticals,
 7      22-17842.  Mr. Sorkin, I'm sorry.
 8                    MR. SORKIN:  It's a team effort, your Honor.
 9      Andrew Sorkin, Latham & Watkins, on behalf of the debtors.
10                    THE COURT:  Thank you.
11                    MR. GUSO:  Good afternoon, your Honor.
12      Jordi Guso, of Berger Singerman, we are co-counsel to the
13      debtors.
14                    THE COURT:  Thank you.
15                    MS. QUARTAROLO:  Good afternoon, your Honor.
16      Amy Quartarolo, of Latham & Watkins, on behalf of the
17      debtors.
18                    THE COURT:  Thank you.
19                    MR. SALZBERG:  Good afternoon, your Honor.
20      Mark Salzberg, Squire Patton Boggs, on behalf of KJ Can
21      Singapore.
22                    I'm sorry, S-a-l-z-b-e-r-g, r-g, yes.
23                    Thank you.
24                    MR. MENDOZA:  Good afternoon, your Honor.
25      Juan Mendoza on behalf of the Official Committee of
```

1    Unsecured Creditors.

2              MS. MANNIX:  Good afternoon, your Honor.

3    Erica Mannix, of Lowenstein Sandler, on behalf of the

4    Official Committee of Unsecured Creditors, and joining us

5    today via Zoom is my colleague Jordana Renert.

6              THE COURT:  Manix, M-a-n-i-x?

7              MS. MANNIX:  M-a-n-n-i-x.

8              THE COURT:  M-a-n-n-i-x.  Okay.  Thank you.

9              MR. BERGER:  Good afternoon, your Honor.

10   Eyal Berger, B-e-r-g-e-r, Akerman, on behalf of Monster

11   Energy, and my co-counsel is on Zoom, and they'll make

12   their own appearances.

13             THE COURT:  All right.  Thank you.

14             So on Zoom, Mr. Pachulski.

15             MR. PACHULSKI:  Thank you so much,

16   your Honor.  Richard Pachulski, of Pachulski Stang Ziehl &

17   Jones on behalf of Monster Energy.

18             THE COURT:  Thank you.

19             Mr. Wilkes.

20             MR. WILKES:  Good afternoon, your Honor.

21   J. Steven Wilkes for the United States Trustee, Region 21.

22             THE COURT:  Thank you.

23             Mr. Combest, Combest.

24             MR. COMBEST:  Thank you, your Honor.

25   Christopher Combest, representing the debtors, as special

1    counsel, Quarles & Brady, and also here on behalf of

2    Quarles & Brady in support of their retention order.

3                    THE COURT:  Thank you.

4                    And Mr. Murtagh.

5                    MR. MURTAGH:  Good afternoon, your Honor.

6    It's Hugh Murtagh, from the Latham & Watkins, on behalf of

7    the debtors.  I'm just joining today to talk about some

8    scheduling matters.

9                    THE COURT:  All right.  Thank you.

10                    I was going to call on Mr. Goldberg's

11    computer, since I saw that for a second, but he's now

12    gone.

13                    All right.  Okay.  So we have a number of

14    matters, including the application to employ the

15    Quarles & Brady counsel as special counsel, who is

16    handling that?

17                    Well, I'll take these matters in any order

18    you wish, I'll leave it to you.

19                    MR. SORKIN:  Good afternoon, again,

20    your Honor.  Andrew Sorkin on behalf of the debtors.

21                    I have a proposal for how we take up the

22    matters today, and I'm pleased to report, I think all of

23    the matters are uncontested that are going forward.

24                    So if it's acceptable to your Honor, I would

25    suggest we proceed with the bid procedures motion first,

1   that was filed at Docket 707.  I will be presenting that

2   one.

3              THE COURT:  Okay, sure.

4              MR. SORKIN:  Then I will turn it over to

5   Mr. Guso to address the retention application issues, I

6   think that's both Quarles & Brady, as well as

7   Haynes & Boone and Faulkner Law, and then finally, you

8   know, by way of status, as you probably saw, the debtors

9   filed an adversary proceeding last Friday seeking certain

10  declaratory relief with respect to the Monster and Orange

11  Bang arbitration award, and in particular the, what I'll

12  call the availability of the 5 percent royalty option to a

13  buyer in our sale process.

14              We've conferred with Monster and Orange Bang

15  regarding scheduling for that matter, and I think we have

16  alignment on a proposed briefing schedule.

17              THE COURT:  Oh, good, I was about to enter a

18  briefing schedule order, which we generally do in the

19  ordinary course, but then thought I would wait to see if

20  there were cross-motions and other things that might be

21  filed so that we get them all set at the same time.

22              So, tell me where you ended up.

23              MR. SORKIN:  So, I will leave that to

24  Mr. Murtagh.  I mean, I can give you the rough --

25              THE COURT:  Oh, okay.

1                    MR. SORKIN:  -- framework.  I mean --

2                    THE COURT:  No, no, we can wait.  We can

3      wait, no problem.

4                    MR. SORKIN:  Okay.  He's on to address those

5      issues --

6                    THE COURT:  Okay.

7                    MR. SORKIN:  -- and generally leading the

8      charge on that matter.

9                    THE COURT:  Right, understood.

10                   MR. SORKIN:  So if it pleases the Court,

11     I'll proceed with the bid procedures motion.

12                   THE COURT:  Sure.

13                   MR. SORKIN:  And I just want to start with a

14     few housekeeping matters, just, first, in terms of the

15     paper that's been filed.

16                   We filed on Tuesday night a revised bid

17     procedures order, with all of the exhibits and red lines

18     to the versions of those documents that were filed with

19     the original motion.

20                   The changes in those documents, largely just

21     extend dates and deadlines for our process, and there is

22     one other change that I'll get to in a moment.

23                   Separately we entered into an agreement with

24     the DIP lenders by which they consented to extensions to

25     the applicable DIP milestones to make those new dates and

```
 1   deadlines work for purposes of the DIP, that was filed

 2   late yesterday evening, once it was executed, at

 3   Docket 842.

 4              Second, we did submit a declaration in

 5   support of the bid procedures motion from Charles Delo, of

 6   Rothschild, our investment banker, that was filed at

 7   Docket 834.

 8              Mr. Delo should be present by Zoom today.

 9              THE COURT:  All right.  Let me just -- I do

10   not see him.  Oh, there he is, I see him.  He's waving,

11   there he is.

12              MR. SORKIN:  He's off camera.

13              I would ask that we admit his declaration

14   into the evidentiary record --

15              THE COURT:  All right, and that --

16              MR. SORKIN:  -- of today's hearing.

17              THE COURT:  -- declaration is at docket

18   entry what?

19              MR. SORKIN:  834.

20              THE COURT:  834.

21              All right.  So the Court has reviewed the

22   declaration, and understands that is the proffer in

23   support of the motion to approve the bid procedures.

