1                 UNITED STATES BANKRUPTCY COURT

                 SOUTHERN DISTRICT OF FLORIDA

2

3

4  IN RE:                  CASE NO. 22-17842-PDR

5 VITAL PHARMACEUTICALS, INC.,

6         Debtor.

    _____/

7

8                    ECF #786

9                 March 2, 2023

10           The above-entitled cause came on for hearing

11 before the Honorable Peter D. Russin, one of the Judges in

12 the UNITED STATES BANKRUPTCY COURT, in and for the

13 SOUTHERN DISTRICT OF FLORIDA, at 299 E. Broward Blvd.,

14 Fort Lauderdale, Broward County, Florida, on March 2,

15 2023, commencing at or about 2:30 p.m., and the following

16 proceedings were had.

17

18

19

20

21

22

23

24         Transcribed from a digital recording by:

           Cheryl L. Jenkins, RPR, RMR

25

Page 2

```
 1
                        APPEARANCES:
 2
 3                    BERGER SINGERMAN, by
                   SAMUEL CAPUANO, Esquire
 4                          and
                   LATHAM & WATKINS, by
 5                 AMY QUARTAROLO, Esquire
                   On behalf of the Debtor
 6
 7                     SEQUOR LAW, by
                   LEYZA BLANCO, Esquire
 8                 JUAN MENDOZA, Esquire
                          and
 9                 LOWENSTEIN SANDLER, by
                   ERICA MANNIX, Esquire
10                 RACHEL MAIMIN, Esquire
                   ERIC CHAFETZ, Esquire
11                 On behalf of the Official
               Committee of Unsecured Creditors
12
                      AKERMAN, LLP, by
13                  EYAL BERGER, Esquire
                           and
14         PACHULSKI STANG ZIEHL & JONES, by
           ROBERT FEINSTEIN, Esquire (via Zoom)
15            On behalf of Monster Energy
16    J. STEVEN WILKES, Trial Attorney (via Zoom)
                Office of the U.S. Trustee
17              Department of Justice
18                 K&L GATES, by
                JEFFREY KUCERA, Esquire
19
                     ALSO PRESENT
20
                    BRENT WILLIAMS
21
       ECRO - Electronic Court Reporting Operator
22
                     - - - - - - -
23
24
25
```

Page 3

1

2

3                              **INDEX**

   **WITNESS**            **DIRECT**   **CROSS**   **REDIRECT**   **RE-CROSS**
4

**Brent Williams**
5   By Ms. Maimin       11                         48
    By Ms. Quartarolo               31
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    THE COURT:  Okay.  Vital Pharmaceuticals,
 2    22-17842.  Nobody wants to come up to the podium, huh?
 3    Somebody's got to start.
 4                    MS. QUARTAROLO:  I'll start, your Honor.
 5    Amy Quartarolo, last name is spelled Q-u-a-r-t-a-r-o-l-o,
 6    Latham & Watkins, on behalf of the debtors.
 7                    THE COURT:  Thank you.
 8                    MR. CAPUANO:  Good afternoon, your Honor.
 9    Samuel Capuano, C-a-p-u-a-n-o, from Berger Singerman,
10    co-counsel with Latham & Watkins for the debtors.
11                    THE COURT:  Thank you.
12                    MS. BLANCO:  Good afternoon, your Honor.
13    Leyza Blanco, of Sequor Law, B-l-a-n-c-o, first name
14    L-e-y-z-a.  Also joining me today by Zoom is
15    Mr. Juan Mendoza, his name is spelled M-e-n-d-o-z-a, from
16    Sequor, as well, and in the courtroom with me today are
17    co-counsel from Lowenstein Sandler, Ms. Rachel Maimin,
18    M-a-i-m-i-n, Mr. Eric Chafetz, C-h-a-f-e-t-z, and
19    Ms. Erica Mannix, M-a-n-n-i-x.  Also in the courtroom,
20    your Honor, today is Mr. Brent Williams.  He's the co-head
21    of the capital advisory group of Lincoln Partners
22    Advisors, LLC, the declarant in support of our motion
23    today.
24                    THE COURT:  Thank you.
25                    MS. BLANCO:  Thank you.
```

1              MR. KUCERA:  Good morning, your Honor.

2      Jeffrey Kucera, K-u-c-e-r-a, from K&L Gates, LLP, on

3      behalf of several of these subpoenaed entities that are

4      affected by today's motion, Jonathan W. Owoc, 3 Pelican

5      Drive, LLC, JWO Real Estate Investment I, LLC, JWO Real

6      Estate Investment 2, LLC, JW Owoc Enterprises, LLC, 167

7      Spyglass Lane, LLC and 120 Spyglass Lane, LLC.

8              THE COURT:  Thank you.

9              MR. BERGER:  Good afternoon, your Honor.

10     Eyal Berger, B-e-r-g-e-r, Akerman, co-counsel for Monster

11     Energy, creditor.

12             THE COURT:  Thank you.

13             And on Zoom, Mr. Kapur, do you want to make

14     a --

15             MR. FEINSTEIN:  Oh, I'm sorry, I'll change

16     my name, your Honor.

17             THE COURT:  Oh, Mr. Feinstein.

18     Mr. Feinstein, I'm sorry.

19             MR. FEINSTEIN:  Yeah, I'll correct that, but

20     I'm appearing today on behalf of Monster Energy.  Thank

21     you.

22             THE COURT:  Yes, Mr. Feinstein, just give

23     your full name, and spell your last name.

24             MR. FEINSTEIN:  Sure, Robert Feinstein,

25     F-e-i-n-s-t-e-i-n, appearing on behalf of Monster Energy.

1                    THE COURT:  Thank you.

2                    Mr. Wilkes.

3                    MR. WILKES:  Good afternoon, your Honor.

4    J. Steven Wilkes for the United States Trustee, Region 21.

5                    THE COURT:  Thank you.

6                    So the reason, we're getting a little

7    difficulty with the court reporter on these transcripts,

8    so we're -- we have to do better, apparently, apparently,

9    in getting people's full names, and spelling their names,

10   so -- that was actually one of the first things that

11   happened to me when I got on the bench, was I got an email

12   from Cheryl, who is the court reporter that does most of

13   these things, telling me that I'm not doing a good job

14   getting people's names and spellings.  So, it was

15   literally one of the first emails I got.

16                    So, anyway, all right, so who is going to be

17   -- who wants to be heard on this motion?  And, in fact,

18   let me ask, if you don't mind, there seems to be sort of

19   an issue hanging out there still, maybe, because I don't

20   recall getting an order yet on approving, in part,

21   debtors' application for order authorizing the employment

22   of Andrew Beilfuss, and the law firm of Quarles & Brady.

23   Has that been -- I just want to clear this up because --

24                    MR. CHAFETZ:  Yes, your Honor, Eric Chafetz.

25                    THE COURT:  I know that I already sort of

1   screwed up by not having seen the competing orders, and

2   then we had a whole big discussion about it.

3                   MR. CHAFETZ:  Yes, just --

4                   THE COURT:  And then I still left it upon

5   you guys to work it out.  So what happened?

6                   MR. CHAFETZ:  No.  Thank you.  Eric Chafetz

7   on behalf of the official committee of unsecured

8   creditors.

9                   There -- par for the course, there have been

10  competing orders going back and forth between the

11  committee and the debtors.  We just got a copy of the

12  transcript today, I believe.

13                  THE COURT:  Okay.

14                  MR. CHAFETZ:  And we should be able to

15  submit something -- I don't want to be held to this, in

16  the next day or so, and hopefully we can come to an

17  agreement on the form of order, but we're just not there

18  yet, but there --

19                  THE COURT:  All right.  So --

20                  MR. CHAFETZ:  It's in process, we're just

21  not there yet.

22                  THE COURT:  -- if you can't resolve it, send

23  me competing orders, I will resolve it.

24                  MR. CHAFETZ:  That's fine.

25                  THE COURT:  I want you to know that I am

1   going to do that if you all can't do it yourselves.

2                   MR. CHAFETZ:  That's fine.

3                   THE COURT:  My preference was, of course --

4                   MR. CHAFETZ:  Of course.

5                   THE COURT:  -- to give you an opportunity to

6   do that, but anyway --

7                   MR. CHAFETZ:  Right.  No, we will get back

8   to you as soon as possible, your Honor.  Thank you.

9                   THE COURT:  Okay.  Thank you.

10                  All right.  Ms. Quartarolo.

11                  MS. QUARTAROLO:  Thank you, your Honor.

12                  So, we're here this afternoon on the

13  debtors' motion to quash, or motion for protective order.

14  I'm happy to handle things in whichever order your Honor

15  would like.  We understand that the committee --

16                  THE COURT:  Well, there is one motion, no?

17                  MS. QUARTAROLO:  There is one motion, but we

18  understand --

19                  THE COURT:  But it's two different remedies,

20  or what order are we talking about?

21                  MS. QUARTAROLO:  Sure, let me expand on

22  that.

23                  We understand that the committee actually

24  would propose putting their declarant on the stand, and so

25  I'd defer to your Honor in terms of whether you'd like to

1    have argument, and then determine whether you would like

2    to take evidence, or whether you'd like to take evidence

3    first, up to you.

4                 THE COURT:  Yeah, so I wasn't actually

5    expecting evidence on such a matter.  I know there was a

6    declaration, but I was not really expecting that, but if

7    that's what -- if that's how this needs to be prosecuted,

8    I'm fine with that.

9                 MS. MAIMIN:  Your Honor, we don't expect --

10   I'm Rachel Maimin, your Honor.

11                THE COURT:  Yes, I have that, okay, yes.

12                MS. MAIMIN:  We don't expect the direct

13   examination to last more than 15 or 20 minutes.  So --

14                THE COURT:  Okay.

15                MS. MAIMIN:  -- it shouldn't hold things up

16   too much.

17                THE COURT:  All right, understood.

18                Okay.  All right.  So -- but the burden is

19   on the movant, right, Ms. Quartarolo?  So do you want to

20   -- you're just going to rest on your pleading, or how are

21   you doing this?

22                MS. QUARTAROLO:  No.  Well, we certainly

23   intend to argue, but we're happy to have the evidence

24   taken first, if that's most efficient.

25                THE COURT:  Okay.  All right.  That's fine.

