Page 1

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA

1

2

3

4    IN RE:                    CASE NO. 22-17842-PDR

5    VITAL PHARMACEUTICALS, INC.,

6            Debtor.
     _____/

7

8              ECF #670, 862, 878

9               March 9, 2023

10            The above-entitled cause came on for hearing

11   before the Honorable Peter D. Russin, one of the Judges in

12   the UNITED STATES BANKRUPTCY COURT, in and for the

13   SOUTHERN DISTRICT OF FLORIDA, at 299 E. Broward Blvd.,

14   Fort Lauderdale, Broward County, Florida, on March 9,

15   2023, commencing at or about 2:00 p.m., and the following

16   proceedings were had.

17

18

19

20

21

22

23

24          Transcribed from a digital recording by:
              Cheryl L. Jenkins, RPR, RMR

25

1

APPEARANCES:

2
3              BERGER SINGERMAN, by
               JORDI GUSO, Esquire
4                        and
               LATHAM & WATKINS, by
5              HUGH MURTAGH, Esquire
               On behalf of the Debtor
6
7               SEQUOR LAW, by
               JUAN MENDOZA, Esquire
8                        and
               LOWENSTEIN SANDLER, by
9          ERIC CHAFETZ, Esquire (via Zoom)
           LINDSAY SKLAR, Esquire (via Zoom)
10             On behalf of the Official
           Committee of Unsecured Creditors
11
12             AKERMAN, LLP, by
               MICHAEL GOLDBERG, Esquire
13             EYAL BERGER, Esquire
               On behalf of Monster Energy
14
15       MARKOWITZ RINGEL TRUSTY & HARTOG, by
               JERRY MARKOWITZ, Esquire
16                       and
               LEWIS ROCA, by
17             ROBERT CHARLES, Esquire
       On behalf of Faith Technologies and CM Builders
18
19             SHUTTS & BOWEN, by
               HARRIS KOROGLU, Esquire
20                       and
               MOORE & VAN ALLEN, by
21         LUIS LLUBERAS, Esquire (via Zoom)
               On behalf of Truist Bank
22
23         SCOTT REYNOLDS, Esquire (via Zoom)
         On behalf of Hardrock Concrete Placement Co.
24
25

1
                     CONTINUED APPEARANCES
2

3            MATTHEW DAVIS, Esquire (via Zoom)
        On behalf of HACI Mechanical Contractors
4

5                       AGENTIS, by
                   JESSE CLOYD, Esquire
6              On behalf of Stellar, Inc.

7

8            DAVID BARLOW, Esquire (via Zoom)
              On behalf of Nexus Steel, LLC
9

       J. STEVEN WILKES, Trial Attorney (via Zoom)
10              Office of the U.S. Trustee
                  Department of Justice
11

12            SQUIRE PATTON BOGGS, by
            MAURA MCINTYRE, Esquire (via Zoom)
13     On behalf of Sidel Blowing and Services SAS

14

                      ALSO PRESENT
15

       ECRO - Electronic Court Reporting Operator
16

17                    - - - - - - -

18

19

20

21

22

23

24

25

1              THE COURT:  Vital Pharmaceuticals, 22-17842.

2              Mr. Guso.

3              MR. GUSO:  Yes, sir.  May it please the

4    Court.  Good afternoon, your Honor.  Jordi Guso, G-u-s-o,

5    of Berger Singerman.  We are co-counsel to the debtors.

6              I am joined at counsel table, your Honor,

7    from the Latham & Watkins firm, Hugh Murtagh,

8    M-u-r-t-a-g-h.  Thank you.

9              THE COURT:  Thank you.

10             Welcome, Mr. Murtagh.

11             MR. MURTAGH:  Good afternoon, your Honor.

12             MR. CLOYD:  Good afternoon, your Honor.

13   Jesse Cloyd --

14             THE COURT:  Mr. Cloyd.

15             MR. CLOYD:  -- C-l-o-y-d, on behalf of

16   Stellar Group, Inc.

17             THE COURT:  Thank you.

18             MR. KOROGLU:  Good afternoon, your Honor.

19   Harris Koroglu, K-o-r-o-g-l-u, from Shutts & Bowen, on

20   behalf of Truist Bank, which is the agent for the

21   prepetition lender and the DIP lender, and on the Zoom

22   today is my co-counsel, from the Moore & Van Allen firm,

23   Mr. Luis Lluberas.

24             THE COURT:  Let me just find him.

25             MR. MARKOWITZ:  Good afternoon, your Honor.

1    Jerry Markowitz, M-a-r-k-o-w-i-t-z, Markowitz Ringel

2    Trusty & Hartog, for Faith Technologies.  Also in the

3    courtroom with me today is Robert Charles, from

4    Lewis & Roca, for Faith Technology.

5                    I am also here for CM Builders, who has

6    filed a joinder in the motion.

7                    THE COURT:  Mr. Markowitz, who at the

8    University of Miami, who was the team that ended up third?

9                    MR. MARKOWITZ:  What we called the number

10   two team, that was not in the final round that you judged.

11                   THE COURT:  Really?

12                   MR. MARKOWITZ:  Yes.

13                   THE COURT:  I can't imagine how that -- the

14   round that we judged didn't make it to the --

15                   MR. MARKOWITZ:  Well, they were in the

16   octofinals with the winner, Baylor, and as I understand

17   it, it was too close to call, but it went the other way.

18                   THE COURT:  Well, there must have been some

19   really talented folks at that competition.

20                   MR. MARKOWITZ:  Apparently so.

21                   THE COURT:  Yeah, pretty impressive.

22                   Anyway, thank you.

23                   MR. CHARLES:  Good afternoon, your Honor.

24   Robert Charles, C-h-a-r-l-e-s.

25                   THE COURT:  On behalf of?

1              MR. CHARLES:  Faith Technologies, Inc.  I am
2    working with Mr. Markowitz.
3              THE COURT:  Oh thank you.
4              MR. CHARLES:  Thank you.
5              THE COURT:  All right, and on Zoom,
6    Mr. Wilkes.
7              MR. WILKES:  Good afternoon, your Honor.
8    J. Steven Wilkes for the United States Trustee, Region 21.
9              THE COURT:  Thank you.
10             Ms. McIntyre.
11             MS. MCINTYRE:  Good afternoon, your Honor.
12   Maura McIntyre, from Squire Patton Boggs, on behalf of
13   Sidel Blowing and Services SAS.
14             THE COURT:  Thank you.
15             MS. MCINTYRE:  And, your Honor, I have a
16   pro hac pending at Docket 918.
17             THE COURT:  All right, and you submitted an
18   order, it was ex parte, or how did you submit it?
19             MS. MCINTYRE:  I did submit it.  It actually
20   was scheduled for a hearing.
21             THE COURT:  You don't need to do that.
22             MS. MCINTYRE:  And I, in accordance with
23   your procedures, I don't intend to speak unless the Court
24   wants to hear from me.  I'm here to observe.
25             THE COURT:  Okay.  That's fine.

1          I'm just saying for your pro hac admission,

2    you can just submit an order.  You can file those motions

3    ex parte.  Who is your local?

4              MS. MCINTYRE:  It is Squire Patton Boggs,

5    Ms. Preston.

6              THE COURT:  Okay.  Well, I think you can --

7    if you want to avoid a hearing on that, and I highly

8    recommend that you do, then just have that order entered,

9    or I guess probably resubmit the motion as ex parte, and

10   just upload the order, okay?

11             MS. MCINTYRE:  I appreciate that.

12             THE COURT:  You don't have a felony

13   background, do you?

14             MS. MCINTYRE:  I do not.

15             THE COURT:  Okay.  You're probably going to

16   be okay.

17             Hold on one second.  Ms. Weldon.

18             (Inaudible conversation.)

19             THE COURT:  Ah, okay, so don't pay again,

20   because there is a charge for it.  So, call Ms. Weldon, my

21   courtroom deputy, and see how you can get around that,

22   okay?

23             MS. MCINTYRE:  I appreciate it.

24             THE COURT:  Okay.

25             MS. MCINTYRE:  Thank you.

1                    THE COURT:  All right.  Mr. Reynolds.

2                    MR. REYNOLDS:  Good afternoon, your Honor.

3     Scott Reynolds, for secured creditor Hardrock Concrete

4     Placement Company.

5                    THE COURT:  Thank you.

6                    Mr. Barlow.

7                    MR. BARLOW:  Good afternoon, your Honor.

8     David Barlow on behalf of the creditor Nexus Steel, LLC.

9     I did file a pro hac vice application.  An order was

10    entered at Docket Entry 903.

11                   THE COURT:  All right.  Great.

12                   Mr. Chafetz.

13                   MR. CHAFETZ:  Yes, your Honor.

14    Eric Chafetz, of Lowenstein Sander, on behalf of the

15    official committee of unsecured creditors.  I'm on the

16    line with my colleague Lindsay Sklar, also of

17    Lowenstein Sandler.

18                   THE COURT:  All right.  Thank you.

19                   Mr. Mendoza.

20                   MR. MENDOZA:  Good afternoon, your Honor.

21    Juan Mendoza here on behalf of the official committee of

22    unsecured creditors.

