UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION
www.flsb.uscourts.gov

| | |
|---|---|
| IN RE: | Chapter 11 Case |
| VITAL PHARMACEUTICALS, INC., *et al.*, | Case No. 22-17842 (PDR) |
| Debtors.[1] | (Jointly Administered) |

**JOINT OPPOSITION OF MONSTER ENERGY COMPANY AND ORANGE BANG, INC. TO (I) DEBTORS' MOTION FOR AN ORDER APPROVING (A) THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL CLAIMS, LIENS, LIABILITIES, RIGHTS, INTERESTS AND ENCUMBRANCES, AND (B) THE DEBTORS' ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (II) DEBTORS' NOTICE OF (A) EXECUTORY CONTRACTS AND UNEXPIRED LEASES THAT MAY BE ASSUMED AND ASSIGNED IN CONNECTION WITH A SALE OF THE DEBTORS' ASSETS AND (B) THE PROPOSED CURE AMOUNTS WITH RESPECT THERETO**

Monster Energy Company ("Monster") and Orange Bang, Inc. ("Orange Bang"), by and through their undersigned counsel, hereby file this opposition ("Opposition") to *Debtors' Motion for an Order Approving (A) the Sale of Substantially All of The Debtors' Assets Free and Clear of All Claims, Liens, Liabilities, Rights, Interests and Encumbrances, and (B) the Debtors' Assumption and Assignment of Certain Executory Contracts and Unexpired Leases* (the "Motion") [Docket No. 707] and *Debtors' Notice of (A) Executory Contracts and Unexpired Leases That May Be Assumed and Assigned in Connection With a Sale of the Debtors' Assets and (B) the Proposed Cure Amounts With Respect Thereto* [Docket No. 893] (the "Cure Notice"). In support

---

[1] The address of the Debtors is 1600 N. Park Drive, Weston, FL 33326. The last four digits of the Debtors' federal tax identification numbers are: (i) Vital Pharmaceuticals, Inc. (8430); (ii) Bang Energy Canada. Inc. (5454); (iii) JHO Intellectual Property Holdings, LLC (0010); (iv) JHO Real Estate Investment, LLC (9394); (v) Quash Seltzer, LLC (6501); (vi) Rainbow Unicom Bev LLC (2254); and (vii) Vital Pharmaceuticals International Sales, Inc. (8019).

of this Opposition, Orange Bang and Monster hereby incorporate their *Joint Opposition to Debtors' Motion for Summary Judgment and Incorporated Memorandum of Law in Connection with Debtors' Adversary Complaint for Declaratory Judgment,* filed in Adv. Pro. No 23-01031 (PDR) (the "Adversary Proceeding") [Adv. Docket No. 31] (the "MSJ Opposition"), as well as certain exhibits submitted in the Adversary Proceeding in connection with the MSJ Opposition and the *Debtors' Motion for Summary Judgment and Incorporated Memorandum of Law in Connection with Debtors' Adversary Complaint for Declaratory Judgment* [Adv. Docket Nos. 2 and 3] (the "MSJ"), and respectfully state as follows:

## PRELIMINARY STATEMENT[2]

1.      Vital Pharmaceuticals, Inc. ("VPX") and JHO Intellectual Property Holdings, LLC ("JHO" and, together with VPX, the "Debtors") seek, by way of this Motion and the related Adversary Proceeding, an order of this Court authorizing the Debtors – over the objection of Orange Bang and Monster – to transfer to a third party purchaser the Debtors' license to use the Bang trademarks which are owned by Orange Bang, including, without limitation, U.S. Trademark Registration Nos. 3,960,381, 1,223,619, and 1,224,457 (collectively, the "Bang Trademark").[3] As briefed in detail in the MSJ Opposition and discussed herein, the relief sought by the Debtors is prohibited under federal trademark law, without any exception in the Bankruptcy Code or federal trademark law for transfers of licenses by debtors or trustees in bankruptcy cases, and should be denied.

2.      Before the Debtors instituted the chapter 11 bankruptcy proceedings, Orange Bang and Monster brought an arbitration against the Debtors for infringing the Bang Trademark and breaching a prior settlement agreement (the "2010 Settlement Agreement")[4] concerning those

---

[2] Capitalized terms used in this Preliminary Statement that are not otherwise defined have the meanings ascribed to such terms later in this Opposition.
[3] Adv. Dkt. No. 3-2 (Award) at 7-8.
[4] Adv. Dkt. No. 3-1 (2010 Settlement Agreement).

2

marks (the "<u>Arbitration</u>"). After Orange Bang and Monster prevailed on all claims, Arbitrator Bruce Isaacs (the "<u>Arbitrator</u>") issued a 177-page final arbitration award (the "<u>Award</u>"),[5] which, among other things, sets forth a licensing arrangement that the parties elected in lieu of the imposition of a permanent injunction precluding the Debtors from using the Bang Trademark in twelve states and restricting them to the limited use permitted by the prior settlement elsewhere (the "<u>Permanent Injunction</u>").  Specifically, the Award gives the Debtors a non-exclusive "license" to use the Bang Trademark, as long as they pay a "5% continuing royalty" on "Net Sales" of Bang-branded products (the "<u>5% Continuing Royalty</u>").  If the Debtors choose to stop paying the 5% Continuing Royalty, the Permanent Injunction automatically takes effect following notice of the default.  The United States District Court for the Central District of California (the "<u>Central District Court of California</u>") confirmed the Award and entered final judgment (the "<u>Final Judgment</u>").[6]

3.      Federal trademark law is clear: "trademark licenses are not assignable in the absence of express authorization from the licensor." *In re Ajranc Ins. Agency, Inc.,* 2021 WL 2774937, at *2 (Bankr. M.D. Fla. July 2, 2021).  Express authorization is absent here because there is no provision in the Award permitting the Debtors to transfer or assign the 5% Continuing Royalty to a third party. Nevertheless, the Debtors assert that they are entitled to assign the 5% Continuing Royalty and associated license to use the Bang Trademark to ***any*** third-party purchaser whatsoever ***without*** Orange Bang's authorization.  The Debtors claim that the 5% Continuing Royalty is somehow not a "trademark license" and is therefore freely assignable.  *See* Adv. Mot. ¶¶ 66-77.

4.      The express terms of the Award squarely contradict the Debtors' contention that the remedy it provides is not a license. The Award (confirmed in the Final Judgment)

---

[5] Adv. Dkt. No. 3-2 (Award).
[6] Adv. Dkt. Nos. 3-5 (Order Confirming Award) and 3-6 (Final Judgment).

DOCS_LA:348076.4 57536/00001
69930474;1

unequivocally states that the remedy under the Award is a "compulsory license" to use the Bang Trademark in exchange for a "5% continuing royalty." *See, e.g.*, Award at 150. In fact, the phrase "5% continuing royalty" is used in the Award no fewer than **34 times**. *See generally* Award.

5.      The Debtors try to hide these dispositive facts by referring to the remedy as a "fee regime" or a "continuing fee." Adv. Compl. ¶ 1; Adv. Mot. ¶¶ 1-3. But those phrases appear nowhere in the Award or Final Judgment. The Debtors invented them out of whole cloth. The reality is that, during the Arbitration hearing, everyone—the Arbitrator, Orange Bang, Monster, and even the Debtors themselves—called the remedy a "license." *See* Arb. Trial Tr. 4407:8-23 (Debtors' counsel referring to the remedy as an "ongoing license" and Arbitrator referring to a "license agreement").[7] The Debtors' attempt to affix a made-up new label to the license and the royalty cannot change the substance of what the Award actually provides—a trademark license put in place at the request of Monster and Orange Bang (as trademark owner/licensor) upon terms voluntarily agreed to by VPX/JHO (as trademark user/licensee).

6.      Because federal trademark law prohibits the assignment of the Debtors' license to use the Bang Trademark without express authorization, the Debtors may not effect such an assignment under either section 365 or 363 of the Bankruptcy Code (the "Code") and, thus, the relief sought by the Debtors in the Motion and Adversary Proceeding should be denied.

7.      Alternatively, if the Court determines that the Debtors may transfer their right to use the Bang Trademark without Orange Bang's consent, its order should clarify that (i) such transfer must include the Debtors' rights and obligations imposed not only by the 5% Continuing Royalty and the Permanent Injunction, but also under the 2010 Settlement Agreement to which they are tied; (ii) the foregoing necessitates curing the monetary defaults under the 5% Continuing

---

[7] *See* Declaration of Ira D. Kharasch filed in support of MSJ Opposition ("Kharasch Declaration") [Adv. Dkt. No. 31] Ex. A (Arb. Trial Tr. 12/10/2021) at 4407:8-23.

