Page 1

1                    UNITED STATES BANKRUPTCY COURT
                      SOUTHERN DISTRICT OF FLORIDA
2

3

4     IN RE:                        CASE NO. 22-17842-PDR

5     VITAL PHARMACEUTICALS, INC.,

6              Debtor.
      _____/
7     VITAL PHARMACEUTICALS, INC.,

8              Plaintiff,
      v                              ADV. NO. 23-1051-PDR-A
9
      JOHN H. OWOC and MEGAN E. OWOC.,
10
               Defendant.
11    _____/

12            ECF #1164(main) and #20(adversary)

13                      April 25, 2023

14              The above-entitled cause came on for hearing

15    before the Honorable Peter D. Russin, one of the Judges in

16    the UNITED STATES BANKRUPTCY COURT, in and for the

17    SOUTHERN DISTRICT OF FLORIDA, at 299 E. Broward Blvd.,

18    Fort Lauderdale, Broward County, Florida, on April 25,

19    2023, commencing at or about 1:30 p.m., and the following

20    proceedings were had.

21

22

23        Transcribed from a backup digital recording by:
                    Cheryl L. Jenkins, RPR, RMR
24

25

1

APPEARANCES VIA ZOOM:

2

3                BERGER SINGERMAN, by
                JORDI GUSO, Esquire

4                      and
                LATHAM & WATKINS, by

5                HUGH MURTAGH, Esquire
              AMY QUARTAROLO, Esquire

6             On behalf of the Debtor

7                 SEQUOR LAW, by
              JUAN MENDOZA, Esquire

8                      and
             LOWENSTEIN SANDLER, by

9             RACHEL MAIMIN, Esquire
           On behalf of the Official

10       Committee of Unsecured Creditors

11

12             SHRAIBERG PAGE, by
           BRADLEY SHRAIBERG, Esquire

13           PATRICK DORSEY, Esquire
        On behalf of John and Megan Owoc

14              ALSO PRESENT

15    ECRO - Electronic Court Reporting Operator

16            - - - - - - -

17

18

19

20

21

22

23

24

25

1                    (The following was transcribed from a backup

2      digital recording and not from the main DAR recording due

3      to the courthouse being closed.)

4                    THE COURT:  Good afternoon everybody.

5      Calling Vital Pharmaceuticals versus Owoc,

6      Adversary 23-1051.

7                    Appearances, please.  I'll just go through

8      the Zoom screen.

9                    Ms. Maimin.

10                   MS. MAIMIN:  Good afternoon, your Honor.

11     Rachel Maimin on behalf of the Committee of Unsecured

12     Creditors.

13                   THE COURT:  Thank you.

14                   Mr. Murtagh.

15                   MR. MURTAGH:  Good afternoon, your Honor.

16     It's Steve Murtagh, of Latham & Watkins, on behalf of the

17     debtors.

18                   THE COURT:  Thank you.

19                   Mr. Guso.

20                   MR. GUSO:  Good afternoon, your Honor.

21     Jordi Guso, of Berger Singerman.  We are co-counsel to the

22     debtors, along with Latham & Watkins.

23                   THE COURT:  Thank you.  Ms. Quartarolo.

24                   MS. QUARTAROLO:  Good afternoon, your Honor.

25     Amy Quartarolo, of Latham & Watkins, on behalf of the

1    debtors.

2                    THE COURT:  Thank you.

3                    Mr. Mendoza.

4                    MR. MENDOZA:  Good afternoon, your Honor.

5    Juan Mendoza on behalf of the Official Committee of

6    Unsecured Creditors.

7                    THE COURT:  Thank you.

8                    And Mr. Shraiberg.

9                    MR. SHRAIBERG:  Good afternoon, your Honor.

10   Brad Shraiberg on behalf of Jack and Megan Owoc.

11                   I'm joined today with my partner,

12   Mr. Patrick Dorsey.

13                   THE COURT:  Okay.  Thank you.

14                   Any other appearances?

15                   (No verbal response.)

16                   THE COURT:  All right.  So, this hearing is

17   on Docket Entry Number 20 in the adversary, on the motion

18   for summary judgment filed by the debtors.

19                   I have read everything, and I guess the way

20   to go would be, you know, the debtor would argue those

21   issues that it wishes to emphasize.  I may have some

22   questions in between, and then we'll move to the Owocs,

23   and then a brief reply by the debtor.  Does that work?

24                   Who's going to be arguing this, Mr. Murtagh?

25                   MR. MURTAGH:  That's me, your Honor.

```
 1                    THE COURT:  Okay, and how much time do you
 2    think you need on your argument?
 3                    (Inaudible.)
 4                    MR. MURTAGH:  I imagine 20 to 25 minutes
 5    should be good.
 6                    THE COURT:  Okay.  Ms. Maimin, could you
 7    maybe mute yourself?  There is some (inaudible) sound
 8    coming through you.  There.
 9                    Okay.  All right.  20, 25 minutes.
10                    All right.  Mr. Shraiberg.
11                    MR. SHRAIBERG:  Two things.  One, I don't
12    know if it's my connection, but debtors' counsel seems
13    very distant.  It's a little hard to hear.  I don't know
14    if that's for everyone or just my --
15                    THE COURT:  Yes, no, I'm having the same
16    issue.
17                    Mr. Murtagh, is there a way to increase your
18    volume, perhaps, or --
19                    MR. MURTAGH:  I'm sure there is, your Honor.
20    I might need 30 seconds to (inaudible) --
21                    THE COURT:  Tech support never takes 30
22    second, ever.
23                    MR. SHRAIBERG:  And it may be a good segue,
24    the second motion on your calendar may be significantly
25    quicker than the summary judgment, the motion to extend
```

1    time.

2                    THE COURT:  Yes, filed by the -- filed by

3    you.  That's relating to the committee, correct?

4                    MR. SHRAIBERG:  Correct, your Honor.

5                    THE COURT:  Okay.  We can do that first,

6    that's fine.

7                    Let me hear then appearances for

8    (inaudible).

9                    MS. MAIMIN:  Your Honor, Rachel --

10                   THE COURT:  Well, actually, hold on one

11   second, Ms. Maimin.  Let me just call the case first,

12   because (inaudible) yet and it's in the main case.

13                   Vital Pharmaceuticals, 22-17842.

14                   All right.  Now let me hear appearances for

15   those that need to appear for that matter.

16                   MS. MAIMIN:  Good afternoon, your Honor.

17   Rachel Maimin (inaudible).

18                   THE COURT:  Ms. Maimin, you have an echo

19   going on.

20                   See, I am winning this argument on personal

21   appearances, okay?

22                   Anyway, who else needs to appear,

23   Mr. Dorsey?

24                   MR. DORSEY:  Yes, Judge.  Patrick Dorsey on

25   behalf of the Owocs.  I'll be arguing the motion.

```
 1                    THE COURT:  Okay, and who else --

 2                    MR. MENDOZA:  Judge --

 3                    THE COURT:  -- needs to appear for this

 4   (inaudible) particular matter.

 5                    MR. MENDOZA:  Good afternoon, your Honor.

 6   Juan Mendoza on behalf of the Official Committee of

 7   Unsecured Creditors.

 8                    THE COURT:  Okay.  Thank you.

 9                    I'm going to mute Mr. Murtagh.  So, there we

10   go, that should help.

11                    Anyone else?

12                    (No verbal response.)

13                    THE COURT:  No?

14                    MS. QUARTAROLO:  Sorry, your Honor.

15   Amy Quartarolo, of Latham & Watkins, on behalf of the

16   debtors, to the extent there is issues that relate to us.

17                    THE COURT:  Okay.  Thank you.

18                    Anyone else?

19                    (No verbal response.)

20                    THE COURT:  All right.  So, Ms. Maimin, for

21   some reason whatever is happening in your -- on your -- in

22   your office is coming through.

23                    So, all right, who is arguing on behalf of

24   the movant?

25                    Ms. Maimin, again, there is sound coming
```

1    through (inaudible) --

2                    MS. MAIMIN:  (Inaudible.)

3                    THE COURT:  I can't understand a word you're

4    saying because it's also echoing.  So, let's just keep it

5    muted.

6                    Okay.  Mr. Dorsey.

7                    MR. DORSEY:  Yes, your Honor.  Would you

8    like me to proceed?  I'm sorry, there has been a lot of

9    back-and-forth.

10                    THE COURT:  Yes, please proceed, and just

11   everyone remember me when you're on a plane coming down to

12   Florida for hearings in person, that's all I'm saying.

13                    Go ahead.

14                    MR. DORSEY:  With that being said, Judge,

15   good afternoon, Patrick Dorsey, on behalf of Jack and

16   Megan Owoc.  This is their motion to extend time to

17   respond to discovery requests at ECF Number 1164.

18                    Judge, you're very familiar with the history

19   between the Owocs and the committee on the discovery, so I

20   won't get into it.

21                    I will just say that the Owocs did not

22   respond to their discovery request under prior counsel,

23   and once my firm entered the case, we negotiated an agreed

24   order with the committee, which is at ECF Number 1150.

25   The agreed order sets out deadlines for the Owocs to

1  respond to discovery, but it says that those deadlines can

2  be extended for cause.

3              I would like to represent to the Court that

4  "cause" (inaudible) the order was a key term of that order

5  from the Owocs' perspective.

6              The primary reason for that is that since

7  his termination from the debtors, Mr. Owoc does not have

8  access to work email, the corporate documents that he did

9  earlier on in the case when he was still CEO.

10              I think, we believe, and I don't think the

11  committee would dispute this fact, that given that most of

12  the responsive documents are going to be on his

13  smartphone, Mr. Owoc texts regularly, both for business

14  and personal purposes.  He obtained a third-party vendor

15  to image the phone, and make those text messages

16  searchable, but at the time the agreed order was entered

17  into, we didn't know how many texts we were dealing with,

18  was it 5, was it 5 million, we didn't know, and so given

19  the uncertainties, we included that cause provision, and I

20  would like just to underscore, this was an agreed order,

21  that cause provision was consented to by the committee --

22  the cause provision, excuse me.

23              The committee gave us approximately 80

24  search terms to run on Mr. Owoc's phone.  We did so

25  through the third-party vendor, and we have about, in

Page 10

1    excess of 25,000 pages of texts to go through.

2                    It simply would not have been possible to go

3    through these texts under the timeframes in the original

4    agreed order.

5                    And let me introduce something, your Honor,

6    that is beyond the purview of the motion that came to

7    light following its filing, it's not just an issue of

8    Mr. Owoc reviewing those texts, personally, for his

9    personal privilege, if any, and for responsiveness.

10                    The debtors are the holders of the corporate

11    privilege.  Mr. Owoc did a lot of work texts on his phone,

12    and so in addition to being reviewed by Mr. Owoc,

13    personally, the texts need to be reviewed by the debtors

14    prior to being turned over to the committee.

15                    In addition, my understanding, the debtors

16    want to sit in on a Rule 2004 Examination given by

17    Mr. Owoc so they can raise the privilege if and when that

18    issue comes up.

19                    So the reason we haven't begun rolling

20    production to the committee yet is, again, we started the

21    review on our end, but we also need to run these documents

22    by the debtors, and I have reached out to the debtors, and

23    they have been very responsive, and we're getting on the

24    same page.

25                    So, we think cause exists, first and

Page 11

1    foremost, given the volume of texts at issue, and needs to

2    coordinate with the debtors on this point.

3                      Number two, the agreed order was entered on

4    April 10th.  As your Honor is very aware (inaudible)

5    your Honor's ruling in the docket earlier, on April 11th,

6    the debtors filed a motion to hold Mr. Owoc in contempt

7    for making comments on his Instagram account.

8                      Again, I understand the Court has ruled on

9    that issue.  I'm not here to argue the merits of that, but

10   during the week of April 11th, to approximately

11   April 18th, the very time during which we were, you know,

12   expecting to go over discovery issues with Mr. Owoc and

13   commence production to the committee, there was a hearing

14   held on, I believe, two days' notice, there was a trial,

15   there was supplemental briefing, and the Owocs and their

16   counsel, obviously, expended substantial time and energy

17   dealing with those contempt issues.

18                      And the third reason we think cause exists,

19   Judge, is that at the time the agreed order was entered

20   into, the committee was going to examine the Owocs in

21   mid-April.

22                      The committee let me know around that

23   timeframe that those examinations would be continued to

24   May.  The committee unilaterally set the Owocs for

25   examination on April 2nd, 4th and 5th.  I think, those

1    dates, there is a conflict on our end, and there may be on

2    the debtors' end as well.  The Owocs have said to the

3    committee we're available on May 22nd, 23rd, and 24th, if

4    that works for you.  The parties are still discussing that

5    issue, and so even if the Owocs' examinations are now

6    going to occur in May -- I understand the committee's

7    frustration 100 percent, I wish my firm had been in this

8    matter from the beginning and, frankly, I don't think we

9    would be at this juncture, but the larger point is, is

10   that if the Owocs are not going to be deposed until mid to

11   late May, I don't think a short extension of time to

12   complete their production is going to prejudice the

13   committee.

14              So for those three reasons, Judge, the

15   volume of documents, and the need to coordinate with the

16   debtors, the time and energy that was absorbed in the

17   contempt hearing, and the fact that the Owocs'

18   examinations have been moved, we think an extension is

19   appropriate under the "for cause" standard that was,

20   again, stipulated to by the committee.

21              THE COURT:  All right.  Mr. Dorsey, and just

22   to be clear, you're asking for an extension through

23   April 28, is that right, three days from now?

24              MR. DORSEY:  So, your Honor, when the motion

25   was filed, it was April 28th.  The only thing I would ask

1  the Court, and maybe this isn't before the Court right

2  now, if the Owocs are not being examined until May 22nd,

3  23rd and 24th, which are the dates we have given to the

4  committee, I would request a longer extension, but that's

5  -- maybe we can (inaudible) and discuss that.

6              THE COURT:  All right.  Let me ask you a

7  couple of other questions.

8              It's true that part of the reason you were

9  not counsel is because the Owocs had other counsel, all of

10  whom have been dismissed as counsel, correct?

11             MR. DORSEY:  I think, technically, Mr. Luna

12  has been stipulated out of the adversary.  We entered an

13  appearance in this case.  I do not know off the top of my

14  head if Mr. Luna has formalized his withdrawal in the main

15  case.

16             THE COURT:  Okay, but the issue with not

17  having counsel, or having counsel change, or not having

18  you as a counsel has been at Mr. Owoc's -- you know,

19  that's his own decision, to change counsel from time to

20  time, which has occurred in this case, correct?

21             MR. DORSEY:  Yes.  Yes, sir.

22             THE COURT:  Okay, and the distraction, if

23  you will, with respect to the contempt proceedings, and

24  now that you have my ruling, I found that they were caused

25  by Mr. Owoc himself.

1              So not to produce documents because you're

2     distracted by something you're doing, you know, sort of

3     falls on deaf ears, if you will.

4              MR. DORSEY:  Well, let me, if I could give a

5     slight pushback on that issue, Judge.  Mr. Owoc did turn

6     over his phone to a third-party vendor.  It has been

7     imaged.  We are retaining outside --

8              THE COURT:  When was that?

9              MR. DORSEY:  Right around the time that we

10    entered into the agreed order with the commitment, right

11    around the time of the contempt hearing.

12             THE COURT:  That same day, or within a day?

13             MR. DORSEY:  On the eve of the contempt

14    hearing, your Honor, we had a --

15             (Two people speaking.)

16             MR. DORSEY:  I'm sorry?

17             THE COURT:  That was the 12th, right,

18    April 12th?

19             MR. DORSEY:  Well, no, the order was entered

20    on April 10th.  So I'm going to assume, without having the

21    docket in front of me, that the contempt hearing was a day

22    or two beforehand, so April 8th, April 9th.

23             We retained the third-party vendor during

24    that timeframe, April 8th, 9th, 10th, right around then.

25    We re -- we got the responsive documents.  I don't want to

1   get over my skis, but I'll represent to the Court,

2   probably about four or five business days after that, and

3   this was right around the time of the contempt motion.

4               So, again, you Honor's point on the contempt

5   motion is well taken, but this isn't just the client

6   reviewing his documents for privilege or responsiveness,

7   it's the attorney as well.

8               THE COURT:  All right.  I understand, and

9   the attorneys would have been available earlier to do so

10  had there not been a change of counsel, correct?

