1              UNITED STATES BANKRUPTCY COURT.

               SOUTHERN DISTRICT OF FLORIDA

2

3

4  IN RE:               CASE NO. 22-17842-PDR

5  VITAL PHARMACEUTICALS, INC.,

6         Debtor.

  _____/

7

8          ECF #558, 986, 988, 991, 992,

           993, 994, 996, 997, 998, 999

9

              April 20, 2023

10

11         The above-entitled cause came on for hearing

12  before the Honorable Peter D. Russin, one of the Judges in

13  the UNITED STATES BANKRUPTCY COURT, in and for the

14  SOUTHERN DISTRICT OF FLORIDA, at 299 E. Broward Blvd.,

15  Fort Lauderdale, Broward County, Florida, on April 20,

16  2023, commencing at or about 1:30 p.m., and the following

17  proceedings were had.

18

19

20

21

22

23

24    Transcribed from a backup of the digital recording by:

           Cheryl L. Jenkins, RPR, RMR

25

```
 1
                    APPEARANCES VIA ZOOM:
 2
 3                   BERGER SINGERMAN, by
                      JORDI GUSO, Esquire
 4                  MICHAEL NILES, Esquire
                             and
 5                   LATHAM & WATKINS, by
                    ANDREW SORKIN, Esquire
 6                  On behalf of the Debtor
 7
                     QUARLES & BRADY, by
 8                CHRISTOPHER COMBEST, Esquire
                     DAVID MUTH, Esquire
 9         Special Counsel on behalf of the Debtor
10
                   SANCHEZ FISCHER LEVINE, by
11                   DAVID LEVINE, Esquire
                  VERONICA RABINOWITZ, Esquire
12         Special Counsel on behalf of the Debtor
13
                      SEQUOR LAW, by
14                  JUAN MENDOZA, Esquire
                             and
15                 LOWENSTEIN SANDLER, by
                    RACHEL MAIMIN, Esquire
16                 LINDSAY SKLAR, Esquire
                    On behalf of the Official
17            Committee of Unsecured Creditors
18
                     AKERMAN, LLP, by
19                MICHAEL GOLDBERG, Esquire
                             and
20          PACHULSKI STANG ZIEHL & JONES, by
                  ROBERT FEINSTEIN, Esquire
21             On behalf of Monster Energy
22
23
24
25
```

Page 3

1

             CONTINUED APPEARANCES VIA ZOOM

2

3

       J. STEVEN WILKES, Trial Attorney

         Office of the U.S. Trustee

4

          Department of Justice

5

            ALSO PRESENT

6

7

   ECRO - Electronic Court Reporting Operator

8

             - - - - - - -

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    (The following was transcribed from a backup

2    digital recording and not from the main DAR recording due

3    to the courthouse being closed.)

4                    THE COURT:  Moving to Vital Pharmaceuticals,

5    22-17842.  Appearances, please.  Mr. Guso.

6                    MR. GUSO:  Yes, sir.  Good afternoon,

7    your Honor.  Jordi Guso, of Berger Singerman.  Along with

8    the Latham & Watkins firm, we are co-counsel to the

9    debtors.

10                   THE COURT:  Thank you.

11                   Mr. Wilkes.

12                   MR. WILKES:  Good afternoon, your Honor.

13   J. Steven Wilkes for the United States Trustee, Region 21.

14                   THE COURT:  Thank you.

15                   Ms. Sklar.

16                   MS. SKLAR:  Good afternoon, your Honor.

17   Lindsay Sklar, from Lowenstein Sandler, for the official

18   committee of unsecured creditors, and with me today is my

19   colleague, Rachel Maimin.

20                   THE COURT:  Thank you.

21                   Mr. Sorkin.

22                   MR. SORKIN:  Good afternoon, your Honor.

23   Andrew Sorkin, Latham & Watkins, on behalf of the

24   debtors.

25                   THE COURT:  Thank you.  Mr. Niles.

```
 1                    MR. NILES:  Good afternoon, your Honor.
 2  Mike Niles, from Berger Singerman, also on behalf of the
 3  debtors.
 4                    THE COURT:  Thank you.
 5                    Mr. Mendoza.
 6                    MR. MENDOZA:  Good afternoon, your Honor.
 7  Juan Mendoza, Sequor Law, on behalf of the official
 8  committee of unsecured creditors.
 9                    THE COURT:  And Mr. Combest.
10                    MR. COMBEST:  Good morning (sic),
11  your Honor.  Christopher Combest, of Quarles & Brady.
12  Quarles is special counsel to the debtors, and today I am
13  here with my colleague, David Muth, who may just be on the
14  phone right now, in support of our fee application.
15                    There he is.
16                    THE COURT:  Yes, I see him, Mr. Muth.
17                    MR. MUTH:  Good afternoon, your Honor.
18                    THE COURT:  Just make your appearance,
19  please.
20                    MR. MUTH:  David Muth, Quarles & Brady,
21  special counsel to the debtor.
22                    THE COURT:  I forgot to ask you all to spell
23  your names.  So we're not going to, and if I get in
24  trouble with the court reporter, so be it.  So I'm risking
25  my life for you all.
```

Page 6

1                    Anyway, Mr. Levine.

2                    MR. LEVINE:  Good afternoon, your Honor.

3    David Levine, as special counsel to the debtor, and with

4    me is my law partner, Veronica Rabinowitz.

5                    THE COURT:  All right.  Anyone else?

6                    (No verbal response.)

7                    THE COURT:  Okay.  All right.  So, first

8    there is a status conference on 558, which was the motion

9    to establish procedures pursuant to Section 503(b)(9).

10   Who is handling the hearing, Mr. Guso?

11                   MR. GUSO:  Your Honor, Mr. Niles will be

12   addressing the Court in connection with that matter.

13                   THE COURT:  All right.  I don't mean to

14   dictate an order in which to proceed.  So, Mr. Niles, do

15   you want to start with that, or something else?

16                   MR. NILES:  Absolutely, your Honor.

17                   THE COURT:  Okay.  Go for it.

18                   MR. NILES:  Thank you.  Again, this is

19   Michael Niles on behalf of the debtor, presenting on the

20   motion -- on a status conference regarding 503(b)(9)

21   claims that were filed pursuant to the debtors' approved

22   procedures set forth in the order filed at ECF 715.

23                   Your Honor, pursuant to the approved

24   (inaudible) procedures, we received 12 proof of claims

25   asserting 503(b)(9) claims.  The total amount of those

1    claims were $708,149.  However, there does appear to be

2    two duplicate claims, that reduces the total payment

3    amount to approximately $479,000.

4                    Additionally, the debtors recently

5    identified another creditor that's potentially entitled to

6    a 503(b)(9) claim, and we served them with the 503(b)(9)

7    order and proof of claim form, which the certificate of

8    service is at ECF 1209.

9                    They'll have 45 days to file their claim,

10   but the debtors are in the process of reviewing each of

11   the 503(b)(9) claims, and we'll work collaboratively with

12   the committee to reconcile the claims.

13                   THE COURT:  Okay.  All right.  So it seems

14   like you had a significant overestimate there, which is

15   good news.

16                   All right.  Anything else you need to

17   report?

18                   MR. NILES:  Nothing else on the status

19   conference, your Honor.

20                   THE COURT:  Okay.  Anyone else wish to be

21   heard?

22                   MS. MAIMIN:  Yes, your Honor, this is

23   Rachel Maimin.  I was hoping to address the Court about a

24   matter related to this case.

25                   THE COURT:  Yes, no problem, Ms. Maimin.

1    Just speak up a little bit because it's hard to hear you.

2                    MS. MAIMIN:  Oh, I apologize.  Can you hear

3    me now?

4                    THE COURT:  Yes, better.

5                    MS. MAIMIN:  Okay.  Good.

6                    Your Honor will recall that we had

7    previously got relief from the Court because we hadn't yet

8    received any material from the (inaudible) in this case,

9    Jack Owoc.  To date we still have not received a single

10   document from him.

11                   Your Honor had previously ordered immediate

12   production of his materials, but when new counsel came

13   into the case, we compromised on an agreed order in which

14   he would produce material by a certain date.

15                   THE COURT:  Is this Mr. Shraiberg --

16                   MS. MAIMIN:  Yes.

17                   THE COURT:  -- the new counsel?

18                   MS. MAIMIN:  Yes.

19                   THE COURT:  Okay.

20                   MS. MAIMIN:  And we agreed to that, and then

21   Mr. Shraiberg filed a motion for an extension until

22   April 27th, even though the deposition is scheduled

23   May 5th, and the original order had ordered a rolling

24   production, even though we haven't received anything.

25                   We filed an objection, and requested an

1    expedited hearing, and the hearing was moved from

2    May 11th to 4-27, which was expedited, but it effectively,

3    or exactly grants the relief that's sought by

4    Mr. Shraiberg.

5                    So, we're not really having the opportunity

6    to be heard on our motion, and we're still going days

7    without any production.  We're seeking an earlier date,

8    please.

