UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION
www.flsb.uscourts.gov

IN RE:                                          Chapter 11 Cases

VITAL PHARMACEUTICALS, INC., *et al.*,[1]      Case No.: 22-17842-PDR

    Debtors.                                (Jointly Administered)

_____/

### DEBTORS' MOTION TO APPROVE COMPROMISE BETWEEN (I) DEBTORS, VITAL PHARMACEUTICALS, INC. AND JHO INTELLECTUAL PROPERTY HOLDINGS, LLC; AND (II) PhD MARKETING, INC.

**Any interested party who fails to file and serve a written response to this motion within 21 days after the date of service stated in this motion[2] shall, pursuant to Local Rule 9013-1(D), be deemed to have consented to the entry of an order in the form attached to this motion. Any scheduled hearing may then be canceled.**

Vital Pharmaceuticals, Inc., Bang Energy Canada, Inc., JHO Intellectual Property Holdings, LLC, JHO Real Estate Investment, LLC, Quash Seltzer, LLC, Rainbow Unicorn Bev LLC and Vital Pharmaceuticals International Sales, Inc. (each a "<u>Debtor</u>" and, collectively, the "<u>Debtors</u>"), by undersigned counsel, move the Court, pursuant to Fed. R. Bankr. P. 9019 and Local Rule 9019-1, for entry of an Order approving a compromise between (i) Debtors, Vital Pharmaceuticals, Inc. ("<u>VPX</u>") and JHO Intellectual Property Holdings, LLC ("<u>JHO Intellectual</u>") and (ii) PhD Marketing, Inc. ("<u>PhD</u>", and, together with VPX and JHO Intellectual, collectively, the "<u>Parties</u>"). In support of this Motion, the Debtors state:

---

[1] The address of the Debtors is 1600 N. Park Drive, Weston, FL 33326. The last four digits of the Debtors' federal tax identification numbers are: (i) Vital Pharmaceuticals, Inc. (8430); (ii) Bang Energy Canada, Inc. (5454); (iii) JHO Intellectual Property Holdings, LLC (0010); (iv) JHO Real Estate Investment, LLC (9394); (v) Quash Seltzer, LLC (6501); (vi) Rainbow Unicorn Bev LLC (2254); and (vii) Vital Pharmaceuticals International Sales, Inc. (8019).

[2] Although there is no Certificate of Service included in this Motion reflecting the date of service, this Motion will be served today, June 22, 2023, by the Debtors' notice, claims and solicitation agent, Stretto, Inc.

12199003-1

## Jurisdiction and Venue

1.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

2.      Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The Debtors move for approval of that certain *Settlement Agreement* entered into between the Parties on June 15, 2023, (the "Agreement"), pursuant to Fed. R. Bankr. P. 9019.  A true and correct copy of the Agreement is attached hereto as **Exhibit A**.

## Background

4.      On October 10, 2022 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of title 11 of the Bankruptcy Code.

5.      The Debtors are operating their business and managing their affairs as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

6.      For a detailed description of the Debtors and their operations, the Debtors respectfully refer the Court and parties in interest to the *Declaration of John C. DiDonato in Support of Chapter 11 Petitions and First Day Pleadings* [ECF No. 26] filed on the Petition Date.

7.      On October 11, 2022, the Court entered an order jointly administering the Debtors' chapter 11 cases [ECF No. 43].

8.      On November 1, 2022, the Office of the United States Trustee appointed an Official Committee of Unsecured Creditors in these chapter 11 cases [ECF No. 245].

9.      Prior to the Petition Date, the Parties were engaged in litigation originally pending in the U.S. District Court for the Central District of California, Los Angeles, Case No. 2:20-cv-06745-RSWL-JC (the "California District Court"), and currently pending on appeal before the Ninth Circuit, with appellate case number 22-55815 (the "Appeal").  The case is styled as *Vital*

*Pharmaceuticals, Inc. and JHO Intellectual Property Holdings, LLC, v. PhD Marketing, Inc.* (the "Litigation").

10.     On August 5, 2022, the California District Court entered a final judgment (the "Judgment") in favor of VPX and against PhD (Docket Entry Number 205), granting VPX, *inter alia*, injunctive relief (the "Injunctive Relief") against PhD, as well as a monetary award against PhD in the amount of $10,584,308.48 (the "Monetary Award"), which PhD Marketing appealed.

## Relief Requested and Basis Therefor

11.     After good faith, arm's-length negotiations, the Parties have entered into the Agreement, which memorializes the terms and conditions of their resolution, and is subject to the approval of this Court after notice and hearing.   The principal terms and conditions of the Agreement are as follows:[3]

A.     **Settlement Payment**:  PhD shall pay in full to VPX the sum of Nine-Hundred Thousand Dollars (USD) ($900,000) in a lump-sum, no later than ten (10) business days of the Effective Date[4] (the "Settlement Payment").  PhD shall make the Settlement Payment at VPX's option, via check made payable to Vital Pharmaceuticals, Inc. or via wire transfer, upon VPX's request, along with submission of the applicable wire instructions.

B.     **Dismissal of Appeal**:  Pending this Court's approval of the Agreement, the Parties stipulate to stay PhD's Appeal. Within five business days of the receipt of the Settlement Payment, counsel for PhD shall file a dismissal of the Appeal with prejudice.  Each Party shall be responsible for its own attorneys' fees and costs incurred in the Litigation.  If, for whatever reason, the Bankruptcy Court does not approve the Agreement, the Parties further stipulate that PhD shall have thirty (30) days from such decision by the Bankruptcy Court to file

---

[3] The terms and conditions set forth herein are in summary form only. The Debtors urge all interested parties to review the Agreement in its entirety for all of the terms and conditions of the Agreement.
[4] The term| "Effective Date" is defined as the date that the Bankruptcy Court approves the Agreement.

its opening appellate brief.

   C. **Injunction**: PhD is and shall remain bound by the Injunctive Relief granted to VPX within the Judgment.  For avoidance of doubt, such Injunctive Relief, without limitation, prohibits PhD from using the two designs specifically identified in the injunction as well as anything that is confusingly similar to VPX's BANG and B-Logo trademarks, identified as U.S. Trademark Reg. Nos. 3,545,129, 4,985,030, and 4,990,091.  For reference, the relevant order is attached to the Agreement as **Exhibit A** and explicitly incorporated into the Agreement.

   D. **Warranties.**  PhD warrants and represents that neither it, nor any of its principals, owners, affiliates, successors, assigns, or related companies, is not now, or has been since August of 2022, in violation of the injunction entered as Document 205 in the docket for the Litigation.  PhD further warrants and represents that neither it, nor any of its principals, owners, affiliates, successors, assigns, or related companies, are importing into the U.S., selling in the U.S., offering to sell in the U.S. or generating revenue from vaping products bearing the word BANG or a B logo.

   E. **Limited Release.**  Effective commensurate with VPX's receipt, free and clear, of the full amount of the Settlement Payment from PhD, VPX releases PhD from any obligation to pay any further monies that PhD otherwise would have been obligated to pay to VPX pursuant to the Monetary Award within the Judgment.  VPX shall file with the California District Court a Notice of Satisfaction of Judgment within five business days of VPX's receipt of the Settlement Payment to reflect PhD's full and final satisfaction of the Monetary Award.  The foregoing release is not, and shall not be construed as, a general release, and for avoidance of doubt and without limitation, the foregoing release shall not, and shall not be construed to, release PhD from any of its obligations arising under any aspect of the Judgment, including the Injunctive Relief granted therein, that is not specifically released hereinabove.

