# **EXHIBIT 1**

```
1              UNITED STATES BANKRUPTCY COURT
               SOUTHERN DISTRICT OF FLORIDA
2               FORT LAUDERDALE DIVISION

3                  Case No: 22-17842-PDR

4        In Re:

5

6        VITAL PHARMACEUTICALS, INC., et al.,

7

8        _____/

9

10       LOCATION:    Remote Audio-Video Communication
                      Friday, July 7th, 2023
11                    10:06 o'clock A.M.

12

13

14           VIDEOTAPED DEPOSITION OF JOHN H. OWOC

15

16

17

18

19           Taken before Andrea Denise West,

20       Registered Professional Reporter, Florida

21       Professional Reporter and Notary Public in and

22       for the State of Florida at Large, pursuant to a

23       Notice of Taking Deposition filed in the

24       above-styled cause.

25
```

```
 1     APPEARANCES:

 2     ON BEHALF OF THE DEBTORS:

 3         LATHAM & WATKINS, LLP
           BY: AMY QUARTAROLO, ESQUIRE,
 4         and ANDREW D. SORKIN, ESQUIRE,
           and HUGH MURTAGH, ESQUIRE,
 5             335 S GRAND AVENUE
               LOS ANGELES, CALIFORNIA 90071
 6             (213)891-8966
               amy.quartarolo@lw.com
 7
           LATHAM & WATKINS, LLP
 8         BY: ELIZABETH MORRIS, ESQUIRE
           and JON WEICHSELBAUM, ESQUIRE
 9             1271 AVENUE OF THE AMERICAS
               NEW YORK, NY  10020
10             (212) 906-1200
               elizabeth.morris@lw.com
11             jon.weichselbaum@lw.com

12     ON BEHALF OF MEG & JOHN OWOC
           CONRAD & SCHERER, LLP
13         BY: IRWIN R. GILBERT, ESQUIRE,
               633 SOUTH FEDERAL HIGHWAY
14             SUITE 800
               FORT LAUDERDALE, FLORIDA 33316
15             (954)847-3328
               IGilbert@conradscherer.com
16
           PHANG & FELDMAN, P.A.
17         BY: JONATHAN S. FELDMAN, ESQUIRE,
               2 SOUTH BISCAYNE BOULEVARD, SUITE 1600
18             ONE BISCAYNE TOWER
               MIAMI, FLORIDA 33131
19             (305)614-1223
               feldman@katiephang.com
20
       ON BEHALF OF MONSTER ENERGY:
21         HEUSTON HENNIGAN
           BY: CASSIDY O'SULLIVAN, ESQUIRE,
22         and ALLISON LIBEU, ESQUIRE,
               523 WEST 6TH STREET
23             UNIT 400
               LOS ANGELES, CALIFORNIA 90014
24             (213)788-4589
               cosullivan@heuston.com
25             alibeu@heuston.com
```

```
 1      (CONTINUED APPEARANCES)

 2    ON BEHALF OF THE DEBTORS:

 3        AKERMAN, LLP
          BY: EYAL BERGER, ESQUIRE,
 4            201 EAST LAS OLAS BOULEVARD
              SUITE 1800
 5            FORT LAUDERDALE, FLORIDA 33301
              (954-463-2700
 6            eyal.berger@akerman.com

 7    ON BEHALF OF TRUIST BANK:

 8        SHUTTS & BOWEN, LLP
          BY: HARRIS KOROGLU, ESQUIRE,
 9            200 SOUTH BISCAYNE BOULEVARD
              SUITE 4100
10            MIAMI, FLORIDA 33131
              (305)358-6300
11            hkoroglu@shutts.com

12    ON BEHALF OF THE OFFICIAL COMMITTEE OF UNSECURED
      CREDITORS:
13
          LOWENSTEIN SANDLER
14        BY: LINDSAY SKLAR, ESQUIRE,
          and ERICA MANNIX, ESQUIRE
15            1251 AVENUE OF THE AMERICAS
              NEW YORK, NEW YORK 10020
16            (646)414-6883
              lsklar@lowenstein.com
17            emannix@lowenstein.com

18    ALSO PRESENT:

19        Oliver Lee, Videographer
          Olivia Gonzalez, Conrad & Scherer
20        Alexa Gebert, Conrad & Scherer
          Joe Teresi, Esquire, Latham & Watkins
21        Jordi Guso, Esquire, Berger Singerman
          Terry Gray, Esquire, Schoeppl Law
22        Michael Goldberg, Esquire
          Luis Lluberas, Esquire
23        Gregg Metzger, Esquire
          Jade Silver, Esquire, Truist Bank
24        Carly Rothenberg, Esquire, Monster Energy

25
```



1                        I N D E X

2    WITNESS:                                      PAGE

3    **JOHN H. OWOC**

4    Direct Examination by Ms. Quartarolo            5
     Cross Examination by Ms. Allison Libeu         254
5

6

7                     E X H I B I T S

8    Owoc              Description              PAGE

9    Exhibit No. 1    Emergency Motion to Dismiss    19
     Exhibit No. 2    Sept 29, 2022 Board Minutes    55
10   Exhibit No. 3    Declaration John DiDonato      80
     Exhibit No. 4    10/9/22 email Sorkin to Owoc   97
11   Exhibit No. 5    Email Owoc to Sorkin          100
     Exhibit No. 6    Claim 654 Owoc JHO R.E.       102
12   Exhibit No. 7    Quash Seltzer Written Consent 114
     Exhibit No. 8    JHO Written Consent           119
13   Exhibit No. 9    Bang Canada Written Consent   124
     Exhibit No. 10   Rainbow Unicorn Writ. Consent 127
14   Exhibit No. 11   VPX Int. Written Consent      134
     Exhibit No. 12   JHO IP Written Consent        141
15   Exhibit No. 13   VPX Written Consent           144
     Exhibit No. 14   JHO RE 1/7/23 Writ. Consent   153
16   Exhibit No. 15   11/2/22 Rest. Committee Mins. 171
     Exhibit No. 16   2/28/23 Board Minutes         179
17   Exhibit No. 17   Declaration J. Owoc iso MTD   195
     Exhibit No. 18   9/30/22 Pmt & Engagement Ltr. 202
18   Exhibit No. 19   Priv. Log (Owoc Txt Mesgs.)   221
     Exhibit No. 20   7/6/23 Supplemental Brief     236
19   Exhibit No. 21   10/9/22 Sorkin Email Owoc     253

20

21

22

23

24

25

 1          Thereupon, the following proceedings were had:

 2                  THE VIDEOGRAPHER:  In Re:  Vital

 3          Pharmaceuticals, Inc., et al.  Case

 4          number 22-17842-PDR.  This is the

 5          videotaped deposition of John Owoc.  This

 6          deposition -- sorry -- of John H. Owoc.

 7          This deposition is taking place via Zoom

 8          on July 7, 2023.  The time is now

 9          10:06 a.m.  Our videographer is Oliver

10          Lee.

11                  Counsel will state their

12          appearances for the record after which

13          our court reporter Andrea West will swear

14          in The Witness.

15          MS. QUARTAROLO:  Amy Quartarolo, with

16          Latham & Watkins on behalf of the

17          debtors.

18          MS. SKLAR:  Lindsay Sklar from

19          Lowenstein Sandler on behalf of the

20          official committee of unsecured

21          creditors.

22          MR. GILBERT:  Well, I observe that

23          there are at least a dozen other

24          attendees.  I'm not sure whether they are

25          appearing today and participating.  My

1          name is Irwin Gilbert with the law firm

2          of Conrad & Scherer, and with me my

3          associate, Alexa Gebert, and we represent

4          John and Meg Owoc.

5     Thereupon,

6                    JOHN H. OWOC

7     after having been first duly sworn, was examined

8     and testified as follows:

9                    DIRECT EXAMINATION

10         THE WITNESS:  I do.

11              Irwin, are we going to identify

12         all these individuals on here?

13         MR. GILBERT:  I wanted to ask the

14         reporter if you've noted for the record

15         all of the attendees?

16         THE REPORTER:  I asked for their names

17         when they signed on but as we were

18         speaking, a couple more just joined.

19         MR. GILBERT:  Would you go ahead

20         and -- and identify them so that your

21         record is complete as to all of the

22         attendees?

23         THE REPORTER:  I need to get Ms.

24         Cassidy O'Sullivan.

25         MS. O'SULLIVAN:  Hello, I'm with

1          Heuston Hennigan from Monster Energy.

2             THE REPORTER:  Okay.  And Mr. Harris

3          Koroglu.

4             MR. KOROGLU:  Good morning.  Harris

5          Koroglu from Shutts & Bowen on behalf of

6          Truist Bank.

7             THE REPORTER:  Okay.  And Mr. Eyal

8          Berger.

9             MR. BERGER:  Good morning.  Eyal

10         Berger, Akerman on -- local counsel on

11         behalf of Monster Energy.

12            THE REPORTER:  Okay.  And then there

13         was Hugh Murtagh.

14            MR. MURTAGH:  Hi, I'm Hugh Murtagh

15         from Latham & Watkins on behalf of the

16         debtors.

17            THE REPORTER:  And one more was Andrew

18         Sorkin.

19            MR. SORKIN:  Hi, Andrew Sorkin, Latham

20         on behalf of the debtors.

21            THE REPORTER:  I believe that is

22         everyone.

23            MR. GILBERT:  All right.  Mr. Owoc, we

24         have -- we have a record of all of the

25         people that are attending and we can

```
 1            proceed.
 2   BY MS. QUARTAROLO
 3            Q.    Thank you.  Good morning, Mr. Owoc.
 4   Good to see you again.  Where are you right now?
 5   Are you in your home?
 6            A.    Yes, ma'am.
 7            Q.    Are you aware that your counsel
 8   represented to The Court that you were on a
 9   vacation this week?
10            A.    I had to cut my vacation short to
11   satisfy The Court's requirements.
12            Q.    So you did return to Fort Lauderdale
13   area in advance of this deposition?
14            A.    I arrived at my home last night at
15   around 10:30 p.m.
16            Q.    Are you aware that we requested to
17   depose you in person?
18            A.    Yes, I am.
19            Q.    Is anyone in the room with you
20   today?
21            A.    Yes.
22            Q.    Who?
23            A.    My two rabbits and my dog Rev.
24            Q.    Are there any humans in the room
25   with you today?
```

1           A.    Not that I could -- not that I'm

2     aware of.

