1     does.  He's a complete fraud.

2              Q.    Have you seen this document before?

3              A.    To the best of my recollection, I

4     have not seen this document before.

5              Q.    Can we scroll down to Page 5 of this

6     document?

7              A.    I see the document.  Can you make it

8     bigger so I can read it.  And then just -- all

9     right.  If I'm going to comment on this

10    document, I'm going to need to read the entire

11    thing.

12             Q.    Feel free to take your time.

13    There's a PDF link in the chat.

14             A.    I don't know how to access the PDF

15    link and so I'll just read it here on, if you

16    don't mind.  You can start with Page 1, please.

17    I can tell you when to scroll down.

18             Q.    Happy to do so.

19             A.    What's the date of this document?

20             Q.    Scroll to the top.  This is

21    October 10th of 2022; do you see that?

22             A.    Yes, if you can page down to the No.

23    2.  No, too far.  Keep going, please.  Yeah,

24    nowhere in here does it say he was ever a CEO,

25    yet he made himself CEO of an energy drink,

1    that's laughable but I'm going to continue to

2    read.

3              Q.   And, Mr. Owoc --

4              A.   Please -- please don't interrupt me

5    when I'm reading, please.

6              Q.   For the record --

7              A.   Please.

8              Q.   -- I'm happy to have you read --

9              A.   You're interrupting me --

10             Q.   -- whatever you would like.

11             A.   -- when I'm reading.  I'm reading.

12             Q.   This is a 51-page document.

13             A.   You said you weren't going to talk

14   over me for the court reporter, so please allow

15   me to read the document so I can comment on it.

16   You're messing up my train of thought.  Please

17   do not interrupt me.

18              These -- his opinions are based --

19   his -- his statements are based on his opinions.

20   Interesting.  Okay.  Please page to No. 4.

21   Five, please.  Keep going, please.  Please keep

22   going.  Please go to No. 9.  Please keep going.

23   Please keep going.  All right.  Thirteen,

24   please.  Please keep going.  Too far.  Little

25   less.  Keep going.  Keep going to No. 17.  No.

1    19.  Twenty.  Please continue.  Twenty-one.

2    Keep going.

3              Irwin, take note of No. 22, please.

4         MR. GILBERT:  Okay.  Done.

5         THE WITNESS:  Twenty-three, please.

6    Irwin, take note of Dr. Escalante and

7    Eric Hillman, each who has a deep

8    knowledge of industries in the debtors'

9    product.  It would be letter B.

10        MR. GILBERT:  I see that.

11        THE WITNESS:  Thank you.  Twenty-four,

12   please.  Roman Numeral No. II, please.

13   Okay.  Keep going, please.  I just need

14   to see the last previous line.  Keep

15   going, please.  A little too much.  Wait,

16   never mind, just go to 27.

17            The debtors have not funded or

18   now funded on 27, does anybody know?

19   Irwin, make sure Carl gets a copy of

20   this, please.

21        MR. GILBERT:  Okay.  We can do that.

22   Each of these exhibits are going to be

23   attached to the transcript of the

24   deposition.

25        THE WITNESS:  No. 30, please.

1          Thirty-three, please.  Thirty-four,

2          please.  Thirty-five, please.

3          Thirty-seven.  Thirty-eight.  Forty.

4          Forty-one.

5                   Can you go back a second?  I need

6          to see what the FAA verdict is.  Never

7          mind.  Hold on.  Can anybody tell me what

8          the FAA verdict is?  Anybody?

9            MR. GILBERT:  That's not possible

10          during the deposition.  You just have to

11          read it and make the best out of it that

12          you can.

13            THE WITNESS:  All right.  Please go

14          back to where we were.

15            MS. QUARTAROLO:  We're there.

16            THE WITNESS:  Okay.  Forty-two,

17          please.  Please keep going.  Take note of

18          43, Irwin.  Forty-four, please.

19            MR. GILBERT:  Okay.  Got it.

20            THE WITNESS:  Please continue.

21            MS. QUARTAROLO:  And, Mr. Owoc, just

22          for the record, the only questions I'm

23          going to ask you are about the first half

24          of this document that you've already

25          read.  I'm happy to sit here and have you

```
1        read the rest of the document, if you

2        insist on doing so, but I just want to

3        make that clear for the record because

4        you've already been reviewing this

5        document for about 23 minutes.

6            THE WITNESS:  Forty-six, please.

7        Forty-eight, please.  Forty-nine.  Next

8        page, letter E.  Next page.  Please take

9        note, Irwin, of chapter -- excuse me --

10       Paragraph 54.

11           MR. GILBERT:  Okay.

12           THE WITNESS:  Thank you, sir.  Next

13       page, please.  Fifty-six.  Make note of

14       57, Irwin, it's false.  Fifty-eight,

15       please.  Fifty-nine.  No. 59 is false,

16       Latham's 22 hour -- 2,200-dollar an hour

17       rates are far above everybody else.

18       Please take note.

19               Sixty is false.  Sixty-one,

20       please.  Sixty-one is false.  I believe

21       Latham & Watkins has worked with some of

22       these firms and so outlined in 62 is

23       false.

24           MS. QUARTAROLO:  Mr. Owoc, just for

25       the record, there's no question pending.
```

1          THE WITNESS:  Please go to No. 63 and

2          do not interrupt my train of thought,

3          please, Counselor.  Sixty-four, please.

4          Notice in 65, Irwin, that it's about

5          restructuring, not a fire sale of assets.

6               Sixty-six, please.  Sixty-seven,

7          please.  Sixty-seven is false.  Huron was

8          an abject failure.  People were checking

9          into mental hospitals due to their abuse

10         at VPX, the debtor.  Sixty-nine, please.

11         Sixty-nine, Huron and Rothschild failed.

12         They were abject failures and ruined a

13         multibillion dollar business.

14              Next page, please.  Seventy,

15         please.  Seventy-one, please.

16         Seventy-two, please.  Seventy-one is

17         false.  I tried to fire Rothschild and I

18         tried to fire Huron but the bank wouldn't

19         let me.

20              Seventy-three is false.  They

21         failed.  They destroyed a multibillion

22         dollar business.  Seventy-four, please.

23         Next page, please.  Seventy-seven,

24         please.  Make note of 77 where

25         individuals fed at the trough

1    pathetically consuming gross majority of

2    the hundred million dollar DIP financing

3    making it unable to restructure VPX and

4    lying to me that the hundred million

5    would be used to restructure.  Next page,

6    please.

7        MS. QUARTAROLO:  Mr. Owoc, there's no

8    question pending.

9        THE WITNESS:  Next page.  I'm reading.

10   Do not interrupt my reading and my train

11   of thought.

12       MS. QUARTAROLO:  I think you're

13   interrupting your own reading --

14       THE WITNESS:  You're interrupting --

15       MS. QUARTAROLO:  -- and so I would

16   encourage you to finish up.

17       THE WITNESS:  I'm doing the best I

18   can.  This is a very long document with

19   lots of big words and I need to

20   understand what I need to comment on.  I

21   think you should afford me that courtesy,

22   Amy.

23       MR. GILBERT:  Counsel, there's a long

24   way to go here.  I wonder can -- can he

25   just review this on screen but off the

```
1          record?  Can we go off the record?

2          MS. QUARTAROLO:  I would be happy to

3     go off the record and have him finish

4     reviewing this.

5          MR. GILBERT:  All right.  So,

6     Mr. Owoc, keep going but I'm going to go

7     step aside -- step away for a moment.

8          THE WITNESS:  As long as somebody

9     could page up on the document, I'm fine

10    with that.  Seventy-eight, please.

11         MR. GILBERT:  Sorry about that.  So

12    there's a gate box, do you see it?

13         THE WITNESS:  Irwin, we hear you on

14    speaker.  Seventy-eight, please.

15    Seventy-nine, please.

16         MR. TERESI:  Mr. Owoc, I just tried

17    giving you control to scroll the

18    document.  Let me know if that worked.

19         THE WITNESS:  It does not work.

20         MR. TERESI:  Okay.

21         THE WITNESS:  It may -- put that thing

22    back on the screen and let me see if I

23    can click on it, please?  No, you had

24    like a -- a little thing.  Okay.  Then it

25    disappeared real quick.
```

```
 1            MR. TERESI:  I'm working on doing it

 2       again.

 3            THE WITNESS:  Okay.

 4            MR. TERESI:  There.

 5            THE WITNESS:  It still won't let me.

 6       I clicked on it.  It still won't let

 7       me --

 8            MS. QUARTAROLO:  Hold on, just one

 9       second, one second.  Mr. Gilbert, are you

10       there?

11            MR. GILBERT:  I am.

12            MS. QUARTAROLO:  Okay.  Let's go off

13       the record and finish this and you let me

14       know when The Witness is ready to answer

15       questions.

16            MR. GILBERT:  All right.

17            THE WITNESS:  I have control of the

18       document now.

19            THE VIDEOGRAPHER:  Okay.  Let's go off

20       the record --

21            MR. GILBERT:  All right.  Let's go off

22       the record then.

23            THE VIDEOGRAPHER:  Off the record at

24       12:26.

25            (Whereupon, a brief recess was
```

1                    taken.)

2              THE VIDEOGRAPHER:  Back on the record

3         at 1:09.

4    BY MS. QUARTAROLO

5         Q.    Mr. Owoc, you understand you're

6    still under oath; right?

7         A.    You broke up.

8         Q.    Can you hear me?

9         A.    Now I can, yes.

10        Q.    You understand you're still under

11   oath; correct?

12        A.    Absolutely.

13        Q.    And just prior to the lunch break,

14   you spent about 40 minutes reviewing

15   Mr. DiDonato's first day declaration; right?

16        A.    Untrue mischaracterization.

17        Q.    Can you please just answer the

18   question, Mr. Owoc.

19        A.    I did.

20        Q.    Prior to the lunch break, did you

21   spend approximately 40 minutes reviewing

22   Mr. DiDonato's first day declaration?

23        A.    I don't know.  Did you time it or

24   are you rounding up, Amy, to make it sound like

25   I spent longer than I really did and defraud the

1    judge like you continuously do?  What are you

2    doing?

