1    with Eric Hillman and tried to force him to take

2    the side of him and Steve Dickinson.  His very

3    first day, he was openly fired in front of 34

4    people.

5              Mr. Gray ended up being the corrupt

6    board member put on and forced upon us by the

7    bank.  Both of these members are over 80 years

8    old and were highly incompetent and basically

9    half dead whenever we did any of these meetings.

10   Have no right being board members in an energy

11   drink whose average consumer is 20 years old,

12   which is 400 percent younger than these

13   individuals.  If they drank a sip of an energy

14   drink, they would die instantly.

15        Q.   So, Mr. Owoc, you don't dispute that

16   this document lists yourself, Mr. Hillman,

17   Mr. Dickinson, Mr. Panagoes, and Mr. Gray as the

18   managers of JHO Real Estate; correct?

19        A.   This document lists that, but this

20   document is a fraud.  And I never agreed to

21   that, and this is not what the records -- the

22   corporation records, the real ones, reflect.

23        Q.   And when you say this document is a

24   fraud, what is your basis to say that?

25        A.   The whole thing is a fraud.  To the



1    best of my knowledge, I've never seen it before,

2    and I would never put Dickinson on anything

3    because he proved to be corrupt the very first

4    day he was on the board when he colluded with

5    Steve Panagoes, who is also corrupt, to sway the

6    vote of Mr. Hillman and actually threatened

7    Mr. Hillman who complained about it, as you

8    know, Amy, openly in the board minutes that you

9    took.

10        Q.    So, Mr. Owoc, I just want to ask

11    about something you just said.  You don't

12    dispute, do you, that Mr. Dickinson attended

13    board meetings and acted as a board member after

14    you purport to have fired him; right?

15        A.    I don't dispute that, no, but he was

16    not authorized.  He was fired.  He was fired

17    when I was the CEO, chairman of the board, and

18    sole shareholder and had the complete right to

19    do so.

20        Q.    And when was it that you indicate or

21    claim that you terminated Mr. Dickinson?

22        A.    I think I terminated him within 24

23    hours of hiring him after he -- after Eric

24    Hillman vehemently complained, that you heard,

25    that Andrew Sorkin heard, that Jordi Guso heard.



1    On the line he complained vehemently that Bob

2    Dickinson threatened Eric Hillman, threatened

3    him, and he wasn't even there 24 hours, to the

4    best of my recollection, and threatened him and

5    said you better vote against Jack Owoc and vote

6    with me and Steve Panagoes and it's just a

7    disgraceful individual.  And I fired him

8    immediately with 34 people present.  You don't

9    dispute that, do you, Amy?  Because you were on

10   that call, weren't you, when I told him to leave

11   the call now you're fired.

12        Q.    And was that in December of 2022?

13        A.    I don't know.  Ask Andrew Sorkin

14   because I distinctly remember him being on the

15   line.

16        Q.    But you don't remember?

17        A.    It was Bob Dickinson's first or

18   second day.  You can look it up.

19        Q.    And between that day and your

20   termination as CEO in March, several months

21   later, Bob Dickinson continued to participate as

22   a board member; correct?

23            MR. FELDMAN:  Form.

24            THE WITNESS:  I never recognized him

25        as a board member, and, furthermore,



1              Jonathan, I fired Dickinson, Panagoes,

2              and Gray because sales dropped 57 percent

3              because of their continuous habitual bad

4              decisions.  They have no business being

5              on the board of an energy drink.  They're

6              all clueless as you can see yesterday in

7              Mr. Panagoes' deposition where he

8              perjured himself several times.

9    BY MS. QUARTAROLO

10          Q.   And just to make the record clear,

11   Mr. Owoc, you indicated that you believe this

12   document is a fraud, and I want you to state for

13   the record all reasons why you think this

14   document is a fraud.

15          A.   I just think these signatures are

16   wrong, and I would never authorize this

17   document.

18          Q.   Anything else?

19          A.   No, ma'am.  We can continue, please,

20   Counselor.

21          Q.   We can take it down.

22              Mr. Owoc, are you -- sitting here

23   today, are you aware that the Phoenix facility

24   is among the assets that are being sold as part

25   of the sale process the debtors are pursuing?

1          **A.**    I don't understand the terminology

2      "sitting here today" as opposed to sitting here

3      tomorrow or yesterday?

4          **Q.**    No.  Well, I am deposing you today;

5      correct?

6          **A.**    Correct.

7          **Q.**    So today based on your knowledge,

8      are you aware that the Phoenix facility is among

9      the assets that are being sold as part of the

10     debtors sale process?

11          MR. FELDMAN:  Objection, form.

12          THE WITNESS:  I think -- I think the

13              debtors committed fraud on all the

14              potential prospective bidders and

15              everybody else and made them think that

16              they were part of the sale when, in fact,

17              they're not.  They're being contested.

18              And they are owned outright by me.

19     BY MS. QUARTAROLO

20          **Q.**    What does that mean, they're being

21      contested?

22          MR. GILBERT:  Objection, form.

23          THE WITNESS:  Didn't you just show me

24              a motion that we filed saying that they

25              were contested?  I don't know.

1    BY MS. QUARTAROLO

2              Q.    So when did you first become aware

3    that the Phoenix facility was part of the assets

4    being sold by the debtors?

5              A.    Very recently as I told you 16 times

6    now.

7              Q.    And do you have an estimate of when

8    that was?

9              A.    Very, very recently.

10             Q.    Like within the last month?

11             A.    And as I pointed out earlier,

12   Jonathan, the vice president of finance told me

13   I owned the facility.  Everybody told me I owned

14   the facility.  In fact, I sent an email very

15   clearly telling Andrew Sorkin and John DiDonato

16   and all the key stakeholders and Huron

17   Consulting Group and Rothchild and everybody

18   when we were doing the dip financing, make sure

19   that this is in my best interest.

20             And I believe it said something on

21   there that I owned these facilities.  I made

22   sure over and over.  I asked them to make sure

23   this was in my best interest.  Gregg Metzger

24   acknowledged and he said he would, and then he

25   went behind my back, Jonathan, and signed some

1    legal document when I was the CEO of the company

2    and chairman of the board with Berger and Latham

3    signing away my legal rights and circumventing

4    me as the CEO.  It's a complete fraud.

5         Q.    So I'm going to ask my question

6    again.  I think it's a fairly simple and

7    straightforward one, which is:  When did you

8    first learn that the Phoenix facility was among

9    the assets being sold as part of the debtors

10   sale process?

11        A.    Respectfully, Amy, I told you this

12   is probably the 17th time, very recently.

13        Q.    My question --

14        A.    I know you don't like that answer,

15   but that answer is going to stay the same.

16        Q.    What is very recently?  In the last

17   month?  I'm asking for an estimate.

18        A.    I'm not going to estimate on the

19   record.  Absolutely not.

20        Q.    Just sitting here today, you're

21   unable to provide an estimate of when you

22   learned that the Phoenix facility was among the

23   assets being sold?

24        A.    Anybody can provide an estimate, but

25   I will never provide any estimates or guesses

1    under oath.  That would be ridiculous.

2            Q.    Mr. Owoc, do you understand the

3    difference between a guess and an estimate?

4            A.    No.  I didn't know there was one,

5    but I'm sure you'll enlighten me.  Go ahead.

6            Q.    I'm happy to.  So like if I asked

7    you the size of my dining room table, that would

8    be a guess because you have no idea.  You've

9    never been to my dining room.  If I asked you to

10   provide an estimate as to the size of your

11   dining room table, you would be able to provide

12   me that estimate because you're either sitting

13   at your dining room table or you're familiar

14   with it.  And so you are able to provide that as

15   an estimate.  That's the distinction that I'm

16   trying to draw.

17           And so I'm asking you if you have an

18   estimate as to when you learned whether or not

19   the Phoenix facility was part of the assets

20   being sold through the debtors sale process?

21           A.    First of all, your description is an

22   insult to my intelligence, and you are asking me

23   to guess.  And I'm not going to guess.

24           Q.    So you're refusing to answer that

25   question, sir?

1          A.    No, I'm not.  I'm refusing to guess.

2     I'm not going to guess on the record.

3          Q.    When you were a board member of the

4     debtors, you attended meetings regularly;

5     correct?

6          A.    I was chairman of the board, yes.

7          Q.    And you attended board meetings

8     regularly; correct?

9          A.    I don't know if your

10    characterization is true.  I attended board

11    meetings, yes.

12         Q.    Did you learn during any of those

13    board meetings that the Phoenix facility was

14    among the assets being sold as part of the

15    debtors sale process?

16         A.    Not to my recollection, no.

17         MS. QUARTAROLO:  Let's pull up Tab 15,

18         we'll look at Exhibit 15, we'll mark this

19         Exhibit 15.

20              (Whereupon, OWOC Exhibit No. 15 was

21              marked for identification.)

22    BY MS. QUARTAROLO

23         Q.    For the record, this is "Vital

24    Pharmaceuticals and Certain Affiliates and

25    Subsidiaries Joint Meeting of the Restructuring

1    Committees" labeled VPX-BOD213.

2              Mr. Owoc, you were not a member of

3    the restructuring committee; correct?

4         A.    I think -- I don't know whether I

5    was or not because there was a lot of fraud and

6    deception going on with John DiDonato and Homer

7    Parkhill and Latham Watkins.

8         Q.    And I will represent to you that you

9    were not a member of the restructuring committee

10   for the debtors.  But you, nevertheless,

11   attended meetings of the restructuring

12   committee, didn't you?

13        A.    As the chairman, CEO, and sole

14   shareholder, yes.

15        Q.    And on these --

16        A.    And the restructuring people answer

17   to me.  Yes, you're correct, Amy.

18        Q.    And on these minutes from the

19   November 2nd, 2022, meeting of the restructuring

20   committee, you see your name listed under "also

21   present."  Do you see that?

