# **<u>EXHIBIT 8</u>**

## SECOND FORBEARANCE AGREEMENT

THIS SECOND FORBEARANCE AGREEMENT (this "Agreement"), dated as of June 17, 2022, is entered into by and among VITAL PHARMACEUTICALS, INC., a Florida corporation (the "Borrower"), the Guarantors party hereto, the Lenders party hereto, TRUIST BANK, in its capacity as administrative agent for the Lenders (the "Administrative Agent"), Swingline Lender, and Issuing Bank, and JOHN H. OWOC, an individual resident of the State of Florida (the "Owner Pledgor").

## RECITALS

WHEREAS, the Borrower, the Guarantors from time to time party thereto, the Lenders from time to time party thereto, the Administrative Agent, the Swingline Lender, and the Issuing Bank are parties to that certain Amended and Restated Revolving Credit and Term Loan Agreement dated as of August 14, 2020 (as amended by that certain First Amendment to Amended and Restated Revolving Credit and Term Loan Agreement dated as of June 15, 2021, that certain Second Amendment to Amended and Restated Revolving Credit and Term Loan Agreement dated as of June 30, 2021, and that certain Third Amendment to Amended and Restated Revolving Credit and Term Loan Agreement dated as of December 31, 2021, and as further amended, modified, extended, restated, replaced, or supplemented in writing from time to time, the "Credit Agreement").

WHEREAS, pursuant to the Owner Pledge Agreement, the Owner Pledgor has pledged certain assets to the Administrative Agent to secure the Secured Obligations (as defined therein).

WHEREAS, the parties hereto have previously entered into that certain Forbearance Agreement, dated as of March 11, 2022, and the "Forbearance Period" as defined therein will automatically expire according to its terms at 11:59 p.m. (Eastern time) on June 17, 2022.

WHEREAS, the Loan Parties have informed the Administrative Agent and the Lenders that certain Events of Default have occurred and are continuing as described in Part A of Schedule 1 attached hereto (collectively, the "Existing Events of Default").

WHEREAS, the Loan Parties have also informed the Administrative Agent and the Lenders that certain Defaults and Events of Default are anticipated to occur as described in Part B of Schedule 1 attached hereto (collectively, the "Anticipated Events of Default" and together with the Existing Events of Default, the "Acknowledged Events of Default").

WHEREAS, the Loan Parties and the Owner Pledgor have requested that the Administrative Agent and the Lenders agree to forbear from exercising their rights and remedies arising under the Loan Documents and applicable Laws as a result of the Acknowledged Events of Default during the Forbearance Period.

WHEREAS, the Administrative Agent and the Lenders have agreed to do so, but only pursuant to the terms and conditions set forth herein.

## AGREEMENT

NOW, THEREFORE, in consideration of these premises and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

CHAR2\2638886v7

1.    <u>Definitions</u>. Capitalized terms used herein but not otherwise defined herein shall have the meanings provided to such terms in the Credit Agreement. As used in this Agreement, the following terms shall have the meanings set forth below:

"<u>Acknowledged Events of Default</u>" has the meaning set forth in the Recitals.

"<u>Administrative Agent</u>" has the meaning set forth in the preamble to this Agreement.

"<u>Administrative Agent's Financial Advisor</u>" has the meaning set forth in <u>Section 12</u>.

"<u>Anticipated Events of Default</u>" has the meaning set forth in the Recitals.

"<u>Borrower</u>" has the meaning set forth in the preamble to this Agreement.

"<u>Capital Raise Transaction</u>" means one transaction or a series of transactions in the form of a sale, financing, issuance of Capital Stock, other liquidity generating event or some combination thereof that is intended to generate cash proceeds sufficient for the payment of the Obligations in full.

"<u>Capital Raise Transaction Process</u>" has the meaning set forth in <u>Section 7(a)</u>.

"<u>Cash Flow Forecast</u>" has the meaning set forth in <u>Section 9(a)</u>.

"<u>Credit Agreement</u>" has the meaning set forth in the Recitals.

"<u>CTO</u>" has the meaning set forth in <u>Section 8</u>.

"<u>CTO Scope</u>" has the meaning set forth in <u>Section 8</u>.

"<u>Effective Date</u>" has the meaning set forth in <u>Section 16</u>.

"<u>Enterprise Valuator</u>" has the meaning set forth in <u>Section 13(a)</u>.

"<u>Existing Events of Default</u>" has the meaning set forth in the Recitals.

"<u>Forbearance Period</u>" means the period from the Effective Date to (but excluding) the earliest date that a Forbearance Termination Event occurs.

"<u>Forbearance Termination Event</u>" means the earliest of the following to occur: (a) any Event of Default other than an Event of Default constituting an Acknowledged Event of Default; (b) any Default other than a Default constituting an Acknowledged Event of Default that continues unremedied for a period of seven (7) days after written (which may be by email) notice thereof by the Administrative Agent to the Borrower; (c) the breach by any Loan Party or the Owner Pledgor of any covenant or provision of this Agreement; (d) the Borrower's failure to challenge any final award or judgment against the Borrower by a Commercial Arbitration Tribunal of the America Arbitration Association in *Orange Bang, Inc. and Monster Energy Company v. Vital Pharmaceuticals, Inc d/b/a VPX Sports* (Case No. 01-20-0005-6081) (such proceeding, the "<u>Orange Bang Arbitration</u>") within the applicable time period therefor, including, but not limited to such challenges as may be available by way of vacatur, appeal or any other means; (e) the complete and final exhaustion of all of the Borrower's rights to challenge the award or judgment, including but not limited to challenges to the finality of the award or judgment, against

the Borrower in the Orange Bang Arbitration; (f) termination by the Borrower or PepsiCo, Inc. ("Pepsi") of that certain Distribution Agreement, dated as of March 6, 2020 (the "Pepsi Distribution Agreement"), by and between the Borrower and Pepsi other than pursuant to the terms of a settlement agreement mutually acceptable to the Borrower and Pepsi; and (g) 11:59 p.m. (Eastern time) on June 30, 2022.

"IB Scope" has the meaning set forth in Section 7(a).

"Investment Banker" has the meaning set forth in Section 7(a).

"Litigation Disclosure Summary" has the meaning set forth in Section 9(b).

"Orange Bang Arbitration" has the meaning set forth in the definition of "Forbearance Termination Event" in this Section 1.

