# EXHIBIT 9

## THIRD FORBEARANCE AGREEMENT AND FOURTH AMENDMENT TO AMENDED AND RESTATED REVOLVING CREDIT AND TERM LOAN AGREEMENT

THIS THIRD FORBEARANCE AGREEMENT AND FOURTH AMENDMENT TO AMENDED AND RESTATED REVOLVING CREDIT AND TERM LOAN AGREEMENT (this "Agreement"), dated as of June 30, 2022, is entered into by and among VITAL PHARMACEUTICALS, INC., a Florida corporation (the "Borrower"), the Guarantors party hereto, the Lenders party hereto, TRUIST BANK, in its capacity as administrative agent for the Lenders (the "Administrative Agent"), Swingline Lender, and Issuing Bank, and JOHN H. OWOC, an individual resident of the State of Florida (the "Owner Pledgor").

### RECITALS

WHEREAS, the Borrower, the Guarantors from time to time party thereto, the Lenders from time to time party thereto, the Administrative Agent, the Swingline Lender, and the Issuing Bank are parties to that certain Amended and Restated Revolving Credit and Term Loan Agreement dated as of August 14, 2020 (as amended by that certain First Amendment to Amended and Restated Revolving Credit and Term Loan Agreement dated as of June 15, 2021, that certain Second Amendment to Amended and Restated Revolving Credit and Term Loan Agreement dated as of June 30, 2021, and that certain Third Amendment to Amended and Restated Revolving Credit and Term Loan Agreement dated as of December 31, 2021, and as further amended, modified, extended, restated, replaced, or supplemented in writing from time to time, the "Credit Agreement").

WHEREAS, pursuant to the Owner Pledge Agreement, the Owner Pledgor has pledged certain assets to the Administrative Agent to secure the Secured Obligations (as defined therein).

WHEREAS, the parties hereto have previously entered into that certain Second Forbearance Agreement, dated as of June 17, 2022 and the "Forbearance Period" as defined therein will automatically expire according to its terms at 11:59 p.m. (Eastern time) on June 30, 2022.

WHEREAS, the Loan Parties have informed the Administrative Agent and the Lenders that certain Events of Default have occurred and are continuing as described in Part A of Schedule 1 attached hereto (collectively, the "Existing Events of Default").

WHEREAS, the Loan Parties have also informed the Administrative Agent and the Lenders that certain Defaults and Events of Default are anticipated to occur as described in Part B of Schedule 1 attached hereto (collectively, the "Anticipated Events of Default" and together with the Existing Events of Default, the "Acknowledged Events of Default").

WHEREAS, the Loan Parties and the Owner Pledgor have requested that the Administrative Agent and the Lenders agree to forbear from exercising their rights and remedies arising under the Loan Documents and applicable Laws as a result of the Acknowledged Events of Default during the Forbearance Period.

WHEREAS, the Administrative Agent and the Lenders have agreed to do so, but only pursuant to the terms and conditions set forth herein.

CHAR2\2652687v9

<u>AGREEMENT</u>

NOW, THEREFORE, in consideration of these premises and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

1.    <u>Definitions</u>. Capitalized terms used herein but not otherwise defined herein shall have the meanings provided to such terms in the Credit Agreement. As used in this Agreement, the following terms shall have the meanings set forth below:

"<u>Acknowledged Events of Default</u>" has the meaning set forth in the Recitals.

"<u>Administrative Agent</u>" has the meaning set forth in the preamble to this Agreement.

"<u>Administrative Agent's Financial Advisor</u>" has the meaning set forth in <u>Section 13</u>.

"<u>Anticipated Events of Default</u>" has the meaning set forth in the Recitals.

"<u>Borrower</u>" has the meaning set forth in the preamble to this Agreement.

"<u>Capital Raise Offer</u>" has the meaning set forth in <u>Section 7(b)(ii)(D)</u>.

"<u>Capital Raise Transaction</u>" means one transaction or a series of transactions in the form of a sale, financing, issuance of Capital Stock, other liquidity generating event or some combination thereof that is intended to generate cash proceeds sufficient for the payment of the Obligations in full.

"<u>Capital Raise Transaction Process</u>" has the meaning set forth in <u>Section 7(a)</u>.

"<u>Cash Flow Forecast</u>" has the meaning set forth in <u>Section 11(a)</u>.

"<u>Credit Agreement</u>" has the meaning set forth in the Recitals.

"<u>CTO</u>" has the meaning set forth in <u>Section 8</u>.

"<u>CTO Scope</u>" has the meaning set forth in <u>Section 8</u>.

"<u>DIP Budget</u>" has the meaning set forth in <u>Section 11(f)</u>.

"<u>Effective Date</u>" has the meaning set forth in <u>Section 17</u>.

"<u>Enterprise Valuator</u>" has the meaning set forth in <u>Section 14(a)</u>.

"<u>Existing Events of Default</u>" has the meaning set forth in the Recitals.

"<u>Facility Payoff</u>" means the payment in full of all Obligations and the termination of the Commitments of the Lenders.

"<u>Forbearance Fee</u>" has the meaning set forth in <u>Section 4.</u>

CONFIDENTIAL                                                                                    VPX-JHO0000000234

"<u>Forbearance Period</u>" means the period from the Effective Date to (but excluding) the earliest date that a Forbearance Termination Event occurs.

"<u>Forbearance Termination Event</u>" means the earliest of the following to occur: (a) any Event of Default other than an Event of Default constituting an Acknowledged Event of Default; (b) any Default other than a Default constituting an Acknowledged Event of Default that continues unremedied for a period of seven (7) days after written (which may be by email) notice thereof by the Administrative Agent to the Borrower; (c) the breach by any Loan Party or the Owner Pledgor of any covenant or provision of this Agreement; (d) the Borrower's failure to challenge any final award or judgment against the Borrower by a Commercial Arbitration Tribunal of the America Arbitration Association in *Orange Bang, Inc. and Monster Energy Company v. Vital Pharmaceuticals, Inc d/b/a VPX Sports* (Case No. 01-20-0005-6081) (such proceeding, the "<u>Orange Bang Arbitration</u>") within the applicable time period therefor, including, but not limited to such challenges as may be available by way of vacatur, appeal or any other means; (e) the complete and final exhaustion of all of the Borrower's rights to challenge the award or judgment, including but not limited to challenges to the finality of the award or judgment, against the Borrower in the Orange Bang Arbitration; (f) the termination, rescission, or modification in any manner materially adverse to the Administrative Agent or the Lenders of that certain settlement agreement dated as of June 21, 2022, and entered into by and among Borrower, Quash Seltzer, LLC, JHO Intellectual Property Holdings, LLC, Elite IP Holdings, LLC and PepsiCo, Inc. (the "<u>Pepsi Settlement Agreement</u>"); (g) the occurrence of any of the events described in <u>Section 7(c)</u>; and (h) 11:59 p.m. (Eastern time) on August 5, 2022.

