# **EXHIBIT 10**

**FOURTH FORBEARANCE AGREEMENT AND FIFTH AMENDMENT TO AMENDED AND RESTATED REVOLVING CREDIT AND TERM LOAN AGREEMENT**

THIS FOURTH FORBEARANCE AGREEMENT AND FIFTH AMENDMENT TO AMENDED AND RESTATED REVOLVING CREDIT AND TERM LOAN AGREEMENT (this "Agreement"), dated as of August 8, 2022, is entered into by and among VITAL PHARMACEUTICALS, INC., a Florida corporation (the "Borrower"), the Guarantors party hereto, the Lenders party hereto, TRUIST BANK, in its capacity as administrative agent for the Lenders (the "Administrative Agent"), Swingline Lender, and Issuing Bank, and JOHN H. OWOC, an individual resident of the State of Florida (the "Owner Pledgor").

<u>RECITALS</u>

WHEREAS, the Borrower, the Guarantors from time to time party thereto, the Lenders from time to time party thereto, the Administrative Agent, the Swingline Lender, and the Issuing Bank are parties to that certain Amended and Restated Revolving Credit and Term Loan Agreement dated as of August 14, 2020 (as amended by that certain First Amendment to Amended and Restated Revolving Credit and Term Loan Agreement dated as of June 15, 2021, that certain Second Amendment to Amended and Restated Revolving Credit and Term Loan Agreement dated as of June 30, 2021, that certain Third Amendment to Amended and Restated Revolving Credit and Term Loan Agreement dated as of December 31, 2021, and that certain Third Forbearance and Fourth Amendment to Amended and Restated Revolving Credit and Term Loan Agreement, dated as of June 30, 2022 (the "Third Forbearance"), and as further amended, modified, extended, restated, replaced, or supplemented in writing from time to time, the "Credit Agreement").

WHEREAS, pursuant to the Owner Pledge Agreement, the Owner Pledgor has pledged certain assets to the Administrative Agent to secure the Secured Obligations (as defined therein).

WHEREAS, the "Forbearance Period" as defined in the Third Forbearance will automatically expire according to its terms at 11:59 p.m. (Eastern time) on August 5, 2022.

WHEREAS, the Loan Parties have informed the Administrative Agent and the Lenders that certain Events of Default have occurred and are continuing as described in Part A of Schedule 1 attached hereto (collectively, the "Existing Events of Default").

WHEREAS, the Loan Parties have also informed the Administrative Agent and the Lenders that certain Defaults and Events of Default are anticipated to occur as described in Part B of Schedule 1 attached hereto (collectively, the "Anticipated Events of Default" and together with the Existing Events of Default, the "Acknowledged Events of Default").

WHEREAS, the Loan Parties and the Owner Pledgor have requested that the Administrative Agent and the Lenders (i) agree to forbear from exercising their rights and remedies arising under the Loan Documents and applicable Laws as a result of the Acknowledged Events of Default during the Forbearance Period and (ii) make certain modifications to the Credit Agreement.

WHEREAS, the Administrative Agent and the Lenders have agreed to do so, but only pursuant to the terms and conditions set forth herein.

CHAR2\2684772v6

VPX-JHO0000000266

<u>AGREEMENT</u>

NOW, THEREFORE, in consideration of these premises and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

1.    <u>Definitions</u>. Capitalized terms used herein but not otherwise defined herein shall have the meanings provided to such terms in the Credit Agreement. As used in this Agreement, the following terms shall have the meanings set forth below:

"<u>363 Sale Process</u>" has the meaning set forth in <u>Section 8(a)</u>.

"<u>Acknowledged Events of Default</u>" has the meaning set forth in the Recitals.

"<u>Administrative Agent</u>" has the meaning set forth in the preamble to this Agreement.

"<u>Administrative Agent's Financial Advisor</u>" has the meaning set forth in <u>Section 14</u>.

"<u>Anticipated Events of Default</u>" has the meaning set forth in the Recitals.

"<u>Approved Budget</u>" means the detailed budget prepared by the Borrower attached as <u>Exhibit A</u>.

"<u>Approved Variance Report</u>" has the meaning set forth in <u>Section 17(b)</u>.

"<u>Bankruptcy Code</u>" means title 11 of the United States Code, Section 101 et seq.

"<u>Borrower</u>" has the meaning set forth in the preamble to this Agreement.

"<u>Capital Raise Offer</u>" has the meaning set forth in <u>Section 8(b)(ii)(D)</u>.

"<u>Capital Raise Transaction</u>" means one transaction or a series of transactions in the form of a sale, financing, issuance of Capital Stock, other liquidity generating event or some combination thereof that is intended to generate cash proceeds sufficient for the payment of the Obligations in full.

"<u>Capital Raise Transaction Process</u>" has the meaning set forth in <u>Section 8(a)</u>.

"<u>Cash Balance Report</u>" has the meaning set forth in <u>Section 17(b)</u>.

"<u>Cash Flow Forecast</u>" has the meaning set forth in <u>Section 12(a)</u>.

"<u>Credit Agreement</u>" has the meaning set forth in the Recitals.

"<u>CTO</u>" has the meaning set forth in <u>Section 9</u>.

"<u>CTO Scope</u>" has the meaning set forth in <u>Section 9</u>.

"<u>DIP Budget</u>" has the meaning set forth in <u>Section 11(b)</u>.

"<u>DIP Financing</u>" has the meaning set forth in <u>Section 11(c)</u>.

CHAR2\2684772v6

2

"Effective Date" has the meaning set forth in Section 18.

"Enterprise Valuator" has the meaning set forth in Section 15(a).

"Existing Events of Default" has the meaning set forth in the Recitals.

"Facility Payoff" means the payment in full of all Obligations and the termination of the Commitments of the Lenders.

"Forbearance Fee" has the meaning set forth in Section 4.

"Forbearance Period" means the period from the Effective Date to (but excluding) the earliest date that a Forbearance Termination Event occurs.

"Forbearance Termination Event" means the earliest of the following to occur: (a) any Event of Default other than an Event of Default constituting an Acknowledged Event of Default; (b) any Default other than a Default constituting an Acknowledged Event of Default that continues unremedied for a period of seven (7) days after written (which may be by email) notice thereof by the Administrative Agent to the Borrower; (c) the breach by any Loan Party or the Owner Pledgor of any covenant or provision of this Agreement; (d) the termination, rescission, or modification in any manner materially adverse to the Administrative Agent or the Lenders of that certain settlement agreement dated as of June 21, 2022 (the "Pepsi Settlement Agreement"), and entered into by and among Borrower, Quash Seltzer, LLC, JHO Intellectual Property Holdings, LLC, Elite IP Holdings, LLC and PepsiCo, Inc. ("Pepsi"), which shall not include, for the avoidance of doubt, any acceleration of the Operative Payment Amounts (as defined in the Pepsi Settlement Agreement) pursuant to Section 2(d)(i) of the Pepsi Settlement Agreement; and (e) 11:59 p.m. (Eastern time) on August 26, 2022.

"IB Scope" has the meaning set forth in Section 8(a).

"Interim Maximum Amount" means, as of any date of determination, the amount set forth in the table below for the appropriate applicable period:

| Applicable Period | Total Available Interim Maximum Amount |
|---|---|
| From Effective Date through and including August 7, 2022 | $200,000,000 |
| From August 8, 2022, through and including August 14, 2022 | $212,000,000 |
| From August 15, 2022, through and including August 21, 2022 | $220,000,000 |
| From August 22, 2022, through and including August 26, 2022 | $231,000,000 |

"Investment Banker" has the meaning set forth in Section 8(a).

"Litigation Disclosure Summary" has the meaning set forth in Section 12(b).

"Owner Pledgor" has the meaning set forth in the preamble to this Agreement.

"Pepsi" has the meaning set forth in the definition of "Forbearance Termination Event" in this Section 1.

CONFIDENTIAL

"Pepsi Settlement Agreement" has the meaning set forth in the definition of "Forbearance Termination Event" in this Section 1.

"Permitted Variance" means: (a) Total Operating Disbursements (as defined in the Approved Budget) must not exceed for the cumulative two weeks ending August 12, 2022, the cumulative three weeks ending August 19, 2022, and the cumulative four weeks ending August 26, 2022, 110% of the budgeted amount for the applicable Variance Testing Period on a cumulative basis; (b) Operating Net Cash Flow (as defined in the Approved Budget) must not exceed (for the avoidance of doubt, on a negative (loss) basis) for the cumulative two weeks ending August 12, 2022, the cumulative three weeks ending August 19, 2022, and the cumulative four weeks ending August 26, 2022, 110% of the budgeted amount for the applicable Variance Testing Period on a cumulative basis; and (c) Total Other Disbursement (as defined in the Approved Budget) must not exceed for the cumulative two weeks ending August 12, 2022, the cumulative three weeks ending August 19, 2022, and the cumulative four weeks ending August 26, 2022, 110% of the budgeted amount for the applicable Variance Testing Period on a cumulative basis.

"Process Letter" means any bid process letter from the Investment Banker that, among other things, requests third parties to submit to any Loan Party, the Owner Pledgor, or the Investment Banker either (a) written, non-binding, initial indications of interest with respect to a Capital Raise Transaction or (b) written good faith offers with respect to a Capital Raise Transaction.

"Released Party" has the meaning set forth in Section 21.

"Updated Appraisals" has the meaning set forth in Section 15(b).

"Variance Testing Period" means the period from August 1, 2022 through the week most recently ended.

2.      Estoppel. Each Loan Party and the Owner Pledgor each hereby acknowledges and agrees that, as of the close of business on August 5, 2022, (a) the aggregate outstanding principal amount of the Revolving Loans was $195,000,000.00, (b) the aggregate outstanding principal amount of the Term Loans was $104,190,218.45, (c) the aggregate outstanding principal amount of the Swingline Loans was $0.00, and (d) the LC Exposure was $0.00, (e) the aggregate amount of accrued and unpaid interest in respect of the Revolving Loans was $1,398,214.06, and (f) the aggregate amount of accrued and unpaid interest in respect of the Term Loans was $726,537.93, each of which constitutes a valid and subsisting obligation of each Loan Party, jointly and severally, owed to the Lenders that is not subject to any credits, offsets, defenses, claims, counterclaims, or adjustments of any kind.

3.      Consent, Acknowledgement and Reaffirmation. Each Loan Party and the Owner Pledgor each hereby: (a) acknowledges that (i) the Existing Events of Default have occurred and have not been waived, (ii) the Anticipated Events of Default are expected to occur and have not been waived, (iii) no Acknowledged Event of Default is being waived pursuant to this Agreement, and (iv) Default Interest that has accrued on all Obligations is not being waived pursuant to this Agreement and is (or shall be) due and payable in the ordinary course pursuant to the Credit Agreement; (b) acknowledges and consents to this Agreement and the terms and provisions hereof; (c) reaffirms the covenants and agreements contained in each Loan Document to which such Person is party, including, in each case, as such covenants and agreements may be modified by this Agreement and the transactions contemplated hereby; (d) reaffirms that each of the Liens created and granted in or pursuant to the Loan Documents in favor of the Administrative Agent for the benefit of the holders of the Obligations is valid and subsisting, and acknowledges and agrees that this Agreement shall in no manner impair or otherwise adversely affect such

Liens; and (e) confirms that each Loan Document to which such Person is a party is and shall continue to be in full force and effect and the same is hereby ratified and confirmed in all respects.

4.    <u>Forbearance Fee</u>. In consideration of the written consent of the Lenders that have delivered a duly executed signature page to this Agreement to the Administrative Agent by 12:00 p.m. (Eastern time) on the Effective Date (or such later time as may be agreed to by the Borrower and the Administrative Agent) (each a "<u>Consenting Lender</u>" and collectively, the "<u>Consenting Lenders</u>"), the Borrower shall pay to the Administrative Agent, for the Consenting Lenders on a *pro rata* basis, a forbearance fee (the "<u>Forbearance Fee</u>") in an amount equal to one hundred basis points (1.0%) times the sum of (a) the outstanding principal balance of the Term Loans as of the Effective Date held by the Consenting Lenders plus (b) the amount of the Revolving Commitments as of the Effective Date held by the Consenting Lenders. The Forbearance Fee shall be fully earned and non-refundable as of the Effective Date and shall be due and payable upon the earlier to occur of a Forbearance Termination Event and the Facility Payoff; <u>provided</u> that if the Facility Payoff occurs during the periods listed in the table below, a portion of the Forbearance Fee in an amount equal to the corresponding percentage in the table below times the sum of (a) the outstanding principal balance of the Term Loans as of the Effective Date held by the Consenting Lenders plus (b) the amount of the Revolving Commitments as of the Effective Date held by the Consenting Lenders shall be automatically deemed waived and cancelled.

| Period | Portion Waived |
|---|---|
| The Effective Date through and including August 26, 2022 | Seventy Basis Points (0.70%) |
| August 27, 2022, through and including September 2, 2022 | Sixty-Five Basis Points (0.65%) |
| September 3, 2022, through and including September 9, 2022 | Sixty Basis Points (0.60%) |

5.    <u>Forbearance</u>.

(a)    *Forbearance.* Subject to the terms and conditions set forth herein, the Administrative Agent and the Lenders shall, during the Forbearance Period, forbear from exercising any and all of the rights and remedies available to them under the Loan Documents and applicable Laws, but only to the extent that such rights and remedies arise exclusively as a result of the existence of the Acknowledged Events of Default; <u>provided</u>, <u>however</u>, that (i) the Administrative Agent and the Lenders shall be free to exercise any or all of their rights and remedies arising on account of the Acknowledged Events of Default at any time upon or after the occurrence of a Forbearance Termination Event and (ii) except as set forth in <u>Section 5(c)</u>, the Acknowledged Events of Default shall continue to exist and apply for all purposes and provisions under the Loan Documents, including those provisions, conditions, requirements, rights, and obligations that are dependent upon the absence of any Default or Event of Default. For the avoidance of doubt: (A) during the Forbearance Period Default Interest shall continue to accrue on all Obligations; and (B) this Agreement shall not constitute the Administrative Agent's or any Lender's agreement or consent to the terms of the Pepsi Settlement Agreement or a waiver of any Default or Event of Default that may arise, if any, from the Pepsi Settlement Agreement.

(b)    *Forbearance Period*. Nothing set forth herein or contemplated hereby is intended to constitute an agreement by the Administrative Agent or any Lender to forbear from exercising any of the rights or remedies available to the Administrative Agent and the Lenders under the Loan Documents or applicable Laws (all of which rights and remedies are hereby expressly reserved by the Administrative Agent and the Lenders) upon or after the occurrence of a Forbearance Termination Event.

CONFIDENTIAL                                                    VPX-JHO0000000270

(c)    *Credit Events; Conversion/Continuation*. Notwithstanding anything to the contrary contained in the Credit Agreement, during the Forbearance Period: (i) the Swingline Lender, the Issuing Bank, and the Lenders shall honor requests for Credit Events, in each case to the extent that (A) all conditions precedent to the funding of any Credit Event set forth in the Credit Agreement are satisfied (other than any requirement or representation in the Credit Agreement relating solely to the occurrence and continued existence of the Acknowledged Events of Default) and (B) after giving effect to any Credit Event (I) the Aggregate Revolving Credit Exposure shall not exceed the Interim Maximum Amount, (II) the Revolving Credit Exposure of any Lender shall not exceed such Lender's Revolving Commitment, and (III) with respect to any extension of any Letter of Credit, the aggregate LC Exposure shall not exceed the aggregate LC Commitment; (ii) the Borrower shall have the ability to borrow (subject to this Section 5(c)), continue, and convert into SOFR Loans; and (iii) the Borrower shall have the option to borrow, convert or continue from one Type of Loan to another Type of Loan, subject to the requirements of the Credit Agreement (other than any requirement or representation in the Credit Agreement relating solely to the occurrence and continued existence of the Acknowledged Events of Default). Notwithstanding anything in the Credit Agreement to the contrary, each Notice of Revolving Borrowing, Notice of Swingline Borrowing, or Letter of Credit Application that the Borrower delivers during the Forbearance Period shall include a representation and warranty that no Forbearance Termination Event has occurred or would occur from the honoring of the request set forth therein.

6.    Amendments to Credit Agreement; SOFR Conversion.

(a)    *Amendments to Credit Agreement.* Effective as of the Effective Date (as defined below), the Credit Agreement is hereby amended to delete the stricken text (indicated textually in the same manner as the following example: stricken text) and to add the bold and double-underlined text (indicated textually in the same manner as the following example: double underlined text) as set forth in the pages of the amended Credit Agreement attached as Annex A hereto. For the avoidance of doubt, it is understood and agreed that nothing in this Section 6 amends or modifies the Exhibits or Schedules to the Credit Agreement.

(b)    *SOFR Conversion.* Notwithstanding anything to the contrary set forth in the Credit Agreement or in any other Loan Document, effective upon the Effective Date all LIBO Index Rate Loans shall be converted to SOFR Loans.

7.    Amendments to Exhibits to Credit Agreement. Effective as of the Effective Date, Exhibit 2.3 (Form of Notice of Revolving Borrowing), Exhibit 2.5 (Form of Notice of a Term Loan Borrowing), and Exhibit 2.7 (Form of Notice of Conversion / Continuation) to the Credit Agreement are hereby amended in their entirety to read in the forms attached hereto as Exhibit 2.3, Exhibit 2.5, and Exhibit 2.7, respectively.

8.    Investment Banking Process.

(a)    *Investment Banker.* At all times during the Forbearance Period the Loan Parties shall continue to retain a recognized third-party investment banker reasonably acceptable to the Required Lenders and the Loan Parties (the "Investment Banker"), it being acknowledged and agreed that Rothschild & Co is acceptable to the Required Lenders and the Loan Parties. The Loan Parties shall be responsible for the fees and expenses incurred in connection with the engagement of the Investment Banker. The scope of the Investment Banker's engagement shall include, among other things, the development and implementation of a process intended to generate a potential Capital Raise Transaction (the "Capital Raise Transaction Process"), and from and after the Effective Date it shall be expanded to include the development and implementation of a process

intended to generate bidders for a sale of the Loan Parties pursuant to Section 363 of the Bankruptcy Code (the "363 Sale Process"), and be otherwise on terms reasonably acceptable to the Required Lenders and the Loan Parties (the "IB Scope"). The Investment Banker shall report to the Chief Executive Officer of the Borrower and work with the CTO and other management for the purpose of carrying out the IB Scope. Any material change, limitation, or revision to the IB Scope without the prior written consent of the Required Lenders, which consent shall not be unreasonably withheld, conditioned, or delayed, shall constitute an immediate Forbearance Termination Event; provided, that, notwithstanding the foregoing the Loan Parties may broaden the IB Scope without the consent of the Required Lenders. During the Forbearance Period, the Loan Parties shall be prohibited from terminating the Investment Banker's engagement without the prior written consent of the Required Lenders, which shall not be unreasonably withheld, conditioned, or delayed and shall not be required if the Investment Banker is replaced with another Investment Banker whose identity and scope of engagement are reasonably acceptable to the Required Lenders within five (5) Business Days of such termination. Within one (1) Business Day of the Effective Date, the Loan Parties shall provide the Administrative Agent with a written certification (which may be provided by email) from the CTO, the Investment Banker, or a Responsible Officer of the Borrower that the Investment Banker's engagement has been expanded to formally include the 363 Sale Process.

(b)      *Investment Banking Process Materials.* The Loan Parties shall (i) provide, or cause the Investment Banker to provide, access at all times to the Administrative Agent and its professionals to the data room related to the Capital Raise Transaction Process or the 363 Sale Process and (ii) deliver to the Administrative Agent for distribution to the Lenders copies of the following documents and information with respect to the Capital Raise Transaction Process or the 363 Sale Process (which documents and information shall be subject to the confidentiality obligations set forth in Section 11.11 of the Credit Agreement), as promptly as practicable after such information or documents are received or produced by the Loan Parties, the Owner Pledgor, or the Investment Banker: (A) the investor presentation and each Process Letter; (B) on a weekly basis, an updated list of all interested third parties that have entered into non-disclosure agreements with the Loan Parties in respect of a Capital Raise Transaction (including confirmation that such parties have received the investor presentation and each Process Letter) or the 363 Sale Process and have not withdrawn their indications of interest; (C) on a weekly basis, written summaries describing the proposed amount of financing, equity contribution, or other consideration to be provided to the Loan Parties and any material, non-customary conditions precedent to funding or closing of all non-binding, initial indications of interest in a Capital Raise Transaction or offers therefor received from third parties (including a description as to whether such indications of interest or offers have not been withdrawn), in each case with such third parties' names and identifying information redacted; (D) following the applicable submission deadline set forth in any Process Letter, copies of any final offers to consummate a Capital Raise Transaction submitted by third parties, in each case, with such third parties' names and identifying information redacted (each a "Capital Raise Offer"); and (E) on a weekly basis, written summaries describing the terms upon which any prospective purchaser would serve as a stalking horse bidder in the 363 Sale Process. The Loan Parties shall: (y) use best efforts to cause the Investment Banker to endeavor to obtain offers in respect of the Capital Raise Transaction with exceptions to confidentiality provisions to permit disclosure thereof to the Administrative Agent and the Lenders on a redacted basis as contemplated by this Section 8(b); and (z) cause the Investment Banker to, promptly upon the request of the Administrative Agent's professionals, deliver on a "professional eyes only" basis to the Administrative Agent's professionals the name(s) of the party(ies) to any Capital Raise Offer(s).

9.      Chief Transaction Officer. At all times during the Forbearance Period the Loan Parties shall continue to retain a Chief Transaction Officer (the "CTO") reasonably acceptable to the Required Lenders and the Loan Parties, it being acknowledged and agreed that Mr. Richard D. Caruso is acceptable

CONFIDENTIAL                                                            VPX-JHO0000000272

to the Required Lenders and the Loan Parties. The Loan Parties shall be responsible for the fees and expenses incurred in connection with the engagement of the CTO. The scope of the CTO's engagement shall be as set forth on Schedule 2 hereto (the "CTO Scope"). The CTO shall report to the Chief Executive Officer of the Borrower and work with management for the purpose of carrying out the CTO Scope. Any material change, limitation, or revision to CTO Scope without the prior written consent of the Required Lenders, which consent shall not be unreasonably withheld, conditioned, or delayed, shall constitute an immediate Forbearance Termination Event; provided, that, notwithstanding the foregoing the Loan Parties may broaden the CTO Scope without the consent of the Required Lenders. During the Forbearance Period, the Loan Parties shall be prohibited from terminating the CTO's engagement without the prior written consent of the Required Lenders, which shall not be unreasonably withheld, conditioned, or delayed and shall not be required if the CTO is replaced with another CTO whose identity and scope of engagement are reasonably acceptable to the Required Lenders within five (5) Business Days of such termination. Upon the death, disability, or voluntary termination of the CTO, the Loan Parties shall engage and retain a CTO reasonably acceptable to the Required Lenders and the Loan Parties within fourteen (14) days after the death, disability, or voluntary termination of the CTO (or such later date as the Required Lenders shall agree, such consent not to be unreasonably withheld, conditioned, or delayed).

10.    Distribution Agreement Transition Milestones. The Loan Parties shall: (a) have executed distribution agreements (i) as of August 12, 2022, with not less than 40% of the distributors that the Loan Parties identified prior to the Effective Date to be part of their new, independent distribution network, (ii) as of August 19, 2022, with not less than 42% of the distributors that the Loan Parties identified prior to the Effective Date to be part of their new, independent distribution network, and (iii) as of August 26, 2022, not less than 44% of the distributors that the Loan Parties identified prior to the Effective Date to be part of their new, independent distribution network; and (b) as soon as possible and in any event within two (2) Business Days after each such testing date, provide the Administrative Agent with a written certification (which may be provided by email) from the CTO or a Responsible Officer of the Borrower confirming that the Loan Parties remain in compliance with this Section 10.

11.    Bankruptcy Preparation. The Loan Parties shall:

(a)    (i) on or before the Effective Date, engage, and at all times thereafter during the Forbearance Period the Loan Parties shall continue to retain, nationally recognized legal counsel with sufficient experience representing debtors under chapter 11 of the Bankruptcy Code to capably represent the Loan Parties in connection with a matter of this complexity and (ii) within one (1) Business Day after the Effective Date, provide evidence satisfactory to the Administrative Agent of such engagement and the payment to such legal counsel of any applicable retainer;

(b)    on or before August 12, 2022, deliver an updated draft of a budget for the Loan Parties' liquidity and financing needs, as applicable, in the event that one or more of the Loan Parties avails itself of any Debtor Relief Law (the "DIP Budget"); and

(c)    on or before August 19, 2022, deliver (i) draft petitions for relief for the Loan Parties under chapter 11 of the Bankruptcy Code, (ii) a draft motion for the sale of substantially all the assets of the Loan Parties pursuant to Section 363 of the Bankruptcy Code and related bid procedures, (iii) a draft motion for the approval of postpetition financing from the Lenders or a subset thereof on a secured, priming basis pursuant to Section 364 of the Bankruptcy Code and use of cash collateral pursuant to Section 363 of the Bankruptcy Code (collectively, "DIP Financing"), (iv) a draft motion to retain an Investment Banker for the debtors, and (v) other draft motions for relief typically filed on the first day of a chapter 11 case by debtors of the size and complexity of the Loan Parties.

CONFIDENTIAL                                                                        VPX-JHO0000000273

From and after the Loan Parties' delivery of the initial draft of the DIP Budget and during the Forbearance Period, the Loan Parties shall, and shall cause their professionals to, reasonably cooperate with the Administrative Agent and its professionals regarding (i) the continued refinement of the DIP Budget to reflect the Loan Parties' then-current and expected financial condition and (ii) the negotiation of milestones to be included in the definitive documents evidencing the provision of DIP Financing by the Lenders or a subset thereof.

12.    <u>Additional Reporting During Forbearance Period</u>. In addition to all existing reporting requirements under the Credit Agreement and the other Loan Documents, during the Forbearance Period, the Loan Parties shall deliver to the Administrative Agent, for distribution to the Lenders, in each case in form and detail reasonably satisfactory to the Administrative Agent:

(a)    every fourth Thursday, a rolling 13-week forecast of cash flows for the Loan Parties and their Subsidiaries on a consolidated basis as of the last day of the immediately preceding week (each a "<u>Cash Flow Forecast</u>");

(b)    contemporaneously with the delivery of each Cash Flow Forecast, a written summary of every litigation or arbitration to which any Loan Party or the Owner Pledgor is party (each a "<u>Litigation Disclosure Summary</u>"); <u>provided</u>, that (i) the Litigation Disclosure Summary shall not be required to contain any information that the Loan Parties believe in good faith is subject to the attorney-client privilege, the attorney work product doctrine and/or other applicable privilege or protection from disclosure that the Loan Parties believe in good faith could be deemed waived as a result of disclosure of the Litigation Disclosure Summary to the Administrative Agent and/or the Lenders, and (ii) any estimate of liabilities or other projected outcomes set forth in the Litigation Disclosure Summary that is made in good faith shall be deemed a projection and not be the basis for any breach of any representation or warranty set forth in the Loan Documents;

(c)    every Thursday, (i) a variance report showing a comparison of the previous week's actual cash flows for the Loan Parties and their Subsidiaries (on a consolidated basis) to the most recently previously delivered Cash Flow Forecast in both dollar and percentage units, together with a written explanation of any variance (positive or negative) for any line item that exceeds ten percent (10%), and (ii) a report of the previous week's sales volume, itemized by brand;

(d)    as soon as available, but in any event within thirty (30) days after the end of each calendar month, an unaudited combined balance sheet of the Loan Parties and Subsidiaries as of the end of such calendar month, and the related unaudited combined statements of income or operations, changes in stockholders' equity and cash flows of the Loan Parties and Subsidiaries for such calendar month and the then elapsed portion of such Fiscal Year, all in reasonable detail and prepared in accordance with GAAP, such combined statements to be certified by the chief executive officer, chief financial officer, treasurer or controller (or a Responsible Officer of substantially equivalent title and authority) of the Borrower as presenting fairly the financial condition, results of operations, stockholders' equity and cash flows of the Loan Parties and Subsidiaries in accordance with GAAP, and including management discussion and analysis of operating results, profitability trends and customer retention, subject only to normal year-end audit adjustments and the absence of footnotes and, in the case of such combined statements, certified by the chief executive officer, chief financial officer, treasurer or controller (or a Responsible Officer of substantially equivalent title and authority) of the Borrower, to the effect that such statements are fairly stated in all material respects when considered in relation to the combined financial statements of the Loan Parties and Subsidiaries; and

CONFIDENTIAL                                                                      VPX-JHO0000000274

(e)      promptly following the Administrative Agent's request therefor, (i) information regarding the status of the implementation of the terms of the Pepsi Settlement Agreement, including the Loan Parties' establishment or expansion of any distribution network that replaces the distribution network established with Pepsi, and (ii) such other information regarding the results of operations, business affairs, and financial condition of any or all of the Loan Parties and Subsidiaries.

13.      Periodic Updates. During the Forbearance Period, the Loan Parties shall make certain representatives of the Loan Parties and their advisors (including, without limitation, the Investment Banker and the CTO), as reasonably requested by the Administrative Agent, available to the Administrative Agent and the Lenders for periodic conference calls to be held on a bi-weekly basis, or more frequently as reasonably requested by the Administrative Agent.

14.      Administrative Agent's Financial Advisor. The Administrative Agent, through its counsel, has retained FTI Consulting, Inc. (the "Administrative Agent's Financial Advisor") to monitor the Loan Parties' financial and operational performance. During the Forbearance Period, the Loan Parties shall cooperate in good faith with the Administrative Agent's Financial Advisor and provide the Administrative Agent's Financial Advisor with reasonable access to the Loan Parties' facilities, books and records, officers and consultants (including, without limitation, the Investment Banker and the CTO) and to any information reasonably necessary for the Administrative Agent's Financial Advisor to perform the services within the scope of its engagement.

15.      Valuations, Appraisals.

(a)      *Enterprise Valuation.* If the Administrative Agent, or counsel to the Administrative Agent, engages an independent contractor to prepare and provide, exclusively for the benefit of the Administrative Agent and the Lenders, an enterprise valuation of the Loan Parties (the "Enterprise Valuator"), then the Loan Parties shall cooperate in good faith with the Enterprise Valuator and provide the Enterprise Valuator with reasonable access, at reasonable times and upon reasonable advance written (which may be by email) notice, to the Loan Parties' facilities, books and records, officers and consultants and any information reasonably necessary for the Enterprise Valuator to perform the services within the scope of its engagement.

(b)      *Appraisals.* The Loan Parties shall permit the representatives and independent contractors of the Administrative Agent to prepare and provide, exclusively for the benefit of the Administrative Agent and the Lenders, one or more appraisals of the Mortgaged Property and any other Collateral (the "Updated Appraisals"). The Loan Parties shall cooperate in good faith in connection with the Updated Appraisals and provide reasonable access, at reasonable times and upon reasonable written (which may be by email) advance notice, to the Mortgaged Properties and the other Collateral.

16.      Fees and Expenses. Without in any way limiting the obligations of the Loan Parties and the Owner Pledgor under the Loan Documents, including without limitation Section 11.3 of the Credit Agreement, the Loan Parties shall, within ten (10) Business Days after written demand therefor, reimburse the Administrative Agent for all of its documented and invoiced out-of-pocket fees and expenses reasonably incurred in connection with this Agreement, the Credit Agreement, and the other Loan Documents (including, without limitation, (a) the documented and invoiced fees and out-of-pocket expenses of (i) Moore & Van Allen PLLC, as counsel to the Administrative Agent, (ii) the Administrative Agent's Financial Advisor, and (iii) the Enterprise Valuator and (b) the documented out-of-pocket fees and expenses incurred in connection with the Updated Appraisals).

CHAR2\2684772v6

10

17. <u>Approved Budget</u>.

(a) *Approved Budget*. The use of Borrowings and other extensions of credit by the Loan Parties under the Credit Agreement and the other Loan Documents shall be limited in accordance with the Approved Budget. For the avoidance of doubt, the undersigned Lenders' execution of this Agreement shall constitute their approval of the Approved Budget. Funds borrowed under the Credit Agreement and cash collateral used during the Forbearance Period shall be used by the Loan Parties in accordance with the Credit Agreement, this Agreement, the other Loan Documents, and the Approved Budget (subject to Permitted Variances).

(b) *Approved Budget Reporting*. The Loan Parties shall deliver to the Administrative Agent for distribution to the Lenders, on or before 11:00 a.m. Eastern time on the second Business Day of each week: (i) commencing the week ended August 12, 2022, the then current cash balance calculations as of the last Business Day of the immediately preceding week (the "<u>Cash Balance Report</u>"); and (ii) commencing the week ended August 19, 2022, a cash flow reconciliation and variance report in form and detail reasonably acceptable to the Administrative Agent (an "<u>Approved Variance Report</u>") that shows (A) comparisons of actual results for each line item against such line item in the Approved Budget for the prior periods ended and (B) a report setting forth compliance or non-compliance with the Permitted Variance for such Variance Testing Period. The Approved Variance Report shall also provide a commercially reasonable narrative explanation of each variance.

(c) *Budget Compliance*. The Loan Parties' payment of any expenses or other disbursements (i) during any Variance Testing Period in excess of the projected aggregate cash disbursements set forth in the Approved Budget for such Variance Testing Period (subject to Permitted Variances) or (ii) that are otherwise prohibited by this Agreement, the Credit Agreement, or the other Loan Documents, in each case without the written consent of the Administrative Agent, shall constitute an immediate Forbearance Termination Event; <u>provided</u>, <u>however</u>, that in the case of the fees, costs and expenses of the Administrative Agent and the Lenders, the Loan Parties shall pay such fees, costs and expenses in accordance with this Agreement, the Credit Agreement, and the other Loan Documents, without being limited by the Approved Budget or constituting a Forbearance Termination Event.

18. <u>Conditions Precedent</u>. This Agreement shall be effective on the date (the "<u>Effective Date</u>") that each of the following conditions have been satisfied as determined by the Administrative Agent in its reasonable discretion, or waived by the Required Lenders in their sole discretion:

(a) *Executed Agreement*. The Administrative Agent shall have received a copy of this Agreement duly executed by each of the Loan Parties, the Owner Pledgor, the Lenders constituting the Required Lenders, the Lenders constituting the Required Revolving Lenders, and the Administrative Agent.

(b) *Officer's Certificate, Authorizing Resolutions, and Incumbencies*. The Administrative Agent shall have received certificates of resolutions or other action, incumbency certificates, and/or other certificates of the Secretary, Assistant Secretary, or other appropriate officer (or member or manager, as the case may be, in the case of limited liability companies) acceptable to the Administrative Agent, of each Loan Party, dated as of the Effective Date, addressing the matters set forth in Section 3.1(b)(i) of the Credit Agreement, in each case updated to reflect the transactions contemplated by this Agreement and in form reasonably satisfactory to the Administrative Agent; <u>provided</u>, that to the extent none of the foregoing has changed since they

CONFIDENTIAL                                                                                      VPX-JHO0000000276

were most recently delivered to the Administrative Agent for a Loan Party, then such Loan Party may deliver a customary, short-form "bring down" certificate.

(c)     *Administrative Agent's Fees.* The Administrative Agent shall have received all reasonable, documented, and invoiced fees payable to the Administrative Agent or any Affiliate thereof as agreed between the Administrative Agent and the Borrower (and, for the avoidance of doubt, excluding the reimbursable amounts described in Section 30).

(d)     *Payment of Deferred Forbearance Fee.* The Administrative Agent shall have received payment of the "Forbearance Fee", as defined in the Third Forbearance, in the amount of $546,285.33.

(e)     *New Entity Joinder.* The Administrative Agent shall have received (i) a Guarantor Joinder Agreement, duly executed by Rainbow Unicorn Bev LLC, joining Rainbow Unicorn Bev LLC to the Credit Agreement as a Guarantor and (ii) appropriate authorizing resolutions of the board of directors or managers (or equivalent governing body), as applicable, of Rainbow Unicorn Bev LLC.

19.     <u>Representations of Loan Parties</u>. Each Loan Party represents and warrants to the Administrative Agent and the Lenders as follows:

(a)     Such Loan Party has the requisite power and authority and has taken all necessary action to authorize the execution, delivery, and performance of this Agreement in accordance with its terms.

(b)     This Agreement has been duly executed and delivered by such Loan Party and the Owner Pledgor and is the legally valid and binding obligation of such Person, enforceable against such Person in accordance with its respective terms, except as may be limited by Debtor Relief Laws or by equitable principles relating to enforceability.

(c)     The execution, delivery, and performance by such Loan Party and the Owner Pledgor of this Agreement and the consummation of the transactions contemplated by this Agreement do not and will not require, as a condition to the effectiveness thereof, any registration with, consent, or approval of, or notice to, or other action to, with, or by, any Governmental Authority except for (i) filings necessary to perfect, and/or maintain the perfection of, the Liens created under the Loan Documents or (ii) filings, recordings, or consents where failure to obtain or make could not reasonably be expected to have a Material Adverse Effect.

(d)     After giving effect to this Agreement: (i) the representations and warranties of the Loan Parties set forth in the Loan Documents (other than the representations and warranties set forth in Section 4.6 (solely as it relates to the Existing Events of Default) of the Credit Agreement) are true and correct in all material respects (but without duplication of any existing materiality qualifiers) on and as of the Effective Date to the same extent as though made on and as of such date except to the extent such representations and warranties specifically relate to an earlier date (in which case they are true, accurate and complete in all material respects (but without duplication of any existing materiality qualifiers) as of such earlier date); and (ii) no Default or Event of Default (other than any Existing Event of Default) exists on and as of the Effective Date.

(e)     The parties executing this Agreement as Guarantors include each Person that is required pursuant to Section 5.13 of the Credit Agreement to become a Loan Party as of the date hereof.

CONFIDENTIAL                                                                 VPX-JHO0000000277

If any representation and warranty set forth in this Section is incorrect in any material respect, then such incorrect representation and warranty shall constitute a new and immediate Forbearance Termination Event without regard to any otherwise applicable notice, cure, or grace period.

20.    Representations of the Owner Pledgor. The Owner Pledgor represents and warrants to the Administrative Agent and the Lenders as follows:

(a)    This Agreement has been duly executed and delivered by the Owner Pledgor and is the legally valid and binding obligation of such Person, enforceable against such Person in accordance with its respective terms, except as may be limited by Debtor Relief Laws or by equitable principles relating to enforceability.

(b)    He is (i) a natural person, (ii) of the age of majority, (iii) a citizen of the United States, (iv) a resident of the State of Florida, (v) legally competent to enter into this Agreement, and (vi) sophisticated in business matters.

(c)    After giving effect to this Agreement, the representations and warranties of the Owner Pledgor set forth in the Owner Pledge Agreement are true and correct in all material respects (but without duplication of any existing materiality qualifiers) on and as of the Effective Date to the same extent as though made on and as of such date except to the extent such representations and warranties specifically relate to an earlier date (in which case they are true, accurate and complete in all material respects (but without duplication of any existing materiality qualifiers) as of such earlier date).

If any representation and warranty set forth in this Section is incorrect in any material respect, then such incorrect representation and warranty shall constitute a new and immediate Forbearance Termination Event without regard to any otherwise applicable notice, cure, or grace period.

21.    Release. Each Loan Party and the Owner Pledgor each hereby releases and forever discharges the Administrative Agent, the Swingline Lender, the Issuing Bank, each Lender, and each of their respective predecessors, successors, assigns, and Related Parties (each and every of the foregoing, a "Released Party") from any and all claims, counterclaims, demands, damages, debts, suits, liabilities, actions, and causes of action of any nature whatsoever, in each case through the Effective Date, whether arising at law or in equity, whether known or unknown, whether liability be direct or indirect, whether liquidated or unliquidated, whether absolute or contingent, whether foreseen or unforeseen, and whether or not heretofore asserted, which any Loan Party or the Owner Pledgor may have or claim to have against any Released Party.

22.    No Actions, Claims. Each Loan Party and the Owner Pledgor each hereby represents, warrants, acknowledges, and confirms that such Person has no knowledge of any action, cause of action, claim, demand, damage, or liability of whatever kind or nature, in law or in equity, against any Released Party arising from any action by such Person, or failure of such Person to act, in any way on or prior to the date hereof.

23.    Incorporation of Agreement. Except as specifically modified herein, the terms of the Loan Documents shall remain in full force and effect. The execution, delivery, and effectiveness of this Agreement shall not operate as a waiver of any right, power, or remedy of the Administrative Agent or the Lenders under the Loan Documents or constitute a waiver or amendment of any provision of the Loan Documents. The breach of any covenant or provision of this Agreement shall constitute an immediate Forbearance Termination Event and this Agreement shall constitute a Loan Document.

CHAR2\2684772v6

13

VPX-JHO0000000278

24.    No Third-Party Beneficiaries. This Agreement and the rights and benefits hereof shall inure to the benefit of each of the parties hereto and their respective successors and assigns, and the obligations hereof shall be binding upon the Loan Parties and the Owner Pledgor (as the case may be). No other Person shall have or be entitled to assert rights or benefits under this Agreement, other than any non-party Released Party with respect to Section 21 and Section 22 hereof (which Persons are intended to be third party beneficiaries of this Agreement).

25.    Entirety. This Agreement, the Credit Agreement, and the other Loan Documents embody the entire agreement among the parties hereto and supersede all prior agreements and understandings, oral or written, if any, relating to the subject matter hereof. This Agreement, the Credit Agreement, and the other Loan Documents represent the final agreement between the parties and may not be contradicted by evidence of prior, contemporaneous, or subsequent oral agreements of the parties.

26.    Counterparts. This Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. Delivery of an executed counterpart of a signature page of this Agreement by telecopy or other electronic imaging means (*e.g.*, "pdf" or "tif" format) shall be effective as delivery of a manually executed counterpart of this Agreement.

27.    Governing Law; Jurisdiction; Consent to Service of Process; Waiver of Jury Trial. The governing law, jurisdiction, consent to service of process, and waiver of jury trial provisions contained in Sections 11.5 and 11.6 of the Credit Agreement are hereby incorporated by reference *mutatis mutandis*.

28.    Further Assurances. Each of the parties hereto agrees to execute and deliver, or to cause to be executed and delivered, all such instruments as may reasonably be requested to effectuate the intent and purposes, and to carry out the terms, of this Agreement.

29.    Miscellaneous. Section headings in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose. Wherever possible, each provision of this Agreement shall be interpreted in such a manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under applicable law, then such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement. Except as otherwise provided in this Agreement, if any provision contained in this Agreement conflicts with, or is inconsistent with, any provision in any Loan Document, then the provision contained in this Agreement shall govern and control.

30.    Post-Closing Covenants.

(a)    *Administrative Agent's Expenses.* Within one (1) Business Day after the Effective Date, the Administrative Agent shall have received reimbursement from the Loan Parties for all documented and invoiced out-of-pocket fees and expenses reasonably incurred in connection with this Agreement, the Credit Agreement, and the other Loan Documents (including, without limitation, the documented and invoiced fees and out-of-pocket expenses of Moore & Van Allen PLLC, as counsel to the Administrative Agent, and of the Administrative Agent's Financial Advisor) through the Effective Date to the extent invoiced to the Loan Parties at least one (1) Business Day prior to the Effective Date, except to the extent otherwise agreed by the Administrative Agent.

(b)    *New Entity Joinder Materials.* Within seven (7) days after the Effective Date (or such later date as the Administrative Agent shall agree), the Administrative Agent shall have

CONFIDENTIAL                    VPX-JHO0000000279

received any additional documentation required by the Credit Agreement, the Loan Documents, or reasonably requested by the Administrative Agent not previously received by the Administrative Agent in connection with the joinder of Rainbow Unicorn Bev LLC as a Guarantor.

31.    Disqualified Institutions List. From and after the Effective Date, Schedule 3 to this Agreement constitutes the list of Disqualified Institutions notwithstanding anything to the contrary either delivered by the Loan Parties (or its professionals) to the Administrative Agent (or its professionals) or communicated among the Loan Parties and the Administrative Agent (or on their behalf by their respective professionals) regarding Disqualified Institutions, in each case prior to the Effective Date.

[*Remainder of page intentionally left blank.*]

CONFIDENTIAL                                                                          VPX-JHO0000000280

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the date first above written.

BORROWER:          VITAL PHARMACEUTICALS, INC.,
                   a Florida corporation

                   By: _____
                   Name:  John H. Owoc
                   Title:   President, Chief Scientific Officer & Chief Executive Officer


GUARANTORS:        BANG ENERGY CANADA, INC.,
                   a Florida corporation
                   ELITE IP HOLDINGS, LLC,
                   a Florida limited liability company
                   JHO INTELLECTUAL PROPERTY HOLDINGS, LLC,
                   a Florida limited liability company
                   JHO GA-1 INVESTMENT, LLC,
                   a Florida limited liability company
                   JHO NV-1 INVESTMENT, LLC,
                   a Florida limited liability company
                   JHO REAL ESTATE INVESTMENT, LLC,
                   a Florida limited liability company
                   QUASH SELTZER, LLC,
                   a Florida limited liability company
                   SHERIDAN REAL ESTATE INVESTMENT A, LLC,
                   a Florida limited liability company
                   SHERIDAN REAL ESTATE INVESTMENT B, LLC,
                   a Florida limited liability company
                   SHERIDAN REAL ESTATE INVESTMENT C, LLC,
                   a Florida limited liability company
                   VITAL PHARMACEUTICALS INTERNATIONAL SALES, INC.,
                   a Delaware corporation

                   By: _____
                   Name:  John H. Owoc
                   Title:   President, Chief Scientific Officer & Chief Executive Officer


OWNER PLEDGOR:     JOHN H. OWOC,
                   an individual resident of the State of Florida

                   _____


VITAL PHARMACEUTICALS, INC.
FOURTH FORBEARANCE AGREEMENT AND FIFTH AMENDMENT

CONFIDENTIAL                                           VPX-JHO0000000281

ADMINISTRATIVE AGENT:                    TRUIST BANK,
                                         as Administrative Agent

                                         By: _____
                                         Name:    Jade Silver
                                         Title:   Senior Vice President

CONFIDENTIAL                                                    VPX-JHO0000000282

LENDERS:

TRUIST BANK,
as a Lender, as Swingline Lender, and as Issuing Bank

By:_____
Name:   Jade Silver
Title:   Senior Vice President

VITAL PHARMACEUTICALS, INC.
FOURTH FORBEARANCE AGREEMENT AND FIFTH AMENDMENT

COBANK, ACB,
as a Lender

By: _____
Name: Janet Downs
Title: Lead Special Assets Officer

VITAL PHARMACEUTICALS, INC.
FOURTH FORBEARANCE AGREEMENT AND FIFTH AMENDMENT

AGCOUNTRY FARM CREDIT SERVICES, FLCA,
as a Lender

By: _____

Name:   Lisa Caswell
Title:    Vice President

CONFIDENTIAL                                                  VPX-JHO0000000285

FARM CREDIT BANK OF TEXAS,
as a Lender

By: _____

Name: Mike C. Hawkins
Title:  Director

VITAL PHARMACEUTICALS, INC.
FOURTH FORBEARANCE AGREEMENT AND FIFTH AMENDMENT

CONFIDENTIAL

CITIZENS BANK, N.A.,
as a Lender

By:

Name: Seth McIntyre
Title: Assistant Vice President

CONFIDENTIAL                                                                 VPX-JHO0000000287

COMPEER FINANCIAL, PCA,
as a Lender

By: _____
Name: Kevin Buente
Title: Principal Credit Officer

CONFIDENTIAL

VPX-JHO0000000288

SYNOVUS BANK,
as a Lender

By: _____

Name: John M. Quarles, Jr.
Title:   Senior Special Assets Officer

CONFIDENTIAL

FEDERAL AGRICULTURAL MORTGAGE
CORPORATION,
as a Lender

By: *Kyle Weaver*
     Name:  Kyle Weaver
     Title:   Managing Director

VITAL PHARMACEUTICALS, INC.
FOURTH FORBEARANCE AGREEMENT AND FIFTH AMENDMENT

CONFIDENTIAL

THE HUNTINGTON NATIONAL BANK,
as a Lender

By: *Nathan Drews*
_____
Name: Nathan Drews
Title: Financial Recovery Rep

CONFIDENTIAL

GREENSTONE FARM CREDIT SERVICES, FLCA,
as a Lender

By: _Mark Strebel_____
Name: Mark Strebel
Title: Vice President of Risk Assets

VITAL PHARMACEUTICALS, INC.
FOURTH FORBEARANCE AGREEMENT AND FIFTH AMENDMENT

COMERICA BANK,
as a Lender

By: _____

Name:  Cynthia B. Jones
Title:   Vice President

VITAL PHARMACEUTICALS, INC.
FOURTH FORBEARANCE AGREEMENT AND FIFTH AMENDMENT

CONFIDENTIAL

HSBC BANK USA, N.A.,
as a Lender

By: _____

Name: Rino Falsone
Title:  Vice President

VITAL PHARMACEUTICALS, INC.
FOURTH FORBEARANCE AGREEMENT AND FIFTH AMENDMENT

CONFIDENTIAL

UNITED COMMUNITY BANK d/b/a SEASIDE
BANK AND TRUST,
as a Lender

By: _____

Name: J. Brett Brown

Title: Sr. Vice President

CONFIDENTIAL

## SCHEDULE 1

### Acknowledged Events of Default

#### A.  Existing Events of Default

1.      Certain Events of Default have occurred and are continuing under Section 8.1(d) of the Credit Agreement as a result of:

      a.      the Loan Parties' failure to comply with the Combined Total Leverage Ratio covenant set forth in Section 6.1 of the Credit Agreement for the Fiscal Quarters ended December 31, 2021, March 31, 2022, and June 30, 2022;

      b.      the Loan Parties' failure to comply with the Combined Fixed Charge Coverage Ratio covenant set forth in Section 6.2 of the Credit Agreement for the Fiscal Quarters ended December 31, 2021, March 31, 2022, and June 30, 2022;

      c.      the Loan Parties' failure to comply with Section 5.1(a) of the Credit Agreement with respect to the annual audited report for the Fiscal Year ended December 31, 2021 for the Loan Parties and Subsidiaries as a result of such report and opinion of the Loan Parties' independent public accounting firm not being unqualified as to "going concern" or like qualification or scope of such audit; and

      d.      the Loan Parties' failure to provide notice under Section 5.2(a)(i) of the Credit Agreement in connection with the occurrence of any of the other Acknowledged Events of Default.

#### B.  Anticipated Events of Default

1.      An Event of Default may occur under Sections 8.1(c), 8.1(d) and/or 8.1(k)(i) of the Credit Agreement as a result of Monster Energy Company (or other Person acting on its behalf or on behalf of any of its Affiliates) recording a judgment against the Borrower by a Commercial Arbitration Tribunal of the America Arbitration Association in Orange Bang, Inc. and Monster Energy Company v. Vital Pharmaceuticals, Inc d/b/a VPX Sports (Case No. 01-20-0005-6081) with any applicable Governmental Authority, which may (i) constitute a Lien on the assets of the Loan Parties that is not a Permitted Encumbrance or otherwise permitted by Section 7.2 of the Credit Agreement, and/or (ii) constitute enforcement proceedings in respect of a judgment against a Loan Party.

*[Remainder of page intentionally left blank; end of Schedule I.]*

CHAR2\2684772v6

CONFIDENTIAL                                                                                              VPX-JHO0000000296

## SCHEDULE 2

## CTO Scope

The Chief Transaction Officer at the Borrower shall report directly to the Borrower's Chief Executive Officer, shall collaborate primarily with the Borrower's Senior Vice President of Finance, and shall be responsible for the following tasks related to the Capital Raise Transaction:

1.  Evaluating the Borrower's cash and liquidity requirements, including overseeing the development and review of cash flow projections, revenue projections, preparation of appropriate cash flow forecasts, and other financial and accounting information related to continuing operations and any re-financing or other restructuring that the Borrower may explore;

2.  Directing the Borrower's efforts of financial and administrative management and coordinating with external professionals, consultants, and advisors in connection with day-to-day operations and re-financing or restructuring initiatives, including overseeing the negotiation of any agreements with lenders or potential investors or funding sources;

3.  Evaluating the Borrower's operational processes and procedures, including the opportunities for, and implementation of, cost reduction measures;

4.  Directing negotiations with existing lenders, including the Administrative Agent and its professionals, under existing credit facilities and any other holders of secured debt, as well as any significant trade creditors;

5.  Evaluating and directing payments to vendors, the Borrower's external professionals, consultants, and advisors, and the Administrative Agent's professionals, consultants, and advisors, and in each case seeking the Borrower's Chief Executive Officer's approval of the same;

6.  Assisting the Borrower in connection with its anticipated transition away from the Pepsi distribution network and the implementation of a new distribution network;

7.  Communicating directly with the Borrower's Chief Executive Officer, other personnel working on the Capital Raise Transaction, the Investment Banker, the Borrower's outside attorneys and other professionals, and/or the Administrative Agent regarding negotiations with existing lenders under existing credit facilities and any other holders of secured debt, as well as any significant trade creditors, and providing information to, and as reasonably requested by, the Administrative Agent and others in connection with existing credit facilities;

8.  Collaborating with the Borrower's Chief Executive Officer, other personnel working on the Capital Raise Transaction, the Investment Banker, and the Borrower's outside attorneys and other professionals regarding the preparation of financial information and presentation of materials required for the marketing, sale and/or refinancing of the Borrower;

9.  Depending upon the initial indications of the refinancing process conducted by the Investment Banker, assisting the Borrower in connection with any in-court restructuring or liquidation proceedings, including coordinating with the Investment Banker, the Borrower's legal counsel, and the Borrower's other outside professionals, and overseeing the preparation of related budgets, milestones, and other financial models; and

CHAR2\2684772v6

10.     Providing such other services as are customarily provided in connection with the analysis and negotiation of a re-financing or restructuring or liquidation initiative, as reasonably requested by the Administrative Agent and mutually agreed to by the Borrower.

[*Remainder of page intentionally left blank; end of <u>Schedule 2</u>.*]

CHAR2\2684772v6

CONFIDENTIAL

## SCHEDULE 3

### Disqualified Institutions List

1. Anheuser-Busch
2. Celsius Holdings, Inc.
3. Coca-Cola
4. Keurig Dr. Pepper
5. Monster Beverage Corporation
6. Nutrabolt
7. PepsiCo
8. Red Bull

CHAR2\2684772v6

VPX-JHO0000000299

**Exhibit A**

**Approved Budget**

[see attached]

CHAR2\2684772v6

CONFIDENTIAL

VPX-JHO0000000300

Fourth Forbearance Agreement Approved Budget

| | 8/5/2022 | 8/12/2022 | 8/19/2022 | 8/26/2022 |
|---|---|---|---|---|
| **Receipts** | | | | |
| Cash Collections from operations (pepsi) | $ 11,749,564 | $ 6,093,261 | $ 6,093,261 | $ 6,093,261 |
| Cash Collections Other customers | 2,990,958 | 3,053,880 | 3,053,880 | 3,053,880 |
| Potential Pepsi Deductions | (3,600,000) | (6,093,261) | (6,093,261) | (6,093,261) |
| Total Cash In | 11,140,522 | 3,053,880 | 3,053,880 | 3,053,880 |
| | | | | |
| **Operating Disbursements** | | | | |
| COGS (Materials, Co-Packers and Employee) | (5,425,444) | (9,104,494) | (5,681,522) | (8,804,494) |
| Trade Spends | (3,192,000) | (1,375,000) | (1,375,000) | (625,000) |
| Freight | (1,537,391) | (1,200,000) | (1,200,000) | (1,200,000) |
| Facility / Office Costs | (2,348,312) | (750,000) | (750,000) | (750,000) |
| Legal | (762,500) | (662,500) | (662,500) | (662,500) |
| Taxes | - | - | - | - |
| Marketing | (1,975,000) | (225,000) | (225,000) | (225,000) |
| Interest/Principle Payments (after filing see adequate assurance below) | (546,000) | - | - | - |
| CAPEX | - | - | - | - |
| Total Operating Disbursements | (15,786,647) | (13,316,994) | (9,894,022) | (12,266,994) |
| Operating Net Cash Flow | (4,646,125) | (10,263,114) | (6,840,141) | (9,213,114) |
| **Other Disbursements** | | | | |
| Transactional - legal/FA (after filing, see below) | (100,000) | - | (100,000) | - |
| Bank Financial Advisor (after filing, see below) | (533,250) | - | - | - |
| Professional Fees | - | (1,836,667) | (1,836,667) | (1,836,667) |
| Retention Plans ‘Amounts only contemplated to be paid in the event of a bankruptcy fili | - | - | (1,627,500) | - |
| Total Other Disbursements | (633,250) | (1,836,667) | (3,564,167) | (1,836,667) |
| | | | | |
| Net Cash flow | (5,279,375) | (12,099,780) | (10,404,308) | (11,049,780) |

VPX-JHO0000000301

**Exhibit 2.3**

**[Form of] Notice of Revolving Borrowing**

[see attached]

CHAR2\2684772v6

CONFIDENTIAL                                                                                          VPX-JHO0000000302

EXHIBIT 2.3

[*FORM OF*] **NOTICE OF REVOLVING BORROWING**

*Date*: _____ ___, 20___

Truist Bank
Agency Services
303 Peachtree St., N.E., 25th Fl.
Atlanta, Georgia 30308
*Attn*:    Agency Services Manager
Phone: (404) 221–2001

To Whom It May Concern:

Reference is hereby made to that certain Amended and Restated Revolving Credit and Term Loan Agreement, dated as of August 14, 2020 (as amended, restated, amended and restated, supplemented, increased, extended, refinanced, renewed, replaced, and/or otherwise modified in writing from time to time, the "*Credit Agreement*"), by and among Vital Pharmaceuticals, Inc., a Florida corporation (the "*Borrower*"), the Guarantors from time to time party thereto, the Lenders from time to time party thereto, and Truist Bank, as Administrative Agent, Swingline Lender, and Issuing Bank. Capitalized terms used herein but not otherwise defined herein shall have the meanings provided for such terms in the Credit Agreement. This notice constitutes a Notice of Revolving Borrowing.

The Borrower hereby requests a Borrowing of Revolving Loans pursuant to Section 2.2 of the Credit Agreement, and, in connection therewith, the Borrower specifies the following information with respect to the Borrowing of Revolving Loans requested hereby:

(A)    Aggregate principal amount of Borrowing of Revolving Loans[1]:

$_____.

(B)    Date of Borrowing of Revolving Loans (which is a Business Day):

_____ ___, 20___.

(C)    Type of Revolving Loans comprising such Borrowing of Revolving Loans[2]:

_____.

[(D)    Interest Period[3]: _____ months.][4]

---

[1]  In the case of any Borrowing of Loans (whether Base Rate Loans or SOFR Loans), *not less than* One Million Dollars ($1,000,000), or in a larger multiple of Five-Hundred Thousand Dollars ($500,000) in excess thereof.

[2]  Borrowing of SOFR Loans or Base Rate Loans.

[3]  Which must (i) comply with the definition of "Interest Period", and (ii) end *not later than* the Revolving Commitment Termination Date.

[4]  Include clause (D) only for SOFR Loans.

CHAR2\2686244v2

CONFIDENTIAL    VPX-JHO0000000303

(E)     Location and number of Borrower's account to which proceeds of such Borrowing of Revolving Loans are to be disbursed:

*Location*: _____

*Number*: _____

The Borrower hereby represents and warrants that each of the conditions set forth in Section 3.2 of the Credit Agreement has been satisfied on, and as of, the date of such Borrowing.

[*Remainder of Page Intentionally Left Blank*; *Signature Page Follows*]

2

CONFIDENTIAL                                                                                                      VPX-JHO0000000304

IN WITNESS WHEREOF, the Borrower has caused this Notice of Revolving Borrowing to be duly executed and delivered by its duly authorized officer as of the date first written above, intending to create an instrument under seal.

BORROWER:

**VITAL PHARMACEUTICALS, INC.**,
a Florida corporation

By: _____ (Seal)
Name:
Title:

CONFIDENTIAL

**<u>Exhibit 2.5</u>**

**[Form of] Notice of a Term Loan Borrowing**

[see attached]

CHAR2\2684772v6

EXHIBIT 2.5

[*FORM OF*] **NOTICE OF TERM LOAN A BORROWING**

<u>*Date*</u>: _____ ___, 20___

Truist Bank
Agency Services
303 Peachtree St., N.E., 25th Fl.
Atlanta, Georgia  30308
*Attn*:    Agency Services Manager
Phone:  (404) 221–2001

To Whom It May Concern:

Reference is hereby made to that certain Amended and Restated Revolving Credit and Term Loan Agreement, dated as of August 14, 2020 (as amended, restated, amended and restated, supplemented, increased, extended, refinanced, renewed, replaced, and/or otherwise modified in writing from time to time, the "*Credit Agreement*"), by and among Vital Pharmaceuticals, Inc., a Florida corporation (the "*Borrower*"), the Guarantors from time to time party thereto, the Lenders from time to time party thereto, and Truist Bank, as Administrative Agent, Swingline Lender, and Issuing Bank. Capitalized terms used herein but not otherwise defined herein shall have the meanings provided for such terms in the Credit Agreement. This notice constitutes a Notice of Term Loan A Borrowing.

The Borrower hereby requests a Borrowing of the Term Loan A pursuant to Section 2.5 the Credit Agreement, and, in connection therewith, the Borrower specifies the following information with respect to the Borrowing of the Term Loan A requested hereby:

(A)    Aggregate principal amount of Borrowing of the Term Loan A: $231,400,000

(B)    Date of Borrowing of the Term Loan A (which is a Business Day): the Effective Date

(C)    Type of Loan(s) comprising such Borrowing of the Term Loan A[5]:

[(D)    Interest Period[6]: _____ months.][7]

(E)    Location and number of Borrower's account to which proceeds of such Borrowing of the Term Loan A are to be disbursed:

*Location*: _____

*Number*: _____

---

[5]  Borrowing of Base Rate Loans or SOFR Loans.

[6]  Which must (i) comply with the definition of "Interest Period", and (ii) end *not later than* the Maturity Date for the Term A Loan.

[7]  Include <u>clause (D)</u> only for SOFR Loans.

CHAR2\2686244v2

VPX-JHO0000000307

The Borrower hereby represents and warrants that each of the conditions set forth in Section 3.2 of the Credit Agreement has been satisfied on, and as of, the date of such Borrowing.

[*Remainder of Page Intentionally Left Blank*; *Signature Page Follows*]

CHAR2\2686244v2

IN WITNESS WHEREOF, the Borrower has caused this Notice of Term Loan A Borrowing to be duly executed and delivered by its duly authorized officer as of the date first written above, intending to create an instrument under seal.

BORROWER:                              **VITAL PHARMACEUTICALS, INC.**,
                                       a Florida corporation


                                       By: _____ (Seal)
                                       Name:
                                       Title:


                                       [*Signature Page Ends*]

CHAR2\2686244v2

**Exhibit 2.7**

**[Form of] Notice of Conversion / Continuation**

[see attached]

CHAR2\2684772v6

VPX-JHO0000000310

EXHIBIT 2.7

[*FORM OF*] **NOTICE OF CONVERSION / CONTINUATION**

*Date*: _____ ___, 20___

Truist Bank
Agency Services
303 Peachtree St., N.E., 25th Fl.
Atlanta, Georgia 30308
*Attn*:    Agency Services Manager
Phone: (404) 221–2001

To Whom It May Concern:

Reference is hereby made to that certain Amended and Restated Revolving Credit and Term Loan Agreement, dated as of August 14, 2020 (as amended, restated, amended and restated, supplemented, increased, extended, refinanced, renewed, replaced, and/or otherwise modified in writing from time to time, the "*Credit Agreement*"), by and among Vital Pharmaceuticals, Inc., a Florida corporation (the "*Borrower*"), the Guarantors from time to time party thereto, the Lenders from time to time party thereto, and Truist Bank, as Administrative Agent, Swingline Lender, and Issuing Bank. Capitalized terms used herein but not otherwise defined herein shall have the meanings provided for such terms in the Credit Agreement. This notice constitutes a Notice of Conversion / Continuation.

The Borrower hereby requests a continuation or conversion pursuant to Section 2.7 of the Credit Agreement, and, in connection therewith, the Borrower specifies the following information with respect to the continuation or conversion requested hereby:

(A)    Aggregate principal amount of the Borrowing to be continued or converted[1]:

(B)    Date of continuation or conversion (which is a Business Day):

(C)    Type of Loan(s) comprising such Borrowing[2]:

[(D)    Interest Period[3]: _____ months.][4]

The Borrower hereby represents and warrants that each of the conditions set forth in Section 3.2 of the Credit Agreement has been satisfied on, and as of, the date of such Borrowing.

---

[1]  In the case of a continuation of, or a conversion into, any Loans (whether Base Rate Loans or SOFR Loans), *not less than* One Million Dollars ($1,000,000), or in a larger multiple of Five-Hundred Thousand Dollars ($500,000) in excess thereof.

[2]  Borrowing of Base Rate Loans or SOFR Loans.

[3]  Which must (i) comply with the definition of "Interest Period", and (ii) end *not later than* the Revolving Commitment Termination Date or the Maturity Date, as applicable.

[4]  Include clause (D) only for SOFR Loans.

CHAR2\2686244v2

[*Remainder of Page Intentionally Left Blank*; *Signature Page Follows*]

2

CHAR2\2686244v2

CONFIDENTIAL

VPX-JHO0000000312

IN WITNESS WHEREOF, the Borrower has caused this Notice of Conversion / Continuation to be duly executed and delivered by its duly authorized officer as of the date first written above, intending to create an instrument under seal.

BORROWER:

**VITAL PHARMACEUTICALS, INC.,**
a Florida corporation

By: _____ (Seal)
Name:
Title:

[*Signature Page Ends*]

CHAR2\2686244v2

VPX-JHO0000000313

## Annex A

**Amended Credit Agreement**

[see attached]

CHAR2\2684772v6

VPX-JHO0000000314

AMENDED AND RESTATED REVOLVING CREDIT AND TERM LOAN AGREEMENT

dated as of August 14, 2020, as amended in its entirety by that certain Fourth Forbearance Agreement and Fifth Amendment to Amended and Restated Revolving Credit and Term Loan Agreement dated as of August 8, 2022,

by and among

VITAL PHARMACEUTICALS, INC.,
as the Borrower,

THE SUBSIDIARIES AND AFFILIATES OF THE BORROWER IDENTIFIED HEREIN,
as the Guarantors,

THE LENDERS FROM TIME TO TIME PARTY HERETO,

TRUIST BANK,
as Administrative Agent, Swingline Lender, and Issuing Bank,

and

COBANK, ACB,
CITIZENS BANK, N.A.,
and
COMPEER FINANCIAL, PCA
as Co-Syndication Agents

TRUIST SECURITIES, INC.,
as Lead Arranger and Book Runner

CHAR2\2683123v6

CONFIDENTIAL

# TABLE OF CONTENTS

*Page*

ARTICLE I —— DEFINITIONS; CONSTRUCTION ............................................................. 1

| | | |
|---|---|---|
| Section 1.1 | Definitions | 1 |
| Section 1.2 | Classifications of Loans and Borrowings | ~~45~~46 |
| Section 1.3 | Accounting Terms and Determination | ~~45~~46 |
| Section 1.4 | Terms Generally | ~~46~~47 |
| Section 1.5 | Letter of Credit Amounts | ~~46~~48 |

ARTICLE II —— AMOUNT AND TERMS OF THE COMMITMENTS ............................... ~~47~~49

| | | |
|---|---|---|
| Section 2.1 | General Description of Facilities | ~~47~~49 |
| Section 2.2 | Revolving Loans | ~~47~~49 |
| Section 2.3 | Procedure for Revolving Borrowings | ~~47~~49 |
| Section 2.4 | Swingline Commitment | ~~48~~50 |
| Section 2.5 | Term Loan A Commitment | ~~49~~51 |
| Section 2.6 | Funding of Borrowings | ~~49~~51 |
| Section 2.7 | Interest Elections | ~~50~~52 |
| Section 2.8 | Optional Reduction and Termination of Commitments | ~~50~~52 |
| Section 2.9 | Repayment of Loans | ~~51~~53 |
| Section 2.10 | Evidence of Indebtedness | ~~51~~53 |
| Section 2.11 | Optional Prepayments | ~~52~~54 |
| Section 2.12 | Mandatory Prepayments | ~~52~~54 |
| Section 2.13 | Interest on Loans | ~~54~~56 |
| Section 2.14 | Fees | ~~54~~56 |
| Section 2.15 | Computation of Interest and Fees | ~~55~~57 |
| Section 2.16 | Inability to Determine Interest Rates ~~56~~; Benchmark Replacement Setting | 58 |
| Section 2.17 | Illegality | ~~57~~60 |
| Section 2.18 | Increased Costs | ~~57~~60 |
| Section 2.19 | Funding Indemnity | ~~58~~61 |
| Section 2.20 | Taxes | ~~59~~62 |
| Section 2.21 | Payments Generally; Pro Rata Treatment; Sharing of Set-offs | ~~62~~65 |
| Section 2.22 | Letters of Credit | ~~63~~66 |
| Section 2.23 | Increase of Commitments; Additional Lenders | ~~67~~70 |
| Section 2.24 | Mitigation of Obligations | ~~69~~72 |
| Section 2.25 | Replacement of Lenders | ~~70~~72 |
| Section 2.26 | Defaulting Lenders | ~~70~~73 |

ARTICLE III —— CONDITIONS PRECEDENT TO LOANS AND LETTERS OF CREDIT ... ~~71~~74

| | | |
|---|---|---|
| Section 3.1 | Conditions to Effectiveness | ~~71~~74 |
| Section 3.2 | Conditions to Each Credit Event | ~~74~~77 |
| Section 3.3 | Delivery of Documents | ~~75~~78 |

ARTICLE IV —— REPRESENTATIONS AND WARRANTIES ........................................ ~~75~~78

| | | |
|---|---|---|
| Section 4.1 | Existence; Power | ~~75~~78 |
| Section 4.2 | Organizational Power; Authorization; Enforceability | ~~75~~78 |
| Section 4.3 | Governmental Approvals; No Conflicts | ~~75~~78 |
| Section 4.4 | Financial Statements; No Material Adverse Effect | ~~76~~79 |
| Section 4.5 | Litigation and Environmental Matters | ~~76~~79 |
| Section 4.6 | Compliance with Laws and Agreements; No Default | ~~76~~79 |
| Section 4.7 | Investment Company Act, Etc | ~~76~~79 |

i

CONFIDENTIAL

| | | |
|---|---|---|
| Section 4.8 | Taxes | 7679 |
| Section 4.9 | Margin Regulations | 7780 |
| Section 4.10 | ERISA | 7780 |
| Section 4.11 | Ownership of Property; Insurance | 7881 |
| Section 4.12 | Disclosure | 7881 |
| Section 4.13 | Labor Relations | 7881 |
| Section 4.14 | Subsidiaries and Loan Parties | 7982 |
| Section 4.15 | Solvency | 7982 |
| Section 4.16 | Business Locations; Taxpayer Identification Number | 7982 |
| Section 4.17 | Deposit and Disbursement Accounts | 7982 |
| Section 4.18 | Collateral Documents | 7982 |
| Section 4.19 | Material Agreements | 8083 |
| Section 4.20 | Sanctions and Anti-Corruption Laws | 8083 |
| Section 4.21 | No Affected Financial Institutions | 8184 |
| Section 4.22 | Cannabis and Hemp Products | 8184 |
| Section 4.23 | Regulatory Matters | 8184 |
| ARTICLE V —— AFFIRMATIVE COVENANTS | | 8386 |
| Section 5.1 | Financial Statements and Other Information | 8386 |
| Section 5.2 | Notices of Material Events | 8588 |
| Section 5.3 | Existence; Conduct of Business | 8790 |
| Section 5.4 | Compliance with Laws | 8790 |
| Section 5.5 | Payment of Obligations | 8790 |
| Section 5.6 | Books and Records | 8790 |
| Section 5.7 | Visitation and Inspection | 8790 |
| Section 5.8 | Maintenance of Properties; Insurance | 8891 |
| Section 5.9 | Use of Proceeds; Margin Regulations | 8891 |
| Section 5.10 | Casualty and Condemnation | 8992 |
| Section 5.11 | Cash Management | 8992 |
| Section 5.12 | Collateral Assurances | 8992 |
| Section 5.13 | Additional Subsidiaries and Collateral | 9093 |
| Section 5.14 | Additional Real Estate | 9295 |
| Section 5.15 | Further Assurances | 9295 |
| Section 5.16 | PPP Loans. | 9396 |
| Section 5.17 | Post-Closing Requirements | 9396 |
| ARTICLE VI —— FINANCIAL COVENANTS | | 9497 |
| Section 6.1 | Combined Total Leverage Ratio | 9497 |
| Section 6.2 | Combined Fixed Charge Coverage Ratio | 9497 |
| ARTICLE VII —— NEGATIVE COVENANTS | | 9497 |
| Section 7.1 | Indebtedness and Preferred Equity | 9497 |
| Section 7.2 | Liens | 9699 |
| Section 7.3 | Fundamental Changes; Conduct of Business | 98101 |
| Section 7.4 | Investments; Loans | 99102 |
| Section 7.5 | Restricted Payments | 100103 |
| Section 7.6 | Asset Sales | 100103 |
| Section 7.7 | Transactions with Affiliates | 102105 |
| Section 7.8 | Restrictive Agreements | 102105 |
| Section 7.9 | Sale and Leaseback Transactions | 102106 |
| Section 7.10 | Hedging Transactions | 102106 |
| Section 7.11 | Amendments to Organization Documents and Material Agreements | 103106 |
| Section 7.12 | Accounting Changes | 103106 |

ii

| | | | |
|---|---|---|---|
| Section 7.13 | Prepayments of Certain Indebtedness; Modifications of Certain Documents | ~~103~~106 | |
| Section 7.14 | PPP Loans | ~~103~~106 | |
| Section 7.15 | Sanctions and Anti-Corruption Laws | ~~103~~107 | |
| Section 7.16 | Margin Regulations | ~~104~~107 | |
| Section 7.17 | Preferred Equity | ~~104~~107 | |
| ARTICLE VIII —— EVENTS OF DEFAULT | | ~~104~~107 | |
| Section 8.1 | Events of Default | ~~104~~107 | |
| Section 8.2 | Application of Proceeds from Collateral | ~~107~~110 | |
| Section 8.3 | Equity Cure | ~~108~~111 | |
| ARTICLE IX —— THE ADMINISTRATIVE AGENT | | ~~109~~112 | |
| Section 9.1 | Appointment of Administrative Agent | ~~109~~112 | |
| Section 9.2 | Nature of Duties of Administrative Agent | ~~109~~113 | |
| Section 9.3 | Lack of Reliance on the Administrative Agent | ~~110~~113 | |
| Section 9.4 | Certain Rights of the Administrative Agent | ~~110~~114 | |
| Section 9.5 | Reliance by Administrative Agent | ~~111~~114 | |
| Section 9.6 | The Administrative Agent in its Individual Capacity | ~~111~~114 | |
| Section 9.7 | Successor Administrative Agent | ~~111~~114 | |
| Section 9.8 | Withholding Tax | ~~112~~115 | |
| Section 9.9 | Administrative Agent May File Proofs of Claim | ~~112~~115 | |
| Section 9.10 | Authorization to Execute Other Loan Documents | ~~113~~116 | |
| Section 9.11 | Collateral and Guaranty Matters | ~~113~~116 | |
| Section 9.12 | Syndication Agent | ~~113~~117 | |
| Section 9.13 | Right to Realize on Collateral and Enforce Guarantee | ~~113~~117 | |
| Section 9.14 | Secured Bank Product Obligations and Hedging Obligations | ~~113~~117 | |
| ARTICLE X —— THE GUARANTY | | ~~114~~117 | |
| Section 10.1 | The Guaranty | ~~114~~117 | |
| Section 10.2 | Obligations Unconditional | ~~114~~118 | |
| Section 10.3 | Reinstatement | ~~115~~118 | |
| Section 10.4 | Certain Additional Waivers | ~~115~~118 | |
| Section 10.5 | Remedies | ~~115~~119 | |
| Section 10.6 | Rights of Contribution | ~~115~~119 | |
| Section 10.7 | Guarantee of Payment; Continuing Guarantee | ~~116~~119 | |
| Section 10.8 | Keepwell | ~~116~~119 | |
| ARTICLE XI —— MISCELLANEOUS | | ~~116~~119 | |
| Section 11.1 | Notices | ~~116~~119 | |
| Section 11.2 | Waiver; Amendments | ~~119~~122 | |
| Section 11.3 | Expenses; Indemnification | ~~121~~124 | |
| Section 11.4 | Successors and Assigns | ~~123~~126 | |
| Section 11.5 | Governing Law; Jurisdiction; Consent to Service of Process | ~~128~~131 | |
| Section 11.6 | WAIVER OF JURY TRIAL | ~~128~~132 | |
| Section 11.7 | Right of Set-off | ~~129~~132 | |
| Section 11.8 | Counterparts; Integration | ~~129~~132 | |
| Section 11.9 | Survival | ~~129~~133 | |
| Section 11.10 | Severability | ~~130~~133 | |
| Section 11.11 | Confidentiality | ~~130~~133 | |
| Section 11.12 | Interest Rate Limitation | ~~130~~134 | |
| Section 11.13 | Waiver of Effect of Corporate Seal | ~~131~~134 | |
| Section 11.14 | Patriot Act | ~~131~~134 | |

iii

| Section 11.15 | No Advisory or Fiduciary Responsibility | ~~131~~134 |
|---|---|---|
| Section 11.16 | Location of Closing | ~~131~~135 |
| Section 11.17 | Acknowledgement and Consent to Bail-In of Affected Financial Institutions | ~~132~~135 |
| Section 11.18 | Certain ERISA Matters | ~~132~~135 |
| Section 11.19 | Acknowledgement Regarding any Supported QFCs | ~~133~~136 |
| Section 11.20 | Amendment and Restatement | ~~133~~137 |
| Section 11.21 | Waiver of Breakage Costs | ~~134~~137 |
| Section 11.22 | Reallocation | ~~134~~138 |

CHAR2\2683123v6

CONFIDENTIAL

VPX-JHO0000000319

Schedules

| Schedule I | – | Commitment Amounts |
| Schedule 4.14 | – | Subsidiaries and Loan Parties |
| Schedule 4.16–1 | – | Locations of Real Estate |
| Schedule 4.16–2 | – | Locations of Chief Executive Office, Taxpayer Identification Number, Etc. |
| Schedule 4.16–3 | – | Changes in Legal Name, State of Formation and Structure |
| Schedule 4.17 | – | Deposit and Disbursement Accounts |
| Schedule 4.19 | – | Material Agreements |
| Schedule 5.17(c) | – | Stoked IP |
| Schedule 7.1 | – | Existing Indebtedness |
| Schedule 7.2 | – | Existing Liens |
| Schedule 7.4 | – | Existing Investments |

Exhibits

| Exhibit 2.3 | – | [*Form of*] Notice of Revolving Borrowing |
| Exhibit 2.4 | – | [*Form of*] Notice of Swingline Borrowing |
| Exhibit 2.5 | – | [*Form of*] Notice of Term Loan A Borrowing |
| Exhibit 2.7 | – | [*Form of*] Notice of Conversion / Continuation |
| Exhibit 2.10 | – | [*Form of*] Note |
| Exhibits 2.20–A-D | – | [*Forms of*] U.S. Tax Compliance Certificates |
| Exhibit 5.1 | – | [*Form of*] Compliance Certificate |
| Exhibit 5.105.13 | – | [*Form of*] Guarantor Joinder Agreement |
| Exhibit 11.4 | – | [*Form of*] Assignment and Assumption |

v

CONFIDENTIAL                                                                 VPX-JHO0000000320

## AMENDED AND RESTATED REVOLVING CREDIT AND TERM LOAN AGREEMENT

This AMENDED AND RESTATED REVOLVING CREDIT AND TERM LOAN AGREEMENT (this "*Agreement*") is made and entered into as of August 14, 2020, as amended in its entirety by that certain Fourth Forbearance Agreement and Fifth Amendment to Amended and Restated Revolving Credit and Term Loan Agreement dated as of August 8, 2022, by and among VITAL PHARMACEUTICALS, INC., a Florida corporation (the "*Borrower*"), the Guarantors (as defined herein), the Lenders (as defined herein), and TRUIST BANK, in its capacities as Administrative Agent, Issuing Bank, and Swingline Lender.

### R E C I T A L S

WHEREAS, certain Loan Parties are party to the Existing Credit Agreement, pursuant to which Truist (as successor in interest to Branch Banking and Trust Company) provided One-Hundred Ten Million Five-Hundred Fifty Thousand Dollars ($110,550,000) in aggregate senior secured credit facilities in favor of the Borrower;

WHEREAS, the Borrower has requested that the Lenders (i) establish a Three-Hundred Ten Million Dollar ($310,000,000) revolving credit facility in favor of, and (ii) make a term loan (to be advanced in full on the Effective Date) in an aggregate principal amount equal to Two-Hundred Thirty-One Million Four-Hundred Thousand Dollars ($231,400,000) to, the Borrower;

WHEREAS, subject to the terms and conditions of this Agreement, the Lenders, the Issuing Bank and the Swingline Lender, to the extent of their respective Commitments (as defined herein), are willing severally to establish the requested revolving credit facility, letter of credit sub-facility, and swingline sub-facility in favor of the Borrower, and the Lenders severally agree to make the term loan to the Borrower; and

WHEREAS, at the request of the Borrower, the parties hereto agree that the Existing Credit Agreement shall be, and hereby is, amended and restated in its entirety as set forth herein;

NOW, THEREFORE, in consideration of the premises and the mutual covenants herein contained, each of the Borrower, the Lenders, the Administrative Agent, the Issuing Bank, and the Swingline Lender agree as follows:

### A G R E E M E N T

### ARTICLE I

### DEFINITIONS; CONSTRUCTION

Section 1.1    Definitions. In addition to the other terms defined herein, the following terms used herein shall have the meanings specified below (to be equally applicable to both the singular and plural forms of the terms so defined):

"*Acquired Business*" shall mean the Person or assets acquired by any Loan Party or Subsidiary in an Acquisition on or after the date hereof.

"*Acquired Indebtedness*" shall have the meaning set forth in Section 7.1(h).

"*Acquisition*" shall mean: (a) any Investment by any Loan Party or Subsidiary in any other Person pursuant to which such Person shall become a Subsidiary, or shall be merged with a Loan Party or Subsidiary; or (b) any acquisition by a Loan Party or Subsidiary of the assets of any Person (other than a Subsidiary) that

CHAR2\2683123v6

CONFIDENTIAL                                        VPX-JHO0000000321

constitute all, or a substantial portion, of the assets of such Person, or a division or business unit of such Person, whether through purchase, exercise of an option to purchase, merger or other business combination or transaction. For purposes of determining the amount of an Acquisition, such amount shall include all consideration (including, without limitation, any deferred payments or other contingent consideration) set forth in the applicable purchase, acquisition and/or sale agreements governing such Acquisition, as well as the assumption of any Indebtedness in connection therewith.

"*Additional Commitment Amount*" shall have the meaning set forth in Section 2.23.

"*Additional Lender*" shall have the meaning set forth in Section 2.23.

"~~*Adjusted LIBO Rate*~~" ~~shall mean, with respect to each Interest Period for a Eurodollar Loan, (a) the rate per annum equal to the London interbank offered rate for deposits in Dollars appearing on Reuters screen page "LIBOR 01" (or, if such service is not available, on any successor or substitute page of such service or any successor to such service, or such other commercially available source providing such quotations as may be designated by the Administrative Agent from time to time) at approximately 11:00 A.M. (London time) on the date that is two (2) Business Days prior to the first (1st) day of such Interest Period, with a maturity comparable to such Interest Period, *divided by* (b) a percentage equal to one hundred percent (100.0%) *minus* the then-stated maximum rate of all reserve requirements (including, without limitation, any marginal, emergency, supplemental, special and/or other reserves, and without the benefit of credits for any proration, exceptions or offsets that may be available from time to time) expressed as a decimal (rounded upward to the next 1/100th of one percent (1.00%)) applicable to any member bank of the Federal Reserve System in respect of Eurocurrency liabilities as defined in Regulation D (or any successor category of liabilities under Regulation D); provided, that, if the rate referred to in clause (a) above is *not* available at any such time for any reason, then the rate referred to in clause (a) above shall instead be the interest rate per annum, as determined by the Administrative Agent, to be the arithmetic average of the rates per annum at which deposits in Dollars, in an amount equal to the amount of such Eurodollar Loan, are offered by major banks in the London interbank market to the Administrative Agent at approximately 11:00 A.M. (London time) on the date that is two (2) Business Days prior to the first (1st) day of such Interest Period. Notwithstanding anything to the contrary in the foregoing, if the Adjusted LIBO Rate is *less than* three-fourths of one percent (0.75%), then such rate shall be deemed to be three-fourths of one percent (0.75%) for all purposes of this Agreement and the other Loan Documents.~~

"*Adjusted Daily SOFR*" shall mean, as of any date of determination, with respect to any calculations relating to any Loan bearing interest at a rate determined by reference to Daily SOFR and/or the determination of the Base Rate in accordance with clause (c) of such definition below, the *sum of:* (a) the rate per annum equal to Daily SOFR determined as of such date; *plus* (b) the SOFR Adjustment.

"*Adjusted Term SOFR*" shall mean, as of any date of determination, with respect to any calculations relating to a Term SOFR Loan for any applicable Interest Period or a Term SOFR Borrowing for any selected Interest Period, the *sum of:* (a) the rate per annum equal to Term SOFR for such Interest Period determined as of such date; *plus* (b) the SOFR Adjustment.

"*Administrative Agent*" shall mean Truist, in its capacity as administrative agent under any of the Loan Documents, or any successor administrative agent.

"*Administrative Questionnaire*" shall mean, with respect to each Lender, an administrative questionnaire in the form provided to such Lender by the Administrative Agent and submitted to the Administrative Agent duly completed by such Lender.

"*Affected Financial Institution*" means: (a) any EEA Financial Institution; or (b) any UK Financial Institution.

"*Affiliate*" shall mean, with respect to any Person, any other Person that directly, or indirectly through one (1) or more intermediaries, Controls, is Controlled by, or is under common Control with, such specified

2

CHAR2\2683123v6

Person. For the purposes of this definition of "*Affiliate*", "*Control*" shall mean the possession, directly or indirectly, of the power to either: (a) vote ten percent (10.0%) or more of the Capital Stock having ordinary voting power for the election of directors or managers (or Persons performing similar functions), as applicable, of a Person; or (b) direct, or cause the direction of, the management and policies of a Person, whether through the ability to exercise voting power, by control, or otherwise. The term "*Controlling*", and the phrases "*Controlled by*" and "*under common Control with*", shall have the meanings correlative thereto.

"*Agent Parties*" shall have the meaning set forth in Section 11.1(b)(iv).

"*Aggregate Revolving Commitment Amount*" shall mean, at any time, the aggregate principal amount of the Aggregate Revolving Commitments outstanding as of such time. On the Fourth Amendment Effective Date, the Aggregate Revolving Commitment Amount was Two-Hundred Sixty Million Dollars ($260,000,000).

"*Aggregate Revolving Commitments*" shall mean, collectively, all Revolving Commitments of all Lenders at any time outstanding.

"*Aggregate Revolving Credit Exposure*" shall mean, in aggregate, the Revolving Credit Exposure of all Lenders at any time outstanding.

"*Agreement*" shall have the meaning set forth in the introductory paragraph hereto.

"*Aircraft*" shall mean that certain Gulfstream Aerospace Corporation GV-SP (G550) aircraft, manufacturer's serial number 5349, FAA registration mark N961JF, together with all equipment, components, parts, additions, accessions and attachments.

"*Aircraft Loan Documents*" shall mean, collectively, (a) that certain Promissory Note, dated as of September 19, 2018, executed by Bang Jets in favor of PNC Equipment Finance, LLC, (b) that certain Aircraft Security Agreement, dated as of September 19, 2018, executed by Bang Jets in favor of PNC Equipment Finance, LLC, (c) any Related Documents (as defined in the Aircraft Security Agreement referred to in the foregoing clause (b)), and (d) all material documents and/or instruments executed in connection with the agreements referred to in the foregoing clauses (a) through (c) at any time, in each case of the foregoing clauses (a) through (d), as amended, restated, amended and restated, supplemented, increased, extended, refinanced, renewed, replaced, and/or otherwise modified in writing from time to time. As of the Effective Date, the aggregate principal amount of Indebtedness outstanding under the Aircraft Loan Documents was Seventeen Million Two-Hundred Thirty-Eight Thousand Six-Hundred Fifty-Nine Dollars and Thirty-Three Cents (17,238,659.33).

"*Anti-Assignment Provisions*" shall mean, collectively, Sections 9–406, 9–407, 9–408 and 9–409 of the UCC.

"*All-In Yield*" shall mean, as to any Indebtedness, the yield thereof (without giving effect to any underlying fluctuations in the underlying base rate), whether in the form of interest rate, margin, original issue discount, upfront fees, a ~~Eurodollar~~SOFR or Base Rate floor, or otherwise, in each case of the foregoing, incurred or payable by the Borrower generally to all of the lenders of such Indebtedness; provided, that, (i) original issue discount and upfront fees shall be equated to interest rate assuming a four (4) year life to maturity (or, if less, the stated life to maturity at the time of incurrence of the applicable Indebtedness), and (ii) "*All-In Yield*" shall *not* include customary arrangement fees, structuring fees, commitment fees, underwriting fees, amendment fees and similar fees (regardless of whether paid, in whole or in part, to any or all of lenders of such Indebtedness), or other fees not paid generally to all lenders of such Indebtedness.

"*Anti-Corruption Laws*" shall mean all Laws, rules and regulations of any jurisdiction applicable to any Loan Party or Subsidiary from time to time concerning, or relating to, bribery or corruption.

CHAR2\2683123v6

                                                                                                          VPX-JHO0000000323

"*Applicable Lending Office*" shall mean, for each Lender and for each Type of Loan, the "Lending Office" of such Lender (or an Affiliate of such Lender) designated for such Type of Loan in the Administrative Questionnaire submitted by such Lender to the Administrative Agent, or such other office of such Lender (or an Affiliate of such Lender) as such Lender may from time to time specify to the Administrative Agent and the Borrower as the office by which its Loans of such Type are to be made and maintained.

"*Applicable Margin*" shall mean, except as set forth in any Incremental Facility Amendment with respect to the incurrence of any Incremental Term Loan pursuant to Section 2.23, as of any date of determination, with respect to interest on all Loans outstanding on such date or the Letter of Credit Fee, as the case may be, a percentage per annum, determined by reference to the applicable Combined Total Leverage Ratio in effect on such date as set forth in the pricing grid below, provided, that: (a) a change in the Applicable Margin resulting from a change in the Combined Total Leverage Ratio shall be effective on the second (2nd) Business Day after the date on which the Borrower delivers each of (i) the financial statements required by Section 5.1(a) and Section 5.1(b), and (ii) the Compliance Certificate required by Section 5.1(c); and (b) if, at any time, the Borrower shall have failed to deliver such financial statements and such Compliance Certificate when so required, the Applicable Margin shall be at Level I as set forth in the pricing grid below, until the second (2nd) Business Day after the date on which such financial statements and Compliance Certificate are delivered, at which time, the Applicable Margin shall be determined as provided above.

| Level | Combined Total Leverage Ratio | ~~Eurodollar Loans, LIBO Index Rate~~SOFR Loans and Letter of Credit Fee | Base Rate Loans | Commitment Fee |
|-------|-------------------------------|-------------------------------------------------------------------------|-----------------|----------------|
| I | ≥ 2.75 to 1.0 | 3.00% | 2.00% | 0.35% |
| II | < 2.75 to 1.0, *but* ≥ 2.25 to 1.0 | 2.75% | 1.75% | 0.35% |
| III | < 2.25 to 1.0, *but* ≥ 1.75 to 1.0 | 2.50% | 1.50% | 0.25% |
| IV | < 1.75 to 1.0, *but* ≥ 1.25 to 1.0 | 2.25% | 1.25% | 0.25% |
| V | < 1.25 to 1.0, *but* ≥ 0.75 to 1.0 | 2.00% | 1.00% | 0.20% |
| VI | < 0.75 to 1.0 | 1.75% | 0.75% | 0.20% |

Notwithstanding anything to the contrary in the foregoing, the Applicable Margin during the period from the Effective Date through, but excluding, the second (2nd) Business Day after the date on which the financial statements and Compliance Certificate with respect to the Fiscal Quarter ending September 30, 2020 are required to be delivered pursuant to Section 5.1(a), Section 5.1(b) and Section 5.1(c), as applicable, shall be at Level IV as set forth in the pricing grid above. In the event that any financial statement or Compliance Certificate delivered hereunder is shown to be inaccurate (regardless of whether this Agreement or the Commitments are in effect when such inaccuracy is discovered), and such inaccuracy, if corrected, would have led to the application of a higher Applicable Margin based upon the pricing grid set forth above (the "*Accurate Applicable Margin*") for any period that such financial statement or Compliance Certificate covered, then: (i) the Borrower shall immediately deliver to the Administrative Agent a correct financial statement(s) or Compliance Certificate, as the case may be, for such period; (ii) the Applicable Margin shall be adjusted such that, after giving effect to the corrected financial statement(s) or Compliance Certificate, as the case may be, the Applicable Margin shall be reset to the Accurate Applicable Margin based upon the pricing grid set forth above for such period; and (iii) the Borrower shall immediately pay to the Administrative Agent, for the account of the Lenders, the accrued additional interest owing as a result of such Accurate Applicable Margin for such period.

Notwithstanding anything to the contrary in the foregoing: (A) the provisions of this definition of "*Applicable Margin*" shall *not* limit the rights of the Administrative Agent and/or the Lenders with respect to

4

either of Section 2.13(d) or Article VIII; and (B) the "*Applicable Margin*" for any Incremental Term Loan shall be the percentage per annum provided in the Incremental Facility Amendment establishing such Incremental Term Loan.

Notwithstanding anything to the contrary in the foregoing, as of any date of determination from and after the Fifth Amendment Effective Date, the Applicable Margin for all SOFR Loans and Letter of Credit Fees shall be 5.50% per annum and the Applicable Margin on all Base Rate Loans shall be 4.50% per annum, each of which amounts shall increase automatically by an additional fifty basis points (0.50%) on the first day of each calendar month commencing September 1, 2022.

"*Approved Fund*" shall mean any Person (other than a natural Person) that is (or will be) engaged in the making, purchasing or holding of, or otherwise investing in, commercial loans and similar extensions of credit in the ordinary course of its business and that is administered or managed by: (a) a Lender; (b) an Affiliate of a Lender; or (c) an entity, or an Affiliate of an entity, that administers or manages a Lender.

"*Arranger*" shall mean Truist Securities, in its capacity as lead arranger and book runner.

"*Asset Sale*" shall mean the sale, transfer, license, lease or other disposition of any property by any Loan Party or Subsidiary, including, without limitation, any sale and leaseback transaction and any sale, assignment, transfer or other disposal, with or without recourse, of any notes or accounts receivable (including, for purposes of clarity, pursuant to any Permitted HNB Receivables Asset Sale), or any rights and claims associated therewith, but *excluding*: (a) the sale or other disposition of inventory in the ordinary course of business; (b) the sale or disposition, for fair market value (as reasonably determined by the applicable Loan Party or Subsidiary in good faith), of obsolete, surplus, damaged or worn out property, or other property *not* necessary for operations of the Loan Parties and Subsidiaries disposed of in the ordinary course of business; (c) the disposition of property (including the cancellation of Indebtedness permitted by Section 7.4(d)) to any Loan Party or Subsidiary, provided, that, if the transferor of such property is a Loan Party, then the transferee thereof must be a Loan Party; (d) the write-off, discount, sale or other disposition of accounts receivable and similar obligations in connection with the collection or compromise thereof (other than, for the avoidance of doubt, pursuant to or in connection with any Permitted HNB Receivables Asset Sale); (e) licenses, sublicenses, leases or subleases granted to others in the ordinary course of business, or *not* interfering in any material respect with the business of any Loan Party or Subsidiary; (f) the sale or disposition of cash or Cash Equivalents, for fair market value, in the ordinary course of business; (g) the disposition of shares of Capital Stock of any Subsidiary in order to qualify members of the governing body of such Subsidiary, if required by applicable Law; (h) the termination or surrender of any real property lease of any Loan Party in the ordinary course of business, so long as the loss of such leased location could *not* reasonably be expected to have an adverse and material effect on any business of any Loan Party; (i) the abandonment or other disposition of any IP Right, whether now or hereafter owned or leased or whether acquired in connection with an Acquisition or other permitted Investment, that is, in the reasonable business judgment of the Borrower, no longer economically practicable or commercially desirable to maintain or used or useful in the business of the Loan Parties and Subsidiaries; (j) *solely* to the extent *not* otherwise permitted hereunder, sales, transfers and other dispositions permitted by Section 7.3; (k) to the extent constituting a sale, transfer, lease, or other disposition of any property and/or asset, any Restricted Payment made pursuant to Section 7.5; (l) sales, transfers or other dispositions of Investments *solely* to the extent permitted under Section 7.4 in joint ventures, to the extent required by, or made pursuant to customary buy/sell arrangements between, the parties set forth in joint venture arrangements and similar binding agreements; and (m) any sale or other disposition of the Aircraft.

"*Assignment and Assumption*" shall mean an assignment and assumption entered into by a Lender and an Eligible Assignee (with the consent of any party whose consent is required by Section 11.4(b)) and accepted by the Administrative Agent, in the form of Exhibit 11.4 attached hereto (or such other form approved by the Administrative Agent).

5

CONFIDENTIAL                                                                                   VPX-JHO0000000325

"*Audited Financial Statements*" shall mean the audited consolidated balance sheet of the Borrower and its Subsidiaries for the Fiscal Year ended December 31, 2019, and the related consolidated statements of income or operations, shareholders' equity and cash flows of the Borrower and its Subsidiaries for such Fiscal Year, including the notes thereto.

"*Availability Period*" shall mean the period from, and including, the Effective Date to, but *excluding*, the Revolving Commitment Termination Date.

"*Available Tenor*" shall mean, as of any date of determination and with respect to the then-current Benchmark, as applicable, (a) if such Benchmark is a term rate, any tenor for such Benchmark (or component thereof) that is, or may be, used for determining the length of any interest period (including any Interest Period) pursuant to this Agreement, and (b) if such Benchmark is *not* a term rate, any payment period for interest calculated with reference to such Benchmark (or component thereof) that is, or may be, used for determining any frequency of the making of payments of interest calculated with reference to such Benchmark pursuant to this Agreement, in each case of the foregoing clauses (a) and (b), as of such date of determination, but *excluding*, in any event and for the avoidance of doubt, any tenor for such Benchmark that is removed as of such date of determination from the definition of "*Interest Period*" below in accordance with Section 2.16(e).

"*Bail-In Action*" shall mean the exercise of any Write-Down and Conversion Powers by the applicable Resolution Authority in respect of any liability of an Affected Financial Institution.

"*Bail-In Legislation*" shall mean: (a) with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing Law for such EEA Member Country from time to time which is described in the applicable EU Bail-In Legislation Schedule; and (b) with respect to the United Kingdom, Part I of the United Kingdom Banking Act of 2009 (as amended from time to time), and any other Law applicable in the United Kingdom relating to the resolution of unsound or failing banks, investment firms or other financial institutions, or any affiliates of any of the foregoing (other than through liquidation, administration, or other insolvency proceedings).

"*Bang Jets*" shall mean Bang Jets, LLC, a Florida limited liability company.

"*Bank Product Amount*" shall have the meaning set forth in the definition of "*Bank Product Provider*" below. Notwithstanding anything to the contrary in the definition of "*Bank Product Provider*" below: (a) the Bank Product Amount may be changed from time to time upon written notice to the Administrative Agent by the applicable Bank Product Provider; and (b) no Bank Product Amount may be established at any time that a Default or an Event of Default exists.

"*Bank Product Obligations*" shall mean, collectively, all obligations and other liabilities of any Loan Party or Subsidiary to any Bank Product Provider arising with respect to any Bank Products.

"*Bank Product Provider*" shall mean any Person that: (a) (i) at the time it provides any Bank Product(s) to any Loan Party or Subsidiary, is a Lender or an Affiliate of a Lender, or (ii) has provided any Bank Product(s) to any Loan Party or Subsidiary that exist on the Effective Date, and such Person is a Lender, or an Affiliate of a Lender, on the Effective Date; and (b) except when the Bank Product Provider is Truist and/or any of its Affiliates, has provided prior written notice to the Administrative Agent, which notice has been acknowledged by the Borrower, of (i) the existence of any specified Bank Product(s), (ii) the maximum Dollar amount of Bank Product Obligation(s) arising under such Bank Product(s) (such amount, the "*Bank Product Amount*"), and (iii) the methodology to be used by such parties in determining the Bank Product Obligation(s) arising under such Bank Product(s) from time to time. Notwithstanding anything to the contrary in the foregoing: (A) in no event shall any Bank Product Provider, acting in such capacity, be deemed a Lender for purposes hereof to the extent of, and as to, any Bank Product(s); provided, that, each reference to the term "*Lender*" in Article IX, Section 11.3(b) and Section 11.4 shall be deemed to include such Bank Product Provider; and (B) in no event shall the approval of any such Person, in its capacity as Bank Product Provider, be

6

CONFIDENTIAL

required in connection with the release or termination of any security interest or Lien of the Administrative Agent.

"*Bank Products*" shall mean any of the following services provided to any Loan Party or Subsidiary by any Bank Product Provider: (a) any treasury or other cash management services, including, without limitation, any deposit accounts, automated clearing house (ACH) origination and other funds transfer, depository (including cash vault and check deposit), zero balance accounts and sweeps, return items processing, controlled disbursement accounts, positive pay, lockboxes and lockbox accounts, account reconciliation and information reporting, payables outsourcing, payroll processing, trade finance services, investment accounts and securities accounts; and (b) card services, including, without limitation, credit cards (including purchasing cards and commercial cards), prepaid cards, including payroll, stored value and gift cards, merchant services processing, and debit card services.

"*Bankruptcy Code*" shall mean Title 11 of the U.S. Code, as amended and in effect from time to time.

"*Base Rate*" shall mean, for any date of determination, a rate per annum equal to the *highest* of: (a) the rate of interest that the Administrative Agent announces from time to time as its prime lending rate, as in effect from time to time (the "*Prime Rate*")~~:~~, (b) the Federal Funds Rate, as in effect from time to time, *plus* one-half of one percent (0.50%)~~;~~ per annum, (c) ~~the One-Month LIBO Index Rate~~Adjusted Daily SOFR, *plus* one percent (1.00%) per annum (with any change(s) in ~~such rates~~any of the rates described in the foregoing clauses (a) through (c) to be effective as of the date of any such change(s) in such ~~rates~~rates)~~;~~, and (d) ~~zero percent (0.00%)~~the Floor. The Prime Rate is a reference rate and does *not* necessarily represent the lowest or best rate actually charged to any customer. The Administrative Agent and the Lenders may make commercial loans, or other loans, at rates of interest at, above, or below the Prime Rate. Any change(s) to the Base Rate due to a change in the Prime Rate, the Federal Funds Rate~~,~~ and/or ~~the~~Adjusted ~~LIBO Rate~~Daily SOFR, as the case may be, will be deemed to be effective from, and including, the date of effectiveness of such change(s) to the Prime Rate, the Federal Funds Rate~~,~~ and/or ~~the~~Adjusted ~~LIBO Rate~~Daily SOFR. For the avoidance of doubt and notwithstanding anything to the contrary in the foregoing, ~~in the event that~~if, at any time, the Base Rate is *less than* ~~three-fourths of one percent (0.75%)~~the Floor, then the Base Rate shall be deemed to ~~be three-fourths of one percent (0.75%) for~~equal the Floor for all purposes of this Agreement and the other Loan Documents.

"*Base Rate Borrowing*" shall mean a Borrowing, the Loans in respect of which bear interest at a rate determined by reference to the Base Rate.

"*Base Rate Loan*" shall mean a Loan bearing interest at a rate determined by reference to the Base Rate.

"*Benchmark*" shall mean, initially as of the Fifth Amendment Effective Date, the Term SOFR Reference Rate; provided, that, if a Benchmark Transition Event has occurred with respect to the SOFR Reference Rate or the then-current Benchmark, then "*Benchmark*" shall thereafter mean the applicable Benchmark Replacement, to the extent that such Benchmark Replacement has replaced such prior benchmark rate pursuant to Section 2.16(h).

"*Benchmark Replacement*" shall mean, with respect to any Benchmark Transition Event, the first (1st) alternative set forth in the alphabetic order immediately below that can be determined by the Administrative Agent for the applicable Benchmark Replacement Date:

    (a)    Adjusted Daily SOFR; or

    (b)    "*~~Benchmark Replacement~~*" ~~shall mean~~ the *sum of*: (a~~i~~) the alternate benchmark rate ~~(which may include Term SOFR)~~ that has been selected by the Administrative Agent and the Borrower, giving due consideration to (~~i~~A) any selection or recommendation of a replacement benchmark rate, or the mechanism for determining such a replacement rate, by the Relevant Governmental Body, and (~~ii~~B) any evolving, or then-prevailing, market convention for determining a benchmark rate ~~of interest~~as a

7

CONFIDENTIAL

replacement to the ~~Screen Rate~~then-current Benchmark for Dollar-denominated syndicated credit facilities; and (b~~ii~~) the related Benchmark Replacement Adjustment~~. Notwithstanding~~;

provided, that, notwithstanding anything to the contrary in the foregoing, ~~in the event that~~ or elsewhere in this Agreement or any other Loan Document, if, at any time, the Benchmark ~~Rate as so~~Replacement (as determined pursuant to the foregoing clauses (a) or (b), as applicable) would be *less than* ~~three-fourths of one percent (0.75%), the~~the Floor, then the Benchmark Replacement shall be deemed to be ~~three-fourths of one percent (0.75%) for the~~equal the Floor for all purposes of this Agreement and the other Loan Documents.

"*Benchmark Replacement Adjustment*" shall mean, with respect to any replacement of the ~~Screen Rate~~then-current Benchmark with an Unadjusted Benchmark Replacement ~~for each applicable Interest Period~~, the spread adjustment, or method for calculating or determining such spread adjustment (which may be a positive or negative value or equal to zero), that has been selected by the Administrative Agent and the Borrower, giving due consideration to: (a) any selection or recommendation of a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of ~~the Screen Rate~~such Benchmark with the applicable Unadjusted Benchmark Replacement by the Relevant Governmental Body; or (b) any evolving, or then-prevailing, market convention for determining a spread adjustment, or a method for calculating or determining such spread adjustment, for the replacement of ~~the Screen Rate~~such Benchmark with the applicable Unadjusted Benchmark Replacement for Dollar-denominated syndicated credit facilities at such time.

~~"*Benchmark Replacement Conforming Changes*" shall mean, with respect to any Benchmark Replacement, any technical, administrative and/or operational change(s) (including, without limitation, any change(s) to the definition of "*Base Rate*", the definition of "*Interest Period*", the timing and frequency of determining rates and making payments of interest, and/or other administrative matters) that the Administrative Agent, in consultation with the Borrower, determines may be appropriate to reflect the adoption and/or implementation of such Benchmark Replacement, and to permit the administration thereof by the Administrative Agent in a manner substantially consistent with market practice (or, if the Administrative Agent, in consultation with the Borrower, determines that (i) the adoption and/or implementation of, or of any portion of, such market practice is not administratively feasible, or (ii) no market practice for the administration of such Benchmark Replacement exists, then, in each case of the foregoing clauses (i) and (ii), permit the administration thereof by the Administrative Agent in such other manner as the Administrative Agent, in consultation with the Borrower, determines is reasonably necessary in connection with the administration of this Agreement and the other Loan Documents).~~

"*Benchmark Replacement Date*" shall mean~~, with respect to the Screen Rate, the *earlier*~~ a date and time determined by the Administrative Agent, which date shall be *no later than* the *earliest* to occur of the following events with respect to the then-current Benchmark:

(a)    in the case of the occurrence of any event(s) described in clauses (a) or (b) of the definition of "*Benchmark Transition Event*" below, the *later* to occur of: (i) the date of the public statement or publication of information, as applicable, referred to in such clause (a) or (b), as applicable; and (ii) the date on which the administrator of ~~the Screen Rate~~such Benchmark (or the published component used in the calculation thereof) permanently or indefinitely ceases to provide ~~the Screen Rate~~all Available Tenors of such Benchmark (or such component thereof); or

(b)    in the case of the occurrence of any event(s) described in clause (c) of the definition of "*Benchmark Transition Event*" below, the ~~date of the public~~first (1st) date on which such Benchmark (or the published component used in the calculation thereof) has been determined and announced by the regulatory supervisor for the administrator of such Benchmark (or such component thereof) to be non-representative; provided, that, such non-representativeness shall be determined by reference to the most recent statement or publication ~~of information, as applicable,~~ referred to in such clause (c),

8

VPX-JHO0000000328

notwithstanding that any Available Tenor of such Benchmark (or such component thereof) may continue to be provided as of such date.

For the avoidance of doubt, in any such case of occurrence of the foregoing clauses (a) or (b) of this definition of "*Benchmark Replacement Date*" with respect to any Benchmark, the Benchmark Replacement Date will be deemed to have occurred upon the occurrence of the applicable event(s) set forth therein with respect to all then-current Available Tenors of such Benchmark (or the published component used in the calculation thereof).

"*Benchmark Transition Event*" shall mean, with respect to the ~~Screen Rate~~then-current Benchmark, the occurrence of one (1) or more of the following events:

(a)    a public statement or publication of information by, or on behalf of, the administrator of ~~the Screen Rate~~such Benchmark (or the published component used in the calculation thereof), in either case, announcing that such administrator has ceased, or will ~~in the future~~ cease, to provide ~~the Screen Rate~~all Available Tenors of such Benchmark (or such component thereof), permanently or indefinitely; provided, that, at the time of such statement or publication, no successor administrator has been identified that will continue to provide ~~the Screen Rate~~any Available Tenor of such Benchmark (or such component thereof);

(b)    a public statement or publication of information by the regulatory supervisor for the administrator of ~~the Screen Rate, the U.S.~~such Benchmark (or the published component used in the calculation thereof), the Federal Reserve ~~System~~Board, the FRBNY, an insolvency official with jurisdiction over the administrator for ~~the Screen Rate~~such Benchmark (or such component thereof), a resolution authority with jurisdiction over the administrator for ~~the Screen Rate~~such Benchmark (or such component thereof), or a court or other Person with similar insolvency or resolution authority over the administrator for ~~the Screen Rate~~such Benchmark (or such component thereof), in any such case, which states that the administrator of ~~the Screen Rate~~such Benchmark (or such component thereof) has ceased, or will ~~in the future~~ cease, to provide ~~the Screen Rate~~all Available Tenors of such Benchmark (or such component thereof), permanently or indefinitely; provided, that, at the time of such statement or publication, no successor administrator has been identified that will continue to provide ~~the Screen Rate~~any Available Tenor of such Benchmark (or such component thereof); or

(c)    a public statement or publication of information by the regulatory supervisor for the administrator of ~~the Screen Rate, announcing that the Screen Rate is no longer~~such Benchmark (or the published component used in the calculation thereof) announcing that all Available Tenors of such Benchmark (or such component thereof) are *not*, or, as of a specified future date, will *not* be, representative.

~~"*Benchmark Transition Start Date*" shall mean: (a) in the case of the occurrence of a Benchmark Transition Event, the *earlier* to occur of (i) the applicable Benchmark Replacement Date, and (ii) if such Benchmark Transition Event is a public statement or publication of information of a prospective event, the date that is ninety (90) days *prior* to the expected dated of such prospective event, determined as of the date of such public statement or publication of information (or, if the expected date of such prospective event is *less than* ninety (90) days after the date of such public statement or publication of information, then the date of such public statement or publication of information); and (b) in the case of an Early Opt-In Election, the date specified by the Administrative Agent or the Required Lenders, as applicable, by notice to the Borrower, the Administrative Agent (in the case of such notice provided by the Required Lenders), and the Lenders.~~

For the avoidance of doubt, a "*Benchmark Transition Event*" shall be deemed to have occurred, with respect to any Benchmark, if a public statement or publication of information as described above has occurred with respect to each then-current Available Tenor of such Benchmark (or the published component used in the calculation thereof).

9

CONFIDENTIAL                                                    VPX-JHO0000000329

"*Benchmark Unavailability Period*" shall mean~~, if a Benchmark Transition Event and its related Benchmark Replacement Date have each occurred with respect to the Screen Rate, and, *solely* to the extent that the Screen Rate has *not* been replaced with a Benchmark Replacement,~~ the period (if any): (i~~a~~) *beginning* at the time that ~~such~~a Benchmark Replacement Date has occurred~~;~~ if, at such time, no Benchmark Replacement has replaced the ~~Screen Rate~~then-current Benchmark for all purposes hereunder and under any other Loan Document in accordance with Section 2.16; and (ii~~b~~) *ending* at the time that a Benchmark Replacement has replaced the ~~Screen Rate~~then-current Benchmark for all purposes hereunder ~~pursuant to~~and under any other Loan Document in accordance with Section 2.16.

"*Beneficial Ownership Certification*" shall mean a certification regarding beneficial ownership as required by the Beneficial Ownership Regulation.

"*Beneficial Ownership Regulation*" shall mean 31 C.F.R. §‑1010.230, as amended and in effect from time to time.

"*Benefit Plan*" shall mean any of: (a) an "employee benefit plan" (as defined in ERISA) that is subject to Title I of ERISA; (b) a "plan" as defined in, and subject to, Section 4975 of the Code; or (c) any Person whose assets include (for purposes of ERISA Section 3(42), or otherwise for purposes of Title I of ERISA or Section 4975 of the Code) the assets of any such "employee benefit plan" or "plan".

"*BHC Act Affiliate*" of a party means an "affiliate" (as such term is defined under, and interpreted in accordance with, 12 U.S.C. §‑1841(k)) of such party.

"*Borrower*" shall have the meaning set forth in the introductory paragraph hereof.

"*Borrower Materials*" shall have the meaning set forth in Section 5.1.

"*Borrowing*" shall mean, as the context may require, a borrowing consisting of: (a) Loans of the same Class and Type, made, converted or continued on the same date, and, in the case of ~~Eurodollar~~SOFR Loans, as to which a single Interest Period is in effect; or (b) a Swingline Loan.

"*Business Day*" shall mean any day, other than: (a) a Saturday, Sunday or other day on which commercial banks in Charlotte, North Carolina or New York, New York are authorized, or required by applicable Law, to close; and (b) if such day relates to a ~~Borrowing of, a payment or prepayment of principal or interest on, a conversion of or into, or an Interest Period for, a Eurodollar Loan or LIBOR Index Rate Loan, or a~~determination of, or a calculation involving, SOFR, any SOFR Reference Rate and/or any SOFR-Based Rate (or any notice with respect to any of the foregoing), any ~~such day that is also a~~ day on which ~~dealings in Dollar deposits are not conducted by and between banks in the London interbank market.~~any of SIFMA, the New York Stock Exchange and/or the FRBNY is *not* open for business because such day is a legal holiday under the federal laws of the United States or the laws of the State of New York, as applicable.

"*Capital Expenditures*" shall mean, for any period and without duplication, (a) the additions to property, plant and equipment and other capital expenditures of the Loan Parties and Subsidiaries that are (or would be) set forth on a combined statement of cash flows of the Loan Parties and Subsidiaries for such period prepared in accordance with GAAP, and (b) Capital Lease Obligations incurred by the Loan Parties and Subsidiaries during such period.

"*Capital Lease*" shall mean, for any Person, each lease (or other arrangement conveying the right to use) of real or personal property, or a combination thereof, which obligations are required to be classified, and accounted for, as capital leases on a balance sheet of such Person in accordance with GAAP (subject to the provisions in Section 1.3 hereof).

"*Capital Lease Obligations*" of any Person shall mean all obligations of such Person to pay rent or other amounts under any Capital Lease, and the amount of such obligations shall, for purposes of this

CHAR2\2683123v6

VPX-JHO0000000330

Agreement and the other Loan Documents, be deemed to be the capitalized amount thereof determined in accordance with GAAP (subject to the provisions in Section 1.3 hereof).

"*Capital Stock*" shall mean all shares, options, warrants, general or limited partnership interests, membership interests or other equivalents (regardless of how designated) of or in a corporation, partnership, limited liability company, or equivalent entity, whether voting or non-voting, including, without limitation, common stock, preferred stock, or any other "equity security" (as such term is defined in Rule 3a11–1 of the General Rules and Regulations promulgated by the SEC under the Securities Exchange Act).

"*CARES Act*" shall mean the Coronavirus Aid, Relief, and Economic Security Act of 2020 (Pub. L. 116–136), as amended and in effect from time to time, and any successor statute(s), together with any rules and regulations promulgated in connection therewith, any rulings or orders issued by any applicable Governmental Authorities (including, without limitation, the U.S. Small Business Administration) thereunder, or the application or official interpretation of any of the foregoing.

"*Cash Collateralize*" shall mean to pledge and deposit with, or deliver to, the Administrative Agent, for the benefit of the Issuing Bank and/or the Swingline Lender (as applicable) and the Lenders, as collateral for the L/C Obligations, Obligations in respect of Swingline Loans, or obligations of Lenders to fund participations in respect of any of the foregoing (as the context may require), cash and/or deposit account balances, or, if the Issuing Bank and/or the Swingline Lender benefitting from such collateral shall agree in its or their sole discretion, other credit support, in each case, pursuant to documentation in form and substance satisfactory to: (a) the Administrative Agent; and (b) the Issuing Bank and/or the Swingline Lender, as applicable. "*Cash Collateralization* and "*Cash Collateral*" shall have meanings correlative to the foregoing and shall include the proceeds of such Cash Collateral and other credit support.

"*Cash Equivalents*" shall mean:

(a)     direct obligations of, or obligations the principal of and interest on which are unconditionally guaranteed by, the United States (or by any agency thereof, to the extent such obligations are backed by the full faith and credit of the United States), in each case, maturing within one (1) year from the date of acquisition thereof;

(b)     commercial paper having the highest rating, at the time of acquisition thereof, of S&P or Moody's, and, in either case, maturing within six (6) months from the date of acquisition thereof;

(c)     certificates of deposit, bankers' acceptances and time deposits maturing within one hundred eighty (180) days of the date of acquisition thereof, issued or guaranteed by or placed with, and money market deposit accounts issued or offered by, any domestic office of any commercial bank organized under the Laws of the United States, or any state thereof, which has a combined capital and surplus and undivided profits of *not less than* Five-Hundred Million Dollars ($500,000,000);

(d)     fully collateralized repurchase agreements with a term of *not more than* thirty (30) days for securities described in clause (a) above and entered into with a financial institution satisfying the criteria described in clause (c) above; and

(e)     mutual funds investing *solely* in any one (1) or more of the Cash Equivalents described in clauses (a) through (d) above.

"*Change in Control*" shall mean the occurrence of one (1) or more of the following events:

(a)     the Permitted Holders cease to: (i) own and control, beneficially and of record, directly or indirectly, *at least* seventy-five percent (75.0%) of the outstanding Voting Stock in the Borrower; or (ii) possess the right to elect (through contract, ownership of voting securities, or otherwise), at all times, a majority of the

11

CONFIDENTIAL

board of directors or managers (or equivalent governing body) of each Loan Party, and to direct the management policies and decisions of each Loan Party;

(b)    except to the extent that a merger or consolidation transaction, or a liquidation or dissolution of a Subsidiary, is expressly permitted by Section 7.3, the Borrower ceases to own and control, beneficially and of record, directly or indirectly, *at least* one-hundred percent (100.0%) of each class of the outstanding Capital Stock in each other Loan Party; or

(c)    the occurrence of a "change of control", or any similar provision, under, or with respect to, any Material Indebtedness.

"*Change in Law*" shall mean the occurrence, after the date of this Agreement, of any of the following: (a) the adoption, or taking effect, of any applicable Law, (b) any change in any applicable Law, or in the administration, interpretation, implementation or application thereof by any Governmental Authority, or (c) the making or issuance of any request, rule, guideline or directive (whether or not having the force of law) of any Governmental Authority. Notwithstanding anything to the contrary herein, (i) the Dodd-Frank Wall Street Reform and Consumer Protection Act, and all requests, rules, guidelines and/or directives promulgated in connection therewith, and (ii) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the U.S. or foreign regulatory authorities, in each case of this clause (ii), pursuant to Basel III, shall, in each case of the foregoing clauses (i) and (ii), be deemed to be a Change in Law, regardless of the date enacted or adopted.

"*Charges*" shall have the meaning set forth in Section 11.12.

"*Class*", when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, are Revolving Loans, Swingline Loans, the Term Loan A, or an Incremental Term Loan, and, when used in reference to any Commitment, refers to whether such Commitment is a Revolving Commitment, a Swingline Commitment, a Term Loan A Commitment, or an Incremental Term Loan Commitment.

"*Code*" shall mean the Internal Revenue Code of 1986, as amended and in effect from time to time.

"*Collateral*" shall mean all tangible and intangible property, real and personal, of any Loan Party that is, or purports to be, the subject of a Lien in favor of the Administrative Agent, for the ratable benefit of the holders of the Obligations, to secure, in whole or in part, the Obligations (or any Guarantee thereof), and shall include, without limitation, all casualty insurance proceeds and condemnation awards with respect to any of the foregoing.

"*Collateral Access Agreement*" shall mean each landlord waiver or bailee agreement granted to, and in form and substance reasonably acceptable to, the Administrative Agent.

"*Collateral Documents*" shall mean, collectively, the Security Agreement, the Owner Pledge Agreement, any Mortgages, any Collateral Access Agreements, any Controlled Account Agreements, any Economic Incentive Bond Pledge Agreements, all other instruments and agreements, now or hereafter in effect, securing or perfecting the Liens securing, in whole or in part, the Obligations (or any Guarantee thereof), all UCC financing statements and fixture filings, all stock and unit powers and similar instruments of transfer, and all other documents, instruments, agreements and/or certificates executed and delivered by any Loan Party to the Administrative Agent and the Lenders in connection with the foregoing.

"*Combined EBITDA*" shall mean, for any period of measurement, for the Loan Parties and Subsidiaries determined on a combined basis, an amount equal to the *sum of* (in each case, as determined in accordance with GAAP): (a) Combined Net Income for such period; *plus* (b) to the extent *deducted* in determining Combined Net Income for such period (other than with respect to clause (b)(vii) below), without duplication, (i) Combined

12

CHAR2\2683123v6

                                                                                   VPX-JHO0000000332

Interest Expense for such period, (ii) income tax expense for such period, (iii) depreciation and amortization for such period, (iv) non-cash charges, non-cash expenses and/or non-cash losses (including, without limitation, non-cash compensation expenses arising from the issuance of Capital Stock, options to purchase Capital Stock, and Capital Stock appreciation rights to management, but *excluding* (A) any non-cash charge, loss and/or expense that is an accrual of, or a cash reserve for, any cash expense or payment to be made, or anticipated to be made, in a future period, (B) any expenses and/or charges related to the write-down or write-off of accounts receivable and/or other Current Assets, and (C) any non-cash loss, non-cash charge or non-cash expense to the extent that there were cash charges or losses with respect thereto in past accounting periods) for such period, (v) reasonable and documented transaction costs and expenses paid in cash during such period, to the extent incurred in connection with the Loan Documents and prior to the date that is three (3) months after the Effective Date, (vi) losses incurred by the Loan Parties in connection with the Ball Can disruption (A) during the Fiscal Year ended December 31, 2019 in an aggregate amount *not to exceed* Eighteen Million Seven-Hundred Thousand Dollars ($18,700,000), (B) during the Fiscal Year ended December 31, 2020 in an aggregate amount *not to exceed* Five Million Eight-Hundred Forty-Two Thousand Two-Hundred Eighty-One Dollars ($5,842,281), and (C) during the Fiscal Year ended December 31, 2021 in an aggregate amount *not to exceed* Fifty-Nine Thousand Seven-Hundred Sixty-Eight Dollars ($59,768.00), (vii) bonus compensation payments made by the Borrower to its chief executive officer during such period that were returned to the Borrower by its chief executive officer prior to the Effective Date, in an aggregate amount *not to exceed* Eight Million Five-Hundred Thousand Dollars ($8,500,000), (viii) any unusual or non-recurring cash expenses or losses during such period, provided, that, the aggregate amount of all amounts added back to Combined EBITDA in reliance on this clause (b)(viii), together with all amounts added back to Combined EBITDA in reliance on the below clauses (b)(ix) and (b)(x) of this definition of "*Combined EBITDA*", shall *not exceed*, in the aggregate, fifteen percent (15.0%) of Combined EBITDA in any consecutive four (4) Fiscal Quarter period of measurement (calculated before giving effect to such add-backs), (ix) restructuring and similar charges, severance and relocation costs, startup costs and other business optimization expenses, cash stay bonuses paid to employees, retention, recruiting, relocation and signing bonuses and expenses, severance, stock option and other equity-based expenses, and modifications to pension and post-retirement employee benefit plans (including any settlement of pension liabilities) for such period, provided, that, the aggregate amount of all amounts added back to Combined EBITDA in reliance on this clause (b)(ix), together with all amounts added back to Combined EBITDA in reliance on the foregoing clause (b)(viii) and the below clause (b)(x) of this definition of "*Combined EBITDA*", shall *not exceed*, in the aggregate, fifteen percent (15.0%) of Combined EBITDA in any consecutive four (4) Fiscal Quarter period of measurement (calculated before giving effect to such add-backs), (x) all reasonable out-of-pocket fees, costs and expenses payable or otherwise incurred in connection with any Indebtedness permitted to be incurred hereunder, any amendment, consent or modification thereto, or any amendment, consent or modification to this Agreement and/or the other Loan Documents during such period, provided, that, the aggregate amount of all amounts added back to Combined EBITDA in reliance on this clause (b)(x), together with all amounts added back to Combined EBITDA in reliance on the foregoing clauses (b)(viii) and (b)(ix) of this definition of "*Combined EBITDA*", shall *not exceed*, in the aggregate, fifteen percent (15.0%) of Combined EBITDA in any consecutive four (4) Fiscal Quarter period of measurement (calculated before giving effect to such add-backs), and (xi) reasonable and, to the extent requested by the Administrative Agent, documented transaction expenses incurred in connection with (A) any Permitted Acquisition that is consummated, and (B) any Permitted Acquisition that is *not* consummated, provided, that, the aggregate amount of all amounts added back to Combined EBITDA in reliance on this clause (b)(xi)(B) shall *not exceed* One Million Dollars ($1,000,000) in any consecutive four (4) Fiscal Quarter period of measurement; *minus* (c) to the extent *included* in determining Combined Net Income for such period, without duplication, (i) unusual and non-recurring gains for such period, (ii) non-cash gains and/or profits for such period, but *excluding* any non-cash gain and/or profit that represents the reversal of an accrual of, or a cash reserve for, any anticipated cash items in any prior period (other than any such accruals and/or cash reserves that have been added back to Combined Net Income in calculating Combined EBITDA in accordance with this definition), and (iii) any unusual or non-recurring cash gains and/or profits for such period.

"*Combined Fixed Charge Coverage Ratio*" shall mean, as of any period of measurement, for the Loan Parties and Subsidiaries on determined on a combined basis, the ratio of (a) Combined EBITDA for such

13

CONFIDENTIAL    VPX-JHO0000000333

period, *minus* (i) Maintenance Capital Expenditures during such period, *minus* (ii) the actual amount paid in cash during such period by the Loan Parties and Subsidiaries on account of all federal, state, local, and foreign income taxes (and franchise tax in the nature of income tax), *minus* (iii) Permitted Tax Distributions, to (b) (i) Combined Fixed Charges, *plus* (ii) Restricted Payments that are paid during such period (but *excluding* (A) Restricted Payments made *solely* (I) pursuant to Section 7.5(a), or (II) to a Loan Party pursuant to Section 7.5(b), and (B) Permitted Tax Distributions), in each case, measured on a combined basis as of the last day of the period consisting of the four (4) Fiscal Quarters most recently ended.

"*Combined Fixed Charges*" shall mean, for any period of measurement, for the Loan Parties and Subsidiaries determined on a combined basis, the *sum of* (without duplication): (a) Combined Interest Expense paid in cash for such period; and (b) scheduled principal payments payable with respect to Combined Total Debt during such period (determined without giving effect to any voluntary prepayments of any Term Loan pursuant to Section 2.12).

"*Combined Interest Expense*" shall mean, for any period of measurement, for the Loan Parties and Subsidiaries determined on a combined basis, the *sum of* (in each case, as determined in accordance with GAAP): (a) total interest expense, including, without limitation, the interest component of any payments in respect of Capital Lease Obligations capitalized or expensed during such period (whether or not actually paid during such period); *plus* (b) the net amount payable (or *minus* the net amount receivable) with respect to Hedging Transactions during such period (whether or not actually paid or received during such period).

"*Combined Leverage Ratio*" shall mean, as of any date of determination, the ratio of: (a) Combined Total Debt as of such date; to (b) Combined EBITDA, measured on a combined basis as of the last day of the period consisting of the four (4) Fiscal Quarters most recently ended.

"*Combined Maintenance Capital Expenditures*" shall mean, for any period of measurement, for the Loan Parties and Subsidiaries determined on a combined basis, all Combined Capital Expenditures made to maintain or replace existing or capital assets of the Loan Parties and Subsidiaries for such period, determined in accordance with GAAP.

"*Combined Net Income*" shall mean, for any period of measurement, for the Loan Parties and Subsidiaries determined on a combined basis in accordance with GAAP, the net income (or loss) of the Loan Parties and Subsidiaries for such period, but *excluding* therefrom (to the extent otherwise included therein): (a) any unusual and infrequent gains or losses; (b) any gains attributable to write-ups of assets or Asset Sales permitted under Section 7.6 (other than permitted sales of inventory in the ordinary course of business); (c) any equity interest of any Loan Party or Subsidiary in the unremitted earnings of any Person that is *not* a Subsidiary; (d) the net income of any Subsidiary during such period, *solely* to the extent that the declaration and/or payment of dividends (or similar distributions) by such Subsidiary of such income is *not* permitted by operation of the terms of its Organization Documents, or any other agreement, instrument, or Law applicable to such Subsidiary during such period, provided, that, the Borrower's equity in any net loss of any such Subsidiary for such period shall be *included* in determining Combined Net Income; and (e) any income of any Person if such Person is *not* a Wholly-Owned Subsidiary, except that any Loan Party's or any Wholly-Owned Subsidiary's equity in the net income of any such Person shall be *included* in Consolidated Net Income up to the aggregate amount of cash actually distributed by such Person during such period to any Loan Party or any Wholly-Owned Subsidiary as a dividend or other distribution (and, in the case of any such dividend or other distribution to a Wholly-Owned Subsidiary, such Wholly-Owned Subsidiary is *not* precluded from further distributing such amount to any Loan Party as described in the foregoing clause (d)). Notwithstanding anything to the contrary in the foregoing of this definition of "*Combined Net Income*": (i) to the extent that the PPP Loan is forgiven pursuant to the terms thereof and no longer constitutes Indebtedness, the proceeds of the PPP Loan shall *not* be included in any calculation of Combined Net Income; and (ii) all net income of the Loan Parties that is attributed to the payment, in the Fiscal Year ended December 31, 2020, of the Transition Amount (as defined in that certain Channel Transition Agreement, dated as of March 6, 2020, by and between the Borrower and PepsiCo, Inc., a North Carolina corporation, as such agreement was in effect on March 6, 2020) shall, for purposes of the

14

CHAR2\2683123v6

calculation of Combined Net Income of the Loan Parties and notwithstanding anything to the contrary in the operation of (or otherwise pursuant to) GAAP and/or ASC 606 (as in effect on the First Amendment Effective Date), (A) be *included* in the Combined Net Income of the Loan Parties with respect to the Fiscal Year ended December 31, 2020, notwithstanding that any such net income was or will be realized or booked in accordance with GAAP in any subsequent Fiscal Year, and (B) be *excluded* from the Combined Net Income of the Loan Parties with respect to each Fiscal Year other than the Fiscal Year ended December 31, 2020, notwithstanding that any such net income was realized or booked in accordance with GAAP in such other Fiscal Year.

"*Combined Total Debt*" shall mean, as of any date, all Indebtedness of the Loan Parties and Subsidiaries measured on a combined basis as of such date, but *excluding*: (a) Indebtedness of the type described in clause (i) of the definition of "*Indebtedness*" below; and (b) any Indebtedness under, or incurred pursuant to, any Economic Incentive Transaction.

"*Combined Total Leverage Ratio*" shall mean, as of any date, the ratio of: (a) Combined Total Debt as of such date; to (b) Combined EBITDA, measured on a combined basis as of the last day of the period consisting of the four (4) Fiscal Quarters most recently ended.

"*Commitment*" shall mean, as to each Lender, a Revolving Commitment, a Swingline Commitment, a Term Loan A Commitment, or an Incremental Term Loan Commitment, and/or any combination thereof (as the context shall permit or require).

"*Commitment Fee*" shall have the meaning set forth in Section 2.14(b).

"*Commodity Exchange Act*" shall mean the Commodity Exchange Act (7 U.S.C. §–1 *et seq.*), as amended and in effect from time to time, and any successor statute(s), together with any rules and regulations promulgated in connection therewith, any rulings or orders issued by any applicable Governmental Authorities (including, without limitation, the U.S. Commodity Futures Trading Commission) thereunder, or the application or official interpretation of any of the foregoing.

"*Communications*" shall have the meaning set forth in Section 11.1(b)(iv).

"*Compliance Certificate*" shall mean a certificate from the principal executive officer or the principal financial officer of the Borrower in the form of, and containing the certifications set forth in, the certificate attached hereto as Exhibit 5.1.

"*Conforming Changes*" shall mean, with respect to (a) the use and/or administration of, and/or any conventions associated with, SOFR, any SOFR Reference Rate and/or any SOFR-Based Rate (for any Interest Period, as applicable), or (b) the use, administration, adoption and/or implementation of, and/or any conventions associated with, any Benchmark Replacement, in each case of the foregoing clauses (a) and (b), any technical, administrative and/or operational change(s) (including, without limitation, any such change(s) to the definition of "*Base Rate*" above, the definition of "*Business Day*" above, the definition of "*Interest Period*" below (or any similar or analogous definition, or the addition of an applicable concept of "interest period"), the definition of "*U.S. Government Securities Business Day*" below, the timing and frequency of determining rates and making payments of interest, the timing of delivery of any Notices of Borrowing (or other requests for borrowing of Loans), the timing of delivery of any notices of optional reduction or termination of any Commitment(s), the timing of delivery of any notices of optional prepayment of Loans (or other notices of prepayment of Loans), the timing of delivery of any Notices of Continuation / Conversion (or other notices of the continuation or conversion of Loans), the applicability and length of lookback periods, the applicability of Section 2.19, and any other technical, administrative and/or operational matters) that the Administrative Agent determines, in its discretion, may be appropriate to reflect the adoption and/or implementation of any such rate and/or to permit the use and administration thereof by the Administrative Agent in a manner substantially consistent with market practice (or, if the Administrative Agent determines, in its discretion, that (i) the adoption and/or implementation of, or of any portion of, such market practice is *not* administratively feasible for the Administrative Agent, or (ii) no market practice for the administration of any such rate exists, then, in

15

CHAR2\2683123v6

each case of the foregoing clauses (i) and (ii), permit the use and administration thereof by the Administrative Agent in such other manner of administration as the Administrative Agent determines is reasonably necessary in connection with the administration of this Agreement and the other Loan Documents).

"*Connection Income Taxes*" shall mean Other Connection Taxes that are imposed on, or measured by, net income (however denominated), or that are franchise Taxes or branch profits Taxes.

"*Contingent Liability*" shall mean, with respect to any Person, each obligation and liability of such Person, and all such obligations and liabilities of such Person incurred pursuant to any agreement, undertaking or arrangement by which such Person: (a) guarantees, endorses or otherwise becomes, or is contingently liable upon (by direct or indirect agreement, contingent or otherwise, to provide funds for payment, to supply funds to, or otherwise to invest in, a debtor, or otherwise to assure a creditor against loss), the indebtedness, dividend, obligation or other liability of any other Person in any matter (other than by endorsement of instruments in the course of collection), including any indebtedness, dividend or other obligation which may be issued or incurred at some future time; (b) guarantees the payment of dividends or other distributions upon the Capital Stock of any other Person; (c) undertakes or agrees (whether contingently or otherwise): (i) to purchase, repurchase, or otherwise acquire any indebtedness, obligation or liability of any other Person or any property or assets constituting security therefor, (ii) to advance or provide funds for the payment or discharge of any indebtedness, obligation or liability of any other Person (whether in the form of loans, advances, stock purchases, capital contributions or otherwise), or to maintain solvency, assets, level of income, working capital or other financial condition of any other Person, or (iii) to make payment to any other Person other than for value received; (d) agrees to lease property or to purchase securities, property or services from such other Person with the purpose or intend of assuring the owner of such indebtedness or obligation of the ability of such other Person to make payment of the indebtedness or obligation; (e) to induce the issuance of, or in connection with the issuance of, any letter of credit for the benefit of such other Person; or (f) undertakes or agrees otherwise to assure a creditor against loss. The amount of any Contingent Liability shall (subject to any limitation set forth herein) be deemed to be the outstanding principal amount (or maximum permitted principal amount, if larger) of the indebtedness, obligation or other liability guaranteed or supported thereby.

"*Contractual Obligation*" of any Person shall mean any provision of any security issued by such Person or of any agreement, instrument or undertaking under which such Person is obligated, or by which it or any of the property in which it has an interest is bound.

"*Controlled Account Agreement*" shall mean any tri-party agreement by and among a Loan Party, the Administrative Agent, and a depositary bank or securities intermediary, as applicable, at which such Loan Party maintains a Controlled Account, in each case, in form and substance satisfactory to the Administrative Agent.

"*Controlled Account*" shall have the meaning set forth in Section 5.11(a).

"*Copyrights*" shall have the meaning set forth in the Security Agreement.

"*Covered Entity*" means any of the following: (a) a "covered entity" as that term is defined in, and interpreted in accordance with, 12 C.F.R. §–252.82(b); (b) a "covered bank" as that term is defined in, and interpreted in accordance with, 12 C.F.R. §–47.3(b); and (c) a "covered FSI" as that term is defined in, and interpreted in accordance with, 12 C.F.R. §–382.2(b).

"*Covered Party*" shall have the meaning set forth in Section 11.18.

"*Credit Event*" shall mean the advancing of any Loan to any Loan Party or Subsidiary, or the issuance, extension of the maturity date or expiration date, or increase in the amount, of, any Indebtedness of any Loan Party or Subsidiary or any Letter of Credit.

16

CONFIDENTIAL                                                                                    VPX-JHO0000000336

"*Current Assets*" shall mean, with respect to any Person as of any date, all current assets of such Person as determined as of such date, calculated in accordance with GAAP, but excluding any cash, Cash Equivalents, and debts due from Affiliates of such Person.

"*Current Liabilities*" shall mean, with respect to any Person as of any date, all liabilities of such Person that should, in accordance with GAAP, be classified as current liabilities as of such date, and, in any event, including all Indebtedness payable on demand, or within one (1) year from such date, without any option, on the part of the obligor thereof, to extend or renew such Indebtedness beyond such year, and all accruals for federal or other taxes based on, or measured by, income and payable within such year, but excluding: (i) the current portion of long-term Indebtedness required to be paid within one (1) year; and (ii) the aggregate outstanding principal balance of the Revolving Loans and/or Swingline Loans, as applicable, outstanding as of such date.

"*Daily SOFR*" shall mean, as of any specified date of determination, for any calculations with respect to any Loan bearing interest at a rate determined by reference to Daily SOFR and/or any determination of the Base Rate pursuant to clause (c) of the definition of "*Base Rate*" above, the rate per annum equal to the Daily SOFR Reference Rate, determined as of the date that is five (5) U.S. Government Securities Business Days prior to such specified date of determination (such prior date, a "*Periodic Daily SOFR Determination Date*"), as such rate is published by the SOFR Administrator on such Periodic Daily SOFR Determination Date; provided, that, (a) if, as of 5:00 P.M. on any Periodic Daily SOFR Determination Date, (i) the Daily SOFR Reference Rate has *not* been published by the SOFR Administrator, and (ii) a Benchmark Replacement Date with respect to the Daily SOFR Reference Rate has *not* occurred, then "*Daily SOFR*" shall instead mean the Daily SOFR Reference Rate as published by the SOFR Administrator on the first (1st) preceding U.S. Government Securities Business Day for which the Daily SOFR Reference Rate was published by the SOFR Administrator, so long as such first (1st) preceding U.S. Government Securities Business Day is *not more than* three (3) U.S. Government Securities Business Days prior to such Periodic Daily SOFR Determination Date, and (b) if, at any time, Daily SOFR (determined in accordance with the foregoing of this definition of "*Daily SOFR*", including in accordance with the foregoing clause (a) of this proviso) is *less than* the Floor, then Daily SOFR shall be deemed to equal the Floor for all purposes of this Agreement and the other Loan Documents. Any change(s) in Daily SOFR due to any change(s) in the Daily SOFR Reference Rate shall be effective from, and including, the effective date of any such change(s) in the Daily SOFR Reference Rate, without further notice to any Loan Party or Subsidiary, any other party to this Agreement or any other Loan Document, or any other Person.

"*Daily SOFR Reference Rate*" shall mean the rate per annum determined by the Administrative Agent as the daily published index rate based on SOFR.

"*Debtor Relief Laws*" shall mean the Bankruptcy Code, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief Laws of the United States or other applicable jurisdictions from time to time in effect.

"*Default*" shall mean any condition or event that, with the giving of notice or the lapse of time or both, would constitute an Event of Default.

"*Default Interest*" shall have the meaning set forth in Section 2.13(d).

"*Default Right*" has the meaning assigned to that term in, and shall be interpreted in accordance with, 12 C.F.R. §§–252.81, 47.2 or 382.1, as applicable.

"*Defaulting Lender*" shall mean, at any time, any Lender as to which the Administrative Agent has notified the Borrower that: (a) such Lender has failed, for three (3) or more Business Days, to comply with its obligations under this Agreement to make a Loan, unless such Lender notifies the Administrative Agent and the Borrower in writing that such failure is the result of such Lender's determination that one (1) or more conditions precedent to funding (each of which conditions precedent, together with any applicable default, shall

17

CONFIDENTIAL

be specifically identified in such writing) has not been satisfied and/or to make a payment to the Issuing Bank in respect of a Letter of Credit or to the Swingline Lender in respect of a Swingline Loan (each, a "*funding obligation*"); (b) such Lender has notified the Administrative Agent or the Borrower, or has stated publicly, that it will not comply with any such funding obligation hereunder (unless such writing or public statement relates to such Lender's obligation to fund a Loan hereunder and states that such position is based on such Lender's determination that a condition precedent to funding (which condition precedent, together with any applicable default, shall be specifically identified in such writing or public statement) cannot be satisfied), or has defaulted on, its obligation to fund generally under any other loan agreement, credit agreement or other financing agreement; (c) such Lender has, for three (3) or more Business Days, failed to confirm in writing to the Administrative Agent, in response to a written request of the Administrative Agent, that it will comply with its funding obligations hereunder (provided, that, such Lender shall cease to be a Defaulting Lender pursuant to this clause (c) upon receipt of such written confirmation by the Administrative Agent and the Borrower); (d) a Lender Insolvency Event has occurred and is continuing with respect to such Lender; or (e) such Lender has become the subject of a Bail-In Action. The Administrative Agent will promptly send to all parties hereto a copy of any notice to the Borrower provided for in this definition.

"*Disqualified Institution*" shall mean~~, as of any date of determination,~~ (a~~a~~) any competitor (as reasonably determined by the Borrower) identified in writing to the Administrative Agent on ~~or prior to the Effective Date, (b) any other Person that is a competitor (as reasonably determined by the Borrower) of any Loan Party or Subsidiary, which Person has been designated by the Borrower as a "Disqualified Institution" by written notice to the Administrative Agent and the Lenders (by posting such notice to the Platform) *not less than* two (2) Business Days prior to such date;~~Schedule 3 to the Fifth Amendment and (e~~b~~) any Affiliate of a "Disqualified Institution" described in the foregoing ~~clauses~~clause (a) ~~or (b)~~ of this definition of "*Disqualified Institution*"~~, which Person has been designated by the Borrower as a "Disqualified Institution" by written notice to the Administrative Agent and the Lenders (by posting such notice to the Platform) *not less than* two (2) Business Days prior to such date~~; provided, that, "*Disqualified Institutions*" shall *exclude* any Person that the Borrower has designated as no longer being a "Disqualified Institution" by written notice delivered to the Administrative Agent and the Lenders from time to time.

"*Disqualified Capital Stock*" shall mean Capital Stock that, by its terms (or by the terms of any security into which they are convertible, or for which they are exchangeable) (a) require the payment of any cash dividends (other than dividends payable *solely* in shares of Qualified Capital Stock, or, in the case of any pass through entity, in respect of taxes), (b) mature, or are mandatorily redeemable, or subject to mandatory repurchase or redemption or repurchase at the option of the holders thereof, in whole or in part, and whether upon the occurrence of any event, pursuant to a sinking fund obligation, on a fixed date or otherwise, prior to the date that is ninety one (91) calendar days after *later* of the latest Maturity Date of any Term Loan and the Revolving Commitment Termination Date, or (c) are convertible or exchangeable, automatically or at the option of any holder thereof, into any Indebtedness other than Indebtedness otherwise permitted under Section 7.1; provided, that, if such Capital Stock is issued pursuant to a plan or other agreement (including, without limitation, any Organization Document of such Person) for the benefit of current or former employees, officers, directors, or consultants of any Loan Party or Subsidiary, or by any such plan or other agreement to such Persons, such Capital Stock shall *not* constitute Disqualified Capital Stock *solely* because it may be required to be repurchased by the Loan Parties or Subsidiaries in order to satisfy applicable statutory or regulatory obligations, or as a result of such Person's termination or cessation of services, death or disability.

"*Doehler Note*" shall have the meaning set forth in Section 7.1(w).

"*Dollar(s)*" and the sign "*$*" shall mean lawful money of the United States.

"*Domestic Subsidiary*" shall mean any Subsidiary that is organized under the Laws of the United States or of any state, district or other political subdivision thereof.

18

CONFIDENTIAL                                                                                   VPX-JHO0000000338

~~"*Early Opt-in Election*" shall mean the occurrence of *at least* one (1) of the following events: (a) (i) a determination by the Administrative Agent, or (ii) a notification by the Required Lenders to the Administrative Agent (with a copy to the Borrower) that the Required Lenders have determined, in each case of the foregoing clauses (a)(i) and (a)(ii), that Dollar-denominated syndicated credit facilities (A) being executed at such time, or (B) that include language similar to that contained in Section 2.16, in each case of the foregoing clauses (a)(A) and (a)(B), are being executed, amended, restated and/or amended and restated, as applicable, to incorporate or adopt a new benchmark interest rate to replace the Screen Rate; and/or (b) (i) the election by the Administrative Agent, or (ii) the election by the Required Lenders, in each case of the foregoing clauses (b)(i) and (b)(ii), to declare that an Early Opt-in Election has occurred, and the provision, (A) in the case of the foregoing clause (b)(i), by the Administrative Agent of written notice of such election to the Borrower and the Lenders, or (B) in the case of the foregoing clause (b)(ii), by the Required Lenders of written notice of such election to the Administrative Agent.~~

"*Economic Incentive Bond Pledge Agreement*" shall have the meaning provided in the definition of "*Economic Incentive Transaction*" below.

"*Economic Incentive Transaction*" shall mean any transaction between any Loan Party or Subsidiary (an "*Incentives Beneficiary*"), on the one hand, and an applicable Governmental Authority, on the other hand, entered into for the purpose of providing property tax incentives, governmental grants and/or other economic incentives to the applicable Incentives Beneficiary that is structured either as (I) a lease of real and/or personal property by the Incentives Beneficiary from an applicable Governmental Authority, or (II) a sale and leaseback transaction, whereby the Incentives Beneficiary transfers title to the underlying real and/or personal property to such Governmental Authority and leases such property back from such Governmental Authority, provided, that: (a) (i) if, and to the extent that, such Governmental Authority issues any bonds or notes pursuant to, or in connection with, such Economic Incentive Transaction, then one-hundred percent (100.0%) of such bonds or notes (as the case may be) shall, promptly after the issuance thereof, be purchased by a Loan Party or a Wholly-Owned Subsidiary of a Loan Party, and at all times thereafter, shall be held by a Loan Party or a Wholly-Owned Subsidiary of a Loan Party, (ii) the rental payments under any such lease (disregarding any such amount that is concurrently repaid to a Loan Party, or to a Wholly-Owned Subsidiary of a Loan Party, in the form of debt service on any bonds or notes, or which is otherwise offset with no payment required to be made) shall *not exceed* the *sum of* (A) the amount that the Incentives Beneficiary would have paid in property taxes in respect of such real and/or personal property that is the subject of (or in respect of which ownership is transferred pursuant to) such Economic Incentive Transaction, *plus* (B) all other grants, rebates, credits, deductions and/or other amounts that the Incentives Beneficiary would *not* have received from an applicable Governmental Authority, in each case of the foregoing clauses (ii)(A) and (ii)(B), but for the consummation of such Economic Incentive Transaction, (iii) in the case of any such sale and leaseback transaction, the Incentives Beneficiary shall have the option, at all times after the consummation of such Economic Incentive Transaction pursuant to the definitive documentation therefor, to terminate the underlying lease and to reacquire any such property transferred by the Incentives Beneficiary to such Governmental Authority for nominal consideration (disregarding any additional consideration that is concurrently repaid to a Loan Party, or a Wholly-Owned Subsidiary of a Loan Party, in the form of bond or note repayments), (iv) any bonds or notes purchased or held by any Loan Party or Subsidiary pursuant to, or in connection with, such Economic Incentive Transaction shall be subject to a pledge agreement in favor of the Administrative Agent in form and substance reasonably satisfactory to the Administrative Agent (any such pledge agreement, an "*Economic Incentive Bond Pledge Agreement*"), and (v) in addition to, and without limitation of, any of the foregoing provisions of this definition of "*Economic Incentive Transaction*" or any other provision of this Agreement or any other Loan Document, the Loan Parties shall, and shall cause their respective Subsidiaries to, take all action(s) reasonably requested by the Administrative Agent to obtain Liens, in favor of the Administrative Agent for the benefit of the holders of the Obligations, on (A) any real and/or personal property (whether owned by a Loan Party, a Wholly-Owned Subsidiary of a Loan Party, an applicable Governmental Authority, or any other Person(s) party to any Economic Incentive Transaction with or involving a Loan Party or Subsidiary) that is the subject of (or in respect of which ownership is transferred pursuant to) such Economic Incentive Transaction, to the extent that such Liens are *not* prohibited by the applicable laws and statutes governing such Economic Incentive

19

CHAR2\2683123v6

Transaction, and (B) the interest(s) of any Loan Party in, or granted pursuant to, any definitive documentation governing any Economic Incentives Transaction (to the extent that such interest(s) do *not* constitute Excluded Property); and (b) notwithstanding anything to the contrary in the foregoing, if, at any time, any of the conditions set forth in the foregoing <u>clause (a)</u> shall cease to be satisfied, then such transaction subject to such conditions shall cease to be, and shall be deemed *not* to be, an Economic Incentive Transaction for purposes of this Agreement and the other Loan Documents.

"*EEA Financial Institution*" shall mean: (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority; (b) any entity established in an EEA Member Country which is a parent of an institution described in <u>clause (a)</u> of this definition; or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described the foregoing <u>clauses (a)</u> or (<u>b</u>) and is subject to consolidated supervision with its parent.

"*EEA Member Country*" shall mean any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"*EEA Resolution Authority*" shall mean any public administrative authority, or any Person entrusted with public administrative authority, of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"*Effective Date*" shall mean the date hereof.

"*Eligible Assignee*" shall mean any Person that meets the requirements to be an assignee as set forth in <u>Section 11.4</u> (subject to such consents, if any, as may be required under <u>Section 11.4(b)(iii)</u>).

"*Environmental Indemnity*" shall mean each environmental indemnity made by each Loan Party with Real Estate required to be pledged as Collateral in favor of the Administrative Agent for the ratable benefit of the holders of the Obligations, in each case, in form and substance satisfactory to the Administrative Agent.

"*Environmental Laws*" shall mean all Laws, rules, regulations, codes, ordinances, orders, decrees, judgments, injunctions, notices or binding agreements issued, promulgated or entered into by or with any Governmental Authority, relating in any way to the environment, preservation or reclamation of natural resources, the management, Release or threatened Release of any Hazardous Material or to health and safety matters concerning exposure to Hazardous Materials.

"*Environmental Liability*" shall mean any liability, contingent or otherwise (including any liability for damages, costs of environmental investigation and remediation, costs of administrative oversight, fines, natural resource damages, penalties or indemnities), of any Loan Party or Subsidiary directly or indirectly resulting from, or based upon: (a) any actual or alleged violation of any Environmental Law; (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials; (c) any actual or alleged exposure to any Hazardous Materials; (d) the Release or threatened Release of any Hazardous Materials; or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"*ERISA*" shall mean the Employee Retirement Income Security Act of 1974 (29 U.S.C. §–18 *et seq.*), as amended and in effect from time to time, and any successor statute(s), together with any rules and regulations promulgated in connection therewith, any rulings or orders issued by any applicable Governmental Authorities (including, without limitation, the U.S. Department of Labor) thereunder, or the application or official interpretation of any of the foregoing.

"*ERISA Affiliate*" shall mean any Person that, for purposes of Title I or Title IV of ERISA or Section 412 of the Code, would be deemed, at any relevant time, to be a "single employer", or otherwise aggregated

CONFIDENTIAL

with any of the Loan Parties and Subsidiaries, under Section 414(b), Section 414(c), Section 414(m), or Section 414(o) of the Code, or Section 4001(b)(1) of ERISA.

"*ERISA Event*" shall mean: (a) any "reportable event", as defined in Section 4043 of ERISA with respect to a Plan (other than an event as to which the PBGC has waived, under subsection .22, .23, .25, .27 or .28 of PBGC Regulation Section 4042, the requirement of Section 4043(a) of ERISA that the PBGC be notified of such event); (b) any failure to make a required contribution to any Plan that would result in the imposition of a Lien or other encumbrance, or the provision of security, under Section 430 of the Code or Section 303 or Section 4068 of ERISA, or the arising of such a Lien or encumbrance, there being or arising any "unpaid minimum required contribution" or "accumulated funding deficiency" (each, as defined, or otherwise set forth, in Section 4971 of the Code or Part 3 of Subtitle B of Title 1 of ERISA), whether or not waived, or any filing of any request for, or receipt of, a minimum funding waiver under Section 412 of the Code or Section 302 of ERISA with respect to any Plan or Multiemployer Plan, or that such filing may be made, or any determination that any Plan is, or is expected to be, in at-risk status under Title IV of ERISA; (c) any incurrence by any Loan Party or Subsidiary, or any of their respective ERISA Affiliates, of any material liability under Title IV of ERISA with respect to any Plan or Multiemployer Plan (other than for premiums due and not delinquent under Section 4007 of ERISA); (d) any institution of proceedings, or the occurrence of any event or condition that would reasonably be expected to constitute grounds for the institution of proceedings, by the PBGC, under Section 4042 of ERISA for the termination of, or the appointment of, a trustee to administer any Plan(s); (e) any incurrence by any Loan Party or Subsidiary, or any of their respective ERISA Affiliates, of any liability with respect to the withdrawal, or partial withdrawal, from any Plan or Multiemployer Plan; (f) the receipt by any Loan Party or Subsidiary, or any of their respective ERISA Affiliates, of any notice that a Multiemployer Plan is in endangered or critical status under Section 305 of ERISA; (g) any receipt by any Loan Party or Subsidiary, or any of their respective ERISA Affiliates, of any notice, or any receipt by any Multiemployer Plan from any Loan Party or Subsidiary, or any of their respective ERISA Affiliates, of any notice, in each case, concerning the imposition of Withdrawal Liability, or a determination that a Multiemployer Plan is, or is expected to be, insolvent or in reorganization, within the meaning of Title VI of ERISA; (h) engaging in a non-exempt prohibited transaction within the meaning of Section 4975 of the Code or Section 406 of ERISA that results in material liability to any Loan Party or Subsidiary; or (i) any filing of a notice of intent to terminate any Plan, if such termination would require material additional contributions in order to be considered a standard termination within the meaning of Section 4041(b) of ERISA, any filing under Section 4041(c) of ERISA of a notice of intent to terminate any Plan, or the termination of any Plan under Section 4041(c) of ERISA.

"*EU Bail-In Legislation Schedule*" shall mean the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor Person), as in effect from time to time.

"~~*Eurodollar*~~", ~~when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, bears interest at a rate determined by reference to the Adjusted LIBO Rate.~~

"*Event of Default*" shall have the meaning set forth in <u>Section 8.1</u>.

"*Excluded Accounts*" shall mean: (a) deposit and/or securities accounts, the balance of which consists exclusively of (i) withheld income taxes and federal, state or local employment taxes, in such amounts as are required, in the reasonable judgment of the Borrower, to be paid to the IRS or state or local government agencies within the following two (2) months, with respect to employees of any of the Loan Parties, or (ii) amounts required to be paid over to an employee benefit plan pursuant to DOL Reg. §–2510.3–102 on behalf of, or for the benefit of, employees of one (1) or more Loan Parties; (b) all tax accounts (including, without limitation, sales tax accounts), accounts used *solely* for payroll, accounts maintained *solely* in trust for the benefit of third parties and fiduciary purposes, escrow accounts, zero balance or swept accounts, and employee benefit accounts (including 401(k) accounts and pension fund accounts), in each case of this <u>clause (b)</u>, so long as such account is used *solely* for such purpose; and (c) any deposit and/or securities account maintained in a jurisdiction outside of the United States, so long as (i) such account has a balance (or holds assets with a fair market value) (in each case, as reasonably determined by the Borrower in good faith) that is *not* in *excess of*

21

CONFIDENTIAL                                                                                                          VPX-JHO0000000341

Two-Hundred Fifty Thousand Dollars ($250,000) at any time, and (ii) all such accounts, taken together, have an aggregate account balance (or aggregate amount of the fair market value of assets) (in each case, as reasonably determined by the Borrower in good faith) that is *not* in *excess* of One Million Dollars ($1,000,000) at any time.

"*Excluded Property*" shall mean, with respect to any Loan Party: (a) (i) any leased Real Estate, (ii) any fee owned Real Estate that is located outside of the United States, and (iii) any fee owned Real Estate located in the United States with a fair market value (as reasonably determined by the Borrower in consultation with the Administrative Agent) of *less than* Two Million Five-Hundred Thousand Dollars ($2,500,000); (b) any IP Rights for which a perfected Lien thereon is *not* effected either by the filing of a UCC financing statement or by appropriate evidence of such Lien being filed in either the U.S. Copyright Office or the U.S. Patent and Trademark Office; (c) unless requested by the Administrative Agent or the Required Lenders, any personal property (other than personal property described in clause (b) above) for which the attachment or perfection of a Lien thereon is *not* governed by the UCC; (d) the Capital Stock held by any Loan Party in (i) any Foreign Subsidiary that is *not* a direct Subsidiary of a Loan Party, (ii) any direct Subsidiary of any Loan Party that is an Excluded Subsidiary *solely* pursuant to clause (b) of such definition, except for (A) sixty-five percent (65.0%) of the issued and outstanding Capital Stock in any such Subsidiary entitled to vote (within the meaning of U.S. Treas. Reg. Section 1.956–2(c)(2)), and (B) one-hundred percent (100.0%) of the issued and outstanding Capital Stock in any such Subsidiary *not* entitled to vote (within the meaning of U.S. Treas. Reg. Section 1.956–2(c)(2)), and (iii) any Subsidiary that is an Excluded Subsidiary *solely* pursuant to clause (c) of such definition; (e) any property which, subject to the terms of Section 7.8, is subject to a Lien of the type described in Section 7.2(d) pursuant to documents which prohibit such Loan Party from granting any other Liens in such property; (f) any intent-to-use trademark application prior to the filing of a "Statement of Use" or "Amendment to Allege Use" with respect thereto, to the extent, if any, that, and *solely* during the period, if any, in which, the grant or enforcement of a security interest therein would impair the validity or enforceability of such intent-to-use trademark application under applicable Law; (g) those assets over which the granting of a Lien in such assets in favor of the Administrative Agent, for the ratable benefit of the holders of the Obligations, would be prohibited by applicable Law or Contractual Obligation (including, without limitation, any requirement under, or in accordance with, such Law or Contractual Obligation to obtain consent from a third-party, including any Governmental Authority), so long as any such Contractual Obligation (i) is *not* incurred in contemplation of (A) the owning entity's becoming a Subsidiary, or (B) the entry of such owning entity into any Loan Documents, and (ii) is permitted under this Agreement (in each case of the foregoing clauses (g)(i) and (g)(ii), after giving effect to the Anti-Assignment Provisions or any other applicable Law or principle of equity), other than any receivables and proceeds thereof (the assignment of which is expressly deemed to be effective under the UCC, notwithstanding such prohibition); (h) Excluded Accounts; (i) any motor vehicles or other asset covered by a certificate of title or ownership, in each case, in respect of which perfection of a Lien therein is *not* governed by the UCC; (j) the Aircraft and any other aircraft, airframes, engines and related property; (k) all Stoked IP; and (l) the proceeds of any of the Property and/or assets described in the foregoing clauses (a) through (k), *solely* to the extent that such proceeds themselves constitute the type(s) of property and/or assets described in one (1) or more of the foregoing clauses (a) through (k). Notwithstanding anything to the contrary in the foregoing, the security interests granted to the Administrative Agent under the Collateral Documents shall attach immediately to any property and/or assets of any Loan Party that is Collateral at such time as such asset ceases to meet any of the criteria for "*Excluded Property*" described in any of the foregoing clauses (a) through (l).

"*Excluded Subsidiary*" shall mean, collectively, each Subsidiary of any Loan Party: (a) that is an Immaterial Subsidiary; (b) that is a Foreign Subsidiary; (c) that is *not* a Wholly-Owned Subsidiary; (d) that is prohibited by applicable Laws from providing a Guarantee of the Obligations; and (e) to the extent that the Administrative Agent and the Borrower mutually determine and agree in writing that the costs and/or burden (including regulatory burdens) of obtaining a Guarantee by such Subsidiary of the Obligations would outweigh the benefit to the Lenders of obtaining such Guarantee.

"*Excluded Swap Obligation*" shall mean, with respect to any Guarantor, any Swap Obligation if, and to the extent that, all, or a portion, of the Guaranty of such Guarantor of, or the grant by such Guarantor of a security interest to secure, such Swap Obligation (or any Guarantee thereof) is or becomes illegal under the

22

CONFIDENTIAL

VPX-JHO0000000342

Commodity Exchange Act, by virtue of such Guarantor's failure, for any reason, to constitute an "eligible contract participant", as defined in the Commodity Exchange Act, at the time the Guaranty of such Guarantor, or the grant by such Guarantor of a security interest, becomes effective with respect to such related Swap Obligation; provided, that, for the avoidance of doubt, in determining whether any Guarantor is an "eligible contract participant" under the Commodity Exchange Act, the keepwell agreement set forth in Section 10.8 shall be taken into account. If a Swap Obligation arises under a Master Agreement governing *more than* one (1) Hedging Transaction, such exclusion shall apply only to the portion of such Swap Obligation that is attributable to Hedging Transactions for which such Guaranty or security interest is, or becomes, excluded in accordance with the first (1st) sentence of this definition of "*Excluded Swap Obligation*".

"*Excluded Taxes*" shall mean any of the following Taxes imposed on, or with respect to, a Recipient, or required to be withheld or deducted from a payment to a Recipient: (a) Taxes imposed on, or measured by, net income (however denominated), franchise Taxes, and branch profits Taxes, in each case of this clause (a), (i) imposed as a result of such Recipient being organized under the Laws of, or having its principal office, or, in the case of any Lender, its Applicable Lending Office, in the jurisdiction imposing such Tax (or any political subdivision thereof), or (ii) that are Other Connection Taxes; (b) in the case of a Lender, U.S. federal withholding Taxes imposed on amounts payable to, or for the account of, such Lender with respect to an applicable interest in a Loan or Commitment, pursuant to a Law in effect on the date on which (i) such Lender acquires such interest in the Loan or Commitment (other than pursuant to an assignment request by the Borrower under Section 2.25), or (ii) such Lender changes its lending office, except, in each case of this clause (b), to the extent that, pursuant to Section 2.20, amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender became a party hereto or to such Lender immediately before it changed its lending office; (c) Taxes attributable to such Recipient's failure to comply with Section 2.20(g); and (d) any U.S. federal withholding Taxes imposed under FATCA.

"*Existing Credit Agreement*" shall mean that certain Amended and Restated Loan Agreement, dated as of September 20, 2019 (as amended by that certain First Amendment to Amended and Restated Loan Agreement, dated as of December 5, 2019, that certain Second Amendment to Amended and Restated Loan Agreement, dated as of March 10, 2020, and as further amended, restated, amended and restated, supplemented, increased, extended, refinanced, renewed, replaced, and/or otherwise modified in writing from time to time prior to the Effective Date), by and among Truist (as successor in interest to Branch Banking and Trust Company), the Borrower, JHO Real Estate Investment A, LLC, a Florida limited liability company, Sheridan Real Estate Investment A, LLC, a Florida limited liability company, and the Guarantors (as defined therein) party thereto.

"*FATCA*" shall mean Sections 1471 through 1474 of the Code, as in effect as of the Effective Date (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof, any agreements entered into pursuant to Section 1471(b)(1) of the Code, any applicable intergovernmental agreements implementing any of the foregoing, and any fiscal or regulatory legislation, rules or practices adopted pursuant to any such intergovernmental agreements.

~~"*FRBNY's Website*" shall mean the website of the FRBNY accessible at (as of the Effective Date) http://www.newyorkfed.org, or any successor source.~~

"*FDA*" shall mean the U.S. Food and Drug Administration, or any Governmental Authority succeeding to any of its principal functions.

"*FD&C Act*" shall mean the U.S. Federal Food, Drug, and Cosmetic Act of 1938 (21 U.S.C. §–301 *et seq.*), as amended and in effect from time to time, and any successor statute(s), together with any rules and regulations promulgated in connection therewith, any rulings or orders issued by any applicable Governmental Authorities (including, without limitation, the FDA) thereunder, or the application or official interpretation of any of the foregoing.

CHAR2\2683123v6

"*Federal Funds Rate*" shall mean, for any date of determination, the rate per annum (expressed as a decimal, rounded upwards, if necessary, to the next higher one one-hundredth of one percent (1/100 of one percent (1.000.01%))) equal to the weighted average of the rates on overnight federal funds transactions with member banks of the Federal Reserve System, as published by the FRBNY on the Business Day next succeeding such day; provided, that, (a) if such day is *not* a Business Day, the Federal Funds Rate for such day shall be such rate on such transactions on the next preceding Business Day as so published on the next succeeding Business Day, and (b) if no such rate is so published on such next succeeding Business Day, the Federal Funds Rate for such day shall be the average rate per annum (expressed as a decimal, rounded upwards, if necessary, to the next higher one one-hundredth of one percent (1/100 of one percent (1.000.01%))) of the quotations for such day on such transactions received by the Administrative Agent from *at least* three (3) federal funds brokers of recognized good standing selected by the Administrative Agent, as determined by the Administrative Agent. Notwithstanding anything to the contrary in the foregoing, if the Federal Funds Rate is less than zero (0.00%), at any time, the Federal Funds Rate is *less than* the Floor, then the Federal Funds Rate shall be deemed to be zero (0.00%)equal the Floor for all purposes of this Agreement and the other Loan Documents.

"*Federal Reserve Board*" meansshall mean the Board of Governors of the Federal Reserve System (or any successor).

"*Fee Letter*" shall mean that certain letter agreement, dated as of March 16, 2020, executed by Truist Securities and accepted by the Borrower.

"*Fifth Amendment*" shall mean that certain Fourth Forbearance Agreement and Fifth Amendment to Amended and Restated Revolving Credit and Term Loan Agreement, dated as of the Fifth Amendment Effective Date, by and among the Borrower, the Guarantors party thereto, the Owner Pledgor, the Lenders party thereto, and the Administrative Agent.

"*Fifth Amendment Effective Date*" shall mean August 8, 2022.

"*First Amendment*" shall mean that certain First Amendment to Amended and Restated Revolving Credit and Term Loan Agreement, dated as of the First Amendment Effective Date, by and among the Borrower, the Guarantors party thereto, the Lenders party thereto, and the Administrative Agent.

"*First Amendment Effective Date*" shall mean June 15, 2021.

"*Fiscal Month*" shall mean any fiscal month of the Borrower.

"*Fiscal Quarter*" shall mean any fiscal quarter of the Borrower.

"*Fiscal Year*" shall mean any fiscal year of the Borrower.

"*Flood Insurance Laws*" shall mean, collectively: (a) the National Flood Insurance Reform Act of 1994 (which comprehensively revised the National Flood Insurance Act of 1968 and the Flood Disaster Protection Act of 1973), as now or hereafter in effect, or any successor statute thereto; (b) the Flood Insurance Reform Act of 2004, as now or hereafter in effect, or any successor statute thereto; and (c) the Biggert-Waters Flood Insurance Reform Act of 2012, as now or hereafter in effect, or any successor state thereto.

"*Floor*" shall mean a rate of interest equal to three-fourths of one percent (0.75%) per annum (subject to the proviso to the last sentence of Section 2.16(a)).

"*Foreign Lender*" shall mean: (a) if the Borrower is a U.S. Person, a Lender that is not a U.S. Person; and (b) if the Borrower is *not* a U.S. Person, a Lender that is resident, or organized under the Laws, of a jurisdiction other than the jurisdiction in which the Borrower is resident for tax purposes.

24

CONFIDENTIAL

"*Foreign Subsidiary*" shall mean any Subsidiary that is *not* a Domestic Subsidiary.

"*Fourth Amendment Effective Date*" shall mean June 30, 2022.

"*FRBNY*" shall mean the Federal Reserve Bank of New York (or any successor).

"*GAAP*" shall mean generally accepted accounting principles in the United States, applied on a consistent basis and subject to the terms of Section 1.3.

"*Governmental Authority*" shall mean the government of the United States, any other nation, or any political subdivision of any of the foregoing, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of, or pertaining to, government (including, without limitation, the FDA and any supra-national bodies such as the European Union or the European Central Bank).

"*Guarantee*" of or by any Person (the "*guarantor*") shall mean any obligation, contingent or otherwise, of the guarantor guaranteeing, or having the economic effect of guaranteeing, any Indebtedness or other obligation of any other Person (the "*primary obligor*") in any manner, whether directly or indirectly, and including any obligation, direct or indirect, of the guarantor (a) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation, or to purchase (or to advance or supply funds for the purchase of) any security for the payment thereof, (b) to purchase or lease property, securities or services for the purpose of assuring the owner of such Indebtedness or other obligation of the payment thereof, (c) to maintain working capital, equity capital, or any other financial statement condition or liquidity of the primary obligor, so as to enable the primary obligor to pay such Indebtedness or other obligation, or (d) as an account party in respect of any letter of credit or letter of guaranty issued in support of such Indebtedness or obligation; provided, that, the term "*Guarantee*" shall not include endorsements for collection or deposit in the ordinary course of business. The amount of any Guarantee shall be deemed to be an amount equal to the stated or determinable amount of the primary obligation in respect of which such Guarantee is made, or, if not so stated or determinable, the maximum reasonably anticipated liability in respect thereof (assuming that such Person is required to perform thereunder), as determined by such Person in good faith. The term "*Guarantee*" used as a verb shall have a corresponding meaning.

"*Guarantor Joinder Agreement*" shall mean a joinder agreement, substantially in the form of Exhibit 5.13, executed and delivered by a Subsidiary in accordance with the provisions of Section 5.13, or any other documents as the Administrative Agent shall deem appropriate for such purpose.

"*Guarantors*" shall mean, collectively: (a) each Subsidiary identified as a "*Guarantor*" on the signature pages hereto; (b) each Person that joins as a Guarantor pursuant to Section 5.13 or otherwise; (c) with respect to (i) any Hedging Obligations, entered into between any Loan Party (other than the Borrower) or Subsidiary and any Lender-Related Hedge Provider, that are permitted to be incurred pursuant to Section 7.10 and any Bank Products Obligations owing by any Loan Party (other than the Borrower) or Subsidiary, the Borrower, and (ii) the payment and performance by each Specified Loan Party of its obligations under its Guaranty with respect to all Swap Obligations, the Borrower; and (d) the successors and permitted assigns of each such Person referred to in the foregoing clauses (a) through (c).

"*Guaranty*" shall mean that certain Guaranty made by the Guarantors in favor of the Administrative Agent, for the ratable benefit of the holders of the Obligations, pursuant to Article X.

"*Hazardous Materials*" shall mean all explosive or radioactive substances or wastes and all hazardous or toxic substances, wastes or other pollutants, including petroleum or petroleum distillates, asbestos or asbestos containing materials, polychlorinated biphenyls, radon gas, infectious or medical wastes and all other substances or wastes of any nature regulated pursuant to any Environmental Law.

25

CHAR2\2683123v6

"*Healthcare Law*" shall mean, individually or collectively (as the context may require), (a) the FD&C Act, and (b) any and all other applicable laws, regulations, manual provisions, policies and administrative guidance, applicable to any Loan Party or Subsidiary, in respect of each of the foregoing clauses (a) and (b), as may be amended and in effect from time to time.

"*Hedge Termination Value*" shall mean, in respect of any one (1) or more Hedging Transactions, after taking into account the effect of any legally enforceable netting agreement relating to such Hedging Transactions: (a) for any date on or after the date on which such Hedging Transactions have been closed out and termination value(s) have been determined in accordance therewith, such termination value(s); and (b) for any date prior to the date referenced in clause (a) above, the amount(s) determined as the mark-to-market value(s) for such Hedging Transactions, as determined based upon one (1) or more mid-market or other readily available quotations provided by any recognized dealer in such Hedging Transactions (which, for the avoidance of doubt, may include any Lender or any Affiliate of a Lender).

"*Hedging Obligations*" of any Person shall mean any and all obligations of such Person, whether absolute or contingent, and howsoever and whensoever created, arising, evidenced or acquired, under: (a) any and all Hedging Transactions; (b) any and all cancellations, buy backs, reversals, terminations, or assignments of any Hedging Transactions; and (c) any and all renewals, extensions and modifications of any Hedging Transactions, and any and all substitutions for any Hedging Transactions.

"*Hedging Transaction*" of any Person shall mean: (a) any transaction (including an agreement with respect to any such transaction) now existing, or hereafter entered into, by such Person that is a rate swap transaction, swap option, basis swap, forward rate transaction, commodity swap, commodity option, equity or equity index swap or option, bond option, interest rate option, foreign exchange transaction, cap transaction, floor transaction, collar transaction, currency swap transaction, cross-currency rate swap transaction, currency option, spot transaction, credit protection transaction, credit swap, credit default swap, credit default option, total return swap, credit spread transaction, repurchase transaction, reverse repurchase transaction, buy/sell-back transaction, securities lending transaction, or any other similar transaction (including any option with respect to any of these transactions) or any combination thereof, whether or not any such transaction is governed by, or subject to, any Master Agreement); and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any Master Agreement, including any such obligations or liabilities under any Master Agreement.

"*Hemp*" has the meaning set forth in the Agriculture Improvement Act of 2018 (7 U.S.C. ch. 38 §§–1639o, *et seq.*), as amended, restated or replaced from time to time.

"*Hostile Acquisition*" shall mean the Acquisition of the Capital Stock of a Person through a tender offer or similar solicitation of the owners of such Capital Stock that has *not* been approved (prior to such Acquisition) by resolutions of the board of directors or managers (or equivalent governing body) of such Person (or by similar action if such Person is not a corporation), or if (as of the date of consummation of such Acquisition) such approval has been withdrawn.

"*HSR Act*" shall mean the Hart-Scott-Rodino Antitrust Improvements Act of 1976 (Pub. L. §–94–435), as amended and in effect from time to time, and any successor statute(s), together with any rules and regulations promulgated in connection therewith, any rulings or orders issued by any applicable Governmental Authorities (including, without limitation, the U.S. Federal Trade Commission and the U.S. Department of Justice) thereunder, or the application or official interpretation of any of the foregoing.

"*Immaterial Subsidiary*" shall mean, as of any date of determination, any Subsidiary of a Loan Party that is *not* a Material Subsidiary.

"*Incentives Beneficiary*" shall have the meaning provided in the definition of "*Economic Incentive Transaction*" above.

26

CHAR2\2683123v6

VPX-JHO0000000346

"*Incremental Facility Amendment*" shall have the meaning set forth in Section 2.23.

"*Incremental Request*" shall have the meaning set forth in Section 2.23.

"*Incremental Term Loan*" shall have the meaning set forth in Section 2.23.

"*Incremental Term Loan Commitment*" shall mean, with respect to Persons identified as an "Incremental Term Loan Lender" in the applicable Incremental Facility Amendment establishing an Incremental Term Loan, together with their respective successors and assigns, the commitment of such Person to make an Incremental Term Loan hereunder pursuant to such Incremental Facility Amendment; provided, that, at any time after the funding of the Incremental Term Loan, determination of "*Required Lenders*" shall include the outstanding principal amount of the Incremental Term Loan.

"*Indebtedness*" of any Person shall mean, without duplication: (a) all obligations of such Person for borrowed money; (b) all obligations of such Person evidenced by bonds, debentures, notes or other similar instruments; (c) all obligations of such Person in respect of the deferred purchase price of property or services (other than trade payables incurred in the ordinary course of business, provided, that, for purposes of Section 8.1(f), trade payables overdue by more than one-hundred twenty (120) days shall be included in this definition of "Indebtedness", except to the extent that any of such trade payables are being disputed in good faith and by appropriate measures); (d) all obligations of such Person under any conditional sale or other title retention agreement(s) relating to property acquired by such Person; (e) all Capital Lease Obligations of such Person; (f) all obligations, contingent or otherwise, of such Person in respect of letters of credit, acceptances or similar extensions of credit and all Contingent Obligations; (g) all obligations of such Person, contingent or otherwise, to purchase, redeem, retire or otherwise acquire for value any Capital Stock of such Person; (h) all Off-Balance Sheet Liabilities; (i) the Hedge Termination Value of all Hedging Obligations; (j) all Guarantees of such Person of the type of Indebtedness described in clauses (a) through (i) above; and (k) all Indebtedness of a third-party secured by any Lien on property owned by such Person, whether or not such Indebtedness has been assumed by such Person. The Indebtedness of any Person shall *include* the Indebtedness of any partnership or joint venture in which such Person is a general partner or a joint venturer, except to the extent that the terms of such Indebtedness provide that such Person is not liable therefor. Notwithstanding anything to the contrary in this Agreement, the PPP Loan shall *not* constitute Indebtedness for any purposes under this Agreement, so long as: (A) no Loan Party takes any action that would cause any portion of the principal amount of the PPP Loan to be deemed ineligible for forgiveness under Section 1106 of the CARES Act (including, without limitation, any reduction in headcount or salar(y)(ies) that would have such an effect) or otherwise allows any such principal to no longer be eligible for such forgiveness; and (B) no Governmental Authority has informed the Borrower that the PPP Loan shall *not* be, or is *not*, eligible for forgiveness pursuant to the CARES Act.

"*Indemnified Taxes*" shall mean: (a) Taxes, other than Excluded Taxes, imposed on, or with respect to, any payment made by, or on account of, any obligation of any Loan Party under any Loan Document; and (b) to the extent not otherwise described in clause (a) above, Other Taxes.

"*Indemnitee*" shall have the meaning set forth in Section 11.3(b).

"*Interest Period*" shall mean, with respect to any ~~Eurodollar~~SOFR Borrowing ~~or any SOFR Loan~~, a period of one (1)~~, two (2), three (3), six (6) months (in each case,~~ month (subject to availability), provided, that:

(a)     the initial Interest Period for such Borrowing shall commence on the date of such Borrowing (including the date of any conversion from a Borrowing of another Type), and each Interest Period occurring thereafter in respect of such Borrowing shall commence on the day on which the next preceding Interest Period expires;

27

(b)      if any Interest Period would otherwise end on a day other than a Business Day, such Interest Period shall be extended to the next succeeding Business Day, unless such Business Day falls in another calendar month, in which case, such Interest Period would end on the next preceding Business Day;

(c)      any Interest Period which begins on the last Business Day of a calendar month, or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period, shall end on the last Business Day of such calendar month;

(d)      each principal installment of the Term Loans shall have an Interest Period ending on each installment payment date, and the remaining principal balance (if any) of the Term Loans shall have an Interest Period determined as set forth above; and

(e)      no Interest Period may extend beyond the Revolving Commitment Termination Date, unless, on the Revolving Commitment Termination Date, the aggregate outstanding principal amount of Term Loans is *equal to* or *greater than* the aggregate principal amount of ~~Eurodollar~~SOFR Loans with Interest Periods expiring after such date, and, in any event, no Interest Period may extend beyond the Maturity Date~~.~~; and

(f)      notwithstanding anything to the contrary in the foregoing of this definition of "*Interest Period*" or elsewhere in this Agreement or any other Loan Document, no tenor that has been removed from this definition of "*Interest Period*" by operation of Section 2.16(e) shall be available for specification by the Borrower in any Notice of Borrowing and/or any Notice of Conversion / Continuation, as applicable.

"*Interim Financial Statements*" shall mean the unaudited consolidated financial statements of the Borrower and its Subsidiaries for the Fiscal Quarter ending June 30, 2020, including balance sheets and statements of income or operations, shareholders' equity and cash flows.

"*Investment Company Act*" shall mean the Investment Company Act of 1940 (15 U.S.C. §§–80a-1, 80a-64 *et seq.*), as amended and in effect from time to time, and any successor statute(s), together with any rules and regulations promulgated in connection therewith, any rulings or orders issued by any applicable Governmental Authorities (including, without limitation, the SEC) thereunder, or the application or official interpretation of any of the foregoing.

"*Investments*" shall mean, as to any Person, any direct or indirect acquisition of or relating to, or investment by, such Person (including pursuant to any merger with any Person that was *not* a Wholly-Owned Subsidiary prior to such merger), whether by means of: (a) any purchase or other acquisition of any Capital Stock in another Person; (b) any loan or advance to, any other evidence of Indebtedness of, any other security (including, without limitation, any option, warrant, or other right to acquire any of the foregoing) of, any Guarantee or assumption of any Indebtedness or obligations of, any purchase or other acquisition of any Indebtedness of, any capital contribution to, and/or any equity participation or other interest in, another Person; or (c) an Acquisition. For purposes of calculating compliance with the financial covenants set forth in Article VI (and, for purposes of any calculations substantially based on, or derivative from, such compliance), the amount of any Investment shall be deemed to be the amount *actually* invested, without adjustment for subsequent increases or decreases in the value of such Investment.

"*IP Notice Filings*" shall mean, collectively, (a) with regard to any Copyrights (as defined in the Security Agreement), a Notice of Grant of Security Interest in Copyrights for filing with the United States Copyright Office, (b) with regard to any Patents (as defined in the Security Agreement), a Notice of Grant of Security Interest in Patents for filing with the United States Patent and Trademark Office, and (c) with regard to any Trademarks (as defined in the Security Agreement), a Notice of Grant of Security Interest in Trademarks for filing with the United States Patent and Trademark Office, in each case of the foregoing clauses (a) through (c), substantially in the form of the applicable Exhibit to the Security Agreement (or such other form as reasonably requested by the Administrative Agent) that are, or are required to be, filed under, or in connection with, the Security Agreement.

CONFIDENTIAL                                                                                                          VPX-JHO0000000348

"*IP Rights*" shall mean all of the trademarks, service marks, trade names, copyrights, patents, patent rights, franchises, licenses, and other intellectual property rights that are reasonably necessary for the operation of their respective businesses that any Loan Party or Subsidiary owns, or possesses the legal right to use.

"*IRS*" shall mean the United States Internal Revenue Service.

"*Issuer Documents*" shall mean, with respect to any Letter of Credit, the Letter of Credit Application, and any other document, agreement and instrument entered into by the Issuing Bank and any Borrower (or any Subsidiary) or in favor of the Issuing Bank and relating to such Letter of Credit.

"*Issuing Bank*" shall mean Truist, in its capacity as the issuer of Letters of Credit hereunder, or any successor issuer of Letters of Credit.

"*Laws*" or "*Law*" shall mean, collectively, all international, foreign, federal, state and local statutes, treaties, rules, guidelines, regulations, ordinances, codes and administrative or judicial precedents or authorities, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and all applicable administrative orders, directed duties, requests, licenses, authorizations and permits of, and agreements with, any Governmental Authority, in each case, whether or not having the force of law.

"*LC Commitment*" shall mean that portion of the Aggregate Revolving Commitments that may be used by the Borrower for the issuance of Letters of Credit in an aggregate face amount *not to exceed* Twenty-Five Million Dollars ($25,000,000).

"*LC Disbursement*" shall mean a payment made by the Issuing Bank pursuant to a Letter of Credit.

"*LC Documents*" shall mean all applications, agreements and instruments relating to the Letters of Credit, but excluding the Letters of Credit.

"*LC Exposure*" shall mean, at any time, the *sum of*: (a) the aggregate undrawn amount of all outstanding Letters of Credit at such time; *plus* (b) the aggregate amount of all LC Disbursements that have *not* been reimbursed by, or on behalf of, the Borrower at such time. The LC Exposure of any Lender shall be its Pro Rata Share of the total LC Exposure at such time. Unless otherwise specified herein, the amount of a Letter of Credit at any time shall be deemed to be the stated amount of such Letter of Credit in effect at such time; provided, that, with respect to any Letter of Credit that, by its terms or any LC Document related thereto, provides for one (1) or more automatic increases in the stated amount thereof, the amount of such Letter of Credit shall be deemed to be the maximum stated amount of such Letter of Credit after giving effect to all such increases, whether or not such maximum stated amount is in effect at such time.

"*Lender Insolvency Event*" shall mean that (a) a Lender or its Parent Company is insolvent, or is generally unable to pay its debts as they become due, or admits in writing its inability to pay its debts as they become due, or makes a general assignment for the benefit of its creditors, (b) a Lender or its Parent Company is the subject of a bankruptcy, insolvency, reorganization, liquidation or similar proceeding, or a receiver, trustee, conservator, custodian or the like has been appointed for such Lender or its Parent Company, or such Lender or its Parent Company has taken any action in furtherance of, or indicating its consent to, or acquiescence in, any such proceeding or appointment, or (c) a Lender or its Parent Company has been adjudicated as, or determined by any Governmental Authority having regulatory authority over such Person or its property or assets to be, insolvent; provided, that, for the avoidance of doubt, a Lender Insolvency Event shall *not* be deemed to have occurred *solely* by virtue of the ownership or acquisition of any equity interest in or control of a Lender or a Parent Company thereof by a Governmental Authority or an instrumentality thereof.

"*Lender-Related Hedge Provider*" shall mean any Person that: (a) (i) at the time it enters into any Hedging Transaction(s) with any Loan Party, is a Lender or an Affiliate of a Lender, or (ii) has entered into any Hedging Transaction(s) with any Loan Party that exists on the Effective Date, and such Person is a Lender, or

29

CHAR2\2683123v6

an Affiliate of a Lender, on the Effective Date; and (b) except when the Lender-Related Hedge Provider is Truist and/or any of its Affiliates, has provided prior written notice to the Administrative Agent, which notice has been acknowledged by the Borrower, of (i) the existence of any such Hedging Transaction(s), and (ii) the methodology to be used by such parties in determining the obligations arising under, or in connection with, any such Hedging Transaction(s) from time to time. Notwithstanding anything to the contrary in the foregoing: (A) in no event shall any Lender-Related Hedge Provider, acting in such capacity, be deemed to be a Lender for purposes hereof to the extent of, and as to, Hedging Obligations, provided, that, each reference to the term "*Lender*" in Article IX, Section 11.3(b) and Section 11.4 shall be deemed to include such Lender-Related Hedge Provider; and (B) in no event shall the approval of any such Person, in its capacity as Lender-Related Hedge Provider, be required in connection with the release or termination of any security interest or Lien of the Administrative Agent.

"*Lenders*" shall mean each of the Persons identified as a "*Lender*" on the signature pages hereto and each Additional Lender that joins this Agreement pursuant to Section 2.23, and each of their respective successors and assigns, and shall include, where appropriate, the Swingline Lender.

"*Letter of Credit*" shall mean any stand-by letter of credit issued pursuant to Section 2.22 by the Issuing Bank, for the account of the Borrower, pursuant to the LC Commitment.

"*Letter of Credit Application*" shall mean an application and agreement for the issuance or amendment of a Letter of Credit, in the form from time to time in use by the Issuing Bank.

"*Letter of Credit Fee*" shall have the meaning set forth in Section 2.14(c).

"*~~LIBO Index Rate~~*", ~~when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, bears interest at a rate determined by reference to the One Month LIBO Index Rate.~~

"*Lien*" shall mean any mortgage, pledge, security interest, lien (statutory or otherwise), charge, encumbrance, hypothecation, assignment, deposit arrangement, or other arrangement having the practical effect of any of the foregoing, or any preference, priority or other security agreement or preferential arrangement of any kind or nature whatsoever (including, without limitation, any conditional sale or other title retention agreement and any capital lease having the same economic effect as any of the foregoing).

"*Loan Documents*" shall mean, collectively, this Agreement, the Collateral Documents, the LC Documents, the Fee Letter, all Notices of Borrowing, all Notices of Conversion / Continuation, all Compliance Certificates, all Issuer Documents, any promissory notes issued hereunder, and any and all other instruments, agreements, documents and writings executed in connection with any of the foregoing.

"*Loan Parties*" shall mean, collectively, the Borrower and each Guarantor. For the avoidance of doubt, "*Loan Parties*" shall *not* include any Owner Pledgor.

"*Loans*" shall mean all Revolving Loans, all Swingline Loans, the Term Loan A, and all Incremental Term Loans, in the aggregate or any of them, as the context shall require.

"*Master Agreement*" shall mean any form of master agreement published by the International Swaps and Derivatives Association, Inc. or any executed master agreement based on such form, any International Foreign Exchange Master Agreement, or any other master agreement relating to the documentation of, or entered into in connection with, any Hedging Transactions (any such master agreement, together with any related schedules and/or annexes thereto, a "*Master Agreement*")

"*Material Adverse Effect*" shall mean, with respect to any event, act, condition or occurrence of whatever nature (including any adverse determination in any litigation, arbitration, or governmental investigation or proceeding), whether singularly or in conjunction with any other event(s), act(s), condition(s)

CHAR2\2683123v6

and/or occurrence(s), whether or not related, resulting in a material adverse change in, or a material adverse effect on: (a) the business, results of operations, financial condition, assets, liabilities, or prospects of the Loan Parties and Subsidiaries, taken as a whole; (b) the ability of the Loan Parties to perform any of their respective obligations under the Loan Documents; (c) the rights and remedies of the Administrative Agent, the Issuing Bank, the Swingline Lender, and the Lenders under any of the Loan Documents; or (d) the legality, validity or enforceability against any Loan Party or any Owner Pledgor of any of the Loan Documents to which it is party.

"*Material Agreements*" shall mean: (a) all agreements, indentures or notes governing the terms of any Material Indebtedness; (b) all leases of Real Estate with annual rent payments in *excess* of Ten Million Dollars ($10,000,000); (c) all Related Transaction Documents; (d) that certain Distribution Agreement, dated as of March 6, 2020, by and between the Borrower and PepsiCo, Inc., a North Carolina corporation (as amended, restated, amended and restated, supplemented, extended, renewed, replaced, and/or otherwise modified in writing from time to time); (e) that certain Channel Transition Agreement, dated as of March 6, 2020, by and between the Borrower and PepsiCo, Inc., a North Carolina corporation (as amended, restated, amended and restated, supplemented, extended, renewed, replaced, and/or otherwise modified in writing from time to time); and (f) all other agreements, documents, contracts, indentures and instruments, pursuant to which a default, breach, or termination thereof could reasonably be expected to result in a Material Adverse Effect.

"*Material Indebtedness*" shall mean any Indebtedness (other than the Loans and Letters of Credit) and Hedging Obligations of any Loan Party or any Subsidiary owing to any Person, individually or, together with all other such Indebtedness (other than the Loans and Letters of Credit) and Hedging Obligations of the Loan Parties and Subsidiaries owing to such Person and/or its Affiliates, in an aggregate, committed or outstanding principal amount in *excess* of Fifteen Million Dollars ($15,000,000). For purposes of determining the amount of attributed Indebtedness from Hedging Obligations, the "*principal amount*" of any Hedging Obligations at any time shall be deemed to be the Net Mark-to-Market Exposure of such Hedging Obligations.

"*Material Subsidiary*" shall mean, as of any date of determination, any direct or indirect Subsidiary of a Loan Party having (a) assets in an amount equal to *at least* two and one-half of one percent (2.50%) of the total assets of the Loan Parties and Subsidiaries, determined on a combined basis as of the last day of the most recently ended Fiscal Quarter as of such time, or (b) revenues or net income, in an amount equal to *at least* two and one-half of one percent (2.50%) of the total revenues or net income of the Loan Parties and Subsidiaries, determined on a combined basis for the period consisting of the four (4) consecutive Fiscal Quarters most recently ended (determined upon the date of delivery of the most recently delivered financial statements of the Loan Parties and Subsidiaries pursuant to Section 5.1(a) or Section 5.1(b), as applicable); provided, that, if, at any time, all Subsidiaries of the Loan Parties that do *not* constitute Material Subsidiaries pursuant to the foregoing clauses (a) or (b), taken as a whole, shall have, collectively, (i) assets in an amount equal to *greater than* five percent (5.00%) of the total assets of the Loan Parties and Subsidiaries, determined on a combined basis as of the last day of the most recently ended Fiscal Quarter as of such time, or (ii) revenues or net income, in an amount equal to *greater than* five percent (5.00%) of the total revenues or net income of the Loan Parties and Subsidiaries, determined on a combined basis for the period consisting of the four (4) consecutive Fiscal Quarters most recently ended (determined upon the date of delivery of the most recently delivered financial statements of the Loan Parties and Subsidiaries pursuant to Section 5.1(a) or Section 5.1(b), as applicable), then, in either case of the foregoing clauses (i) or (ii), the Borrower shall, in consultation with the Administrative Agent, designate one (1) or more such Subsidiaries of the Loan Parties that do *not*, prior to giving effect to such designation(s), constitute Material Subsidiaries pursuant to the foregoing clauses (a) or (b) as "Material Subsidiaries" for purposes of this Agreement and each of the other Loan Documents, so that (A) the assets held by all Subsidiaries of the Loan Parties that do *not* constitute Material Subsidiaries pursuant to the foregoing clauses (a) or (b), taken as a whole after giving effect to such determination(s), shall be *no greater than* five percent (5.00%) of the total assets of the Loan Parties and Subsidiaries, determined on a combined basis as of the last day of the most recently ended Fiscal Quarter as of such time, and (B) the revenues or net income attributable to all Subsidiaries of the Loan Parties that do *not* constitute Material Subsidiaries pursuant to the foregoing clauses (a) or (b), taken as a whole after giving effect to such designation(s), shall be *no greater than* five percent (5.00%) of the total revenues or net income of the Loan

31

CHAR2\2683123v6

Parties and Subsidiaries, determined on a combined basis for the period consisting of the four (4) consecutive Fiscal Quarters most recently ended (determined upon the date of delivery of the most recently delivered financial statements of the Loan Parties and Subsidiaries pursuant to Section 5.1(a) or Section 5.1(b), as applicable).

"*Maturity Date*" shall mean: (a) with respect to the Term Loan A, the *earlier* of (i) August 14, 2025, and (ii) the date on which the outstanding principal amount of all outstanding Term Loans has been declared, or automatically has become, due and payable pursuant to Section 8.1 (whether by acceleration or otherwise); and (b) with respect to any Incremental Term Loan, the *earlier* of (i) the maturity date identified in the applicable Incremental Facility Amendment establishing such Incremental Term Loan, and (ii) the date on which the principal amount of all outstanding Term Loans has been declared, or automatically has become, due and payable pursuant to Section 8.1 (whether by acceleration or otherwise).

"*Maximum Rate*" shall have the meaning set forth in Section 11.12.

"*Moody's*" shall mean Moody's Investors Service, Inc.

"*Mortgaged Property*" shall mean, collectively, all Real Estate subject, or required hereunder or under any Collateral Document to be subject, to a Mortgage.

"*Mortgages*" shall mean, collectively with respect to all of the Real Estate, each mortgage, deed of trust, trust deed, security deed, debenture, deed of immovable hypothec, deed to secure debt, or similar document or instrument that grants, or purports to grant, to the Administrative Agent, for the ratable benefit of the holders of the Obligations, a security interest in such Real Estate, each in form and substance satisfactory to the Administrative Agent (as the same may be amended, restated, amended and restated, supplemented, increased, extended, refinanced, renewed, replaced, and/or otherwise modified in writing from time to time).

"*Multiemployer Plan*" shall mean any "multiemployer plan", as defined in Section 4001(a)(3) of ERISA, which is contributed to by (or to which there is, or may be, an obligation to contribute of) any Loan Party or Subsidiary, or any of their respective ERISA Affiliates, and each such plan for the five (5) year period immediately following the latest date on which any Loan Party or Subsidiary, or any of their ERISA Affiliates, contributed to, or had an obligation to contribute to, such plan.

"*Net Cash Proceeds*" shall mean the aggregate cash or Cash Equivalents proceeds received by any Loan Party or Subsidiary in respect of any Asset Sale (including, without limitation, any Permitted HNB Receivables Asset Sale), Recovery Event, or any issuance of Indebtedness or Capital Stock, net of: (a) direct costs incurred in connection therewith (including legal, accounting and investment banking fees, and sales commissions); (b) taxes paid or payable as a result thereof (including any reasonable estimate of taxes to be paid within one (1) year of the date of the relevant transaction as a result of any gain recognized in connection therewith, provided, that, any such estimated taxes *not* actually due or payable by the end of such one (1) year period shall constitute Net Cash Proceeds upon the *earlier* of (i) the date on which such taxes are first determined by the Borrower in good faith *not* to be actually payable, and (ii) the end of such one (1) year period; (c) reasonable reserves in accordance with GAAP for any liabilities or indemnification payments (fixed or contingent) attributable to seller's indemnities and representations and warranties to purchasers and other retained liabilities in respect of such Asset Sale undertaken by any Loan Party or Subsidiary in connection with such Asset Sale, provided, that, to the extent that any such amount ceases to be so reserved (other than any reduction in such reserve to make a payment in respect of such liability or indemnification obligations), the amount thereof shall be deemed to be Net Cash Proceeds of such Asset Sale at such time; and (d) in the case of any Asset Sale or any Recovery Event, the amount necessary to retire any Indebtedness secured by a Lien permitted by Section 7.2 (ranking senior to any Lien of the Administrative Agent) on the related property.

"*Net Mark-to-Market Exposure*" of any Person shall mean, as of any date of determination with respect to any Hedging Obligation, the *excess* (if any) of all unrealized losses *over* all unrealized profits of such Person arising from such Hedging Obligation. "*Unrealized losses*" shall mean the fair market value of the cost to such

32

CONFIDENTIAL                                                                                    VPX-JHO0000000352

Person of replacing the Hedging Transaction giving rise to such Hedging Obligation as of the date of determination (assuming that such Hedging Transaction were to be terminated as of that date), and "*unrealized profits*" shall mean the fair market value of the gain to such Person of replacing such Hedging Transaction as of the date of determination (assuming such Hedging Transaction were to be terminated as of that date).

"*Non-Consenting Lender*" shall have the meaning set forth in Section 2.25.

"*Non-Defaulting Lender*" shall mean, at any time, a Lender that is not a Defaulting Lender.

"*Non-U.S. Plan*" shall mean any plan, fund (including, without limitation, any superannuation fund), or other similar program established, contributed to (regardless of whether through direct contributions or through employee withholding), or maintained outside the United States by any Loan Party or Subsidiary primarily for the benefit of employees of such Loan Party or Subsidiary residing outside of the United States, which plan, fund, or other similar program provides, or results in, retirement income, a deferral of income in contemplation of retirement, or payments to be made upon termination of employment, and which plan is *not* subject to ERISA or the Code.

"*Note*" shall have the meaning set forth in Section 2.10(b).

"*Notice of Borrowing*" shall mean: (a) with respect to a Revolving Borrowing that is *not* a Swingline Borrowing, a Notice of Revolving Borrowing: (b) with respect to any Swingline Borrowing, a Notice of Swingline Borrowing: (c) with respect to the Borrowing of the Term Loan A on the Effective Date, a Notice of Term Loan A Borrowing; and (d) with respect to the Borrowing of any Incremental Term Loan, a notice of the Borrowing of such Incremental Term Loan on the effective date for such Incremental Term Loan as specified in the applicable Incremental Facility Amendment, which notice shall be substantially similar to a Notice of Term Loan A Borrowing.

"*Notice of Conversion / Continuation*" shall have the meaning set forth in Section 2.7(b).

"*Notice of Intent to Cure*" shall have the meaning set forth in Section 8.3.

"*Notice of Revolving Borrowing*" shall have the meaning set forth in Section 2.3.

"*Notice of Swingline Borrowing*" shall have the meaning set forth in Section 2.4.

"*Notice of Term Loan A Borrowing*" shall have the meaning set forth in Section 2.5.

"*Obligations*" shall mean, collectively, (a) all amounts owing by the Loan Parties to the Administrative Agent, the Issuing Bank, any Lender (including the Swingline Lender), or the Arranger pursuant to, or in connection with, this Agreement or any other Loan Document, or otherwise with respect to any Commitment, any Loan, or any Letter of Credit, including, without limitation, all principal, interest (including any interest accruing after the filing of any petition in bankruptcy or the commencement of any insolvency, reorganization or like proceeding relating to any Loan Party, whether or not a claim for post-filing or post-petition interest is allowed in such proceeding), all reimbursement obligations, fees, expenses, indemnification and reimbursement payments, costs and expenses (including all fees and expenses of counsel to the Administrative Agent, the Issuing Bank, and any Lender (including the Swingline Lender) incurred pursuant to this Agreement or any other Loan Document), whether direct or indirect, absolute or contingent, liquidated or unliquidated, now existing or hereafter arising hereunder or thereunder, (b) all Hedging Obligations owed by any Loan Party or Subsidiary to any Lender-Related Hedge Provider permitted by Section 7.10, and (c) all Bank Product Obligations, together with all renewals, extensions, modifications and/or refinancings of any of the foregoing; provided, that, "*Obligations*" of any Guarantor shall *not* include any Excluded Swap Obligations of such Guarantor.

33

CONFIDENTIAL                                                                                          VPX-JHO0000000353

"*OFAC*" shall mean the U.S. Department of the Treasury's Office of Foreign Assets Control.

"*Off-Balance Sheet Liabilities*" of any Person shall mean: (a) any repurchase obligation or liability of such Person with respect to accounts or notes receivable sold by such Person; (b) any liability of such Person under any sale and leaseback transactions that do *not* create a liability on the balance sheet of such Person; (c) any Synthetic Lease Obligation; or (d) any obligation arising with respect to any other transaction that is the functional equivalent of, or takes the place of, borrowing but which does *not* constitute a liability on the balance sheet of such Person.

~~"*One Month LIBO Index Rate*" shall mean, with respect to a LIBO Index Rate Loan, (a) the rate per annum equal to the London interbank offered rate for deposits in Dollars, for an interest period of one (1) month, appearing on Reuters screen page "LIBOR 01" (or, if such service is not available, on any successor or substitute page of such service or any successor to such service, or such other commercially available source providing such quotations as may be designated by the Administrative Agent from time to time) at approximately 11:00 A.M. (London time) on the date that is two (2) Business Days prior to the date of Borrowing of such LIBO Index Rate Loan and on the first (1st) Business Day of each calendar month ending thereafter, as applicable, *divided by* (b) a percentage equal to one hundred percent (100.0%) *minus* the then-stated maximum rate of all reserve requirements (including, without limitation, any marginal, emergency, supplemental, special and/or other reserves, and without the benefit of credits for any proration, exceptions or offsets that may be available from time to time) expressed as a decimal (rounded upward to the next 1/100th of one percent (1.00%)) applicable to any member bank of the Federal Reserve System in respect of Eurocurrency liabilities as defined in Regulation D (or any successor category of liabilities under Regulation D); provided, that, if the rate referred to in clause (a) above is *not* available at any such time for any reason, then the rate referred to in clause (a) above shall instead be the interest rate per annum, as determined by the Administrative Agent, to be the arithmetic average of the rates per annum at which deposits in Dollars, for an interest period of one (1) month, in an amount equal to the amount of such LIBO Index Rate Loan, are offered by major banks in the London interbank market to the Administrative Agent at approximately 11:00 A.M. (London time) on the date that is two (2) Business Days prior to the date of Borrowing of such LIBO Index Rate Loan and on the first (1st) Business Day of each calendar month ending thereafter, as applicable. Notwithstanding anything to the contrary in the foregoing, if the One Month LIBO Rate is *less than* three-fourths of one percent (0.75%), then such rate shall be deemed to be three-fourths of one percent (0.75%) for all purposes of this Agreement and the other Loan Documents.~~

"*Operating Lease*" shall mean any lease of, or other agreement conveying the right to use, any real or personal property by any Loan Party, as lessee, other than any Capital Lease.

"*Organization Documents*" shall mean: (a) with respect to any corporation, the certificate or articles of incorporation and the bylaws (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction); (b) with respect to any limited liability company, the certificate or articles of formation or organization and operating agreement; and (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization, and any agreement, instrument, filing or notice with respect thereto, filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization, and, if applicable, any certificate or articles of formation or organization of such entity.

"*OSHA*" shall mean the Occupational Safety and Health Act of 1970 (29 U.S.C. §–15 *et seq.*), as amended and in effect from time to time, and any successor statute(s), together with any rules and regulations promulgated in connection therewith, any rulings or orders issued by any applicable Governmental Authorities (including, without limitation, the U.S. Occupational Safety and Health Administration and the National Institute for Occupational Safety and Health) thereunder, or the application or official interpretation of any of the foregoing.

CHAR2\2683123v6

CONFIDENTIAL                                                                                           VPX-JHO0000000354

"*Other Connection Taxes*" shall mean, with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Tax (other than connections arising from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

"*Other Taxes*" shall mean all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to Section 2.25).

"*Owner Pledge Agreement*" shall mean that certain Owner Pledge Agreement, dated as of the Effective Date, executed in favor of the Administrative Agent, for the ratable benefit of the holders of the Obligations, by John Henry Owoc, an individual resident of the State of Florida, directly in his personal capacity.

"*Owner Pledgor*" shall have the same meaning as the term "*Obligor*" as defined in the Owner Pledge Agreement.

"*Parent Company*" shall mean, with respect to a Lender, the "bank holding company" (as defined in Regulation Y), if any, of such Lender, and/or any Person owning, beneficially or of record, directly or indirectly, a majority of the shares of such Lender.

"*Participant*" shall have the meaning set forth in Section 11.4(d).

"*Participant Register*" shall have the meaning set forth in Section 11.4(e).

"*Patents*" shall have the meaning set forth in the Security Agreement.

"*Patriot Act*" shall mean the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Pub. L. §–107–56), as amended and in effect from time to time, and any successor statute(s), together with any rules and regulations promulgated in connection therewith, any rulings or orders issued by any applicable Governmental Authorities thereunder, or the application or official interpretation of any of the foregoing.

"*Payment Office*" shall mean the office of the Administrative Agent located at 303 Peachtree Street, N.E., Atlanta, Georgia 30308, or such other location as to which the Administrative Agent shall have given written notice to the Borrower and the Lenders.

"*PBGC*" shall mean the U.S. Pension Benefit Guaranty Corporation, as referred to and defined in ERISA, and any successor entity performing similar functions.

"*Periodic Daily SOFR Determination Date*" shall have the meaning provided for such term in the definition of "*Daily SOFR*" above.

35

CONFIDENTIAL                                                                                                      VPX-JHO0000000355

"*Periodic Term SOFR Determination Date*" shall have the meaning provided for such term in the definition of "*Term SOFR*" below.

"*Permitted Acquisition*" shall mean any Acquisition by a Loan Party that either has been approved in writing by the Required Lenders or with respect to which all of the following conditions shall have been satisfied:

(a)    the Acquired Business is in the same or similar line(s) of business as conducted by the Loan Parties and Subsidiaries on the Effective Date, or any business(es) reasonably related thereto, and has its primary operations within the United States;

(b)    the Acquisition shall *not* be a Hostile Acquisition;

(c)    such Acquisition is consummated in compliance with all Requirements of Law, and all consents and approvals from any applicable Governmental Authorities (including, without limitation, clearance under the HSR Act, if applicable), or other Person(s) whose consent and approval is reasonably required in connection with such Acquisition, have been obtained;

(d)    the representations and warranties made by each of the Loan Parties in each Loan Document (including, without limitation, the representations and warranties made in Article IV) shall be true and correct in all material respects (other than those representations and warranties that are expressly qualified by a Material Adverse Effect or other materiality, in which case, such representations and warranties shall be true and correct in all respects) as if made on the date of such Acquisition (after giving effect thereto), except to the extent that such representations and warranties expressly relate to an earlier date, in which case, such representations and warranties shall be true and correct in all material respects (other than those representations and warranties that are expressly qualified by a Material Adverse Effect or other materiality, in which case, such representations and warranties shall be true and correct in all respects) as of such earlier date, provided, that, for purposes of this clause (d), the representations and warranties contained in Section 4.4 shall be deemed to refer to the most recent statements furnished pursuant to Section 5.1(a) and Section 5.1(b), respectively;

(e)    both immediately before and immediately after giving effect to such Acquisition and any Credit Event in connection therewith on a Pro Forma Basis: (i) no Default or Event of Default shall have occurred or be continuing; (ii) each Loan Party is Solvent; and (iii) on a Pro Forma Basis, (A) the Borrower shall be in compliance with the financial covenants set forth in Article VI for the period consisting of the four (4) Fiscal Quarters most recently ended, and (B) Combined EBITDA, recomputed as of the end of the period consisting of the four (4) Fiscal Quarters most recently ended, shall be *greater than* the Combined EBITDA for such four (4) Fiscal Quarter period determined prior to giving effect to such Acquisition on a Pro Forma Basis;

(f)    upon request by the Administrative Agent, the Borrower shall have promptly furnished to the Administrative Agent, *at least* five (5) days prior to the date of consummation of such Acquisition (or by such later date as the Administrative Agent may agree in its sole discretion), notice of such Acquisition, together with such financial, business, environmental, legal, and other information and analysis related to such Acquisition or the Acquired Business as the Administrative Agent may have reasonably requested (including, without limitation, historical financial information and analysis, environmental assessments and reports, copies of the applicable acquisition, purchase or sale agreement and related legal documents, opinions and certificates, and lien searches);

(g)    promptly upon the consummation of such Acquisition, the final, executed material documentation relating to such Acquisition (including, without limitation, the applicable acquisition, purchase or sale agreement);

(h)    the Acquired Business shall have earnings, before interest, taxes, depreciation and amortization (calculated in a manner substantially similar to the calculation of Combined EBITDA of the Loan Parties and Subsidiaries in accordance with this Agreement), for the period of twelve (12) fiscal months of the Acquired

36

CHAR2\2683123v6

Business most recently ended, of *greater than* Zero Dollars ($0.00) on an as-acquired basis and on a Pro Forma Basis, determined based upon financial statements for the most recently completed fiscal year of the Acquired Business and the most recent interim financial period of the Acquired Business completed within forty five (45) days prior to the date of consummation of such Acquisition;

(i)        (i) if a new Subsidiary is formed or acquired as a result of, or in connection with, such Acquisition, the Loan Parties shall have caused such Subsidiary to join as a Guarantor within ten (10) Business Days after the date of consummation of the Acquisition, and (ii) the Loan Parties shall have otherwise executed and delivered, or caused their Subsidiaries to have executed and delivered, all Guarantees, Collateral Documents, and other related documents and/or instruments, in each case of the foregoing clauses (i)(i) and (i)(ii), in accordance with the terms of <u>Section 5.12</u> and <u>Section 5.13</u>;

(j)        the aggregate cash and/or non-cash consideration (including any incurrence or assumption of Indebtedness, deferred purchase price and/or earn-out obligations, equity consideration, and related transaction fees, costs and expenses) paid or payable by the Loan Parties and Subsidiaries in connection with such Acquisition shall *not exceed*, (i) with respect to all Acquisitions, in aggregate, that are consummated during the same Fiscal Year as the consummation of such Acquisition, Seventy-Five Million Dollars ($75,000,000), and (ii) with respect to all Acquisitions, in aggregate, that are consummated during the term of this Agreement, Two-Hundred Fifty Million Dollars ($250,000,000); and

(k)        *at least* five (5) days prior to the date of consummation of such Acquisition (or by such later date as the Administrative Agent may agree in its sole discretion), the Borrower shall have delivered to the Administrative Agent a duly completed Pro Forma Compliance Certificate, certifying that each of the conditions set forth above in this definition of "*Permitted Acquisition*" have been satisfied.

"*Permitted Encumbrances*" shall mean:

(a)        Liens imposed by Law for taxes not yet due or which are being contested in good faith by appropriate proceedings diligently conducted and with respect to which adequate reserves are being maintained in accordance with GAAP;

(b)        statutory Liens of landlords, carriers, warehousemen, mechanics, materialmen and other Liens imposed by Law in the ordinary course of business for amounts not yet due, or which are being contested in good faith by appropriate proceedings and with respect to which adequate reserves are being maintained in accordance with GAAP;

(c)        pledges and deposits made in the ordinary course of business in compliance with workers' compensation, unemployment insurance and other social security Laws or regulations;

(d)        deposits to secure the performance of bids, trade contracts, leases, statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature, in each case in the ordinary course of business;

(e)        judgment and attachment liens *not* giving rise to a Default or an Event of Default, or Liens created by, or existing from, any litigation or legal proceeding that are currently being contested in good faith by appropriate proceedings and with respect to which adequate reserves are being maintained in accordance with GAAP;

(f)        customary rights of set-off, revocation, refund or chargeback under deposit agreements, the UCC, or common law of banks or other financial institutions where any Loan Party or Subsidiary maintains deposits (other than deposits intended as cash collateral) in the ordinary course of business;

37

CHAR2\2683123v6

CONFIDENTIAL

(g)    Liens consisting of precautionary filings of UCC financing statements filed with respect to Operating Leases permitted hereunder, and any interest of title of a lessor under any Operating Lease permitted hereunder; and

(h)    easements, zoning restrictions, rights-of-way and similar encumbrances on any Real Estate imposed by Law, or arising in the ordinary course of business, that do *not* secure any monetary obligations and do *not* materially detract from the value of the affected property or materially interfere with the ordinary conduct of business of the Loan Parties and Subsidiaries, taken as a whole;

provided, that, the term "*Permitted Encumbrances*" shall *not* include any Lien securing borrowed money.

"*Permitted HNB Receivables Asset Sale*" shall have the meaning provided in Section 7.6(d).

"*Permitted HNB Receivables Purchase Agreement*" shall mean a receivables purchase and sale agreement entered into by a Loan Party or Subsidiary thereof, on the one hand, and The Huntington National Bank, on the other hand, in form and substance reasonably acceptable to the Administrative Agent, as such agreement is in effect on the Second Amendment Effective Date and as such agreement may be amended, restated, amended and restated, supplemented, extended, renewed, replaced, and/or otherwise modified in writing after the Second Amendment Effective Date *solely* with the written consent of the Administrative Agent (such consent shall *not* be unreasonably withheld, conditioned or delayed).

"*Permitted Holders*" shall mean: (a) John Henry Owoc, an individual resident of the State of Florida; and (b) any trust or other estate-planning vehicle established for the benefit of any such individual, or any other individual having a relationship by blood (to the second (2nd) degree of consanguinity), marriage, or adoption to any such individual, and, in respect of which, such individual serves as sole trustee or in a similar capacity.

"*Permitted Refinancing*" means any extension, renewal or replacement of any existing Indebtedness so long as any such renewal, refinancing and extension of such Indebtedness: (a) has market terms and conditions; (b) has an average life to maturity that is *greater than* or *equal to* that of the Indebtedness being extended, renewed or refinanced; (c) does *not* include a Loan Party as an obligor that was not an obligor with respect to the Indebtedness being extended, renewed or refinanced; (d) remains subordinated, if the Indebtedness being refinanced or extended was subordinated to the prior payment of the Obligations; (e) does *not exceed* in a principal amount the Indebtedness being renewed, extended or refinanced plus reasonable fees and expenses incurred in connection therewith; and (f) is *not* incurred, created or assumed, if any Default or Event of Default has occurred and continues to exist or would result therefrom.

"*Permitted Tax Distributions*" shall mean cash dividends and/or distributions made, directly or indirectly, to the member(s) of the Borrower (with respect to each taxable year during which the Borrower is, or is electing to be taxed as, a limited liability company, a partnership, or an S corporation) to provide such member(s) with sufficient funds to pay any federal, state and/or local income taxes attributable to such member's or members' (as the case may be) ownership interest in the Borrower.

"*Permitted Third Party Bank*" shall mean any Lender, other than Truist, with whom any Loan Party maintains a Controlled Account.

"*Person*" shall mean any natural person or individual, corporation, limited liability company, trust, joint venture, association, company, firm, partnership (whether a general partnership, a limited partnership or otherwise), Governmental Authority, or other entity.

"*Personal Information*" shall mean: (a) all information that could reveal the identity of any natural Person; and (b) all other information regarding natural Persons, the collection, use, or disclosure of which is subject to applicable Privacy Laws.

CHAR2\2683123v6

VPX-JHO0000000358

"*Previous Florida Notes*" shall have the meaning set forth in Section 11.20(b).

"*Privacy Laws*" shall mean all Laws applicable to the privacy or security of individually identifiable information of any patient or individual.

"*Plan*" shall mean any "employee benefit plan" as defined in Section 3 of ERISA (other than a Multiemployer Plan) subject to Section 412 of the Code and/or Title IV of ERISA that is maintained or contributed to by any Loan Party or Subsidiary, or to which any Loan Party or Subsidiary has, or may have, an obligation not contribute, and each such plan that is subject to Section 412 of the Code and/or Title IV of ERISA for the five (5) year period immediately following the latest date on which any Loan Party or Subsidiary maintained, contributed to, or had an obligation to contribute to (or is deemed, under Section 4069 of ERISA, to have maintained, contributed to, had an obligation to contribute to, or otherwise had liability with respect to) such plan.

"*Platform*" shall mean Debt Domain, IntraLinks, Syndtrak, ClearPar, or a substantially similar electronic transmission system.

"*PPP Loan*" shall mean that certain small business loan under the federal Paycheck Protection Program as provided in Section 7(a) of the Small Business Act, as amended by the CARES Act (as amended from time to time, the "*PPP*"), provided to the Borrower on April 19, 2020, in the original principal amount of Eight Million One-Hundred Forty-One Thousand Dollars ($8,141,000).

"*Prime Rate*" shall have the meaning set forth in the definition of "*Base Rate*" above.

"*Pro Forma Basis*" shall mean, for purposes of calculating compliance with respect to any Asset Sale, Recovery Event, Permitted Acquisition, Restricted Payment, increase in the Aggregate Revolving Commitments or incurrence of an Incremental Term Loan pursuant to Section 2.23, or incurrence of Indebtedness, or any other transaction subject to calculation on a "*Pro Forma Basis*" as indicated herein, that: (A) such transaction shall be deemed to have occurred as of the first (1st) day of the period consisting of the four (4) Fiscal Quarters most recently ended for which the Borrower has delivered financial statements pursuant to Section 5.1(a) or Section 5.1(b), as applicable; and (B) such items are supported by a quality of earnings report, in form and substance, and from a third-party provider, reasonably satisfactory to the Administrative Agent. For purposes of any such calculation in respect of any Permitted Acquisition: (a) income statement and cash flow statement items attributable to the Person or property subject to such Permitted Acquisition shall be included in Combined EBITDA to the extent that such items are included in such income statement and cash flow statement items of the Loan Parties and Subsidiaries in accordance with the definition of "*Combined EBITDA*" set forth above; (b) any Indebtedness incurred or assumed by the Loan Parties or any Subsidiary (including the Person or property acquired) in connection with such Permitted Acquisition, and any Indebtedness of the Person or property so acquired which is not retired in connection with such Permitted Acquisition, (i) shall be deemed to have been incurred as of the first (1st) day of the applicable period, and (ii) if such Indebtedness has a floating or formula rate, shall have an implied rate of interest for the applicable period for purposes of this definition of "*Pro Forma Basis*", determined by utilizing the rate that is, or would be, in effect with respect to such Indebtedness as of the relevant date of determination; and (c) Capital Expenditures attributable to the Person or property acquired shall be included beginning as of the first (1st) day of the applicable period.

"*Pro Forma Compliance Certificate*" shall mean a certificate of a Responsible Officer of the Borrower: (a) if delivered in connection with the satisfaction of a condition or provision hereof relating to, or based upon, compliance on a Pro Forma Basis with any financial covenant(s) set forth in Article VI, a calculation of compliance on a Pro Forma Basis with such financial covenant(s) (or with any such condition(s) or provision(s) based on such compliance) as demonstrated by reasonably detailed calculations attached thereto, after giving effect to the applicable transaction on a Pro Forma Basis; and (b) if delivered in connection with any Permitted Acquisition, certifications that clauses (a) through (l) of the definition of "*Permitted Acquisition*" set forth above have been satisfied (or will be satisfied at such time permitted under this Agreement); and (c) if delivered

39

CHAR2\2683123v6

in connection with any Restricted Payment made pursuant to Section 7.5(d), certifications that all conditions listed in Section 7.2(f)(ii) have been satisfied (or will be satisfied at such time permitted under this Agreement).

"*Pro Rata Share*" shall mean: (a) with respect to any Class of Commitment or Loan of any Lender at any time, a percentage, the *numerator* of which shall be such Lender's Commitment of such Class (or, if such Commitment has been terminated or expired, or the Loans have been declared to be due and payable, such Lender's Revolving Credit Exposure or Term Loan, as applicable), and the *denominator* of which shall be the *sum of* all Commitments of such Class of all Lenders (or, if such Commitments have been terminated or expired or the Loans have been declared to be due and payable, all Revolving Credit Exposure or Term Loans, as applicable, of all Lenders); and (b) with respect to all Classes of Commitments and Loans of any Lender at any time, the *numerator* of which shall be the *sum of* such Lender's Revolving Commitment (or, if such Revolving Commitment has been terminated or expired, or the Loans have been declared to be due and payable, such Lender's Revolving Credit Exposure) and Term Loan, and the *denominator* of which shall be the *sum of* all Lenders' Revolving Commitments (or, if such Revolving Commitments have been terminated or expired, or the Loans have been declared to be due and payable, all Revolving Credit Exposure of all Lenders funded under such Commitments) and Term Loans.

"*PTE*" shall mean a prohibited transaction class exemption issued by the U.S. Department of Labor, as any such exemption may be amended from time to time.

"*Public Lender*" shall have the meaning set forth in Section 5.1.

"*QFC*" has the meaning assigned to the term "qualified financial contract" in, and shall be interpreted in accordance with, 12 U.S.C. §−5390(c)(8)(D).

"*QFC Credit Support*" shall have the meaning set forth in Section 11.18.

"*Qualified Capital Stock*" shall mean any Capital Stock other than Disqualified Capital Stock.

"*Qualified ECP Guarantor*" shall mean, in respect of any Swap Obligation, each Loan Party that has total assets in *excess* of Ten Million Dollars ($10,000,000) at the time the relevant Guaranty, or the grant of the relevant security interest, becomes effective with respect to such Swap Obligation, or such other Loan Party as constitutes an "eligible contract participant" under the Commodity Exchange Act, and can cause another Person to qualify as an "eligible contract participant" at such time by entering into a keepwell under Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

"*Real Estate*" shall mean all real property owned or leased by any Loan Party or Subsidiary.

"*Real Estate Documents*" shall mean, with respect to any fee interest of a Loan Party in any Real Estate that is *not* Excluded Property:

(a)    a fully executed and notarized Mortgage encumbering the fee interest of such Loan Party in such Real Estate;

(b)    if requested by the Administrative Agent in its reasonable discretion, maps or plats of an as-built survey of the sites of such Real Estate, certified to the Administrative Agent and the title insurance company issuing the policies referred to in clause (c) below, in a manner satisfactory to each of the Administrative Agent and such title insurance company, dated as of a date reasonably satisfactory to each of the Administrative Agent and such title insurance company, by an independent professional licensed land surveyor, which maps or plats, together with the surveys on which they are based, shall: (i) be sufficient to delete any standard printed survey exception contained in the applicable title policy; and (ii) be made in accordance with the Minimum Standard Detail Requirements for Land Title Surveys, jointly established and adopted by the

40

CONFIDENTIAL                                                                                    VPX-JHO0000000360

American Land Title Association and the National Society of Professional Surveyors, Inc. in 2016, with items 2, 3, 4, 6(b), 7(a), 7(b)(1), 7(c), 8, 9, 10, 11, 13, 14, 16,17, 18 and 19 on Table A thereof completed;

(c)    ALTA mortgagee title insurance policies issued by a title insurance company reasonably acceptable to the Administrative Agent with respect to such Real Estate, assuring the Administrative Agent that the Mortgage covering such Real Estate creates a valid and enforceable, first priority mortgage lien on such Real Estate, free and clear of all defects and encumbrances except Permitted Encumbrances, which title insurance policies shall: (i) otherwise be in form and substance satisfactory to the Administrative Agent; and (ii) include such endorsements as are requested by the Administrative Agent;

(d)    evidence as to (i) whether such Real Estate is in an area designated by the Federal Emergency Management Agency as having special flood or mud slide hazards (a "_Flood Hazard Property_"), and (ii) if such Real Estate is a Flood Hazard Property: (A) whether the community in which such Real Estate is located is participating in the National Flood Insurance Program; (B) the applicable Loan Party's written acknowledgment of receipt of written notification from the Administrative Agent (I) as to the fact that such Real Estate is a Flood Hazard Property, and (II) as to whether the community in which each such Flood Hazard Property is located is participating in the National Flood Insurance Program; and (C) copies of flood insurance policies under the National Flood Insurance Program (or private insurance endorsed to cause such private insurance to be fully compliant with the federal Law as regards private placement insurance applicable to the National Flood Insurance Program, with financially sound and reputable insurance companies not Affiliates of any Loan Party or Subsidiary) or certificates of insurance of the Loan Parties and Subsidiaries evidencing such flood insurance coverage, in such amounts and with such deductibles as the Administrative Agent may request and naming the Administrative Agent, and its successors and/or assigns, as sole loss payee on behalf of the holders of the Obligations;

(e)    if requested by the Administrative Agent, a duly executed Environmental Indemnity with respect thereto;

(f)    if requested by the Administrative Agent, (i) environmental questionnaires, or (ii) Phase I Environmental Site Assessment Reports, consistent with American Society of Testing and Materials (ASTM) Standard E 1527–05, and applicable state requirements, on all of the owned Real Estate, each dated _no more than_ six (6) months prior to the Effective Date (or prior to the date of the applicable Mortgage, if executed and recorded post-closing), prepared by environmental engineers satisfactory to the Administrative Agent, all in form and substance satisfactory to the Administrative Agent, and such environmental review and audit reports, including Phase II reports, with respect to the Real Estate of any Loan Party as the Administrative Agent shall have requested, in each case, together with letters executed by the environmental firms preparing such environmental reports, in form and substance satisfactory to the Administrative Agent, authorizing the Administrative Agent and the Lenders to rely on such reports, and the Administrative Agent shall be satisfied with the contents of all such environmental questionnaires or reports;

(g)    if requested by the Administrative Agent, evidence satisfactory to the Administrative Agent that such Real Estate, and the uses of such Real Estate, are in compliance in all material respects with all applicable zoning Laws (the evidence submitted as to which should include the zoning designation made for such Real Estate, the permitted uses of such Real Estate under such zoning designation, and, if available, zoning requirements as to parking, lot size, ingress, egress and building setbacks); and

(h)    an opinion of legal counsel to the Loan Party granting the Mortgage on such Real Estate, addressed, and in form and substance acceptable, to the Administrative Agent and each Lender.

"_Recipient_" shall mean, as applicable, (a) the Administrative Agent, (b) any Lender, and/or (c) the Issuing Bank.

41

CONFIDENTIAL

"*Recovery Event*" shall mean any loss of, damage to or destruction of, or any condemnation or other taking for public use of, any property of the Loan Parties and/or Subsidiaries.

"*Register*" shall have the meaning set forth in Section 11.4(c).

"*Regulation D*" shall mean Regulation D of the Federal Reserve Board, as the same may be in effect from time to time, and any successor regulations.

"*Regulation T*" shall mean Regulation T of the Federal Reserve Board, as the same may be in effect from time to time, and any successor regulations.

"*Regulation U*" shall mean Regulation U of the Federal Reserve Board, as the same may be in effect from time to time, and any successor regulations.

"*Regulation X*" shall mean Regulation X of the Federal Reserve Board, as the same may be in effect from time to time, and any successor regulations.

"*Regulation Y*" shall mean Regulation Y of the Federal Reserve Board, as the same may be in effect from time to time, and any successor regulations.

"*Related Parties*" shall mean, with respect to any Person, such Person's Affiliates, together with the respective managers, administrators, trustees, partners, directors, officers, employees, agents, advisors, legal counsel, consultants and/or other representatives of such Person and such Person's Affiliates.

"*Related Transaction Documents*" shall mean the Loan Documents and all other agreements and/or instruments executed in connection with the Related Transactions.

"*Related Transactions*" shall mean, collectively, the Borrowing of the Term Loan A on the Effective Date, the Borrowing of any Revolving Loans on the Effective Date, the preparation, negotiation, execution and delivery of all Related Transaction Documents, and the payment of all fees, costs and expenses associated with any of the foregoing.

"*Release*" shall mean any release, spill, emission, leaking, dumping, injection, pouring, deposit, disposal, discharge, dispersal, leaching or migration into the environment (including ambient air, surface water, groundwater, land surface or subsurface strata) or within any building, structure, facility or fixture.

"*Relevant Governmental Body*" shall mean the Federal Reserve Board and/or the FRBNY, or a committee officially endorsed or convened by the Federal Reserve Board and/or the FRBNY, or any successor thereto.

"*Replacement Lender*" shall have the meaning set forth in Section 2.25.

"*Required Lenders*" shall mean, at any time that there are two (2) or more Lenders that are not affiliated, *at least* two (2) Lenders that are not affiliated holding, in aggregate, *more than* fifty percent (50.0%) of the Aggregate Revolving Commitments and Term Loans at such time (or, if there is only one (1) Lender at such time, such Lender), or, if the Lenders have no Commitments outstanding at such time, then Lenders holding *more than* fifty percent (50.0%) of the Aggregate Revolving Credit Exposure and Term Loans of the Lenders at such time; provided, that, to the extent that any Lender is a Defaulting Lender, such Defaulting Lender, and all of its Revolving Commitments, Revolving Credit Exposure and Term Loans, shall be *excluded* for purposes of determining the Required Lenders.

"*Required Revolving Lenders*" shall mean, at any time that there are two (2) or more Lenders that are not affiliated, at least two (2) Lenders that are not affiliated holding, in aggregate, more than fifty percent (50.0%) of the Aggregate Revolving Commitments at such time (or, if there is only one (1) Lender at such time,

42

CONFIDENTIAL                                                                                    VPX-JHO0000000362

such Lender), or, if the Lenders have no Revolving Commitments outstanding at such time, then Lenders holding more than fifty percent (50.0%) of the Aggregate Revolving Credit Exposure of the Lenders at such time; provided, that, to the extent that any Lender is a Defaulting Lender, such Defaulting Lender, and all of its Revolving Commitments and Revolving Credit Exposure, shall be excluded for purposes of determining the Required Revolving Lenders.

"*Resolution Authority*" shall mean an EEA Resolution Authority, or, with respect to any UK Financial Institution, a UK Resolution Authority.

"*Responsible Officer*" shall mean: (a) with respect to certifying compliance with the financial covenants set forth in Article VI, the chief financial officer or the treasurer (or director, manager, member or other titled officer, in each case, of substantially equivalent title and authority) of the Borrower; and (b) otherwise, any of the president, the chief executive officer, the chief operating officer, the chief financial officer, the treasurer, or a vice president of the Borrower, or such other representative of the Borrower as may be designated in writing by any one (1) of the foregoing with the consent of the Administrative Agent.

"*Restricted Debt*" shall mean, collectively, any Indebtedness that: (a) constitutes Material Indebtedness; and (b) (i) is secured, on a junior lien basis, to the Obligations, (ii) is unsecured, or (iii) is subordinated in right of payment to the Obligations.

"*Restricted Payment*" shall mean: (a) any dividend or other distribution (whether in cash, securities or other property) with respect to any Capital Stock of any Person, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, defeasance, acquisition, cancellation or termination of any such Capital Stock, or on account of any return of capital to such Person's stockholders, partners or members (or the equivalent Person thereof), or any option, warrant or other right to acquire any such dividend or other distribution or payment; and (b) any payment of management fees, transaction-based fees, or similar fees to any Person holding Capital Stock in any Loan Party or Subsidiary, or any Affiliate thereof.

"*Revolving Commitment*" shall mean, with respect to each Lender, the commitment of such Lender to make Revolving Loans to the Borrower, and to acquire participations in Letters of Credit and Swingline Loans, in an aggregate principal amount *not to exceed* the amount set forth with respect to such Lender on Schedule I hereto, or, in the case of a Person becoming a Lender after the Effective Date, the amount of the assigned "Revolving Commitment" as provided in the Assignment and Assumption executed by such Person as an assignee, or the joinder executed by such Person, in each case, as such commitment may subsequently be increased or decreased pursuant to the terms hereof.

"*Revolving Commitment Termination Date*" shall mean the *earliest* of: (a) August 14, 2025; (b) the date on which the Revolving Commitments are terminated pursuant to Section 2.8; and (c) the date on which all amounts outstanding under this Agreement have been declared, or have automatically become, due and payable (whether by acceleration or otherwise).

"*Revolving Credit Exposure*" shall mean, with respect to any Lender at any time, the *sum of* the outstanding principal amount of such Lender's Revolving Loans, LC Exposure, and Swingline Exposure at such time.

"*Revolving Loan*" shall mean a loan made by a Lender (other than the Swingline Lender) to the Borrower under its Revolving Commitment, which may either be a Base Rate Loan, a Eurodollar Loan or a LIBO Index RateSOFR Loan.

"*S&P*" shall mean Standard & Poor's, a Standard & Poor's Financial Services LLC business, and any successor thereto.

43

CHAR2\2683123v6

"*Sanctioned Country*" shall mean, at any time, a country, region or territory that is, or whose government is, the subject or target of any Sanctions.

"*Sanctioned Person*" shall mean, at any time: (a) any Person that is the subject or target of any Sanctions; (b) any Person listed in any Sanctions-related list of designated Persons maintained by OFAC, the U.S. Department of State, the United Nations Security Council, the European Union or any European Union member state, or other relevant Sanctions authority; (c) any Person located, organized, operating or resident in a Sanctioned Country; or (d) any Person owned or controlled by any Person referred to in the foregoing <u>clauses (a)</u> through (c).

"*Sanctions*" shall mean economic or financial sanctions or trade embargoes imposed, administered or enforced from time to time by: (a) the U.S. government, including those administered by OFAC or the U.S. Department of State; (b) the United Nations Security Council, the European Union or Her Majesty's Treasury of the United Kingdom; or (c) any other relevant sanctions authority.

"~~*Screen Rate*~~" ~~shall mean the rate specified in clause (i) of the definition of "*Adjusted LIBO Rate*" set forth above.~~

"*SEC*" shall mean the U.S. Securities and Exchange Commission, or any Governmental Authority succeeding to any of its principal functions.

"*Second Amendment Effective Date*" shall mean June 29, 2021.

"*Securities Exchange Act*" shall mean the Securities Exchange Act of 1934 (15 U.S.C. §–78a *et seq*.), as amended and in effect from time to time, and any successor statute(s), together with any rules and regulations promulgated in connection therewith, any rulings or orders issued by any applicable Governmental Authorities (including, without limitation, the SEC) thereunder, or the application or official interpretation of any of the foregoing.

"*Security Agreement*" shall mean that certain security and pledge agreement, dated as of the Effective Date, executed in favor of the Administrative Agent, for the ratable benefit of the holders of the Obligations, by each of the Loan Parties (as amended, restated, amended and restated, supplemented, extended, replaced, and/or otherwise modified in writing from time to time in accordance with the terms hereof and thereof).

"*Sheridan A*" shall mean Sheridan Real Estate Investment A, LLC, a Florida limited liability company.

"*Sheridan B*" shall mean Sheridan Real Estate Investment B, LLC, a Florida limited liability company.

"*Sheridan C*" shall mean Sheridan Real Estate Investment C, LLC, a Florida limited liability company.

"*Small Business Act*" shall mean the Small Business Act of 1953 (15 U.S.C. §–14A et seq.), as amended and in effect from time to time (including, without limitation, as amended by the CARES Act), and any successor statute(s), together with any rules and regulations promulgated in connection therewith, any rulings or orders issued by any applicable Governmental Authorities (including, without limitation, the U.S. Small Business Administration) thereunder, or the application or official interpretation of any of the foregoing.

"*SOFR*" shall mean a rate per annum equal to the secured overnight financing rate as administered by the SOFR Administrator.

"*SOFR Adjustment*" shall mean a percentage equal to 0.11448% (11.448 basis points) per annum.

44

CONFIDENTIAL

"*SOFR Administrator*" shall mean~~, for any date,~~ the FRBNY (or any successor administrator of the secured overnight financing rate ~~published for such day by the FRBNY, as the administrator of the benchmark (or a successor administrator) on the FRBNY's Website)~~.

"*SOFR-Based Rate*" shall mean each of Adjusted Daily SOFR, Daily SOFR, Adjusted Term SOFR for any Interest Period and Term SOFR for any Interest Period.

"*SOFR Borrowing*" shall mean a Borrowing, the Loans in respect of which bear interest at a rate determined by reference to Adjusted Term SOFR for any available Interest Period.

"*SOFR Loan*" shall mean a Loan bearing interest at a rate determined by reference to Adjusted Term SOFR for any available Interest Period.

"*SOFR Reference Rates*" shall mean, collectively, the Daily SOFR Reference Rate and any Term SOFR Reference Rate for an applicable tenor.

"*Solvent*" shall mean, with respect to any Person on a particular date, that, on such date: (a) the fair value of the property of such Person is *greater than* the total amount of liabilities, including subordinated and contingent liabilities, of such Person; (b) the present fair saleable value of the assets of such Person is *not less than* the amount that will be required to pay the probable liability of such Person on its debts and liabilities, including subordinated and contingent liabilities as they become absolute and matured; (c) such Person does *not* intend to, and does *not* believe that it will, incur debts or liabilities beyond such Person's ability to pay as such debts and liabilities mature; (d) such Person is *not* engaged in a business or transaction, and is *not* about to engage in a business or transaction, for which such Person's property would constitute an unreasonably small capital; (e) such Person is able to pay its debts and other liabilities, contingent obligations and other commitments as they mature in the ordinary course of business; and (f) such Person does *not* intend, in any transaction, to hinder, delay or defraud either present or future creditors or any other person to which such Person is or will become, through such transaction, indebted. The amount of contingent liabilities (such as litigation, guaranties and pension plan liabilities) at any time shall be computed as the amount that, in light of all the facts and circumstances existing at the time, represents the amount that could reasonably be expected to become an actual or matured liability.

"*Specified Equity Contribution*" shall have the meaning set forth in Section 8.3.

"*Specified Loan Party*" shall mean each Loan Party that is, at the time on which the relevant Guarantee, or grant of the relevant security interest, under the applicable Loan Documents by such Loan Party becomes effective with respect to a Swap Obligation, a corporation, partnership, proprietorship, organization, trust or other entity that would *not* be an "eligible contract participant" under the Commodity Exchange Act at such time *but for* the effect of Section 10.8.

"*Specified Event of Default*" shall mean an Event of Default pursuant to Section 8.1(a), Section 8.1(d) (*solely* with respect to a failure to observe or perform any covenant or agreement contained in Article VI), Section 8.1(f) or Section 8.1(g).

"*Stoked Entity*" shall mean each of Stoked Seltzer, LLC, a Florida limited liability company, Stoked, LLC, a Delaware limited liability company, Stoked Brands, LLC, a Delaware limited liability company, Cognitive IP Holdings, LLC, a Florida limited liability company, and each direct and indirect Subsidiary of each of the foregoing.

"*Stoked IP*" shall mean each trademark, trademark application, service mark, trade name, copyright, copyright application, patent, patent right, patent application, franchise, license, and other intellectual property right listed on Schedule 5.17(c).

CHAR2\2683123v6

CONFIDENTIAL                                                                                                    VPX-JHO0000000365

"*Subject Property*" shall mean that certain property owned in fee by one (1) or more of the Loan Parties located at 20351 Sheridan Street in Pembroke Pines, Florida that includes an industrial building totaling approximately 249,700 square feet located on approximately 13.7 acres of land.

"*Subsidiary*" shall mean, with respect to any Person (the "*parent*"), as of any date, any corporation, limited liability company, joint venture, association, company, firm, partnership (whether a general partnership, a limited partnership or otherwise), or other Person, the accounts of which would be consolidated with those of the parent in the parent's consolidated financial statements if such financial statements were prepared in accordance with GAAP as of such date, as well as any other corporation, limited liability company, joint venture, association, company, firm, partnership (whether a general partnership, a limited partnership or otherwise), or other Person (a) of which securities (or other ownership interests) representing *more than* fifty percent (50.0%) of the equity, or *more than* fifty percent (50.0%) of the ordinary voting power, or, in the case of a partnership, *more than* fifty percent (50.0%) of the general partnership interests, are, as of such date, owned, controlled or held, or (b) that is, as of such date, otherwise controlled, in each case of the foregoing clauses (a) and (b), by the parent, by one (1) or more subsidiaries of the parent, or by the parent together with one (1) or more subsidiaries of the parent. Unless otherwise indicated, all references to "*Subsidiary*" hereunder shall mean a Subsidiary of the Borrower or a Loan Party, as applicable. Notwithstanding anything to the contrary in the foregoing, each Stoked Entity shall be deemed *not* to be a Subsidiary hereunder.

"*Supported QFC*" shall have the meaning set forth in Section 11.18.

"*Swap Obligation*" shall mean, with respect to any Loan Party, any obligation to pay or perform under any agreement, contract or transaction that constitutes a "swap" within the meaning of Section 1a(47) of the Commodity Exchange Act.

"*Swingline Commitment*" shall mean the commitment of the Swingline Lender to make Swingline Loans in an aggregate principal amount at any time outstanding *not to exceed* Twenty-Five Million Dollars ($25,000,000).

"*Swingline Exposure*" shall mean, with respect to each Lender, the principal amount of the Swingline Loans in which such Lender is legally obligated either to make a Base Rate Loan or to purchase a participation in accordance with Section 2.4, which shall equal such Lender's Pro Rata Share of all outstanding Swingline Loans.

"*Swingline Lender*" shall mean Truist, in its capacity as provider of Swingline Loans, or any successor swingline lender hereunder.

"*Swingline Loan*" shall mean a loan made to the Borrower by the Swingline Lender under the Swingline Commitment.

"*Synthetic Lease*" shall mean a lease transaction under which the parties intend that: (a) the lease will be treated as an "operating lease" by the lessee pursuant to Accounting Standards Codification Sections 840–10 and 840–20, as amended; and (b) the lessee will be entitled to various tax and other benefits ordinarily available to owners (as opposed to lessees) of like property.

"*Synthetic Lease Obligations*" shall mean, with respect to any Person, the *sum of*: (a) all remaining rental obligations of such Person as lessee under Synthetic Leases which are attributable to principal; and, without duplication, (b) all rental and purchase price payment obligations of such Person under such Synthetic Leases assuming such Person exercises the option to purchase the lease property at the end of the lease term.

"*Taxes*" shall mean any and all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees, or charges imposed by any Governmental Authority, including any interest, additions to tax, or penalties applicable thereto.

46

CONFIDENTIAL                                                                                    VPX-JHO0000000366

"*Term Loan A*" shall have the meaning set forth in Section 2.5.

"*Term Loan A Commitment*" shall mean, with respect to each Lender, the obligation of such Lender to make its portion of the Term Loan A hereunder in one (1) advance on the Effective Date, in a principal amount *not to exceed* the amount set forth with respect to such Lender on Schedule I hereto. The aggregate principal amount of all Lenders' Term Loan A Commitments as of the Effective Date is Two-Hundred Thirty-One Million Four-Hundred Thousand Dollars ($231,400,000).

~~"*Term SOFR*" shall mean that certain forward-looking term rate based on SOFR that has been selected or recommended by the Relevant Governmental Body.~~

"*Term Loan Commitments*" shall mean the Term Loan A Commitments and the Incremental Term Loan Commitments.

"*Term Loans*" shall mean the Term Loan A and each Incremental Term Loan, if any.

<u>"*Term SOFR*" shall mean, as of any date of determination, for any calculations with respect to a SOFR Loan and/or a SOFR Borrowing, the rate per annum equal to the Term SOFR Reference Rate for a tenor comparable to the then applicable or selected (as applicable) Interest Period for such SOFR Loan or SOFR Borrowing, determined as of the date (such date, a "*Periodic Term SOFR Determination Date*") that is two (2) U.S. Government Securities Business Days *prior* to the first (1st) day of such Interest Period, as such rate is published by the Term SOFR Administrator on such Periodic Term SOFR Determination Date; provided, that, (a) if, as of 5:00 P.M. on any Periodic Term SOFR Determination Date, (i) the Term SOFR Reference Rate for the applicable tenor has *not* been published by the Term SOFR Administrator, and (ii) a Benchmark Replacement Date with respect to such Term SOFR Reference Rate has *not* occurred, then "*Term SOFR*" shall instead mean the Term SOFR Reference Rate for such applicable tenor as published by the Term SOFR Administrator on the first (1st) preceding U.S. Government Securities Business Day for which such Term SOFR Reference Rate for such applicable tenor was published by the Term SOFR Administrator, so long as such first (1st) preceding U.S. Government Securities Business Day is *not more than* three (3) U.S. Government Securities Business Days prior to such Periodic Term SOFR Determination Date, and (b) if, at any time, Term SOFR (determined in accordance with the foregoing of this definition of "*Term SOFR*", including in accordance with the foregoing clause (a) of this proviso) is *less than* the Floor, then Term SOFR shall be deemed to equal the Floor for all purposes of this Agreement and the other Loan Documents. Any change(s) in Term SOFR for any Interest Period due to any change(s) in the Term SOFR Reference Rate for a comparable tenor shall be effective from, and including, the effective date of any such change(s) in such Term SOFR Reference Rate, without further notice to any Loan Party or Subsidiary, any other party to this Agreement or any other Loan Document, or any other Person.</u>

<u>"*Term SOFR Administrator*" shall mean the CME Group Benchmark Administration Limited (CBA) (or a successor administrator of the applicable Term SOFR Reference Rate selected by the Administrative Agent in its reasonable discretion).</u>

<u>"*Term SOFR Reference Rate*" shall mean the rate per annum determined by the Administrative Agent as the forward-looking term rate based on SOFR for an applicable tenor.</u>

"*Trademarks*" shall have the meaning set forth in the Security Agreement.

"*Truist*" shall mean Truist Bank and its successors.

"*Truist Securities*" shall mean Truist Securities, Inc. (formerly known as SunTrust Robinson Humphrey, Inc.), and its successors.

47

CONFIDENTIAL                                                                 VPX-JHO0000000367

"*Type*", when used in reference to a Loan or Borrowing, refers to whether the rate of interest on such Loan, or on the Loans comprising such Borrowing, is determined by reference to ~~the~~ Adjusted ~~LIBO Rate, the One Month LIBO Rate~~Term SOFR or the Base Rate.

"*U.S. Person*" shall mean any Person that is a "United States person" as defined in Section 7701(a)(30) of the Code.

"*U.S. Special Resolution Regime*" shall have the meaning set forth in <u>Section 11.18</u>.

"*U.S. Tax Compliance Certificate*" shall have the meaning set forth in <u>Section 2.20(g)</u>.

"*UK Financial Institution*" means any BRRD Undertaking (as such term is defined under the PRA Rulebook (as amended from time to time) promulgated by the United Kingdom Prudential Regulation Authority) or any person falling within IFPRU 11.6 of the FCA Handbook (as amended from time to time) promulgated by the United Kingdom Financial Conduct Authority, which includes certain credit institutions and investment firms, and certain affiliates of such credit institutions or investment firms.

"*UK Resolution Authority*" means the Bank of England or any other public administrative authority having responsibility for the resolution of any UK Financial Institution.

"*Unadjusted Benchmark Replacement*" shall mean the Benchmark Replacement without giving effect to the Benchmark Replacement Adjustment.

"*Unfunded Pension Liability*" of any Plan shall mean the amount, if any, by which the value of the accumulated plan benefits under the Plan, determined on a plan termination basis in accordance with actuarial assumptions as of such time that are consistent with those prescribed by the PBGC for purposes of Section 4044 of ERISA, in *excess* of the fair market value of all Plan assets allocable to such liabilities under Title IV of ERISA (but excluding any accrued but unpaid contributions).

"*Uniform Commercial Code*" or "*UCC*" shall have the meaning assigned to such term in the Security Agreement.

"*United States*" or "*U.S.*" shall mean the United States of America.

"*Voting Stock*" shall mean, with respect to any Person, any Capital Stock issued by such Person the holders of which are ordinarily, in the absence of contingencies, entitled to vote for the election of directors (or persons performing similar functions) of such Person, even though the right so to vote has been suspended by the happening of such a contingency.

"*Waterfall*" shall have the meaning set forth in Section 8.2.

"*Weighted Average Life*" shall mean, when applied to any Indebtedness as of any date, the number of years obtained by *dividing*: (a) the *sum of* the products obtained by *multiplying* (i) the amount of each then-remaining installment, sinking fund, serial maturity or other required payments of principal, including payment at final maturity, in respect thereof, *by* (ii) the number of years (calculated to the nearest one-twelfth (1/12)) that will elapse between such date and the making of such payment; *by* (b) the then-outstanding principal amount of such Indebtedness.

"*Wholly-Owned Subsidiary*" means, as of any date of determination, any Person, one-hundred percent (100.0%) of whose Capital Stock (other than director-qualifying shares, as required by applicable Law) is, as of such date, owned by one (1) or more Loan Parties, directly or indirectly through other Persons one-hundred percent (100.0%) of whose Capital Stock (other than director-qualifying shares, as required by applicable Law) is, as of such date, owned, directly or indirectly, by one (1) or more Loan Parties.

48

CONFIDENTIAL                                                                                           VPX-JHO0000000368

"*Withdrawal Liability*" shall mean liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of Title IV of ERISA.

"*Withholding Agent*" shall mean any Loan Party and/or the Administrative Agent, as applicable.

"*Write-Down and Conversion Powers*" shall mean: (a) with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule; and (b) with respect to the United Kingdom, any powers of the applicable Resolution Authority under the Bail-In Legislation to cancel, reduce, modify or change the form of a liability of any UK Financial Institution, or any contract or instrument under which that liability arises, to convert all or part of that liability into shares, securities or obligations of that Person or any other Person, to provide that any such contract or instrument is to have effect as if a right had been exercised under it, or to suspend any obligation in respect of that liability, or any of the powers under that Bail-In legislation that are related or ancillary to any of those powers.

Section 1.2    Classifications of Loans and Borrowings. For purposes of this Agreement and the other Loan Documents, Loans may be classified and referred to by Class (*e.g.*, a "Revolving Loan", the "Term Loan A", or an "Incremental Term Loan"), by Type (*e.g.*, a "~~Eurodollar~~SOFR Loan", ~~a "LIBO Index Rate Loan"~~ or a "Base Rate Loan"), or by Class and Type (*e.g.*, "Revolving ~~Eurodollar~~SOFR Loan"). Borrowings also may be classified and referred to by Class (*e.g.*, "Revolving Borrowing"), by Type (*e.g.*, "~~Eurodollar~~SOFR Borrowing"), or by Class and Type (*e.g.*, "Revolving ~~Eurodollar~~SOFR Borrowing").

Section 1.3    Accounting Terms and Determination.

(a)    Unless otherwise defined or specified herein, all accounting terms used herein shall be interpreted, all accounting determinations hereunder shall be made, and all financial statements required to be delivered hereunder shall be prepared, in accordance with GAAP as in effect from time to time, applied on a basis consistent with the most recent audited combined financial statement of the Loan Parties delivered pursuant to Section 5.1(a) (or, if, at any time, no such financial statements have been delivered pursuant to Section 5.1(a), then on a basis consistent with the Audited Financial Statements); provided, that, if the Borrower notifies the Administrative Agent that the Borrower wishes to amend any covenant in Article VI to eliminate the effect of any change in GAAP on the operation of such covenant (or, if the Administrative Agent notifies the Borrower that the Required Lenders wish to amend Article VI for such purpose), then the Loan Parties' compliance with such covenant shall be determined on the basis of GAAP as in effect on the date immediately prior to the date on which the relevant change in GAAP became effective, until either such notice is withdrawn or such covenant is amended in a manner satisfactory to the Borrower and the Required Lenders.

(b)    Notwithstanding any other provision contained herein: (i) all terms of an accounting or financial nature used herein shall be construed, and all computations of amounts and ratios referred to herein shall be made, without giving effect to any election under Accounting Standards Codification Section 825–10 (or any other Financial Accounting Standard having a similar result or effect) to value any Indebtedness or other liabilities of any Loan Party or Subsidiary at "fair value", as defined therein; and (ii) all liability amounts shall be determined *excluding* any liability relating to any operating lease, all asset amounts shall be determined *excluding* any right-of-use assets relating to any operating lease, all amortization amounts shall be determined *excluding* any amortization of a right-of-use asset relating to any operating lease, and all interest amounts shall be determined *excluding* any deemed interest comprising a portion of fixed rent payable under any operating lease, in each case of the foregoing, to the extent that such liability, asset, amortization or interest, as the case may be, pertains to an operating lease under which the covenantor, or a member of its consolidated or combined group, is the lessee and would *not* have been accounted for as such under GAAP as in effect on December 31, 2015.

49

CONFIDENTIAL                                                                                                                    VPX-JHO0000000369

(c)     Notwithstanding anything to the contrary in the foregoing, the parties hereto acknowledge and agree that all calculations of the financial covenants in Article VI (including for purposes of determining the Applicable Margin and any transaction that, by the terms of this Agreement, requires that any financial covenant contained in Article VI be calculated on a Pro Forma Basis) shall be made on a Pro Forma Basis with respect to any Asset Sale (including, without limitation, any Permitted HNB Receivables Asset Sale), Recovery Event and/or Acquisition occurring during such period.

Section 1.4     Terms Generally. The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "*include*", "*includes*" and "*including*" shall be deemed to be followed by the phrase ", *without limitation*,". The word "*will*" shall be construed to have the same meaning and effect as the word "*shall*". In the computation of periods of time from a specified date to a later specified date, the word "*from*" means "*from, and including*," and the word "*to*" means "*to, but excluding*,". Unless the context requires otherwise:

(a)     any definition of, or reference to, any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as it was originally executed, or as it may from time to time be amended, restated, amended and restated, supplemented, increased, extended, refinanced, renewed, replaced, and/or otherwise modified in writing, as applicable (subject to any restrictions on such amendments, restatements, amendments and restatements, supplements, increases, extensions, refinancings, renewals, replacements, and/or other written modifications as set forth herein);

(b)     any reference herein to any Person shall be construed to include such Person's successors and permitted assigns;

(c)     the words "*hereof*", "*herein*" and "*hereunder*", and words of similar import, shall be construed to refer to this Agreement as a whole, and not to any particular provision hereof;

(d)     all references herein to Articles, Sections, Exhibits and/or Schedules shall be construed to refer to Articles, Sections, Exhibits and/or Schedules, as applicable, to this Agreement;

(e)     all references contained in a Section to clauses or definitions occurring "above" or "below" shall refer to the applicable clause of, or definition set forth in, such Section, and all general references contained in a Section or clause thereof to "the above" or "the below" shall refer collectively to all provisions of such Section or clause, as applicable, occurring prior to or after, as applicable, the occurrence of such general reference;

(f)     all references herein to sums denominated in dollars, or with the symbol "$", refer to the lawful currency of the United States, unless such reference specifically identifies another currency;

(g)     all references herein to a specific time of day shall be construed to refer to such time in the city and state of the Administrative Agent's principal office as set forth in Section 11.1, unless otherwise indicated;

(h)     any reference herein to a merger, transfer, consolidation, amalgamation, consolidation, assignment, sale, disposition or transfer, or similar term shall be deemed to apply to a division of or by a limited liability company, or an allocation of assets to a series of a limited liability company (or the unwinding of such a division or allocation), as if it were a merger, transfer, consolidation, amalgamation, consolidation, assignment, sale, disposition or transfer, or similar term, as applicable, to, of, or with a separate Person. Any division of a limited liability company shall constitute a separate Person hereunder (and each division of any limited liability company that is a Subsidiary, joint venture, or any other like term shall also constitute such a Person); and

(i)     any definition of, or reference to, any Law shall include all statutory and regulatory provisions consolidating, amending, or interpreting any such Law, and any reference to, or definition of, any Law or

50

CHAR2\2683123v6

regulation, unless otherwise specified, shall refer to such Law or regulation as amended, modified, and/or supplemented from time to time.

Section 1.5    Letter of Credit Amounts. Unless otherwise specified herein, the amount of a Letter of Credit at any time shall be deemed to be the stated amount of such Letter of Credit in effect at such time; provided, that, with respect to any Letter of Credit that, by its terms or the terms of any Issuer Document related thereto, provides for one (1) or more automatic increases in the stated amount thereof, the amount of such Letter of Credit shall be deemed to be the maximum stated amount of such Letter of Credit after giving effect to all such increases, whether or not such maximum stated amount is in effect at such time.

Section 1.6    Interest Rate Disclosure. The Administrative Agent does *not* warrant or accept responsibility for, and shall *not* have any liability whatsoever with respect to: (a) the continuation, administration, submission and/or calculation of, or any other matter related to, any of the Base Rate, any SOFR Reference Rate and/or any SOFR-Based Rate (for any Interest Period, as applicable), or any component definition used or referred to in, or any rate(s) used or referred to in, the definitions of any of the foregoing in Section 1.1, or for any alternative, successor or replacement rate thereto (including, without limitation, any Benchmark Replacement), including whether the composition and/or characteristics of any such actual or proposed alternative, successor or replacement rate (including, without limitation, any Benchmark Replacement) is or will be similar to, or produces or will produce the same or substantially equivalent value or economic equivalence of, or has or will have the same or a comparable volume or liquidity as, any of the Base Rate, any SOFR Reference Rate, any SOFR-Based Rate (for any Interest Period, as applicable) and/or any other Benchmark prior to its discontinuance or unavailability; or (b) the effect, implementation and/or composition of any Conforming Changes. The Administrative Agent, together with its affiliates and other related entities, may engage in transactions that affect the calculation of any of the Base Rate, any SOFR Reference Rate, any SOFR-Based Rate (for any Interest Period, as applicable), any alternative, successor or replacement rate of any of the foregoing (including, without limitation, any Benchmark Replacement), and/or any relevant adjustments to any of the foregoing, in any such case of the foregoing, in a manner adverse to the Borrower and the other Loan Parties. The Administrative Agent may select information sources or services in its reasonable discretion to ascertain any of the Base Rate, any SOFR Reference Rate, any SOFR-Based Rate (for any Interest Period, as applicable), and/or any other Benchmark, in each case of the foregoing, pursuant to the terms of this Agreement, and the Administrative Agent shall have no liability whatsoever to the Borrower, any other Loan Party, any Subsidiary, any Lender and/or any other Person for damages of any kind, including direct or indirect, special, punitive, incidental and/or consequential damages, costs, losses and/or expenses (whether in tort, contract or otherwise and whether at law or in equity), for any error or calculation of any such rate (or any component thereof) provided by any such information source or service.

## ARTICLE II

## AMOUNT AND TERMS OF THE COMMITMENTS

Section 2.1    General Description of Facilities. Subject to and upon the terms and conditions herein set forth: (a) the Lenders hereby establish in favor of the Borrower a revolving credit facility, pursuant to which each Lender severally agrees (to the extent of such Lender's Revolving Commitment) to make Revolving Loans to the Borrower in Dollars in accordance with Section 2.2; (b) the Issuing Bank may issue Letters of Credit denominated in Dollars in accordance with Section 2.22; (c) the Swingline Lender may make Swingline Loans to the Borrower in Dollars in accordance with Section 2.4; (d) each Lender agrees to purchase a participation interest in the Letters of Credit and the Swingline Loans pursuant to the terms and conditions hereof, provided, that, in no event shall the aggregate principal amount of all outstanding Revolving Loans, Swingline Loans, and outstanding LC Exposure *exceed* the Aggregate Revolving Commitment Amount in effect from time to time; and (e) each Lender severally agrees to advance its portion of the Term Loan A to the Borrower in Dollars on the Effective Date in a principal amount *not to exceed* such Lender's Term Loan A Commitment.

51

CHAR2\2683123v6

Section 2.2    Revolving Loans. Subject to the terms and conditions set forth herein, each Lender severally agrees to make Revolving Loans, ratably in proportion to its Pro Rata Share of the Aggregate Revolving Commitments, to the Borrower in Dollars, from time to time during the Availability Period, in an aggregate principal amount outstanding at any time that will not result in: (a) such Lender's Revolving Credit Exposure *exceeding* such Lender's Revolving Commitment; or (b) the Aggregate Revolving Credit Exposure *exceeding* the Aggregate Revolving Commitment Amount. During the Availability Period, the Borrower shall be entitled to borrow, prepay and reborrow Revolving Loans in accordance with the terms and conditions of this Agreement; provided, that, the Borrower may *not* borrow or reborrow should there exist a Default or Event of Default.

Section 2.3    Procedure for Revolving Borrowings. The Borrower shall give the Administrative Agent written notice (or telephonic notice promptly confirmed in writing) of each Revolving Borrowing substantially in the form of Exhibit 2.3 (a "*Notice of Revolving Borrowing*") (i) prior to 11:00 A.M. *at least* one (1) Business Day prior to the requested date of each Base Rate Borrowing, and (ii) prior to 11:00 A.M. on the requested date of each LIBO Index Rate Borrowing, and (iii) prior to 11:00 A.M. *at least* three (3) Business Days prior to the requested date of each EurodollarSOFR Borrowing; provided, that, notwithstanding anything to the contrary in the foregoing, the Notice of Borrowing with respect to the Borrowing on the Effective Date may be delivered on or prior to 11:00 A.M. on the date that is one (1) Business Day prior to the Effective Date, in the case of a Base Rate Borrowing or a LIBO Index Rate Borrowing. Each Notice of Revolving Borrowing shall be irrevocable and shall specify: (a) the aggregate principal amount of such Borrowing; (b) the date of such Borrowing (which shall be a Business Day); (c) the Type of such Revolving Loan comprising such Borrowing; and (d) in the case of a EurodollarSOFR Borrowing, the duration of the initial Interest Period applicable thereto (subject to the provisions of the definition of Interest Period). Each Revolving Borrowing shall consist entirely of Base Rate Loans, LIBO Index Rate Loans or Eurodollar or SOFR Loans (or a combination thereof), as the Borrower may request. The aggregate principal amount of each EurodollarSOFR Borrowing shall *not* be *less than* One Million Dollars ($1,000,000) or a larger multiple of Five-Hundred Thousand Dollars ($500,000) in excess thereof, and the aggregate principal amount of each Base Rate Borrowing and each LIBO Index Rate Borrowing shall *not* be *less than* One Million Dollars ($1,000,000) or a larger multiple of Five-Hundred Thousand Dollars ($500,000) in excess thereof; provided, that, Base Rate Loans made pursuant to Section 2.4 or Section 2.22(d) may be made in lesser amounts as provided therein. Notwithstanding anything to the contrary herein or in any other Loan Document, the total number of EurodollarSOFR Borrowings outstanding at any time shall *not exceed* six (6). Promptly following the receipt of a Notice of Revolving Borrowing in accordance herewith, the Administrative Agent shall advise each Lender of the details thereof and the amount of such Lender's Revolving Loan to be made as part of the requested Revolving Borrowing.

Section 2.4    Swingline Commitment.

(a)    Subject to the terms and conditions set forth herein, the Swingline Lender may, in its sole discretion, make Swingline Loans to the Borrower in Dollars, from time to time during the Availability Period, in an aggregate principal amount outstanding at any time *not to exceed* the *lesser of* (i) the Swingline Commitment then in effect, and (ii) the *difference* between the Aggregate Revolving Commitment Amount and the Aggregate Revolving Credit Exposure; provided, that, the Swingline Lender shall *not* be required to make a Swingline Loan to refinance an outstanding Swingline Loan. The Borrower shall be entitled to borrow, repay, and reborrow Swingline Loans in accordance with the terms and conditions of this Agreement.

(b)    The Borrower shall give the Administrative Agent written notice (or telephonic notice promptly confirmed in writing) of each Swingline Borrowing, substantially in the form of Exhibit 2.4 attached hereto (a "*Notice of Swingline Borrowing*"), prior to 1:00 P.M. on the requested date of each Swingline Borrowing. Each Notice of Swingline Borrowing shall be irrevocable and shall specify: (i) the principal amount of such Swingline Loan; (ii) the date of such Swingline Loan (which shall be a Business Day); and (iii) the account of the Borrower to which the proceeds of such Swingline Loan should be credited. The Administrative Agent will promptly advise the Swingline Lender of each Notice of Swingline Borrowing. The aggregate principal amount

52

of each Swingline Loan shall *not* be *less than* One Million Dollars ($1,000,000) or a larger multiple of Five-Hundred Thousand Dollars ($500,000) in excess thereof, or such other minimum amounts agreed to by the Swingline Lender and the Borrower. The Swingline Lender will make the proceeds of each Swingline Loan available to the Borrower in Dollars in immediately available funds at the account specified by the Borrower in the applicable Notice of Swingline Borrowing *not later than* 2:00 P.M. on the requested date of such Swingline Loan.

(c)     The Swingline Lender, at any time and from time to time in its sole discretion, may, on behalf of the Borrower (which hereby irrevocably authorizes and directs the Swingline Lender to act on its behalf), give a Notice of Revolving Borrowing to the Administrative Agent requesting that the Lenders (including the Swingline Lender) make Base Rate Loans in an amount equal to the unpaid principal amount of any Swingline Loan. Each Lender will make the proceeds of its Base Rate Loan included in such Borrowing available to the Administrative Agent for the account of the Swingline Lender in accordance with Section 2.6, and such proceeds will be used *solely* for the repayment of such Swingline Loan.

(d)     If, for any reason, a Base Rate Borrowing may *not* be (as determined in the sole discretion of the Administrative Agent), or is *not*, made in accordance with the foregoing provisions, then each Lender (other than the Swingline Lender) shall purchase an undivided participating interest in such Swingline Loan in an amount equal to its Pro Rata Share thereof on the date that such Base Rate Borrowing should have occurred. On the date of such required purchase, each Lender shall promptly transfer, in immediately available funds, the amount of its participating interest to the Administrative Agent for the account of the Swingline Lender.

(e)     Each Lender's obligation to make a Base Rate Loan pursuant to clause (c) above, or to purchase the participating interests pursuant to clause (d) above, shall be absolute and unconditional and shall not be affected by any circumstance, including, without limitation: (i) any set-off, counterclaim, recoupment, defense or other right that such Lender or any other Person may have or claim against the Swingline Lender, the Borrower, or any other Person for any reason whatsoever; (ii) the existence of a Default or an Event of Default or the termination of any Lender's Revolving Commitment; (iii) the existence (or alleged existence) of any event or condition which has had, or could reasonably be expected to have, a Material Adverse Effect; (iv) any breach of this Agreement or any other Loan Document by any Loan Party, the Administrative Agent, or any Lender; or (v) any other circumstance, happening or event whatsoever, whether or not similar to any of the foregoing. If such amount is not in fact made available to the Swingline Lender by any Lender, the Swingline Lender shall be entitled to recover such amount on demand from such Lender, together with accrued interest thereon for each day from the date of demand thereof: (A) at the Federal Funds Rate, until the second (2nd) Business Day after such demand; and (B) at the Base Rate at all times thereafter. Until such time as such Lender makes its required payment, the Swingline Lender shall be deemed to continue to have outstanding Swingline Loans in the amount of the unpaid participation for all purposes of the Loan Documents. In addition, such Lender shall be deemed to have assigned any and all payments made of principal and interest on its Loans and any other amounts due to it hereunder, to the Swingline Lender to fund the amount of such Lender's participation interest in such Swingline Loans that such Lender failed to fund pursuant to this Section 2.4, until such amount has been purchased in full.

Section 2.5     Term Loan A Commitment. Subject to the terms and conditions set forth herein, each Lender severally agrees to make its portion of a single term loan (the "*Term Loan A*") to the Borrower in Dollars in one (1) advance on the Effective Date in a principal amount equal to the Term Loan A Commitment of such Lender. The Term Loan A may be outstanding, from time to time, as Base Rate Loans, ~~LIBO Index Rate~~ or SOFR Loans ~~or Eurodollar Loans~~ (or a combination thereof); provided, that, (A) notwithstanding anything to the contrary in the foregoing, the Notice of Borrowing with respect to the Borrowing on the Effective Date may be delivered on or prior to 11:00 A.M. on the date that is one (1) Business Day prior to the Effective Date, in the case of a Base ~~Rate Borrowing or a LIBO Index~~ Rate Borrowing, and (B) on the Effective Date, the Borrowing of the Term Loan A shall consist *solely* of Base Rate Loans, unless the Administrative Agent shall have received a funding indemnity letter, in form and substance reasonably satisfactory to the Administrative Agent. The Borrower shall give the Administrative Agent written notice (or telephonic notice

CHAR2\2683123v6

CONFIDENTIAL                                                                                                 VPX-JHO0000000373

promptly confirmed in writing) of the Borrowing of the Term Loan A on the Effective Date substantially in the form of Exhibit 2.5 (a "*Notice of Term Loan A Borrowing*") (i) prior to 11:00 A.M. on the requested date of such Borrowing, if such Borrowing is requested to be a Base Rate Borrowing, and (ii) prior to 11:00 A.M. *at least* three (3) Business Days prior to the requested date of such Borrowing, if such Borrowing is requested to be a ~~Eurodollar~~SOFR Borrowing. The Notice of Term Loan A Borrowing shall be irrevocable and shall specify: (a) the aggregate principal amount of such Borrowing; (b) the date of such Borrowing (which shall be a Business Day); (c) the Type of Loan comprising such Borrowing; and (d) if such Borrowing is requested to be a ~~Eurodollar~~SOFR Borrowing, the duration of the initial Interest Period applicable thereto (subject to the provisions of the definition of Interest Period). Amounts repaid on the Term Loan A may *not* be reborrowed.

Section 2.6    Funding of Borrowings.

(a)    Each Lender will make available each Loan to be made by it hereunder on the proposed date thereof by wire transfer in immediately available funds by 11:00 A.M. to the Administrative Agent at the Payment Office; provided, that, the Swingline Loans will be made as set forth in Section 2.4. The Administrative Agent will make such Loans available to the Borrower by promptly crediting the amounts that it receives, in like funds by the close of business on such proposed date, to an account maintained by the Borrower with the Administrative Agent, or, at the Administrative Agent's sole discretion and at the Borrower's option, by effecting a wire transfer of such amounts to an account designated by the Borrower to the Administrative Agent that is *not* maintained by the Borrower with the Administrative Agent.

(b)    Unless the Administrative Agent shall have been notified by any Lender, prior to 5:00 P.M. one (1) Business Day prior to the date of a Borrowing in which such Lender is to participate, that such Lender will not make available to the Administrative Agent such Lender's share of such Borrowing, the Administrative Agent may assume that such Lender has made such amount available to the Administrative Agent on such date, and the Administrative Agent, in reliance on such assumption, may make available to the Borrower on such date a corresponding amount. If such corresponding amount is *not* in fact made available to the Administrative Agent by such Lender on the date of such Borrowing, the Administrative Agent shall be entitled to recover such corresponding amount on demand from such Lender, together with interest: (i) at the Federal Funds Rate until the second (2nd) Business Day after such demand; and (ii) thereafter, at the Base Rate. If such Lender does *not* pay such corresponding amount forthwith upon the Administrative Agent's demand therefor, the Administrative Agent shall promptly notify the Borrower, and the Borrower shall immediately pay such corresponding amount to the Administrative Agent together with interest at the rate specified for such Borrowing. Nothing in this clause (b) shall be deemed to relieve any Lender from its obligation to fund its Pro Rata Share of any Borrowing hereunder or to prejudice any rights which the Borrower may have against any Lender as a result of any default by such Lender hereunder.

(c)    All Revolving Borrowings shall be made by the Lenders on the basis of their respective Pro Rata Shares. No Lender shall be responsible for any default by any other Lender in its obligations hereunder, and each Lender shall be obligated to make its Loans provided to be made by it hereunder, regardless of the failure of any other Lender to make its Loans hereunder.

Section 2.7    Interest Elections.

(a)    Each Borrowing initially shall be of the Type specified in the applicable Notice of Borrowing. Thereafter, the Borrower may elect to convert such Borrowing into a different Type or to continue such Borrowing, all as provided in this Section 2.7. The Borrower may elect different options with respect to different portions of the affected Borrowing, in which case, each such portion shall be allocated ratably among the Lenders holding Loans comprising such Borrowing, and the Loans comprising each such portion shall be considered a separate Borrowing.

(b)    To make an election pursuant to this Section 2.7, the Borrower shall give the Administrative Agent prior written notice (or telephonic notice promptly confirmed in writing) of each Borrowing that is to be converted or continued, as the case may be, substantially in the form of Exhibit 2.7 attached hereto (a "*Notice of*

54

_Conversion / Continuation_") (A) prior to 10:00 A.M. _at least_ one (1) Business Day prior to the requested date of a conversion into a Base Rate Borrowing, and (B) prior to 11:00 A.M. _at least_ three (3) Business Days prior to a continuation of, or conversion into, a ~~Eurodollar~~SOFR Borrowing. Each such Notice of Conversion / Continuation shall be irrevocable and shall specify: (i) the Borrowing to which such Notice of Conversion / Continuation applies, and, if different options are being elected with respect to different portions thereof, the portions thereof that are to be allocated to each resulting Borrowing (in which case, the information to be specified pursuant to clauses (b)(iii) and (b)(iv) below shall be specified for each resulting Borrowing); (ii) the effective date of the election made pursuant to such Notice of Conversion / Continuation, which shall be a Business Day; (iii) whether the resulting Borrowing is to be a Base Rate Borrowing or a ~~Eurodollar~~SOFR Borrowing; and (iv) if the resulting Borrowing is to be a ~~Eurodollar~~SOFR Borrowing, the Interest Period applicable thereto after giving effect to such election, which shall be a period contemplated by the definition of "_Interest Period_". If any such Notice of Conversion / Continuation requests a ~~Eurodollar~~SOFR Borrowing but does _not_ specify an Interest Period, the Borrower shall be deemed to have selected an Interest Period of one (1) month. The principal amount of any resulting Borrowing shall satisfy the minimum borrowing amount for ~~Eurodollar~~SOFR Borrowings and Base Rate Borrowings set forth in Section 2.3.

(c)     If, on the expiration of any Interest Period in respect of any ~~Eurodollar~~SOFR Borrowing, the Borrower shall have failed to deliver a Notice of Conversion / Continuation, then, unless such Borrowing is repaid as provided herein, the Borrower shall be deemed to have elected ~~to convert~~(subject to the immediate next sentence) to continue such Borrowing ~~to a Base Rate~~as a SOFR Borrowing for the immediate succeeding one (1) month Interest Period. No Borrowing may be converted into, or continued as, a ~~Eurodollar~~SOFR Borrowing if a Default or an Event of Default exists, unless the Administrative Agent and each of the Lenders shall have otherwise consented in writing. No conversion of any ~~Eurodollar~~SOFR Loan shall be permitted, except on the last day of the Interest Period in respect thereof~~, and no conversion of any LIBO Index Rate Loan shall be permitted, except on the last day of the then-current calendar month~~.

(d)     Upon receipt of any Notice of Conversion / Continuation, the Administrative Agent shall promptly notify each Lender of the details thereof and of such Lender's portion of each resulting Borrowing.

Section 2.8     Optional Reduction and Termination of Commitments.

(a)     Unless previously terminated, all Revolving Commitments, Swingline Commitments, and LC Commitments shall terminate on the Revolving Commitment Termination Date. The Term Loan A Commitments shall terminate on the Effective Date upon the making of the Term Loan A pursuant to Section 2.5.

(b)     Upon _at least_ three (3) Business Days' prior written notice (or telephonic notice promptly confirmed in writing) to the Administrative Agent (which notice shall be irrevocable), the Borrower may reduce the Aggregate Revolving Commitments in part, or terminate the Aggregate Revolving Commitments in whole; provided, that, (i) any partial reduction shall apply to reduce proportionately and permanently the Revolving Commitment of each Lender, (ii) any partial reduction pursuant to this Section 2.8 shall be in an amount of _at least_ One Million Dollars ($1,000,000) and any larger multiple of Five-Hundred Thousand Dollars ($500,000) in _excess_ thereof, and (iii) no such reduction shall be permitted which would reduce the Aggregate Revolving Commitment Amount to an amount that is _less than_ the Aggregate Revolving Credit Exposure. Any such reduction in the Aggregate Revolving Commitments to an Aggregate Revolving Commitment Amount that is _below_ the principal amount of the Swingline Commitment and the LC Commitment shall result in a dollar-for-dollar reduction in the Swingline Commitment and the LC Commitment.

Section 2.9     Repayment of Loans.

(a)     The outstanding principal amount of all Revolving Loans and Swingline Loans shall be due and payable (together with accrued and unpaid interest thereon) on the Revolving Commitment Termination Date.

CHAR2\2683123v6

CONFIDENTIAL                                                                                    VPX-JHO0000000375

(b)    The Borrower unconditionally promises to pay to the Administrative Agent, for the account of each Lender, the then unpaid principal amount of the Term Loan A of such Lender in installments payable on the dates set forth below, with each such installment being in the aggregate principal amount (as such installment may be adjusted as a result of prepayments made pursuant to Section 2.11 and Section 2.12) for all Lenders set forth opposite such date below (and on such other date(s), and in such other amounts, as may be required from time to time pursuant to this Agreement):

| Installment Date | Aggregate Principal Amount |
| --- | --- |
| The last day of each Fiscal Quarter from, and including, the Fiscal Quarter ending December 31, 2020, to, and including, the last Fiscal Quarter ending prior to the Maturity Date | $2,892,500 |
| Maturity Date | All remaining outstanding principal balance of the Term Loan A |

Notwithstanding anything to the contrary in the foregoing, and for purposes of clarity, to the extent not previously paid, the aggregate unpaid principal balance of the Term Loan A shall be due and payable on the Maturity Date.

(c)    Each Incremental Term Loan shall be repayable as provided in the applicable Incremental Facility Amendment establishing such Incremental Term Loan. Amounts repaid on any Incremental Term Loan may not be reborrowed.

Section 2.10    Evidence of Indebtedness.

(a)    Each Lender shall maintain, in accordance with its usual and customary practice, appropriate records evidencing the Indebtedness of the Borrower to such Lender resulting from each Loan made by such Lender from time to time, including the amounts of principal and interest payable thereon and paid to such Lender from time to time under this Agreement. The Administrative Agent shall maintain appropriate records in which shall be recorded: (i) the Revolving Commitment and Term Loan Commitments of each Lender; (ii) the amount of each Loan made hereunder by each Lender, the Class and Type thereof, and, in the case of each EurodollarSOFR Loan, the Interest Period applicable thereto; (iii) the date of any continuation of any Loan pursuant to Section 2.7; (iv) the date of any conversion of all, or a portion, of any Loan to another Type pursuant to Section 2.7; (v) the date and amount of any principal or interest due and payable, or to become due and payable, from the Borrower to each Lender hereunder in respect of the Loans; and (vi) both the date and amount of any sum received by the Administrative Agent hereunder from the Borrower in respect of the Loans and each Lender's Pro Rata Share thereof. The entries made in such records shall be *prima facie* evidence of the existence and amounts of the obligations of the Borrower therein recorded; provided, that, the failure or delay of any Lender or the Administrative Agent in maintaining or making entries into any such record, or any error therein, shall not in any manner affect the obligation of the Borrower to repay the Loans (both principal and unpaid accrued interest) of such Lender in accordance with the terms of this Agreement.

(b)    This Agreement evidences the obligation of the Borrower to repay the Loans and is being executed as a "noteless" credit agreement. However, at the request of any Lender (including the Swingline Lender) at any time, the Borrower agrees that it will prepare, execute and deliver to such Lender a promissory note payable to the order of such Lender (or, if requested by such Lender, to such Lender and its registered assigns) in the form of Exhibit 2.10 (a "*Note*"). Thereafter, the Loans evidenced by such promissory note and interest thereon shall, at all times (including after assignment permitted hereunder), be represented by one (1) or more promissory notes in such form payable to the order of the payee named therein (or, if such promissory note is a registered note, to such payee and its registered assigns).

56

CONFIDENTIAL                                                                 VPX-JHO0000000376

Section 2.11    Optional Prepayments. The Borrower shall have the right, at any time and from time to time, to prepay any Borrowing, in whole or in part, without premium or penalty, by giving irrevocable written notice (or telephonic notice promptly confirmed in writing) to the Administrative Agent *no later than*: (a) in the case of any prepayment of any ~~Eurodollar~~SOFR Borrowing, 11:00 A.M. on a date that is *not less than* three (3) Business Days prior to the date of any such prepayment; (b) in the case of any prepayment of any Base Rate Borrowing, 11:00 A.M. on a date that is *not less than* one (1) Business Day prior to the date of any such prepayment; and (c) in the case of any prepayment of any Swingline Borrowing, 11:00 A.M. on the date of such prepayment. Each such notice shall be irrevocable and shall specify the proposed date of such prepayment and the principal amount of each Borrowing, or portion thereof, to be prepaid. Upon receipt of any such notice, the Administrative Agent shall promptly notify each affected Lender of the contents thereof and of such Lender's Pro Rata Share of any such prepayment. If such notice is given, the aggregate amount specified in such notice shall be due and payable on the date designated in such notice, together with accrued interest to, and including, such date on the amount so prepaid in accordance with Section 2.13(d); provided, that, if a ~~Eurodollar~~SOFR Borrowing is prepaid on a date other than the last day of an Interest Period applicable thereto, the Borrower shall also pay all amounts required pursuant to Section 2.19. Each partial prepayment of any Loan (other than a Swingline Loan) shall be in an amount that would be permitted in the case of an advance of a Revolving Borrowing of the same Type pursuant to Section 2.3, or, in the case of a Swingline Loan, pursuant to Section 2.4. Each prepayment of a Borrowing shall be applied ratably to the Loans comprising such Borrowing, and, in the case of a prepayment of the Term Loan A or any then outstanding Incremental Term Loan, ratably to the principal installments thereof on a *pro rata* basis (including, in each case, the installment thereof due and payable on the applicable Maturity Date).

Section 2.12    Mandatory Prepayments.

(a)    Within: (i) three (3) Business Days of the receipt by any Loan Party or Subsidiary of Net Cash Proceeds of any Asset Sale or Recovery Event (other than any Permitted HNB Receivables Asset Sale), the Borrower shall prepay the Obligations in accordance with clause (e) below in an amount equal to such Net Cash Proceeds, provided, that, so long as no Event of Default shall have occurred and be continuing, such Net Cash Proceeds shall *not* be required to be applied (A) until the aggregate amount of the Net Cash Proceeds from all such Asset Sales and Recovery Events, taken together, in any Fiscal Year is in *excess* of Ten Million Dollars ($10,000,000), or (B) at the election of the Borrower (as notified by the Borrower to the Administrative Agent on, or prior to, the date of such Asset Sale or Recovery Event), to the extent that such Net Cash Proceeds are reinvested in assets (but excluding Current Assets) within (I) one-hundred eighty (180) days after the receipt of such Net Cash Proceeds, with respect to all Collateral that is *not* owned Real Estate, or (II) twelve (12) calendar months after the receipt of such Net Cash Proceeds, with respect to all Collateral that is owned Real Estate, provided, that, if such Net Cash Proceeds shall *not* have been so reinvested, such prepayment shall be due immediately upon the expiration of the applicable period; and (ii) one (1) Business Day of the receipt by any Loan Party or Subsidiary of Net Cash Proceeds of any Permitted HNB Receivables Asset Sale, the Borrower shall, with respect to the initial Fifty Million Dollars ($50,000,000) of such Net Cash Proceeds in the aggregate received by any Loan Party or Subsidiary, prepay the Obligations in accordance with clause (e) below in an amount equal to such Net Cash Proceeds.

(b)    Within one (1) Business Days of the receipt by any Loan Party or Subsidiary of Net Cash Proceeds of any issuance of Indebtedness (other than Indebtedness permitted under Section 7.1), the Borrower shall prepay the Obligations in accordance with clause (e) below in an amount equal to such Net Cash Proceeds.

(c)    Within three (3) Business Days of the receipt by any Loan Party or Subsidiary of Net Cash Proceeds from the issuance of any Capital Stock (other than Capital Stock issued by a Subsidiary of a Loan Party to such Loan Party, or to another such Subsidiary that is a Loan Party) in an amount that is in *excess* of twenty percent (20.0%) of the total issued and outstanding Capital Stock of the Loan Parties and Subsidiaries as of the Effective Date, the Borrower shall prepay the Obligations in accordance with clause (e) below in an amount equal to the portion of such Net Cash Proceeds that are attributable to such excess issuance.

57

CONFIDENTIAL                                                                                      VPX-JHO0000000377

(d)      Within one (1) Business Day of the receipt by any Loan Party or Subsidiary of a Specified Equity Contribution, the Borrower shall prepay the Term Loans in accordance with clause (e) below in an amount that is equal to the amount of such Specified Equity Contribution.

(e)      Any prepayments made by the Borrower pursuant to clauses (a) through (d) above shall be applied as follows: (i) *first*, to the Administrative Agent's fees and reimbursable expenses then due and payable pursuant to any of the Loan Documents; (ii) *second*, to all reimbursable expenses of the Lenders, and all fees and reimbursable expenses of the Issuing Bank, then due and payable pursuant to any of the Loan Documents, *pro rata* to the Lenders and the Issuing Bank based on their respective Pro Rata Shares of such fees and expenses; (iii) *third*, to interest and fees then due and payable hereunder, *pro rata* to the Lenders, based on their respective Pro Rata Shares of such interest and fees; (iv) *fourth*, ratably to the principal balances of the Term Loan A and any then-outstanding Incremental Term Loans (including, with respect to each Term Loan, the principal installment thereof due and payable on the applicable Maturity Date) in *inverse* order of maturity until the same shall have been paid in full, *pro rata* to the Lenders based on their respective Pro Rata Shares thereof, and applied to the remaining principal installments thereof (including, with respect to each Term Loan, the principal installment thereof due and payable on the applicable Maturity Date) on a *pro rata* basis; (v) *fifth*, to the principal balance of the Swingline Loans, until the same shall have been paid in full, to the Swingline Lender; (vi) *sixth*, to the principal balance of the Revolving Loans, until the same shall have been paid in full, *pro rata* to the Lenders based on their respective Revolving Commitments; and (vii) *seventh*, to Cash Collateralize the Letters of Credit in an amount in cash equal to the LC Exposure as of such date, *plus* any accrued and unpaid fees thereon. The Revolving Commitments of the Lenders shall *not* be permanently reduced by the amount of any prepayments made pursuant to the *fifth* through *seventh* clauses above, unless a Default or an Event of Default has occurred and is continuing and the Required Lenders so request.

(f)      If, at any time, the Aggregate Revolving Credit Exposure *exceeds* the Aggregate Revolving Commitment Amount, as reduced pursuant to Section 2.8 or otherwise, the Borrower shall, within one (1) Business Day of the occurrence of such excess, repay the Swingline Loans and the Revolving Loans in an amount equal to such excess, together with all accrued and unpaid interest on such excess amount and any amounts due under Section 2.19. Each prepayment shall be applied as follows: (i) *first*, to the Swingline Loans to the full extent thereof; (ii) *second*, to the Base Rate Loans to the full extent thereof; and (iii) *third*, to the ~~LIBO Index Rate Loans and Eurodollar~~SOFR Loans to the full extent thereof. If, after giving effect to prepayment of all Swingline Loans and Revolving Loans, the Aggregate Revolving Credit Exposure *exceeds* the Aggregate Revolving Commitment Amount, the Borrower shall Cash Collateralize its reimbursement obligations with respect to all Letters of Credit in an amount equal to such excess, *plus* any accrued and unpaid fees thereon.

Section 2.13      Interest on Loans.

(a)      The Borrower shall pay interest on: (i) each Base Rate Loan at the Base Rate, *plus* the Applicable Margin in effect from time to time; and (ii) each ~~LIBOR Index Rate Loan at the One Month LIBO Rate, *plus* the Applicable Margin in effect from time to time; and (iii) each Eurodollar Loan at the Adjusted LIBO Rate~~SOFR Loan at Adjusted Term SOFR for the applicable Interest Period in effect for such Loan, *plus* the Applicable Margin in effect from time to time.

(b)      The Borrower shall pay interest on each Swingline Loan at the Base Rate, *plus* the Applicable Margin in effect from time to time.

(c)      The Borrower shall pay interest on each Incremental Term Loan as provided in the applicable Incremental Facility Amendment establishing such Incremental Term Loan.

(d)      Notwithstanding anything to the contrary in the foregoing of this Section 2.13, if an Event of Default has occurred and is continuing, at the option of the Required Lenders, or automatically in the case of a Specified Event of Default, the Borrower shall pay interest ("*Default Interest*") with respect to all ~~Eurodollar~~SOFR Loans at the rate per annum equal to two percent (2.0%) above the otherwise applicable

58

CHAR2\2683123v6

interest rate for such ~~Eurodollar~~SOFR Loans for the then-current Interest Period until the last day of such Interest Period, and thereafter, the rate per annum equal to all Base Rate ~~Loans, LIBOR Index~~ Rate Loans and all other Obligations hereunder (other than Loans), at the rate per annum equal to two percent (2.0%) above the otherwise applicable interest rate for Base Rate Loans ~~or LIBOR Index Rate Loans, as the case may be~~.

(e)    Interest on the principal amount of all Loans shall accrue from, and including, the date such Loans are made to, but *excluding*, the date of any repayment thereof. Interest on all outstanding Base Rate Loans~~, LIBOR Index Rate Loans~~ and Swingline Loans shall be payable ~~quarterly~~monthly in arrears on the last day of each ~~March, June, September, and December~~calendar month (except for the calendar month ending August 31, 2022) and on the Revolving Commitment Termination Date or the applicable Maturity Date, as the case may be. Interest on all outstanding ~~Eurodollar~~SOFR Loans shall be payable on the last day of each Interest Period applicable thereto~~, and, in the case of any Eurodollar Loans having an Interest Period in excess of three (3) months, on each day which occurs every three (3) months after the initial date of such Interest Period~~ (commencing with the first (1st) Interest Period applicable thereto ending after August 31, 2022), and on the Revolving Commitment Termination Date or the applicable Maturity Date, as the case may be. Interest on any Loan which is converted into a Loan of another Type, or which is repaid or prepaid, shall be payable on the date of such conversion or on the date of any such repayment or prepayment (on the amount repaid or prepaid) thereof. All Default Interest shall be payable on demand.

(f)    The Administrative Agent shall determine each interest rate applicable to the Loans hereunder and shall promptly notify the Borrower and the Lenders of such rate in writing (or by telephone, promptly confirmed in writing). Any such determination shall be conclusive and binding for all purposes, absent manifest error.

(g)    In connection with the use and/or administration of SOFR, any SOFR Reference Rate and/or any SOFR-Based Rate, the Administrative Agent shall have the right to make Conforming Changes from time to time and, notwithstanding anything to the contrary in this Agreement or in any other Loan Document, any amendment(s) implementing any such Conforming Changes shall become effective without any further action(s) and/or consent(s) of any other party to this Agreement or any other Loan Document or of any other Person. The Administrative Agent shall promptly notify the Borrower and the Lenders of the effectiveness of any Conforming Changes implemented in connection with the use and/or administration of SOFR, any SOFR Reference Rate and/or any SOFR-Based Rate.

Section 2.14    Fees.

(a)    The Borrower shall pay to the Administrative Agent for its own account fees in the amounts and at the times previously agreed upon in writing by the Borrower and the Administrative Agent.

(b)    The Borrower agrees to pay to the Administrative Agent, for the account of each Lender, a commitment fee (the "*Commitment Fee*"), which shall accrue at the Applicable Margin per annum on the average daily amount of the unused Revolving Commitment of such Lender during the Availability Period. For purposes of computing the Commitment Fee, the Revolving Commitment of each Lender shall be deemed used to the extent of the outstanding Revolving Loans and LC Exposure, but *not* Swingline Exposure, of such Lender.

(c)    The Borrower agrees to pay: (i) to the Administrative Agent, for the account of each Lender, a letter of credit fee with respect to its participation in each issued Letter of Credit (the "*Letter of Credit Fee*"), which shall accrue at a rate per annum equal to the Applicable Margin for ~~Eurodollar~~SOFR Loans then in effect on the average daily amount of such Lender's LC Exposure attributable to such Letter of Credit during the period from, and including, the date of issuance of such Letter of Credit to, but *excluding*, the date on which such Letter of Credit expires or is drawn in full (provided, that, such Letter of Credit Fee shall continue to accrue on any LC Exposure that remains outstanding after the Revolving Commitment Termination Date); and (ii) to the Issuing Bank, for its own account, a fronting fee, which shall accrue at the rate of one-eighth of one percent (0.125%) per annum, on the average daily amount of the LC Exposure (excluding any portion thereof

59

CHAR2\2683123v6

attributable to unreimbursed LC Disbursements) during the Availability Period (or until the date that such Letter of Credit is irrevocably cancelled, whichever is later), as well as the Issuing Bank's standard fees with respect to issuance, amendment, renewal and/or extension of any Letter of Credit or processing of drawings thereunder. Notwithstanding anything to the contrary in the foregoing, if the Default Interest has been applied in accordance with Section 2.13(c), the rate per annum used to calculate the letter of credit fee pursuant to clause (c)(i) above shall automatically be increased by two percent (2.0%).

(d)      The Borrower shall pay on the Effective Date to the Administrative Agent and/or its Affiliates, as applicable, all fees in the Fee Letter (including, for the avoidance of doubt, any upfront fees payable to any Lender) that are due and payable on the Effective Date. The Borrower shall pay on the Effective Date to the Lenders all upfront fees previously agreed in writing.

(e)      Accrued fees under clauses (b) and (c) above shall be payable ~~quarterly~~monthly in arrears on the last day of each ~~March, June, September, and December~~calendar month (except for the calendar month ending August 31, 2022), commencing on the first (1st) such date to occur after the Effective Date and on the Revolving Commitment Termination Date (and, if later, on the date that the Loans and LC Exposure shall be repaid in their entirety); provided, that, any such fees accruing after the Revolving Commitment Termination Date shall be payable on demand.

(f)      Anything herein to the contrary notwithstanding, during such period as a Lender is a Defaulting Lender, such Defaulting Lender will not be entitled to Commitment Fees during such period pursuant to clause (b) above or Letter of Credit Fees accruing during such period pursuant to clause (c) above  (without prejudice to the rights of the Lenders other than Defaulting Lenders in respect of such fees), provided, that: (i) to the extent that a portion of the LC Exposure of such Defaulting Lender is reallocated to the Non-Defaulting Lenders pursuant to Section 2.26, such fees that would have accrued for the benefit of such Defaulting Lender will instead accrue for the benefit of, and be payable to, such Non-Defaulting Lenders, pro rata in accordance with their respective Revolving Commitments; and (ii) to the extent any portion of such LC Exposure cannot be so reallocated, such fees will instead accrue for the benefit of, and be payable to, the Issuing Bank. The pro rata payment provisions of Section 2.21 shall automatically be deemed adjusted to reflect the provisions of this clause (f).

Section 2.15      Computation of Interest and Fees.

All computations of interest and fees hereunder shall be computed on the basis of a year of three hundred sixty (360) days and paid for the actual number of days elapsed (including the first (1st) day, but excluding the last day). Each determination by the Administrative Agent of an interest rate or fee hereunder shall be made in good faith and, except for manifest error, shall be final, conclusive, and binding for all purposes.

Section 2.16      Inability to Determine Interest Rates; Benchmark Replacement Setting.

~~(a) If, prior to the commencement of any Interest Period for any Eurodollar Borrowing, or prior to any LIBO Index Rate Borrowing:~~

(a)      Inability to Determine SOFR. Subject to clauses (b) through (f) below, if, at any time (prior to the commencement of any affected Interest Period) for any SOFR Borrowing:

(i)      the Administrative Agent shall have determined (which determination shall be conclusive and binding ~~upon the Borrower) that, by reason of circumstances affecting the relevant interbank market, adequate and reasonable means do~~ *not* ~~exist for ascertaining the Adjusted LIBO Rate or the LIBO Index Rate (including, without limitation, because the Screen Rate is not available or published  on a current basis) for such Interest Period (in the case of a Eurodollar Borrowing); provided, that, no Benchmark Transition Event or Early Opt-In Election shall have occurred at such time or with respect to such Interest Period (in the case of a Eurodollar Borrowing); or~~absent manifest

60

CONFIDENTIAL

error) that any SOFR-Based Rate (for any affected Interest Period) cannot be determined pursuant to the applicable definition thereof in Section 1.1; or

(ii)    the Administrative Agent shall have received notice from the Required Lenders that the Adjusted LIBO any SOFR-Based Rate (for such any affected Interest Period or the One Month LIBO Rate, as the case may be,) will *not* adequately and fairly reflect the cost to such Lender(s) of making, funding and/or maintaining their (or its, as the case may be) Eurodollar Loans or LIBO Index Rate Loans, as the case may be, for such SOFR Loans (for any affected Interest Period);

then, the Administrative Agent shall give written notice (or telephonic notice, promptly confirmed in writing) thereof to the Borrower and to the Lenders as soon as practicable thereafter. Until Upon notice thereof by the Administrative Agent shall notify to the Borrower and the Lenders that the circumstances giving rise to such notice no longer exist: (A) the obligations, any obligation of the Lenders to make Eurodollar Loans and/or LIBO Index Rate Loans, or to continue or convert outstanding Loans as or into Eurodollar Loans and/or LIBO Index Rate Loans, shall be suspended; and (B) all such SOFR Loans, and any right of the Borrower to continue SOFR Loans (for any affected Interest Period) and/or to convert Base Rate Loans to SOFR Loans, shall be suspended (to the extent of the affected SOFR Loans and/or the affected Interest Periods) until the Administrative Agent shall have revoked such notice. Upon receipt of such notice: (A) the Borrower may revoke any pending request for a Borrowing of, conversion to, and/or continuation of any SOFR Loans (to the extent of the affected SOFR Loans and/or the affected Interest Periods), or, failing that, the Borrower will be deemed to have converted any such request into a request for a Borrowing of or a conversion to (as applicable) Base Rate Loans in the amount specified therein; and (B) any outstanding affected SOFR Loans shall be will be deemed to have been converted into Base Rate Loans on (at the last day end of the then current applicable Interest Period applicable thereto (in the case of Eurodollar Loans) or the last day of the then current calendar month (in the case of LIBO Index Rate Loans), unless the Borrower prepays such Loans in accordance with this Agreement. Unless the Borrower notifies the Administrative Agent, *at least* one (1) Business Day before the date of any Eurodollar Borrowing or LIBO Index Rate Borrowing for which a Notice of Revolving Borrowing or Notice of Conversion / Continuation has previously been given, that it elects not to borrow, continue as, or convert to a Eurodollar Borrowing or LIBO Index Rate Borrowing, as the case may be, on such date, then such Revolving Borrowing shall be made as, continued as, or converted into a Base Rate Borrowing.). Upon any such conversion, the Borrower shall also pay accrued interest on the amount so converted, together with any additional amounts required pursuant to Section 2.19. Subject to clauses (b) through (f) below, if the Administrative Agent determines (which determination shall be conclusive and binding absent manifest error) that Adjusted Daily SOFR cannot be determined pursuant to the applicable definition thereof in Section 1.1 on any given day, then applicable interest rate for Base Rate Loans shall be determined by the Administrative Agent without reference to clause (c) of the definition of "*Base Rate*" in Section 1.1, until the Administrative Agent shall have revoked such determination; provided, that, notwithstanding anything to the contrary in this Agreement or in any other Loan Document, at any time that the applicable interest rate for Base Rate Loans is determined without reference to clause (c) of the definition of "*Base Rate*" in Section 1.1 by operation of this clause (a), then the "*Floor*", for purposes of calculating such applicable interest rate, shall be increased by one percent (1.00%) per annum.

(b)    Benchmark Replacement.

(i)    (b) Notwithstanding anything to the contrary herein or in any other Loan Document, upon the occurrence of if a Benchmark Transition Event or an Early Opt-in Election, as applicable, the Administrative Agent and the Borrower may amend this Agreement to replace the Screen Rate with a Benchmark Replacement. Any such amendment with respect to a Benchmark Transition Event will become effective at, together with its related Benchmark Replacement Date, have occurred *prior* to any setting of the then-current Benchmark, then: (i) if a Benchmark Replacement is determined in accordance with clause (a) of the definition of "*Benchmark Replacement*" in Section 1.1 for such Benchmark Replacement Date, such Benchmark Replacement will replace such Benchmark for all purposes of this Agreement and each other Loan Document in respect of such Benchmark setting and

61

CONFIDENTIAL

any subsequent Benchmark settings, without any amendment to, or further action or consent of any other party to, this Agreement or any other Loan Document; and (ii) if a Benchmark Replacement is determined in accordance with clause (b) of the definition of "*Benchmark Replacement*" in Section 1.1 for such Benchmark Replacement Date, such Benchmark Replacement will replace such Benchmark for all purposes of this Agreement and each other Loan Document in respect of any Benchmark setting at or after 5:00 P.M. on the date that is five (5) Business Days after the date on which ~~the Administrative Agent shall have posted such proposed amendment to all Lenders and the Borrower~~notice of such Benchmark Replacement is first provided to the Lenders, without any amendment to, or further action or consent of any other party to, this Agreement or any other Loan Document, so long as the Administrative Agent ~~has~~shall *not* ~~have~~ received, by ~~such time~~the date that is five (5) Business Days after the date on which notice of such Benchmark Replacement is first provided to the Lenders, written notice of objection to such ~~amendment~~Benchmark Replacement from Lenders comprising the Required Lenders ~~of each Class. Any such amendment with respect to an Early Opt-in Election will become effective on the date that Lenders comprising the Required Lenders of each Class have delivered to the Administrative Agent written notice that such Required Lenders accept such amendment. No replacement of the Screen Rate with a Benchmark Replacement pursuant to this clause (b) shall occur prior to the applicable Benchmark Transition Start Date.~~at such time.

(ii)    Notwithstanding anything to the contrary herein or in any other Loan Document, no Master Agreement and/or any other agreement evidencing Swap Obligations shall be deemed to be a "*Loan Document*" for purposes of this Section 2.16.

(c)    Benchmark Replacement Conforming Changes. In connection with the use, administration, adoption and/or implementation of a Benchmark Replacement, the Administrative Agent will have the right to make ~~Benchmark Replacement~~ Conforming Changes from time to time, and, notwithstanding anything to the contrary herein or in any other Loan Document, any amendments implementing such ~~Benchmark Replacement~~ Conforming Changes will become effective without any further ~~action or consent of any~~action(s) and/or consent(s) of any Loan Party, any other party to this Agreement~~or any other Loan Document and/or any other Person.

(d)    Notices; Standards for Decisions and Determinations. The Administrative Agent will promptly notify the Borrower and the Lenders of: (i) ~~any occurrence of a Benchmark Transition Event or an Early Opt-in Election, as applicable, and its related Benchmark Replacement Date and Benchmark Transition Start Date; (ii)~~ the implementation of any Benchmark Replacement; and (~~iii~~ii) the effectiveness of any Conforming Changes implemented in connection with the use, administration, adoption and/or implementation of a Benchmark Replacement ~~Confirming Changes~~. The Administrative Agent will notify the Borrower of: (A) the removal or reinstatement of any tenor of a Benchmark pursuant to clause (e) below; and (~~iv~~B) the commencement ~~or conclusion~~ of any Benchmark Unavailability Period. Any determination, decision, or election that may be made by the Administrative Agent or, if applicable, any Lender (or group of Lenders) pursuant to this Section 2.16, including ~~any~~, without limitation, any determination with respect to a tenor, rate or adjustment, or of the occurrence or non-occurrence of an event, circumstance, or date, and any decision to take, or refrain from taking, any action or any selection, will be conclusive and binding absent manifest error, and may be made in its or their, as applicable, sole discretion, and, in any event, without consent from any Loan Party, any other party ~~hereto~~to this Agreement or any other Loan Document or any other Person, except, in each case, as expressly required pursuant to this Section 2.16.

(e)    Unavailability of Tenor of Benchmark. Notwithstanding anything to the contrary in this Agreement or any other Loan Document, at any time (including in connection with the implementation of a Benchmark Replacement): (i) if the then-current Benchmark is a term rate (including the Term SOFR Reference Rate for any applicable tenor) and either (A) any tenor for such Benchmark is *not* displayed on a screen or other information service that publishes such rate from time to time as selected by the Administrative Agent in its reasonable discretion, or (B) the regulatory supervisor for the administrator of such Benchmark has provided a public statement or publication of information announcing that any tenor for such Benchmark is *not* or will *not*

62

be representative, then, in any such case of the foregoing clauses (e)(i)(A) or (e)(i)(B), the Administrative Agent may modify the definition of "*Interest Period*" in Section 1.1 (or any similar or analogous definition) for any Benchmark settings at or after such time in order to remove such unavailable or non-representative tenor; and (ii) if a tenor that was removed pursuant to the foregoing clause (e)(i) either (A) is subsequently displayed on a screen or information service for a Benchmark (including, without limitation, a Benchmark Replacement), or (B) is *not*, or is no longer, subject to an announcement that it is *not* or will *not* be representative for a Benchmark (including, without limitation, a Benchmark Replacement), then, in any such case of the foregoing clauses (e)(ii)(A) or (e)(ii)(B), the Administrative Agent may modify the definition of "*Interest Period*" in Section 1.1 (or any similar or analogous definition) for all Benchmark settings at or after such time in order to reinstate such previously removed tenor.

(f)    (e)  Benchmark Unavailability Period. Upon the Borrower's receipt of notice of the commencement of a Benchmark Unavailability Period, the Borrower may revoke any pending request for a ~~Eurodollar Borrowing or LIBO Index Rate~~SOFR Borrowing of, a conversion to, or a continuation of ~~Eurodollar Loans or LIBO Index Rate~~SOFR Loans to be made, converted, or continued, as the case may be, during any Benchmark Unavailability Period, and, failing that, the Borrower will be deemed to have converted any such request into a request for a Borrowing of, or a conversion to, Base Rate Loans. During ~~any~~a Benchmark Unavailability Period, ~~the components of~~ or at any time that a tenor for the then-current Benchmark is *not* an Available Tenor, ~~the component of the~~ Base Rate that is based upon the ~~Adjusted LIBO Rate and the LIBO Index Rate~~then-current Benchmark or such tenor for such Benchmark, as applicable, shall *not* be used in any determination of the Base Rate for purposes of this Agreement or the other Loan Documents.

Section 2.17    Illegality. If any Change in Law shall make it unlawful or impossible for any Lender to perform any of its obligations hereunder, or to make, maintain or fund any ~~Eurodollar Loan or LIBO Index Rate Loan~~SOFR Loan or to determine or charge interest rates based upon SOFR, any SOFR Reference Rate and/or any SOFR-Based Rate (for any Interest Period, as applicable), and, in any such case, such Lender shall so notify the Administrative Agent, then the Administrative Agent shall promptly give notice thereof to the Borrower and the other Lenders, whereupon, until such Lender notifies the Administrative Agent and the Borrower that the circumstances giving rise to such suspension no longer exist~~:~~: (a) the obligation of such Lender to ~~make Eurodollar Loans or LIBO Index Rate~~fund or maintain Loans, or to continue or convert outstanding Loans as or into ~~Eurodollar Loans or LIBO Index Rate~~SOFR Loans, shall be suspended. ~~In;~~ and (b) the Base Rate shall, if necessary to avoid such illegality, be determined by the Administrative Agent without reference to the component thereof described in clause (c) thereof. Thereafter, in the case of the making of a ~~Eurodollar Borrowing or a LIBO Index Rate~~SOFR Borrowing, such Lender's Revolving Loan shall be made as a Base Rate Loan as part of the same Revolving Borrowing, and, ~~with respect to Eurodollar Loans,~~ for the same Interest Period.~~;~~ and, if the affected ~~Eurodollar~~SOFR Loan ~~or LIBO Index Rate Loan~~ is then outstanding, such Loan shall be converted to a Base Rate Loan either: (i**A**) on the last day of the then current Interest Period applicable to such ~~Eurodollar Loan or, in the case of any such LIBO Index Rate Loan, on the last day of the then-current calendar month,~~affected SOFR Loan, if such Lender may lawfully continue to maintain such affected SOFR Loan to such date~~:~~, or (ii**B**) immediately, if such Lender shall determine that it may *not* lawfully continue to maintain such ~~Eurodollar Loan or LIBO Index Rate~~affected SOFR Loan to such date (and, in each instance, the Base Rate shall, if necessary to avoid such illegality, be determined by the Administrative Agent without reference to the component thereof described in clause (c) thereof). Notwithstanding anything to the contrary in the foregoing, the affected Lender shall, prior to giving such notice to the Administrative Agent, use reasonable efforts to designate a different Applicable Lending Office if such designation would avoid the need for giving such notice, and if such designation would *not* otherwise be disadvantageous to such Lender in the good faith exercise of its discretion. Upon any such prepayment or conversion in accordance with this Section 2.17, the Borrower shall also pay accrued interest on the amount so prepaid or converted, together with any additional amounts required pursuant to Section 2.19.

Section 2.18    Increased Costs.

63

CONFIDENTIAL

(a)     If any Change in Law shall:

    (i)     impose, modify or deem applicable any reserve, (including pursuant to regulations issued from time to time by the Federal Reserve Board for determining the maximum reserve requirement (including any emergency, special, supplemental and/or other marginal reserve requirement)) with respect to any special deposit, compulsory loan, insurance charge and/or similar requirement that is not otherwise included in the determination of the Adjusted LIBO Rate or the One Month LIBO Rate hereunder against assets of, deposits with or for the account of, or credit extended or participated in by, any Lender (except any such reserve requirement reflected in the Adjusted LIBO Rate or the One Month LIBO Rate) or the Issuing Bank;

    (ii)     subject any Recipient to any Taxes (other than (A) Indemnified Taxes, and/or (B) Taxes described in clauses (b) through (d) of the definition of "*Excluded Taxes*" in Section 1.01, and/or (C) Connection Income Taxes); or

    (iii)     impose on any Lender, the Issuing Bank, or the eurodollarsecured overnight financing or any other applicable interbank lending market any other condition, cost or expense (other than Taxes) affecting this Agreement or any Eurodollar Loans or LIBO Index Rate Loans made by such Lender, or any LetterLetters of Credit or any participationparticipation(s) therein;

and the result of any of the foregoing is to increase the cost to such Lender of making, converting into, continuing or maintaining a Eurodollar Loan or LIBO Index Rate Loan, or to increase the cost to such Lender or the Issuing Bank of participating in or issuing any Letter of Credit, or to reduce the amount received or receivable by such Lender or the Issuing Bank hereunder (whether of principal, interest or any other amount), then, from time to time, such Lender or the Issuing Bank may provide the Borrower (with a copy thereof to the Administrative Agent) with written notice and demand with respect to such increased costs or reduced amounts, and, within five (5) Business Days after receipt of such notice and demand, the Borrower shall pay to the Administrative Agent, for the account of such Lender or the Issuing Bank, as applicable, such additional amounts as will compensate such Lender or the Issuing Bank for any such increased costs incurred or reduction suffered.

    (b)     If any Lender or the Issuing Bank shall have determined that any Change in Law regarding capital or liquidity ratios or requirements has, or would have, the effect of reducing the rate of return on such Lender's or the Issuing Bank's capital (or on the capital of the Parent Company of such Lender or the Issuing Bank) as a consequence of its obligations hereunder, or under, or in respect of, any Letter of Credit, to a level *below* that which such Lender, the Issuing Bank, or such Parent Company could have achieved *but for* such Change in Law (taking into consideration such Lender's or the Issuing Bank's policies or the policies of such Parent Company with respect to capital adequacy and liquidity), then, from time to time, such Lender or the Issuing Bank may provide the Borrower (with a copy thereof to the Administrative Agent) with written notice and demand with respect to such reduced amounts, and, within five (5) Business Days after receipt of such notice and demand, the Borrower shall pay to the Administrative Agent, for the account of such Lender or the Issuing Bank, as applicable, such additional amounts as will compensate such Lender, the Issuing Bank, or such Parent Company for any such reduction suffered.

    (c)     A certificate of such Lender or the Issuing Bank, as applicable, setting forth the amount(s) necessary to compensate such Lender, the Issuing Bank, or such Parent Company, as applicable, specified in clauses (a) or (b) above shall be delivered to the Borrower (with a copy to the Administrative Agent) and shall be conclusive, absent manifest error.

    (d)     Failure or delay on the part of any Lender or the Issuing Bank to demand compensation pursuant to this Section 2.18 shall *not* constitute a waiver of such Lender's or the Issuing Bank's right to demand such compensation; provided, that, the Borrower shall *not* be required to compensate a Lender or the Issuing Bank pursuant to this Section 2.18 for any increased costs incurred, or reductions suffered, *more than* six (6) calendar months prior to the date that such Lender or the Issuing Bank, as the case may be, delivers to

64

CONFIDENTIAL                                                                      VPX-JHO0000000384

the Borrower the certificate referenced in the foregoing clause (c) and notifies the Borrower of such Lender's or the Issuing Bank's, as the case may be, intention to claim compensation therefor (provided, that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the six (6) month period referred to in the foregoing shall be extended to include the period of retroactive effect thereof).

Section 2.19    Funding Indemnity. In the event of (a) the payment of any principal of a ~~Eurodollar~~SOFR Loan~~,~~ other than on the last day of the Interest Period applicable thereto (including, without limitation, as a result of an Event of Default), (b) the conversion or continuation of a ~~Eurodollar~~SOFR Loan~~,~~ other than on the last day of the Interest Period applicable thereto, or (c) the failure by the Borrower to borrow, prepay, convert or continue any ~~Eurodollar~~SOFR Loan on the date specified in any applicable notice (regardless of whether such notice is withdrawn or revoked), then, in any such event, the Borrower shall compensate each Lender, promptly and, in any event, within five (5) Business Days after written demand therefor from such Lender, for any loss, cost or expense attributable to such event. In the case of a ~~Eurodollar~~SOFR Loan, such loss, cost or expense shall be deemed to include an amount determined by such Lender to be the *excess*, if any, of: (i) the amount of interest that would have accrued on the principal amount of such ~~Eurodollar~~SOFR Loan if such event had *not* occurred, at ~~the Adjusted LIBO Rate applicable to such Eurodollar Loan for the period from the date of such event to the last day of the~~Adjusted Term SOFR for the then current Interest Period ~~therefor~~for such SOFR Loan (or, in the case of a failure to borrow, convert or continue, for the ~~period that would have been the~~requested Interest Period for ~~such Eurodollar Loan)~~the applicable SOFR Borrowing) for the period from, and including, the date of such event to, and including, the last day of such Interest Period; over (ii) the amount of interest that would accrue on the principal amount of such ~~Eurodollar~~SOFR Loan for the same period, if ~~the~~Adjusted ~~LIBO Rate~~Term SOFR for such Interest Period were set on the date on which such ~~Eurodollar~~SOFR Loan was prepaid or converted, or the date on which the Borrower failed to borrow, convert, or continue such ~~Eurodollar~~SOFR Loan~~, as the case may be~~. A certificate as to any additional amount payable under this Section 2.19 submitted to the Borrower by any Lender (with a copy to the Administrative Agent) shall be conclusive, absent manifest error.

Section 2.20    Taxes.

(a)    Defined Terms. For purposes of this Section 2.20: (i) the term "*Lender*" includes any Issuing Bank; and (ii) in any event, the phrase "*applicable Law*" includes FATCA.

(b)    Payments Free of Taxes. Any and all payments by or on account of any obligation of any Loan Party under any Loan Document shall be made without deduction or withholding for any Taxes, except as required by applicable Law. If any applicable Law (as determined in the good faith discretion of an applicable Withholding Agent) requires the deduction or withholding of any Tax from any such payment by a Withholding Agent, then the applicable Withholding Agent shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable Law, and, if such Tax is an Indemnified Tax, then the *sum* payable by the applicable Loan Party shall be *increased* as necessary so that, after such deduction or withholding has been made (including, without limitation, such deductions and withholdings applicable to additional sums payable under this Section 2.20), the applicable Recipient shall receive an amount equal to the sum it would have received had no such deduction or withholding been made.

(c)    Payment of Other Taxes by the Loan Parties. In addition, the Loan Parties shall timely pay to the relevant Governmental Authority in accordance with applicable Law, or at the option of the Administrative Agent timely reimburse it for the payment of, any Other Taxes.

(d)    Indemnification by the Loan Parties. The Loan Parties shall, jointly and severally, indemnify each Recipient, within ten (10) Business Days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section 2.20) payable or paid by such Recipient or required to be withheld or deducted from a payment to such Recipient and any reasonable expenses arising therefrom or with respect thereto, whether or not such

65

CONFIDENTIAL

Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to the Borrower by a Lender (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of a Lender, shall be conclusive and binding absent manifest error.

(e)    Indemnification by the Lenders. Each Lender shall severally indemnify the Administrative Agent, within ten (10) days after demand therefor, for: (i) any Indemnified Taxes attributable to such Lender (but only to the extent the Loan Parties have not already indemnified the Administrative Agent for such Indemnified Taxes, and without limiting the obligation of the Loan Parties to do so); (ii) any Taxes attributable to such Lender's failure to comply with the provisions of Section 11.4(e) relating to the maintenance of a Participant Register; and (iii) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by the Administrative Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive and binding absent manifest error. Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under any Loan Document, or otherwise payable by the Administrative Agent to such Lender from any other source, against any amount due to the Administrative Agent under this clause (e).

(f)    Evidence of Payments. As soon as practicable after any payment of Taxes by any Loan Party to a Governmental Authority pursuant to this Section 2.20, such Loan Party shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(g)    Status of Lenders.

(i)    Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Loan Document shall deliver to the Borrower and the Administrative Agent, at the time or times reasonably requested by the Borrower or the Administrative Agent, such properly completed and executed documentation reasonably requested by the Borrower or the Administrative Agent as will permit such payments to be made without withholding or at a reduced rate of withholding. In addition, any Lender, if reasonably requested by the Borrower or the Administrative Agent, shall deliver such other documentation prescribed by applicable Law or reasonably requested by the Borrower or the Administrative Agent as will enable the Borrower or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements. Notwithstanding anything to the contrary in the preceding two (2) sentences, the completion, execution and submission of such documentation (other than such documentation set forth in clauses (g)(ii)(A), (g)(ii)(B) and (g)(ii)(D) below) shall *not* be required if, in the Lender's reasonable judgment, such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense, or would materially prejudice the legal or commercial position of such Lender.

(ii)    Without limiting the generality of the foregoing, in the event that the Borrower is a U.S. Person:

(A)    any Lender that is a U.S. Person shall deliver to the Borrower and the Administrative Agent on, or prior to, the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed originals of IRS Form W–9 certifying that such Lender is exempt from U.S. federal backup withholding tax;

(B)    any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on, or prior to, the date on which such Foreign Lender becomes a Lender under this

66

CONFIDENTIAL                                                                      VPX-JHO0000000386

Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), whichever of the following is applicable:

(I)         in the case of a Foreign Lender claiming the benefits of an income tax treaty to which the United States is a party: (1) with respect to payments of interest under any Loan Document, executed originals of IRS Form W–8BEN or IRS Form W–8BEN–E, as applicable, establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "interest" article of such tax treaty; and (2) with respect to any other applicable payments under any Loan Document, IRS Form W–8BEN or IRS Form W–8BEN–E, as applicable, establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

(II)        executed originals of IRS Form W–8ECI;

(III)       in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code: (1) a certificate substantially in the form of Exhibit 2.20–A to the effect that such Foreign Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of the Borrower within the meaning of Section 881(c)(3)(B) of the Code, or a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code (a "*U.S. Tax Compliance Certificate*"); and (2) executed originals of IRS Form W–8BEN or IRS Form W–8BEN–E, as applicable; or

(IV)       to the extent a Foreign Lender is not the beneficial owner, executed originals of IRS Form W–8IMY, accompanied by IRS Form W–8ECI, IRS Form W–8BEN or IRS Form W–8BEN–E, as applicable, a U.S. Tax Compliance Certificate substantially in the form of Exhibit 2.20–B or Exhibit 2.20–C, IRS Form W–9, and/or other certification documents from each beneficial owner, as applicable; provided, that, if the Foreign Lender is a partnership and one (1) or more direct or indirect partners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide a U.S. Tax Compliance Certificate substantially in the form of Exhibit 2.20–D on behalf of each such direct and indirect partner;

(C)     any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on, or prior to, the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed originals of any other form prescribed by applicable Law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by applicable Law to permit the Borrower or the Administrative Agent to determine the withholding or deduction required to be made; and

(D)     if a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrower and the Administrative Agent, at the time or times prescribed by Law, and at such time or times reasonably requested by the Borrower or the Administrative Agent, such documentation prescribed by applicable Law (including, without limitation, as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent, as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment. Solely for purposes of this clause (g)(ii)(D), "*FATCA*" shall include any amendments made to FATCA after the date of this Agreement.

67

CONFIDENTIAL                                                                    VPX-JHO0000000387

Each Lender agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Borrower and the Administrative Agent in writing of its legal inability to do so.

(h)     Treatment of Certain Refunds. If any party determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified pursuant to this Section 2.20 (including by the payment of additional amounts pursuant to this Section 2.20), it shall pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made under this Section 2.20 with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of such indemnified party and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund). Such indemnifying party, upon the request of such indemnified party, shall repay to such indemnified party the amount paid over pursuant to this clause (h) (*plus* any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event that such indemnified party is required to repay such refund to such Governmental Authority. Notwithstanding anything to the contrary in this clause (h), in no event will the indemnified party be required to pay any amount to an indemnifying party pursuant to this clause (h) the payment of which would place the indemnified party in a less favorable net after-Tax position than the indemnified party would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid. This clause (h) shall not be construed to require any indemnified party to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the indemnifying party or any other Person.

(i)     Survival. Each party's obligations under this Section 2.20 shall survive the resignation or replacement of the Administrative Agent, any assignment of rights by, or the replacement of, a Lender, and the repayment, satisfaction and/or discharge of all Obligations, and the termination of all Commitments, under the Loan Documents.

Section 2.21     Payments Generally; Pro Rata Treatment; Sharing of Set-offs.

(a)     The Borrower shall make each payment required to be made by it hereunder (whether of principal, interest, fees or reimbursement of LC Disbursements, or of amounts payable under Section 2.18, Section 2.19 or Section 2.20, or otherwise) prior to 2:00 P.M. on the date when due, in immediately available funds, free and clear of any defenses, rights of set-off, counterclaim, or withholding or deduction of taxes. Any amounts received after such time on any date may, in the discretion of the Administrative Agent, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon. All such payments shall be made to the Administrative Agent at the Payment Office, except payments to be made directly to the Issuing Bank or the Swingline Lender as expressly provided herein and except that payments pursuant to Section 2.18, Section 2.19, Section 2.20 and Section 11.3 shall be made directly to the Persons entitled thereto. The Administrative Agent shall distribute any such payments received by it for the account of any other Person to the appropriate recipient promptly following receipt thereof. If any payment hereunder shall be due on a day that is not a Business Day, the date for payment shall be extended to the next succeeding Business Day, and, in the case of any payment accruing interest, interest thereon shall be made payable for the period of such extension. All payments hereunder shall be made in Dollars.

(b)     If, at any time, insufficient funds are received by and available to the Administrative Agent to pay fully all amounts of principal, unreimbursed LC Disbursements, interest and fees then due hereunder, such funds shall be applied as follows: (i) *first*, to all fees and reimbursable expenses of the Administrative Agent then due and payable pursuant to any of the Loan Documents; (ii) *second*, to all reimbursable expenses of the Lenders and all fees and reimbursable expenses of the Issuing Bank then due and payable pursuant to any of the Loan Documents, *pro rata* to the Lenders and the Issuing Bank based on their respective *pro rata* shares of such fees and expenses; (iii) *third*, to all interest and fees then due and payable hereunder, *pro rata* to the Lenders based on their respective pro rata shares of such interest and fees; and(iv) *fourth*, to the payment of principal of

68

CONFIDENTIAL                                                                                       VPX-JHO0000000388

all Loans and unreimbursed LC Disbursements then due and payable hereunder, *pro rata* to the parties entitled thereto based on their respective Pro Rata Shares of such principal and unreimbursed LC Disbursements.

(c)    If any Lender shall, by exercising any right of set-off or counterclaim or otherwise, obtain payment in respect of any principal of, or interest on, any of its Loans, or participations in LC Disbursements or Swingline Loans, that would result in such Lender receiving payment of a greater proportion of the aggregate amount of its Revolving Credit Exposure, Term Loans and accrued interest and fees thereon than the proportion received by any other Lender with respect to its Revolving Credit Exposure or Term Loans, then the Lender receiving such greater proportion shall purchase (for cash at face value) participations in the Revolving Credit Exposure and Term Loans of other Lenders to the extent necessary so that the benefit of all such payments shall be shared by the Lenders ratably in accordance with the aggregate amount of principal of and accrued interest on their respective Revolving Credit Exposure and Term Loans; provided, that, (i) if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest, and (ii) the provisions of this <u>clause (c)</u> shall *not* be construed to apply to any payment made by the Borrower pursuant to, and in accordance with, the express terms of this Agreement (including, without limitation, the application of funds arising from the existence of a Defaulting Lender), or any payment obtained by a Lender as consideration for the assignment of, or sale of a participation in, any of its Revolving Credit Exposure and Term Loans to any assignee or participant, other than to the Borrower or any Subsidiary or Affiliate thereof (as to which the provisions of this <u>clause (c)</u> shall apply). The Borrower consents to the foregoing and agrees, to the extent it may effectively do so under applicable Law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against the Borrower rights of set-off and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of the Borrower in the amount of such participation.

(d)    Unless the Administrative Agent shall have received notice from the Borrower prior to the date on which any payment is due to the Administrative Agent for the account of the Lenders or the Issuing Bank hereunder that the Borrower will not make such payment, the Administrative Agent may assume that the Borrower has made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the Lenders or the Issuing Bank, as the case may be, the amount or amounts due. In such event, if the Borrower has not in fact made such payment, then each of the Lenders or the Issuing Bank, as the case may be, severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Lender or Issuing Bank with interest thereon, for each day from, and including, the date such amount is distributed to it to, but excluding, the date of payment to the Administrative Agent, at the greater of the Federal Funds Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.

(e)    Notwithstanding anything herein to the contrary, any amount paid by the Borrower for the account of a Defaulting Lender under this Agreement (whether on account of principal, interest, fees, reimbursement of LC Disbursements, indemnity payments or other amounts) will be retained by the Administrative Agent in a segregated non-interest bearing account until the Revolving Commitment Termination Date at which time, the funds in such account will be applied by the Administrative Agent, to the fullest extent permitted by Law, in the following order of priority: (i) *first* to the payment of any amounts owing by such Defaulting Lender to the Administrative Agent under this Agreement; (ii) *second*, to the payment of any amounts owing by such Defaulting Lender to the Issuing Bank and the Swingline Lender under this Agreement; (iii) *third*, to the payment of all interest due and payable to the Lenders hereunder that are not Defaulting Lenders, ratably among them in accordance with the amounts of such interest then due and payable to them; (iv) *fourth*, to the payment of all fees then due and payable to the Lenders hereunder that are not Defaulting Lenders, ratably among them in accordance with the amounts of such fees then due and payable to them; (v) *fifth*, to pay principal and unreimbursed LC Disbursements then due and payable to the Lenders hereunder that are not Defaulting Lenders, ratably in accordance with the amounts thereof then due and payable to them; (vi) *sixth*, to the ratable payment of all other amounts then due and payable to the Lenders hereunder

69

that are not Defaulting Lenders; and (vii) _seventh_, to pay all amounts owing under this Agreement to such Defaulting Lender, or as a court of competent jurisdiction may otherwise direct.

Section 2.22    Letters of Credit.

(a)      During the Availability Period, the Issuing Bank, in reliance upon the agreements of the other Lenders pursuant to clauses (d) and (e) below, may, in its sole discretion, issue, at the request of the Borrower, Letters of Credit for the account of the Borrower on the terms and conditions hereinafter set forth; provided, that, (i) each Letter of Credit shall expire on the _earlier_ of (A) the date that is one (1) year after the date of issuance of such Letter of Credit (or, in the case of any renewal or extension thereof, the date that is one (1) year after such renewal or extension), and (B) the date that is five (5) Business Days prior to the Revolving Commitment Termination Date; (ii) each Letter of Credit shall be in a stated amount of _at least_ One-Hundred Thousand Dollars ($100,000) (or such lesser amount as the Issuing Bank may agree in its sole discretion); (iii) the Borrower may not request any Letter of Credit if, after giving effect to such issuance, (A) the aggregate LC Exposure would exceed the LC Commitment, or (B) the Aggregate Revolving Credit Exposure would _exceed_ the Aggregate Revolving Commitment Amount; and (iv) the Borrower shall _not_ request, and the Issuing Bank shall have no obligation to issue, any Letter of Credit the proceeds of which would be made available to any Person (A) to fund any activity or business of, or with, any Sanctioned Person, or in any Sanctioned Countries, that, at the time of such finding, is the subject of any Sanctions, or (B) in any manner that would result in a violation of any Sanctions by any party to this Agreement. Each Lender shall be deemed to, and hereby irrevocably and unconditionally agrees to, purchase from the Issuing Bank, without recourse, a participation in each Letter of Credit equal to such Lender's Pro Rata Share of the aggregate amount available to be drawn under such Letter of Credit on the date of issuance with respect to all other Letters of Credit. Each issuance of a Letter of Credit  shall be deemed to utilize the Revolving Commitment of each Lender by an amount equal to the amount of such participation.

(b)      To request the issuance of a Letter of Credit (or any amendment, renewal and/or extension of an outstanding Letter of Credit), the Borrower shall give the Issuing Bank and the Administrative Agent irrevocable written notice (which may be in the form of a duly completed Letter of Credit Application) _at least_ three (3) Business Days prior to the requested date of such issuance, specifying the date (which shall be a Business Day) such Letter of Credit is to be issued (or amended, renewed and/or extended, as the case may be), the expiration date of such Letter of Credit, the amount of such Letter of Credit, the name and address of the beneficiary thereof, and such other information as shall be necessary to prepare, amend, renew or extend such Letter of Credit. In addition to the satisfaction of the conditions in Article III, the issuance of such Letter of Credit (or any amendment which increases the amount of such Letter of Credit) will be subject to the further conditions that such Letter of Credit shall be in such form, and contain such terms, as the Issuing Bank shall approve, and that the Borrower shall have executed and delivered any Issuer Documents as the Issuing Bank shall require; provided, that, in the event of any conflict between such applications, agreements or instruments and this Agreement, the terms of this Agreement shall control.

(c)      _At least_ two (2) Business Days prior to the issuance of any Letter of Credit, the Issuing Bank will confirm with the Administrative Agent (by telephone or in writing) that the Administrative Agent has received such notice, and, if not, the Issuing Bank will provide the Administrative Agent with a copy thereof. Unless the Issuing Bank has received notice from the Administrative Agent, on or before 5:00 P.M. on the Business Day immediately preceding the date the Issuing Bank is to issue the requested Letter of Credit, directing the Issuing Bank not to issue the Letter of Credit because such issuance is not then permitted hereunder because of the limitations set forth in clause (a) above, or that one (1) or more conditions specified in Article III are not then satisfied, then, subject to the terms and conditions hereof, the Issuing Bank shall, on the requested date, issue such Letter of Credit in accordance with the Issuing Bank's usual and customary business practices.

(d)      The Issuing Bank shall examine all documents purporting to represent a demand for payment under a Letter of Credit promptly following its receipt thereof. The Issuing Bank shall notify the Borrower and

70

CONFIDENTIAL                                                                                                    VPX-JHO0000000390

the Administrative Agent of such demand for payment and whether the Issuing Bank has made, or will make, a LC Disbursement thereunder; provided, that, any failure to give, or delay in giving, such notice shall not relieve the Borrower of its obligation to reimburse the Issuing Bank and the Lenders with respect to such LC Disbursement. The Borrower shall be irrevocably and unconditionally obligated to reimburse the Issuing Bank for any LC Disbursements paid by the Issuing Bank in respect of such drawing, without presentment, demand or other formalities of any kind. Unless the Borrower shall have notified the Issuing Bank and the Administrative Agent, prior to 11:00 A.M. on the Business Day immediately prior to the date on which such drawing is honored, that the Borrower intends to reimburse the Issuing Bank for the amount of such drawing in funds other than from the proceeds of Revolving Loans, the Borrower shall be deemed to have timely given a Notice of Revolving Borrowing to the Administrative Agent requesting the Lenders to make a Base Rate Borrowing on the date on which such drawing is honored in an exact amount due to the Issuing Bank; provided, that, for purposes solely of such Borrowing, the conditions precedent set forth in Section 3.2 hereof shall not be applicable. The Administrative Agent shall notify the Lenders of such Borrowing in accordance with Section 2.3, and each Lender shall make the proceeds of its Base Rate Loan included in such Borrowing available to the Administrative Agent for the account of the Issuing Bank in accordance with Section 2.6. The proceeds of such Borrowing shall be applied directly by the Administrative Agent to reimburse the Issuing Bank for such LC Disbursement.

(e)     If, for any reason, a Base Rate Borrowing may not be (as determined in the sole discretion of the Administrative Agent), or is not, made in accordance with the foregoing provisions, then each Lender (other than the Issuing Bank) shall be obligated to fund the participation that such Lender purchased pursuant to clause (a) above in an amount equal to its Pro Rata Share of such LC Disbursement on and as of the date which such Base Rate Borrowing should have occurred. Each Lender's obligation to fund its participation shall be absolute and unconditional and shall not be affected by any circumstance, including, without limitation: (i) any set-off, counterclaim, recoupment, defense or other right that such Lender or any other Person may have against the Issuing Bank or any other Person for any reason whatsoever; (ii) the existence of a Default or an Event of Default or the termination of the Aggregate Revolving Commitments; (iii) any adverse change in the condition (financial or otherwise) of the Borrower or any of its Subsidiaries; (iv) any breach of this Agreement by the Borrower or any other Lender; (v) any amendment, renewal and/or extension of any Letter of Credit; or (vi) any other circumstance, happening or event whatsoever, whether or not similar to any of the foregoing. On the date that such participation is required to be funded, each Lender shall promptly transfer, in immediately available funds, the amount of its participation to the Administrative Agent for the account of the Issuing Bank. Whenever, at any time after the Issuing Bank has received from any such Lender the funds for its participation in a LC Disbursement, the Issuing Bank (or the Administrative Agent on its behalf) receives any payment on account thereof, the Administrative Agent or the Issuing Bank, as the case may be, will distribute to such Lender its Pro Rata Share of such payment; provided, that, if such payment is required to be returned for any reason to the Borrower or to a trustee, receiver, liquidator, custodian or similar official in any bankruptcy proceeding, such Lender will return to the Administrative Agent or the Issuing Bank any portion thereof previously distributed by the Administrative Agent or the Issuing Bank to it.

(f)     To the extent that any Lender shall fail to pay any amount required to be paid pursuant to clauses (d) or (e) above on the due date therefor, such Lender shall pay interest to the Issuing Bank (through the Administrative Agent) on such amount from such due date to the date such payment is made at a rate per annum equal to the Federal Funds Rate; provided, that, if such Lender shall fail to make such payment to the Issuing Bank within three (3) Business Days of such due date, then, retroactively to the due date, such Lender shall be obligated to pay interest on such amount at the rate set forth in Section 2.13(d).

(g)     If any Event of Default shall occur and be continuing, on the Business Day that the Borrower receives notice from the Administrative Agent or the Required Lenders demanding that its reimbursement obligations with respect to the Letters of Credit be Cash Collateralized pursuant to this clause (g), the Borrower shall deposit in an account with the Administrative Agent, in the name of the Administrative Agent and for the benefit of the Issuing Bank and the Lenders, an amount in cash equal to one hundred three percent (103.0%) of the aggregate LC Exposure of all Lenders as of such date, plus any accrued and unpaid fees thereon; provided,

71

CONFIDENTIAL                                                                                    VPX-JHO0000000391

that, such obligation to Cash Collateralize the reimbursement obligations of the Borrower with respect to the Letters of Credit shall become effective immediately, and such deposit shall become immediately due and payable, without demand or notice of any kind, upon the occurrence of any Event of Default with respect to the Borrower described in Section 8.1(f) or Section 8.1(g). Such deposit shall be held by the Administrative Agent as Cash Collateral for the payment and performance of the obligations of the Borrower under this Agreement. The Administrative Agent shall have exclusive dominion and control, including the exclusive right of withdrawal, over such account. The Borrower agrees to execute any documents and/or certificates required by the Administrative Agent to effectuate the intent of this clause (g). Other than any interest earned on the investment of such deposits, which investments shall be made at the option of the Administrative Agent in consultation with the Borrower and at the Borrower's risk and expense, such deposits shall not bear interest. Interest and profits, if any, on such investments shall accumulate in such account. Moneys in such account shall be applied by the Administrative Agent to reimburse the Issuing Bank for LC Disbursements for which it had not been reimbursed, and, to the extent not so applied, shall be held for the satisfaction of the reimbursement obligations of the Borrower for the LC Exposure at such time, or, if the maturity of the Loans has been accelerated, with the consent of the Required Lenders, be applied to satisfy other obligations of the Borrower under this Agreement and the other Loan Documents. If the Borrower is required to Cash Collateralize its reimbursement obligations with respect to the Letters of Credit as a result of the occurrence of an Event of Default, such cash collateral so posted (to the extent not so applied as aforesaid) shall be returned to the Borrower within three (3) Business Days after all Events of Default have been cured or waived.

(h)      Upon the request of any Lender, but no more frequently than quarterly, the Issuing Bank shall deliver (through the Administrative Agent) to each Lender and the Borrower a report describing the aggregate Letters of Credit then outstanding. Upon the request of any Lender from time to time, the Issuing Bank shall deliver to such Lender any other information reasonably requested by such Lender with respect to each Letter of Credit then outstanding.

(i)      The Borrower's obligation to reimburse LC Disbursements hereunder shall be absolute, unconditional and irrevocable and shall be performed strictly in accordance with the terms of this Agreement under all circumstances whatsoever and irrespective of any of the following circumstances:

(i)      any lack of validity or enforceability of any Letter of Credit or this Agreement;

(ii)      the existence of any claim, set-off, defense or other right which any Loan Party or Subsidiary, or Affiliate thereof, may have at any time against a beneficiary or any transferee of any Letter of Credit (or any Persons or entities for whom any such beneficiary or transferee may be acting), any Lender (including the Issuing Bank) or any other Person, whether in connection with this Agreement or the Letter of Credit or any document related hereto or thereto or any unrelated transaction;

(iii)      any draft or other document presented under a Letter of Credit proving to be forged, fraudulent or invalid in any respect or any statement therein being untrue or inaccurate in any respect;

(iv)      payment by the Issuing Bank under a Letter of Credit against presentation of a draft or other document to the Issuing Bank that does not comply with the terms of such Letter of Credit;

(v)      any other event or circumstance whatsoever, whether or not similar to any of the foregoing, that might, but for the provisions of this Section 2.22, constitute a legal or equitable discharge of, or provide a right of set-off against, the Borrower's obligations hereunder; or

(vi)      the existence of a Default or an Event of Default.

Neither the Administrative Agent, the Issuing Bank, any Lender, nor any Related Party of any of the foregoing shall have any liability or responsibility by reason of, or in connection with, the issuance or transfer of any Letter of Credit, or any payment or failure to make any payment thereunder (irrespective of any of the circumstances referred to above), or any error, omission, interruption, loss or delay in transmission or delivery

72

CHAR2\2683123v6

of any draft, notice or other communication under or relating to any Letter of Credit (including any document required to make a drawing thereunder), any error in interpretation of technical terms or any consequence arising from causes beyond the control of the Issuing Bank; provided, that, the foregoing shall not be construed to excuse the Issuing Bank from liability to the Borrower to the extent of any actual direct damages (as opposed to special, indirect (including claims for lost profits or other consequential damages), or punitive damages, claims in respect of which are hereby waived by the Borrower to the extent permitted by applicable Law) suffered by the Borrower that are caused by the Issuing Bank's failure to exercise due care when determining whether drafts or other documents presented under a Letter of Credit comply with the terms thereof. The parties hereto expressly agree that, in the absence of gross negligence or willful misconduct on the part of the Issuing Bank (as finally determined by a court of competent jurisdiction), the Issuing Bank shall be deemed to have exercised due care in each such determination. In furtherance of the foregoing and without limiting the generality thereof, the parties agree that, with respect to documents presented that appear on their face to be in substantial compliance with the terms of a Letter of Credit, the Issuing Bank may, in its sole discretion, either accept and make payment upon such documents without responsibility for further investigation, regardless of any notice or information to the contrary, or refuse to accept and make payment upon such documents if such documents are not in strict compliance with the terms of such Letter of Credit.

(j)     Unless otherwise expressly agreed by the Issuing Bank and the Borrower when a Letter of Credit is issued and subject to applicable Laws: (i) each standby Letter of Credit shall be governed by the "International Standby Practices 1998" (ISP98) (or such later revision as may be published by the Institute of International Banking Law & Practice on any date any Letter of Credit may be issued); (ii) each documentary Letter of Credit shall be governed by the Uniform Customs and Practices for Documentary Credits (2007 Revision), International Chamber of Commerce Publication No. 600 (or such later revision as may be published by the International Chamber of Commerce on any date any Letter of Credit may be issued); and (iii) the Borrower shall specify the foregoing in each Letter of Credit Application submitted for the issuance of a Letter of Credit.

(k)     Any Issuing Bank may resign as an "Issuing Bank" hereunder upon at least thirty (30) days' prior written notice to each of the Administrative Agent, the Lenders, and the Borrower; provided, that, on or prior to the expiration of such thirty (30) day period, the relevant Issuing Bank shall have identified a successor Issuing Bank reasonably acceptable to the Borrower that is willing to accept its appointment as successor Issuing Bank, and the effectiveness of such resignation shall be conditioned upon such successor assuming the rights and duties of the resigning Issuing Bank. In the event of any such resignation as Issuing Bank, the Borrower shall be entitled to appoint, from among the Lenders, a successor Issuing Bank hereunder; provided, that, no failure by the Borrower to appoint any such successor shall affect the resignation of the resigning Issuing Bank, except as expressly provided above. The Borrower may terminate the appointment of any Issuing Bank as an "Issuing Bank" hereunder by providing a written notice thereof to such Issuing Bank, with a copy to the Administrative Agent. Any such termination shall become effective upon the *earlier* of: (i) such Issuing Bank acknowledging receipt of such notice; and (ii) the occurrence of the third (3rd) Business Day following the date of the delivery of such notice; provided, that, no such termination shall become effective until and unless the LC Exposure attributable to Letters of Credit issued by such Issuing Bank (or its Affiliates) shall have been reduced to zero ($0.00). At the time any such resignation or termination shall become effective, the Borrower shall pay all unpaid fees accrued for the account of the resigning or terminated Issuing Bank pursuant to Section 2.14(c). Notwithstanding the effectiveness of any such resignation or termination, the resigning or terminated Issuing Bank shall remain a party hereto and shall continue to have all the rights of an Issuing Bank under this Agreement with respect to Letters of Credit issued by it prior to such resignation or termination, but shall *not* be required to issue any additional Letters of Credit.

(l)     In the event of any conflict between the terms hereof and the terms of any Issuer Document, the terms hereof shall control.

(m)     Notwithstanding that a Letter of Credit issued or outstanding hereunder is in support of any obligations of, or is for the account of, any Loan Party or Subsidiary other than the Borrower, the Borrower

73

CHAR2\2683123v6

shall be obligated to reimburse the Issuing Bank hereunder for any and all drawings under such Letter of Credit. The Borrower hereby acknowledges and agrees that the issuance of any Letters of Credit for the account of any other Loan Party or Subsidiary shall inure to the benefit of the Borrower, and that the Borrower's business derives substantial benefits from the businesses of such Loan Parties and Subsidiaries.

Section 2.23    Increase of Commitments; Additional Lenders.

Subject to the terms and conditions set forth herein, the Borrower shall have the right, from time to time, and upon *at least* ten (10) Business Days' prior written notice to the Administrative Agent (or such shorter period of notice as the Administrative Agent may agree in its sole discretion) (an "*Incremental Request*"), to increase the Aggregate Revolving Commitments, or to increase the borrowings under the Term Loan A and/or incur one (1) or more additional tranche a term loans (each such increase under the Term Loan A or incurrence of an additional tranche a term loan, an "*Incremental Term Loan*"), subject, however, in any such case, to satisfaction of the following conditions precedent:

(a)    the aggregate principal amount of all increases in the Aggregate Revolving Commitments, together with all Incremental Term Loans incurred, pursuant to this Section 2.22, taken together, shall *not exceed* One-Hundred Fifty Million Dollars ($150,000,000);

(b)    on the date on which any Incremental Facility Amendment (as defined below) is to become effective, both immediately prior to, and immediately after giving effect to, the increase in the Aggregate Revolving Commitments or the incurrence of an Incremental Term Loan pursuant to this Section 2.23, as the case may be, and any related transactions, no Default or Event of Default shall exist;

(c)    any increase in the Aggregate Revolving Commitments and any incurrence of an Incremental Term Loan pursuant to this Section 2.23 shall, in each case, be in a minimum amount of Ten Million Dollars ($10,000,000), and in integral multiples of Five Million Dollars ($5,000,000) in excess thereof (or such lesser amounts as agreed by the Administrative Agent in its sole discretion);

(d)    any existing Lender with a Revolving Commitment providing additional, or any new Lender providing new, Revolving Commitments in connection with any increase in the Aggregate Revolving Commitments pursuant to this Section 2.23 shall be reasonably acceptable to each of the Issuing Bank and the Swingline Lender;

(e)    any additional or new Revolving Commitments being provided by any existing Lender with a Revolving Commitment or by any new Lender, as the case may be, in connection with any increase in the Aggregate Revolving Commitments pursuant to this Section 2.23 shall be on the same terms as the existing Revolving Commitments of the existing Lenders in effect at such time (except for fees payable to the existing Lenders or new lenders providing commitments for such increase in the Aggregate Revolving Commitments);

(f)    If any Revolving Loans are outstanding at the time of any increase in the Aggregate Revolving Commitments pursuant to this Section 2.23, the Borrower shall, if applicable, prepay one (1) or more existing Revolving Loans in an amount necessary such that, after giving effect to the increase in the Aggregate Revolving Commitments, each Lender will hold its Pro Rata Share of outstanding Revolving Loans;

(g)    the Administrative Agent shall have received, when taken together with any commitment it may provide in its sole discretion in connection with any increase in the Aggregate Revolving Commitments or the incurrence of any Incremental Term Loan pursuant to this Section 2.23, as the case may be, additional commitments in a corresponding amount of such requested increase in the Aggregate Revolving Commitments or such requested Incremental Term Loan, as the case may be, from one (1) or more financial institutions that are permitted assignees under Section 11.4 and are reasonably acceptable to the Administrative Agent (it being understood and agreed that the Administrative Agent shall *not* be required to provide an additional commitment

74

CONFIDENTIAL                                                                                                       VPX-JHO0000000394

in connection with any increase in the Aggregate Revolving Commitments or the incurrence of any Incremental Term Loan pursuant to this Section 2.23);

(h)      the Administrative Agent shall have received customary closing certificates, legal opinions, and all other documents (including, without limitation, resolutions of the board of directors or managers (or equivalent governing body) of each Loan Party) it may reasonably request relating to the corporate or other necessary authority for any such increase in the Aggregate Revolving Commitments or the establishment of any such Incremental Term Loan pursuant to this Section 2.23, and the validity of any such increase in the Aggregate Revolving Commitment or the establishment of any such Incremental Term Loan pursuant to this Section 2.23, as the case may be, and any other matters relevant thereto, all in form and substance reasonably satisfactory to the Administrative Agent;

(i)      the Administrative Agent shall have received such amendments to the Collateral Documents as the Administrative Agent requests to cause the Collateral Documents to secure the Obligations (in a manner consistent with the terms of the Loan Documents), after giving effect to such increase in the Aggregate Revolving Commitments or the incurrence of such Incremental Term Loan pursuant to this Section 2.23, as the case may be;

(j)      the Administrative Agent shall have received a Pro Forma Compliance Certificate, in form and substance reasonably satisfactory to the Administrative Agent, demonstrating that, after giving effect to such increase in the Aggregate Revolving Commitments or the incurrence of such Incremental Term Loan pursuant to this Section 2.23, as the case may be, and any related transactions, on a Pro Forma Basis, the Loan Parties shall be in compliance with the financial covenants set forth in Article VI for the period consisting of the four (4) Fiscal Quarters most recently ended for which the Borrower has delivered financial statements pursuant to Section 5.1(a) or Section 5.1(b);

(k)      the representations and warranties of each Loan Party set forth in the Loan Documents (including, without limitation, the representations and warranties of each Loan Party set forth in Article IV) shall be true and correct in all material respects (or, if such representation and warranty is qualified by materiality or Material Adverse Effect, it shall be true and correct in all respects) on, and as of, the date on which the applicable Incremental Facility Amendment is to become effective, except to the extent that such representations and warranties specifically relate to an earlier date, in which case, they shall be true and correct in all material respects (or, if such representation and warranty is qualified by materiality or Material Adverse Effect, it shall be true and correct in all respects) as of such earlier date; and

(l)      with respect to the incurrence of an Incremental Term Loan pursuant to this Section 2.23, amortization, pricing and use of proceeds applicable to such Incremental Term Loan shall be as set forth in the applicable Incremental Facility Amendment establishing such Incremental Term Loan, provided, that: (i) any such Incremental Term Loan shall have a final maturity date that is coterminous with, or later than, the *later of* the Maturity Date of the Term Loan A and the Maturity Date of any then-outstanding Incremental Term Loan; (ii) the Weighted Average Life of such Incremental Term Loan shall *not* be *less than* the Weighted Average Life of the Term Loan A, or of any other then outstanding Incremental Term Loan; and (iii) the All-In Yield applicable to such Incremental Term Loan shall *not* be *more than* fifty basis points (0.50%) *higher than* the corresponding All-In Yield applicable to the Term Loan A, or to any then outstanding Incremental Term Loan (it being understood that interest on the Term Loan A and any then outstanding Incremental Term Loan may be increased to the extent necessary to satisfy this requirement).

Notwithstanding anything to the contrary in the foregoing, neither the Administrative Agent nor any Lender, nor any Affiliate thereof (nor any of their respective successors or assigns), shall have any obligation to provide any additional commitments in connection with any increase in the Aggregate Revolving Commitments or to provide any Incremental Term Loan, or any portion thereof, effected pursuant to this Section 2.23, nor shall have any responsibility for arranging any such increase in the Aggregate Revolving Commitments or such

CHAR2\2683123v6

CONFIDENTIAL                                                                                VPX-JHO0000000395

Incremental Term Loan, in any such case, without its prior written consent, and subject to such conditions, including, without limitation, fee arrangements, as it may provide in its sole discretion in connection therewith.

Each increase in the Aggregate Revolving Commitments and the establishment of each Incremental Term Loan pursuant to this Section 2.23 shall, in each case, be evidenced by an amendment (an "*Incremental Facility Amendment*") to this Agreement, giving effect to the modifications permitted by this Section 2.23 (and subject to the limitations set forth in the immediately preceding paragraph), executed by the Loan Parties, the Administrative Agent and each other lender providing any new or additional Revolving Commitments or providing all, or any portion, of the Incremental Term Loan, as the case may be; which such amendment, when so executed, shall amend this Agreement as provided therein. Each Incremental Facility Amendment shall also require such amendments to the other Loan Documents, and such other new Loan Documents, as the Administrative Agent reasonably deems necessary or appropriate to give effect to the modifications and credit extensions permitted by this Section 2.23.

Section 2.24    Mitigation of Obligations. If any Lender requests compensation under Section 2.18, or if the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 2.20, then such Lender shall use reasonable efforts to designate a different lending office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the sole judgment of such Lender, such designation or assignment: (a) would eliminate or reduce amounts payable under Section 2.18 or Section 2.20, as the case may be, in the future; and (b) would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender. The Borrower hereby agrees to pay all costs and expenses incurred by any Lender in connection with such designation or assignment.

Section 2.25    Replacement of Lenders. If (a) any Lender requests compensation under Section 2.18, (b) the Borrower is required to pay any additional amount to any Lender or any Governmental Authority of the account of any Lender pursuant to Section 2.20, (c) any Lender notifies the Borrower and the Administrative Agent that it is unable to fund ~~Eurodollar~~SOFR Loans pursuant to Section 2.16 or Section 2.17, (d) a Lender (a "*Non-Consenting Lender*") does *not* consent to a proposed change, waiver, discharge or termination with respect to any Loan Document that has been approved by the Required Lenders as provided in Section 11.2(b), but which requires the unanimous consent of all Lenders or of all of the Lenders directly affected thereby (as the case may be), or (e) any Lender is a Defaulting Lender, then, the Borrower may, at its sole expense and effort, upon notice to such Lender and the Administrative Agent, require such Lender to assign and delegate, without recourse (in accordance with, and subject to the restrictions set forth in, Section 11.4(b)), all of its interests, rights (other than its existing rights to payments pursuant to Section 2.18 and/or Section 2.20, as applicable), and obligations under this Agreement and the related Loan Documents to an assignee that shall assume such obligations (which assignee may be another Lender) (a "*Replacement Lender*"); provided, that, (i) the Borrower shall have received the prior written consent of the Administrative Agent, which consent shall *not* be unreasonably withheld, (ii) such Lender shall have received payment of an amount equal to the outstanding principal amount of all Loans owed to it, accrued interest thereon, accrued fees and all other amounts payable to it hereunder, from the assignee (in the case of such outstanding principal and accrued interest) and from the Borrower (in the case of all other amounts), (iii) in the case of a claim for compensation under Section 2.18 or payments required to be made pursuant to Section 2.20, such assignment will result in a reduction in such compensation or payments, (iv) such assignment does *not* conflict with applicable Law, and (v) in the case of any such assignment resulting from a Non-Consenting Lender's failure to consent to a proposed change, waiver, discharge or termination with respect to any Loan Document, the applicable assignee consents to the proposed change, waiver, discharge or termination, provided, that, the failure by such Non-Consenting Lender to execute and deliver an Assignment and Acceptance shall *not* impair the validity of the removal of such Non-Consenting Lender, and the mandatory assignment of such Non-Consenting Lender's Commitments and outstanding Loans pursuant to this Section 2.25 shall nevertheless be effective without the execution by such Non-Consenting Lender of an Assignment and Acceptance. A Lender shall *not* be required to make any such assignment and

76

CONFIDENTIAL                                                                                 VPX-JHO0000000396

delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the Borrower to require such assignment and delegation cease to apply.

Section 2.26    Defaulting Lenders.

(a)    Cash Collateral; Defaulting Lender Adjustments. If a Revolving Lender becomes, and during the period it remains, a Defaulting Lender, the following provisions shall apply, notwithstanding anything to the contrary in this Agreement:

(i)    the LC Exposure and Swingline Exposure of such Defaulting Lender will, subject to the limitation in the first (1st) proviso below, automatically be reallocated (effective on the day such Revolving Lender becomes a Defaulting Lender) among the Non-Defaulting Lenders *pro rata* in accordance with their respective Revolving Commitments (calculated as if the Defaulting Lender's Revolving Commitment was reduced to zero and each Non-Defaulting Lender's Revolving Commitment had been increased proportionately); provided, that, (A) the *sum of* each Non-Defaulting Lender's total Revolving Credit Exposure may not in any event exceed the Revolving Commitment of such Non-Defaulting Lender as in effect at the time of such reallocation, and (B) neither such reallocation (subject to Section 11.17) nor any payment by a Non-Defaulting Lender pursuant thereto will constitute a waiver or release of any claim the Borrower, the Administrative Agent, the Issuing Bank, the Swingline Lender or any other Lender may have against such Defaulting Lender or cause such Defaulting Lender to be a Non-Defaulting Lender; and

(ii)    to the extent that any portion (the "*un-reallocated portion*") of the LC Exposure and Swingline Exposure of any Defaulting Lender cannot be reallocated pursuant to clause (a)(i) above for any reason the Borrower will, *not later than* two (2) Business Days after demand by the Administrative Agent (at the direction of the Issuing Bank and/or the Swingline Lender): (A) Cash Collateralize the obligations of the Defaulting Lender to the Issuing Bank or Swingline Lender in respect of such LC Exposure or Swingline Exposure, as the case may be, in an amount at least equal to the aggregate amount of the un-reallocated portion of the LC Exposure and Swingline Exposure of such Defaulting Lender; (B) in the case of such Swingline Exposure, prepay and/or Cash Collateralize in full the un-reallocated portion thereof; or (C) make other arrangements satisfactory to the Administrative Agent, the Issuing Bank and the Swingline Lender in their sole discretion to protect them against the risk of non-payment by such Defaulting Lender.

(b)    Defaulting Lender Cure. If the Borrower, the Administrative Agent, the Issuing Bank and the Swingline Lender agree in writing in their discretion that any Defaulting Lender has ceased to be a Defaulting Lender, the Administrative Agent will so notify the parties hereto, whereupon as of the effective date specified in such notice and subject to any conditions set forth therein, the LC Exposure and Swingline Exposure of the other Lenders shall be readjusted to reflect the inclusion of such Lender's Commitment, and such Lender will purchase at par such portion of outstanding Revolving Loans of the other Lenders and/or make such other adjustments as the Administrative Agent may determine to be necessary to cause the Revolving Credit Exposure of the Lenders to be on a pro rata basis in accordance with their respective Revolving Commitments, whereupon such Lender will cease to be a Defaulting Lender and will be a Non-Defaulting Lender (and such Revolving Credit Exposure of each Lender will automatically be adjusted on a prospective basis to reflect the foregoing). If any cash collateral has been posted with respect to the LC Exposure or Swingline Exposure of such Defaulting Lender, the Administrative Agent will promptly return such cash collateral to the Borrower; provided, that, (i) no adjustments will be made retroactively with respect to fees accrued or payments made by, or on behalf of, the Borrower while such Lender was a Defaulting Lender, and (ii) except to the extent otherwise expressly agreed by the affected parties, no change hereunder from Defaulting Lender to Non-Defaulting Lender will constitute a waiver or release of any claim of any party hereunder arising from such Lender's having been a Defaulting Lender.

(c)    New Swingline Loans / Letters of Credit. So long as any Lender is a Defaulting Lender: (i) the Swingline Lender shall not be required to fund any Swingline Loans, unless it is satisfied that it will have no Swingline Exposure after giving effect to such Swingline Loan; and (ii) the Issuing Bank shall not be required

77

CONFIDENTIAL                                                                           VPX-JHO0000000397

to issue, extend, renew, and/or increase any Letter of Credit, unless it shall be satisfied that it will have no LC Exposure after giving effect thereto.

## ARTICLE III

## CONDITIONS PRECEDENT TO LOANS AND LETTERS OF CREDIT

Section 3.1    Conditions to Effectiveness. This Agreement, and the obligations of the Lenders (including the Swingline Lender) to make Loans, and the obligation of the Issuing Bank to issue any Letter of Credit, hereunder, shall *not* be effective until the date on which each of the following conditions precedent is satisfied (or waived in accordance with Section 11.2), in each case, in form and substance satisfactory to the Administrative Agent and each Lender:

(a)    Loan Documents. Receipt by the Administrative Agent of a counterpart of this Agreement and each of the other Loan Documents signed by, or on behalf of, each party hereto or thereto, or written evidence satisfactory to the Administrative Agent (which may include telecopy transmission of such signed signature page) that such party has signed a counterpart of this Agreement and the other Loan Documents to which such party is a party.

(b)    Organization Documents; Resolutions and Certificates. Receipt by the Administrative Agent of:

(i)    a certificate of the Secretary or Assistant Secretary (or a Responsible Officer of substantially equivalent title and authority) of each Loan Party, attaching and certifying copies of such Loan Party's Organization Documents and resolutions of its board of directors or managers (or equivalent governing body), authorizing the execution, delivery and performance of the Loan Documents to which it is a party, and certifying the name, title and true signature of each officer of such Loan Party executing the Loan Documents to which it is a party; and

(ii)    certified copies of the articles or certificate of incorporation, certificate of organization or limited partnership, or other registered organizational documents of each Loan Party, together with certificates of good standing or existence, as may be available from the Secretary of State of the jurisdiction of organization of such Loan Party.

(c)    Opinions of Counsel. Receipt by the Administrative Agent of favorable written opinions of counsel to the Loan Parties, addressed to the Administrative Agent, the Issuing Bank, and each of the Lenders, and covering such customary matters relating to the Loan Parties, the Loan Documents, and the transactions contemplated therein as are satisfactory to the Administrative Agent, the Issuing Bank, and each of the Lenders (which opinions shall, in any event, expressly permit reliance by permitted successors and assigns of the Administrative Agent, the Issuing Bank, and the Lenders).

(d)    Officer's Closing Certifications. Receipt by the Administrative Agent of written certification, dated as of the Effective Date, by (i) a Responsible Officer of each Loan Party that the conditions specified in clause (f) below and in Section 3.2(a), Section 3.2(b) and Section 3.2(c), and (ii) the chief financial officer or chief executive officer (or a Responsible Officer of substantially equivalent title and authority) of each Loan Party that the conditions specified in clauses (g) and (m) below, in each case of the foregoing clauses (d)(i) and (d)(ii), are satisfied as of the Effective Date, both immediately before and immediately after giving effect to the Related Transactions and any Credit Event to occur on or prior to the Effective Date in connection therewith on a Pro Forma Basis.

(e)    Sources and Uses. Receipt by the Administrative Agent of: (i) a duly executed copy of any Notice(s) of Borrowing submitted to the Administrative Agent with respect to any Borrowing(s) on the Effective Date; and (ii) a duly executed funds disbursement letter, together with a report setting forth the sources and uses of, without limitation, the proceeds of any Borrowing(s) on the Effective Date.

78

CHAR2\2683123v6

(f)    <u>Required Consents and Approvals</u>. Receipt by the Loan Parties of all consents (including, without limitation, any other necessary governmental consents, as applicable), approvals, authorizations, registrations, filings and orders required or advisable to be made or obtained under any applicable Law, the Organization Documents of any Loan Party, or by any Contractual Obligation of any Loan Party, in connection with the execution, delivery, performance, validity and enforceability of the Related Transaction Documents or any of the Related Transactions, and such consents, approvals, authorizations, registrations, filings and orders shall be in full force and effect, and all applicable waiting periods shall have expired, and no investigation or inquiry by any Governmental Authority regarding the Commitments, or any transaction being financed with the proceeds of Loans, shall be ongoing.

(g)    <u>Solvency</u>. (i) The Borrower is solvent on an individual basis, and (ii) the Loan Parties are Solvent on a combined basis.

(h)    <u>Insurance</u>. Receipt by the Administrative Agent of certificates of insurance issued on behalf of insurers of the Loan Parties, describing in reasonable detail the types and amounts of insurance (property and liability) maintained by the Loan Parties.

(i)    <u>Personal Property Collateral</u>. Receipt by the Administrative Agent of the following:

(i)    searches of UCC filings in the jurisdiction of incorporation or formation, as applicable, of each Loan Party and each Owner Pledgor;

(ii)    UCC financing statements for each appropriate jurisdiction as is necessary, in the Administrative Agent's reasonable discretion, to perfect the Administrative Agent's security interest in the Collateral;

(iii)    electronic "pdf" copies of all certificates evidencing any certificated Capital Stock pledged to the Administrative Agent pursuant to the Security Agreement, the Owner Pledge Agreement, or any other pledge agreement, together with duly executed in blank, undated electronic "pdf" copies of stock powers attached thereto (unless, with respect to the pledged Capital Stock of any Foreign Subsidiary, such stock powers are deemed unnecessary by the Administrative Agent in its reasonable discretion under the Law of the jurisdiction of organization of such Person);

(iv)    searches of ownership of, and Liens on, United States registered intellectual property owned by each Loan Party in the appropriate governmental offices; and

(v)    duly executed notices of grant of security interest in the form required by any security agreement as are necessary, in the Administrative Agent's reasonable discretion, to perfect the Administrative Agent's security interest in the United States registered intellectual property owned by the Loan Parties (if, and to the extent, perfection may be achieved in the United States Patent and Trademark Office or the United States Copyright Office by such filings).

(j)    <u>Refinancing of Existing Indebtedness</u>. Receipt by the Administrative Agent of: (i) evidence of the payment in full of any Indebtedness *not* permitted under this Agreement to remain outstanding after the Effective Date; (ii) UCC–3s or other appropriate termination statements, in form and substance satisfactory to the Administrative Agent, releasing all Liens granted under, or in connection with, any such secured Indebtedness referred to in the foregoing <u>clause (j)(i)(B)</u> upon any personal property of the Loan Parties and Subsidiaries; (iii) cancellations and releases, in form and substance satisfactory to the Administrative Agent, releasing all Liens granted under, or in connection with, any such secured Indebtedness referred to in the foregoing <u>clause (j)(i)(B)</u> upon any Real Estate; and (iv) any other releases, terminations and/or other documents reasonably required by the Administrative Agent to evidence the payoff of any such Indebtedness referred to in <u>clause (j)(i)</u> above.

CONFIDENTIAL    VPX-JHO0000000399

(k)    Patriot Act; Anti-Money Laundering Laws. *At least* five (5) days prior to the Effective Date, receipt by the Administrative Agent of all documentation and other information required by bank regulatory authorities, or reasonably requested by the Administrative Agent or any Lender, under, or in respect of, applicable "know your customer" and anti-money laundering Laws, including, without limitation, the Patriot Act, and, if any Loan Party qualifies as a "legal entity customer" under the Beneficial Ownership Regulation, a Beneficial Ownership Certification in relation to such Loan Party.

(l)    Financial Statements. Receipt by the Administrative Agent of copies of: (i) the Audited Financial Statements, (ii) the Interim Financial Statements, (iii) the unaudited combined financial statements of the Loan Parties and Subsidiaries for each Fiscal Month ending after May 31, 2020, to the extent available, including balance sheets and statements of income or operations, shareholders' equity and cash flows; and (iv) pro forma financial budgets of the Loan Parties and Subsidiaries for the remainder of the then current Fiscal Year and for the first (1st) full Fiscal Year ending thereafter during the term of this Agreement.

(m)    Effective Date Financial Condition. (i) The Loan Parties are in compliance with all financial covenants set forth in Article VI, and (ii) the Combined Total Leverage Ratio for the twelve (12) Fiscal Month period most recently ended, calculated using monthly combined financial statements of the Loan Parties and Subsidiaries for such period, is *not greater than* 1.60:1.00, in each case of the foregoing clauses (m)(i) and (m)(ii), as supported by reasonably detailed calculations provided to the Administrative Agent.

(n)    Material Agreements. Receipt by the Administrative Agent of certified copies of all Material Agreements.

(o)    Controlled Account Agreements. Receipt by the Administrative Agent of a duly-executed copy of each Controlled Account Agreement required to be entered into on, or prior to, the Effective Date pursuant to Section 5.11(b).

(p)    Execution Affidavits. Receipt by the Administrative Agent of execution affidavits, or other evidence as the Administrative Agent may reasonably request, in order to establish that either: (i) this Agreement and any Notes have been executed by the Borrower outside of the State of Florida, and delivered to the Administrative Agent (or its agent) outside of the State of Florida; or (ii) all applicable documentary stamp taxes have been paid or are being paid simultaneously herewith.

(q)    Fees and Expenses. Receipt by the Administrative Agent of payment of all fees, expenses and other amounts due and payable on, or prior to, the Effective Date, including, without limitation, reimbursement or payment of all out-of-pocket expenses of the Administrative Agent, the Arranger and their respective Affiliates (including, without limitation, all reasonable fees, charges and disbursements of counsel to the Administrative Agent) required to be reimbursed or paid by the Borrower hereunder, under any other Loan Document, and under any agreement with the Administrative Agent or the Arranger.

Without limiting the generality of the provisions of this Section 3.1, for purposes of determining compliance with the conditions specified in this Section 3.1, each Lender that has signed this Agreement shall be deemed to have consented to, approved of, accepted, or been satisfied with, each document or other matter required thereunder to be consented to or approved by, or acceptable or satisfactory to, a Lender, unless the Administrative Agent shall have received notice from such Lender prior to the proposed Effective Date specifying its objection thereto.

Section 3.2    Conditions to Each Credit Event. The obligation of each Lender to make a Loan on the occasion of any Borrowing, and of the Issuing Bank to issue, amend, renew or extend any Letter of Credit, in each case, is subject to Section 2.26(b) and the satisfaction of the following conditions:

(a)    on the date on which such Borrowing, or the issuance, amendment, renewal and/or extension of such Letter of Credit, as applicable, is to become effective, both immediately prior to, and immediately after

80

CHAR2\2683123v6

giving effect to, the incurrence of such Borrowing or the issuance, amendment, renewal and/or extension of such Letter of Credit, as applicable, no Default or Event of Default shall exist;

(b)       on the date on which such Borrowing, or the issuance, amendment, renewal and/or extension of such Letter of Credit, as applicable, is to become effective, both immediately prior to, and immediately after giving effect to, the incurrence of such Borrowing or the issuance, amendment, renewal and/or extension of such Letter of Credit, as applicable, all representations and warranties of each Loan Party set forth in the Loan Documents (including, without limitation, the representations and warranties of each Loan Party set forth in Article IV) shall be true and correct in all material respects (other than those representations and warranties that are expressly qualified by a Material Adverse Effect or other materiality, in which case, such representations and warranties shall be true and correct in all respects), except to the extent that such representations and warranties specifically relate to an earlier date, in which case, they shall be true and correct in all material respects (other than those representations and warranties that are expressly qualified by a Material Adverse Effect or other materiality, in which case, such representations and warranties shall be true and correct in all respects) as of such earlier date;

(c)       the Borrower shall have delivered the required Notice of Borrowing; and

(d)       if any Revolving Lender is a Defaulting Lender at the time of any request by the Borrower of a Borrowing of a Swingline Loan, or the issuance, amendment, renewal and/or extension of a Letter of Credit, as applicable, set forth in this Section 3.2, the Issuing Bank will not be required to issue, amend or increase any Letter of Credit, and the Swingline Lender will not be required to make any Swingline Loans, unless, in each case, they are satisfied that one hundred percent (100.0%) of the related LC Exposure and Swingline Exposure is fully covered or eliminated pursuant to Section 2.26.

Each Borrowing, and each issuance, amendment, renewal and/or extension of any Letter of Credit, shall be deemed to constitute a representation and warranty by the Borrower, on the date thereof, as to the matters specified in clauses (a), (b) and (c) above.

Section 3.3     Delivery of Documents. All of the Loan Documents, certificates, legal opinions, and other documents, papers and instruments referred to in this Article III shall, unless otherwise specified, be: (a) delivered to the Administrative Agent, for the account of each of the Lenders, in sufficient number of original counterparts and/or ".pdf" copies as requested by the Administrative Agent; and (b) in form and substance otherwise satisfactory in all respects to the Administrative Agent.

ARTICLE IV

REPRESENTATIONS AND WARRANTIES

Each Loan Party represents and warrants, both immediately before and immediately after giving effect to the Related Transactions and any Credit Event to occur on or prior to the Effective Date in connection therewith on a Pro Forma Basis, to the Administrative Agent, each Lender and the Issuing Bank as follows:

Section 4.1     Existence; Power. Each Loan Party and Subsidiary (other than any Immaterial Subsidiary) (a) is duly organized, validly existing and in good standing as a corporation, partnership or limited liability company under the Laws of the jurisdiction of its organization, (b) has all requisite power and authority to carry on its business as now conducted, and (c) is duly qualified to do business, and is in good standing, in each jurisdiction where such qualification is required, except where a failure to be so qualified could not reasonably be expected to result in a Material Adverse Effect.

Section 4.2     Organizational Power; Authorization; Enforceability. The execution, delivery and performance by each Loan Party of the Loan Documents and the other Related Transaction Documents to which it is a party are within such Loan Party's organizational powers and have been duly authorized by all necessary organizational, and if required, shareholder, partner or member (as the case may be), action. This

81

CHAR2\2683123v6

Agreement has been duly executed and delivered by each Loan Party, and constitutes, and each other Loan Document and Related Transaction Document to which any Loan Party is a party, when executed and delivered by such Loan Party, will constitute, a legal, valid and binding obligation of such Loan Party, enforceable against such Loan Party in accordance with its respective terms, except as may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, or similar Laws affecting the enforcement of creditors' rights generally and by general principles of equity.

Section 4.3    _Governmental Approvals; No Conflicts_. The execution, delivery and performance by each Loan Party of this Agreement, and by each Loan Party of the other Loan Documents and the other Related Transaction Documents to which it is a party, do _not_, and will _not_: (a) require any consent or approval of, registration or filing with, notice to, or any action by, any Governmental Authority, except (i) those as have been obtained or made and are in full force and effect, and (ii) filings necessary to perfect, and/or maintain the perfection of, the Liens created under the Loan Documents; (b) violate (i) the Organization Documents of any Loan Party, or (ii) any Law applicable to any Loan Party or Subsidiary, or any judgment, order, decree and/or ruling of any Governmental Authority; (c) violate, conflict with, result in a breach of, or constitute (with due notice, lapse or time, or both) a default under, any Material Contract of any Loan Party or Subsidiary, or any of their respective property or assets, or give rise to a right thereunder to require any payment to be made by any Loan Party or Subsidiary; (d) result in the creation or imposition of any Lien on any asset or property of any Loan Party or Subsidiary, except Liens (if any) created under the Loan Documents; and (e) require any approval of stockholders, members or partners (as the case may be), or any approval or consent of any Person under any Material Contract, of any Loan Party or Subsidiary, except for such approvals or consents which will be obtained on or before the Effective Date and disclosed in writing to the Administrative Agent.

Section 4.4    _Financial Statements; No Material Adverse Effect_. The Borrower has furnished to each Lender: (a) the Audited Financial Statements; and (b) the Interim Financial Statements. Such financial statements fairly present the combined financial condition of the Loan Parties and Subsidiaries as of such dates, and the combined results of operations for such periods, in each case, in conformity with GAAP consistently applied, subject to year-end audit adjustments and the absence of footnotes in the case of the Interim Financial Statements. The financial statements most recently delivered pursuant to Section 5.1(a) and Section 5.1(b), as applicable, have been prepared in accordance with GAAP and present fairly (on the basis disclosed in the footnotes to such financial statements) the combined financial condition, results of operations and cash flows of the Loan Parties and Subsidiaries as of the dates thereof and for the periods covered thereby. Since the date of the Audited Financial Statements, there have been no changes with respect to the Loan Parties and Subsidiaries that have had, or could reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect.

Section 4.5    _Litigation and Environmental Matters_.

(a)    No litigation, investigation or proceeding of or before any arbitrators or Governmental Authorities (including, without limitation, the FDA) is pending against, or, to the knowledge of any Responsible Officer of the Loan Parties, threatened against or affecting, the Loan Parties or their Subsidiaries: (i) as to which there is a reasonable possibility of an adverse determination that could reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect; or (ii) which, in any manner, challenges the validity or enforceability of this Agreement, any other Loan Document, or any other Related Transaction Document.

(b)    Except with respect to any matters that, either individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect, neither any Loan Party nor any Subsidiary: (i) has failed to comply with any Environmental Law or to obtain, maintain or comply with any permit, license or other approval required under any Environmental Law; (ii) has become subject to any Environmental Liability; (iii) has received written notice of any claim with respect to any Environmental Liability; or (iv) knows of any basis for any Environmental Liability.

82

CONFIDENTIAL                                                                    VPX-JHO0000000402

Section 4.6    <u>Compliance with Laws and Agreements; No Default</u>.

(a)    Each Loan Party and Subsidiary is in compliance with (i) all applicable Laws, and all judgments, decrees and/or orders of any Governmental Authority, and (ii) all Contractual Obligations binding upon it or its assets or property, and neither any Loan Party nor any Subsidiary is in default under, or with respect to, any Contractual Obligation, except, with respect to the foregoing <u>clauses (a)(i)</u> and <u>(a)(ii)</u>, where such non-compliance or default, either individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

(b)    No Default or Event of Default has occurred and is continuing.

Section 4.7    <u>Investment Company Act, Etc</u>. Neither any Loan Party nor any Subsidiary is: (a) an "investment company" or is "controlled" by an "investment company", as such terms are defined in, or subject to regulation under or in connection with, the Investment Company Act; or (b) otherwise subject to any other regulatory scheme limiting its ability to incur debt, or requiring any approval or consent from, or registration or filing with, any Governmental Authority in connection therewith.

Section 4.8    <u>Taxes</u>. The Loan Parties and Subsidiaries (other than any Immaterial Subsidiary) have timely filed, or caused to be filed, all U.S. federal, and material state and other tax returns that are required to be filed by them, and have paid all material taxes shown to be due and payable on such returns or on any assessments made against it or its property and all other material taxes, fees or other charges imposed on it or any of its property by any Governmental Authority, except where the same are currently being contested in good faith by appropriate proceedings and for which such Loan Party or Subsidiary, as the case may be, has set aside on its books adequate reserves in accordance with GAAP. The charges, accruals and reserves on the books of the Loan Parties and Subsidiaries in respect of such taxes are adequate, and no tax liabilities that could be materially in excess of the amount so provided are anticipated.

Section 4.9    <u>Margin Regulations</u>. None of the proceeds of any of the Loans or Letters of Credit will be used, directly or indirectly, for "purchasing" or "carrying" any "margin stock" within the respective meanings of each of such terms under Regulation U or for any purpose that violates the provisions of Regulation T, Regulation U or Regulation X. Neither any Loan Party nor any Subsidiary is engaged principally, or as one of its important activities, in the business of extending credit for the purpose of purchasing or carrying "margin stock".

Section 4.10    <u>ERISA</u>.

(a)    Each Plan is in material compliance, in form and operation, with its terms, with ERISA, with the Code (including, without limitation, the Code provisions compliance with which is necessary for any intended favorable tax treatment), and with all other applicable Laws. Each Plan (and each related trust, if any) that is intended to be qualified under Section 401(a) of the Code has received a favorable determination letter from the Internal Revenue Service, to the effect that it meets the requirements of Section 401(a) and Section 501(a) of the Code covering all applicable tax Law changes, or is comprised of a master or prototype plan that has received a favorable opinion letter from the Internal Revenue Service, and, to the knowledge of any Responsible Officer of any Loan Party or Subsidiary, nothing has occurred since the date of such determination that would adversely affect such determination (or, in the case of a Plan with no determination, nothing has occurred that would adversely affect the issuance of a favorable determination letter, or otherwise adversely affect such qualification).

(b)    No ERISA Event has occurred or is reasonably expected to occur. There exists no Unfunded Pension Liability with respect to any Plan. No Loan Party or Subsidiary, nor any of their respective ERISA Affiliates, is making, or accruing an obligation to make, contributions, or has, within any of the five (5) calendar years immediately preceding the date on which the assurance provided by this <u>Section 4.10</u> is given, or deemed to be given, made, or accrued an obligation to make, contributions to any Multiemployer Plan.

83

CONFIDENTIAL                                                                                                VPX-JHO0000000403

(c)     There are no actions, suits or claims pending against or involving a Plan (other than routine claims for benefits), or, to the knowledge of any Loan Party or Subsidiary, or any of their respective ERISA Affiliates, threatened, which would reasonably be expected to be asserted successfully against any Plan, and, if so asserted successfully, would reasonably be expected, either individually or in the aggregate, to result in material liability to any Loan Party or Subsidiary. Each Loan Party and Subsidiary, and each of their respective ERISA Affiliates, have made all contributions to or under each Plan and Multiemployer Plan required by applicable Law within the applicable time limits prescribed thereby, by the terms of such Plan or Multiemployer Plan, respectively, or by any contract or agreement requiring contributions to a Plan or Multiemployer Plan. No Plan that is subject to Section 412 of the Code or Section 302 of ERISA has applied for, or received, an extension of any amortization period within the meaning of Section 412 of the Code or Section 303 or 304 of ERISA. No Loan Party or Subsidiary, nor, to the knowledge of any Responsible Officer of any Loan Party or Subsidiary, any of their respective ERISA Affiliates, have ceased operations at a facility so as to become subject to the provisions of Section 4068(a) of ERISA, withdrawn as a substantial employer so as to become subject to the provisions of Section 4063 of ERISA, or ceased making contributions to any Plan subject to Section 4064(a) of ERISA to which it made contributions.

(d)     Each Non-U.S. Plan has been maintained in compliance in all material respects with its terms and with the requirements of any and all applicable Laws, and has been maintained, where required, in good standing with applicable regulatory authorities, except as would *not* reasonably be expected to result in material liability to any Loan Party or Subsidiary. All contributions required to be made with respect to a Non-U.S. Plan have been timely made, except as would *not* reasonably be expected to result in material liability to any Loan Party or Subsidiary. No Loan Party or Subsidiary has incurred any obligation in connection with the termination of, or withdrawal from, any Non-U.S. Plan. The present value of the accrued benefit liabilities (whether or not vested) under each Non-U.S. Plan, determined as of the end of the most recently ended Fiscal Year on the basis of reasonable actuarial assumptions, did *not exceed* the current value of the assets of such Non-U.S. Plan allocable to such benefit liabilities.

Section 4.11    Ownership of Property; Insurance.

(a)     Each of the Loan Parties and Subsidiaries has good title to, or valid leasehold interests in, all of its real and personal property material to the operation of its business, including, without limitation, all such property or assets reflected in the Audited Financial Statements or the most recent audited combined balance sheet of the Loan Parties and Subsidiaries delivered pursuant to Section 5.1(a), or purported to have been acquired by any Loan Party or Subsidiary after said date (except as sold, or otherwise disposed of, in the ordinary course of business), in each case, free and clear of Liens not permitted by this Agreement. All leases that, individually or in the aggregate, are material to the business or operations of the Loan Parties and Subsidiaries are valid and subsisting and are in full force.

(b)     Each of the Loan Parties and Subsidiaries owns, or is licensed, or otherwise has the right, to use, all patents, trademarks, service marks, trade names, copyrights and other intellectual property material to its business, and the use thereof by the Loan Parties and Subsidiaries, to the knowledge of any Responsible Officer of any Loan Party or Subsidiary, does *not* infringe in any material respect on the rights of any other Person.

(c)     The property and assets of the Loan Parties and Subsidiaries are insured with financially sound and reputable insurance companies which are not Affiliates of any Loan Party, in such amounts, and with such deductibles and covering such risks, as are customarily carried by companies engaged in similar businesses and owning similar property and assets in localities where any Loan Party, or any Subsidiary thereof, operates.

(d)     Each Loan Party and Subsidiary has taken all reasonable action to maintain all material licenses necessary or desirable in the normal conduct of its business, except to the extent that the failure to do so could not reasonably be expected to have a Material Adverse Effect.

84

CONFIDENTIAL

Section 4.12    <u>Disclosure</u>.

(a)    Each Loan Party has disclosed to the Lenders all agreements, instruments, and corporate or other restrictions to which such Loan Party, or any of its Subsidiaries, is subject, and all other matters known to any of them, that, either individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect. None of the reports (including, without limitation, all reports that any Loan Party is required to file with the SEC), financial statements, certificates or other information furnished by, or on behalf of, any Loan Party to the Administrative Agent or any Lender in connection with the negotiation or syndication of this Agreement or any other Loan Document, or delivered hereunder or thereunder (as modified and/or supplemented by any other information so furnished), contains any material misstatement of fact or omits to state any material fact necessary to make the statements therein, taken as a whole, in light of the circumstances under which they were made, not misleading; <u>provided</u>, <u>that</u>, with respect to projected financial information, each Loan Party represents only that such information was prepared in good faith based upon assumptions believed to be reasonable at the time, it being understood that any such projected information may vary from actual results and such variations could be material.

(b)    As of the Effective Date, the information included in the Beneficial Ownership Certification is true and correct in all respects.

Section 4.13    <u>Labor Relations</u>. There are no strikes, lockouts, or other material labor disputes or grievances against any Loan Party or Subsidiary, or, to the knowledge of a Responsible Officer of any Loan Party, threatened in writing against or affecting any Loan Party or Subsidiary, and no significant unfair labor practice, charges, or grievances are pending against any Loan Party or Subsidiary, or, to the knowledge of a Responsible Officer of any Loan Party, threatened in writing against any of them, before any Governmental Authority. All payments due from the Loan Parties and Subsidiaries pursuant to the provisions of any collective bargaining agreement have been paid or accrued as a liability on the books of any such Loan Party or Subsidiary, except where the failure to do so could not reasonably be expected to have a Material Adverse Effect.

Section 4.14    <u>Subsidiaries and Loan Parties</u>. Schedule 4.14 hereto sets forth: (a) the name of, the ownership interest of each applicable Loan Party and Owner Pledgor, as the case may be, in, the jurisdiction of incorporation or organization of (as the case may be), and the type of, each Subsidiary and Loan Party, and identifies each Subsidiary that is a Loan Party, in each case, as of the Second Amendment Effective Date; and (b) the authorized Capital Stock of each Loan Party, and each Subsidiary thereof, as of the Second Amendment Effective Date. All issued and outstanding Capital Stock of each Loan Party, and each Subsidiary thereof, is duly authorized and validly issued, fully paid, non-assessable, as applicable, and free and clear of all Liens, other than those in favor of the Administrative Agent, for the ratable benefit of the holders of the Obligations. All such securities were issued in compliance with all applicable state and federal Laws concerning the issuance of securities. As of the Second Amendment Effective Date, all of the issued and outstanding Capital Stock of each Loan Party and Subsidiary is owned by the Person(s), and in the amount(s), set forth on <u>Schedule 4.14</u> hereto. Except as set forth on <u>Schedule 4.14</u> hereto, there are no pre-emptive or other outstanding rights, options, warrants, conversion rights, commitments, or other similar agreements or understandings for the purchase or acquisition of any Capital Stock of any Loan Party or Subsidiary, and there are no membership interest or other Capital Stock of any Loan Party or Subsidiary outstanding that, upon conversion or exchange, would require the issuance by any Loan Party or Subsidiary of any additional membership interests or other Capital Stock of any Loan Party or Subsidiary, or other securities convertible into, exchangeable for, or evidencing the right to subscribe for a purchase, a membership interest or other Capital Stock of, any Loan Party or Subsidiary.

Section 4.15    <u>Solvency</u>. (a) The Borrower is Solvent on an individual basis, and (b) the Loan Parties are Solvent on a combined basis.

85

CHAR2\2683123v6

Section 4.16    <u>Business Locations; Taxpayer Identification Number</u>. Set forth on <u>Schedule 4.16–1</u> hereto is a list of all Real Estate as of the Second Amendment Effective Date (identifying whether such Real Estate is owned or leased, and which Loan Party owns or leases such Real Estate). Set forth on <u>Schedule 4.16–2</u> hereto is the chief executive office, U.S. taxpayer identification number, and organizational identification number of each Loan Party as of the Second Amendment Effective Date. The exact legal name and state of organization of each Loan Party, as of the Second Amendment Effective Date, is as set forth on the signature pages hereto. Except as set forth on <u>Schedule 4.16–3</u> hereto, no Loan Party has, during the five (5) years preceding the Second Amendment Effective Date: (i) changed its legal name; (ii) changed its state of formation; or (iii) been party to a merger, consolidation, or other change in structure.

Section 4.17    <u>Deposit and Disbursement Accounts</u>. Schedule 4.17 hereto lists all banks and other financial institutions at which any Loan Party maintains any deposit account, lockbox account, disbursement account, investment account, and/or other similar account(s) as of the Effective Date, and such <u>Schedule 4.17</u> correctly identifies the name, address, and telephone number of each such financial institution, the exact name in which any such account is held, the type of any such account, and the complete account number thereof.

Section 4.18    <u>Collateral Documents</u>.

(a)    The Security Agreement and the Owner Pledge Agreement are each effective to create in favor of the Administrative Agent, for the ratable benefit of the holders of the Obligations, a legal, valid, and enforceable security interest in the Collateral (in each case, as defined therein) except as may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar Laws affecting the enforcement of creditors' rights generally and by general principles of equity, and, when UCC financing statements in appropriate form are filed in the appropriate offices, the Liens created under the Security Agreement and the Owner Pledge Agreement shall constitute a fully perfected Lien (to the extent that such Lien may be perfected by the filing of a UCC financing statement) on, and security interest in, all right, title, and interest of the Obligors (in each case, as defined therein) in such Collateral, in each case, prior, and superior in right, to any other Person(s), other than with respect to (i) Liens expressly permitted by Section 7.2, and (ii) Liens perfected by "control" (as defined in the UCC); <u>provided, that</u>, when the certificates evidencing all Capital Stock pledged pursuant to the Security Agreement and the Owner Pledge Agreement are delivered to the Administrative Agent, together with appropriate stock and/or unit powers (or other similar instruments of transfer) duly executed in blank, the Liens in such Capital Stock shall be fully-perfected, first priority security interests, perfected by "control" (as defined in the UCC).

(b)    When the filings described in <u>clause (a)</u> above are made, and when, if applicable, any IP Notice Filings are filed in the United States Copyright Office or the United States Patent and Trademark Office, as applicable, the Liens created under the Security Agreement shall constitute a perfected Lien on, and security interest in, all right, title, and interest of the Loan Parties in all Copyrights, Patents and Trademarks, if any, with respect to which a security interest may be perfected by the filing, recording, or registering a security agreement, financing statement, notice of security interest, or analogous document in the United States Patent and Trademark Office or the United States Copyright Office, as applicable, in each case, prior, and superior in right, to any other Person(s), other than with respect to Liens expressly permitted by <u>Section 7.2</u>.

(c)    Each Mortgage, when duly executed and delivered by the relevant Loan Party, will be effective to create, in favor of the Administrative Agent, for the ratable benefit of the holders of the Obligations, a legal, valid and enforceable Lien, except as may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar Laws affecting the enforcement of creditors' rights generally and by general principles of equity, on all of such Loan Party's right, title, and interest in and to the Real Estate covered by such Mortgage, and the proceeds thereof, and, when such Mortgage is filed in the real estate records where the underlying Mortgaged Property is located, such Mortgage shall constitute a perfected Lien on, and security interest in, all right, title, and interest of such Loan Party in such Real Estate, and the proceeds thereof, in each case, prior, and superior in right, to any other Person(s), other than with respect to Liens expressly permitted by <u>Section 7.2</u>.

86

CONFIDENTIAL                                                                                       VPX-JHO0000000406

(d)    No Mortgage encumbers any improved Real Estate that is located in an area that has been identified by the Secretary of Housing and Urban Development as an area having special flood hazards, and in which flood insurance has been made available under applicable Flood Insurance Laws, except to the extent that the applicable Loan Party maintains flood insurance with respect to such improved Real Estate in compliance with the requirements of Section 5.8.

Section 4.19    Material Agreements. As of the Effective Date, all Material Agreements of the Loan Parties and Subsidiaries are described on Schedule 4.19 hereto, and each such Material Agreement is in full force and effect. The Loan Parties do *not* have any knowledge of any pending amendments or threatened termination of any of the Material Agreements. As of the Effective Date, the Borrower has delivered to the Administrative Agent a true, complete and correct copy of each Material Agreement (including all schedules, exhibits, amendments, supplements, modifications, assignments and all other documents delivered pursuant thereto or in connection therewith).

Section 4.20    Sanctions and Anti-Corruption Laws.

(a)    No Loan Party or Subsidiary, or any of their respective directors, officers, employees or, to the knowledge of any Responsible Officer of any Loan Party, any of their respective agents and/or affiliates, is a Sanctioned Person.

(b)    Each Loan Party and Subsidiary, and each of their respective directors, officers and employees, and, to the knowledge of any Responsible Officer of any Loan Party, the agents of each Loan Party and Subsidiary, are in compliance with all applicable Anti-Corruption Laws and applicable Sanctions. The Loan Parties and Subsidiaries have instituted and maintain policies and procedures designed to ensure continued compliance with all applicable Sanctions and Anti-Corruption Laws.

Section 4.21    No Affected Financial Institutions. No Loan Party or Subsidiary is an Affected Financial Institution.

Section 4.22    Cannabis and Hemp Products.

(a)    None of the Credit Parties or Subsidiaries manufactures, purchases, sells, distributes or invests in, or finances any other Person that manufactures, purchases, sells, distributes, invests in or finances, any products containing parts of the plant Cannabis sativa L., whether growing or not, including, without limitation, the seeds thereof, the resin extracted from any part of such plant, and every compound, manufacture, salt, derivative, mixture, or preparation of such plant, its seeds and/or its resin.

(b)    Except for shared legal, administrative, operations, management and/or distribution services with certain of its Affiliates permitted under applicable Laws, and except in respect of the Stoked IP prior to the satisfaction of the requirements set forth in Section 5.17, none of the Credit Parties or Subsidiaries manufactures, purchases, sells, distributes, or invests in, or finances any other Person that manufactures, purchases, sells, distributes, invests in or finances, any products containing Hemp or any compound, manufacture, salt, derivative, mixture, or preparation from Hemp, including, without limitation, Cannabidiol (commonly known as "CBD") derived from Hemp.

(c)    For purposes of clarity, the provisions of this Section 4.22 do *not* apply to, and are *not* representations and warranties of, any Owner Pledgor or any companies or entities owned by any Owner Pledgor that are *not* Credit Parties or their Subsidiaries.

Section 4.23    Regulatory Matters.

(a)    Each Loan Party and Subsidiary is in compliance with, and is conducting, and has conducted, its respective business and operations in compliance with applicable Healthcare Laws, including, without limitation, the FD&C Act and regulations promulgated by the FDA, and all products manufactured, marketed or

87

CONFIDENTIAL

distributed by any of the Loan Parties or Subsidiaries comply with applicable Healthcare Laws, except as would *not* reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect. Each Loan Party and Subsidiary obtains and maintains all licenses, permits, certifications, registrations, authorizations and approvals of all applicable Governmental Authorities as are required for the conduct of its business as currently conducted and herein contemplated (including, without limitation, any required by the FDA), except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(b)    During the period of six (6) years immediately preceding the Effective Date, no Loan Party nor any Subsidiary has introduced into commercial distribution any product that was, upon its shipment, adulterated or misbranded in violation of 21 U.S.C. §–331. No Loan Party nor any Subsidiary has received any correspondence, warning letter, or notice from the FDA or any other federal, state or local Governmental Authority with regard to any product, or the manufacture, processing, packaging or holding thereof, or any comparable correspondence from any foreign counterpart of the FDA, or any comparable correspondence from any foreign counterpart of any federal, state or local Governmental Authority with regard to any product or the manufacture, processing, packing, or holding thereof that would be reasonably expected to have a Material Adverse Effect, or that would be reasonably expected to result in a cessation of production or recall of any product manufactured, processed, packaged, or distributed by any Loan Party or Subsidiary. No Loan Party nor, to the actual knowledge of a Responsible Officer of any Loan Party, any Subsidiary has undertaken a recall or field correction or removal of any product manufactured, processed, packaged, or distributed by any Loan Party or Subsidiary, except for any recalls, field corrections, or removals that, individually or in the aggregate, could *not* reasonably be expected to have a Material Adverse Effect.

(c)    No Loan Party or Subsidiary has received any written, or, to the knowledge of any Responsible Officer of any Loan Party, oral notice of any pending or threatened legal proceeding, claim, suit, proceeding, hearing, enforcement, audit, inquiry, inspection, investigation, arbitration or other action from any applicable Governmental Authority, or any *qui tam* relator, alleging that any operation or activity of any member of any Loan Party or Subsidiary is in violation of any applicable Healthcare Law, and to the knowledge of any Responsible Officer of any Loan Party, no such action currently exists. No Loan Party or Subsidiary has received any subpoenas or civil investigative demands or similar written, or, to the knowledge of any Responsible Officer of any Loan Party, oral requests for information, has been a party to a corporate integrity agreement, or has had any reporting obligations pursuant to a settlement agreement, monitoring agreement, consent decree, order or other similar contract or remedial measure entered into with any Governmental Authority. No Loan Party or any Subsidiary has entered into any consent decree or order with any Governmental Authority, nor is, or has been, subject to any judgment, decree or judicial or administrative order, except for any decrees, judgments, or orders that could *not* reasonably be expected to have a Material Adverse Effect.

(d)    No Loan Party or Subsidiary, nor, to the knowledge of any Responsible Officer of any Loan Party, any of their respective equityholders, directors, limited liability company managers, officers, personnel (whether employees or independent contractors), distributors or other agents or representatives, in their capacities as such, are reasonably be expected to have individual culpability for any material violation of applicable Law, or have made any materially false statements on, or material omissions from, any application, notification, registration, report or other submission to any Governmental Authority, or made any materially false statements on, or omissions from, any other records and documentation prepared or maintained to comply with applicable Law (or applicable requirements of the any Governmental Authority thereunder).

(e)    No Loan Party or Subsidiary, nor, to the knowledge of any Responsible Officer of any Loan Party, any of their directors, officers, employees, agents or, to the knowledge of any Responsible Officer of any Loan Party, any other Person authorized to act on any Loan Party or Subsidiary's behalf, has knowingly or willfully taken, directly or indirectly, any act in furtherance of an offer, payment, promise to pay, authorization, or ratification of the payment, directly or indirectly, of any gift, money, payment, contribution, or anything of

88

CONFIDENTIAL

value to any Person to secure any improper advantage, or to obtain or retain business that would cause any Loan Party or Subsidiary to be in violation of any Healthcare Laws.

(f)    No Loan Party or Subsidiary employs or contracts with any physicians, pharmacists or other health care professionals to provide professional health care services requiring a license or accreditation under any Healthcare Laws.

(g)    No Loan Party or Subsidiary nor, to the knowledge of any Responsible Officer of any Loan Party, any of their respective equityholders, directors, limited liability company managers, officers, personnel (whether employees or independent contractors) distributors or other agents or representatives, in their capacities as such, is, or ever has been: (i) debarred or otherwise disqualified from submitting applications to the FDA under 21 U.S.C. §–335a(k) or otherwise transacting business with the FDA; or (ii) designated a Specially Designated National or Blocked Person by the Office of Foreign Asset Control of the U.S. Department of Treasury.

(h)    To the extent that any Loan Party or Subsidiary has access to any individually identifiable information of any individual, the Loan Parties and Subsidiaries are in material compliance with all applicable Privacy Laws and maintain information security processes that include safeguards for the security, privacy confidentiality, and integrity of transactions and confidential or proprietary data or Personal Information used, disclosed, or accessed by the Loan Parties and Subsidiaries. No Loan Party or Subsidiary has received written notice, nor, to the knowledge of any Responsible Officer of any Loan Party, oral notice, of any claim that any Loan Party, or any of its respective Subsidiaries, have suffered a breach of Personal Information as defined under applicable Law, except to the extent that any such breach: (A) did *not* require, and is *not* likely to require, any Loan Party or Subsidiary to provide notification in accordance with applicable Law to affected customers, patients or other impacted individuals, or to any Governmental Authority; and (B) would *not* be reasonably likely to have a Material Adverse Effect.

(i)    Each Loan Party or Subsidiary is, and has been, in compliance, in all material respects, with all applicable Laws related to: (i) the requirement for, and the terms of, all necessary registrations, listings, or other authorizations necessary and applicable to the performance of its services; and (ii) payment of all establishment registration fees. No Loan Party or Subsidiary has received any written notice or communication from any Governmental Authority of any actual or threatened investigation, inquiry, or administrative, judicial or regulatory Action, hearing or enforcement proceeding against any member of any Loan Party or Subsidiary regarding any violation of applicable Law. No Responsible Officer of any Loan Party has any knowledge of any material obligation arising under an investigation, inquiry, or administrative, judicial or regulatory action, hearing or enforcement proceeding by, or on behalf of, the FDA or other Governmental Authority, except where such obligation could *not* reasonably be expected to be material to any Loan Party or Subsidiary.

ARTICLE V

AFFIRMATIVE COVENANTS

Until the Commitments have expired or been terminated and all Obligations have been paid in full, and all Letters of Credit shall have expired or been terminated, in each case, without any pending draw, or all such Letters of Credit shall have been Cash Collateralized to the satisfaction of the Issuing Bank, and all LC Disbursements shall have been reimbursed, each Loan Party covenants and agrees with the Lenders that such Loan Party shall, and shall cause each Subsidiary to:

Section 5.1    <u>Financial Statements and Other Information</u>. Deliver to the Administrative Agent and each Lender:

(a)    as soon as available and, in any event, within one-hundred twenty (120) days after the end of each Fiscal Year, commencing with the Fiscal Year ending December 31, 2020, a copy of the annual audited

89

CONFIDENTIAL

report for such Fiscal Year for the Loan Parties and Subsidiaries, containing a combined balance sheet of the Loan Parties and Subsidiaries as of the end of such Fiscal Year, and the related combined statements of income or operations, changes in stockholders' equity and cash flows (together with all footnotes thereto) of the Loan Parties and Subsidiaries for such Fiscal Year, setting forth, in each such case in comparative form, the figures for the previous Fiscal Year, all in reasonable detail and reported on by an independent public accounting firm reasonably acceptable to the Administrative Agent (without a "going concern" or like qualification, exception or explanation and without any qualification or exception as to the scope of such audit, except to the extent that any qualification results *solely* from a current maturity of any Indebtedness) to the effect that such financial statements present fairly, in all material respects, the financial condition and the results of operations of the Loan Parties and Subsidiaries for such Fiscal Year on a combined basis in accordance with GAAP, and that the examination by such accountants in connection with such combined financial statements has been made in accordance with generally accepted auditing standards;

(b)      as soon as available and, in any event, within forty-five (45) days after the end of each Fiscal Quarter, commencing with the Fiscal Quarter ending September 30, 2020 (and including, for the avoidance of doubt, each Fiscal Quarter whose end corresponds with the end of a Fiscal Year), an unaudited combined balance sheet of the Loan Parties and Subsidiaries as of the end of such Fiscal Quarter, and the related unaudited combined statements of income or operations, changes in stockholders' equity and cash flows of the Loan Parties and Subsidiaries for such Fiscal Quarter and the then elapsed portion of such Fiscal Year, setting forth, in each such case in comparative form, the figures for the corresponding Fiscal Quarter and the corresponding portion of the Borrower's previous Fiscal Year and the corresponding figures for the budget for the current Fiscal Year, all in reasonable detail and prepared in accordance with GAAP, such combined statements to be certified by the chief executive officer, chief financial officer, treasurer or controller (or a Responsible Officer of substantially equivalent title and authority) of the Borrower as presenting fairly the financial condition, results of operations, stockholders' equity and cash flows of the Loan Parties and Subsidiaries in accordance with GAAP, and including management discussion and analysis of operating results, profitability trends and customer retention, subject only to normal year-end audit adjustments and the absence of footnotes and, in the case of such combined statements, certified by the chief executive officer, chief financial officer, treasurer or controller (or a Responsible Officer of substantially equivalent title and authority) of the Borrower, to the effect that such statements are fairly stated in all material respects when considered in relation to the combined financial statements of the Loan Parties and Subsidiaries;

(c)      concurrently with the delivery of the financial statements referred to in clauses (a) and (b) above, as applicable, a Compliance Certificate, signed by the principal executive officer or the principal financial officer (or a Responsible Officer of substantially equivalent title and authority) of the Borrower:

(i)      certifying as to whether there exists a Default or Event of Default on the date on which such Compliance Certificate is delivered to the Administrative Agent, and, if a Default or an Event of Default then exists, specifying the details thereof and the action(s) that the Loan Parties have taken, or propose to take, with respect thereto;

(ii)      setting forth in reasonable detail calculations demonstrating compliance with the financial covenants set forth in Article VI;

(iii)      specifying any change in the identity of the Subsidiaries of any Loan Party as of the end of such Fiscal Quarter or Fiscal Year, as applicable, from the Subsidiaries of such Loan Party identified to the Lenders on the Effective Date, or as of the most recent Fiscal Quarter or Fiscal Year, as the case may be, and attaching an updated Schedule 4.14 hereto;

(iv)      certifying that all representations and warranties of each Loan Party set forth in the Loan Documents are true and correct in all material respects (other than those representations and warranties that are expressly qualified by a Material Adverse Effect or other materiality, in which case, such representations and warranties are true and correct in all respects) as of the date thereof, except to

90

CONFIDENTIAL                                                                                    VPX-JHO0000000410

the extent that such representations and warranties specifically refer to an earlier date, in which case, they are true and correct in all material respects (other than those representations and warranties that are expressly qualified by a Material Adverse Effect or other materiality, in which case, such representations and warranties shall be true and correct in all respects) as of such earlier date;

       (v)     stating whether any change in GAAP, or the application thereof, has occurred since the date of the financial statements most recently delivered pursuant to Section 5.1(a) and/or Section 5.1(b), as applicable, or, if, as of such date, no financial statements have been delivered pursuant to Section 5.1(a) and/or Section 5.1(b), since the date of the Audited Financial Statements and, in any such case, if any such change has occurred, specifying the effect of such change on the financial statements accompanying such Compliance Certificate; and

       (d)     as soon as available and, in any event, within sixty (60) days after the end of each Fiscal Year: (i) a pro forma budget for the current Fiscal Year, containing an income statement, balance sheet, and statement of cash flows of the Loan Parties and Subsidiaries on a Fiscal Quarter basis for such succeeding Fiscal Year; and (ii) financial projections of the Loan Parties and Subsidiaries, prepared on a Fiscal Year basis, for the remaining Fiscal Years ending during the term of this Agreement;

       (e)     promptly after the same become publicly available, copies of all periodic and other reports, proxy statements and other materials filed with the SEC, any Governmental Authority succeeding to any or all functions of the SEC, or any national securities exchange, or distributed by the Borrower to its shareholders or members (as the case may be) generally; and

       (f)     promptly following any request therefor: (i) such other information regarding the results of operations, business affairs, and financial condition of any or all of the Loan Parties and Subsidiaries as the Administrative Agent or any Lender may reasonably request; and (ii) information and documentation reasonably requested by the Administrative Agent or any Lender for purposes of compliance with applicable "know your customer" requirements under the Patriot Act or other applicable anti-money laundering Laws.

If, at any time, the Borrower is required to file periodic reports under Section 13(a) or Section 15(d) of the Securities Exchange Act, the Loan Parties may satisfy their obligation to deliver the financial statements referred to in clauses (a) and (b) above by delivering such financial statements by electronic mail to such e-mail addresses as the Administrative Agent and the Lenders shall have provided to the Borrower from time to time.

Each Loan Party hereby acknowledges that: (A) the Administrative Agent, the Arranger, and/or any Affiliates thereof may, but shall *not* be obligated to, make available to the Lenders and the Issuing Bank materials and/or information provided by, or on behalf of, the Loan Parties hereunder (collectively, "*Borrower Materials*") by posting the Borrower Materials on a Platform; and (B) certain of the Lenders (each, a "*Public Lender*") may have personnel who do *not* wish to receive material non-public information with respect to the Loan Parties and their Subsidiaries and Affiliates, or the respective securities of any of the foregoing, and who may be engaged in investment and other market-related activities with respect to such Persons' securities. Each Loan Party hereby agrees that it will use commercially reasonable efforts to identify that portion of the Borrower Materials that may be distributed to the Public Lenders, and that: (I) all such Borrower Materials shall be clearly and conspicuously marked "PUBLIC", which, at a minimum, shall mean that the word "PUBLIC" shall appear prominently on the first (1st) page thereof; (II) by marking Borrower Materials "PUBLIC", the Borrower shall be deemed to have authorized the Administrative Agent, the Arranger, any Affiliates of the foregoing, the Issuing Bank, and the Lenders to treat such Borrower Materials as *not* containing any material non-public information (although such information may be sensitive and proprietary) with respect to the Loan Parties or their securities for purposes of U.S. federal and state securities laws (provided, that, to the extent that such Borrower Materials constitute information subject to the confidentiality provisions of Section 11.11, they shall be treated as set forth in Section 11.11; (III) all Borrower Materials marked "PUBLIC" are permitted to be made available through a portion of a Platform designated "Public Side Information;" and (IV) the Administrative Agent, the Arranger, and/or any Affiliates thereof, shall be entitled to treat any

91

CHAR2\2683123v6

                                                                                       VPX-JHO0000000411

Borrower Materials that are not marked "PUBLIC" as being suitable *only* for posting on a portion of a Platform that is *not* designated "Public Side Information".

Section 5.2    Notices of Material Events. Furnish to the Administrative Agent (for forwarding to the Lenders):

(a)    promptly and, in any event, within:

(i)    two (2) Business Days thereafter, written notice of the occurrence of any Default or Event of Default;

(ii)    five (5) Business Days thereafter, written notice of the filing or commencement of, or any material development in, any action, suit or proceeding by or before any arbitrator or Governmental Authority (including, without limitation, the FDA) against, or, to the knowledge of any Loan Party, affecting, any Loan Party or Subsidiary, which, if adversely determined, could reasonably be expected to result in a Material Adverse Effect;

(iii)    five (5) Business Days thereafter, written notice of the occurrence of any event or any other development by which any Loan Party or Subsidiary, (A) fails to comply with any Environmental Law or Healthcare Law, or to obtain, maintain or comply with any permit, license or other approval required under any Environmental Law or Healthcare Law, (B) becomes subject to any Environmental Liability or non-compliance with any Healthcare Law, (C) receives notice of any claim with respect to any Environmental Liability or non-compliance with any Healthcare Law, or (D) becomes aware of any basis for any Environmental Liability or non-compliance with any Healthcare Law, and, in each such case of the foregoing clauses (a)(iii)(A) through (a)(iii)(D), which, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect;

(iv)    two (2) Business Days thereafter, written notice of the occurrence of any default or event of default, or the receipt by any Loan Party or Subsidiary of any written notice of an alleged default or event of default, with respect to any Material Indebtedness of any Loan Party or Subsidiary;

(v)    five (5) Business Days thereafter, written notice of any termination, expiration, or loss of any Material Agreement that, individually or in the aggregate, could reasonably be expected to result in a reduction in revenue (calculated on a combined basis) and/or Combined EBITDA of the Loan Parties of *greater than* ten percent (10.0%) from the prior Fiscal Year;

(vi)    two (2) Business Days thereafter, written notice of any other development that results in, or could reasonably be expected to result in, a Material Adverse Effect;

(vii)    ten (10) Business Days thereafter, written notice of any change in the information provided in the Beneficial Ownership Certification that would result in a change to the list of beneficial owners identified in part (c) or part (d) of such certification; and

(viii)    two (2) Business Days after any Responsible Officer of any Loan Party or Subsidiary becoming aware, or having reason to become aware, thereof, written notice that the U.S. Small Business Administration or any other applicable Governmental Authority has determined that the PPP Loan is *not*, or in the future will *not* be, eligible for forgiveness pursuant to the PPP as provided in Section 7(a) of the Small Business Act.

(b)    promptly and, in any event, within fifteen (15) days thereafter, written notice of: (i) any Responsible Officer of any Loan Party or Subsidiary knows, or has reason to know, that an ERISA Event has occurred, a certificate of the chief financial officer (or a Responsible Officer of substantially equivalent title and authority) of the Borrower describing such ERISA Event, together with the action(s), if any, taken, or proposed to be taken, with respect to such ERISA Event, and a copy of any notice(s) filed with the PBGC or the

92

IRS pertaining to such ERISA Event, together with any notice(s) received by any Loan Party or Subsidiary from the PBGC or any other Governmental Authority with respect thereto; and (ii) any Responsible Officer of any Loan Party or Subsidiary becoming aware, or having reason to become aware, (A) that there has been an increase in Unfunded Pension Liabilities (but not taking into account Plans with negative Unfunded Pension Liabilities) since the most recent date on which the representations and warranties contained in this Article IV were given, or deemed to be given, or from any prior notice, as applicable, (B) of the existence of any Withdrawal Liability, (C) of the adoption of, or the commencement of contributions to, any Plan by any Loan Party or Subsidiary, or (D) of the adoption of any amendment to a Plan that results in a material increase in contribution obligations of any Loan Party or Subsidiary, together with detailed written description thereof from the chief financial officer (or a Responsible Officer of substantially equivalent title and authority) of the Borrower;

(c)        promptly and, in any event, *at least* ten (10) days prior thereto, written notice of any change: (i) in any Loan Party's legal name; (ii) in any Loan Party's chief executive office, its principal place of business, any office in which it maintains books or records, or any office or facility at which Collateral owned by it is located (including, without limitation, the establishment of any such new office or facility); (iii) in any Loan Party's identity or legal structure; (iv) in any Loan Party's federal taxpayer identification number or organizational number; or (v) in any Loan Party's jurisdiction of organization; and

(d)        as soon as available and, in any event, within thirty (30) days after receipt thereof, a copy of any environmental report or site assessment obtained by, on behalf of, or for any Loan Party or Subsidiary after the Effective Date with respect to any Real Estate.

Each notice or other document delivered under this Section 5.2 shall be accompanied by a written statement of a Responsible Officer of the Borrower setting forth the details of the event(s) or development(s) requiring such notice or other document, together with any action(s) taken, or proposed to be taken, with respect thereto.

Section 5.3        Existence; Conduct of Business.

(a)        Do, or cause to be done, all things necessary to preserve, renew, and maintain in full force and effect its legal existence and, to the extent that the failure to do so would *not* reasonably be expected to result in a Material Adverse Effect its respective rights, licenses, permits, privileges, franchises, copyrights, patents, trademarks, and trade names material to the conduct of its business; provided, that, (i) nothing in this Section 5.3 shall prohibit any merger, consolidation, liquidation or dissolution permitted under Section 7.3, and (ii) this clause (a) shall *not* apply to Immaterial Subsidiaries; and

(b)        Engage *solely* in the same line(s) of business as conducted by the Loan Parties and Subsidiaries on the Effective Date, or any business(es) reasonably related thereto.

Section 5.4        Compliance with Laws. (a) Comply with all Laws applicable to its business, real and personal property and assets, including, without limitation, all Environmental Laws, Healthcare Laws, ERISA and OSHA, except where the failure to do so, either individually or in the aggregate, could *not* reasonably be expected to result in a Material Adverse Effect; and (b) maintain in effect and enforce policies and procedures designed to ensure compliance by the Loan Parties and Subsidiaries, and each of their respective directors, officers, employees and agents, with applicable Healthcare Laws (including, without limitation, the FD&C Act and HIPAA), applicable Anti-Corruption Laws and applicable Sanctions.

Section 5.5        Payment of Obligations. Pay and discharge, at or before maturity, all of its obligations and liabilities (including, without limitation, all taxes, assessments and other governmental charges, levies and all other claims that could result in a statutory Lien) before the same shall become delinquent or in default, except where: (a) the validity or amount thereof is being contested in good faith by appropriate proceedings; (b) such Loan Party or Subsidiary has set aside on its books adequate reserves with respect thereto in accordance with GAAP; and (c) in the case of a tax or claim which has, or may become, a Lien against any of the

93

CHAR2\2683123v6

Collateral, such contest proceedings conclusively operate to stay the sale of any portion of the Collateral to satisfy such tax or claim.

Section 5.6    Books and Records. Keep proper books of record and account in which full, true and correct entries shall be made of all dealings and transactions in relation to its business and activities to the extent necessary to prepare the combined financial statements of the Loan Parties and Subsidiaries in conformity with GAAP.

Section 5.7    Visitation and Inspection. Permit any representative of the Administrative Agent (which may be accompanied by representatives of any of the Lenders) to visit and inspect its properties, to examine its books and records, and to make copies and take extracts therefrom, and to discuss its affairs, finances and accounts with any of its officers and with its independent certified public accountants (at which an authorized representative of the Loan Parties shall be entitled to be present, so long as such Person uses commercially reasonable efforts to be available), and to conduct appraisals, field audits and field examinations, all at such reasonable times and during normal business hours and as often as the Administrative Agent or any Lender may reasonably request after reasonable prior notice to the Borrower, and, in each case of the foregoing, all at the Borrower's reasonable expense; provided, that, (a) so long as no Event of Default has occurred and is continuing, the Loan Parties shall *not* be responsible for the expense of more than one (1) inspection, appraisal, field audit and field examination per Fiscal Year, and (b) if a Default or an Event of Default has occurred and is continuing, no prior notice shall be required. Notwithstanding anything to the contrary in the foregoing: (i) neither any Loan Party nor any Subsidiary will be required to disclose, or to permit the inspection or discussion of, any document, information or other matter (A) that constitutes trade secrets or proprietary information, (B) in respect of which disclosure to the Administrative Agent or any Lender (or any of their respective representatives) is prohibited by applicable Law, fiduciary duty, or any binding agreement, or (C) that is subject to attorney client or similar privilege, or constitutes attorney work product; (ii) nothing in the foregoing shall prohibit any Lender from requesting information regarding the results of operations, business affairs, and financial condition of any or all of the Loan Parties and Subsidiaries pursuant to Section 5.1(f) or from otherwise discussing the results of operations, business affairs, and financial condition of any or all of the Loan Parties and Subsidiaries with management of the Loan Parties and Subsidiaries; and (iii) this Section 5.7 shall *not* apply to Immaterial Subsidiaries, unless an Event of Default has occurred and is continuing.

Section 5.8    Maintenance of Properties; Insurance.

(a)    Keep and maintain all property material to the conduct of its business in good working order and condition, ordinary wear and tear excepted, except where failure to do so would *not* materially adversely affect the operations of the business of the Loan Parties and their Subsidiaries, taken as a whole;

(b)    maintain, with financially sound and reputable insurance companies not Affiliates of any Loan Party: (i) insurance with respect to its business, property and assets, and the business, property and assets of its Subsidiaries, against loss and/or damage of the kinds customarily insured against by companies in the same or similar businesses operating in the same or similar locations; and (ii) all insurance required to be maintained pursuant to the Collateral Documents (including, in any event, flood insurance to the extent required hereunder or by any other Loan Document);

(c)    at all times, shall name the Administrative Agent as additional insured on all liability policies of the Loan Parties and Subsidiaries, and as lender's loss payee (pursuant to a lender's loss payee endorsement approved by the Administrative Agent) on all casualty and property insurance policies of the Loan Parties and Subsidiaries;

(d)    cause all Mortgaged Property that constitutes Flood Hazard Property to be covered by flood insurance provided under the National Flood Insurance Program (or with private insurance endorsed to cause such private insurance to be fully compliant with the federal Law as regards private placement insurance applicable to the National Flood Insurance Program, with financially sound and reputable insurance companies

94

not Affiliates of any Loan Party), in such amounts, and with such deductibles, as the Administrative Agent may request; and

(e)     upon the request of the Administrative Agent, furnish to each Lender, at reasonable intervals, a certificate of a Responsible Officer of the Borrower setting forth the nature and extend of all insurance maintained by the Loan Parties and Subsidiaries in accordance with this Section 5.8;

Section 5.9     Use of Proceeds; Margin Regulations.

(a)     Use the proceeds of:

(i)     all Revolving Loans, on or after the Effective Date: (A) to finance Capital Expenditures; (B) to finance working capital needs; and (C) for other general corporate purposes of the Loan Parties and Subsidiaries;

(ii)     the Term Loan A: (A) on the Effective Date, (I) to refinance certain existing Indebtedness and to pay related transaction fees, costs and expenses, and (II) to pay transaction fees, costs and expenses associated with the Loan Documents and the other Related Transaction Documents; and (B) after the Effective Date, to finance Capital Expenditures;

(iii)     each Incremental Term Loan for the purposes set forth in the applicable Incremental Facility Amendment establishing such Incremental Term Loan; and

(iv)     all Letters of Credit for general corporate purposes;

in each case of the foregoing clauses (a)(i) through (a)(iv), not in violation of this Agreement or applicable Laws.

(f)     No part of the proceeds of any Loan will be used, whether directly or indirectly, for any purpose that would violate any rule or regulation of the Federal Reserve Board, including, without limitation, Regulation T, Regulation U and/or Regulation X.

Section 5.10     Casualty and Condemnation. (a) Furnish to the Administrative Agent and the Lenders prompt written notice of any casualty or other insured damage to any material portion of any Collateral, or the commencement of any action or preceding for the taking of any material portion of any Collateral, or any part thereof or interest therein, under power of eminent domain, by condemnation or by similar proceeding; and (b) ensure that the net cash proceeds of any such event (whether in the form of insurance proceeds, condemnation awards, or otherwise) are collected and applied in accordance with the applicable provisions of this Agreement and the Collateral Documents.

Section 5.11     Cash Management.

(a)     Maintain all primary cash management and treasury business of the Loan Parties and Subsidiaries with Truist, including, without limitation, all primary deposit accounts, disbursement accounts and lockbox accounts (other than any Excluded Accounts, all of which the Loan Parties may maintain without restriction) (each such deposit account, disbursement account and lockbox account, a "*Controlled Account*"); each Controlled Account shall be a Cash Collateral account, with all cash, Cash Equivalents, checks, and other similar items of payment in such account securing payment of the Obligations, and in which the Loan Parties shall have granted a first priority Lien to the Administrative Agent, ratably on behalf of the holders of the Obligations, perfected either automatically under the UCC (with respect to Controlled Accounts at Truist) or otherwise in accordance with clause (b) below;

(b)     cause each Controlled Account (other than, for the avoidance of doubt, any Excluded Accounts) that is *not* held at Truist to be held with a Permitted Third Party Bank and to be subject, at all times,

95

CONFIDENTIAL                                                                                         VPX-JHO0000000415

to a Controlled Account Agreement (it being understood and agreed that the Borrower shall have up to ninety (90) calendar days after the Effective Date (or such later date as the Administrative Agent may agree in its sole discretion) to cause any such accounts existing as of the Effective Date to become subject to a Controlled Account Agreement); provided, that, (i) no such Controlled Account Agreement shall be required with respect to any Controlled Account that has a balance (or which holds assets with a fair market value) of *less than* One-Hundred Fifty Thousand Dollars ($150,000), in any individual instance, or Three-Hundred Thousand Dollars ($300,000), when taken together with the account balances (or aggregate amount of the fair market value of assets) of all other Controlled Accounts that are *not* subject to a Controlled Account Agreement, and (ii) no such Controlled Account Agreement shall be required for any account in *excess* of the foregoing dollar limitations to the extent that amounts in excess of such limitations are swept, on *not less than* a weekly basis, to an account that is held at the Administrative Agent or subject to a Controlled Account Agreement; and

(c)    at any time after the occurrence, and during the continuance, of an Event of Default, at the request of the Required Lenders, cause all payments constituting proceeds of accounts or other Collateral to be directed into lockbox accounts, under agreements in form and substance satisfactory to the Administrative Agent.

Section 5.12    <u>Collateral Assurances</u>. Cause all personal property of each Loan Party and, subject to <u>Section 5.17(a)</u>, all fee ownership interests in Real Estate existing on the Effective Date (in each case, other than any Excluded Property), and all Collateral (as defined in the Owner Pledge Agreement) owned by each Owner Pledgor, in each case, to be subject, at all times (but subject, in the case of fee ownership interests in Real Estate existing on the Effective Date (other than Excluded Property), to <u>Section 5.17(a)</u>), to a valid, perfected (in the case of any such interests in Real Estate and any such Collateral (as defined in the Owner Pledge Agreement)), and, subject to any applicable filings, deliveries and/or recordings required to be made pursuant to the Loan Documents, enforceable Lien on, and security interest in, such personal property, such interests in Real Estate, and such Collateral (as defined in the Owner Pledge Agreement), in each case, that is prior, and superior in right, to any other Lien thereon, in each case, in favor of the Administrative Agent, for the ratable benefit of the holders of the Obligations, to secure the Obligations as required by the Collateral Documents (subject to Liens expressly permitted by <u>Section 7.2</u>), and, in connection with the foregoing, authorize and/or deliver, at the request of the Administrative Agent, such UCC financing statements (and/or similar instruments), Real Estate Documents, and other documents, supplements, certificates and/or instruments (including, without limitation, any filings and/or deliveries to perfect such liens, certified copies of Organization Documents, appropriate authorizing resolutions of the board of directors or managers (or equivalent governing body), as applicable, of such Loan Party, lien searches, IP Notice Filings, title insurance policies, surveys, environmental reports, legal opinions, and original stock and/or unit certificates, together with appropriate stock and/or unit powers (or other similar instruments of transfer) duly executed in blank), and take all such other actions, as the Administrative Agent shall require to perfect such Liens granted under any of the Loan Documents.

Section 5.13    <u>Additional Subsidiaries and Collateral</u>.

(a)    In the event that, after the Effective Date, any Person becomes a Domestic Subsidiary and such Subsidiary is *not* an Immaterial Subsidiary, whether pursuant to formation, acquisition or otherwise, (I) promptly provide written notice thereof to the Administrative Agent and the Lenders, and (II) as promptly as practicable and, in any event, within forty-five (45) days after such Person becomes a Domestic Subsidiary (or such longer period as the Administrative Agent shall agree in its sole discretion):

(i)    cause such Domestic Subsidiary to: (A) become a new Guarantor, and to grant Liens in favor of the Administrative Agent, for the ratable benefit of the holders of the Obligations, in all of its personal property and any personal property that is subject to (or in respect of which ownership is transferred pursuant to) any Economic Incentive Transaction to which such Domestic Subsidiary is a party, to the extent that Liens in favor of the Administrative Agent, for the benefit of the holders of the Obligations, are *not* prohibited by

96

CHAR2\2683123v6

the applicable laws and statutes governing such Economic Incentive Transaction (other than any Excluded Property), by (I) executing and delivering to the Administrative Agent a Guarantor Joinder Agreement, in form and substance reasonably satisfactory to the Administrative Agent, accompanied by (1) all other Loan Documents related thereto, (2) certified copies of Organization Documents, (3) appropriate authorizing resolutions of the board of directors or managers (or equivalent governing body), as applicable, of such Domestic Subsidiary, (4) legal opinions comparable to those delivered pursuant to Section 3.1(c), and (5) any IP Notice Filings reasonably requested by the Administrative Agent, and (II) authorizing and/or delivering, at the request of the Administrative Agent, such UCC financing statements and/or similar instruments required by the Administrative Agent to perfect the Liens in favor of the Administrative Agent, for the ratable benefit of the holders of the Obligations, and granted under any of the Loan Documents; (B) grant Liens in favor of the Administrative Agent, for the ratable benefit of the holders of the Obligations, in all fee ownership interests in Real Estate (other than any Excluded Property) by executing and delivering to the Administrative Agent such Real Estate Documents as the Administrative Agent shall require; and (C) deliver to the Administrative Agent all such other supplements, documents, certificates and/or instruments (including, without limitation, any filings and/or deliveries to perfect such Liens, lien searches, title insurance policies, surveys, environmental reports, and legal opinions), and take all such other actions, as such Domestic Subsidiary would have been required to deliver and take, as applicable, pursuant to Section 3.1 if such Domestic Subsidiary had been a Loan Party on the Effective Date, or that such Domestic Subsidiary would have been required to deliver or take, as applicable, pursuant to Section 5.13 with respect to any Real Estate, or as the Administrative Agent may otherwise reasonably request; and

(ii)    (A) cause one hundred percent (100.0%) of the issued and outstanding Capital Stock in such Domestic Subsidiary (other than any Excluded Property) to be subject, at all times, to a first priority, perfected Lien in favor of the Administrative Agent, for the ratable benefit of the holders of the Obligations, to secure the Obligations pursuant to the Collateral Documents (subject to Liens expressly permitted by Section 7.2); and (B) in connection with the actions described in the foregoing clause (a)(ii)(A), deliver to the Administrative Agent (I) the original stock and/or unit certificate(s) evidencing such pledged Capital Stock, together with appropriate stock and/or unit powers (or other similar instruments of transfer) duly executed in blank, and (II) all such other supplements, documents, certificates and/or instruments (including, without limitation, any filings and/or deliveries to perfect such Liens, lien searches, and legal opinions), and take all such other actions, as the Administrative Agent may reasonably request;

(b)    In the event that, after the Effective Date, any Person becomes a Foreign Subsidiary, whether pursuant to formation, acquisition or otherwise, (I) promptly provide written notice thereof to the Administrative Agent and the Lenders, and (II) to the extent that such Foreign Subsidiary is owned directly by any Loan Party, as soon as practicable and, in any event, within sixty (60) days after such Person becomes a Foreign Subsidiary (or such longer period as the Administrative Agent shall agree in its sole discretion):

(i)    cause sixty-five (65.0%) of the issued and outstanding Capital Stock in such Foreign Subsidiary (other than any Excluded Property) entitled to vote (within the meaning of Treas. Reg. Section 1.956–2(c)(2)), and one hundred percent (100.0%) of the issued and outstanding Capital Stock in such Foreign Subsidiary (other than any Excluded Property) *not* entitled to vote (within the meaning of Treas. Reg. Section 1.956–2(c)(2)), to be subject, at all times, to a first priority, perfected Lien in favor of the Administrative Agent, for the ratable benefit of the holders of the Obligations, to secure the Obligations pursuant to the Collateral Documents (subject to Liens expressly permitted by Section 7.2); and

97

CONFIDENTIAL                                                                 VPX-JHO0000000417

(ii)    in connection with the actions described in the foregoing <u>clause (b)(i)</u>, deliver to the Administrative Agent: (A) the original stock and/or unit certificate(s) evidencing such pledged Capital Stock, together with appropriate stock and/or unit powers (or other similar instruments of transfer) duly executed in blank; and (B) all such other supplements, documents, certificates and/or instruments (including, without limitation, any filings and/or deliveries to perfect such Liens, lien searches, and legal opinions), and take all such other actions, as the Administrative Agent may reasonably request;

<u>provided</u>, <u>that</u>, notwithstanding anything to the contrary in this <u>clause (b)</u> or elsewhere in this Agreement or any other Loan Document, to the extent that the granting of a first-priority, valid Lien in favor of the Administrative Agent, for the benefit of the holders of the Obligations, in the Capital Stock in any Foreign Subsidiary requires that one (1) or more of the Loan Parties or the Owner Pledgor enter into documentation governed by Laws other than those of the United States, the District of Columbia, or any state or subdivision of any of the foregoing, then the Loan Parties or the Owner Pledgor (as the case may be) shall *not* be required to cause such Capital Stock to be subject to the requirements set forth above in this <u>clause (b)</u> if, in the sole judgment of the Administrative Agent, the cost or burden of creating or perfecting such pledge(s) or security interest(s) therein would be excessive in light of the benefit(s) to be obtained therefrom by the Lenders and the other holders of the Obligations (it being understood and agreed that, as of the First Amendment Effective Date, the Capital Stock in each of Bang Energy Mexico, S. DE R.L. DE C.V. and Bang Energy B.V. shall *not* be required to be pledged in accordance with this Section 5.13 by operation of this proviso).

(c)    The Loan Parties agree that, following the delivery of any Collateral Documents required to be executed and delivered pursuant to this <u>Section 5.13</u>, the Administrative Agent shall have a valid and enforceable, first priority perfected Lien on all property required to be pledged pursuant to <u>clauses (a)</u> and <u>(b)</u> above (to the extent that such Lien can be perfected by execution, delivery and/or recording of the Collateral Documents or UCC financing statements, or by possession of such Collateral), free and clear of all Liens, other than Liens expressly permitted by <u>Section 7.2</u>. All actions to be taken pursuant to this <u>Section 5.13</u> shall be at the expense of the Borrower and any other applicable Loan Party, and shall be taken to the reasonable satisfaction of the Administrative Agent.

(d)    For purposes of clarity, in the event that a Subsidiary becomes a Guarantor after the Effective Date, such Subsidiary shall remain a Guarantor even if such Subsidiary subsequently becomes an Immaterial Subsidiary, except as otherwise expressly permitted to cease being a Guarantor pursuant to the terms of this Agreement.

Section 5.14    <u>Additional Real Estate</u>. To the extent otherwise permitted hereunder, if any Loan Party proposes to acquire a fee ownership interest in Real Estate (other than any Excluded Property) after the Effective Date, as promptly as practicable and, in any event, within ninety (90) days (or such later date as the Administrative Agent may agree in its sole discretion) after the date of such acquisition, deliver, or cause to be delivered, to the Administrative Agent such Real Estate Documents with respect to such acquired Real Estate as the Administrative Agent shall require; <u>provided</u>, <u>that</u>, notwithstanding anything to the contrary in the foregoing, (a) in connection with any Economic Incentive Transaction, the Loan Parties shall, and shall cause their Subsidiaries to, use their commercially reasonable efforts to cause the fee ownership interest(s) of any Loan Party, Subsidiary or Governmental Authority in any applicable Real Estate that is the subject of (or in respect of which ownership is transferred pursuant to) such Economic Incentive Transaction to be subject to Liens in favor of the Administrative Agent, for the benefit of the holders of the Obligations, in accordance with this <u>Section 5.14</u>, and (b) in the event that the Loan Parties are unable to cause any such fee ownership interest(s) referred to in the foregoing <u>clause (a)</u> to be subject to Liens as described in the foregoing <u>clause (a)</u>, then (i) such fee ownership interest(s) shall *not* be required to be subject to Liens in favor of the Administrative Agent, for the benefit of the holders of the Obligations, whether pursuant to this <u>Section 5.14</u> or any other provision of this Agreement or any other Loan Document, (ii) upon the reasonable request of the Borrower, the Administrative Agent shall, if such fee ownership interest(s) is then subject to Liens in favor of the Administrative Agent, provide release(s) in form and substance reasonably satisfactory to the Administrative

98

CHAR2\2683123v6

Agent with respect to the Mortgage in favor of the Administrative Agent, for the benefit of the holders of the Obligations, encumbering such fee ownership interest(s), and (iii) as soon as practicable and, in any event, within ninety (90) calendar days of (A) the consummation of such Economic Incentives Transaction (or by such later date as the Administrative Agent may agree in its sole discretion), the Loan Parties shall cause any leasehold ownership interest(s) of any Loan Party or Subsidiary in any Real Estate that is the subject of (or in respect of which ownership is transferred pursuant to) such Economic Incentive Transaction to be subject, at all times thereafter, to a first-priority, valid and title-insured Lien in favor of the Administrative Agent, for the benefit of the holders of the Obligations, by promptly delivering to the Administrative Agent a duly-executed Mortgage with respect to such leasehold ownership interest(s), together with such other Real Estate Document(s) as may be requested by the Administrative Agent in connection with such Economic Incentive Transaction, and (B) the termination or earlier expiration of the tax abatement program established by, pursuant to, or as a result of such Economic Incentives Transaction (or by such later date as the Administrative Agent may agree in its sole discretion), the Loan Parties shall cause any such fee ownership interest(s) referred to in the foregoing <u>clause (a)</u> that had previously been the subject of (or in respect of which ownership had been transferred pursuant to) such terminated or expired Economic Incentives Transaction to be subject, at all times thereafter, to a first priority, valid and title-insured Lien in favor of the Administrative Agent, for the benefit of the holders of the Obligations, by promptly delivering to the Administrative Agent a duly-executed Mortgage with respect to such fee ownership interest(s), together with such other Real Estate Document(s) as may be requested by the Administrative Agent in connection with such termination or expiration.

Section 5.15    Further Assurances.

(a)    Execute and deliver any and all further documents, financing statements, agreements, certificates and/or instruments, and take all such further actions (including, without limitation, the filing and recording of financing statements, fixture filings, Mortgages, and other documents) that may, in the determination of the Administrative Agent, be required under applicable Law, or that the Administrative Agent or the Required Lenders may reasonably request, in each case of the foregoing, to effectuate the transactions contemplated by the Loan Documents, or to grant, preserve, protect or perfect the Liens created under the Collateral Documents, or the validity and/or priority of any such Lien, all at the expense of the Loan Parties; and

(b)    Provide to the Administrative Agent, from time to time upon request, evidence, reasonably satisfactory to the Administrative Agent, as to the perfection and priority of the Liens created, or intended to be created, by the Collateral Documents.

Section 5.16    PPP Loans.

(a)    As promptly as reasonably practical, apply for forgiveness or other relief of any PPP Loan received under Section 1106 of the CARES Act as permitted by the applicable Governmental Authority.

(b)    Use the proceeds of the PPP Loan for permitted uses under the PPP regulations and the CARES Act within eight (8) weeks of receipt thereof, and, in no case utilize such proceeds for any purpose other than forgivable purposes under the PPP regulations and the CARES Act (*e.g.*, *at least* seventy-five percent (75.0%) of the proceeds of the PPP Loan must be used for "payroll costs", as defined in the CARES Act).

Section 5.17    Post-Closing Requirements.

(a)    Fee Owned Real Estate. As soon as practicable and, in any event, within thirty (30) calendar days of the Effective Date (or such later date as the Administrative Agent may agree in its sole discretion), deliver to the Administrative Agent all Real Estate Documents with respect to each Mortgaged Property.

(b)    Collateral Access Agreements. Use commercially reasonable efforts to deliver, or cause to be delivered, unless the Administrative Agent otherwise expressly consents in writing, to the Administrative Agent, as soon as practicable and, in any event, within thirty (30) calendar days from (i) the Effective Date (or

99

CONFIDENTIAL

such later date as the Administrative Agent may agree in its sole discretion), in the case of any leased Real Estate of any Loan Party as of the Effective Date, and (ii) the date on which the applicable lease is entered into (or such later date as the Administrative Agent may agree in its sole discretion), in the case of any leased Real Estate of any Loan Party acquired after the Effective Date, in each case of the foregoing <u>clauses (b)(i)</u> and <u>(b)(ii)</u>, a duly executed Collateral Access Agreement with respect to each leased Real Estate that is, or will be, a headquarters location, or a location where material corporate books and/or records, or Collateral with a value of *at least* One Million Dollars ($1,000,000), of the Loan Parties is, or will be, stored and/or located from the landlord of such leased Real Estate, or from the bailee with respect to any warehouse or other location where such material corporate books and/or records, or such Collateral, is, or will be, stored and/or located (in each case, other than any Excluded Property), together with a copy of the underlying lease or bailee agreement, as applicable.

(c)     <u>Stoked IP Transfer</u>. As soon as practicable and, in any event, (i) with respect to each IP Right constituting Stoked IP that is *not* pending registration with the United States Copyright Office or United States Patent and Trademark Office, as the case may be, on the Effective Date, within thirty (30) calendar days of the Effective Date (or such later date as the Administrative Agent may agree in its sole discretion), and (ii) with respect to any such IP Right constituting Stoked IP that is pending registration with the United States Copyright Office or the United States Patent and Trademark Office, as the case may be, on the Effective Date, within thirty (30) calendar days of the date on which such registration is completed for such IP Right constituting Stoked IP (or such later date as the Administrative Agent may agree in its sole discretion), in each case of the foregoing <u>clauses (c)(i)</u> and <u>(c)(ii)</u>, cause each such IP Right constituting Stoked IP to be transferred to, and thereafter to be wholly-owned by, any Stoked Entity (or any combination of Stoked Entities).

(d)     <u>Certified Capital Stock</u>. As soon as practicable and, in any event, within thirty (30) calendar days of the Effective Date (or such later date as the Administrative Agent may agree in its sole discretion), deliver to the Administrative Agent all original certificates evidencing any certificated Capital Stock pledged to the Administrative Agent pursuant to the Security Agreement, the Owner Pledge Agreement, or any other pledge agreement, together with duly executed in blank, undated original stock powers attached thereto (unless, with respect to the pledged Capital Stock of any Foreign Subsidiary, such stock powers are deemed unnecessary by the Administrative Agent in its reasonable discretion under the Law of the jurisdiction of organization of such Person).

(e)     <u>Insurance</u>. As soon as practicable and, in any event, within thirty (30) calendar days of the Effective Date (or such later date as the Administrative Agent may agree in its sole discretion), deliver to the Administrative Agent insurance policy endorsements naming the Administrative Agent as additional insured on liability insurance policies and lender's loss payee on property and casualty insurance policies.

ARTICLE VI

<u>FINANCIAL COVENANTS</u>

Until the Commitments have expired or been terminated and all Obligations have been paid in full, and all Letters of Credit shall have expired or been terminated, in each case, without any pending draw, or all such Letters of Credit shall have been Cash Collateralized to the satisfaction of the Issuing Bank, and all LC Disbursements shall have been reimbursed, each Loan Party covenants and agrees with the Lenders that no Loan Party shall, nor shall it permit any Subsidiary to, directly or indirectly:

Section 6.1     <u>Combined Total Leverage Ratio</u>. Permit the Combined Total Leverage Ratio, as of the end of any Fiscal Quarter, commencing with the Fiscal Quarter ending September 30, 2020, to be greater than 3:00:1.00.

100

CHAR2\2683123v6

Section 6.2    <u>Combined Fixed Charge Coverage Ratio</u>. Permit the Combined Fixed Charge Coverage Ratio, as of the end of any Fiscal Quarter, commencing with the Fiscal Quarter ending September 30, 2020, to be less than 1.25:1.00.

ARTICLE VII

NEGATIVE COVENANTS

Until the Commitments have expired or been terminated and all Obligations have been paid in full, and all Letters of Credit shall have expired or been terminated, in each case, without any pending draw, or all such Letters of Credit shall have been Cash Collateralized to the satisfaction of the Issuing Bank, and all LC Disbursements shall have been reimbursed, each Loan Party covenants and agrees with the Lenders that no Loan Party shall, nor shall it permit any Subsidiary to, directly or indirectly:

Section 7.1    <u>Indebtedness and Preferred Equity</u>. Create, incur, assume, issue, or suffer to exist any Indebtedness, except:

(a)    Indebtedness created pursuant to the Loan Documents;

(b)    Indebtedness of any Loan Party or Subsidiary existing on the date hereof and set forth on <u>Schedule 7.1</u> hereto and any Permitted Refinancing thereof;

(c)    Indebtedness of any Loan Party or Subsidiary incurred to finance the acquisition, construction or improvement of any fixed or capital assets, including Capital Lease Obligations, and any Indebtedness assumed in connection with the acquisition of such assets or secured by a Lien on any such assets prior to the acquisition thereof; <u>provided, that</u>, (i) such Indebtedness is incurred prior to, or within ninety (90) days after, such acquisition, or the completion of such construction or improvements, or Permitted Refinancings thereof; and (ii) the aggregate principal amount of such Indebtedness does *not exceed* Twenty Million Dollars ($20,000,000) at any time outstanding;

(d)    Indebtedness of any Loan Party owing to any Subsidiary, and of any Subsidiary owing to any Loan Party or any other Subsidiary; <u>provided, that</u>, (i) any such Indebtedness that is owed by a Subsidiary that is *not* a Loan Party shall be subject to <u>Section 7.4</u>, and (ii) (A) such Indebtedness in a principal amount in *excess* of Two Million Five-Hundred Thousand Dollars ($2,500,000), or, if reasonably requested by the Administrative Agent, such Indebtedness in a principal amount *not* in *excess* of Two Million Five-Hundred Thousand Dollars ($2,500,000), shall be evidenced by a demand note, in form and substance reasonably satisfactory to the Administrative Agent and pledged and delivered to the Administrative Agent pursuant to the Collateral Documents as additional collateral security for the Obligations, and (B) the obligations under such demand note shall be subordinated to the obligations of the Loan Parties under the Loan Documents (including, without limitation, the Obligations of the Borrower hereunder) in a manner reasonably satisfactory to the Administrative Agent;

(e)    Guarantees by any Loan Party of Indebtedness of any Subsidiary, and by any Subsidiary of Indebtedness of any Loan Party or any other Subsidiary; <u>provided, that</u>, Guarantees by any Loan Party of Indebtedness of any Subsidiary that is *not* a Loan Party shall be subject to <u>Section 7.4</u>;

(f)    Indebtedness arising in connection with endorsements of instruments for deposit in the ordinary course of business;

(g)    Contingent Liabilities arising with respect to: (i) customer indemnification obligations in favor of purchasers in connection with dispositions permitted under <u>Section 7.3</u>; and (ii) the Guarantee by any Loan Party or Subsidiary of a lease, sublease, license or sublicense entered into in the ordinary course of business by another Loan Party or Subsidiary;

101

CONFIDENTIAL                                                                                                    VPX-JHO0000000421

(h)      Indebtedness of any Person acquired in a Permitted Acquisition ("*Acquired Indebtedness*"), provided, that: (i) such Acquired Indebtedness exists *prior* to the consummation of the applicable Permitted Acquisition, and is *not* incurred in anticipation of, or in connection with, such Permitted Acquisition; (ii) the aggregate principal amount of all Acquired Indebtedness shall *not exceed* Five Million Dollars ($5,000,000) at any time outstanding; and (iii) no Loan Party (other than the acquired Person) shall have any liability or other obligation with respect to such Acquired Indebtedness (unless otherwise permitted under this Agreement);

(i)      Hedging Obligations permitted by Section 7.10; and

(j)      Indebtedness incurred by one (1) or more Subsidiaries that are *not* Loan Parties; provided, that, the aggregate principal amount of such Indebtedness incurred pursuant to this clause (j) shall *not exceed* Ten Million Dollars ($10,000,000) at any time outstanding;

(k)      Indebtedness owed to any Person (including obligations in respect of letters of credit for the benefit of such Person) providing workers' compensation, health, disability or other employee benefits, or property, casualty or liability insurance or self-insurance, pursuant to reimbursement or indemnification obligations to such Person or to finance insurance premiums, in each case of the foregoing, incurred in the ordinary course of business or consistent with past practice;

(l)      Indebtedness in respect of, or Guarantees of, performance bonds, bid bonds, appeal bonds, surety bonds, performance and completion guarantees, workers' compensation claims, letters of credit, bank guarantees and banker's acceptances, warehouse receipts or similar instruments and similar obligations (other than in respect of other Indebtedness for borrowed money), in each case of the foregoing, provided in the ordinary course of business or consistent with past practice;

(m)      cash management obligations and other Indebtedness in respect of netting services, overdraft protection and similar arrangements, in each case of the foregoing, incurred in connection with cash management and deposit accounts maintained in the ordinary course of business;

(n)      to the extent constituting Indebtedness, take or pay obligations contained in supply arrangements, in each case of the foregoing, incurred in the ordinary course of business or consistent with past practice;

(o)      to the extent constituting Indebtedness, obligations arising from agreements providing for indemnification, purchase price adjustments or similar obligations (other than earnout obligations), in each case of the foregoing, incurred or assumed in connection with the acquisition or disposition of any business or assets permitted under this Agreement;

(p)      to the extent constituting Indebtedness, Guarantees in the ordinary course of business of the obligations of suppliers, customers, franchisees and licensees of the Loan Parties and Subsidiaries;

(q)      performance guarantees primarily Guaranteeing performance of contractual obligations to a third-party, and *not* for the purpose of Guaranteeing payment of Indebtedness;

(r)      obligations in respect of letters of support, Guarantees or similar obligations issued, made or incurred for the benefit of any of the Loan Parties or Subsidiaries, to the extent required in connection with any statutory filing or the delivery of audit opinions performed in jurisdictions other than the United States;

(s)      Indebtedness incurred pursuant to the Aircraft Loan Documents, and any Permitted Refinancing thereof;

(t)      unsecured Indebtedness in the form of the PPP Loan, in an aggregate principal amount *not to exceed* the maximum loan amount permitted under the applicable payroll-based formula specified under the CARES Act or any related regulations applicable to the Loan Parties; provided, that, the aggregate principal

102

CHAR2\2683123v6

amount of the PPP Loan incurred under this <u>clause (t)</u> shall *not exceed* Eight Million One-Hundred Forty-One Thousand Dollars ($8,141,000);

(u)    other unsecured Indebtedness of the Loan Parties and Subsidiaries in an aggregate principal amount not to exceed Twenty-Five Million Dollars ($25,000,000) at any time outstanding; <u>provided</u>, <u>that</u>, any outstanding Indebtedness incurred under Section 7.1(w) shall reduce capacity under this Section 7.1(u) on a dollar-for-dollar basis (but not below $0);

(v)    Indebtedness under, or incurred pursuant to, any Economic Incentive Transaction; and

(w)    Indebtedness in respect of an unsecured promissory note (the "<u>Doehler Note</u>") issued by the Borrower in favor of Doehler USA, Inc., in a principal amount not to exceed Twenty-Six Million Dollars ($26,000,000) at any one time outstanding and for which no yield (whether in the form of interest rate, margin, original issue discount, upfront fees or otherwise) shall accrue or be payable in respect of principal balance thereof; <u>provided</u>, <u>that</u>, any outstanding Indebtedness incurred under <u>Section 7.1(u)</u> shall reduce capacity under this Section 7.1(w) on a dollar-for-dollar basis.

Section 7.2    <u>Liens</u>. Create, incur, assume or suffer to exist any Lien on any of its property or assets now owned or hereafter acquired, except:

(a)    Liens securing the Obligations pursuant to the Loan Documents; <u>provided</u>, <u>that</u>, no Liens may secure Hedging Obligations and/or Bank Product Obligations without also securing all other Obligations on *at least* a *pari passu* basis with such Hedging Obligations and/or Bank Product Obligations, and, in any event, subject to the priority of payments provisions set forth in <u>Section 2.21</u> and <u>Section 8.2</u>;

(b)    Permitted Encumbrances;

(c)    any Liens on any property or assets of the Loan Parties or Subsidiaries existing on the Effective Date set forth on <u>Schedule 7.2</u> hereto; <u>provided</u>, <u>that</u>, such Lien shall *not* apply to any other property or asset of any Loan Party or Subsidiary;

(d)    purchase money Liens upon or in any fixed or capital assets to secure the purchase price, or the cost of construction or improvement, of such fixed or capital assets, or to secure Indebtedness incurred *solely* for the purpose of financing the acquisition, construction or improvement of such fixed or capital assets (including Liens securing any Capital Lease Obligations); <u>provided</u>, <u>that</u>, (i) such Lien secures Indebtedness permitted by <u>Section 7.1(c)</u>, (ii) such Lien attaches to such asset concurrently with, or within ninety (90) days after, the acquisition, or completion of the construction or improvement, thereof, (iii) such Lien does *not* extend to any other asset, and (iv) the Indebtedness secured thereby does *not exceed* the cost of acquiring, constructing or improving such fixed or capital assets;

(e)    any Lien (i) in connection with Indebtedness incurred pursuant to <u>Section 7.1(h)</u>, (ii) existing on any asset of any Person at the time such Person is merged with, or into, any Loan Party or Subsidiary, or (iii) existing on any asset prior to the acquisition thereof by any Loan Party or Subsidiary; <u>provided</u>, <u>that</u>, (A) such Lien exists *prior* to the consummation of the applicable Permitted Acquisition, merger or acquisition, and is *not* created in contemplation of, or in connection with, such Permitted Acquisition, merger or acquisition; (B) such Lien secures *only* those obligations that it secured on the date of consummation of the applicable Permitted Acquisition, merger or acquisition; and (C) such Lien does *not*, at any time, encumber any property other than the property that it encumbered on the date of consummation of the applicable Permitted Acquisition, merger or acquisition;

(f)    extensions, renewals, and/or replacements of any Lien referred to in <u>clauses (a)</u> through <u>(e)</u> above; <u>provided</u>, <u>that</u>, (i) the principal amount of the Indebtedness secured thereby is *not* increased, and (ii) any such extension, renewal and/or replacement is limited to the assets originally encumbered thereby; and

103

CONFIDENTIAL                                                     VPX-JHO0000000423

(g)        Liens (i) of a collecting bank arising in the ordinary course of business under Section 4–208 of the UCC, as in effect in the relevant jurisdiction, covering only the items being collected upon, (ii) in favor of a banking or other financial institution, arising as a matter of law or contract, encumbering deposits or other funds maintained with a financial institution (including netting arrangements or the right of set off) and which are within the general parameters customary in the banking industry; and (iii) encumbering reasonable customary initial deposits and margin deposits and similar Liens attaching to commodity trading accounts or other brokerage accounts, in each case of the foregoing clauses (g)(i) through (g)(iii), incurred in the ordinary course of business, not for speculative purposes, and not in connection with the incurrence of any Indebtedness for borrowed money;

(h)        Liens representing (i) any interest or title of a licensor, lessor or sub-licensor or sub-lessor under any lease or license permitted by this Agreement, (ii) any Lien or restriction that the interest or title of such lessor, licensor, sub-lessor or sub-licensor may be subject to, or (iii) the interest of a licensee, lessee, sub-licensee or sub-lessee arising by virtue of being granted a license or lease permitted by this Agreement, in each case of the foregoing clauses (h)(i) through (h)(iii), *not* interfering, in any material respect, with the ordinary conduct of the business of the Loan Parties and Subsidiaries, taken as a whole;

(i)         Liens arising out of conditional sale, title retention, consignment or similar arrangements for the sale of goods;

(j)         Liens granted by a Subsidiary that is not a Loan Party in favor of any Loan Party in respect of Indebtedness or other obligations owed by such Subsidiary to such Loan Party;

(k)        Liens: (i) attaching *solely* to cash advances and cash earnest money deposits in connection with Investments permitted under Section 7.4; or (ii) consisting of an agreement to dispose of any property and/or assets in any disposition permitted hereunder;

(l)         Liens on insurance policies, and the proceeds thereof, granted in the ordinary course of business to secure the financing of insurance premiums with respect thereto;

(m)        Liens encumbering deposits made to secure obligations arising from contractual or warranty requirements entered into in the ordinary course of business;

(n)        Liens in favor of customs and revenue authorities to secure payment of customs duties in connection with the importation of goods in the ordinary course of business;

(o)        Liens of bailees in the ordinary course of business, subject to compliance with Section 5.17(b);

(p)        utility and similar deposits in the ordinary course of business;

(q)        Liens disclosed as exceptions to coverage in title policies and endorsements with respect to any Real Estate, in each case of the foregoing, approved by the Administrative Agent;

(r)         Liens that are contractual rights of set-off: (i) relating to the establishment of depository relations with banks or other financial institutions not given in connection with the incurrence of Indebtedness for borrowed money; (ii) relating to pooled deposit or sweep accounts of any Loan Party to permit satisfaction of overdraft or similar obligations incurred in the ordinary course of business of the Loan Parties; or (iii) relating to purchase orders and other agreements entered into by any Loan Party or Subsidiary in the ordinary course of business;

(s)        Liens on property and/or assets of any Loan Party or Subsidiary that do *not* constitute Collateral; provided, that, such Liens permitted pursuant to this clause (s) shall secure only Indebtedness permitted under Section 7.1(j);

104

CONFIDENTIAL                                                                                      VPX-JHO0000000424

(t)     non-exclusive licenses and sub-licenses granted by any Loan Party or Subsidiary, and leases and sub-leases by any Loan Party or Subsidiary, in each case of the foregoing: (i) to third-parties in the ordinary course of business; and (ii) *not* interfering with any business of any Loan Party or Subsidiary;

(u)     Liens granted by Foreign Subsidiaries and Immaterial Subsidiaries securing Indebtedness to the extent permitted by <u>Section 7.1</u>; <u>provided</u>, <u>that</u>, such Liens do *not* encumber any property and/or assets of the Loan Parties that constitutes Collateral;

(v)     Liens granted pursuant to the Aircraft Loan Documents, and any Permitted Refinancing thereof;

(w)     other Liens securing Indebtedness outstanding in an aggregate principal amount *not to exceed* Fifteen Million Dollars ($15,000,000) at any time;

(x)     Liens granted after the Second Amendment Effective Date on any accounts receivable due from PepsiCo, Inc., a North Carolina corporation (and/or any of its Subsidiaries or controlled Affiliates), to any Loan Party or Subsidiary thereof that, in each case, is the subject of a Permitted HNB Receivables Asset Sale; <u>provided</u>, <u>that</u>, any such Liens are granted in accordance with the terms of an applicable Permitted HNB Receivables Purchase Agreement governing such Permitted HNB Receivables Asset Sale; and

(y)     Liens securing obligations under, or incurred pursuant to, any Economic Incentive Transaction on the real and/or personal property that is the subject of (or in respect of which ownership is transferred pursuant to) such Economic Incentive Transaction.

Section 7.3     <u>Fundamental Changes; Conduct of Business</u>.

(a)     Merge into, or consolidate into, any other Person, or permit any other Person to merge into or consolidate with it, or sell, lease, transfer, or otherwise dispose of (in a single transaction or a series of transactions) all, or substantially all, of its property or assets (in each case, whether now owned or hereafter acquired) or any line of business, or all, or substantially all, of the equity interests in any of its Subsidiaries (in each case, whether now owned or hereafter acquired), or otherwise liquidate or dissolve; <u>provided</u>, <u>that</u>, if, at the time thereof and immediately after giving effect thereto, no Default or Event of Default shall have occurred and be continuing, (i) any Loan Party or Subsidiary may merge with another Person pursuant to a Permitted Acquisition, if such Loan Party (or such Subsidiary, if such Loan Party is *not* a party to such merger) is the surviving Person, (ii) any Subsidiary may merge into another Subsidiary, <u>provided</u>, <u>that</u>, if any party to such merger is a Loan Party, the Loan Party shall be the surviving Person, (iii) any Subsidiary may sell, lease, transfer, or otherwise dispose of all, or substantially all, of its property or assets to any Loan Party or Subsidiary, and (iv) any Subsidiary that is *not* a Loan Party may liquidate or dissolve, if the Borrower determines in good faith that such liquidation or dissolution (A) is in the best interests of the Loan Parties, and (B) is *not* materially disadvantageous to the Lenders, <u>provided</u>, <u>that</u>, (I) all of its property or assets are disposed of subject to <u>Section 2.12(a)(i)</u>, and (II) any such merger involving a Person that is *not* a Wholly-Owned Subsidiary of a Loan Party immediately prior to such merger shall *not* be permitted, unless also permitted by <u>Section 7.4</u>.

(b)     Engage in any business, other than any business in the same line(s) of business as conducted by the Loan Parties and Subsidiaries on the Effective Date, or any business(es) reasonably related thereto (and non-core incidental businesses acquired in connection with any Permitted Acquisition or permitted Investment or other immaterial businesses).

CONFIDENTIAL     VPX-JHO0000000425

Section 7.4 <u>Investments; Loans</u>. Make, purchase, hold, acquire, or permit to exist (as applicable) any Investment, or purchase or otherwise acquire (in one (1) transaction or a series of transactions) any assets of any other Person that constitute a business unit, or create or form any Subsidiary, except:

(a)    Investments (other than Cash Equivalents) existing on the date hereof and set forth on <u>Schedule 7.4</u> hereto (including, without limitation, Investments in Subsidiaries so scheduled);

(b)    Cash Equivalents;

(c)    Guarantees by any Loan Party or Subsidiary constituting Indebtedness permitted by <u>Section 7.1</u>; <u>provided</u>, <u>that</u>, the aggregate principal amount of Indebtedness of Subsidiaries that are *not* Loan Parties that is Guaranteed by any Loan Party shall be subject to the proviso set forth in <u>clause (d)</u> below;

(d)    Investments made by any Loan Party in or to any Subsidiary thereof, and by any Subsidiary of a Loan Party to such Loan Party, or in or to another such Subsidiary; <u>provided</u>, <u>that</u>, the aggregate amount of Investments by Loan Parties in or to, and Guarantees by Loan Parties of Indebtedness of, any Subsidiary that is *not* a Loan Party (including, without limitation, all such Investments and Guarantees existing on the Effective Date) shall *not exceed* Ten Million Dollars ($10,000,000) at any time outstanding;

(e)    loans or advances to employees, officers or directors of any Loan Party or Subsidiary in the ordinary course of business for travel, relocation and related expenses; <u>provided</u>, <u>that</u>, the aggregate amount of all such loans and advances does *not exceed* Five-Hundred Thousand Dollars ($500,000) in the aggregate at any time outstanding;

(f)    Hedging Transactions permitted by <u>Section 7.10</u>;

(g)    Permitted Acquisitions;

(h)    Contingent Liabilities constituting Indebtedness to the extent permitted under <u>Section 7.1</u>;

(i)    bank deposits established in accordance with the Loan Documents;

(j)    Investments received in connection with the bankruptcy or reorganization of, or settlement of delinquent accounts and disputes with, customers and suppliers, or upon the foreclosure with respect to any secured Investment or other transfer of title with respect to any secured Investment;

(k)    Investments of any Person existing at the time such Person becomes a Subsidiary or otherwise consolidates, amalgamates or merges with any Loan Party or Subsidiary (including in connection with an Acquisition or other Investment permitted hereunder); <u>provided</u>, <u>that</u>, such Investment was *not* made in contemplation of such Person becoming a Subsidiary or such consolidation, amalgamation or merger, as the case may be;

(l)    Investments resulting from pledges or deposits described in <u>clauses (c)</u> and/or <u>(d)</u> of the definition of "*Permitted Encumbrances*" in <u>Section 1.1</u>;

(m)    receivables or other trade payables owing to any Loan Party or Subsidiary if created or acquired in the ordinary course of business and payable or dischargeable in accordance with customary trade terms; <u>provided</u>, <u>that</u>, such trade terms may include such concessionary trade terms as such Loan Party or Subsidiary deems to be reasonable under the circumstances;

(n)    Investments consisting of cash earnest money deposits in connection with a Permitted Acquisition or other Investment permitted hereunder;

106

CONFIDENTIAL                                                                 VPX-JHO0000000426

(o)     Investments consisting of endorsements for collection or deposit in the ordinary course of business;

(p)     Guarantee obligations of the Loan Parties or Subsidiaries in respect of letters of support, Guarantees or similar obligations issued, made or incurred for the benefit of any Loan Party or Subsidiary, to the extent required in connection with any statutory filing or the delivery of audit opinions performed in jurisdictions other than within the United States;

(q)     Guarantees by any Loan Party or Subsidiary of leases of real property (other than Capital Lease Obligations), contracts, or of other obligations that do not constitute Indebtedness, in each case of the foregoing, entered into in the ordinary course of business; and

(r)     other Investments, provided, that: (i) both immediately before and immediately after giving effect to such Investment on a Pro Forma Basis, no Default or Event of Default shall exist; and (ii) immediately after giving effect to such Investment on a Pro Forma Basis, the Loan Parties shall be in compliance with all financial covenants set forth in Article VI.

Section 7.5     Restricted Payments. Declare or make, or agree to pay or make, directly or indirectly, any Restricted Payment, except:

(a)     dividends payable by the Borrower *solely* in the Capital Stock of the Borrower; provided, that, no Default or Event of Default has occurred and is continuing at the time of any such Restricted Payment or would result therefrom;

(b)     Restricted Payments made by any Subsidiary of the Borrower to Persons that own Capital Stock in such Subsidiary, on a *pro rata* basis according to their respective holdings of the type of Capital Stock in respect of which such Restricted Payment is being made with any other holder(s) thereof (if such Subsidiary is *not* a Wholly-Owned Subsidiary); provided, that, no Default or Event of Default has occurred and is continuing at the time of any such Restricted Payment or would result therefrom;

(c)     Permitted Tax Distributions; and

(d)     other Restricted Payments, provided, that: (i) both immediately before and immediately after giving effect to such Restricted Payment on a Pro Forma Basis, no Default or Event of Default shall exist; and (ii) immediately after giving effect to such Restricted Payment on a Pro Forma Basis, the Loan Parties shall be in compliance with all financial covenants set forth in Article VI.

Section 7.6     Asset Sales. Make any Asset Sale, except:

(a)     the sale or other disposition, for fair market value, of (i) obsolete or worn out property and/or equipment, or other property and/or equipment not necessary for the operations of the Loan Parties and Subsidiaries, (ii) inventory, and (iii) Cash Equivalents, in each case of the foregoing clauses (a)(i) and (a)(ii), to the extent sold or otherwise disposed of in the ordinary course of business;

(b)     any Asset Sale consummated pursuant to, or in connection with, an Economic Incentive Transaction;

(c)     the transfer of Stoked IP in accordance with Section 5.17;

(d)     the sale by any Loan Party or Subsidiary thereof after the Second Amendment Effective Date in the ordinary course of business of accounts receivable due from PepsiCo, Inc., a North Carolina corporation (and/or any of its Subsidiaries or controlled Affiliates), to The Huntington National Bank (and/or any of its Subsidiaries or controlled Affiliates) (and/or any successors or permitted assigns of any of the foregoing) pursuant to a Permitted HNB Receivables Purchase Agreement (each such sale, a "*Permitted HNB Receivables*

107

CONFIDENTIAL

*Asset Sale*"); provided, that, (i) any such sale is made on a non-recourse basis with respect to each of the Loan Parties and their Subsidiaries (other than (A) with respect to any express representation(s) given by any Loan Party and/or any Subsidiary thereof to the extent relating to the underlying accounts receivable being sold, or (B) recourse that is expressly contingent upon the occurrence of a force majeure event or an embargo), (ii) any such account receivables purchase and sale agreement (and/or any updated pricing schedule (or equivalent) related thereto) shall *not* provide for a total "discount rate" resulting in *more than* a five percent (5.00%) discount on the total amount of each account receivable sold pursuant to such receivables sale and purchase agreement (*i.e.*, it shall be prohibited to discount any such account receivable so that the account receivable would be sold for *less than* "95 cents on the dollar"), (iii) the Net Cash Proceeds received in connection with any such sale of accounts receivable are contractually required to be paid into a deposit account of such Loan Party or Subsidiary maintained with Truist Bank or Huntington National Bank, (iv) any Lien release letter and/or no interest letter made or entered into by the Administrative Agent in connection with the release of any Lien(s) on any subject accounts receivable, and/or any UCC-3 financing statement amendment(s) required or advisable to be filed in connection therewith, shall, in each case, be reasonably satisfactory to the Administrative Agent (including, without limitation, in respect of the terms and conditions applicable to any such Lien release), and further, any such UCC-3 financing statement amendment(s) shall, unless otherwise consented to in writing by the Administrative Agent, be promptly filed by the Administrative Agent (and *not* by any other Person) after the execution of any such applicable Lien release letter, and (v) the aggregate book value of all accounts receivable sold pursuant to any Permitted HNB Receivables Asset Sale in respect of which any Loan Party or Subsidiary has or may have an actual or potential obligation to repurchase, or a voluntary right to purchase, such accounts receivable (whether upon the occurrence of any specified event(s) and/or circumstance(s) (including, without limitation, an election by a party to an applicable Permitted HNB Receivables Purchase Agreement) or otherwise) pursuant to the terms of an applicable Permitted HNB Receivables Purchase Agreement shall *not exceed* Seventy Million Dollars ($70,000,000) at any time during the term of this Agreement;

(e)    the sale of the Subject Property on or before January 7, 2022 (or by such later date as the Administrative Agent may agree in its sole discretion), so long as (i) the Subject Property is sold at fair market value for cash consideration of *at least* $58,250,000, and (ii) one hundred percent (100.0%) of the Net Cash Proceeds of such sale are deposited, by the applicable title company used in connection with such sale, directly into an account designated by the Administrative Agent (or its designee), from which account the Administrative Agent shall, substantially concurrently with such sale, debit funds in the amount equal to such Net Cash Proceeds for payment on the Term Loan A (it being acknowledged and agreed that such Net Cash Proceeds debited by the Administrative Agent shall applied to the remaining principal installments of the Term Loan A in *inverse* order of maturity (including, for purposes of clarity, the principal installment thereof due and payable on the applicable Maturity Date)); and

(f)    other Asset Sales, provided, that, either (A) the Required Lenders shall have expressly consented in writing to such Asset Sale (including to the material terms and conditions thereof), or (B) each of the following conditions shall have been satisfied:

(i)    *at least* seventy-five percent (75.0%) of the consideration paid in connection therewith shall be cash or Cash Equivalents paid contemporaneously with the consummation of the transaction, and shall be in an amount *not less than* the fair market value of the property or assets sold or otherwise disposed of;

(ii)    such transaction is *not* prohibited by the terms of Section 7.9;

(iii)    such transaction does *not* involve the sale, or other disposition, of minority Capital Stock in any Subsidiary;

108

CONFIDENTIAL                                                                                    VPX-JHO0000000428

(iv)        such transaction does *not* involve a sale, or other disposition, of receivables, other than receivables owned by, or attributable to, other property or assets concurrently being disposed of in a transaction otherwise permitted under this Section 7.6; and

(v)        the aggregate net book value of all property and assets sold, or otherwise disposed of, by the Loan Parties and Subsidiaries pursuant to this clause (f) in any Fiscal Year shall *not exceed* Twenty-Five Million Dollars ($25,000,000).

Section 7.7    Transactions with Affiliates. Sell, lease, or otherwise transfer any property or assets to, or purchase, lease or otherwise acquire any property or assets from, or otherwise engage in any other transactions with, any of its Affiliates (other than any transactions, or any series of related transactions, with respect to which the aggregate consideration paid, or fair market value of property and/or assets sold, leased or otherwise transferred, is *less than* One Million Dollars ($1,000,000)), except: (a) in the ordinary course of business, at prices, and on terms and conditions, *not* less favorable to such Loan Party or Subsidiary than could be obtained on an arm's-length basis from unrelated third parties; (b) transactions between or among the Loan Parties and *not* involving any other Affiliates that are not Loan Parties; and (c) any Restricted Payment permitted by Section 7.5.

Section 7.8    Restrictive Agreements. Enter into, incur or permit to exist any agreement that prohibits, restricts or imposes any condition upon (a) the ability of any Loan Party or Subsidiary to create, incur or permit any Lien upon any of its property or assets, whether now owned or hereafter acquired, or (b) the ability of any Subsidiary to pay dividends, or other distributions, with respect to its Capital Stock, to make or repay loans or advances to any Loan Party or Subsidiary, to Guarantee Indebtedness of any Loan Party or Subsidiary, or to transfer any of its property or assets to any Loan Party or Subsidiary; provided, that, (i) the foregoing shall *not* apply to restrictions or conditions imposed by Law, or by this Agreement or any other Loan Document, (ii) the foregoing shall *not* apply to customary restrictions and conditions contained in purchase, acquisition or sale agreements relating to the sale of a Subsidiary pending such sale, provided, that, (A) such restrictions and conditions apply *only* to the Subsidiary that is sold, and (B) such sale is permitted hereunder, (iii) clause (a) above shall *not* apply to (A) restrictions or conditions imposed by any agreement relating to secured Indebtedness or Capital Lease Obligations permitted to remain outstanding under this Agreement, so long as such restrictions and conditions apply only to the property or assets securing such Indebtedness, (B) customary provisions in leases restricting the assignment thereof, (C) restrictions or conditions imposed by any agreement relating to secured Indebtedness or Capital Lease Obligations permitted by this Agreement, so long as such restrictions and conditions apply only to the property and/or assets securing such Indebtedness, and (D) customary provisions in leases and other contracts restricting the assignment thereof, (iv) any restrictions on cash or other deposits imposed by agreements entered into in the ordinary course of business, (v) any restrictions regarding licensing or sub-licensing by the Loan Parties and Subsidiaries of IP Rights in the ordinary course of business, (vi) any restrictions that arise in connection with cash escrow or other deposits permitted under Section 7.2 and Section 7.4, (vii) restrictions on cash or other deposits imposed by customers under contracts entered into in the ordinary course of business, (viii) restrictions on any Foreign Subsidiary by the terms of any Indebtedness of such Foreign Subsidiary permitted to be incurred under this Agreement, if such limitations only apply to the property and/or assets of such Foreign Subsidiary, and (ix) restrictions that arise in connection with Indebtedness permitted to be incurred pursuant to Section 7.1(j).

Section 7.9    Sale and Leaseback Transactions. Enter into any arrangement, directly or indirectly, whereby any Loan Party or Subsidiary shall sell or transfer any property, real or personal, of the Loan Parties used or useful in their business(es), whether now owned or hereafter acquired, and thereafter, rent or lease such property, or any other substitute property that any Loan Party or Subsidiary intends to use for substantially the same purpose(s) as the property so sold or transferred; provided, that, the leasing of the Subject Property by any of the Loan Parties and/or their Subsidiaries after the sale of the Subject Property in accordance with Section 7.6(e) shall *not* be prohibited by this Section 7.9.

109

Section 7.10    <u>Hedging Transactions</u>. Enter into any Hedging Transaction, other than Hedging Transactions entered into in the ordinary course of business to hedge or mitigate risks to which any Loan Party or Subsidiary is exposed in the conduct of its business or the management of its liabilities. Solely for the avoidance of doubt, such Loan Party acknowledges that a Hedging Transaction entered into for speculative purposes or of a speculative nature (which shall be deemed to include any Hedging Transaction under which any Loan Party or Subsidiary is, or may become, obliged to make any payment: (i) in connection with the purchase by any third party of any Capital Stock or any Indebtedness; or (ii) as a result of changes in the market value of any Capital Stock or any Indebtedness) is *not* a Hedging Transaction entered into in the ordinary course of business to hedge or mitigate risks.

Section 7.11    <u>Amendments to Organization Documents and Material Agreements</u>. Amend, modify and/or waive any of its rights under (a) its Organization Documents, or (b) any Material Agreements, except with respect to the foregoing <u>clauses (a)</u> and (<u>b</u>), in any manner that would *not*, in the reasonable determination of the Administrative Agent, have a material adverse effect on the Lenders, the Administrative Agent, the Loan Parties, or any Subsidiary.

Section 7.12    <u>Accounting Changes</u>. (a) Make any significant change in accounting treatment or reporting practices, except as required by GAAP, or (b) change the fiscal year of any Loan Party or Subsidiary, except to change the fiscal year of such Loan Party or Subsidiary other than the Borrower to conform to the Fiscal Year.

Section 7.13    <u>Prepayments of Certain Indebtedness; Modifications of Certain Documents</u>. No Loan Party shall, nor shall it permit any of its Subsidiaries to, directly or indirectly:

(a)    pay, prepay, redeem, purchase, repurchase, defease, or otherwise satisfy, in each case of the foregoing, prior to the scheduled maturity thereof, in any manner, any Restricted Debt, except for payments, prepayments, redemptions, purchases, repurchases, defeasances, and other payments of (i) Restricted Debt of any Subsidiary that is *not* a Loan Party to any Loan Party or any other Subsidiary, (ii) Restricted Debt of any Loan Party to any other Loan Party, (iii) regularly scheduled payments of principal and/or interest required to be made under the applicable documents governing such Restricted Debt, (iv) other Restricted Debt, so long as, both immediately before and immediately after giving effect to such payment, prepayment, redemption, purchase, repurchase, defeasance, or other payment on a Pro Forma Basis, (A) no Default or Event of Default shall exist, and (B) the Loan Parties shall be in compliance with all financial covenants set forth in <u>Article VI</u>, and (v) on and after December 31, 2022, the Doehler Note; or

(b)    amend, modify or change, in any manner materially adverse to the interests of the Lenders, any term or condition of any Restricted Debt, except to the extent expressly permitted pursuant to specified exceptions to restrictions set forth in any applicable intercreditor and/or subordination agreement.

Section 7.14    <u>PPP Loans</u>. (a) Amend any documents (taken as a whole) governing the PPP Loan in any manner that would, in the reasonable determination of the Administrative Agent, be adverse to the interests of the Lenders, without the prior written consent of the Administrative Agent (such consent *not* to be unreasonably withheld, conditioned or delayed); or (b) take, or omit to take, any action, the result of which would be to cause the PPP Loan to *not* be eligible for forgiveness under the CARES Act or any other applicable rules and regulations under the PPP.

Section 7.15    <u>Sanctions and Anti-Corruption Laws</u>.

(a)    Request any Borrowing or Letter of Credit, or, directly or indirectly, use, or allow any of their respective officers, directors, employees and/or agents to use, the proceeds of any Borrowing or Letter of Credit, or lend, contribute, or otherwise make available such proceeds to any Subsidiary, joint venture, or any other Person: (i) to fund, finance, or facilitate any activities, business or transactions of or with any Sanctioned Person,

110

CONFIDENTIAL                                                                                 VPX-JHO0000000430

or in any Sanctioned Country; (ii) in any manner that would result in a violation of Sanctions by any Person (including, without limitation, any Person participating in the Loans or Letters of Credit, whether as the Administrative Agent, the Arranger, any Lender (including the Swingline Lender), the Issuing Bank, underwriter, advisor, investor, or otherwise); or (iii) in furtherance of any offer, payment, promise to pay, or authorization of the payment, or giving of money or anything else of value, to, any Person in violation of applicable Anti-Corruption Laws.

(b)    (i) Be or become subject, at any time, to any Law or list of any U.S. Governmental Authority (including, without limitation, the OFAC list) that prohibits or limits the Lenders or the Administrative Agent from making any advance or extension of credit to the Borrower, or from otherwise conducting business with the Loan Parties; or (ii) fail to provide, promptly upon request therefor, documentary and/or other evidence of the identity of the Loan Parties as may be requested by any Lender and/or the Administrative Agent at any time to enable the Lenders and the Administrative Agent to: (A) verify the identity of the Loan Parties; or (B) comply with any applicable Law, including, without limitation, Section 326 of the Patriot Act.

Section 7.16    <u>Margin Regulations</u>. Use all, or any portion, of the proceeds of any Borrowing or Letter of Credit, directly or indirectly, for any purpose that would violate any rule or regulation of the Federal Reserve Board, including, without limitation, Regulation T, Regulation U, or Regulation X.

Section 7.17    <u>Preferred Equity</u>. Permit any Subsidiary to issue, or have outstanding, any shares of preferred Capital Stock.

## ARTICLE VIII

## EVENTS OF DEFAULT

Section 8.1    <u>Events of Default</u>. If any of the following events (each, an "*Event of Default*") shall occur:

(a)    any Loan Party shall fail to pay any principal of any Loan, or of any reimbursement obligation in respect of any LC Disbursement, when and as the same shall become due and payable, whether at the due date thereof, at a date fixed for prepayment, or otherwise; or

(b)    any Loan Party shall fail to pay any interest on any Loan, or any fee or any other amount (other than an amount (i) payable under <u>clause (a)</u> above, or (ii) related to a Bank Product Obligation) payable under this Agreement or any other Loan Document, when and as the same shall become due and payable, and such failure shall continue unremedied for a period of five (5) Business Days; or

(c)    any representation or warranty made, or deemed to be made, by, or on behalf of, any Loan Party, any Subsidiary, or any Owner Pledgor in, or in connection with, this Agreement or any other Loan Document (including, without limitation, the Schedules attached hereto and thereto), or in any amendment, restatement, amendment and restatement, supplement, and/or other written modification hereof, or waiver hereunder, or in any certificate, report, financial statement or other document submitted to the Administrative Agent and/or the Lenders by, or on behalf of, any Loan Party, any Subsidiary, or any Owner Pledgor, or any representative of any Loan Party or Subsidiary, or of any Owner Pledgor, pursuant to, or in connection with, this Agreement or any other Loan Document, shall prove to be incorrect in any material respect (other than any representation or warranty that is expressly qualified by a Material Adverse Effect or other materiality, in which case, such representation or warranty shall prove to be incorrect in any respect) when made or deemed made or submitted; or

(d)    any Loan Party shall fail to observe or perform any covenant or agreement contained in <u>Section 5.1</u> (and such default or non-compliance remains uncured for a period of five (5) Business Days), <u>Section 5.2</u>, <u>Section 5.3(a)</u> (solely with respect to the existence of any Loan Party in their

respective jurisdiction of organization or incorporation), <u>Section 5.7</u>, <u>Section 5.8</u> (other than in <u>clause</u> <u>(a)</u> thereof), <u>Section 5.9</u>, <u>Section 5.12</u>, or <u>Section 5.14</u>, or in <u>Article VI</u> or <u>Article VII</u>; or

(e)     (i) any Loan Party shall fail to observe or perform any covenant or agreement contained in this Agreement (other than those referred to in <u>clauses (a)</u>, <u>(b)</u>, <u>(c)</u> and <u>(d)</u> above) or any other Loan Document or related to any Bank Product Obligation, and such failure shall remain unremedied for thirty (30) days after the *earlier* of (A) any Responsible Officer of any Loan Party becomes aware of such failure, or (B) notice thereof shall have been given to any Loan Party by the Administrative Agent or any Lender; or (ii) any Owner Pledgor shall fail to observe or perform any covenant or agreement contained in the Owner Pledge Agreement (other than the breach of a representation and warranty referred to in <u>clause (c)</u> above, and, in each case of this <u>clause (e)(ii)</u>, such failure shall remain unremedied for thirty (30) days after the *earlier of* (I) any Owner Pledgor, or any representative or agent thereof, becoming aware of such failure, or (II) notice thereof shall have been given to such Owner Pledgor, or any representative or agent thereof, by the Administrative Agent or any Lender; or

(f)     (i) (A) any Loan Party or Subsidiary (whether as primary obligor or as guarantor or other surety) shall fail to pay any principal of, or premium or interest on, any Material Indebtedness (other than Hedging Obligations) or that is outstanding or the PPP Loan, when and as the same shall become due and payable (whether at scheduled maturity, required prepayment, acceleration, demand or otherwise), and such failure shall continue after the applicable grace period, if any, specified in the agreement or instrument evidencing or governing such Material Indebtedness the PPP Loan, (B) any other event shall occur, or condition shall exist, under any agreement or instrument relating to any Material Indebtedness or the PPP Loan and shall continue after the applicable grace period, if any, specified in such agreement or instrument, if the effect of such event or condition is to accelerate, or permit the acceleration of, the maturity of such Material Indebtedness or the PPP Loan, or (C) any such Material Indebtedness or the PPP Loan shall be declared to be due and payable, or required to be prepaid or redeemed (other than by a regularly scheduled required prepayment or redemption), purchased or defeased, or any offer to prepay, redeem, purchase or defease such Material Indebtedness or the PPP Loan shall be required to be made, in each case of this <u>clause (g)(i)(C)</u>, prior to the stated maturity thereof; or (ii) there occurs under, or in connection with, any Hedging Transaction an Early Termination Date (or substantially equivalent term, in each case, as defined in the definitive documentation for such Hedging Transaction) resulting from (A) any event of default under, or in connection with, such Hedging Transaction, as to which (I) any Loan Party or Subsidiary is the Defaulting Party (or substantially equivalent term, as defined in the definitive documentation for such Hedging Transaction), and (II) the Hedge Termination Value owed to such Loan Party or Subsidiary as a result thereof is *greater than* Fifteen Million Dollars ($15,000,000), or (B) the occurrence of a Termination Event (or substantially equivalent term, as defined in the definitive documentation for such Hedging Transaction), and the Hedge Termination Value owed by such Loan Party or Subsidiary as a result thereof is *greater than* Fifteen Million Dollars ($15,000,000) and is not paid;

(g)     any Loan Party or Subsidiary (other than an Immaterial Subsidiary), or any Owner Pledgor, shall: (i) commence a voluntary case or other proceeding, or file any petition seeking liquidation, reorganization or other relief under any federal, state or foreign bankruptcy, insolvency or other similar Law now or hereafter in effect, or seeking the appointment of a custodian, trustee, receiver, liquidator or other similar official of it or any substantial part of its property; (ii) consent to the institution of, or fail to contest in a timely and appropriate manner, any proceeding or petition described in <u>clause (h)</u> below; (iii) apply for, or consent to, the appointment of a custodian, trustee, receiver, liquidator or other similar official for any such Loan Party or Subsidiary, or any such Owner Pledgor, or for a substantial part of its respective property or assets; (iv) file an answer admitting the material allegations of a petition filed against it in any such proceeding; (v) make a general assignment for the benefit of creditors; or (vi) take any action for the purpose of effecting any of the foregoing; or

112

CONFIDENTIAL                                                          VPX-JHO0000000432

(h)      an involuntary proceeding shall be commenced, or an involuntary petition shall be filed, seeking (i) liquidation, reorganization or other relief in respect of any Loan Party or Subsidiary (other than an Immaterial Subsidiary), or any Owner Pledgor, or any of their debts, or any substantial part of any of their property or assets, under any federal, state or foreign bankruptcy, insolvency or other similar Law now or hereafter in effect, or (ii) the appointment of a custodian, trustee, receiver, liquidator or other similar official for any Loan Party or Subsidiary (other than an Immaterial Subsidiary), or any Owner Pledgor, or for a substantial part of any of their property or assets, and, in any such case with respect to the foregoing clauses (h)(i) through (h)(iii), such proceeding or petition shall remain undismissed for a period of sixty (60) days, or an order or decree approving or ordering any of the foregoing shall be entered; or

(i)      any Loan Party or Subsidiary (other than an Immaterial Subsidiary), or any Owner Pledgor, shall become unable to pay, shall admit in writing its inability to pay, or shall fail to pay, its debts as they become due; or

(j)      (i) an ERISA Event shall have occurred that, in the opinion of the Required Lenders, when taken together with other ERISA Events that have occurred, could reasonably be expected to result in liability to the Loan Parties and Subsidiaries in an aggregate amount in *excess* of Fifteen Million Dollars ($15,000,000); (ii) there is or arises an Unfunded Pension Liability (but not taking into account Plans with negative Unfunded Pension Liability) in an aggregate amount in *excess* of Fifteen Million Dollars ($15,000,000); or (iii) there is or arises any potential Withdrawal Liability in an aggregate amount in *excess* of Fifteen Million Dollars ($15,000,000); or

(k)      any final, non-appealable judgment, writ, warrant of attachment, other order for the payment of money, involving an amount in *excess* of Fifteen Million Dollars ($15,000,000) (to the extent not covered by insurance or indemnities as to which the applicable insurance company or third-party has been notified of such claim and has confirmed coverage), individually or in the aggregate, shall be rendered against any Loan Party or Subsidiary (other than an Immaterial Subsidiary), or any Owner Pledgor, and either: (i) enforcement proceedings shall have been commenced by any creditor upon such judgment or order; or (ii) there shall be a period of sixty (60) consecutive days during which a stay of enforcement of such judgment or order, by reason of a pending appeal or otherwise, shall not be in effect; or

(l)      any non-monetary judgment or order shall be rendered against any Loan Party or Subsidiary, or any Owner Pledgor, that could reasonably be expected, either individually or in the aggregate, to have a Material Adverse Effect, and there shall be a period of thirty (30) consecutive days during which a stay of enforcement of such judgment or order, by reason of a pending appeal or otherwise, shall not be in effect; or

(m)      a Change in Control shall occur or exist; or

(n)      (i) any provision of any Loan Document, at any time after the execution and delivery of such Loan Document, and for any reason other than (I) as expressly permitted hereunder or thereunder, or (II) the satisfaction in full of the Obligations and the termination of the Commitments, ceases to (A) be valid and binding on, and enforceable against, any Loan Party, or (B) grant to the Administrative Agent, for the ratable benefit of the holders of the Obligations, all, or any material portion, of the Liens otherwise created, or purported to be created, thereby; (ii) any Loan Party or Subsidiary, any Owner Pledgor, or any other Person contests, in any manner, the validity and/or enforceability of any Loan Document; or (iii) any Loan Party, or any Owner Pledgor, denies that it/he/she, as applicable, has any or further liability or obligation under any Loan Document to which it is party, or purports to revoke, terminate and/or rescind any such Loan Document (other than with respect to the release of any Guaranty or Collateral, to the extent permitted pursuant to Section 9.11); or

113

CONFIDENTIAL                                                                                      VPX-JHO0000000433

(o)    any Lien granted, or purported to be granted, under any Collateral Document shall fail or cease to be, or shall be asserted by any Loan Party or Subsidiary, or any Owner Pledger, not to be a valid and perfected Lien on any Collateral with the priority required by the applicable Collateral Documents;

then, and in every such event (other than an event with respect to the Borrower described in clause (g) or (h) above), and, at any time thereafter during the continuance of such event, the Administrative Agent may, and upon the written request of the Required Lenders shall, by notice to the Borrower, take any or all of the following actions, at the same or different times: (i) terminate the Commitments, whereupon the Commitment of each Lender shall terminate immediately; (ii) declare the principal of, and any accrued interest on, the Loans, and all other Obligations owing hereunder, to be, whereupon the same shall become, due and payable immediately, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrower; (iii) exercise all remedies contained in any other Loan Document; and (iv) exercise any other remedies available at Law or in equity; and that, if an Event of Default specified in either of clauses (g) or (h) above shall occur, the Commitments shall automatically terminate and the principal of the Loans then outstanding, together with accrued interest thereon, and all fees, and all other Obligations shall automatically become due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrower.

Section 8.2    Application of Proceeds from Collateral. All proceeds from each sale of, or other realization upon, all, or any portion, of the Collateral by the Administrative Agent, or any other holder of the Obligations, after an Event of Default arises shall be applied as follows (such order of application, the "*Waterfall*"):

(a)    *first*, to the reimbursable expenses of the Administrative Agent incurred in connection with such sale or other realization upon the Collateral, until the same shall have been paid in full;

(b)    *second*, to the fees, indemnities, reimbursable expenses and other amounts constituting Obligations owing to the Administrative Agent, the Swingline Lender, and the Issuing Bank (other than any such fees or other amounts constituting Obligations owing to any such Person described in any other clause of this Section 8.2), if any, then due and payable pursuant to any of the Loan Documents, until the same shall have been paid in full;

(c)    *third*, to all fees, indemnities, reimbursable expenses and other amounts constituting Obligations owing to the Lenders (other than any such fees or other amounts constituting Obligations owing to the Lenders described in any other clause of this Section 8.2), if any, then due and payable pursuant to any of the Loan Documents, until the same shall have been paid in full;

(d)    *fourth*, to the fees due and payable under Section 2.14 of this Agreement and interest then due and payable under the terms of this Agreement, until the same shall have been paid in full;

(e)    *fifth*, to the aggregate outstanding principal amount of the Loans, the LC Exposure, the Bank Product Obligations, and the Hedging Obligations that constitute Obligations, until the same shall have been paid in full, allocated *pro rata* among the holders of the Obligations, based on their respective Pro Rata Shares of the aggregate amount of such Loans, LC Exposure, Bank Product Obligations and Hedging Obligations;

(f)    *sixth*, to additional Cash Collateral for the aggregate amount of all outstanding Letters of Credit, until the aggregate amount of all Cash Collateral held by the Administrative Agent pursuant to this Agreement is equal to *at least* one hundred five percent (105.0%) of the LC Exposure, after giving effect to the foregoing *fifth* clause; and

114

CONFIDENTIAL                                                                                    VPX-JHO0000000434

(g)    to the extent any proceeds remain, to the Borrower, or as otherwise provided by a court of competent jurisdiction.

All amounts allocated pursuant to the foregoing *third* through *sixth* clauses of the Waterfall to the Lenders as a result of amounts owed to the Lenders under the Loan Documents shall be allocated among, and distributed to, the Lenders *pro rata* based on their respective Pro Rata Shares; provided, that, all amounts allocated to that portion of the LC Exposure comprised of the aggregate undrawn amount of all outstanding Letters of Credit pursuant to the foregoing *fifth* and *sixth* clauses of the Waterfall shall be distributed to the Administrative Agent, rather than to the Lenders, and held by the Administrative Agent in an account in the name of the Administrative Agent, for the benefit of the Issuing Bank and the Lenders with Revolving Commitments, as Cash Collateral for the LC Exposure, such account to be administered in accordance with Section 2.22(g). All Cash Collateral for LC Exposure shall be applied to satisfy drawings under the Letters of Credit as they occur; if any amount remains on deposit as Cash Collateral after all Letters of Credit have either been fully drawn or expired, then such remaining amount shall be applied to the other Obligations, if any, in accordance with the Waterfall.

Notwithstanding anything to the contrary in this Agreement or any other Loan Document: (A) no amount received from any Guarantor (including, without limitation, any proceeds of any sale of, or other realization upon, all, or any portion, of the Collateral owned by such Guarantor) shall be applied to any Excluded Swap Obligations of such Guarantor, as applicable, but appropriate adjustments shall be made with respect to payments from the other Loan Parties to preserve, to the extent practicable, the Waterfall; and (B) Bank Product Obligations and/or Hedging Obligations shall be excluded from the Waterfall without any liability to the Administrative Agent, if the Administrative Agent has *not* received written notice thereof, together with such supporting documentation as the Administrative Agent may request, from the applicable Bank Product Provider(s) and/or Lender-Related Hedge Provider(s). Each Bank Product Provider and Lender-Related Hedge Provider that has given the notice contemplated by the foregoing clause (B) shall, by such notice, be deemed to have acknowledged and accepted the appointment of the Administrative Agent pursuant to the terms of Article IX, for itself and its Affiliates, as if a "*Lender*" party hereto.

Section 8.3    Equity Cure. For purposes of determining compliance with Section 6.1 and Section 6.2, a cash equity contribution that does *not* take the form of Disqualified Capital Stock made by John Henry Owoc (or any Person wholly-owned and controlled, directly or indirectly, by him), a resident of the State of Florida, to the Borrower after the Effective Date but on or prior to the date that is ten (10) Business Days following the date on which financial statements are required to be delivered pursuant to Section 5.1(a) and/or Section 5.1(b), as the case may be, in respect of the applicable Fiscal Quarter, will, upon the written notice of the Borrower (a "*Notice of Intent to Cure*"), be included in the calculation of Combined EBITDA *solely* for the purpose of determining compliance with Section 6.1 and/or Section 6.2 as of the end of such Fiscal Quarter, and any subsequent period that includes such Fiscal Quarter (a "*Specified Equity Contribution*"), and *not* for any other purpose; provided, that, (a) in each consecutive four (4) Fiscal Quarter period, there will be *at least* two (2) Fiscal Quarters in which no Specified Equity Contribution is made, (b) the amount of any Specified Equity Contribution will be *no greater than* the amount required to cause the Loan Parties to be in compliance with Section 6.1 and/or Section 6.2, as applicable, (c) all Specified Equity Contributions will be disregarded for purposes of the calculation of Combined EBITDA (other than for the purposes expressly set forth in this Section 8.3) and for all other purposes, including, without limitation, calculating basket levels and other items governed by reference to Combined EBITDA, (d) there shall be *no more than* four (4) Specified Equity Contributions made in the aggregate after the Effective Date, (e) a Specified Equity Contribution may *not* be made in any two (2) consecutive Fiscal Quarters, (f) notwithstanding anything to the contrary in the foregoing, the proceeds received by the Borrower from all Specified Equity Contributions shall be promptly used to prepay the Term Loans in accordance with Section 2.12(d), (g) such Specified Equity Contribution shall be *included* as Combined EBITDA as provided above in any trailing period that contains the applicable Fiscal Quarter, and (h) there shall be no *pro forma* or other reduction in Indebtedness, through either the netting of cash or prepayment of Loans or other Indebtedness, with the proceeds of any such Specified Equity Contribution for purposes of determining compliance with Section 6.1 and Section 6.2 for any of the periods in which such Specified Equity

115

CONFIDENTIAL

Contribution is included in Combined EBITDA (including, without limitation, the three (3) subsequent Fiscal Quarters following the Fiscal Quarter in respect of which the applicable Specified Equity Contribution was made. Notwithstanding anything to the contrary contained in the foregoing, upon the Administrative Agent's receipt of a Notice of Intent to Cure and through the date that is ten (10) Business Days after the date on which the Borrower is required to deliver the financial statements required by Section 5.1(a) and/or Section 5.1(b), as applicable, in respect of the Fiscal Quarter to which the applicable financial covenant violation relates, *solely* to the extent that no Event of Default then exists and is continuing (other than an Event of Default pursuant to Section 8.1(d) as a result of non-compliance with any such financial covenants set forth in Article VI) at such time, the Administrative Agent and the Lenders shall *not* be permitted to (i) accelerate the Obligations, (ii) terminate the Commitments, or (iii) exercise remedies under the Loan Documents (including against the Collateral), in each case of the foregoing clauses (i) through (iii), *solely* as a result of any such Event of Default pursuant to Section 8.1(d) as a result of non-compliance with any such financial covenants set forth in Article VI, until the end of such ten (10) Business Day period (it being understood that the Lenders shall *not* be required to make Loans, and the Issuing Bank shall *not* be required to issue, amend or extend Letters of Credit, during such standstill period).

ARTICLE IX

THE ADMINISTRATIVE AGENT

Section 9.1    Appointment of Administrative Agent.

(a)    Each Lender irrevocably appoints Truist as the Administrative Agent and authorizes it to take such actions on its behalf and to exercise such powers as are delegated to the Administrative Agent under this Agreement and the other Loan Documents, together with all such actions and powers that are reasonably incidental thereto. The Administrative Agent may perform any of its duties hereunder or under the other Loan Documents by or through any one (1) or more sub-agents or attorneys-in-fact appointed by the Administrative Agent. The Administrative Agent and any such sub-agent or attorney-in-fact may perform any and all of its duties and exercise its rights and powers through their respective Related Parties. The exculpatory provisions set forth in this Article IX shall apply to any such sub-agent, attorney-in-fact or Related Party and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as the Administrative Agent.

(b)    The Issuing Bank shall act on behalf of the Lenders with respect to any Letters of Credit issued by it and the documents associated therewith until such time and except for so long as the Administrative Agent may agree at the request of the Required Lenders to act for the Issuing Bank with respect thereto; provided, that, the Issuing Bank shall have all the benefits and immunities: (i) provided to the Administrative Agent in this Article IX with respect to any acts taken or omissions suffered by the Issuing Bank in connection with Letters of Credit issued by it, or proposed to be issued by it, and the application and agreements for letters of credit pertaining to the Letters of Credit as fully as if the term "Administrative Agent" as used in this Article IX included the Issuing Bank with respect to such acts or omissions; and (ii) as additionally provided in this Agreement with respect to the Issuing Bank.

(c)    It is understood and agreed that the use of the term "agent" (or any similar term) herein, or in any other Loan Document, with reference to the Administrative Agent, is *not* intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable Law. Instead, such term is used herein and in the other Loan Documents *solely* as a matter of market custom, and is intended to create or reflect only an administrative relationship between the contracting parties.

Section 9.2    Nature of Duties of Administrative Agent. The Administrative Agent shall not have any duties or obligations except those expressly set forth in this Agreement and the other Loan Documents. Without limiting the generality of the foregoing: (a) the Administrative Agent shall not be subject to any fiduciary or other implied duties, regardless of whether a Default or an Event of Default has occurred and is continuing; (b)

116

CHAR2\2683123v6

the Administrative Agent shall not have any duty to take any discretionary action or exercise any discretionary powers, except those discretionary rights and powers expressly contemplated by the Loan Documents that the Administrative Agent is required to exercise in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in <u>Section 11.2</u>), <u>provided</u>, <u>that</u>, the Administrative Agent shall not be required to take any action that, in its opinion or the opinion of its counsel, may expose the Administrative Agent to liability or that is contrary to any Loan Document or applicable Law, including for the avoidance of doubt any action that may be in violation of the automatic stay under any Debtor Relief Law or that may effect a forfeiture, modification or termination of property of a Defaulting Lender in violation of any Debtor Relief Law; and (c) except as expressly set forth in the Loan Documents, the Administrative Agent shall not have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Borrower or any of its Subsidiaries that is communicated to or obtained by the Administrative Agent or any of its Affiliates in any capacity. The Administrative Agent shall not be liable for any action taken or not taken by it, its sub-agents or its attorneys-in-fact with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in <u>Section 11.2</u>) or in the absence of its own gross negligence or willful misconduct as determined by a court of competent jurisdiction in a final, non-appealable judgment. The Administrative Agent shall *not* be responsible for the negligence or misconduct of any sub-agents and/or attorneys-in-fact selected by it, except to the extent that a court of competent jurisdiction determines in a final, non-appealable judgment that the Administrative Agent acted with gross negligence or willful misconduct in the selection of any such sub-agents and/or attorneys-in-fact. The Administrative Agent shall not be deemed to have knowledge of any Default or Event of Default unless and until written notice thereof (which notice shall include an express reference to such event being a "*Default*" or "*Event of Default*" hereunder) is given to the Administrative Agent by the Borrower or any Lender, and the Administrative Agent shall not be responsible for or have any duty to ascertain or inquire into: (i) any statement, warranty or representation made in or in connection with any Loan Document; (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith; (iii) the performance or observance of any of the covenants, agreements, or other terms and conditions set forth in any Loan Document; (iv) the validity, enforceability, effectiveness or genuineness of any Loan Document or any other agreement, instrument or document; or (v) the satisfaction of any condition set forth in <u>Article III</u> or elsewhere in any Loan Document, other than to confirm receipt of items expressly required to be delivered to the Administrative Agent. The Administrative Agent may consult with legal counsel (including counsel for the Borrower) concerning all matters pertaining to such duties. Neither the Administrative Agent nor any of its Related Parties shall be responsible, or have any liability, for, or have any duty to ascertain, inquire into, monitory or enforce, compliance with the provisions of this Agreement relating to Disqualified Institutions. Without limiting the generality of the foregoing, the Administrative Agent shall *not*: (A~~A~~) be obligated to ascertain, monitor or inquire as to whether any Lender or prospective Lender is a Disqualified Institution; or (B~~B~~) have any liability with respect to, or arising out of, any assignment of Loans, or disclosure of confidential information, to any Disqualified Institution.

Section 9.3     <u>Lack of Reliance on the Administrative Agent</u>. Each of the Lenders, the Swingline Lender, and the Issuing Bank acknowledges that it has, independently and without reliance upon the Administrative Agent, the Issuing Bank, or any other Lender, and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement. Each of the Lenders, the Swingline Lender, and the Issuing Bank also acknowledges that it will, independently and without reliance upon the Administrative Agent, the Issuing Bank, or any other Lender, and based on such documents and information as it has deemed appropriate, continue to make its own credit analyses, appraisals and decisions in taking, or not taking, any action under, or based on, this Agreement, any related agreement, or any document furnished hereunder or thereunder, and to make such investigations as it deems necessary to inform itself as to the business, prospects, operations, property and assets, financial and other condition, and creditworthiness of the Loan Parties. Each Lender represents and warrants that: (a) the Loan Documents set forth the terms of a commercial lending facility; (b) such Lender is engaged in making, acquiring, and/or holding commercial loans in the ordinary course of its business, and is entering into this Agreement as a Lender for the purpose of making, acquiring, and/or holding commercial loans, and providing other facilities set forth

117

CONFIDENTIAL

herein as may be applicable to such Lender, and *not* for the purpose of purchasing, acquiring, and/or holding any other type of financial instrument; and (c) such Lender is sophisticated with respect to decisions to make, acquire, and/or hold commercial loans, and to provide other facilities set forth herein as may be applicable to such Lender, and either such Lender, or the Person exercising discretion in making such Lender's decision to make, acquire, and/or hold such commercial loans, or to provide such other facilities, is experienced in making, acquiring, and/or holding such commercial loans or providing such other facilities. Each Lender agrees *not* to assert a claim in contravention of any of the foregoing.

Section 9.4    <u>Certain Rights of the Administrative Agent</u>. If the Administrative Agent shall request instructions from the Required Lenders with respect to any action or actions (including the failure to act) in connection with this Agreement, the Administrative Agent shall be entitled to refrain from such act or taking such act unless and until it shall have received instructions from such Lenders, and the Administrative Agent shall not incur liability to any Person by reason of so refraining. Without limiting the foregoing, no Lender shall have any right of action whatsoever against the Administrative Agent as a result of the Administrative Agent acting or refraining from acting hereunder in accordance with the instructions of the Required Lenders where required by the terms of this Agreement.

Section 9.5    <u>Reliance by Administrative Agent</u>. The Administrative Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, posting or other distribution) believed by it to be genuine and to have been signed, sent or made by the proper Person. The Administrative Agent may also rely upon any statement made to it orally or by telephone and believed by it to be made by the proper Person and shall not incur any liability for relying thereon. The Administrative Agent may consult with legal counsel (including counsel for the Borrower), independent public accountants and other experts selected by it and shall not be liable for any action taken or not taken by it in accordance with the advice of such counsel, accountants or experts.

Section 9.6    <u>The Administrative Agent in its Individual Capacity</u>. The bank serving as the Administrative Agent shall have the same rights and powers under this Agreement and any other Loan Document in its capacity as a Lender as any other Lender and may exercise or refrain from exercising the same as though it were not the Administrative Agent; and the terms "*Lenders*", "*Required Lenders*", or any similar terms shall, unless the context clearly otherwise indicates, include the Administrative Agent in its individual capacity. The bank acting as the Administrative Agent and its Affiliates may accept deposits from, lend money to, and generally engage in any kind of business with the Borrower or any Subsidiary or Affiliate of the Borrower as if it were not the Administrative Agent hereunder.

Section 9.7    <u>Successor Administrative Agent</u>.

(a)    The Administrative Agent may resign at any time by giving notice thereof to the Lenders and the Borrower. Upon any such resignation, the Required Lenders shall have the right to appoint a successor Administrative Agent, subject to approval by the Borrower, <u>provided</u>, <u>that</u>, no Default or Event of Default shall exist at such time. If no successor Administrative Agent shall have been so appointed, and shall have accepted such appointment within thirty (30) days after the retiring Administrative Agent gives notice of resignation, then the retiring Administrative Agent may, on behalf of the Lenders, appoint a successor Administrative Agent which shall be a commercial bank organized under the laws of the United States or any state thereof or a bank which maintains an office in the United States. Any resignation by the Administrative Agent pursuant to this <u>Section 9.7</u> shall also constitute its resignation as the Issuing Bank and the Swingline Lender. Upon the acceptance of a successor's appointment as Administrative Agent hereunder: (a) such successor shall succeed to, and become vested with, all of the rights, powers, privileges, and duties of the retiring Issuing Bank and Swingline Lender; (b) the retiring Issuing Bank and Swingline Lender shall each be discharged from all of their respective duties and obligations hereunder or under any of the other Loan Documents; and (c) the successor Issuing Lender shall issue letters of credit in substitution for the Letters of Credit, if any, outstanding as of the

118

time of such succession, or make other arrangement(s) satisfactory to the retiring Issuing Bank to effectively assume the obligations of the retiring Issuing Bank with respect to such Letters of Credit.

(b)    Upon the acceptance of its appointment as the Administrative Agent hereunder by a successor, such successor Administrative Agent shall thereupon succeed to and become vested with all the rights, powers, privileges and duties of the retiring Administrative Agent, and the retiring Administrative Agent shall be discharged from its duties and obligations under this Agreement and the other Loan Documents. If, within forty five (45) days after written notice is given of the retiring Administrative Agent's resignation under this Section 9.7, no successor Administrative Agent shall have been appointed and shall have accepted such appointment, then on such forty-fifth (45th) day: (i) the retiring Administrative Agent's resignation shall become effective; (ii) the retiring Administrative Agent shall thereupon be discharged from its duties and obligations under the Loan Documents; and (iii) the Required Lenders shall thereafter perform all duties of the retiring Administrative Agent under the Loan Documents until such time as the Required Lenders appoint a successor Administrative Agent as provided above. After any retiring Administrative Agent's resignation hereunder, the provisions of this Article IX shall continue in effect for the benefit of such retiring or removed Administrative Agent and its representatives and agents in respect of any actions taken, or not taken, by any of them while it was serving as the Administrative Agent.

(c)    In addition to the foregoing, if a Lender becomes, and during the period it remains, a Defaulting Lender, and, if any Default has arisen from a failure of the Borrower to comply with Section 2.26(b), then, the Issuing Bank and the Swingline Lender may, upon prior written notice to the Borrower and the Administrative Agent, resign as Issuing Bank or as Swingline Lender, as the case may be, effective at the close of business Charlotte, North Carolina time on a date specified in such notice (which date may *not* be *less than* five (5) Business Days after the date of such notice).

Section 9.8    Withholding Tax. To the extent required by any applicable Law, the Administrative Agent may withhold from any interest payment to any Lender an amount equivalent to any applicable withholding tax. If the Internal Revenue Service or any authority of the United States or any other jurisdiction asserts a claim that the Administrative Agent did not properly withhold tax from amounts paid to or for the account of any Lender (because the appropriate form was not delivered or was not properly executed, or because such Lender failed to notify the Administrative Agent of a change in circumstances that rendered the exemption from, or reduction of, withholding tax ineffective, or for any other reason), such Lender shall indemnify the Administrative Agent (to the extent that the Administrative Agent has not already been reimbursed by the Borrower and without limiting the obligation of the Borrower to do so) fully for all amounts paid, directly or indirectly, by the Administrative Agent as tax or otherwise, including penalties and interest, together with all expenses incurred, including legal expenses, allocated staff costs and any out of pocket expenses.

Section 9.9    Administrative Agent May File Proofs of Claim.

(a)    In case of the pendency of any receivership, insolvency, liquidation, bankruptcy, reorganization, arrangement, adjustment, composition or other judicial proceeding relative to any Loan Party, the Administrative Agent (irrespective of whether the principal of any Loan or any Revolving Credit Exposure shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on the Borrower) shall be entitled and empowered, by intervention in such proceeding or otherwise:

(i)    to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans or Revolving Credit Exposure and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders, the Issuing Bank and the Administrative Agent (including, without limitation, any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders, the Issuing Bank and the Administrative Agent and its agents and counsel and all other amounts due the

119

CONFIDENTIAL                                                                 VPX-JHO0000000439

Lenders, the Issuing Bank and the Administrative Agent under <u>Section 10.3</u>) allowed in such judicial proceeding; and

(ii)    to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

(b)    Any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender and the Issuing Bank to make such payments to the Administrative Agent and, if the Administrative Agent shall consent to the making of such payments directly to the Lenders and the Issuing Bank, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Administrative Agent and its agents and counsel, and any other amounts due the Administrative Agent under <u>Section 11.3</u>.

(c)    Nothing contained herein shall be deemed to authorize the Administrative Agent to authorize or consent to or accept or adopt on behalf of any Lender or the Issuing Bank any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any Lender or to authorize the Administrative Agent to vote in respect of the claim of any Lender in any such proceeding.

Section 9.10    <u>Authorization to Execute Other Loan Documents</u>. Each Lender hereby authorizes the Administrative Agent to execute on behalf of all Lenders all Loan Documents (including, without limitation, the Collateral Documents and any subordination agreements) other than this Agreement.

Section 9.11    <u>Collateral and Guaranty Matters</u>. The Lenders irrevocably authorize the Administrative Agent, at its option and in its discretion:

(a)    to release any Lien on any property granted to or held by the Administrative Agent under any Loan Document: (i) upon the termination of all Revolving Commitments, the Cash Collateralization of all reimbursement obligations with respect to Letters of Credit in an amount equal to *at least* one hundred three percent (103.0%) of the aggregate LC Exposure of all Lenders, and the payment in full of all Obligations (other than contingent indemnification obligations and such Cash Collateralized reimbursement obligations); (ii) that is sold, or to be sold, as part of, or in connection with, any sale permitted hereunder or under any other Loan Document; or (iii) if approved, authorized or ratified in writing in accordance with <u>Section 11.2</u>; and

(b)    to release any Loan Party from its obligations under the applicable Collateral Documents if such Person ceases to be a Subsidiary as a result of a transaction permitted hereunder.

Upon request by the Administrative Agent at any time, the Required Lenders will confirm in writing the Administrative Agent's authority to release its interest in particular types or items of property, or to release any Loan Party from its obligations under the applicable Collateral Documents pursuant to this <u>Section 9.11</u>. In each case as specified in this <u>Section 9.11</u>, the Administrative Agent is authorized, at the Borrower's expense, to execute and deliver to the applicable Loan Party such documents as such Loan Party may reasonably request to evidence the release of such item of Collateral from the Liens granted under the applicable Collateral Documents, or to release such Loan Party from its obligations under the applicable Collateral Documents, in each case in accordance with the terms of the Loan Documents and this <u>Section 9.11</u>.

Section 9.12    <u>Syndication Agent</u>. Each Lender hereby: (a) designates each of CoBank, ACB, Citizens Bank, N.A., and Compeer Financial, PCA as Syndication Agents; and (b) agrees that each of the Syndication Agents shall have no duties or obligations under any Loan Documents to any Lender or to any Loan Party.

Section 9.13    <u>Right to Realize on Collateral and Enforce Guarantee</u>. Anything contained in any of the Loan Documents to the contrary notwithstanding, the Borrower, the Administrative Agent and each Lender hereby agree that: (a) no Lender shall have any right individually to realize upon any of the Collateral or to enforce the Collateral Documents, it being understood and agreed that all powers, rights and remedies

120

hereunder and under the Collateral Documents may be exercised solely by the Administrative Agent; and (b) in the event of a foreclosure by the Administrative Agent on any of the Collateral pursuant to a public or private sale or other disposition, the Administrative Agent or any Lender may be the purchaser or licensor of any or all of such Collateral at any such sale or other disposition and the Administrative Agent, as agent for and representative of the Lenders (but not any Lender or Lenders in its or their respective individual capacities unless the Required Lenders shall otherwise agree in writing), shall be entitled, for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Collateral sold at any such public sale, to use and apply any of the Obligations as a credit on account of the purchase price for any collateral payable by the Administrative Agent at such sale or other disposition.

Section 9.14     Secured Bank Product Obligations and Hedging Obligations. No Bank Product Provider or Lender-Related Hedge Provider that obtains the benefits of Section 8.2, the Collateral Documents, or any Collateral by virtue of the provisions hereof or of any other Loan Document shall have any right to notice of any action, or to consent to, direct, or object to, any action hereunder, under any other Loan Document, or otherwise in respect of the Collateral (including, without limitation, the release or impairment of any Collateral), other than in its capacity as a Lender, and, in such case, only to the extent expressly provided in the Loan Documents. Notwithstanding anything to the contrary in this Article IX, the Administrative Agent shall *not* be required to verify the payment of, or that other satisfactory arrangements have been made with respect to, any Bank Product Obligations and Hedging Obligations, unless the Administrative Agent shall have received written notice of such Obligations, together with such supporting documentation as the Administrative Agent may request, from the applicable Bank Product Provider(s) or Lender-Related Hedge Provider(s), as the case may be.

## ARTICLE X

### THE GUARANTY

Section 10.1     The Guaranty. Each of the Guarantors hereby jointly and severally guarantees to the Administrative Agent, each Lender and/or each Affiliate of a Lender that enters into Bank Products or a Hedging Transaction with the Borrower, or any Subsidiary, and each other holder of the Obligations as hereinafter provided, as primary obligor and not as surety, the prompt payment of the Obligations in full when due (whether at stated maturity, as a mandatory prepayment, by acceleration, as a mandatory cash collateralization or otherwise) strictly in accordance with the terms thereof. The Guarantors hereby further agree that, if any of the Obligations is not paid in full when due (whether at stated maturity, as a mandatory prepayment, by acceleration, as a mandatory cash collateralization or otherwise), the Guarantors will, jointly and severally, promptly pay the same, without any demand or notice whatsoever, and that in the case of any extension of time of payment or renewal of any of the Obligations, the same will be promptly paid in full when due (whether at extended maturity, as a mandatory prepayment, by acceleration, as a mandatory cash collateralization or otherwise) in accordance with the terms of such extension or renewal.

Notwithstanding any provision to the contrary contained herein or in any other of the Loan Documents or the other documents relating to the Obligations, the obligations of each Guarantor under this Agreement and the other Loan Documents shall not exceed an aggregate amount equal to the largest amount that would not render such obligations subject to avoidance under applicable Debtor Relief Laws.

Section 10.2     Obligations Unconditional. The obligations of the Guarantors under Section 10.1 are joint and several, absolute and unconditional, irrespective of the value, genuineness, validity, regularity or enforceability of any of the Loan Documents or other documents relating to the Obligations, or any substitution, release, impairment or exchange of any other guarantee of or security for any of the Obligations, and, to the fullest extent permitted by applicable Law, irrespective of any other circumstance whatsoever which might otherwise constitute a legal or equitable discharge or defense of a surety or guarantor, it being the intent of this Section 10.2 that the obligations of the Guarantors hereunder shall be absolute and unconditional under any and all circumstances. Each Guarantor agrees that such Guarantor shall have no right of subrogation, indemnity,

121

CONFIDENTIAL                                                                                      VPX-JHO0000000441

reimbursement or contribution against the Borrower or any other Guarantor for amounts paid under this <u>Article X</u> until such time as the Obligations have been paid in full and the Commitments have expired or terminated. Without limiting the generality of the foregoing, it is agreed that, to the fullest extent permitted by Law, the occurrence of any one (1) or more of the following shall not alter or impair the liability of any Guarantor hereunder, which shall remain absolute and unconditional as described above:

> (a)     at any time or from time to time, without notice to any Guarantor, the time for any performance of or compliance with any of the Obligations shall be extended, or such performance or compliance shall be waived;

> (b)     any of the acts mentioned in any of the provisions of any of the Loan Documents or any other document relating to the Obligations shall be done or omitted;

> (c)     the maturity of any of the Obligations shall be accelerated, or any of the Obligations shall be modified, supplemented and/or amended in any respect, or any right under any of the Loan Documents or any other document relating to the Obligations shall be waived or any other guarantee of any of the Obligations or any security therefor shall be released, impaired or exchanged in whole or in part or otherwise dealt with;

> (d)     any Lien granted to, or in favor of, the Administrative Agent or any other holder of the Obligations as security for any of the Obligations shall fail to attach or be perfected; or

> (e)     any of the Obligations shall be determined to be void or voidable (including for the benefit of any creditor of any Guarantor) or shall be subordinated to the claims of any Person (including any creditor of any Guarantor).

With respect to its obligations hereunder, each Guarantor hereby expressly waives diligence, presentment, demand of payment, protest and all notices whatsoever and any requirement that the Administrative Agent or any other holder of the Obligations exhaust any right, power or remedy or proceed against any Person under any of the Loan Documents or any other document relating to the Obligations or against any other Person under any other guarantee of, or security for, any of the Obligations.

Section 10.3     <u>Reinstatement</u>. The obligations of each Guarantor under this <u>Article X</u> shall be automatically reinstated if, and to the extent that, for any reason, any payment by, or on behalf of, any Person in respect of the Obligations is rescinded or must be otherwise restored by any holder of any of the Obligations, whether as a result of any Debtor Relief Law or otherwise, and each Guarantor agrees that it will indemnify the Administrative Agent and each other holder of the Obligations on demand for all reasonable costs and expenses (including, without limitation, the fees, charges and disbursements of counsel) incurred by the Administrative Agent or such holder of the Obligations in connection with such rescission or restoration, including, without limitation, any such costs and expenses incurred in defending against any claim alleging that such payment constituted a preference, fraudulent transfer or similar payment under any Debtor Relief Law.

Section 10.4     <u>Certain Additional Waivers</u>. Each Guarantor agrees that such Guarantor shall have no right of recourse to security for the Obligations, except through the exercise of rights of subrogation pursuant to <u>Section 10.2</u> and through the exercise of rights of contribution pursuant to <u>Section 10.6</u>.

Section 10.5     <u>Remedies</u>. The Guarantors agree that, to the fullest extent permitted by Law, as between the Guarantors, on the one hand, and the Administrative Agent and the other holders of the Obligations, on the other hand, the Obligations may be declared to be forthwith due and payable as specified in <u>Section 8.1</u> (and shall be deemed to have become automatically due and payable in the circumstances specified in <u>Section 8.1</u>) for purposes of <u>Section 10.1</u> notwithstanding any stay, injunction or other prohibition preventing such declaration (or preventing the Obligations from becoming automatically due and payable) as against any other Person, and that, in the event of such declaration (or the Obligations being deemed to have become automatically due and payable), the Obligations (whether or not due and payable by any other Person) shall

122

CHAR2\2683123v6

forthwith become due and payable by the Guarantors for purposes of <u>Section 10.1</u>. The Guarantors acknowledge and agree that their obligations hereunder are secured in accordance with the terms of the Collateral Documents and that the holders of the Obligations may exercise their remedies thereunder in accordance with the terms thereof.

Section 10.6    <u>Rights of Contribution</u>. The Guarantors agree among themselves that, in connection with payments made hereunder, each Guarantor shall have contribution rights against the other Guarantors as permitted under applicable Law. Such contribution rights shall be subordinate and subject in right of payment to the obligations of such Guarantors under the Loan Documents and no Guarantor shall exercise such rights of contribution until the Obligations have been paid in full and the Commitments have terminated.

Section 10.7    <u>Guarantee of Payment; Continuing Guarantee</u>. The guarantee in this <u>Article X</u> is a guaranty of payment and not of collection, is a continuing guarantee, and shall apply to the Obligations whenever arising.

Section 10.8    <u>Keepwell</u>. Each Qualified ECP Guarantor hereby jointly and severally absolutely, unconditionally and irrevocably undertakes to provide such funds or other support as may be needed from time to time by each Specified Loan Party to honor all of such Specified Loan Party's obligations under this Agreement and the other Loan Documents in respect of Swap Obligations (<u>provided</u>, <u>that</u>, each Qualified ECP Guarantor shall only be liable under this <u>Section 10.8</u> for the maximum amount of such liability that can be hereby incurred without rendering its obligations under this <u>Section 10.8</u> or otherwise under this Agreement voidable under applicable Law relating to fraudulent conveyance or fraudulent transfer, and not for any greater amount). The obligations of each Qualified ECP Guarantor under this <u>Section 10.8</u> shall remain in full force and effect until the Obligations have been indefeasibly paid and performed in full. Each Qualified ECP Guarantor intends that this <u>Section 10.8</u> constitute, and this <u>Section 10.8</u> shall be deemed to constitute, a "keepwell, support, or other agreement" for the benefit of each Specified Loan Party for all purposes of Section la(18)(A)(v)(II) of the Commodity Exchange Act.

ARTICLE XI

<u>MISCELLANEOUS</u>

Section 11.1    <u>Notices</u>.

(a)    <u>Written Notices</u>.

(i)    Except in the case of notices and other communications expressly permitted to be given by telephone, all notices and other communications to any party herein to be effective shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by telecopy, as follows:

| | |
|---|---|
| <u>To any Loan Party</u>: | 1600 N. Park Dr.<br>Weston, FL 33326<br>*Attn*:    Office of General Counsel |
| *With a copy* (*for Information purposes only*) *to*: | Greenberg Traurig, LLP<br>3333 Piedmont Road<br>Atlanta, GA 30326<br>*Attn*:    Jeffrey Smith, Esq.<br>Phone:  +1 (678) 553–2100 |
| <u>To the Administrative Agent</u>: | Truist Bank<br>Agency Services<br>303 Peachtree St., N.E. / 25th Floor |

123

CHAR2\2683123v6

CONFIDENTIAL                                                                                           VPX-JHO0000000443

Atlanta, Georgia 30308
*Attn*:    Agency Services Manager
Phone: (404) 221–2001

*With a copy* (*for Information purposes only*) *to*:

Truist Bank
50 N. Laura St.
Jacksonville, FL  32202
*Attn*:    Aimee Kilgore
Phone: (904) 632–2740

Moore & Van Allen PLLC
100 North Tryon Street, Suite 4700
Charlotte, NC  28202
*Attn*:    Charlie Harris
Phone: (704) 331–1141

To the Issuing Bank:

Truist Bank
245 Peachtree Center Ave., 17ᵗʰ Fl.
Atlanta, Georgia 30303
*Attn*:    Standby Letter of Credit Dept.
Fax:    (800) 951–7847

To the Swingline Lender:

Truist Bank
Agency Services
303 Peachtree St., N.E. / 25ᵗʰ Floor
Atlanta, Georgia 30308
*Attn*:    Agency Services Manager
Fax:    (404) 221–2001

To any other Lender:

To the address or facsimile number, set forth in the Administrative Questionnaire or the Assignment and Assumption executed by such Lender.

Any party hereto may change its address or telecopy number for notices and other communications hereunder by notice to the other parties hereto. All such notices and other communications sent to any party hereto in accordance with the provisions of this Agreement or made upon the earlier to occur of (A) actual receipt by the relevant party hereto, and (B) (I) if delivered by hand or by courier, when signed for by, or on behalf of, the relevant party hereto, (II) if delivered by mail, four (4) Business Days after deposit in the mails, postage prepaid, (III) if delivered by facsimile, when sent and receipt has been confirmed by telephone, and (IV) if delivered by electronic mail, to the extent provided in clause (b) below and effective as provided in such clause; provided, that, notices and other communications to the Administrative Agent and the Issuing Bank pursuant to Article II shall not be effective until actually received by such Person. In no event shall a voice mail message be effective as a notice, communication or confirmation hereunder.

(ii)    Any agreement of the Administrative Agent, the Issuing Bank, or any Lender herein to receive certain notices by telephone or facsimile is solely for the convenience, and at the request, of the Borrower. The Administrative Agent, the Issuing Bank and the Lenders shall be entitled to rely on the authority of any Person purporting to be a Person authorized by the Borrower to give such notice, and the Administrative Agent, the Issuing Bank and the Lenders shall not have any liability to the Borrower or other Person on account of any action taken, or not taken, by the Administrative Agent, the Issuing Bank and the Lenders in reliance upon such telephonic or facsimile notice. The obligation of the

124

CHAR2\2683123v6

Borrower to repay the Loans and all other Obligations hereunder shall not be affected in any way, or to any extent, by any failure of the Administrative Agent, the Issuing Bank and the Lenders to receive written confirmation of any telephonic or facsimile notice, or the receipt by the Administrative Agent, the Issuing Bank and the Lenders of a confirmation which is at variance with the terms understood by the Administrative Agent, the Issuing Bank and the Lenders to be contained in any such telephonic or facsimile notice.

(b)      Electronic Communications.

(i)      Notices and other communications to the Lenders and the Issuing Bank hereunder may be delivered or furnished by electronic communication (including e-mail and Internet or intranet websites) pursuant to procedures approved by the Administrative Agent, provided, that, the foregoing shall not apply to notices to any Lender or the Issuing Bank if such Lender, the Issuing Bank, as applicable, and the Administrative Agent have agreed to receive notices by electronic communication and have agreed to the procedures governing such communications. The Administrative Agent or the Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it; provided, that, approval of such procedures may be limited to particular notices or communications.

(ii)      Unless the Administrative Agent otherwise prescribes: (A) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement), provided, that, if such notice or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next Business Day for the recipient; and (B) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (ii)(A) of notification that such notice or communication is available and identifying the website address therefor.

(iii)      The Borrower agrees that the Administrative Agent may, but shall not be obligated to, make Communications (as defined below) available to the Issuing Bank and the other Lenders by posting the Communications on a Platform.

(iv)      THE PLATFORMS USED BY THE ADMINISTRATIVE AGENT ARE PROVIDED "AS IS" AND "AS AVAILABLE". THE AGENT PARTIES (AS DEFINED BELOW) DO *NOT* WARRANT THE ADEQUACY OF ANY PLATFORM, AND EXPRESSLY DISCLAIM LIABILITY FOR ERRORS AND/OR OMISSIONS IN THE COMMUNICATIONS. NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING, WITHOUT LIMITATION, ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD-PARTY RIGHTS, OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS, IS MADE BY ANY AGENT PARTY IN CONNECTION WITH THE COMMUNICATIONS OR ANY PLATFORM. In no event shall the Administrative Agent or any of its Related Parties (collectively, the "*Agent Parties*") have any liability to any Loan Party, any Lender, the Issuing Bank or any other Person or entity for damages of any kind, including, without limitation, direct or indirect, special, incidental or consequential damages, losses or expenses (whether in tort, contract or otherwise) arising out of any Loan Party's or the Administrative Agent's transmission of Communications through the Platform. "*Communications*" means, collectively, any notice, demand, communication, information, document or other material provided by, or on behalf of, any Loan Party pursuant to any Loan Document or the transactions contemplated therein which is distributed by the Administrative Agent, any Lender or the Issuing Bank by means of electronic communications pursuant to this Section 11.1, including through the Platform.

125

CONFIDENTIAL                                                                      VPX-JHO0000000445

(c)     <u>Telephonic Notices</u>. Unless otherwise expressly provided herein, all notices and/or other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail, or sent by telecopier or electronic mail, as follows, and all notices and/or other communications expressly permitted hereunder to be given by telephone shall be made to the applicable telephone number, as follows:

(i)     if to any Loan Party, the Administrative Agent, or the Issuing Bank, or, to the address, telecopier number, electronic mail address, or telephone number specified for such Person on <u>Schedule 11.2</u>, or to such other address, telecopier number, electronic mail address, or telephone number as shall be designated by such party in a notice to the other parties hereto, as provided in <u>Section 11.2(d)</u>; and

(ii)     if to any other Lender, to the address, telecopier number, electronic mail address, or telephone number specified in its Administrative Questionnaire.

(d)     All such notices and other communications sent to any party hereto in accordance with the provisions of this Agreement or made upon the *earlier* to occur of (i) actual receipt by the relevant party hereto, and (ii) (A) if delivered by hand or by courier, when signed for by, or on behalf of, the relevant party hereto, (B) if delivered by mail, four (4) Business Days after deposit in the mails, postage prepaid, (C) if delivered by facsimile, when sent and receipt has been confirmed by telephone, and (D) if delivered by electronic mail, to the extent provided in <u>clause (b)</u> above and effective as provided in such <u>clause (b)</u>; <u>provided</u>, <u>that</u>, notices and other communications to the Administrative Agent and an Issuing Bank pursuant to Article II shall not be effective until actually received by such Person. In no event shall a voice mail message be effective as a notice, communication, or confirmation hereunder.

(e)     Loan Documents may be transmitted and/or signed by facsimile or other electronic communication. The effectiveness of any such documents and signature shall, subject to applicable Law, have the same force and effect as manually signed originals, and shall be binding on all Loan Parties, the Administrative Agent, and the Lenders.

Section 11.2     <u>Waiver; Amendments</u>.

(a)     No failure or delay by the Administrative Agent, the Issuing Bank or any Lender in exercising any right or power hereunder or under any other Loan Document, and no course of dealing between any Loan Party and the Administrative Agent or any Lender, shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power or any abandonment or discontinuance of steps to enforce such right or power, preclude any other or further exercise thereof or the exercise of any other right or power hereunder or thereunder. The rights and remedies of the Administrative Agent, the Issuing Bank and the Lenders hereunder and under the other Loan Documents are cumulative and are *not* exclusive of any rights or remedies provided by Law. No waiver of any provision of this Agreement or any other Loan Document, or consent to any departure by any Loan Party therefrom, shall in any event be effective, unless the same shall be permitted by this <u>clause (b)</u> below, and then, such waiver or consent shall be effective only in the specific instance and for the purpose for which given. Without limiting the generality of the foregoing, the making of a Loan or the issuance of a Letter of Credit shall not be construed as a waiver of any Default or Event of Default, regardless of whether the Administrative Agent, any Lender or the Issuing Bank may have had notice or knowledge of such Default or Event of Default at the time.

(b)     No amendment or waiver of any provision of this Agreement or the other Loan Documents (other than the Fee Letter), nor consent to any departure by any Loan Party therefrom, shall in any event be effective, unless the same shall be in writing and signed by each Loan Party and the Required Lenders (and, in the case of the Owner Pledge Agreement, by the Owner Pledgors), or the Borrower and the Administrative Agent with the consent of the Required Lenders (and, in the case of the Owner Pledge Agreement, by the Owner Pledgors), and then, such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given; <u>provided</u>, <u>that</u>, subject to <u>Section 2.16(b)</u>:

126

CHAR2\2683123v6

(i)      no amendment or waiver shall:

(A)      extend or increase the Commitment of any Lender without the written consent of such Lender;

(B)      reduce the principal amount of any Loan or LC Disbursement or reduce the rate of interest thereon, or reduce any fees payable hereunder, without the written consent of each Lender affected thereby; provided, that, (I) the waiver of (or amendment to the terms of) any (1) mandatory prepayment of the Loans (but, for purposes of clarity, *not* the manner of application of any mandatory prepayment), (2) Default or Event of Default, or (3) payment of Default Interest shall *not* constitute a reduction of the payment of principal or interest, and (II) any change to the definition of "*Combined Total Leverage Ratio*" in Section 1.1 (or in the component definitions thereof), or any other ratio used as a basis for calculating the amount of any principal or interest payment (or in the component definitions thereof), shall *not* constitute a reduction in any amount of interest or fee;

(C)      postpone the date fixed for any payment of any principal (excluding any mandatory prepayment) of, or interest on, any Loan or LC Disbursement or interest thereon or any fees hereunder or reduce the amount of, waive or excuse any such payment, or postpone the scheduled date for the termination or reduction of any Commitment, without the written consent of each Lender affected thereby; provided, that, no amendment, modification or waiver of, or consent to departure from, any condition precedent contained in Article III, any Default or Event of Default, any waiver of the obligation to pay Default Interest, or any mandatory prepayment or mandatory reduction of the Commitments shall constitute a postponement of any date scheduled for the payment of principal or interest, or an extension of the final maturity of any Loan or the scheduled termination date of any Commitment;

(D)      change Section 2.21(b) or Section 2.21(c) in a manner that would alter the pro rata sharing of payments required thereby or change the provisions of Section 8.2, without the written consent of each Lender;

(E)      change any of the provisions of this Section 11.2 or the definition of "*Required Lenders*" or any other provision hereof specifying the number or percentage of Lenders which are required to waive, amend or modify any rights hereunder or make any determination or grant any consent hereunder, without the consent of each Lender;

(F)      release the Borrower without the consent of each Lender, or release all, or substantially all, of the Guarantors, or limit the liability of all, or substantially all, of the Guarantors under any Guaranty, in each case, without the written consent of each Lender; or

(G)      release all, or substantially all, of the Collateral (if any) securing any of the Obligations, without the written consent of each Lender;

(ii)      prior to the Revolving Commitments Termination Date: (A) unless also signed by each Lender holding any Revolving Commitment or any Revolving Credit Exposure, no such amendment or waiver shall change the definition of "*Required Revolving Lenders*" or this clause (b)(ii)(A) without the consent of each such Lender; and (B) unless also signed by the Required Revolving Lenders, no such amendment or waiver shall (i) waive any Default or Event of Default for purposes of Section 3.2, (ii) amend, change, waive, discharge or terminate Section 3.2 or Section 8.1 in a manner adverse to such Lenders, or (iii) amend, change, waive, discharge or terminate Article VI (or any defined term used therein) or this clause (b)(ii)(B); or

(iii)      unless also signed by Lenders (other than Defaulting Lenders) holding, in the aggregate, *at least* a majority of the outstanding amount of the Term Loans, no such amendment or

127

CONFIDENTIAL

waiver shall: (i) amend, change, waive, discharge or terminate <u>Section 2.12(e)</u> so as to alter the manner of application of proceeds of any mandatory prepayment required by <u>Section 2.12(a)</u>, <u>Section 2.12(b)</u>, <u>Section 2.12(c)</u> or <u>Section 2.12(d)</u> hereof; or (ii) amend, change, waive, discharge or terminate this <u>clause (a)(iii)</u>;

<u>provided</u>, <u>further</u>, <u>that</u>, no such agreement shall amend, modify or otherwise affect the rights, duties or obligations of the Administrative Agent, the Swingline Lender or the Issuing Bank without the prior written consent of such Person. Notwithstanding anything to the contrary herein: (i) no Defaulting Lender shall have any right to approve or disapprove any amendment, waiver or consent hereunder, except that (A) the Commitment of such Lender may *not* be increased or extended, and amounts payable to such Lender hereunder may *not* be permanently reduced, in each case of the foregoing, without the consent of such Lender (other than reductions in fees and interest in which such reduction does *not* disproportionately affect such Lender), and (B) any amendment, waiver or consent requiring the consent of all Lenders or each affected Lenders that, by its terms, affects any Defaulting Lender disproportionately and adversely relative to the other affected Lenders shall require the consent of such Defaulting Lender; (ii) this Agreement may be amended <u>(A) to effect Conforming Changes in accordance with Section 2.13(e), and (B) in connection with the implementation of a Benchmark Replacement and/or any related Conforming Changes, all as provided in Section 2.16; (iii) this Agreement may be amended</u> and restated without the consent of any Lender (but with the consent of the Borrower and the Administrative Agent) if, upon giving effect to such amendment and restatement, such Lender shall no longer be a party to this Agreement (as so amended and restated), the Commitments of such Lender shall have terminated (but such Lender shall continue to be entitled to the benefits of <u>Section 2.18</u>, <u>Section 2.19</u>, <u>Section 2.20</u> and <u>Section 11.3</u>), such Lender shall have no other commitment or other obligation hereunder and shall have been paid in full all principal, interest and other amounts owing to it or accrued for its account under this Agreement; (~~iii~~<u>iv</u>) each Lender is entitled to vote as such Lender sees fit on any bankruptcy reorganization plan that affects the Loans, and each Lender acknowledges that the provisions of Section 1126(c) of the Bankruptcy Code of the United States supersedes the unanimous consent provisions set forth herein; (~~iv~~<u>v</u>) the Required Lenders shall determine whether or not to allow a Loan Party to use cash collateral in the context of a bankruptcy or insolvency proceeding and such determination shall be binding on all of the Lenders; and (~~v~~<u>vi</u>) if, following the Effective Date, the Administrative Agent and the Borrower shall have jointly identified an inconsistency, obvious error or omission of a technical or immaterial nature, in each case, in any provision of the Loan Documents, then the Administrative Agent and the Loan Parties shall be permitted to amend such provision and such amendment shall become effective without any further action or consent of any other party to any Loan Documents if the same is not objected to in writing by the Required Lenders within five (5) Business Days following receipt of notice thereof.

Section 11.3    <u>Expenses; Indemnification</u>.

(a)    The Loan Parties, on a joint and several basis, shall pay (i) all reasonable out-of-pocket costs and expenses of the Administrative Agent, the Arranger and their Affiliates, including, without limitation, the reasonable fees, charges and disbursements of one (1) primary counsel for the Administrative Agent, the Arranger and their Affiliates and, to the extent reasonably necessary (as determined by the Administrative Agent in good faith), of one (1) additional special and/or local counsel in each applicable jurisdiction for the Administrative Agent, the Arranger and their Affiliates (and, in the event of any actual or potential conflict of interest, of one (1) additional counsel (and, if reasonably necessary (as determined by the Administrative Agent in good faith), of one (1) additional special and/or local counsel) for each party subject to such conflict), in connection with the syndication of the credit facilities provided for herein, the preparation and administration of the Loan Documents and any amendments, modifications or waivers thereof (whether or not the transactions contemplated in this Agreement or any other Loan Document shall be consummated), including, without limitation, the reasonable fees, charges and disbursements of one (1) primary counsel for the Administrative Agent, the Arranger and their Affiliates and, to the extent reasonably necessary (as determined by the Administrative Agent in good faith), of one (1) additional special and/or local counsel in each applicable jurisdiction for the Administrative Agent, the Arranger and their respective Affiliates (and, in the event of any actual or potential conflict of interest, of one (1) additional counsel (and, if reasonably necessary (as determined

128

CONFIDENTIAL                                                                                           VPX-JHO0000000448

by the Administrative Agent in good faith), of one (1) additional special and/or local counsel) for each party subject to such conflict), (ii) all reasonable out-of-pocket expenses incurred by the Issuing Bank in connection with the issuance, amendment, renewal and/or extension of any Letter of Credit or any demand for payment thereunder, and (iii) all reasonable out-of-pocket costs and expenses (including, without limitation, the reasonable fees, charges and disbursements of one (1) outside counsel for the Administrative Agent, the Arranger, the Issuing Bank and the Lenders and, to the extent reasonably necessary (as determined by the Administrative Agent in good faith), of one (1) additional special and/or local counsel in each applicable jurisdiction for the Administrative Agent, the Arranger, the Issuing Bank and the Lenders (and, in the event of any actual or potential conflict of interest, of one (1) additional counsel (and, if reasonably necessary (as determined by the Administrative Agent in good faith), of one (1) additional special and/or local counsel) for each party subject to such conflict)) incurred by the Administrative Agent, the Arranger, the Issuing Bank or any Lender in connection with the enforcement or protection of its rights in connection with this Agreement and the other Loan Documents, including, without limitation, its rights under this Section 11.3, or in connection with the Loans made or any Letters of Credit issued hereunder, including, without limitation, all such out-of-pocket expenses incurred during any workout, restructuring or negotiations in respect of such Loans or Letters of Credit.

(b)    The Loan Parties, on a joint and several basis, shall indemnify the Administrative Agent (and any sub-agent thereof), the Arranger, each Lender and the Issuing Bank, and each Related Party of any of the foregoing Persons (each such Person, an "_Indemnitee_") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities, penalties and related expenses (including, without limitation, the fees, charges and disbursements of one (1) primary counsel for all Indemnitees and, to the extent reasonably necessary (as determined by the applicable Indemnitees in good faith), one (1) additional special and local counsel in each applicable jurisdiction for the Indemnitees (and, in the event of any actual or potential conflict of interest, of one (1) additional counsel (and, if reasonably necessary (as determined by the applicable Indemnitees in good faith), of one (1) additional special and/or local counsel) for each Indemnitee subject to such conflict)), incurred by any Indemnitee or asserted against any Indemnitee by any third party, or by the Borrower or any other Loan Party, arising out of, in connection with, or as a result of (i) the execution or delivery of this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, the performance by the parties hereto of their respective obligations hereunder or thereunder or the consummation of the transactions contemplated hereby or thereby (including, without limitation, the payment of any documentary and/or stamp taxes owing in connection with any Mortgaged Properties, including as a result of the foreclosure of any Mortgaged Property), (ii) any Loan or Letter of Credit or the use or proposed use of the proceeds therefrom (including, without limitation, any refusal by the Issuing Bank to honor a demand for payment under a Letter of Credit if the documents presented in connection with such demand do not strictly comply with the terms of such Letter of Credit), (iii) any actual or alleged presence or Release of Hazardous Materials on or from any property owned or operated by any Loan Party or Subsidiary, or any actual or alleged Environmental Liability related in any way to any Loan Party or Subsidiary, or (iv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by a third party or by any Loan Party, and regardless of whether any Indemnitee is a party thereto, provided, that, such indemnity shall _not_, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities, penalties or related expenses are determined by a court of competent jurisdiction by final, non-appealable judgment to have resulted: (A) from the gross negligence or willful misconduct of such Indemnitee (including any Related Party of such Indemnitee); or (B) _solely_ from a claim brought by a Loan Party against an Indemnitee for breach in bad faith of such Indemnitee's obligations hereunder or under any other Loan Document. This clause (b) shall not apply with respect to Taxes other than any Taxes that represent losses, claims, damages, etc. arising from any non-Tax claim.

(c)    The Loan Parties shall pay, and hold the Administrative Agent, the Issuing Bank, and each of the Lenders harmless from and against, any and all present and future stamp, documentary, and other similar taxes with respect to this Agreement and the other Loan Documents, any Collateral described therein, or any

CHAR2\2683123v6

CONFIDENTIAL                                                                                  VPX-JHO0000000449

payments due thereunder, and save the Administrative Agent, the Issuing Bank, and each Lender harmless from and against any and all liabilities with respect to, or resulting from, any delay or omission to pay such taxes.

(d)    To the extent that the Loan Parties fail to pay any amount required to be paid to the Administrative Agent, the Issuing Bank or the Swingline Lender under clauses (a) or (b) above, each Lender severally agrees to pay to the Administrative Agent, the Issuing Bank or the Swingline Lender, as the case may be, such Lender's Pro Rata Share (determined as of the time that the unreimbursed expense or indemnity payment is sought) of such unpaid amount; provided, that, the unreimbursed expense or indemnified payment, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against the Administrative Agent, the Issuing Bank or the Swingline Lender in its capacity as such.

(e)    To the extent permitted by applicable Law, no Loan Party or Subsidiary shall assert, and hereby waives, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to actual or direct damages) arising out of, in connection with or as a result of, this Agreement or any agreement or instrument contemplated hereby, the transactions contemplated therein, any Loan or any Letter of Credit or the use of proceeds thereof.

(f)    All amounts due under this Section 11.3 shall be payable within ten (10) calendar days of receipt of written demand therefor.

Section 11.4    Successors and Assigns.

(a)    The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that the Borrower may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of the Administrative Agent and each Lender, and no Lender may assign or otherwise transfer any of its rights or obligations hereunder, except: (i) to an assignee in accordance with the provisions of clause (b) below; (ii) by way of participation in accordance with the provisions of clause (d) below; or (iii) by way of pledge or assignment of a security interest subject to the restrictions of clause (f) below (and any other attempted assignment or transfer by any party hereto shall be null and void). Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided in clause (d) below, and, to the extent expressly contemplated hereby, the Related Parties of each of the Administrative Agent and the Lenders) any legal or equitable right, remedy or claim under, or by reason of, this Agreement.

(b)    Any Lender may at any time assign to one (1) or more assignees all, or a portion, of its rights and obligations under this Agreement (including all, or a portion, of its Commitments, Loans, and other Revolving Credit Exposure at the time owing to it); provided, that, any such assignment shall be subject to the following conditions:

(i)    Minimum Amounts.

(A)    in the case of an assignment of the entire remaining amount of the assigning Lender's Commitments, Loans and other Revolving Credit Exposure at the time owing to it or in the case of an assignment to a Lender (including, in any event on the Effective Date, Federal Agricultural Mortgage Corporation), an Affiliate of a Lender (including, in any event on the Effective Date, Federal Agricultural Mortgage Corporation) or an Approved Fund, no minimum amount need be assigned; and

(B)    in any case not described in clause (b)(i)(A) above, the aggregate amount of the Commitment (which for this purpose includes Loans and Revolving Credit Exposure outstanding thereunder) or, if the applicable Commitment is not then in effect, the principal outstanding balance of the Loans and Revolving Credit Exposure of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Assumption

130

CONFIDENTIAL                                                                        VPX-JHO0000000450

with respect to such assignment is delivered to the Administrative Agent, or, if "Trade Date" is specified in the Assignment and Assumption, as of the Trade Date) shall *not* be *less than* Two Million Dollars ($2,000,000) with respect to Term Loans and Five Million Dollars ($5,000,000) with respect to Revolving Loans and in minimum increments of One Million Dollars ($1,000,000), unless each of the Administrative Agent, and, so long as no Event of Default has occurred and is continuing, the Borrower otherwise consents (each such consent not to be unreasonably withheld, conditioned or delayed).

(ii)    Proportionate Amounts. Each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement with respect to the Loans, other Revolving Credit Exposure or the Commitments assigned.

(iii)    Required Consents. No consent shall be required for any assignment except to the extent required by clause (b)(i)(B) above and, in addition:

(A)    the consent of the Borrower (such consent *not* to be unreasonably withheld, conditioned or delayed) shall be required, unless: (I) an Event of Default has occurred and is continuing at the time of such assignment; or (II) such assignment is to a Lender (including, in any event on the Effective Date, Federal Agricultural Mortgage Corporation), an Affiliate of a Lender (including, in any event on the Effective Date, Federal Agricultural Mortgage Corporation) or an Approved Fund;

(B)    the consent of the Administrative Agent (such consent *not* to be unreasonably withheld, conditioned or delayed) shall be required for: (I) assignments to a Person that is *not* a Lender (including, in any event on the Effective Date, Federal Agricultural Mortgage Corporation) with a Commitment, an Affiliate of such a Lender (including, in any event on the Effective Date, Federal Agricultural Mortgage Corporation) or an Approved Fund; and (II) assignments by Defaulting Lenders; and

(C)    the consent of the Issuing Bank (such consent *not* to be unreasonably withheld, conditioned or delayed) shall be required for any assignment (other than any assignment to Federal Agricultural Mortgage Corporation on the Effective Date otherwise permitted hereunder) that increases the obligation of the assignee to participate in exposure under one (1) or more Letters of Credit (whether or not then outstanding), and the consent of the Swingline Lender (such consent *not* to be unreasonably withheld, conditioned or delayed) shall be required for any assignment (other than any assignment to Federal Agricultural Mortgage Corporation on the Effective Date otherwise permitted hereunder) in respect of the Revolving Commitments.

(iv)    Assignment and Assumption. The parties to each assignment shall deliver to the Administrative Agent: (A) a duly executed Assignment and Assumption; (B) a processing and recordation fee of Three Thousand Five Hundred Dollars ($3,500); (C) an Administrative Questionnaire unless the assignee is already a Lender; and (D) the documents required under Section 2.20 if such assignee is a Foreign Lender.

(v)    No Assignment to Certain Persons. No such assignment shall be made to: (A) the Borrower or any of the Borrower's Affiliates or Subsidiaries; or (B) to any Defaulting Lender or any of its Subsidiaries, or any Person who, upon becoming a Lender hereunder, would constitute any of the foregoing Persons described in this clause (b)(v)(B). For the avoidance of doubt, any Disqualified Institution is subject to clause (h) below.

131

CONFIDENTIAL                                                                                    VPX-JHO0000000451

(vi)     <u>No Assignment to Natural Persons</u>. No such assignment shall be made to a natural person.

(vii)     <u>Certain Additional Payments</u>. In connection with any assignment of rights and obligations of any Defaulting Lender hereunder, no such assignment shall be effective unless and until, in addition to the other conditions thereto set forth herein, the parties to such assignment shall make such additional payments to the Administrative Agent in an aggregate amount sufficient, upon distribution thereof as appropriate (which may be outright payment, purchases by the assignee of participations or sub-participations, or other compensating actions, including, without limitation, funding, with the consent of the Loan Parties and the Administrative Agent, the applicable pro rata share of Loans previously requested but not funded by the Defaulting Lender, to each of which the applicable assignee and assignor hereby irrevocably consent), to: (A) pay and satisfy in full all payment liabilities then owed by such Defaulting Lender to the Administrative Agent, the Issuing Bank, the Swingline Lender, and each other Lender hereunder (and interest accrued thereon); and (B) acquire (and fund as appropriate) its full *pro rata* share of all Loans and participations in Letters of Credit and Swingline Loans. Notwithstanding anything to the contrary in the foregoing, in the event that any assignment of rights and obligations of any Defaulting Lender hereunder shall become effective under applicable Law without compliance with the provisions of this <u>clause (b)(viii)</u>, then the assignee of such interest shall be deemed to be a Defaulting Lender for all purposes of this Agreement until such compliance occurs.

Subject to acceptance and recording thereof by the Administrative Agent pursuant to <u>clause (c)</u> below, from and after the effective date specified in each Assignment and Assumption, the assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto) but shall continue to be entitled to the benefits of <u>Section 2.18</u>, <u>Section 2.19</u>, <u>Section 2.20</u> and <u>Section 11.3</u> with respect to facts and circumstances occurring prior to the effective date of such assignment. Any assignment or transfer by a Lender of rights or obligations under this Agreement that does *not* comply with this paragraph shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with <u>clause (d)</u> below. If the consent of the Borrower to an assignment is required hereunder (including, without limitation, a consent to an assignment which does not meet the minimum assignment thresholds specified above), the Borrower shall be deemed to have given its consent five (5) Business Days after the date notice thereof has actually been delivered by the assigning Lender (through the Administrative Agent) to the Borrower, unless such consent is expressly refused by the Borrower prior to such fifth (5th) Business Day.

(c)     The Administrative Agent, acting *solely* for this purpose as an agent of the Borrower, shall maintain at one of its offices in Charlotte, North Carolina or Atlanta, Georgia a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitments of, and principal amounts (and stated interest) of the Loans and Revolving Credit Exposure owing to, each Lender pursuant to the terms hereof from time to time (the "<u>*Register*</u>"). The entries in the Register shall be conclusive and binding absent manifest error, and the Borrower, the Administrative Agent and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement. The Register shall be available for inspection by the Borrower and any Lender at any reasonable time and from time to time upon reasonable prior notice; information contained in the Register shall also be available for inspection by the Borrower at any reasonable time, and from time to time upon reasonable prior notice. In establishing and maintaining the Register, the Administrative Agent shall serve as the agent of the Loan Parties *solely* for tax purposes and *solely* with respect to the actions described in this <u>Section 11.4</u>, and the Loan Parties hereby agree that, to the extent that Truist

132

serves in such capacity, Truist and its officers, directors, employees, agents, sub-agents, and affiliates shall constitute "*Indemnitees*".

(d)    Any Lender may at any time, without the consent of, or notice to, the Borrower, the Administrative Agent, the Swingline Lender or the Issuing Bank sell participations to any Person (other than a natural person, the Borrower or any of the Borrower's Affiliates or Subsidiaries, a Disqualified Institution, or a Defaulting Lender) (each, a "*Participant*") in all, or a portion, of such Lender's rights and/or obligations under this Agreement (including all, or a portion, of its Commitment and/or the Loans owing to it), provided, that, (i) such Lender's obligations under this Agreement shall remain unchanged; (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations; and (iii) the Borrower, the Administrative Agent, the Lenders, the Issuing Bank and the Swingline Lender shall continue to deal *solely* and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.

(e)    Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement, provided, that, such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver with respect to the following to the extent affecting such Participant: (i) increase the Commitment of any Lender without the written consent of such Lender; (ii) reduce the principal amount of any Loan or LC Disbursement or reduce the rate of interest thereon, or reduce any fees payable hereunder, without the written consent of each Lender affected thereby; (iii) postpone the date fixed for any payment of any principal of, or interest on, any Loan or LC Disbursement or interest thereon or any fees hereunder or reduce the amount of, waive or excuse any such payment, or postpone the scheduled date for the termination or reduction of any Commitment, without the written consent of each Lender affected thereby; (iv) change Section 2.21(b) or Section 2.21(c) in a manner that would alter the pro rata sharing of payments required thereby, without the written consent of each Lender; (v) change any of the provisions of this Section 11.4 or the definition of "*Required Lenders*" or any other provision hereof specifying the number or percentage of Lenders which are required to waive, amend or modify any rights hereunder or make any determination or grant any consent hereunder, without the consent of each Lender; (vi) release any Guarantor, or limit the liability of any such Guarantor under any Guaranty, in each case, without the written consent of each Lender, except to the extent such release is expressly provided under the terms of this Agreement; or (vii) release all, or substantially all, Collateral (if any) securing any of the Obligations. The Borrower agrees that each Participant shall be entitled to the benefits of Section 2.18, Section 2.19, and Section 2.20 (subject to the requirements and limitations therein, including the requirements under Section 2.20(g) (it being understood that the documentation required under Section 2.20(g) shall be delivered to the participating Lender)) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to clause (b) above; provided, that, such Participant (A) agrees to be subject to the provisions of Section 2.24 and Section 2.25 as if it were an assignee under clause (b) above, and (B) shall not be entitled to receive any greater payment under Section 2.18 or Section 2.20, with respect to any participation, than its participating Lender would have been entitled to receive, except to the extent such entitlement to receive a greater payment results from a Change in Law that occurs after the Participant acquired the applicable participation. Each Lender that sells a participation agrees, at the Borrower's request and expense, to use reasonable efforts to cooperate with Borrower to effectuate the provision of Section 2.25 with respect to any Participant. To the extent permitted by Law, each Participant also shall be entitled to the benefits of Section 11.7 as though it were a "Lender", provided, that, such Participant agrees to be subject to Section 2.21 as though it were a "Lender". Each Lender that sells a participation shall, acting solely for this purpose as an agent of the Borrower, maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under the Loan Documents (the "*Participant Register*"); provided, that, no Lender shall have any obligation to disclose all, or any portion, of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any commitments, loans, letters of credit or its other obligations under any Loan Document) to any Person, except to the extent that such disclosure is necessary to establish that such commitment, loan, letter of credit or other obligation is in registered form under Section 5f.103–1(c) of the United States Treasury Regulations. The entries in the Participant Register shall be

133

CHAR2\2683123v6

conclusive and binding absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary. For the avoidance of doubt, the Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.

(f)      A Participant shall *not* be entitled to receive any greater payment under <u>Section 2.18</u> or <u>Section 2.20</u> than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the prior written consent of the Loan Parties. A Participant shall *not* be entitled to the benefits of <u>Section 2.20</u> unless the Borrower is notified of the participation sold to such Participant and such Participant agrees, for the benefit of the Loan Parties, to comply with <u>Section 2.20(c)</u> and <u>Section 2.20(f)</u> as though it were a Lender.

(g)      Any Lender may at any time pledge or assign a security interest in all, or any portion, of its rights under this Agreement to secure obligations of such Lender, including, without limitation, any pledge or assignment to secure obligations to a Federal Reserve Bank; <u>provided</u>, <u>that</u>, no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(h)      *Disqualified Institutions*.

(i)      No assignment shall be made to any Person that was a Disqualified Institution as of the date (the "*Trade Date*") on which the applicable Lender entered into a binding agreement to sell and assign all, or a portion, of its rights and obligations under this Agreement to such Person (unless the Borrower has consented to such assignment as otherwise contemplated by this <u>Section 11.4</u>, in which case, such Person will *not* be considered a Disqualified Institution for the purpose of such assignment). For the avoidance of doubt, with respect to any assignee that becomes a Disqualified Institution after the applicable Trade Date (including, without limitation, as a result of the delivery of a notice pursuant to, and/or the expiration of the notice period referred to in, the definition of "*Disqualified Institution*" in <u>Section 1.1</u>), such assignee shall *not* retroactively be considered a Disqualified Institution. Any assignment in violation of this <u>clause (g)(i)</u> shall *not* be void, but the other provisions of this <u>clause (g)</u> shall apply.

(ii)      If any assignment is made to any Disqualified Institution without the Borrower's prior consent in violation of the foregoing <u>clause (g)(i)</u>, then the Borrower may, at its sole expense and effort, upon notice to the applicable Disqualified Institution and the Administrative Agent, (A) terminate any Revolving Commitment of such Disqualified Institution and repay all obligations of the Borrower owing to such Disqualified Institution in connection with such Revolving Commitment, (B) in the case of outstanding Term Loans held by Disqualified Institutions, prepay such Term Loan by paying the *lesser* of (I) the principal amount thereof, and (II) the amount that such Disqualified Institution paid to acquire such Term Loans, in each case of the foregoing, *plus* accrued interest, accrued fees and all other amounts (other than principal amounts) payable to it hereunder and under the other Loan Documents and/or (C) require such Disqualified Institution to assign and delegate, without recourse (in accordance with, and subject to the restrictions contained in, this <u>Section 11.4</u>), all of its interest, rights and obligations under this Agreement and related Loan Documents to an assignee that meets the requirements of the foregoing <u>clause (b)</u> that shall assume such obligations at the *lesser* of (I) the principal amount thereof, and (II) the amount that such Disqualified Institution paid to acquire such interests, rights and obligations, in each case of the foregoing, *plus* accrued interest, accrued fees and all other amounts (other than principal amounts) payable to it hereunder and other the other Loan Documents; <u>provided</u>, <u>that</u>, (1) the Borrower shall have paid to the Administrative Agent the assignment fee (if any) specified in the foregoing <u>clause (b)</u>, (2) such assignment does *not* conflict with applicable Laws, and (3) in the case of the foregoing <u>clause (g)(ii)(B)</u>, the Borrower shall *not* use the proceeds from any Loans to prepay Term Loans held by Disqualified Institutions.

134

CONFIDENTIAL                                                                                                      VPX-JHO0000000454

(iii)    Notwithstanding anything to the contrary contained in this Agreement, Disqualified Institutions (A) will *not* (I) have the right to receive information, reports or other materials provided to Lenders by the Borrower, the Administrative Agent or any other Lender, (II) attend or participate in meetings attended by the Lenders and the Administrative Agent, or (III) access any electronic site established for the Lenders or confidential communications from counsel to, or financial advisors of, the Administrative Agent or the Lenders and (B) (I) for purposes of any consent to any amendment, waiver or modification of, or any action under, and for the purpose of any direction to the Administrative Agent or any Lender to undertake any action (or refrain from taking any action) under this Agreement or any other Loan Document, each Disqualified Institution will be deemed to have consented, in the same proportion as the Lenders that are *not* Disqualified Institutions consented, to such matter, and (II) for purposes of voting on any plan of reorganization or plan of liquidation pursuant to any Debtor Relief Laws ("*Plan of Reorganization*"), each Disqualified Institution party hereto hereby agrees (1) *not* to vote on such Plan of Reorganization, (2) if such Disqualified Institution does vote on such Plan of Reorganization notwithstanding the restriction in the foregoing clause (h)(iii)(B)(II)(1), such vote will be deemed *not* to be in good faith and shall be "designated" pursuant to Section 1126(e) of the Bankruptcy Code (or any similar provision in any other Debtor Relief Laws), and such vote shall *not* be counted in determining whether the applicable class has accepted or rejected such Plan of Reorganization in accordance with Section 1126(c) of the Bankruptcy Code (or any similar provision in any other Debtor Relief Laws), and (3) *not* to contest any request by any party for a determination by any bankruptcy court (or other applicable court of competent jurisdiction) effectuating the foregoing clause (h)(iii)(B)(II)(2).

(iv)    The Administrative Agent shall have the right, and the Borrower hereby expressly authorizes the Administrative Agent, to: (A) post the list of Disqualified Institutions provided by the Borrower and any updates thereto from time to time (collectively, the "*DQ List*") on the Platform, including that portion of the Platform that is designated for "public side" Lenders; or (B) provide the DQ List to each Lender requesting the same.

Section 11.5    Governing Law; Jurisdiction; Consent to Service of Process.

(a)    This Agreement and the other Loan Documents and any claims, controversy, dispute or cause of action (whether in contract or tort or otherwise) based upon, arising out of, or relating to, this Agreement or any other Loan Document (except, as to any other Loan Document, as expressly set forth therein), and the transactions contemplated hereby and thereby, shall be construed in accordance with, and be governed by, the Law (without giving effect to the conflict of law principles thereof) of the State of New York.

(b)    Each Loan Party hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of the United States District Court of the Southern District of New York, and of Supreme Court of the State of New York sitting in New York county and any appellate court from any thereof, in any action or proceeding arising out of, or relating to, this Agreement or any other Loan Document or the transactions contemplated hereby or thereby, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such District Court or New York state court, or, to the extent permitted by applicable Law, such Federal court. Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law. Nothing in this Agreement or any other Loan Document shall affect any right that the Administrative Agent, the Issuing Bank or any Lender may otherwise have to bring any action or proceeding relating to this Agreement or any other Loan Document against any Loan Party or its property or assets in the courts of any jurisdiction.

(c)    Each Loan Party irrevocably and unconditionally waives any objection that it may now or hereafter have to the laying of venue of any such suit, action or proceeding described in clause (b) above, and brought in any court referred to, in clause (b) above. Each of the parties hereto irrevocably waives, to the fullest

135

CONFIDENTIAL                                                                                          VPX-JHO0000000455

extent permitted by applicable Law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(d)     Each party to this Agreement irrevocably consents to the service of process in the manner provided for notices in Section 11.1. Nothing in this Agreement or in any other Loan Document will affect the right of any party hereto to serve process in any other manner permitted by Law.

Section 11.6    WAIVER OF JURY TRIAL. EACH PARTY HERETO IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO: (a) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER; AND (b) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 11.6.

Section 11.7    Right of Set-off. In addition to any rights now or hereafter granted under applicable Law, and not by way of limitation of any such rights, each Lender and the Issuing Bank shall have the right, at any time or from time to time, upon the occurrence and during the continuance of an Event of Default, without prior notice to the Borrower, any such notice being expressly waived by the Borrower to the extent permitted by applicable Law, to set off and apply against all deposits (general or special, time or demand, provisional or final) of any Loan Party at any time held, or other obligations at any time owing by such Lender and the Issuing Bank to, or for the credit or the account of, a Loan Party, against any and all Obligations held by such Lender or the Issuing Bank, as the case may be, irrespective of whether such Lender or the Issuing Bank shall have made demand hereunder and although such Obligations may be unmatured; provided, that, I the event that any Defaulting Lender shall exercise any such right of setoff, (i) all amounts so set-off shall be paid over immediately to the Administrative Agent for further application in accordance with the provisions of Section 2.26(b), and, pending such payment, shall be segregated by such Defaulting Lender from its other funds and deemed to be held in trust for the benefit of the Administrative Agent, the Issuing Bank, and the Lenders, and (ii) the Defaulting Lender shall provide promptly to the Administrative Agent a statement describing in reasonable detail the Obligations owing to such Defaulting Lender as to which it exercised such right of set-off. Each Lender and the Issuing Bank agree promptly to notify the Administrative Agent and the Borrower after any such set-off and any application made by such Lender and the Issuing Bank, as the case may be; provided, that, the failure to give such notice shall not affect the validity of such set-off and application. Each Lender and the Issuing Bank agrees to apply all amounts collected from any such set-off to the Obligations before applying such amounts to any other Indebtedness or other obligations owed by the Borrower and any of its Subsidiaries to such Lender or Issuing Bank.

Section 11.8    Counterparts; Integration. This Agreement may be executed by one (1) or more of the parties to this Agreement on any number of separate counterparts (including by telecopy), and all of said counterparts taken together shall be deemed to constitute one (1) and the same instrument. This Agreement, the Fee Letter, the other Loan Documents, and any separate letter agreement(s) relating to any fees payable to the Administrative Agent and its Affiliates, constitute the entire agreement among the parties hereto and thereto and their affiliates regarding the subject matters hereof and thereof, and supersede all prior agreements and understandings, oral or written, regarding such subject matters. Delivery of an executed counterpart of a signature page of this Agreement and any other Loan Document by facsimile transmission or by any other electronic imaging means (including ".pdf"), shall be effective as delivery of a manually executed counterpart of this Agreement or such other Loan Document.

136

CONFIDENTIAL                                                                                                VPX-JHO0000000456

Section 11.9    <u>Survival</u>. All covenants, agreements, representations and warranties made by any Loan Party herein, in the Loan Documents and in the certificates or other instruments delivered in connection with, or pursuant to, this Agreement shall be considered to have been relied upon by the other parties hereto, and shall survive the execution and delivery of this Agreement and the making of any Loans and issuance of any Letters of Credit, regardless of any investigation made by any such other party, or on its behalf, and notwithstanding that the Administrative Agent, the Issuing Bank or any Lender may have had notice or knowledge of any Default or Event of Default or incorrect representation or warranty at the time any credit is extended hereunder, and shall continue in full force and effect as long as the principal of, or any accrued interest on, any Loan or any fee, or any other amount payable under this Agreement, is outstanding and unpaid, or any Letter of Credit is outstanding, and so long as the Commitments have not expired or terminated. The provisions of <u>Section 2.18</u>, <u>Section 2.19</u>, <u>Section 2.20</u>, and <u>Section 11.3</u> and <u>Article IX</u> shall survive and remain in full force and effect regardless of the consummation of the transactions contemplated hereby, the repayment of the Loans, the expiration or termination of the Letters of Credit and the Commitments, or the termination of this Agreement or any provision hereof. All representations and warranties made herein, in the Loan Documents, in the certificates, reports, notices, and other documents delivered pursuant to this Agreement shall survive the execution and delivery of this Agreement and the other Loan Documents, and the making of the Loans and the issuance of the Letters of Credit.

Section 11.10    <u>Severability</u>. Any provision of this Agreement or any other Loan Document held to be illegal, invalid or unenforceable in any jurisdiction, shall, as to such jurisdiction, be ineffective to the extent of such illegality, invalidity or unenforceability without affecting the legality, validity or enforceability of the remaining provisions hereof or thereof; and the illegality, invalidity or unenforceability of a particular provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

Section 11.11    <u>Confidentiality</u>. Each of the Administrative Agent, the Issuing Bank and the Lenders agrees to take normal and reasonable precautions to maintain the confidentiality of any information relating to the Loan Parties and/or their Subsidiaries, or any of their respective businesses, to the extent designated in writing as confidential and provided to it by any Loan Party or Subsidiary, other than any such information that is available to the Administrative Agent, the Issuing Bank or any Lender on a non-confidential basis prior to disclosure by any Loan Party or Subsidiary, except that such information may be disclosed: (a) to any Related Party of the Administrative Agent, the Issuing Bank or any such Lender, including, without limitation, accountants, legal counsel and other advisors; (b) to the extent required by applicable Laws or regulations or by any subpoena or similar legal process; (c) to the extent requested by any regulatory agency or authority purporting to have jurisdiction over it (including any self-regulatory authority such as the National Association of Insurance Commissioners); (d) to the extent that such information becomes publicly available other than as a result of a breach of this <u>Section 11.11</u>, or which becomes available to the Administrative Agent, the Issuing Bank, any Lender or any Related Party of any of the foregoing on a non-confidential basis from a source other than the Loan Parties; (e) in connection with the exercise of any remedy hereunder or under any other Loan Documents or any suit, action or proceeding relating to this Agreement or any other Loan Documents, or the enforcement of rights hereunder or thereunder; (f) subject to an agreement containing provisions substantially the same as those of this <u>Section 11.11</u>, to (i) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Agreement, or (ii) any actual or prospective party (or its Related Parties) to any swap or derivative or similar transaction under which payments are to be made by reference to the Borrower and its obligations, this Agreement or payments hereunder; (g) any rating agency; (h) the CUSIP Service Bureau or any similar organization; or (i) with the consent of the Borrower.  Any Person required to maintain the confidentiality of any information as provided for in this <u>Section 11.11</u> shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such information as such Person would accord its own confidential information. Notwithstanding anything to the contrary in the foregoing, the Loan Parties consent to the publication by the Administrative Agent and the Lenders of a tombstone or similar advertising material relating to the financing transactions contemplated by this Agreement, and the Administrative Agent and the Lenders reserve the right to provide to industry trade organizations information necessary and customary for inclusion in league table measurements;  <u>provided</u>, <u>that</u>, to the extent that such marketing, press releases or other transactional

137

CONFIDENTIAL

announcements include non-public information about the Loan Parties, their Subsidiaries and/or their businesses other than the names and logos of the Loan Parties and their Subsidiaries and the amount, type and effectiveness date of the Loans established hereby, each such Lender or Affiliate of a Lender shall obtain the prior written consent of the Borrower (which consent shall not be unreasonably withheld, conditioned or delayed). If any provision of any confidentiality agreement, non-disclosure agreement, or other similar agreement between any Loan Party and any Lender conflicts with, or contradicts, this Section 11.11 with respect to the treatment of confidential information, this Section 11.11 shall supersede all such prior or contemporaneous agreements and understandings between the parties.

Section 11.12    Interest Rate Limitation. Notwithstanding anything herein to the contrary, if, at any time, the interest rate applicable to any Loan, together with all fees, charges and other amounts which may be treated as interest on such Loan under applicable Law (collectively, the "*Charges*"), shall exceed the maximum lawful rate of interest (the "*Maximum Rate*") which may be contracted for, charged, taken, received or reserved by a Lender holding such Loan in accordance with applicable Law, the rate of interest payable in respect of such Loan hereunder, together with all Charges payable in respect thereof, shall be limited to the Maximum Rate and, to the extent lawful, the interest and Charges that would have been payable in respect of such Loan but were not payable as a result of the operation of this Section 11.12 shall be cumulated and the interest and Charges payable to such Lender in respect of other Loans or periods shall be increased (but not above the Maximum Rate therefor) until such cumulated amount, together with interest thereon at the Federal Funds Rate to the date of repayment (to the extent permitted by applicable Law), shall have been received by such Lender.

Section 11.13    Waiver of Effect of Corporate Seal. Each Loan Party represents and warrants to the Administrative Agent and the Lenders that neither it nor any other Loan Party is required to affix its corporate seal to this Agreement or any other Loan Document pursuant to any Law, agrees that this Agreement is delivered by the Loan Parties under seal, and waives any shortening of the statute of limitations that may result from not affixing the corporate seal to this Agreement or such other Loan Documents.

Section 11.14    Patriot Act. The Administrative Agent and each Lender subject to the Patriot Act hereby notifies the Loan Parties that: (a) pursuant to the requirements of the Patriot Act, it is required to obtain, verify and record information that identifies each Loan Party, which information includes the name and address of such Loan Party and other information that will allow such Lender or the Administrative Agent, as applicable, to identify such Loan Party in accordance with the Patriot Act; and (b) pursuant to the Beneficial Ownership Regulation, it is required to obtain a Beneficial Ownership Certificate.

Section 11.15    No Advisory or Fiduciary Responsibility. In connection with all aspects of each transaction contemplated hereby (including in connection with any amendment, waiver or other modification hereof or of any other Loan Document), each Loan Party acknowledges and agrees, and acknowledges its Affiliates' understanding, that: (a) (i) the services regarding this Agreement provided by the Administrative Agent, the Arranger and/or the Lenders are arm's-length commercial transactions between the Borrower, each other Loan Party and their respective Affiliates, on the one hand, and the Administrative Agent, the Arranger and the Lenders, on the other hand, (ii) each of the Borrower and the other Loan Parties have consulted their own legal, accounting, regulatory and tax advisors to the extent they have deemed appropriate, and (iii) the Borrower and each other Loan Party are capable of evaluating and understanding, and understands and accepts, the terms, risks and conditions of the transactions contemplated hereby and by the other Loan Documents; (b) (i) each of the Administrative Agent, the Arranger and the Lenders is, and has been, acting *solely* as a principal, and, except as expressly agreed in writing by the relevant parties, has not been, is not, and will not be acting as an advisor, agent or fiduciary, for the Borrower, any other Loan Party, or any of their respective Affiliates, or any other Person, and (ii) none of the Administrative Agent, the Arranger and any Lender has any obligation to the Borrower, any other Loan Party or any of their Affiliates with respect to the transaction contemplated hereby, except those obligations expressly set forth herein and in the other Loan Documents; (c) the Administrative Agent, the Arranger, the Lenders and their respective Affiliates may be engaged in a broad range of transactions that involve interests that differ from those of the Borrower, the other Loan Parties and their respective Affiliates, and each of the Administrative Agent, the Arranger and the Lenders has no

138

CHAR2\2683123v6

obligation to disclose any of such interests to the Borrower, any other Loan Party of any of their respective Affiliates; and (d) the Administrative Agent has *not* provided any Loan Party with any guidance or advice regarding the CARES Act, the PPP Loan (including, without limitation, the authority of the Loan Parties to qualify for any PPP Loan and/or the conditions for forgiveness with respect to the PPP Loan) or any matters related thereto, and, to the extent that any Loan Party or Subsidiary has applied for, or obtained, the PPP Loan, such Loan Party or Subsidiary has consulted its own advisor in connection therewith, including, without limitation, with respect to eligibility and loan amount. To the fullest extent permitted by Law, each of the Borrower and the other Loan Parties hereby waive and release, any claims that it may have against the Administrative Agent, the Arranger and each Lender with respect to any breach, or alleged breach, of agency or fiduciary duty in connection with any aspect of any transaction contemplated hereby.

Section 11.16    Location of Closing. Each Lender and the Issuing Bank acknowledges and agrees that is has delivered, with the intent to be bound hereby, its executed counterparts of this Agreement to the Administrative Agent, c/o Moore & Van Allen PLLC, 100 N. Tryon St., Suite #4700, Charlotte, North Carolina 28202. Each Loan Party acknowledges and agrees that it has delivered, with the intent to be bound hereby, its executed counterparts of this Agreement and each other Loan Document, together with all other documents, instruments, opinions, certificates, and/or other items required pursuant to Section 3.1, to the Administrative Agent, c/o Moore & Van Allen PLLC, 100 N. Tryon St., Suite #4700, Charlotte, North Carolina 28202. All parties agree that the closing of this Agreement and the other Loan Documents, and the transactions contemplated hereby and thereby, have occurred in Mecklenburg County, North Carolina.

Section 11.17    Acknowledgement and Consent to Bail-In of Affected Financial Institutions. Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any Lender that is an Affected Financial Institution arising under any Loan Document, to the extent that such liability is unsecured, may be subject to the Write-Down and Conversion Powers of the applicable Resolution Authority, and each party hereto agrees and consents to, and acknowledges and agrees to be bound by: (a) the application of any Write-Down and Conversion Powers by the applicable Resolution Authority to any such liabilities arising hereunder that may be payable to it by any Lender that is an Affected Financial Institution; and (b) the effects of any Bail-In Action on any such liability, including, if applicable, (i) a reduction, in full or in part, or cancellation of any such liability, (ii) a conversion of all, or a portion, of such liability into shares or other instruments of ownership in such Affected Financial Institution, its parent undertaking, or a bridge institution that may be issued to, or otherwise conferred on, it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document, or (iii) the variation of the terms of such liability in connection with the exercise of the Write-Down and Conversion Powers of the applicable Resolution Authority.

Section 11.18    Certain ERISA Matters.

(a)    Each Lender (I) represents and warrants, as of the date on which such Person became a Lender party hereto, to, and (II) covenants, from the date on which such Person became a Lender party hereto to the date on which such Person ceases being a Lender party hereto, for the benefit of, the Administrative Agent, the Arranger, and any of their respective Affiliates, and *not*, for the avoidance of doubt, to or for the benefit of any Loan Party or Subsidiary, that *at least* one (1) of the following is and will be true:

(i)    such Lender is *not* using "plan assets" (within the meaning of 29 CFR §–2510.3–101, as modified by Section 3(42) of ERISA or otherwise) of one (1) or more Benefit Plans with respect to such Lender's entrance into, participation in, administration of, and performance under, the Loans, the Letters of Credit, the Commitments, and/or this Agreement;

(ii)    the transaction exemption set forth in one (1) or more PTEs, such as PTE 84–14 (a class exemption for certain transactions determined by independent qualified professional asset managers), PTE 95–60 (a class exemption for certain transactions involving insurance company general

139

CHAR2\2683123v6

                                                                        VPX-JHO0000000459

accounts), PTE 90–1 (a class exemption for certain transactions involving insurance company pooled separate accounts), PTE 91–38 (a class exemption for certain transactions involving bank collective investment funds) or PTE 96–23 (a class exemption for certain transactions determined by in-house asset managers), is applicable with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Letters of Credit, the Commitments and this Agreement;

(iii)　(A) such Lender is an investment fund managed by a "Qualified Professional Asset Manager" (within the meaning of Part VI of PTE 84–14); (B) such Qualified Professional Asset Manager made the investment decision on behalf of such Lender to enter into, participate in, administer and perform the Loans, the Letters of Credit, the Commitments and this Agreement; (C) the entrance into, participation in, administration of and performance of the Loans, the Letters of Credit, the Commitments and this Agreement satisfies the requirements of sub-sections (b) through (g) of Part I of PTE 84–14; and (D) to the best knowledge of such Lender, the requirements of sub-section (a) of Part I of PTE 84–14 are satisfied with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Letters of Credit, the Commitments and this Agreement; or

(iv)　such other representation, warranty and covenant as may be agreed in writing between the Administrative Agent, in its sole discretion, and such Lender.

(b)　In addition, unless either clause (a)(i) above is true with respect to a Lender, or such Lender has provided another representation, warranty and covenant as provided in clause (a)(iv) above, such Lender further (I) represents and warrants, as of the date on which such Person became a Lender party hereto, and (II) covenants, from, and including, the date on which such Person became a Lender party hereto to, but excluding, the date on which such Person ceases being a Lender party hereto, in each case of the foregoing clauses (b)(I) and (b)(II), for the benefit of the Administrative Agent, the Arranger, and each of their respective Affiliates, and *not*, for the avoidance of doubt, to or for the benefit of any Loan Party, that, none of the Administrative Agent, the Arranger, or any of their respective Affiliates, is a fiduciary with respect to the assets of such Lender involved in such Lender's entrance into, participation in, administration of, and/or performance under, the Loans, the Letters of Credit, the Commitments, and/or this Agreement (including, without limitation, in connection with the reservation or exercise of any rights by the Administrative Agent, the Arranger, or any of their respective Affiliates, under this Agreement, any Loan Document, or any other documents related hereto or thereto).

Section 11.19　Acknowledgement Regarding any Supported QFCs. To the extent that the Loan Documents provide support, through a guarantee or otherwise, for any Swap Obligation or any other agreement or instrument that is a QFC (such support, "*QFC Credit Support*"; and each such QFC, a "*Supported QFC*"), the parties acknowledge and agree as follows with respect to the resolution power of the Federal Deposit Insurance Corporation under the Federal Deposit Insurance Act and Title II of the Dodd-Frank Wall Street Reform and Consumer Protection Act (together with the regulations promulgated thereunder, the "*U.S. Special Resolution Regimes*") in respect of such Supported QFC and QFC Credit Support (with the provisions below applicable notwithstanding that the Loan Documents and any Supported QFC may in fact be stated to be governed by the laws of the State of New York and/or of the United States or any other state of the United States.

In the event that a Covered Entity that is a party to a Supported QFC (each, a "*Covered Party*") becomes subject to a proceeding under a U.S. Special Resolution Regime, the transfer of such Supported QFC and the benefit of such QFC Credit Support (and any interest and obligation in or under such Supported QFC and such QFC Credit Support, and any rights in property securing such Supported QFC or such QFC Credit Support) from such Covered Party will be effective to the same extent as the transfer would be effective under the U.S. Special Resolution Regime if the Supported QFC and such QFC Credit Support (and any such interest, obligation and rights in property) were governed by the laws of the United States or a state of the United States. In the event that a Covered Party, or a BHC Act Affiliate of a Covered Party, becomes subject to a proceeding

140

CHAR2\2683123v6

under a U.S. Special Resolution Regime, Default Rights under the Loan Documents that might otherwise apply to such Supported QFC or any QFC Credit Support that may be exercised against such Covered Party are permitted to be exercised to no greater extent than such Default Rights could be exercised under the U.S. Special Resolution Regime if the Supported QFC and the Loan Documents were governed by the laws of the United States or a state of the United States. Without limitation of the foregoing, it is understood and agreed that rights and remedies of the parties with respect to a Defaulting Lender shall in no event affect the rights of any Covered Party with respect to a Supported QFC or any QFC Credit Support.

       Section 11.20    Amendment and Restatement.

       (a)    The parties hereto agree that, on the Effective Date, the following transactions shall be deemed to occur automatically, without further action by any party hereto: (i) the Existing Credit Agreement shall be deemed to be amended and restated in its entirety pursuant to this Agreement; (ii) all obligations of the Loan Parties under the Existing Credit Agreement outstanding on the Effective Date shall, in all respects, be continuing, and shall be deemed to be Obligations outstanding hereunder; (iii) the Guarantees made pursuant to the Existing Credit Agreement to Truist (as successor in interest to Branch Banking and Trust Company) shall remain in full force and effect with respect to the Obligations and are hereby reaffirmed; (iv) the Collateral Documents and the Liens created thereunder in favor of Truist (as successor in interest to Branch Banking and Trust Company) shall remain in full force and effect with respect to the Obligations and are hereby reaffirmed; and (v) all references in the other Loan Documents to the Existing Credit Agreement shall be deemed to refer, without further amendment, to this singular Agreement.

       (b)    Without limiting anything in the foregoing clause (a), the obligations that are amended and restated by this Agreement include, without limitation, (i) that certain Promissory Note, dated as of February 14, 2019, made by each of the Borrower and Sheridan A, jointly and severally, in favor of Branch Banking & Trust Company, in the original principal amount of Seventy-Five Million Dollars ($75,000,000), as modified by that certain Note and Addendum Modification Agreement, dated as of January 22, 2020, by each of said makers and Sheridan B, jointly and severally, in favor of Truist Bank (formerly known as Branch Banking & Trust Company), and (ii) that certain Promissory Note, dated as of March 10, 2020, made by each of the Borrower and Sheridan C, jointly and severally, in favor of Truist Bank, in the original principal amount of Twenty-Five Million Dollars ($25,000,000) (collectively, the "*Previous Florida Notes*"). All Florida documentary stamp taxes and intangible taxes due in connection with the Previous Florida Notes have been paid with respect to the following mortgages previously recorded in the Public Records of Broward County, Florida, as Instrument No. 115624139, Instrument No. 116307694, and Instrument No. 116405272, securing the Previous Florida Notes, and the renewal of the Previous Florida Notes is exempt from Florida documentary stamp tax pursuant to Section 201.09 of the Florida Statutes. In addition to the renewal of the Previous Florida Notes, this Agreement evidences an increase in the principal amount of the loans evidenced by the Previous Florida Notes, and all Florida documentary stamp taxes due with respect to such increase are being paid upon recordation, in Broward County, Florida, of three (3) Mortgages made by Sheridan A, Sheridan B and Sheridan C, respectively, to secure their respective obligations as Guarantors under Article X. No Florida intangible taxes are due with respect to said guaranty Mortgages pursuant to the case of *West Flagler Associates, Ltd. v. Department of Revenue*, 633 So. 2d 555 (*Fla. 3d DCA 1994*). It is the shared intention of the Borrower, the other Loan Parties, the Administrative Agent and the Lenders that, while this Agreement and the Notes together constitute a renewal, amendment, restatement and replacement of, and supersede in their entirety, the Previous Florida Notes, this Agreement is *not* made in payment or satisfaction of any of the Previous Florida Notes, but rather evidence the substitution of one (1) evidence of debt for another, without any intent to extinguish the old, and are *not* intended to constitute a novation of any of the Previous Florida Notes nor to impair or modify in any way the priority of any security document executed in connection therewith.

       Section 11.21    Waiver of Breakage Costs. Inasmuch as loans are outstanding under the Existing Credit Agreement immediately prior to the Effective Date, the Borrower must make prepayments and adjustments on such loans as are necessary to give effect to the Commitments and Pro Rata Share of Loans of the Lenders set forth on Schedule I attached hereto. The Borrower, in consultation with the Administrative Agent, has

CONFIDENTIAL                                                                                    VPX-JHO0000000461

endeavored to manage the allocation of Commitments and Loans, and the selection of Interest Periods with respect to outstanding ~~Eurodollar~~SOFR Loans, in such a manner as to minimize break-funding costs. Nonetheless, such prepayments of such Loans under this Agreement likely will cause breakage costs. Notwithstanding anything to the contrary in Section 2.19, Truist hereby waives its right to receive compensation or reimbursement for such breakage costs: (a) in connection with the reallocation of Commitments and Pro Rata Share of Loans on the Effective Date; and (b) in connection with any resetting of the Interest Period for Loans outstanding as of the Effective Date.

Section 11.22    Reallocation. The Administrative Agent, the Loan Parties, and the Lenders hereby acknowledge and agree that the Commitment amount(s), of each Lender as set forth on Schedule I hereto, is/are the Commitment amounts of such Lender as of the Effective Date, with the reallocation of Loans outstanding under the Commitments of the Lenders as they existed immediately prior to the Effective Date having been made per instructions from the Administrative Agent, and neither any Assignment and Assumption, nor any other action of any Person, is required to give effect to such Commitments as set forth on Schedule I hereto.

*[Remainder of Page Intentionally Left Blank; Signature Pages Follow]*

CHAR2\2683123v6

CONFIDENTIAL

VPX-JHO0000000462

[*SIGNATURE PAGES INTENTIONALLY OMITTED*]

Signature Page to Credit Agreement (Vital Pharmaceuticals, Inc.)

CHAR2\2683123v6

VPX-JHO0000000463