or cause to be provided to the DIP Agent, the Prepetition Agent, and the Creditors' Committee a weekly report from Rothschild & Co and the management team of the Debtors (with any written reports being in form and substance reasonably satisfactory to the DIP Agent, the Prepetition Agent, and the Creditors' Committee), which report shall address such items as are reasonably requested by the DIP Agent, the Prepetition Agent, and the Creditors' Committee, including addressing the status of the marketing and sale process of the Debtors. Any non-legally privileged written materials prepared or produced by Rothschild & Co for any of the Debtors shared with the DIP Agent and the Prepetition Agent may be shared with the DIP Lenders and the Prepetition Lenders, respectively. The Debtors shall also cause: (a) their management team and Rothschild & Co to provide periodic telephonic updates of such reports to the DIP Agent, the DIP Lenders, the Prepetition Agent, the Prepetition Lenders, and the Creditors' Committee from time to time (but not less frequently than weekly unless agreed to by the DIP Agent), as reasonably requested by the DIP Agent or the Creditors' Committee; (b) to be delivered to the Additional Information Recipients, on a professional eyes only basis (and, for clarity, limited solely to bankruptcy counsel of each such entity), anonymized/no-names summaries of material terms of indications of interest and/or binding offers received by the Debtors regarding commitments for an Acceptable Financing and/or an acquisition of all or substantially all of the Debtors' assets; and (c) Rothschild & Co to provide to each Additional Information Recipient's bankruptcy counsel telephonic updates regarding the investment banking process on a weekly basis (unless otherwise agreed to by the Debtors and the Additional Information Recipients).

47.    No Marshaling/Applications of Proceeds. Except as expressly set forth in this paragraph 47 and in paragraph 61 as the DIP Motion Concessions, the DIP Agent, DIP Lenders and Prepetition Secured Parties shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral or the Prepetition Collateral,

as the case may be, and proceeds shall be received and applied pursuant to this Final Order and the DIP Documents notwithstanding any other agreement or provision to the contrary; *provided*, that, notwithstanding anything in this paragraph 47 to the contrary, (i) the ability (if any) of the Arizona Mechanics' Lienholders to assert the equitable doctrine of "marshaling" or any other similar doctrine solely with respect to the DIP Agent's exercise of remedies against other DIP Collateral or collateral of the non-Debtor affiliates before exercising such remedies against the Arizona Real Property, and (ii) the ability of the DIP Agent to exercise remedies against the Arizona Real Property and otherwise contest the application of any such doctrine(s) are each hereby expressly reserved.

48.   Section 552(b). The Prepetition Secured Parties shall each be entitled to all of the rights and benefits of section 552 of the Bankruptcy Code, and the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the Prepetition Secured Parties, with respect to proceeds, product, offspring or profits of any of the Prepetition Collateral.

49.   No Discharge; Survival of Claims. The DIP Obligations shall not be discharged by the entry of an order confirming a plan of reorganization, compromise or arrangement in any of the Cases (notwithstanding the provisions of section 1141(d)(4) of the Bankruptcy Code) except to the extent paid-in-full in cash in connection therewith, converting any of the Cases to a case under chapter 7 of the Bankruptcy Code, or dismissing any of the Cases, or withdrawing the reference in any of the Cases or any Successor Case, or terminating the joint administration of the Cases or any Successor Cases.  The DIP Superpriority Claim and the DIP Liens granted to the DIP Agent and the DIP Lenders, as applicable, and the Adequate Protection Liens and the Adequate Protection Superpriority Claims granted to the Prepetition Secured Parties and the Arizona Mechanics' Lienholders pursuant to the Interim Order and this Final Order shall not be affected in any manner by the entry of an order confirming a plan of reorganization or liquidation in the Cases

or any Successor Case (except to the extent paid-in-full in cash in connection therewith, including on the effective date of any such plan).

50.    <u>Waiver of any Priming Rights</u>. Without in any way limiting the rights of the DIP Agent and the DIP Lenders under paragraph 6 herein, except with the prior written consent of the DIP Agent and the Prepetition Agent, as applicable, it shall be a Termination Event if any Debtor seeks or supports, directly or indirectly, the entry of any order that provides for the grant of any lien of equal or greater priority than the liens securing the DIP Obligations and the Prepetition Obligations, or that approves of a claim of equal or greater priority than the DIP Obligations and the Prepetition Obligations, except as expressly provided in this Final Order.

51.    <u>Joint and Several Liability</u>. Nothing in this Final Order shall be construed to constitute a substantive consolidation of any of the Debtors' estates, it being understood, however, that the Debtors shall be jointly and severally liable for the obligations hereunder and in accordance with the terms of the DIP Facility and the DIP Documents.

52.    <u>Rights Preserved</u>. Notwithstanding anything herein to the contrary, the entry of this Final Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, the DIP Agent's, DIP Lenders' and Prepetition Secured Parties' respective rights: (a) to seek any other or supplemental relief in respect of the Debtors under the Bankruptcy Code or under non-bankruptcy law, including, without limitation, the right to (i) request modification of the automatic stay of section 362 of the Bankruptcy Code, (ii) request dismissal of any of the Cases or Successor Cases, conversion of any of the Cases to cases under chapter 7, or appointment of a chapter 11 trustee or examiner with expanded powers, or (iii) propose, subject to the provisions of section 1121 of the Bankruptcy Code, a chapter 11 plan or plans; or (b) any other rights, claims or privileges (whether legal, equitable or otherwise).

53.     <u>No Waiver by Failure to Seek Relief</u>. The failure of the DIP Agent, DIP Lenders or Prepetition Secured Parties to seek relief or otherwise exercise their rights and remedies under the Interim Order, this Final Order, the DIP Documents, the Prepetition Credit Documents, or applicable law, as the case may be, shall not constitute a waiver of any of the rights hereunder, thereunder, or otherwise of the DIP Agent, DIP Lenders, Prepetition Secured Parties, Creditors' Committee or any party in interest.

54.     <u>Binding Effect of Final Order</u>. Immediately upon this Court's entry of this Final Order, the terms and provisions of this Final Order shall become valid and binding upon and inure to the benefit of the Debtors, DIP Agent, DIP Lenders, Prepetition Secured Parties, all other creditors of any of the Debtors, the Creditors' Committee (or any other court appointed committee) appointed in the Cases, and all other parties-in-interest and their respective successors and assigns, including any trustee or other fiduciary hereafter appointed in any of the Cases, any Successor Cases, or upon dismissal of any Case or Successor Case.

55.     <u>Debtors' Waivers With Respect to Modification of Final Order</u>. It shall be a Termination Event if any Debtor seeks or supports, directly or indirectly: (a) without the prior written consent of the DIP Agent (at the direction of the Requisite DIP Lenders) and the Prepetition Agent (at the direction of the Requisite Prepetition Lenders), as applicable, (i) the entry of any order reconsidering, modifying, staying, vacating or amending the Interim Order or this Final Order, or (ii) the entry of any order granting a priority claim for any administrative expense or unsecured claim against the Debtors (now existing or hereafter arising of any kind or nature whatsoever, including, without limitation any administrative expense of the kind specified in sections 503(b), 506(c), 507(a) or 507(b) of the Bankruptcy Code) in any of the Cases or Successor Cases, equal or superior to the DIP Superpriority Claim or the Prepetition Secured Parties Adequate Protection Superpriority Claim, other than the Carve-Out; (b) without the prior written

consent of the DIP Agent (at the direction of the Requisite DIP Lenders) and the Prepetition Agent (at the direction of the Requisite Prepetition Lenders under the Prepetition Credit Agreement), the entry of any order allowing use of Cash Collateral (other than as permitted during the Remedies Notice Period) derived from DIP Collateral or Prepetition Collateral; (c) without the prior written consent of the DIP Agent (at the direction of the Requisite DIP Lenders under the DIP Credit Agreement), the granting of any lien on any of the DIP Collateral with priority equal or superior to the DIP Liens, except as specifically provided in the DIP Documents; or (d) without the prior written consent of the Prepetition Agent (at the direction of the Requisite Prepetition Lenders), the granting of any lien on any of the DIP Collateral with priority equal or superior to the Prepetition Liens or Prepetition Secured Parties Adequate Protection Liens (other than the DIP Liens). The prior written consent of the DIP Agent or the Prepetition Agent shall not be implied by any other action, inaction or acquiescence of the DIP Agent or the Prepetition Agent, as applicable.

56. <u>Final Order Controls</u>. In the event of any inconsistency between the terms and conditions of the DIP Documents, of the Interim Order and of this Final Order, the provisions of this Final Order shall govern and control.

57. <u>Survival</u>. The provisions of this Final Order and any actions taken pursuant hereto shall survive entry of any order which may be entered: (a) confirming any plan of reorganization or liquidation in any of the Cases; (b) converting any of the Cases to a case under chapter 7 of the Bankruptcy Code; (c) dismissing any of the Cases or any Successor Cases; or (d) pursuant to which this Court abstains from hearing any of the Cases or Successor Cases. The terms and provisions of this Final Order, including the claims, liens, security interests and other protections granted to the DIP Agent, DIP Lenders and Prepetition Secured Parties granted pursuant to the Interim Order, this Final Order and/or the DIP Documents, notwithstanding the entry of any such order, shall continue in the Cases, in any Successor Cases, or following dismissal of the Cases or any Successor

Cases, and shall maintain their priority as provided by this Final Order until the Consummation Date. The terms and provisions concerning the indemnification of the DIP Agent and DIP Lenders, and any other terms or provisions contained in the DIP Facility which survive the repayment and discharge of the DIP Facility, shall continue in the Cases, in any Successor Cases, following dismissal of the Cases or any Successor Cases, following termination of the DIP Documents and/or repayment in full and discharge of the DIP Obligations.

58.     Retroactive Effect of this Final Order. This Final Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect and be enforceable retroactively to the Petition Date immediately upon execution thereof.

59.     Retention of Jurisdiction. The Court has and will retain jurisdiction to enforce this Final Order according to its terms.

60.     Chubb Reservation of Rights. For the avoidance of doubt, nothing, including the DIP Documents and/or this Final Order, alters or modifies the terms and conditions of any insurance policies issued by Federal Insurance Company and/or any of its U.S.-based affiliates and/or any agreements related thereto.

61.     Concessions for Support of Creditors' Committee. To resolve objections and concerns of the Creditors' Committee with respect to, among other things, the DIP Motion and the relief sought thereby, the DIP Agent, the DIP Lenders, the Prepetition Secured Parties, the Creditors' Committee and the Debtors have agreed to the following (the "DIP Motion Concessions") among other matters:

(a)     Extent of DIP Collateral. Notwithstanding anything set forth herein or in the DIP Documents to the contrary: (i) the DIP Obligations not constituting the Roll Up

(up to $100,000,000) shall be secured by the DIP Collateral,[10] *provided* that the DIP Agent and the DIP Lenders shall not seek recovery from Commercial Tort Claims[11] against insiders or affiliates (as such terms are defined in section 101 of the Bankruptcy Code) before exhausting all avenues of recovery from other DIP Collateral; and (ii) the DIP Obligations constituting the Roll Up shall be secured by the DIP Collateral but excluding (A) claims and causes of action available to the Debtors or their estates through the exercise of the powers granted by sections 549 and 550 (with respect to any applicability to section 549) of the Bankruptcy Code against insiders, affiliates, or any other person or entity (as such terms are defined in section 101 of the Bankruptcy Code), and (B) Commercial Tort Claims that do not already constitute Prepetition Collateral.

      (b)    *Extent of DIP Superpriority Claim.* Notwithstanding anything set forth herein or in the DIP Documents to the contrary: (i) the DIP Superpriority Claim in respect of the DIP Obligations not constituting the Roll Up (up to $100,000,000) shall be payable from and have recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof, including, without limitation, any proceeds or property recovered in connection with the pursuit of Prepetition Avoidance Actions other than claims and causes of action available to the Debtors or their estates through the exercise of the powers granted by section 547 (against insiders, affiliates, or any other person or entity (as such terms are defined in section 101 of the Bankruptcy Code)) and section 550 (with respect to any applicability to section 547) of the Bankruptcy Code; and (ii) the DIP Superpriority Claim in respect of the DIP Obligations constituting the Roll Up shall be payable from and have

---

[10] For clarity and the avoidance of doubt, the term "DIP Collateral" as defined in paragraph 5 hereof specifically excludes Prepetition Avoidance Action from the DIP Collateral.

[11] As used herein "Commercial Tort Claims" has the meaning provided in the Uniform Commercial Code as enacted by the State of New York.

recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof, but excluding any proceeds or property recovered in connection with the pursuit of (A) Prepetition Avoidance Actions, (B) claims and causes of action available to the Debtors or their estates through the exercise of the powers granted by sections 549 and 550 (with respect to any applicability to section 549) of the Bankruptcy Code against insiders, affiliates, or any other person or entity (as such terms are defined in section 101 of the Bankruptcy Code), or (C) Commercial Tort Claims that do not already constitute Prepetition Collateral.

      (c)    *Limitation on Adequate Protection.* Notwithstanding anything set forth herein or in the Prepetition Credit Documents to the contrary, from and after the expiration of the Challenge Period applicable to the Creditors' Committee without the prosecution of a Challenge, adequate protection in the form of cash pay interest in respect of the Prepetition Obligations (after giving effect to the Roll Up) required pursuant to paragraph 15(i) hereof shall not exceed the Agreed Rate;[12] _provided_, that (i) interest shall continue to accrue on the outstanding balance of the Prepetition Obligations at the Default Rate (as defined in the Prepetition Credit Agreement) at the applicable reference rate and giving effect, for avoidance of doubt, to any future increases in the applicable rate of interest after the Petition Date to the extent provided for under the Prepetition Credit Agreement, and (ii) interest accrued in respect of the outstanding balance of the Prepetition Obligations in excess of the Agreed Rate may be paid (A) without restriction from Prepetition Collateral that does not constitute assets of the Debtors' estates, including from the proceeds of any

---

[12] The term "Agreed Rate" shall mean the sum of (i) Base Rate (as defined in the Prepetition Credit Agreement), subject to a 0.75% per annum floor, plus (ii) 7.00% per annum, plus (iii) 2.00% per annum (in accordance with section 2.13(d) of the Prepetition Credit Agreement); provided, that the Agreed Rate shall never be less than fifteen percent (15%) per annum.

such Prepetition Collateral, in accordance with the terms of the Prepetition Credit Agreement and (B) in full upon the occurrence of a GUC Recovery Event.[13]

(d)  *Non-Estate Asset Sale Proceeds.* Contemporaneously with the consummation of the consensual sale of any parcel of real estate owned by a Landlord Non-Debtor Affiliate, the Prepetition Agent shall deliver or cause to be delivered to the Debtors cash proceeds in an aggregate amount equal to the actual and documented costs and expenses the Debtors funded to or on behalf of such Landlord Non-Debtor Affiliate in respect of such parcel since the Petition Date.

(e)  *Extension of Scheduled Maturity Date.* The scheduled maturity date in the DIP Credit Agreement shall occur no earlier than May 24, 2023.

62.   Debtors' Governance Matters. From and after the First Amendment Effective Date (as defined in the DIP Credit Agreement after giving effect to that certain First Amendment to Superpriority Secured Debtor-in-Possession Credit Agreement dated as of on or about the date of the entry of this Final Order), the Debtors shall comply with each of the following except to the extent otherwise agreed to in writing by the Creditors' Committee and the DIP Agent (acting on behalf of the Requisite DIP Lenders):

(a)  *CTO Scope for Chief Transformation Officer.* The Debtors' Chief Transformation Officer shall be vested with certain authority, which shall include, at a minimum: (i) oversight of treasury and cash management functions, including (A) preparation and maintenance of cash flow forecasts, (B) management of cash disbursements, and (C) liquidity enhancement and cost savings initiatives; (ii) oversight of

---

[13] The term "GUC Recovery Event" shall mean the distribution to holders of general unsecured claims of value in excess of twenty percent (20%) (including cash in such amount or treatment with a value of twenty percent (20%) pursuant to a plan of reorganization or liquidation).

purchasing functions including (A) daily monitoring and analysis of purchase orders issued the previous day, goods received, and vendor relationships, (B) review of all purchase orders issued to ensure alignment with the Approved Budget, and cancelling any purchase order the Chief Transformation Officer determines is not aligned with the Approved Budget, and (C) for purchase orders (other than for materials, excluding purchases from Crown Holdings, Inc. and affiliates) exceeding $75,000 individually or in the aggregate, approval thereof before issuance; and (iii) review of restructuring related expenses and professional fee invoices and fee statements or applications.

