"*Regulation X*" shall mean Regulation X of the Federal Reserve Board, as the same may be in effect from time to time, and any successor regulations.

"*Regulation Y*" shall mean Regulation Y of the Federal Reserve Board, as the same may be in effect from time to time, and any successor regulations.

"*Related Parties*" shall mean, with respect to any Person, such Person's Affiliates, together with the respective managers, administrators, trustees, partners, directors, officers, employees, agents, advisors, legal counsel, consultants and/or other representatives of such Person and such Person's Affiliates.

"*Release*" shall mean any release, spill, emission, leaking, dumping, injection, pouring, deposit, disposal, discharge, dispersal, leaching or migration into the environment (including ambient air, surface water, groundwater, land surface or subsurface strata) or within any building, structure, facility or fixture.

"*Relevant Governmental Body*" shall mean the Federal Reserve Board and/or the FRBNY, or a committee officially endorsed or convened by the Federal Reserve Board and/or the FRBNY, or any successor thereto.

"*Replacement Lender*" shall have the meaning set forth in Section 2.25.

"*Required Lenders*" shall mean, at any time that there are two (2) or more Lenders that are not affiliated, *at least* two (2) Lenders that are not affiliated holding, in aggregate, *more than* fifty percent (50.0%) of the Aggregate Revolving Commitments at such time (or, if there is only one (1) Lender at such time, such Lender), or, if the Lenders have no Commitments outstanding at such time, then at least two (2) Lenders that are not affiliated holding, in the aggregate, *more than* fifty percent (50.0%) of the Aggregate Revolving Credit Exposure of the Lenders at such time; provided, that, to the extent that any Lender is a Defaulting Lender, such Defaulting Lender, and all of its Revolving Commitments and Revolving Credit Exposure, shall be *excluded* for purposes of determining the Required Lenders.

"*Resolution Authority*" shall mean an EEA Resolution Authority, or, with respect to any UK Financial Institution, a UK Resolution Authority.

"*Responsible Officer*" shall mean: (a) with respect to certifying compliance with the financial covenants set forth in Article VI, the chief financial officer or the treasurer (or director, manager, member or other titled officer, in each case, of substantially equivalent title and authority) of the Borrower; and (b) otherwise, any of the president, the chief executive officer, the chief operating officer, the chief financial officer, the treasurer, or a vice president of the Borrower, or such other representative of the Borrower as may be designated in writing by any one (1) of the foregoing with the consent of the Administrative Agent.

"*Restricted Payment*" shall mean: (a) any dividend or other distribution (whether in cash, securities or other property) with respect to any Capital Stock of any Person, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, defeasance, acquisition, cancellation or termination of any such Capital Stock, or on account of any return of capital to such Person's stockholders, partners or members (or the equivalent Person thereof), or any option, warrant or other right to acquire any such dividend or other distribution or payment; and (b) any payment of management fees, transaction-based fees, or similar fees to any Person holding Capital Stock in any Loan Party or Subsidiary, or any Affiliate thereof.

"*Restructuring Committee*" shall have the meaning set forth in the definition of "*Change in Control*" above.

"*Restructuring Fees*" shall mean, collectively, (i) the Debtors' disbursements in respect of professional fees paid to professionals of the Debtors and the Unsecured Creditors Committee (if appointed), and (ii) fees, costs and expenses of the Administrative Agent and the Prepetition Agent.

"*Revolving Commitment*" shall mean, with respect to each Lender, the commitment of such Lender to make Revolving Loans to the Borrower in an aggregate principal amount *not to exceed* the amount set forth with respect to such Lender on Schedule I hereto, or, in the case of a Person becoming a Lender after the Effective Date, the amount of the assigned "Revolving Commitment" as provided in the Assignment and Assumption executed by such Person as an assignee, or the joinder executed by such Person, in each case, as such commitment may subsequently be increased or decreased pursuant to the terms hereof (including, without limitation, pursuant to Section 2.8).

"*Revolving Commitment Termination Date*" shall mean the *earliest* of: (a) the DIP Facility Maturity Date; (b) the date on which the Revolving Commitments are terminated pursuant to Section 2.8; and (c) the date on which all amounts outstanding under this Agreement have been declared, or have automatically become, due and payable (whether by acceleration or otherwise).

"*Revolving Credit Exposure*" shall mean, with respect to any Lender at any time, the outstanding principal amount of such Lender's Revolving Loans at such time.

"*Revolving Loan*" shall mean a loan made by a Lender to the Borrower under its Revolving Commitment, which may either be a Base Rate Loan or a SOFR Loan.

"*Roll-Up Amount*" shall mean an aggregate amount equal to $235,000,000, which is composed of the sum of (a) $224,420,016.89 of Prepetition Revolving Loans, *plus* (b) the amount of the Specified Prepetition Accruals.

"*S&P*" shall mean Standard & Poor's, a Standard & Poor's Financial Services LLC business, and any successor thereto.

"*Sale Order*" shall mean a final order entered by the Bankruptcy Court approving the Sale Transaction, which Sale Order shall be in form and content reasonably acceptable to the Administrative Agent and the Prepetition Agent.

"*Sale Process*" shall have the meaning set forth in Section 5.18(d).

"*Sale Transaction*" shall mean one or more sale(s) by the Loan Parties of all or substantially all of their respective assets pursuant to Section 363 of the Bankruptcy Code to the Stalking Horse Bidder or another third party bidder.

"*Sanctioned Country*" shall mean, at any time, a country, region or territory that is, or whose government is, the subject or target of any Sanctions.

"*Sanctioned Person*" shall mean, at any time: (a) any Person that is the subject or target of any Sanctions; (b) any Person listed in any Sanctions-related list of designated Persons maintained by OFAC, the U.S. Department of State, the United Nations Security Council, the European Union or any European Union member state, or other relevant Sanctions authority; (c) any Person located, organized, operating or resident in a Sanctioned Country; or (d) any Person owned or controlled by any Person referred to in the foregoing clauses (a) through (c).

"*Sanctions*" shall mean economic or financial sanctions or trade embargoes imposed, administered or enforced from time to time by: (a) the U.S. government, including those administered by OFAC or the U.S. Department of State; (b) the United Nations Security Council, the European Union or Her Majesty's Treasury of the United Kingdom; or (c) any other relevant sanctions authority.

"*SEC*" shall mean the U.S. Securities and Exchange Commission, or any Governmental Authority succeeding to any of its principal functions.

"*Secured Parties*" shall mean, collectively, the Administrative Agent, the Lenders, the Bank Product Providers, the Indemnitees and each other holder of Obligations.

"*Securities Exchange Act*" shall mean the Securities Exchange Act of 1934 (15 U.S.C. §–78a *et seq.*), as amended and in effect from time to time, and any successor statute(s), together with any rules and regulations promulgated in connection therewith, any rulings or orders issued by any applicable Governmental Authorities (including, without limitation, the SEC) thereunder, or the application or official interpretation of any of the foregoing.

"*Security Agreement*" shall mean that certain security and pledge agreement, dated as of the Effective Date, executed in favor of the Administrative Agent, for the ratable benefit of the holders of the Obligations, by each of the Loan Parties (as amended, restated, amended and restated, supplemented, extended, replaced, and/or otherwise modified in writing from time to time in accordance with the terms hereof and thereof).

"*SIFMA*" shall mean the Securities Industry and Financial Markets Association (or any successor thereto).

"*SOFR*" shall mean a rate per annum equal to the secured overnight financing rate as administered by the SOFR Administrator.

"*SOFR Adjustment*" shall mean a percentage equal to 0.11448% (11.448 basis points) per annum.

"*SOFR Administrator*" shall mean the FRBNY (or any successor administrator of the secured overnight financing rate).

"*SOFR-Based Rate*" shall mean each of Adjusted Daily SOFR, Daily SOFR, Adjusted Term SOFR for any Interest Period and Term SOFR for any Interest Period.

"*SOFR Borrowing*" shall mean a Borrowing, the Loans in respect of which bear interest at a rate determined by reference to Adjusted Term SOFR for any available Interest Period.

"*SOFR Loan*" shall mean a Loan bearing interest at a rate determined by reference to Adjusted Term SOFR for any available Interest Period.

"*SOFR Reference Rates*" shall mean, collectively, the Daily SOFR Reference Rate and any Term SOFR Reference Rate for an applicable tenor.

"*Specified Cash Collateral*" shall mean all "Cash Collateral" as defined in Section 363 of the Bankruptcy Code and all deposits subject to setoff and cash arising from the collection or other conversion to cash of property of the Loan Parties in which the Prepetition Lenders or Prepetition Agent has a security interest, Lien or mortgage, whether such security interests, Liens or mortgages existed as of the commencement of the Chapter 11 Case or arise thereafter pursuant to an Order, and whether the property converted to cash existed as of the commencement of the Chapter 11 Case or arose or was generated thereafter, including, without limitation, all proceeds from the sale or other disposition of the Prepetition Collateral or Collateral.

"*Specified Entity*" shall mean (a) JHO GA-1 Investment, LLC, a Florida limited liability company, (b) JHO NV-1 Investment, LLC, a Florida limited liability company, (c) Sheridan Real Estate Investment A, LLC, a Florida limited liability company, (d) Sheridan Real Estate Investment B, LLC, a Florida limited liability company, or (e) Sheridan Real Estate Investment C, LLC, a Florida limited liability company.

"*Specified Foreign Entity*" shall mean (a) Bang Energy Canada, ULC, (b) Bang Energy Mexico S. DE R.L. de C.V., (c) Bang Energy B.V., (d) Bang Energy (Australia) Pty Ltd., (e) Bang Energy VPX Sports Ecuador S.A.S., (f) Energy Peru, LLC, (g) Bang Energy Peru S.A.C., (h) Bang Energy Costa Rica LTDA, (i) Bang Energy Brazil LTDA, (j) Bang Energy Chile SPA or (k) Bang Energy Columbia SA.

"*Specified Prepetition Accruals*" shall mean $10,579,983.11 in accrued and unpaid interest, unused fees and forbearance fees arising under the Prepetition Loan Documents through October 9, 2022 and owing as of the Petition Date.

"*Specified Prepetition Facility Obligations Amount*" shall mean $354,770,201.56, which amount is comprised of (x) $344,190,218.45 in outstanding principal of loans arising under the Prepetition Credit Agreement owing as of the Petition Date *plus* (y) the Specified Prepetition Accruals.

"*Stalking Horse Bidder*" shall have the meaning set forth in Section 5.18(d).

"*Subsidiary*" shall mean, with respect to any Person (the "*parent*"), as of any date, any corporation, limited liability company, joint venture, association, company, firm, partnership (whether a general partnership, a limited partnership or otherwise), or other Person, the accounts of which would be consolidated with those of the parent in the parent's consolidated financial statements if such financial statements were prepared in accordance with GAAP as of such date, as well as any other corporation, limited liability company, joint venture, association, company, firm, partnership (whether a general partnership, a limited partnership or otherwise), or other Person (a) of which securities (or other ownership interests) representing *more than* fifty percent (50.0%) of the equity, or *more than* fifty percent (50.0%) of the ordinary voting power, or, in the case of a partnership, *more than* fifty percent (50.0%) of the general partnership interests, are, as of such date, owned, controlled or held, or (b) that is, as of such date, otherwise controlled, in each case of the foregoing clauses (a) and (b), by the parent, by one (1) or more subsidiaries of the parent, or by the parent together with one (1) or more subsidiaries of the parent. Unless otherwise indicated, all references to "*Subsidiary*" hereunder shall mean a Subsidiary of the Borrower or a Loan Party, as applicable.

"*Superpriority Claim*" shall mean a claim against the Borrower or other Loan Parties in any Chapter 11 Case which is an administrative expense claim having priority over any or all administrative expenses of a Chapter 11 and Chapter 7 trustee, subject and subordinate to the Carve-Out, of the kind specified in Sections 364(c)(1), 503(b), 507(a)(2) and 507(d) of the Bankruptcy Code.

"*Supported QFC*" shall have the meaning set forth in Section 11.18.

"*Swap Obligation*" shall mean, with respect to any Loan Party, any obligation to pay or perform under any agreement, contract or transaction that constitutes a "swap" within the meaning of Section 1a(47) of the Commodity Exchange Act.

"*Synthetic Lease*" shall mean a lease transaction under which the parties intend that: (a) the lease will be treated as an "operating lease" by the lessee pursuant to Accounting Standards Codification Sections 840–10 and 840–20, as amended; and (b) the lessee will be entitled to various tax and other benefits ordinarily available to owners (as opposed to lessees) of like property.

"*Synthetic Lease Obligations*" shall mean, with respect to any Person, the *sum of*: (a) all remaining rental obligations of such Person as lessee under Synthetic Leases which are attributable to principal; and, without duplication, (b) all rental and purchase price payment obligations of such Person under such Synthetic Leases assuming such Person exercises the option to purchase the lease property at the end of the lease term.

"*Taxes*" shall mean any and all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees, or charges imposed by any Governmental Authority, including any interest, additions to tax, or penalties applicable thereto.

"*Term SOFR*" shall mean, as of any date of determination, for any calculations with respect to a SOFR Loan and/or a SOFR Borrowing, the rate per annum equal to the Term SOFR Reference Rate for a tenor comparable to the then applicable or selected (as applicable) Interest Period for such SOFR Loan or SOFR Borrowing, determined as of the date (such date, a "*Periodic Term SOFR Determination Date*") that is two (2)

U.S. Government Securities Business Days *prior* to the first (1st) day of such Interest Period, as such rate is published by the Term SOFR Administrator on such Periodic Term SOFR Determination Date; provided, that, (a) if, as of 5:00 P.M. on any Periodic Term SOFR Determination Date, (i) the Term SOFR Reference Rate for the applicable tenor has *not* been published by the Term SOFR Administrator, and (ii) a Benchmark Replacement Date with respect to such Term SOFR Reference Rate has *not* occurred, then "*Term SOFR*" shall instead mean the Term SOFR Reference Rate for such applicable tenor as published by the Term SOFR Administrator on the first (1st) preceding U.S. Government Securities Business Day for which such Term SOFR Reference Rate for such applicable tenor was published by the Term SOFR Administrator, so long as such first (1st) preceding U.S. Government Securities Business Day is *not more than* three (3) U.S. Government Securities Business Days prior to such Periodic Term SOFR Determination Date, and (b) if, at any time, Term SOFR (determined in accordance with the foregoing of this definition of "*Term SOFR*", including in accordance with the foregoing clause (a) of this proviso) is *less than* the Floor, then Term SOFR shall be deemed to equal the Floor for all purposes of this Agreement and the other Loan Documents. Any change(s) in Term SOFR for any Interest Period due to any change(s) in the Term SOFR Reference Rate for a comparable tenor shall be effective from, and including, the effective date of any such change(s) in such Term SOFR Reference Rate, without further notice to any Loan Party or Subsidiary, any other party to this Agreement or any other Loan Document, or any other Person.

"*Term SOFR Administrator*" shall mean the CME Group Benchmark Administration Limited (CBA) (or a successor administrator of the applicable Term SOFR Reference Rate selected by the Administrative Agent in its reasonable discretion).

"*Term SOFR Reference Rate*" shall mean the rate per annum determined by the Administrative Agent as the forward-looking term rate based on SOFR for an applicable tenor.

"*Threshold Amount*" shall mean $5,000,000.

"*Trade Date*" shall have the meaning set forth in Section 11.4(h)(i).

"*Trademarks*" shall have the meaning set forth in the Security Agreement.

"*Truist*" shall mean Truist Bank and its successors.

"*Type*", when used in reference to a Loan or Borrowing, refers to whether the rate of interest on such Loan, or on the Loans comprising such Borrowing, is determined by reference to Adjusted Term SOFR or the Base Rate.

"*U.S. Government Securities Business Day*" shall mean any day, other than: (i) a Saturday or a Sunday; or (ii) any day on which SIFMA recommends that the fixed income departments of its members be closed for the entire day for purposes of trading in U.S. government securities.

"*U.S. Person*" shall mean any Person that is a "United States person" as defined in Section 7701(a)(30) of the Code.

