**<u>DEBTORS EXHIBIT 9</u>**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION
www.flsb.uscourts.gov

In re:                                          Chapter 11 Cases

VITAL PHARMACEUTICALS, INC., *et al.*,          Case No. 22-17842 (PDR)
                                                (Joint Administration Pending)
      Debtors.[1]
_____/

## DECLARATION OF JOHN C. DIDONATO IN SUPPORT OF
## CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS

Under 28 U.S.C. § 1746, John C. DiDonato hereby declares as follows under the penalty of perjury:

1.      I am the Chief Transformation Officer of Vital Pharmaceuticals, Inc. ("VPX") and the other debtors and debtors in possession (together with VPX, the "Company" or the "Debtors") in the above-captioned cases (collectively, the "Chapter 11 Cases"). I am authorized by each of the Debtors to submit this declaration (the "First Day Declaration") on behalf of the Debtors.

2.      In addition to being the Debtors' Chief Transformation Officer, I am a Managing Director of Huron Consulting Services LLC ("Huron") and Huron's Business Advisory Capability Leader. Huron is an operationally focused consulting firm that specializes in, among other things, bankruptcy and restructuring consulting, interim management, and financial and operational consulting to financially distressed companies. I have more than 30 years of experience counseling companies through operational turnarounds, capital raising, buy and sell side advisories, merger integrations, and other financial consulting and bankruptcy assignments in both out-of-court and

_____

[1]  The address of the Debtors is 1600 N. Park Drive, Weston, FL 33326. The last four digits of the Debtors' federal tax identification numbers are: (i) Vital Pharmaceuticals, Inc. (8430); (ii) Bang Energy Canada, Inc. (5454); (iii) JHO Intellectual Property Holdings, LLC (0010); (iv) JHO Real Estate Investment, LLC (9394); (v) Quash Seltzer, LLC (6501); (vi) Rainbow Unicorn Bev LLC (2254); and (vii) Vital Pharmaceuticals International Sales, Inc. (8019).

in-court situations. I have served more than 100 debtors, functioning for many as a chief restructuring strategist. My expertise encompasses a wide range of industries, including logistics, distribution, transformation, automotive suppliers, aerospace suppliers, engineering and construction, metals, equipment leasing, and retail.

3.      Since my appointment as the Chief Transformation Officer on September 6, 2022, I have become familiar with the Debtors' financial affairs and business operations. In addition, I have been responsible for overseeing the Debtors' preparations for these Chapter 11 Cases, their business plans, and the procurement of debtor-in-possession financing. I have further familiarized myself with the Debtors' day-to-day operations, organizational structure, and books and records by reviewing key financial documents and engaging in discussions with other members of the Debtors' management team and the Huron professionals providing financial advisory services to the Debtors. Except as otherwise stated in this First Day Declaration, the statements set forth herein are based on (a) my personal knowledge or opinion derived from my experience, (b) information that I have received from the Debtors' advisors or employees and/or the Huron professionals working directly with me or under my supervision, direction, or control, and/or (c) my review of relevant documents. Any references to the Bankruptcy Code (as defined below), the chapter 11 process, and related legal matters herein reflect my understanding of such matters based on the explanations and advice counsel to the Debtors has provided. If called upon, I would testify competently to the facts set forth in this First Day Declaration.

4.      On October 10, 2022 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief in the United States Bankruptcy Court for the Southern District of Florida (the "Court"). The Debtors will continue to operate their businesses and manage their properties as debtors in possession.

5.      I submit this First Day Declaration on behalf of the Debtors in support of their (a) voluntary petitions for relief that they filed under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code") and (b) "first-day" pleadings, which the Debtors are filing concurrently herewith (collectively, the "First Day Pleadings").  The Debtors seek the relief set forth in the First Day Pleadings to minimize the adverse effects of the commencement of these Chapter 11 Cases on their businesses.  I have reviewed the Debtors' petitions and the other First Day Pleadings or have otherwise had their contents explained to me, and it is my belief that the relief sought therein is essential to ensure the uninterrupted operation of the Debtors' businesses and to successfully maximize the value of the Debtors' estates.

6.      To familiarize the Court with the Debtors, their businesses, the circumstances leading to the commencement of these Chapter 11 Cases, the objectives of such cases, and the relief the Debtors are seeking in the First Day Pleadings, this First Day Declaration includes the following information:

- Part I provides an overview of the Company's business;
- Part II provides an overview of the Company's prepetition capital structure and indebtedness;
- Part III describes certain prepetition litigation in which the Company was involved;
- Part IV provides an overview of the circumstances leading to the commencement of these Chapter 11 Cases, the objectives of these Chapter 11 Cases, and the means for implementing such objectives; and
- Part V introduces the various First Day Pleadings and sets forth my belief that the relief sought therein is crucial to the Debtors' business.

## I.      THE COMPANY'S BUSINESS

### A.      Business Overview

7.      Established in 1993 and headquartered in Weston, Florida, the Company is a frontrunner in sports nutrition and a pioneer in the performance energy drink industry.  The

3

Company produces novel and great tasting beverages without sugar, calories, carbohydrates, or artificial flavors, and with caffeine, electrolytes, and other performance ingredients.

8.    The Company's leading product is Bang energy drink ("Bang"), which was launched by the Company in 2012 and was the fastest growing beverage in the U.S. non-alcoholic beverage sector in 2018. Bang is the third best-selling energy drink in the United States as measured by retail sales and market share data, in each case, as of April 2022.

9.    The Company historically has been profitable. As illustrated in the chart below, from 2016 to 2019, the Company demonstrated significant enterprise growth and received increased customer demand for the Company's products. In 2019, prior to its distribution network transition (further described below), the Debtors achieved approximately $1.2 billion in retail sales, approximately $626 million in net revenue, and approximately $175 million in earnings before interest, taxes, depreciation, and amortization, and had a 184% compound annual growth rate from 2017 to 2019.



|  | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022E |
|---|---|---|---|---|---|---|---|
| Net Sales | $47.1 | $77.7 | $285.6 | $626.2 | $700.8 | $715.2 | $525.2 |
| EBITDA [1] | $9.4 | $17.5 | $83.7 | $175.1 | $127.3 | $25.5 | $(73.5) |

[1] Before income and expenses related to Pepsi distribution transition and separation

10. A chart illustrating the Company's corporate organizational structure, as of the date hereof, is attached hereto as **Exhibit A**. A summary of the operations and purpose for each Debtor can be found in the following table:

| Debtor | Description |
|---|---|
| Vital Pharmaceuticals, Inc. | Operating company of the Debtors' non-alcohol-based beverages, including Bang, and party to the Debtors' distribution agreements. |
| Bang Energy Canada, Inc. | Holding company for a non-Debtor foreign entity doing business in Canada (Bang Energy Canada, ULC). |
| JHO Intellectual Property Holdings, LLC | Owner of the intellectual property rights used in connection with the Debtors' beverage business. |
| JHO Real Estate Investment, LLC | Owner of the Debtors' manufacturing facility in Phoenix, Arizona. |
| Quash Seltzer, LLC | Operating company that manufactures and distributes the Debtors' alcoholic seltzer. |
| Rainbow Unicorn Bev, LLC | Inactive entity with no operations, entities, or employees. |
| Vital Pharmaceuticals International Sales, Inc. | Inactive entity with no operations, entities, or employees; a domestic corporation previously formed to export U.S. products. |

### B. Business Operations

11. Since inception, the Company and its non-Debtor affiliates have invested approximately $437 million into various manufacturing and distribution facilities across the United States, with plans to expand further into international markets. For example, the Debtors' Phoenix facility, where most Bang products are manufactured, has a footprint of over 394,000 square feet and can manufacture 4.8 million twelve-pack cases of Bang every month with demonstrated efficiencies, capable of producing 3,600 cans per minute.

12. In addition to the Phoenix facility, certain of the non-Debtor affiliates lease or own manufacturing, distribution, and storage facilities in Florida, California, Georgia, North Carolina,

Texas, Arizona, and Canada, which have a combined footprint of approximately two million square feet.

13.    Bang is available in all 50 states and internationally, and is distributed through a large network of mainstream retailers and suppliers throughout the United States, Canada, Latin America, Europe, and Australia.  The Company's distribution network is critical to its success and is discussed further below.

14.    The Company performs substantially all research and development in its Florida laboratories.  As of September 30, 2022, the product development and quality control team consists of more than thirty employees who are dedicated to improving the current product portfolio, creating new product offerings for existing customers, and developing markets across the globe. The Company takes pride in manufacturing and perfecting upon its own unique flavors and vigorously tests its products until they are ready for launch.

**C.    Marketing Strategy**

15.    The Company deploys a unique marketing strategy utilizing (a) digital marketing, including social media (*e.g.*, TikTok, Facebook, Instagram, and YouTube), (b) influencers and brand ambassadors, and (c) in-store promotion.  Taken together, the Company's marketing strategy has resulted in the Company becoming a dominant brand on social media, with over 4 million followers across its various social media accounts.  As of September 30, 2022, the Company works with approximately 1,000 influencers.  In total, the Company's marketing efforts on social media reach approximately 1.3 billion followers through the Company's contracted influencers and brand ambassadors.

16.    The Company's marketing strategy is geared towards promoting fitness and performance for energy drink consumers.  The Company hosts and sponsors music festivals, sporting events, concerts, and trade shows around the world to connect with customers at live

gatherings and events. In addition, the Company introduces its products through sampling and unique giveaways and utilizes unique packaging and vibrant displays to make its products stand out in stores. Due to the marketing strategy described above, the Company has historically been able to achieve such significant success and rapid growth in a competitive market. As set forth below, the Company hopes and expects to resume its upward trajectory with the benefit of its transition to a network of valued distributors through the chapter 11 process.

### D. The Company's Distribution Network and Transition

17. The Company's distribution network is critical to the sales of its products and overall business strategy. Indeed, maintaining and building its distribution network is and will remain the core focus of the Company in these cases, and the Company strongly believes that any value-maximizing outcome in these cases is dependent upon that distribution network remaining intact throughout the Chapter 11 Cases and beyond. As detailed below, the Company has spent the last several months carefully building out their network of distributors, and that network is now positioned for success and represents one of the Company's most valuable assets on a go-forward basis.

