**<u>DEBTORS EXHIBIT 32</u>**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION
www.flsb.uscourts.gov

| | |
|---|---|
| IN RE: | Chapter 11 |
| VITAL PHARMACEUTICALS, INC., *et al.*, | Case No. 22-17842 (PDR) |
| Debtors. | (Jointly Administered) |

**JOINT MOTION FOR RELIEF FROM THE AUTOMATIC STAY
TO CONTINUE ACTION IN NON-BANKRUPTCY FORUM**

> **ANY INTERESTED PARTY WHO FAILS TO FILE AND SERVE A
> WRITTEN RESPONSE TO THIS MOTION WITHIN 14 DAYS
> AFTER THE DATE OF SERVICE STATED IN THIS MOTION,
> PURSUANT TO LOCAL RULE 4001-1(C), WILL BE DEEMED TO
> HAVE CONSENTED TO THE ENTRY OF AN ORDER GRANTING
> THE RELIEF REQUESTED IN THE MOTION.**

Faith Technologies Incorporated ("FTI") and Nexus Steel, LLC ("Nexus ") (together

"Movants") jointly move this Court pursuant to 11 U.S.C. §§ 105(a), 362(d), Bankr. R. 4001(a), 9014

and 9019, Local Rules 4001-1(C) and 9013-1(D), and this Court's guideline for Motion for Relief from

the Automatic Stay, seeking entry of an order substantially in the form of **Exhibit L** terminating the

automatic stay to allow the parties to prosecute to judgment the action pending in the superior court of

Arizona in Maricopa County, Case No. CV2022-008873 (the "Arizona Action") by Nexus Steel, LLC

as plaintiff, against JHO Real Estate Investment, LLC ("JHO") and Vital Pharmaceuticals, Inc. ("Vital")

(together "Debtors"); and non-debtor defendants FABCO Metal Products, LLC; Belvac Production

Machinery, Inc.; Truist Bank; ISEC, Inc.; Heavy Equipment Movers & Installation, LLC; Hardrock

Concrete Placement Co., Inc.; Stellar Group, Inc.; FTI; Integrated Masonry; HACI Mechanical

119752844.4

Contractors, Inc.; and Trench Shore Rentals (together the "Non-Debtor Defendants").[1] FTI submits that resolution of the Arizona Action with respect to the validity, priority and extent of the Arizona Mechanics' Lienholders' mechanics liens and claims as well as their counterclaims and cross-claims serves the best interests of Debtors' estate and creditors. In support of this motion, FTI respectfully states as follows:

## JURISDICTION AND VENUE

1. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Movants consent to this Court's entry of a final order with respect to stay relief, but otherwise reserves its rights.

2. Venue of this case and this Motion is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3. The statutory predicate for the relief requested in this Motion is 11 U.S.C. §§ 105(a), 362(d), and 363(b), as complemented by Bankruptcy Rules 4001(a), 9014 and 9019 and Local Bankruptcy Rules 4001-1 and 9013-1(D).

## BACKGROUND

4. On October 10, 2022, the now jointly-administered debtors ("Debtors") each filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code with this Court.

5. JHO owns the real property located 1635 South 43rd Avenue, Phoenix, Arizona 85009, APN 105-14-001Q (the "Arizona Property") in Maricopa County, State of Arizona. Debtor Vital apparently is occupant/tenant of the Arizona Property. Movants are not aware of the value of the Arizona Property other than as asserted in Debtor's schedules.

---

[1] Nexus Steel, LLC; FABCO Metal Products, LLC; Belvac Production Machinery, Inc.; ISEC, Inc.; Heavy Equipment Movers & Installation, LLC; Hardrock Concrete Placement Co., Inc.; Stellar Group, Inc.; FTI; Integrated Masonry; HACI Mechanical Contractors, Inc.; and Trench Shore Rentals are the "Arizona Mechanics' Lienholders".

119752844.4

<u>Branch Banking Deed of Trust</u>

6.      On or about September 20, 2019, JHO as trustor entered into a Deed of Trust and Assignment of Rents and Security Agreement and Fixture Filing with Branch Banking and Trust Company ("Branch Banking") to secure repayment of a debt identified as being in the principal amount of $35,550,000.  The Branch Banking Deed of Trust was recorded on September 24, 2019 in the office of the Recorder, Maricopa County, Arizona.

<u>Stellar General Contract</u>

7.      Stellar Group, Inc. ("Stellar") alleges in its pleading filed in the Arizona Action on August 25, 2022 that on or about July 28, 2020, Stellar as design-builder, and Vital, as owner, entered into a Standard Form of Agreement between owner and design-builder (the "Stellar Contract"), in which Stellar agreed to serve as the design-builder on a construction project known as Phoenix Can Manufacturing at the Arizona Property.  The work was to be located on the Arizona Property.[2]

8.      Stellar alleges it commenced work on the Project in August 2020.

<u>Hardrock Subcontract</u>

9.      Hardrock alleges that[3] on November 12, 2020, Hardrock, as a concrete subcontractor and Stellar as general contractor, entered into a written agreement ("Hardrock Agreement") for labor, material and services to be provided by Hardrock to a project known as the Bang Phoenix Can Manufacturing Project #23006976 (the "Project"), located at the Arizona Property.

10.      On November 18, 2020, and in accordance with A.R.S. § 33-992.01, Hardrock timely provided its 20-Day Preliminary Notice.

---

[2] Stellar Group, Inc's Answer, Counterclaim, and Cross-Claims at 8-9, *Nexus Steel, LLC v. JHO Real Estate Investment, LLC et al*, Case. No. CV2022-008873.  An accurate copy is attached as **Exhibit H**.
[3] Hardrock Concrete Placement Co., Inc.'s Answer, Counterclaim and Crossclaims at 8, ¶¶ 17-19, 21. *Nexus Steel, LLC v. JHO Real Estate Investment, LLC et al*, Case. No. CV2022-008873.  An accurate copy is attached as **Exhibit G**.

119752844.4

11.     Commencing on or about November 16, 2020, and continuing, Hardrock furnished labor and materials and performed concrete construction work on the Arizona Property in accordance with the terms of the Hardrock Agreement, change orders and other instructions from Stellar or its authorized agents.

### Release of Branch Banking Deed of Trust

12.     The Branch Banking Deed of Trust was released of record by a Certificate of Satisfaction made by Branch Banking and Trust Company by Truist Bank dated November 14, 2020 and recorded on December 2, 2020.  As a result of the Certificate of Satisfaction, the Branch Banking Deed of Trust was released of record.

### Truist Deed of Trust

13.     JHO entered into a Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing in favor of Truist Bank as beneficiary to secure repayment of obligations alleged to be in the principal amount of $541,400,000 (the "Truist Deed of Trust").  The Truist Deed of Trust was recorded on December 14, 2020, after commencement of work on the Project.

### FTI Building Subcontract

14.     On or about December 22, 2020, FTI entered into a written agreement with Stellar to furnish labor, professional services, materials, equipment, machinery, fixtures and tools for the building electrical work on the Project (the "FTI Building Subcontract").

15.     Pursuant to the FTI Building Subcontract, FTI was to be paid the Contract Sum in the amount of $3,926,196.00, subject to additions and deductions, as provided in the Building Subcontract.

16.     During performance of the work under the FTI Building Subcontract, Stellar issued 10 change orders to FTI in the combined amount of $2,048,932.95, increasing the total Building Subcontract amount to $5,975,128.95.

17.     FTI substantially performed its work under the Building Subcontract.

18.    Without justification or excuse, Stellar has failed and refused to pay FTI $2,777,007.15 due and owing under the Building Subcontract.

### FTI Process Subcontract

19.    On or about September 22, 2021, FTI entered into a written agreement with Stellar to furnish labor, professional services, materials, equipment, machinery, fixtures and tools for the process electrical work on the Project (the "FTI Process Subcontract").

20.    Pursuant to the FTI Process Subcontract, FTI was to be paid the Contract Sum in the amount of $2,132,996.30 subject to additions and deductions as provided by the Contract.

21.    During performance of the Process Subcontract, Stellar directed FTI to perform additional work in order to demobilize from the Project and orally agreed to increase the Contract Sum by $37,781 to $2,170,777.30.

22.    After cancellation of the Process Subcontract, Stellar issued a change order to FTI in the amount of $1,325,215.30 in order to remove all unperformed work from the contract, revising the Process Subcontract amount to $807,781.00

23.    FTI has substantially performed its work under the Process Subcontract.

24.    Without justification or excuse, Stellar has failed and refused to pay FTI $807,781.00 due and owing under the Process Subcontract.

### FTI Undertakes Recourse Through Lien Foreclosure Process

25.    On or about February 12, 2021, FTI served a Preliminary 20-Day Notice concerning the amounts due and owing under the Building Subcontract, as required by A.R.S. ¶ 33-992.01, a true and correct copy of which is attached to FTI's pleading in the Arizona Action (**Exhibit J**) as **Exhibit A-C (at p. 242)**.

26.    On or about November 30, 2021, FTI served a Preliminary 20-Day Notice concerning amounts due and owing under the Process Subcontract, as required by A.R.S. § 33-992.01, a true and

correct copy which is attached FTI's pleading in the Arizona Action (**Exhibit J**) as **Exhibit B-2-C (at p. 489)**.

27.     On or about March 17, 2022, FTI recorded two valid Notices of Claim of Lien for Labor, Materials, Machinery, Fixtures and/or Tools relating to the amounts due and owing under both the Building Subcontract and Process Subcontract (the "FTI Liens").  The FTI Liens were timely recorded with the Maricopa County Recorder's Office on March 24, 2022, recorder numbers 2022-0266675 and 2022-0266676.  True and correct copies of the FTI Liens are attached FTI's pleading in the Arizona Action (**Exhibit J**) as **Exhibit B-1 (p. 291) and Exhibit A (p. 25)**.

<u>Nexus Steel Subcontract</u>

28.     On or about January 20, 2021, Nexus entered into a Subcontract Agreement ("Subcontract") with Fabco to provide and erect the structural steel, miscellaneous steel, and trench steel at the Property, for the lump sum contract amount of $733,448.00.

29.     Nexus, pursuant to its Subcontract, provided labor and materials as a licensed sub-contractor, to the Property between February 1, 2021 and December 22, 2021.

30.     On or about October 30, 2021, November 30, 2021, and December 31, 2021, Nexus submitted to Fabco its Pay Applications 1-3, in the total amount of $405,750.86, for labor and materials supplied to the Property up through that date.

31.     Notwithstanding its demand for payment, Nexus has not been paid the full sums it is due on its Pay Applications, in the total amount of $360,885.86.

32.     On or about February 2, 2021, Nexus provided a valid Preliminary 20-Day Notice,  as required by A.R.S. § 33-981 et. seq., a true and correct copy of same is attached as Exhibit A to Nexus' Complaint in the Arizona Action.

33.     On or about January 20, 2022, Nexus recorded a valid Notice and Claim of Lien for Labor, Services, Materials, Machinery, Fixtures and/or Tools ("Mechanic's Lien") which was timely

recorded with the Maricopa County Recorder's Office on January 20, 2022, recorder number

20220060823, a true and correct copy of same is attached as Exhibit A to Nexus' Complaint in the

Arizona Action.

34.     On July 12, 2022 Nexus filed a Complaint for a mechanic's lien foreclosure and a Notice

of Recording a Lis Pendens, with the Maricopa County Superior Court, Case. No. CV2022-008873

captioned: *Nexus Steel LLC  v. JHO Real Estate Investment LLC Et All* ("Arizona Action") and a Notice

of Lis Pendens on the Property. Concurrent with the filing of the Arizona Action, Nexus has recorded a

Notice of Lis Pendens on the Arizona Property.

35.     In the Arizona Action Nexus alleged a lien foreclosure claim against all defendants

(Count I); a breach of subcontract claim against Fabco Metal Products LLC (Count II) and an unjust

enrichment claim against JHO Real Estate Investments Inc. and Vital Pharmaceuticals (Count III).

<u>FTI Undertakes Recourse Through Lien Foreclosure Process</u>

Concurrent with the filing of its pleading in the Arizona Action, FTI recorded a Notice of Lis

Pendens on the Arizona Property on September 21, 2022.

36.     The other non-debtor Defendants recorded mechanics liens against the Arizona Property

within the applicable period covered by A.R.S. § 33-992.01.  A summary of the filed mechanic's liens is

set forth in the table below.

| Claimant | Amount |
|---|---|
| FTI | $3,584,788.15[4] |
| Nexus Steel, LLC | $313,512.91[5] |
| Fabco Metal Products, LLC | $2,160,783.76[6] |

[4] Faith Technologies, Inc.'s Answer to Nexus Steel, LLC's Complaint and Faith Technologies, Inc.'s
Counterclaim, Cross-Claims and Third-Party Complaint at 17-22, *Nexus Steel, LLC v. JHO Real Estate
Investment, LLC et al*, Case. No. CV2022-008873 (an accurate copy is attached as **Exhibit J**).  Nexus
Steel, LLC also seeks to recover interest and fees in addition to the principal amount claimed.
[5] Nexus Steel, LLC's Complaint at 4, *Nexus Steel, LLC v. JHO Real Estate Investment, LLC et al*, Case.
No.  CV2022-008873.  An accurate copy is attached as **Exhibit D**.
[6] Fabco Metal Products, LLC's Counterclaim and Cross-Claims at 4, *Nexus Steel, LLC v. JHO Real*

| Claimant | Amount |
|---|---|
| ISEC, Inc. | Unknown |
| Heavy Equipment Movers & Installation, Inc. | Unknown |
| Hardrock Concrete Placement Co., Inc. | $669,195.67[7] |
| Stellar Group, Inc. | $7,722,974.37[8] |
| Integrated Masonry | $145,637.30[9] |
| HACI Mechanical Contractors, Inc. | $224,126.00[10] |
| Trench Shore Rentals | Unknown |
| **Total** | **$14,821,018.16** |

<u>Arizona Action</u>

37.     The Arizona Action was commenced when Nexus Steel filed its Complaint on July 12, 2022 seeking to foreclose its mechanic's lien.[11]  Thereafter, the non-debtor defendants filed their respective pleadings, generally in the nature of answer, counterclaim and cross-claim, asserting *inter alia* claims against plaintiff and cross-defendants, claims against Debtors, and seeking foreclosure of each party's mechanic's lien.  Further, the pleadings asserted priority over the Truist Bank Deed of Trust.

38.     To date, Stellar, Nexus, Fabco, Hardrock, Integrated Masonry, HACI, and FTI have appeared in the Arizona Action through counsel, as have JHO and Vital and Truist Bank.

39.     The filing of Debtors' bankruptcy petitions caused the automatic stay of Bankruptcy Code § 362(a) to stay prosecution of the Arizona Action.

---

*Estate Investment, LLC et al*, Case. No. CV2022-008873.  An accurate copy is attached as **Exhibit E**.
[7] Hardrock Concrete Placement Co., Inc.'s Answer, Counterclaim and Crossclaims at 9, *Nexus Steel, LLC v. JHO Real Estate Investment, LLC et al*, Case. No. CV2022-008873.  An accurate copy is attached as **Exhibit G**.
[8] **Exhibit H**, Stellar Group, Inc's Answer, Counterclaim, and Cross-Claims at 10-11, *Nexus Steel, LLC v. JHO Real Estate Investment, LLC et al*, Case. No. CV2022-008873.
[9] Integrated Masonry's Answer, Counterclaim and Crossclaims at 9-10, *Nexus Steel, LLC v. JHO Real Estate Investment, LLC et al*, Case. No. CV2022-008873.  An accurate copy is attached as **Exhibit K**.
[10] HACI Mechanical Contractors, Inc. Notice of Lien Perfection & Preservation and Intent to Enforce Pursuant to 11 U.S.C. 546(b), Doc. 189 in *Vital Pharmaceuticals, Inc.* Chap. 11 proceeding, 22-17842-PDR and Doc. 12 in *JHO Real Estate Investment, LLC* Chap. 11 proceeding, 22-17847.
[11] Complaint, *Nexus Steel, LLC v. JHO Real Estate Investment, LLC et al*, Case. No. CV2022-008873. An accurate copy is attached as **Exhibit D**.

119752844.4

<u>Applicable Law</u>

40.     The issues in the Arizona Action are governed by Arizona law. For example, A.R.S.

§§ 33-981 to 33-1008 provides specific procedures for enforcement of mechanics' and materialmen's

liens in Arizona.

41.     The priority issues between the Arizona Mechanics Lienholders among themselves and

Truist Bank, are governed by Arizona law.  For example, the Arizona Mechanics' Lienholders have

priority over the Truist Bank deed of trust because work commenced on the Project before that deed of

trust was recorded.  A.R.S. § 33-992(A).  Other statutory and common law of Arizona will also govern

the priority dispute.

42.     Further, the mechanics' lienholders share priority regardless of, for example, the date of

recording of the notice and claim of lien or commencement of work under A.R.S. § 33-1000.

43.     The non-debtor Defendants assert claims against Stellar as general contractor, and those

claims, like the other claims in the Arizona Action, are governed by Arizona law.

RELIEF REQUESTED

44.     By this Motion, Movants seek entry of an order from this Court terminating the

automatic stay to permit the prosecution of the Arizona Action to final judgment and appeal.  This

would include discovery, motion practice and trial as required.  The Arizona courts would determine the

rights and liabilities as well as priority of each of the parties to the action.  However, enforcement of the

judgment would not be permitted due to the automatic stay.  Movants do not seek leave to foreclose

liens.

45.     A proposed order granting the relief requested is attached as **Exhibit L**.

119752844.4

BASIS FOR RELIEF REQUESTED

## I.    LEGAL STANDARDS

46.    Cause exists to grant relief from the automatic stay under Bankruptcy Code § 362(d).[12] Courts ordinarily consider cause by reference to factors.

47.    The applicable factors uniformly support granting the relief sought.[13]  Those factors were succinctly summarized by courts in this Circuit: "whether a) any 'great prejudice' to either the bankrupt estate or the debtor will result from continuation of a civil suit, b) the hardship to the non-bankrupt by maintenance of the stay considerably outweighs the hardship of the debtor, and c) the creditor has a probability of prevailing on the merits of his case."[14]

## II.    DEBTORS WILL NOT BE PREJUDICED, AND IN FACT WILL BE BENEFITTED BY, TERMINATION OF THE STAY

48.    This factor weighs in favor of terminating the stay in order to allow the Arizona Action to reduce the claims of the non-debtor Defendants and the non-debtor Plaintiff to judgment, to

---

[12] "On request of a party in interest, and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay - (1) for cause . . ." 11 U.S.C. § 362(d)(1).

[13] "'Cause' is not defined under § 362(d) and therefore is assessed on a case-by-case basis, with courts being afforded wide latitude in deciding whether to grant relief." *Lord v. True Funding, LLC*, 618 B.R. 588, 592 (S.D. Fla. 2020) (citing *In re Feingold*, 730 F.3d 1268, 1277 (11th Cir. 2013), other citation omitted). "There is no set list of circumstances that a bankruptcy court is required to consider in evaluating whether § 362(d)(1) 'cause' exists to lift the automatic stay. Rather, courts evaluating whether to grant stay relief have looked to a variety of case-specific factors . . ." *In re Feingold*, 730 F.3d at 1277.

[14] *In re Makarewicz*, 121 B.R. 262, 265 (Bankr. S.D. Fla. 1990) (citation omitted); *see also In re R.J. Groover Const., LLC*, 411 B.R. 460, 466 (Bankr. S.D. Ga. 2008) (same analysis as *Makarewicz*), *In re Tricare Rehabilitation Systems, Inc.*, 181 B.R. 569, 573 (Bankr. N.D. Ala. 1994) (cause to lift stay requires court to "balance the potential prejudice to the debtor, the bankruptcy estate, and to other creditors against the hardship to the plaintiff if she is not allowed to continue the lawsuit"); *In re Murray Indus., Inc.*, 121 B.R. 635, 637 (Bankr. M.D. Fla. 1990) ("courts have generally considered the prejudice to the debtor's reorganization efforts, conservation of judicial resources, and prejudice to the movant") (citations omitted).

119752844.4

determine the asserted mechanic's liens, the claims among the non-debtors, and the priority of the mechanic's liens.  Administration of the estates will be facilitated by resolution of these issues.

49.    Debtors will suffer no more expense in the existing Arizona forum than they would suffer in determination of the same issues in any other forum, including this Court. To the contrary, because the Arizona Action is pending in a court of general jurisdiction and all of the parties have been joined, resolution of the disputes in the Arizona Action should be more efficient than in a new action in any other court.

## III.    THE ARIZONA MECHANICS' LIENHOLDERS WILL SUFFER SEVERE PREJUDICE IF THE AUTOMATIC STAY IS NOT TERMINATED

50.    Courts find prejudice to creditors like the Arizona Mechanics' Lienholders where not lifting the automatic stay of a pending litigation would force the creditor to "duplicate all of its efforts in the bankruptcy court."[15]

51.    Here, Movants will be severely prejudiced if the automatic stay is not lifted. Absent relief, Movants will be required to prosecute two duplicative proceedings involving the same facts, witnesses, documents and issues in two different fora—one in Arizona among the Plaintiff and the non-debtor Defendants and one in Florida against Debtors —a gross waste of private and judicial resources.

52.    Lifting the stay will also conserve judicial resources by allowing the Superior Court of Arizona in Maricopa County, which is more familiar with this matter and the legal issues therein, to adjudicate the parties' claims expeditiously.[16]

---

[15] *Matter of Fernstrom Storage & Van Co*., 938 F.2d 731, 736-37 (7th Cir. 1991) (finding such duplication to be "unfair").

[16] *In re Santa Clara County Fair Assoc., Inc*., 180 B.R. at 566 (finding judicial economy warranted lifting stay where district court was better positioned to resolved issues raised in litigation); *In re Humphrey's Pest Control Co., Inc*., 35 B.R. at 714 (finding cause existed to lift stay and allow litigation to proceed where litigation involved same issues that would need to be resolved before the bankruptcy court).

119752844.4

53.     Further, all of the claims asserted in the Arizona Action are state law causes of action involving contracts and mechanics' liens, which should be decided by a court that routinely handles these types of claims.[17]

54.     Finally, the non-Debtor Plaintiff and all of the non-debtor Defendants are from Arizona, Debtors operate in Arizona, and Truist lent into Arizona.  It is hard to identify a less convenient forum for the Arizona-based parties than a Florida court.  Resolution of this dispute in the Bankruptcy Court requires the Arizona-based parties to duplicate counsel, travel, and bring Arizona witnesses to Florida. None of those burdens are present in Arizona, where Debtors and Truist have already retained counsel. The balance of hardships is clearly on the Arizona Mechanics' Lienholders to resolve their disputes before this Court.

55.     Nor is it clear that absent consent, this Court will have final order jurisdiction over all of the Arizona law causes of action among all of the parties.  None of the inefficiencies of navigating *Stern*, *Wellness* and consent to final orders by the bankruptcy court are present in the Arizona Action.

## IV.    THE ARIZONA MECHANICS' LIENHOLDERS ARE LIKELY TO PREVAIL ON THE MERITS

56.     With respect to likelihood of success on the merits, Arizona law is clear: a mechanics' lien complying with the Arizona statutes is valid, shares priority with other valid liens, and takes priority over subsequent encumbrances.  A.R.S. §§ 33-992, 1000.  After the Branch Banking deed of trust was released, there were no liens of record senior to the mechanics' liens, although Truist will argue that it is entitled to be subrogated to up to $35,500,000 on the released deed of trust.  The Arizona Mechanics' Lienholders will dispute the application of subrogation and point out that because the

---

[17] *Robbins v. Robbins* (*In re Robbins*), 964 F.2d 342, 345-46 (4th Cir. 1992) (holding that relief from stay may be granted to permit litigation to go forward in a non-bankruptcy forum where issues of state law are involved and judicial economy will be promoted); *In re Tribune Co.*, 418 B.R. 116, 127-29 (Bankr. D. Del. 2009) (lifting stay to allow litigation to proceed in California court where suit was commenced).

Arizona Property was literally lien free prior to recording the Truist Bank deed of trust, their liens should not be prejudiced by subrogation.[18]  The relevant factual determinations include the Arizona Mechanics' Lienholders' compliance with Arizona law, determining when commencement of work occurred, and the circumstances of the release of the Branch Banking deed of trust.

57.     In sum, the Arizona Mechanics Liens are junior to no more than $35,500,000, and are likely the senior liens on the Arizona Property. Retaining the stay against the Arizona Action simply and only defers that outcome.

<div align="center">CONCLUSION</div>

For itself and the other Arizona Mechanics Lienholders, Movants request termination of the stay.

Dated:  January 23, 2023

LEWIS ROCA ROTHGERBER CHRISTIE LLP

  */s/ Robert M. Charles, Jr.*
Robert M. Charles, Jr.
Arizona Bar No. 007359
201 E Washington St #1200
Phoenix, AZ 85004,
T: (520) 629.4427
F: (602) 262-5747
rcharles@lewisroca.com
*Attorney for Faith Technologies Incorporated*
-and-

---

[18] *See* Restatement (Third) of Property § 7.6 cmt. f (1997) (intervening lienholders [mechanics lien claimants] prejudiced when they acquire junior interest, incorrectly believing they hold first mortgage, and belief caused by subrogee's [current lender's] delay in making demand for subrogation.")  *See also In re Mortgages Ltd.*, 482 B.R. 298, 310 (Bankr. D. Ariz. 2012).

119752844.4

MARKOWITZ RINGEL TRUSTY & HARTOG P.A.
*Local Counsel for Faith Technologies Incorporated*
9130 South Dadeland Boulevard, Suite 1800
Miami, FL 33156
T: (305) 670-5000
F: (305) 670-5011

By: /s/ Jerry M. Markowitz
       Jerry M. Markowitz
       Florida Bar No. 182420
       Ross R. Hartog
       Florida Bar No. 272370

TIFFANY & BOSCO, P.A.

By: /s/ *Christopher R. Kaup*
    Christopher R. Kaup (*pro hac vice*),
    Arizona Bar No. 0014820
    Seventh Floor Camelback Esplanade II
    2525 East Camelback Road
    Phoenix, Arizona 85016
    crk@tblaw.com

    -and-

    Jason A. Weber (Florida Bar No. 0051681)
    1000 Corporate Drive, Suite 150
    Fort Lauderdale, Florida 33334
    jaw@tblaw.com
    *Attorneys for creditor, Nexus Steel, LLC, an Arizona*
    *Limited Liability Company*

## DECLARATION

I, <u>Ron Rheinheimer</u>, hereby declare under penalty of perjury as follows:

1.     I am the <u>Sr. Vice President</u> of Faith Technologies Incorporated ("FTI") and am authorized to make this declaration on behalf of FTI. I make the following statements based upon my personal knowledge and FTI's business records for which I am responsible.

2.     This declaration accompanies a motion for relief from stay filed by FTI concerning Case No. CV2022-008873, Superior Court of Arizona, Maricopa County.

3.     Attached to the motion is an accurate copy of Notice of Claim of Lien for Labor, Materials, Machinery, Fixtures and/or Tools recorded with the Maricopa County Recorder's Office on March 24, 2022, recorder number 2022-0266675.

4.     Also attached to the motion is an accurate copy of Notice of Claim of Lien for Labor, Materials, Machinery, Fixtures and/or Tools recorded with the Maricopa County Recorder's Office on March 24, 2022, recorder number 2022-0266676.

5.     On behalf of FTI, I attest that the amount of the indebtedness owed to FTI and the nature and extent of default set forth in the motion is information derived from records that were made at or near the time of the occurrence of the matters set forth by, or from information transmitted by, a person with knowledge of those matters, the records were kept in the course of the regularly conducted activity and were made by the regularly conducted activity as a regular practice.

6.     All of the documents attached to the motion as an exhibit are true and accurate copies of the original documents.

119752844.4

I make the foregoing statements under penalty of perjury under the laws of the United States.

Executed on January 12, 2023 in _Appleton_ , Wisconsin.

Dated: 1/12/2023

Faith Technologies Incorporated

Ron Rheinheimer
Sr. Vice President

15

## DECLARATION

I, <u>Rob Martens</u>, hereby declare under penalty of perjury as follows:

1.      I am the owner and <u>President</u> of Nexus Steel, LLC ("Nexus") and am authorized to make this declaration on behalf of Nexus. I make the following statements based upon my personal knowledge and Nexus's business records for which I am responsible.

2.      This declaration accompanies a joint motion for relief from stay filed by Faith Technologies, Inc., and Nexus concerning Case No. CV2022-008873 (the "Case"), Superior Court of Arizona, Maricopa County.  Nexus is the Plaintiff in the Case.

3.      Attached to the motion is an accurate copy of Notice of Claim of Lien for Labor, Materials, Machinery, Fixtures and/or Tools recorded with the Maricopa County Recorder's Office on January 20, 2022, recorder number 20220060823.

4.      On behalf of Nexus, I attest that the amount of the indebtedness owed to Nexus and the nature and extent of default set forth in the motion is information derived from records that were made at or near the time of the occurrence of the matters set forth by, or from information transmitted by, a person with knowledge of those matters, the records were kept in the course of the regularly conducted activity and were made by the regularly conducted activity as a regular practice.

5.      All of the documents relating to Nexus attached to the motion as exhibits are true and accurate copies of the original documents.

6.      I make this declaration under penalty of perjury as being true and correct based on my personal knowledge of Nexus' books and business records.

I make the foregoing statements under penalty of perjury under the laws of the United

States. Executed on January 19, 2023 in _Gilbert_, Arizona.

Dated:

Nexus Steel, LLC

Rob Martens
President & Owner

INDEBTEDNESS WORKSHEET

## **DEBT AS OF THE PETITION DATE**

A.  Total pre-petition indebtedness of debtor(s) to movant (if movant is not the lender, this refers to the indebtedness owed to the lender) as of petition filing date:  $ _____

### **Please see FTI's mechanics' liens attached.**

1.   Amount of principal:                                          $_____

2.   Amount of interest:                                          $_____

3.   Amount of escrow (taxes and insurance):             $_____

4.   Amount of forced placed insurance expended by movant:   $_____

5.   Amount of attorney's fees billed to debtor(s) pre-petition:   $_____

6.   Amount of pre-petition late fees, if any, billed to debtor(s):   $_____

7.   Any additional pre-petition fees, charges or amounts charged to debtors/debtors account and not listed above: _____ (if additional space is needed, list the amounts on a separate sheet and attach the sheet as an exhibit to this form; please list the exhibit number here: _____.)

B.  Contractual interest rate: _____ (if interest rate is (or was) adjustable, list the rate(s) and date(s) the rate(s) was/were in effect on a separate sheet and attach the sheet as an exhibit to this form; list the exhibit number here: _____.)

16

119752844.4

## AMOUNT OF ALLEGED POST-PETITION DEFAULT

### (AS OF <MM/DD/YYYY>)

### No payments have been received since the filing date.

C.  Date last payment was received: _____ <mm/dd/yyyy>

D.  Alleged total number of payments due postpetition from filing of petition through payment due on <mm/dd/yyyy>: _____.

E.  All postpetition payments alleged to be in default:

| Alleged Amount Due Date | Alleged Amount Due | Amount Received | Amount Applied to Principal | Amount Applied to Interest | Amount Applied to Escrow | Late Fee Charged (If Any) |
|---|---|---|---|---|---|---|
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
| Total: $ | $ | $ | $ | $ | $ | $ |

F.  Amount of movant's attorneys fees billed to debtor for the preparation, and filing and prosecution of this motion:  $ _____

119752844.4

G.  Amount of movant's filing fee for this motion:  $ _____

H.  Other attorney's fees billed to debtor post-petition:  $ _____

I.  Amount of movant's post-petition inspection fees:  $ _____

J.  Amount of movant's post-petition appraisal broker's price opinion:  $ _____

K.  Amount of forced placed insurance or insurance provided by the movant post-petition:  $ _____

L.  Sum held in suspense by movant in connection with this contract, if applicable:  $ _____

M.  Amount of other post-petition advances or charges, for example taxes, insurance incurred by debtor, etc., (itemize each charge):  $ _____

119752844.4

EXHIBITS

A.  Branch Banking Deed of Trust

B.  Release of Branch Banking Deed of Trust

C.  Truist Deed of Trust

D.  Nexus Steel, LLC's Complaint (7/14/2022)

E.  Fabco Metal Products, LLC's Counterclaim and Cross-Claims (08/01/2022)

F.  Truist Notice of Appearance (08.08.2022)

G.  Hardrock Concrete Placement Co., Inc.'s Answer, Counterclaim and Crossclaims (08/10/2022)

H.  Stellar Group, Inc's Answer, Counterclaim, and Cross-Claims (08/25/2022)

I.  JHO Real Estate and Vital's Answer to Plaintiff's Complaint (09/19/2022)

J.  Faith Technologies Incorporated's Answer to Nexus Steel, LLC's Complaint and FTI's Counterclaim, Cross-Claims and Third-Party Complaint (09/20/2022)

K.  Integrated Masonry's Answer, Counterclaim and Crossclaims (10/03/2022)

L.  Proposed Order

119752844.4

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true and correct copy of the foregoing *Joint Motion for Relief From the Automatic Stay to Continue Action In Non-Bankruptcy Forum*, was served via the Court's CM/ECF to all counsel of record and interested parties registered to receive electronic noticing in this case on January 23, 2023 and listed on the attached Electronic Service List.

I FURTHER CERTIFY that a true and correct copy of the referenced Motion, will be served by U.S. Mail, postage prepaid, to those parties who are not registered to receive electronic noticing in this case and listed on the attached Mail Service List on January 24, 2023.

<div style="text-align:right">

By: /s/ Jerry M. Markowitz

Jerry M. Markowitz

Florida Bar No. 182420

</div>

119752844.4

**Electronic Mail Notice Service List**

The following is the list of **parties** who are currently on the list to receive email notice/service for this case.

- **Anne Aaronson**　aaaronson@dilworthlaw.com, ctomlin@dilworthlaw.com
- **Thomas L Abrams**　tabrams@tabramslaw.com, fcolumbo@tabramslaw.com
- **Scott Andron**　sandron@broward.org, swulfekuhle@broward.org
- **John A Anthony**　janthony@anthonyandpartners.com, efilings@anthonyandpartners.com;euzonwanne@anthonyandpartners.com;sdavis@anthonyandpartners.com
- **Anthony J Aragona**　aja@devaronalaw.com
- **Marc P Barmat**　mbarmat@furrcohen.com, rrivera@furrcohen.com;atty_furrcohen@bluestylus.com;staff1@furrcohen.com
- **Paul J. Battista**　pjbattista@venable.com, cascavone@venable.com;jnunez@venable.com;imalcolm@venable.com;heburke@venable.com
- **Eyal Berger**　eyal.berger@akerman.com, jeanette.martinezgoldberg@akerman.com
- **Leyza F. Blanco**　lblanco@sequorlaw.com, jdiaz@sequorlaw.com
- **Ronald D. P. Bruckmann**　rbruckmann@shumaker.com, celgin@shumaker.com
- **Kyler K Burgi**　kyler.burgi@dgslaw.com
- **Kevin Michael Capuzzi**　kcapuzzi@beneschlaw.com, docket2@beneschlaw.com;lmolinaro@beneschlaw.com
- **Robert P. Charbonneau**　rpc@agentislaw.com, nsocorro@agentislaw.com;bankruptcy@agentislaw.com;bankruptcy.ecc@ecf.courtdrive.com
- **Jesse R Cloyd**　jrc@agentislaw.com, bankruptcy@agentislaw.com;nsocorro@agentislaw.com;bankruptcy.ecc@ecf.courtdrive.com
- **David H Conaway**　dconaway@slk-law.com
- **Ralph W. Confreda**　rconfreda@mcglinchey.com, alozada@mcglinchey.com
- **Philip W Crawford**　pcrawford@gibbonslaw.com
- **Matthew G Davis**　mdavis@pdtlegal.com, jdorta@pdtlegal.com
- **Ronald M Emanuel**　ron.emanuel@emzwlaw.com, martha.rivera@emzwlaw.com;eservice@emzwlaw.com;cindy.carhartt@emzwlaw.com
- **Brendan S Everman**　beverman@stroock.com, ksuarez@pryorcashman.com;docketing@pryorcashman.com
- **Heidi A Feinman**　Heidi.A.Feinman@usdoj.gov
- **G Steven Fender**　steven.fender@fender-law.com, simone@fenderbollingpaiva.com

21

- **Keith W. Fendrick**    keith.fendrick@hklaw.com,
  andrea.olson@hklaw.com;hapi@hklaw.com;brittany.jacobs@hklaw.com
- **Edward M Fitzgerald**    edward.fitzgerald@hklaw.com, tonya.berger@hklaw.com
- **Joseph D Frank**    jfrank@fgllp.com,
  mmatlock@fgllp.com;csmith@fgllp.com;jkleinman@fgllp.com;csucic@fgllp.com
- **Robert C Furr**    ltitus@furrcohen.com,
  atty_furrcohen@bluestylus.com;jcrane@furrcohen.com;staff1@furrcohen.com;furrrr84158@notify.bestcase.com
- **David L Gay**    dgay@carltonfields.com,
  cguzman@carltonfields.com;efile@ecf.inforuptcy.com;miaecf@cfdom.net
- **Michael I Goldberg**    michael.goldberg@akerman.com,
  charlene.cerda@akerman.com
- **Eric S. Golden**    egolden@burr.com, mlucca-cruz@burr.com;ccrumrine@burr.com
- **Jordi Guso**    jguso@bergersingerman.com,
  fsellers@bergersingerman.com;efile@bergersingerman.com;efile@ecf.inforuptcy.com
- **Aaron L Hammer**    ahammer@hmblaw.com, ecfnotices@hmblaw.com
- **Andrea S. Hartley**    andrea.hartley@akerman.com, janet.salinas@akerman.com
- **Ross R Hartog**    rhartog@mrthlaw.com,
  ecfnotices@mrthlaw.com;gruiz@mrthlaw.com;mrthbkc@gmail.com;lgener@mrthlaw.com;ycandia@mrthlaw.com;rhartog@ecf.courtdrive.com
- **Daniel Harvath**    dharvath@harvathlawgroup.com
- **Christopher R Kaup**    crk@tblaw.com, mburns@tblaw.com
- **Craig I Kelley**    craig@kelleylawoffice.com,
  cassandra@kelleylawoffice.com;bankruptcy@kelleylawoffice.com;scott@kelleylawoffice.com;kelleycr75945@notify.bestcase.com
- **Scott D Knapp**    scott.knapp@nelsonmullins.com, traci.lewis@nelsonmullins.com
- **Harris J. Koroglu**    hkoroglu@shutts.com,
  mcabo@shutts.com;bvelapoldi@shutts.com
- **Matthew F Kye**    mkye@kyelaw.com
- **Dennis J LeVine**    Theresa.Byington@brockandscott.com,
  wbecf@brockandscott.com
- **Peter H Levitt**    plevitt@shutts-law.com, sboisvert@shutts.com
- **Corali Lopez-Castro**    clc@kttlaw.com, rcp@kttlaw.com
- **Nir Maoz**    nmaoz@ktbslaw.com
- **Jerry M Markowitz**    jmarkowitz@mrthlaw.com,
  ycandia@mrthlaw.com,rrubio@mrthlaw.com,mrthbkc@gmail.com,gruiz@mrthlaw.com,markowitzjr73991@notify.bestcase.com,jmarkowitz@ecf.courtdrive.com
- **David B Marks**    brett.marks@akerman.com, charlene.cerda@akerman.com
- **Brigette G McGrath**    bmcgrath@askllp.com, mudem@askllp.com
- **Juan J Mendoza**    jmendoza@sequorlaw.com, ngonzalez@sequorlaw.com
- **Fernando J Menendez**    fmenendez@sequorlaw.com, jdiaz@sequorlaw.com

- **Megan W Murray**    mmurray@underwoodmurray.com, dstrand@underwoodmurray.com;kmilliken@underwoodmurray.com;kmilliken@ecf. courtdrive.com
- **Klaus Peter Muthig**    muthigk@mcao.maricopa.gov
- **Arthur C. Neiwirth**    aneiwirthcourt@qpwblaw.com
- **Michael Jordan Niles**    mniles@bergersingerman.com, efile@bergersingerman.com;efile@ecf.inforuptcy.com;zmorton@bergersingerman.com
- **Office of the US Trustee**    USTPRegion21.MM.ECF@usdoj.gov
- **Joseph A Pack**    joe@packlaw.com
- **Jimmy D. Parrish**    jparrish@bakerlaw.com, orlbankruptcy@bakerlaw.com;cmartin@bakerlaw.com
- **Justin D Plean**    justin.plean@qpwblaw.com
- **Hamid R. Rafatjoo**    hrafatjoo@raineslaw.com, bclark@raineslaw.com
- **Aliette D Rodz**    arodz@shutts.com
- **Mark S. Roher**    mroher@markroherlaw.com, ECF.markroherlaw@gmail.com;ECF2.markroherlaw@gmail.com
- **Ezequiel Joseph Romero**    romeroe@bryancave.com, zeke.romero30@gmail.com
- **Ian M. Ross**    iross@sidley.com
- **Steven R Safra**    Steven.Safra@csklegal.com, maria.montenegro@csklegal.com
- **David Samole**    das@kttlaw.com, rcp@kttlaw.com;ycc@kttlaw.com
- **Michael D. Seese**    mseese@seeselaw.com, sseward@seeselaw.com
- **Zach B Shelomith**    zbs@lss.law, info@lss.law;mch@lss.law;zshelomith@ecf.inforuptcy.com
- **Steven J. Solomon**    steven.solomon@gray-robinson.com, Ana.Marmanillo@gray-robinson.com;Amador.Ruiz-Baliu@gray-robinson.com
- **Andrew Sorkin**    andrew.sorkin@lw.com, andrew-sorkin-3703@ecf.pacerpro.com;new-york-ma-2860@ecf.pacerpro.com;christopher.tarrant@lw.com
- **Annie Yang Stoops**    annie.stoops@afslaw.com
- **Carolyn Tatkin**    tatkin@radixlaw.com
- **Frank Terzo**    frank.terzo@nelsonmullins.com, francis.santelices@nelsonmullins.com
- **Christopher R Thompson**    crthompson@burr.com, mlucca-cruz@burr.com;ccrumrine@burr.com
- **Thomas W. Tierney**    ttierney@rosswayswan.com, kkelly@rosswayswan.com
- **Michael W Ullman**    michael.ullman@uulaw.net, jared.ullman@uulaw.net;diana.simon@uulaw.net;alexandra.wagener@uulaw.net;laura.lytle@uulaw.net
- **Jeramy D Webb**    jeramy.webb@ropesgray.com, new-york-ma-2860@ecf.pacerpro.com;jeramy-webb-1209@ecf.pacerpro.com
- **Jason A. Weber**    jaw@tblaw.com, Nboffill@tblaw.com

- **Aaron A Wernick**    awernick@wernicklaw.com,
  awernick@ecf.courtdrive.com;crubin@wernicklaw.com;dkariotis@wernicklaw.com;
  slamontagne@wernicklaw.com
- **J. Steven Wilkes**    steven.wilkes@usdoj.gov
- **Stuart F Wilson-Patton**    stuart.wilson-patton@ag.tn.gov

**SERVICE LIST – BY U.S. MAIL TO:**

Jordi Guso, Esq.
BERGER SINGERMAN LLP
1450 Brickell Ave #1900
Miami, FL 33131
-and-
Andrew D. Sorkin
George A. Davis
Tianjiao ("TJ") Li
Brian S. Rosen
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004
-and-
Jeramy D. Webb LATHAM & WATKINS LLP
330 North Wabash Avenue
Suite 2800
Chicago, IL 60611
-and-
Amy C. Quartarolo
LATHAM & WATKINS LLP
355 South Grand Avenue, Suite 100
Los Angeles, CA 90071

Attorneys for Vital Pharmaceuticals, Inc. and JHO Real Estate Investment, LLC

Jason A. Weber
Tiffany & Bosco, P.A.
1000 Corporate Drive, Suite 150
Fort Lauderdale, Florida 33334
-and
Christopher R. Kaup
Tiffany & Bosco, P.A.
2525 East Camelback Road, Floor 7
Phoenix, Arizona 85016-4237
Attorneys for Nexus Steel, LLC
FABCO Metal Products, LLC

Belvac Production Machinery, Inc.
237 Graves Mill Road
Lynchburg, VA 24502

Keith L. Hendricks
Moyes Sellers & Hendricks
1850 North Central Avenue, Suite 1100
Phoenix, AZ 85004
*Attorneys for ISEC, Inc.*

Heavy Equipment Movers & Installation, LLC
126 Industrial Drive
Maysville, GA 3055

Heavy Equipment Movers
8825 North 23rd Avenue, #100
Phoenix, AZ 85021

K. Scott Reynolds, Suite 101
3133 West Frye Road #101
Phoenix, AZ 85226
-and-
Arthur C. Neiwirth
Quintairos, Prieto, Wood & Boyer, PA
2400 East Commercial Blvd., Suite 520
Ft. Lauderdale, FL 33308
-and-
Justin Plean, Esq.
Quintairos, Prieto, Wood & Boyer, PA
1475 Centrepark Blvd., Suite 130
West Palm Beach, FL 33401
Attorneys for Hardrock Concrete Placement Co., Inc.

Robert P. Charbonneau
Jesse R. Cloyd
AGENTIS PLLC
55 Alhambra Plaza, Suite 800
Coral Gables, Florida 33134
Attorneys for Stellar Group, Inc.

Carolyn R. Tatkin
Radix Law
15205 N. Kierland Blvd., Suite 200
Scottsdale, AZ 85254
Attorneys for CM Builders, Inc. dba Integrated Masonry

26

119752844.4

Matthew G. Davis, Esq.
Alston A. Merritt, Esq.
Paskert Divers Thompson
100 North Tampa Street, Suite 3700
Tampa, Florida 33602
Attorneys for HACI Mechanical Contractors, Inc.

Trench Shore Rentals
17200 N. Perimeter Drive, #102
Scottsdale, AZ 85255

Peter H. Levitt
Harris J. Koroglu
Aliette D. Rodz
SHUTTS & BOWEN LLP
200 South Biscayne Blvd., Ste. 4100,
Miami, FL 33131
Telephone: (305) 415-9447
-and-
Luis M. Lluberas
Steven E. Gruendel
Cole Richins
Moore & Van Allen PLLC
100 North Tryon Street, Suite 47
Charlotte, North Carolina 28202-4003
Attorneys for Truist Bank

Branch Banking and Trust Company
8825 North 23rd Avenue, #100
Phoenix, AZ 85021

119752844.4

# EXHIBIT A



**WHEN RECORDED RETURN TO:**

Lewis Brisbois Bisgaard & Smith LLP
1700 Lincoln Street, Suite 4000
Denver, Colorado 80203
Attn: Wade A. Houser, Esq.

## DEED OF TRUST AND ASSIGNMENT OF RENTS
## AND SECURITY AGREEMENT AND FIXTURE FILING

DATE:                    September 20, 2019

PARTIES:

|  |  |
|---|---|
| Trustor: | JHO REAL ESTATE INVESTMENT, LLC, a Florida limited liability company |
| Trustor's Address: | 1600 N. Park Drive, Weston, Florida 33326 |
| Trustee: | Stewart Title and Trust of Phoenix, Inc. |
| Trustee's Address: | 2930 E. Camelback Road, Suite 210, Phoenix, AZ 85016 |
| Beneficiary: | BRANCH BANKING AND TRUST COMPANY, a North Carolina banking corporation |
| Beneficiary's Address: | P.O. Box 1290, Whiteville, North Carolina 28472 |

**NOTICE:  THIS DEED OF TRUST SECURES A PROMISSORY NOTE THAT PROVIDES FOR A VARIABLE INTEREST RATE BASED UPON CHANGES IN THE PRIME RATE OF INTEREST, ALL AS MORE FULLY DESCRIBED IN THE PROMISSORY NOTE.**

For good and valuable consideration, the receipt and sufficiency of which are acknowledged, Trustor agrees and covenants as follows.

1. **Grant in Trust**. Trustor irrevocably grants, conveys, and transfers to Trustee, its successors and assigns, in trust, pursuant to this Deed of Trust and Assignment of Rents and Security Agreement and Fixture Filing ("**Deed of Trust**") and Arizona law, with power of sale and right of entry and possession, all of Trustor's right, title, and interest in and to that real property ("**Premises**") situated in the County of Maricopa, State of Arizona, more particularly described on **Exhibit A** attached and, by this reference, incorporated in this Deed of Trust. The Premises are conveyed by Trustor in trust together with all present and future tenements, hereditaments, rights, rights-of-way, easements, privileges, licenses, benefits, and appurtenances that belong to the Premises or in any way pertain to the Premises (all as part of the premises conveyed), which will include, but is not limited to:

      (a)     Oil, gas, soil, and/or mineral rights including, without limitation, any related royalties;

      (b)     All buildings, improvements, fixtures, and equipment (whether or not annexed to the Premises) now or in the future located on, used in connection with, or intended to be used in connection with the Premises including, without limiting the generality of the foregoing, all machinery, materials, appliances, and fixtures for generating or distributing air, water, heat, electricity, light, or fuel refrigeration, for ventilating, cooling, or sanitary purposes, for the exclusion of vermin or insects, and for the removal of dust, refuse, or garbage, wall safes, engines, machinery, boilers, furnaces, oil burners, coolers, refrigeration plants, motors, cabinets, shelving, lockers, partitions, doors, vaults, elevators, sprinkling systems, irrigating systems, awnings, window shades, shutters, venetian blinds, light fixtures, fire hoses, fire brackets, fire boxes, fire sprinklers, alarm systems, drapery rods, brackets, screens, floor tile, linoleum, carpets, plumbing, water systems, power systems, incinerators, communication systems, appliances, built-in furniture, and built-in bars, and all other installations and appliances on the Premises (and all substitutions and replacements for all of the foregoing) (All of the items described in this subparagraph are declared to be part of the real property and are called collectively the "**Improvements**");

      (c)     All water and water rights (whether riparian, appropriative, or otherwise and whether or not appurtenant to the Premises) which now relate to or in the future may relate to or be used in connection with the Premises;

      (d)     All shares of stock evidencing any water rights;

      (e)     All privileges and other rights that are now or in the future may become appurtenant to the Premises including, without limitation, all of Trustor's right, title, and interest in and to all streets, roads, easements, rights-of-way, and public places, whether opened or proposed or public or private;

      (f)     Subject to the rights of Beneficiary under Paragraph 16 of this Deed of Trust, all rents, issues, incomes, profits, revenues, bonuses, rights, and benefits

(collectively, the "**Rents**") from or under any and all existing and future leases or tenancies created on the Premises or any part with the right to receive and apply the Rents to the Obligations;

(g)     Subject to the rights of Beneficiary under Paragraph 18 of this Deed of Trust, all current and future judgments, awards of damages, and settlements made as a result of any Condemnation or made as a result of any damage (whether caused by a taking or otherwise) to the Premises or the Improvements or any part of or interest in the Premises, including any award for change of grade or width of streets;

(h)     Subject to the rights of Beneficiary under Paragraph 6 of this Deed of Trust, all right, title, and interest of Trustor in and to any insurance proceeds payable to Trustor with respect to all or any portion of the Premises, including, without limitation, the Trust Property;

(i)     All monetary deposits that Trustor has given to any public or private utility with respect to utility services furnished to the Premises;

(j)     All funds, accounts, instruments, documents, general intangibles (including trademarks, trade names, and symbols) permits, licenses, franchises, certificates, and other rights and privileges obtained in connection with the Premises;

(k)     All proceeds of the conversion, voluntary or involuntary, of any of the foregoing into cash or liquidated claims;

(l)     All reversion and remainder interests arising out of ownership of the Trust Property;

(m)     All present and future licenses, permits, approvals, and agreements from or with any governmental, quasi-governmental, or private entity relevant to the zoning, subdivision, development, construction, improvement, sale, lease, or other disposition of all or part of the Premises or Improvements;

(n)     All present and future plans, specifications, drawings, surveys, appraisals, reports, and studies regarding the Premises;

(o)     All management, maintenance, construction, purchase, sale, or service contracts related to the Premises or its operation;

(p)     All present and future rights of Trustor under or with respect to any declaration of covenants, conditions, and/or restrictions imposing rights or responsibilities on the Premises or its owner, including any declarant rights of Trustor under any declaration of covenants, conditions, and/or restrictions;

(q)     All rights of Trustor in and to any present or future contracts, agreements, guarantees, options, deposits, refunds, credits, retentions, surety bonds, or any other considerations which relate in any way to the ownership, development, use, improvement, leasing, sale, or other disposition of the Premises or Improvements; and

(r)     Without limiting any of the foregoing, all present and future equipment, inventory, general intangibles, accounts, chattel papers, instruments, royalties, contract rights, and documents that directly or indirectly relate to or are used or intended for use with the Premises.

2.     **Additional Grants**.    Trustor also absolutely and irrevocably grants, assigns, transfers, and conveys to Beneficiary all rents, issues, profits, incomes, damages, royalties, revenues, and benefits now or in the future due and payable arising in connection with the Trust Property, together with the right to collect these items for the purposes and upon the terms and conditions set forth in this Deed of Trust. Trustor acknowledges that certain of the descriptions of items in the preceding paragraphs may be duplicative and redundant, but Trustor acknowledges that it is the agreement and intent of Trustor that the descriptions are to be construed as cumulative and not limiting.

3.     **Warranty of Title**.    All real, personal, intangible, and other property granted, conveyed, and transferred to Trustee under this Deed of Trust is referred to as the "**Trust Property**".    Trustor warrants that it has marketable fee simple title to the Premises, subject only to those matters set forth on **Exhibit B** ("**Permitted Exceptions**").    Trustor warrants that its title to the Trust Property is and will remain free and unencumbered, except for the Permitted Exceptions, and any other encumbrances on title to which Beneficiary consents to in writing. Trustor agrees to warrant and defend title to the Trust Property for the benefit of Beneficiary against all claims whatsoever, except the Permitted Exceptions and those matters consented to in writing by Beneficiary. Trustor warrants that this Deed of Trust is and will remain a valid and enforceable first lien on the Premises, subject to the Permitted Exceptions, and any other encumbrances on title to which Beneficiary consents to in writing.    Trustor agrees that any greater title to the Trust Property that Trustor may acquire during the term of this Deed of Trust will be subject to this Deed of Trust.

4.     **Secured Obligations**.    Trustor has executed and delivered this Deed of Trust for the purpose of securing (collectively, the "**Obligations**"):

(a)     Payment of the indebtedness evidenced by that certain Promissory Note of even date herewith, and any addendums, renewals, extensions, substitutions, modifications, or amendments, in the stated and original principal sum of Thirty-Five Million Five Hundred Fifty Thousand and 00/100 U.S. Dollars ($35,550,000.00) executed by Trustor and VITAL PHARMACEUTICALS, INC., a Florida corporation (together, "**Borrower**") and payable to Beneficiary (the "**Note**"), together with all interest, late charges, prepayment fees, additional interest, collection costs, fees, and expenses as provided in the Note, with a maturity date of **September 15, 2034**.

(b)     Payment of all amounts specified in this Deed of Trust that Trustor has agreed to or is required to pay.

(c)     Prompt and complete performance and observance of each and every covenant, obligation, or agreement of Trustor contained in this Deed of Trust or contained in any other document or instrument given by Trustor to further evidence or secure the indebtedness represented by the Note ("**Additional Documents**").    The Note,

Deed of Trust, and the Additional Documents are called collectively the "**Loan Documents**."

(d)     Payment of any additional sums (and accrued interest) that may be loaned or advanced by Beneficiary to Trustor, whether or not evidenced by the Note or any promissory note or notes reciting that they are secured by this Deed of Trust, including future loans, advances, and obligations.

(e)     Payment of all indebtedness and obligations of Trustor or Borrower to Beneficiary under any interest rate swap transactions, interest rate cap and/or floor transactions, interest rate collar transactions, swap agreements (as defined in 11 U.S.C. §101) or other similar transactions or agreements, including without limitation any ISDA Master Agreement executed by Trustor or Borrower and all Schedules and Confirmations entered into in connection therewith, hereinafter collectively referred to as a "**Hedge Agreement**," the terms of which are incorporated into this Deed of Trust by this reference.

5.     **Taxes**.  Trustor will pay: (i) before delinquent, all taxes, general and special assessments, and improvement district assessments of every type or nature affecting the Trust Property; (ii) all rents or charges payable under any lease affecting the Trust Property; (iii) all adverse claims, liens, charges, and encumbrances which now are or in the future may be or appear to be a lien on the Trust Property; (iv) all charges for water, water delivery, gas, electricity, sewers, waste removal; (v) all repairs; and (vi) all assessments due on any water stock.  If any real estate taxes or general, special, or improvement district assessments (collectively, "**Taxes and Assessments**") are not separately assessed to the Trust Property but include other property owned or not owned by Trustor, Trustor agrees that it will promptly apply for and complete the separation of the Trust Property from all other property for the purpose of all Taxes and Assessments.  If Trustor does not promptly complete the separation, Beneficiary may exercise all remedies available under this Deed of Trust including the right to advance all monies necessary to pay all or any portion of the Taxes and Assessments.  All money so advanced will be secured by the lien of this Deed of Trust.

6.     **Insurance**.

(a)     Trustor will carry the insurance with regard to the Trust Property as is required by the terms of the Loan Documents.  Unless and until Beneficiary elects to receive the impound payments referred to in Paragraph 34, Trustor agrees to pay the premiums on the insurance, when due and prior to delinquency, and to furnish proof of the payment to Beneficiary not less than thirty (30) days prior to the expiration date of the insurance.

(b)     If any loss or damage to any portion of the Trust Property, Trustor will promptly give notice to Beneficiary and make proper proof of loss.  If not made by Trustor, Beneficiary may make a proof of loss.  Beneficiary may require that the payment for the loss be paid directly to Beneficiary only and not jointly to Trustor and Beneficiary.  Beneficiary may, at its option, apply the insurance proceeds to the reduction

5

of the Obligations or may apply the insurance proceeds to the restoration or repair of the property damaged.

      (c)    Notwithstanding 6(b), upon the written request of Trustor, the insurance proceeds will be applied to the payment of repair and restoration of the loss or damage and will be paid out from time to time as the work progresses, but subject to the following additional conditions:

      (i)    In Beneficiary's sole judgment the available insurance proceeds must be sufficient to repair or restore the improvements or Trustor, before commencement of work, must have deposited with Beneficiary funds which, together with any insurance proceeds, are sufficient to repair or restore the improvements;

      (ii)    The work must be performed in accordance with plans and specifications identical to the original plans and specifications, unless changes are otherwise consented to in writing by Beneficiary;

      (iii)    Trustor will make periodic requests for payment in accordance with the terms of the Loan Documents and in form acceptable to Beneficiary;

      (iv)    There must not exist an Event of Default or event that with the giving of notice, the passage of time, or both, could become an Event of Default;

      (v)    The repairs or restoration must be capable of being completed before the earlier of the due date of the Note or the date set forth in the Loan Documents for completion of the improvements; and

      (vi)    No application of the insurance proceeds from any applicable insurance policy towards a reduction of the indebtedness will result in the application of any prepayment penalty or restriction.

    7.    **Repairs and Waste**.  Trustor will keep the Trust Property in good condition and repair and will not commit or permit waste.  Trustor will not remove or demolish, nor commence or continue any grading or construction of, nor alter the design or structural character of, any Improvements comprising part of the Trust Property, without the written consent of Beneficiary (whose consent will be given or withheld at Beneficiary's sole discretion).  Trustor will keep all Improvements comprising part of the Trust Property free of termites, dry rot, fungus, beetles, and all other harmful or destructive insects.  Trustor will keep all plants, trees, and shrubs comprising part of the Trust Property neatly pruned and in good condition.  Trustor will to keep the Trust Property free of rubbish and other unsightly or unhealthful conditions and will not in any way change or restrict the use of the Trust Property without the prior written consent of Beneficiary, whose consent will be given or withheld in Beneficiary's sole discretion.  Beneficiary, its agents, and/or its employees may, at any time or from time to time, without notice to Trustor, and without liability to Trustor (or any entity claiming any rights through Trustor) for trespass, abuse of access, or otherwise, enter and inspect or protect the Trust Property in the manner and to the extent as Beneficiary may deem desirable in its sole discretion.

8. **Improvements**. Subject to Paragraph 6 above, Trustor will complete promptly any improvements that may be commenced in a good and workmanlike manner in conformity with plans and specifications approved by Beneficiary. Trustor, with reasonable diligence, will repair and restore any portions of the Trust Property that may be damaged or destroyed whether insurance against the cause of the damage or destruction is collected or not. Trustor will pay when due all claims for work performed or materials furnished, or both, on or in connection with the Trust Property, and will pay, discharge, or cause to be removed, all mechanic's, artisan's, laborer's, or materialmen's charges, liens, claims of liens, or encumbrances upon the Trust Property. Prior to the commencement of any construction, grading, demolition, or other act or omission by Trustor that might give rise to any materialmen, mechanics, or similar lien or security interest in or against the Trust Property, Trustor will deliver to Beneficiary all completion, construction, surety, or other bonds issued by a company acceptable to Beneficiary as Beneficiary may elect or deem appropriate to fully ensure completion of the grading, construction, demolition, or other act, and protect Beneficiary and the Trust Property against any liens.

9. **Defense**. Unless otherwise requested by Beneficiary in writing, Trustor will appear in and prosecute or defend any action or proceeding that may affect the priority of this Deed of Trust or the security of the Beneficiary or the Trust Property, and Trustor will pay all reasonable costs, expenses (including, without limitation, the cost of searching title), and attorney fees incurred in the action or proceeding. Beneficiary, at its option, may appear in and defend any action or proceeding purporting to affect the priority of this Deed of Trust or the Trust Property or the rights or powers of Beneficiary. Beneficiary, at its option, may pay, purchase, contest, or compromise any adverse, encumbrance, charge, or lien which, in the good faith judgment of Beneficiary, appears to be prior or superior to the lien of this Deed of Trust or which otherwise may affect this Deed of Trust or the Trust Property, without affecting any duty, obligation, or liability of Trustor under this Deed of Trust or under any other document or instrument given by Trustor to evidence or otherwise secure the indebtedness secured by this Deed of Trust, and without subjecting Beneficiary to any liability to Trustor on account of the payment, purchase, contest, or compromise. All amounts paid, suffered, or incurred by Beneficiary in exercising the authority granted in this Paragraph (including, without limitation, attorney fees in a reasonable amount) will be payments immediately repayable by Trustor pursuant to Paragraph 8 below.

10. **Compliance**. Trustor will comply with all laws, ordinances, regulations, covenants, conditions, and restrictions affecting the Trust Property and will not suffer or permit any act to be done in or upon the Trust Property in violation of the foregoing.

11. **Performance**. If Trustor fails to do so, Beneficiary, without demand or notice and as it in its sole judgment may consider necessary or advisable, and without obligation to do so, may do any or all things required of Trustor by any of the provisions of this Deed of Trust and incur and pay expenses in connection with the performance. All expenses or charges incurred by Beneficiary in the performance of any matters under this Paragraph 11 will be considered to be payments that are immediately repayable under Paragraph 12 below.

12. **Payment**. Trustor will pay to Trustee and Beneficiary, respectively, promptly and upon demand, all sums of money that Beneficiary or Trustee have paid pursuant to, or

resulting from, any of the provisions of this Deed of Trust. All of these amounts must be paid with interest upon each of these amounts, until repaid, from the time of the payment at the applicable rate set forth in the Note, which may be a default rate.

13. **Default**. Any of the following events will constitute an "**Event of Default**" under this Deed of Trust.

(a)     Trustor's or Borrower's failure to pay any of the indebtedness secured by this Deed of Trust on the date due or to perform any covenant or warranty in this Deed of Trust, in any of the Notes or any related loan document, in any Loan Agreement, Hedge Agreement, Business Card Plan Agreement, or other note or instrument of Trustor or Borrower to Beneficiary; or in any contract between Trustor and/or Borrower and Beneficiary; or in any contract between any third party and Beneficiary made for the benefit of Trustor; or

(b)     If any warranty, representation, report or statement made or furnished to Beneficiary by or on behalf of Trustor or Borrower in connection with the indebtedness secured hereby prove to have been false or misleading in any material respect when made or furnished; or

(c)     If Trustor suffers any material loss, theft, damage or destruction to the Trust Property which is not covered by insurance, or upon the assertion or filing of any levy, seizure, mechanic's or materialman's lien or attachment thereof or thereon; or

(d)     The death, dissolution, termination of existence, insolvency, business failure or the appointment of a receiver for any part of the Property or other assets of the Trustor, Borrower or any co-maker, endorser, guarantor or surety for the indebtedness, or should any of the same make an assignment for the benefit of creditors or admit the inability to pay its debts in the ordinary course of business; or

(e)     Failure of any of Trustor, Borrower or any co-maker, endorser, guarantor or surety for Trustor or Borrower to maintain its legal existence in good standing; or

(f)     The entry of any final monetary judgment which is not covered by insurance or pending appeal, or the assessment of unpaid taxes against Trustor or Borrower or filing of any tax, mechanic's or materialman's lien against the Trust Property; or upon the issuance of any writ of garnishment or attachment is levied against the Trust Property for debts due or rights of Trustor or Borrower or any guarantor; or

(g)     The sale (including sale by land contract upon delivery of possession), transfer or encumbrance of all or any part of the Trust Property or any interest therein, or any change in the ownership or control of Trustor or Borrower, made without Beneficiary's prior written consent; or

(h)     Should Beneficiary in good faith determine that its liens and security interests in the Trust Property are invalid, unperfected, unenforceable, or failing to have the priority required by Beneficiary; or should the Trust Property decline in fair market or appraised value below the amount required at the execution hereof; or should Beneficiary

in good faith determine that there has been a material adverse change in the financial condition or business operations of Trustor, Borrower, or any comaker, endorser, guarantor or surety; or

(i)     Should Trustor or Borrower default under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Trustor's property or Trustor's or Borrower's ability to repay the Notes or Trustor's or Borrower's ability to perform Trustor's obligations under this Deed of Trust or any of the related documents; or

(j)     Should any change in any zoning ordinance or regulation or any other public restriction be enacted, adopted or implemented, which limits or defines the uses which may be made of the Trust Property such that the present or intended use of the Trust Property, as specified in any of the related documents, would be in violation of such zoning ordinance or regulation or public restriction, as changed; or

(k)     Should foreclosure or forfeiture proceedings be commenced, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Trustor or by any governmental agency against any of the Trust Property, including any garnishment of any of Trustor's accounts, including deposit accounts, with Beneficiary;

(l)     Should any of the preceding events occur with respect to any guarantor, endorser, surety, or accommodation party of any of the indebtedness or should any guarantor, endorser, surety or accommodation party die or become incompetent, or revoke or dispute the validity of, or liability under, any guaranty of the indebtedness secured hereby;

(m)     Upon any Event of Default under any of the Loan Documents;

(n)     Upon the recordation or filing of any mechanics' or materialmen's lien, attachment, garnishment, replevin, execution, or other statutory or judicial lien against all or any portion of the Trust Property that is not discharged, satisfied, or bonded over to Beneficiary's satisfaction; or

(o)     Upon any Prohibited Transfer, as defined in Paragraph 35(b) below.

14.     **Remedies**. Upon any Event of Default, Beneficiary may pursue any and all rights and remedies at law or at equity, including, without limitation, those described in this Deed of Trust. Without limiting the foregoing sentence, Beneficiary may declare all sums secured by this Deed of Trust to be immediately due and payable by delivery to Trustee of written notice setting forth the nature of the Event of Default. The notice may contain an election to cause the Trust Property to be sold under this Deed of Trust. Beneficiary may proceed as if all of the Trust Property were real property, or Beneficiary may elect to treat any of the Trust Property which consists of a right of action on property that can be secured from the Premises without structural damage as if it were personal property and dispose of the personal property separate and apart from the sale of the real property. Notice to Trustor of Beneficiary's election to accelerate the indebtedness will not be required. If Beneficiary elects to cause the sale of the Trust Property, Beneficiary will deposit with Trustee this Deed of Trust, the Note, and all documents evidencing

expenditures secured by this Deed of Trust. Trustee will record and give all notices of Trustee's sale in the manner required by law, and after the lapse of time such as then may be required by law, Trustee, without further notice to Trustor, may sell the Trust Property at the time and place fixed by it in the notice of Trustee's sale, either as a whole or in separate parcels, and in the order as Beneficiary may determine, at public auction to the highest bidder for cash in lawful money of the United States, payable at the time of sale. Trustee will deliver to the purchaser its deed conveying the Trust Property so sold, but without any covenant or warranty, express or implied. Any person or entity, including Trustor, Trustee, or Beneficiary, may purchase the Trust Property or any part at the sale. After deducting all costs, fees, and expenses of Trustee, including costs to insure or obtain evidence of title in connection with the sale, Trustee will apply the proceeds of sale to payment of: (i) all sums expended under the terms of this Deed of Trust which are unpaid, together with accrued interest at the rate set forth in the Note (including, without limitation, all sums expended by Beneficiary pursuant to this Deed of Trust); (ii) all other sums by this Deed of Trust; and (iii) the remainder, if any, to the person or persons "legally entitled thereto", or as provided in A.R.S. § 33-812, or any similar or successor statute. To the extent permitted by law, an action may be maintained by Beneficiary to recover a deficiency judgment for any balance due under the Note or due under this Deed of Trust. In lieu of the power of sale, this Deed of Trust, at the option of Beneficiary, may be foreclosed in the same manner provided by law for the foreclosure of mortgages on real property. Beneficiary also will have all other rights and remedies available to it under this Deed of Trust and at law or in equity, specifically including, but not limited to, those described in A.R.S. § 33-702(B) or any similar or successor statute. All rights and remedies of Beneficiary will be cumulative.

15.    **Trust Acceptance**. Trustee accepts this trust when this Deed of Trust, duly executed and acknowledged, is made of public record as provided by law. Trustee is not obligated to notify any party of pending sale under any other deed of trust or of any action or proceeding in which Trustor, Beneficiary, or Trustee are a party unless brought by Trustee and relating to the Trust Property.

16.    **Assignment of Rents**. All of the existing and future rents, incomes, leases, issues, revenues, bonuses, and profits of the Trust Property (or any part) and all rights to the Trust Property (or any part) and all rights of Trustor against any guarantors of the foregoing are assigned absolutely to Beneficiary as further security for the payment of the indebtedness and performance of the Obligations. To enforce Beneficiary's rights under this Deed of Trust, Trustor also assigns to Beneficiary all rights to exercise any landlord liens under A.R.S. § 33-361 and § 33-362 and any other remedial rights to which a landlord may be entitled under Arizona law. When requested by Beneficiary from time to time, and within the time as Beneficiary may reasonably require, Trustor will execute, deliver, and record, and will cause any lessee, tenant, or occupant (collectively, a "**Tenant**") of Trustor designated by Beneficiary to execute, deliver, and record separate lease assignments covering any or all of the leases that may affect any part or all of the Trust Property. All separate lease assignments will be in a form as Beneficiary, in its sole discretion, may require. Without limiting the generality of the foregoing, Beneficiary may require any Tenant to subordinate the Tenant's rights to the lien of this Deed of Trust. In no event will Beneficiary be required to give non-disturbance or similar commitments to any Tenant. Upon the occurrence of an Event of Default, Trustor authorizes and directs the Tenants of the Trust Property to make, upon written notice from Beneficiary, all payments required under any leases directly to the Beneficiary as they become due. Trustor relieves all Tenants from any

liability to Trustor by reason of any payments being made to Beneficiary. Beneficiary may apply all rents collected by Beneficiary in any manner Beneficiary elects, in its sole discretion. Provided that no Event of Default will have occurred, Trustor will be entitled to collect all the rents and/or payments.

17. **Receiver**. Upon the occurrence of an Event of Default, Beneficiary, in addition to all rights and remedies available at law and/or under this Deed of Trust, will be entitled, at any time and without notice and without regard to the adequacy of any security, to enter upon and take possession of the Trust Property (or any part). Trustor will upon demand peaceably surrender possession of the Trust Property to Beneficiary or the receiver. Beneficiary's entry may be made by Beneficiary's agents, attorneys, or employees or by a court-appointed receiver. Beneficiary, in its name and/or in the name of Trustor, may operate and maintain all or any portion of the Trust Property to the extent Beneficiary deems advisable, and Trustor agrees that Beneficiary will be entitled to do and perform any acts that Beneficiary may deem necessary or proper to conserve the value of the Trust Property, including the ability to sue for and otherwise collect and receive all rents, issues, and profits (including those past due and unpaid as well as those later accruing) and the ability to rent or lease the Trust Property (or any portion) to the persons on terms and conditions approved by Beneficiary in its sole discretion. Trustor further agrees that Beneficiary also may take possession of and use any and all personal property contained in the Trust Property or used by Trustor in the rental or leasing of the Trust Property (or any part). Beneficiary may apply all the rents, issues, and profits collected or received by it to the payment of costs and expenses incurred in the operation of the Trust Property or to protect and preserve its security, or Beneficiary may permit any part of all of these moneys to be released by Beneficiary at its sole option. Expense (including receivers' fees, if any, and compensation to any agent appointed by Beneficiary, and attorney fees, costs, and disbursements) incurred in taking possession and effecting collection or attempting to take possession and effecting collection, will be deemed an expense of this Deed of Trust to be paid by Trustor and secured by this Deed of Trust. Neither the entering upon and taking possession of the Trust Property, nor the collection of the rents, issues, and profits, nor the application or release of these amounts will cure or waive any default or notice of sale or invalidate any act done pursuant to the notice of sale. In dealing with the Trust Property or any related personal property as a beneficiary in possession, Beneficiary will be without any liability, charge, or obligation to Trustor other than for willful misconduct, and all losses, costs, and expenses incurred by Beneficiary will be advancements covered by Paragraph 8. Trustor specifically agrees that the appointment of a receiver may be sought and pursued concurrently with the exercise of any other remedies of Beneficiary, including exercise of Trustee's power of sale.

18. **Condemnation**.

(a) All judgments, awards of damages, and settlements made as a result of each of the following (collectively, a "**Condemnation**") are assigned to and will be paid to Beneficiary: (i) any condemnation or other proceeding for public use; (ii) any private trespass to the Trust Property; and (iii) any eminent domain proceeding. Beneficiary will have the right, but not the obligation, to participate in any such proceedings, and Trustor will not settle or otherwise resolve any such proceedings or execute or deliver any deed without the prior written consent of Beneficiary, whose consent will not be unreasonably withheld.

11

(b)     Provided that the Condemnation affects less than substantially all of the Trust Property and further provided that legal access to the Trust Property has not been affected or impaired ("**Partial Condemnation**"), the proceeds of any judgment, award, or settlement will be held, applied, and disbursed by Beneficiary as provided in Paragraph 6(b) above to the restoration of the Trust Property if requested by Trustor. Prior to any disbursement pursuant to the preceding sentence, Trustor, at its cost, must supply Beneficiary with a current ALTA survey of the Trust Property indicating the area lost, an updated appraisal for the Trust Property showing an appraised value acceptable to Beneficiary, and any endorsement or update to Beneficiary's lender's policy of title insurance.

(c)     If a Condemnation other than a partial Condemnation, Beneficiary will be solely entitled to any award, judgment, or settlement, and Trustor agrees to immediately deliver to Beneficiary all proceeds of any such award, judgment, or settlement that may be received by Trustor.  Beneficiary, at its option, may apply any proceeds to the satisfaction of any amounts secured by this Deed of Trust. Neither the application nor the release of any proceeds will cure or waive any default or notice of sale or invalidate any act done pursuant to the notice of sale.

19.     **Modification Without Release**.  Without affecting the liability of Trustor, any guarantor under any of the Loan Documents, or any other person (except any person expressly released by Beneficiary in writing) for payment of any indebtedness or for performance of any obligation secured by or contained in this Deed of Trust, and without affecting the rights of Beneficiary with respect to any security not expressly released in writing, Beneficiary, at any time and from time to time, either before or after maturity of the Note, and without notice or consent, may:

(a)     Release any guarantor or other person liable for payment of all or any part of the indebtedness or for performance of any obligation;

(b)     Make any agreement extending the time or otherwise altering the terms of payment of all or any part of the indebtedness, or modifying or waiving any obligation, or subordinating, modifying, or otherwise dealing with the lien or charge of this Deed of Trust;

(c)     Exercise or refrain from exercising or waive any right available to Beneficiary;

(d)     Accept additional security of any kind; and

(e)     Release or otherwise deal with any property, real or personal, securing the indebtedness, including all or any part of the Trust Property.

20.     **Other Security**.  If the indebtedness secured by this Deed of Trust is now or in the future further secured by chattel mortgages, security interests, deeds of trust, pledges, contracts of guaranty, or other additional securities, Beneficiary may, at its option, exhaust its security under this Deed of Trust or any future security either concurrently or independently and in the order as it may determine.  Beneficiary may apply any proceeds received to the amounts

secured by this Deed of Trust without affecting the status of, or waiving any right to exhaust, all or any other security, and without waiving any breach or default or any right or power, whether contained in this Deed of Trust or in any such other security. Trustor waives any right or privilege that it or its creditors might otherwise have to require Trustee and/or Beneficiary to proceed against the assets encumbered by this Deed of Trust or by any other security documents in any particular order or fashion under any legal or equitable doctrines or principles, and Trustor further agrees that upon a default, Trustee and/or Beneficiary may proceed to exercise any or all remedies with regard to any or all assets encumbered by this Deed of Trust or by any other security documents in the manner and order as Beneficiary in its sole discretion may determine.

21. **Partial Payment**. Acceptance by Beneficiary of any sum in payment, or part payment, of any indebtedness secured by this Deed of Trust after the amount is due or after the recording of a notice of sale will not constitute a waiver of the right to require prompt payment, when due, of all other sums so secured, nor will the acceptance cure or waive any remaining default or invalidate any sale held pursuant to notice of sale for any such remaining default, or prejudice any of the rights of Beneficiary under this Deed of Trust.

22. **Resignation**. Trustee may resign by mailing or delivering notice to Beneficiary and Trustor, and Beneficiary may, at any time Beneficiary may desire, appoint another Trustee in place of Trustee or any successor. Trustor will cause this Deed of Trust to be duly recorded in the Recorder's Office of the County in which the Trust Property is situated.

23. **Irrevocable**. The trusts created by this Deed of Trust are irrevocable.

24. **Water Rights**. Any stock in a water, irrigation, or water storage company assigned to Beneficiary in connection with this transaction may be registered in the name of Trustee or Beneficiary as pledge, and held by either as Beneficiary may determine. Whether or not the stock is appurtenant to the Trust Property (or any part) and regardless of how the stock is registered or held, Trustor and Beneficiary agree that, if a default, Trustee may sell the stock (or any part) and any other shares of stock subject to this Deed of Trust, together with and at the time of any Trustee's sale of the Trust Property (or any part). With respect to the sale of the stock, Trustor waives compliance with any and all statutory requirements concerning the sale of pledged property and agrees that the provisions of law and of this Deed of Trust governing the manner, notice, and conditions of a Trustee's sale of the Trust Property apply to the sale of the stock by Trustee.

25. **Mineral Rights**. As additional security to Beneficiary, Trustor further assigns and transfers all damages, royalties, and revenues of every kind, nature, and description whatsoever that Trustor may be entitled to receive from any person, company, or corporation owning or having or acquiring a right to the oil, gas, or mineral rights and reservations of the Trust Property. Beneficiary will have the right to receive and apply the damages, royalties, and revenues to the indebtedness either before or after any default, and Beneficiary may demand, sue for, and recover any such payments (but will not be required to do so).

26. **Waiver of Certain Statutes**. Trustor waives the pleading of any statute of limitations as a defense to any of the Obligations to the fullest extent permissible by law. Any person or entity that has signed this Deed of Trust as an accommodation party or as a surety or

13

that has subjected its property to this Deed of Trust to secure the debt of another expressly waives the benefits of A.R.S. § 12-1641, 12-1642, and 44-142 and Ariz. R. Civ. P., Rule 17(f). In any action by Beneficiary to recover a deficiency judgment for any balance due under the Note after a foreclosure of this Deed of Trust or in any action to recover or compel the performance of the Obligations, Trustor acknowledges and agrees that the successful bid amount made at any judicial or non-judicial foreclosure sale, if any, will be deemed conclusively to constitute the fair market value of the Trust Property, will be binding against Trustor in any proceeding seeking to determine or contest the fair market value of the Trust Property, and will be the preferred alternative means of determining and establishing the fair market value of the Trust Property. Trustor waives any right to have the fair market value of the Trust Property determined by judge or jury in any action seeking a deficiency judgment or any action on the Obligations, including any hearing to determine fair market value pursuant to A.R.S. § 12-1566, § 33-814, § 33-725, or § 33-727.

27.  **Invalidity**.  If any one or more of the provisions of this Deed of Trust or the applicability of any such provision to a specific situation are held to be invalid or unenforceable, the provision will be modified to the minimum extent necessary to make it or its application valid and enforceable, and the validity and enforceability of all other provisions of this Deed of Trust and all other applications of the provisions will not be affected.

28.  **Statements**.  Trustor will pay Beneficiary's and/or Trustee's reasonable charges, to the maximum amount permitted by law, for any statement regarding or relating to the Obligations that have been requested by Trustor or on its behalf.

29.  **Legal**.  If it becomes necessary for the Beneficiary to employ legal counsel or to take legal action to collect the indebtedness, to enforce any provision, or to protect any of Beneficiary's rights under this Deed of Trust (including any protection of Beneficiary's rights under any proceedings under Title 11 of the United States Code), Trustor agrees to pay to Beneficiary, in addition to taxable costs of any legal proceeding or action, attorney fees in a reasonable amount and all costs of preparation and conduct of the proceedings, including costs of title searches and title policy commitments, all of which will be a lien upon the Trust Property and secured by this Deed of Trust.

30.  **No Offset**.  No offset or claim that Trustor now has or may in the future have against Beneficiary will relieve Trustor from paying installments or performing any other obligation in or secured by this Deed of Trust.

31.  **Corrections**.  Trustor will, upon request of the Trustee, promptly correct any defect or error which may be discovered in the contents of this Deed of Trust or in its execution or acknowledgment, and will execute, acknowledge, and deliver such further instruments and do such further acts as may be necessary or as may be reasonably requested by the Trustee or by the Beneficiary to carry out more effectively the purposes of this Deed of Trust and to perfect and maintain the lien and security interest created by this Deed of Trust.

32.  **Security Interest**.  Trustor agrees that the Obligations are further secured by security interests in all fixtures, equipment, and other property covered by the Arizona Uniform Commercial Code, if any, that are used upon, in, or about the Trust Property (or any part) or that

are used by Trustor or any other person in connection with the Trust Property. Trustor grants to Beneficiary a valid and effective security interest in all the personal property, together with all replacements, additions, and proceeds. Except for the security interest granted by Trustor under this Deed of Trust, Trustor agrees that, without the written consent of Beneficiary, no other security interest will be created under the provisions of the Uniform Commercial Code or the Arizona Commercial Code and no lease will be entered into with respect to any goods, fixtures, equipment, appliances, or articles of personal property now attached to or used or to be attached to or used in connection with the Trust Property. Trustor agrees that all property of every nature and description covered by the lien and charge of this Deed of Trust together with all the property and interests covered by this security interest are encumbered as a unit, and upon a default by Trustor, all of the Trust Property, at Beneficiary's option, may be foreclosed upon or sold in the same or different proceedings or at the same or different time, subject to the provisions of applicable law. The filing of any financing statement relating to any such property or rights or interests will not be construed to diminish or alter any of Beneficiary's rights or priorities under this Deed of Trust. This Deed of Trust constitutes a financing statement and, to the extent required under A.R.S. § 47-9402(E) because portions of the Property may constitute fixtures, this Deed of Trust is to be filed in the office where a mortgage for the Premises would be recorded. Beneficiary also will be entitled to proceed against all or portions of the Trust Property in accordance with the rights and remedies available under A.R.S. § 47-9501(D).

33. **Hazardous Materials**.

(a) **"Hazardous Materials"** will mean: (i) any chemical, material, or substance defined or included in the definition of "hazardous substances," "hazardous materials," "toxic substances," or words of similar import under any Hazardous Materials Laws; (ii) any oil, petroleum, flammable substances, explosives, asbestos; or (iii) any other chemical, material or substance which may or could pose a hazard to health or safety.

(b) Trustor represents and warrants that, except as disclosed in any environmental report received by Beneficiary regarding the Trust Property prior to the date of this Deed of Trust, and to Trustor's actual knowledge, (A) no Hazardous Materials have been, are, or will be used, generated, stored, or disposed of on, under, or about the Trust Property; and (B) the Trust Property and all past, present, and future uses of the Trust Property were, are, and will be in compliance with all relevant local, state, and federal laws, rules, regulations, policies, ordinances, court decisions, settlement orders, and consent decrees relating to the protection of the environment on, under, or about the Trust Property (collectively, the "**Hazardous Materials Laws**"). At Trustor's expense, Trustor will comply with and will cause any tenants or occupants of the Trust Property to comply with the Hazardous Materials Laws. If any Hazardous Materials are found to exist on, under, or about the Trust Property, Trustor will at Trustor's expense take all necessary and appropriate remedial action that Beneficiary or any relevant authority will require. Trustor shall immediately advise Beneficiary in writing of any governmental or regulatory communications or proposed or instituted actions with regard to Hazardous Materials and the Trust Property, and shall immediately provide Beneficiary with copies of any written communications to and from the authorities. Upon any default, Beneficiary shall have the right, at Trustor's expense, to obtain or

require Trustor to obtain an environmental survey or study of the Trust Property from a qualified independent environmental engineer, all to the satisfaction of Beneficiary.

(c)     To induce Beneficiary to make the loan secured by this Deed of Trust, Trustor agrees to indemnify, defend, and hold Beneficiary and Trustee harmless on demand for, from, and against any liability, loss, costs, damages, and expenses (including attorney fees) which Beneficiary or Trustee may sustain in any way related to any Hazardous Materials on, under, or about the Trust Property. This indemnity will survive any foreclosure, trustee's sale, or deed in lieu of the Trust Property, will benefit any foreclosure purchaser, and is not subject to any otherwise applicable statutory or contractual anti-deficiency limitation or nonrecourse provision.

34.     **Impounds**. Upon the occurrence of an Event of Default and upon Bank's written demand therefor, Trustor, on a monthly basis, will deposit with Beneficiary, in addition to any other required payments under the Note, an amount sufficient to enable Beneficiary to pay before delinquency all taxes, assessments, ground rents, and insurance premiums due on the Trust Property. Trustor's installments will be equal to the estimated amounts of the payments next due (as estimated by Beneficiary in its good faith), less all installments already paid, divided by the number of months that are to elapse before one month prior to the date when the payments are due. If the amounts paid to Beneficiary under the provisions of this paragraph are insufficient to discharge the obligation of Trustor for the actual amount of the payments, Trustor will immediately pay to Beneficiary upon demand the additional sums as may be required to fully pay and discharge these items. All moneys paid may, at Beneficiary's option: (a) be held by Beneficiary to pay taxes, assessments, ground rents, and insurance before delinquency; or (b) be credited directly to interest and/or principal due upon the indebtedness secured by this Deed of Trust. Upon payment by Beneficiary of any such taxes, assessments, good rents, or insurance premiums, the amount paid will be added to the principal of the indebtedness secured by this Deed of Trust. Deposits made under this paragraph may be commingled with Beneficiary's general funds, and Beneficiary will have no liability to Trustor for any interest on the deposits. Nothing in this Paragraph 34 will be deemed to release Trustor from the obligation to pay taxes, assessments, ground rents, or insurance premiums to the extent these payments are in excess of those impounded by Beneficiary. All amounts deposited by Trustor under this Paragraph 34 are assigned by Trustor to Beneficiary as additional security for the Obligations.

35.     **Transfers**.

(a)     Any actual or attempted sale, transfer, assignment, encumbrance, lease, conveyance, lease with option to purchase any part, right, title, or interest in the Trust Property or the Trustor, whether legal or equitable, will constitute a "**Transfer**".

(b)     All Transfers are subject to Beneficiary's prior written approval, which approval may be granted or conditioned in Beneficiary's sole and absolute discretion, and any Transfer that is not so approved by Beneficiary is a "**Prohibited Transfer**". Notwithstanding the other terms of this Section 35 to the contrary, a "**Prohibited Transfer**" does not include any transfer of direct or indirect ownership interests in Borrower for estate planning purposes to a trust controlled by the original owner or, in the case of an owner who is deceased or declared judicially incompetent, transfers to such

owner's heirs, legatees, devisees, executors, administrators, estate or personal representatives.

(c)     In addition to any other right or remedy available to Beneficiary, Beneficiary may void any Prohibited Transfer.

(d)     If any Transfer is effected, whether or not Beneficiary consents, Beneficiary, in addition to any other remedies provided in this Deed of Trust, may require that a transfer fee be paid to Beneficiary prior to the sale, transfer, assignment, encumbrance, conveyance, or lease and may further increase the rate of interest payable on the unpaid principal balance of the Note.  Consent to any one Transfer will not be deemed to be consent to any other Transfer, and no consent will constitute a commitment to subordinate the lien of this Deed of Trust to any interest created by the Transfer.

36.     **Authority**.  Trustor and each signatory who signs on the Trustor's behalf jointly and severally represent and warrant that: (i) Trustor is a duly formed and validly existing Florida limited liability company and is authorized to due business in Arizona; (ii) Trustor has all requisite power and authority to enter into and perform under this Deed of Trust; (iii) Trustor's execution and delivery of this Deed of Trust and its performance under this Deed of Trust will not violate Trustor's organizational documents or any other agreement to which Trustor is a party; and (iv) this Deed of Trust and the Obligations are the valid and enforceable obligations of Trustor.

37.     **Change of Tax or Other Laws**.  If, after the date of recordation of this Deed of Trust, the United States of America or the State of Arizona or any other governmental entity enacts a law or regulation which:  (i) changes, in any material and adverse way, the taxation of this Deed of Trust as to Beneficiary; (ii) deducts from the value of the Trust Property, for the purposes of taxation, the value of any lien on the Trust Property; or (iii) impose a tax, directly or indirectly, on Beneficiary on this Deed of Trust, the Note, or any sums due and payable under either or both, Beneficiary may declare all sums secured by this Deed of Trust to be due and payable in full within not less than 60 days.  Beneficiary's declaration must be made by written notice to Trustor.  The foregoing declaration by Beneficiary will be ineffective, however, if Trustor is permitted under these laws to pay the tax and if, prior to the date of election is to be effective, Trustor does pay the tax levied or assessed.

38.     **Other Encumbrances**.  Trustor will pay or perform before delinquency all obligations under any prior or subordinate mortgage, deed of trust, agreement of sale, or any other lien or encumbrance (collectively called an "**Encumbrance**").  Without the prior written consent of Beneficiary, Trustor will not consent to or agree to the increase in the principal amount of any Encumbrance or to any extension of time for payment of the Encumbrance.  If any Encumbrance is in default for any reason, Beneficiary may cure such default without notice, and the cost of curing such default, with interest at the default rate of interest specified in the Note, will be considered an advance.  All advances will be added to the Obligations and may be collected from Trustor upon demand at any time after the advances are made, and the holder of the Note and Deed of Trust will be subrogated to the rights of any lienholder so paid.  Immediately upon receiving any knowledge or notice of any default or claimed default under any Encumbrance, Trustor will give written notice to Beneficiary and will give to Beneficiary a true

copy of each and every notice, summons, legal process, legal paper, or other communication relating in any way to any Encumbrance or any default under the Encumbrance. If payment of all or any part of principal or interest secured by any Encumbrance is not made at the time required, then, regardless of any postponement, extension, indulgence, or forgiveness that may be agreed to or acquiesced in by the holder of the Encumbrance, a sum equal to the amount of the principal will immediately become due and payable in reduction of the Obligations. If, with or without Beneficiary's consent, the principal amount of any Encumbrance that is superior in lien priority to this Deed of Trust is increased over the amount of its unpaid principal as it exists on the date of this Deed of Trust, then, upon Beneficiary's demand, a sum equal to the amount of the increase will immediately become due and payable in reduction of the Obligations.

39.    **Security Intended**. Notwithstanding any provision of this Deed of Trust to the contrary, the parties intend that this document is security for the payment and performance of the Obligations and will be a "deed of trust" as defined in A.R.S. § 33-801. If, despite that intention, a court of competent jurisdiction determines that this document does not qualify as a "trust deed" or "deed of trust" within the meaning of Chapter 6.1, Title 33, Arizona Revised Statutes, then, ab initio, this instrument will be deemed a realty mortgage under A.R.S. § 33-702 and will be enforceable as a realty mortgage, Trustor will be deemed a "mortgagor", Beneficiary will be deemed a "mortgagee", and Trustee will be disregarded and all references to the "Trustee" will be deemed to refer to the "mortgagee" to the extent not inconsistent with interpreting this instrument as though it were a realty mortgage. As a realty mortgage, Trustor, as mortgagor, will be deemed to have conveyed the Trust Property ab initio to the Beneficiary as mortgagee, the conveyance as a security to be void upon condition that Trustor pay and perform all its Obligations. <span>Unofficial Document</span>

40.    **General**.

(a)    Upon the written request of Beneficiary stating that all of the Obligations have been paid or performed and upon surrender of this Deed of Trust to Trustee for cancellation and upon payment by Trustor of its fees, Trustee will reconvey, without warranty, the estate in the Trust Property then held by Trustee. The grantee in the reconveyance may be designated and described as the "person or persons legally entitled thereto", or by other appropriate terms. In lieu of execution of a reconveyance by Trustee, Beneficiary may execute or release or, on behalf of Trustee, execute the reconveyance, in which case legal title will be vested in the "person or persons legally entitled thereto". Beneficiary will not be obligated to consent to or permit any partial releases of the Trust Property.

(b)    Except as provided in Paragraph 35, this Deed of Trust will inure to and bind the heirs, legatees, devisees, administrators, executors, successors, and assigns of the parties. This Deed of Trust will be so construed that, wherever applicable, the use of the singular number will include the plural number, the use of the plural number will include the singular number, the use of the masculine gender will include the feminine gender. The term "**Beneficiary**" will mean the owner and holder of the Note, and will include all successors and assigns of a beneficiary to this Deed of Trust. Any appointment of Beneficiary as attorney-in-fact for Trustor will be with full power of substitution. This Deed of Trust was prepared after negotiations by and between Trustor and Beneficiary,

and Trustor waives any rule of construction that requires that this Deed of Trust be construed against Beneficiary because Beneficiary or its attorneys prepared this Deed of Trust.

(c)     Unless otherwise specifically set forth in this Deed of Trust, any consent, approval, or election by Beneficiary (or the establishment of any item to the satisfaction of Beneficiary) will be deemed and construed as being given, withheld, or established at and in Beneficiary's sole and absolute discretion.

(d)     Trustor requests that a copy of any Notice of Sale under this Deed of Trust be mailed to it at its address set forth above.

(e)     If the payment or performance of any provision of this Deed of Trust will require a payment in excess of that permitted by any applicable law, the obligation to be paid or performed will be reduced to the minimum extent necessary to comply with any limitation of law.  By acceptance of this Deed of Trust, the Beneficiary expressly waives the right to demand any such excess.  The provisions of this paragraph will control every other provision of this Deed of Trust.

(f)     Time is of the essence in the payment and performance of each and every provision of this Deed of Trust.  No failure on the part of Beneficiary to exercise any of its rights upon any default will be construed to prejudice its rights if any other or subsequent default.  No delay on the part of Beneficiary in exercising any of the rights will be construed to preclude it from their exercise at any time during the continuance of the default.  Beneficiary may enforce any one or more remedies or rights under this Deed of Trust successively or concurrently at its option, and any such enforcement of any one or more remedies will be not deemed to be any election against or preclusion of any other rights or remedies.

(g)     Unless otherwise required by applicable law, all notices required to be given under this Deed of Trust will be in writing and will be either served personally, overnight receipted courier (such as Federal Express), or by registered or certified United States mail, postage prepaid, and addressed to Trustor, Trustee, and Beneficiary at their respective addresses first above written.  These addresses may be changed by notice to the other parties given in the same manner as provided in this paragraph.  Notices given by certified mail will be deemed to have been given upon their deposit in a regular receptacle of U.S. mail.

(h)     This Deed of Trust, the Note, and any documents secured by this Deed of Trust will be governed and construed in accordance with the laws of the State of Arizona. Trustor irrevocably submits to jurisdiction and venue in the State of Arizona for any legal action relating to this Deed of Trust, the Note, or any other agreement given in connection with the Note or Deed of Trust.  Trustor waives any defense or objection to jurisdiction or venue based on the doctrine of "forum non conveniens", and Trustor stipulates that any state court in the State of Arizona will have personal jurisdiction over Trustor for the purpose of litigating any dispute or controversy arising out of this Deed of Trust, the Note, or any other loan documents.  Trustor agrees that if Trustor commences

or maintains any action or proceeding arising out of this Deed of Trust, the Note, or the other loan documents in any forum other than a state court in Arizona, Beneficiary will be entitled to the removal, dismissal, or stay of such action.

[THE REST OF THIS PAGE INTENTIONALLY LEFT BLANK; SIGNATURES APPEAR ON THE FOLLOWING PAGE]

Unofficial Document

Executed as of the day and year first written above.

TRUSTOR:

JHO REAL ESTATE INVESTMENT, LLC, a Florida
limited liability company

By: _____
Name: JOHN H. OWOC
Its: MANAGER MEMBER


STATE OF FLORIDA          )
                          ) ss.
COUNTY OF Broward         )


The foregoing instrument was acknowledged before me this 18 day of
September 2019, by John Owoc as the Managing Member, of JHO REAL
ESTATE INVESTMENT, LLC, a Florida liability company, who acknowledged and
executed the foregoing on behalf of the company being authorized so to do for the purposes
therein contained.

_____
Notary Public

My Commission Expires:

_____

Soo Jin Kang Isicoff
Commission # GG162669
Expires: November 21, 2021
Bonded thru Aaron Notary


[Signature Page to Deed of Trust and Assignment of Rents
and Security Agreement and Fixture Filing]


*Signature Page to Deed of Trust*

EXHIBIT A

LEGAL DESCRIPTION OF THE PREMISES

That portion of the Northwest quarter of Section 15, Township 1 North, Range 2 East of the Gila and Salt River Meridian, Maricopa County, Arizona, described as follows:

Beginning at the Northwest corner of the North half of the Southwest quarter of said Northwest quarter;

Thence South (assumed bearing for purposes of this description) along the West line of said section, a distance of 660.00 feet to a line that is parallel with and distant 1968.46 feet Southerly measured at right angles from the North line of said section;

Thence South 89 degrees 50 minutes East, along said parallel line, a distance of 1307.28 feet to a line that is parallel with and distant 10.00 feet Westerly, measured at right angle, from the East line of said Southwest quarter, last said parallel line being also the center line of an existing drill track;

Thence North 00 degrees 01 minutes West, along last said parallel line, a distance of 1095.68 feet to a point of CUSP;

Thence Southwesterly along a tangent curve concave Northwesterly having a radius of 642.43 feet, through a central angle of 05 degrees 42 minutes 29 seconds, an arc distance of 64.19 feet; Thence South 05 degrees 42 minutes 29 seconds West, tangent to said curve, a distance 26.38 feet;

Thence Southwesterly and Westerly along a tangent curve to the right having a radius 382.24 feet, through a central angle of 84 degrees 27 minutes 31 seconds, an arc distance of 563.45 feet to a point of tangency in a line that is parallel with and distant 1308.46 feet Southerly, measured at right angles, from said North line;

Thence North 89 degrees 50 minutes West, along last said parallel line, a distance of 919.70 feet to the point of beginning.

EXCEPTING THEREFROM that portion of said property lying below a depth of 500.00 feet measured vertically from the contour of the surface thereof;

Provided, however, that said grantor, its successors and assigns, shall not have the right for any and all purposes to enter upon, into or through the surface of the portion of said property lying above 500.00 feet, measured vertically from the contour of the surface of said property, as reserved in Deed recorded in Docket 9581, Page 180 and also recorded in Docket 9590, Page 873; and

EXCEPT all rights retained by Southern Pacific Company, a Delaware corporation in Warranty Deed recorded in Docket 3976, Page 407 of official records of Maricopa County, Arizona.

*Exhibit A*

EXHIBIT B

PERMITTED EXCEPTIONS

1. Taxes and assessments collectible by the County Treasurer, a lien not yet due and payable for the year 2019 and subsequent years.
2. Easement for roadway and incidental purposes and rights incident thereto, as set forth in the map recorded in Book 2 of Maps, page 14, Maricopa County Records.
3. Easement for gas pipe line and incidental purposes and rights incident thereto, as set forth in instrument recorded in Docket 648, Page 597, corrected in Docket 668, page 277.
4. Easement for cathodic protection station and rights incident thereto, as set forth in instrument recorded in Docket 2762, page 471.
5. Easement for street and public utility and incidental purposes and rights incident thereto, as set forth in instrument recorded in Docket 3988, page 532.
6. The right to enter upon, into or through the surface of the portion of said property lying below 500.00 feet, measured vertically from the contour of the surface of said property, as reserved in deed recorded in Docket 9581, Page 180 and also recorded in Docket 9590, page 873, without any right of entry upon, into or through the surface of said property or the portion thereof lying above 500.00 feet, measured vertically from the contour of the surface of said property.
7. Easement for railroad and transportation and incidental purposes and rights incident thereto, as set forth in instrument recorded in Docket 9581, Page 180 and in Docket 9590, page 873.
8. Easement for overhead and underground power and incidental purposes and rights incident thereto, as set forth in
9. instrument recorded in Docket 9793, page 901.
10. Easement for gas lines and incidental purposes and rights incident thereto, as set forth in instrument recorded in Docket 9834, page 235.
11. Easement for overhead and underground power and incidental purposes and rights incident thereto, as set forth in instrument recorded in Docket 9881, page 496.
12. Easement for natural gas transmission line and appurtenant facilities and rights incident thereto, as set forth in instrument recorded in Docket 10000, page 1214.
13. Easement for overhead and underground power and incidental purposes and rights incident thereto, as set forth in instrument recorded in Document No. 2000-37849.
14. Easement for power distribution and incidental purposes and rights incident thereto, as set forth in instrument recorded in Document No. 2005-83240.
15. Terms, conditions, liabilities and obligations contained in an instrument entitled "Ordinance S-39425", recorded in Document No. 2012-1122895.
16. Easement for sidewalk and incidental purposes and rights incident thereto, as set forth in instrument recorded in Document No. 2012-1129191.
17. Terms, conditions, liabilities and obligations contained in an instrument entitled "Ordinance S-39589", recorded in Document No. 2013-0125519.
18. Easement for transmission and distribution of electricity and incidental purposes and rights incident thereto, as set forth in instrument recorded in Document No. 2013-0905321.

*Exhibit B*

19. Easement for sidewalk and rights incident thereto, as set forth in instrument recorded in Document No. 2013-0169280.

20. Easement for power distribution and rights incident thereto, as set forth in instrument recorded in Document No. 2017-0374545.

21. Easement for sidewalk, as set forth in instrument recorded in Document No. 2017-0420402.

END

Unofficial Document

*Exhibit B*

# EXHIBIT B

Unofficial Document

20

16
am

**SATISFACTION/CANCELLATION/RELEASE/TERMINATION OF SECURITY INSTRUMENT**
**ASSIGNMENT OF LEASES AND RENTS**

Know all men by these present:

That Truist Bank FKA BRANCH BANKING AND TRUST COMPANY does hereby acknowledge that the indebtedness secured by a certain Assignment of Leases and Rents made by JHO REAL ESTATE INVESTMENT LLC dated 09/20/2019 and recorded among the land records of Maricopa, Arizona in Book N/A, at Page N/A, Instrument # 20190753166 has been paid and discharged, that Truist Bank FKA BRANCH BANKING AND TRUST COMPANY was, at the time of termination, the holder of the Note and Assignment of Leases and Rents, and that the lien of the Assignment of Leases and Rents is hereby terminated.

Parcel I.D.#: 4073378-9-5-5--

ADDRESS: 1635 S 43RD AVE, PHOENIX, AZ 85009

In witness whereof, the holder of said Assignment of Leases and Rents has caused the

instrument to be executed in its behalf by (its agent) Vicky Watts Vice President, this 11/14/2020 .


*Brenda B Nobles*
Brenda B Nobles, Witness

Truist Bank FKA BRANCH BANKING AND
TRUST COMPANY


*Lisa Ward*                                             *Vicky Watts*
Lisa Ward, Witness                        By: _____
                                          Vicky Watts, Vice President

State of North Carolina, County of COLUMBUS, to wit:

The foregoing instrument was acknowledged before me, Faye S Suggs, this 14th day of

 November , 2020 , by Vicky Watts, Vice President of Truist Bank FKA BRANCH BANKING AND TRUST COMPANY the holder of the Assignment of Leases and Rents referred to above and the he/she executed the aforegoing Release of Assignment of Leases and Rents for the purposed therein contained and that the facts set forth therein are true.

Witness my hand and Notarial Seal.

```
        FAYE S SUGGS
    Electronic Notary Public
   Columbus Co., North Carolina
My Commission Expires Jul. 28, 2021
```

Notary Commission No.:              *Faye S Suggs*
19951870015                         Faye S Suggs, Electronic Notary Public

Prepared By and     Lisa Ward
Return to:          Truist Bank,  PO Box 1290,  Whiteville, NC 28472-9962
                    9700309261 00001

# EXHIBIT C

Drawn By and Return To:
Greg Faltin
Moore & Van Allen, PLLC
Bank of America Corporate Center
100 North Tryon Street, Suite 4700
Charlotte, North Carolina 28202-4003

STATE OF ARIZONA

COUNTY OF MARICOPA

ATTENTION:  FILING OFFICER – THIS DEED OF TRUST COVERS GOODS THAT ARE OR ARE TO BECOME FIXTURES ON THE REAL PROPERTY DESCRIBED HEREIN AND IS TO BE FILED FOR RECORD IN THE RECORDS WHERE DEED OF TRUSTS ON REAL ESTATE ARE RECORDED.  ADDITIONALLY, THIS DEED OF TRUST SHOULD BE APPROPRIATELY INDEXED, NOT ONLY AS A DEED OF TRUST, BUT ALSO AS A FIXTURE FILING AND FINANCING STATEMENT COVERING GOODS THAT ARE OR ARE TO BECOME FIXTURES ON THE REAL PROPERTY DESCRIBED HEREIN.  THE MAILING ADDRESSES OF THE GRANTOR (DEBTOR) AND AGENT (SECURED PARTY) ARE SET FORTH IN THIS INSTRUMENT.

MAXIMUM PRINCIPAL AMOUNT TO BE ADVANCED PURSUANT TO THE LOAN DOCUMENTS IS $541,400,000.00

THE MATURITY DATE OF THE LOAN DOCUMENTS, EXCLUSIVE OF ANY OPTION TO RENEW OR EXTEND SUCH MATURITY DATE, IS AUGUST 14, 2025.

### DEED OF TRUST, ASSIGNMENT OF LEASES AND RENTS, SECURITY AGREEMENT AND FIXTURE FILING

THIS  DEED  OF  TRUST,  ASSIGNMENT  OF  LEASES  AND  RENTS,  SECURITY AGREEMENT AND FIXTURE FILING (this "Deed of Trust") is made and entered into as of December ろ , 2020, by JHO REAL ESTATE INVESTMENT, LLC, a Florida limited liability company with an address of 1600 N. Park Drive, Weston, Florida 33326 (the "Grantor"), as grantor, in favor of STEWART TITLE & TRUST OF PHOENIX, INC.,  a Delaware corporation with an address of 2930 E. Camelback

CHAR2\2313747v4

Road, Suite 210, Phoenix, AZ 85016, in its capacity as trustee (together with its successors and assigns in such capacity, the "Trustee"), for the benefit of TRUIST BANK ("Truist", as successor by merger to Branch Banking and Trust), in its capacity as Administrative Agent for the Lenders (as defined in the Credit Agreement (as hereinafter defined)), and any other holder of the Secured Obligations (as hereinafter defined), with an address of Agency Services, 303 Peachtree St., N.E. / 25th Floor, Atlanta, Georgia 30308, Attn Agency Services Manager (Truist, in such capacity, together with any successors and assigns, the "Agent"), as beneficiary.

## RECITALS

WHEREAS, Vital Pharmaceuticals, Inc., a Florida corporation (the "Borrower") and certain other Loan Parties are party to that certain Amended and Restated Loan Agreement, dated as of September 20, 2019, as amended from time to time (the "Existing Credit Agreement");

WHEREAS, certain obligations described in the Existing Credit Agreement are secured by the Existing Deed of Trust;

WHEREAS, the Borrower, the Agent, and the Lenders desire to amend and restate the Existing Credit Agreement pursuant to the terms of that certain Amended and Restated Revolving Credit And Term Loan Agreement dated as of August 14, 2020, between the Borrower, the Guarantors from time to time party thereto, the Agent, and the Lenders (as further amended, modified, supplemented, extended, renewed or replaced from time to time, the "Credit Agreement"). All terms used but not otherwise defined herein shall have the meanings provided in the Credit Agreement.

WHEREAS, the Grantor is a Guarantor under the Credit Agreement and, as such, is required by the Credit Agreement to execute and deliver this Deed of Trust as security for the Secured Obligations (as hereinafter defined), which the Grantor is willing to do in consideration of the agreement of Agent and the Lenders to make the Loans available to the Borrower pursuant to the terms of the Credit Agreement.

## W I T N E S S E T H:

In consideration of the foregoing recitals and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Grantor irrevocably grants, mortgages, warrants, bargains, sells, pledges, remises, aliens, assigns, conveys, transfers and sets over to Trustee and the Trustee's successors and assigns, in trust, Unofficial Document "ER OF SALE, for the benefit of Agent and the Lenders, and with all other statutory rights and covenants and subject to the further terms of this Deed of Trust, all of the Grantor's right, title and interest in and to the following:

(a)      All those tracts or parcels of land and other real property interests in Maricopa County, Arizona, as more particularly described in Exhibit A attached hereto and made a part hereof, together with all of the Grantor's right, title and interest in, to and under all rights of way, easements, privileges and appurtenances relating or appertaining to such real estate and all water and water rights, sewer and sewer rights, ditches and ditch rights, minerals, oil and gas rights, royalties, lease or leasehold interests owned by the Grantor, now or hereafter used in connection with or appurtenant to or related to such real estate, and all interests of the Grantor now owned or hereafter acquired in and to streets, roads, alleys and public places, now or hereafter used in connection with such real estate, and all existing or future licenses, contracts, permits and agreements required or used in connection with the ownership, operation or maintenance of such real estate, and any and all insurance proceeds, and any and all awards, including interest, previously or hereafter made to the Grantor for taking by eminent domain or in lieu thereof (collectively, the "Land"); and

2

(b)     All buildings and improvements of every kind and description now or hereafter erected or placed on the Land (the "Improvements") and all materials intended for construction, reconstruction, alteration and repair of such Improvements now or hereafter erected thereon, all of which materials shall be deemed to be included within the Premises (as hereinafter defined) immediately upon the delivery thereof to the Land, and all "equipment", "goods" and "fixtures" as such terms are defined in the Uniform Commercial Code as adopted and in effect in the state in which the Premises is located, as amended from time to time (the "Uniform Commercial Code") and all articles of personal property now or hereafter owned by the Grantor and attached to or contained in and used in connection with the Land and Improvements including, but not limited to, all furniture, furnishings, apparatus, machinery, equipment, motors, elevators, supplies, fittings, radiators, ranges, refrigerators, awnings, shades, screens, blinds, carpeting, office equipment and other furnishings and all plumbing, heating, lighting, cooking, laundry, ventilating, refrigerating, incinerating, air conditioning and sprinkler equipment and fixtures and appurtenances thereto and all renewals or replacements thereof or articles in substitution thereof, whether or not the same are or shall be attached to the Land and Improvements in any manner (the "Tangible Personalty") and all proceeds of the Tangible Personalty (hereinafter, the Land, Improvements, Tangible Personalty and all other property and interests described above, together with all proceeds thereof, being collectively referred to as the "Premises").

TO HAVE AND HOLD the same, together with all privileges, hereditaments, easements and appurtenances thereunto belonging forever, subject to the Permitted Encumbrances, to the Trustee and Trustee's successors and assigns, to secure the Secured Obligations (hereinafter defined) and other obligations herein recited; provided that, should (i) the Secured Obligations secured hereby be paid in full and the Borrower fully discharges its obligations secured hereby and satisfy the obligations in full or (ii) the conditions set forth in the Credit Agreement for the release of this Deed of Trust be fully satisfied, the lien and security interest of this Deed of Trust shall cease, terminate and be void and Agent shall promptly cause a release of this Deed of Trust to be filed in the appropriate office; and until such obligations are fully satisfied, it shall remain in full force and effect.

And, as additional security for the Secured Obligations, the Grantor hereby irrevocably assigns to the Agent, for the benefit of the Lenders, all the security deposits, rents, issues, profits and revenues of the Premises from time to time accruing (the "Rents and Profits") which assignment constitutes a present, absolute and unconditional assignment and not an assignment for additional security only. Notwithstanding the foregoing, so long as no Event of Default (as defined in Article III) shall exist, Grantor shall have a license (which license shall terminate automatically and without notice upon the occurrence and during the continuance of an Unofficial Document Default) to collect, but not prior to accrual, all Rents and Profits. In the event, however, that Grantor shall cure any such Event of Default, then the license granted under this paragraph shall be reinstated unless and until another Event of Default occurs and is continuing, at which time the license shall again terminate.

As additional collateral and further security for the Secured Obligations, the Grantor does hereby assign to Agent, for the benefit of the Lenders, a security interest in all of the right, title and the interest of the Grantor in and to any and all insurance policies and proceeds thereof and any and all leases (including equipment leases), rental agreements, management contracts, construction contracts, architects' contracts, technical services agreements, or other contracts, licenses and permits to the extent now or hereafter relating solely to the Premises (the "Intangible Personalty") or any part thereof, and the Grantor agrees to execute and deliver to the Agent such additional instruments, in form and substance reasonably satisfactory to the Agent, as may hereafter be reasonably requested by the Agent to evidence and confirm said assignment; provided, however, that acceptance of any such assignment shall not be construed as a consent by the Agent to any lease, rental agreement, management contract, franchise agreement, construction contract, technical services agreement or other contract, license or permit, or to impose upon the Agent, or any Lender, any obligation with respect thereto. Notwithstanding the foregoing provisions,

3

such assignment and grant of security interest contained herein shall not extend to, and the Intangible Personalty shall not include, any personalty which is now or hereafter held by the Grantor as licensee, lessee or otherwise, to the extent that such personalty is not assignable or capable of being encumbered as a matter of law or under the terms of the license, lease or other agreement applicable thereto (but solely to the extent that any such restriction shall be enforceable under applicable law); provided, however, that the foregoing assignment and grant of security interest shall extend to, and the Intangible Personalty shall include, any and all proceeds of such personalty to the extent that the assignment or encumbering of such proceeds is not so restricted under the terms of the license, lease or other agreement applicable thereto.

All the Tangible Personalty which comprises a part of the Premises shall, as far as permitted by law, be deemed to be affixed to the aforesaid Land and conveyed therewith. Grantor hereby grants to Agent, for the benefit of the Lenders, a security interest as to the balance of the Tangible Personalty and the Intangible Personalty, and this Deed of Trust shall be considered to be a security agreement which creates a security interest in such items for the benefit of the Agent and the Lenders. In that regard, the Grantor grants to the Agent all of the rights and remedies of a secured party under the laws of the state in which the Premises are located.

The Grantor and the Agent covenant, represent and agree as follows:

## ARTICLE I

### Secured Obligations

1.1     Secured Obligations.  The Lenders have established Five Hundred Forty-One Million Four Hundred Thousand and No/100 Dollars ($541,400,000.00) in secured credit facilities in favor of the Borrower pursuant to the terms of the Credit Agreement.  This Deed of Trust is given to secure the payment and performance of (a) all Obligations of the Loan Parties under the Credit Agreement, as the same may be amended from time to time, (b) all obligations of the Grantor under the terms of this Deed of Trust, and (c) all obligations and liabilities incurred in connection with the collection and enforcement of the foregoing (all of which whether now existing or hereafter arising, collectively, the "Secured Obligations").

1.2     Future Advances.  This Deed of Trust is given to secure the Secured Obligations and the repayment of the aforesaid credit facilities together with each advance of any Loan, any renewals or extensions or modifications thereof upon the different terms or at the same or different rate of interest and also to secure all future advances and readvances that may subsequently be made to the Borrower or any other Loan Party by Agent or the Lenders, in connection with the aforesaid Credit Agreement, and all renewals, modifications, replacements and extensions thereof.

## ARTICLE II

### Grantor's Covenants, Representations and Agreements

2.1     Title to Property.  The Grantor represents and warrants to the Agent and Lenders (i) that it is seized of the Land and the Improvements and has indefeasible fee simple title to the Land and the Improvements and has the right to encumber and convey the same, and title to such Land and Improvements is free and clear of all liens and encumbrances except for Permitted Encumbrances, (ii) that it is the owner of the Tangible Personalty free and clear of all liens and encumbrances except for the Permitted Encumbrances and (iii) that it will warrant and defend the title to such property except for the Permitted Encumbrances against the claims of all Persons.  As to the balance of the Premises, the Rents

4

and Profits and the Intangible Personalty, the Grantor represents and warrants that it will defend such property against the claims of all Persons subject to the Permitted Encumbrances.

2.2     Taxes and Fees.  Subject to the right of the Grantor set forth in Section 4.8 of the Credit Agreement to contest the same, the Grantor will pay prior to delinquency all taxes, general and special assessments, permit fees, inspection fees, user fees, license fees, water and sewer charges, and franchise fees lawfully levied, imposed or asserted by the United States of America or any state, county, municipality or other taxing authority upon the Grantor in respect of the Premises or any charge which, if unpaid, would become a lien or charge upon the Premises prior to or equal to the lien of this Deed of Trust for any amounts secured hereby or which would have priority or equality with this Deed of Trust in the distribution of the proceeds of any foreclosure sale of the Premises (collectively, "Governmental Assessments") and all insurance premiums due and payable in connection with maintaining the insurance required under Section 2.9(a) hereof as required by the terms and conditions of the Credit Agreement (and the Grantor, upon request of the Agent, will submit to the Agent receipts evidencing said payments).  The Grantor shall also pay all Deed of Trust taxes, recording fees and all other costs and expenses, if any, due or payable in connection with the execution, delivery and/or recording of this Deed of Trust and in connection with any advance secured by this Deed of Trust.

2.3     Reimbursement.  Subject to the right of the Grantor set forth in Section 4.8 of the Credit Agreement to contest any tax assessment or charge, the Grantor agrees that if it shall fail to pay on or before the date that the same become delinquent any Governmental Assessment or any utility charge, whether public or private, or any insurance premium, on or prior to the cancellation date of such insurance, or if it shall fail to procure the insurance coverage and deliver the insurance certificates required hereunder, or if it shall fail to pay any other charge or fee described in Sections 2.2, 2.3, 2.6 or 5.6 hereof, then the Agent or the Lenders, at their option, may pay or procure the same and will give the Grantor prompt notice of any such expenditures.  The Grantor will reimburse the Agent or the Lenders within thirty (30) days of demand for any sums of money paid by the Agent or the Lenders pursuant to this Section, together with interest on each such payment at the default rate under the Credit Agreement, and all such sums and interest thereon shall be secured hereby.

2.4     Additional Documents.  The Grantor agrees to execute and deliver to the Agent, concurrently with the execution of this Deed of Trust and upon the reasonable request of the Agent from time to time hereafter, all financing statements and other documents reasonably required to perfect and maintain the security interest created hereby. The Grantor hereby authorizes the Agent to prepare and file such financing statements, fixture filings, renewals thereof, amendments thereof, supplements thereto and other instruments as the Agent may from time to time deem necessary or appropriate in order to perfect and maintain the security interests granted hereby in accordance with the Uniform Commercial Code as adopted and as in effect in the state in which the Land is located (the "UCC").

2.5     Sale or Encumbrance.  Except as otherwise permitted in the Credit Agreement, the Grantor will not sell, encumber or otherwise dispose of any of the Tangible Personalty except to incorporate such into the Improvements or replace such with goods of quality and value at least equal to that replaced.  In the event the Grantor sells or otherwise disposes of any of the Tangible Personalty other than as permitted above, the Agent's security interest in the proceeds of the Tangible Personalty shall continue pursuant to this Deed of Trust.

2.6     Fees and Expenses.  The Grantor will promptly pay upon demand any and all reasonable costs and expenses of the Agent or the Lenders and the Trustee, including, without limitation, reasonable attorneys' fees actually incurred by Agent or the Lenders, (a) as required under the Credit Agreement and (b) as necessary to protect the Premises, the Rents and Profits or the Intangible Personalty in accordance with Section 5.6 hereof, or to exercise any rights or remedies under this Deed of Trust or with respect to

5

the Premises, Rents and Profits or the Intangible Personalty. All of the foregoing costs and expenses shall be secured hereby.

2.7     Leases and Other Agreements. The Grantor shall faithfully keep and perform, or cause to be kept and performed, in all material respects, all of the covenants, conditions, and agreements contained in each material lease now or hereafter affecting the Premises on the part of the Grantor to be kept and performed (including performance of all covenants to be performed under any and all leases of the Premises or any part thereof) and shall at all times use commercially reasonable efforts to enforce, with respect to each other party to said agreements, all material obligations, covenants and agreements by such other party to be performed thereunder.

2.8     Maintenance of Premises. The Grantor will abstain from and will not permit the commission of any material physical waste in or about the Premises and will maintain, or cause to be maintained, the Premises in reasonable condition and repair, ordinary wear and tear and casualty and obsolescence excepted.

2.9     Insurance.

(a)     Types Required. The Grantor shall maintain insurance for the Premises as set forth in Section 5.8 of the Credit Agreement. Notwithstanding any other provision in this Deed of Trust or the Credit Agreement to the contrary, to the extent any building located on the real property that is subject to this Deed of Trust contains personal property owned by the Grantor, Agent disclaims any security interest created under this Deed of Trust in such personal property if (i) such personal property is required to be insured pursuant to any existing or future Federal statute, regulation, policy or guideline related to flood insurance (collectively, the "Flood Laws") and (ii) such personal property is not covered by flood insurance to the extent required by the Flood Laws.

(b)     Use of Proceeds. The Grantor assigns to the Agent any proceeds which may become due by reason of any material loss, damage to or destruction of the Premises to which the Grantor is entitled. All insurance proceeds shall be used and applied in the manner set forth in Section 5.8 of the Credit Agreement.

2.10    Eminent Domain. Subject to the provisions of the Credit Agreement, the Grantor assigns to the Agent any proceeds or awards which may become due by reason of any condemnation or other taking for public use of the whole or any part of the premises or any rights appurtenant thereto to which the Grantor is entitled, and such proceeds or awards shall be applied in the same manner the insurance proceeds are applied as set forth in the Credit Agreement. If such proceeds exceed the balance due under Credit Agreement and the other Loan Documents, any such excess shall be repaid to the Grantor. The Grantor agrees to execute such further assignments and agreements as may be reasonably required by the Agent to assure the effectiveness of this Section. In the event any Governmental Authority shall require or commence any proceedings for the demolition of any buildings or structures comprising a part of the Premises, or shall commence any proceedings to condemn or otherwise take pursuant to the power of eminent domain a material portion of the Premises, the Grantor shall promptly notify the Agent of such requirements or commencement of proceeding (for demolition, condemnation or other taking).

2.11    Releases and Waivers. The Grantor agrees that no release by the Agent of any portion of the Premises, the Rents and Profits or the Intangible Personalty, no subordination of lien, no forbearance on the part of the Agent to collect on any Loans, or any part thereof, no waiver of any right granted or remedy available to the Agent and no action taken or not taken by the Agent shall, except to the extent expressly released, in any way have the effect of releasing the Grantor from full responsibility to the Agent for the complete discharge of each and every of the Grantor's obligations hereunder.

6

2.12     Transfer of Premises.  Any sale, transfer, conveyance, mortgage, encumbrance or other disposition of the Premises, the Rents and Profits or the Intangible Personalty or any part thereof or any interest therein, or any subordinate financing with respect thereto, during the term of this Deed of Trust may be made only in accordance with the terms and conditions of the Credit Agreement.

2.13     Compliance with Law.  The Grantor will comply with all applicable statutes, regulations and orders of, and all applicable restrictions imposed by, all governmental authorities in respect of the ownership of the Premises (including applicable statutes, regulations, orders and restrictions relating to environmental standards and controls) to the extent required by the Credit Agreement.

2.14     Inspection.  Subject to the terms of the Credit Agreement, the Grantor will permit the Agent, or its agents, at all reasonable times and with advance prior notice to enter and pass through or over the Premises for the purpose of inspecting same; provided, however, so long as no Event of Default has occurred and is continuing, inspections shall be at reasonable times during the Grantor's normal business hours.

2.15     Security Agreement.

(a)     This Deed of Trust is hereby made and declared to be a security agreement, encumbering each and every item of Fixtures and Tangible Personalty.  In furtherance thereof, in order to secure the payment of the Secured Obligations, Grantor hereby grants to Agent, for the benefit of the Lenders, a security interest in all of Grantor's right, title and interest in all Fixtures and Tangible Personalty in compliance with the provisions of the UCC.  A financing statement or statements reciting this Deed of Trust to be a security agreement, affecting all of said Fixtures and Tangible Personalty, shall be appropriately filed by Agent.  Grantor hereby authorizes the Agent to file financing statements in any jurisdiction and with any filing office that the Agent may determine, in its sole discretion, is necessary or advisable to perfect the security interests granted herein.  Such financing statements may describe or indicate the collateral to the extent a security interest therein is granted hereby, including without limitation the description "All goods of the debtor that are or are to become fixtures located on the Land, whether now owned or hereafter acquired by Debtor and whether now or hereafter located on the Land" or words of similar import.  To the extent permitted by applicable law, the remedies for any violation of the covenants, terms and condition of the security agreement herein contained shall be (i) as prescribed herein or (ii) as prescribed by general law or (iii) as prescribed by the specific statutory consequences now or hereafter enacted and specified under the UCC, all at Agent's sole election. The Grantor and the Agent agree that the filing of such financing statement(s) in the records normally having to do with personal property shall never be construed as in anywise derogating from or impairing this declaration and hereby stated intention of the Grantor and the Agent that everything used in connection with the production of income from the Premises or adapted for use therein or which is described or reflected in this Deed of Trust is, and at all times and for all purposes and in all proceedings both legal or equitable shall be, regarded as part of the real estate irrespective of whether (a) any such item is physically attached to the improvements, (b) serial numbers are used for the better identification of certain items capable of being thus identified in a recital contained herein, or (c) any such item is referred to or reflected in any such financing statement(s) so filed at any time.  Similarly, the mention in any such financing statement(s) of the rights in and to (aa) the proceeds of any fire or hazard insurance policy or (bb) any award in eminent domain proceedings for a taking or for loss of value or (cc) the Grantor's interest as lessor in any present or future lease or rights to income growing out of the use or occupancy of the Premises, whether pursuant to lease or otherwise, shall never be construed as in anywise altering any of the rights of the Grantor or the Agent as determined by this instrument or impugning the priority of the Agent's lien granted hereby or by any other recorded document, but such mention in such financing statement(s) is declared to be for the protection of the Agent in the event any court shall at any time hold

7

with respect to the foregoing (aa) or (bb) or (cc), that notice of the Agent's priority of interest to be effective against a particular class of persons, must be filed in the UCC records, provided, if there is a conflict between the terms of this paragraph and the terms of the Credit Agreement, the Credit Agreement shall govern.

(b)     The Grantor warrants that the name and address of the "Debtor" (which is the Grantor) are as set forth in Section 6.2 hereof and a statement indicating the types, or describing the items, of collateral is set forth hereinabove. Grantor warrants that Grantor's exact legal name is correctly set forth in the preamble of this Deed of Trust. The Grantor agrees to furnish the Agent with notice of any change in the name, identity, state of organization, residence, principal place of business or mailing address of the Grantor within twenty (20) days of the effective date of any such change and the Grantor will promptly take any action reasonably deemed necessary by the Agent to prevent any filed financing statement from becoming misleading or losing its perfected status.

## ARTICLE III

### Event of Default

An Event of Default shall exist under the terms of this Deed of Trust upon the existence of an Event of Default under the terms of the Credit Agreement.

## ARTICLE IV

### Acceleration; Foreclosure

4.1     Acceleration of Secured Obligations; Foreclosure. Upon the occurrence and during the continuance of an Event of Default after expiration of all applicable cure periods, the entire balance of the Secured Obligations and any other obligations due under the Loan Documents, including all accrued interest, shall, at the option of the Agent, become immediately due and payable. Upon failure to pay the Secured Obligations or reimburse any other amounts due under the Loan Documents in full at any stated or accelerated maturity and in addition to all other remedies available to the Agent at law or in equity, the Agent may do any of the following:

(a)     Give such notice of default and of election to cause the Premises (together with the Rents and Profits, Intangible Property and all other property subject to this Deed of Trust) to be sold as may be required by law or as may be necessary to cause the Trustee to exercise the power of sale granted herein. The Trustee shall then record and give such notice of trustee's sale as then required by law and, after the expiration of such time as may be required by law, may sell the property subject to this Deed of Trust at the time and place specified in the notice of sale, as a whole or in separate parcels as directed by the Agent, or by the Grantor to the extent required by law, at public auction to the highest bidder for cash in lawful money of the United States, payable at time of sale, all in accordance with applicable law. The Trustee, from time to time, may postpone or continue the sale of all or any portion of the property subject to this Deed of Trust by public declaration at the time and place last appointed for the sale. No other notice of the postponed sale shall be required except as required by applicable law. Upon any sale, the Trustee shall deliver its deed conveying the property sold, without any covenant or warranty, express or implied, to the purchaser or purchasers at the sale. The recitals in such deed of any matters or facts shall be conclusive as to the accuracy thereof. Any person, including the Grantor, the Trustee, Agent or any Lender, may purchase at the sale.

(b)     Commence proceedings for foreclosure of this Deed of Trust in the manner provided by law for the foreclosure of a real property mortgage or deed of trust.

8

4.2     Proceeds of Sale.  The proceeds of any foreclosure sale of the Premises, or any part thereof, will be distributed and applied in accordance with the terms and conditions of the Credit Agreement (subject to any applicable provisions of applicable law).

4.3     Trustee's Fees.  If a foreclosure proceeding is commenced by the Trustee but terminated prior to its completion, the Trustee shall be entitled to a reasonable fee in accordance with applicable law.

## ARTICLE V

### Additional Rights and Remedies of Agent

5.1     Rights Upon an Event of Default.  Upon the occurrence and during the continuance of an Event of Default after expiration of all applicable cure periods, the Agent, immediately and without additional notice and without liability therefor to the Grantor, except for gross negligence, willful misconduct or unlawful conduct, may do or cause to be done any or all of the following to the extent permitted by applicable law: (a) exercise its right to collect the Rents and Profits; (b) enter into contracts for the completion, repair and maintenance of the Improvements thereon; (c) expend Loan funds and any rents, income and profits derived from the Premises for the payment of any taxes, insurance premiums, assessments and charges for completion, repair and maintenance of the Improvements, preservation of the lien of this Deed of Trust and satisfaction and fulfillment of any liabilities or obligations of the Grantor arising out of or in any way connected with the Premises whether or not such liabilities and obligations in any way affect, or may affect, the lien of this Deed of Trust; (d) take such steps to protect and enforce the specific performance of any covenant, condition or agreement in this Deed of Trust, the Credit Agreement or the other Loan Documents, or to aid the execution of any power herein granted; and (e) generally, supervise, manage, and contract with reference to the Premises as if the Agent were equitable owner of the Premises.  Notwithstanding the occurrence of an Event of Default or acceleration of any Loans, the Agent shall continue to have the right to pay money, whether or not Loan funds, for the purposes described in Sections 2.2, 2.6 and 2.8 hereof, and all such sums and interest thereon shall be secured hereby.  The Grantor also agrees that any of the foregoing rights and remedies of the Agent may be exercised at any time during the continuance of an Event of Default independently of the exercise of any other such rights and remedies, and the Agent may continue to exercise any or all such rights and remedies until the Event(s) of Default are cured, until foreclosure and the conveyance of the Premises to the high bidder or until the Credit Agreement Unofficial Document 'onger in effect or the Secured Obligations is otherwise satisfied or paid in full.

5.2     Appointment of Receiver.  Upon the occurrence and during the continuance of an Event of Default after expiration of all applicable cure periods, the Agent shall be entitled, without additional notice and without regard to the adequacy of any security for the Secured Obligations secured hereby, whether the same shall then be occupied as a homestead or not, or the solvency of any party bound for its payment, to make application for the appointment of a receiver to take possession of and to operate the Premises, and to collect the rents, issues, profits, and income thereof, all expenses of which shall be added to the Secured Obligations and secured hereby. The receiver shall have all the rights and powers provided for under the laws of the state in which the Premises are located, including without limitation, the power to execute leases, and the power to collect the rents, sales proceeds, issues, profits and proceeds of the Premises during the pendency of such foreclosure suit, as well as during any further times when the Grantor, its successors or assigns, except for the intervention of such receiver, would be entitled to collect such rents, sales proceeds, issues, proceeds and profits, and all other powers which may be necessary or are usual in such cases for the protection, possession, control, management and operation of the Premises during the whole of said period.  All costs and expenses (including receiver's fees, reasonable attorneys'

9

fees and costs incurred in connection with the appointment of a receiver) shall be secured by this Deed of Trust. Notwithstanding the appointment of any receiver, trustee or other custodian, the Agent shall be entitled to retain possession and control of any cash or other instruments at the time held by or payable or deliverable under the terms of the Deed of Trust to the Agent to the fullest extent permitted by law.

5.3     Waivers.  No waiver of any Event of Default shall at any time thereafter be held to be a waiver of any rights of the Agent stated anywhere in this Deed of Trust, the Credit Agreement or any of the other Loan Documents, nor shall any waiver of a prior Event of Default operate to waive any subsequent Event(s) of Default.  All remedies provided in this Deed of Trust, the Credit Agreement or any of the other Loan Documents are cumulative and may, at the election of the Agent, be exercised alternatively, successively, or in any manner and are in addition to any other rights provided by law.

5.4     Delivery of Possession After Foreclosure.     In the event there is a foreclosure sale hereunder and at the time of such sale, the Grantor or the Grantor's heirs, devises, representatives, successors or assigns are occupying or using the Premises, or any part thereof, each and all immediately shall become the tenant of the purchaser at such sale, which tenancy shall be a tenancy from day to day, terminable at the will of either landlord or tenant, at a reasonable rental per day based upon the value of the property occupied, such rental to be due daily to the purchaser; and to the extent permitted by applicable law, the purchaser at such sale, notwithstanding any language herein apparently to the contrary, shall have the sole option to demand possession immediately following the sale or to permit the occupants to remain as tenants at will.  In the event the tenant fails to surrender possession of said property upon demand, the purchaser shall be entitled to institute and maintain a summary action for possession of the property (such as an action for forcible detainer) in any court having jurisdiction.

5.5     Marshalling.     The Grantor hereby waives, in the event of foreclosure of this Deed of Trust or the enforcement by the Agent of any other rights and remedies hereunder, any right otherwise available in respect to marshalling of assets which secure any Loans and any other indebtedness secured hereby or to require the Agent to pursue its remedies against any other such assets.

5.6     Protection of Premises.  If Grantor fails to perform the covenants and agreements contained in this Deed of Trust, the Credit Agreement or any of the other Loan Documents, and such failure continues beyond any applicable grace, notice and cure periods, except in the case of an emergency in which event Agent may act immediately, then Agent may take such actions, including, but not limited to, disbursements of such sums, as Agent in its sole but reasonable discretion deems necessary to protect Agent's interest in the Premises.     Unofficial Document


## ARTICLE VI

### General Conditions

6.1     Substitution of Trustee.  If, for any reason, the Agent shall  elect to substitute for the Trustee herein named (or for any successor to said Trustee), the Agent shall have the right to  appoint successor Trustee(s) by duly acknowledged written instruments, and each new Trustee immediately upon recordation of the instrument so appointing him shall become successor in title to the Premises for the uses and purposes of this Deed of Trust, with all the powers, duties and obligations conferred on the Trustee in the same manner and to the same effect as though he were named herein as the Trustee.  If more than one Trustee has been appointed, each of such Trustees and each successor thereto shall be and hereby is empowered to act independently.

10

6.2    Terms.  The singular used herein shall be deemed to include the plural; the masculine deemed to include the feminine and neuter; and the named parties deemed to include their heirs, successors and assigns.  The term "Agent" shall include any of the Persons identified as a "Agent" on the signature pages to the Credit Agreement, and any Person which may become a Agent by way of assignment in accordance with the terms of the Credit Agreement, together with their successors and permitted assigns.  Capitalized terms used herein and not otherwise defined shall have the respective meanings ascribed to such terms in the Credit Agreement.

6.3    Notices.  All notices and other communications required or permitted to be given hereunder shall have been duly given in accordance with the requirement of the Credit Agreement.

6.4    Severability.  If any provision of this Deed of Trust is determined to be illegal, invalid or unenforceable, such provision shall be fully severable and the remaining provisions shall remain in full force and effect and shall be construed without giving effect to the illegal, invalid or unenforceable provisions.

6.5    Headings.  The captions and headings herein are inserted only as a matter of convenience and for reference and in no way define, limit, or describe the scope of this Deed of Trust nor the intent of any provision hereof.  The Recitals set forth above are incorporated herein.

6.6    Conflicting Terms.  In the event the terms and conditions of this Deed of Trust conflict with the terms and conditions of the Credit Agreement, the terms and conditions of the Credit Agreement shall control and supersede the provisions of this Deed of Trust with respect to such conflicts.

6.7    Governing Law.  This Deed of Trust shall be governed by and construed in accordance with the internal law of the state where the Premises is located.

6.8    Application of the Foreclosure Law.  If any provision in this Deed of Trust shall be inconsistent with any provision of the foreclosure laws of the state where the Premises is located, the provisions of such laws shall take precedence over the provisions of this Deed of Trust, but shall not invalidate or render unenforceable any other provision of this Deed of Trust that can be construed in a manner consistent with such laws.

6.9    WRITTEN AGREEMENT.

Unofficial Document

(a)    THE RIGHTS AND OBLIGATIONS OF THE GRANTOR AND THE AGENT SHALL BE DETERMINED SOLELY FROM THIS WRITTEN DEED OF TRUST AND THE OTHER LOAN DOCUMENTS, AND ANY PRIOR ORAL OR WRITTEN AGREEMENTS BETWEEN THE AGENT AND THE GRANTOR CONCERNING THE SUBJECT MATTER HEREOF AND OF THE OTHER LOAN DOCUMENTS ARE SUPERSEDED BY AND MERGED INTO THIS DEED OF TRUST AND THE OTHER LOAN DOCUMENTS.

(b)    THIS DEED OF TRUST MAY NOT BE VARIED BY ANY ORAL AGREEMENTS OR DISCUSSIONS THAT OCCUR BEFORE, CONTEMPORANEOUSLY WITH, OR SUBSEQUENT TO THE EXECUTION OF THIS DEED OF TRUST OR THE OTHER LOAN DOCUMENTS.

(c)    THIS WRITTEN DEED OF TRUST AND THE OTHER LOAN DOCUMENTS REPRESENT THE FINAL AGREEMENTS BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.  THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

11

6.10     WAIVER OF JURY TRIAL. THE AGENT AND THE GRANTOR HEREBY WAIVE, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING BASED UPON, OR RELATED TO, THE SUBJECT MATTER OF THIS DEED OF TRUST. THIS WAIVER IS KNOWINGLY, INTENTIONALLY, AND VOLUNTARILY MADE BY THE AGENT AND THE GRANTOR, AND THE AGENT AND THE GRANTOR ACKNOWLEDGE THAT NO PERSON ACTING ON BEHALF OF ANOTHER PARTY TO THIS AGREEMENT HAS MADE ANY REPRESENTATIONS OF FACT TO INDUCE THIS WAIVER OF TRIAL BY JURY OR IN ANY WAY TO MODIFY OR NULLIFY ITS EFFECT. THE AGENT AND THE GRANTOR FURTHER ACKNOWLEDGE THAT THEY HAVE BEEN REPRESENTED (OR HAVE HAD THE OPPORTUNITY TO BE REPRESENTED) IN THE SIGNING OF THIS DEED OF TRUST AND IN THE MAKING OF THIS WAIVER BY INDEPENDENT LEGAL COUNSEL, SELECTED OF THEIR OWN FREE WILL, AND THAT THEY HAVE HAD THE OPPORTUNITY TO DISCUSS THIS WAIVER WITH COUNSEL.

6.11     State Specific Provisions. In the event of any inconsistencies between this Section and any of the other terms and provisions of this Deed of Trust, the terms and provisions of this Section shall control and be binding.

(a)     Without limiting any of the rights, benefits and remedies otherwise conferred upon Agent and/or Trustee in this Deed of Trust, Agent and Trustee shall have all of the rights, benefits and remedies conferred under the laws of the State of Arizona with respect to the property encumbered by this Deed of Trust, including, without limitation, those provided under Arizona Revised Statutes ("A.R.S."), §§ 33-801 et. seq. and 33-702B.

(b)     Grantor agrees to an effective rate of interest equal to the rate stated herein and in the documents evidencing the Secured Obligations plus any additional rate, if any, resulting from any charge or fee in the nature of interest paid or to be paid by Grantor or Borrower in connection with the Secured Obligations, or any benefit received or to be received by Agent or Trustee in connection with the Secured Obligations.

(c)     If for any reason this Deed of Trust shall be ineffective as a deed of trust, it shall be construed as a realty mortgage with Grantor being the mortgagor and Agent being the mortgagee.

(d)     Any party that has signed this Deed of Trust as a surety or accommodation party, or that has subjected its property to this Deed of Trust to secure the Secured Obligations of another hereby expressly waives the benefits of any statutory provision limiting the liability of a surety, including without limitation, the provisions of A.R.S. §§ 12-1641, et seq. and Rule 17(f) of the Arizona Rules of Civil Procedures, and any defense arising by reason of any disability or other defense of Borrower or by reason of the cessation from any cause whatsoever of the liability of Borrower.

(e)     Without obtaining the prior written consent of Agent, Grantor shall not consent to, or vote in favor of, the inclusion of all or any part of the Premises in any Community Facilities District formed pursuant to the Community Facilities District Act, A.R.S. § 48-701, et seq., as amended from time to time. Grantor shall immediately give notice to Agent of any notification or advice that Grantor may receive from any municipality or other third party of any intent or proposal to include all or any part of the Premises in a Community Facilities District. Agent shall have the right to file a written objection to the inclusion of all or any part of the Premises in a Community Facilities District, either in its own name or in the name of Grantor, and to appear at, and participate in, any hearing with respect to the formation of any such district.

12

(f)      This Deed of Trust constitutes a financing statement filed as a fixture filing under A.R.S. § 47-9502.C, or any successor or similar statute, covering any property which now is or later may become fixtures attached to the Premises.

PROVIDED ALWAYS, and it is the true intent and meaning of the Grantor and the Agent, that if the Secured Obligations shall be fully and finally paid and discharged according to the terms of the Credit Agreement, this Deed of Trust and the other Loan Documents and all Commitments are terminated, then this Deed of Trust shall cease and be void, otherwise it shall remain in full force and virtue.

[Page Ends Here; Signatures to Follow]

Unofficial Document

13

IN WITNESS WHEREOF, the Grantor has executed and delivered this Deed of Trust under seal as of the above written date.

JHO REAL ESTATE INVESTMENT, LLC,
a Florida limited liability company,

By: _____ (SEAL)
    John H. Owoc, Manager

STATE OF FLORIDA

COUNTY OF BROWARD

The foregoing instrument was acknowledged before me this 4 day of December 2020, by John H. Owoc, as Manager of JHO REAL ESTATE INVESTMENT, LLC, a Florida limited liability company, on behalf of said limited liability company.

_____
Notary Public

My Commission Expires: 01 |29| 2022

PATRICIA MARIE ARIAS
Notary Public – State of Florida
Commission # GG 180248
My Comm. Expires Jan 29, 2022
Bonded Through National Notary Assn

[Affix Seal]

Unofficial Document

CHAR2\2313747v3

**TRUIST BANK,**
as Administrative Agent

By:
Name: KEITH ARNOLD
Title: SVP

STATE OF _Florida_
COUNTY OF _Broward_

The foregoing instrument was acknowledged before me this _17_ day of November, 2020, by _Keith Arnold_, as _SVP_ of Truist Bank, a North Carolina banking corporation on behalf of said banking corporation.

_____
Notary Public

My Commission Expires

```
CAMILLE P. LALL
Notary Public - State of Florida
Commission # GG 063665
My Comm. Expires Feb 13, 2021
Bonded through National Notary Assn.
```

[Affix Seal]

Unofficial Document

**[Signature Page to Amended and Restated Arizona Deed of Trust]**

EXHIBIT A

Legal Description

That portion of the Northwest quarter of Section 15, Township 1 North, Range 2 East of the Gila and Salt River Meridian, Maricopa County, Arizona, described as follows:

Beginning at the Northwest corner of the North half of the Southwest quarter of said Northwest quarter;

Thence South (assumed bearing for purposes of this description) along the West line of said section, a distance of 660.00 feet to a line that is parallel with and distant 1968.46 feet Southerly measured at right angles from the North line of said section;

Thence South 89 degrees 50 minutes East, along said parallel line, a distance of 1307.28 feet to a line that is parallel with and distant 10.00 feet Westerly, measured at right angle, from the East line of said Southwest quarter, last said parallel line being also the center line of an existing drill track;

Thence North 00 degrees 01 minutes West, along last said parallel line, a distance of 1095.68 feet to a point of CUSP;

Thence Southwesterly along a tangent curve concave Northwesterly having a radius of 642.43 feet, through a central angle of 05 degrees 43 minutes 29 seconds, an arc distance of 64.19 feet;

Thence South 05 degrees 42 minutes 29 seconds West, tangent to said curve, a distance 26.38 feet;

Thence Southwesterly and Westerly along a tangent curve to the right having a radius 382.24 feet, through a central angle of 84 degrees 27 minutes 31 seconds, an arc distance of 563.45 feet to a point of tangency in a line that is parallel with and distant 1308.46 feet Southerly, measured at right angles, from said North line;

Thence North 89 degrees 50 minutes West, along last said parallel line, a distance of 919.70 feet to the point of beginning.

EXCEPTING THEREFROM that portion of said property lying below a depth of 500.00 feet measured vertically from the contour of the surface there Unofficial Document

Provided, however, that said grantor, its successors and assigns, shall not have the right for any and all purposes to enter upon, into or through the surface of the portion of said property lying above 500.00 feet, measured vertically from the contour of the surface of said property, as reserved in Deed recorded in Docket 9581, Page 180 and also recorded in Docket 9590, Page 873; and

EXCEPT all rights retained by Southern Pacific Company, a Delaware corporation in Warranty Deed recorded in Docket 3976, Page 407 of official records of Maricopa County, Arizona.

CHAR2\2313747v3

# EXHIBIT D

Clerk of the Superior Court
*** Electronically Filed ***
M. Farrow, Deputy
7/12/2022 2:52:21 PM
Filing ID 14549120

1  Richard C. Gramlich (SBN 014449)

2  **TB** T I F F A N Y & B O S C O
        P.A.

SEVENTH FLOOR CAMELBACK ESPLANADE II
3  2525 EAST CAMELBACK ROAD
PHOENIX, ARIZONA 85016-4237
4  TELEPHONE: (602) 255-6000
FACSIMILE:  (602) 255-0103
5  EMAIL: rcg@tblaw.com

*Attorneys for Nexus Steel, LLC*

6

## IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

7

## IN AND FOR THE COUNTY OF MARICOPA

8

| | |
|---|---|
| NEXUS STEEL, LLC, an Arizona limited liability company, | Case No.  **CV2022-008873** |
| Plaintiffs, | **COMPLAINT** |
| v. | |
| JHO REAL ESTATE INVESTMENT, LLC., a Florida limited liability company, VITAL PHARMACEUTICALS, INC., a Florida corporation, d/b/a BANG, LLC, a Florida limited liability company, FABCO METAL PRODUCTS, LLC., a Florida limited liability company, BELVAC PRODUCTION MACHINERY, INC., a Virginia corporation, TRUIST BANK, a North Carolina company, ISEC, INC., a Colorado corporation, HEAVY EQUIPMENT MOVERS & INSTALLATION, LLC, a Delaware limited liability company, HARDROCK CONCRETE PLACEMENT CO. INC., an Arizona corporation, STELLAR GROUP, INC., a Florida corporation, FAITH TECHNOLOGIES INC., a Wisconsin corporation, INTEGRATED MASONRY, an Arizona company, HACI MECHANICAL CONTRACTORS, INC., an Arizona corporation, TRENCH SHORE RENTALS, an Arizona corporation, THE MARICOPA COUNTY TREASURER'S OFFICE, BLACK & WHITE CORPORATIONS 1-10, | **(Civil: Mechanic's Lien Foreclosure.)**  **(Commercial Assignment Requested)**  **(Tier III)** |

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-1-

1      Defendants.

2

3        Nexus Steel, LLC ("Nexus") as and for its Complaint against JHO Real Estate

4 Investment, LLC ("JHO"), Vital Pharmaceuticals, Inc. ("Vital") d/b/a Bang, LLC, Fabco

Metal Products, LLC ("Fabco"), Belvac Production Machinery, Inc. ("Belvac"), Truist Bank
5
("Truist"), ISEC, Inc. ("ISEC"), Heavy Equipment Movers & Installation, Inc. ("HEMI"),
6
Hardrock Concrete Placement Co., Inc. ("Hardrock"), Stellar Group, Inc. ("Stellar"), Faith
7
Technologies, Inc. ("Faith"), Integrated Masonry ("Integrated"), HACI Mechanical
8
Contractors, Inc. ("HACI"), Trench Shore Rentals ("Trench"), and the Maricopa County
9
Treasurer's Office ("Maricopa County Treasurer") affirmatively alleges as follows:

10                   **GENERAL ALLEGATIONS**

11      1.     Nexus at all times material hereto holds a valid Contractors License pursuant

12 to Arizona Revised Statutes, Title 32, Chapter 10.

13      2.     JHO is a Florida corporation, which owns and operates the subject Real

14 Property located at 1635 South 43rd Avenue, Phoenix, Arizona 85009, APN 105-14-001Q

15 ("Property") in Maricopa County, State of Arizona such that it is subject to this Court's

16 jurisdiction and venue.

17      3.     Vital is a Florida corporation, which operates an energy drink bottling facility at

18 the Property, in Maricopa County, State of Arizona such that it is subject to this Court's

jurisdiction and venue.
19
     4.     Fabco is a Florida LLC, which conducted business and acted as the general
20
contractor on the subject Property, in Maricopa County, State of Arizona such that it is
21
subject to this Court's jurisdiction and venue.
22
     5.     Belvac is a Virginia corporation, which recorded a Mechanic's Lien on the
23
subject Property, in Maricopa County, State of Arizona such that it is subject to this Court's
24
jurisdiction and venue.

25      6.     Truist is a North Carolina bank, which recorded a Deed of Trust on the subject

26 Property, in Maricopa County, State of Arizona such that it is subject to this Court's

27 jurisdiction and venue

28

7.     ISEC is a Colorado corporation, which recorded a Mechanic's Lien on the subject Property, in Maricopa County, State of Arizona such that it is subject to this Court's jurisdiction and venue.

8.     HEMI is a Delaware limited liability company, which recorded a Mechanic's Lien on the subject Property, in Maricopa County, State of Arizona such that it is subject to this Court's jurisdiction and venue.

9.     Hardrock is an Arizona corporation, which recorded a Mechanic's Lien on the subject Property, in Maricopa County, State of Arizona such that it is subject to this Court's jurisdiction and venue.

10.    Stellar is a Florida corporation, which recorded a Mechanic's Lien on the subject Property, in Maricopa County, State of Arizona such that it is subject to this Court's jurisdiction and venue.

11.    Faith is a Wisconsin corporation, which recorded a Mechanic's Lien on the subject Property, in Maricopa County, State of Arizona such that it is subject to this Court's jurisdiction and venue.

12.    Integrated is an Arizona company, which recorded a Mechanic's Lien on the subject Property, in Maricopa County, State of Arizona such that it is subject to this Court's jurisdiction and venue.

13.    HACI is an Arizona corporation, which recorded a Mechanic's Lien on the subject Property, in Maricopa County, State of Arizona such that it is subject to this Court's jurisdiction and venue.

14.    Trench is an Arizona corporation, which recorded a Mechanic's Lien on the subject Property, in Maricopa County, State of Arizona such that it is subject to this Court's jurisdiction and venue.

15.    Maricopa County Treasurer recorded a tax lien on the subject Property, in Maricopa County, State of Arizona such that it is subject to this Court's jurisdiction and venue.

16.    Black & White Corporations 1-10 are fictitious entities that may have other legal or equitable interests in the subject Property such that they are subject to this Court's jurisdiction and venue.

17.     This matter qualifies for Tier III treatment pursuant to Rule 26.2 A.R.C.P.

18.     On or about January 20, 2021, Nexus entered into a Subcontract Agreement ("Subcontract") with Fabco to provide and erect the structural steel, miscellaneous steel, and trench steel at the Property, for the lump sum contract amount of $733,448.00.

18.     Nexus, pursuant to its Subcontract, provided labor and materials as a licensed sub-contractor, to the Property between February 1, 2021 and December 22, 2021.

19.     On or about October 30, 2021, November 30, 2021, and December 31, 2021, Nexus submitted to Fabco its Pay Applications 1-3, in the total amount of $405,750.86, for labor and materials supplied to the Property up through that date.

20.     Notwithstanding its demand for payment, Nexus has not been paid the full sums it is due on its Pay Applications, in the total amount of $360,885.86.

21.     On or about February 2, 2021, Nexus provided a valid Preliminary 20-Day Notice,  as required by A.R.S. § 33-981 *et. seq.*, a true and correct copy of which is included in the documents attached hereto as Exhibit A.

22.     On or about January 20, 2022, Nexus recorded a valid Notice and Claim of Lien for Labor, Services, Materials, Machinery, Fixtures and/or Tools ("Mechanic's Lien") which was timely recorded with the Maricopa County Recorder's Office on January 20, 2022, recorder number 20220060823, a true and correct copy of which is attached hereto as Exhibit A.

23.     Concurrent with the filing of this lawsuit, Nexus has recorded a Notice of Lis Pendens on the Property.

## **Count I**

### **(Lien Foreclosure - All Defendants)**

24.     Nexus incorporates herein and by reference all previous allegations.

25.     Nexus has performed all acts necessary to secure a valid and enforceable Mechanic's Lien on the Property.

26.     Nexus' Mechanic's Lien shares equal priority with any other Mechanic's Lien.

27.     Nexus is entitled to have this Court determine and declare the rights, priority, and title of all lien claimants, and other parties' claiming an interest in the Property, and to have an order that Nexus' lien be foreclosed on the Property, which is to be sold to satisfy

all liens against it, in the order of their priority, treating all of the Mechanic's Liens as being in parity and to have the sales proceeds distributed accordingly.

28.     Pursuant to the Subcontract and/or A.R.S.§33-995(E) and 33-998(B), Nexus is entitled to recover its reasonable attorneys' fees and costs incurred herein.

**WHEREFORE,** Nexus requests this Court to enter Judgment in its favor and against all the Defendants, entering a Judgment of foreclosure in favor of Nexus and against all the Defendants, foreclosing out all subordinated interests to Nexus' mechanic's lien and entering an order for the sale of the Property, with the proceeds therefrom being first applied to satisfy any superior liens and then to satisfy Nexus' mechanic's lien, in a pro rata amount to the other mechanic's liens,  plus an award of a reasonable sum as and for Nexus' attorneys' fees and costs, pursuant to A.R.S.§12-341.01, A.R.S.§33-995(E) and/or 33-998(B).

## Count II

### (Breach of Subcontract - Fabco Metal Products, LLC)

29.     Nexus incorporates herein and by reference all previous allegations.

30.     On or about January 20, 2021, Nexus entered into a Subcontract with Fabco for the installation of all structural, miscellaneous and trench steel, for the lump sum of $733,448.00.

31.     Nexus performed approximately 55% of its work when work was stopped by the General Contractor, due to non-payment by the Owner.

32.     Pursuant to paragraph 9 of the Subcontract, Nexus is entitled to monthly progress payments in the amount it applies for from Fabco.

33.     Nexus applied for payments in October, November, and December of 2021 for the total amount of $405,750.86, for labor and materials supplied to the Property.

34.     Nexus only received payments in the amount of $44,865.00 from Fabco, leaving a balance due of $360,885.86.

35.     To the extent that Fabco was paid by the Owner for Nexus' work, Nexus is entitled to payment of that amount by Fabco.

36.     To the extent that Fabco has failed to forward payments it has received from the Owner to Nexus, it is in breach of paragraph 9 of the Subcontract.

37.     Nexus has been damaged in the amount of payments received by Fabco for Nexus' work, but not forwarded to Nexus, plus a reasonable sum as and for its attorneys' fees and costs and other expenses incurred pursuant to paragraph 11 of the Subcontract.

**WHEREFORE,** Nexus requests this Court enters judgment in its favor and against Fabco, awarding it as damages whatever sums Fabco received from JHO for Nexus' Scope of Work, and failed to forward on to Nexus, in an amount to be determined at trial, plus Nexus' reasonable attorneys' fees and cost incurred herein.

<u>**Count III**</u>

**(Unjust Enrichment - JHO Real Estate Investments, Inc. and Vital Pharmaceuticals)**

38.     All previous allegations are incorporated herein by reference as if set forth in their entirety.

39.     Nexus provided and installed structural steel, miscellaneous steel, and trench steel to the Property, which benefited the Property by the reasonable value of same.

40.     Nexus has not been paid $360,885.86 worth of its work and materials provided to the Property, resulting in an improvishment to Nexus.

41.     To the extent JHO and/or Vital have not paid in full, for the labor and materials supplied by Nexus to improve the Property, they have received an enrichment.

42.     It would be inequitable and unjust to allow JHO and/or Vital to be enriched by Nexus' labor and materials without having paid for same.

43.     In equity, Nexus is entitled to be paid the reasonable value of its labor and materials provided to the Property, which have not been paid for, in the amount of $360,885.86.

44.     This matter arises out of Contract such that Nexus, upon prevailing, is entitled to the recovery of its reasonable attorneys' fees and costs incurred, pursuant to A.R.S.§12-341.01.

**WHEREFORE,** Nexus requests that this Court enters judgment in its favor and against JHO and/or Vital awarding to Nexus the reasonable value of all labor and materials supplied by Nexus which JHO and/or Vital have not paid for, in an amount to be determined at trial, plus a reasonable sum as and for its attorneys' fees and costs.

-6-

DATED this 12th day of July 2022.

**TIFFANY & BOSCO, P.A.**

By: /s/ *Richard C. Gramlich*
    Richard C. Gramlich
    Seventh Floor Camelback Esplanade II
    2525 East Camelback Road
    Phoenix, Arizona 85016-9239
    ***Attorneys for Nexus Steel, LLC***

E-filed through AZTurboCourt this
12th day of July 2022, and
copies mailed to:

By: /s/ Susan Saville

-7-

EXHIBIT A

OFFICIAL RECORDS OF
MARICOPA COUNTY RECORDER
STEPHEN RICHER
20220060823  01/20/2022  04:39
ELECTRONIC RECORDING

1642720598956-26-1-1--
morenoa

WHEN RECORDED RETURN TO:

CONSTRUCTION NOTICE SERVICES, INC.
P.O. Box 82190
Phoenix, AZ  85071
(602) 493-2042
AZCLDP #80775

NOTICE AND CLAIM
OF
MECHANIC'S AND MATERIALMEN'S LIEN
A.R.S. Sec. 33-993 (A)

| | |
|---|---|
| Claimant: | Nexus Steel, L.L.C.<br>214 South Hamilton Place<br>Gilbert, AZ 85233 |
| Owner or Reputed Owner: | JHO Real Estate Investment, Inc.<br>1600 North Park Drive<br>Weston, Florida 33326 |
| Tenant/Lessee | Vital Pharmaceuticals, Inc.<br>Bank Energy<br>1600 North Park Drive<br>Weston, Florida 33326 |
| Prime Contractor: | Stellar Group, Inc.<br>2900 Hartley Road<br>Jacksonville, Florida 32257 |
| Real Property Address: | Phoenix Can (Bang Energy)<br>1635 South 43rd Avenue<br>Phoenix, Arizona 85009<br>County of Maricopa<br>APN: 105-14-001Q |
| Real Property Description: | Legally situated within Section 16, Township 1 North, Range 2 East of the Gila and Salt River Base and Meridian, Maricopa County, Arizona. Further described in Exhibit A, incorporated by reference hereto. |
| Amount of Claim: | Claims a lien in the principal amount of $313,512.91, together with Lien preparation fees of $250.00, interest from the date due until paid at the rate of 10% per annum, and attorney's fees and costs incurred in collecting this debt. |

1. I am the Claimant or have knowledge of the facts of this claim and make this Affidavit in compliance with A.R.S. sec. 33-993.

   Nexus Steel, L.L.C.
   214 South Hamilton Place
   Gilbert, AZ 85233

2. Claimant has furnished labor, materials, machinery, fixtures or tools in the construction, alteration, or repair of the buildings, other structures, pertaining to the improvements on subject real property, specifically: Steel Supply and Erection, further outlined in the Subcontractor Agreement. Contractor's License 221966.

3. Claimant was employed by or furnished materials to:

   Fabco Metal Products, LP
   1490 Frances Drive
   Daytona Beach, FL 32124

20220060823

4. The labor, materials, machinery, fixtures or tools were furnished pursuant to a Subcontract Agreement. Subcontract Agreement and Payment Applications evidencing the debt are attached as Exhibit B, incorporated by reference hereto. Terms are Net 30 with interest being assessed at the contractual rate of 10% per annum from the date the debt became due until paid in full.

5. Upon information and belief, labor, materials, machinery, fixtures or tools were first furnished to the job site approximately: January 26, 2021

6. The building, structure, or improvement, or the alteration or repair of such building, structure or improvement was completed as to Claimant's portion: December 24, 2021 The final date was due to a Stop work order from the General Contractor dated December 22, 2021.

7. The Preliminary Twenty-Day Notice required by A.R.S. sec. 33-992.01 was duly and timely served on February 2, 2021, copies of the Notice, Proof of Service and Affidavit of Service by Mail are attached as Exhibit C, incorporated by reference hereto.

8. For the purpose of fixing this lien, Claimant has made this Notice and Claim of Lien, and delivered the original thereof to the County Recorder of Maricopa County, Arizona to be recorded as required by law, and causes duplicates hereof to be served upon the Contractor and Reputed Owners, if they can be found within Maricopa County (the reputed owners are believed to be located within Maricopa County, Arizona).

9. I hereby acknowledge that I have knowledge of and have hereinafter furnished information of the facts as contained herein; and that I make this Affidavit to the best of my knowledge, information and belief on behalf of said Company/Claimant.

WHEREFORE, Claimant demands a lien on subject Real Property and all improvement thereon in the amount set forth above and claims priority over all liens, mortgages, encumbrances upon the subject property attaching subsequent to the time labor was commenced or materials furnished to the subject property.

Nexus Steel, L.L.C. (Claimant)

By _____

Print Name: _ROBERT MARTENS_

Title: _MANAGING MEMBER_

SUBSCRIBED AND SWORN TO before me this 20ᵗʰ day of January, 2022 .

MICHELLE GRIFFIN
Notary Public Arizona
Maricopa County
Commission # 551968
My Comm. Expires Oct 15, 2022

10|15|2022
_____
My Commission Expires:

_____
Notary Public

20220060823

EXHIBIT A

## EXHIBIT A

## LEGAL DESCRIPTION

That portion of the Northwest quarter of Section 15, Township 1 North, Range 2 East of the Gila and Salt River Meridian, Maricopa County, Arizona, described as follows:

Beginning at the Northwest corner of the North half of the Southwest quarter of said Northwest quarter;

Thence South (assumed bearing for purposes of this description) along the West line of said section, a distance of 660.00 feet to a line that is parallel with and distant 1968.46 feet Southerly measured at right angles from the North line of said section;

Thence South 89 degrees 50 minutes East, along said parallel line, a distance of 1307.28 feet to a line that is parallel with and distant 10.00 feet Westerly, measured at right angle, from the East line of said Southwest quarter, last said parallel line being also the center line of an existing drill track;

Thence North 00 degrees 01 minutes West, along last said parallel line, a distance of 1095.68 feet to a point of CUSP;

Thence Southwesterly along a tangent curve concave Northwesterly having a radius of 642.43 feet, through a central angle of 05 degrees 43 minutes 29 seconds, an arc distance of 64.19 feet;

Thence South 05 degrees 42 minutes 29 seconds West, tangent to said curve, a distance 26.38 feet;

Thence Southwesterly and Westerly along a tangent curve to the right having a radius 382.24 feet, through a central angle of 84 degrees 27 minutes 31 seconds, an arc distance of 563.45 feet to a point of tangency in a line that is parallel with and distant 1308.46 feet Southerly, measured at right angles, from said North line;

Thence North 89 degrees 50 minutes West, along last said parallel line, a distance of 919.70 feet to the point of beginning.

EXCEPTING THEREFROM that portion of said property lying below a depth of 500.00 feet measured vertically from the contour of the surface thereof;

Provided, however, that said grantor, its successors and assigns, shall not have the right for any and all purposes to enter upon, into or through the surface of the portion of said property lying above 500.00 feet, measured vertically from the contour of the surface of said property, as reserved in Deed recorded in Docket 9581, Page 180 and also recorded in Docket 9590, Page 873; and

EXCEPT all rights retained by Southern Pacific Company, a Delaware corporation in Warranty Deed recorded in Docket 3976, Page 407 of official records of Maricopa County, Arizona.

20220060823

# EXHIBIT B



22-Dec-2021

Fabco Metal Products, LLC. – Structural & Misc. Steel - 23006976-SUB-05
Bob Ralston
1490 Frances Drive
Daytona Beach, FL 32124
bralston@fabcometal.com

**RE: NOTICE OF WORK STOPPAGE**
*Bang Phoenix Can Manufacturing*
Project #23006976

Dear Bob:

Please accept this letter as formal notification and instruction to stop work on the Bang Phoenix Can Manufacturing project. In accordance with the General Conditions of the Prime Contract, Stellar informed the Owner on 17-Dec-2021 of its intent to stop work after seven (7) days due to non-payment by the Owner.

Stellar has been in contact with the Owner and was advised that the Owner believes it will have funds in place near the end of January 2022, or sooner. Stellar has informed the Owner that it will restart work at the site when all outstanding balances are paid, and when adequate assurances are given relating to the Owner's ability to fund the project through completion.

Accordingly, you are hereby instructed that the last normal working day on site will be 24-Dec-2021. It is understood that ongoing works may take several weeks to make safe prior to demobilizing. Stellar supervision tentatively plans to remain on site until 7-Jan-2022. Please ensure that your work areas are cleaned, rental equipment is demobilized, and materials are stowed and secured prior to departing the site. Stellar will be in contact as soon as updated information is available.

Stellar will be reaching out to each subcontractor to confirm demobilization and suspension plans over the next two (2) weeks.

Stellar trusts that it has your understanding with this matter and hopes for a prompt resolution so that this project may continue.

Sincerely,
STELLAR GROUP, INC.

Greg Ortego
Project Manager II

xc: Derek Bickerton
Mike Davis
Chuck Harrison
Kerry Gauthier

Fabco Metal Products LLC          Project # 20-042

# SUBCONTRACT AGREEMENT

This Subcontract Agreement (hereinafter "Agreement") is between FABCO METAL PRODUCTS LLC, located at 1490 Frances Drive, Daytona Beach, Florida 32124 (hereinafter Fabco) and Nexus Steel LLC (hereinafter "Erector") for Erector to provide certain labor, tools, construction equipment and consumable supplies all as more particularly described below for that project known as: Bang Energy – Phoenix Can Manufacturing (hereinafter the "Project") which project is located at: 1635 South 43rd Ave, Phoenix, AZ 85009 and has been assigned the following project number by Fabco 20-042

1. NOTICES AND COMMUNICATION: All written notices called for herein shall be mailed to the appropriate party postage prepaid and addressed to the appropriate address specified above, or hand delivered to the appropriate address specified above. Any party hereto wishing to change the address at which it is to receive notices must provide the other party with written notification of such change of address.

2. CONTRACT AMOUNT: FOR THE LUMP SUM OF $733,448.00 (HEREINAFTER "Contract Amount") the Erector agrees to furnish and pay for all taxes, labor, tools, construction equipment and consumable supplies necessary to furnish and completely install those goods, equipment, materials, products and other matters which are more particularly described in Attachment "A" which is attached hereto and incorporated herein by reference. Everything described in Attachment "A" including the unloading of materials, the verification of quantity of items received against respective packing lists, as well as all labor, tools, construction equipment and consumable supplies necessary to furnish and install everything described in Attachment "A" is hereinafter called the "Work" All Work is to be performed in a thorough and workman-like manner in accordance with all sections of the Plans, Specifications and other contract documents applicable to the Project. The Erector is bound to Fabco by the same terms and conditions and to the fullest extent by which Fabco is bound to the General Contractor under the contract.

3. GENERAL PROVISIONS: The Erector in consideration of the Contract Amount, and other good and valuable consideration, agrees as follows:

(a) to at all times supervise and direct the Work to ensure it is performed according to the American Institute of Steel Construction (AISC) guidelines. The Erector shall solely be responsible for all construction means, methods, techniques, sequences and procedures for coordinating all portions of the Work, unless otherwise specifically noted, the Erector shall provide and pay for all labor, equipment, tools, construction equipment and machinery necessary for the proper execution and completion of the Work. THE ERECTOR SHALL AT ALL TIMES ADEQUATELY STAFF THE WORK SITE WITH SKILLED WORKMEN UNDER THE FULL-TIME SUPERVISION OF EITHER A QUALIFIED FOREMAN OR SUPERINTENDENT:

(b) to at all times keep the project free from accumulation of waste materials or rubbish caused by his operation. To accomplish this Erector agrees that on a daily basis the waste materials or rubbish caused by his operation shall be removed from the Project site or alternatively, shall be placed in a dumpster if the General Contractor provides a dumpster on the Project site. If the Erector fails to clean up, Fabco may do so and the cost thereof shall be back-charged against the Contract amount owed to Erector hereunder against the Contract Amount owed to Erector hereunder or, if such sums are inadequate, Fabco shall be entitled to recover such charges from Erector.

(c) to provide and maintain a separate performance and payment bond with a surety acceptable to Fabco for the faithful performance of this agreement in the amount of $ _____ N/A _____ payable to Fabco or to whom Fabco may designate. Failure of Erector to supply this bond or to keep this bond in full force and effect at all times while this Agreement is in effect shall give Fabco, at his sole option, the right to rescind this Agreement with or without prior notice to the Erector and upon such rescission Fabco shall have no obligations to Erector other than under the doctrine of Quantum Meruit for Erector's performance prior to rescission;

(d) to perform Work only during working hours as set forth by the Contractor's Project Superintendent other designated representative;

(e) to perform the Work subject to the direction and satisfaction of the Project Architect, Project Engineer, Project Owner, Project Contractor (hereinafter the Architect, Engineer, Owner and Contractor respectively) and Fabco , and that decisions of said Architect, Engineer, and Subcontractor as to the true construction and meaning of the Plans and Specifications shall be final. Fabco will furnish to the Erector such additional information and Plans as may be prepared by the Architect or Engineer to further describe the Work to be performed under this agreement and Erector shall conform to and abide by the same in so far as they are consistent with purpose and intent or the Plans and Specifications referenced in Attachment "A" Fabco reserves the right, from time to time, 'whether the Work or part thereof has or has not been completed, to make changes, additions, or omissions to the Work as Fabco may, deem necessary, and upon Fabco communicating such changes, additions or omissions to the Erector by written order, such changes, additions or omissions shall be followed by the Erector. NO CHANGES, ADDITIONS, DELETIONS OR REVISIONS TO THE WORK SHALL BE BINDING OR ENFORCEABLE OR A PART OF THIS AGREEMENT UNLESS AND UNTIL THEY ARE REFLECTED IN A WRITTEN CHANGE ORDER SIGNED BY FABCO.

(f) to provide all temporary facilities, storage, scaffolding, lifting and material handling required for Erector to execute the Work;

(g) to provide all cutting, patching, backing and supports for the installation of the Work.

(h) to provide a trained and qualified safety person on the project at all times who will be responsible for all safety procedures as outlined by O.S.H.A. or any other governing body All cost associated with any fines levied against this Erector or caused to be levied against another party on this project arising out of or relating to the Work of Erector shall be borne by this Erector

(i) Erector shall submit a list of any proposed sub-tier subcontractors and Erector shall not delegate or subcontract to others the performance of any obligations or Work required or contemplated by this Agreement without prior written consent from Fabco. If the Erector enters into agreements with any sub-tier subcontractor, it shall require each sub-tier subcontractor to agree in writing to be bound by all terms, conditions and provisions of this Agreement to the full extent that the Erector is obligated to Fabco

1 of 9

20220060823

**Fabco Metal Products LLC**                    Project # 20-042

4. <u>CONTRACT TIME DELAY, ACCELERATION, DAMAGES</u>:

(a) Contract Time. The Work shall be commenced by Erector no later than 3 calendar days after Fabco has notified Erector to commence the Work, The Erector shall perform the Work according to the construction schedule described in Attachment "A" (hereinafter referred to as the "construction schedule.") at a speed that will not cause delay in the progress of Fabco's work or work being performed by others at or on the Project, and shall complete the Work within the time specified in the construction schedule;

(b) No Damages For Delay. Except as provided in the following sentence, Erector shall not be entitled to any claim whatsoever for damages based on "delay" whether such delay is attributable to breach of the agreement, tort, acts of God or any reason whatsoever In the event of delay Erector's sole and exclusive remedy shall be an extension of time for completion of the Work unless the delay is caused directly and solely by material active interference with the Work by Fabco or caused directly and solely by unreasonably long and unjustifiable delays by Fabco in carrying out its duties under the Agreement in either of which cases Erector shall be entitled to damages This No Damages for Delay clause applies to all damages whatsoever including but not limited to loss of profits, loss of use of equipment. tools, materials or personnel; home office and branch office overhead expenses; job site expenses; equipment rental; increase prices; additional employees and third party claims.

(c) Acceleration To Regain Construction Schedule. It is agreed time is of the essence, therefore if in Fabco's opinion the Erector falls behind the construction schedule in the progress of the Work, Fabco may direct the Erector to take such steps than Fabco deems necessary to improve the rate of progress, including but not limited to requiring Erector to increase the labor force, number of shifts and/or overtime operations. To increase days of work and. at the option of Fabco, requiring Erector to submit for approval supplementary schedules demonstrating the method and rate at which Erector will regain the construction schedule, all without additional costs or charge to Fabco.

When the Erector is requested by Fabco in writing to accelerate or expedite to regain the construction schedule and to provide supplementary schedules demonstrating the method and rate at which he will regain the construction schedule, the Erector shall promptly submit for approval such supplementary schedules as may be necessary to demonstrate the method and rate at which the schedule will be regained. If the Erector does not promptly reply with such directions, Fabco has the right, after a three day written notice and opportunity to cure, to terminate this Agreement. IF ERECTOR MUST ACCELERATE TO REGAIN THE CONSTRUCTION SCHEDULE. ERECTOR IS PROHIBITED FROM ASSERTING A CLAIM BASED ON ACCELERATION OR "IMPLIED" OR "CONSTRUCTIVE" ACCELERATION.

(d) <u>Temporarily Accelerating When Not Behind The Construction Schedule.</u> If at time when the Erector is not behind the construction schedule Fabco in writing requires, for short periods of time (periods not exceeding five (5) consecutive working days), that the Erector perform Work outside the normal working hours, the Erector shall do so; in which case the Erector will be reimbursed only for actual labor premium payments made for the overtime hours so worked. No percentage fee will be applied to such overtime premium payments.

(e) <u>Impact Damage Generally Prohibited.</u> Except as authorized in section 4(e) below, Erector shall not be entitled to any claim whatsoever for impact damages arising directly or indirectly from Fabco's order to accelerate or expedite the Work whether or not at the time of such request the Erector is on or behind the construction schedule. As used here in the phrase "impact damages" means all damages or problems arising directly or indirectly from the acceleration or expedition of the Work, including but not limited to the loss of efficiency, loss of productivity. loss due to out of sequence scheduling, loss due to errors because of acting in haste or loss due to repetition.

(f) <u>Limited Impact Damages</u> If at a time when the Erector is not behind the construction schedule Fabco by written order requires that the work be accelerated or expedited for a substantial period of time so that such request does not fall within subsection 4(d) above then prior to the Erector implementing the acceleration Erector shall issue a Change Order changing the construction schedule and changing the contract amount stated herein. In negotiating the increase in the Contract Amount the Erector shall take into account the Erector's increased costs in carrying out the Work due to loss of efficiency, loss of productivity and out of sequence scheduling The Eichleay Formula shall not. however, be used. EXCEPT AS SPECIFICALLY PROVIDED IN THIS SUBSECTION (f) THE Erector is expressly and specifically prohibited from seeking any claims for impact damages, and neither any Court nor any Arbitration Panel shall consider loss of efficiency, loss of productivity, out of sequence scheduling or other impacts on Erector resulting from acceleration when determining or deciding any disputes between Fabco and Erector

(g) <u>Liquidated Damages.</u> In the event Fabco is liable for liquidated damages for delay In completion of it's work to contractor caused by the Erector, the Erector is liable for and shall pay to Fabco the identical sum of money as fixed and agreed liquidated damages (not a penalty) for each and every calendar day after the Completion Date, as amended, that the Work is not finished and completed in compliance with the Plans and Specifications

5. <u>TERMINATION FOR FAILURE TO PERFORM.</u> If Fabco reasonably believes the Erector's failure to adequately or timely perform the Work is causing or threatening to cause substantial delay in the general progress of the Project, Fabco shall have the right to terminate this Agreement forty-eight (48) hours after giving written notice to Erector at the above given address. Fabco will then have the right to negotiate and execute a contract or contracts with other Erectors for the completion of the remaining Work. All losses, damages and <u>expenses</u>. including attorney's fees in the prosecution or defense of any action or suit, incurred by or resulting to Fabco on account of the Erector's failure to timely or adequately perform shall be borne by and charged against Erector, and Fabco may recover by deducting any such losses, expenses and damages from any money owed Erector, and both the Erector and his surety agree to pay Fabco such losses. damages, expenses and attorneys fees.

5. <u>DEFECTIVE WORK</u>:

(a) <u>Approval or Disapproval</u>. All Work shall be performed subject to the final approval by the designing or supervising Architect, Engineer. Owner and Contractor, and their respective decisions as to the performance of the Work in accordance with the plans, specifications and local codes shall be final.

(b) <u>Replacement and Repair of Unacceptable Work</u>. Any Work condemned or not approved for which the Erector is responsible shall, within twenty-four (24) hours after issuance of written notice of such condemned or unapproved Work, be removed, replaced, and/or repaired, including any part of the Project damaged or destroyed in removing or making good said disapproved or condemned Work. Erector's failure to so make these repairs will result in Fabco, without notice, bringing in another Erector or one of Fabco's employees, at an hourly rate per man, plus material and equipment cost, to repair the same The charge for these repairs, if done by Fabco, including repairs to damages caused to the Project as set out above, will be deducted from any balance due the Erector on the Contract Amount, if the balance owed the Erector is not sufficient to cover the total cost of such repairs, Fabco reserves the right to institute legal proceedings against Erector for the balance plus due plus attorney's fees, cost and interest.

Fabco Metal Products LLC                    Project # 20-042

7 INSURANCE AND INDEMNITY:

(a) Purchased By Erector. Erector shall purchase and maintain with respect to the Work general liability insurance with minimum policy limits of $1,000,000 property damage and $1,000,000 / 5,000,000 wrongful death or personal injury (or) greater if so specified in an Addendum hereto, Attachment "B" Insurance). The Erector's General Liability and Excess Liability insurance policies shall be endorsed to name Contractor(Fabco) , General Contractor and Owner as Additional Insured on a primary non-contributory basis. Erector shall obtain Workman's Compensation coverage which complies with state statues in the jurisdiction where Work is to be performed. The Erector shall obtain Disability Insurance (Statutory Limits). Erector warrants that such insurance as listed above is in force and effect as of the time this Agreement is executed as evidenced by the attached Certificates of Insurance. Should the Erector fail to provide current Certificates of Insurance evidencing the required coverages, then Fabco may declare this Agreement in default. If at any time all such required coverages is not in force, Fabco may retain all monies due and owing to Erector until such time as acceptable current certificates are furnished showing all required coverages are in force

(b) Vandalism  Fabco, General Contractor and Owner shall not be held liable for vandalism to Erector's Work until accepted by the General Contractor, Architect and Owner  Erector at its expense is to purchase insurance to cover such risk;

(c) Binding Nature of Insurance Company Settlements and Adjustments. Erector shall be bound by any and all adjustments or settlements which shall be made between Fabco and/or the Owner and the Insurance Company or Companies insuring such vandalism losses;

(d) Indemnification of Fabco: The Erector shall defend. indemnify and save Fabco, the General Contractor and Owner harmless against and from any and all claims, including but not limited to claims for property damage, bodily injury, and occupational illness or accidents, arising from or related to any act or omission of the Erector, or any of its agents, Subcontractors, servants, employees or licensees.  or of any other person or entity for whose acts or omissions may be or is alleged to be liable; or arising from any breach or default on the part of the Erector in the performance of any covenant or agreement to be performed pursuant to the terms of this subcontract; or arising from any act or negligence of Fabco, the General Contractor and Owner, or from any equipment or materials used by Erector or its agents, Subcontractors, servants, employees or licenses. This provision shall apply to all claims of any kind whatsoever which are caused by or related to performance of work required hereunder, or based upon any violations of any statute, ordinance, building code, or regulations. The parties agree that the limitation on indemnification for damages, losses or expenses caused or alleged to be caused by the negligent acts or omissions of any Indemnitee is one hundred [100] times the contract amount, subject to a minimum of $1,000,000 and a maximum of $5,000,000 as required by F.S. 725.06  Erector shall indemnify Fabco, the General Contractor and Owner, for all costs, reasonable attorney fees, expenses and liabilities incurred in connection with any claim, action or proceeding or (threat thereof) covered by this paragraph.

8. CHANGES IN WORK: Fabco, without invalidating the Agreement. may order changes in the Work within the general scope of the Agreement consisting of additions, deletions or other revisions. When additions, deletions or other revisions are made, the Contract Amount shall be adjusted accordingly  Such additions, deletions or other revisions shall be at a negotiated price in accordance with Fabco's agreement with the Owner, and shall be added to or deducted from the Contract Amount. No changes, additions, deletions or revisions shall be made in any portion of the Work unless and until approval is reflected in a written change order signed by Fabco.

9.    PAYMENTS:

(a)  Monthly Progress Payments. Payment shall be made on or about the 20TH day of each month to Erector in an amount equal to ninety percent (90%) of the value of completed Work as shown on all approved progress reports RECEIVED BY THE 20TH DAY of the preceding month or received within a different time frame if such is agreed to in writing by Fabco. Said monthly progress payments are specifically conditioned upon none of the provisions of the Agreement being in default. The final payment shall be made forty-five (45) days after completion of The Project, upon approval and acceptance of the Project by the designing or inspecting Architect, Engineer, Contractor and Fabco. Not withstanding anything herein to the contrary. It is specifically understood and agreed that any payment to Erector for the Work is absolutely dependent upon Fabco receiving payment from Contractor

(b) Payment Affidavits; Lien Waivers. A condition precedent to the Erector receiving either a progress or final payment hereunder is the furnishing by the Erector of a sworn affidavit stating, that all lienors or prospective lienors have been paid in full, or, if the fact be otherwise, showing the name of each lienor who has not been paid in full and the amount due or to become due each for labor, services or materials furnished and the reason for non-payment. Fabco may at its option pay prospective lienors direct or by joint check and may require lien waivers from prospective lienors and from Erector prior to making progress or final payment to Erector  Receipt of any lien notice to Owner or payment affidavit listing prospective lienors entitle Fabco, at it's option, to either make payment by a check jointly payable to Erector and such prospective lienors or the right to condition payment on receipt of lien waivers from said prospective lienors.

(c)  Payment Does Not Constitute Acceptance of Defective Work. No payments made under this Agreement shall be conclusive evidence of the performance of this Agreement contract either wholly or in part, and no payments shall be construed to be acceptance of defective Work;

(d) Title to Work. Upon receipt of payment by Erector, Erector warrants and guarantees that title to all Work, materials and equipment will pass to the Owner free and clear of all liens, claims, security interest or encumbrances of any kind, Erector shall protect and save harmless Fabco and Owner from any liens, claims, security interest or encumbrances growing out of or resulting from Work performed pursuant to this Agreement. Should a claim of lien be filed as a result of the Erector's failure to pay for materials, labor or equipment rental furnished as part of the Work Fabco may declare this Agreement in default and all expenses, including reasonable attorney's fees, incurred in defending against, settling or paying said liens shall be reimbursed to Fabco by Erector

10. TERMINATION. In the event Erector is adjudged bankrupt or makes a general assignment for the benefit of its creditors, or if a receiver is appointed on account of Erector's insolvency or if Erector persistently and/or repeatedly refuses or fails to supply an adequate number of skilled workers or proper materials or equipment or otherwise substantially fails to perform the Work, then Erector shall be in default under this agreement and upon giving of 48 hours notice, Fabco may terminate this Agreement without any liability whatsoever (other than for Work properly performed prior to termination) and may hold Erector liable for any and all damages or losses directly or indirectly due to Erector's default, including but not limited to additional expenses over the Contract Amount to complete the Work and all attorney's fees and costs resulting from Erector's default.

11 DISPUTES, FEES AND EXPENSES.

(a)  Disputes Not To Delay Work. Work which is the subject of a claim or dispute shall be promptly carried out by the Erector without awaiting settlement or final resolution of arbitration or litigation arising from such claims or dispute.

20220060823

Fabco Metal Products LLC                    Project # 20-042

   (b)   **Arbitration.** Any and all claims or disputes arising directly or indirectly from the application, interpretation or enforcement of this Agreement involving sums of money not in excess of $ 50,000.00 shall be resolved by binding arbitration between the parties hereto in accordance with the Construction Industry Rules or the American Arbitration Association in effect at the time of the arbitration. The prevailing party in such arbitration proceeding shall be entitled to receive as a separately set out portion of the award its reasonable attorney's fees and costs incurred in preparing for and participation in the arbitration proceedings.

   (c)   **Litigation.** Any and all claims or disputes arising directly or indirectly from the application, interpretation or enforcement of this Agreement involving sums of money exceeding $50,000.00 shall be resolved by litigation. The prevailing party in any such litigation proceedings shall be entitled to recover litigation related fees, including but not limited to reasonable attorneys fees, reasonable expert witness fees, reasonable transcript fees and charges and other costs in addition to court costs as long as such fees and costs were incurred as part of a good faith preparation for said litigation whether or not the work product produced as a result of such fees and charges is actually used at hearings or trials, and this provision shall be applicable to both Trial, Appellate Court and Bankruptcy Court proceedings;

   (d)   Florida Law, Venue. Any arbitration or litigation arising directly or indirectly from the interpretation, application or enforcement of this Agreement shall be construed in accordance with the laws of the State of Florida and the venue for any such arbitration or civil litigation shall be in Volusia County, Florida, the county in which this Agreement has been finally accepted.


      IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year indicated below, with the effective date of this Agreement being the date the last party hereto executes the Agreement.


DATE _____          Date _____
**FABCO METAL PRODUCTS LLC**          ERECTOR: Nexus Steel LLC

                                       Robert D Martens    Digitally signed by Robert D Martens
                                                           DN, C=US,
                                                           E=rob.martens@nexussteel.com,
                                                           O="Nexus Steel, LLC" OU=Owner,
                                                           CN=Robert D Martens
                                                           Date: 2021.01.20 10:56:58-07'00'

By: _____    By: _____
Shane King, President                   Print Name / Title:_____


4 of 9

20220060823

Fabco Metal Products LLC                    Project # 20-042

# ATTACHMENT "A"

**Date: 1-12-21**
**Project: 20-042**
**Location: 1635 South 43rd Ave., Phoenix, AZ 85009**

Scope of Work Under this Contract is per FABCO'S "Shop Drawings," Contract Drawings and Contract Specifications. The following list is general in nature and may or may not mention each specific item covered under this Contract. **Inclusive of Contract Drawings dated on or before 11/24/20.**

Lien waivers (attached for reproduction) are to be submitted with each application for payment, pay request will not be processed unless the aforementioned is received with the current application for payment. Application for payment must be on the AIA Document G702 and G703.

Scope of Work to Include:
Install:

1. Structural Steel
2. Columns and beams.
3. 5/16" galvanized checker plate @ platforms attached with 3/8" diameter galvanized self drilling screws, wafer head (recessed) Weld between supports @ side lap.
4. Lower platform framing per drawing S1200A.
5. Upper platform framing per drawings S1200B, S1210, S1220, S1230, S1240.
6. Cooling tower framing with WT bracing (galvanized) per A, B/S1300.
7. Columns, beams, perimeter bent plate and wall shear plates per drawing S1302.
8. Approximately one hundred and eighty (180) linear feet of ledger angle per drawing S1301.
9. 3/8" x 6" bent plates @ existing columns per detail 3/S1300.
10. ¼" perimeter bent plates per detail 4/S1300.
11. HSS 4" x 4" x ¼" tube braces per detail 5/S1300.
12. Angle bracing per drawing S1220A (between lines 20-21/E-F)
13. Channel beams per drawing S1220A (between lines 20-21/E-F).
14. Six (6) HSS 12" x 12" x ¼" tube columns per drawing S3001.
15. Twelve (12) HSS 12" x 4" x ¼" tube columns, twelve (12) HSS 12" x 4" x ¼" tube horizontals, twelve (12) 5" x 5" x ¼" angle supports @ door frames per drawing S3010.
16. Epoxy anchoring of columns as indicated per details 9 &10/S5004.
17. Two-line perimeter safety cable where required
18. Miscellaneous Steel
19. All exterior stairs & guardrails galvanized; all interior stairs guardrail and checker plate to be galvanized, stairs prime painted.
20. Two (2) exterior stairs per drawings A1110, A3102 and A4101.
21. Exterior ramp and stair railing per drawings A1110, A3102 and A4201.
22. Thirteen (13) interior switchback stairs per drawings S1200A & S1200B.
23. Six (6) 'straight' interior stairs per drawings S1200A & S1200B.
24. Four (4) small interior stairs to grating platforms per drawing S1200A.
25. Galvanized guardrail at interior platforms per drawings A1310, A1320, A1330, A1340. Approximately 3,000 linear feet.
26. Trench Steel
27. Water Foundation, Trenches and Sump per 'ENERGY-PHX-B07-WA' drawing sheets 1-7. Includes W10 x 21 stainless steel sub base framing with angle and bar attachment (Items 1-5), stainless steel shims at anchor bolt locations, fiberglass grating at trenches and pits, stainless steel sump pit ladder and stainless steel sump liner.
28. Wet Can Trench & Die Coolant Sump Steel per 'ENERGY-PHX-B07-WC' drawing sheets 1-7. Includes galvanized sump frame and grating, TS 4" x 3" x ¼" galvanized

20220060823

Fabco Metal Products LLC                    Project # 20-042

tube steel for grating support (Items 1-8), galvanized grating at trench (Items 9-10) and galvanized guardrail where indicated.

29. Cupper Foundation trench grating per detail 1/S1022. Galvanized.
30. Chemical Storage Foundation grating per detail 2/S1021 and details 4, 12 & 16/S5001. Stainless steel.
31. Die Coolant Room, Chemical Storage and Support Room Storage trench grating per drawing S1020, details 5 & 6/S5001, details 4, 5 & 7/S5004. Stainless steel.
32. Chemical Containment Pit grating per drawing S1020, detail 4/S1022 and detail 11/S5003. Fiberglass.
33. General Notes
34. Field touch-up priming or cold galvanizing as required.
35. Equipment rental.
36. Multiple mobilizations will be required.

Project Manager must approve any and all Change Order work prior to Erector performing work outside of our scope. Any work performed without authorization will not be eligible for compensation by Fabco Metal Products. Erector agrees to an hourly change order rate up to $75 per man hour, which includes all tools and equipment necessary to perform the work. Erector agrees to an hourly change order rate of $55 per man hour for any work which will be charged directly to Fabco Metal Products.

STEEL ERECTION TO BEGIN APPROXIMATELY 2-1-21, DURATION PER THE GENERAL CONTRACTORS CONSTRUCTION SCHEDULE.

1) Erector shall strictly adhere to, and include all costs related to current OSHA steel erection standards. This includes, but not limited to  the use of controlled decking zones and fall protection as outlined in OSHA compliance directive CPL 2-1.34; OSHA Subpart R 1926.757; Safety cable railing and orange safety netting per OSHA, as required. Includes removal when required. Temporary safety posts (L3x3x1/4"x3'-6", furnished by fabricator, cable furnished by steel erector).
2) See attached General Contractor/Fabco subcontract agreement and exhibits for additional scope of work & safety items is part of this attachment.
3) The steel erection foreman is to start the project and is to remain as foreman on this project until it is substantially complete. Use this scope of work in conjunction with general contractor's steel scope of work (see attached). Obtain all City Business Licenses and Welding Certs, attend weekly jobsite meetings prior to and during the steel erection phase as required by the GC. Change of work pricing must be submitted within the time frame noted in the General Contractor's Subcontract Agreement, if it is not noted maximum is 10 days, failure to submit pricing within the allotted time may result in $0.00 cost impact for change in work.
4) Reference Documents (Latest Editions): AISC code of standard practices, SJI Standard Specifications and Manual SDI Manual of Construction with Steel Deck
5) Erector takes full responsibility of the cargo during the off-loading process as well as count and verify that the quantities & condition of Structural Steel, Steel Joist and Metal Deck and accessories agree with the loading manifest prior to the carrier leaving the site.
6) Erector will notify Fabco within 48 hours after delivery of materials for any shortages or damages in Structural Steel, Steel Joist Metal Deck Bundles and/or sheets within bundles. Documentation by photograph required.
7) Erector shall store Structural Steel per AISC requirements, Steel Joist and Accessories per SJI requirements. Erector shall store Metal Deck bundles minimum of 6" off the ground with one end elevated a minimum of 2" to provide drainage and allow circulation from below. The deck shall be protected from the elements by a ventilated non-asphaltic waterproof covering to avoid condensation. Erector shall stack deck bundles so that there is no danger of tipping, sliding, rolling, shifting or material damage.

Erector: Nexus Steel LLC                          FABCO METAL PRODUCTS LLC

BY: Robert D Martens _____            BY: _____

                                                   Shane King, President

20220060823

Fabco Metal Products LLC                    Project # 20-042

## ATTACHMENT B

## INSURANCE REQUIREMENTS FOR ERECTOR

**Certificate Holder:**

Fabco Metal Products LLC
1490 Frances Drive
Daytona Beach, FL 32124

Certificate of Insurance to evidence the following information:

1. **Insurance Company Rating:** A.M. Best A-VI or better

2. **Insured:** Erector's company name and address
   (b) **Additional Insured endorsement naming Fabco Metal Products LLC and Fabsouth LLC**, the General Contractor and Owner.

3. **Workers Compensation/Employers Liability:**
   Workers Compensation – Statutory
   Employers Liability     $500,000 each accident
                           $500,000 disease-policy
                           $500,000 disease-each employee

4. **Commercial General Liability including Products/Completed Operations Coverage**
   (a) Limits: $1,000,000 per occurrence
               $2,000,000 general aggregate
               $2,000,000 products & completed operations aggregate
   (b) At least as broad as ISO Form CG0001 12 04 or equivalent
   (c) Additional Insured Endorsement including completed operations naming Fabco Metal Products LLC, General Contractor & Owner.  ISO Forms CG 20 26 07 04 and CG 20 37 07 04 or their equivalent (see attached forms)
   (d) Primary and non-contributory with any other insurance available to the certificate holder
   (e) Per project general aggregate

5. **Automobile to include owned, hired and non-owned autos:**
   (a) Limits: $1,000,000 Combined Single Limit
   (b) At least as broad as ISO form CA 99 48 09 02 or equivalent,

6. **Umbrella:  (limit can be changed as needed)**
   (a) Limits:  $5,000,000 Each Occurrence
                $5,000,000 Aggregate
   (b) Excess of Employers Liability, General Liability and Automobile
   (c) Follow Form as to coverage's and endorsements on primary policies

20220060823

Fabco Metal Products LLC                    Project # 20-042
                                            ATTACHMENT B


7. **Pollution Liability Insurance (if applicable):**
   (a) Limits:  $1,000,000 Each Claim
                 $2,000,000 Aggregate

8. **Waiver of Subrogation:** General Liability, Auto and Workers Compensation in favor
   of Fabco.

9. **Notice of Cancellation:** All policies contain a provision that the policy will not be cancelled,
   materially changed or non-renewed without 30 days prior written notice to Fabco.

10. **Crane Insurance**-if using your own crane, please understand that GC dependent, may require a
    $10,000,000. umbrella coverage(can be combined with your umbrella to total $10 mill) for crane
    coverage.

11. Notwithstanding the above requirements, the Erector is bound to Fabco by the same terms and
    conditions and to the fullest extent by which Fabco is bound to the General  Contractor under their
    contract.


Please forward the certificate of insurance to our office at the above address or via FAX at (386) 258-
3402.

If you have any questions, please do not hesitate to call Fabco at (386) 252-3730.

20220060823

Fabco Metal Products LLC                    Project # 20-042

# *FABCO METAL PRODUCTS LLC*
1490 FRANCES DRIVE
DAYTONA BEACH, FL 32124
PH: 386-252-3730
FAX: 386-258-3402

TO:    ERECTOR

TO: INSURANCE DEPARTMENT

FROM: KERRY GAUTHIER

SUBJECT: CERTIFICATE OF INSURANCE

AT YOUR EARLIEST CONVENIENCE PLEASE HAVE YOUR AGENT SEND US A CURRENT CERTIFICATE WITH THE FOLLOWING COVERAGE'S LISTED. **POLICY MUST STATE COVERAGE FOR THE STATE YOU ARE WORKING IN. ALSO SEE ATTACHMENT B**

__X__ WORKERS COMPENSATION AND EMPLOYERS' LIABILITY **(MUST LIST STATE YOU ARE WORKING IN IS COVERED)**

__X__ GENERAL LIABILITY

__X__ AUTO LIABILITY

__X__ IN ADDITION TO THE ABOVE PLEASE HAVE <u>ADDITIONAL INSURED</u>:
IN DESCRIPTION BOX:
**PROJECT:** FOUND ON FRONT PAGE OF CONTRACT
**PROJECT ADDRESS:** FOUND ON FRONT PAGE OF CONTRACT

**ADD'L INSURED: FABCO METAL PRODUCTS LLC, FABSOUTH LLC, THE GENERAL CONTRACTOR, THE OWNER, AND THE ARCHITECT AND IT'S OFFICERS, DIRECTORS, EMPLOYEES, AGENTS, AFFILIATES, & ITS SUBSIDIARIES AND ANY OTHER PARTIES REQUIRED BY THE OWNER OR AGENT INCLUDED AS ADD'L INSURED . WAIVER OF SUBROGATION APPLIES TO G/L, AUTO, AND W/C. G/L AND AUTO INCLUDE PRIMARY & NON-CONTRIBUTORY IN FAVOR OF FABCO METAL PRODUCTS.**

**NOTE- FABCO METAL PRODUCTS LLC NEEDS TO BE LISTED AS CERTIFICATE HOLDER (THIS IS A REQUIREMENT, NOT A REQUEST)**

SINCERELY,

KERRY GAUTHIER- COMPLIANCE MANAGER

20220060823

# PAYMENT APPLICATION

Page 1

| | | |
|---|---|---|
| TO: | Fabco Metal Produts LLC | PROJECT | AZ2031 |
| | 1492 Frances Drive | NAME AND | Bang Energy - Phoenix Can manufacturing |
| | Daytona Beach, FL 32124 | LOCATION: | 1635 South 43rd Ave |
| | Attn: Kerry Gauthier | | Phoenix, AZ 85009 |
| FROM: | Nexus Steel LLC | ARCHITECT: | |
| | 214 S. Hamilton Place | | |
| | Gilbert, AZ 85233 | | |
| FOR: | Nexus Steel, LLC | | |

| APPLICATION # | 20314 | Distribution to: |
|---|---|---|
| PERIOD THRU: | 11/30/2021 | ☐ CONTRACTOR |
| PROJECT #s: | 20-042 | ☐ ARCHITECT |
| | | ☐ SUBCONTRACTOR |
| DATE OF CONTRACT: | 01/20/2021 | ☐ ACCOUNTS RECI |
| | | ☒ PROJECT MANAGER |

## SUBCONTRACTOR'S SUMMARY OF WORK

Application is made for payment as shown below.
Continuation Page is attached.

| | | |
|---|---|---|
| 1 | CONTRACT AMOUNT | $733,448.00 |
| 2 | SUM OF ALL CHANGE ORDERS | $1,812.86 |
| 3 | CURRENT CONTRACT AMOUNT (Line 1 +/- 2) | $735,260.86 |
| 4 | TOTAL COMPLETED AND STORED (Column G on Continuation Page) | $317,228.86 |
| 5 | RETAINAGE: | |
| | a. 10.00% of Completed Work (Columns D + E on Continuation Page) | $31,722.89 |
| | b. 0.00% of Material Stored (Column F on Continuation Page) | $0.00 |
| | Total Retainage (Line 5a + 5b or Column I on Continuation Page) | $31,722.89 |
| 6 | TOTAL COMPLETED AND STORED LESS RETAINAGE (Line 4 minus Line 5 Total) | $285,505.97 |
| 7 | LESS PREVIOUS PAYMENT APPLICATIONS | $166,001.27 |
| 8 | PAYMENT DUE | $119,504.70 |
| 9 | BALANCE TO COMPLETION (Line 3 minus Line 6) | $449,754.89 |

| SUMMARY OF CHANGE ORDERS | ADDITIONS | DEDUCTIONS |
|---|---|---|
| Total changes approved in previous months | $1,812.86 | $0.00 |
| Total approved this month | $0.00 | $0.00 |
| TOTALS | $1,812.86 | $0.00 |
| NET CHANGES | $1,812.86 | |

Subcontractor's signature below is his assurance to Contractor, concerning the payment herein applied for, that: (1) the Work has been performed as required in the Contract Documents, (2) all sums previously paid to Subcontractor under the Contract have been used to pay Subcontractor's costs for labor, materials and other obligations under the Contract for Work previously paid for, and (3) Subcontractor is legally entitled to this payment.

SUBCONTRACTOR: Nexus Steel LLC

By: _Robert Martens_

Robert Martens / Owner

Date: 11/11/2021

PAYMENT APPLICATION

Nexus Steel, LLC Document 6/1/2021

# CONTINUATION PAGE

Payment Application containing Contractor's signature is attached.

PROJECT:  A22031
Bang Energy - Phoenix Can manufacturing

Page 2 of 2

APPLICATION #: 20314
DATE OF APPLICATION: 11/11/2021
PERIOD THRU: 11/30/2021
PROJECT #s: 20-042

| A | B | C | D | E | F | G | H | I |
|---|---|---|---|---|---|---|---|---|
| | | | COMPLETED WORK | | | | | |
| ITEM # | WORK DESCRIPTION | SCHEDULED AMOUNT | AMOUNT PREVIOUS PERIODS | AMOUNT THIS PERIOD | STORED MATERIALS (NOT IN D OR E) | TOTAL COMPLETED AND STORED (D + E + F) | % COMP (G / C) | BALANCE TO COMPLETION (C-G) | RETAINAGE (If Variable) |
| 1 | Structural Steel Install | $442,610.00 | $132,783.00 | $132,783.00 | $0.00 | $265,566.00 | 60% | $177,044.00 | |
| 2 | Miscellaneous Items Install | $170,039.00 | $0.00 | $0.00 | $0.00 | $0.00 | 0% | $170,039.00 | |
| 3 | Trench Items Install | $49,850.00 | $49,850.00 | $0.00 | $0.00 | $49,850.00 | 100% | $0.00 | |
| 4 | COR 001 - (Revs up to 11/24/20) Rev 2 | $70,958.00 | $0.00 | $0.00 | $0.00 | $0.00 | 0% | $70,958.00 | |
| 5 | CO 20042-E01 (COR003 & 007) | $1,812.86 | $1,812.86 | $0.00 | $0.00 | $1,812.86 | 100% | $0.00 | |
| | TOTALS | $735,260.86 | $184,445.86 | $132,783.00 | | $317,228.86 | 43% | $418,032.00 | |

CONTINUATION PAGE

Nexus Steel, LLC Document 9/1/2021

20220060823

# PAYMENT APPLICATION

| | |
|---|---|
| TO: | Falco Metal Products LLC<br>1492 Frances Drive<br>Daytona Beach, FL 32124<br>Attn: Kerry Gauthier |
| FROM: | Nexus Steel LLC<br>214 S. Hamilton Place<br>Gilbert, AZ 85233<br>Nexus Steel, LLC |
| FOR: | |

| PROJECT NAME AND LOCATION: | A22031<br>Bang Energy - Phoenix Can manufacturing<br>1635 South 43rd Ave<br>Phoenix, AZ 85009 |
|---|---|
| ARCHITECT: | |

| | |
|---|---|
| APPLICATION # | 20313 |
| PERIOD THRU: | 10/30/2021 |
| PROJECT #s: | 20-042 |
| DATE OF CONTRACT: | 01/20/2021 |

Distribution to:
☐ CONTRACTOR
☐ ARCHITECT
☐ SUBCONTRACTOR
☒ ACCOUNTS RECI
☒ PROJECT MANAGER

Application is made for payment as shown below.
Continuation Page is attached.

Subcontractor's signature below is his assurance to Contractor, concerning the payment herein applied for, that: (1) the Work has been performed as required in the Contract Documents, (2) all sums previously paid to Subcontractor under the Contract have been used to pay Subcontractor's costs for labor, materials and other obligations under the Contract for Work previously paid for, and (3) Subcontractor is legally entitled to this payment.

SUBCONTRACTOR: Nexus Steel LLC

By: *Robert Martens*      Date: 10/12/2021

Robert Martens / Owner

## SUBCONTRACTOR'S SUMMARY OF WORK

| | | |
|---|---|---|
| 1. CONTRACT AMOUNT | | $733,448.00 |
| 2. SUM OF ALL CHANGE ORDERS | | $1,812.86 |
| 3. CURRENT CONTRACT AMOUNT (Line 1 +/- 2) | | $735,260.86 |
| 4. TOTAL COMPLETED AND STORED<br>(Column G on Continuation Page) | | $184,445.86 |
| 5. RETAINAGE: | | |
| a. 10.00% of Completed Work<br>(Columns D + E on Continuation Page) | $18,444.59 | |
| b. 0.00% of Material Stored<br>(Column F on Continuation Page) | $0.00 | |
| Total Retainage (Line 5a + 5b or<br>Column I on Continuation Page) | | $18,444.59 |
| 6. TOTAL COMPLETED AND STORED LESS RETAINAGE<br>(Line 4 minus Line 5 Total) | | $166,001.27 |
| 7. LESS PREVIOUS PAYMENT APPLICATIONS | | $51,662.86 |
| 8. PAYMENT DUE | | $114,338.41 |
| 9. BALANCE TO COMPLETION<br>(Line 3 minus Line 6) | | $569,259.59 |

| SUMMARY OF CHANGE ORDERS | ADDITIONS | DEDUCTIONS |
|---|---|---|
| Total changes approved in previous months | $0.00 | $0.00 |
| Total approved this month | $1,812.86 | $0.00 |
| TOTALS | $1,812.86 | $0.00 |
| NET CHANGES | $1,812.86 | |

PAYMENT APPLICATION

Nexus Steel, LLC Document 8/1/2021

# CONTINUATION PAGE

Payment Application containing Contractor's signature is attached.

PROJECT- AZ2031
Bang Energy - Phoenix Can manufacturing

APPLICATION #: 20313
DATE OF APPLICATION: 10/12/2021
PERIOD THRU: 10/30/2021
PROJECT No: 20-042

| A | B | C | D | E | F | G | % | H | I |
|---|---|---|---|---|---|---|---|---|---|
| | | | COMPLETED WORK | | | | | | |
| ITEM # | WORK DESCRIPTION | SCHEDULED AMOUNT | AMOUNT PREVIOUS PERIODS | AMOUNT THIS PERIOD | STORED MATERIALS (NOT IN D OR E) | TOTAL COMPLETED AND STORED (D + E + F) | COMP (G / C) | BALANCE TO COMPLETION (C-G) | RETAINAGE (if Variable) |
| 1 | Structural Steel Install | $442,610.00 | $0.00 | $132,783.00 | $0.00 | $132,783.00 | 30% | $309,827.00 | |
| 2 | Miscellaneous Items Install | $170,030.00 | $0.00 | $0.00 | $0.00 | $0.00 | 0% | $170,030.00 | |
| 3 | Trench Items Install | $49,850.00 | $49,850.00 | $0.00 | $0.00 | $49,850.00 | 100% | $0.00 | |
| 4 | COR.U01 - (Revs up to 11/24/20) Rev 2 | $70,958.00 | $0.00 | $0.00 | $0.00 | $0.00 | 0% | $70,958.00 | |
| 5 | CO 20042-E01 (COR003 & 007) | $1,812.86 | $1,812.86 | $0.00 | $0.00 | $1,812.86 | 100% | $0.00 | |
| | TOTALS | $735,260.86 | $51,662.86 | $132,783.00 | | $184,445.86 | 25% | $550,815.00 | |

CONTINUATION PAGE

Nexus Steel, LLC Document 6/1/2021

20220060823

# PAYMENT APPLICATION

Page 1

| | |
|---|---|
| TO: | Fabco Metal Products LLC<br>1492 Frances Drive<br>Daytona Beach, FL 32124<br>Attn: Kerry Gauthier |
| FROM: | Nexus Steel LLC<br>214 S. Hamilton Place<br>Gilbert, AZ 85233 |
| FOR: | Nexus Steel, LLC |

| | |
|---|---|
| PROJECT NAME AND LOCATION: | AZ2031<br>Bang Energy - Phoenix Can manufacturing<br>1635 South 43rd Ave<br>Phoenix, AZ 85009 |
| ARCHITECT: | |

| | | |
|---|---|---|
| APPLICATION # | 20315 | |
| PERIOD THRU: | 12/31/2021 | |
| PROJECT #s: | 20-042 | |
| DATE OF CONTRACT: | 01/20/2021 | |

Distribution to:
☐ CONTRACTOR
☐ ARCHITECT
☐ SUBCONTRACTOR
☒ ACCOUNTS RECI
☒ PROJECT MANAGER

Subcontractor's signature below is his assurance to Contractor, concerning the payment herein applied for, that: (1) the Work has been performed as required in the Contract Documents, (2) all sums previously paid to Subcontractor under the Contract have been used to pay Subcontractor's costs for labor, materials and other obligations under the Contract for Work previously paid for, and (3) Subcontractor is legally entitled to this payment.

SUBCONTRACTOR: Nexus Steel LLC

By: *Robert Martens*     Date: 12/15/2021

Robert Martens / Owner

## SUBCONTRACTOR'S SUMMARY OF WORK

Application is made for payment as shown below.
Continuation Page is attached.

| | | |
|---|---|---|
| 1. CONTRACT AMOUNT | | $733,448.00 |
| 2. SUM OF ALL CHANGE ORDERS | | $1,812.86 |
| 3. CURRENT CONTRACT AMOUNT (Line 1 +/- 2) | | $735,260.86 |
| 4. TOTAL COMPLETED AND STORED<br>(Column G on Continuation Page) | | $405,750.86 |
| 5. RETAINAGE: | | |
| a. 10.00% of Completed Work<br>(Columns D + E on Continuation Page) | $40,575.09 | |
| b. 0.00% of Material Stored<br>(Column F on Continuation Page) | $0.00 | |
| Total Retainage (Line 5a + 5b or<br>Column I on Continuation Page) | | $40,575.09 |
| 6. TOTAL COMPLETED AND STORED LESS RETAINAGE<br>(Line 4 minus Line 5 Total) | | $365,175.77 |
| 7. LESS PREVIOUS PAYMENT APPLICATIONS | | $285,505.97 |
| 8. PAYMENT DUE | | $79,669.80 |
| 9. BALANCE TO COMPLETION<br>(Line 3 minus Line 6) | | $370,085.09 |

| SUMMARY OF CHANGE ORDERS | ADDITIONS | DEDUCTIONS |
|---|---|---|
| Total changes approved in previous months | $0.00 | $0.00 |
| Total approved this month | $1,812.86 | $0.00 |
| TOTALS | $1,812.86 | $0.00 |
| NET CHANGES | $1,812.86 | |

PAYMENT APPLICATION

Nexus Steel, LLC Document 6/1/2021

# CONTINUATION PAGE

Payment Application containing Contractor's signature is attached.

PROJECT: AZ2031
Barig Energy - Phoenix Can manufacturing

Page 2 of 2

APPLICATION #: 20315
DATE OF APPLICATION:
PERIOD THRU: 12/15/2021 12/31/2021
PROJECT #s: 20-042

| A | B | C | D | E | F | G | H | | I |
|---|---|---|---|---|---|---|---|---|---|
| | | | COMPLETED WORK | | | | | | |
| ITEM # | WORK DESCRIPTION | SCHEDULED AMOUNT | AMOUNT PREVIOUS PERIODS | AMOUNT THIS PERIOD | STORED MATERIALS (NOT IN D OR E) | TOTAL COMPLETED AND STORED (D + E + F) | % COMP. (G / C) | BALANCE TO COMPLETION (C-G) | RETAINAGE (If Variable) |
| 1 | Stuctural Steel Install | $442,610.00 | $265,566.00 | $88,522.00 | $0.00 | $354,088.00 | 80% | $88,522.00 | |
| 2 | Miscellaneous Items Install | $170,030.00 | $0.00 | $0.00 | $0.00 | $0.00 | 0% | $170,030.00 | |
| 3 | Trench Items Install | $49,850.00 | $49,850.00 | $0.00 | $0.00 | $49,850.00 | 100% | $0.00 | |
| 4 | COR 001 - (Revs up to 11/24/20) Rev 2 | $70,958.00 | $0.00 | $0.00 | $0.00 | $0.00 | 0% | $70,958.00 | |
| 5 | CO 20042-E01 (COR003 & 007) | $1,812.86 | $1,812.86 | $0.00 | $0.00 | $1,812.86 | 100% | $0.00 | |
| | TOTALS | $735,260.86 | $317,228.86 | $88,522.00 | $0.00 | $405,750.86 | 55% | $329,510.00 | |

Nexus Steel, LLC Document 6/1/2021

CONTINUATION PAGE

20220060823

**EXHIBIT C**

20220060823

File No: 782317 | AZ | PRIVATE | OWNER
Notice Requested by and Return To:
Construction Notice Services, Inc.
P.O. Box 82190 CLDP80753/80776
Phoenix, AZ 85071 | Job No: B6199-AZ2031
Phone: Phone: (602) 493-2042 | FAX: Fax: (602) 493-2046

Customer: Fabco Metal Products, LP
Project: Phoenix Can (Bang Energy)
Rec. ID 443040-YZ0IGC5C

## TWENTY DAY PRELIMINARY NOTICE
In Accordance With Arizona Revised Statutes Section 33-992.01
**THIS IS NOT A LIEN. THIS IS NOT A REFLECTION ON THE INTEGRITY OF ANY CONTRACTOR OR SUBCONTRACTOR**

**TO: OWNER OR REPUTED OWNER**
Vital Pharmaceuticals, Inc
Bang Energy
1600 N. Park Drive
Weston, FL 33326

**TO: ORIGINAL CONTRACTOR
OR REPUTED CONTRACTOR**
Stellar Group, Inc
2900 Hartley Road
Jacksonville, FL 32257-

**TO: LENDER, SURETY OR BONDING COMPANY**
Owner Financed  If there is a lender,
please notify CNS.

**SEE ADDITIONAL LEGAL PARTIES: EXHIBIT D**

1. The following is a general description of the labor, service, equipment or materials furnished or to be furnished by the undersigned.
Steel Supply & Install

2. Estimated Price:     $662,490.00

3. The name of the person who furnished that labor, service, equipment or materials is:
Nexus Steel, LLC
214 S. Hamilton Place
Gilbert, AZ 85233

4. The name of the person who contracted for purchase of that labor, service, equipment or material is:
Fabco Metal Products, LP
1490 Frances Drive
Daytona Beach, FL 32124

5. The description of the jobsite is:
Phoenix Can (Bang Energy)
1635 South 43rd Avenue
Phoenix, AZ 85009
County of Maricopa

### NOTICE TO PROPERTY OWNER
If bills are not paid in full for the labor, professional services, materials, machinery, fixtures or tools furnished, or to be furnished, a Mechanic's Lien leading to the loss, through court foreclosure proceedings, of all or part of your property being improved may be placed against the property. You may wish to protect yourself against this consequence by either:

   1. Requiring your contractor to furnish a conditional waiver and release pursuant to Arizona Revised Statutes Section 33-1008, Subsection D, Paragraphs 1 and 3 signed by the person or firm giving you this notice before you make payment to your contractor.
   2. Requiring your contractor to furnish an unconditional waiver and release pursuant to Arizona Revised Statutes Section 33-1008, Subsection D, Paragraphs 2 and 4 signed by the person or firm giving you this notice before you make payment to your contractor.
   3. Using any other method or device that is appropriate under the circumstances.

Within ten days of the receipt of this preliminary twenty day notice the owner or other interested party is required to furnish all information necessary to correct any inaccuracies in the notice pursuant to Arizona Revised Statutes Section 33-992.01, Subsection 1 or lose as a defense or lose as a defense any inaccuracy of that information.
Within ten days of the receipt of this preliminary twenty day notice if any Payment Bond has been recorded in compliance with Arizona Revised Statutes Section 33-1003. The owner must provide a copy of the Payment Bond including the name and address of the surety company and bonding agent providing the Payment Bond to the person who has given the preliminary twenty day notice. In the event that the owner or other interested party fails to provide the bond information within that ten day period, the claimant shall retain lien rights to the extent precluded or prejudiced from asserting a claim against the bond as a result of not timely receiving the bond information.

By: _____ Debra A. Pope, Limited  Agent, February 2, 2021

------------------------DETACH HERE AND SEND LOWER PORTION TO CLAIMANT------------------------
**ACKNOWLEDGMENT OF RECEIPT OF TWENTY DAY PRELIMINARY NOTICE**

This acknowledges receipt on (today's date)_____ of a copy of the Twenty

Day Preliminary Notice at (address where notice received)_____

Date (date this acknowledgment is executed)_____

Signature of person acknowledging receipt, with title if acknowledgment is made for another person

_____

Prepared by: Construction Notice Services, Inc., P.O. Box 82190 CLDP80753/80776, Phoenix, AZ 85071  Phone: (602) 493-2042, Fax: (602) 493-2046

**Exhibit D - List of Additional Parties**

Owner: Vital Pharmaceuticals, Inc., Bang Energy, 1600 N. Park Drive, Weston, FL 33326, Phone: (954) 641-0570
Project: Phoenix Can (Bang Energy), 1635 South 43rd Avenue, Phoenix, AZ 85009 in the County of Maricopa

The following is a complete list, to the best of our knowledge, of all additional or secondary parties with an interest in the aforementioned project:

ADDITIONAL OR REPUTED OWNER, LESSEE OR AGENT
JHO Real Estate Investment, Inc.
1600 N. Park Drive
Weston, FL  33326

20220060823

02/02/2021 15:34:32                                                      Page 20

## Construction Notice Services, Inc.
### P.O. Box 82190 CLDP80753/80776
### Phoenix, AZ 85071
### First Class Certificate of Mailing
### 02/02/2021 Thru 02/02/2021

| Item | Certified Number | Name of Addressee Address | Prelim # | Job # | Postage |
|------|------------------|---------------------------|----------|-------|---------|
| 1 | 1st Class Mail | Vital Pharmaceuticals, Inc. 1600 N. Park Drive Weston, FL 33326 | 782317 | B6199-AZ2030 | 0.50 |
| 2 | 1st Class Mail | Stellar Group, Inc. 2900 Hartley Road Jacksonville, FL 32257 | 782317 | B6199-AZ2030 | 0.50 |
| 3 | 1st Class Mail | Fabco Metal Products, LP 1490 Frances Drive Daytona Beach, FL 32124 | 782317 | B6199-AZ2030 | 0.50 |
| 4 | 1st Class Mail | JHO Real Estate Investment, Inc. 1600 N. Park Drive Weston, FL 33326 | 782317 | B6199-AZ2030 | 0.50 |
| 5 | 1st Class Mail | Hancock Builders, LLC 4040 E Camelback Road, Suite 215 Phoenix, AZ 85018 | 782330 | B6230-210142 | 0.50 |
| 6 | 1st Class Mail | Petra Contracting 18435 W. Van Buren Street Goodyear, AZ 85338 | 782330 | B6230-210142 | 0.50 |
| 7 | 1st Class Mail | GTIS Cadence QOZ, LLC 787 Seventh Avenue 50th Fl. New York, NY 10019 | 782331 | B6228-210130 | 0.50 |

NUMBER OF PIECES: 7                                                        3.50
Date Prepared: 02/02/2021

## VERIFICATION

MAILING PARTY        POSTMASTER                Total Pieces Received: _____
Construction Notice Services, Inc.
P O. Box 82190 CLDP80753/80776              NUMBER OF PIECES: 7
Phoenix, AZ 85071
                                            RECEIVED BY:_____

                                            DATE PREPARED:_____

                                            DATE CERTIFIED:_____

CPU



U.S. POSTAGE
$3.08
CTOM      0000
Orig: 85022
02/02/21
2000062139

20220060823

AFFIDAVIT AND PROOF OF SERVICE
ARIZONA PRELIMINARY TWENTY-DAY LIEN NOTICE

Pursuant to A.R.S. Sec. 33-992.02, Debra A. Pope, President of Construction Notice Services, Inc., and Limited Agent for Nexus Steel, LLC, Claimant, being first duly sworn deposes and says that:

1. On February 2, 2021 The Arizona Twenty Day Lien Notices (Notices) (Notice No. B6199-AZ2031) was sent by First Class Certificate of Mailing, by Debra A. Pope, President of Construction Notice Services, Inc., and Limited Agent for Nexus Steel, LLC to the following addresses:

CUSTOMER
Fabco Metal Products, LP
1490 Frances Drive
Dayton Beach, FL 32124

GENERAL CONTRACTOR:
Stellar Group, Inc.
2900 Hartley Road
Jacksonville, FL 32257

OWNER(S) OR REPUTED OWNER(S):
JHO Real Estate Investment, Inc.
1600 N. Park Drive
Weston, FL 33326

Vital Pharmaceuticals, Inc.
Bank Energy
1600 N. Park Drive
Weston, FL 33326

Regarding the project of: Phoenix Can (Bang Energy) 1635 South 43rd Avenue, Phoenix, Arizona (county of Maricopa).

2. The Notice was sent in accordance with the requirements in A.R.S. Sec 33-992.01.

3. Attached hereto are true and correct copies of the Notice(s) and the Certificate(s) of mailing the Notices. The Notice(s) were mailed at the United States Post Office indentified on the attached certificate of mailing.

_____
Debra A Pope, Limited Agent for Nexus Steel, LLC,
Claimant.

STATE OF ARIZONA      )
                      ) ss
COUNTY OF MARICOPA    )

Subscribed and sworn to (or affirmed) before me on this 20th day of January, 2022, by Debra A. Pope, proved to me on the basis of satisfactory evidence to be the person(s) who appeared before me.

Sep. 23rd, 2025.
_____        _____
My Commission Expires:           Notary Public:



VICTORIA PORTILLO
Notary Public - State of Arizona
MARICOPA COUNTY
Commission # 615128
Expires September 23, 2025

# EXHIBIT E

Clerk of the Superior Court
*** Electronically Filed ***
M. De La Cruz, Deputy
8/1/2022 2:47:41 PM
Filing ID 14637125

1  JOHN L. CONDREY (SBN: 026220)
   **GORDON REES SCULLY MANSUKHANI, LLP**
2  Two North Central Avenue Suite 2200
   Phoenix, AZ 85004
3  Telephone: (602) 794-2474
   Facsimile: (602) 265-4716
4  jcondrey@grsm.com

5  Attorneys for
   Fabco Metal Products, LLC
6

7

8              **SUPERIOR COURT OF THE STATE OF ARIZONA**

9                          **MARICOPA COUNTY**

10  NEXUS STEEL, LLC, an Arizona        )  **CASE NO.   CV2022-008873**
    limited liability company,          )
11                                      )
                         Plaintiff,     )
12                                      )  **FABCO METAL PRODUCTS, LLC**
    vs.                                 )  **COUNTERCLAIM AND CROSS-**
13                                      )  **CLAIMS**
    JHO REAL ESTATE INVESTMENT,         )
14  LLC., a Florida limited liability   )
    company, VITAL                      )
15  PHARMACEUTICALS, INC., a Florida    )
    corporation, d/b/a BANG, LLC, a     )
16  Florida limited liability company,  )
    FABCO METAL PRODUCTS, LLC., a       )
17  Florida limited liability company,  )
    BELVAC PRODUCTION                   )
18  MACHINERY, INC., a Virginia         )
    corporation, TRUIST BANK, a North   )
19  Carolina company, ISEC, INC., a     )
    Colorado corporation, HEAVY         )
20  EQUIPMENT MOVERS &                  )
    INSTALLATION, LLC, a Delaware       )
21  limited liability company, HARDROCK )
    CONCRETE PLACEMENT CO. INC.,        )
22  an Arizona corporation, STELLAR     )
    GROUP, INC., a Florida corporation, )
23  FAITH TECHNOLOGIES INC., a          )
    Wisconsin corporation, INTEGRATED   )
24  MASONRY, an Arizona company,        )
    HACI MECHANICAL                     )
25  CONTRACTORS, INC., an Arizona       )
    corporation, TRENCH SHORE           )
26  RENTALS, an Arizona corporation,    )
    THE MARICOPA COUNTY                 )
27  TREASURER'S OFFICE, BLACK &         )
    WHITE CORPORATIONS 1-10,            )
28                                      )
                         Defendants.    )

Gordon Rees Scully Mansukhani, LLP
Two North Central Avenue Suite 2200
Phoenix, AZ 85004

-1-

Now comes Fabco Metal Products, LLC ("Fabco") and sets forth its Counterclaim against Nexus Steel, LLC's ("Nexus") and Cross-Claims Against JHO Real Estate Investment, LLC ("JHO"), Vital Pharmaceuticals, Inc. ("Vital") d/b/a Bang, LLC, Belvac Production Machinery, Inc. ("Belvac"), Truist Bank ("Truist"), ISEC, Inc. ("ISEC"), Heavy Equipment Movers & Installation, Inc. ("HEMI"), Hardrock Concrete Placement Co., Inc. ("Hardrock"), Stellar Group, Inc. ("Stellar"), Faith Technologies, Inc. ("Faith"), Integrated Masonry ("Integrated"), HACI Mechanical Contractors, Inc. ("HACI"), Trench Shore Rentals ("Trench"), and the Maricopa County Treasurer's Office ("Maricopa County Treasurer"), and states as follows:

## FACTS COMMON TO ALL COUNTS

1.      Fabco is a Florida limited liability company and provided structural and miscellaneous steel for the Project that is the subject of the Real Property located at 1635 South 43rd Avenue, Phoenix, Arizona 85009, APN 105-14-001Q ("Property") in Maricopa County, Arizona.

2.      Nexus is an Arizona limited liability company and provided structural and miscellaneous steel erection for the Project that is the subject of the Property in Maricopa County, Arizona.

3.      Upon information and belief, JHO is a Florida corporation, which owns and operates the Property in Maricopa County, Arizona.

4.      Upon information and belief, Vital is a Florida corporation, which operates an energy drink bottling facility at the Property, in Maricopa County, State of Arizona.

5.      Upon information and belief, Belvac is a Virginia corporation, which recorded a Mechanic's Lien on the subject Property, in Maricopa County, Arizona.

6.      Upon information and belief, Truist is a North Carolina bank, which recorded a Deed of Trust on the subject Property, in Maricopa County, Arizona.

7.      Upon information and belief, ISEC is a Colorado corporation, which recorded a Mechanic's Lien on the subject Property, in Maricopa County, Arizona.

8.      Upon information and belief, HEMI is a Delaware limited liability company,

Gordon Rees Scully Mansukhani, LLP
Two North Central Avenue Suite 2200
Phoenix, AZ 85004

1   which recorded a Mechanic's Lien on the subject Property, in Maricopa County, Arizona.

2       9.     Upon information and belief, Hardrock is an Arizona corporation, which

3   recorded a Mechanic's Lien on the subject Property, in Maricopa County, Arizona.

4       10.    Upon information and belief, Stellar is a Florida corporation, which recorded

5   a Mechanic's Lien on the subject Property, in Maricopa County, Arizona.

6       11.    Upon information and belief, Faith is a Wisconsin corporation, which

7   recorded a Mechanic's Lien on the subject Property, in Maricopa County, Arizona.

8       12.    Upon information and belief, Integrated is an Arizona company, which

9   recorded a Mechanic's Lien on the subject Property, in Maricopa County, Arizona.

10      13.    Upon information and belief, HACI is an Arizona corporation, which

11  recorded a Mechanic's Lien on the subject Property, in Maricopa County, Arizona

12      14.    Upon information and belief, Trench is an Arizona corporation, which

13  recorded a Mechanic's Lien on the subject Property, in Maricopa County, Arizona.

14      15.    Upon information and belief, Maricopa County Treasurer recorded a tax lien

15  on the subject Property, in Maricopa County, Arizona.

16      16.    On or about January 8, 2021, Fabco entered into a Steel Fabricator

17  Agreement with Stellar structural and miscellaneous steel for the Project that is the subject

18  of the Property.  A true and correct copy of Fabco's Steel Fabricator Agreement with

19  Stellar is attached hereto as **Exhibit A**.

20      17.    In accordance with the Steel Fabricator Agreement, Stellar agreed to pay

21  Fabco the sum of $3,434,097.31 for Fabco's work performed on the Project.

22      18.    In accordance with the Steel Fabricator Agreement, Fabco fabricated and

23  delivered structural and miscellaneous steel for the Project between June of 2021 and

24  March of 2022.

25      19.    In accordance with the Steel Fabricator Agreement, Fabco submitted eleven

26  payment applications for the work it performed on the Project between June of 2021 and

27  March of 2022.  True and correct copies of Fabco's payment applications are attached

28  hereto as **Group Exhibit B**.

Gordon Rees Scully Mansukhani, LLP
Two North Central Avenue Suite 2200
Phoenix, AZ 85004

-3-

Gordon Rees Scully Mansukhani, LLP
Two North Central Avenue Suite 2200
Phoenix, AZ 85004

20.     In or around October of 2021, the Owner ceased issuing payments on the Project, and as a result, Stellar ceased issuing payments to Fabco on the Project.

21.     In or around March of 2022, work on the Project was suspended in its entirety due to the Owner's failure to issue payments.

22.     To date, Fabco is approximately 75% complete with its scope of work on the Project.

23.     To date, Fabco has only been paid for its first four payment applications.

24.     To date, Fabco is owed $2,160,783.76 for work it has performed on the Project.

25.     In accordance with A.R.S. § 33-992.01, Fabco timely provided its 20-Day Preliminary Notice, a true and correct copy of which is attached hereto as **Exhibit C**.

26.     On or about April 25, 2022, pursuant to A.R.S. § 33-981 *et. seq.*, Fabco timely recorded and provided proper notice of its Notice and Claim of Mechanics' and Materialmen's Lien against the Property in the Office of the County Recorder of Maricopa County, Arizona.  A true and correct copy of Fabco's recorded Lien is attached hereto as **Exhibit D**.

### COUNT I – LIEN FORECLOSURE
### (All Defendants)

27.     Fabco restates and realleges Paragraphs 1 through 26 as if fully set forth herein.

28.     Fabco has performed all acts necessary to secure a valid and enforceable Mechanics' Lien on the Property.

29.     Fabco's Mechanics' Lien shares equal priority with any other Mechanics' liens asserted against the Property.

30.     Fabco is entitled to have this Court determine and declare the rights, priority, and title of all lien claimants, and other parties' claiming an interest in the Property, and to have an order that Fabco's lien be foreclosed on the Property, which is to be sold to satisfy all liens against it, in the order of their priority, treating all of the Mechanics' Liens

-4-

as being in parity and to have the sales proceeds distributed accordingly.

31. In accordance with A.R.S. §33-995(E) and 33-998(B), Fabco is entitled to recover its reasonable attorneys' fees and costs incurred herein.

## COUNT II – BREACH OF CONTRACT

### (Stellar Group, Inc.)

32. Fabco restates and realleges Paragraphs 1 through 26 as if fully set forth herein.

33. Fabco and Stellar entered into a contract in which Fabco agreed to provide structural and miscellaneous steel for the Project in exchange for payment by Stellar in the original contract amount of $3,434,097.31. (*See* **Ex. A**).

34. Fabco has fully performed its obligations under the Steel Fabricator Agreement and has satisfied all conditions precedent thereunder.

35. Stellar has breached the Steel Fabricator Agreement by failing to compensate Fabco for the work it performed on the Project.

36. To date, Fabco has been damaged in the amount of $2,160,783.76 as a result of Stellar's breach of the Steel Fabricator Agreement.

37. Fabco is also entitled to its attorneys' fees resulting from Stellar's breach of the Contract pursuant to A.R.S. § 12-341.01.

## COUNT III – UNJUST ENRICHMENT

### (JHO Real Estate Investments, Inc. and Vital Pharmaceuticals)

38. Fabco restates and realleges Paragraphs 1 through 26 as if fully set forth herein.

39. Fabco provided structural and miscellaneous steel for the Project, which benefitted the subject Property by the reasonable value of the materials and services provided, and has enriched JHO and Vital.

40. To date, Fabco has not been paid $2,160,783.76 for the materials and services providing and enrichment to JHO and Vital for the subject Property, resulting in an impoverishment to Fabco.

Gordon Rees Scully Mansukhani, LLP
Two North Central Avenue Suite 2200
Phoenix, AZ 85004

-5-

41.     To the extent that JHO and/or Vital have not paid Stellar in full for the material and services provided by Fabco, they have been enriched.

42.     It is inequitable and unjust for JHO and/or Vital to retain the benefit of the enrichment from the material and services provided by Fabco without paying Fabco for the same.

43.     Fabco is therefore entitled to receive payment from JHO and/or Vital in the amount, to date, of $2,160,783.76 for the materials and services providing an enrichment to JHO and Vital for the subject Property.

**WHEREFORE**, Defendant/Counterclaimant/Cross-Claimant Fabco Metal Products, LLC respectfully requests that this Court award judgment as follows:

a.     That judgment is entered in Fabco's favor;

b.     For attorneys' fees;

c.     For costs of suit incurred herein; and

d.     For such further relief as the court may deem proper.

Dated this 1st day of August 2022.

GORDON REES SCULLY
MANSUKHANI, LLP

By: <u>John L.Condrey</u>
        John L. Condrey
        *Attorneys for Defendant Fabco Metal*
        *Products, LLC*

Original of the foregoing filed
with the Court this 1st day of
August, 2022, and copy e-served
the same date, to:

Richard C. Gramlich
TIFFANY & BOSCO
Seventh Floor Camelback Esplanade II
2525 East Camelback Road
Phoenix, Arizona 85016-4237
T: 602.255.6000
F: 602.255.0103
Email: rcg@tblaw.com
*Attorneys for Nexus Steel, LLC*

<u>Kimberley M. Davison</u>

Gordon Rees Scully Mansukhani, LLP
Two North Central Avenue Suite 2200
Phoenix, AZ 85004

-6-

# EXHIBIT A

# EXHIBIT A

# SUBCONTRACT
## Stellar Group, Inc.
2900 Hartley Road
Jacksonville, FL 32257

| | |
|---|---|
| **Subcontractor:** Fabco Metal Products, LLC<br>1490 Frances Drive<br>Daytona Beach Florida 32124 | **Project Name and Location:** Bang Energy - Phoenix Can Manufacturing<br>1635 South 43rd Avenue<br>Phoenix Arizona 85009 |
| **Attention:** Tom Emert | **Attention:** Brian Edberg |
| **Phone:** (352) 373-3578 | **Mobile:** (904) 349-0640 |
| **Fax:** (386) 258-3402 | |
| **E-Mail:** temert@fabcometal.com | **E-Mail:** bedberg@stellar.net |

| Date<br>12/16/2020 | SC #<br>23006976-SUB-05 | Project #<br>23006976 | Contract Type<br>Lump Sum | FOB<br>Jobsite | Schedule<br>Per Superintendent |
|---|---|---|---|---|---|
| **Scope of Work: Structural Steel** | | | | | |

This Subcontract is made by and between Stellar Group, Incorporated, d/b/a Stellar, hereinafter referred to as Contractor, and the Subcontractor named above, at Jacksonville, Florida. In consideration of the mutual promises and undertakings set forth herein, Contractor and Subcontractor hereby agree to the terms and conditions set forth herein, including the Terms and Conditions attached hereto. Subcontractor agrees to perform and complete the following Work:

**A. Work:** Subcontractor agrees to perform and complete the scope of work generally as described in Exhibit A attached hereto and incorporated herein.

**B. Construction Progress Schedule:** Subcontractor agrees to complete the Work in strict accordance with the Construction Progress Schedule attached hereto as Exhibit B and incorporated herein.

**C. Contractor's Safety Requirements:** Subcontractor agrees to conform to Contractor's Request for Documentation, Bid Considerations, and Jobsite Safety Rules attached hereto as Exhibit C and incorporated herein.

| | |
|---|---|
| **ALL FOR THE LUMP SUM OF** | **$3,434,097.31** |

All licenses, permits, fees, taxes and insurance with Contractor named as additional insured included)

**Attachments:**
Exhibit-F-General Requirements.pdf, Exhibit-E---Stellar-Guide-for-Subcontractors-Usage-in-Procore.pdf, Exhibit-D-PHX VPX-Stellar DBIA_530___535_Cost_Plus_GMP 2020-07-28_Executed.pdf, 23006976 - Subcontract Attachments.pdf, Exhibit-C-JSP-Bang-Energy-Phoenix.pdf, Exhibit-H-Specifications dated 11.11.2020.pdf, 23006976 - Arizona Form 5005.pdf, 23006976 - Arizona Form 5000.pdf, Exhibit-B-06976-Bang PHX Can Manufacturing Schedule_PRELIMINARY.pdf, Exhibit-A-23006976-SUB-05-Structural Steel.pdf, Structural Steel Submittal Log 12.16.2020.pdf, Exhibit-G-Drawing Log dated 11.24.2020.pdf, 23006976 - Subcontract Attachments.pdf

**FOR ACCOUNTING PURPOSES ONLY:**

| Cost Code | | | Distributed Value |
|---|---|---|---|
| 05-0501 | - | 1760 | $117,903.75 |
| 05-0506 | - | 1760 | $9,904.32 |
| 05-0506 | - | 1760 | $70,959.24 |
| 05-0501 | - | 1760 | $1,769,196.41 |
| 05-0505 | - | 1760 | $130,340.91 |
| 05-0503 | - | 1760 | $524,661.70 |
| 05-0506 | - | 1760 | $591,250.98 |
| 05-0506 | - | 1760 | $219,880.00 |
| | | **Total:** | **$3,434,097.31** |

**THIS SUBCONTRACT INCLUDES AND IS SUBJECT TO THE TERMS AND CONDITIONS ATTACHED HERETO AND INCORPORATED HEREIN.**

IN WITNESS WHEREOF, the Subcontractor and Contractor have executed this Subcontract on the date set forth above.

| | |
|---|---|
| **FABCO METAL PRODUCTS, LLC** | **STELLAR GROUP, INCORPORATED** |
| Subcontractor | Contractor |
| Signed and Dated: _Shane King_ 1/8/21<br>SHANE KING | Signed and Dated: _____ |
| By: ~~Tom Emert~~ PRESIDENT<br>~~VP of Sales~~ | By: Jonah Petoskey<br>Senior Project Manager |

# SUBCONTRACT
## Stellar Group, Inc.

**SC #:** 23006976-SUB-05      **Date:** 12/16/2020

**Subcontractor:** Fabco Metal Products, LLC      **Page:** 2 of 6

## GENERAL NOTES

1. Subcontractor and any Sub-Subcontractors must possess and, at the time of execution of this Agreement, furnish a copy of a valid state Contractors license for the state where the Project is located and for the scope of Work described herein. This Subcontractor must certify and warrant and furnish proof that it is currently registered to do business and remit state sales and use tax in the state where the Project is located. Contractor reserves the right to Withhold payment until this Subcontractor furnishes such proof. It is the Subcontractors responsibility to obtain and keep in force proper licensing in accordance with the laws and statutes of the state where the Project is located and to otherwise comply with all applicable federal, state and local laws, ordinances and regulations. Any Sub-Subcontractor must also comply with these provisions, and Subcontractor shall expressly incorporate these provisions into any agreement in which the Subcontractor subcontracts with another to perform any portion of the Work described herein.

2. Immediately upon execution of this Subcontract, Subcontractor shall furnish to the Contractor all certificates of insurance in accordance with Paragraph Six Insurance Requirements of the Terms and Conditions. Subcontractor must submit all certificates of insurance prior to performing any on this Project.

3. Subcontractor agrees to diligently pursue the Work and to meet the requirements set forth in the Construction Progress Schedule. In the event the Subcontractor delays the progress of the Work, he shall bear all costs of overtime, expediting and all special freight or other charges required to bring its progress to the level required. This Subcontractor may also be subject to damages or claims by the Contractor or other subcontractors brought about by Subcontractors negligence or its failure to adhere to the Construction Progress Schedule for any reason. Failure to comply with the Construction Progress Schedule may result in default under Paragraph Seven Default and Remedies of the Terms and Conditions.

4. Work hours shall be established by the Contractor and shall be followed by the Subcontractor. The Subcontractor must work during regular hours and will not be permitted to work at night and/or on weekends. All overtime work must be approved by the Project Superintendent. A representative of Contractor must be on site at all times work is being performed.

5. Subcontractor shall fully comply with the applicable employment verification procedures for all of its employees. Subcontractor certifies and warrants to Contractor that it maintains a I-9 compliance program for the express purpose of verifying lawful employment authorization to work in the United States for all of Subcontractors employees. The Subcontractor represents that it will follow all I-9 verification, reverification and updating procedures required by the Immigration Reform and Control Act of 1986 for all of Subcontractors employees on the Project. The Subcontractor further represents that it maintains a designated I-9 compliance officer who oversees the Subcontractors I-9 compliance procedures.

6. Subcontractor shall cooperate fully the instructions and directions of the Project Superintendent and shall coordinate its Work the work of other subcontractors.

7. Subcontractor shall perform all Work in a neat and professional manner and shall take great care not to damage any work already in place.

8. The Subcontractor shall furnish shop drawings and submittal data to the Contractor no later than weeks after receipt of this Subcontract. Subcontractor shall submit six copies plus the number to be returned to Subcontractor.

9. The Subcontractor shall furnish all layout and engineering in connection with its Work.

10. The Subcontractor shall clean-up all debris from its work on a daily basis. If, in the opinion of the Contractor, clean-up is not satisfactory, the Contractor, alter giving reasonable notice to the Subcontractor, may clean up the premises at the cost and expense of the subcontractor and deduct such expense from payments due to the Subcontractor.

11. Subcontractor certifies and warrants That he is aware of all federal, state and local safety requirements and regulations pertaining to the Work, and Subcontractor shall perform its Work in strict compliance with such requirements and regulations. Subcontractor shall also comply with Contractors' safety regulations.

12. Subcontractor shall furnish Material Safety Data Sheets to the Contractor for material used in the Work and shall have same in its possession at the jobsite. Subcontractor shall pay any fines imposed for lack of the proper Material Safety Data Sheets,

13. Subcontractor shall comply with the code requirements of any governmental or regulatory body having Jurisdiction over the Work. Subcontractor shall bring to the attention of the Contractor any discrepancy between the code requirements and the drawings or specifications

14. Subcontractor shall be responsible for scheduling, deliveries and receiving of all materials and supplies required for the Work, The Contractor accepts no responsibility for unloading deliveries or the condition or quantity of any materials delivered in the Subcontractor's absence,

15. It is the Subcontractor's responsibility to store and protect its materials, tools and equipment. Contractor shall not be liable in the event that Subcontractors materials, tools or equipment are lost, stolen or damaged.

16. Subcontractor agrees to maintain as built documents and data applicable to the Work. Subcontractor shall provide these documents to (he Contractor prior to release of retainage.

17. Payments shall be made in accordance with Paragraph Eight, Payment, of the Terms and Conditions attached to the Subcontract.

18. Prior to submittal of the first Requisition for Payment, Subcontractor shall submit a detailed Schedule of Values acceptable to the Contractor, for the purpose of approving work-in-place and/or materials suitably stored on site.

19. Prior to the final Requisition for Payment being processed, the Subcontractor shall submit to the Contractor, final lien waivers. final warranty, as-built drawings. copies of inspections and/or permits, three (3) hard copies and one (1) PDF copy of equipment operation and maintenance manuals and any other criteria required by the contract documents.

20. Subcontractor must use the Contractors •Subcontractor Requisition for Payment' form for all payment requisitions, and the form must bear the Subcontractors original signature, notarized.

21. With every requisition for payment, Subcontractor must submit a validly executed Lien Waiver and, in the event that there is a payment bond on the project, a Waiver of Right to Claim Against the Bond, as a condition precedent to payment.

22. The Subcontractor shall execute IRS document W-9 and return it to the Contractor with the executed Subcontract. Contractors receipt of the executed W-9 Is a condition precedent to payment.

23. Subcontractor hereby acknowledges that it has received contract drawings and specifications for the Work.

24. Modifications or alterations to this Subcontract are not valid without prior written approval of the Contractor.

25. Prior to execution of any extra or change in the work, Subcontractor must submit a claim for Change in the Work end a Project Manager. or other Project Executive, must issue a Subcontractor Modification in accordance with Paragraph Three Changes in the Work of the Terms and Conditions. Contractor shall not compensate Subcontractor for such Work if the Subcontractors claim was not timely or the Contractor did not approve the claim and issue a Subcontractor Modification. The Superintendent does not have authority to modify the Subcontract or to approve extra work or claims for Change in the Work.

26. Subcontractor shall not assign, in whole or in part assign or sublet this Subcontract or the proceeds due or to become due under this Subcontract Without the prior, express and written consent of the Contractor.

27. Subcontractor shall maintain accurate as-built drawings during construction, and upon request, Subcontractor shall submit the drawings to the Contractor for periodic review. Failure to maintain accurate as-built drawings during construction may result in default under Paragraph Seven Default and Remedies of the Terms and Conditions. Not later than Substantial Completion, the Subcontractor shall deliver one clean set of marked-up drawings to the Contractor for inclusion in the close-out documents with the Owner.

28. For each day the Subcontractor is on the jobsite, the Subcontractor shall submit a "Subcontractor's Daily Report" form, available at the Contractor's field office, to the Contractors Superintendent by 10:00 a.m. the following morning. Subcontractor's compliance with this provision is a condition precedent to payment.

29. Subcontractor shall pay all taxes, assessments and premiums under the federal Social Security Act, any applicable unemployment insurance, workers compensation, disability benefits, sales tax, use tax, business tax, personal property tax laws, or other applicable laws now or later in effect payable by reason of or in connection with any part of the Work. In the event that Subcontractor fails to comply with these laws and Contractor becomes liable for such taxes, assessment or premiums, Subcontractor shall indemnify and hold harmless the Contractor and/or the Owner from and against such liability that Contractor and/or the Owner may incur as a result of such failure.

30. Subcontractor is responsible for having an approved Subcontractor prequalification package on file prior to the issuance of a Subcontract.

# SUBCONTRACT
**Stellar Group, Inc.**

**SC #:**   23006976-SUB-05

**Subcontractor:**   Fabco Metal Products, LLC

**Date:**   12/16/2020

**Page:**   3 of 6

## TERMS AND CONDITIONS

1.       GENERAL CONTRACT. Contractor has entered or will enter into a General Contract with the Owner for the Project described on the first page of this Subcontract. Contractor has made or will make copies of the General Contract available to the Subcontractor (with dollar amounts redacted). The Project, including Subcontractor's Work, is to be constructed in accordance with the terms and conditions of the General Contract, including drawings and specifications and general, supplemental and special conditions and other Contract Documents described therein. Subcontractor hereby assumes the same conditions and responsibilities with respect to the performance under this Subcontract that the Contractor assumes toward the Owner with respect to its performance under the General Contract. If the General Contract varies or conflicts with any provision of this Subcontract, including any modification hereof, this Subcontract shall govern.

2.       SCOPE OF WORK. Subcontractor shall provide and pay for all labor, materials, services, tools, equipment and other things necessary to fully perform the Work set forth on the first page hereof, in cooperation with the other trades, in a good and workmanlike manner, and to the satisfaction and acceptance of Contractor and Owner or Owner's representative, which shall be final. Subcontractor has examined the premises and ascertained existing site conditions (including sub-surface conditions) and the nature and location of the Work thereon, All Work affected or governed by such site conditions or Work and services required for the thorough and satisfactory execution and completion of the work, whether indicated and specified or not, and regardless of quantity estimated, shall constitute a part of this Subcontract and be performed by Subcontractor without additional charge. Subcontractor expressly waives the right to make any claim arising out of minor variations in the actual condition of the premises from those conditions shown on the drawings and specifications.

3.       CHANGES IN THE WORK. Whenever the Contractor requests extra work, acceleration of work, compression of work or other changes requiring additional payments (collectively referred to herein as a 'Change in the Work') verbally or in writing directly or indirectly, Subcontractor shall present a written claim for compensation to the Contractor for such Change in the Work within ten (10) days of such request, Subcontractor hereby waives any claim for compensation not presented within ten (10) calendar days of the Change in the Work request. No dispute as to adjustment in the contract price due to Change in the Work shall excuse Subcontractor from proceeding within the original scope of Work or Change in the Work.

Subcontractor shall furnish a complete, itemized breakdown in sufficient detail to permit an analysis of all labor, material and equipment for any Change in the Work implemented at the direction of the Contractor and timely claimed in writing by Subcontractor.

In the event a Change in the Work affects the current Construction Progress Schedule, Subcontractor must include the claim for Change in the Work any request for time extension and justifications therefor.

It shall be a condition precedent to Subcontractors recovery of any compensation or damages for a Change in the Work of any type or any extension of time, whether requested (directly or indirectly, verbally or in writing) or caused by Contractor or others, that Subcontractor shall have made a specific written claim for such Change in the Work extension, compensations or damages within ten (10) days of the request or event giving rise to such Change in the Work or extension of time.

Claims for any such Change in the Work, extension, compensation or damages received after ten (10) days are hereby waived by the Subcontractor and shall not be considered by the Contractor.

4.       PERFORMANCE. Subcontractor acknowledges that TIME IS OF THE ESSENCE with respect to Contractors completing the Project pursuant to the General Contract, and that such completion is substantially dependent upon Subcontractor's performance of this Subcontract on or before the dates set forth in the Construction Progress Schedule and/or elsewhere herein. TIME IS OF THE ESSENCE IN THIS SUBCONTRACT. Subcontractor shall turn the Work over to the Contractor in good condition and free and clear of all claims and liens, and shall, at its expense, indemnify Contractor and defend all suits and pay all claims arising from its actions and omissions or those of its vendors, sub-subcontractors or second-tier subcontractors in its performance of this Subcontract. Subcontractor shall pay the cost of any bond necessary to remove any mechanic's lien from the Project arising out of the Work of Subcontractor. Subcontractor covenants, agrees and warrants that he shall not employ any labor which may interfere with labor harmony at the job site or with the introduction and storage of materials and execution of work by other subcontractors. If Subcontractor breaches this covenant and such breach causes a stoppage or slowdown of Work at the jobsite, Subcontractor shall be liable for damages suffered by Contractor caused by such delay in completing the Project, including any liquidated damages in the General Contract imposed on Contractor for failing to complete the Project on the completion date set forth therein. This job shall be run Merit Shop. Subcontractor shall comply with all laws, ordinances and regulations relating to the manner of doing the Work or to the supplying of material, including, without limitation, laws, ordinances, rules, regulations and orders for the safety of persons and property, and Subcontractor shall provide safe working conditions for its employees and all other persons on the jobsite at all times. If Subcontractor discovers any errors, omissions or discrepancies in the drawings or specifications, the General Contract this Subcontract, Subcontractor shall immediately notify Contractor in writing. Any Work affected by such discoveries which Subcontractor performs prior to notifying Contractor and obtaining Contractors authorization to proceed shall be performed at Subcontractors risk. Subcontractor acknowledges that it may be performing the Work in the same area where other subcontractors, Contractor or Owner may be working, and the performance of work by the others may temporarily affect the Subcontractors Work. Subcontractor agrees to fully cooperate with the others to ensure an expeditious completion of the interfaces. If Subcontractors Work depends on the proper execution of work by others, then prior to the execution of its Work, Subcontractor shall inspect such work and submit a written report to the Contractor describing any defects. Subcontractors failure to inspect and report any defects prior to commencing its Work constitutes acceptance of such work by Subcontractor.

5.       INDEMNITY. (a) Indemnity. (1) General Indemnification for Damages to Persons or Property, To the fullest extent permitted by law, Subcontractor shall defend, indemnify and hold harmless the Owner, its officers, directors, agents, and employees; and the Contractor, its officers, directors, agents, and employees; from and against claims, demands, payments, damages, losses and expenses arising from injury to or destruction of tangible property (other than the work itself), including loss of use resulting therefrom or accident, bodily injury, sickness, disease or death, or damage whatsoever to any person, firm or corporation, caused in whole or in part by any act, omission, negligence or default of the Owner or its officers, directors, agents, or employees; the Contractor or its officers, directors, agents, or employees; the Subcontractor or its officers, directors, agents, or employees; or any of the Subcontractors contractors, subcontractors, sub-subcontractors, materialmen, suppliers, servants, agents, or licensees of any tier or their respective employees.

Subcontractors indemnification of Contractor and/or Owner shall include all costs, reasonable attorneys' fees, expenses, interest and liabilities incurred in or about any such claim, action or proceeding brought thereon.

If by reason of such claims any party brings any claim, action or proceeding against Contractor and/or Owner, Subcontractor, if requested and upon notice from Contractor, shall defend the Contractor and/or Owner against such claim, action or proceeding at Subcontractor's expense by counsel satisfactory to Contractor and/or Owner.

In compliance with Florida Statute § 725.06, the indemnity obligation described in 5(a)(1) is limited to the greater of $1,000,000 or two times the total General Liability (including Umbrella Liability Policy) insurance limit required in Paragraph SIX, "+"insurance below, which amount the Parties agree bears a reasonable commercial relationship to the Subcontract and the risks associated with Subcontractor's performance thereunder.——

The indemnity obligation described herein is intended to be consistent with the scope of indemnity obligations authorized by Florida Statute § 725.06, the provisions of which are incorporated herein by reference.

In the event any portion of the indemnity obligations described in the Contract is determined to• be inconsistent with Florida Statute § 725.06, the provisions of Florida Statute § 725.06 shall control, it being the intention of the parties that Subcontractor shall indemnify Owner and Contractor, their officers, directors, agents, or employees to the fullest extent authorized by Florida law.

Additionally, the parties agree that the indemnity provisions herein are hereby incorporated into the project specifications or project bid documents, if any,

# SUBCONTRACT
**Stellar Group, Inc.**

| | | | |
|---|---|---|---|
| **SC #:** | 23006976-SUB-05 | **Date:** | 12/16/2020 |
| **Subcontractor:** | Fabco Metal Products, LLC | **Page:** | 4 of 6 |

(2) Indemnification for Economic Damages-Subcontractor's Labor Force. To the fullest extent permitted by law, the Subcontractor shall defend, indemnify and hold harmless the Owner, its officers, directors, agents, and employees; and the Contractor, its officers, directors, agents, and employees; from and against claims, demands, payments, damages, losses, premiums, fines and any other expenses arising from Subcontractor's, Subcontractor's contractor's, subcontractor's, sub-subcontractor's, or of any tier or their respective employee's or any other statutory employee of Contractor as defined in Florida Statutes, S 440.02, violation of any provision of Chapter 440, Florida Statutes (a/k/a 'Workers Compensation Law).

Subcontractors indemnification of Contractor and Owner shall include all costs, reasonable attorneys' fees, expenses, interest and liabilities incurred in or about any such claim, action or proceeding brought thereon. If by reason of such claims any party brings any claim, action or proceeding against Contractor and/or Owner, Subcontractor, if requested and upon notice from Contractor, shall defend the Contractor and/or Owner against such claim, action or proceeding at Subcontractor's expense by counsel satisfactory to Contractor and/or Owner.

(3) Indemnification for Damages Associated with Performance of the Contract Work. To the fullest extent permitted by law, Subcontractor shall defend, indemnify and hold harmless the Owner, its officers, directors, agents, and employees; and the Contractor, its officers, directors, agents, and employees; from and against claims, demands, payments, damages, losses and expenses arising from the conduct, management, or performance of the Work or the performance by Subcontractor under the terms of this Subcontract, including, but not limited to, any and all 3. claims arising from any condition of the Work due to any act, omission, negligence, breach or default on the part of Subcontractor in the performance of any obligation on its part to be performed pursuant to this Subcontract or liens relating to Subcontractors Work, regardless of who performs the Work, supplies materials, or asserts such lien.

Subcontractors indemnity of Contractor and Owner shall include all costs, reasonable attorneys' fees, expenses, interest and liabilities incurred in or about any such claim, action or proceeding brought thereon. If by reason of such claims any party brings any claim, action or proceeding against Contractor and/or Owner, Subcontractor, if requested and upon notice from Contractor, shall defend the Contractor and/or Owner against such claim, action or proceeding at Subcontractors expense by counsel satisfactory to Contractor and/or Owner.

6.      INSURANCE REQUIREMENTS. At Subcontractor's own expense and prior to commencing the Work, Subcontractor shall procure all insurance coverage as required hereunder and furnish Contractor with certificates of insurance, and copies of additional insured endorsements, executed by an authorized representative from an insurer duty licensed to transact business at the location of the jobsite.

Subcontractor shall maintain the required insurance coverage and provide current evidence of such coverage to the Contractor until the warranty period of the Subcontractors Work expires.

The insurance coverage as set forth below shall be issued from companies satisfactory to the Contractor and with an AM Best rating of not less than A- VII.

Securing and maintaining the insurance required hereunder is a condition precedent to payment, Furthermore, Subcontractor's failure to comply with the terms of this provision or its subparts shall constitute a default under Paragraph Seven Default and Remedies of the Terms and Conditions and, at Contractors option, Contractor may terminate this Subcontract for cause and/or purchase said insurance at Subcontractors expense.

(a) Commercial General and Umbrella Liability Insurance. If the estimated value of the Subcontract, including prospective change orders or modifications, is less than $2,000,000, the Subcontractor shall maintain commercial general liability (CGI) and, if necessary, umbrella insurance with a per project limit of not less than $2,000,000 each occurrence, subject to a general aggregate of not less than $2,000,000. If the estimated value of the Subcontract, including change orders or modifications, exceeds $2,000,000, the Subcontractor shall maintain commercial general liability (CGL) and, if necessary, umbrella insurance with a per project limit of not less than the total estimated value of the Subcontract per occurrence, subject to a general aggregate of not less than said total. If at any time a Change in the Work causes the total value of the Subcontract to exceed the Subcontractors current commercial general liability (CGL) per project limit and/or umbrella insurance per project limit, the Subcontractor must obtain the proper coverage as required herein and provide evidence of such coverage to the Contractor. The general aggregate limit shall apply separately to this Subcontract. The CGI- insurance shall be written on ISO occurrence form CG 00 01 (or a substitute form providing equivalent coverage). The coverage shall include liability arising from premises, operations, independent contractors, products-completed operations, personal injury & advertising injury, and liability assumed under an insured contract, including the tort liability of another assumed in a contract. The Subcontractor's CGL policy shall include Contractor as an additional insured for both ongoing and completed operations. The additional insured endorsements shall be written on ISO additional insured endorsement CG 20 10 07 04 (for ongoing operations) and CG 20 37 07 04 (for completed operations) (or substitute endorsements providing equivalent coverage) and attached to Subcontractors CGL, and to the commercial umbrella, if any. Subcontractor shall maintain ongoing CGL coverage for the products-completed operations hazard, including liability assumed under an insured contract, and the required additional insured coverage for the maximum period of time Subcontractor may be held legally liable for its work following substantial completion of the Work. Subcontractor shall maintain this coverage on ISO occurrence form CG 00 01 (or a substitute form providing equivalent coverage). Subcontractors CGL insurance shall apply as primary insurance with respect to any other insurance or self-insurance programs afforded to Contractor, and no endorsement or modification of the CGL shall make the coverage excess over other available insurance.

(b) Automobile and Umbrella Insurance. Subcontractor shall maintain automobile liability insurance and, if necessary, umbrella liability insurance with a limit of not less than $1,000,000 each accident. Such insurance shall cover liability arising out of 'any auto', including owned, hired, and non-owned autos. Coverage shall be written on ISO form CA 00 01, or a substitute form providing equivalent liability coverage. Stellar shall be added as an additional Insured to the auto and umbrella policy.

(c) Workers Compensation Insurance. Subcontractor shall maintain worker's compensation and employer's liability insurance. The worker's compensation coverage shall provide the statutory maximum limit of liability.

The employer's liability limits shall not be less than $1,000,000 each accident for bodily injury by accident or $1,000,000 each employee for bodily injury by disease.

(d) Pollution Liability Insurance. Pollution Liability Insurance is required with a limit of no less than $1,000,000 This coverage must include damage caused by pollutants, which is any solid, liquid, gaseous or thermal irritant including mold and fungus, smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. This coverage must include completed operations. Any exception to this requirement will be determined by Stellar according to Exhibit A Scope of Work.

(e) Professional Liability Insurance. If Subcontractors scope of services includes design work or other professional services, then Subcontractor shall maintain insurance coverage for Subcontractors errors, omissions and other wrongful acts arising out of the professional services performed by Subcontractor. The limit of liability shall not be less than $1,000,000.

(f) Waiver of Subrogation. Subcontractor waives all rights against Contractor and its agents, officers, directors and employees for recovery of damages to the extent that any of the policies of Insurance maintained pursuant to this Subcontract covers these damages.

(g) Sub-subcontractors Insurance. Subcontractor shall cause each Sub-subcontractor employed by Subcontractor to purchase and maintain insurance of the type specified in this agreement. When requested by Contractor, Subcontractor shall furnish to Contractor copies of certificates of Insurance evidencing coverage for each Sub-subcontractor.

(h) No Representation of Coverage Adequacy. By requiring the insurance as set out in this Subcontract, Contractor does not represent that such coverage and limits will be adequate to protect Subcontractor, and Subcontractor acknowledges that its liability under the indemnities provided to the Contractor and/or Owner pursuant to this Subcontract is not limited to such coverage and limits.

7.      DEFAULT AND REMEDIES. (a) Should Subcontractor at any time fail to prosecute and complete the Work in accordance with the Construction Progress Schedule, as herein provided or as directed by Contractor; or fail to diligently and continuously perform its Work; or if, in the opinion of Contractor, the Work of Subcontractor cannot be completed in the time period required; or if Contractor Is notified of Subcontractors failure to pay for any material or labor used on the Project; or in the event of a

# SUBCONTRACT
## Stellar Group, Inc.

**SC #:** 23006976-SUB-05  
**Subcontractor:** Fabco Metal Products, LLC

**Date:** 12/16/2020  
**Page:** 5 of 6

strike or stoppage of Work resulting from a dispute involving or affecting the labor employed by Subcontractor or its sub-subcontractors; or if Subcontractor fails to perform any of the requirements of this Subcontract; then such event shall constitute a default hereunder and Contractor shall notify Subcontractor to correct such default and shall specify in such notice the action to be taken and the date by which the default shall be corrected (the "Notice of Default").

(b) If a default occurs and Subcontractor has not corrected the default on or before the date specified in the notice to the Subcontractor, Contractor may exercise any or all of the following remedies:

Contractor may immediately take any action necessary to correct such default, including without limitation the right to provide labor, overtime and materials, and may deduct the cost of correcting such default from any payment due or to become due to Subcontractor or recover such cost from Subcontractor if no sums are due or become due to Subcontractor.

The Contractor may terminate this Subcontract, take possession of Subcontractors materials, tools and equipment used in performing the Work, and employ another subcontractor or use the employees of Contractor to finish the remaining Work to be performed hereunder.

Contractor may deduct the costs of completing the remaining Work from the unpaid Subcontract Price and if the cost of completing the remaining Work exceeds the unpaid Subcontract Price, Subcontractor shall pay Contractor such excess cost, including, without limitation, overhead and attorneys' fees; and

The Contractor may exercise any remedy at law or in equity available as a result of Subcontractors default or non-performance under this Subcontract.

Contractor, in any such event, may also refrain from making any further payments to Subcontractor until the entire Project shall be fully finished and accepted by Owner at which time, if the unpaid balance of the amount to be paid under this Subcontract shall exceed the sum of the expense incurred by the Contractor in finishing the Work and the damage sustained by Contractor as a result of Subcontractors default, then such excess shall be paid by Contractor to Subcontractor, but if the sum of such expenses and damages shall exceed such unpaid balance, Subcontractor shall promptly pay the difference to the Contractor.

(c) Upon any default, Subcontractor shall pay to Contractor its attorneys' fees and court costs incurred in enforcing this Subcontract or seeking any remedies hereunder. Subcontractor shall pay all such fees and costs, whether or not suit is filed and in connection with any appeal and in connection with any bankruptcy or other insolvency proceeding.

(d) If Contractor does not terminate Subcontractors right to proceed, Subcontractor shall continue with the Work.

(e) If Owner is damaged by reason of any breach by Subcontractor of this Subcontract, then Subcontractor shall pay Owner such damages, together with all costs of collection including court costs and attorneys' fees.

(f) Subcontractor hereby knowingly and voluntarily waives all claims for damages due to delays, disruptions, constructive acceleration of work and similar economic losses and agrees that its sole and exclusive remedy for any such claims shall be an extension of the contract time provided that Subcontractor makes a written claim for such extension within ten (10) days of the event giving rise to the claim.

(g) Proposed Setoff Clause - if at any time Subcontractor is indebted to Contractor under any other subcontract or for any other reason, Contract shall have the right to set off such indebtedness against any payments earned under this Subcontract. Additionally, if Subcontractor defaults on any other subcontract on this Project for any reason, such default shall also constitute a default under this Subcontract.

(h) Proposed Bankruptcy/Insolvency Clause - If Subcontractor should file for bankruptcy protection, otherwise become insolvent, or encounter financial difficulties which impair the ability of Subcontractor to perform its obligations under this Subcontract fully and efficiently, then Contractor may, upon written notice, terminate Subcontractors performance under this Subcontract for cause, and Subcontractor shall pay to Contractor the amount of loss or damage sustained by Contractor as a result of the termination.

8.     PAYMENT. (a) Subcontractor shall, prior to submission of its first requisition for payment, give Contractor the name, address and telephone number of every material supplier and sub-subcontractor furnishing materials and/or labor to Subcontractor for the Work covered herein.

If Contractor receives the Subcontractor's requisition for payment and all required lien waivers by the 22nd day of the month, Contractor shall process the requisition for payment by the 25th day of the following month or 5 days after receipt of payment from the Owner, whichever is greater. The amount of each such payment is always subject to the approval of Contractor. Subcontractor, at Contractors request, shall provide evidence that that the unpaid balance of the Subcontract Price, exclusive of Retainage, is at all times sufficient to complete Subcontractors remaining Work hereunder. All monthly payments are subject to a ten (10) percent Retainage. Contractor shall disburse Subcontractor's Retainage within sixty (60) days following completion and acceptance by the Owner of the entire Project of which Subcontractors Work is a part, however, Contractors receipt of the Retainage from Owner is an absolute condition precedent to disbursement of the Subcontractors Retainage.

Subcontractor shall submit all requisitions for payments on the Contractors "Subcontractor Requisition for Payment" form. The form must bear the original, notarized signature of an authorized agent of the Subcontractor. With each requisition for payment, Subcontractor must also submit a valid lien and/or bond waiver(s), on the Contractors form(s), from Subcontractor and each of its sub-subcontractors and suppliers. The waiver(s) must bear the original, notarized signature of an authorized agent of the entity waiving its bond and/or lien rights, and must cover the time period and the amount of all materials, labor and Work reflected in such requisition (including final lien and/or bond waivers with the final requisition for payment). Furthermore, if requested, Subcontractor shall submit evidence satisfactory to Contractor that all payroll; bills for materials and equipment; sales, use and business taxes; and all known indebtedness connected with Subcontractor's Work have been satisfied.

(b) Subcontractor shall defend and discharge any liens or claims arising from its performance or failure to perform under this Subcontract and shall indemnify and hold the Contractor and the Owner harmless from any losses, damages, costs, expenses and attorneys' fees relating to or resulting from mechanics' liens, equitable liens or payment bond claims arising by, through, or under Subcontractor.

Subcontractor shall make payment to sub-subcontractors and suppliers in an amount equal to the percentage of completion allowed to the Subcontractor on account of its Work. Subcontractor agrees that it shall only use sums received for its performance of this Subcontract for labor, services and material provided hereunder and shall not use such sums to satisfy Subcontractors obligations on other contracts.

Subcontractor agrees that Contractor may pay Subcontractor's material suppliers or Sub-Subcontractors with Subcontractor-by joint checks at any time. Furthermore, Contractor may make direct payments to Subcontractor's material suppliers or Sub-Subcontractors, provided that Contractor has given Subcontractor seven (7) days prior written notice of intent to make such payment(s) and the amount of such payment(s).

(c) Notwithstanding anything to the contrary appearing herein or in any of the Contract Documents, (including but not limited to the General Contract between Owner and Contractor) either implicitly or explicitly, Subcontractor is not entitled to receive any progress payment or final payment prior to Contractors actual receipt of that payment from Owner, Subcontractor agrees that Contractors actual receipt of full payment from the Owner is a condition precedent to Contractor's obligation to pay Subcontractor and to the bringing of any action by Subcontractor against Contractor (and its surety, if any) relating to Contractors failure to make payment. Subcontractor further agrees that its full performance of this Subcontract shall not constitute an exception to the condition set forth in this paragraph. Subcontractor agrees that this provision also constitutes a condition precedent to any claim against any payment bond in effect on the Project.

9.     SHOP DRAWINGS. Subcontractor shall review Shop Drawings for compliance with the Subcontract Documents and approve and submit to the Contractor all Shop Drawings required by the Subcontract Documents. Subcontractor shall submit Shop Drawings with reasonable promptness and in such sequence as to cause no delay in the Work or in the activities of Owner, Contractor or other subcontractors. Contractors review of the Subcontractor's submittals shall not (a) relieve Subcontractor of its obligations

# SUBCONTRACT
## Stellar Group, Inc.

| | | | |
|---|---|---|---|
| **SC #:** | 23006976-SUB-05 | **Date:** | 12/16/2020 |
| **Subcontractor:** | Fabco Metal Products, LLC | **Page:** | 6 of 6 |

or release Subcontractor for any liability under the Subcontract Documents or any section hereof, (b) constitute Owners or Contractor's approval of Subcontractors safety precautions, construction means, methods, techniques, sequences or procedures, or (c) represent Contractor's determination of accuracy and completeness of details of the Work such as dimensions or qualities, or Contractors substantiation of instructions for installation or performance of equipment or systems, all of which remain the responsibility of Subcontractor as required by the Subcontract Documents.

10.    WARRANTY. Subcontractor warrants to the Contractor that all materials and equipment furnished under the Subcontract will be new unless otherwise specified and that all Work will be of good quality, free from faults and defects and in conformance with the Contract Documents. All Work not so conforming to these standards shall be considered defective. If required by the Contractor, the Subcontractor shall furnish satisfactory evidence as to the kind and quality of materials and equipment incorporated in the Project. Subcontractor shall warrant all materials and workmanship furnished or performed hereunder to be free of defects for a period of one year from date of acceptance by Owner of the entire Project unless otherwise specified herein and shall, at its expense, promptly replace, repair or correct any such defective materials or workmanship appearing within warranty period as set forth herein. Subcontractor shall submit and assign all factory warranties on materials and equipment installed by him and, at the option of Contractor, shall initiate an assignment to Contractor and/or assigns a service agreement with a local service agency covering all equipment, workmanship and materials so installed. The warranty provided in this paragraph and elsewhere in the Contract Documents is in addition to and not in limitation of any other warranty or remedy provided by law or required by the Contract Documents.

11.    IMMIGRATION LAWS COMPLIANCE. Subcontractor must fully comply with all employment verification procedures, including without limitation, complying with all I-9 verification, reverification and updating procedures as required by the Immigration Reform and Control Act of 1986, for all of its employees. Subcontractor certifies and warrants to Contractor that it maintains an I-9 compliance program for the express purpose of verifying lawful employment authorization to work in the United States for all of its employees. The Subcontractor further represents that it maintains a designated I-9 compliance officer who oversees the Subcontractors I-9 compliance procedures.

12.    MISCELLANEOUS. Subcontractor shall remove from the premises, as directed by Contractor, all rubbish and surplus material which may accumulate from the prosecution of its Work.

Should Subcontractor fail to do so, Contractor may, at its option, remove same and deduct the cost of such removal from any amounts owed to Subcontractor and if the cost of such removal exceeds the unpaid Subcontract Price, Subcontractor shall pay Contractor such excess cost.

Notwithstanding anything contained herein to the contrary, Contractor may, without cause, terminate this Subcontract at any time upon written notice to the Subcontractor.

The Subcontractor shall not be entitled to anticipate a profit or damages for any termination by Contractor for its convenience.

This Subcontract contains the entire agreement between Contractor and Subcontractor.

All prior negotiations, representations and agreements with respect to this Subcontract not specifically incorporated herein are hereby cancelled.

Owners substantial performance of the General Contract is a condition of Contractors obligation under this Subcontract.

If Owner becomes bankrupt or otherwise defaults in its payments to Contractor under the General Contract, and/or terminates the General Contract with or without cause, then, upon written notice thereof to Subcontractor, Contractor may terminate this Subcontract and will thereupon, subject to the conditions of paragraph 8(c) of this Subcontract, be liable to Subcontractor only for cost of Work actually performed by Subcontractor at the time of said notice (subject to the provisions of paragraph 8(c) hereof) and for no further compensation or damage.

Subcontractor shall protect its finished Work against damage by other trades and shall be liable for damage caused by him to the Work of others.

Subcontractor shall pay the cost of replacement or repair to the Work of other trades damaged by him or occasioned by the correction of its defective Work and should Subcontractor fail to do so, Contractor may, at its option, correct such defective Work and deduct the cost thereof from any amounts owed to Subcontractor and if the cost of such correction exceeds the unpaid Subcontract Price, Subcontractor shall pay to Contractor such excess cost.

Subcontractor is responsible for determining the location of and for any damage caused by him to any underground objects, including but not limited to sewer, water, gas, electric or telephone lines, cables, pipes and tunnels.

Subcontractor shall obtain and pay for all taxes, permits, licenses and official inspections made necessary by its Work and comply with all laws, ordinances and regulations relating thereto.

Subcontractor expressly understands and agrees that its only remedy for delays in the Work shall be for an extension of time for the number of days by which he has been delayed, as determined by Contractor and/or Owner, and that Subcontractor shall not be entitled to any recovery for losses, expenses or damages relating to such delays, however caused; provided, however, that no allowance for additional time shall be made for any cause unless a request for an extension is presented in writing to Contractor within ten (10) days after occurrence of the event giving rise to the delay.

Any claim not so presented within ten (10) days shall be deemed waived by the Subcontractor and shall not be considered.

It may be necessary for the Owner to occupy a portion of the Work which Subcontractor has either partially or fully completed prior to final inspection or acceptance by the Owner.

Such occupancy shall not relieve the Subcontractor of its guarantee of Work or modify the warranty period described above.

The parties to this Subcontract agree that execution of this Subcontract was in Jacksonville, Duval County, Florida.

The laws of the State of Florida shall govern the construction, interpretation, enforcement and all other matters relating to this Subcontract and any amendments or modifications, and jurisdiction and venue for any litigation arising under this Subcontract lies exclusively with the appropriate court in Duval County, Florida to the exclusion of any other jurisdiction or venue.

Subcontractor waives the right to trial by jury on any issues relating to this Subcontract.

| | |
|---|---|
| **FABCO METAL PRODUCTS, LLC** | **STELLAR GROUP, INCORPORATED** |
| Subcontractor | Contractor |
| Signed and Dated: _____ 1/8/21 | Signed and Dated: _____ |
| By: ~~Tom Emert~~ SHANE KINTON | By: Jonah Petoskey |
| ~~VP of Sales~~ PRESIDENT | Senior Project Manager |

Reviewed by Sales - TE 1-6-21
Bob Ralston PM 1/7/21

# Exhibit A
# Structural Steel

Attachment Fabco Metal Products, LLC Subcontract # 23006976-SUB-05 dated 12/16/2020

## 1. Scope of Work

1.1   The undersigned Subcontractor, having become thoroughly familiar with the project documents provided and the local conditions affecting the performance and cost of the work, hereby agrees to provide all labor, materials, tools, equipment, freight, supervision, applicable taxes, insurance, services, permits, and miscellaneous incidentals as required to complete in every respect the work as described herein, in strict accordance with the Exhibits, General Notes, and Terms and Conditions of the Subcontract, the additional Subcontract support documents listed below, and all applicable federal, state, and local requirements.

1.2   Henceforth, the word "provide" shall mean furnish and deliver.

1.3   Henceforth, the phrase "as indicated" shall mean as indicated in the project documents.

1.4   The Work to be performed under this Subcontract includes (but is not limited to) the following work:

   1.4.1.   Furnish Miscellaneous Steel as indicated, including but not limited to:

      1.4.1.1.   Column Anchor Bolts and Base Plates

      1.4.1.2.   Bollards (Including Bollard Horizontal Rails)

      1.4.1.3.   Dock Leveler Frames and Embeds

      1.4.1.4.   Trench Angles and Embeds

      1.4.1.5.   Vibration Pad Embeds

      ~~1.4.1.6.   Armor Joints~~   excluded per proposal

      1.4.1.7.   Sump Pit Angles and Embeds

   1.4.2.   Provide Structural Steel as indicated, including but not limited to:

      1.4.2.1.   Stairs, Handrails and Guardrails (Exterior – Galvanized)

      1.4.2.2.   Complete Equipment Platform Systems

      1.4.2.3.   Cooling Tower Framing (Galvanized)

      1.4.2.4.   Utility Piping Framing

      1.4.2.5.   Mechanical Louver Opening Columns

      1.4.2.6.   Overhead Door Structural Steel Frames

      1.4.2.7.   Concrete Ceiling Lid Angles to Existing Tilt Up Panels

      1.4.2.8.   Trench Grating and Trench Steel Supports (Galvanized, Stainless Steel and Fiberglass.)

      1.4.2.9.   Structural Steel Columns and Beams

Fabco Metal Products, LLC.
SC#: 23006976-SUB-05

1.4.3. All freight is included in pricing, and delivery is to be FOB jobsite.

1.4.4. Drill and epoxy anchor bolts as needed for structural steel installation.

1.4.5. Provide all columns, beams, channels, angle supports, bent plates, wall shear plates, bars, tubing, pipe, embeds, anchor bolts as necessary and indicated.

1.4.6. Provide all detailing as indicated for a complete installation of the steel scope.

1.4.7. All steel exposed to the external environments is to be hot dipped galvanized.

1.4.8. All interior exposed steel is to be shop painted with structural steel primer.

1.4.9. Any cuts or welds on galvanized steel are to be painting with cold galvanize after completion.

1.4.10. All weld and burn marks on prime painted steel are to be touched up with spray paint primer.

1.4.11. Receive and unload all deliveries of structural steel.

1.4.12. Install all handrail as indicated, to include core drilling at all concrete ramps and stairs.

1.4.13. All anchor bolt sets will have one leveling nut set to elevation and identified as such by others.

1.4.14. Verify all anchor bolt layout prior to steel erection and communicate any deviation to the contractor prior to steel erection. An inspection shall be made at the pre-steel meeting approximately four weeks prior to start of erection.

1.4.15. Provide hard copies of welding certifications for all field welders.

1.4.16. Provide, install and remove an OSHA approved fall protection system for steel erection.

1.4.17. Remove all mud/debris from steel prior to erection.

1.4.18. All steel erected shall be safely temporarily braced per OSHA requirements until all components are installed and connected.

1.4.19. Joist reinforcement and rooftop equipment frames are by others and excluded.


2. **Change Orders & Extra Work**

2.1 Maximum aggregate mark-up of overhead and profit for all change order work performed under this Subcontract shall be as follows:

2.1.1. Overhead & Profit – 10%

SUBCONTRACT CONTINUATION

Fabco Metal Products, LLC.
SC#: 23006976-SUB-05

Date: 12/16/2020
Page: 3 of 6

3.     **Contract Documents**

3.1     "Exhibit B" - Project Schedule dated 11/30/2020

3.2     "Exhibit C" – Job Specific Safety Plan

3.3     "Exhibit D" – DBA Contract dated 07/28/2020

3.4     "Exhibit E" – Stellar Guide for Subcontractors Usage in Procore

3.5     "Exhibit F" – General Requirements

3.6     "Exhibit G" – Facility Access and Site Utilization Plans

3.7     "Exhibit H" – Drawing Log dated 11/24/2020

3.8     "Exhibit I" – Specifications dated 11/11/2020

4.     **Personnel Labor Rates**

| Item | Description | Hourly Rate |
|------|-------------|-------------|
| Labor | | ST |
| 1 | Project Manager | $85.00 |
| 2 | Superintendent | $93.00 |
| 3 | Erector | $85.00 |
| 4 | Laborer | $80.00 |

5.     **Miscellaneous**

5.1     All project collaboration, correspondence, communication, and documentation will be conducted using Procore. A "How To" guide for Subcontractors has been included within this Subcontractor for interaction with Stellar in the Procore system. As a condition of this Subcontract, Procore shall be used throughout the duration of the project for the following items including but not limited to:

5.1.1.   RFI's

5.1.2.   Observations

5.1.3.   Drawings

5.1.4.   Commitments and Payment Requisitions

5.1.5.   Submittals

5.1.6.   Punch List

Fabco Metal Products, LLC.
SC#: 23006976-SUB-05

Date: 12/16/2020
Page: 4 of 6

     5.1.7. Specifications

     5.1.8. Daily Log Entry

     5.1.9. All other documents and documentation pertaining to the project

5.2    The hours of operation for the project shall be five (5) days per week, forty (40) hours per week, eight (8) hours per day. The site shall be available for work from the hours of 6:30 a.m. to 6:30 p.m., Monday through Friday. This work shall be based upon the above listed hours. Different work schedules must be approved by the Stellar Project Manager and Superintendent.

5.3    Provide all training for new equipment and systems installed under this scope of work. Prior to scheduled training session, a written agenda shall be issued for review. A sign in sheet shall be submitted after completion of training. One (1) hard copy of operation and maintenance manuals shall be available during the training session.

5.4    This scope of work will require multiple mobilizations as defined in the construction schedule. All costs for additional mobilizations as shown in the project schedule are specifically included in this subcontract unless noted otherwise.

5.5    Protection of all existing work is included.

5.6    Subcontractor shall store materials on elevated platforms, under cover and in a dry location, to prevent their deterioration or damage due to moisture, temperature changes, contaminants or other causes.

5.7    Make necessary repairs, in a manner acceptable to and approved by Contractor and Owner, including complete removal and replacement, as determined by the contractor of any work adjudged to be defective or nor conforming to the requirements of this Agreement, the Project Specifications, or standards of good and proper workmanship.

5.8    All deliveries will be scheduled with the Project Superintendent forty-eight (48) hours in advance. The Project Superintendent will approve all deliveries to the site in advance. Unannounced or unscheduled deliveries are subject to being turned away at the expense of the company for which the delivery was intended for both shipping costs and schedule delays.

5.9    Jobsite cleanliness and housekeeping is included in this scope of work. As noted in the General Notes of the Subcontract Agreement, the cost and expense to the subcontractor shall be defined as follows:

SUBCONTRACT CONTINUATION

Fabco Metal Products, LLC.
SC#: 23006976-SUB-05

Date: 12/16/2020
Page: 5 of 6

5.9.1. Should the jobsite housekeeping performance be found to be unacceptable, one written warning will be issued to correct the state of jobsite cleanliness for the areas in which this subcontractor is working. If the cleanliness deficiency is not immediately corrected, Stellar will take action to correct the situation at a charge of $2,500.00 per day for violation of the jobsite housekeeping and cleanliness standard. If this subcontractor is found to be a repeat violator of this policy, Stellar may terminate the contract and pursue legal avenues for compensating any losses associated with the completion of the work.

5.10 Responsibility for unloading of materials, tools, or equipment is included in this scope of work unless specifically excluded herein. Should Stellar be asked to unload any deliveries, it shall be done at a cost of $2,500.00 per day and Stellar will require a written release of liability for any damages from the company requesting this service. Deliveries which cannot be unloaded by this method or which do not have personnel onsite to handle their own shipments may be turned away at their expense for both shipping costs and schedule delays.

5.11 This project is a renovation to an existing, functioning facility in full operation. Subcontractor shall take all required steps and shall do all things necessary to ensure that neither the Owner nor his operations are interfered with, disrupted, or disturbed in any way.

5.12 Subcontractor shall strictly limit his activities to the limits of the construction area. All parking, unloading and receiving, storage, fabrication, and other similar activities shall be confined to designated areas away from the existing facility. The existing facilities roadways and parking areas shall not be used by Subcontractor for these activities or for any others, except for where specifically identified by the Stellar Superintendent.

5.13 Subcontractor's employees shall not enter any portion of the existing facility, except as required to install the work of the project. Subcontractor's employees shall not be permitted to use the existing facility's toilet rooms, lunchroom, or break areas.

5.14 Subcontractor shall notify the project superintendent a minimum of two (2) weeks prior to any activities that may impact the Owner's operations. This work shall be coordinated to minimize the impact to the Owner and may be required to be performed during off hours and/or on extended and/or continuous shifts. Premium costs for this work shall not be subject to a modification of the subcontract.

5.15 All eating, drinking (other than water), smoking, and other tobacco use shall occur outside of the existing building in an area designated by the project superintendent. All trash shall

SUBCONTRACT CONTINUATION

Fabco Metal Products, LLC.                          Date: 12/16/2020
SC#: 23006976-SUB-05                                Page: 6 of 6

be placed into the dumpsters provided by the Contactor and shall not be left inside or outside of the building.

5.16    Subcontractor shall use only electrically operated equipment or fuel-based equipment provided with air scrubbers, for work inside the existing facility unless specifically instructed otherwise.  Welding activities shall be limited to essential tasks such as welding of utility piping and held to a minimum indoors.  All welding activities must be properly protected and properly ventilated.

SUBCONTRACTOR ACKNOWLEDGES RECEIPT OF ALL CONTRACT DOCUMENTS NOTED ABOVE IN SECTION 3.

Fabco Metal Products, LLC.                    STELLAR GROUP, INCORPORATED
Subcontractor                                 Contractor

By: _____          By: _____
Tom Emert, Vice President Sales                   Jonah Petoskey, Sr. Project Manager
SHANE KING.  PRESIDENT

# EXHIBIT B

# EXHIBIT B

## SUBCONTRACTOR'S REQUISITION FOR PAYMENT
(See Reverse Side For Instructions)

TO:

FROM: **Fabco Metal Products LLC**
Subcontractor

1490 Frances Drive
Address

Daytona Beach      FL    32124
City           State   Zip

Job #   23006976     Subcontract # 23006976 02

Requisition #    1    Date    12/15/2020

Job Name   Bang Energy Phoenix Can Manufacturing

Location    Phoenix Arizona

| | | |
|---|---|---|
| Original Subcontract Amount | $ | 3,434,097.31 |
| Total Amount of Modifications | $ | 0.00 |
| Current Subcontract Amount | $ | 3,434,097.31 |

100     % Complete as of        12/30/2020       $       198,767.31
                                    DATE

Less   10.00%    Retainage                          $   (     19,876.73    )

Less Net Amount of Previous Requisitions          $   (     0.00    )

Net Amount Due This Requisition                 $      178,890.58

List each sub-subcontractor or vendor who provided labor and/or materials to the project which makes up any part of this requisition and the gross value of such labor and/or materials provided within this requisition period.

| | | | |
|---|---|---|---|
| Sub-Subcontractor/Supplier | | Value | $    - |
| Sub-Subcontractor/Supplier | | Value | |
| Sub-Subcontractor/Supplier | | Value | $    - |
| Sub-Subcontractor/Supplier | | Value | |
| Sub-Subcontractor/Supplier | | Value | |
| Sub-Subcontractor/Supplier | | Value | |
| Sub-Subcontractor/Supplier | | Value | |
| Sub-Subcontractor/Supplier | | Value | |
| Sub-Subcontractor/Supplier | | Value | |
| Sub-Subcontractor/Supplier | | Value | |

| FOR STELLAR USE ONLY - DO NOT WRITE IN THIS SPACE | | | |
|---|---|---|---|
| JOB #     APPROVED BY | VENDOR# | GROSS AMT | POSTED |
| | | | JOURNAL |
| CODE #     DATE | INVOICE # | RETAINAGE | DATE |

The undersigned certifies that all charges for labor, materials, services and of every other nature in connection with this subcontract in the amount of previous monthly requisitions have been paid in full, and that there remains no charge by any Subcontractor, vendor, or individual furnishing labor or material in connection with this subcontract to date for which a lien could be filed, arising out of or relating to said work.

The undersigned hereby further declares and agrees that in the event that any lien or other claim should be brought against The Stellar Companies, Inc., the Owner, or their building or premises, the undersigned will protect the said parties and defend any suit a action brought against them by reason of any lien or other form of claim or action arising out of said subcontract and hold them harmless end indemnified therefrom.

In consideration of the sum of $1.00 to the undersigned in hand paid, receipt whereof is hereby acknowledged, and other benefits accruing, the undersigned does hereby waive release and quitclaim in favor of The Stellar Companies, Inc. and/or owner or owners of said premises as improved all right that the undersigned may have to a lien upon the land and improvements above described.

IT IS UNDERSTOOD AND AGREED THAT THIS WAIVER AND RELEASE IS FOR ALL SERVICES RENDERED, WORK DONE AND MATERIAL FURNISHED PRIOR TO THE DATE HEREOF and is for all such services rendered, work done and material furnished and not only for the particular item indicated.

Witness the following signature and seal this    14    day of   December    20 20

FIRM:    Fabco Metal Products LLC           BY:

                                          TITLE: President

                   (SEAL)

(Services, labor and material furnished)

Subscribed and sworn to before me, A Notary Public for the State of     14    day of   December    20 20

My commission expires   7/28/2022

                                           Notary Public

                                         JERRY W. CROWDER
                                         Commission # GG 205650
                                         Expires July 28, 2022
                                         Bonded Thru Troy Fain Insurance 800-385-7019

Proprietary Information -- This Document Contains Proprietary Information of The Stellar Group, Inc. and may not be Used or Disclosed to Other Except with the Written Permission of Stellar.

FORM 13.4.F.2                                           REV. 07/20/09

# SCHEDULE OF VALUES

Fabco Metal Products LLC

PROJECT: Banq Energy PHX, Phoenix, AZ

*Fabco Job# 20042*

PAGE: ONE OF ONE

Pay App: 1
Date: 12/14/2020
Through: **12/31/2020**

| A | B | C | D | E | F | G | H | I |
|---|---|---|---|---|---|---|---|---|
| ITEM NO. | DESCRIPTION OF WORK | SCHEDULED VALUE | WORK COMPLETED | | MATERIALS PRESENTLY STORED NOT IN (D or E) | TOTAL COMPLETED AND STORED TO DATE (D + E + F) | BALANCE To FINISH (C - G) | RETAINAGE |
| | | | FROM PREVIOUS APPLICATION (D + E) | THIS PERIOD | | | % (G / C) | |
| 1 | Engineering and Shop Drawings (Material) | $117,903.75 | | $117,903.75 | | $117,903.75 | 100% | $0.00 | $11,790.38 |
| 2 | Anchor Bolts (Material) | $9,904.32 | | $9,904.32 | | $9,904.32 | 100% | $0.00 | $990.43 |
| 3 | Embeds (steel, ssi) (Material) | $70,959.24 | | $70,959.24 | | $70,959.24 | 100% | $0.00 | $7,095.92 |
| 4 | Structural Steel Material/Fabrication (Material) | $1,769,196.41 | | | | $0.00 | 0% | $1,769,196.41 | $0.00 |
| 5 | Gratings (steel, ss, fiberglass) (Material) | $130,340.91 | | | | $0.00 | 0% | $130,340.91 | $0.00 |
| 6 | Structural Steel Erection (Labor) | $524,661.70 | | | | $0.00 | 0% | $524,661.70 | $0.00 |
| 7 | Miscellaneous Steel Material/Fabrication (Material) | $591,250.98 | | | | $0.00 | 0% | $591,250.98 | $0.00 |
| 8 | Miscellaneous Steel Erection (Labor) | $219,880.00 | | | | $0.00 | 0% | $219,880.00 | $0.00 |
| | | | | | | | | | |
| | TOTAL | $3,434,097.31 | $0.00 | $198,767.31 | $0.00 | $198,767.31 | 5.79% | $3,235,330.00 | $19,876.73 |

# PARTIAL RELEASE AND WAIVER OF LIEN

KNOW ALL MEN BY THESE PRESENTS, that the undersigned, _FABCO METAL PRODUCTS LLC_____ (company name), by its duly authorized agent, for and in consideration of payment in the amount of $__178,890.58_____, the receipt of which is hereby acknowledged, does hereby waive, release and relinquish any and all claims and demands including any lien or right to claim a lien for labor and materials furnished through _____12/25_____, 2020___ on the following described property:

**VPX Phoenix Can Manufacturing**
**1635 South 43rd Avenue**
**Phoenix, Arizona**
**Project # 23006976**

This Partial Release and Waiver of Lien constitutes a full and complete discharge, release and waiver of any right to further payment and any mechanic's or materialmen's lien or right to lien for any and all work and labor done and performed or any and all materials or both, furnished to The Stellar Group for improvement of the above described property through ___12/25_____, 20_20__.

The undersigned hereby represents and warrants that all labor and/or materials furnished or used on the above described property for which this Partial Release and Waiver of Lien is executed through _____12/25_____, 20_20__ have been paid in full.

The undersigned recognizes and agrees this Partial Release and Waiver of Lien is given to induce The Stellar Group to make the payment described above and The Stellar Group will rely on the Partial Release and Waiver of Lien in making payment described above.

IN WITNESS THEREOF, the undersigned has caused this Partial Release and Waiver of Lien to be duly executed this ___16__ day of __Dezember____, 20_20_.

              ___Fabco Metal Products LLC_____
              COMPANY NAME

              _____
                                     (Signature)
              BY: SHANE KING_____
                                (Print Name)
              ITS: PRESIDENT_____
                                  (Title)

Witness:                              Witness:

_____        _____
Signature                              Signature

_____        _____
Printed Name                          Printed Name

SWORN TO AND SUBSCRIBED before me this 16 day of Dezember, 2020.

              Notary Public: _____
              State of _FL_____
              My Commission Expires: __7/28/2022_____

Personally Known (X)  Produced Identification ( )  Type of ID:_____



JERRY W. CROWDER
Commission # GG 205650
Expires July 28, 2022
Bonded Thru Troy Fain Insurance 800-385-7019

APPLICATION AND CERTIFICATE FOR PAYMENT

DOCUMENT SUMMARY SHEET

**TO CONTRACTOR:**
Stellar
2900 Hartley Road
Jacksonville, Florida 32257

**APPLICATION NO: 2**
INVOICE NO: 02
PERIOD: 01/01/21 - 01/31/21
PROJECT NO: 23006976
CONTRACT DATE: 01/08/2021

DISTRIBUTION TO:

**FROM SUBCONTRACTOR:**
Fabco Metal Products, LLC
1490 Frances Drive
Daytona Beach, Florida 32124

**PROJECT:**
Bang Energy - Phoenix Can Manufacturing
1635 South 43rd Avenue
Phoenix, Arizona 85009

**SUBCONTRACT DATE:** 1/8/2021

SUBCONTRACT FOR: Structural Steel
**SUBCONTRACTOR'S APPLICATION FOR PAYMENT**

Application is made for payment, as shown below, in connection with the Subcontract. Continuation Sheet is attached.

| | | |
|---|---|---|
| 1. | Original Contract Sum | $ 3,434,097.31 |
| 2. | Net change by change orders | $ 0.00 |
| 3. | Contract sum to date (line 1 ± 2) | $ 3,434,097.31 |
| 4. | Total completed and stored to date | $ 223,767.31 |
| | (Column G on detail sheet) | |
| 5. | Retainage: | |
| | a. 10.00% of completed work: | $ 22,376.73 |
| | b. 0.00% of stored material: | $ 0.00 |
| | Total retainage (Line 5a + 5b or total in column I of detail sheet) | $ 22,376.73 |
| 6. | Total earned less retainage | $ 201,390.58 |
| | (Line 4 less Line 5 Total) | |
| 7. | Less previous certificates for payment | $ 178,890.58 |
| | (Line 6 from prior certificate) | |
| 8. | Current payment due: | $ 22,500.00 |
| 9. | Balance to finish, including retainage | $ 3,232,706.73 |
| | (Line 3 less Line 6) | |

The undersigned hereby further declares and agrees that in the event that any lien or other claim should be brought against The Stellar Companies, Inc., the Owner, or their building or premises, the undersigned will protect the said parties and defend any suit a action brought against them by reason of any lien or other form of claim or action arising out of said subcontract and hold them harmless and indemnified therefrom.

In consideration of the sum of $1.00 to the undersigned in hand paid, receipt whereof is hereby acknowledged, and other benefits accruing, the undersigned does hereby waive release and quitclaim in favor of The Stellar Companies, Inc. and/or owner or owners of said premises as improved all right that the undersigned may have to a lien upon the land and improvements above described.

IT IS UNDERSTOOD AND AGREED THAT THIS WAIVER AND RELEASE IS FOR ALL SERVICES RENDERED, WORK DONE AND MATERIAL FURNISHED PRIOR TO THE DATE HEREOF and is for all such services rendered, work done and material furnished and not only for the particular

SUBCONTRACTOR: Fabco Metal Products, LLC

By: _____ Date: _1/27/2021_

State of: _Florida_
County of: _Volusia_

Subscribed and sworn to before me this _27_ day of _January_ 2021

Notary Public: _____
My commission expires: _____

JERRY W. CROWDER
Commission # GG 285659
Expires July 28, 2023
Bonded Thru Troy Fain Insurance 800-385-7019

| CHANGE ORDER SUMMARY | ADDITIONS | DEDUCTIONS |
|---|---|---|
| Total changes approved in previous months by Owner | $ 0.00 | $ 0.00 |
| Total approved this Month: | $ 0.00 | $ 0.00 |
| Totals: | $ 0.00 | $ 0.00 |
| Net change by change orders: | $ 0.00 | |

# CONTINUATION SHEET

*DOCUMENT DETAIL SHEET*

Document SUMMARY SHEET, APPLICATION AND CERTIFICATE FOR PAYMENT, containing
Contractor's signed Certification is attached.
Use Column I on Contracts where variable retainage for line items apply.

APPLICATION NUMBER: 2
APPLICATION DATE: 01/21/2021
PERIOD: 01/01/21 - 01/31/21
ARCHITECTS/ENGINEERS PROJECT NO:

## Contract Lines

| A ITEM NO. | COST CODE | B DESCRIPTION OF WORK | C SCHEDULED VALUE | D WORK COMPLETED FROM PREVIOUS APPLICATION (D + E) | E THIS PERIOD | F MATERIALS PRESENTLY STORED (NOT IN D OR E) | G TOTAL COMPLETED AND STORED TO DATE (D+E+F) | H % (G / C) | BALANCE TO FINISH (C - G) | I RETAINAGE |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 05-0501 - Structural Steel | Engineering and Shop Drawings (Material) | $ 117,903.75 | $ 117,903.75 | $ 0.00 | $ 0.00 | $ 117,903.75 | 100.00% | $ 0.00 | $ 11,790.38 |
| 2 | 05-0506 - Miscellaneous Steel | Anchor Bolts (Material) | $ 9,904.32 | $ 9,904.32 | $ 0.00 | $ 0.00 | $ 9,904.32 | 100.00% | $ 0.00 | $ 990.43 |
| 3 | 05-0506 - Miscellaneous Steel | Embeds (steel,ss) (Material) | $ 70,959.24 | $ 70,959.24 | $ 0.00 | $ 0.00 | $ 70,959.24 | 100.00% | $ 0.00 | $ 7,095.92 |
| 4 | 05-0501 - Structural Steel | Structural Steel Material/Fabrication (Material) | $ 1,769,196.41 | $ 0.00 | $ 0.00 | $ 0.00 | $ 0.00 | 0.00% | $ 1,769,196.41 | $ 0.00 |
| 5 | 05-0505 - Stairs / Catwalks / Ladders / Handrails | Grating (steel, ss, fiberglass) (Material) | $ 130,340.91 | $ 130,340.91 | $ 0.00 | $ 0.00 | $ 0.00 | 0.00% | $ 130,340.91 | $ 0.00 |
| 6 | 05-0503 - Steel Erection | Structural Steel Erection (Labor) | $ 524,661.70 | $ 524,661.70 | $ 0.00 | $ 0.00 | $ 0.00 | 0.00% | $ 524,661.70 | $ 0.00 |
| 7 | 05-0506 - Miscellaneous Steel | Miscellaneous Steel Material/Fabrication (Material) | $ 591,250.98 | $ 0.00 | $ 25,000.00 | $ 0.00 | $ 25,000.00 | 4.23% | $ 566,250.98 | $ 2,500.00 |
| 8 | 05-0506 - Miscellaneous Steel | Miscellaneous Steel Erection (Labor) | $ 219,880.00 | $ 0.00 | $ 0.00 | $ 0.00 | $ 0.00 | 0.00% | $ 219,880.00 | $ 0.00 |
| | | **TOTALS:** | $ 3,434,097.31 | $ 198,767.31 | $ 25,000.00 | $ 0.00 | $ 223,767.31 | 6.52% | $ 3,210,330.00 | $ 22,376.73 |

| A ITEM NO. | B DESCRIPTION OF WORK | C SCHEDULED VALUE | D WORK COMPLETED FROM PREVIOUS APPLICATION (D + E) | E THIS PERIOD | F MATERIALS PRESENTLY STORED (NOT IN D OR E) | G TOTAL COMPLETED AND STORED TO DATE (D+E+F) | H % (G / C) | BALANCE TO FINISH (C - G) | I RETAINAGE |
|---|---|---|---|---|---|---|---|---|---|
| | **TOTALS:** | $ 0.00 | $ 0.00 | $ 0.00 | $ 0.00 | $ 0.00 | NaN% | $ 0.00 | $ 0.00 |

## Grand Totals

| A ITEM NO. | B DESCRIPTION OF WORK | C SCHEDULED VALUE | D WORK COMPLETED FROM PREVIOUS APPLICATION (D + E) | E THIS PERIOD | F MATERIALS PRESENTLY STORED (NOT IN D OR E) | G TOTAL COMPLETED AND STORED TO DATE (D+E+F) | H % (G / C) | BALANCE TO FINISH (C - G) | I RETAINAGE |
|---|---|---|---|---|---|---|---|---|---|
| | **GRAND TOTALS:** | $ 3,434,097.31 | $ 198,767.31 | $ 25,000.00 | $ 0.00 | $ 223,767.31 | 6.52% | $ 3,210,330.00 | $ 22,376.73 |

DOCUMENT DETAIL SHEET

CONTINUATION SHEET

DOCUMENT DETAIL SHEET - APPLICATION AND CERTIFICATE FOR PAYMENT

List each sub-subcontractor or vendor who provided labor and/or materials to the project which makes up any part of this requisition and the gross value of such labor and/or materials provided within this requisition period.

Sub-Subcontractor/Supplier _____ Value _____

Sub-Subcontractor/Supplier _____ Value _____

Sub-Subcontractor/Supplier _____ Value _____

Sub-Subcontractor/Supplier _____ Value _____

Sub-Subcontractor/Supplier _____ Value _____

Sub-Subcontractor/Supplier _____ Value _____

Sub-Subcontractor/Supplier _____ Value _____

APPLICATION AND CERTIFICATE FOR PAYMENT

DOCUMENT SUMMARY SHEET

**TO CONTRACTOR:**
Stellar
2900 Hartley Road
Jacksonville, Florida 32257

**FROM SUBCONTRACTOR:**
Fabco Metal Products, LLC
1490 Frances Drive
Daytona Beach, Florida 32124

**PROJECT:**
Bang Energy - Phoenix Can Manufacturing
1635 South 43rd Avenue
Phoenix, Arizona 85009

SUBCONTRACT DATE: 1/8/2021

APPLICATION NO: 3
INVOICE NO:
PERIOD: 02/01/21 - 02/28/21
PROJECT NO: 23006976
CONTRACT DATE: 01/08/2021

DISTRIBUTION TO:

SUBCONTRACT FOR: Structural Steel
**SUBCONTRACTOR'S APPLICATION FOR PAYMENT**

Application is made for payment, as shown below, in connection with the Subcontract. Continuation Sheet is attached.

| | | |
|---|---|---|
| 1. | Original Contract Sum | $ 3,434,097.31 |
| 2. | Net change by change orders | $ 111,603.89 |
| 3. | Contract sum to date (line 1 ± 2) | $ 3,545,701.20 |
| 4. | Total completed and stored to date (Column G on detail sheet) | $ 1,587,669.66 |
| 5. | Retainage: | |
| | a. 10.00% of completed work: $ 132,188.27 | |
| | b. 10.00% of stored material: $ 26,578.70 | |
| | Total retainage (Line 5a + 5b or total in column I of detail sheet) | $ 158,766.97 |
| 6. | Total earned less retainage (Line 4 less Line 5 Total) | $ 1,428,902.69 |
| 7. | Less previous certificates for payment (Line 6 from prior certificate) | $ 201,390.58 |
| 8. | Current payment due: | $ 1,227,512.11 |
| 9. | Balance to finish, including retainage (Line 3 less Line 6) | $ 2,116,798.51 |

| CHANGE ORDER SUMMARY | ADDITIONS | DEDUCTIONS |
|---|---|---|
| Total changes approved in previous months by Owner | $ 0.00 | $ 0.00 |
| Total approved this Month: | $ 111,603.89 | $ 0.00 |
| Totals: | $ 111,603.89 | $ 0.00 |
| Net change by change orders: | $ 111,603.89 | |

The undersigned hereby further declares and agrees that in the event that any lien or other claim should be brought against The Stellar Companies, Inc., the Owner, or their building or premises, the undersigned will protect the said parties and defend any suit a action brought against them by reason of any lien or other form of claim or action arising out of said subcontract and hold them harmless and indemnified therefrom.

In consideration of the sum of $1.00 to the undersigned in hand paid, receipt whereof is hereby acknowledged, and other benefits accruing, the undersigned does hereby waive release and quitclaim in favor of The Stellar Companies, Inc. and/or owner or owners of said premises as improved all right that the undersigned may have to a lien upon the land and improvements above described.

IT IS UNDERSTOOD AND AGREED THAT THIS WAIVER AND RELEASE IS FOR ALL SERVICES RENDERED, WORK DONE AND MATERIAL FURNISHED PRIOR TO THE DATE HEREOF and is for all such services rendered, work done and material furnished and not only for the particular

SUBCONTRACTOR: Fabco Metal Products, LLC

By: _____   Date: 2/25/21

State of: _____
County of: _____
Subscribed and sworn to before
me this 25 day of February 2021

Notary Public: _____
My commission expires 7/25/2022

JERRY W. CROWDER
Commission # GG 305650
Expires July 26, 2022
Bonded Thru Troy Fain Insurance 800-385-7019

CONTINUATION SHEET

*DOCUMENT DETAIL SHEET*

Document SUMMARY SHEET, APPLICATION AND CERTIFICATE FOR PAYMENT, containing
Contractor's signed Certification is attached.
Use Column I on Contracts where variable retainage for line items apply.

APPLICATION NUMBER: 3
APPLICATION DATE: 02/24/2021
PERIOD 02/01/21 - 02/28/21
ARCHITECTS/ENGINEERS PROJECT NO:

Contract Lines

| A | B | C | D | E | F | G | H | I |
|---|---|---|---|---|---|---|---|---|
| | | | WORK COMPLETED | | | | | |
| ITEM NO. | COST CODE | DESCRIPTION OF WORK | SCHEDULED VALUE | FROM PREVIOUS APPLICATION (D + E) | THIS PERIOD | MATERIALS PRESENTLY STORED (NOT IN D OR E) | TOTAL COMPLETED AND STORED TO DATE (D+E+F) | % (G / C) | BALANCE TO FINISH (C - G) | RETAINAGE |
| 1 | 05-0501 - Structural Steel | Engineering and Shop Drawings (Material) | $ 117,903.75 | $ 117,903.75 | $ 0.00 | $ 0.00 | $ 117,903.75 | 100.00% | $ 0.00 | $ 11,790.38 |
| 2 | 05-0506 - Miscellaneous Steel | Anchor Bolts (Material) | $ 9,904.32 | $ 9,904.32 | $ 0.00 | $ 0.00 | $ 9,904.32 | 100.00% | $ 0.00 | $ 990.43 |
| 3 | 05-0506 - Miscellaneous Steel | Embeds (steel,ss) (Material) | $ 70,959.24 | $ 70,959.24 | $ 0.00 | $ 0.00 | $ 70,959.24 | 100.00% | $ 0.00 | $ 7,095.92 |
| 4 | 05-0501 - Structural Steel | Structural Steel Material/Fabrication (Material) | $ 1,769,196.41 | $ 0.00 | $ 655,268.00 | $ 265,787.00 | $ 921,055.00 | 52.06% | $ 848,141.41 | $ 92,105.50 |
| 5 | 05-0505 - Stairs / Catwalks / Ladders / Handrails | Grating (steel, ss, fiberglass) (Material) | $ 130,340.91 | $ 0.00 | $ 130,340.91 | $ 0.00 | $ 130,340.91 | 100.00% | $ 0.00 | $ 13,034.09 |
| 6 | 05-0503 - Structural Steel Erection | Structural Steel Erection (Labor) | $ 524,661.70 | $ 0.00 | $ 0.00 | $ 0.00 | $ 0.00 | 0.00% | $ 524,661.70 | $ 0.00 |
| 7 | 05-0506 - Miscellaneous Steel | Miscellaneous Steel Material/Fabrication (Material) | $ 591,250.98 | $ 25,000.00 | $ 210,500.00 | $ 0.00 | $ 235,500.00 | 39.83% | $ 355,750.98 | $ 23,550.00 |
| 8 | 05-0506 - Miscellaneous Steel | Miscellaneous Steel Erection (Labor) | $ 219,880.00 | $ 0.00 | $ 50,000.00 | $ 0.00 | $ 50,000.00 | 22.74% | $ 169,880.00 | $ 5,000.00 |
| | | TOTALS: | $ 3,434,097.31 | $ 223,767.31 | $ 1,046,108.91 | $ 265,787.00 | $ 1,535,663.22 | 44.72% | $ 1,898,434.09 | $ 153,566.32 |

*DOCUMENT DETAIL SHEET*

CONTINUATION SHEET

**Whole Change Order Packages**

CONTINUATION SHEET

DOCUMENT DETAIL SHEET

| A | B | C | D | E | F | G | H | | I |
|---|---|---|---|---|---|---|---|---|---|
| | | | WORK COMPLETED | | MATERIALS PRESENTLY STORED (NOT IN D OR E) | TOTAL COMPLETED AND STORED TO DATE (D+E+F) | % (G / C) | BALANCE TO FINISH (C - G) | RETAINAGE |
| ITEM NO. | DESCRIPTION OF WORK | SCHEDULED VALUE | FROM PREVIOUS APPLICATION (D + E) | THIS PERIOD | | | | | |
| 9 | CCO # 23006976-SUB-05A Project Changes Through 2/15/2021 | | | | | | | | |
| | 05-0506 Changes to steel based on building and process design development and owner review comments through revisions dated 11.24.2020. Including but not limited to: 700 LF for armor joint embeds, 210 LF of armor joint notched plates and 200 Hilti bolts for armor joint notched plate install. | | | | | | | | |
| 9.1 | | $ 8,776.11 | $ 0.00 | $ 8,776.11 | $ 0.00 | $ 8,776.11 | 100.00% | $ 0.00 | $ 877.61 |
| | 05-0505 Changes to Guardrails based on building and process design development and owner review comments from drawing set dated 12.02.2020 to 12.10.2020. Including but not limited to: 40 LF of guardrail at bulk lacquer storage with two pieces of channel and six pipes/bollards. | | | | | | | | |
| 9.2 | | $ 18,246.38 | $ 0.00 | $ 5,500.00 | $ 0.00 | $ 5,500.00 | 30.14% | $ 12,746.38 | $ 550.00 |
| | 05-0506 Changes to Misc. Steel based on building and process design development and owner review comments from drawing set dated 12.11.2020 to 01.08.2021. Including but not limited to: 260 LF of exterior galv. guardrails. Removed angle/anchors at new louver locations. | | | | | | | | |
| 9.3 | | $ 23,891.02 | $ 0.00 | $ 7,167.31 | $ 0.00 | $ 7,167.31 | 30.00% | $ 16,723.71 | $ 716.73 |
| | 05-0506 Changes to Misc steel based on building and process design development and owner review comments from drawing set dated 01.18.2020. Including but not limited to: revised concrete lid angle details. Omitted steel erection of deleted overhead door steel support frame. Material was already ordered before changes were published. | | | | | | | | |
| 9.4 | | $ 8,311.86 | $ 0.00 | $ 8,311.86 | $ 0.00 | $ 8,311.86 | 100.00% | $ 0.00 | $ 831.19 |
| 9.5 | 05-0506 Furnish Stainless Steel Liner at Washer Sump Pit per IPS drawings ENERGY-PHX-B08-WA05-WA07 dated 01/13/2021. | $ 40,169.82 | $ 0.00 | $ 10,042.46 | $ 0.00 | $ 10,042.46 | 25.00% | $ 30,127.36 | $ 1,004.25 |
| 9.6 | 05-0501 Cupper Foundation Embeds - Added 1 Nelson Stud | $ 1,177.00 | $ 0.00 | $ 1,177.00 | $ 0.00 | $ 1,177.00 | 100.00% | $ 0.00 | $ 117.70 |

CONTINUATION SHEET

*DOCUMENT DETAIL SHEET*

| A | B | C | D | E | F | G | H | | I |
|---|---|---|---|---|---|---|---|---|---|
| | | | WORK COMPLETED | | | | | | |
| ITEM NO. | DESCRIPTION OF WORK | SCHEDULED VALUE | FROM PREVIOUS APPLICATION (D + E) | THIS PERIOD | MATERIALS PRESENTLY STORED (NOT IN D OR E) | TOTAL COMPLETED AND STORED TO DATE (D+E+F) | % (G / C) | BALANCE TO FINISH (C - G) | RETAINAGE |
| | to bottom of each (4) 8" thick embeds. | | | | | | | | |
| 9.7 | 05-0501 Changes to Structural Steel based on building and process design development and owner review comments from drawing set dated 12.11.2020 to 01.08.2021. Including but not limited to: steel channel to support door framing at Inker Rebuild. Added channel cross members at platforms. | $ 10,320.56 | $ 0.00 | $ 10,320.56 | $ 0.00 | $ 10,320.56 | 100.00% | $ 0.00 | $ 1,032.06 |
| 10 | CCO # 2300 6976-SUB-05B CE #036 - Existing Fire Riser Steel Support Frame for Concrete Pour | | | | | | | | |
| 10.1 | 05-0506 Installed a steel support frame fastened to the tilt up panel wall for the existing fire riser at GL 19 south elevation in order to demo the slab below that the fire riser support was bearing on. | $ 711.14 | $ 0.00 | $ 711.14 | $ 0.00 | $ 711.14 | 100.00% | $ 0.00 | $ 71.11 |
| | TOTALS: | $ 111,603.89 | $ 0.00 | $ 52,006.44 | $ 0.00 | $ 52,006.44 | 46.60% | $ 59,597.45 | $ 5,200.65 |

Grand Totals

| A | B | C | D | E | F | G | H | | I |
|---|---|---|---|---|---|---|---|---|---|
| | | | WORK COMPLETED | | | | | | |
| ITEM NO. | DESCRIPTION OF WORK | SCHEDULED VALUE | FROM PREVIOUS APPLICATION (D + E) | THIS PERIOD | MATERIALS PRESENTLY STORED (NOT IN D OR E) | TOTAL COMPLETED AND STORED TO DATE (D+E+F) | % (G / C) | BALANCE TO FINISH (C - G) | RETAINAGE |
| | GRAND TOTALS: | $ 3,545,701.20 | $ 223,767.31 | $ 1,098,115.35 | $ 265,787.00 | $ 1,587,669.66 | 44.78% | $ 1,958,031.54 | $ 158,766.97 |

DOCUMENT DETAIL SHEET- APPLICATION AND CERTIFICATE FOR PAYMENT

List each sub-subcontractor or vendor who provided labor and/or materials to the project which makes up any part of this requisition and the gross value of such labor and/or materials provided within this requisition period.

Sub-Subcontractor/Supplier _____ Value _____

Sub-Subcontractor/Supplier _____ Value _____

Sub-Subcontractor/Supplier _____ Value _____

Sub-Subcontractor/Supplier _____ Value _____

Sub-Subcontractor/Supplier _____ Value _____

Sub-Subcontractor/Supplier _____ Value _____

Sub-Subcontractor/Supplier _____ Value _____

APPLICATION AND CERTIFICATE FOR PAYMENT

*DOCUMENT SUMMARY SHEET*

**TO CONTRACTOR:**
Stellar
2900 Hartley Road
Jacksonville, Florida 32257

**FROM SUBCONTRACTOR:**
Fabco Metal Products, LLC
1490 Francas Drive
Daytona Beach, Florida 32124

**PROJECT:**
Bang Energy - Phoenix Can Manufacturing
1635 South 43rd Avenue
Phoenix, Arizona 85009

**SUBCONTRACT DATE:** 1/8/2021

APPLICATION NO: 4
INVOICE NO:
PERIOD: 09/01/21 - 09/25/21
PROJECT NO: 23006976
CONTRACT DATE: 01/08/2021

DISTRIBUTION TO:

SUBCONTRACT FOR: Structural Steel
**SUBCONTRACTOR'S APPLICATION FOR PAYMENT**

Application is made for payment, as shown below, in connection with the Subcontract. Continuation Sheet is attached.

| | | |
|---|---|---|
| 1. | Original Contract Sum | $ 3,434,097.31 |
| 2. | Net change by change orders | $ 111,603.89 |
| 3. | Contract sum to date (line 1 ± 2) | $ 3,545,701.20 |
| 4. | Total completed and stored to date | $ 1,640,135.83 |
| | (Column G on detail sheet) | |
| 5. | Retainage: | |
| | a. 10.00% of completed work: | $ 164,013.59 |
| | b. 0.00% of stored material: | $ 0.00 |
| | Total retainage (Line 5a + 5b or total in column I of detail sheet) | $ 164,013.59 |
| 6. | Total earned less retainage (Line 4 less Line 5 Total) | $ 1,476,122.24 |
| 7. | Less previous certificates for payment (Line 6 from prior certificate) | $ 1,429,902.69 |
| 8. | Current payment due: | $ 47,219.55 |
| 9. | Balance to finish, including retainage (Line 3 less Line 6) | $ 2,069,578.96 |

| CHANGE ORDER SUMMARY | ADDITIONS | DEDUCTIONS |
|---|---|---|
| Total changes approved in previous months by Owner: | $ 111,603.89 | $ 0.00 |
| Total approved this Month: | $ 0.00 | $ 0.00 |
| Totals: | $ 111,603.89 | $ 0.00 |
| Net change by change orders: | $ 111,603.89 | |

The undersigned hereby further declares and agrees that in the event that any lien or other claim should be brought against The Stellar Companies, Inc., the Owner, or their building or premises, the undersigned will protect the said parties and defend any suit a action brought against them by reason of any lien or other form of claim or action arising out of said subcontract and hold them harmless and indemnified therefrom.

In consideration of the sum of $1.00 to the undersigned in hand paid, receipt whereof is hereby acknowledged, and other benefits accruing, the undersigned does hereby waive release and quitclaim in favor of The Stellar Companies, Inc. and/or owner or owners of said premises as improved all right that the undersigned may have to a lien upon the land and improvements above described.

IT IS UNDERSTOOD AND AGREED THAT THIS WAIVER AND RELEASE IS FOR ALL SERVICES RENDERED, WORK DONE AND MATERIAL FURNISHED PRIOR TO THE DATE HEREOF and is for all such services rendered, work done and material furnished and not only for the particular

SUBCONTRACTOR: Fabco Metal Products, LLC

By:

Date: 9/20/21

State of:
County of: Volusia
Subscribed and sworn to before
me this 20 day of September 2021

Notary Public:
My commission Expires: 7/28/2022

JERRY W. CROWDER
Commission # GG 205650
Expires July 28, 2022
Bonded Thru Troy Fain Insurance 800-385-7019

CONTINUATION SHEET

DOCUMENT DETAIL SHEET

Page 2 of 6

Document SUMMARY SHEET, APPLICATION AND CERTIFICATE FOR PAYMENT, containing
Contractor's signed Certification is attached.
Use Column I on Contracts where variable retainage for line items apply.

APPLICATION NUMBER: 4
APPLICATION DATE: 09/21/2021
PERIOD: 09/01/21 - 09/25/21
ARCHITECT/ENGINEERS PROJECT NO:

Contract Lines

| A | B | C | D | E | F | G | H | | I |
|---|---|---|---|---|---|---|---|---|---|
| | | | WORK COMPLETED | | | | | | |
| ITEM NO. | DESCRIPTION OF WORK | SCHEDULED VALUE | FROM PREVIOUS APPLICATION (D + E) | THIS PERIOD | MATERIALS PRESENTLY STORED (NOT IN D OR E) | TOTAL COMPLETED AND STORED TO DATE (D+E+F) | % (G / C) | BALANCE TO FINISH (C - G) | RETAINAGE |
| | COST CODE | | | | | | | | |
| 1 | 05-0501 - Structural Steel — Engineering and Shop Drawings (Material) | $ 117,903.75 | $ 117,903.75 | $ 0.00 | $ 0.00 | $ 117,903.75 | 100.00% | $ 0.00 | $ 11,790.38 |
| 2 | 05-0506 - Miscellaneous Steel — Anchor Bolts (Material) | $ 9,904.32 | $ 9,904.32 | $ 0.00 | $ 0.00 | $ 9,904.32 | 100.00% | $ 0.00 | $ 990.43 |
| 3 | 05-0506 - Miscellaneous Steel — Embeds (steel,ss) (Material) | $ 70,959.24 | $ 70,959.24 | $ 0.00 | $ 0.00 | $ 70,959.24 | 100.00% | $ 0.00 | $ 7,095.92 |
| 4 | 05-0501 - Structural Steel — Structural Steel Material/Fabrication (Material) | $ 1,769,196.41 | $ 921,055.00 | $ 0.00 | $ 0.00 | $ 921,055.00 | 52.06% | $ 848,141.41 | $ 92,105.50 |
| 5 | 05-0505 - Stairs / Catwalks / Ladders / Handrails — Grating (steel, ss, fiberglass) (Material) | $ 130,340.91 | $ 130,340.91 | $ 0.00 | $ 0.00 | $ 130,340.91 | 100.00% | $ 0.00 | $ 13,034.09 |
| 6 | 05-0503 - Steel Erection — Structural Steel Erection (Labor) | $ 524,661.70 | $ 0.00 | $ 52,466.17 | $ 0.00 | $ 52,466.17 | 10.00% | $ 472,195.53 | $ 5,246.62 |
| 7 | 05-0506 - Miscellaneous Steel — Miscellaneous Steel Material/Fabrication (Material) | $ 591,250.98 | $ 235,500.00 | $ 0.00 | $ 0.00 | $ 235,500.00 | 39.83% | $ 355,750.98 | $ 23,550.00 |
| 8 | 05-0506 - Miscellaneous Steel — Miscellaneous Steel Erection (Labor) | $ 219,880.00 | $ 50,000.00 | $ 0.00 | $ 0.00 | $ 50,000.00 | 22.74% | $ 169,880.00 | $ 5,000.00 |
| | TOTALS: | $ 3,434,097.31 | $ 1,535,663.22 | $ 52,466.17 | $ 0.00 | $ 1,588,129.39 | 46.25% | $ 1,845,967.92 | $ 158,812.94 |

DOCUMENT DETAIL SHEET

CONTINUATION SHEET
Whole Change Order Packages

CONTINUATION SHEET

DOCUMENT DETAIL SHEET

| A | B | C | D | E | F | G | H | | I |
|---|---|---|---|---|---|---|---|---|---|
| | | | WORK COMPLETED | | | | | | |
| ITEM NO. | DESCRIPTION OF WORK | SCHEDULED VALUE | FROM PREVIOUS APPLICATION (D + E) | THIS PERIOD | MATERIALS PRESENTLY STORED (NOT IN D OR E) | TOTAL COMPLETED AND STORED TO DATE (D+E+F) | % (G / C) | BALANCE TO FINISH (C - G) | RETAINAGE |
| 9 | CCO # 23006976-SUB-05A Project Changes Through 2/15/2021 | | | | | | | | |
| 9.1 | 05-0506 Changes to steel based on building and process design development and owner review comments through revisions dated 11.24.2020. Including but not limited to: 700 LF for armor joint embeds, 210 LF of armor joint notched plates and 200 Hilti bolts for armor joint notched plate install. | $ 8,776.11 | $ 8,776.11 | $ 0.00 | $ 0.00 | $ 8,776.11 | 100.00% | $ 0.00 | $ 877.61 |
| 9.2 | 05-0505 Changes to Guardrails based on building and process design development and owner review comments from drawing set dated 12.02.2020 to 12.10.2020. Including but not limited to: 40 LF of guardrail at bulk lacquer storage with two pieces of channel and six pipes/bollards. | $ 18,246.38 | $ 5,500.00 | $ 0.00 | $ 0.00 | $ 5,500.00 | 30.14% | $ 12,746.38 | $ 550.00 |
| 9.3 | 05-0506 Changes to Misc. Steel based on building and process design development and owner review comments from drawing set dated 12.11.2020 to 01.08.2021. Including but not limited to: 260 LF of exterior galv. guardrails. Removed angle/anchors at new louver locations. | $ 23,891.02 | $ 7,167.31 | $ 0.00 | $ 0.00 | $ 7,167.31 | 30.00% | $ 16,723.71 | $ 716.73 |
| 9.4 | 05-0506 Changes to Misc steel based on building and process design development and owner review comments from drawing set dated 01.18.2020. Including but not limited to: revised concrete lid angle details. Omitted steel erection of deleted overhead door steel support frame. Material was already ordered before changes were published. | $ 8,311.86 | $ 8,311.86 | $ 0.00 | $ 0.00 | $ 8,311.86 | 100.00% | $ 0.00 | $ 831.19 |
| 9.5 | 05-0506 Furnish Stainless Steel Liner at Washer Sump Pit per IPS drawings ENERGY-PHX-B08-WA05-WA07 dated 01/13/2021. | $ 40,169.82 | $ 10,042.46 | $ 0.00 | $ 0.00 | $ 10,042.46 | 25.00% | $ 30,127.36 | $ 1,004.25 |
| 9.6 | 05-0501 Cupper Foundation Embeds - Added 1 Nelson Stud | $ 1,177.00 | $ 1,177.00 | $ 0.00 | $ 0.00 | $ 1,177.00 | 100.00% | $ 0.00 | $ 117.70 |

**CONTINUATION SHEET**

*DOCUMENT DETAIL SHEET*

| A | B | C | D | E | F | G | H | | I |
|---|---|---|---|---|---|---|---|---|---|
| ITEM NO. | DESCRIPTION OF WORK | SCHEDULED VALUE | WORK COMPLETED | | MATERIALS PRESENTLY STORED (NOT IN D OR E) | TOTAL COMPLETED AND STORED TO DATE (D+E+F) | % (G / C) | BALANCE TO FINISH (C - G) | RETAINAGE |
| | | | FROM PREVIOUS APPLICATION (D + E) | THIS PERIOD | | | | | |
| 9.7 | to bottom of each (4) 8" thick embeds. 05-0501 Changes to Structural Steel based on building and process design development and owner review comments from drawing set dated 12.11.2020 to 01.08.2021. Including but not limited to: steel channel to support door framing at Inker Rebuild. Added channel cross members at platforms. | $ 10,320.56 | $ 10,320.56 | $ 0.00 | $ 0.00 | $ 10,320.56 | 100.00% | $ 0.00 | $ 1,032.06 |
| | **CCO # 23006976-SUB-05B CE #036 - Existing Fire Riser Steel Support Frame for Concrete Pour** | | | | | | | | |
| 10 | | | | | | | | | |
| 10.1 | 05-0506 Installed a steel support frame fastened to the tilt up panel wall for the existing fire riser at GL 19 south elevation in order to demo the slab below that the fire riser support was bearing on. | $ 711.14 | $ 711.14 | $ 0.00 | $ 0.00 | $ 711.14 | 100.00% | $ 0.00 | $ 71.11 |
| | **TOTALS:** | $ 111,603.89 | $ 52,006.44 | $ 0.00 | $ 0.00 | $ 52,006.44 | 46.60% | $ 59,597.45 | $ 5,200.65 |

**Grand Totals**

| A | B | C | D | E | F | G | H | | I |
|---|---|---|---|---|---|---|---|---|---|
| ITEM NO. | DESCRIPTION OF WORK | SCHEDULED VALUE | WORK COMPLETED | | MATERIALS PRESENTLY STORED (NOT IN D OR E) | TOTAL COMPLETED AND STORED TO DATE (D+E+F) | % (G / C) | BALANCE TO FINISH (C - G) | RETAINAGE |
| | | | FROM PREVIOUS APPLICATION (D + E) | THIS PERIOD | | | | | |
| | **GRAND TOTALS:** | $ 3,545,701.20 | $ 1,587,669.66 | $ 52,466.17 | $ 0.00 | $ 1,640,135.83 | 46.26% | $ 1,905,565.37 | $ 164,013.59 |

DOCUMENT DETAIL SHEET- APPLICATION AND CERTIFICATE FOR PAYMENT

List each sub-subcontractor or vendor who provided labor and/or materials to the project which makes up any part of this requisition and the gross value of such labor and/or materials provided within this requisition period.

Sub-Subcontractor/Supplier _____ Value _____

Sub-Subcontractor/Supplier _____ Value _____

Sub-Subcontractor/Supplier _____ Value _____

Sub-Subcontractor/Supplier _____ Value _____

Sub-Subcontractor/Supplier _____ Value _____

Sub-Subcontractor/Supplier _____ Value _____

Sub-Subcontractor/Supplier _____ Value _____

Page 1 of 6

## APPLICATION AND CERTIFICATE FOR PAYMENT

*DOCUMENT SUMMARY SHEET*

**TO CONTRACTOR:**
Stellar
2900 Hartley Road
Jacksonville, Florida 32257

**FROM SUBCONTRACTOR:**
Fabco Metal Products, LLC
1490 Frances Drive
Daytona Beach, Florida 32124

**PROJECT:**
Bang Energy - Phoenix Can Manufacturing
1635 South 43rd Avenue
Phoenix, Arizona 85009

**SUBCONTRACT DATE:** 1/8/2021

**APPLICATION NO:** 5
**INVOICE NO:**
PERIOD: 09/26/21 - 10/25/21
PROJECT NO: 23006976
CONTRACT DATE: 01/08/2021

**DISTRIBUTION TO:**

SUBCONTRACT FOR: Structural Steel
**SUBCONTRACTOR'S APPLICATION FOR PAYMENT**

Application is made for payment, as shown below, in connection with the Subcontract. Continuation Sheet is attached.

| | | |
|---|---|---|
| 1. | Original Contract Sum | $ 3,434,097.31 |
| 2. | Net change by change orders | $ 111,603.89 |
| 3. | Contract sum to date (line 1 ± 2) | $ 3,545,701.20 |
| 4. | Total completed and stored to date (Column G on detail sheet) | $ 2,221,068.61 |
| 5. | Retainage: | |
| | a. 10.00% of completed work: | $ 222,106.87 |
| | b. 0.00% of stored material: | $ 0.00 |
| | Total retainage (Line 5a + 5b or total in column I of detail sheet) | $ 222,106.87 |
| 6. | Total earned less retainage (Line 4 less Line 5 Total) | $ 1,998,961.74 |
| 7. | Less previous certificates for payment (Line 6 from prior certificate) | $ 1,476,122.24 |
| 8. | Current payment due: | $ 522,839.50 |
| 9. | Balance to finish, including retainage (Line 3 less Line 6) | $ 1,546,739.46 |

| CHANGE ORDER SUMMARY | ADDITIONS | DEDUCTIONS |
|---|---|---|
| Total changes approved in previous months by Owner | $ 111,603.89 | $ 0.00 |
| Total approved this Month | $ 0.00 | $ 0.00 |
| Totals: | $ 111,603.89 | $ 0.00 |
| Net change by change orders: | $ 111,603.89 | |

The undersigned hereby further declares and agrees that in the event that any lien or other claim should be brought against The Stellar Companies, Inc., the Owner, or their building or premises, the undersigned will protect the said parties and defend any suit a action brought against them by reason of any lien or other form of claim or action arising out of said subcontract and hold them harmless end indemnified therefrom.

In consideration of the sum of $1.00 to the undersigned in hand paid, receipt whereof is hereby acknowledged, and other benefits accruing, the undersigned does hereby waive release and quitclaim in favor of The Stellar Companies, Inc. and/or owner or owners of said premises as improved all right that the undersigned may have to a lien upon the land and improvements above described.

IT IS UNDERSTOOD AND AGREED THAT THIS WAIVER AND RELEASE IS FOR ALL SERVICES RENDERED, WORK DONE AND MATERIAL FURNISHED PRIOR TO THE DATE HEREOF and is for all such services rendered, work done and material furnished and not only for the particular

SUBCONTRACTOR: Fabco Metal Products, LLC

By: _____        Date: 10/15/21

State of: Florida
County of: _____
Subscribed and sworn to before me this 15 day of October 2021

Notary Public: _____
My commission expires: 7/28/2022

JERRY W. CROWDER
Commission # GG 205650
Expires July 28, 2022
Bonded Thru Troy Fain Insurance 800-385-7019

CONTINUATION SHEET

*DOCUMENT DETAIL SHEET*

Document SUMMARY SHEET, APPLICATION AND CERTIFICATE FOR PAYMENT, containing
Contractor's signed Certification is attached.
Use Column I on Contracts where variable retainage for line items apply.

APPLICATION NUMBER: 5
APPLICATION DATE: 10/20/2021
PERIOD: 09/26/21 - 10/25/21
ARCHITECTS/ENGINEERS PROJECT NO:

Contract Lines

| A ITEM NO. | B DESCRIPTION OF WORK | COST CODE | C SCHEDULED VALUE | D WORK COMPLETED FROM PREVIOUS APPLICATION (D + E) | E WORK COMPLETED THIS PERIOD | F MATERIALS PRESENTLY STORED (NOT IN D OR E) | G TOTAL COMPLETED AND STORED TO DATE (D+E+F) | H % (G / C) | BALANCE TO FINISH (C - G) | I RETAINAGE |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Engineering and Shop Drawings (Material) | 05-0501 - Structural Steel | $117,903.75 | $117,903.75 | $0.00 | $0.00 | $117,903.75 | 100.00% | $0.00 | $11,790.38 |
| 2 | Anchor Bolts (Material) | 05-0506 - Miscellaneous Steel | $9,904.32 | $9,904.32 | $0.00 | $0.00 | $9,904.32 | 100.00% | $0.00 | $990.43 |
| 3 | Embeds (steel,ss) (Material) | 05-0506 - Miscellaneous Steel | $70,959.24 | $70,959.24 | $0.00 | $0.00 | $70,959.24 | 100.00% | $0.00 | $7,095.92 |
| 4 | Structural Steel Material/Fabrication (Material) | 05-0501 - Structural Steel | $1,769,196.41 | $921,055.00 | $423,534.27 | $0.00 | $1,344,589.27 | 76.00% | $424,607.14 | $134,458.93 |
| 5 | Grating (steel, ss, fiberglass) (Material) | 05-0505 - Stairs / Catwalks / Ladders / Handrails | $130,340.91 | $130,340.91 | $0.00 | $0.00 | $130,340.91 | 100.00% | $0.00 | $13,034.09 |
| 6 | Structural Steel Erection (Labor) | 05-0503 - Steel Erection | $524,661.70 | $52,466.17 | $157,398.51 | $0.00 | $209,864.68 | 40.00% | $314,797.02 | $20,986.47 |
| 7 | Miscellaneous Steel Material/Fabrication (Material) | 05-0506 - Miscellaneous Steel | $591,250.98 | $235,500.00 | $0.00 | $0.00 | $235,500.00 | 39.83% | $355,750.98 | $23,550.00 |
| 8 | Miscellaneous Steel Erection (Labor) | 05-0506 - Miscellaneous Steel | $219,880.00 | $50,000.00 | $0.00 | $0.00 | $50,000.00 | 22.74% | $169,880.00 | $5,000.00 |
| | TOTALS: | | $3,434,097.31 | $1,588,129.39 | $580,932.78 | $0.00 | $2,169,062.17 | 63.16% | $1,265,035.14 | $216,906.22 |

CONTINUATION SHEET
Whole Change Order Packages

DOCUMENT DETAIL SHEET

CONTINUATION SHEET

DOCUMENT DETAIL SHEET

| ITEM NO. | DESCRIPTION OF WORK | SCHEDULED VALUE | WORK COMPLETED | | MATERIALS PRESENTLY STORED (NOT IN D OR E) | TOTAL COMPLETED AND STORED TO DATE (D+E+F) | % (G / C) | BALANCE TO FINISH (C - G) | RETAINAGE |
| | | | FROM PREVIOUS APPLICATION (D + E) | THIS PERIOD | | | | | |
| A | B | C | D | E | F | G | H | | I |
| 9 | CCO # 23006976-SUB-05A Project Changes Through 2/15/2021 | | | | | | | | |
| 9.1 | 05-0506 Changes to steel based on building and process design development and owner review comments through revisions dated 11.24.2020. Including but not limited to: 700 LF for armor joint embeds, 210 LF of armor joint notched plates and 200 Hilti bolts for armor joint notched plate install. | $ 8,776.11 | $ 8,776.11 | $ 0.00 | $ 0.00 | $ 8,776.11 | 100.00% | $ 0.00 | $ 877.61 |
| 9.2 | 05-0505 Changes to Guardrails based on building and process design development and owner review comments from drawing set dated 12.02.2020 to 12.10.2020. Including but not limited to: 40 LF of guardrail at bulk lacquer storage with two pieces of channel and six pipes/bollards. | $ 18,246.38 | $ 5,500.00 | $ 0.00 | $ 0.00 | $ 5,500.00 | 30.14% | $ 12,746.38 | $ 550.00 |
| 9.3 | 05-0506 Changes to Misc. Steel based on building and process design development and owner review comments from drawing set dated 12.08.2021, 12.11.2020 to 01.08.2021. Including but not limited to: 260 LF of exterior galv. guardrails. Removed angle/anchors at new louver locations. | $ 23,891.02 | $ 7,167.31 | $ 0.00 | $ 0.00 | $ 7,167.31 | 30.00% | $ 16,723.71 | $ 716.73 |
| 9.4 | 05-0506 Changes to Misc steel based on building and process design development and owner review comments from drawing set dated 01.18.2020. Including but not limited to: revised concrete lid angle details. Omitted steel erection of deleted overhead door steel support frame. Material was already ordered before changes were published. | $ 8,311.86 | $ 8,311.86 | $ 0.00 | $ 0.00 | $ 8,311.86 | 100.00% | $ 0.00 | $ 831.19 |
| 9.5 | 05-0506 Furnish Stainless Steel Liner at Washer Sump Pit per IPS drawings ENERGY-PHX-B08-WA05-WA07 dated 01/13/2021. | $ 40,169.82 | $ 10,042.46 | $ 0.00 | $ 0.00 | $ 10,042.46 | 25.00% | $ 30,127.36 | $ 1,004.25 |
| 9.6 | 05-0501 Cupper Foundation Embeds - Added 1 Nelson Stud | $ 1,177.00 | $ 1,177.00 | $ 0.00 | $ 0.00 | $ 1,177.00 | 100.00% | $ 0.00 | $ 117.70 |

CONTINUATION SHEET

DOCUMENT DETAIL SHEET

| A ITEM NO. | B DESCRIPTION OF WORK | C SCHEDULED VALUE | D WORK COMPLETED FROM PREVIOUS APPLICATION (D + E) | E THIS PERIOD | F MATERIALS PRESENTLY STORED (NOT IN D OR E) | G TOTAL COMPLETED AND STORED TO DATE (D+E+F) | H % (G / C) | I BALANCE TO FINISH (C - G) | RETAINAGE |
|---|---|---|---|---|---|---|---|---|---|
| | to bottom of each (4) 8" thick embeds. | | | | | | | | |
| 9.7 | 05-0501 Changes to Structural Steel based on building and process design development and owner review comments from drawing set dated 12.11.2020 to 01.08.2021. Including but not limited to: steel channel to support door framing at Inker Rebuild. Added channel cross members at platforms. | $ 10,320.56 | $ 10,320.56 | $ 0.00 | $ 0.00 | $ 10,320.56 | 100.00% | $ 0.00 | $ 1,032.06 |
| 10 | CCO # 23006976-SUB-05B CE #036 - Existing Fire Riser Steel Support Frame for Concrete Pour | | | | | | | | |
| 10.1 | 05-0506 Installed a steel support frame fastened to the tilt up panel wall for the existing fire riser at GL 19 south elevation in order to demo the slab below that the fire riser support was bearing on. | $ 711.14 | $ 711.14 | $ 0.00 | $ 0.00 | $ 711.14 | 100.00% | $ 0.00 | $ 71.11 |
| | TOTALS: | $ 111,603.89 | $ 52,006.44 | $ 0.00 | $ 0.00 | $ 52,006.44 | 46.60% | $ 59,597.45 | $ 5,200.65 |

Grand Totals

| A ITEM NO. | B DESCRIPTION OF WORK | C SCHEDULED VALUE | D WORK COMPLETED FROM PREVIOUS APPLICATION (D + E) | E THIS PERIOD | F MATERIALS PRESENTLY STORED (NOT IN D OR E) | G TOTAL COMPLETED AND STORED TO DATE (D+E+F) | H % (G / C) | I BALANCE TO FINISH (C - G) | RETAINAGE |
|---|---|---|---|---|---|---|---|---|---|
| | GRAND TOTALS: | $ 3,545,701.20 | $ 1,640,135.83 | $ 580,932.78 | $ 0.00 | $ 2,221,068.61 | 62.64% | $ 1,324,632.59 | $ 222,106.87 |

DOCUMENT DETAIL SHEET- APPLICATION AND CERTIFICATE FOR PAYMENT

List each sub-subcontractor or vendor who provided labor and/or materials to the project which makes up any part of this requisition and the gross value of such labor and/or materials provided within this requisition period.

Sub-Subcontractor/Supplier _____ Value _____

Sub-Subcontractor/Supplier _____ Value _____

Sub-Subcontractor/Supplier _____ Value _____

Sub-Subcontractor/Supplier _____ Value _____

Sub-Subcontractor/Supplier _____ Value _____

Sub-Subcontractor/Supplier _____ Value _____

Sub-Subcontractor/Supplier _____ Value _____

**APPLICATION AND CERTIFICATE FOR PAYMENT**

*DOCUMENT SUMMARY SHEET*

TO CONTRACTOR:
Stellar
2900 Hartley Road
Jacksonville, Florida 32257

FROM SUBCONTRACTOR:
Fabco Metal Products, LLC
1490 Frances Drive
Daytona Beach, Florida 32124

PROJECT:
Bang Energy - Phoenix Can Manufacturing
1635 South 43rd Avenue
Phoenix, Arizona 85009

SUBCONTRACT DATE: 1/8/2021

APPLICATION NO: 6
INVOICE NO:
PERIOD: 10/26/21 - 11/25/21
PROJECT NO: 23006976
CONTRACT DATE: 01/08/2021

DISTRIBUTION TO:

SUBCONTRACT FOR: Structural Steel
**SUBCONTRACTOR'S APPLICATION FOR PAYMENT**

Application is made for payment, as shown below, in connection with the Subcontract. Continuation Sheet is attached.

| | | |
|---|---|---|
| 1. | Original Contract Sum | $3,434,097.31 |
| 2. | Net change by change orders | $111,603.89 |
| 3. | Contract sum to date (line 1 ± 2) | $3,545,701.20 |
| 4. | Total completed and stored to date (Column G on detail sheet) | $2,573,688.45 |
| 5. | Retainage: | |
| | a. 10.00% of completed work: $257,368.85 | |
| | b. 0.00% of stored material: $0.00 | |
| | Total retainage (Line 5a + 5b or total in column I of detail sheet) | $257,368.85 |
| 6. | Total earned less retainage (Line 4 less Line 5 Total) | $2,316,319.60 |
| 7. | Less previous certificates for payment (Line 6 from prior certificate) | $1,998,961.74 |
| 8. | Current payment due: | $317,357.86 |
| 9. | Balance to finish, including retainage (Line 3 less Line 6) | $1,229,381.60 |

| CHANGE ORDER SUMMARY | ADDITIONS | DEDUCTIONS |
|---|---|---|
| Total changes approved in previous months by Owner | $111,603.89 | $0.00 |
| Total approved this Month: | $0.00 | $0.00 |
| Totals: | $111,603.89 | $0.00 |
| Net change by change orders: | $111,603.89 | |

The undersigned hereby further declares and agrees that in the event that any lien or other claim should be brought against The Stellar Companies, Inc., the Owner, or their building or premises, the undersigned will protect the said parties and defend any suit a action brought against them by reason of any lien or other form of claim or action arising out of said subcontract and hold them harmless and indemnified therefrom.

In consideration of the sum of $1.00 to the undersigned in hand paid, receipt whereof is hereby acknowledged, and other benefits accruing, the undersigned does hereby waive release and quitclaim in favor of The Stellar Companies, Inc. and/or owner or owners of said premises as improved all right that the undersigned may have to a lien upon the land and improvements above described.

IT IS UNDERSTOOD AND AGREED THAT THIS WAIVER AND RELEASE IS FOR ALL SERVICES RENDERED, WORK DONE AND MATERIAL FURNISHED PRIOR TO THE DATE HEREOF and is for all such services rendered, work done and material furnished and not only for the particular

SUBCONTRACTOR: Fabco Metal Products, LLC

By:

State of:
County of: Volusia
Subscribed and sworn to before me this 15 day of November 2021

Notary Public:
My commission expires: 7/28/2022

Date: 11/15/21

JERRY W. CROWDER
Commission # GG 205650
Expires July 28, 2022
Bonded Thru Troy Fain Insurance 800-385-7019

CONTINUATION SHEET

*DOCUMENT DETAIL SHEET*

Document SUMMARY SHEET, APPLICATION AND CERTIFICATE FOR PAYMENT, containing
Contractor's signed Certification is attached.
Use Column I on Contracts where variable retainage for line items apply.

APPLICATION NUMBER: 6
APPLICATION DATE: 11/21/2021
PERIOD: 10/26/21 - 11/25/21
ARCHITECTS/ENGINEERS PROJECT NO:

Contract Lines

| A | B | C | D | E | F | G | H | | I |
|---|---|---|---|---|---|---|---|---|---|
| | | | WORK COMPLETED | | | TOTAL | | | |
| ITEM NO. | COST CODE | DESCRIPTION OF WORK | SCHEDULED VALUE | FROM PREVIOUS APPLICATION (D + E) | THIS PERIOD | MATERIALS PRESENTLY STORED (NOT IN D OR E) | COMPLETED AND STORED TO DATE (D+E+F) | % (G / C) | BALANCE TO FINISH (C - G) | RETAINAGE |
| 1 | 05-0501 - Structural Steel | Engineering and Shop Drawings (Material) | $117,903.75 | $117,903.75 | $0.00 | $0.00 | $117,903.75 | 100.00% | $0.00 | $11,790.38 |
| 2 | 05-0506 - Miscellaneous Steel | Anchor Bolts (Material) | $9,904.32 | $9,904.32 | $0.00 | $0.00 | $9,904.32 | 100.00% | $0.00 | $990.43 |
| 3 | 05-0506 - Miscellaneous Steel | Embeds (steel,ss) (Material) | $70,959.24 | $70,959.24 | $0.00 | $0.00 | $70,959.24 | 100.00% | $0.00 | $7,095.92 |
| 4 | 05-0501 - Structural Steel | Material/Fabrication (Material) | $1,769,196.41 | $1,344,589.27 | $247,687.50 | $0.00 | $1,592,276.77 | 90.00% | $176,919.64 | $159,227.68 |
| 5 | 05-0505 - Stairs / Catwalks / Ladders / Handrails | Grating (steel, ss, fiberglass) (Material) | $130,340.91 | $130,340.91 | $0.00 | $0.00 | $130,340.91 | 100.00% | $0.00 | $13,034.09 |
| 6 | 05-0503 - Steel Erection | Structural Steel Erection (Labor) | $524,661.70 | $209,864.68 | $104,932.34 | $0.00 | $314,797.02 | 60.00% | $209,864.68 | $31,479.70 |
| 7 | 05-0506 - Miscellaneous Steel | Miscellaneous Steel Material/Fabrication (Material) | $591,250.98 | $235,500.00 | $0.00 | $0.00 | $235,500.00 | 39.83% | $355,750.98 | $23,550.00 |
| 8 | 05-0506 - Miscellaneous Steel | Miscellaneous Steel Erection (Labor) | $219,880.00 | $50,000.00 | $0.00 | $0.00 | $50,000.00 | 22.74% | $169,880.00 | $5,000.00 |
| | | TOTALS: | $3,434,097.31 | $2,169,062.17 | $352,619.84 | $0.00 | $2,521,682.01 | 73.43% | $912,415.30 | $252,168.20 |

DOCUMENT DETAIL SHEET

CONTINUATION SHEET
Whole Change Order Packages

CONTINUATION SHEET

DOCUMENT DETAIL SHEET

| A | B | C | D | E | F | G | H | | I |
|---|---|---|---|---|---|---|---|---|---|
| ITEM NO. | DESCRIPTION OF WORK | SCHEDULED VALUE | WORK COMPLETED FROM PREVIOUS APPLICATION (D + E) | THIS PERIOD | MATERIALS PRESENTLY STORED (NOT IN D OR E) | TOTAL COMPLETED AND STORED TO DATE (D+E+F) | % (G / C) | BALANCE TO FINISH (C - G) | RETAINAGE |
| 9 | CCO # 23006976-SUB-05A Project Changes Through 2/15/2021 | | | | | | | | |
| 9.1 | 05-0506 Changes to steel based on building and process design development and owner review comments through revisions dated 11.24.2020. Including but not limited to: 700 LF for armor joint embeds, 210 LF of armor joint notched plates and 200 Hilti bolts for armor joint notched plate install. | $ 8,776.11 | $ 8,776.11 | $ 0.00 | $ 0.00 | $ 8,776.11 | 100.00% | $ 0.00 | $ 877.61 |
| 9.2 | 05-0505 Changes to Guardrails based on building and process design development and owner review comments from drawing set dated 12.02.2020 to 12.10.2020. Including but not limited to: 40 LF of guardrail at bulk lacquer storage with two pieces of channel and six pipes/bollards. | $ 18,246.38 | $ 5,500.00 | $ 0.00 | $ 0.00 | $ 5,500.00 | 30.14% | $ 12,746.38 | $ 550.00 |
| 9.3 | 05-0506 Changes to Misc. Steel based on building and process design development and owner review comments from drawing set dated 12.11.2020 to 01.08.2021. Including but not limited to: 260 LF of exterior galv, guardrails. Removed angle/anchors at new louver locations. | $ 23,891.02 | $ 7,167.31 | $ 0.00 | $ 0.00 | $ 7,167.31 | 30.00% | $ 16,723.71 | $ 716.73 |
| 9.4 | 05-0506 Changes to Misc steel based on building and process design development and owner review comments from drawing set dated 01.18.2020. Including but not limited to: revised concrete lid angle details. Omitted steel erection of deleted overhead door steel support frame. Material was already ordered before changes were published. | $ 8,311.86 | $ 8,311.86 | $ 0.00 | $ 0.00 | $ 8,311.86 | 100.00% | $ 0.00 | $ 831.19 |
| 9.5 | 05-0506 Furnish Stainless Steel Liner at Washer Sump Pit per IPS drawings ENERGY-PHX-B08-WA05-WA07 dated 01/13/2021. | $ 40,169.82 | $ 10,042.46 | $ 0.00 | $ 0.00 | $ 10,042.46 | 25.00% | $ 30,127.36 | $ 1,004.25 |
| 9.6 | 05-0501 Cupper Foundation Embeds - Added 1 Nelson Stud | $ 1,177.00 | $ 1,177.00 | $ 0.00 | $ 0.00 | $ 1,177.00 | 100.00% | $ 0.00 | $ 117.70 |

| A ITEM NO. | B DESCRIPTION OF WORK | C SCHEDULED VALUE | D WORK COMPLETED FROM PREVIOUS APPLICATION (D + E) | E WORK COMPLETED THIS PERIOD | F MATERIALS PRESENTLY STORED (NOT IN D OR E) | G TOTAL COMPLETED AND STORED TO DATE (D+E+F) | H % (G / C) | BALANCE TO FINISH (C - G) | I RETAINAGE |
|---|---|---|---|---|---|---|---|---|---|
|  | to bottom of each (4) 8" thick embeds. |  |  |  |  |  |  |  |  |
| 9.7 | 05-0501 Changes to Structural Steel based on building and process design development and owner review comments from drawing set dated 12.11.2020 to 01.08.2021. Including but not limited to: steel channel to support door framing at Inker Rebuild. Added channel cross members at platforms. | $ 10,320.56 | $ 10,320.56 | $ 0.00 | $ 0.00 | $ 10,320.56 | 100.00% | $ 0.00 | $ 1,032.06 |
| 10 | CCO # 23006976-SUB-05B CE #036 - Existing Fire Riser Steel Support Frame for Concrete Pour |  |  |  |  |  |  |  |  |
| 10.1 | 05-0506 Installed a steel support frame fastened to the tilt up panel wall for the existing fire riser at GL 19 south elevation in order to demo the slab below that the fire riser support was bearing on. | $ 711.14 | $ 711.14 | $ 0.00 | $ 0.00 | $ 711.14 | 100.00% | $ 0.00 | $ 71.11 |
| **TOTALS:** |  | $ 111,603.89 | $ 52,006.44 | $ 0.00 | $ 0.00 | $ 52,006.44 | 46.60% | $ 59,597.45 | $ 5,200.65 |

Grand Totals

| A ITEM NO. | B DESCRIPTION OF WORK | C SCHEDULED VALUE | D WORK COMPLETED FROM PREVIOUS APPLICATION (D + E) | E WORK COMPLETED THIS PERIOD | F MATERIALS PRESENTLY STORED (NOT IN D OR E) | G TOTAL COMPLETED AND STORED TO DATE (D+E+F) | H % (G / C) | BALANCE TO FINISH (C - G) | I RETAINAGE |
|---|---|---|---|---|---|---|---|---|---|
| **GRAND TOTALS:** |  | $ 3,545,701.20 | $ 2,221,068.61 | $ 352,619.84 | $ 0.00 | $ 2,573,688.45 | 72.59% | $ 972,012.75 | $ 257,368.85 |

DOCUMENT DETAIL SHEET- APPLICATION AND CERTIFICATE FOR PAYMENT

List each sub-subcontractor or vendor who provided labor and/or materials to the project which makes up any part of this requisition and the gross value of such labor and/or materials provided within this requisition period.

Sub-Subcontractor/Supplier _____ Value _____

Sub-Subcontractor/Supplier _____ Value _____

Sub-Subcontractor/Supplier _____ Value _____

Sub-Subcontractor/Supplier _____ Value _____

Sub-Subcontractor/Supplier _____ Value _____

Sub-Subcontractor/Supplier _____ Value _____

Sub-Subcontractor/Supplier _____ Value _____

# APPLICATION AND CERTIFICATE FOR PAYMENT

## DOCUMENT SUMMARY SHEET

**TO CONTRACTOR:**
Stellar
2900 Hartley Road
Jacksonville, Florida 32257

**PROJECT:**
Bang Energy - Phoenix Can Manufacturing
1635 South 43rd Avenue
Phoenix, Arizona 85009

**APPLICATION NO:** 7
INVOICE NO:
PERIOD: 11/26/21 - 12/25/21
PROJECT NO: 23006976
CONTRACT DATE: 01/08/2021

**DISTRIBUTION TO:**

**FROM SUBCONTRACTOR:**
Fabco Metal Products, LLC
1490 Frances Drive
Daytona Beach, Florida 32124

SUBCONTRACT DATE: 1/8/2021

SUBCONTRACT FOR: Structural Steel
**SUBCONTRACTOR'S APPLICATION FOR PAYMENT**

Application is made for payment, as shown below, in connection with the Subcontract. Continuation Sheet is attached.

| | | |
|---|---|---|
| 1. | Original Contract Sum | $3,434,097.31 |
| 2. | Net change by change orders | $111,603.89 |
| 3. | Contract sum to date (line 1 ± 2) | $3,545,701.20 |
| 4. | Total completed and stored to date | $2,948,557.94 |
| | (Column G on detail sheet) | |
| 5. | Retainage: | |
| | a. 10.00% of completed work: | $294,855.80 |
| | b. 0.00% of stored material: | $0.00 |
| | Total retainage (Line 5a + 5b or total in column I of detail sheet) | $294,855.80 |
| 6. | Total earned less retainage | $2,653,702.14 |
| | (Line 4 less Line 5 Total) | |
| 7. | Less previous certificates for payment | $2,316,319.60 |
| | (Line 6 from prior certificate) | |
| 8. | Current payment due | $337,382.54 |
| 9. | Balance to finish, including retainage | $891,999.06 |
| | (Line 3 less Line 6) | |

| CHANGE ORDER SUMMARY | ADDITIONS | DEDUCTIONS |
|---|---|---|
| Total changes approved in previous months by Owner | $111,603.89 | $0.00 |
| Total approved this Month | $0.00 | $0.00 |
| Totals | $111,603.89 | $0.00 |
| Net change by change orders | $111,603.89 | |

The undersigned hereby further declares and agrees that in the event that any lien or other claim should be brought against The Stellar Companies, Inc., the Owner, or their building or premises, the undersigned will protect the said parties and defend any suit a action brought against them by reason of any lien or other form of claim or action arising out of said subcontract and hold them harmless end indemnified therefrom.

In consideration of the sum of $1.00 to the undersigned in hand paid, receipt whereof is hereby acknowledged, and other benefits accruing, the undersigned does hereby waive release and quitclaim in favor of The Stellar Companies, Inc. and/or owner or owners of said premises as improved all right that the undersigned may have to a lien upon the land and improvements above described.

IT IS UNDERSTOOD AND AGREED THAT THIS WAIVER AND RELEASE IS FOR ALL SERVICES RENDERED, WORK DONE AND MATERIAL FURNISHED PRIOR TO THE DATE HEREOF and is for all such services rendered, work done and material furnished and not only for the particular

SUBCONTRACTOR: Fabco Metal Products, LLC
By:
State of: _____ Date: 12/1/21
County of:
Subscribed and sworn to before me this 17 day of December 2021.

Notary Public:
My commission expires:

JERRY W. CROWDER
Commission # GG 205650
Expires July 28, 2022
Bonded Thru Troy Fain Insurance 800-385-7019

CONTINUATION SHEET

DOCUMENT *DETAIL SHEET*

Document SUMMARY SHEET, APPLICATION AND CERTIFICATE FOR PAYMENT, containing
Contractor's signed Certification is attached.
Use Column I on Contracts where variable retainage for line items apply.

APPLICATION NUMBER: 7
APPLICATION DATE: 12/21/2021
PERIOD: 11/26/21 - 12/25/21
ARCHITECTS/ENGINEERS PROJECT NO:

Contract Lines

| A | B | C | D | E | F | G | H | I |
|---|---|---|---|---|---|---|---|---|
| ITEM NO. | COST CODE | DESCRIPTION OF WORK | SCHEDULED VALUE | WORK COMPLETED | | MATERIALS PRESENTLY STORED (NOT IN D OR E) | TOTAL COMPLETED AND STORED TO DATE (D+E+F) | % (G / C) | BALANCE TO FINISH (C - G) | RETAINAGE |
| | | | | FROM PREVIOUS APPLICATION (D + E) | THIS PERIOD | | | | | |
| 1 | 05-0501 - Structural Steel | Engineering and Shop Drawings (Material) | $ 117,903.75 | $ 117,903.75 | $ 0.00 | $ 0.00 | $ 117,903.75 | 100.00% | $ 0.00 | $ 11,790.38 |
| 2 | 05-0506 - Miscellaneous Steel | Anchor Bolts (Material) | $ 9,904.32 | $ 9,904.32 | $ 0.00 | $ 0.00 | $ 9,904.32 | 100.00% | $ 0.00 | $ 990.43 |
| 3 | 05-0506 - Miscellaneous Steel | Embeds (steel,ss) (Material) | $ 70,959.24 | $ 70,959.24 | $ 0.00 | $ 0.00 | $ 70,959.24 | 100.00% | $ 0.00 | $ 7,095.92 |
| 4 | 05-0501 - Structural Steel | Structural Steel Material/Fabrication (Material) | $ 1,769,196.41 | $ 1,592,276.77 | $ 176,919.64 | $ 0.00 | $ 1,769,196.41 | 100.00% | $ 0.00 | $ 176,919.64 |
| 5 | 05-0505 - Stairs / Catwalks / Ladders / Handrails | Grating (steel, ss, fiberglass) (Material) | $ 130,340.91 | $ 130,340.91 | $ 0.00 | $ 0.00 | $ 130,340.91 | 100.00% | $ 0.00 | $ 13,034.09 |
| 6 | 05-0503 - Steel Erection | Structural Steel Erection (Labor) | $ 524,661.70 | $ 314,797.02 | $ 78,699.26 | $ 0.00 | $ 393,496.28 | 75.00% | $ 131,165.42 | $ 39,349.63 |
| 7 | 05-0506 - Miscellaneous Steel | Miscellaneous Steel Material/Fabrication (Material) | $ 591,250.98 | $ 235,500.00 | $ 119,250.59 | $ 0.00 | $ 354,750.59 | 60.00% | $ 236,500.39 | $ 35,475.06 |
| 8 | 05-0506 - Miscellaneous Steel | Miscellaneous Steel Erection (Labor) | $ 219,880.00 | $ 50,000.00 | $ 0.00 | $ 0.00 | $ 50,000.00 | 22.74% | $ 169,880.00 | $ 5,000.00 |
| | TOTALS: | | $ 3,434,097.31 | $ 2,521,682.01 | $ 374,869.49 | $ 0.00 | $ 2,896,551.50 | 84.35% | $ 537,545.81 | $ 289,655.15 |

*DOCUMENT DETAIL SHEET*

CONTINUATION SHEET
**Whole Change Order Packages**

CONTINUATION SHEET

DOCUMENT DETAIL SHEET

| A | B | C | D | E | F | G | H | BALANCE TO FINISH (C - G) | I |
|---|---|---|---|---|---|---|---|---|---|
| | | | WORK COMPLETED | | | | | | |
| ITEM NO. | DESCRIPTION OF WORK | SCHEDULED VALUE | FROM PREVIOUS APPLICATION (D + E) | THIS PERIOD | MATERIALS PRESENTLY STORED (NOT IN D OR E) | TOTAL COMPLETED AND STORED TO DATE (D+E+F) | % (G / C) | | RETAINAGE |
| 9 | CCO # 23006976-SUB-05A  Project Changes Through 2/15/2021 | | | | | | | | |
| 9.1 | 05-0506 Changes to steel based on building and process design development and owner review comments through revisions dated 11.24.2020. Including but not limited to: 700 LF for armor joint embeds, 210 LF of armor joint notched plates and 200 Hilti bolts for armor joint notched plate install. | $ 8,776.11 | $ 8,776.11 | $ 0.00 | $ 0.00 | $ 8,776.11 | 100.00% | $ 0.00 | $ 877.61 |
| 9.2 | 05-0505 Changes to Guardrails based on building and process design development and owner review comments from drawing set dated 12.10.2020 to 12.10.2020. Including but not limited to: 40 LF of guardrail at bulk lacquer storage with two pieces of channel and six pipes/bollards. | $ 18,246.38 | $ 5,500.00 | $ 0.00 | $ 0.00 | $ 5,500.00 | 30.14% | $ 12,746.38 | $ 550.00 |
| 9.3 | 05-0506 Changes to Misc. Steel based on building and process design development and owner review comments from drawing set dated 12.11.2020 to 01.08.2021. Including but not limited to: 260 LF of exterior galv. guardrails. Removed angle/anchors at new louver locations. | $ 23,891.02 | $ 7,167.31 | $ 0.00 | $ 0.00 | $ 7,167.31 | 30.00% | $ 16,723.71 | $ 716.73 |
| 9.4 | 05-0506 Changes to Misc steel based on building and process design development and owner review comments from drawing set dated 01.18.2020. Including but not limited to: revised concrete lid angle details. Omitted steel erection of deleted overhead door steel support frame. Material was already ordered before changes were published. | $ 8,311.86 | $ 8,311.86 | $ 0.00 | $ 0.00 | $ 8,311.86 | 100.00% | $ 0.00 | $ 831.19 |
| 9.5 | 05-0506 Furnish Stainless Steel Liner at Washer Sump Pit per IPPS drawings ENERGY-PHX-B0B-WA07 dated 01/13/2021. | $ 40,169.82 | $ 10,042.46 | $ 0.00 | $ 0.00 | $ 10,042.46 | 25.00% | $ 30,127.36 | $ 1,004.25 |
| 9.6 | 05-0501 Cupper Foundation Embeds - Added 1 Nelson Stud | $ 1,177.00 | $ 1,177.00 | $ 0.00 | $ 0.00 | $ 1,177.00 | 100.00% | $ 0.00 | $ 117.70 |

CONTINUATION SHEET

DOCUMENT DETAIL SHEET

| A | B | C | D | E | F | G | H | | I |
|---|---|---|---|---|---|---|---|---|---|
| | | | WORK COMPLETED | | | | | | |
| ITEM NO. | DESCRIPTION OF WORK | SCHEDULED VALUE | FROM PREVIOUS APPLICATION (D + E) | THIS PERIOD | MATERIALS PRESENTLY STORED (NOT IN D OR E) | TOTAL COMPLETED AND STORED TO DATE (D+E+F) | % (G / C) | BALANCE TO FINISH (C - G) | RETAINAGE |
| | to bottom of each (4) 8" thick embeds. | | | | | | | | |
| | 05-0501 Changes to Structural Steel based on building and process design development and owner review comments from drawing set dated 12.11.2020 to 01.08.2021. Including but not limited to: steel channel to support door framing at hiker Rebuild Added channel cross members at platform. | | | | | | | | |
| 9.7 | | $ 10,320.56 | $ 10,320.56 | $ 0.00 | $ 0.00 | $ 10,320.56 | 100.00% | $ 0.00 | $ 1,032.06 |
| 10 | CCO # 23006976-SUB-05B CE #036 - Existing Fire Riser Steel Support Frame for Concrete Pour | | | | | | | | |
| 10.1 | 05-0506 Installed a steel support frame fastened to the lift up panel wall for the existing fire riser at GL 19 south elevation in order to demo the slab below that the fire riser support was bearing on. | $ 711.14 | $ 711.14 | $ 0.00 | $ 0.00 | $ 711.14 | 100.00% | $ 0.00 | $ 71.11 |
| | TOTALS: | $ 111,603.89 | $ 52,006.44 | $ 0.00 | $ 0.00 | $ 52,006.44 | 46.60% | $ 59,597.45 | $ 5,200.65 |

Grand Totals

| A | B | C | D | E | F | G | H | | I |
|---|---|---|---|---|---|---|---|---|---|
| | | | WORK COMPLETED | | | | | | |
| ITEM NO. | DESCRIPTION OF WORK | SCHEDULED VALUE | FROM PREVIOUS APPLICATION (D + E) | THIS PERIOD | MATERIALS PRESENTLY STORED (NOT IN D OR E) | TOTAL COMPLETED AND STORED TO DATE (D+E+F) | % (G / C) | BALANCE TO FINISH (C - G) | RETAINAGE |
| | GRAND TOTALS: | $ 3,545,701.20 | $ 2,573,688.45 | $ 374,869.49 | $ 0.00 | $ 2,948,557.94 | 83.16% | $ 597,143.26 | $ 294,855.80 |

DOCUMENT DETAIL SHEET- APPLICATION AND CERTIFICATE FOR PAYMENT

List each sub-subcontractor or vendor who provided labor and/or materials to the project which makes up any part of this requisition and the gross value of such labor and/or materials provided within this requisition period.

Sub-Subcontractor/Supplier _____ Value _____

Sub-Subcontractor/Supplier _____ Value _____

Sub-Subcontractor/Supplier _____ Value _____

Sub-Subcontractor/Supplier _____ Value _____

Sub-Subcontractor/Supplier _____ Value _____

Sub-Subcontractor/Supplier _____ Value _____

Sub-Subcontractor/Supplier _____ Value _____

# APPLICATION AND CERTIFICATE FOR PAYMENT

DOCUMENT SUMMARY SHEET

**TO CONTRACTOR:**
Stellar
2900 Hartley Road
Jacksonville, Florida 32257

**FROM SUBCONTRACTOR:**
Fabco Metal Products, LLC
1490 Frances Drive
Daytona Beach, Florida 32124

**PROJECT:**
Bang Energy - Phoenix Can Manufacturing
1635 South 43rd Avenue
Phoenix, Arizona 85009

**SUBCONTRACT DATE:** 1/8 /2021

APPLICATION NO: 8
INVOICE NO:
PERIOD: 12/26/21 - 01/25/22
PROJECT NO: 23006976
CONTRACT DATE: 01/08/2021

DISTRIBUTION TO:

SUBCONTRACT FOR: Structural Steel
**SUBCONTRACTOR'S APPLICATION FOR PAYMENT**

Application is made for payment, as shown below, in connection with the Subcontract. Continuation Sheet is attached.

| | | |
|---|---|---|
| 1. | Original Contract Sum | $ 3,434,097.31 |
| 2. | Net change by change orders | $ 111,603.89 |
| 3. | Contract sum to date (line 1 ± 2) | $ 3,545,701.20 |
| 4. | Total completed and stored to date (Column G on detail sheet) | $ 3,127,629.29 |
| 5. | Retainage: | |
| | a. 10.00% of completed work: | $ 312,762.94 |
| | b. 0.00% of stored material: | $ 0.00 |
| | Total retainage (Line 5a + 5b or total in column I of detail sheet) | $ 312,762.94 |
| 6. | Total earned less retainage (Line 4 less Line 5 Total) | $ 2,814,866.35 |
| 7. | Less previous certificates for payment (Line 6 from prior certificate) | $ 2,653,702.14 |
| 8. | Current payment due | $ 161,164.21 |
| 9. | Balance to finish, including retainage (Line 3 less Line 6) | $ 730,834.85 |

| CHANGE ORDER SUMMARY | ADDITIONS | DEDUCTIONS |
|---|---|---|
| Total changes approved in previous months by Owner: | $ 111,603.89 | $ 0.00 |
| Total approved this Month: | $ 0.00 | $ 0.00 |
| Totals: | $ 111,603.89 | $ 0.00 |
| Net change by change orders: | $ 111,603.89 | |

The undersigned hereby further declares and agrees that in the event that any lien or other claim should be brought against The Stellar Companies, Inc., the Owner, or their building or premises, the undersigned will protect the said parties and defend any suit a action brought against them by reason of any lien or other form of claim or action arising out of said subcontract and hold them harmless end indemnified therefrom.

In consideration of the sum of $1.00 to the undersigned in hand paid, receipt whereof is hereby acknowledged, and other benefits accruing, the undersigned does hereby waive release and quitclaim in favor of The Stellar Companies, Inc. and/or owner or owners of said premises as improved all right that the undersigned may have to a lien upon the land and improvements above described.

IT IS UNDERSTOOD AND AGREED THAT THIS WAIVER AND RELEASE IS FOR ALL SERVICES RENDERED, WORK DONE AND MATERIAL FURNISHED PRIOR TO THE DATE HEREOF and is for all such services rendered, work done and material furnished and not only for the particular

SUBCONTRACTOR: Fabco Metal Products, LLC

By: _____

State of: Florida
County of: Volusia
Subscribed and sworn to before me this 17 day of January , 2222

Date: 1/7/2022

Notary Public: _____
My commission expires: 7/28/2022

JERRY W. CROWDER
Commission # GG 205650
Expires July 28, 2022
Bonded Thru Troy Fain Insurance 800-385-7019

Page 2 of 6

*DOCUMENT DETAIL SHEET*

**CONTINUATION SHEET**

Document SUMMARY SHEET, APPLICATION AND CERTIFICATE FOR PAYMENT, containing
Contractor's signed Certification is attached.
Use Column I on Contracts where variable retainage for line items apply.

APPLICATION NUMBER: 8
APPLICATION DATE: 01/21/2022.
PERIOD: 12/26/21 - 01/25/22
ARCHITECT'S/ENGINEERS PROJECT NO:

Contract Lines

| A | B | C | D | E | F | G | H | I |
|---|---|---|---|---|---|---|---|---|
| | | | WORK COMPLETED | | | | | |
| ITEM NO. | COST CODE | DESCRIPTION OF WORK | SCHEDULED VALUE | FROM PREVIOUS APPLICATION (D + E) | THIS PERIOD | MATERIALS PRESENTLY STORED (NOT IN D OR E) | TOTAL COMPLETED AND STORED TO DATE (D+E+F) | % (G / C) | BALANCE TO FINISH (C - G) | RETAINAGE |
| 1 | 05-0501 - Structural Steel | Engineering and Shop Drawings (Material) | $ 117,903.75 | $ 117,903.75 | $ 0.00 | $ 0.00 | $ 117,903.75 | 100.00% | $ 0.00 | $ 11,790.38 |
| 2 | 05-0506 - Miscellaneous Steel | Anchor Bolts (Material) | $ 9,904.32 | $ 9,904.32 | $ 0.00 | $ 0.00 | $ 9,904.32 | 100.00% | $ 0.00 | $ 990.43 |
| 3 | 05-0506 - Miscellaneous Steel | Embeds (steel,ss) (Material) | $ 70,959.24 | $ 70,959.24 | $ 0.00 | $ 0.00 | $ 70,959.24 | 100.00% | $ 0.00 | $ 7,095.92 |
| 4 | 05-0501 - Structural Steel | Structural Steel Material/Fabrication (Material) | $ 1,769,196.41 | $ 1,769,196.41 | $ 0.00 | $ 0.00 | $ 1,769,196.41 | 100.00% | $ 0.00 | $ 176,919.64 |
| 5 | 05-0505 - Stairs / Catwalks / Ladders / Handrails | Grating (steel, ss, fiberglass) (Material) | $ 130,340.91 | $ 130,340.91 | $ 0.00 | $ 0.00 | $ 130,340.91 | 100.00% | $ 0.00 | $ 13,034.09 |
| 6 | 05-0503 - Steel Erection | Structural Steel Erection (Labor) | $ 524,661.70 | $ 393,496.28 | $ 0.00 | $ 0.00 | $ 393,496.28 | 75.00% | $ 131,165.42 | $ 39,349.63 |
| 7 | 05-0506 - Miscellaneous Steel | Miscellaneous Steel Material/Fabrication (Material) | $ 591,250.98 | $ 354,750.59 | $ 141,900.23 | $ 0.00 | $ 496,650.82 | 84.00% | $ 94,600.16 | $ 49,665.08 |
| 8 | 05-0506 - Miscellaneous Steel | Miscellaneous Steel Erection (Labor) | $ 219,880.00 | $ 50,000.00 | $ 26,958.00 | $ 0.00 | $ 76,958.00 | 35.00% | $ 142,922.00 | $ 7,695.80 |
| | | TOTALS: | $ 3,434,097.31 | $ 2,896,551.50 | $ 168,858.23 | $ 0.00 | $ 3,065,409.73 | 89.26% | $ 368,687.58 | $ 306,540.97 |

CONTINUATION SHEET
Whole Change Order Packages

DOCUMENT DETAIL SHEET

**CONTINUATION SHEET**

*DOCUMENT DETAIL SHEET*

| A ITEM NO. | B DESCRIPTION OF WORK | C SCHEDULED VALUE | D WORK COMPLETED FROM PREVIOUS APPLICATION (D + E) | E THIS PERIOD | F MATERIALS PRESENTLY STORED (NOT IN D OR E) | G TOTAL COMPLETED AND STORED TO DATE (D+E+F) | H % (G / C) | BALANCE TO FINISH (C - G) | I RETAINAGE |
|---|---|---|---|---|---|---|---|---|---|
| 9 | **CCO # 23006976-SUB-05A Project Changes Through 2/15/2021** | | | | | | | | |
| 9.1 | 05-0506 Changes to steel based on building and process design development and owner review comments through revisions dated 11.24.2020. Including but not limited to: 700 LF for armor joint embeds, 210 LF of armor joint notched plates and 200 Hilti bolts for armor joint notched plate install. | $ 8,776.11 | $ 8,776.11 | $ 0.00 | $ 0.00 | $ 8,776.11 | 100.00% | $ 0.00 | $ 877.61 |
| 9.2 | 05-0505 Changes to Guardrails based on building and process design development and owner review comments from drawing set dated 12.02.2020 to 12.10.2020. Including but not limited to 40 LF of guardrail at bulk lacquer storage with two pieces of channel and six pipes/bollards. | $ 18,246.38 | $ 5,500.00 | $ 1,798.55 | $ 0.00 | $ 7,298.55 | 40.00% | $ 10,947.83 | $ 729.86 |
| 9.3 | 05-0506 Changes to Misc. Steel based on building and process design development and owner review comments from drawing set dated 12.11.2020 to 08.2021. Including but not limited to: 260 LF of exterior galv. guardrails. Removed angle/anchors at new louver locations. | $ 23,891.02 | $ 7,167.31 | $ 2,389.10 | $ 0.00 | $ 9,556.41 | 40.00% | $ 14,334.61 | $ 955.64 |
| 9.4 | 05-0506 Changes to Misc steel based on building and process design development and owner review comments from drawing set dated 01.18.2020. Including but not limited to: revised concrete lid angle details. Omitted steel erection of deleted overhead door steel support frame. Material was already ordered before changes were published. | $ 8,311.86 | $ 8,311.86 | $ 0.00 | $ 0.00 | $ 8,311.86 | 100.00% | $ 0.00 | $ 831.19 |
| 9.5 | 05-0506 Furnish Stainless Steel Liner at Washer Sump Pit per IPS drawings ENERGY-PHX-B08-WA05-WA07 dated 01/13/2021. | $ 40,169.82 | $ 10,042.46 | $ 6,025.47 | $ 0.00 | $ 16,067.93 | 40.00% | $ 24,101.89 | $ 1,606.80 |
| 9.6 | 05-0501 Cupper Foundation Embeds - Added 1 Nelson Stud | $ 1,177.00 | $ 1,177.00 | $ 0.00 | $ 0.00 | $ 1,177.00 | 100.00% | $ 0.00 | $ 117.70 |

CONTINUATION SHEET

DOCUMENT DETAIL SHEET

Page 5 of 6

| A | B | C | D | E | F | G | H | | I |
|---|---|---|---|---|---|---|---|---|---|
| ITEM NO. | DESCRIPTION OF WORK | SCHEDULED VALUE | WORK COMPLETED | | MATERIALS PRESENTLY STORED (NOT IN D OR E) | TOTAL COMPLETED AND STORED TO DATE (D+E+F) | % (G / C) | BALANCE TO FINISH (C - G) | RETAINAGE |
| | | | FROM PREVIOUS APPLICATION (D + E) | THIS PERIOD | | | | | |
| | to bottom of each (4) 8" thick embeds. 05-0501 Changes to Structural Steel based on building and process design development and owner review comments from drawing set dated 12.11.2020 to 01.08.2021. Including but not limited to: steel channel to support door framing at Inker Rebuild. Added channel cross members at platforms. | | | | | | | | |
| 9.7 | | $ 10,320.56 | $ 10,320.56 | $ 0.00 | $ 0.00 | $ 10,320.56 | 100.00% | $ 0.00 | $ 1,032.06 |
| 10 | CCO # 2300976-SUB-05B CE #036 - Existing Fire Riser Steel Support Frame for Concrete Pour | | | | | | | | |
| 10.1 | 05-0506 Installed a steel support frame fastened to the tilt up panel wall for the existing fire riser at GL 19 south elevation in order to demo the slab below that the fire riser support was bearing on. | $ 711.14 | $ 711.14 | $ 0.00 | $ 0.00 | $ 711.14 | 100.00% | $ 0.00 | $ 71.11 |
| | TOTALS: | $ 111,603.89 | $ 52,006.44 | $ 10,213.12 | $ 0.00 | $ 62,219.56 | 55.75% | $ 49,384.33 | $ 6,221.97 |

Grand Totals

| A | B | C | D | E | F | G | H | | I |
|---|---|---|---|---|---|---|---|---|---|
| ITEM NO. | DESCRIPTION OF WORK | SCHEDULED VALUE | WORK COMPLETED | | MATERIALS PRESENTLY STORED (NOT IN D OR E) | TOTAL COMPLETED AND STORED TO DATE (D+E+F) | % (G / C) | BALANCE TO FINISH (C - G) | RETAINAGE |
| | | | FROM PREVIOUS APPLICATION (D + E) | THIS PERIOD | | | | | |
| | GRAND TOTALS: | $ 3,545,701.20 | $ 2,948,557.94 | $ 179,071.35 | $ 0.00 | $ 3,127,629.29 | 88.21% | $ 418,071.91 | $ 312,762.94 |

DOCUMENT DETAIL SHEET: APPLICATION AND CERTIFICATE FOR PAYMENT

List each sub-subcontractor or vendor who provided labor and/or materials to the project which makes up any part of this requisition and the gross value of such labor and/or materials provided within this requisition period.

Sub-Subcontractor/Supplier     _____      Value     _____

Sub-Subcontractor/Supplier     _____      Value     _____

Sub-Subcontractor/Supplier     _____      Value     _____

Sub-Subcontractor/Supplier     _____      Value     _____

Sub-Subcontractor/Supplier     _____      Value     _____

Sub-Subcontractor/Supplier     _____      Value     _____

Sub-Subcontractor/Supplier     _____      Value     _____

**APPLICATION AND CERTIFICATE FOR PAYMENT**

DOCUMENT SUMMARY SHEET

TO CONTRACTOR:
Stellar
2900 Hartley Road
Jacksonville, Florida 32257

FROM SUBCONTRACTOR:
Fabco Metal Products, LLC
1490 Frances Drive
Daytona Beach, Florida 32124

PROJECT:
Bang Energy - Phoenix Can Manufacturing
1635 South 43rd Avenue
Phoenix, Arizona 85009

SUBCONTRACT DATE: 1/8/2021

APPLICATION NO: 9
INVOICE NO:
PERIOD: 03/01/22 - 03/31/22
PROJECT NO: 23006976
CONTRACT DATE: 01/08/2021

DISTRIBUTION TO:

SUBCONTRACT FOR: Structural Steel
SUBCONTRACTOR'S APPLICATION FOR PAYMENT

Application is made for payment, as shown below, in connection with the Subcontract. Continuation Sheet is attached.

| | | |
|---|---|---|
| 1. | Original Contract Sum | $ 3,434,097.31 |
| 2. | Net change by change orders | $ 630,129.89 |
| 3. | Contract sum to date (line 1 ± 2) | $ 4,064,227.20 |
| 4. | Total completed and stored to date | $ 3,672,342.59 |
| | (Column G on detail sheet) | |
| 5. | Retainage: | |
| | a. 10.00% of completed work: | $ 367,234.27 |
| | b. 0.00% of stored material: | $ 0.00 |
| | Total retainage (Line 5a + 5b or total in column I of detail sheet) | $ 367,234.27 |
| 6. | Total earned less retainage | $ 3,305,108.32 |
| | (Line 4 less Line 5 Total) | |
| 7. | Less previous certificates for payment | $ 2,814,866.35 |
| | (Line 6 from prior certificate) | |
| 8. | Current payment due: | $ 490,241.97 |
| 9. | Balance to finish, including retainage (Line 3 less Line 6) | $ 759,118.88 |

| CHANGE ORDER SUMMARY | ADDITIONS | DEDUCTIONS |
|---|---|---|
| Total changes approved in previous months by Owner | $ 111,603.89 | $ 0.00 |
| Total approved this Month | $ 518,526.00 | $ 0.00 |
| Totals: | $ 630,129.89 | $ 0.00 |
| Net change by change orders: | $ 630,129.89 | |

The undersigned hereby further declares and agrees that in the event that any lien or other claim should be brought against The Stellar Companies, Inc., the Owner, or their building or premises, the undersigned will protect the said parties and defend any suit a action brought against them by reason of any lien or other form of claim or action arising out of said subcontract and hold them harmless and indemnified therefrom.

In consideration of the sum of $1.00 to the undersigned in hand paid, receipt whereof is hereby acknowledged, and other benefits accruing, the undersigned does hereby waive release and quitclaim in favor of The Stellar Companies, Inc. and/or owner or owners of said premises as improved all right that the undersigned may have to a lien upon the land and improvements above described.

IT IS UNDERSTOOD AND AGREED THAT THIS WAIVER AND RELEASE IS FOR ALL SERVICES RENDERED, WORK DONE AND MATERIAL FURNISHED PRIOR TO THE DATE HEREOF and is for all such services rendered, work done and material furnished and not only for the particular

SUBCONTRACTOR: Fabco Metal Products, LLC

By: _____ Date: 3/21/2022

State of: Florida
County of: Volusia
Subscribed and sworn to before
me this 21 day of March 2022

_____
Notary Public:
My commission expires: 7/28/2022

JERRY W. CROWDER
Commission # GG 206650
Expires July 28, 2022
Bonded Thru Troy Fain Insurance 800-385-7019

CONTINUATION SHEET

DOCUMENT DETAIL SHEET

Document SUMMARY SHEET, APPLICATION AND CERTIFICATE FOR PAYMENT, containing
Contractor's signed Certification is attached.
Use Column I on Contracts where variable retainage for line items apply.

APPLICATION NUMBER: 9
APPLICATION DATE: 03/23/2022
PERIOD: 03/01/22 - 03/31/22
ARCHITECTS/ENGINEERS PROJECT NO.

Contract Lines

| ITEM NO. | COST CODE | DESCRIPTION OF WORK | SCHEDULED VALUE | WORK COMPLETED | | MATERIALS PRESENTLY STORED (NOT IN D OR E) | TOTAL COMPLETED AND STORED TO DATE (D+E+F) | % (G / C) | BALANCE TO FINISH (C - G) | RETAINAGE |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | FROM PREVIOUS APPLICATION (D + E) | THIS PERIOD | | | | | |
| | | | C | D | E | F | G | H | | I |
| 1 | 05-0501 - Structural Steel | Engineering and Shop Drawings (Material) | $ 117,903.75 | $ 117,903.75 | $ 0.00 | $ 0.00 | $ 117,903.75 | 100.00% | $ 0.00 | $ 11,790.38 |
| 2 | 05-0506 - Miscellaneous Steel | Anchor Bolts (Material) | $ 9,904.32 | $ 9,904.32 | $ 0.00 | $ 0.00 | $ 9,904.32 | 100.00% | $ 0.00 | $ 990.43 |
| 3 | 05-0506 - Miscellaneous Steel | Embeds (steel,ss) (Material) | $ 70,959.24 | $ 70,959.24 | $ 0.00 | $ 0.00 | $ 70,959.24 | 100.00% | $ 0.00 | $ 7,095.92 |
| 4 | 05-0501 - Structural Steel | Structural Steel Material/Fabrication (Material) | $ 1,769,196.41 | $ 1,769,196.41 | $ 0.00 | $ 0.00 | $ 1,769,196.41 | 100.00% | $ 0.00 | $ 176,919.64 |
| 5 | 05-0505 - Stairs / Catwalks / Ladders / Handrails | Grating (steel, ss, fiberglass) (Material) | $ 130,340.91 | $ 130,340.91 | $ 0.00 | $ 0.00 | $ 130,340.91 | 100.00% | $ 0.00 | $ 13,034.09 |
| 6 | 05-0503 - Steel Erection | Structural Steel Erection (Labor) | $ 524,661.70 | $ 393,496.28 | $ 0.00 | $ 0.00 | $ 393,496.28 | 75.00% | $ 131,165.42 | $ 39,349.63 |
| 7 | 05-0506 - Miscellaneous Steel | Miscellaneous Steel Material/Fabrication (Material) | $ 591,250.98 | $ 496,650.82 | $ 35,475.06 | $ 0.00 | $ 532,125.88 | 90.00% | $ 59,125.10 | $ 53,212.59 |
| 8 | 05-0506 - Miscellaneous Steel | Miscellaneous Steel Erection (Labor) | $ 219,880.00 | $ 76,958.00 | $ 10,994.00 | $ 0.00 | $ 87,952.00 | 40.00% | $ 131,928.00 | $ 8,795.20 |
| | | TOTALS: | $ 3,434,097.31 | $ 3,065,409.73 | $ 46,469.06 | $ 0.00 | $ 3,111,878.79 | 90.62% | $ 322,218.52 | $ 311,187.88 |

*DOCUMENT DETAIL SHEET*

CONTINUATION SHEET
Whole Change Order Packages

CONTINUATION SHEET

*DOCUMENT DETAIL SHEET*

| A | B | C | D | E | F | G | H | | I |
|---|---|---|---|---|---|---|---|---|---|
| ITEM NO. | DESCRIPTION OF WORK | SCHEDULED VALUE | WORK COMPLETED FROM PREVIOUS APPLICATION (D + E) | WORK COMPLETED THIS PERIOD | MATERIALS PRESENTLY STORED (NOT IN D OR E) | TOTAL COMPLETED AND STORED TO DATE (D+E+F) | % (G / C) | BALANCE TO FINISH (C - G) | RETAINAGE |
| 9 | CCO # 23006976-SUB-05A Project Changes Through 2/15/2021 | | | | | | | | |
| 9.1 | 05-0506 Changes to steel based on building and process design development and owner review comments through revisions dated 11.24.2020. Including but not limited to: 700 LF for armor joint embeds, 210 LF of armor joint notched plates and 200 Hilti bolts for armor joint notched plate install. | $ 8,776.11 | $ 8,776.11 | $ 0.00 | $ 0.00 | $ 8,776.11 | 100.00% | $ 0.00 | $ 877.61 |
| 9.2 | 05-0505 Changes to Guardrails based on building and process design development and owner review comments from drawing set dated 12.02.2020 to 12.10.2020. Including but not limited to: 40 LF of guardrail at bulk lacquer storage with two pieces of channel and six pipes/bollards. | $ 18,246.38 | $ 7,298.55 | $ 6,386.24 | $ 0.00 | $ 13,684.79 | 75.00% | $ 4,561.59 | $ 1,368.48 |
| 9.3 | 05-0506 Changes to Misc. Steel based on building and process design development and owner review comments from drawing set dated 12.11.2020 to 01.08.2021. Including but not limited to: 260 LF of exterior galv. guardrails. Removed angle/anchors at new louver locations. | $ 23,891.02 | $ 9,556.41 | $ 8,361.86 | $ 0.00 | $ 17,918.27 | 75.00% | $ 5,972.75 | $ 1,791.83 |
| 9.4 | 05-0506 Changes to Misc steel based on building and process design development and owner review comments from drawing set dated 01.18.2020. Including but not limited to: revised concrete lid angle details. Omitted steel erection of deleted overhead door steel support frame. Material was already ordered before changes were published. | $ 8,311.86 | $ 8,311.86 | $ 0.00 | $ 0.00 | $ 8,311.86 | 100.00% | $ 0.00 | $ 831.19 |
| 9.5 | 05-0506 Furnish Stainless Steel Liner at Washer Sump Pit per IPS drawings ENERGY-PHX-B08-WA05-WA07 dated 01/13/2021. | $ 40,169.82 | $ 16,067.93 | $ 14,059.44 | $ 0.00 | $ 30,127.37 | 75.00% | $ 10,042.45 | $ 3,012.74 |
| 9.6 | 05-0501 Cupper Foundation Embeds - Added 1 Nelson Stud | $ 1,177.00 | $ 1,177.00 | $ 0.00 | $ 0.00 | $ 1,177.00 | 100.00% | $ 0.00 | $ 117.70 |

CONTINUATION SHEET

DOCUMENT DETAIL SHEET

| A ITEM NO. | B DESCRIPTION OF WORK | C SCHEDULED VALUE | WORK COMPLETED | | F MATERIALS PRESENTLY STORED (NOT IN D OR E) | G TOTAL COMPLETED AND STORED TO DATE (D+E+F) | H % (G/C) | BALANCE TO FINISH (C - G) | I RETAINAGE |
|---|---|---|---|---|---|---|---|---|---|
| | | | D FROM PREVIOUS APPLICATION (D + E) | E THIS PERIOD | | | | | |
| 9.7 | to bottom of each (4) 8" thick embeds. 05-0501 Changes to Structural Steel based on building and process design development and owner review comments from drawing set dated 12.11.2020 to 01.08.2021. Including but not limited to: steel channel to support door framing at Inter Rebuild. Added channel cross members at platforms. | | | | | | | | |
| 10 | CCO # 23006976-SUB-05B CE #036 - Existing Fire Riser Steel Support Frame for Concrete Pour | $ 10,320.56 | $ 10,320.56 | $ 0.00 | $ 0.00 | $ 10,320.56 | 100.00% | $ 0.00 | $ 1,032.06 |
| 10.1 | 05-0506 Installed a steel support frame fastened to the tilt up panel wall for the existing fire riser at GL 19 south elevation in order to demo the slab below that the fire riser support was bearing on. | $ 711.14 | $ 711.14 | $ 0.00 | $ 0.00 | $ 711.14 | 100.00% | $ 0.00 | $ 71.11 |
| 11 | CCO # 23006976-SUB-05C CE #046 - Bang PHX - Project Hold Until September 2021 Start | | | | | | | | |
| 11.1 | 05-0501 Please review the revised schedule attached and provide details as list below. Provide detail for all impacts associated with the delay reflected in the updated schedule dated May 29, 2020. Confirm that you can meet the commitment required under your existing contract terms based on the revised schedule. Provide detail for any additional costs associated with the delay if any. If you have any equipment in fabrication or storage, provide schedule or cost impacts associated with the equipment delivery or storage. Provide detail for any current cost you have that has not been billed and a date for when the costs will be billed. If you have any items onsite that need to be removed provide | $ 271,026.00 | $ 0.00 | $ 271,026.00 | $ 0.00 | $ 271,026.00 | 100.00% | $ 0.00 | $ 27,102.60 |

CONTINUATION SHEET

DOCUMENT DETAIL SHEET

| A ITEM NO. | B DESCRIPTION OF WORK | C SCHEDULED VALUE | D WORK COMPLETED FROM PREVIOUS APPLICATION (D + E) | E THIS PERIOD | F MATERIALS PRESENTLY STORED (NOT IN D OR E) | G TOTAL COMPLETED AND STORED TO DATE (D+E+F) | H % (G / C) | BALANCE TO FINISH (C - G) | I RETAINAGE |
|---|---|---|---|---|---|---|---|---|---|
| 12 | details of what needs to be removed and when it will be removed. Provide any other information that may be of concern regarding the revised project schedule. CCO # 23006976-SUB-05D CE #035 - Washer Sump Pit Ladder and Grating Dimensions | | | | | | | | |
| 12.1 | 05-0506 RFI #40 - Modified washer pit ladder dimensions and washer pit grating dimensions to purchase new material for these areas. | $1,797.00 | $0.00 | $1,797.00 | | $1,797.00 | 100.00% | $0.00 | $179.70 |
| 13 | CCO # 23006976-SUB-05E CE #052 - Drawing Revisions #16 - Construction Issue Set - 09/13/2021 | | | | | | | | |
| 13.1 | 05-0506 Structural Steel and Misc. Metals | $163,631.00 | $0.00 | $114,541.70 | $0.00 | $114,541.70 | 70.00% | $49,089.30 | $11,454.17 |
| 14 | CCO # 23006976-SUB-05F CE #097 - Steel Erection - Field Changes and Adjustments to Columns and Beams | | | | | | | | |
| 14.1 | 05-0506 Field Changes and Steel Corrections | $3,795.00 | $0.00 | $3,795.00 | $0.00 | $3,795.00 | 100.00% | $0.00 | $379.50 |
| 15 | CCO # 23006976-SUB-05G CE #054 - Drawing Revisions #17 - Revised As Noted Structural and Architectural - 10/06/21 | | | | | | | | |
| 15.1 | 05-0501 Changed Beam Sizes, Added Anchor Bolts, Added Beams, Removed Framing for Platform, Added Stair with rail, Added Ledger Angles | $15,955.00 | $0.00 | $15,955.00 | $0.00 | $15,955.00 | 100.00% | $0.00 | $1,595.50 |
| 16 | CCO # 23006976-SUB-05H CE #098 - Re-Prep and Re-Prime Sequence 1 Steel Onsite (Phase 1 & 2) | | | | | | | | |
| 16.1 | 05-0501 Re-Prep and Re-Prime Painting of Seq. 1 Structural Steel | $62,322.00 | $0.00 | $62,322.00 | $0.00 | $62,322.00 | 100.00% | $0.00 | $6,232.20 |
| | TOTALS: | $630,129.89 | $62,219.56 | $498,244.24 | $0.00 | $560,463.80 | 88.94% | $69,666.09 | $56,046.39 |

CONTINUATION SHEET

Grand Totals

DOCUMENT DETAIL SHEET

Page 7 of 8

| A | B | C | D | E | F | G | H | I |
|---|---|---|---|---|---|---|---|---|
| | | | WORK COMPLETED | | | | | |
| ITEM NO. | DESCRIPTION OF WORK | SCHEDULED VALUE | FROM PREVIOUS APPLICATION (D + E) | THIS PERIOD | MATERIALS PRESENTLY STORED (NOT IN D OR E) | TOTAL COMPLETED AND STORED TO DATE (D+E+F) | % (G / C) | BALANCE TO FINISH (C - G) | RETAINAGE |
| | GRAND TOTALS: | $ 4,064,227.20 | $ 3,127,629.29 | $ 544,713.30 | $ 0.00 | $ 3,672,342.59 | 90.36% | $ 391,884.61 | $ 367,234.27 |

DOCUMENT DETAIL SHEET- APPLICATION AND CERTIFICATE FOR PAYMENT

List each sub-subcontractor or vendor who provided labor and/or materials to the project which makes up any part of this requisition and the gross value of such labor and/or materials provided within this requisition period.

Sub-Subcontractor/Supplier _____ Value _____

Sub-Subcontractor/Supplier _____ Value _____

Sub-Subcontractor/Supplier _____ Value _____

Sub-Subcontractor/Supplier _____ Value _____

Sub-Subcontractor/Supplier _____ Value _____

Sub-Subcontractor/Supplier _____ Value _____

Sub-Subcontractor/Supplier _____ Value _____

# APPLICATION AND CERTIFICATE FOR PAYMENT

*DOCUMENT SUMMARY SHEET*

Page 1 of 8

**TO CONTRACTOR:**
Stellar
2900 Hartley Road
Jacksonville, Florida 32257

**PROJECT:**
Bang Energy - Phoenix Can Manufacturing
1635 South 43rd Avenue
Phoenix, Arizona 85009

**FROM SUBCONTRACTOR:**
Fabco Metal Products, LLC
1490 Frances Drive
Daytona Beach, Florida 32124

**SUBCONTRACT DATE:** 1/8/2021

APPLICATION NO: 10
INVOICE NO:
PERIOD: 03/01/22 - 03/31/22
PROJECT NO: 23006976
CONTRACT DATE: 01/08/2021

DISTRIBUTION TO:

SUBCONTRACT FOR: Structural Steel

**SUBCONTRACTOR'S APPLICATION FOR PAYMENT**

Application is made for payment, as shown below, in connection with the Subcontract. Continuation Sheet is attached.

| | | |
|---|---|---|
| 1. | Original Contract Sum | $ 3,434,097.31 |
| 2. | Net change by change orders | $ 630,129.89 |
| 3. | Contract sum to date (line 1 ± 2) | $ 4,064,227.20 |
| 4. | Total completed and stored to date (Column G on detail sheet) | $ 3,672,342.59 |
| 5. | Retainage: | |
| | a. 1.53% of completed work: | $ 56,046.39 |
| | b. 0.00% of stored material: | $ 0.00 |
| | Total retainage (Line 5a + 5b or total in column I of detail sheet) | $ 56,046.39 |
| 6. | Total earned less retainage (Line 4 less Line 5 Total) | $ 3,616,296.20 |
| 7. | Less previous certificates for payment (Line 6 from prior certificate) | $ 3,305,108.32 |
| 8. | Current payment due | $ 311,187.88 |
| 9. | Balance to finish, including retainage (Line 3 less Line 6) | $ 447,931.00 |

| CHANGE ORDER SUMMARY | ADDITIONS | DEDUCTIONS |
|---|---|---|
| Total changes approved in previous months by Owner | $ 630,129.89 | $ 0.00 |
| Total approved this Month: | $ 0.00 | $ 0.00 |
| Totals: | $ 630,129.89 | $ 0.00 |
| Net change by change orders: | $ 630,129.89 | |

The undersigned hereby further declares and agrees that in the event that any lien or other claim should be brought against The Stellar Companies, Inc., the Owner, or their building or premises, the undersigned will protect the said parties and defend any suit a action brought against them by reason of any lien or other form of claim or action arising out of said subcontract and hold them harmless and indemnified therefrom.

In consideration of the sum of $1.00 to the undersigned in hand paid, receipt whereof is hereby acknowledged, and other benefits accruing, the undersigned does hereby waive release and quitclaim in favor of The Stellar Companies, Inc. and/or owner or owners of said premises as improved all right that the undersigned may have to a lien upon the land and improvements above described.

IT IS UNDERSTOOD AND AGREED THAT THIS WAIVER AND RELEASE IS FOR ALL SERVICES RENDERED, WORK DONE AND MATERIAL FURNISHED PRIOR TO THE DATE HEREOF and is for all such services rendered, work done and material furnished and not only for the particular

SUBCONTRACTOR: Fabco Metal Products, LLC

By: _____ Date: 3/21/2022

State of: Florida
County of: Volusia
Subscribed and sworn to before me this 21 day of March 2022

Notary Public: _____
My commission expires 7/28/2022

JERRY W. CROWDER
Commission # GG 205650
Expires July 28, 2022
Bonded Thru Troy Fain Insurance 800-385-7019

CONTINUATION SHEET

DOCUMENT DETAIL SHEET

Page 2 of 8

Document SUMMARY SHEET, APPLICATION AND CERTIFICATE FOR PAYMENT, containing
Contractor's signed Certification is attached.
Use Column I on Contracts where variable retainage for line items apply.

APPLICATION NUMBER: 10
APPLICATION DATE: 03/23/2022
PERIOD: 03/01/22 - 03/31/22
ARCHITECTS/ENGINEERS PROJECT NO:

Contract Lines

| A | B | C | D | E | F | G | H | I |
|---|---|---|---|---|---|---|---|---|
| | | | WORK COMPLETED | | | | | |
| ITEM NO. | DESCRIPTION OF WORK | SCHEDULED VALUE | FROM PREVIOUS APPLICATION (D + E) | THIS PERIOD | MATERIALS PRESENTLY STORED (NOT IN D OR E) | TOTAL COMPLETED AND STORED TO DATE (D+E+F) | % (G / C) | BALANCE TO FINISH (C - G) | RETAINAGE |
| 1 | 05-0501 - Structural Steel / Engineering and Shop Drawings (Material) | $ 117,903.75 | $ 117,903.75 | $ 0.00 | $ 0.00 | $ 117,903.75 | 100.00% | | $ 0.00 |
| 2 | 05-0506 - Miscellaneous Steel / Anchor Bolts (Material) | $ 9,904.32 | $ 9,904.32 | $ 0.00 | $ 0.00 | $ 9,904.32 | 100.00% | | $ 0.00 |
| 3 | 05-0506 - Miscellaneous Steel / Embeds (steel,ss) (Material) | $ 70,959.24 | $ 70,959.24 | $ 0.00 | $ 0.00 | $ 70,959.24 | 100.00% | | $ 0.00 |
| 4 | 05-0501 - Structural Steel / Structural Steel Material/Fabrication (Material) | $ 1,769,196.41 | $ 1,769,196.41 | $ 0.00 | $ 0.00 | $ 1,769,196.41 | 100.00% | | $ 0.00 |
| 5 | 05-0505 - Stairs / Catwalks / Ladders / Handrails / Grating (steel, ss, fiberglass) (Material) | $ 130,340.91 | $ 130,340.91 | $ 0.00 | $ 0.00 | $ 130,340.91 | 100.00% | | $ 0.00 |
| 6 | 05-0503 - Steel Erection / Structural Steel Erection (Labor) | $ 524,661.70 | $ 393,496.28 | $ 0.00 | $ 0.00 | $ 393,496.28 | 75.00% | $ 131,165.42 | $ 0.00 |
| 7 | 05-0506 - Miscellaneous Steel / Miscellaneous Steel Material/Fabrication (Material) | $ 591,250.98 | $ 532,125.88 | $ 0.00 | $ 0.00 | $ 532,125.88 | 90.00% | $ 59,125.10 | $ 0.00 |
| 8 | 05-0506 - Miscellaneous Steel / Miscellaneous Steel Erection (Labor) | $ 219,880.00 | $ 87,952.00 | $ 0.00 | $ 0.00 | $ 87,952.00 | 40.00% | $ 131,928.00 | $ 0.00 |
| | TOTALS: | $ 3,434,097.31 | $ 3,111,878.79 | $ 0.00 | $ 0.00 | $ 3,111,878.79 | 90.62% | $ 322,218.52 | $ 0.00 |

DOCUMENT DETAIL SHEET

CONTINUATION SHEET
Whole Change Order Packages

CONTINUATION SHEET

DOCUMENT DETAIL SHEET

| A | B | C | D | E | F | G | H | I |
|---|---|---|---|---|---|---|---|---|
| ITEM NO. | DESCRIPTION OF WORK | SCHEDULED VALUE | WORK COMPLETED — FROM PREVIOUS APPLICATION (D + E) | WORK COMPLETED — THIS PERIOD | MATERIALS PRESENTLY STORED (NOT IN D OR E) | TOTAL COMPLETED AND STORED TO DATE (D+E+F) | % (G / C) | BALANCE TO FINISH (C - G) | RETAINAGE |
| 9 | CCO # 23006976-SUB-05A Project Changes Through 2/15/2021 | | | | | | | | |
| 9.1 | 05-0506 Changes to steel based on building and process design development and owner review comments through revisions dated 11.24.2020. Including but not limited to: 700 LF for armor joint embeds, 210 LF of armor joint notched plates and 200 Hilti bolts for armor joint notched plate install. | $ 8,776.11 | $ 8,776.11 | $ 0.00 | $ 0.00 | $ 8,776.11 | 100.00% | $ 0.00 | $ 877.61 |
| 9.2 | 05-0505 Changes to Guardrails based on building and process design development and owner review comments from drawing set dated 12.02.2020 to 12.16.2020. Including but not limited to: 40 LF of guardrail at bulk lacquer storage with two pieces of channel and six pipes/bollards. | $ 18,246.38 | $ 13,684.79 | $ 0.00 | $ 0.00 | $ 13,684.79 | 75.00% | $ 4,561.59 | $ 1,368.48 |
| 9.3 | 05-0506 Changes to Misc. Steel based on building and process design development and owner review comments from drawing set dated 12.11.2020 to 01.08.2021. Including but not limited to: 260 LF of exterior galv. guardrails. Removed angle/anchors at new louver locations. | $ 23,891.02 | $ 17,918.27 | $ 0.00 | $ 0.00 | $ 17,918.27 | 75.00% | $ 5,972.75 | $ 1,791.83 |
| 9.4 | 05-0506 Changes to Misc steel based on building and process design development and owner review comments from drawing set dated 01.18.2020. Including but not limited to: revised concrete lid angle details. Omitted steel erection of deleted overhead door steel support frame. Material was already ordered before changes were published. | $ 8,311.86 | $ 8,311.86 | $ 0.00 | $ 0.00 | $ 8,311.86 | 100.00% | $ 0.00 | $ 831.19 |
| 9.5 | 05-0506 Furnish Stainless Steel Liner at Washer Sump Pit per IPS drawings ENERGY-PHX-B08-WA05-WA07 dated 01/13/2021. | $ 40,169.82 | $ 30,127.37 | $ 0.00 | $ 0.00 | $ 30,127.37 | 75.00% | $ 10,042.45 | $ 3,012.74 |
| 9.6 | 05-0501 Cupper Foundation Embeds - Added 1 Nelson Stud | $ 1,177.00 | $ 1,177.00 | $ 0.00 | $ 0.00 | $ 1,177.00 | 100.00% | $ 0.00 | $ 117.70 |

CONTINUATION SHEET

DOCUMENT DETAIL SHEET

| A | B | C | D | E | F | G | H | | I |
|---|---|---|---|---|---|---|---|---|---|
| | | | WORK COMPLETED | | | | | | |
| ITEM NO. | DESCRIPTION OF WORK | SCHEDULED VALUE | FROM PREVIOUS APPLICATION (D + E) | THIS PERIOD | MATERIALS PRESENTLY STORED (NOT IN D OR E) | TOTAL COMPLETED AND STORED TO DATE (D+E+F) | % (G / C) | BALANCE TO FINISH (C - G) | RETAINAGE |
| | to bottom of each (4) 8" thick embeds. 05-0501 Changes to Structural Steel based on building and process design development and owner review comments from drawing set dated 12.11.2020 to 01.08.2021. Including but not limited to: steel channel to support door framing at Inker Rebuild. Added channel cross members at platforms. | | | | | | | | |
| 9.7 | | $ 10,320.56 | $ 10,320.56 | $ 0.00 | $ 0.00 | $ 10,320.56 | 100.00% | $ 0.00 | $ 1,032.06 |
| 10 | CCO # 23006976-SUB-05B CE #036 - Existing Fire Riser Steel Support Frame for Concrete Pour | | | | | | | | |
| 10.1 | 05-0506 Installed a steel support frame fastened to the tilt up panel wall for the existing fire riser at GL 19 south elevation in order to demo the slab below that the fire riser support was bearing on. | $ 711.14 | $ 711.14 | $ 0.00 | $ 0.00 | $ 711.14 | 100.00% | $ 0.00 | $ 71.11 |
| 11 | CCO # 23006976-SUB-05C CE #046 - Bang PHX - Project Hold Until September 2021 Start | | | | | | | | |
| 11.1 | 05-0501 Please review the revised schedule attached and provide details as list below. Provide detail for all impacts associated with the delay reflected in the updated schedule dated May 29, 2020. Confirm that you can meet the commitment required under your existing contract terms based on the revised schedule. If not please provide additional details. Provide detail for any additional costs associated with the delay if any. If you have any equipment in fabrication or storage, provide schedule or cost impacts associated with the equipment delivery or storage. Provide detail for any current cost you have that has not been billed and a date for when the costs will be billed. If you have any items onsite that need to be removed provide | $ 271,026.00 | $ 271,026.00 | $ 0.00 | $ 0.00 | $ 271,026.00 | 100.00% | $ 0.00 | $ 27,102.60 |

| ITEM NO. | DESCRIPTION OF WORK | SCHEDULED VALUE | WORK COMPLETED FROM PREVIOUS APPLICATION (D + E) | THIS PERIOD | MATERIALS PRESENTLY STORED (NOT IN D OR E) | TOTAL COMPLETED AND STORED TO DATE (D+E+F) | % (G / C) | BALANCE TO FINISH (C - G) | RETAINAGE |
|---|---|---|---|---|---|---|---|---|---|
| A | B | C | D | E | F | G | H | | I |
| 12 | details of what needs to be removed and when it will be removed. Provide any other information that may be of concern regarding the revised project schedule.<br><br>CCO # 23006976-SUB-05D CE #035 - Washer Sump Pit Ladder and Grating Dimensions | | | | | | | | |
| 12.1 | 05-0506 RFI #40 - Modified washer pit ladder dimensions and washer pit grating dimensions to purchase new material for these areas.<br><br>CCO # 23006976-SUB-05E CE #052 - Drawing Revisions #16 - Construction Issue Set - 09/13/2021 | $1,797.00 | $1,797.00 | $0.00 | $0.00 | $1,797.00 | 100.00% | $0.00 | $179.70 |
| 13 | 05-0506 Structural Steel and Misc. Metals | $163,631.00 | $114,541.70 | $0.00 | $0.00 | $114,541.70 | 70.00% | $49,089.30 | $11,454.17 |
| 13.1 | CCO # 23006976-SUB-05F CE #097 - Steel Erection - Field Changes and Adjustments to Columns and Beams | | | | | | | | |
| 14 | 05-0506 Field Changes and Steel Corrections | $3,795.00 | $3,795.00 | $0.00 | $0.00 | $3,795.00 | 100.00% | $0.00 | $379.50 |
| 14.1 | CCO # 23006976-SUB-05G CE #054 - Drawing Revisions #17 - Revised As Noted Structural and Architectural - 10/06/21 | | | | | | | | |
| 15 | 05-0501 Changed Beam Sizes, Added Anchor Bolts, Added Beams, Removed Framing for Platform, Added Stair with rail, Added Ledger Angles | $15,955.00 | $15,955.00 | $0.00 | $0.00 | $15,955.00 | 100.00% | $0.00 | $1,595.50 |
| 15.1 | CCO # 23006976-SUB-05H CE #098 - Re-Prep and Re-Prime Sequence 1 Steel Onsite (Phase 1 & 2) | | | | | | | | |
| 16 | 05-0501 Re-Prep and Re-Prime Painting of Seq. 1 Structural Steel | $62,322.00 | $62,322.00 | $0.00 | $0.00 | $62,322.00 | 100.00% | $0.00 | $6,232.20 |
| 16.1 | | | | | | | | | |
| **TOTALS:** | | $630,129.89 | $560,463.80 | $0.00 | $0.00 | $560,463.80 | 88.94% | $69,666.09 | $56,046.39 |

CONTINUATION SHEET

Grand Totals

DOCUMENT DETAIL SHEET

| A | B | C | D | E | F | G | H | I |
|---|---|---|---|---|---|---|---|---|
| | | | WORK COMPLETED | | | | | |
| ITEM NO. | DESCRIPTION OF WORK | SCHEDULED VALUE | FROM PREVIOUS APPLICATION (D + E) | THIS PERIOD | MATERIALS PRESENTLY STORED (NOT IN D OR E) | TOTAL COMPLETED AND STORED TO DATE (D+E+F) | % (G / C) | BALANCE TO FINISH (C - G) | RETAINAGE |
| | GRAND TOTALS: | $ 4,064,227.20 | $ 3,672,342.59 | $ 0.00 | $ 0.00 | $ 3,672,342.59 | 90.36% | $ 391,884.61 | $ 56,046.39 |

DOCUMENT DETAIL SHEET- APPLICATION AND CERTIFICATE FOR PAYMENT

List each sub-subcontractor or vendor who provided labor and/or materials to the project which makes up any part of this requisition and the gross value of such labor and/or materials provided within this requisition period.

Sub-Subcontractor/Supplier _____    Value _____

Sub-Subcontractor/Supplier _____    Value _____

Sub-Subcontractor/Supplier _____    Value _____

Sub-Subcontractor/Supplier _____    Value _____

Sub-Subcontractor/Supplier _____    Value _____

Sub-Subcontractor/Supplier _____    Value _____

Sub-Subcontractor/Supplier _____    Value _____

# APPLICATION AND CERTIFICATE FOR PAYMENT

## DOCUMENT SUMMARY SHEET

**TO CONTRACTOR:**
Stellar
2900 Hartley Road
Jacksonville, Florida 32257

**FROM SUBCONTRACTOR:**
Fabco Metal Products, LLC
1490 Frances Drive
Daytona Beach, Florida 32124

**PROJECT:**
Bang Energy - Phoenix Can Manufacturing
1635 South 43rd Avenue
Phoenix, Arizona 85009

**SUBCONTRACT DATE:** 1 /8 /2021

**APPLICATION NO:** 11
**INVOICE NO:**
PERIOD: 03/01/22 - 03/31/22
PROJECT NO: 23006976
CONTRACT DATE: 01/08/2021

**DISTRIBUTION TO:**

SUBCONTRACT FOR: Structural Steel
**SUBCONTRACTOR'S APPLICATION FOR PAYMENT**

Application is made for payment, as shown below, in connection with the Subcontract. Continuation Sheet is attached.

| | | |
|---|---|---|
| 1. | Original Contract Sum | $3,434,097.31 |
| 2. | Net change by change orders | $ 630,129.89 |
| 3. | Contract sum to date (line 1 ± 2) | $4,064,227.20 |
| 4. | Total completed and stored to date | $3,672,342.59 |
| | (Column G on detail sheet) | |
| 5. | Retainage: | |
| | a. 0.00% of completed work: | $ 0.00 |
| | b. 0.00% of stored material: | $ 0.00 |
| | Total retainage (Line 5a + 5b or total in column I of detail sheet) | $ 0.00 |
| 6. | Total earned less retainage | $3,672,342.59 |
| | (Line 4 less Line 5 Total) | |
| 7. | Less previous certificates for payment | $3,616,296.20 |
| | (Line 6 from prior certificate) | |
| 8. | Current payment due: | $ 56,046.39 |
| 9. | Balance to finish, including retainage | $ 391,884.61 |
| | (Line 3 less Line 6) | |

| CHANGE ORDER SUMMARY | ADDITIONS | DEDUCTIONS |
|---|---|---|
| Total changes approved in previous months by Owner | $ 630,129.89 | $ 0.00 |
| Total approved this Month | $ 0.00 | $ 0.00 |
| Totals: | $ 630,129.89 | $ 0.00 |
| Net change by change orders: | $ 630,129.89 | |

The undersigned hereby further declares and agrees that in the event that any lien or other claim should be brought against The Stellar Companies, Inc., the Owner, or their building or premises, the undersigned will protect the said parties and defend any suit a action brought against them by reason of any lien or other form of claim or action arising out of said subcontract and hold them harmless and indemnified therefrom.

In consideration of the sum of $1.00 to the undersigned in hand paid, receipt whereof is hereby acknowledged, and other benefits accruing, the undersigned does hereby waive release and quitclaim in favor of The Stellar Companies, Inc. and/or owner or owners of said premises as improved all right that the undersigned may have to a lien upon the land and improvements above described.

IT IS UNDERSTOOD AND AGREED THAT THIS WAIVER AND RELEASE IS FOR ALL SERVICES RENDERED, WORK DONE AND MATERIAL FURNISHED PRIOR TO THE DATE HEREOF and is for all such services rendered, work done and material furnished and not only for the particular

SUBCONTRACTOR: Fabco Metal Products, LLC
By:
State of: Florida
County of: Volusia
Subscribed and sworn to before me this 21 day of March 2022

Date: 3/21/22

Notary Public:
My commission expires:

JERRY W. CROWDER
Commission # GG 205650
Expires July 28, 2022
Bonded Thru Troy Fain Insurance 800-385-7019

# CONTINUATION SHEET

*DOCUMENT DETAIL SHEET*

Document SUMMARY SHEET, APPLICATION AND CERTIFICATE FOR PAYMENT, containing
Contractor's signed Certification is attached.
Use Column I on Contracts where variable retainage for line items apply.

APPLICATION NUMBER: 11
APPLICATION DATE: 03/23/2022
PERIOD: 03/01/22 - 03/31/22
ARCHITECTS/ENGINEERS PROJECT NO:

Contract Lines

| A | B | C | D | E | F | G | H | I |
|---|---|---|---|---|---|---|---|---|
| | | | WORK COMPLETED | | | | | |
| ITEM NO. | DESCRIPTION OF WORK | SCHEDULED VALUE | FROM PREVIOUS APPLICATION (D + E) | THIS PERIOD | MATERIALS PRESENTLY STORED (NOT IN D OR E) | TOTAL COMPLETED AND STORED TO DATE (D+E+F) | % (G / C) | BALANCE TO FINISH (C - G) | RETAINAGE |
| COST CODE | | | | | | | | | |
| 1 | 05-0501 - Structural Steel — Engineering and Shop Drawings (Material) | $ 117,903.75 | $ 117,903.75 | $ 0.00 | $ 0.00 | $ 117,903.75 | 100.00% | | $ 0.00 |
| 2 | 05-0506 - Miscellaneous Steel — Anchor Bolts (Material) | $ 9,904.32 | $ 9,904.32 | $ 0.00 | $ 0.00 | $ 9,904.32 | 100.00% | | $ 0.00 |
| 3 | 05-0506 - Miscellaneous Steel — Embeds (steel,ss) (Material) | $ 70,959.24 | $ 70,959.24 | $ 0.00 | $ 0.00 | $ 70,959.24 | 100.00% | | $ 0.00 |
| 4 | 05-0501 - Structural Steel — Structural Steel Material/Fabrication (Material) | $ 1,769,196.41 | $ 1,769,196.41 | $ 0.00 | $ 0.00 | $ 1,769,196.41 | 100.00% | | $ 0.00 |
| 5 | 05-0505 - Stairs / Catwalks / Ladders / Handrails — Grating (steel, ss, fiberglass) (Material) | $ 130,340.91 | $ 130,340.91 | $ 0.00 | $ 0.00 | $ 130,340.91 | 100.00% | | $ 0.00 |
| 6 | 05-0503 - Steel Erection — Structural Steel Erection (Labor) | $ 524,661.70 | $ 393,496.28 | $ 0.00 | $ 0.00 | $ 393,496.28 | 75.00% | $ 131,165.42 | $ 0.00 |
| 7 | 05-0506 - Miscellaneous Steel — Miscellaneous Steel Material/Fabrication (Material) | $ 591,250.98 | $ 532,125.88 | $ 0.00 | $ 0.00 | $ 532,125.88 | 90.00% | $ 59,125.10 | $ 0.00 |
| 8 | 05-0506 - Miscellaneous Steel — Miscellaneous Steel Erection (Labor) | $ 219,880.00 | $ 87,952.00 | $ 0.00 | $ 0.00 | $ 87,952.00 | 40.00% | $ 131,928.00 | $ 0.00 |
| | **TOTALS:** | $ 3,434,097.31 | $ 3,111,878.79 | $ 0.00 | $ 0.00 | $ 3,111,878.79 | 90.62% | $ 322,218.52 | $ 0.00 |

*DOCUMENT DETAIL SHEET*

**CONTINUATION SHEET**
Whole Change Order Packages

CONTINUATION SHEET

DOCUMENT DETAIL SHEET

| A | B | C | D | E | F | G | H | I |
|---|---|---|---|---|---|---|---|---|
| ITEM NO. | DESCRIPTION OF WORK | SCHEDULED VALUE | WORK COMPLETED | | MATERIALS PRESENTLY STORED (NOT IN D OR E) | TOTAL COMPLETED AND STORED TO DATE (D+E+F) | % (G / C) | RETAINAGE |
| | | | FROM PREVIOUS APPLICATION (D + E) | THIS PERIOD | | | | |
| 9 | CCO # 23006976-SUB-05A Project Changes Through 2/15/2021 | | | | | | | |
| 9.1 | 05-0506 Changes to steel based on building and process design development and owner review comments through revisions dated 11.24.2020. Including but not limited to: 700 LF for armor joint embeds, 210 LF of armor joint notched plates and 200 Hilti bolts for armor joint notched plate install. | $ 8,776.11 | $ 8,776.11 | $ 0.00 | $ 0.00 | $ 8,776.11 | 100.00% | $ 0.00 |
| 9.2 | 05-0505 Changes to Guardrails based on building and process design development and owner review comments from drawing set dated 12.02.2020 to 12.10.2020. Including but not limited to: 40 LF of guardrail at bulk lacquer storage with two pieces of channel and six pipes/bollards. | $ 18,246.38 | $ 13,684.79 | $ 0.00 | $ 0.00 | $ 13,684.79 | 75.00% | $ 0.00 |
| 9.3 | 05-0506 Changes to Misc. Steel based on building and process design development and owner review comments from drawing set dated 12.11.2020 to 01.08.2021. Including but not limited to: 260 LF of exterior galv. guardrails. Removed angle/anchors at new louver locations. | $ 23,891.02 | $ 17,918.27 | $ 0.00 | $ 0.00 | $ 17,918.27 | 75.00% | $ 4,561.59 |
| 9.4 | 05-0506 Changes to Misc steel based on building and process design development and owner review comments from drawing set dated 01.18.2020. Including but not limited to: revised concrete lid angle details. Omitted steel erection of deleted overhead door steel support frame. Material was already ordered before changes were published. | $ 8,311.86 | $ 8,311.86 | $ 0.00 | $ 0.00 | $ 8,311.86 | 100.00% | $ 5,972.75 |
| 9.5 | 05-0506 Furnish Stainless Steel Liner at Washer Sump Pit per IPS drawings ENERGY-PHX-B08-WA05-WA07 dated 01/13/2021. | $ 40,169.82 | $ 30,127.37 | $ 0.00 | $ 0.00 | $ 30,127.37 | 75.00% | $ 10,042.45 |
| 9.6 | 05-0501 Cupper Foundation Embeds - Added 1 Nelson Stud | $ 1,177.00 | $ 1,177.00 | $ 0.00 | $ 0.00 | $ 1,177.00 | 100.00% | $ 0.00 |

CONTINUATION SHEET

DOCUMENT DETAIL SHEET

| A | B | C | D | E | F | G | H | I |
|---|---|---|---|---|---|---|---|---|
| ITEM NO. | DESCRIPTION OF WORK | SCHEDULED VALUE | WORK COMPLETED | | MATERIALS PRESENTLY STORED (NOT IN D OR E) | TOTAL COMPLETED AND STORED TO DATE (D+E+F) | % (G / C) | BALANCE TO FINISH (C - G) | RETAINAGE |
| | | | FROM PREVIOUS APPLICATION (D + E) | THIS PERIOD | | | | | |
| 9.7 | to bottom of each (4) 8" thick embeds. 05-0501 Changes to Structural Steel based on building and process design development and owner review comments from drawing set dated 12.11.2020 to 01.08.2021. Including but not limited to: steel channel to support door framing at Inker Rebuild. Added channel cross members at platforms. | $ 10,320.56 | $ 10,320.56 | $ 0.00 | $ 0.00 | $ 10,320.56 | 100.00% | $ 0.00 | $ 0.00 |
| 10 | CCO # 2300697 6-SUB-05B CE #036 - Existing Fire Riser Steel Support Frame for Concrete Pour | | | | | | | | |
| 10.1 | 05-0506 Installed a steel support frame fastened to the till up panel wall for the existing fire riser at GL 19 south elevation in order to demo the slab below that the fire riser support was bearing on. | $ 711.14 | $ 711.14 | $ 0.00 | $ 0.00 | $ 711.14 | 100.00% | $ 0.00 | $ 0.00 |
| 11 | CCO # 2300697 6-SUB-05C CE #046 - Bang PHX - Project Hold Until September 2021 Start | | | | | | | | |
| 11.1 | 05-0501 Please review the revised schedule attached and provide details as list below. Provide detail for all impacts associated with the delay reflected in the updated schedule dated May 29, 2020. Confirm that you can meet the commitment required under your existing contract terms based on the revised schedule. If not please provide additional details. Provide detail for any additional costs associated with the delay if any. If you have any equipment in fabrication or storage, provide schedule or cost impacts associated with the equipment delivery or storage. Provide detail for any current cost you have that has not been billed and a date for when the costs will be billed. If you have any items onsite that need to be removed provide | $ 271,026.00 | $ 271,026.00 | $ 0.00 | $ 0.00 | $ 271,026.56 | 100.00% | $ 0.00 | $ 0.00 |

CONTINUATION SHEET

DOCUMENT DETAIL SHEET

| A | B | C | D | E | F | G | H | | I |
|---|---|---|---|---|---|---|---|---|---|
| ITEM NO. | DESCRIPTION OF WORK | SCHEDULED VALUE | WORK COMPLETED | | MATERIALS PRESENTLY STORED (NOT IN D OR E) | TOTAL COMPLETED AND STORED TO DATE (D+E+F) | % (G / C) | BALANCE TO FINISH (C - G) | RETAINAGE |
| | | | FROM PREVIOUS APPLICATION (D + E) | THIS PERIOD | | | | | |
| | details of what needs to be removed and when it will be removed. Provide any other information that may be of concern regarding the revised project schedule. | | | | | | | | |
| 12 | CCO # 23006976-SUB-05D CE #035 - Washer Sump Pit Ladder and Grating Dimensions | | | | | | | | |
| 12.1 | 05-0506 RFI #40 - Modified washer pit ladder dimensions and washer pit grating dimensions to purchase new material for these areas. | $ 1,797.00 | $ 1,797.00 | $ 0.00 | $ 0.00 | $ 1,797.00 | 100.00% | $ 0.00 | $ 0.00 |
| 13 | CCO # 23006976-SUB-05E CE #052 - Drawing Revisions #16 - Construction Issue Set - 09/13/2021 | | | | | | | | |
| 13.1 | 05-0506 Structural Steel and Misc. Metals | $ 163,631.00 | $ 114,541.70 | $ 0.00 | $ 0.00 | $ 114,541.70 | 70.00% | $ 49,089.30 | $ 0.00 |
| 14 | CCO # 23006976-SUB-05F CE #097 - Steel Erection - Field Changes and Adjustments to Columns and Beams | | | | | | | | |
| 14.1 | 05-0506 Field Changes and Steel Corrections | $ 3,795.00 | $ 3,795.00 | $ 0.00 | $ 0.00 | $ 3,795.00 | 100.00% | $ 0.00 | $ 0.00 |
| 15 | CCO # 23006976-SUB-05G CE #054 - Drawing Revisions #17 - Revised As Noted Structural and Architectural - 10/06/21 | | | | | | | | |
| 15.1 | 05-0501 Changed Beam Sizes, Added Anchor Bolts, Added Beams, Removed Framing for Platform, Added Stair with rail, Added Ledger Angles | $ 15,955.00 | $ 15,955.00 | $ 0.00 | $ 0.00 | $ 15,955.00 | 100.00% | $ 0.00 | $ 0.00 |
| 16 | CCO # 23006976-SUB-05H CE #098 - Re-Prep and Re-Prime Sequence 1 Steel Onsite (Phase 1 & 2) | | | | | | | | |
| 16.1 | 05-0501 Re-Prep and Re-Prime Painting of Seq. 1 Structural Steel | $ 62,322.00 | $ 62,322.00 | $ 0.00 | $ 0.00 | $ 62,322.00 | 100.00% | $ 0.00 | $ 0.00 |
| | TOTALS: | $ 630,129.89 | $ 560,463.80 | $ 0.00 | $ 0.00 | $ 560,463.80 | 88.94% | $ 69,666.09 | $ 0.00 |

**CONTINUATION SHEET**

DOCUMENT DETAIL SHEET

Grand Totals

| A | B | C | D | E | F | G | H | I |
|---|---|---|---|---|---|---|---|---|
| | | | WORK COMPLETED | | | | | |
| ITEM NO. | DESCRIPTION OF WORK | SCHEDULED VALUE | FROM PREVIOUS APPLICATION (D + E) | THIS PERIOD | MATERIALS PRESENTLY STORED (NOT IN D OR E) | TOTAL COMPLETED AND STORED TO DATE (D+E+F) | % (G / C) | BALANCE TO FINISH (C - G) | RETAINAGE |
| | **GRAND TOTALS:** | $ 4,064,227.20 | $ 3,672,342.59 | $ 0.00 | $ 0.00 | $ 3,672,342.59 | 90.36% | $ 391,884.61 | $ 0.00 |

DOCUMENT DETAIL SHEET - APPLICATION AND CERTIFICATE FOR PAYMENT

List each sub-subcontractor or vendor who provided labor and/or materials to the project which makes up any part of this requisition and the gross value of such labor and/or materials provided within this requisition period.

Sub-Subcontractor/Supplier     _____     Value     _____

Sub-Subcontractor/Supplier     _____     Value     _____

Sub-Subcontractor/Supplier     _____     Value     _____

Sub-Subcontractor/Supplier     _____     Value     _____

Sub-Subcontractor/Supplier     _____     Value     _____

Sub-Subcontractor/Supplier     _____     Value     _____

Sub-Subcontractor/Supplier     _____     Value     _____

# EXHIBIT C

# EXHIBIT C

ARIZONA PRELIMINARY TWENTY DAY LIEN NOTICE
PURSUANT TO A.R.S. SECTION 33-992
IN ACCORDANCE WITH ARIZONA REVISED STATUTES SECTION 33-992.01, THIS IS NOT A LIEN. THIS IS NOT A
REFLECTION ON THE INTEGRITY OF ANY CONTRACTOR OR SUBCONTRACTOR

# Exhibit C

The name and address of the owner or reputed owner are:
JHO REAL ESTATE INVESTMENT, LLC
1600 N PARK DR
FORT LAUDERDALE, FL 33326

JHO REAL ESTATE INVESTMENT, LLC
C/O CORPORATE CREATIONS NETWORK INC.
3260 N. HAYDEN ROAD #210
SCOTTSDALE, AZ 85251

VITAL PHARMACEUTICALS, INC.
DBA BANG ENERGY
C/O CORPORATE CREATIONS NETWORK INC.
3260 N HAYDEN ROAD #210
SCOTTSDALE, AZ 85251

The name and address of the original contractor are:
STELLAR GROUP, INCORPORATED
2900 HARTLEY RD
JACKSONVILLE, FL 32257

STELLAR GROUP, INCORPORATED
C/O CORPORATION SERVICE COMPANY
8825 N 23RD AVENUE
SUITE 100
PHOENIX, AZ 85021

The name and address of any lender or reputed lender and or
assigns are:
UNABLE TO DETERMINE. A REQUEST IS INCLUDED
HEREIN PER A.R.S. 33-992.01.

The name and address of the person with whom the claimant
has contracted are:
STELLAR GROUP, INCORPORATED
2900 HARTLEY RD
JACKSONVILLE, FL 32257

The name and address of any surety company/agent are:
UNABLE TO DETERMINE. A REQUEST IS INCLUDED
HEREIN PER A.R.S. 33-992.01.

*We request a copy of the bond, if applicable.*

Date: JUNE 14, 2021 (Notice #N171066)
This preliminary lien notice has been completed (Name and
Address of Claimant):

For:
FABCO METAL PRODUCTS LLC
1490 FRANCES DRIVE
DAYTONA BEACH, FL 32124

By:
Michelle Gerred, Esq., #031678
PO Box 24101
Cleveland, OH 44124
(as limited agent for FABCO METAL PRODUCTS LLC)



You are hereby notified that the Claimant has furnished or will
furnish labor, professional services, materials, machinery,
fixtures or tools of the following general description:

MATERIALS AND LABOR, STRUCTURAL STEEL &
ERECTION

In the construction, alteration or repair of the building,
structure or improvement located at:

BANG ENERGY
1635 S 43RD AVE
PHOENIX, AZ 85009

And situated upon that certain lot(s) or parcel(s) of land in
MARICOPA County, Arizona, described as follows:

1635 S 43RD AVE
PHOENIX, AZ 85009

An estimate of the total price of the labor, professional
services, materials, machinery, fixtures or tools furnished or to
be furnished is:

$3,434,097.31

NOTICE TO PROPERTY OWNER

If bills are not paid in full for the labor, professional services, materials, machinery, fixtures or tools furnished, or to be furnished, a mechanic's lien leading to the loss, through court foreclosure proceedings, of all or part of your property being improved may be placed against the property. You may wish to protect yourself against this consequence by either:

1) Requiring your contractor to furnish a conditional waiver and release pursuant to Arizona Revised Statutes section 33-1008, subsection D, paragraphs 1 and 3 signed by the person or firm giving you this notice before you make payment to your contractor.

2) Requiring your contractor to furnish an unconditional waiver and release pursuant to Arizona Revised Statutes section 33-1008, subsection D, paragraphs 2 and 4, signed by the person or firm giving you this notice after you make payment to your contractor.

3) Using any other method or device that is appropriate under the circumstances.

Within ten days of the receipt of this preliminary twenty day notice the owner or other interested party is required to furnish all information necessary to correct any inaccuracies in the notice pursuant to Arizona Revised Statutes section 33-992.01, subsection I or lose as a defense any inaccuracy of that information.

Within ten days of the receipt of this preliminary twenty day notice if any payment bond has been recorded in compliance with Arizona Revised Statutes section 33-1003, the owner must provide a copy of the payment bond including the name and address of the surety company and bonding agent providing the payment bond to the person who has given the preliminary twenty day notice. In the event that the owner or other interested party fails to provide the bond information within that ten day period, the claimant shall retain lien rights to the extent precluded or prejudiced from asserting a claim against the bond as a result of not timely receiving the bond information.

DATED.          JUNE 14, 2021

FABCO METAL PRODUCTS LLC

By: _____

Michelle Gerred, Esq., #031678
(as limited agent for FABCO METAL PRODUCTS LLC)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**ACKNOWLEDGEMENT OF RECEIPT OF PRELIMINARY TWENTY-DAY NOTICE**

This acknowledges receipt on ___ / ___ / ___ (date) of a copy of the preliminary twenty-day notice at
_____ (address). Date: ___/___/___ (date this
acknowledgment was executed)

_____

Signature of person acknowledging receipt, with title if acknowledgment is made on behalf of another person)

Please note: Arizona Revised Statutes, Section 33-992.02, provides that the acknowledgement be returned to the person or firm sending the Preliminary Twenty Day Notice (Michelle Gerred, Esq.) within thirty days of receipt thereof.

(Our Ref. N171066 20.042)



AFFIDAVIT AND PROOF OF MAILING OF PRELIMINARY TWENTY DAY NOTICE

## BY MAIL

STATE OF OHIO          )
                       ) ss.
COUNTY OF CUYAHOGA     )

Colleen Kirk, being first duly sworn upon his/her oath, deposes and says:

1.     I make this affidavit on my personal knowledge of the facts herein set forth.

2.     On June 14, 2021, pursuant to A.R.S. 33-992.01, I mailed a copy of the Arizona Preliminary Twenty Day Notice to:

Owner or Reputed Owner
JHO REAL ESTATE INVESTMENT, LLC
1600 N PARK DR
FORT LAUDERDALE, FL 33326

JHO REAL ESTATE INVESTMENT, LLC
C/O CORPORATE CREATIONS NETWORK INC.
3260 N. HAYDEN ROAD #210
SCOTTSDALE, AZ 85251

VITAL PHARMACEUTICALS, INC.
DBA BANG ENERGY
C/O CORPORATE CREATIONS NETWORK INC.
3260 N HAYDEN ROAD #210
SCOTTSDALE, AZ 85251

by certified mail, return receipt requested.  A copy of the certified mail receipt is attached hereto as part of Exhibit C and incorporated herein by reference.

3.     I also mailed this same Notice by certified mail, return receipt requested, to the following entities:

Person with Whom Claimant has Contracted:
STELLAR GROUP, INCORPORATED
2900 HARTLEY RD
JACKSONVILLE, FL 32257

Project Original Contractor or Reputed Contractor
STELLAR GROUP, INCORPORATED
2900 HARTLEY RD
JACKSONVILLE, FL   32257

STELLAR GROUP, INCORPORATED
C/O CORPORATION SERVICE COMPANY
8825 N 23RD AVENUE, SUITE 100
PHOENIX, AZ 85021

by certified mail, return receipt requested.  A copy of the certified mail receipt is attached hereto as part of Exhibit C and incorporated herein by reference.

Dated this _9th_ day of _April_ , _2022_

_Colleen Kirk_ _____

By: Colleen Kirk

SUBSCRIBED AND SWORN to before me this _19th_ day of _April_ _2022_ by Colleen Kirk.

_____
Notary Public

My Commission Expires:

_May 27, 2024_

(Ref. N171066)

NOTARIAL SEAL
STATE OF OHIO

TARA SCHILLING
NOTARY PUBLIC
FOR THE
STATE OF OHIO
My Commission Expires
May 27, 2024



NCS[AZ(N171066OW]B0
729 Miner Road
Cleveland OH 44143

USPS CERTIFIED MAIL

9214 8901 5273 7200 0016 1571 52



JHO REAL ESTATE INVESTMENT LLC
1600 N PARK DR
Fort Lauderdale FL 33326

# ATTENTION

Why are you receiving this notice?  Please visit http://www.ncscredit.com/notice for more
information.  If you have any additional questions, please email Clare Wilson
noticeprem@ncscredit.com

## Distribution List

JHO REAL ESTATE INVESTMENT LLC
1600 N PARK DR
Fort Lauderdale FL 33326

STELLAR GROUP INCORPORATED
2900 Hartley Rd
Jacksonville FL 32257

Vital Pharmaceuticals Inc. dba BANG ENERGY
C\O CORPORATE CREATIONS NETWORK INC.
3260 N HAYDEN ROAD #210
Scottsdale AZ 85251

JHO REAL ESTATE INVESTMENT LLC
C\O CORPORATE CREATIONS NETWORK INC.
3260 N. HAYDEN ROAD #210
Scottsdale AZ 85251

STELLAR GROUP INCORPORATED
C\O CORPORATION SERVICE COMPANY
8825 N 23rd Avenue Suite 100
Phoenix AZ 85021

NCS[AZ(N171066TE]B0
729 Miner Road
Cleveland OH 44143



USPS CERTIFIED MAIL

9214 8901 5273 7200 0016 1571 76

Vital Pharmaceuticals Inc. dba BANG ENERGY
C\O CORPORATE CREATIONS NETWORK INC.
3260 N HAYDEN ROAD #210
Scottsdale AZ 85251

# ATTENTION

Why are you receiving this notice?  Please visit http://www.ncscredit.com/notice for more
information.  If you have any additional questions, please email Clare Wilson
noticeprem@ncscredit.com

## Distribution List

JHO REAL ESTATE INVESTMENT LLC
1600 N PARK DR
Fort Lauderdale FL 33326

STELLAR GROUP INCORPORATED
2900 Hartley Rd
Jacksonville FL 32257

Vital Pharmaceuticals Inc. dba BANG ENERGY
C\O CORPORATE CREATIONS NETWORK INC.
3260 N HAYDEN ROAD #210
Scottsdale AZ 85251

JHO REAL ESTATE INVESTMENT LLC
C\O CORPORATE CREATIONS NETWORK INC.
3260 N. HAYDEN ROAD #210
Scottsdale AZ 85251

STELLAR GROUP INCORPORATED
C\O CORPORATION SERVICE COMPANY
8825 N 23rd Avenue Suite 100
Phoenix AZ 85021

NCS[AZ(N171066GC]B0
729 Miner Road
Cleveland OH 44143



USPS CERTIFIED MAIL

9214 8901 5273 7200 0016 1571 69

STELLAR GROUP INCORPORATED
2900 Hartley Rd
Jacksonville FL 32257

# ATTENTION

Why are you receiving this notice? Please visit http://www.ncscredit.com/notice for more information. If you have any additional questions, please email Clare Wilson at noticeprem@ncscredit.com

## Distribution List

JHO REAL ESTATE INVESTMENT LLC
1600 N PARK DR
Fort Lauderdale FL 33326

STELLAR GROUP INCORPORATED
2900 Hartley Rd
Jacksonville FL 32257

Vital Pharmaceuticals Inc. dba BANG ENERGY
C\O CORPORATE CREATIONS NETWORK INC.
3260 N HAYDEN ROAD #210
Scottsdale AZ 85251

JHO REAL ESTATE INVESTMENT LLC
C\O CORPORATE CREATIONS NETWORK INC.
3260 N. HAYDEN ROAD #210
Scottsdale AZ 85251

STELLAR GROUP INCORPORATED
C\O CORPORATION SERVICE COMPANY
8825 N 23rd Avenue Suite 100
Phoenix AZ 85021



NCS[AZ(N171066A2]B0
729 Miner Road
Cleveland OH 44143

**USPS CERTIFIED MAIL**

9214 8901 5273 7200 0016 1571 90



STELLAR GROUP INCORPORATED
C\O CORPORATION SERVICE COMPANY
8825 N 23rd Avenue Suite 100
Phoenix AZ 85021

# ATTENTION

Why are you receiving this notice?  Please visit http://www.ncscredit.com/notice for more information.  If you have any additional questions, please email Clare Wilson noticeprem@ncscredit.com

## Distribution List

JHO REAL ESTATE INVESTMENT LLC
1600 N PARK DR
Fort Lauderdale FL 33326

STELLAR GROUP INCORPORATED
2900 Hartley Rd
Jacksonville FL 32257

Vital Pharmaceuticals Inc. dba BANG ENERGY
C\O CORPORATE CREATIONS NETWORK INC.
3260 N HAYDEN ROAD #210
Scottsdale AZ 85251

JHO REAL ESTATE INVESTMENT LLC
C\O CORPORATE CREATIONS NETWORK INC
3260 N. HAYDEN ROAD #210
Scottsdale AZ 85251

STELLAR GROUP INCORPORATED
C\O CORPORATION SERVICE COMPANY
8825 N 23rd Avenue Suite 100
Phoenix AZ 85021

20220358988



NCS[AZ(N171066A1]B0
729 Miner Road
Cleveland OH 44143

**USPS CERTIFIED MAIL**

9214 8901 5273 7200 0016 1571 83

JHO REAL ESTATE INVESTMENT LLC
C\O CORPORATE CREATIONS NETWORK INC.
3260 N. HAYDEN ROAD #210
Scottsdale AZ 85251

# ATTENTION

Why are you receiving this notice?  Please visit http://www.ncscredit.com/notice for more
information.  If you have any additional questions, please email Clare Wilson
noticeprem@ncscredit.com

## Distribution List

JHO REAL ESTATE INVESTMENT LLC
1600 N PARK DR
Fort Lauderdale FL 33326

STELLAR GROUP INCORPORATED
2900 Hartley Rd
Jacksonville FL 32257

Vital Pharmaceuticals Inc. dba BANG ENERGY
C\O CORPORATE CREATIONS NETWORK INC.
3260 N HAYDEN ROAD #210
Scottsdale AZ 85251

JHO REAL ESTATE INVESTMENT LLC
C\O CORPORATE CREATIONS NETWORK INC.
3260 N. HAYDEN ROAD #210
Scottsdale AZ 85251

STELLAR GROUP INCORPORATED
C\O CORPORATION SERVICE COMPANY
8825 N 23rd Avenue Suite 100
Phoenix AZ 85021

# EXHIBIT D

# EXHIBIT D

OFFICIAL RECORDS OF
MARICOPA COUNTY RECORDER
STEPHEN RICHER
20220358988   04/25/2022   08:47
ELECTRONIC RECORDING

1650899695027-74-1-1--
ramosj

Recorded at the request of:
FABCO METAL PRODUCTS LLC
c/o Michelle Gerred, Esq., #031678
P.O. Box 24101
Cleveland, OH 44124
Ref: N171066 20.042

Please return this instrument to the above.

## NOTICE AND CLAIM OF MECHANICS' AND MATERIALMEN'S LIEN

1.  The party on whose behalf this lien is filed and served ("Claimant"):

    FABCO METAL PRODUCTS LLC
    1490 FRANCES DRIVE
    DAYTONA BEACH, FL 32124

2.  The legal description of the lands and improvements to be charged with a lien:

    a.  Address of location of property:

        BANG ENERGY - WAREHOUSE/DIST FACILITY
        1635 S 43RD AVE
        PHOENIX, AZ 85009

    b.  Legal description of property:

        See Exhibit A attached hereto.

    c.  Tax Parcel Number:          105-14-001-Q

3.  The name of the owner(s) or reputed owner(s) of the property concerned ("Owner"):

    JHO REAL ESTATE INVESTMENT, LLC
    1600 N PARK DR
    FORT LAUDERDALE, FL 33326

    JHO REAL ESTATE INVESTMENT, LLC
    C/O CORPORATE CREATIONS NETWORK INC.
    3260 N. HAYDEN ROAD #210
    SCOTTSDALE, AZ 85251

    VITAL PHARMACEUTICALS, INC. DBA BANG ENERGY
    C/O CORPORATE CREATIONS NETWORK INC.
    3260 N HAYDEN ROAD #210
    SCOTTSDALE, AZ 85251

    VITAL PHARMACEUTICALS, INC. DBA BANG ENERGY
    1600 N PARK DR
    SUITE 200
    FORT LAUDERDALE, FL 33326

Verification of:

MR. SHANE KING - PRESIDENT

Dated: _____

STATE OF _Florida_ )
                          )ss.
COUNTY OF _Volusia_ )

The foregoing Notice and Claim of Mechanics' and Materialmen's Lien was subscribed and sworn to before me, the undersigned notary public, this _6th_ day of _APRIL_____, _2022_ by MR. SHANE KING, PRESIDENT, who stated under oath that he/she has personal knowledge of the facts contained in the lien, that he/she had read the lien and that the facts contained therein are true and correct.

_____
Notary Public

My Commission Expires:

DIANE B. VAUGHN
Commission # GG 982849
Expires August 29, 2024
Bonded Thru Troy Fain Insurance 800-385-7019

4.  The name of the person by whom the lienor was employed or to whom he furnished materials:

STELLAR GROUP, INCORPORATED
2900 HARTLEY RD
JACKSONVILLE, FL 32257

5.  The lender or reputed lender(s).

Unknown

6.  A statement of the terms, time given and conditions of the contract, if it is oral, or a copy of the contract, if it is written:

Please see Exhibit B attached hereto.

7.  A statement of the lienor's demand, after deducting just credits and offsets (reasonable value of labor/materials provided):

$2,160,783.76, plus interest at the highest percent allowed pursuant to A.R.S. 44-1201, and reasonable attorney fees pursuant to A.R.S. 33-998(B)

8.  A statement of the date of completion of the building, structure or improvement, or any alteration or repair of such building, structure or improvement.

To claimant's knowledge date of Completion has not been received or recorded.

9.  A statement of the date the preliminary twenty-day notice required by section 33-992.01 was given.  A copy of such preliminary twenty day notice and the proof of mailing required by section 33-992.02 shall be attached as Exhibit C.

Date notice given:  06/14/2021

10.  A statement of the labor and/or materials provided:

STRUCTURAL STEEL & ERECTION (MATERIALS AND LABOR)

**WHEREFORE,** Claimant demands a lien on the subject real property and the leasehold interest and all improvements thereof in the amount of the claim and claims the benefit of the laws of the State of Arizona relating to the liens of labor, materialmen, mechanics, and others; and in order to fix this lien, has made this Notice and Claim of Lien in two or more duplicate copies; causing one thereof to be recorded in the Office of the County Recorder of MARICOPA County and causing the others to be served upon the Owner(s) or Reputed Owner(s) if they can be found in said County.

FABCO METAL PRODUCTS LLC, Lien Claimant

By: _____
MR. SHANE KING, PRESIDENT

**EXHIBIT A**

**LEGAL DESCRIPTION**

That portion of the Northwest quarter of Section 15, Township 1 North, Range 2 East of the Gila and Salt River Meridian, Maricopa County, Arizona, described as follows:

Beginning at the Northwest corner of the North half of the Southwest quarter of said Northwest quarter;

Thence South (assumed bearing for purposes of this description) along the West line of said section, a distance of 660.00 feet to a line that is parallel with and distant 1968.46 feet Southerly measured at right angles from the North line of said section;

Thence South 89 degrees 50 minutes East, along said parallel line, a distance of 1307.28 feet to a line that is parallel with and distant 10.00 feet Westerly, measured at right angle, from the East line of said Southwest quarter, last said parallel line being also the center line of an existing drill track;

Thence North 00 degrees 01 minutes West, along last said parallel line, a distance of 1095.68 feet to a point of CUSP;

Thence Southwesterly along a tangent curve concave Northwesterly having a radius of 642.43 feet, through a central angle of 05 degrees 43 minutes 29 seconds, an arc distance of 64.19 feet;

Thence South 05 degrees 42 minutes 29 seconds West, tangent to said curve, a distance 26.38 feet;

Thence Southwesterly and Westerly along a tangent curve to the right having a radius 382.24 feet, through a central angle of 84 degrees 27 minutes 31 seconds, an arc distance of 563.45 feet to a point of tangency in a line that is parallel with and distant 1308.46 feet Southerly, measured at right angles, from said North line;

Thence North 89 degrees 50 minutes West, along last said parallel line, a distance of 919.70 feet to the point of beginning.

EXCEPTING THEREFROM that portion of said property lying below a depth of 500.00 feet measured vertically from the contour of the surface thereof;

Provided, however, that said grantor, its successors and assigns, shall not have the right for any and all purposes to enter upon, into or through the surface of the portion of said property lying above 500.00 feet, measured vertically from the contour of the surface of said property, as reserved in Deed recorded in Docket 9581, Page 180 and also recorded in Docket 9590, Page 873; and

EXCEPT all rights retained by Southern Pacific Company, a Delaware corporation in Warranty Deed recorded in Docket 3976, Page 407 of official records of Maricopa County, Arizona.

# Exhibit B

**SUBCONTRACT**
**Stellar Group, Inc.**
2900 Hartley Road
Jacksonville, FL 32257

| | |
|---|---|
| **Subcontractor:** Fabco Metal Products, LLC<br>1490 Frances Drive<br>Daytona Beach Florida 32124 | **Project Name and Location:** Bang Energy - Phoenix Can Manufacturing<br>1635 South 43rd Avenue<br>Phoenix Arizona 85009 |
| **Attention:** Tom Emert | **Attention:** Brian Edberg |
| **Phone:** (352) 373-3578 | **Mobile:** (904) 349-0640 |
| **Fax:** (386) 258-3402 | **E-Mail:** bedberg@stellar.net |
| **E-Mail:** temert@fabcometal.com | |

| Date<br>12/16/2020 | SC #<br>23006976-SUB-05 | Project #<br>23006976 | Contract Type<br>Lump Sum | FOB<br>Jobsite | Schedule<br>Per Superintendent |
|---|---|---|---|---|---|
| **Scope of Work: Structural Steel** | | | | | |

This Subcontract is made by and between Stellar Group, Incorporated, d/b/a Stellar, hereinafter referred to as Contractor, and the Subcontractor named above, at Jacksonville, Florida. In consideration of the mutual promises and undertakings set forth herein, Contractor and Subcontractor hereby agree to the terms and conditions set forth herein, including the Terms and Conditions attached hereto. Subcontractor agrees to perform and complete the following Work:

**A. Work:** Subcontractor agrees to perform and complete the scope of work generally as described in Exhibit A attached hereto and incorporated herein.

**B. Construction Progress Schedule:** Subcontractor agrees to complete the Work in strict accordance with the Construction Progress Schedule attached hereto as Exhibit B and incorporated herein.

**C. Contractor's Safety Requirements:** Subcontractor agrees to conform to Contractor's Request for Documentation, Bid Considerations, and Jobsite Safety Rules attached hereto as Exhibit C and incorporated herein.

**ALL FOR THE LUMP SUM OF** $3,434,097.31

All licenses, permits, fees, taxes and insurance with Contractor named as additional insured included)

**Attachments:**
Exhibit E-General Requirements.pdf, Exhibit F - Stellar Guide to Subcontractor Usage in Procore.pdf, Exhibit D-PHX VPX-Stellar DBIA_630 __SA_Cost_Plus_GMP_2020.07.28_Executed.pdf, 23006976 - Subcontract Attachments.pdf, Exhibit C-USP Bang Energy-Phoenix.pdf, Exhibit H-Specifications dated 11.11.2020.pdf, 23006976-Arizona Form 5005.pdf, 23006976 - Arizona Form 5000.pdf, Exhibit B-06976-Bang PHX Can Manufacturing Schedule_PRELIMINARY.pdf, Exhibit A 23006976-SUB-05 Structural Steel.pdf, Structural Steel Submittal Log 12.16.2020.pdf, Exhibit G-Drawing Log dated 11.24.2020.pdf, 23006976 _Subcontract Attachments.pdf

**FOR ACCOUNTING PURPOSES ONLY:**

| Cost Code | | Distributed Value |
|---|---|---|
| 05-0501 - 1760 | | $117,903.75 |
| 05-0506 - 1760 | | $9,904.32 |
| 05-0506 - 1760 | | $70,959.24 |
| 05-0501 - 1760 | | $1,769,196.41 |
| 05-0505 - 1760 | | $130,340.91 |
| 05-0503 - 1760 | | $524,661.70 |
| 05-0506 - 1760 | | $591,250.98 |
| 05-0506 - 1760 | | $219,880.00 |
| | **Total:** | **$3,434,097.31** |

**THIS SUBCONTRACT INCLUDES AND IS SUBJECT TO THE TERMS AND CONDITIONS ATTACHED HERETO AND INCORPORATED HEREIN.**

IN WITNESS WHEREOF, the Subcontractor and Contractor have executed this Subcontract on the date set forth above.

**FABCO METAL PRODUCTS, LLC**
Subcontractor

Signed and Dated: _Shane King_  1/8/21
SHANE KING

By: ~~Tom Emert~~
~~VP of Sales~~  PRESIDENT

**STELLAR GROUP, INCORPORATED**
Contractor

Signed and Dated: _____

By: Jonah Petoskey
Senior Project Manager

# SUBCONTRACT
## Stellar Group, Inc.

| | | | |
|---|---|---|---|
| **SC #:** | 23006976-SUB-05 | **Date:** | 12/16/2020 |
| **Subcontractor:** | Fabco Metal Products, LLC | **Page:** | 2 of 6 |

## GENERAL NOTES

1. Subcontractor and any Sub-Subcontractors must possess and, at the time of execution of this Agreement, furnish a copy of a valid state Contractors license for the state where the Project is located and for the scope of Work described herein. This Subcontractor must certify and warrant and furnish proof that it is currently registered to do business and remit state sales and use tax in the state where the Project is located. Contractor reserves the right to Withhold payment until this Subcontractor furnishes such proof. It is the Subcontractors responsibility to obtain and keep in force proper licensing in accordance with the laws and statutes of the state where the Project is located and to otherwise comply with all applicable federal, state and local laws, ordinances and regulations. Any Sub-Subcontractor must also comply with these provisions, and Subcontractor shall expressly incorporate these provisions into any agreement in which the Subcontractor subcontracts with another to perform any portion of the Work described herein.

2. Immediately upon execution of this Subcontract, Subcontractor shall furnish to the Contractor all certificates of insurance in accordance with Paragraph Six Insurance Requirements of the Terms and Conditions. Subcontractor must submit all certificates of insurance prior to performing any on this Project.

3. Subcontractor agrees to diligently pursue the Work and to meet the requirements set forth in the Construction Progress Schedule. In the event the Subcontractor delays the progress of the Work, he shall bear all costs of overtime, expediting and all special freight or other charges required to bring its progress to the level required. This Subcontractor may also be subject to damages or claims by the Contractor or other subcontractors brought about by Subcontractors negligence or its failure to adhere to the Construction Progress Schedule for any reason. Failure to comply with the Construction Progress Schedule may result in default under Paragraph Seven Default and Remedies of the Terms and Conditions.

4. Work hours shall be established by the Contractor and shall be followed by the Subcontractor. The Subcontractor must work during regular hours and will not be permitted to work at night and/or on weekends. All overtime work must be approved by the Project Superintendent. A representative of Contractor must be on site at all times work is being performed.

5. Subcontractor shall fully comply with the applicable employment verification procedures for all of its employees. Subcontractor certifies and warrants to Contractor that it maintains a I-9 compliance program for the express purpose of verifying lawful employment authorization to work in the United States for all of Subcontractors employees. The Subcontractor represents that it will follow all I-9 verification, reverification and updating procedures required by the Immigration Reform and Control Act of 1986 for all of Subcontractors employees on the Project. The Subcontractor further represents that it maintains a designated I-9 compliance officer who oversees the Subcontractors I-9 compliance procedures.

6. Subcontractor shall cooperate fully the instructions and directions of the Project Superintendent and shall coordinate its Work the work of other subcontractors.

7. Subcontractor shall perform all Work in a neat and professional manner and shall take great care not to damage any work already in place.

8. The Subcontractor shall furnish shop drawings and submittal data to the Contractor no later than weeks after receipt of this Subcontract. Subcontractor shall submit six copies plus the number to be returned to Subcontractor.

9. The Subcontractor shall furnish all layout and engineering in connection with its Work.

10. The Subcontractor shall clean-up all debris from its work on a daily basis. If, in the opinion of the Contractor, clean-up is not satisfactory, the Contractor, after giving reasonable notice to the Subcontractor, may clean up the premises at the cost and expense of the subcontractor and deduct such expense from payments due to the Subcontractor.

11. Subcontractor certifies and warrants That he is aware of all federal, state and local safety requirements and regulations pertaining to the Work, and Subcontractor shall perform its Work in strict compliance with such requirements and regulations. Subcontractor shall also comply with Contractors' safety regulations.

12. Subcontractor shall furnish Material Safety Data Sheets to the Contractor for material used in the Work and shall have same in its possession at the jobsite. Subcontractor shall pay any fines imposed for lack of the proper Material Safety Data Sheets.

13. Subcontractor shall comply with the code requirements of any governmental or regulatory body having jurisdiction over the Work. Subcontractor shall bring to the attention of the Contractor any discrepancy between the code requirements and the drawings or specifications

14. Subcontractor shall be responsible for scheduling, deliveries and receiving of all materials and supplies required for the Work. The Contractor accepts no responsibility for unloading deliveries or the condition or quantity of any materials delivered in the Subcontractor's absence.

15. It is the Subcontractor's responsibility to store and protect its materials, tools and equipment. Contractor shall not be liable in the event that Subcontractors materials, tools or equipment are lost, stolen or damaged.

16. Subcontractor agrees to maintain as built documents and data applicable to the Work. Subcontractor shall provide these documents to (he Contractor prior to release of retainage.

17. Payments shall be made in accordance with Paragraph Eight, Payment, of the Terms and Conditions attached to the Subcontract.

18. Prior to submittal of the first Requisition for Payment, Subcontractor shall submit a detailed Schedule of Values acceptable to the Contractor, for the purpose of approving work-in-place and/or materials suitably stored on site.

19. Prior to the final Requisition for Payment being processed, the Subcontractor shall submit to the Contractor, final lien waivers, final warranty, as-built drawings, copies of inspections and/or permits, three (3) hard copies and one (1) PDF copy of equipment operation and maintenance manuals and any other criteria required by the contract documents.

20. Subcontractor must use the Contractors •Subcontractor Requisition for Payment' form for all payment requisitions, and the form must bear the Subcontractors original signature, notarized.

21. With every requisition for payment, Subcontractor must submit a validly executed Lien Waiver and, in the event that there is a payment bond on the project, a Waiver of Right to Claim Against the Bond, as a condition precedent to payment.

22. The Subcontractor shall execute IRS document W-9 and return it to the Contractor with the executed Subcontract. Contractors receipt of the executed W-9 is a condition precedent to payment.

23. Subcontractor hereby acknowledges that it has received contract drawings and specifications for the Work.

24. Modifications or alterations to this Subcontract are not valid without prior written approval of the Contractor.

25. Prior to execution of any extra or change in the work, Subcontractor must submit a claim for Change in the Work end a Project Manager, or other Project Executive, must issue a Subcontract Modification in accordance with Paragraph Three Changes in the Work of the Terms and Conditions. Contractor shall not compensate Subcontractor for such Work if the Subcontractors claim was not timely or the Contractor did not approve the claim and issue a Subcontract Modification. The Superintendent does not have authority to modify the Subcontract or to approve extra work or claims for Change in the Work.

26. Subcontractor shall not assign, in whole or in part assign or sublet this Subcontract or the proceeds due or to become due under this Subcontract Without the prior, express and written consent of the Contractor.

27. Subcontractor shall maintain accurate as-built drawings during construction, and upon request, Subcontractor shall submit the drawings to the Contractor for periodic review. Failure to maintain accurate as-built drawings during construction may result in default under Paragraph Seven Default and Remedies of the Terms and Conditions. Not later than Substantial Completion, the Subcontractor shall deliver one clean set of marked-up drawings to the Contractor for inclusion in the close-out documents with the Owner.

28. For each day the Subcontractor is on the jobsite, the Subcontractor shall submit a "Subcontractor's Daily Report" form, available at the Contractor's field office, to the Contractors Superintendent by 10:00 a.m. the following morning. Subcontractor's compliance with this provision is a condition precedent to payment.

29. Subcontractor shall pay all taxes, assessments and premiums under the federal Social Security Act, any applicable unemployment insurance, workers compensation, disability benefits, sales tax, use tax, business tax, personal property tax laws, or other applicable laws now or later in effect payable by reason of or in connection with any part of the Work. In the event that Subcontractor fails to comply with these laws and Contractor becomes liable for such taxes, assessment or premiums, Subcontractor shall indemnify and hold harmless the Contractor and/or the Owner from and against such liability that Contractor and/or the Owner may incur as a result of such failure.

30. Subcontractor is responsible for having an approved Subcontractor prequalification package on file prior to the issuance of a Subcontract.

# SUBCONTRACT
## Stellar Group, Inc.

| | | | |
|---|---|---|---|
| **SC #:** | 23006976-SUB-05 | **Date:** | 12/16/2020 |
| **Subcontractor:** | Fabco Metal Products, LLC | **Page:** | 3 of 6 |

## TERMS AND CONDITIONS

1.     GENERAL CONTRACT. Contractor has entered or will enter into a General Contract with the Owner for the Project described on the first page of this Subcontract. Contractor has made or will make copies of the General Contract available to the Subcontractor (with dollar amounts redacted). The Project, including Subcontractor's Work, is to be constructed in accordance with the terms and conditions of the General Contract, including drawings and specifications and general, supplemental and special conditions and other Contract Documents described therein. Subcontractor hereby assumes the same conditions and responsibilities with respect to the performance under this Subcontract that the Contractor assumes toward the Owner with respect to its performance under the General Contract. If the General Contract varies or conflicts with any provision of this Subcontract, including any modification hereof, this Subcontract shall govern.

2.     SCOPE OF WORK. Subcontractor shall provide and pay for all labor, materials, services, tools, equipment and other things necessary to fully perform the Work set forth on the first page hereof, in cooperation with the other trades, in a good and workmanlike manner, and to the satisfaction and acceptance of Contractor and Owner or Owner's representative, which shall be final. Subcontractor has examined the premises and ascertained existing site conditions (including sub-surface conditions) and the nature and location of the Work thereon. All Work affected or governed by such site conditions or Work and services required for the thorough and satisfactory execution and completion of the work, whether indicated and specified or not, and regardless of quantity estimated, shall constitute a part of this Subcontract and be performed by Subcontractor without additional charge. Subcontractor expressly waives the right to make any claim arising out of minor variations in the actual condition of the premises from those conditions shown on the drawings and specifications.

3.     CHANGES IN THE WORK. Whenever the Contractor requests extra work, acceleration of work, compression of work or other changes requiring additional payments (collectively referred to herein as a 'Change in the Work') verbally or in writing directly or indirectly, Subcontractor shall present a written claim for compensation to the Contractor for such Change in the Work within ten (10) days of such request. Subcontractor hereby waives any claim for compensation not presented within ten (10) calendar days of the Change in the Work request. No dispute as to adjustment in the contract price due to Change in the Work shall excuse Subcontractor from proceeding within the original scope of Work or Change in the Work.

Subcontractor shall furnish a complete, itemized breakdown in sufficient detail to permit an analysis of all labor, material and equipment for any Change in the Work implemented at the direction of the Contractor and timely claimed in writing by Subcontractor.

In the event a Change in the Work affects the current Construction Progress Schedule, Subcontractor must include the claim for Change in the Work any request for time extension and justifications therefor.

It shall be a condition precedent to Subcontractors recovery of any compensation or damages for a Change in the Work of any type or any extension of time, whether requested (directly or indirectly, verbally or in writing) or caused by Contractor or others, that Subcontractor shall have made a specific written claim for such Change in the Work extension, compensations or damages within ten (10) days of the request or event giving rise to such Change in the Work or extension of time.

Claims for any such Change in the Work, extension, compensation or damages received after ten (10) days are hereby waived by the Subcontractor and shall not be considered by the Contractor.

4.     PERFORMANCE. Subcontractor acknowledges that TIME IS OF THE ESSENCE with respect to Contractors completing the Project pursuant to the General Contract, and that such completion is substantially dependent upon Subcontractor's performance of this Subcontract on or before the dates set forth in the Construction Progress Schedule and/or elsewhere herein. TIME IS OF THE ESSENCE IN THIS SUBCONTRACT. Subcontractor shall turn the Work over to the Contractor in good condition and free and clear of all claims and liens, and shall, at its expense, indemnify Contractor and defend all suits and pay all claims arising from its actions and omissions or those of its vendors, sub-subcontractors or second-tier subcontractors in its performance of this Subcontract. Subcontractor shall pay the cost of any bond necessary to remove any mechanic's lien from the Project arising out of the Work of Subcontractor. Subcontractor covenants, agrees and warrants that he shall not employ any labor which may interfere with labor harmony at the job site or with the introduction and storage of materials and execution of work by other subcontractors. If Subcontractor breaches this covenant and such breach causes a stoppage or slowdown of Work at the jobsite, Subcontractor shall be liable for damages suffered by Contractor caused by such delay in completing the Project, including any liquidated damages in the General Contract imposed on Contractor for failing to complete the Project on the completion date set forth therein. This job shall be run Merit Shop. Subcontractor shall comply with all laws, ordinances and regulations relating to the manner of doing the Work or to the supplying of material, including, without limitation, laws, ordinances, rules, regulations and orders for the safety of persons and property, and Subcontractor shall provide safe working conditions for its employees and all other persons on the jobsite at all times. If Subcontractor discovers any errors, omissions or discrepancies in the drawings or specifications, the General Contractor this Subcontract, Subcontractor shall immediately notify Contractor in writing. Any Work affected by such discoveries which Subcontractor performs prior to notifying Contractor and obtaining Contractors authorization to proceed shall be performed at Subcontractors risk. Subcontractor acknowledges that it may be performing the Work in the same area where other subcontractors, Contractor or Owner may be working, and the performance of work by the others may temporarily affect the Subcontractors Work. Subcontractor agrees to fully cooperate with the others to ensure an expeditious completion of the interfaces. If Subcontractors Work depends on the proper execution of work by others, then prior to the execution of its Work, Subcontractor shall inspect such work and submit a written report to the Contractor describing any defects. Subcontractors failure to inspect and report any defects prior to commencing its Work constitutes acceptance of such work by Subcontractor.

5.     INDEMNITY. (a) Indemnity. (1) General Indemnification for Damages to Persons or Property. To the fullest extent permitted by law, Subcontractor shall defend, indemnify and hold harmless the Owner, its officers, directors, agents, and employees; and the Contractor, its officers, directors, agents, and employees; from and against claims, demands, payments, damages, losses and expenses arising from injury to or destruction of tangible property (other than the work itself), including loss of use resulting therefrom or accident, bodily injury, sickness, disease or death, or damage whatsoever to any person, firm or corporation, caused in whole or in part by any act, omission, negligence or default of the Owner or its officers, directors, agents, or employees; the Contractor or its officers, directors, agents, or employees; the Subcontractor or its officers, directors, agents, or employees; or any of the Subcontractors contractors, subcontractors, sub-subcontractors, materialmen, suppliers, servants, agents, or licensees of any tier or their respective employees.

Subcontractors indemnification of Contractor and/or Owner shall include all costs, reasonable attorneys' fees, expenses, interest and liabilities incurred in or about any such claim, action or proceeding brought thereon.

If by reason of such claims any party brings any claim, action or proceeding against Contractor and/or Owner, Subcontractor, if requested and upon notice from Contractor, shall defend the Contractor and/or Owner against such claim, action or proceeding at Subcontractor's expense by counsel satisfactory to Contractor and/or Owner.

In compliance with Florida Statute § 725.06, the indemnity obligation described in 5(a)(1) is limited to the greater of $1,000,000 or two times the total General Liability (including Umbrella Liability Policy) insurance limit required in Paragraph SIX, "I Insurance below, which amount the Parties agree bears a reasonable commercial relationship to the Subcontract and the risks associated with Subcontractor's performance thereunder. —

The indemnity obligation described herein is intended to be consistent with the scope of indemnity obligations authorized by Florida Statute § 725.06, the provisions of which are incorporated herein by reference.

In the event any portion of the indemnity obligations described in the Contract is determined to be inconsistent with Florida Statute § 725.06, the provisions of Florida Statute § 725.06 shall control, it being the intention of the parties that Subcontractor shall indemnify Owner and Contractor, their officers, directors, agents, or employees to the fullest extent authorized by Florida law.

Additionally, the parties agree that the indemnity provisions herein are hereby incorporated into the project specifications or project bid documents, if any,

# SUBCONTRACT
## Stellar Group, Inc.

**SC #:** 23006976-SUB-05          **Date:** 12/16/2020

**Subcontractor:** Fabco Metal Products, LLC          **Page:** 4 of 6

(2) Indemnification for Economic Damages-Subcontractor's Labor Force. To the fullest extent permitted by law, the Subcontractor shall defend, indemnify and hold harmless the Owner, its officers, directors, agents, and employees; and the Contractor, its officers, directors, agents, and employees; from and against claims, demands, payments, damages, losses, premiums, fines and any other expenses arising from Subcontractor's, Subcontractor's, sub-subcontractor's, or of any tier or their respective employee's or any other statutory employee of Contractor as defined in Florida Statutes, S 440.02, violation of any provision of Chapter 440, Florida Statutes (a/k/a 'Workers Compensation Law).

Subcontractors indemnification of Contractor and/or Owner shall include all costs, reasonable attorneys' fees, expenses, interest and liabilities incurred in or about any such claim, action or proceeding brought thereon. If by reason of such claims any party brings any claim, action or proceeding against Contractor and/or Owner, Subcontractor, if requested and upon notice from Contractor, shall defend the Contractor and/or Owner against such claim, action or proceeding at Subcontractor's expense by counsel satisfactory to Contractor and/or Owner.

(3) Indemnification for Damages Associated with Performance of the Contract Work. To the fullest extent permitted by law, Subcontractor shall defend, indemnify and hold harmless the Owner, its officers, directors, agents, and employees; and the Contractor, its officers, directors, agents, and employees; from and against claims, demands, payments, damages, losses and expenses arising from the conduct, management, or performance of the Work or the performance by Subcontractor under the terms of this Subcontract, including, but not limited to, any and all 3. claims arising from any condition of the Work due to any act, omission, negligence, breach or default on the part of Subcontractor in the performance of any obligation on its part to be performed pursuant to this Subcontract or liens relating to Subcontractors Work, regardless of who performs the Work, supplies materials, or asserts such lien.

Subcontractors indemnity of Contractor and Owner shall include all costs, reasonable attorneys' fees, expenses, interest and liabilities incurred in or about any such claim, action or proceeding brought thereon. If by reason of such claims any party brings any claim, action or proceeding against Contractor and/or Owner, Subcontractor, if requested and upon notice from Contractor, shall defend the Contractor and/or Owner against such claim, action or proceeding at Subcontractors expense by counsel satisfactory to Contractor and/or Owner.

6.     INSURANCE REQUIREMENTS. At Subcontractor's own expense and prior to commencing the Work, Subcontractor shall procure all insurance coverage as required hereunder and furnish Contractor with certificates of insurance, and copies of additional insured endorsements, executed by an authorized representative from an insurer duty licensed to transact business at the location of the jobsite.

Subcontractor shall maintain the required insurance coverage and provide current evidence of such coverage to the Contractor until the warranty period of the Subcontractors Work expires.

The insurance coverage as set forth below shall be issued from companies satisfactory to the Contractor and with an AM Best rating of not less than A- VII.

Securing and maintaining the insurance required hereunder is a condition precedent to payment, Furthermore, Subcontractor's failure to comply with the terms of this provision or its subparts shall constitute a default under Paragraph Seven Default and Remedies of the Terms and Conditions and, at Contractors option, Contractor may terminate this Subcontract for cause and/or purchase said insurance at Subcontractors expense.

(a) Commercial General and Umbrella Liability Insurance. If the estimated value of the Subcontract, including prospective change orders or modifications, is less than $2,000,000, the Subcontractor shall maintain commercial general liability (CGI) and, if necessary, umbrella insurance with a per project limit of not less than $2,000,000 each occurrence, subject to a general aggregate of not less than $2,000,000. If the estimated value of the Subcontract, including charge orders or modifications, exceeds $2,000,000, the Subcontractor shall maintain commercial general liability (CGL) and, if necessary, umbrella insurance with a per project limit of not less than the total estimated value of the Subcontract per occurrence, subject to a general aggregate of not less than said total. If at any time a Change in the Work causes the total value of the Subcontract to exceed the Subcontracts current commercial general liability (CGL) per project limit and/or umbrella insurance per project limit, the Subcontractor must obtain the proper coverage as required herein and provide evidence of such coverage to the Contractor. The general aggregate limit shall apply separately to this Subcontract. The CGI- insurance shall be written on ISO occurrence form CG 00 01 (or a substitute form providing equivalent coverage). The coverage shall include liability arising from premises, operations, independent contractors, products-completed operations, personal injury & advertising injury, and liability assumed under an insured contract, including the tort liability of another assumed in a contract. The Subcontractor's CGL policy shall include Contractor as an additional insured for both ongoing and completed operations. The additional insured endorsements shall be written on ISO additional insured endorsement CG 20 10 07 04 (for ongoing operations) and CG 20 37 07 04 (for completed operations) (or substitute endorsements providing equivalent coverage) and attached to Subcontractors CGL, and to the commercial umbrella, if any. Subcontractor shall maintain ongoing CGL coverage for the products-completed operations hazard, including liability assumed under an insured contract, and the required additional insured coverage for the maximum period of time Subcontractor may be held legally liable for its work following substantial completion of the Work. Subcontractor shall maintain this coverage on ISO occurrence form CG 00 01 (or a substitute form providing equivalent coverage). Subcontractors CGL insurance shall apply as primary insurance with respect to any other insurance or self-insurance programs afforded to Contractor, and no endorsement or modification of the CGL shall make the coverage excess over other available insurance.

(b) Automobile and Umbrella Insurance. Subcontractor shall maintain automobile liability insurance and, if necessary, umbrella liability insurance with a limit of not less than $1,000,000 each accident. Such insurance shall cover liability arising out of 'any auto', including owned, hired, and non-owned autos. Coverage shall be written on ISO form CA 00 01, or a substitute form providing equivalent liability coverage. Stellar shall be added as an additional insured to the auto and umbrella policy.

(c) Workers Compensation Insurance. Subcontractor shall maintain worker's compensation and employer's liability insurance. The worker's compensation coverage shall provide the statutory maximum limit of liability.

The employer's liability limits shall not be less than $1,000,000 each accident for bodily injury by accident or $1,000,000 each employee for bodily injury by disease.

(d) Pollution Liability Insurance. Pollution Liability Insurance is required with a limit of no less than $1,000,000 This coverage must include damage caused by pollutants, which is any solid, liquid, gaseous or thermal irritant including mold and fungus, smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. This coverage must include completed operations. Any exception to this requirement will be determined by Stellar according to Exhibit A Scope of Work.

(e) Professional Liability Insurance. If Subcontractors scope of services includes design work or other professional services, then Subcontractor shall maintain insurance coverage for Subcontractors errors, omissions and other wrongful acts arising out of the professional services performed by Subcontractor. The limit of liability shall not be less than $1,000,000.

(f) Waiver of Subrogation. Subcontractor waives all rights against Contractor and its agents, officers, directors and employees for recovery of damages to the extent that any of the policies of insurance maintained pursuant to this Subcontract covers these damages.

(g) Sub-subcontractors Insurance. Subcontractor shall cause each Sub-subcontractor employed by Subcontractor to purchase and maintain insurance of the type specified in this agreement. When requested by Contractor, Subcontractor shall furnish to Contractor copies of certificates of insurance evidencing coverage for each Sub-subcontractor.

(h) No Representation of Coverage Adequacy. By requiring the insurance as set out in this Subcontract, Contractor does not represent that such coverage and limits will be adequate to protect Subcontractor, and Subcontractor acknowledges that such liability under the indemnities provided to the Contractor and/or Owner pursuant to this Subcontract is not limited to such coverage and limits.

7.     DEFAULT AND REMEDIES. (a) Should Subcontractor at any time fail to prosecute and complete the Work in accordance with the Construction Progress Schedule, as herein provided or as directed by Contractor; or fail to diligently and continuously perform its Work; or if, in the opinion of Contractor, the Work of Subcontractor cannot be completed in the time period required; or if Contractor is notified of Subcontractors failure to pay for any material or labor used on the Project; or in the event of a

# SUBCONTRACT
## Stellar Group, Inc.

| | | | |
|---|---|---|---|
| **SC #:** | 23006976-SUB-05 | **Date:** | 12/16/2020 |
| **Subcontractor:** | Fabco Metal Products, LLC | **Page:** | 5 of 6 |

strike or stoppage of Work resulting from a dispute involving or affecting the labor employed by Subcontractor or its sub-contractors; or if Subcontractor fails to perform any of the requirements of this Subcontract; then such event shall constitute a default hereunder and Contractor shall notify Subcontractor to correct such default and shall specify in such notice the action to be taken and the date by which the default shall be corrected (the "Notice of Default").

(b) If a default occurs and Subcontractor has not corrected the default on or before the date specified in the notice to the Subcontractor, Contractor may exercise any or all of the following remedies:

Contractor may immediately take any action necessary to correct such default, including without limitation the right to provide labor, overtime and materials, and may deduct the cost of correcting such default from any payment due or to become due to Subcontractor or recover such cost from Subcontractor if no sums are due or become due to Subcontractor.

The Contractor may terminate this Subcontract, take possession of Subcontractors materials, tools and equipment used in performing the Work, and employ another subcontractor or use the employees of Contractor to finish the remaining Work to be performed hereunder.

Contractor may deduct the costs of completing the remaining Work from the unpaid Subcontract Price and if the cost of completing the remaining Work exceeds the unpaid Subcontract Price, Subcontractor shall pay Contractor such excess cost, including, without limitation, overhead and attorneys' fees; and

The Contractor may exercise any remedy at law or in equity available as a result of Subcontractors default or non-performance under this Subcontract.

Contractor, in any such event, may also refrain from making any further payments to Subcontractor until the entire Project shall be fully finished and accepted by Owner at which time, if the unpaid balance of the amount to be paid under this Subcontract shall exceed the sum of the expense incurred by the Contractor in finishing the Work and the damage sustained by Contractor as a result of Subcontractors default, then such excess shall be paid by Contractor to Subcontractor, but if the sum of such expenses and damages shall exceed such unpaid balance, Subcontractor shall promptly pay the difference to the Contractor

(c) Upon any default, Subcontractor shall pay to Contractor its attorneys' fees and court costs incurred in enforcing this Subcontract or seeking any remedies hereunder. Subcontractor shall pay all such fees and costs, whether or not suit is filed and in connection with any appeal and in connection with any bankruptcy or other insolvency proceeding.

(d) If Contractor does not terminate Subcontractors right to proceed, Subcontractor shall continue with the Work.

(e) If Owner is damaged by reason of any breach by Subcontractor of this Subcontract, then Subcontractor shall pay Owner such damages, together with all costs of collection including court costs and attorneys' fees.

(f) Subcontractor hereby knowingly and voluntarily waives all claims for damages due to delays, disruptions, constructive acceleration of work and similar economic losses and agrees that its sole and exclusive remedy for any such claims shall be an extension of the contract time provided that Subcontractor makes a written claim for such extension within ten (10) days of the event giving rise to the claim.

(g) Proposed Setoff Clause - If at any time Subcontractor is indebted to Contractor under any other subcontract or for any other reason, Contract shall have the right to set off such indebtedness against any payments earned under this Subcontract. Additionally, if Subcontractor defaults on any other subcontract on this Project for any reason, such default shall also constitute a default under this Subcontract.

(h) Proposed Bankruptcy/Insolvency Clause - If Subcontractor should file for bankruptcy protection, otherwise become insolvent, or encounter financial difficulties which impair the ability of Subcontractor to perform its obligations under this Subcontract fully and efficiently, then Contractor may, upon written notice, terminate Subcontractors performance under this Subcontract for cause, and Subcontractor shall pay to Contractor the amount of loss or damage sustained by Contractor as a result of the termination.

8.      PAYMENT. (a) Subcontractor shall, prior to submission of its first requisition for payment, give Contractor the name, address and telephone number of every material supplier and sub-subcontractor furnishing materials and/or labor to Subcontractor for the Work covered herein.

If Contractor receives the Subcontractor's requisition for payment and all required lien waivers by the 22nd day of the month, Contractor shall process the requisition for payment by the 25th day of the following month or 5 days after receipt of payment from the Owner, whichever is greater. The amount of each such payment is always subject to the approval of Contractor. Subcontractor, at Contractors request, shall provide evidence that that the unpaid balance of the Subcontract Price, exclusive of Retainage, is at all times sufficient to complete Subcontractors remaining Work hereunder. All monthly payments are subject to a ten (10) percent Retainage. Contractor shall disburse Subcontractor's Retainage within sixty (60) days following completion and acceptance by the Owner of the entire Project of which Subcontractors Work is a part, however, Contractors receipt of the Retainage from Owner is an absolute condition precedent to disbursement of Subcontractors Retainage.

Subcontractor shall submit all requisitions for payments on the Contractors "Subcontractor Requisition for Payment" form. The form must bear the original, notarized signature of an authorized agent of the Subcontractor. With each requisition for payment, Subcontractor must also submit a valid lien and/or bond waiver(s), on the Contractors form(s), from Subcontractor and each of its sub-subcontractors and suppliers. The waiver(s) must bear the original, notarized signature of an authorized agent of the entity waiving its bond and/or lien rights, and must cover the time period and the amount of all materials, labor and Work reflected in such requisition (including final lien and/or bond waivers with the final requisition for payment). Furthermore, if requested, Subcontractor shall submit evidence satisfactory to Contractor that all payroll; bills for materials and equipment; sales, use and business taxes; and all known indebtedness connected with Subcontractor's Work have been satisfied.

(b) Subcontractor shall defend and discharge any liens or claims arising from its performance or failure to perform under this Subcontract and shall indemnify and hold the Contractor and the Owner harmless from any losses, damages, costs, expenses and attorneys' fees relating to or resulting from mechanics' liens, equitable liens or payment bond claims arising by, through, or under Subcontractor.

Subcontractor shall make payment to sub-subcontractors and suppliers in an amount equal to the percentage of completion allowed to the Subcontractor on account of its Work. Subcontractor agrees that it shall only use sums received for its performance of this Subcontract for labor, services and material provided hereunder and shall not use such sums to satisfy Subcontractors obligations on other contracts.

Subcontractor agrees that Contractor may pay Subcontractor's material suppliers or Sub-Subcontractors with Subcontractor by joint checks at any time. Furthermore, Contractor may make direct payments to material suppliers or Sub-Subcontractors, provided that Contractor has given Subcontractor seven (7) days prior written notice of intent to make such payment(s) and the amount of such payment(s).

(c) Notwithstanding anything to the contrary appearing herein or in any of the Contract Documents, (including but not limited to the General Contract between Owner and Contractor) either implicitly or explicitly, Subcontractor is not entitled to receive any progress payment or final payment prior to Contractors actual receipt of that payment from Owner, Subcontractor agrees that Contractors actual receipt of full payment from the Owner is a condition precedent to Contractor's obligation to pay Subcontractor and to the bringing of any action by Subcontractor against Contractor (and its surety, if any) relating to Contractors failure to make payment. Subcontractor further agrees that its full performance of this Subcontract shall not constitute an exception to the condition set forth in this paragraph. Subcontractor agrees that this provision also constitutes a condition precedent to any claim against any payment bond in effect on the Project.

9.      SHOP DRAWINGS. Subcontractor shall review Shop Drawings for compliance with the Subcontract Documents and approve and submit to the Contractor all Shop Drawings required by the Subcontract Documents. Subcontractor shall submit Shop Drawings with reasonable promptness and in such sequence as to cause no delay in the Work or in the activities of Owner, Contractor or other subcontractors. Contractors review of the Subcontractor's submittals shall not (a) relieve Subcontractor of its obligations

# SUBCONTRACT
## Stellar Group, Inc.

| | | | |
|---|---|---|---|
| **SC #:** | 23006976-SUB-05 | **Date:** | 12/16/2020 |
| **Subcontractor:** | Fabco Metal Products, LLC | **Page:** | 6 of 6 |

or release Subcontractor for any liability under the Subcontract Documents or any section hereof, (b) constitute Owners or Contractor's approval of Subcontractors safety precautions, construction means, methods, techniques, sequences or procedures, or (c) represent Contractor's determination of accuracy and completeness of details of the Work such as dimensions or qualities, or Contractors substantiation of instructions for installation or performance of equipment or systems, all of which remain the responsibility of Subcontractor as required by the Subcontract Documents.

10.   WARRANTY. Subcontractor warrants to the Contractor that all materials and equipment furnished under the Subcontract will be new unless otherwise specified and that all Work will be of good quality, free from faults and defects and in conformance with the Contract Documents. All Work not so conforming to these standards shall be considered defective. If required by the Contractor, the Subcontractor shall furnish satisfactory evidence as to the kind and quality of materials and equipment incorporated in the Project. Subcontractor shall warrant all materials and workmanship furnished or performed hereunder to be free of defects for a period of one year from date of acceptance by Owner of the entire Project unless otherwise specified herein and shall, at its expense, promptly replace, repair or correct any such defective materials or workmanship appearing within warranty period as set forth herein. Subcontractor shall submit and assign all factory warranties on equipment and materials installed by him and, at the option of Contractor, shall initiate an assignment to Contractor and/or assigns a service agreement with a local service agency covering all equipment, workmanship and materials so installed. The warranty provided in this paragraph and elsewhere in the Contract Documents is in addition to and not in limitation of any other warranty or remedy provided by law or required by the Contract Documents

11.   IMMIGRATION LAWS COMPLIANCE. Subcontractor must fully comply with all employment verification procedures, including without limitation, complying with all I-9 verification, reverification and updating procedures as required by the Immigration Reform and Control Act of 1986, for all of its employees. Subcontractor certifies and warrants to Contractor that it maintains an I-9 compliance program for the express purpose of verifying lawful employment authorization to work in the United States for all of its employees. The Subcontractor further represents that it maintains a designated I-9 compliance officer who oversees the Subcontractors I-9 compliance procedures.

12.   MISCELLANEOUS. Subcontractor shall remove from the premises, as directed by Contractor, all rubbish and surplus material which may accumulate from the prosecution of its Work.

Should Subcontractor fail to do so, Contractor may, at its option, remove same and deduct the cost of such removal from any amounts owed to Subcontractor and if the cost of such removal exceeds the unpaid Subcontract Price, Subcontractor shall pay Contractor such excess cost.

Notwithstanding anything contained herein to the contrary, Contractor may, without cause, terminate this Subcontract at any time upon written notice to the Subcontractor.

The Subcontractor shall not be entitled to anticipate a profit or damages for any termination by Contractor for its convenience.

This Subcontract contains the entire agreement between Contractor and Subcontractor.

All prior negotiations, representations and agreements with respect to this Subcontract not specifically incorporated herein are hereby cancelled.

Owners substantial performance of the General Contract is a condition of Contractors obligation under this Subcontract.

If Owner becomes bankrupt or otherwise defaults in its payments to Contractor under the General Contract, and/or terminates the General Contract with or without cause, then, upon written notice thereof to Subcontractor, Contractor may terminate this Subcontract and will thereupon, subject to the conditions of paragraph 8(c) of this Subcontract, be liable to Subcontractor only for cost of Work actually performed by Subcontractor at the time of said notice (subject to the provisions of paragraph 8(c) hereof) and for no further compensation or damage.

Subcontractor shall protect its finished Work against damage by other trades and shall be liable for damage caused by him to the Work of others.

Subcontractor shall pay the cost of replacement or repair to the Work of other trades damaged by him or occasioned by the correction of its defective Work and should Subcontractor fail to do so, Contractor may, at its option, correct such defective Work and deduct the cost thereof from any amounts owed to Subcontractor and if the cost of such correction exceeds the unpaid Subcontract Price, Subcontractor shall pay to Contractor such excess cost.

Subcontractor is responsible for determining the location of and for any damage caused by him to any underground objects, including but not limited to sewer, water, gas, electric or telephone lines, cables, pipes and tunnels.

Subcontractor shall obtain and pay for all taxes, permits, licenses and official inspections made necessary by its Work and comply with all laws, ordinances and regulations relating thereto.

Subcontractor expressly understands and agrees that its only remedy for delays in the Work shall be for an extension of time for the number of days by which he has been delayed, as determined by Contractor and/or Owner, and that Subcontractor shall not be entitled to any recovery for losses, expenses or damages relating to such delays, however caused; provided, however, that no allowance for additional time shall be made for any cause unless a request for an extension is presented in writing to Contractor within ten (10) days after occurrence of the event giving rise to the delay.

Any claim not so presented within ten (10) days shall be deemed waived by the Subcontractor and shall not be considered.

It may be necessary for the Owner to occupy a portion of the Work which Subcontractor has either partially or fully completed prior to final inspection or acceptance by the Owner.

Such occupancy shall not relieve the Subcontractor of its guarantee of Work or modify the warranty period described above.

The parties to this Subcontract agree that execution of this Subcontract was in Jacksonville, Duval County, Florida.

The laws of the State of Florida shall govern the construction, interpretation, enforcement and all other matters relating to this Subcontract and any amendments or modifications, and jurisdiction and venue for any litigation arising under this Subcontract lies exclusively with the appropriate court in Duval County, Florida to the exclusion of any other jurisdiction or venue.

Subcontractor waives the right to trial by jury on any issues relating to this Subcontract.

| | |
|---|---|
| **FABCO METAL PRODUCTS, LLC** | **STELLAR GROUP, INCORPORATED** |
| Subcontractor | Contractor |
| Signed and Dated: _~Shawn King~_ _1/8/21_ | Signed and Dated: _____ |
| By: ~Tom Emch~  Shawn King | By: Jonah Petoskey |
| ~VP of Sales~  President | Senior Project Manager |

Reviewed by Sales - TE 1-6-21
Bob Ralston PM 1/7/21

# Exhibit A
# Structural Steel

Attachment Fabco Metal Products, LLC Subcontract # 23006976-SUB-05 dated 12/16/2020

1. **Scope of Work**

1.1 The undersigned Subcontractor, having become thoroughly familiar with the project documents provided and the local conditions affecting the performance and cost of the work, hereby agrees to provide all labor, materials, tools, equipment, freight, supervision, applicable taxes, insurance, services, permits, and miscellaneous incidentals as required to complete in every respect the work as described herein, in strict accordance with the Exhibits, General Notes, and Terms and Conditions of the Subcontract, the additional Subcontract support documents listed below, and all applicable federal, state, and local requirements.

1.2 Henceforth, the word "provide" shall mean furnish and deliver.

1.3 Henceforth, the phrase "as indicated" shall mean as indicated in the project documents.

1.4 The Work to be performed under this Subcontract includes (but is not limited to) the following work:

  1.4.1. Furnish Miscellaneous Steel as indicated, including but not limited to:

    1.4.1.1. Column Anchor Bolts and Base Plates

    1.4.1.2. Bollards (Including Bollard Horizontal Rails)

    1.4.1.3. Dock Leveler Frames and Embeds

    1.4.1.4. Trench Angles and Embeds

    1.4.1.5. Vibration Pad Embeds

    ~~1.4.1.6. Armor Joints~~ excluded per proposal

    1.4.1.7. Sump Pit Angles and Embeds

  1.4.2. Provide Structural Steel as indicated, including but not limited to:

    1.4.2.1. Stairs, Handrails and Guardrails (Exterior – Galvanized)

    1.4.2.2. Complete Equipment Platform Systems

    1.4.2.3. Cooling Tower Framing (Galvanized)

    1.4.2.4. Utility Piping Framing

    1.4.2.5. Mechanical Louver Opening Columns

    1.4.2.6. Overhead Door Structural Steel Frames

    1.4.2.7. Concrete Ceiling Lid Angles to Existing Tilt Up Panels

    1.4.2.8. Trench Grating and Trench Steel Supports (Galvanized, Stainless Steel and Fiberglass.)

    1.4.2.9. Structural Steel Columns and Beams

SUBCONTRACT CONTINUATION

Fabco Metal Products, LLC.
SC#: 23006976-SUB-05

1.4.3. All freight is included in pricing, and delivery is to be FOB jobsite.

1.4.4. Drill and epoxy anchor bolts as needed for structural steel installation.

1.4.5. Provide all columns, beams, channels, angle supports, bent plates, wall shear plates, bars, tubing, pipe, embeds, anchor bolts as necessary and indicated.

1.4.6. Provide all detailing as indicated for a complete installation of the steel scope.

1.4.7. All steel exposed to the external environments is to be hot dipped galvanized.

1.4.8. All interior exposed steel is to be shop painted with structural steel primer.

1.4.9. Any cuts or welds on galvanized steel are to be painting with cold galvanize after completion.

1.4.10. All weld and burn marks on prime painted steel are to be touched up with spray paint primer.

1.4.11. Receive and unload all deliveries of structural steel.

1.4.12. Install all handrail as indicated, to include core drilling at all concrete ramps and stairs.

1.4.13. All anchor bolt sets will have one leveling nut set to elevation and identified as such by others.

1.4.14. Verify all anchor bolt layout prior to steel erection and communicate any deviation to the contractor prior to steel erection. An inspection shall be made at the pre-steel meeting approximately four weeks prior to start of erection.

1.4.15. Provide hard copies of welding certifications for all field welders.

1.4.16. Provide, install and remove an OSHA approved fall protection system for steel erection.

1.4.17. Remove all mud/debris from steel prior to erection.

1.4.18. All steel erected shall be safely temporarily braced per OSHA requirements until all components are installed and connected.

1.4.19. Joist reinforcement and rooftop equipment frames are by others and excluded.

2.  **Change Orders & Extra Work**

2.1  Maximum aggregate mark-up of overhead and profit for all change order work performed under this Subcontract shall be as follows:

2.1.1.  Overhead & Profit – 10%

SUBCONTRACT CONTINUATION

Fabco Metal Products, LLC.
SC#: 23006976-SUB-05

Date: 12/16/2020
Page: 3 of 6

3.    Contract Documents

    3.1    "Exhibit B" - Project Schedule dated 11/30/2020

    3.2    "Exhibit C" – Job Specific Safety Plan

    3.3    "Exhibit D" – DBA Contract dated 07/28/2020

    3.4    "Exhibit E" – Stellar Guide for Subcontractors Usage in Procore

    3.5    "Exhibit F" – General Requirements

    3.6    "Exhibit G" – Facility Access and Site Utilization Plans

    3.7    "Exhibit H" – Drawing Log dated 11/24/2020

    3.8    "Exhibit I" – Specifications dated 11/11/2020

4.    Personnel Labor Rates

| Item | Description | Hourly Rate |
|------|-------------|-------------|
| Labor | | ST |
| 1 | Project Manager | $85.00 |
| 2 | Superintendent | $93.00 |
| 3 | Erector | $85.00 |
| 4 | Laborer | $80.00 |

5.    Miscellaneous

    5.1    All project collaboration, correspondence, communication, and documentation will be conducted using Procore. A "How To" guide for Subcontractors has been included within this Subcontractor for interaction with Stellar in the Procore system.  As a condition of this Subcontract, Procore shall be used throughout the duration of the project for the following items including but not limited to:

        5.1.1.  RFI's

        5.1.2.  Observations

        5.1.3.  Drawings

        5.1.4.  Commitments and Payment Requisitions

        5.1.5.  Submittals

        5.1.6.  Punch List

SUBCONTRACT CONTINUATION

Fabco Metal Products, LLC.                                    Date: 12/16/2020
SC#: 23006976-SUB-05                                          Page: 4 of 6

5.1.7.  Specifications

5.1.8.  Daily Log Entry

5.1.9.  All other documents and documentation pertaining to the project

5.2    The hours of operation for the project shall be five (5) days per week, forty (40) hours per week, eight (8) hours per day. The site shall be available for work from the hours of 6:30 a.m. to 6:30 p.m., Monday through Friday. This work shall be based upon the above listed hours. Different work schedules must be approved by the Stellar Project Manager and Superintendent.

5.3    Provide all training for new equipment and systems installed under this scope of work. Prior to scheduled training session, a written agenda shall be issued for review. A sign in sheet shall be submitted after completion of training. One (1) hard copy of operation and maintenance manuals shall be available during the training session.

5.4    This scope of work will require multiple mobilizations as defined in the construction schedule. All costs for additional mobilizations as shown in the project schedule are specifically included in this subcontract unless noted otherwise.

5.5    Protection of all existing work is included.

5.6    Subcontractor shall store materials on elevated platforms, under cover and in a dry location, to prevent their deterioration or damage due to moisture, temperature changes, contaminants or other causes.

5.7    Make necessary repairs, in a manner acceptable to and approved by Contractor and Owner, including complete removal and replacement, as determined by the contractor of any work adjudged to be defective or nor conforming to the requirements of this Agreement, the Project Specifications, or standards of good and proper workmanship.

5.8    All deliveries will be scheduled with the Project Superintendent forty-eight (48) hours in advance. The Project Superintendent will approve all deliveries to the site in advance. Unannounced or unscheduled deliveries are subject to being turned away at the expense of the company for which the delivery was intended for both shipping costs and schedule delays.

5.9    Jobsite cleanliness and housekeeping is included in this scope of work. As noted in the General Notes of the Subcontract Agreement, the cost and expense to the subcontractor shall be defined as follows:

SUBCONTRACT CONTINUATION

Fabco Metal Products, LLC.
SC#: 23006976-SUB-05

Date: 12/16/2020
Page: 5 of 6

5.9.1. Should the jobsite housekeeping performance be found to be unacceptable, one written warning will be issued to correct the state of jobsite cleanliness for the areas in which this subcontractor is working. If the cleanliness deficiency is not immediately corrected, Stellar will take action to correct the situation at a charge of $2,500.00 per day for violation of the jobsite housekeeping and cleanliness standard. If this subcontractor is found to be a repeat violator of this policy, Stellar may terminate the contract and pursue legal avenues for compensating any losses associated with the completion of the work.

5.10 Responsibility for unloading of materials, tools, or equipment is included in this scope of work unless specifically excluded herein. Should Stellar be asked to unload any deliveries, it shall be done at a cost of $2,500.00 per day and Stellar will require a written release of liability for any damages from the company requesting this service. Deliveries which cannot be unloaded by this method or which do not have personnel onsite to handle their own shipments may be turned away at their expense for both shipping costs and schedule delays.

5.11 This project is a renovation to an existing, functioning facility in full operation. Subcontractor shall take all required steps and shall do all things necessary to ensure that neither the Owner nor his operations are interfered with, disrupted, or disturbed in any way.

5.12 Subcontractor shall strictly limit his activities to the limits of the construction area. All parking, unloading and receiving, storage, fabrication, and other similar activities shall be confined to designated areas away from the existing facility. The existing facilities roadways and parking areas shall not be used by Subcontractor for these activities or for any others, except for where specifically identified by the Stellar Superintendent.

5.13 Subcontractor's employees shall not enter any portion of the existing facility, except as required to install the work of the project. Subcontractor's employees shall not be permitted to use the existing facility's toilet rooms, lunchroom, or break areas.

5.14 Subcontractor shall notify the project superintendent a minimum of two (2) weeks prior to any activities that may impact the Owner's operations. This work shall be coordinated to minimize the impact to the Owner and may be required to be performed during off hours and/or on extended and/or continuous shifts. Premium costs for this work shall not be subject to a modification of the subcontract.

5.15 All eating, drinking (other than water), smoking, and other tobacco use shall occur outside of the existing building in an area designated by the project superintendent. All trash shall

SUBCONTRACT CONTINUATION

Fabco Metal Products, LLC.
SC#: 23006976-SUB-05

Date: 12/16/2020
Page: 6 of 6

be placed into the dumpsters provided by the Contactor and shall not be left inside or outside of the building.

5.16    Subcontractor shall use only electrically operated equipment or fuel-based equipment provided with air scrubbers, for work inside the existing facility unless specifically instructed otherwise.  Welding activities shall be limited to essential tasks such as welding of utility piping and held to a minimum indoors.  All welding activities must be properly protected and properly ventilated.

SUBCONTRACTOR ACKNOWLEDGES RECEIPT OF ALL CONTRACT DOCUMENTS NOTED ABOVE IN SECTION 3.

Fabco Metal Products, LLC.
Subcontractor

STELLAR GROUP, INCORPORATED
Contractor

By: _____
       Tom Emett, Vice-President Sales
       SHANE KING.  PRESIDENT

By: _____
       Jonah Petoskey, Sr. Project Manager

# SUBCONTRACT MODIFICATION
## Stellar Group, Inc.
### 2900 Hartley Road
### Jacksonville, FL 32257

| | |
|---|---|
| **Subcontractor:** Fabco Metal Products, LLC<br>1490 Frances Drive<br>Daytona Beach Florida 32124 | **Project Name and Location:** Bang Energy - Phoenix Can Manufacturing<br>1635 South 43rd Avenue<br>Phoenix Arizona 85009 |
| **Attention:** Bob Ralston | **Attention:** Chuck Harrison |
| **Phone:** (386) 252-3730 | **Phone:** (904) 383-0163 |
| **Fax:** | **E-Mail:** charrison@stellar.net |
| **E-Mail:** bralston@fabcometal.com | |

| Date<br>3/8/2022 | SC #<br>23006976-SUB-05G | Project #<br>23006976 | Contract Type<br>Lump Sum | FOB<br>Jobsite | Schedule<br>Per Superintendent |
|---|---|---|---|---|---|

This Subcontract is made by and between Stellar Group, Incorporated, d/b/a Stellar, hereinafter referred to as "Contractor," and the Subcontractor named above, at Jacksonville, Florida. In consideration of the mutual promises and undertakings set forth herein, Contractor and Subcontractor hereby agree to the terms and conditions set forth herein, including the Terms and Conditions attached hereto. Subcontractor agrees to perform and complete the following Work:

Subcontract agrees to modify Subcontract No.: 23006976-SUB-05

| Item | Description | Net Amount |
|---|---|---|
| 1 | Changed Beam Sizes, Added Anchor Bolts, Added Beams, Removed Framing for Platform, Added Stair with rail, Added Ledger Angles | $15,955.00 |

**Attachments:**
COR-58-PR2-14.pdf

**FOR ACCOUNTING PURPOSES ONLY:**

| | Cost Codes | Net Amount |
|---|---|---|
| | 05-0501 - 1760 | $15,955.00 |

**TOTAL AMOUNT OF THIS MODIFICATION**                                                     **$15,955.00**
(All licenses, taxes, permits, fees and insurance with Stellar named as additional insured included)

| | |
|---|---|
| ORIGINAL SUBCONTRACT | $3,434,097.31 |
| PREVIOUS MODIFICATION(S) | $551,852.89 |
| THIS MODIFICATION | $15,955.00 |
| REVISED SUBCONTRACT | $4,001,905.20 |

**This subcontract includes and is subject to the terms and conditions previously attached to the original subcontract.**

IN WITNESS WHEREOF, the Subcontractor and Contractor have executed this Subcontract on the date set forth above.

| **FABCO METAL PRODUCTS, LLC** | **STELLAR GROUP, INC.** |
|---|---|
| Subcontractor | Contractor |
| Bob Ralston | |
| By: Bob Ralston | By: Gregory Ortego |
| Project Manager | Project Manager |

APPLICATION AND CERTIFICATE FOR PAYMENT

DOCUMENT SUMMARY SHEET

**TO CONTRACTOR:**
Stellar
2900 Hartley Road
Jacksonville, Florida 32257

**PROJECT:**
Barg Energy - Phoenix Can Manufacturing
1835 South 43rd Avenue
Phoenix, Arizona 85009

**APPLICATION NO:** 5
**INVOICE NO:**
**PERIOD:** 09/26/21 - 10/25/21
**PROJECT NO:** 23006976
**CONTRACT DATE:** 01/08/2021

DISTRIBUTION TO:

**FROM SUBCONTRACTOR:**
Faboo Metal Products, LLC
1490 Frances Drive
Daytona Beach, Florida 32124

**SUBCONTRACT DATE:** 1/8/2021

SUBCONTRACT FOR: Structural Steel
**SUBCONTRACTOR'S APPLICATION FOR PAYMENT**

Application is made for payment, as shown below, in connection with the Subcontract. Continuation Sheet is attached.

| | | |
|---|---|---|
| 1. | Original Contract Sum | $ 3,434,097.31 |
| 2. | Net change by change orders | $ 111,603.89 |
| 3. | Contract sum to date (line 1 ± 2) | $ 3,545,701.20 |
| 4. | Total completed and stored to date | $ 2,221,063.81 |
| | (Column G on detail sheet) | |
| 5. | Retainage: | |
| | a. 10.00% of completed work; | $ 222,106.87 |
| | b. 0.00% of stored material; | $ 0.00 |
| | Total retainage (Line 5a + 5b or total in column I of detail sheet) | $ 222,106.87 |
| 6. | Total earned less retainage | $ 1,998,961.74 |
| | (Line 4 less Line 5 Total) | |
| 7. | Less previous certificates for payment | $ 1,476,122.24 |
| | (Line 6 from prior certificate) | |
| 8. | Current payment due: | $ 522,839.50 |
| 9. | Balance to finish, including retainage | $ 1,546,739.46 |
| | (Line 3 less Line 6) | |

| CHANGE ORDER SUMMARY | ADDITIONS | DEDUCTIONS |
|---|---|---|
| Total changes approved previous months by Owner: | $ 111,603.89 | $ 0.00 |
| Total approved this Month: | $ 0.00 | $ 0.00 |
| Totals: | $ 111,603.89 | $ 0.00 |
| Net change by change orders: | $ 111,603.89 | |

The undersigned hereby further declares and agrees that in the event that any lien or other claim should be brought against The Stellar Companies, Inc., the Owner or their building or premises, the undersigned will protect the said parties and defend any suit or action brought against them, by reason of any lien or other form of claim or action arising out of said subcontract and hold them harmless and indemnified therefore.

In consideration of the sum of $1.00 to the undersigned in hand paid, receipt whereof is hereby acknowledged, and other benefits accruing, the undersigned does hereby waive release and quitclaim in favor of The Stellar Companies, Inc. and/or owner or owners of said premises as improved all right that the undersigned may have to a lien upon the land and improvements above described.

IT IS UNDERSTOOD AND AGREED THAT THIS WAIVER AND RELEASE IS FOR ALL SERVICES RENDERED, WORK DONE AND MATERIAL FURNISHED PRIOR TO THE DATE HEREOF and is for all such services rendered, work done and material furnished and not only for the particular

SUBCONTRACTOR: Faboo Metal Products, LLC
By:
State of:
County of:
Subscribed and sworn to before me this _____ 15 _____ day of _____ October _____ 20 21

Date 10/25/21

Notary Public:
My commission expires:

JERRY R. CROWDER
Commission # GG...
Expires...
Bonded Thru...

Document's SUMMARY SHEET, APPLICATION AND CERTIFICATE FOR PAYMENT, containing
Contractor's signed Certification is attached.
Use Column I in Contracts where variable retainage for line items apply.

APPLICATION NUMBER: 5
APPLICATION DATE: 10/20/2021
PERIOD: 09/26/21 - 10/25/21
ARCHITECTS/ENGINEERS PROJECT NO:

Contract Lines

| A | B | | C | D | E | F | G | H | BALANCE TO FINISH (C - G) | I |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | WORK COMPLETED | | | | | | |
| ITEM NO. | COST CODE | DESCRIPTION OF WORK | SCHEDULED VALUE | FROM PREVIOUS APPLICATION (D + E) | THIS PERIOD | MATERIALS PRESENTLY STORED (NOT IN D OR E) | TOTAL COMPLETED AND STORED TO DATE (D+E+F) | % (G / C) | | RETAINAGE |
| 1 | 05-0501 - Structural Steel | Engineering and Shop Drawings (Material) | $ 117,903.75 | $ 117,903.75 | $ 0.00 | $ 0.00 | $ 117,903.75 | 100.00% | $ 0.00 | $ 11,790.38 |
| 2 | 05-0502 - Miscellaneous Steel | Anchor Bolts (Material) | $ 9,904.32 | $ 9,904.32 | $ 0.00 | $ 0.00 | $ 9,904.32 | 100.00% | $ 0.00 | $ 990.43 |
| 3 | 05-0504 - Miscellaneous Steel | Embeds (steel,ss) (Material) | $ 70,959.24 | $ 70,959.24 | $ 0.00 | $ 0.00 | $ 70,959.24 | 100.00% | $ 0.00 | $ 7,095.92 |
| 4 | 05-0501 - Structural Steel | Structural Steel Material/Fabrication (Material) | $ 1,769,196.41 | $ 921,055.00 | $ 423,534.27 | $ 0.00 | $ 1,344,589.27 | 76.00% | $ 424,607.14 | $ 134,458.93 |
| 5 | 05-0505 - Stairs / Catwalks / Ladders / Handrails | Grating (steel, ss, fiberglass) (Material) | $ 130,340.91 | $ 130,340.91 | $ 0.00 | $ 0.00 | $ 130,340.91 | 100.00% | $ 0.00 | $ 13,034.09 |
| 6 | 05-0503 - Steel Erection | Structural Steel Erection (Labor) | $ 524,661.70 | $ 52,466.17 | $ 157,398.51 | $ 0.00 | $ 209,864.68 | 40.00% | $ 314,797.02 | $ 20,986.47 |
| 7 | 05-0504 - Miscellaneous Steel | Miscellaneous Steel Material/Fabrication (Material) | $ 591,250.98 | $ 235,500.00 | $ 0.00 | $ 0.00 | $ 235,500.00 | 39.83% | $ 355,750.98 | $ 23,550.00 |
| 8 | 05-0506 - Miscellaneous Steel | Miscellaneous Steel Erection (Labor) | $ 212,890.00 | $ 50,000.00 | $ 0.00 | $ 0.00 | $ 60,000.00 | 22.74% | $ 169,890.00 | $ 5,000.00 |
| | | TOTALS: | $ 3,434,097.31 | $ 1,588,129.39 | $ 580,932.78 | $ 0.00 | $ 2,169,062.17 | 63.16% | $ 1,265,035.14 | $ 216,906.22 |

20220358988

DOCUMENT DETAIL SHEET

CONTINUATION SHEET

Whole Change Order Packages

CONTINUATION SHEET

DOCUMENT DETAIL SHEET

20220358988

| A ITEM NO. | B DESCRIPTION OF WORK | C SCHEDULED VALUE | D WORK COMPLETED FROM PREVIOUS APPLICATION (D + E) | E WORK COMPLETED THIS PERIOD | F MATERIALS PRESENTLY STORED (NOT IN D OR E) | G TOTAL COMPLETED AND STORED TO DATE (D+E+F) | H % (G / C) | BALANCE TO FINISH (C - G) | I RETAINAGE |
|---|---|---|---|---|---|---|---|---|---|
| 9 | CCO # 23006976-SUB-05A Project Changes Through 2/15/2021 | | | | | | | | |
| 9.1 | 05-0506 Changes to steel based on building and process design development and owner review comments through revisions dated 11.24.2020. Including but not limited to: 700 LF of armor joint embeds, 210 LF of armor joint notched plates and 200 +/- lb bolts for armor joint notched plate install. | $8,776.11 | $8,776.11 | $0.00 | $0.00 | $8,776.11 | 100.00% | $0.00 | $877.61 |
| 9.2 | 05-0506 Changes to Gleectrans based on building and process design development and owner review comments from drawing set dated 11.24.2020. Including but not limited to 40 LF of additional bulk fastener storage with two pieces of channel and six pipes/bollards. | $18,246.38 | $5,500.00 | $0.00 | $0.00 | $5,500.00 | 30.14% | $12,746.38 | $550.00 |
| 9.3 | 05-0506 Changes to Misc. Steel based on building and process design development and owner review comments from drawing set dated 12.11.2020 to 01.08.2021. Including but not limited to: 260 LF of exterior galv. guardrails. Removed angle/anchors at new louver locations. | $23,891.02 | $7,167.31 | $0.00 | $0.00 | $7,167.31 | 30.00% | $16,723.71 | $716.73 |
| 9.4 | 05-0506 Changes to Misc steel based on building and process design development and owner review comments from drawing set dated 01.18.2020 including but not limited to revised concrete lid angle details. Omitted steel erection of deleted overhead door steel support frame. Material was already ordered before changes were published. | $8,311.86 | $8,311.86 | $0.00 | $0.00 | $8,311.86 | 100.00% | $0.00 | $831.19 |
| 9.5 | 05-0506 Furnish Stainless Steel Liner at Washer Sump Pit per IPS drawings ENERG-APHX-B09-WA05-WA07 dated 01/13/2021. | $40,169.82 | $10,042.46 | $0.00 | $0.00 | $10,042.46 | 25.00% | $30,127.36 | $1,004.25 |
| 9.6 | 05-0501 Copper Foundation Embeds - Added 1 Nelson Stud | $1,177.00 | $1,177.00 | $0.00 | $0.00 | $1,177.00 | 100.00% | $0.00 | $117.70 |

CONTINUATION SHEET

## DOCUMENT DETAIL SHEET

| A | B | C | D | E | F | G | H | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | WORK COMPLETED | | MATERIALS | TOTAL COMPLETED | | | |
| ITEM NO. | DESCRIPTION OF WORK | SCHEDULED VALUE | FROM PREVIOUS APPLICATION (D + E) | THIS PERIOD | PRESENTLY STORED (NOT IN D OR E) | AND STORED TO DATE (D+E+F) | % (G / C) | BALANCE TO FINISH (C - G) | RETAINAGE |
| 9.7 | to bottom of each (4) 8" thick embeds. 05-0501 Changes to Structural Steel based on building and process design development and owner review comments from drawing set dated 12.11.2020 to 01.08.2021. Including but not limited to: steel channel to support ccccc framing at linker Rebuild. Added channel cross members at platforms. | $10,320.56 | $10,320.56 | $0.00 | $0.00 | $10,320.56 | 100.00% | $0.00 | $1,032.06 |
| 10 | **CCO # 23006976-SUB-05B CE #036 - Existing Fire Riser Steel Support Frame for Concrete Pour** | | | | | | | | |
| 10.1 | 05-0506 Installed a steel support frame fastened to the block panel wall for the existing fire riser at GL 19 south elevation in order to demo the slab below that the fire riser support was bearing on. | $711.14 | $711.14 | $0.00 | $0.00 | $711.14 | 100.00% | $0.00 | $71.11 |
| | TOTALS: | $111,863.59 | $52,006.44 | $0.00 | $0.00 | $52,006.44 | 46.50% | $59,597.45 | $5,200.65 |

Grand Totals

| A | B | C | D | E | F | G | H | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | WORK COMPLETED | | MATERIALS | TOTAL COMPLETED | | | |
| ITEM NO. | DESCRIPTION OF WORK | SCHEDULED VALUE | FROM PREVIOUS APPLICATION (D + E) | THIS PERIOD | PRESENTLY STORED (NOT IN D OR E) | AND STORED TO DATE (D+E+F) | % (G / C) | BALANCE TO FINISH (C - G) | RETAINAGE |
| | GRAND TOTALS: | $3,545,701.20 | $1,640,135.83 | $580,932.78 | $0.00 | $2,221,068.61 | 62.64% | $1,324,632.59 | $222,106.87 |

DOCUMENT DETAIL SHEET-APPLICATION AND CERTIFICATE FOR PAYMENT

20220358988

List each sub-subcontractor or vendor who provided labor and/or materials to the project which makes up
any part of this requisition and the gross value of such labor and/or materials provided within this requisition period.

Sub-Subcontractor/Supplier _____ Value _____

Sub-Subcontractor/Supplier _____ Value _____

Sub-Subcontractor/Supplier _____ Value _____

Sub-Subcontractor/Supplier _____ Value _____

Sub-Subcontractor/Supplier _____ Value _____

Sub-Subcontractor/Supplier _____ Value _____

Sub-Subcontractor/Supplier _____ Value _____

APPLICATION AND CERTIFICATE FOR PAYMENT

DOCUMENT SUMMARY SHEET

TO CONTRACTOR:
Stellar
2900 Hartley Road
Jacksonville, Florida 32257

PROJECT:
Barg Energy - Phoenix Can Manufacturing
1635 South 43rd Avenue
Phoenix, Arizona 85009

DISTRIBUTION TO:

FROM SUBCONTRACTOR:
Fabco Metal Products, LLC
1490 Frances Drive
Daytona Beach, Florida 32124

SUBCONTRACT DATE: 1/8/2021

APPLICATION NO: 6
INVOICE NO:
PERIOD: 10/26/21 - 11/25/21
INVOICE NO: 23006976
PROJECT NO: 23006976
CONTRACT DATE: 01/08/2021

SUBCONTRACT FOR: Structural Steel
SUBCONTRACTOR'S APPLICATION FOR PAYMENT

Application is made for payment, as shown below, in connection with the Subcontract, Continuation Sheet is attached.

| | | |
|---|---|---|
| 1. | Original Contract Sum | $3,434,097.31 |
| 2. | Net change by change orders | $111,603.89 |
| 3. | Contract sum to date (line 1 ± 2) | $3,545,701.20 |
| 4. | Total completed and stored to date | $2,573,688.45 |
| | (Column G on detail sheet) | |
| 5. | Retainage: | |
| | a. 10.00% of completed work; | $257,368.85 |
| | b. 0.00% of stored material. | $0.00 |
| | Total retainage (Line 5a + 5b or total in column I of detail sheet) | $257,368.85 |
| 6. | Total earned less retainage | $2,316,319.60 |
| | (Line 4 less Line 5 Total) | |
| 7. | Less previous certificates for payment | $1,998,961.74 |
| | (Line 6 from prior certificate) | |
| 8. | Current payment due: | $317,357.86 |
| 9. | Balance to finish, including retainage | $1,229,381.60 |
| | (Line 3 less Line 6) | |

| CHANGE ORDER SUMMARY | ADDITIONS | DEDUCTIONS |
|---|---|---|
| Total changes approved in previous months by Owner: | $111,603.89 | $0.00 |
| Total approved this Month: | $0.00 | $0.00 |
| Totals: | $111,603.89 | $0.00 |
| Net change by change orders: | $111,603.89 | |

The undersigned hereby further declares and agrees that in the event that any lien or other claim should be brought against The Stellar Companies, Inc., the Owner, or their building or premises, the undersigned will protect the said parties and defend any suit or action brought against them by reason of any lien or other form of claim or action arising out of labor arising out of said subcontract and hold them harmless and indemnified therefrom.

In consideration of the sum of $1.00 to the undersigned in hand paid, receipt whereof is hereby acknowledged, and other benefits accruing, the undersigned does hereby waive release and quitclaim in favor of The Stellar Companies, Inc. and/or owner or owners of said premises as improved all right that the undersigned may have to a lien upon the land and improvements above described.

IT IS UNDERSTOOD AND AGREED THAT THIS WAIVER AND RELEASE IS FOR ALL SERVICES RENDERED, WORK DONE AND MATERIAL FURNISHED PRIOR TO THE DATE HEREOF and is for all such services rendered, work done and material furnished and not only for the particular.

SUBCONTRACTOR: Fabco Metal Products, LLC

By: _____  Date: 11/5/21

State of: Volusia
County of: _____

Subscribed and sworn to before me this 15 day of November 2021

Notary Public: _____
My commission expires: 7/26/2022

JERRY W. CROWDER
Commission # GG 305650
Expires July 26, 2022
Bonded Thru Budget Notary Service 800-305-7019

Document SUMMARY SHEET, APPLICATION AND CERTIFICATE FOR PAYMENT, containing
Contractor's signed Certification is attached.
Use Column I on Contracts where variable retainage for line items apply.

APPLICATION NUMBER: 6
APPLICATION DATE: 11/21/2021
PERIOD: 10/26/21 - 11/25/21
ARCHITECTS/ENGINEERS PROJECT NO:

Contract Lines

| A | B | C | D | E | F | G | H | | RETAINAGE |
|---|---|---|---|---|---|---|---|---|---|
| | | | WORK COMPLETED | | MATERIALS PRESENTLY STORED (NOT IN D OR E) | TOTAL COMPLETED AND STORED TO DATE (D+E+F) | % (G / C) | BALANCE TO FINISH (C - G) | |
| ITEM NO. | COST CODE | DESCRIPTION OF WORK | SCHEDULED VALUE | FROM PREVIOUS APPLICATION (D + E) | THIS PERIOD | | | | | |
| 1 | 05-0501 - Structural Steel | Engineering and Shop Drawings (Material) | $ 117,903.75 | $ 117,903.75 | $ 0.00 | $ 0.00 | $ 117,903.75 | 100.00% | $ 0.00 | $ 11,790.38 |
| 2 | 05-0506 - Miscellaneous Steel | Anchor Bolts (Material) | $ 9,904.32 | $ 9,904.32 | $ 0.00 | $ 0.00 | $ 9,904.32 | 100.00% | $ 0.00 | $ 990.43 |
| 3 | 05-0506 - Miscellaneous Steel | Embeds (steel,ss) (Material) | $ 70,959.24 | $ 70,959.24 | $ 0.00 | $ 0.00 | $ 70,959.24 | 100.00% | $ 0.00 | $ 7,095.92 |
| 4 | 05-0501 - Structural Steel | Structural Steel Material/Fabrication (Material) | $ 1,769,196.41 | $ 1,344,589.27 | $ 247,687.50 | $ 0.00 | $ 1,592,276.77 | 90.00% | $ 176,919.64 | $ 159,227.68 |
| 5 | 05-0505 - Stairs / Catwalks / Ladders / Handrails | Grating (steel, ss, fiberglass) (Material) | $ 130,340.91 | $ 130,340.91 | $ 0.00 | $ 0.00 | $ 130,340.91 | 100.00% | $ 0.00 | $ 13,034.09 |
| 6 | 05-0503 - Steel Erection | Structural Steel Erection (Labor) | $ 524,661.70 | $ 209,864.68 | $ 104,932.34 | $ 0.00 | $ 314,797.02 | 60.00% | $ 209,864.68 | $ 31,479.70 |
| 7 | 05-0506 - Miscellaneous Steel | Miscellaneous Steel Material/Fabrication (Material) | $ 591,250.98 | $ 235,500.00 | $ 0.00 | $ 0.00 | $ 235,500.00 | 39.83% | $ 355,750.98 | $ 23,550.00 |
| 8 | 05-0506 - Miscellaneous Steel | Miscellaneous Steel Erection (Labor) | $ 219,880.00 | $ 50,000.00 | $ 0.00 | $ 0.00 | $ 50,000.00 | 22.74% | $ 169,880.00 | $ 5,000.00 |
| | | TOTALS: | $ 3,434,097.31 | $ 2,169,062.17 | $ 352,619.84 | $ 0.00 | $ 2,521,682.01 | 73.43% | $ 912,415.30 | $ 252,168.20 |

*DOCUMENT DETAIL SHEET*

**CONTINUATION SHEET**
Whole Change Order Packages

CONTINUATION SHEET

DOCUMENT DETAIL SHEET

| A ITEM NO. | B DESCRIPTION OF WORK | C SCHEDULED VALUE | D WORK COMPLETED FROM PREVIOUS APPLICATION (D + E) | E WORK COMPLETED THIS PERIOD | F MATERIALS PRESENTLY STORED (NOT IN D OR E) | G TOTAL COMPLETED AND STORED TO DATE (D+E+F) | H % (G / C) | BALANCE TO FINISH (C - G) | RETAINAGE |
|---|---|---|---|---|---|---|---|---|---|
| 9. | CCO # 23006976-SUB-05A Project Changes Through 2/15/2021 | | | | | | | | |
| 9.1 | 05-0506 Changes to steel based on building and process design development and owner review comments through revisions dated 11.24.2020. Including but not limited to: 700 LF for armor joint embeds, 210 LF of armor joint notched plates and 200 Hilti bolts for armor joint notched plate install. | $ 8,776.11 | $ 8,776.11 | $ 0.00 | $ 0.00 | $ 8,776.11 | 100.00% | $ 0.00 | $ 877.61 |
| 9.2 | 05-0505 Changes to Guardrails based on building and process design development and owner review comments from drawing set dated 12.02.2020 to 12.10.2020. Including but not limited to 40 LF of guardrail at bulk lacquer storage with two pieces of channel and six pipes/bollards. | $ 18,246.38 | $ 5,500.00 | $ 0.00 | $ 0.00 | $ 5,500.00 | 30.14% | $ 12,746.38 | $ 550.00 |
| 9.3 | 05-0506 Changes to Misc. Steel based on building and process design development and owner review comments from drawing set dated 12.11.2020 to 01.08.2021. Including but not limited to: 260 LF of exterior galv. guardrails. Removed angle/anchors at new louver locations. | $ 23,891.02 | $ 7,167.31 | $ 0.00 | $ 0.00 | $ 7,167.31 | 30.00% | $ 16,723.71 | $ 716.73 |
| 9.4 | 05-0506 Changes to Misc steel based on building and process design development and owner review comments from drawing set dated 01.18.2021. Including but not limited to: revised concrete lid angle details. Omitted steel erection of deleted overhead door steel support frame. Material was already ordered before changes were published. | $ 8,311.86 | $ 8,311.86 | $ 0.00 | $ 0.00 | $ 8,311.86 | 100.00% | $ 0.00 | $ 831.19 |
| 9.5 | 05-0506 Furnish Stainless Steel at Water Sump Pit per IPS drawings EN-FXGY-FHX-B08-WA05-WA07 dated 01/13/2021. | $ 40,169.82 | $ 10,042.46 | $ 0.00 | $ 0.00 | $ 10,042.46 | 25.00% | $ 30,127.36 | $ 1,004.25 |
| 9.6 | 05-0501 Cupper Foundation Embeds - Added 1 Nelson Stud | $ 1,177.00 | $ 1,177.00 | $ 0.00 | $ 0.00 | $ 1,177.00 | 100.00% | $ 0.00 | $ 117.70 |

20220358988

| A | B | C | D | E | F | G | H | I | |
|---|---|---|---|---|---|---|---|---|---|
| ITEM NO. | DESCRIPTION OF WORK | SCHEDULED VALUE | WORK COMPLETED | | MATERIALS PRESENTLY STORED (NOT IN D OR E) | TOTAL COMPLETED AND STORED TO DATE (D+E+F) | % (G/C) | BALANCE TO FINISH (C - G) | RETAINAGE |
| | | | FROM PREVIOUS APPLICATION (D + E) | THIS PERIOD | | | | | |
| | to bottom of each (4) 8" thick embeds. | | | | | | | | |
| 9.7 | 05-0501 Changes to Structural Steel based on building and process design development and owner review comments from drawing set dated 12.11.2020 to 01.08.2021. Including but not limited to: steel channel to support door framing at Inker Rebuild. Added channel cross members at platforms. | $ 10,320.56 | $ 10,320.56 | $ 0.00 | $ 0.00 | $ 10,320.56 | 100.00% | $ 0.00 | $ 1,032.06 |
| 10 | CCO # 2306076-SUB-05B CE #036 - Existing Fire Riser Steel Support Frame for Concrete Pour | | | | | | | | |
| 10.1 | 05-0506 installed a steel support frame fastened to the lift up panel wall for the existing fire riser at GL 19 south elevation in order to demo the slab below that the fire riser support was bearing on. | $ 711.14 | $ 711.14 | $ 0.00 | $ 0.00 | $ 711.14 | 100.00% | $ 0.00 | $ 71.11 |
| | TOTALS: | $ 111,603.89 | $ 52,006.44 | $ 0.00 | $ 0.00 | $ 52,006.44 | 46.60% | $ 59,597.45 | $ 5,200.65 |

Grand Totals

| A | B | C | D | E | F | G | H | I | |
|---|---|---|---|---|---|---|---|---|---|
| ITEM NO. | DESCRIPTION OF WORK | SCHEDULED VALUE | WORK COMPLETED | | MATERIALS PRESENTLY STORED (NOT IN D OR E) | TOTAL COMPLETED AND STORED TO DATE (D+E+F) | % (G/C) | BALANCE TO FINISH (C - G) | RETAINAGE |
| | | | FROM PREVIOUS APPLICATION (D + E) | THIS PERIOD | | | | | |
| | GRAND TOTALS: | $ 3,545,701.20 | $ 2,221,068.61 | $ 352,619.84 | $ 0.00 | $ 2,573,688.45 | 72.59% | $ 972,012.75 | $ 257,368.85 |

DOCUMENT DETAIL SHEET- APPLICATION AND CERTIFICATE FOR PAYMENT

List each sub-subcontractor or vendor who provided labor and/or materials to the project which makes up any part of this requisition and the gross value of such labor and/or materials provided within this requisition period.

Sub-Subcontractor/Supplier ______________________ Value ______________

Sub-Subcontractor/Supplier ______________________ Value ______________

Sub-Subcontractor/Supplier ______________________ Value ______________

Sub-Subcontractor/Supplier ______________________ Value ______________

Sub-Subcontractor/Supplier ______________________ Value ______________

Sub-Subcontractor/Supplier ______________________ Value ______________

Sub-Subcontractor/Supplier ______________________ Value ______________

APPLICATION AND CERTIFICATE FOR PAYMENT

DOCUMENT SUMMARY SHEET

TO CONTRACTOR:
Stellar
2900 Hartley Road
Jacksonville, Florida 32257

PROJECT:
Bang Energy - Phoenix Can Manufacturing
1635 South 43rd Avenue
Phoenix, Arizona 85009

APPLICATION NO: 7
INVOICE NO:
PERIOD: 11/26/21 - 12/25/21
PROJECT NO: 230063976
CONTRACT DATE: 01/08/2021

DISTRIBUTION TO:

FROM SUBCONTRACTOR:
Fabco Metal Products, LLC
1490 Frances Drive
Daytona Beach, Florida 32124

SUBCONTRACT DATE: 1/8/2021

SUBCONTRACT FOR: Structural Steel
SUBCONTRACTOR'S APPLICATION FOR PAYMENT

Application is made for payment, as shown below, in connection with the Subcontract, Continuation Sheet is attached

| | | |
|---|---|---|
| 1. | Original Contract Sum | $ 3,434,097.31 |
| 2. | Net change by change orders | $ 111,603.89 |
| 3. | Contract sum to date (line 1 ± 2) | $ 3,545,701.20 |
| 4. | Total completed and stored to date | $ 2,948,557.34 |
| | (Column G on detail sheet) | |
| 5. | Retainage: | |
| | a. 10.00% of completed work, | $ 294,855.80 |
| | b. 0.00% of stored material | $ 0.00 |
| | Total retainage (Line 5a + 5b or total in column I of detail sheet) | $ 294,855.80 |
| 6. | Total earned less retainage | $ 2,653,702.14 |
| | (Line 4 less Line 5 Total) | |
| 7. | Less previous certificates for payment | $ 2,316,319.60 |
| | (Line 6 from prior certificate) | |
| 8. | Current payment due | $ 337,382.54 |
| 9. | Balance to finish, including retainage (Line 3 less Line 6) | $ 891,999.06 |

| CHANGE ORDER SUMMARY | ADDITIONS | DEDUCTIONS |
|---|---|---|
| Total changes approved in previous months by Owner | $ 111,603.89 | $ 0.00 |
| Total approved this Month | $ 0.00 | $ 0.00 |
| Totals: | $ 111,603.89 | $ 0.00 |
| Net change by change orders. | $ 111,603.89 | |

The undersigned hereby further declares and agrees that in the event that any lien or other claim should be brought against The Stellar Companies, Inc., the Owner, or their building or premises, the undersigned will protect the said parties and defend any suit or action brought against them by reason of any lien or other form of claim or action arising out of said subcontract and hold them harmless and indemnified therefrom.

In consideration of the sum of $1.00 to the undersigned in hand paid, receipt whereof is hereby acknowledged, and other benefits accruing, the undersigned does hereby waive release and quitclaim in favor of The Stellar Companies, Inc. and/or owner or owners of said premises as improved all right that the undersigned may have to a lien upon the land and improvements above described.

IT IS UNDERSTOOD AND AGREED THAT THIS WAIVER AND RELEASE IS FOR ALL SERVICES RENDERED, WORK DONE AND MATERIAL FURNISHED PRIOR TO THE DATE HEREOF and is for a such services rendered, work done and material furnished and not only for the particular

SUBCONTRACTOR: Fabco Metal Products, LLC

By _____

Date: 12/14/21

State of: FL
County of: Volusia
Subscribed and sworn to before me this 14 day of December 2021.

Notary Public: _____
My commission expires: 7/28/2022

JERRY W. CROWDER
Commission # GG 205650
Expires July 28, 2022
Bonded Thru Troy Fain Insurance 800-385-7019

DOCUMENT DETAIL SHEET

Document SUMMARY SHEET, APPLICATION AND CERTIFICATE FOR PAYMENT, containing
Contractor's signed Certification is attached.
Use Column 1 on Contracts where variable retainage for line items apply.

APPLICATION NUMBER: 7
APPLICATION DATE: 12/21/2021
PERIOD: 11/26/21 - 12/25/21
ARCHITECTS/ENGINEERS PROJECT NO:

Contract Lines

| A ITEM NO. | B DESCRIPTION OF WORK | COST CODE | C SCHEDULED VALUE | D WORK COMPLETED FROM PREVIOUS APPLICATION (D + E) | E WORK COMPLETED THIS PERIOD | F MATERIALS PRESENTLY STORED (NOT IN D OR E) | G TOTAL COMPLETED AND STORED TO DATE (D+E+F) | H % (G/C) | BALANCE TO FINISH (C - G) | I RETAINAGE |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Engineering and Shop Drawings (Material) | 05-0501 - Structural Steel | $117,903.75 | $117,903.75 | $0.00 | $0.00 | $117,903.75 | 100.00% | $0.00 | $11,790.38 |
| 2 | Anchor Bolts (Material) | 05-0506 - Miscellaneous Steel | $9,904.32 | $9,904.32 | $0.00 | $0.00 | $9,904.32 | 100.00% | $0.00 | $990.43 |
| 3 | Embeds (steel,ss) (Material) | 05-0506 - Miscellaneous Steel | $70,959.24 | $70,959.24 | $0.00 | $0.00 | $70,959.24 | 100.00% | $0.00 | $7,095.92 |
| 4 | Structural Steel Material/Fabrication (Material) | 05-0501 - Structural Steel | $1,769,196.41 | $1,592,276.77 | $176,919.64 | $0.00 | $1,769,196.41 | 100.00% | $0.00 | $176,919.64 |
| 5 | Grating (steel, ss, fiberglass) (Material) | 05-0506 - Stairs, Catwalks, Ladders, Handrails | $130,340.91 | $130,340.91 | $0.00 | $0.00 | $130,340.91 | 100.00% | $0.00 | $13,034.09 |
| 6 | Structural Steel Erection (Labor) | 05-0501 - Steel Erection | $524,661.70 | $314,797.02 | $78,699.26 | $0.00 | $393,496.28 | 75.00% | $131,165.42 | $39,349.63 |
| 7 | Miscellaneous Steel Material/Fabrication (Material) | 05-0506 - Miscellaneous Steel | $591,250.59 | $235,500.00 | $119,250.59 | $0.00 | $354,750.59 | 60.00% | $236,500.59 | $35,475.06 |
| 8 | Miscellaneous Steel Erection (Labor) | 05-0506 - Miscellaneous Steel | $219,880.00 | $50,000.00 | $0.00 | $0.00 | $50,000.00 | 22.74% | $169,880.00 | $5,000.00 |
| | **TOTALS:** | | $3,434,097.31 | $2,521,682.01 | $374,869.49 | $0.00 | $2,896,551.50 | 84.35% | $537,545.81 | $289,655.15 |

DOCUMENT DETAIL SHEET

**CONTINUATION SHEET**

Whole Change Order Packages

CONTINUATION SHEET

DOCUMENT DETAIL SHEET

| A | B | C | WORK COMPLETED | | F | G | H | | |
|---|---|---|---|---|---|---|---|---|---|
| ITEM NO. | DESCRIPTION OF WORK | SCHEDULED VALUE | FROM PREVIOUS APPLICATION (D - E) | THIS PERIOD | MATERIALS PRESENTLY STORED (NOT IN D OR E) | TOTAL COMPLETED AND STORED TO DATE (D+E+F) | % (G / C) | BALANCE TO FINISH (C - G) | RETAINAGE |
| 9 | CCO # 23006976-SUB-05A Project Changes Through 2/15/2021 | | | | | | | | |
| 9.1 | 05-0506 Changes to steel based on building and process design development and owner review comments through revisions dated 11,24,2020. Including but not limited to: 700 LF for armor joint embeds, 210 LF of armor joint notched plates and 200 Hilti bolts for armor joint notched plate install. | $8,776.11 | $8,776.11 | $0.00 | $0.00 | $8,776.11 | 100.00% | $0.00 | $877.61 |
| 9.2 | 05-0505 Changes to Guardrails based on building and process design development and owner review comments from drawing set dated 12.02.2020 to 12.10.2020. Including but not limited to 40 LF of guardrail at bulk lacquer storage with two pieces of channel and six pipes/bollards. | $18,246.38 | $5,500.00 | $0.00 | $0.00 | $5,500.00 | 30.14% | $12,746.38 | $550.00 |
| 9.3 | 05-0506 Changes to Misc. Steel based on building and process design development and owner review comments from drawing set dated 12.11.2020 to 01.06.2021. Including but not limited to 260 LF of exterior galv. guardrails. Removed angle/anchors at new louver locations. | $23,891.02 | $7,167.31 | $0.00 | $0.00 | $7,167.31 | 30.00% | $16,723.71 | $716.73 |
| 9.4 | 05-0506 Changes to Misc steel based on building and process design development and owner review comments from drawing set dated 01.18.2020, including but not limited to: revised concrete bi angle details, concrete steel emboss of coated overhead door, revised support frame. Material was already ordered before changes were published. | $8,311.86 | $8,311.86 | $0.00 | $0.00 | $8,311.86 | 100.00% | $0.00 | $831.19 |
| 9.5 | 05-0506 Furnish Stainless Steel Liner at Vented Sump. Per IPS drawing ENERGY-PHX-B08-WA05-WA07 dated 01/13/2021. | $40,169.82 | $10,042.45 | $0.00 | $0.00 | $10,042.46 | 25.00% | $30,127.36 | $1,004.25 |
| 9.6 | 05-0501 Cupper Foundation Embeds - Added 1 Nelson Stud | $1,177.00 | $1,177.00 | $0.00 | $0.00 | $1,177.00 | 100.00% | $0.00 | $117.70 |

CONTINUATION SHEET

DOCUMENT DETAIL SHEET

| A | B | C | D | E | F | G | I | | |
|---|---|---|---|---|---|---|---|---|---|
| ITEM NO. | DESCRIPTION OF WORK | SCHEDULED VALUE | WORK COMPLETED | | MATERIALS PRESENTLY STORED (NOT IN D OR E) | TOTAL COMPLETED AND STORED TO DATE (D+E+F) | % (G/C) | BALANCE TO FINISH (C-G) | RETAINAGE |
| | | | FROM PREVIOUS APPLICATION (D+E) | THIS PERIOD | | | | | |
| 9.7 | to bottom of each (4) 8" thick embeds. | | | | | | | | |
| | 05-0501 Changes to Structural Steel based on building and process design development and owner review comments from drawing set dated 12.11.2020 to 01.08.2021. Including but not limited to: steel channel to support door framing at linker Rebuild Added channel cross members at platforms. | $ 10,326.56 | $ 10,326.56 | $ 0.00 | $ 0.00 | $ 10,326.56 | 100.00% | $ 0.00 | $ 1,032.06 |
| 10 | CCO # 23006976-SUB-056 CE #036 - Existing Fire Riser Steel Support Frame for Concrete Pour | | | | | | | | |
| 10.1 | 05-0506 Installed a steel support frame fastened to the tilt up panel wall on the existing fire riser at GL 19 south elevation in order to demo the slab below that the fire riser support was bearing on. | $ 711.14 | $ 711.14 | $ 0.00 | $ 0.00 | $ 711.14 | 100.00% | $ 0.00 | $ 71.11 |
| | **TOTALS:** | $ 111,503.89 | $ 52,006.44 | $ 0.00 | $ 0.00 | $ 52,006.44 | 46.60% | $ 59,597.45 | $ 5,200.65 |

Grand Totals

| A | B | C | D | E | F | G | H | | |
|---|---|---|---|---|---|---|---|---|---|
| ITEM NO. | DESCRIPTION OF WORK | SCHEDULED VALUE | WORK COMPLETED | | MATERIALS PRESENTLY STORED (NOT IN D OR E) | TOTAL COMPLETED AND STORED TO DATE (D+E+F) | % (G/C) | BALANCE TO FINISH (C-G) | RETAINAGE |
| | | | FROM PREVIOUS APPLICATION (D+E) | THIS PERIOD | | | | | |
| | **GRAND TOTALS:** | $ 3,545,701.20 | $ 2,573,688.45 | $ 374,869.49 | $ 0.00 | $ 2,948,557.94 | 83.16% | $ 597,143.26 | $ 294,855.80 |

DOCUMENT DETAIL SHEET- APPLICATION AND CERTIFICATE FOR PAYMENT

List each sub-subcontractor or vendor who provided labor and/or materials to the project which makes up any part of this requisition and the gross value of such labor and/or materials provided within this requisition period.

Sub-Subcontractor/Supplier _____ Value _____

Sub-Subcontractor/Supplier _____ Value _____

Sub-Subcontractor/Supplier _____ Value _____

Sub-Subcontractor/Supplier _____ Value _____

Sub-Subcontractor/Supplier _____ Value _____

Sub-Subcontractor/Supplier _____ Value _____

Sub-Subcontractor/Supplier _____ Value _____

**APPLICATION AND CERTIFICATE FOR PAYMENT**

**DOCUMENT SUMMARY SHEET**

TO CONTRACTOR:
Stellar
2900 Hartley Road
Jacksonville, Florida 32257

PROJECT:
Brang Energy - Phoenix Can Manufacturing
1025 South 43rd Avenue
Phoenix, Arizona 85009

APPLICATION NO: 8
INVOICE NO:
PERIOD: 12/26/21 - 01/25/22
PROJECT NO: 23006976
CONTRACT DATE: 01/08/2021

DISTRIBUTION TO:

FROM SUBCONTRACTOR:
Fabco Metal Products, LLC
1490 Frances Drive
Daytona Beach, Florida 32124

SUBCONTRACT DATE: 1/8/2021

SUBCONTRACT FOR: Structural Steel
**SUBCONTRACTOR'S APPLICATION FOR PAYMENT**

Application is made for payment, as shown below, in connection with the Subcontract. Continuation Sheet is attached.

| | | |
|---|---|---|
| 1. Original Contract Sum | | $ 3,434,097.31 |
| 2. Net change by change orders | | $ 111,603.89 |
| 3. Contract Sum to date (Line 1 + 2) | | $ 3,545,701.20 |
| 4. Total completed and stored to date | | $ 3,127,629.29 |
| (Column G on Detail Sheet) | | |
| 5. Retainage: | | |
| a. 10 % of completed work | $ 312,762.94 | |
| (Columns D + E on Detail Sheet) | | |
| b. 0 % of stored material | $ 0.00 | |
| (Column F on Detail Sheet) | | |
| Total Retainage (Line 5a + 5b or Total in Column I of Detail) | | $ 312,762.94 |
| 6. Total earned less retainage | | $ 2,814,866.35 |
| (Line 4 less Line 5 Total) | | |
| 7. Less previous certificates for payment | | $ 2,653,702.14 |
| (Line 6 from prior Certificate) | | |
| 8. Current payment due | | $ 161,164.21 |
| 9. Balance to finish, including retainage | | $ 730,834.85 |
| (Line 3 less Line 6) | | |

| CHANGE ORDER SUMMARY | ADDITIONS | DEDUCTIONS |
|---|---|---|
| Total changes approved in previous months by Owner | $ 111,603.89 | $ 0.00 |
| Total approved this Month | $ 0.00 | $ 0.00 |
| Totals: | $ 111,603.89 | $ 0.00 |
| Net change by change orders: | $ 111,603.89 | |

The undersigned hereby further declares and agrees that in no event that any lien or other claim should be brought against The Stellar Companies, Inc., the Owner or their holding or premises, the undersigned will protect the said parties and defend any such action brought against them by reason of any lien or other form of claim or action arising out of said subcontractor, and hold them harmless and indemnified therefrom.

In consideration of the sum of $1.00 to the undersigned in hand paid, receipt whereof is hereby acknowledged, and other benefits accruing, the undersigned does hereby waive release and quitclaim, in favor of The Stellar Companies, Inc. and/or Owner any and all claims or liens it may have or claim, which the undersigned may have or claim, in or upon the land and improvements above described.

IT IS UNDERSTOOD AND AGREED THAT THIS WAIVER AND RELEASE IS FOR ALL SERVICES RENDERED, WORK DONE AND MATERIAL FURNISHED PRIOR TO THE DATE HEREOF, and gives up such lien cost rendered, work done and material furnished and all prior pending particulars.

SUBCONTRACTOR: Fabco Metal Products, LLC

By: _____

Subscribed and sworn to before me this 17 day of January 2022

Notary Public: _____
My commission Address: 7-28-2022

JERRY W. CROWDER
Commission # GG 265650
Expires July 28, 2022
Bonded Thru Troy Fain Insurance 800-385-7019

DOCUMENT DETAIL SHEET

Document SUMMARY SHEET, APPLICATION AND CERTIFICATE FOR PAYMENT, containing
Contractor's signed Certification is attached.
Use Column I on Contracts where variable retainage for line items apply.

APPLICATION NUMBER: 8
APPLICATION DATE: 01/21/2022
PERIOD: 12/26/21 - 01/25/22
ARCHITECTS/ENGINEERS PROJECT NO.

Contract Lines

| A | B | C | D | E | F | G | H | I |
|---|---|---|---|---|---|---|---|---|
| | | | WORK COMPLETED | | MATERIALS PRESENTLY STORED (NOT IN D OR E) | TOTAL COMPLETED AND STORED TO DATE (D+E+F) | | |
| ITEM NO. | COST CODE | DESCRIPTION OF WORK | SCHEDULED VALUE | FROM PREVIOUS APPLICATION (D + E) | THIS PERIOD | | | % (G / C) | BALANCE TO FINISH (C - G) | RETAINAGE |
| | 05-0501 - Structural Steel | Engineering and Shop Drawings (Material) | $ 117,903.75 | $ 117,903.75 | $ 0.00 | $ 0.00 | $ 117,903.75 | 100.00% | | $ 11,790.38 |
| 2 | 05-0502 - Structural Steel | Anchor Bolts (Material) | $ 9,904.32 | $ 9,904.32 | $ 0.00 | $ 0.00 | $ 9,904.32 | 100.00% | | $ 990.43 |
| 3 | 05-0502 - Structural Steel | Embeds (stainless) (Material) | $ 70,959.24 | $ 70,959.24 | $ 0.00 | $ 0.00 | $ 70,959.24 | 100.00% | | $ 7,095.92 |
| | 05-0501 - Structural Steel | Structural Steel Material/Fabrication (Material) | $ 1,769,196.41 | $ 1,769,196.41 | $ 0.00 | $ 0.00 | $ 1,769,196.41 | 100.00% | | $ 176,919.64 |
| | 05-0505 - Stairs / Catwalks / Ladders / Handrails | Grating (steel, ss, fiberglass) (Material) | $ 130,340.91 | $ 130,340.91 | $ 0.00 | $ 0.00 | $ 130,340.91 | 100.00% | | $ 13,034.09 |
| | 05-0503 - Steel Erection | Structural Steel Erection (Labor) | $ 524,661.70 | $ 393,496.28 | $ 0.00 | $ 0.00 | $ 393,496.28 | 75.00% | $ 131,165.42 | $ 39,349.63 |
| | 05-0506 - Miscellaneous Steel | Miscellaneous Steel Material/Fabrication (Material) | $ 591,250.98 | $ 354,750.59 | $ 141,900.23 | $ 0.00 | $ 496,650.82 | 84.00% | $ 94,600.16 | $ 49,665.08 |
| | 05-0506 - Miscellaneous Steel | Miscellaneous Steel Erection (Labor) | $ 219,880.00 | $ 50,000.00 | $ 26,958.00 | $ 0.00 | $ 76,958.00 | 35.00% | $ 142,922.00 | $ 7,695.80 |
| | | TOTALS: | $ 3,434,097.31 | $ 2,896,551.50 | $ 168,858.23 | $ 0.00 | $ 3,065,409.73 | 89.26% | $ 368,687.58 | $ 306,540.97 |

**CONTINUATION SHEET**

Whole Change Order Packages

*DOCUMENT DETAIL SHEET*

**CONTINUATION SHEET**

**DOCUMENT DETAIL SHEET**

| ITEM NO. (A) | DESCRIPTION OF WORK (B) | SCHEDULED VALUE (C) | WORK COMPLETED — FROM PREVIOUS APPLICATION (D + E) | THIS PERIOD (E) | MATERIALS PRESENTLY STORED (NOT IN D OR E) (F) | TOTAL COMPLETED AND STORED TO DATE (D+E+F) (G) | % (G / C) (H) | BALANCE TO FINISH (C - G) | RETAINAGE |
|---|---|---|---|---|---|---|---|---|---|
| | | $ 8,776.11 | | $ 0.00 | $ 0.00 | $ 8,776.11 | 100.00% | | |
| | | | | | | $ 7,298.55 | | | |
| | | | $ 7,167.31 | | $ 0.00 | $ 9,556.41 | | | |
| | | $ 8,311.86 | $ 8,311.86 | $ 0.00 | $ 0.00 | $ 8,311.86 | | $ 0.00 | |
| 9.5 | | $ 40,169.82 | $ 10,042.46 | $ 6,025.47 | $ 0.00 | $ 16,067.93 | | $ 24,101.89 | |
| 9.6 | | | | | | | | | |

CONTINUATION SHEET

*DOCUMENT DETAIL SHEET*

Page 5 of 6

| ITEM NO. | B DESCRIPTION OF WORK | C SCHEDULED VALUE | D WORK COMPLETED FROM PREVIOUS APPLICATION (D + E) | E WORK COMPLETED THIS PERIOD | F MATERIALS PRESENTLY STORED (NOT IN D OR E) | G TOTAL COMPLETED AND STORED TO DATE (D+E+F) | H % (G / C) | BALANCE TO FINISH (C - G) | RETAINAGE |
|---|---|---|---|---|---|---|---|---|---|
| | to bottom of each (4) 8" thick embeds. | | | | | | | | |
| | 05-0501 Changes to Structural Steel based on building and process design development and owner review comments from drawing set dated 12.11.2020 to 01.08.2021 including but not limited to: steel channel to support door framing at Inker Rebuild. Added channel cross members at platforms. | $ 10,320.56 | $ 10,320.56 | $ 0.00 | $ 0.00 | $ 10,320.56 | 100.00% | $ 0.00 | |
| 10 | CCO # 2300697&-SUB-05B  CE #036 - Existing Fire Riser Steel Support Frame for Concrete Pour | | | | | | | | |
| | 05-0506 Installed a steel support frame fastened to the lower panel wall or the existing lower at GL1 through elevation in order to demo the slab below that the fire riser support was bearing on. | $ 711.14 | $ 711.14 | $ 0.00 | $ 0.00 | $ 711.14 | 100.00% | $ 0.00 | |
| | **TOTALS:** | $ 111,603.89 | $ 52,006.44 | $ 10,213.12 | $ 0.00 | $ 62,219.56 | 55.75% | $ 49,384.33 | |

Grand Totals

| ITEM NO. | B DESCRIPTION OF WORK | C SCHEDULED VALUE | D WORK COMPLETED FROM PREVIOUS APPLICATION (D = E) | E WORK COMPLETED THIS PERIOD | F MATERIALS PRESENTLY STORED (NOT IN D OR E) | G TOTAL COMPLETED AND STORED TO DATE (D+E+F) | H (G / C) | BALANCE TO FINISH (C - G) | RETAINAGE |
|---|---|---|---|---|---|---|---|---|---|
| | **GRAND TOTALS:** | $ 3,545,701.20 | $ 2,948,557.94 | $ 179,071.35 | $ 0.00 | $ 3,127,629.29 | 88.21% | $ 418,071.91 | $ 319,762.90 |

DOCUMENT DETAIL SHEET: APPLICATION AND CERTIFICATE FOR PAYMENT

List each sub-subcontractor or vendor who provided labor and/or materials to the project which makes up any part of this requisition and the gross value of such labor and/or materials provided within this requisition period.

Sub-Subcontractor/Supplier _____  Value _____

Sub-Subcontractor/Supplier _____  Value _____

Sub-Subcontractor/Supplier _____  Value _____

Sub-Subcontractor/Supplier _____  Value _____

Sub-Subcontractor/Supplier _____  Value _____

Sub-Subcontractor/Supplier _____  Value _____

Sub-Subcontractor/Supplier _____  Value _____

20220358988

APPLICATION AND CERTIFICATE FOR PAYMENT

DOCUMENT SUMMARY SHEET

TO CONTRACTOR:
Stellar
2900 Hartley Road
Jacksonville, Florida 32257

PROJECT:
Bang Energy - Phoenix Can Manufacturing
1635 South 43rd Avenue
Phoenix, Arizona 85009

APPLICATION NO. 9
INVOICE NO.
PERIOD: 03/01/22 - 03/31/22
PROJECT NO. 23006976
CONTRACT DATE: 01/08/2021

DISTRIBUTION TO:

FROM SUBCONTRACTOR:
Fabco Metal Products, LLC
1490 Frances Drive
Daytona Beach, Florida 32124

SUBCONTRACT DATE: 1/8/2021

SUBCONTRACT FOR: Structural Steel
SUBCONTRACTOR'S APPLICATION FOR PAYMENT

Application is made for payment, as shown below, in connection with the Subcontract. Continuation Sheet is attached.

| | | ADDITIONS | DEDUCTIONS |
|---|---|---|---|

|   | | |
|---|---|---|
| 1. | Original Contract Sum | $ 3,434,097.31 |
| | Net change by change orders | $ 630,129.89 |
| 2. | Contract sum to date (line 1 + 2) | $ 4,064,227.20 |
| 3. | Total completed and stored to date | $ 3,672,342.59 |
| | (Column G on detail sheet) | |
| | Retainage: | |
| | a. 10.00% of completed work: | |
| | b. 0.00% of stored material: | |
| | Total retainage (Line 5a + 5b or total in column I of detail sheet) | $ 367,234.27 |
| 6. | Total earned less retainage | $ 367,234.27 |
| | (Line 4 less Line 5 Total) | $ 3,305,108.32 |
| 7. | Less previous certificates for payment | $ 2,814,866.35 |
| | (Line 6 from prior certificate) | |
| 8. | Current payment due: | |
| 9. | Balance to finish, including retainage | $ 490,241.97 |
| | (Line 3 less Line 6) | $ 759,118.88 |

The undersigned hereby further declares and agrees that in the event that any lien or other claim should be brought against The Stellar Companies, Inc., the Owner, or their building or premises, the undersigned will protect the said parties and defend any such action brought against them by reason of any lien or other form of claim or action arising out of said subcontract and hold them harmless and indemnified therefrom.

In consideration of the sum of $1.00 to the undersigned in hand paid, receipt whereof is hereby acknowledged, and other benefits accruing, the undersigned does hereby waive release and quitclaim in favor of The Stellar Companies, Inc. and/or owner or owners of said premises as improved all rights that the undersigned may have to a lien upon the land and improvements above described.

IT IS UNDERSTOOD AND AGREED THAT THIS WAIVER AND RELEASE IS FOR ALL SERVICES RENDERED, WORK DONE AND MATERIAL FURNISHED PRIOR TO THE DATE HEREOF and is for all such services rendered, work done and material furnished and not only for the particular

SUBCONTRACTOR, Fabco Metal Products, LLC

By: _____  Date: 3/21/2022

County of: Volusia
State of: FL
Subscribed and sworn to before
me this    21    day of   March   2022

_____
Notary Public:
My commission expires: 7/25/2022

| CHANGE ORDER SUMMARY | ADDITIONS | DEDUCTIONS |
|---|---|---|
| Total changes approved in previous months by Owner | $ 11,603.89 | $ 0.00 |
| Total approved this Month | $ 518,526.00 | $ 0.00 |
| Totals: | $ 630,129.89 | $ 0.00 |
| Net change by change orders: | $ 630,129.89 | |

Case 22-11783-FDR   Doc 1600-51   Filed 07/20/23   Page 252 of 401
20220358988

CONTINUATION SHEET

Document SUMMARY SHEET, APPLICATION AND CERTIFICATE FOR PAYMENT, containing
Contractor's signed Certification is attached.
Use Column I on Contracts where variable retainage for line items apply.

Contract Lines

*DOCUMENT DETAIL SHEET*

Page 2 of 8

APPLICATION NUMBER: 9
APPLICATION DATE: 03/23/2022
PERIOD: 03/01/22 - 03/31/22
ARCHITECTS/ENGINEERS PROJECT NO:

| A | B | | C | D | E | F | G | H | | I |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | WORK COMPLETED | | MATERIALS PRESENTLY STORED (NOT IN D OR E) | TOTAL COMPLETED AND STORED TO DATE (D+E+F) | % (G/C) | BALANCE TO FINISH (C - G) | RETAINAGE |
| ITEM NO. | COST CODE | DESCRIPTION OF WORK | SCHEDULED VALUE | FROM PREVIOUS APPLICATION (D + E) | THIS PERIOD | | | | | |
| 1 | 05-0500 - Structural Steel | Engineering and Shop Drawings (Material) | $117,903.75 | $117,903.75 | $0.00 | $0.00 | $117,903.75 | 100.00% | | $11,790.38 |
| 2 | 05-0505 - Miscellaneous Steel | Anchor Bolts (Material) | $9,904.32 | $9,904.32 | $0.00 | $0.00 | $9,904.32 | 100.00% | $0.00 | $990.43 |
| 3 | 05-0505 - Miscellaneous Steel | Embeds (stainless) (Material) | $70,959.24 | $70,959.24 | $0.00 | $0.00 | $70,959.24 | 100.00% | $0.00 | $7,095.92 |
| 4 | 05-0501 - Structural Steel | Structural Steel Material/Fabrication (Material) | $1,769,196.41 | $1,769,196.41 | $0.00 | $0.00 | $1,769,196.41 | 100.00% | $0.00 | $176,919.64 |
| 5 | 05-0505 - Stairs / Catwalks / Ladders / Handrails | Grating (steel, ss, fiberglass) (Material) | $130,340.91 | $130,340.91 | $0.00 | $0.00 | $130,340.91 | 100.00% | $0.00 | $13,034.09 |
| 6 | 05-0501 - Steel | Structural Steel Erection (Labor) | $524,661.70 | $393,493.28 | $0.00 | $0.00 | $393,496.28 | 75.00% | $131,165.42 | $39,349.63 |
| 7 | 05-0505 - Miscellaneous Steel | Miscellaneous Steel Material/Fabrication (Material) | $591,250.98 | $496,650.82 | $35,475.06 | $0.00 | $532,125.88 | 90.00% | $59,125.10 | $53,212.59 |
| 8 | 05-0505 - Miscellaneous Steel | Miscellaneous Steel Erection (Labor) | $219,880.00 | $76,958.00 | $10,994.00 | $0.00 | $87,952.00 | 40.00% | $131,928.00 | $8,795.50 |
| | | TOTALS: | $3,434,097.31 | $3,065,408.73 | $46,469.06 | $0.00 | $3,111,878.79 | 90.62% | $322,218.52 | $311,187.68 |

20220358988

*DOCUMENT DETAIL SHEET*

**CONTINUATION SHEET**
Whole Change Order Packages

CONTINUATION SHEET

DOCUMENT DETAIL SHEET

| A ITEM NO. | B DESCRIPTION OF WORK | C SCHEDULED VALUE | WORK COMPLETED | | F MATERIALS PRESENTLY STORED (NOT IN D OR E) | G TOTAL COMPLETED AND STORED TO DATE (D+E+F) | H % (G/C) | BALANCE TO FINISH (C-G) | I RETAINAGE |
|---|---|---|---|---|---|---|---|---|---|
| | | | D FROM PREVIOUS APPLICATION (D+E) | E THIS PERIOD | | | | | |
| 9 | CCO # 23006976-SUB-95A Project Changes Through 2/15/2021 | | | | | | | | |
| 9.1 | 05-0506 Changes to steel based on building and process development and owner review comments through revisions dated 11-24-2020. Including but not limited to: 700 LF for armor joint embeds, 110 LF of armor joint notched plates and 220 H.S. bolts for armor joint notched plate install. | $8,776.11 | $8,776.11 | $0.00 | $0.00 | $8,776.11 | 100.00% | $0.00 | $877.61 |
| 9.2 | 05-0506 Changes to Guardrails based on building and process design development and owner review comments from drawing set dated 12-22-2020 to 12-14-2020. Including but not limited to: 40 LF of pedestrian at bulk railings at sawcage with two pieces of channel and six pipe bollards. | $18,246.38 | $7,322.55 | $6,362.24 | $0.00 | $13,684.79 | 75.00% | $4,561.59 | $1,368.48 |
| 9.3 | 05-0506 Changes to Misc. Steel based on building and process design development and owner review comments from drawing set dated 12-14-2020 to 01-06-2021. Including but not limited to: 250 LF of exterior galv. guardrails. Removers angle anchors at max louver locations. | $23,891.02 | $9,556.41 | $8,361.86 | $0.00 | $17,918.27 | 75.00% | $5,972.75 | $1,791.83 |
| 9.4 | 05-0506 Changes to Misc. steel based on building and process design development and owner review comments from drawing set dated 01-18-2020 including but not limited to: revised concrete to angle details, Omitted steel erection of deleted overhead door steel support frame. Material was already ordered before changes were published. | $8,311.85 | $8,311.85 | $0.00 | $0.00 | $8,311.85 | 100.00% | $0.00 | $831.19 |
| 9.5 | 05-0506 Furnish Stainless Steel Liner at Wagner Sump Pit per IPS drawings ENERGY-PHX-B08-WA05-WA07 dated 01/13/2021. | $40,169.82 | $16,067.93 | $14,059.44 | $0.00 | $30,127.37 | 75.00% | $10,042.45 | $3,012.74 |
| 9.6 | 05-0501 Copper Foundation Embeds - Added 1 Nelson Stud | $1,177.00 | $1,177.00 | $0.00 | $0.00 | $1,177.00 | 100.00% | $0.00 | $117.70 |

CONTINUATION SHEET

DOCUMENT DETAIL SHEET

| A | B | C | D | E | F | G | H | | I |
|---|---|---|---|---|---|---|---|---|---|
| ITEM NO. | DESCRIPTION OF WORK | SCHEDULED VALUE | WORK COMPLETED FROM PREVIOUS APPLICATION (D + E) | WORK COMPLETED THIS PERIOD | MATERIALS PRESENTLY STORED (NOT IN D OR E) | TOTAL COMPLETED AND STORED TO DATE (D+E+F) | % (G / C) | BALANCE TO FINISH (C - G) | RETAINAGE |
| 9.7 | to bottom of each (4) 8" thick member. | | | | | | | | |
| 10 | 05-0501 Changes to Structural Steel based on building and product design development and owner review comments from drawing set dated 12.11.2020. GL 19-25.5.1 includes but not limited to steel channel to support door framing at lever Republic. Added channel cross members at platforms.  CCO # 23006976-SUB-05B CE #035 - Existing Fire Riser Steel Support Frame for Concrete Four | $ 10,320.56 | $ 10,320.56 | $ 0.00 | $ 0.00 | $ 10,320.56 | 100.00% | $ 0.00 | $ 1,032.06 |
| 10.1 | 05-0506 installed a steel support frame fastened to the lift up canal wall for the existing fire riser at GL 19 south elevation in order to demo the slab below that the fire riser support was bearing on. | $ 711.14 | $ 711.14 | $ 0.00 | $ 0.30 | $ 711.14 | 100.00% | $ 0.00 | $ 711.11 |
| 11 | CCO # 23006976-SUB-05C CE #046 - Bang PHX - Project Hold Unit September 2021 Start | | | | | | | | |
| 11.1 | 05-0501: Please review the revised schedule attached and provide details as list below. Provide detail for all impacts associated with the dates reflected in the updated schedule dated May 25, 2020. Confirm that you can meet the commitment required under your existing contract terms based on the revised schedule. If not, please provide additional details. Provide detail on any additional costs associated with the delay if any. If you have any equipment in fabrication or storage, provide schedule or cost impacts associated with the equipment delivery or storage. Please provide detail for any current cost you have that has not been billed and a date for when the costs will be billed. If you have any items onsite that need to be removed provide | $ 271,026.00 | $ 0.00 | $ 271,026.00 | $ 0.00 | $ 271,026.00 | 100.00% | $ 0.00 | $ 27,102.60 |

CONTINUATION SHEET

DOCUMENT DETAIL SHEET

| ITEM NO. | DESCRIPTION OF WORK | SCHEDULED VALUE | WORK COMPLETED FROM PREVIOUS APPLICATION (D + E) | THIS PERIOD | MATERIALS PRESENTLY STORED (NOT IN D OR E) | TOTAL COMPLETED AND STORED TO DATE (D+E+F) | % (G/C) | BALANCE TO FINISH (C - G) | RETAINAGE |
|---|---|---|---|---|---|---|---|---|---|
| 12 | details of what needs to be removed and when it will be removed. Provide any other information that may be of concern regarding the revised project schedule | | | | | | | | |
| | CCO # 23006976-SUB- 05D CE #035 - Washer Sump Pit Ladder and Grating Dimensions | | | | | | | | |
| | 05-0506 RFI #40 - Modified washer pit ladder dimensions and washer pit grating dimensions to purchase new material for these areas. | $1,797.00 | $0.00 | $1,797.00 | $0.00 | $1,797.00 | 100.00% | $0.00 | $179.70 |
| 13 | CCO # 23006976-SUB- 05E CE #052 - Drawing Revisions #16 - Construction Issue Set - 09/13/2021 | | | | | | | | |
| 13.1 | 05-0506 Structural Steel and Misc Metals | $163,631.00 | $0.00 | $114,541.70 | $0.00 | $114,541.70 | 70.00% | $49,089.30 | $11,454.17 |
| 14 | CCO # 23006976-SUB- 05F CE #097 - Steel Erection - Field Changes and Adjustments to Columns and Beams | | | | | | | | |
| 14.1 | 05-0506 Field Changes and Steel Corrections | $3,795.00 | $0.00 | $3,795.00 | $0.00 | $3,795.00 | 100.00% | $0.00 | $379.50 |
| 15 | CCO # 23006976-SUB- 05G CE #054 - Drawing Revisions #17 - Revised As Noted Structural and Architectural - 10/06/21 | | | | | | | | |
| 15.1 | 05-0501 Changed Beam Sizes, Added Anchor Bolts, Added Beams, Removed Framing for Platform, Added Steel with Rail, Added Ledger Angles | $15,955.00 | $0.00 | $15,955.00 | $0.00 | $15,955.00 | 100.00% | $0.00 | $1,595.50 |
| 16 | CCO # 23006976-SUB- 05H CE #098 - Re-Prep and Re-Prime Sequence 1 Steel Onsite (Phase 1 & 2) | | | | | | | | |
| 16.1 | 05-0501 Re-Prep and Re-Prime Priming of Seq. 1 Structural Steel | $62,322.00 | $0.00 | $62,322.00 | $0.00 | $62,322.00 | 100.00% | $0.00 | $6,232.20 |
| | TOTALS | $650,129.86 | $62,219.56 | $499,244.24 | $0.00 | $560,463.80 | 88.94% | $69,666.09 | $56,045.39 |

CONTINUATION SHEET

Grand Totals

DOCUMENT DETAIL SHEET

| A | B | C | D | E | F | G | H | I |
|---|---|---|---|---|---|---|---|---|
| | | | WORK COMPLETED | | | | | |
| ITEM NO. | DESCRIPTION OF WORK | SCHEDULED VALUE | FROM PREVIOUS APPLICATION (D + E) | THIS PERIOD | MATERIALS PRESENTLY STORED (NOT IN D OR E) | TOTAL COMPLETED AND STORED TO DATE (D+E+F) | % (G / C) | BALANCE TO FINISH (C - G) | RETAINAGE |
| GRAND TOTALS: | | $4,064,227.20 | $3,127,629.29 | $544,713.30 | $0.00 | $3,672,342.59 | 90.36% | $391,884.61 | $367,234.27 |

DOCUMENT DETAIL SHEET- APPLICATION AND CERTIFICATE FOR PAYMENT

20220358988

List each sub-subcontractor or vendor who provided labor and/or materials to the project which makes up any part of this requisition and the gross value of such labor and/or materials provided within this requisition period.

Sub-Subcontractor/Supplier _____ Value _____

Sub-Subcontractor/Supplier _____ Value _____

Sub-Subcontractor/Supplier _____ Value _____

Sub-Subcontractor/Supplier _____ Value _____

Sub-Subcontractor/Supplier _____ Value _____

Sub-Subcontractor/Supplier _____ Value _____

Sub-Subcontractor/Supplier _____ Value _____

APPLICATION AND CERTIFICATE FOR PAYMENT

DOCUMENT SUMMARY SHEET

TO CONTRACTOR:
Stellar
2900 Hartley Road
Jacksonville, Florida 32257

APPLICATION NO: 10
INVOICE NO:
PERIOD: 03/01/22 - 03/31/22
PROJECT NO: 23106976
CONTRACT DATE: 01/08/2021

DISTRIBUTION TO:

FROM SUBCONTRACTOR:
Fabco Metal Products, LLC
1180 Frances Drive
Daytona Beach, Florida 32124

PROJECT:
Bano Energy - Phoenix Can Manufacturing
1635 South 43rd Avenue
Phoenix, Arizona 85009

SUBCONTRACT DATE: 1/8/2021

SUBCONTRACT FOR: Structural Steel
SUBCONTRACTOR'S APPLICATION FOR PAYMENT

Application is made for payment, as shown below, in connection with the Subcontract. Continuation Sheet is attached.

1. Original Contract Sum ... $3,434,067.31
2. Net change by change orders ... $630,129.89
3. Contract sum to date (line 1 + 2) ... $4,064,227.20
4. Total completed and stored to date (Column G on detail sheet) ... $3,672,942.59
5. Retainage:
   a 1.525% of completed work: ... $56,046.39
   b 0.00% of stored material: ... $0.00
   Total retainage (Line 5a + 5b or total in column I of detail sheet) ... $56,046.39
6. Total earned less retainage (Line 4 less Line 5 Total) ... $3,616,296.20
7. Less previous certificates for payment (Line 6 from prior certificate) ... $3,305,108.32
8. Current payment due: ... $311,187.88
9. Balance to finish, including retainage (Line 3 less Line 6) ... $447,931.00

The undersigned hereby further declares and agrees that in the event that any lien or other claim should be brought against The Stellar Companies, Inc., the Owner of that building or premises, the undersigned will protect the said premises and defend any suit action brought against them by reason of any lien or other form of claim or action arising out of said premises as improved all right that the undersigned may have to a lien upon the bond and improvements above described.

In consideration of the sum of $1.00 to the undersigned in hand paid receipt whereof is hereby acknowledged, and other benefits accruing the undersigned does hereby waive release and quit claim in favor of The Stellar Companies, Inc. and/or owner, or owners of said premises as improved all right that the undersigned may have to a lien upon the bond and improvements above described.

IT IS UNDERSTOOD AND AGREED THAT THIS WAIVER AND RELEASE IS FOR ALL SERVICES RENDERED, WORK DONE AND MATERIAL FURNISHED PRIOR TO THE DATE HEREOF and to all such services rendered, work done and material furnished and not only for the particular

SUBCONTRACTOR: Fabco Metal Products, LLC
By: _____
State of: _____
County of: _____
Subscribed and sworn to before me this ____ Date: 3/21/2022
21 day of March 2022

_____
Notary Public:
My commission expires: 7/28/2022

| CHANGE ORDER SUMMARY | ADDITIONS | DEDUCTIONS |
|---|---|---|
| Total changes approved in previous months by Owner: | $630,129.89 | $0.00 |
| Total approved this Month: | $0.00 | $0.00 |
| Totals: | $630,129.89 | $0.00 |
| Net change by change orders: | $630,129.89 | |

20220358988

CONTINUATION SHEET

DOCUMENT DETAIL SHEET

Document SUMMARY SHEET APPLICATION AND CERTIFICATE FOR PAYMENT, containing
Contractor's signed Certification is attached
Use Column I on Contracts where variable retainage for line items apply.

Contract Lines

APPLICATION NUMBER: 10
APPLICATION DATE: 03/23/2022
PERIOD: 03/01/22 - 03/31/22
ARCHITECTS/ENGINEERS PROJECT NO.

| A | B | | C | D | E | F | G | H | | I |
|---|---|---|---|---|---|---|---|---|---|---|
| ITEM NO. | COST CODE | DESCRIPTION OF WORK | SCHEDULED VALUE | WORK COMPLETED | | MATERIALS PRESENTLY STORED (NOT IN D OR E) | TOTAL COMPLETED AND STORED TO DATE (D+E+F) | % (G/C) | BALANCE TO FINISH (C-G) | RETAINAGE |
| | | | | FROM PREVIOUS APPLICATION (D+E) | THIS PERIOD | | | | | |
| 1 | 05-0501 - Structural Steel | Engineering and Shop Drawings (Material) | $117,903.75 | $117,903.75 | $0.00 | $0.00 | $117,903.75 | 100.00% | | $0.00 |
| 2 | 05-0506 - Miscellaneous Steel | Anchor Bolts (Material) | $9,904.32 | $9,904.32 | $0.00 | $0.00 | $9,904.32 | 100.00% | | $0.00 |
| 3 | 05-0506 - Miscellaneous Steel | Embeds (Material) | $70,959.24 | $70,959.24 | $0.00 | $0.00 | $70,959.24 | 100.00% | | $0.00 |
| 4 | 05-0501 - Structural Steel | Structural Steel Material/Fabrication (Material) | $1,769,196.41 | $1,769,196.41 | $0.00 | $0.00 | $1,769,196.41 | 100.00% | | $0.00 |
| 5 | 05-0505 - Stairs / Catwalks / Ladders / Handrails | Stairs (steel, ss, fiberglass) (Material) | $130,340.91 | $130,340.91 | $0.00 | $0.00 | $130,340.91 | 100.00% | | $0.00 |
| 6 | 05-0503 - Steel Erection | Structural Steel Erection (Labor) | $524,661.70 | $393,496.28 | $0.00 | $0.00 | $393,496.28 | 75.00% | $131,185.42 | $0.00 |
| 7 | 05-0506 - Miscellaneous Steel | Miscellaneous Steel Material/Fabrication (Material) | $591,250.98 | $532,125.88 | $0.00 | $0.00 | $532,125.88 | 90.00% | $59,125.10 | $0.00 |
| 8 | 05-0506 - Miscellaneous Steel | Miscellaneous Steel Erection (Labor) | $219,880.00 | $87,952.00 | $0.00 | $0.00 | $87,952.00 | 40.00% | $131,928.00 | $0.00 |
| | | TOTALS: | $3,434,097.31 | $3,111,878.79 | $0.00 | $0.00 | $3,111,878.79 | 90.62% | $322,218.52 | $0.00 |

CONTINUATION SHEET

Whole Change Order Packages

DOCUMENT DETAIL SHEET

CONTINUATION SHEET

DOCUMENT DETAIL SHEET

| A ITEM NO. | B DESCRIPTION OF WORK | C SCHEDULED VALUE | D WORK COMPLETED FROM PREVIOUS APPLICATION (D + E) | E WORK COMPLETED THIS PERIOD | F MATERIALS PRESENTLY STORED (NOT IN D OR E) | G TOTAL COMPLETED AND STORED TO DATE (D+E+F) | H % (G/C) | BALANCE TO FINISH (C - G) | RETAINAGE |
|---|---|---|---|---|---|---|---|---|---|
| 9 | CCO # 23006976-SUB-05A Project Changes Through 2/15/2021 | | | | | | | | |
| 9.1 | 05-0506 Changes to steel based on building and process design development and owner review comments through revisions dated 11.24.2020. Including but not limited to: 700 LF for armor joint embeds, 210 LF of armor joint notched plates and 200 Hilti bolts for armor joint notched plate install | $8,776.11 | $8,776.11 | $0.00 | $0.00 | $8,776.11 | 100.00% | $0.00 | $877.61 |
| 9.2 | 05-0505 Changes to Guardrails based on building and process design development and owner review comments from drawing set dated 12.02.2020 to 12.10.2020. Including but not limited to: 40 LF of guardrail at bulk lacquer storage with two pieces of channel and six pipes/bollards. | $18,246.38 | $13,684.79 | $0.00 | $0.00 | $13,684.79 | 75.00% | $4,561.59 | $1,368.48 |
| 9.3 | 05-0506 Changes to Misc. Steel based on building and process design development and owner review comments from drawing set dated 12.11.2020 to 01.09.2921, Including but not limited to: 260 LF of exterior galv. guardrails. Removed angle/anchors at new louver locations. | $23,890.02 | $17,918.27 | $0.00 | $0.00 | $17,918.27 | 75.00% | $5,972.75 | $1,791.83 |
| 9.4 | 05-0506 Changes to Misc. steel based on building and process design development and owner review comments from drawing set dated 01.18.2020. Including but not limited to: revised concrete lid angle details. Omitted steel erection of deleted overhead door steel support frame. Material was already ordered before changes were published. | $8,311.86 | $8,311.86 | $0.00 | $0.00 | $8,311.86 | 100.00% | $0.00 | $931.19 |
| 9.5 | 05-0506 Furnish Stainless Steel Liner at Washer Sump Pit per IPS drawings ENERGY-PHX-B08-WA005-WA07 dated 01/13/2021 | $40,169.82 | $30,127.37 | $0.00 | $0.00 | $30,127.37 | 75.00% | $10,042.45 | $3,012.74 |
| 9.6 | 05-0501 Cupper Foundation Embeds – Added 1 Nelson Stud | $1,177.00 | $1,177.00 | $0.00 | $0.00 | $1,177.00 | 100.00% | $0.00 | $117.70 |

**DOCUMENT DETAIL SHEET**

**CONTINUATION SHEET**

| A | B | C | D | E | F | G | H | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | WORK COMPLETED | | | | | | |
| ITEM NO. | DESCRIPTION OF WORK | SCHEDULED VALUE | FROM PREVIOUS APPLICATION (D + E) | THIS PERIOD | MATERIALS PRESENTLY STORED (NOT IN D OR E) | TOTAL COMPLETED AND STORED TO DATE (D+E+F) | % (G / C) | BALANCE TO FINISH (C - G) | RETAINAGE |
| | to bottom of each (4) 8" thick embeds. | | | | | | | | |
| | 05-0501 Changes to Structural Steel based on building and process design development and owner review comments from drawing set dated 12.11.2020 to 01.08.2021, including but not limited to: steel channel to support door framing at Inker Rebuild. Added channel cross members at platforms. | | | | | | | | |
| 10 | CCO # 23006976-SUB-05B CE #036 - Existing Fire Riser Steel Support Frame for Concrete Four | $ 10,320.56 | $ 10,320.56 | $ 0.00 | $ 0.00 | $ 10,320.56 | 100.00% | $ 0.00 | $ 1,032.06 |
| | 05-0506 Installed a steel support frame fastened to the lift up panel wall for the existing fire riser at GL 19 south elevation in order to demo the slab below that the fire riser support was bearing on. | | | | | | | | |
| 11 | CCO # 23006976-SUB-05C CE #046 - Bang PHX - Project Hold Until September 2021 Start | $ 711.14 | $ 711.14 | $ 0.00 | $ 0.00 | $ 711.14 | 100.00% | $ 0.00 | $ 71.11 |
| 11.1 | 05-0501 Please review the revised schedule attached and provide details as list below. Provide detail for all impacts associated with the delay reflected in the updated schedule dated May 29, 2020. *Confirm that you can meet the commitment required under your existing contract terms based on the revised schedule. If not please provide additional details. Provide detail for any additional costs associated with the delay. If any. If you have any equipment in fabrication or storage, provide schedule or cost impacts associated with the equipment delivery or storage. Provide detail for any current cost you have that has not been billed and a date for when the costs will be billed. If you have any items onsite that need to be removed provide | $ 271,026.00 | $ 271,026.00 | $ 0.00 | $ 0.00 | $ 271,026.00 | 100.00% | $ 0.00 | $ 27,102.60 |

CONTINUATION SHEET

DOCUMENT DETAIL SHEET

| A | B | C | D | E | F | G | H | | I |
|---|---|---|---|---|---|---|---|---|---|
| ITEM NO. | DESCRIPTION OF WORK | SCHEDULED VALUE | WORK COMPLETED | | MATERIALS PRESENTLY STORED (NOT IN D OR E) | TOTAL COMPLETED AND STORED TO DATE (D+E+F) | % (G / C) | BALANCE TO FINISH (C - G) | RETAINAGE |
| | | | FROM PREVIOUS APPLICATION (D + E) | THIS PERIOD | | | | | |
| 12 | details of what needs to be removed and when it will be replaced. Provide any other information that may be of concern regarding the revised project schedule | | | | | | | | |
| | CCO # 23006976-SUB-05D CE #035 - Washer Sump Pit Ladder and Grating Dimensions | | | | | | | | |
| 12.1 | 05-0506 RFI #40 - Modified washer pit ladder dimensions and washer pit grating dimensions to purchase new material for these areas. | $ 1,797.00 | $ 1,797.00 | $ 0.00 | $ 0.00 | $ 1,797.00 | 100.00% | $ 0.00 | $ 179.70 |
| 13 | CCO # 23006976-SUB-05E CE #052 - Drawing Revisions #16 - Construction Issue Set - 09/13/2021 | | | | | | | | |
| 13.1 | 05-0506 Structural Steel and Misc. Metals | $ 163,631.00 | $ 114,541.70 | $ 0.00 | $ 0.00 | $ 114,541.70 | 70.00% | $ 49,089.30 | $ 11,454.17 |
| 14 | CCO # 23006976-SUB-05F CE #097 - Steel Erection - Field Changes and Adjustments to Columns and Beams | | | | | | | | |
| 14.1 | 05-0506 Field Changes and Steel Corrections | $ 3,795.00 | $ 3,795.00 | $ 0.00 | $ 0.00 | $ 3,795.00 | 100.00% | $ 0.00 | $ 379.50 |
| 15 | CCO # 23006976-SUB-05G CE #054 - Drawing Revisions #7 - Revised As Noted Structural and Architectural - 10/06/21 | | | | | | | | |
| 15.1 | 05-0501 Changed Beam Sizes, Added Anchor Bolts, Added Beams, Removed Framing for Platform Across Stair with rail, Added Ledger Angles | $ 15,955.00 | $ 15,955.00 | $ 0.00 | $ 0.00 | $ 15,955.00 | 100.00% | $ 0.00 | $ 1,595.50 |
| 16 | CCO # 23006976-SUB-05H CE #098 - Re-Prep and Re-Prime Sequence 1 Steel Onsite (Phase 1 & 2) | | | | | | | | |
| | 05-0501 Re-Prep and Re-Prime Painting of Seq. 1 Structural Steel | $ 62,322.00 | $ 62,322.00 | $ 0.00 | $ 0.00 | $ 62,322.00 | 100.00% | $ 0.00 | $ 6,232.20 |
| | TOTALS | $ 630,129.99 | $ 560,463.80 | $ 0.00 | $ 0.00 | $ 560,463.80 | 88.94% | $ 69,666.09 | $ 56,046.39 |

CONTINUATION SHEET

**DOCUMENT DETAIL SHEET**

Grand Totals

| A | B | C | D | E | F | G | H | I |
|---|---|---|---|---|---|---|---|---|
| ITEM NO. | DESCRIPTION OF WORK | SCHEDULED VALUE | WORK COMPLETED | | MATERIALS PRESENTLY STORED (NOT IN D OR E) | TOTAL COMPLETED AND STORED TO DATE (D+E+F) | % (G / C) | RETAINAGE |
| | | | FROM PREVIOUS APPLICATION (D + E) | THIS PERIOD | | | | |
| | GRAND TOTALS: | $ 4,064,227.20 | $ 3,672,342.59 | $ 0.00 | $ 0.00 | $ 3,672,342.59 | 90.36% | $ 56,046.39 |

(Column I continued): BALANCE TO FINISH (C - G) — $ 391,884.61

DOCUMENT DETAIL SHEET - APPLICATION AND CERTIFICATE FOR PAYMENT

20220358988

List each sub-subcontractor or vendor who provided labor and/or materials to the project which makes up any part of this requisition and the gross value of such labor and/or materials provided within this requisition period.

Sub-Subcontractor/Supplier _____        Value _____

Sub-Subcontractor/Supplier _____        Value _____

Sub-Subcontractor/Supplier _____        Value _____

Sub-Subcontractor/Supplier _____        Value _____

Sub-Subcontractor/Supplier _____        Value _____

Sub-Subcontractor/Supplier _____        Value _____

Sub-Subcontractor/Supplier _____        Value _____

APPLICATION AND CERTIFICATE FOR PAYMENT

DOCUMENT SUMMARY SHEET

Page 1 of 8

**TO CONTRACTOR:**
Stellar
2900 Hartley Road
Jacksonville, Florida 32257

**FROM SUBCONTRACTOR:**
Faboo Metal Products, LLC
1490 Frances Drive
Daytona Beach, Florida 32124

**PROJECT:**
Barg Energy - Phoenix Can Manufacturing
1635 South 43rd Avenue
Phoenix, Arizona 85009

**SUBCONTRACT DATE:** 1/8/2021

APPLICATION NO.: 11
INVOICE NO.:
PERIOD: 03/01/22 - 03/31/22
PROJECT NO: 23006976
CONTRACT DATE: 01/08/2021

**DISTRIBUTION TO:**

SUBCONTRACT FOR: Structural Steel

**SUBCONTRACTOR'S APPLICATION FOR PAYMENT**

Application is made for payment, as shown below, in connection with the Subcontract. Continuation Sheet is attached.

| | | |
|---|---|---|
| 1. | Original Contract Sum | $ 3,434,097.31 |
| 2. | Net change by change orders | $ 630,129.89 |
| 3. | Contract sum to date (line 1 ± 2) | $ 4,064,227.20 |
| 4. | Total completed and stored to date | $ 3,672,342.59 |
| | (Column G on detail sheet) | |
| 5. | Retainage: | |
| | a. 0.00% of completed work: | $ 0.00 |
| | b. 0.00% of stored material: | $ 0.00 |
| | Total retainage (Line 5a + 5b or total in column 1 of detail sheet) | $ 0.00 |
| 6. | Total earned less retainage | $ 3,672,342.59 |
| | (Line 4 less Line 6 Total) | |
| 7. | Less previous certificates for payment | $ 3,616,296.20 |
| | (Line 6 from prior certificate) | |
| 8. | Current payment due: | $ 56,046.39 |
| 9. | Balance to finish, including retainage | $ 391,884.61 |
| | (Line 3 less Line 6) | |

| CHANGE ORDER SUMMARY | ADDITIONS | DEDUCTIONS |
|---|---|---|
| Total changes approved in previous months by Owner: | $ 630,129.89 | $ 0.00 |
| Total approved this Month | $ 0.00 | $ 0.00 |
| Totals: | $ 630,129.89 | $ 0.00 |
| Net change by change orders: | $ 630,129.89 | |

The undersigned hereby further declares and agrees that in the event that any lien or other claim should be brought against The Stellar Companies, Inc., the Owner, or their building or premises, the undersigned will protect the said parties and defend any suit a action brought against them by reason of any lien or other form of claim or action arising out of said subcontract and hold them harmless and indemnified therefor.

In consideration of the sum of $1.00 to the undersigned in hand paid, receipt whereof is hereby acknowledged, and other benefits accruing, the undersigned does hereby waive release and quitclaim in favor of The Stellar Companies, Inc. and/or owner or owners of said premises as improved all right that the undersigned may have to a lien upon the land and improvements above described.

IT IS UNDERSTOOD AND AGREED THAT THIS WAIVER AND RELEASE IS FOR ALL SERVICES RENDERED, WORK DONE AND MATERIAL FURNISHED PRIOR TO THE DATE HEREOF and is for all such services rendered, work done and material furnished and not only for the particular

SUBCONTRACTOR: Faboo Metal Products, LLC

By: _____    Date: 3/21/22

State of: Florida
County of: Volusia
Subscribed and sworn to before me this 21 day of March 2022

Notary Public: _____
My commission expires: 7/25/2022

20220358988

CONTINUATION SHEET

DOCUMENT DETAIL SHEET

Page 2 of 8

Document SUMMARY SHEET, APPLICATION AND CERTIFICATE FOR PAYMENT, containing
Contractor's signed Certification is attached.
Use Column I on Contracts where variable retainage for line items apply.

APPLICATION NUMBER: 11
APPLICATION DATE: 03/23/2022
PERIOD: 03/01/22 - 03/31/22
ARCHITECT'S/ENGINEERS PROJECT NO:

Contract Lines

| A | B | C | D | E | F | G | H | I |
|---|---|---|---|---|---|---|---|---|
| | | | WORK COMPLETED | | | | | |
| ITEM NO | COST CODE | DESCRIPTION OF WORK | SCHEDULED VALUE | FROM PREVIOUS APPLICATION (D + E) | THIS PERIOD | MATERIALS PRESENTLY STORED (NOT IN D OR E) | TOTAL COMPLETED AND STORED TO DATE (D+E+F) | % (G / C) | BALANCE TO FINISH (C - G) | RETAINAGE |
| | 05-0501 - Structural Steel | Engineering and Shop Drawings (Material) | $ 117,903.75 | $ 117,903.75 | $ 0.00 | $ 0.00 | $ 117,903.75 | 100.00% | $ 0.00 | $ 0.00 |
| 2 | 05-0503 - Miscellaneous Steel | Anchor Bolts (Material) | $ 9,904.32 | $ 9,904.32 | $ 0.00 | $ 0.00 | $ 9,904.32 | 100.00% | $ 0.00 | $ 0.00 |
| 3 | 05-0505 - Miscellaneous Steel | Embeds (steel,ss) (Material) | $ 70,959.24 | $ 70,959.24 | $ 0.00 | $ 0.00 | $ 70,959.24 | 100.00% | $ 0.00 | $ 0.00 |
| 4 | 05-0501 - Structural Steel | Structural Steel Material/Fabrication (Material) | $ 1,769,196.41 | $ 1,769,196.41 | $ 0.00 | $ 0.00 | $ 1,769,196.41 | 100.00% | $ 0.00 | $ 0.00 |
| 5 | 05-0505 - Stairs / Catwalks / Ladders / Handrails | Grating (steel, ss, fiberglass) (Material) | $ 130,340.91 | $ 130,340.91 | $ 0.00 | $ 0.00 | $ 130,340.91 | 100.00% | $ 0.00 | $ 0.00 |
| 6 | 05-0503 - Steel Erection | Structural Steel Erection (Labor) | $ 524,661.70 | $ 393,496.28 | $ 0.00 | $ 0.00 | $ 393,496.28 | 75.00% | $ 131,165.42 | $ 0.00 |
| 7 | 05-0505 - Miscellaneous Steel | Miscellaneous Steel Material/Fabrication (Material) | $ 591,250.98 | $ 532,125.88 | $ 0.00 | $ 0.00 | $ 532,125.88 | 90.00% | $ 59,125.10 | $ 0.00 |
| 8 | 05-0505 - Miscellaneous Steel | Miscellaneous Steel Erection (Labor) | $ 219,880.00 | $ 87,952.00 | $ 0.00 | $ 0.00 | $ 87,952.00 | 40.00% | $ 131,928.00 | $ 0.00 |
| | | TOTALS: | $ 3,434,097.31 | $ 3,111,878.79 | $ 0.00 | $ 0.00 | $ 3,111,878.79 | 90.62% | $ 322,218.52 | $ 0.00 |

DOCUMENT DETAIL SHEET

CONTINUATION SHEET

Whole Change Order Packages

CONTINUATION SHEET

DOCUMENT DETAIL SHEET

| ITEM NO. A | DESCRIPTION OF WORK B | SCHEDULED VALUE C | WORK COMPLETED FROM PREVIOUS APPLICATION (D + E) D | THIS PERIOD E | MATERIALS PRESENTLY STORED (NOT IN D OR E) F | TOTAL COMPLETED AND STORED TO DATE (D+E+F) G | % (G/C) H | BALANCE TO FINISH (C - G) | RETAINAGE I |
|---|---|---|---|---|---|---|---|---|---|
| 9 | CCO # 23006976-SUB-05A Project Changes Through 2/15/2021 | | | | | | | | |
| 9.1 | 05-0506 Changes to steel based on building and process design development and owner review comments through revisions dated 11.24.2020. Including but not limited to: 700 LF for armor joint embeds, 210 LF of armor joint notched plates and 200 Hilti bolts for armor joint notched plate install. | $ 8,776.11 | $ 8,776.11 | $ 0.00 | $ 0.00 | $ 8,776.11 | 100.00% | $ 0.00 | $ 0.00 |
| 9.2 | 05-0505 Changes to Guardrails based on building and process design development and owner review comments from drawing revisions dated 12.10.2020 through 12.10.2020. Including but not limited to: 40 LF of guardrail at bulk lacquer storage with two pieces of channel and six pieces of channel and six pipes/bollards. | $ 18,246.39 | $ 13,684.79 | $ 0.00 | $ 0.00 | $ 13,684.79 | 75.00% | $ 4,561.59 | $ 0.00 |
| 9.3 | 05-0506 Changes to Misc. Steel based on building and process design development and owner review comments from drawing set dated 12.11.2020 to 01.08.2021. Including but not limited to: 260 LF of exterior galv. guardrails. Removed angle/anchors at new louver locations. | $ 23,891.02 | $ 17,918.27 | $ 0.00 | $ 0.00 | $ 17,918.27 | 75.00% | $ 5,972.75 | $ 0.00 |
| 9.4 | 05-0506 Changes to Misc. steel based on building and process design development and owner review comments from drawing set dated 01.18.2020. Including but not limited to: revised concrete lid angle details. Omitted steel erection of deleted overhead door steel support frame. Material was already ordered before changes were published. | $ 8,311.86 | $ 8,311.86 | $ 0.00 | $ 0.00 | $ 8,311.86 | 100.00% | $ 0.00 | $ 0.00 |
| 9.5 | 05-0506 Furnish Stainless Steel Liner at Washer Sump Pit per IPS drawings ENERGY-PHX-B08-WA05-WA07 dated 01/13/2021. | $ 40,169.82 | $ 30,127.37 | $ 0.00 | $ 0.00 | $ 30,127.37 | 75.00% | $ 10,042.45 | $ 0.00 |
| 9.6 | 05-0501 Copper Foundation Embeds - Added 1 Nelson Stud | $ 1,177.00 | $ 1,177.00 | $ 0.00 | $ 0.00 | $ 1,177.00 | 100.00% | $ 0.00 | $ 0.00 |

CONTINUATION SHEET

DOCUMENT DETAIL SHEET

| A ITEM NO. | B DESCRIPTION OF WORK | C SCHEDULED VALUE | D WORK COMPLETED — FROM PREVIOUS APPLICATION (D + E) | E WORK COMPLETED — THIS PERIOD | F MATERIALS PRESENTLY STORED (NOT IN D OR E) | G TOTAL COMPLETED AND STORED TO DATE (D+E+F) | H % (G / C) | BALANCE TO FINISH (C - G) | I RETAINAGE |
|---|---|---|---|---|---|---|---|---|---|
| | to bottom of each (4) 8" thick embeds. | | | | | | | | |
| 9.7 | 05-0501 Changes to Structural Steel based on building and process design development and owner review comments from drawing set dated 12.11.2020 to 01.08.2021. Including but not limited to: steel channel to support door framing at Inker Rebuild. Added channel cross members at platforms. | $ 10,320.56 | $ 10,320.56 | $ 0.00 | $ 0.00 | $ 10,320.56 | 100.00% | $ 0.00 | $ 0.00 |
| 10 | CCO # 2300697G-SUB-05B CE #036 - Existing Fire Riser Steel Support Frame for Concrete Pour | | | | | | | | |
| 10.1 | 05-0506 Installed a steel support frame fastened to the tilt up panel wall for the existing fire riser at GL 10 south elevation in order to demo the slab below that the fire riser support was bearing on. | $ 711.14 | $ 711.14 | $ 0.00 | $ 0.00 | $ 711.14 | 100.00% | $ 0.00 | $ 0.00 |
| 11 | CCO # 2300697G-SUB-05C CE #046 - Bang PHX - Project Hold Until September 2021 Start | | | | | | | | |
| 11.1 | 05-0501 Please review the revised schedule attached and provide details as list below. Provide detail for all impacts associated with the delay reflected in the updated schedule dated May 29, 2020. Confirm that you can meet the commitment required under your existing contract terms based on the revised schedule. If not please provide additional details. Provide detail for any additional costs associated with the delay if any. If you have any equipment in fabrication or storage, provide schedule or cost impacts associated with the equipment delivery or storage. Provide detail for any current cost you have that has not been billed and a date for when the costs will be billed. If you have any items onsite that need to be removed provide | $ 271,026.00 | $ 271,026.00 | $ 0.00 | $ 0.00 | $ 271,026.00 | 100.00% | $ 0.00 | $ 0.00 |

Case 22-11743-PDR    Doc 166-51    Filed 07/30/23    Page 272 of 401
20220358988

CONTINUATION SHEET

DOCUMENT DETAIL SHEET

| A | B | C | D | E | F | G | H | | I |
|---|---|---|---|---|---|---|---|---|---|
| | | | WORK COMPLETED | | | | | | |
| ITEM NO. | DESCRIPTION OF WORK | SCHEDULED VALUE | FROM PREVIOUS APPLICATION (D + E) | THIS PERIOD | MATERIALS PRESENTLY STORED (NOT IN D OR E) | TOTAL COMPLETED AND STORED TO DATE (D+E+F) | % (G / C) | BALANCE TO FINISH (C - G) | RETAINAGE |
| 12 | details of what needs to be removed and when it will be removed. Provide any other information that may be of concern regarding the revised project schedule. | | | | | | | | |
| | CCO #23006976-SUB-05D CE #035 - Washer Sump Pit Ladder and Grating Dimensions | | | | | | | | |
| 12.1 | 05-0506 RFI #40 - Modified washer pit ladder dimensions and washer pit grating dimensions to purchase new material for these areas. | $1,797.00 | $1,797.00 | $0.00 | $0.00 | $1,797.00 | 100.00% | $0.00 | $0.00 |
| 13 | CCO #23006976-SUB-05E CE #052 - Drawing Revisions #16 - Construction Issue Set - 08/13/2021 | | | | | | | | |
| 13.1 | 05-0506 Structural Steel and Misc. Metals | $163,631.00 | $114,541.70 | $0.00 | $0.00 | $114,541.70 | 70.00% | $49,089.30 | $0.00 |
| 14 | CCO #23006976-SUB-05F CE #097 - Steel Erection - Field Changes and Adjustments to Columns and Beams | | | | | | | | |
| 14.1 | 05-0506 Field Changes and Steel Corrections | $3,795.00 | $3,795.00 | $0.00 | $0.00 | $3,795.00 | 100.00% | $0.00 | $0.00 |
| 15 | CCO #23006976-SUB-05G CE #054 - Drawing Revisions #17 - Revised As Noted Structural and Architectural - 10/06/21 | | | | | | | | |
| 15.1 | 05-0501 Changed Beam Sizes, Added Anchor Bolts, Added Bearing, Removed Framing for Platform, Added Stair with rail Added Ledger Angles | $15,955.00 | $15,955.00 | $0.00 | $0.00 | $15,955.00 | 100.00% | $0.00 | $0.00 |
| 16 | CCO #23006976-SUB-05H CE #098 - Re-Prep and Re-Prime Sequence 1 Steel Onsite (Phase 1 & 2) | | | | | | | | |
| 16.1 | 05-0501 Re-Prep and Re-Prime Painting of Seq. 1 Structural Steel | $62,322.00 | $62,322.00 | $0.00 | $0.00 | $62,322.00 | 100.00% | $0.00 | $0.00 |
| | TOTALS: | $630,129.89 | $560,463.80 | $0.00 | $0.00 | $560,463.80 | 88.94% | $69,666.09 | $0.00 |

CONTINUATION SHEET

Grand Totals

*DOCUMENT DETAIL SHEET*

| A | B | C | D | E | F | G | H | I |
|---|---|---|---|---|---|---|---|---|
| | | | WORK COMPLETED | | | | | |
| ITEM NO. | DESCRIPTION OF WORK | SCHEDULED VALUE | FROM PREVIOUS APPLICATION (D + E) | THIS PERIOD | MATERIALS PRESENTLY STORED (NOT IN D OR E) | TOTAL COMPLETED AND STORED TO DATE (D+E+F) | % (G/C) | BALANCE TO FINISH (C - G) | RETAINAGE |
| | GRAND TOTALS: | $ 4,064,227.20 | $ 3,672,342.59 | $ 0.00 | $ 0.00 | $ 3,672,342.59 | 90.36% | $ 391,884.61 | $ 0.00 |

DOCUMENT DETAIL SHEET- APPLICATION AND CERTIFICATE FOR PAYMENT

20220358988

List each sub-subcontractor or vendor who provided labor and/or materials to the project which makes up any part of this requisition and the gross value of such labor and/or materials provided within this requisition period.

Sub-Subcontractor/Supplier _____ Value _____

Sub-Subcontractor/Supplier _____ Value _____

Sub-Subcontractor/Supplier _____ Value _____

Sub-Subcontractor/Supplier _____ Value _____

Sub-Subcontractor/Supplier _____ Value _____

Sub-Subcontractor/Supplier _____ Value _____

Sub-Subcontractor/Supplier _____ Value _____

20220358988

ARIZONA PRELIMINARY TWENTY DAY LIEN NOTICE

# Exhibit C

PURSUANT TO A.R.S. SECTION 33-992

**IN ACCORDANCE WITH ARIZONA REVISED STATUTES SECTION 33-992.01, THIS IS NOT A LIEN.  THIS IS NOT A REFLECTION ON THE INTEGRITY OF ANY CONTRACTOR OR SUBCONTRACTOR**

The name and address of the owner or reputed owner are:
JHO REAL ESTATE INVESTMENT, LLC
1600 N PARK DR
FORT LAUDERDALE, FL 33326

JHO REAL ESTATE INVESTMENT, LLC
C/O CORPORATE CREATIONS NETWORK INC.
3260 N. HAYDEN ROAD #210
SCOTTSDALE, AZ 85251

VITAL PHARMACEUTICALS, INC.
DBA BANG ENERGY
C/O CORPORATE CREATIONS NETWORK INC.
3260 N HAYDEN ROAD #210
SCOTTSDALE, AZ 85251

The name and address of the original contractor are:
STELLAR GROUP, INCORPORATED
2900 HARTLEY RD
JACKSONVILLE, FL 32257

STELLAR GROUP, INCORPORATED
C/O CORPORATION SERVICE COMPANY
8825 N 23RD AVENUE
SUITE 100
PHOENIX, AZ 85021

The name and address of any lender or reputed lender and or assigns are:
UNABLE TO DETERMINE. A REQUEST IS INCLUDED
HEREIN PER A.R.S. 33-992.01.

The name and address of the person with whom the claimant has contracted are:
STELLAR GROUP, INCORPORATED
2900 HARTLEY RD
JACKSONVILLE, FL 32257

The name and address of any surety company/agent are:
UNABLE TO DETERMINE. A REQUEST IS INCLUDED
HEREIN PER A.R.S. 33-992.01.

*We request a copy of the bond, if applicable.*

Date:  JUNE 14, 2021 (Notice #N171066)
This preliminary lien notice has been completed (Name and Address of Claimant):

For:
FABCO METAL PRODUCTS LLC
1490 FRANCES DRIVE
DAYTONA BEACH, FL 32124

By:
Michelle Gerred, Esq., #031678
PO Box 24101
Cleveland, OH 44124
(as limited agent for FABCO METAL PRODUCTS LLC)



You are hereby notified that the Claimant has furnished or will furnish labor, professional services, materials, machinery, fixtures or tools of the following general description:

MATERIALS AND LABOR, STRUCTURAL STEEL & ERECTION

In the construction, alteration or repair of the building, structure or improvement located at:

BANG ENERGY
1635 S 43RD AVE
PHOENIX, AZ 85009

And situated upon that certain lot(s) or parcel(s) of land in MARICOPA County, Arizona, described as follows:

1635 S 43RD AVE
PHOENIX, AZ 85009

An estimate of the total price of the labor, professional services, materials, machinery, fixtures or tools furnished or to be furnished is:

$3,434,097.31

NOTICE TO PROPERTY OWNER

If bills are not paid in full for the labor, professional services, materials, machinery, fixtures or tools furnished, or to be furnished, a mechanic's lien leading to the loss, through court foreclosure proceedings, of all or part of your property being improved may be placed against the property. You may wish to protect yourself against this consequence by either:

1) Requiring your contractor to furnish a conditional waiver and release pursuant to Arizona Revised Statutes section 33-1008, subsection D, paragraphs 1 and 3 signed by the person or firm giving you this notice before you make payment to your contractor.

2) Requiring your contractor to furnish an unconditional waiver and release pursuant to Arizona Revised Statutes section 33-1008, subsection D, paragraphs 2 and 4, signed by the person or firm giving you this notice after you make payment to your contractor.

3) Using any other method or device that is appropriate under the circumstances.

Within ten days of the receipt of this preliminary twenty day notice the owner or other interested party is required to furnish all information necessary to correct any inaccuracies in the notice pursuant to Arizona Revised Statutes section 33-992.01, subsection I or lose as a defense any inaccuracy of that information.

Within ten days of the receipt of this preliminary twenty day notice if any payment bond has been recorded in compliance with Arizona Revised Statutes section 33-1003, the owner must provide a copy of the payment bond including the name and address of the surety company and bonding agent providing the payment bond to the person who has given the preliminary twenty day notice. In the event that the owner or other interested party fails to provide the bond information within that ten day period, the claimant shall retain lien rights to the extent precluded or prejudiced from asserting a claim against the bond as a result of not timely receiving the bond information.

DATED.          JUNE 14, 2021

FABCO METAL PRODUCTS LLC

By: _____
Michelle Gerred, Esq., #031678
(as limited agent for FABCO METAL PRODUCTS LLC)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

## ACKNOWLEDGEMENT OF RECEIPT OF PRELIMINARY TWENTY-DAY NOTICE

This acknowledges receipt on ___ / ___ / ___ (date) of a copy of the preliminary twenty-day notice at
_____ (address). Date: ___/___/___ (date this acknowledgment was executed)

_____
Signature of person acknowledging receipt, with title if acknowledgment is made on behalf of another person)

Please note: Arizona Revised Statutes, Section 33-992.02, provides that the acknowledgment be returned to the person or firm sending the Preliminary Twenty Day Notice (Michelle Gerred, Esq.) within thirty days of receipt thereof.

(Our Ref. N171066 20.042)



20220358988

AFFIDAVIT AND PROOF OF MAILING OF PRELIMINARY TWENTY DAY NOTICE

**BY MAIL**

STATE OF OHIO          )
                              ) ss.
COUNTY OF CUYAHOGA    )

        Colleen Kirk, being first duly sworn upon his/her oath, deposes and says:

1.      I make this affidavit on my personal knowledge of the facts herein set forth.

2.      On June 14, 2021, pursuant to A.R.S. 33-992.01, I mailed a copy of the Arizona Preliminary Twenty Day Notice to:

Owner or Reputed Owner
JHO REAL ESTATE INVESTMENT, LLC
1600 N PARK DR
FORT LAUDERDALE, FL 33326

JHO REAL ESTATE INVESTMENT, LLC
C/O CORPORATE CREATIONS NETWORK INC.
3260 N. HAYDEN ROAD #210
SCOTTSDALE, AZ 85251

VITAL PHARMACEUTICALS, INC.
DBA BANG ENERGY
C/O CORPORATE CREATIONS NETWORK INC.
3260 N HAYDEN ROAD #210
SCOTTSDALE, AZ 85251

by certified mail, return receipt requested. A copy of the certified mail receipt is attached hereto as part of Exhibit C and incorporated herein by reference.

3.      I also mailed this same Notice by certified mail, return receipt requested, to the following entities:

Person with Whom Claimant has Contracted:
STELLAR GROUP, INCORPORATED
2900 HARTLEY RD
JACKSONVILLE, FL 32257

Project Original Contractor or Reputed Contractor
STELLAR GROUP, INCORPORATED
2900 HARTLEY RD
JACKSONVILLE, FL   32257

STELLAR GROUP, INCORPORATED
C/O CORPORATION SERVICE COMPANY
8825 N 23RD AVENUE, SUITE 100
PHOENIX, AZ 85021

by certified mail, return receipt requested.  A copy of the certified mail receipt is attached hereto as part of Exhibit C and incorporated herein by reference.

Dated this 9TH day of April, 2022

By: Colleen Kirk

SUBSCRIBED AND SWORN to before me this 19th day of April, 2022 by Colleen Kirk.

My Commission Expires:

May 27, 2024

Notary Public

(Ref. N17 066)

TARA SCHILLING
NOTARY PUBLIC
FOR THE
STATE OF OHIO
My Commission Expires
May 27, 2024

NOTARIAL SEAL
STATE OF OHIO

20220358988



NCS[AZ(N171066OW]B0
729 Miner Road
Cleveland OH 44143

## USPS CERTIFIED MAIL

9214 8901 5273 7200 0016 1571 52

JHO REAL ESTATE INVESTMENT LLC
1600 N PARK DR
Fort Lauderdale FL 33326

# ATTENTION

Why are you receiving this notice?  Please visit http://www.ncscredit.com/notice for more information.  If you have any additional questions, please email Clare Wilson noticeprem@ncscredit.com

## Distribution List

JHO REAL ESTATE INVESTMENT LLC
1600 N PARK DR
Fort Lauderdale FL 33326

STELLAR GROUP INCORPORATED
2900 Hartley Rd
Jacksonville FL 32257

Vital Pharmaceuticals Inc. dba BANG ENERGY
C\O CORPORATE CREATIONS NETWORK INC.
3260 N HAYDEN ROAD #210
Scottsdale AZ 85251

JHO REAL ESTATE INVESTMENT LLC
C\O CORPORATE CREATIONS NETWORK INC.
3260 N. HAYDEN ROAD #210
Scottsdale AZ 85251

STELLAR GROUP INCORPORATED
C\O CORPORATION SERVICE COMPANY
8825 N 23rd Avenue Suite 100
Phoenix AZ 85021



USPS CERTIFIED MAIL

NCS[AZ[N171066TE]B0
729 Miner Road
Cleveland OH 44143

9214 8901 5273 7200 0016 1571 76



Vital Pharmaceuticals Inc. dba BANG ENERGY
C\O CORPORATE CREATIONS NETWORK INC.
3260 N HAYDEN ROAD #210
Scottsdale AZ 85251

# ATTENTION

Why are you receiving this notice?  Please visit http://www.ncscredit.com/notice for more
information.  If you have any additional questions, please email Clare Wilson
noticeprem@ncscredit.com

## Distribution List

JHO REAL ESTATE INVESTMENT LLC
1600 N PARK DR
Fort Lauderdale FL 33326

STELLAR GROUP INCORPORATED
2900 Hartley Rd
Jacksonville FL 32257

Vital Pharmaceuticals Inc. dba BANG ENERGY
C\O CORPORATE CREATIONS NETWORK INC.
3260 N HAYDEN ROAD #210
Scottsdale AZ 85251

JHO REAL ESTATE INVESTMENT LLC
C\O CORPORATE CREATIONS NETWORK INC.
3260 N. HAYDEN ROAD #210
Scottsdale AZ 85251

STELLAR GROUP INCORPORATED
C\O CORPORATION SERVICE COMPANY
8825 N 23rd Avenue Suite 100
Phoenix AZ 85021

20220358988

NCS[AZ(N171066GC]B0
729 Miner Road
Cleveland OH 44143



USPS CERTIFIED MAIL

9214 8901 5273 7200 0016 1571 69

STELLAR GROUP INCORPORATED
2900 Hartley Rd
Jacksonville FL 32257

# ATTENTION

Why are you receiving this notice?  Please visit http://www.ncscredit.com/notice for more information.  If you have any additional questions, please email Clare Wilson
noticeprem@ncscredit.com

## Distribution List

JHO REAL ESTATE INVESTMENT LLC
1600 N PARK DR
Fort Lauderdale FL 33326

STELLAR GROUP INCORPORATED
2900 Hartley Rd
Jacksonville FL 32257

Vital Pharmaceuticals Inc. dba BANG ENERGY
C\O CORPORATE CREATIONS NETWORK INC.
3260 N HAYDEN ROAD #210
Scottsdale AZ 85251

JHO REAL ESTATE INVESTMENT LLC
C\O CORPORATE CREATIONS NETWORK INC.
3260 N. HAYDEN ROAD #210
Scottsdale AZ 85251

STELLAR GROUP INCORPORATED
C\O CORPORATION SERVICE COMPANY
8825 N 23rd Avenue Suite 100
Phoenix AZ 85021

20220358988

NCS[AZ(N171066A2]B0
729 Miner Road
Cleveland OH 44143



### USPS CERTIFIED MAIL

9214 8901 5273 7200 0016 1571 90



STELLAR GROUP INCORPORATED
C\O CORPORATION SERVICE COMPANY
8825 N 23rd Avenue Suite 100
Phoenix AZ 85021

# ATTENTION

Why are you receiving this notice?  Please visit http://www.ncscredit.com/notice for more information.  If you have any additional questions, please email Clare Wilson noticeprem@ncscredit.com

## Distribution List

JHO REAL ESTATE INVESTMENT LLC
1600 N PARK DR
Fort Lauderdale FL 33326

STELLAR GROUP INCORPORATED
2900 Hartley Rd
Jacksonville FL 32257

Vital Pharmaceuticals Inc. dba BANG ENERGY
C\O CORPORATE CREATIONS NETWORK INC.
3260 N HAYDEN ROAD #210
Scottsdale AZ 85251

JHO REAL ESTATE INVESTMENT LLC
C\O CORPORATE CREATIONS NETWORK INC
3260 N. HAYDEN ROAD #210
Scottsdale AZ 85251

STELLAR GROUP INCORPORATED
C\O CORPORATION SERVICE COMPANY
8825 N 23rd Avenue Suite 100
Phoenix AZ 85021

20220358988

NCS[AZ(N171066A1]B0
729 Miner Road
Cleveland OH 44143



USPS CERTIFIED MAIL

9214 8901 5273 7200 0016 1571 83

JHO REAL ESTATE INVESTMENT LLC
C\O CORPORATE CREATIONS NETWORK INC.
3260 N. HAYDEN ROAD #210
Scottsdale AZ 85251

# ATTENTION

Why are you receiving this notice?  Please visit http://www.ncscredit.com/notice for more information.  If you have any additional questions, please email Clare Wilson noticeprem@ncscredit.com

## Distribution List

JHO REAL ESTATE INVESTMENT LLC
1600 N PARK DR
Fort Lauderdale FL 33326

STELLAR GROUP INCORPORATED
2900 Hartley Rd
Jacksonville FL 32257

Vital Pharmaceuticals Inc. dba BANG ENERGY
C\O CORPORATE CREATIONS NETWORK INC.
3260 N HAYDEN ROAD #210
Scottsdale AZ 85251

JHO REAL ESTATE INVESTMENT LLC
C\O CORPORATE CREATIONS NETWORK INC.
3260 N. HAYDEN ROAD #210
Scottsdale AZ 85251

STELLAR GROUP INCORPORATED
C\O CORPORATION SERVICE COMPANY
8825 N 23rd Avenue Suite 100
Phoenix AZ 85021

# EXHIBIT F

Clerk of the Superior Court
*** Electronically Filed ***
M. Farrow, Deputy
8/8/2022 5:01:23 PM
Filing ID 14669795

1  Christopher J. Berry, Esq. – #015385
   **BERRY LAW GROUP, PLLC**
2  1850 N. Central Ave., Suite 1150
   Phoenix, Arizona 85004
3  Telephone: (602) 462-1141
   Facsimile: (602) 462-1151
4  cberry@berrylawgroup.com
   admin@berrylawgroup.com
5  *Attorneys for Defendant Truist Bank*

6

   **IN THE SUPERIOR COURT OF THE STATE OF ARIZONA**
7  **IN AND FOR THE COUNTY OF MARICOPA**

8  NEXUS STEEL, LLC, an Arizona limited          **CV2022-008873**
   liability company,
9

10                   Plaintiff,
             v.                                   **NOTICE OF APPEARANCE**
11

12 JHO REAL ESTATE INVESTMENT, LLC, a
   Florida limited liability company, VITAL
13 PHARMACEUTICALS, INC., a Florida
   corporation, d/b/a BANK, LLC, a Florida
14 limited liability company, FABCO METAL
   PRODUCTS, LLC, a Florida limited liability
15 company, BELVAC PRODUCTION
   MACHINERY, INC., a Virginia corporation,
16 TRUIST BANK, a North Carolina company,
   ISEC, INC., Colorado corporation, HEAVY
17 EQUIPMENT MOVERS & INSTALLATION,
   LLC, a Delaware limited liability company,
18 HARDROCK CONCRETE PLACEMENT CO.
   INC., an Arizona corporation, STELLAR
19 GROUP, INC., a Florida corporation, FAITH
   TECHNOLOGIES, INC., a Wisconsin
20 corporation, INTEGRATED MASONRY, an
   Arizona company, HACI MECHANICAL
21 CONTRACTORS, INC., an Arizona
   corporation, TRENCH SHORE RENTALS, an
22 Arizona corporation, THE MARICOPA
23 COUNTY TREASURER'S OFFICE, BLACK
   & WHITE CORPORATIONS 1-10,
24
25                   Defendants.
26

                                    -1-

Notice if hereby given that Christopher J. Berry of the law firm of Berry Law Group, PLLC appears as attorney of record on behalf of Truist Bank.

DATED this 8th day of August, 2022.

**BERRY LAW GROUP, PLLC**

By:  /s/ Christopher J. Berry
     _____
     Christopher J. Berry, Esq.
     *Attorneys for Defendant Truist Bank*

**COPY** of the foregoing E-filed
this 8th day of August, 2022.

**COPY** of the foregoing E-served
this 8th day of August, 2022.

Richard C. Gramlich, Esq.
TIFFANY & BOSCO, P.A.
Seventh Floor Camelback Esplanade II
2525 E. Camelback Road
Phoenix, AZ 85016
reg@tblaw.com
*Attorneys for Plaintiff*

 /s/ Maria Elena Garcia
_____

# EXHIBIT G

Case 2:27-84842-DPR Doc 163017 Filed 07/08/33 Page 288 of 401
Clerk of the Superior Court
*** Electronically Filed ***
M. De La Cruz, Deputy
8/10/2022 1:10:48 PM
Filing ID 14680365

Scott Reynolds (State Bar No. 013652)
SATTERLEE GIBBS PLLC
3133 W. Frye Road, Suite 101
Chandler, Arizona 85226
Telephone: 480-702-1211
Fax: 480-546-3218
E-mail: scott@sgazlaw.com
        minuteentries@sgazlaw.com

Attorneys for Defendant/Counterclaimant/Cross-Claimant Hardrock Concrete Placement Co. Inc.

## IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

## IN AND FOR THE COUNTY OF MARICOPA

| | |
|---|---|
| NEXUS STEEL, LLC, an Arizona limited liability company, | Case No. CV2022-008873 |
| Plaintiff, | **HARDROCK CONCRETE PLACEMENT CO., INC.'S ANSWER, COUNTERCLAIM AND CROSSCLAIMS** |
| vs. | |
| JHO REAL ESTATE INVESTMENT, LLC., a Florida limited liability company, VITAL PHARMACEUTICALS, INC., a Florida corporation, d/b/a BANG, LLC, a Florida limited liability company, FABCO METAL PRODUCTS, LLC., a Florida limited liability company, BELVAC PRODUCTION MACHINERY, INC., a Virginia corporation, TRUIST BANK, a North Carolina company, ISEC, INC., a Colorado corporation, HEAVY EQUIPMENT MOVERS & INSTALLATION, LLC, a Delaware limited liability company, HARDROCK CONCRETE PLACEMENT CO. INC., an Arizona corporation, STELLAR GROUP, INC., a Florida corporation, FAITH TECHNOLOGIES INC., a Wisconsin corporation, INTEGRATED MASONRY, | **(Assigned to the Honorable Brad Astrowsky)** |

1

an Arizona company, HACI
MECHANICAL CONTRACTORS, INC.,
an Arizona corporation, TRENCH
SHORE RENTALS, an Arizona
corporation, THE MARICOPA COUNTY
TREASURERER'S OFFICE, BLACK &
WHITE CORPORATIONS 1-10,

Defendants.

For its Answer to Plaintiff Nexus Steel, LLC's ("Plaintiff") Complaint, Defendant Hardrock Concrete Placement Co. Inc. ("Hardrock") admits, denies, and affirmatively alleges as follows:

### GENERAL ALLEGATIONS

1.      Hardrock is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 1 of Plaintiff's Complaint and, therefore, denies them.

2.      Hardrock is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 2 of Plaintiff's Complaint and, therefore, denies them.

3.      Hardrock is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 3 of Plaintiff's Complaint and, therefore, denies them.

4.      Hardrock is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 4 of Plaintiff's Complaint and, therefore, denies them.

5.      Hardrock is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 5 of Plaintiff's Complaint and, therefore, denies them.

6.      Hardrock is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 6 of Plaintiff's Complaint and, therefore, denies them.

7.      Hardrock is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 7 of Plaintiff's Complaint and, therefore, denies them.

8.      Hardrock is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 8 of Plaintiff's Complaint and, therefore, denies them.

9.      Hardrock admits the allegations in Paragraph 9 of Plaintiff's Complaint.

10.      Hardrock is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 10 of Plaintiff's Complaint and, therefore, denies them.

11.      Hardrock is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 11 of Plaintiff's Complaint and, therefore, denies them.

12.      Hardrock is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 12 of Plaintiff's Complaint and, therefore, denies them.

13.      Hardrock is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 13 of Plaintiff's Complaint and, therefore, denies them.

14.      Hardrock is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 14 of Plaintiff's Complaint and, therefore, denies them.

15.      Hardrock is without knowledge or information sufficient to form a belief

as to the truth or falsity of the allegations contained in Paragraph 15 of Plaintiff's Complaint and, therefore, denies them.

16.     Hardrock is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 16 of Plaintiff's Complaint and, therefore, denies them.

17.     Hardrock agrees that Tier III is appropriate for this case.

18.     Hardrock is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in both Paragraphs that are identified as number 18 of Plaintiff's Complaint and, therefore, denies them.

19.     Hardrock is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 19 of Plaintiff's Complaint and, therefore, denies them.

20.     Hardrock is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 20 of Plaintiff's Complaint and, therefore, denies them.

21.     Hardrock is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 21 of Plaintiff's Complaint and, therefore, denies them.

22.     Hardrock is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 22 of Plaintiff's Complaint and, therefore, denies them.

23.     Hardrock is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 23 of Plaintiff's Complaint and, therefore, denies them.

**COUNT I**
**(Lien Foreclosure – All Defendants)**

24.     Hardrock incorporates its prior responses as though fully set forth herein.

25.     Hardrock is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 25 of Plaintiff's Complaint and, therefore, denies them.

26.     To the extent valid, Hardrock admits the allegations contained in Paragraph 26 of Plaintiff's Complaint.

27.     Hardrock denies the allegations contained in Paragraph 27 of Plaintiff's Complaint.

28.     Hardrock denies the allegations contained in Paragraph 28 of Plaintiff's Complaint.

29.     Hardrock incorporates its prior responses as though fully set forth herein.

30.     The allegations set forth in Paragraphs 30-44 are neither alleged against, nor concern Hardrock, and, accordingly, no Answer is required.

## AFFIRMATIVE AND OTHER DEFENSES

1.     To the extent not addressed above, all remaining facts and allegations contained within Plaintiff's Complaint are expressly denied.

2.     Plaintiff has failed to state a cause or causes of action upon which relief may be granted.

3.     Contribution.

4.     Failure to comply with statutory requirements.

5.     Non-parties to this action may be solely or comparatively at fault. Pursuant to Rule 26 (b)(5), Arizona Rules of Civil Procedure and A.R.S. § 12-2506(B), *et seq*. Defendants reserve the right to have the trier of fact assess fault against these non-parties.

5

6.      Defendant Hardrock does not know whether additional defenses will prove to be applicable and therefore reserve the right to add affirmative defenses dependent upon subsequently discovered information including, but not limited to, those affirmative defenses contained within Rules 8(c) and 12(b) of the Arizona Rules of Civil Procedure.

**WHEREFORE,** Hardrock requests that Plaintiff take nothing on its Complaint and request that judgment be entered in favor of Hardrock and award Hardrock its attorneys' fees, costs, and charges as well as such further relief as it deems appropriate under the circumstances.

## COUNTERCLAIM AND CROSS-CLAIMS

Hardrock Concrete Placement Co., Inc. ("Hardrock") for its Counterclaim against Nexus Steel, LLC ("Nexus") and Cross-Claims against JHO Real Estate Investment, LLC ("JHO"), Vital Pharmaceuticals, Inc. ("Vital") d/b/a Bang, LLC, Fabco Metal Products, LLC ("Fabco"), Belvac Production Machinery, Inc. ("Belvac"), Truist Bank ("Truist"), ISEC, Inc. ("ISEC"), Heavy Equipment Movers & Installation, Inc ("HEMI"), Stellar Group, Inc. ("Stellar"), Faith Technologies, Inc. ("Faith"), Integrated Masonry ("Integrated"), HACI Mechanical Contractors, Inc. ("HACI"), Trench Shore Rentals ("Trench"), and the Maricopa County Treasurer's Office ("MCT"), hereby alleges and states as follows:

1.      Hardrock is an Arizona corporation with its principal place of business in Maricopa County, Arizona. Hardrock is a duly licensed contractor with the Arizona Registrar of Contractors bearing license numbers 096338 and 102993. Hardrock provided concrete materials and other services for the project located at 1635 South 43rd Avenue, Phoenix, Arizona, APN 105-14-001Q (hereinafter the "Property").

2.      JHO is a Florida corporation which is the owner and operator of the Property located at 1635 South 43rd Avenue, Phoenix, Arizona 85009, APN 105-14-001Q located in Maricopa County that is the subject of this action.

3.     Vital is a Florida corporation which operates an energy drink bottling facility and who otherwise may have an ownership or other interest in the Property that is the subject of this action.

4.     Fabco Metal Products, LLC is a Florida limited liability company which recorded a Mechanic's Lien on the Property.

5.     Belvac is a Virginia corporation which recorded a Mechanic's Lien on the Property.

6.     Truist is a North Carolina bank which recorded a Deed of Trust on the Property.

7.     ISEC is a Colorado corporation which recorded a Mechanic's Lien on the Property.

8.     HEMI is a Delaware limited liability company which recorded a Mechanic's Lien on the Property.

9.     Stellar is a Florida corporation who was the General Contractor on the Project and, upon information and belief, recorded a Mechanic's Lien on the Property.

10.    Faith is a Wisconsin which recorded a Mechanic's Lien on the Property.

11.    Integrated is an Arizona company which recorded a Mechanic's Lien on the Property.

12.    HACI is an Arizona corporation which recorded a Mechanic's Lien on the Property.

13.    Trench is an Arizona corporation which recorded a Mechanic's Lien on the Property.

14.    Upon information and belief, the MCT recorded a tax lien on the Property.

15.    The contracts that are the basis of this lawsuit were entered into, executed and breached in Maricopa County, Arizona.  The lien sought to be foreclosed by this Counterclaim and Cross-Claims are upon Property situated in Maricopa County, Arizona.

16.     This Court has jurisdiction over the subject matter and the parties to this action.  Venue is proper in this Court.

**GENERAL ALLEGATIONS**

17.     On November 12, 2020, Hardrock, as a concrete subcontractor and Stellar as the general contractor, entered into a written agreement ("Agreement") for labor, material, and services to be provided by Hardrock to a project known as the Bang Phoenix Can Manufacturing Project #23006976 (the "Project"), located at 1635 South 43rd Avenue, Phoenix, Arizona, APN 105-14-001Q.  A copy of the Agreement is attached hereto as Tab 1, Exhibit B thereto which is incorporated by this reference.

18.     On November 18, 2020, and in accordance with A.R.S. § 33-992.01, Hardrock timely provided its 20-Day Preliminary Notice. A copy of the mailing receipt is attached hereto as Tab 1, Exhibit C thereto which is incorporated by this reference.

19.     The legal description of the Property upon which Hardrock's labor, material, and services were provided is more specifically identified in Tab 1, Exhibit A thereto, which is attached hereto and incorporation by this reference ("Property").

20.     The title to the Property is, upon information and belief, vested in JHO and/or Vital.

21.     Commencing on or about November 16, 2020, and continuing, Hardrock furnished labor and materials and performed concrete construction work on the Property in accordance with the terms of the Agreement, change orders and other instructions from Stellar or its authorized agents.

22.     Hardrock has fulfilled and performed all of its contractual obligations and duties under the Agreement, change orders and other instructions from Stellar or any of their authorized agents.

23. Hardrock has made demand for payment from Stellar in the amount of $669,195.67 and Stellar has failed to make payment.

24. Counterdefendant and Cross-Defendants may have an actual or beneficial interest in the Property.

**FIRST CLAIM FOR RELIEF**

**(Judicial Foreclosure of Lien – Counterdefendant and All Cross-Defendants)**

25. Hardrock realleges all of the allegations set forth herein.

26. Commencing on or about November 16, 2020, and continuing, Hardrock furnished labor and materials and performed concrete construction work on the Project and the Property in accordance with the terms of the Agreement, change orders and other instructions from Stellar or its authorized agents which is owned or reputed to be owned by JHO and/or Vital.

27. The labor and materials furnished by Hardrock were installed and incorporated into the building structures or improvements on the Property.

28. The unpaid liquidated balance due to Hardrock for the labor and materials furnished is $669,195.67, plus interest, costs, and fees.

29. The amount set forth above is the reasonable value of the labor and materials supplied by Hardrock to the Property after deducting just credits and offsets.

30. On March 22, 2022, Hardrock, duly and timely, recorded in the Maricopa County Recorder's Office, at instrument number 2022-0257254, its Notice and Claim of Mechanic's, Materialman's, or Professional Services Lien (in the amount of $669,195.67), exclusive of interest, costs, and fees. A copy of the recorded Notice of Claim of Lien is attached as Tab 1 and incorporated by this reference. Hardrock's Lien was also duly mailed to the reputed owners or those have a possible leasehold interest in the Project – JHO and Vital.

31.     Hardrock has performed all conditions precedent to the fixing of a good and sufficient lien under the provisions of Article 6, Chapter 7, Title 33 of the Arizona Revised Statutes, in favor of Hardrock and against the improvements and the Property.

32.     At the time of Hardrock's Notice and Claim of Lien was recorded, the construction of the project has not yet been completed, or in the alternative, not more than sixty (60) days had elapsed from the date of completion to the date the Notice and Claim of Lien was recorded.

33.     Upon information and belief, no Notice of Completion has been recorded at the time that Hardrock's Notice of Claim of Lien was recorded.  In the alternative, if a Notice of Completion was recorded, it was not served upon Hardrock in accordance with the requirement of A.R.S. § 33-993(f).

34.     Since the recording of the Notice of Claim of Lien, Hardrock has not been paid any part of the amount set forth in said Lien.

35.     Hardrock has impressed and secured a valid Lien in accordance with A.R.S. § 33-993, and entitled to enforce and foreclose upon the Lien, and to have the subject Property sold to satisfy the amount set forth in the Notice of Claim of Lien, including, all interest, attorneys' fees and costs.

36.     Except as to those mechanic's liens or other liens that may have been filed by other person, which are valid, and which mechanic's liens or other liens are on parity with Hardrock's Lien, the right, title, interest and claim of said other claimants in and to the Property and improvements thereon are junior and inferior to the Lien of Hardrock.

WHEREFORE, Hardrock requests judgment against Counterdefendant and Cross-Defendants as follows:

A. That Hardrock be determined and adjudged to have a valid lien on the Property and the improvements in an amount to be proven at trial, but not less that the

sum of $669,195.67, together with pre-judgment and post judgment interest, costs, and attorneys' fees;

B.  That Hardrock's Lien on the Property and improvements thereon be foreclosed and that each and all of the Counterdefendants and Cross-Defendants, except those valid mechanic's liens or other valid liens on parity with Hardrock's Lien, be decreed to have claims junior and inferior to the lien of Hardrock;

C.  That Counterdefendant and Cross-Defendants be forever barred and foreclosed of all right, title, interest, lien and equity in the Property and the improvements thereon;

D.  That the Court order that the Property and improvements thereon be sold and a writ or other special execution be issued to the Sherriff of Maricopa County, Arizona directing him or her to seize and sell the Property, according to the law and practices of this Court, and that the proceeds of the sale be applied in satisfaction of the amount due to Hardrock, including all pre and post judgment interest, costs and attorneys' fees;

E.  In the event of default, attorneys' fees in the amount of $25,000;

F.  That Hardrock have judgment against the Counterdefendant and Cross-defendants for the amount of any deficiency after such sale;

G.  For such other and further relief that this Court deems just and appropriate.

## SECOND CLAIM FOR RELIEF

### (Breach of Contract - Stellar)

37.     Hardrock realleges all of the allegations set forth herein.

38.     Cross-Defendant Stellar has failed to make payment as required by the Agreement.

11

39.     As a consequence of Stellar's breach, Hardrock has been damaged in the amount to be determined at trial, but not less than $669,195.67, plus pre and post judgment interest, attorneys' fees (A.R.S. 12-341.01) and costs.

WHEREFORE, Hardrock requests judgment against Stellar as follows:

A. For damages in an amount to be determined at trial, but in no event less than $669,195.67;

B. For pre and post judgment interest;

C. For attorneys' fees and costs;

D. In the event of default, attorneys' fees in the amount of $25,000;

E. For such further relief as this Court deems just and appropriate.

**THIRD CLAIM FOR RELIEF**

**(Unjust Enrichment – JHO and Vital)**

40.     Hardrock realleges all of the allegations set forth herein.

41.     Hardrock provided concrete materials and labor for the Project which was a benefit to the subject Property according to the reasonable value of such materials and materials, which has enriched JHO and Vital.

42.     To date, Hardrock not been paid in the amount of $669,195.67 for those materials and services which enriched JHO and Vital which has resulted in a detriment or impoverishment to Hardrock.

43.     As such, JHO and/or Vital have been unjustly enriched and it is inequitable for JHO and/or Vital to retain said enrichment to the detriment of Hardrock, and, accordingly, Hardrock is entitled to payment from JHO and/or Vital for the materials and services provided by Hardrock.

WHEREFORE, Hardrock requests judgment against JHO and Vital as follows:

A. For damages in an amount to be determined at trial, but in no event less than $669,195.67;

12

B.  For pre and post judgment interest;

C.  For attorneys' fees and costs;

D.  In the event of default, attorneys' fees in the amount of $25,000;

E.  For such further relief as this Court deems just and appropriate.

DATED this 10th day of August, 2022.

SATTERLEE GIBBS PLLC

By:   */s/ Scott Reynolds*
Scott Reynolds
3133 W. Frye Road, Suite 101
Chandler, Arizona 85226
Attorneys for
Defendant/Counterclaimant/Cross-Claimant

ORIGINAL of the foregoing e-filed and e-served
this 10th day of August, 2022, to:

Richard C. Gramlich
TIFFANY & BOSCO
Seventh Floor Camelback Esplanade II
2525 East Camelback Road
Phoenix, Arizona 85016-4237
Attorneys for Plaintiff/Counterdefendant Nexus Steel, LLC

John L. Condrey
GORDON REES SCULLY MANSUKHANI, LLP
Two North Central Avenue, Suite 2200
Phoenix, Arizona 85004
Attorneys for Cross-Defendant Fabco Metal Products, LLC

13

COPY mailed this 10th day of August, 2022, to:

JHO Real Estate Investment, LLC
1600 N Park Drive
Weston, FL 33326

Vital Pharmaceuticals, Inc.
1600 N Park Drive
Weston, FL 33326

Belvac Production Machinery, Inc.
237 Graves Mill Road
Lynchburg, VA 24502

Truist Bank
Attn: Agency Services Manager
Agency Services
303 Peachtree St., NE
25th Floor
Atlanta, GA 30308

ISEC Incorporated
6000 Greenwood Plaza Blvd., Suite 200
Greenwood Village, CO 80111

Heavy Equipment Movers & Installation
126 Industrial Drive
Maysville, GA 30558

Stellar Group, Inc.
2900 Hartley Road
Jacksonville, Florida 32257

Faith Technologies, Incorporated
225 Man Street
Menasha Wisconsin 54952

Integrated Masonry
3241 E Shea Blvd, Ste 613
Phoenix Arizona 85028

HACI Mechanical Contractors, Inc.
2108 W Shangri La Rd
Phoenix Arizona 85029

14

Trench Shore Rentals
17200 N Perimeter, Ste 103
Scottsdale, Arizona 85255

Maricopa County Treasurer
301 W Jefferson Street
Suite 100
Phoenix Arizona 85003


By: */s/ Scott Reynolds*

**TAB 1**

OFFICIAL RECORDS OF MARICOPA
COUNTY RECORDER STEPHEN RICHER
ELECTRONIC RECORDING
20220257254,03/22/2022
03:07,satterlee009-30-1-1--,N

**WHEN RECORDED RETURN TO:**

SATTERLEE GIBBS
3133 W. Frye Road, Suite 101
Chandler, Arizona 85226
Attention: Scott Reynolds

Recorder's Use

## NOTICE AND CLAIM OF
## MECHANIC'S, MATERIALMAN'S,
## OR PROFESSIONAL SERVICES LIEN

1.  **CLAIMANT.** Party on whose behalf this Lien is filed and served (the "Claimant"):

     Hardrock Concrete Placement Co., Inc.
     4839 West Brill Street
     Phoenix, Arizona 85043

2.  **REAL PROPERTY.** The real property sought to be charged with this Lien is the following described land, and includes any and all structures and improvements located thereon (the "Real Property"):

     (a)   Address of Location of Real Property:

     Phoenix Can Manufacturing
     1635 South 43rd Avenue
     Phoenix, Arizona 85009

     (b)   Legal Description of Real Property:

     The Legal Description is attached hereto as Exhibit "A" and is incorporated herein by this reference.  APN 105-14-001Q

3.  **OWNER.** Owner or Reputed Owner of the Property (the "Owner"):

     Vital Pharmaceuticals, Inc.
     JHO Real Estate Investment LLC
     1600 N. Park Drive
     Weston, Florida 33326

-1-

4.    **OWNER'S AGENT.**  The name of the person by whom Claimant was employed, or to whom Claimant furnished the Materials or Services is:

> Stellar Group, Inc.
> 2900 Hartley Road
> Jacksonville, Florida 32257

5.    **PROJECT.**  The name or description of Owner's Project, if any, and the nature of the construction, alteration, repair, expansion, addition or improvement of the buildings, other structures or improvements on the Real Property (the "Project"), are as follows:

> Bang Phoenix Can Manufacturing – Project #23006976

6.    **CONTRACT.**  The Materials or Services were furnished by Claimant to the Project pursuant to a Contract with the following terms, time given, and conditions ("Terms"):

> Stellar Group Subcontractor Agreement dated November 12, 2020 and Subcontract Change Orders attached collectively as Exhibit "B".

7.    **AMOUNT OF CLAIM.**  After deducting all just offsets and credits, the Amount of Claim herein demanded by Claimant is as follows (which is also the reasonable value of the materials and services for which Claimant has not been paid).  This Amount of Claim shall bear interest at 10% per annum.  In addition, the Claimant shall be entitled to reimbursement for the cost of preparation and foreclosure of this Lien, pursuant to A.R.S. § 33-995(E) and 33-998(B), costs and attorneys' fees incurred in collecting this debt:

> $669,195.67

8.    **MATERIALS OR SERVICES.**  Claimant furnished to the Project the following types of materials and/or services, including labor, professional services, materials, machinery, fixture or tools (the "Materials or Services").

> Furnishing concrete, labor and materials.

9.    **COMPLETION DATE.**  Completion of the Project occurred on the following date:

> As of February 11, 2022, all work on the Project has ceased.  Completion of the Project will occur as provided for in A.R.S. § 33-993(A).

10.     **COMMENCEMENT DATE.**  Materials and Services were first furnished to the Project:

      November 16, 2020

11.     **DATE OF PRE-LIENS.**  The preliminary twenty-day notices (the "Pre-Liens") were mailed pursuant to A.R.S. § 33-992.01 and given on the following dates:

      November 18, 2020

     A copy of the Pre-Liens and the proof of mailings required by A.R.S. § 33-992.02 are attached hereto collectively and incorporated by this reference as Exhibit "C".

     WHEREFORE, and pursuant to A.R.S. § 33-993, Claimant claims and fixes a lien upon the Real Property in the Amount of Claim provided herein by causing this Notice and Claim to be recorded with the County Recorder of the county in which the Real Property is situated and a copy to be served within a reasonable time upon the Owner if he can be found within that county.

      HARDROCK CONCRETE PLACEMENT CO., INC.

Dated: March _18_ , 2022   By _____
               Dean Abrahamson Its Chief Financial Officer

STATE OF ARIZONA    )
                ) ss.
County of Maricopa    )

On this _18th_ day of March, 2022, Dean Abrahamson, who is known to me, or satisfactorily proven to me, to be the person whose name is subscribed to this document, personally appeared before me, a notary public, and who being duly sworn upon oath, stated that he read this document and knows of his own knowledge that the facts stated herein are true and correct, except those matters based upon information, which he believes to be true, and acknowledged that he executed this document in the capacity indicated for the principal named.

My Commission Expires:            Notary Public

_May 8, 2024_               _Rachelly Cazares_

RACHEL Y CAZARES
Notary Public - Arizona
Maricopa County
Commission # 580601
My Comm. Expires May 8, 2024

-3-

# Exhibit A

**Exhibit A**
**Legal Description**
**(Assessor Parcel Number 105-14-001Q)**

That portion of the Northwest quarter of Section 15, Township 1 North, Range 2 East of the Gila and Salt River Meridian, Maricopa County, Arizona, described as follows:

Beginning at the Northwest corner of the North half of the Southwest quarter of said Northwest quarter;

Thence South (assumed bearing for purposes of this description) along the West line of said section, a distance of 660.00 feet to a line that is parallel with and distant 1968.46 feet Southerly measured at right angles from the North line of said section;

Thence South 89 degrees 50 minutes East, along said parallel line, a distance of 1307.28 feet to a line that is parallel with and distant 10.00 feet Westerly, measured at right angle, from the East line of said Southwest quarter, last said parallel line being also the center line of an existing drill track;

Thence North 00 degrees 01 minutes West, along last said parallel line, a distance of 1095.68 feet to a point of CUSP;

Thence Southwesterly along a tangent curve concave Northwesterly having a radius of 642.43 feet, through a central angle of 05 degrees 43 minutes 29 seconds, an arc distance of 64.19 feet;

Thence South 05 degrees 42 minutes 29 seconds West, tangent to said curve, a distance 26.38 feet;

Thence Southwesterly and Westerly along a tangent curve to the right having a radius 382.24 feet, through a central angle of 84 degrees 27 minutes 31 seconds, an arc distance of 563.45 feet to a point of tangency in a line that is parallel with and distant 1308.46 feet Southerly, measured at right angles, from said North line;

Thence North 89 degrees 50 minutes West, along last said parallel line, a distance of 919.70 feet to the point of beginning.

EXCEPTING THEREFROM that portion of said property lying below a depth of 500.00 feet measured vertically from the contour of the surface thereof;

Provided, however, that said grantor, its successors and assigns, shall not have the right for any and all purposes to enter upon, into or through the surface of the portion of said property lying above 500.00 feet, measured vertically from the contour of the surface of said property, as reserved in Deed recorded in Docket 9581, Page 180 and also recorded in Docket 9590, Page 873; and

EXCEPT all rights retained by Southern Pacific Company, a Delaware corporation in Warranty Deed recorded in Docket 3976, Page 407 of official records of Maricopa County, Arizona.

# Exhibit B

DocuSign Envelope ID: 32CC09D8-5F1B-425F-B5B2-09EDDCEC3356

# SUBCONTRACT
## Stellar Group, Inc.
2900 Hartley Road
Jacksonville, FL 32257

| | | |
|---|---|---|
| **Subcontractor:** | Hardrock Concrete Placement Co. Inc.<br>4839 W Brill St<br>Phoenix Arizona 85043-1815 | **Project Name and Location:**    Bang Energy – Phoenix Can Manufacturing<br>1635 South 43rd Avenue<br>Phoenix Arizona 85009 |
| **Attention:** | Cindy Kennemer | **Attention:**    Brian Edberg |
| **Phone:** | (602) 233-3334 | **Mobile:**    (904) 349-0640 |
| **Fax:** | (602) 233-2777 | **E-Mail:**    bedberg@stellar.net |
| **E-Mail:** | ckennemer@hrconcrete.com | |

| Date | SC # | Project # | Contract Type | FOB | Schedule |
|---|---|---|---|---|---|
| 11/9/2020 | 23006976-SUB-03 | 23006976 | Lump Sum | Jobsite | 10/23/2020 |

**Scope of Work: Concrete**

This Subcontract is made by and between Stellar Group, Incorporated, d/b/a Stellar, hereinafter referred to as Contractor, and the Subcontractor named above, at Jacksonville, Florida. In consideration of the mutual promises and undertakings set forth herein, Contractor and Subcontractor hereby agree to the terms and conditions set forth herein, including the Terms and Conditions attached hereto. Subcontractor agrees to perform and complete the following Work:

**A. Work:** Subcontractor agrees to perform and complete the scope of work generally as described in Exhibit A attached hereto and incorporated herein.

**B. Construction Progress Schedule:** Subcontractor agrees to complete the Work in strict accordance with the Construction Progress Schedule attached hereto as Exhibit B and incorporated herein.

**C. Contractor's Safety Requirements:** Subcontractor agrees to conform to Contractor's Request for Documentation, Bid Considerations, and Jobsite Safety Rules attached hereto as Exhibit C and incorporated herein.

**ALL FOR THE LUMP SUM OF** ......................................................................................... **$2,111,428.00**

All licenses, permits, fees, taxes and insurance with Contractor named as additional insured included)

**Attachments:**
Exhibit-F-General Requirements.pdf, Exhibit-E—Stellar-Guide-for-Subcontractors-Usage-in-Procore.pdf, Exhibit-D-PHX VPX-Stellar DBIA_530___535_Cost_Plus_GMP 2020-07-28_Executed (3).pdf, 23006976 - Arizona Form 5000.pdf, 23006976 - Subcontract Attachments.pdf, Exhibit-C-JSP- Bang-Energy-Phoenix.pdf, 23006976 - Arizona Form 5005.pdf, Exhibit-B-06976- Bang PHX Can Manufacturing Schedule_PRELIMINARY.pdf, Concrete Submittal Log dated 11.09.2020.pdf, Concrete Drawing Log as of 10.13.2020.pdf, 23006976 - Subcontract Attachments.pdf, Exhibit_A_23006976_SUB-03_Concrete.pdf

**FOR ACCOUNTING PURPOSES ONLY:**

| Cost Code | Distributed Value |
|---|---|
| 03-0301 – 1760 | $329,119.00 |
| 03-0302 – 1760 | $771,203.00 |
| 03-0304 – 1760 | $697,496.00 |
| 03-0305 – 1760 | $145,796.00 |
| 03-0306 – 1760 | $122,000.00 |
| 03-0307 – 1760 | $45,814.00 |
| **Total:** | **$2,111,428.00** |

**THIS SUBCONTRACT INCLUDES AND IS SUBJECT TO THE TERMS AND CONDITIONS ATTACHED HERETO AND INCORPORATED HEREIN.**

IN WITNESS WHEREOF, the Subcontractor and Contractor have executed this Subcontract on the date set forth above.

**HARDROCK CONCRETE PLACEMENT CO. INC.**
Subcontractor

Signed and Dated: *Cindy Kennemer*    11/12/2020 | 10:15 AM PST

By: Cindy Kennemer

**STELLAR GROUP, INCORPORATED**
Contractor

Signed and Dated: _____

By: Jonah Petoskey
Senior Project Manager

_ _ _CONTRACT

## Stellar Group, Inc.

| | | | |
|---|---|---|---|
| SC #: | 23006976-SUB-03 | **Date:** | 11/9/2020 |
| **Subcontractor:** | Hardrock Concrete Placement Co. Inc. | **Page:** | 2 of 6 |

Contract Agreement for: Bang Energy – Phoenix Can Manufacturing

Subcontract Agreement Addendum

This addendum modifies the accompanying Subcontract Agreement (together the "Subcontract Agreement") as set forth below.

## GENERAL NOTES

1.      Subcontractor and any Sub-Subcontractors must possess and, at the time of execution of this Agreement, furnish a copy of a valid state Contractors license for the state where the Project is located and for the scope of Work described herein. This Subcontractor must certify and warrant and furnish proof that it is currently registered to do business and remit state sales and use tax in the state where the Project is located. Contractor reserves the right to Withhold payment until this Subcontractor furnishes such proof. It is the Subcontractor's responsibility to obtain and keep in force proper licensing in accordance with the laws and statutes of the state where the Project is located and to otherwise comply with all applicable federal, state and local laws, ordinances and regulations. Any Sub-Subcontractor must also comply with these provisions, and Subcontractor shall expressly incorporate these provisions into any agreement in which the Subcontractor subcontracts with another to perform any portion of the Work described herein.

2.      Immediately upon execution of this Subcontract, Subcontractor shall furnish to the Contractor all certificates of insurance in accordance with Paragraph Six Insurance Requirements of the Terms and Conditions. Subcontractor must submit all certificates of insurance prior to performing any on this Project.

3.      Subcontractor agrees to diligently pursue the Work and to meet the requirements set forth in the Construction Progress Schedule. In the event the Subcontractor delays the progress of the Work, he shall bear all costs of overtime, expediting and all special freight or other charges required to bring its progress to the level required. This Subcontractor may also be subject to damages or claims by the Contractor or other subcontractors brought about by Subcontractor's negligence or its failure to adhere to the Construction Progress Schedule for any reason. Failure to comply with the Construction Progress Schedule may result in default under Paragraph Seven Default and Remedies of the Terms and Conditions.

4.      Work hours shall be established by the Contractor and shall be followed by the Subcontractor. The Subcontractor must work during regular hours and will not be permitted to work at night and/or on weekends. All overtime work must be approved by the Project Superintendent. A representative of Contractor must be on site at all times work is being performed.

5.      Subcontractor shall fully comply with the applicable employment verification procedures for all of its employees. Subcontractor certifies and warrants to Contractor that it maintains a I-9 compliance program for the express purpose of verifying lawful employment authorization to work in the United States for all of Subcontractors employees. The Subcontractor represents that it will follow all I-9 verification, reverification and updating procedures required by the Immigration Reform and Control Act of 1986 for all of Subcontractors employees on the Project. The Subcontractor further represents that it maintains a designated I-9 compliance officer who oversees the Subcontractors I-9 compliance procedures.

6.      Subcontractor shall cooperate fully the instructions and directions of the Project Superintendent and shall coordinate its Work the work of other subcontractors.

7.      Subcontractor shall perform all Work in a neat and professional manner and shall take great care not to damage any work already in place.

8.      The Subcontractor shall furnish shop drawings and submittal data to the Contractor no later than weeks after receipt of this Subcontract. Subcontractor shall submit six copies plus the number to be returned to Subcontractor.

9.      The Subcontractor shall furnish all layout and engineering in connection with its Work.

10.     The Subcontractor shall clean-up all debris from its work on a daily basis. If, in the reasonable opinion of the Contractor, clean-up is not satisfactory, the Contractor, alter giving reasonable notice to the Subcontractor, may clean up the premises at the reasonable cost and expense of the subcontractor and deduct such expense from payments due to the Subcontractor.

11.     Subcontractor certifies and warrants that he is aware of all federal, state and local safety requirements and regulations pertaining to the Work, and Subcontractor shall perform its Work in strict compliance with such requirements and regulations. Subcontractor shall also comply with Contractor's safety regulations.

12.     Subcontractor shall furnish Material Safety Data Sheets to the Contractor for material used in the Work and shall have same in its possession at the jobsite. Subcontractor shall pay any fines imposed for lack of the proper Material Safety Data Sheets.

13.     Subcontractor shall comply with the code requirements of any governmental or regulatory body having jurisdiction over the Work. Subcontractor shall bring to the attention of the Contractor any patent discrepancy between the code requirements and the drawings or specifications.

14.     Subcontractor shall be responsible for scheduling, deliveries and receiving of all materials and supplies required for the Work. The Contractor accepts no responsibility for unloading deliveries or the condition or quantity of any materials delivered in the Subcontractor's absence.

15.     It is the Subcontractor's responsibility to store and protect its materials, tools and equipment. Contractor shall not be liable in the event that Subcontractor's materials, tools or equipment are lost, stolen or damaged.

16.     Subcontractor agrees to maintain as built documents and data applicable to the Work. Subcontractor shall provide these documents to (he Contractor prior to release of retainage.

17.     Payments shall be made in accordance with Paragraph Eight, Payment, of the Terms and Conditions attached to the Subcontract.

18.     Prior to submittal of the first Requisition for Payment, Subcontractor shall submit a detailed Schedule of Values acceptable to the Contractor, for the purpose of approving work-in-place and/or materials suitably stored on site.

19.     Prior to the final Requisition for Payment being processed, the Subcontractor shall submit to the Contractor, final lien waivers, final warranty, as-built drawings. copies of inspections and/or permits, three (3) hard copies and one (1) PDF copy of equipment operation and maintenance manuals and any other criteria required by the contract documents.

20.     Subcontractor must use the Contractors •Subcontractor Requisition for Payment' form for all payment requisitions, and the form must bear the Subcontractor's original signature, notarized.

21.     With every requisition for payment, Subcontractor must submit a validly executed Lien Waiver and, in the event that there is a payment bond on the project, a Waiver of Right to Claim Against the Bond, as a condition precedent to payment.

22.     The Subcontractor shall execute IRS document W-9 and return it to the Contractor with the executed Subcontract. Contractors receipt of the executed W-9 is a condition precedent to payment.

23.     Subcontractor hereby acknowledges that it has received contract drawings and specifications for the Work.

24.     Modifications or alterations to this Subcontract are not valid without prior written approval of the Contractor.

25.     Prior to execution of any extra or change in the work, Subcontractor must submit a claim for Change in the Work. and a Project Manager. or other Project Executive, must issue a Subcontract Modification in accordance with Paragraph Three Changes in the Work of the Terms and Conditions. Contractor shall not compensate Subcontractor for such Work if the Subcontractors claim was not timely or the Contractor did not approve the claim and issue a Subcontract Modification. The Superintendent does not have authority to modify the Subcontract or to approve extra work or claims for Change in the Work. Contractor covenants that it shall never direct Subcontractor to perform extra work except by means of a written change order properly executed by its authorized representative.

26.     Subcontractor shall not in whole or in part assign or sublet this Subcontract or the proceeds due or to become due under this Subcontract without the prior, express and written consent of the Contractor.

27.     Subcontractor shall maintain accurate as-built drawings during construction, and upon request, Subcontractor shall submit the drawings to the Contractor for periodic review. Failure to maintain accurate as-built drawings during construction may result in default under Paragraph Seven Default and Remedies of the Terms and Conditions. Not later than Substantial Completion, the Subcontractor shall deliver one clean set of marked-up drawings to the Contractor for inclusion in the close-out documents with the Owner.

28.     For each day the Subcontractor is on the jobsite, the Subcontractor shall submit a "Subcontractor's Daily Report" form, available at the Contractor's field office, to the Contractors Superintendent by 10:00 a.m. the following morning. Subcontractor's compliance with this provision is a condition precedent to payment.

29.     Subcontractor shall pay all taxes, assessments and premiums under the federal Social Security Act, any applicable unemployment insurance, workers compensation, disability benefits, sales tax, use tax, business tax, personal property tax laws, or other applicable laws now or later in effect payable by reason of or in connection with any part of the Work. In the event that Subcontractor fails to comply with these laws and Contractor becomes liable for such taxes, assessment or premiums, Subcontractor shall indemnify and hold harmless the Contractor and/or the Owner from and against such liability that Contractor and/or the Owner may incur as a result of such failure.

30.     Subcontractor is responsible for having an approved Subcontractor prequalification package on file prior to the issuance of a Subcontract.

**\_\_\_\_\_ CONTRACT**

**Stellar Group, Inc.**

| | | | |
|---|---|---|---|
| **SC #:** | 23006976-SUB-03 | **Date:** | 11/9/2020 |
| **Subcontractor:** | Hardrock Concrete Placement Co. Inc. | **Page:** | 2 of 6 |

## TERMS AND CONDITIONS

1.   GENERAL CONTRACT. Contractor has entered or will enter into a General Contract with the Owner for the Project described on the first page of this Subcontract. Contractor has made or will make copies of the General Contract available to the Subcontractor (with dollar amounts redacted). The Project, including Subcontractor's Work, is to be constructed in accordance with the terms and conditions of the General Contract, including drawings and specifications and general, supplemental and special conditions and other Contract Documents described therein. Subcontractor hereby assumes the same conditions and responsibilities with respect to the performance under this Subcontract that the Contractor assumes toward the Owner with respect to its performance under the General Contract; and vice versa. If the General Contract varies or conflicts with any provision of this Subcontract, including any modification hereof, this Subcontract shall govern.

2.   SCOPE OF WORK. Subcontractor shall provide and pay for all labor, materials, services, tools, equipment and other things necessary to fully perform the Work set forth on the first page hereof, in cooperation with the other trades, in a good and workmanlike manner, and to the reasonable satisfaction and the acceptance of Contractor and Owner or Owner's representative, which shall be final. Subcontractor has examined the premises and ascertained existing site conditions (including sub-surface conditions) and the nature and location of the Work thereon, the extent such conditions can be discovered by a reasonable and diligent inspection. All Work affected or governed by such site conditions or Work and services required for the thorough and satisfactory execution and completion of the work, whether indicated and specified or not, and regardless of quantity estimated, shall constitute a part of this Subcontract and be performed by Subcontractor without additional charge. Subcontractor expressly waives the right to make any claim arising out of minor variations in the actual condition of the premises from those conditions shown on the drawings and specifications.

3.   CHANGES IN THE WORK. Whenever the Contractor requests extra work, acceleration of work, compression of work or other changes requiring additional payments (collectively referred to herein as a 'Change in the Work') verbally or in writing directly or indirectly, Subcontractor shall present a written claim for compensation to the Contractor for such Change in the Work within ten (10) days of such request. Subcontractor hereby waives any claim for compensation not presented within ten (10) calendar days of the Change in the Work request. No dispute as to adjustment in the contract price due to Change in the Work shall excuse Subcontractor from proceeding within the original scope of Work or Change in the Work.

Subcontractor shall furnish a complete, itemized breakdown in sufficient detail to permit an analysis of all labor, material and equipment for any Change in the Work implemented at the direction of the Contractor and timely claimed in writing by Subcontractor.

In the event a Change in the Work affects the current Construction Progress Schedule, Subcontractor must include the claim for Change in the Work any request for time extension and justifications therefor.

It shall be a condition precedent to Subcontractors recovery of any compensation or damages for a Change in the Work of any type or any extension of time, whether requested (directly or indirectly, verbally or in writing) or caused by Contractor or others, that Subcontractor shall have made a specific written claim for such Change in the Work extension, compensations or damages within ten (10) days of the request or event giving rise to such Change in the Work or extension of time.

Subcontractor shall have no obligation to perform any Change in the Work unless it receives direction to do so in writing signed by Contractor's authorized representative.

Claims for any such Change in the Work, extension, compensation or damages received after ten (10) days are hereby waived by the Subcontractor and shall not be considered by the Contractor.

4.   PERFORMANCE. Subcontractor acknowledges that TIME IS OF THE ESSENCE with respect to Contractor's completing the Project pursuant to the General Contract, and that such completion is substantially dependent upon Subcontractor's performance of this Subcontract on or before the dates set forth in the Construction Progress Schedule and/or elsewhere herein. TIME IS OF THE ESSENCE IN THIS SUBCONTRACT. Subcontractor shall turn the Work over to the Contractor in good condition and free and clear of all claims and liens, and shall, at its expense, indemnify Contractor and defend all suits and pay all claims arising from its actions and omissions or those of its vendors, sub-subcontractors or second-tier subcontractors in its performance of this Subcontract. Subcontractor shall pay the cost of any bond necessary to remove any mechanic's lien from the Project arising out of the Work of Subcontractor, except when a mechanic's lien results from Contractor's breach of its payment obligations or Owner's breach of its payment obligations. Subcontractor covenants, agrees and warrants that he shall not employ any labor which may interfere with labor harmony at the job site or with the introduction and storage of materials and execution of work by other subcontractors. If Subcontractor breaches this covenant and such breach causes a stoppage or slowdown of Work at the jobsite, Subcontractor shall be liable for damages suffered by Contractor caused by such delay in completing the Project, including any liquidated damages in the General Contract imposed on Contractor for failing to complete the Project on the completion date set forth therein. This job shall be run Merit Shop. Subcontractor shall comply with all laws, ordinances and regulations relating to the manner of doing the Work or to the supplying of material, including, without limitation, laws, ordinances, rules, regulations and orders for the safety of persons and property, and Subcontractor shall provide safe working conditions for its employees and all other persons on the jobsite at all times. If Subcontractor discovers any errors, omissions or discrepancies in the drawings or specifications, the General Contractor this Subcontract, Subcontractor shall immediately notify Contractor in writing. Any Work affected by such discoveries which Subcontractor performs prior to notifying Contractor and obtaining Contractors authorization to proceed shall be performed at Subcontractor's risk. Subcontractor acknowledges that it may be performing the Work in the same area where other subcontractors, Contractor or Owner may be working, and the performance of work by the others may temporarily affect the Subcontractor's Work. Subcontractor agrees to fully cooperate with the others to ensure an expeditious completion of the interfaces. If Subcontractor's Work depends on the proper execution of work by others, then prior to the execution of its Work, Subcontractor shall inspect such work and submit a written report to the Contractor describing any defects. Subcontractor's failure to inspect and report any defects, which could have been detected by a reasonable and diligent inspection, prior to commencing its Work, constitutes acceptance of such work by Subcontractor.

5.   INDEMNITY. (a) Indemnity. (1) General Indemnification for Damages to Persons or Property, To the fullest extent permitted by law, Subcontractor shall defend, indemnify and hold harmless the Owner, its officers, directors, agents, and employees; and the Contractor, its officers, directors, agents, and employees; from and against claims, demands, payments, damages, losses and expenses arising from injury to or destruction of tangible property (other than the work itself), including loss of use resulting therefrom or accident, bodily injury, sickness, disease or death, or damage whatsoever to any person, firm or corporation, caused in whole or in part by any act, omission, negligence or default of the Subcontractor or its officers, directors, agents, or employees; or any of the Subcontractor's contractors, subcontractors, sub-subcontractors, materialmen, suppliers, servants, agents, or licensees of any tier or their respective employees.

Subcontractor's indemnification of Contractor and/or Owner shall include all costs, reasonable attorneys' fees, expenses, interest and liabilities incurred in or about any such claim, action or proceeding brought thereon.

If, by reason of such claims, any party brings any claim, action or proceeding against Contractor and/or Owner, Subcontractor, if requested and upon notice from Contractor, shall defend the Contractor and/or Owner against such claim, action or proceeding at Subcontractor's expense by counsel reasonably satisfactory to Contractor and/or Owner.

Additionally, the parties agree that the indemnity provisions herein are hereby incorporated into the project specifications or project bid documents, if any,

Case 3:22-cr-00434-PDR Doc 66:30-7 Filed 07/12/23 Page 313 of 401

**CONTRACT**

**Stellar Group, Inc.**

| SC #: | 23006976-SUB-03 | Date: | 11/9/2020 |
|---|---|---|---|
| Subcontractor: | Hardrock Concrete Placement Co. Inc. | Page: | 2 of 6 |

(2) Indemnification for Economic Damages–Subcontractor's Labor Force. To the fullest extent permitted by law, the Subcontractor shall defend, indemnify and hold harmless the Owner, its officers, directors, agents, and employees; and the Contractor, its officers, directors, agents, and employees; from and against claims, demands, payments, damages, losses, premiums, fines and any other expenses arising from Subcontractor's, Subcontractor's contractor's, subcontractor's, sub-subcontractor's, or of any tier or their respective employee's or any other statutory employee of Contractor as defined in the Workers Compensation Laws applicable in the jurisdiction in which the Project is located.

Subcontractor's indemnification of Contractor and/or Owner shall include all costs, reasonable attorneys' fees, reasonable expenses, interest and liabilities incurred in or about any such claim, action or proceeding brought thereon. If by reason of such claims any party brings any claim, action or proceeding against Contractor and/or Owner, Subcontractor, if requested and upon notice from Contractor, shall defend the Contractor and/or Owner against such claim, action or proceeding at Subcontractor's expense by counsel reasonably satisfactory to Contractor and/or Owner.

(3) Indemnification for Damages Associated with Performance of the Contract Work. To the fullest extent permitted by law, Subcontractor shall defend, indemnify and hold harmless the Owner, its officers, directors, agents, and employees; and the Contractor, its officers, directors, agents, and employees; from and against claims, demands, payments, damages, losses and expenses arising from the conduct, management, or performance of the Work or the performance by Subcontractor under the terms of this Subcontract, including, but not limited to, any and all claims arising from any condition of the Work due to any act, omission, negligence, breach or default on the part of Subcontractor in the performance of any obligation on its part to be performed pursuant to this Subcontract or liens relating to Subcontractors Work, regardless of who performs the Work, supplies materials, or asserts such lien, excepting liens resulting from the breach of payment obligations respectively by Owner or Contractor.

Subcontractor's indemnity of Contractor and Owner shall include all costs, reasonable attorneys' fees, reasonable expenses, interest and liabilities incurred in or about any such claim, action or proceeding brought thereon. If, by reason of such claims, any party brings any claim, action or proceeding against Contractor and/or Owner, Subcontractor, if requested and upon notice from Contractor, shall defend the Contractor and/or Owner against such claim, action or proceeding at Subcontractors expense by counsel satisfactory to Contractor and/or Owner.

6. INSURANCE REQUIREMENTS. At Subcontractor's own expense and prior to commencing the Work, Subcontractor shall procure all insurance coverage as required hereunder and furnish Contractor with certificates of insurance, and copies of additional insured endorsements, executed by an authorized representative from an insurer duty licensed to transact business at the location of the jobsite.

Subcontractor shall maintain the required insurance coverage and provide current evidence of such coverage to the Contractor until the warranty period of the Subcontractor's Work expires.

The insurance coverage as set forth below shall be issued from companies reasonably satisfactory to the Contractor and with an AM Best rating of not less than A- VII.

Securing and maintaining the insurance required hereunder is a condition precedent to payment. Furthermore, Subcontractor's failure to comply with the terms of this provision or its subparts shall constitute a default under Paragraph Seven Default and Remedies of the Terms and Conditions and, at Contractors option, Contractor may terminate this Subcontract for cause and/or purchase said insurance at Subcontractors expense.

(a) Commercial General and Umbrella Liability Insurance. If the estimated value of the Subcontract, including prospective change orders or modifications, is less than $2,000,000, the Subcontractor shall maintain commercial general liability (CGI) and, if necessary, umbrella insurance with a per project limit of not less than $2,000,000 each occurrence, subject to a general aggregate of not less than $2,000,000. If the estimated value of the Subcontract, including change orders or modifications, exceeds $2,000,000, the Subcontractor shall maintain commercial general liability (CGL) and, if necessary, umbrella insurance with a per project limit of not less than the total estimated value of the Subcontract per occurrence, subject to a general aggregate of not less than said total. If at any time a Change in the Work causes the total value of the Subcontract to exceed the Subcontractors current commercial general liability (CGL) per project limit and/or umbrella insurance per project limit, the Subcontractor must obtain the proper coverage as required herein and provide evidence of such coverage to the Contractor. The general aggregate limit shall apply separately to this Subcontract. The CGI- insurance shall be written on ISO occurrence form CG 00 01 (or a substitute form providing equivalent coverage). The coverage shall include liability arising from premises, operations, independent contractors, products-completed operations, personal injury & advertising injury, and liability assumed under an insured contract, including the tort liability of another assumed in a contract. The Subcontractor's CGL policy shall include Contractor as an additional insured for both ongoing and completed operations. The additional insured endorsements shall be written on ISO additional insured endorsement CG 20 10 07 04 (for ongoing operations) and CG 20 37 07 04 (for completed operations) (or substitute endorsements providing equivalent coverage) and attached to Subcontractors CGL, and to the commercial umbrella, if any. Subcontractor shall maintain ongoing CGL coverage for the products-completed operations hazard, including liability assumed under an insured contract, and the required additional insured coverage for the maximum period of time Subcontractor may be held legally liable for its work following substantial completion of the Work. Subcontractor shall maintain this coverage on ISO occurrence form CG 00 01 (or a substitute form providing equivalent coverage). Subcontractor's CGL insurance shall apply as primary insurance with respect to any other insurance or self-insurance programs afforded to Contractor, and no endorsement or modification of the CGL shall make the coverage excess over other available insurance.

(b) Automobile and Umbrella Insurance. Subcontractor shall maintain automobile liability insurance and, if necessary, umbrella liability insurance with a limit of not less than $1,000,000 each accident. Such insurance shall cover liability arising out of 'any auto', including owned, hired, and non-owned autos. Coverage shall be written on ISO form CA 00 01, or a substitute form providing equivalent liability coverage. Stellar shall be added as an additional insured to the auto and umbrella policy.

(c) Workers Compensation Insurance. Subcontractor shall maintain worker's compensation and employer's liability insurance. The worker's compensation coverage shall provide the statutory maximum limit of liability.

The employer's liability limits shall not be less than $1,000,000 each accident for bodily injury by accident or $1,000,000 each employee for bodily injury by disease.

(d) Pollution Liability Insurance. Pollution Liability insurance is required with a limit of no less than $1,000,000 This coverage must include damage caused by pollutants, which is any solid, liquid, gaseous or thermal irritant including mold and fungus, smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. This coverage must include completed operations. Any exception to this requirement will be determined by Stellar according to Exhibit A Scope of Work.

(e) Professional Liability Insurance. If Subcontractor's scope of services includes design work or other professional services, then Subcontractor shall maintain insurance coverage for Subcontractor's errors, omissions and other wrongful acts arising out of the professional services performed by Subcontractor. The limit of liability shall not be less than $1,000,000.

(f) Waiver of Subrogation. Subcontractor waives all rights against Contractor and its agents, officers, directors and employees for recovery of damages to the extent that any of the policies of insurance maintained pursuant to this Subcontract covers these damages.

(g) Sub-subcontractor's Insurance. Subcontractor shall cause each Sub-subcontractor employed by Subcontractor to purchase and maintain insurance of the type specified in this agreement. When requested by Contractor, Subcontractor shall furnish to Contractor copies of certificates of insurance evidencing coverage for each Sub-subcontractor.

(h) No Representation of Coverage Adequacy. By requiring the insurance as set out in this Subcontract, Contractor does not represent that such coverage and limits will be adequate to protect Subcontractor, and Subcontractor acknowledges that its liability under the indemnities provided to the Contractor and/or Owner pursuant to this Subcontract is not limited to such coverage and limits.

7. DEFAULT AND REMEDIES. (a) Should Subcontractor at any time fail to prosecute and complete the Work in accordance with the Construction Progress Schedule, as herein provided or as directed by Contractor; or fail to diligently and continuously perform its Work; or if, in the reasonable opinion of Contractor, the Work of Subcontractor cannot be completed in the time period required; or if Contractor Is notified of Subcontractor's failure to pay for any material or labor used on the Project; or in the event of a

DocuSign Envelope ID: 32CC09D8-5F1B-425F-B5B2-09EDDCEC3356

**_ CONTRACT**

**Stellar Group, Inc.**

| | | | |
|---|---|---|---|
| **SC #:** | 23006976-SUB-03 | **Date:** | 11/9/2020 |
| **Subcontractor:** | Hardrock Concrete Placement Co. Inc. | **Page:** | 2 of 6 |

strike or stoppage of Work resulting from a dispute involving or affecting the labor employed by Subcontractor or its sub-subcontractors; or if Subcontractor fails to perform any of the requirements of this Subcontract; then such event shall constitute a default hereunder and Contractor shall notify Subcontractor to correct such default and shall specify in such notice the action to be taken and the date by which the default shall be corrected (the "Notice of Default").

(b) If a default occurs and Subcontractor has not corrected the default on or before the date specified in the notice to the Subcontractor, Contractor may exercise any or all of the following remedies:

Contractor may immediately take any action necessary to correct such default, including without limitation the right to provide labor, overtime and materials, and may deduct the reasonable cost of correcting such default from any payment due or to become due to Subcontractor or recover such cost from Subcontractor if no sums are due or become due to Subcontractor.

The Contractor may terminate this Subcontract, take possession, to the extent it has paid for them, of Subcontractor's materials, tools and equipment used in performing the Work, and employ another subcontractor or use the employees of Contractor to finish the remaining Work to be performed hereunder.

Contractor may deduct the reasonable costs of completing the remaining Work from the unpaid Subcontract Price and if the cost of completing the remaining Work exceeds the unpaid Subcontract Price, Subcontractor shall pay Contractor such excess cost, including, without limitation, overhead and reasonable attorneys' fees; and

The Contractor may exercise any remedy at law or in equity available as a result of Subcontractor's default or non-performance under this Subcontract.

Contractor, in any such event, may also refrain from making any further payments to Subcontractor until the entire Project shall be fully finished and accepted by Owner at which time, if the unpaid balance of the amount to be paid under this Subcontract shall exceed the sum of the reasonable expense incurred by the Contractor in finishing the Work and the damage sustained by Contractor as a result of Subcontractor's default, then such excess shall be paid by Contractor to Subcontractor, but if the sum of such expenses and damages shall exceed such unpaid balance, Subcontractor shall promptly pay the difference to the Contractor.

(c) Upon any default or contract dispute, the prevailing party shall be entitled to collect from the non-prevailing party its reasonable attorneys' fees and court costs incurred in enforcing this Subcontract or seeking any remedies hereunder. The non-prevailing party shall pay all such fees and costs, whether or not suit is filed and in connection with any appeal and in connection with any bankruptcy or other insolvency proceeding.

(d) If Contractor does not terminate Subcontractor's right to proceed, Subcontractor shall continue with the Work.

(e) If Owner is damaged by reason of any breach by Subcontractor of this Subcontract, then Subcontractor shall pay Owner such damages, together with all costs of collection including, court costs and reasonable attorneys' fees.

(f) Only if subcontractor is in default, Subcontractor hereby knowingly and voluntarily waives all claims for damages due to delays, disruptions, constructive acceleration of work and similar economic losses and agrees that its sole and exclusive remedy for any such claims shall be an extension of the contract time provided that Subcontractor makes a written claim for such extension within ten (10) days of the event giving rise to the claim.

(g) Proposed Setoff Clause – If at any time Subcontractor is indebted to Contractor under any other subcontract or for any other reason, Contract shall have the right to set off such indebtedness against any payments earned under this Subcontract. Additionally, if Subcontractor defaults on any other subcontract on this Project for any reason, such default shall also constitute a default under this Subcontract.

(h) Proposed Bankruptcy/insolvency Clause - If Subcontractor should file for bankruptcy protection, otherwise become insolvent, or encounter financial difficulties which impair the ability of Subcontractor to perform its obligations under this Subcontract fully and efficiently, then Contractor may, upon written notice, terminate Subcontractor's performance under this Subcontract for cause, and Subcontractor shall pay to Contractor the amount of loss or damage sustained by Contractor as a result of the termination.

8.      PAYMENT. (a) Subcontractor shall, prior to submission of its first requisition for payment, give Contractor the name, address and telephone number of every material supplier and sub-subcontractor furnishing materials and/or labor to Subcontractor for the Work covered herein.

If Contractor receives the Subcontractor's requisition for payment and all required lien waivers by the 22nd day of the month, Contractor shall process the requisition for payment by the 25th day of the following month or 5 days after receipt of payment from the Owner, whichever is greater. The amount of each such payment is always subject to the approval of Contractor. Subcontractor, at Contractor's request, shall provide evidence that that the unpaid balance of the Subcontract Price, exclusive of Retainage, is at all times sufficient to complete Subcontractor's remaining Work hereunder. All monthly payments are subject to a ten (10) percent Retainage. Contractor shall disburse Subcontractor's Retainage within the earlier of due date required under the prompt pay laws applicable in the jurisdiction in which the Project is located or sixty (60) days following completion and acceptance by the Owner of the entire Project of which Subcontractors Work is a part, however, Contractor's receipt of the Retainage from Owner is an absolute condition precedent to disbursement of the Subcontractors Retainage.

Subcontractor shall submit all requisitions for payments on the Contractors "Subcontractor Requisition for Payment" form. The form must bear the original, notarized signature of an authorized agent of the Subcontractor. With each requisition for payment, Subcontractor must also submit a valid lien and/or bond waiver(s), on the Contractor's form(s), from Subcontractor and each of its sub-subcontractors and suppliers. The waiver(s) must bear the original, notarized signature of an authorized agent of the entity waiving its bond and/or lien rights, and must cover the time period and the amount of all materials, labor and Work reflected in such requisition (including final lien and/or bond waivers with the final requisition for payment). Furthermore, if requested, Subcontractor shall submit evidence reasonably satisfactory to Contractor that all payroll; bills for materials and equipment; sales, use and business taxes; and all known indebtedness connected with Subcontractor's Work have been satisfied.

(b) Subcontractor shall defend and discharge any liens or claims arising from its performance or failure to perform under this Subcontract and shall indemnify and hold the Contractor and the Owner harmless from any losses, damages, costs, expenses and reasonable attorneys' fees relating to or resulting from mechanics' liens, equitable liens or payment bond claims arising by, through, or under Subcontractor, excepting any mechanic's liens recorded as a result of the failure by Owner or Contractor or both to comply with their legally binding payment obligations.

Subcontractor shall make payment to sub-subcontractors and suppliers in an amount equal to the percentage of completion allowed to the Subcontractor on account of its Work. Subcontractor agrees that it shall only use sums received for its performance of this Subcontract for labor, services and material provided hereunder and shall not use such sums to satisfy Subcontractors obligations on other contracts.

Subcontractor agrees that Contractor may pay Subcontractor's material suppliers or Sub-Subcontractors with Subcontractor-by joint checks at any time. Furthermore, Contractor may make direct payments to Subcontractor's material suppliers or Sub-Subcontractors, provided that Contractor has given Subcontractor seven (7) days prior written notice of intent to make such payment(s) and the amount of such payment(s).

(c) Notwithstanding anything to the contrary appearing herein or in any of the Contract Documents, (including but not limited to the General Contract between Owner and Contractor) either implicitly or explicitly, Subcontractor is not entitled to receive any progress payment or final payment prior to Contractor's actual receipt of that payment from Owner, Subcontractor agrees that Contractors actual receipt of full payment from the Owner is a condition precedent to Contractor's obligation to pay Subcontractor and to the bringing of any action by Subcontractor against Contractor (and its surety, if any) relating to Contractor's failure to make payment. Subcontractor further agrees that its full performance of this Subcontract shall not constitute an exception to the condition set forth in this paragraph. Subcontractor agrees that this provision also constitutes a condition precedent to any claim against any payment bond in effect on the Project.

9.      SHOP DRAWINGS. Subcontractor shall review Shop Drawings for compliance with the Subcontract Documents and approve and submit to the Contractor all Shop Drawings required by the Subcontract Documents. Subcontractor shall submit Shop Drawings with reasonable promptness and in such sequence as to cause no delay in the Work or in the activities of Owner, Contractor or other subcontractors. Contractor's review of the Subcontractor's submittals shall not (a) relieve Subcontractor of its obligations

## CONTRACT

### Stellar Group, Inc.

| | | | |
|---|---|---|---|
| **SC #:** | 23006976-SUB-03 | **Date:** | 11/9/2020 |
| **Subcontractor:** | Hardrock Concrete Placement Co. Inc. | **Page:** | 2 of 6 |

or release Subcontractor for any liability under the Subcontract Documents or any section hereof, (b) constitute Owner's or Contractor's approval of Subcontractor's safety precautions, construction means, methods, techniques, sequences or procedures, or (c) represent Contractor's determination of accuracy and completeness of details of the Work such as dimensions or qualities, or Contractor's substantiation of instructions for installation or performance of equipment or systems, all of which remain the responsibility of Subcontractor as required by the Subcontract Documents.

10.     WARRANTY. Subcontractor warrants to the Contractor that all materials and equipment furnished under the Subcontract will be new unless otherwise specified and that all Work will be of good quality, free from faults and defects and in conformance with the Contract Documents. All Work not so conforming to these standards shall be considered defective. If required by the Contractor, the Subcontractor shall furnish reasonably satisfactory evidence as to the kind and quality of materials and equipment incorporated in the Project. Subcontractor shall warrant all materials and workmanship furnished or performed hereunder to be free of defects for a period of one year from date of acceptance by Owner of the entire Project unless otherwise specified herein and shall, at its expense, promptly replace, repair or correct any such defective materials or workmanship appearing within the warranty period as set forth herein. Subcontractor shall submit and assign all factory warranties on equipment and materials installed by it and, at the option of Contractor, shall initiate an assignment to Contractor and/or assigns a service agreement with a local service agency covering all equipment, workmanship and materials so installed. The warranty provided in this paragraph and elsewhere in the Contract Documents is in addition to and not in limitation of any other warranty or remedy provided by law or required by the Contract Documents.

11.     IMMIGRATION LAWS COMPLIANCE. Subcontractor must fully comply with all employment verification procedures, including without limitation, complying with all I-9 verification, reverification and updating procedures as required by the Immigration Reform and Control Act of 1986, for all of its employees. Subcontractor certifies and warrants to Contractor that it maintains an I-9 compliance program for the express purpose of verifying lawful employment authorization to work in the United States for all of its employees. The Subcontractor further represents that it maintains a designated I-9 compliance officer who oversees the Subcontractors I-9 compliance procedures.

12.     MISCELLANEOUS. Subcontractor shall remove from the premises, as directed by Contractor, all rubbish and surplus material which may accumulate from the prosecution of its Work.

Should Subcontractor fail to do so, Contractor may, at its option, remove same and deduct the reasonable cost of such removal from any amounts owed to Subcontractor and if the cost of such removal exceeds the unpaid Subcontract Price, Subcontractor shall pay Contractor such excess cost.

Notwithstanding anything contained herein to the contrary, Contractor may, without cause, terminate this Subcontract at any time upon written notice to the Subcontractor.

The Subcontractor shall not be entitled to anticipate a profit or damages for any termination by Contractor for its convenience.

This Subcontract contains the entire agreement between Contractor and Subcontractor.

All prior negotiations, representations and agreements with respect to this Subcontract not specifically incorporated herein are hereby cancelled.

Owner's substantial performance of the General Contract is a condition of Contractor's obligation under this Subcontract.

If Owner becomes bankrupt or otherwise defaults in its payments to Contractor under the General Contract, and/or terminates the General Contract with or without cause, then, upon written notice thereof to Subcontractor, Contractor may terminate this Subcontract and will thereupon, subject to the conditions of paragraph 8(c) of this Subcontract, be liable to Subcontractor only for cost of Work actually performed by Subcontractor at the time of said notice (subject to the provisions of paragraph 8(c) hereof) and for no further compensation or damage.

Subcontractor shall protect its finished Work against damage by other trades and shall be liable for damage caused by him to the Work of others.

Subcontractor shall pay the cost of replacement or repair to the Work of other trades damaged by it or occasioned by the correction of its defective Work and should Subcontractor fail to do so, Contractor may, at its option, correct such defective Work and deduct the reasonable cost thereof from any amounts owed to Subcontractor and if the cost of such correction exceeds the unpaid Subcontract Price, Subcontractor shall pay to Contractor such excess cost.

Subcontractor is responsible for determining the location of and for any damage caused by him to any underground objects, including but not limited to sewer, water, gas, electric or telephone lines, cables, pipes and tunnels.

Subcontractor shall obtain and pay for all taxes, permits, licenses and official inspections made necessary by its Work and comply with all laws, ordinances and regulations relating thereto.

~~Subcontractor expressly understands and agrees that its only remedy for delays in the Work shall be for an extension of time for the number of days by which he has been delayed, as determined by Contractor and/or Owner, and that Subcontractor shall not be entitled to any recovery for losses, expenses or damages relating to such delays, however caused; provided, however, that no allowance for additional time shall be made for any cause unless a request for an extension is presented in writing to Contractor within ten (10) days after occurrence of the event giving rise to the delay.~~

~~Any claim not so presented within ten (10) days shall be deemed waived by the Subcontractor and shall not be considered.~~

It may be necessary for the Owner to occupy a portion of the Work which Subcontractor has either partially or fully completed prior to final inspection or acceptance by the Owner.

Such occupancy shall not relieve the Subcontractor of its guarantee of Work or modify the warranty period described above.

The parties to this Subcontract agree that execution of this Subcontract was in Jacksonville, Duval County, Florida.

The laws of the State in which the Project is located shall govern the construction, interpretation, enforcement and all other matters relating to this Subcontract and any amendments or modifications, and jurisdiction and venue for any litigation arising under this Subcontract lies exclusively with the appropriate court in ~~the conty n which the Project is located~~, to the exclusion of any other jurisdiction or venue.

Subcontractor waives the right to trial by jury on any issues relating to this Subcontract.

| | |
|---|---|
| **HARDROCK CONCRETE PLACEMENT CO. INC.** | **STELLAR GROUP, INCORPORATED** |
| Subcontractor | Contractor |
| DocuSigned by: | |
| *Cindy Kennemer* | |
| Signed and Dated: 451EEBACE4A7454... 11/12/2020 \| 10:15 AM PST | Signed and Dated: |
| By: Cindy Kennemer | By: Grayson Avery |
| Vice President | Senior Project Manager |

# Exhibit A
# Concrete

**Attachment Hardrock Concrete Placement Subcontract # 23006976-SUB-03 dated 11/09/2020**

## 1. Scope of Work

1.1 The undersigned Subcontractor, having become thoroughly familiar with the project documents provided and the local conditions affecting the performance and cost of the work, hereby agrees to provide all labor, materials, tools, equipment, freight, supervision, applicable taxes, insurance, services, permits, and miscellaneous incidentals as required to complete in every respect the work as described herein, in strict accordance with the Exhibits, General Notes, and Terms and Conditions of the Subcontract, the additional Subcontract support documents listed below, and all applicable federal, state, and local requirements.

1.2 Henceforth, the word "provide" shall mean furnish and install.

1.3 Henceforth, the phrase "as indicated" shall mean as indicated in the project documents.

1.4 The Work to be performed under this Subcontract includes (but is not limited to) the following work:

    1.4.1. Foundations

    1.4.2. Cast in Place Concrete (Trench Walls, Stem Walls, Dock Pits, Ramps, Etc.)

    1.4.3. Slabs

    1.4.4. Concrete Curbs

    1.4.5. Install Only of Misc. Steel (Embeds, Grating, Bolts, Angle, Bollards, Etc.)

    1.4.6. Misc. Concrete (House Keeping Pads for Lockers, Equipment, Etc.)

    1.4.7. Concrete Reinforcement

    1.4.8. Excavation, Backfill and Compaction for Concrete Work Only

1.5 **Scope Specific Clarifications**

    1.5.1. Subcontractor is responsible for all layout for this scope of work. Contractor to provide property benchmark and building corner.

    1.5.2. Subcontractor acknowledges all required concrete placement (pumping or other means) is included in this scope of work and shall include all equipment necessary for complete execution of Subcontractor's work.

    1.5.3. All earthwork required for the slabs including excavation, back filling, stockpiling, and compacting. All excavated materials shall be stored in a manner that they will be suitable for back fill where needed.

## SUBCONTRACT CONTINUATION

Hardrock Concrete Placement
SC#: 23006976-SUB-03

Date: 11/09/2020
Page: 2 of 7

1.5.4.  All excavated soils not used shall be legally disposed at an alternate/approved location offsite. This location must be compliant with all local, state and federal laws, ordinances, and standards for dumping material.

1.5.5.  Provide all formwork, vapor barriers, rebar, and concrete required for a complete installation of this scope.

1.5.6.  Provide clean granular base as required.

1.5.7.  Ensure exterior edges are flat and true where Insulated Metal Panel walls will be installed.

1.5.8.  Protect all finished work already in-place during concrete installation.

1.5.9.  Provide all necessary drilling, epoxy and doweling into existing slabs as indicated.

1.5.10. Place all armored edge embeds and bollard embeds as indicated.

1.5.11. Form, pour, and finish all concrete slabs on grade to correct elevation. Sloped slabs shall have the correct elevation at all high points.

1.5.12. Control joints are to be cut as soon as possible to minimize unwanted cracking.

1.5.13. Provide concrete sealer as indicated on drawings. This includes floor caulking at sealed floor areas only.

1.5.14. Provide all forms, dowels, concrete, and finishing of interior concrete curbs as indicated. All curbs are to be hard troweled unless otherwise indicated.

1.5.15. Provide mock-up concrete curb constructed for approval by the Contractor and Owner prior to installation on finish floors. Mock-up curbs will be approximately 10 linear feet and will be installed inside of the facility at a location chosen by Contractor.

1.5.16. Attend Concrete Pre-Pour Meeting (date to be announced) at the jobsite trailer. It is also mandatory to arrange for any concrete suppliers and/or pumping sub tier subcontractors attend.

1.5.17. Provide, maintain, and install high visibility safety caps over rebar ends during installation as per OSHA requirements.

1.5.18. Set all bollards and U-guards as indicated. Where possible, bollards are to be set prior to concrete slab pours. Core drill existing slabs for installation of new bollards. Bollards to be filled solid with concrete and have a precast dome top.

1.5.19. Place all housekeeping pads as indicated on drawings. Coordinate with subcontractors.

**SUBCONTRACT CONTINUATION**

    1.5.20. All exterior concrete paving, sidewalk, dolly pads, and door stoops shall have a light broom finish.

    1.5.21. Additional demo and excavation of existing slab to safely perform trench work is included.

    1.5.22. Protect existing slabs from undermining when excavating.

1.6    **RELATED WORK NOT INCLUDED, ITEMS TO BE ADDED AS DESIGN IS FINALIZED:**

    1.6.1.  Concrete Waterproofing Admixture for Trenches ILO Membrane - $48,600

    1.6.2.  Concrete Lids and Tie Beams for Rooms Chem Storage 193, Coolant 184 & Bulk Storage 165.

    1.6.3.  Equipment Rails (Embeds)

    1.6.4.  Masonry Wall Foundations

    1.6.5.  Electrical Panels/Transformer Pads

    1.6.6.  Equipment Housekeeping Pads (3.5" Thick) - $14/SF

    1.6.7.  Saw Cutting/Demo/Pourback for Exterior Plumbing Tie-In

    1.6.8.  24 Hour 7 Days a Week Work Schedule - $390,000

    1.6.9.  Furnish Trench Grating, Beam, Embeds, Bollards and Angle

    1.6.10. Additional Floor Caulking - $2.50/LF

    1.6.11. Cooling Tower Exterior Foundations

    1.6.12. Concrete Truck Paving Outside of Ramp Paving.

2.    **Change Orders & Extra Work**

2.1    Maximum aggregate mark-up of overhead and profit for all change order work performed under this Subcontract shall be as follows:

    2.1.1.  OHP – 10%

3.    **Contract Documents**

3.1    "Exhibit B" - Project Schedule dated 10/23/2020.

3.2    "Exhibit C" – Job Specific Safety Plan.

3.3    "Exhibit D" – DBA Owner Contract dated 07/28/2020.

3.4    "Exhibit E" – Stellar Guide for Subcontractors Usage in Procore

3.5    "Exhibit F" – General Requirements

3.6    "Exhibit G" – Facility Access and Site Utilization Plans

**SUBCONTRACT CONTINUATION**

Hardrock Concrete Placement
SC#: 23006976-SUB-03

Date: 11/09/2020
Page: 4 of 7

3.7 "Exhibit H" – Drawings Included with Bid Package as of 10/13/2020.

4. **Personnel Labor Rates**

| Item | Description | Hourly Rate |
|------|-------------|-------------|
| Labor | | ST |
| 1 | Project Manager | $65.00 |
| 2 | Superintendent | $60.00 |
| 3 | Carpenter | $55.00 |
| 4 | Finisher/Equipment Operator | $55.00 |

5. **Miscellaneous**

5.1 All project collaboration, correspondence, communication, and documentation will be conducted using Procore. A "How To" guide for Subcontractors has been included within this Subcontractor for interaction with Stellar in the Procore system. As a condition of this Subcontract, Procore shall be used throughout the duration of the project for the following items including but not limited to:

5.1.1. RFI's

5.1.2. Observations

5.1.3. Drawings

5.1.4. Commitments and Payment Requisitions

5.1.5. Submittals

5.1.6. Punch List

5.1.7. Specifications

5.1.8. Daily Log Entry

5.1.9. All other documents and documentation pertaining to the project

5.2 The hours of operation for the project shall be five (5) days per week, forty (40) hours per week, eight (8) hours per day. The site shall be available for work from the hours of 6:30 a.m. to 6:30 p.m., Monday through Friday. This work shall be based upon the above listed hours.

**SUBCONTRACT CONTINUATION**

Hardrock Concrete Placement
SC#: 23006976-SUB-03

Date: 11/09/2020
Page: 5 of 7

Different work schedules must be approved by the Stellar Project Manager and Superintendent.

5.3　Provide all training for new equipment and systems installed under this scope of work. Prior to scheduled training session, a written agenda shall be issued for review. A sign in sheet shall be submitted after completion of training. One (1) hard copy of operation and maintenance manuals shall be available during the training session.

5.4　This scope of work will require multiple mobilizations as defined in the construction schedule. All costs for additional mobilizations as shown in the project schedule are specifically included in this subcontract unless noted otherwise.

5.5　Protection of all existing work is included.

5.6　Subcontractor shall store materials on elevated platforms, under cover and in a dry location, to prevent their deterioration or damage due to moisture, temperature changes, contaminants or other causes.

5.7　Make necessary repairs, in a manner acceptable to and approved by Contractor and Owner, including complete removal and replacement, as determined by the contractor of any work adjudged to be defective or nor conforming to the requirements of this Agreement, the Project Specifications, or standards of good and proper workmanship.

5.8　All deliveries will be scheduled with the Project Superintendent forty-eight (48) hours in advance. The Project Superintendent will approve all deliveries to the site in advance. Unannounced or unscheduled deliveries are subject to being turned away at the expense of the company for which the delivery was intended for both shipping costs and schedule delays.

5.9　Jobsite cleanliness and housekeeping is included in this scope of work. As noted in the General Notes of the Subcontract Agreement, the cost and expense to the subcontractor shall be defined as follows:

　　5.9.1.　Should the jobsite housekeeping performance be found to be unacceptable, one written warning will be issued to correct the state of jobsite cleanliness for the areas in which this subcontractor is working. If the cleanliness deficiency is not immediately corrected, Stellar will take action to correct the situation at a charge of $2,500.00 per day for violation of the jobsite housekeeping and cleanliness standard. If this subcontractor is found to be a repeat violator of

# SUBCONTRACT CONTINUATION

Hardrock Concrete Placement
SC#: 23006976-SUB-03

Date: 11/09/2020
Page: 6 of 7

this policy, Stellar may terminate the contract and pursue legal avenues for compensating any losses associated with the completion of the work.

5.10  Responsibility for unloading of materials, tools, or equipment is included in this scope of work unless specifically excluded herein. Should Stellar be asked to unload any deliveries, it shall be done at a cost of $2,500.00 per day and Stellar will require a written release of liability for any damages from the company requesting this service. Deliveries which cannot be unloaded by this method or which do not have personnel onsite to handle their own shipments may be turned away at their expense for both shipping costs and schedule delays.

5.11  This project is a renovation to an existing, functioning facility in full operation. Subcontractor shall take all required steps and shall do all things necessary to ensure that neither the Owner nor his operations are interfered with, disrupted, or disturbed in any way.

5.12  Subcontractor shall strictly limit his activities to the limits of the construction area. All parking, unloading and receiving, storage, fabrication, and other similar activities shall be confined to designated areas away from the existing facility. The existing facilities roadways and parking areas shall not be used by Subcontractor for these activities or for any others, except for where specifically identified by the Stellar Superintendent.

5.13  Subcontractor's employees shall not enter any portion of the existing facility, except as required to install the work of the project. Subcontractor's employees shall not be permitted to use the existing facility's toilet rooms, lunchroom, or break areas.

5.14  Subcontractor shall notify the project superintendent a minimum of two (2) weeks prior to any activities that may impact the Owner's operations. This work shall be coordinated to minimize the impact to the Owner and may be required to be performed during off hours and/or on extended and/or continuous shifts. Premium costs for this work shall not be subject to a modification of the subcontract.

5.15  All eating, drinking (other than water), smoking, and other tobacco use shall occur outside of the existing building in an area designated by the project superintendent. All trash shall be placed into the dumpsters provided by the Contactor and shall not be left inside or outside of the building.

5.16  Subcontractor shall use only electrically operated equipment or fuel-based equipment provided with air scrubbers, for work inside the existing facility unless specifically instructed otherwise. Welding activities shall be limited to essential tasks such as welding of utility

## SUBCONTRACT CONTINUATION

Hardrock Concrete Placement
SC#: 23006976-SUB-03

Date: 11/09/2020
Page: 7 of 7

piping and held to a minimum indoors. All welding activities must be properly protected and properly ventilated.

SUBCONTRACTOR ACKNOWLEDGES RECEIPT OF ALL CONTRACT DOCUMENTS NOTED ABOVE IN SECTION 3.

**Hardrock Concrete Placement**
Subcontractor

**STELLAR GROUP, INCORPORATED**
Contractor

By: *Cindy Kennemer*
Cindy Kennemer

By: _____
Jonah Petoskey, Sr. Project Manager

DocuSign Envelope ID: 659FD1C3-FB1E-4636-A6C8-9FB6A458153F

# SUBCONTRACT MODIFICATION

**Stellar Group, Inc.**
2900 Hartley Road
Jacksonville, FL 32257

| | | | |
|---|---|---|---|
| **Subcontractor:** | Hardrock Concrete Placement Co. Inc.<br>4839 W Brill St<br>Phoenix Arizona 85043-1815 | **Project Name and Location:** | Bang Energy - Phoenix Can Manufacturing<br>1635 South 43rd Avenue<br>Phoenix Arizona 85009 |
| Attention: | Donna Wood | Attention: | Chuck Harrison |
| Phone: | (602) 233-3334 | Phone: | (904) 383-0163 |
| Fax: | (602) 233-2777 | E-Mail: | charrison@stellar.net |
| E-Mail: | dwood@hrconcrete.com | | |

| Date<br>3/1/2022 | SC #<br>23006976-SUB-03F | Project #<br>23006976 | Contract Type<br>Lump Sum | FOB<br>Jobsite | Schedule<br>Per Superintendent |
|---|---|---|---|---|---|

This Subcontract is made by and between Stellar Group, Incorporated, d/b/a Stellar, hereinafter referred to as "Contractor," and the Subcontractor named above, at Jacksonville, Florida. In consideration of the mutual promises and undertakings set forth herein, Contractor and Subcontractor hereby agree to the terms and conditions set forth herein, including the Terms and Conditions attached hereto. Subcontractor agrees to perform and complete the following Work:

Subcontract agrees to modify Subcontract No.: 23006976-SUB-03

| Item | Description | Net Amount |
|---|---|---|
| 1 | CIP Concrete Beams for Door Openings ILO of Steel & Precast Lintels. | $6,969.00 |

**Attachments:**
COR #11 CIP Lintels.pdf

**FOR ACCOUNTING PURPOSES ONLY:**

| Cost Codes | Net Amount |
|---|---|
| 03-0302 - 1760 | $6,969.00 |

| **TOTAL AMOUNT OF THIS MODIFICATION** | **$6,969.00** |
|---|---|
| (All licenses, taxes, permits, fees and insurance with Stellar named as additional insured included) | |

| ORIGINAL SUBCONTRACT | $2,111,428.00 |
|---|---|
| PREVIOUS MODIFICATION(S) | $614,642.00 |
| THIS MODIFICATION | $6,969.00 |
| REVISED SUBCONTRACT | $2,733,039.00 |

This subcontract includes and is subject to the terms and conditions previously attached to the original subcontract.

IN WITNESS WHEREOF, the Subcontractor and Contractor have executed this Subcontract on the date set forth above.

**HARDROCK CONCRETE PLACEMENT CO. INC.**
Subcontractor

*Cindy Kennemer*

By: Donna Wood   Cindy Kennemer

**STELLAR GROUP, INC.**
Contractor

By: Gregory Ortego
Project Manager

DocuSign Envelope ID: BBB572EC-5E84-4E56-A182-A11ACF285F59

# SUBCONTRACT MODIFICATION

## Stellar Group, Inc.
### 2900 Hartley Road
### Jacksonville, FL 32257

| | | |
|---|---|---|
| **Subcontractor:** | Hardrock Concrete Placement Co. Inc.<br>4839 W Brill St<br>Phoenix Arizona 85043-1815 | **Project Name and Location:** Bang Energy - Phoenix Can Manufacturing<br>1635 South 43rd Avenue<br>Phoenix Arizona 85009 |
| **Attention:** | Lee Lopez | **Attention:** Brian Edberg |
| **Phone:** | (602) 233-3334 | **Phone:** (904) 349-0640 |
| **Fax:** | (602) 233-2777 | **E-Mail:** bedberg@stellar.net |
| **E-Mail:** | lmlopez@hrconcrete.com | |

| Date | SC # | Project # | Contract Type | FOB | Schedule |
|---|---|---|---|---|---|
| 3/17/2021 | 23006976-SUB-03C | 23006976 | Lump Sum | Jobsite | Per Superintendent |

This Subcontract is made by and between Stellar Group, Incorporated, d/b/a Stellar, hereinafter referred to as "Contractor," and the Subcontractor named above, at Jacksonville, Florida. In consideration of the mutual promises and undertakings set forth herein, Contractor and Subcontractor hereby agree to the terms and conditions set forth herein, including the Terms and Conditions attached hereto. Subcontractor agrees to perform and complete the following Work:

Subcontract agrees to modify Subcontract No.: 23006976-SUB-03

| Item | Description | Net Amount |
|---|---|---|
| 1 | Demolition of concrete slab at GL 19 around existing fire riser on the south elevation in order to pour the foundation below. | $3,261.00 |

**Attachments:**

**FOR ACCOUNTING PURPOSES ONLY:**

| Cost Codes | Net Amount |
|---|---|
| 03-0307 – 1760 | $3,261.00 |

| | |
|---|---|
| **TOTAL AMOUNT OF THIS MODIFICATION** | **$3,261.00** |
| (All licenses, taxes, permits, fees and insurance with Stellar named as additional insured included) | |
| ORIGINAL SUBCONTRACT | $2,111,428.00 |
| PREVIOUS MODIFICATION(S) | $611,381.00 |
| THIS MODIFICATION | $3,261.00 |
| REVISED SUBCONTRACT | $2,726,070.00 |

**This subcontract includes and is subject to the terms and conditions previously attached to the original subcontract.**

IN WITNESS WHEREOF, the Subcontractor and Contractor have executed this Subcontract on the date set forth above.

| | |
|---|---|
| **HARDROCK CONCRETE PLACEMENT CO. INC.** | **STELLAR GROUP, INCORPORATED** |
| Subcontractor | Contractor |
| *Cindy Kennemer* | |
| DocuSigned by: | |
| 451EEBACE4A7454... | |
| By: Lee Lopez   Cindy Kennemer | By: Jonah Petoskey |
| President   Vice President | Senior Project Manager |

DocuSign Envelope ID: FE25892F-C57D-43A1-87EE-DC44D7912D44

# SUBCONTRACT MODIFICATION
### Stellar Group, Inc.
2900 Hartley Road
Jacksonville, FL 32257

| | | |
|---|---|---|
| **Subcontractor:** | Hardrock Concrete Placement Co. Inc.<br>4839 W Brill St<br>Phoenix Arizona 85043-1815 | **Project Name and Location:** Bang Energy - Phoenix Can Manufacturing<br>1635 South 43rd Avenue<br>Phoenix Arizona 85009 |
| **Attention:** | Lee Lopez | **Attention:** Brian Edberg |
| **Phone:** | (602) 233-3334 | **Phone:** (904) 349-0640 |
| **Fax:** | (602) 233-2777 | **E-Mail:** bedberg@stellar.net |
| **E-Mail:** | lmlopez@hrconcrete.com | |

| Date | SC # | Project # | Contract Type | FOB | Schedule |
|------|------|-----------|---------------|-----|----------|
| 2/16/2021 | 23006976-SUB-03B | 23006976 | Lump Sum | Jobsite | Per Superintendent |

This Subcontract is made by and between Stellar Group, Incorporated, d/b/a Stellar, hereinafter referred to as "Contractor," and the Subcontractor named above, at Jacksonville, Florida. In consideration of the mutual promises and undertakings set forth herein, Contractor and Subcontractor hereby agree to the terms and conditions set forth herein, including the Terms and Conditions attached hereto. Subcontractor agrees to perform and complete the following Work:

Subcontract agrees to modify Subcontract No.: 23006976-SUB-03

| Item | Description | Net Amount |
|------|-------------|------------|
| 1 | Changes to Slabs based on building and process design development and owner review comments from drawing set dated 12.11.2020 to 01.08.2021. Including but not limited to: Concrete Paving 6" Thick & 12" Thick Reinforced, Exterior Chiller and Pump Pads. and Transformer Pads. | $43,864.10 |
| 2 | Concrete pour back for new AHU-5 floor sink underground piping. | $950.00 |
| 3 | Changes to Foundations based on building and process design development and owner review comments from drawing set dated 12.11.2020 to 01.08.2021. Including but not limited to: Exterior Retaining Wall and Cooling Tower Foundations. | $32,437.90 |
| 4 | Changes to Curbs based on building and process design development and owner review comments from drawing set dated 12.11.2020 to 01.08.2021. Including but not limited to: Exterior site curb and cooling tower curb. | $4,782.80 |
| 5 | Changes to CIP Concrete based on building and process design development and owner review comments from drawing set dated 12.11.2020 to 01.06.2021. Including but not limited to: Cast in place concrete at retaining walls. | $40,471.20 |

**Attachments:**
Change Request 4 CE 17 - Exterior Improvements (2).pdf, Change Request 5 CE 19 - Floor Drain Pour Back.pdf

**FOR ACCOUNTING PURPOSES ONLY:**

| Cost Codes | Net Amount |
|------------|------------|
| 03-0304 - 1760 | $43,864.10 |
| 03-0304 - 1760 | $950.00 |
| 03-0301 - 1760 | $32,437.90 |
| 03-0305 - 1760 | $4,782.80 |
| 03-0302 - 1760 | $40,471.20 |

| | |
|---|---|
| **TOTAL AMOUNT OF THIS MODIFICATION** | **$122,506.00** |
| (All licenses, taxes, permits, fees and insurance with Stellar named as additional insured included) | |
| ORIGINAL SUBCONTRACT | $2,111,428.00 |
| PREVIOUS MODIFICATION(S) | $488,875.00 |
| THIS MODIFICATION | $122,506.00 |
| REVISED SUBCONTRACT | $2,722,809.00 |

**This subcontract includes and is subject to the terms and conditions previously attached to the original subcontract.**

IN WITNESS WHEREOF, the Subcontractor and Contractor have executed this Subcontract on the date set forth above.

**HARDROCK CONCRETE PLACEMENT CO. INC.**
Subcontractor

*Cindy Kennemer*

By: Lee Lopez    451EFBACE4A7454... Cindy Kennemer

President    Vice President

**STELLAR GROUP, INCORPORATED**
Contractor

By: Jonah Petoskey
Senior Project Manager

DocuSign Envelope ID: 910EC4BD-34B6-4774-9EA7-0B809C0F58C5

# SUBCONTRACT MODIFICATION

**Stellar Group, Inc.**
2900 Hartley Road
Jacksonville, FL 32257

| | |
|---|---|
| **Subcontractor:** Hardrock Concrete Placement Co. Inc.<br>4839 W Brill St<br>Phoenix Arizona 85043-1815 | **Project Name and Location:** Bang Energy – Phoenix Can Manufacturing<br>1635 South 43rd Avenue<br>Phoenix Arizona 85009 |

| | | | |
|---|---|---|---|
| Attention: | Lee Lopez | Attention: | Brian Edberg |
| Phone: | (602) 233-3334 | Phone: | (904) 349-0640 |
| Fax: | (602) 233-2777 | E-Mail: | bedberg@stellar.net |
| E-Mail: | lmlopez@hrconcrete.com | | |

| Date | SC # | Project # | Contract Type | FOB | Schedule |
|---|---|---|---|---|---|
| 1/8/2021 | 23006976-SUB-03A | 23006976 | Lump Sum | Jobsite | Per Superintendent |

This Subcontract is made by and between Stellar Group, Incorporated, d/b/a Stellar, hereinafter referred to as "Contractor," and the Subcontractor named above, at Jacksonville, Florida. In consideration of the mutual promises and undertakings set forth herein, Contractor and Subcontractor hereby agree to the terms and conditions set forth herein, including the Terms and Conditions attached hereto. Subcontractor agrees to perform and complete the following Work:

Subcontract agrees to modify Subcontract No.: 23006976-SUB-03

| Item | Description | Net Amount |
|---|---|---|
| 1 | Changes to foundations based on building and process design development and owner review comments through revisions dated 11.24.2020 | $54,337.80 |
| 2 | Changes to curbs and columns based on building and process design development and owner review comments through revisions dated 11.24.2020 | -$18,876.00 |
| 3 | Changes to slabs based on building and process design development and owner review comments through revisions dated 11.24.2020 | $22,761.20 |
| 4 | Changes to cast in place concrete based on building and process design development and owner review comments through revisions dated 11.24.2020 | $316,742.80 |
| 5 | Changes to concrete misc steel install based on building and process design development and owner review comments through revisions dated 11.24.2020 | $924.00 |
| 6 | Changes to misc. concrete based on building and process design development and owner review comments through revisions dated 11.24.2020 | $51,185.20 |
| 7 | Concrete Waterproofing Admixture | $61,800.00 |

**Attachments:**
Change Request 1 Waterproofing Admixture (1).pdf, Change Request 3 Updated Drawings (1).pdf, Change Request 2 Waterproofing Admixture in Cast in Place Pit Walls (1).pdf

**FOR ACCOUNTING PURPOSES ONLY:**

| Cost Codes | | Net Amount |
|---|---|---|
| 03-0301 – | 1760 | $54,337.80 |
| 03-0305 – | 1760 | -$18,876.00 |
| 03-0304 – | 1760 | $22,761.20 |
| 03-0302 – | 1760 | $316,742.80 |
| 03-0306 – | 1760 | $924.00 |
| 03-0307 – | 1760 | $51,185.20 |
| 03-0302 – | 1760 | $61,800.00 |

| | |
|---|---|
| **TOTAL AMOUNT OF THIS MODIFICATION** | **$488,875.00** |

(All licenses, taxes, permits, fees and insurance with Stellar named as additional insured included)

| | |
|---|---|
| ORIGINAL SUBCONTRACT | $2,111,428.00 |
| PREVIOUS MODIFICATION(S) | $0.00 |
| THIS MODIFICATION | $488,875.00 |
| REVISED SUBCONTRACT | $2,600,303.00 |

**This subcontract includes and is subject to the terms and conditions previously attached to the original subcontract.**

IN WITNESS WHEREOF, the Subcontractor and Contractor have executed this Subcontract on the date set forth above.

| | |
|---|---|
| **HARDROCK CONCRETE PLACEMENT CO. INC.** | **STELLAR GROUP, INCORPORATED** |
| Subcontractor | Contractor |

DocuSign Envelope ID: 910EC4BD-34B6-4774-9EA7-0B809C0F58C5

Cindy Kennemer

By: Lee Lopez    Cindy Kennemer

President    Vice President

By: Jonah Petoskey

Senior Project Manager

DocuSign Envelope ID: 659FD1C3-FB1E-4636-A6C8-9FB6A458153F

# SUBCONTRACT MODIFICATION
## Stellar Group, Inc.
2900 Hartley Road
Jacksonville, FL 32257

| | | |
|---|---|---|
| Subcontractor: | Hardrock Concrete Placement Co. Inc.<br>4839 W Brill St<br>Phoenix Arizona 85043-1815 | |
| Attention: | Donna Wood | |
| Phone: | (602) 233-3334 | |
| Fax: | (602) 233-2777 | |
| E-Mail: | dwood@hrconcrete.com | |

| | |
|---|---|
| **Project Name and Location:** | Bang Energy – Phoenix Can Manufacturing<br>1635 South 43rd Avenue<br>Phoenix Arizona 85009 |
| Attention: | Chuck Harrison |
| Phone: | (904) 383-0163 |
| E-Mail: | charrison@stellar.net |

| Date<br>3/1/2022 | SC #<br>23006976-SUB-03D | Project #<br>23006976 | Contract Type<br>Lump Sum | FOB<br>Jobsite | Schedule<br>Per Superintendent |
|---|---|---|---|---|---|

This Subcontract is made by and between Stellar Group, Incorporated, d/b/a Stellar, hereinafter referred to as "Contractor," and the Subcontractor named above, at Jacksonville, Florida. In consideration of the mutual promises and undertakings set forth herein, Contractor and Subcontractor hereby agree to the terms and conditions set forth herein, including the Terms and Conditions attached hereto. Subcontractor agrees to perform and complete the following Work:

Subcontract agrees to modify Subcontract No.: 23006976-SUB-03

| Item | Description | Net Amount |
|---|---|---|
| 1 | Please review the revised schedule attached and provide details as list below. Provide detail for all impacts associated with the delay reflected in the updated schedule dated May 29, 2020. Confirm that you can meet the commitment required under your existing contract terms based on the revised schedule. If not please provide additional details. Provide detail for any additional costs associated with the delay if any. If you have any equipment in fabrication or storage, provide schedule or cost impacts associated with the equipment delivery or storage. Provide detail for any current cost you have that has not been billed and a date for when the costs will be billed. If you have any items onsite that need to be removed provide details of what needs to be removed and when it will be removed. Provide any other information that may be of concern regarding the revised project schedule. | $17,860.00 |

**Attachments:**
Change Request 9 Rescheduled Start.pdf, 06976- Bang PHX Can Manufacturing
Preliminary Restart Schedule.pdf

**FOR ACCOUNTING PURPOSES ONLY:**

| Cost Codes | Net Amount |
|---|---|
| 03-0302 - 1760 | $17,860.00 |

| | |
|---|---|
| **TOTAL AMOUNT OF THIS MODIFICATION** | **$17,860.00** |

(All licenses, taxes, permits, fees and insurance with Stellar named as additional insured included)

| | |
|---|---|
| ORIGINAL SUBCONTRACT | $2,111,428.00 |
| PREVIOUS MODIFICATION(S) | $621,611.00 |
| THIS MODIFICATION | $17,860.00 |
| REVISED SUBCONTRACT | $2,750,899.00 |

This subcontract includes and is subject to the terms and conditions previously attached to the original subcontract.

IN WITNESS WHEREOF, the Subcontractor and Contractor have executed this Subcontract on the date set forth above.

**HARDROCK CONCRETE PLACEMENT CO. INC.**
Subcontractor

*Cindy Kennemer*

By: Donna Wood    Cindy Kennemer

**STELLAR GROUP, INC.**
Contractor

By: Gregory Ortego
Project Manager

# SUBCONTRACT MODIFICATION

## Stellar Group, Inc.
### 2900 Hartley Road
### Jacksonville, FL 32257

| | | | |
|---|---|---|---|
| **Subcontractor:** | Hardrock Concrete Placement Co. Inc.<br>4839 W Brill St<br>Phoenix Arizona 85043-1815 | **Project Name and Location:** | Bang Energy – Phoenix Can Manufacturing<br>1635 South 43rd Avenue<br>Phoenix Arizona 85009 |
| **Attention:** | Donna Wood | **Attention:** | Chuck Harrison |
| **Phone:** | (602) 233-3334 | **Phone:** | (904) 383-0163 |
| **Fax:** | (602) 233-2777 | **E-Mail:** | charrison@stellar.net |
| **E-Mail:** | dwood@hrconcrete.com | | |

| Date<br>3/1/2022 | SC #<br>23006976-SUB-03E | Project #<br>23006976 | Contract Type<br>Lump Sum | FOB<br>Jobsite | Schedule<br>Per Superintendent |
|---|---|---|---|---|---|

This Subcontract is made by and between Stellar Group, Incorporated, d/b/a Stellar, hereinafter referred to as "Contractor," and the Subcontractor named above, at Jacksonville, Florida. In consideration of the mutual promises and undertakings set forth herein, Contractor and Subcontractor hereby agree to the terms and conditions set forth herein, including the Terms and Conditions attached hereto. Subcontractor agrees to perform and complete the following Work:

Subcontract agrees to modify Subcontract No.: 23006976-SUB-03

| Item | Description | Net Amount |
|---|---|---|
| 1 | Please review the revised schedule attached and provide details as list below. Provide detail for all impacts associated with the delay reflected in the updated schedule dated May 29, 2020. Confirm that you can meet the commitment required under your existing contract terms based on the revised schedule. If not please provide additional details. Provide detail for any additional costs associated with the delay if any. If you have any equipment in fabrication or storage, provide schedule or cost impacts associated with the equipment delivery or storage. Provide detail for any current cost you have that has not been billed and a date for when the costs will be billed. If you have any items onsite that need to be removed provide details of what needs to be removed and when it will be removed. Provide any other information that may be of concern regarding the revised project schedule. | $15,400.00 |

**Attachments:**
Change Request 7 CE # 26 Project Hold.pdf, 06976- Bang PHX Can Manufacturing
Schedule_60 Day Hold.pdf

| FOR ACCOUNTING PURPOSES ONLY: | | |
|---|---|---|
| Cost Codes | | Net Amount |
| - | | $15,400.00 |

| | |
|---|---|
| **TOTAL AMOUNT OF THIS MODIFICATION**<br>(All licenses, taxes, permits, fees and insurance with Stellar named as additional insured included) | **$15,400.00** |

| | |
|---|---|
| ORIGINAL SUBCONTRACT | $2,111,428.00 |
| PREVIOUS MODIFICATION(S) | $639,471.00 |
| THIS MODIFICATION | $15,400.00 |
| REVISED SUBCONTRACT | $2,766,299.00 |

**This subcontract includes and is subject to the terms and conditions previously attached to the original subcontract.**

IN WITNESS WHEREOF, the Subcontractor and Contractor have executed this Subcontract on the date set forth above.

**HARDROCK CONCRETE PLACEMENT CO. INC.**
Subcontractor

*Cindy Kennemer*

By: Donna Wood        Cindy Kennemer

**STELLAR GROUP, INC.**
Contractor

By: Gregory Ortego
Project Manager

# Exhibit C

Customer: STELLAR GROUP, INC.
Project: Phoenix Can Manufacturing
1st Class Mail
Return Receipt Requested

File No: 183885 | AZ | OWNER

**TWENTY DAY PRELIMINARY NOTICE**
In Accordance With Arizona Revised Statutes Section 33-992.01
THIS IS NOT A LIEN. THIS IS NOT A REFLECTION ON THE INTEGRITY OF ANY CONTRACTOR OR SUBCONTRACTOR.

**NOTICE TO PROPERTY OWNER**

If bills are not paid in full for the labor, professional services, materials, machinery, fixtures or tools furnished, or to be furnished, a Mechanic's Lien leading to the loss, through court foreclosure proceedings, of all or part of your property being improved may be placed against the property. You may wish to protect yourself against this consequence by either:

1. Requiring your contractor to furnish a conditional waiver and release pursuant to Arizona Revised Statutes Section 33-1008, Subsection D, Paragraphs 1 and 3 signed by the person or firm giving you this notice before you make payment to your contractor.
2. Requiring your contractor to furnish an unconditional waiver and release pursuant to Arizona Revised Statutes Section 33-1008, Subsection D, Paragraphs 2 and 4 signed by the person or firm giving you this notice before you make payment to your contractor.
3. Using any other method or device that is appropriate under the circumstances.

Within ten days of the receipt of this preliminary twenty day notice the owner or other interested party is required to furnish all information necessary to correct any inaccuracies in the notice pursuant to Arizona Revised Statutes Section 33-992.01, Subsection 1 or lose as a defense any inaccuracy of that information.

Within ten days of the receipt of this preliminary twenty day notice if any Payment Bond has been recorded in compliance with Arizona Revised Statutes Section 33-1003, the owner must provide a copy of the Payment Bond including the name and address of the surety company and bonding agent providing the Payment Bond to the person who has given the preliminary twenty day notice. In the event that the owner or other interested party fails to provide the bond information within that ten day period, the claimant shall retain lien rights to the extent precluded or prejudiced from asserting a claim against the bond as a result of not timely receiving the bond information.

NAME AND ADDRESS OF
OWNER OR REPUTED OWNER:
Vital Pharmaceuticals, Inc.
c/o JHO Real Estate Investment LLC
1600 N. Park Drive
Weston, FL 33326

We hereby request lender and/or bond information, if any.

NAME AND ADDRESS OF GENERAL
OR PRIME CONTRACTOR:
STELLAR GROUP, INC.
2900 Hartley Road
JACKSONVILLE, FL 32257

THE NAME AND ADDRESS OF JOB:
Phoenix Can Manufacturing
1635 S. 43rd Ave.
PHOENIX, AZ 85009
County of Maricopa

1. The following is an explanation of the labor, service, equipment or materials furnished or to be furnished by the undersigned:
CONCRETE CONTRACTOR

2. Estimated Amount of Labor or Material Furnished:        $2,533,713.60

3. The name of the person or company who furnished the labor, service, equipment or materials is:
HARDROCK CONCRETE PLACEMENT CO. INC.
4839 W BRILL ST
PHOENIX, AZ 85043

4. The name of the person or company who contracted for the labor, material or equipment is:
STELLAR GROUP, INC.
2900 Hartley Road
JACKSONVILLE, FL 32257

5. Date Claimant first provided said labor, services, equipment or materials:
November 16, 2020

By: _____ TODD HALEY, LIMITED AGENT, November 18, 2020

---------------------------- PLEASE DETACH AND MAIL BACK TO BOTTOM ADDRESS ------------------------

ACKNOWLEDGMENT OF RECEIPT OF TWENTY DAY PRELIMINARY NOTICE --- File #: 183885

This acknowledges receipt on (date notice received) _____ of a copy of the Twenty Day Preliminary Notice

at (address where notice received) _____

Today's date _____

Signature of person acknowledging receipt, with title if acknowledgment is made for another person

_____

Prepared by: Corporate Lien Services LLC, 6908 E Thomas Rd Suite 210, Scottsdale, AZ 85251, Phone: (480) 345-2500, Fax: (480) 345-9931, Email: info@corpcollection.com

**AFFIDAVIT OF SERVICE OF PRELIMINARY TWENTY DAY NOTICE**

I, Todd Haley, declare under penalty of perjury that on November 18th, 2020 I served copies of this Preliminary Notice by placing them first-class postage prepaid with a certificate of mailing in the United States mail addressed to the reputed owner, lender (if a lender is listed), and the party with whom the claimant originally contracted with at their respective addresses shown on the attached record.

DATED this 22nd day of February, 2022

By: _____

Todd Haley

STATE OF ARIZONA          )

                          )ss

County of Maricopa

SUBSCRIBED AND SWORN TO before me this 22nd day of February, 2022

JAMIE ANN EVERETT
Notary Public - Arizona
Maricopa County
Commission # 576173
My Comm. Expires Feb 1, 2024

Notary Public

11-18-2020 10:18:16                                                                Page 1

**Corporate Lien Services LLC**
6908 E Thomas Rd Suite 210
Scottsdale, AZ 85251
**First Class Certificate of Mailing**
11/18/2020 Thru 11/18/2020

| Item | Name of Addressee | Address | City | State | Zip | Prelim # |
|---|---|---|---|---|---|---|
| 1 | TOUCHMARK AT THE RANCH LLC | 5150 SW GRIFFITH DR | BEAVERTON | OR | 97005 | 182905 |
| 2 | Wespac Construction, Inc. | 9440 North 26th Street Ste. #100 | PHOENIX | AZ | 85028 | 182905 |
| 3 | Mountain High Excavating | 4183 E. Huntington Dr | FLAGSTAFF | AZ | 86004 | 182905 |
| 4 | WEEKLEY HOMES LLC | 1111 N POST OAK RD | HOUSTON | TX | 77055 | 184098 |
| 5 | David Weekley Homes | 8058 S Priest Drive | Tempe | AZ | 85284 | 184098 |
| 6 | WEEKLEY HOMES LLC | 1111 N POST OAK RD | HOUSTON | TX | 77055 | 184099 |
| 7 | David Weekley Homes | 8058 S Priest Drive | Tempe | AZ | 85284 | 184099 |
| 8 | FHMC LLC | 9700 N. SAGUARO BLVD POB 17240 | FOUNTAIN HIL | AZ | 85269 | 184248 |
| 9 | E.D. SMITH PAVING, INC. | 12325 W. ALICE AVE | EL MIRAGE | AZ | 85335 | 184248 |
| 10 | STORE MASTER FUNDING XVIII LL | 8377 E. HARTFORD DR., SUITE 100 | SCOTTSDALE | AZ | 85255 | 184244 |
| 11 | STORE MASTER FUNDING  XVIII, LL | 55635 N. VULTURE MINE RD | WICKENBURG | AZ | 85390 | 184244 |
| 12 | TP RACING LLLP | 1501 W BELL RD | PHOENIX | AZ | 85023 | 184250 |
| 13 | Pinewood Country Club, Inc. | 395 Pinewood Blvd | MUNDS PARK | AZ | 86017 | 184240 |
| 14 | Pinewood Country Club, Inc. | PO Box 18614 | MUNDS PARK | AZ | 86017 | 184240 |
| 15 | SAFEWAY INC | 1371 OAKLAND BLVD STE 200 | WALNUT CRE | CA | 94596 | 184209 |
| 16 | National Retail Service Group | 8987 E. Tanque Verde #309-410 | TUCSON | AZ | 85749 | 184209 |
| 17 | EASTGROUP PROPERTIES L.P. | 2200 E. CAMELBACK RD., SUITE 210 | Phoenix | AZ | 85016 | 183914 |
| 18 | WILLMENG CONSTRUCTION INC | 2048 N. 44TH ST., STE 200 | PHOENIX | AZ | 85008 | 183914 |
| 19 | CTC GILBERT LLC | 4450 MACARTHUR BLVD 2ND FLOOR | NEWPORT BE | CA | 92660 | 183914 |
| 20 | Vital Pharmaceuticals, Inc. | 1600 N. Park Drive | Weston | FL | 33326 | 183885 |
| 21 | STELLAR GROUP, INC. | 2900 Hartley Road | JACKSONVILL | FL | 32257 | 183885 |
| 22 | GC NET LEASE PHOENIX BEARDSL | 410 17TH ST STE 1175 | DENVER | CO | 80202 | 183999 |

NUMBER OF PIECES: 22                                                               8.8
Date Prepared: 11-18-2020

## VERIFICATION

MAILING PARTY                    POSTMASTER                NUMBER OF PIECES: 22
Corporate Lien Services LLC
6908 E Thomas Rd Suite 210       _____   Total Pieces Received: _____
Scottsdale, AZ  85251

                                                           RECEIVED BY: _____

MAILED FROM ZIP CODE 85251
0001938000
NOV 18 2020
$ 008.80
PITNEY BOWES

# EXHIBIT H

Clerk of the Superior Court
*** Electronically Filed ***
M. De La Cruz, Deputy
8/25/2022 10:00:12 AM
Filing ID 14752069

**MURPHY CORDIER CASALE AXEL PLC**
4647 North 32ⁿᵈ Street, Suite 150
Phoenix, Arizona 85018
Telephone (602) 274-9000

Richard B. Murphy (State Bar No. 015211)
  *Rich@mccalaw.com*
Chase E. Halsey (State Bar No. 023247)
  *Chase@mccalaw.com*

*Attorneys for Stellar Group, Inc.*

## IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

## IN AND FOR THE COUNTY OF MARICOPA

| | |
|---|---|
| NEXUS STEEL, LLC, an Arizona limited liability company,<br><br>    Plaintiff,<br><br>v.<br><br>JHO REAL ESTATE INVESTMENT, LLC, a Florida limited liability company; VITAL PHARMACEUTICALS, INC., a Florida corporation, d/b/a BANG, LLC, a Florida limited liability company; FABCO METAL PRODUCTS, LLC, a Florida limited liability company; BELVAC PRODUCTION MACHINERY, INC., a Virginia corporation; TRUIST BANK, a North Carolina company; ISEC, INC., a Colorado corporation; HEAVY EQUIPMENT MOVERS & INSTALLATION, LLC, a Delaware limited liability company; HARDROCK CONCRETE PLACEMENT CO., INC., an Arizona corporation; STELLAR GROUP, INC., a Florida corporation; FAITH TECHNOLOGIES, INC., a Wisconsin corporation; INTEGRATED MASONRY, an Arizona company; HACI MECHANICAL CONTRACTORS, INC., an Arizona | Case No: CV2022-008873<br><br>**STELLAR GROUP, INC.'S ANSWER, COUNTERCLAIM, AND CROSS-CLAIMS**<br><br>(Assigned to the Hon. Brad Astrowsky) |

1  corporation; TRENCH SHORE RENTALS, an
   Arizona corporation; THE MARICOPA
2  COUNTY TREASURERS OFFICE, BLACK
   AND WHITE CORPORATIONS 1-10;
3
4       Defendants.

5  _____

   STELLAR GROUP, INC., a Florida
6  corporation,

7          Counterclaimant,

8  v.

9
   NEXUS STEEL, LLC, an Arizona limited
10 liability company,

11         Counterdefendant.

12 _____

13 STELLAR GROUP, INC., a Florida
   corporation,
14
15         Cross-claimant,

16 v.

17
   JHO REAL ESTATE INVESTMENT, LLC, a
18 Florida limited liability company; VITAL
   PHARMACEUTICALS, INC., a Florida
19 corporation, d/b/a BANG, LLC, a Florida
   limited liability company; FABCO METAL
20 PRODUCTS, LLC, a Florida limited liability
   company; BELVAC PRODUCTION
21 MACHINERY, INC., a Virginia corporation;
   TRUIST BANK, a North Carolina company;
22 ISEC, INC., a Colorado corporation; HEAVY
   EQUIPMENT MOVERS &
23 INSTALLATION, LLC, a Delaware limited
   liability company; HARDROCK CONCRETE
24
25 PLACEMENT CO., INC., an Arizona
   corporation; STELLAR GROUP, INC., a
26 Florida corporation; FAITH

1    TECHNOLOGIES, INC., a Wisconsin
     corporation; INTEGRATED MASONRY, an
2    Arizona company; HACI MECHANICAL
     CONTRACTORS, INC., an Arizona
3    corporation; TRENCH SHORE RENTALS, an
     Arizona corporation; THE MARICOPA
4    COUNTY TREASURERS OFFICE; and
     BLACK AND WHITE CORPORATIONS  1-
5    10,

6
            Cross-defendants.
7

8          For its Answer to Nexus Steel, LLC's Complaint, Stellar Group, Inc. ("Stellar")

9    admits, denies, and alleges as follows:

10                              **GENERAL ALLEGATIONS**

11         1.     Stellar does not have sufficient knowledge or information on which to form

12   a belief as to the truth of the matters alleged in paragraph 1 and therefore denies the same.

13         2.     Upon information and belief, Stellar admits the allegations in paragraph 2.

14         3.     Upon information and belief, Stellar admits the allegations in paragraph 3.

15         4.     Stellar denies the allegations in paragraph 4 and affirmatively alleges that

16   Fabco was a subcontractor to Stellar.

17         5.     Upon information and belief, Stellar admits the allegations in paragraph 5.

18         6.     Upon information and belief, Stellar admits the allegations in paragraph 6.

19         7.     Upon information and belief, Stellar admits the allegations in paragraph 7.

20         8.     Upon information and belief, Stellar admits the allegations in paragraph 8.

21         9.     Upon information and belief, Stellar admits the allegations in paragraph 9.

22         10.    Upon information and belief, Stellar admits the allegations in paragraph 10.

23         11.    Upon information and belief, Stellar admits the allegations in paragraph 11.

24         12.    Upon information and belief, Stellar admits the allegations in paragraph 12.

25         13.    Upon information and belief, Stellar admits the allegations in paragraph 13.

26         14.    Upon information and belief, Stellar admits the allegations in paragraph 14.

15.     Upon information and belief, Stellar admits the allegations in paragraph 15.

16.     Stellar does not have sufficient knowledge or information on which to form a belief as to the truth of the matters alleged in paragraph 16 and therefore denies the same.

17.     Stellar admits the allegations in paragraph 17.

18.     Stellar does not have sufficient knowledge or information on which to form a belief as to the truth of the matters alleged in both paragraph numbered as 18 and therefore denies the same.

19.     Stellar does not have sufficient knowledge or information on which to form a belief as to the truth of the matters alleged in paragraph 19 and therefore denies the same.

20.     Stellar does not have sufficient knowledge or information on which to form a belief as to the truth of the matters alleged in paragraph 20 and therefore denies the same.

21.     Stellar does not have sufficient knowledge or information on which to form a belief as to the truth of the matters alleged in paragraph 21 and therefore denies the same.

22.     Upon information and belief, Stellar admits that Nexus recorded a mechanic's lien on January 20, 2022, but does not have sufficient knowledge or information on which to form a belief as to the remaining allegations in paragraph 22 and therefore denies the same.

23.     Stellar admits the allegations in paragraph 23.

## COUNT I

### (Lien Foreclosure – All Defendants)

24.     Stellar incorporates its prior responses as though fully set forth herein.

25.     Stellar does not have sufficient knowledge or information on which to form

1    a belief as to the truth of the matters alleged in paragraph 25 and therefore denies the

2    same.

3          26.     Stellar does not have sufficient knowledge or information on which to form

4    a belief as to the truth of the matters alleged in paragraph 26 and therefore denies the

5    same.

6          27.     Stellar does not have sufficient knowledge or information on which to form

7    a belief as to the truth of the matters alleged in paragraph 27 and therefore denies the

8    same.

9          28.     Stellar does not have sufficient knowledge or information on which to form

10    a belief as to the truth of the matters alleged in paragraph 28 and therefore denies the

11    same.

12                                         **COUNT II**

13                   **(Breach of Subcontract – Fabco Metal Products, LLC)**

14          29.     Stellar incorporates its prior responses as though fully set forth herein.

15          30.     The allegations in paragraphs 30 through 37 do not state a cause of action

16    against Stellar, and therefore no response is required.

17                                         **COUNT III**

18             **(Unjust Enrichment – JHO Real Estate Investments, Inc., and Vital**

19                               **Pharmaceuticals)**

20          31.     Stellar incorporates its prior responses as though fully set forth herein.

21          32.     The allegations in paragraphs 39 through 44 do not state a cause of action

22    against at Steller, and therefore no response is required.

23                            **AFFIRMATIVE DEFENSES**

24          33.     Stellar denies all allegations not specifically admitted.

25          34.     Stellar affirmatively alleges the Complaint fails to state a cause of action

26    against it.

35.     Stellar affirmatively alleges that discovery in this action may reveal facts to support affirmative defenses.  Therefore, under Rule 8(d), *Ariz.R.Civ.P.*, Stellar asserts the following affirmative defenses:  failure of condition precedent; statute of limitations; and failure to comply with Arizona's mechanic's lien statutes.

WHEREFORE, having answered Nexus Steel, LLC's Complaint, Stellar prays that it be dismissed, that Nexus take nothing thereby from Stellar, and that Stellar recover its attorneys' fees and costs incurred herein, as well as any further relief the Court deems proper.

## COUNTERCLAIM AND CROSS-CLAIMS

For its Counterclaim against Nexus and Cross-Claims against Cross-Defendants JHO Real Estate Investment, LLC, Vital Pharmaceuticals, Inc., d/b/a Bang, LLC, Fabco Metal Products, LLC, Belvac Production Machinery, Inc., Truist Bank, ISEC, Inc., Heavy Equipment Movers & Installation, Inc., Hardrock Concrete Placement Co., Inc., Faith Technologies, Inc., Integrated Masonry, HACI Mechanical Contractors, Inc., Trench Shore Rentals, The Maricopa County Treasurer's Office, and Black and White Corporations 1-10, Stellar alleges as follows:

## PARTIES, JURISDICTION AND VENUE

1.     Stellar Group, Inc. ("Stellar") is a Florida corporation authorized to and transacting business in Maricopa County, Arizona.

2.     At all times material hereto, Stellar held a valid license as a contractor under Arizona Revised Statutes, Title 32, Chapter 10.

3.     Upon information and belief, Nexus Steel, LLC ("Nexus"), is an Arizona limited liability company authorized to and transacting business in Maricopa County, Arizona.

4.     Upon information and belief, JHO Real Estate Investment, LLC ("JHO") is a Florida limited liability company authorized to and transacting business in Maricopa

County, Arizona. JHO is the owner of the real property located at 1635 South 43rd Avenue, Phoenix, Arizona 85009 (the "Subject Property").

5. Upon information and belief, Vital Pharmaceuticals, Inc., d/b/a Bang, LLC, ("Vital") is a Florida limited liability company authorized to and transacting business in Maricopa County, Arizona.

6. Upon information and belief, Fabco Metal Products, LLC ("Fabco") is a Florida limited liability company authorized to and transacting business in Maricopa County, Arizona.

7. Upon information and belief, Belvac Product Machinery, Inc. ("Belvac") is a Virginia corporation authorized to and transacting business in Maricopa County, Arizona.

8. Upon information and belief, Truist Bank ("Truist") is a North Carolina bank authorized to and transacting business in Maricopa County, Arizona. Truist has an interest in the Subject Property by virtue of having recorded a Deed of Trust against the Subject Property.

9. Upon information and belief, ISEC, Inc., is a Colorado corporation authorized to and transacting business in Maricopa County, Arizona.

10. Upon information and belief, Heavy Equipment Movers & Installation, Inc. ("Heavy") is a Delaware limited liability company authorized to and transacting business in Maricopa County, Arizona.

11. Upon information and belief, Hardrock Concrete Placement Co., Inc. ("Hardrock") is an Arizona corporation authorized to and transacting business in Maricopa County, Arizona.

12. Upon information and belief, Faith Technologies, Inc. ("Faith") is a Wisconsin corporation authorized to and transacting business in Maricopa County, Arizona.

13.     Upon information and belief, Integrated Masonry ("Integrated") is an Arizona corporation  to and transacting business in Maricopa County, Arizona.

14.     Upon information and belief, HACI Mechanical Contractors, Inc., ("HACI") is an Arizona corporation authorized to and transacting business in Maricopa County, Arizona.

15.     Upon information and belief, Trench Shore Rentals ("Trench") is an Arizona corporation authorized to and transacting business in Maricopa County, Arizona.

16.     The Maricopa County Treasurer recorded a tax lien on the Subject Property that is the subject of Stellar's lien foreclosure claim.

17.     Nexus, Fabco, Belvac, ISEC, Heavy,  Hardrock, Faith , Integrated, HACI, and Trench have an interest in the Subject Property by virtue of having recorded mechanic's liens against the Subject Property.

18.     Black and White Corporations 1-10 represent unknown parties who have an interest or claim in the Subject Property that is the subject of Stellar's lien foreclosure claim.  The actual names of these defendants are currently unknown and Stellar may later amend its claims when said names are discovered.

19.     JHO, Vital, Nexus, Fabco, Belvac, Truist, ISEC, Heavy, Hardrock, Faith, Integrated, HACI, and Trench have caused events to occur in Maricopa County, Arizona out of which the claims that are the subject of Stellar's counterclaim and cross-claims arose.  Further, the mechanic's lien Stellar seeks to foreclose herein in upon land located in Maricopa County.  Venue is proper in Maricopa County, Arizona.

## GENERAL ALLEGATIONS

20.     On or about July 28, 2020, Stellar, as design-builder, and Vital as owner, entered into that certain Standard Form of Agreement Between Owner and Design-Builder (the "Contract"), in which Stellar agreed to serve as the design-builder on a construction project known as "Phoenix Can Manufacturing" (the "Project").

21.     The Project is located on the Subject Property.

22.     Stellar commenced work on the Project in August 2020.

23.     In or about October or November 2021, Vital missed payments due under the Contract.  Stellar continued to provide labor, materials, and equipment to the Project despite Vital's failure to pay Stellar under its October and November 2021 invoices.

24.     Stellar served on Vital a *Notice of Intent to Stop Work* dated December 17, 2021, because of Vital's ongoing failure to make payments due under the Contract. However, Stellar continued to provide labor, materials, and equipment to the Project.

25.     Stellar served on Vital a *Notice of Intent to Terminate Agreement* dated February 7, 2022, because of Vital's failure to cure its failure to make payments due under the Contract.

26.     Stellar served on Vital a *Second Notice of Intent to Terminate Agreement* dated February 17, 2022, because of Vital's ongoing failure to make payments due under the Contract.

27.     Stellar served on Vital a *Declaration of Termination* dated March 3, 2022, formally terminating the Contract because of Vital's failure to make payment of all sums due for labor, materials and equipment provided to the Project.  Stellar ceased work thereafter.

28.     At no time between December 2021 and March 2022 did Vital pay Stellar in response to the Notices.

29.     As of March 2022, Stellar had furnished $18,168,578.50 in labor, materials, fixtures, and tools to the Project for incorporation into the Subject Property for which it has not been paid.

\\\

\\\

\\\

**COUNT ONE**

**(Mechanic's Lien Foreclosure – Nexus and all Cross-Defendants)**

30.     Stellar incorporates its prior allegations as though fully set forth herein.

31.     In accordance with A.R.S. § 33-992.01, Stellar served an Arizona Preliminary 20-Day Notice on or about December 23, 2021.  A true and correct copy of Stellar's Preliminary 20-Day Notice is attached to the Lien (as defined herein) and incorporated by reference.

32.     Within the applicable period covered by A.R.S. § 33-992.01, Stellar provided labor, material, and equipment to the Project in the amount of $7,722,974.37 for which it has not been paid.

33.     Stellar timely recorded a Notice and Claim of Mechanics' and Materialmen's Lien against the Subject Property on March 23, 2022, in the Maricopa County Recorder's Office at Document No. 2022-0259809 (the "Lien").  A true and correct copy of the Lien is attached hereto as **Exhibit 1**.

34.     Pursuant to A.R.S. § 33-981, et seq., Stellar performed all conditions to impose and secure a good and valid lien against the Subject Property for such labor, materials, fixtures, and tools furnished and incorporated into the Subject Property.

35.     Stellar is entitled to have this Court determine and declare the right and title of all lien claimants and other parties claiming an interest in the real property that is the subject of the Lien; to have this Court order Stellar's Lien foreclosed, and the Subject Property sold to satisfy all liens against it in the order of their priority and treating all valid mechanic's liens as being in parity; and to have the sales proceeds distributed accordingly.

36.     Stellar is entitled to foreclose the Lien against Nexus, all Cross-Defendants, and all others holding an interest that is equal or inferior to Stellar's Lien and to recover the amounts secured by the Lien from the foreclosure sale proceeds of the Subject

1 Property based upon the priorities established by the Court. The amount claimed in the
2 Lien represents the reasonable value of the labor, materials, fixtures, and tools furnished
3 and incorporated into the Project and Subject Property for which Stellar has not been paid
4 and which is not otherwise limited by the applicable provisions of A.R.S. § 33-992.01.

5       37.     Pursuant to A.R.S. §§ 33-995(E) and 33-998(B), Stellar is entitled to
6 recover its reasonable attorneys' fees incurred herein.

7       WHEREFORE, Stellar requests the following relief:

8       A.     Judgment on its Lien claim in favor of Stellar for the total sum of
9 $7,722,974.37, together with accruing interest thereon at the highest legal rate from the
10 date due until paid, plus reasonable attorneys' fees and collection costs;

11       B.     Judgment in favor of Stellar and against all that oppose this action for the
12 sum of money paid by Stellar for recording and serving its Lien, together with interest
13 thereon at the highest legal rate from the date due until paid;

14       C.     Judgment ordering that the Lien be foreclosed and that any person claiming
15 a junior interest in the real property subject to the Lien be forever barred and foreclosed
16 to all right, title, interest, estate, lien or equity;

17       D.     Judgment ordering that the Subject Property be adjudged and decreed to be
18 sold according to the law and practice of this Court and that Stellar be paid the amount
19 due out of the proceeds of that sale pursuant to A.R.S. § 33-1000;

20       E.     Judgement declaring that the above sum be adjudged to be a valid lien upon
21 the real property subject to the Lien to the full extent of and as described therein; and

22       F.     Judgment for such other and further relief as this Court deems just and
23 proper.

24 <div align="center">**COUNT TWO**</div>

25 <div align="center">**(Breach of Contract – Vital)**</div>

26       38.     Stellar incorporates its prior allegations as though fully set forth herein.

39.   The Contract is a valid and binding contract between Stellar and Vital.

40.   Pursuant to the Contract, Stellar furnished design-build services to Project.

41.   Stellar fully performed its obligations under the Contract through March 2022, when it ceased work because of Vital's first material breach of the Contract.

42.   Stellar ceased work and terminated the Contract in accordance with its rights under A.R.S. § 32-1185(A).

43.   Vital breached its obligations under the Contract by failing to pay Stellar in full for the labor, materials, and equipment Stellar furnished to the Project under the Contract.

44.   As a direct result of Vital's breach of the Contract, Stellar has been damaged in an amount to be proven at trial, but in no event less than $18,168,578.50.

45.   In accordance with A.R.S. § 32-1182, Stellar is entitled to interest on the unpaid amount at the rate of 18% per annum from the date due until paid.

46.   Stellar is entitled to recover its attorneys' fees and costs under the terms of the Contract and/or A.R.S. §§ 12-341 and 12-341.01.

WHEREFORE, Stellar requests the following relief against Vital:

A.   For damages arising from Vital's breach of contract in an amount to be proven at trial, but in no event less than $18,168,578.50;

B.   For Stellar's reasonable attorneys' fees and costs under the terms of the Contract and/or A.R.S. §§ 12-341 and 12-341.01;

C.   For pre and post-judgment interest at the highest rate permitted by law; and

D.   For such further relief the Court deems just and proper.

\\\

\\\

\\\

1

DATED this 25th day of August 2022.

2

**MURPHY CORDIER CASALE AXEL PLC**

3

By: /s/ Chase E. Halsey

4
       Richard B. Murphy

5
       Chase E. Halsey
       *Attorneys for Stellar Group, Inc.*

6

7

E-Filed through AZ Turbo Court

8

this 25th day of August, 2022 with COPIES e-mailed to:

9

Richard C. Gramlich, Esq.

rcg@tblaw.com

10

TIFFANY & BOSCO

11

2525 E. Camelback Road, 7th Floor

Phoenix, Arizona 85016

12

*Attorneys for Nexus Steel, LLC*

13

John L. Condrey, Esq.

14

jcondrey@grsm.com

GORDON REES SCULLY MANSUKHANI, LLP

15

Two N. Central Avenue, Suite 2200

Phoenix, Arizona 85004

16

*Attorneys for Fabco Metal Products, LLC*

17

18

*/s/ Tiffany J. Hayes*

19

20

21

22

23

24

25

26

# EXHIBIT 1

OFFICIAL RECORDS OF
MARICOPA COUNTY RECORDER
STEPHEN RICHER
20220259809  03/23/2022  11:14
ELECTRONIC RECORDING

StellarMechLien-35-1-1--
Garciac

When recorded return to:

> MURPHY CORDIER CASALE AXEL PLC
> 2025 N. 3rd Street, Suite 200
> Phoenix, Arizona 85004
> (602) 274-9000

## NOTICE AND CLAIM OF MECHANIC'S
## AND MATERIALMEN'S LIEN

**Claimant:**

> Stellar Group, Inc.
> 2900 Hartley Road
> Jacksonville, Florida 32257

**Owner(s) or Reputed Owner(s):**

> Vital Pharmaceuticals, Inc.
> One Alhambra Plaza, Floor PH
> Coral Gables, Florida 33132

> Vital Pharmaceuticals, Inc.
> c/o Corporate Creations Network, Inc.
> 3260 North Hayden Road, Suite 210
> Scottsdale, Arizona 85251

> JHO Real Estate Investment, LLC
> 1600 North Park Drive
> Weston, Florida 33326

> JHO Real Estate Investment, LLC
> c/o Corporate Creations Network, Inc.
> 3260 North Hayden Road, Suite 210
> Scottsdale, Arizona 85251

**Amount Due:** $ 7,722,974.37

**Amount of Mechanic's Lien Claim After Deducting Just Credits and Offsets:**

> $ 7,722,974.37, for the value of the work performed and covered by Claimant's Preliminary

Twenty Day Lien Notice, plus accruing interest and lien fees, in accordance with the limitations imposed by A.R.S. 33-992.01(E).

**Subject Real Property (Address or Location, City and County):**

> 1635 South 43rd Avenue
> Phoenix, Arizona 85009
> Maricopa County, Arizona

**Subject Real Property (Legal Description):**

> A copy of the Subject Property's legal description is attached hereto as **Exhibit A**.

| | | |
|---|---|---|
| STATE OF FLORIDA | ) | |
| | ) | ss. |
| County of Duval | ) | |

Gabriel B. Crafton, being duly sworn upon oath, deposes and states that:

1.      I am the Claimant or Claimant's limited agent and have knowledge of the facts of this claim and make the statements set forth herein on Claimant's behalf in compliance with A.R.S. § 33-993.

2.      Claimant has furnished labor, services, materials, machinery, fixtures or tools in the construction, alteration or repair of the buildings, other structures or above described improvements on the Subject Real Property.  This was done at the request of Owner or Reputed Owner, or at the request of a person whom Claimant reasonably believed to be the lawful agent of Owner or Reputed Owner.

3.      Claimant was employed by and furnished labor and/or materials to:

> Vital Pharmaceutical, Inc.
> 1600 North Park Drive
> Weston, Florida 33326

4.      The labor, services, materials, machinery, fixtures or tools were furnished pursuant to a written contract, a copy of which is attached hereto as **Exhibit B**.

5.      The date of completion of the building, structure, or improvement, or any alteration or repair of such building, structure, or improvement:  Incomplete.

6.      A Preliminary Twenty Day Notice as required by A.R.S. § 33-992.01 was served on December 23, 2021.  A copy of said notice and proofs of service as required by A.R.S. § 33-992.02 are attached as **Exhibit C**.

WHEREFORE, in accordance with A.R.S. § 33-993, Claimant does claim and fix upon the property this lien in the amount provided herein by causing this Notice and Claim of Lien to be recorded with the Maricopa County Recorder and a copy served within a reasonable time upon the

2

Owner, the Owner's agent, the original contractor, or any other interested person, if found within Maricopa County.

DATED this 21st day of March 2022.

**STATE OF FLORIDA** )

**COUNTY OF DUVAL** )

STELLAR GROUP, INC.

By _____

Name: Gabriel B. Crafton

Its: Chief Legal Officer

Sworn to or affirmed and signed before me by means of physician presence on this 21st day of March, 2022 by Gabriel B. Crafton who is personally known to me or who has produced _____, as identification.

_____
Notary Public, State of Florida
Print Name: Dorothy B Miller
My Commission Expires: March 2, 2026

DOROTHY BLANTON MILLER
NOTARY PUBLIC
MY COMMISSION
EXPIRES 3-2-2026
STATE OF FLORIDA
COMMISSION NUMBER HH 200076

3

20220259800

EXHIBIT A

## LEGAL DESCRIPTION

That portion of the Northwest quarter of Section 15, Township 1 North, Range 2 East of the Gila and Salt River Meridian, Maricopa County, Arizona, described as follows:

Beginning at the Northwest corner of the North half of the Southwest quarter of said Northwest quarter;

Thence South (assumed bearing for purposes of this description) along the West line of said section, a distance of 660.00 feet to a line that is parallel with and distant 1968.46 feet Southerly measured at right angles from the North line of said section;

Thence South 89 degrees 50 minutes East, along said parallel line, a distance of 1307.28 feet to a line that is parallel with and distant 10.00 feet Westerly, measured at right angle, from the East line of said Southwest quarter, last said parallel line being also the center line of an existing drill track;

Thence North 00 degrees 01 minutes West, along last said parallel line, a distance of 1095.68 feet to a point of CUSP;

Thence Southwesterly along a tangent curve concave Northwesterly having a radius of 642.43 feet, through a central angle of 05 degrees 43 minutes 29 seconds, an arc distance of 64.19 feet;

Thence South 05 degrees 42 minutes 29 seconds West, tangent to said curve, a distance 26.38 feet;

Thence Southwesterly and Westerly along a tangent curve to the right having a radius 382.24 feet, through a central angle of 84 degrees 27 minutes 31 seconds, an arc distance of 563.45 feet to a point of tangency in a line that is parallel with and distant 1308.46 feet Southerly, measured at right angles, from said North line;

Thence North 89 degrees 50 minutes West, along last said parallel line, a distance of 919.70 feet to the point of beginning.

EXCEPTING THEREFROM that portion of said property lying below a depth of 500.00 feet measured vertically from the contour of the surface thereof;

Provided, however, that said grantor, its successors and assigns, shall not have the right for any and all purposes to enter upon, into or through the surface of the portion of said property lying above 500.00 feet, measured vertically from the contour of the surface of said property, as reserved in Deed recorded in Docket 9581, Page 180 and also recorded in Docket 9590, Page 873; and

EXCEPT all rights retained by Southern Pacific Company, a Delaware corporation in Warranty Deed recorded in Docket 3976, Page 407 of official records of Maricopa County, Arizona.

20220259809

# EXHIBIT B

Date: 7/28/2020



**D B I A**

**DESIGN-BUILD**
**INSTITUTE OF AMERICA**

# Standard Form of Agreement Between Owner and Design-Builder — Cost Plus Fee with an Option for a Guaranteed Maximum Price

*This document has important legal consequences. Consultation with an attorney is recommended with respect to its completion or modification.*

This **AGREEMENT** is made as of the 28th day of July in the year of 2020, by and between the following parties, for services in connection with the Project identified below:

**OWNER:**
*(Name and address)*

Vital Pharmaceuticals, Inc.
1600 N. Park Drive
Weston, FL 33326

**DESIGN-BUILDER:**
*(Name and address)*

Stellar Group, Inc.
2900 Hartley Road
Jacksonville, FL 32257

**PROJECT:**
*(Include Project name and location as it will appear in the Contract Documents)*

Phoenix Can Manufacturing
1635 South 43rd Avenue
Phoenix, AZ 85009

In consideration of the mutual covenants and obligations contained herein, Owner and Design-Builder agree as set forth herein.

# Article 1

## Scope of Work

**1.1** Design-Builder shall perform all design and construction services, and provide all material, equipment, tools and labor, necessary to complete the Work described in and reasonably inferable from the Contract Documents.

# Article 2

## Contract Documents

**2.1** The Contract Documents are comprised of the following:

.1 All written modifications, amendments (including, as applicable, the GMP Exhibit referenced in Section 6.5.1.1 hereof or the GMP Proposal accepted by Owner in accordance with Section 6.5.2 hereof) and change orders to this Agreement issued in accordance with DBIA Document No. 535, *Standard Form of General Conditions of Contract Between Owner and Design-Builder* (1998 Edition) ("General Conditions of Contract");

.2 This Agreement, including all exhibits (but excluding, if applicable, the GMP Exhibit) and attachments;

.3 The General Conditions of Contract;

.4 Construction Documents prepared and approved in accordance with Section 2.4 of the General Conditions of Contract;

.5 Stellar Group Proposal revision 1 dated July 24, 2020 including the exceptions and clarifications set forth therein;

.6 The following other documents, if any *(List, for example, Unit Price Schedules, Design-Builder's allowances, Performance Standard Requirements, Owner's Permit List and any other document Owner and Design-Builder elect to make a Contract Document);*

.7 Exhibit B – Insurance Requirements

.8 Design-Builder Rate Sheet, a copy of which is attached to this Agreement as Exhibit C. The rates contained in this Rate Sheet will remain fixed for the duration of the project.

.9 Exhibit D – Owner Permit List

# Article 3

## Interpretation and Intent

**3.1** The Contract Documents are intended to permit the parties to complete the Work and all obligations required by the Contract Documents within the Contract Time(s) for the Contract Price. The Contract Documents are intended to be complementary and interpreted in harmony so as to avoid conflict, with words and phrases interpreted in a manner consistent with construction and design industry standards. In the event of any inconsistency, conflict, or ambiguity between or among the Contract

DBIA Document No. 530 • Standard Form of Agreement Between
Owner and Design-Builder — Cost Plus Fee with an Option for a Guaranteed Maximum Price
© 1998 Design-Build Institute of America

Documents, the Contract Documents shall take precedence in the order in which they are listed in Section 2.1 hereof.

**3.2** Terms, words and phrases used in the Contract Documents, including this Agreement, shall have the meanings given them in the General Conditions of Contract.

**3.3** The Contract Documents form the entire agreement between Owner and Design-Builder and by incorporation herein are as fully binding on the parties as if repeated herein. No oral representations or other agreements have been made by the parties except as specifically stated in the Contract Documents.

## Article 4

## Ownership of Work Product

**4.1** **Work Product.** All drawings, specifications and other documents and electronic data furnished by Design-Builder to Owner under this Agreement ("Work Product") are deemed to be instruments of service and Design-Builder shall retain the ownership and property interests therein, including the copyrights thereto.

**4.2** **Owner's Limited License Upon Payment in Full.** Upon Owner's payment in full for all Work performed under the Contract Documents, Design-Builder shall grant Owner a limited license to use the Work Product in connection with Owner's occupancy of the Project, conditioned on Owner's express understanding that its use of the Work Product is at Owner's sole risk and without liability or legal exposure to Design-Builder or anyone working by or through Design-Builder, including Design Consultants of any tier (collectively the "Indemnified Parties").

**4.3** **Owner's License upon Owner's Termination for Convenience or Design-Builder's Election to Terminate.** If Owner terminates this Agreement for its convenience as set forth in Article 8 hereof, or if Design-Builder elects to terminate this Agreement in accordance with Section 11.4 of the General Conditions of Contract, Design-Builder shall, upon Owner's payment in full of the undisputed amounts due Design-Builder under the Contract Documents, grant Owner an irrevocable, royalty-free, and transferable license to use the Work Product to complete the Project and subsequently occupy and use the Project, and Owner shall thereafter have the same rights as set forth in Section 4.2. However, if the Work Product is incomplete or the Owner alters or causes it on any other project without the involvement of the Design-Builder the Design-Builder or anyone working by or through Design-Builder, including Design Consultants of any tier shall not be liable for such use, and Owner shall have the obligation to provide the indemnity set forth in Section 4.5 below.

**4.4** **Owner's Limited License Upon Design-Builder's Default.** If this Agreement is terminated due to Design-Builder's default pursuant to Section 11.2 of the General Conditions of Contract and (i) it is determined that Design-Builder was in default and (ii) Owner has fully satisfied all of its obligations under the Contract Documents, Design-Builder shall grant Owner a limited license to use the Work Product in connection with Owner's completion and occupancy of the Project. This limited license is conditioned on Owner's express understanding that its use of the Work Product is at Owner's sole risk and without liability or legal exposure to any Indemnified Party.

**4.5** **Owner's Indemnification for Use of Work Product.** If Owner uses the Work Product under any of the circumstances identified in this Article 4, Owner shall defend, indemnify and hold harmless the Indemnified Parties from and against any and all claims, damages, liabilities, losses and expenses, including attorneys' fees, arising out of or resulting from the use of the Work Product.

## Article 5

### Contract Time

**5.1     Date of Commencement.** The Work shall commence within five (5) days of Design-Builder's receipt of Owner's Notice to Proceed ("Date of Commencement") unless the parties mutually agree otherwise in writing.

.1     The "Date of Commencement" shall be dependent upon receipt of required permits and the execution of this Agreement.

**5.2     Substantial Completion and Final Completion**

**5.2.1**     Mutually agreed Substantial Completion of the Phased Work shall be established by the Guaranteed Maximum Price (GMP) proposal, to be submitted at a later date.

**5.2.2**     Interim milestones and/or Substantial Completion of identified portions of the Work shall be achieved as follows:  *(Insert any interim milestones for portions of the Work with different scheduled dates for Substantial Completion)*

.1     **Design Development 1 – (30% Issue)**     8/28/2020
.2     **Design Development 2 – (60% Issue)**     10/30/2020
.3     **Establish GMP Budget**     11/11/2020
.3     **Additional Interim milestones and / or Substantial Completion Dates will be established by the GMP Proposal.**

**5.2.3**     Final Completion of the Work or identified portions of the Work shall be achieved as expeditiously as reasonably practicable.

**5.2.4**     All of the dates set forth in this Article 5 ("Contract Time(s)") shall be subject to adjustment in accordance with the General Conditions of Contract.

**5.3     Time is of the Essence.** Owner and Design-Builder mutually agree that time is of the essence with respect to the dates and times set forth in the Contract Documents.

**5.4     Liquidated Damages.** Design-Builder understands that if Substantial Completion is not attained by the Scheduled Substantial Completion Date, Owner will suffer damages which are difficult to determine and accurately specify. Design-Builder agrees that if Substantial Completion is not attained by fourteen (14) days after the Scheduled Substantial Completion Date (the "LD Date"), Design-Builder shall pay Owner Five thousand  Dollars ($ 5,000) as liquidated damages for each day that Substantial Completion extends beyond the LD Date capped at Half of the CM Fee . The liquidated damages provided herein shall be in lieu of all liability for any and all extra costs, losses, expenses, claims, penalties and any other damages, whether special or consequential, and of whatsoever nature incurred by Owner which are occasioned by any delay in achieving Substantial Completion. *(If a GMP is not established upon execution of this Agreement, the parties should consider setting liquidated damages after GMP negotiations. If liquidated damages are applicable to any dates set forth in Section 5.2.2 hereof, this Section 5.4 will need to be modified accordingly.)*

**5.5     Omitted.**

**5.6 Adverse Weather.** Design-Builder has included normal working hours of forty (40) hours per week in the project schedule unless otherwise noted in GMP Proposal. Design-Builder has included one (1) adverse weather make-up day per week throughout the duration of on-site works for the Project (Saturdays). Should adverse weather occur in excess of one (1) day per week, an Extension of Time shall



be granted equal to the lost time and any additional days necessary to dry-out or de-muck the site. Unused adverse weather make-up days do not carry over from week to week.

## Article 6
## Contract Price

**6.1  Contract Price**

**6.1.1**  Owner shall pay Design-Builder in accordance with Article 6 of the General Conditions of Contract a contract price ("Contract Price") equal to Design-Builder's Fee (as defined in Section 6.2 hereof) plus the Cost of the Work (as defined in Section 6.3 hereof), subject to any GMP established in Section 6.5 hereof and any adjustments made in accordance with the General Conditions of Contract.

**6.1.2**  For the specific Work set forth below, Owner agrees to pay Design-Builder, as part of the Contract Price, on the following basis:

**6.2  Design-Builder's Fees and Insurance**

**6.2.1**  Design-Builder's Fee shall be:

> **.1**  The Construction Management Fee is included at <u>Six</u> percent (<u>6</u>%) of the actual Cost of the Work.

**6.2.2**  Design-Builder's Fee will be adjusted as follows for any changes in the Work:  *(Insert financial arrangements for adjustment)*

> **.1**  Design Engineering Services will be adjusted for scope additions to the project via a lump sum amount or on a Time and Material basis per the Design-Builder's Rate Sheet included in Exhibit C to this Agreement, at Owner's option.

> **.2**  All administrative and engineering travel associated with the changes will be invoiced to the Owner at cost.

> **.3**  The Construction Management Fee of <u>6</u>% will be charged on the Cost of the Work in accordance with Section 6.2.1.1.

**6.2.3**  Design-Builder's Insurance shall be:

> **.1**  The costs for Project Insurance is included at <u>One and Sixty Five hundredths</u> percent (<u>1.65</u>%) of the sum of (1) the actual Cost of Work plus (2) the Construction Management Fee calculated pursuant to Section 6.2.1.1.

**6.3  Cost of the Work.**  The term Cost of the Work shall mean costs reasonably incurred by Design-Builder in the proper performance of the Work. The Cost of the Work shall include only the following:

> **.1**  Wages of direct employees of Design-Builder performing the Work at the Site or, with Owner's agreement, at locations off the Site. Until the GMP is established, these costs shall be in accordance with the rates set forth in exhibit C to this Agreement.

.2    Wages or salaries of Design-Builder's supervisory and administrative personnel engaged in the performance of the Work and who are located at the Site or working off-Site to assist in the production or transportation of material and equipment necessary for the Work. Until the GMP is established, these costs shall be in accordance with the rates set forth in Design-Builder's Rate Sheet included in Exhibit C to this Agreement.

.3    Wages or salaries of Design-Builder's personnel stationed at Design-Builder's principal or branch offices, which might include the vice president, project developer, senior project manager, project manager, assistant project manager, administrative assistant and the project accountant. Until the GMP is established, these costs shall be in accordance with the rates set forth in Design-Builder's Rate Sheet included in Exhibit C to this Agreement.

.4    Costs incurred by Design-Builder for employee benefits, premiums, taxes, insurance, contributions and assessments required by law, collective bargaining agreements, or which are customarily paid by Design-Builder, to the extent such costs are based on wages and salaries paid to employees of Design-Builder covered under Sections 6.3.1 through 6.3.3 hereof. Until the GMP is established, these costs shall be in accordance with and included in the rates set forth in Design-Builder's Rate Sheet included in Exhibit C to this Agreement.

.5    The reasonable portion of the cost of travel, accommodations and meals for Design-Builder's personnel necessarily and directly incurred in connection with the performance of the Work.

.6    Payments properly made by Design-Builder to Subcontractors and Design Consultants for performance of portions of the Work, including any insurance and bond premiums incurred by Subcontractors and Design Consultants.

.7    Costs incurred by Design-Builder in repairing or correcting defective, damaged or nonconforming Work, provided that such defective, damaged or nonconforming Work was beyond the reasonable control of Design-Builder or those working by or through Design-Builder. If the costs associated with such defective, damaged or nonconforming Work are recoverable from Insurances, Subcontractors or Design Consultants, Design-Builder shall exercise best efforts to obtain recovery from the appropriate source and credit Owner if recovery is obtained.

.8    Costs, including deposits, transportation, inspection, testing, storage and handling, of materials, equipment and supplies incorporated or reasonably used in completing the Work.

.9    Costs less salvage value of materials, supplies, temporary facilities, machinery, equipment and hand tools not customarily owned by the workers that are not fully consumed in the performance of the Work and which remain the property of Design-Builder, including the costs of transporting, inspecting, testing, handling, installing, maintaining, dismantling and removing such items.

.10    Costs of removal of debris and waste from the Site.

DBIA Document No. 530 • Standard Form of Agreement Between Owner and Design-Builder — Cost Plus Fee with an Option for a Guaranteed Maximum Price © 1998 Design-Build Institute of America

.11 The reasonable costs and expenses incurred in establishing, operating and demobilizing the Site office, including the cost of facsimile transmissions, long-distance telephone calls, postage and express delivery charges, telephone service, high speed internet service, photocopying, video and/or photographic services and reasonable petty cash expenses.

.12 Rental charges and the costs of transportation, installation, minor repairs and replacements, dismantling and removal of temporary facilities, machinery, equipment and hand tools not customarily owned by the workers, which are provided by Design-Builder at the Site, whether rented from Design-Builder or others, and incurred in the performance of the Work.

.13 Premiums for insurance and bonds required by this Agreement or the performance of the Work.

.14 All fuel and utility costs incurred in the performance of the Work.

.15 Sales, use or similar taxes, tariffs or duties incurred in the performance of the Work.

.16 Legal costs, court costs and costs of mediation and arbitration reasonably arising from Design-Builder's performance of the Work, provided such costs do not arise from disputes between Owner and Design-Builder and incurred after the consent of the Owner.

.17 Costs for permits, royalties, licenses, tests and inspections incurred by Design-Builder as a requirement of the Contract Documents.

.18 The cost of defending suits or claims for infringement of patent rights arising from the use of a particular design, process, or product required by Owner, paying legal judgments against Design-Builder resulting from such suits or claims, and paying settlements made with Owner's consent.

.19 Deposits which are lost, except to the extent caused by Design-Builder's negligence.

.20 Costs incurred in preventing damage, injury or loss in case of an emergency affecting the safety of persons and property.

.21 Other costs reasonably and properly incurred in the performance of the Work to the extent approved in writing by Owner.

.22 Design Engineering Services as written in Design-Builder's proposal revision 1 dated <u>July 24, 2020</u> and included to this Agreement in Exhibit A. These services are defined and charged as follows:

.1 Building and Infrastructure Design Engineering Services, charged at a lump sum cost of <u>Two million One hundred Seventy Five thousand</u> Dollars ($ <u>2,175,000</u>), not including travel and expenses, or Project Insurance.

.2 Process Design Engineering Services, charged at a lump sum cost of <u>One million Two hundred Sixty Five thousand</u> Dollars ($ <u>1,265,000</u>), not including travel and expenses, or Project Insurance.

.3 Pre-Construction Services, charged at a lump sum cost of One hundred Fifty thousand Dollars ($ 150,000).

.23 Design-Builder's self-performed work and work performed by related companies to the Design-Builder (as noted below), will include a fifteen percent (15.0%) mark up on the total costs for the following scopes of work. These scopes of work will provide an open book estimate which will detail all cost, and show three (3) competitive bids for all major materials and equipment. Once the estimate has been reviewed and approved by Owner, the scope will become a lump sum cost and will be handled like all other trade contracts.

.1 Design-Builder self-performed work including:

.1 Thermal (roofing, insulation metal panel walls/ceilings, floor insulation and thermal doors),

.2 Design-Builder related companies self-performing work:

.1 Stellar Refrigeration Contracting - Refrigeration (equipment, skids, piping, etc.) for all areas 60° and lower.

.2 Mechanical HVAC for all areas above 60°,

.3 Utilities (Steam, air, water, etc.)

.3 All other trades required, not listed above, will be subcontracted.

## 6.4 Non-Reimbursable Costs

The following shall be excluded from the Cost of the Work:

.1 Compensation for Design-Builder's personnel stationed at Design-Builder's principal or branch offices, except as provided for in Sections 6.3.1, 6.3.2 and 6.3.3 hereof.

.2 Overhead and general expenses, except as provided for in Section 6.3 hereof, or which may be recoverable for changes to the Work.

.3 The cost of Design-Builder's capital used in the performance of the Work.

.4 If the parties have agreed on a GMP, costs that would cause the GMP, as adjusted in accordance with the Contract Documents, to be exceeded.

*(The parties shall comply with the following Section 6.5 based upon whether the GMP is agreed upon before the execution of this Agreement or will be developed and agreed upon after execution of this Agreement. If the parties do not use a GMP, this Section 6.5 shall be deemed inapplicable and compensation to Design-Builder shall be based on those fees and costs identified in the balance of this Article 6.)*

## 6.5 The Guaranteed Maximum Price

DBIA Document No. 530 • Standard Form of Agreement Between
Owner and Design-Builder -- Cost Plus Fee with an Option for a Guaranteed Maximum Price
© 1998 Design-Build Institute of America



**6.5.1  Omitted**

**6.5.1.1  Omitted**

**6.5.1.2  Omitted**

**6.5.2  GMP Established after Execution of this Agreement**

**6.5.2.1 GMP Proposal.**  No later than four (4) weeks after the 60% design review with Owner, Design-Builder shall submit a GMP Proposal to Owner which shall include the following, unless the parties mutually agree otherwise:

.1  A proposed GMP, which shall be the sum of:

    I.  Design-Builder's Fee as defined in Section 6.2.1 hereof;

    II.  If applicable, any prices established under Section 6.1.2 hereof; and

    III.  the estimated Cost of the Work as defined in Section 6.3 hereof, inclusive of any Design-Builder's Contingency defined as defined in Section 6.5.2.5 hereof.

.2  A list of the drawings and specifications, including all addenda, used as the basis for the GMP proposal;

.3  A list of the assumptions and clarifications made by Design-Builder in the preparation of the GMP Proposal, which list is intended to supplement the information contained in the drawings and specifications;

.4  The Scheduled Substantial Completion Date upon which the proposed GMP is based, to the extent said date has not already been established under Section 5.2 hereof, and a schedule upon which the Scheduled Substantial Completion Date is based;

.5  If applicable, a list of allowances and a statement of their basis;

.6  If applicable, a schedule of alternate prices;

.7  If applicable, a schedule of unit prices;

.8  If applicable, a statement of Additional Services; and

.9  The time limit for acceptance of the GMP Proposal.

**6.5.2.2 Review and Adjustment to GMP Proposal.**  After submission of the GMP Proposal, Design-Builder and Owner shall meet to discuss and review the GMP Proposal.  If Owner has any comments regarding the GMP Proposal, or finds any inconsistencies or inaccuracies in the information presented, it shall promptly give written notice to Design-Builder of such comments or findings.  If appropriate, Design-Builder shall, upon receipt of Owner's notice, make appropriate adjustments to the GMP Proposal.

**6.5.2.3 Acceptance of GMP Proposal.**  If Owner accepts the GMP Proposal, as may be amended by Design-Builder, the GMP and its basis shall be set forth in an amendment to this Agreement.

**6.5.2.4 Failure to Accept the GMP Proposal.** If Owner rejects the GMP Proposal, or fails to notify Design-Builder in writing on or before the date specified in the GMP Proposal that it accepts the GMP Proposal, the GMP Proposal shall be deemed withdrawn and of no effect. In such event, Owner and Design-Builder shall meet and confer as to how the Project will proceed, with Owner having the following options:

    .1    Owner may suggest modifications to the GMP Proposal, whereupon, if such modifications are accepted in writing by Design-Builder, the GMP Proposal shall be deemed accepted and the parties shall proceed in accordance with Section 6.5.2.3 above;

    .2    Owner may authorize Design-Builder to continue to proceed with the Work on the basis of reimbursement as provided in Section 6.1 hereof without a GMP, in which case all references in this Agreement to the GMP shall not be applicable; or

    .3    Owner may terminate this Agreement for convenience in accordance with Article 8 hereof.

If Owner fails to exercise any of the above options, Design-Builder shall have the right to (i) continue with the Work as if Owner had elected to proceed in accordance with Item .2 above, and be paid by Owner accordingly, unless and until Owner notifies it in writing to stop the Work, or (ii) suspend performance of Work in accordance with Section 11.3.1 of the General Conditions of Contract.

**6.5.2.5 Contingency.** The GMP may contain an agreed amount for the Design-Builder's contingency. The contingency is available for Design-Builder's exclusive use for costs that are incurred in performing the Work that are not included in a specific line item or the basis for a Change Order under the Contract Documents. The Design-Builder shall be entitled to payment for costs that are incurred in performing the Work that are not included in the Cost of the Work set forth in Section 6.3. By way of example, and not as a limitation, such costs include trade buy-out differentials, overtime, acceleration, costs in correcting defective, damaged or nonconforming Work, design errors or omissions and Subcontractor defaults. The Contingency is not available to Owner for any reason, including changes in scope or any other item which would enable Design-Builder to increase the GMP under the Contract Documents. Design-Builder shall provide Owner with notice of all anticipated charges against the Contingency. Any unspent Contingency at project final completion will be considered "Savings" and addressed as defined in section 6.5.3.

**6.5.3 Savings**

**6.5.3.1** If the sum of the actual Cost of the Work and Design-Builder's Fee and amounts paid as contingency items pursuant to Section 6.5.2.5 (and, if applicable, any prices established under Section 6.1.2 hereof) is less than the GMP, as such GMP may have been adjusted over the course of the Project, the difference ("Savings") shall be shared as follows:

    Zero percent (0 %) to Design-Builder and <u>One hundred</u> percent (<u>100</u>%) to Owner.

**6.5.3.2** Savings shall be calculated and paid as part of Final Payment under Section 7.3 hereof, with the understanding that to the extent Design-Builder incurs costs after Final Completion which would have been payable to Design-Builder as a Cost of the Work, Design-Builder shall be entitled to payment from Owner for that portion of such costs that were distributed to Owner as Savings.

DBIA Document No. 530 • Standard Form of Agreement Between
Owner and Design-Builder — Cost Plus Fee with an Option for a Guaranteed Maximum Price
© 1998 Design-Build Institute of America

**Article 7**

**Procedure for Payment**

**7.1    Progress Payments**

**7.1.1**    Design-Builder shall submit to Owner on the <u>Twenty-Fifth</u> (<u>25th</u>) day of each month, beginning with the first month after the Date of Commencement, Design-Builder's Application for Payment in accordance with Article 6 of the General Conditions of Contract.

**7.1.2**    Owner shall make payment within thirty (30) days after Owner's receipt of each properly submitted and accurate Application for Payment in accordance with Article 6 of the General Conditions of Contract, but in each case less the total of payments previously made, and less amounts properly withheld under Section 6.3 of the General Conditions of Contract.

**7.1.3**    If Design-Builder's Fee under Section 6.2.1 hereof is a fixed amount, the amount of Design-Builder's Fee to be included in Design-Builder's monthly Application for Payment and paid by Owner shall be proportional to the percentage of the Work completed, less payments previously made on account of Design-Builder's Fee.

**7.1.4**    Prior to commencement of construction, the Design-Builder may submit a payment application in advance not to exceed <u>Two hundred and Fifty thousand</u> Dollars ($<u>250,000</u>) for labor, material and General Conditions costs. The advanced amount is considered a mobilization and cash flow payment and is to be considered part of the overall GMP.  The payment under this Section 7.1.4 shall be credited against the subsequent Applications for Payment until the amount advanced is recouped.

**7.2    Retainage on Progress Payments**

**7.2.1**    Owner will retain <u>Ten</u> percent (<u>10</u>%) of each Application for Payment provided, however, that when fifty percent (50%) of the Work has been completed by Design-Builder, if there are no disputes or delays, Owner will not retain any additional amounts from Design-Builder's subsequent Applications for Payment.  Owner will also reasonably consider reducing retainage for Subcontractors completing their work early in the Project.

  **.1**    Retainage will not be held on amounts covered by the General Conditions Amount, Design Engineering Services, Process Design Services, Process Equipment Purchases, Construction Management Fee and Project Insurances.

**7.2.2**    Upon Substantial Completion of the entire Work or, if applicable, any portion of the Work, pursuant to Section 6.6 of the General Conditions of Contract, Owner shall release to Design-Builder all retained amounts relating, as applicable, to the entire Work or completed portion of the Work, less an amount equal to the reasonable value of all remaining or incomplete items of Work as noted in the Certificate of Substantial Completion.

**7.3    Final Payment.**  Design-Builder shall submit its Final Application for Payment to Owner in accordance with Section 6.7 of the General Conditions of Contract.  Owner shall make payment on Design-Builder's properly submitted and accurate Final Application for Payment within thirty (30) days after Owner's receipt of the Final Application for Payment, provided that Design-Builder has satisfied the requirements for final payment set forth in Section 6.7.2 of the General Conditions of Contract.

**7.4    Interest.**  Payments due and unpaid by Owner to Design-Builder, whether progress payments or final payment, shall bear interest commencing fifteen (15) days after payment is due at the rate of <u>Five</u> percent(<u>5.00</u>%) per annum.

**7.5    Record Keeping and Finance Controls.** Design-Builder acknowledges that this Agreement is to be administered on an "open book" arrangement relative to Costs of the Work. Design-Builder shall keep full and detailed accounts and exercise such controls as may be necessary for proper financial management, using accounting and control systems in accordance with generally accepted accounting principles and as may be provided in the Contract Documents. During the performance of the Work and for a period of three (3) years after Final Payment, Owner and Owner's accountants shall be afforded access from time to time, upon reasonable notice, to Design-Builder's records, books, correspondence, receipts, subcontracts, purchase orders, vouchers, memoranda and other data relating to the Work, all of which Design-Builder shall preserve for a period of three (3) years after Final Payment.

## Article 8

## Termination for Convenience

**8.1**    Upon ten (10) days' written notice to Design-Builder, Owner may, for its convenience and without cause, elect to terminate this Agreement. In such event, Owner shall pay Design-Builder for the following:

> .1    All Work executed and for proven loss, cost or expense in connection with the Work in accordance with the terms of this Agreement; and

> .2    The reasonable costs and expenses attributable to such termination, including demobilization costs and amounts due in settlement of terminated contracts with Subcontractors and Design Consultants; and

> .3    The fair and reasonable sums for overhead and profit on the sum of items .1 and .2 above.

**8.2**    Omitted.

> .1

**8.3**    If Owner terminates this Agreement pursuant to Section 8.1 above and proceeds to design and construct the Project through its employees, agents or third parties, Owner's rights to use the Work Product shall be as set forth in Article 4 hereof.

## Article 9

## Representatives of the Parties

**9.1    Owner's Representatives**

**9.1.1**    Owner designates the individual listed below as its Senior Representative ("Owner's Senior Representative"), which individual has the authority and responsibility for avoiding and resolving disputes under Section 10.2.3 of the General Conditions of Contract: *(Identify individual's name, title, address and telephone numbers)*

DBIA Document No. 530  ·  Standard Form of Agreement Between
Owner and Design-Builder — Cost Plus Fee with an Option for a Guaranteed Maximum Price
© 1998 Design-Build Institute of America

**9.1.2** Owner designates the individual listed below as its Owner's Representative, which individual has the authority and responsibility set forth in Section 3.4 of the General Conditions of Contract: *(Identify individual's name, title, address and telephone numbers)*

**9.2    Design-Builder's Representatives**

**9.2.1** Design-Builder designates the individual listed below as its Senior Representative ("Design-Builder's Senior Representative"), which individual has the authority and responsibility for avoiding and resolving disputes under Section 10.2.3 of the General Conditions of Contract: *(Identify individual's name, title, address and telephone numbers)*

Stellar Group, Inc.

Scott Mark
Sr. Vice President Food Manufacturing and Logistics
2900 Hartley Road
Jacksonville, FL 32257
Phone: 904-899-9448
Email: smark@stellar.net

**9.2.2** Design-Builder designates the individuals listed below as its Design-Builder's Representative, which individual has the authority and responsibility set forth in Section 2.1.1 of the General Conditions of Contract: *(Identify individual's name, title, address and telephone numbers)*

Derek Bickerton
Project Developer
2900 Hartley Road
Jacksonville, FL 32257
Phone: 904-899-9242
Email: dbickerton@stellar.net

## Article 10

### Bonds and Insurance

**10.1    Insurance.**  Design-Builder shall procure in accordance with Article 5 of the General Conditions of Contract the insurance coverages set forth in the Exhibit B (Insurance Requirements) attached hereto:. *(Attach Insurance Schedule indicating the required coverage, amount of required coverage, duration of coverage, required rating of insurance carriers and any other insurance requirements required of the parties)*

**10.2    Bonds and Other Performance Security.**  Payment and Performance Bonds are not required.

## Article 11

### Other Provisions

**11.1    Other provisions, if any, are as follows:**  *(Insert any additional provisions)*

**11.1.1** Notwithstanding anything to the contrary herein contained, both the price and the project schedule set forth herein or elsewhere in the contract documents are subject to, conditioned upon and shall be changed as a result of the direct or indirect impacts experienced due to the COVID-19 or Corona virus. Such impacts include, but are not limited to, supply chain disruption, material shortage, labor shortage, price increases, governmental mandates, orders or directives, plant or facility closures, diminished output, disruption of the economy, permit delays or refusals, disruption of the financial system, and banking moratoriums. Contractor shall endeavor to notify the Owner from time to time of changes to [the price and/or the project schedule due to any such impacts, and where appropriate, provide any available backup documentation.

In executing this Agreement, Owner and Design-Builder each individually represents that it has the necessary financial resources to fulfill its obligations under this Agreement, and each has the necessary corporate approvals to execute this Agreement, and perform the services described herein.

**OWNER:**

John H. Owoc
*(Name of Owner)*

*(Signature)*

John H. Owoc
*(Printed Name)*

CEO & CSO
*(Title)*

Date: 7-28-2020

**DESIGN-BUILDER:**

Stellar Group, Inc.
*(Name of Design-Builder)*

*(Signature)*

Scott Mark
*(Printed Name)*

Sr. VP Food+Beverage
*(Title)*

Date: 8-3-2020

**Caution:  You should sign an original DBIA document which has this caution printed in blue.  An original assures that changes will not be obscured as may occur when documents are reproduced.**

**EXHIBIT B**

**INSURANCE REQUIREMENTS**

1. **Insurance Coverage of Stellar Group, Inc.** Stellar Group, Inc. ("Stellar") will maintain the insurance policies described in Schedule 1 attached hereto (collectively, the "Insurance Policies") for the duration agreed to by the parties in the Design Builder proposal or contract. If any of the Insurance Policies are canceled, renewal refused or materially changed, Stellar shall provide written notice to Owner within (10) days. Upon request by Owner, Stellar shall provide Owner with written evidence that the Insurance Policies are in force. Stellar shall name Owner as an additional insured under those Insurance Policies on Schedule 1 which indicate Owner is an additional insured.

2. **Builders' Risk Insurance.** Check one: ☐ Owner ☐☒ Stellar shall purchase and maintain in force builders' risk insurance for the Work. Such builders' risk insurance (the "Builders' Risk Insurance") shall:

(a) Be written in an amount at least equal to the initial contract sum as well as subsequent modifications of that sum.

(b) Name as insureds the Owner and Stellar, and contain a provision that the insurance will not be canceled or allowed to expire unless at least 10 days prior written notice has been given to Stellar and Owner

(c) Apply on a replacement cost basis and cover all risks of physical loss except those specifically excluded in the policy, but at a minimum cover the perils of fire, lightning, explosion, windstorm, hail, smoke, aircraft, vehicles, riot, civil commotion, theft, vandalism, malicious mischief, and collapse.

(d) Cover the portions of the Work that are intended for use at the construction site, but temporarily located away from the site or in transit to the site.

(e) Cover the cost of removing debris, including demolition as may be made legally necessary by the operation of any law, ordinance, or regulation.

If Stellar is responsible for purchasing and maintaining the Builders' Risk Insurance (as indicated above), Owner acknowledges and agrees that the Contract Sum does not include the amount of the premium of the Builders' Risk Insurance and Owner shall pay Stellar the amount of such premium in addition to the Contract Sum.

3. **Flood and Earthquake.** If either party desires to include under the Builders' Risk Insurance coverage for flood or earthquake, Owner and Stellar shall agree upon the price, scope and amount of deductibles of the supplemental coverage to be purchased. Otherwise, the Builders Risk Insurance will not cover damage caused by

flood or earthquake, and any and all Losses (as defined herein) attributable to flood or earthquake shall be exclusively the responsibility of Owner.

4. **Coverage of Owner's Property.** If Owner desires to include under the Builders' Risk Insurance coverage for damage or losses (a) arising from or out of work performed by Owner or by separate contractors under Owner's control (the "Owner's Work") or (b) sustained to Owner's property, including, but not limited to materials, structures, machinery or equipment, located or stored by Owner at the Site (the "Owner's Property"), Owner and Stellar shall agree upon the price, scope and amount of deductibles of the supplemental coverage to be purchased. Otherwise, the Builders' Risk Insurance will not cover losses or damage relating to the Owner's Work or damages sustained to the Owner's Property, and any and all such losses or damage shall be exclusively the responsibility of Owner.

5. **Partial occupancy or use of the Work.** Owner shall not commence with the partial occupancy or use of the Work until the Builders' Risk Insurance underwriter (the "Underwriter") has provided written consent to Owner's partial occupancy or use. Owner and Stellar shall take reasonable steps to obtain such consent, but failure to do so will preclude coverage under the Builders' Risk Insurance. Unless otherwise provided by the Underwriter, any and all Losses sustained after Owner's occupancy or use of the Work shall be exclusively the responsibility of Owner.

6. **Builders' Risk Insurance Policy Period.** The Builders' Risk Insurance will be maintained in effect, unless otherwise provided for by written agreement, from the date construction activities begin until the earliest of the following dates:

(a) the date the Owner and Stellar agree that it shall be terminated;

(b) the date final payment, as provided for in the agreement, has been made or

(c) the date a certificate of occupancy is issued.

7. **Builders' Risk Insurance Deductible.** In the event a claim is made under the Builders' Risk Insurance, payment of any deductibles applicable to the Builders' Risk Insurance (the "Builders' Risk Deductibles") shall be the sole and exclusive responsibility of Owner. Payment of the Builders' Risk Deductibles shall be the sole responsibility of Stellar regardless of whether the Builders' Risk Insurance is procured by Owner or procured by Stellar. Stellar shall include an allowance in the GMP Amendment to cover these potential costs.

8. **Waiver of Subrogation**. Owner and Stellar waive all rights against each other and their officers, directors, agents, and employees for recovery from damages and injuries however caused to the extent they are covered by the Insurance Policies and the Builders' Risk Insurance or any other insurance applicable to the Work.

9. **Adequacy of Coverage**. Owner agrees that the maintenance of the Insurance Policies (and the Builders' Risk Insurance, if applicable) shall fulfill any and all of Stellar's obligations of insurance coverage. Owner agrees that the Insurance Policies (and the Builders' Risk Insurance, if applicable) are the only insurance policies maintained, and that are required to be maintained, by Stellar.

10. **Insurance As Sole Remedy**. Owner acknowledges the coverage limits of each of the Insurance Policies (and the Builders' Risk Insurance, if applicable) (the "Coverage Limits") and agrees that Stellar's obligation to Owner for any and all losses, damages or injuries arising from or out of the performance of the Work (each a "Loss" and collectively, "Losses") shall be limited to the Coverage Limits. Upon the occurrence of any Loss, Owner shall look solely to the Insurance Policies and the Builders' Risk Insurance for recovery for any Loss and Stellar shall not be responsible or liable for Loss in excess of the Coverage Limits. Owner acknowledges that any and all Losses covered by the Insurance Policies or the Builders' Risk Insurance that are in excess of the Coverage Limits, including, but not limited to, payment of deductibles or losses relating to Owner's collateral operations, shall be exclusively the responsibility of Owner and not Stellar regardless of the cause of the Loss.

11. **Supplemental Insurance**. If Owner requires coverage in excess of the Coverage Limits, then Owner shall obtain such additional coverage or supplemental insurance.

12. **Owner's Insurance**. Owner shall procure the following insurance (collectively, the "Owner's Insurance Policies"): (a) Commercial general liability; (b) Automobile liability insurance; (c) Property insurance; (d) Business interruption insurance; (e) Workers' compensation and employers liability insurance; and (f) Other insurance required by applicable law, rule, regulation or ordinance.

Owner shall maintain the Owner's Insurance Policies in full force and effect for the duration as agreed to by the parties. None of the Owner's Insurance Policies (or the Builders' Risk Insurance, if applicable) will be canceled, renewal refused or materially changed unless at least ten (10) days prior written notice is given to Stellar by either Owner or the insurer. Owner shall provide Stellar with insurance certificates and endorsements naming Stellar as an additional insured for ongoing and completed operation and waiving rights of subrogation. **Owner's Property and Work**. Owner acknowledges that, unless Owner has obtained coverage under the Builders' Risk Insurance as described in Section 4 above, neither the Insurance Policies nor the Builders' Risk Insurance shall provide coverage for any losses relating to the Owner's Work or damages sustained to the Owner's Property. Owner acknowledges and agrees that, unless Owner obtains coverage under the Builders' Risk Insurance as described in Section 4 above, it shall be the sole and exclusive responsibility of Owner to pay for any such losses or damage to the Owner's Work or the Owner's Property.

Acknowledged and agreed by:

**STELLAR GROUP, INC.**

By: _____

Its: _____

Owner: _____

By: _____

Its: _____

# CERTIFICATE OF LIABILITY INSURANCE

**DATE (MM/DD/YYYY)**
10/01/2019

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must have ADDITIONAL INSURED provisions or be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | CONTACT NAME: | |
|---|---|---|
| MARSH USA, INC. | PHONE (A/C, No, Ext): | FAX (A/C, No): |
| TWO ALLIANCE CENTER | E-MAIL ADDRESS: | |
| 3560 LENOX ROAD, SUITE 2400 | | |
| ATLANTA, GA 30326 | INSURER(S) AFFORDING COVERAGE | NAIC # |
| 101379894-GAUX-19-20 | INSURER A : The Travelers Indemnity Company | 25658 |
| INSURED | INSURER B : | |
| Stellar Group Inc. | INSURER C : | |
| 2900 Hartley Rd | INSURER D : The Charter Oak Fire Insurance Co. | 25615 |
| Jacksonville, FL 32257 | INSURER E : Travelers Property Casualty Company of America | 25674 |
| | INSURER F : | |

## COVERAGES
**CERTIFICATE NUMBER:** ATL-004861409-02  **REVISION NUMBER:** 1

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| A | X COMMERCIAL GENERAL LIABILITY | X | | VTC2K-CO-6914800A-19 | 10/01/2019 | 10/01/2020 | EACH OCCURRENCE | $ 1,000,000 |
| | CLAIMS-MADE X OCCUR | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ 300,000 |
| | | | | | | | MED EXP (Any one person) | $ 5,000 |
| | | | | | | | PERSONAL & ADV INJURY | $ 1,000,000 |
| | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | | | GENERAL AGGREGATE | $ 2,000,000 |
| | POLICY PRO-JECT LOC | | | | | | PRODUCTS - COMP/OP AGG | $ 2,000,000 |
| | OTHER: | | | | | | | $ |
| E | AUTOMOBILE LIABILITY | | | VTJCAP-5913858A-19 | 10/01/2019 | 10/01/2020 | COMBINED SINGLE LIMIT (Ea accident) | $ 1,000,000 |
| | X ANY AUTO | | | | | | BODILY INJURY (Per person) | $ |
| | OWNED AUTOS ONLY SCHEDULED AUTOS | | | | | | BODILY INJURY (Per accident) | $ |
| | HIRED AUTOS ONLY NON-OWNED AUTOS ONLY | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| E | X UMBRELLA LIAB X OCCUR | | | VTSMU-CUP-0F683485-TIA-19 | 10/01/2019 | 10/01/2020 | EACH OCCURRENCE | $ 5,000,000 |
| | EXCESS LIAB CLAIMS-MADE | | | | | | AGGREGATE | $ 5,000,000 |
| | DED X RETENTION $ | | | UB-9K4562E7-19-25-X (AOS) | 10/01/2019 | 10/01/2020 | | |
| D E | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY | Y/N | | UB-9K161699-19-25-R (AZ & WI) | 10/01/2019 | 10/01/2020 | X PER STATUTE OTH-ER | |
| | ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? (Mandatory in NH) | N | N/A | | | | E.L. EACH ACCIDENT | $ 500,000 |
| | | | | | | | E.L. DISEASE - EA EMPLOYEE | $ 500,000 |
| | If yes, describe under DESCRIPTION OF OPERATIONS below | | | | | | E.L. DISEASE - POLICY LIMIT | $ 500,000 |

**DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)**
Evidence of Insurance

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| Stellar Group Inc.<br>2900 Hartley Rd<br>Jacksonville, FL 32257 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS. |
| | AUTHORIZED REPRESENTATIVE<br>of Marsh USA Inc.<br>Manashi Mukherjee |

© 1988-2016 ACORD CORPORATION. All rights reserved.

**ACORD 25 (2016/03)**  The ACORD name and logo are registered marks of ACORD

**EXHIBIT C**

**DESIGN-BUILDER RATE SHEET**

**(October 2019 – September 2020)**

|  |  | Hourly Rate | OT Hourly Rate |
|---|---|---|---|
| **Design Engineering Services** | | | |
| I. | Vice President – Design & Engineering | $175.00 | $175.00 |
| II. | Design Project Manager | $155.00 | $155.00 |
| III. | Discipline Director | $155.00 | $155.00 |
| IV. | Senior Architect/Engineer | $140.00 | $140.00 |
| V. | Project Architect/Engineer | $125.00 | $125.00 |
| VI. | Senior Designer | $110.00 | $165.00 |
| VII. | Designer | $95.00 | $143.00 |
| VIII. | Document Controller | $80.00 | $120.00 |
| IX. | CADD Technician | $75.00 | $113.00 |
| X. | Administrative Assistant | $55.00 | $83.00 |
| **Construction Administration & Field Services** | | | |
| I. | Project Executive | $175.00 | $175.00 |
| II. | Project Developer | $170.00 | $170.00 |
| III. | Senior Project Manager | $162.00 | $162.00 |
| IV. | Project Manager | $155.00 | $155.00 |
| V. | Assistant Project Manager | $135.00 | $135.00 |
| VII. | Project Accountant | $75.00 | $75.00 |
| VIII. | Superintendent | $165.00 | $165.00 |
| IX. | Assistant Superintendent | $145.00 | $145.00 |
| X. | On-Site Safety Manager | $145.00 | $145.00 |
| XI. | Field Engineer | $125.00 | $125.00 |
| XII. | Administrative Assistant | $55.00 | $83.00 |
| XIII. | Field Clerk | $35.00 | $53.00 |

The above rates shall be used for billing and valuation of any future works associated with the project. All hourly rates listed are current through September 2020 and are subject to adjustment should the contract execution be delayed beyond this date.

Jax\926574_4

-17-

**EXHIBIT D**

**PERMIT RESPONSIBILITY LIST**

To Be finalized with GMP Proposal

SMM

EXHIBIT C

**AFFIDAVIT AND PROOF OF SERVICE**
**RE:  ARIZONA TWENTY DAY PRELIMINARY LIEN NOTICE**

STATE OF FLORIDA )
)  ss.
County of Duval )

Gabriel B. Crafton, being first duly sworn upon [his/her] oath, deposes and states:

1.      I am the Chief Legal Officer for Stellar Group, Inc. ("Stellar").

2.      On December 23, 2021, I served copies of Stellar's Preliminary 20-Day Notice by mailing via certified mail, return receipt requested to the following parties:

| | |
|---|---|
| Vital Pharmaceuticals, Inc.<br>One Alhambra Plaza, Floor PH<br>Coral Gables, Florida 33132 | Vital Pharmaceuticals, Inc.<br>c/o Corporate Creations Network, Inc.<br>3260 North Hayden Road, Suite 210<br>Scottsdale, Arizona 85251 |
| JHO Real Estate Investment, LLC<br>1600 North Park Drive<br>Weston, Florida 33326 | JHO Real Estate Investment, LLC<br>c/o Corporate Creations Network, Inc.<br>3260 North Hayden Road, Suite 210<br>Scottsdale, Arizona 85251 |

3.      True and correct copies of the Preliminary Twenty Day Lien Notice and Certified Mail proofs of mailing are attached hereto.

[Signature Page Follows]

C-1

DATED this 21st day of March 2022.

**STATE OF FLORIDA** )

**COUNTY OF DUVAL** )

                                        **STELLAR GROUP, INC.**

                                        By _____
                                        Name: Gabriel B. Crafton
                                        Its: Chief Legal Officer

Sworn to or affirmed and signed before me by means of physician presence on this 21st day of

March, 2022 by Gabriel B. Crafton, who is personally known to me or who has produced

_____, as identification.

_____
Notary Public State of Florida
Print Name: Dorothy B. Miller
My Commission Expires: March 2, 2026

C-2

**Arizona Preliminary Twenty Day Lien Notice**

**In accordance with Arizona Revised Statutes section 33-992.01, this is not a lien. This is not a reflection on the integrity of any contractor or subcontractor.**

The name and address of the Owner or Reputed Owner are:

Vital Pharmaceuticals, Inc.
One Alhambra Plaza, Floor PH
Coral Gables, Florida 33132

JHO Real Estate Investment, LLC
1600 N. Park Drive
Weston, Florida 33326

Vital Pharmaceuticals, Inc.
c/o Corporate Creations Network, Inc.
3260 N. Hayden Road, Suite 210
Scottsdale, Arizona 85251

JHO Real Estate Investment, LLC
c/o Corporate Creations Network, Inc.
3260 N. Hayden Road, Suite 210
Scottsdale, Arizona 85251

The name and address of the Original Contractor are:

Stellar Group, Inc.
2900 Hartley Road
Jacksonville, Florida 32257

The name and address of any lender or reputed lender and/or assigns are:

Unknown/Requested

The name and address of the person with whom the claimant contracted are:

Vital Pharmaceuticals, Inc.
1600 N. Park Drive
Weston, Florida 33326

This preliminary lien notice has been completed by (name and address of claimant):

Stellar Group, Inc.
2900 Hartley Road
Jacksonville, Florida 32257

Date: December 23, 2021

You are hereby notified that the claimant has furnished or will furnish labor, professional services, material, machinery, fixtures tools of the following general description:

Construction of the Bang Phoenix Can Manufacturing Facility located at:

1635 South 43rd Avenue
Phoenix, Arizona 85009

and situated upon that certain lot(s) or parcel(s) of land in Maricopa County, Arizona, described as follows:

1635 South 43rd Avenue
Phoenix, Arizona 85009
Parcel Number 105-14-001Q

An estimate of the total price of the labor, professional services, materials, machinery, fixtures or tools furnished or to be furnished is:

$58,596,630.00

- 1 -

Notice to Property Owner

If bills are not paid in full for the labor, professional services, materials, machinery, fixtures or tools furnished, or to be furnished, a mechanic's lien leading to the loss, through court foreclosure proceedings, of all or part of your property being improved may be placed against the property. You may wish to protect yourself against this consequence by either:

1. Requiring your contractor to furnish a conditional waiver and release pursuant to Arizona Revised Statutes section 33-1008, subsection D, paragraphs 1 and 3 signed by the person or firm giving you this notice before you make payment to your contractor.

2. Requiring your contractor to furnish an unconditional waiver and release pursuant to Arizona Revised Statutes section 33-1008, subsection D, paragraphs 2 and 4 signed by the person or firm giving you this notice after you make payment to your contractor.

3. Using any other method or device that is appropriate under the circumstances.

(The following language shall be in type at least as large as the largest type otherwise on the document.)

Within ten days of the receipt of this preliminary twenty day notice the owner or other interested party is required to furnish all information necessary to correct any inaccuracies in the notice pursuant to Arizona Revised Statutes section 33-992.01, subsection I or lose as a defense any inaccuracy of that information.

Within ten days of the receipt of this preliminary twenty-day notice if any payment bond has been recorded in compliance with Arizona Revised Statutes section 33-1003, the owner must provide a copy of the payment bond including the name and address of the surety company and bonding agent providing the payment bond to the person who has given the preliminary twenty-day notice. In the event that the owner or other interested party fails to provide the bond information within that ten-day period, the claimant shall retain lien rights to the extent precluded or prejudiced from asserting a claim against the bond as a result of not timely receiving the bond information.

Dated: December 23, 2021

Stellar Group, Inc.

By: _Gabe Crafton_

Gabriel Crafton, Chief Legal Officer

- 2 -

Upon receipt of this notice, please detach and sign this
Acknowledgement and return to Claimant listed above

----------------------------------------------------------------

**Acknowledgment of Receipt of Preliminary Twenty Day Notice**

This acknowledges receipt on _____ of a copy of the preliminary twenty day notice at
                                                  (insert date)

_____ . Date: _____ .
          (insert address)                              (date this acknowledgment is executed)

_____
Signature of person acknowledging receipt, with
title if acknowledgment is made on behalf of another person

- 3 -

## Transaction Details

**Recipient:**
Vital Pharmaceuticals, Inc.
c/o Corporate Creations Network, Inc.
3260 N. Hayden Road, Suite 210
Scottsdale, AZ 85251

**Sender:**
Stellar Group, Inc.
c/o Gabe Crafton
2900 Hartley Road
Jacksonville, FL 32257

Transaction created by: gtaylor@rtlaw.com
User ID: 22579
Firm Mailing Book ID: None
Batch ID:

| | |
|---|---|
| Date Created: | 12/23/2021 1:41 PM |
| Date Mail Delivered: | 12/27/2021 4:19 PM |
| USPS Article Number: | 9314869904300090178263 |
| Return Receipt Article Number: | Not Applicable |
| Service Options: | Return Receipt - Electronic |
| | Certified Mail |
| Mail Service: | Certified |
| Reference #: | 04646 |
| Postage: | $0.73 |
| Certified Mail Fees: | $5.60 |
| Status: | Delivered |

## Transaction History

| Event Description | Event Date | Details |
|---|---|---|
| USPS® Certified Mail | 12-23-2021 05:23 PM | [USPS] - PRESHIPMENT INFO SENT USPS AWAITS ITEM at JACKSONVILLE,FL |
| USPS® Certified Mail | 12-23-2021 10:04 PM | [USPS] - ORIGIN ACCEPTANCE at JACKSONVILLE,FL |
| USPS® Certified Mail | 12-23-2021 11:19 PM | [USPS] - PROCESSED THROUGH USPS FACILITY at JACKSONVILLE FL DISTRIBUTION CE |
| USPS® Certified Mail | 12-25-2021 11:36 AM | [USPS] - PROCESSED THROUGH USPS FACILITY at PHOENIX AZ DISTRIBUTION CENTER |
| USPS® Certified Mail | 12-26-2021 06:32 PM | [USPS] - PROCESSED THROUGH USPS FACILITY at PHOENIX AZ DISTRIBUTION CENTER |
| USPS® Certified Mail | 12-27-2021 04:19 PM | [USPS] - CERTIFIED MAIL DELIVERED FRONT DESKRECEPTIONMAIL ROOM at SCOTTSDALE,AZ |

## Transaction Details

**Recipient:**
Vital Pharmaceuticals, Inc.
One Alhambra Plaza, Floor PH
Coral Gables, FL 33132

**Sender:**
Stellar Group, Inc.
c/o Gabe Crafton
2900 Hartley Road
Jacksonville, FL 32257

Transaction created by: gtaylor@rtlaw.com
User ID: 22579
Firm Mailing Book ID: None
Batch ID:

Date Created: 12/23/2021 1:35 PM
Date Mail Delivered: 12/28/2021 4:34 PM
USPS Article Number: 9314869904300090178201
Return Receipt Article Number: Not Applicable

Service Options: Return Receipt - Electronic
Certified Mail
Mail Service: Certified
Reference #: 04646
Postage: $0.73
Certified Mail Fees: $5.60
Status: Delivered

## Transaction History

| Event Description | Event Date | Details |
|---|---|---|
| USPS® Certified Mail | 12-23-2021 05:23 PM | [USPS] - PRESHIPMENT INFO SENT  USPS AWAITS ITEM at JACKSONVILLE,FL |
| USPS® Certified Mail | 12-23-2021 10:04 PM | [USPS] - ORIGIN ACCEPTANCE at JACKSONVILLE,FL |
| USPS® Certified Mail | 12-23-2021 11:19 PM | [USPS]  PROCESSED THROUGH USPS FACILITY at JACKSONVILLE FL DISTRIBUTION CE |
| USPS® Certified Mail | 12-26-2021 11:46 AM | [USPS]  PROCESSED THROUGH USPS FACILITY at OPA LOCKA FL DISTRIBUTION CENTE |
| USPS® Certified Mail | 12-27-2021 02:37 AM | [USPS] - PROCESSED THROUGH USPS FACILITY at OPA LOCKA FL DISTRIBUTION CENTE |
| USPS® Certified Mail | 12-27-2021 07:57 PM | [USPS] - PROCESSED THROUGH USPS FACILITY at OPA LOCKA FL DISTRIBUTION CENTE |
| USPS® Certified Mail | 12-27-2021 09:20 PM | [USPS] - PROCESSED THROUGH USPS FACILITY at OPA LOCKA FL DISTRIBUTION CENTE |
| USPS® Certified Mail | 12-28-2021 04:34 PM | [USPS] - CERTIFIED MAIL DELIVERED LEFT WITH INDIVIDUAL at MIAMI,FL |

## Transaction Details

**Recipient:**
JHO Real Estate Investment, LLC
c/o Corporate Creations Network, Inc.
3260 N. Hayden Road, Suite 210
Scottsdale, AZ 85251

**Sender:**
Stellar Group, Inc.
c/o Gabe Crafton
2900 Hartley Road
Jacksonville, FL 32257

Transaction created by: gtaylor@rtlaw.com
User ID: 22579
Firm Mailing Book ID: None
Batch ID:

Date Created: 12/23/2021 1:44 PM
Date Mail Delivered: 12/31/2021 4:57 PM
USPS Article Number: 9314869904300090178287
Return Receipt Article Number: Not Applicable

Service Options: Return Receipt - Electronic
Certified Mail
Mail Service: Certified
Reference #: 04646
Postage: $0.73
Certified Mail Fees: $5.60
Status: Delivered

## Transaction History

| Event Description | Event Date | Details |
|---|---|---|
| USPS® Certified Mail | 12-23-2021 05:23 PM | [USPS] - PRESHIPMENT INFO SENT USPS AWAITS ITEM at JACKSONVILLE,FL |
| USPS® Certified Mail | 12-23-2021 10:04 PM | [USPS] - ORIGIN ACCEPTANCE at JACKSONVILLE,FL |
| USPS® Certified Mail | 12-23-2021 11:19 PM | [USPS] - PROCESSED THROUGH USPS FACILITY at JACKSONVILLE FL DISTRIBUTION CE |
| USPS® Certified Mail | 12-25-2021 11:36 AM | [USPS] - PROCESSED THROUGH USPS FACILITY at PHOENIX AZ DISTRIBUTION CENTER |
| USPS® Certified Mail | 12-31-2021 04:57 PM | [USPS] - CERTIFIED MAIL DELIVERED FRONT DESKRECEPTIONMAIL ROOM at SCOTTSDALE,AZ |

## Transaction Details

**Recipient:**
JHO Real Estate Investment, LLC
1600 N. Park Drive
Weston, FL 33326

**Sender:**
Stellar Group, Inc.
c/o Gabe Crafton
2900 Hartley Road
Jacksonville, FL 32257

| | |
|---|---|
| Transaction created by: | gtaylor@rtlaw.com |
| User ID: | 22579 |
| Firm Mailing Book ID: | None |
| Batch ID: | |

| | |
|---|---|
| Date Created: | 12/23/2021 1:38 PM |
| Date Mail Delivered: | 12/27/2021 9:59 AM |
| USPS Article Number: | 93148699043000090178232 |
| Return Receipt Article Number: | Not Applicable |
| | |
| Service Options: | Return Receipt - Electronic |
| | Certified Mail |
| Mail Service: | Certified |
| Reference #: | 04646 |
| Postage: | $0.73 |
| Certified Mail Fees: | $5.60 |
| Status: | Delivered |

## Transaction History

| Event Description | Event Date | Details |
|---|---|---|
| USPS® Certified Mail | 12-23-2021 05:23 PM | [USPS] - PRESHIPMENT INFO SENT USPS AWAITS ITEM at JACKSONVILLE,FL |
| USPS® Certified Mail | 12-23-2021 10:04 PM | [USPS] - ORIGIN ACCEPTANCE at JACKSONVILLE,FL |
| USPS® Certified Mail | 12-23-2021 11:19 PM | [USPS] - PROCESSED THROUGH USPS FACILITY at JACKSONVILLE FL DISTRIBUTION CE |
| USPS® Certified Mail | 12-26-2021 07:29 AM | [USPS] - PROCESSED THROUGH USPS FACILITY at OPA LOCKA FL DISTRIBUTION CENTE |
| USPS® Certified Mail | 12-26-2021 09:36 PM | [USPS] - PROCESSED THROUGH USPS FACILITY at OPA LOCKA FL DISTRIBUTION CENTE |
| USPS® Certified Mail | 12-27-2021 09:59 AM | [USPS] - CERTIFIED MAIL DELIVERED LEFT WITH INDIVIDUAL at FORT LAUDERDALE,FL |

# EXHIBIT I

Clerk of the Superior Court
*** Electronically Filed ***
M. De La Cruz, Deputy
9/19/2022 2:39:41 PM
Filing ID 14865625

1
2
3
4

Quarles & Brady LLP
One Renaissance Square
Two North Central Avenue
Suite 600
Phoenix, AZ 85004-2322
TELEPHONE 602-229-5200

5
6
7
8

Attorneys for Defendants
JHO Real Estate Investment, LLC and Vital
Pharmaceuticals, Inc.
Edward A. Salanga (#20654)
Edward.Salanga@quarles.com
Cale S. Johnson (#035557)
Cale.Johnson@quarles.com

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

9
10

IN AND FOR THE COUNTY OF MARICOPA

11
12

NEXUS STEEL, INC., an Arizona limited
liability company,

13

Plaintiff,

14

v.

15
16
17
18
19
20
21
22
23
24
25
26
27

JHO REAL ESTATE INVESTMENT, LLC,
a Florida limited liability company; VITAL
PHARMACEUTICALS, INC., a Florida
corporation, dba BANG, LLC, a Florida
limited liability company; FABCO METAL
PRODUCTS, LLC, a Florida liability
company; BELVAC PRODUCTION
MACHINERY, INC., a Virginia corporation;
TRUIST BANK, a North Carolina company;
ISEC, INC., a Colorado corporation;
HEAVY EQUIPMENT MOVERS &
INSTALLATION, LLC, a Delaware limited
liability company; HARDROCK
CONCRETE PLACEMENT CO., INC., an
Arizona corporation; STELLAR GROUP,
INC., a Florida corporation; FAITH
TECHNOLOGIES, INC., a Wisconsin
corporation; INTEGRATED MASONRY, an
Arizona company; HACI MECHANICAL
CONTRACTORS, INC., an Arizona
corporation; TRENCH SHORE RENTALS,
an Arizona corporation; THE MARICOPA
COUNTY TREASURERS OFFICE,
BLACK AND WHITE CORPORATIONS
1-10,

28

Defendants.

NO. CV2022-008873

**DEFENDANTS/CROSS-DEFENDANTS JHO REAL ESTATE INVESTMENT, LLC'S AND VITAL PHARMACEUTICALS, INC.'S ANSWER TO STELLAR GROUP INC.'S CROSS-CLAIM**

Assigned to the Honorable
Brad Astrowsky

QB\75848875.2

STELLAR GROUP, INC., a Florida
corporation,

        Counterclaimant,

        v.

NEXUS STEEL, LLC, an Arizona limited
liability company,

        Counterdefendant.

---

STELLAR GROUP, INC., a Florida
corporation,

        Cross-claimant,

        v.

JHO REAL ESTATE INVESTMENT, LLC, a
Florida limited liability company; VITAL
PHARMACEUTICALS, INC., a Florida
corporation, dba BANG, LLC, a Florida
limited liability company; FABCO METAL
PRODUCTS, LLC, a Florida limited liability
company; BELVAC PRODUCTION
MACHINERY, INC., a Virginia corporation;
TRUIST BANK, a North Carolina company;
ISEC, INC., a Colorado corporation; HEAVY
EQUIPMENT MOVERS &
INSTALLATION, LLC, a Delaware limited
liability company; HARDROCK
CONCRETE PLACEMENT CO., INC., an
Arizona corporation; STELLAR GROUP,
INC., a Florida corporation; FAITH
TECHNOLOGIES, INC., a Wisconsin
corporation; INTEGRATED MASONRY, an
Arizona company; HACI MECHANICAL
CONTRACTORS, INC., an Arizona
corporation; TRENCH SHORE RENTALS,
an Arizona corporation; THE MARICOPA
COUNTY TREASURERS OFFICE, BLACK
AND WHITE CORPORATIONS 1-10,

        Cross-defendants.

Defendants/Cross-Defendants JHO REAL ESTATE INVESTMENT, LLC ("JHO")

and VITAL PHARMACEUTICALS, INC. ("Vital") (collectively "Defendants") hereby

file this Answer to Stellar Group, Inc.'s ("Stellar") Counterclaim and Cross-claims, dated

- 2 -

August 25, 2022 (the "Crossclaim") and admit, deny, and allege as follows:

**PARTIES, JURISDICTION AND VENUE**

1.      Defendants lack sufficient knowledge or information to respond to the allegations contained in Paragraph 1 of the Crossclaim and therefore deny the same.

2.      Defendants lack sufficient knowledge or information to respond to the allegations contained in Paragraph 2 of the Crossclaim and therefore deny the same.

3.      Defendants lack sufficient knowledge or information to respond to the allegations contained in Paragraph 3 of the Crossclaim and therefore deny the same.

4.      Responding to the allegations contained in Paragraph 4 of the Crossclaim, Defendants admit JHO is a Florida limited liability authorized to do business in Maricopa County company that owns real property located at 1635 South 43rd Avenue, Phoenix, Arizona 85009 (the "Property").

5.      Responding to the allegations contained in Paragraph 5 of the Crossclaim, Defendants admit Vital is a Florida limited liability company that is authorized to do business in Maricopa County, Arizona.

6.      Defendants lack sufficient knowledge or information to respond to the allegations contained in Paragraph 6 of the Crossclaim and therefore deny the same.

7.      Defendants lack sufficient knowledge or information to respond to the allegations contained in Paragraph 7 of the Crossclaim and therefore deny the same.

8.      Responding to the allegations contained in Paragraph 8 of the Crossclaim, Defendants admit only that Truist Bank has recorded a deed of trust on the Property and affirmatively allege, upon information and belief, that Truist Bank's deed of trust is senior in priority to Stellar's mechanic's lien. Responding to the remaining allegations contained in Paragraph 8 of the Crossclaim, Defendants lack sufficient knowledge or information to respond to the allegations and therefore deny the same.

9.      Defendants lack sufficient knowledge or information to respond to the allegations contained in the Paragraph 9 of the Crossclaim and therefore deny the same.

10.      Defendants lack sufficient knowledge or information to respond to the

allegations contained in Paragraph 10 of the Crossclaim and therefore deny the same.

11.     Defendants lack sufficient knowledge or information to respond to the allegations contained in Paragraph 11 of the Crossclaim and therefore deny the same.

12.     Defendants lack sufficient knowledge or information to respond to the allegations contained in Paragraph 12 of the Crossclaim and therefore deny the same.

13.     Defendants lack sufficient knowledge or information to respond to the allegations contained in Paragraph 13 of the Crossclaim and therefore deny the same.

14.     Defendants lack sufficient knowledge or information to respond to the allegations contained in Paragraph 14 of the Crossclaim and therefore deny the same.

15.     Defendants lack sufficient knowledge or information to respond to the allegations contained in Paragraph 15 of the Crossclaim and therefore deny the same.

16.     Defendants lack sufficient knowledge or information to respond to the allegations contained in Paragraph 16 of the Crossclaim and therefore deny the same.

17.     Responding to the allegations contained in Paragraph 17 of the Crossclaim, Defendants admit only that Nexus, ISEC, Heavy, Hardrock, Integrated, Heavy, Faith, and HACI have purportedly recorded mechanic's liens on the Property. Answering the remaining allegations regarding Belvac, Defendants deny Belvac has filed a mechanic's lien on the Property. Answering the remaining allegations in this paragraph not otherwise admitted or denied, Defendants lack sufficient knowledge or information to respond to the remaining allegations contained in Paragraph 17 of the Crossclaim and therefore deny the same.

18.     Defendants lack sufficient knowledge or information to respond to the allegations contained in Paragraph 18 of the Crossclaim and therefore deny the same.

19.     Responding to the allegations contained in Paragraph 19 of the Crossclaim, Defendants admit only that the Crossclaim alleges that certain events occurred in Maricopa County, Arizona. Responding to the remaining allegations, Defendants admit only that the Property that is the subject of the Crossclaim is located in Maricopa County and therefore, venue is proper. To the extent not otherwise admitted or denied, Defendants lack sufficient

- 4 -

knowledge or information to respond to the remaining allegations contained in Paragraph 19 of the Crossclaim and therefore deny the same.

## **GENERAL ALLEGATIONS**

20.     Defendants admit the allegations contained in Paragraph 20 of the Crossclaim.

21.     Defendants admit the allegations contained in Paragraph 21 of the Crossclaim.

22.     Defendants lack sufficient knowledge or information to respond to the allegations contained in Paragraph 22 of the Crossclaim and therefore deny the same.

23.     Responding to the allegations contained in Paragraph 23 of the Crossclaim, Defendants admit that it did not pay Stellar certain sums in October and/or November 2021. Responding to the remaining allegations, Defendants lack sufficient knowledge or information to respond to the allegations and therefore deny the same.

24.     Responding to the allegations contained in Paragraph 24 of the Crossclaim, Defendants admit only that Stellar served Vital a document purporting to be a *Notice of Intent to Stop Work*. Responding to the remaining allegations, Defendants lack sufficient knowledge or information to respond to the allegations and therefore deny the same.

25.     Defendants lack sufficient knowledge or information to respond to the allegations contained in Paragraph 25 of the Crossclaim and therefore deny the same.

26.     Defendants lack sufficient knowledge or information to respond to the allegations in Paragraph 26 of the Crossclaim and therefore deny the same.

27.     Defendants lack sufficient knowledge or information to respond to the allegations contained in Paragraph 27 of the Crossclaim and therefore deny the same.

28.     Defendants admit the allegations contained in Paragraph 28 of the Crossclaim.

29.     Defendants lack sufficient knowledge or information to respond to the allegations contained in Paragraph 29 of the Crossclaim and therefore deny the same.

1                                     **<u>COUNT ONE</u>**

2          **<u>(Mechanic's Lien Foreclosure - Nexus and All Cross-Defendants)</u>**

3           30.      Responding to Paragraph 30 of the Crossclaim, Defendants incorporate by

4 reference their responses to the previous paragraphs as if fully set forth herein.

5           31.      Responding to the allegations contained in Paragraph 31 of the Crossclaim,

6 Defendants admit only that they received a document purporting to be a Preliminary 20-

7 Day Notice. Defendants deny the remaining allegations in Paragraph 31.

8           32.      Defendants lack sufficient information or knowledge to respond to the

9 allegations contained in Paragraph 32 of the Crossclaim and therefore deny the same.

10           33.      Responding to the allegations contained in Paragraph 33 of the Crossclaim,

11 Defendants admit only that on or about March 23, 2022, Stellar purportedly caused to be

12 recorded in the records of Maricopa County, Arizona as instrument number 2022-0259809

13 a notice of claim of mechanic's and materialmen's lien.

14           34.      Defendants lack sufficient information or knowledge to respond to the

15 allegations contained in Paragraph 34 of the Crossclaim and therefore denies the same.

16           35.      Defendants deny the allegations contained in Paragraph 35 of the Crossclaim.

17           36.      Defendants deny the allegations contained in Paragraph 36 of the Crossclaim.

18           37.      Defendants deny the allegations contained in Paragraph 37 of the Crossclaim

19 and affirmatively allege that as the successful party, Defendants are entitled to attorney's

20 fees under A.R.S. §§33-995(E) and 33-998(B).

21                                      **<u>COUNT TWO</u>**

22                           **<u>(Breach of Contract - Vital)</u>**

23           38.      Responding to the allegations in Paragraph 38 of the Crossclaim, Defendants

24 incorporate by reference their responses to the previous paragraphs as though fully set forth

25 herein.

26           39.      Defendants admit the allegations contained in Paragraph 39 of the

27 Crossclaim.

28           40.      Defendants admit the allegations contained in Paragraph 40 of the

Crossclaim.

41.     Defendants deny the allegations contained in Paragraph 41 of the Crossclaim.

42.     Responding to the allegations contained in Paragraph 42 of the Crossclaim, Defendants admit only that Stellar ceased work. Defendants deny the remaining allegations.

43.     Defendants deny the allegations contained in Paragraph 43 of the Crossclaim.

44.     Defendants deny the allegations contained in Paragraph 44 of the Crossclaim.

45.     Defendants deny the allegations contained in Paragraph 45 of the Crossclaim.

46.     Defendants deny the allegations contained in Paragraph 46 of the Crossclaim and affirmatively allege that they are entitled to recover its attorneys' fees and costs under the terms of the Contract and/or A.R.S. §§12-341 and 12-341.01.

47.     Defendants deny all allegations in the Crossclaim that are not expressly admitted above.

48.     Defendants deny that Stellar is entitled to any of its requested relief in either of its Prayers for Relief.

## AFFIRMATIVE DEFENSES

1.     Stellar's Crossclaim and each purported claim for relief stated therein fails to state a claim upon which relief can be granted.

2.     Stellar's claims are barred, in whole or in part, by Stellar's failure to strictly comply with the Arizona mechanics' lien statutes, A.R.S. § 33-981, *et. seq.*

3.     Under the doctrine of equitable subrogation and/or replacement, Stellar's lien claim is junior in priority to the lien held by Truist Bank.

4.     Stellar's claims are barred, in whole or in part, because the damages allegedly suffered by Stellar were caused by intervening and/or superseding causes that are separate and apart from Defendants' conduct.

5.     Stellar's alleged damaged and injuries were not directly or proximately caused by Defendants.

6.     To the extent Stellar has suffered any damages, Stellar has failed to take reasonable steps to mitigate those alleged damages.

7.     Stellar's claims are barred, in whole or in part, by the doctrines of waiver and estoppel.

8.     Stellar's claims are barred, in whole or in part, to the extent Stellar's performance on the project at 1635 43rd Avenue, Phoenix, Arizona 85009, APN 105-14-001Q, was defective, incomplete, not in accordance with industry standards, not in accordance with the Contract, and/or Stellar otherwise failed to perform in a reasonable and workmanlike manner.

9.     Stellar's claims are barred, in whole or in part, to the extent Stellar seeks damages for overhead costs, profits, or any amounts over and above the reasonable value of labor and/or materials furnished.

10.     Stellar's claims are barred, in whole or in party, to the extent Plaintiff failed to satisfy all conditions precedent to the filing of its lawsuit and asserting claims against Defendants.

11.     Stellar's claims are or may be barred or reduced by any other matter constituting an avoidance or affirmative defense as set forth in Rules 8 and 12 of the Arizona Rules of Civil Procedure and as may be determined to exist through discovery.

12.     Defendants specifically reserve the right to amend and supplement these affirmative defenses as discovery proceeds.

## **PRAYER FOR RELIEF**

**WHEREFORE**, having fully responded to the Stellar's Crossclaim, Defendants JHO and Vital pray judgment as follows:

A.     Stellar take nothing by its Crossclaim and that the same be dismissed with prejudice;

B.     That Judgment be entered in favor of Defendants;

C.     That Defendants be awarded their attorneys' fees and costs incurred herein pursuant to A.R.S. §§ 12-341, 12-349, 33-995(E), and 33-998(B); and

D.     For all other relief available under law and equity.

RESPECTFULLY SUBMITTED this 19th day of September, 2022

QUARLES & BRADY LLP
One Renaissance Square
Two North Central Avenue
Suite 600
Phoenix, AZ  85004-2322


By:    /s/ Cale S. Johnson
        Edward A. Salanga
        Cale S. Johnson

Attorneys for Defendants
JHO Real Estate Investment, LLC and Vital
Pharmaceuticals, Inc.

**EFILED** with the Clerk of the Court this 19th day of September, 2022.

**COPY** of the foregoing mailed/emailed this 19th day of September, 2022, to:

Richard C. Gramlich
TIFFANY & BOSCO
2525 East Camelback Road, 7th Floor
Phoenix, AZ  85016
rcg@tblaw.com
Attorneys for Nexus Steel, LLC

John L Condrey
GORDON REES SCULLY MANSUKHANI, LLP
2 North Central Avenue, #2200
Phoenix, AZ  85004
jcondrey@grsm.com
Attorneys for Fabco Metal Products, LLC

Richard B. Murphy
Chase E. Halsey
Murphy Cordier Casale Axel PLC
4647 North 32nd Street, #150
Phoenix, AZ  85018
rich@mccalaw.com
chase@mccalaw.com
Attorneys for Stellar Group, Inc.


   /s/ Kim Simmons

# EXHIBIT A

# EXHIBIT A

When recorded return to:

Robert F. Roos, Esq.
Lewis Roca Rothgerber Christie LLP
201 E. Washington Street, Suite 1200
Phoenix, Arizona 85004-2595
(602) 262-5779

OFFICIAL RECORDS OF
MARICOPA COUNTY RECORDER
STEPHEN RICHER
2022-0266676 03/24/22 04:49
PAPER RECORDING

0351934-265-2-2
mor gana

THIS SPACE RESERVED FOR RECORDING INFORMATION

## MECHANIC'S AND MATERIALMAN'S LIEN

| | |
|---|---|
| FAITH TECHNOLOGIES INCORPORATED., a Wisconsin corporation, ) ) ) ) | **NOTICE AND CLAIM OF LIEN** |
| Claimant, ) ) ) | |
| vs. ) ) | |
| JHO Real Estate Investment, LLC, a Florida limited liability company, ) ) ) | |
| Owner or Reputed Owner. ) ) | |

STATE OF WISCONSIN )
                    )ss.
County of Winnebago )

David Jahner, being first duly sworn, upon his oath deposes and says that:

1. I am the President of Faith Technologies Incorporated ("Claimant"), and have personal knowledge of the facts hereafter set forth. Claimant holds a valid license as a contractor pursuant to Arizona Revised Statutes, Title 32, Chapter 10, and was duly licensed as such at all times material to the facts stated herein.

2. Claimant furnished labor, materials, machinery, fixtures, equipment and tools for the construction of improvements on a certain parcel of land situated in Maricopa County, Arizona at 1635 South 43rd Avenue, Phoenix, Arizona 85009 (the "Subject Property") and sought to be

charged, together with the improvements thereon, with the lien hereby claimed. The legal description of the Subject Property is attached as Exhibit A and is incorporated by this reference.

3.      JHO Real Estate Investment, LLC, a Florida limited liability company ("Owner"), is the Owner or reputed Owner of the Subject Property.

4.      The name of the person by whom Claimant was employed is Stellar Group, Incorporated ("Agent"). Claimant entered into a written agreement (the "Contract") with the Agent on or about December 22, 2020, wherein Claimant agreed to furnish labor, professional services, materials, equipment, machinery, fixtures and tools for the building electrical work at Bang Energy Phoenix Can Manufacturing Facility located at the Subject Property. Under the Contract, Claimant was to be paid the Contract Sum in the amount of $3,926,196.00, subject to additions and deductions, as provided in the Contract. During performance of the Work on the Project, the Agent issued 10 change orders to Claimant in the combined amount of $2,048,932.95 increasing the total Subcontract amount to $5,975,128.95. The current sum due and owing to Claimant for work performed on the Subject Property pursuant to the Contract is $2,777,007.15 together with interest on this sum at the highest legal rate from the date due until paid in full. A true and correct copy of the Contract including all change orders documenting the Agent's agreement with and obligations to Claimant are attached as Exhibit B and incorporated by reference.

5.      Labor, materials, machinery, fixtures and tools were first furnished to the jobsite by Claimant under the Contract on or about January 26, 2021. Claimant ceased work on the Project on or about February 8, 2022, and Claimant is informed and believes that all work on the Project has now ceased. Based on the cessation of labor occurring on or after February 8, 2022, the Project is not yet completed under the provisions of A.R.S. § 33-993(C). Consequently, this lien is timely under applicable law.

6.      As of this date, the unpaid balance due and owing to Claimant under the Contract for work performed on the Project is $2,777,007.15. The total amount due and owing to Claimant for work performed on the Project under the Contract after deducting all just offsets and credits is $2,777,007.15, together with interest on that amount at the highest legal rate from the date due until paid. That amount is also the reasonable value of the labor, materials, machinery, fixtures and tools furnished by Claimant under the Contract for which Claimant has not been compensated.

7.      On or about February 12, 2021, Claimant served a preliminary 20-day notice as required by A.R.S. § 33-992.01 upon the Owner and Agent. The notice was given by certified mail, return receipt requested. A true and correct copy of the notice is attached hereto as Exhibit C and incorporated herein by reference.

8.      None of the parties returned the acknowledgement of receipt of the twenty-day notice to Claimant within thirty days from the date of mailing. Therefore, under A.R.S. § 33-992.02, proof of service of the twenty-day notice is made by the affidavit of Colleen Kirk which is attached as Exhibit D and incorporated here by reference. The affidavit recites: (a) the time,

2

place and manner of mailing; and (b) the names and addresses of the persons to whom copies of the notices were mailed.

    9.  Claimant claims a lien on the Subject Property and the structures and improvements thereon in the amount of **$2,777,007.15** together with costs incurred recording this lien, and together with interest and attorneys' fees, pursuant to the laws of the state of Arizona relating to the liens of mechanics, materialmen, laborers and others.  For the sums due under the Contract, and for the purpose of filing this lien, Claimant has made this notice and claim of lien, and delivers the original thereof to the County Recorder of Maricopa County, Arizona to be recorded as required by law, and causes duplicate copies to be served upon the Owner or Reputed Owner, if the Owner can be found in Maricopa County, Arizona.

<div style="text-align:right">

FAITH TECHNOLOGIES, INCORPORATED, a
Wisconsin corporation authorized to transact
business in Arizona

</div>

By: _____

        David Jahner
        President

STATE OF WISCONSIN    )
                   )ss.
County of Winnebago     )

    The foregoing instrument was subscribed, sworn to and acknowledged before me this **17** day of March, 2022, by David Jahner, President of Faith Technologies Incorporated, a Wisconsin corporation authorized to transact business in Arizona, on behalf of the corporation.



                               NOTARY PUBLIC

My Commission Expires:

**12-10-2024**

# EXHIBIT A

## EXHIBIT A

### LEGAL DESCRIPTION

That portion of the Northwest quarter of Section 15, Township 1 North, Range 2 East of the Gila and Salt River Meridian, Maricopa County, Arizona, described as follows:

Beginning at the Northwest corner of the North half of the Southwest quarter of said Northwest quarter;

Thence South (assumed bearing for purposes of this description) along the West line of said section, a distance of 660.00 feet to a line that is parallel with and distant 1968.46 feet Southerly measured at right angles from the North line of said section;

Thence South 89 degrees 50 minutes East, along said parallel line, a distance of 1307.28 feet to a line that is parallel with and distant 10.00 feet Westerly, measured at right angle, from the East line of said Southwest quarter, last said parallel line being also the center line of an existing drill track;

Thence North 00 degrees 01 minutes West, along last said parallel line, a distance of 1095.68 feet to a point of CUSP;

Thence Southwesterly along a tangent curve concave Northwesterly having a radius of 642.43 feet, through a central angle of 05 degrees 43 minutes 29 seconds, an arc distance of 64.19 feet;

Thence South 05 degrees 42 minutes 29 seconds West, tangent to said curve, a distance 26.38 feet;

Thence Southwesterly and Westerly along a tangent curve to the right having a radius 382.24 feet, through a central angle of 84 degrees 27 minutes 31 seconds, an arc distance of 563.45 feet to a point of tangency in a line that is parallel with and distant 1308.46 feet Southerly, measured at right angles, from said North line;

Thence North 89 degrees 50 minutes West, along last said parallel line, a distance of 919.70 feet to the point of beginning.

EXCEPTING THEREFROM that portion of said property lying below a depth of 500.00 feet measured vertically from the contour of the surface thereof;

Provided, however, that said grantor, its successors and assigns, shall not have the right for any and all purposes to enter upon, into or through the surface of the portion of said property lying above 500.00 feet, measured vertically from the contour of the surface of said property, as reserved in Deed recorded in Docket 9581, Page 180 and also recorded in Docket 9590, Page 873; and

EXCEPT all rights retained by Southern Pacific Company, a Delaware corporation in Warranty Deed recorded in Docket 3976, Page 407 of official records of Maricopa County, Arizona.

# EXHIBIT B

DocuSign Envelope ID: 9F081A25-2D7C-4229-931A-00A5ACED7684

# SUBCONTRACT
## Stellar Group, Inc.
2900 Hartley Road
Jacksonville, FL 32257

| | | | |
|---|---|---|---|
| **Subcontractor:** Faith Technologies, Inc.<br>225 Main Street<br>Menasha Wisconsin 54952 | | **Project Name and Location:** | Bang Energy - Phoenix Can Manufacturing<br>1635 South 43rd Avenue<br>Phoenix Arizona 85009 |
| **Attention:** | Terry Flaherty | **Attention:** | Brian Edberg |
| **Phone:** | (920) 738-1500 | **Mobile:** | (904) 349-0840 |
| **Fax:** | | **E-Mail:** | bedberg@stellar.net |
| **E-Mail:** | terry.flaherty@faithtechnologies.com | | |

| Date<br>12/22/2020 | SC #<br>23006976-SUB-09 | Project #<br>23006976 | Contract Type<br>Lump Sum | FOB<br>Jobsite | Schedule<br>Per Superintendent |
|---|---|---|---|---|---|
| **Scope of Work: Building Electrical** | | | | | |

This Subcontract is made by and between Stellar Group, Incorporated, d/b/a Stellar, hereinafter referred to as Contractor, and the Subcontractor named above, at Jacksonville, Florida. In consideration of the mutual promises and undertakings set forth herein, Contractor and Subcontractor hereby agree to the terms and conditions set forth herein, including the Terms and Conditions attached hereto. Subcontractor agrees to perform and complete the following Work:

**A. Work:** Subcontractor agrees to perform and complete the scope of work generally as described in Exhibit A attached hereto and incorporated herein.

**B. Construction Progress Schedule:** Subcontractor agrees to complete the Work in strict accordance with the Construction Progress Schedule attached hereto as Exhibit B and incorporated herein.

**C. Contractor's Safety Requirements:** Subcontractor agrees to conform to Contractor's Request for Documentation, Bid Considerations, and Jobsite Safety Rules attached hereto as Exhibit C and incorporated herein.

**ALL FOR THE LUMP SUM OF**                               **$3,926,196.00**

All licenses, permits, fees, taxes and insurance with Contractor named as additional insured included)

**Attachments:**
Exhibit-F-General Requirements.pdf, Exhibit-E---Stellar-Guide-for-Subcontractors-Usage-in-Procore.pdf, Exhibit-D-PHX VPX-Stellar DBIA_530___535 Cost_Plus_GMP 2020-07-28 Executed.pdf, 23006976 - Subcontract Attachments.pdf, Exhibit-C-JSP-Bang-Energy-Phoenix.pdf, Exhibit-H-Specifications dated 11.11.2020.pdf, 23006976 - Arizona Form 5005.pdf, 23006976 - Arizona Form 5000.pdf, Exhibit-B-06976-Bang PHX Can Manufacturing Schedule_PRELIMINARY.pdf, Exhibit-A-23006976-Sub-09-Building Electrical.pdf, Exhibit-G-Drawing Log dated 10.23.2020.pdf, 23006976 - Subcontract Attachments.pdf

| FOR ACCOUNTING PURPOSES ONLY: | |
|---|---|
| Cost Code | Distributed Value |
| 26-2601 - 1760 | $1,584,520.00 |
| 26-2606 - 1760 | $226,012.00 |
| 26-2602 - 1760 | $230,260.00 |
| 26-2604 - 1760 | $573,119.00 |
| 26-2605 - 1760 | $1,302,285.00 |
| Total: | $3,926,196.00 |

**THIS SUBCONTRACT INCLUDES AND IS SUBJECT TO THE TERMS AND CONDITIONS ATTACHED HERETO AND INCORPORATED HEREIN.**

IN WITNESS WHEREOF, the Subcontractor and Contractor have executed this Subcontract on the date set forth above.

| **FAITH TECHNOLOGIES, INC.** | **STELLAR GROUP, INCORPORATED** |
|---|---|
| Subcontractor | Contractor |
| Signed and Dated: *Ron Rheinheimer*<br>1/20/2021 | 11:29 AM CST | Signed and Dated: |
| By: Terry Flaherty   Senior Vice President | By: Jonah Petoskey |
| Owner/Group Leader | Senior Project Manager |