24              Does anyone object to that proffer, or the

25   admission of that declaration?
```

1                    (No verbal response.)

2                    THE COURT:  Does anyone wish to

3    cross-examine Mr. Delo?

4                    (No verbal response.)

5                    THE COURT:  All right.  So the Court will

6    admit that without the need to swear the witness, since

7    that declaration is all that's coming in, and he does not

8    need to testify.

9                    MR. SORKIN:  Well, thank you, your Honor.

10                   And lastly, in terms of housekeeping, I

11   would note one party, KJ Can Singapore, filed a responsive

12   pleading in connection with the bid procedures motion.  It

13   was a request for clarification of the procedures as they

14   relate to bids for less than substantially all of the

15   debtors' assets.

16                   THE COURT:  And Mr. Salzberg is here for

17   KJ Can.

18                   Okay.  So explain the KJ Can situation.  I

19   did not quite understand that.

20                   MR. SORKIN:  So, they are interested,

21   potentially, in submitting a bid for certain assets

22   located at our Arizona manufacturing facility, and they

23   filed their request for clarification, to get greater

24   certainty, that they knew what they had to do to submit a

25   qualified bid, because some of the -- you know, the

1   requirements are generally tailored for a bid for the

2   whole.

3                    THE COURT:  Right, so I understood they were

4   interested in only certain items that I assume relates --

5   can I guess the KJ Can is in the canning business?

6                    MR. SORKIN:  I don't want to speak for

7   Mr. Salzberg.

8                    MR. SALZBERG:  That's correct, your Honor.

9                    MR. SORKIN:  There you go.

10                   THE COURT:  Okay.

11                   MR. SORKIN:  I think that's correct.

12                   THE COURT:  So I assume they're interested

13  in canning equipment and things of that sort, separate and

14  apart from the business as a going concern.

15                   MR. SORKIN:  Correct.

16                   THE COURT:  Okay.  So how are you proposing

17  to handle that then?

18                   MR. SORKIN:  So, we added language to the

19  proposed bid procedures order at Paragraph 34, that was

20  agreed with KJ Can.  I think at the time we filed it, we

21  included a footnote that it was still under discussion.

22                   THE COURT:  Yeah.

23                   MR. SORKIN:  I think that language has now

24  been finalized.

25                   We kind of went through each of the

1  qualification requirements one by one and determined where

2  it was appropriate to either waive or modify the

3  requirement to accommodate their bid.

4              And I just want to include one caveat here,

5  which is, you know, it may well be the case that a bid

6  for, you know, less than the whole isn't value-maximizing,

7  isn't actionable, stacked up against bids for the whole,

8  you know, absent, you know, the bidders agreeing to carve

9  out the assets in which KJ Can is interested, and so kind

10 of the push/pull there on our side was just ensuring that

11 notwithstanding their potential qualification as a bidder,

12 you know, we retain discretion when it comes to advancing

13 the bid at auction, if we find ourselves in that

14 situation.

15             Obviously we have every incentive on the

16 debtor and seller side to take all comers when it comes to

17 the auction, and try to find, you know, whatever bid or,

18 you know, combination of bids yields maximum value, but we

19 just wanted to account for that --

20             THE COURT:  Yeah, so I guess there is the

21 possibility that KJ Can offers an amount for the assets

22 that they seek, and the buyer of the overall business is

23 fine with those items being removed from what they're

24 purchasing for a, I guess, reduction of the purchase

25 price, but the overall ends up being more money, I guess

1   that's a possibility.

2                   MR. SORKIN:  Exactly, I think that would be

3   the circumstance in which, you know, KJ Can's bid would be

4   very attractive.

5                   THE COURT:  And your procedures make that

6   possibility a -- you know, remains in play --

7                   MR. SORKIN:  Yes.

8                   THE COURT:  -- if you will.

9                   Okay.  All right.

10                  MR. SORKIN:  Yes.

11                  So, that is -- I got a little bit --

12                  THE COURT:  That language, Mr. Salzberg, you

13  are in agreement with?

14                  MR. SALZBERG:  Yes, your Honor.

15                  THE COURT:  Okay.  Thank you.

16                  MR. SORKIN:  So that's it in terms of the

17  housekeeping matters, and I'll just proceed with my

18  presentation if that's okay.

19                  THE COURT:  Absolutely.

20                  MR. SORKIN:  I'd just start by noting the

21  relief we're seeking today is very limited.  We're not

22  here today to ask your Honor to approve a stalking horse

23  bid, or any bid protections, that's going to come later in

24  March.

25                  Rather, we're simply asking you to establish

1    the dates, and deadlines, and ground rules for an auction

2    so that we can lock in a framework in which interested

3    bidders can -- you know, on which they can rely, and on

4    which they'll be competing.

5                The proposed bidding procedures before

6    your Honor are, in our view, appropriately tailored, and

7    flexible, and in our business judgment represent the best

8    means available to achieve a successful conclusion to a

9    marketing process that has now been going on for many,

10   many months.

11               As your Honor is aware, we kicked off that

12   marketing process in the summer of 2022.  Rothschild has

13   been leading the process, in close consultation with

14   advisors to the DIP lenders and creditors' committee, with

15   whom they confer regularly, and we confer on the legal

16   side, I should say, and we share information, including,

17   you know, number of bids, names of bidders, and the status

18   of diligence that they're conducting, the feedback we're

19   receiving and the like.

20               I can say we're -- you know, without

21   revealing too much, we're fortunate to have serious

22   interests in the debtors' business from a number of

23   potential bidders, and we expect those discussions to

24   culminate with the appointment of a stalking horse bid by

25   the applicable milestone in our DIP facility.

1               And I'll turn to those milestones for a

2   moment, because that's largely what changed from when we

3   filed the motion.  I'll begin by noting that we have

4   satisfied all of the milestones to date.  The first

5   required us to receive at least one indication of interest

6   for substantially all of our assets by January 13th.  We

7   did that.  We filed the bid procedure motion by

8   January 27th, and we were required to have this hearing at

9   some point before February 28th.

10              Looking ahead, based on feedback from

11  potential bidders, we've determined, with the support of

12  the DIP lenders and committee, to extend certain of the

13  forthcoming deadlines that were originally proposed in the

14  bid procedures, in order to ensure that those bidders have

15  sufficient time to complete their diligence, and we and

16  they have time to negotiate a form of stalking horse

17  purchase agreement.

18              I just want to be very clear, because I know

19  people listen to these hearings, you know, we're not

20  extending these deadlines for purposes of locating

21  additional potential bidders.  It's simply a matter of

22  working with who we have at the table to get through the

23  diligence and APA negotiation process.

24              So, if it's helpful, I can walk through the

25  date changes that were made or --

```
 1                    THE COURT:  Yes, just as an example, I was
 2    not sure whether the sale hearing would actually be in May
 3    or -- April 26th, I saw that date, and we just need to
 4    make sure that the Court is available when you are
 5    available, but I thought -- it seemed to have been
 6    extended out to May.
 7                    MR. SORKIN:  It has, your Honor, and we
 8    coordinated with your courtroom deputy this week on a
 9    date, and I believe we've settled on May 11th.
10                    THE COURT:  Okay.  May 11th, let me just
11    look at that because -- I just have my son's PhD
12    graduation, which I cannot miss, so -- and it's in
13    California.
14                    MR. SORKIN:  Congratulations to him,
15    your Honor.
16                    THE COURT:  Although he has told his
17    parents, that have stuck behind him the whole way, that
18    he's happy to skip it and move on with his life, which
19    apparently a lot of PhD students do that, I wasn't aware
20    of that, and rob us of the joy of watching, you know, the
21    fruits of our, you know, support for him just, you know,
22    become nothing.
23                    But anyway, that's up to him.
24                    MR. SORKIN:  I will leave that to you and
25    your son, and we will not let our sale hearing get in the
```

1    way of that.

2                    THE COURT:  I was hoping you would help me

3    out on this, but anyway.

4                    All right.  So that's May 11th.  May 11th is

5    our motion calendar, and of course I'm not a hundred

6    percent sure we're going to have enough time, I don't know

7    if it's going to be disputed, I guess no one can tell that

8    at this point.  So, it's a little bit risky doing it on

9    May 11th, because we just may not have, you know, the two

10   or three hours you might need, or whatever time you need,

11   because it's morning and afternoon motion calendar.

12                    So, does it make sense maybe to move it up

13   to the 10th?

14                    MR. SORKIN:  That would work.

15                    THE COURT:  Okay.  Anyone else have an issue

16   with that, May 10th?

17                    (No verbal response.)

18                    THE COURT:  All right.  So let's do that,

19   that way you'll -- you know, hopefully it's a 10-minute

20   hearing.  Unlikely, just because you've got to put on

21   certain proof, at a minimum, but let's make it on the 10th

22   at 10:00 a.m., does that work?

23                    MR. SORKIN:  Yes, it does, and, thank you,

24   your Honor, for accommodating us.

25                    THE COURT:  Okay.  Of course.  All right.

1                    MR. SORKIN:  It sounds like you've reviewed

2       the dates and deadlines in the revised order as a general

3       matter, so I will, you know, not belabor --

4                    THE COURT:  But don't assume I wasn't

5       confused by them.  So you may as well lay them out --

6                    MR. SORKIN:  Okay.

7                    THE COURT:  -- just to make sure.

8                    MR. SORKIN:  Happy to do so.

9                    First, starting with the sort of stalking

10      horse designation process, we moved the initial deadline

11      to designate a stalking horse and file a notice seeking

12      approval of the bid protections from March 13th to

13      March 24th.

14                   THE COURT:  All right.  So let's talk about

15      that for one moment.

16                   I saw that you're reserving for yourselves

17      the ability to notice that.  I don't know that a notice,

18      Ms. Weldon, would be picked up as a motion to be set for

19      hearing.

20                   So, the term notice sort of threw me a

21      little bit, but are you saying that the parameters would

22      be approved today, and a motion or hearing would not be

23      necessary to approve the stalking horse bid, or how do you

24      see that happening?

25                   MR. SORKIN:  I would describe what we're

1   attempting to set up as an expedited approval process, in

2   which, I think in my mind, the notice effectively serves

3   as a motion to approve the -- I mean, that's going to be

4   the issue before the Court, is the bid protections that

5   the stalking horse has demanded, and in order to avail

6   ourselves of that expedited process, they have to fit

7   within the parameters that are established under this

8   order.

9              THE COURT:  All right.  So why don't we just

10  call it a motion instead of a notice --

11             MR. SORKIN:  Okay.

12             THE COURT:  -- and that way that terminology

13  will be picked up by the clerk's office, and we'll make

14  sure we get that set, and do you have a designated date

15  that you're looking at to make sure that --

16             MR. SORKIN:  We do, and I believe I ran this

17  by Ms. Weldon yesterday as well.  I think we'd like

18  April 6th, if a hearing is necessary.

19             THE COURT:  April 6th, and why wouldn't it

20  be necessary?

21             MR. SORKIN:  Pursuant to our procedures, if

22  no objection were filed, the Court would have the ability

23  to enter it without an order, but if your Honor wants a

24  hearing in any event, that is fine as well.

25             THE COURT:  No, no, if everyone agrees, and

1    there is no objection, I don't see a problem with just

2    submitting an order.

3                    I guess the only issue for me is just to

4    make sure -- I think the Court has somewhat of an

5    independent duty to make sure that the bid protections are

6    reasonable.  For example, in this case where, you know, we

7    throw around this 3 percent as though it's a given for a,

8    I guess, breakup fee, or however you wish to call it, but

9    in a case like this, where the numbers may be, you know,

10   fairly high, 3 percent of a much higher number doesn't

11   necessarily equate to the expense or the cost of the due

12   diligence and things of that sort.

13                    So, that's the only thing that I would just

14   want to make sure of, that it's not necessarily tied to a

15   mere percentage, and that, you know, the law is the law,

16   as I'm sure you're aware, there has got to be some

17   rational relationship between that and the actual cost and

18   expenses associated with that.

19                    The other issue I had was, you know, whether

20   the due diligence that is acquired through this process is

21   shared with other bidders or not, or what that process is.

22                    So, I just have a couple of things that as

23   the -- you know, a bit of a gating function for the Court,

24   just to make sure that down the road, if they're outbid,

25   and they come to collect, and they make an assumption that

Page 20