```
 1                    MS. MAIMIN:  I think it was raised for the
 2   first time in the reply papers, that there is an
 3   application for protective order.  So, I was just --
 4                    THE COURT:  So maybe the burden is.
 5                    MS. MAIMIN:  I mean, I just hope that we are
 6   able to distinguish between those two requests, because
 7   that's a new request.
 8                    THE COURT:  Understood, okay, and you'll
 9   remind me of that.
10                    MS. MAIMIN:  Yes, Judge.
11                    THE COURT:  Okay.  All right.  So who's
12   calling the witness?
13                    MS. MAIMIN:  Your Honor, we'd call
14   Brent Williams.
15                    THE COURT:  All right.  Ms. Weldon, swear or
16   affirm the witness.
17                    ECRO:  Do you swear or affirm that the
18   testimony you will give in this case will be the truth,
19   the whole truth, and nothing but the truth under penalty
20   of perjury?
21                    MR. WILLIAMS:  I do.
22                    ECRO:  Thank you.
23   Thereupon,
24                        BRENT WILLIAMS,
25   having been first duly sworn, was examined and testified
```

1  as follows:

2              THE COURT:  Ms. Neiman, you can -- it's

3  Neiman or Maimin?

4              MS. MAIMIN:  Maimin.

5              THE COURT:  Maimin.

6              Ms. Maimin, proceed.

7                   DIRECT EXAMINATION

8  BY MS. MAIMIN:

9        Q.    Okay.  I'm definitely going to ask you your

10  name, because I think that's mandatory at this point.

11             Please state, and spell your name for the

12  record?

13       A.    Sure, it's Brent C. Williams, first name is

14  B-r-e-n-t, C., and then Williams, W-i-l-l-i-a-m-s.

15       Q.    Where do you work?

16       A.    I work at Lincoln Partners Advisory out of

17  New York.

18       Q.    What is that?

19       A.    That's a financial advisory and investment

20  bank firm that specializes in mergers and acquisitions,

21  capital-raising, as well as (inaudible) restructuring.

22       Q.    What's your title and role there?

23       A.    I co-head the capital advisory group.

24       Q.    So, can you just, not going into too much

25  detail, explain the trajectory of your career before you

1   joined Lincoln?

2        A.    Yes, sure.  So I've probably been involved

3   in restructuring, both operational and financial for over

4   25 years.  I've been involved in probably $110 billion of

5   restructures.

6        Q.    So, you've been in this industry for over

7   25 years --

8        A.    Correct.

9        Q.    -- you said?

10       A.    Yes.

11       Q.    Do you have experience, in particular, in

12  Chapter 11 bankruptcies?

13       A.    Yes, I've been working in both CCAA and

14  Chapter 11 since probably the late '90s.  So, advised the

15  committee in PG&E, Chassix, Dura Automotive, Visteon, and

16  some cases down in Florida, actually, both Super Telecom,

17  well as Pier USA.

18       Q.    In what capacity were you --

19            THE COURT:  We were counsel for Super

20  Telecom.

21            THE WITNESS:  I recall that, your Honor.

22            THE COURT:  I don't recall you.

23            THE WITNESS:  Okay.

24            THE COURT:  But that does not mean that, you

25  know, you weren't fantastic, but I don't think there is

1    any issue with the fact that we were representing Super

2    Telecom.  Who were you --

3                    THE WITNESS:  I had --

4                    THE COURT:  -- involved with in that case?

5                    THE WITNESS:  -- a co-advisory, your Honor,

6    with BellSouth and the UCC.

7                    THE COURT:  Ah, gotcha, okay, no issue

8    there, because we were definitely on opposite sides of

9    that transaction.

10                   MS. MAIMIN:  No issue from our point of

11   view.

12   BY MS. MAIMIN:

13        Q.    In what capacity were you retained, and you

14   just mentioned one of them, in these Chapter 11

15   bankruptcies, primarily?

16        A.    Sure, we'd either take the role of financial

17   advisor or investment banker, and that could also include

18   company side, both in court and out of court, as well as

19   committee representations.

20        Q.    So, what exactly do you do in your capacity,

21   when you are hired in a Chapter 11 bankruptcy, what's your

22   mission?

23        A.    Sure, I guess it depends whether you're

24   company side by debtor or creditor side.  So, on the

25   company side you could provide, you know, capital raising,

1    distressed M&A negotiations on behalf of the debtor, in

2    terms of debt restructuring.

3              On the creditor side you can do both

4    financial advisory, which we're doing in this role, or

5    also investment banking services, which Miller Buckfire is

6    doing that role.

7         Q.   What financial advisory services are you

8    primarily providing here?

9         A.   Here, we're really focused on what we refer

10   to as the FA side of it.  So we're looking at the books

11   and records.  Obviously we went through and looked at the

12   MORs, the SOFAs.  We due-diligenced the business plan.  We

13   also tracked liquidity vis-a-vis the DIP lender.

14              MS. MAIMIN:  Your Honor, we respectfully

15   move into evidence Mr. Williams' declaration.  We

16   understand that's on consent of debtors.

17              THE COURT:  Okay.  So no objection to -- but

18   subject to cross-examination, of course.

19              MS. MAIMIN:  Of course.

20              MS. QUARTAROLO:  Correct, your Honor.

21              THE COURT:  Okay.  All right, then the Court

22   will accept that declaration, I guess as a proffer, is

23   what you're essentially saying.

24              MS. MAIMIN:  Yes, your Honor.

25              THE COURT:  And subject to

1    cross-examination.

2                    MS. MAIMIN:  We don't want to waste too much

3    time today.  So we're going to really augment the

4    declaration.

5                    THE COURT:  Okay.  Great.

6    BY MS. MAIMIN:

7         Q.    So, during the course of the task that you

8    just mentioned, did you seek from debtors' professionals,

9    and did counsel for the committee seek from debtors'

10   lawyers certain documents?

11        A.    Yes.  So, this is a unique situation,

12   your Honor, because it is an S Corp, which you don't

13   usually see given the size of the company.  So the way the

14   S Corp mechanism works is you have an income flow through

15   to, in this case it would be Mr. Owoc, and those

16   distributions could take the form of straight cash

17   payments, or it could be payments of third parties, that

18   are for his benefit, and would basically become a

19   distribution.

20                   THE COURT:  And it's those payments that are

21   the subject matter of the discovery, essentially?

22                   MS. MAIMIN:  Correct, Judge.

23                   THE COURT:  Okay, yes.

24   BY MS. MAIMIN:

25        Q.    And that's because Mr. Owoc is the whole --

1    the owner of the company?

2              A.    Correct, yes.

3              Q.    So, what documents did you get in their

4    totality from either Heron, who is the professionals for

5    the debtors, or through the lawyers?

6              A.    Yes.  So today we've got, I think it was,

7    the GL was upwards of 100,000 transactions or records in

8    that document, which we had to due diligence.  In addition

9    to that, you know, there has been some Excel spreadsheets

10   and, obviously, commentary provided by Heron, but to date

11   we don't have the underlying, you know, information or

12   data we need to assess the merits of the various

13   transactions and distributions.

14             Q.    And we'll get to that in a moment, but I

15   take it you did ask for additional material?

16             A.    Yeah, I mean, there is a basic protocol in

17   place.  So, you know, we obviously have various

18   conversations with Heron, and then in order to not, you

19   know, burden the estate with duplication, we would

20   coordinate with Lowenstein, and have a document request

21   that would be sent to, obviously, our colleagues at

22   Latham.

23             Q.    And you didn't receive anything in addition

24   to what we just mentioned?

25             A.    There has been some verbal commentary, a few

1    Excel spreadsheets, but nothing of --

2                    THE COURT:  So let me make sure I

3    understand, Mr. Williams.  You're saying that discovery

4    that would be sought is discovery of information that you

5    feel you need to do your analysis, essentially, is that

6    right?

7                    THE WITNESS:  Correct, your Honor.

8                    THE COURT:  And you would provide that

9    information to counsel, counsel would theoretically put it

10   in a 2004 document request, and here we are.

11                   THE WITNESS:  Yeah, I think that could be a

12   protocol, yes.

13                   THE COURT:  Okay.

14                   MS. MAIMIN:  Well, we're close -- it's close

15   to that, your Honor.

16                   The reason why we're seeking the 2004 is

17   because we haven't been able to get the information from

18   the debtors.

19                   THE COURT:  The lack of the information.

20                   MS. MAIMIN:  Yes, exactly.

21                   THE COURT:  I understand.

22                   MS. MAIMIN:  Exactly, your Honor.

23                   THE COURT:  Okay.

24   BY MS. MAIMIN:

25        Q.    So, when you reviewed the material that you

1    were provided, what, if anything, did you notice that was

2    unusual about that material?

3              A.    Well, I think there is obviously a

4    significant volume, which I understand because it is an S

5    Corp, but --

6                    THE COURT:  Volume of information, or volume

7    of transactions?

8                    THE WITNESS:  Volume of transactions,

9    your Honor.

10                   THE COURT:  Okay.

11                   THE WITNESS:  But, again, I think part of

12   the issue is we don't have the underlying information in

13   terms of the merits of the transaction, who authorized the

14   distribution, and I guess the other issue is with

15   third-party payments, we have no information or no backup

16   in terms of, you know, what were the points of that

17   transaction, was there an invoice, was it authorized by,

18   you know, whatever party at the debtors.  So that's really

19   kind of the crux of the issue here.

20   BY MS. MAIMIN:

21             Q.    Can you give the Court an example, without

22   going into any specifics that we're not allowed to, of a

23   transaction that you don't understand because you don't

24   have this additional information?

25             A.    Yeah, a lot of the information is

1    professional eyes only.  So, you know, what I can say is

2    that there were transactions or payments made from the

3    debtor entities to third parties for purchases of real

4    property, and again, we just don't have the information to

5    assess the merits of the transaction.

6              THE COURT:  Meaning that the debtor made

7    payments to third parties for real property that the

8    debtor did not end up owning?

9              THE WITNESS:  Correct, it could either be

10   with insiders, affiliates, we just don't know all the

11   details, but definitely the debtor does not own it, but

12   again, that can be --

13             THE COURT:  So the question would be what's

14   the consideration for the payments?

15             THE WITNESS:  Yeah, it would either have to

16   take a form of a distribution, or there would have to be

17   consideration, and we just don't have that information.

18             THE COURT:  Okay.

19   BY MS. MAIMIN:

20        Q.   I take it you haven't seen any evidence of

21   consideration though?

22        A.   I have not, no.

23        Q.   So, why is it important for you to

24   understand these in terms of assessing the claims that may

25   be brought in this case?

Page 20

1          A.    Well, I think first of all we have a

2    fiduciary responsibility to the committee to investigate

3    those claims, and just given that information, we don't

4    know the totality of the claims yet, whereas vis-a-vis a

5    two thousand --

6               THE COURT:  Sorry, let's step back.  What do

7    you mean by "claims"?  Not claims filed against the

8    estate, but third-party actions that --

9               MS. MAIMIN:  Third-party actions.

10              THE COURT:  -- could be brought by third

11   parties, avoidance actions, those types of actions --

12              MS. MAIMIN:  Avoidance actions, breach of

13   fiduciary duty actions, all of the actions that it's our

14   job to assess and evaluate.

15              THE COURT:  Okay.

16   BY MS. MAIMIN:

17         Q.    So, has Lincoln tried to resolve these

18   inconsistencies?

19         A.    Yeah, I mean, we've communicated both

20   directly with Heron, and obviously through the protocol

21   for document requests from Lowenstein to Latham.  So --

22         Q.    Did you just --

23         A.    -- they just haven't been providing them.

24         Q.    Did you receive emails that would support or

25   explain these transactions?

1          A.     To my knowledge Lincoln hasn't received

2    any --

3          Q.     What about --

4          A.     -- material emails.

5          Q.     -- invoices?

6          A.     Haven't received anything.

7          Q.     Any kind of internal correspondence that

8    would give you the context that you need?

9          A.     We received some verbal clarification from

10   Heron on some of the transactions, but we haven't seen any

11   data --

12         Q.     So --

13         A.     -- documents.

14         Q.     -- do you need data in order to make an

15   analysis that's reliable?

16         A.     That's correct.

17         Q.     So why can't we just add up everything that

18   was called a distribution, and say this was all potential

19   -- these all add up to potential claims, and just use that

20   number?

21         A.     Well, we haven't been able to conclude all

22   our work.  So we're not sure -- again, as I mentioned the

23   totality of the claims, or the potential actions out

24   there.  In addition, you know, if for whatever reason the

25   debtor made a payment to a third party on real property or

Page 22

1    whatever, and there was upside, or that asset was sold in

2    the future, you know, that should be a determination as to

3    whether or not that profit should inure to the benefit of

4    the estate, or to the, to the -- you know, whoever that

5    third party is, or affiliate that received the asset.

6             Q.    I take it you also want the purchaser in

7    this case to have an accurate number for the value of the

8    claims?

9                   MS. QUARTAROLO:  (Inaudible.)

10   BY MS. MAIMIN:

11            Q.    Is it important --

12                  THE COURT:  Sustained.

13   BY MS. MAIMIN:

14            Q.    Is it important for the purchaser of the

15   claims, if any, to have an accurate understanding of their

16   value?

17            A.    I mean, Miller Buckfire is handling the sale

18   process as it relates to the UCC, so I couldn't comment as

19   to whether or not a party is going to buy the claims or

20   not.

21            Q.    Right, but it is important to have an

22   accurate sense of them, generally?

23            A.    Correct, we need quantification, because

24   when your analysis -- in analyzing the bids, pardon me,

25   and one party may include the claims, another party may

1    not, in order to properly assess the merits of each bid,

2    what's highest and best, you need to have visibility on

3    that.

4              Q.    How many transactions to date have you

5    identified as suspect, approximately?

6              A.    There is about 200,000 -- 200, pardon me,

7    200 transactions that we want to investigate further.

8              Q.    And would the additional information that --

9              THE COURT:  Say that again, how many?

10             THE WITNESS:  It's 200, your Honor.

11             THE COURT:   200 transactions?

12             THE WITNESS:  Correct.

13   BY MS. MAIMIN:

14             Q.    Suspect transactions.

15             So would having the additional material we

16   discussed, invoices, internal correspondence, email, the

17   backup, would that also help you potentially identify

18   additional claims, which is part of your fiduciary duty?

19             A.    Correct, and it also could, you know,

20   address some of the issues on existing claims.  Like I

21   said, we're -- I'm not opining on the merits of

22   distributions, but we just need additional data so we can

23   do our job, to assess whether or not it was appropriate.

24             Q.    Is it unusual for you, given your 25 years

25   of experience, to have no backup data for any of the

1    transactions at issue?

2            A.   Well, I think it's unusual, because this is

3    an S Corp.  So you don't usually see a Chapter 11 case of

4    this magnitude, this size with an S Corp.  So, by

5    definition, that's unusual but, you know, normally you

6    would get a higher level of documentation than we've seen

7    so far.

8            Q.   Isn't all of this just hypothetical?  We're

9    not revealing any secret information, but let's assume no

10   one to date has come forward and sought to purchase the

11   claims.  Why do we need to do all of this work, and get

12   all of this backup now, rather than wait and see if

13   somebody is going to come forward?

14           A.   Well, I think there is a timing issue.

15   Obviously, we've got bidding procedures that were

16   approved, we've got an auction coming up.  So, you know,

17   there just wouldn't be enough time if you waited until

18   that period, closer to, you know, when the bids were filed

19   and you had actual auction to, you know, review and

20   investigate the potential claims.

21           Q.   March 31st is the objection deadline for the

22   stalking horse, correct?

23           A.   My understanding, yes.

24           Q.   And April 5th is the hearing on the

25   contested stalking horse motion?

1              A.    I don't have the exact dates in front of me

2       but directionally, correct.