23                   THE COURT:  Thank you.

24                   And Mr. Davis.

25                   MR. DAVIS:  Yes, your Honor.  Matthew Davis

1  on behalf of creditor HACI Mechanical Contractors, Inc.

2              THE COURT:  Thank you.

3              All right, and again --

4              MR. DAVIS:  Thank you.

5              THE COURT:  -- there is a Taylor Harrison,

6  and there is no camera working, so I don't know if there

7  is an appearance there to be made, but if you want to make

8  an appearance, now is your chance.

9              (No verbal response.)

10             THE COURT:  Okay.  All right.  Mr. Guso,

11 Docket Entry -- or what order do you wish to proceed in,

12 or how many -- is there --

13             MR. GUSO:  Yes, sir.

14             THE COURT:  -- more than one matter?

15             MR. GUSO:  May it please the Court,

16 your Honor.

17             THE COURT:  Yes, there are a couple of

18 matters, so --

19             MR. GUSO:  There is three matters on the

20 calendar, your Honor.  Again, Jordi Guso on behalf of the

21 debtors.

22             Perhaps, your Honor, I believe the two

23 expedited motions to approve compromise of controversy is

24 probably going to be quicker, and then the Court can

25 entertain argument on the stay relief motion, if that's

1   acceptable to the Court?

2                   THE COURT:  Sure.

3                   MR. GUSO:  Very good, Judge.

4                   Your Honor, I'll take up first the expedited

5   motion to compromise controversy with Sidel Blowing and

6   Services SAS.

7                   Your Honor, this motion seeks approval of an

8   equipment repurchase agreement between Vital

9   Pharmaceuticals, Inc. -- it's actually called an agreement

10  for take-back of equipment, dated February 23rd, 2023, and

11  Sidel, represented by Ms. McIntyre.

12                  Your Honor, prepetition, dating back to

13  November of 2020, Vital Pharmaceuticals signed an

14  agreement with Sidel for the manufacturing and delivery of

15  specialized equipment, which the debtors intended to use

16  in connection with the bottling and canning line in a

17  facility they were developing in Lithia Springs, Georgia.

18  The debtor has paid approximately $9 million for the

19  equipment.  It was delivered.  It is still boxed in its

20  original packaging.

21                  THE COURT:  I've got a question.

22                  MR. GUSO:  Yes, sir.

23                  THE COURT:  Okay.  So you're getting some of

24  that back.

25                  MR. GUSO:  Yes, sir.

1              THE COURT:  Some of it is staying.

2              MR. GUSO:  Yes, sir.

3              THE COURT:  And is some of it going with you

4    to be sold at a later date, or tell me about that.

5              MR. GUSO:  There --

6              THE COURT:  What I didn't understand about

7    the motion, obviously you're taking a fairly significant

8    loss --

9              MR. GUSO:  Yes, sir.

10             THE COURT:  -- and I understood at least a

11   portion of the equipment would remain.  I don't -- what I

12   didn't understand was how much equipment would be left

13   that you're taking with you, and what would happen to

14   that.

15             MR. GUSO:  The debtors have arranged for a

16   storage facility in the area, your Honor, from which

17   they'll relocate the equipment that's being retained,

18   that's not being repurchased, if you will --

19             THE COURT:  Right.

20             MR. GUSO:  -- by Sidel, and the debtors will

21   attempt to sell it.

22             THE COURT:  Is it the majority of the

23   equipment, or how -- as a percentage of the nine-plus

24   million dollars, what does it represent?

25             MR. GUSO:  Your Honor, I can't answer that

1    question directly.  I know that the equipment, and

2    package, it's pretty specialized, from what we were told.

3    I can tell your Honor that we had an equipment broker go

4    out and look at it and see if it could be monetized before

5    we engaged in discussions with Sidel.  The broker

6    concluded, your Honor, that it was very specialized, hard

7    to find a buyer.

8                We then went back and visited with the

9    broker about the proposal that Sidel made to us, and the

10   recommendation from the broker was to take it for purposes

11   of this transaction.

12               And so, your Honor, I think we'll try and

13   find a buyer for the remaining equipment.  I'm not sure on

14   a percentage basis what that represents, I can certainly

15   inquire, but in the event it's not sold, your Honor,

16   obviously we would probably look to scrap it for value,

17   for some value.

18               THE COURT:  And are you offering up the

19   declaration of Mr. DiDonato in support of this?

20               MR. GUSO:  It is, your Honor.

21   Mr. DiDonato's declaration in support of the Sidel

22   arrangement, your Honor.

23               THE COURT:  That's at 901?

24               MR. GUSO:  901, correct, your Honor.

25               THE COURT:  All right, and is Mr. DiDonato

1    available, or --

2                    MR. GUSO:  He was supposed to -- we had no

3    objection.  He was supposed to be on by Zoom, your Honor.

4    I don't know if you --

5                    THE COURT:  He may be, but he just doesn't

6    have his camera on.

7                    MR. GUSO:  Right.  Judge, we did visit with

8    both the lenders and with the committee regarding the

9    relief that the debtors seek here, your Honor, neither has

10   an objection, and to my understanding support the relief.

11                   And as we plead in the motion, your Honor,

12   the facility itself is actually under contract to sell.

13                   THE COURT:  Yes.

14                   MR. GUSO:  That facility, the real estate

15   and the improvements, your Honor, secure our collateral

16   for the prepetition lenders, and so proceeds of the sale

17   first would -- a portion would go back to the debtors, to

18   refund the carry that the debtors have had on that

19   property postpetition, closing costs, et cetera, with the

20   net going to the lenders to be applied to reduce the

21   prepetition indebtedness.

22                   THE COURT:  Okay.  All right.  Great.

23                   So, how do you want to proceed then, you

24   have the description, it's of record.

25                   MR. GUSO:  Yes, sir.

1          THE COURT:  We can certainly bring it into

2     evidence.  The only issue is that I don't see Mr. DiDonato

3     available for cross-examination, but let's find out if

4     anybody would even want to do so, which I doubt.

5          MR. GUSO:  I doubt as well, your Honor,

6     but --

7          THE COURT:  It's on an emergency basis, so

8     I'm just wanting to make sure that we -- that you cover

9     your bases in terms of process.  So --

10          MR. GUSO:  Sure.

11          THE COURT:  -- does anyone have an objection

12     to the proffer represented by the declaration of

13     Mr. DiDonato at Docket Entry 901?

14          (No verbal response.)

15          THE COURT:  Does anyone wish to -- I'm

16     sorry, Mr. Chafetz.

17          MR. CHAFETZ:  No, your Honor.  Eric Chafetz

18     appearing on behalf of the official committee of unsecured

19     creditors.

20          We just have one clarifying question, the

21     answer has been represented to us, but we noticed that it

22     wasn't referenced in the order, the proceeds from the

23     sale, we've been told, are going to remain with the estate

24     for use of general corporate purposes, for lack of a

25     better term, and we just wanted to ensure that that is the

1  case, because there is no reference to the treatment of

2  the proceeds in the order.

3           THE COURT:  All right, Mr. Guso.

4           MR. GUSO:  Correct, your Honor, and we're

5  happy to include that language in the order, your Honor.

6           THE COURT:  How much of the proceeds does

7  that represent?

8           MR. GUSO:  It's about a million -- well, I

9  think Mr. Chafetz --

10          THE COURT:  It's the full amount --

11          MR. GUSO:  -- was referring to the proceeds

12  of the sale of the equipment, which is roughly --

13          MR. CHAFETZ:  Yes.

14          MR. GUSO:  -- $1.8 million.

15          In terms of the reimbursement to the debtors

16  from the sale of the underlying real estate, your Honor,

17  approximately a million dollars.

18          MR. CHAFETZ:  And --

19          THE COURT:  I see.  Okay.  All right.

20          MR. CHAFETZ:  Sorry, your Honor.

21          And, your Honor, just to clarify, or put a

22  slightly finer point on that point, as part of our DIP

23  resolution, the lenders, the debtors, and the committee

24  agreed that the postpetition carrying costs for the

25  underlying piece of real property would be reimbursed to

1    the estate, which is a different issue than this, but a

2    similar concept.

3                    MR. GUSO:  That's the million dollars I

4    referred to, your Honor.

5                    THE COURT:  Okay.

6                    MR. GUSO:  There is two components.

7                    THE COURT:  Reimbursed out of the proceeds?

8                    MR. GUSO:  Out of the proceeds of the sale

9    of the real estate, yes, sir.

10                   THE COURT:  Okay, as opposed to going where?

11                   MR. GUSO:  As opposed to going --

12                   MR. CHAFETZ:  To the -- I'm sorry.

13                   MR. GUSO:  -- to the prepetition lenders.

14                   THE COURT:  And the prepetition lenders have

15    agreed with that?