Royalty and compensating for the defaults under the 2010 Settlement Agreement by paying all unpaid pre- and post-petition royalties (estimated to exceed $31 million) and the unpaid breach of contract damage award with respect to the 2010 Settlement Agreement in the amount of at least $101,525,000, as well as the approximately $9.3 million award of attorneys' fees and costs; and (iii) the Debtors are required to reserve proceeds of the sale in an amount necessary to protect Orange Bang's and Monster's consent rights, as well as the cure and compensation rights asserted herein, should the Court's order authorizing such transfer be reversed on appeal.

## FACTUAL BACKGROUND

A.     **Orange Bang's Trademark Infringement Litigation Against VPX and the 2010 Settlement Agreement**

8.      Orange Bang is the exclusive owner of the Bang Trademark and has been the exclusive owner since 1971.  *See* Adv. Dkt. 3-2 (Award) at 8.   For over five decades, Orange Bang has used the Bang Trademark prominently in its corporate title and trade names, and to identify its premium flavored drinks.  *Id*.  Orange Bang has a long history of enforcing its trademark rights in, and protecting the integrity of, the Bang Trademark.  *Id.* at 97.

9.      In 2008, VPX began unlawfully selling a pre-workout supplement using Orange Bang's "Bang" marks.  *Id.* at 9.  As a result, in September 2009, Orange Bang brought an action against VPX in the Central District Court of California for, among other claims, trademark infringement under the Lanham Act.  *See Orange Bang Inc. v. Vital Pharm. Inc.,* Case No. 2:09-cv-06551-MMM-E.

10.     In August 2010, Orange Bang and VPX resolved that litigation in a settlement agreement (the "2010 Settlement Agreement"), which sets forth specific, limited ways in which VPX may use the Bang mark. Adv. Dkt. 3-1 (2010 Settlement Agreement).  Among other things, the 2010 Settlement Agreement provides that VPX may use the Bang mark to market and sell "nutritionally fortified," "creatine-based" dietary supplement and nutritional products.  *Id.* at 5.

5

The 2010 Settlement Agreement further provides that VPX may sell products that are not creatine-based, but only under certain conditions and in certain channels not relevant here.  *Id.* at 5-6.

**B.    2020 Arbitration and California District Court Action**

11.    Following the 2010 Settlement Agreement, VPX dramatically expanded its Bang products and marketing of those products.  By 2019, VPX escalated its unauthorized use of the Bang Trademark by rebranding the entire company to "Bang Energy."  Award at 37, 124-25, 128. Around the same time, Orange Bang discovered that VPX was breaching the 2010 Settlement Agreement by selling products with the Bang Trademark that did not even purport to contain creatine or comply with the restrictions on the sale and marketing of non-creatine-based products. *Id.* at 37-38.

12.    In June 2020, Orange Bang and Monster—to whom Orange Bang had assigned certain rights under the 2010 Settlement Agreement—initiated the Arbitration against VPX.[8]  *See Orange Bang, Inc. and Monster Energy Co. v. Vital Pharmaceuticals, Inc.*, AAA Case No. 01-20-0005-6081. Orange Bang and Monster alleged, among other things, that VPX had infringed Orange Bang's Bang Trademark and breached the 2010 Settlement Agreement.  Award at 6-7.

13.    In July 2020, the Debtors filed a parallel proceeding against Orange Bang and Monster in the Central District Court of California, seeking, among other things, a declaration that they had not, in fact, infringed the Bang Trademark.  *See Vital Pharmaceuticals, Inc. v. Orange Bang, Inc.*, Case No. 5:20-cv-01464 (C.D. Cal.) (the "California District Court Action").  The Court granted Orange Bang and Monster's motion to compel arbitration and stayed the California District Court Action, pending the Arbitration.  *Id.* (Dkt. 50).

---

[8] VPX affiliate, JHO, was subsequently made part of the Arbitration. In July 2017, VPX transferred ownership of the VPX's Bang mark to JHO, which licensed said mark back to VPX.  Because JHO's mark-related rights derive from a grant of rights from VPX, JHO is subject to the 2010 Settlement Agreement.  *See* Award at 135 n.36, 164 n.48.

**C.**     **The Arbitration Award and District Court Judgment**

14.     In January 2022, the Arbitrator issued an Interim Arbitration Award – Phase 1 (the "Interim Award") in favor of Orange Bang and Monster on all claims and counterclaims. Award at 151. Orange Bang and Monster had requested, as an alternative to the issuance of a permanent injunction, the award of a continuing royalty for the ongoing use of the Bang Trademark.  The Arbitrator then afforded the Debtors the opportunity to elect between (a) the imposition of the Permanent Injunction enjoining them from using the Bang Trademark; or (b) payment of the 5% Continuing Royalty, which would stay enforcement of the Permanent Injunction for so long as the Debtors continued to make payment.  Although the Award defines the election to pay the 5% Continuing Royalty as the "VPX 5% Continuing Royalty Election," Award at 151, the Debtors have rebranded it as the "Continuing Fee Election," Adv. Mot. ¶ 21.

15.     On January 31, 2022, the Debtors voluntarily elected the 5% Continuing Royalty option. Award at 151.  They reaffirmed that election in March 2022.  *Id.* at 150.

16.     In April 2022, the Arbitrator issued his 177-page final Award, finding that Orange Bang and Monster prevailed on all claims and counterclaims at issue in the Arbitration.  Honoring the Debtors' election of the 5% Continuing Royalty, the Arbitrator imposed the chosen equitable remedy, which the Award expressly refers to as a "license." *Id*.

17.     The Arbitrator further noted that "VPX was under no compulsion" to opt for the 5% Continuing Royalty and had instead "made the informed business decision" to stay the Permanent Injunction to avoid the risk and "meaningful expense" associated with endeavoring to market their infringing beverages without using the Bang Trademark. *Id.* at 150-51.

18.     The Award thus stayed the Permanent Injunction and provided that it would not spring into effect "so long as VPX and JHO continue[] to pay the [5% Continuing Royalty] to Orange Bang and Monster each quarter":

[I]n lieu of the issuance of the Permanent Injunction as set forth in paragraphs 1 – 3 above, if VPX and JHO pay Orange Bang (as to the trademark infringement claim) and Monster (as to the breach of contract claim for which it seeks specific performance in the future) an amount equal to 5% of "Net Sales" generated from the sales of Bang branded products, including BANG Energy RTD, each quarter beginning July 1, 2022, and payment is made as set forth in this paragraph, then the Permanent Injunction referred to above shall be stayed, and shall not go into effect, so long as VPX and JHO continues to pay the 5% of Net Sales to Orange Bang and Monster each quarter.[9]

19.    Notably, the Award made no provision for the transfer or assignment of rights under the 5% Continuing Royalty or for the 5% Continuing Royalty to be paid by any entity other than VPX and JHO.[10]

20.    In addition to the 5% Continuing Royalty—a remedy intended to address the strong likelihood of future breaches of the 2010 Settlement Agreement and trademark infringement—the Arbitrator also found that the Debtors were jointly and severally liable for past breaches of the 2010 Settlement Agreement and trademark infringement and calculated damages for each of trademark infringement and breach of contract based on alternative damage measures of a reasonable royalty and a disgorgement of profits. *Id.* at 174-75; *see also id.* at 63-80. Honoring Orange Bang's and Monster's election between these alternative measures of damages, the Arbitrator awarded disgorgement of VPX/JHO's profits attributable to use of the Bang Trademark in the amount of $175 million. *Id.* at 138. The Award further provided for payment of attorneys' fees and costs (totaling approximately $9.3 million) and interest. *Id.* at 151, 165-173, 176.

---

[9] Award at 149-51 (internal footnotes omitted). *See also id.* at 175 ("In lieu of the issuance of the above Permanent Injunction, and based upon the VPX 5% Continuing Royalty Election, **VPX and JHO shall pay Orange Bang and Monster a royalty at the rate of 5%** of VPX's Net Sales (as defined above) derived from the sale of Bang branded products, including BANG Energy RTD, **on an ongoing, continuing basis in the future** as set forth above and for so long as VPX or JHO make any use of the BANG mark.") (emphasis in original).

[10] Nor does the Award permit the Debtors to use the Bang Trademark "without restriction," as they claim. MSJ ¶ 29. The Award sets forth the terms of the license, which include, among other things, payment of the 5% Continuing Royalty, backed by the Permanent Injunction, and compliance with audit and inspection obligations. *See* Award at 154-56.

21.     The Award also provided that the 2010 Settlement Agreement would survive and remain in full force and effect and made clear that the 2010 Settlement Agreement and the prospective provisions of the Award—which include the license to use the Bang Trademark—are inextricably tied together.  *Id.* at 177.