11              MR. DORSEY:  Yes.

12              THE COURT:  Okay, and the estimate of the

13  number of documents that would be produced, the best --

14  the person that's in the best position to estimate that is

15  Mr. Owoc himself, correct?

16              MR. DORSEY:  Yes, we suspected it would be

17  large, but I can tell you, Judge, if you ask me, I'm a

18  (inaudible) on my phone, and I'm not a frequent user of

19  texts, I couldn't, I couldn't tell you off the top of my

20  head.  I don't think it's unreasonable that he said I

21  don't know how many you're going to get in response to

22  these search terms.

23              THE COURT:  I thought there was an estimate

24  of -- given at the time, or at least it was estimated to

25  the point where the agreement was made to produce by a

1    certain date because that would not be a problem.

2                    MR. DORSEY:  Your Honor, I'm a little

3    reluctant to get into the discussions with the committee

4    that occurred in that timeframe, but the number being

5    tossed around for a "for cause" extension at the time by

6    the committee, I think they said, look, if you have

7    something more, like, 5,000, let us know, and that will be

8    cause -- that could be cause for an extension,

9    potentially, and then we got the search results back, and

10   it seemed substantially larger than that.

11                   THE COURT:  Which is, what, 25,000 or

12   something I thought I read?

13                   MR. DORSEY:  Yes.

14                   THE COURT:  Okay, and what about rolling

15   production, why has nothing been produced so far?

16                   MR. DORSEY:  Largely because of the issues I

17   talked about, that we can't just produce -- number one, we

18   can't just produce documents without running them by the

19   debtors, number one.

20                   And then, number two, during kind of that

21   crucial time period of April 11th through, you know, the

22   18th or 19th, there was extensive energy used in a

23   contempt motion that had not been filed when we entered

24   into that agreement, and I understand your point,

25   your Honor's position on the contempt, it's well taken,

1    but I'm just telling you how that interfered with us

2    logistically.

3                    THE COURT:  Understood.  Okay.

4                    All right.  Ms. Maimin, are you arguing

5    this?

6                    MS. MAIMIN:  Yes, Judge.

7                    THE COURT:  Okay.  So, go ahead and make

8    your argument.  You may want to focus on the main points.

9                    MS. MAIMIN:  Yes, your Honor.

10                   This, we believe, is additional

11   gamesmanship, not by counsel, of course, for Mr. Owoc, by

12   Mr. Owoc himself.  He knew from over two months ago, when

13   this notice was served, that his electronic devices were

14   going to have to be searched.  He was represented by

15   extremely competent counsel then, and on and off since

16   then.

17                   These delays, I haven't heard a single

18   excuse for why no production has been made, no rolling

19   production has been made.  I don't understand, to the

20   extent the debtors have to review documents, why that

21   hasn't begun already, why paper documents, or other type

22   of documents haven't been provided for their review

23   already.  I don't understand why the dumping of the phone

24   and that review is taking so long.  It typically takes one

25   day to download a phone, load the documents, you spend the

1   time to review them, and it sounds like, admittedly,

2   Mr. Owoc's counsel was otherwise -- decided to prioritize

3   other things, and now the committee and its members are

4   going to suffer again because of the additional delay, the

5   additional gamesmanship, and when do the delays end,

6   your Honor?  We don't understand when they end.  We

7   haven't been able to get a single document.

8                    THE COURT:  All right.  I understand.

9                    Mr. Dorsey, let me ask you, Ms. Maimin

10  brings up a good point, there are documents, other than

11  electronic documents within a phone, potentially, that

12  could have been produced.  Has anything been found to be

13  produced at this point that's not electronic?

14                   MR. DORSEY:  Well, your Honor, let me divide

15  Meg Owoc and Elite Island from Jack Owoc.

16                   Meg Owoc and Elite Island produced timely

17  documents to the committee, and my office is finishing

18  Bates labeling, and redacting personal information on

19  additional documents, which are being produced today.

20                   So, Meg Owoc and Elite Island are producing,

21  once the production today is made, it's going to be in

22  excess of, I think, 5,000 pages of documents.

23                   So I would respectfully disagree with

24  opposing counsel's view that this is gamesmanship.  They

25  are producing documents.  I just think this is an issue of

1  -- I'm hesitant to throw people under the bus, but it

2  sounds like no action was taken when these 2004 notices

3  were issued way back when, earlier this year, and so we

4  have been -- the Owocs have been working as hard as they

5  can to produce documents in accordance with the agreed

6  order, and they have produced documents, as I said, but

7  that production has been limited for the reasons I said

8  earlier.

9          MS. MAIMIN:  Your Honor, the main issue --

10          THE COURT:  Hold on, hold on one second.

11  Ms. Maimin, hold on one second.

12          MS. MAIMIN:  I'm sorry.  I apologize.

13          THE COURT:  Mr. Dorsey, let me just ask you,

14  have any documents been turned over to the debtor for

15  their review prior to the production to the committee at

16  this point?

17          MR. DORSEY:  No, because we -- the Meg Owoc

18  documents do not implicate, and the Elite Island documents

19  do not, we believe, implicate the same privilege issues

20  that the Jack Owoc documents do.

21          THE COURT:  Well, what about the Jack Owoc

22  documents, have any Jack Owoc documents been turned over

23  to the debtor for reviewing?

24          MR. DORSEY:  Not as of this hearing,

25  your Honor, no.

Page 20

1          THE COURT:  And when do you anticipate that

2    occurring?

3          MR. DORSEY:  We have started review on our

4    end.  So probably tomorrow, I had anticipated sending the

5    first patch of documents to the debtors for their review.

6          THE COURT:  Okay.  So let's get into that a

7    little bit.  I just -- so tell me what the universe looks

8    like.  With respect to Meg Owoc and the entity -- what's

9    the name of the entity again, I forget?

10          MR. DORSEY:  Elite Island.

11          THE COURT:  So, those two entities, that

12    person and that entity have completed their production

13    from your perspective?

14          MR. DORSEY:  We are making a supplemental

15    production from documents that Mrs. Owoc obtained after

16    her initial production, and I've informed the committee

17    that I don't expect any further supplementation.

18          I have said if anything comes up during the

19    Rule 2004, of course let me know, and I'll supplement, but

20    I don't expect to supplement after this.

21          THE COURT:  All right.  So, for the most

22    part, if you get a one-day extension for that production,

23    then you're fine, from your perspective, is that --

24          MR. DORSEY:  Yes.

25          THE COURT:  -- right?

1          MR. DORSEY:  Yes.

2          THE COURT:  Okay.  So that takes care of

3    everybody except for Jack Owoc, correct?

4          MR. DORSEY:  Yes.

5          THE COURT:  Okay.  So, tell me what it looks

6    like, what, there is like 25,000 documents, are they

7    sitting in piles on your desk, and you're going through

8    one by one, and highlighting anything you think might be

9    privileged, or tell me, what does it look like?

10          MR. DORSEY:  Well, it's on an online server,

11   and we have been working with co-counsel, who has not

12   appeared in this case, to assist with the document review.

13          So, again, my understanding is, based on the

14   representation from a third-party vendor, we're dealing

15   with over 25,000 pages of texts, and if your Honor would

16   like, I can pull up search terms given by the committee,

17   so I can give you a flavor of potentially what the texts

18   might include.

19          THE COURT:  So, the twenty -- yeah, I don't

20   know that -- I don't need that, but thank you for that.

21          But the 25,000 documents are being reviewed

22   by someone in your office, and then being transmitted to

23   the debtor for their review, prior to being submitted to

24   the committee?

25          MR. DORSEY:  The way we had envisioned this

Page 22

1    process unfolding is, we review on our end for

2    responsiveness and personal privilege.  We send it to the

3    debtors.  They review for corporate privilege, and then

4    one or the other of us sends them to the committee.

5                    THE COURT:  Okay, and when do you think you

6    will be done with your review, and ready to send to the

7    committee and, frankly, even -- I'm also fine with hearing

8    when you can do a personal completion and production to

9    the committee on a rolling basis, what does that look

10   like, from a --

11                   MR. DORSEY:  I am --

12                   THE COURT:  -- (inaudible.)

13                   MR. DORSEY:  I am absolutely confident we

14   can commence the rolling production of the texts to the

15   committee this week.

16                   If your Honor -- let me put it this way, if

17   the examinations are not until May 22nd, May 23rd and

18   May 24th --

19                   THE COURT:  Let's ignore that for a moment.

20                   MR. DORSEY:  Okay.

21                   THE COURT:  I want to know what it's going

22   to take for you to produce the documents.

23                   MR. DORSEY:  I think this could be done by,

24   and I'm pulling up my calendar, I would like to say

25   May 5th.

Page 23

1              THE COURT:  Okay, then say May 5th.

2              MR. DORSEY:  I'll take that date then.

3    Thank you.

4              THE COURT:  Okay.  No, I'm just trying to

5    get a little bit of a commitment here, because this seems

6    to be -- I mean, as you can imagine from -- at least from

7    my perspective, in looking at the facts, this has been out

8    there since March.

9                   So, you know, we're way past, you know, sort

10   of a reasonable period of time, from what I can tell.  So,

11   and whatever fault that is, not saying it's anyone's fault

12   in particular, I haven't decided that, nor do I

13   necessarily need to at this point, although I can.  You

14   know, there needs to be some commitment here that's

15   actually going to come to fruition, because otherwise,

16   again, it just goes on and on.  So, you're committed to

17   May 5th?

18             MR. DORSEY:  Yes, your Honor, and again, let

19   me reiterate --

20             THE COURT:  Is that to produce, is that to

21   produce to the debtor, or is that to produce the documents

22   to the committee after debtor review?

23             MR. DORSEY:  To the committee.  My -- I'm

24   not going to speak for the debtors --

25             THE COURT:  Okay.

Page 24

1              MR. DORSEY:  -- who are represented by very

2      capable counsel, but my understanding is they can turn the

3      documents around quickly as we provide them to them.

4              THE COURT:  When can you get those documents

5      to the debtor?

6              MR. DORSEY:  We can commence as early as

7      today or tomorrow morning, and I --

8              THE COURT:  By when?

9              MR. DORSEY:  I'll say Wednesday, May 3rd.

10             THE COURT:  Okay.  Ms. Quartarolo, are you

11     going to be speaking on behalf of the debtor?  And I'd

12     just ask you if you got --

13             MS. QUARTAROLO:  Yes.

14             THE COURT:  If you got the documents on a

15     rolling basis, starting in a day or two, and ending by

16     May 3rd, can you be completed with your review and

17     production to the -- or authorized production to the

18     committee by May 5th?

19             MS. QUARTAROLO:  Certainly if it's on a

20     rolling basis, and depending if -- assuming that the

21     volume, full volume isn't held back until the 3rd, I think

22     that is fine.

23             And what we have represented to both

24     Mr. Dorsey and to the committee is that we don't intend to

25     get in the way, but we do need an opportunity to assert

1    the company's privilege, and we will review documents when

2    they're provided to us, and we'll do so efficiently and

3    promptly.

4                    THE COURT:  Okay, and then I assume a

5    privilege log will be prepared, and then the committee can

6    argue over the privilege log if they deem that's

7    necessary, in terms of process, correct?

8                    MS. QUARTAROLO:  Right.

9                    THE COURT:  Okay.  All right.  So,

10   Ms. Maimin, we seem to have somewhat of a commitment to

11   May 5th, and while this is not a motion to -- a motion for

12   contempt, this is a motion to compel -- actually it's a

13   motion -- it's not even a motion to compel.  It's a motion

14   for extension of time, and then in response you're

15   essentially saying, enough is enough, please, produce the

16   documents, which I get, but that's the procedural context

17   in which we're in, it's just an extension of time.

18                   The next step, in any event, would have to

19   be a motion to compel, and if the Court order is not

20   complied with, then a motion for contempt, it seems to me.

21                   So, there are a couple of steps here left to

22   go, and it would be nice to avoid all of that if I could

23   enter an order that the Owocs would comply with, as well

24   as, obviously, debtors' counsel, completes their review,

25   and the documents are produced, and then you all can

1    agree, hopefully, to a depo date that's going to be

2    continued anyway some time thereafter, within a few days,

3    assuming you're comfortable with enough time to review the

4    document for the deposition.  So that's the point I'm

5    trying to get to here.  If none of that -- if that's not

6    complied with, that sets up an entirely different

7    procedure.

8              So, I'm trying to separate, you know,

9    compelling and contempt from where we are now, which is

10   merely an extension.  So, tell me what you can live with.

11             MS. MAIMIN:  The problem, your Honor, is

12   during the course of our investigation, we have learned

13   about third parties who are in possession of significant

14   assets that are going to be dissipated and removed from

15   the estates if we do not act quickly in terms of filing a

16   complaint and taking action in this case, and we need to

17   take these depositions, and want to take these

18   depositions, are entitled to take these depositions before

19   we file those pleadings, and we, and debtors' counsel are

20   available the week of May 8th.

21             What I've heard is a fairly leisurely review

22   schedule, especially given the delays that have happened.

23   We would be happy to agree to a schedule that gets us the

24   documents sufficiently in advance of our being able to

25   take a deposition the week of May 8th, that way --

1              THE COURT:  What date is that, what is

2    sufficiently in advance of that?

3              MS. MAIMIN:  Depending on the quantity,

4    your Honor, we're willing to --

5              THE COURT:  25,000 documents.

6              MS. MAIMIN:  A week.

7              THE COURT:  Which is the 1st, May 1st?

8              MS. MAIMIN:  Yes.

9              THE COURT:  Okay, and are the depos being

10   delayed because you don't have the documents, or is there

11   some other reason you've said that the depos aren't going

12   forward as scheduled?

13             MS. MAIMIN:  The depos are delayed because

14   we have no documents, but we also don't want to delay them

15   until the end of May because of the dissipation of these

16   assets.  We're trying to find a balance.  We've been put

17   in a horrible position because of Mr. Owoc.

18             THE COURT:  And did you have some fear that

19   I would not require Mr. Owoc to sit for deposition twice?

20   Because you should not have that fear under these

21   circumstances.

22             MS. MAIMIN:  It's not that, your Honor.  We

23   think that we can be efficient -- we appreciate that.  We

24   think we can be efficient with Mr. Owoc, but we need to

25   depose him.  We've been wanting to depose him for a very

Page 28

1    long time, and it's now at the point where we are going to

2    be -- the committee is going to be prejudiced if we're not

3    able to take these depositions soon.

4                    Memorial Day weekend is (inaudible) to us

5    nuts in light of what's transpired, and we understand that

6    debtors' counsel is available the week of the 8th, and we

7    think that is when the depositions should happen.  It's,

8    again, later than when we noticed them for.  We're giving

9    yet another agreed opinion adjournment to the deponents.

10                    THE COURT:  I understand.

11                    MS. MAIMIN:  We shouldn't have to do it any

12    further.

13                    THE COURT:  I understand.

14                    All right, and for the law students that are

15    watching, the term "nuts" was a legal term.  Just kidding.

16                    All right.  I get that you're frustrated.

17    Let me go back to Mr. Dorsey.  Can you move the date up,

18    and is the deposition during the week of the 8th something

19    that you can commit to?

20                    MR. DORSEY:  Your Honor --

21                    THE COURT:  And just so you know, my

22    patience is running a little bit short on this because,

23    again, much of the delay, I would not blame you and

24    Mr. Shraiberg by any stretch, but much of the delay, you

25    know, can be laid at the feet of Mr. Owoc.

1           So --

2           MR. DORSEY:  Understood.

3           Judge, with return -- with respect to

4    specific dates, I haven't spoke with my clients about the

5    week of May 8th.  They, again, have given those 22nd,

6    23rd, 24th dates.  If those dates are unacceptable to the

7    committee, this might be an area where we need to discuss

8    this more offline, and either come back after the Court

9    does the summary judgment hearing, or thereafter, because

10   I just don't know the Owocs' availability at this point in

11   time.