9                    THE COURT:  Okay.  Well, if I deny the

10   extension, and they -- the person, Mr. Owoc, has therefore

11   not complied with my prior order compelling, it seems to

12   me that a number bad things flow from that.

13                   MS. MAIMIN:  Yes, your Honor.

14                   THE COURT:  So, I'm not sure -- when is the

15   deposition?

16                   MS. MAIMIN:  The deposition is presently

17   scheduled for May 5th, and we will make ourselves,

18   obviously, available any time before April 27th.  We just

19   want to start receiving documents so we can prepare.

20   We've already --

21                   THE COURT:  Well, I already gave you that

22   remedy, but their filing of a motion for extension of time

23   in the face of an order compelling isn't the same as a

24   motion for extension of time with respect to a deadline,

25   where an order compelling does not exist, at least in my

1    view.

2                    MS. MAIMIN:  No, I agree, your Honor.

3                    THE COURT:  So, Mr. Owoc is taking a risk

4    here by not complying, and thinking a motion for extension

5    of time solves that problem.  It doesn't.  So -- but by

6    the same token, I didn't really want to set it -- I wasn't

7    sure, frankly, by your motion when you wanted the hearing.

8    Was it clear in the motion, I don't recall, or the

9    objection?

10                    MS. MAIMIN:  We just asked for a hearing as

11   soon as possible, your Honor.

12                    THE COURT:  So when you do that, I guess

13   that leaves me way too much wiggle room, Ms. Maimin.

14                    MS. MAIMIN:  Oh, I apologize.

15                    THE COURT:  (Inaudible.)

16                    MS. MAIMIN:  To be more specific, the

17   nearest moment that the Court has available.

18                    THE COURT:  Yeah, I mean, I get that, but

19   then I -- just so you know, I think about other things

20   than just the moment I have available.  I think about

21   noticing.

22                    MS. MAIMIN:  Of course, of course, Judge.

23                    THE COURT:  All right.  So, let me --

24                    MS. MAIMIN:  (Inaudible.)

25                    THE COURT:  So there is not a lot of time

Page 11

1   before the 27th --

2              MS. MAIMIN:  No.

3              THE COURT:  -- to have a hearing.

4              MS. MAIMIN:  That's true, but we'll take

5   anything we can, because we just want to receive -- start

6   receiving documents.

7              I don't know if --

8              THE COURT:  All right.  So, I'm going to,

9   I'm going to notice it for the hearing date of the 25th,

10  which is the date of the hearing on the motion for summary

11  judgment in the Vital versus Owoc matter, that's at 1:30.

12             Did I notice it by order or by clerk's

13  notice?

14             MS. MAIMIN:  I'm not certain of that,

15  your Honor.

16             THE COURT:  Okay.  So, just give me an order

17  saying that the Court considered the matter ore tenus at

18  this hearing, and ordered that the hearing is reset for

19  1:30 on April 25th.

20             MS. MAIMIN:  Thank you, your Honor.  We

21  really appreciate your consideration.

22             THE COURT:  Yes, no problem.  I'm not sure

23  it's really going to make that much of a difference, given

24  that it's only two days in advance, but since everybody is

25  going to theoretically be there anyway, it probably makes

1    sense to do that, but next time just -- and just for

2    everybody, just tell me what day you want, okay?  That way

3    at least -- and why you want it on that specific date, or

4    close to that date, and that makes it a lot easier for us.

5              And by the way, we get a gazillion emergency

6    motions.  It's almost as though everything is expedited or

7    an emergency.  So it starts to lose its meaning after a

8    while.  So just be aware of that, and just be very

9    specific, in bold, right after the heading, that it's an

10   emergency or expedited, why it's an emergency or

11   expedited, and the very specific date you want it by and

12   why.

13             If you do that, it makes it much easier on

14   my office to get that -- to get you what is necessary,

15   okay?

16             MS. MAIMIN:  We will be mindful of that,

17   Judge.  Thank you very much, and we apologize for any

18   confusion.

19             THE COURT:  No apology necessary, it's all

20   good.  I just want you all to know what we go through on

21   this side, which is managing, you know, like, 3,000 cases.

22   Luckily I don't have to look at all of them, but it's

23   managing the docket, and it's not obvious how that

24   happens.

25             By the way, I would have done things much

Page 13

1    differently as a lawyer if I knew then what I know now.

2    I'm always trying to help you guys.

3                    Anyway, all right, all good.  Okay.  So, get

4    me that order, and now I think we're up to fee apps, is

5    that right?

6                    MR. GUSO:  Yes, sir.

7                    THE COURT:  Who is handling that, Mr. Guso?

8                    MR. GUSO:  Your Honor, there are nine

9    applications for interim compensation before the Court.

10   On the debtors' side, your Honor, I will handle all of

11   them, aside from the Latham & Watkins' application, which

12   Mr. Sorkin will handle, and I'm happy to take them up in

13   any order the Court wishes.

14                   THE COURT:  Okay.  Let me -- before we go

15   there, let me just, on this emergency motion thing, we get

16   a lot of these, and we get a lot of these in this case, as

17   you know, a lot of emergency motions or expedited motions,

18   like, Docket Entries 1185, 1188, in particular, you know,

19   it seems to me that those motions could have been filed

20   earlier, and they weren't, which would have created the

21   emergency.

22                   You know, if you all can think as far ahead

23   as possible, and just don't create the emergency by

24   waiting to file the motion.  If it can be filed earlier,

25   it helps everyone.  So, I'm just putting that out there.

1               A lot of, you know, practicing law is

2    anticipating what you're going to need as quickly as

3    possible.  So, if you can do all that, it's going to be

4    very helpful.

5               I also note that there is about

6    $16.7 million in funds available.  If I granted all of the

7    fees today, and expenses, I think it uses up almost all of

8    that money.

9               I'm not saying I won't do that, but I do

10   need to understand what the relationship is between the

11   available cash, and the granting and paying of these fee

12   apps.

13              Is there anyone that can address that,

14   Mr. Guso?

15              MR. GUSO:  I can answer that question with

16   the Court's permission, your Honor.

17              THE COURT:  Of course.

18              MR. GUSO:  Thank you.

19              Your Honor, actually nearly all of the

20   applications that are before you request compensation that

21   the debtors have already paid in accordance with the

22   interim compensation procedures order.

23              THE COURT:  Ah, okay.

24              MR. GUSO:  Yes, sir, and so, your Honor,

25   that interim compensation procedures order did require the

1    professionals to file quarterly fee applications,

2    notwithstanding their service of monthly fee statements to

3    the debtor, the committee, and the other noticed parties

4    in the case.

5              In my experience, your Honor, in this

6    District, that's customary so as to afford other parties,

7    who are not noticed parties under the interim compensation

8    procedures order, the opportunity to be heard if there is

9    concerns regarding the applications.

10             Your Honor, I can report to the Court that

11   we visited with Mr. Wilkes.  The United States Trustee

12   does not have opposition to the applications that are

13   before you.

14             There are two applications which are subject

15   of committee's limited objections and reservation of

16   rights.  None of the other applications, to my knowledge,

17   are subject of objection, your Honor.

18             THE COURT:  And in granting the

19   applications, it's still -- there is still a holdback --

20             MR. GUSO:  Yes, sir.

21             THE COURT:  -- pending final applications of

22   the 20 percent, so that you're not asking that the

23   holdback be paid, is that right?

24             MR. GUSO:  That's correct, your Honor.  None

25   of the professionals are requesting at this juncture an

1   award of the payment of the 20 percent that has been held

2   back in accordance with the interim compensation

3   procedures order.

4                    I would describe the procedure that's before

5   the Court as interim ratification of the compensation that

6   the debtors have paid in accordance with the interim

7   compensation procedures order.

8                    THE COURT:  With no change in financial

9   impact since they've been, essentially, paid on a

10  monthly --

11                   MR. GUSO:  Correct, your Honor.

12                   THE COURT:  I understand.

13                   Okay.  All right.  Great.  Thank you for

14  that, Mr. Guso.

15                   All right.  So, I guess I'll just take these

16  in the order in which they appear in my notes.  Docket

17  Entry 986 is the first fee application for Sanchez Fischer

18  Levine.

19                   MR. GUSO:  Yes, Judge.

20                   THE COURT:  Mr. Guso.

21                   MR. GUSO:  Your Honor, Mr. Levine is

22  participating remotely, your Honor.  His firm is special

23  litigation counsel to the debtors in connection with two

24  matters that are pending in the District Court, both

25  involving Monster Energy, and certain of its affiliates,

1  in the what we call the 2019 case, your Honor, it's

2  litigation that is pending before Judge Altonaga, where

3  Vital Pharmaceuticals has asserted claims under the Lanham

4  Act and the Florida Deceptive and Unfair Trade Practices

5  Act.

6          As I said, your Honor, this case is before

7  Judge Altonaga, was recently reopened, and leave was

8  granted by Judge Altonaga for the debtor to amend the

9  complaint over Monster's objection.