12199003-1               4

F.  **PhD Default.**  The Parties acknowledge and agree that, absent a written agreement among the Parties otherwise, PhD will be deemed in default of its obligations under the Agreement if:

a.  PhD fails to pay the Settlement Payment identified in paragraph 3 of the Agreement within 10 days of the Effective Date of the Agreement; or

b.  PhD files or is the subject of a petition for relief under Title 11 of the United States Code, or seeks other similar relief under any other law (in each case, an "Insolvency Proceeding"), within 91 days after the Effective Date or payment of the Settlement Payment by PhD is avoided, recovered, clawed back or set aside in the Insolvency Proceeding (a "Successful Avoidance").

G.  **PhD Insolvency Proceeding.**  Should PhD enter into an Insolvency Proceeding within 91 days after the Effective Date or payment of the Settlement Payment by PhD, the Limited Release in paragraph 7 of the Agreement will be void and will automatically dissolve as if never granted.  Any claw back of the Settlement Payment or any portion thereof will be default  by PhD under the Agreement. PhD will indemnify VPX for up to $900,000 plus reasonable attorneys' fees and costs, and hold VPX harmless in the event of a claw back.  The Agreement and, specifically, paragraph 9 thereof, does not impose, and shall not be construed to impose upon VPX a duty to defend any action seeking to claw back the Settlement Payment as a preferential transfer.

H.  **Non-Exclusive Remedies Upon PhD Default.**  Should PhD default on its obligations under the Agreement, VPX will be entitled to the following remedies, in addition to any others that may be available to it by law or in equity:

a.      The full amount of the Final Judgment will become immediately due and payable, less any payments that have been made to VPX.  VPX may immediately proceed to execute on the Final Judgment in its entirety to the extent permitted by law.  In the event of a Successful Avoidance in the Insolvency Proceeding in respect of PhD, VPX will be permitted to file a claim for recovery of any remaining balance due under the Final Judgment.

b.      The Limited Release of PhD in paragraph 7 of the Agreement will automatically terminate and be void as if never granted.

c.      VPX will not be required to file a satisfaction of judgment or stipulation of dismissal.

d.      VPX will be permitted to seek enforcement of the Agreement in any manner permitted by law.

I.      **Assignment, Predecessors, Successors and Assigns.**  The Agreement shall be binding upon and shall inure to the benefit of the Parties thereto and their legal representatives, predecessors, heirs, successors, and assigns, including any plan trustee, liquidating agent, Chapter 11 or Chapter 7 trustee or any other representative of VPX's bankruptcy estate.

12.     The Debtors seek approval of the Agreement pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure.

13.     Rule 9019(a) provides that, after notice and a hearing, a court may approve a proposed settlement of a claim.  The decision of whether or not to approve a compromise is within the sound discretion of the court.  *In re Carson*, 82 B.R. 847 (Bankr. S.D. Ohio 1987); *In re Mobile Air Drilling Co.*, 53 B.R. 605 (Bankr. N.D. Ohio 1985).

14.     In passing on proposed settlements, the standard that courts applied under the former Bankruptcy Act is the same standard as courts should apply under the Bankruptcy

Code. *In re Carla Leather, Inc.*, 44 B.R. 457, 466 (Bankr. S.D.N.Y. 1984). As stated by the United States Supreme Court in *Protective Committee v. Anderson*, 300 U.S. 414 (1968), under the Act, to approve a proposed settlement, a court must find that the settlement was "fair and equitable" based on an educated estimate of the complexity, expense, and likely duration of . . . litigation, the possible difficulties of collecting on any judgment which might be obtained and all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise. *Protective Committee*, 300 U.S. at 424.

15.     This test was adopted by the Eleventh Circuit in *In re Justice Oaks II, Ltd.*, 898 F.2d 1544, 1549 (11th Cir. 1990), which provides additional guidance as to whether a compromise should be approved. *Justice Oaks* established a four-part test for approval:

(a)     The probability of success in litigation;

(b)     The difficulties, if any, to be encountered in the matter of collection;

(c)     The complexity of the litigation involved and the expense, inconvenience and delay necessarily attending it; and

(d)     The paramount interest of the creditors and a proper deference to their reasonable views in the premises.

16.     The Agreement satisfies the *Justice Oaks* standard.

17.     Applying the foregoing, the terms of the Agreement satisfy that four-part test relating to the Rule 9019 request. The Parties believe that after full and careful consideration of the claims asserted by PhD, the terms of the Agreement would be in the best interests of VPX's estate. Specifically, the estate of VPX will receive a lump sum payment of $900,000.00, in exchange for the dismissal of the Appeal, and PhD is and shall remain bound by the Injunctive Relief granted to VPX, which prohibits PhD from using the two designs specifically identified in

the injunction as well as anything similar to VPX's BANG and B-Logo trademarks, identified as U.S. Trademark Reg. Nos. 3,545,129, 4,985,030, and 4,990,091.

18.    Counsel for each of the Parties is mindful of the additional administrative expenses that will be incurred in the event that the Agreement is not approved.  The Parties believe that resolution of the disputes between the Parties, upon the terms set forth in the Agreement, is reasonable and falls well above the lowest point in the range of reasonableness as required by Rule 9019 of the Federal Rules of Bankruptcy Procedure and applicable caselaw.

**WHEREFORE**, the Debtors respectfully request that this Court enter an Order, substantially in the form attached hereto as **Exhibit B**, (a) granting this Motion; (b) approving the Agreement; and (c) granting such other and further relief as the Court deems just and proper.

Dated: June 22, 2023
      Miami, Florida

George A. Davis (admitted *pro hac vice*)
Tianjiao ("TJ") Li (admitted *pro hac vice*)
Brian S. Rosen (admitted *pro hac vice*)
Jonathan J. Weichselbaum (admitted *pro hac vice*)
**LATHAM & WATKINS LLP**
1271 Avenue of the Americas
New York, NY 10020
Telephone:  (212) 906-1200
Email:  george.davis@lw.com
       tj.li@lw.com
       brian.rosen@lw.com
       jon.weichselbaum@lw.com

– and –

Andrew D. Sorkin (admitted *pro hac vice*)
**LATHAM & WATKINS LLP**
555 Eleventh Street, NW, Suite 1000
Washington, D.C. 20004
Telephone:  (202) 637-2200
Email:  andrew.sorkin@lw.com

– and –

Respectfully submitted,

*/s/ Jordi Guso*
Jordi Guso
Florida Bar No. 863580
Michael J. Niles
Florida Bar No. 107203
**BERGER SINGERMAN LLP**
1450 Brickell Avenue, Suite 1900
Miami, FL 33131
Telephone:  (305) 755-9500
Email:  jguso@bergersingerman.com
       mniles@bergersingerman.com

Whit Morley (admitted *pro hac vice*)
**LATHAM & WATKINS LLP**
330 North Wabash Avenue, Suite 2800
Chicago, IL 60611
Telephone: (312) 876-7700
Email:  whit.morley@lw.com

*Co-Counsel for the Debtors*

# **EXHIBIT A**

## SETTLEMENT AGREEMENT

This Settlement Agreement ("Agreement") is made and entered into by and between Plaintiffs - Appellees, Vital Pharmaceuticals, Inc, and JHO Intellectual Property Holdings, LLC, (collectively referred to as "VPX") on one hand and Defendant - Appellant PhD Marketing, Inc. ("PhD") on the other.  VPX and PhD are collectively referred to as "the Parties" throughout this Agreement.