3           Q.    I assume that you are on a computer

4     right now?

5           A.    Yes, ma'am.

6           Q.    What computer is that?

7           A.    It's a laptop.

8           Q.    And who purchased that laptop?

9           A.    I don't know.

10          Q.    How long have you had it?

11          A.    I don't know.

12          Q.    Is it a laptop that you used at any

13    point when you were the CEO of Vital

14    Pharmaceuticals?

15          A.    I don't know.

16          Q.    Do you know when you came into

17    possession of that laptop?

18          A.    I don't know.

19          Q.    When is the first time you recall

20    using that laptop?

21          A.    I don't know.

22          Q.    Do you believe that you purchased

23    that laptop with your own money?

24          A.    I don't know.

25          Q.    Have you searched that laptop for

1     documents in connection with discovery that's

2     been served upon you in these cases?

3              **A.**   I don't know.

4              **Q.**   Have you ever provided that laptop

5     to your counsel for purposes of searching for

6     information in connection with discovery served

7     upon you in these cases?

8              **A.**   Not that I'm aware of.

9              **Q.**   Has your -- has any of your counsel

10    ever asked you to provide that laptop to you?

11         MR. GILBERT:  Mr. Owoc, I'm going to

12              instruct you not to answer that question

13              or describe your conversations with

14              counsel.

15         MS. QUARTAROLO:  I'm not asking --

16         THE WITNESS:  Thank you.

17         MR. GILBERT:  Do you have another --

18              do you have another question for The

19              Witness?

20         MS. QUARTAROLO:  I do.  I'm actually

21              going to ask that question again.  It's a

22              yes or no question and it does not call

23              for privileged information.  I'm not

24              asking you to reveal the contents of

25              privileged information.

1    BY MS. QUARTAROLO

2              Q.    Have any of your counsel ever

3        requested that laptop be provided to them?

4              MR. GILBERT:  I instruct you not to

5              answer that question.  The question

6              contains the content of the conversation

7              that would be privileged.  And so --

8              MS. QUARTAROLO:  I --

9              MR. GILBERT:  -- I must ask you if you

10             have another question for The Witness.

11             MS. QUARTAROLO:  Thank you, Counsel.

12             Just for the record, I'm not asking for

13             any privileged communications or legal

14             advice.

15             MR. GILBERT:  Well, I won't pretend to

16             give you legal advice.  I'm not sure that

17             it would be useful but if you have a

18             different question for The Witness, let's

19             proceed.

20             THE WITNESS:  Yes, maybe something

21             substantive this time.

22             MS. QUARTAROLO:  Oh, I think this is

23             all substantive, Mr. Owoc.

24   BY MS. QUARTAROLO

25             Q.    Do you have any phones or other

1    electronic devices near or around you other than

2    the computer device that you are on?

3        **A.**    Yes.

4        **Q.**    What device is that?

5        **A.**    There's computers and phones setting

6    on this same table that I'm sitting at.

7        **Q.**    Okay.  So what -- tell me the make

8    and model of the computer that you are on right

9    now?

10       **A.**    I don't know.

11       **Q.**    It does not have any markings on it

12   that has a brand name or a -- a model name?

13       **A.**    I can't see that from where I'm

14   sitting.

15       **Q.**    How would you have to see it, what

16   would you have to do to see that?

17       THE WITNESS:  Irwin, can you instruct

18       opposing counsel that we are here for a

19       specific topic and she's to stick to that

20       topic and one of them is not computers?

21       MR. GILBERT:  Well, unfortunately,

22       Mr. Owoc, there is some flexibility that

23       an attorney has in conducting a

24       deposition.  She has not yet reached a

25       boundary that would cause me to stop the

1          deposition.  I'm going to ask you to be

2          patient, go ahead and do your best and --

3          and go ahead and answer these questions.

4                   At a certain point in time, I --

5          I -- in fact, if I think she has crossed

6          a boundary, I will terminate the

7          deposition.  But for now, let's -- let's

8          keep going.  Is that all right with you,

9          sir?

10          THE WITNESS:  Thank you kindly.

11          MR. GILBERT:  All right.

12     BY MS. QUARTAROLO

13          Q.   So Mr. Owoc, what would you have to

14     do in order to see the make and model on the

15     computer that you're on right now?

16          A.   Terminate the deposition and look it

17     up.

18          Q.   Do you have any device -- excuse

19     me -- other applications other than the Zoom

20     application open on that computer right now?

21          A.   I don't know.  I can't see any other

22     applications.  I'm just looking at you, your

23     beautiful face.

24          Q.   Thank you.

25          MR. GILBERT:  Mr. Owoc, I'm going to

```
 1              ask you to avoid that type of editorial.

 2              Okay?

 3                  THE WITNESS:  Yeah.

 4                  MR. GILBERT:  Listen to the question,

 5              answer the question.  Thank you.

 6     BY MS. QUARTAROLO

 7              Q.    The -- the other devices that you

 8         said are on the table right now, can you name

 9         those devices for me?

10              A.    I can't see those devices from where

11         I'm sitting.  They're --

12              Q.    You said there's -- I'm sorry.

13              A.    They are at the other end of the

14         table.

15              Q.    Okay.  You said there was a phone?

16              A.    They're all at the other end of the

17         table.

18              Q.    I understand, but did you say that

19         there was a phone on the table?

20              A.    Yes, there is.

21              Q.    Is that a cellphone?

22              A.    Yes, it is.

23              Q.    Is that an iPhone?

24              A.    Yes, it is.

25              Q.    And is that your iPhone?
```

1          A.    I don't know.  I know it's a not --

2    it's a not working phone.

3          Q.    When you say not working, what do

4    you mean?

5          A.    I tried to turn it on just to see

6    what it was this morning and it wasn't working.

7          Q.    Do you know when you first came into

8    possession of that iPhone?

9          A.    No, ma'am.

10         Q.    And what other devices just

11   generally are on the table?

12         A.    I can't see them from where I'm

13   sitting.

14         Q.    So you would have to get up from

15   where you're sitting to look at those?

16         A.    Yes, ma'am.

17         Q.    Mr. Owoc, do you intend to testify

18   at the hearing on the motion to dismiss next

19   week?

20         A.    You would have to ask Irwin Gilbert.

21         Q.    Okay.  Do -- are you -- do you plan

22   to be in the courtroom on Tuesday of next week

23   in the bankruptcy court?

24         A.    You would have to ask Carl Schoeppl.

25         Q.    Who is Carl Schoeppl?

1    A.    Carl Schoeppl is a brilliant SEC

2    attorney.

3        Q.    And why would I have to ask

4    Mr. Schoeppl as to whether or not you will be in

5    the courtroom next Tuesday?

6        A.    I don't know.  You would have to

7    actually ask that to Mr. Schoeppl.

8        Q.    So but today, as of now, you don't

9    know whether you'll be in the courtroom next

10   Tuesday?

11       A.    Correct.

12       Q.    What about next Wednesday at the

13   sale hearing?

14       A.    Same answers.  Would you like me to

15   be there, Amy?

16       Q.    Well, your -- it's not -- not my

17   motion so it's your motion.

18            Mr. Owoc, what, if anything, did you

19   do to prepare for today's deposition?

20       A.    Spoke with Irwin Gilbert.

21       Q.    When did you do that?

22       A.    This morning.

23       Q.    For how long?

24       A.    You would have to ask Irwin.  I

25   wasn't timing it.

```
 1          Q.    Approximately?

 2          A.    I don't want to guess on the record.

 3          Q.    More than an hour?

 4          A.    I'm not going to guess on the

 5    record.

 6          Q.    You have no idea how long you met

 7    with Mr. Gilbert this morning?

 8          A.    I didn't time it.

 9          Q.    Mr. Owoc, prior to your meeting with

10    Mr. Gilbert this morning, did you do anything to

11    prepare for today's deposition?

12          A.    Yes, I slept a lot to make sure I

13    was well rested.

14          Q.    Anything else?

15          A.    No, ma'am.

16          Q.    Did you review any documents in

17    connection with your preparation for today's

18    deposition?

19          A.    No, ma'am.

20          Q.    Have you reviewed any documents that

21    have been produced by the debtors in connection

22    with discovery in the motion to dismiss matter?

23          A.    Can you say that again, please?

24          Q.    No problem.  Have you reviewed any

25    documents that were produced by the debtors to
```

1    your counsel in connection with discovery that

2    was served on the debtors in connection with

3    your motion to dismiss?

4         A.    Can you define the word debtors?  It

5    sounds like a legal term.

6         Q.    Well, there's -- are you aware that

7    there's Chapter 11 cases pending in connection

8    with Vital Pharmaceuticals and certain

9    affiliated entities?

10        A.    Vital Pharmaceuticals, yes.

11        Q.    And I will refer to those Chapter 11

12   cases and the parties, the entities that are

13   party to them as the debtors; do you understand

14   that?

15        A.    I understand but don't necessarily

16   agree.

17        Q.    I understand.  I'm just -- I want to

18   make sure that we're clear and if you do have

19   any questions about which entities I'm referring

20   to, you can let me know.

21             So my question for you, again, is

22   did you review any documents that were provided

23   by the debtors to your counsel in connection

24   with discovery that was served by your counsel

25   upon the debtors in connection with the motion

1    to dismiss?

2            A.    That is a very -- I did teach school

3    for nine years and mostly science but that -- I

4    taught a section of English and I would flag

5    that as a run-on sentence that's incoherent and

6    incohesive and I don't understand it.

7            Q.    I'm happy to break it down for you.

8    Are you aware -- are you aware that you filed a

9    motion to dismiss in the bankruptcy cases?