3          **Q.**    No.  I --

4          **A.**    Tell me the exact time, Amy.

5          **Q.**    You can answer the question,

6    Mr. Owoc.

7          **A.**    Tell me the exact time on the record

8    since you're trying to manipulate the record

9    like you did with the minutes in the board

10   meeting.

11         **Q.**    I'll move to strike at

12   nonresponsive.

13         **A.**    Answer the question, Amy.

14         **Q.**    That's now how depositions work.

15         **A.**    Yes, it is.  You made a false

16   statement on the record.  Clarify yourself.

17         MR. GILBERT:  Mr. Owoc, I need you to

18         resist the temptation to ask questions.

19         THE WITNESS:  If Amy is going to lie

20         on the record, I need her to clarify

21         because she said at one point it was

22         27 minutes.  And I was on about two or

23         three more minutes and she just jumped to

24         40.  So she's going take that back and

25         file one of her emergency motions with

```
 1              the judge, her BS emergency motions, and

 2              lie to the judge again.  So, yes, I do

 3              need to know.

 4          MR. GILBERT:  If she does that, we'll

 5              deal with it.  For now just treat her

 6              questions as questions and answer them.

 7              It could be yes.  It could be no.  It

 8              could be you don't know, but just go

 9              ahead and do your best to answer the

10              questions.  Okay?

11          THE WITNESS:  I'll try, but I'm not

12              going to let her queer the record.

13          MR. GILBERT:  Counsel.

14          MS. QUARTAROLO:  There's a question

15              pending.  I'll ask that it be read back.

16              (Whereupon, the last question was

17              read back by the court reporter.)

18          THE WITNESS:  No.

19  BY MS. QUARTAROLO

20      Q.   Did you -- prior to the lunch break,

21   did you review Mr. DiDonato's first day

22   declaration?

23      A.   Yes, briefly.

24      Q.   The record will reflect how long it

25   took.
```

1          Mr. Teresi, can you please pull up

2     Exhibit 3.

3          This is the document that you

4     reviewed prior to the lunch break; correct,

5     Mr. Owoc?

6          **A.**   I don't know.  Is it, Amy, or did

7     you switch it with another document?  Why don't

8     you page to the end and let me see.

9          **Q.**   No problem.

10          So, again, we've scrolled through

11     this document.  Do you see it, Mr. Owoc?

12          **A.**   No.  Because I just noticed now that

13     you tried to defraud me again because there's an

14     exhibit on there that I just saw now that I

15     didn't see before.  Very clever try.  Good try.

16          **Q.**   Is there some portion of this that

17     you would like to see, Mr. Owoc?

18          **A.**   I don't know.  An exhibit popped up

19     and now I don't see it.  There it is.  Why did

20     you try to deceive me by not showing this

21     exhibit?

22          **Q.**   This has been available to you the

23     entire time.

24          **A.**   No, it hasn't.  You never showed me

25     this part of the document.

1      Q.   I'm not going to engage in argument

2  with you, Mr. Owoc.

3      A.   Then stop arguing.  You lost the

4  argument.  Make it smaller so I can see it.  I

5  need a minute to review this.  Let the record

6  reflect that you just tried to deceive me by not

7  showing me this part of the document.

8           Let the record show that I've never

9  seen this before.  It's another fraud by John

10  DiDonato.  Go ahead.  Proceed, Counselor.

11      Q.   So we can leave aside the exhibit

12  for just a moment.  Prior to the break, you

13  reviewed the content of the declaration itself;

14  correct?

15      A.   Yes.

16      Q.   My question for you, Mr. Owoc, is:

17  Before sitting here today during your

18  deposition, have you seen this document before?

19      A.   To the best of my knowledge, no, and

20  it's a stamped signature that's a fraud.

21      Q.   Which stamped signature are you

22  referring to?

23      A.   We talked about it extensively, Amy.

24      Q.   I'm not trying to be argumentative,

25  Mr. Owoc.

1          A.     Were you drinking during lunch?  We

2     talked about it extensively.

3            MR. GILBERT:  Mr. Owoc, don't do that.

4        Don't do that.

5   BY MS. QUARTAROLO

6          Q.    Mr. Teresi, can you scroll down to

7     Page 5.

8              Mr. Owoc, do you see the chart that

9     is listed as part of Paragraph 10 here?

10         A.    Yes.

11         Q.    And you see the fourth row in that

12    chart is JHO Real Estate Investment, LLC?  Do

13    you see that?

14         A.    Yes.

15         Q.    And you say -- you see under the

16    description column, it says "Owner of the

17    Debtors' manufacturing facility in Phoenix,

18    Arizona."  Do you see that?

19         A.    Yes.  That's false.

20         Q.    And you see at the top in the body

21    of Paragraph 10, it says "A summary of the

22    operations and purpose for each Debtor can be

23    found in the following table."  Do you see that?

24         A.    Yes.

25         Q.    Did you review this document before

1    it was filed with the court?

2           A.    Absolutely not.  And it's a stamped

3    bogus signature, and nobody ever reviewed it

4    with me.  Latham Watkins and Berger Singerman

5    never discussed it with me.  In fact, I've never

6    even had a private meeting with Latham Watkins

7    or Berger Singerman ever.  Very interesting.

8           Q.    Thank you, Mr. Owoc.

9                 We can bring this down.  Let's bring

10   up Tab 4 and mark this as Exhibit 4.

11                (Whereupon, OWOC Exhibit No. 4 was

12             marked for identification.)

13   BY MS. QUARTAROLO

14           Q.    Just if you can scroll out to the

15   full document, and then we can scroll back in to

16   review the contents.  Can you do it so we can

17   see the Bates stamp on the document, please.

18   There we go.

19                 So just for the record, this is an

20   email that is from Mr. Sorkin at Latham &

21   Watkins to you, Jack Owoc, dated October 9,

22   2022, and the Bates stamp is VPX-JHO1096.  Do

23   you see that, Mr. Owoc?

24           A.    Not really.  Can you make it bigger,

25   please?

1      **Q.**    Sure.

2      **A.**    I don't recognize the "to" section

3   of the email.  That's not my email address.

4      **Q.**    Is it your position that you never

5   received this email?

6      **A.**    I don't know.  How about letting me

7   read it and maybe I can answer that question.

8      **Q.**    Feel free.

9      **A.**    Is this the entire email that's on

10  the screen right now?

11     **Q.**    Yes, it is, sir.  It is also in the

12  chat as a PDF and available for you to use --

13     **A.**    I can't access that.  I've told you

14  that several times already.  Are you sure you're

15  not going to pull a fast one on me like you did

16  on the last document and leave out an exhibit?

17     **Q.**    Mr. Owoc, there's no gotcha here.

18     **A.**    I'm trying to read the document.

19  Please don't interrupt me.

20            I have no idea what he's talking

21  about, and I don't recall seeing this document.

22  And my email is not affixed on there, just my

23  name.  It says Jack Owoc ExchangeLabs, Exchange

24  Administrative Group, whatever.  There is no

25  Bang Energy CEO email on here, nor do I recall

1    ever seeing this document.

2          Q.    So you don't recall receiving an

3    email from --

4          A.    I just said that, Amy.  Are we going

5    to play this game all day?  I just said no.

6          Q.    Mr. Owoc, I've tried to be very

7    respectful of you today.

8          A.    No.  You're not being respectful.  I

9    just said that I don't recognize the email.

10   It's not my email address.

11         Q.    So my question for you for the

12   record, Mr. Owoc, is:  Do you recall receiving

13   an email on or about --

14         A.    And I said I don't recall receiving

15   this email already.

16         Q.    Okay.  We're going to have to stop

17   the deposition and resume in person on Monday if

18   you're going to continue to interrupt me.

19         A.    Do what you got to do, but if I

20   answer your question, I need you to move on,

21   Counselor.  I said I don't recognize the

22   document, and it's not my email three times.

23         Q.    I need you to let me ask my

24   question.

25         A.    Go ahead.

IN RE: VITAL PHARMACEUTICALS, et al
Deposition of John H. Owoc - July 7th, 2023
Case 22-17842-PDR    Doc 1588-2    Filed 07/10/23    Page 19 of 81


```
1            Q.    Do you recall receiving an email on

2       or about October 9 of 2022 that contained a

3       declaration that John DiDonato was to file in

4       court in connection with the bankruptcy filing?

5            A.    No, I do not.

6            Q.    Did you review a declaration that

7       was John DiDonato's declaration to be filed in

8       court in connection with the bankruptcy filing?

9            A.    To the best of my knowledge, I did

10      not.

11           Q.    Let's pull up Exhibit 5, which is

12      Tab 5.

13                 (Whereupon, OWOC Exhibit No. 5 was

14              marked for identification.)

15   BY MS. QUARTAROLO

16           Q.    Just for the record, it's an email

17      from Jack Owoc to Andrew Sorkin copying others,

18      dated October 9, 2022, Bates-stamped

19      VPX-JHO1167.

20                 Mr. Owoc, have you seen --

21           A.    For the record, Amy, you

22      mischaracterized this email.  Nowhere is my

23      email on this, and there's no way to tell it's

24      from me.  Because it just says Jack Owoc, and

25      there's no Bang email or anything like that.  So
```

Jeannie Reporting
Your Wish Is Our Job!
www.jeanniereporting.com
305-577-1705

1    I would please ask you, once again, stop

2    queering the record and saying things that

3    aren't true.  Where do you see my email, Amy?

4    If you do, I'll gladly answer your question.

5              Irwin, do you see my email?

6         Q.   Mr. Owoc, at the top under -- do you

7    see where it says "from"?

8         A.   Yes.  It says my name, and that's

9    not my email address.

10        Q.   So but you agree it has your name;

11   correct?  Yes or no?

12        A.   It has my name, but that's not my

13   email address.

14        Q.   And you see that this is a response

15   to the email from Mr. Sorkin that we just looked

16   at, and the content of the email that says Jack

17   Owoc, Bang Energy CEO, CSO, says "Approved."  Do

18   you see that?