22        A.    Yes.

23        Q.    And if we turn to Page 4 that bears

24   the Bates stamp 216, do you see under that first

25   heading it says "Phoenix Manufacturing Facility

1    Update."  Do you see that?

2              A.    Let me read that, please.  Yes.

3              Q.    And who is Mr. Delo who is

4    referenced in that first paragraph?

5              A.    I don't know.

6              Q.    Do you know --

7              A.    Pretty low importance because I

8    don't know who he is.

9              Q.    And you don't know that Charles

10   Delo -- have you ever met Charles Delo?

11             A.    To the best of my knowledge, no.

12             Q.    And are you familiar with him as

13   among the Rothchild bankers who are working on

14   this matter?

15             A.    I've heard his name before.

16             Q.    Have you ever met him?

17             A.    Refer to my previous answer.

18             Q.    I'm just asking if you ever met him

19   in person?

20             A.    I already answered that.

21             Q.    Have you ever met him on a board

22   meeting?

23             A.    Met him on a board meeting?  I don't

24   think you can meet somebody on a board meeting.

25             Q.    I'm happy to rephrase if you don't

1    understand my question, Mr. Owoc.

2            Did you and Mr. Delo ever attend

3    board meetings, the same board meetings of the

4    debtors?

5        A.    We may have.  We may not have.  I

6    can't recall.

7        Q.    And from this November 2nd, 2022,

8    restructuring committee meeting, do you recall

9    Mr. Delo, on behalf of Rothchild, presenting to

10   the board on an interest from parties with

11   respect to the Phoenix facility?

12       A.    It says here he would not recommend

13   that a company pursue a piecemeal sale of the

14   Phoenix facility at this time.  What does that

15   even mean?  And he has no authority to recommend

16   or not recommend anything.  That's my facility.

17       Q.    So my question is different,

18   Mr. Owoc.

19       A.    But my answer is that he can't

20   recommend that.  It's not his property.  That

21   would be like me recommending that his house not

22   be part of his estate and that we were going

23   sell it.

24       Q.    So, again, I'll ask my question.  I

25   think it's a slightly different question.

1       A.    Mr. Delo, there's no way -- he's not

2    a principal or anything of any organization.  I

3    don't even know who he is.

4       Q.    So I'm going to ask my question

5    again.

6       A.    All right.

7       Q.    I'll ask you to listen to it and

8    answer the question that I've asked, which is:

9    Do you recall at the November 2nd, 2022,

10   restructuring committee meeting sitting through

11   a presentation by Mr. Delo about parties'

12   interest in connection with the Phoenix

13   manufacturing facility?

14          MR. FELDMAN:  Objection, form.

15          THE WITNESS:  Absolutely not.  As you

16       can see, there was major, major things on

17       the agenda for this day, and he writes

18       three short paragraphs comprised of about

19       40 words.  So it was of very little

20       importance, and, of course, I don't

21       remember.  And there's nothing -- there's

22       nothing substantial in what Mr. Delo

23       reports here.

24   BY MS. QUARTAROLO

25          Q.    But you understand from the first

1    page of this document, don't you, that you were

2    present for that meeting; correct?

3         A.   I may have been.  I don't know.

4    Let's see whose signature is on there.  I

5    remember, as you do, Amy, contesting the board

6    minutes and requesting that they be recorded and

7    you wouldn't let me.  Then I requested, because

8    the board minutes were faked by Latham Watkins

9    and manipulated to their agendas, that we have a

10   court reporter, and you wouldn't let me do that

11   either, would you?  Because you wanted to

12   recreate the record and the agenda.

13        Q.   Mr. Owoc, are you done?

14        A.   So I don't remember signing off on

15   any minutes, and you remember that was highly

16   contested.  One call we were waiting 20 minutes

17   with Jordi Guso about the recording because I

18   wouldn't give in to 34 of you who didn't want

19   the truth recorded.

20        Q.   Mr. Owoc, you were never asked to

21   sign minutes for the restructuring committee;

22   right?

23        A.   I was always asked to sign them.

24   They were sent to my emails all the time, and I

25   refused to sign them.  And I told you guys that

1    the minutes were fake on numerous occasions.

2    Read the minutes themselves, and if Latham

3    recorded them properly, you'll see that all

4    throughout the minutes.  And you do recall, Amy,

5    that I asked to record it because I said the

6    minutes were fake and I'm not signing it.  And

7    you wouldn't let me.  Jordi Guso blocked me,

8    blocked me from recording it.  Then I offered --

9              MS. QUARTAROLO:  So, again,

10         Mr. Feldman, I'm going to interject.

11              MR. FELDMAN:  Mr. Owoc -- Mr. Owoc,

12         please -- Mr. Owoc, please just stop.  Go

13         ahead, Ms. Quartarolo, please.

14    BY MS. QUARTAROLO

15         Q.    Respectfully, Mr. Owoc, you are not

16    allowed to testify to the content of

17    communications with the company's counsel.  We

18    will have to stop the deposition if you

19    continue.

20         A.    There are our communications.  I'm

21    saying that I asked for a meeting to be recorded

22    when everybody is on there.

23         Q.    You are continuing on and we can

24    move on.

25         A.    Attorney-client privilege is waived

```
 1        because there's 20 --

 2               MR. FELDMAN:  Mr. Owoc -- Mr. Owoc --

 3               THE WITNESS:  -- that are not

 4        attorneys, so it's not attorney-client

 5        privileged.  I asked to record them, and

 6        I asked for a court reporter and you guys

 7        refused.

 8           MS. QUARTAROLO:  Mr. Feldman, we need

 9           to take a break.

10           MR. FELDMAN:  Mr. Owoc -- Mr. Owoc,

11        please stop.  Ms. Quartarolo, please just

12        give me a moment.

13               Mr. Owoc, rather than debate

14        Mr. Quartarolo on this issue, please, if

15        she just indicates to you that these are

16        materials that they believe are subject

17        to attorney-client privilege, just please

18        respect the request and do not allude to

19        it.  Just say I cannot answer

20        comprehensively because there's materials

21        that refer to the privilege and just

22        let's move on, sir.  Okay?  Let's not

23        debate Ms. Quartarolo about whether or

24        not it is, in fact, privileged.

25
```

```
1    BY MS. QUARTAROLO

2              Q.    Are you ready, Mr. Owoc?

3              MR. FELDMAN:  Please proceed.

4              THE WITNESS:  Yes, ma'am.

5              MS. QUARTAROLO:  Can we -- let's pull

6         up a different document.  Let's do Tab 23

7         and we will have this be Exhibit 16.

8                   (Whereupon, OWOC Exhibit No. 16 was

9              marked for identification.)

10   BY MS. QUARTAROLO

11             Q.    This, for the record, is "Vital

12        Pharmaceuticals, Inc., and Certain Affiliates

13        and Subsidiaries Joint Special Meeting Board of

14        Directors/Managers" dated February 28, 2023,

15        bearing the Bates stamp VPX-BOD1004.

16                   Do you see this document on the

17        screen, Mr. Owoc?

18             A.    Yes.

19             Q.    And you see that your name is listed

20        as among the board members present.  Do you see

21        that?

22             A.    Yes.

23             Q.    Do you have any reason to believe

24        that you were not present at the February 28

25        meeting of the boards?
```

1        A.    I have no way of telling.  How would

2   I know?

3        Q.    Well, this document indicates it at

4   least; right?

5        A.    We've seen a lot of fraudulent

6   documents today, so, no, I don't agree with it.

7   And I don't believe I've seen it.  And where are

8   the rest of the minutes for this?  Where is the

9   rest of the information?

10       Q.    We'll get to the rest of the

11  information.  My question is:  Just -- well, I

12  guess sitting here today, do you recall being at

13  a February 28 board meeting?

14       A.    No.

15       Q.    Do you have any reason to believe

16  you were not at that board meeting?

17       A.    I don't have any reason to believe I

18  was at it.

19       Q.    So my question was different.  Do

20  you have any reason to believe that you were not

21  at that board meeting?

22       A.    Not -- I can't answer the question

23  because you won't accept my answer.

24       Q.    I actually think it's a very simple

25  question, and I will ask you to answer it.

1          A.     I can't recall being at the meeting.

2          Q.     Thank you.  Do you recall

3    discussions during board meetings about

4    diligence that would be provided as part of the

5    Phase II diligence process with bidders?

6          A.     Say that again.

7          Q.     Sure.  So let me break that down.

8    You understood that there were -- there was a

9    diligence process going on in connection with

10   potential bidders for the company's assets;

11   right?

12         A.     Yes.

13         Q.     And you also understood that there

14   was a Phase I process followed by a Phase II

15   process; correct?

16         A.     I understood?  I didn't understand

17   anything because the process was flawed.  I just

18   remember that there was about a list of a

19   hundred potential bidders and strategics that

20   the debtors and Rothchild and Huron burned

21   through with zero success.

22         Q.     So do you recall that there were

23   discussions at the board level about what

24   diligence materials should be provided to which

25   bidders?

1          A.    I don't recall.

2          Q.    Do you recall at the board level

3    discussions about particular materials that you

4    felt shouldn't be included -- should not be

5    provided to certain bidders?

6          A.    Yes, Monster Energy.

7          Q.    And so do you recall that there was

8    discussion at the board level about what

9    diligence materials should be provided?

10         A.    I told the board that once they gave

11   information to Monster Energy all strategics,

12   everybody would drop out.  And, once again, on

13   the board meeting, I was right because when

14   Cerberus had an indication of interest up to a

15   billion dollars plus equity, they dropped out

16   when they knew Monster had access to the data

17   room.  And when Monster started making all these

18   strange requests, because no one is going to

19   battle with Monster when they have all the

20   company inside information in the bidding

21   process.

22              And so as soon as Monster entered as

23   Eric Hillman and I told the other board members,

24   everybody dropped out and the bidding process

25   was pretty much over.