"Owner Pledgor" has the meaning set forth in the preamble to this Agreement.

"Pepsi" has the meaning set forth in the definition of "Forbearance Termination Event" in this Section 1.

"Pepsi Distribution Agreement" has the meaning set forth in the definition of "Forbearance Termination Event" in this Section 1.

"Process Letter" means any bid process letter from the Investment Banker that, among other things, requests third parties to submit to any Loan Party, the Owner Pledgor, or the Investment Banker either (a) written, non-binding, initial indications of interest with respect to a Capital Raise Transaction or (b) written good faith offers with respect to a Capital Raise Transaction.

"Released Party" has the meaning set forth in Section 19.

"Synovus Note" has the meaning set forth in Section 28.

"Updated Appraisals" has the meaning set forth in Section 13(b).

2.      Estoppel. Each Loan Party and the Owner Pledgor each hereby acknowledges and agrees that, as of the close of business on June 16, 2022, (a) the aggregate outstanding principal amount of the Revolving Loans was $195,000,000.00, (b) the aggregate outstanding principal amount of the Term Loans was $107,082,718.45, (c) the aggregate outstanding principal amount of the Swingline Loans was $0.00 and (d) the LC Exposure was $0.00, each of which constitutes a valid and subsisting obligation of each Loan Party, jointly and severally, owed to the Lenders that is not subject to any credits, offsets, defenses, claims, counterclaims, or adjustments of any kind.

3.      Consent, Acknowledgement and Reaffirmation. Each Loan Party and the Owner Pledgor each hereby: (a) acknowledges that (i) the Existing Events of Default have occurred and have not been waived, (ii) [reserved], (iii) no Acknowledged Event of Default is being waived pursuant to this Agreement, and (iv) Default Interest that has accrued on all Obligations is not being waived pursuant to this Agreement and is (or shall be) due and payable in the ordinary course pursuant to the Credit Agreement; (b) acknowledges and consents to this Agreement and the terms and provisions hereof; (c) reaffirms the covenants and agreements contained in each Loan Document to which such Person is party, including, in each case, as such covenants and agreements may be modified by this Agreement and the transactions

CONFIDENTIAL                                                                    VPX-JHO0000000205

contemplated hereby; (d) reaffirms that each of the Liens created and granted in or pursuant to the Loan Documents in favor of the Administrative Agent for the benefit of the holders of the Obligations is valid and subsisting, and acknowledges and agrees that this Agreement shall in no manner impair or otherwise adversely affect such Liens; and (e) confirms that each Loan Document to which such Person is a party is and shall continue to be in full force and effect and the same is hereby ratified and confirmed in all respects.

4.      [Reserved.]

5.      Forbearance.

(a)      *Forbearance.* Subject to the terms and conditions set forth herein, the Administrative Agent and the Lenders shall, during the Forbearance Period, forbear from exercising any and all of the rights and remedies available to them under the Loan Documents and applicable Laws, but only to the extent that such rights and remedies arise exclusively as a result of the existence of the Acknowledged Events of Default; provided, however, that (i) the Administrative Agent and the Lenders shall be free to exercise any or all of their rights and remedies arising on account of the Acknowledged Events of Default at any time upon or after the occurrence of a Forbearance Termination Event and (ii) the Acknowledged Events of Default shall continue to exist and apply for all purposes and provisions under the Loan Documents, including those provisions, conditions, requirements, rights, and obligations that are dependent upon the absence of any Default or Event of Default. For the avoidance of doubt, during the Forbearance Period: (A) Default Interest shall continue to accrue on all Obligations; (B) the Lenders and the Issuing Bank (as applicable) shall have no obligation to make, additional Revolving Loans, additional Swingline Loans, or any other Credit Event; (C) no Borrowing may be converted into, or continued as, a Eurodollar Borrowing; and (D) this Agreement shall not constitute the Administrative Agent's or any Lender's agreement or consent to the terms of any definitive settlement agreement between the Borrower and Pepsi regarding the Pepsi Distribution Agreement or a waiver of any Default or Event of Default that may arise, if any, from such definitive settlement agreement.

(b)      *Forbearance Period.* Nothing set forth herein or contemplated hereby is intended to constitute an agreement by the Administrative Agent or any Lender to forbear from exercising any of the rights or remedies available to the Administrative Agent and the Lenders under the Loan Documents or applicable Laws (all of which rights and remedies are hereby expressly reserved by the Administrative Agent and the Lenders) upon or after the occurrence of a Forbearance Termination Event.

6.      [Reserved.]

7.      Investment Banking Process.

(a)      *Investment Banker.* At all times during the Forbearance Period the Loan Parties shall continue to retain a recognized third-party investment banker reasonably acceptable to the Required Lenders and the Loan Parties (the "Investment Banker"), it being acknowledged and agreed that Rothschild & Co is acceptable to the Required Lenders and the Loan Parties. The Loan Parties shall be responsible for the fees and expenses incurred in connection with the engagement of the Investment Banker. The scope of the Investment Banker's engagement shall include, among other things, the development and implementation of a process intended to generate a potential Capital Raise Transaction (the "Capital Raise Transaction Process") and be otherwise on terms reasonably acceptable to the Required Lenders and the Loan Parties (the "IB Scope"). The Investment Banker shall report to the Chief Executive Officer of the Borrower and work with the CTO and other management for the purpose of carrying out the IB Scope. Any material change,

CONFIDENTIAL                                                                 VPX-JHO0000000206

limitation, or revision to the IB Scope without the prior written consent of the Required Lenders, which consent shall not be unreasonably withheld, conditioned, or delayed, shall constitute an immediate Forbearance Termination Event; provided, that, notwithstanding the foregoing the Loan Parties may broaden the IB Scope without the consent of the Required Lenders. During the Forbearance Period, the Loan Parties shall be prohibited from terminating the Investment Banker's engagement without the prior written consent of the Required Lenders, which shall not be unreasonably withheld, conditioned, or delayed and shall not be required if the Investment Banker is replaced with another Investment Banker whose identity and scope of engagement are reasonably acceptable to the Required Lenders within five (5) Business Days of such termination.