"<u>IB Scope</u>" has the meaning set forth in <u>Section 7(a)</u>.

"<u>Investment Banker</u>" has the meaning set forth in <u>Section 7(a)</u>.

"<u>Litigation Disclosure Summary</u>" has the meaning set forth in <u>Section 11(b)</u>.

"<u>Orange Bang Arbitration</u>" has the meaning set forth in the definition of "Forbearance Termination Event" in this <u>Section 1</u>.

"<u>Owner Pledgor</u>" has the meaning set forth in the preamble to this Agreement.

"<u>Pepsi</u>" has the meaning set forth in the definition of "Forbearance Termination Event" in this <u>Section 1</u>.

"<u>Pepsi Settlement Agreement</u>" has the meaning set forth in the definition of "Forbearance Termination Event" in this <u>Section 1</u>.

"<u>Process Letter</u>" means any bid process letter from the Investment Banker that, among other things, requests third parties to submit to any Loan Party, the Owner Pledgor, or the Investment Banker either (a) written, non-binding, initial indications of interest with respect to a Capital Raise Transaction or (b) written good faith offers with respect to a Capital Raise Transaction.

"<u>Released Party</u>" has the meaning set forth in <u>Section 20</u>.

"<u>Specified Borrowing</u>" has the meaning set forth in <u>Section 10</u>.

"<u>Updated Appraisals</u>" has the meaning set forth in <u>Section 14(b)</u>.

CONFIDENTIAL

2.    Estoppel. Each Loan Party and the Owner Pledgor each hereby acknowledges and agrees that, as of the close of business on June 29, 2022, (a) the aggregate outstanding principal amount of the Revolving Loans was $195,000,000.00, (b) the aggregate outstanding principal amount of the Term Loans was $107,082,718.45, (c) the aggregate outstanding principal amount of the Swingline Loans was $0.00 and (d) the LC Exposure was $0.00, each of which constitutes a valid and subsisting obligation of each Loan Party, jointly and severally, owed to the Lenders that is not subject to any credits, offsets, defenses, claims, counterclaims, or adjustments of any kind.

3.    Consent, Acknowledgement and Reaffirmation. Each Loan Party and the Owner Pledgor each hereby: (a) acknowledges that (i) the Existing Events of Default have occurred and have not been waived, (ii) the Anticipated Events of Default are expected to occur and have not been waived, (iii) no Acknowledged Event of Default is being waived pursuant to this Agreement, and (iv) Default Interest that has accrued on all Obligations is not being waived pursuant to this Agreement and is (or shall be) due and payable in the ordinary course pursuant to the Credit Agreement; (b) acknowledges and consents to this Agreement and the terms and provisions hereof; (c) reaffirms the covenants and agreements contained in each Loan Document to which such Person is party, including, in each case, as such covenants and agreements may be modified by this Agreement and the transactions contemplated hereby; (d) reaffirms that each of the Liens created and granted in or pursuant to the Loan Documents in favor of the Administrative Agent for the benefit of the holders of the Obligations is valid and subsisting, and acknowledges and agrees that this Agreement shall in no manner impair or otherwise adversely affect such Liens; and (e) confirms that each Loan Document to which such Person is a party is and shall continue to be in full force and effect and the same is hereby ratified and confirmed in all respects.

4.    Forbearance Fee. In consideration of the written consent of the Lenders that have delivered a duly executed signature page to this Agreement to the Administrative Agent by 12:00 p.m. (Eastern time) on the Effective Date (or such later time as may be agreed to by the Borrower and the Administrative Agent) (each a "Consenting Lender" and collectively, the "Consenting Lenders"), the Borrower shall pay to the Administrative Agent, for the account of each Consenting Lender, a forbearance fee (the "Forbearance Fee") in the amount of $546,285.33. The Forbearance Fee shall be fully earned and non-refundable as of the Effective Date and shall be due and payable upon the earlier to occur of a Forbearance Termination Event and the Facility Payoff; provided that if the Facility Payoff occurs on or before July 29, 2022, then $182,095.11 of the Forbearance Fee shall be automatically deemed waived and cancelled.

5.    Forbearance.

(a)    *Forbearance.* Subject to the terms and conditions set forth herein, the Administrative Agent and the Lenders shall, during the Forbearance Period, forbear from exercising any and all of the rights and remedies available to them under the Loan Documents and applicable Laws, but only to the extent that such rights and remedies arise exclusively as a result of the existence of the Acknowledged Events of Default; provided, however, that (i) the Administrative Agent and the Lenders shall be free to exercise any or all of their rights and remedies arising on account of the Acknowledged Events of Default at any time upon or after the occurrence of a Forbearance Termination Event and (ii) the Acknowledged Events of Default shall continue to exist and apply for all purposes and provisions under the Loan Documents, including those provisions, conditions, requirements, rights, and obligations that are dependent upon the absence of any Default or Event of Default. For the avoidance of doubt, during the Forbearance Period: (A) Default Interest shall continue to accrue on all Obligations; (B) the Lenders and the Issuing Bank (as applicable) shall have no obligation to make, additional Revolving Loans, additional Swingline Loans, or any other Credit Event; (C) no Borrowing may be converted into, or continued as, a Eurodollar Borrowing; and (D) this Agreement shall not constitute the Administrative Agent's

or any Lender's agreement or consent to the terms of the Pepsi Settlement Agreement or a waiver of any Default or Event of Default that may arise, if any, from the Pepsi Settlement Agreement.

(b)    *Forbearance Period*. Nothing set forth herein or contemplated hereby is intended to constitute an agreement by the Administrative Agent or any Lender to forbear from exercising any of the rights or remedies available to the Administrative Agent and the Lenders under the Loan Documents or applicable Laws (all of which rights and remedies are hereby expressly reserved by the Administrative Agent and the Lenders) upon or after the occurrence of a Forbearance Termination Event.

6.    <u>Amendments to Credit Agreement</u>. Effective as of the Effective Date, the Credit Agreement is amended as follows:

(a)    *Definition of Aggregate Revolving Commitment Amount*. The definition of "Aggregate Revolving Commitment Amount" in Section 1.01 of the Credit Agreement is amended and restated in its entirety to read as follows:

"*Aggregate Revolving Commitment Amount*" shall mean, at any time, the aggregate principal amount of the Aggregate Revolving Commitments outstanding as of such time. On the Fourth Amendment Effective Date, the Aggregate Revolving Commitment Amount was Two-Hundred Sixty Million Dollars ($260,000,000).

(b)    *Definition of Doehler Note*. Section 1.01 of the Credit Agreement is amended to include a definition for "Doehler Note" in appropriate alphabetical order to read as follows:

"*Doehler Note*" shall have the meaning set forth in <u>Section 7.1(w)</u>.

(c)    *Definition of Fourth Amendment Effective Date*. Section 1.01 of the Credit Agreement is amended to include a definition for "Fourth Amendment Effective Date" in appropriate alphabetical order to read as follows:

"*Fourth Amendment Effective Date*" shall mean June 30, 2022.