(b)     *Composition of Boards of Directors.* Each Debtor's board of directors or managers (or other equivalent governing body) shall at all times: (i) be composed of five (5) individuals at least three (3) of whom (A) do not have a relationship by blood (to the second (2nd) degree of consanguinity), marriage or adoption to John Henry Owoc, (B) are not employees, officers, managers or consultants of, or independent contractors or advisors to, any Debtor (other than in respect of service on such board or other equivalent governing body) and (C) are otherwise acceptable to the Creditors' Committee and the Required DIP Lenders (including, without limitation, in respect of independence and restructuring experience), it being understood that Bob Dickinson, Stephen S. Gray and Steven G. Panagos are acceptable to the Creditors' Committee and the Required DIP Lenders; and (ii) include a restructuring committee (the "Restructuring Committee") composed solely of one (1) individual reasonably acceptable to the Creditors' Committee and the Required DIP Lenders, it being understood that Steven G. Panagos is reasonably acceptable to the Creditors' Committee and the Required DIP Lenders; *provided*, that, upon the death, incapacity or resignation (but, for the avoidance of doubt, not the removal) of any individual serving on the board of directors or managers (or equivalent governing body) of

any Debtor or serving on the Restructuring Committee, there shall not occur a breach of this paragraph 62(b) if a replacement therefor that satisfies the criteria set forth in this paragraph 62(b)(i) or (ii) case may be, shall have been appointed within seven (7) days after such death, incapacity or resignation, and, upon such appointment, such replacement is vested with the same scope of authority held by his or her predecessor. For the avoidance of doubt, as of the First Amendment Effective Date, the Debtors' boards of directors or managers (or equivalent body) shall be composed of John H. Owoc, as Chairman of the Board, Eric Hillman, Bob Dickinson, Stephen S. Gray and Steven G. Panagos.

(c)    *Amendment to Organization Documents*. Each Debtor shall not amend, modify and/or waive any of its respective certificate or articles of incorporation, certificate or articles of formation or organization, bylaws or operating agreement, as the case may be, as any of the foregoing are in effect as of the First Amendment Effective Date (as defined in the DIP Credit Agreement) after giving effect to the amendments thereto necessary to cause the First Amendment Effective Date to occur.

(d)    *Officer's Certificate*. Within one (1) business day of the occurrence of the First Amendment Effective Date, the Debtors shall deliver to the Creditors' Committee a certificate of the Secretary or Assistant Secretary (or a responsible officer of substantially equivalent title and authority) of each Debtor attaching and certifying copies of the documents referenced in the foregoing paragraph 62(c) for such Debtor.

63.    <u>Information Rights</u>. The Debtors shall cause to be provided to the Additional Information Parties, substantially contemporaneously with delivery to the Creditors' Committee, each of the following: (a) any Updated Budget; (b) any report of month-to-date sales and created sales orders; and (c) any bank account reporting; *<u>provided</u>*, that the Additional Information Parties'

receipt of any report of month-to-date sales and created sales orders shall be on a professional eyes only basis (and, for clarity, limited solely to bankruptcy counsel of each such entity).

# # #

Submitted by:
Jordi Guso, Esq.
BERGER SINGERMAN LLP
1450 Brickell Avenue, Ste. 1900
Miami, FL 33131
Telephone: (305) 755-9500
Facsimile: (305) 714-4340
Email: jguso@bergersingerman.com

*(Attorney Guso is directed to serve this order upon all non-registered users who have yet to appear electronically in this case and file a conforming certificate of service.)*

**Exhibit A**

**Approved Budget**

**Vital Pharmaceuticals, Inc.**
Weekly Cashflow_DIP budget

($ in millions)

| | Week Number | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 13-Week | WCF |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Actual/Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast |
| | Week Ending | 01/06/23 | 01/13/23 | 01/20/23 | 01/27/23 | 02/03/23 | 02/10/23 | 02/17/23 | 02/24/23 | 03/03/23 | 03/10/23 | 03/17/23 | 03/24/23 | 03/31/23 | 04/07/23 | 04/14/23 | 04/21/23 | 04/28/23 | 05/05/23 | 05/12/23 | 05/19/23 | 05/26/23 | Total | Total |
| **Receipts** | | | | | | | | | | | | | | | | | | | | | | | | |
| Customer Receipts | | 5.4 | 6.8 | 5.4 | 6.8 | 7.1 | 7.8 | 7.8 | 6.3 | 8.0 | 8.1 | 8.1 | 8.1 | 8.1 | 7.7 | 9.6 | 9.6 | 9.6 | 8.8 | 8.8 | 8.8 | 8.8 | 94.0 | 165.9 |
| Other Receipts | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Operating Receipts** | | 5.4 | 6.8 | 5.4 | 6.8 | 7.1 | 7.8 | 7.8 | 6.3 | 8.0 | 8.1 | 8.1 | 8.1 | 8.1 | 7.7 | 9.6 | 9.6 | 9.6 | 8.8 | 8.8 | 8.8 | 8.8 | 94.0 | 165.9 |
| | | | | | | | | | | | | | | | | | | | | | | | | |
| DIP Draw | | 9.0 | 6.0 | 13.0 | 5.0 | 14.0 | 3.0 | - | 3.0 | 12.0 | 2.0 | - | - | 4.0 | 8.0 | - | - | - | 12.0 | - | - | 2.0 | 71.0 | 93.0 |
| **Total Receipts** | | 14.4 | 12.8 | 18.4 | 11.8 | 21.1 | 10.8 | 7.8 | 9.3 | 20.0 | 10.1 | 8.1 | 8.1 | 12.1 | 15.7 | 9.6 | 9.6 | 9.6 | 20.8 | 8.8 | 8.8 | 10.8 | 165.0 | 258.9 |
| | | | | | | | | | | | | | | | | | | | | | | | | |
| **Disbursements** | | | | | | | | | | | | | | | | | | | | | | | | |
| Material costs | | (1.7) | (2.5) | (1.6) | (1.9) | (2.5) | (2.6) | (1.7) | (1.3) | (1.9) | (2.0) | (2.0) | (2.0) | (2.0) | (2.0) | (2.5) | (2.5) | (2.5) | (2.2) | (2.2) | (2.2) | (2.2) | (25.7) | (44.2) |
| Co-Packers | | (0.2) | (0.2) | (0.2) | (0.2) | (0.3) | (0.3) | (0.3) | (0.2) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.4) | (0.4) | (0.4) | (0.3) | (0.3) | (0.3) | (0.3) | (3.4) | (6.2) |
| Freight & handling | | (1.3) | (2.2) | (1.4) | (1.7) | (1.9) | (1.9) | (1.9) | (1.5) | (2.0) | (2.0) | (2.0) | (2.2) | (2.1) | (2.7) | (2.7) | (2.4) | (2.4) | (2.4) | (2.4) | (2.4) | (2.4) | (24.2) | (43.9) |
| Employee expenses | | (0.6) | (3.7) | (0.6) | (3.8) | (0.6) | (3.9) | (0.6) | (3.8) | (0.6) | (4.1) | (0.6) | (3.5) | (0.5) | (3.5) | (0.5) | (3.8) | (0.5) | (3.9) | (0.5) | (3.6) | (0.5) | (27.3) | (44.3) |
| Trade promotion | | (0.5) | (1.2) | (1.1) | (1.2) | (1.0) | (1.0) | (0.4) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (0.4) | (8.2) | (11.2) |
| Facility/Office expenses | | (1.3) | (0.6) | (0.7) | (0.6) | (2.4) | (0.8) | (0.8) | (0.8) | (4.6) | (0.7) | (0.7) | (0.6) | (0.5) | (1.2) | (0.5) | (0.5) | (1.2) | (0.5) | (0.5) | (0.5) | (0.5) | (14.8) | (22.3) |
| Marketing | | (1.0) | (0.6) | (0.6) | (0.7) | (1.1) | (0.6) | (0.6) | (0.5) | (1.0) | (0.5) | (0.5) | (0.5) | (0.5) | (1.2) | (0.5) | (0.5) | (1.2) | (0.4) | (0.4) | (0.4) | (0.4) | (8.8) | (14.2) |
| Legal expenses | | (0.1) | (0.3) | (0.3) | (0.3) | (0.3) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (1.6) | (1.7) |
| Other | | (0.1) | (0.1) | (0.5) | (1.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | (0.1) | - | - | - | - | - | - | - | - | - | (2.5) | (2.5) |
| Taxes | | (0.1) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | (0.1) | (0.1) |
| OBI royalty reserve/payment | | - | (4.3) | (0.8) | - | (0.8) | - | (0.8) | - | (0.8) | - | (0.8) | - | (0.8) | - | (0.8) | - | (0.8) | - | (0.8) | - | - | (9.1) | (12.3) |
| **Total Operating Disbursements** | | (6.8) | (15.8) | (7.8) | (11.5) | (10.9) | (11.3) | (7.2) | (9.1) | (11.6) | (10.0) | (7.3) | (9.5) | (7.1) | (11.8) | (8.3) | (10.9) | (8.3) | (12.7) | (7.5) | (9.9) | (7.5) | (125.8) | (202.8) |
| | | | | | | | | | | | | | | | | | | | | | | | | |
| Operating cash flow | | (1.5) | (9.0) | (2.4) | (4.7) | (3.8) | (3.5) | 0.6 | (2.9) | (3.6) | 1.8 | 0.8 | (1.3) | 1.1 | (4.2) | 1.3 | (1.3) | 1.3 | (3.9) | 1.3 | (1.1) | 1.4 | (31.8) | (37.0) |
| | | | | | | | | | | | | | | | | | | | | | | | | |
| **Professional Fees & Employee Retention** | | | | | | | | | | | | | | | | | | | | | | | | |
| Professional fees carve out | | (0.5) | - | (11.2) | - | (4.7) | - | - | - | (4.2) | - | - | - | (4.4) | - | - | - | (4.3) | - | - | - | (4.2) | (25.0) | (33.5) |
| Retention Plans | | - | - | - | - | - | - | (0.3) | - | - | - | - | - | - | - | - | - | (0.7) | - | - | - | - | (0.3) | (1.0) |
| **Total Professional Fees & Employee Retent** | | (0.5) | - | (11.2) | - | (4.7) | - | (0.3) | - | (4.2) | - | - | - | (4.4) | - | - | - | (0.7) | (4.3) | - | - | (4.2) | (25.3) | (34.6) |
| | | | | | | | | | | | | | | | | | | | | | | | | |
| **Debt Service** | | | | | | | | | | | | | | | | | | | | | | | | |
| Adequate protection payments | | (5.2) | - | - | - | (2.7) | - | - | - | (1.5) | - | - | - | - | (0.7) | - | - | - | (0.7) | - | - | - | (9.4) | (10.8) |
| Interest/Fees on DIP | | (0.1) | - | - | - | (2.5) | - | - | - | (3.0) | - | - | - | - | (3.5) | - | - | - | (3.6) | - | - | - | (5.7) | (12.8) |
| **Total Debt Service** | | (5.3) | - | - | - | (5.2) | - | - | - | (4.5) | - | - | - | - | (4.3) | - | - | - | (4.3) | - | - | - | (15.0) | (23.6) |
| | | | | | | | | | | | | | | | | | | | | | | | | |
| **Net Cash Flow / (Deficit)** | | 1.8 | (3.0) | (0.6) | 0.3 | 0.3 | (0.5) | 0.3 | 0.1 | (0.3) | 0.2 | 0.8 | (1.3) | 0.7 | (0.5) | 1.3 | (1.3) | 0.6 | (0.5) | 1.3 | (1.1) | (0.9) | (1.2) | (2.2) |
| | | | | | | | | | | | | | | | | | | | | | | | | |
| **Cash Balance** | | | | | | | | | | | | | | | | | | | | | | | | |
| Beginning Cash Balance | | 6.7 | 8.5 | 5.5 | 4.9 | 5.2 | 5.5 | 5.0 | 5.3 | 5.4 | 5.1 | 5.3 | 6.1 | 4.8 | 5.5 | 5.0 | 6.3 | 5.0 | 5.6 | 5.1 | 6.5 | 5.4 | 6.7 | |
| Ending Cash Balance | | 8.5 | 5.5 | 4.9 | 5.2 | 5.5 | 5.0 | 5.3 | 5.4 | 5.1 | 5.3 | 6.1 | 4.8 | 5.5 | 5.0 | 6.3 | 5.0 | 5.6 | 5.1 | 6.5 | 5.4 | 4.5 | 5.5 | 4.5 |
| | | | | | | | | | | | | | | | | | | | | | | | | |
| DIP Balance | | 16.0 | 22.0 | 35.0 | 40.0 | 54.0 | 57.0 | 57.0 | 60.0 | 72.0 | 74.0 | 74.0 | 74.0 | 78.0 | 86.0 | 86.0 | 86.0 | 98.0 | 98.0 | 98.0 | 100.0 | | | |

**Exhibit B**

**Form of DIP Credit Agreement**

SUPERPRIORITY SECURED DEBTOR-IN-POSSESSION CREDIT AGREEMENT

dated as of October 26, 2022,

by and among

VITAL PHARMACEUTICALS, INC.,
as the Borrower,

THE SUBSIDIARIES AND AFFILIATES OF THE BORROWER IDENTIFIED HEREIN,
as the Guarantors,

THE LENDERS FROM TIME TO TIME PARTY HERETO,

and

TRUIST BANK,
as Administrative Agent

## TABLE OF CONTENTS

*Page*

ARTICLE I DEFINITIONS; CONSTRUCTION ................................................................................. 1
    Section 1.1    Definitions ................................................................................................. 1
    Section 1.2    Classifications of Loans and Borrowings ............................................... 35
    Section 1.3    Accounting Terms and Determination .................................................... 35
    Section 1.4    Terms Generally ..................................................................................... 35
    Section 1.5    Interest Rate Disclosure ......................................................................... 36

ARTICLE II AMOUNT AND TERMS OF THE COMMITMENTS ...................................... 37
    Section 2.1    General Description of Facility .............................................................. 37
    Section 2.2    Revolving Loans ..................................................................................... 37
    Section 2.3    Procedure for Borrowings ...................................................................... 37
    Section 2.4    [Reserved] ............................................................................................... 38
    Section 2.5    [Reserved] ............................................................................................... 38
    Section 2.6    Roll-Up; Funding of Borrowings ........................................................... 38
    Section 2.7    Interest Elections .................................................................................... 38
    Section 2.8    Termination and Reductions of Commitments ....................................... 39
    Section 2.9    Repayment of Loans ............................................................................... 40
    Section 2.10    Evidence of Indebtedness ...................................................................... 40
    Section 2.11    Optional Prepayments ........................................................................... 40
    Section 2.12    Mandatory Prepayments ........................................................................ 40
    Section 2.13    Interest on Loans .................................................................................... 41
    Section 2.14    Fees ........................................................................................................ 42
    Section 2.15    Computation of Interest and Fees .......................................................... 43
    Section 2.16    Inability to Determine Interest Rates; Benchmark Replacement Setting ........... 43
    Section 2.17    Illegality ................................................................................................. 45
    Section 2.18    Increased Costs ...................................................................................... 45
    Section 2.19    Funding Indemnity ................................................................................. 46
    Section 2.20    Taxes ...................................................................................................... 46
    Section 2.21    Payments Generally; Pro Rata Treatment; Sharing of Set-offs .............. 50
    Section 2.22    [Reserved] ............................................................................................... 51
    Section 2.23    [Reserved] ............................................................................................... 51
    Section 2.24    Mitigation of Obligations ...................................................................... 51
    Section 2.25    Replacement of Lenders ......................................................................... 51
    Section 2.26    Defaulting Lenders ................................................................................. 52
    Section 2.27    Priority and Liens ................................................................................... 52

ARTICLE III CONDITIONS PRECEDENT TO LOANS ..................................................... 54
    Section 3.1    Conditions to Effectiveness ................................................................... 54
    Section 3.2    Conditions to Each Credit Event ............................................................ 56
    Section 3.3    Roll-Up Borrowing ................................................................................ 57
    Section 3.4    Delivery of Documents .......................................................................... 57

ARTICLE IV REPRESENTATIONS AND WARRANTIES .................................................. 57
    Section 4.1    Existence; Power ..................................................................................... 57
    Section 4.2    Organizational Power; Authorization; Enforceability .......................... 57
    Section 4.3    Governmental Approvals; No Conflicts ................................................ 58
    Section 4.4    No Material Adverse Effect .................................................................... 58