"*U.S. Special Resolution Regime*" shall have the meaning set forth in Section 11.18.

"*U.S. Tax Compliance Certificate*" shall have the meaning set forth in Section 2.20(g).

"*UK Financial Institution*" means any BRRD Undertaking (as such term is defined under the PRA Rulebook as amended from time to time) promulgated by the United Kingdom Prudential Regulation Authority) or any person falling within IFPRU 11.6 of the FCA Handbook (as amended from time to time) promulgated by the United Kingdom Financial Conduct Authority, which includes certain credit institutions and investment firms, and certain affiliates of such credit institutions or investment firms.

"*UK Resolution Authority*" means the Bank of England or any other public administrative authority having responsibility for the resolution of any UK Financial Institution.

"*Unadjusted Benchmark Replacement*" shall mean the Benchmark Replacement without giving effect to the Benchmark Replacement Adjustment.

"*Unfunded Pension Liability*" of any Plan shall mean the amount, if any, by which the value of the accumulated plan benefits under the Plan, determined on a plan termination basis in accordance with actuarial assumptions as of such time that are consistent with those prescribed by the PBGC for purposes of Section 4044 of ERISA, in *excess* of the fair market value of all Plan assets allocable to such liabilities under Title IV of ERISA (but excluding any accrued but unpaid contributions).

"*Uniform Commercial Code*" or "*UCC*" shall have the meaning assigned to such term in the Security Agreement.

"*United States*" or "*U.S.*" shall mean the United States of America.

"*Unrestricted Cash*" shall mean, as of any date of determination, the aggregate amount of cash and Cash Equivalents (measured at fair market value) of the Loan Parties on such date maintained in the United States that do not appear (or would not be required to appear) as "restricted" on a combined balance sheet of the Loan Parties and Subsidiaries (other than solely as a result of Liens thereon under this Agreement or any other Loan Document or imposed by any Prepetition Loan Document) and are otherwise available for use by the Loan Parties without restriction (other than as required by the Budget (subject to compliance with the permitted variance contemplated by Section 6.1(a))) in the ordinary course of business, measured based on daily closing account balances.

"*Unrestricted Cash Threshold Amount*" shall mean $15,000,000.

"*Unsecured Creditors Committee*" shall mean the official committee of unsecured creditors (if any) appointed in the Chapter 11 Case, as the composition thereof may be amended from time to time.

"*Updated Budget*" shall have the meaning set forth in Section 5.1(k).

"*Variance Report*" shall have the meaning set forth in Section 5.1(i).

"*Variance Testing Period*" shall mean the period from the Petition Date through the week most recently ended.

"*Voting Stock*" shall mean, with respect to any Person, any Capital Stock issued by such Person the holders of which are ordinarily, in the absence of contingencies, entitled to vote for the election of directors (or persons performing similar functions) of such Person, even though the right so to vote has been suspended by the happening of such a contingency.

"*Waterfall*" shall have the meaning set forth in Section 8.2.

"*Wholly-Owned Subsidiary*" means, as of any date of determination, any Person, one-hundred percent (100.0%) of whose Capital Stock (other than director-qualifying shares, as required by applicable Law) is, as of such date, owned by one (1) or more Loan Parties, directly or indirectly through other Persons one-hundred percent (100.0%) of whose Capital Stock (other than director-qualifying shares, as required by applicable Law) is, as of such date, owned, directly or indirectly, by one (1) or more Loan Parties.

"*Withdrawal Liability*" shall mean liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of Title IV of ERISA.

"*Withholding Agent*" shall mean any Loan Party and/or the Administrative Agent, as applicable.

"*Write-Down and Conversion Powers*" shall mean: (a) with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule; and (b) with respect to the United Kingdom, any powers of the applicable Resolution Authority under the Bail-In Legislation to cancel, reduce, modify or change the form of a liability of any UK Financial Institution, or any contract or instrument under which that liability arises, to convert all or part of that liability into shares, securities or obligations of that Person or any other Person, to provide that any such contract or instrument is to have effect as if a right had been exercised under it, or to suspend any obligation in respect of that liability, or any of the powers under that Bail-In Legislation that are related or ancillary to any of those powers.

Section 1.2    Classifications of Loans and Borrowings. For purposes of this Agreement and the other Loan Documents, Loans may be classified and referred to by Type (*e.g.*, a "SOFR Loan", a "Base Rate Loan" or "Revolving SOFR Loan"). Borrowings also may be classified and referred to by Type (*e.g.*, "SOFR Borrowing" or "Revolving SOFR Borrowing").

Section 1.3    Accounting Terms and Determination.

(a)    Unless otherwise defined or specified herein, all accounting terms used herein shall be interpreted, all accounting determinations hereunder shall be made, and all financial statements required to be delivered hereunder shall be prepared, in accordance with GAAP as in effect from time to time, applied on a basis consistent with the past practice of the Borrower; provided, that, if the Borrower notifies the Administrative Agent that the Borrower wishes to amend any covenant in Article VI to eliminate the effect of any change in GAAP on the operation of such covenant (or, if the Administrative Agent notifies the Borrower that the Required Lenders wish to amend Article VI for such purpose), then the Loan Parties' compliance with such covenant shall be determined on the basis of GAAP as in effect on the date immediately prior to the date on which the relevant change in GAAP became effective, until either such notice is withdrawn or such covenant is amended in a manner satisfactory to the Borrower and the Required Lenders.

(b)    Notwithstanding any other provision contained herein: (i) all terms of an accounting or financial nature used herein shall be construed, and all computations of amounts and ratios referred to herein shall be made, without giving effect to any election under Accounting Standards Codification Section 825–10 (or any other Financial Accounting Standard having a similar result or effect) to value any Indebtedness or other liabilities of any Loan Party or Subsidiary at "fair value", as defined therein; and (ii) all liability amounts shall be determined *excluding* any liability relating to any operating lease, all asset amounts shall be determined *excluding* any right-of-use assets relating to any operating lease, all amortization amounts shall be determined *excluding* any amortization of a right-of-use asset relating to any operating lease, and all interest amounts shall be determined *excluding* any deemed interest comprising a portion of fixed rent payable under any operating lease, in each case of the foregoing, to the extent that such liability, asset, amortization or interest, as the case may be, pertains to an operating lease under which the covenantor, or a member of its consolidated or combined group, is the lessee and would *not* have been accounted for as such under GAAP as in effect on December 31, 2015.

Section 1.4    Terms Generally. The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "*include*", "*includes*" and "*including*" shall be deemed to be followed by the phrase ", *without limitation*,". The word "*will*" shall be construed to have the same meaning and effect as the word "*shall*". In the computation of periods of time from a specified date to a later specified date, the word "*from*" means "*from, and including,*" and the word "*to*" means "*to, but excluding,*". Unless the context requires otherwise:

(a)     any definition of, or reference to, any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as it was originally executed, or as it may from time to time be amended, restated, amended and restated, supplemented, increased, extended, refinanced, renewed, replaced, and/or otherwise modified in writing, as applicable (subject to any restrictions on such amendments, restatements, amendments and restatements, supplements, increases, extensions, refinancings, renewals, replacements, and/or other written modifications as set forth herein);

(b)     any reference herein to any Person shall be construed to include such Person's successors and permitted assigns;

(c)     the words "*hereof*", "*herein*" and "*hereunder*", and words of similar import, shall be construed to refer to this Agreement as a whole, and not to any particular provision hereof;

(d)     all references herein to Articles, Sections, Exhibits and/or Schedules shall be construed to refer to Articles, Sections, Exhibits and/or Schedules, as applicable, to this Agreement;

(e)     all references contained in a Section to clauses or definitions occurring "above" or "below" shall refer to the applicable clause of, or definition set forth in, such Section, and all general references contained in a Section or clause thereof to "the above" or "the below" shall refer collectively to all provisions of such Section or clause, as applicable, occurring prior to or after, as applicable, the occurrence of such general reference;

(f)     all references herein to sums denominated in Dollars, or with the symbol "$", refer to the lawful currency of the United States, unless such reference specifically identifies another currency;

(g)     all references herein to a specific time of day shall be construed to refer to such time in the city and state of the Administrative Agent's principal office as set forth in <u>Section 11.1</u>, unless otherwise indicated;

(h)     any reference herein to a merger, transfer, consolidation, amalgamation, consolidation, assignment, sale, disposition or transfer, or similar term shall be deemed to apply to a division of or by a limited liability company, or an allocation of assets to a series of a limited liability company (or the unwinding of such a division or allocation), as if it were a merger, transfer, consolidation, amalgamation, consolidation, assignment, sale, disposition or transfer, or similar term, as applicable, to, of, or with a separate Person. Any division of a limited liability company shall constitute a separate Person hereunder (and each division of any limited liability company that is a Subsidiary, joint venture, or any other like term shall also constitute such a Person); and

(i)     any definition of, or reference to, any Law shall include all statutory and regulatory provisions consolidating, amending, or interpreting any such Law, and any reference to, or definition of, any Law or regulation, unless otherwise specified, shall refer to such Law or regulation as amended, modified, and/or supplemented from time to time.

Section 1.5     <u>Interest Rate Disclosure</u>. The Administrative Agent does *not* warrant or accept responsibility for, and shall *not* have any liability whatsoever with respect to: (a) the continuation, administration, submission and/or calculation of, or any other matter related to, any of the Base Rate, any SOFR Reference Rate and/or any SOFR-Based Rate (for any Interest Period, as applicable), or any component definition used or referred to in, or any rate(s) used or referred to in, the definitions of any of the foregoing in <u>Section 1.1</u>, or for any alternative, successor or replacement rate thereto (including, without limitation, any Benchmark Replacement), including whether the composition and/or characteristics of any such actual or proposed alternative, successor or replacement rate (including, without limitation, any Benchmark Replacement) is or will be similar to, or produces or will produce the same or substantially equivalent value or economic equivalence of, or has or will have the same or a comparable volume or liquidity as, any of the Base Rate, any SOFR Reference Rate, any SOFR-Based Rate (for any Interest Period, as applicable) and/or any other Benchmark prior to its discontinuance or unavailability; or (b) the effect, implementation and/or composition of any Conforming Changes. The Administrative Agent, together with its Affiliates and other related entities, may engage in transactions that affect

the calculation of any of the Base Rate, any SOFR Reference Rate, any SOFR-Based Rate (for any Interest Period, as applicable), any alternative, successor or replacement rate of any of the foregoing (including, without limitation, any Benchmark Replacement), and/or any relevant adjustments to any of the foregoing, in any such case of the foregoing, in a manner adverse to the Borrower and the other Loan Parties. The Administrative Agent may select information sources or services in its reasonable discretion to ascertain any of the Base Rate, any SOFR Reference Rate, any SOFR-Based Rate (for any Interest Period, as applicable), and/or any other Benchmark, in each case of the foregoing, pursuant to the terms of this Agreement, and the Administrative Agent shall have no liability whatsoever to the Borrower, any other Loan Party, any Subsidiary, any Lender and/or any other Person for damages of any kind, including direct or indirect, special, punitive, incidental and/or consequential damages, costs, losses and/or expenses (whether in tort, contract or otherwise and whether at law or in equity), for any error or calculation of any such rate (or any component thereof) provided by any such information source or service.

## ARTICLE II

## AMOUNT AND TERMS OF THE COMMITMENTS

Section 2.1    General Description of Facility. Subject to and upon the terms and conditions herein set forth, the Lenders hereby establish in favor of the Borrower a revolving credit facility, pursuant to which: (a) each Lender severally agrees (to the extent of such Lender's Revolving Commitment) to make Revolving Loans to the Borrower in Dollars in accordance with Section 2.2; and (b) subject to entry of the Final DIP Order, a portion of the Prepetition Facility Obligations will be converted to outstanding Revolving Loans in the amount of the Roll-Up Amount; provided, that, in no event shall the Aggregate Revolving Credit Exposure *exceed* the DIP Facility Available Amount in effect from time to time.

Section 2.2    Revolving Loans. Subject to the terms and conditions set forth herein, each Lender severally agrees to make Revolving Loans, ratably in proportion to its Pro Rata Share of the Aggregate Revolving Commitments, to the Borrower in Dollars, from time to time during the Availability Period, in an aggregate principal amount outstanding at any time that will not result in: (a) such Lender's Revolving Credit Exposure *exceeding* such Lender's Revolving Commitment; or (b) the Aggregate Revolving Credit Exposure *exceeding* the DIP Facility Available Amount. During the Availability Period, the Borrower shall be entitled to borrow, prepay and reborrow Revolving Loans in accordance with the terms and conditions of this Agreement; provided, that, the Borrower may *not* borrow or reborrow should there exist a Default or Event of Default.

Section 2.3    Procedure for Borrowings. The Borrower shall give the Administrative Agent written notice (or telephonic notice promptly confirmed in writing) of each Borrowing substantially in the form of Exhibit 2.3 (a "*Notice of Borrowing*") (i) prior to 11:00 A.M. *at least* one (1) Business Day prior to the requested date of each Base Rate Borrowing, and (ii) prior to 11:00 A.M. *at least* three (3) Business Days prior to the requested date of each SOFR Borrowing; provided, that, notwithstanding anything to the contrary in the foregoing, the Notice of Borrowing with respect to the Borrowing on the Effective Date may be delivered on or prior to 11:00 A.M. on the date that is one (1) Business Day prior to the Effective Date, in the case of a Base Rate Borrowing. Each Notice of Borrowing shall be irrevocable and shall specify: (a) the aggregate principal amount of such Borrowing; (b) the date of such Borrowing (which shall be a Business Day); (c) the Type of such Revolving Loan comprising such Borrowing; and (d) in the case of a SOFR Borrowing, the duration of the initial Interest Period applicable thereto (subject to the provisions of the definition of Interest Period). Each Borrowing shall consist entirely of Base Rate Loans or SOFR Loans (or a combination thereof), as the Borrower may request. The aggregate principal amount of each SOFR Borrowing of Revolving Loans shall *not* be *less than* One Million Dollars ($1,000,000) or a larger multiple of Five-Hundred Thousand Dollars ($500,000) in excess thereof (or such lesser amount of the undrawn Aggregate Revolving Commitment Amount), and the aggregate principal amount of each Base Rate Borrowing of Revolving Loans shall *not* be *less than* One Million Dollars ($1,000,000) or a larger multiple of Five-Hundred Thousand Dollars ($500,000) in excess thereof (or such lesser amount of the undrawn Aggregate Revolving Commitment Amount). Notwithstanding anything to the contrary herein or in any other Loan Document, the total number of SOFR Borrowings outstanding at any time shall *not exceed* ten (10). Promptly following the receipt of

a Notice of Borrowing in accordance herewith, the Administrative Agent shall advise each Lender of the details thereof and the amount of such Lender's Revolving Loan to be made as part of the requested Borrowing.

Section 2.4   [Reserved].

Section 2.5   [Reserved].

Section 2.6   Roll-Up; Funding of Borrowings.

(a)     On the Final DIP Order Entry Date, in accordance with the terms of the Final DIP Order and Section 3.3 (and, for the avoidance of doubt, without the need for a Notice of Borrowing with respect thereto), each Lender agrees that a portion of the Prepetition Facility Obligations outstanding as of the Petition Date in an aggregate amount equal to the Roll-Up Amount (and composed of the Prepetition Facility Obligations described in the definition of "Roll-Up Amount") shall be deemed exchanged for and converted into its Pro Rata Share of Revolving Loans in the aggregate principal amount equal to the Roll-Up Amount on a dollar-for-dollar basis, which exchange and conversion (for the avoidance of doubt) shall not constitute a novation, and such portion of the Revolving Loans shall constitute a Borrowing and be deemed a SOFR Borrowing with an Interest Period commencing on the Final DIP Order Entry Date and shall constitute Obligations hereunder for all purposes under the Loan Documents and in the Orders.