18. Historically, the Company relied on a decentralized network of regional distributors to put its products in the hands of the ultimate consumers. In April 2020, to both centralize and expand its distribution footprint and achieve further growth, VPX changed paths and entered into an exclusive distribution agreement (the "Pepsi Distribution Agreement") with PepsiCo, Inc. ("Pepsi"), which encompassed the distribution of "BANG-branded Licensed Products" (as defined in the Pepsi Distribution Agreement).

19. On October 23, 2020, the Company terminated the Pepsi Distribution Agreement due to its view that Pepsi's strategies were suboptimal and the parties' varying expectations and

visions. Following the termination, various legal proceedings ensued.[2] While the legal proceedings were pending, VPX and Pepsi engaged in constructive dialogue toward a comprehensive settlement. On June 21, 2022, VPX and Pepsi entered into that certain confidential settlement agreement and release of all claims (the "Pepsi Settlement"), under which VPX and Pepsi agreed to, among other things, the dismissal of the Existing Legal Matters (as defined in the Pepsi Settlement), the termination of the Pepsi Distribution Agreement, and entered into certain post-termination transition arrangements. In accordance with resolution of the Existing Legal Matters, Pepsi continued to distribute products for VPX into 2022. In 2021, Pepsi's distribution accounted for approximately 81.6% of VPX's sales.

20. Since entering the Pepsi Settlement and through the summer and early fall of 2022, the Company has been in the process of transitioning to a decentralized distribution network, which consists of (a) a best-in-class regional independent distributors, many of which distributed VPX's products prior to VPX's entry into the Pepsi Distribution Agreement, and (b) in-house direct store delivery ("DSD") using existing Company-owned distribution fleet. This transition includes (a) expanding the territory and coverage of independent distributors that distributed the Company's Bang products including, during the period in which VPX was transitioning distribution *to* Pepsi (approximately 80% of which distributors are independent bottlers that have a license to distribute products on behalf of Anheuser-Busch Inc. and Molson Coors Beverage

---

[2] Such legal proceedings are defined as "Existing Legal Matters" in the Pepsi Settlement Agreement and means, collectively: *PepsiCo, Inc. v. Vital Pharmaceuticals, Inc.*, Case 01-20-0015-8060, American Arbitration Association (filed November 23, 2020); *Vital Pharmaceuticals, Inc. v. PepsiCo, Inc.*, Case No. 0:20-cv-62415-RAR (S.D. Fla., filed November 25, 2020); *Quash Seltzer, LLC v. PepsiCo, Inc.*, No. 21-CV-60191-RAR (S.D. Fla., filed January 26, 2021); *PepsiCo, Inc. v. Vital Pharmaceuticals, Inc.*, No. 0:22-cv-60805-RAR (S.D. Fla., filed April 27, 2022); *JHO Intellectual Property Holdings, LLC, Elite IP Holdings, LLC, and Vital Pharmaceuticals, Inc., v. PepsiCo, Inc.*, No. 2:22-cv-00353 (D. Ari., filed January 28, 2022); *Vital Pharmaceuticals, Inc. v. PepsiCo, Inc.*, No. 2:22-cv-00593 (D. Ari., filed April 11, 2022); and *Vital Pharmaceuticals, Inc. v. PepsiCo, Inc.*, No. 2:22-cv-00591 (D. Ari., filed April 11, 2022).

Company); (b) adding independent distributors that previously had been part of VPX's distribution network prior to VPX's relationship with Pepsi, but had not served as independent distributors during the period when the Pepsi Distribution Agreement was in effect; (c) adding additional independent distributors that had not previously distributed the Bang products; and (d) reestablishing the DSD network.  New distributors (which are not under a pre-existing distribution agreement with VPX) are typically required to sign an Exclusive Distribution Agreement (each, an "EDA" and collectively, the "EDAs"), provide an initial purchase order, and maintain a mutually agreed upon minimum supply of product.   Other terms of the EDAs, including commitments on the part of the distributor to achieve certain performance levels/distribution volumes, are negotiated with each distributor and may vary.

21.     As of the Petition Date, VPX has made significant progress in its transition to its new distribution network, which is expected to consist of 269 independent distributors.  As of October 3, 2022, 227 of such independent distributors (which cover 92.3% of the overall distribution volume) are now under contract (whether through an EDA or a legacy agreement), 149 of such distributors have outstanding accounts receivable with VPX, and 105 of such distributors are already actively distributing VPX's products.  The transition is expected to be substantially complete by mid-November 2022, after which point Pepsi will no longer distribute VPX products.  This fall, the Company also will be negotiating for shelf space with major national retail outlets in order to maximize the performance of the best-in-class distribution network.

22.     VPX is highly optimistic about the performance of the new distribution network. Put simply, the implementation of the new distribution network is expected to return the Company to the trajectory of rapid growth it was on as recently as 2019 (prior to VPX's entry into the Pepsi Distribution Agreement).

### E.   Corporate Governance

23.    Historically, John H. Owoc, the founder and sole shareholder of the Company, had served as the sole director or member, as well as the Chief Executive Officer or managing member, as applicable, of the each of the Debtor entities.   In the months leading up to these Chapter 11 Cases and in order to facilitate a value-maximizing restructuring process, Mr. Owoc retained well-qualified restructuring advisors and authorized a number of changes to the Debtors' governance structure.   *First*, as set forth above, on September 6, 2022, Mr. Owoc appointed me as the Chief Transformation Officer of each of the Debtors, with a mandate to support, manage, and oversee the Company's restructuring activities.   *Second*, Mr. Owoc intends to expand the size of the board of directors of each of the Debtor entities to include five directors, consisting of (a) two Company executives, Mr. Owoc and Kathleen Cole (who serves as the Company's Chief Operating Officer); (b) two members unaffiliated with the Company, Dr. Guillermo Escalante and Eric Hillman, each of whom has deep knowledge of the industry and/or the Debtors' products; and (c) Steve Panagos, a veteran restructuring advisor with extensive experience serving as an independent director for companies undergoing in-court or out-of-court restructurings.   *Third*, each board will constitute a restructuring committee comprised solely of Mr. Panagos (the "Restructuring Committee"), which will be charged with overseeing the restructuring process and making recommendations to the full board with respect to the restructuring process and these Chapter 11 Cases.

24.    The Debtors believe they will benefit from the diverse perspectives and expertise of the five board members, as well as the specialized experience and expertise of the Restructuring Committee, as the Debtors transition into Chapter 11 and look to maximize the value of the Debtors' bankruptcy estates for the benefit of all stakeholders.   Moreover, the formation of the Restructuring Committee will enable Mr. Owoc, Ms. Cole, and the Debtors' management team to focus on continuing to run a top-tier energy drink company and core operational initiatives (*i.e.*,

product development, manufacturing, distribution, and marketing) while retaining the ability to make informed decisions about the course of the Debtors' restructuring with the advice of an experienced restructuring professional.

## II. PREPETITION CAPITAL STRUCTURE

### A. Revolving Credit Facility and Term Loans

25. VPX, as borrower, certain subsidiaries and affiliates of VPX (collectively, with VPX, the "Prepetition Loan Parties"), as guarantors, the lenders from time to time party thereto (the "Secured Lenders"), and Truist Bank, as administrative agent (the "Prepetition Agent" and, together with the Secured Lenders, the "Prepetition Secured Parties"), are parties to the *Amended and Restated Revolving Credit and Term Loan Agreement*, dated as of August 14, 2020, (as amended, modified, or supplemented from time to time, the "Prepetition Credit Agreement"). The Prepetition Credit Agreement provides two separate credit facilities, each maturing on August 14, 2025: (a) a revolving credit facility (the "Prepetition Revolving Credit Facility"), and (b) a term loan A (the "Prepetition Term Loan" and, together with the Prepetition Revolving Credit Facility and all other obligations arising under the Prepetition Credit Agreement, the "Prepetition Loans"). As of the Petition Date, the aggregate outstanding principal of the Prepetition Loans was approximately $344.2 million, consisting of: (a) approximately $240.0 million in outstanding principal of the Prepetition Revolving Credit Facility, and (b) approximately $104.2 million in outstanding principal of the Prepetition Term Loan. As set forth below, the Company has been in default under the Prepetition Credit Agreement for, among other things, failure to satisfy certain financial maintenance covenants since March 2022. The Prepetition Secured Parties agreed to forbear from exercising their rights and remedies in respect of those defaults pursuant to five forbearance agreements entered into with the Company and advanced critical funding (totaling approximately $60 million) to the Company.

26.     In connection with the Prepetition Credit Agreement, the parties executed the *Amended and Restated Security and Pledge Agreement*, dated as of August 14, 2020 (as amended, supplemented or otherwise modified from time to time, the "<u>Prepetition Security Agreement</u>"). Under the Prepetition Security Agreement, the Prepetition Loans are secured by first-priority liens on the Collateral (as defined therein, the "<u>Prepetition Collateral</u>"), which includes substantially all of the assets of the Debtors.

**B.     Unsecured Debt**

27.     The Debtors have no funded unsecured debt and incur trade debt in connection with the operation of their businesses.  In the ordinary course, the Debtors also incur trade debt with certain vendors and suppliers in connection with the operation of their businesses.  As of the Petition Date, the Debtors have approximately $83 million in trade payables outstanding, excluding their obligations under the Customer Programs (described below).[3]

28.     In addition, the Debtors have other disputed and/or contingent liabilities related to litigation, pension, and employee obligations, certain of which are described herein.  The OBI Judgment and the FAA Verdict (each as defined and described below) are two of the most significant litigation liabilities.

## III.     <u>NOTABLE PREPETITION LITIGATION</u>

29.     As of the Petition Date, the Debtors are party to approximately 63 disputes that are in active litigation or are the subject of threatened litigation.  Certain material litigation disputes are described below.

---

[3] This sum excludes amounts charged by customers (*i.e.*, retailers) in connection with the execution of the Debtors' programs and promotions with respect to the Debtors' products (such as "buy one, get one free"), which amounts are assessed against the Debtors at a later date following the sale.