```
 1    perhaps they shouldn't make, that, you know, it's not
 2    already a foregone conclusion.
 3                    MR. SORKIN:  Right.  Your Honor, we're not
 4    trying to tie your hands with respect to conducting that
 5    independent review.
 6                    THE COURT:  I'm not suggesting you are.
 7                    MR. SORKIN:  Okay.
 8                    THE COURT:  I just want to make sure that
 9    the buyer doesn't necessarily believe that my hands are
10    tied.
11                    MR. SORKIN:  I think we've made that clear,
12    I hope, to anyone who is listening in.
13                    THE COURT:  Okay.  All right.  So, you will
14    file a motion, and it will be set for hearing, and whether
15    that hearing occurs or not, I guess will depend on large
16    part on whether there is raging agreement with respect to
17    the terms.
18                    MR. SORKIN:  Correct.
19                    THE COURT:  Okay.
20                    MR. SORKIN:  Or if your Honor independently
21    would like to set a hearing --
22                    THE COURT:  Yeah, and we'll take a look at
23    that --
24                    MR. SORKIN:  -- to express your concerns.
25                    THE COURT:  -- and we'll let the parties
```

Page 21

1    know if we think it needs to be set, or at least that

2    hearing that's already set will go forward.

3                    So that date was on motion calendar on

4    April 6th?

5                    MR. SORKIN:  Correct.

6                    THE COURT:  And what do you think, if it's

7    contested, from a timing perspective, does the motion

8    calendar make sense, or is it -- remember it's usually a

9    busy day.

10                   MR. SORKIN:  Yes, I mean, it obviously could

11   be an evidentiary matter if it is heavily contested.  So I

12   can't -- you know, I can't assure you standing here today

13   that motion calendar will be sufficient.

14                   THE COURT:  Good Friday is the next day, so

15   probably not a great day to roll over to.

16                   MR. SORKIN:  Understood.  I would ask if the

17   Court has availability on the 5th perhaps.

18                   THE COURT:  All right.  So the problem with

19   the 5th is that I'm committed at the University of Miami

20   to help teach an appellate oral argument class, and I --

21   you know, I don't necessarily want to miss that.

22                   However, we could do it in the afternoon, or

23   we could do it on the 4th.  The 4th is probably getting a

24   little tight, given your time schedule, but --

25                   MR. SORKIN:  That would leave us five days

1    between the objection deadline and the hearing, I think,

2    for the stalking horse under our current schedule.  I

3    think we can make that work.

4                    THE COURT:  All right.  So -- but the 5th,

5    in the afternoon is okay.  I just need to get all the way

6    from South Miami to Fort Lauderdale, I just need time to

7    do that from about 11:00.  So we could probably start

8    fairly easily at 2 o'clock, if you wanted to do that.

9                    MR. SORKIN:  Let's go with the 5th at

10   2 o'clock, if that's okay with you.

11                   THE COURT:  Yes, okay.

12                   MR. SORKIN:  And then we can continue --

13                   THE COURT:  All right, the 5th at 2 o'clock.

14                   MR. SORKIN:  -- on the 6th, as necessary,

15   but hopefully it won't be.

16                   THE COURT:  All right.  So, Ms. Weldon, just

17   make sure that's in my calendar so I know to get in my car

18   quickly and get up here.

19                   MR. SORKIN:  I think we've addressed the

20   stalking horse-related dates and deadlines.  I think the

21   adjustment of those deadlines has knock-on effects for the

22   second phase, so we extended some of those deadlines as

23   well.

24                   The bid deadline, which was previously

25   April 11th, will be extended to April 24th, with an

Page 23

1    auction to follow on April 27th, it was supposed to be 10

2    days earlier on the 17th.

3                    The applicable milestone in the DIP --

4                    THE COURT:  And that auction is going to be

5    conducted in New York by whom?

6                    MR. SORKIN:  It will be at our offices, at

7    Latham New York.  I mean, we've reserved the right to

8    conduct it electronically, conduct it somewhere else, as

9    is typical in bid procedures, but that's the default.

10                   THE COURT:  All right, but somebody from

11   your firm is conducting the auction?

12                   MR. SORKIN:  Correct.

13                   THE COURT:  Okay.

14                   MR. SORKIN:  It might be me.

15                   THE COURT:  Okay.  Well, good luck with

16   that.

17                   MR. SORKIN:  Thank you, your Honor.

18                   THE COURT:  Do you have your fast-speaking

19   capabilities ready to go?

20                   MR. SORKIN:  I found that those aren't

21   always necessary at Chapter 11 auctions.

22                   THE COURT:  Yes, they're not.

23                   Anyway, go ahead.

24                   MR. SORKIN:  I'm just trying to make sure we

25   covered all of the other dates.

1                    Just a couple of others, milestone-related,

2    we had a deadline to consummate the transition of May

3    17th, that's been extended to May 24th, which also happens

4    to be the outside maturity date of the DIP, and then

5    unrelated to the --

6                    THE COURT:  So you'd have from the hearing

7    of May 10th, I think we landed on, to that date to get the

8    deal closed?

9                    MR. SORKIN:  Correct.

10                   THE COURT:  Okay.

11                   MR. SORKIN:  And then unrelated to the sale

12   and bidding process itself, but relevant to kind of the

13   objection process that's going on in the background, we've

14   extended the date for the debtors to file the initial

15   version of the sale order, and the assumption notice for

16   executory contracts and unexpired leases to March 3rd, and

17   we've maintained the same objection period for parties.

18   So, the deadline to object to those matters as well would

19   be March 31st.

20                   And obviously on the contract side of that

21   there are some exceptions, you know, adequate assurance,

22   obviously, can't be objected to until the identity of the

23   bidder is known, and things like that.

24                   THE COURT:  Sure.

25                   MR. SORKIN:  But that's the baseline

1    objection deadline.

2                    THE COURT:  All right.

3                    MR. SORKIN:  I think we've covered

4    everything I had to cover on the bid procedures.  I won't

5    belabor the points in Mr. Delo's declaration, other than

6    to say we believe we've established the timeline and

7    ground rules that will maximize the likelihood of a

8    successful value-maximizing transaction within the

9    timeframe that we're required to under the DIP facility.

10                   And so with that, subject to any questions

11   or comments your Honor has, we'd request that you --

12                   THE COURT:  You know, I'm just looking at my

13   notes to see if everything has been resolved, and it seems

14   like it has.  Yes, all of my questions have been answered.

15   So, I'm good.

16                   Does anyone else wish to be heard?

17                   (No verbal response.)

18                   THE COURT:  Wow, a very quiet crowd.

19                   All right.  So, work on an order, I'm sure

20   you already have, and get it submitted, and we'll get it

21   entered.

22                   MR. SORKIN:  We will make the changes

23   discussed, and upload that order.

24                   Thank you, your Honor.

25                   THE COURT:  Great.  Thank you.

Page 26

1              MR. SORKIN:  Let me turn it over to Mr. Guso

2    for --

3              THE COURT:  All right.

4              MR. SORKIN:  -- the next item.

5              THE COURT:  Good afternoon.

6              MR. GUSO:  May it please the Court.  Good

7    afternoon, your Honor.  Jordi Guso on behalf of the

8    debtors as well.

9              Judge, there are two other matters on the

10   calendar.  If I may address the second omnibus motion for

11   an order authorizing the rejection of a lease of

12   nonresidential real property, and an executory contract,

13   that's Docket Entry 709.

14             And, your Honor, pursuant to this motion,

15   the debtor, Vital Pharmaceuticals, Inc., seeks authority

16   to reject a lease of nonresidential real property with

17   East Group Properties, LP, for a facility located in

18   Jacksonville.

19             The debtor is current with respect to

20   postpetition rent, but the term runs through July 31st,

21   2025.  Because of new distributor relationships in that

22   market, your Honor, the debtor no longer needs that

23   facility, and so we seek authority to reject the lease

24   effective March 3rd of this year.

25             Tom Abrams is counsel to East Group

1    Properties, LP, your Honor.  He has authorized us to

2    represent that he has no objection to the relief the

3    debtors seek.

4               In exchange, your Honor, the debtors have

5    agreed to deliver to his client keys and the access codes

6    for the premises when they delivered possession and,

7    your Honor, we have a form of order that grants that

8    relief.

9               And, secondly, your Honor, that motion also

10   requests authority to reject a co-packing services

11   agreement with Portland Bottling Company.  The debtor no

12   longer needs these services because it has other

13   relationships with co-packers in that market.  We've

14   received no objection to the motion, your Honor, and ask

15   the Court to grant the relief.

16               THE COURT:  All right.  Anyone wish to be

17   heard?

18               (No verbal response.)

19               THE COURT:  All right.  The Court will grant

20   that motion.  Of course you'll include the proof of claim

21   deadline information and all that --

22               MR. GUSO:  Yes, sir.

23               THE COURT:  -- that's standard.  All right.

24               MR. GUSO:  Pursuant to the local rules.

25               THE COURT:  Thank you, Mr. Guso.

1            MR. GUSO:  Thank you, your Honor.

2            Your Honor, if I may, the next matter on the

3    calendar is the application -- continued hearing on the

4    application to employ Mr. Beilfuss, and the law firm of

5    Quarles & Brady, but if I may, your Honor, I'd like to

6    address the debtors' amended application for the approval

7    of the employment of Mr. Geyser, the law firm of

8    Haynes & Boone, and Richard Falkner and his law firm, it's

9    Docket Entry 805, and let me explain, if I may.  Judge,

10   that's Court Entry -- Docket Entry 805.

11           THE COURT:  So there is 511 --

12           MR. GUSO:  Correct.

13           THE COURT:  -- and then is 805 set for

14   today, or --

15           MR. GUSO:  It's not, and I can explain.

16           THE COURT:  Okay.

17           MR. GUSO:  I can explain, Judge.  We were --

18           THE COURT:  Remind me, before we finish, I'm

19   supposed to hear from somebody on the adversary proceeding

20   and the briefing schedule --

21           MR. GUSO:  Correct, Judge.

22           THE COURT:  -- right?

23           MR. GUSO:  Correct.

24           THE COURT:  So don't let me forget that.

25           MR. GUSO:  Mr. Murtagh.

1           THE COURT:  Okay.  Good.  All right.  Go

2    ahead.

3           MR. GUSO:  So, your Honor may recall, we

4    were here on February 9th in connection with three

5    applications.  First, your Honor, was the application to

6    employ Quarles & Brady, 511, the application to employ

7    Haynes & Boone, Docket Entry 565, and the application to

8    employ Faulkner Law, Docket Entry 566.

9           Your Honor, with respect to those three, it

10   was to represent Vital Pharmaceuticals, Inc. and JHO

11   Intellectual Property in connection with an appeal that is

12   before the 9th Circuit Court of Appeals of the judgment

13   confirming the arbitration award in favor of Monster

14   Energy and Orange Bang, Inc.

15          We reported at that time, your Honor, the

16   day before the debtors had received a proposal from

17   Haynes & Boone, and Faulkner Law to handle prosecution of

18   the appeal on a fixed fee.

19          And so, your Honor, the debtors requested

20   that the Court continue the applications until today to

21   permit the debtors to evaluate the proposal, and if

22   appropriate, amend the application, and that's what we've

23   done, your Honor, it's Docket Entry 805, and although that

24   has not been noticed for hearing today, there is an order

25   continuing all three applications to today.

Page 30

1               And, your Honor, the amended application,

2   Docket Entry 805, includes a legend that the Court would

3   consider it today, given the Court had continued the

4   applications and the relief that's before you is more in

5   the nature of an amended application.

6               So, the committee consents to the debtor --

7   assuming acceptable to your Honor, with the Court going

8   forward to consider the amended application today based on

9   those terms.

10               THE COURT:  My only concern is that I

11   haven't focused on the change in terms, not having

12   recognized that it was continued to today, or at least

13   could be considered today, and haven't looked at the

14   amendment, so -- but, you know, tell me about it and we'll

15   see if there are any objections or concerns.

16               MR. GUSO:  So, your Honor -- thank you,

17   your Honor, if I may.

18               On February 15th, the debtors filed the

19   amended application, it's Docket Entry 805, to employ

20   Haynes & Boone and Faulkner ADR Law as counsel in the OBI

21   appeal pursuant to the terms of an amended engagement

22   letter dated February 8th, 2023.

23               The amended -- as I said, your Honor, that

24   amended application included a header that the Court would

25   consider the amended application today, given the

1    continuance of the hearing on the original applications.

2                    Your Honor, Haynes & Boone and Faulkner Law

3    have agreed to prosecute the OBI appeal before the 9th

4    Circuit for a fixed fee of $399,000, inclusive of costs

5    and expenses payable as follows, your Honor, the first

6    payment of $299,250 would be due upon the Court's approval

7    of the application.  A second payment in the amount of

8    $24,937.50 would be due on March 1.  A third payment in

9    the same amount would be due on April 1, and on May 1 a

10   fourth and final payment would be due in the amount of

11   $49,975.

12                   THE COURT:  And that's to sort of match the

13   briefing schedule, I guess --

14                   MR. GUSO:  Yes, your Honor, in fact --

15                   THE COURT:  -- and the level of work that

16   would be required.

17                   MR. GUSO:  -- in preparation for this

18   hearing, your Honor, the applicants, proposed counsel met

19   not only with us, but also with counsel to the committee,

20   and explained that this process is essentially

21   front-loaded between the review of the brief -- excuse me,

22   the record and the drafting of the brief and so forth, and

23   that's how the fee was -- that's why the fee was

24   structured in that manner.

25                   THE COURT:  And is the appeal -- I guess the

Page 32

1    appeal is current.  Is it stayed currently or --

2                    MR. GUSO:  When the cases were filed,

3    your Honor, the 9th Circuit clerk automatically entered a

4    notice staying the appeal.  It's the debtors' intention to

5    prosecute the appeal promptly and diligently.

6                    THE COURT:  All right, and if you would do

7    so, there is no order necessary for the 9th Circuit from

8    me to remove the stay?

9                    MR. GUSO:  We don't believe so, your Honor.

10   The retention order that we've drafted, and with the

11   committee's input, your Honor, provides -- expressly

12   provides that the debtors are authorized to diligently and

13   expeditiously prosecute the appeal.

14                   We think --

15                   THE COURT:  And the debtor, through its

16   corporate governance process, believes that for whatever

17   reason it makes business judgment to proceed with that

18   appeal now at the -- for the fees that are being charged

19   as you just described?

20                   MR. GOLDBERG:  Yes, sir, and it represents a

21   substantial reduction off the normal hourly rates that

22   both of the law firms would charge, and given the fact

23   that we are paying a postpetition royalty to Monster under

24   the adequate protection stipulate that the Court

25   previously approved, and the fact that this is a rather

Page 33