3              Q.    At the end of April is the bid deadline

4       where someone else, other than the stalking horse, could

5       come in?

6              A.    Correct, and the auction is around that time

7       as well.

8              Q.    So if we were to wait, even past the

9       stalking horse, even if the stalking horse didn't seek to

10      purchase the claims, if we were to wait, someone could

11      still come by, seek to purchase the claims, and would we

12      be able to do the analysis, based on your experience, in

13      that compressed timeframe that we needed to?

14             A.    It would be very challenging time-wise.

15             Q.    And does airing out these transactions now,

16      these potentially suspicious transactions, does that

17      negatively impact the sale process?

18                   MS. QUARTAROLO:  Objection (inaudible) --

19      qualify as an expert, certainly not on that topic.

20                   THE COURT:  Didn't the witness already say

21      that he's not running the sale process?  So what's

22      qualification to answer that question?

23                   MS. MAIMIN:  Your Honor, we think that this

24      is of a piece with the work that he's been doing, but if

25      Ms. Quartarolo doesn't think that that's a subject worth

Page 26

1    bringing up, then we're fine with it.  We --

2                   THE COURT:  Well, you can argue it.

3                   MS. MAIMIN:  Right, we had understood --

4                   THE COURT:  I'm not sure about this witness'

5    capacity to testify on that point as an expert or

6    otherwise.

7                   MS. MAIMIN:  Yes, so we can --

8                   THE COURT:  You can further develop that, or

9    seek to develop it if you think you can, that's fine with

10   me.

11                  MS. MAIMIN:  Yes, your Honor, we can just

12   ask a couple of factual questions.

13   BY MS. MAIMIN:

14        Q.    Are the transactions that you're asking

15   about, are they part of the debtors' historical books and

16   records?

17        A.    Yeah, so, you know, my view on it, again,

18   and I've been probably been involved in 25, 30 363s in my

19   career, is, you know, in this type of sale, they're

20   probably more focused on a go-forward business.  They're

21   all very sophisticated acquirers, so they would understand

22   that, you know, something is historic, something is tied

23   to an insider, and they would be focused on a go-forward

24   business.

25                  THE COURT:  And as focused on a go-forward

1   business, does that prevent the sale of these claims in

2   the future should they simply not be purchased?

3                     THE WITNESS:  Well, they --

4                     THE COURT:  It goes to the "why now"

5   question, which is a good question, and one raised through

6   the papers.  Is it -- I guess my question is, ultimately

7   are the claims and the claim analysis inexplicably

8   intertwined with the assets that are being sold, or what

9   you suggested, they're really looking to the go-forward

10  business, they aren't necessarily going to be focused on

11  this?

12                    THE WITNESS:  That's a good question, and I

13  think right now as it stands, my understanding -- excuse

14  me, my understanding of the APA is that the claims are

15  excluded, but that, you know, it's --

16                    THE COURT:  I was going to ask that, too.  I

17  didn't even know that.  So the claims are excluded from

18  the APA, it's not something buyers are looking into right

19  now?

20                    MS. MAIMIN:  Well, we don't know,

21  your Honor.  There is a template in the data room that

22  does not include the sale of these claims, but as is

23  typical, these documents are heavily marked up, and anyone

24  can come in at any point to purchase the claims, and these

25  are potentially --

1          THE COURT:  Meaning that --

2               MS. MAIMIN:  -- valuable claims.

3               THE COURT:  -- a buyer could take the APA,

4    red line it, and add the claims as an asset that they wish

5    to purchase?

6               MS. MAIMIN:  Yes, absolutely.  We expect

7    them to edit the APA, which is just basically a

8    boilerplate document, that they would come in and

9    individualize, according to what they want to purchase.

10              THE COURT:  Okay, and I guess Mr. Williams

11   wouldn't be in a position to tell us, given the last

12   colloquy we just had, what the likelihood of that

13   occurring is.

14              MS. MAIMIN:  I think that he had testified

15   that's not his area of expertise.

16              THE COURT:  Got it.  Okay.  All right.  Go

17   ahead.

18   BY MS. MAIMIN:

19        Q.   But having these 2004, these

20   2004 examinations, and seeking these documents, it doesn't

21   call into integrity the debtors' current books and records

22   in a way that might scare off a buyer, does it?

23        A.   No.

24              MS. QUARTAROLO:  Objection.

25              THE WITNESS:  I'm sorry.

1              THE COURT:  Hold on, Mr. Williams, there is

2    an objection.

3              Go ahead, what's the objection?

4              MS. QUARTAROLO:  It's not his area of

5    expertise, he's not been called as an expert on this

6    topic.

7              THE COURT:  I think that sounds like it's

8    part of the same subject matter relating to the sale, and

9    predicting what a buyer may or may not do.  So, I'm not

10   sure that he's qualified for that, but any response?

11             MS. MAIMIN:  Your Honor, I think the fact

12   that we've established that it's part of their historical

13   books and records, and doesn't call into question their

14   current books and records, is sufficient for a temporal

15   argument.

16             THE COURT:  Okay.  Let me stop you for one

17   second.

18             Ms. Weldon, I mean, it's really weird to see

19   my face on this screen all over the place.  Is it possible

20   to get the camera focused on the lawyer and witness?

21             Okay, then I'm going to stop talking,

22   because honestly this is freaking me out.  Well, it

23   stopped moving.  It transferred to me, suddenly, and then

24   didn't transfer back.

25             You know what, I'm going to turn my camera

1    off.  Boom.

2              Okay.  Continue.

3    BY MS. MAIMIN:

4        Q.    I'm just going to ask you a question in

5    closing.  Mr. Williams, could you explain how the

6    information we're seeking, in particular invoices and

7    internal correspondence, might help illuminate a

8    transaction, like the one you talked about before, where

9    real estate was going to nondebtor entities?

10       A.    Well, I think our work is -- again, we have

11   a fiduciary responsibility to the committee.  So we need

12   confirmatory evidence as to the merits of a transaction,

13   i.e., should that inure to the benefit of the estate, or

14   was it a legitimate transaction, that's what we're focused

15   on.

16             MS. MAIMIN:  One moment, please, your Honor.

17             THE COURT:  Sure.

18             MS. MAIMIN:  No further questions at this

19   time.  Thank you.

20             THE COURT:  Thank you, Ms. Maimin.

21             All right.  Cross-examination,

22   Ms. Quartarolo.

23             MS. QUARTAROLO:  Good afternoon.

24             THE COURT:  Let me stop you one second.

25             Ms. Weldon, we need to call Eric, and we

Page 31

1    need to figure out why this is happening because, again,

2    the system doesn't quite work the way we want it to.

3                    Anyway, go ahead.

4                    MS. QUARTAROLO:  Thank you, your Honor.

5                        CROSS-EXAMINATION

6    BY MS. QUARTAROLO:

7          Q.    Good afternoon, Mr. Williams.  I'm

8    Amy Quartarolo, counsel to the debtors.

9                    Mr. Williams, you understand that the

10   Rule 2004 discovery that is the subject of the motion

11   today includes 18 separate subpoenas, right?

12         A.    I'm generally aware of the number, yes.

13         Q.    And are you also aware that 11 of those

14   subpoenas are to current or former employees of the

15   debtors?

16         A.    I believe Lowenstein advised me of that,

17   yes.

18         Q.    And do you understand, as to the roles of --

19   excuse me, as to those targets of the subpoenas that are

20   current employees, do you understand their titles?

21         A.    I don't.

22         Q.    Do you know that Ms. Sury Rodriguez is a

23   target of the subpoena?

24         A.    I do not know.

25         Q.    Do you know what her title is?

Page 32

1          A.    I don't.

2          Q.    Would -- if I will represent to you that she

3   is the current vice president of finance of the company,

4   do you have any reason to disagree with that?

5          A.    To my knowledge, no.

6          Q.    And Mr. Greg Robbins is the current senior

7   vice president of finance for the company.  Do you have

8   any basis to disagree with that?

9          A.    No.

10         Q.    And Mr. Gene Bukovi is the current executive

11  vice president of sales for the company.  Do you have any

12  reason to disagree with that?

13         A.    No.

14         Q.    And Ms. Meg Liz Owoc is the current head of

15  the marketing department.  Do you have any basis to

16  disagree with that?

17         A.    That's my understanding, yes.

18         Q.    And the subpoenas also are to seven

19  third-party entities, do you understand that?

20         A.    That's my basic understanding, yes.

21         Q.    You're aware, Mr. Williams, that the cost

22  and fees associated with Lincoln's work in this case is

23  borne by the estates, right?

24         A.    That's correct.

25         Q.    And Lowenstein's fees are also borne by the

Page 33

1    estates, right?

2            A.    That's correct.

3            Q.    As are Latham's, counsel to the debtors, our

4    fees are borne by the estate?

5            A.    Yes.

6            Q.    And Heron's, as financial advisor, correct?

7            A.    Yes.

8            Q.    And are you also aware that the estates are

9    covering the costs and fees associated with the lender's

10   professionals?

11           A.    Yes.

12           Q.    Have you, or anyone on behalf of the

13   committee, made any effort to estimate the cost and fees

14   expected to be associated with the 18 separate

15   Rule 2004 Examinations, each of which contemplate both

16   document discovery and an examination?

17           A.    I have not, no.

18           Q.    Do you know if anyone has on behalf of the

19   committee?

20           A.    I know Lincoln hasn't.  I can't speak to

21   others.

22           Q.    Do you have any basis to disagree with me if

23   I represented to you that it could cost as much as 3 to

24   $4 million to the estate in fees and expenses?

25           A.    I have no idea if that's accurate or not.

1          Q.     You're aware that the debtors have a

2    $100 million DIP facility, right?

3          A.     That's correct.

4          Q.     And that DIP facility needs to cover all

5    costs and expenses associated with these Chapter 11 cases,

6    at least through the sale process, right?

7          A.     Correct, I believe maturity is May 24th.

8          Q.     And I think you covered this on direct

9    already with Ms. Maimin, but you're aware that the debtors

10   are you currently engaged in a sale process?

11         A.     Yes.

12         Q.     And you understand that that process

13   requires -- even though you're not the professional that's

14   involved directly in the sale process, you have a general

15   understanding that that process requires time of the

16   debtors' professionals and employees, right?

17         A.     That's correct.

18         Q.     And you would agree with me that a sale

19   process of this type is quite resource intensive, right?

20         A.     It is, yes.

21         Q.     You mentioned earlier in your testimony with

22   Ms. Maimin on direct, you had spoke about the

23   distributions in the general ledger?

24         A.     That's correct.

25         Q.     And you said that those could be either

1    straight cash payments or payments directly to third

2    parties because of the nature of the company here, right?

3           A.    That is correct, but I guess my concern was

4    we didn't have the underlying support to understand the

5    merits of the transaction.

6           Q.    I understand.

7                 The payments to third parties for real

8    estate that you spoke about on direct, those were listed

9    as distributions in the general ledger, right?

10          A.    That's my understanding, yes.

11          Q.    And you said that the information that you

12   need goes to the merits of potential claims, right?

13          A.    That's correct.

14          Q.    You do have information as to the amounts

15   and dates for everything in the general ledger that the

16   debtors listed as a distribution, right?

17          A.    Assuming that it encompasses everything,

18   we've received that level of information.

19          Q.    And the 200 transactions that you say you've

20   identified, did you provide that list to the debtors?

21          A.    We have not provided the details.

22          Q.    But you were asked for it, weren't you?

23          A.    I believe so, yes.

24          Q.    Why didn't you provide that?

25          A.    You have to ask counsel.

Page 36

1          Q.    You and --

2                THE COURT:  Do you know how many of the 200

3    transactions are distributions?

4                MS. QUARTAROLO:  No, they're all

5    distributions, your Honor.

6                THE COURT:  All distributions, they're all

7    listed as distributions --

8                MS. QUARTAROLO:  They're all listed as

9    distributions.

10               THE COURT:  -- in the debtors' books and

11   records?

12               MS. QUARTAROLO:  Yes.

13               UNIDENTIFIED:  (Inaudible.)

14               THE COURT:  If you can approach, just

15   because -- or put the mic on near your disk.

16               UNIDENTIFIED:  I'll just speak to

17   Ms. Quartarolo.

18               THE COURT:  Okay.  Sure.

19   BY MS. QUARTAROLO:

20          Q.    And you understand that Heron Consulting

21   Services serves as the debtors' financial advisor, right?

22          A.    Yes.

23          Q.    And Lincoln and Heron communicate regularly,

24   right?

25          A.    That's correct.

1          Q.    At least once a week, if not more?

2          A.    Correct.

3          Q.    And there is, you know, an opportunity to

4    ask questions of the debtors' professionals, and to ask

5    for more information during any of those regularly

6    scheduled meetings, right?

7          A.    We've done that numerous times, yes.

8                THE COURT:  And have they been refused, your

9    requests?

10               THE WITNESS:  Not refused, they just say

11   either it's not available, or they would give a verbal

12   response, but we haven't really got the level of

13   documentation that we need.

14               THE COURT:  Meaning that you're finding it

15   necessary to obtain the information from the 18 subpoenas

16   because you're not getting the information from Heron or

17   the debtor?

18               THE WITNESS:  Well, the debtor may not have

19   access to that information.

20               THE COURT:  Okay, but either way, it's not

21   coming from the debtor, so the idea is to get it from the

22   third parties who are part of the transactions?

23               THE WITNESS:  That's correct.

24               THE COURT:  Okay.

25   BY MS. QUARTAROLO:

1          Q.    But to be clear, Mr. Williams, the list of

2    200 transactions that you've identified, the debtors'

3    professionals have asked you to provide that list, and you

4    have not done so, correct?

5          A.    Yeah, I can't recall if they asked directly.

6    They may have asked one of my colleagues, but to my

7    knowledge it has been provided.

8                THE COURT:  Well, hold on, I'm a little

9    confused.

10               Are you -- in these conversations with

11   Heron, are you telling them which transactions you're

12   asking information for, and they are responding that they

13   don't have it, or what -- explain the Heron

14   communications.

15               THE WITNESS:  Sure.  So, I mean, Heron, as

16   you know, is the financial advisor to the debtor, so they

17   have the responsibility of advising on the sale process,

18   you know, cash flow management and the like.

19               So, we've asked -- and I don't know, and

20   again I can't recall if we've actually given them the list

21   of the 200, but we've asked for additional information as

22   it relates to distributions across the board.

23               THE COURT:  So, as a general matter --

24               THE WITNESS:  Correct.

25               THE COURT:  -- you've asked for information

1    relating to distributions, generally, not specifying a

2    specific distribution or transaction?

3                    THE WITNESS:  That's my understanding.

4                    THE COURT:  Okay.

5    BY MS. QUARTAROLO:

6            Q.    And from the distribution --

7                    THE COURT:  I'm sorry, Ms. Quartarolo.

8                    MS. QUARTAROLO:  Yes, go ahead.

9                    THE COURT:  Let me ask one other question.

10                   Did the response from Heron come back to you

11   saying, well, what transactions specifically, and you

12   wouldn't tell them, or they didn't ask that follow-up?

13                   THE WITNESS:  That, I can't recall that

14   follow-up, your Honor, but I knew generally we were

15   saying, you know, we've got a series of distributions, do

16   you have backup for those distributions, and the answer

17   was -- you know, either they would give some verbal

18   responses, or they would, you know, say it's with a third

19   party.

20                   THE COURT:  Meaning what, what would they

21   say?

22                   THE WITNESS:  You know, an example, like,

23   okay, that was a payment on behalf of Mr. Owoc, but it

24   subsequently became -- or was a distribution, so then you

25   shouldn't really be concerned about it because it's a

Page 40