16                   MR. GUSO:  Correct, your Honor.

17                   THE COURT:  They would otherwise have a

18    security interest in that cash, but have agreed to let it

19    stay with the debtor?

20                   MR. GUSO:  Correct, your Honor, that's

21    provided for in the DIP credit agreement, but I'll defer

22    to --

23                   THE COURT:  Mr. Koroglu is standing, and

24    nodding his head in the affirmative.

25                   MR. KOROGLU:  (Inaudible.)

```
 1                    THE COURT:  All right.  Okay.  Good.
 2                    Mr. Chafetz, does that cover your inquiry?
 3                    MR. CHAFETZ:  Yes, your Honor.  Thank you.
 4                    THE COURT:  Okay.  Great.  All right.
 5                    MR. GUSO:  We'll include that provision in
 6      the order, your Honor.
 7                    THE COURT:  I think the details are maybe
 8      what's lacking.  So, sure, if you can include it in the
 9      order.
10                    MR. GUSO:  Yes, sir.
11                    THE COURT:  And maybe, and also include the
12      acquiescence of the bank --
13                    MR. GUSO:  Yes, sir.
14                    THE COURT:  -- in the order as well.
15                    All right.  So, where were we?  We were --
16      the declaration.
17                    MR. GUSO:  The declaration.
18                    THE COURT:  No one wishes to cross-examine
19      the declarant, correct?
20                    MR. GUSO:  Correct, your Honor.
21                    THE COURT:  All right.  So the declaration
22      will be admitted into evidence, and are there any
23      objections to the motion itself?
24                    (No verbal response.)
25                    THE COURT:  Hearing none, then the Court
```

1   will grant the motion, and will look forward to receiving

2   the order from you, Mr. Guso.

3                    MR. GUSO:  Yes, your Honor.

4                    And I'll run the order by Mr. Chafetz before

5   we submit it, your Honor.

6                    THE COURT:  Thank you.

7                    MR. GUSO:  Yes, sir.

8                    Your Honor, I think that takes us to the

9   expedited motion to approve the compromise of controversy

10  with Crown Cork & Seal USA, Inc.  Your Honor, that is

11  Docket Entry 878.

12                   Your Honor, I'll refer to the counterparties

13  to this arrangement as Crown.  Crown supplies can bodies

14  and can ends to the debtors, which the debtors then use to

15  package their product and sell it.

16                   Your Honor, Crown is one of the essential

17  vendors under the order entered by your Honor authorizing

18  the debtors to pay certain prepetition claims of critical

19  vendors.

20                   THE COURT:  The new term is "essential

21  vendors", not "critical vendors"?

22                   MR. GUSO:  You know, I think they're

23  interchangeable, but --

24                   THE COURT:  Are they?  Okay.

25                   MR. GUSO:  I think they're interchangable,

1    but you're right, they --

2                 THE COURT:  Okay.  I just want to be, you

3    know, up to speed on most current lingo.

4                 MR. GUSO:  Current lingo, but your Honor is

5    right, in that the order refers to "critical vendors" not

6    "essential vendors".  So, thank you for the correction.

7                 THE COURT:  My kids correct me all the time

8    on my language.  So, you know --

9                 MR. GUSO:  If it's only your kids, you're

10   doing a good job because --

11                THE COURT:  Yeah, good point.

12                MR. GUSO:  -- my wife is doing that, too.

13                THE COURT:  Well, then she's cool.

14                MR. GUSO:  Yes, senior management, Judge, as

15   I call it.

16                THE COURT:  Yes.

17                MR. GUSO:  Your Honor, Crown, as of the

18   petition date, was owed approximately $5.5 million for the

19   services that -- we're bringing this back before you

20   because the arrangement is broader than simply a

21   resolution of the prepetition claim.  We are --

22                THE COURT:  I got a little confused in

23   reading the motion.  I know that you've paid them about a

24   million five as part of the critical vendor --

25                MR. GUSO:  Program, plus --

Page 20

```
1                    THE COURT:  -- program.

2                    MR. GUSO:  -- $500,000 --

3                    THE COURT:  Okay.

4                    MR. GUSO:  -- a week.

5                    THE COURT:  And you've been paying them 500

6     a week since then?

7                    MR. GUSO:  Yes, sir.

8                    THE COURT:  I see.  Okay.

9                    MR. GUSO:  Yes.

10                   THE COURT:  That's what I thought, but I

11    just wasn't quite sure --

12                   MR. GUSO:  Yes, sir.

13                   THE COURT:  -- about that.  Okay.

14                   MR. GUSO:  But in addition to that, Crown

15    has been storing some can inventory for the debtors that

16    has not yet been utilized, approximately 68 million cans.

17                   THE COURT:  68 million?

18                   MR. GUSO:  68 million.

19                   THE COURT:  Where do you put 68 million

20    cans?

21                   MR. GUSO:  In a large facility, evidently,

22    Judge.

23                   THE COURT:  Wow.  Okay.

24                   MR. GUSO:  And the debtors have been --

25                   THE COURT:  That's a lot of drink.
```

Page 21

1                    MR. GUSO:  It is, and the debtors have been

2    accruing --

3                    THE COURT:  A lot of aluminum, I guess.  Is

4    it aluminum?

5                    MR. GUSO:  -- storage charges.

6                    Correct, Judge.

7                    THE COURT:  Yeah.

8                    MR. GUSO:  -- storage charges, with respect

9    to that inventory.

10                   This agreement deals with the disposition of

11   that inventory.  Your Honor, it permits the debtors to

12   continue to access the inventory, and pay $65,000 for the

13   storage charges that have accrued through April of 2023.

14   We will endeavor to repurchase all of the remaining can

15   inventory by May 19th, and if the debtors are unable to do

16   so, the debtors --

17                   THE COURT:  What does it mean to repurchase,

18   as opposed to purchase?

19                   MR. GUSO:  We haven't paid for the can

20   inventory that's there.  So, it's literally --

21                   THE COURT:  Really a purchase?

22                   MR. GUSO:  Purchase.

23                   THE COURT:  Okay.

24                   MR. GUSO:  Correct, Judge.

25                   THE COURT:  But it's identified for the

Page 22

1  debtor?

2            MR. GUSO:  For the debtor.

3            THE COURT:  I see.

4            MR. GUSO:  Correct, Judge.

5            THE COURT:  Okay.

6            MR. GUSO:  Right, by May 19th --

7            THE COURT:  Made to order --

8            MR. GUSO:  Made to order.

9            THE COURT:  -- is the term.

10           MR. GUSO:  And if we are unable to purchase

11  the inventory by May 19th, the parties have also

12  negotiated a price for scrapping the can inventory, and

13  with an agreement, your Honor, that if the cost of that

14  process exceeds a million dollars, the debtors'

15  administrative expense liability would be limited to a

16  million dollars, with any overage being asserted solely as

17  an unsecured claim.

18           THE COURT:  So, it's $69 per thousand can

19  bodies.

20           MR. GUSO:  Yes, sir.

21           THE COURT:  And if you do the math, you can

22  push that beyond a million dollars, but your liability

23  would be limited to a million?

24           MR. GUSO:  On an administrative basis.

25           THE COURT:  Oh, and what happens to --

Page 23

```
 1                 MR. GUSO:  The overage --
 2                 THE COURT:  -- the balance?
 3                 MR. GUSO:  The overage is a general
 4   unsecured claim.
 5                 THE COURT:  General unsecured claim.
 6                 MR. GUSO:  Right, judge.
 7                 THE COURT:  Okay.
 8                 MR. GUSO:  And --
 9                 THE COURT:  And how high could it be?  I
10   guess, what's a million times -- I'm sorry, what is
11   68 million times 69 -- no, 68 million, divided by a
12   thousand, times $69?
13                 MR. GUSO:  The estimate was, assuming we get
14   it out of there by May 19th, was $713,000, but there is
15   the prospect that we don't get it out of there by that
16   time, your Honor, in which event the cost could go up.
17                 THE COURT:  Yep.
18                 MR. GUSO:  And so if it goes up, and it goes
19   over a million dollars, the administrative expense
20   liability is capped at a million, the excess over a
21   million is allowed as a general unsecured claim.
22                 THE COURT:  All right.
23                 MR. GUSO:  Okay.  The other component of
24   this, your Honor, is that Crown has agreed to provide to
25   the debtors postpetition trade credit for any new orders
```

Page 24

1    that the debtor places, of either specialized inventory

2    and the like, up to the maximum amount of $3 million on

3    net 30 days terms.

4                    And, your Honor, notwithstanding the

5    approval of this agreement, it's expressly understood that

6    if for some reason down the road the debtors desire to

7    reject the agreement going forward, the debtors will have

8    that option, or conversely a buyer for the debtors' assets

9    will have that option as well.

10                   THE COURT:  And upon rejection, would the

11   rejection damage claim be any different than what you've

12   already described?

13                   MR. GUSO:  No, sir.

14                   THE COURT:  Okay.

15                   MR. GUSO:  No, sir.

16                   THE COURT:  All right.  Great.

17                   MR. GUSO:  Your Honor, we've also previewed

18   this issue with the committee and with the lenders.