22.     On June 30, 2022, the Central District Court of California confirmed the Award, and on September 29, 2022, entered the Award as a Judgment (the "Final Judgment").  *See* Adv. Dkt. 3-5 (Order Confirming Award) and 3-6 (Final Judgment).  The Final Judgment provides that "the [Award] entered by [Arbitrator] . . . on April 4, 2022 . . . shall have the same force and effect as a civil judgment rendered by this Court." *See* California District Court Action (Dkt. 127).

23.     On October 28, 2022, VPX and JHO filed an appeal of the Final Judgment (the "Appeal").  The Appeal is pending, but stayed, and the Debtors have not sought to lift the stay so that the Appeal can proceed.

**D.     Chapter 11 Filings and the Adversary Proceeding**

24.     On October 10, 2022, the Debtors filed voluntary chapter 11 petitions in this Court. By the Motion and Cure Notice, the Debtors seek an order of this Court approving the sale of substantially all of the Debtors' assets and the assumption and assignment of executory contracts.

25.     On February 17, 2023, the Debtors filed the Adversary Proceeding against Orange Bang and Monster.  In the Adversary Proceeding, the Debtors ask this Court to declare that "the Debtors may sell, assign, or otherwise transfer their interest" in the use of the Bang Trademark under the Award and Final Judgment. Adv. Compl. ¶¶ 55-56.  Concurrently with their Adversary Complaint, the Debtors filed the MSJ, seeking summary adjudication of their declaratory relief claims that (a) *res judicata* precludes Monster and Orange Bang from contesting any transfer of the 5% Continuing Royalty to a third-party purchaser, and (b) the 5% Continuing Royalty is

property of the Debtors' estates subject to transfer without Monster's and Orange Bang's consent. MSJ ¶ 5.

26.     On March 17, 2023, Orange Bang and Monster filed the MSJ Opposition.

**E.     Outstanding and Unpaid Amounts Under the Award**

27.     Although the Debtors have paid the 5% Continuing Royalty for last quarter for post-petition sales,[11] they have not paid any royalties that accrued during the pre-petition period. According to the Debtors, the amount of outstanding royalties from the pre-petition period exceeds approximately $31 million.[12]   Nor have the Debtors paid any portion of the damages awarded under the Award and Final Judgment, or any of the costs, fees, or interest amounts due under the Award.  Award at 138, 151, 169-70, 176.[13]

**ARGUMENT**

**I.   THE 5% CONTINUING ROYALTY IS A TRADEMARK LICENSE THAT CANNOT BE TRANSFERRED WITHOUT ORANGE BANG'S AND MONSTER'S CONSENT UNDER FEDERAL TRADEMARK LAW.**

28.     As set forth in further detail in the MSJ Opposition, the 5% Continuing Royalty is a trademark license that cannot be transferred without Orange Bang's and Monster's consent.  *See In re XMH Corp.*, 647 F.3d 690, 695 (7th Cir. 2011) ("[A]s far as we've been able to determine, the universal rule is that trademark licenses are not assignable in the absence of a clause expressly authorizing assignment.").

**A.     The Award Expressly Holds that the 5% Continuing Royalty Is a Trademark License.**

29.     The Award and Final Judgment expressly provide that the remedy being imposed at the parties' election for the Debtors' breach of contract and trademark infringement is a "license"

---

[11] See *Order Granting Debtors' and Creditors Monster Energy Company and Orange Bang, Inc.'s Joint Agreed Motion to Approve Agreement Regarding Royalty That Accrues Postpetition [ECF No. 603]* [Bankr. Main Dkt No. 639].
[12] Kharasch Declaration at ¶ 5.
[13] *Id.*

DOCS_LA:348076.4 57536/00001
69930474;1

to use the Bang Trademark in exchange for a "5% continuing royalty." *See, e.g.*, Award at 150. The Debtors do not dispute that "under federal trademark law, trademark licenses are not assignable in the absence of some express authorization from the licensor …" MSJ ¶ 66. By itself, this principle is dispositive and mandates a finding that the 5% Continuing Royalty is a non-assignable trademark license. *See* MSJ Opposition, ¶ 29.

**B.    The Debtors Are Precluded from Disputing That the 5% Continuing Royalty Is a License.**

30.    The plain language of the Award precludes the Debtors from now asserting that they may freely assign their right to use the Bang Trademark because that right is not a "license." The issue of whether the remedy under the Award is a "license" was already determined by the Arbitrator and incorporated into the Award, which unequivocally refers to the remedy as a "***license***" granted by Orange Bang and Monster in exchange for a "5% continuing royalty" on "Net Sales" of the Debtors' Bang-branded products. Award at 150. The Arbitrator also looked to "***comparable industry license agreements***" in defining "Net Sales" for purposes of the 5% Continuing Royalty, and looked to comparable trademark licenses to determine the percentage royalty rate on Net Sales to be paid by the Debtors, ultimately finding that a 5% royalty rate is consistent with other licenses in the beverage industry. *Id.* at 153. Further, the Arbitration hearing transcript reveals that the Arbitrator and both parties – including the Debtors – consistently referred to the remedy as a "license." [14] Black-letter law obligates this Court to honor the express provision

---

[14] For example, in discussing the remedy that Orange Bang and Monster proposed and that the Award ultimately imposed, the Arbitrator recognized that the law generally precludes "stick[ing] an unwilling party with a license agreement." Kharasch Declaration, Ex. A (Arb. Trial Tr. 12/10/2021) at 4407:8-14. "But," the Arbitrator continued, "that doesn't seem to be what's happening here in as much as I understand the ask from Orange Bang is we would like a royalty in the future in lieu of the injunction if that's what VPX is willing to do." *Id.* at 4407:15-19. Debtors' counsel replied: "You're completely right. This is a unique circumstance. It's pretty unusual that trademark owner would want an ***ongoing license***." *Id.* at 4407:20-23 (emphasis added). Indeed, the Debtors repeatedly described the remedy as a license. *Id.* at 4381:13-16 (Debtors' counsel discussing industry trademark "***licenses***"); 4407:8-23 (Arbitrator: "I totally agree with this notion that a court or an arbitrator should not be able to stick an unwilling party with a ***license agreement*** that they don't want and say yep, you're ***licensing your trademark*** to Mr. Jones and you're paying them a blank percent royalty and just, that's it. I agree with that notion. But that doesn't seem to be what's happening here in as much as I understand the ask from Orange Bang is we would like a royalty

in the Award (confirmed in the Final Judgment) that the remedy under the Award—the 5% Continuing Royalty—is a "license." *See, e.g., B & B Hardware, Inc. v. Hargis Indus., Inc.*, 575 U.S. 138, 148 (2015); *Heiser v. Woodruff*, 327 U.S. 726, 731-33 (1946). *See* MSJ Opposition, ¶¶ 30-34.

### C.    Orange Bang and Monster Granted a License for the Use of the Bang Trademark in Exchange for the 5% Continuing Royalty.

31.    Orange Bang and Monster granted permission for the use of the Bang Trademark in exchange for the 5% Continuing Royalty. In other words, there was a grant by Orange Bang and Monster of a license to use the Bang Trademark to the Debtors in exchange for a royalty. The option to make the VPX 5% Continuing Royalty Election existed only because it was offered by Orange Bang and Monster. Indeed, as the Arbitrator expressly recognized, the remedy he awarded was proper only because it was requested by Orange Bang and Monster and was voluntarily elected by VPX. Award at 150.[15] Absent Orange Bang and Monster's express consent, the Arbitrator would not have been empowered to implement the 5% Continuing Royalty arrangement. *Id.* at 148; *See A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 166 F.3d 197, 207 (3d Cir. 1999). *See* MSJ Opposition, ¶¶ 36-40.[16]

### D.    Binding Precedent Establishes That Trademark Licenses Are Not Assignable Without the Licensor's Consent.

---

in the future in lieu of the injunction if that's what VPX is willing to do." Debtors' counsel [Ms. Wilbert]: "You're completely right. This is a unique circumstance. ***It's pretty unusual that a trademark owner would want an ongoing license.*** […]"). (all emphases added).

[15] "The arbitrator is **not** imposing a compulsory license on a "resisting" Orange Bang. Rather, the arbitrator is granting a compulsory license to a "requesting" Orange Bang, imposed on VPX, a party found to be liable for trademark infringement and found to be liable for breach of the 2010 Settlement Agreement who, at its election, has elected to avoid the corporate realities and meaningful expense of re-branding that may be the practical result of the Permanent Injunction …." (Award at 150, emphasis in original).

[16] The Debtors other arguments set forth in the MSJ that the right to use the Bang Trademark is not a trademark license are addressed in the MSJ Opposition, ¶¶ 41-47 (the 5% Continuing Royalty is not a "naked license" due to the lack of "quality control"); ¶¶ 48-50 (policy considerations mandate the non-assignability of the trademark license).