12           MS. MAIMIN:  The Owocs are unemployed, they

13   are unemployed.  They --

14           THE COURT:  Ms. Maimin, I --

15           MS. MAIMIN:  But if I've --

16           THE COURT:  Ms. Maimin, I get it.

17   Ms. Maimin, hold on, I get it.  Let me speak to

18   Mr. Dorsey.

19           While it would be inconvenient, and likely

20   not very fun, can you complete the production of the

21   documents by the agreed upon date of April 28th, which is

22   what you asked for, so that the committee (sic) would have

23   from the 28th until the first couple days in May to

24   complete their production, so that then the committee

25   would have, you know, maybe not a week, but would have

```
 1   five or six days to prepare for a depo during the week of
 2   the 8th?  Can that be done?
 3                     MR. DORSEY:  I will do everything I can,
 4   your Honor.  I can't say that it will be done.  If
 5   your Honor orders it, we will do everything we can to make
 6   it happen.
 7                     THE COURT:  Okay.  All right.  So, it's not
 8   -- I don't want to use the term impossible, but it can be
 9   done, essentially, is what I'm hearing?
10                     MR. DORSEY:  I would, I would view the glass
11   not (inaudible), your Honor.
12                     Let me put it this way, if your Honor orders
13   it, we will do absolutely everything we can to make it
14   happen, such as if it hasn't happened, it would be beyond
15   -- circumstances beyond our control.
16                     THE COURT:  What if I were to rule that you
17   were to do it on a rolling basis, and you need to get a
18   high percentage of the documents produced by that date,
19   which can be followed over the next couple of days by the
20   remainder of the documents.  Does that at least give you
21   enough leeway to complete the production so that the
22   debtor can also complete their review and production --
23   not production, but their review and authorization for
24   production by, you know, May 1st, 2nd -- actually let me
25   look and see .
```

1          MR. DORSEY:  Your Honor, I don't know if

2     it's just me, but I can't hear your voice.

3          MS. MAIMIN:  I couldn't either.

4          THE COURT:  How about now?

5          MR. DORSEY:  Yes, I can hear you now.

6          THE COURT:  Okay.  So, sorry, what I was

7     trying -- I touched my phone, and my phone is the

8     microphone, so -- so, what I was suggesting is that you

9     produce on a rolling basis, obviously beginning

10    immediately, or as quickly as possible, and you complete

11    as much of the production, hopefully a very high

12    percentage of the production by April 28th or so, to be

13    followed by whatever remains by May 1st, and then the

14    debtor, of course, review and authorize production, or

15    create the privilege log, or both, on a rolling basis as

16    well, to be completed by, say, May 2nd or May 3rd.  Does

17    that schedule work for you, Mr. Dorsey?

18          MR. DORSEY:  (Inaudible.)

19          THE COURT:  (Inaudible) -- if I order it,

20    I'm asking you, though, if it's rational to expect that

21    you'd be able to do that without, you know, driving

22    everybody crazy?

23          MR. DORSEY:  Yes, I think that's rational,

24    Judge, yes.

25          THE COURT:  Okay.  All right.

```
 1   Ms. Quartarolo, does that work for you, from a timing

 2   perspective?

 3                   MS. QUARTAROLO:  Yes, as we represent

 4   (inaudible) we will not want to slow things down, and so

 5   as soon as information is provided to us, we will review

 6   it as promptly and efficiently as possible.

 7                   THE COURT:  Okay.  So that's what I'm going

 8   to rule, that the production begin, certainly within the

 9   -- you know, by the 28th, and if you can produce earlier,

10   on a rolling basis, begin before that, a high percentage

11   of the documents produced, you know, by the 28th -- start

12   now, a high percentage produced by the 28th, whatever

13   other documents you haven't quite gotten to, produced by,

14   say, May 1st -- when I say high percentage, I'm talking,

15   you know, hopefully 70-plus percent, finish it up by

16   May 1st on a rolling basis, the debtor complete their

17   review and authorization for production on a rolling basis

18   by May 3rd, and throughout that process, a constant

19   rolling production of documents to the committee on a

20   consistent basis, and then I'm not going to order the

21   Owocs to appear during the week of May 8th, but I can

22   assure you that if asked, I may order it, because it seems

23   to me that this has been dragging on for far too long, and

24   needs to come to an end, and these depositions need to

25   take place.
```

1                    Okay.  So, work out the dates, but just

2       understand that, you know, from a discovery perspective,

3       this needs to come to an end, from the Court's

4       perspective, all right?

5                    MR. DORSEY:  Understood, judge.

6                    THE COURT:  Okay.  Anything else we need to

7       do here on this matter, Ms. Maimin?

8                    MS. MAIMIN:  I just wanted to note also, and

9       the Court has stated, that there are a bunch of motions in

10      the air.  I just wanted to note that we still have the

11      right to renew our motion for contempt and sanctions for

12      failure to comply, and we'll let the -- keep the Court

13      posted if that happens.

14                   And we also just wanted to confirm, given

15      the adjustment of these deadlines, that, in fact, the

16      debtors -- that there is no sale objection deadline at

17      this time.

18                   THE COURT:  Okay.  So you're just noting

19      that for the record for everyone --

20                   MS. MAIMIN:  Yes.

21                   THE COURT:  -- to take note.

22                   Okay.  All right.  Understood.

23                   And, Ms. Maimin, you'll prepare the order

24      consistent with what I've just ordered, right, and

25      (inaudible) the document.

1                    MS. MAIMIN:  We will, yes.

2                    THE COURT:  Okay.  All right.  Great.  I'll

3    look forward to receiving that order.

4                    And, you know, there is nothing I love more

5    than a good discovery dispute.  So, please don't bring

6    this back to me again, all right?

7                    MR. DORSEY:  Understood, Judge.  Thank you.

8                    THE COURT:  Thank you all.  Okay.

9                    MS. MAIMIN:  Thank you, your Honor.

10                   THE COURT:  Thank you.

11                   All right.  So now back to the motion for

12   summary judgment.  Let's see, all right, so I think,

13   Mr. Murtagh, you were going to begin that argument, take

14   20 to 25 minutes.  Mr. Shraiberg, you can have also 20 to

15   25 minutes, and then a brief reply, five minutes,

16   Mr. Murtagh, does that work?

17                   MR. MURTAGH:  Yes, your Honor.  Can you hear

18   me better now?

19                   THE COURT:  Yes, it's a little better, yes.

20   So, it's 2:10.  Let's hopefully finish all of this up by

21   3 o'clock, okay?

22                   MR. MURTAGH:  Your Honor, the only --

23                   THE COURT:  3:05, that is, okay?

24                   MR. MURTAGH:  Okay.  I'll put myself on the

25   clock, your Honor.

1          We did have evidentiary issues that were

2   preliminary, I think, to the argument.  I don't know if

3   your Honor wants to hear those or not, or --

4          THE COURT:  Does that relate to the

5   declaration containing hearsay?

6          MR. MURTAGH:  For the debtors it relates to

7   portions of Mr. and Mrs. Owoc's declaration, primarily a

8   couple things.

9          One is there are a number of paragraphs that

10  just state legal conclusions that they own the account,

11  that should not be taken to establish the fact that they

12  own the accounts.

13         There are also a couple of paragraphs that

14  state a legal conclusion as to the content of a persona,

15  that should not be taken for the truth that that is the

16  legal definition of a persona, it's just a legal

17  conclusion.

18         Then there is also a legal conclusion as to

19  the existence of a de facto licensing agreement and,

20  finally, there is a privilege document in Exhibit 1 to

21  Megan Owoc's declaration that should be excluded entirely,

22  and that's the whole thing, your Honor.

23         THE COURT:  Okay.  All right.  So, you can

24  go ahead and take me through those.

25         I will tell you that because, and again this

1    is a -- you know, there is no jury here, and I'm not, you

2    know, persuaded by -- I can tell the difference between a,

3    you know, legal conclusion and a fact.  I don't think fear

4    of, you know, the Court's consideration of those

5    declarations, you know, should be overstated, there

6    shouldn't be much fear, I can tell the difference.

7                    So, hopefully that, you know, can sway some

8    of your concerns, but I'm happy to hear the argument of

9    course.

10                   MR. MURTAGH:  No, your Honor, I don't want

11   to belabor the point.  I think that addresses all of the

12   concerns, with the possible exception of the submission of

13   the one privileged document that Mr. Shraiberg agreed

14   should be (inaudible) from view.  Our request is that it

15   be excluded from consideration, and that's Exhibit 1 to

16   the Meg Owoc declaration.

17                   THE COURT:  All right.  Let me just take --

18   well, tell me the argument.  I don't remember that

19   particular document.  I do remember entering an order that

20   allows that document to be, to be held, you know, not

21   subject to public view.  I think I just entered that

22   order, is that right, Mr. Shraiberg?

23                   MR. SHRAIBERG:  Yes, your Honor.

24                   THE COURT:  Okay.  So, tell me what you're

25   concerned about in terms of the content, and then I can

1    make a ruling.

2                    MR. MURTAGH:  Your Honor, yes, it's -- the

3    email is an exhibit -- it's Exhibit 1, it's an email from

4    in-house counsel to others, plainly within the privilege

5    at the time it was sent, when Meg Owoc was an employee.

6    It reflects legal advice regarding what's in the email.  I

7    think that's common ground, but Mr. Shraiberg can tell me

8    otherwise, and, therefore, under relevant precedent,

9    including Smith v Armour Pharmaceuticals, 838 F.Supp.

10   1577, at 1577, 78, the Court is entitled to, and should

11   ignore all references to, and prohibit citation to that

12   privileged document, and should be -- if your Honor would

13   be willing, to make sure that there is no waiver of any

14   privilege by the disclosure of that document by Ms. Owoc.

15                   THE COURT:  Okay.  Mr. Shraiberg.

16                   MR. SHRAIBERG:  The response is, is that the

17   privilege is narrowly construed.  While we believe that

18   one sentence could potentially fall within the

19   attorney/client privilege, and we would have no problem

20   redacting that sentence.  It's the second sentence that is

21   not protected by the attorney/client privilege, it is a

22   comment to Mr. Owoc, personally, stating that his personal

23   accounts, such as yours and Jack's, would be excluded from

24   the list.  That's not an attorney/client privilege

25   comment.  He's talking specifically -- Mr. Echouse

1    (phonetic) is specifically talking about his personal

2    account, Mr. Owoc's personal account, that's not

3    attorney/client.

4              The first sentence does deal with advice

5    from the Latham team.  That, we would have no problem

6    redacting, but specifically the second sentence, it says

7    personal accounts, such as yours and Jack's, would be

8    excluded from this list.  Further, they are not asking for

9    any access to the accounts at this time.

10             That is just a communication to Mr. Owoc,

11   personally, about Mr. Owoc's personal accounts.

12             THE COURT:  Okay, and what's the, what's the

13   import of that statement, the personal accounts may not be

14   sold, is what I'm understanding.  The list would be the

15   list of those accounts that would be transferred to a

16   buyer, is that right?

17             MR. SHRAIBERG:  Correct, correct, and --

18             THE COURT:  And so what -- on what issue

19   does that impact?  Because it seems to me that just

20   because they would be transferred, doesn't necessarily

21   mean that they're not assets of the debtor, or assets of

22   Jack Owoc, for example.

23             MR. SHRAIBERG:  Understood.

24             THE COURT:  It doesn't really help on that

25   particular issue, does it.

1          MR. SHRAIBERG:  Your Honor, we believe it

2  does.  We're going to be arguing, and I even think that

3  the plaintiffs agree, that this is going to be some type

4  of totality of the circumstances test.

5          We believe that the test should actually be

6  a reasonableness test as to whether -- as to ownership of

7  (inaudible) addressing them as the personal accounts, the

8  three accounts that are at issue.

9          We are using this to show that employees of

10  the debtor believe that these accounts are, in fact, the

11  Owocs' (inaudible) personal accounts, that's the sole

12  relevance of it, and it is just addressing Mr. Owoc's --

13          THE COURT:  I get it, I get it.

14          All right.  So, Mr. Murtagh, what's the

15  privilege then?  I mean, if certain aspects of that

16  document are redacted, this is, it seems to be, an email

17  from counsel for the debtor.  It's not really drawing any

18  legal conclusion, but it's to a non-debtor individual,

19  talking about personal accounts.  Why is that not -- why

20  is that privileged?

21          MR. MURTAGH:  Well, your Honor, it's an

22  email from in-house counsel to Ms. Owoc when she was still

23  employed.  It's --

24          (Two people speaking.)

25          THE COURT:  Is it being sent to her in her

1    capacity as an employee of the debtor, or was it being

2    sent to her -- at least with that one line, in her

3    capacity as a potential owner of -- a personal owner of an

4    account?

5                    MR. MURTAGH:  No, your Honor, it's being

6    sent for approval on a course of action, as Ms. Owoc -- in

7    Ms. Owoc's capacity as an employee, and the sentence that

8    Mr. Shraiberg is reading into the record, despite having

9    agreed this should be redacted from public view until

10   there was a determination made, begins with the statement,

11   the Latham team has advised as follows.

12                    THE COURT:  Okay.  So that's advice to the

13   person who sent the email, right?

14                    MR. MURTAGH:  That's advice from Latham to

15   Mr. Echouse, as in-house counsel, that's being transmitted

16   to Ms. Owoc, as an employee of the debtors.

17                    THE COURT:  Okay.  So, I think it's the last

18   part of your statement that might be in dispute, which is

19   whether it was being transmitted solely to her as an

20   employee of the debtor, or whether it was being

21   transmitted to her so that she had some understanding of

22   what might occur with respect to her personal account

23   and/or Jack Owoc's personal account.  Is that a fair way

24   to potentially read it, Mr. Murtagh, or you disagree with

25   that?

1          MR. MURTAGH:  Your Honor, I don't think

2    that's the proper way to read it.  I can't say no

3    reasonable person could look at it that way.

4          I also don't want to belabor the minor

5    evidentiary points on this too much.  I'd prefer to give

6    your Honor the argument.  If Mr. Shraiberg wants to argue

7    on the basis of the two sentences that he believes are not

8    attorney/client privilege, but could do us the favor of

9    limiting the other disclosure that's in this document,

10   then I think we should just go ahead.  Your Honor

11   understands what it relates to.

12         THE COURT:  Okay, and Mr. Shraiberg, you're

13   not suggesting that you're intending to have any kind of

14   waiver of attorney/client privilege here, correct?

15         MR. SHRAIBERG:  Correct, your Honor, there

16   was -- we are not implying that there is any type of a

17   waiver.

18         THE COURT:  And you're also -- because there

19   is no waiver, and because this is an attorney/client

20   privilege, it would only be attorney/client privilege if

21   Ms. Owoc was receiving it in her capacity as an employee

22   of the debtor, no?

23         MR. MURTAGH:  Correct.

24         THE COURT:  Okay.  So there is no issue

25   there, and you're agreeing not to -- you know, to keep

1   from public view those sensitive portions of the document

2   that might suggest otherwise, right?

3                   MR. MURTAGH:  Correct.

4                   MR. SHRAIBERG:  Hence the filing of the

5   motion.

6                   THE COURT:  Okay.  All right, and then the

7   Court can just give it the weight the Court feels is

8   appropriate, do you agree with that, Mr. Shraiberg?

9                   MR. SHRAIBERG:  Yes, your Honor.

10                  THE COURT:  Okay.  All right.  Mr. Murtagh,

11  does that cover everything for you from an evidentiary

12  perspective?

13                  MR. MURTAGH:  Yes, your Honor --

14                  THE COURT:  Okay.

15                  MR. MURTAGH:  -- it does.

16                  THE COURT:  All right.  So, do I need a

17  separate order on this, or how do you want to --

18                  MR. MURTAGH:  I don't think we need a

19  separate order, your Honor.  I believe Mr. Shraiberg will

20  be sensitive to our concerns and it's understood.

21                  THE COURT:  Okay.  Fair enough.  Okay.

22                  Go ahead, Mr. Murtagh.

23                  MR. SHRAIBERG:  I was just going to say, a

24  housekeeping issue, though, in spite of the order that was

25  entered, the Court still has a copy of that letter, just

```
 1   only the Court can review it, correct?
 2              THE COURT:  I just looked at it.  I don't
 3   know who else can see it, but I can see it.
 4              MR. SHRAIBERG:  Perfect.
 5              THE COURT:  And, again, I am fully capable
 6   of disregarding those aspects that are privileged and not
 7   admissible, not a problem, okay?
 8              MR. SHRAIBERG:  Okay.
 9              THE COURT:  All right.  Okay.  So,
10   Mr. Murtagh, I'll give you an extra six minutes.
11              MR. MURTAGH:  Okay.  Your Honor, I put
12   myself on the clock.  If I can share my screen, we've got
13   some demonstrative exhibits that will lay out how this
14   argument goes.
15              THE COURT:  Yep, that's fine.
16              MR. MURTAGH:  You need to hit the button.
17              THE COURT:  Just, while you're doing that, I
18   have -- I see a chat message originating from Megan Owoc,
19   stating that Jack Owoc would like to speak.  I just want,
20   for the record, everyone to recognize that I don't
21   consider chat messages on Zoom -- I wish I could turn off
22   that function, maybe there is a way to do it, I haven't
23   been able to figure it out, and if Jack Owoc wishes to
24   speak, he needs to speak to his counsel, and speak through
25   his counsel, since this is non-evidentiary, and it would
```

Page 44

1    be inappropriate to hear from him.