10          The second case, your Honor, is before

11  Judge Altman, and that involves claims by Vital

12  Pharmaceuticals, as well as against Monster Energy, for

13  violation of common law -- excuse me, common law unfair

14  competition, and also violations under the Lanham Act.

15          Here, your Honor, Monster has moved to

16  dismiss the case, and has also served a motion for

17  sanctions, which the debtors are evaluating special

18  counsel.  Special counsel who is present, your Honor, is

19  confident that the motion lacks merit.

20          Notwithstanding, your Honor, for the period

21  October 1st, 2022 to February 28th, 2023, the Sanchez

22  Levine firm requests interim compensation of $102,433.11

23  in fees, and two thousand nine hundred -- $2,798.45 in

24  costs.  On an interim basis, your Honor, they request an

25  award of 80 percent of the fees, consistent with the

1    interim compensation procedures, which I understand the

2    debtors have already paid, and as I said, your Honor, this

3    application is subject to a reservation of rights filed by

4    the committee and by Monster.

5                    I won't speak for Mr. Levine but,

6    your Honor, the Sanchez Levine firm acknowledges, like the

7    other professionals that are before you this afternoon in

8    connection with requests for interim compensation, that

9    all of these applications, even if awarded, are subject to

10   further review when the Court considers the final

11   applications for compensation.

12                   Your Honor, I'm happy to answer any

13   questions the Court may have, or yield the virtual lectern

14   to Mr. Levine, who knows more about the underlying cases,

15   candidly, than I do.

16                   THE COURT:  Sure.

17                   I don't have any specific questions.  Just

18   to confirm, though, the 102,433 is the total fees billed

19   during that time period, of which 80 percent has been

20   paid, correct?

21                   MR. GUSO:  That's correct.  That's correct,

22   your Honor.

23                   And, again, the applicants are only seeking

24   a ratification of that 80 percent award at this juncture.

25                   THE COURT:  Understood.  Okay.  Thank you

Page 19

1    for that.

2                    All right.  Mr. Levine, anything to add?

3                    MR. LEVINE:  Nothing to add beyond what

4    Mr. Guso said.

5                    THE COURT:  All right.  Thank you.

6                    And who wishes to be heard for Monster?

7                    (No verbal response.)

8                    THE COURT:  I don't see anybody on behalf of

9    -- I see Mr. Goldberg, but he hasn't made an appearance.

10   Mr. Feinstein.  Anybody?

11                   MR. FEINSTEIN:  Good afternoon, your Honor.

12   Robert Feinstein, F-e-i-n-s-t-e-i-n.

13                   We filed a simple reservation of rights, but

14   don't wish to be heard otherwise at this point.

15                   THE COURT:  Understood.  Okay.  Thank you

16   for that.

17                   And the committee, who wishes to be heard,

18   Ms. Sklar?

19                   MS. SKLAR:  Yes.  Lindsay Sklar for the

20   committee.

21                   Similarly, we filed a reservation of rights,

22   but don't seek to be heard in relation to this matter at

23   that time.

24                   THE COURT:  All right.  Thank you.

25                   All right.  So -- and, Mr. Levine, you're

Page 20

1    aware that the objection -- the fee applications, on an

2    interim basis, although granted, are still subject to

3    final fee applications, and a final hearing where, you

4    know, just to put it clearly, it's a whole new ball game

5    in terms of objections, we have to deal with it at that

6    point.

7                    You may not be familiar with the Bankruptcy

8    Court, but fees are granted on an interim basis fairly

9    typically, with a 20 percent holdback, but the objections

10   are all preserved for the final fee application and final

11   hearing, all right?

12                    MR. LEVINE:  Thank you.

13                    THE COURT:  Okay.  All right, then the Court

14   will grant the application as provided and, Mr. Guso,

15   you're going to submit that order?

16                    MR. GUSO:  Yes, sir.

17                    THE COURT:  All right.  Great.

18                    Let's move to 988, which is the first

19   application for interim compensation of Grant Thornton,

20   and let me raise this issue first, as I understand it,

21   what I did was approve the application for Grant Thornton

22   as the tax accounting firm for the debtor, but as I

23   understood it, any objections to fee applications, or fee

24   apps disputed -- fee applications, generally, would go to

25   Judge Grossman, is that right, Mr. Guso?

```
 1                    MR. GUSO:  That's correct, your Honor.
 2                    THE COURT:  Okay, and I assume that there is
 3    no issue with me ruling on this on an interim basis, since
 4    there doesn't seem to be any objections or even
 5    reservation of rights?
 6                    MR. GUSO:  None from the debtors,
 7    your Honor.
 8                    THE COURT:  All right.  Does anyone else
 9    wish to be heard on that?
10                    (No verbal response.)
11                    THE COURT:  Okay.  All right.  Mark -- the
12    reason for this is Mark Margulies, who is the managing
13    partner, or tax partner at Grant Thornton, is my first
14    cousin.  So we had this whole discussion about what my
15    role would be in these fee apps, and while it would give
16    me great pleasure to deny them all, I'm kidding, the idea
17    was that Judge Grossman would deal with any disputes, and
18    there doesn't seem to be any.  So, that's the idea.
19                    MR. GUSO:  Yes, sir.
20                    THE COURT:  Did you want to say something?
21                    MR. GUSO:  No, sir.
22                    THE COURT:  Oh, I thought I heard from
23    Mr. Combest.
24                    Okay.  So, the Court will grant that on an
25    interim basis, all objections preserved for final hearing
```

Page 22

1   80/20, for the prior matter as well.

2                   (Two people speaking.)

3                   THE COURT:  I'm sorry, Mr. Guso?

4                   MR. GUSO:  I said, yes, sir.

5                   THE COURT:  Okay, and you'll get me that

6   order?

7                   MR. GUSO:  I shall.

8                   THE COURT:  All right.  991, first

9   application for interim compensation of Berger Singerman.

10  Mr. Guso.

11                  MR. GUSO:  Yes, sir.  Again, your Honor,

12  this application covers the period, the petition date to

13  February 28th, 2023, representing, your Honor, 1,258 hours

14  of services for the debtor, at a blended hourly rate of

15  $513.95.  Our firm also incurred $7,393.73 in expenses.

16                  At this time, your Honor, we're seeking a

17  ratification of the 80 percent that the debtors have paid

18  in accordance with the interim compensation procedures

19  order, which totals $518,066, and we're also requesting a

20  hundred percent of the costs on an interim basis.

21                  THE COURT:  All right.  Let me just start

22  out by telling you that we had some trouble reviewing

23  these and other applications because, because they are not

24  formatted so that we can search, as searchable documents,

25  which they are required to be.

1          Local Rule 5005-1(a)(1) requires that all

2   PDF files be text searchable.  It helps us tremendously to

3   be able to search these pleadings, really all pleadings.

4   So, I will ask that you -- for either the objections or

5   reservations of rights, if any, but I guess you don't need

6   to do it for this one, but the next one -- actually, I

7   think you do.  If the next fee application is not going to

8   subsume this fee application, or the final doesn't subsume

9   this fee application, we're going to need to have them

10  searchable.  So, you may need to re-file them in a

11  searchable PDF format.  Is that a problem?

12          MR. GUSO:  No, sir.  In fact, we'll do that

13  promptly, your Honor.  I'm surprised by the Court's

14  comments.  I was not aware that they were -- this was not

15  in searchable text.  Our filings typically are.  I don't

16  know what happened with this one.  I apologize to the

17  Court, but we'll do a notice of filing of a searchable

18  version of the fee application by no later than tomorrow.

19          THE COURT:  That's fine.  We're not going to

20  look at them again, so you don't need to rush.  I just,

21  you know, pointed that out.  Maybe it's an error on our

22  side, I don't think so, but we were unable to search them.

23          The same goes for Quarles & Brady's at 992,

24  and the same for Latham's at 994, and I think those were

25  the three we could not search.  So -- all right.  So, if

Page 24

1   you guys can correct that, that would be very helpful.

2                  Let me go back then to Berger Singerman.

3   All right.  So, does anyone else wish to be heard on

4   Berger Singerman's application?

5                  (No verbal response.)

6                  THE COURT:  All right.  So the Court will

7   grant that application on an 80/20 basis, as per the

8   guidelines that we have and, Mr. Guso, I assume you'll get

9   me the order.

10                  MR. GUSO:  I shall, your Honor.

11                  And, your Honor, we handled the filing of

12  the two other fee applications which you mentioned, as

13  well as the other ones that are before you, at least on

14  the debtors' side.  I don't know why these weren't

15  searchable, or the other's searchable.