**WHEREAS,** the Parties are engaged in litigation originally pending in the U.S. District Court Central District of California, Los Angeles, Case No. 2:20-cv-06745-RSWL-JC and currently pending on appeal before the Ninth Circuit, with appellate case number 22-55815.  The case is styled as *Vital Pharmaceuticals, Inc. and JHO Intellectual Property Holdings, LLC, v. PhD Marketing, Inc.* (the "Litigation");

**WHEREAS,** on August 5, 2022, the U.S. District Court of the Central District of California entered a final judgment (the "Judgment") in favor of VPX and against PhD (Docket Entry Number 205), granting VPX, *inter alia*, injunctive relief (the "Injunctive Relief") against PhD as well as a monetary award against PhD in the amount of $10,584,308.48 (the "Monetary Award"), which PhD Marketing has appealed;

**WHEREAS,** on October 10, 2022, VPX filed a Voluntary Chapter 11 Petition in the United States Bankruptcy Court for the Southern District of Florida, Fort Lauderdale Division (the "Bankruptcy Court"), under Case No. 22-17842-PDR.

**WHEREAS,** after good faith, arm's-length negotiation, and subject to Bankruptcy Court approval, the Parties to this Agreement agreed to amicably resolve the Litigation without further expense or inconvenience;

**NOW, THEREFORE**, in consideration of the promises and the mutual covenants set forth in this Agreement and for other good and valuable consideration, the receipt and sufficiency of which are hereby expressly acknowledged, the Parties agree as follows:

1. **Recitals.**  The foregoing recitals are true and correct and are adopted by the Parties.

2. **Court Approval.**  This Agreement is subject to Bankruptcy Court approval. Upon full execution hereof, VPX shall promptly take steps necessary to procure Bankruptcy Court approval of this Agreement as soon as possible.  The "Effective Date" of this Agreement shall be the date such Bankruptcy Court approval has been obtained.

3. **Payment.**  PhD shall pay in full to VPX the sum of Nine-Hundred Thousand Dollars (USD) ($900,000) in a lump-sum, no later than ten (10) business days of the Effective Date (the "Settlement Payment").  PhD shall make the Settlement Payment at VPX's option, via check made payable to Vital Pharmaceuticals, Inc. or via wire transfer upon VPX's request, along with submission of the applicable wire instructions.

1

146389657.1

4. **Dismissal of Appeal.** Pending the Bankruptcy Court approval of this Agreement, the Parties stipulate to stay PhD's appeal. Within five business days of the receipt of the Settlement Payment, counsel for PhD shall file a dismissal of the appeal with prejudice. Each Party shall be responsible for its own attorneys' fees and costs incurred in the Litigation. If, for whatever reason, the Bankruptcy Court does not approve this Agreement, the Parties further stipulate that PhD shall have thirty (30) days from such decision by the Bankruptcy Court to file its opening appellate brief.

5. **Injunction.** PhD is and shall remain bound by the Injunctive Relief granted to VPX within the Judgment. For avoidance of doubt, such Injunctive Relief, without limitation, prohibits PhD from using the two designs specifically identified in the injunction as well as anything that is confusingly similar to VPX's BANG and B-Logo trademarks, identified as U.S. Trademark Reg. Nos. 3,545,129, 4,985,030, and 4,990,091. For reference, the relevant order is attached hereto as Exhibit A and explicitly incorporated into this Agreement.

6. **Warranties.** PhD warrants and represents that neither it, nor any of its principals, owners, affiliates, successors, assigns, or related companies is not now, or has been since August of 2022 in violation the injunction entered as Document 205 in the docket for the Litigation. PhD further warrants and represents that neither it, nor any of its principals, owners, affiliates, successors, assigns, or related companies are importing into the U.S., selling in the U.S., offering to sell in the U.S. or generating revenue from vaping products bearing the word BANG or a B logo.

7. **Limited Release.** Effective commensurate with VPX's receipt, free and clear, of the full amount of the Settlement Payment from PhD, VPX releases PhD from any obligation to pay any further monies that PhD otherwise would have been obligated to pay to VPX pursuant to the Monetary Award within the Judgment. VPX shall file with the District Court a Notice of Satisfaction of Judgment within five business days of VPX's receipt of the Settlement Payment to reflect PhD's full and final satisfaction of the Monetary Award. The foregoing release is not, and shall not be construed as, a general release, and for avoidance of doubt and without limitation, the foregoing release shall not, and shall not be construed to, release PhD from any of its obligations arising under any aspect of the Judgment, including the Injunctive Relief granted therein, that is not specifically released hereinabove.

8. **PhD Default.** The Parties acknowledge and agree that, absent a written agreement among the Parties otherwise, PhD will be deemed in default of its obligations under this Settlement Agreement if:

   a. PhD fails to pay the Settlement Payment identified in paragraph 3 above within 10 days of the Effective Date of this Settlement Agreement; or

   b. PhD files or is the subject of a petition for relief under Title 11 of the United States Code, or seeks other similar relief under any other law (in each case, an "Insolvency Proceeding"), within 91 days after the Effective Date or payment of

146389657.1

the Settlement Payment by PhD is avoided, recovered, clawed back or set aside in the Insolvency Proceeding (a "Successful Avoidance").

9. **PhD Insolvency Proceeding.** Should PhD enter into an Insolvency Proceeding within 91 days after the Effective Date or payment of the Settlement Payment by PhD, the Limited Release in paragraph 7 will be void and will automatically dissolve as if never granted. Any claw back of the Settlement Payment or any portion thereof will be Default by PhD under this Agreement. PhD will indemnify VPX for up to $900,000 plus reasonable attorneys' fees and costs, and hold VPX harmless in the event of a claw back. This paragraph and this Settlement Agreement does not impose, and shall not be construed to impose, upon VPX a duty to defend any action seeking to claw back the Settlement Payment as a preferential transfer.

10. **Non-Exclusive Remedies Upon PhD Default.** Should PhD default on its obligations under this Settlement Agreement, VPX will be entitled to the following remedies, in addition to any others that may be available to it by law or in equity:

   a. The full amount of the Final Judgment will become immediately due and payable, less any payments that have been made to VPX. VPX may immediately proceed to execute on the Final Judgment in its entirety to the extent permitted by law. In the event of a Successful Avoidance in the Insolvency Proceeding in respect of PhD, VPX will be permitted to file a claim for recovery of any remaining balance due under the Final Judgement.

   b. The Limited Release of PhD in paragraph 7 of this Settlement Agreement will automatically terminate and be void as if never granted.

   c. VPX will not be required to file a satisfaction of judgment or stipulation of dismissal.

   d. VPX will be permitted to seek enforcement of this Settlement Agreement in any manner permitted by law.

11. **Covenant of Authority.** Except to the extent that Bankruptcy Court approval of this Agreement is required, the Parties expressly covenant, warrant, and acknowledge to the other that they have the right and authority to execute this Agreement.

12. **Assignment, Predecessors, Successors and Assigns.** This Agreement shall be binding upon and shall inure to the benefit of the Parties hereto and their legal representatives, predecessors, heirs, successors, and assigns, including any plan trustee, liquidating agent, Chapter 11 or Chapter 7 trustee or any other representative of VPX's bankruptcy estate.

13. **Complete Agreement.** This Agreement contains the entire agreement between the Parties concerning the settlement of the Litigation, and there is no agreement on the part of the Parties to do any act or thing other than expressly stated in this Agreement. There

146389657.1

shall be no modification or amendment to this Agreement unless in writing and signed by all affected Parties.

14. **Enforcement.**  Nothing herein shall be construed to prohibit or release any claim for breach or specific performance of this Agreement.

15. **Severability.**  The provisions of this Agreement are severable and should any provision hereof be void, voidable, or unenforceable under any applicable law, such void, voidable, or unenforceable provision shall not affect or invalidate any other provision of this Agreement, which shall continue to govern the relative rights and duties of the Parties.

16. **Consultation with Counsel.**  Each Party to this Agreement has either consulted with, or had the opportunity to consult with, legal counsel regarding the scope and meaning of the terms and conditions set forth herein.