10           A.    Can you explain motion to dismiss?

11           Q.    Sure.  I will ask my colleague,

12   Mr. Teresi, to pull up what has been -- I guess

13   what we will mark as Owoc Exhibit 1, which is

14   Tab 1.

15                 (Whereupon, Owoc Exhibit No. 1 was

16             marked for identification.)

17   BY MS. QUARTAROLO

18           Q.    Mr. Owoc, do you recognize this

19   document?

20           A.    No, ma'am.

21           Q.    Do you -- have you ever seen this

22   document before?

23           A.    I may have.  I'm not saying I

24   didn't, I'm not saying I did.

25           Q.    Do you see that it's titled creditor

1    and interested party John H. Owoc's emergency

2    motion to dismiss Chapter 11 bankruptcy of

3    debtor JHO Real Estate Investment, LLC.  Do you

4    see that?

5          A.    Yes.

6          Q.    Okay.  So are you aware that you

7    have filed in the Chapter 11 cases a motion to

8    dismiss and this is the document I'm referring

9    to?

10         A.    I didn't file anything, ma'am.

11         Q.    When I refer to you, and I'm happy

12   to clarify, I'm referring to you and your

13   counsel or anyone acting on your behalf.

14               Are you aware that someone acting on

15   your behalf has filed a motion to dismiss in the

16   Chapter 11 cases?

17         A.    Yeah, I remember talking about that.

18   Yes.

19         Q.    When you say you remember talking

20   about that, what do you mean?

21         A.    To my attorneys so that would be

22   attorney/client privilege, Amy.

23         Q.    And you -- you can go ahead and take

24   this down, Joe, thank you.

25               And in connection with that motion

1    to dismiss that we just looked at, Mr. Owoc, are

2    you aware that discovery, requests for

3    documents, were served by your counsel upon the

4    debtors?

5         A.    I don't know.

6         Q.    Are you aware that the debtors

7    produced certain documents and information to

8    your counsel in connection with such discovery?

9         A.    Yes.

10        Q.    And so my question for you,

11   Mr. Owoc, is the documents that have been

12   produced by the debtors to your counsel in

13   connection with that discovery, have you

14   reviewed any of them?

15        A.    To the best of my knowledge, I only

16   reviewed one document.

17        Q.    What document?

18        A.    Now, what -- I know you're going to

19   ask me what that document is and I can't recall

20   but if it comes up, I'll gladly point that out

21   to you.

22        Q.    Do you know if it was an email?

23        A.    I can't recall.

24        Q.    And when did you review that

25   document?

1          A.    I don't remember.

2          Q.    Who provided it to you?

3          A.    I don't know.  We have, I think, six

4    law firms working on this with various

5    individuals from each law firm so I can't

6    recall.

7          Q.    Mr. Owoc, are you familiar with an

8    entity called JHO Real Estate Investment, LLC?

9          A.    Yes.

10         Q.    When was that entity formed?

11         A.    I have no idea.

12         Q.    By whom?

13         A.    I don't know.

14         Q.    Do you know for what purpose it was

15   formed?

16         A.    Say the name of the entity again

17   because there's a lot of JHOs and it's been

18   confusing to everybody including Jordi Guso.

19         Q.    JHO Real Estate Investment, LLC, are

20   you familiar with that entity?

21         A.    Vaguely, yes.

22         Q.    And if I refer to JHO Real Estate,

23   will you understand that that's the entity that

24   I'm referring to?

25         A.    Yes.

1      Q.     And so --

2      A.     Yeah, more than likely, yes.

3      Q.     And if there's any confusion, you

4    just let me know.  For what purpose was JHO Real

5    Estate formed?

6      A.     To the best of my recollection, it

7    was formed as a separate corporation for the

8    Phoenix manufacturing facility.

9      Q.     Meaning to -- to own or hold the

10   Phoenix manufacturing facility?

11     A.     I asked -- I answered it the best

12   way I know how.  Anything beyond that would kind

13   of be a legal thing.

14     Q.     So is it -- I'm just asking for your

15   understanding, sir.  Is it your understanding

16   that JHO Real Estate owns or holds the Phoenix

17   manufacturing facility that you referred to?

18     A.     Asked and answered.

19      MR. GILBERT:  Excuse me, Mr. Owoc,

20      you're going to have to let me make the

21      objections and in this particular case, I

22      would object to the form of the question.

23           Counsel, do you have another

24      question for The Witness?

25

1          MS. QUARTAROLO:  No, I don't.  I'd

2     like him to answer that question, please.

3          MR. GILBERT:  All right.  Well, you're

4     asking -- you're asking a compound

5     question.  Can you break it up into a

6     noncompound set of questions?

7  BY MS. QUARTAROLO

8          Q.    Mr. Owoc, is it your understanding

9  that JHO Real Estate owns or holds the Phoenix

10  facility?

11          MR. GILBERT:  If you understand the

12     question, sir, just answer it.

13          THE WITNESS:  Owns or holds?  I don't

14     understand the term holds.  It's -- I'm

15     going to give you my original answer.

16     When I say it's asked and answered,

17     that's not an objection, it's a laymen's

18     term meaning I already answered the

19     question.

20          So I already answered the

21     question but I'll gladly answer it again,

22     is we set up a special corporation, to

23     the best of my knowledge, for the Phoenix

24     facility.  Holds, owns, operates, you

25     would have to ask Irwin on a break.

1    BY MS. QUARTAROLO

2            Q.    So when you say we set it up, who

3    are you referring to?

4            A.    I'm referring to myself and certain

5    attorneys that may have been involved.  Actually

6    the attorneys are the ones that actually set it

7    up.

8            Q.    Which attorneys were those?

9            A.    I don't know.

10           Q.    You don't know which attorneys set

11   up that entity?

12           A.    Absolutely not.  We -- I'm sure all

13   the attorneys online are aware that we had 68

14   legal cases going and eight or nine in-house

15   attorneys so I couldn't possibly remember that.

16           Q.    When was the Phoenix facility

17   purchased?

18           A.    I don't know.

19           Q.    Do you know for how long it was held

20   by JHO Real Estate?

21           A.    I don't know.

22           Q.    Where did you first learn that JHO

23   Real Estate Investment, LLC, had filed for

24   Chapter 11 protection?

25           A.    I never recall filing for Chapter 11

1  protection.

2          **Q.**   So sitting here today, you

3  understand that JHO Real Estate Investment, LLC,

4  filed a Chapter 11 petition, correct?

5          **A.**   Not necessarily, no.

6          **Q.**   At some point, did you learn that

7  JHO Real Estate Investment, LLC, had filed for

8  bankruptcy?

9          **A.**   I didn't think it did file for

10  bankruptcy.  The only thing I thought filed for

11  bankruptcy was Vital Pharmaceuticals, Inc.

12          **Q.**   Okay.  Mr. Owoc, you file -- we

13  looked at just a moment ago the -- the motion to

14  dismiss that you -- your counsel had filed.  Do

15  you remember that?

16          **A.**   Yes, ma'am.

17          **Q.**   Why did you authorize -- I assume

18  you authorized that filing; is that correct?

19          **A.**   Yes.

20          **Q.**   And if you filed a motion to dismiss

21  the JHO Real Estate bankruptcy, you must have

22  understood that a bankruptcy had been initiated,

23  right?

24          MR. GILBERT:  I'm sorry, I apologize

25          for interrupting, Counsel.  We need to

1        just stop for one moment.  I have a call

2        from my physician.  Stand by, please.

3            THE VIDEOGRAPHER:  Are we going off

4        record, any consensus?

5            MS. QUARTAROLO:  I guess we can go off

6        the record.  It's fine with me.

7            THE VIDEOGRAPHER:  Off the record at

8        10:30.

9                (Whereupon, a brief recess was

10            taken.)

11            THE VIDEOGRAPHER:  Back on the record

12        at 10:32.

13            MS. QUARTAROLO:  Madam Court Reporter,

14        can you read back the last question?  I

15        think there may have been a question

16        pending.

17                (Whereupon, the last question was

18            read back by the court reporter.)

19    BY MS. QUARTAROLO

20        Q.    Can you answer that question,

21    Mr. Owoc?

22        A.    I do now.

23        Q.    You do now understand that a

24    bankruptcy had been initiated; is that correct?

25        A.    Correct.

1    Q.    So my question for you is when did

2    you first learn that such a bankruptcy had been

3    initiated by JHO Real Estate?

4    A.    I don't recall.  I don't ever recall

5    until just now knowing that it was in there

6    because there's a lot of legal things that we

7    deal with about, it's probably about 12 hours a

8    day.

9    Q.    So did you know at the time of your

10   termination in March of 2023?

11        MR. GILBERT:  Object to the form of

12        the question.  Did you know what?

13   BY MS. QUARTAROLO

14        Q.    Did you know, Mr. Owoc, that JHO

15   Real Estate had initiated a Chapter 11

16   proceeding at the time of your termination from

17   the debtors in March of 2023?

18        A.    Are you saying that's when it

19   occurred?  Do I know that's when it occurred?

20        Q.    I'm asking if you knew at that time.

21        A.    No, I already answered that

22   question.

23        Q.    Okay.  So you claim to not have

24   known in March of 2023, but you know sitting

25   here today.  So my question for you is, at what

1    point did you learn that JHO Real Estate had

2    initiated a Chapter 11 bankruptcy proceeding?

3          A.    I think I'm just learning that now.

4          Q.    Did you know it at the time that you

5    filed the motion to dismiss?

6          A.    When was the motion to dismiss

7    filed?

8          Q.    Mr. Toresi, can you pull that

9    document up again for Mr. Owoc.

10          Do you see the date at the top of

11   this that says 6/16/23, Mr. Owoc?

12          A.    Yes.

13          Q.    So that's June 16.  As of June 16th

14   of 2023, did you know that JHO Real Estate had

15   initiated a Chapter 11 bankruptcy proceeding?

16          A.    I can't recall.

17          Q.    Do you have any information as to at

18   what point in time you learned that JHO Real

19   Estate had initiated a Chapter 11 bankruptcy

20   proceeding?