19        A.   I don't know that that's to be true

20   because that looks like another manipulated

21   document because that's not my email address.

22   Anybody could have copied and pasted my

23   signature there.

24        Q.   What is your basis --

25        A.   That doesn't look -- that doesn't



1    look -- my basis is it's not my email.  What

2    other basis do I need to have?  It's a pretty

3    strong basis.

4            Q.    I need you to let me finish my

5    question.

6            A.    I need you to finish let me and then

7    I'll let you go.

8                  That's a pretty strong basis when

9    it's not my email.

10           Q.    So, Mr. Owoc, did you send this

11   email on or about October 9 of 2020?

12           A.    To the best of my knowledge, I did

13   not, and that's not my email, so how could I

14   have sent it?

15           Q.    What is your basis to say that you

16   did not send this email on or about October 9?

17           A.    Asked and answered, Amy.  I just

18   said it's not my email.

19           Q.    Is that the only basis?

20           A.    That's a pretty good basis, don't

21   you think?  It's not my email.  Yes, it is.

22           Q.    Take that down.  Let's bring up Tab

23   6, which will be Exhibit 6.

24                 (Whereupon, OWOC Exhibit No. 6 was

25                 marked for identification.)

1    BY MS. QUARTAROLO

2            Q.    For the record, this is proof of

3    claim number 654 filed in connection with JHO

4    Real Estate Investment, LLC.

5            Do you see this document, Mr. Owoc?

6            A.    Yes, I do.

7            Q.    And it is dropped into the chat and

8    available for attendees to view on their own,

9    but it is up on the screen before you.

10            Do you recognize this document,

11    Mr. Owoc?

12            A.    You would have to make it bigger and

13    let me see it.

14            I do not recognize this document.

15    When was this filed?

16            Q.    Well, there's a date up at the top

17    that is December 19 of 2022.  Do you see that?

18            A.    Yes.

19            Q.    Do you know what a proof of claim

20    is, Mr. Owoc?

21            A.    Yes.  I think after looking at this,

22    Paul Battista may have filed it, but I don't

23    know.

24            Q.    You say you think Paul Battista may

25    have filed it.  What's your basis for saying

1    that?

2           A.    I have no basis.

3           Q.    Do you recall authorizing

4    Mr. Battista to file one or more proofs of claim

5    on your behalf?

6           A.    Yes.

7           Q.    Do you recall signing those proofs

8    of claim?

9           A.    I do not.

10           Q.    Can we scroll down to Page 7 of 11

11    of the PDF.

12                Mr. Owoc, is that your signature?

13           A.    It looks like the first real

14    signature in wet ink you showed me today, but I

15    can't guarantee that a hundred percent because

16    there's a lot of fraud being committed here.

17           Q.    Mr. Owoc, do you believe that that

18    is your signature?

19           A.    I have no way of telling because you

20    continuously commit fraud with my signatures

21    using stamped signatures.  Any one of these can

22    be manipulated and stamped as we've just seen.

23           Q.    Mr. Owoc, do you recall signing a

24    proof of claim that was filed against JHO Real

25    Estate Investments, LLC?

1          A.    No, I do not.

2          Q.    Did you review this before it was

3    filed?

4          A.    I can't recall.

5          Q.    Did you approve it for filing?

6          A.    I can't recall.

7          Q.    Do you routinely sign documents that

8    you haven't reviewed or approved?

9          A.    Sometimes if it's a lengthy legal

10   document, I just trusted my attorneys and sign

11   it without reading it.  I'm not a lawyer, so I

12   don't understand all the legalese.  And so if I

13   have attorneys that I trust, like I used to

14   trust Latham & Watkins and Berger Singerman and

15   my in-house counsel until they colluded together

16   and signed away my legal rights to operate apart

17   from me when I was CEO and chairman of the

18   board, yes, up until that point, I did trust

19   them.  And, unfortunately, that trust destroyed

20   my entire business -- my business down the

21   drain.

22         Q.    Are you done, Mr. Owoc?

23         A.    Yes, I am.

24         Q.    Mr. Battista was your counsel in

25   December 2022; right?

1    **A.**    That's debatable.

2    **Q.**    It's yes or no.

3    **A.**    You would have to define counsel.

4    **Q.**    Was he engaged as your counsel in

5    December of 2022?

6    **A.**    He was more disengaged than engaged.

7    **Q.**    Was he authorized to file this proof

8    of claim on your behalf?

9    **A.**    I don't know.  You would have to ask

10   Mr. Battista.  You'll get your chance soon when

11   we set him for deposition.

12   **Q.**    Can you see the box that is checked

13   above your signature where it says "Check the

14   appropriate box," and it's checked by "I am the

15   creditor."  Do you see that?

16   **A.**    No, I don't.  Oh, yes, yes, I do.

17   **Q.**    Do you understand that by signing

18   this document you are representing that you're a

19   creditor of JHO Real Estate Investments, LLC?

20   **A.**    Explain creditor.

21   **Q.**    Well, you signed a document that

22   checks a box that says "I'm a creditor."  What

23   did that mean to you?

24   **A.**    I don't know unless you explain it.

25   It's a legal term.

1       **Q.**   So you didn't know at the time you

2      signed this document; is that right?

3       **A.**   I may have known.  Someone may have

4      explained it to me.  I don't know.  I sign a lot

5      of documents.

6       **Q.**   And you don't remember all the

7      documents you sign; is that right?

8       **A.**   Absolutely not.  During a period of

9      a few months, we signed about 400 -- over --

10     let's see.  One -- 360 distributor contracts

11     along with everything else.  No, I don't,

12     neither does any CEO of a multibillion dollar

13     business.  They trust their attorneys.

14      **Q.**   And, sorry, just to make sure that

15     the record is clear, I think I understood your

16     response, but it's that you signed many

17     documents and you don't remember all the

18     documents you signed; right?

19      **A.**   You know that, Amy.  Yes, that's

20     correct.

21      **Q.**   We can take this down.

22           Mr. Owoc, you indicated that your

23     email address when you were the CEO of the

24     debtors was ceo@bangenergy.com; right?

25      **A.**   Say that again, please.

1        Q.   You understand that your email

2   address at the time you were CEO of the debtors

3   was ceo@bangenergy.com; correct?

4        A.   Incorrect.

5        Q.   What about that statement was

6   incorrect?

7        A.   Well, that was not only my email but

8   the email that the debtors were accessing and

9   using as well.

10       Q.   And what is your basis to say that

11  the debtors were accessing that email?

12       A.   Because they hacked into my

13  computer, as I told you four or five times.

14       Q.   And what is your basis?

15       A.   And, again, they hacked in -- I have

16  no basis.  The basis will show up when the

17  forensics are done on the computer you guys

18  confiscated from my house.

19       Q.   Who else at the company do you

20  believe had access to your email address

21  ceo@bangenergy.com?

22       A.   I don't know.  Didn't you guys hire

23  a high-powered CIO and give somebody a C-suite

24  title that was just a consultant for the first

25  time in 29 years at VPX?  Isn't that what you

1     guys did to get him to do your will?  I think it

2     is.  So maybe you should ask the CIO because I

3     don't know his name, but I hear he's very

4     proficient in all games played on computers.

5          Q.    Mr. Owoc, do you believe that anyone

6     else had access to your email address

7     CEO@bangenergy --

8          A.    And coincidentally --

9          Q.    Let me finish.

10          A.    Let me finish.

11          Q.    Mr. Owoc --

12          A.    Coincidentally --

13          Q.    -- let me finish.

14          A.    -- I was supposed to interview the

15     CIO, and I was fired on the very day I was

16     supposed to interview him.  Do you think that's

17     a consequence, Amy?

18          Q.    I'm going to ask my question again.

19     I'm going to ask you to please not interrupt me

20     until I'm done, and then I will not interrupt

21     you and you can give your whole answer.

22               Do you believe that anyone else at

23     the company during the time when you were CEO

24     had access to your email account while -- excuse

25     me ceo@bangenergy.com?

1          A.    Absolutely.

2          Q.    Who?

3          A.    I don't know.  Ask the CIO.

4    Apparently, there was --

5          Q.    What is your basis --

6          A.    -- a hurry to get him in there and

7    fire me so that they could do their dirty work.

8          Q.    What is your basis to say --

9          A.    The basis is the CIO.  Ask John

10   DiDonato.  I don't know.

11         Q.    So I just want to make sure I

12   understand this.  The basis is that there's a

13   CIO who came into the company after you were

14   terminated?

15         A.    He was -- I believe he was hired

16   afterwards, but you guys are so sketchy.  And

17   there's so much fraud going, he might have been

18   working behind my back before he was even hired.

19   But my basis is not him.  It's just anybody in

20   IT instructed by John DiDonato to do John's

21   dirty work.

22         Q.    Is that everything?  Do you have

23   anything more in terms of your basis for that

24   statement?

25         A.    That's not a basis.

1      Q.   It's not a basis?

2      A.   I don't know.  What is a basis?

3      Q.   What is the basis for your statement

4   that you made on the record, Mr. Owoc, that you

5   believe that someone else had access to your

6   email account ceo@bangenergy.com?

7      A.   So that I can be crystal clear, you

8   attorneys use the word "basis" different from

9   laypeople.  So what do you mean by "basis"?

10     Q.   How do you understand that term?

11     A.   I don't understand it because you

12  keep manipulating and asking questions.  And I

13  thought I might have understood it, but I don't.

14  So now I'm asking you to please define it

15  because you're using it as a legal term.  And

16  the rest of the population, Amy, does not use it

17  that way.

18     Q.   If you don't understand a question,

19  I'm happy to rephrase.

20     A.   I don't understand the word "basis."

21   I just told you that.

22     Q.   Yes, Mr. Owoc.  So why do you say

23  that?

24     A.   Why do I say what?

25     Q.   Why do you say that you believe

1    someone else was having access to your email

2    account ceo@bangenergy.com?

3        A.    Let's see.  You forged documents.

4    You hacked into my email.  How much more reason

5    do you need?

6        Q.    So when you say hacked into your

7    email, what are you referring to?