1          Q.    Can we scroll down to the page four

2     of this document, which bears the Bates stamp

3     1007.  And, Mr. Owoc, in the -- I guess it's the

4     fourth paragraph here.  It's the paragraph that

5     begins "third".  Do you see that paragraph?

6          A.    Yes.

7          Q.    And about halfway through that

8     paragraph, there's a sentence that starts

9     "Mr. Gray."  Do you see that?

10          A.    Yes.

11          Q.    And it says "Mr. Gray, echoing

12     Mr. Panagoes' question, expressed his concern

13     with the level of detail that would be shared.

14     Mr. Parkhill responded that production detail

15     would allow, redacted, to understand the

16     run-rate capacity of Phoenix facility."

17               Did I read that correctly?

18          A.    I can't comment on this or any other

19     document until reading the entire document, and

20     I'm hesitant to answer questions where there's

21     redactions in the document.

22          Q.    Okay.  So do you see the reference

23     to the Phoenix facility in that sentence?

24          A.    I would have to read the entire

25     document before I'm going to comment on it.

1      We've established this earlier.

2              Q.    If you would like to take a break

3      and read this document, I'm happy to accommodate

4      that.

5              A.    We don't need a break.  I'll read it

6      on the record.

7              Q.    I'm not going to let you burn time

8      on the record as you did before.

9              A.    This is -- I'm not burning time on

10     the record.  You're asking me to comment on

11     that -- on the document, and I have a right to

12     read it.  And I have the right to stay on the

13     record while I read it because it's my time.

14             Q.    If you insist on staying on the

15     record, I will reserve our right to go over the

16     seven hours.  I think this is an abuse of the

17     deposition process, but I'm happy to accommodate

18     you on or off the record to review any portions

19     of this document that you would like, but I will

20     get answers to my questions.

21             A.    I agree that this is an abuse of

22     this process, and you're the one abusing it by

23     not allowing me my right by law to read a

24     document before I'm going to comment on it.  So

25     I have to read the document, and I insist that

1    we stay on the record while I read it.

2                    And I still don't know if I'm going

3    to comment on it.  I would have to get

4    permission from my attorney because there are

5    certain things redacted, and I don't necessarily

6    want to comment on something where there's

7    redactions, especially in the exact paragraph

8    where you're asking me questions.

9        Q.    Sir, would you like time to review

10   this document?

11       A.    Absolutely.

12       Q.    Would you like to review it

13   separately, or would you like my colleague to

14   scroll down through the document to enable your

15   review?

16       A.    I could -- I would rather scroll

17   myself because I could go a lot faster.

18       Q.    I will ask my colleague to turn over

19   control of this document to you.

20       A.    Thank you.  I would like the text to

21   be just slightly smaller so that I can go

22   through it quicker.  Great.  Perfect.  Okay.

23   Let's see.

24           THE WITNESS:  Jonathan, I would

25       instruct you to read the second paragraph

1      down that says "Ninth."

2          MR. FELDMAN:  Sure.

3          THE WITNESS:  You notice there's

4      redactions in the second paragraph under

5      "Tenth" that are critical missing

6      information, Jonathan, that I need to be

7      able to comment on this document.

8          MR. FELDMAN:  Okay.

9          THE WITNESS:  We need to get the

10     unredacted version.

11             Please read the one under

12     "Financial Updates," Jonathan.

13         MR. FELDMAN:  Yeah.

14         THE WITNESS:  That's where they gave

15     false forecasts, which caused all the

16     bidders to drop out, one of the things.

17     They kept lowering the bid and lowering

18     the bid and still failed by 50 percent or

19     more causing a lot of interested parties

20     to head for the hills.

21             So here's the name, Jonathan, of

22     all the strategics that are interestingly

23     redacted.  Why would they be redacted?

24     What are they trying to hide?

25             I'm ready to go.

1    BY MS. QUARTAROLO

2         Q.    All right.  Great.  So let's scroll

3    back up to Page 4 bearing the Bates stamp 1007.

4    And in the same paragraph that we were just

5    looking at that starts "Third," we read a

6    sentence into the record in the middle of the

7    page that starts with "Mr. Gray," and then

8    there's a sentence that starts with

9    "Mr. Parkhill."  Do you see those sentences in

10   the middle of that paragraph?

11        A.    Start reading it and let me see.

12        Q.    It says, again, for the record,

13   "Mr. Gray, echoing Mr. Panagoes' question,

14   expressed his concern with the level of detail

15   that would be shared.  Mr. Parkhill responded

16   that production detail would allow, redacted, to

17   understand the run-rate capacity of the Phoenix

18   facility."  Do you see that?

19        A.    Yes.

20        Q.    Did I read that correctly?

21        A.    Yes.  I don't understand what it

22   means because there's redaction.

23        Q.    You do not dispute that these

24   minutes indicate that there was discussion about

25   the Phoenix facility during this board meeting;

```
1    correct?

2              MR. FELDMAN:  Objection.

3              THE WITNESS:  About run rate, yes.

4        Nothing about ownership.

5    BY MS. QUARTAROLO

6         Q.    But the run-rate capacity of the

7    Phoenix facility; correct?

8         A.    Yeah.  That has nothing to do with

9    ownership.

10        Q.    And you understand that this was

11   part of the broader discussion about what

12   diligence materials would be provided to

13   potential bidders; correct?

14        A.    I do not and there's redactions as

15   well.

16        Q.    So you don't understand that?

17        A.    No.  I do not.

18        Q.    Okay.  So let's turn to the next

19   page, and under the paragraph that starts

20   "Ninth," you see that that reads -- excuse me,

21   "Ninth, Mr. Metzger introduced the Phoenix Plan

22   Production Analysis, and Mr. Burke and

23   Mr. Metzger provided a summary of the same."  Do

24   you see that?

25        A.    Yes.
```

1          Q.    And so you don't dispute that these

2     board minutes reference that there was a

3     discussion about the Phoenix Plan Production

4     Analysis in connection with what diligence

5     materials would be provided to potential

6     bidders; right?

7               MR. FELDMAN:   Form.   Go ahead.

8               THE WITNESS:   Mischaracterization.   I

9          don't read all of that that you read into

10         it, and there's redactions.   And so it's

11         difficult to comment, and this has

12         nothing, again, to do with ownership or

13         sale or anything like that.

14    BY MS. QUARTAROLO

15         Q.    And I'm not asking about ownership,

16    sir.   I'm just asking what the minutes reflect

17    in terms of there being discussion about the

18    Phoenix Plan Production Analysis.   Do you see

19    that?

20         A.    The minutes -- the minutes say what

21    they say.   Did I sign these minutes?

22         Q.    Let's go down to the board meeting

23    presentation, which bears the Bates number 1021.

24    Have you seen this document before, sir?

25         A.    Did I sign off on these minutes?

1      **Q.**    I'm just going to ask you a

2    question.  You're welcome to look at the

3    signatures on these documents.  These were

4    documents that were produced in the Chapter 11

5    cases.

6      **A.**    I need to see the signatures on the

7    documents to know what I'm commenting on.

8      **Q.**    Okay.  So I'm happy to show you a

9    signature block.  Let's scroll up to the

10   signature page.  So it says "At the joint

11   meeting of the Board held on May 15, Board

12   Members Steven Panagoes, Bob Dickinson, and

13   Stephen Gray approved and Acting Secretary of

14   the Board ratified the minutes of the foregoing

15   meeting of the board held on February 28, 2023."

16   Do you see that?

17     **A.**    So, interestingly, that the shell

18   board members, that were forced on us by the

19   bank, approved this, and Eric and I -- they

20   violated their fiduciary agreement because it's

21   always supposed to be five board members act in

22   unison.  And Eric and I aren't on here, and

23   they're also supposed to sign these board

24   minutes, sign -- sign off on them with the

25   DocuSigns and Adobe that was passed around.  And

 1     there's no signatures.  So this is as useless as

 2     the paper it's written on it.  It has

 3     redactions, and it's tough to comment on.

 4          **Q.**   Mr. Owoc, you understand that board

 5     members are permitted to vote to approve board

 6     meeting minutes; right?

 7          MR. FELDMAN:  Objection, form.

 8          THE WITNESS:  I understand that the

 9          fiduciary responsibility of the board is

10          that all five members have to act in

11          unison and approve things and disapprove

12          things, and that was rarely the case.

13 BY MS. QUARTAROLO

14          **Q.**   All right.  So let's go back down

15     to --

16          **A.**   As you can see here, where is --

17     where is the approval by Eric and I?  It's not

18     on there.  And so the document speaks for

19     itself, and it does not speak in your favor.

20          **Q.**   All right.  Let's go back down to

21     the document bearing the Bates stamp 1021.

22          And, Mr. Owoc, do you recall seeing

23     this board presentation providing expert -- an

24     update on expert session scheduling in

25     connection with the sale process?  Do you recall

1    that?

2         A.    No, I don't recall it, and I didn't

3    sign it.

4         Q.    Well, you would never sign a board

5    presentation, would you?

6         A.    I would have -- I would have

7    authorized this, just like the other three board

8    members did.

9         Q.    Do you have any reason to believe

10   that you did not receive a copy of this board

11   presentation?

12        A.    Absolutely.  Why are -- why are

13   three out of the five board members on there and

14   I'm not on there?

15        Q.    Do you see under Number 1 on the far

16   left there's a series of numbered items.  Do you

17   see that on this page?

18        A.    Yes, ma'am.

19        Q.    And you see Number 10 lists "Arizona

20   facility site visit."  Do you see that?

21        A.    On the document that I never saw

22   before, yeah.

23        Q.    And it listed that there was an

24   Arizona facility site visit, and the date is

25   listed as February 15, 2023.  Do you see that?

1          A.     What is a site visit?

2          Q.     Do you understand that in connection

3     with the sale process there were certain site

4     visits that were scheduled for bidders to see

5     the facilities that they would be purchasing

6     from the debtors?