(b)  *Investment Banking Process Materials.* The Loan Parties shall (i) provide, or cause the Investment Banker to provide, access at all times to the Administrative Agent and its professionals to the data room related to the Capital Raise Transaction Process and (ii) deliver to the Administrative Agent for distribution to the Lenders copies of the following documents and information with respect to the Capital Raise Transaction Process (which documents and information shall be subject to the confidentiality obligations set forth in Section 11.11 of the Credit Agreement), as promptly as practicable after such information or documents are received or produced by the Loan Parties, the Owner Pledgor, or the Investment Banker: (A) the investor presentation and each Process Letter; (B) on a weekly basis, an updated list of all interested third parties that have entered into non-disclosure agreements with the Loan Parties in respect of a Capital Raise Transaction (including confirmation that such parties have received the investor presentation and each Process Letter) and have not withdrawn their indications of interest; (C) on a weekly basis, written summaries describing the proposed amount of financing, equity contribution, or other consideration to be provided to the Loan Parties and any material, non-customary conditions precedent to funding or closing of all non-binding, initial indications of interest in a Capital Raise Transaction or offers therefor received from third parties (including a description as to whether such indications of interest or offers have not been withdrawn), in each case with such third parties' names and identifying information redacted; and (D) following the applicable submission deadline set forth in any Process Letter, copies of any final offers to consummate a Capital Raise Transaction submitted by third parties, in each case, with such third parties' names and identifying information redacted. The Loan Parties shall use best efforts to cause the Investment Banker to endeavor to obtain offers in respect of the Capital Raise Transaction with exceptions to confidentiality provisions to permit disclosure thereof to the Administrative Agent and the Lenders on a redacted basis as contemplated by this Section 7(b).

8.  Chief Transaction Officer. At all times during the Forbearance Period the Loan Parties shall continue to retain a Chief Transaction Officer (the "CTO") reasonably acceptable to the Required Lenders and the Loan Parties, it being acknowledged and agreed that Mr. Richard D. Caruso is acceptable to the Required Lenders and the Loan Parties. The Loan Parties shall be responsible for the fees and expenses incurred in connection with the engagement of the CTO. The scope of the CTO's engagement shall be as set forth on Schedule 3 hereto (the "CTO Scope"). The CTO shall report to the Chief Executive Officer of the Borrower and work with management for the purpose of carrying out the CTO Scope. Any material change, limitation, or revision to CTO Scope without the prior written consent of the Required Lenders, which consent shall not be unreasonably withheld, conditioned, or delayed, shall constitute an immediate Forbearance Termination Event; provided, that, notwithstanding the foregoing the Loan Parties may broaden the CTO Scope without the consent of the Required Lenders. During the Forbearance Period, the Loan Parties shall be prohibited from terminating the CTO's engagement without the prior written consent of the Required Lenders, which shall not be unreasonably withheld, conditioned, or delayed and shall not be required if the CTO is replaced with another CTO whose identity and scope of engagement are reasonably acceptable to the Required Lenders within five (5) Business Days of such termination. Upon the death, disability, or voluntary termination of the CTO, the Loan Parties shall engage and retain a CTO

CONFIDENTIAL                                                                          VPX-JHO0000000207

reasonably acceptable to the Required Lenders and the Loan Parties within fourteen (14) days after the death, disability, or voluntary termination of the CTO (or such later date as the Required Lenders shall agree, such consent not to be unreasonably withheld, conditioned, or delayed).

9.    <u>Additional Reporting During Forbearance Period</u>. In addition to all existing reporting requirements under the Credit Agreement and the other Loan Documents, during the Forbearance Period, the Loan Parties shall deliver to the Administrative Agent, for distribution to the Lenders, in each case in form and detail reasonably satisfactory to the Administrative Agent:

(a)    every fourth Thursday following March 17, 2022, a rolling 13-week forecast of cash flows for the Loan Parties and their Subsidiaries on a consolidated basis as of the last day of the immediately preceding week (each a "<u>Cash Flow Forecast</u>");

(b)    contemporaneously with the delivery of each Cash Flow Forecast, a written summary of every litigation or arbitration to which any Loan Party or the Owner Pledgor is party (each a "<u>Litigation Disclosure Summary</u>"); <u>provided</u>, that (i) the Litigation Disclosure Summary shall not be required to contain any information that the Loan Parties believe in good faith is subject to the attorney-client privilege, the attorney work product doctrine and/or other applicable privilege or protection from disclosure that the Loan Parties believe in good faith could be deemed waived as a result of disclosure of the Litigation Disclosure Summary to the Administrative Agent and/or the Lenders, and (ii) any estimate of liabilities or other projected outcomes set forth in the Litigation Disclosure Summary that is made in good faith shall be deemed a projection and not be the basis for any breach of any representation or warranty set forth in the Loan Documents;

(c)    every Thursday, (i) a variance report showing a comparison of the previous week's actual cash flows for the Loan Parties and their Subsidiaries (on a consolidated basis) to the most recently previously delivered Cash Flow Forecast in both dollar and percentage units, together with a written explanation of any variance (positive or negative) for any line item that exceeds ten percent (10%), and (ii) a report of the previous week's sales volume, itemized by brand;

(d)    as soon as available, but in any event within thirty (30) days after the end of each calendar month, commencing with the month ending May 31, 2022, an unaudited combined balance sheet of the Loan Parties and Subsidiaries as of the end of such calendar month, and the related unaudited combined statements of income or operations, changes in stockholders' equity and cash flows of the Loan Parties and Subsidiaries for such calendar month and the then elapsed portion of such Fiscal Year, all in reasonable detail and prepared in accordance with GAAP, such combined statements to be certified by the chief executive officer, chief financial officer, treasurer or controller (or a Responsible Officer of substantially equivalent title and authority) of the Borrower as presenting fairly the financial condition, results of operations, stockholders' equity and cash flows of the Loan Parties and Subsidiaries in accordance with GAAP, and including management discussion and analysis of operating results, profitability trends and customer retention, subject only to normal year-end audit adjustments and the absence of footnotes and, in the case of such combined statements, certified by the chief executive officer, chief financial officer, treasurer or controller (or a Responsible Officer of substantially equivalent title and authority) of the Borrower, to the effect that such statements are fairly stated in all material respects when considered in relation to the combined financial statements of the Loan Parties and Subsidiaries;

(e)    as soon as available, but in any event within two (2) Business Days after the parties to the Pepsi Distribution Agreement reach any agreement in principle or definitive settlement agreement, the terms of such agreement in principle or definitive settlement agreement; and

CONFIDENTIAL                                                                        VPX-JHO0000000208

(f)    promptly following the Administrative Agent's request therefor, (i) information regarding the status and terms of the resolution of any dispute arising under or relating to the Pepsi Distribution Agreement, (ii) information regarding the Loan Parties' establishment or expansion of any distribution network to replace, in whole or in part, the distribution network established pursuant to the Pepsi Distribution Agreement, and (iii) such other information regarding the results of operations, business affairs, and financial condition of any or all of the Loan Parties and Subsidiaries.