(d)    *Definition of Required Revolving Lenders*. Section 1.01 of the Credit Agreement is amended to include a definition for "Required Revolving Lenders" in appropriate alphabetical order to read as follows:

"*Required Revolving Lenders*" shall mean, at any time that there are two (2) or more Lenders that are not affiliated, at least two (2) Lenders that are not affiliated holding, in aggregate, more than fifty percent (50.0%) of the Aggregate Revolving Commitments at such time (or, if there is only one (1) Lender at such time, such Lender), or, if the Lenders have no Revolving Commitments outstanding at such time, then Lenders holding more than fifty percent (50.0%) of the Aggregate Revolving Credit Exposure of the Lenders at such time; provided, that, to the extent that any Lender is a Defaulting Lender, such Defaulting Lender, and all of its Revolving Commitments and Revolving Credit Exposure, shall be excluded for purposes of determining the Required Revolving Lenders.

(e)    *Section 7.1 (Indebtedness and Preferred Equity) of the Credit Agreement*. Section 7.1 of the Credit Agreement is amended by (i) replacing the period at the end of clause (v) of such Section with "; and", (ii) amending and restating clause (u) of such Section to read as follows:

CONFIDENTIAL                    VPX-JHO0000000237

(u)      other unsecured Indebtedness of the Loan Parties and Subsidiaries in an aggregate principal amount not to exceed Twenty-Five Million Dollars ($25,000,000) at any time outstanding; provided, that, any outstanding Indebtedness incurred under Section 7.1(w) shall reduce capacity under this Section 7.1(u) on a dollar-for-dollar basis (but not below $0);

and (iii) adding new clause (w) to such Section to read as follows:

(w)      Indebtedness in respect of an unsecured promissory note (the "Doehler Note") issued by the Borrower in favor of Doehler USA, Inc., in a principal amount not to exceed Twenty-Six Million Dollars ($26,000,000) at any one time outstanding and for which no yield (whether in the form of interest rate, margin, original issue discount, upfront fees or otherwise) shall accrue or be payable in respect of principal balance thereof; provided, that, any outstanding Indebtedness incurred under Section 7.1(u) shall reduce capacity under this Section 7.1(w) on a dollar-for-dollar basis.

(f)      *Section 7.13 (Prepayments of Certain Indebtedness; Modification of Certain Documents) of the Credit Agreement.* Section 7.13(a) of the Credit Agreement is amended by (i) deleting "and" immediately preceding clause (iv) of such Section, (ii) adding "and" immediately following clause (iv) of such Section, and (iii) adding new clause (v) to such Section to read as follows:

(v)      only on and after December 31, 2022, the Doehler Note.

(g)      *Section 11.2(b)(ii) (Waiver; Amendments) of the Credit Agreement.* Section 11.2(b)(ii) of the Credit Agreement is amended and restated in its entirety to read as follow:

(ii)      prior to the Revolving Commitments Termination Date: (A) unless also signed by each Lender holding any Revolving Commitment or any Revolving Credit Exposure, no such amendment or waiver shall change the definition of "*Required Revolving Lenders*" or this clause (b)(ii)(A) without the consent of each such Lender; and (B) unless also signed by the Required Revolving Lenders, no such amendment or waiver shall (i) waive any Default or Event of Default for purposes of Section 3.2, (ii) amend, change, waive, discharge or terminate Section 3.2 or Section 8.1 in a manner adverse to such Lenders, or (iii) amend, change, waive, discharge or terminate Article VI (or any defined term used therein) or this clause (b)(ii)(B); or

(h)      *Schedule I to Credit Agreement.* Schedule I to the Credit Agreement is amended and restated in its entirety to read in the form attached to this Agreement as Schedule 2. Each party hereto acknowledges, agrees, and confirms that Schedule 2 reflects the Revolving Commitment of each Lender (after giving effect to this Agreement) as of the Effective Date.

7.      Investment Banking Process.

(a)      *Investment Banker.* At all times during the Forbearance Period the Loan Parties shall continue to retain a recognized third-party investment banker reasonably acceptable to the Required Lenders and the Loan Parties (the "Investment Banker"), it being acknowledged and agreed that Rothschild & Co is acceptable to the Required Lenders and the Loan Parties. The Loan Parties shall be responsible for the fees and expenses incurred in connection with the engagement of the Investment Banker. The scope of the Investment Banker's engagement shall include, among other things, the development and implementation of a process intended to generate a potential

CONFIDENTIAL                                                        VPX-JHO0000000238

Capital Raise Transaction (the "Capital Raise Transaction Process") and be otherwise on terms reasonably acceptable to the Required Lenders and the Loan Parties (the "IB Scope"). The Investment Banker shall report to the Chief Executive Officer of the Borrower and work with the CTO and other management for the purpose of carrying out the IB Scope. Any material change, limitation, or revision to the IB Scope without the prior written consent of the Required Lenders, which consent shall not be unreasonably withheld, conditioned, or delayed, shall constitute an immediate Forbearance Termination Event; provided, that, notwithstanding the foregoing the Loan Parties may broaden the IB Scope without the consent of the Required Lenders. During the Forbearance Period, the Loan Parties shall be prohibited from terminating the Investment Banker's engagement without the prior written consent of the Required Lenders, which shall not be unreasonably withheld, conditioned, or delayed and shall not be required if the Investment Banker is replaced with another Investment Banker whose identity and scope of engagement are reasonably acceptable to the Required Lenders within five (5) Business Days of such termination.

(b)    *Investment Banking Process Materials.* The Loan Parties shall (i) provide, or cause the Investment Banker to provide, access at all times to the Administrative Agent and its professionals to the data room related to the Capital Raise Transaction Process and (ii) deliver to the Administrative Agent for distribution to the Lenders copies of the following documents and information with respect to the Capital Raise Transaction Process (which documents and information shall be subject to the confidentiality obligations set forth in Section 11.11 of the Credit Agreement), as promptly as practicable after such information or documents are received or produced by the Loan Parties, the Owner Pledgor, or the Investment Banker: (A) the investor presentation and each Process Letter; (B) on a weekly basis, an updated list of all interested third parties that have entered into non-disclosure agreements with the Loan Parties in respect of a Capital Raise Transaction (including confirmation that such parties have received the investor presentation and each Process Letter) and have not withdrawn their indications of interest; (C) on a weekly basis, written summaries describing the proposed amount of financing, equity contribution, or other consideration to be provided to the Loan Parties and any material, non-customary conditions precedent to funding or closing of all non-binding, initial indications of interest in a Capital Raise Transaction or offers therefor received from third parties (including a description as to whether such indications of interest or offers have not been withdrawn), in each case with such third parties' names and identifying information redacted; (D) following the applicable submission deadline set forth in any Process Letter, copies of any final offers to consummate a Capital Raise Transaction submitted by third parties, in each case, with such third parties' names and identifying information redacted (each a "Capital Raise Offer"); and (E) on a weekly basis, a written certification (which may be provided by email) from the General Counsel of the Borrower confirming that the Loan Parties remain in compliance with Section 7(c). The Loan Parties shall use best efforts to cause the Investment Banker to endeavor to obtain offers in respect of the Capital Raise Transaction with exceptions to confidentiality provisions to permit disclosure thereof to the Administrative Agent and the Lenders on a redacted basis as contemplated by this Section 7(b).