Section 4.5      Litigation and Environmental Matters .................................................... 58
Section 4.6      Compliance with Laws and Agreements; No Default ......................... 58
Section 4.7      Investment Company Act, Etc ............................................................. 58
Section 4.8      Taxes.................................................................................................... 59
Section 4.9      Margin Regulations.............................................................................. 59
Section 4.10     ERISA................................................................................................... 59
Section 4.11     Ownership of Property; Insurance ...................................................... 60
Section 4.12     Disclosure ............................................................................................ 60
Section 4.13     Labor Relations ................................................................................... 61
Section 4.14     Subsidiaries and Loan Parties ............................................................ 61
Section 4.15     [Reserved] ........................................................................................... 61
Section 4.16     Business Locations; Taxpayer Identification Number ....................... 61
Section 4.17     Deposit and Disbursement Accounts .................................................. 61
Section 4.18     Collateral Documents .......................................................................... 61
Section 4.19     [Reserved] ........................................................................................... 62
Section 4.20     Sanctions and Anti-Corruption Laws ................................................. 62
Section 4.21     No Affected Financial Institutions...................................................... 63
Section 4.22     Cannabis and Hemp Products ............................................................. 63
Section 4.23     Regulatory Matters .............................................................................. 63
Section 4.24     Bankruptcy Matters ............................................................................. 65

ARTICLE V AFFIRMATIVE COVENANTS ........................................................................ 65

Section 5.1      Financial and Other Information ......................................................... 65
Section 5.2      Notices of Material Events .................................................................. 68
Section 5.3      Existence; Conduct of Business .......................................................... 69
Section 5.4      Compliance with Laws ........................................................................ 69
Section 5.5      Payment of Obligations ...................................................................... 70
Section 5.6      Books and Records .............................................................................. 70
Section 5.7      Visitation and Inspection; Conference Calls....................................... 70
Section 5.8      Maintenance of Properties; Insurance ................................................ 71
Section 5.9      Use of Proceeds; Margin Regulations................................................. 71
Section 5.10     Casualty and Condemnation ............................................................... 72
Section 5.11     Cash Management................................................................................ 72
Section 5.12     [Reserved]............................................................................................ 72
Section 5.13     Additional Subsidiaries and Collateral ............................................... 72
Section 5.14     Additional Real Estate ........................................................................ 74
Section 5.15     Further Assurances .............................................................................. 74
Section 5.16     [Reserved]............................................................................................ 74
Section 5.17     Post-Closing Requirements................................................................. 74
Section 5.18     Transaction Milestones ....................................................................... 75
Section 5.19     Investment Banker............................................................................... 76
Section 5.20     Postpetition Obligations...................................................................... 76

ARTICLE VI FINANCIAL COVENANTS .............................................................................. 76

Section 6.1      Compliance with the Budget................................................................ 76
Section 6.2      Liquidity .............................................................................................. 76

ARTICLE VII NEGATIVE COVENANTS .............................................................................. 76

Section 7.1      Indebtedness and Preferred Equity ..................................................... 76
Section 7.2      Liens .................................................................................................... 78
Section 7.3      Fundamental Changes; Conduct of Business....................................... 80

Section 7.4    Investments; Loans ................................................................. 80
Section 7.5    Restricted Payments ............................................................... 81
Section 7.6    Asset Sales ............................................................................. 81
Section 7.7    Transactions with Affiliates .................................................. 82
Section 7.8    Restrictive Agreements ......................................................... 82
Section 7.9    Sale and Leaseback Transactions ......................................... 82
Section 7.10   Hedging Transactions ........................................................... 82
Section 7.11   Amendments to Organization Documents ............................ 82
Section 7.12   Accounting Changes ............................................................. 82
Section 7.13   Prepayments of Certain Indebtedness ................................. 82
Section 7.14   [Reserved] ............................................................................. 83
Section 7.15   Sanctions and Anti-Corruption Laws ................................... 83
Section 7.16   Margin Regulations .............................................................. 83
Section 7.17   Preferred Equity ................................................................... 83
Section 7.18   Bankruptcy Matters .............................................................. 83

ARTICLE VIII EVENTS OF DEFAULT ...................................................................... 84

Section 8.1    Events of Default ................................................................... 84
Section 8.2    Application of Proceeds from Collateral ............................... 89

ARTICLE IX THE ADMINISTRATIVE AGENT ......................................................... 90

Section 9.1    Appointment of Administrative Agent ................................. 90
Section 9.2    Nature of Duties of Administrative Agent ............................ 90
Section 9.3    Lack of Reliance on the Administrative Agent ..................... 91
Section 9.4    Certain Rights of the Administrative Agent .......................... 91
Section 9.5    Reliance by Administrative Agent ......................................... 92
Section 9.6    The Administrative Agent in its Individual Capacity ........... 92
Section 9.7    Successor Administrative Agent ........................................... 92
Section 9.8    Withholding Tax ................................................................... 92
Section 9.9    Administrative Agent May File Proofs of Claim .................. 93
Section 9.10   Authorization to Execute Other Loan Documents ............... 93
Section 9.11   Collateral and Guaranty Matters ......................................... 93
Section 9.12   [Reserved] ............................................................................. 94
Section 9.13   Right to Realize on Collateral and Enforce Guarantee ........ 94
Section 9.14   Secured Bank Product Obligations ....................................... 94

ARTICLE X THE GUARANTY ...................................................................................... 94

Section 10.1   The Guaranty ........................................................................ 94
Section 10.2   Obligations Unconditional .................................................... 95
Section 10.3   Reinstatement ....................................................................... 95
Section 10.4   Certain Additional Waivers .................................................. 96
Section 10.5   Remedies ............................................................................... 96
Section 10.6   Rights of Contribution .......................................................... 96
Section 10.7   Guarantee of Payment; Continuing Guarantee ................... 96

ARTICLE XI MISCELLANEOUS ................................................................................. 96

Section 11.1   Notices .................................................................................. 96
Section 11.2   Waiver; Amendments ........................................................... 99
Section 11.3   Expenses; Indemnification .................................................. 101
Section 11.4   Successors and Assigns ....................................................... 102
Section 11.5   Governing Law; Jurisdiction; Consent to Service of Process ........... 107

| | | |
|---|---|---|
| Section 11.6 | WAIVER OF JURY TRIAL | 107 |
| Section 11.7 | Right of Set-off | 108 |
| Section 11.8 | Counterparts; Integration | 108 |
| Section 11.9 | Survival | 108 |
| Section 11.10 | Severability | 109 |
| Section 11.11 | Confidentiality | 109 |
| Section 11.12 | Interest Rate Limitation | 109 |
| Section 11.13 | Waiver of Effect of Corporate Seal | 110 |
| Section 11.14 | Patriot Act | 110 |
| Section 11.15 | No Advisory or Fiduciary Responsibility | 110 |
| Section 11.16 | Location of Closing | 110 |
| Section 11.17 | Acknowledgement and Consent to Bail-In of Affected Financial Institutions | 110 |
| Section 11.18 | Certain ERISA Matters | 111 |
| Section 11.19 | Acknowledgement Regarding any Supported QFCs | 112 |

Schedules

| | | |
|---|---|---|
| Schedule I | – | Commitment Amounts |
| Schedule 4.14 | – | Subsidiaries and Loan Parties |
| Schedule 4.16–1 | – | Locations of Real Estate |
| Schedule 4.16–2 | – | Locations of Chief Executive Office, Taxpayer Identification Number, Etc. |
| Schedule 4.16–3 | – | Changes in Legal Name, State of Formation and Structure |
| Schedule 4.17 | – | Deposit and Disbursement Accounts |
| Schedule 7.2 | – | Existing Liens |
| Schedule 7.4 | – | Existing Investments |

Exhibits

| | | |
|---|---|---|
| Exhibit 1.1 | – | [*Form of*] Interim DIP Order |
| Exhibit 2.3 | – | [*Form of*] Notice of Borrowing |
| Exhibit 2.7 | – | [*Form of*] Notice of Conversion / Continuation |
| Exhibit 2.10 | – | [*Form of*] Note |
| Exhibits 2.20–A-D | – | [*Forms of*] U.S. Tax Compliance Certificates |
| Exhibit 5.13 | – | [*Form of*] Guarantor Joinder Agreement |
| Exhibit 11.4 | – | [*Form of*] Assignment and Assumption |

v

## SUPERPRIORITY SECURED DEBTOR-IN-POSSESSION CREDIT AGREEMENT

This SUPERPRIORITY SECURED DEBTOR-IN-POSSESSION CREDIT AGREEMENT (this "*Agreement*") is made and entered into as of October 26, 2022, by and among VITAL PHARMACEUTICALS, INC., a Florida corporation (the "*Borrower*"), the Guarantors (as defined herein), the Lenders (as defined herein), and TRUIST BANK, in its capacity as Administrative Agent.

R E C I T A L S

WHEREAS, on October 10, 2022 (the "*Petition Date*"), the Borrower and the other Loan Parties (together with certain Subsidiaries and/or Affiliates that are or are to become debtors under the Chapter 11 Case, collectively, the "*Debtors*") filed voluntary petitions for relief under Title 11 of the United States Code (as now or hereafter in effect, or any successor thereto, the "*Bankruptcy Code*") in the United States Bankruptcy Court for the Southern District of Florida (the "*Bankruptcy Court*") (such cases being jointly administered under Case No. 22-17842 and are referred to herein as the "*Chapter 11 Case*"), and such Debtors continue to operate their businesses and manage their properties as debtors and debtors-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code;

WHEREAS, the Borrower has requested that the Lenders provide senior secured superpriority debtor-in-possession credit facilities to the Borrower in an aggregate principal amount not to exceed $335,000,000.00 (the "*DIP Facility*") for the purposes set forth herein, and the Lenders are willing to do so on the terms and conditions set forth herein;

WHEREAS, each of the Loan Parties acknowledges that such Loan Party will receive substantial direct and indirect benefits by reason of the making of the Loans and other financial accommodations to the Loan Parties as provided in this Agreement; and

WHEREAS, to provide for the security and repayment of all obligations of any kind of the Loan Parties hereunder and under the other Loan Documents, each of the Loan Parties will provide to the Administrative Agent (for the benefit of the Lenders and the other holders of the Obligations) the Liens, status and protection set forth in the Interim DIP Order and the Final DIP Order.

NOW, THEREFORE, in consideration of the premises and the mutual covenants herein contained, each of the parties hereto agrees as follows:

A G R E E M E N T

ARTICLE I

DEFINITIONS; CONSTRUCTION

Section 1.1    Definitions. In addition to the other terms defined herein, the following terms used herein shall have the meanings specified below (to be equally applicable to both the singular and plural forms of the terms so defined):

"*Acceptable Financing*" shall have the meaning set forth in Section 5.18(d).

"*Acquisition*" shall mean: (a) any Investment by any Loan Party or Subsidiary in any other Person pursuant to which such Person shall become a Subsidiary, or shall be merged with a Loan Party or Subsidiary; or (b) any acquisition by a Loan Party or Subsidiary of the assets of any Person (other than a Subsidiary) that constitute all, or a substantial portion, of the assets of such Person, or a division or business unit of such Person,

whether through purchase, exercise of an option to purchase, merger or other business combination or transaction. For purposes of determining the amount of an Acquisition, such amount shall include all consideration (including, without limitation, any deferred payments or other contingent consideration) set forth in the applicable purchase, acquisition and/or sale agreements governing such Acquisition, as well as the assumption of any Indebtedness in connection therewith.

"*Adjusted Daily SOFR*" shall mean, as of any date of determination, with respect to any calculations relating to any Loan bearing interest at a rate determined by reference to Daily SOFR and/or the determination of the Base Rate in accordance with clause (c) of such definition below, the *sum of*: (a) the rate per annum equal to Daily SOFR determined as of such date; *plus* (b) the SOFR Adjustment.

"*Adjusted Term SOFR*" shall mean, as of any date of determination, with respect to any calculations relating to a SOFR Loan for any applicable Interest Period or a SOFR Borrowing for any selected Interest Period, the *sum of*: (a) the rate per annum equal to Term SOFR for such Interest Period determined as of such date; *plus* (b) the SOFR Adjustment.

"*Administrative Agent*" shall mean Truist, in its capacity as administrative agent under any of the Loan Documents, or any successor administrative agent.

"*Administrative Questionnaire*" shall mean, with respect to each Lender, an administrative questionnaire in the form provided to such Lender by the Administrative Agent and submitted to the Administrative Agent duly completed by such Lender.

"*Affected Financial Institution*" means: (a) any EEA Financial Institution; or (b) any UK Financial Institution.

"*Affiliate*" shall mean, with respect to any Person, any other Person that directly, or indirectly through one (1) or more intermediaries, Controls, is Controlled by, or is under common Control with, such specified Person. For the purposes of this definition of "*Affiliate*", "*Control*" shall mean the possession, directly or indirectly, of the power to either: (a) vote ten percent (10.0%) or more of the Capital Stock having ordinary voting power for the election of directors or managers (or Persons performing similar functions), as applicable, of a Person; or (b) direct, or cause the direction of, the management and policies of a Person, whether through the ability to exercise voting power, by control, or otherwise. The term "*Controlling*", and the phrases "*Controlled by*" and "*under common Control with*", shall have the meanings correlative thereto.

"*Agent Parties*" shall have the meaning set forth in <u>Section 11.1(b)(iv)</u>.

"*Aggregate Revolving Commitment Amount*" shall mean, at any time, the aggregate principal amount of the Aggregate Revolving Commitments outstanding as of such time. On the Effective Date, the Aggregate Revolving Commitment Amount is $335,000,000.00.

"*Aggregate Revolving Commitments*" shall mean, collectively, all Revolving Commitments of all Lenders at any time outstanding.

"*Aggregate Revolving Credit Exposure*" shall mean, in aggregate, the Revolving Credit Exposure of all Lenders at any time outstanding.

"*Agreement*" shall have the meaning set forth in the introductory paragraph hereto.

"*Anti-Corruption Laws*" shall mean all Laws, rules and regulations of any jurisdiction applicable to any Loan Party or Subsidiary from time to time concerning, or relating to, bribery or corruption.

"*Applicable Lending Office*" shall mean, for each Lender and for each Type of Loan, the "Lending Office" of such Lender (or an Affiliate of such Lender) designated for such Type of Loan in the Administrative Questionnaire submitted by such Lender to the Administrative Agent, or such other office of such Lender (or an Affiliate of such Lender) as such Lender may from time to time specify to the Administrative Agent and the Borrower as the office by which its Loans of such Type are to be made and maintained.

"*Applicable Margin*" shall mean, as of any date of determination, with respect to (a) interest on all SOFR Loans outstanding on such date, a rate per annum equal to 8.50% and (b) interest on all Base Rate Loans outstanding on such date, a rate per annum equal to 7.50%.

Notwithstanding anything to the contrary in the foregoing: the provisions of this definition of "*Applicable Margin*" shall *not* limit the rights of the Administrative Agent and/or the Lenders with respect to either of Section 2.13(d) or Article VIII.

"*Approved Fund*" shall mean any Person (other than a natural Person) that is (or will be) engaged in the making, purchasing or holding of, or otherwise investing in, commercial loans and similar extensions of credit in the ordinary course of its business and that is administered or managed by: (a) a Lender; (b) an Affiliate of a Lender; or (c) an entity, or an Affiliate of an entity, that administers or manages a Lender.

"*Asset Sale*" shall mean the sale, transfer, license, lease or other disposition of any property by any Loan Party or Subsidiary, including, without limitation, any sale and leaseback transaction and any sale, assignment, transfer or other disposal, with or without recourse, of any notes or accounts receivable, or any rights and claims associated therewith, but *excluding*: (a) the sale or other disposition of inventory in the ordinary course of business; (b) the sale or disposition, for fair market value (as reasonably determined by the applicable Loan Party or Subsidiary in good faith), of obsolete, surplus, damaged or worn out property; (c) the disposition of property (including the cancellation of Indebtedness permitted by Section 7.4(d)) to any Loan Party or Subsidiary, provided, that, if the transferor of such property is a Loan Party, then the transferee thereof must be a Loan Party; (d) the write-off, discount, sale or other disposition of accounts receivable and similar obligations in connection with the collection or compromise thereof; (e) licenses, sublicenses, leases or subleases granted to others in the ordinary course of business, or *not* interfering in any material respect with the business of any Loan Party or Subsidiary; (f) the sale or disposition of cash or Cash Equivalents, for fair market value, in the ordinary course of business; (g) the disposition of shares of Capital Stock of any Foreign Subsidiary in order to qualify members of the governing body of such Subsidiary, if required by applicable Law; (h) the termination or surrender of any real property lease of any Loan Party in the ordinary course of business, so long as the loss of such leased location could *not* reasonably be expected to have an adverse and material effect on any business of any Loan Party; (i) [reserved]; (j) *solely* to the extent *not* otherwise permitted hereunder, sales, transfers and other dispositions permitted by Section 7.3; and (k) to the extent constituting a sale, transfer, lease, or other disposition of any property and/or asset, any Restricted Payment made pursuant to Section 7.5.

"*Assignment and Assumption*" shall mean an assignment and assumption entered into by a Lender and an Eligible Assignee (with the consent of any party whose consent is required by Section 11.4(b)) and accepted by the Administrative Agent, in the form of Exhibit 11.4 attached hereto (or such other form approved by the Administrative Agent).