(b)     Each Lender will make available each Loan to be made by it hereunder on the proposed date thereof by wire transfer in immediately available funds by 11:00 A.M. to the Administrative Agent at the Payment Office. The Administrative Agent will make such Loans available to the Borrower by promptly crediting the amounts that it receives, in like funds by the close of business on such proposed date, to an account maintained by the Borrower with the Administrative Agent, or, at the Administrative Agent's sole discretion and at the Borrower's option, by effecting a wire transfer of such amounts to an account designated by the Borrower to the Administrative Agent that is *not* maintained by the Borrower with the Administrative Agent.

(c)     Unless the Administrative Agent shall have been notified by any Lender, prior to 5:00 P.M. one (1) Business Day prior to the date of a Borrowing in which such Lender is to participate, that such Lender will not make available to the Administrative Agent such Lender's share of such Borrowing, the Administrative Agent may assume that such Lender has made such amount available to the Administrative Agent on such date, and the Administrative Agent, in reliance on such assumption, may make available to the Borrower on such date a corresponding amount. If such corresponding amount is *not* in fact made available to the Administrative Agent by such Lender on the date of such Borrowing, the Administrative Agent shall be entitled to recover such corresponding amount on demand from such Lender, together with interest: (i) at the Federal Funds Rate until the second (2nd) Business Day after such demand; and (ii) thereafter, at the Base Rate. If such Lender does *not* pay such corresponding amount forthwith upon the Administrative Agent's demand therefor, the Administrative Agent shall promptly notify the Borrower, and the Borrower shall immediately pay such corresponding amount to the Administrative Agent together with interest at the rate specified for such Borrowing. Nothing in this clause (c) shall be deemed to relieve any Lender from its obligation to fund its Pro Rata Share of any Borrowing hereunder or to prejudice any rights which the Borrower may have against any Lender as a result of any default by such Lender hereunder.

(d)     All Borrowings shall be made by the Lenders on the basis of their respective Pro Rata Shares. No Lender shall be responsible for any default by any other Lender in its obligations hereunder, and each Lender shall be obligated to make its Loans provided to be made by it hereunder, regardless of the failure of any other Lender to make its Loans hereunder.

Section 2.7   Interest Elections.

(a)     The Revolving Loans funded pursuant to Section 2.6(a) shall, initially, be SOFR Borrowings and each other Borrowing initially shall be of the Type specified in the applicable Notice of Borrowing therefor.

Thereafter, the Borrower may elect to convert such Borrowing into a different Type or to continue such Borrowing, all as provided in this Section 2.7. The Borrower may elect different options with respect to different portions of the affected Borrowing, in which case, each such portion shall be allocated ratably among the Lenders holding Loans comprising such Borrowing, and the Loans comprising each such portion shall be considered a separate Borrowing.

(b)     To make an election pursuant to this Section 2.7, the Borrower shall give the Administrative Agent prior written notice (or telephonic notice promptly confirmed in writing) of each Borrowing that is to be converted or continued, as the case may be, substantially in the form of Exhibit 2.7 attached hereto (a "*Notice of Conversion / Continuation*") (A) prior to 10:00 A.M. *at least* one (1) Business Day prior to the requested date of a conversion into a Base Rate Borrowing, and (B) prior to 11:00 A.M. *at least* three (3) Business Days prior to a continuation of, or conversion into, a SOFR Borrowing. Each such Notice of Conversion / Continuation shall be irrevocable and shall specify: (i) the Borrowing to which such Notice of Conversion / Continuation applies, and, if different options are being elected with respect to different portions thereof, the portions thereof that are to be allocated to each resulting Borrowing (in which case, the information to be specified pursuant to clauses (b)(iii) and (b)(iv) below shall be specified for each resulting Borrowing); (ii) the effective date of the election made pursuant to such Notice of Conversion / Continuation, which shall be a Business Day; (iii) whether the resulting Borrowing is to be a Base Rate Borrowing or a SOFR Borrowing; and (iv) if the resulting Borrowing is to be a SOFR Borrowing, the Interest Period applicable thereto after giving effect to such election, which shall be a period contemplated by the definition of "*Interest Period*". If any such Notice of Conversion / Continuation requests a SOFR Borrowing but does *not* specify an Interest Period, the Borrower shall be deemed to have selected an Interest Period of one (1) month. The principal amount of any resulting Borrowing shall satisfy the minimum borrowing amount for SOFR Borrowings and Base Rate Borrowings set forth in Section 2.3.

(c)     If, on the expiration of any Interest Period in respect of any SOFR Borrowing, the Borrower shall have failed to deliver a Notice of Conversion / Continuation, then, unless such Borrowing is repaid as provided herein, the Borrower shall be deemed to have elected (subject to the immediate next sentence) to continue such Borrowing as a SOFR Borrowing for the immediate succeeding one (1) month Interest Period. No Borrowing may be converted into, or continued as, a SOFR Borrowing if a Default or an Event of Default exists, unless the Administrative Agent and each of the Lenders shall have otherwise consented in writing. No conversion of any SOFR Loan shall be permitted, except on the last day of the Interest Period in respect thereof.

(d)     Upon receipt of any Notice of Conversion / Continuation, the Administrative Agent shall promptly notify each Lender of the details thereof and of such Lender's portion of each resulting Borrowing.

Section 2.8     Termination and Reductions of Commitments.

(a)     Unless previously terminated, all Revolving Commitments shall terminate on the Revolving Commitment Termination Date.

(b)     Upon *at least* three (3) Business Days' prior written notice (or telephonic notice promptly confirmed in writing) to the Administrative Agent (which notice shall be irrevocable), the Borrower may reduce the Aggregate Revolving Commitments in part, or terminate any such Revolving Commitments in whole; provided, that, (i) any partial reduction shall apply to reduce proportionately and permanently the Revolving Commitment of each Lender, as applicable, (ii) any partial reduction pursuant to this Section 2.8(b) shall be in an amount of *at least* One Million Dollars ($1,000,000) and any larger multiple of Five-Hundred Thousand Dollars ($500,000) in *excess* thereof, and (iii) no such reduction of the Aggregate Revolving Commitment shall be permitted which would reduce the Aggregate Revolving Commitments to an amount that is *less than* the Aggregate Revolving Credit Exposure.

Section 2.9    Repayment of Loans. The outstanding principal amount of all Revolving Loans shall be due and payable (together with accrued and unpaid interest thereon) on the Revolving Commitment Termination Date.

Section 2.10    Evidence of Indebtedness.

(a)    Each Lender shall maintain, in accordance with its usual and customary practice, appropriate records evidencing the Indebtedness of the Borrower to such Lender resulting from each Loan made by such Lender from time to time, including the amounts of principal and interest payable thereon and paid to such Lender from time to time under this Agreement. The Administrative Agent shall maintain appropriate records in which shall be recorded: (i) the Revolving Commitment of each Lender; (ii) the amount of each Loan made hereunder by each Lender, the Type thereof, and, in the case of each SOFR Loan, the Interest Period applicable thereto; (iii) the date of any continuation of any Loan pursuant to Section 2.7; (iv) the date of any conversion of all, or a portion, of any Loan to another Type pursuant to Section 2.7; (v) the date and amount of any principal or interest due and payable, or to become due and payable, from the Borrower to each Lender hereunder in respect of the Loans; and (vi) both the date and amount of any sum received by the Administrative Agent hereunder from the Borrower in respect of the Loans and each Lender's Pro Rata Share thereof. The entries made in such records shall be *prima facie* evidence of the existence and amounts of the obligations of the Borrower therein recorded; provided, that, the failure or delay of any Lender or the Administrative Agent in maintaining or making entries into any such record, or any error therein, shall not in any manner affect the obligation of the Borrower to repay the Loans (both principal and unpaid accrued interest) of such Lender in accordance with the terms of this Agreement.

(b)    This Agreement evidences the obligation of the Borrower to repay the Loans and is being executed as a "noteless" credit agreement. However, at the request of any Lender at any time, the Borrower agrees that it will prepare, execute and deliver to such Lender a promissory note payable to the order of such Lender (or, if requested by such Lender, to such Lender and its registered assigns) in the form of Exhibit 2.10 (a "*Note*"). Thereafter, the Loans evidenced by such promissory note and interest thereon shall, at all times (including after assignment permitted hereunder), be represented by one (1) or more promissory notes in such form payable to the order of the payee named therein (or, if such promissory note is a registered note, to such payee and its registered assigns).

Section 2.11    Optional Prepayments. The Borrower shall have the right, at any time and from time to time, to prepay any Borrowing, in whole or in part, without premium or penalty, by giving irrevocable written notice (or telephonic notice promptly confirmed in writing) to the Administrative Agent *no later than*: (a) in the case of any prepayment of any SOFR Borrowing, 11:00 A.M. on a date that is *not less than* three (3) Business Days prior to the date of any such prepayment; and (b) in the case of any prepayment of any Base Rate Borrowing, 11:00 A.M. on a date that is *not less than* one (1) Business Day prior to the date of any such prepayment. Each such notice shall be irrevocable and shall specify the proposed date of such prepayment and the principal amount of each Borrowing, or portion thereof, to be prepaid. Upon receipt of any such notice, the Administrative Agent shall promptly notify each affected Lender of the contents thereof and of such Lender's Pro Rata Share of any such prepayment. If such notice is given, the aggregate amount specified in such notice shall be due and payable on the date designated in such notice, together with accrued interest to, and including, such date on the amount so prepaid in accordance with Section 2.13(d); provided, that, if a SOFR Borrowing is prepaid on a date other than the last day of an Interest Period applicable thereto, the Borrower shall also pay all amounts required pursuant to Section 2.19. Each partial prepayment of any Loan shall be in an amount that would be permitted in the case of an advance of a Borrowing of the same Type pursuant to Section 2.3. Each prepayment of a Borrowing shall be applied ratably to the Loans comprising such Borrowing.

Section 2.12    Mandatory Prepayments.

(a)    Within three (3) Business Days of the receipt by any Loan Party or Subsidiary of Net Cash Proceeds of any Asset Sale or Recovery Event (other than the Sale Transaction), the Borrower shall prepay the Obligations in accordance with clause (e) below in an amount equal to such Net Cash Proceeds.

(b)      Within one (1) Business Days of the receipt by any Loan Party or Subsidiary of Net Cash Proceeds of any issuance of Indebtedness (other than Indebtedness permitted under Section 7.1), the Borrower shall prepay the Obligations in accordance with clause (e) below in an amount equal to such Net Cash Proceeds.

(c)      Within three (3) Business Days of the receipt by any Loan Party or Subsidiary of Net Cash Proceeds from the issuance of any Capital Stock (other than Capital Stock issued by a Subsidiary of a Loan Party to such Loan Party, or to another such Subsidiary that is a Loan Party), the Borrower shall prepay the Obligations in accordance with clause (e) below in an amount equal to the portion of such Net Cash Proceeds that are attributable to such issuance.

(d)      On the Business Day immediately following the last Business Day of any calendar week on which, as of the close of business, Unrestricted Cash exceeds the Unrestricted Cash Threshold Amount, the Borrower shall prepay the Obligations in accordance with clause (e) below in an amount equal to such excess.

(e)      Any prepayments made by the Borrower pursuant to clauses (a) through (d) above shall be applied as follows: (i) *first*, to the Administrative Agent's fees and reimbursable expenses then due and payable pursuant to any of the Loan Documents; (ii) *second*, to all reimbursable expenses of the Lenders then due and payable pursuant to any of the Loan Documents, *pro rata* to the Lenders based on their respective Pro Rata Shares of such fees and expenses; (iii) *third*, to interest and fees then due and payable hereunder, *pro rata* to the Lenders, based on their respective Pro Rata Shares of such interest and fees; (iv) *fourth*, [reserved]; and (v) *fifth*, to the principal balance of the Revolving Loans, until the same shall have been paid in full, *pro rata* to the Lenders based on their respective Revolving Commitments.

(f)      If, at any time, the Aggregate Revolving Credit Exposure *exceeds* the DIP Facility Available Amount, the Borrower shall, within one (1) Business Day of the occurrence of such excess, repay the Revolving Loans in an amount equal to such excess, together with all accrued and unpaid interest on such excess amount and any amounts due under Section 2.19. Each prepayment shall be applied as follows: (i) *first*, to Revolving Loans consisting of Base Rate Loans to the full extent thereof; and (ii) *second*, to Revolving Loans constituting SOFR Loans to the full extent thereof.

Section 2.13      Interest on Loans.

(a)      The Borrower shall pay interest on: (i) each Base Rate Loan at the Base Rate, *plus* the Applicable Margin in effect from time to time; and (ii) each SOFR Loan at Adjusted Term SOFR for the applicable Interest Period in effect for such Loan, *plus* the Applicable Margin in effect from time to time.

(b)      [Reserved].

(c)      [Reserved].

(d)      Notwithstanding anything to the contrary in the foregoing of this Section 2.13, if an Event of Default has occurred and is continuing, at the option of the Required Lenders, the Borrower shall pay interest ("*Default Interest*") with respect to all SOFR Loans at the rate per annum equal to two percent (2.0%) above the otherwise applicable interest rate for such SOFR Loans for the then-current Interest Period until the last day of such Interest Period, and thereafter, and with respect to all Base Rate Loans and all other Obligations hereunder (other than Loans), at the rate per annum equal to two percent (2.0%) above the otherwise applicable interest rate for Base Rate Loans.

(e)      Interest on the principal amount of all Loans shall accrue from, and including, the date such Loans are made to, but *excluding*, the date of any repayment thereof. Interest on all outstanding Base Rate Loans shall be payable monthly in arrears on the last day of each calendar month and on the Revolving Commitment Termination Date. Interest on all outstanding SOFR Loans shall be payable on the last day of each Interest Period applicable thereto, and on the Revolving Commitment Termination Date. Interest on any Loan which is converted

into a Loan of another Type, or which is repaid or prepaid, shall be payable on the date of such conversion or on the date of any such repayment or prepayment (on the amount repaid or prepaid) thereof. All Default Interest shall be payable on demand.

(f)     The Administrative Agent shall determine each interest rate applicable to the Loans hereunder and shall promptly notify the Borrower and the Lenders of such rate in writing (or by telephone, promptly confirmed in writing). Any such determination shall be conclusive and binding for all purposes, absent manifest error.

(g)     In connection with the use and/or administration of SOFR, any SOFR Reference Rate and/or any SOFR-Based Rate, the Administrative Agent shall have the right to make Conforming Changes from time to time and, notwithstanding anything to the contrary in this Agreement or in any other Loan Document, any amendment(s) implementing any such Conforming Changes shall become effective without any further action(s) and/or consent(s) of any other party to this Agreement or any other Loan Document or of any other Person. The Administrative Agent shall promptly notify the Borrower and the Lenders of the effectiveness of any Conforming Changes implemented in connection with the use and/or administration of SOFR, any SOFR Reference Rate and/or any SOFR-Based Rate.

Section 2.14    Fees.

(a)     The Borrower shall pay to the Administrative Agent for its own account fees in the amounts and at the times previously agreed upon in writing by the Borrower and the Administrative Agent.

(b)     The Borrower agrees to pay to the Administrative Agent, for the account of each Lender, a commitment fee (the "_Commitment Fee_"), which shall accrue at a rate per annum equal to (i) fifty basis points (0.50%) _multiplied by_ (ii) the average daily amount of each Lender's ratable share of the unused DIP Facility Available Amount during the Availability Period calculated based on such Lender's respective Pro Rata Share. For purposes of computing the Commitment Fee, the ratable share of the DIP Facility Available Amount of each Lender shall be deemed used to the extent of the outstanding Revolving Loans of such Lender.

(c)     [Reserved].

(d)     The Borrower shall pay on the Effective Date, for the account of each Lender, an upfront fee (the "_Upfront Fee_") in an amount equal to each Lender's ratable share of $2,500,000 calculated based on each Lender's respective Pro Rata Share. Such Upfront Fees shall be in consideration for the Lenders' participation in the Revolving Commitments established hereunder and shall be due and payable in full on, and subject to the occurrence of, the Effective Date. For the avoidance of doubt, the aggregate amount of all such Upfront Fees shall be equal to $2,500,000.