### A.     Orange Bang/Monster Arbitration

30.     In 2009, Orange Bang, Inc. ("OBI"), a closely-held business that owns the ORANGE BANG trademark, brought a trademark infringement action against VPX in the United States District Court for the Central District of California, alleging that a then-existing pre-workout supplement product branded BANG was infringing OBI's fountain whipped beverage product branded ORANGE BANG. In 2010, VPX and OBI resolved that lawsuit pursuant to a confidential settlement agreement (the "OBI Settlement Agreement") under which (among other terms): (i) VPX was permitted to use the BANG trademark regardless of trade channel for products that meet certain criteria, and (ii) VPX was permitted to use the BANG trademark within specified trade channels for products that meet other criteria. The OBI Settlement Agreement included an arbitration provision.

31.     In late September 2019, unbeknownst to VPX at the time, OBI assigned to Monster Energy Company ("Monster") all of its rights and interest in the OBI Settlement Agreement, while purporting to retain all rights and interest in the BANG trademark.

32.     On June 16, 2020, Monster and OBI served a joint demand for arbitration upon VPX, wherein Monster asserted breach of contract claims as assignee of the OBI Settlement Agreement and OBI asserted trademark infringement claims as the continued holder of the BANG trademark.

33.     On July 23, 2020, VPX and JHO Intellectual Property Holdings, LLC ("JHO"), which is the owner of the BANG trademark and VPX's licensor, commenced a federal action against OBI and Monster in the District Court for the Central District of California, captioned *Vital Pharms., Inc. and JHO Intellectual Prop. Holdings, LLC v. Orange Bang, Inc. and Monster Energy Co.*, Case No. 5:20-cv-1464 (the "OBI District Court Action"), seeking a judicial determination that the claims OBI and Monster had asserted in their demand for arbitration were

not subject to arbitration. Monster and OBI counter-moved to compel arbitration. On November 30, 2020, the District Court for the Central District of California ordered VPX and JHO to submit to arbitration.

34.     Following a two-week arbitration hearing in October 2021, on January 6, 2022, the arbitrator issued an interim arbitration award in favor of Monster and OBI and against VPX and JHO, pursuant to which Monster and OBI jointly elected (i) a $175 million disgorgement of profits award on OBI's trademark infringement claim, and (ii) certain injunctive relief providing for a royalty payment equal to 5% of net sales of BANG-branded beverages in lieu of VPX's discontinuing its use of the "BANG" mark (the "Interim Arbitration Award"). Thereafter, Monster and OBI requested that the arbitrator also award attorneys' fees and injunctive relief substantially beyond that granted in the Interim Arbitration Award. On April 4, 2022, the arbitrator issued a final award, which provided: (i) approximately $9.3 million in fees and costs, in addition to the $175 million disgorgement award that Monster and OBI had elected, and (ii) granted injunctive relief substantially beyond that granted in the Interim Arbitration Award (the "Final Arbitration Award").

35.     On April 29, 2022, VPX and JHO moved to vacate the Final Arbitration Award in the OBI District Court Action. OBI and Monster opposed that motion and moved to confirm the award. On June 30, 2022, the District Court for the Central District of California denied the motion to vacate the Final Arbitration Award and granted the motion to confirm the award.

36.     On July 28, 2022, VPX and JHO initiated an appeal of the order confirming the Final Arbitration Award to the United States Court of Appeals for the Ninth Circuit (the "OBI Appeal").

14

37.     On September 29, 2022, the District Court for the Central District of California entered a final judgment incorporating its confirmation of the Final Arbitration Award (the "<u>OBI Judgment</u>"), the appeal from which VPX and JHO expect will be consolidated with the previously-filed OBI Appeal.  VPX does not have the financial ability to post a *supersedeas* bond in an amount sufficient to stay enforcement of the OBI Judgment.  Accordingly, chapter 11 protection, including the protection of the automatic stay, is integral to the Debtors' ability to protect their business and estate assets while the OBI Appeal is pending.

### B.     <u>Monster's False Advertising Lawsuit Against VPX</u>

38.     On September 4, 2018, Monster initiated a lawsuit against VPX and its CEO, John H. Owoc, in the District Court for the Central District of California, captioned *Monster Energy Co. v. Vital Pharms., Inc. and John H. Owoc.*, Case No. 5:18-cv-1882.  The lawsuit included claims for false advertising, alleged trade secret misappropriation, alleged violation of the Federal Computer Fraud and Abuse Act,  and alleged interference with Monster contracts for retail shelf space.

39.     A jury trial was conducted in the action, and on September 29, 2022, the jury delivered a verdict in favor of Monster and against VPX and Mr. Owoc and awarded approximately $293 million in damages to Monster.  Post-verdict motion practice is contemplated, at which time the District Court for the Central District of California may consider whether the jury award will be enhanced, reduced, or set aside.  I understand that VPX and Mr. Owoc intend to appeal from any adverse judgment entered against them.

### C.     <u>VPX's False Advertising Action Against Monster</u>

40.     On August 31, 2022, VPX brought a lawsuit against Monster and its Chief Executive Officer, Rodney Sacks, in the United States District Court for the Southern District of Florida, captioned *Vital Pharms., Inc. v. Monster Energy Co. and Rodney Sacks*, Case No. 0:22-

cv-61621. I understand that, in that lawsuit, VPX asserts claims for false advertising and unfair competition, and seeks lost profits, disgorgement of Monster's profits, and injunctive relief.

## IV.   KEY EVENTS LEADING TO COMMENCEMENT OF, AND THE COMPANY'S OBJECTIVES IN, THESE CHAPTER 11 CASES

41.     The Company commenced these cases in order to (a) obtain "breathing room" from pending litigation, including the OBI Judgment and FAA Verdict, as well as consequences of pending defaults under the Prepetition Credit Agreement; (b) obtain an essential infusion of liquidity totaling $100 million to help stabilize the Company's operations at a critical juncture in the Company's business cycle (i.e., on the precipice of launching its new distribution network) through the DIP Facility (as defined and described below); and (c) pursue a recapitalization, a replacement financing, or other transaction that will result in the payment in full of the Company's outstanding obligations under the Prepetition Credit Agreement and position the Company for success upon its emergence from chapter 11.

42.     Since March 2022, the Company has been in default under the Prepetition Credit Agreement because of, among other things, failure to satisfy certain financial maintenance covenants. From March 2022 through September 30, 2022, the Prepetition Secured Parties agreed to forbear from exercising their rights and remedies in respect of those defaults pursuant to five forbearance agreements entered into with the Company. Since June 2022, the Secured Lenders have also advanced critical funding (totaling approximately $60 million) to the Company to enable it to continue operations, transition away from its distribution arrangement with Pepsi and to its new best-in-class distribution network, pursue a capital raise process, and engage in contingency planning around a potential filing. At all times since June 2022, the Secured Lenders have made clear that such accommodations were to assist the Company in achieving their desired outcome: repayment in full of the obligations owed to them.

43.     Beginning in late June 2022, the Debtors' management, together with the assistance of their advisors (in particular, Rothschild & Co US Inc. ("Rothschild & Co"), the Company's proposed investment banker who was engaged in April 2022), commenced a robust financing process in pursuit of a capital raise transaction and other alternative transactions designed to (a) refinance the prepetition lenders, (b) generate sufficient liquidity for the Company's operations and capital expenditures, and (c) if necessary, to post a *supersedeas* bond in connection with Ninth Circuit Appeal.  However, a feasible transaction that would achieve the Company's objectives did not materialize in the capital raise process due to, among other factors, uncertainty regarding the Debtors' then-nascent distribution network transition, concerns about potential contingent liabilities related to outstanding litigation, as well as increasingly challenging macroeconomic factors more generally.

44.     Although the Company remained in discussions regarding potential financing transactions with numerous parties as of the Petition Date, in connection with the most recent forbearance, the Secured Lenders indicated that they would not continue to forbear past September 30, or advance additional funding outside of chapter 11.  The Secured Lenders did, however, offer to provide sufficient funding for a chapter 11 process through the proposed facility under the DIP Credit Agreement, and afford the Company an opportunity to continue their efforts to recapitalize their balance sheet and refinance or otherwise repay the obligations under the Prepetition Credit Facility.  To avail themselves of this opportunity and mitigate the jeopardy to VPX's assets following entry of the OBI Judgment and FAA Verdict, the Company commenced these Chapter 11 Cases.

## V.     FACTS SUPPORTING RELIEF SOUGHT IN FIRST DAY PLEADINGS[4]

45.     In furtherance of the objective of preserving value for all stakeholders, the Debtors have sought approval of the First Day Pleadings and related orders (the "Proposed Orders"), and respectfully request that the Court consider entering the Proposed Orders granting the First Day Pleadings.  For the avoidance of doubt, the Debtors seek authority, but not direction, to pay amounts or satisfy obligations with respect to the relief requested in those of the First Day Pleadings for which such authority is sought.  The First Day Pleadings include:

### A.     Administrative and Procedural Pleadings

a.     *Debtors' Ex Parte Motion for Joint Administration* (the "Joint Administration Motion")

46.     The Debtors believe that the joint administration of these cases will promote efficiency.  The Debtors anticipate that a significant portion of the activity during these cases and most hearings will be substantially identical for all of the Debtors resulting in duplicative pleadings repeatedly being filed should joint administration be denied.  Consequently, joint administration would reduce costs and facilitate the economical, efficient, and convenient administration of the Debtors' estates.

47.     The Debtors submit that the rights of the creditors of each of the Debtors will not be adversely affected by joint administration of these Chapter 11 Cases.  I am advised that the Debtors filed the Joint Administration Motion on an *ex parte* basis as contemplated by Local Rule 1015-1(B)(2)(a).  I believe the entry of an order approving joint administration of the Debtors' Chapter 11 Cases is in the best interests of the estates and their creditors.