```
1    large claim, the debtors, in the exercise of business
2    judgment, do believe it's prudent --
3                   THE COURT:  Time is relevant in overturning
4    it, if you're able to do that, to stop that --
5                   MR. GUSO:  Right.
6                   THE COURT:  -- expense.
7                   All right, and do you have -- is there a
8    proffer of evidence in that regard, or are you just
9    proffering that that's what your --
10                   MR. GUSO:  We made a proffer with
11   Mr. DiDonato in the courtroom --
12                   THE COURT:  The last time.
13                   MR. GOLDBERG:  -- on February 9th,
14   your Honor.
15                   THE COURT:  We went through each set of
16   litigations.
17                   MR. GUSO:  Right, Judge, and given,
18   your Honor, that the committee met with counsel, and do
19   not oppose the relief based on the form of the order, we
20   excused Mr. DiDonato from today's attendance.
21                   THE COURT:  No, that's fine.  I just wanted
22   to make sure there was --
23                   MR. GUSO:  Yes, sir.
24                   THE COURT:  There had been a record, and
25   you've reminded me that there is.
```

1            MR. GUSO:  There was a pretty robust

2    discussion about the different litigation --

3            THE COURT:  I do recall that, and the fee,

4    as a flat fee, is actually less than what arguably would

5    have been sought at the prior hearing.

6            MR. GUSO:  Correct, Judge, and it's less

7    than what the debtors had originally budgeted.

8            THE COURT:  So if Mr. DiDonato thought the

9    deal was okay the last time, he's certainly going to think

10   it's better this time.

11           MR. GUSO:  Yes, sir.

12           THE COURT:  All right.  Understood.

13           MR. GUSO:  Your Honor, for the benefit of

14   the record, your Honor, the amended application is

15   supported by the declarations of Mr. Geyser, which is

16   Exhibit B to Docket Entry 572, the declaration of

17   Mr. Faulkner, which is Exhibit B to Docket Entry 572.

18           Your Honor, his supplemental declaration,

19   which is Exhibit -- excuse me, Docket Entry 769, and the

20   declaration of Mr. Lori (phonetic), which is Docket

21   Entry 771.

22           Your Honor, as Mr. Faulkner tells us in his

23   supplemental declaration, Vital Pharmaceuticals, Inc.

24   listed his law firm as a creditor on Schedule F, holding a

25   claim in the amount of $68,395.

Page 35