```
 1    distribution, it's not necessarily -- because of the S
 2    Corp status.
 3                    THE COURT:  And, therefore, you don't want
 4    to take their word for it --
 5                    THE WITNESS:  Correct.
 6                    THE COURT:  -- and want to see the backup
 7    itself?
 8                    THE WITNESS:  Correct.
 9                    THE COURT:  Okay.
10    BY MS. QUARTAROLO:
11         Q.    But -- sorry to come back to this, I just
12    want to make sure I understand because I think your answer
13    may have differed a bit.
14              The list of 200 transactions that you
15    testified on direct, that you've identified, that list has
16    not been provided, to your knowledge, to the debtors or
17    their professionals, right?
18         A.    Yeah, I recall if it's been provided or not.
19         Q.    And you are aware that the debtors'
20    professionals asked for that list so that they could
21    provide information?
22         A.    They may have asked one of my colleagues, as
23    I mentioned, but I can't recall if they directly asked.
24         Q.    I also want to touch upon something in your
25    declaration.  Do you have a copy of your declaration?
```

```
 1              A.    I do not.

 2              Q.    Let me grab it.

 3                    MS. QUARTAROLO:  Would you like a hard copy,

 4       your Honor.

 5                    THE COURT:  No, I have it electronically

 6       right in front of me.

 7                    MS. QUARTAROLO:  May I approach?

 8                    THE COURT:  Yes, you may.

 9                    THE WITNESS:  Thank you.

10       BY MS. QUARTAROLO:

11              Q.    So, if you can turn to Paragraph 7, do you

12       see that?

13              A.    I do.

14              Q.    And it references that the debtors produced

15       documents purportedly from the general ledger account, do

16       you see that?

17              A.    Yes, I do.

18              Q.    Do you have any reason to believe that those

19       are not actual copies of the general ledger account?

20              A.    I mean, no, we're saying we don't know for

21       sure if it has the GL and totality, because there were

22       some fields missing or blocked out.

23              Q.    And --

24              A.    So we're saying that you basically -- or the

25       advisors said this is the GL totality.
```

Page 42

1          Q.    And for the -- let me back up.

2                Isn't it true that Lincoln identified

3    portions of the GL that it would like produced, and the

4    debtors' professionals provided those?

5          A.    I believe most of it.  There might have been

6    a field missing here and there, because there were manual

7    entries.  So we asked for, you know, support for that

8    manual entry, and who was the party at the debtor that

9    actually entered that manual entry.  That wasn't provided

10   to us.

11         Q.    And you understand that there have been

12   subsequent conversations where the debtors have provided

13   that information, right?

14         A.    Some.

15         Q.    And there is continuing conversations, and

16   Lincoln certainly has the opportunity to ask questions of

17   the debtors, to the extent it believes more fields are

18   necessary, right?

19         A.    We continue to have conversations, correct.

20         Q.    Can you turn to -- actually we can set aside

21   your declaration for just a moment, but -- so I want to

22   speak about the distributions, and you understand, of

23   course, that distributions on a company's books and

24   records are transfers of funds that are either to or on

25   behalf of an insider shareholder, right?

Page 43

1            A.    Well, it would be the leaky shareholder
2     situation.
3            Q.    Yeah, and from the general ledger, as
4     produced to you by the debtors, you have been able to
5     identify the dates and amounts of all of the payments that
6     have been categorized as distributions, right?
7            A.    I am, assuming that the information is
8     total, that would be correct.  But, again, we haven't
9     fulfilled our responsibility to fully investigate, and
10    that's --
11           Q.    And the debtors explained to you an issue
12    that you raise in your declaration about the distributions
13    and the supplier payments.  Do you know what I'm talking
14    about?
15           A.    What specific provision or paragraph are you
16    referring to?
17           Q.    Sure, so let's take a look at Paragraph 11,
18    and let me know when you're there?
19           A.    Yes.
20           Q.    Okay.  Romanette Number (i) says that
21    certain transactions appear on both the distribution file,
22    and the supplier payment file, do you see that?
23           A.    Yes.
24           Q.    And as the debtors' advisors explained to
25    Lincoln, that is on account of certain payments were not

Page 44

1    directly to the shareholder, but on behalf of the

2    shareholder and, therefore, had to be processed also in

3    the supplier payment file so that those payments could be

4    made to a third party on behalf of the shareholder, do you

5    understand that?

6              A.   Yes, we've spent a lot of time with Heron

7    going through the reconciliation of that.

8              Q.   And so you now understand that that's the

9    reason why there is distributions that are on the supplier

10   payment GL, and also on the distribution GL, you

11   understand that, right?

12             A.   Yeah, we understand that.  That's not really

13   the issue here.  The issue is --

14             Q.   I'm just asking you if you understand my

15   question.

16             THE COURT:  Yeah, let the witness finish the

17   answer.

18             Go ahead.

19             THE WITNESS:  So, yeah, no, we've gone

20   through and recognized -- pardon me, reconciled what was

21   in the SOFA between the supplier payments and

22   distributions, we understand that.  Like I said, our --

23   regarding the point of the actual transactions and the

24   merits.

25             THE COURT:  Let me make sure I understand.

1          Your point, Ms. Quartarolo, is that these

2   distributions are documented as distributions and,

3   therefore, would be essentially 1099ed to these folks

4   and/or they would have the tax burden associated with it,

5   and that, therefore, it wasn't really -- it couldn't be an

6   avoidance, or the subject of avoidance action, or it could

7   be, but it's --

8          MS. QUARTAROLO:  Yeah, I mean, we're not

9   making any -- drawing any conclusions about whether a

10  trans -- a particular transaction is avoidable or not.

11  We're just making the point that the witness understands,

12  as has been explained multiple times, that there are

13  distributions that are marked as distributions on both the

14  distribution GL, which were payments directly to --

15          THE COURT:  Suppliers, to pay suppliers --

16          MS. QUARTAROLO:  -- and to -- correct.

17          THE COURT:  -- on behalf of those

18  distributees, if you will.

19          MS. QUARTAROLO:  They were -- they're

20  payments on behalf of the shareholder directly to third

21  parties and, therefore, are --

22          THE COURT:  So you're not trying --

23          MS. QUARTAROLO:  -- treated as

24  distributions.

25          THE COURT:  So you're not trying to get into

Page 46

1   the merits of the potential avoidance actions.

2                   Your point is that Lincoln has enough

3   information where the -- so that the subpoenas are not

4   necessary at the present time, or tell me what the

5   ultimate point is.

6                   MS. QUARTAROLO:  That they certainly have

7   enough information to understand the dates and amounts of

8   all distributions, whether they're on one portion of the

9   GL or another, and going to the merits of the claims, and

10  we'll address this in argument, obviously, but that's not

11  necessarily needing to be a today issue.

12                  THE COURT:  Okay.  All right.

13  BY MS. QUARTAROLO:

14          Q.    And the same thing, I guess sticking with

15  Paragraph 11, you refer to, in Romanette (ii), you refer

16  to SOFA 4, and having those distributions that are

17  included on SOFA 4 pulled from a combination of the

18  distributions file and the supplier payments file, do you

19  understand that?

20          A.    Yes.

21          Q.    And that's the same issue, correct?

22          A.    Correct.

23          Q.    And the Romanette Number (iii), certain

24  transactions being presented as distributions to Jack, as

25  the shareholder, and SOFA 4, appear to be payments to

Page 47

1  third parties, that's the same issue that we've been

2  talking about, right?

3         A.    Correct.

4         Q.    Mr. Williams, in the event that the Court

5  were to grant the motion to quash, you would expect that

6  the committee could still have an opportunity to

7  investigate the claims at a later date after the sale,

8  right?

9         A.    Well, that's one of our concerns, is that

10  given we have bidding procedures already, we've got a DIP

11  maturing May 24th, we've got an auction coming up.

12              If one of the parties actually wants the

13  claims, how do we quantify them at that point in time, we

14  don't have enough time.

15         Q.    So, I think you may not have appreciated my

16  question, or I misspoke, but if a point in time comes, say

17  the Court grants the motion that we're seeking now, and

18  the committee is not allowed to pursue some or all of

19  these subpoenas at this point in time, do you understand

20  that the subpoenas could be pursued after a sale closes,

21  during these Chapter 11 cases?

22         A.    I think they're two separate issues.  Yes,

23  it could be, but again, it comes to the point that we want

24  to quantify the claims as of, you know, the time of a

25  transaction under 363.

Page 48

1          Q.    But you understand the amounts, the dates

2    and amounts for all distributions sitting here today?

3          A.    We haven't finished all our work.  So,

4    again, we haven't concluded our investigation, so we can't

5    opine on the total.

6          Q.    I understand that you may not have concluded

7    your investigation going to the merits of those claims,

8    but sitting here today, you have information available to

9    you that goes to the dates and amounts of all

10   distributions, right?

11         A.    I'm assuming that's accurate, but again, we

12   still have to do our work.

13              MS. QUARTAROLO:  Thank you.

14              THE COURT:  All right.  Redirect.

15              MS. MAIMIN:  Yes, one question.

16                   REDIRECT EXAMINATION

17   BY MS. MAIMIN:

18         Q.    In terms --

19              THE COURT:  I've never seen one question

20   actually be one question, but go for it.

21              MS. MAIMIN:  I'm going to do it.

22              THE COURT:  Okay.

23   BY MS. MAIMIN:

24         Q.    In terms of the general ledger data that you

25   did receive, is it complete, or is there additional years

1    and times outstanding?

2            A.    I believe we're missing -- the request was

3    for an additional year, which I guess would be year four

4    going back.  So that would be October of 2018 to October

5    of 2019, if I'm not mistaken.

6                    MS. MAIMIN:  I'm going to resist asking a

7    follow-up question.

8                    THE COURT:  Oh, you can ask another

9    question.

10                   MS. MAIMIN:  It's not really that important,

11   but I do have some oral argument that I'd like to make to

12   the Court.  I don't know which order the Judge would --

13                   THE COURT:  Well, is there -- are we

14   finished with this --

15                   MS. MAIMIN:  I don't have any further

16   questions for this witness.

17                   THE COURT:  All right.  So let's at least

18   get Mr. Williams comfortable over there.  You may step

19   down, sir.

20                   THE WITNESS:  Thank you, your Honor.

21                   THE COURT:  And then let's talk about

22   burdens.

23                   MS. MAIMIN:  Yes.

24                   THE COURT:  Because it seems to me that with

25   respect to the motion to quash, or the motion for

Page 50