19   Neither has any objection.  We've received no objection to

20   the motion.  This relief, your Honor, is also supported by

21   the declaration of Mr. DiDonato, at Docket Entry

22   Number 916.

23                   And, your Honor --

24                   THE COURT:  I have 915 and 16.

25                   MR. GUSO:  There was an amended declaration,

1   your Honor, filed at 916.

2                   THE COURT:  All right.  So --

3                   MR. GUSO:  I believe either the same day or

4   the day after.

5                   THE COURT:  So 916 replaces 15?

6                   MR. GUSO:  Yes, sir.

7                   THE COURT:  Okay.  All right.  Great.

8                   All right.  First let me ask, does anyone

9   object to the Court's acceptance of the proffer as

10  provided in Docket Entry 916, and the declaration of

11  Mr. DiDonato?

12                  (No verbal response.)

13                  THE COURT:  Does anyone -- would anyone, had

14  Mr. DiDonato been here, wanted to cross-examine

15  Mr. DiDonato?  He's lost somewhere in Zoom space, but

16  anyway, so hearing none, then the Court will accept the

17  declaration at Docket Entry 916 into evidence, and anyone

18  wish to be heard on the motion itself, any objections?

19                  (No verbal response.)

20                  THE COURT:  Hearing none, then the Court

21  will grant the motion, and will look forward to receiving

22  an order from you, Mr. Guso.

23                  MR. GUSO:  Thank you, your Honor.

24                  I'll yield the podium to Mr. Charles.

25                  THE COURT:  Okay.  Mr. Charles.

Page 26

```
 1                    MR. CHARLES:  Good afternoon, your Honor.
 2   Rob Charles, Lewis Roca, on behalf of Faith Technologies,
 3   Inc.  This is our motion for relief from the stay.  It's
 4   at Docket 670.
 5                    You've received oppositions, there have been
 6   joinders to the motion, joiners to the opposition, and we
 7   filed a reply memo.
 8                    I have not had the pleasure of appearing
 9   before you in person.
10                    THE COURT:  You're going to love it.
11                    MR. CHARLES:  I thought so, based upon my
12   Zoom experiences.
13                    In a stay relief context, it occurs to me
14   this is a preliminary hearing, and obviously the Court has
15   discretion under 362(d)(1), and if you say we're setting a
16   final hearing, I can save us all a lot of anguish, and if
17   you'd like to hear argument, I'm happy to -- I have
18   argument ready, but I don't want to be inefficient or
19   waste your -- particularly waste your time.
20                    THE COURT:  Okay.  So what's your view of
21   treating this as a final hearing?
22                    MR. CHARLES:  We did -- it was scheduled as
23   a preliminary hearing.  I'm not aware that there are
24   material evidentiary objections, but there are certainly a
25   number of exhibits attached to our motion, and I did not
```

1   anticipate, and wouldn't anticipate at a final hearing,

2   really having anything other than a stipulated record, but

3   I've certainly not discussed with counsel for the

4   objectors their view with respect to treating this as a

5   final hearing.

6          On the other hand, since the issues are

7   primarily legal, in my view, and this is a matter within

8   your discretion, obviously, if the purpose of treating

9   this as a final hearing is to, for example, deny the

10  motion without prejudice, then I'm certainly not going to

11  object on some procedural basis.

12         THE COURT:  I actually came to the same

13  conclusion as you've just suggested, which is that since

14  this seems to be almost an entirely legal issue, not one

15  based in evidence, and not requiring testimony of any

16  party, in particular, that I can see, just trying to save

17  some time, frankly.

18         MR. CHARLES:  I appreciate that.

19         The two -- and I'm now harkening back a

20  little bit to your discussion with counsel for the

21  unsecured employment claims in California, and you had a

22  pretty significant discussion with them about time to

23  trial and that sort of thing, but those were unsecured

24  claims, and ours, obviously, is not.  So there really is

25  nothing in the record in any way with respect to speed of

1    form.  On the other hand, that's simply a fact.

2                    The other fact that is out there, but there

3    is no evidence on it yet, is what's going to happen in the

4    sale process?

5                    And so if this were, for example, set for a

6    final hearing later, it might well be that we know

7    something about that.  I don't know that that's a reason

8    to delay.  I simply point those two potential issues out

9    to you, and I'm really happy to give you a very quick

10   highlight of why I think, even as a final hearing on a

11   legal issue, it would be reasonable for you to exercise

12   your discretion and terminate the stay.

13                   THE COURT:  All right.  Well, I want to hear

14   that, and I think we should probably use as much time

15   today, to get as close to an answer, if not getting to the

16   answer today as possible, just on the hopes that perhaps

17   we will not have to have any further hearings, or if we do

18   have to have a further hearing, it will be limited in

19   scope, because we will have at least gotten as far down

20   the road as we can.

21                   Let me ask you an overarching question.  You

22   can file a proof of claim, and I assume -- and when I say

23   "you", I mean each of the movants, and those that have

24   joined in the motion, each of the lienholders, if you

25   will, can file proofs of claims, right?  And I assume they

1    have?

2                    MR. CHARLES:  Some have and some have not.

3    We have.

4                    THE COURT:  Okay.  Is there any

5    understanding as to why those that haven't have not?

6                    MR. CHARLES:  Not based upon fact.  This is

7    not a convenient forum.  A number of the lien claimants

8    are small, and their enthusiasm for pressing on with this

9    venture wanes.

10                    THE COURT:  Okay.

11                    MR. CHARLES:  So, but I can't tell you that.

12                    THE COURT:  All right.  So it may be, where

13   they hope their lien travels through the bankruptcy case,

14   and they just don't want to submit themselves to the

15   jurisdiction --

16                    MR. CHARLES:  And that's another --

17                    THE COURT:  -- of the Court.

18                    MR. CHARLES:  -- reason, is that the lien

19   will survive the bankruptcy unless it's avoided, and

20   filing a proof of claim, in a lot of ways, just gives the

21   debtor the opportunity to take different shots at you.

22                    THE COURT:  Yeah, I understand that.

23                    Okay.  Well, let me ask you this then,

24   assume the sale is for all of the assets, or at least the

25   assets upon which the liens attach, and that that sale is

Page 30

1    of those assets free and clear of liens, all the liens,

2    with the liens to attach to the proceeds, and assume that

3    the debtor gives some assurances, or adequate assurances

4    that those proceeds will remain segregated, subject to

5    those liens, is there any reason why this all needs --

6    this litigation needs to take place now, as opposed to

7    letting the sale process happen, and then resolving the

8    lien claims after the sale?

9                 MR. CHARLES:  Probably not.

10                THE COURT:  Okay.  All right, but my

11   question assumed a few things --

12                MR. CHARLES:  Yes, it did.

13                THE COURT:  -- that you would need to make

14   sure actually --

15                MR. CHARLES:  And you should touch, not

16   necessarily today, but when it's convenient for you, the

17   proposed order that was submitted with respect to the

18   sale --

19                THE COURT:  I don't know that I've seen that

20   yet.

21                MR. CHARLES:  It was filed, but I wouldn't,

22   if I were a judicial officer, have looked at it yet,

23   because I'm not at the sale hearing or an objection --

24                THE COURT:  Thank you for that.

25                MR. CHARLES:  -- but --

Page 31

1                    THE COURT:  I thought I might have forgotten

2    to do something.

3                    MR. CHARLES:  Not at all.  No, it's out

4    there, but it looks like it's part of the notice process,

5    and so it's premature.  It's filed at Docket 896.

6                    THE COURT:  Okay, and have you seen it?

7                    MR. CHARLES:  I have seen it, because it's

8    filed with the Court.

9                    THE COURT:  Does it do those things that I

10   assumed --

11                   MR. CHARLES:  Nope.

12                   THE COURT:  -- in my question.

13                   MR. CHARLES:  Nope.  I apologize --

14                   THE COURT:  I think that's why you were

15   pointing it out to me.

16                   MR. CHARLES:  Indeed.

17                   If you look at Paragraph 15 of the proposed

18   order on Page 20, the sentence that I -- that caught my

19   eye is that when the sale closes, that we will have

20   payment in full of the outstanding obligations under the

21   DIP facility and the prepetition obligations, as such term

22   is defined in the final DIP order, then anything else

23   that's left, if anything, is sale proceeds, and sale

24   proceeds are then held subject to further order of the

25   Court, with liens to attach to the proceeds.

1             THE COURT:  Okay.  Let me ask you a

2 different question.  So, theoretically, your concern, of

3 course, is there is nothing left?

4             MR. CHARLES:  Yes.

5             THE COURT:  Okay.  Let me ask you this a

6 different way.  Is the litigation -- in California, is

7 that where it is?

8             MR. CHARLES:  Arizona.

9             THE COURT:  In Arizona.

10             Is the litigation in Arizona about the

11 debtor contesting the liens, or is it a lien priority

12 fight with the existing lenders?