32.     The Debtors concede, as they must, that binding precedent establishes that trademark licenses are not assignable without the licensor's consent.  *See, e.g.*, *In re Wellington Vision, Inc.*, 364 B.R. 129, 134 (S.D. Fla. 2007) ("The Lanham Act provides that a licensor who grants a non-exclusive license for the use of its trademark is entitled to certain protections, including restrictions on assignment."); *In re Travelot Co.*, 286 B.R. 447, 455 (Bankr. S.D. Ga. 2002) ("[T]he grant of a non-exclusive [trademark] license is ... ***one personal to the assignee and thus not freely assignable to a third party***.") (citations omitted, emphasis added); *In re Trump Ent. Resorts, Inc.*, 526 B.R. 116, 124 (Bankr. D. Del. 2015) ("[F]ederal trademark law generally bans assignment of trademark licenses absent the licensor's consent[.]"); *In re Taylor Inv. Partners II, LLC*, 533 B.R. 837, 840 n.1 (Bankr. N.D. Ga. 2015) ("Federal trademark law precludes unauthorized assignment of a non-exclusive trademark license[.]").  Applying that law, bankruptcy courts routinely find that debtors are barred from assuming and assigning trademark licenses absent the licensors' consent.  *Id.*

33.     Because trademark licenses are "personal," Orange Bang and Monster have the absolute right to choose ***who*** will use the Bang Trademark.  *See In re XMH Corp*., 647 F.3d at 696; *see also, e.g., In re Taylor*, 533 B.R. at 843 (barring debtors from assuming trademark license because "[t]he Lanham Act excuses [licensor] from accepting performance from a party other than Debtors, and [licensor] does not consent to Debtors' assumption of the executory contract").  For this reason, nothing in the Award permits the Debtors to assign their license to the Bang Trademark to a third party without the consent of Orange Bang/Monster.

## II.     THE 5% CONTINUING ROYALTY IS NOT FREELY TRANSFERABLE ESTATE PROPERTY.

34.     The Debtors assert that the 5% Continuing Royalty is "estate property" under section 541(a)(1) of the Code.  *See* MSJ ¶ 59.  Similarly, they claim that the 5% Continuing Royalty is a right under a prepetition judgment, and that "rights created under prepetition

13

judgments and arbitration awards constitute estate property […]." MSJ ¶ 58. From there, the Debtors jump to the unsupported conclusion that the 5% Continuing Royalty is "an estate asset that may be transferred subject to the sole condition that the [5% Continuing Royalty] continues to be paid by the purchaser." MSJ ¶ 63. Not so.

35.    Even if the 5% Continuing Royalty was deemed to be an estate asset, it is not an estate asset that may be freely transferred; the fact that an asset becomes estate property does not uncouple the asset from restrictions on transfer that were enforceable against the Debtors at the time of the chapter 11 filing. Indeed, the Debtors admit as much, by referring to the right to use the Bang Trademark as: "estate property, which, like any other kind of property, is subject to ongoing obligations and restrictions and remains unchanged by the bankruptcy process." MSJ ¶ 59.

36.    The Eleventh Circuit has held that section 541 "is not intended to expand the debtors' rights against others more than they exist at the commencement of the case," *In re Bracewell*, 454 F.3d 1234, 1242 (11th Cir. 2006); *see also In re Majestic Star Casino, LLC*, 716 F.3d 736, 759 (3d Cir. 2013) ("The trustee can assert no greater rights than the debtor himself had on the date the case was commenced."). As discussed above, at the commencement of this bankruptcy case, the Debtors had no right to assign their license to use the Bang Trademark to a third party without consent. Section 541(a)(1) does not enlarge the Debtors' rights beyond the rights they held pre-petition under the Final Judgment and federal trademark law.

### III. THE DEBTORS' RIGHT TO USE THE BANG TRADEMARK IN EXCHANGE FOR THE 5% CONTINUING ROYALTY IS AN EXECUTORY CONTRACT THAT, PURSUANT TO SECTION 365(c), CANNOT BE ASSUMED OR ASSIGNED WITHOUT CONSENT.

37.    The Debtors contend that their right to use the Bang Trademark in exchange for the 5% Continuing Royalty is not an executory contract. MSJ ¶ 64. This is incorrect. As a result,

DOCS_LA:348076.4 57536/00001
69930474;1

section 365(c) precludes the Debtors from assuming or assigning the right to use the Bang Trademark under the Award and Final Judgment without Orange Bang's and Monster's consent.

38.    Section 365(c) of the Code provides an exception to a debtor's ability to assume and assign an executory contract where (i) applicable law excuses the counterparty from accepting performance from, or rendering performance to, a third party, and (ii) the counterparty does not consent to the assumption or assignment. 11 U.S.C. § 365(c).  For purposes of Section 365(c), "applicable law" includes intellectual property law governing the assignment of licenses.  *See, e.g.*, *In re Kazi Foods of Mich., Inc.*, 473 B.R. 887, 889 (Bankr. E.D. Mich. 2011) (citing *Travelot*, 286 B.R. at 454).

39.    A license is generally considered executory as it imposes ongoing performance obligations on the part of the parties. *Mission Prod. Holdings v. Tempnology, LLC*, 139 S. Ct. 1652, 1658 (2019*)*.  Trademark licenses—such as the Debtors' right to use the Bang Trademark in exchange for the 5% Continuing Royalty here—are almost invariably considered to be executory contracts subject to the anti-assignment restrictions of federal trademark law and section 365(c) of the Code, absent express consent from the owner/licensor.  *See, e.g.*, *In re XMH Corp.*, 647 F.3d at 695-97 (trademark license was an executory contract that could not be assigned without consent); *Ajranc*, 2021 WL 2774937, at *3-5 (franchise agreement with trademark license was an executory contract that could not be assigned without consent); *Trump Entertainment Resorts*, 526 B.R. at 121-25 (trademark license was a non-assumable or assignable executory contract).  Thus, absent express consent, a trademark license cannot be assumed or assigned by a debtor as an executory contract under section 365. *See Wellington Vision,* 364 B.R. at 134-35 (affirming holding of bankruptcy court that, reading section 365(c) in conjunction with the assignment restrictions of the Lanham Act, the debtor could not, as a matter of law, assume or assign a franchise agreement granting it the right to use trademarks as a license).

DOCS_LA:348076.4 57536/00001
69930474;1

40.     There is no "policy" exception for the general rule that trademark licenses fall within the ambit of section 365(c) that would allow a court to inquire as to whether the particular trademark license in question adequately promotes the policy behind the general rule that trademark licenses are covered under section 365(c).   Section 365(c)(1)(A) is clear and unambiguous that once it is determined that "applicable law" excuses a party from performance, the inquiry ends; the statute does not provide that once such "applicable law" is determined, that the court has authority to conduct a further inquiry as to whether the policy behind such applicable law is adequately promoted by the specific contract in question.   This is consistent with all of the case law holding that trademark licenses come within the ambit of 365(c).   See eg *In re Trump Entm't Resorts, Inc*., 526 B.R. 116, 124 (Bankr. D. Del. 2015) (once it was determined that trademark licenses fall within the ambit of section 365(c), the only issue was whether the parties intended to contract around the default or universal rule of consent being required to assign the license).

41.     In this case, neither side has completed performance.   There are material obligations outstanding on the part of the Debtors, as licensees of the Bang Trademark, and Orange Bang and Monster, respectively, as the licensor of the Bang Trademark and assignee of certain rights under the 2010 Settlement Agreement—which render the license executory under section 365.   On the Debtors' part, their agreement to pay the 5% Continuing Royalty for the use of the Bang Trademark, as well as to comply with the detailed reporting and audit requirements under the Award,[17] are material unperformed obligations. *See, e.g.*, *HQ Global Holdings*, 290 B.R. at 510 (requirement to pay royalties and provide operating reports were unquestionably unperformed obligations making the licensing agreement executory under § 365); *Chipwich, Inc.*, 54 B.R. at

---

[17] The Award provides for fulsome audit and inspection procedures.  *See* Award at 154-56.

430 (licensee's continuing duty to pay royalties and account for such royalties, and licensor's right to inspect this accounting, made the license executory).