2                    Any issues there, Mr. Shraiberg?

3                    MR. SHRAIBERG:  No, your Honor.

4                    THE COURT:  Okay.  All right.  Thank you.

5                    All right.  Go ahead, Mr. Murtagh.

6                    MR. MURTAGH:  Your Honor, are you able to

7    see the presentation now?

8                    THE COURT:  I am.

9                    MR. MURTAGH:  Okay.  So, let's jump in.

10                   Your Honor, preliminary, very quickly on the

11   summary judgment standard, as it's relevant to today's

12   hearing, as is common ground, summary judgment is

13   appropriate if the movant shows there is no genuine issue

14   of material fact.

15                   As your Honor knows, an issue of fact is

16   material if it might affect the outcome of the case under

17   governing law, and it is genuine if the evidence could

18   lead a reasonable jury to find for the non-moving party.

19                   Importantly, your Honor, Rule 56

20   contemplates that a court may grant summary judgment

21   without the party having conducted discovery, and that's

22   Edgewater House from the 11th Circuit.  In that instance,

23   your Honor, as is the instance here, then the non-movant

24   must specifically demonstrate how postponing the Court's

25   ruling would (inaudible) enable him, by discovery or

1   otherwise, to rebut the opposing party's showing of the

2   absence of a genuine issue of fact.

3                And as I'll presently explain, your Honor,

4   defendants cannot make that showing now because they have

5   either conceded or demonstrated through their own

6   evidentiary submission, that the debtors own these

7   personal -- these allegedly personal social media accounts

8   under relevant law.  So that leads to the question, what

9   is the relevant law?

10               There is no law that dictates your Honor

11  follow it in this case.  However, it is not disputed that

12  there is relevant law, and that the entirety of the

13  relevant law are CTLI, Filback (phonetic) and JLM cases.

14               There is no dispute that these cases

15  thoughtfully considered the question whether a company, or

16  an individual associated with the company, owns the social

17  media accounts, there is no dispute that a company can own

18  the social media accounts, and there is no dispute that

19  there is actually no other legal authority for your court

20  on this question.

21               So those are the cases that we are going to

22  rely upon, your Honor, given how similar they are, and how

23  thoughtfully they go through the analysis, and just to

24  spell that out quickly, there is CTLI, LLC, where the

25  Court dealt with the issue of whether a company, or the

1    former -- the founder and former CEO owned a Twitter and

2    Facebook page.  The Court noted the accounts were in the

3    name of the company, the accounts were directly linked to

4    the debtor's business, allegedly personal posts were

5    clearly promotional, and the employees had access to and

6    posted on the account, and concluded that the company

7    owned the account.

8                      THE COURT:  Mr. Murtagh, let me ask you a

9    question about that.

10                     Where it says accounts were in the name of

11   the company, how does one determine the name in which the

12   account is held?

13                     MR. MURTAGH:  In that instance, your Honor,

14   the name of the account was Tactical -- of the page and

15   the Twitter account was Tactical Firearms.  So this is

16   just a reference --

17                     THE COURT:  So, the actual -- it's the

18   actual handle?

19                     MR. MURTAGH:  Yes, your Honor.

20                     THE COURT:  In other words, there is no,

21   like, separate, you know -- you know, you set up an

22   account on a website, and sometimes you put in your email

23   address, or you put in your ID, or whatever, and that

24   might establish who owns the account, but here it's based

25   on the words in the handle?

1              MR. MURTAGH:  That's right, your Honor,

2    because what's important under the Court's analysis is

3    what was the name of the account, and what did that

4    indicate to the public, not whether there was, internally

5    to the systems operating, the name of the user that

6    created the account, or something else that wasn't public

7    facing.  The question that the courts ask is what did the

8    public understand through the name of the account.

9              THE COURT:  I see, okay.

10             MR. MURTAGH:  Similarly, your Honor, there

11   is King v Filback (phonetic), where the Court granted

12   summary judgment on the question that the union owned the

13   Facebook page and user group, created and controlled by

14   the former president.  The court noted that it was created

15   -- the page and the account -- the user group, were

16   created to communicate with union members, they were held

17   out to the public as union pages, promoted on business

18   cards, the official website, and other members of the

19   union had administrative privileges.

20                  And, finally, your Honor, JLM Couture v

21   Gutman (phonetic), from the Southern District of New York

22   from this year, this case follows CTLI, and Filback and

23   synthesizes their analyses into a three-factor test, which

24   is what I'm going to go through with regard to application

25   of the governing law to the undisputed or conceded facts.

1              So, how does JLM synthesize the cases, and

2    the factors to review?  The first is the manner in which

3    the account is held out to the public.

4              Within that, your Honor, the court noted

5    that use of the business or entity name to identify the

6    account to the public weighs heavily in finding that the

7    account is owned by the entity.

8              Second, your Honor, use of the account

9    handle on products, advertisements, and websites of the

10   company also demonstrate company ownership.

11             And, third, within this, links to other

12   company media accounts also tend to demonstrate company

13   ownership, that's the first factor of three.

14             The second, your Honor, is the purpose for

15   which the account has been utilized.  In other words, is

16   it used for business purposes?  Is it used for marketing,

17   advertising, promotion giveaways?

18             Within that, your Honor, the courts, both

19   CTLI and JLM note that there is overt marketing of the

20   kind I just described, and also subtle marketing.  Both

21   note that there is a form of marketing that is appropriate

22   for social media in which lifestyle is tied to the brand,

23   and we'll go through that.

24             And the third, your Honor, is whether the

25   employees of the business access the account in

1   furtherance of business interests, and again, that's all

2   JLM Couture synthesizing CTLI and Filback.  So that's

3   laying out the totality of the relevant law as of today on

4   the subject, your Honor.

5                   THE COURT:  Thank you.

6                   MR. MURTAGH:  So, let's go through those.

7   Starting with number one, the first prong, how are the

8   accounts held out to the public, the company name?  The

9   debtors' assertion is the CEO account handle is employed

10  in the name of the business.  The account handles are

11  @bangenergyceo, @bangenergyceo, and @bangenergyceo on

12  Instagram, TikTok and Twitter, respectfully.

13                  The defendants' concession on this point is

14  that the CEO account handles refer to the CEO of the

15  debtors.  This is Mr. Owoc's declaration, in Paragraph 12,

16  Bang Energy CEO is double entendres that on the one hand

17  obviously referred to my former position as CEO of the

18  debtors.  So, here, on the first prong, defendants concede

19  that the account handles refer to the CEO of the debtors,

20  conceded.

21                  Now Mr. Owoc characterizes that and says at

22  the same time Bang Energy CEO refers to the Jack Owoc

23  persona, literally the Bank Energy CEO.

24                  The problem with that, your Honor, is there

25  -- is there any evidence or any assertion that any person

Page 50

1    other than the defendants were aware of this double

2    entendres, i.e., could the public have known, or is there

3    even an assertion that the public knew that this was a

4    secret second meaning, the answer is, no, there is no

5    evidence, no assertion.

6                So, with regard to the public face of these

7    accounts, all you're left with is an assertion that, yes,

8    in fact, these accounts refer to the company's CEO.

9                Second, your Honor, how are the accounts

10   held out to the public?  Are they used on products?

11               The debtors' assertion is that the CEO

12   Instagram account is prominently displayed on the can

13   label for the debtors' signature product Bang Energy

14   drink.  There is an example of the can label there.

15   Your Honor, if you can see it, at the bottom, the Bang

16   Energy CEO Instagram handle is there, right above the

17   bangenergy.com website, and the Bang Energy company

18   Instagram handle.

19               The debtors concede -- defendants concede

20   this point as well, the CEO Instagram account appears on

21   the debtors' product.  This is from Mr. Owoc's declaration

22   at Paragraph 35, he says, further, the presence -- and he

23   notes the presence of one of my personal accounts,

24   allegedly personal accounts, on the can of one of the

25   debtors' products.  So it's conceded that it appears on

1    debtor products.

2              Again, Mr. Owoc characterizes that, he says,

3    that's no more than a de facto mutual licensing agreement.

4    Again, we already got into this point a little bit in the

5    evidence, your Honor.  The problem with that

6    characterization is that it's a legal conclusion about the

7    existence of a, quote, unquote, de facto license, as to

8    which there is no evidence or legal support offered.

9              And notably, your Honor, in addition to the

10   absence of any support, it is the debtors, rather than the

11   defendants, who have any claim into the registered word

12   mark "Bang", that appears in the Instagram handle.

13             So, again, your Honor, absent the

14   characterization, there is only the concession that, in

15   fact, the CEO account handle, at least the Instagram

16   handle, sit on the back of the debtors' flagship product.

17             Third, your Honor, how are the accounts held

18   out to the public in terms of their links to other media?

19   The debtors' assertion is that all of the CEO accounts

20   link regularly to other companies' media.  The defendants'

21   concession is embodied in Mr. Owoc's evidentiary

22   submissions, which are Exhibits 1 through 3 to his

23   declaration of the Instagram, TikTok and Twitter content

24   that he selected for this Court's review.

25             Just pulling examples, your Honor, the

1   TikTok CEO account description, the very description of

2   the TikTok account, at the bottom (inaudible) to

3   bangenergy.com, it's linking right back to Bang Energy's

4   official website, and you'll note that the one tag that's

5   in this description is actually an advertisement for

6   Raging Raspberry Hibiscus.

7                    This is not a promotion of any persona, or

8   any individual.  It's an express link to Bang Energy, and

9   an advertisement for one of its products.

10                   Second, your Honor, the Instagram CEO

11  account, a couple examples, this is, again, a pull from,

12  again, Exhibit 1 of Mr. Owoc's declaration.  If you can't

13  read the highlight, what it says is, if you haven't

14  checked out the dope gear at bangenergy.com, view it

15  today, linking back to the debtors' website to sell

16  products.

17                   Here, your Honor, Mr. Owoc touting that Bang

18  Energy is responsible with regard to its use of aluminum

19  over plastic, and drives that back to bangenergy.com to

20  get more tips on ways to reduce plastic pollution.  So

21  there is another link back to the company's website in

22  order to promote its responsible use of aluminum.

23                   And then, your Honor, the Twitter CEO

24  account link links and re-tweets a couple of examples.

25  Here is the tweet where Mr. Owoc is congratulating a

1    winner of a Bang Energy, a case of Bang Energy beverage,

2    and asking people to get a favorite case of Bang if they

3    will follow Bang Energy CEO account.  So it's linked

4    backwards and forwards, both Bang Energy -- congratulating

5    the winner of the Bang Energy giveaway, and also asking

6    that Bang Energy follows, follow Bang Energy CEO, and

7    then, your Honor, just a retweet of something we'll see

8    later, Mr. Owoc tweeting that Bang Energy is the

9    third-largest energy drink company in the world, it's a

10   link right out of the debtors' Instagram media account.

11             So, these are just some examples,

12   your Honor.  There are, of course, others.  Honestly, if

13   you look through Exhibits 1 through 3 to Mr. Owoc's

14   declaration, it is riddled, every single one of these

15   accounts is riddled with crosslinks back to debtor media.

16             So, your Honor, that's the totality of the

17   first question, which is how is the account presented to

18   the public?  The company's name is used in the account,

19   which weighs heavily, if not presents a presumption that

20   it's company owned.  There are links to other media all

21   over the place, which demonstrates company ownership, and

22   there is use of the handle on the debtors' flagship

23   product, which also demonstrates ownership.

24             So, second, your Honor, the account for --

25   the purpose for which the account has been utilized.

Page 54

1    Okay, here are a couple of quick points.  Regularly

2    utilizing -- again, it's not a math test, it's just a

3    holistics examination -- regularly utilizing the account

4    to promote the company's business demonstrates ownership,

5    that should be obvious.  That promotion includes overt

6    marketing, such as advertising, product sales of

7    inventory, and featuring company products and posts.

8                    It also -- within that, your Honor, the JLM

9    court noted that posts relating to or depicting company

10   products can hardly be labeled personal.

11                   Promotion also includes subtle marketing,

12   your Honor.  CTLI and JLM both make that point.  CTLI

13   notes, in particular, that, for instance, the example of

14   the owner posting himself at a gun show, far from being

15   personal in nature, is an example of subtle marketing,

16   because it tends to associate the owner and the store with

17   expertise in guns.

18                   JLM makes a similar point, that the

19   individual, Ms. Paige's use of girly, whimsical aspects of

20   her personality to associate that lifestyle, or those

21   personality aspects with the design is also subtle

22   marketing of the kind that social media is appropriate

23   for, and demonstrates company ownership.

24                   What's in these posts, your Honor?  Starting

25   with Instagram posts, the most commonly appearing post in

1    the Instagram exhibits submitted by Mr. Owoc is just

2    giveaways and sales of Bang products.  On the screen now

3    is a t-shirt giveaway, there is a phone case, a jersey, a

4    weight belt, a backpack, Vooz, a gold chain, a gym bag,

5    Bang Energy drink, a cooler, keto coffee, and another

6    jersey.  There is nothing here about Mr. Owoc.  He appears

7    in one of these 12 or 13 posts.  These are straight-up

8    product promotion, marketing.

9              Another category of the posts, your Honor,

10   advertisement of Bang products that may or may not include

11   Mr. and Mrs. Owoc.  So, here is Mr. Owoc in a post, this

12   is a post about choosing Vooz beverage.  It's all about

13   Vooz, there is two Vooz cans in the front.

14             You saw this post, your Honor, before, this

15   is about the dope gear at bangenergy.com.

16             Here is a post with product placement, time

17   to Vooz.  Bang Energy fuels any lifestyle, new can, same

18   thing, what makes Vooz so revolutionary, fuel your

19   destiny, new flavor coming soon.

20             Yes, Mr. Owoc, and to some extent Mrs. Owoc,

21   appear in these posts, but these are plainly and

22   explicitly promotional posts for Bang Energy merchandise

23   and beverages.  It's just marketing.

24             Many of the posts also just promote the Bang

25   brand, explicitly, and link back to the @bangenergy

1    Instagram account.  So, here, again, is that top three

2    energy drink list, but there are several more examples, at

3    Bang Energy we disrupt and we differentiate, check out all

4    the products you want at Bang Energy, going through

5    obstacles, that's what we're doing at Bang Energy, Bang

6    Energy is the third-largest drink energy in the world --

7    energy drink in world, 60 percent of Bang Energy's

8    employee are minority, Bang Energy is 90 percent alluminum

9    usage, while Bang Energy is a company that sells energy

10   drinks, it also offers a variety of sports supplements,

11   and is one of the biggest media companies in the country.

12              So, again, these are marketing posts, but

13   the last one, your Honor, tells not only what Bang Energy

14   is, but that it is one of the largest social media

15   companies in the country.  It is tying the entire social

16   media presence to the company.  It's marketing about the

17   social media marketing.  These are just marketing posts.

18              Now, your Honor, there are a number of posts

19   that are allegedly personal because they feature snapshots

20   of some component of the Owoc family's lives, but they

21   also tend to put into the foreground product placement.

22              So, for instance, this is a post from a

23   birthday party, your Honor, Mr. Owoc's beautiful family at

24   a birthday party, and Mr. Owoc is using the opportunity to

25   point out that rather than piling more sugar on top of

1   birthday cake, and other sweet treats, that people should

2   serve Vooz, instead, which he's holding in his hand.

3                Here is an admittedly adorable picture of a

4   member of the Owoc family, in the foreground are two Bang

5   Energy beverages.  Here, your Honor, is a Valentine's Day

6   post of the couple in the background, and in the

7   foreground are two more Bang Energy beverages, and here is

8   a video still of Mr. Owoc holding, again, two Bang

9   beverages, and there are more of these, your Honor, at the

10  risk of becoming cumulative.