16                  By way of example, Grant Thornton --

17                  THE COURT:  We may not have searched them

18  because they were really pretty -- much shorter.  There

19  may not have been a reason to search, but I don't know if

20  they were filed in searchable format or not.

21                  MR. GUSO:  We'll look into that promptly,

22  and I again apologize to the Court.

23                  THE COURT:  Okay.  No, no worries.  It's

24  just, if it was final, then I think it would have been a

25  different story, but anyway, no harm, no foul.

```
 1                    MR. GUSO:  Thank you, your Honor.

 2                    THE COURT:  Okay.  So, Quarles & Brady, 992.

 3                    MR. GUSO:  Yes, sir.

 4                    THE COURT:  Okay.

 5                    MR. GUSO:  The Court has authorized the

 6     debtors' retention of Quarles & Brady as special counsel

 7     in connection with four matters, your Honor, the Monster

 8     litigation that is pending in the Central District of

 9     California, where the parties are engaged in post-verdict

10     motion practice, and the court recently entered injunctive

11     relief in favor of Monster on those motions, what we call

12     the PhD appeal, which is also an appeal from a California

13     court's judgment, your Honor.  There --

14                    THE COURT:  Mr. Guso, let me stop you there

15     for a second.  When you say that the court in California

16     entered injunctive relief recently, what does that mean?

17                    MR. GUSO:  Your Honor, to my -- well, let me

18     yield to Mr. Combest, your Honor, who is in the trenches

19     in that one, if I may.  He will answer the Court's

20     question.

21                    THE COURT:  Okay, or Mr. Muth.

22                    MR. COMBEST:  Actually, I'm probably in a

23     better position to answer that question.

24                    The judge entered a permanent injunction

25     precluding the use of certain words in advertisements, and
```

Page 26

1   we have 60 days to comply with that, in addition to some

2   corrective advertising that is being required of the

3   debtor to conduct, plus certain notice is going out to

4   distributors, retailers, et cetera, et cetera.

5                  THE COURT:  I see, and -- but I had granted

6   full stay relief for that litigation to continue, is that

7   right?

8                  MR. COMBEST:  Well, your Honor, you had

9   opened the stay, and this is a nonbankruptcy lawyer

10  talking, so I apologize --

11                 THE COURT:  I think it was by agreement

12  between the parties --

13                 MR. GUSO:  Correct.

14                 THE COURT:  -- right?

15                 MR. GUSO:  Yes, sir.

16                 THE COURT:  Okay.  All right.  So that's why

17  the -- when Mr. Guso said what he said, it first caught my

18  (inaudible) that anything happened in that litigation as

19  important as an injunction, and then, of course, I was

20  curious as to what the injunction meant, but I assume I

21  will hear from others at an appropriate point what the

22  impact of all that is on the debtor, et cetera, and we

23  don't have do deal with that now, but that's why it caught

24  my attention.

25                 Anyway, Mr. Guso, go ahead and continue.

Page 27

```
 1              MR. COMBEST:  Thank you.

 2              MR. GUSO:  Yes, sir.

 3              Your Honor -- thank you.

 4              The three other matters, your Honor, as I

 5    mentioned, were the PhD appeal, where the court had

 6    actually ordered mediation, and Quarles & Brady assisted

 7    the debtor there.

 8              Let me go backwards, your Honor.  In the

 9    Monster litigation, during the application period,

10    Quarles & Brady incurred $1,482 -- excuse me, 1,482 hours

11    of services for which it's seeking $675,752 in fees.  In

12    the PhD appeal, your Honor, it incurred 66.3 hours of

13    services, for which it's seeking $24,638.50 in fees.

14              The third matter, your Honor, is the

15    Webb & Gerritsen appeal, where Quarles & Brady has

16    principally perfected the record on appeal, and sought to

17    maintain the status quo via a stay.  There, your Honor,

18    they have incurred 7.6 hours of services, totaling $3,362

19    in fees.

20              And then, your Honor, the Court also

21    authorized the retention of Quarles & Brady for general

22    corporate matters, which includes, among other things,

23    assisting the debtors in negotiating, documenting

24    distributor agreements, employment agreements, and other

25    material contracts.  For those services, your Honor,
```

Page 28

1    Quarles & Brady is seeking $113,707 in fees.  There -- to

2    my knowledge, your Honor, there no objection to those

3    fees.

4              There is a limited objection by the

5    committee, and a reservation of rights with respect to the

6    services provided by Quarles & Brady in connection with

7    the Orange Bang appeal.

8              Your Honor, Quarles & Brady initially

9    provided services to the debtor in connection with the

10   Orange Bang appeal that's before the 9th Circuit.

11   Prepetition it undertook that representation under a fixed

12   alternative fee arrangement.  Obviously those economic

13   arrangements ended on the petition date, and

14   Quarles & Brady and the debtors negotiated new terms of

15   its postpetition retention.  That engagement letter was

16   signed on December 9th, and the application seeking

17   authority to retain Quarles & Brady was filed on

18   December 14th.

19             And, your Honor, that engagement letter

20   includes and contemplates Quarles & Brady's representation

21   of the debtors in connection with the Orange Bang appeal.

22             The hearing to consider the debtors'

23   application to employ Quarles & Brady as special counsel

24   was continued, the Court may recall, on at least two

25   occasions, to allow Quarles & Brady and the committee to

Page 29

1    engage in certain discussions regarding the terms of the
2    retention.
3                    Your Honor, ultimately the debtors received
4    an alternative fee proposal from Haynes & Boone, and the
5    Faulkner Law Firm to handle the Orange Bang appeal on a
6    fixed fee basis, which the debtors accepted, and the Court
7    approved.
8                    During the time that the application to
9    retain Quarles & Brady was pending before your Honor,
10   Quarles & Brady continued to represent the debtors in
11   connection with the Orange Bang appeal, and in connection
12   with those services, your Honor, Quarles & Brady requests
13   an award of $60,673 for its work, totalling a total of
14   126.2 hours.
15                   The committee has filed a limited objection
16   opposing any payment to Quarles & Brady for the services
17   rendered in connection with the Orange Bang appeal on the
18   basis that the Court did not formally authorize the
19   retention of Quarles & Brady to prosecute the Orange Bang
20   appeal.
21                   Your Honor, from our perspective, given that
22   the postpetition engagement letter provided for the
23   retention of Quarles & Brady to handle the Orange Bang
24   appeal, and given that Orange Bang -- excuse me, that
25   Quarles & Brady did provide services to the debtors during

1    the time that the retention application was pending, the

2    debtors believe that it's appropriate for the Court to

3    award reasonable compensation to Quarles & Brady for its

4    services in the (inaudible).

5                    In total, your Honor, Quarles & Brady seeks

6    an award of $945,749 in fees, and $19,807.19 in costs,

7    subject to the same limitations and reservation of rights,

8    your Honor, that I announced earlier in my presentation.

9                    THE COURT:  All right.  Thank you.

10                   Ms. Sklar, let me hear from you on the

11   limited objection.  I guess what I'm most interested in is

12   whether you believe that there was some benefit to the

13   estate despite the OBI appeal not being included within

14   the scope of Quarles & Brady's final retention, and

15   anything else, of course.

16                   MS. SKLAR:  Thank you, your Honor.

17                   Yes, the committee filed its limited

18   objection to Quarles & Brady first interim fee

19   application, it's Docket Number 1194, and it focuses on,

20   as debtors' counsel said, the inclusion of $60,673 worth

21   of fees, for 126.2 hours of postpetition work related to

22   the OBI appeal.

23                   The committee was concerned about this work

24   from the get-go, and Quarles & Brady had not been retained

25   to prosecute the OBI appeal because Quarles & Brady

1    refused to constrain its work to the OBI appeal to a

2    reasonable litigation budget, as requested and advocated

3    for by the committee.

4                    Therefore, your Honor, they were -- it was

5    taken out of the scope of their work, it was not included

6    in their retention order, and those debtors then obtained

7    Court approval for Haynes & Boone, and for Faulkner ADR to

8    handle the OBI appeal for a flat fee.

9                    So, to answer your question, your Honor, the

10   committee questions whether or not this was beneficial to

11   the estate, and we think that although retained

12   professionals do have the right to seek payment for work

13   performed within the scope of their retention, the crux

14   here is that Quarles & Brady's OBI appeal was not within

15   the scope of their retention, it's fees should be removed

16   from their application, and they should seek payment for

17   these fees by motion for payment of administrative

18   expense, and in such motion they should have to, you know,

19   apply a more stringent legal standard to show that it was

20   necessary and beneficial to the estate, which is something

21   the committee continues to question, and would like to see

22   proven.

23                    THE COURT:  All right, and this OBI appeal

24   relates to the final judgment entered in the arbitration,

25   is that right?

1          MS. SKLAR:  That's right, your Honor.

2          THE COURT:  Okay, and, Ms. Sklar, your

3    argument that it's (inaudible) beneficial to the estate is

4    based on what, the typical standard in appealing an

5    arbitration award, or what's the -- what's the argument

6    there?