17. **Joint Preparation.**  This Agreement shall not be construed against the Party preparing it but shall be construed as if all Parties jointly prepared it, and any uncertainty or ambiguity shall not on grounds of authorship be interpreted against any Party.

18. **Counterparts.**  This Agreement may be executed in one or more counterparts, all of which taken together shall constitute one and the same instrument.

19. **Further Assurances.**  Each Party to this Agreement shall execute all instruments and documents and take all actions as may be reasonably required to effectuate this Agreement.

**IN WITNESS WHEREOF**, the undersigned executed this Settlement Agreement:

**Vital Pharmaceuticals, Inc.**

**By:** _Gregg Metzger_____

**Its:** General Counsel/Authorized Representative_____

**Date:** 6/14/23_____

4

**JHO Intellectual Properties Holdings, LLC**

By: _Gregg Metzger_

Its: General Counsel/Authorized Representative

Date: 6/14/23


**PhD Marketing Inc.**

By: _____
K.J. Semikian

Its:  **Secretary / C.F.O.**_____

Date:  **06 - 15 - 2023**_____

5

**Exhibit A**

'O'

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| VITAL PHARMACEUTICALS d/b/a Bang Energy; and JHO INTELLECTUAL PROPERTY HOLDINGS, LLC,<br><br>        Plaintiffs,<br><br>   v.<br><br>PHD MARKETING, INC.,<br><br>        Defendant. | CV 20-06745-RSWL-JCx<br><br>**ORDER re: Findings of Fact & Conclusions of Law in Ruling for Plaintiffs**<br><br><br>Complaint Filed: May 19, 2020<br><br>Trial Date: May 31-June 1, 2022 |

     Plaintiffs Vital Pharmaceuticals, Inc. ("Vital")
and JHO Intellectual Property Holdings, LLC ("JHO")
(collectively, "Plaintiffs") initiated this Action
against Defendant PhD Marketing, Inc. ("Defendant") for
trademark infringement and unfair competition arising
from Defendant's infringement of Plaintiffs' registered
"BANG" mark and "B" logo.  On May 31 and June 1, 2022,
the Court conducted a bench trial.  Having considered

1

the evidence, the parties' objections to the evidence, the credibility of the trial witnesses, and both parties' arguments at trial, the Court issues the following findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

## I. FINDINGS OF FACT

1. <u>The Parties</u>

Vital has manufactured and sold energy drinks consistently using its "BANG" and "B" logos (the "BANG Marks") since at least February 2016. Day 1 Vol. 1 Tr. 35:15-19, 39:4-12, 40:9-13; Ex. 98 at 42. Vital uses its BANG Marks to promote its products and its brand, and most of Vital's promotion takes place on social media. Day 1 Vol. 1 Tr. 36:12-17; Ex. 103. Vital also sells other merchandise using the BANG Marks, such as clothing, coolers, and pens. Day 1 Vol. 2 Tr. 9:5-10:1; Ex. 34. In advertising its BANG products, Vital places large emphasis on its drink being the "healthy energy drink on the market." Day 1 Vol. 1 Tr. 37:20-24.

Defendant runs a "cash and carry" business out of an approximately 12,000 square-foot warehouse. Day 2 Vol. 1 Tr. 45:22-25. Defendant's customers typically come to the warehouse and choose the products they would like to purchase, and then customers either carry out the products themselves or have Defendant ship the products to them. <u>Id.</u> at 45:25-46:1.

///

2.  The Infringing Products

In June 2019, Defendant received a sample shipment of vaping products from VTEK, a Chinese supplier.  Id. at 30:10-16, 55:25-56:5; Ex. 2014.  The packaging for these products contained the word "bang" and a star-shaped symbol in the middle of the "b."  Ex. 2006. Defendant refers to this logo as "Design One."  Day 2 Vol. 1 Tr. 8:20-9:7.  Below is a side-by-side comparison of the BANG Mark (taken from Exhibit 93) and Design One (taken from Exhibit 2006):

|  |  |
|---|---|
| BANG Mark (Ex. 93) | Design One (Ex. 2006) |

In July 2019, Defendant sent the VTEK vaping products to its customers to get feedback on their quality and functionality.  Id. at 56:14-17.  By April 2020, Defendant had agreed to order more vapes manufactured by VTEK and began regularly selling them to customers.  Id. at 56:21-57:5; Ex. 2014.  Defendant had agreed to be responsible for all sales and distribution of VTEK's vaping products within the United States.  Day 2 Vol. 1 Tr. 54:24-56:2, 69:10-14.  Defendant sold two different models of vape pens using Design One, one

1  known as "Bang Bars" and the other known as "XL" vape
2  pens. Ex. 2014. Defendant typically sold Bang Bars to
3  its customers at a price of around $4 and typically sold
4  XL vape pens to its customers at a price of around $5.
5  Jaber Dep. 129:2-20.

6     Once Defendant began selling VTEK's vaping
7  products, a VTEK representative known as Bob would
8  frequently visit Defendant's warehouse to verify the
9  quantity of vape pens remaining on the shelves and to
10 discuss future orders. Day 2 Vol. 1 Tr. 61:10-13. Bob
11 and Samir Jaber, Defendant's CEO, would agree on the
12 models and quantities of products to be ordered from
13 VTEK, and those products would be shipped to Defendant's
14 warehouse with an accompanying invoice. Id. at 62:22-
15 63:1. Defendant would often receive quantities that
16 varied from the amount reflected on the invoice, so
17 Defendant would count what it received and log that
18 amount into Defendant's QuickBooks account.[1] Id. at
19 63:1-8.

20    In June 2020, VTEK changed the design of its vape
21 pens to use what is known as "Design Two." Day 2 Vol. 1
22 Tr. 59:25-60:5. Design Two is the same as Design One
23 with the addition of the words "vape with a" above the

---

24 [1] Defendant's General Manager, Khajadour Semikian, testified
25 that Bob and Jaber would confer on the proper amount to be paid
   to VTEK and would instruct Semikian to pay that amount. Id. at
26 77:15-78:5. Semikian would then input the amount paid and apply
   it to the invoices in the QuickBooks system. Id. at 78:5-6. The
27 payments made by Semikian did not tie directly to particular
   invoices; the payments sometimes covered only a portion of an
28 invoice and sometimes covered multiple invoices. Id. at 78:7-9.

word "bang."[2]  Day 2 Vol. 1 Tr. 11:25-12:3; Ex. 2008.
VTEK began shipping vape pens using Design Two to
Defendant in June 2020, and Defendant sold vape pens
using only Design Two from June 2020 until it ceased
selling VTEK's products.  Day 2 Vol. 1 Tr. 60:2-12; Ex.
2014.  Defendant only sold XL and XXL vape pens using
Design Two.  Ex. 2014.  Defendant typically sold XXL
vape pens, which were bigger and heavier than the other
two models, to its customers at a price between $7.50
and $9.  Day 2 Vol. 1 Tr. 59:3-7.

3.  Vital Receives Notice of Infringing Products

     Meanwhile, on April 2, 2020, Vital received an
email from a marketing and distribution company
requesting more information about a vaping product
labelled with Design One.  Ex. 45.  After receiving
notice of this product and believing that Design One
infringed on Plaintiffs' trademark rights, Vital sent
cease-and-desist letters in May 2020 to companies that
it believed were selling vaping products using Design
One.  Exs. 2002-04.  On May 4, 2020, Semikian sent a
letter to one of Defendant's customers agreeing to
indemnify it from any trademark claims made by third
parties.  Day 2 Vol. 1 Tr. 7:22-24, 23:6-24:13; Ex. 2.
On May 13, 2020, Semikian received a letter from the
same customer notifying Semikian that it had indeed
received a cease-and desist letter from Vital.  Day 2

---

[2] The vaping products using either Design One or Design Two
will collectively be referred to as the "Infringing Products."