21          A.    I asked and answered that three

22   times but I'll gladly answer it again.  I think

23   I'm just learning of that now.  I could have

24   been aware of it but there's -- again, we're --

25   we're working on legal things here about ten, 12

1    hours a day.

2         Q.    What does that mean you're working

3    on legal things for ten or 12 hours a day?

4         A.    The answer speaks for itself.

5         Q.    I'm asking what you meant because I

6    don't understand it.

7         A.    I can't explain it any better.  I'm

8    sorry.

9         Q.    From -- you can take that down,

10   Mr. Teresi.  Thank you.

11              From -- from whom did you first

12   learn that JHO Real Estate Investment had filed

13   for Chapter 11 bankruptcy proceeding?

14        A.    To the best my knowledge, you.

15        Q.    When do you think I informed you of

16   that?

17        A.    During this deposition.

18        Q.    Did you ever learn that from your

19   counsel?

20        A.    If you need to know the precise

21   time, the court reporter could probably tell

22   you.

23        Q.    But is your -- just to confirm, is

24   your testimony that you first learned that

25   sitting here today?

1          A.    I can't recall.  Again, we have very

2     long legal days.

3          Q.    From whom did you -- strike that.

4                Did you ever have conversations with

5     your counsel, anyone representing you, about JHO

6     Real Estate filing for Chapter 11 bankruptcy

7     protection?

8          A.    That would be attorney/client

9     privilege.

10          Q.    It's a yes or no question.

11          A.    My answer is attorney/client

12     privilege.

13          MS. QUARTAROLO:  Mr. Gilbert, this --

14          I'm not asking for privileged

15          communication.

16          THE WITNESS:  It sounds like you are.

17          MR. GILBERT:  All right.  Counsel,

18          when your question contains the subject

19          matter of the conversation, answering yes

20          or no would in effect be revealing the

21          substance of the attorney/client

22          communication.

23                I don't know whether it will

24          assist you in your deposition today but

25          we will stipulate that when the motion to

1              dismiss the JHO Real Estate Investment

2              bankruptcy was filed, that the client was

3              put on notice that JHO Real Estate

4              Investment had been included in the

5              Chapter 11 filings.

6                   MS. QUARTAROLO:  Well, Mr. Gilbert,

7              respectfully I think his testimony is to

8              the contrary and I mean, it is what it is

9              but I -- I don't think it's your place to

10             testify or try to clean up your client's

11             testimony.

12                  MR. GILBERT:  I'm not trying to clean

13             anything up.  I'm trying to move the

14             deposition along and --

15                  MS. QUARTAROLO:  Thank you.

16                  MR. GILBERT:  -- Mr. Owoc to the

17             extent that you're able to provide

18             insight into a timeframe when you learned

19             that JHO Real Estate Investments, LLC,

20             had been included in a Chapter 11

21             bankruptcy filing, please tell counsel so

22             we might be able to move on to something

23             else.

24                  THE WITNESS:  I -- I would but I can't

25             recall.

```
1              MR. GILBERT:  Okay.

2    BY MS. QUARTAROLO

3         Q.   So sitting here today, you have no

4    information as to when you learned for the first

5    time that JHO Real Estate filed for Chapter 11

6    bankruptcy protection?

7         A.   I can't recall.

8         Q.   And do you know from whom you

9    learned that?

10        A.   No.

11        Q.   Do you know if you learned in

12   writing or if someone told you orally?

13        A.   I can't recall.

14        Q.   When you first learned that JHO Real

15   Estate had filed for Chapter 11 protection, were

16   you surprised?

17        A.   Yes.

18        Q.   Why?

19        A.   I was alarmed because Sury

20   Rodriguez, Greg Robbins, Gregg Metzger,

21   everybody told me I owned that facility.  I

22   think there's an over abundance of written

23   communication to that effect, that I vaguely

24   recall.  I'm sure you're aware of it, Amy.

25              And I always believed that I owned
```

1    that facility outright.  I had plans for that

2    facility to produce.

3              I discussed with shark -- one of the

4    sharks on Shark Tank for producing their product

5    at the facility, potential beverage.  Continuing

6    my vision was to continue to produce Bang when

7    it was sold for $3.2 billion or more, and also

8    if I had any new inventions or other third

9    parties that wanted to produce.

10             So my understanding is the facility

11   can produce 70 million cases a year at $3.50

12   totaling per case, that's quite a substantial

13   number in excess of, I believe, a quarter of a

14   billion dollars per year in profit.

15             So those were my intentions and so I

16   never had any intention of giving that facility

17   up.  I only believed that Vital Pharmaceuticals

18   was in bankruptcy.  I see that my friend Luis

19   Lluberas is on here and Jade Silver of Truist

20   who repeatedly said, along with Frank McCormack,

21   this sale of this business is going to produce

22   generational wealth.

23             They were trying to sell me on dip

24   financing and -- and take -- and doing a hostile

25   takeover of my board of directors which they did

1    effectuate.

2              And generational wealth, Jade, do

3    you remember that?  How many times did you say

4    that, Jade and Luis?  About a dozen, maybe more,

5    two dozen?

6         MR. GILBERT:  Mr. Owoc, I don't want

7         you to ask anyone questions.  You're --

8         you're going to be asked questions and I

9         need you to answer them.  Okay?

10        THE WITNESS:  Thank you, kindly.  So

11        instead of generational wealth, it looks

12        like the gross mismanage of one of the

13        most expensive bankruptcy cases in

14        history is going to actually produce

15        generational debt for my family.

16   BY MS. QUARTAROLO

17        Q.   So going back to your answer, you --

18   you say you were alarmed when you first learned

19   that -- that JHO Real Estate had filed for

20   Chapter 11 protection.  What did you do in

21   response to being alarmed?

22        A.   I don't know.  You would have to

23   speak to my attorneys, but you see that

24   Rothschild, Huron and the bank's hostile

25   takeover of our board resulted in a loss of a

```
1      $3.2 billion legitimate offer that Steve
2      Panagoes lied and perjured himself under oath
3      yesterday and said that it was an indication of
4      interest when it was an official offer.  Steve
5      Panagoes lied and perjured himself under oath
6      yesterday again when he claimed he couldn't
7      remember an indication of interest up to
8      $1 billion in equity by Cerberus.  He just -- he
9      couldn't remember that because he was only
10     getting paid $45,000 a month.
11              So there's lot of fraud here.
12     There's an ongoing racket of organized crime and
13     we're going to get to the bottom of this.  I
14     believe that there's going to be a senate
15     investigation and so I ask all of you on here to
16     prepare yourselves and govern yourselves
17     accordingly.
18          MS. QUARTAROLO:  So I will move to
19          strike the answer as nonresponsive.
20          THE WITNESS:  Why don't we move to
21          keep it on the record.  You know it stays
22          on the record.
23          MS. QUARTAROLO:  Mr. --
24          THE WITNESS:  Let's not engage in
25          chicanery and tomfoolery.  It stays on
```

1       the record.

2            MR. GILBERT:  Excuse me, excuse me,

3       Counsel.

4               Mr. Owoc, I'm very much aware of

5       your feelings and the depth of your

6       feelings on this subject.  I want you to

7       exercise the maximum amount of self

8       restraint.  I need you to follow the

9       following premise:  Listen to the

10      question.  If you understand the

11      question, answer it.  If you don't

12      understand the question, say that and

13      don't answer the question.  But then stop

14      because otherwise this deposition might

15      go well past my planned retirement date.

16           THE WITNESS:  Thank you for your wise

17      counsel.

18           MR. GILBERT:  I just need you -- I

19      fully understand your feelings.  I just

20      need you to keep them in check.  Okay?

21           THE WITNESS:  Yes, sir.

22           MR. GILBERT:  All right.  Counsel, did

23      you have another question for The

24      Witness?

25

1          MS. QUARTAROLO:  No.  Actually, I

2          would like an answer to the question that

3          I asked.

4          MR. GILBERT:  Did you -- did you want

5          to have the reporter reread the question

6          or did you --

7          MS. QUARTAROLO:  No, I'll -- I'll go

8          ahead.  I got it.

9          MR. GILBERT:  Okay.

10   BY MS. QUARTAROLO

11          Q.    Mr. Owoc, you say you were alarmed

12   when you learned that JHO Real Estate had filed

13   for Chapter 11 protection.  So my question for

14   you is what did you do in response to learning

15   that JHO Real Estate had filed for Chapter 11

16   protection?

17          A.    My attorneys were working on that.

18   There's nothing I could do.

19          Q.    Did you speak with anyone about it

20   other than your attorneys?

21          A.    You mean like go put chains and

22   locks on the door in the Phoenix facility

23   because there's nothing really I could do.  My

24   attorneys would have done that.

25          Q.    So you didn't -- you -- is it

1    correct, you did nothing other than speak with

2    your attorneys?

3        A.    Well, what else could I do, Amy?

4        Q.    It's just a question, Mr. Owoc.  I

5    would appreciate an answer.

6        A.    I already asked and answered it

7    several times.  Do you want me to answer it

8    again?

9        Q.    Yes, please.

10       A.    I spoke with my attorneys and let

11   them handle it.

12       Q.    And nothing else; is that correct?

13       A.    Asked and answered.

14       Q.    Did you speak with anyone other than

15   your attorneys about JHO Real Estate's Chapter

16   11 filing upon learning that it had initiated a

17   Chapter 11 bankruptcy petition?

18       A.    Asked and answered.

19       Q.    That's not an answer, Mr. Owoc?

20       A.    I already gave you that answer.  Do

21   you want the court reporter to read it back,

22   Amy?

23       Q.    No, I don't, Mr. Owoc, and I -- I

24   really -- it's not worth your time or ours or

25   your counsels to argue on the record.

1           A.    I'm not arguing.

2           Q.    Please answer the question and I

3    will implore your counsel to assist in this

4    regard so that we can move this deposition

5    forward because we will  continue --

6           A.    I only spoke with my attorney --

7           Q.    -- on Monday in person.

8           A.    -- I only spoke with my attorneys.

9    I told you that four times.  So if you ask me if

10   I spoke with my brother, the answer would be no;

11   sister, no.  You can name the entire eight

12   billion people on the planet, the answer will be

13   no.  I spoke to my attorneys.