8        A.    Hacked into my email.  Forensics

9    will show -- let the forensics evidence speak

10   for itself.

11       Q.    What forensic evidence are you

12   speaking to?

13       A.    The forensic evidence that will come

14   as a result of confiscating my home computer out

15   of my house.

16       Q.    Sitting here today, Mr. Owoc, are

17   you aware of any evidence that demonstrates that

18   your email account was hacked into?

19       A.    Yes.

20       Q.    What evidence is that?

21       A.    I don't know.  We're going to have

22   to recover it from the hard drive.

23       Q.    So you have no evidence today?  You

24   believe that evidence is to come in the future;

25   right?

```
1          A.    The evidence is in the hands of the
2     forensic third party that's going to investigate
3     these cyber crimes.
4          Q.    Is there a specific person who you
5     believe hacked into your email account?
6          A.    I have no idea.  All of them are
7     very deceptive, manipulative, and commit fraud
8     almost on a daily basis.
9          Q.    Is there a specific time period in
10    which you believe your email account was hacked?
11         A.    I don't know.  You would have to ask
12    John DiDonato.
13         Q.    What -- I think we established this
14    before, but I just want to make sure I
15    understand your testimony.
16               From time to time you electronically
17    signed documents; right, Mr. Owoc?
18         A.    Correct.
19         Q.    And you certainly don't contend that
20    every single one of those documents that you
21    electronically signed is a forgery; correct?
22         A.    Correct.
23         Q.    And so how would you go about
24    determining which documents you believe are ones
25    that you applied your electronic signature to
```

1    and ones that you didn't apply your electronic

2    signature to?

3         A.   Well, the one we just saw just shows

4    that it was a stamp of Frank Massabki and a

5    stamp of my signature, that one is obvious.  For

6    the ones that aren't so obvious, I don't -- I'm

7    not a cyber crimes or computer expert, so I

8    wouldn't know.  And I leave that up to my

9    attorneys.

10        MS. QUARTAROLO:  Let's pull up Tab 7.

11        We'll mark this as Exhibit 7.

12             (Whereupon, OWOC Exhibit No. 7 was

13             marked for identification.)

14   BY MS. QUARTAROLO

15        Q.   Let's scroll out to see the full

16   first page.  And just for the record, this is

17   also being dropped into the chat so it is

18   accessible.  For the record, this is a document

19   titled "Written Consent of Sole Member and Sole

20   Manager of Quash Seltzer, LLC."  The Bates stamp

21   is VPX-JHO128.

22             Do you see this document, Mr. Owoc?

23        A.   Yes, ma'am.

24        Q.   Do you recognize this document?

25        A.   No, ma'am.



1          Q.    Let's scroll down to page six.  Do

2     you see that electronic signature that is on

3     this document?

4          A.    Let's zoom in on that.

5          Q.    Sure.

6          A.    So on all these signature that you

7     showed me thus far, they're supposed to be in

8     wet ink or they're invalid by law.  And this

9     doesn't even look like my signature.  It looks

10    like somebody made a bad rendition of a star, so

11    I have no recollection signing this.

12              I don't drink alcohol or use any

13    other type of drugs, but I don't recognize that

14    as my signature.  Now, it could be, but it looks

15    awfully strange.  It looks like another

16    signature stamp or something.  I have no idea

17    whether I signed this or not.

18         MR. GILBERT:  Excuse me, Counsel.  Can

19         you enlarge this a little bit more?

20         MS. QUARTAROLO:  Sure.

21         THE WITNESS:  Yeah.  And I want to

22         also point out that there's no such

23         individual on planet Earth as Jack H.

24         Owoc.  I never go by that.  I would have

25         never signed that.  I go by John Owoc or

```
1            John H. Owoc or Jack Owoc.  I don't go by

2            Jack H. Owoc because my dad's name is

3            Jack A. Owoc.  And that's confusingly

4            similar, especially an A. and an H. in a

5            signature.  So this looks like more fraud

6            here because there is no Jack H. Owoc.

7            If you find him, tell him to give me a

8            call.

9    BY MS. QUARTAROLO

10           Q.    And can you scroll back out, please.

11           A.    Does that look like my signature to

12    you, Amy?

13           Q.    Mr. Owoc, is it your testimony that

14    you did not sign this document?

15           A.    It's my testimony that I do not

16    know, but that doesn't look like my signature.

17    And there is no Jack H. Owoc on planet Earth to

18    the best of my knowledge.

19           Q.    Let's scroll down to the next page.

20                 Mr. Owoc, do you recognize this

21    page?

22           A.    No, ma'am.

23           Q.    Do you see it says "Final Audit

24    Report," and it's dated October 10 of 2022.  Do

25    you see that?
```

1          A.    Yes.

2          Q.    And in the history that is set forth

3    here, similar to the prior documents that we've

4    looked at, you can see that this shows to be a

5    document created by Yaylin Duran, subsequently

6    emailed to ceo@bangenergy.com for signature.  Do

7    you see that?

8          A.    Yes.

9          Q.    And it shows that the email was

10   viewed by ceo@bangenergy.com.  Do you see that?

11         A.    Viewed?

12         Q.    Yes.

13         A.    Where does it say that?

14         Q.    The third bullet segment there.  Do

15   you see that?

16         MR. GILBERT:  Could you make that just

17         a little larger, please?  Thank you.

18         THE WITNESS:  Yeah.  Did you happen to

19         check where that IP address is from, Amy?

20   BY MS. QUARTAROLO

21         Q.    Mr. Owoc, my question for you is:

22   Do you see where it says email --

23         A.    That's my question for you.  There's

24   an IP address there.  Did you do your diligence

25   and check where that was signed?

1        Q.    Mr. Owoc, respectfully, you'll be

2    answering the questions today.

3        A.    Okay.  Go ahead.

4        Q.    Do you see where it says "Email

5    viewed by ceo@bangenergy.com"?

6        A.    Yes.

7        Q.    And then you see it says "Signer

8    ceo@bangenergy.com entered the name signing as

9    John Owoc"?  Do you see that?

10        A.    I do see that, but I don't recognize

11    these IP addresses.  And why are the IP

12    addresses different?  If I signed them, why are

13    they radically different?  They would be the

14    same IP address.

15        Q.    Mr. Owoc, do you understand that if

16    you view a device from -- excuse me.  If you

17    view something from one device and then you open

18    it on a different device those may have --

19    generate different IP addresses.  Do you

20    understand that?

21        A.    Are you saying that I did that, Amy?

22        Q.    I'm asking if you understand that or

23    not?

24        A.    I -- I might.  Yeah, I do understand

25    that.  But then why is it different?

1          Q.    And you see the second to last

2     bullet here, it says "Document e-signed by John

3     Owoc."  And that has your email address.  Do you

4     see that?

5          A.    Yes.  And the debtors could have did

6     that because they had access to my emails.

7          Q.    And what is your basis to say the

8     debtors had access to your emails?

9          A.    They did.

10         Q.    Is there any basis that you have to

11    say that?

12         A.    As I sit here today, I don't have

13    proof.

14         MS. QUARTAROLO:  Let's bring this

15         down.  Let's pull up Tab 8, which will be

16         marked as Exhibit 8.

17              (Whereupon, OWOC Exhibit No. 8 was

18              marked for identification.)

19    BY MS. QUARTAROLO

20         Q.    Scroll out so I can see the Bates

21    stamp.  For the record, this document is titled

22    "Written Consent of Sole Member and Sole Manager

23    JHO Real Estate Investment, LLC," Bates-stamped

24    VPX-JHO158.

25              Do you see this document, Mr. Owoc?

```
 1                      Sorry.  I didn't hear you.

 2           A.    Yes.

 3           Q.    Okay.  And have you seen this

 4      document before?

 5           A.    Make it a little bigger.  Page to

 6      the end.  Page to the signature.  I do note that

 7      this is the exact same signature that was copied

 8      and pasted as a stamp on the Frank Massabki

 9      document, erratically different from the last

10      document.  That's what I know.  So I don't know.

11      Do I recall seeing the document?  No, I do not

12      recall.

13           Q.    Do you recall signing this document?

14           A.    No, I do not recall signing the

15      document.  Why is this the exact same signature

16      as the Frank Massabki.  It's an exact duplicate

17      of that stamp, Amy.

18           Q.    And let's scroll down to the

19      final --

20           A.    There is Jack H. Owoc.  Who is Jack

21      H. Owoc.

22           Q.    And --

23           A.    JHO Real Estate belongs to John

24      Owoc.  There is no Jack H. Owoc.

25           Q.    You don't dispute that you go by
```

```
 1    Jack Owoc; correct?  That's how your name is
 2    labeled on your Zoom.
 3         A.   I dispute that I don't go -- I
 4    dispute that I don't -- I go by Jack H. Owoc.  I
 5    do not go by that.
 6         Q.   And on the screen before you,
 7    Mr. Owoc, is the final audit report.  Do you see
 8    that?
 9         A.   Yes.
10         Q.   And do you see, as the previous
11    documents we looked at, this indicates the
12    document was created by Yaylin Duran.  Do you
13    see that?
14         A.   Yes.
15         Q.   And it indicates beneath that the
16    document was emailed to ceo@bangenergy for
17    signature.  Do you see that?
18         A.   Yes, I do.
19         Q.   And it indicates that the email was
20    viewed by ceo@bangenergy.com?
21         A.   Yes, I do.  And these documents are
22    all fraud.
23         Q.   And you see that it says "Signer
24    ceo@bangenergy.com entered name at signing as
25    John Owoc"?
```

1        A.    Doesn't John DiDonato also go by

2    ceo@bangenergy.

3        Q.    Mr. Owoc, can you respond to the

4    question, please?

5        A.    Yes.  I see it.  And every document

6    you show me, I see it, but I don't think it's

7    authentic.

8        Q.    And what is your basis to say this

9    is not an authentic document?

10        A.    Refer to my previous answer.

11        Q.    I'm asking you with respect to this

12    document.

13        A.    We just spoke about the signature at

14    length, Amy.  The signature is the exact -- it's

15    a stamp.  It's not a real signature.