7          A.     Absolutely not.  I would have put a

8     stop to it immediately, and that's why they

9     didn't include me on here because it's a big

10    fraud, as you can see.  And thank you for

11    proving that, that only certain board members

12    knew.  And they purposely cut me out.

13               Jonathan, please make a note of that

14    fraud.

15         Q.     And you see that in the last-hand

16    column -- the last column under "Status," it

17    listed that that Arizona facility site visit is

18    listed as completed.  Do you see that?

19         A.     Yes, ma'am.  But what is a site

20    visit?  You don't know, do you, as we sit here

21    today?

22         Q.     Mr. Owoc, is it your testimony that

23    you are unaware, as the debtors CEO, that

24    bidders were visiting the Arizona facility?

25         A.     Yes, because Latham Watkins and



1        Berger Singerman and the board was corrupt and

2        they kept it from me.  Absolutely.

3              Q.    Let's take this document down.

4              MR. FELDMAN:  Ms. Quartarolo, if

5        you're about to start your next topic, if

6        you don't mind, can we just take a --

7        let's say a five-minute break and just

8        come back at 3:30 if that's okay?

9              MS. QUARTAROLO:  Fine with me.

10             THE WITNESS:  How about a ten-minute

11       break.

12             MR. FELDMAN:  All right.  That's fine.

13             THE WITNESS:  Actually, I need a

14       15-minute break.

15             MR. FELDMAN:  Okay.  So

16       Ms. Quartarolo, 3:40, is that okay?

17             MS. QUARTAROLO:  That's fine.

18             MR. FELDMAN:  Thank you so much.

19             THE VIDEOGRAPHER:  Off the record at

20       3:26.

21                 (Whereupon, a brief recess was

22             taken.)

23             THE VIDEOGRAPHER:  Back on the record

24       at 3:43.

25

1   BY MS. QUARTAROLO

2           Q.   Mr. Owoc, did someone join you in

3      the room?  I think you're on mute, sir.

4           A.   No one joined me in the room.  My

5      son just walked by and I waved to him.

6           Q.   Is anyone else in your family

7      present in the home with you today?

8           A.   I don't know.  It's a pretty big

9      home.  They may or may not be.

10          MS. QUARTAROLO:  Mr. Owoc, I'm going

11          to show you another document.  I'll ask

12          that Tab 16 be brought up.  We will mark

13          this as Exhibit 17.

14              (Whereupon, OWOC Exhibit No. 17 was

15              marked for identification.)

16   BY MS. QUARTAROLO

17          Q.   Mr. Owoc, do you see the document on

18      the screen?

19          A.   Yes.

20          Q.   Just for the record, this is titled

21      "Declaration of John H. Owoc in Support of

22      Motion to Dismiss Chapter 11 Bankruptcy of

23      Debtor JHO Real Estate Investment, LLC," and it

24      is Docket No. 1520.  Do you see that?

25          A.   Yes.

1    Q.    Are you familiar with this document?

2    A.    Yes.

3    Q.    Let's scroll down to the last page.

4    Is that your signature?

5    A.    That looks like a proper wet ink

6    signature.  I think so.

7    Q.    And you recognize that as your

8    signature?

9    A.    Yes.

10    Q.    Do you know who drafted this

11    document?

12    A.    No, I don't.

13    Q.    Did you draft it?

14    A.    No, I did not.

15    Q.    Do you know when it was drafted?

16    A.    No, I do not.

17    Q.    Did you review this document before

18    signing?

19    A.    Yes, I did.

20    Q.    And did you make an effort to ensure

21    all of the statements in this declaration were

22    true and accurate?

23    A.    I go by my attorney's

24    recommendation, and I would never knowingly sign

25    something that was not true and accurate.

1          **Q.**   Great.  If we scroll back up, let's

2     actually look at Page 2, and I will direct your

3     attention to Paragraph 7 of this declaration.

4          **A.**   I'm going to need to read it real

5     quick, please.

6          **Q.**   Take your time.

7          **A.**   Can I have access to the cursor,

8     please?  Can somebody make this bigger or tell

9     me how to do it?  Wait, I think I see.  All

10    right.  Thank you.  And then access to the

11    cursor, please.  Okay.  Good.

12         **Q.**   Are you finished reading, Mr. Owoc?

13         **A.**   Yes, ma'am.

14         **Q.**   Since you took such a careful review

15    of this document, is there anything in this

16    document that you believe is in any way

17    inaccurate?

18         **A.**   State the question again so I can

19    give you a yes or no answer.

20         **Q.**   Is there anything in this

21    declaration that you believe is in any way

22    inaccurate?

23         **A.**   No.

24         **Q.**   Can we turn to Paragraph 7 on

25    Page 2.

```
 1          A.     To the best of my knowledge, I

 2     believe it's accurate.  Can you make that a

 3     little bigger?  It looks like you're straining.

 4          Q.     I'm straining?

 5          A.     Yes.  Well, yes.

 6          Q.     I'm good.

 7          A.     You look like it.  You're leaning

 8     towards the computer.

 9          Q.     Paragraph 7 starts "I did not

10     discover that JHO Real Estate was a party to the

11     bankruptcy until recently in late April 2023."

12     Do you see that?

13          A.     Yes.  I've repeatedly said that in

14     today's deposition.

15          Q.     And you did say recently, and then

16     you declined to give me an estimate.  So I --

17     based on this, my question for you is:  Is it

18     your testimony that you learned that JHO Real

19     Estate was a party to the bankruptcy in late

20     April 2023?

21          A.     To the best of my knowledge, yes.

22          Q.     And it continues on to reference one

23     of your attorneys.  Do you see that?

24          A.     Where is that, please?  Can you put

25     the cursor there, please?
```

1     Q.    It's the second clause.

2     A.    Maybe highlight that in yellow.

3     Q.    The second clause of that first

4  sentence.  Do you see that?

5     A.    Yes.  Let me read it, please.

6           Yes.

7     Q.    Which attorney are you referring to

8  there?

9     A.    I don't know.

10    Q.    These are your words, sir; correct?

11    A.    Correct.

12    Q.    And you just confirmed their

13  accuracy; correct?

14    A.    Correct.

15    Q.    So you don't know which attorney

16  you're referring to in this sentence?

17    A.    Correct, Amy.  That's what I said,

18  yes.

19    Q.    Do you know which law firm you're

20  referring to?

21    A.    No, ma'am, I don't.

22    Q.    Mr. Owoc, which of your attorneys

23  was charged with looking into the ownership of

24  the JHO Real Estate's sole asset?

25    A.    I don't know.  Maybe it's in this

1    document and you can point that out.

2          Q.   No.  It's not.  And so that's why

3    I'm asking you a question.

4          A.   I don't know.

5          Q.   And you say that it was pointed out

6    to you that the Phoenix facility was owned by

7    JHO Real Estate and that JHO Real Estate was a

8    debtor in this proceeding.  Do you see that?

9          A.   Yes.

10         Q.   So who pointed that out to you?

11         A.   I can't recall.

12         Q.   Do you know if it was orally or in

13   writing?

14         A.   I can't recall.

15         Q.   Do you have any documents that show

16   when that was pointed out to you?

17         A.   Not that I'm aware of.

18         Q.   Did you look for any documents that

19   would show when that was pointed out to you?

20         A.   No, I did not.  The debtors have

21   most of my documents.

22         Q.   You do have text messages, sir;

23   right?

24         A.   Yes.

25         Q.   Did you look for text messages that

1    showed when you were first made aware of when it

2    was pointed out to you that the Phoenix facility

3    was owned by JHO Real Estate?

4         A.    I did not.

5         Q.    And if we look next to paragraph 8,

6    it says "I was not represented by Paul Battista

7    until after the petition was filed."  Do you see

8    that?

9         A.    Yes, ma'am.

10        Q.    That's an inaccurate statement,

11   isn't it?

12        A.    I don't know.  Give me the dates and

13   let me confirm them for you.  I believe that

14   everything, to the best of my knowledge, in this

15   document is accurate.

16        Q.    Well, we looked at the September 29

17   board meeting minutes, correct, and Mr. Battista

18   was in attendance as your counsel; correct?

19        A.    What date was that, ma'am?

20        Q.    September 29, 2022.

21        A.    I don't know.

22        Q.    Do you not remember when you engaged

23   Paul Battista as your counsel?

24        A.    Absolutely not, ma'am.  I'm working

25   with seven firms and maybe up to 11 firms during

1    this process.

2          Q.    You understand that the petition

3    that you're referring to in this sentence, that

4    was filed on October 10 of 2022; right?

5          A.    Refresh my memory what a petition

6    is.

7          Q.    Chapter 11 petition, sir, is the

8    operative document that initiates a bankruptcy

9    case and is filed with The Court.  You

10   understand that the debtors filed for bankruptcy

11   on October 10?  We established that earlier.  Do

12   you understand that?

13         A.    If we established that earlier, I

14   understand it.  When was Paul Battista hired?

15         Q.    So my question is do you know

16   sitting here?

17         A.    No, I don't.

18         MS. QUARTAROLO:  Let's look at --

19         let's pull up Tab 17, which I guess is

20         now Exhibit 18.

21              (Whereupon, OWOC Exhibit No. 18 was

22              marked for identification.)

23         THE WITNESS:  Is this a new exhibit?

24   BY MS. QUARTAROLO

25         Q.    It is.  We'll come back to that one,

1    sir, but this is going to be a new exhibit.

2         A.    Please make that about twice as big.

3         Q.    So before you jump there, let me

4    just state the document for the record.  So this

5    is a document that is entitled "Payment Details"

6    with some wire transfers, and it bears the Bates

7    stamp VPX-JHO1013.  Now we can blow it up for

8    you.

9         A.    Is this the document in its

10   entirety?