10.    <u>Periodic Updates</u>. During the Forbearance Period, the Loan Parties shall make certain representatives of the Loan Parties and their advisors (including, without limitation, the Investment Banker and the CTO), as reasonably requested by the Administrative Agent, available to the Administrative Agent and the Lenders for periodic conference calls to be held on a bi-weekly basis commencing the week of June 20, 2022, or more frequently as reasonably requested by the Administrative Agent.

11.    [Reserved.]

12.    <u>Administrative Agent's Financial Advisor</u>. The Administrative Agent, through its counsel, has retained FTI Consulting, Inc. (the "<u>Administrative Agent's Financial Advisor</u>") to monitor the Loan Parties' financial and operational performance. During the Forbearance Period, the Loan Parties shall cooperate in good faith with the Administrative Agent's Financial Advisor and provide the Administrative Agent's Financial Advisor with reasonable access to the Loan Parties' facilities, books and records, officers and consultants (including, without limitation, the Investment Banker and the CTO) and to any information reasonably necessary for the Administrative Agent's Financial Advisor to perform the services within the scope of its engagement.

13.    <u>Valuations, Appraisals</u>.

(a)    *Enterprise Valuation.* If the Administrative Agent, or counsel to the Administrative Agent, engages an independent contractor to prepare and provide, exclusively for the benefit of the Administrative Agent and the Lenders, an enterprise valuation of the Loan Parties (the "<u>Enterprise Valuator</u>"), then the Loan Parties shall cooperate in good faith with the Enterprise Valuator and provide the Enterprise Valuator with reasonable access, at reasonable times and upon reasonable advance written (which may be by email) notice, to the Loan Parties' facilities, books and records, officers and consultants and any information reasonably necessary for the Enterprise Valuator to perform the services within the scope of its engagement.

(b)    *Appraisals.* The Loan Parties shall permit the representatives and independent contractors of the Administrative Agent to prepare and provide, exclusively for the benefit of the Administrative Agent and the Lenders, one or more appraisals of the Mortgaged Property and any other Collateral (the "<u>Updated Appraisals</u>"). The Loan Parties shall cooperate in good faith in connection with the Updated Appraisals and provide reasonable access, at reasonable times and upon reasonable written (which may be by email) advance notice, to the Mortgaged Properties and the other Collateral.

14.    <u>Fees and Expenses</u>. Without in any way limiting the obligations of the Loan Parties and the Owner Pledgor under the Loan Documents, including without limitation Section 11.3 of the Credit Agreement, the Loan Parties shall, within ten (10) Business Days after written demand therefor, reimburse the Administrative Agent for all of its documented and invoiced out-of-pocket fees and expenses reasonably incurred in connection with this Agreement, the Credit Agreement, and the other Loan Documents (including, without limitation, (a) the documented and invoiced fees and out-of-pocket expenses of (i)

Moore & Van Allen PLLC, as counsel to the Administrative Agent, (ii) the Administrative Agent's Financial Advisor, and (iii) the Enterprise Valuator and (b) the documented out-of-pocket fees and expenses incurred in connection with the Updated Appraisals).

15.    Commercial Tort Claims (Schedule to Security Agreement). Schedule 3(j) of the Security Agreement is hereby amended and restated to read in the form of Schedule 2 attached hereto.

16.    Conditions Precedent. This Agreement shall be effective on the date (the "Effective Date") that each of the following conditions have been satisfied as determined by the Administrative Agent in its reasonable discretion, or waived by the Required Lenders in their sole discretion:

(a)    *Executed Agreement.* The Administrative Agent shall have received a copy of this Agreement duly executed by each of the Loan Parties, the Owner Pledgor, the Lenders constituting the Required Lenders, and the Administrative Agent.

(b)    *Officer's Certificate, Authorizing Resolutions, and Incumbencies.* The Administrative Agent shall have received certificates of resolutions or other action, incumbency certificates, and/or other certificates of the Secretary, Assistant Secretary, or other appropriate officer (or member or manager, as the case may be, in the case of limited liability companies) acceptable to the Administrative Agent, of each Loan Party, dated as of the Effective Date, addressing the matters set forth in Section 3.1(b)(i) of the Credit Agreement, in each case updated to reflect the transactions contemplated by this Agreement and in form reasonably satisfactory to the Administrative Agent; provided, that to the extent none of the foregoing has changed since they were most recently delivered to the Administrative Agent for a Loan Party, then such Loan Party may deliver a customary, short-form "bring down" certificate.

(c)    *Administrative Agent's Fees and Expenses.* The Administrative Agent shall have received: (i) all reasonable, documented, and invoiced fees payable to the Administrative Agent or any Affiliate thereof as agreed between the Administrative Agent and the Borrower; and (ii) reimbursement from the Loan Parties for all documented and invoiced out-of-pocket fees and expenses reasonably incurred in connection with this Agreement, the Credit Agreement, and the other Loan Documents (including, without limitation, the documented and invoiced fees and out-of-pocket expenses of Moore & Van Allen PLLC, as counsel to the Administrative Agent, and of the Administrative Agent's Financial Advisor) through the Effective Date to the extent invoiced to the Loan Parties at least one (1) Business Day prior to the Effective Date, except to the extent otherwise agreed by the Administrative Agent.

(d)    *Commencement of Investment Banking Process.* The Administrative Agent shall have received (i) a copy of each of (A) the investor presentation and (B) any Process Letter that is available for distribution to third parties interested in participating in the Capital Raise Transaction Process and (ii) a written certification (which may be provided by email) from the General Counsel of the Borrower and an authorized officer of the Investment Banker confirming that the Investment Banker has distributed such materials to such third parties that have, as of one (1) Business Day prior to the Effective Date, signed a non-disclosure agreement.