(c)    *Investment Banking Process Milestones.* The Loan Parties and the Owner Pledgor hereby agree as follows:

i.    Failure of the Loan Parties, on or before July 8, 2022, to have (A) received at least one (1) non-binding, initial indication of interest for a Capital Raise Transaction from one or more third parties and (B) caused the Investment Banker to deliver on a "professional eyes only" basis to the Administrative Agent's professionals the name(s) of the party(ies) that have submitted any such non-

CONFIDENTIAL                                                                    VPX-JHO0000000239

binding, initial indication of interest shall constitute an immediate Forbearance Termination Event.

ii.    Failure of the Loan Parties, on or before July 19, 2022, to have (A) received at least one (1) Capital Raise Offer and (B) caused the Investment Banker to deliver on a "professional eyes only" basis to the Administrative Agent's professionals the name(s) of the party(ies) to such Capital Raise Offer(s) shall constitute an immediate Forbearance Termination Event.

iii.    From and after July 19, 2022, the absence of at least one (1) fully effective Capital Raise Offer that has not been terminated, withdrawn, or modified in a material adverse manner (as determined in the reasonable discretion of the Administrative Agent) shall constitute an immediate Forbearance Termination Event.

8.    <u>Chief Transaction Officer</u>. At all times during the Forbearance Period the Loan Parties shall continue to retain a Chief Transaction Officer (the "CTO") reasonably acceptable to the Required Lenders and the Loan Parties, it being acknowledged and agreed that Mr. Richard D. Caruso is acceptable to the Required Lenders and the Loan Parties. The Loan Parties shall be responsible for the fees and expenses incurred in connection with the engagement of the CTO. The scope of the CTO's engagement shall be as set forth on <u>Schedule 3</u> hereto (the "CTO Scope"). The CTO shall report to the Chief Executive Officer of the Borrower and work with management for the purpose of carrying out the CTO Scope. Any material change, limitation, or revision to CTO Scope without the prior written consent of the Required Lenders, which consent shall not be unreasonably withheld, conditioned, or delayed, shall constitute an immediate Forbearance Termination Event; <u>provided</u>, that, notwithstanding the foregoing the Loan Parties may broaden the CTO Scope without the consent of the Required Lenders. During the Forbearance Period, the Loan Parties shall be prohibited from terminating the CTO's engagement without the prior written consent of the Required Lenders, which shall not be unreasonably withheld, conditioned, or delayed and shall not be required if the CTO is replaced with another CTO whose identity and scope of engagement are reasonably acceptable to the Required Lenders within five (5) Business Days of such termination. Upon the death, disability, or voluntary termination of the CTO, the Loan Parties shall engage and retain a CTO reasonably acceptable to the Required Lenders and the Loan Parties within fourteen (14) days after the death, disability, or voluntary termination of the CTO (or such later date as the Required Lenders shall agree, such consent not to be unreasonably withheld, conditioned, or delayed).

9.    <u>One-Time Funding</u>. The Borrower has requested that the Lenders honor a Notice of Revolving Borrowing on June 30, 2022, in the aggregate amount of $6,000,000.00, which Loans would be composed of LIBO Index Rate Loans (the "Specified Borrowing"). Notwithstanding anything to the contrary herein (including <u>Section 5(a)(ii)(B)</u>), in the Credit Agreement, or in any other Loan Document, the Required Lenders and the Required Revolving Lenders hereby agree (a) to qualify the conditions and requirements set forth in Sections 3.2(a) and 3.2(b) of the Credit Agreement to exclude the Acknowledged Events of Default in order to honor the Borrower's request for the Specified Borrowing and (b) to honor the Borrower's request for the Specified Borrowing subject to the following conditions: (i) the conditions precedent set forth in Section 3.2 of the Credit Agreement, as qualified hereby with respect to the Acknowledged Events of Default, shall be satisfied; (ii) the occurrence and continuance of the Acknowledged Events of Default shall not, in and of itself, constitute a failure to satisfy the conditions set forth in Sections 3.2(a) and 3.2(b) of the Credit Agreement, and the Borrower's representation and warranty in the Notice of Revolving Borrowing that no Default or Event of Default exists, and the Loan Parties' representations and warranties in the Credit Agreement and the other Loan Documents that no Default or Event of Default exists, shall in each case be deemed qualified to the extent that the Acknowledged Events of Default exist; (iii) the Effective Date shall have occurred; and (iv) Administrative Agent shall have

received a duly executed Notice of Revolving Borrowing for the Specified Borrowing. Each Loan Party and the Owner Pledgor each hereby acknowledge that the agreement of the Administrative Agent and the Required Revolving Lenders to make this one-time funding of the Specified Borrowing shall not constitute: (a) a waiver of any Default or Event of Default that may exist, including without limitation the Acknowledged Events of Default, (b) except as expressly set forth in this Agreement, an agreement by any Lender or the Issuing Bank to honor any other request for a Credit Event, or (c) a course of conduct or dealing among the parties.

10.      Mandatory Repayment of Revolving Loan. The Borrower shall make mandatory prepayments of the Obligations to the Administrative Agent, each of which shall be applied to the principal balance of the Revolving Loans, *pro rata* to the Lenders based on their respective Revolving Commitments, between the Effective Date and on or prior to the dates and in the amounts set forth in the table below (provided that any overpayment shall be applied to reduce the amount of the following payments in direct order):

| Date | Amount |
|------|--------|
| July 14, 2022 | $1,000,000.00 |
| July 21, 2022 | $2,000,000.00 |
| July 28, 2022 | $3,000,000.00 |

For the avoidance of doubt and notwithstanding anything to the contrary in the Credit Agreement: (a) each prepayment shall be applied *first*, to the Revolving Loans that are Base Rate Loans to the full extent thereof and *second*, to the Revolving Loans that are LIBO Index Rate Loans to the full extent thereof; (b) the Revolving Commitments of the Lenders shall not be permanently reduced by the amount of any prepayments made pursuant to this Section 10; and (c) any failure by the Borrower to timely pay the amounts set forth in this Section 10 shall constitute an immediate Event of Default and Forbearance Termination Event.