"*Availability Period*" shall mean the period from, and including, the Effective Date to, but *excluding*, the Revolving Commitment Termination Date.

"*Available Tenor*" shall mean, as of any date of determination and with respect to the then-current Benchmark, as applicable, (a) if such Benchmark is a term rate, any tenor for such Benchmark (or component thereof) that is, or may be, used for determining the length of any interest period (including any Interest Period) pursuant to this Agreement, and (b) if such Benchmark is *not* a term rate, any payment period for interest calculated with reference to such Benchmark (or component thereof) that is, or may be, used for determining any frequency of the making of payments of interest calculated with reference to such Benchmark pursuant to this Agreement,

in each case of the foregoing clauses (a) and (b), as of such date of determination, but *excluding*, in any event and for the avoidance of doubt, any tenor for such Benchmark that is removed as of such date of determination from the definition of "*Interest Period*" below in accordance with Section 2.16(e).

"*Avoidance Actions*" means actions for preferences, fraudulent conveyances and other avoidance power claims under Sections 544, 545, 547, 548, 549, 550 and 553 of the Bankruptcy Code.

"*Bail-In Action*" shall mean the exercise of any Write-Down and Conversion Powers by the applicable Resolution Authority in respect of any liability of an Affected Financial Institution.

"*Bail-In Legislation*" shall mean: (a) with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing Law for such EEA Member Country from time to time which is described in the applicable EU Bail-In Legislation Schedule; and (b) with respect to the United Kingdom, Part I of the United Kingdom Banking Act of 2009 (as amended from time to time), and any other Law applicable in the United Kingdom relating to the resolution of unsound or failing banks, investment firms or other financial institutions, or any affiliates of any of the foregoing (other than through liquidation, administration, or other insolvency proceedings).

"*Bank Product Amount*" shall have the meaning set forth in the definition of "*Bank Product Provider*" below. Notwithstanding anything to the contrary in the definition of "*Bank Product Provider*" below: (a) the Bank Product Amount may be changed from time to time upon written notice to the Administrative Agent by the applicable Bank Product Provider; and (b) no Bank Product Amount may be established at any time that a Default or an Event of Default exists.

"*Bank Product Obligations*" shall mean, collectively, all obligations and other liabilities of any Loan Party or Subsidiary to any Bank Product Provider arising with respect to any Bank Products.

"*Bank Product Provider*" shall mean any Person that: (a) (i) at the time it provides any Bank Product(s) to any Loan Party or Subsidiary, is a Lender or an Affiliate of a Lender, or (ii) has provided any Bank Product(s) to any Loan Party or Subsidiary that exist on the Effective Date, and such Person is a Lender, or an Affiliate of a Lender, on the Effective Date; and (b) except when the Bank Product Provider is Truist and/or any of its Affiliates, has provided prior written notice to the Administrative Agent, which notice has been acknowledged by the Borrower, of (i) the existence of any specified Bank Product(s), (ii) the maximum Dollar amount of Bank Product Obligation(s) arising under such Bank Product(s) (such amount, the "*Bank Product Amount*"), and (iii) the methodology to be used by such parties in determining the Bank Product Obligation(s) arising under such Bank Product(s) from time to time. Notwithstanding anything to the contrary in the foregoing: (A) in no event shall any Bank Product Provider, acting in such capacity, be deemed a Lender for purposes hereof to the extent of, and as to, any Bank Product(s), provided, that, each reference to the term "*Lender*" in Article IX, Section 11.3(b) and Section 11.4 shall be deemed to include such Bank Product Provider; and (B) in no event shall the approval of any such Person, in its capacity as Bank Product Provider, be required in connection with the release or termination of any security interest or Lien of the Administrative Agent.

"*Bank Products*" shall mean any of the following services provided to any Loan Party or Subsidiary by any Bank Product Provider: (a) any treasury or other cash management services, including, without limitation, any deposit accounts, automated clearing house (ACH) origination and other funds transfer, depository (including cash vault and check deposit), zero balance accounts and sweeps, return items processing, controlled disbursement accounts, positive pay, lockboxes and lockbox accounts, account reconciliation and information reporting, payables outsourcing, payroll processing, trade finance services, investment accounts and securities accounts; and (b) card services, including, without limitation, credit cards (including purchasing cards and commercial cards), prepaid cards, including payroll, stored value and gift cards, merchant services processing, and debit card services.

"*Bankruptcy Code*" shall have the meaning set forth in the recitals hereto.

"*Bankruptcy Court*" shall have the meaning set forth in the recitals hereto.

"*Base Rate*" shall mean, for any date of determination, a rate per annum equal to the *highest* of (a) the rate of interest that the Administrative Agent announces from time to time as its prime lending rate, as in effect from time to time (the "*Prime Rate*"), (b) the Federal Funds Rate, as in effect from time to time, *plus* one-half of one percent (0.50%) per annum, (c) Adjusted Daily SOFR, *plus* one percent (1.00%) per annum (with any change(s) in any of the rates described in the foregoing clauses (a) through (c) to be effective as of the date of any such change(s) in such rates), and (d) the Floor. The Prime Rate is a reference rate and does *not* necessarily represent the lowest or best rate actually charged to any customer. The Administrative Agent and the Lenders may make commercial loans, or other loans, at rates of interest at, above, or below the Prime Rate. Any change(s) to the Base Rate due to a change in the Prime Rate, the Federal Funds Rate and/or Adjusted Daily SOFR, as the case may be, will be deemed to be effective from, and including, the date of effectiveness of such change(s) to the Prime Rate, the Federal Funds Rate and/or Adjusted Daily SOFR. For the avoidance of doubt and notwithstanding anything to the contrary in the foregoing, if, at any time, the Base Rate is *less than* the Floor, then the Base Rate shall be deemed to equal the Floor for all purposes of this Agreement and the other Loan Documents.

"*Base Rate Borrowing*" shall mean a Borrowing, the Loans in respect of which bear interest at a rate determined by reference to the Base Rate.

"*Base Rate Loan*" shall mean a Loan bearing interest at a rate determined by reference to the Base Rate.

"*Benchmark*" shall mean, initially as of the Effective Date, the Term SOFR Reference Rate; provided, that, if a Benchmark Transition Event has occurred with respect to the SOFR Reference Rate or the then-current Benchmark, then "*Benchmark*" shall thereafter mean the applicable Benchmark Replacement, to the extent that such Benchmark Replacement has replaced such prior benchmark rate pursuant to Section 2.16(b).

"*Benchmark Replacement*" shall mean, with respect to any Benchmark Transition Event, the first (1st) alternative set forth in the alphabetic order immediately below that can be determined by the Administrative Agent for the applicable Benchmark Replacement Date:

        (a)      Adjusted Daily SOFR; or

        (b)      the *sum of*: (i) the alternate benchmark rate that has been selected by the Administrative Agent and the Borrower, giving due consideration to (A) any selection or recommendation of a replacement benchmark rate, or the mechanism for determining such a replacement rate, by the Relevant Governmental Body, and (B) any evolving, or then-prevailing, market convention for determining a benchmark rate as a replacement to the then-current Benchmark for Dollar-denominated syndicated credit facilities; and (ii) the related Benchmark Replacement Adjustment;

provided, that, notwithstanding anything to the contrary in the foregoing or elsewhere in this Agreement or any other Loan Document, if, at any time, the Benchmark Replacement (as determined pursuant to the foregoing clauses (a) or (b), as applicable) would be *less than* the Floor, then the Benchmark Replacement shall be deemed to equal the Floor for all purposes of this Agreement and the other Loan Documents.

"*Benchmark Replacement Adjustment*" shall mean, with respect to any replacement of the then-current Benchmark with an Unadjusted Benchmark Replacement, the spread adjustment, or method for calculating or determining such spread adjustment (which may be a positive or negative value or equal to zero), that has been selected by the Administrative Agent and the Borrower, giving due consideration to: (a) any selection or recommendation of a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement by the Relevant Governmental Body; or (b) any evolving, or then-prevailing, market convention for determining a spread adjustment, or a method for calculating or determining such spread adjustment, for the replacement of such

Benchmark with the applicable Unadjusted Benchmark Replacement for Dollar-denominated syndicated credit facilities at such time.

"*Benchmark Replacement Date*" shall mean a date and time determined by the Administrative Agent, which date shall be *no later than* the *earliest* to occur of the following events with respect to the then-current Benchmark:

        (a)     in the case of the occurrence of any event(s) described in clauses (a) or (b) of the definition of "*Benchmark Transition Event*" below, the *later* to occur of: (i) the date of the public statement or publication of information, as applicable, referred to in such clause (a) or (b), as applicable; and (ii) the date on which the administrator of such Benchmark (or the published component used in the calculation thereof) permanently or indefinitely ceases to provide all Available Tenors of such Benchmark (or such component thereof); or

        (b)     in the case of the occurrence of any event(s) described in clause (c) of the definition of "*Benchmark Transition Event*" below, the first (1st) date on which such Benchmark (or the published component used in the calculation thereof) has been determined and announced by the regulatory supervisor for the administrator of such Benchmark (or such component thereof) to be non-representative; provided, that, such non-representativeness shall be determined by reference to the most recent statement or publication referred to in such clause (c), notwithstanding that any Available Tenor of such Benchmark (or such component thereof) may continue to be provided as of such date.

For the avoidance of doubt, in any such case of occurrence of the foregoing clauses (a) or (b) of this definition of "*Benchmark Replacement Date*" with respect to any Benchmark, the Benchmark Replacement Date will be deemed to have occurred upon the occurrence of the applicable event(s) set forth therein with respect to all then-current Available Tenors of such Benchmark (or the published component used in the calculation thereof).

"*Benchmark Transition Event*" shall mean, with respect to the then-current Benchmark, the occurrence of one (1) or more of the following events:

        (a)     a public statement or publication of information by, or on behalf of, the administrator of such Benchmark (or the published component used in the calculation thereof), in either case, announcing that such administrator has ceased, or will cease, to provide all Available Tenors of such Benchmark (or such component thereof), permanently or indefinitely; provided, that, at the time of such statement or publication, no successor administrator has been identified that will continue to provide any Available Tenor of such Benchmark (or such component thereof);

        (b)     a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof), the Federal Reserve Board, the FRBNY, an insolvency official with jurisdiction over the administrator for such Benchmark (or such component thereof), a resolution authority with jurisdiction over the administrator for such Benchmark (or such component thereof), or a court or other Person with similar insolvency or resolution authority over the administrator for such Benchmark (or such component thereof), in any such case, which states that the administrator of such Benchmark (or such component thereof) has ceased, or will cease, to provide all Available Tenors of such Benchmark (or such component thereof), permanently or indefinitely; provided, that, at the time of such statement or publication, no successor administrator has been identified that will continue to provide any Available Tenor of such Benchmark (or such component thereof); or

        (c)     a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that all Available Tenors of such Benchmark (or such component thereof) are *not*, or, as of a specified future date, will *not* be, representative.

For the avoidance of doubt, a "*Benchmark Transition Event*" shall be deemed to have occurred, with respect to any Benchmark, if a public statement or publication of information as described above has occurred with respect to each then-current Available Tenor of such Benchmark (or the published component used in the calculation thereof).

"*Benchmark Unavailability Period*" shall mean the period (if any): (a) *beginning* at the time that a Benchmark Replacement Date has occurred if, at such time, no Benchmark Replacement has replaced the then-current Benchmark for all purposes hereunder and under any other Loan Document in accordance with <u>Section 2.16</u>; and (b) *ending* at the time that a Benchmark Replacement has replaced the then-current Benchmark for all purposes hereunder and under any other Loan Document in accordance with <u>Section 2.16</u>.

"*Beneficial Ownership Certification*" shall mean a certification regarding beneficial ownership as required by the Beneficial Ownership Regulation.

"*Beneficial Ownership Regulation*" shall mean 31 C.F.R. §–1010.230, as amended and in effect from time to time.

"*Benefit Plan*" shall mean any of: (a) an "employee benefit plan" (as defined in ERISA) that is subject to Title I of ERISA; (b) a "plan" as defined in, and subject to, Section 4975 of the Code; or (c) any Person whose assets include (for purposes of ERISA Section 3(42), or otherwise for purposes of Title I of ERISA or Section 4975 of the Code) the assets of any such "employee benefit plan" or "plan".

"*BHC Act Affiliate*" of a party means an "affiliate" (as such term is defined under, and interpreted in accordance with, 12 U.S.C. §–1841(k)) of such party.

"*Bid Procedures Motion*" shall have the meaning set forth in <u>Section 5.18(b)</u>.

"*Borrower*" shall have the meaning set forth in the introductory paragraph hereof.

"*Borrower Materials*" shall have the meaning set forth in <u>Section 5.1</u>.

"*Borrowing*" shall mean, as the context may require, a borrowing consisting of Loans of the same Type, made, converted or continued on the same date, and, in the case of SOFR Loans, as to which a single Interest Period is in effect.

"*Budget*" shall mean (a) the Initial Budget or (b) the most recent Updated Budget, if any.

"*Business Day*" shall mean any day, other than: (a) a Saturday, Sunday or other day on which commercial banks in Charlotte, North Carolina or New York, New York are authorized, or required by applicable Law, to close; and (b) if such day relates to a determination of, or a calculation involving, SOFR, any SOFR Reference Rate and/or any SOFR-Based Rate (or any notice with respect to any of the foregoing), any day on which any of SIFMA, the New York Stock Exchange and/or the FRBNY is *not* open for business because such day is a legal holiday under the federal laws of the United States or the laws of the State of New York, as applicable.

"*Capital Lease*" shall mean, for any Person, each lease (or other arrangement conveying the right to use) of real or personal property, or a combination thereof, which obligations are required to be classified, and accounted for, as capital leases on a balance sheet of such Person in accordance with GAAP (subject to the provisions in <u>Section 1.3</u> hereof).

"*Capital Lease Obligations*" of any Person shall mean all obligations of such Person to pay rent or other amounts under any Capital Lease, and the amount of such obligations shall, for purposes of this Agreement and the other Loan Documents, be deemed to be the capitalized amount thereof determined in accordance with GAAP (subject to the provisions in <u>Section 1.3</u> hereof).

"*Capital Stock*" shall mean all shares, options, warrants, general or limited partnership interests, membership interests or other equivalents (regardless of how designated) of or in a corporation, partnership, limited liability company, or equivalent entity, whether voting or non-voting, including, without limitation, common stock, preferred stock, or any other "equity security" (as such term is defined in Rule 3a11–1 of the General Rules and Regulations promulgated by the SEC under the Securities Exchange Act).

"*Carve-Out*" has the meaning given to such term in the Interim DIP Order and, as applicable, the Final DIP Order.

"*Cash Equivalents*" shall mean:

(a)     direct obligations of, or obligations the principal of and interest on which are unconditionally guaranteed by, the United States (or by any agency thereof, to the extent such obligations are backed by the full faith and credit of the United States), in each case, maturing within one (1) year from the date of acquisition thereof;

(b)     commercial paper having the highest rating, at the time of acquisition thereof, of S&P or Moody's, and, in either case, maturing within six (6) months from the date of acquisition thereof;

(c)     certificates of deposit, bankers' acceptances and time deposits maturing within one hundred eighty (180) days of the date of acquisition thereof, issued or guaranteed by or placed with, and money market deposit accounts issued or offered by, any domestic office of any commercial bank organized under the Laws of the United States, or any state thereof, which has a combined capital and surplus and undivided profits of *not less than* $500,000,000;

(d)     fully collateralized repurchase agreements with a term of *not more than* thirty (30) days for securities described in clause (a) above and entered into with a financial institution satisfying the criteria described in clause (c) above; and

(e)     mutual funds investing *solely* in any one (1) or more of the Cash Equivalents described in clauses (a) through (d) above.

"*Cash Management Order*" shall mean, collectively, the orders entered by the Bankruptcy Court with respect to the Loan Parties in the Chapter 11 Case authorizing and approving the Loan Parties' cash management arrangements and procedures, and which orders shall be in form and substance reasonably satisfactory to the Administrative Agent.