(e)     The Borrower shall pay on the Effective Date to the Administrative Agent and/or its Affiliates, as applicable, all fees in the Fee Letter (including, for the avoidance of doubt, any upfront fees payable to any Lender) that are due and payable on the Effective Date. The Borrower shall pay on the Effective Date to the Lenders all upfront fees previously agreed in writing.

(f)     Accrued fees under clause (b) above shall be payable monthly in arrears on the last day of each calendar month, commencing on the first (1st) such date to occur after the Effective Date and on the Revolving Commitment Termination Date (and, if later, on the date that the Loans shall be repaid in their entirety); provided, that, any such fees accruing after the Revolving Commitment Termination Date shall be payable on demand.

(g)     Anything herein to the contrary notwithstanding, during such period as a Lender is a Defaulting Lender, such Defaulting Lender will _not_ be entitled to Commitment Fees during such period pursuant to clause (b) above (without prejudice to the rights of the Lenders other than Defaulting Lenders in respect of such fees). The _pro rata_ payment provisions of Section 2.21 shall automatically be deemed adjusted to reflect the provisions of this clause (g).

Section 2.15    Computation of Interest and Fees.

All computations of interest and fees hereunder shall be computed on the basis of a year of three hundred sixty (360) days and paid for the actual number of days elapsed (including the first (1st) day, but excluding the last day). Each determination by the Administrative Agent of an interest rate or fee hereunder shall be made in good faith and, except for manifest error, shall be final, conclusive, and binding for all purposes.

Section 2.16    Inability to Determine Interest Rates; Benchmark Replacement Setting.

(a)    Inability to Determine SOFR. Subject to clauses (b) through (f) below, if, at any time (prior to the commencement of any affected Interest Period) for any SOFR Borrowing:

(i)    the Administrative Agent shall have determined (which determination shall be conclusive and binding absent manifest error) that any SOFR-Based Rate (for any affected Interest Period) cannot be determined pursuant to the applicable definition thereof in Section 1.1; or

(ii)    the Administrative Agent shall have received notice from the Required Lenders that any SOFR-Based Rate (for any affected Interest Period) will *not* adequately and fairly reflect the cost to such Lender(s) of making, funding and/or maintaining their (or its, as the case may be) SOFR Loans (for any affected Interest Period);

then, the Administrative Agent shall give written notice (or telephonic notice, promptly confirmed in writing) thereof to the Borrower and to the Lenders as soon as practicable thereafter. Upon notice thereof by the Administrative Agent to the Borrower, any obligation of the Lenders to make SOFR Loans, and any right of the Borrower to continue SOFR Loans (for any affected Interest Period) and/or to convert Base Rate Loans to SOFR Loans, shall be suspended (to the extent of the affected SOFR Loans and/or the affected Interest Periods) until the Administrative Agent shall have revoked such notice. Upon receipt of such notice: (A) the Borrower may revoke any pending request for a Borrowing of, conversion to, and/or continuation of any SOFR Loans (to the extent of the affected SOFR Loans and/or the affected Interest Periods), or, failing that, the Borrower will be deemed to have converted any such request into a request for a Borrowing of or a conversion to (as applicable) Base Rate Loans in the amount specified therein; and (B) any outstanding affected SOFR Loans will be deemed to have been converted into Base Rate Loans (at the end of the applicable Interest Period). Upon any such conversion, the Borrower shall also pay accrued interest on the amount so converted, together with any additional amounts required pursuant to Section 2.19. Subject to clauses (b) through (f) below, if the Administrative Agent determines (which determination shall be conclusive and binding absent manifest error) that Adjusted Daily SOFR cannot be determined pursuant to the applicable definition thereof in Section 1.1 on any given day, then applicable interest rate for Base Rate Loans shall be determined by the Administrative Agent without reference to clause (c) of the definition of "*Base Rate*" in Section 1.1, until the Administrative Agent shall have revoked such determination; provided, that, notwithstanding anything to the contrary in this Agreement or in any other Loan Document, at any time that the applicable interest rate for Base Rate Loans is determined without reference to clause (c) of the definition of "*Base Rate*" in Section 1.1 by operation of this clause (a), then the "*Floor*", for purposes of calculating such applicable interest rate, shall be increased by one percent (1.00%) per annum.

(b)    Benchmark Replacement.

(i)    Notwithstanding anything to the contrary herein or in any other Loan Document, if a Benchmark Transition Event, together with its related Benchmark Replacement Date, have occurred *prior* to any setting of the then-current Benchmark, then: (i) if a Benchmark Replacement is determined in accordance with clause (a) of the definition of "*Benchmark Replacement*" in Section 1.1 for such Benchmark Replacement Date, such Benchmark Replacement will replace such Benchmark for all purposes of this Agreement and each other Loan Document in respect of such Benchmark setting and any subsequent Benchmark settings, without any amendment to, or further action or consent of any other party to, this Agreement or any other Loan Document; and (ii) if a Benchmark Replacement is determined in

accordance with clause (b) of the definition of "*Benchmark Replacement*" in Section 1.1 for such Benchmark Replacement Date, such Benchmark Replacement will replace such Benchmark for all purposes of this Agreement and each other Loan Document in respect of any Benchmark setting at or after 5:00 P.M. on the date that is five (5) Business Days after the date on which notice of such Benchmark Replacement is first provided to the Lenders, without any amendment to, or further action or consent of any other party to, this Agreement or any other Loan Document, so long as the Administrative Agent shall *not* have received, by the date that is five (5) Business Days after the date on which notice of such Benchmark Replacement is first provided to the Lenders, written notice of objection to such Benchmark Replacement from Lenders comprising the Required Lenders at such time.

(ii)     Notwithstanding anything to the contrary herein or in any other Loan Document, no Master Agreement and/or any other agreement evidencing Swap Obligations shall be deemed to be a "*Loan Document*" for purposes of this Section 2.16.

(c)     Benchmark Replacement Conforming Changes. In connection with the use, administration, adoption and/or implementation of a Benchmark Replacement, the Administrative Agent will have the right to make Conforming Changes from time to time, and, notwithstanding anything to the contrary herein or in any other Loan Document, any amendments implementing such Conforming Changes will become effective without any further action(s) and/or consent(s) of any Loan Party, any other party to this Agreement or any other Loan Document and/or any other Person.

(d)     Notices; Standards for Decisions and Determinations. The Administrative Agent will promptly notify the Borrower and the Lenders of: (i) the implementation of any Benchmark Replacement; and (ii) the effectiveness of any Conforming Changes implemented in connection with the use, administration, adoption and/or implementation of a Benchmark Replacement. The Administrative Agent will notify the Borrower of: (A) the removal or reinstatement of any tenor of a Benchmark pursuant to clause (e) below; and (B) the commencement of any Benchmark Unavailability Period. Any determination, decision, or election that may be made by the Administrative Agent or, if applicable, any Lender (or group of Lenders) pursuant to this Section 2.16, including, without limitation, any determination with respect to a tenor, rate or adjustment, or of the occurrence or non-occurrence of an event, circumstance, or date, and any decision to take, or refrain from taking, any action or any selection, will be conclusive and binding absent manifest error, and may be made in its or their, as applicable, sole discretion, and, in any event, without consent from any Loan Party, any other party to this Agreement or any other Loan Document or any other Person, except, in each case, as expressly required pursuant to this Section 2.16.

(e)     Unavailability of Tenor of Benchmark. Notwithstanding anything to the contrary in this Agreement or any other Loan Document, at any time (including in connection with the implementation of a Benchmark Replacement): (i) if the then-current Benchmark is a term rate (including the Term SOFR Reference Rate for any applicable tenor) and either (A) any tenor for such Benchmark is *not* displayed on a screen or other information service that publishes such rate from time to time as selected by the Administrative Agent in its reasonable discretion, or (B) the regulatory supervisor for the administrator of such Benchmark has provided a public statement or publication of information announcing that any tenor for such Benchmark is *not* or will *not* be representative, then, in any such case of the foregoing clauses (e)(i)(A) or (e)(i)(B), the Administrative Agent may modify the definition of "*Interest Period*" in Section 1.1 (or any similar or analogous definition) for any Benchmark settings at or after such time in order to remove such unavailable or non-representative tenor; and (ii) if a tenor that was removed pursuant to the foregoing clause (e)(i) either (A) is subsequently displayed on a screen or information service for a Benchmark (including, without limitation, a Benchmark Replacement), or (B) is *not*, or is no longer, subject to an announcement that it is *not* or will *not* be representative for a Benchmark (including, without limitation, a Benchmark Replacement), then, in any such case of the foregoing clauses (e)(ii)(A) or (e)(ii)(B), the Administrative Agent may modify the definition of "*Interest Period*" in Section 1.1 (or any similar or analogous definition) for all Benchmark settings at or after such time in order to reinstate such previously removed tenor.

(f)     Benchmark Unavailability Period. Upon the Borrower's receipt of notice of the commencement of a Benchmark Unavailability Period, the Borrower may revoke any pending request for a SOFR Borrowing of, a conversion to, or a continuation of SOFR Loans to be made, converted or continued, as the case may be, during any Benchmark Unavailability Period, and, failing that, the Borrower will be deemed to have converted any such request into a request for a Borrowing of, or a conversion to, Base Rate Loans. During a Benchmark Unavailability Period or at any time that a tenor for the then-current Benchmark is *not* an Available Tenor, the component of the Base Rate that is based upon the then-current Benchmark or such tenor for such Benchmark, as applicable, shall *not* be used in any determination of the Base Rate for purposes of this Agreement or the other Loan Documents.

Section 2.17     Illegality. If any Change in Law shall make it unlawful or impossible for any Lender to perform any of its obligations hereunder, to make, maintain or fund any SOFR Loan or to determine or charge interest rates based upon SOFR, any SOFR Reference Rate and/or any SOFR-Based Rate (for any Interest Period, as applicable), and, in any such case, such Lender shall so notify the Administrative Agent, then the Administrative Agent shall promptly give notice thereof to the Borrower and the other Lenders, whereupon, until such Lender notifies the Administrative Agent and the Borrower that the circumstances giving rise to such suspension no longer exist: (a) the obligation of such Lender to fund or maintain SOFR Loans, or to continue or convert outstanding Loans as or into SOFR Loans, shall be suspended; and (b) the Base Rate shall, if necessary to avoid such illegality, be determined by the Administrative Agent without reference to the component thereof described in clause (c) thereof. Thereafter, in the case of the making of a SOFR Borrowing, such Lender's Revolving Loan shall be made as a Base Rate Loan as part of the same Borrowing and for the same Interest Period; and, if the affected SOFR Loan is then outstanding, such Loan shall be converted to a Base Rate Loan either (A) on the last day of the then current Interest Period applicable to such affected SOFR Loan, if such Lender may lawfully continue to maintain such affected SOFR Loan to such date, or (B) immediately, if such Lender shall determine that it may *not* lawfully continue to maintain such affected SOFR Loan to such date (and, in each instance, the Base Rate shall, if necessary to avoid such illegality, be determined by the Administrative Agent without reference to the component thereof described in clause (c) thereof). Notwithstanding anything to the contrary in the foregoing, the affected Lender shall, prior to giving such notice to the Administrative Agent, use reasonable efforts to designate a different Applicable Lending Office if such designation would avoid the need for giving such notice, and if such designation would *not* otherwise be disadvantageous to such Lender in the good faith exercise of its discretion. Upon any such prepayment or conversion in accordance with this Section 2.17, the Borrower shall also pay accrued interest on the amount so prepaid or converted, together with any additional amounts required pursuant to Section 2.19.

Section 2.18     Increased Costs.

(a)     If any Change in Law shall:

(i)     impose, modify or deem applicable any reserve (including pursuant to regulations issued from time to time by the Federal Reserve Board for determining the maximum reserve requirement (including any emergency, special, supplemental and/or other marginal reserve requirement)) with respect to any special deposit, compulsory loan, insurance charge and/or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in by, any Lender;

(ii)     subject any Recipient to any Taxes (other than (A) Indemnified Taxes, and/or (B) Taxes described in clauses (b) through (d) of the definition of "*Excluded Taxes*" in Section 1.1, and/or (C) Connection Income Taxes); or

(iii)     impose on any Lender or the secured overnight financing or any other applicable interbank lending market any other condition, cost or expense (other than Taxes) affecting this Agreement or any Loans made by such Lender;

and the result of any of the foregoing is to increase the cost to such Lender of making, converting into, continuing or maintaining a Loan, or to reduce the amount received or receivable by such Lender hereunder (whether of principal, interest or any other amount), then, from time to time, such Lender may provide the Borrower (with a

copy thereof to the Administrative Agent) with written notice and demand with respect to such increased costs or reduced amounts, and, within five (5) Business Days after receipt of such notice and demand, the Borrower shall pay to the Administrative Agent, for the account of such Lender, such additional amounts as will compensate such Lender for any such increased costs incurred or reduction suffered.

(b)     If any Lender shall have determined that any Change in Law regarding capital or liquidity ratios or requirements has, or would have, the effect of reducing the rate of return on such Lender's capital (or on the capital of the Parent Company of such Lender) as a consequence of its obligations hereunder to a level *below* that which such Lender or such Parent Company could have achieved *but for* such Change in Law (taking into consideration such Lender's policies or the policies of such Parent Company with respect to capital adequacy and liquidity), then, from time to time, such Lender may provide the Borrower (with a copy thereof to the Administrative Agent) with written notice and demand with respect to such reduced amounts, and, within five (5) Business Days after receipt of such notice and demand, the Borrower shall pay to the Administrative Agent, for the account of such Lender, such additional amounts as will compensate such Lender or such Parent Company for any such reduction suffered.

(c)     A certificate of such Lender setting forth the amount(s) necessary to compensate such Lender or such Parent Company, as applicable, specified in clauses (a) or (b) above shall be delivered to the Borrower (with a copy to the Administrative Agent) and shall be conclusive, absent manifest error.

(d)     Failure or delay on the part of any Lender to demand compensation pursuant to this <u>Section 2.18</u> shall *not* constitute a waiver of such Lender's right to demand such compensation; <u>provided</u>, <u>that</u>, the Borrower shall *not* be required to compensate a Lender pursuant to this <u>Section 2.18</u> for any increased costs incurred, or reductions suffered, *more than* six (6) calendar months prior to the date that such Lender delivers to the Borrower the certificate referenced in the foregoing <u>clause (c)</u> and notifies the Borrower of such Lender's intention to claim compensation therefor (<u>provided</u>, <u>that</u>, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the six (6) month period referred to in the foregoing shall be extended to include the period of retroactive effect thereof).

Section 2.19     <u>Funding Indemnity</u>. In the event of (a) the payment of any principal of a SOFR Loan other than on the last day of the Interest Period applicable thereto (including, without limitation, as a result of an Event of Default), (b) the conversion or continuation of a SOFR Loan other than on the last day of the Interest Period applicable thereto, or (c) the failure by the Borrower to borrow, prepay, convert or continue any SOFR Loan on the date specified in any applicable notice (regardless of whether such notice is withdrawn or revoked), then, in any such event, the Borrower shall compensate each Lender, promptly and, in any event, within five (5) Business Days after written demand therefor from such Lender, for any loss, cost or expense attributable to such event. In the case of a SOFR Loan, such loss, cost or expense shall be deemed to include an amount determined by such Lender to be the *excess*, if any, of: (i) the amount of interest that would have accrued on the principal amount of such SOFR Loan if such event had *not* occurred, at Adjusted Term SOFR for the then current Interest Period for such SOFR Loan (or, in the case of a failure to borrow, convert or continue, for the requested Interest Period for the applicable SOFR Borrowing) for the period from, and including, the date of such event to, and including, the last day of such Interest Period; over (ii) the amount of interest that would accrue on the principal amount of such SOFR Loan for the same period, if Adjusted Term SOFR for such Interest Period were set on the date on which such SOFR Loan was prepaid or converted, or the date on which the Borrower failed to borrow, convert, or continue such SOFR Loan, as the case may be. A certificate as to any additional amount payable under this <u>Section 2.19</u> submitted to the Borrower by any Lender (with a copy to the Administrative Agent) shall be conclusive, absent manifest error.

Section 2.20     <u>Taxes</u>.