---

[4]  Unless otherwise defined herein, all capitalized terms in this Part V shall have the meanings ascribed to them in the applicable First Day Pleadings.

       b.     *Debtors' Ex Parte Motion for Authorization to File Consolidated Chapter 11 Case Management Summary* (the "<u>Case Management Summary Motion</u>")

48.     I am advised that, ordinarily, each Debtor is required to file its own Case Management Summary. It would be unduly burdensome for each Debtor to separately file a Case Management Summary. Much, if not all, of the information contained in the Case Management Summary is duplicative for many of the Debtors and the filing of a consolidated Case Management Summary is more efficient. I believe a Consolidated Case Management Summary will provide the Court and parties-in-interest with-accurate and sufficiently detailed information and, as such, no creditor or party-in-interest will be prejudiced if the Court grants this relief.

       c.     *Debtors' Motion For Entry Of An Order Authorizing The Debtors To File A Consolidated Creditor Matrix And Consolidated List Of The Top Thirty Unsecured Creditors* (the "<u>Consolidated Top-30 Motion</u>")

49.     The Debtors have filed the Consolidated Top-30 Motion requesting authority to file a single, consolidated list of the creditors who hold the 30 largest unsecured claims. Given the affiliated nature of the Debtors, I believe that permitting them to maintain and submit a single consolidated Top 30 List, *in lieu* of filing a separate list of the top 20 unsecured creditors for each of the seven Debtors, is warranted. The Debtors operate as an integrated business with common ownership and control. The Debtors share financial and operational systems and also share many of the same creditors. Accordingly, I believe that requiring the Debtors to maintain separate Top 20 Lists for each of the seven Debtors would likely result in redundant duplicative mailings, adding unnecessary administrative expense to the Debtors' estates. Further, filing a single consolidated Top 30 List will facilitate the U.S. Trustee's review of creditors' claims and aid in its determination of whether to appoint, and whom to appoint to, a single creditors' committee in these cases. Accordingly, I believe that the approval of the Consolidated Top-30 Motion is warranted.

        d.    *Debtors' Emergency Motion for Approval of Form of Notice of Commencement of Cases and Proofs of Claims* (the "<u>Case Commencement Motion</u>")

50.     I am advised that because the Debtors have filed an application to retain Stretto, Inc. as the Debtors' noticing, claims and balloting agent, the Debtors are required to file the Case Commencement Motion requesting approval of (i) the form of the commencement of the Chapter 11 Cases, (ii) bar dates for filing proofs of claim, (iii) the form of proof of claim, (iv) the procedures for filing proofs of claim, and (v) approval of the publication notice of the Chapter 11 Cases and bar dates.

51.     I am advised that the Debtors have been working closely with the Clerk of the Court with respect to developing and finalizing the form of the notice of the commencement of the Chapter 11 Cases and the form of proof of claim. The Debtors believe that the cooperative and efficient approach between and among Stretto, Inc., the Debtors, and the Clerk of the Court has conserved the Debtors' limited resources and will also benefit the creditors of the Debtors by establishing clear guidelines with respect to the noticing of the commencement of the cases and the preparation and filing of proofs of claim.

        e.    *Debtors' Emergency Application for Approval, on an Interim and Final Basis, of the Employment of Jordi Guso and the Law Firm of Berger Singerman LLP as Local Counsel for Debtors-in-Possession, Effective as of the Petition Date* (the "<u>BSLLP Retention Application</u>")

52.     The Debtors seek authority to retain, on an interim basis, Jordi Guso and the law firm of Berger Singerman LLP ("<u>BSLLP</u>") as co-counsel *nunc pro tunc* to the Petition Date. As detailed in the BSLLP Application, the Debtors understand that Mr. Guso and BSLLP have extensive experience representing chapter 11 debtors in this district (and other districts across the country) and that they are well-qualified to serve as co-counsel to the Debtors. The Debtors believe

it is in their best interests, and those of those of their creditors, that Mr. Guso and BSLLP be retained to serve as the Debtor's bankruptcy co-counsel in their Chapter 11 Cases.

53.     BSLLP has provided the Debtors with a prospective budget and staffing plan to ensure that BSLLP's staffing with respect to the representation of the Debtors is appropriate to meet the Debtors' needs and expectations during the Chapter 11 Cases.  Based on the Debtors' review of the budget and staffing plan and my discussions with Mr. Guso, I believe that the budget and staffing plan are consistent with the Debtors' needs.  Accordingly, I have approved the budget and staffing plan.

54.     I understand that, except to the extent disclosed in the *Declaration of Jordi Guso on Behalf of Berger Singerman LLP, as Proposed Co-Counsel for the Debtors-In-Possession, Nunc Pro Tunc to the Petition Date*, affirmed by Mr. Guso and attached to the BSLLP Application as Exhibit A, neither Mr. Guso nor BSLLP has any connection with the Debtors' creditors or other parties in interest or their respective attorneys.  Counsel has informed me that corporations and limited liability companies like the Debtors may not appear in a Florida or federal court pro se, and that only a licensed attorney may appear on their behalf.  Because there is myriad relief that must be sought from the Court immediately, the Debtors will suffer immediate and irreparable harm if they are unable to obtain the services of counsel before a final hearing on the application for approval of counsel's employment can be convened.  For example, the Debtors require the Court's approval of debtor-in-possession financing to continue to operate and various "first day" operational motions.  Without access to the financing, the Debtors will be unable to operate and maximize value for the benefit of their estates.  Therefore, I believe that only with the granting of interim approval of counsel's employment will such immediate and irreparable injury be avoided.

In that regard, counsel advises that this relief has been granted in numerous chapter 11 cases in this District.

          f.    *Debtors' Emergency Application for Approval, on an Interim and Final Basis, of the Employment of Latham & Watkins LLP as Co-Counsel for Debtors-In-Possession, Effective as of the Petition Date* (the "L&W Retention Application")

55.    The Debtors also seek authority to retain the law firm of Latham & Watkins LLP ("L&W") as general bankruptcy co-counsel to the debtors and debtors-in-possession effective as of the Petition Date.  In my capacity as Chief Transformation Officer, I (along with the other members of the Debtors' management team and the Huron professionals) am involved in the Debtors' retention and supervision of certain outside professional services firms, including the professionals proposed to be retained in the Chapter 11 Cases.  For the following reasons and as detailed in the L&W Retention Application, I support the Debtors' retention of L&W as restructuring counsel.

56.    The Debtors seek to ensure that bankruptcy professionals are subject to the same client-driven market forces, scrutiny, and accountability as professionals in non-bankruptcy engagements.  I understand that, before selecting L&W to serve as their attorneys in the Chapter 11 Cases, the Debtors conducted an extensive review of potential bankruptcy counsel in order to select a firm well-suited to address the complex issues that may arise during the course of these Chapter 11 Cases.

57.    In the course of that review process, I understand that the Debtors considered and evaluated a number of law firms and assessed potential counsel based on their expertise in the relevant and complex legal issues and in similar proceedings.  Ultimately, the Debtors selected L&W on the basis of L&W's past work for and experience with the Debtors, including L&W's

prior work on, among other matters, financing, corporate, and restructuring matters, and its extensive experience with and knowledge of complex chapter 11 proceedings.

58.     Since June 2022, L&W has advised the Debtors with respect to various restructuring and contingency planning issues, including both potential in-court and out-of-court strategies, as well as a variety of non-restructuring matters.  As a result, L&W has become familiar with the Debtors' businesses and capital structure, and many of the legal issues that the Company may face during the pendency of the Chapter 11 Cases.  For this reason, as well as L&W's extensive experience in complex corporate reorganizations, I believe that L&W is both well-qualified and uniquely able to represent the Debtors in the Chapter 11 Cases.  Thus, I support the Debtors' decision to continue to retain L&W as the Debtors' bankruptcy co-counsel during the Chapter 11 Cases.

59.     With respect to L&W's compensation, prior to the commencement of the Chapter 11 Cases, L&W and the Company discussed, and the Company approved, L&W's standard billing rates and the material terms of the engagement.  Based on the Debtors' evaluation of other law firms prior to retaining L&W and my experiences, I can confirm that L&W's rates and terms are comparable to those of other comparably skilled professionals.  Additionally, L&W has informed the Debtors that its rates for bankruptcy representations are comparable to the rates it charges for non-bankruptcy representations.

60.     I along with the other members of the Debtors' management team are responsible for reviewing the invoices submitted by L&W and can confirm that the rates L&W charged the Debtors in the prepetition period are consistent with the rates L&W will charge the Debtors in the postpetition period.

61.     L&W has also provided the Debtors with a prospective budget and staffing plan to ensure that L&W's staffing with respect to the representation of the Debtors is appropriate to meet the Debtors' needs and expectations during the Chapter 11 Cases. Based on the Debtors' review of the budget and staffing plan and my discussions with L&W, I believe that the budget and staffing plan are consistent with the Debtors' needs. Accordingly, I have approved the budget and staffing plan.

62.     I understand that, except to the extent disclosed in the *Declaration of Andrew Sorkin, on Behalf of Latham & Watkins LLP as Proposed Co-Counsel for Debtors-In-Possession, Effective as of the Petition Date*, affirmed by Andrew Sorkin, a partner at L&W, and filed contemporaneously herewith, the partners, counsel, and associates of L&W (a) do not have any connection with any of the Debtors, their affiliates, their creditors, any other party in interest, the United States Trustee for the Southern District of Florida or any person employed in the office of the same, or any judge in the United States Bankruptcy Court for the Southern District of Florida or any person employed in the offices of the same; (b) are "disinterested persons," as that term is defined in section 101(14) of the Bankruptcy Code, as modified by section 1107(b) of the Bankruptcy Code; and (c) do not hold or represent any interest adverse to the Debtors' estates.

63.     Because the Debtors seek various relief that must be sought immediately from the Court, and L&W has been and will continue to be instrumental in pursuing such relief, the Debtors will suffer immediate and irreparable harm if they are unable to obtain the services of L&W before a final hearing on the L&W Retention Application can be convened. For example, the Debtors require the Court's approval of debtor-in-possession financing to continue to operate and various "first day" operational motions. Without access to the financing, the Debtors will be unable to operate and maximize value for the benefit of their estates. Therefore, I believe that only with the

granting of interim approval of counsel's employment will such immediate and irreparable injury be avoided. In that regard, counsel advises that this relief has been granted in numerous chapter 11 cases in this and other districts in Florida, including large chapter 11 cases.