```
 1              Neither Mr. Faulkner nor his firm have filed
 2    a proof of claim, yet, your Honor -- notwithstanding,
 3    your Honor, effective, and subject to the Court's approval
 4    of the application, Mr. Faulkner and his firm have agreed
 5    to waive their claim against the Vital Pharmaceuticals,
 6    Inc. estate.
 7              And as I said, your Honor, we've discussed
 8    the amended application with counsel to the committee.
 9    Counsel to the committee has provided comments to the
10    proposed form of order, and, your Honor, the committee has
11    no objection to the Court granting the relief.
12              THE COURT:  All right.  So tell me the name
13    of that firm again.
14              MR. GUSO:  Which firm, your Honor?
15              THE COURT:  The 805.
16              MR. GUSO:  Oh, I'm sorry.
17              THE COURT:  Yes.
18              MR. GUSO:  Thank you.  Two firms, Judge.
19              THE COURT:  Yes.
20              MR. GUSO:  Haynes & Boone --
21              THE COURT:  Yep.
22              MR. GUSO:  -- your Honor, and Faulkner Law.
23    From Haynes & Boone, your Honor, it's Daniel L. Geyser,
24    who would be the lead counsel, and from Faulkner ADR Law,
25    PLLC, it would be Mr. Faulkner, who is also associated
```

Page 36

1   with Mr. Lori.

2               THE COURT:  And that's 39,999,999, is being

3   shared by them --

4               MR. GUSO:  Yes, sir.

5               THE COURT:  -- or how is that happening?

6               MR. GUSO:  Yes, sir, it is being shared by

7   them.

8               THE COURT:  Okay, and they're going to

9   decide how that gets split?

10              MR. GUSO:  Yes, sir.

11              THE COURT:  And is it subject to further fee

12  applications?

13              MR. GUSO:  No, sir.

14              THE COURT:  It's just a flat fee --

15              MR. GUSO:  It's a 328 retention.

16              THE COURT:  -- 328 retention --

17              MR. GUSO:  Yes, sir.

18              THE COURT:  -- unless something improvident

19  were to --

20              MR. GUSO:  Correct.

21              THE COURT:  -- have been disclosed.

22              Okay.  All right, and their task will be

23  limited to the appeal?

24              MR. GUSO:  To the appeal, but before the

25  9th Circuit, your Honor, and not beyond.  If the debtors

Page 37

1  wish to expand the scope of that retention after the

2  appeal, we'd have to come back before you.

3                    THE COURT:  All right.  Okay, and the

4  committee supports it?

5                    MR. GUSO:  It has no objection, your Honor,

6  I believe.

7                    THE COURT:  All right.  Any objections?

8                    (No verbal response.)

9                    THE COURT:  All right.  I'm not hearing any

10  objections.

11                    All right, and I assume that -- Mr. Wilkes'

12  camera is off, so that means he doesn't object either.

13                    MR. GUSO:  I checked with Mr. Wilkes,

14  your Honor.  He deferred to the committee.

15                    THE COURT:  All right.  All right.  So,

16  great.  So that will be approved, but let me ask you, in

17  coordination with the Quarles & Brady, tell me why there

18  need to be three law firms.

19                    MR. GUSO:  There aren't, there are going to

20  be two law firms, your Honor.  So, it's just --

21                    THE COURT:  It's just Haynes & Boone and

22  Faulkner Law with respect to the 9th Circuit appeal?

23                    MR. GUSO:  With respect to the 9th Circuit

24  appeal, the Court has approved, which takes me to the last

25  item I was going to --

1                    THE COURT:  Okay.  So, Quarles & Brady

2    aren't going to be involved in that task?

3                    MR. GUSO:  With respect to the -- correct,

4    your Honor.

5                    THE COURT:  Okay.

6                    MR. GUSO:  There were a number of matters

7    that Quarles & Brady was handling for the debtors, this

8    was one of them.  The Court authorized the retention of

9    Quarles & Brady on February 9th for those matters, but

10   continued the proposed retention with respect to the OBI

11   appeal.  Given the Court's approval of the amended

12   application, we can submit a supplemental order denying

13   solely the application as to the OBI appeal.

14                    Your Honor, however, Quarles & Brady did do

15   some preliminary work on the matter to preserve the

16   record, et cetera, and I believe it wishes to reserve the

17   right to --

18                    THE COURT:  Seek fees.

19                    MR. GUSO:  -- seek compensation for that,

20   with all parties' rights being reserved.

21                    And then lastly, your Honor, on that point,

22   there was a -- the committee and the debtors, and

23   Quarles & Brady were unable to reach agreement on the form

24   of the order approving the retention for those other

25   matters, and the parties, I believe, submitted competing

1    orders to Chambers, I believe that matter is still under

2    advisement with your Honor.

3                    THE COURT:  All right.  So when were those

4    competing orders submitted?

5                    MR. GUSO:  Your Honor, the 9th -- February,

6    thank you, February 14th.

7                    THE COURT:  All right.  Okay.  Is there any

8    reason to discuss what the differences are between the

9    orders now?

10                   MR. GUSO:  I'm happy to take it up if you

11   wish, your Honor.

12                   THE COURT:  And assuming that we reach some

13   resolution of that, then the Quarles & Brady application

14   will be, therefore, resolved --

15                   MR. GUSO:  Yes, sir.

16                   THE COURT:  -- as of today?

17                   MR. GUSO:  Yes, sir.

18                   THE COURT:  And that's the only outstanding

19   issue?

20                   MR. GUSO:  Yes, sir.

21                   THE COURT:  Okay.  So tell me about the

22   differences.

23                   MR. GUSO:  Sure.

24                   The difference, your Honor, is in

25   Paragraph 7 of the order, which reads, including the

1   committee's proposed language, your Honor, Paragraph 7

2   would read, with the committee's language, the debtors and

3   Quarles & Brady shall agree to a reasonable litigation

4   budget, and here is what the committee requested,

5   reflecting the scope of Quarles & Brady, LLP's services to

6   be performed postpetition, contained within the legal

7   expense line item in the approved budget attached to the

8   final order approving DIP financing, with the docket entry

9   number.

10                  THE COURT:  In other words, they want to

11  know how much of that line item Quarles & Brady expects to

12  get.

13                  MR. GUSO:  They want Quarles & Brady to stay

14  within that line item.

15                  THE COURT:  Certainly stay within it.

16                  MR. GUSO:  Correct, Judge.

17                  THE COURT:  But it's a gross amount, and so

18  there needs to be some specificity with -- in terms of how

19  that gets divvied up or --

20                  MR. GUSO:  Right, and Mr. Combest is on the

21  phone, he can speak for Quarles & Brady.

22                  Quarles & Brady's concern, as I understand

23  it, your Honor, is that this language could be construed

24  to mean that Quarles & Brady has agreed to a fee cap,

25  which Quarles & Brady takes the position it has not agreed

Page 41

1    to.

2                    I can tell your Honor that it also takes the

3    position that this language isn't found in any of the

4    other retention orders for general counsel.  The other

5    firms that have been retained, your Honor, as special

6    counsel have agreed to this language.  The parties have

7    been unable to reach --

8                    THE COURT:  But is it a fair statement,

9    though, that all of the professionals -- well, the debtor

10   needs to remain within the budget --

11                   MR. GUSO:  All the professionals need to --

12                   THE COURT:  -- and, therefore, all the

13   professionals need to figure out a way, in working with

14   the debtor, how, as a group, they all stay within the

15   budget.

16                   MR. GUSO:  The debtor and the professionals

17   are all constrained by the budget, Judge.

18                   THE COURT:  And if the budget is blown, what

19   happens?

20                   MR. GUSO:  If the budget is blown,

21   your Honor, as to a particular line item, I suppose that

22   the -- unless there is availability in another area of the

23   budget, within the confines of the DIP credit agreement,

24   the practical effect is there won't be funds to pay them,

25   even if the Court awarded more than the budgeted amount.

1              THE COURT:  All right.  Okay.  So before I

2    hear from Mr. Combest, who I'm sure, you know, would argue

3    against it, let me hear first from the committee so I

4    understand what the issues are completely.

5              MR. GUSO:  Sure.

6              THE COURT:  And then I would hear what the

7    response is from Mr. Combest, which I already understand

8    the issue, which is we don't want to be constrained by a

9    cap.  We don't know how long something is going to take,

10   or how much time has to be spent and, you know, it will be

11   what it will be, but anyway, let me hear from the

12   committee counsel.

13             MR. GUSO:  Would you like to see the red

14   line of the order?

15             THE COURT:  That would be very helpful.

16   Thank you.

17             MR. GUSO:  May I approach?

18             THE COURT:  Sure.

19             Thank you, and I apologize, I don't know --

20   for some reason we just didn't see the competing orders --

21             MR. GUSO:  No need to apologize, Judge.

22             THE COURT:  -- but I probably would have

23   wanted to air this out today in any respect, so --

24             MR. GUSO:  That's what we figured, Judge.

25   No need to apologize at all.

1                    THE COURT:  Ms. Maxim.

2                    MS. MANNIX:  Ms. Mannix.

3                    THE COURT:  Mannix.

4                    MS. MANNIX:  Thank you, your Honor.

5                    THE COURT:  Sorry about that.

6                    MS. MANNIX:  Erica Mannix on behalf of the

7    Official Committee of Unsecured Creditors.

8                    So I think that the committee has differing

9    views on the language that Mr. Guso just discussed for the

10   proposed order for Quarles & Brady, which the committee's

11   view is should expressly say that Quarles & Brady should

12   stay within the bounds of the line item in the DIP budget

13   which sets forth an amount of $1.8 million.

14                   THE COURT:  Well, how does Quarles & Brady

15   do that on their own?  Don't they need -- since they're

16   not going to comprise the full 1.8 million, I assume,

17   they're sharing that line item with others, how is

18   Quarles & Brady supposed to protect themselves against

19   others billing more, that requires them to bill less, and

20   how does that -- I'm trying to picture how they can police

21   that.

22                   MS. MANNIX:  I would think it's the same

23   process that applies to the other professionals that are

24   bound by line items in the budget.  For instance, debtors

25   retained Sanchez Levine, and within their order that was

Page 44

1   entered retaining that firm, the same language appears in

2   that order as well.

3              THE COURT:  The same language that has been

4   proposed here, which is, litigation budget reflecting the

5   scope of Quarles & Brady's services to be performed

6   postpetition contained within the legal expenses, that

7   same language?

8              MS. MANNIX:  The exact language is -- it's

9   at Docket 798.  The language from the Sanchez Levine

10  retention order, Paragraph 5, the debtors and Sanchez

11  Fischer Levine, LLP shall agree to a reasonable litigation

12  budget reflected in the scope of Sanchez Fischer Levine,

13  LLP's services to be performed postpetition contained

14  within the legal expense line item in the approved budget

15  attached to the final order approving DIP finance.

16             THE COURT:  So your point is that you're

17  trying to put, appropriately in your view, because a

18  budget is a budget, and you've got to stay within the

19  budget, the burden on Quarles & Brady and the debtor to

20  work together to create a budget as between them that fits

21  within the million eight in consideration of other

22  information that the debtor may have, that Quarles & Brady

23  doesn't, with respect to who else is bidding against that

24  line item, or billing against that line item, to make sure

25  that all works and doesn't exceed the $1.8 million --

1              MS. MANNIX:  That's --

2              THE COURT:  That's the bottom line?

3              MS. MANNIX:  That's correct, your Honor, and

4    regardless, the debtors would have to manage that budget

5    line item anyway because it's --

6              THE COURT:  They have all the information.

7              MS. MANNIX:  -- for all of these special

8    counsels that are being retained.

9              THE COURT:  Yeah, the only party here that