```
1    protective order, I think the burden shifts to the
2    committee to provide an explanation of the reasonableness
3    of the request, but actually let me -- give me a second,
4    and let me just catch up, because -- well, you tell me,
5    tell me what you think the burdens are and why, and then
6    we'll hear them in that order.
7             MS. MAIMIN:  Well, there is a threshold
8    burden, your Honor, which is the question of standing.
9    The law is clear that in order for there to be a motion to
10   quash, and I'll get to the protective order in a second --
11            THE COURT:  The debtor is not the subject of
12   the subpoenas and, therefore, the debtor has to explain
13   how they have standing, and how it will affect -- impact
14   the debtor to have these subpoenas outstanding, and as I
15   understand it the argument is that no matter what, they're
16   going to have to review any information that these 18
17   subpoenaed entities or persons have, to the extent there
18   is privileged and other reasons that the debtor would need
19   to review that information, so they're involved in that
20   way.
21            I'm not sure what else they argue, but --
22            MS. MAIMIN:  Well, the standard is
23   specific --
24            MS. QUARTAROLO:  I'm sorry to interrupt,
25   your Honor.  Are we in argument now?  I just want to make
```

(305) 358-8875

1    sure --

2              THE COURT:  Well, I don't know, that's a

3    good question.  Have you -- are there any other -- there

4    is no other evidence, I assume, no other witnesses.

5              MS. MAIMIN:  Not from us.

6              THE COURT:  Okay.  Do you have any

7    witnesses, Ms. Quartarolo?

8              MS. QUARTAROLO:  I do not, but it is our

9    motion, and so unless the Court would prefer, given the

10   burden issue, that the committee goes first --

11             THE COURT:  I am perfectly fine with any

12   order that makes sense to you all.  It's not, it's not so

13   much -- it's not a confusing issue to me, no matter where

14   the burden lies.  At the end of the day, it's going to

15   come down to the same standard.

16             So why don't we address, why don't we

17   address standing first, since that's a threshold issue.

18   So, why don't I hear from you, as to why they don't have

19   standing, and then I'll hear from Ms. Quartarolo as to why

20   the debtor does have standing.

21             MS. MAIMIN:  Yes, your Honor.  The law

22   specifically defines the nature of the interest that the

23   debtors would have to have here, which is a personal right

24   or privilege implicated.

25             As came out during the testimony today, most

Page 52

1    of the information that we're seeking are things like

2    invoices, evidence of transfers, things that don't

3    particularly implicate privilege, and to the extent there

4    are emails directing transfers, we have no reason to think

5    that it will be overly burdensome for them to review these

6    things and, frankly, that's not part of the -- that's not

7    part of the standard that the Court is considering when

8    determining whether or not there is standing.

9                 The question is whether there is a personal

10   right or privilege implicated, and they haven't identified

11   one.

12                For the protective order, the standard is

13   even more stringent, the party must bear -- the party

14   seeking the order bears the burden to demonstrate good

15   cause, and must make a particular and specific

16   demonstration of fact, as distinguished from stereotyped

17   and conclusory statements supporting the need for a

18   protective order.  That's -- that comes from a case that

19   -- the Armor Screen Corp. case from the Southern District

20   of Florida that debtors cited in their reply.

21                I want to be clear, too, because it's a

22   little bit misleading to say there are 18 subpoenas,

23   because that makes it sound much more burdensome than it

24   actually is.  There are 18 subpoenas that have been

25   challenged.  Nine of them pertain to employees, and those

Page 53

1    are, in fact, the employees who would be most likely to

2    have the key information, so they were thoughtfully

3    selected.  10 of them pertain to non-employees, but just

4    to be clear, those all -- those all almost relate to

5    entities that are owned by a particular third party.  So,

6    while there are 10 outstanding 2004s, so that we could get

7    to each of the entities, the 10 only amounts to two

8    depositions, because we'd be able to ask the person about

9    all of the entities that they --

10                   THE COURT:  The nine humans are associated

11   with --

12                   MS. MAIMIN:  The 10, yes, the 10 humans are

13   associated with all of the LLCs.

14                   THE COURT:  All of the LLCs.

15                   MS. MAIMIN:  So, we -- and we also

16   anticipate not necessarily needing depositions from

17   everybody, and possibly just needing documents, as the

18   testimony just showed, it really is data and documents

19   that we're looking for.

20                   I also want to note that we have listed,

21   during the course of this process, all of the suspect

22   transactions, we've identified them.  They're embodied in

23   the requests from Lincoln.  I don't think that

24   Mr. Williams, being at the top of the heap, was involved

25   in sending those emails, but it was only after the

Page 54

1    scheduling of this hearing, when I think the debtors

2    realized that they hadn't produced any e-mails, that they

3    actually asked for a list of the 200.

4                    THE COURT:  Well, let me hear about standing

5    first though.  So, you're going a little beyond standing

6    here, right?  So --

7                    MS. MAIMIN:  Yes.

8                    So, your Honor, they haven't -- as far as I

9    can tell, they haven't identified a personal right or

10   privilege implicated by the subpoena request.

11                   THE COURT:  All right.  So let's hear about

12   that then, and then we'll move on from there.

13                   MS. MAIMIN:  Sure.

14                   THE COURT:  Ms. Quartarolo, what's your

15   response on the standing issue?

16                   MS. QUARTAROLO:  Thank you, your Honor.

17   Amy Quartarolo, of Latham & Watkins, for the debtors.

18                   I think the debtors indisputably have

19   standing here.  The -- under Local Rule 2004-1(c), an

20   interested party may file a motion for protective order.

21   I don't think there is any doubt that the debtors are an

22   interested party in connection with, you know,

23   transactions that are tied to the debtors' books and

24   records.

25                   But, in any event, I think it goes without

1    saying that, you know, even if the committee is correct,

2    that the standard isn't personal right or privilege, that

3    we have such a personal right or privilege.

4              It is possible that information that is

5    being sought is privileged in nature, and so the debtors

6    would certainly -- not only would the expenses associated

7    with the subpoenas be borne by the estates, but the

8    debtors would have to be involved in each of the

9    depositions, likely prepping witnesses in connection with

10   current employees, and gathering information, because much

11   -- as we pointed out in our motion, much of what they seek

12   is actually debtor information, and not something that any

13   of the current employees would have in their individual

14   capacity.

15             And then you get to, like, true privilege

16   where, you know, if there is something that is

17   attorney/client privilege in nature, certainly we would

18   have to review for those purposes.  So I just don't think

19   that there is any doubt here that we have standing to

20   bring the motion.

21             THE COURT:  All right.  Okay.

22             MS. MAIMIN:  Your Honor, Ms. Quartarolo's

23   argument is based almost solely on the burden that they

24   would have to bear if these, if these examinations were to

25   go forward.  Again, most of the information we seek isn't

Page 56

1    conceivably privileged, and that burden does not establish

2    a personal right or privilege.  It establishes something

3    hypothetical.  It doesn't establish actual standing.

4                   And Ms. Quartarolo, I think, has conflated,

5    again, the question of standing to quash the motion for a

6    protective order.  To the extent that that is being

7    sought, it requires a much more specific and

8    particularized showing than that has been made here.

9                   Indeed, the debtors haven't even attempted

10   to address each subpoena.  They've just made a conclusory

11   statement about them in general, and are continuing to do

12   so today, which is the exact thing that courts have said

13   should not be the basis of a protective order.

14                   THE COURT:  All right.  Okay.  So what I'm

15   going to do then is reserve on standing, and I'll consider

16   that when I consider the balance of the arguments, and

17   then we'll proceed with the rest of the argument.

18                   Now, with respect to -- I think,

19   Ms. Quartarolo, you should probably go first.  Again, the

20   order is not important to me.  I'm going to hear all the

21   arguments no matter what, and this is a -- you know, it's

22   not so latent with -- or ladened with burden issues that

23   I'm not going to be able to figure it out.

24                   So, why don't you go ahead and go first,

25   since it's your motion?

1              MS. QUARTAROLO:  Thank you, your Honor.

2    Again, Amy Quartarolo, of Latham & Watkins, on behalf of

3    the debtors.

4              So, your Honor, it's been established there

5    is 18 subpoenas that are at issue, each of them seeks

6    documents and testimony on their face, but I want to begin

7    by making clear what the debtors are seeking and what

8    they're not seeking.

9              THE COURT:  Okay.

10             MS. QUARTAROLO:  So, we are not trying to

11   impede the committee's ability to conduct an appropriate

12   investigation into possible estate causes of action.

13             THE COURT:  It's timing.

14             MS. QUARTAROLO:  Yes, and we're also not

15   speaking to specific -- and to prohibit any specific

16   third-party discovery for all times, but what we do

17   question is the necessary approach to pursue such broad

18   discovery now, and I think your Honor understands that.

19             Discovery of this nature now would have a

20   lot of cost associated with it.

21             THE COURT:  It's going to have cost now or

22   later.

23             MS. QUARTAROLO:  Agreed.

24             THE COURT:  The cost is a constant, so --

25             MS. QUARTAROLO:  Cost is a constant, but we

1    are currently in a window where we're operating within the

2    constraints of a DIP budget.

3                    And I think what this comes down to is this

4    could be pursued after a sale, and at that point in time,

5    we're talking about case costs that are coming from the

6    proceeds of a sale, and not case costs that are coming

7    within the confines of DIP financing, and I think that

8    that's --

9                    THE COURT:  Is it all about costs, or are

10   there other reasons?

11                   MS. QUARTAROLO:  There are other reasons,

12   your Honor.

13                   THE COURT:  Okay.

14                   MS. QUARTAROLO:  And I think the other

15   reason, and I think this played without Mr. Williams'

16   testimony, is --

17                   THE COURT:  I mean, there is no evidence in

18   front of me as to what this will cost.

19                   MS. QUARTAROLO:  Agreed.

20                   THE COURT:  Other than a statement in a

21   question that you asked the witness, which is not

22   evidence.

23                   MS. QUARTAROLO:  Understood, but there is

24   also evidence -- I mean, there is a lack of evidence, that

25   the committee has made no attempt to assess the potential

Page 59

1    cost, and I think that that was established with

2    Mr. Williams.

3                   The other issue is that the committee should

4    play this out with the debtors first.  The debtors have

5    asked for information.  There was a lot that was in the

6    committee's objection that, frankly, was news to the

7    debtors, and upon reading the committee's objection -- I'm

8    sorry, did you have a question?

9                   THE COURT:  Yes.  So, you're saying that the

10   objection to your motion, there was information that was

11   news to you, like, what information, that there were 200

12   transactions or that there were --

13                  MS. QUARTAROLO:  There were transactions

14   that they thought they needed more information about, and

15   we've asked them, you know, for that list, and we have

16   committed to, you know, following up with them and seeing

17   that process through.

18                  This is the informal diligence that the

19   committee and the debtors have been undertaking for the

20   last several months.

21                  THE COURT:  So, you would be happy providing

22   the backup information on the 200 transactions, that's

23   something that you can control, that the costs can be

24   controlled, that you can put a person on it, they would

25   gather the information, and they would provide it, but you

Page 60

```
 1   need the list of the 200 transactions in order to do so --
 2                 MS. QUARTAROLO:  We would need those --
 3                 THE COURT:  -- and you never got it?
 4                 MS. QUARTAROLO:  Correct.
 5                 THE COURT:  Okay.
 6                 MS. QUARTAROLO:  And there may be -- I'm not
 7   -- I don't want to represent that there is every shred of
 8   paper that the debtors will have that they want.  So, I
 9   think how this process would work, in the most efficient
10   manner, which I think we should all be trying to do
11   this --
12                 THE COURT:  But let me ask, you'd be willing
13   to do that now, or you think that that also needs to wait?
14                 MS. QUARTAROLO:  No, we would be willing to
15   do that now.
16                 THE COURT:  Okay.  All right.
17                 MS. QUARTAROLO:  And --
18                 THE COURT:  Please, finish, I'm sorry.
19                 MS. QUARTAROLO:  No problem.
20                 And I think the issue is, there may be
21   things that the debtors don't have, and that absolutely
22   may be appropriate for third-party discovery, but we --
23                 THE COURT:  Well, on 200 transactions, that
24   are all listed as distributions and/or supplier payments,
25   how is it that the debtor would not have the information?
```

Page 61

```
 1                    MS. QUARTAROLO:  Well, so what I'm
 2    representing is that the debtor would have some
 3    information, right?
 4                    THE COURT:  These are all payments that
 5    originated with the debtor.
 6                    MS. QUARTAROLO:  Correct.  So, the --
 7                    THE COURT:  And the debtor would
 8    theoretically make these payments based on an invoice, or
 9    some transaction, or some notation and, therefore, would
10    be in control of at least the debtors' side of the
11    transition.
12                    MS. QUARTAROLO:  Correct.
13                    THE COURT:  Okay.
14                    MS. QUARTAROLO:  And if there is additional
15    information that they believe is necessary once they
16    exhaust whatever information is available from the
17    debtors, that, I think, may be appropriate for third-party
18    discovery, but we don't think there is any need for that
19    right now, certainly from a cost perspective, and from a
20    demand and efficiency perspective in terms of the already
21    constrained resources during the midst of a sale process.
22                    But even beyond that, you know, they should
23    get from the debtors what the debtors can provide, narrow
24    the issues, and then pursue third-party discovery that may
25    be appropriate.
```

1           THE COURT:  All right, and there is no case

2    law that you could point to that's specific with respect

3    to that as a remedy.  You're just saying, from a

4    practical, reasonable perspective, given the sales

5    circumstances and the burden on the debtor, because you

6    have an interest in the -- well, let me ask you this, what

7    is the status of these nine employees, and what is this

8    going to do with respect to their job function?

9           MS. QUARTAROLO:  Well, I mean, again, like,

10   I don't think this is, you know, rocket science in terms

11   of, you know, when you have -- two things, when you're

12   talking about current employees, many of them who, you

13   know, I named in my examination of Mr. Williams, these are

14   people who have, you know, roles in finance, in key

15   functions of the company, and they're -- I can tell you

16   and, you know, represent to you --

17           THE COURT:  Are they impacted in the sale

18   process?

19           MS. QUARTAROLO:  Absolutely, they're

20   absolutely involved in the sale process, and so there is

21   an issue just with, you know, already existing burden, and

22   then piling on more, but it's also that they're -- the

23   information that they're seeking from these individuals is

24   information they wouldn't even have in their individual

25   capacity because it's information about these -- you know,

Page 63

1   as you heard from Ms. Maimin, they're looking for

2   invoices, they're looking for -- you know, that's not

3   information that these people would have in their

4   individual capacity anyway.

5                  THE COURT:  The debtor would have it.

6                  MS. QUARTAROLO:  The debtor would have it.

7                  THE COURT:  Okay, and what about this

8   concept, I mean, clearly the committee does have a duty,

9   certainly it's part of the committee's function to

10  investigate these 200 transactions, and it's certainly,

11  under any other circumstances, putting a sale -- if there

12  was not a sale going on, you wouldn't be in front of me

13  today making this argument, is that a fair statement?

14                 MS. QUARTAROLO:  I would say I might be

15  making the argument if they had not given it a fair shake

16  with the debtors first, because I think there is -- while

17  it absolutely is appropriate for the -- for a committee to

18  fully and finally investigate its claims, the whole

19  purpose is to do so efficiently, and so --

20                 THE COURT:  The protocol, generally, would

21  require them to go to the debtor first to get all the

22  debtor information, provide the debtor the list of 200

23  transactions, let the debtor do their best to comply, and

24  then proceed with third parties, but is that an

25  obligation, or is that just --

Page 64