13             MR. CHARLES:  Both.

14             THE COURT:  It's both.  So the debtors do

15 contest the extent, validity and/or priority of those

16 liens?

17             MR. CHARLES:  In general, yes, and I can't

18 tell you that I've memorized, but the debtors filed an

19 answer.  The action is kicked off by one of the lien

20 claimants saying I have a lien, I want to foreclose it,

21 debtor, you're liable, and that complaint names all the

22 other lienholders and Truist.

23             The debtor has filed an answer, and the

24 debtors' answer, at the risk of oversimplifying it, is

25 kind of what you and I used to think --

Page 33

1              THE COURT:  General denial.

2              MR. CHARLES:  General denial.

3              THE COURT:  Yes.

4              MR. CHARLES:  You can't do that in Arizona,

5    so you have to be boring and repetitious by generally

6    denying, but that's --

7              THE COURT:  But then you've got to move to

8    strike, and you can't do that without stay relief,

9    correct?

10             MR. CHARLES:  We're not as excited about

11   demurrers and moving to strike as some places, but in any

12   event, it's at least at issue by the pleadings.

13             THE COURT:  Okay.  All right, and what about

14   the status and timing of that litigation?  Let's assume

15   the debtor argues to me that there has got to be a

16   resolution so that there is no debate that the assets at

17   least can be sold free and clear of the liens.  So no

18   matter what, somebody has to decide, whether it's me or

19   the Arizona court, to be determined, but someone would

20   have to decide so that the sale can occur, uninhibited, if

21   you will, that the assets subject to the liens can be sold

22   free and clear of those liens, and that there will be

23   something for those liens to attach to, or that you are

24   out of the money anyway and, therefore, there need not be

25   something for those liens to attach to, or under 363(f),

Page 34

1    that there is a bona fide dispute with respect to those

2    liens.

3                    What is your view of those -- that grouping

4    of issues, if you will?

5                    MR. CHARLES:  Those are their arguments, and

6    the lenders' arguments.  They're going to have to raise

7    those in an adversary proceeding seeking to determine the

8    validity, priority, and extent of the liens --

9                    THE COURT:  So let me stop you there for a

10   second to make sure I understand.  You're saying that if

11   they wish to sell the assets subject to the liens, free

12   and clear of those liens --

13                   MR. CHARLES:  And --

14                   THE COURT:  -- over your objection --

15                   MR. CHARLES:  And to add to your hypothesis,

16   and the lenders refuse to set aside "ish" 15 million

17   around this dispute -- please go ahead with your question.

18                   THE COURT:  Then the, then the issue will be

19   whether the liens are in bona fide dispute, and you're

20   saying the only way to make them in bona fide dispute is

21   to file this adversary?

22                   MR. CHARLES:  I think that's right.

23   Objections to claims wouldn't get you there.

24                   THE COURT:  Is that the law?

25                   MR. CHARLES:  I think it is.  We certainly

1   don't have that briefed yet because that has not been teed

2   up anywhere, but I think it is.

3                   THE COURT:  Okay.

4                   MR. CHARLES:  And neither you nor I probably

5   want to guess about that as determinate for today's

6   hearing.

7                   THE COURT:  No, I don't.

8                   MR. CHARLES:  But I think that --

9                   THE COURT:  I don't want to guess about

10  anything ever.

11                  MR. CHARLES:  Sure, but I think that that's

12  right, if you tell me that your lien is -- "dispute" isn't

13  simply someone files an objection.  You have to have --

14                  THE COURT:  It's bona fide, it has to be --

15                  MR. CHARLES:  Right.

16                  THE COURT:  -- a bona fide dispute.

17                  MR. CHARLES:  And our view of the priority

18  -- the argument is going to be about priority.  You know,

19  they can -- we've had lien litigation where some defendant

20  says, what I want you to do is bring in every invoice, and

21  we're going to run you through that wringer, and we do

22  that for a while, and then the judge tires of it.

23                  The real dispute is going to be priority,

24  and Arizona law, which is different than Florida, I'm

25  told, is really simple and clear on this, if worked by --

1          THE COURT:  Why not litigate here then?

2          MR. CHARLES:  Because --

3          THE COURT:  I can handle simple and clear.

4          MR. CHARLES:  But so can an Arizona judge.

5          THE COURT:  Maybe I can't, I don't --

6          MR. CHARLES:  Litigating here means all of

7     the lienholders have to come here, after whatever the

8     proceeding is that hasn't been commenced yet is commenced,

9     and decide if they consent to this Court's jurisdiction,

10    entry of final orders, and don't seek to abstain -- ask

11    the Court to abstain, again, in its discretion, in favor

12    of the Arizona action, and I don't know if you know this,

13    because you live in Florida, and Florida is lovely, but

14    it's not easy to get here from Arizona, and if you've got

15    to schlep all of your lawyers, and witnesses, and clients

16    here, it's a challenge, and thankfully for this case --

17          THE COURT:  Did you come from Arizona today?

18          MR. CHARLES:  I did, I did, and I'm going to

19    probably miss my flight coming home.

20          THE COURT:  How was your travel?

21          MR. CHARLES:  The usual air flight, you

22    know, turbulence, no one died, and I'm going to probably

23    miss my flight tonight, and not get back until tomorrow.

24    That's okay, I'm a lawyer, I love things like that.

25          But there is an imbalance of hardships, and

Page 37

1    as it happens, both the debtors and Truist already have

2    fine Arizona lawyers who have appeared in the Arizona

3    action.

4                    THE COURT:  So let me ask you this then,

5    let's say I granted stay relief, and the litigation

6    proceeds in Arizona.  At what point in time do you

7    anticipate you, as an officer of the court, would be able

8    to determine that your liens are in bona fide dispute

9    vis-a-vis the debtor?

10                   MR. CHARLES:  If the Court, as with respect

11   to either the validity or priority of it, made a

12   determination --

13                   THE COURT:  Well, there would have to be an

14   actual determination?

15                   MR. CHARLES:  I think so.  I don't think --

16                   THE COURT:  Not just a pleading filed by the

17   debtor --

18                   MR. CHARLES:  I don't think --

19                   THE COURT:  -- saying we think your liens

20   are no good for 10 reasons and/or are junior to the lender

21   for another 12 reasons, or Truist files something and

22   says, you're junior to me for the following reasons, that

23   does not create a bona fide dispute?

24                   MR. CHARLES:  I don't believe so, and this

25   is really a due process problem, because what you're doing

1    at that point is depriving the mechanic's lien claimants

2    of property, and to do it based on allegations, seems to

3    me, and again I didn't bring that research here today, but

4    actually --

5                    THE COURT:  Well, I mean, it allows -- I

6    don't know that it's depriving you of property.  It is --

7    it's allowing the sale of the assets free and clear of

8    your liens, with your liens to attach to those proceeds.

9                    MR. CHARLES:  If --

10                   THE COURT:  So the next step would be --

11                   MR. CHARLES:  But that was the first

12   question.

13                   THE COURT:  -- what we talked about earlier,

14   that sufficient assets be set aside --

15                   MR. CHARLES:  Right.

16                   THE COURT:  -- to cover those liens.

17                   MR. CHARLES:  If you --

18                   THE COURT:  And how much money is that?

19                   MR. CHARLES:  The face amount, rounded, is

20   15 million.

21                   THE COURT:  That's everybody.

22                   MR. CHARLES:  And that may be an

23   overinclusive number.  There are a couple that hadn't --

24   we couldn't figure out what their amounts were from the

25   pleadings yet, so it could be a little more than 15.  They

1    don't look like the big contractors, and it may be an

2    overinclusive number because Stellar is the general, and

3    we're a sub, and so our number may be in their number, but

4    it's "ish", less than $20 million.

5                    THE COURT:  Okay.  All right.  Mr. Charles,

6    thank you for that.

7                    What I'd like to -- as you can see, I'm

8    trying to sort of cut to the chase here in light of the

9    sale process itself.

10                    MR. CHARLES:  Right.

11                    THE COURT:  I assume you expected me to do

12   that.  I want to see if we can be successful in that

13   regard, and make this go away, if you will, at least the

14   stay relief issue itself, because I cannot imagine a

15   circumstance, unless you tell me otherwise, and I'm all

16   ears, where if I give stay relief, the Arizona court will

17   get far enough down the road to resolve the issue of

18   whether the sale can go forward free and clear of those

19   liens, and that is likely the big issue from the debtors'

20   perspective.  Do you think the Arizona court could get

21   that far --

22                    MR. CHARLES:  So, your question,

23   your Honor --

24                    THE COURT:  -- in a relatively short period

25   of time?