42.    On Orange Bang's and Monster's part, the implicit agreement not to sue the Debtors for their use of the Bang Trademark in accordance with the Award is also a material unperformed obligation. *See, e.g.*, *Everex Systems, Inc. v. Cadtrak Corp. (In re CFLC, Inc.),* 89 F.3d 673, 667 (9th Cir. 1996) (a covenant not to sue implicit in a licensing agreement is both a significant and continuing performance obligation that make a contract executory as to the licensor); *In re W.B. Care Ctr., LLC*, 419 B.R. 62, 72-73 (Bankr. S.D. Fla. 2009) (adopting the Ninth Circuit's decision in *Everex* and stating that the Eleventh Circuit also concurs with the *Everex* view).[18]

43.    The Debtors' sole argument as to why their rights and obligations under the VPX 5% Continuing Royalty Election do not constitute an executory contract is that they are contained in a judicial order.  MSJ ¶¶ 64-65.  This feature of those rights and obligations is, however, irrelevant in this case as the Award reflects the agreement of the parties.  *See* MSJ Opposition ¶¶ 61-63.

44.    The use of the Bang Trademark is thus subject to the anti-assignment provisions under federal trademark law and section 365(c) and cannot be transferred to a new licensee absent the consent of Orange Bang and Monster.

45.    Further, as discussed below, because there are material obligations outstanding on both sides, even if the right to use the Bang Trademark was determined not to be a trademark license, the terms of that right would still constitute an executory contract.  *See Mission Prod.*

---

[18] In *W.B. Care Ctr.*, the bankruptcy court (Southern District of Florida), in adopting the *Everex* view, discussed an earlier decision in 2003 from the bankruptcy court (Middle District of Florida), *Gencor Indus.,* 298 B.R. at 912, which appeared to be critical of the *Everex* approach, attempting to reconcile the language of the *Gencor* opinion with the *Everex* approach, but ultimately finding that, "[r]egardless, all of the above cases agree that a waiver of the right to sue is a covenant not to sue, and that this is an ongoing obligation."

*Holdings*, 139 S. Ct. at 1658 (citation omitted) ("A contract is executory if 'performance remains due to some extent on both sides.'").

## IV.  THE DEBTORS CANNOT TRANSFER THE RIGHT TO USE THE BANG TRADEMARK WITHOUT CONSENT UNDER SECTION 363 OF THE CODE WITHOUT SATISFYING SECTION 365 OF THE CODE.

46.    The Debtors contend that section 363 of the Code authorizes them to transfer the right to use the Bang Trademark. MSJ ¶¶ 60-63.  But the law is clear that section 363 cannot be utilized to circumvent the requirements of section 365.

47.    Courts uniformly hold that section 365 is the ***exclusive remedy*** available to a trustee or debtor in possession wishing to sell rights under an executory contract—and debtors cannot avoid the requirements of section 365 by invoking the sale provisions of section 363.  *See, e.g.*, *In re Qintex Entertainment, Inc.* 950 F.2d 1492, 1495-96 (9th Cir. 1991) (denying a sale of assets under section 363 because it involved executory contracts which the court determined had to be assumed or rejected as provided in section 365); *In re Chira*, 367 B.R. 888, 900-901 (S.D. Fla. 2007) ("In the context of executory contracts, courts have recognized section 365 as the exclusive remedy available to parties wishing to sell property or other assets of the estate."); *In re Access Beyond Techs., Inc.,* 237 B.R. 32, 47-48 (Bankr. D. Del. 1999) ("A debtor cannot avoid the requirements of section 365 by saying it is 'selling' a lease or executory contract, rather than assuming and assigning it.  To hold otherwise would lead to ludicrous results.").

48.    In this case, the right to use the Bang Trademark arises under an executory contract that cannot be assumed or assigned absent express consent from Orange Bang and Monster.  The Debtors cannot use section 363 as a back door to avoid the restrictions of section 365.

DOCS_LA:348076.4 57536/00001
69930474;1

**V.     EVEN IF THE RIGHT TO USE THE BANG TRADEMARK UNDER THE 5% CONTINUING ROYALTY IS NOT AN EXECUTORY CONTRACT, THE DEBTORS CANNOT TRANSFER THAT RIGHT WITHOUT ORANGE BANG'S AND MONSTER'S CONSENT.**

49.     The Debtors also contend that they are entitled to assign their right to use the Bang Trademark under section 363(b) of the Code to any purchaser "subject to the sole condition that the [5% Continuing Royalty] continues to be paid by the purchaser." MSJ ¶ 60. This contention is meritless because it misapprehends the reach of section 363(b).

50.     As the Debtors' own authority confirms, section 363(b)(1) is "simply [an] enabling statute[] that give[s] the trustee the authority to sell or dispose of property ***if the debtors would have had the same right under state [or applicable nonbankruptcy] law.***" *In re Schauer*, 835 F.2d 1222, 1225 (8th Cir. 1988) (emphasis added) (cited at MSJ ¶ 60). Section 363(b)(1) does not authorize the sale of property in violation of restrictions imposed by state law, contract law, or other nonbankruptcy law. *Id.*; *see also Integrated Solutions, Inc. v. Serv. Support Specialties, Inc.*, 124 F.3d 487, 492–94 (3rd Cir.1997) (trustee was not permitted to assign pre-judgment tort claims because state law prohibited such assignment); *In re Paul*, 355 B.R. 64, 68 (Bankr. N.D. Ill. 2001) ("[Section] 363(b)(1) does not expand a trustee's rights in property of the estate beyond those held by the debtor.").[19]

51.     As outlined above, federal trademark law (the applicable nonbankruptcy law here)[20] prohibits the Debtors from freely assigning their right to use the Bang Trademark. *See,*

---

[19] Unlike section 365(f), which generally permits the assignment of an executory contract "notwithstanding a provision . . . in applicable law, that prohibits, restricts or conditions the assignment of such contract" (subject to the exception in section 365(c)), section 363 contains no similar "notwithstanding" language that limits the enforceability of non-bankruptcy law restrictions on transfer. The specificity of section 365(f)—which shows that Congress clearly knew how to limit restrictions on transfer when it wanted to—counsels against reading any similar limit on the enforceability of non-bankruptcy law restrictions on transfer into section 363 in the absence of express language to that effect. *See U.S. Bank Trust Nat'l Ass'n v. AMR Corp. (In re AMR Corp.)*, 730 F.3d 88, 107 (2d Cir. 2013).

[20] The Debtors' assertion that California state law – and its general "policy" of free transferability of property – applies here is incorrect. The 5% Continuing Royalty and the Permanent Injunction were specifically awarded under, among other things, federal trademark law—the Lanham Act. Award at 149. *See* MSJ Opposition ¶¶ 72.

19

*e.g., In re XMH Corp.*, 647 F.3d at 695. Section 363(b) does not authorize the Debtors to sell the right to use the Bang Trademark to anyone who will continue to pay the 5% Continuing Royalty, because they have never had that right under nonbankruptcy law.

52.     The Debtors are also precluded from arguing that § 365(f) of the Code permits them to assign the right to use the Bang Trademark without the licensor's consent. Courts in the Eleventh Circuit have held that § 365(c), rather than § 365(f), applies where there is specific law that excuses a non-debtor contracting party from accepting performance from a third party (including trademark law). *See In re Quantegy, Inc*., 326 B.R. 467, 470 (Bankr. M.D. Ala. 2005) ("Section 365(f) allows assignment despite applicable law prohibiting assignment. Section 365(c)(1) limits that right only where the applicable law actually excuses performance or acceptance of performance to or from a third party."); *Matter of Fulton Air Serv., Inc*., 34 B.R. 568 (Bankr. N.D. Ga. 1983) (same).

53.     Under federal trademark law, the 5% Continuing Royalty—even if non-executory and not subject to the provisions of section 365—cannot be transferred under section 363 without Orange Bang and Monster's consent.

## VI.    **EVEN IF THE 5% CONTINUING ROYALTY IS NOT A TRADEMARK LICENSE, IT – TOGETHER WITH THE INTERTWINED 2010 SETTLEMENT – IS AN INTEGRATED EXECUTORY CONTRACT SUBJECT TO THE CURE REQUIREMENTS OF SECTION 365(b).**

54.     Even assuming *arguendo* that the 5% Continuing Royalty is found not to be a trademark license, the 5% Continuing Royalty—together with its constituent parts, the Permanent Injunction and the 2010 Settlement Agreement—would still constitute an executory contract, the assumption and assignment of which would be subject to the "cure" requirements of section 365 of the Code.