11               The point is, posts relating to or depicting

12  company products and events can hardly be labeled

13  personal.  What's going on here is still promotion, it's

14  overt promotion of the product.

15               And finally, your Honor, examples of subtle

16  marketing here.  The scene here is plainly linking Bang

17  with fitness and diet.  So, you will see a number of posts

18  in which there are Bang-branded messages on fitness and

19  diet, such as the merits of training to failure, with a

20  big Bang B and Bang color logo, three ways to optimize

21  routines in the guy, the big Bang B and color scheme,

22  should you track your calories, the discussion, the big

23  Bang B and color scheme, and can you lose body fat and

24  gain muscle at the same time, again, the big Bang B and

25  bright colors.

1           So, this is tying Bang Energy to fitness and

2   diet, and when we see Mr. Owoc, what does he do?  He ties

3   the seam of fitness and diet back to the account.

4           So here he is saying, just recently he

5   talked about the benefits of doing 10 sets of resistance

6   training, sort of like training to failure.  Here,

7   your Honor, he is advising viewers, or followers to choose

8   your battle with the iron wisely, i.e., how to optimize

9   your time in the gym.

10          Here, your Honor, he is seen lifting some

11  very heavy weights, promoting the merits of resistance

12  training again.

13          And here, your Honor, he offers diet advice,

14  that science indicated that each time an individual bulks

15  up or, or gains excess weight, it becomes increasingly

16  more difficult to lose body fat and get lean, which is,

17  again, exactly what the Bang-branded posts above are

18  attempting to accomplish, and to link to Bang Energy,

19  because the Bang Energy beverages are, as the posts

20  disclose, free of sugar, and free of calories.

21          This is just the sort of subtle marketing

22  that we see in CTLI and JLM, where lifestyle is promoted

23  to drive people with interest in those lifestyle choices

24  to the product.  So, even here, your Honor, these are

25  marketing again.  It's marketing from start to finish.

1          Now, there are a handful of posts in

2     Exhibit 1, with regard to the Instagram accounts, which

3     have, let's say, a Christmas scene in them, and we can

4     debate whether there is any promotion going on in there.

5          In a totality of the review of these

6     accounts, it's marketing, marketing, marketing.  It's most

7     of the posts, and it's the purpose of the whole feed.

8          Similarly, your Honor, I won't go into the

9     same detail on TikTok and Twitter, because I'm already

10    running short on time, but you see the same pattern,

11    advertising, promoting the company, personal posts with

12    product placement here, holding a can, and talking about

13    being caffeine free, and subtle marketing, here we are in

14    the gym again.

15         Twitter is just reposting the same content,

16    advertising, new can, same Bang, promoting top three in

17    the world, giving away products, and subtle marketing,

18    there is the exact same advice on diet that we saw in the

19    last posts.

20         So, again, your Honor, all three of these

21    accounts are doing the same thing, it's marketing from

22    start to finish, and what's notably absent is any

23    cultivation of a separate, quote, unquote, Jack Owoc

24    persona.

25         So, we see (inaudible) used to promote, we

1   see overt marketing, and we see just the sort of subtle

2   marketing that CTLI and JLM talk about.

3              The final factor, your Honor, employee

4   access in furtherance of business interests.  The debtors'

5   assertion is the debtors created and had access to the CEO

6   accounts in furtherance of the business.

7              Defendants' concession, the exact same

8   thing.  How do we know?  Deposition testimony from 2022.

9   This is Mr. Owoc being asked and answering, with regard to

10  Instagram, who created that account.  I don't know.

11  Presumably if Mr. Owoc had created it, he would know.

12             He said -- he's asked, somebody at Vital?

13  He says, yes.

14             With regard to the TikTok account, who

15  created that?  I don't know.  Somebody at Vital?  Yes.

16             So, even though he doesn't know who did it,

17  he is conceding that it was created by somebody at Vital,

18  i.e., a company employee, in a company capacity.

19             He goes on to say in the same deposition, in

20  response to the question, with regard to the postings on

21  the Instagram, TikTok and YouTube account, who posted

22  those Vital videos, someone from the marking department?

23  Yes.

24             And Meg Owoc from the same matter, does

25  Vital operate the Instagram account @bangenergyceo?  Yes.

1              So, in indisputable deposition testimony,

2    Mr. and Mrs. Owoc are admitting that somebody at Vital

3    created the accounts, posted to the accounts, and

4    controlled the accounts.

5              And I understand now that Mr. and Mrs. Owoc

6    would like to walk away from that but, frankly, Mr. Owoc's

7    sworn declaration admits basically the same thing.  He

8    says, the only employees of the debtors who ever had

9    access to the passwords for my accounts are those whom I,

10    as the owner of the debtors, specifically tasked with

11    assisting me.  The marketing department of the debtors

12    created videos that were posted to my personal TikTok

13    account.  Again, we don't agree that it's personal, but

14    here again is the concession, employees had access, they

15    had access as employees of the debtors, and they posted

16    marketing content.

17              He says later, it's true that I personally

18    posted or approved, and directed the posting on my

19    accounts of marketing content created by the debtor for

20    the benefit of the debtor.

21              Again, it's explicitly a (inaudible) being

22    used to post marketing content of the debtors, that when

23    you strip away the characterization that is around the

24    highlighted passages, you have essentially the same

25    concession that's made in the deposition testimony that

1    they can't walk away from in any event.  Defendants

2    conceded then and they concede now that the debtors

3    created, posted to -- excuse me, posted to, and operated

4    the accounts, that's also conceded.

5              So, your Honor, just circling back to the

6    summary.  The manner in which the account is held out to

7    the public, use of business or entity name to identify the

8    account to the public, which weighs heavily, conceded; use

9    of the account handle on products, conceded; links to

10   other company media account, proven by defendants' own

11   evidence; the purpose for which the account has been

12   utilized, overt marketing, again, proven over and over

13   again by defendants' own evidence; subtle marketing, also

14   proven by defendants' evidence within the meaning of the

15   relevant case law, and whether employees of the business

16   accessed the account in furtherance of business interests,

17   as we just went through, absolutely conceded, your Honor.

18              So, with regard to all of the relevant

19   factors that have been enumerated in the case law that has

20   thoughtfully gone through this issue prior to your Honor's

21   consideration, the defendants have, in fact, either

22   conceded, or demonstrated through their own evidentiary

23   submissions that every single one of those factors

24   demonstrates company ownership.

25              No amount of discovery is going to change

1   that, and no amount of characterizing the concessions is

2   going to change that.  It all points to debtor ownership

3   and, therefore, summary judgment is appropriate for the

4   debtors on this record.

5                    THE COURT:  Thank you, Mr. Murtagh.

6                    MR. MURTAGH:  Thank you, your Honor.

7                    THE COURT:  Mr. Shraiberg.

8                    MR. SHRAIBERG:  Thank you, your Honor.

9                    Mr. Murtagh's presentation was very good.

10  However, it was selectively edited.  There were thousands

11  of posts, and only a few selected ones have been published

12  to the Court.

13                   Similarly, in the response -- excuse me,

14  Mr. Owoc's depo -- excuse me, in his affidavit, they're

15  taking part of his answer, and not the explanation, and

16  the explanation is so important here because today we have

17  a matter of first impression.  None of the cases cited

18  deal with a social influencer, with over a million

19  followers.  That's what we have here today.

20                   Out of the -- the debtor is, in essence,

21  trying to -- excuse me, yes, the debtor is, in essence,

22  trying to talk out of both sides of its mouth.  Out of the

23  left side it is saying that -- thank you for creating an

24  account that has over a million followers, and out of the

25  right side of their mouth, well, we want it because we

1   loved how you promoted our product.

2                   There isn't a problem with someone creating

3   a personal account and promoting a product that -- a

4   company that they are the sole owner and CEO of, that's

5   what this evidence shows.

6                   Ownership disputes over social media

7   accounts constitute a cutting-edge area of the law.  Few

8   courts have addressed this issue, especially in a

9   bankruptcy context, and there appears to be no bright line

10  test or other precedent binding on this Court on how to

11  determine the ownership of the disputed account.

12                  It is apparent, however, no matter what test

13  this Court conducts, an ownership inquiry must be a

14  fact-intensive one, focusing on unique circumstances of

15  each case, not unlike an actual fraudulent transfer case

16  that comes before this Court, or any matter that comes

17  before this Court that has an intent element to it.

18                  The circumstance includes the persona of the

19  individual account holder, its historical use and content

20  of that account, and the terms and conditions of the

21  social media platform that the user agreed to in creating

22  that account.

23                  The debtors' motion ignores the principles.

24  Through it the debtors are attempting to shoehorn a

25  complex fact pattern by selectively editing the parts that

1    they want to show, involving individuals who maintain

2    public personas on social media, and accounts with both

3    individual and business posting, into a simplistic

4    narrative, or corporate ownership, rather than a holistic

5    inquiry.  For this reason we believe that summary judgment

6    is not appropriate, and that the debtor will not be able,

7    and has not been able to meet its burden.

8                    Going -- backing up and looking at the facts

9    before the Court.  First, looking at the Jack Owoc

10   persona.

11                   Mr. Owoc is the founder of the debtors, and

12   until recently served as the chief executive officer and

13   chief science officer.

14                   Throughout his life Mr. Owoc has been an

15   avid fitness trainer, designer, and producer of fitness

16   supplements, a weight lifter, a motivational speaker and

17   writer.  He has conceptualized, created, and brought to

18   market numerous energy drinks and fitness supplements.

19                   As a result of these endeavors, Mr. Owoc has

20   created a very colorful public persona.  The character

21   investor of Jack Owoc.  His individual persona, brand, is

22   distinct from and has personal value apart from the

23   debtors.

24                   Due to the value of this character, of the

25   persona, when the Owocs decided to incorporate social

Page 66

1    media to market the debtors' product, they deliberately

2    created their own personal, individual social media

3    accounts, that were segregated from the assortment of the

4    debtors' social media accounts, and treated differently.

5    This is the issue where there is a material -- a genuine

6    issue of material fact.

7              Through the motion the debtors seek summary

8    judgment regarding the ownership of the three accounts at

9    issue, Instagram, TikTok and bangenergy.ceo on Twitter --

10   I'm sorry, and the Twitter account, Bang Energy CEO.

11             It's important to note that in this case,

12   unlike the cases cited by the debtor, this debtor holds

13   approximately 52 corporate social media accounts,

14   consisting of over 20 Instagram accounts, eight TikTok

15   accounts, five Twitter accounts, and over 19 Facebook

16   accounts.  These are business accounts that are used for

17   business purposes.

18             By contrast, the accounts at issue are

19   personal accounts, segregated from the larger assortment

20   of the debtors' social media accounts.

21             The handle to the account at issue, which

22   incorporates the term Bang Energy CEO, are a double

23   entendres.  They reference the former position of

24   Mr. Owoc, as an officer of the debtors, but also

25   references individual persona and personality as a high

Page 67

1    intensity, energetic leader of Bang Energy CEO.  This,

2    too, is a major genuine issue of material fact that the

3    debtor -- excuse me, the defendants need to be able to

4    produce evidence to show.

5                    Given the reference to Mr. Owoc's individual

6    persona, the Owocs concede the handle for the accounts to

7    refer to and compliment this persona, this character.

8                    The Owocs essentially had exclusive

9    possession, custody, or control over the accounts with,

10   one, Mr. Owoc -- Mrs. Owoc personally creating the

11   Instagram and Twitter accounts, two, the debtors never

12   requesting or having possession of the passwords of the

13   accounts and, three, Mr. Owoc having full, complete, and

14   unilateral discretion over the content posted to the

15   accounts.

16                   Moreover, the substantial majority of the

17   contents on the accounts is a personal nature, not

18   relating to the debtors' businesses.

19                   Of the 99 postings made on Instagram between

20   November 17th, 2022 and April 10th, 2023, roughly 68, in

21   other words, 59 percent are clearly personal and

22   reflective of the Jack Owoc persona and not the debtors.

23                   Of the 146 postings made to the TikTok

24   account between January 1st, 2022 and April 10th, 2023,

25   roughly 80, or 55 percent are clearly personal and

1    reflective of the Jack Owoc persona and not the debtors.

2                    THE COURT:  Mr. Shraiberg, do you have

3    those, are you able to show me that it's -- that it is

4    only reflective of a personal nature, and not reflective,

5    or marketing any of the products?

6                    MR. SINGERMAN:  It comes from, it comes from

7    the debtors' declaration, as well as Exhibit 1, which --

8    Docket Entry 41, starting at Page 12 of 190.

9                    THE COURT:  Hold on, let me get there.  41.

10   What page?

11                   MR. SHRAIBERG:  13 of 190.

12                   THE COURT:  Okay.  13 of 190.

13                   MR. SHRAIBERG:  We gave examples -- we

14   attached examples of the Instagram account.

15                   THE COURT:  Show me, show me -- point out a

16   few of these that you say reflect solely a personal -- a

17   post of a personal nature, having nothing to do with Bang.

18   I mean, on the first page, I mean, you see Bang in the

19   background of this picture.  So, help me with this.

20                   MR. SHRAIBERG:  I want to clear up one

21   thing.  I am not saying that there is no Bang product in

22   every one of these.  I am saying that these Instagram

23   posts, the -- all of the posts that we described,

24   Instagram, TikTok and Twitter, we are dealing with posts

25   that create the Jack Owoc persona, and while doing that,

Page 69

```
1    he can present -- he can have product placement of a Bang
2    Energy can, or the logo, that only helps his company.
3                    THE COURT:  All right.  So, point -- so, in
4    other words, you're saying that it's, in the first
5    instance, about Jack Owoc, and in the second instance, as
6    a bonus, it's about Bang Energy drink, correct?
7                    MR. SHRAIBERG:  Correct, exactly.
8                    THE COURT:  All right.  So, take me -- show
9    me some of those.  Show me some of those very
10   specifically.
11                   MR. SHRAIBERG:  Yes, let's start with the --
12   with Page 14.  You see extreme sports, that's part of the
13   persona that Jack Owoc is creating.
14                   Page --
15                   THE COURT:  But it's, but it's -- it's also
16   -- is it not equally promoting the Bang Energy concept by
17   its product?
18                   MR. SHRAIBERG:  Correct, but this is one of,
19   and if we go through, you'll see, this is the theme that's
20   creating who Jack Owoc is.
21                   THE COURT:  Okay.
22                   MR. SHRAIBERG:  The --
23                   THE COURT:  Show me another.
24                   MR. PAGE:  Sure.
25                   Page 15 of 190, he's an animal lover, and he
```

Page 70

1    cares about animal rights.

2                    THE COURT:  Or perhaps the company, Bang

3    Energy, cares about animal rights.  I mean, how do you

4    distinguish Jack Owoc caring about animals versus Bang

5    Energy?

6                    And, in fact, it even says, Bang Energy is

7    fur the animals, f-u-r.

8                    So what is it that makes this about

9    Jack Owoc instead of about Bang Energy, or more about

10   Jack Owoc than it is about Bang Energy?

11                   MR. SCHNEIDERMAN:  That taken as a whole,

12   and we will continue to go through, along with ones that

13   we have not published, this is just Instagram, but we'll

14   go through, that each one will deal with what Jack Owoc

15   specifically cares about, what Jack Owoc specifically is

16   promoting, what Jack Owoc wants you to think about when

17   you think about Jack Owoc.

18                   THE COURT:  All right.  So, where is Jack --

19   the words Jack Owoc on Page 15?  I don't see, it's not

20   jumping out at me.

21                   MR. SHRAIBERG:  Sure.

22                   THE COURT:  It's small writing, so I may be

23   missing something, but --

24                   MR. SHRAIBERG:  No, that it's being

25   published by Jack Owoc on this account, not on --

1           THE COURT:  Well, it's being published by

2    Bang Energy CEO.  It's not -- there is no words

3    "Jack Owoc" in Bang Energy CEO, is there?

4           MR. SHRAIBERG:  That's the persona, Bang

5    Energy CEO, correct, that's what we're saying.

6           THE COURT:  Okay.  All right.  Show me

7    another one then.

8           MR. SHRAIBERG:  Let me jump to more -- I'll

9    be straight up, more obvious, if we look to Page 24 of

10   190.