7          And the only reason I'm asking, frankly, is

8    of course I am concerned with granting fees for

9    professionals for work, especially special counsel that's

10   been retained for specific purposes, that it's not being

11   (inaudible) of course, that is concerning, but it may be

12   the timing issue, where they thought they were retained,

13   and I'm going to hear from Mr. Combest, I guess, or

14   Mr. Muth about this but, you know, I also don't want to be

15   unfair if, in fact, they had some reasonable basis to

16   believe that they would be doing this work, as described

17   by Mr. Guso, and they did the work, and the work, you

18   know, was reasonable in terms of fees, and expected, you

19   know, once counsel was representing the debtor in an

20   appeal, they did the work, that would be expected in that

21   appeal.  So, I guess I'm looking at it from that

22   perspective.  What is your view of that?

23          MS. SKLAR:  I understand that, your Honor,

24   but our -- the committee's position is that this work was

25   not necessary at this time.  We believe that the

1    allocation of the debtors' resources should be

2    constrained, and focused on the Chapter 11 cases, or

3    marketing and sale process, something that would inure to

4    the benefit of the estate and all of its stakeholders.

5                   We do not believe that this is necessary

6    work at this time, not necessary to go forward, the

7    expenditure of these fees.  Apart from being wholly

8    outside of the scope of Quarles & Brady's retention, it's

9    not meeting that high stringent standard of being

10   necessary and beneficial to the bankruptcy estate.

11                  THE COURT:  All right.  Thank you for that.

12                  Mr. Guso, do you want to address this, or

13   should I hear from Mr. Muth or Mr. Combest?

14                  MR. GUSO:  Yes, your Honor, just very

15   briefly.  From the debtors' perspective, your Honor,

16   again, given that these are interim requests for

17   compensation, subject to final applications, which will be

18   reviewed de novo at the appropriate time by the Court, the

19   Court at that time can, in fact, in my view, your Honor,

20   evaluate the benefit to the estate in connection with its

21   consideration of the final fee applications.

22                  I yield, your Honor, to Mr. Muth or

23   Mr. Combest, if they wish to elaborate, or I'll otherwise

24   answer any questions the Court may have.

25                  THE COURT:  Well, let me -- yes, let me ask

1   you just another question.  If there -- does the Court

2   have the authority, if Quarles & Brady was not retained

3   for this purpose, to grant fees, or am I limited by 328,

4   they were -- it was a 328 retention?

5               MR. GUSO:  This was a 327 retention,

6   your Honor.

7               THE COURT:  327, okay.

8               MR. GUSO:  Your Honor, I think these are

9   unique circumstances, in that the debtors intended to hire

10  Quarles & Brady for these purposes.  There was an

11  application -- their was an engagement letter that was

12  negotiated, the application was filed.  While the

13  application was pending, Quarles & Brady conducted certain

14  -- or undertook the representation, and provided services

15  for the benefit of the debtors.

16              We then received -- or the debtors received,

17  rather, an alternative fee proposal from Haynes & Boone,

18  as I indicated, and elected to go --

19              THE COURT:  Was all this work done before

20  Haynes & Boone --

21              MR. GUSO:  Yes.

22              THE COURT:  -- came on board?

23              MR. GUSO:  Yes, sir.

24              THE COURT:  Okay.

25              MR. GUSO:  And I yield to Mr. Muth and

```
1    Combest -- and Mr. Combest to elaborate, your Honor.

2                    THE COURT:  Do you all know of any law that

3    prevents, under 330 or 328, granting fees, despite the

4    lack, ultimately, of any order approving the retention on

5    that particular matter?

6                    MR. GUSO:  Your Honor, off the top of my

7    head, I'm not aware of that, but if the Court wishes to

8    reserve on that issue when it evaluates the final fee

9    application, I think it would be appropriate for it to do

10   so.

11                   THE COURT:  All right.  Understood.

12                   All right.  Mr. Combest or Mr. Muth.

13                   MR. COMBEST:  I think I'll jump in,

14   your Honor.  Christopher Combest, C-o-m-b-e-s-t.  I'll try

15   to save you some pain from your court reporter, and

16   Mr. Muth --

17                   THE COURT:  (Inaudible) Mr. Combest, but

18   thank you.

19                   MR. COMBEST:  Mr. Muth is intimately

20   familiar with the details of the services provided, so if

21   your Honor has questions about those specifically, he can

22   jump in.

23                   If I could address just first the issue that

24   you were talking to Mr. Guso about, I think this is an

25   unusual situation, and I think the order for our retention
```

1    accommodates it.

2            Let me -- I'll note first that Mr. Guso, at

3    the February 9th hearing on this application, where he

4    disclosed that there was a possibility that the OBI appeal

5    would be moved to other counsel, mentioned that

6    Quarles & Brady had done this preliminary work.  He didn't

7    go into detail, but he mentioned that this preliminary

8    work had been done, and that we were reserving our right

9    to seek fees for it, and then that reservation made its

10   way into the retention order, which is attached as

11   Exhibit A to our application.  In --

12           THE COURT:  Was that, what Mr. Combest had

13   done, in the first -- within the first 21 days of the case

14   or so?

15           MR. COMBEST:  No.

16           THE COURT:  It was not?

17           MR. COMBEST:  No.  Most of this work --

18           MR. GUSO:  Oh, I'm sorry, your Honor, I

19   misunderstood the Court's question, I apologize.

20           MR. COMBEST:  Maybe I did, too.  What was

21   the -- would you repeat it, please, your Honor?

22           THE COURT:  So what happens sometimes is

23   that the -- well, all the time, really, applications are

24   filed for retention of counsel, but counsel -- the Code

25   doesn't really allow those applications to be considered

1    by the Court for the first 21 days or so, and sometimes

2    they get set within 21 days, other times they get set

3    within 30.  I mean, so I guess I'm asking, was any of this

4    work done within that period of time, when counsel was

5    really (inaudible) --

6                    MR. COMBEST:  Some of it certainly was,

7    your Honor, but the timing issue here does not arise from

8    those rules.

9                    I'm sorry, is that David?

10                   On the petition date, if I may just finish

11   my first thought, the reservation that Mr. Guso put into

12   the February 9th transcript made its way, a little more

13   generally, into our retention order, where it states that

14   while we will only seek compensation from and after the

15   date of the order for the matters that are described in

16   the order, nothing in the order would bar Quarles from

17   seeking allowance and payment for services rendered, and

18   costs incurred during the period from the petition date

19   through the date of the order, and everyone reserved all

20   their rights.

21                   Would it have been a little clearer if that

22   had said for work done on the OBI appeal?  Sure.  But that

23   general reservation, which I think permits the Court to

24   review the request in the context of a 330 application.

25                   As far as the timeline goes, your Honor, I

1  would like to add a couple of things (inaudible) -- on the

2  petition date we were working for the debtors on, among

3  other things, the Orange Bang arbitration award, or the

4  appeals of the Orange Bang award, and the district court's

5  subsequent judgment.

6         The debtors were facing an October deadline

7  for filing a notice of appeal, which would have been

8  forfeited if it hadn't been filed, as well as regular

9  court ordered mediation and things and, of course, the

10  debtors in-house counsel (inaudible) was looking for

11  advice and recommendations from Quarles with regard to

12  that appeal.

13         We -- during that time period, we were

14  negotiating our retention letter with the debtors, as

15  Mr. Guso said, and at the time of our retention

16  application, which was filed on December 14th, we were

17  still engaged to handle the OBI appeal.

18         At the time of the first scheduled hearing

19  on the application, this was January, January 11th, I

20  think, we were still engaged to handle the OBI appeal.

21  The retention order had not yet been entered because the

22  hearing had been continued to deal with the concerns

23  raised by the committee.

24         At the second hearing, on February 9th, we

25  were still engaged to handle the OBI appeal, and then, as

Page 39

1   Mr. Guso said, in mid-February the debtors chose to take

2   an alternative fee arrangement offered by Haynes and

3   Faulkner, those two firms, and our last work was on

4   February 20th.  They were retained on February 24th.

5              I do feel compelled, your Honor, if you'd

6   indulge me, to respond to the committee's shot at

7   Quarles & Brady with respect to the matter, an objection

8   in which (inaudible) began here, referring -- suggesting

9   that somehow the matter was moved from Quarles to Haynes

10  and Faulkner, and had some kind of flack with Quarles

11  because we were (inaudible) demanding some kind of

12  unreasonable amounts, Quarles was.

13             I find nothing, or I see nothing in the

14  record, your Honor, not in the Haynes and Faulkner

15  retention applications, not in the order, not in the

16  transcripts of the February 9th and 23rd hearing that says

17  anything of that sort.