5

1  Vol. 1 Tr. 26:20-27:4; Ex. 1.

2      On June 2, 2020, Vital's customer service

3  department received an email regarding a product quality

4  control concern.  Ex. 42.  In the email, the customer

5  stated that he loves the BANG brand and frequently buys

6  BANG energy drinks but was "highly disappointed" with

7  the quality of their vape pen.  Id.  He stated that he

8  was excited to try all the vape flavors, but because of

9  his negative experience, he did not think he would buy

10 another one.  Id.  On July 11, 2020, a Facebook account

11 for a vendor posted a picture of BANG energy drinks

12 together with the Infringing Products to notify

13 followers that the store had both in stock.  Ex. 112.

14 From December 2020 through March 2021, Defendant also

15 received inquiries about its affiliation with BANG

16 energy drinks.  Day 2 Vol. 1 Tr. 35:10-19; Exs. 2019-23.

17 In October 2020, Defendant sought to obtain copyrights

18 over Design One and Design Two.  Ex. 2017.

19 4.  Defendant Ceases Sales of Infringing Products

20     Defendant stopped selling the Infringing Products

21 in April 2021, in part because of its ongoing litigation

22 with Plaintiffs, and in part because it became difficult

23 to compete with other companies that had started selling

24 "copycat" products with packaging using Design One and

25 Design Two.  Day 2 Vol. 1 Tr. 67:25-68:19.  Once

26 Defendant decided to stop selling the Infringing

27 Products, it sold off its remaining inventory.  Id. at

28 31:22-24.

In total, Defendant sold 730,207 vape pens that used Design One and 1,097,629 vape pens that used Design Two. Ex. 2032. Defendant's total revenue for Design One was $3,520,968.53. Ex. 2028 at 4-5. Defendant's total revenue for Design Two was $7,252,971.95. Id. at 2-3. Thus, Defendant's total revenue for its sales of the Infringing Products was $10,773,940.48. Id.

## II.   CONCLUSIONS OF LAW

On February 4, 2022, the Court entered judgment in favor of Plaintiffs and against Defendant for Plaintiffs' trademark infringement and unfair competition claims and dismissed Defendant's counterclaims with prejudice [151]. Thus, the only issues remaining are the equitable remedies to be awarded for Defendant's trademark infringement. Specifically: (1) whether Plaintiffs are entitled to disgorgement of profits under the Lanham Act, and if so, the amount of net profits to be awarded; (2) whether Plaintiffs are entitled to a permanent injunction; and (3) whether Plaintiffs are entitled to attorneys' fees under the Lanham Act.

## A.   Disgorgement of Profits

The Lanham Act provides that once trademark infringement has been established, a plaintiff is entitled, "subject to the principles of equity, to recover . . . defendant's profits." 15 U.S.C. § 1117. This statute affords district courts "broad discretion" in fashioning a remedy for trademark infringement.

1 _Maier Brewing Co. v. Fleischmann Distilling Corp._, 390
2 F.2d 117, 124 (9th Cir. 1968).

3     1.   <u>Willfulness</u>

4     While a finding of willfulness is not a
5 prerequisite to disgorgement of profits, "a trademark
6 defendant's mental state [remains] a highly important
7 consideration in determining whether an award of profits
8 is appropriate." _Romag Fasteners, Inc. v. Fossil, Inc.,_
9 140 S. Ct. 1492, 1497 (2020). District courts should
10 therefore consider a defendant's mental state in
11 determining what award of profits is appropriate.
12 _Grasshopper House, LLC v. Clean & Sober Soc. Media, LLC,_
13 2021 WL 3702243, at *3 (9th Cir. Aug. 20, 2021).

14     Here, the Court finds that Defendant's mental state
15 sufficiently warrants disgorgement of the profits
16 Defendant received from its sale of the Infringing
17 Products. The evidence at trial revealed that Defendant
18 continued to sell the Infringing Products, and even
19 purchased additional products from VTEK, long after it
20 became aware of Plaintiffs' BANG Marks. Day 2 Vol. 1
21 Tr. 23:6-24:13, 60:2-12; Exs. 2, 2014. Plaintiffs put
22 forth evidence of confused consumers, <u>see</u> Exs. 42, 60,
23 as well as confused vendors, <u>see</u> Exs. 61, 83, 112, 118.
24 Notably, the instances of consumer confusion included
25 emails received by Defendant directly, <u>see</u> Exs. 2019-24.
26 This confusion is unsurprising given the similarity of
27 the marks.

28     Defendant was therefore on notice of at least one

instance of consumer confusion as early as June 30,
2020, but it did not stop selling the Infringing
Products until April 2021.  Day 2 Vol. 1 Tr. 68:2-3.
Defendant also sought to obtain copyrights over Design
One and Design Two in October 2020, despite its
knowledge of Plaintiffs' nearly identical BANG Marks.
Ex. 2017.  Moreover, Defendant stopped selling the
products not in recognition of Plaintiffs' trademark
rights, but because it was no longer profitable to
continue sales.  Id. at 68:8-15.

Defendant's continued sales despite its knowledge
of consumer confusion with Plaintiffs' nearly identical
marks is indicative of an improper motive.  See Lindy
Pen Co., Inc. v. Bic Pen Corp., 982 F.2d 1400, 1406 (9th
Cir. 1993) (internal quotation marks and citation
omitted) ("Willfulness and bad faith require a
connection between a defendant's awareness of its
competitors and its actions at those competitors'
expense."); Monster Energy Co. v. Integrated Supply
Network, LLC, 533 F. Supp. 3d 928, 933 (C.D. Cal. 2021)
(finding willfulness where "[d]efendant continued to
sell the infringing products after it received
[p]laintiff's cease and desist letters and after
[p]laintiff filed the instant lawsuit"); Color Me Mine
Enters. Inc. v. S. States Mktg. Inc., No. CV 12-00860-
RGK (JCx), 2013 WL 12119715, at *11 (C.D. Cal. Apr. 25,
2013) (finding a triable issue of fact as to willfulness
where defendant continued to sell infringing product

despite knowledge of plaintiff's mark and the likelihood of consumer confusion).  The Court therefore concludes that disgorgement of Defendant's profits is warranted here based on Defendant's willful infringement.

2.  Net Profits

In determining the profits to be disgorged, the plaintiff bears the burden to prove the defendant's gross sales from the infringing activity with reasonable certainty.  15 U.S.C. § 1117(a).  Once the plaintiff demonstrates gross sales, they are presumed to be the result of the infringing activity.  Lindy Pen, 982 F.2d at 1408.  The burden then shifts to the defendant to prove which, if any, of its total sales are not attributable to the infringing activity and any permissible cost deductions.  15 U.S.C. § 1117(a).

a.  Gross Sales

At trial, Plaintiffs' damages expert relied on income statements provided by Defendant to determine that Defendant's total sales from January 2018 through April 2021 for products using Design One and Design Two were $10,773,940.48.  Day 2 Vol. 2 Tr. 94:17-97:17; Ex. 2028.  Defendant's damages expert agreed with this figure as an accurate representation of Defendant's gross sales.  Day 2 Vol. 2 Tr. 28:23-29:8.  This figure appears credible given the total number of vapes Defendant claims to have sold and the estimated price of the vapes sold to Defendant's customers.[3]  See Ex. 2032;

---

[3] Indeed, while the Court accepts the figure provided by the

10

1    Jaber Dep. 129:2-130:1.  Therefore, Plaintiffs have met
2    their burden of proving Defendant's sales.  See Monster
3    Energy, 533 F. Supp. at 937 (finding that plaintiff met
4    its burden where its damages expert based profits on
5    defendant's financial documents and where defendant's
6    CFO agreed on profit figure).