14          Q.    Thank you for that answer, Mr. Owoc.

15          A.    Thank you kindly for understanding

16   it.

17          Q.    When did you first learn that the

18   Phoenix facility that you referred to was among

19   the assets being sold in the sales process being

20   run by the debtors in the Chapter 11 cases?

21          A.    I can't recall.

22          Q.    Do you know if you were aware at any

23   time while you were CEO of the debtors that the

24   Phoenix facility was part of the sales process?

25          A.    Say that again, please?

1        Q.    Sure.  So prior to March of this

2    year, you were the CEO of the debtors; is that

3    correct?

4        A.    Correct.

5        Q.    And at some point -- at any point

6    while you were CEO of the debtors, were you

7    aware that the Phoenix facility was part of the

8    assets being sold by the debtors?

9        A.    I'm not sure.

10       Q.    Sorry.  You're not sure of what?

11       A.    Ask the question again, please?  I'm

12   sorry.

13       Q.    Sure.  So, Mr. Owoc, during your

14   tenure as CEO of the debtors, at some point did

15   you learn that the Phoenix facility was among

16   the assets being sold as part of the sale

17   process being run?

18       A.    What I understood is after Jade

19   Silver corrupted our board by forcing us to take

20   on a member, Steven Gray who is known as a

21   wrecking ball in the bankruptcy industry, when

22   she and Frank McCormack did the hostile

23   takeover, I understand that Andrew Sorkin and

24   you were probably involved in this, Amy, and

25   your firm wrote these two letters on behalf of

1    three of the board members, which is a violation

2    of their fiduciary agreement and responsibility

3    as well as yours.

4                    You wrote these letters on behalf of

5    those board members when you're supposed to be

6    representing the company in its entirety and all

7    the board and you did not, you failed to include

8    two of the board members.  And so one of the

9    things I believe cited in those letters that

10   Latham & Watkins wrote, which is gross

11   malpractice, is that they were going to kick me

12   off, they were going to fire me as CEO and

13   chairman of the board because I wouldn't

14   willingly give up property, be it intellectual

15   or real property.

16                   So they -- they fired me and they --

17   and -- and Latham & Watkins was, excuse the

18   expression, but dumb enough to put that in

19   writing that Mr. Owoc won't give us what Monster

20   has valued as $10 million worth of intellectual

21   property and a -- and a facility that who knows

22   what it's valued at in Phoenix for hundreds of

23   millions of dollars in property.  So we're going

24   to fire Mr. Owoc.

25                   So that's what happened.  Do you



1     remember those letters, Amy, because you

2     probably colluded with others to write those.

3          MS. QUARTAROLO:  I will move to strike

4          that answer as nonresponsive.

5          THE WITNESS:  Thank you.  It will stay

6          on the record.  You know that, Amy.

7          MS. QUARTAROLO:  Mr. Teresi, can you

8          bring up Exhibit 1, again.

9     BY MS. QUARTAROLO

10         Q.   We've been over this document just

11    briefly before, Mr. Owoc.  This is the motion to

12    dismiss.  Do you recall that?

13         A.   Yes.

14         Q.   And do you know if you reviewed this

15    document before it was filed by your attorneys?

16         A.   I don't believe I did.  I can't

17    recall.

18         Q.   Did you authorize its filing by your

19    attorneys?

20         A.   If my attorneys advised me to do

21    something, I listen.

22         Q.   So my question is, did you authorize

23    its filing?

24         A.   More than likely, yes.  I don't

25    think they would have done like Latham & Watkins

1    and do things behind my back, yes.

2         Q.   Which counsel -- you said you have

3    many law firms involved, which counsel

4    represents you in connection with this motion to

5    dismiss?

6         A.   I can't recall.

7         Q.   You don't know any of the counsel

8    who -- who are involved in this?

9         A.   I just know that I have a lot of law

10   firms to put up with.  Latham & Watkins and

11   Berger Singerman's weaponization of the

12   bankruptcy process, filing motions.  Everything

13   is an emergency motion, isn't it, Amy.  So yes,

14   we have lots of law firms and I don't know which

15   specific one worked on this.

16        Q.   So when you say you -- you

17   authorized its filing, do you know to whom you

18   communicated that authorization?

19        A.   No, ma'am.  I can't recall.

20        Q.   Mr. Owoc, what is the relief that

21   you're seeking through this motion?

22        A.   The main relief I'm seeking is for

23   you and your firm and all the other people who

24   fed at the trough voraciously on $67 million to

25   go away and leave me alone.

1    Q.    Are you seeking that the JHO Real

2    Estate bankruptcy is dismissed?

3        A.    You would have to ask my attorneys.

4        Q.    You don't know?

5        A.    You -- feel free to speak with Irwin

6    on a break.  We can take a break now if you'd

7    like.

8        Q.    No, I'm -- I'm entitled to know your

9    understanding and -- and that's what I'm asking

10    for.

11        A.    Okay.  So please ask your question

12    again?

13        Q.    What is your understanding of the

14    relief that you're seeking in connection with

15    this motion to dismiss?

16        A.    I don't know.  That's a legal

17    question.

18        Q.    And my question, again, is do you

19    have an understanding as to whether or not

20    you're seeking that the JHO Real Estate

21    bankruptcy would be dismissed?

22        A.    Again, I -- I would refer to my

23    attorneys.

24        Q.    Did you do any diligence or

25    investigation prior to filing this motion?

1      **A.**    My attorneys did diligence, yes.

2      **Q.**    Did you --

3      **A.**    When you ask me a question, you're

4      speaking of me and my attorneys so, yes, my

5      attorneys did.

6      **Q.**    Did you do any investigation or

7      diligence independent of whatever your attorneys

8      did?

9      **A.**    Not that I can recall.

10     **Q.**    Did you provide any documents to

11     your attorneys in connection with that diligence

12     or investigation?

13     **A.**    Any documents that were used were

14     provided, to the best of my recollection, by the

15     debtors.

16     **Q.**    And what documents are you referring

17     to?

18     **A.**    Whatever documents the debtor

19     provided.  I didn't look at them.

20     **Q.**    When you say documents provided --

21     **A.**    They just provided them while I was

22     on vacation several days ago, in case you

23     forgot, Amy.

24     **Q.**    So -- so --

25     **A.**    You gave us at least 24 hours to



1    look at them.  We appreciate that.

2         Q.    So, Mr. Owoc, I think you may have

3    misunderstood my question.  So --

4         A.    I don't think I did.  I -- I

5    understood it.

6         Q.    Let -- let me ask it again because I

7    think you misunderstood what I was getting at

8    and my question may have been unclear.  This

9    motion to dismiss was filed on June 16th so my

10   question for you is did you do any diligence or

11   investigation prior to the filing of this motion

12   in connection with the factual allegations that

13   are set forth in the motion to dismiss?

14        A.    Well, let's see.  You stole my whole

15   computer.  You're in possession of that.  And

16   what -- what investigation would I do?

17        Q.    It's -- it's just a question, Mr. --

18   I mean, you can answer however you want.

19        A.    The computer I used for the last,

20   you know, or at least the emails that I accessed

21   for the last 29 years of, you -- you guys took

22   possession of that.  You -- do you recall that,

23   Amy?  You came into my house and did that.  How

24   do you think the jury is going to feel about

25   that?

1       Q.    What are you referring to, Mr. Owoc?

2       A.    The computer that you guys

3    confiscated.

4       Q.    What computer are you referring to?

5       A.    The one that The Court allowed you

6    to confiscate.  You would have to ask The Court.

7       Q.    Where is that computer now?

8       A.    I don't know.  Ask The Court.

9       Q.    When is the last time it was in your

10   possession?

11      A.    You took it out of my home.  I can't

12   recall.

13      Q.    When you say it was taken out of

14   your home, when was that?

15      A.    I can't recall.

16      Q.    Who took it?

17      A.    I don't know.

18      Q.    Did you give it to your counsel?

19      A.    I didn't give anything to anybody.

20   I -- I was instructed not to touch it so I did

21   not touch it.

22      Q.    Okay.  So prior to filing this

23   motion on or about June 16th, did you or your

24   counsel access the computer that you were just

25   referencing and look at any documents?

1    **A.**    Because the debtor was breaking the

2    law and accessing my computer illegally and

3    shutting it down illegally, I had unplugged the

4    device, I don't know, probably a month ago and

5    haven't touched it and The Court said not to

6    touch it, so I didn't touch it.  I certainly

7    couldn't access it because there was about, you

8    know, ten or so cables that were disconnected a

9    long time ago.

10        **Q.**    And you don't know where that

11   computer is now?

12        **A.**    You have it.

13        **Q.**    You believe that that's been

14   provided to the debtors?

15        **A.**    No.  I believe a third party has it

16   that you're in control of according to The

17   Court's request.

18        **Q.**    Okay.  And you -- you said a moment

19   ago that you believe that the debtor was

20   accessing that computer.  Do you recall that?

21        **A.**    Absolutely.

22        **Q.**    What do you mean by that?

23        **A.**    It's -- the answer speaks for

24   itself.

25        **Q.**    What is your basis to say that the

1    debtors were accessing that computer?

2         A.    They -- the debtors committed

3    multiple cyber crimes and I don't know.  Are

4    you -- are you involved in that, Amy, in those

5    cyber crimes for the debtors, are they sharing

6    that information with you?

7         Q.    Mr. Owoc, respectfully --

8         A.    -- cyber crimes, Amy.

9         Q.    -- the questions will be --

10        A.    They're punishable by one year in

11   prison and -- and one additional year, one

12   additional subsequent year for each time that

13   you and the debtors access that.  Are you aware

14   of that, Amy?

15        Q.    So --

16        MR. GILBERT:  Mr. Owoc -- excuse me,

17        Counsel.  Mr. Owoc, again, please do not

18        ask questions.  Just do your best to

19        answer the questions that you're being

20        asked.  Okay?