16        Q.    So your basis -- just to be clear,

17    your basis is that you think that signature was

18    an electronic signature?

19        A.    Refer to my previous answer.

20        Q.    Mr. Owoc, I'll wait for you to

21    answer the questions that I'm asking.

22        A.    It's not a wet -- it's not a wet ink

23    signature as required by law, and it's a

24    signature stamp, worse yet, which could have

25    been done by anybody.

1    Q.    Mr. Owoc, you're no lawyer; right?

2    A.    Excuse me?

3    Q.    You're not a lawyer; correct?

4    A.    In most instances, I'm far more

5    intelligent than lawyers, but, no, I'm not a

6    lawyer.

7    Q.    And what is your basis to say that

8    wet ink signatures are required?

9    A.    It's my limited knowledge of the law

10    in that specific area of the law.

11    Q.    Does anyone advise you that wet ink

12    signatures are required in order for signatures

13    to have a binding effect?

14    A.    Actually, I advised my attorneys of

15    that.

16    Q.    And why is it that you believe that

17    is the case?

18    A.    It's the law.

19    Q.    Is there a particular law you could

20    point me to?

21    A.    No, I can't.  I don't memorize

22    sections of the law.  I'm just -- I'll try to

23    for you in my continued deposition tomorrow, but

24    right now I just haven't done that.  I

25    apologize.

```
 1              Q.   And just turning back to this final
 2      audit record, you see that it says "Document
 3      e-signed by John Owoc," and it has your email
 4      address there?  Do you see that?
 5              A.   Yes.  And we all see that.
 6              MS. QUARTAROLO:  Can we take this down
 7          and pull up Tab 9, which we'll mark as
 8          Exhibit 9.
 9              (Whereupon, OWOC Exhibit No. 9 was
10              marked for identification.)
11      BY MS. QUARTAROLO
12              Q.   Let's scroll all the way out so I
13      can see the Bates stamp at the bottom.
14              Just for the record, this document
15      is titled "Written Consent of Sole Shareholder
16      and Sole Director of Bang Energy Canada, Inc."
17      and it's Bates-stamped VPX-JHO121.  Do you see
18      that document, Mr. Owoc?
19              A.   Yes, ma'am.
20              Q.   Do you recognize this document?
21              A.   No, ma'am.
22              Q.   Have you seen it before?
23              A.   I don't know.
24              Q.   Let's scroll down to Page 6.
25              A.   There's that same fake stamp
```

1    signature.  It's amazing how good I am at

2    replicating my signature.  Wow, down to the 16th

3    of a millimeter.

4         MR. GILBERT:  Excuse me, Counsel.  Can

5         you enlarge so we can see this a little

6         better.

7         THE WITNESS:  Yeah.  Can you enlarge

8         so we can see the fake signature?  Very

9         good, Counselor.  Yes.  Good forgery

10        again there.  That is a stamp signature.

11        It's not my real signature, and it's not

12        a wet ink signature.  And I am not

13        Jack H. Owoc.

14        MR. GILBERT:  Thank you.  Thank you,

15        Counsel.

16        MS. QUARTAROLO:  Thank you.  We can

17        scroll up.  Excuse me.  We can zoom back

18        out.

19   BY MS. QUARTAROLO

20        Q.   Mr. Owoc, I believe you just used

21   the word "forgery."  What is your basis to

22   believe that this document is a forgery?

23        A.   It's somebody else used a stamp of

24   my signature.

25        Q.   And what's your basis to say that

1      someone else applied the electronic signature to

2      this document?

3            A.    I don't know.  We'll have a forensic

4      expert look at it.  All three documents you just

5      showed me have the exact same signature down to

6      a 32nd of a millimeter, and it's a stamp.  And

7      it's a fake name.  There is no Jack H. Owoc.

8      It's a fraud.

9            Q.    I'm sorry.  Are you done?  I didn't

10     mean to cut you off.

11           A.    Thank you.  It's just more and more

12     fraud on the part of all of the professionals

13     colluding together.

14           Q.    And let's scroll down to the next

15     page.  Do you see --

16           A.    Yes.  And I see all of these.  It's

17     emailed to CEO of Bang Energy.  It's viewed by

18     CEO of Bang Energy.  Its signer is Bang Energy

19     with a fake signature.  I see it all, Amy, yes.

20     And all your answers are always going to be

21     same.  I see exactly what you see.

22           Q.    So you see all of those things on

23     this final audit report?

24           A.    Absolutely.

25              MS. QUARTAROLO:  Thank you.  Let's go

1          to Tab 10, which we'll mark as Exhibit

2          10.

3                    (Whereupon, OWOC Exhibit No. 10 was

4             marked for identification.)

5    BY MS. QUARTAROLO

6          Q.    And just for the record, this is a

7    document titled "Written Consent of Sole Member

8    and Sole Manager of Rainbow Unicorn BEV, LLC,"

9    Bates-stamped VPX-JHO142.

10                    Do you see this document, Mr. Owoc?

11         A.    Yes, ma'am.  Please scroll down to

12   the signature.

13         Q.    Just for the record, my first

14   question is going to be:  Have you seen this

15   document before?

16         A.    Look at that fake signature.  Wow.

17   Fake signature.  Fake name.  Don't ever recall

18   seeing this document before.  And I agree with

19   everything you say that as Bang Energy CEO, yes,

20   it was viewed fraudulently.  It was signed

21   fraudulently and everything else.  I agree with

22   you.

23            MR. GILBERT:  I apologize.  Counselor,

24         could you go ahead and enlarge again one

25         more time.  Okay.  Thank you.  Appreciate

1           it.

2                   THE WITNESS:  Down to the hundredth of

3           a millimeter, Irwin.  You didn't know I

4           was that good, did you, Irwin?

5   BY MS. QUARTAROLO

6           Q.   I mean we can scroll down to the

7   next page.  Can you see this final audit record

8   and that has the same information indicating it

9   was emailed and signed by ceo@bangenergy.com;

10  right?

11          A.   Yes.  And signed and viewed and

12  blah, blah, blah, same as the last, but it's a

13  fraud.

14          MR. GILBERT:  I apologize for

15          interrupting.

16                  Can you enlarge this page,

17          please?  Just a tiny bit more.  Scroll

18          down a little bit.  Thank you very much.

19          I need just a second.

20          MS. QUARTAROLO:  And Mr. Owoc --

21          MR. GILBERT:  Hold on just a moment.

22          I apologize.  Can we take a very short

23          break, just two minutes?

24          MS. QUARTAROLO:  Not while a question

25          is pending.

```
1            MR. GILBERT:  Okay.  Go ahead and ask
2       your question then.
3         THE WITNESS:  No.  I agree with Amy.
4       I'm trying to make her feel good and
5       happy because she thinks sometimes I
6       don't agree with her.  But I agree
7       wholeheartedly.  It says on this document
8       email viewed by Bang Energy, signed by
9       Bang Energy as John Owoc.  I don't agree
10      with that because it says signing as John
11      Owoc when, in fact, it says Jack H. Owoc.
12      It's a fraudulent signature, e-signed.
13      It says that, but this is all fraudulent.
14      You know that, Amy.
15         MS. QUARTAROLO:  And --
16         MR. GILBERT:  Counsel, I just need two
17      minutes.  Then you can resume.  Thank
18      you.
19         THE VIDEOGRAPHER:  Are we going off
20      record?
21         MS. QUARTAROLO:  I suppose we are.
22         THE WITNESS:  I say we stay on the
23      record because I enjoy Amy and would like
24      to continue with her.
25         THE VIDEOGRAPHER:  Okay.  We'll stay
```

1          on the record.

2                   THE WITNESS:  Thank you.

3                        Just for the record, I'm sitting

4          here waiting for everybody.

5                   MS. QUARTAROLO:  I think the only

6          person we are waiting for, Mr. Owoc, is

7          your counsel.

8                   THE WITNESS:  Thank you kindly.

9                        (Whereupon, Mr. Gilbert was having a

10                  phone discussion off the record.)

11                  MR. GILBERT:  Mr. Owoc, Mr. Feldman is

12         going to take over for me now.

13                  THE WITNESS:  All right.  All the best

14         to you, Irwin.  You did great today.  I

15         couldn't have done it without you.

16                  MR. GILBERT:  I'm not so sure, but I

17         appreciate the compliment.  And to my

18         colleagues, thank you for your time, and

19         we will see you on Tuesday, if not

20         sooner.

21                  MR. FELDMAN:  This is Jonathan

22         Feldman.

23                       Andrea, are you taking -- are you

24         our court reporter for the day?  You look

25         to be the court reporter.

1          THE REPORTER:  I am Andrea with

2          Jeannie Reporting.  Yes, I am the court

3          reporter today.

4          MR. FELDMAN:  Okay.  Can you hear me

5          okay, first and foremost?

6          THE REPORTER:  Yes, I can.

7          MR. FELDMAN:  Great, let's roll.

8          THE WITNESS:  Just so you know,

9          Jonathan, we just went over what appear

10          to be a string of forgeries with all of

11          the same exact stamped signature.  It's a

12          stamp, not a signature, and it's

13          definitely not a wet signature.  So it's

14          just a stamp all of them the exact same

15          down to a hundredth of a millimeter.

16              Go ahead, Amy, please proceed.

17          MS. QUARTAROLO:  And would you please

18          pull up the document that we were

19          speaking about just before we took the

20          break to accommodate Mr. Gilbert.

21     BY MS. QUARTAROLO

22          Q.    So, Mr. Owoc, before the break, we

23     were looking at what's been marked as Exhibit 10

24     and, specifically, the final audit report in

25     connection with the Rainbow Unicorn BEV, LLC,

1    written consent.  Do you see that?

2         A.    Yes, ma'am.

3         Q.    And just to complete the questioning

4    on this document, you see that on this final

5    audit report it indicates that the document was

6    emailed to ceo@bangenergy.com for signature.

7    And it also notes that it was e-signed by John

8    Owoc, and it has that email address of

9    ceo@bangenergy.com.  Do you see that?