11        Q.    It is not.  And I'm happy to -- we

12   can facilitate your review by giving you access

13   to and control over it so you can scroll at your

14   leisure.

15        A.    All right.  So I'm supposed to be

16   scrolling through this?

17        Q.    If you would like to.

18        A.    Well, it depends what questions

19   you're going to ask me.

20        Q.    Would you like me to just direct you

21   and ask you questions and you can look at it as

22   you would like?

23        A.    Yeah.  I'll determine whether I need

24   to read the whole thing or not.

25        Q.    Okay.  So I guess first is:  Do you



1    recognize this document?

2          A.    No.

3          Q.    In the top right in the box labeled

4    "Beneficiary," do you see that?

5          A.    Yes, ma'am.

6          Q.    And it names Genovese Joblove and

7    Battista Trust Account.  Do you see that?

8          A.    Yes.

9          Q.    And that was Paul Battista's or was

10   Paul Battista's, at the time, law firm; is that

11   correct?

12         A.    Correct.

13         Q.    And the date on this document, if

14   you look at the left-hand column, lists a

15   transaction date of September 30, 2022.  Do you

16   see that?

17         A.    The extracted date?

18         Q.    I think there's -- well, there's

19   multiple dates that refer to September 30

20   throughout this page.

21         A.    Correct.  I see that, yes.

22         Q.    Okay.  And so the retainer amount

23   here or credit amount in the left-hand column is

24   $100,000.  Do you see that?

25         A.    Yes.

1          Q.    And was that the amount that was

2     paid to Mr. Battista's law firm in connection

3     with his engagement as counsel?

4          A.    Yes.

5          Q.    And if we look at page, I guess,

6     Bates-stamped 1015, do you recognize this

7     document?

8          A.    Not really.

9          Q.    Feel free to take a look at it if

10    you would like.

11         A.    All right.  Let's make it about

12    20 percent bigger, please.  You can go all the

13    way to the third paragraph, please.  I think you

14    jumped to the last paragraph.  Right there is

15    good.  I'll just read this.  All right.

16         Q.    Do you recognize this document, sir?

17         A.    I don't recognize it, but that

18    doesn't mean I didn't see it.  So it's just a

19    normal engagement letter.

20         Q.    Okay.  And if we scroll back up to

21    the first page of that engagement letter on

22    1015, do you see in the -- let's stop moving for

23    a second.  In the end of the fourth line down,

24    it references JHO Real Estate Investment, LLC.

25    Do you see that?

1        A.    Yes, ma'am.

2        Q.    And the full sentence says "I am

3    pleased that you have decided to engage Genovese

4    Joblove & Battista, PA, to represent and advise

5    you in connection with your roles and interest

6    in respect of (i) each of" -- and there's a list

7    of entities, and among that list is JHO Real

8    Estate Investment, LLC; correct?

9        A.    Correct.

10        Q.    And it continues on to note "As they

11    negotiate to resolve issues with their senior

12    secured creditors and in the event they decide

13    to file Chapter 11 bankruptcy cases."  Do you

14    see that?

15        A.    Yes, I do.

16        Q.    Do you believe that you read this

17    letter on or about the time that you engaged

18    Mr. Battista as your counsel?

19        A.    I can't recall reading it.

20        Q.    Do you believe you received it?

21        A.    I don't know.  You control all my

22    emails, Amy.

23        Q.    Do you have any reason to believe

24    you did not receive it?

25        A.    Did you turn those responsive emails

1    over to us so that I can answer that question?

2            Q.   So you can't answer that sitting

3    here today?

4            THE WITNESS:  Jonathan, do you

5            remember if we got the responsive emails

6            in relation to Paul Battista that the

7            debtor now has in their possession?

8            MR. FELDMAN:  Sure.

9            THE WITNESS:  I don't remember it, but

10           he was supposed to resolve the issues.

11           Please put that back to the same size I

12           was reading it.  Thank you.

13               In the event they decide to file

14           Chapter 11, Paul was instructed very

15           specifically, and you know this by the

16           email the debtors hold, that not to allow

17           them to file Chapter 11 bankruptcy on any

18           of these properties, especially JHO.  But

19           as I pointed out earlier, Battista failed

20           miserably.  He was a malpractice

21           nightmare, and I said so in

22           documentations.

23               But I do question, Jonathan, why

24           their documents are attorney-client

25           privilege but mine are not.

```
 1   BY MS. QUARTAROLO
 2          Q.   So, Mr. Owoc, this letter is
 3   dated --
 4          A.   Can you answer that question,
 5   Jonathan, for me?
 6          Q.   Sir, the questions are going to be
 7   directed to you, and the sooner that we get on
 8   board with that, the sooner we can get through
 9   this deposition.
10          A.   Well, this deposition is likely to
11   carry on for several days, and I have the
12   physical and mental stamina to go as long and as
13   late as you want.
14          Q.   I have no doubt.  So my question for
15   you, sir, is this letter from Mr. Battista to
16   you is dated September 29, 2022; correct?
17          A.   Correct.
18          Q.   And looking at -- scroll out just a
19   bit so I can see the Bates numbers, please.
20   Yeah, stay on this page.
21          A.   Can you page down to the bottom of
22   the page, please, to see if I signed this.
23   Yeah, that's exactly what I thought.
24          Q.   I'm sorry.  What did you mean by
25   that?
```

```
1              A.    I didn't sign it.

2              Q.    But you don't dispute that you, in

3    fact, engaged Mr. Battista as your counsel;

4    right?

5              A.    That's questionable.

6              Q.    You understand that he filed a

7    notice of appearance in the bankruptcy cases as

8    your counsel; correct?

9              A.    But did he ever appear?  Did Justin

10   Luna ever appear?  Did they not show up for

11   court?

12             Q.    Sir, my question for you is very

13   simple.  Are you aware that Mr. Battista filed a

14   notice of appearance as your counsel in the

15   Chapter 11 cases?

16             A.    I'm not aware that he filed a notice

17   of appearance, no.  I believe that he acted in

18   gross malpractice and didn't do anything.  In

19   fact, when our attorneys asked him what

20   documents he had, he had no documents after

21   supposedly working with me for a month and

22   running up the bill.

23             Q.    And at the beginning of this letter,

24   you agree that this letter is addressed to you;

25   correct?
```

1          **A.**    Correct.

2          **Q.**    And the first sentence reads "It was

3     a pleasure meeting and speaking with you today."

4     Do you see that?

5          **A.**    Yes, ma'am.

6          **Q.**    And so you agree that you met with

7     and spoke with Mr. Battista on September 29,

8     2022?

9          **A.**    I do not agree.

10         **Q.**    What do you not agree with?

11         **A.**    Where does it say that I met with

12    him on that day, or are you just making things

13    up, Amy, like you normally do?

14         **Q.**    Sir, I would urge you to be

15    respectful.

16         **A.**    Where does it say that I met with

17    him on that date?

18         **Q.**    Okay.  I'm going to ask you to read

19    aloud the first sentence of this letter.

20         **A.**    "It was a pleasure meeting and

21    speaking with you today."  That doesn't

22    necessarily mean on this date of this letter.

23         **Q.**    What do you think it means if it

24    doesn't mean that?

25         **A.**    I don't know what it means.  You can

1    ask Paul Battista.

2         Q.   And it says "I am pleased that you

3    have decided to engage Genovese Joblove &

4    Battista, PA."  Do you see that?

5         A.   Yes, ma'am.

6         Q.   And so by September 29 of 2022, you

7    had decided, Jack Owoc, to engage with

8    Mr. Battista and his firm to represent you as

9    counsel?

10        A.   Mischaracterization.  The document

11   is not signed as you can see below.

12        Q.   Do you believe that that is an

13   inaccurate statement?

14        A.   I believe it's a mischaracterization

15   of the document below that's not signed.

16        Q.   Okay.  That has nothing to do with

17   the question.  I'm asking you do you believe

18   that is a correct statement?

19        A.   Asked and answered.

20        Q.   Okay.

21        A.   Refer to previous --

22        Q.   It's not your place to interpose

23   objections, sir.

24        A.   It's not -- I didn't interpose an

25   objection.  I'm not an attorney.  Asked an

1    answered just simply means I asked and answered

2    the question.  I don't raise objections.

3              **Q.**   Right.

4              **A.**   I don't get paid $2,200 an hour.

5              **Q.**   Right.

6              **A.**   Thank you.

7              **Q.**   It says "I am pleased that you have

8    decided to engage Genovese Joblove & Battista."

9    So my question for you, sir, again is:  As of

10   September 29, 2022, had you decided to engage

11   Paul Battista and his firm to represent you as

12   counsel?

13             **A.**   I don't know.

14             **Q.**   Did you ever tell Mr. Battista that

15   you disagreed with this statement in the letter?

16             **A.**   I don't know.

17             **Q.**   Did you ever tell anyone else that

18   you disagreed with the statement in the letter?

19             **A.**   I don't know.  I can't recall.

20             **Q.**   Do you agree that the company on

21   your behalf paid $100,000 to Mr. Battista's law

22   firm in connection with this engagement as your

23   counsel?

24             **A.**   I cannot confirm or deny that.

25             **Q.**   If you look at that first page under



```
1    Romanette (ii), which is, I guess, three or four
2    lines up from the bottom?
3             A.   I don't understand Romanette.
4             Q.   Sorry.  If you don't understand
5    that.  It is where there's, in parentheses, two
6    small Roman numerals.  I refer to those as
7    Romanettes, but some people refer to them
8    differently.
9             A.   Thank you.
10            Q.   Do you see that?
11            A.   Yes.
12            Q.   Okay.  So I want to focus on that
13   clause of this sentence, and it references
14   certain other entities owned and/or controlled
15   by you that are not expected to file Chapter 11
16   bankruptcy cases.  Do you see that?
17            A.   Yes, ma'am.
18            Q.   Which entities are those?
19            A.   I don't know.
20            Q.   Did you ever --
21            A.   I have to read this.  Let me read
22   this, please.
23                 So Paul Battista is saying that
24   these are not expected to file Chapter 11 and he
25   indicates that he's going to fight this
```

1    consistent with the rules of professional

2    responsibilities which govern all attorneys.