17.    Representations of Loan Parties. Each Loan Party represents and warrants to the Administrative Agent and the Lenders as follows:

(a)    Such Loan Party has the requisite power and authority and has taken all necessary action to authorize the execution, delivery, and performance of this Agreement in accordance with its terms.

CONFIDENTIAL                                                                        VPX-JHO0000000210

(b)      This Agreement has been duly executed and delivered by such Loan Party and the Owner Pledgor and is the legally valid and binding obligation of such Person, enforceable against such Person in accordance with its respective terms, except as may be limited by Debtor Relief Laws or by equitable principles relating to enforceability.

(c)      The execution, delivery, and performance by such Loan Party and the Owner Pledgor of this Agreement and the consummation of the transactions contemplated by this Agreement do not and will not require, as a condition to the effectiveness thereof, any registration with, consent, or approval of, or notice to, or other action to, with, or by, any Governmental Authority except for (i) filings necessary to perfect, and/or maintain the perfection of, the Liens created under the Loan Documents or (ii) filings, recordings, or consents where failure to obtain or make could not reasonably be expected to have a Material Adverse Effect.

(d)      After giving effect to this Agreement: (i) the representations and warranties of the Loan Parties set forth in the Loan Documents (other than the representations and warranties set forth in Section 4.6 (solely as it relates to the Existing Events of Default) of the Credit Agreement) are true and correct in all material respects (but without duplication of any existing materiality qualifiers) on and as of the Effective Date to the same extent as though made on and as of such date except to the extent such representations and warranties specifically relate to an earlier date (in which case they are true, accurate and complete in all material respects (but without duplication of any existing materiality qualifiers) as of such earlier date); and (ii) no Default or Event of Default (other than any Existing Event of Default) exists on and as of the Effective Date.

(e)      The parties executing this Agreement as Guarantors include each Person that is required pursuant to Section 5.13 of the Credit Agreement to become a Loan Party as of the date hereof.

If any representation and warranty set forth in this Section is incorrect in any material respect, then such incorrect representation and warranty shall constitute a new and immediate Forbearance Termination Event without regard to any otherwise applicable notice, cure, or grace period.

18.      Representations of the Owner Pledgor. The Owner Pledgor represents and warrants to the Administrative Agent and the Lenders as follows:

(a)      This Agreement has been duly executed and delivered by the Owner Pledgor and is the legally valid and binding obligation of such Person, enforceable against such Person in accordance with its respective terms, except as may be limited by Debtor Relief Laws or by equitable principles relating to enforceability.

(b)      He is (i) a natural person, (ii) of the age of majority, (iii) a citizen of the United States, (iv) a resident of the State of Florida, (v) legally competent to enter into this Agreement, and (vi) sophisticated in business matters.

(c)      After giving effect to this Agreement, the representations and warranties of the Owner Pledgor set forth in the Owner Pledge Agreement are true and correct in all material respects (but without duplication of any existing materiality qualifiers) on and as of the Effective Date to the same extent as though made on and as of such date except to the extent such representations and warranties specifically relate to an earlier date (in which case they are true, accurate and complete in all material respects (but without duplication of any existing materiality qualifiers) as of such earlier date).

CONFIDENTIAL                                                                                          VPX-JHO0000000211

If any representation and warranty set forth in this Section is incorrect in any material respect, then such incorrect representation and warranty shall constitute a new and immediate Forbearance Termination Event without regard to any otherwise applicable notice, cure, or grace period.

19.    Release. Each Loan Party and the Owner Pledgor each hereby releases and forever discharges the Administrative Agent, the Swingline Lender, the Issuing Bank, each Lender, and each of their respective predecessors, successors, assigns, and Related Parties (each and every of the foregoing, a "Released Party") from any and all claims, counterclaims, demands, damages, debts, suits, liabilities, actions, and causes of action of any nature whatsoever, in each case through the Effective Date, whether arising at law or in equity, whether known or unknown, whether liability be direct or indirect, whether liquidated or unliquidated, whether absolute or contingent, whether foreseen or unforeseen, and whether or not heretofore asserted, which any Loan Party or the Owner Pledgor may have or claim to have against any Released Party.

20.    No Actions, Claims. Each Loan Party and the Owner Pledgor each hereby represents, warrants, acknowledges, and confirms that such Person has no knowledge of any action, cause of action, claim, demand, damage, or liability of whatever kind or nature, in law or in equity, against any Released Party arising from any action by such Person, or failure of such Person to act, in any way on or prior to the date hereof.

21.    Incorporation of Agreement. Except as specifically modified herein, the terms of the Loan Documents shall remain in full force and effect. The execution, delivery, and effectiveness of this Agreement shall not operate as a waiver of any right, power, or remedy of the Administrative Agent or the Lenders under the Loan Documents or constitute a waiver or amendment of any provision of the Loan Documents. The breach of any covenant or provision of this Agreement shall constitute an immediate Forbearance Termination Event and this Agreement shall constitute a Loan Document.

22.    No Third-Party Beneficiaries. This Agreement and the rights and benefits hereof shall inure to the benefit of each of the parties hereto and their respective successors and assigns, and the obligations hereof shall be binding upon the Loan Parties and the Owner Pledgor (as the case may be). No other Person shall have or be entitled to assert rights or benefits under this Agreement, other than any non-party Released Party with respect to Section 19 and Section 20 hereof (which Persons are intended to be third party beneficiaries of this Agreement).

23.    Entirety. This Agreement, the Credit Agreement, and the other Loan Documents embody the entire agreement among the parties hereto and supersede all prior agreements and understandings, oral or written, if any, relating to the subject matter hereof. This Agreement, the Credit Agreement, and the other Loan Documents represent the final agreement between the parties and may not be contradicted by evidence of prior, contemporaneous, or subsequent oral agreements of the parties.

24.    Counterparts. This Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. Delivery of an executed counterpart of a signature page of this Agreement by telecopy or other electronic imaging means (e.g., "pdf" or "tif" format) shall be effective as delivery of a manually executed counterpart of this Agreement.

25.    Governing Law; Jurisdiction; Consent to Service of Process; Waiver of Jury Trial. The governing law, jurisdiction, consent to service of process, and waiver of jury trial provisions contained in Sections 11.5 and 11.6 of the Credit Agreement are hereby incorporated by reference *mutatis mutandis*.