11.      Additional Reporting During Forbearance Period. In addition to all existing reporting requirements under the Credit Agreement and the other Loan Documents, during the Forbearance Period, the Loan Parties shall deliver to the Administrative Agent, for distribution to the Lenders, in each case in form and detail reasonably satisfactory to the Administrative Agent:

(a)      every fourth Thursday following March 17, 2022, a rolling 13-week forecast of cash flows for the Loan Parties and their Subsidiaries on a consolidated basis as of the last day of the immediately preceding week (each a "Cash Flow Forecast");

(b)      contemporaneously with the delivery of each Cash Flow Forecast, a written summary of every litigation or arbitration to which any Loan Party or the Owner Pledgor is party (each a "Litigation Disclosure Summary"); provided, that (i) the Litigation Disclosure Summary shall not be required to contain any information that the Loan Parties believe in good faith is subject to the attorney-client privilege, the attorney work product doctrine and/or other applicable privilege or protection from disclosure that the Loan Parties believe in good faith could be deemed waived as a result of disclosure of the Litigation Disclosure Summary to the Administrative Agent and/or the Lenders, and (ii) any estimate of liabilities or other projected outcomes set forth in the Litigation Disclosure Summary that is made in good faith shall be deemed a projection and not be the basis for any breach of any representation or warranty set forth in the Loan Documents;

(c)      every Thursday, (i) a variance report showing a comparison of the previous week's actual cash flows for the Loan Parties and their Subsidiaries (on a consolidated basis) to the most recently previously delivered Cash Flow Forecast in both dollar and percentage units, together with

a written explanation of any variance (positive or negative) for any line item that exceeds ten percent (10%), and (ii) a report of the previous week's sales volume, itemized by brand;

(d)    as soon as available, but in any event within thirty (30) days after the end of each calendar month, commencing with the month ending May 31, 2022, an unaudited combined balance sheet of the Loan Parties and Subsidiaries as of the end of such calendar month, and the related unaudited combined statements of income or operations, changes in stockholders' equity and cash flows of the Loan Parties and Subsidiaries for such calendar month and the then elapsed portion of such Fiscal Year, all in reasonable detail and prepared in accordance with GAAP, such combined statements to be certified by the chief executive officer, chief financial officer, treasurer or controller (or a Responsible Officer of substantially equivalent title and authority) of the Borrower as presenting fairly the financial condition, results of operations, stockholders' equity and cash flows of the Loan Parties and Subsidiaries in accordance with GAAP, and including management discussion and analysis of operating results, profitability trends and customer retention, subject only to normal year-end audit adjustments and the absence of footnotes and, in the case of such combined statements, certified by the chief executive officer, chief financial officer, treasurer or controller (or a Responsible Officer of substantially equivalent title and authority) of the Borrower, to the effect that such statements are fairly stated in all material respects when considered in relation to the combined financial statements of the Loan Parties and Subsidiaries;

(e)    promptly following the Administrative Agent's request therefor, (i) information regarding the status of the implementation of the terms of the Pepsi Settlement Agreement, including the Loan Parties' establishment or expansion of any distribution network that replaces the distribution network established with Pepsi, and (ii) such other information regarding the results of operations, business affairs, and financial condition of any or all of the Loan Parties and Subsidiaries; and

(f)    on or before July 8, 2022, a draft of a budget for the Loan Parties' liquidity and financing needs, as applicable, in the event that one or more of the Loan Parties avails itself of any Debtor Relief Law (the "DIP Budget"). From and after the Loan Parties' delivery of the initial draft of the DIP Budget and during the Forbearance Period, the Loan Parties shall, and shall cause their professionals to, reasonably cooperate with the Administrative Agent and its professionals regarding the continued refinement of the DIP Budget to reflect the Loan Parties' then-current and expected financial condition.

12.    Periodic Updates. During the Forbearance Period, the Loan Parties shall make certain representatives of the Loan Parties and their advisors (including, without limitation, the Investment Banker and the CTO), as reasonably requested by the Administrative Agent, available to the Administrative Agent and the Lenders for periodic conference calls to be held on a bi-weekly basis commencing the week of July 4, 2022, or more frequently as reasonably requested by the Administrative Agent.

13.    Administrative Agent's Financial Advisor. The Administrative Agent, through its counsel, has retained FTI Consulting, Inc. (the "Administrative Agent's Financial Advisor") to monitor the Loan Parties' financial and operational performance. During the Forbearance Period, the Loan Parties shall cooperate in good faith with the Administrative Agent's Financial Advisor and provide the Administrative Agent's Financial Advisor with reasonable access to the Loan Parties' facilities, books and records, officers and consultants (including, without limitation, the Investment Banker and the CTO) and to any information reasonably necessary for the Administrative Agent's Financial Advisor to perform the services within the scope of its engagement.

CONFIDENTIAL                                              VPX-JHO0000000242

14.     <u>Valuations, Appraisals</u>.

(a)     *Enterprise Valuation.* If the Administrative Agent, or counsel to the Administrative Agent, engages an independent contractor to prepare and provide, exclusively for the benefit of the Administrative Agent and the Lenders, an enterprise valuation of the Loan Parties (the "<u>Enterprise Valuator</u>"), then the Loan Parties shall cooperate in good faith with the Enterprise Valuator and provide the Enterprise Valuator with reasonable access, at reasonable times and upon reasonable advance written (which may be by email) notice, to the Loan Parties' facilities, books and records, officers and consultants and any information reasonably necessary for the Enterprise Valuator to perform the services within the scope of its engagement.

(b)     *Appraisals.* The Loan Parties shall permit the representatives and independent contractors of the Administrative Agent to prepare and provide, exclusively for the benefit of the Administrative Agent and the Lenders, one or more appraisals of the Mortgaged Property and any other Collateral (the "<u>Updated Appraisals</u>"). The Loan Parties shall cooperate in good faith in connection with the Updated Appraisals and provide reasonable access, at reasonable times and upon reasonable written (which may be by email) advance notice, to the Mortgaged Properties and the other Collateral.

15.     <u>Fees and Expenses</u>. Without in any way limiting the obligations of the Loan Parties and the Owner Pledgor under the Loan Documents, including without limitation Section 11.3 of the Credit Agreement, the Loan Parties shall, within ten (10) Business Days after written demand therefor, reimburse the Administrative Agent for all of its documented and invoiced out-of-pocket fees and expenses reasonably incurred in connection with this Agreement, the Credit Agreement, and the other Loan Documents (including, without limitation, (a) the documented and invoiced fees and out-of-pocket expenses of (i) Moore & Van Allen PLLC, as counsel to the Administrative Agent, (ii) the Administrative Agent's Financial Advisor, and (iii) the Enterprise Valuator and (b) the documented out-of-pocket fees and expenses incurred in connection with the Updated Appraisals).

16.     [Reserved.]

17.     <u>Conditions Precedent</u>. This Agreement shall be effective on the date (the "<u>Effective Date</u>") that each of the following conditions have been satisfied as determined by the Administrative Agent in its reasonable discretion, or waived by the Required Lenders in their sole discretion:

(a)     *Executed Agreement.* The Administrative Agent shall have received a copy of this Agreement duly executed by each of the Loan Parties, the Owner Pledgor, the Lenders constituting the Required Lenders, the Lenders constituting the Required Revolving Lenders (as defined in the Credit Agreement after giving effect to the transactions contemplated hereby), and the Administrative Agent.