"*Change in Control*" shall mean the occurrence of one (1) or more of the following events:

(a)     the Permitted Holders cease to: (i) own and control, beneficially and of record, directly or indirectly, *at least* seventy-five percent (75.0%) of the outstanding Voting Stock in the Borrower; or (ii) possess the right to elect (through contract, ownership of voting securities, or otherwise), at all times, a majority of the board of directors or managers (or equivalent governing body) of each Loan Party, and to direct the management policies and decisions of each Loan Party;

(b)     except to the extent that a merger or consolidation transaction, or a liquidation or dissolution of a Subsidiary, is expressly permitted by Section 7.3, the Borrower ceases to own and control, beneficially and of record, directly or indirectly, *at least* one-hundred percent (100.0%) of each class of the outstanding Capital Stock in each other Loan Party;

(c)     (i) the board of directors or managers (or equivalent governing body) of the Borrower or any other Loan Party ceases to be composed of five (5) individuals at least three (3) of whom (A) do not have a relationship by blood (to the second (2nd) degree of consanguinity), marriage or adoption to John Henry Owoc, (B) are not

employees, officers, managers or consultants of, or independent contractors or advisors to, any Loan Party (other than in respect of service on such board or other equivalent governing body) and (C) are otherwise reasonably acceptable to the Required Lenders (including, without limitation, in respect of independence and restructuring experience), it being understood that Bob Dickinson, Stephen S. Gray and Steven G. Panagos are reasonably acceptable to the Required Lenders, (ii) the board of directors or managers (or equivalent governing body) of the Borrower or any other Loan Party ceases to have all or any portion of the authority invested in or otherwise designated to it as of the First Amendment Effective Date (without giving effect to any provision of such authority allowing for the amendment thereof), (iii) the board of directors or managers (or equivalent governing body) of the Borrower or any other Loan Party ceases to include a restructuring committee composed solely of one (1) individual (the "_Restructuring Committee_") reasonably acceptable to the Required Lenders, it being understood that Steven G. Panagos is reasonably acceptable to the Required Lenders, (iv) the Restructuring Committee ceases to have all or any portion of the authority invested in or otherwise designated to it as of the Effective Date (without giving effect to any provision of such authority allowing for the amendment thereof), which authority shall include, at a minimum, the making of recommendations to the board of directors or managers (or equivalent governing body) of the Borrower or such other Loan Party, as applicable, regarding all aspects of the Chapter 11 Case, including without limitation the undertaking by any Debtor of any action necessary to satisfy any requirement of Section 5.18, or (v) the board of directors or managers (or equivalent governing body) of the Borrower or any other Loan Party delegates any of its authority in respect of the Chapter 11 Case to any individual(s) or committee(s) (other than the Restructuring Committee); _provided_, _that_, upon the death, incapacity or resignation (but, for the avoidance of doubt, _not_ the removal) of any individual serving on the board of directors or managers (or equivalent governing body) of the Borrower or any other Loan Party or serving on the Restructuring Committee, there shall not occur a Change in Control pursuant to this clause (c) if a replacement therefor that satisfies the criteria set forth in this clause (c)(i) or (iii), as the case may be, shall have been appointed within seven (7) days after such death, incapacity or resignation, and, upon such appointment, such replacement is vested with the same scope of authority held by his or her predecessor; or

(d)    John C. DiDonato (i) ceases to have all or any portion of the authority invested in or otherwise designated to him as Chief Transformation Officer of the Borrower and the other Loan Parties as of the First Amendment Effective Date (without giving effect to any provision of such authority allowing for the amendment thereof), which authority shall include, at a minimum, the CTO Scope, (ii) ceases to report to the Restructuring Committee, or (iii) ceases to be the Chief Transformation Officer of the Borrower and the other Loan Parties; _provided_, _that_, upon the death or incapacity (but, for the avoidance of doubt, _not_ the removal or resignation) of John C. DiDonato, there shall not occur a Change in Control pursuant to this clause (d) if a replacement for him that is reasonably acceptable to the Required Lenders shall have been appointed within seven (7) days after such death or incapacity, and, upon such appointment, such replacement is vested with the same scope of authority held by him prior to his death or incapacity (including, at a minimum, the CTO Scope).

"_Change in Law_" shall mean the occurrence, after the date of this Agreement, of any of the following: (a) the adoption, or taking effect, of any applicable Law, (b) any change in any applicable Law, or in the administration, interpretation, implementation or application thereof by any Governmental Authority, or (c) the making or issuance of any request, rule, guideline or directive (whether or not having the force of law) of any Governmental Authority. Notwithstanding anything to the contrary herein, (i) the Dodd-Frank Wall Street Reform and Consumer Protection Act, and all requests, rules, guidelines and/or directives promulgated in connection therewith, and (ii) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the U.S. or foreign regulatory authorities, in each case of this clause (ii), pursuant to Basel III, shall, in each case of the foregoing clauses (i) and (ii), be deemed to be a Change in Law, regardless of the date enacted or adopted.

"_Chapter 11 Case_" shall have the meaning set forth in the recitals hereto.

"_Charges_" shall have the meaning set forth in Section 11.12.

"_Code_" shall mean the Internal Revenue Code of 1986, as amended and in effect from time to time.

"*Collateral*" shall mean all tangible and intangible property, real and personal, of any Loan Party that is, or purports to be, the subject of a Lien in favor of the Administrative Agent, for the ratable benefit of the holders of the Obligations, to secure, in whole or in part, the Obligations (or any Guarantee thereof), and shall include, without limitation, all casualty insurance proceeds and condemnation awards with respect to any of the foregoing.

"*Collateral Access Agreement*" shall mean each landlord waiver or bailee agreement granted to, and in form and substance reasonably acceptable to, the Administrative Agent.

"*Collateral Documents*" shall mean, collectively, the Security Agreement, any Mortgages, any Collateral Access Agreements, any Controlled Account Agreements, all other instruments and agreements, now or hereafter in effect, securing or perfecting the Liens securing, in whole or in part, the Obligations (or any Guarantee thereof), all UCC financing statements and fixture filings, all stock and unit powers and similar instruments of transfer, and all other documents, instruments, agreements and/or certificates executed and delivered by any Loan Party to the Administrative Agent and the Lenders in connection with the foregoing.

"*Commitment*" shall mean, as to each Lender, a Revolving Commitment.

"*Commitment Fee*" shall have the meaning set forth in <u>Section 2.14(b)</u>.

"*Commodity Exchange Act*" shall mean the Commodity Exchange Act (7 U.S.C. §–1 *et seq.*), as amended and in effect from time to time, and any successor statute(s), together with any rules and regulations promulgated in connection therewith, any rulings or orders issued by any applicable Governmental Authorities (including, without limitation, the U.S. Commodity Futures Trading Commission) thereunder, or the application or official interpretation of any of the foregoing.

"*Communications*" shall have the meaning set forth in <u>Section 11.1(b)(iv)</u>.

"*Conforming Changes*" shall mean, with respect to (a) the use and/or administration of, and/or any conventions associated with, SOFR, any SOFR Reference Rate and/or any SOFR-Based Rate (for any Interest Period, as applicable), or (b) the use, administration, adoption and/or implementation of, and/or any conventions associated with, any Benchmark Replacement, in each case of the foregoing <u>clauses (a)</u> and <u>(b)</u>, any technical, administrative and/or operational change(s) (including, without limitation, any such change(s) to the definition of "*Base Rate*" above, the definition of "*Business Day*" above, the definition of "*Interest Period*" below (or any similar or analogous definition, or the addition of an applicable concept of "interest period"), the definition of "*U.S. Government Securities Business Day*" below, the timing and frequency of determining rates and making payments of interest, the timing of delivery of any Notices of Borrowing (or other requests for borrowing of Loans), the timing of delivery of any notices of optional reduction or termination of any Commitment(s), the timing of delivery of any notices of optional prepayment of Loans (or other notices of prepayment of Loans), the timing of delivery of any Notices of Continuation / Conversion (or other notices of the continuation or conversion of Loans), the applicability and length of lookback periods, the applicability of <u>Section 2.19</u>, and any other technical, administrative and/or operational matters) that the Administrative Agent determines, in its discretion, may be appropriate to reflect the adoption and/or implementation of any such rate and/or to permit the use and administration thereof by the Administrative Agent in a manner substantially consistent with market practice (or, if the Administrative Agent determines, in its discretion, that (i) the adoption and/or implementation of, or of any portion of, such market practice is *not* administratively feasible for the Administrative Agent, or (ii) no market practice for the administration of any such rate exists, then, in each case of the foregoing <u>clauses (i)</u> and <u>(ii)</u>, permit the use and administration thereof by the Administrative Agent in such other manner of administration as the Administrative Agent determines is reasonably necessary in connection with the administration of this Agreement and the other Loan Documents).

"*Connection Income Taxes*" shall mean Other Connection Taxes that are imposed on, or measured by, net income (however denominated), or that are franchise Taxes or branch profits Taxes.

"*Contingent Liability*" shall mean, with respect to any Person, each obligation and liability of such Person, and all such obligations and liabilities of such Person incurred pursuant to any agreement, undertaking or arrangement by which such Person: (a) guarantees, endorses or otherwise becomes, or is contingently liable upon (by direct or indirect agreement, contingent or otherwise, to provide funds for payment, to supply funds to, or otherwise to invest in, a debtor, or otherwise to assure a creditor against loss), the indebtedness, dividend, obligation or other liability of any other Person in any matter (other than by endorsement of instruments in the course of collection), including any indebtedness, dividend or other obligation which may be issued or incurred at some future time; (b) guarantees the payment of dividends or other distributions upon the Capital Stock of any other Person; (c) undertakes or agrees (whether contingently or otherwise): (i) to purchase, repurchase, or otherwise acquire any indebtedness, obligation or liability of any other Person or any property or assets constituting security therefor, (ii) to advance or provide funds for the payment or discharge of any indebtedness, obligation or liability of any other Person (whether in the form of loans, advances, stock purchases, capital contributions or otherwise), or to maintain solvency, assets, level of income, working capital or other financial condition of any other Person, or (iii) to make payment to any other Person other than for value received; (d) agrees to lease property or to purchase securities, property or services from such other Person with the purpose or intend of assuring the owner of such indebtedness or obligation of the ability of such other Person to make payment of the indebtedness or obligation; (e) to induce the issuance of, or in connection with the issuance of, any letter of credit for the benefit of such other Person; or (f) undertakes or agrees otherwise to assure a creditor against loss. The amount of any Contingent Liability shall (subject to any limitation set forth herein) be deemed to be the outstanding principal amount (or maximum permitted principal amount, if larger) of the indebtedness, obligation or other liability guaranteed or supported thereby.

"*Contractual Obligation*" of any Person shall mean any provision of any security issued by such Person or of any agreement, instrument or undertaking under which such Person is obligated, or by which it or any of the property in which it has an interest is bound.

"*Controlled Account*" shall have the meaning set forth in <u>Section 5.11(a)</u>.

"*Controlled Account Agreement*" shall mean any tri-party agreement by and among a Loan Party, the Administrative Agent, and a depositary bank or securities intermediary, as applicable, at which such Loan Party maintains a Controlled Account, in each case, in form and substance satisfactory to the Administrative Agent.

"*Copyrights*" shall have the meaning set forth in the Security Agreement.

"*Covered Entity*" means any of the following: (a) a "covered entity" as that term is defined in, and interpreted in accordance with, 12 C.F.R. §–252.82(b); (b) a "covered bank" as that term is defined in, and interpreted in accordance with, 12 C.F.R. §–47.3(b); and (c) a "covered FSI" as that term is defined in, and interpreted in accordance with, 12 C.F.R. §–382.2(b).

"*Covered Party*" shall have the meaning set forth in <u>Section 11.18</u>.

"*Credit Event*" shall mean the advancing of any Loan to any Loan Party or Subsidiary, or the issuance, extension of the maturity date or expiration date, or increase in the amount, of, any Indebtedness of any Loan Party.

"*CTO Scope*" shall mean the scope of authority vested in the Debtors' Chief Transformation Officer, which shall include, at a minimum: (a) oversight of treasury and cash management functions, including (i) preparation and maintenance of cash flow forecasts, (ii) management of cash disbursements, and (iii) liquidity enhancement and cost savings initiatives; (b) oversight of purchasing functions including (i) daily monitoring and analysis of purchase orders issued the previous day, goods received, and vendor relationships, (ii) review of all purchase orders issued to ensure alignment with the Budget, and cancelling any purchase order the Chief Transformation Officer determines is not aligned with the Budget, and (iii) for purchase orders (other than for materials, excluding purchases from Crown Holdings, Inc. and affiliates) exceeding $75,000 individually or in the

aggregate, approval thereof before issuance; and (c) review of restructuring related expenses and professional fee invoices and fee statements or applications.

"*Daily SOFR*" shall mean, as of any specified date of determination, for any calculations with respect to any Loan bearing interest at a rate determined by reference to Daily SOFR and/or any determination of the Base Rate pursuant to clause (c) of the definition of "*Base Rate*" above, the rate per annum equal to the Daily SOFR Reference Rate, determined as of the date that is five (5) U.S. Government Securities Business Days prior to such specified date of determination (such prior date, a "*Periodic Daily SOFR Determination Date*"), as such rate is published by the SOFR Administrator on such Periodic Daily SOFR Determination Date; provided, that, (a) if, as of 5:00 P.M. on any Periodic Daily SOFR Determination Date, (i) the Daily SOFR Reference Rate has *not* been published by the SOFR Administrator, and (ii) a Benchmark Replacement Date with respect to the Daily SOFR Reference Rate has *not* occurred, then "*Daily SOFR*" shall instead mean the Daily SOFR Reference Rate as published by the SOFR Administrator on the first (1st) preceding U.S. Government Securities Business Day for which the Daily SOFR Reference Rate was published by the SOFR Administrator, so long as such first (1st) preceding U.S. Government Securities Business Day is *not more than* three (3) U.S. Government Securities Business Days prior to such Periodic Daily SOFR Determination Date, and (b) if, at any time, Daily SOFR (determined in accordance with the foregoing of this definition of "*Daily SOFR*", including in accordance with the foregoing clause (a) of this proviso) is *less than* the Floor, then Daily SOFR shall be deemed to equal the Floor for all purposes of this Agreement and the other Loan Documents. Any change(s) in Daily SOFR due to any change(s) in the Daily SOFR Reference Rate shall be effective from, and including, the effective date of any such change(s) in the Daily SOFR Reference Rate, without further notice to any Loan Party or Subsidiary, any other party to this Agreement or any other Loan Document, or any other Person.

"*Daily SOFR Reference Rate*" shall mean the rate per annum determined by the Administrative Agent as the daily published index rate based on SOFR.

"*Debtor Relief Laws*" shall mean the Bankruptcy Code, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief Laws of the United States or other applicable jurisdictions from time to time in effect.

"*Debtors*" shall have the meaning set forth in the recitals hereto.

"*Default*" shall mean any condition or event that, with the giving of notice or the lapse of time or both, would constitute an Event of Default.

"*Default Interest*" shall have the meaning set forth in Section 2.13(d).

"*Default Right*" has the meaning assigned to that term in, and shall be interpreted in accordance with, 12 C.F.R. §§–252.81, 47.2 or 382.1, as applicable.

"*Defaulting Lender*" shall mean, at any time, any Lender as to which the Administrative Agent has notified the Borrower that: (a) such Lender has failed, for three (3) or more Business Days, to comply with its obligations under this Agreement to make a Loan, unless such Lender notifies the Administrative Agent and the Borrower in writing that such failure is the result of such Lender's determination that one (1) or more conditions precedent to funding (each of which conditions precedent, together with any applicable default, shall be specifically identified in such writing) has not been satisfied (each, a "*funding obligation*"); (b) such Lender has notified the Administrative Agent or the Borrower, or has stated publicly, that it will not comply with any such funding obligation hereunder (unless such writing or public statement relates to such Lender's obligation to fund a Loan hereunder and states that such position is based on such Lender's determination that a condition precedent to funding (which condition precedent, together with any applicable default, shall be specifically identified in such writing or public statement) cannot be satisfied), or has defaulted on, its obligation to fund generally under any other loan agreement, credit agreement or other financing agreement; (c) such Lender has, for three (3) or more

Business Days, failed to confirm in writing to the Administrative Agent, in response to a written request of the Administrative Agent, that it will comply with its funding obligations hereunder (provided, that, such Lender shall cease to be a Defaulting Lender pursuant to this clause (c) upon receipt of such written confirmation by the Administrative Agent and the Borrower); (d) a Lender Insolvency Event has occurred and is continuing with respect to such Lender; or (e) such Lender has become the subject of a Bail-In Action. The Administrative Agent will promptly send to all parties hereto a copy of any notice to the Borrower provided for in this definition.

"*Disqualified Institution*" shall mean: (a) any competitor (as reasonably determined by the Borrower) identified in writing to the Administrative Agent on or prior to the Effective Date; and (b) any Affiliate of a "Disqualified Institution" described in the foregoing clause (a) of this definition of "Disqualified Institution"; provided, that, (i) "Disqualified Institution" shall exclude any Person that the Borrower has designated as no longer being a "Disqualified Institution" by written notice delivered to the Administrative Agent and the Lenders from time to time and (ii) notwithstanding anything to the contrary in the foregoing, no Person shall constitute a Disqualified Institution during the continuance of an Event of Default.