(a)     <u>Defined Terms</u>. For purposes of this <u>Section 2.20</u>, the phrase "*applicable Law*" includes FATCA.

(b)      _Payments Free of Taxes_. Any and all payments by or on account of any obligation of any Loan Party under any Loan Document shall be made without deduction or withholding for any Taxes, except as required by applicable Law. If any applicable Law (as determined in the good faith discretion of an applicable Withholding Agent) requires the deduction or withholding of any Tax from any such payment by a Withholding Agent, then the applicable Withholding Agent shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable Law, and, if such Tax is an Indemnified Tax, then the _sum_ payable by the applicable Loan Party shall be _increased_ as necessary so that, after such deduction or withholding has been made (including, without limitation, such deductions and withholdings applicable to additional sums payable under this Section 2.20), the applicable Recipient shall receive an amount equal to the sum it would have received had no such deduction or withholding been made.

(c)      _Payment of Other Taxes by the Loan Parties_. In addition, the Loan Parties shall timely pay to the relevant Governmental Authority in accordance with applicable Law, or at the option of the Administrative Agent timely reimburse it for the payment of, any Other Taxes.

(d)      _Indemnification by the Loan Parties_. The Loan Parties shall, jointly and severally, indemnify each Recipient, within ten (10) Business Days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section 2.20) payable or paid by such Recipient or required to be withheld or deducted from a payment to such Recipient and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to the Borrower by a Lender (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of a Lender, shall be conclusive and binding absent manifest error.

(e)      _Indemnification by the Lenders_. Each Lender shall severally indemnify the Administrative Agent, within ten (10) days after demand therefor, for: (i) any Indemnified Taxes attributable to such Lender (but only to the extent that the Loan Parties have not already indemnified the Administrative Agent for such Indemnified Taxes, and without limiting the obligation of the Loan Parties to do so); (ii) any Taxes attributable to such Lender's failure to comply with the provisions of Section 11.4(e) relating to the maintenance of a Participant Register; and (iii) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by the Administrative Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive and binding absent manifest error. Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under any Loan Document, or otherwise payable by the Administrative Agent to such Lender from any other source, against any amount due to the Administrative Agent under this clause (e).

(f)      _Evidence of Payments_. As soon as practicable after any payment of Taxes by any Loan Party to a Governmental Authority pursuant to this Section 2.20, such Loan Party shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(g)      _Status of Lenders_.

(i)      Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Loan Document shall deliver to the Borrower and the Administrative Agent, at the time or times reasonably requested by the Borrower or the Administrative Agent, such properly completed and executed documentation reasonably requested by the Borrower or the Administrative Agent as will permit such payments to be made without withholding or at a reduced rate of withholding. In addition, any Lender, if reasonably

requested by the Borrower or the Administrative Agent, shall deliver such other documentation prescribed by applicable Law or reasonably requested by the Borrower or the Administrative Agent as will enable the Borrower or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements. Notwithstanding anything to the contrary in the preceding two (2) sentences, the completion, execution and submission of such documentation (other than such documentation set forth in clauses (g)(ii)(A), (g)(ii)(B) and (g)(ii)(D) below) shall *not* be required if, in the Lender's reasonable judgment, such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense, or would materially prejudice the legal or commercial position of such Lender.

(ii)     Without limiting the generality of the foregoing, in the event that the Borrower is a U.S. Person:

(A)     any Lender that is a U.S. Person shall deliver to the Borrower and the Administrative Agent on, or prior to, the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed originals of IRS Form W–9 certifying that such Lender is exempt from U.S. federal backup withholding tax;

(B)     any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on, or prior to, the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), whichever of the following is applicable:

(I)     in the case of a Foreign Lender claiming the benefits of an income tax treaty to which the United States is a party: (1) with respect to payments of interest under any Loan Document, executed originals of IRS Form W–8BEN or IRS Form W–8BEN–E, as applicable, establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "interest" article of such tax treaty; and (2) with respect to any other applicable payments under any Loan Document, IRS Form W–8BEN or IRS Form W–8BEN–E, as applicable, establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

(II)     executed originals of IRS Form W–8ECI;

(III)     in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code: (1) a certificate substantially in the form of Exhibit 2.20–A to the effect that such Foreign Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of the Borrower within the meaning of Section 881(c)(3)(B) of the Code, or a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code (a "*U.S. Tax Compliance Certificate*"); and (2) executed originals of IRS Form W–8BEN or IRS Form W–8BEN–E, as applicable; or

(IV)     to the extent a Foreign Lender is not the beneficial owner, executed originals of IRS Form W–8IMY, accompanied by IRS Form W–8ECI, IRS Form W–8BEN or IRS Form W–8BEN–E, as applicable, a U.S. Tax Compliance Certificate substantially in the form of Exhibit 2.20–B or Exhibit 2.20–C, IRS Form W–9, and/or other certification documents from each beneficial owner, as applicable; provided, that, if the Foreign Lender is a partnership and one (1) or more direct or indirect partners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide a U.S. Tax Compliance Certificate substantially in the form of Exhibit 2.20–D on behalf of each such direct and indirect partner;

(C)     any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient)

on, or prior to, the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed originals of any other form prescribed by applicable Law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by applicable Law to permit the Borrower or the Administrative Agent to determine the withholding or deduction required to be made; and

(D)     if a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrower and the Administrative Agent, at the time or times prescribed by Law, and at such time or times reasonably requested by the Borrower or the Administrative Agent, such documentation prescribed by applicable Law (including, without limitation, as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent, as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment. Solely for purposes of this clause (g)(ii)(D), "*FATCA*" shall include any amendments made to FATCA after the date of this Agreement.

Each Lender agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Borrower and the Administrative Agent in writing of its legal inability to do so.

(h)     Administrative Agent. On or prior to the date the Administrative Agent becomes a party to this Agreement, the Administrative Agent (or any sub-agent or successor Administrative Agent) shall provide to the Borrower a duly completed and executed IRS Form W-9.

(i)     Treatment of Certain Refunds. If any party determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified pursuant to this Section 2.20 (including by the payment of additional amounts pursuant to this Section 2.20), it shall pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made under this Section 2.20 with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of such indemnified party and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund). Such indemnifying party, upon the request of such indemnified party, shall repay to such indemnified party the amount paid over pursuant to this clause (i) (*plus* any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event that such indemnified party is required to repay such refund to such Governmental Authority. Notwithstanding anything to the contrary in this clause (i), in no event will the indemnified party be required to pay any amount to an indemnifying party pursuant to this clause (i) the payment of which would place the indemnified party in a less favorable net after-Tax position than the indemnified party would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid. This clause (i) shall not be construed to require any indemnified party to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the indemnifying party or any other Person.

(j)     Survival. Each party's obligations under this Section 2.20 shall survive the resignation or replacement of the Administrative Agent, any assignment of rights by, or the replacement of, a Lender, and the repayment, satisfaction and/or discharge of all Obligations, and the termination of all Commitments, under the Loan Documents.

Section 2.21    Payments Generally; Pro Rata Treatment; Sharing of Set-offs.

(a)    The Borrower shall make each payment required to be made by it hereunder (whether of principal, interest or fees, or of amounts payable under Section 2.18, Section 2.19 or Section 2.20, or otherwise) prior to 2:00 P.M. on the date when due, in immediately available funds, free and clear of any defenses, rights of set-off, counterclaim, or withholding or deduction of taxes (except as otherwise expressly provided herein). Any amounts received after such time on any date may, in the discretion of the Administrative Agent, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon. All such payments shall be made to the Administrative Agent at the Payment Office, except that payments pursuant to Section 2.18, Section 2.19, Section 2.20 and Section 11.3 shall be made directly to the Persons entitled thereto. The Administrative Agent shall distribute any such payments received by it for the account of any other Person to the appropriate recipient promptly following receipt thereof. If any payment hereunder shall be due on a day that is not a Business Day, the date for payment shall be extended to the next succeeding Business Day, and, in the case of any payment accruing interest, interest thereon shall be made payable for the period of such extension. All payments hereunder shall be made in Dollars.

(b)    If, at any time, insufficient funds are received by and available to the Administrative Agent to pay fully all amounts of principal, interest and fees then due hereunder, such funds shall be applied as follows: (i) *first*, to all fees and reimbursable expenses of the Administrative Agent then due and payable pursuant to any of the Loan Documents; (ii) *second*, to all reimbursable expenses of the Lenders then due and payable pursuant to any of the Loan Documents, *pro rata* to the Lenders based on their respective Pro Rata Shares of such fees and expenses; (iii) *third*, to all interest and fees then due and payable hereunder, *pro rata* to the Lenders based on their respective Pro Rata Shares of such interest and fees; and (iv) *fourth*, to the payment of principal of all Loans then due and payable hereunder, *pro rata* to the parties entitled thereto based on their respective Pro Rata Shares of such principal.

(c)    If any Lender shall, by exercising any right of set-off or counterclaim or otherwise, obtain payment in respect of any principal of, or interest on, any of its Loans that would result in such Lender receiving payment of a greater proportion of the aggregate amount of its Revolving Credit Exposure and accrued interest and fees thereon than the proportion received by any other Lender with respect to its Revolving Credit Exposure receiving such greater proportion shall purchase (for cash at face value) participations in the Revolving Credit Exposure of other Lenders to the extent necessary so that the benefit of all such payments shall be shared by the Lenders ratably in accordance with the aggregate amount of principal of and accrued interest on their respective Revolving Credit Exposure; provided, that, (i) if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest, and (ii) the provisions of this clause (c) shall *not* be construed to apply to any payment made by the Borrower pursuant to and in accordance with, the express terms of this Agreement (including, without limitation, the application of funds arising from the existence of a Defaulting Lender), or any payment obtained by a Lender as consideration for the assignment of, or sale of a participation in, any of its Revolving Credit Exposure to any assignee or Participant, other than to the Borrower or any Subsidiary or Affiliate thereof (as to which the provisions of this clause (c) shall apply). The Borrower consents to the foregoing and agrees, to the extent it may effectively do so under applicable Law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against the Borrower rights of set-off and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of the Borrower in the amount of such participation.

(d)    Unless the Administrative Agent shall have received notice from the Borrower prior to the date on which any payment is due to the Administrative Agent for the account of the Lenders hereunder that the Borrower will not make such payment, the Administrative Agent may assume that the Borrower has made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the Lenders the amount or amounts due. In such event, if the Borrower has not in fact made such payment, then each of the Lenders severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Lender with interest thereon, for each day from, and including, the date such amount is distributed to it to,

but excluding, the date of payment to the Administrative Agent, at the greater of the Federal Funds Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.

(e)     Notwithstanding anything herein to the contrary, any amount paid by the Borrower for the account of a Defaulting Lender under this Agreement (whether on account of principal, interest, fees, indemnity payments or other amounts) will be retained by the Administrative Agent in a segregated non-interest bearing account until the Revolving Commitment Termination Date at which time, the funds in such account will be applied by the Administrative Agent, to the fullest extent permitted by Law, in the following order of priority: (i) *first* to the payment of any amounts owing by such Defaulting Lender to the Administrative Agent under this Agreement; (ii) *second*, [reserved]; (iii) *third*, to the payment of all interest due and payable to the Lenders hereunder that are not Defaulting Lenders, ratably among them in accordance with the amounts of such interest then due and payable to them; (iv) *fourth*, to the payment of all fees then due and payable to the Lenders hereunder that are not Defaulting Lenders, ratably among them in accordance with the amounts of such fees then due and payable to them; (v) *fifth*, to pay principal then due and payable to the Lenders hereunder that are not Defaulting Lenders, ratably in accordance with the amounts thereof then due and payable to them; (vi) *sixth*, to the ratable payment of all other amounts then due and payable to the Lenders hereunder that are not Defaulting Lenders; and (vii) *seventh*, to pay all amounts owing under this Agreement to such Defaulting Lender, or as a court of competent jurisdiction may otherwise direct.

Section 2.22     [Reserved].

Section 2.23     [Reserved].

Section 2.24     Mitigation of Obligations. If any Lender requests compensation under Section 2.18, or if the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 2.20, then such Lender shall use reasonable efforts to designate a different lending office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or Affiliates, if, in the sole judgment of such Lender, such designation or assignment: (a) would eliminate or reduce amounts payable under Section 2.18 or Section 2.20, as the case may be, in the future; and (b) would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender. The Borrower hereby agrees to pay all costs and expenses incurred by any Lender in connection with such designation or assignment.

Section 2.25     Replacement of Lenders. If (a) any Lender requests compensation under Section 2.18, (b) the Borrower is required to pay any additional amount to any Lender or any Governmental Authority of the account of any Lender pursuant to Section 2.20, (c) any Lender notifies the Borrower and the Administrative Agent that it is unable to fund SOFR Loans pursuant to Section 2.16 or Section 2.17, (d) a Lender (a "*Non-Consenting Lender*") does *not* consent to a proposed change, waiver, discharge or termination with respect to any Loan Document that has been approved by the Required Lenders as provided in Section 11.2(b), but which requires the unanimous consent of all Lenders or of all of the Lenders directly affected thereby (as the case may be), or (e) any Lender is a Defaulting Lender, then, the Borrower may, at its sole expense and effort, upon notice to such Lender and the Administrative Agent, require such Lender to assign and delegate, without recourse (in accordance with, and subject to the restrictions set forth in, Section 11.4(b)), all of its interests, rights (other than its existing rights to payments pursuant to Section 2.18 and/or Section 2.20, as applicable), and obligations under this Agreement and the related Loan Documents to an assignee that shall assume such obligations (which assignee may be another Lender) (a "*Replacement Lender*"); provided, that, (i) the Borrower shall have received the prior written consent of the Administrative Agent, which consent shall *not* be unreasonably withheld, (ii) such Lender shall have received payment of an amount equal to the outstanding principal amount of all Loans owed to it, accrued interest thereon, accrued fees and all other amounts payable to it hereunder, from the assignee (in the case of such outstanding principal and accrued interest) and from the Borrower (in the case of all other amounts), (iii) in the case of a claim for compensation under Section 2.18 or payments required to be made pursuant to Section 2.20, such assignment will result in a reduction in such compensation or payments, (iv) such assignment does *not* conflict with applicable Law, and (v) in the case of any such assignment resulting from a Non-Consenting Lender's

failure to consent to a proposed change, waiver, discharge or termination with respect to any Loan Document, the applicable assignee consents to the proposed change, waiver, discharge or termination, provided, that, the failure by such Non-Consenting Lender to execute and deliver an Assignment and Acceptance shall *not* impair the validity of the removal of such Non-Consenting Lender, and the mandatory assignment of such Non-Consenting Lender's Commitments and outstanding Loans pursuant to this Section 2.25 shall nevertheless be effective without the execution by such Non-Consenting Lender of an Assignment and Acceptance. A Lender shall *not* be required to make any such assignment and delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the Borrower to require such assignment and delegation cease to apply.

Section 2.26    Defaulting Lenders. If the Borrower and the Administrative Agent agree in writing in their discretion that any Defaulting Lender has ceased to be a Defaulting Lender, the Administrative Agent will so notify the parties hereto, whereupon as of the effective date specified in such notice and subject to any conditions set forth therein, such Lender will purchase at par such portion of outstanding Revolving Loans of the other Lenders and/or make such other adjustments as the Administrative Agent may determine to be necessary to cause the Revolving Credit Exposure of the Lenders to be on a pro rata basis in accordance with their respective Revolving Commitments, whereupon such Lender will cease to be a Defaulting Lender and will be a Non-Defaulting Lender (and such Revolving Credit Exposure of each Lender will automatically be adjusted on a prospective basis to reflect the foregoing); provided, that, (i) no adjustments will be made retroactively with respect to fees accrued or payments made by, or on behalf of, the Borrower while such Lender was a Defaulting Lender, and (ii) except to the extent otherwise expressly agreed by the affected parties, no change hereunder from Defaulting Lender to Non-Defaulting Lender will constitute a waiver or release of any claim of any party hereunder arising from such Lender's having been a Defaulting Lender.

Section 2.27    Priority and Liens.