64. Accordingly, in the exercise of my business judgment, I believe it is in the best interests of the Debtors, their estates, and creditors to retain L&W as the Debtors' general bankruptcy co-counsel.

> g. *Debtors' Application, Pursuant to Section 363(b) of the Bankruptcy Code, for Authority to Employ and Retain, on an Interim and Final Basis, Huron Consulting Services LLC to Provide the Services of a Chief Transformation Officer, Effective as of the Petition Date* (the "Huron Retention Application")

65. The Debtors seek authority to retain Huron on an interim basis, *nunc pro tunc* to the Petition Date, pursuant to sections 105(a) and 363(b) of the Bankruptcy Code to provide my services as Chief Transformation Officer as well as the services of additional Huron personnel to assist me in the discharge of my duties to the Debtors, as set forth in the engagement letter attached as Exhibit B to the Huron Retention Application. I have significant experience in providing advisory services to companies undergoing a financial restructuring, including in chapter 11 bankruptcy cases.

66. The Debtors initially retained Huron as a financial advisor on August 15, 2022 to provide contingency planning services. On September 15, 2022, effective as of September 6, 2022, Huron's scope of services was expanded to include managing workstreams related to the Company's restructuring initiatives. In that capacity, Huron has reviewed the financial and operating performance of the Debtors, reviewed and helped manage the Debtors' operating budgets and liquidity, and advised the Debtors in regard to their restructuring initiatives. The continued post-petition retention of Huron is in the best interests of the Debtors and will enhance

their ability to (a) operate and meet their administrative obligations in these cases, and (b) preserve and maximize the value of their assets.

67.     Due to Huron's extensive experience in restructuring matters, and in light of the prepetition work done for the Debtors by Huron, the Debtors will suffer immediate and irreparable harm if they are unable to obtain the services of Huron effective as of the Petition Date.

68.     Except to the extent in my declaration in support of the *Huron Retention Application*, neither Huron nor I have any connection with the Debtors' creditors or other parties in interest or their respective attorneys.

> h.    *Debtors' Application for Entry of Interim and Final Orders Under 11 U.S.C. §§ 327 and 328(A) Authorizing the Employment and Retention of Rothschild & Co US Inc. as Investment Bankers for the Debtors, Effective as of the Petition Date* (the "<u>Rothschild & Co Retention Application</u>")

69.     The Debtors have filed an application to employ Rothschild & Co US, Inc. ("<u>Rothschild & Co</u>") as the investment bankers to the Debtors to provide the following services: (a) advise the Debtors with respect to a potential minority investment, sale, merger or other business/strategic combination involving the Debtors; (b) assist the Debtors in identifying possible counterparties for a potential M&A Transaction (as defined in the engagement letter attached as Exhibit B to the Rothschild & Co Retention Application (the "<u>Rothschild Engagement Letter</u>"); (c) assist the Debtors in their assessment of the financial aspects of a M&A Transaction and, if the Debtors determine to pursue a M&A Transaction, in the development of a plan for accomplishing such M&A Transaction; (d) assist the Debtors in raising new debt or equity financing in connection with a New Capital Raise (as defined in the Rothschild Engagement Letter); (e) assist the Debtors in making internal and external presentations concerning the financial aspects of any proposed Transaction (as defined in the Rothschild Engagement Letter), as appropriate; (f) advise and assist the Debtors in the development and implementation of a process intended to generate bidders for

a sale pursuant to Section 363 of the Bankruptcy Code; (g) advise and assist the Debtors in connection with any case or cases commenced by or against the Debtors, whether individually or on a consolidated basis, under title 11 of the Bankruptcy Code and if requested by the Debtors, participating in hearings before the Court in which such cases are commenced and providing relevant testimony with respect to the matters described herein and issues arising in connection with any proposed plan of reorganization; (h) review and analyze any proposals the Debtors receive from third parties in connection with a transaction during the restructuring process, including, without limitation, any proposals for debtors-in-possession financing, mergers and acquisitions or other strategic alternatives, as appropriate; (i) assist or participate in negotiations with the parties in interest, including, without limitation, any current or prospective creditors of, holders of equity in, or claimants against the Debtors and/or their respective representatives in connection with a transaction during the restructuring process; and (j) provide such other investment banking and financial advisory services as the Debtors and Rothschild & Co may from time to time agree.

70.     As set forth in the Rothschild & Co Retention Application, Rothschild & Co has extensive experience in providing investment banking and financial restructuring services to debtors, their boards of directors, and various secured and unsecured classes of creditors in chapter 11 cases and other restructurings.  Rothschild & Co's business reorganization professionals have served as financial and strategic advisors in numerous high-profile bankruptcies and restructurings, providing services to debtors, creditors' committees, and other constituencies in numerous cases, as set forth in the Rothschild & Co Retention Application.  Moreover, Rothschild & Co has intimate familiarity with the Debtors' operations and capital structure through its prepetition services to the Debtors.

71. Due to Rothschild & Co's extensive experience in restructuring matters, and in light of the prepetition work done for the Debtors by Rothschild & Co, the Debtors will suffer immediate and irreparable harm if they are unable to obtain the services of Rothschild & Co effective as of the Petition Date.

72. I understand that, except to the extent disclosed in *the Declaration of Homer Parkhill in Support of the Application for Entry of Interim and Final Orders Authorizing the Employment and Retention of Rothschild & Co US Inc. as Investment Bankers for the Debtors, Effective as of the Petition Date*, affirmed by Homer Parkhill and attached to the Rothschild & Co Retention Application as Exhibit A, Rothschild & Co has no connection with the Debtors' creditors or other parties in interest or their respective attorneys that would cause it not to be disinterested.

73. The Debtors retained Rothschild & Co on April 8, 2022. Rothschild is intimately familiar with the Debtors' operations and capital structure. Rothschild is well qualified to serve as the Debtors' investment banker.

     i.    *Debtors' Emergency Application for Entry of Order Authorizing Debtors to Employ and Retain Stretto, Inc., as Notice, Claims and Solicitation Agent, Effective as of the Petition Date* (the "Stretto Retention Application")

74. The Debtors seek approval of its agreement with Stretto, Inc. ("Stretto") and appointment of Stretto as notice, claims, and solicitation agent of the Court (the "Claims and Noticing Agent"). I am advised that Stretto has substantial experience in noticing, claims administration, solicitation, balloting, and facilitating other administrative aspects of chapter 11 cases. I am further advised that Stretto has substantial experience in cases of this size and complexity, and has acted as the official notice, claims, and balloting agent in many large bankruptcy cases pending in this and other districts nationwide as set forth in the Stretto Retention Application. The approval of the Debtors' agreement with Stretto and Stretto's appointment as

the Claims and Noticing Agent will facilitate the orderly and efficient management of the Chapter 11 Cases.

75. I understand that, except to the extent disclosed in the *Declaration of Sheryl Betance in Support of the Debtors Emergency Application for Entry of Order Authorizing Debtors to Employ and Retain Stretto, Inc., as Notice, Claims and Solicitation Agent, Effective as of the Petition Date*, affirmed by Sheryl Betance and attached to the Stretto Retention Application as Exhibit A, neither Ms. Betance nor Stretto has any connection with the Debtors' creditors or other parties in interest or their respective attorneys.

76. I am advised that given the number of creditors and notice parties involved in these Chapter 11 Cases, retention of the Claims and Noticing Agent is required. Stretto has substantial experience and has been authorized to serve as Claims Noticing Agent in other cases in this District.

**B. Business Operation Motions**

    a. *Debtors' Emergency Motion for Interim and Final Orders (I) Approving Postpetition Financing, (II) Authorizing Use of Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief (the "DIP Motion")*

77. By the DIP Motion, the Debtors seek approval of the proposed DIP facility (the "DIP Facility") in the amount of approximately $455 million, which amount is composed of the sum of (a) $100 million of new money (of which $34 million would be immediately accessible by the Debtors upon entry of the proposed Interim Order) for the continued operation of their business during the pendency of the Chapter 11 Cases, plus (b) approximately $355 million of additional commitments, subject to entry of a final order, including approximately $71 million in outstanding obligations under the Prepetition Credit Agreement that would be deemed to be DIP Obligations

pursuant to the final order, and the remainder in increased "new money" commitments that will become available as remaining obligations under the Prepetition Credit Agreement are paid down from postpetition receipts (*i.e.*, a "creeping roll-up"). I have reviewed the DIP Motion and DIP documentation and the terms of the DIP Credit Agreement as listed in the DIP Motion are accurate to the best of my knowledge.

78.     I, along with my colleagues, have worked tirelessly to familiarize myself with the Debtors' day-to-day operations, business affairs, financial performance, books and records, and restructuring efforts. As part of the Debtors' evaluation of their liquidity position, we worked closely with the Debtors' management and other advisors to review, analyze, and assist in the development of the Debtors' 13-week cash flow forecast and prepare a budget describing projected operating cash flow and disbursements of the Debtors over the next 13 weeks (the "Approved Budget"), and engage in negotiations with the DIP lenders concerning the Approved Budget. The Approved Budget, attached as Exhibit A to the proposed Interim Order would provide an appropriate amount of postpetition financing to allow the Debtors to operate in the ordinary course and administer these Chapter 11 Cases.

79.     Based on my and my team's analysis of the Debtors' current cash position and needs, I believe that the Debtors require an immediate capital infusion in the form of the DIP Facility in order to operate their business postpetition and to preserve the Debtors' estates as going concerns. As the Debtors' financial forecasts and the Approved Budget reveal, I believe that the Debtors are unable to generate sufficient levels of operating cash flow in the ordinary course of business to cover their operating and capital costs and the projected costs of these Chapter 11 Cases absent immediate funding.

80. Specifically, the Debtors require the funding available from the DIP Facility in order to, among other things, fund working capital, meet payroll obligations, pay suppliers, cover overhead costs, make adequate protection payments, make payments to critical vendors and shippers, and make any other payments that are essential for the continued management, operation, and preservation of the Debtors' business. The ability to make these payments when due is essential to the continued operation of the Debtors' business during the pendency of these Chapter 11 Cases. Specifically, during the first 30 days of the cases, the Debtors need access to $34 million in the DIP Facility to pay, among other obligations, key payments contemplated by the Interim DIP Budget. I believe that all such expenses are critical to the Debtors' business and that the Debtors' failure to make such payments will result in immediate and irreparable harm to the Debtors and their estates.