10   has all the information is the debtor.  Quarles & Brady

11   may not know what other law firms are billing, so they

12   can't -- or what their budget is, so they can't know.

13             So, actually it might be helpful to hear

14   from the debtor on how the debtor intends to manage all of

15   that, even -- Mr. Combest, I do want to hear from you, I'm

16   not ignoring you.  I just want to hear how this process is

17   supposed to go down, which you actually have no control

18   over, to some degree.

19             So let me hear about that, because it's not

20   an unreasonable request and, in fact, it sort of protects

21   everybody, because if the debtor is the ultimate source of

22   all of the information that's necessary to know whether

23   the debtor is staying within that million eight, it stands

24   to reason that the debtor should have communications with

25   each separate law firm to make sure that it knows what

1   their budget is, so that the total doesn't exceed the

2   million eight.

3                    So, what's the plan there, Mr. Guso?

4                    MR. GUSO:  Not the plan, Judge, what we've

5   done, what the debtors --

6                    THE COURT:  Even better.

7                    MR. GUSO:  What the debtors have done.

8                    THE COURT:  Okay.

9                    MR. GUSO:  The debtors have shared with --

10  we don't wish to speak publicly about how much the debtors

11  have allocated to a particular litigation, but the debtors

12  have shared with their proposed special counsel --

13                   THE COURT:  And this doesn't require that,

14  this language?

15                   MR. GUSO:  That they've shared -- correct,

16  Judge, and they shared with the committee's lawyers on a

17  professional-eyes-only basis, subject of a joint interest

18  arrangement, how the debtors proposed to allocate the

19  million eight amongst the different professionals.  That

20  has been shared.  We've given Quarles & Brady our initial

21  allocation.

22                   By way of example, your Honor, now that the

23  OBI appeal will likely be handled for less dollars than

24  what the debtors originally budgeted, there will be

25  additional dollars, theoretically, available within the

1    overall litigation budget.  Whether those are allocated to

2    Quarles & Brady, or in some other fashion, could be left

3    to the debtors' discretion.  I think that's the

4    flexibility that Quarles & Brady wishes to preserve.

5                    THE COURT:  I see.  All right, but we're all

6    sort of in agreement that --

7                    MR. GUSO:  All of us are constrained by the

8    budget --

9                    THE COURT:  You're all constrained by the

10   budget --

11                   MR. GUSO:  -- including the debtor.

12                   THE COURT:  -- and the debtor is the one

13   that sort of has to manage it all.

14                   MR. GUSO:  Yes, sir.

15                   THE COURT:  All right.  So, Mr. Combest,

16   tell me.

17                   MR. COMBEST:  Thank you, your Honor.  For

18   the record, again, Christopher Combest, for the purposes

19   of today, here on behalf of Quarles & Brady and its

20   retention order.

21                   If I may, I'd like to just step back a

22   moment and distinguish between two very different things

23   that we're talking about here.

24                   The budget that we've been discussing is the

25   cash collateral budget, that is the amount of the bank's

Page 48

1    own property, its collateral, that the banks are willing

2    to allow to be used for a particular purpose, in this case

3    for the nonbankruptcy litigation.

4            That amount bears no necessary relationship

5    to the amount of fees and costs that this Court may

6    ultimately approve as reasonable, and necessary, and

7    beneficial to the estate.

8            We have no control over our opponents, we

9    have no control over what they may file, and what we may

10   need to respond to.

11           What we see this language as, and I think

12   the committee essentially said this a moment ago, the

13   committee wants to ensure that we don't even have the

14   right to seek allowance of fees and costs beyond whatever

15   amount happens to be in that line item of -- that cash

16   collateral line item.

17           Well, if the recapitalization or sale

18   process does very well, and the secured creditors are paid

19   off, and there is money for administrative expenses that

20   is unencumbered, there is no reason that we should not be

21   allowed to look to that money for payment of fees that the

22   Court allows through the fee application process, which is

23   where the committee's protection comes in.

24           We view this language as the committee is

25   seeking to prevent us from doing that, and to agree that

1    we will never bill anything more, and never seek allowance

2    of anything more than whatever share of that 1.8 million

3    we negotiate with the other professionals to be our fees.

4    That, I think, is inappropriate, your Honor.  It's not

5    required by Section 327.

6                    And, in any event, the committee included

7    this objection regarding the language in a pleading they

8    filed before the February 9th hearing.  It was entitled a

9    supplemental objection to the Levine firm, or the

10   Sanchez's firm retention, they didn't mention

11   Quarles & Brady, but in the actual body of the objection

12   it did say that the committee wanted this language.  The

13   committee didn't raise it at the hearing.  The committee

14   didn't alert the Court to it, and then the Court granted

15   the application, without sustaining, to my recollection,

16   any objections of the committee.

17                    So I would say that that objection is waived

18   in any event, but it is inappropriate to ask us to, at

19   this moment, on retention, agree never to seek any fees

20   for our work beyond what's in the -- beyond what the banks

21   are willing to let go of their collateral for.

22                    We know that we may not be paid in full, all

23   estate professionals take that risk, but we shouldn't have

24   to now -- sort of agree now not to be paid in full, and

25   that we see as -- that's our view of what the language is

1    trying to do.

2            THE COURT:  All right.  So, to summarize

3    you're essentially saying that the budget is the budget,

4    and you recognize that it will be within the debtor's

5    discretion to allocate the available million eight to your

6    firm and the other firms as the debtor deems appropriate

7    in its business judgment, but if you are not paid in full,

8    in terms of what's available under that budget, you're

9    simply reserving the right to seek an application, as an

10   administrative expense claim, that subject to the Johnson

11   factors, and reasonableness, and all of those things, but

12   if allowed you see no reason why the budget should

13   constrain your allowed claim, essentially, and whether

14   that gets paid or not is anyone's guess, depending on the

15   outcome of the case.

16           MR. COMBEST:  Yes, your Honor, that's

17   absolutely right.  The amount of collateral that the bank

18   wants to -- is willing to let go of for this purpose

19   should not constrain our ability to seek allowance of, you

20   know, whatever fees we incur pursuant to all the various

21   procedures --

22           THE COURT:  All right, and some of your

23   concern is that your work is unpredictable.

24           MR. COMBEST:  Correct, and it depends on

25   what our very well-funded opponents may do.

Page 51

1          THE COURT:  Understood.

2          All right.  So, Ms. Mannix, let me just ask

3   you about that.  It seems to me that no one disputes the

4   fact that the debtor does have a budget, and that it has

5   to live with it, the million eight is the million eight.

6          I don't think it's really disputable either

7   that if a law firm retained by the estate performs work,

8   files a fee application, and that fee application is

9   granted because it complies with all of the reasonableness

10  standards, and those things that are applicable to fee

11  applications, that that firm ought to have an

12  administrative expense claim.  Whether it's paid or not is

13  always the big question.

14         Tell me what the concern is then, having

15  heard Mr. Combest explain his concern that the committee

16  has, as long as the debtor, who is going to, I assume, do

17  everything it can to make sure it stays within the budget,

18  what is the concern with Quarles & Brady, again, subject

19  to fee application and it being allowed, it's got to

20  benefit the estate, et cetera, et cetera, having what

21  essentially amounts to a potentially unpaid administrative

22  expense claim?

23         MS. MANNIX:  Your Honor, I don't think it's

24  the committee's position that this language is meant to be

25  a cap on their ability to seek fees, and the committee

Page 52

1    understands that fees are contested at a later date.

2                    This is simply language that we're

3    proposing, for Quarles & Brady to acknowledge this line

4    item in the budget.  It's something that has not only been

5    put in the email that was sent to Chambers with the

6    proposed order.  All estate professionals are constrained

7    by the budget which sets the limits the debtors can spend

8    during the pendency of the cases.  It's not only

9    acknowledged in that email, it was acknowledged on the

10   record by debtors' counsel on the February 9th hearing.

11   So it's something that they've acknowledged, affirmatively

12   admitted, and we just want to memorialize it here in this

13   retention order.

14                   THE COURT:  All right.  So let me just look

15   at the language.  It says, Quarles & Brady shall agree to

16   a reasonable litigation budget reflecting the scope.  So

17   you're asking them to agree that their scope is limited to

18   do a pre-approved budget, which I think Mr. Combest is

19   saying he can't really do because of the unpredictable

20   nature of the work that he's engaged in, or that the firm

21   is engaged in.  So there might be a difference between

22   this and the other firm you were referring to previously,

23   I don't know.

24                   But just as a general matter, I do think

25   this is limiting language.  It does read like a cap.  So,

Page 53

1   I don't see why you're saying it doesn't read like a cap,

2   and maybe it could be altered a bit to simply suggest that

3   Quarles & Brady understands going in that there is a

4   budget, and that they will have to work with the debtor in

5   terms of payment from that budget, but not necessarily cap

6   their fees, they can also file an application that isn't

7   covered by the budget, and they may get paid, they may

8   not.

9              MS. MANNIX:  Understood, your Honor.  If you

10  think the language could be tweaked a bit to be more clear

11  as to what we're trying to achieve, your Honor, that's --

12             THE COURT:  Not so much clear, as just to

13  make sure it comports with your goal, which is to make

14  sure the debtor stays within the budget, and Mr. Combest's

15  goal, which is to make sure that Quarles & Brady is not

16  overly constrained.  They know the budget is out there,

17  but they've got to do the work they're going to do, and if

18  granted by the Court, even though it's not paid by the

19  budget, they have the possibility of having an allowed

20  administrative expense claim that may be paid, may not.

21             So, I assume there is some language that

22  fixes -- that covers both of those eventualities.

23  Mr. Combest.

24             MR. COMBEST:  If I may, your Honor?

25             It's not at all clear to me why this

1    language is even necessary, or why this is the committee

2    issue.  We're talking about cash collateral that the bank

3    is letting go of for our pur -- for the purposes of

4    funding this litigation.  If we don't get it, it will go

5    back to the bank.

6              The only purpose of this language, and I

7    would read it as a reasonable litigation budget contained

8    within the legal expenses line item, it does read like a

9    cap because, and if it's not a cap, it's not clear why the

10   committee is concerned at all.

11             Again, the budget is about the bank's

12   property and what it's willing to allow to be used for

13   this purpose.  So, I don't --

14             THE COURT:  Well, I'll tell you my --

15             MR. COMBEST:  -- really understand why this

16   language is necessary at all.

17             THE COURT:  I'll tell you my position.  My

18   position is consistent with, frankly, what Mr. Combest has

19   said, and what you seem to agree to, which is that the

20   debtors got to stay within the budget.  The debtor and the

21   debtors' team of lawyers is only going to get paid from

22   that million eight, and until court approval, or something

23   else changes, that's the -- not the cap, but that's the

24   limit of payment that they all have to live with, and it's

25   for the debtor to manage all of those law firms and what

Page 55