```
 1                    MS. QUARTAROLO:  No, I don't think it's an
 2    obligation, and I don't think that this is something that
 3    you would necessarily find in a case.
 4                    I think that this is, you know, the
 5    practical effect of the efficient -- running a Chapter 11
 6    case as efficiently as possible, while allowing all
 7    parties to comply with their fiduciary obligations.
 8                    THE COURT:  All right.  So tell me about
 9    claims, is there any interest in the debtor, or
10    expectation that the debtor would sell the claims?
11                    MS. QUARTAROLO:  Sure.
12                    THE COURT:  Or are the claims -- let's say a
13    buyer submits a bid, red lines the APA, and includes all
14    claims against, I don't know, Mr. Owoc, or whoever is on
15    this list.
16                    MS. QUARTAROLO:  So, I will tell you this,
17    it's not currently in the APA, that was the committee's
18    request, we've stipulated that that was the committee's
19    request.
20                    THE COURT:  What was?
21                    MS. QUARTAROLO:  That --
22                    THE COURT:  Hold on.  Let me just hear from
23    Ms. Quartarolo.
24                    Go ahead.
25                    MS. QUARTAROLO:  Hold on.  Let me confirm
```

```
1    something --
2                   THE COURT:  Oh, okay.
3                   MS. QUARTAROLO:  -- because I certainly
4    don't want to misrepresent what we agreed to.
5                   THE COURT:  Okay.
6                   MS. QUARTAROLO:  Okay.  I just want to make
7    sure that, you know, we're all acting in good faith.  We
8    consulted in advance, and tried to make sure that we could
9    stipulate to certain facts.
10                   And so what I can say that we've stipulated
11   to is, one, the current APA does not contemplate sale of
12   excluded assets.  Two, that that --
13                   THE COURT:  And this would be among the
14   excluded assets?
15                   MS. QUARTAROLO:  Yes, exactly.
16                   THE COURT:  Okay.
17                   MS. QUARTAROLO:  Estate causes of action,
18   actions, anything of that like, would be excluded assets,
19   that was a request --
20                   THE COURT:  What was their request?
21                   MS. QUARTAROLO:  Let me back up, because I'm
22   hearing some muttering behind me, and I don't want to get
23   it wrong.
24                   THE COURT:  Okay.
25                   MS. QUARTAROLO:  That the current version of
```

Page 66

1   the APA does not -- excuse me, has avoidance actions and

2   estate cause of action among the excluded assets.

3                  THE COURT:  Okay.

4                  MS. QUARTAROLO:  That that was a specific

5   request from the committee in their markup.

6                  THE COURT:  Okay.  So, in other words, the

7   debtor intended, actually, to include those causes of

8   action within the APA, and then it was removed because the

9   committee asked for that?

10                  MS. QUARTAROLO:  I don't think -- I just

11  think it was silent on that.  It didn't --

12                  THE COURT:  Oh, it was silent?

13                  MS. QUARTAROLO:  Yeah.

14                  THE COURT:  Okay.

15                  MS. QUARTAROLO:  So --

16                  THE COURT:  So they wanted specificity that

17  they would not be included.

18                  MS. QUARTAROLO:  Yes, that's my

19  understanding, your Honor.

20                  THE COURT:  All right.

21                  MS. QUARTAROLO:  The committee did request

22  that the debtors specifically exclude estate causes of

23  action from any potential sale.

24                  THE COURT:  Okay.

25                  MS. QUARTAROLO:  And what we represented is

1    that we didn't think that that was in anyone's interest,

2    because if a buyer were to come forward and assign some,

3    you know, incredibly high value, everyone should be

4    wanting that to go forward, but the committee certainly --

5    you know, we are on notice that they object to a sale that

6    would include avoidance actions, unless they are, you

7    know, in agreement with the price, and what we have said

8    is that if there is -- you know, if this becomes relevant

9    because some buyer --

10                   THE COURT:  It would become relevant because

11   the buyer would red line it and ask -- and insert it back,

12   or have an exception to the excluded assets.

13                   MS. QUARTAROLO:  And, your Honor, we'll know

14   that tomorrow.

15                   THE COURT:  Yeah.

16                   MS. QUARTAROLO:  So --

17                   THE COURT:  What's tomorrow?

18                   MS. QUARTAROLO:  Tomorrow is the markups for

19   the APA.

20                   THE COURT:  Well, I won't know that.

21                   MS. QUARTAROLO:  You won't know that, but we

22   will, and the committee will.

23                   And so, you know, to the extent this becomes

24   a relevant, timely issue --

25                   THE COURT:  Well, what happens if a buyer