Page 40

```
1                    MR. CHARLES:  I hear you.

2                    Your question, your Honor, presumes

3      something.  Your question presumes --

4                    THE COURT:  I'm sure it presumes a lot,

5      but --

6                    MR. CHARLES:  Well, I think it presumes one

7      important thing, which is essentially it's possible that

8      based upon allegations on paper, a bankruptcy judge could

9      use 363(f) to say bona fide dispute, you lose your rights,

10     I don't have to make any determination beyond something

11     like, maybe it's a good faith dispute, and something

12     similar under 363(k).  I think that's wrong.

13                   And so your question is premised on an

14     assumption that we disagree about, but if that's the

15     question, hey, in a motion in about a month I'll blow your

16     liens out, I agree with you, we couldn't get to that kind

17     of resolution in a court that is hearing this on a -- we

18     are, essentially, federal rules kind of basis, even if you

19     accelerate it, or did an adversary proceeding here, you

20     wouldn't get to that resolution in an adversary in a

21     month.  So --

22                   THE COURT:  You mean here?

23                   MR. CHARLES:  Here.

24                   THE COURT:  Okay, and you wouldn't get it --

25                   MR. CHARLES:  Anywhere.
```

Page 41

1          THE COURT:  -- in state court either?

2          MR. CHARLES:  No, the only place you would

3    get that would be in Delaware, where you can sell things

4    over the weekend.

5          THE COURT:  You don't think I could expedite

6    an adversary to the point of getting, not necessarily to a

7    resolution of the issue, but to a determination that the

8    liens are in bona fide dispute.

9          MR. CHARLES:  If the standard is something

10   like Rule 11, or plausible, or something like that, then

11   once it was filed, once it was served and briefed, and

12   then an argument, it will take you a couple -- even you,

13   extraordinary jurist, very efficient, and looking forward

14   to resolving -- you can't, you've got to let me have some

15   license, it will take you some time, and more than --

16          THE COURT:  My eyes rolling back --

17          MR. CHARLES:  I did, I did.

18          THE COURT:  -- rolling around in my head.

19          MR. CHARLES:  That's how I react when people

20   say nice things about me.

21          THE COURT:  Yeah.

22          MR. CHARLES:  But it will be more than

23   30 days, but less than a full-blown resolution, I grant

24   you that, but we believe that the law is, and we'll have

25   the opportunity -- they haven't even actually asked to

Page 42

```
 1    sell anything yet.  The sale motion says, if we're going

 2    to sell, so if we get a bid, if we like the bid, and if we

 3    don't have an auction and we accept some bid, then there

 4    is a sale.

 5                   And, by the way, then you have to find out,

 6    what are you selling?  Are you selling our collateral or

 7    not?  And what's the price?  You know, all these things,

 8    but whenever that issue is teed up, our position will be

 9    you can't simply use a Rule 11 or plausible standard as

10    the way to avoid our client's liens.

11                   THE COURT:  All right.  So let me ask you

12    this then, what's the hardship?  If they can't avoid your

13    lien, and you can sit there and prevent a sale of your

14    assets free and clear of your liens, with your liens to

15    attach to the proceeds, where is the hardship?

16                   MR. CHARLES:  If --

17                   THE COURT:  Don't you have the power here?

18                   MR. CHARLES:  If, if -- your first question

19    was actually what I think is the right way to resolve

20    this, if you simply hold back proceeds to cover our claim

21    then there is no hardship and we're done, and --

22                   THE COURT:  And if they don't, that is the

23    hardship --

24                   MR. CHARLES:  That is --

25                   THE COURT:  -- that the money will flow away
```

Page 43

1    and never be seen again?

2                    MR. CHARLES:  And by definition, in this

3    space they're selling everything.  So if there is no money

4    for us, and if they've sold everything, we've just become

5    unsecured by the stroke of an order approving a sale.

6                    THE COURT:  I see.  All right.  I get it,

7    Mr. Charles.  Thank you for that.  I'm sure I'm going to

8    want to hear from you again, but let me hear from debtors'

9    counsel.

10                    MR. CHARLES:  Thank you, your Honor.

11                    THE COURT:  Mr. Murtagh.

12                    MR. MURTAGH:  Good afternoon, your Honor.

13                    THE COURT:  So you know my focus.  Is that

14   the debtors' focus with all of this?  What is the debtors'

15   focus?

16                    I know that you argued on the merits with

17   respect to the hardship, and those types of issues.  Is

18   the real issue here making sure that you can sell free and

19   clear of these liens, and it doesn't interfere with the

20   sale process?

21                    MR. MURTAGH:  Your Honor, that's the primary

22   issue, is protecting the sale process.

23                    THE COURT:  It's not litigating in Arizona.

24   If you had to litigate in Arizona, it wouldn't be the end

25   of the world.  You would do it if that's what I ordered,

Page 44

1   it is what it is.  It's just making sure that you can go
2   forward with the sale?
3                   MR. MURTAGH:  Yes.  Yes, your Honor.  I
4   don't want to get ahead of myself, or my colleagues, or my
5   client, but --
6                   THE COURT:  Well, it's my fault, I'm sorry.
7   I'm trying to skip to the end, because I -- you know,
8   again, that's where I view --
9                   MR. MURTAGH:  I understand.
10                  THE COURT:  -- the rubber meeting the road
11  here.
12                  MR. MURTAGH:  I believe it's a slight
13  speculation, but I believe our side would be comfortable
14  if your Honor said at the end of the day this dispute
15  exists, and it needs to be litigated, and the best place
16  is Arizona, we'd be comfortable doing that in Arizona, if
17  we're not trying to do it now, before we get the sale
18  done.
19                  I mean, honestly before we get the plan
20  confirmed, and effective, and into claims reconciliation,
21  when there is more time to address these sorts of things,
22  I don't think that as we sit here today there is an
23  absolute objection to having this done in Arizona.
24                  THE COURT:  It's just timing?
25                  MR. MURTAGH:  It's timing, that's right.

Page 45

1           THE COURT:  All right, and let's talk about

2    the timing.

3           Any issue, and have you spoken with the bank

4    about just making sure that sufficient assets, or proceeds

5    from the sale are set aside, from the sale of these

6    particular assets?  Are they worth the $15 million?  I

7    mean, what are we --

8           MR. MURTAGH:  Well, the --

9           THE COURT:  You know, it seems to me that a

10   very quick resolution of this, or at least to delay the

11   litigation, whether it be here or in Arizona, would be to

12   deal with the hardship issue, which sounds like a

13   hardship.  I mean, if a sale is going to happen free and

14   clear of their liens, and the assets are ultimately deemed

15   insufficient to cover their liens, it sounds like a

16   hardship.  I'm not sure if that qualifies as a hardship

17   under the case law, but it sounds like one, which could

18   easily be resolved if there was a pot of money set aside

19   subject to their liens to be litigated.

20           MR. MURTAGH:  I think that's right,

21   your Honor.

22           A few things, first, I believe the movants

23   here, their claims aggregate to about $5 million, although

24   they --

25           THE COURT:  Movants, plus joinders, or who

Page 46

1    are we talking about?

2                    MR. MURTAGH:  It's movants, including

3    joinders, and there is another 10 million out there that

4    are not represented by this motion.

5                    THE COURT:  I see, that haven't appeared,

6    that haven't filed a joinder, et cetera.

7                    MR. MURTAGH:  That's my --

8                    THE COURT:  And you have to worry about all

9    of them.

10                   MR. MURTAGH:  Well, according to movants we

11   need to reserve for all of them, but the movants

12   themselves, and their joinders are, I believe, around

13   $5 million, and another $10 million of claims have not

14   expressed concern.

15                   THE COURT:  Well, it's not that they --

16   they've not expressed anything.

17                   MR. MURTAGH:  Correct.

18                   THE COURT:  That doesn't mean they're not

19   concerned.  I think Mr. Charles suggested, and maybe I

20   prompted it, but suggested the notion that maybe they're

21   sitting on their lien rights, passing through a

22   bankruptcy, never having to appear.

23                   MR. MURTAGH:  It may be, your Honor.  I just

24   wanted to clarify that point, maybe it will become

25   relevant if we have to have a discussion about an amount

Page 47

1   to be reserved.

2              THE COURT:  Okay, and have you had that

3   discussion about amount to be reserved?  In other words,

4   in looking at the sale, there is far more in sale

5   proceeds, theoretically, than the 15 or $20 million

6   involved in this.

7              MR. MURTAGH:  Correct, your Honor, and our

8   hope is that the sales proceeds are sufficient to satisfy

9   both sets of claims and, in fact, this dispute never needs

10  to be had.  So, it's --

11             THE COURT:  I hope not.

12             MR. MURTAGH:  And if it's not, then we may

13  -- parties may well need to litigate this lien priority

14  issue, and I think what your Honor is saying is, movants

15  are saying that that creates a hardship on us if we're

16  being asked to litigate the issue after all the proceeds

17  are gone.

18             THE COURT:  Yeah.

19             MR. MURTAGH:  I would frame it slightly

20  differently.  I think what would happen is they would have

21  a secured claim, and would be -- I'm not saying that

22  reserving is not the answer, but it would go to plan

23  feasibility, is there going to be sufficient -- are there

24  going to be sufficient assets in the debtor to execute the

25  plan distributions, regardless of -- money being fungible,

Page 48

1    regardless of what the sales proceeds are and where

2    they've gone, can the plan pay the secured claim?  And

3    their objection would sound in feasibility to say you're

4    not going to be able to pay me, even if we've admitted

5    your claim as secured.