55.     As discussed above, there are material ongoing performance obligations outstanding on the part of both parties, rendering the 5% Continuing Royalty an executory contract

under section 365.[21] Moreover, per the Award, the 2010 Settlement Agreement remains in full force and effect, Award at 177; and the Debtors and Orange Bang/Monster have material ongoing performance obligations under that Agreement as well: among other things, the Debtors and Orange Bang/Monster agreed not to oppose pending, *or future*, trademark applications with respect to each other's respective Bang marks and agreed to provide certain consents to register trademark applications in their respective classes.[22]

56.     These continuing obligations render the 5% Continuing Royalty and the 2010 Settlement Agreement executory on both sides. Moreover, because the 2010 Settlement Agreement provides the framework and foundation for the prospective relief in the Award (*i.e.,* the 5% Continuing Royalty and Permanent Injunction), any assumption and assignment of the 5% Continuing Royalty (which would be subject to the Permanent Injunction), would also require the assumption and assignment of the 2010 Settlement Agreement. It is black-letter law that an executory contract must be either assumed in its entirety, *cum onere*, or completely rejected. *See, e.g., In re Ecoventure Wiggins Pass, Ltd.,* 406 B.R. 123, 128 (Bankr. M.D. Fla. 2009) (citing *In re Aneco Electrical Construction, Inc*., 326 B.R. 197, 201 (Bankr. M.D. Fla. 2005) ("[S]imply because a debtor determines that it wishes to maintain the benefits of a contract and not the concurrent obligations does not mean that a debtor can, under Code § 365, accept the benefits and reject the burdens.  It is black-letter law that an executory contract must be either assumed in its entirety, *cum onere*, or completely rejected.")). *See also* Cure Notice (listing the 2010 Settlement Agreement on the list of executory contracts that may be assumed and assigned).

57.     The Award's provision for the 5% Continuing Royalty, the springing Permanent Injunction, and the survival of the 2010 Settlement Agreement, are inextricably intertwined and

---

[21] *See* discussion at ¶¶ 41, 42, *supra*.
[22] 2010 Settlement Agreement at 4-5 (¶ III.7.E-L).

DOCS_LA:348076.4 57536/00001
69930474;1

taken together constitute a single executory contract. Indeed, the Award explains that "the fundamental purpose of the equitable remedies of specific performance and the issuing of the Permanent Injunction (now stayed by virtue of the VPX 5% Continuing Royalty Election) is to ensure compliance with the 2010 Settlement Agreement."[23] The Award expressly states that the 2010 Settlement Agreement survives and remains in full force and effect. Award at 177. The Permanent Injunction is keyed to the 2010 Settlement Agreement and phrased with specific reference to provisions and defined terms therein. *See id.* at 135-36.

58.    Thus, the Award makes clear that the prospective provisions of the Award under the 5% Continuing Royalty (which would be subject to the terms of the Permanent Injunction in the event of non-payment, as the Debtors concede)[24] and the Debtors' rights and obligations under the 2010 Settlement Agreement, are inextricably intertwined. As such, even if the right to use the Bang Trademark in exchange for the 5% Continuing Royalty under the prospective provisions of the Award is determined to be assignable without Orange Bang/Monster's consent, any buyer of the Debtors' assets seeking to enjoy that right would also have to take on the Debtors' rights and obligations under the 2010 Settlement Agreement.

---

[23] *Id.* at 177; *see also id.* at 143 ("[I]n many respects, the entire purpose of the Permanent Injunction in the first instance is to ensure compliance with the 2010 Settlement Agreement"); at 147 ("Thus, one of the stated objectives underlying the imposition of the Permanent Injunction is to enforce specific performance of the 2010 Settlement Agreement (or the payment of the 5% Continuing Royalty in lieu thereof) . . . ."); at 149-50 ("[T]he award of specific performance . . . and the award of the Injunction and, in lieu thereof, the award of the 5% Continuing Royalty, both of which are intended to prevent future trademark infringements *and* future violations of the 2010 Settlement Agreement (a co-existence agreement which itself is a covenant not to sue for trademark infringement so long as the parties stay in their agreed-upon 'lanes') are therefore rationally derived from and related to the contract, the 2010 Settlement Agreement, and the potential breach thereof."); at 153 ("To put it another way, the 5% Continuing Royalty now payable because of the VPX 5% Continuing Royalty Election is the mechanism designed to ensure compliance with the 2010 Settlement Agreement and to obviate accounting and payment disputes between the parties.").

[24] *See* MSJ ¶ 77 ("Either the buyer will pay the Continuing Fee or be enjoined from selling Bang branded products."), ¶ 62 ("Plaintiffs do not contest that the conditions necessary to maintaining the Continuing Fee Election will remain enforceable as to any assignee, and nothing in the Award or under nonbankruptcy law prohibits Plaintiffs from transferring their rights under the Continuing Fee Election subject to the Award's terms."), ¶ 41 ("[A]ny buyer of Plaintiffs' rights in the Bang Mark is entitled to continue selling Bang Products as long as it pays the Continuing Fee.").

59.     The assumption and assignment of the integrated executory contract, comprised of the 5% Continuing Royalty (subject to the terms of the Permanent Injunction) and the 2010 Settlement Agreement, is subject to the "cure" and compensation requirements of section 365(b) with respect to prior defaults. Section 365(b)(1) requires that, "[u]pon assuming an executory contract or unexpired lease under section 365 the estate must (i) cure all defaults, (ii) compensate the other party for any pecuniary losses arising from any such defaults, and (iii) provide adequate assurance of future performance under the agreement.  Moreover, the estate becomes liable for performance of the entire contract, as if bankruptcy had never intervened." *GATX Leasing Corp. v. Airlift International, Inc. (In re Airlift International, Inc.)*, 761 F.2d 1503, 1508 (11th Cir. 1985) (citations omitted); *see also In re FPSDA I, LLC*, 450 B.R. 392, 397-401 (Bankr. E.D.N.Y. 2011) (where multiple contracts constituted "one controlling agreement," defaults under both agreements needed to be cured).  Just as in *In re FPSDA*, allowing the Debtors here to "separate parts of an integrated transaction by picking the pieces [they] wish[] to assume and which pieces [they] wish[] to reject" would provide the Debtors with "a windfall at the expense of the creditor by denying the creditor the benefit of its bargained for transaction." *FPSDA*, 450 B.R. at 398.

A.      **The 2010 Settlement Agreement, and the Intertwined License to Use the Bang Trademark Pursuant to the VPX 5% Continuing Royalty Election, May Not be Assumed and Assigned Because There are Material Incurable Non-Monetary Defaults Thereunder.**

60.     The 2010 Settlement Agreement, and the interlinked license to use the Bang Trademark pursuant to the VPX 5% Continuing Royalty Election, may not be assumed and assigned pursuant to Section 365(b)(1)(A) of the Bankruptcy Code because there are material non-monetary defaults under the 2010 Settlement Agreement that are not subject to cure.

61.     Section 365(b)(1) of the Code provides that, if there has been a default under an executory contract, the debtor may not assume the contract unless, among other things, the debtor:

23

(A) cures, or provides adequate assurance that the [debtor] will promptly cure, such default other than a default that is a breach of a provision relating to the satisfaction of any provision (other than a penalty rate or penalty provision) relating to a default arising from any failure to perform nonmonetary obligations under an unexpired lease of real property, if it is impossible for the [debtor] to cure such default by performing nonmonetary acts at and after the time of assumption, except that if such default arises from a failure to operate in accordance with a nonresidential real property lease, then such default shall be cured by performance at and after the time of assumption in accordance with such lease, and pecuniary losses resulting from such default shall be compensated in accordance with the provisions of this paragraph; …

11 U.S.C. § 365(b)(1)(A).[25]

62.    The Award and Final Judgment specifically found that the Debtors breached the 2010 Settlement Agreement for years by selling and marketing their Bang energy drinks in violation of the provisions of paragraph 7 of the 2010 Settlement Agreement. Award at 174. The Debtors' years-long failure to comply with paragraph 7 of the 2010 Settlement Agreement constitutes a non-monetary default that cannot be cured, and thus precludes the Debtors' assumption and assignment of the 2010 Settlement Agreement (and thereby precludes the assumption and assignment of the intertwined 5% Continuing Royalty).

63.    If defaults under an executory contract (that is not an unexpired lease of real property) are non-monetary in nature and incapable of being cured, a debtor may not assume the contract. *Quantum Diversified Holdings, Inc. v. Wienheimer (In re Escarent Entities, L.P.),* 423 Fed. Appx. 462, 465 (5th Cir. 2011) (section 365 precludes assumption of a contract – which is not a real property lease – if a non-monetary default is material and incurable). *See also In re Patriot Place, Ltd.,* 486 B.R. 773, 797 and n.7 (Bankr. W.D. Tex. 2013) (where the agreement is

---

[25] Pursuant to the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, section 365 was revised to provide a limited exception to the requirement that a debtor may not assume an executory contract or unexpired lease without curing, or providing adequate assurance of cure of, any default that applies only if the default "arise[s] from any failure to perform nonmonetary obligations under an unexpired lease of real property." Notably, personal property leases and nonlease executory contracts are "expressly excluded" from this exception to the cure requirement in revised section 365(b)(1)(A). *See* 3 *Collier on Bankruptcy*, ¶ 365.06[3][c] (Rev. 16th ed.). The 2005 revision to section 365(b)(2)(D) "ma[de] it clear that most non-monetary defaults are not exempted from the cure requirements." *In re Empire Equities Capital Corp.*, 405 B.R. 687, 690-91 (Bankr. S.D.N.Y. 2009).