11          THE COURT:  Okay.  One moment.  Okay.  Yep.

12          MR. SHRAIBERG:  The second one, a picture of

13   Mr. and Mrs. Owoc, with a caption, 11 years ago we said I

14   do, and promised to love each other forever.  Today I am

15   grateful for every moment, every memory, and every

16   challenge that has brought us closer together.  Happy

17   anniversary to my one and only, my soulmate, my best

18   friend, my forever love.  Here's to many more years of

19   love, laughter, and happily ever after.

20          That's not a promotion of Bang Energy.  It

21   is in promotion of who Jack Owoc is.

22          THE COURT:  Okay.  All right.  I don't see

23   much about Bang Energy in there, other than just the words

24   Bang Energy CEO, but, okay.

25          All right, and I also note that there is a

Page 72

1    megliz.owoc.  So it seems to me that Meg Owoc has her own

2    (inaudible).  Does Mr. Owoc have his own, with the words

3    Owoc in it?

4                    MR. SHRAIBERG:  He may, but that's not at

5    issue today, and it certainly doesn't have --

6                    THE COURT:  Okay.

7                    MR. SHRAIBERG:  -- a million followers.

8                    THE COURT:  Yes, I understand.  Okay.  All

9    right.  Fair enough.

10                   What else.

11                   MR. SHRAIBERG:  The next page -- well, even

12   the one above is just Jack Owoc giving his advice, the

13   secret to long-term body remodeling is to do things

14   differently and consciously avoid losing weight,

15   Jack Owoc, and then a longer recitation is what's posted.

16                   THE COURT:  Okay.  I'm just reading -- okay.

17   All right.

18                   MR. SHRAIBERG:  Page 25, artificial

19   intelligence is becoming more instrumental in our lives,

20   understanding its benefits and limitations will be crucial

21   to your success and happiness.  Yes, AI can negatively

22   affect your mental health in the future.  In a future post

23   I will discuss some of the pros and cons associated with

24   AI.  In the comments tell me your thoughts on IA, and

25   share this post with others.

Page 73

1              THE COURT:  All right, and then it hashtags

2    bangenergy, bangenergyceo, bangenergydrink, et cetera, and

3    it says, stay with us.  What does that mean, what does --

4    who is the "us"?

5              MR. SHRAIBERG:  Your Honor, I'm not seeing

6    what you're seeing.

7              THE COURT:  On the picture itself, it says

8    "stay with us".

9              MR. SHRAIBERG:  Oh, sorry, but I also don't

10   see that #bangenergy.

11             THE COURT:  Just look to your right, about

12   where Mr. Owoc's left knee is.

13             MR. SHRAIBERG:  Oh, I see it now.  It's

14   further down.  Yes, correct, along with numerous other

15   hashtags.

16             THE COURT:  All right.  So, no, no question,

17   and what I'm trying to understand is your argument in the

18   context of how to balance -- if balancing is even

19   appropriate, the use of the bangenergy.ceo account, you

20   know, for personal versus bangenergy, to promote Bang

21   Energy as a general matter, and, you know, maybe a

22   combination of both, and if it's a combination of both,

23   how are you going to prevail on the argument that the

24   Court should consider it Jack Owoc's more so than Bang

25   Energy's?

1          MR. SHRAIBERG:  Because we believe that the

2    evidence is going to show that the world believes that

3    that is Jack Owoc's account.  There is a Bang Energy

4    account, there are (inaudible) Bang Energy accounts.

5          THE COURT:  Do you have any affidavits from

6    any third parties suggesting the world views it that way?

7          MR. SHRAIBERG:  No, this is a -- we filed

8    our answer two days ago.  What we have is a start.  We

9    have the intent, and what actually happened from both

10   Owocs' declarations.  We have --

11         THE COURT:  How does an assertion that the

12   evidence will show create a genuine issue of fact, if

13   there is no evidence in the record that does show?

14         MR. SHRAIBERG:  Sure, because there is

15   evidence in the record already through the Owocs'

16   declarations, and through the actual postings, and if I

17   can continue, we can keep going through and --

18         THE COURT:  Okay.  Go ahead.

19         MR. SHRAIBERG:  Page 26, the next page, is

20   Mr. Owoc lifting, stating that one of the biggest mistakes

21   people make is not pushing themselves in the gym.  The gym

22   is not a place to go and relax.  It's a place to work.  If

23   you push yourself, you'll not only show better results,

24   I'll be doing a post soon about the benefits of training

25   to failure, but you'll feel so much better, too.  Pound

1   the like button if you know what I mean, and then there

2   are numerous hashtags.

3                    THE COURT:  But, again -- but, again, you

4   would acknowledge that this can easily be interpreted to

5   promote Bang Energy, the company and its products, as much

6   as it would be to create the Jack Owoc persona, given the

7   fact that it's consistent with the Bang Energy -- with

8   Bang Energy product, products marketing, it refers to Bang

9   Energy, energy drink, and Bang Energy CEO, you know, the

10  words, and I don't see Jack Owoc anywhere on this

11  particular post, the words Jack Owoc.

12                   MR. SHRAIBERG:  Sure (inaudible) -- that's

13  Jack Owoc lifting.

14                   THE COURT:  Well, yeah, I mean, you're

15  saying that, and I believe you, and from what I recall, it

16  sort of looks like him, but the words Jack Owoc are not

17  anywhere.

18                   MR. SHRAIBERG:  Because it's his account, it

19  would be speaking in third person.

20                   THE COURT:  Well, if this account said

21  Jack Owoc, Bang Energy CEO, perhaps I would agree with

22  you, but it doesn't.  It says Bang Energy CEO, without any

23  reference to the words Jack Owoc.

24                   MR. SHRAIBERG:  Okay, but he has a million

25  followers, and that would be an example, if we look at

1    next page, Page 27, you'll see it now specifically says

2    jackowoc@bangenergyceo.  When it gives a code like that, I

3    think that you're -- a follower knows that "bangenergyceo"

4    is Jack Owoc, that's why you follow a person on social

5    media.

6              THE COURT:  Okay.  All right.  I mean, I

7    hear you.  Okay.  Go ahead.  What else?

8              MR. SHRAIBERG:  Wait a second.

9              THE COURT:  So in your percentages,

10    Mr. Shraiberg, that you were arguing earlier, X-percent or

11    50, 99, or whatever it was, you're not saying -- what

12    percentage of those were exclusively Jack Owoc, and much

13    less about Bank Energy, did you do that calculation, or

14    are all of these within that same calculation, even ones

15    that include a picture of the can, and various

16    merchandise, et cetera?  I'm trying to understand --

17              MR. SHRAIBERG:  I understand.

18              I will give an example, I can answer your

19    question with an example.  If you look at Page 28 of 190,

20    that would be an example of one we would not use.

21              THE COURT:  Okay, because it's, again,

22    Jack Owoc doesn't appear anywhere, he doesn't say

23    anything, it's all about Bang products.

24              MR. SHRAIBERG:  Correct, and similarly on

25    Page 29 of 190, would be one we would not use.

Page 77

```
 1                THE COURT:  Because that's, again, no
 2  reference to Mr. Owoc?
 3                MR. SHRAIBERG:  Correct.
 4                THE COURT:  But you would, but you would
 5  include Page 26, you would include Page 25, you would
 6  include certainly the bottom of Page 24, right?
 7                MR. SHRAIBERG:  Correct, correct.
 8                THE COURT:  And would you also include --
 9  hold on a second.  Would you include 23 or 22?
10                MR. SHRAIBERG:  Give me a second.
11                THE COURT:  The top of 22?
12                MR. SHRAIBERG:  23, no.  22, yes, that's
13  product placement in front of a situation where he is
14  talking about lifting, and how to increase your strength.
15                THE COURT:  Okay.
16                MR. SHRAIBERG:  And I'm not suggesting that
17  Bang Energy will do it, he just conveniently puts product
18  placement in front of him, which helps the company.
19                THE COURT:  Okay.  All right.  I understand.
20                MR. SHRAIBERG:  Other examples of just
21  black-and-white personal can be found at --
22                THE COURT:  Well, let me ask you this,
23  Mr. Shraiberg --
24                MR. SHRAIBERG:  Yes.
25                THE COURT:  -- if we had a trial on this --
```

Page 78

1                    MR. SHRAIBERG:  Yes.

2                    THE COURT:  -- what would be different about

3   the evidence?

4                    MR. SHRAIBERG:  Sure, we would go through --

5   either we would work out beforehand a stipulation with the

6   debtor as to the posts that are 100 percent agreed

7   personal and, like, say, Page 70 and 71, it's him and his

8   wife, there is no argument that -- I can't think of an

9   argument that they're not --

10                   THE COURT:  70 and 71?

11                   MR. SHRAIBERG:  Yes.

12                   THE COURT:  Let me see that.

13                   MR. SHRAIBERG:  I take it back, 70.

14                   THE COURT:  Well, I see 70, about family and

15  his advice.

16                   MR. SHRAIBERG:  And 68.  We would go through

17  what we would believe under all social media accounts are

18  black-and-white personal.  Then we would say -- we would

19  have a bucket for ones that are, we would argue, creating

20  the persona, they would argue has product placement, and

21  third would be -- well, third would be clearly just

22  product, and fourth would be a gray area, where we say it

23  is personal, they would say it's not.

24                   THE COURT:  And what is the standard, is it

25  numerical standard or what's the standard?

1          MR. SHRAIBERG:  So, coupled with -- excuse

2    me, coupled with evidence from employees of the debtor

3    that will say -- that will testify that these are

4    Jack Owoc's accounts, coupled with third-party depositions

5    of other influencers who would offer testimony of what

6    they think this account is, and who is behind it.  We

7    would create the objective standard that no reasonable

8    person would believe that these accounts are anything but

9    their personal accounts.

10          We have in here births of their children.

11   There is no, there was no part of the company that could

12   have said, hey, Mr. Owoc, you can't publish that on your

13   personal account.  He controlled it.  To this day, before

14   5 o'clock, he's the only person that has the passwords to

15   these accounts.

16          THE COURT:  Understood.

17          MR. SHRAIBERG:  If we had the ability to

18   take evidence, specifically with the debtors' primary and

19   only affiant, Mr. DiDonato, we would take his deposition

20   to ask him what was the source of each assertion within

21   his declaration, because his declaration begins, from my

22   own personal knowledge, and from speaking with third

23   parties.

24          Two, we would get -- we would want

25   confirmation that no one at the debtor had the password to

Page 80

1    the accounts.

2                    Three, we would ask about confirmation that

3    Meg Owoc did, indeed, create these accounts.

4                    Four, we would want to know who, if anyone,

5    created content, and what did that entail.

6                    Five, that no one in the company could post

7    on that account.  We believe these are all going to be

8    undisputed facts from the debtor.

9                    Six, that the company could not control the

10   content that Mr. Owoc posted, and that, we believe, is

11   huge, and we believe that there can be nothing that

12   refutes that.

13                   Seven, that the Instagram page has a button

14   on it with pictures of Mr. Owoc's family right at the top,

15   that he titled The Bang Family, part of this persona, of

16   the Bang CEO, he called the Bang Family.  It's still there

17   today.

18                   Eight, we would --

19                   THE COURT:  Except the word "Bang" is a mark

20   owned by the debtor, not by Mr. Owoc, correct?

21                   MR. SHRAIBERG:  Correct, but the Bang Family

22   could be generic, that is what their, and to this date

23   we've received nothing that says that the debtor

24   complained that the Bang Family is there.  This is part of

25   the persona that brings a million people to that account.

1   They share their personal life.  Their followers care

2   about their personal life.

3                Eight, we would solicit discovery that the

4   debtor itself believes that the accounts are personal,

5   which came from the Owocs' declarations, but we believe

6   that the debtors' principals -- excuse me, the debtors'

7   employees, they, too, believe that these accounts were

8   always their personal account, as evidenced by the portion

9   of the email that was the subject at the beginning of the

10  argument.

11               Nine, that the testimony from employees as

12  to whose accounts -- we would seek testimony from the

13  employees as to whose accounts they believed these were.

14               From Instagram we would solicit information

15  with regard to -- substantiate that Meg did, in fact --

16  Mrs. Owoc did, in fact, open up the account.  We similarly

17  would --

18               THE COURT:  Well, but she was an employee of

19  Bang Energy at the time she did that, no?

20               MR. SHRAIBERG:  No, she definitely was,

21  but --

22               THE COURT:  So how do we know whether she

23  did that in her individual capacity, or her personal

24  capacity?  In other words, that fact doesn't really add

25  much, or anything, if we can't determine whether she was

1    acting in her individual or corporate capacity, correct?

2                        MR. SHRAIBERG:  I view it differently,

3    that's --

4                        THE COURT:  Not only was she working for the

5    company, but she was in the marketing department.

6                        MR. SHRAIBERG:  And that's specifically why

7    we need to put on testimony of Ms. Owoc, who will testify,

8    consistent with her -- consistent with her declaration,

9    that this is why she set up 62 accounts for the

10   corporation, and three for him, individually.

11                       The corporation has its marketing, it has --

12   and she didn't not do her job with regard to social media

13   for the company, but she equally set up three accounts,

14   and that's what the testimony will show.  It's what she

15   has said, set forth in her declaration.

16                       Similarly, from Instagram, they can put into

17   evidence the terms of service that all individuals that

18   set up an account, or all companies that set up an account

19   have to click on, I think we're all familiar with that --

20                       THE COURT:  Mr. Shraiberg, let me ask you a

21   question.

22                       MR. SHRAIBERG:  Yes.

23                       THE COURT:  The name of the account is Bang

24   Energy CEO, right, the handle for each of these accounts

25   is Bang Energy CEO, and Mr. Owoc is no longer the CEO,

Page 83

1    correct?

2                    MR. SHRAIBERG:  Correct.

3                    THE COURT:  Okay.  There is a CEO of Bang

4    Energy, there is a CEO of Vital Pharmaceuticals that would

5    -- that replaced Mr. Owoc, right?

6                    MR. SHRAIBERG:  Yes, correct.

7                    THE COURT:  Are you saying that that person

8    that is now the Bang Energy CEO would not be -- it would

9    not be appropriate for that person to use these three

10   accounts, even though that person is the CEO of Bang

11   Energy --

12                   MR. SHRAIBERG:  Correct.

13                   THE COURT:  -- and Bang Energy CEO is the

14   handle?

15                   MR. SHRAIBERG:  Correct, and that is what

16   the evidence is going to show specifically, that this is

17   not a seat holder.  A million people are not following any

18   CEO.  A million people --

19                   THE COURT:  All right.  So, let me ask you

20   this, let me ask you this then, what about the converse,

21   now that Mr. Owoc is not the CEO of Bang Energy, and you

22   can't change the handle, right, bangenergy.ceo has to be

23   the handle --

24                   MR. SHRAIBERG:  No, you can change the

25   handle.  I think even in the debtors' evidence, at Docket

Page 84

1    Entry 21-2, Page 2 of 2, I'm sure it's in their exhibits,
2    you can see former user names, that if one clicks on the
3    Bang Energy CEO, three dots in the upper right-hand
4    corner, you can see the former user names used for the
5    account, and this account says one.  I don't know if that
6    means it was ever changed, there was one prior, or one
7    means that this is the only one.
8                   THE COURT:  Okay.  Where do I see that?
9                   MR. SHRAIBERG:  Docket Entry 21-2, Page 2 of
10   2.
11                  THE COURT:  21-2, hold on a second.  Sorry,
12   hold on one second.
13                  MR. SHRAIBERG:  Sure.
14                  THE COURT:  Those are the screenshots.
15                  MR. SHRAIBERG:  Yes, and for our pop
16   culture, I believe Kanye West changed to Ye.  So it can be
17   done.
18                  THE COURT:  Okay.  I mean, that's not
19   evidence, but --
20                  MR. SHRAIBERG:  Sorry.
21                  THE COURT:  -- I hear you.
22                  All right.  So, you're saying that if there
23   is the three dots -- you're just showing the three dots,
24   but you're not showing what other names this particular
25   account had, or handle.

1          MR. SHRAIBERG:  Correct, from my preparation

2    for today, to make that screen pop up, you had to hit

3    those three dots in the upper right-hand corner.  I wanted

4    to see if there is a way to click, to see what were the

5    former user names.

6          THE COURT:  And were you able to determine

7    what the former user names are?

8          MR. SHRAIBERG:  I was not, and I don't know

9    the answer to, does "one" mean just this one, or there was

10   one former user name.

11         THE COURT:  I see.  Okay, and so if the user

12   name changed, the followers still stay on the account and

13   flow to whatever that user name is?