18             I would also note, your Honor, that as far

19  as reasonable amounts go, Quarles has not capped its fees,

20  as the committee wanted, and that's true, but we have

21  capped our rates.  We're charging 495 an hour for partner

22  time, and 395 an hour for associate time.  Those rates are

23  a significant economic benefit to the estates, and I would

24  suggest are -- compare quite favorably to the rates

25  charged by other estate professionals in these cases.  So,

Page 40

1    I could not let that point go by your Honor.

2                     What I think we're seeing here, your Honor,

3    is the committee also referred to this work being

4    unnecessary, their view that it was not ripe, or not

5    beneficial to the estate from the get-go.

6                     Essentially the committee is raising the

7    same issue it raised earlier on, which is that it wants

8    this Court to replace the independent board's business

9    judgment with the committee's business judgment on those

10   issues.

11                    Not surprisingly the Court declined to do

12   that, and so in our view now they're trying to get that

13   same relief by (inaudible) up for fees for performing

14   services that were reasonably requested by the debtors,

15   that no one else had been engaged or retained to do and

16   it, frankly, would have been negligent of us not to do.

17                    So, your Honor, if Quarles has to take a hit

18   because of an accident of timing, and a change in the

19   course that the debtors were pursuing, that we couldn't

20   have anticipated, then, you know, we'll have to do that.

21   I don't think the Court is required to make us do that,

22   and given that there is a 20 percent holdback to protect

23   the estate, if the Court could later decide that these

24   interim fees were improvidently granted, then that money

25   is there to protect the estate.

Page 41

1                    So, given that, and given the timing issues

2    here, we'd ask the Court to overrule the objection and

3    grant the fee applications.

4                    Thank you, your Honor.

5                    THE COURT:  All right.  Thank you.

6                    Does anyone else wish to be heard?

7    Mr. Wilkes?

8                    MR. WILKES:  Thank you, your Honor.

9    J. Steven Wilkes for the United States Trustee.

10                   At this time the United States Trustee is

11   not taking a position on the objection or the fee app, the

12   interim fee application.

13                   THE COURT:  All right.  Well, Mr. Wilkes,

14   let me ask you a couple of questions, though.

15                   MR. WILKES:  Yes, sir.

16                   THE COURT:  Would you say that the request

17   for those fees, to the extent that they were, they were

18   accrued during a time when Quarles & Brady likely

19   understood that they were under an obligation to represent

20   the debtor, because it was all prior to the time the

21   application was ultimately considered, or their retention

22   was replaced with another firm, but that had nothing to do

23   with disinterestedness, or anything else that might lead

24   the Court to deny fees so as to essentially protect the

25   process?  It's really, it seems to me, a matter of timing

Page 42

1    more than anything else, is that how you understood the

2    facts to be here?

3                    MR. WILKES:  That is correct, your Honor.

4                    At the time that much, if not all of the

5    services that were rendered were being rendered to the

6    estate fiduciary, the applicant was under a pending

7    application for the Court to approve their employment for

8    those services rendered.  There hasn't been any

9    allegations of lack of disinterestedness, actual conflict

10   of interest, or anything like that, that would disqualify

11   their application to be employed under 327.

12                   So, you're in that wonderful quagmire of,

13   the attorney has to provide services due to ethical

14   obligations by the bar that he or she is authorized to

15   practice law through, but at the same time not yet

16   employed by the Judge and the Court under Title 11, that

17   is required for him to have an application for

18   compensation approved under 330.

19                   You know, now you're under 331 right now,

20   understanding that if the Court ultimately determines at

21   the final stage that all of the fees that have been

22   awarded to the applicant under 331 are subject to

23   clawback, then the applicant understands that that may be

24   the end result, but right now the issue isn't really

25   primed before the Court.

1          THE COURT:  I understand.  All right, and

2    that is essentially my concern, is that while the

3    committee's objection, you know, is what it is, and

4    certainly can be considered at the final hearing, it seems

5    to me an unhappy accident of timing right now that seems

6    to be causing this problem, and on those grounds alone, I

7    don't feel that the fees should be denied.

8          However, however, of course, should it be

9    determined that, at a final hearing, that the committee's

10   objections are sustained, in that the work did not benefit

11   the estate and, you know, the general other standards that

12   apply to final fee applications, of course, those are

13   still alive, as they are with respect to all fee

14   applications.

15         You know, it's interesting, you know, this

16   21-day rule, which I just don't understand at all, I think

17   it's 6003, I don't understand why Congress forces us all

18   to wait 21 days to get counsel on board, but that's what

19   Congress has decided, or at least what's what the rules

20   provide.  So this issue really applies to lots of lawyers,

21   in lots of circumstances under the Bankruptcy Code, where

22   they're working for 21 days, not knowing whether their

23   retention is going to be approved or not, and if not

24   approved, they did the work, and they benefitted the

25   estate, shouldn't their fees be approved?

Page 44

1          I sort of feel like this is similar to that

2    circumstance, even though it is a little bit different in

3    that Quarles & Brady is special counsel and, you know,

4    where an appeal, you know, was pending, or needed to be

5    pending in the business judgment of the debtor, and that's

6    what's been described to me, and Quarles & Brady gave

7    advice on that issue and did the work.

8          Whether their work was efficient, whether

9    their work is compensable for other reasons, whether their

10   advice was sound, whether the appeal benefitted the

11   estate, or their work on the appeal benefitted the estate,

12   those are all open questions to be determined at the final

13   hearing, but I'm just not prepared, Ms. Sklar, to deem

14   Quarles & Brady's -- or Quarles & Brady over timing, with

15   the (inaudible) timing issue.

16         That, to me, just sets me up for all kinds

17   of problems in very similar circumstances, with literally

18   every bankruptcy case that gets filed for that first 21

19   days, and I don't think that's the intention of the rules,

20   and I don't think that was the intention here.

21         It may be that this appellate firm,

22   Haynes & Boone, gave a better deal, and while I hear you

23   that that might indicate that the fees were unreasonable,

24   as demanded by Quarles & Brady, I'm not going to consider

25   that today because those are all objections that are

1    preserved for a final hearing.

2              Any questions about that, Ms. Sklar?  Do you

3    understand where I'm coming from?

4              MS. SKLAR:  Yes, I understand, your Honor.

5    I understand, your Honor.  Thank you.

6              THE COURT:  All right.  So, what I'm going

7    to do is just treat this application, including the OBI

8    work, all as being authorized, if you will, from the

9    Court's perspective.

10             I assume Quarles & Brady stopped work

11   immediately when it was no longer counsel approved by the

12   Court, is that right, Mr. Combest?  There is no work you

13   did after that point in time, whenever that was, is that

14   right?

15             MR. COMBEST:  Your Honor, there was simply

16   the transaction work with counsel, working with them to

17   make an orderly transition of the appeal, but other than

18   that, you're correct.

19             THE COURT:  Okay.  All right.  So I'm going

20   to grant the application on an 80/20 basis, with all

21   objections preserved.  You've heard me on the timing

22   issue.  I guess you can raise it, but I don't see the

23   point, frankly.  You know, just consider this my ruling on

24   that particular issue, but all other objections are

25   reserved for a final hearing, all right, for a final

1  application.

2              MR. COMBEST:  Thank you very much,

3  your Honor.

4              THE COURT:  All right.  Mr. Guso, will I get

5  that order from you?

6              MR. GUSO:  Yes, sir.

7              THE COURT:  Okay.  All right.  The next

8  application is Homer Parkhill.

9              MR. GUSO:  Yes, your Honor.

10             THE COURT:  Or, I'm sorry,

11 Rothschild & Company or Homer Parkhill?

12             MR. GUSO:  It's Rothschild & Company,

13 your Honor.  Mr. Parkhill is one of Rothschild's

14 representatives, involved in the representation of the

15 debtor.

16             Here, the debtors' investment banker, the

17 Court authorized the debtors' retention of Rothschild as

18 its investment banker pursuant to Section 328(a) of the

19 Bankruptcy Code.

20             Consistent with the engagement letter and

21 the retention order, your Honor, the debtors have paid

22 Rothschild a monthly fee of $200,000 per month, plus

23 expenses.

24             In addition, your Honor, the debtors paid a

25 portion of the transaction fee, which is a success fee

1   that was due to Rothschild in connection with the closing

2   of the final DIP order.

3                   Your Honor, that fee would have been a

4   million dollars, but the debtors paid only 80 percent of

5   that, $800,000, on the terms set forth in the engagement

6   letter.

7                   Your Honor, Rothschild seeks an interim

8   award of $1,741,935.48 in fees, and $71,382.32 in

9   expenses, your Honor.  It is not seeking an award of the

10  20 percent that remains due to it on account of the

11  transaction fee, that will be deferred until the final

12  hearing.  There has been no objection to the application,

13  your Honor.

14                  THE COURT:  All right.  Anyone else wish to

15  be heard?

16                  (No verbal response.)

17                  THE COURT:  Okay.  The Court will grant that

18  application as well on an 80/20 basis.