7          b.   Deductions

8          Defendant claims a total of over $9.5 million in
9    cost deductions, yet it has produced troublingly little
10   evidence to support that figure.  Not a single invoice,
11   receipt, or other original source document has been
12   produced to support the costs and expenses Defendant
13   claims.  Indeed, the only documents Defendant has
14   offered in support of its claimed deductions are summary
15   financial reports, which were created by Semikian in
16   preparation for this litigation.  See Exs. 2030-31.
17   Defendant's damages expert, John Bone, relied on the
18   summary financial documents to arrive at the $9.5
19   million deduction figure, but he did not review any
20   original source documents in doing so.[4]  Day 2 Vol. 2
21   Tr. 32:7-15.  In short, there is no evidence to support
22   the specific figures set forth in either Exhibit 2030 or
23   Exhibit 2031.

24   parties as credible, it appears possible from the information
     provided by Defendant that its sales exceeded this amount.
25

26          [4] Bone repeatedly emphasized that Plaintiffs never requested
     that Defendant produce any original source documents, but that is
27   irrelevant.  It is Defendant's burden to produce evidence
     sufficient to support its deductions claim, regardless of the
28   evidence Plaintiffs sought to discover prior to trial.  See Lindy
     Pen, 982 F.2d at 1408.

First, the Court finds no credibility as to Defendant's claimed payments to VTEK of over $7.3 million.  Aside from the lack of evidence to support the document summarizing these payments, see Ex. 2030, the Court has a number of concerns regarding the stated figures themselves.  In particular, both the timing of payments and the amount of each payment were highly irregular.  Day 2 Vol. 2 Tr. 100:8-102:6.  Such a lax payment arrangement is unusual between two companies with no prior business relationship.  Id. at 101:8-21.

It is possible that Defendant had a unique relationship with VTEK that allowed for irregular payments.  But in light of such an unusual payment system, Defendant should have been especially mindful to keep clear records.  Had an invoice, receipt, or other source document been produced during trial to support the VTEK payments, Defendant may very well have met its burden as to that deduction.  But the only documentary evidence in support of the $7.3 million figure — aside from the made-for-litigation summary financial document, see Ex. 2030 — is Semikian's testimony that these payments did occur and are accurate.  He testified that Bob and Jaber would agree on an arbitrary amount for Defendant to pay to VTEK that was not tied to any invoice.  Day 2 Vol. 1 Tr. 77:20-78:11.  Semikian would then manually input the amount he paid into Defendant's QuickBooks account.  Id.  This testimony is simply not enough to overcome Defendant's burden to prove that

1   these payments occurred in light of the aforementioned
2   irregularities.  Without any corresponding invoices or
3   other documentation to substantiate this unusual payment
4   system, the Court has no way to confirm the accuracy of
5   the payments listed in Exhibit 2030.[5]

6       The same lack of evidentiary support belies
7   Defendant's claimed deduction for shipping and delivery
8   expenses of over $2 million.  While these payments are
9   slightly more regular than Defendant's payments to VTEK,
10  there are still some months with multiple payments and
11  other months with no payments at all.  See Ex. 2031.
12  Moreover, the shipping and delivery costs increased
13  drastically between September and November 2020.  Id.
14  The only explanations Defendant offered for this
15  increase were the two-month gap in payments, the supply
16  chain bottleneck, and the increased weight of the XXL
17  vape as compared to the other two models.  See Day 2
18  Vol. 1 Tr. 83:14-84:3.  However, none of these
19  explanations justifies a cost increase of over six times
20  the previous monthly shipping cost, and other payments
21  that were more than ten times prior shipping costs.  In

22

23  _____

     [5] Defendant points to Voth's statement that if the average
24  cost per unit of the Infringing Products was $4, and Defendant
     sold about 1.8 million units, then there is support for
25  Semikian's claim that total costs were around $7 million.  See
     Day 2 Vol. 2 Tr. 126:9-127:14.  There is no evidence before the
26  Court as to the Infringing Products' average cost per unit,
     however, so any assumption as to that amount is speculative.
27  Moreover, Voth testified during trial that Jaber's deposition
     testimony about average cost per unit was vague and equivocal.
28  Id. at 125:8-21.

1  addition, there appears to be no correlation between the

2  payments made to VTEK and the claimed shipping and

3  delivery costs.

4      Without any additional support, the Court finds no

5  credibility as to the summary financial documents put

6  forth as Exhibits 2030 and 2031.  Consequently, the

7  Court finds that Defendant has failed to meet its burden

8  to prove deductions based on either: 1) payments made to

9  VTEK, or 2) shipping and delivery expenses.

10      Other courts have similarly found that summary

11  financial documents coupled with testimony, absent any

12  documentary evidence, were insufficient to satisfy the

13  defendant's burden to prove costs.  See Brighton

14  Collectibles, LLC v. Believe Production, Inc., No. 2:15-

15  cv-00579-CAS(ASx), 2018 WL 1381894, at *7 (C.D. Cal.

16  Mar. 15, 2018) (declining to deduct cost where only

17  evidence in support of cost was witness testimony and

18  spreadsheets produced by the witness); Brighton

19  Collectibles, Inc. v. Marc Chantal USA, Inc., No. 06-CV-

20  1584 H (POR), 2009 WL 10674076, at *10 (S.D. Cal. Aug.

21  12, 2009) (declining to deduct costs because defendant

22  "did not submit any documentary evidence such as

23  invoices to substantiate its claimed deductions").

24  Because Defendant has failed to meet its burden, the

25  Court declines to make any deductions on these bases.

26  See Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc., 772

27  F.2d 505, 514 (1985) (citing Russell v. Price, 612 F.2d

28  1123, 1130-31 (9th Cir. 1979) ("If the infringing

14

defendant does not meet its burden of proving costs, the
gross figure stands as the defendant's profits.").

Defendant also seeks a deduction of $189,632 for
selling and operating expenses.[6]  Plaintiffs' experts
did not dispute this deduction at trial.  The Court
therefore deducts $189,632 in allocated selling expenses
from Plaintiff's monetary award.

        c.  Apportionment

Disgorgement of profits "is intended to award
profits only on sales that are attributable to the
infringing conduct." Lindy Pen, 982 F.2d at 1408.
However, "[o]nce the plaintiff demonstrates gross
profits, they are presumed to be the result of the
infringing activity." Id.  It is therefore the
defendant's burden to demonstrate which of its total
sales are not attributable to the infringing activity.
Id.  District courts should not apportion profits where
they cannot do so based on a "reasonable, nonspeculative
formula." Frank Music Corp. v. Metro-Goldwyn-Mayer,
Inc., 772 F.2d 505, 519 (9th Cir. 1985).

To argue that some of Defendant's profits are not

---

[6] To arrive at this figure, Bone first determined
Defendant's total selling expenses using its income statements.
Day 2 Vol. 2 Tr. 21:7-14.  He then used the same income
statements to determine the percentage of total sales
attributable to the Infringing Products.  Id.  Bone then
allocated selling expenses based on this percentage to determine
the amount of selling expenses attributable to the Infringing
Products.  Id.  Courts have approved of similar allocation
methods when actual overhead costs for individual products could
not be determined.  See Kamar Int'l, Inc. v. Russ Berrie & Co.,
Inc., 752 F.2d 1326, 1333 (9th Cir. 1984).

attributable to the infringement of the BANG Marks, Bone relied on a likelihood of confusion survey conducted by Plaintiff's survey expert, Justin Anderson.  The Anderson survey found that approximately 20% of survey respondents somehow associated Design One and Design Two with the BANG Marks.  Thus, Bone reasoned that because 80% of survey respondents did not associate the two, then 80% of Defendant's sales cannot be attributed to its infringement of the BANG Marks.  Day 2 Vol. 2 Tr. 26:8-18.