21        THE WITNESS:  Yes, sir.  Yes, Counsel.

22   BY MS. QUARTAROLO

23        Q.    So, Mr. Owoc, you said that you

24   believe that the debtors were accessing that

25   computer.  So my question for you again is what

1    do you mean by that?

2           A.    I -- you know, I can't explain it

3    any better.

4           Q.    When do you believe that the debtors

5    were accessing that computer?

6           A.    I don't know.

7           Q.    Do you believe that there was any

8    access of that computer after your termination?

9           A.    Absolutely.

10          Q.    What is your basis for saying that?

11          A.    I have no basis, but I'm sure the

12   forensic expert will provide that information

13   for you, Amy.  If you guys don't mind, Amy, I'm

14   going to allow you to finish this line of

15   questioning, I do not want to interrupt you, and

16   then I'm going to take about a seven minute

17   break but, you know, you have about five more

18   minutes.  I don't want to interrupt your

19   questioning or anything like that.

20          Q.    You're not interrupting me.  Thank

21   you, Mr. Owoc, we can take a break now.

22          A.    Are you sure?

23          Q.    Positive.

24          A.    I'm here for you, Amy.  I'm here to

25   serve you.

1           Q.    Thank you.

2             MS. QUARTAROLO:  Are we off the

3         record.

4             THE VIDEOGRAPHER:  Off the record at

5         11:01.

6                  (Whereupon, a brief recess was

7             taken.)

8             THE VIDEOGRAPHER:  Back on the record

9         at 11:14.

10    BY MS. QUARTAROLO

11           Q.    Mr. Owoc, did you speak with your

12    counsel during the break?

13           A.    Yes, for exactly -- well, roughly 18

14    seconds.

15           Q.    What did you speak about?

16           A.    That's attorney/client privilege but

17    I'm going to tell you anyhow.  He said just

18    answer the questions.

19           Q.    Anything else?

20           A.    Attorney/client privilege but it was

21    18 seconds.

22           Q.    I disagree that there's privilege

23    during the breaks but in any event, is that all

24    you spoke about?

25           A.    Yes, ma'am.

1          Q.     Mr. Owoc, before the petition date,

2     are you aware that when I refer to petition date

3     that that was the time that the bankruptcy cases

4     were filed on or about October 10th of 2022; do

5     you recall that?

6          A.     There was a lot of incoherent

7     rhetoric there.  If you can simplify that to a

8     question, I'll gladly answer it.

9          Q.     I'm happy to rephrase.  When I refer

10    to petition date, I will refer to the

11    October 10, 2022, date, on which the bankruptcy

12    cases were filed.  Do you understand that?

13         A.     Correct.

14         Q.     Okay.  And prior to the petition

15    date, you were the only board member of the

16    debtors; is that correct?

17         A.     I can't recall but if you say so,

18    I'll agree with you.

19         Q.     And historically prior to the

20    bankruptcy filing, the boards of the debtor

21    entities, they didn't meet for formal board

22    meetings; isn't that correct?

23         A.     Say that again, please?

24         Q.     Prior to the bankruptcy filing, in

25    or about October of 2022, the boards of which

1      you were a member of the debtor entities did not

2      regularly meet for formal board meetings,

3      correct?

4              A.    Vital -- the board members of Vital

5      met on a daily basis.  We didn't have a formal

6      board meeting but the members met on a daily

7      basis.

8              Q.    And when you say members, who are

9      you referring to?

10             A.    I don't know.

11             Q.    You don't know who the board members

12     of Vital Pharmaceuticals were prior to the

13     petition date?

14             A.    I can't recall and I don't want to

15     guess.

16             Q.    But you know that you were on the

17     board; is that correct?

18             A.    Correct.

19             Q.    Do you recall when was the first

20     time that there was a formal board meeting of

21     Vital Pharmaceuticals?

22             A.    You're saying with all five board

23     members?

24             Q.    No, I'm saying a -- like a formal

25     board meeting with minutes and an agenda, as

1    opposed to an ad hoc meeting that there may have

2    been of -- of management?

3         A.    That would be with the corporate

4    records of which I have no access.

5         Q.    So all I'm asking is for your

6    recollection, sir.  Do you recall when the first

7    time that the board of Vital Pharmaceuticals

8    met?

9         A.    No.

10        Q.    Okay.  Do you recall attending a

11   board meeting on or about September 29th of

12   2022?

13        A.    I -- no, I don't readily recall

14   that.

15        Q.    Okay.  Mr. Teresi, can I ask you to

16   bring up Tab 2B.  I guess we'll mark this as

17   Exhibit 2, Owoc Exhibit 2.

18             (Whereupon, Owoc Exhibit No. 2 was

19         marked for identification.)

20   BY MS. QUARTAROLO

21        Q.    And, Mr. Owoc, from time to time

22   during today's deposition, we will show you

23   documents.  If at any point in time you want to

24   review any portion of the document that's up on

25   the screen, my colleague will also drop a PDF

1    link into the chat so that you can access that

2    document directly.

3            Do you see that that document just

4    appeared in the chat?

5        A.    Yes, ma'am.

6        Q.    Okay.  My question for you,

7    Mr. Owoc, is do you recognize this document?

8        A.    Can I see it all the way to the

9    bottom and is this the document in its entirety?

10        Q.    We're happy to scroll through.  And,

11    again, as I just referenced, you -- you have a

12    PDF that is accessible to you that you can open

13    and scroll through as well.

14        A.    I don't really know how to do that.

15    Why would all these things be redacted if this

16    was a document that I've supposedly already

17    seen?

18        Q.    This is how it was produced in the

19    bankruptcy cases.

20        A.    So there's being information

21    withheld.  Thank you.

22        Q.    Yes.  Redactions were made for

23    privilege.

24        A.    Well, if I've already seen it, why

25    would it be privileged?

1    **Q.**    I'll leave that for your counsel to

2    explain to you.

3        MR. GILBERT:  Someone may have to

4        explain it to me as well.

5    BY MS. QUARTAROLO

6        **Q.**    So my colleague is now scrolling

7    through these materials.  Do you see -- do you

8    see the end of the document, Mr. Owoc?  We can

9    scroll back up to the beginning.  If there's any

10    portion of it you want to see --

11        **A.**    It looks like there's something

12    missing at the bottom.

13        **Q.**    -- we can look at it.  I'm sorry.

14    Go ahead.

15        **A.**    It looks like there's something

16    missing at the bottom.

17        **Q.**    So my question for you, Mr. Owoc, is

18    have you seen this document before?

19        **A.**    I don't know.  Is -- is my signature

20    on it or you -- you -- I -- I noticed you left

21    off the bottom of it.  I didn't see the last

22    little piece.

23        **Q.**    Was there a portion of this that you

24    want to see?

25        **A.**    All the way at the very end.  All

1    right.  And is my signature the one --

2          Q.    Yes, the one --

3          A.    -- the one that you didn't -- the

4    one that you didn't forge, is -- is that

5    signature on here or no?

6          Q.    Why don't we go to the page that is

7    Bates stamped and just for the record, this is

8    the September 29th board meeting minutes

9    VPXJHO1238.

10          We -- can we please scroll to the

11    Bates No. 1243.  Mr. Owoc, do you see that?

12          A.    Yes.

13          Q.    Is that your signature?

14          A.    Is it my forged signature?

15          Q.    I asked you a question.  Is that

16    your signature?

17          A.    I don't know, is it?

18          Q.    Mr. Owoc, I'll ask the question

19    until you answer it.

20          A.    I don't know.  It could be my forged

21    signature.  I think there's a lot of chicanery

22    going on here and I -- I don't know if that's

23    real or not.

24          Q.    Do you recall signing the board

25    minutes for the September 29, 2022, board

1    meeting?

2         **A.**    I do not recall.

3         **Q.**    Okay.

4         **A.**    I remember being vehemently against

5    signing board minutes.  However, that does not

6    mean that I did or did not sign this because

7    Latham & Watkins would manipulate the board

8    meetings and wouldn't let me record them or have

9    a stenographer present.

10              Do you remember that, Amy?

11        **Q.**    Mr. Teresi, can you please scroll

12   down to the last page of this document.

13              Mr. Owoc, do you know what this is?

14        **A.**    No.

15        **Q.**    Do you see up at the top it says

16   September 29th, 2022, board meeting minutes

17   final audit report; do you see that?

18        **A.**    Yes.

19        **Q.**    Do you know what a final audit

20   report from Adobe Acrobat Sign is?

21        **A.**    No, ma'am.

22        **Q.**    Do you see the -- on this page, the

23   list of the -- it's listed under history; do you

24   see that?

25              MR. GILBERT:  Can you make the

1            document larger so that it can be read?

2                THE WITNESS:  Thank you, Irwin.  Okay.

3        And what is the question?

4                MS. QUARTAROLO:  And it also is

5        accessible.

6    BY MS. QUARTAROLO

7        **Q.**    So do you see where it says

8    September 29, 2022, board meeting minutes

9    history; do you see that?

10        **A.**    Yes.

11        **Q.**    Okay.  And the first thing it says:

12    Document created by Yaylin Duran; do you see

13    that?

14        **A.**    Yes.

15        **Q.**    And who is Yaylin?

16        **A.**    Somebody that works in VPX in-house

17    legal.

18        **Q.**    Is she a paralegal?

19        **A.**    I don't know.

20        **Q.**    And it says document was created by

21    Yaylin Duran and beneath that it says document

22    emailed to Frank Massabki; do you see that?

23        **A.**    Yes.

24        **Q.**    Who is Frank Massabki?

25        **A.**    Former general counsel prior to

1    Gregg Metzger.

2            Q.    And then beneath that, it says email

3    viewed by Frank Massabki; do you see that?

4            A.    Yes.

5            Q.    And then it says signor

6    FrankMassabki@bangenergy.com entered name; do

7    you see that?

8            A.    Yes.

9            Q.    And beneath that it says document

10   e-signed by Frank Massabki; do you see that?