10        A.    Yeah.  Which is fraudulent,

11   Jonathan, because when you look at the

12   signature, it says Jack H. Owoc.  Could we look

13   at the signature, please, for a second?  See, it

14   says John Owoc here.  There is no Jack H. Owoc,

15   Jonathan.  Just so you're aware, there's John

16   Owoc and there's Jack Owoc.  And this same exact

17   stamp signature here, could you make that

18   bigger, please, appears on every document down

19   to a hundredth of a millimeter.  And there is no

20   Jack H. Owoc, as it said there.  So these to me

21   are all fraudulent.  It's a stamp.  It's not a

22   real signature that's just repetitively used by

23   somebody other than myself.  To the best of my

24   knowledge there is no Jack H. Owoc.  But go

25   ahead, Amy.

1          Q.    And just based on that statement

2     right there, I want you to look -- if we need to

3     blow it up even more, we can.

4          A.    Go ahead.

5          Q.    Do you see that under that

6     e-signature, it actually says John Owoc.  Do you

7     see that?  And it has a date, October 9, 2022.

8     Do you see that?

9          A.    Yeah.  After you blew it up into

10    about a -- what is that?  Like a 72 font that

11    can't be seen with the human eye?  Yeah, it's

12    all pixilated.  Yes, I do see it now.  Very

13    good.

14         Q.    Thank you.

15         A.    You can't see it with the human eye,

16    though.

17         Q.    Let's turn to --

18         A.    Now we can see it now, Jonathan, on

19    a regular document.  It's just more deceptive

20    stuff by Latham Watkins.

21         MS. QUARTAROLO:  Mr. Owoc, we're going

22         to turn to another exhibit, which we'll

23         mark as Exhibit 11.  I'll ask that Tab 11

24         be brought up on the screen.

25

```
 1                    (Whereupon, OWOC Exhibit No. 11 was

 2             marked for identification.)

 3   BY MS. QUARTAROLO

 4          Q.    And, Mr. Feldman, I know you're

 5   coming in fresh to this.  We are bringing up

 6   exhibits on the screen.  They're also being

 7   dropped into the chat in case you would like to

 8   access them directly.

 9          MR. FELDMAN:  Okay.  Great.  Thank

10       you.

11   BY MS. QUARTAROLO

12          Q.    So, Mr. Owoc, just for the record,

13   this is a document titled "Written Consent of

14   Sole Shareholder and Sole Director of Vital

15   Pharmaceuticals International Sales, Inc."

16   bearing the Bates stamp VPX-JHO135.  Do you see

17   that document on the screen?

18          A.    Yes, ma'am.

19          Q.    Have you seen this document before?

20          A.    I don't know.  It looks exactly like

21   all the other documents, same title; correct?

22          Q.    You understand that each of these

23   has a different entity in the title; correct?

24          A.    How would I -- different entity.

25   Okay.  Thank you for pointing that out.  Yes, I
```

1    do now.

2         Q.    And so you -- one of the previous

3    ones we looked at was for JHO Real Estate

4    Investments, LLC, and this one is for Vital

5    Pharmaceuticals International Sales, Inc, right?

6         A.    Correct.

7         Q.    And if you scroll down to Page 6 of

8    this document.

9         A.    There's that same fake signature

10   again.  Look at that, Jonathan, down to a

11   hundredth of a millimeter.

12        Q.    And, Mr. Owoc, do you recall signing

13   this document?

14        A.    No, ma'am.

15        Q.    And if you -- if we blow that

16   signature up, do you see that beneath the

17   electronic signature it says John Owoc, and it

18   has a date, October 9, 2022.  Do you see that?

19        A.    I don't know.  That's kind of hard

20   to read.  It's pixilated, and some of it is not

21   even readable on like 100-point font.

22        Q.    Are you able to read that or not?

23        A.    I'm not able to read the time stamp,

24   no.

25        Q.    But you see it says John Owoc.  Do



1    you see that?

2           A.    Yes.  After you blew it up to

3    100-point font that can't be seen on the regular

4    document.  Yes, very good job, Amy.  So let's

5    put the document at hundred percent, please, so

6    that we can view it just as you would view a

7    normal document so we can see if we can see

8    that, Jonathan.  Do you mind?

9                 That's a hundred percent, and you

10   definitely can't see it to the human eye.  It's

11   not visible.

12          Q.    So, Mr. Owoc, we're going scroll

13   down.  This is the final audit report that is

14   attached to this document.  Do you see this

15   document, Mr. Owoc?

16          A.    Yes, ma'am.

17          Q.    And you would agree that similar to

18   the other final audit reports that we looked at

19   that accompanied the other written consents that

20   this one also indicates that the document was

21   emailed to ceo@bangenergy.com for signature and

22   also notes that the document was e-signed by

23   John Owoc?

24          A.    Fraudulently, yes.

25            MR. FELDMAN:  Objection to form.  Go



1          ahead.
2              THE WITNESS:  Fraudulently, yes, it
3          was -- it wasn't to John Owoc.  It was to
4          Jack H. Owoc.
5   BY MS. QUARTAROLO
6          Q.   But you did see that the signature
7      has a label under this as John Owoc; right?
8          A.   No.  We did not see that.  You can't
9      see it to the human eye.  After you blow it up
10     500 times in size, you can see it.  But you
11     cannot see it.  Like when somebody is signing
12     it, they can't see it.  We just showed you that,
13     Amy, so please stop trying to be deceptive.
14     Because your firm and you are habitually
15     deceptive.
16         Q.   Mr. Owoc, the commentary is
17     unnecessary.
18         A.   No, it's necessary, because we got
19     to get it on the record.
20         Q.   So you understand that this document
21     indicates that the document was e-signed by John
22     Owoc and has the email address
23     ceo@bangenergy.com?
24         A.   This document is a fraud.  It says
25     that in writing, but it's a fraud.

1          Q.    And what is your basis sitting here

2    today to say that the document --

3          A.    It has a fake signature, and it's

4    the same fake stamped signature on all the

5    documents.  And it's not a wet signature

6    required by law.

7          Q.    And what is your basis to say that

8    the --

9          A.    The law is the basis, Amy.  The law.

10   I told you that already.  The law is the basis

11   requiring a wet signature.  I'm sorry you didn't

12   do your homework and don't have a grasp of the

13   knowledge of the law like I do.  I wish you did,

14   but you don't.  And so I'm trying to help you

15   out.

16         Q.    Mr. Owoc --

17         A.    Free of charge.  Free of charge,

18   Amy.

19         Q.    I need you to let me --

20         A.    I'm going to do it for you free.

21   I'm going to serve you.

22         Q.    Mr. Owoc, I need you to let me get

23   my question out before you start answering it.

24   Okay?

25         A.    Absolutely.

1    Q.    What is your basis to say that this

2    document is a fraud?

3    A.    Refer to my previous answers on this

4    document and all documents.

5    Q.    Well, I don't think you've answered

6    that question in connection with this document.

7    A.    Fake signature.  Fake name.  That's

8    pretty -- basis is that word you use that I'm

9    not even sure I understand because laypersons

10   don't use basis in their terminology.

11   Q.    And when you say --

12   A.    Should we Google the word "basis" so

13   that you can get a handle on how regular

14   non-attorneys understand that word?

15   Q.    So, Mr. Owoc, you said that you

16   believe that this document bears a fake

17   signature; correct?

18   A.    Stamped signature.

19   Q.    A stamped signature?

20   A.    Which is -- and it requires a wet

21   signature, yes.  Do you, Ms. Quartarolo, in your

22   infinite wisdom believe that those signatures

23   came out exactly the same like that and I signed

24   them down to a hundredth of a millimeter exactly

25   the same?  Do you believe that a jury is going

1    to believe that?  I don't think you do, but go

2    ahead and move on.  The document speaks for

3    itself.

4         Q.   The document may well speak for

5    itself, Mr. Owoc, but I'm asking you a question.

6              The question is:  What is your basis

7    to say that this document bears a fake

8    signature?

9         A.   Because it's a stamp and it's not a

10   wet signature.  And a stamp is even worse yet.

11   It requires a wet ink signature.  Furthermore,

12   it's a stamp, which anybody can do, anybody can

13   forge, and somebody did forge, it looks like.

14        Q.   When you say --

15        A.   Furthermore, it's signed Jack H.

16   Owoc.  So I answered your question every time.

17   You refused to listen to the answer, and then

18   you run in circles and ask nothing substantive.

19   Ask a substantive question and move on.  This is

20   why we haven't got through any documents.  I

21   know you're going to cry to the judge tomorrow

22   and say Jack Owoc was combative.  But you've

23   asked nothing substantive, and we've been here

24   for hours, Amy.

25        Q.   Are you done?  Are you done,

1    Mr. Owoc?

2            A.    Are you done?

3            Q.    No, I'm not done.  I have lots of

4    questions for you.

5            A.    Proceed, Counselor.  If you're not

6    done, proceed.

7            Q.    Is there any other basis other than

8    what --

9            A.    There is no other basis.  We've

10   asked and answered that.  Move on, Counselor.

11           Q.    I'm sorry.  I --

12           A.    There's no other basis.

13           MS. QUARTAROLO:  Thank you.  Let's

14       pull up Tab 12, which we'll mark as

15       Exhibit 12.

16               (Whereupon, OWOC Exhibit No. 12 was

17           marked for identification.)

18   BY MS. QUARTAROLO

19           Q.    For the record, this is document

20   titled "Written Consent of Sole Member and Sole

21   Manager of JHO Intellectual Property Holdings,

22   LLC," and bears the Bates stamp VPX-JHO165.

23               Mr. Owoc, do you see this document

24   on the screen?