3           So he's -- I think he's contesting

4    in this statement all of these and maybe some

5    additional entities of which he did not name

6    because he is probably new on the case.

7        Q.   And so that's what you take this

8    clause to mean?

9        A.   Absolutely.

10       Q.   And so when this says "certain other

11   entities," what entities do you believe this

12   letter is referring to by "certain other

13   entities"?

14       A.   I don't know.

15       Q.   As of September 29, 2022, did you

16   expect JHO Real Estate to file for Chapter 11

17   protection?

18       A.   Absolutely not.  It never had to

19   file because we had an offer that Rothchild

20   queered for 2.3 billion dollars from KDP,

21   another offer from Cerberus for a billion plus

22   equity, Jade Silver, Lewis Lluberas, and Frank

23   McCormack repeatedly saying that this sale was

24   going to cause generational wealth, them giving

25   a hundred million dollar book financing based on

```
1    the fact that the enterprise value of Vital

2    Pharmaceuticals alone was so great.

3              So I would never sell that Phoenix

4    facility.

5         Q.   Are you done?

6         A.   Yes, ma'am.

7         Q.   Let's take this document down.

8    Actually, hold on.  Before we -- put it back up

9    for a second.  Sorry, Joe.

10             If you scroll down to the page that

11   is 1020, Mr. Owoc, do you see this email at the

12   top from Sury Rodriguez?

13        A.   Yes, ma'am.

14        Q.   And who is Sury Rodriguez?

15        A.   I think you know who she is because

16   you guys deposed her.

17        Q.   I'm asking you, sir.  Who is --

18        A.   Right here it says vice president of

19   finance, that you can clearly see as well as

20   everybody else.

21        Q.   And you know that that was her

22   position at the time; correct?

23        A.   Can you blow that up for Amy to look

24   at, please, the title there.  Yes, vice

25   president of finance.
```

1      Q.    And do you see that she writes here,

2   "please send $100,000 retainer to Jack's

3   personal attorney that is approved by the bank."

4   Do you see that?

5      A.    Yes, ma'am.

6      Q.    And this was sent on sent September

7   30, 2022, this email?

8      A.    The email was sent, yes.

9      Q.    So did you instruct anyone to have

10   this amount paid to Mr. Battista?

11      A.    I don't know.  I can't recall.

12      Q.    Let's scroll down to the next page.

13      A.    If you're going to be showing me

14   email chains, start from the beginning of the

15   chain and let me read the whole chain prior to

16   answering questions, please.

17      Q.    You're welcome to look at any

18   portion of this document, sir, that's been

19   offered to you.

20      A.    No, it hasn't.

21      Q.    Can you scroll down, please.  Right

22   here.  Do you see the email?

23      A.    So are you saying that the Paul

24   Battista engagement letter and a bunch of

25   attached emails is all one document?

1      **Q.**    Indeed, I am.

2          **A.**    I find that very strange, so I need

3      to see the whole document from beginning to end.

4      If it's an email chain, that probably means

5      starting at the bottom.

6          **Q.**    Okay.  So why don't we give Mr. Owoc

7      access to this document again, and he can look

8      at it for himself.  Let us know when you're

9      ready to answer questions, sir.

10          MR. TERESI:  I just handed control

11          over to Mr. Owoc.

12          THE WITNESS:  I don't have control.

13          MR. TERESI:  Let's try it again.  You

14          should have it now.

15          THE WITNESS:  All right.  All right.

16          Go ahead, please.

17      BY MS. QUARTAROLO

18          **Q.**    All right.  Let's take back control

19      of document so we can scroll.  And scroll back

20      down to the page Bates-stamped 1021.

21              Mr. Owoc, do you see that email from

22      Paul Battista to you dated September 29 of 2022?

23          **A.**    Yes.

24          **Q.**    And do you recall receiving that on

25      September 29?

```
 1              A.   No, I do not.

 2              Q.   Do you have any reason to believe

 3      that you didn't receive that document, this

 4      email?

 5              A.   I can't recall.

 6              Q.   Sir, I'm asking whether or not you

 7      have any reason to believe one way or the other.

 8      I don't think "I don't recall" is a responsive

 9      answer, so I'm going to ask the question again.

10      Do you have any reason to believe that you did

11      not receive this email on or about September 29?

12              MR. FELDMAN:  Objection to form.

13              THE WITNESS:  I can't recall.

14   BY MS. QUARTAROLO

15              Q.   It's a yes or no question.

16              MR. FELDMAN:  Objection to form.

17              THE WITNESS:  I can't recall.

18   BY MS. QUARTAROLO

19              Q.   What is it that you can't recall,

20      sir?

21              A.   Whether or not I received it.

22              Q.   And so that's a different question

23      that you answered, and so my question is, do you

24      have any reason to believe that you didn't

25      receive this email?
```

1          **A.**    I can't recall.

2          MS. QUARTAROLO:  Counsel, if the

3    client -- if your client is going to

4    continue this nonsense, we'll stop the

5    deposition and resume on Monday.

6          THE WITNESS:  Let's stop.

7          MS. QUARTAROLO:  These are really,

8    really simple questions.

9          THE WITNESS:  If you threaten, let's

10   do it.  Go Monday, Tuesday, whenever you

11   want.

12         MS. QUARTAROLO:  It's not a threat,

13   sir.

14         THE WITNESS:  I think you need to

15   regroup, Amy, anyhow, and get some

16   substantive questions for the deposition,

17   maybe do a little more homework.

18         MR. FELDMAN:  Mr. Owoc --

19         THE WITNESS:  I really do.  I'm

20   willing to go all night.  She wants to

21   force me to answer a question.  If you

22   want to put your own answers, answer your

23   own questions, Amy.  If you want my

24   answer, I'll give you my answer.  If you

25   want your answer, then just answer your

```
 1              own questions.
 2                  MR. FELDMAN:  Ms. Quartarolo, to your
 3              point that you were just trying to make
 4              right now, I think his answer is actually
 5              responsive.  If he doesn't recall, he
 6              doesn't recall, and he's stated that a
 7              couple times now.
 8     BY MS. QUARTAROLO
 9          Q.    Mr. Owoc, do you have any basis to
10     believe that you did not receive this email from
11     Mr. Battista?
12          A.    I can't recall.
13          Q.    The email itself, it says "per our
14     discussion today."  Do you see that?
15          A.    No, I don't.
16          Q.    Can we highlight that for him?
17          A.    Yes, I see it.  I see it.
18          Q.    Is it correct that you had a
19     discussion with Paul Battista on September 29 of
20     2022 about engaging him as your counsel?
21          A.    I can't recall.
22          Q.    The -- it also says in the second
23     paragraph there "If this is acceptable to you,
24     then please sign and return to me."  Do you see
25     that?
```

1          A.    Yeah.  And I didn't sign and return

2     it, did I?

3          Q.    Well, certainly, the version that we

4     looked at did not include your signature, but my

5     question for you is:  Do you believe that you

6     ever signed that document?

7          A.    I can't recall.

8          Q.    You don't know one way or the other?

9          A.    I can't recall.

10        MS. QUARTAROLO:  And let's take that

11            down and bring up Tab 18, which will be

12            Exhibit 19.

13                (Whereupon, OWOC Exhibit No. 19 was

14                marked for identification.)

15    BY MS. QUARTAROLO

16         Q.    Mr. Owoc, have you seen this

17    document before?

18         A.    Let me move this.

19         Q.    And just for the record, this is

20    titled "John Owoc's Privilege Log Dated July 6,

21    2023."

22         A.    I have not seen this document

23    before.

24         Q.    You've never seen this?

25         A.    Never seen it.

1          Q.    Do you understand what a privilege

2     log is?

3          A.    No, I don't.

4          Q.    Do you understand that your counsel

5     withheld certain documents on the basis of

6     privilege?

7          A.    No, I don't understand that.

8          Q.    Let's scroll to the next page.  And

9     so I'm going to point you to numbers 36 through

10    38.  Do you see that?

11         A.    Yes.

12         Q.    And so this is referencing three

13    documents that were withheld on the basis of

14    privilege that are dated October 1st, 2022.  Do

15    you see that?

16         A.    Yes.

17         Q.    Mr. Owoc, was Paul Battista serving

18    as your counsel on October 1st of 2022?

19         A.    I don't know.  I can't recall.

20         Q.    Do you know what your attorney's

21    basis to withhold these documents was?

22         A.    You would have to ask him.

23         Q.    We will do so.

24               Let's turn back to Tab 16, which is

25    Exhibit 17.  I want to direct your attention to

1    Paragraph 11.

2         A.    What document is this?

3         Q.    This is your declaration, sir.

4         A.    Okay.

5         Q.    And the very last sentence of

6    paragraph 11 -- I believe we can highlight that

7    for you to make it easier.

8         A.    Appreciate it.

9         Q.    It says "The Phoenix facility is

10   worth substantially more than the purchase

11   price."  Do you see that?

12        A.    Yes, ma'am.

13        Q.    What purchase price are you

14   referring to?

15        A.    The price that was paid for the

16   facility.

17        Q.    And remind everyone what price was

18   that?

19        A.    Well, it says that in No. 11, JHO

20   Real Estate paid 47.9 million.

21        Q.    And what is the basis for your

22   belief that the Phoenix facility is worth

23   substantially more than 47.9 million?

24        A.    I believe running three 8-hour

25   shifts a day, the Phoenix facility could produce

1    70 million, 12-count cases.  So if you look at

2    about $3.50 tolling fee per cases, what do you

3    got there, Jonathan, 210,000,000?