CONFIDENTIAL                                                                           VPX-JHO0000000212

26.    Further Assurances. Each of the parties hereto agrees to execute and deliver, or to cause to be executed and delivered, all such instruments as may reasonably be requested to effectuate the intent and purposes, and to carry out the terms, of this Agreement.

27.    Miscellaneous. Section headings in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose. Wherever possible, each provision of this Agreement shall be interpreted in such a manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under applicable law, then such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement. Except as otherwise provided in this Agreement, if any provision contained in this Agreement conflicts with, or is inconsistent with, any provision in any Loan Document, then the provision contained in this Agreement shall govern and control.

28.    Correction of a Lender's Name (Synovus). The parties hereto hereby acknowledge and agree that Synovus Bank, a Georgia banking corporation, is a Lender as described in (and signatory to certain of) the Loan Documents, and that Synovus Bank is the Lender as defined in that certain Note, dated as of August 14, 2020 (the "Synovus Note"), executed by the Borrower and delivered to Synovus Bank (erroneously referred to in the Synovus Note as "Synovus Financial"). All references in the Loan Documents to either "Synovus Financial" or "Synovus Financial Corporation" are unintentional errors and such references should have been, at the time of the execution of any such Loan Document, references to "Synovus Bank". It was the intention of all signatories to the Loan Documents at the time of their execution that Synovus Bank (rather than Synovus Financial or Synovus Financial Corporation) be a Lender. Each Loan Document, including without limitation the Synovus Note, is hereby amended, to the extent necessary, so that all references to either "Synovus Financial" or "Synovus Financial Corporation" therein shall, from and after the Effective Date, be deemed to refer to "Synovus Bank". Synovus Bank hereby represents and warrants to each other party hereto that any signatory of Synovus Bank for any Loan Document executed on its behalf (to which Synovus Bank was erroneously referred to as either "Synovus Financial" or "Synovus Financial Corporation") had, at the time of the execution of such Loan Document, the authority to sign such Loan Document on behalf of Synovus Bank in the capacity set forth therein.

[*Remainder of page intentionally left blank.*]

CONFIDENTIAL                                                                     VPX-JHO0000000213

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the date first above written.

BORROWER:                     VITAL PHARMACEUTICALS, INC.,
a Florida corporation

By:
Name: John H. Owoc
Title:   President, Chief Scientific Officer & Chief Executive Officer

GUARANTORS:            BANG ENERGY CANADA, INC.,
a Florida corporation
ELITE IP HOLDINGS, LLC,
a Florida limited liability company
JHO INTELLECTUAL PROPERTY HOLDINGS, LLC,
a Florida limited liability company
JHO GA-1 INVESTMENT, LLC,
a Florida limited liability company
JHO NV-1 INVESTMENT, LLC,
a Florida limited liability company
JHO REAL ESTATE INVESTMENT, LLC,
a Florida limited liability company
QUASH SELTZER, LLC,
a Florida limited liability company
SHERIDAN REAL ESTATE INVESTMENT A, LLC,
a Florida limited liability company
SHERIDAN REAL ESTATE INVESTMENT B, LLC,
a Florida limited liability company
SHERIDAN REAL ESTATE INVESTMENT C, LLC,
a Florida limited liability company
VITAL PHARMACEUTICALS INTERNATIONAL SALES, INC.,
a Delaware corporation

By:
Name:  John H. Owoc
Title:   President, Chief Scientific Officer & Chief Executive Officer

OWNER PLEDGOR:      JOHN H. OWOC,
an individual resident of the State of Florida

VITAL PHARMACEUTICALS, INC.
SECOND FORBEARANCE AGREEMENT

CONFIDENTIAL

ADMINISTRATIVE AGENT:                    TRUIST BANK,
                                         as Administrative Agent

                                         By: _____
                                         Name: Jade Silver
                                         Title: Senior Vice President

VITAL PHARMACEUTICALS, INC.
SECOND FORBEARANCE AGREEMENT

                                         VPX-JHO0000000215

LENDERS:                          TRUIST BANK,
                                  as a Lender, as Swingline Lender, and as Issuing Bank

                                  By: _____
                                  Name: Jade Silver
                                  Title: Senior Vice President

VITAL PHARMACEUTICALS, INC.
SECOND FORBEARANCE AGREEMENT

COBANK, ACB,
as a Lender

By: _Janet Downs_____
Name:  Janet Downs
Title:  Lead Special Assets Officer

VITAL PHARMACEUTICALS, INC.
SECOND FORBEARANCE AGREEMENT

VPX-JHO0000000217

AGCOUNTRY FARM CREDIT SERVICES, FLCA,
as a Lender

By: _____

Name:   Lisa Caswell
Title:    Vice President

VITAL PHARMACEUTICALS, INC.
SECOND FORBEARANCE AGREEMENT

FARM CREDIT BANK OF TEXAS,
as a Lender

By: _____

Name: Michael C. Hawkins

Title: Director

VITAL PHARMACEUTICALS, INC.
SECOND FORBEARANCE AGREEMENT

CONFIDENTIAL

VPX-JHO0000000219

CITIZENS BANK, N.A.,
as a Lender

By: _____

Name: Seth McIntyre
Title: Assistant Vice President

VITAL PHARMACEUTICALS, INC.
SECOND FORBEARANCE AGREEMENT

VPX-JHO0000000220

COMPEER FINANCIAL, PCA,
as a Lender

By: _____
Name: Betty Janelle
Title:   Director, Capital Markets

VITAL PHARMACEUTICALS, INC.
SECOND FORBEARANCE AGREEMENT

SYNOVUS BANK,
as a Lender

By: _John M. Quarles, Jr._____
Name: John M. Quarles, Jr.
Title: Senior Special Credits Officer

VITAL PHARMACEUTICALS, INC.
SECOND FORBEARANCE AGREEMENT

CONFIDENTIAL

FEDERAL AGRICULTURAL MORTGAGE
CORPORATION,
as a Lender

By: _____
Name:  Bradley A. Pierce
Title:  Executive Director

VITAL PHARMACEUTICALS, INC.
SECOND FORBEARANCE AGREEMENT

VPX-JHO0000000223

THE HUNTINGTON NATIONAL BANK,
as a Lender

By: *Nathan Drews*
_____
Name: Nathan Drews
Title: Financial Recovery Rep.