(b)     *Officer's Certificate, Authorizing Resolutions, and Incumbencies.* The Administrative Agent shall have received certificates of resolutions or other action, incumbency certificates, and/or other certificates of the Secretary, Assistant Secretary, or other appropriate officer (or member or manager, as the case may be, in the case of limited liability companies) acceptable to the Administrative Agent, of each Loan Party, dated as of the Effective Date, addressing the matters set forth in Section 3.1(b)(i) of the Credit Agreement, in each case updated to reflect the transactions contemplated by this Agreement and in form reasonably satisfactory to the Administrative Agent; provided, that to the extent none of the foregoing has changed since they were most recently delivered to the Administrative Agent for a Loan Party, then such Loan Party may deliver a customary, short-form "bring down" certificate.

CONFIDENTIAL

(c)    *Administrative Agent's Fees and Expenses.* The Administrative Agent shall have received: (i) all reasonable, documented, and invoiced fees payable to the Administrative Agent or any Affiliate thereof as agreed between the Administrative Agent and the Borrower; and (ii) reimbursement from the Loan Parties for all documented and invoiced out-of-pocket fees and expenses reasonably incurred in connection with this Agreement, the Credit Agreement, and the other Loan Documents (including, without limitation, the documented and invoiced fees and out-of-pocket expenses of Moore & Van Allen PLLC, as counsel to the Administrative Agent, and of the Administrative Agent's Financial Advisor) through the Effective Date to the extent invoiced to the Loan Parties at least one (1) Business Day prior to the Effective Date, except to the extent otherwise agreed by the Administrative Agent.

18.    <u>Representations of Loan Parties.</u> Each Loan Party represents and warrants to the Administrative Agent and the Lenders as follows:

(a)    Such Loan Party has the requisite power and authority and has taken all necessary action to authorize the execution, delivery, and performance of this Agreement in accordance with its terms.

(b)    This Agreement has been duly executed and delivered by such Loan Party and the Owner Pledgor and is the legally valid and binding obligation of such Person, enforceable against such Person in accordance with its respective terms, except as may be limited by Debtor Relief Laws or by equitable principles relating to enforceability.

(c)    The execution, delivery, and performance by such Loan Party and the Owner Pledgor of this Agreement and the consummation of the transactions contemplated by this Agreement do not and will not require, as a condition to the effectiveness thereof, any registration with, consent, or approval of, or notice to, or other action to, with, or by, any Governmental Authority except for (i) filings necessary to perfect, and/or maintain the perfection of, the Liens created under the Loan Documents or (ii) filings, recordings, or consents where failure to obtain or make could not reasonably be expected to have a Material Adverse Effect.

(d)    After giving effect to this Agreement: (i) the representations and warranties of the Loan Parties set forth in the Loan Documents (other than the representations and warranties set forth in Section 4.6 (solely as it relates to the Existing Events of Default) of the Credit Agreement) are true and correct in all material respects (but without duplication of any existing materiality qualifiers) on and as of the Effective Date to the same extent as though made on and as of such date except to the extent such representations and warranties specifically relate to an earlier date (in which case they are true, accurate and complete in all material respects (but without duplication of any existing materiality qualifiers) as of such earlier date); and (ii) no Default or Event of Default (other than any Existing Event of Default) exists on and as of the Effective Date.

(e)    The parties executing this Agreement as Guarantors include each Person that is required pursuant to Section 5.13 of the Credit Agreement to become a Loan Party as of the date hereof.

If any representation and warranty set forth in this Section is incorrect in any material respect, then such incorrect representation and warranty shall constitute a new and immediate Forbearance Termination Event without regard to any otherwise applicable notice, cure, or grace period.

CONFIDENTIAL                                                                    VPX-JHO0000000244

19.    Representations of the Owner Pledgor. The Owner Pledgor represents and warrants to the Administrative Agent and the Lenders as follows:

(a)    This Agreement has been duly executed and delivered by the Owner Pledgor and is the legally valid and binding obligation of such Person, enforceable against such Person in accordance with its respective terms, except as may be limited by Debtor Relief Laws or by equitable principles relating to enforceability.

(b)    He is (i) a natural person, (ii) of the age of majority, (iii) a citizen of the United States, (iv) a resident of the State of Florida, (v) legally competent to enter into this Agreement, and (vi) sophisticated in business matters.

(c)    After giving effect to this Agreement, the representations and warranties of the Owner Pledgor set forth in the Owner Pledge Agreement are true and correct in all material respects (but without duplication of any existing materiality qualifiers) on and as of the Effective Date to the same extent as though made on and as of such date except to the extent such representations and warranties specifically relate to an earlier date (in which case they are true, accurate and complete in all material respects (but without duplication of any existing materiality qualifiers) as of such earlier date).

If any representation and warranty set forth in this Section is incorrect in any material respect, then such incorrect representation and warranty shall constitute a new and immediate Forbearance Termination Event without regard to any otherwise applicable notice, cure, or grace period.

20.    Release. Each Loan Party and the Owner Pledgor each hereby releases and forever discharges the Administrative Agent, the Swingline Lender, the Issuing Bank, each Lender, and each of their respective predecessors, successors, assigns, and Related Parties (each and every of the foregoing, a "Released Party") from any and all claims, counterclaims, demands, damages, debts, suits, liabilities, actions, and causes of action of any nature whatsoever, in each case through the Effective Date, whether arising at law or in equity, whether known or unknown, whether liability be direct or indirect, whether liquidated or unliquidated, whether absolute or contingent, whether foreseen or unforeseen, and whether or not heretofore asserted, which any Loan Party or the Owner Pledgor may have or claim to have against any Released Party.

21.    No Actions, Claims. Each Loan Party and the Owner Pledgor each hereby represents, warrants, acknowledges, and confirms that such Person has no knowledge of any action, cause of action, claim, demand, damage, or liability of whatever kind or nature, in law or in equity, against any Released Party arising from any action by such Person, or failure of such Person to act, in any way on or prior to the date hereof.

22.    Incorporation of Agreement. Except as specifically modified herein, the terms of the Loan Documents shall remain in full force and effect. The execution, delivery, and effectiveness of this Agreement shall not operate as a waiver of any right, power, or remedy of the Administrative Agent or the Lenders under the Loan Documents or constitute a waiver or amendment of any provision of the Loan Documents. The breach of any covenant or provision of this Agreement shall constitute an immediate Forbearance Termination Event and this Agreement shall constitute a Loan Document.

23.    No Third-Party Beneficiaries. This Agreement and the rights and benefits hereof shall inure to the benefit of each of the parties hereto and their respective successors and assigns, and the obligations hereof shall be binding upon the Loan Parties and the Owner Pledgor (as the case may be). No other Person shall have or be entitled to assert rights or benefits under this Agreement, other than any non-party Released

CHAR2\2652687v9

13

Party with respect to Section 20 and Section 21 hereof (which Persons are intended to be third party beneficiaries of this Agreement).