"*DIP Facility*" shall have the meaning set forth in the recitals hereto.

"*DIP Facility Available Amount*" shall mean, at any time, the *lesser* of (a) the Aggregate Revolving Commitment Amount and (b) the sum of the following:

(i) the Interim DIP Facility Amount, *plus*

(ii) from and after the Full DIP Commitment Date, an amount equal to $100,000,000 *minus* the Interim DIP Facility Amount, *plus*

(iii) from and after the Full DIP Commitment Date, an amount equal to the Roll-Up Amount.

"*DIP Facility Maturity Date*" shall mean the earliest to occur of the following:

(a) [reserved];

(b) the date upon which any Plan of Reorganization becomes effective;

(c) the date upon which the Sale Transaction is consummated; and

(d) May 24, 2023.

"*DIP Motion Concessions*" shall have the meaning set forth in the Final DIP Order (as in effect as of the First Amendment Effective Date).

"*Dollar(s)*" and the sign "$" shall mean lawful money of the United States.

"*Domestic Subsidiary*" shall mean any Subsidiary that is organized under the Laws of the United States or of any state, district or other political subdivision thereof.

"*DQ List*" shall have the meaning set forth in Section 11.4(h)(iv).

"*EEA Financial Institution*" shall mean: (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority; (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition; or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described the foregoing clauses (a) or (b) and is subject to consolidated supervision with its parent.

"*EEA Member Country*" shall mean any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"*EEA Resolution Authority*" shall mean any public administrative authority, or any Person entrusted with public administrative authority, of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"*Effective Date*" shall mean the date hereof.

"*Eligible Assignee*" shall mean any Person that meets the requirements to be an assignee as set forth in Section 11.4 (subject to such consents, if any, as may be required under Section 11.4(b)(iii)).

"*Environmental Laws*" shall mean all Laws, rules, regulations, codes, ordinances, orders, decrees, judgments, injunctions, notices or binding agreements issued, promulgated or entered into by or with any Governmental Authority, relating in any way to the environment, preservation or reclamation of natural resources, the management, Release or threatened Release of any Hazardous Material or to health and safety matters concerning exposure to Hazardous Materials.

"*Environmental Liability*" shall mean any liability, contingent or otherwise (including any liability for damages, costs of environmental investigation and remediation, costs of administrative oversight, fines, natural resource damages, penalties or indemnities), of any Loan Party or Subsidiary directly or indirectly resulting from, or based upon: (a) any actual or alleged violation of any Environmental Law; (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials; (c) any actual or alleged exposure to any Hazardous Materials; (d) the Release or threatened Release of any Hazardous Materials; or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"*ERISA*" shall mean the Employee Retirement Income Security Act of 1974 (29 U.S.C. §–18 *et seq.*), as amended and in effect from time to time, and any successor statute(s), together with any rules and regulations promulgated in connection therewith, any rulings or orders issued by any applicable Governmental Authorities (including, without limitation, the U.S. Department of Labor) thereunder, or the application or official interpretation of any of the foregoing.

"*ERISA Affiliate*" shall mean any Person that, for purposes of Title I or Title IV of ERISA or Section 412 of the Code, would be deemed, at any relevant time, to be a "single employer", or otherwise aggregated with any of the Loan Parties and Subsidiaries, under Section 414(b), Section 414(c), Section 414(m), or Section 414(o) of the Code, or Section 4001(b)(1) of ERISA.

"*ERISA Event*" shall mean: (a) any "reportable event", as defined in Section 4043 of ERISA with respect to a Plan (other than an event as to which the PBGC has waived, under subsection .22, .23, .25, .27 or .28 of PBGC Regulation Section 4042, the requirement of Section 4043(a) of ERISA that the PBGC be notified of such event); (b) any failure to make a required contribution to any Plan that would result in the imposition of a Lien or other encumbrance, or the provision of security, under Section 430 of the Code or Section 303 or Section 4068 of ERISA, or the arising of such a Lien or encumbrance, there being or arising any "unpaid minimum required contribution" or "accumulated funding deficiency" (each, as defined, or otherwise set forth, in Section 4971 of the Code or Part 3 of Subtitle B of Title 1 of ERISA), whether or not waived, or any filing of any request for, or receipt of, a minimum funding waiver under Section 412 of the Code or Section 302 of ERISA with respect to any Plan or Multiemployer Plan, or that such filing may be made, or any determination that any Plan is, or is expected to be, in at-risk status under Title IV of ERISA; (c) any incurrence by any Loan Party or Subsidiary, or any of their respective ERISA Affiliates, of any material liability under Title IV of ERISA with respect to any Plan or Multiemployer Plan (other than for premiums due and not delinquent under Section 4007 of ERISA); (d) any institution of proceedings, or the occurrence of any event or condition that would reasonably be expected to constitute grounds for the institution of proceedings, by the PBGC, under Section 4042 of ERISA for the

termination of, or the appointment of, a trustee to administer any Plan(s); (e) any incurrence by any Loan Party or Subsidiary, or any of their respective ERISA Affiliates, of any liability with respect to the withdrawal, or partial withdrawal, from any Plan or Multiemployer Plan; (f) the receipt by any Loan Party or Subsidiary, or any of their respective ERISA Affiliates, of any notice that a Multiemployer Plan is in endangered or critical status under Section 305 of ERISA; (g) any receipt by any Loan Party or Subsidiary, or any of their respective ERISA Affiliates, of any notice, or any receipt by any Multiemployer Plan from any Loan Party or Subsidiary, or any of their respective ERISA Affiliates, of any notice, in each case, concerning the imposition of Withdrawal Liability, or a determination that a Multiemployer Plan is, or is expected to be, insolvent or in reorganization, within the meaning of Title VI of ERISA; (h) engaging in a non-exempt prohibited transaction within the meaning of Section 4975 of the Code or Section 406 of ERISA that results in material liability to any Loan Party or Subsidiary; or (i) any filing of a notice of intent to terminate any Plan, if such termination would require material additional contributions in order to be considered a standard termination within the meaning of Section 4041(b) of ERISA, any filing under Section 4041(c) of ERISA of a notice of intent to terminate any Plan, or the termination of any Plan under Section 4041(c) of ERISA.

"*EU Bail-In Legislation Schedule*" shall mean the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor Person), as in effect from time to time.

"*Event of Default*" shall have the meaning set forth in <u>Section 8.1</u>.

"*Excluded Accounts*" shall mean: (a) deposit and/or securities accounts, the balance of which consists exclusively of (i) withheld income taxes and federal, state or local employment taxes, in such amounts as are required, in the reasonable judgment of the Borrower, to be paid to the IRS or state or local government agencies within the following two (2) months, with respect to employees of any of the Loan Parties, or (ii) amounts required to be paid over to an employee benefit plan pursuant to DOL Reg. §–2510.3–102 on behalf of, or for the benefit of, employees of one (1) or more Loan Parties; and (b) all tax accounts (including, without limitation, sales tax accounts), accounts used *solely* for payroll, accounts maintained *solely* in trust for the benefit of third parties and fiduciary purposes, escrow accounts, zero balance or swept accounts, and employee benefit accounts (including 401(k) accounts and pension fund accounts), in each case of this <u>clause (b)</u>, so long as such account is used *solely* for such purpose.

"*Excluded Property*" shall mean, with respect to any Loan Party: (a) Avoidance Actions (other than such actions arising under Sections 549 and 550 (other than with respect to any applicability to section 549 of the Bankruptcy Code), which shall not constitute Excluded Property), and the proceeds thereof; (b) Excluded Accounts; (c) the Capital Stock held by any Loan Party in (i) any Foreign Subsidiary that is not a direct Subsidiary of a Loan Party and (ii) any direct Subsidiary of any Loan Party that is an Excluded Subsidiary solely pursuant to clause (iii) of such definition, except for (A) sixty-five percent (65.0%) of the issued and outstanding Capital Stock in any such Subsidiary entitled to vote (within the meaning of Treasury Regulations Section 1.956-2(c)(2)) and (B) one hundred percent (100.0%) of the issued and outstanding Capital Stock in any such Subsidiary not entitled to vote (within the meaning of Treasury Regulations Section 1.956-2(c)(2)); and (d) any license of intellectual property in favor of such Loan Party to the extent the grant of a security interest in or Lien upon such license is prohibited under applicable non-bankruptcy Law, <u>provided</u>, <u>that</u>, the foregoing prohibition (i) shall only apply to the extent that such prohibition (A) could not be rendered ineffective pursuant to the UCC or other applicable non-bankruptcy Law or (B) is not terminated or eliminated to the extent sufficient to permit any such license to become Collateral or (ii) shall not limit, impair or otherwise affect any of the Administrative Agent's continuing security interests in and Liens upon any rights or interests of any Loan Party in or to (A) monies due or to become due under or in connection with any such license or (B) any proceeds from the sale, license, lease, or other disposition of any such license.

"*Excluded Subsidiary*" shall mean, collectively, each Subsidiary that is (i) not a Loan Party under the Prepetition Credit Agreement as of the Petition Date, (ii) is not a Debtor at the applicable time of determination or (iii) a Foreign Subsidiary (or any Subsidiary of any Foreign Subsidiary).

"*Excluded Taxes*" shall mean any of the following Taxes imposed on, or with respect to, a Recipient, or required to be withheld or deducted from a payment to a Recipient: (a) Taxes imposed on, or measured by, net income (however denominated), franchise Taxes, and branch profits Taxes, in each case of this clause (a), (i) imposed as a result of such Recipient being organized under the Laws of, or having its principal office, or, in the case of any Lender, its Applicable Lending Office, in the jurisdiction imposing such Tax (or any political subdivision thereof), or (ii) that are Other Connection Taxes; (b) in the case of a Lender, U.S. federal withholding Taxes imposed on amounts payable to, or for the account of, such Lender with respect to an applicable interest in a Loan or Commitment, pursuant to a Law in effect on the date on which (i) such Lender acquires such interest in the Loan or Commitment (other than pursuant to an assignment request by the Borrower under Section 2.25), or (ii) such Lender changes its lending office, except, in each case of this clause (b), to the extent that, pursuant to Section 2.20, amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender became a party hereto or to such Lender immediately before it changed its lending office; (c) Taxes attributable to such Recipient's failure to comply with Section 2.20(g); and (d) any U.S. federal withholding Taxes imposed under FATCA.

"*Facility Termination Date*" means the date as of which all of the following shall have occurred: (a) the Commitments have expired or been terminated; and (b) all Obligations have been paid in full in cash or immediately available funds (other than contingent indemnification obligations for which no claim has been asserted) or, with respect to any Obligations constituting Bank Product Obligations, other arrangements with respect thereto satisfactory to the applicable Bank Product Provider shall have been made.

"*FATCA*" shall mean Sections 1471 through 1474 of the Code, as in effect as of the Effective Date (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof, any agreements entered into pursuant to Section 1471(b)(1) of the Code, any applicable intergovernmental agreements implementing any of the foregoing, and any fiscal or regulatory legislation, rules or practices adopted pursuant to any such intergovernmental agreements.

"*FDA*" shall mean the U.S. Food and Drug Administration, or any Governmental Authority succeeding to any of its principal functions.

"*FD&C Act*" shall mean the U.S. Federal Food, Drug, and Cosmetic Act of 1938 (21 U.S.C. §–301 *et seq.*), as amended and in effect from time to time, and any successor statute(s), together with any rules and regulations promulgated in connection therewith, any rulings or orders issued by any applicable Governmental Authorities (including, without limitation, the FDA) thereunder, or the application or official interpretation of any of the foregoing.

"*Federal Funds Rate*" shall mean, for any date of determination, the rate per annum (expressed as a decimal, rounded upwards, if necessary, to the next higher one one-hundredth of one percent (0.01%)) equal to the weighted average of the rates on overnight federal funds transactions with member banks of the Federal Reserve System, as published by the FRBNY on the Business Day next succeeding such day; provided, that, (a) if such day is *not* a Business Day, the Federal Funds Rate for such day shall be such rate on such transactions on the next preceding Business Day as so published on the next succeeding Business Day, and (b) if no such rate is so published on such next succeeding Business Day, the Federal Funds Rate for such day shall be the average rate per annum (expressed as a decimal, rounded upwards, if necessary, to the next higher one one-hundredth of one percent (0.01%)) of the quotations for such day on such transactions received by the Administrative Agent from *at least* three (3) federal funds brokers of recognized good standing selected by the Administrative Agent, as determined by the Administrative Agent. Notwithstanding anything to the contrary in the foregoing, if, at any time, the Federal Funds Rate is *less than* the Floor, then the Federal Funds Rate shall be deemed to equal the Floor for all purposes of this Agreement and the other Loan Documents.

"*Federal Reserve Board*" shall mean the Board of Governors of the Federal Reserve System (or any successor).

"*Fee Letter*" shall mean that certain letter agreement, dated as of the date hereof, executed by Truist and accepted by the Borrower.

"*Final DIP Order*" shall mean, collectively, the final order or orders entered by the Bankruptcy Court with respect to the Loan Parties in the Chapter 11 Case after a final hearing under Bankruptcy Rule 4001(c)(2) or such other procedures as approved by the Bankruptcy Court, which order shall be substantially in the form of the Interim DIP Order (with only such modifications thereto as are satisfactory in form and substance to the Administrative Agent), and from which no appeal or motion to reconsider has been timely filed, or if timely filed, the making of the Loans and/or the performance by any Loan Party of any of their respective obligations under any of the Loan Documents, and the rights and remedies granted to the Administrative Agent and the Lenders pursuant to this Agreement and the other Loan Documents, shall not be the subject of a presently effective stay pending such appeal (unless the Administrative Agent waives such requirement), together with all extensions, modifications and amendments thereto, in form and substance satisfactory to the Administrative Agent.

"*Final DIP Order Entry Date*" shall mean the date on which the Final DIP Order (which, for purposes of this definition, shall be determined without regard to whether or not the time to appeal, petition for certiorari, or move for re-argument or rehearing has expired) shall have been entered on the docket of the Bankruptcy Court in the Chapter 11 Case.

"*First Amendment Effective Date*" shall mean January [--], 2023.

"*Fiscal Quarter*" shall mean any fiscal quarter of the Borrower.

"*Fiscal Year*" shall mean any fiscal year of the Borrower.

"*Flood Insurance Laws*" shall mean, collectively: (a) the National Flood Insurance Reform Act of 1994 (which comprehensively revised the National Flood Insurance Act of 1968 and the Flood Disaster Protection Act of 1973), as now or hereafter in effect, or any successor statute thereto; (b) the Flood Insurance Reform Act of 2004, as now or hereafter in effect, or any successor statute thereto; and (c) the Biggert-Waters Flood Insurance Reform Act of 2012, as now or hereafter in effect, or any successor state thereto.

"*Floor*" shall mean a rate of interest equal to three-fourths of one percent (0.75%) per annum (subject to the proviso to the last sentence of Section 2.16(a)).

"*Foreign Lender*" shall mean: (a) if the Borrower is a U.S. Person, a Lender that is not a U.S. Person; and (b) if the Borrower is *not* a U.S. Person, a Lender that is resident, or organized under the Laws, of a jurisdiction other than the jurisdiction in which the Borrower is resident for tax purposes.

"*Foreign Subsidiary*" shall mean any Subsidiary that is *not* a Domestic Subsidiary.

"*FRBNY*" shall mean the Federal Reserve Bank of New York (or any successor).

"*Full DIP Commitment Date*" shall mean the first date as of which all of the following shall have occurred: (a) the entry of the Final DIP Order shall have occurred; and (b) no Default or Event of Default shall have occurred and be continuing.

"*GAAP*" shall mean generally accepted accounting principles in the United States, applied on a consistent basis and subject to the terms of Section 1.3.

"*Governmental Authority*" shall mean the government of the United States, any other nation, or any political subdivision of any of the foregoing, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or

administrative powers or functions of, or pertaining to, government (including, without limitation, the FDA and any supra-national bodies such as the European Union or the European Central Bank).

"*Guarantee*" of or by any Person (the "*guarantor*") shall mean any obligation, contingent or otherwise, of the guarantor guaranteeing, or having the economic effect of guaranteeing, any Indebtedness or other obligation of any other Person (the "*primary obligor*") in any manner, whether directly or indirectly, and including any obligation, direct or indirect, of the guarantor (a) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation, or to purchase (or to advance or supply funds for the purchase of) any security for the payment thereof, (b) to purchase or lease property, securities or services for the purpose of assuring the owner of such Indebtedness or other obligation of the payment thereof, (c) to maintain working capital, equity capital, or any other financial statement condition or liquidity of the primary obligor, so as to enable the primary obligor to pay such Indebtedness or other obligation, or (d) as an account party in respect of any letter of credit or letter of guaranty issued in support of such Indebtedness or obligation; provided, that, the term "*Guarantee*" shall not include endorsements for collection or deposit in the ordinary course of business. The amount of any Guarantee shall be deemed to be an amount equal to the stated or determinable amount of the primary obligation in respect of which such Guarantee is made, or, if not so stated or determinable, the maximum reasonably anticipated liability in respect thereof (assuming that such Person is required to perform thereunder), as determined by such Person in good faith. The term "*Guarantee*" used as a verb shall have a corresponding meaning.