(a)    Superpriority Claims and Liens. Each Loan Party hereby covenants, represents and warrants that, upon entry of the Interim DIP Order (or, where indicated below, the Final DIP Order), the Obligations are authorized by the Orders and:

(i)    pursuant to Sections 364(c)(1) and 507(b) of the Bankruptcy Code, constitute joint and several allowed administrative expense claims in the Chapter 11 Case having superpriority over all administrative expenses of the kind specified in Section 364(c)(1), 503(b), 507(a)(2), 507(b) or 507(d) of the Bankruptcy Code;

(ii)    pursuant to Sections 361, 362, 364(c)(2), 364(c)(3) and 364(d) of the Bankruptcy Code and the Collateral Documents, shall be secured by, and each Loan Party shall have granted to the Administrative Agent, for the benefit of the Secured Parties, a perfected first-priority Lien on all presently owned and hereafter acquired unencumbered tangible and intangible property and assets of the Borrower, the Guarantors and their respective estates wherever located, and any proceeds and products thereof, including, without limitation, accounts, deposit accounts, cash, chattel paper, investment property, letter-of-credit rights, securities accounts, software, supporting obligations, commercial tort claims, causes of action, investments, instruments, documents, inventory, contract rights, general intangibles, intellectual property, real property, fixtures, goods, equipment, vessels and other fixed assets, and accessions and proceeds and products of all of the foregoing (including earnings and insurance proceeds) and including (subject to entry of the Final DIP Order) any amounts that are recovered or otherwise received by the Debtors in respect of Avoidance Actions pursuant to Sections 549 and 550 of the Bankruptcy Code and any proceeds thereof;

(iii)    pursuant to Section 364(c)(3) of the Bankruptcy Code and the Collateral Documents, shall be secured by, and each Loan Party shall have granted to the Administrative Agent, for the benefit of the Secured Parties, a perfected junior Lien on all property of the Borrower, the Guarantors and their respective estates wherever located, and any proceeds and products thereof, including, without limitation, accounts, deposit accounts, cash, chattel paper, investment property, letter-of-credit rights, securities

accounts, software, supporting obligations, commercial tort claims, causes of action, investments, instruments, documents, inventory, contract rights, general intangibles, intellectual property, real property, fixtures, goods, equipment, vessels and other fixed assets, and accessions and proceeds and products of all of the foregoing (including earnings and insurance proceeds), that is subject to valid and perfected Liens in existence as of the Petition Date (including Liens (if any) perfected subsequent to the Petition Date as permitted by and in accordance with Section 546(b) of the Bankruptcy Code but excluding the Primed Liens in favor of the Prepetition Agent for the benefit of the holders of the Prepetition Facility Obligations which Liens will be primed as described in the next clause) (such existing Liens, the "*Permitted Prior Liens*") but with a priority immediately junior to such Liens; and

(iv)    pursuant to Section 364(d)(1) of the Bankruptcy Code and the Collateral Documents, shall be secured by, and each Loan Party shall have granted to the Administrative Agent, for the benefit of the Secured Parties, a perfected first-priority, senior priming Lien (the "*Priming Lien*") on the Prepetition Collateral, which Priming Lien shall prime (A) all Liens securing the Prepetition Facility Obligations and (B) any existing Liens that are junior thereto, and shall also be senior to any Liens arising after the Petition Date to provide adequate protection in respect of any Liens to which the Priming Lien is senior (collectively, the "*Primed Liens*"), provided, that, such Priming Liens in favor of the Administrative Agent shall not prime Liens that are valid, properly perfected, non-avoidable and senior in priority as a matter of law to the Primed Liens as of the Petition Date;

provided, that, the Liens in favor of the Administrative Agent, for the benefit of the Secured Parties, shall: (A) not encumber any Excluded Property; (B) be subject to the Carve-Out, any senior Liens, if any, permitted under this Agreement and the other Loan Documents, and the rights of the cash management banks as set forth in the Cash Management Order; and (C) the administrative expense claims and Liens described in this Section 2.27 and granted pursuant to any Loan Document or the Final DIP Order shall be subject in all respects to the DIP Motion Concessions.

(b)    Security Perfection. Each of the Loan Parties agrees to take all action that the Administrative Agent or the Required Lenders may reasonably request as a matter of nonbankruptcy law to perfect and protect the Administrative Agent's Liens for the benefit of the Secured Parties, and upon the Collateral and for such Liens to obtain the priority therefor contemplated hereby, including, without limitation, executing and delivering such documents and instruments, financing statements, providing such notices and assents of third parties, obtaining such governmental authorizations and providing such other instruments and documents in recordable form as the Administrative Agent or any Lender may reasonably request. Each Loan Party hereby irrevocably authorizes the Administrative Agent (or its designee) at any time and from time to time to file in any filing office in any UCC jurisdiction any initial financing statements and amendments thereto that (i) indicate the Collateral (A) as all assets of such Loan Party or words of similar effect, regardless of whether any particular asset comprised in the Collateral falls within the scope of Article 9 of the UCC, or (B) as being of an equal or lesser scope or with greater detail, and (ii) provide any other information required by part 5 of Article 9 of the UCC for the sufficiency or filing office acceptance of any financing statement or amendment, including (A) whether such Loan Party is an organization, the type of organization and any organization identification number issued to such Loan Party and, (B) in the case of a financing statement filed as a fixture filing, a sufficient description of real property to which the Collateral relates. Such Loan Party agrees to use commercially reasonable efforts to furnish any such information to the Administrative Agent promptly upon request. Notwithstanding the provisions of this Section 2.27(b), the Administrative Agent and the Lenders shall have the benefits of the Orders.

(c)    Real Property. Subject in all respects to the priorities set forth in Section 2.27(a) above and to the Carve-Out and subject to the entry of the Final DIP Order, the Borrower and the Guarantors shall grant to the Administrative Agent on behalf of the Secured Parties a security interest in, and Mortgage on, all of the right, title and interest of the Borrower and the Guarantors in all real property, if any, now or hereafter owned or leased by either the Borrower or any of the Guarantors, together in each case with all of the right, title and interest of the Borrower or such Guarantor in and to all buildings, improvements, and fixtures related thereto, any lease or sublease thereof, all general intangibles relating thereto and all proceeds thereof, except to the extent constituting

Excluded Property. The Borrower and the Guarantors shall acknowledge that, pursuant to the Final DIP Order, the Liens in favor of the Administrative Agent on behalf of the Secured Parties in all of such real property and leasehold interests shall be perfected without the recordation of any instruments of mortgage or assignment and the Administrative Agent and the Lenders shall have the benefits of the Final DIP Order. Notwithstanding the foregoing, at the reasonable request of the Administrative Agent but subject to the entry of the Final DIP Order, the Loan Parties shall enter into Mortgages in recordable form with respect to such properties on terms reasonably satisfactory to the Administrative Agent, which the Administrative Agent may, in its sole discretion, elect to record. In the event of a conflict between, or inconsistency among, the Interim DIP Order or the Final DIP Order, on the one hand, and any Loan Document, on the other hand, the Interim DIP Order or the Final DIP Order, as the case may be, shall control.

(d)     No Modification. Except as otherwise agreed to by the Lenders, the Liens, Lien priorities, Superpriority Claims and other rights and remedies granted to the Secured Parties pursuant to the Orders, this Agreement or the other Loan Documents (specifically including, but not limited to, the existence, perfection, enforceability and priority of the Liens provided for herein and therein, and the Superpriority Claims provided herein and therein) shall not be modified, altered or impaired in any manner by any other financing or extension of credit or incurrence of indebtedness by the Borrower or any other Loan Party (pursuant to Section 364 of the Bankruptcy Code or otherwise), or by dismissal or conversion of any Chapter 11 Case, or by any other act or omission whatsoever.

## ARTICLE III

## CONDITIONS PRECEDENT TO LOANS

Section 3.1     Conditions to Effectiveness. This Agreement, and the obligations of the Lenders to make Loans shall *not* be effective until the date on which each of the following conditions precedent is satisfied (or waived in accordance with Section 11.2), in each case, in form and substance satisfactory to the Administrative Agent and each Lender:

(a)     Loan Documents. Receipt by the Administrative Agent of a counterpart of this Agreement and each of the other Loan Documents signed by, or on behalf of, each party hereto or thereto, or written evidence satisfactory to the Administrative Agent (which may include telecopy transmission of such signed signature page) that such party (including, without limitation, each Loan Party and each Lender party hereto) has signed a counterpart of this Agreement and the other Loan Documents (including, without limitation, a Note payable to the order of each Lender that requested such Note at least one (1) Business Day prior to the Effective Date) to which such party is a party.

(b)     Organization Documents; Resolutions and Certificates. Receipt by the Administrative Agent of:

(i)     a certificate of the Secretary or Assistant Secretary (or a Responsible Officer of substantially equivalent title and authority) of each Loan Party, attaching and certifying copies of such Loan Party's Organization Documents and resolutions of its board of directors or managers (or equivalent governing body), authorizing the execution, delivery and performance of the Loan Documents to which it is a party, and certifying the name, title and true signature of each officer of such Loan Party executing the Loan Documents to which it is a party;

(ii)     certified copies of the articles or certificate of incorporation, certificate of organization or limited partnership, or other registered organizational documents of each Loan Party, together with certificates of good standing or existence, as may be available from the Secretary of State of the jurisdiction of organization of such Loan Party; and

(iii)     evidence reasonably satisfactory to the Administrative Agent that, as of the Effective Date, the board of directors or managers (or equivalent governing body) of the Borrower and each other

Loan Party (A) is composed of five (5) individuals at least three (3) of whom (I) do not have a relationship by blood (to the second (2nd) degree of consanguinity), marriage or adoption to John Henry Owoc, (II) are not employees, officers, managers or consultants of, or independent contractors or advisors to, any Loan Party (other than in respect of service on such board or other equivalent governing body) and (III) are otherwise reasonably acceptable to the Required Lenders, and (B) includes the Restructuring Committee composed solely of one (1) individual reasonably acceptable to the Required Lenders, it being understood that Steven G. Panagos is reasonably acceptable to the Required Lenders, with authority to, at a minimum, make recommendations to the board of directors or managers (or equivalent governing body) of the Borrower or such other Loan Party, as applicable, regarding all aspects of the Chapter 11 Case, including without limitation the undertaking by any Debtor of any action necessary to satisfy any requirement of <u>Section 5.18</u>.

(c)     <u>Commencement of Chapter 11 Case</u>. The Loan Parties shall have commenced the Chapter 11 Case in the Bankruptcy Court.

(d)     <u>Interim DIP Order</u>. The Bankruptcy Court shall have entered the Interim DIP Order, which Interim DIP Order shall be in full force and effect and shall not have been amended, modified, stayed or reversed other than in respect of (i) immaterial modifications with the prior written consent of the Administrative Agent (such consent not to be unreasonably withheld) or (ii) material modifications with the prior written consent of the Administrative Agent. If the Interim DIP Order is the subject of a pending appeal in any respect, neither the Interim DIP Order nor the making of the Loans or the performance by any Loan Party of any of its obligations under any of the Loan Documents shall be the subject of a presently effective stay pending appeal.

(e)     [Reserved].

(f)     <u>First Day Orders</u>. All of the "first day orders" (other than the Interim DIP Order) entered by the Bankruptcy Court in the Chapter 11 Case shall be reasonably satisfactory in form and substance to the Administrative Agent and the Required Lenders in all material respects, and all adequate protection payments and critical vendor payments approved by the Bankruptcy Court in the Interim DIP Order or otherwise shall be satisfactory to the Administrative Agent.

(g)     [Reserved].

(h)     <u>Initial Budget; Other Financial Information</u>. The Administrative Agent shall have received a reasonably detailed weekly budget of projected receipts and expenditures of the Loan Parties for the period commencing on the Petition Date and ending on the date that is thirteen (13) weeks after the Petition Date, in form and substance reasonably satisfactory to the Administrative Agent and the Required Lenders and consistent with the budget prepared by the Loan Parties and delivered to the Administrative Agent prior to the Effective Date (the "*Initial Budget*"), with such supporting detail as the Administrative Agent may reasonably request.

(i)     [Reserved].

(j)     <u>Patriot Act; Anti-Money Laundering Laws</u>. *At least* one (1) day prior to the Effective Date, receipt by the Administrative Agent of all documentation and other information required by bank regulatory authorities, or reasonably requested by the Administrative Agent or any Lender at least two (2) days prior to the Effective Date, under, or in respect of, applicable "know your customer" and anti-money laundering Laws, including, without limitation, the Patriot Act, and, if any Loan Party qualifies as a "legal entity customer" under the Beneficial Ownership Regulation, a Beneficial Ownership Certification in relation to such Loan Party.

(k)     [Reserved].

(l)     <u>Other Information</u>. Subject to applicable legal privileges, trade secrets, proprietary information, fiduciary duty, binding agreements and applicable Law, the Administrative Agent shall have received all

information (financial or otherwise) and copies of all material documents reasonably requested in writing at least one (1) Business Day prior to the Effective Date by the Administrative Agent.

(m)     Fees and Expenses. Receipt by the Administrative Agent of payment of all fees, expenses and other amounts due and payable on, or prior to, the Effective Date, including, without limitation, reimbursement or payment of all out-of-pocket expenses of the Administrative Agent and its Affiliates (including, without limitation, all reasonable fees, charges and disbursements of the Administrative Agent's counsel and financial advisor) required to be reimbursed or paid by the Borrower hereunder, under any other Loan Document, and under any agreement with the Administrative Agent.

Without limiting the generality of the provisions of this Section 3.1, for purposes of determining compliance with the conditions specified in this Section 3.1, each Lender that has signed this Agreement shall be deemed to have consented to, approved of, accepted, or been satisfied with, each document or other matter required thereunder to be consented to or approved by, or acceptable or satisfactory to, a Lender, unless the Administrative Agent shall have received notice from such Lender prior to the proposed Effective Date specifying its objection thereto. The Administrative Agent shall notify the Borrower and the Lenders of the Effective Date, and such notice shall be conclusive and binding.

Section 3.2     Conditions to Each Credit Event. The obligation of each Lender to make a Loan on the occasion of any Borrowing (other than any Borrowing effectuated pursuant to Section 2.6(a)) is subject to Section 2.26 and the satisfaction of the following conditions:

(a)     on the date on which such Borrowing is to become effective, both immediately prior to, and immediately after giving effect to, the incurrence of such Borrowing, no Default or Event of Default shall exist;

(b)     on the date on which such Borrowing, is to become effective, both immediately prior to, and immediately after giving effect to, the incurrence of such Borrowing, all representations and warranties of each Loan Party set forth in the Loan Documents (including, without limitation, the representations and warranties of each Loan Party set forth in Article IV) shall be true and correct in all material respects (other than those representations and warranties that are expressly qualified by a Material Adverse Effect or other materiality, in which case, such representations and warranties shall be true and correct in all respects), except to the extent that such representations and warranties specifically relate to an earlier date, in which case, they shall be true and correct in all material respects (other than those representations and warranties that are expressly qualified by a Material Adverse Effect or other materiality, in which case, such representations and warranties shall be true and correct in all respects) as of such earlier date;

(c)     the Borrower shall have delivered the required Notice of Borrowing;

(d)     at the time of such Borrowing, (i) if such extension of credit has been requested before the Final DIP Order has been entered by the Bankruptcy Court, the Interim DIP Order shall be in full force and effect and shall not have been vacated, reversed, stayed, modified or amended in any respect other than immaterial modifications made with the prior written consent of the Administrative Agent (such consent not to be unreasonably withheld), and (ii) if such extension of credit is requested after the Final DIP Order has been entered by the Bankruptcy Court, the Administrative Agent and the Lenders shall have received a copy of the Final DIP Order and the Final DIP Order shall be in full force and effect and shall not have been vacated, reversed, stayed, modified or amended in any respect other than immaterial modifications made with the prior written consent of the Administrative Agent (such consent not to be unreasonably withheld); provided, that, if either the Interim DIP Order or the Final DIP Order is the subject of a pending appeal in any respect, none of such Order, the making of Loans or the performance by any Loan Party of any of its obligations under any of the Loan Documents shall be the subject of a presently effective stay pending appeal; provided, further, that, the Loan Parties, the Administrative Agent and the Lenders shall be permitted and required to perform their respective obligations in compliance with this Agreement, notwithstanding any such objection or appeal unless the relevant Order has been stayed by a court of competent jurisdiction;

(e)    the Borrower shall have paid the balance of all fees and expenses then due and payable to the Administrative Agent and, the Lenders as of the date of such extension of credit that (i) have been invoiced to the Borrower in writing at least one (1) Business Day prior to such extension of credit and (ii) are permitted to be paid under the Orders (as applicable);

(f)    the Borrower shall have operated in all material respects in accordance with the Budget (subject to compliance with the permitted variance contemplated by Section 6.1(a));

(g)    [reserved]; and

(h)    immediately after giving effect to such Borrowing, Unrestricted Cash shall not exceed the Unrestricted Cash Threshold Amount.