81. If the Debtors cannot quickly access the DIP Facility, based on the Debtors' financial forecasts and the Approved Budget, the Debtors will not be able to operate their business in the ordinary course until the hearing on the Final Order (as defined in the DIP Motion). In turn, this would negatively impact the Debtors' revenue, jeopardize the Debtors' stakeholders' confidence in the Debtors' business, and harm the value of the Debtors' estates to the detriment of all stakeholders. Based on the Debtors' financial forecasts and the Approved Budget, the liquidity provided by the DIP Facility should allow the Debtors to implement their business plan while they focus on a refinancing process to pay their prepetition lenders in full.

82. Additionally, as set forth more fully in the DIP Credit Agreement, the proceeds of the DIP Facility will also be used (a) for working capital and other general corporate purposes of the Debtors, including the payment of professional fees and expenses and other administrative expenses in the Chapter 11 Cases, (b) in the case of the Roll Up, to repay the Prepetition Agent,

on behalf of the Prepetition Lenders, certain of the Obligations arising under (and as defined in) the Prepetition Credit Agreement (the "Prepetition Obligations"), (c) to pay the reasonable fees and expenses of the Administrative Agent and the Prepetition Agent (including reasonable fees and expenses of counsel and financial advisors), and (d) to pay claims in respect of certain prepetition creditors, which may include, without limitation, employees and taxing authorities; in each case, in accordance with the Approved Budget, subject to permitted variances.

83.     Accordingly, I believe that absent immediate access to the DIP Facility and Cash Collateral, the Debtors could (a) face a severe interruption of their businesses; (b) lose the support of key constituencies, including the Debtors' workforce, key marketing partners, and customers; and (c) be forced to modify their operations in a significant and adverse manner.  To avoid those outcomes, it is imperative that the Debtors have access to the DIP Facility from the outset of these cases in order to signal to the Debtors' stakeholders, including their employees, marketing partners, vendors, and customers, that despite the filing the outlook for the Debtors and their stakeholders is strong, and that they have the liquidity necessary to meet their obligations in the ordinary course until the business is able to emerge from the chapter 11 process.  For all these reasons, I believe that access to the proposed DIP financing is a necessity.

84.     Moreover, immediate access to both the DIP Facility and Cash Collateral is the stabilizing assumption upon which the Approved Budget, attached as Exhibit A to the Interim Order, is based.  Without such access, the Debtors could (a) lose the confidence and cooperation of employees and key business partners, including creditors, vendors, and customers; (b) face a detrimental interruption of their business; and (c) be forced to modify business operations in significant and adverse manners, all of which could detrimentally affect the Debtors' ability to

maximize the value of the estates. In contrast, access to the proposed DIP Facility will send a clear signal to the market that the Debtors' operations are stable and "business as usual" will continue.

85.     In short, without immediate access to both the DIP Facility and Cash Collateral, the Debtors' liquidity situation will be bleak. The Debtors would in all likelihood face a liquidity crisis and run out of cash more quickly than the Approved Budget projects and the erosion of confidence concerning the Debtors' ongoing operations would be significant and irreparably harm the Debtors' estates.

      b.     *Debtors' Emergency Motion for Order (I) Authorizing Debtors to Pay (A) Certain Prepetition Employee Obligations and (B) Prepetition Withholding Obligations, (II) Authorizing the Debtors to Maintain Employee Benefit Programs, and (III) Directing Banks to Honor Related Prepetition Transfers* (the "Employee Wages Motion")

86.     The Debtors seek the relief requested in the Employee Wages Motion because any delay in paying employee compensation or deductions in honoring employee benefits will destroy the Debtors' relationships with their employees and independent contractors irreparably impair employee morale at the very time when the dedication, confidence, and cooperation of these employees are most critical. As a result of the commencement of these cases, and in the absence of an order of the Court providing otherwise, VPX, as the only Debtor with employees (the "Employer Debtor") will be prohibited from paying or otherwise satisfying its Prepetition Employment Obligations. To maintain employee morale at this critical time for the Employer Debtor, and to minimize the personal hardship the employees would suffer if Prepetition Employment Obligations are not paid when due, the Employer Debtor seeks authority to honor such obligations in the exercise of its business judgment.

87.     The Debtors face the imminent risk that their operations may be severely impaired if the Debtors are not immediately granted authority to make the payments and honor the obligations described in the Employee Wages Motion. The support of employees and independent

contractors for the Debtors' reorganization efforts is crucial to the success of those efforts, particularly given the unique knowledge of the employees regarding the Debtors' product lines, customers, and operations.

> c. *Debtors' Emergency Motion for Entry of Interim and Final Orders (A) Authorizing the Debtors to Continue to (I) Maintain Their Cash Management System, (II) Honor Certain Prepetition Obligations Related Thereto, (III) Use Existing Business Forms, and (IV) Perform Intercompany Transactions, and (B) Granting Related Relief (the "*<u>Cash Management Motion</u>*")*

88.    By the Cash Management Motion, the Debtors seek entry of interim and final orders: (a) authorizing the Debtors to continue to (i) maintain their cash management system, (ii) honor certain prepetition obligations related thereto, (iii) use existing business forms, and (iv) perform certain intercompany transactions, and (b) granting related relief.

89.    I understand from counsel that the U.S. Trustee has established certain operating guidelines for debtors-in-possession in order to supervise the administration of chapter 11 cases. These guidelines require chapter 11 debtors to, among other things, close all existing bank accounts and open new debtor-in-possession bank accounts, establish one debtor-in-possession bank account for all estate monies required for the payment of taxes (including payroll taxes), maintain a separate debtor-in-possession bank account for cash collateral, and obtain checks for all debtor-in-possession accounts that bear the designation "debtor-in-possession," the bankruptcy case number, and the type of account. These requirements are designed to provide a clear line of demarcation between prepetition and postpetition transactions and operations and to prevent the inadvertent postpetition payment of prepetition claims. In the Cash Management Motion, the Debtors seek a waiver of these requirements so that its operations are not further disrupted by the need to alter the cash management system.

90.     Prior to the Petition Date, in the ordinary course of business, the Debtors maintained an integrated, centralized cash management system (the "Cash Management System").  The Cash Management System is comparable to the centralized cash management systems used by similarly-situated companies to manage the cash of operating units in a cost-effective, efficient manner.  The Debtors use the Cash Management System in the ordinary course of their businesses to collect, transfer, and disburse funds generated from their operations and to facilitate cash monitoring, forecasting, and reporting.  I am aware that the Debtors' treasurer maintains daily oversight over the Cash Management System and utilizes cash management controls for entering, processing, and releasing funds, including in connection with Intercompany Transactions, and the Debtors' accounting department regularly reconciles the Debtors' books and records to ensure that all transfers are accounted for properly.

91.     The Cash Management System is summarized on Exhibit 1 to the proposed interim order for the Cash Management Motion and consists of ten Debtor-owned and controlled bank accounts (each, a "Bank Account" and, collectively, the "Bank Accounts") with the following banking institutions (collectively, the "Cash Management Banks"):

    (a)     Two Bank Accounts maintained at Truist Bank;

    (b)     One Bank Account maintained at Citizens Bank, N.A.;

    (c)     Three Bank Accounts maintained at PNC Bank, N.A.;

    (d)     One Bank Account maintained at Bank of America, N.A.;

    (e)     One Bank Account maintained at HSBC Bank USA, National Association;

    (f)     One Bank Account maintained at PayPal; and

    (g)     One Bank Account maintained at The Huntington National Bank.

92.     I understand that four of the seven Cash Management Banks are designated as authorized depositories by the U.S. Trustee, under the U.S. Trustee Guidelines, and that all but one

of the Cash Management Banks are insured by the Federal Deposit Insurance Corporation ("FDIC"). The value of the funds in the Bank Account at PayPal, the Cash Management Bank that is not FDIC-insured, is de minimis.

93.     I believe that requiring the Debtors to adopt a new, segmented cash management system during these Chapter 11 Cases would be expensive, burdensome, and unnecessarily disruptive to the Debtors' operations. The Cash Management System provides the Debtors with the ability to efficiently track and report the location and amount of funds, which, in turn, allows the Debtors to track and control such funds, ensure cash availability, and reduce administrative costs through a method of coordinating the collection and movement of funds. I believe that any disruption of the Cash Management System (or requiring the Debtors to adopt a new, segmented cash management system) will have a negative effect on the Debtors' restructuring efforts and needlessly reduce the value of the Debtors' business enterprise. By contrast, maintaining the current Cash Management System will facilitate the Debtors' transition into chapter 11 by, among other things, minimizing delays in paying postpetition debts and eliminating administrative inefficiencies. I believe maintaining the current Cash Management System will allow the Debtors and their management to focus on their daily responsibilities.

94.     In the ordinary course of their business, the Debtors have historically engaged in routine business relationships with each other and with their non-Debtor affiliates (such ordinary course transactions, the "Intercompany Transaction"), which result in intercompany receivables and payables. As funds are disbursed throughout the Cash Management System and as business is transacted between a Debtor and another Debtor or between a Debtor and its non-Debtor affiliate, there may be intercompany balances owing by a Debtor to another Debtor or non-Debtor affiliate. This flow of funds is carefully tracked and diligently recorded. My understanding is that

the Intercompany Transactions are critical to the Debtors' business, and, among other things, support the operations of the Debtors' core beverage business on a daily basis.

95.     Specifically, the Intercompany Transactions fund the operations of certain foreign non-Debtor affiliates (the "Foreign Non-Debtor Affiliates"). I understand that the Debtors believe that financially supporting the growth and development of the Foreign Non-Debtor Affiliates is critical to the Debtors' strategy to grow sales in important foreign markets that will, in turn, maximize the enterprise value of the Debtors' business as a whole. I believe that the Intercompany Transactions are an essential component of the Debtors' operations, and that any interruption would severely disrupt their operations and result in harm to the Debtors' estates and their stakeholders. My understanding is that the Intercompany Transactions are comparable to those of other companies.