```
 1   they're getting paid, to stay within that million eight,
 2   but I'm not finding today, or at any time, that that's the
 3   limit of what the reasonable fees may be, because I don't
 4   know, I can't say that, and I don't think anybody here can
 5   say that.
 6               And, again, Mr. Combest is right, that he
 7   can't predict entirely what he's going to have to face,
 8   you know, from opposing counsel, who is -- you know, it
 9   may end up being more expensive, maybe it's less
10   expensive, but it may be more expensive.
11               So I'm not finding, and I don't think you're
12   asking that Quarles & Brady be disallowed from filing an
13   application that may exceed the budget, as long as they
14   understand they need another source of payment.
15               MS. MANNIX:  That's correct, your Honor.
16               THE COURT:  Okay.  So I'll give you -- you
17   all can work on that language, now that you know where I
18   am, and I don't think you're disagreeing with where I am.
19   I think that --
20               MS. MANNIX:  We're in agreement, your Honor.
21               THE COURT:  -- you're in agreement.  If you
22   all can work on some language and submit an agreed --
23   language (sic) with agreed language in it, or an order
24   with agreed language in it, that would be better than me
25   working on the language, because I can assure you I
```

```
 1    probably won't even be consistent with what I've just
 2    said, okay?
 3                    MS. MANNIX:  Understood, your Honor.
 4                    THE COURT:  So, you guys work that out.
 5                    MS. MANNIX:  Will do.
 6                    THE COURT:  And at least I think this
 7    discussion was fruitful, because I think you all weren't
 8    really disagreeing with each other.  So -- all right?
 9                    MS. MANNIX:  Thank you.
10                    THE COURT:  All right.  So get me a
11    different order.
12                    MR. COMBEST:  Thank you, your Honor.
13                    THE COURT:  All right.  Thank you.
14                    Is that everything?
15                    Oh, no.  Mr. Murtagh, I need a schedule from
16    you.  Tell me.
17                    So let me make sure I understand.  I read
18    the complaint, and I read parts of the motion for summary
19    judgment, and I didn't get all the way through it, but it
20    seems to me, just a relatively simple issue, wanting to
21    make sure that buyers know, essentially, what they're
22    getting, namely the five percent or not.  So --
23                    MR. MURTAGH:  Correct.
24                    THE COURT:  -- it seems to be ripe for
25    summary judgment, if you will, I guess, I'm not really
```

1    sure what goes into that.  So tell me what schedule,

2    because I guess it may affect the auction.

3                    MR. MURTAGH:  So, your Honor, that's, I

4    think, an accurate short description of what's at stake in

5    the complaint and the summary judgment motion.

6                    We've conferred with counsel to Monster and

7    OBI, and we agreed on a schedule, that if it's acceptable

8    to your Honor, would go as follows, Monster and OBI would

9    respond to the summary judgment motion on March 17th.  We

10   would reply no later than March 24th, and we would be

11   before your Honor for a hearing on March 30th.

12                   THE COURT:  Okay.  Let me just take a look

13   at those dates, the most important of which is March 30th.

14   Okay.  So March 30th, again, is my motion calendar.

15   Generally for oral argument for motions for summary

16   judgment I don't let those go more than an hour.

17                   Do we have time, you think, on March 30th to

18   put an hour aside?

19                   MR. PACHULSKI:  Your Honor, if I may

20   comment?  I apologize.

21                   THE COURT:  Sure, Mr. Pachulski.

22                   MR. PACHULSKI:  I think this is going to

23   take way more than an hour, and I'll -- I didn't want to

24   interrupt either your Honor or counsel to VPX, but this is

25   a much more complicated set of issues, and we would be

1    surprised if it would take only an hour, you're dealing

2    with both trademark and bankruptcy-related issues.

3                    THE COURT:  What are you proposing then, how

4    much time do you think?

5                    MR. PACHULSKI:  I think it would -- I would

6    propose two hours, and I would not be surprised if it took

7    more than that.  I think you're going --

8                    THE COURT:  I mean, it's oral argument, so

9    theoretically I get the benefit of the briefs, and it's a

10   rare occasion that oral argument is better than the

11   briefs, but that's just in my experience, but so tell me

12   why you think you need two hours, where you have the

13   ability to file a brief, that's hopefully going to explain

14   it.

15                   Now, I'm not saying you have unlimited pages

16   in the brief, because if I did that then I'd really be

17   asking for trouble.

18                   MR. PACHULSKI:  Your Honor, I think you're

19   going to have a lot of questions.  This, just to be --

20   since -- and I was going to wait until this is done.  We

21   think, frankly, that -- we've agreed to the schedule, so

22   that's for sure, but what your Honor should understand is

23   because this is so trademark dominant, and because it's

24   been determined that the issue has been decided by

25   California District Court, that we are considering to

Page 59

1   file, some time next week, a motion for mandatory

2   withdrawal of the reference, and to change the venue to

3   the District Court in California.

4              So, this isn't just a run-of-the-mill, we're

5   going to sell an asset, and a run-of-the-mill assumption

6   or assignment.

7              This is a determination of whether or not

8   the District Court in California intended to create this

9   as a license, or as something else, something else

10  amorphous.

11             So, your Honor, we'll do it in an hour, if

12  that's what your Honor wants.  I just want to give a

13  heads-up, that this is not just, we're trying to sell an

14  asset, what's the big deal?

15             If your Honor ultimately is the one who

16  decides it, you're going to have to get into the head of

17  the California District Court, and make that

18  determination.  This is not a, let's look at the statute

19  and it's all good.  There will be statutes involved, but

20  this is way more complicated.

21             So, we'll take whatever your Honor says.

22  This was sprung on us.  We thought this was going to be

23  potentially later.  This could have been filed any time in

24  the last four, five months, and we're trying to deal with

25  it real time, but I just, I don't want anybody -- I don't

Page 60

```
 1   want your Honor to say why did we set an hour, and now
 2   I've got 50 questions about what the district court judge
 3   did, why is there a fee versus a royalty in the argument
 4   of the debtor.  It's, again --
 5                THE COURT:  Well --
 6                MR. PACHULSKI:  To the debtors' credit, they
 7   did a nice job of trying to make it simple, but it's not.
 8                THE COURT:  I understand.  All right.  So,
 9   that's your perspective, I get that, and when I say
10   limited to an hour, frankly, I was limiting the parties'
11   argument to an hour.  I wasn't limiting myself to an hour
12   if I needed more time.
13                MR. PACHULSKI:  No, I assume --
14                THE COURT:  One of the few luxuries I have
15   as a judge is I get to go past my own time limits, so I
16   wasn't --
17                MR. PACHULSKI:  That's fine.
18                THE COURT:  -- expecting that, but it is
19   helpful, actually, if I limit the amount of time for the
20   lawyers, because then you all need to focus your
21   arguments, actually.  It's also -- I'm learning, actually,
22   but it's also helpful to limit the number of pages in a
23   brief because, again, that helps you focus your argument,
24   or it requires you to focus your argument, which may be
25   painful, because writing something shorter is always
```

1    painful, but it's actually -- in the long run, it's

2    actually helpful.

3                    So, I hear what you're saying, and I am open

4    to a longer hearing, which is why I'm going to suggest the

5    day before the 30th, because I've got an open day then,

6    and we can set it for 10:00 a.m., and we can set it for an

7    hour, but I would reserve the right to go beyond an hour

8    if I'm still -- if I need that time, as opposed to you all

9    needing that time.

10                   Does that work, Mr. Pachulski, from your

11   perspective?

12                   MR. PACHULSKI:  It does, your Honor.

13                   THE COURT:  Because it was -- by the way, I

14   heard in your voice concern for me, which I appreciate,

15   not so much for yourself.

16                   MR. PACHULSKI:  Well, I think -- well, I

17   didn't -- the reason I wanted to lay out all of the issues

18   is I'm concerned for myself, too, that your Honor won't

19   appreciate it, and then say why didn't you tell me.  So --

20                   THE COURT:  No, no, no, I get that, I get

21   that, and that's -- and I was half joking, but only half

22   joking.

23                   MR. PACHULSKI:  And I'm the other half of

24   the joke, your Honor.

25                   THE COURT:  Right.  So does the 29th work,

1    though, for everybody?  Because that would give us some

2    more time.

3                    MR. PACHULSKI:  Yes.  Your Honor, just so

4    it's clear, and it does, one of the big battles that we

5    had in terms of coming up with the dates, is the amount of

6    time to give your Honor the time to consider it because,

7    as I said --

8                    THE COURT:  When is the last brief due?

9    When is reply due?

10                   MR. PACHULSKI:  The last brief due is

11   March 24th, so you would have five -- you would have,

12   effectively, three or four days to really think about it.

13   So --

14                   THE COURT:  Okay.

15                   MR. PACHULSKI:  -- if your Honor -- again, I

16   was trying to accommodate -- before it looked like it

17   would be two, three days, when we were in discussions.  I

18   didn't think that -- frankly, I didn't think that was fair

19   to us or to your Honor.  Whether it's six days or five, I

20   think six is better but, you know --

21                   THE COURT:  All right.  So, let's --

22                   MR. PACHULSKI:  -- it's your call.

23                   THE COURT:  So what's very important in that

24   regard is page limits.

25                   So, how long was your motion, Mr. Murtagh?

1    I forget.

2                    MR. MURTAGH:  I'd have to pull it up to get

3    the page numbers, your Honor.

4                    But as I do that, I'd say, you know, in our

5    view it was a model of concision, but let me get the

6    numbers.

7                    (Laughter.)

8                    MR. PACHULSKI:  Your Honor, if I may?

9                    What makes this really complicated in some

10   respects is there are four sets of lawyers that are going

11   to be dealing with it on our side, because you have --

12   just to be clear, Monster and Orange Bang, while they have

13   the combined judgment, may have different views.

14                   So, we will be filing a brief, I suspect

15   Orange Bang will be filing a brief, just to be clear,

16   because the motion for summary judgment is against both of

17   us, and we both have trademark counsel, separate trademark

18   counsel.  In fact, we'll have to discuss how we will argue

19   this.

20                   What I would prefer to do, if at all

21   possible, because we're going to work on this, but our

22   brief isn't due until March 17th, is I would like to at

23   least be able to consult with my co-counsel, as compared

24   to let's just pick the pages, if we could.  I think there

25   are other hearings coming up, we could have a status

1   conference in Orange --

2                   THE COURT:  Well, what I would do,

3   Mr. Pachulski, frankly, is limit the pages now, and if you

4   needed leave of that order to -- and had good reason to

5   need more pages, you can let me know that in a motion for

6   relief from that order.

7                   But normally speaking, I frankly would have

8   entered an order limiting the pages anyway, but of course

9   open to, if you need more pages, to explain your

10  circumstance, then you'd file a motion, and you can even

11  do it, frankly, ex parte, and the Court would consider it.

12                  But I can assure you that if I don't limit

13  the pages, you're not well served, and the Court is not

14  well served, so -- when it comes to these kinds of things.

15  So, at least that's -- I've been doing this for two and a

16  half years, and that's become very clear to me over that

17  two and a half years, and if you ask any other judge

18  that's been doing it for decades, they would tell you the

19  exact same thing.

20                  And, in fact, Judge Mark rails on and on

21  about if you don't have page limits in your briefing

22  schedule, you're really -- you're really making a mistake.

23  So, I'm going to put a page limit on it, but again, if you

24  all need leave from that, and you can explain why, then

25  I'm open to it.

Page 65