```
1    includes it, or re-includes it, these claims, what is the
2    -- so the debtors' reaction to that is, let's see what
3    they're willing to pay, I guess.  You're not --
4                    MS. QUARTAROLO:  They're certainly --
5                    THE COURT:  You're not foreclosing the
6    possibility that a buyer could buy those claims?
7                    MS. QUARTAROLO:  Because we don't think that
8    that's adhering to our obligations.
9                    THE COURT:  Okay.
10                   MS. QUARTAROLO:  So, again, we're trying to
11   maximize value.  We understand that the committee has
12   suggested that those be excluded assets, and that's, you
13   know, how we're proceeding until we hear otherwise.
14                   So, again, I'm not foreclosing the prospect
15   that this might --
16                   THE COURT:  So then if that's the case, tell
17   me how this plays out, because, first of all, I don't
18   think anyone would suggest, and I don't think you're
19   suggesting, that the information requested by the
20   committee is somehow out of bounds.  I mean, 2004 just,
21   you know, has been described as a fishing expedition, and
22   it's certainly within the committee's right and, frankly,
23   an expectation that the committee would investigate
24   potentially avoidable transactions, fair statement?
25                   MS. QUARTAROLO:  I don't disagree with that,
```

Page 69

1    your Honor.

2                    THE COURT:  Now you're saying to me that if

3    somebody wants to buy those avoidance actions, or those

4    claims, as they've been described, that the debtor would

5    entertain that, right?

6                    MS. QUARTAROLO:  I mean, I can't tell you

7    one way or another.  It's --

8                    THE COURT:  It sounds like you're saying,

9    though, that it would be -- it would be questionable with

10   respect to the debtors' duty to continue to exclude those

11   claims when a buyer has exhibited an interest in buying

12   them.

13                   MS. QUARTAROLO:  That was certainly behind

14   our hesitance in agreeing with the committee in advance to

15   exclude those claims.

16                   THE COURT:  Okay.  So that leads to the next

17   question, the next obvious question is that if that's the

18   debtors' position, and if no one knows whether a buyer

19   will make that request to purchase those presently

20   excluded claims, how is it that the buyer will have any

21   understanding of the value of those claims, or what those

22   claims even consist of, if a committee is unable to do its

23   investigation?

24                   MS. QUARTAROLO:  Well, I think as a

25   practical matter that's oftentimes why these are not --

Page 70

1    they're commonly excluded assets.

2                    THE COURT:  Oh --

3                    MS. QUARTAROLO:  Because I think the

4    investigation --

5                    THE COURT:  -- I think in every sale I've

6    ever been a part of, avoidance actions have been excluded.

7                    MS. QUARTAROLO:  Right.

8                    THE COURT:  But that doesn't mean they have

9    to be.  It just means that they generally are, because you

10   sort of leave those behind for the liquidation or -- the

11   liquidation trust, and the plan, if the company gets sold

12   and, you know, then they're pursued, and the unsecured

13   creditors get theoretically a benefit from those down the

14   road, but that doesn't mean that that's, you know,

15   required, by any means.

16                   MS. QUARTAROLO:  Well, I understand.  I

17   mean, you can have, you know, a myriad, you know, of

18   transactions.

19                   But I think, you know, they're not typically

20   excluded -- excuse me, they're not typically included.

21   They're typically part of the excluded assets, as

22   your Honor just mentioned.  I think they certainly are

23   here under the form APA, and we will know tomorrow whether

24   someone is marking it up in a way that changes that.

25                   What I think is also important, is that they

Page 71

1    know now the amounts and the times of each of these
2    distributions.
3                    THE COURT:  And the recipient.
4                    MS. QUARTAROLO:  And the recipient.  So, in
5    terms of --
6                    THE COURT:  What they don't know is whether
7    there is consideration for the transaction, or what the
8    consideration was.
9                    MS. QUARTAROLO:  Although, I think we can
10   assume -- these are listed as distributions, so --
11                   THE COURT:  But they don't know that, and I
12   take Mr. Williams at his word, that, yes, that's a
13   representation made on the books and records of the
14   debtor, and by the debtor, but that -- you know, I'm sure
15   he's had enough experience to know that sometimes what's
16   included in the debtors' books and records is not always
17   accurate.  So --
18                   MS. QUARTAROLO:  And so that's where I come
19   back to, they have the information to be able to, you
20   know, understand the dates and amounts, and we've asked
21   them for this list of the 200 transactions, to see if
22   there is additional information that the debtors can give
23   them on those.
24                   We were told --
25                   THE COURT:  If I deny -- I understand what

Page 72

1   you were told.

2                   If I deny, what happens?  What is the, what

3   is the world-ending circumstance that you're most

4   concerned about?

5                   MS. QUARTAROLO:  If you --

6                   THE COURT:  Again, it boils down to timing

7   from your perspective.

8                   MS. QUARTAROLO:  It does.

9                   THE COURT:  So tell me why not now?  What's

10  going to happen if I deny your motion?

11                  MS. QUARTAROLO:  I think it will be an

12  additional constraint on the debtors' professionals and

13  employees in dealing with --

14                  THE COURT:  True, but constraint is okay

15  sometimes.  It's not --

16                  MS. QUARTAROLO:  It is.

17                  THE COURT:  It's not the end of the world.

18                  MS. QUARTAROLO:  I don't disagree with you,

19  but I would say that when you're talking about a sale

20  process, that is -- you know, we're only talking about the

21  next two months.  When you're talking about a sale process

22  that is designed with a common goal of maximizing value,

23  there should be a thumb on the scale to make sure that the

24  debtors' professionals, employees, and everyone else who

25  is both being paid out of the DIP budget and otherwise,

Page 73

1    can focus on that, and that's where we come back to the

2    standard for the motion -- you know, in Rule 2004

3    discovery, they have to show that there is good cause, and

4    here what we would say is there is not sufficient good

5    cause to show that they need this information --

6                    THE COURT:  Tell me that standard --

7                    MS. QUARTAROLO:  -- from third parties and

8    now.

9                    THE COURT:  Where does it require them to

10   show good cause, walk me through that.

11                   MS. QUARTAROLO:  Sure.

12                   So, in -- and I believe this may even be

13   your case, your Honor, In Re:  No Rust Rebar, it says the

14   granting --

15                   THE COURT:  I love having my cases thrown

16   back at me, but anyway, go ahead.

17                   MS. QUARTAROLO:  The granting of a

18   Rule 2004 Examination is dependent on the discretion of

19   the Court, and this is at Page Number 4, and it goes on,

20   that the party seeking the 2004 discovery bears the burden

21   of proving good cause.

22                   And I would also cite to In Re:  Coffee

23   Cupboard, 128 BR 509, that establishing good cause

24   requires more than just showing that the documents are

25   relevant under 2004.  Relevance alone, and I'm now quoting

1    from Page 5 --

2              THE COURT:  There is no doubt that the

3    documents sought are relevant.

4              MS. QUARTAROLO:  Exactly, but our point is,

5    it has to be -- they have to show more than just

6    relevance, that in order to establish good cause, it's --

7    and, if I may, on Page 514 of this case, it says, the

8    documents meet the requirement of relevance, it does not

9    alone demonstrate there is good cause for requiring the

10   production.  The burden of showing good cause is an

11   affirmative one, and that it is not satisfied merely by

12   showing that justice would be impeded -- would not be

13   impeded by production of the documents.

14              And I think this really comes down to a

15   balancing of interests, and our request, again, is that we

16   let the process play out with the debtors first, provide

17   whatever information we can, hopefully we can get our

18   hands on that list of their 200 transactions, we're not

19   sure why there has been resistance so far, and if there is

20   additional information beyond those that they need from

21   third parties, we would suggest that it be limited in

22   nature.  To the extent that they argue that it needs to be

23   soon, rather than later, and certainly after the sale

24   process, we have no issue with --

25              THE COURT:  All right.  Let's say they show

Page 75

1    good cause, does that end the inquiry, or what is your

2    response to that?  Other than that it's what they've

3    sought to show as good case isn't good cause, put that

4    aside for a moment, is there then some other standard that

5    the --

6                    MS. QUARTAROLO:  I think the Court has

7    discretion.

8                    THE COURT:  And it's just pure discretion at

9    that point?

10                   MS. QUARTAROLO:  I do think it's

11   discretion --

12                   THE COURT:  And that's the balancing --

13                   MS. QUARTAROLO:  Yes.

14                   THE COURT:  -- you're talking about?

15                   MS. QUARTAROLO:  Yes, yes.  That's --

16                   THE COURT:  All right.

17                   MS. QUARTAROLO:  That's our position.

18                   THE COURT:  Okay.

19                   MS. QUARTAROLO:  Thank you, your Honor.

20                   THE COURT:  Thank you, Ms. Quartarolo.

21                   All right, Ms. Maimin, let's start with good

22   cause, what's the good cause?

23                   MS. MAIMIN:  Your Honor --

24                   THE COURT:  And why can't this wait?  But

25   let's start with the good cause, and then go to why this

1   can't wait.

2              MS. MAIMIN:  Yes, there is a couple of

3   reasons why this can't wait.  Number one, we have a very

4   serious factual dispute with debtors that makes it hard

5   for us to trust debtors, that they would be able to

6   provide the information that they say they're going to

7   provide now, which is the first time they've offered to

8   provide that information in the next few weeks.

9              We have, we have identified the suspicious

10  transactions over many months, and we have been asking for

11  emails over many months.  It was only when we filed our

12  response to this motion that this offer has come up, and

13  they don't have a history, at least in this case --

14             THE COURT:  Offer, meaning we'll get you the

15  information offer?  What offer?

16             MS. MAIMIN:  They said that they would be

17  willing to provide emails in the next few weeks.

18             THE COURT:  Well, let me go back, because I

19  think you're a little bit of ahead of me.

20             The 200 transactions, the list, are you

21  arguing now that that list has been provided, or at

22  least --

23             MS. MAIMIN:  Yes.

24             THE COURT:  -- they could cobble together

25  enough information from the emails that have been

Page 77

1   exchanged to compile the list, and they know what

2   transactions you're talking about?

3                    MS. MAIMIN:  Yes, yes.

4                    THE COURT:  And is it fair to say that one

5   of your arguments is that they know what the 200

6   transactions are because the 200 transactions are on their

7   own GL under distributions and supply, or are there many

8   more transactions under that GL, and you're focused on

9   only 200 of them?

10                   MS. MAIMIN:  We are currently focused on

11  only 200 of them.

12                   THE COURT:  There are many, many more?

13                   MS. MAIMIN:  There are many, many more, and

14  we're trying to analyze --

15                   THE COURT:  How do you know they know what

16  the 200 are?

17                   MS. MAIMIN:  We've told them.

18                   THE COURT:  How have you told them?  Because

19  there clearly is a dispute of fact --

20                   MS. MAIMIN:  There is a dispute of fact.  I

21  don't know --

22                   THE COURT:  I don't know how to get past

23  that dispute of fact without evidence --

24                   MS. MAIMIN:  I don't know how to get that

25  dispute --

Page 78

1                THE COURT:  -- because I can't go by two

2       lawyers --

3                MS. MAIMIN:  -- either --

4                THE COURT:  -- debating the issue.

5                MS. MAIMIN:  Your Honor, I think that there

6       -- I can make several other points that I hope may --

7                THE COURT:  Will resonate bit more, okay, go

8       for that.

9                MS. MAIMIN:  So that we don't have to deal

10      with this factual dispute.

11               THE COURT:  Yes.

12               MS. MAIMIN:  Number one, unlike in many

13      cases, the debtors are not doing any investigation of

14      their own into the value of these claims.  So -- and they

15      have told us that they are actually relying on us to do

16      the investigation.  So, it makes no sense for them to be

17      denying us information.

18               THE COURT:  Well, they want you to do it.

19      They just don't want you to do it now.

20               MS. MAIMIN:  And one of the reasons --

21               THE COURT:  -- with respect to these 18

22      third parties.

23               MS. MAIMIN:  One of the reasons why they

24      don't want us to do it now is because they claim we can

25      just add up all the distributions, and that's it.  That

Page 79

1   assumes that all we want to bring are avoidance actions,

2   but that's not the case.

3              Here, the facts support a number of

4   potential causes of action, including, in particular,

5   causes of action for breach of fiduciary duty that can

6   give rise to much more significant sums of money for the

7   potential purchasers, and so just adding up the

8   distributions doesn't even roughly approximate what our

9   potential gains could be for the estate.  There is a major

10  assumption there we're only doing avoidance actions.

11             We also know that even if debtor did try to

12  provide the documents right now, they don't have the

13  documents in possession of the insider, and I'll give the

14  Court an example of one such transaction, without being

15  overly specific, and this builds off of the testimony

16  today, the debtors made transactions that we can see to a

17  law firm that were then transferred to an LLC owned by an

18  insider, owned or controlled by an insider, and we don't

19  have any of the information that insider has.

20             THE COURT:  But listed as a distribution.

21             MS. MAIMIN:  But listed as a distribution.

22  So, even if the debtor did the best they could, after

23  refusing to provide us with emails for months, which we

24  have been asking them for, they wouldn't be able to

25  provide us with all the information that we're seeking,

Page 80

1   and we don't think that it's appropriate for the sale

2   process to go forward without an accurate assessment of --

3                    THE COURT:  Tell me about that, because it

4   is unusual to sell causes of action as part of a

5   transaction like that contemplated in the APA.  The debtor

6   is certainly on record that says if they get an offer,

7   they have a duty to consider it.

8                    But putting that aside for a moment, if

9   ultimately we find out tomorrow that no one is seeking to

10  purchase those claims, can this then wait?

11                   MS. MAIMIN:  Your Honor, we have no idea

12  what this deadline is tomorrow.  The deadline --

13                   THE COURT:  It's not on a -- well, I don't

14  either.  So --

15                   MS. MAIMIN:  The deadline for submitting

16  bids in this case is April 24th.

17                   THE COURT:  So let me just stop you for one

18  moment.

19                   Ms. Quartarolo, what is the deadline

20  tomorrow?  I'm sorry.

21                   MS. QUARTAROLO:  This is in the process --

22                   THE COURT:  Just come up here, because I

23  don't think that mic is necessarily working.

24                   MS. QUARTAROLO:  This is in the sale process

25  letter that the committee has seen.

Page 81

1                    THE COURT:  So what's the deadline, though?

2                    MS. QUARTAROLO:  The deadline is to mark up

3      the APA.

4                    THE COURT:  But not to make a bid, just to

5      mark up the APA?

6                    MS. QUARTAROLO:  Correct, and so if there

7      was, we will have some indication tomorrow whether

8      there --

9                    THE COURT:  Some, but not complete.

10                   MS. QUARTAROLO:  Of course, negotiations --

11                   THE COURT:  It could be a month from now,

12     when the -- on April 5th, or whenever that date is that

13     someone includes these causes of action?

14                   MS. QUARTAROLO:  I think it's fair to say

15     that there will be some period of negotiation, but I also

16     think it's fair to say that if someone intended to -- that

17     they did not like that these were excluded, they would

18     probably include that in their first markup.

19                   MS. MAIMIN:  Your Honor, we're making a lot

20     of assumptions here --

21                   THE COURT:  Yes.

22                   MS. MAIMIN:  -- including that all of the

23     potential buyers are going to be identified by tomorrow,

24     and the whole point of the bid -- the deadline, is that

25     anyone can show up and make an offer up until April 24th,

Page 82

1    and that offer can include these claims.

2                    THE COURT:  A marked up APA, even if -- they

3    don't have to do that by tomorrow?

4                    MS. MAIMIN:  No, they are allowed --

5                    THE COURT:  Is that right, Ms. Quartarolo,

6    they do not have to -- you can -- if that green light is

7    on -- you might be able to push the button and speak from

8    there.

9                    MS. MAIMIN:  The green light is on.

10                   THE COURT:  Oh, okay, good.  Just get closer

11   to the mic.  I'm sorry.

12                   MS. QUARTAROLO:  I don't think that -- I

13   mean, again, I don't want to overstep, in terms of what

14   the process --

15                   THE COURT:  Actually you're not coming

16   through, so come up.  I'm sorry.

17                   We have a lot of disappointing technological

18   issues, apparently, but go ahead.

19                   MS. QUARTAROLO:  So, the process letter

20   provides that markups will be submitted tomorrow.

21                   I don't want to overstate, you know, what

22   dates and deadlines may prohibit people from engaging

23   after that, obviously, but there certainly will be some

24   indication that we would expect.

25                   THE COURT:  All right.  So all we're getting

Page 83

1    tomorrow is an indication, but not necessarily the end of

2    the road.

3              MS. MAIMIN:  Yeah, it's an indication by

4    entities who have already indicated an interest, it's

5    completely preliminary, it doesn't prevent them from

6    changing their mind later about the claims, especially if,

7    you know, as we proceed, we're able to more accurately

8    assess the value of the claims.

9              We don't want, we don't want to just add up

10   all the distributions.  It's possible that some of

11   distributions may not be properly avoidance actions.  We

12   want the buyer to have a fair process with integrity.  We

13   think it's probably going to end up being much more

14   because of breach of fiduciary duty, but we also have an

15   obligation to provide honest and complete information.

16   We're not able to do that under the process that's been --

17             THE COURT:  Let me ask you this then --

18             MS. MAIMIN:  Yes.

19             THE COURT:  -- if I were to order today that

20   the debtor -- that you make it very clear what the 200

21   transactions are, in other words, you give them a list,

22   you can do very quickly, I assume --

23             MS. MAIMIN:  Yes.

24             THE COURT:  -- correct?

25             MS. MAIMIN:  Yes.

1              THE COURT:  And if I then ordered the debtor
2    to take that list of 200 transactions, and give you the
3    information from the debtors' side, or whatever
4    information they have on those 200 transactions, and that
5    they do so within some reasonable period of time, two
6    weeks, three weeks, I don't know, some amount of time that
7    Ms. Quartarolo believes that that can happen, and then --
8    but withhold judgment on whether these subpoenas can go