6                     But passing that, it may give -- if it gives

7    movants sufficient comfort on this issue to have a reserve

8    of a certain amount, to have them say, okay, we're

9    protected against the risk and the hardship is gone, the

10   debtors are not adverse to structuring some sort of

11   reserve to have this dispute resolved, if it needs to be

12   resolved.  I think that's also Truist's position, but I

13   defer to Truist to make a statement on that.

14                     THE COURT:  Okay, and let me ask you about

15   allocation of the sale proceeds.  Has anyone determined

16   what the value of the assets are that are the subject of

17   these liens, all of them, whether they've appeared or not,

18   movant, joinders, and anyone who claims a lien on these

19   assets?

20                     MR. MURTAGH:  For the purposes of this

21   bankruptcy, I believe the answer is, no, your Honor.  It's

22   a nuanced question of bankruptcy law, what value is to be

23   associated with any piece of the going concern value of a

24   business that's sold in bankruptcy as a going concern.

25                     THE COURT:  Remind me what the liens are

Page 49

```
 1    against, it's real property, or what, or physical assets
 2    or what?
 3                    MR. MURTAGH:  I believe movants would say
 4    it's subject -- the liens are on the real property and
 5    improvements.
 6                    THE COURT:  Okay, and it's not easy to
 7    determine whether those -- that real property and
 8    improvements is worth more than the lien amounts?  It
 9    seems to me that that should be fairly easy to determine.
10                    MR. MURTAGH:  That may be a relativistic
11    review to say is it worth at least the liens that are
12    claimed on it?  I think that might actually be relatively
13    straightforward.
14                    THE COURT:  Right, and no one has done that
15    work yet?
16                    MR. MURTAGH:  No, your Honor.
17                    THE COURT:  Okay.  All right.  So, this
18    being a -- let me ask you this, from a timing perspective,
19    when would this issue, the motion for stay relief, need to
20    be resolved one way or the other with respect to the sale
21    process?  Do we have a month?  Do we have a month and a
22    half?  How much time do we have?
23                    MR. MURTAGH:  Well, the debtors' hope was to
24    resolve this motion today, and we're prepared to argue the
25    merits of it.  I'm prepared to accept their evidentiary
```

Page 50

```
 1    proffer, if it's what's attached to their motion, to get

 2    it decided.

 3                    THE COURT:  Okay.

 4                    MR. MURTAGH:  I think there is possibly a

 5    quick solution here, where we all agree that we'll find a

 6    way to reserve, and maybe what your Honor is saying, you

 7    need to have that discussion and find out whether this is

 8    mooted, and --

 9                    THE COURT:  Do you have the parties

10    necessary to have that discussion today here?

11                    MR. MURTAGH:  In terms of having a -- I

12    think --

13                    THE COURT:  You don't have to, it would be a

14    settlement, it would be a resolution of the motion, it's

15    up to you, but if you're willing to have that

16    conversation, that does avoid a lot of litigation,

17    potentially.

18                    MR. MURTAGH:  I think we've probably got the

19    parties here who are necessary to say we're committed to

20    that in concept.

21                    I don't know that there is going to be --

22    you know, the devil is in the details, if people want to

23    fight over how, and when, and how much would be reserved,

24    but the debtors aren't going to be interested in going

25    down that road if we're just sitting here with a motion
```

Page 51

1    hanging out to come back in two weeks and hear this motion

2    again.  To be frank, your Honor, I don't think that

3    movants can come anywhere close to demonstrating cause to

4    lift the stay to litigate in Arizona now, an issue that

5    may never be needed to litigate -- need to be litigated at

6    all, and we're prepared to have that argument.

7                So if we're being put to the question, do

8    you have to have that argument now and see if you can win

9    the motion, defeat the motion, or work on this for a few

10   more weeks, I'd rather just defeat the motion, your Honor.

11               THE COURT:  Yeah, I get it.

12               So let's cut to the chase on that then.  It

13   seems to me that the argument being made by the movants,

14   plus joinders, is that if we don't resolve this issue, or

15   grant stay relief, and the sale happens, because the sale

16   is going to happen, and you get approval to sell, and it

17   turns out there are insufficient proceeds to cover the

18   liens, then clearly that would be a hardship, that's their

19   argument.

20               Your argument is, let's not worry about that

21   for now, because you think there will be enough to cover

22   everything, and that makes all of this moot, until down

23   the road where you can decide, or litigate over the lien

24   priorities and validity, extent and priority of liens,

25   et cetera, so don't -- let's not bother with that right

1    now.

2                    What if they're right and you're wrong about

3    the sufficiency of the proceeds from the sale, is that not

4    a hardship?  And if it's not a hardship, why not?

5                    MR. MURTAGH:  Well, your Honor, in the event

6    that we do not get sufficient proceeds to pay everybody

7    who is concerned here in full, that will be the first time

8    that their request is even relevant.  They're asking for

9    relief from the stay now, to begin litigating an issue in

10   Arizona that we're hopeful we will never need to litigate

11   at all.

12                   And on that basis alone, relief from the

13   stay now doesn't make any sense, because it would be a

14   hardship not only on us, but also on movants, and on

15   Truist, and everybody else involved, to go litigate an

16   issue in Arizona that's going to be mooted by the sale.

17                   THE COURT:  Let me accept that as a premise.

18   Walk me through this, you have the sale, the sale proceeds

19   -- there is no reserve, the bank gets paid, there is --

20   what happens, what happens to these lienholders?

21                   MR. MURTAGH:  Well, if we were unwilling --

22   the first point was, I think that's the moment at which

23   they have an argument about requiring relief from the

24   stay.

25                   THE COURT:  Well, but even if they got stay

1    relief, and they went to Arizona, and they won their

2    case --

3                      MR. MURTAGH:  Right.

4                      THE COURT:  -- there is nothing left, it's

5    been sold.

6                      MR. MURTAGH:  Well, the proceeds of the sale

7    have been distributed.  If they've been distributed on the

8    basis that Truist was senior in all respects, then those

9    proceeds are gone.

10                     Let's assume those are the only assets

11   available to satisfy claims, just for simplicity, then

12   they would be harmed because there are not assets

13   sufficient to satisfy their secured claims, we wouldn't be

14   able to confirm the plan, presumably, and --

15                     THE COURT:  Wouldn't you argue that under

16   506, they're under-secured and, therefore, treat them as

17   unsecured creditors?

18                     MR. MURTAGH:  Well, but we would need to

19   prevail on the very thing they're asking for the stay to

20   be lifted on, which is that the Truist bank deed is senior

21   in time to their mechanics liens.

22                     THE COURT:  So you're saying that their

23   liens not only remain intact vis-a-vis the proceeds, but

24   follow the proceeds into Truist bank's pocket?

25                     MR. MURTAGH:  Well, I think that's the

Page 54

1  argument they would -- where does this go?  If we dis --

2  the only proceeds are the sale proceeds, we disburse it

3  all to Truist, and we then, all of us who are opposing the

4  movants, lose on the argument that Truist was senior on

5  that property, then it would presumably need to come back

6  in order to pay them, which does seem like a colossal

7  waste of time.  So, I --

8              THE COURT:  All leading to the same road,

9  which is -- or the same destination, which is setup a

10 reserve so we don't have to do that.

11             MR. MURTAGH:  No, I agree with that,

12 your Honor.  I think there may be some haggling over what

13 the reserve should look like.  I would propose, though,

14 your Honor, that -- there is a motion before your Honor

15 today to lift the stay today to go to Arizona.

16             THE COURT:  I know, and I'm fully aware that

17 I could just rule on that, deny it, grant it, I get that.

18 I'm trying to look at the bigger picture, to get past all

19 of that, and see if there is some way of resolving

20 everything to everyone's dissatisfaction or satisfaction,

21 depending on your perspective.