24

not a real property lease, any past incurable nonmonetary defaults by the debtor would result in the contract not being assumable in bankruptcy). Some courts hold that even non-material non-monetary defaults may prohibit assumption and assignment under the cure requirements of section 365(b)(1)(A), *see e.g., Smart Cap. Invs. I, LLC v. Hawkeye Ent., LLC (In re Hawkeye Ent., LLC)*, 49 F.4th 1232 (9th Cir. 2022), while other courts prohibit assumption and assignment where the non-monetary default is material or caused substantial economic detriment. *Escarent Entities,* 423 Fed. Appx. at 465; *In re Chapin Revenue Cycle Management, LLC*, 343 B.R. 728, 731 (Bankr. M.D. Fla. 2006); *In re Vent Alarm Corp.,* 2016 Bankr. LEXIS 1725, *4-6 (Bankr. Dist. P.R. Apr. 18, 2016). Historical non-monetary defaults are considered to be incurable because the breaching party cannot go back in time to cure the default, rendering cure an impossibility.[26]

64.     Here, there exist material non-monetary defaults under the 2010 Settlement Agreement. Specifically, the Debtors committed wholesale violations of paragraph 7 of the 2010 Settlement Agreement, which requires, among other things, that the Debtors comply with the restrictions on sales and marketing of Bang-branded products. Compliance with these restrictions is a non-monetary obligation that the Debtors repeatedly breached. Award at 95-97, 134, 174. The Debtors' failure to comply with these provisions of the 2010 Settlement Agreement constitutes a material default under, and breach of, the 2010 Settlement Agreement as these provisions form the very essence of the parties' agreement regarding the use of the Bang marks. The Debtors' failure to abide by the terms of paragraph 7 from 2010 forward thwarted the very purpose of the 2010 Settlement Agreement and is a historical fact that cannot now be undone. Thus, the Debtors'

---

[26] *Ipso Facto: The Pattern of Assumable Contracts in Bankruptcy*, 40 N.M.L. Rev. 77, 101 (Winter 2010) ("The debtor cannot assume an executory contract unless it cures any defaults under that contract. As a matter of simple logic, then, if certain defaults by their nature cannot be cured, then the debtor cannot assume the contract. And rightly or wrongly, it is accepted that the Code provides that certain defaults – specifically nonmonetary defaults, in which the debtor has failed to comply with an obligation to do something other than pay money – cannot be cured. As a result, once the debtor has defaulted on a nonmonetary obligation, the contract of course cannot be assumed. This idea, that nonmonetary defaults cannot be cured, is grounded on what is known as the 'historical facts doctrine': the debtor's non-compliance with a nonmonetary obligation is a historical fact that cannot be undone, at least in the absence of a time machine.").

failure to comply with these provisions constitutes a material, non-monetary default that cannot be retroactively cured, and precludes the Debtors from assuming and assigning the 2010 Settlement Agreement. *Escarent Entities,* 423 Fed. Appx. at 465.

65.    Likewise, due to the intertwined nature of the 2010 Settlement Agreement and the right to use the Bang Trademark pursuant to the VPX 5% Continuing Royalty Election[27] – which together form a single integrated executory contract – the Debtors' inability to assume and assign the 2010 Settlement Agreement based on incurable non-monetary defaults also results in their inability to assume and assign the Debtors' Bang Trademark use right.

### B.    To the Extent the Defaults are Curable, Cure Requires the Prompt Payment of All Unpaid Amounts Due under the 5% Continuing Royalty and All Damages Caused by the Debtors' Breach of the 2010 Settlement Agreement.

66.    The Debtors have stated that, to the extent the Court determines the 5% Continuing Royalty is an executory contract, they can assume and assign it under section 365 of the Code.[28] They further acknowledge that such assumption and assignment would require a showing of adequate assurance of future performance by a buyer.[29] The Debtors fail, however, to address the "cure" requirements of section 365(b) with respect to the 5% Continuing Royalty; and while the Debtors identify the 2010 Settlement Agreement as an executory contract that may be assumed and assigned, they have listed a cure amount of $0.

67.    A purpose of the cure requirement is "to insure that the contracting parties receive the full benefit of their bargain if they are forced to continue performance." *In re Ionosphere Clubs, Inc.*, 85 F.3d 992, 999 (2d Cir. 1996) (quoting *In re Superior Toy & Mfg. Co.*, 78 F.3d 1169, 1174 (7th Cir. 1996)).  Under section 365(b), "[f]irst, there must be a cure.  This means that the contract … must be brought back into compliance with its terms.  Second, there must be

---

[27] *See* discussion at ¶¶ 58, 59, *supra.*
[28] *See* MSJ ¶ 66; Adv. Compl. ¶¶ 57, 61.
[29] *See* Adv. Compl. at ¶ 61.

DOCS_LA:348076.4 57536/00001
69930474;1

compensation for pecuniary loss to the other party." *See* 3 *Collier on Bankruptcy*, ¶ 365.06[3] (Rev. 16th ed.). *See also Adventure Resources Inc. v. Holland*, 137 F.3d 786, 793 (4th Cir. 1998) (Section 365(b)(1) of the Code specifically requires that "as conditions of the contract's assumption, the [Chapter 11] debtor cure any existing default and compensate all non-debtor parties for actual pecuniary losses that have resulted therefrom.").

68.     The cure of defaults and provision of compensation for pecuniary losses resulting from the Debtors' defaults require the payment of all outstanding pre- and post-petition royalties, in an amount which likely exceeds $31 million.[30] Indeed, if this default is not cured, Orange Bang and Monster would have the right, upon notice, to terminate the stay of the Permanent Injunction, resulting in the Permanent Injunction becoming permanently binding on the buyer, as a successor or assign of VPX/JHO. Award at 157.

69.     In addition, as the assumption and assignment of the 5% Continuing Royalty (subject to the terms of the Permanent Injunction) would necessarily entail the assumption and assignment of the interlinked 2010 Settlement Agreement, the Debtors would be required to cure, and provide compensation for pecuniary losses resulting from, defaults thereunder. As already explained, such cure (and, therefore, assumption and assignment) is impossible; but even if it were, section 365(b) would require payment of the unpaid money damages caused by the Debtors' breach. *In re Fleming Cos.*, 2004 Bankr. LEXIS 198, *13-14 (Bankr. D. Del. Feb. 27, 2004), *aff'd on other grounds*, 499 F.3d 300 (3d Cir. 2007) (where there is an ability to calculate damages caused by the debtors' breach, such quantifiable damages can be cured by prompt payment).

70.     In this case, as reflected in the Award, the actual pecuniary losses resulting from the breach of the 2010 Settlement Agreement were calculated based on the application of a 5%

---

[30] Pursuant to the Award, the 5% Continuing Royalty began accruing on September 20, 2021. Award at 151. The Debtors have not paid the 5% Continuing Royalty for net sales during the pre-petition period (i.e., September 20, 2021 through October 9, 2022). Based on VPX's list of creditors, it appears that the Debtors estimate that they owe Orange Bang and Monster more than $31 million in royalties for the pre-petition period. *See* Bankr. Main Case Dkt. No. 2.

reasonable royalty rate to net sales of Bang branded products, resulting in damages in the amount of $101,525,000. Award at 174. The Award provides that "the calculation of a reasonable royalty is a proper measure of damages for a breach of contract claim under California law[,] … and "is an appropriate methodology to measure the damages suffered by Monster by virtue of VPX's breach of the 2010 Settlement Agreement." *Id.* at 84.[31] Both the Debtors and Orange Bang/Monster agreed that the calculation of a reasonable royalty was "an appropriate damages methodology for … a breach of contract claim … [and was] an appropriate measure of damages for this case." *Id.* at 80. The breach of contract damages based on a reasonable royalty were determined to be $101,525,000. *Id.* at 114, 174. This amount reflects a "reasonable royalty for the pervasive use of the BANG mark by VPX from August 11, 2010 [the effective date of the 2010 Settlement Agreement] to September 19, 2021 [the date through which the expert calculated the royalty base]" which "lost licensing income should have flowed to Orange Bang from a[] licensing agreement with VPX based on a reasonable royalty." *Id.* at 113-14. Thus, the damages based on the Debtors' breach of the 2010 Settlement Agreement have been quantified, and these reflect the actual pecuniary losses, through September 19, 2021, which are required to be paid under section 365(b).[32]

---

[31] *See also* Award at 84 ("The classic approach for the determination of a reasonable royalty … is to conduct a hypothetical negotiation pursuant to the [factors articulated in *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F.Supp 1116 (S.D.N.Y. 1970)] and then determine the royalty base, which represents the net sales generated by the infringement [or by the breach of the contract], and multiply it by the reasonable royalty rate, which represents the amount of damages owed to the aggrieved party. … The *Georgia-Pacific* factors are 'a reasoned economic framework for a hypothetical negotiation [which] attempts to ascertain the royalty upon which the parties would have agreed had they successfully negotiated an agreement just before the infringement [breach] began.'") (Citation omitted).