14         MR. SHRAIBERG:  Correct.

15         THE COURT:  Okay.  Is it your view that

16   Mr. Owoc would be able to -- if it is his account, would

17   be able to keep the name bangenergy.ceo, even though he's

18   not associated with Bang Energy or the CEO of Bang Energy

19   any longer?

20         MR. SHRAIBERG:  I'm not an intellectual

21   property lawyer.  He does have one.  I would defer to her.

22   I don't want to guess, but I can tell you what my gut is,

23   but I would be guessing.  My gut would be that he would

24   change it, but I don't know that answer.

25         THE COURT:  I see.  Okay.  All right.

1              Go ahead.  Interesting, an interesting

2    issue.

3              What else?

4              MR. SHRAIBERG:  Sorry.

5              THE COURT:  You're convincing me more than

6    ever to stay off social media, but anyway, go ahead.

7              MR. SHRAIBERG:  Okay.  The law regarding the

8    disputed social media accounts, especially in a bankruptcy

9    context, as we've been saying, is scarce.

10             Unsurprisingly, the debtors are able to cite

11   only -- recited only two cases, but today they added a

12   third, none of which is binding on the Court in support of

13   their ownership claims.  We believe they are completely

14   distinguishable because they don't deal with a social

15   influencer.

16             The primary case that they were relying on,

17   CTLI, LLC is -- it comes with a company that only had one

18   social media account, and it was the name of the debtor.

19   While the debtor's official name was CTLI, LLC, it went by

20   the name Tactical Firearms, and that was the name of the

21   account.  This is exactly inapposite of what we have in

22   this case, where the debtor has its own accounts, and that

23   is the major distinguishing characteristic between the two

24   cases, and even more so, in the CTLI case, that debtor

25   provided only one example of a personal tweet on the

1    account.  Here we believe that we have over 50 percent on

2    all of the social media outlets that are at issue.

3              In that CTLI case, again, it involves a

4    Facebook page specifically designed for business brands

5    and organizations, not individual people, like we've got

6    here, there is no such limitation here.  The court in CTLI

7    found the posts on the Facebook page and Twitter account

8    were expressly business related, and the debtor could not

9    identify any personal posts.  By contrast, we contend that

10   the majority of the posts on the accounts are of a

11   personal nature, and concern subjects such as the birth of

12   Mr. Owoc's daughter.

13             Nothing in CTLI suggests that the principal

14   of the debtor had a public persona like Mr. Owoc does, and

15   personal brand (inaudible) that of the Owocs.  The

16   principal of CTLI argued that every social media

17   accounting of the debtors was, in fact, his, and by

18   contrast, the Owocs are only saying three out of the 55

19   are theirs.

20             Although CTLI was ultimately decided against

21   the principal, the court made the determination, after --

22   our reading was a two-day trial, I believe the debtor, in

23   their reply said it was only a one-day trial, but

24   regardless, it was from reviewing the totality of the

25   evidence, and the debtors here are attempting to prosecute

1    what we believe to be a far weaker case, certainly a far

2    more distinguishable case via a rushed summary judgment --

3                    THE COURT:  Mr. Shraiberg, what -- is there

4    evidence in the record right now that Mr. Owoc is, in

5    fact, a social influencer?

6                    MR. SHRAIBERG:  That he has over a million

7    followers, that's the --

8                    THE COURT:  Well, the question is, does he

9    have it, or does Bang Energy CEO have those followers?  I

10   mean, that's the ultimate question, who is going to end up

11   with the followers?

12                   So, to me, is there anything else that

13   suggests, or is evidence of the facts you're asserting,

14   which is that -- which is that Mr. Owoc is, in fact, a

15   social influencer?

16                   MR. SHRAIBERG:  No, it's that he has been --

17   first of all, it's over 2 million when you consider the

18   two accounts, but that -- in each individual one he has

19   over a million followers, and has the ability of putting

20   product placement in front of him, which is what the

21   definition of the social in -- social media influencer is,

22   it is to get people to purchase product from following

23   someone on a social media site.

24                   THE COURT:  Or a company.

25                   MR. SHRAIBERG:  Specifically, there aren't a

1    million people that follow Bang Energy, specifically.

2                    THE COURT:  No, but it's -- but companies

3    are followed, companies have handles, companies are

4    followed, companies are social influencers.

5                    MR. SHRAIBERG:  Sure, like Coca-Cola might

6    have over a million followers, or a very large --

7                    THE COURT:  Yeah, I mean, they're looking --

8    you know, they're looking for -- you know, I guess -- I

9    don't even know.  Honestly, I would be speaking out of

10   turn, but I'm imagining a circumstance in which, like this

11   one, where it's -- you know, one would argue that it's the

12   company that the followers are following, not the person,

13   and of course Mr. Owoc can argue, well, it's me, it's the

14   person that they're following, not the company.

15                    So, anyway, I guess --

16                    MR. SHRAIBERG:  As evidenced by --

17                    THE COURT:  -- that begs the question.

18                    MR. SHRAIBERG:  But it adds evidence by the

19   fact that he has a million followers, and the corporation

20   one doesn't.  People generally follow corporate accounts

21   for 10 percent off coupons, or learning when a new product

22   is coming out, but with regard to his personal one, people

23   are following, people are amused by it, people are

24   learning about either some of his religious posts, his

25   weight lifting posts, his spiritual messages, and his

Page 90

1   personal life, the birth of his children, the pregnancy of

2   his wife, his anniversary, his celebration of Valentine's

3   Day, these are all posted on his personal account.  They

4   are not posted on the corporate account.  So they don't

5   belong on the corporate account.

6               THE COURT:  Okay.  Let me just -- I just

7   want to look at one thing.  Yes, we're running out of time

8   here, so anything more you want to --

9               MR. SHRAIBERG:  One moment.

10              I want to point out that the Owocs in this

11  case never signed an employment agreement.

12              With large corporations, or any company, if

13  the company had a concern about wanting to own the

14  property generated during working hours, they can have a

15  -- they can have an employee contract that deals with the

16  prohibition of doing so, or making it property of the

17  company.  That does not exist here.

18              The debtor would point to an employee

19  handbook that is not signed by Mr. Owoc, and Mr. Owoc --

20  and under Florida law is not a contract that the employees

21  are bound by.

22              THE COURT:  All right.  Take a look at your

23  paragraph -- or Paragraph 20 of Mr. Owoc's declaration, at

24  Page 6 of 190, it says that, quote, it is noteworthy to

25  point out that a company account @bangenergy on Instagram

Page 91

1    has 2.2 million followers, although on my personal

2    @bangenergyceo Instagram account has less than half of

3    that, 1 million followers.

4                    So it does seem as though --

5                    MR. SHRAIBERG:  I apologize.

6                    THE COURT:  -- the company could have as

7    many, if not more, on its account as the, quote, Bang

8    Energy CEO account.  So I'm just letting you know that

9    that's there.

10                   MR. SHRAIBERG:  I apologize, that is

11   correct, I forgot that.

12                   THE COURT:  Yes.  Okay.  No worries.  You

13   don't have to apologize.  It's just -- you know, I'm just

14   trying to assess all the facts that are being thrown at

15   me.

16                   So, okay, what else?

17                   MR. SHRAIBERG:  This is what the debtor --

18   excuse me, the defendants are proposing, that the proper

19   approach for the Court to evaluate the evidence before it,

20   that we think clearly there is a genuine issue of material

21   fact, that the Court needs to consider, one, the persona,

22   or character, or interest of the individual account

23   holder, in the exclusive use of his own identity; two, how

24   the individual account holder uses the account; three, the

25   account ownership interest established in the terms and

Page 92

1    conditions of the social media website; and, four, control

2    over that account, and we think that the --

3                    THE COURT:  So those are different criteria

4    than the case law cited, or additional criteria, if you

5    will, some of it overlaps, than the elements cited in the

6    cases by the debtor?

7                    MR. SHRAIBERG:  Correct, that's correct,

8    your Honor.

9                    And it's what we're saying, it's more of a

10   totality of the circumstances, and a reasonableness test,

11   what would a third party believe that when he or she goes

12   onto this account, is that the Bang Energy's account, or

13   is that Jack Owoc's account?

14                   And we believe, at a minimum, a genuine

15   issue of material fact exists, but we believe more

16   specifically that a review of these posts show that that's

17   the persona, that is Jack Owoc, that he becomes -- if he

18   starts a new energy drink tomorrow, he will still promote

19   his religious beliefs, his weight training, his --

20                   THE COURT:  Well, we don't know that.

21   You're surmising, you don't know that.  That's not in the

22   record.

23                   MR. SHRAIBERG:  Yes, but it could

24   (inaudible) would go to trial.  I think as it's presented

25   today, the --

1          THE COURT:  There is nothing in the record

2    right now that says that.

3          MR. SHRAIBERG:  One moment.

4          When talking about his persona, creating his

5    persona in his declaration --

6          THE COURT:  What page?

7          MR. SHRAIBERG:  Document 41, Page 3 of 190.

8          THE COURT:  Okay.

9          MR. SHRAIBERG:  I designed each of my

10   endeavors with the essence of my own personal philosophy

11   and belief system, that is, in short, that we, as human

12   beings, have an unlimited capacity to develop our bodies,

13   minds, and spirits, with God's help, to their highest

14   capacity through hard work, cutting-edge science, positive

15   thinking, and an adamant refusal to quit, which are

16   characteristics of a CEO or a chief operating officer.

17   The foregoing philosophy, when combined with my image, my

18   style, and my overall identity is my persona.

19          That --

20          THE COURT:  Well, would you agree that this

21   might be more convincing if the handle had the name

22   Jack Owoc in it, or Owoc, or something like that?  It

23   doesn't have it at all.

24          MR. SHRAIBERG:  Correct.  So, instead we

25   have to look to what are the facts behind this.  It's --

Page 94

1    one of those issues are, if it looks like a duck, and

2    quacks like a duck, don't call it a horse, but equally --

3                    THE COURT:  But if you use that language, if

4    it looks like Bang Energy, and quacks like Bang Energy,

5    don't call it Jack Owoc.

6                    MR. SHRAIBERG:  Well --

7                    THE COURT:  I mean --

8                    MR. SHRAIBERG:  -- if you look at the first

9    page of the account, it says Jack Owoc, and that goes back

10   to --

11                   THE COURT:  Where is that?

12                   MR. SHRAIBERG:  I'll show you.  It's the

13   debtors' exhibit, where we looked at Page 2 of 2 and

14   Page 1 of 2.

15                   THE COURT:  Okay.  Page 2 of 4, 21-1?

16                   MR. SHRAIBERG:  Oh, I'm sorry, yes, Page of

17   2 of 4, 21-1, Page 2 of 4, Jack Owoc Bang Energy.

18                   THE COURT:  I see, and who sees that?  How

19   do you see that?  How do you get --

20                   MR. SHRAIBERG:  It is the home page, if you

21   go to bangenergy.ceo.

22                   THE COURT:  This is the home page, I got it,

23   okay.

24                   MR. SHRAIBERG:  Correct, and it says --

25                   THE COURT:  So anyone can push the

Page 95

```
 1    little icon of the home, and they would end up at this
 2    page?
 3                   MR. SHRAIBERG:  Which home are you referring
 4    to?  I apologize.
 5                   THE COURT:  On the bottom of Page 2, there
 6    is a bunch of icons.
 7                   MR. SHRAIBERG:  This is where my social
 8    media -- I believe that's the case.  I found this page by
 9    doing a search for bangenergy.ceo, and this is the screen
10    you land on.  So I believe it is a home page, but I don't
11    want to --
12                   THE COURT:  Okay.  All right.
13                   MR. SHRAIBERG:  It says, Jack Owoc, Bang
14    Energy, entrepreneur, not that he's the CEO of Bang
15    Energy, and it is --
16                   THE COURT:  No, I see that.  I'm just -- I
17    get it.  I'm just wondering who else sees this, or how
18    easy it is to see it or -- et cetera, but --
19                   MR. SHRAIBERG:  It's the screen that you
20    land on when you type in bangenergy.ceo.
21                   THE COURT:  Okay.
22                   MR. SHRAIBERG:  And it's what they
23    reference, this is the plaintiffs' exhibit.
24                   THE COURT:  I understand.  Yep, you're
25    right, you're absolutely right.
```

1                    Okay.  Anything else, Mr. Shraiberg?  I've

2     got to wrap you up.

3                    MR. SHRAIBERG:  I believe that's everything.

4     Let me just, one last -- one moment, your Honor.

5                    THE COURT:  Remember I have all the

6     papers, and I've read them, and so -- and I will read them

7     again.

8                    MR. SHRAIBERG:  I believe that is

9     everything.  If I can have one moment to speak with my

10    co-counsel?

11                   THE COURT:  Sure.

12                   MR. SHRAIBERG:  I just wanted to point out

13    the timing of today's motion for summary judgment with

14    regard to that (inaudible) a discovery deadline set yet,

15    but other than that, we believe the debtor has not met its

16    burden in this case.

17                   THE COURT:  All right.  Thank you,

18    Mr. Shraiberg.

19                   Okay.  Mr. Murtagh.

20                   MR. MURTAGH:  Thank you, your Honor.

21                   THE COURT:  Keep it short.

22                   MR. MURTAGH:  I will, your Honor.  I think

23    I've got five points.

24                   Just starting where your Honor ended, on

25    the, quote, unquote, home page of Instagram, that is what

Page 97

1    the Instagram page, I believe, showed today, or whenever.

2    We didn't publish this.  This is the defendants' exhibit.

3    Okay.  This is their exhibit.  I don't know when the last

4    time the home page was changed is.

5                    You'll note and can draw whatever inferences

6    you want, that this page no longer references that he's

7    even the CEO of Bang Energy, but if this became material,

8    and I don't think it will, there are prior versions that

9    don't say this, your Honor.

10                   Second, we showed you in the presentation

11   the home page for the TikTok account, which appears

12   unmodified, references to CEO, links to bangenergy.com,

13   and advertising Raging Raspberry Hibiscus.

14                   So, the fact that some of these may have

15   been updated to wash out the reference, if that becomes a

16   material fact, we'll have an opportunity to demonstrate

17   that it's been modified, and some of them have not been

18   modified but, again, your Honor, I don't think it matters,

19   that's the more important point.

20                   To go back to the top, I think there was an

21   assertion that we sort of cherry-picked what we showed

22   your Honor.  First of all, we didn't cherry-pick the law.

23   We cited to your Honor the case law that exists on this

24   topic, all of it, and we used it.

25                   Mr. Shraiberg didn't cite a single case,

1    because he's making up a new set of factors that he hopes

2    favors him, or merits discovery, but they've got no

3    support anywhere, your Honor.

4                    Second, we didn't cherry-pick the exhibits.

5    Every exhibit I showed your Honor in the presentation was

6    taken from Mr. Owoc's declaration, and we were choosing

7    examples.  Ultimately it's not a math test, but I think

8    we've probably, in the presentation, have used half of, or

9    more than half of what's in the Instagram account to

10   demonstrate that it's marketing, as has been construed

11   under the relevant case law.  We didn't cherry-pick

12   anything.  We didn't bring our own.  We just used what the

13   defendants wanted you to see.

14                    THE COURT:  What's the impact, in your view,

15   of the Valentine's Day post, or the post with family, or

16   the post about, you know, how to live your life as a

17   general matter, and things of that sort, that really

18   don't have, for example, necessarily a product front and

19   center, aren't really talking about the Bang Energy

20   products, but may reference Bang Energy, you know, handles

21   on the side, among others, what's your view of the impact

22   of that?  Do I count them all up?  I mean, what do I do

23   with that?

24                    MR. MURTAGH:  Well, your Honor, if I can

25   answer that in -- if I can also just share the screen for

1    a minute, because I have those posts.  Can we show you the

2    screen again?

3                    THE COURT:  Sure.

4                    MR. MURTAGH:  Okay.  This is what you're

5    talking about, your Honor, at least in part, the

6    Valentine's Day --

7                    THE COURT:  Well, no, no, no.  I mean, there

8    is one where there was the family, all the kids, I think

9    there were -- I was very impressed, there were five or six

10   kids, what a great family, but they're not necessarily

11   these, I don't remember what they were, but just as a

12   general matter, let's assume that there are some posts

13   that involve much less about Bang Energy drinks, if not

14   nothing, but very little, and just talk about, you know,

15   life and, you know, Jack Owoc's, you know, advice about

16   life, and things that are important, et cetera.