19                  MR. GUSO:  Thank you, your Honor.

20                  THE COURT:  And the next seems to be

21  Latham's fee app.

22                  MR. SORKIN:  I will handle that, your Honor.

23  Again, it's Andrew Sorkin, S-o-r-k-i-n, on behalf of the

24  debtors, and today I'm also here on behalf of my firm,

25  Latham & Watkins, in connection with our first interim fee

1    application.

2              We were retained as Section 327(a)

3    bankruptcy counsel for the debtors, and I'd just like to

4    start by apologizing for the fact that our application,

5    and I think in particular the time detail may not have

6    been searchable, that was news to me.  We'll --

7              THE COURT:  It was the time, yes, it was the

8    time detail, not the -- I think the application probably

9    was searchable, but the attachment, the time detail

10   wasn't.

11             MR. SORKIN:  Right, that's what I -- I

12   tested it out myself while I was on the phone, and I had

13   the same problem you did.  So, we will work with Mr. Guso

14   to upload a revised version that includes searchable time

15   detail.

16             THE COURT:  All right.  Thank you.

17             MR. SORKIN:  Sure.

18             So by our application, your Honor, Latham is

19   seeking interim compensation consisting of $6,447,330.25

20   in fees, and 24,000 -- sorry, $24,818.93 in expenses.

21   That application, like the others you've heard today,

22   covers the period from October 10th, 2022, the petition

23   date, through the end of February 2023, or a little less

24   than a five-month period.

25             Of those amounts, your Honor, we've been

1    paid three million eight hundred seventy three dollars --

2    sorry, I'm clearly terrible at reading numbers.  We've

3    (inaudible) 873,054 to date.  Pursuant to the interim

4    compensation procedures order, we are subject to the

5    20 percent holdback, and like the other professionals, we

6    are not asking the Court to authorize the release of any

7    of those held back amounts at this time, and we also

8    understand that all parties' rights are reserved with

9    respect to final allowance of our compensation.

10                 It's all discussed in more detail in the

11   application itself, but at a high level, based on the

12   services during the application period, including

13   substantial work, negotiating and preparing for a

14   potential contested hearing on DIP financing, over a

15   roughly 90-day period, we also dealt with a panoply of

16   governance matters, including significant changes to the

17   debtors' boards, several litigation matters, as well as

18   M&A work, as we got our sale process off the ground.

19                 As Mr. Guso mentioned earlier, no objections

20   were filed to our fee application, and we've confirmed

21   with Mr. Wilkes that the U.S. Trustee's Office has no

22   objection to interim approval of our application.

23                 So, with that, your Honor, subject to any

24   questions you may have, I'd ask that our application be

25   granted.

Page 50

1           THE COURT:  All right.  Before my comments,

2   any other -- anyone else wish to be heard?

3           (No verbal response.)

4           THE COURT:  All right.  So, Mr. Sorkin, I'm

5   going to grant the application on an 80/20 basis, but I

6   would like you to do me a favor in the future.  Because of

7   the sheer number of lawyers at Latham that are touching

8   this file, if you will, it's very hard for me to sort of

9   run my normal process, because the total time for the

10  various lawyers at the various rates is sort of broken up.

11          It helps me to understand, for example, how

12  much time Mr. Cohen, at $2,175 an hour spent on the file,

13  total, versus how much time Andrew Sorkin, at your rate of

14  -- actually it's hard to know exactly what -- you seem to

15  be billing at different rates, is that true?

16          MR. SORKIN:  There was a rate increase at

17  the beginning of the year, with our normal, you know,

18  annual --

19          THE COURT:  I see $770 an hour, and then

20  (inaudible) an hour, and then 1,655.

21          MR. SORKIN:  Yes.  So, I think the lower

22  rates likely reflect, or do reflect the 50 percent

23  discount for nonworking travel time.

24          THE COURT:  Oh, I see, I got you.

25          MR. SORKIN:  I think that's the issue there.

1          THE COURT:  Okay.  Well, if it's just -- I

2    see, okay, so it's just helpful for me, because what I

3    generally do is I look to see how much time the highest

4    rate lawyers are spending on the matter, versus some of

5    the lower rates, and then I look at the blended hourly

6    rate, which is also helpful to understand, and if you want

7    to remove the 50 percent travel time, you know, just

8    because it skews the issue, that's okay, but if you can do

9    some of this math for me, it's helpful, because I just

10   want to make sure that when a file is touched by so many

11   people -- it's easier when it's only two or three

12   lawyers.  It's just tougher on this kind of fee

13   application to make sure that, you know, the work is being

14   spread among those that can do it for the least hourly

15   rate, and efficiently, while, of course, getting the work

16   done well, and so it just helps me to understand that a

17   little bit.

18          Do you understand what I'm asking for?

19          MR. SORKIN:  I believe so, you Honor.  I

20   mean, I'm hopeful that aside from the nonworking travel

21   time issue, which I think we can solve for that, you know,

22   there shouldn't be any further rate increases in future

23   periods.  So it may kind of sort itself out naturally in

24   that way, but I gather what you're struggling with is, you

25   know, breaking up each timekeeper's aggregate time into,

Page 52

1    you know, multiple subparts based on different hourly

2    rates that might apply to different portions of that time,

3    and you'd prefer --

4                    (Two people speaking.)

5                    THE COURT:  And I don't know how to -- and I

6    don't want to cause brain damage here in trying to fix the

7    cause of that problem, but it just helps me to see a clean

8    list of lawyers, highest rate at the top, you know, lowest

9    rate at the bottom, and then see how much time that

10   they're spending, just to see if that makes some rational

11   sense in terms of who is doing what.

12                   MR. SORKIN:  Understood, your Honor.

13                   THE COURT:  For example, I wouldn't expect,

14   you know, again, Mr. Cohen to be spending nearly as much

15   time as Mr. Sorkin, and I wouldn't expect Mr. Sorkin to be

16   spending nearly as much time, for example, potentially,

17   as, you know, some of the associates that might be getting

18   some (inaudible) work done, research, et cetera.

19                   So, it's just that -- it's just helpful, and

20   a guide for me to make sure that the matter is being

21   handled efficiently, and I'm not doubting that it is being

22   handled efficiently.  It's just helpful to see that in

23   black white.

24                   All right.  So that was my -- that was

25   really my only comment.  I couldn't -- it was, you know,

1   obviously difficult because you couldn't search the time

2   records, but again, since there is no objection, the

3   Court will, of course, grant the application on an

4   80/20 basis, subject to final fee application and final

5   hearing.

6               I will get that order from whom?

7               MR. SORKIN:  It will come from Mr. Guso's

8   firm.

9               THE COURT:  All right.  Thank you.  Okay.

10  Great.

11              Now, Miller Buckfire.

12              MS. SKLAR:  Good afternoon, your Honor.

13  Lindsay Sklar, Lowenstein Sander.  I will address Miller

14  Buckfire's fee application.

15              Miller Buckfire's fee application has a

16  slightly different calculation in terms of some of our

17  other fee applications.  They charge a monthly rate of

18  $125,000 per month, and then a transaction fee that has

19  not yet been triggered yet.  So the first interim fee

20  application is basically payment of fees, and the

21  amount is $375,000, and there have been no objections to

22  this interim fee application for the work performed to

23  date.

24              THE COURT:  All right.  Thank you.  That

25  math I can do, three times 125, okay.

Page 54

```
 1                    Any other person wish to be heard on this?
 2                    (No verbal response.)
 3                    THE COURT:  All right.  So, the Court will
 4   grant that as well, and Ms. Sklar, will I get that from --
 5   that order from you?
 6                    MS. SKLAR:  Yes, sir.
 7                    THE COURT:  Okay.  All right.  Next is,
 8   let's see, Lincoln International, 997.
 9                    MR. MENDOZA:  Your Honor, this is
10   Juan Mendoza, M-e-n-d-o-z-a, of Sequor Law.  I'll be
11   handling the Lincoln International fee application.
12                    THE COURT:  Okay.  Thank you.
13                    MR. MENDOZA:  This is Docket Entry 997,
14   your Honor, this covers the period of November 4th, 2022
15   to February 28th, 2023.  Lincoln International was
16   retained under Section 328, (inaudible) this application
17   period award interim compensation for fees totaling
18   $1,731,208.75, expenses incurred in the period total
19   $4,066.30, for it's representation of the committee during
20   this period.
21                    Pursuant to the interim compensation
22   procedures order, your Honor, Lincoln International, seeks
23   an award of 80 percent of its fees and 100 percent of
24   expenses.
25                    As Mr. Guso said early, there really have
```

1    been no objections filed in connection with the

2    committee's fee application and, therefore, Lincoln

3    International seeks an order granting their interim award

4    of 80 percent, and 100 percent of -- fees, and a hundred

5    percent of expenses.

6              THE COURT:  All right.  Thank you.

7              Anyone else wish to be heard?

8              (No verbal response.)