This logic is flawed for a number of reasons. First, the Anderson survey did not narrow respondents to actual purchasers of Bang vapes, so it reveals nothing as to why actual Bang vape consumers decided to purchase that product.  Id. at 57:14-18.  Second, consumer confusion as to affiliation is not an accurate measure of the importance a consumer places on a brand name and logo when deciding to purchase a product.  Id. at 62:16-63:25.  It is therefore unsurprising that other courts have rejected the use of a likelihood of confusion survey to apportion profits.  See Globefill Inc. v. Elements Spirits, Inc., No. 2:10-cv-02034-CBM (PLAx), 2017 WL 6520589, at *3 (C.D. Cal. Sept. 8, 2017); adidas America, Inc. v. Skechers USA, Inc., No. 3:15-cv-01741-HZ, 2017 WL 3319190, at *28 (D. Or. Aug. 3, 2017).

Defendant offers no additional evidence showing that any of its sales were not attributable to its unlawful infringement.  Thus, the Court awards all of

16

1  Defendant's net profits to Plaintiff because the

2  "infringing and noninfringing elements of [the] work

3  cannot be readily separated." Nintendo of Am., Inc. v.

4  Dragon Pac. Int'l, 40 F.3d 1007, 1012 (9th Cir. 1994)

5  (quoting Hamilton-Brown Shoe Co. v. Wolf Bros. & Co.,

6  240 U.S. 251, 261-62 (1916)).

7       3.  Statutory Enhancement

8       If a court finds that recovery based on profits is

9  either inadequate or excessive, the court in its

10  discretion may enter judgment in an amount it finds to

11  be just.  15 U.S.C. § 1117(a).  If the court exercises

12  its discretion to adjust the award, the sum "shall

13  constitute compensation and not a penalty." Id.  To

14  penalize defendants for misconduct by enhancing Lanham

15  Act damages is an abuse of discretion; enhancement is

16  only available to ensure that the plaintiff receives

17  adequate compensation. Skydive Ariz., Inc. v.

18  Quattrocchi, 673 F.3d 1105, 1115 (9th Cir. 2012).

19       The Court finds that an award based on disgorgement

20  of profits will adequately compensate Plaintiffs for

21  Defendant's infringement.  Indeed, Plaintiffs' argument

22  in favor of a statutory enhancement is based on

23  Defendant's conduct rather than any losses they suffered

24  that disgorgement of profits would not compensate for.

25  See Day 1 Vol. 1 Tr. 21:12-25.  Enhancement based on

26  Defendant's conduct alone would constitute a penalty, so

27  the Court declines to enhance Plaintiffs' award.

28       For the foregoing reasons, the Court awards

17

1  Plaintiffs a total of **$10,584,308.48** in disgorged

2  profits.

3  **B.   Permanent Injunction**

4      The Lanham Act empowers district courts to grant

5  injunctions to prevent the violation of a plaintiff's

6  trademark rights.  15 U.S.C. § 1116(a).  To be awarded a

7  permanent injunction, a plaintiff must show that: (1)

8  the plaintiff has suffered irreparable injury; (2) legal

9  remedies are inadequate to compensate the plaintiff for

10  the injury; (3) the balance of hardships favors an

11  injunction; and (4) the public interest would be served

12  by the injunction.  eBay, Inc. v. MercExchange, LLC, 547

13  U.S. 388, 391 (2006).

14      1.   Irreparable Injury

15      Plaintiffs who prove a violation of the Lanham Act

16  are entitled to a rebuttable presumption of irreparable

17  harm.  15 U.S.C. § 1116(a).  Because Defendant

18  stipulated to trademark infringement and has offered no

19  evidence to rebut the presumption, irreparable harm is

20  presumed.  See Nintendo of Am., Inc. v. Storman, No. CV

21  19-7818-CBM-(RAOx), 2021 WL 4772529, at *2 (C.D. Cal.

22  Aug. 5, 2021).

23      2.   Inadequate Legal Remedies

24      "Injunctive relief is the remedy of choice for

25  trademark and unfair competition cases, since there is

26  no adequate remedy at law for the injury caused by a

27  defendant's continuing infringement." Century 21 Real

28  Estate Corp. v. Sandlin, 846 F.2d 1175, 1180 (9th Cir.

1988).  In addition, "[d]amage to reputation and loss of
customers are intangible harms not adequately
compensable through monetary damages." <u>Leadership
Studies, Inc. v. ReadyToManage, Inc.</u>, No. 2:15-cv-09459-
CAS(AJWx), 2017 WL 2408118, at *6 (C.D. Cal. June 2,
2017) (quoting <u>Car-Freshner Corp. v. Valio, LLC</u>, No.
2:14-cv-01471-RFB-GWF, 2016 WL 7246073, at *8 (D. Nev.
Dec. 15, 2016)).

     The Court has no evidence before it indicating that
Defendant will never begin selling the Infringing
Products again.  While Defendant eventually stopped
selling the Infringing Products, it did not do so until
well into the litigation of this case.  Moreover,
Plaintiffs introduced evidence at trial of reputational
harm they suffered as a result of the association
between BANG energy drinks and the Infringing Products.
<u>See</u> Exs. 42, 60-61.  Plaintiffs have therefore
established that legal remedies are inadequate.

     3.  <u>Balance of Hardships</u>

     Defendant will not be harmed by an injunction
preventing it from selling the Infringing Products
because Defendant has already stopped selling products
that use Design One and Design Two.  Moreover, as
discussed above, Plaintiffs have shown that they may
suffer continued reputational harm and loss of good will
if an injunction is not entered.  Therefore, the balance
of hardships favors granting an injunction.  <u>See AirWair
Int'l Ltd. v. ITX USA LLC</u>, No. 19-cv-07641-SI, 2021 WL

5302922, at *4 (N.D. Cal. Nov. 15, 2021) (citation and internal quotation marks omitted) ("Defendant will experience little to no hardship so long as defendant does not infringe and without an injunction plaintiff would be needlessly vulnerable to future infringement necessitating additional litigation.").

4.  <u>Public Interest</u>

Injunctive relief will serve the public interest here by preventing consumer confusion and will vindicate the Lanham Act by protecting the brands of authorized trademark users.  <u>See</u> <u>Knature Co., Inc. v. Duc Heung Grp., Inc.</u>, No. CV 20-3877-DMG (AFMx), 2021 WL 3913194, at *5 (C.D. Cal. Jul 2, 2021).  There are no exceptional circumstances present here indicating that an injunction would be against the public interest.  <u>See</u> <u>Leadership Studies, Inc.</u>, 2017 WL 2408118, at *6.  Thus, this factor favors entering a permanent injunction.

In sum, all of the <u>eBay</u> factors favor a permanent injunction in this case.  The Court therefore **GRANTS** Plaintiffs a permanent injunction against Defendant preventing Defendant from selling any products using Design One or Design Two.[7]

---

[7] Defendant requests clarity as to whether it may continue to use the "vape with a bang" tagline on products sold under brand names other than "Bang."  <u>See</u> Def.'s Closing Arg. Brief 23:16-20, ECF No. 199.  Plaintiffs do not appear to oppose this request.  <u>See generally</u> Pls.' Reply to Def.'s Closing Arg. Brief, ECF No. 200.  The Court agrees that Defendant should be permitted to continue using this tagline on products that do not use Design One or Design Two.  Plaintiffs have not shown that use of the word "bang" alone, when detached from Designs One and Two, is likely to cause consumer confusion.  Therefore, these sales need

## C.   Attorneys' Fees

The Lanham Act authorizes courts to award reasonable attorneys' fees to the prevailing party in "exceptional cases."  15 U.S.C. § 1117(a).  "[D]istrict courts analyzing a request for fees under the Lanham Act should examine the 'totality of the circumstances' to determine if the case was exceptional . . . using a preponderance of the evidence standard."  SunEarth, Inc. v. Sun Earth Solar Power Co., Ltd., 839 F.3d 1179, 1181 (9th Cir. 2016).  Factors to consider include: "frivolousness, motivation, objective unreasonableness (both in the factual and legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence."  Octane Fitness, LLC v. ICON Health & Fitness, Inc., 572 U.S. 545, 554 n.6 (2014)).