11           A.    Yes.

12           Q.    And beneath that it says document

13   emailed to CEO@bangenergy.com for signature; do

14   you see that?

15           A.    Yes.

16           Q.    That was your email address at the

17   time you were CEO of the company; is that

18   correct?

19           A.    That was my email that you hacked

20   into and had access to, correct, yes, the

21   debtors did that.

22           Q.    That was your email?

23           A.    That was -- the debtors had access

24   to that email and had hacked into that, yes.

25           Q.    What do you mean by the debtors had

```
 1    access to that email?

 2           A.    Well, they had access to the email.

 3           Q.    What is your basis for saying that?

 4           A.    I have no basis but I'm sure this --

 5    the biggest mistake you ever made was

 6    confiscating my computer because when you did

 7    forensic, forensics is going to show exactly

 8    what you and Vital did.

 9           Q.    Then it says beneath that, email

10    viewed by CEO@bangenergy; do you see that?

11           A.    Yes.

12           Q.    And the -- the next two entries, I

13    guess two entries down, it says --

14           A.    I'm still answering that last

15    question but, yes, but that could mean it was

16    just viewed by the debtors who had hacked into

17    my computer.

18           Q.    And it says -- two entries down, it

19    says document e-signed by Jack Owoc and it lists

20    your email address; do you see that?

21           A.    Yeah.  Can I see where it's e-signed

22    by Frank and I, please?

23           Q.    Can we scroll back up to 1243?

24           A.    Yeah.  So this is quite interesting

25    here because that's not Frank Massabki's
```

```
1    signature.  It's just a -- a retread, a recopy

2    or whatever you want to call it, just like it

3    was with mine.  So anybody could have signed

4    this or any other documents and we believe

5    there's a lot of forgery going on here.  This

6    may or may not be one of those forgeries but

7    anybody could have affixed Frank's signature

8    here because that's not his real signature, is

9    it, Amy?  And that's not my real signature, is

10   it, Amy?

11           Q.   Mr. Owoc from time-to-time, did you

12   e-sign documents during your time at the

13   companies?

14           A.   E-sign, please explain.

15           Q.   Do you what -- do you know what an

16   e-signature is?

17           A.   Please explain.

18           Q.   I'm asking if you know, the answer

19   is just yes or no?

20           A.   Please explain because I don't know.

21           Q.   Okay.  So are you aware that

22   documents, agreements, contracts, any documents

23   that require a signature that there's the

24   functionality through different platforms of

25   applying a signature electronically?
```

1     A.    Yes, applying a signature

2  electronically and these are both, look like

3  they were applied and not real signatures and --

4     Q.    And you under --

5     A.    -- they're certainly not wet

6  signatures and they're even worse because

7  they're -- they're copy and pasted signatures.

8     Q.    And you understand --

9     A.    You believe that to be Frank

10  Massabki's real signature?  You know it's not,

11  Amy.  Come on.

12     Q.    So, again, I'll ask the questions

13  here, Mr. Owoc.

14     A.    Go ahead.

15     Q.    For -- during your time as CEO of --

16  of the company, from time-to-time you signed

17  documents electronically, didn't you?

18     A.    Yes.

19     Q.    And --

20     A.    With a real signature.

21     Q.    Sometimes you did that by Adobe

22  Sign; is that correct?

23     A.    I can't recall.

24     Q.    So, Mr. Owoc, is it your testimony

25  that you signed the September 29, 2022, board

```
 1   minutes?

 2        A.   Is that this document right here?

 3        Q.   It is.

 4        A.   I'll stick to my previous answers.

 5        Q.   I don't believe you answered that

 6   question.

 7             Did you electronically sign this

 8   document, the September 29, 2022, board minutes?

 9        A.   This is not an official signature.

10   It's a signature stamp and I have no way of

11   knowing I signed it because the debtors hacked

12   into my computer.

13        Q.   When you say --

14        A.   Hacked into my home computer.  They

15   hacked into my emails.

16        Q.   So, Mr. Owoc, is it your testimony,

17   sitting here today --

18        A.   It's my testimony that anybody could

19   have signed this, including you, because it's a

20   signature stamp just like Frank Massabki's.

21   It's not a real signature, Amy.

22        Q.   So, again, just --

23        A.   I mean, are you even listening to me

24   because you keep asking the same --

25        Q.   I certainly am listening to you.
```

```
 1        A.    I don't think you are --

 2        Q.    Mr. Owoc --

 3        A.    -- because you keep asking the same

 4   question.  It's a signature stamp, not a real

 5   signature and anybody can do that --

 6        Q.    So, Mr. Owoc --

 7        A.    -- especially somebody who has

 8   hacked into all my electronic devices.

 9        Q.    Are you done, Mr. Owoc?

10        A.    No, I'm not.  I'm still thinking.

11   Who signed this, Amy.  That's what I'm thinking.

12        Q.    So, Mr. Owoc, just frankly, out of

13   respect for the court reporter, I'm going to ask

14   that we not talk over each other because it's

15   very difficult for her, she has a hard job, it's

16   very difficult for her when we're talking over

17   each other.

18        A.    Nobody is talking over anyone.

19        Q.    So I will ask the question again.

20   Is this your electronic signature on the

21   September 29, 2022, board minutes?

22        A.    I stick to my previous answers.

23        Q.    Please answer the question, sir.

24        A.    I stick to my previous answers.

25        Q.    You have not answered that question.
```

```
 1            A.    I stick to my previous answers.
 2            Q.    Mr. Owoc, are you refusing to answer
 3      the question?
 4            A.    No, I answered the question.
 5      Please, Court Reporter, Madam Court Reporter,
 6      read my answer to that question back, please.
 7            MR. GILBERT:  Actually, Mr. Owoc, that
 8         would be at the request of one of the
 9         lawyers generally so let's -- let's just
10         go forward.
11            THE WITNESS:  All right.
12      BY MS. QUARTAROLO
13            Q.    So, Mr. Owoc, respectfully, I do not
14      think that you've answered that question and so
15      I'll ask it again and we will ask it until you
16      answer the question.
17            Mr. Owoc, is it your testimony that
18      this is your e-signature on the September 29,
19      2022, board minutes?
20            A.    This is an electronic stamp, not a
21      signature and therefore your question is invalid
22      and faulty logic and I cannot answer it.  It's
23      not a real signature, Amy.
24            Q.    Mr. Owoc, did you apply the
25      electronic signature that you see on this page?
```

1          **A.**     I don't know but you know, Amy, that

2     in all the minutes and all the board meetings

3     that you -- you forged the minutes.  You faked

4     the minutes.  You fraudulently made the minutes

5     and there are strings of emails telling you that

6     you did that.  And when I tried to record the

7     board meetings and the CTO and the CRO meetings,

8     you blocked me and it took 20 minutes for us to

9     proceed because you wouldn't allow me to record

10    them because they were false.  And than I

11    suggested that we use a court reporter and you

12    also blocked that because it was your, you know,

13    Berger Singerman continuously manipulating the

14    minutes to create a false narrative.

15          So you know that, Amy, there was --

16    there was long drawn-out fights on these board

17    meetings about recording the meetings, which

18    you, Andrew Sorkin and Jordi Guso let -- refused

19    to let me record the meetings to have an

20    accurate record.  So we don't know, do we, Amy?

21    But as we sit here today, I don't know if I

22    signed that or not because It's not a real

23    signature so I can't sign it.  It's a signature

24    stamp.

25          **Q.**     And did you apply that signature



*Jeannie Reporting*
Your Wish Is Our Job!

www.jeanniereporting.com
305-577-1705

1    stamp?

2         A.    I don't know, Amy.  I just told you

3    I don't know.

4         Q.    If you turn back, let's turn to

5    1238.  And --

6         A.    I believe under the law I have the

7    right to read a document in its entirety before

8    commenting on that and with all these

9    redactions, I can't read the document.  So I'm

10   going to not comment on the document because I

11   can't read it and it's -- it's -- everything is

12   redacted.  So I think you're setting up a legal

13   trap here and I'm not going to get involved in

14   it.

15        Q.    Okay.  Well, Mr. Owoc, I -- I will

16   ask you my questions.

17        A.    What is the law on me being able to

18   read the entire document, Amy?

19        Q.    I'll -- I'll invite you to speak

20   with your counsel.

21        A.    The document in its entirety, Amy.

22        Q.    Mr. Owoc, all -- respectfully, I

23   will ask the questions.  You will answer them or

24   not.  If you decline to answer --

25        A.    Whenever you say respectfully, it

1    seems like you're being disrespectful so just if

2    you're going to be disrespectful just go ahead

3    and be disrespectful.

4            **Q.**    I will never disrespect you,

5    Mr. Owoc.

6            **A.**    Oh, you have many times.

7            **Q.**    I -- I will ask the questions.  You

8    will answer them or you won't and if you decline

9    to answer them then we'll see you on Monday

10    morning.

11            **A.**    I'll answer all of your questions

12    gladly but I can't comment on an incomplete

13    redacted -- greatly redacted documents with

14    redactions in like a 52-point font.

15            **Q.**    Okay.  So do you see at the bottom

16    of this page, it has --

17            **A.**    No, I don't because I can't see the

18    entire document.

19            **Q.**    Do you see where it says also

20    present by invitation of the board; do you see

21    that?

22            **A.**    Yes.

23            **Q.**    And there's a list of names; do you

24    see that?

25            **A.**    Yes.

1       Q.    And let me back up.  At the top

2   of -- or I guess under -- under the first

3   paragraph it says board member present; do you

4   see that?

5       A.    Yes.

6       Q.    It says Jack Owoc, correct?

7       A.    Correct.

8       Q.    And then scrolling down to also

9   present and then continuing on, if we can scroll

10  down to the top of the next page, you see where

11  it says Paul J. Batista, counsel to Jack Owoc in

12  his individual capacity, Genovese, Joblove &

13  Batista, PA; do you see that?

14      A.    Yes.

15      Q.    Was it your understanding that Paul

16  Batista was in attendance at this meeting?

17      A.    I have no idea.

18      Q.    You don't recall?

19      A.    I don't recall.

20      Q.    And Mr. Batista was serving as your

21  counsel at this time in September 29th of 2022,

22  correct?