25           A.    Absolutely.

```
1          Q.     Have you seen this document before?

2          A.     I don't recall.

3          Q.     We scroll down to Page 6.

4          A.     To the fake signature?  Go ahead.

5     Watch, Jonathan.  Get ready.  Boom, there it is

6     again.

7          Q.     And, Mr. Owoc, you see that this

8     document bears an electronic signature?

9          A.     Yes.

10         Q.     And do you recall signing this

11    document?

12         A.     I do not.

13         Q.     And do you have any reason to

14    believe that you did not sign this document?

15         A.     Yes.  I'm not Jack H. Owoc.

16         Q.     Is that the only basis to believe

17    that you didn't sign this document?

18         A.     The signature looks like a fake

19    stamp, and it requires a wet signature.

20         Q.     Anything else?

21         A.     I have no other basis.

22         Q.     Can we scroll down to the next page.

23                Can you see this final audit record

24    there Adobe Acrobat Sign, Mr. Owoc, on the

25    screen?
```

1       **A.**    Yes, ma'am.  Yes, I do.

2       **Q.**    And you would agree that this

3    document -- excuse me, this final audit report

4    indicates that the document was emailed to

5    ceo@bangenergy.com for signature?

6       **A.**    Mischaracterization.  I don't

7    believe that.  I believe the document is a

8    fraud.

9       **Q.**    You believe this final audit report

10    is a fraud?

11       **A.**    I believe that you're a fraud.

12        MR. FELDMAN:  Objection to form.  Go

13        ahead.

14    BY MS. QUARTAROLO

15       **Q.**    I'm sorry.  I didn't hear the answer

16    to my question.

17       **A.**    I'm sorry.  What was your question?

18       **Q.**    Do you -- well, let's start it this

19    way.  Do you see in the second -- in the middle

20    of the page where it says "Document emailed to

21    ceo@bangenergy.com for signature"?  Do you see

22    that?

23       **A.**    Yes, I do.

24       **Q.**    And do you see the second from the

25    bottom where it says "Document e-signed by John

1    Owoc," and it has your email address,

2    ceo@bangenergy.com?  Do you see that?

3         MR. FELDMAN:  Objection to form.  Go

4         ahead.

5         THE WITNESS:  I see it, but it doesn't

6         mean anything.

7    BY MS. QUARTAROLO

8         Q.   Why do you say it doesn't mean

9    anything?

10        A.   I see it.  It doesn't mean that the

11   document is true.  It doesn't mean that the

12   document wasn't signed by somebody else.  We

13   went over this, Amy.

14        Q.   And what is your basis to say that

15   this document --

16        A.   I have no basis.  I have no other

17   basis other than the previous basis listed a

18   dozen times.

19        MS. QUARTAROLO:  Let's pull up Tab 13,

20        Exhibit 13.

21        (Whereupon, OWOC Exhibit No. 13 was

22        marked for identification.)

23   BY MS. QUARTAROLO

24        Q.   Just for the record, this is a

25   document titled "Written Consent of Sole

1    Shareholder and Sole Director of Vital

2    Pharmaceuticals, Inc.," and it bears the Bates

3    stamp VPX-JHO151.  Do you see this document on

4    the screen, Mr. Owoc?

5         **A.**    Yes, ma'am.

6         **Q.**    Do you recognize this document?

7         **A.**    No, ma'am.

8         **Q.**    If you scroll to Page 6 of the

9    document, do you see that this document bears an

10    electronic signature?

11         **A.**    A stamp, yes.

12         **Q.**    And do you believe that you signed

13    this document?

14         **A.**    Let me go back to my last question.

15    That's not an electronic signature.  To the best

16    of my knowledge, it's a stamp and anybody can

17    stamp it.

18         **Q.**    What does that mean, anyone can

19    stamp?

20         **A.**    Anybody can stamp it using Adobe.

21         **Q.**    And why do you say that?

22         **A.**    Why do you -- why do you think all

23    the stamps are exactly the same?

24         **Q.**    I'm asking you.

25         **A.**    Where's the wet signature required

1      by law?  Are you going to go around in circles

2      again about the wet signature by law or are you

3      going to have one of your

4      2,200-dollar-attorneys-an-hour look it up?

5            Q.    Mr. Owoc, just for the record,

6      again, you are not an attorney; correct?

7            A.    Correct, ma'am.

8            Q.    And my question for you is:  Do you

9      recall signing this document?

10           A.    No, ma'am.

11           Q.    Do you have any reason to believe

12     that the electronic signature on this document

13     is not one that you applied to the document?

14           A.    I do.

15           Q.    What is that basis?

16           A.    It looks like a stamp to me, and

17     it's not a wet signature required by law.

18           Q.    Anything else?

19           A.    No.  Do you have anything else?

20           Q.    Please scroll down is to the next

21     page.

22                 Do you see the final audit report

23     attached to this document?

24           A.    I do, yes, ma'am.

25           Q.    And do you see in the middle of the

1    page where it says that this document was

2    emailed to ceo@bangenergy.com for signature?

3         A.   Yes.  Just so you know, Jonathan,

4    they hacked into my email, so this could have

5    went to anybody.

6         Q.   Mr. Owoc, do you see that on the

7    document?

8         A.   I do.

9         Q.   And do you see the second --

10        A.   I see it, but yet I don't

11   authenticate it.  But go ahead.

12        Q.   What does that mean?

13        A.   I can't explain it any better.  The

14   words speak for themselves.

15        Q.   Thank you.  Do you see that the

16   second bullet from the bottom says "Document

17   e-signed by John Owoc" and has the email address

18   ceo@bangenergy.com?

19        A.   I see but don't authenticate and

20   don't agree with it.  It's not a signature.

21   It's a stamp.  Boom.  Bam.  That's what it is.

22        Q.   Mr. Owoc, are there any of the

23   debtor entities that you authorized for filing

24   in Chapter 11 petitions?

25        A.   Explain that in layman's terms,

1    please.

2            Q.    You understand that Chapter 11

3    petitions were filed for Vital Pharmaceuticals

4    and various affiliates; correct?  We established

5    that at the beginning of this deposition?

6            MR. FELDMAN:  Objection to form.  Go

7        ahead.

8            THE WITNESS:  I just learned that

9        recently as we established in the

10       beginning of this deposition, and I

11       understand that Latham & Watkins and

12       Berger Singerman were supposed to sit

13       down and explain this and never once did

14       we have an in-person meeting.

15            In fact, they purposely didn't

16       have a meeting because they wanted to

17       defraud me out of hundreds of millions of

18       dollars in real estate.  Isn't that true,

19       Amy?  Were you part of that?  Because

20       that is a major fraud.

21  BY MS. QUARTAROLO

22           Q.    Mr. Owoc, again, respectfully --

23           A.    Never sat me down once --

24           Q.    -- I'll be asking the questions.

25           A.    -- and explained these bogus



1    filings.  Never once.  Isn't that required by

2    law?  Isn't that your fiduciary duty at Latham &

3    Watkins, Amy?

4         **Q.**    Mr. Owoc, respectfully, the

5    questions will be asked by me, and I need you to

6    answer them.

7         **A.**    You just said --

8         **Q.**    The commentary is inappropriate, and

9    I will raise this with the judge if we have to.

10        **A.**    Please raise it to him because you

11   do anyhow with all your fake emergency motions.

12   Go ahead and raise it with him and cry like a

13   little baby.  That's what you do to try to rig

14   the bankruptcy court, and it leaves a black eye

15   on the bankruptcy court because you rig it, you

16   abuse it, and you weaponize it.

17        **Q.**    So, Mr. Owoc, my question --

18        **A.**    If you want to call the judge right

19   now, we can call the judge right now.  Let's go.

20        **Q.**    Mr. Owoc, my question for you is:

21   Of the entities that filed for Chapter 11

22   protection on or about October 10th of 2022, did

23   you authorize the filing of any of those

24   entities?

25        **A.**    To the best of my knowledge, I

1    didn't authorize them, and I was defrauded by

2    Berger Singerman and Latham Watkins, who never

3    took the time to explain to me about those.

4    Furthermore, we had an offer from KDP, which I

5    believe has about a 28-billion dollar market

6    cap, a legitimate offer for $3.2 billion, and

7    Rothchild queered the deal.

8              And then Berger Singerman blocked

9    for them and conducted a faulty investigation, a

10   fraud on the missing $3.2 billion.  And when Meg

11   Liz Owoc, Meg Liz Owoc, out of marketing, asked

12   on the board call to Rothchild and Berger

13   Singerman, she asked Jordi, she said, Jordi, did

14   you --

15         Q.    So, Mr. Owoc, I'm going to interrupt

16   you because --

17         A.    -- did you take any --

18         Q.    You're unable --

19         A.    Did you take any depositions?  Did

20   you do any emails?

21         MS. QUARTAROLO:  Mr. Feldman, he's not

22         allowed to testify to privileged

23         information, privileged communications,

24         and we will shut this deposition down

25         right now.

```
1            THE WITNESS:  No.  Jonathan, they did
2       not even get any emails for discovery or
3       make any calls and 3.2 billion dollars is
4       missing.  Jordi Guso is a fraud.  He's a
5       scam.  Go ahead, Amy.  That's the answer.
6          MS. QUARTAROLO:  Mr. Feldman, we need
7       to go off the record.  I need to speak
8       with you.
9          MR. FELDMAN:  Sure.
10         THE VIDEOGRAPHER:  Hold on.  We're off
11      the record at 2:18.
12            (Whereupon, a brief recess was
13         taken.)
14         THE VIDEOGRAPHER:  We are back on the
15      record at 2:31.
16         MS. QUARTAROLO:  I'm sorry.  We can go
17      ahead and take the document down.
18      Thanks.
19         MR. FELDMAN:  So, Ms. Quartarolo just
20      briefly -- you expressed a concern
21      regarding disclosure of attorney-client
22      privileged communications and material in
23      which the privilege is controlled by the
24      debtor.  Mr. Owoc obviously is a lay
25      witness, not a lawyer, so his
```

```
 1            understanding of privilege may not be as

 2            comprehensive as us -- ones a lawyer may

 3            have.

 4                    So to the extent he's answering a

 5            question which you believe he's somehow

 6            disclosing such privileged materials,

 7            just request for you to politely

 8            interject and address or raise that issue

 9            with Mr. Owoc.  And we, of course, will

10            accommodate your request not to disclose

11            that privileged material.  Okay?

12         MS. QUARTAROLO:  Thank you.

13         MR. FELDMAN:  You're welcome.  Go

14            ahead.

15   BY MS. QUARTAROLO

16         Q.   Mr. Owoc, in January of 2023, were

17      you the sole member of JHO Real Estate

18      Investments, LLC?

19         A.   I can't recall.

20         Q.   At any point in time have you

21      been -- have there been other members of JHO

22      Real Estate Investments, LLC?

23         A.   No.

24         Q.   Just you're the sole member;

25      correct?
```

1          **A.**     Correct.