4         MR. FELDMAN:  Give or take.

5         THE WITNESS:  Plus another 21, that's

6         two-point -- 230,000,000, close to about

7         250,000,000 in revenue a year, probably a

8         profit on that is about a 200 million

9         dollar EBITDA.  That would make that

10        facility selling EBITDA for about eight

11        times, about 1.6 billion it's probably

12        worth.  Quick math, though.

13   BY MS. QUARTAROLO

14        Q.    Sorry.  1.6 billion with a B?

15        A.    Yeah, with a B, yes.

16        Q.    Have you ever had an appraisal for

17   that property done?

18        A.    No, ma'am, I haven't.

19        Q.    And you're not an appraiser; right?

20        A.    I don't have to be an appraiser.  I

21   just gave you the figures of net worth and how

22   things are traded in our industry.

23        Q.    So my question for you is very

24   simple.  You're not an appraiser by trade;

25   correct?

1      **A.**    You know, I have to restate that

2    too.  So the facility today because it was built

3    up with Red Bull there, Monster now, White Claw,

4    everything like that.  We paid 47, but it's

5    probably worth at least a hundred.  So, yeah,

6    that facility is probably -- would sell to

7    somebody in the beverage industry or someone

8    wanting to get in, it could sell for closer

9    probably maybe one-and-three-quarter billion.

10            It's a turnkey facility that has the

11   capabilities, as you read earlier from John

12   DiDonato, to produce 3,600 cans a minute.  Those

13   are blistering speeds.  Two full pallets out the

14   door every single minute robotically palletized.

15   And it's faster than any Coke, Pepsi, KDP

16   facility I ever visited, and it's far more

17   efficient and ten times cleaner.  So, yeah,

18   we're approaching for the right buyer 2 billion,

19   somewhere between 1.5 and 2 billion probably.

20      **Q.**    Are you done?

21      **A.**    Am I an appraiser?  No, but it's

22   just very simple mathematics.

23      **Q.**    Okay.  So we've established you're

24   not an appraiser; correct?

25      **A.**    No.  Last time I checked, I wasn't



1    an appraiser.

2         Q.   And you have no special skills in

3    valuing properties; correct?

4         A.   Yes.  I have a lot of special

5    skills.  I made hundreds of millions of dollars

6    in real estate that I turned over to the bank.

7    That's pretty special.

8         Q.   And do you have specific skills in

9    valuing or appraising properties, sir?

10        A.   I have very specific skills in real

11   estate.  I've sold hundreds of millions of

12   dollars in real estate to the bank's credit.

13        Q.   Regardless of what has been sold,

14   are you in the business of valuing properties?

15        A.   Absolutely.  I value them for

16   myself.  I bought one facility for $41 million

17   in Olympia Springs and sold it for 87.  I bought

18   another property for 35,000,000 and sold it for

19   58.25 million.  Yes, I would consider myself an

20   expert in these big facilities.

21        Q.   Have you seen any documents that

22   suggest that the facility is worth any number

23   north of a billion dollars?

24        MR. FELDMAN:  Objection.

25        THE WITNESS:  No.  I've seen no



1              documents to that effect, but I know John

2              DiDonato is trying to scam us out of that

3              by selling for like tens of millions,

4              just the value of the building alone

5              rather than the product it can produce,

6              and he actually forged a document making

7              himself the CEO and the company has no

8              CEO.

9                   The guy is pathetic.  He forged

10             documents.  You guys continuously commit

11             fraud.

12     BY MS. QUARTAROLO

13             Q.   Are you done, sir?

14             A.   Yes, ma'am.  Why don't you pull up

15      that document by John DiDonato again so we can

16      look at it.

17             Q.   No.  I think I'll ask the questions

18      and you'll answer them.

19             A.   Go right ahead.  You certainly have

20      that right.  Go ahead.

21             Q.   Let's look at paragraph number 12.

22      So in paragraph number 12, it reads "It was

23      never revealed to me that there was a plan to

24      liquidate the assets of JHO Real Estate."  Do

25      you see that?

```
 1              A.    Yes, ma'am.  And that is correct.
 2              Q.    What do you mean by "never revealed
 3       to me"?
 4              A.    Never revealed speaks for itself.
 5              Q.    They're your words, sir, and I'm
 6       asking to understand them.  So please help me
 7       understand what that means.
 8              A.    It was never revealed to me speaks
 9       for itself.
10              Q.    By whom?
11              A.    There's no explanation.
12              Q.    It was never revealed to you by
13       whom?
14              A.    By anybody.
15              Q.    And --
16              A.    Basically, that refers to the people
17       responsible that were supposed to reveal it to
18       me was you, Latham Watkins, and Berger Singerman
19       and Gregg Metzger, but Gregg Metzger signed a
20       deal with you, didn't he, behind my back who
21       acted with you against me.
22                    Gregg is on the call if you want to
23       ask Gregg about that, feel free to, but that's
24       how you were able to circumvent me.
25                    You were supposed to sit down and
```

```
1    explain that to me, and even Judge Russin said
2    that in our last hearing.  He goes, well,
3    certainly, they explained it to Mr. Owoc, didn't
4    they?
5           So I think you're in trouble, Amy,
6    when you go in front of Judge Russin next time.
7    The Honorable Judge Russin should -- your
8    actions are punitive.  So, hopefully, he
9    sanctions you, we sanction you, everything else.
10   Jonathan, please take note.
11        Q.   I will move to strike that as
12   entirely nonresponsive.
13        A.   Move to keep it on the record.
14        Q.   Mr. Owoc, paragraph 13, it says "On
15   around April 19, 2023, my attorneys discovered
16   that the Phoenix facility was included in the
17   bankruptcy estate."  Do you see that?
18        A.   Yes, ma'am.
19        Q.   Which attorneys is that referring
20   to?
21        A.   I don't know.  I can't recall.  I
22   have a lot of attorneys.
23        Q.   Did they then communicate that to
24   you that the Phoenix facility was included in
25   the bankruptcy estate?
```

1          **A.**    Yes.  I don't know the exact date

2     they communicated it to me, but, yes, they did.

3          **Q.**    Do you know how your attorneys

4     discovered that the Phoenix facility was

5     included in the bankruptcy estate?

6          **A.**    I do not know.

7          **Q.**    And do you know if they communicated

8     the fact that they had learned that the Phoenix

9     facility was included in the bankruptcy estate

10    to you orally or in writing?

11         **A.**    I don't know.

12         **Q.**    Mr. Owoc, did you ever discuss with

13    any of your personal counsel which entities were

14    to be included in the bankruptcy filings?

15         **A.**    Say that again, please.

16         MS. QUARTAROLO:  Can we read it back,

17        please.

18            (Whereupon, the last question was

19            read back by the court reporter.)

20         THE WITNESS:  I don't recall

21        discussing that, but the only thing that

22        I thought was in bankruptcy was Vital

23        Pharmaceuticals.  And then these other --

24        some of these other assets might have

25        been pledged or something.  I don't know,

1          but the only one that I was aware that

2          was in bankruptcy was Vital

3          Pharmaceuticals.  And nothing else needed

4          to be because it had a 3.2-billion dollar

5          valuation.  Jonathan, listen to this.

6                It had a Kroll valuation, who is

7          number one in the valuation space in the

8          world, Kroll, Duff & Phelps, mark those

9          down please, for 2.4 to $3.7 billion

10         consistent with the KDP offer.

11               But there was three models

12         developed by Kroll, and one of the models

13         there was up to a 4.8-billion dollar

14         valuation, which I still think was a

15         little low, but that was with all the

16         heat from Monster and everything else all

17         complied.  And the documents Sury

18         Rodriguez provided for them that Huron

19         Consulting Group produced.

20               So those are very accurate.  You

21         can't deny those.  And so it was worth

22         billions and billions of dollars until

23         Latham Watkins, Berger Singerman, and

24         everybody else queered the deal with

25         Rothchild, with John DiDonato and made it

```
 1              worthless through all their chicanery and
 2              tomfoolery.
 3                   So, yes, I never thought that
 4              anything else would have to be in
 5              bankruptcy, nor would I ever agree to it
 6              because there was billions of dollars
 7              here.  Even Jade Silver over and over,
 8              Lewis Lluberas and Frank McCormack from
 9              Truist said that you will have
10              generational wealth.  Because those were
11              the deals that were being discussed.
12   BY MS. QUARTAROLO
13         Q.   Are you done, sir?
14         A.   I don't know.  Do you want me to
15      continue or do you want to go?  Either way --
16         Q.   I just want to -- I'm just waiting
17      for you to finish so I can ask a question.
18         A.   I'm finished.  When I stop talking,
19      I'm finished.
20         Q.   So in paragraphs -- let's scroll to
21      Paragraph 17, the second -- I guess it's the
22      third sentence of this paragraph reads "JHO Real
23      Estate had guaranteed certain indebtedness to a
24      lender group administered by Truist Bank, along
25      with several other companies."  Do you see that?
```

1          **A.**    Wait.  Say that again.  Hold on.

2          **Q.**    We'll highlight the sentence for

3     you, sir.

4          **A.**    Thank you kindly.

5          **Q.**    Do you see that?

6          **A.**    I'm reading, please.

7                Yes, I do.

8          **Q.**    And that the certain indebtedness

9     that you're referring to, you're referring to

10    the prepetition secured debt that Vital

11    Pharmaceuticals had; correct?

12         **A.**    I don't know.

13         **Q.**    You don't know what you're referring

14    to here?

15         **A.**    Let me read it again.  Just keep the

16    highlight on there if you could.

17                Okay.  So with the highlight, go

18    ahead and ask me the question.

19         **Q.**    So, sir, the question is:  These are

20    your words; correct?

21         **A.**    These are the attorney's words that

22    I agreed to, yes.

23         **Q.**    Okay.  So when this sentence refers

24    to certain indebtedness, my question for you is

25    whether that's in reference to the pre-petition

1    secured debt that Vital Pharmaceuticals had?