Confidential

jguso@bergersingerman.com

2022-08-12 14:33:30 -0400

VITAL PHARMACEUTICALS, INC.
SECOND FORBEARANCE AGREEMENT

VPX-JHO0000000224

COMERICA BANK,
as a Lender

By: _____

Name: Cynthia B. Jones
Title:   Vice President

VITAL PHARMACEUTICALS, INC.
SECOND FORBEARANCE AGREEMENT

jguso@bergersingerman.com
2022-08-12 14:33:30 -0400
Confidential

UNITED COMMUNITY BANK d/b/a SEASIDE
BANK AND TRUST,
as a Lender

By: _____

Name: J. Brett Brown

Title: Sr. Vice President

Confidential

jguso@bergersingerman.com

2022-08-12 14:33:30 -0400

VITAL PHARMACEUTICALS, INC.
SECOND FORBEARANCE AGREEMENT

**SCHEDULE 1**

**Acknowledged Events of Default**

A.  **Existing Events of Default**

1.      Certain Events of Default have occurred and are continuing under Section 8.1(d) of the Credit Agreement as a result of:

    a.      the Loan Parties' failure to comply with the Combined Total Leverage Ratio covenant set forth in Section 6.1 of the Credit Agreement for the Fiscal Quarters ended December 31, 2021 and March 31, 2022;

    b.      the Loan Parties' failure to comply with the Combined Fixed Charge Coverage Ratio covenant set forth in Section 6.2 of the Credit Agreement for the Fiscal Quarters ended December 31, 2021 and March 31, 2022;

    c.      the Loan Parties' failure to comply with Section 5.1(a) of the Credit Agreement with respect to the annual audited report for the Fiscal Year ended December 31, 2021 for the Loan Parties and Subsidiaries as a result of such report and opinion of the Loan Parties' independent public accounting firm not being unqualified as to "going concern" or like qualification or scope of such audit; and

    d.      the Loan Parties' failure to provide notice under Section 5.2(a)(i) of the Credit Agreement in connection with the occurrence of any of the other Acknowledged Events of Default.

B.  **Anticipated Events of Default**

1.      Not Applicable.

*[Remainder of page intentionally left blank; end of Schedule I.]*

CONFIDENTIAL

## SCHEDULE 2

### Updated Schedule 3(j) of Security Agreement

1.  Commercial Tort Claims asserted by Vital Pharmaceuticals, Inc. against ProSupps et al. in connection with claims for (i) usurpation of corporate opportunity by former Executive Vice-President of Sales, (ii) tortious interference/non-compete against former Executive Vice-President of Sales and other former Vital Pharmaceuticals, Inc. employees and competing supplement company, and (iii) leave to seek punitive damages against former Executive Vice-President of Sales, with litigation pending in case number CACE-12-007083 in Broward County Circuit Court, Florida.

2.  Commercial Tort Claims asserted by Vital Pharmaceuticals, Inc. against Ball Metal et al. in connection with a breach/product liability action against a can supplier for defective can liner, with arbitration pending before the Commercial Arbitration Tribunal of the American Arbitration Association in case number 01-21-0000-1032.

3.  Commercial Tort Claims asserted by Vital Pharmaceuticals, Inc. against Suddath Global Logistics et al. in connection with a claim against a logistics company for mismanagement of Vital Pharmaceuticals, Inc's inventory, with litigation pending in case number CACE-21-003572 in Broward County Circuit Court, Florida.

4.  Commercial Tort Claims asserted by Vital Pharmaceuticals, Inc. against Daniel Yepes in connection with a claim against a former employee and conspirator for theft, with litigation pending in case number CACE-21-015520 in Broward County Circuit Court, Florida.

5.  Commercial Tort Claims asserted by Vital Pharmaceuticals, Inc. against Alejandro Machado in connection with a claim against a former employee for civil theft, with proceedings in (i) Broward County Circuit Court, Florida, in case no. CACE-17-022732, (ii) United States Bankruptcy Court, Southern District of Florida, in case number 21-17098-PDR and (iii) an adversary proceeding in the United States Bankruptcy Court, Southern District of Florida, in case number 21-01369-PDR.

6.  Commercial Tort Claims asserted by Vital Pharmaceuticals, Inc. against Berlin Manufacturing in connection with a claim under Section 1 of the Sherman Act with litigation pending in the Northern District of Illinois, United States District Court in case number 21-cv-6866-GSF.

7.  Commercial Tort Claims asserted by Vital Pharmaceuticals, Inc. against Triller et al. in connection with claims for failure to render services and defamation, with litigation pending in Broward County Circuit Court, Florida, in case number CACE-20-016430.

8.  Commercial Tort Claims asserted by Vital Pharmaceuticals, Inc. against NutraBlend Foods LLC et al. in connection with claims against a co-packer for delivering non-conforming product, with litigation pending in Broward County Circuit Court, Florida, in case number CACE-16-010090.

9.  Commercial Tort Claims asserted by Vital Pharmaceuticals, Inc. and Bang Jets, LLC against Gulfstream & Expert Aviation et al. in connection with claims for unfair trade practices, with litigation pending in Broward County Circuit Court, Florida in case number CACE-20-013100.

CHAR2\2638886v7

10.    Commercial Tort Claims asserted by Vital Pharmaceuticals, Inc. against Gulfstream in connection with claims for unfair trade practices, with an arbitration pending before the American Arbitration Association in case number 01-21-0000-1032.

11.    Commercial Tort Claims asserted by Vital Pharmaceuticals, Inc. against Brightfractl, Inc. in connection with a dispute over adequacy of social media ad placement services, with litigation pending in Palm Beach Circuit Court, Florida in case number 50-2020-CA-005690-XXXX.

12.    Commercial Tort Claims asserted by Vital Pharmaceuticals, Inc. against Monster Energy Company et al. in connection with a claim of trade disparagement, with litigation pending in the Southern District of Florida, United States District Court in case number 19-cv-61974-CMA, which case was previously administratively closed but not dismissed. Vital Pharmaceuticals, Inc. is in the process of reopening the matter.

13.    Commercial Tort Claims asserted by Quash Seltzer, LLC against PepsiCo Inc. in connection with claims for tortious interference with hard seltzer sales, with litigation stayed in the Southern District of Florida, United States District Court in case number 21-cv-601910-RAR, and the issuance of a Final Partial Award by the Commercial Arbitration Tribunal of the American Arbitration Association in case number 01-20-0015-8060.