24.     Entirety. This Agreement, the Credit Agreement, and the other Loan Documents embody the entire agreement among the parties hereto and supersede all prior agreements and understandings, oral or written, if any, relating to the subject matter hereof. This Agreement, the Credit Agreement, and the other Loan Documents represent the final agreement between the parties and may not be contradicted by evidence of prior, contemporaneous, or subsequent oral agreements of the parties.

25.     Counterparts. This Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. Delivery of an executed counterpart of a signature page of this Agreement by telecopy or other electronic imaging means (*e.g.*, "pdf" or "tif" format) shall be effective as delivery of a manually executed counterpart of this Agreement.

26.     Governing Law; Jurisdiction; Consent to Service of Process; Waiver of Jury Trial. The governing law, jurisdiction, consent to service of process, and waiver of jury trial provisions contained in Sections 11.5 and 11.6 of the Credit Agreement are hereby incorporated by reference *mutatis mutandis*.

27.     Further Assurances. Each of the parties hereto agrees to execute and deliver, or to cause to be executed and delivered, all such instruments as may reasonably be requested to effectuate the intent and purposes, and to carry out the terms, of this Agreement.

28.     Miscellaneous. Section headings in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose. Wherever possible, each provision of this Agreement shall be interpreted in such a manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under applicable law, then such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement. Except as otherwise provided in this Agreement, if any provision contained in this Agreement conflicts with, or is inconsistent with, any provision in any Loan Document, then the provision contained in this Agreement shall govern and control.

[*Remainder of page intentionally left blank.*]

CONFIDENTIAL                                                                        VPX-JHO0000000246

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the date first above written.

BORROWER:

VITAL PHARMACEUTICALS, INC.,
a Florida corporation

By:
Name:   John H. Owoc
Title:   President, Chief Scientific Officer & Chief Executive Officer

GUARANTORS:

BANG ENERGY CANADA, INC.,
a Florida corporation
ELITE IP HOLDINGS, LLC,
a Florida limited liability company
JHO INTELLECTUAL PROPERTY HOLDINGS, LLC,
a Florida limited liability company
JHO GA-1 INVESTMENT, LLC,
a Florida limited liability company
JHO NV-1 INVESTMENT, LLC,
a Florida limited liability company
JHO REAL ESTATE INVESTMENT, LLC,
a Florida limited liability company
QUASH SELTZER, LLC,
a Florida limited liability company
SHERIDAN REAL ESTATE INVESTMENT A, LLC,
a Florida limited liability company
SHERIDAN REAL ESTATE INVESTMENT B, LLC,
a Florida limited liability company
SHERIDAN REAL ESTATE INVESTMENT C, LLC,
a Florida limited liability company
VITAL PHARMACEUTICALS INTERNATIONAL SALES, INC.,
a Delaware corporation

By:
Name:   John H. Owoc
Title:   President, Chief Scientific Officer & Chief Executive Officer

OWNER PLEDGOR:

JOHN H. OWOC,
an individual resident of the State of Florida

VITAL PHARMACEUTICALS, INC.
THIRD FORBEARANCE AGREEMENT AND FOURTH AMENDMENT

VPX-JHO0000000247

ADMINISTRATIVE AGENT:

TRUIST BANK,
as Administrative Agent

By:_____
Name:  Jade Silver
Title:  Senior Vice President

VITAL PHARMACEUTICALS, INC.
THIRD FORBEARANCE AGREEMENT AND FOURTH AMENDMENT

CONFIDENTIAL

VPX-JHO0000000248

LENDERS:

TRUIST BANK,
as a Lender, as Swingline Lender, and as Issuing Bank

By: *Jade Silver*

Name:  Jade Silver
Title:  Senior Vice President

**COBANK, ACB,**
as a Lender

By: _Janet Downs_
Name: Janet Downs
Title: Lead Special Assets Officer

VITAL PHARMACEUTICALS, INC.
THIRD FORBEARANCE AGREEMENT AND FOURTH AMENDMENT

VPX-JHO0000000250

AGCOUNTRY FARM CREDIT SERVICES, FLCA,
as a Lender

By: _____

Name:  Lisa Caswell
Title:    Vice President

VITAL PHARMACEUTICALS, INC.
THIRD FORBEARANCE AGREEMENT AND FOURTH AMENDMENT

CONFIDENTIAL

FARM CREDIT BANK OF TEXAS,
as a Lender

By: _____
Name: Alan Robinson
Title:  Managing Director

VITAL PHARMACEUTICALS, INC.
THIRD FORBEARANCE AGREEMENT AND FOURTH AMENDMENT

CONFIDENTIAL

VPX-JHO0000000252

CITIZENS BANK, N.A.,
as a Lender

By:_____
Name: Seth McIntyre
Title: Assistant Vice President

VITAL PHARMACEUTICALS, INC.
THIRD FORBEARANCE AGREEMENT AND FOURTH AMENDMENT

CONFIDENTIAL

COMPEER FINANCIAL, PCA,
as a Lender

By: _____

Name:  Kevin Buente

Title:  Principal Credit Officer

CONFIDENTIAL

SYNOVUS BANK,
as a Lender

By: _____
Name: John M. Quarles, Jr.
Title:   Senior Special Assets Officer

FEDERAL AGRICULTURAL MORTGAGE
CORPORATION,
as a Lender

By: *Zachary Carpenter*

Name: Zachary Carpenter
Title:  EVP

CONFIDENTIAL

THE HUNTINGTON NATIONAL BANK,
as a Lender

*Nathan Drews*

By:_____

Name: Nate Drews
Title: Financial Recovery Rep

CONFIDENTIAL

GREENSTONE FARM CREDIT SERVICES, FLCA,
as a Lender

By: _Mark Strebel_____

Name:  Mark Strebel
Title:  Vice President of Risk Assets

COMERICA BANK,
as a Lender

By:_____

Name: Cynthia B. Jones
Title:   Vice President

CONFIDENTIAL

HSBC BANK USA, N.A.,
as a Lender

By: _____

Name: Rino Falsone
Title:  Vice President

VITAL PHARMACEUTICALS, INC.
THIRD FORBEARANCE AGREEMENT AND FOURTH AMENDMENT

CONFIDENTIAL

UNITED COMMUNITY BANK d/b/a SEASIDE
BANK AND TRUST,
as a Lender

By: _____
Name: J Brett Brown
Title: Sr. Vice President

CONFIDENTIAL

## SCHEDULE 1

### Acknowledged Events of Default

**A.  Existing Events of Default**

1.      Certain Events of Default have occurred and are continuing under Section 8.1(d) of the Credit Agreement as a result of:

      a.      the Loan Parties' failure to comply with the Combined Total Leverage Ratio covenant set forth in Section 6.1 of the Credit Agreement for the Fiscal Quarters ended December 31, 2021 and March 31, 2022;

      b.      the Loan Parties' failure to comply with the Combined Fixed Charge Coverage Ratio covenant set forth in Section 6.2 of the Credit Agreement for the Fiscal Quarters ended December 31, 2021 and March 31, 2022;

      c.      the Loan Parties' failure to comply with Section 5.1(a) of the Credit Agreement with respect to the annual audited report for the Fiscal Year ended December 31, 2021 for the Loan Parties and Subsidiaries as a result of such report and opinion of the Loan Parties' independent public accounting firm not being unqualified as to "going concern" or like qualification or scope of such audit; and

      d.      the Loan Parties' failure to provide notice under Section 5.2(a)(i) of the Credit Agreement in connection with the occurrence of any of the other Acknowledged Events of Default.