"*Guarantor Joinder Agreement*" shall mean a joinder agreement, substantially in the form of Exhibit 5.13, executed and delivered by a Subsidiary in accordance with the provisions of Section 5.13, or any other documents as the Administrative Agent shall deem appropriate for such purpose.

"*Guarantors*" shall mean, collectively: (a) each Subsidiary identified as a "*Guarantor*" on the signature pages hereto; (b) each Person that joins as a Guarantor pursuant to Section 5.13 or otherwise; (c) with respect to any Bank Product Obligations owing by any Loan Party (other than the Borrower) or Subsidiary, the Borrower; and (d) the successors and permitted assigns of each such Person referred to in the foregoing clauses (a) through (c).

"*Guaranty*" shall mean that certain Guaranty made by the Guarantors in favor of the Administrative Agent, for the ratable benefit of the holders of the Obligations, pursuant to Article X.

"*Hazardous Materials*" shall mean all explosive or radioactive substances or wastes and all hazardous or toxic substances, wastes or other pollutants, including petroleum or petroleum distillates, asbestos or asbestos containing materials, polychlorinated biphenyls, radon gas, infectious or medical wastes and all other substances or wastes of any nature regulated pursuant to any Environmental Law.

"*Healthcare Law*" shall mean, individually or collectively (as the context may require), (a) the FD&C Act, and (b) any and all other applicable Laws, regulations, manual provisions, policies and administrative guidance, applicable to any Loan Party or Subsidiary, in respect of each of the foregoing clauses (a) and (b), as may be amended and in effect from time to time.

"*Hedge Termination Value*" shall mean, in respect of any one (1) or more Hedging Transactions, after taking into account the effect of any legally enforceable netting agreement relating to such Hedging Transactions: (a) for any date on or after the date on which such Hedging Transactions have been closed out and termination value(s) have been determined in accordance therewith, such termination value(s); and (b) for any date prior to the date referenced in clause (a) above, the amount(s) determined as the mark-to-market value(s) for such Hedging Transactions, as determined based upon one (1) or more mid-market or other readily available quotations provided by any recognized dealer in such Hedging Transactions (which, for the avoidance of doubt, may include any Lender or any Affiliate of a Lender).

"*Hedging Obligations*" of any Person shall mean any and all obligations of such Person, whether absolute or contingent, and howsoever and whensoever created, arising, evidenced or acquired, under: (a) any and all Hedging Transactions; (b) any and all cancellations, buy backs, reversals, terminations, or assignments of any Hedging Transactions; and (c) any and all renewals, extensions and modifications of any Hedging Transactions, and any and all substitutions for any Hedging Transactions.

"*Hedging Transaction*" of any Person shall mean: (a) any transaction (including an agreement with respect to any such transaction) now existing, or hereafter entered into, by such Person that is a rate swap transaction, swap option, basis swap, forward rate transaction, commodity swap, commodity option, equity or equity index swap or option, bond option, interest rate option, foreign exchange transaction, cap transaction, floor transaction, collar transaction, currency swap transaction, cross-currency rate swap transaction, currency option, spot transaction, credit protection transaction, credit swap, credit default swap, credit default option, total return swap, credit spread transaction, repurchase transaction, reverse repurchase transaction, buy/sell-back transaction, securities lending transaction, or any other similar transaction (including any option with respect to any of these transactions) or any combination thereof, whether or not any such transaction is governed by, or subject to, any Master Agreement; and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any Master Agreement, including any such obligations or liabilities under any Master Agreement.

"*Hemp*" has the meaning set forth in the Agriculture Improvement Act of 2018 (7 U.S.C. ch. 38 §§–1639o, *et seq.*), as amended, restated or replaced from time to time.

"*Indebtedness*" of any Person shall mean, without duplication: (a) all obligations of such Person for borrowed money; (b) all obligations of such Person evidenced by bonds, debentures, notes or other similar instruments; (c) all obligations of such Person in respect of the deferred purchase price of property or services (other than trade payables incurred in the ordinary course of business, provided, that, for purposes of Section 8.1(f), trade payables overdue by more than one-hundred twenty (120) days shall be included in this definition of "Indebtedness", except to the extent that any of such trade payables are being disputed in good faith and by appropriate measures); (d) all obligations of such Person under any conditional sale or other title retention agreement(s) relating to property acquired by such Person; (e) all Capital Lease Obligations of such Person; (f) all obligations, contingent or otherwise, of such Person in respect of letters of credit, acceptances or similar extensions of credit and all Contingent Liabilities; (g) all obligations of such Person, contingent or otherwise, to purchase, redeem, retire or otherwise acquire for value any Capital Stock of such Person; (h) Off-Balance Sheet Liabilities; (i) the Hedge Termination Value of all Hedging Obligations; (j) all Guarantees of such Person of the type of Indebtedness described in clauses (a) through (i) above; and (k) all Indebtedness of a third-party secured by any Lien on property owned by such Person, whether or not such Indebtedness has been assumed by such Person. The Indebtedness of any Person shall *include* the Indebtedness of any partnership or joint venture in which such Person is a general partner or a joint venturer, except to the extent that the terms of such Indebtedness provide that such Person is not liable therefor.

"*Indemnified Taxes*" shall mean: (a) Taxes, other than Excluded Taxes, imposed on, or with respect to, any payment made by, or on account of, any obligation of any Loan Party under any Loan Document; and (b) to the extent not otherwise described in clause (a) above, Other Taxes.

"*Indemnitee*" shall have the meaning set forth in Section 11.3(b).

"*Initial Budget*" shall have the meaning set forth in Section 3.1(h).

"*Interest Period*" shall mean, with respect to any SOFR Borrowing or any SOFR Loan, a period of one (1) month (subject to availability), provided, that:

(a)    the initial Interest Period for such Borrowing shall commence on the date of such Borrowing (including the date of any conversion from a Borrowing of another Type), and each Interest Period occurring

thereafter in respect of such Borrowing shall commence on the day on which the next preceding Interest Period expires;

(b)     if any Interest Period would otherwise end on a day other than a Business Day, such Interest Period shall be extended to the next succeeding Business Day, unless such Business Day falls in another calendar month, in which case, such Interest Period would end on the next preceding Business Day;

(c)     any Interest Period which begins on the last Business Day of a calendar month, or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period, shall end on the last Business Day of such calendar month;

(d)     [reserved];

(e)     no Interest Period may extend beyond the Revolving Commitment Termination Date; and

(f)     notwithstanding anything to the contrary in the foregoing of this definition of "*Interest Period*" or elsewhere in this Agreement or any other Loan Document, no tenor that has been removed from this definition of "*Interest Period*" by operation of Section 2.16(e) shall be available for specification by the Borrower in any Notice of Borrowing and/or any Notice of Conversion / Continuation, as applicable.

"*Interim DIP Facility Amount*" means $34,000,000.

"*Interim DIP Order*" shall mean, collectively, the interim order or orders entered by the Bankruptcy Court with respect to the Loan Parties in the Chapter 11 Case after an interim hearing, together with all extensions, modifications and amendments thereto, in form and substance satisfactory to the Administrative Agent, which, among other matters but not by way of limitation, authorizes, on an interim basis, the Loan Parties to execute and perform under the terms of this Agreement and the other Loan Documents, as applicable, pay all fees and expenses provided for herein, and incur (and guarantee) and secure the Loans and other Obligations in connection therewith, and which approves all of the rights and remedies granted to the Administrative Agent and the Lenders pursuant to this Agreement and the other Loan Documents, which order shall be in form and substance satisfactory to the Administrative Agent, and which shall be deemed satisfactory to the Administrative Agent if such order is substantially in the form of Exhibit 1.1.

"*Interim DIP Order Entry Date*" shall mean the date on which the Interim DIP Order was entered on the docket of the Bankruptcy Court in the Chapter 11 Case.

"*Investment Banker*" shall mean any investment banking firm satisfactory to the Administrative Agent (it being understood that Rothschild & Co US Inc. is satisfactory) retained by the Loan Parties to market the assets of the Loan Parties and their Subsidiaries for sale.

"*Investment Company Act*" shall mean the Investment Company Act of 1940 (15 U.S.C. §§–80a-1, 80a-64 *et seq.*), as amended and in effect from time to time, and any successor statute(s), together with any rules and regulations promulgated in connection therewith, any rulings or orders issued by any applicable Governmental Authorities (including, without limitation, the SEC) thereunder, or the application or official interpretation of any of the foregoing.

"*Investments*" shall mean, as to any Person, any direct or indirect acquisition of or relating to, or investment by, such Person (including pursuant to any merger with any Person that was *not* a Wholly-Owned Subsidiary prior to such merger), whether by means of: (a) any purchase or other acquisition of any Capital Stock in another Person; (b) any loan or advance to, any other evidence of Indebtedness of, any other security (including, without limitation, any option, warrant, or other right to acquire any of the foregoing) of, any Guarantee or assumption of any Indebtedness or obligations of, any purchase or other acquisition of any Indebtedness of, any capital contribution to, and/or any equity participation or other interest in, another Person; or (c) an Acquisition.

For purposes of calculating compliance with the financial covenants set forth in <u>Article VI</u> (and, for purposes of any calculations substantially based on, or derivative from, such compliance), the amount of any Investment shall be deemed to be the amount *actually* invested, without adjustment for subsequent increases or decreases in the value of such Investment.

"<u>*IP Notice Filings*</u>" shall mean, collectively, (a) with regard to any Copyrights, a Notice of Grant of Security Interest in Copyrights for filing with the United States Copyright Office, (b) with regard to any Patents, a Notice of Grant of Security Interest in Patents for filing with the United States Patent and Trademark Office, and (c) with regard to any Trademarks, a Notice of Grant of Security Interest in Trademarks for filing with the United States Patent and Trademark Office, in each case of the foregoing clauses (a) through (c), substantially in the form of the applicable Exhibit to the Security Agreement (or such other form as reasonably requested by the Administrative Agent) that are, or are required to be, filed under, or in connection with, the Security Agreement.

"<u>*IP Rights*</u>" shall mean all of the trademarks, service marks, trade names, copyrights, patents, patent rights, franchises, licenses, and other intellectual property rights that are reasonably necessary for the operation of their respective businesses that any Loan Party or Subsidiary owns, or possesses the legal right to use.

"<u>*IRS*</u>" shall mean the United States Internal Revenue Service.

"<u>*Laws*</u>" or "<u>*Law*</u>" shall mean, collectively, all international, foreign, federal, state and local statutes, treaties, rules, guidelines, regulations, ordinances, codes and administrative or judicial precedents or authorities, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and all applicable administrative orders, directed duties, requests, licenses, authorizations and permits of, and agreements with, any Governmental Authority, in each case, whether or not having the force of law.

"<u>*Lender Insolvency Event*</u>" shall mean that (a) a Lender or its Parent Company is insolvent, or is generally unable to pay its debts as they become due, or admits in writing its inability to pay its debts as they become due, or makes a general assignment for the benefit of its creditors, (b) a Lender or its Parent Company is the subject of a bankruptcy, insolvency, reorganization, liquidation or similar proceeding, or a receiver, trustee, conservator, custodian or the like has been appointed for such Lender or its Parent Company, or such Lender or its Parent Company has taken any action in furtherance of, or indicating its consent to, or acquiescence in, any such proceeding or appointment, or (c) a Lender or its Parent Company has been adjudicated as, or determined by any Governmental Authority having regulatory authority over such Person or its property or assets to be, insolvent; <u>provided</u>, <u>that</u>, for the avoidance of doubt, a Lender Insolvency Event shall *not* be deemed to have occurred *solely* by virtue of the ownership or acquisition of any equity interest in or control of a Lender or a Parent Company thereof by a Governmental Authority or an instrumentality thereof.

"<u>*Lenders*</u>" shall mean each of the Persons identified as a "<u>*Lender*</u>" on the signature pages hereto, and each of their respective successors and assigns.

"<u>*Lien*</u>" shall mean any mortgage, pledge, security interest, lien (statutory or otherwise), charge, encumbrance, hypothecation, assignment, deposit arrangement, or other arrangement having the practical effect of any of the foregoing, or any preference, priority or other security agreement or preferential arrangement of any kind or nature whatsoever (including, without limitation, any conditional sale or other title retention agreement and any Capital Lease having the same economic effect as any of the foregoing).

"<u>*Liquidity*</u>" shall mean, as of any date of determination, the sum of (a) Unrestricted Cash as of such date *plus* (b) the difference between (i) the DIP Facility Available Amount as of such date *minus* (ii) the Aggregate Revolving Credit Exposure as of such date.

"*Loan Documents*" shall mean, collectively, this Agreement, the Collateral Documents, the Fee Letter, all Notices of Borrowing, all Notices of Conversion / Continuation, any promissory notes issued hereunder, and any and all other instruments, agreements, documents and writings executed in connection with any of the foregoing.

"*Loan Parties*" shall mean, collectively, the Borrower and each Guarantor.

"*Loans*" shall mean all Revolving Loans in the aggregate or any of them, as the context shall require.

"*Master Agreement*" shall mean any form of master agreement published by the International Swaps and Derivatives Association, Inc. or any executed master agreement based on such form, any International Foreign Exchange Master Agreement, or any other master agreement relating to the documentation of, or entered into in connection with, any Hedging Transactions (any such master agreement, together with any related schedules and/or annexes thereto, a "*Master Agreement*").

"*Material Adverse Effect*" shall mean, with respect to any event, act, condition or occurrence of whatever nature (including any adverse determination in any litigation, arbitration, or governmental investigation or proceeding), whether singularly or in conjunction with any other event(s), act(s), condition(s) and/or occurrence(s), whether or not related, resulting in a material adverse change in, or a material adverse effect on: (a) the business, results of operations, financial condition, assets or liabilities of the Loan Parties and Subsidiaries, taken as a whole; (b) the ability of the Loan Parties to perform any of their respective obligations under the Loan Documents; (c) the rights and remedies of the Administrative Agent and the Lenders under any of the Loan Documents; or (d) the legality, validity or enforceability against any Loan Party of any of the Loan Documents to which it is party; *provided*, that, changes, events, effects, or circumstances which, directly or indirectly, to the extent they relate to or result from the following, shall be excluded from the determination of a Material Adverse Effect: (i) the filing of the Chapter 11 Case and the circumstances and events leading up thereto to the extent such event(s) would reasonably be expected to result therefrom (including, without limitation, any defaults under Prepetition agreements, so long as the exercise of remedies as a result of such defaults are stayed under the Bankruptcy Code or such agreements are voided or invalidated by the Bankruptcy Court); (ii) any litigation or claim threatened or initiated by creditors of the Loan Parties against the Loan Parties or any of their respective officers or directors, in each case, arising out of filing of the Chapter 11 Case or the transactions contemplated thereby; and (iii) the existence of any Prepetition claim or liability which is unsecured and junior in priority to the Obligations.

"*Material Indebtedness*" shall mean any Indebtedness (other than the Loans) and Hedging Obligations of any Loan Party or any Subsidiary owing to any Person, individually or, together with all other such Indebtedness (other than the Loans) and Hedging Obligations of the Loan Parties and Subsidiaries owing to such Person and/or its Affiliates, in an aggregate, committed or outstanding principal amount in *excess* of the Threshold Amount. For purposes of determining the amount of attributed Indebtedness from Hedging Obligations, the "*principal amount*" of any Hedging Obligations at any time shall be deemed to be the Net Mark-to-Market Exposure of such Hedging Obligations.

"*Maximum Rate*" shall have the meaning set forth in Section 11.12.

"*Moody's*" shall mean Moody's Investors Service, Inc.

"*Mortgaged Property*" shall mean, collectively, all Real Estate subject, or required hereunder or under any Collateral Document to be subject, to a Mortgage.

"*Mortgages*" shall mean, collectively with respect to all of the Real Estate, each mortgage, deed of trust, trust deed, security deed, debenture, deed of immovable hypothec, deed to secure debt, or similar document or instrument that grants, or purports to grant, to the Administrative Agent, for the ratable benefit of the holders of the Obligations, a security interest in such Real Estate, each in form and substance satisfactory to the

Administrative Agent (as the same may be amended, restated, amended and restated, supplemented, increased, extended, refinanced, renewed, replaced, and/or otherwise modified in writing from time to time).