Each Borrowing shall be deemed to constitute a representation and warranty by the Borrower, on the date thereof, as to the matters specified in clauses (a), (b), (d), (e), (f) and (h) above.

Section 3.3    Roll-Up Borrowing. Notwithstanding anything herein to the contrary, to the extent that the Effective Date shall have occurred on or prior to such date, the Borrowing effectuated pursuant to Section 2.6(a) shall be (and shall be deemed to have been) made immediately and automatically upon the Final DIP Order Entry Date (and subject to the terms of the Final DIP Order), without the need for the taking of any action by any Person or the satisfaction of any other condition.

Section 3.4    Delivery of Documents. All of the Loan Documents, certificates, legal opinions, and other documents, papers and instruments referred to in this Article III shall, unless otherwise specified, be: (a) delivered to the Administrative Agent, for the account of each of the Lenders, in sufficient number of original counterparts and/or ".pdf" copies as requested by the Administrative Agent; and (b) in form and substance otherwise satisfactory in all respects to the Administrative Agent.


ARTICLE IV

REPRESENTATIONS AND WARRANTIES

Each Loan Party represents and warrants to the Administrative Agent and each Lender as follows:

Section 4.1    Existence; Power. Each Loan Party and Subsidiary (a) is duly organized, validly existing and in good standing as a corporation, partnership or limited liability company under the Laws of the jurisdiction of its organization, (b) has all requisite power and authority to (i) carry on its business as now conducted and (ii) execute, deliver and perform its obligations under the Loan Documents to which it is a party, and (c) is duly qualified to do business, and is in good standing, in each jurisdiction where such qualification is required, except in the case of the foregoing clauses (b)(i) and (c) where a failure to be so qualified could not reasonably be expected to result in a Material Adverse Effect, and except, in the case of each of the foregoing clauses (a), (b) and (c), where failure or non-compliance is permitted by the Bankruptcy Code.

Section 4.2    Organizational Power; Authorization; Enforceability. Subject to entry of the Interim DIP Order and, as applicable, the Final DIP Order, the execution, delivery and performance by each Loan Party of the Loan Documents to which it is a party are within such Loan Party's organizational powers and have been duly authorized by all necessary organizational, and if required, shareholder, partner or member (as the case may be), action. This Agreement has been duly executed and delivered by each Loan Party, and constitutes, and each other Loan Document to which any Loan Party is a party, when executed and delivered by such Loan Party, will constitute, a legal, valid and binding obligation of such Loan Party, enforceable against such Loan Party in accordance with its respective terms, except as may be limited by applicable bankruptcy, insolvency,

reorganization, moratorium, or similar Laws affecting the enforcement of creditors' rights generally and by general principles of equity.

Section 4.3    Governmental Approvals; No Conflicts. Subject to entry of the Interim DIP Order and, as applicable, the Final DIP Order, the execution, delivery and performance by each Loan Party of this Agreement, and by each Loan Party of the other Loan Documents to which it is a party, do *not*, and will *not*: (a) require any consent or approval of, registration or filing with, notice to, or any action by, any Governmental Authority, except (i) those as have been obtained or made and are in full force and effect, and (ii) filings necessary to perfect, and/or maintain the perfection of, the Liens created under the Loan Documents; (b) violate (i) the Organization Documents of any Loan Party, or (ii) any Law applicable to any Loan Party or Subsidiary, or any judgment, order, decree and/or ruling of any Governmental Authority; (c) violate, conflict with, result in a breach of, or constitute (with due notice, lapse or time, or both) a default under, any material contract of any Loan Party or Subsidiary, or any of their respective property or assets, or give rise to a right thereunder to require any payment to be made by any Loan Party or Subsidiary; (d) result in the creation or imposition of any Lien on any asset or property of any Loan Party or Subsidiary, except Liens (if any) created under the Loan Documents; or (e) require any approval of stockholders, members or partners (as the case may be), or any approval or consent of any Person under any material contract, of any Loan Party or Subsidiary, except for such approvals or consents which will be obtained on or before the Effective Date and disclosed in writing to the Administrative Agent, in the case of each of the foregoing clauses (a), through (e), where failure or non-compliance is permitted by the Bankruptcy Code.

Section 4.4    No Material Adverse Effect. Since the Petition Date, there have been no changes with respect to the Loan Parties and Subsidiaries that have had, or could reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect.

Section 4.5    Litigation and Environmental Matters.

(a)    No litigation, investigation or proceeding of or before any arbitrators or Governmental Authorities (including, without limitation, the FDA) is pending against, or, to the knowledge of any Responsible Officer of the Loan Parties, threatened against or affecting, the Loan Parties or their Subsidiaries: (i) as to which there is a reasonable possibility of an adverse determination that could reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect; or (ii) which, in any manner, challenges the validity or enforceability of this Agreement or any other Loan Document.

(b)    Except with respect to any matters that, either individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect, neither any Loan Party nor any Subsidiary: (i) has failed to comply with any Environmental Law or to obtain, maintain or comply with any permit, license or other approval required under any Environmental Law; (ii) has become subject to any Environmental Liability; (iii) has received written notice of any claim with respect to any Environmental Liability; or (iv) knows of any basis for any Environmental Liability.

Section 4.6    Compliance with Laws and Agreements; No Default.

(a)    Each Loan Party and Subsidiary is in compliance with (i) all applicable Laws, and all judgments, decrees and/or orders of any Governmental Authority, and (ii) all Contractual Obligations binding upon it or its assets or property, and neither any Loan Party nor any Subsidiary is in default under, or with respect to, any Contractual Obligation, except, with respect to the foregoing clauses (a)(i) and (a)(ii), where such non-compliance or default (x) either individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect or (y) is permitted under the Bankruptcy Code.

(b)    No Default or Event of Default has occurred and is continuing.

Section 4.7    Investment Company Act, Etc. Neither any Loan Party nor any Subsidiary is: (a) an "investment company" or is "controlled" by an "investment company", as such terms are defined in, or subject to

regulation under or in connection with, the Investment Company Act; or (b) otherwise subject to any other regulatory scheme limiting its ability to incur debt, or requiring any approval or consent from, or registration or filing with, any Governmental Authority in connection therewith.

Section 4.8    Taxes. The Loan Parties and Subsidiaries have timely filed, or caused to be filed, all U.S. federal, and material state and other tax returns that are required to be filed by them, and have paid all material taxes shown to be due and payable on such returns or on any assessments made against it or its property and all other material taxes, fees or other charges imposed on it or any of its property by any Governmental Authority, except where the same are currently being contested in good faith by appropriate proceedings and for which such Loan Party or Subsidiary, as the case may be, has set aside on its books adequate reserves in accordance with GAAP. The charges, accruals and reserves on the books of the Loan Parties and Subsidiaries in respect of such taxes are adequate, and no tax liabilities that could be materially in excess of the amount so provided are anticipated.

Section 4.9    Margin Regulations. None of the proceeds of any of the Loans will be used, directly or indirectly, for "purchasing" or "carrying" any "margin stock" within the respective meanings of each of such terms under Regulation U or for any purpose that violates the provisions of Regulation T, Regulation U or Regulation X. Neither any Loan Party nor any Subsidiary is engaged principally, or as one of its important activities, in the business of extending credit for the purpose of purchasing or carrying "margin stock".

Section 4.10    ERISA.

(a)    Each Plan is in material compliance, in form and operation, with its terms, with ERISA, with the Code (including, without limitation, the Code provisions compliance with which is necessary for any intended favorable tax treatment), and with all other applicable Laws. Each Plan (and each related trust, if any) that is intended to be qualified under Section 401(a) of the Code has received a favorable determination letter from the Internal Revenue Service, to the effect that it meets the requirements of Section 401(a) and Section 501(a) of the Code covering all applicable tax Law changes, or is comprised of a master or prototype plan that has received a favorable opinion letter from the Internal Revenue Service, and, to the knowledge of any Responsible Officer of any Loan Party or Subsidiary, nothing has occurred since the date of such determination that would adversely affect such determination (or, in the case of a Plan with no determination, nothing has occurred that would adversely affect the issuance of a favorable determination letter, or otherwise adversely affect such qualification).

(b)    No ERISA Event has occurred or is reasonably expected to occur. There exists no Unfunded Pension Liability with respect to any Plan. No Loan Party or Subsidiary, nor any of their respective ERISA Affiliates, is making, or accruing an obligation to make, contributions, or has, within any of the five (5) calendar years immediately preceding the date on which the assurance provided by this Section 4.10 is given, or deemed to be given, made, or accrued an obligation to make, contributions to any Multiemployer Plan.

(c)    There are no actions, suits or claims pending against or involving a Plan (other than routine claims for benefits), or, to the knowledge of any Loan Party or Subsidiary, or any of their respective ERISA Affiliates, threatened, which would reasonably be expected to be asserted successfully against any Plan, and, if so asserted successfully, would reasonably be expected, either individually or in the aggregate, to result in material liability to any Loan Party or Subsidiary. Each Loan Party and Subsidiary, and each of their respective ERISA Affiliates, have made all contributions to or under each Plan and Multiemployer Plan required by applicable Law within the applicable time limits prescribed thereby, by the terms of such Plan or Multiemployer Plan, respectively, or by any contract or agreement requiring contributions to a Plan or Multiemployer Plan. No Plan that is subject to Section 412 of the Code or Section 302 of ERISA has applied for, or received, an extension of any amortization period within the meaning of Section 412 of the Code or Section 303 or 304 of ERISA. No Loan Party or Subsidiary, nor, to the knowledge of any Responsible Officer of any Loan Party or Subsidiary, any of their respective ERISA Affiliates, have ceased operations at a facility so as to become subject to the provisions of Section 4068(a) of ERISA, withdrawn as a substantial employer so as to become subject to the provisions of

Section 4063 of ERISA, or ceased making contributions to any Plan subject to Section 4064(a) of ERISA to which it made contributions.

(d)      Each Non-U.S. Plan has been maintained in compliance in all material respects with its terms and with the requirements of any and all applicable Laws, and has been maintained, where required, in good standing with applicable regulatory authorities, except as would *not* reasonably be expected to result in material liability to any Loan Party or Subsidiary. All contributions required to be made with respect to a Non-U.S. Plan have been timely made, except as would *not* reasonably be expected to result in material liability to any Loan Party or Subsidiary. No Loan Party or Subsidiary has incurred any obligation in connection with the termination of, or withdrawal from, any Non-U.S. Plan. The present value of the accrued benefit liabilities (whether or not vested) under each Non-U.S. Plan, determined as of the end of the most recently ended Fiscal Year on the basis of reasonable actuarial assumptions, did *not exceed* the current value of the assets of such Non-U.S. Plan allocable to such benefit liabilities.

Section 4.11      Ownership of Property; Insurance.

(a)      Each of the Loan Parties and Subsidiaries has good title to, or valid leasehold interests in, all of its real and personal property material to the operation of its business, in each case, free and clear of Liens not permitted by this Agreement. All leases that, individually or in the aggregate, are material to the business or operations of the Loan Parties and Subsidiaries are valid and subsisting and are in full force, other than as a result of the Chapter 11 Case.

(b)      Each of the Loan Parties and Subsidiaries owns, or is licensed, or otherwise has the right, to use, all patents, trademarks, service marks, trade names, copyrights and other intellectual property material to its business, and the use thereof by the Loan Parties and Subsidiaries, to the knowledge of any Responsible Officer of any Loan Party or Subsidiary, does *not* infringe in any material respect on the rights of any other Person.

(c)      The property and assets of the Loan Parties and Subsidiaries are insured with financially sound and reputable insurance companies which are not Affiliates of any Loan Party, in such amounts, and with such deductibles and covering such risks, as are customarily carried by companies engaged in similar businesses and owning similar property and assets in localities where any Loan Party, or any Subsidiary thereof, operates.

(d)      Each Loan Party and Subsidiary has taken all reasonable action to maintain all material licenses necessary or desirable in the normal conduct of its business, except to the extent that the failure to do so could not reasonably be expected to have a Material Adverse Effect.

Section 4.12      Disclosure.

(a)      Each Loan Party has disclosed to the Lenders all agreements, instruments, and corporate or other restrictions to which such Loan Party, or any of its Subsidiaries, is subject, and all other matters known to any of them, that, either individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect. None of the reports (including, without limitation, all reports that any Loan Party is required to file with the SEC), financial statements, certificates or other information furnished by, or on behalf of, any Loan Party to the Administrative Agent or any Lender in connection with the negotiation of this Agreement or any other Loan Document, or delivered hereunder or thereunder (as modified and/or supplemented by any other information so furnished), contains any material misstatement of fact or omits to state any material fact necessary to make the statements therein, taken as a whole, in light of the circumstances under which they were made, not misleading; provided, that, with respect to projected financial information, each Loan Party represents only that such information was prepared in good faith based upon assumptions believed to be reasonable at the time, it being understood that any such projected information may vary from actual results and such variations could be material.

(b)      As of the Effective Date, the information included in the Beneficial Ownership Certification is true and correct in all respects.

Section 4.13    <u>Labor Relations</u>. There are no strikes, lockouts, or other material labor disputes or grievances against any Loan Party or Subsidiary, or, to the knowledge of a Responsible Officer of any Loan Party, threatened in writing against or affecting any Loan Party or Subsidiary, and no significant unfair labor practice, charges, or grievances are pending against any Loan Party or Subsidiary, or, to the knowledge of a Responsible Officer of any Loan Party, threatened in writing against any of them, before any Governmental Authority. All payments due from the Loan Parties and Subsidiaries pursuant to the provisions of any collective bargaining agreement have been paid or accrued as a liability on the books of any such Loan Party or Subsidiary, except where the failure to do so could not reasonably be expected to have a Material Adverse Effect.

Section 4.14    <u>Subsidiaries and Loan Parties</u>. <u>Schedule 4.14</u> hereto sets forth: (a) the name of, the ownership interest of each applicable Loan Party, as the case may be, in, the jurisdiction of incorporation or organization of (as the case may be), and the type of, each Subsidiary and Loan Party, and identifies each Subsidiary that is a Loan Party, in each case, as of the Effective Date; and (b) the authorized Capital Stock of each Loan Party, and each Subsidiary thereof, as of the Effective Date. All issued and outstanding Capital Stock of each Loan Party, and each Subsidiary thereof, is duly authorized and validly issued, fully paid, non-assessable, as applicable, and free and clear of all Liens, other than those in favor of the Administrative Agent, for the ratable benefit of the holders of the Obligations. All such securities were issued in compliance with all applicable state and federal Laws concerning the issuance of securities. As of the Effective Date, all of the issued and outstanding Capital Stock of each Loan Party and Subsidiary is owned by the Person(s), and in the amount(s) and class(es), set forth on <u>Schedule 4.14</u> hereto. Except as set forth on <u>Schedule 4.14</u> hereto, there are no pre-emptive or other outstanding rights, options, warrants, conversion rights, commitments, or other similar agreements or understandings for the purchase or acquisition of any Capital Stock of any Loan Party or Subsidiary, and there are no membership interest or other Capital Stock of any Loan Party or Subsidiary outstanding that, upon conversion or exchange, would require the issuance by any Loan Party or Subsidiary of any additional membership interests or other Capital Stock of any Loan Party or Subsidiary, or other securities convertible into, exchangeable for, or evidencing the right to subscribe for a purchase, a membership interest or other Capital Stock of, any Loan Party or Subsidiary.