96.     The Debtors lease real property, including warehouses, from certain non-Debtor affiliates (the "Non-Debtor Landlords"). The Debtors pay expenses (including tax, upkeep, and maintenance) for which they are obligated under such leases directly to third parties from the PNC Bank Concentration Account and the Truist Concentration Account. The real property leased from the Landlord Non-Debtor Affiliates is used in the ordinary course of the Debtors' businesses.

97.     Accordingly, the Debtors request that they be authorized to, among other things, continue to maintain their Cash Management System, honor certain prepetition and postpetition obligations related thereto, and perform Intercompany Transactions in the ordinary course of business in accordance with prepetition practices.

      d.    *Debtors' Emergency Motion for Order Authorizing Debtors to Pay Prepetition Sales, Use, Trust Fund, Property, and Other Taxes and Similar Obligations (the "Tax Motion")*

98.     By the Tax Motion, the Debtors seek an order: (i) authorizing, but not directing, the Debtors: (a) to pay, in the Debtors' sole discretion, prepetition sales, use, trust fund, property, and

other taxes and similar obligations, as detailed herein, in the ordinary course of the Debtors' businesses; and (b) (i) to seek a refund of any taxes that have been already paid by the Debtors that the Debtors determine, in the exercise of their business judgment, should not have been paid, and (ii) authorizing the Debtors to set aside, in a segregated account, funds to pay any taxes that have not yet been paid by the Debtors but which the Debtors dispute, until a final determination is made as to whether the Debtors are obligated to pay the alleged tax, and (iii) authorizing financial institutions to receive, process, honor and pay all related checks and electronic payment requests, solely to the extent the Debtors have sufficient funds standing to their credit with such financial institutions, and such financial institutions may rely on the representations of the Debtors as to which checks are issued and authorized or wire transfers are made and authorized to be paid in accordance with the Tax Motion without any duty of further inquiry and without liability for following the Debtors' instructions.

99.     I understand that in the ordinary course of operating their businesses, the Debtors (a) incur certain sales, use, and trust fund property taxes (collectively, the "Taxes"), and (b) are charged amounts for fees and other similar charges and assessments by various licensing authorities (collectively, the "Fees").  The Debtors remit the Taxes and Fees to various federal, state, and local taxing, licensing and other governmental authorities (collectively, the "Authorities") on a periodic basis (whether monthly, quarterly, or yearly) that are established for each particular Tax or Fee.

100.     I understand that, as of the Petition Date, the Debtors estimate that they owe the various Authorities approximately $2,717,000.00 in prepetition Taxes and Fees, as described in detail on Exhibit A to the Tax Motion.  As of the Petition Date, it is estimated that there are approximately $850,000.00 of sales and use taxes owed to various taxing authorities.  Exhibit "A"

to the Tax Motion reflects two-line items indicating the taxing authority as "various" because the Debtors operate and sell products throughout the United States and do not know the exact amount of sales and use taxes owed or which authority the taxes are owed to until these taxes are reconciled. In the ordinary course of business, the Debtors reconcile these sales and use taxes owed and pay the various authorities at the end of the following month. Notwithstanding, the Debtors dispute approximately $1.5 million of these Taxes which represent the sales and use tax allegedly owed in several states. The majority of the Debtors' sales are through distributors where a sales tax is not required. There was a discrepancy in the sales and use tax returns that were filed in the respective states that resulted in the assessment of use and sales taxes in several states, which the Debtors believe they would not otherwise owe. The Debtors' global tax manager is working with the various state taxing agencies to file amendments to the sales and use tax returns which should result in the Debtors owing significantly less sales and use taxes. Through the Tax Motion, the Debtors seek only the authorization to pay the Authorities the prepetition amounts described in the Tax Motion in the ordinary course, and only to the extent that the liabilities are assessed against the Debtors on a final basis.

101.    I understand that many of the Taxes and Fees collected prepetition are not property of the Debtors' estates, and therefore, must be remitted to the Authorities and that even if certain prepetition Taxes and Fees are not considered to be the property of the Debtors' estates, they may give rise to priority claims by the Authorities. Moreover, I believe that if the Taxes and Fees are not paid, it is possible that some, if not all, of the Authorities may, pursuant to section 362(b)(9) of the Bankruptcy Code, cause the Debtors to be audited and subjected to various administrative proceedings. Such audits and administrative proceedings and the accompanying disruption in

business activities would materially and adversely affect the Debtors' reorganization efforts and unnecessarily divert the Debtors' attention away from these cases.

102.     Accordingly, the Debtors request that they be authorized, but not directed, to pay the Taxes and Fees to the relevant Authorities in the ordinary course of business.  Nothing in the Tax Motion, however, shall preclude the Debtors from contesting, in their sole discretion, the validity and amount of any Taxes or Fees under bankruptcy or non-bankruptcy law.

> e.     *Debtors' Emergency Motion for Authorization to (I) Continue to Administer Insurance Policies and Related Agreements; and (II) Honor Certain Obligations in Respect Thereof* (the "<u>Insurance Motion</u>")

103.     By the Insurance Motion, the Debtors seek authority, in their reasonable business judgment, to (i) continue to administer the insurance policies described herein (collectively, the "<u>Insurance Policies</u>"); and (ii) continue to pay certain claims, deductibles and/or premiums if and to the extent any may become due and payable according to the terms of the Insurance Policies. The Debtors further request authority to pay certain amounts as they come due under the Insurance Policies in the ordinary course of their businesses, if and to the extent such amounts become due.

104.     I believe that it is essential for the Debtors to maintain the Insurance Policies.  As set forth in the Insurance Motion, such policies provide a comprehensive range of coverage for the Debtors.  If the Insurance Policies are allowed to lapse, the Debtors will be exposed to substantial liability for any damages resulting to persons or property of the Debtors and others, and the Debtors would have to bear the costs and expenses of defense litigation.  Moreover, I understand that maintenance of the Insurance Policies is mandatory under the United States Trustee guidelines and various state and federal laws.

105.     I believe that the Debtors' continued operations and restructuring efforts require that the Insurance Policies be maintained on an ongoing and uninterrupted basis.  In maintaining those obligations, it is crucial that the administrative fees paid to providers and the premiums paid

for the Insurance Policies, to the extent applicable, are continued and maintained by the Debtors. For example, I believe that the risk that eligible claimants will not receive payments with respect to employment-related injuries may have a devastating effect on the financial well-being and morale of the employees, and their willingness to remain in the Debtors' employ. Departures by employees at this critical time may result in a severe disruption of the Debtors' businesses to the detriment of all parties in interest.

106.     To the extent that any of the Insurance Policies may be deemed executory contracts, I understand that the Debtors do not at this time seek authority to assume these contracts. The Debtors request only authorization to continue the programs, pay certain claims in accordance with the programs, and pay such premiums and administrative expenses, if and to the extent such payments are required of the Debtors, as may be necessary to keep the Insurance Policies in force.

f.    *Debtors' Emergency Motion for an Order Authorizing Payment of Prepetition Claims of Critical Vendors* (the "Critical Vendors Motion")

107.     By the Critical Vendors Motion, the Debtors seek authority to pay the prepetition claims of certain vendors that are critical to the Debtors' businesses. I believe that the Critical Vendors are essential to the Debtors' business operations as they provide goods and services to the Debtors that are necessary to the ongoing business operations, as they provide goods and services to the Debtors that are necessary to the ongoing business operations. Certain of the Critical Vendors are vendors that are the sole source provider of products used in the Debtors' business operations. Due to market constraints, relationship issues and other challenges, these Critical Vendors are the Debtors' only supplier options. In addition, certain of the Critical Vendors provide specific ingredients required for the Debtors' products. The Debtors and their research and development team have spent years developing specifications that have been adopted, tested, and perfected over time with these Critical Vendors. Further, the ingredients that these Critical

Vendors supply provide the Debtors with a competitive advantage. Shifting to other vendors would be very challenging and time consuming as it would require the Debtors' research and development team to start over with new vendors which would take 60 to 90 days and cause significant disruption in production. Further, certain of the Critical Vendors are utilized by the Debtors for all of their east coast domestic production, as well as all Canadian production. Due to the production facility in Phoenix being offline as a result of a fire, the Debtors rely upon these Critical Vendors to assist in maintaining competitive pricing and continued production. Shifting to other vendors could take approximately 60 days causing a disruption in the Debtors' operations while jeopardizing quality of the Debtors' products.

108. Lastly, certain of the Critical Vendors are vital to the Debtors' promotional, endorsement, advertising, and marketing efforts. These Critical Vendors provide specialized and unique services for, or on behalf of, the Debtors. These services include creation and posting of bespoke content on social media platforms, and participation in photoshoots, video-shoots, demos, fitness shows, professional events, industry expos, and trade shows (collectively, "Special Events"). As consideration for such services, these Critical Vendors receive monetary payments depending on the social media platform(s) at issue, number of followers that each such critical vendor possesses, and frequency of that vendor's posting; hourly payments for Special Events; in-kind payments consisting of the Debtors' products; and/or commission payments for sales of the Debtors' products generated online. These Critical Vendors cannot be readily replaced with a new set of random vendors with separate and distinct individualities, talents, follower communities, and audience demographics. The Debtors have spent years, significant costs, and significant effort and other internal resources developing its network of these Critical Vendors. This network of Critical Vendors is industry-leading, and has helped create a brand image for the Debtors that is

known globally. Based on the Debtors' estimate, approximately $350,000 in prepetition claims is owed to these influencers in the aggregate. It is imperative that the Debtors remain current with these vendors because the influencers' large number of social media followers and their vast networks help foster deep connections between consumers and the brand and positively affect sales.