```
 1                So, Mr. Murtagh, did you figure out how many

 2    pages your motion was?

 3                MR. MURTAGH:  I did, your Honor.  It's 27

 4    pages, without a superfluous word in them.

 5                (Laughter.)

 6                THE COURT:  Okay.

 7                MR. MURTAGH:  And, look, I just wanted to

 8    note, your Honor, I understand that Mr. Pachulski thinks

 9    this is complicated, and it may or may not be, but I do

10    have an issue with the multiplication of briefs.

11                If your Honor sets a 20-page limit, and

12    instead it's 40 because there is two briefs -- I mean, we

13    didn't file two briefs because we've got two debtors that

14    are subject to the arbitral award.  They're one party for

15    the purposes of defending this interest, and I don't think

16    they can tell you otherwise.

17                THE COURT:  Well --

18                MR. PACHULSKI:  Your Honor --

19                THE COURT:  Yeah, I'm not going to agree

20    with that, Mr. Murtagh.  They're two separate

21    corporations, they have two separate interests.  You know,

22    they may be aligned in certain respects, but I rarely

23    require two parties to figure out how to put within a

24    number of pages their arguments, so -- but it's for me to

25    read.  I know it's for you to reply to, but theoretically,
```

1    if they're smart, they will limit their arguments, because

2    that's far more effective, to their best arguments, and

3    they'll stay within the length of the brief, and then

4    you'll have an opportunity to reply.

5             So, I hear what you're saying, but again, in

6    my experience, I just don't -- I don't want to put them in

7    a situation that's untenable.

8             So, Mr. Pachulski, I would say that each,

9    Orange and Monster, would have a page limit of 25, it's

10   not quite 27, but it's 25, which Mr. Murtagh is not wrong,

11   that gives you a lot more pages then he had, and then,

12   Mr. Murtagh, I would give you 15 pages to reply.  Does

13   that make sense?

14             MR. MURTAGH:  That amount of space is

15   adequate for the debtor's reply, your Honor.

16             THE COURT:  Okay.  All right.  So that's

17   what I'm ruling.  Mr. Pachulski, you know, again, if you

18   need leave, you can file a motion, but just make sure it's

19   a very good reason because, again, I'm trying to do us all

20   a favor here, all right?

21             MR. PACHULSKI:  Your Honor, as someone who

22   has spent a long time working on the Boy Scouts case,

23   where briefs are 200 pages, I appreciate the comment.

24             THE COURT:  Yeah, I mean, it's just -- and,

25   by the way, they could be 200 pages, but it doesn't help.

1    Remember, I'm a human being, I've got law clerks that are
2    human beings.  To have us go through 200 pages is not only
3    -- and absorb it all, and really understand it, but not
4    only is it inefficient, but it's just not helpful, and
5    it --
6                    MR. PACHULSKI:  Yes, I --
7                    THE COURT:  -- doesn't get you where you
8    want to be, so --
9                    MR. PACHULSKI:  Yeah, I get it.  I probably
10   would have asked for 30 pages.  I wasn't asking for 100 or
11   200.  I probably would have asked for five more, but we'll
12   make it work, and if we need the extra five, we'll come
13   before your Honor and ask for them.
14                   THE COURT:  All right.  So get me an order
15   then, Mr. Murtagh, since you're the movant, laying out
16   that scheduling order and briefing schedule, with the page
17   limits, and we'll see you here on March 29th, did I say?
18   March 29th at 10:00 a.m. --
19                   MR. PACHULSKI:  Yes.
20                   THE COURT:  -- for an hour, with the Court
21   reserving the right, if I'm particularly dense that day,
22   more dense than usual, to ask more questions beyond that
23   hour, okay?
24                   MR. PACHULSKI:  Your Honor, one very, very
25   last matter.  I assume we'll just coordinate with the

1    clerk, because if we do decide to file the motion for

2    mandatory withdrawal of the reference, in the first

3    instance, if we wanted a stay of the proceeding, we'd go

4    to your Honor.

5              THE COURT:  Correct.

6              MR. PACHULSKI:  And so we would just

7    coordinate that, if that's where we end up going.

8              THE COURT:  Yeah, and just, in advance, the

9    -- you know, the stay issue would certainly, unless you

10   can get the appellate court, or the district court to

11   withdraw the reference and rule on this motion quickly,

12   there is a sale at issue, and this could affect the sale

13   for obvious reasons.

14             So, you know, at least that's why the motion

15   and the adversary was filed in the first place.  Now, I'm

16   not finding that, because I don't know exactly, you know,

17   other than the obvious, does the buyer get the 5 percent

18   or not, that's a pretty obvious question, but I don't know

19   whether it's necessary or not, but just keep that in mind,

20   and as we all know, I don't decide motions to withdraw the

21   reference.  So I would get your stay, and I would -- your

22   stay motion, and I would rule on it very quickly, and then

23   if you don't like the result, you would go to the district

24   court.  If you like the result, then I guess Mr. Murtagh

25   would go to the district court, but --

Page 69

1               MR. PACHULSKI:  Yes, your Honor, just to be

2       clear, we appreciate that, which is why we're assessing

3       the issues.

4               We would have hoped this would have been

5       filed months ago, because there is no reason it shouldn't

6       have been.  This was -- it's the same issue the day the

7       case was filed but we inherited --

8               THE COURT:  I can't help that.

9               MR. PACHULSKI:  -- what we inherited, and

10      we'll live with it.

11              THE COURT:  Yeah, I mean, I can't change

12      that, and it is what it is, and maybe it dawned on them

13      because a buyer raised the issue.  You know, I don't know.

14              MR. PACHULSKI:  Well, that I don't know

15      either, and we just wanted to make it work so that we

16      could have a hearing that accommodated all of the parties,

17      so that's what we tried to do.

18              THE COURT:  All right.  Understood.

19              Okay.  So I'll get that order from you,

20      Mr. Murtagh, or who should I be looking for it to be

21      submitted by?

22              MR. MURTAGH:  By ourselves, or Mr. Guso's

23      firm, your Honor.

24              THE COURT:  All right.  Fine.

25              Okay.  Anything else we need to do in Vital

Page 70

1  Pharmaceuticals?

2              MR. GUSO:  No, sir.  Thank you, your Honor.

3              THE COURT:  All right.  Everybody have a

4  great day.  Thank you all.

5              MS. MANNIX:  Thank you, your Honor.

6              MR. SORKIN:  Thank you, your Honor.

7              MR. PACHULSKI:  Thank you, your Honor.

8

9

10

11              (Thereupon, the hearing was concluded.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 71

1

2

3                        **CERTIFICATION**

4

5    STATE OF FLORIDA        :

6    COUNTY OF MIAMI-DADE  :

7

8                    I, Cheryl L. Jenkins, RPR, RMR, Shorthand

9    Reporter and Notary Public in and for the State of Florida

10   at Large, do hereby certify that the foregoing proceedings

11   were transcribed by me from a digital recording held on

12   the date and from the place as stated in the caption

13   hereto on Page 1 to the best of my ability.

14                    WITNESS my hand this 2nd day of March, 2023.

15

16

17            _____

18             CHERYL L. JENKINS, RPR, RMR

19             Court Reporter and Notary Public
               in and for the State of Florida at Large
20                  Commission #HH 170910
                    December 27, 2025

21

22

23

24

25