9    forward until you tell me whether you're satisfied with
10   the production, and have enough information to do what you
11   think you need to do, without involving these other 18
12   third parties, is that something that at least bridges the
13   gap for the time being?  I'm trying to balance --
14             MS. MAIMIN:  Yes, Judge.
15             THE COURT:  -- the concerns, which resonate
16   me.  I mean, they are in the middle of a sale process
17   which, frankly, is in the UCC's, you know, interest that
18   that sale process go forward and achieve the highest and
19   best price.
20             MS. MAIMIN:  Yes.
21             THE COURT:  We all agree with that, but it's
22   also in the unsecured creditors' committee's interest to
23   make sure that you have the information about avoidance
24   actions, or about these claims, and D&O claims, that might
25   produce even a better result for the creditors, so I get

1    that.  Those are competing interests.

2                    I'm not so the convinced that the timing is

3    so important right now because, you know, I come to this,

4    and I'm very careful about bias, but I do have a little

5    bit of a bias, because I just don't see buyers making

6    offers for these types of claims in transactions like

7    this, I've just never seen it before, and it may be a

8    non-issue there, at least for the time being.  So I'm

9    trying to sort of --

10                   MS. MAIMIN:  Your Honor, I think the proof

11   is sort of in the details.  If we could get the

12   information quickly, and we actually were able to obtain

13   what you just outlined, namely all documents and

14   communications, including emails and text messages,

15   because we've seen those in this case be critical,

16   relating to those 200 suspect transactions, within a

17   finite amount of time, we would be able to make an

18   assessment about whether or not additional examinations

19   would need to go forward, but it would have to be --

20                   THE COURT:  So, even if --

21                   MS. MAIMIN:  -- a very finite time.

22                   THE COURT:  I get it.

23                   And even if you got lots of information, but

24   perhaps not all, because the debtor hasn't really had time

25   to scrub their servers, or do whatever it is they need to

Page 86

1   do to give you all, you could still assess by that time

2   whether you have generally enough information and can wait

3   on the excess stuff, with a rolling -- an obligation to

4   produce on a rolling basis?

5                    MS. MAIMIN:  Your Honor, yes, if the debtor

6   committed to actually produce the material we described on

7   a short-term basis, I think that's probably a reasonable

8   compromise.

9                    Let me consult with my colleagues for a

10  moment, please.

11                   THE COURT:  Yeah, I don't have an answer

12  from Ms. Quartarolo yet, she might yell at me for -- I

13  can't do this in two weeks, no way.

14                   MS. MAIMIN:  Your Honor, when we asked

15  recently about emails, we were told that a lot of these

16  transactions were directed by phone.  So, we are

17  concerned --

18                   THE COURT:  Emails either exist or they

19  don't.

20                   MS. MAIMIN:  Yes.

21                   So, that's why we want to put a really tight

22  timeline on that, because if we're going to end up with a

23  whole lot of nothing, we don't want to be compressed by

24  the --

25                   THE COURT:  All right.

Page 87

1              MS. MAIMIN:  -- schedule.

2              THE COURT:  So let me explore that, you're

3    saying that giving us the general ledger that shows the

4    transactions doesn't help us, that's irrelevant because we

5    already know that.

6              If you give us an invoice, or whatever, that

7    might help you identify the transaction, especially on the

8    supplier's side, but on anything else, it may be that the

9    only way for you to understand the transaction is through

10   the human communication that's occurring?

11             MS. MAIMIN:  That's correct, because of the,

12   I think slightly peculiar process that a lot of this, we

13   understand from debtors, took place by telephone.  We're

14   willing to try, if they can produce the material, which I

15   don't think --

16             THE COURT:  And if telephone, you have to

17   take a depo, you don't have a choice.

18             MS. MAIMIN:  Right.

19             THE COURT:  It's the only way to find out

20   what happened.

21             MS. MAIMIN:  Yes, which is why I think

22   that's where we're going to end up, and one of the reasons

23   why we're here.

24             I like to compromise, too, your Honor.  I

25   didn't think it's likely we're going to be able to avoid

1    these depositions, but if the debtors have emails, they

2    can produce them within the next week, emails, invoices

3    relating to these 200 transactions, then it is possible

4    that we would be able to streamline our requests.

5                    THE COURT:  Okay.

6                    MS. MAIMIN:  And we would certainly --

7                    THE COURT:  What's the return date on the

8    subpoenas, March 9th or something, I thought I saw, maybe?

9                    MS. MAIMIN:  Yes, I think the time -- it

10   already passed, your Honor.

11                   THE COURT:  Oh, it's already passed?

12                   MS. MAIMIN:  We'd have to start all over

13   again, and the reason why we're asking for such a short

14   timeframe is because we are skeptical that we are actually

15   going to get much of anything that's particularly useful

16   from the debtors, and not necessarily by their own -- not

17   their own facility, they don't have it.  That's why we're

18   seeking it from the third parties.  So --

19                   THE COURT:  And part of what's driving this

20   is the fact that it is a Subchapter S company, and that

21   it's --

22                   MS. MAIMIN:  Yes.

23                   THE COURT:  -- a large number of

24   transactions, that you don't generally see in a C Corp

25   and, therefore, it suggests perhaps a higher level of

Page 89

1    suspicion than you would otherwise --

2                    MS. MAIMIN:  Your Honor, there are so many

3    extremely suspicious transactions.  I just gave you an

4    example of one.  We can't get very specific, but there is

5    a panoply, and I'm just concerned -- you know, I'd be

6    happy to get what the debtors have quickly, but I think

7    it's unlikely that this is going to resolve the issue,

8    because I don't think they have much, and I don't think --

9                    THE COURT:  But at least they can give you

10   what they do have, that might allow you to exclude a

11   hundred of the transactions, or 40, whatever the number

12   is.

13                   MS. MAIMIN:  Potentially, but we would need

14   the information quickly so that we're not --

15                   THE COURT:  Yes, I see.

16                   MS. MAIMIN:  -- butting up against the bid

17   deadlines.

18                   THE COURT:  All right.  Go ahead,

19   Ms. Quartarolo.

20                   You know, I have to tell you, you know, I

21   don't have a good sense from you as to -- not that you

22   haven't tried, and you've done the best job you can do.  I

23   mean, I'm not questioning that at all, but I'm not really

24   seeing the damage to the process of having to go through

25   this.  There is no evidence in front of me to suggest

Page 90

1    that, you know, the sale process will be damaged if you

2    have to -- if these folks have to spend the time on this.

3                    MS. QUARTAROLO:  No, and I think,

4    your Honor, if I can just respond to that point, I mean,

5    think that's not -- that's hypothetical, so I don't know

6    that we could come forward with evidence about that.

7                    I think what is before the Court is a

8    request to balance the -- you know, balance the parties'

9    respective --

10                   THE COURT:  Competing interests.

11                   MS. QUARTAROLO:  -- interests.

12                   THE COURT:  Yeah.

13                   MS. QUARTAROLO:  And that's really what

14   we're trying to do here.

15                   And, you know, Chapter 11 cases are not

16   always the model of efficiency, but we're really trying,

17   and we're trying to proceed in a manner where we can get

18   them information.  Again, while we were --

19                   THE COURT:  Oh, let me put it this way, if

20   you're really a suspicious person, and committees are and

21   should be, frankly, you may say to yourself, well, the

22   only reason the debtor is even here is because they're

23   trying to prevent information from coming out now that

24   might be considered pretty damaging.

25                   You know, I mean, that's certainly arguably

1    what it might look like.

2                    MS. QUARTAROLO:  And that's why we've -- I'm

3    sorry, that's why we've tried to be really careful about

4    saying it's not that we are trying to hamper their ability

5    to get this information.  We just don't think that they

6    need it right now.

7                    And we think they should get it from us

8    first, exhaust that as a potential resource.  I can tell

9    you right now, I cannot commit to giving you -- to giving

10   the committee, and investigating a full list of 200

11   transactions in a week, and I don't think that's

12   reasonable.

13                   THE COURT:  How long would you take?

14                   MS. QUARTAROLO:  I'm not sure, I think

15   something closer to three or four weeks is probably

16   closer, when you're talking about 200 transactions, and

17   we're going to have to look at them individually, but

18   I --

19                   THE COURT:  Well, 200 transactions, frankly,

20   to me doesn't sound like a lot.

21                   MS. QUARTAROLO:  Okay.

22                   THE COURT:  I mean, you know, it's a list

23   two pages long.

24                   MS. QUARTAROLO:  And certainly I think what

25   we would commit to doing, is to getting the information to

Page 92

1    them on a rolling basis, and so what we would do is figure

2    out what we can get quickly, give that to them, and go

3    from there.

4                    THE COURT:  Okay.  All right.  Any -- sure.

5                    MS. MAIMIN:  We are not going to be able to

6    make the assessment that we need, even a reasonable

7    assessment, it doesn't have to be down to the cent, if

8    three or four weeks go by, after we've been asking for

9    these emails for months, and have told them about these

10   transactions for months --

11                   THE COURT:  I get it.

12                   MS. MAIMIN:  We're not going to be able to

13   do it.

14                   THE COURT:  I understand.

15                   MS. MAIMIN:  Okay.

16                   THE COURT:  So, Ms. Quartarolo --

17                   MS. MAIMIN:  Thank you.

18                   THE COURT:  -- have they been asking for

19   these emails for months?  And have you -- has the debtor

20   just not been willing to investigate, or has the debtor

21   actually looked and just found none?

22                   MS. QUARTAROLO:  So the answer, I think, to

23   both of those is, no.

24                   I don't think it's fair that they've --

25   you know, this is an informal diligence process, so

Page 93

1    it's an ongoing process.  Obviously we have tried to get

2    them information without producing some emails, like,

3    to --

4                    THE COURT:  I understand that.

5                    MS. QUARTAROLO:  So there is information

6    that we wanted to get them on a threshold level.  So --

7                    THE COURT:  What does that mean?

8                    MS. QUARTAROLO:  So, things like general

9    ledgers, financial information, records.

10                   THE COURT:  They want the emails, they want

11   explanations of the transactions.

12                   MS. QUARTAROLO:  And I understand that,

13   and --

14                   THE COURT:  So let's focus on that.

15                   MS. QUARTAROLO:  Yes.

16                   THE COURT:  What has the debtor done to get

17   them information on the transactions?

18                   MS. QUARTAROLO:  I had a conversation with

19   Ms. Maimin, where I said that we would have that

20   discussion and agree on potential email perimeters.

21                   THE COURT:  When was that discussion?

22                   MS. QUARTAROLO:  We haven't had the

23   discussion.

24                   THE COURT:  You promised to have the

25   discussion about --

Page 94

1              MS. QUARTAROLO:  Tomorrow.

2              THE COURT:  But is that just now coming up,

3  or did you offer that months ago?

4              MS. QUARTAROLO:  I didn't offer that months

5  ago, your Honor.

6              I mean, I think the issue is because when

7  they came and said we want all documents of a certain

8  variety, we got them a substantial volume of documents, I

9  think it's cited in our motion.  We have not done full

10  emails searches, but we have told the committee's counsel

11  that we will do that.  We just want to do it in the most

12  efficient way possible, and so --

13             THE COURT:  That, what you're suggesting you

14  can do over the next three to four weeks?

15             MS. QUARTAROLO:  Correct.

16             THE COURT:  I'm not ruling three or four

17  weeks is sufficient --

18             MS. QUARTAROLO:  I understand.

19             THE COURT:  -- but --

20             MS. QUARTAROLO:  Yes.

21             THE COURT:  But they would give you search

22  terms, and you would do the searches?

23             MS. QUARTAROLO:  Correct.

24             THE COURT:  Okay.

25             MS. QUARTAROLO:  In, you know, an efficient

Page 95

1   manner.

2                   THE COURT:  Okay.  All right.  Anyone else

3   wish to be heard before I --

4                   MR. FEINSTEIN:  May I be heard briefly,

5   your Honor?

6                   MS. MAIMIN:  Your Honor, I'll just note that

7   we -- and we're happy to show this to the Court in camera,

8   there is a document tracker, tracking our requests, and we

9   made a request for all documents and communications

10  regarding shareholder distributions, and we were told by

11  the debtor that their document production of that was

12  complete in November.  So we are very --

13                  THE COURT:  Nothing further coming?

14                  MS. MAIMIN:  That's what they said,

15  complete, produced 11-22-22.  So --

16                  THE COURT:  And from that, Mr. Williams has

17  not been able to discern the purpose of these

18  transactions?

19                  MS. MAIMIN:  We didn't get any documents and

20  communications.

21                  THE COURT:  So there was none?

22                  MS. MAIMIN:  All we got was the general

23  ledger.

24                  Well, that's what we assume.  So I don't

25  know what emails or documents the debtor is talking about

1    right now.

2                    THE COURT:  All right.  Mr. Feinstein, you

3    wanted to comment?

4                    MR. FEINSTEIN:  Yes, your Honor.  Thank you

5    very briefly.  I just wanted to raise one thing that

6    neither of the parties have raised.

7                    Monster Energy did file a joinder in the

8    committee's position, and the point I want to raise, that

9    none of parties have raised, concerns the prepetition

10   transfers.  I mean, we're not concerned about postpetition

11   transfers.  With Heron in place, I'm sure that the books

12   are being run with great integrity, but there are

13   obviously a lot of prepetition distributions, and whether

14   you call them distributions, or transfers, or what have

15   you, to the extent that Monster -- that Vital was

16   insolvent when those transfers were made, and Vital was a

17   main defendant in some significant litigation in the

18   bankruptcy, those are avoidable, and now -- because

19   they're gratuitous transfers.

20                   So now we're concerned that the recipient of

21   those transfers have been identified, they received

22   subpoenas, and we're concerned about the prospect of

23   subsequent transfers by those parties, where they encumber

24   the asset that's been conveyed to them, if it's a piece of

25   real estate, they put on a mortgage, or they sell it so,

Page 97

1    you know, a number of related --

2                    THE COURT:  Yes, Mr. Feinstein, that may be,

3    but there is a long road between here and filing --

4    getting the information, filing a lawsuit, where they have

5    a right to defend themselves and, you know, and obtaining

6    something that would prevent that type of concern, or

7    would address that concern.

8                    So, I get it, but I'm not sure that that

9    really is going to play a role today, because we're really

10   talking weeks, we're not talking months.

11                   MR. FEINSTEIN:  You're right, your Honor,

12   and when we were talking about months, it was a big

13   concern.  If we're talking about a couple of weeks, that's

14   another matter.

15                   THE COURT:  I don't know about a couple of

16   weeks, but we're talking about a time period that you

17   wouldn't be able to get an injunction even if you wanted

18   to, but anyway, I hear you.  All right.

19                   MR. FEINSTEIN:  Thank you.

20                   THE COURT:  Anything -- anyone else wish to

21   be heard?

22                   MS. MAIMIN:  Not from the committee,

23   your Honor.  Thank you.

24                   THE COURT:  All right.  So give me a little

25   bit of time, and I'll be back to you shortly.

Page 98

1               (Thereupon, a recess was had, after which

2    the following proceedings were had:)

3               THE COURT:  Please be seated.

4               Okay.  So, the reason this didn't take me

5    long is because I just don't think the debtor has -- are

6    we waiting for some people?

7               MS. MAIMIN:  We can proceed.

8               THE COURT:  Okay.  I just don't think,

9    Ms. Quartarolo, that the debtor has provided me with a

10   good reason to issue an order on this.  There is probably

11   standing, but I'm not ruling on that one way or the other

12   because I don't really think I need to, but I am going to

13   deny the motion.

14              Yes, there is a sale process, I get it.

15   Yes, it's possible that the debtor will have to spend some

16   time to protect whatever interest the debtor has in this

17   discovery.

18              Yes, the debtor may choose to have counsel

19   sitting at the depositions that may occur, but the debtor

20   admits itself that a buyer may be interested in buying

21   these claims, but regardless, 2004, this goes to the very

22   heart of what a committee -- the duty of a committee is in

23   a case like this, to investigate transactions, and that's

24   what they're doing.

25              Having said that, if, in the course of the

1   discovery, it becomes apparent that it is, in fact,

2   interfering with the sale process, then -- I'm denying it

3   without prejudice, to the debtor coming back before the

4   Court with concrete evidence -- concrete evidence, forget

5   concrete, that's not a term -- evidence sufficient to show

6   that either it's enormously expensive, although I don't

7   think that's going to be very persuasive, or that it is,

8   in fact, interfering, and this is how it's interfering,

9   for example, you know, the executive vice president of

10  finance spent X amount of time in deposition or

11  2004 Examination, and delayed returning three buyers'

12  calls that wanted information, you know, and, therefore,

13  we didn't -- you know, they may fall out.

14                  I don't know, I can't even imagine exactly

15  what would occur, but I need evidence that it's actually

16  interfering because, again, I find what the committee is

17  doing goes to the very heart of what the committee should

18  be doing.

19                  So, I'm going to deny the motion, and I will

20  look for, Ms. Maimin to -- or I don't know who is going to

21  submit the order, but a simple order denying for the

22  reason stated on the record, okay?

23                  All right.  Thank you all.

24                  MS. QUARTAROLO:  Thank you, your Honor.

25                  THE COURT:  I think that concludes the

1     hearing today.  All right.  You all don't need to stand

2     for me.  We're good.

3               MS. MAIMIN:  Okay.

4

5

6

7               (Thereupon, the hearing was concluded.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1
2
3                          CERTIFICATION
4
5    STATE OF FLORIDA        :
6    COUNTY OF MIAMI-DADE    :
7
8                 I, Cheryl L. Jenkins, RPR, RMR, Shorthand
9    Reporter and Notary Public in and for the State of Florida
10   at Large, do hereby certify that the foregoing proceedings
11   were transcribed by me from a digital recording held on
12   the date and from the place as stated in the caption
13   hereto on Page 1 to the best of my ability.
14                 WITNESS my hand this 15th day of
15   March, 2023.
16
17
18              _____
19                 CHERYL L. JENKINS, RPR, RMR
20             Court Reporter and Notary Public
             in and for the State of Florida at Large
21                  Commission #HH 170910
                    December 27, 2025
22
23
24
25