22             MR. MURTAGH:  What if, your Honor, we -- and

23 everybody may disagree with this, and I am making the

24 mistake of trying to think on my feet here a lot, but if

25 this motion is denied without prejudice today, to be

Page 55

1   re-filed in the event the sale proceeds are insufficient
2   to cover both sets of claims, provided there is an
3   understanding --
4              THE COURT:  Pre-distribution.
5              MR. MURTAGH:  Sorry?
6              THE COURT:  Pre-distribution of those
7   proceeds?
8              MR. MURTAGH:  Yes, your Honor, pre-dis --
9   but provided there is an understanding that the party --
10  that if that occurs, the parties will work in good faith
11  to establish a reserve that's sufficient, reasonably
12  protects the interest of the movants and the proceeds,
13  provided they prevail on the lien litigation.
14             THE COURT:  Maybe, I don't know.
15             Here is what I'm going to do, I'm going to
16  go back to my chambers, take a break.  See if there is
17  anything you all can talk about that might get to that
18  point.  I'm not only interested in resolving the stay
19  relief issue, but I'm also looking ahead to resolve the
20  inevitable 363(f) issues that you may have, or any other
21  issues that might impede a sale, and try to wrap it up
22  into a nice little neat package, if that's possible.
23             I mean, we're not monkeys, we can look ahead
24  into the future and know what is likely coming, and isn't
25  that likely coming?

```
1                    MR. MURTAGH:  I mean, that seems very
2       prejudicial to monkeys, your Honor, but --
3                    THE COURT:  Actually, you know, monkeys
4       probably do look into the future, so that's not really
5       fair, you're right, but --
6                    MR. MURTAGH:  No, I take the point,
7       your Honor.  I had omitted to consider the arg -- we
8       disagree with the argument under 363(f), both that the
9       only prong is bona fide dispute, and that there is no
10      bona fide dispute when they've --
11                   THE COURT:  I'm not trying to limit it.  I'm
12      just guessing as to at least some issues that you'll
13      likely deal with.
14                   MR. MURTAGH:  In which case there is some
15      prudence to try to figure out a holistic solution before
16      we get into the sale.  So I think it does make sense to
17      take a few minutes to caucus.
18                   THE COURT:  Okay, and, listen, if you all
19      think I'm going ahead too quickly, or that's just not an
20      appropriate destination to go to, and you all think I
21      should rule on the motion, I mean, I'm fully capable of
22      doing that, and would do that.
23                   I'm just trying to anticipate and see if we
24      can, you know, again, get to some -- as you put it
25      holistic resolution.
```

1                    So, let's take a little break.  Why don't

2        you let Ms. Weldon know after you've had this discussion?

3        It's 3:15.  You know, I'd likely reserve on it in any

4        event after hearing argument, but we can get that argument

5        done fairly quickly.  I've read the papers.  They're

6        fairly clear.  They're actually very clear, the issues are

7        fairly clear, so I don't think this is going to be that

8        difficult to get to a resolution of, but I would love it,

9        and I think the parties would be best served if they can

10       all settle it.

11                   Now, what's going to be interesting is what

12       to do with those that are not here, but if the reserve

13       covers those that are not here, knowing that their liens

14       are out there regardless, you know, maybe that doesn't

15       matter, but anyway, so we'll take a recess.  All right.

16                   MR. MURTAGH:  We only need as long as is

17       necessary to make Mr. Charles miss his flight.

18                   (Laughter.)

19                   MR. CHARLES:  I already did, your Honor.

20                   THE COURT:  Fair enough.  Thank you.

21                   MR. MURTAGH:  Thank you, your Honor.

22                   (Thereupon, a recess was had, after which

23       the following proceedings were had:)

24                   THE COURT:  Please be seated.

25                   Okay.  What do you have for me?

1        MR. CHARLES:  So, we don't have Mr. Guso,

2   and I'm not sure if that matters.

3        THE COURT:  Oh, we can wait.

4        MR. CHARLES:  Should we wait.

5        THE COURT:  I think the debtor has an

6   interest in the outcome.

7        MR. MURTAGH:  He went to discuss something

8   with Mr. Sorkin.

9        THE COURT:  Okay.  All right.  Fine, fine.

10       MR. CHARLES:  So, I believe the concept is,

11  your Honor, that we would agree on a form of order to be

12  presented to you that denies the motion on the condition

13  that the sale order contain a provision that essentially

14  provides that enough proceeds to cover the liens will be

15  held pending further order of the Court.

16       THE COURT:  Okay.

17       MR. CHARLES:  At the risk of oversimplifying

18  it.

19       THE COURT:  Well, I think that's eloquently

20  simplified.

21       MR. CHARLES:  Well, and as I said that, I

22  would have said, to cover the liens, plus a little

23  something for interest, cost, and fees, but those are not,

24  in the greater scheme of things, going to be big movers.

25       THE COURT:  Okay.  All right.  So, you all

Page 59

```
1    have an agreement then to talk about that language?
2                    MR. CHARLES:  Yes.
3                    THE COURT:  And what, if you are unable to
4    agree, then what happens?
5                    MR. CHARLES:  Well, we're going to agree,
6    because that's the kind of lawyers that the other side is.
7                    THE COURT:  Okay.
8                    MR. CHARLES:  But the notion is, I guess,
9    your Honor, if for some reason the parties couldn't agree
10   on the language, then we'd ask you to reschedule this as a
11   preliminary hearing.
12                   THE COURT:  Okay.  All right.
13                   MR. CHARLES:  But I am --
14                   THE COURT:  So --
15                   MR. CHARLES:  -- wildly confident that's not
16   going to be necessary.
17                   THE COURT:  All right.  So you'll let
18   Chambers know if that's the case, in which case I would
19   then issue an order resetting the hearing, and we'd come
20   back and talk about it more, I guess.
21                   MR. CHARLES:  Again, yes, but I would be
22   shocked.
23                   THE COURT:  Okay.  Well, I've been
24   shocked --
25                   MR. CHARLES:  I understand.
```

Page 60

1          THE COURT:  -- more often than I anticipated

2    over the last two and a half years.  So, I'm just letting

3    you know it happens.

4          MR. CHARLES:  In this context, I know what

5    generally becomes uncertain.

6          THE COURT:  All right.  Mr. Charles, I'm

7    dying to understand the story behind the tie.

8          MR. CHARLES:  So, when my family goes on

9    vacation, they get ties, and they throw away my boring

10   lawyer ties.  So this is -- they were on --

11         THE COURT:  What does it say?

12         MR. CHARLES:  They were in Paris, and they

13   went by some vendor, and they said, oh, this looks like a

14   tie that we can make him wear instead of the boring lawyer

15   ties.

16         THE COURT:  Gotcha.

17         MR. CHARLES:  So I have this, and the boring

18   lawyer tie actually can be cut up and put on the roof of a

19   steakhouse in Tucson, they cut off your tie if you wear in

20   to dinner.

21         THE COURT:  Oh, I like that, and what does

22   the tie say?

23         MR. CHARLES:  It's Le Chat Noir, someplace

24   in Paris, and it's where -- it's at the -- I think the

25   restaurant was called this.

Page 61

```
 1                    THE COURT:  Gotcha.

 2                    It's almost as cool as Mr. Wilkes' flag tie,

 3      almost as cool.

 4                    MR. CHARLES:  I think he has a bunch of

 5      them, that was the impression I got from the last Zoom.

 6                    THE COURT:  He does.

 7                    MR. CHARLES:  In any event, thank you very

 8      much.

 9                    THE COURT:  All right.  Well, thank you all

10      for working this out, and I'll look forward to receiving

11      an order from whom?

12                    MR. CHARLES:  I believe it will be from us.

13                    THE COURT:  From the movant.

14                    MR. CHARLES:  But it will be after we've

15      worked it out with --

16                    THE COURT:  Okay.

17                    MR. CHARLES:  -- counsel for the debtor, and

18      the lenders, and the committee.

19                    THE COURT:  And is there any reason why --

20      did you all talk about this before the hearing today, or

21      you just never got to that point?

22                    MR. CHARLES:  We never got to that point.  I

23      mean, not having your help.  This is why the Lord made

24      judges, is to help parties get to resolution.

25                    THE COURT:  Okay.  Well, good, I'm glad to
```

1    have served some modest, you know, service here, and

2    hopefully it will work out.

3                    MR. CHARLES:  Thank you.

4                    THE COURT:  And, if not, I'll rule.

5                    Okay.  Anything else we need to do on Vital

6    today?  We've covered everything, right?

7                    MR. MURTAGH:  Nothing else, your Honor.

8                    THE COURT:  Anything you want to take

9    advantage of while Guso is out of the room?

10                   (No verbal response.)

11                   THE COURT:  No, nothing?

12                   All right.  Well, anyway --

13                   UNIDENTIFIED:  (Inaudible.)

14                   THE COURT:  Yes.  All right, you all, have a

15   great day.  Thank you all for your good work, and I'll

16   look forward to receiving that order.

17                   MR. CHARLES:  Thank you very much,

18   your Honor.

19                   MR. MURTAGH:  Thank you, your Honor.

20                   THE COURT:  Thank you.  I just have to close

21   up my computer.

22

23                   (Thereupon, the hearing was concluded.)

24

25

Page 63

1

2

3                        CERTIFICATION

4

5    STATE OF FLORIDA        :

6    COUNTY OF MIAMI-DADE   :

7

8               I, Cheryl L. Jenkins, RPR, RMR, Shorthand

9    Reporter and Notary Public in and for the State of Florida

10   at Large, do hereby certify that the foregoing proceedings

11   were transcribed by me from a digital recording held on

12   the date and from the place as stated in the caption

13   hereto on Page 1 to the best of my ability.

14               WITNESS my hand this 17th day of

15   March, 2023.

16

17

18          _____

19             CHERYL L. JENKINS, RPR, RMR

20          Court Reporter and Notary Public
         in and for the State of Florida at Large
21             Commission #HH 170910
                December 27, 2025

22

23

24

25