[32] Based on Orange Bang's and Monster's election, the Award provided the highest damage amount, $175 million, based on disgorgement of profits attributable to trademark infringement. The Award, however, also provided for a calculation of damages based on a reasonably royalty attributable to breach of contract in the amount of $101,525,000. It is this amount, at a minimum, that reflects the actual pecuniary loss to Orange Bang and Monster for breach of the 2010 Settlement Agreement.

71.     To the extent that the Debtors are authorized to assume and assign the 2010 Settlement Agreement, the amount necessary to cure the defaults thereunder, would be no less than $101,525,000 (through September 19, 2021), with additional unpaid amounts accruing thereafter which the Debtors have calculated to be in excess of $31 million.  In addition, the Award provides for costs and attorney's fees in favor of Orange Bang and Monster, as prevailing parties, in the amount of approximately $9.3 million.  Award at 151, 165-173, 176.  It is beyond cavil that these amounts must be paid.  *In re Williams*, 2011 Bankr. LEXIS 2463, *3 (Bankr. D. Del. June 24, 2011) ("It is beyond cavil that attorneys' fees incurred because of actions taken to enforce the underlying lease or contract may be properly recoverable as part of a cure payment if such lease or contract provides for attorneys' fees.").

72.     In sum, to the extent that the Debtors are authorized to transfer the right to use the Bang Trademark, they must provide for cure of all past-due amounts under the 5% Continuing Royalty and cure of, and compensation for, defaults under the 2010 Settlement Agreement, as well as adequate assurance of ongoing and future performance.

## VII.   IN THE EVENT THAT THE COURT AUTHORIZES THE TRANSFER OF THE RIGHT TO USE THE BANG TRADEMARK WITHOUT THE CONSENT OF ORANGE BANG AND MONSTER, THE DEBTORS SHOULD BE REQUIRED TO RESERVE PROCEEDS OF THE SALE TO PROTECT ORANGE BANG'S AND MONSTER'S CONSENT AND CURE RIGHTS ON APPEAL.

73.     In the event that the Court authorizes the transfer of the Debtors' right to use Orange Bang's Bang Trademark to a third party purchaser without the consent of Orange Bang and Monster, Orange Bang and Monster request that the Court require the Debtors to reserve proceeds of the sale in an amount that is no less than the total unpaid cure or compensation amounts relating to the Debtors' defaults requested herein as adequate protection of Orange Bang's and Monster's consent and cure rights with respect to its interest in the Bang Trademark and the use of the Bang Trademark by any new licensee/purchaser under section 363(e).  *See In re Payne*, 512 B.R. 421,

427 (Bankr. E.D.N.Y. 2014) (("[A] trustee may not sell property under § 363(b) or (f) without the Court providing 'adequate protection' to an 'entity that has an interest' in the property to be used, sold, or leased, if such entity has requested such protection. 11 U.S.C. § 363(e)."); *In re Tel-A-Communications Consultants, Inc.,* 50 B.R. 250, 253 (Bankr. Conn. 1985) ("Code §365(b)(1)(A) requires a lessee in default to cure or give adequate assurance of a prompt cure of the entire default, both prepetition and post petition.  Therefore protection under Code § 363(e) which does less may be inadequate."). *See also In re Lucky Brand Dungarees, LLC*, 2020 Bankr. LEXIS 3642, *68 (Bankr. D. Del. Aug. 12, 2020) (order approving sale and assumption and assignment of executory contracts contained reservation of rights by non-debtor licensee with respect to, among other things, a request for adequate protection under section 363(e) with respect to the non-debtor licensee's rights, interests and claims under licensing agreement with the debtor).

## CONCLUSION

74.    The assignment of the right to use the Bang Trademark without the consent of the trademark owner is prohibited under federal trademark law. As a result, the 5% Continuing Royalty cannot be sold or assigned under either section 365 or 363 of the Code.

75.    In addition, the requested relief should be denied because the 2010 Settlement Agreement (and therefore the intertwined 5% Continuing Royalty in lieu of the Permanent Injunction) cannot be assumed and assigned by virtue of the incurable non-monetary defaults thereunder.

76.    Alternatively, if the Court determines that the Debtors may transfer their right to use the Bang Trademark without Orange Bang's consent, its order should clarify that (i) such transfer must include the Debtors' rights and obligations imposed not only by the 5% Continuing Royalty and the Permanent Injunction, but also under the 2010 Settlement Agreement to which they are tied; (ii) the foregoing necessitates curing the monetary defaults under the 5% Continuing

Royalty and compensating for the defaults under the 2010 Settlement Agreement by paying all

unpaid pre- and post-petition royalties (estimated to exceed $31 million) and the unpaid breach of

contract damage award with respect to the 2010 Settlement Agreement in the amount of at least

$101,525,000, as well as the approximately $9.3 million award of attorneys' fees and costs; and

(iii) the Debtors are required to reserve proceeds of the sale in an amount necessary to protect

Orange Bang's and Monster's consent rights, as well as the cure and compensation rights asserted

herein, should the Court's order authorizing such transfer be reversed on appeal.

Dated: April 14, 2023

**AKERMAN LLP**

*/s/ Michael I. Goldberg*
Michael I. Goldberg, Esq.
Florida Bar No. 886602
Eyal Berger, Esq.
Florida Bar No. 11069
201 East Las Olas Boulevard, Suite 1800
Fort Lauderdale, FL 33301
T: (954) 463-2700 / F: (954) 463-2224
michael.goldberg@akerman.com
eyal.berger@akerman.com

-and-

**PACHULSKI STANG ZIEHL & JONES LLP**[33]
Richard M. Pachulski (pro hac vice)
Ira D. Kharasch (pro hac vice)
Robert J. Feinstein (pro hac vice)
Teddy M. Kapur (pro hac vice)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067-4003
T: (310) 277-6910 / F: (310) 201-0760
rpachulski@pszjlaw.com
ikharasch@pszjlaw.com
rfeinstein@pszjlaw.com
tkapur@pszjlaw.com

*Counsel to Monster Energy Company*

---

[33] Michael I. Goldberg hereby certifies that the undersigned attorneys are appearing *pro hac vice* in this matter pursuant to court orders dated as follows: (i) Teddy M. Kapur, October 14, 2022 [ECF 103]; (ii) Robert J. Feinstein, October 17, 2022 [ECF 133]; (iii) Richard M. Pachulski, October 18, 2022 [ECF 158]; and (iv) Ira D. Kharasch, October 18, 2022 [ECF 159].

DOCS_LA:348076.4 57536/00001
69930474;1

*AND*

**FENDER, BOLLING AND PAIVA, P.A.**

*/s/ G. Steven Fender*
G. Steven Fender, Esq.
Fla. Bar No. 060992
P.O. Box 1545
Ft. Lauderdale, FL 33302
T: (407) 810-2458
steven.fender@fender-law.com

-and-

**KTBS LAW LLP**[34]
Thomas E. Patterson, Esq. (pro hac vice)
Nir Maoz (pro hac vice)
1801 Century Park East
Twenty Sixth Floor
Los Angeles, CA 90067
T: (310) 407-4000 / F: (310) 407-9090
tpatterson@ktbslaw.com
nmaoz@ktbslaw.com

*Counsel to Orange Bang, Inc.*

---

[34] G. Steven Fender hereby certifies that the undersigned attorneys are appearing *pro hac vice* in this matter pursuant to court orders dated as follows: (i) Thomas E. Patterson, November 8, 2022 [ECF 269]; (ii) Nir Maoz, November 8, 2022 [ECF 270].

DOCS_LA:348076.4 57536/00001
69930474;1

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true and correct copy of the forgoing was served via CM/ECF

Notice of Electronic Filings to all parties registered to receive electronic noticing in this case on

April 14, 2023.

Respectfully submitted,

By: /s/ *Michael I. Goldberg*
Michael I. Goldberg, Esq.
Florida Bar No. 886602
michael.goldberg@akerman.com
**AKERMAN LLP**
201 East Las Olas Blvd., Suite 1800
Fort Lauderdale, FL 33301-2999
Tel: 954-463-2700
Fax: 954-463-2224

DOCS_LA:348076.4 57536/00001
69930474;1