17                   MR. MURTAGH:  Right.

18                   THE COURT:  What impact --

19                   (Two people speaking.)

20                   THE COURT:  What impact does that have on

21   the analysis?

22                   MR. MURTAGH:  So, your Honor, two things.

23   First, let's take the simplest example.  Are there posts

24   here, I think there are a handful of posts in defendants'

25   selected exhibits, in which, say, Mr. Owoc and his family

1    are around a Christmas tree, and I don't perceive a

2    product in that post.

3              THE COURT:  Right, that's what I'm asking

4    about.

5              MR. MURTAGH:  For purposes of today's

6    argument, we don't need to debate whether there is some

7    sort of subtle marketing going on in those, because they

8    can exist as drops in the ocean of the marketing content

9    that comprises the account content here, and not affect

10   what it is on balance.  Again, this is what the cases are

11   looking at with regard to how the account is used, is what

12   on balance is going on, what is it really about?

13             Of course --

14             THE COURT:  Well, it is a balancing, that's

15   what I'm asking.  The standard is, it's a balancing, and

16   your argument is that the overwhelming number of posts are

17   product related and, therefore, under that -- under those

18   facts, the standard would dictate that the account is

19   owned by the company.

20             MR. MURTAGH:  Correct, your Honor.  There is

21   three factors that are in the JLM recitation of the proper

22   analysis.  Within the second factor, how is the account

23   used?  The courts look at, what, in the totality of the

24   sweep of what we see in this account, is it being used

25   for?

1    THE COURT:  I see, so totality, balancing

2    those kinds of things?

3    MR. MURTAGH:  I think that's fair,

4    your Honor.

5    THE COURT:  Okay.

6    MR. MURTAGH:  And it's not reduced to a math

7    test, right, it's what's this really being used for.

8    THE COURT:  I get it, okay.

9    MR. MURTAGH:  Okay.  So, if I may --

10    THE COURT:  Sorry if I threw you off your

11    five points.  Go ahead.

12    MR. MURTAGH:  No, your Honor, that's okay.

13    The first point was just that we didn't

14    cherry-pick anything.  We found -- we took the law as we

15    found it, we applied it to the fact that the defendant

16    gave them to us, and this is the conclusion.  So there is

17    no cherry-picking.

18    The second, your Honor, with regard to the

19    idea that things might be different if there were more

20    evidence, which is something you discussed with

21    Mr. Shraiberg.  Mr. Shraiberg offered you some additional

22    evidence that, again, was untethered from relevant facts,

23    as expressed in any case law, they were just some other

24    facts that he thought would be interesting.

25    Second, they generally were not new.

1   Mr. Shraiberg said, well, primarily we would all agree on,

2   within these posts, which ones were expressly marketing,

3   which ones weren't, which ones had nothing to do with

4   marketing.  It's the same posts, your Honor, and you can

5   make that determination, that that's not new.

6                  Mr. Shraiberg said that you would have

7   evidence put in the record that the defendants controlled

8   the accounts.  That's not new, they're saying they

9   controlled the accounts, but we told your Honor that if

10  they controlled the accounts, they were also the CEO and

11  head of marketing of the company.  Right, he said there

12  would be evidence about who posted to the accounts, but

13  whether or not there is anything new --

14                 THE COURT:  Well, I think, I think the

15  argument there, just to put a little bit of a finer point

16  on it, on the control side, is that Mr. Shraiberg is

17  arguing that by controlling the account, by controlling

18  what the content is on the account, Mr. Owoc is protecting

19  his persona.  In other words, rather than just letting the

20  accounts go to the marketing department, and the marketing

21  department just posting anything at all, I think the

22  argument, as I am receiving it, at least, is that Mr. Owoc

23  cares about his persona enough that he wants to make sure

24  that what's ever posted is consistent with his view of

25  his persona.  Maybe I'm putting some words in

1   Mr. Shraiberg's mouth, but that's sort of how I'm hearing

2   it.

3           Does he have a right to do that?  I mean,

4   you know, it does say CEO, he was the CEO.  He does, you

5   know, post some individualized things, you know, but it's

6   still ultimately a totality question is what you're

7   saying.

8           MR. MURTAGH:  No, your Honor.  I think that

9   what I'm saying is the totality examination is the second

10  of the three factors, what was the account used for.  If

11  you look at what was done with the account, and you arrive

12  at the conclusion, but --

13          THE COURT:  But the control relates what

14  it's used for, in that the control is controlling the use

15  of it in furtherance of Mr. Owoc's persona.

16          MR. MURTAGH:  Okay, right, your Honor.  So a

17  few responses to that.

18          First, the idea that there is a persona is a

19  legal conclusion, with no evidence in the record, other

20  than Mr. Owoc's say-so, that has been completely

21  untethered from the use of persona in the case law.

22          CTLI references the existence of a persona,

23  and it says in another case I might have a difficult

24  question if the company wanted to use the name and

25  likeness of the founder, because the name and likeness of

1   a person is a persona, to the extent it has value, and if

2   you were saying you need to be able to use it, then I

3   would have a harder time deciding whether I could force

4   that person to allow the company to use the name and

5   likeness.  That's what persona means in the relevant case

6   law.

7              It's not whatever the defendant thinks about

8   himself.  It's his name and his likeness.

9              THE COURT:  So here you're saying that the

10  name and the likeness is not related to the Bang Energy

11  CEO handle, essentially.

12             MR. MURTAGH:  It's plainly not, and we would

13  be happy -- the handle has never referred to Jack Owoc,

14  and we would be happy with control of the account, to make

15  sure it doesn't reference his likeness in any way.  We

16  don't need his likeness, we don't need his persona.  This

17  account --

18             THE COURT:  Is his likeness tethered to the

19  account in some way?

20             MR. MURTAGH:  No, your Honor.

21             THE COURT:  Okay, and how would it be if it

22  were?

23             MR. MURTAGH:  It would be tethered if -- if

24  we needed his likeness --

25             THE COURT:  Not if you needed it.  I'm

1    asking factually, if a person's likeness is tethered to an

2    account, how does that happen?

3                    MR. MURTAGH:  Well, it's -- that's not quite

4    the question that's examined, your Honor.

5                    The question is, if, for instance -- I'm

6    just making something up.  If you needed, if you needed to

7    demonstrate an association with Michael Jordan to promote

8    your account, and you needed his likeness because people

9    looked for his likeness to get to that account, the Air

10   Jordan account, they would need his likeness.

11                   We don't have any necessary association with

12   Mr. Owoc's likeness.  He can take his likeness, and his

13   name, and form his account, and --

14                   THE COURT:  But that's not the question.  I

15   understand that, but that's the result that you're looking

16   for, and the way of mitigating the result with respect to

17   Mr. Owoc's view that it's his account, a likeness, I get

18   that.

19                   I'm asking, from an ownership perspective,

20   there is a couple of ways that it would have been better

21   for Mr. Owoc to be arguing -- or clearer for Mr. Owoc to

22   be arguing that he owns the account.  One would have been

23   if the name Jack Owoc was in the handle, that's one way.

24   Another is this likeness concept.  Is there ever a

25   likeness associated directly with a handle?  I'm asking

1    out of ignorance on social media accounts, and maybe you

2    don't have an answer, and that's fine.  I'm just, you

3    know, I'm asking for my own information.

4                    MR. MURTAGH:  Well, you can put any picture

5    you want next to the handle, and when Mr. Owoc was the CEO

6    of Bang Energy, it was his picture, because he was the CEO

7    of Bang Energy.

8                    THE COURT:  But that could be replaced by

9    the present CEO of Bang Energy.

10                   MR. MURTAGH:  Correct.

11                   THE COURT:  I understand.  Okay.  All right.

12   Go ahead.

13                   MR. MURTAGH:  So that was just by the way, I

14   think, of answering your Honor's question with regard to

15   safeguarding the persona.

16                   The first point is, persona is not, under

17   the case law, what defendants are saying it means.  The

18   second, it just assumes the conclusion, right, it is a

19   conclusion that because I own the account, and it was used

20   for my persona, therefore, my control demonstrates I was

21   protecting my persona.  It's just a conclusion about a

22   fact, but the facts -- first of all, it's not even true,

23   right?  Your Honor, the fact is defendants have conceded

24   that they didn't create the accounts, other people posted

25   to them, and they didn't control them.  They literally are

```
 1    not permitted in this court to walk away from those

 2    concessions.

 3                    THE COURT:  Yes, understood.

 4                    MR. MURTAGH:  So they've already conceded

 5    the point.

 6                    Furthermore, even if they could write on a

 7    clean slate, as your Honor pointed out, they controlled

 8    the accounts allegedly when they were the CEO and head of

 9    marketing for the company.  There is no inference to be

10    drawn that they controlled them in a personal capacity,

11    other than the (inaudible) of Mr. Owoc.

12                    In fact, what they conceded was, these

13    things were done by someone at Vital, and even if today

14    they say that meant Mr. and Mrs. Owoc, they said it was

15    somebody at Vital, acting in their Vital capacity.  That's

16    the fact, no new evidence is going to change that, you

17    have that already, your Honor.

18                    THE COURT:  Yes.

19                    MR. MURTAGH:  So, the facts -- there is no

20    further evidence on control that's going to change

21    anything.

22                    I did not hear anything else that

23    Mr. Shraiberg mentioned that would actually be new, or

24    helpful, or admissible.  Furthermore, defendants had an

25    opportunity to take discovery, your Honor.  This
```

1    proceeding was commenced over a month ago.

2    Mr. DiDonato's declaration has been on file for almost a

3    month.  They say they need discovery, but they -- and

4    pointed to why they might want it, but they've never asked

5    for any.  They still haven't asked for any.  They had an

6    opportunity.

7                    In the stipulation they seek to get away

8    from now, they agreed that any discovery would be

9    expedited in order to allow your Honor to have this

10   hearing today, and they still haven't done it.  Time

11   is up.  There is nothing new to find, but the time is

12   up, your Honor, and that's the second point on new

13   evidence.

14                   Third, your Honor, I think there was

15   reference to the ability to change the account handle.  Of

16   course the account handle can be changed, but it doesn't

17   answer the question who owns the account.  It begs the

18   question who deserves to benefit from the followers of

19   that account, right?  And there, your Honor, there was a

20   question around who -- basically, who is responsible for

21   these followers today, and is there any evidence in the

22   record?

23                   Well, there is a couple of things,

24   your Honor, if I could just pull up the presentation one

25   more time.

1              THE COURT:  Yep.

2              MR. MURTAGH:  Sorry, I'm just scrolling

3    back.  So, these are product giveaways, your Honor.

4    You'll notice, if you can see it, there is a highlighted

5    box around the big one, the St. Patrick's Day t-shirt

6    giveaway, and what you're required to do here is to follow

7    @bangenergy and @bangenergyceo, in every single one of

8    these, they are linked.  These promotions are intended to

9    get you to follow both accounts, and you're not being fed

10   into Bang Energy by the Jack Owoc persona, you're being

11   fed into Bang Energy CEO by your desire to obtain a Bang

12   Energy product, and the Bang Energy Instagram account has

13   double the following, right, and you're being asked to

14   pair them in service of the company, and you'll see this

15   later on when we talk about the Instagram posting, under

16   the product giveaways, Mr. Owoc is re-tweeting a Bang

17   Energy product giveaway, and asking that you follow

18   @bangenergyceo.

19             The content that's driving the views to Bang

20   Energy CEO is Bang product giveaways from the Bang Energy

21   Instagram site, that's where the following is coming from,

22   that's the evidence in the record.

23             There is literally zero evidence that the

24   flow is going the other way, that people are so

25   interested in the novel Jack Owoc persona, that they want

1   to link back of their own free accord to Bang Energy,

2   that's the evidence in the record of where the following

3   comes from.

4                   THE COURT:  Okay.

5                   MR. MURTAGH:  And I think that that's all I

6   heard that I wanted to respond to in Mr. Shraiberg's

7   presentation, your Honor.

8                   Again, we cited and relied upon all the case

9   law that exists.  We've applied that case law essentially

10  to undisputed facts, because it's the evidence that

11  defendants submitted, and when you marry the one to the

12  other, it's absolutely clear that all of the factors

13  demonstrate company ownership in this case.

14                  THE COURT:  All right.  Thank you.  Thank

15  you both very much.  A very interesting argument.  I will

16  do my best to get an order out promptly, and anything else

17  we can do here today?

18                  MR. GUSO:  May I be heard briefly,

19  your Honor?

20                  THE COURT:  Yes, sure, Mr. Guso.

21                  MR. GUSO:  Thank you, your Honor.

22                  If I may.  Your Honor, shortly before the

23  start of this hearing, the Court entered an order granting

24  the debtors' motion for contempt, it's Docket Entry 61.

25  In Paragraph 2 of that order, your Honor, Mr. Owoc is

1    afforded the opportunity to purge his contempt by deleting

2    his April 10th comments below the debtors' Instagram

3    account.

4                    Your Honor, subsequent to the April 12th

5    hearing when we were before you on this matter, Mr. Owoc

6    actually made two additional posts, one on April 18th, and

7    one on April 20th, and I wonder, your Honor, if the Court

8    (inaudible) -- that matter now, if Mr. Owoc could also

9    take down those comments, or whether the debtor should

10   seek additional leave before the Court.  My sole interest

11   is in proceeding efficiently, your Honor.

12                    THE COURT:  I understand.

13                    So, Mr. Shraiberg, I think this question is

14   more to you than to me, which is whether, in keeping with

15   my prior ruling from earlier today, since these -- since

16   the original comment that was posted, I found to be

17   violative of the order, it certainly is reasonable to

18   conclude that the subsequent comments that have been

19   posted, which I don't recall seeing.  Have I seen those,

20   Mr. Guso?  I don't think I have.  Have I?

21                    MR. GUSO:  I believe one you have,

22   your Honor, it was included in our supplemental brief, the

23   April 18th post, and then there was a subsequent one made

24   on April 20th, while your Honor had the matter under

25   advisement.  That one you haven't seen.

1          THE COURT:  All right.  Do you have any -- I

2  guess what he's asking is does he need to file a motion,

3  and do we need to go through this process again with

4  respect to those specific comments, or will it, I guess,

5  the order apply to all subsequent posts as well?

6          MR. SHRAIBERG:  I think the order would

7  apply to the subsequent posts as well right now.

8          THE COURT:  All right.  So, as it stands

9  right now, Mr. Shraiberg has essentially agreed that it

10  applies.  What Mr. Owoc does or doesn't do is, I guess, to

11  be determined, and of course you know where to find me if

12  you feel further relief is needed from the Court.

13          MR. GUSO:  Yes, sir.  Thank you, your Honor.

14  Thank you, Mr. Shraiberg.

15          THE COURT:  All right.  Okay.  Anything else

16  to do here today?

17          MR. MURTAGH:  Nothing from the debtors,

18  your Honor.

19          THE COURT:  All right.  Thank you all.

20  Really, fascinating arguments, I appreciate it very much,

21  and I will, again, get back to you.

22          I'm sure there is some law students that

23  have been watching.  I'm about to take up a mock argument

24  by those law students and, you know, if you guys want to

25  hang around and watch the law students, and learn from

1    them as much as I'm sure they've learned from you, feel

2    free.

3                     MR. MURTAGH:  Thank you, your Honor.

4                     MR. GUSO:  Good afternoon.

5                     THE COURT:  Have a great day.

6                     MR. SHRAIBERG:  Thank you.

7

8                     (Thereupon, the hearing was concluded.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 114

1

2

3                         **CERTIFICATION**

4

5    **STATE OF FLORIDA        :**

6    **COUNTY OF MIAMI-DADE  :**

7

8                    **I, Cheryl L. Jenkins, RPR, RMR, Shorthand**

9    **Reporter and Notary Public in and for the State of Florida**

10   **at Large, do hereby certify that the foregoing proceedings**

11   **were transcribed by me from a digital recording held on**

12   **the date and from the place as stated in the caption**

13   **hereto on Page 1 to the best of my ability.**

14                    **WITNESS my hand this 1st day of May, 2023.**

15

16

17          _____

18              **CHERYL L. JENKINS, RPR, RMR**

19              **Court Reporter and Notary Public**
             **in and for the State of Florida at Large**
20                  **Commission #HH 170910**
                  **December 27, 2025**

21

22

23

24

25