9              THE COURT:  All right.  So, the Court will

10   grant that application as well on an 80/20 basis and,

11   Mr. Mendoza, will I get that order from you?

12             MR. MENDOZA:  Yes, your Honor.

13             THE COURT:  All right.  Thank you.

14             Let me ask you, by the way, Mr. Sorkin, I

15   probably should have asked earlier, are all of these fees

16   that are being sought within the DIP budget?

17             MR. SORKIN:  They are, your Honor.

18             THE COURT:  Okay.  All right.  Thank you.

19             All right.  Next is Lowenstein Sandler.

20   Ms. Sklar.

21             MS. SKLAR:  Thank you, your Honor.  Yes,

22   Lowenstein Sandler seeks an interim award of its fees for

23   this period, from November 2nd, 2022 through

24   February 28th, 2023.  The total compensation sought for

25   this period is $3,449,431.12.  The total expenses from

1    this period are $102,000 -- I'm sorry, $102,133.

2                    THE COURT:  No, $102,133.63.

3                    MS. SKLAR:  And 63 cents, and 63 cents, yes,

4    your Honor.  So I forgot the 63 cents, your Honor.

5                    The fees sought in this application that

6    have already been paid to date are 1,514,243.34, and the

7    expenses sought in this application that have already been

8    paid are 45,562.75.

9                    Your Honor, this relates to 4,456.1 hours

10   worth of work during the relevant interim fee period.

11   This work has related to a multitude of topics, from the

12   contested DIP hearing, at the beginning of the committee's

13   investigation, the analysis of sale related pleadings, and

14   communications with the committee members.

15                   There have been no objections to this

16   interim fee application, nor any of the monthly fee

17   statements served by the committee to date.  So we

18   respectfully request that this be approved in the same

19   80/20 method as the other professionals retained.

20                   THE COURT:  Okay.  All right.  Well, you win

21   the prize for searchable attachments to your fee

22   application.

23                   MS. SKLAR:  Thank you, your Honor.

24                   THE COURT:  I would just give you the same

25   comment as I gave to Mr. Sorkin, which is if there is a

Page 57

1  way of sort of totaling the hours, and the rates per

2  lawyer that worked on the file, in some (inaudible) order,

3  it will just help us.  It's, again, that gauge I was

4  talking about, just to see how the labors are being

5  divided.  So, if you can work on that on the next one,

6  that would be great.

7           Does anyone else wish to be heard on this

8  fee application?

9           (No verbal response.)

10          THE COURT:  All right, then the Court will

11  grant the application, again on an interim 80/20 basis,

12  and I assume I'll get that order from you, Ms. Sklar?

13          MS. SKLAR:  Yes, your Honor.  Thank you very

14  much.

15          THE COURT:  Okay.  The next is Sequor Law,

16  Mr. Mendoza.

17          MR. MENDOZA:  Thank you, your Honor

18  Juan Mendoza, for Sequor law.

19          Your Honor, we're here on the application

20  for compensation of Sequor Law, as local counsel to the

21  official committee of unsecured creditors, it's Docket

22  Entry 999.  It covers the period of November 4th, 2022 to

23  February 28th, 2023.

24          Your Honor, Sequor seeks interim

25  compensation of $198,750.50 in fees, and expenses totaling

1    $8,163.05 for its representation of the committee as local

2    counsel during the allocation period.

3                    Sequor has been paid to date $98,253.20 for

4    fees, and expenses, $6,206.87.  Pursuant to the interim

5    compensation procedures order, your Honor, we are seeking

6    in an order, 80 percent of our fees, subject to a

7    20 percent holdback, and a hundred percent of our

8    expenses.

9                    I will also note that no objections were

10   filed for fee application, or to any of our monthly fee

11   statements, and accordingly, your Honor, Sequor requests

12   the fees and expenses be approved under the 80/20

13   mechanism set forth in the interim compensation procedures

14   order.

15                   THE COURT:  Thank you, Mr. Mendoza.

16                   Anyone else wish to be heard?

17                   (No verbal response.)

18                   THE COURT:  All right.  Granted.

19   Mr. Mendoza, get me an order, 80/20 on an interim basis.

20                   MR. MENDOZA:  Thanks, your Honor.

21                   THE COURT:  All right.  Thank you.

22                   And I think that's all the fee apps, is that

23   right?  Am I missing any?

24                   (No verbal response.)

25                   THE COURT:  Okay.  All right.  So, I guess

1    that's everything for today.

2                    Mr. Sorkin, I was a little surprised I

3    didn't get your normal status report.  Do you wish to give

4    one?

5                    MR. SORKIN:  I was waiting until the end,

6    your Honor.  I'm happy to do so.

7                    Your Honor, I think when I was last before

8    you a few weeks ago, I noted that we had not filed the

9    motion to approve the stalking horse bid prior to the

10   milestone in our DIP facility.

11                   Since that time we've been working on

12   multiple tracks, with bidders on, you know, firming up

13   proposals, we've also been trying to advance the

14   settlement discussions you heard about with Monster, and

15   we've also been working with the lenders to come up with

16   modified dates and deadlines for the sale process from

17   here forward, and on that last point, while we do not have

18   formal approval of the lenders yet, and I should be very

19   clear about that, in the interest of transparency to the

20   Court and all interested parties, and in particular to

21   provide clarity to our bidders, I did want to preview what

22   I think we're circling as the key dates in the process

23   going forward, and I would expect that we will be able to

24   obtain the lender's support for these dates.

25                   The first is the bid deadline, which is

1   currently set for next Monday, April 24th.  We'd be

2   looking to reset that to May 22nd, also a Monday, with an

3   auction later that week, likely, May 25th and 26th, which

4   would be Thursday and Friday, then we would also need to

5   reset the sale hearing, and we were looking for a date

6   some time late the week following the auction, so the week

7   ending June 2nd, or early the following week, and then

8   June 9th, and I believe Mr. Guso reached out to Ms. Weldon

9   earlier today to check on the Court's availability, and we

10  were told that the afternoon of June 7th at 1:30 might be

11  available.

12              THE COURT:  Yes, there is an evidentiary

13  hearing that morning at 10:00, and I'm out of town on the

14  9th, that's why you were pushed to 7th, to an earlier

15  date.  So, yes, that seems to be available.

16              MR. SORKIN:  Great, your Honor, so I think,

17  you know, tentatively, that's what we will plan on.  You

18  know, we are optimistic we can get to agreement on this

19  timeline shortly, and if we do, we will file all the

20  appropriate documents with the Court, including, you know,

21  the appropriate notice of the hearing, and the other

22  changes to the bid procedures deadline, as well as any

23  amendments to the DIP, to extend the applicable

24  milestones.

25              So I really just wanted to use the status

1    update to provide that visibility to your Honor, and to

2    all interested parties, since we are coming up on, you

3    know, the existing bid deadline of Monday, April 24th, and

4    we just wanted to give everyone a sense of how that date

5    and other key dates might move, sir.

6                    THE COURT:  All right.  Thank you.

7                    And the -- an injunction, is that having an

8    impact on the business, or will it have an impact on the

9    business, or is that not something you wish to discuss,

10   which I would completely understand.  It's just something

11   I learned about today, so --

12                   MR. SORKIN:  Yes, I think it's probably --

13   less is probably more at this stage.  There are

14   discussions going on behind the scenes, including with,

15   you know, Monster, who obtained the injunction, about the

16   (inaudible) from here.  So it might be best to address

17   that in more depth at a later date.

18                   THE COURT:  All right.  Understood.  Okay.

19   Anyone else wish to be heard?

20                   (No verbal response.)

21                   THE COURT:  All right.  Great.  Well,

22   thank you all very much.  I'll look forward to receiving

23   those orders, and I will see you at the next Vital

24   hearing.

25                   MR. GUSO:  Thank you, your Honor.

Page 62

1                    MR. SORKIN:  Thank you, your Honor.

2                    THE COURT:  And that concludes the hearings

3    for today.

4                    MS. SKLAR:  Thank you, your Honor.

5                    MR. MENDOZA:  Thanks, your Honor.

6

7

8

9                    (Thereupon, the hearing was concluded.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 63

1

2

3                          CERTIFICATION

4

5    STATE OF FLORIDA          :

6    COUNTY OF MIAMI-DADE    :

7

8                I, Cheryl L. Jenkins, RPR, RMR, Shorthand

9    Reporter and Notary Public in and for the State of Florida

10   at Large, do hereby certify that the foregoing proceedings

11   were transcribed by me from a digital recording held on

12   the date and from the place as stated in the caption

13   hereto on Page 1 to the best of my ability.

14                WITNESS my hand this 2nd day of May, 2023.

15

16

17          _____

18             CHERYL L. JENKINS, RPR, RMR

19            Court Reporter and Notary Public

                in and for the State of Florida at Large

20                 Commission #HH 170910

                     December 27, 2025

21

22

23

24

25