In short, "an 'exceptional' case is simply one that stands out from others with respect to the substantive strength of a party's litigating position . . . or the unreasonable manner in which the case was litigated."  Id. at 554.  A court's finding that a defendant's infringement was willful does not automatically compel an award of attorneys' fees to the prevailing plaintiff.  See UL LLC v. Space Chariot Inc., 250 F. Supp. 3d 596,

---

not be enjoined.  See Craigslist, Inc. v. Naturemarket, Inc., 694 F. Supp. 2d 1039, 1062 (N.D. Cal. 2010) ("Generally, an injunction must be narrowly tailored to remedy only the specific harms shown by a plaintiff, rather than to enjoin all possible breaches of the law.").

1   615 (C.D. Cal. 2017).

2       Here, while the Court determined early on that

3   Plaintiffs had a high likelihood of success on the

4   merits of their trademark infringement claims, Defendant

5   raised nonfrivolous arguments that led the Court to

6   twice deny Plaintiffs' requests for a preliminary

7   injunction. And while the Court has found that

8   Defendant's infringement was willful, it cannot say that

9   Defendant's litigating position was objectively

10   unreasonable. Plaintiffs put forth no evidence that

11   Defendant was aware of the BANG Marks when it began

12   selling the Infringing Products. Energy drinks also

13   occupy a distinct market from vaping products, and

14   Plaintiffs have not exhibited an intent to expand into

15   the vape industry. See Globefill Inc. v. Elements

16   Spirits, Inc., No. 2:10-cv-02034-CBM (PLAx), 2017 WL

17   6520589, at *3-4 (C.D. Cal. Sept. 8, 2017) (finding a

18   case to be unexceptional where plaintiff's product was

19   different from infringing product and plaintiff had no

20   plans to expand into infringing product's market).

21       Attorneys' fees are also not necessary for purposes

22   of compensation or deterrence. The disgorgement award

23   will fully compensate Plaintiffs for Defendant's

24   infringement, and the permanent injunction will

25   sufficiently deter any risk of future infringement. Cf.

26   Y.Y.G.M. SA v. Redbubble Inc., No. 2:19-cv-04618-RGK-

27   JPR, 2021 WL 4553186, at *4-5 (C.D. Cal. Oct. 5, 2021)

28   (finding a risk of future infringement where the court

1 | denied injunctive relief and defendant could not
2 | guarantee that its policing techniques would completely
3 | eliminate future infringement).  Defendant also did not
4 | litigate this case in an unreasonable manner that
5 | requires deterrence for future cases.  While Defendant
6 | had a low likelihood of success in defending against
7 | trademark infringement, it stipulated to its own
8 | liability and thereby streamlined issues for trial.
9 |      Under the totality of the circumstances, the Court
10 | finds that this is not an exceptional case that stands
11 | out from others.  See UL LLC, 250 F. Supp. at 615
12 | (finding a case to be unexceptional despite defendants'
13 | willful infringement and failure to cooperate during
14 | discovery); Eko Brands, LLC v. Adrian Rivera Maynez
15 | Enters., Inc., No. 20-35369, 2021 WL 3630225, at *2 (9th
16 | Cir. Aug. 17, 2021) (finding that district court did not
17 | abuse its discretion in concluding the case was
18 | unexceptional despite defendant's willful infringement).
19 | The Court therefore exercises its discretion to **DENY**
20 | Plaintiffs' request for attorneys' fees.
21 | ///
22 | ///
23 | ///
24 | ///
25 | ///
26 | ///
27 | ///
28 | ///

**III.  CONCLUSION**

Based on the foregoing, the Court awards Plaintiffs **$10,584,308.48** in disgorged profits.  The Court also **GRANTS** Plaintiffs' request for a permanent injunction. Defendant is hereby enjoined from selling any products using Design One or Design Two.  Finally, the Court **DENIES** Plaintiffs' request for attorneys' fees.  Within seven (7) days of this Order, Plaintiff shall lodge a Proposed Judgment with the Court consistent with the conclusions set forth herein.

**IT IS SO ORDERED.**

DATED: July 26, 2022

/s/ Ronald S.W. Lew
_____
**HONORABLE RONALD S.W. LEW**
Senior U.S. District Judge

# **<u>EXHIBIT B</u>**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION
www.flsb.uscourts.gov

IN RE:                                                    Chapter 11 Cases

VITAL PHARMACEUTICALS, INC., *et al.*,[1]                 Case No.: 22-17842-PDR

    Debtors.                                             (Jointly Administered)
_____/

## ORDER GRANTING DEBTORS' MOTION TO APPROVE COMPROMISE BETWEEN (I) DEBTORS, VITAL PHARMACEUTICALS, INC. AND JHO INTELLECTUAL PROPERTY HOLDINGS, LLC; AND (II) PhD MARKETING, INC.

**THIS MATTER** having come before the Court upon the *Debtors' Motion to Approve*

*Compromise Between (I) Debtors, Vital Pharmaceuticals, Inc. and JHO Intellectual Property*

---

[1] The address of the Debtors is 1600 N. Park Drive, Weston, FL 33326.  The last four digits of the Debtors' federal tax identification numbers are: (i) Vital Pharmaceuticals, Inc. (8430); (ii) Bang Energy Canada, Inc. (5454); (iii) JHO Intellectual Property Holdings, LLC (0010); (iv) JHO Real Estate Investment, LLC (9394); (v) Quash Seltzer, LLC (6501); (vi) Rainbow Unicorn Bev LLC (2254); and (vii) Vital Pharmaceuticals International Sales, Inc. (8019).

*Holdings, LLC; and (II) PhD Marketing, Inc.* (the "Motion") [ECF No. ___] filed by the Debtors[2]. The Court, having considered the Motion and the Agreement attached thereto as Exhibit A, and the Debtors, by submitting this form of order having represented that the Motion was served on all parties required by Local Rule 9013-1(D), that the 21-day response time provided by that rule has expired, that no one has filed, or served on the Debtors, a response to the Motion, and that the form of order was attached as an exhibit to the motion, and being otherwise fully advised in the premises, and for good cause, it is hereby

       **ORDERED AND ADJUDGED** as follows:

       1.      The Motion is **GRANTED**.

       2.      The Agreement attached to the Motion as Exhibit A is **APPROVED** in its entirety, and each and every provision of the Agreement is incorporated herein as if fully set forth in this Order.

       3.      The parties to the Agreement are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the Agreement.

       4.      The Parties are directed to comply with the terms of the Agreement and the Court reserves jurisdiction to enforce the terms of the Agreement.

# # #

Submitted by:
Jordi Guso, Esq.
Michael J. Niles, Esq.
BERGER SINGERMAN LLP
1450 Brickell Avenue, Ste. 1900
Miami, FL 33131
Telephone: (305) 755-9500
Facsimile: (305) 714-4340
Email: jguso@bergersingerman.com
Email: mniles@bergersingerman.com

---

[2] Capitalized terms used but not defined herein shall have the meanings ascribed in the Motion.

12213172-1

*(Attorney Guso is directed to serve this order upon all non-registered users who have yet to appear electronically in this case and file a conforming certificate of service.)*

12213172-1