23      A.    I'm not sure of the dates.

24      Q.    Do you know when you engaged

25  Mr. Batista?

1          A.    I can't recall.

2          Q.    If you turn to 1254, do you see it

3    says Exhibit B, board presentation; do you see

4    that?

5          A.    Yes, ma'am.  You're asking me to

6    comment on a document with a missing exhibit, is

7    that what you're doing, Amy?

8          Q.    No, I'm going to show you exactly

9    what I'm asking about.

10          A.    The contract is invalid if there's

11    missing exhibits.  You do know that, Amy.

12          Q.    Mr. Owoc, if you -- we can turn to

13    Page 1259, and I'll ask you, I guess, just

14    generally from time-to-time various advisers to

15    the company made presentations to the board and

16    presented board materials; do you recall that?

17          A.    You would have to be more specific.

18          Q.    Well, I guess let's talk about this

19    particular board meeting, so we saw that you

20    were in attendance at this board meeting on

21    September 29th, right?

22          A.    I don't necessarily agree with that.

23    That's what the paper says.

24          Q.    But you don't -- you don't have any

25    basis to --

1          A.    What was the --

2          Q.    -- disagree with that, right?

3          A.    -- length of that meeting?  That

4    meeting was what, 15 minutes, 14 minutes?

5          Q.    So you recall that meeting?

6          A.    Does anybody have the -- the notes

7    of how long that meeting was?  I think I might

8    have but it was like a 14-minute meeting.

9          Q.    So do you recall the meeting on

10   September 29th?

11         A.    I don't know if I recall it or not

12   but if my memory serves me correct, this was

13   about a 14-minute meeting.

14         Q.    Okay.  And during that meeting, you

15   recall various advisers to the company providing

16   you with certain information, correct?

17         A.    Not necessarily, no.  I just believe

18   that there was bunch of different topics that

19   weren't covered thoroughly and I -- if somebody

20   can look up the time of this meeting, I think

21   there was like, I don't know, a half a dozen to

22   a dozen corporations that they were discussing

23   and the call ended I believe in less than 20

24   minutes, if my memory serves me correctly, maybe

25   even 14 minutes.

1          Q.    Mr. Owoc, do you see the -- the page

2     that is on the screen before you that's Bates

3     stamped 1259?

4          A.    I just see a big word that says

5     redacted.

6          Q.    And above that, the title of this

7     slide says objectives of bankruptcy case and

8     related considerations; do you see that?

9          A.    Yes, ma'am.

10         Q.    And it lists under the title -- the

11    heading, filing entities.  It lists several

12    entities, correct?

13         A.    Several?  Let's see how many, one,

14    two, three, four, five, six, seven, eight, nine,

15    ten.  Ten different entities, yeah, that we -- I

16    think we discussed in roughly 14- to 20-minute

17    timeframes.

18         Q.    And you see that JHO Real Estate

19    Investment, LLC, is listed under the heading

20    filing entities, correct?

21         A.    I did, yes.

22         Q.    And it -- the first bullet says:

23    Filing entities are borrowers or guarantors on

24    bank debt and/or have other material

25    obligations, e.g. mechanics' liens, litigations

1    claims; do you see that?

2              A.    Yes, ma'am, and nobody ever

3    explained that to me nor was it discussed.

4              Q.    Do you -- you do recall seeing

5    this -- these materials during the board

6    meeting?

7              A.    No, I never seen them.  This was --

8              Q.    The --

9              A.    -- this was created afterwards to

10    the best of my recollection, but this is a

11    highly redacted document so we don't know, do

12    we, Amy?

13              Q.    Mr. Owoc, what is your basis to say

14    that this document was created afterwards?

15              A.    I have no basis.  Was it created

16    afterwards?  Because I've never seen this

17    document.

18              Q.    And, Mr. Owoc, the second bullet --

19              A.    This is part -- isn't this part of

20    the minutes, this document?  Minutes are

21    generally created afterwards, sometimes two

22    weeks afterwards because you create the minutes,

23    don't you, Ms. Sorkin [sic].

24              Q.    Mr. Owoc, you understand that board

25    presentations are then -- that were presented at

1     a -- at a board meeting are then attached to

2     board minutes; do you understand that?

3          A.    Say that again, please?

4          Q.    Do you understand that board

5     presentation materials that may be presented and

6     made available to board members are then

7     attached to board meeting minutes?

8          A.    I don't know.  I just know that

9     Latham controls everything and manipulates it

10    according to their agenda.

11         Q.    Okay.  So let's look at the second

12    bullet point here under the filing entities

13    heading.  Do you see that?  And it lists certain

14    entities that will, quote, stay out to

15    facilitate out-of-court sales of properties; do

16    you see that?

17         A.    Where is that?

18         Q.    The second bullet point, sir.

19         MR. GILBERT:  I'm sorry, could you

20        make the document larger?  And are you

21        speaking of the second bullet point of

22        the three that are now near the top of

23        the screen?

24         MS. QUARTAROLO:  Yes, I think it's

25        clear what I'm referring to.

1           MR. GILBERT:  I just wanted to make

2        sure now that I can actually read it and

3        is it --

4           MS. QUARTAROLO:  And, Mr. Gilbert --

5           MR. GILBERT:  And it's the -- and it's

6        the second one you're referring to?

7           MS. QUARTAROLO:  Yes, and,

8        Mr. Gilbert, there is a PDF in the chat

9        if you would like to open it separately.

10          MR. GILBERT:  Well, I prefer not to.

11       I think it's just fine when you enlarge

12       the document.  I just want to make sure,

13       Mr. Owoc, can you see it?

14          THE WITNESS:  Yes.  Now I can.

15          MR. GILBERT:  All right.

16          MS. QUARTAROLO:  And you --

17          MR. GILBERT:  Counsel, please proceed.

18          MS. QUARTAROLO:  Thank you.

19   BY MS. QUARTAROLO

20       **Q.**   And so you see under that second

21    bullet point it lists certain real estate

22    entities that will, quote, stay out to

23    facilitate out-of-court sales of properties; do

24    you see that?

25       **A.**   Yes.

1    Q.    And those three entities are JHO GA,

2    JHO NV, and Sheridan; do you see that?

3    A.    Will stay out to facilitate -- what

4    is will stay out to facilitate out-of-court

5    sales?  What does that mean?

6    Q.    I'm just asking if you see that

7    bullet, sir.

8    A.    I see the bullet, yes, but I don't

9    understand the bullet.

10   Q.    Okay.  And you -- you understand --

11   you do see on this page that there's three

12   entities that are listed in the parentheses; do

13   you see that?

14   A.    Yes.

15   Q.    Do you recall, sir, discussing the

16   proposed Chapter 11 filings with advisers to the

17   debtors during this meeting?

18   A.    No.

19   Q.    You don't recall one way or the

20   other?

21   A.    Ask the question again, please?

22   Q.    You don't recall one way or the

23   other whether there was discussion during this

24   meeting about which entities would file for

25   Chapter 11 protection; is that right?

```
1              A.    There wasn't any.

2              Q.    Why do you say that?

3              A.    Because we never discussed that and

4         it was never explained to me.

5              Q.    Why do you say that?

6              A.    Because it never was.

7              Q.    And --

8              A.    Didn't I just tell you earlier, I

9         was alarmed to find that out very recently,

10        alarmed.  It was never discussed.  Nobody sat

11        down with me to discuss it.  It was never ever

12        discussed.  It was a scam that you and Jordi

13        Guso pulled behind everybody's back in

14        conjunction with VPX in-house to defraud me out

15        of hundreds of millions of dollars of real

16        estate.  That's what it is.

17             Q.    And --

18             A.    Do you recall your boss, Andrew

19        Sorkin, discussing this with me or Jordi Guso or

20        anybody, no, he never did.  And you dedicated

21        about 15 to 20 minutes to this meeting where

22        there is, I don't know, about seven different

23        major corporations.  That's how important it was

24        to you.  So I -- I consider that intentionally

25        deceptive.
```

1      Q.    And your personal counsel at the

2    time was Paul Batista; is that correct?

3      A.    You can say he was our personal

4    counsel but he was an abject failure that

5    committed gross malpractice.

6      Q.    But he was -- he served as your

7    counsel at this time?

8      A.    No, he did not serve me in any

9    manner whatsoever.  He failed hugely.

10      Q.    He was engaged as your counsel; is

11    that correct, Mr. Owoc?

12      A.    He was engaged in committing gross

13    and continuous malpractice.

14      Q.    And did you ever discuss with

15    Mr. Batista which entities would file for

16    bankruptcy?

17      A.    Absolutely not.  Batista was an

18    abject failure.

19      MS. QUARTAROLO:  Miss -- we can take

20        this document down.  Let's mark as

21        Exhibit 3 what is Tab 3.

22          (Whereupon, Owoc Exhibit No. 3 was

23          marked for identification.)

24  BY MS. QUARTAROLO

25      Q.    And, Mr. -- Mr. Owoc, just for the

1    record, this is the declaration of John DiDonato

2    in support of Chapter 11 petitions and first day

3    pleadings.

4         A.    Is this the same John DiDonato that

5    forged signatures?  Is that who you're talking

6    about?  Are we talking about the same

7    individual?

8         Q.    Mr. Owoc, I'll ask the questions.

9    This is for the record, document --

10        A.    You told me to ask a question if I

11   didn't understand and so that I can better

12   answer this, is he the one that was also

13   involved in the hostile takeover of VPX?  Are we

14   talking about the same one who gave himself the

15   title of CEO of an energy drink company; is that

16   the one?

17        Q.    If I can just finish for the record,

18   trying to make the record clear.  I gave the

19   title of the document and this is docket No. 26

20   as filed in the bankruptcy case.

21        A.    All right.

22        Q.    My question for you, Mr. Owoc, is do

23   you recognize this document?

24        A.    No, I don't and I don't put any

25   weight or anything on anything John DiDonato