2               MS. QUARTAROLO:  Can we pull up Tab

3          14, which we'll mark as Exhibit 14.

4               (Whereupon, OWOC Exhibit No. 14 was

5               marked for identification.)

6     BY MS. QUARTAROLO

7          **Q.**     And just for the record, this is a

8     document titled "JHO Real Estate Investment,

9     LLC, Action by Unanimous Written Consent of

10    Member and Managers In Lieu of Meeting,

11    Effective January 7, 2023," and bearing the

12    Bates stamp VPX-JHO112.  Do you see this

13    document, Mr. Owoc?

14         **A.**     Make it a little bigger, please.

15         **Q.**     Do you see the document on the

16    screen, Mr. Owoc?

17         **A.**     Yes.  Just a little smaller, please.

18    Page to the end of the document, please.

19         **Q.**     So my question for you, Mr. Owoc, is

20    going to be:  Have you seen this document

21    before?

22         **A.**     Not that I can recall.

23         **Q.**     If we scroll to the page for the

24    signatures, Mr. Owoc, do you see that there's an

25    electronic signature under "Member."  Do you see

1    that?

2          A.    Make that bigger, please.  Yeah, so

3    as usual, you can see that these are both

4    stamps.  They're not signatures and they're

5    certainly not in wet ink.  Anybody could have

6    stamped these on there.

7          Q.    Do you specifically recall e-signing

8    this document?

9          A.    I do not.

10         Q.    Do you have any reason to believe

11   that you did not electronically sign this

12   document?

13         A.    Yes.  Because I didn't sign this.

14   Those aren't signatures and they're certainly

15   not wet ink signatures.

16         Q.    I guess -- so leaving aside the wet

17   ink signature, which we can debate with your

18   counsel, in terms of electronic signatures, do

19   you have any reason to believe that you did not

20   apply your electronic signature to this

21   document?

22         A.    Those are not electronic signatures.

23   They're a stamp.

24         Q.    What do you mean by stamp?

25         MR. GILBERT:  Objection to form.



```
 1              THE WITNESS:  So are you -- so,

 2         question, are you saying that I can sign

 3         these the exact same way down to the

 4         hundredth of a millimeter?  Or are they

 5         stamped, Amy?  They're stamps.

 6  BY MS. QUARTAROLO

 7         Q.    What does that mean, sir?

 8         A.    A stamp is -- a stamp is something

 9    that anybody can take and affix to a document

10    like this.  If you page down to the director's

11    signature, I can make that abundantly clear as

12    well.

13         Q.    So we'll stay here.  I want to ask

14    you --

15         A.    Let's stay -- let's go down to the

16    signature so we can resolve this one point.  You

17    asked a question.

18         Q.    Mr. Owoc, respectfully, I'm asking a

19    question about these signatures.

20         A.    These are stamps.  They're not

21    signatures.  I just told you that.

22         Q.    And what is your basis to say that

23    this is a stamp?

24         A.    I just answered that.

25         Q.    What is a stamp, sir?
```

```
 1          A.    I'm trying to explain to you, but
 2     you won't let me.  So let's move on, Counselor.
 3     I offered to help you by going to the other
 4     signatures, but you don't want to do it.
 5          Q.    We can go to the other signatures.
 6          MR. FELDMAN:  Mr. Owoc, just answer
 7          the questions best you can, sir, and then
 8          let's just keep moving forward.  Thank
 9          you.
10     BY MS. QUARTAROLO
11          Q.    What do you mean by stamp in
12     reference to these electronic signatures?
13          A.    Those are exact same stamps.
14     They're not a signature.  They're a copy and
15     pasted stamp.  Anybody can do it.  You can do
16     it.  Jonathan can do it.  Anybody can do it.
17     They're the exact same.
18          Q.    And what --
19          A.    Do you think that was -- that I did
20     those both down to hundredth of a millimeter or
21     are they just copied?  They're copied.  You know
22     they are.  And thank you for showing this
23     document and proving my point.
24          Q.    Mr. Owoc, what is your reason to
25     believe that you did not apply this signature or
```

1    stamp, whatever it is you want it call it, to

2    this document?

3              MR. FELDMAN:  Form.

4              THE WITNESS:  Well, because it's a

5         fake.  It's not a wet ink signature

6         required by law.

7    BY MS. QUARTAROLO

8         Q.    What is your basis to say that this

9    is a fake?

10        A.    Because it's a stamp.

11        Q.    And if we scroll back up to the

12   first page, Mr. Owoc, do you recall receiving

13   this document?

14        A.    No.

15        Q.    Mr. Owoc, do you recall in or about

16   January 7 of 2023 certain changes to the

17   governance of the debtors boards were made?

18        A.    The governance of the debtors?  The

19   board of directors?

20        Q.    Correct.

21        A.    I can't recall the date, but there

22   was a point in time where they were changed.

23        Q.    And do you have any reason to

24   believe that wasn't on or about January 7 of

25   2023?

1      A.    I have no recollection either one

2    way or the other.

3      Q.    And do you see, sir, that this --

4    you see the title of this document references

5    JHO Real Estate Investment, LLC; right?

6      A.    Yes.

7      Q.    And if you look at the end of the

8    first paragraph here, it reads -- and I will --

9    so it says the -- let me start at the beginning,

10    just to make this clear, it says "The

11    undersigned, comprised of the sole member and,

12    after giving effect to their respective

13    appointments, all the managers of JHO Real

14    Estate Investment, LLC."  Do you see that?

15      A.    Yeah.

16      Q.    And then at the end of that

17    paragraph, it says "Consent and agree to the

18    authorization, approval and adoption of the

19    following resolutions."  Do you see that?

20      A.    Yeah.  But those -- these

21    individuals were never managers.  There's only

22    one manager and that's me, and that's reflected

23    on the corporate documents before, again, John

24    DiDonato forging them.

25      Q.    Mr. Owoc --

```
 1              A.    Saying he was the CEO.  John forged
 2       that, said he was the CEO, without any authority
 3       from me as the managing member.
 4              Q.    Do you understand the difference --
 5              A.    Managing member, as you can see
 6       here.
 7              Q.    Are you done?
 8              A.    Yes.
 9              Q.    Do you understand the difference
10       between a member of an LLC and a manager of an
11       LLC?
12              A.    Not really, no.
13              Q.    Okay.  And then if you look at the
14       first "whereas" clause, about two thirds of the
15       way --
16              A.    I have to look, too, to see who
17       signed this because I -- you know, without
18       having to read -- I have the right to read the
19       whole document, but I at least want to see and
20       page down and see who signed this.
21              Q.    Sure.  We can absolutely go back to
22       the signature pages.  We looked at yours, and we
23       can look at the others as well.
24              A.    Let me look at mine real quick.  If
25       you can blow those up a little bit.  So we
```

1    notice that the other three board members did

2    not sign underneath me.  Go ahead.

3         Q.    If you would like to scroll down to

4    the next page, you see there are electronic

5    signatures for Bob Dickinson, Stephen Gray, Eric

6    Hillman, and Steven Panagoes; do you see that?

7         A.    I see that they are all stamps, yes.

8    This is what I was referring to as a stamp, not

9    an authentic signature and certainly not a wet

10   signature as required by law.

11        Q.    And can we scroll -- did you want to

12   look at anything else on this page, sir?

13        A.    I just want to make note to Jonathan

14   how their signatures are affixed in one area and

15   mine in another.

16        Q.    Can we scroll back up to the top,

17   please.

18              If you look at the "whereas" clause,

19   the first one on this page, it reads "Whereas,

20   on October 10, 2022, the LLC and certain of its

21   affiliates filed voluntary petitions for relief

22   under Title 11 United States Code."  Do you see

23   that?

24        A.    Yes, ma'am.

25        Q.    And you see up at the top in, I



1    guess, the third line of the paragraph "LLC is

2    defined as JHO Real Estate Investment, LLC."  Do

3    you see that?

4         A.    Yes, ma'am.

5         Q.    Let's look at the page number, the

6    Bates number at the bottom is 114.  And you see

7    here, sir, that it lists four individuals --

8    Mr. Owoc, Eric Hillman, Bob Dickinson, and

9    Mr. Panagoes -- as managers of the board of JHO

10   Real Estate?

11        A.    They were never managers of the

12   board, and I would never authorize them to be

13   managers, nor did I authorize any of this.  I

14   would never put this facility into bankruptcy

15   because it could produce a quarter of a billion

16   dollars a year and extremely high profits.  So I

17   would never willingly put this in.  Nobody

18   explained it to me and the signatures are all

19   very suspect.

20        Q.    But you don't dispute that that's

21   what this document says, right, that those four

22   individuals, yourself included, are managers of

23   JHO Real Estate?

24        A.    I think the document is a fraud, and

25   they're not managers and they've never been.

1  And if you look up the corporation online,

2  unless John DiDonato fraudulently changed it

3  again like he did in the first place, that would

4  not be reflected thereon.

5       Q.    But you don't dispute that those

6  four names are listed on this page; correct?

7       A.    On this page, yes, which means

8  nothing.

9       Q.    Thank you.  Can you scroll down to

10  116.  And in the middle of the page, do you see

11  the heading "Election of the Additional

12  Managers"?

13       A.    Yes.

14       Q.    I'll give you just a second.  I

15  don't want to read it into the record

16  necessarily, but I'll give you just a second to

17  read that section.  It's pretty short.

18       A.    Which section are we reading?

19       Q.    Under title or the heading "Election

20  of Additional Managers."

21       A.    Yes.  I've never seen this before,

22  nor would I authorize it.  Keep in mind,

23  Mr. Dickinson was fired on his first day, fired

24  on his first day, and they put him back on the

25  board without my permission because he colluded