2         A.   I don't know.  You would have to ask

3    my attorneys.

4         Q.   Well, these are your words, sir.  I

5    guess I'll ask it differently.

6         A.   No.  They're -- my attorneys crafted

7    this.  I read it.  I agreed it and I signed it.

8         Q.   Okay.  So what is the certain

9    indebtedness that is referenced in this

10   sentence?

11        A.   I don't know, ma'am.  I just said

12   you would have to ask my attorneys.

13        Q.   And it is your understanding, sir,

14   that JHO Real Estate was a guarantor on the

15   Vital Pharmaceuticals pre-petition secured debt;

16   correct?

17        A.   I don't know.  I think the words

18   speak for themselves here where it had

19   guaranteed certain indebtedness.  But, again, I

20   was never advised that this was going to be put

21   in bankruptcy.  I would have never agreed to it,

22   and, again, the enterprise value was in billions

23   of Vital Pharmaceuticals until you and all the

24   other professionals destroyed the company.

25        Q.   So your -- sorry.  Your testimony is



1    that you don't know if JHO Real Estate was a

2    guarantor on that debt?

3        **A.**    I don't know.

4        **Q.**    Let's turn to -- we can take this

5    document down.

6        THE WITNESS:  Okay.  I'm going take a

7        bathroom break for about ten minutes

8        here.  Does anybody object to that.

9        MS. QUARTAROLO:  That is perfectly

10       fine, sir.

11       MR. FELDMAN:  Thank you.

12       THE WITNESS:  Thank you, Amy, for your

13       kindness.

14       MS. QUARTAROLO:  We'll be back at

15       4:50.

16       THE VIDEOGRAPHER:  Off the record at

17       4:40.

18           (Whereupon, a brief recess was

19       taken.)

20       THE VIDEOGRAPHER:  Back on the record

21       at 4:51.

22       MS. QUARTAROLO:  Can we pull up what's

23       at Tab 21.  And are we up to Exhibit 20

24       now?  We'll mark this as Exhibit 20.

25       THE REPORTER:  Yes, Exhibit 20 is the

1        next number.  And you said this was Tab

2        21?

3            MS. QUARTAROLO:  It's Tab 21, but it's

4        Exhibit 20.

5            (Whereupon, OWOC Exhibit No. 20 was

6            marked for identification.)

7   BY MS. QUARTAROLO

8        Q.    Perfect.  Let's scroll out to see

9    the whole first page.

10           Mr. Owoc, this is a document that is

11   titled "Supplemental Brief in Support of

12   Creditor Interested Party John H. Owoc's

13   Emergency Motion to Dismiss Chapter 11

14   Bankruptcy of Debtor JHO Real Estate Investment,

15   LLC."  Do you see that?

16       A.    Yes, ma'am.

17       Q.    And it's Docket Number 1574, just

18   for the record.

19           Mr. Owoc, have you seen this

20   document before?

21       A.    I can't recall.

22       Q.    I'll represent to you that this was

23   a filing that was made by your counsel

24   yesterday.  Do you recall signing off on this

25   filing before it was filed?

1          A.    Signing off?  No.

2          Q.    Did you review it before it was

3   filed?

4          A.    Make it bigger.  Let me see.  No, I

5   did not review it to the best of my knowledge.

6          Q.    And so your testimony is you've

7   never seen this before?

8          A.    To the best of my knowledge, I have

9   not seen this.

10         Q.    Let's scroll to page three.

11         A.    How many pages is this document

12  because I'd like to read if I'm going to be

13  commenting on it.

14         Q.    It is five pages, not including the

15  signature page.  If you would like to read it,

16  I'm happy to let you do so.

17         A.    Thank you.  If can you please make

18  it a little bigger and give me control of the

19  cursor.  Thank you.

20         MR. TERESI:  All right.  I'm going to

21      give you control now.

22         THE WITNESS:  Thank you.  Oops.

23         MS. QUARTAROLO:  I'm not sure -- I

24      don't mean to interrupt your flow,

25      Mr. Owoc, but someone is not on mute and

```
 1              there's a conversation going on.
 2                  MR. FELDMAN:  Is it me,
 3          Ms. Quartarolo?
 4                  MS. QUARTAROLO:  I don't know.
 5                  MR. FELDMAN:  Hold on one second.
 6                      Is that better?
 7                  MS. QUARTAROLO:  I'm not hearing
 8          anything.  It wasn't bothering me.  I
 9          just didn't want someone to inadvertently
10          say something on the record.
11                  THE WITNESS:  Okay.  I read the
12          document.  You can proceed, please.
13  BY MS. QUARTAROLO:
14          Q.   All right.  Can we -- let's scroll
15     out just a bit, and if you need us to scroll
16     back in, let us know, sir.
17          A.   Scroll in just a little bit.
18          Q.   Make it a little bit bigger?
19          A.   That's good.  Thank you.
20          Q.   So let's scroll up to page 3.
21     Great.  The last sentence of this first
22     paragraph reads, "Perhaps" -- no, next sentence
23     "Perhaps far more important is the fact that the
24     email consent, which required electronic
25     signatures, did not reach Mr. Owoc and were
```

1    neither signed nor returned by him."  Do you see

2    that?

3          **A.**    Correct.

4          **Q.**    Is it your testimony, sir, that you

5    never received the written consent for JHO Real

6    Estate?

7          **A.**    To the best of my knowledge, I've

8    never received it.

9          **Q.**    Is it your testimony that you never

10   received any of the written consents in

11   connection with authorization for filing of

12   Chapter 11 cases?

13         **A.**    Wait a minute.  Let me read this

14   again.  Your first sentence was what?  I'm

15   sorry.  Your first question?

16         **Q.**    So the question that's pending is,

17   is --

18         **A.**    I need to know the first question

19   first.  I apologize.

20         **Q.**    Okay.  So I'll back up.  I'll ask

21   that question again.  Is it your testimony that

22   you never received the written consent for JHO

23   Real Estate and the authorization for the

24   Chapter 11 filing?

25         **A.**    Correct.

1       Q.   And the next question is, is it your

2  testimony that you never received any of the

3  written consents that we went over earlier today

4  for any of the debtor entities?

5       A.   Is that what this document says?

6       Q.   I'm just -- I pointed out a sentence

7  to you, and I'm asking you a question because

8  I'm trying to understand.

9       A.   From what we -- from what we saw

10  today, I -- I doubt that they have, but I know

11  for sure JHO Holdings never did receive.  And

12  you saw a bunch of copied and pasted signatures

13  that were not wet ink signatures.  So it's

14  likely that none of them made it to me, but

15  especially I'm confirming that JHO Holdings

16  never did.

17       Q.   Sorry.  You said JHO Holdings.  Are

18  you referring to JHO Real Estate?

19       A.   Yes.  I confused that just like

20  Jordi Guso did.

21       Q.   So when you say -- I just want to

22  make sure I understand this.  Your testimony is

23  that you did not receive the written consent for

24  JHO Real Estate; correct?

25       A.   Correct.

```
1              Q.    And your testimony is that you're
2     not sure whether you received the written
3     consents for the other debtor entities; is that
4     right?
5              A.    From what I saw today, it doesn't
6     appear that I did and that they were possibly
7     forgeries.
8              Q.    And I'm leaving aside any of the
9     issues that you've raised about signatures,
10    leaving aside any of the issues with regard to
11    whether you signed or didn't sign.  I just want
12    to know what you received.
13              Did you receive any of the written
14    consents for any of the debtor entities
15    authorizing the Chapter 11 filing?
16              A.    I don't remember or recall receiving
17    any of them.
18              Q.    If we can scroll down, let's scroll
19    down to the fifth page.  Actually, I apologize
20    if I asked you this, in advance.  You did not
21    see this document before it was filed?
22              A.    Correct.
23              Q.    Okay.  And this middle paragraph
24    here, let's highlight this second sentence.  So
25    this reads "The entity" -- well, let me back up.
```

```
 1      The entity that is referenced in this sentence

 2      refers to JHO Real Estate; correct?

 3             A.    Correct.

 4             Q.    So the entity could meet its

 5      obligations to its creditors and did not need to

 6      resort to filing bankruptcy.  Do you see that?

 7             A.    Yes.

 8             Q.    Do you know if -- let me strike

 9      that.

10                   How much cash did the debtors have

11      as of September 29, 2022?

12             A.    Was I still CEO then?

13             Q.    On September 29 of 2022, I believe

14      you were, sir.

15             A.    So the question is how much cash did

16      we have?

17             Q.    Yes.

18             A.    I think we had an adjusted EBITDA of

19      37,000,000.

20             Q.    So I'm not asking for EBITDA.  I'm

21      asking for cash.  Do you know?

22             A.    Well, as Panagoes testified

23      yesterday, we go by EBITDA so I'm going to go

24      with Mr. Panagoes and just tell you I know the

25      adjusted EBITDA was somewhere between 37 and
```

```
1      50,000,000.
2              Q.    So my question --
3              A.    That's to the best of my
4      recollection, because, again, I don't have any
5      access to documents anymore, only the debtors
6      do.
7              Q.    So sitting here today, sir, do you
8      know how much cash the debtors had on or about
9      September 29 of 2022?
10             A.    I do not.
11             Q.    Okay.
12             A.    But the --
13             Q.    Did you have a question?  Are you
14     done?
15             A.    Well, I thought you didn't answer
16     questions.  I was going to --
17             Q.    I'm not trying to cut you off, sir.
18             A.    Okay.  Let me just wait.  Read this
19     one second.
20                   Yeah.  So the highlighted thing says
21     the entity could meet its obligation to its
22     creditors.  Because, again, like I testified
23     earlier, we could have continued to make for
24     Bang Energy, which would be lucrative third
25     parties.  Rohan Oza from Shark Tank contacted
```