14.    Commercial Tort Claims asserted by Vital Pharmaceuticals, Inc., JHO Intellectual Property Holdings LLC, and Elite IP Holdings LLC against PepsiCo Inc. in connection with claims for (i) declaratory relief that a certain Vital Pharmaceuticals, Inc. product is not subject to a certain distribution agreement nor otherwise subject to arbitration, and (ii) tortious interference, with litigation removed to the District Court of Arizona, United States District Court in case number 2:22-cv-00353-DLR from the Maricopa County Superior Court in case number CV2022-001132 as well as arbitration pending before the Commercial Arbitration Tribunal of the American Arbitration Association in case number 01-20-0015-8060.

15.    Commercial Tort Claims asserted by Vital Pharmaceuticals, Inc. against PepsiCo Inc. seeking declaratory relief, injunctive relief, attorneys' fees and other damages arising from PepsiCo Inc.'s requirement of continued payment of management fees with litigation pending in the District of Arizona, United States District Court for the in case number 22-cv-005930-SMB.

16.    Commercial claims asserted by Vital Pharmaceuticals, Inc. against Premier Nutrition Products, LLC & Derik Fay in connection with delivered product, with litigation pending in the Broward County Circuit Court, Florida in case number CACE-21-022185.

17.    Commercial claims asserted by Vital Pharmaceuticals, Inc. against Leading Edge Expositions et al. in connection with reimbursement of a deposit for a trade show cancelation, with litigation pending in Broward County Circuit Court, Florida in case number COWE22000612.

18.    Commercial claims asserted by Vital Pharmaceuticals, Inc. against Arnold Classic Australia in connection with reimbursement of a deposit for a trade show cancelation, with litigation pending in Australia, in case number M11355334.

19.    Commercial claims asserted by Vital Pharmaceuticals, Inc. against GNC et al. in connection with failure to pay for delivered product and improper chargebacks, with litigation pending in the Southern District of Florida, United States District Court in case number 20-cv-60940.

CHAR2\2638886v7

CONFIDENTIAL

20.   Commercial claims asserted by Vital Pharmaceuticals, Inc. against Lloyds London in connection with insurance coverage, with litigation pending in the Broward County Circuit Court, Florida in case number CACE-22-005500.

21.   Commercial claims asserted by Vital Pharmaceuticals, Inc. against Monster Energy Company et al. in connection with infringement claims, with litigation pending in the Southern District of Florida, United States District Court in case number 19-cv-60809.

22.   Commercial Tort Claims asserted by Vital Pharmaceuticals, Inc. et al. against PhD in connection with infringement claims, with litigation pending in the Central District of California, United States District Court in case number 20-cv-6745.

23.   Commercial Tort Claims asserted by Vital Pharmaceuticals, Inc. et al. against Ignite International & Gracely et al. in connection with infringement claims, with litigation pending in the Southern District of Florida, United States District Court in case number 21-cv-60451 and before the American Arbitration Association in case number 01-21-0017-1993.

24.   Commercial Tort Claims asserted by Vital Pharmaceuticals, Inc. against Dang Foods in connection with infringement claims, with litigation pending in the Southern District of Florida, United States District Court in case number 21-cv-61119.

25.   Commercial Tort Claims asserted by Vital Pharmaceuticals, Inc. against Bang Diamonds in connection with infringement claims, with litigation pending in the Southern District of Florida, United States District Court in case number 22-cv-60155.

*[Remainder of page intentionally left blank; end of Schedule 2.]*

CONFIDENTIAL

**SCHEDULE 3**

**CTO Scope**

The Chief Transaction Officer at the Borrower shall report directly to the Borrower's Chief Executive Officer, shall collaborate primarily with the Borrower's Senior Vice President of Finance, and shall be responsible for the following tasks related to the Capital Raise Transaction:

1.  Evaluating the Borrower's cash and liquidity requirements, including overseeing the development and review of cash flow projections, revenue projections, preparation of appropriate cash flow forecasts, and other financial and accounting information related to continuing operations and any re-financing or other restructuring that the Borrower may explore;

2.  Directing the Borrower's efforts of financial and administrative management and coordinating with external professionals, consultants, and advisors in connection with day-to-day operations and re-financing or restructuring initiatives, including overseeing the negotiation of any agreements with lenders or potential investors or funding sources;

3.  Evaluating the Borrower's operational processes and procedures, including the opportunities for, and implementation of, cost reduction measures;

4.  Directing negotiations with existing lenders, including the Administrative Agent and its professionals, under existing credit facilities and any other holders of secured debt, as well as any significant trade creditors;

5.  Evaluating and directing payments to vendors, the Borrower's external professionals, consultants, and advisors, and the Administrative Agent's professionals, consultants, and advisors, and in each case seeking the Borrower's Chief Executive Officer's approval of the same;

6.  Assisting the Borrower in connection with its anticipated transition away from the Pepsi distribution network and the implementation of a new distribution network;

7.  Communicating directly with the Borrower's Chief Executive Officer, other personnel working on the Capital Raise Transaction, the Investment Banker, the Borrower's outside attorneys and other professionals, and/or the Administrative Agent regarding negotiations with existing lenders under existing credit facilities and any other holders of secured debt, as well as any significant trade creditors, and providing information to, and as reasonably requested by, the Administrative Agent and others in connection with existing credit facilities;

8.  Collaborating with the Borrower's Chief Executive Officer, other personnel working on the Capital Raise Transaction, the Investment Banker, and the Borrower's outside attorneys and other professionals regarding the preparation of financial information and presentation of materials required for the marketing, sale and/or refinancing of the Borrower;

9.  Depending upon the initial indications of the refinancing process conducted by the Investment Banker, assisting the Borrower in connection with any in-court restructuring or liquidation proceedings, including coordinating with the Investment Banker, the Borrower's legal counsel, and the Borrower's other outside professionals, and overseeing the preparation of related budgets, milestones, and other financial models; and

CHAR2\2638886v7

10. Providing such other services as are customarily provided in connection with the analysis and negotiation of a re-financing or restructuring or liquidation initiative, as reasonably requested by the Administrative Agent and mutually agreed to by the Borrower.

[*Remainder of page intentionally left blank; end of Schedule 3.*]

CHAR2\2638886v7