**B.  Anticipated Events of Default**

2.      Certain Defaults are anticipated to occur, and certain Events of Default are anticipated to occur under Section 8.1(d) of the Credit Agreement, as the case may be, as a result of:

      a.      the Loan Parties' failure to comply with the Combined Total Leverage Ratio covenant set forth in Section 6.1 of the Credit Agreement for the Fiscal Quarter ended June 30, 2022;

      b.      the Loan Parties' failure to comply with the Combined Fixed Charge Coverage Ratio covenant set forth in Section 6.2 of the Credit Agreement for the Fiscal Quarter ended June 30, 2022; and

      c.      the Loan Parties' failure to provide notice under Section 5.2(a)(i) of the Credit Agreement in connection with the occurrence of any of the other Acknowledged Events of Default.

*[Remainder of page intentionally left blank; end of Schedule I.]*

CHAR2\2652687v9

## SCHEDULE 2

### Amended and Restated Schedule I to Credit Agreement

SCHEDULE I

## COMMITMENT AMOUNTS

| Lender | Revolving Commitment ($) | Applicable Percentage (of Aggregate Revolving Commitments) (%) | Term Loan A Commitment ($) | Applicable Percentage (of Aggregate Term Loan A Commitments) (%) |
|---|---|---|---|---|
| Truist Bank | $65,504,248.24 | .251939416% | $58,298,780.94 | .251939416% |
| CoBank, ACB | $33,616,549.69 | .129294422% | $29,918,729.22 | .129294422% |
| AgCountry Farm Credit Services, FLC | $26,413,003.32 | .101588474% | $23,507,572.96 | .101588474% |
| Farm Credit Bank of Texas | $24,011,821.21 | .092353158% | $21,370,520.87 | .092353158% |
| Citizens Bank, N.A. | $21,610,639.09 | .083117843% | $19,233,468.78 | .083117843% |
| Compeer Financial, PCA | $19,209,456.96 | .073882527% | $17,096,416.70 | .073882527% |
| Synovus Bank | $14,407,092.73 | .055411895% | $12,822,312.52 | .055411895% |
| Federal Agricultural Mortgage Corporation | $12,005,910.60 | .046176579% | $10,685,260.44 | .046176579% |
| The Huntington National Bank | $12,005910.60 | .046176579% | $10,685,260.44 | .046176579% |
| Greenstone Farm Credit Services, FLCA | $9,604,728.48 | .036941263% | $8,548,208.35 | .036941263% |
| Comerica Bank | $7,203,546.36 | .027705948% | $6,411,156.26 | .027705948% |
| HSBC Bank USA, N.A. | $7,203,546.36 | .027705948% | $6,411,156.26 | .027705948% |
| United Community Bank d/b/a Seaside Bank and Trust | $7,203,546.36 | .027705948% | $6,411,156.26 | .027705948% |
| | | | | |
| **TOTAL:** | **$260,000,000.00** | **100.000000000%** | **$231,400,000.00** | **100.000000000%** |

*Note*: Dollar amounts and percentages in the table above are subject to rounding, to two (2) and nine (9) decimal places, respectively. Revolving Commitments are as of the Fourth Amendment Effective Date. Term Loan A Commitments are as of the Effective Date (and giving effect to Truist Bank's assignment of certain Term Loan A Commitments and/or the Term Loan A to Federal Agricultural Mortgage Corporation on or after the Effective Date).

CHAR2\2652687v9

CONFIDENTIAL

## SCHEDULE 3

### CTO Scope

The Chief Transaction Officer at the Borrower shall report directly to the Borrower's Chief Executive Officer, shall collaborate primarily with the Borrower's Senior Vice President of Finance, and shall be responsible for the following tasks related to the Capital Raise Transaction:

1.  Evaluating the Borrower's cash and liquidity requirements, including overseeing the development and review of cash flow projections, revenue projections, preparation of appropriate cash flow forecasts, and other financial and accounting information related to continuing operations and any re-financing or other restructuring that the Borrower may explore;

2.  Directing the Borrower's efforts of financial and administrative management and coordinating with external professionals, consultants, and advisors in connection with day-to-day operations and re-financing or restructuring initiatives, including overseeing the negotiation of any agreements with lenders or potential investors or funding sources;

3.  Evaluating the Borrower's operational processes and procedures, including the opportunities for, and implementation of, cost reduction measures;

4.  Directing negotiations with existing lenders, including the Administrative Agent and its professionals, under existing credit facilities and any other holders of secured debt, as well as any significant trade creditors;

5.  Evaluating and directing payments to vendors, the Borrower's external professionals, consultants, and advisors, and the Administrative Agent's professionals, consultants, and advisors, and in each case seeking the Borrower's Chief Executive Officer's approval of the same;

6.  Assisting the Borrower in connection with its anticipated transition away from the Pepsi distribution network and the implementation of a new distribution network;

7.  Communicating directly with the Borrower's Chief Executive Officer, other personnel working on the Capital Raise Transaction, the Investment Banker, the Borrower's outside attorneys and other professionals, and/or the Administrative Agent regarding negotiations with existing lenders under existing credit facilities and any other holders of secured debt, as well as any significant trade creditors, and providing information to, and as reasonably requested by, the Administrative Agent and others in connection with existing credit facilities;

8.  Collaborating with the Borrower's Chief Executive Officer, other personnel working on the Capital Raise Transaction, the Investment Banker, and the Borrower's outside attorneys and other professionals regarding the preparation of financial information and presentation of materials required for the marketing, sale and/or refinancing of the Borrower;

9.  Depending upon the initial indications of the refinancing process conducted by the Investment Banker, assisting the Borrower in connection with any in-court restructuring or liquidation proceedings, including coordinating with the Investment Banker, the Borrower's legal counsel, and the Borrower's other outside professionals, and overseeing the preparation of related budgets, milestones, and other financial models; and

CHAR2\2652687v9

10.    Providing such other services as are customarily provided in connection with the analysis and negotiation of a re-financing or restructuring or liquidation initiative, as reasonably requested by the Administrative Agent and mutually agreed to by the Borrower.

[*Remainder of page intentionally left blank; end of <u>Schedule 3</u>.*]

CHAR2\2652687v9

VPX-JHO0000000265