"*Multiemployer Plan*" shall mean any "multiemployer plan", as defined in Section 4001(a)(3) of ERISA, which is contributed to by (or to which there is, or may be, an obligation to contribute of) any Loan Party or Subsidiary, or any of their respective ERISA Affiliates, and each such plan for the five (5) year period immediately following the latest date on which any Loan Party or Subsidiary, or any of their ERISA Affiliates, contributed to, or had an obligation to contribute to, such plan.

"*Net Cash Proceeds*" shall mean the aggregate cash or Cash Equivalents proceeds received by any Loan Party or Subsidiary in respect of any Asset Sale, Recovery Event, or any issuance of Indebtedness or Capital Stock, net of: (a) direct costs incurred in connection therewith (including legal, accounting and investment banking fees, and sales commissions); (b) taxes paid or payable as a result thereof; and (c) in the case of any Asset Sale or any Recovery Event, the amount necessary to retire any Indebtedness secured by a Lien permitted by Section 7.2 (ranking senior to any Lien of the Administrative Agent) on the related property.

"*Net Mark-to-Market Exposure*" of any Person shall mean, as of any date of determination with respect to any Hedging Obligation, the *excess* (if any) of all unrealized losses *over* all unrealized profits of such Person arising from such Hedging Obligation. "*Unrealized losses*" shall mean the fair market value of the cost to such Person of replacing the Hedging Transaction giving rise to such Hedging Obligation as of the date of determination (assuming that such Hedging Transaction were to be terminated as of that date), and "*unrealized profits*" shall mean the fair market value of the gain to such Person of replacing such Hedging Transaction as of the date of determination (assuming such Hedging Transaction were to be terminated as of that date).

"*Non-Consenting Lender*" shall have the meaning set forth in Section 2.25.

"*Non-Defaulting Lender*" shall mean, at any time, a Lender that is not a Defaulting Lender.

"*Non-U.S. Plan*" shall mean any plan, fund (including, without limitation, any superannuation fund), or other similar program established, contributed to (regardless of whether through direct contributions or through employee withholding), or maintained outside the United States by any Loan Party or Subsidiary primarily for the benefit of employees of such Loan Party or Subsidiary residing outside of the United States, which plan, fund, or other similar program provides, or results in, retirement income, a deferral of income in contemplation of retirement, or payments to be made upon termination of employment, and which plan is *not* subject to ERISA or the Code.

"*Note*" shall have the meaning set forth in Section 2.10(b).

"*Notice of Borrowing*" shall have the meaning set forth in Section 2.3.

"*Notice of Conversion / Continuation*" shall have the meaning set forth in Section 2.7(b).

"*Obligations*" shall mean, collectively, (a) all amounts owing by the Loan Parties to the Administrative Agent or any Lender pursuant to, or in connection with, this Agreement or any other Loan Document, or otherwise with respect to any Commitment, any Loan, including, without limitation, all principal, interest (including any interest accruing after the filing of any petition in bankruptcy or the commencement of any insolvency, reorganization or like proceeding relating to any Loan Party, whether or not a claim for post-filing or post-petition interest is allowed in such proceeding), all reimbursement obligations, fees, expenses, indemnification and reimbursement payments, costs and expenses (including all fees and expenses of counsel to the Administrative Agent incurred pursuant to this Agreement or any other Loan Document), whether direct or indirect, absolute or contingent, liquidated or unliquidated, now existing or hereafter arising hereunder or thereunder, and (b) all Bank Product Obligations, together with all renewals, extensions, modifications and/or refinancings of any of the foregoing.

"*OFAC*" shall mean the U.S. Department of the Treasury's Office of Foreign Assets Control.

"*Off-Balance Sheet Liabilities*" of any Person shall mean: (a) any repurchase obligation or liability of such Person with respect to accounts or notes receivable sold by such Person; (b) any liability of such Person under any sale and leaseback transactions that do *not* create a liability on the balance sheet of such Person; (c) any Synthetic Lease Obligation; or (d) any obligation arising with respect to any other transaction that is the functional equivalent of, or takes the place of, borrowing but which does *not* constitute a liability on the balance sheet of such Person.

"*Operating Lease*" shall mean any lease of, or other agreement conveying the right to use, any real or personal property by any Loan Party, as lessee, other than any Capital Lease.

"*Orders*" shall mean, collectively, the Interim DIP Order and the Final DIP Order.

"*Organization Documents*" shall mean: (a) with respect to any corporation, the certificate or articles of incorporation and the bylaws (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction); (b) with respect to any limited liability company, the certificate or articles of formation or organization and operating agreement; and (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization, and any agreement, instrument, filing or notice with respect thereto, filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization, and, if applicable, any certificate or articles of formation or organization of such entity.

"*OSHA*" shall mean the Occupational Safety and Health Act of 1970 (29 U.S.C. §–15 *et seq.*), as amended and in effect from time to time, and any successor statute(s), together with any rules and regulations promulgated in connection therewith, any rulings or orders issued by any applicable Governmental Authorities (including, without limitation, the U.S. Occupational Safety and Health Administration and the National Institute for Occupational Safety and Health) thereunder, or the application or official interpretation of any of the foregoing.

"*Other Connection Taxes*" shall mean, with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Tax (other than connections arising from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

"*Other Taxes*" shall mean all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to Section 2.25).

"*Outside Date*" shall have the meaning set forth in Section 5.18(d).

"*Parent Company*" shall mean, with respect to a Lender, the "bank holding company" (as defined in Regulation Y), if any, of such Lender, and/or any Person owning, beneficially or of record, directly or indirectly, a majority of the shares of such Lender.

"*Participant*" shall have the meaning set forth in Section 11.4(d).

"*Participant Register*" shall have the meaning set forth in Section 11.4(e).

"*Patents*" shall have the meaning set forth in the Security Agreement.

"*Patriot Act*" shall mean the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Pub. L. §–107–56), as amended and in effect from time to time, and any successor statute(s), together with any rules and regulations promulgated in connection therewith, any rulings or orders issued by any applicable Governmental Authorities thereunder, or the application or official interpretation of any of the foregoing.

"*Payment Office*" shall mean the office of the Administrative Agent located at 303 Peachtree Street, N.E., Atlanta, Georgia 30308, or such other location as to which the Administrative Agent shall have given written notice to the Borrower and the Lenders.

"*PBGC*" shall mean the U.S. Pension Benefit Guaranty Corporation, as referred to and defined in ERISA, and any successor entity performing similar functions.

"*Periodic Daily SOFR Determination Date*" shall have the meaning provided for such term in the definition of "*Daily SOFR*" above.

"*Periodic Term SOFR Determination Date*" shall have the meaning provided for such term in the definition of "*Term SOFR*" below.

"*Permitted Encumbrances*" shall mean:

(a)     Liens imposed by Law for taxes not yet due or which are being contested in good faith by appropriate proceedings diligently conducted and with respect to which adequate reserves are being maintained in accordance with GAAP;

(b)     statutory Liens of landlords, carriers, warehousemen, mechanics, materialmen and other Liens imposed by Law in the ordinary course of business for amounts not yet due, or which are being contested in good faith by appropriate proceedings and with respect to which adequate reserves are being maintained in accordance with GAAP;

(c)     pledges and deposits made in the ordinary course of business in compliance with workers' compensation, unemployment insurance and other social security Laws or regulations;

(d)     deposits to secure the performance of bids, trade contracts, leases, statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature, in each case in the ordinary course of business;

(e)     judgment and attachment Liens not giving rise to a Default or an Event of Default, or Liens created by, or existing from, any litigation or legal proceeding that are currently being contested in good faith by appropriate proceedings and with respect to which adequate reserves are being maintained in accordance with GAAP;

(f)     customary rights of set-off, revocation, refund or chargeback under deposit agreements, the UCC, or common law of banks or other financial institutions where any Loan Party or Subsidiary maintains deposits (other than deposits intended as cash collateral) in the ordinary course of business;

(g)     Liens consisting of precautionary filings of UCC financing statements filed with respect to Operating Leases permitted hereunder, and any interest of title of a lessor under any Operating Lease permitted hereunder; and

(h)     easements, zoning restrictions, rights-of-way and similar encumbrances on any Real Estate imposed by Law, or arising in the ordinary course of business, that do *not* secure any monetary obligations and

do *not* materially detract from the value of the affected property or materially interfere with the ordinary conduct of business of the Loan Parties and Subsidiaries, taken as a whole;

provided, that, the term "*Permitted Encumbrances*" shall *not* include any Lien securing borrowed money.

"*Permitted Holders*" shall mean: (a) John Henry Owoc, an individual resident of the State of Florida; and (b) any trust or other estate-planning vehicle established for the benefit of any such individual, or any other individual having a relationship by blood (to the second (2nd) degree of consanguinity), marriage, or adoption to any such individual, and, in respect of which, such individual serves as sole trustee or in a similar capacity.

"*Permitted Prior Liens*" shall have the meaning specified in Section 2.27(a).

"*Permitted Refinancing*" means any extension, renewal or replacement of any existing Indebtedness so long as any such renewal, refinancing and extension of such Indebtedness: (a) has market terms and conditions; (b) has an average life to maturity that is *greater than* or *equal to* that of the Indebtedness being extended, renewed or refinanced; (c) does *not* include a Loan Party as an obligor that was not an obligor with respect to the Indebtedness being extended, renewed or refinanced; (d) remains subordinated, if the Indebtedness being refinanced or extended was subordinated to the prior payment of the Obligations; (e) does *not exceed* in a principal amount the Indebtedness being renewed, extended or refinanced *plus* reasonable fees and expenses incurred in connection therewith; and (f) is *not* incurred, created or assumed, if any Default or Event of Default has occurred and continues to exist or would result therefrom.

"*Person*" shall mean any natural person or individual, corporation, limited liability company, trust, joint venture, association, company, firm, partnership (whether a general partnership, a limited partnership or otherwise), Governmental Authority, or other entity.

"*Personal Information*" shall mean: (a) all information that could reveal the identity of any natural Person; and (b) all other information regarding natural Persons, the collection, use, or disclosure of which is subject to applicable Privacy Laws.

"*Petition Date*" shall have the meaning set forth in the recitals hereto.

"*Plan*" shall mean any "employee benefit plan" as defined in Section 3 of ERISA (other than a Multiemployer Plan) subject to Section 412 of the Code and/or Title IV of ERISA that is maintained or contributed to by any Loan Party or Subsidiary, or to which any Loan Party or Subsidiary has, or may have, an obligation not contribute, and each such plan that is subject to Section 412 of the Code and/or Title IV of ERISA for the five (5) year period immediately following the latest date on which any Loan Party or Subsidiary maintained, contributed to, or had an obligation to contribute to (or is deemed, under Section 4069 of ERISA, to have maintained, contributed to, had an obligation to contribute to, or otherwise had liability with respect to) such plan.

"*Plan of Reorganization*" shall mean any plan of reorganization or plan of liquidation filed under Section 1122 of the Bankruptcy Code.

"*Platform*" shall mean Debt Domain, IntraLinks, Syndtrak, ClearPar, or a substantially similar electronic transmission system.

"*Postpetition*" shall mean the time period commencing immediately upon the filing of the Chapter 11 Case.

"*Postpetition Indebtedness*" means the Indebtedness and other obligations of the Loan Parties arising on or after the Petition Date, including related to the Postpetition operation of the Loan Parties' businesses (including the Obligations).

"*Prepetition*" shall mean the time period prior to the filing of the Chapter 11 Case.

"*Prepetition Agent*" shall mean the "Administrative Agent" under and as defined in the Prepetition Credit Agreement.

"*Prepetition Collateral*" shall mean, collectively, all collateral securing the Prepetition Facility Obligations.

"*Prepetition Credit Agreement*" shall mean the Amended and Restated Revolving Credit and Term Loan Agreement, dated as of August 14, 2020 (as amended and otherwise modified from time to time prior to the Petition Date), among, *inter alios*, the Borrower, the guarantors party thereto, the lenders party thereto and Truist, in its capacity as Prepetition Agent.

"*Prepetition Facility Obligations*" shall mean the "Obligations" under and as defined in the Prepetition Credit Agreement, which as of the Petition Date were in the amount of the Specified Prepetition Facility Obligations Amount.

"*Prepetition Issuing Bank*" shall mean the "Issuing Bank" under and as defined in the Prepetition Credit Agreement.

"*Prepetition Lenders*" shall mean the "Lenders" under and as defined in the Prepetition Credit Agreement.

"*Prepetition Loan Documents*" shall mean the "Loan Documents" under and as defined in the Prepetition Credit Agreement.

"*Prepetition Payment*" means a direct or indirect payment, redemption, purchase, defeasance or acquisition for value (by way of adequate protection or otherwise) of principal or interest or otherwise on account of any Prepetition (a) Indebtedness (including, without limitation, the Indebtedness under the Prepetition Loan Documents), (b) "critical vendor payments" or (c) trade payables (including, without limitation, in respect of reclamation claims), or other Prepetition claims against any Loan Party.

"*Prepetition Revolving Loans*" shall mean the "Revolving Loans" under and as defined in the Prepetition Credit Agreement.

"*Prepetition Swingline Lender*" shall mean the "Swingline Lender" under and as defined in the Prepetition Credit Agreement.

"*Prime Rate*" shall have the meaning set forth in the definition of "*Base Rate*" above.

"*Primed Lien*" shall have the meaning specified in Section 2.27(a).

"*Priming Lien*" shall have the meaning specified in Section 2.27(a).

"*Privacy Laws*" shall mean all Laws applicable to the privacy or security of individually identifiable information of any patient or individual.

"*Pro Rata Share*" shall mean with respect to the Commitment or Loans of any Lender at any time, a percentage, the *numerator* of which shall be such Lender's Commitment (or, if such Commitment has been terminated or expired, or the Loans have been declared to be due and payable, such Lender's Revolving Credit Exposure), and the *denominator* of which shall be the *sum of* all Commitments of all Lenders (or, if such Commitments have been terminated or expired or the Loans have been declared to be due and payable, all Revolving Credit Exposure of all Lenders).

"*Professional Fees*" shall mean fees and expenses of third-party professionals engaged by or for the benefit of the Administrative Agent, the Prepetition Agent, the Loan Parties or the Unsecured Creditors Committee.

"*PTE*" shall mean a prohibited transaction class exemption issued by the U.S. Department of Labor, as any such exemption may be amended from time to time.

"*Public Lender*" shall have the meaning set forth in Section 5.1.

"*QFC*" has the meaning assigned to the term "qualified financial contract" in, and shall be interpreted in accordance with, 12 U.S.C. §–5390(c)(8)(D).

"*QFC Credit Support*" shall have the meaning set forth in Section 11.18.

"*Real Estate*" shall mean all real property owned or leased by any Loan Party or Subsidiary.

"*Real Estate Documents*" shall mean, with respect to any fee interest of a Loan Party in any Real Estate that is *not* Excluded Property:

(a)      a fully executed and notarized Mortgage encumbering the fee interest of such Loan Party in such Real Estate; and

(b)      evidence as to (i) whether such Real Estate is in an area designated by the Federal Emergency Management Agency as having special flood or mud slide hazards (a "*Flood Hazard Property*"), and (ii) if such Real Estate is a Flood Hazard Property: (A) whether the community in which such Real Estate is located is participating in the National Flood Insurance Program; (B) the applicable Loan Party's written acknowledgment of receipt of written notification from the Administrative Agent (I) as to the fact that such Real Estate is a Flood Hazard Property, and (II) as to whether the community in which each such Flood Hazard Property is located is participating in the National Flood Insurance Program; and (C) copies of flood insurance policies under the National Flood Insurance Program (or private insurance endorsed to cause such private insurance to be fully compliant with the federal Law as regards private placement insurance applicable to the National Flood Insurance Program, with financially sound and reputable insurance companies not Affiliates of any Loan Party or Subsidiary) or certificates of insurance of the Loan Parties and Subsidiaries evidencing such flood insurance coverage, in such amounts and with such deductibles as the Administrative Agent may request and naming the Administrative Agent, and its successors and/or assigns, as sole loss payee on behalf of the holders of the Obligations.

"*Recipient*" shall mean, as applicable, (a) the Administrative Agent and/or (b) any Lender.

"*Recovery Event*" shall mean any loss of, damage to or destruction of, or any condemnation or other taking for public use of, any property of the Loan Parties and/or Subsidiaries.

"*Register*" shall have the meaning set forth in Section 11.4(c).

"*Regulation D*" shall mean Regulation D of the Federal Reserve Board, as the same may be in effect from time to time, and any successor regulations.

"*Regulation T*" shall mean Regulation T of the Federal Reserve Board, as the same may be in effect from time to time, and any successor regulations.

"*Regulation U*" shall mean Regulation U of the Federal Reserve Board, as the same may be in effect from time to time, and any successor regulations.