Section 4.15    [Reserved].

Section 4.16    <u>Business Locations; Taxpayer Identification Number</u>. Set forth on <u>Schedule 4.16–1</u> hereto is a list of all Real Estate as of the Effective Date (identifying whether such Real Estate is owned or leased, and which Loan Party owns or leases such Real Estate). Set forth on <u>Schedule 4.16–2</u> hereto is the chief executive office, U.S. taxpayer identification number, and organizational identification number of each Loan Party as of the Effective Date. The exact legal name and state of organization of each Loan Party, as of the Effective Date, is as set forth on the signature pages hereto. Except as set forth on <u>Schedule 4.16–3</u> hereto, no Loan Party has, during the five (5) years preceding the Effective Date: (i) changed its legal name; (ii) changed its state of formation; or (iii) been party to a merger, consolidation, or other change in structure.

Section 4.17    <u>Deposit and Disbursement Accounts</u>. <u>Schedule 4.17</u> hereto lists all banks and other financial institutions at which any Loan Party maintains any deposit account, lockbox account, disbursement account, investment account, and/or other similar account(s) as of the Effective Date, and such <u>Schedule 4.17</u> correctly identifies the name, address, and telephone number of each such financial institution, the exact name in which any such account is held, the type of any such account, and the complete account number thereof.

Section 4.18    <u>Collateral Documents</u>.

(a)    The Security Agreement, together with the entry of the Interim DIP Order and, as applicable, the Final DIP Order, are each effective to create in favor of the Administrative Agent, for the ratable benefit of the holders of the Obligations, a legal, valid, and enforceable security interest in the Collateral (or any other similar term) (in each case, as defined therein) except as may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar Laws affecting the enforcement of creditors' rights generally and by general principles of equity, and, when UCC financing statements in appropriate form are filed in the appropriate offices

and when the Interim DIP Order and, as applicable, the Final DIP Order have been entered, the Liens created under the Security Agreement, together with Interim DIP Order and, as applicable, the Final DIP Order, shall constitute a fully perfected Lien (in the case of such UCC financing statements, to the extent that such Lien may be perfected by the filing thereof) on, and security interest in, all right, title, and interest of the Obligors (in each case, as defined therein) in such Collateral, in each case, prior, and superior in right, to any other Person(s), other than with respect to (i) Liens expressly permitted by Section 7.2, and (ii) Liens perfected by "control" (as defined in the UCC); provided, that, when the certificates evidencing all Capital Stock pledged pursuant to the Security Agreement are delivered to the Administrative Agent, together with appropriate stock and/or unit powers (or other similar instruments of transfer) duly executed in blank, the Liens in such Capital Stock shall be fully-perfected, first priority security interests, perfected by "control" (as defined in the UCC).

(b)    When the filings described in clause (a) above are made, and when, if applicable, any IP Notice Filings are filed in the United States Copyright Office or the United States Patent and Trademark Office, as applicable, and when the Interim DIP Order and, as applicable, the Final DIP Order have been entered, the Liens created under the Security Agreement, together with the Liens created under the Interim DIP Order and, as applicable, the Final DIP Order, shall constitute a perfected Lien on, and security interest in, all right, title, and interest of the Loan Parties in all Copyrights, Patents and Trademarks, if any, with respect to which a security interest may be perfected by the filing, recording, or registering a security agreement, financing statement, notice of security interest, or analogous document in the United States Patent and Trademark Office or the United States Copyright Office, as applicable, in each case, prior, and superior in right, to any other Person(s), other than with respect to Liens expressly permitted by Section 7.2.

(c)    Each Mortgage, when duly executed and delivered by the relevant Loan Party, together with the entry of the Interim DIP Order and, as applicable, the Final DIP Order, will be effective to create, in favor of the Administrative Agent, for the ratable benefit of the holders of the Obligations, a legal, valid and enforceable Lien, except as may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar Laws affecting the enforcement of creditors' rights generally and by general principles of equity, on all of such Loan Party's right, title, and interest in and to the Real Estate covered thereby, and the proceeds thereof, and, when such Mortgage is filed in the real estate records where the underlying Mortgaged Property is located, such Mortgage, together with the entry of the Interim DIP Order and, as applicable, the Final DIP Order, shall constitute a perfected Lien on, and security interest in, all right, title, and interest of such Loan Party in such Real Estate, and the proceeds thereof, in each case, prior, and superior in right, to any other Person(s), other than with respect to Liens expressly permitted by Section 7.2.

(d)    No Mortgage encumbers any improved Real Estate that is located in an area that has been identified by the Secretary of Housing and Urban Development as an area having special flood hazards, and in which flood insurance has been made available under applicable Flood Insurance Laws, except to the extent that the applicable Loan Party maintains flood insurance with respect to such improved Real Estate in compliance with the requirements of Section 5.8.

Section 4.19    [Reserved].

Section 4.20    Sanctions and Anti-Corruption Laws.

(a)    No Loan Party or Subsidiary, or any of their respective directors, officers, employees or, to the knowledge of any Responsible Officer of any Loan Party, any of their respective agents and/or affiliates, is a Sanctioned Person.

(b)    Each Loan Party and Subsidiary, and each of their respective directors, officers and employees, and, to the knowledge of any Responsible Officer of any Loan Party, the agents of each Loan Party and Subsidiary, are in compliance with all applicable Anti-Corruption Laws and applicable Sanctions. The Loan Parties and Subsidiaries have instituted and maintain policies and procedures designed to ensure continued compliance with all applicable Sanctions and Anti-Corruption Laws.

Section 4.21    No Affected Financial Institutions. No Loan Party or Subsidiary is an Affected Financial Institution.

Section 4.22    Cannabis and Hemp Products.

(a)    None of the Loan Parties or Subsidiaries manufactures, purchases, sells, distributes or invests in, or finances any other Person that manufactures, purchases, sells, distributes, invests in or finances, any products containing parts of the plant Cannabis sativa L., whether growing or not, including, without limitation, the seeds thereof, the resin extracted from any part of such plant, and every compound, manufacture, salt, derivative, mixture, or preparation of such plant, its seeds and/or its resin.

(b)    Except for shared legal, administrative, operations, management and/or distribution services with certain of its Affiliates permitted under applicable Laws, none of the Loan Parties or Subsidiaries manufactures, purchases, sells, distributes, or invests in, or finances any other Person that manufactures, purchases, sells, distributes, invests in or finances, any products containing Hemp or any compound, manufacture, salt, derivative, mixture, or preparation from Hemp, including, without limitation, Cannabidiol (commonly known as "CBD") derived from Hemp.

Section 4.23    Regulatory Matters.

(a)    Each Loan Party and Subsidiary is in compliance with, and is conducting, and has conducted, its respective business and operations in compliance with applicable Healthcare Laws, including, without limitation, the FD&C Act and regulations promulgated by the FDA, and all products manufactured, marketed or distributed by any of the Loan Parties or Subsidiaries comply with applicable Healthcare Laws, except as would *not* reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect. Each Loan Party and Subsidiary obtains and maintains all licenses, permits, certifications, registrations, authorizations and approvals of all applicable Governmental Authorities as are required for the conduct of its business as currently conducted and herein contemplated (including, without limitation, any required by the FDA), except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(b)    During the period of six (6) years immediately preceding the Effective Date, no Loan Party nor any Subsidiary has introduced into commercial distribution any product that was, upon its shipment, adulterated or misbranded in violation of 21 U.S.C. §–331. No Loan Party nor any Subsidiary has received any correspondence, warning letter, or notice from the FDA or any other federal, state or local Governmental Authority with regard to any product, or the manufacture, processing, packaging or holding thereof, or any comparable correspondence from any foreign counterpart of the FDA, or any comparable correspondence from any foreign counterpart of any federal, state or local Governmental Authority with regard to any product or the manufacture, processing, packing, or holding thereof that would be reasonably expected to have a Material Adverse Effect, or that would be reasonably expected to result in a cessation of production or recall of any product manufactured, processed, packaged, or distributed by any Loan Party or Subsidiary. No Loan Party nor, to the actual knowledge of a Responsible Officer of any Loan Party, any Subsidiary has undertaken a recall or field correction or removal of any product manufactured, processed, packaged, or distributed by any Loan Party or Subsidiary, except for any recalls, field corrections, or removals that, individually or in the aggregate, could *not* reasonably be expected to have a Material Adverse Effect.

(c)    No Loan Party or Subsidiary has received any written, or, to the knowledge of any Responsible Officer of any Loan Party, oral notice of any pending or threatened legal proceeding, claim, suit, proceeding, hearing, enforcement, audit, inquiry, inspection, investigation, arbitration or other action from any applicable Governmental Authority, or any *qui tam* relator, alleging that any operation or activity of any member of any Loan Party or Subsidiary is in violation of any applicable Healthcare Law, and to the knowledge of any Responsible Officer of any Loan Party, no such action currently exists. No Loan Party or Subsidiary has received any subpoenas or civil investigative demands or similar written, or, to the knowledge of any Responsible Officer of any Loan Party, oral requests for information, has been a party to a corporate integrity agreement, or has had any

reporting obligations pursuant to a settlement agreement, monitoring agreement, consent decree, order or other similar contract or remedial measure entered into with any Governmental Authority. No Loan Party or any Subsidiary has entered into any consent decree or order with any Governmental Authority, nor is, or has been, subject to any judgment, decree or judicial or administrative order, except for (i) any decrees, judgments, or orders that could *not* reasonably be expected to have a Material Adverse Effect and (ii) any decree, judgment or order of the Bankruptcy Court (including, without limitation, the Interim DIP Order and, as applicable, the Final DIP Order).

(d)     No Loan Party or Subsidiary, nor, to the knowledge of any Responsible Officer of any Loan Party, any of their respective equityholders, directors, limited liability company managers, officers, personnel (whether employees or independent contractors), distributors or other agents or representatives, in their capacities as such, are reasonably be expected to have individual culpability for any material violation of applicable Law, or have made any materially false statements on, or material omissions from, any application, notification, registration, report or other submission to any Governmental Authority, or made any materially false statements on, or omissions from, any other records and documentation prepared or maintained to comply with applicable Law (or applicable requirements of the any Governmental Authority thereunder).

(e)     No Loan Party or Subsidiary, nor, to the knowledge of any Responsible Officer of any Loan Party, any of their directors, officers, employees, agents or, to the knowledge of any Responsible Officer of any Loan Party, any other Person authorized to act on any Loan Party or Subsidiary's behalf, has knowingly or willfully taken, directly or indirectly, any act in furtherance of an offer, payment, promise to pay, authorization, or ratification of the payment, directly or indirectly, of any gift, money, payment, contribution, or anything of value to any Person to secure any improper advantage, or to obtain or retain business that would cause any Loan Party or Subsidiary to be in violation of any Healthcare Laws.

(f)     No Loan Party or Subsidiary employs or contracts with any physicians, pharmacists or other health care professionals to provide professional health care services requiring a license or accreditation under any Healthcare Laws.

(g)     No Loan Party or Subsidiary nor, to the knowledge of any Responsible Officer of any Loan Party, any of their respective equityholders, directors, limited liability company managers, officers, personnel (whether employees or independent contractors) distributors or other agents or representatives, in their capacities as such, is, or ever has been: (i) debarred or otherwise disqualified from submitting applications to the FDA under 21 U.S.C. §–335a(k) or otherwise transacting business with the FDA; or (ii) designated a Specially Designated National or Blocked Person by the Office of Foreign Asset Control of the U.S. Department of Treasury.

(h)     To the extent that any Loan Party or Subsidiary has access to any individually identifiable information of any individual, the Loan Parties and Subsidiaries are in material compliance with all applicable Privacy Laws and maintain information security processes that include safeguards for the security, privacy confidentiality, and integrity of transactions and confidential or proprietary data or Personal Information used, disclosed, or accessed by the Loan Parties and Subsidiaries. No Loan Party or Subsidiary has received written notice, nor, to the knowledge of any Responsible Officer of any Loan Party, oral notice, of any claim that any Loan Party, or any of its respective Subsidiaries, have suffered a breach of Personal Information as defined under applicable Law, except to the extent that any such breach: (A) did *not* require, and is *not* likely to require, any Loan Party or Subsidiary to provide notification in accordance with applicable Law to affected customers, patients or other impacted individuals, or to any Governmental Authority; and (B) would *not* be reasonably likely to have a Material Adverse Effect.

(i)     Each Loan Party or Subsidiary is, and has been, in compliance, in all material respects, with all applicable Laws related to: (i) the requirement for, and the terms of, all necessary registrations, listings, or other authorizations necessary and applicable to the performance of its services; and (ii) payment of all establishment registration fees. No Loan Party or Subsidiary has received any written notice or communication from any Governmental Authority of any actual or threatened investigation, inquiry, or administrative, judicial or regulatory

action, hearing or enforcement proceeding against any member of any Loan Party or Subsidiary regarding any violation of applicable Law. No Responsible Officer of any Loan Party has any knowledge of any material obligation arising under an investigation, inquiry, or administrative, judicial or regulatory action, hearing or enforcement proceeding by, or on behalf of, the FDA or other Governmental Authority, except where such obligation could *not* reasonably be expected to be material to any Loan Party or Subsidiary.

Section 4.24    Bankruptcy Matters.

(a)    The Interim DIP Order and, at all times after its entry by the Bankruptcy Court, the Final DIP Order, is in full force and effect, and has not been reversed, modified, amended, stayed or vacated absent the written consent of the Administrative Agent.

(b)    Upon the maturity (whether by acceleration or otherwise) of any of the Obligations, the Lenders shall, subject to the provisions of the Interim DIP Order or the Final DIP Order, as applicable, be entitled to immediate payment of such Obligations, and to enforce the remedies provided for hereunder in accordance with the terms hereof, without further application to or order by the Bankruptcy Court.

(c)    If either the Interim DIP Order or the Final DIP Order is the subject of a pending appeal in any respect, none of such Order, the making of the Loans or the performance by the Loan Parties of any of their obligations under any of the Loan Documents is or shall be the subject of a presently effective stay pending appeal. The Loan Parties, the Administrative Agent and the Lenders shall be entitled to rely in good faith upon the Orders, notwithstanding objection thereto or appeal therefrom by any interested party. The Loan Parties, the Administrative Agent and the Lenders shall be permitted and required to perform their respective obligations in compliance with this Agreement notwithstanding any such objection or appeal unless the relevant Order has been stayed by a court of competent jurisdiction.

(d)    The Loan Parties are in compliance with all material agreements entered into and all orders entered by the Bankruptcy Court from and after the Petition Date.

## ARTICLE V

## AFFIRMATIVE COVENANTS

Until the Facility Termination Date, each Loan Party covenants and agrees with the Lenders that such Loan Party shall, and shall cause each Subsidiary to:

Section 5.1    Financial and Other Information. Deliver to the Administrative Agent (for further distribution to each Lender):

(a)    [reserved];

(b)    as soon as available and, in any event, within forty-five (45) days after the end of each Fiscal Quarter, commencing with the Fiscal Quarter ending September 30, 2022 (and including, for the avoidance of doubt, each Fiscal Quarter whose end corresponds with the end of a Fiscal Year), an unaudited combined balance sheet of the Loan Parties and Subsidiaries as of the end of such Fiscal Quarter, and the related unaudited combined statements of income or operations, changes in stockholders' equity and cash flows of the Loan Parties and Subsidiaries for such Fiscal Quarter and the then elapsed portion of such Fiscal Year, setting forth, in each such case in comparative form, the figures for the corresponding Fiscal Quarter and the corresponding portion of the Borrower's previous Fiscal Year and the corresponding figures for the budget for the current Fiscal Year, all in reasonable detail and prepared in accordance with GAAP, such combined statements to be certified by the chief executive officer, chief financial officer, treasurer or controller (or a Responsible Officer of substantially equivalent title and authority) of the Borrower as presenting fairly the financial condition, results of operations,