109. I believe that if payment of the claims of the Critical Vendors, the amounts of which are set forth on Exhibit A to the Critical Vendor Motion (collectively, the "<u>Critical Vendor Claims</u>"), are not paid, the Critical Vendors will terminate the services they provide to the Debtors and operations of the Debtors' business will be jeopardized to the detriment of all creditors. Most if not all of the Debtors' business operations are dependent upon the Critical Vendors. Accordingly, I believe that interrupting the business relationship of the Debtors, on the one hand, and the Critical Vendors, on the other hand, if not fatal to the Debtors' efforts to reorganization, will severely impair that effort to the detriment of the Debtors' estates and the creditors thereof. The Debtors believe that payment of the Critical Vendor Claims is fair and reasonable for the services provided.

       g.    *Debtors' Emergency Motion for Order Authorizing the Payment of Certain Pre-Petition Claims of, and Honoring Certain Contracts With Shippers and Warehousemen* (the "<u>Shippers Motion</u>")

110. By the Shippers Motion, the Debtors seek entry of an order authorizing, but not directing the Debtors to pay, in their sole discretion and in the ordinary course of business, as and when due, certain pre-petition claims of the Shippers; provided, however, that honoring, performing, or exercising of such rights and obligations shall not give rise to administrative claims solely as a result of the entry of an order providing such authorization and shall not be deemed an assumption of any contract.

111.     I believe that an integral part of the Debtors' operations is the use of domestic shippers, packers and warehousemen (collectively, the "Shippers") to pack, ship and deliver a variety of products through established national distribution networks (payments for which services, including any related taxes, are collectively referred to herein as "Shipping Charges"). A list of the Shippers and the amounts owed each as of the Petition Date is attached as Exhibit A to the Shippers Motion.

112.     The Debtors employ several different Shippers throughout the United States.  As reflected on Exhibit A to the Shippers Motion, as of the Petition Date, the Debtors owe approximately $6 million.

113.     I understand that under applicable state law, the Shippers may have a lien on goods in their possession that secure the charges or expenses incurred in connection with the transportation of such goods.  In addition, I understand that, pursuant to section 363(e) of the Bankruptcy Code, Shippers, as bailees, may be entitled to adequate protection for a valid possessory lien.

114.     In the event that, as of the Petition Date, the Shippers have outstanding invoices for goods transported or stored prior to the Petition Date, I believe that the Shippers will likely argue that they have possessory liens for transportation or storage costs, and may refuse to deliver or release those goods held in their possession until their invoices are paid and their liens are redeemed.  I believe that the Shippers may further be unwilling to release the goods in their possession to which they may be entitled to liens since this may result in their claims against the Debtors becoming unsecured.

115.     Moreover, even absent a perfected lien, I believe that a Shipper's refusal to deliver the Debtors' goods and supplies would severely disrupt the Debtors' operations and cause the

Debtors to lose revenue, future business, and goodwill. Indeed, I believe that the Debtors have established an excellent reputation in the industry for meeting delivery schedules and must maintain this reputation in order to maintain their customer base and strengthen the value of the Debtors' businesses.

> h. *Debtors' Emergency Motion Pursuant to Sections 105(A), 363, 1107 and 1108 of the Bankruptcy Code for an Order (A) Authorizing, but Not Directing, the Debtors to (I) Maintain and Administer Customer Programs, and (II) to Honor or Pay Certain Prepetition Obligations to Their Customers in the Ordinary Course of Business; and (B) Granting Certain Related Relief* (the "<u>Customer Program Motion</u>")

116. The success and viability of the Debtors' business is dependent upon the loyalty and confidence of their Customers. The continued support of this constituency is absolutely essential to the survival of the Debtors' business and to maximize the value of their estates. These obligations include those arising in connection certain Trade Promotions, Slotting Allowances, and Other Customer Programs. The Debtors operate in a highly competitive market for energy drinks and dietary supplements, including products purchased for resale, where alternate suppliers of similar products are available to the same demographic that consumes the Debtors' Customer Products. This competition makes retaining the Debtors' relationship with their Customers extremely important. Any delay in honoring or paying various Customer Obligations, as set forth in the Customer Program Motion, will severely and irreparably impair the Debtors' customer relations at a time when the loyalty and support of their customers is extremely critical. By contrast, honoring these prepetition obligations will require limited expenditure of estate funds and will assist the Debtors in preserving their key customer (retail) relationships to the benefit of all stakeholders.

117. The Debtors' Customer Programs include the following:

a.    **Trade Promotions:** The Debtors provide programs where Customers are offered incentives to increase purchase volumes and for specific in-store execution (collectively, the "Trade Promotions").  Customers participating in these Trade Promotions offer Consumers reduced prices, specifically advertise the Debtors' Customer Products in marketing campaigns, erect specific displays, or otherwise feature the Debtors' products to Consumers.  In return, the Debtors provide the Customers with price reductions or cash rebates for the Customer Products sold.

b.    **Slotting Allowances:** Where permitted, the Debtors incur costs associated with purchasing shelf space in retail locations ("Slotting Allowances").  In many instances, due to the competition in the energy drink and dietary supplement industry, payment of the Slotting Allowance is required in order to have an established presence in the Customers' retail establishments.

c.    **Other Customer Programs:** In addition to the foregoing, from time to time, the Debtors may participate in various marketing or other Customer Programs, which can include weekly ad circulars, product samples, cooler placements, free-fills or event sponsorship (either promotional or charitable) for Consumers or Customers.

118.    Accordingly, to preserve the value of their estates and customer satisfaction, I believe that the Debtors must be permitted, in the Debtors' sole discretion, to continue honoring and/or paying all Customer Obligations without interruption or modification.  In addition, to provide necessary assurances to the Debtors' customers on a going forward basis, the Debtors request authority, in their sole discretion, to continue honoring or paying all obligations to customers that arise from and after the Petition Date in the ordinary course of the Debtors' business.  In light of the foregoing, I believe that the honoring and the payment of all Customer

Obligations as requested by the Debtors is essential to the preservation of value, represents a sound exercise of the Debtors' business judgment, and is in the best interests of the Debtors' estates and their creditors.

> i.   *Debtors' Emergency Motion For (A) The Authority To Pay Prepetition Obligations Owing To Foreign Vendors, Service Providers And Governments And (B) To Honor And Continue paying Foreign Vendors In The Ordinary Course Of Business (the "Foreign Vendor Motion")*

119.   By the Foreign Vendor Motion, the Debtors seek entry of an order (a) authorizing the Debtors to pay the prepetition claims of certain foreign vendors and service providers that are critical to the operation of the Debtors' businesses (the "Foreign Vendors"); (b) to honor and continue paying foreign vendors, service providers and governments in the ordinary course of business, and (c) granting certain related relief.  The Debtors are in the process of expanding their market territory in certain international markets.  To support this endeavor, the Debtors created four (4) foreign entities: i) Bang Energy B.V.; ii) Bang Energy Canada, ULC; iii) Bang Energy Chile SPA; and iv) Bang Energy Pty LTD (Australia) (each a "Foreign Entity," and collectively, the "Foreign Entities") to serve as an extension of the Debtors in their specific foreign markets. Each Foreign Entity is owned 100% by Vital Pharmaceuticals, Inc.

120.   These Foreign Entities and their Foreign Vendors are necessary to preserve the Debtors' critical relationships in these new foreign markets and to expand the Debtors' market share.  Without expanding their market and reaching additional international consumers, the profitability of the Debtors' products and its entire enterprise would be reduced.  It is essential, therefore, that the Debtors maintain the Foreign Entities' operations throughout the Debtors' reorganization.

121.   The Debtors rely on these Foreign Vendors to supply various goods and services and deliver their products to foreign retailers for sale to consumers.  Many of the Foreign Vendors

who supply and deliver these essential goods and products may argue that they are not subject to the jurisdiction of this Court or the provisions of the Bankruptcy Code that would otherwise protect the Debtors' assets and business operations from the disruption that would be caused by vendors undertaking collection efforts against the Debtors or their assets.

122.     There is a risk that Foreign Vendors could sue the Debtors in foreign courts and attempt to recover prepetition amounts owed to them if these claims remain unpaid. The Debtors would have no practical ability to remedy this situation (absent payment of amounts sought) and their business operations would be irreparably harmed to the detriment of their estate and their creditors.

123.     The Debtors are making every effort to avoid interruptions in their supply chain and the adverse effects that even a temporary disruption in the supply chain could have on their business in order to maximize the value of their assets. In connection therewith, the Debtors must have the ability to continue to fund the Foreign Vendors on an uninterrupted basis.

124.     The Debtors have reviewed the actual obligations incurred year to date for or related to Foreign Claims and estimate that the amount owed to Foreign Vendors on the Petition Date does not exceed $3 million for the Debtors. Beyond identifying the Foreign Vendors and amounts due each Foreign Vendor, Exhibit A (the "Foreign Vendor Claims") to the Foreign Vendor Motion also includes a description of the goods or services provided to the Debtors and Foreign Entities by each of the Foreign Vendors.

125.     I believe that if payment of the Foreign Vendor Claims is not made, the Foreign Vendors will terminate the services they provide to the Foreign Entities and the Debtors and operations of the Debtors' business will be jeopardized to the detriment of their estates and their

creditors. Most if not all of the Debtors' foreign business operations are dependent upon the Foreign Vendors.

## VI.   **CONCLUSION**

126.   I have reviewed each of the First Day Pleadings, Proposed Orders, and exhibits thereto (or have otherwise had their contents explained to me), and the facts set forth therein are true and correct to the best of my knowledge, information, and belief. Moreover, I believe that the relief sought in each of the First Day Pleadings (a) is vital to enabling the Debtors to make the transition to, and operate in, Chapter 11 with minimal interruptions and disruptions to the Debtors' businesses or loss of productivity or value; (b) is necessary preserve valuable relationships with customers, trade vendors and other creditors; and (c) constitutes a critical element in the Debtors' ability to successfully maximize value for the benefit of their estates.

I declare under penalty of perjury that the foregoing is true and correct to the best of my information, knowledge, and belief.

Dated: October 10, 2022
       Miami, Florida

                                    John C. DiDonato
                                    Chief Transformation Officer

**Exhibit A**

**Organizational Structure**

**Key**

- Debtor Entity
- Non-Debtor entity that is party to the Prepetition Credit Agreement
- Non-Debtor entity whose equity is pledged for the Prepetition Loans. (Such entities are not obligors under the Prepetition Credit Agreement and their assets have not been pledged thereunder).

