UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION
www.flsb.uscourts.gov

In re:

VITAL PHARMACEUTICALS, INC., *et al.*,

Debtors.[1]

_____/

Chapter 11 Cases

Case No. 22-17842 (PDR)
(Jointly Administered)

**DEBTORS' OMNIBUS REPLY IN SUPPORT OF ENTRY OF ORDERS APPROVING
(I) THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS TO BLAST
ASSET ACQUISITION, LLC FREE AND CLEAR OF ALL LIENS, CLAIMS AND
ENCUMBRANCES, (II) THE ASSUMPTION AND ASSIGNMENT OF CERTAIN
EXECUTORY CONTRACTS AND UNEXPIRED LEASES IN CONNECTION
THEREWITH, AND (III) THE RELATED SETTLEMENT AGREEMENT**

1.     The above-captioned debtors and debtors-in-possession (collectively, the "Debtors") submit this omnibus reply (this "Reply") in support of the proposed sale of substantially all of their assets (the "Sale Transaction") to Blast Asset Acquisition LLC (the "Buyer" and together with Monster Energy Company and Monster Beverage Corporation collectively, "Monster") and approval of the related Settlement,[2] and in response to the objections (the "Objections") to entry of the Proposed Sale Order[3] and to the Proposed 9019 Order.[4]

_____

[1] The address of the Debtors is 1600 N. Park Drive, Weston, FL 33326. The last four digits of the Debtors' federal tax identification numbers are: (i) Vital Pharmaceuticals, Inc. (8430); (ii) Bang Energy Canada, Inc. (5454); (iii) JHO Intellectual Property Holdings, LLC (0010); (iv) JHO Real Estate Investment, LLC (9394); (v) Quash Seltzer, LLC (6501); (vi) Rainbow Unicorn Bev, LLC (2254); and (vii) Vital Pharmaceuticals International Sales, Inc. (8019).

[2] *See Debtors' Expedited Motion to Approve Compromise Between (I) the Debtors, (II) Monster Energy Company, (III) Monster Beverage Corporation, (IV) Orange Bang, Inc., (V) the Committee, and (VI) the Supporting Lenders* [ECF No. 1548] (the "9019 Motion").

[3] The "Proposed Sale Order" is the *Order (I) Authorizing and Approving (A) the Sale of Substantially All of the Debtors' Assets Free and Clear of All Liens, Claims, and Encumbrances, and (B) the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection Therewith, and (II) Granting Related Relief* [ECF No. 1547]. Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in, as applicable, the Proposed Sale Order, the Monster APA (as defined herein), or the Bid Procedures Order (as defined herein).

[4] The "Proposed 9019 Order" is the proposed order granting the 9019 Motion, the form of which is attached thereto.

## PRELIMINARY STATEMENT

2.      The Debtors have been engaged in a marketing process for a financing, investment or M&A transaction for over a year.  After hundreds of calls and meetings with potential lenders and bidders, the provision of over 132,000 pages of written diligence information to potential bidders, over 75 management presentations and meetings, thousands of hours of negotiation and exchanging draft documentation, and nearly 70 Board meetings to discuss the Debtors' marketing efforts, the process has culminated with the proposed sale to Monster.  Under the circumstances, nobody can seriously contend — and, as of the objection deadline, nobody has contended[5] — that the sale to Monster is anything other than the best, value-maximizing disposition of the Debtors' assets and path forward in these cases.  The Debtors received no other actionable bids, let alone any that would have approached the value of the Monster bid.

3.      The sale and related Settlement Agreement are affirmatively supported by the DIP and Prepetition Agent and lenders, as well as the Official Committee of Unsecured Creditors. Those constituencies collectively represent substantially all of the Debtors' secured and unsecured creditors.  Virtually no objections to the sale or 9019 Motion remain unresolved; no one has challenged the wisdom or propriety of the sale or settlement as a general matter, and the Debtors do not expect there to be any unresolved objections concerning the Debtors' ability to sell the Purchased Assets free and clear of encumbrances and other interests.  While there remain certain open cure and other contract assumption-related objections, the Debtors believe that with the adjournment of the hearing on those objections to a later date, those objections can be resolved as well.

---

[5]  The Debtors have been advised that Mr. Owoc plans to file an untimely "supplemental objection" more than 36 hours after the objection deadline, and Mr. Owoc styled his initial filing as a "preliminary objection."  *See* ECF No. 1584. The Debtors object to Mr. Owoc flouting the deadlines set by this Court and potentially seeking to add new arguments in an untimely subsequent filing, particularly in a manner prejudicial to the Debtors' ability to respond.

4.      The sole remaining objector is the Debtors' sole shareholder and former CEO and director/manager, John H. Owoc.  None of Mr. Owoc's objections have merit, and all should be overruled.  The Debtors are not trying to sell property that they do not own — and the Monster APA makes this abundantly clear.  The releases contained in the Monster APA do not affect any claims Mr. Owoc may wish to assert in his own right; indeed, it contains only consensual releases of claims that are property of the Debtors and Monster.  Nor does the Monster APA have any impact on any subrogation claims that Mr. Owoc may, someday in the future, seek to assert.

5.      Just a few short days ago, the Debtors were on the precipice of a chapter 7 liquidation that would have cost hundreds of jobs and destroyed hundreds of millions of dollars of value.  The sale to Monster avoids that disastrous outcome and, in stark contrast, provides the Debtors with a viable opportunity to confirm a chapter 11 plan that will pay all creditors significantly more than would be received in a liquidation scenario.  The sale and related settlement that are now before the Court enjoy broad support and are plainly in the best interests of the Debtors, their creditors, and these bankruptcy estates.  They should be approved.

## REPLY

### I.      The Sale to Monster Should Be Approved.

6.      The Debtors' evidence at the July 12 hearing will leave no doubt that the proposed sale to Monster constitutes an exercise of sound business judgment and satisfies the requirements for a "free and clear" sale under section 363(f), and that the Buyer is a good faith purchaser within the meaning of section 363(m).  In fact, the Debtors do not expect any serious dispute as to those issues.  Nevertheless, the Debtors have briefly set out below the reasons why the sale can and should be approved.

**A.     Pursuit of the Proposed Sale Satisfies the Section 363(b) Standard.**

7.      Courts will approve a debtor's use, sale, or lease of estate property outside of the ordinary course of business pursuant to section 363(b) of the Bankruptcy Code "where the debtor has used reasonable business judgment and articulated a business justification for such use." *In re 160 Royal Palm, LLC*, 600 B.R. 119, 126 (S.D. Fla. 2019) (internal quotes omitted), *aff'd*, 785 F. App'x 829 (11th Cir. 2019); *see also In re Allen*, 607 F. App'x 840, 843 (10th Cir. 2015). A sound business purpose for the sale of a debtor's assets outside the ordinary course of business may be found where such a sale is necessary to preserve and enhance the value of the assets for the debtor's estate, its creditors, or interest holders. *See In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir. 1983); *In re Gulf States Steel, Inc.*, 285 B.R. 497, 514 (Bankr. N.D. Ala. 2002) (adopting the *Lionel* standard).

8.      Where a valid business justification exists, the court must also determine whether "(i) the debtor has provided all interested parties with adequate and reasonable notice, (ii) the sale price is fair and reasonable, and (iii) the purchaser is proceeding in good faith." *In re 160 Royal Palm, LLC*, 600 B.R. 119, 129 (S.D. Fla. 2019) (citing *In re MF Global Inc.*, 467 B.R. 726, 730 (Bankr. S.D.N.Y. 2010)), *aff'd*, 785 F. App'x 829 (11th Cir. 2019).

9.      "If a valid business justification exists, then a strong presumption follows that the agreement at issue was negotiated in good faith and is in the best interests of the estate; the burden of rebutting that presumption falls to parties opposing the transaction." *In re Filene's Basement, LLC*, No. 11-13511-KJC, 2014 WL 1713416, at *12 (Bankr. D. Del. Apr. 29, 2014); *see also Royal Palm*, 600 B.R. at 126 ("A debtor's business decision should be approved by the court unless it is shown to be so manifestly unreasonable that it could not be based upon sound business judgment, but only on bad faith, or whim or caprice.").

      **i.**    **Selection of Monster's Bid as the Successful Bid and the Debtors' entry into the Monster APA Are Supported by Sound Business Justifications.**

10.    The Debtors' business reason for the sale to Monster is simple: to maximize the value of their assets for the benefit of creditors. This is *the quintessential business justification* that supports approval of a sale under section 363.

11.    The evidence will show that this fundamental purpose has guided the Debtors' sale process from the start. The Debtors began marketing the business for investment or sale even prior to the Petition Date in response to a prepetition default under their bank debt facility and the specter of mounting litigation liabilities.

12.    In bankruptcy, the Debtors continued those efforts uninterrupted, immediately engaging with potential transaction counterparties after the Petition Date and ultimately, when it became clear that a sale of substantially all assets (rather than a financing transaction or new money investment through a standalone plan) was likely to be the value-maximizing path, commencing a formal, court-approved sale process. The Debtors' Board (including its Restructuring Committee) was highly engaged in the process, meeting a total of 75 times between the Petition Date and June 30, 2023 (approximately twice weekly), with the status of the marketing process front-and-center at nearly all of those meetings (*i.e.*, 69 out of 75). Over the course of the process, the Board consistently urged the Debtors' management and advisors to cast a wide net and explore opportunities with all possible buyers and transaction structures.

13.    In the end, despite the Debtors' best efforts to promote robust competition and multiple extensions of bidding process deadlines and milestones to ensure that all potential bidders had a full and fair opportunity to submit their best proposals, the Debtors' thorough sale process yielded only one actionable bid for the Debtors' entire business — the Monster bid — and that bid was far superior on its face even to the *non-executable* proposals floated by other parties.

Monster's bid features a headline purchase price more than $100 million higher than any other proposal, minimizes execution risk (particularly with Hart-Scott-Rodino issues in the rearview), maximizes recoveries for creditors and allows the Debtors to pursue a chapter 11 plan. Consistent with their sound business judgment and fiduciary duties, the Debtors selected the Monster Bid as the Successful Bid.

> **ii.    The Debtors Gave Adequate and Reasonable Notice and Remained Open and Transparent Throughout the Sale Process.**

14.    All parties in interest have received extensive notice of the sale process and of the sale to Monster specifically.

15.    The evidence will show that the Debtors have been seeking financing for, investments in, or a sale of, their business since prior to the Petition Date. And, after filing for bankruptcy, the Debtors have run their marketing process in a transparent and appropriate manner. The Debtors have consistently made clear their willingness to entertain all possible financing, investment or sale transactions from the first day of the case.[6] The Debtors filed a motion to approve Bid Procedures on January 27, 2023,[7] which were approved on February 24, 2023.[8] Notice of the sale and sale hearing was served on the entire creditor matrix, all parties known to

---

[6]  *See Declaration of John C. DiDonato in Support of Chapter 11 Petitions and First Day Pleadings* ¶ 41 [ECF No. 26]; Hr'g Tr. 22:5-11, *In re Vital Pharmaceuticals, Inc.*, No. 22-17842-PDR (Bankr. S.D. Fla. Oct. 13, 2022) [ECF No. 164].

[7]  *See Debtors' Motion for an Order (I) Approving (A) Bidding Procedures for the Sale of Substantially All of the Debtors' Assets, (B) Procedures for the Debtors' Assumption and Assignment Of Certain Executory Contracts and Unexpired Leases, (C) the Form and Manner of Notice of the Sale Hearing, Assumption Procedures, and Auction Results, (D) Dates for an Auction and Sale Hearing, (E) the Sale of Substantially All of the Debtors' Assets Free and Clear of All Claims, Liens, Liabilities, Rights, Interests and Encumbrances, and (F) the Debtors' Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, (II) Authorizing the Debtors to Provide Bid Protections, and (III) Granting Related Relief* [ECF No. 707] (the "Bid Procedures Motion").

[8]  *See Order (1) Approving Bidding Procedures, (II) Authorizing the Debtors to Provide Bid Protection and (III) Granting Related Relief* [ECF No. 854] (the "Bid Procedures Order").

have expressed interest in a transaction, and all other parties required to receive notice under the Bid Procedures Order and applicable Bankruptcy and Local Rules.[9]

16.     Parties in interest have had even more time than the Debtors initially expected to make themselves heard in the sale process.  Under the Bid Procedures Order, the Debtors had intended to announce a Stalking Horse Bidder on March 24 and receive competing bids on April 24.[10]  However, when no bids materialized on either date, the Debtors extended the Bid Deadline to May 22, 2023.[11]  The Debtors have filed and served numerous notices with respect to the various extensions of the sale-related deadlines.[12]  Debtors' counsel has also provided regular status updates to the Court, even at hearings unrelated to the sale process.[13]  And the record will demonstrate that Debtors and their advisors worked closely and cooperatively with the DIP Lenders, the Prepetition Lenders, the Committee, and each of their representatives throughout the sale process.

17.     Finally, even the Debtors' plan to sell to Monster was no surprise.  The Debtors announced on the record on June 22 that they were seeking to finalize a sale to Monster, but had

---

[9]  *See* Bid Procedures Order ¶¶ 14-19; R. 2002 of the FED. R. BANKR. P. (the "Bankruptcy Rules"); R. 2002-1 of the S.D. FLA. R. BANKR. P. (the "Local Rules").

[10]  *See* Bid Procedures Order Ex. 1.

[11]  *See Notice of Extension of Certain Sale-Related Deadlines* [ECF No. 1283].

[12]  *See Amended Notice of Auction Cancellation and Successful Bidder* [ECF No. 1556]; *Notice of Adjournment of Sale Hearing and Related Deadlines* [ECF No. 1514]; *Notice of Modified Sale-Related Dates and Deadlines* [ECF No. 1457]; *Notice of Adjournment of Auction* [ECF No. 1445]; *Notice of Adjournment of Auction and Modified Sale-Related Dates and Deadlines* [ECF No. 1416]; *Notice of Adjournment of Auction* [ECF No. 1394]; *Notice of Extension of Certain Sale-Related Deadlines* [ECF No. 1283].  Notice was properly provided.  *See Certificate of Service* [ECF No. 1580]; *Certificate of Service* [ECF No. 1541]; *Supplemental Certificate of Service* [ECF No. 1493]; *Certificate of Service* [ECF No. 1464]; *Certificate of Service* [ECF No. 1452]; *Certificate of Service* [ECF No. 1436]; *Certificate of Service* [ECF No. 1403]; *Certificate of Service* [ECF No. 1305].

[13]  *See* Hr'g Tr. 8:16-12:19, *In re Vital Pharmaceuticals, Inc.*, No. 22-17842-PDR (Bankr. S.D. Fla. June 29, 2023); Hr'g Tr. 6:9-10:1, *In re Vital Pharmaceuticals, Inc.*, No. 22-17842-PDR (Bankr. S.D. Fla. June 22, 2023); Hr'g Tr. 5:15-8:1, *In re Vital Pharmaceuticals, Inc.*, No. 22-17842-PDR (Bankr. S.D. Fla. Mar. 29, 2023); Hr'g Tr. 9:20-12:18, *In re Vital Pharmaceuticals, Inc.*, No. 22-17842-PDR (Bankr. S.D. Fl. Feb. 23, 2023).

run into issues with FTC approval.[14]  The Debtors announced that they would seek best and final

offers from potential bidders by June 26.   On June 28, the Debtors filed the Notice of Successful

Bidder, and filed the Monster APA.[15]

        **iii.**    **The Monster Bid Reflects a Fair and Reasonable Price.**

     18.     In determining whether a price is "fair and reasonable" in the context of a

section 363 sale, courts focus on the results of chapter 11 marketing process itself as indicative of

value—not hypothetical "desktop" valuations or expert testimony.  *See In re Chrysler LLC*, 405

B.R. 84, 98 (Bankr. S.D.N.Y. 2009) ("The test of value is the sale process itself."); *In re Granite

Broad. Corp.*, 369 B.R. 120, 143 (Bankr. S.D.N.Y. 2007) ("[T]here is no dispute that in many

circumstances the best evidence of value is what a third party is willing to pay in an arm's length

transaction.").

     19.     Here, the market has spoken.  Over the past eight-and-a-half months, the Debtors

vigorously pursued a transaction that would maximize value with multiple interested parties.  The

Debtors engaged in extensive marketing efforts:  The evidence will show that Rothschild contacted

approximately 150 potential strategic purchasers and financial institutions that could be interested

in pursuing a transaction with the Debtors.  The Debtors entered into non-disclosure agreements

with approximately 50 interested parties, and granted approximately 40 interested parties access

to a secure data room.  To assist these potential bidders with their evaluations of a possible

transaction, the Debtors and their advisors responded to hundreds diligence requests, shared over

11,000 documents in a secure data room, hosted multiple site visits, and held numerous live and

recorded diligence sessions across a wide range of topics.

---

[14] *See* Hr'g Tr. 7:23-25, 8:1-5, *In re Vital Pharmaceuticals, Inc.*, No. 22-17842-PDR (Bankr. S.D. Fla. June 22, 2023).

[15] *See Notice of Auction Cancellation and Successful Bidder* [ECF No. 1546].  The Debtors filed an *Amended Notice of Auction Cancellation and Successful Bidder* [ECF No. 1556] on June 30, 2023.

20.     This marketing process yielded eight non-binding indications of interest.  However, no parties submitted binding bids by the original Stalking Horse Bid Deadline of March 24 or the original April 24 Bid Deadline.  Seeking to jumpstart a competitive process, the Debtors extended the timeline and, on May 22, received two bids.  Only Monster's was a Qualified Bid, and even that was not actionable without further negotiation.  The evidence will show that the Debtors continued to engage with numerous potential bidders with the goal of achieving better actionable offers.  But in the end, even after the Debtors provided one last opportunity for bidders to submit best-and-final offers on June 26, the process yielded only one actionable bid for the Debtors' going-concern business: the Monster Bid.

21.     No party has challenged that the Monster Bid is the most valuable that the Debtors received — and, indeed, the evidence will demonstrate that was the case:  its headline purchase price of $361 million (before taking into account contingent purchase consideration of $10 million and certain assumed liabilities) is far greater than any other received by the Debtors.  As of June 26, the other bids received were $245 million, $75 million, $52 million, and $44 million.  Moreover, the other bids had significant contingencies or deficiencies:  two[16] were only for the Phoenix facility, one lacked an APA markup and had contingencies that would likely have lowered its already-below-Monster headline price further, and one lacked essential committed financing.  In other words, after an extensive marketing process and numerous rounds of bidding, the Monster bid was *both* the highest amount offered and *the only* bid without significant execution risk.

### iv.     The Buyer Is Proceeding In Good Faith.

22.     Good faith from a purchaser requires their honest participation in the negotiation of the bid and in the competitive bidding process.  The test for good faith "focuses on the 'integrity

---

[16]  The $52 million and $44 million bids.

of [the purchaser's] conduct in the course of the sale proceedings' and whether there is 'fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.'" *In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 147 (3d Cir. 1986); *see also In re Exennium, Inc.*, 715 F.2d 1401, 1404–05 (9th Cir. 1983) ("Lack of good faith is generally determined by fraudulent conduct during the sale proceedings."); *In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978) ("The requirement that a purchaser act in good faith, of course, speaks to the integrity of his conduct in the course of the sale proceedings.").

23.    This standard has been met.  The Debtors and the Buyer acted in good faith in connection with the court-approved sale process, and nobody has alleged otherwise. Representatives for substantially all of the Debtors' creditors were consulted throughout the sale process.  Indeed, the Prepetition Lenders and the Committee participated directly in negotiations, are each party to the Settlement Agreement, and fully support the proposed Sale Transaction. Nobody has alleged any fraud by Monster or its collusion with the Debtors or any other bidder.

**B.    The Sale satisfies Section 363(f) of the Bankruptcy Code.**

24.    A debtor may sell assets free and clear of liens, claims and other encumbrances if "the holder of the interest consents."  11 U.S.C. § 363(f)(2).[17]  Consent can be provided explicitly or implicitly.  Pursuant to section 363(f)(2), parties with a claim or interest that do not object or decide to withdraw their objection to a sale motion are "deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code." *In re Aventura*, Nos. 21-12374-BKC-RAM, 21-12375-BKC-RAM, 2021 WL 3879337, at *6 (Bankr. S.D. Fla. Aug. 27, 2021); *see also In re Elliot*,

---

[17]  A debtor may sell assets free and clear if any of the conditions in section 363(f) are met.  However, under the circumstances here, where the Debtors expect to obtain consent, the Debtors have only addressed section 363(f)(2).

94 B.R. 343, 345–46 (E.D. Pa. 1988) (finding that proper notice and failure to submit a timely objection amount to implied consent).

25.     Here, while the Debtors originally received two objections — from Stellar Group, Inc. and Ally Bank — regarding the sale free and clear, they have now reached agreement with these objectors which will be reflected in the Proposed Sale Order.  There are no unresolved objections to the sale of the Purchased Assets free and clear of liens, claims and encumbrances.[18]

## II.     The Settlement Easily Satisfies the Settlement Approval Standard.

26.     At the July 12 hearing, the Debtors will present evidence showing that all legal requirements for approval of the Settlement have been met and that the Settlement is in the best interest of the Debtors' estates.  Nobody has objected to the propriety of the Settlement as a general matter, or the Proposed Settlement Order.  The Debtors respectfully refer the Court and all parties to the arguments in support of the Settlement Agreement contained in the 9019 Motion.

## III.    All Objections Other Than the Owoc Objection Are Resolved or Continued.

27.     Several Objections to the proposed Sale Transaction were filed, almost all of which are limited in scope and/or have been resolved.  Summaries of all filed Objections and informal comments to the Sale Transaction, the Debtors' responses thereto, and the status of each Objection and informal comment are set forth on the "Sale Objection Summary Chart" attached hereto as **Exhibit A**.  Summaries of all filed Objections and informal comments in connection with the cure amounts related to the assumption and assignment of certain executory contracts and unexpired leases, and the status of each Objection and informal comment are set forth on the "Cure Objection Summary Chart" attached hereto as **Exhibit B**.  Summaries of all filed Objections received by the

---

[18]  Although the Debtors believe the "free and clear" nature of the sale is uncontested, the Debtors reserve the right to assert that other prongs of Section 363(f) are satisfied in connection with the sale, such that it could proceed even absent the consent of the affected interest-holder.

Debtors related to adequate assurance requests in connection with the assumption and assignment of certain executory contracts and unexpired leases, and the status of each Objection are set forth on the "Adequate Assurance Summary Chart" attached hereto as **Exhibit C.** The Debtors intend to adjourn the hearing concerning the Objections set forth on the Cure Objection Summary Chart and the Adequate Assurance Summary Chart pending further clarity about the universe of contracts the Buyer intends to have assigned to it, which may moot certain objections. To the extent any such Objections are not mooted, the Debtors and Buyer intend to work in good faith with the applicable counterparties to attempt to resolve such Objections.

## IV.  The Owoc Objection Should Be Overruled.

### A.  The Monster APA Does Not Purport to Sell Property That the Debtors Do Not Own.

28.      Mr. Owoc objects to the Monster APA "to the extent it seeks to sell property that does not belong to the Debtors," and the Owoc Objection lists a number of assets that Mr. Owoc asserts — without providing any support — do not belong to the Debtors.[19] But the Debtors obviously cannot sell what they don't own, and nothing in the Monster APA purports to do so.

29.      Specifically, the Monster APA provides that the "Selling Entities" are only transferring "the *Selling Entities*' right, title and interest" in the Purchased Assets[20] — whatever that may be — and defines the "Selling Entities" as *only* the Debtors.[21] As belt-and-suspenders, the Monster APA lists as "Excluded Assets" — *i.e.*, assets that are *not* being sold to the Buyer —

---

[19]   *Preliminary Objection to Debtors' Expedited Motion to Approve Compromise Between (I) The Debtors, (II) Monster Energy Company, (III) Monster Beverage Corporation, (IV) Orange Bang, Inc., (V) the Committee, and (VI) the Supporting Lenders* [ECF No. 1584] (the "Owoc Objection") ¶¶ 2, 5.

[20]   Monster APA § 2.1.  "Purchased Assets" are the assets that the Buyer is receiving under the Monster APA.

[21]   Specifically, the Monster APA defines the following entities to be "Selling Entities":  Vital Pharmaceuticals, Inc.; Vital Pharmaceuticals International Sales, Inc.; JHO Intellectual Property Holdings, LLC; JHO Real Estate Investment, LLC; Quash Seltzer, LLC; and Rainbow Unicorn Bev, LLC.  *See* Monster APA, preamble, Schedule I.

"all assets that are directly or indirectly owned by the Excluded Parties."[22] Excluded Parties are defined as "John 'Jack' H. Owoc, Megan E. Owoc, each of their family members, any of their Affiliates, and any trusts or other estate planning vehicles of which any of the foregoing are trustees or beneficiaries, in each case that are not Selling Entities . . . ."[23] Thus, if Mr. Owoc (or a non-Debtor entity controlled by Mr. Owoc) is determined to own any of the assets listed in the Owoc Objection, nothing in the Sale Order or the Monster APA would transfer those assets to the Buyer.[24] Indeed, in such a circumstance, section 2.8 of the Monster APA would require the Buyer to return that property to the Debtors, who could then return it to Mr. Owoc.[25]

30.    None of the examples raised in the Owoc Objection suggest the Debtors are purporting to sell property that does not belong to them.  For example, the intellectual property registered in the name of non-Debtor Entourage IP Holdings, LLC ("Entourage" and such property, the "Entourage Assets") is expressly acknowledged *not to be a Purchased Asset* until the

---

[22] Monster APA § 2.2(q).

[23] Monster APA § 1.1 at 9.  The definition goes on to list numerous non-Debtor legal entities that are also Excluded Parties:  "Entourage IP Holdings, LLC, Cognitive IP Holdings, LLC, Fun Energy, LLC, Bang Energy Family, LLC, Bang Gyms, LLC, Candemonium, LLC, Captain Crunch Fishing, LLC, Liquid IP Holdings, LLC, The Fixx, LLC, Bang Vapes, LLC, Ultra Experiences, LLC, Bang Foods, LLC, Energy Train, LLC, VPX Swim and Sports Gear, LLC, Stoked Seltzer, LLC, Stoked Brands, LLC, Birth Right, LLC, Bang Energy International, LLC, JHO GA-1 Investment, LLC, JHO NV-1 Investment, LLC, Sheridan Real Estate Investment A, LLC, Sheridan Real Estate Investment B, LLC and Sheridan Real Estate Investment C, LLC."

[24] If Mr. Owoc is arguing that inclusion of certain items in the Disclosure Schedule to the Monster APA suggests that the Buyer is receiving the assets listed thereon, notwithstanding the limitations of section 2.1, he is wrong.  The Disclosure Schedule states: "The disclosures set forth in this Disclosure Schedule shall not be deemed to expand the scope of any, or create any new, representation, warranty, covenant or agreement set forth in the Agreement."  ECF No. 1546 at p. 111 of 614.  In other words, sections 2.1 and 2.2 of the Monster APA govern what is being sold to Blast, not the Disclosure Schedule.

[25] *See* Monster APA § 2.8(a) ("From and after the Closing, if either the Buyer or any Selling Entity becomes aware that . . . any right, property or asset forming part of the Excluded Assets has been transferred to the Buyer, such Party shall promptly notify the other Party and the Parties shall, as soon as reasonably practicable thereafter, use reasonable best efforts to cause such right, property or asset (and any related Liability) to be transferred at the expense of the Party that is seeking the assets to be transferred to it and with any necessary prior Consent, to . . . the applicable Selling Entity, in the case of any right, property or asset forming part of the Excluded Assets which was transferred to the Buyer at the Closing.").

Selling Entities successfully obtain "title to or ownership of" it.[26]  Because the Entourage Assets are registered in the name of Entourage, but the Debtors believe that they are entitled to recover such assets, the Debtors initiated an adversary proceeding seeking to recover them.[27]  If and when that adversary proceeding is successful, the Entourage Assets "shall be deemed Purchased Assets"[28] under the Monster APA, but not before.

31.    Because the Monster APA transfers only *the Debtors'* rights in the property described, the Court need not determine whether any particular assets identified in the Owoc Objection are owned by the Debtors in order to approve the sale to Monster.[29]  The Debtors reserve all rights to contest any claims by Mr. Owoc that property of the Debtors is instead owned by Mr. Owoc and to pursue turnover of any property that may remain in Mr. Owoc's possession that is nevertheless rightfully property of the Debtors' estates.  However, those disputes are for another day.

### B.  JHO Real Estate Investment, LLC's Assets Can Be Sold.

32.    Mr. Owoc objects to the sale of assets by Debtor JHO Real Estate Investment, LLC ("JHO RE") on the ground that its chapter 11 case should be dismissed as not validly

---

[26] *See* Monster APA § 3.1(a) (providing that the Purchase Price shall include "an additional Ten Million Dollars ($10,000,000.00) (the "Entourage Consideration") paid by the Buyer in cash promptly . . . following the satisfaction of either of the following conditions: (A) the Buyer's receipt . . . of title to and ownership of the Intellectual Property owned by, or purported to be owned by, Entourage IP Holdings (the "Entourage Assets") free and clear of all Encumbrances . . . , or (B) the Selling Entities' exercise of commercially reasonable efforts to secure for the Buyer, [certain] Entourage Assets . . . , resulting in the Buyer's receipt . . . of title to and ownership of at least [those certain] Entourage Assets . . .").

[27] Adversary Complaint for Declaratory Judgement, Turnover of Estate Property, and Usurpation of a Corporate Opportunity, *Vital Pharmaceuticals, Inc. v. Owoc*, Adv. No. 23-01125-PDR (Bankr. S.D. Fla. June 16, 2023) [ECF No. 1].

[28] Monster APA § 3.1(a).

[29] To resolve Mr. Owoc's objection, the Debtors have offered to add language to the Sale Order emphasizing that nothing in the Monster APA or the Sale Order transfers property that is determined to be owned by the Excluded Parties (*i.e.*, Mr. and Mrs. Owoc and non-Debtor entities that they control).  As of the time of filing, the Debtors have received no substantive response.

authorized.[30]  The Court is scheduled to hear argument on Mr. Owoc's *Motion to Dismiss Chapter 11 Bankruptcy of JHO Real Estate Investment LLC*[31] on July 11, 2023, the day before the Sale Hearing.  The Court's ruling on that motion will moot this objection.  Moreover, for the reasons described in the Debtors' Objection to the Motion to Dismiss JHO RE,[32] which are incorporated by reference herein, Mr. Owoc's arguments that the JHO petition was not validly authorized are meritless to the point of frivolity.

        **C.**      **The Releases in the Monster APA Are Legal and Appropriate.**

33.      The Owoc Objection includes only a single conclusory sentence regarding the releases contained in the Monster APA and the Settlement Agreement:  "Mr. Owoc objects to the Monster Agreement to the extent the proposed releases fail to comply with applicable law."[33]  Notably, Mr. Owoc does not argue that the releases are in fact illegal, only that, "to the extent" that they are illegal he objects.[34]

34.      Regardless, there is nothing objectionable under the releases contained in the Monster APA or the Settlement Agreement.  The releases here are entirely consensual:  the Debtors are releasing *the Debtors' claims* and Monster is releasing *its claims*.  Section 7.16 of the Monster APA provides in relevant part:  "*the Buyer, MEC and MBC, on behalf of themselves and each Buyer Related Party . . .* hereby unconditionally and irrevocably and forever releases and

---

[30] Owoc Objection, ¶ 4.

[31] *Creditor and Interested Party John H. Owoc's Emergency Motion to Dismiss Chapter 11 Bankruptcy of Debtor JHO Real Estate Investment, LLC* [ECF No. 1466].

[32] "Debtors' Objection to the Motion to Dismiss JHO RE" refers to *Debtors' Objection to Creditor and Interested Party John H. Owoc's Emergency Motion to Dismiss Chapter 11 Bankruptcy of JHO Real Estate Investment, LLC* [ECF No. 1588].

[33] Owoc Objection, ¶ 7.

[34] Because the Debtors cannot be expected to guess at what objection Mr. Owoc may or may not have to the releases based on this conclusory sentence, Mr. Owoc's challenges to the releases, if any, should be deemed waived.  *See NLRB v. McClain of Ga., Inc.*, 138 F.3d 1418, 1422 (11th Cir. 1998) ("Issues raised in a perfunctory manner, without supporting arguments and citation to authorities, are generally deemed to be waived.").

discharges the Seller Related Parties . . ."[35] and "*each of the Selling Entities, on behalf of itself and each Seller Related Party . . .* hereby unconditionally and irrevocably and forever releases and discharges the Buyer Related Parties . . . ."[36]  The definitions of "Buyer," "MEC," "MBC," and Selling Entities" are each limited to a specific list of enumerated legal entities[37] — none of which includes Mr. Owoc or entities that he controls — and the definitions of "Buyer Related Party" and "Seller Related Party" both include the following language "but excluding, in all cases, any Excluded Parties."[38]

35.     Nothing in the Monster APA, the Settlement Agreement, or the Sale Order purports to release any direct claims that Mr. Owoc may have against any party.[39]  Mr. Owoc has no valid basis to object to the releases.

### D.     The Monster APA Has No Effect on Any Right of Subrogation That Mr. Owoc or Any of His Affiliated Non-Debtor Entities May Have.

36.     Mr. Owoc objects to the Monster APA "to the extent it seeks to eliminate or compromise any right of subrogation that Mr. Owoc or entities affiliated with him may have."[40] But the Monster APA says nothing about any subrogation rights that any party may someday assert against the Debtors.  If Mr. Owoc believes he is subrogated to the rights of another creditor — although he has provided no basis to date to believe that he has such a subrogation right[41] — and

---

[35] Monster APA § 7.16(a) (emphasis added).

[36] Monster APA § 7.16(b) (emphasis added).

[37] *See* Monster APA § 1.1.

[38] *Id.*  As noted above, the Excluded Parties are Mr. and Mrs. Owoc, their families, and non-Debtor legal entities that they control.  *See id.*

[39] To resolve Mr. Owoc's objection, the Debtors have offered to add language to the Sale Order clarifying that no releases contained in the Monster APA or Settlement Agreement release any direct claims that the Excluded Parties may have against any other party.  As of the time of filing, the Debtors have received no substantive response.

[40] Owoc Objection ¶ 8.

[41] The Debtors reserve their right to respond to any such claims if and when Mr. Owoc asserts them.

his claim is allowable by section 502(e)(1)(b) or 509(c) when asserted, then he will be entitled to assert that claim against the Debtors to the same extent as he would have had the Sale never occurred.[42]

## CONCLUSION

37.    The sale to Monster and the Settlement Agreement are both in the best interests of the Debtors' estates and easily meet the applicable legal standards.  Mr. Owoc's objection should be overruled and all others have been consensually resolved or continued.  For the reasons set forth above, the Court should approve the proposed Sale Transaction and Settlement and enter the Proposed Sale Order and Proposed 9019 Order.

[Remainder of page intentionally left blank.]

---

[42] To resolve Mr. Owoc's objection, the Debtors have offered to add language to the Sale Order clarifying that nothing in the Monster APA or the Settlement Agreement prevents any of the Excluded Parties from asserting any rights of subrogation against the Debtors, if any (while preserving all of the Debtors' defenses).  As of the time of filing, the Debtors have received no substantive response.

Dated:   July 10, 2023
          Miami, Florida

Respectfully submitted,

*/s/ Jordi Guso*

George A. Davis (admitted *pro hac vice*)
Yelizaveta L. Burton (admitted *pro hac vice*)
Jonathan J. Weichselbaum (admitted *pro hac vice*)
**LATHAM & WATKINS LLP**
1271 Avenue of the Americas
New York, NY 10020
Telephone:  (212) 906-1200
Email:  george.davis@lw.com
         liza.burton@lw.com
         jon.weichselbaum@lw.com

Jordi Guso
Florida Bar No. 0863580
Michael J. Niles
**BERGER SINGERMAN LLP**
1450 Brickell Avenue, Suite 1900
Miami, FL 33131
Telephone:  (305) 755-9500
Email:  jguso@bergersingerman.com
         mniles@bergersingerman.com

– and –

Andrew D. Sorkin (admitted *pro hac vice*)
**LATHAM & WATKINS LLP**
555 Eleventh Street, NW, Suite 1000
Washington, D.C. 2004
Telephone:  (202) 637-2200
Email:  andrew.sorkin@lw.com

– and –

Joseph C. Celentino[43] (admitted *pro hac vice*)
**LATHAM & WATKINS LLP**
330 North Wabash Avenue, Suite 2800
Chicago, IL 60611
Telephone: (312) 876-7700
Email:  joe.celentino@lw.com

*Co-Counsel for the Debtors*

---

[43]     Not admitted to practice in Illinois.  Admitted in New York.

**<u>Exhibit A</u>**

**Sale Objection Summary Chart**

**Sale Objection Summary Chart**

| Objecting Party [ECF No.] | Summary of Objection | Debtors' Response | Status |
|---|---|---|---|
| *Formal Objections[1]* | | | |
| Stellar Group Inc. ("Stellar") [ECF No. 1095] | • Debtors fail to demonstrate how the sale will satisfy Section 363(f). <br>• To the extent Stellar is not paid in full, their liens should attach to the proceeds of the sale. | • The Debtors will establish a reserve from the Sale Proceeds in an amount equal to Stellar's claims, to which Stellar's liens will attach, resolving Stellar's objection. *See* Sale Order ¶¶ 16–17. | **Resolved** |
| Webb & Gerritsen, Inc. ("Webb") [ECF No. 1094] | • Webb obtained a judgment against the Debtors in the amount of $2,445,098.10. <br>• The Debtors deposited $2,897,098.10 with the Clerk of the Circuit Court to stay Webb's collection of the judgment. <br>• Webb objects to the sale to the extent the Debtors' sale includes deposited funds. | • Webb's objection was resolved pursuant to that certain *Settlement Agreement* by and between Vital Pharmaceuticals, Inc. and Webb & Gerritsen, Inc. dated May 16, 2023. *See* ECF No. 1444. <br>• Webb's objection was withdrawn on June 21, 2023. *See* ECF No. 1505. | **Resolved** |

---

[1]  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in, as applicable, the Sale Order, or if not defined therein, the applicable objection.

US-DOCS\139743842.7

| Objecting Party [ECF No.] | Summary of Objection | Debtors' Response | Status |
|---|---|---|---|
| Ally Bank ("Ally") [ECF No. 1089] | • Ally objects to the Sale to extent the Debtors sell vehicles subject to Ally's liens without paying off such liens. | • The Sale Order provides that the Debtors will set aside funds from the Sale Proceeds to satisfy Ally's liens to the extent the Buyer is purchasing vehicles that are subject to Ally's liens. | **Resolved** |
| Federal Insurance Company, Great Northern Insurance Company, Chubb Custom Insurance Company, Vigilant Insurance Company ("Chubb") [ECF No. 1084] | • To the extent the Debtors' intend to assume and assign the Insurance Program, Chubb objects to the Sale asserting that in order to obtain the benefits of the Insurance Program, (a) the Debtors' must assume and assign the Insurance Program as a whole; (b) Chubb must consent to the assumption and assignment; and (c) successors must remain liable for Obligations under the Insurance Program. | • The Debtors have included agreed language in the Sale Order resolving Chubb's objection. *See* Sale Order ¶ 44. | **Resolved** |
| Monster Energy Company ("Monster") and Orange Bang, Inc. ("OBI") [ECF No. 1170] | • Monster and OBI object to the sale to the extent the Debtors attempt to assign the 5% Continuing Royalty to a potential Buyer without their consent.<br><br>• Alternatively, if the Court allows for the assignment of the 5% Continuing Royalty without the consent of Monster/OBI, the Buyer must continue to make the 5% Continuing Royalty payments. | • Monster and OBI agree that this objection is resolved. | **Resolved** |

-2-

| Objecting Party [ECF No.] | Summary of Objection | Debtors' Response | Status |
|---|---|---|---|
| John H. Owoc [ECF No. 1584] | • Mr. Owoc objects that the Debtors seek to sell property that does not belong to the Debtors.<br>• Mr. Owoc asserts that the assets of JHO Real Estate Investment, LLC should not be included in the sale because its chapter 11 petition was invalid.<br>• Mr. Owoc objects "to the extent the proposed releases fail to comply with applicable law."<br>• Mr. Owoc objects "to the extent [the Monster Agreement] seeks to eliminate or compromise any right of subrogation that Mr. Owoc or entities affiliated with him may have . . . ." | • Mr. Owoc's objections should be overruled for the reasons stated in the Debtors' Reply. | **Unresolved** |
| *Informal Objections* | | | |
| Broward County, Florida ("BC") | • BC objects to any sale to the extent (a) sale proceeds are not used to pay estimated taxes for 2023 or (b) the Debtors do not provide BC adequate protections for its liens. | • The Debtors have included agreed language in the Sale Order resolving BC's objection. *See* Sale Order ¶ 43. | **Resolved** |
| Kearny Mesa West (San Diego), LLC ("Kearny") | • Kearny requested the inclusion of certain language in the Sale Order regarding the potential assumption of unexpired leases and associated cure amounts. | • The Debtors have rejected Kearny's lease. | **Resolved** |

-3-

**<u>Exhibit B</u>**

**Cure Objection Summary Chart**

## Cure Objection Summary Chart

| Counterparty/Objector | Summary[1] | Status |
|---|---|---|
| *Formal Objections* | | |
| Southeast Cold Fill, LLC ("SCF")<br><br>[ECF No. 1021] | • SCF asserts that there is not assignable executory contract.<br><br>• To the extent there is an assignable contract, SCF objects to the proposed Cure Amount. | **Resolved — Removed from Cure Schedule** |
| VS Carbonics ("VS")<br><br>[ECF No. 1053] | • VS objects to the proposed Cure Amount. | **Resolved by agreement of parties.** *See* [ECF No. 1387] |
| SLBS Limited Partnership d/b/a Summit Distributing ("SLBS")<br><br>[ECF No. 1054] | • SLBS objects to the proposed Cure Amount and the absence of certain agreements on the Cure Schedule that must be assumed in connection with the parties' distribution agreements. | **Adjourned to a date to be determined** |
| Crown Cork & Seal USA, Inc. ("Crown")<br><br>[ECF No. 1060] | • Crown objects on the grounds that the Cure Schedule does not include an agreement that is a necessary component of the other Crown agreements listed on the Cure Schedule and must be assumed and assigned if the other Crown agreements are to be assumed and assigned. | **Resolved** |
| Archer Daniels Midland Company, ADM Wild Europe GmbH & Co. KG and Wild Flavors ("ADM")<br><br>[ECF No. 1040] | • ADM Objects to the proposed Cure Amount. | **Adjourned to a date to be determined** |

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in, as applicable, the Sale Order, or if not defined therein, the applicable objection.

| Counterparty/Objector | Summary[1] | Status |
|---|---|---|
| RXO Capacity Solutions, LLC ("RXO") [ECF No. 1035] | • RXO objects because (a) the incorrect party was listed on the Cure Schedule (*i.e.*, XPO Global Forwarding, Inc.), (b) the Cure Schedule does not accurately describe the contract (*e.g.*, Invoices for Transportation Services) that may be assumed and assigned, and (c) the proposed Cure Amount is incorrect. | **Resolved** |
| The Kroger Co. and 84.51 LLC ("Kroger") [ECF No. 1072] | • Kroger objects to the proposed Cure Amount.[2] | **Resolved — Removed from Cure Schedule** |
| LPUSA, LLC, d/b/a Network ("Lease Plan") [ECF No. 1074] | • Lease Plan objects to the proposed Cure Amount. | **Adjourned to a date to be determined** |
| American Express National Bank and AMEX TRS Co. Inc. ("AMEX") [ECF No. 1082] | • AMEX objects to proposed Cure Amount and the assumption and assignment of any revolving credit card agreement. | **Resolved — Removed from Cure Schedule** |
| Federal Insurance Company, Great Northern Insurance Company, Chubb Custom Insurance Company, Vigilant Insurance Company ("Chubb") [ECF No. 1084] | • Chubb Asserts that the Cure Schedule does not sufficiently describe the agreement that may be assumed/assigned.<br>• Chubb asserts that the insurance policy must be assumed in whole for any access to benefits. | **Resolved.** *See* Sale Order ¶ 44. |
| Doehler USA Inc. ("Doehler") [ECF No. 1087] | • Doehler objects to the proposed Cure Amount. | **Adjourned to a date to be determined** |

---

[2] The Debtors have been in contact with Kroger regarding certain contracts that were inadvertently omitted from the Cure Schedule. To the extent the Debtors file an amended Cure Schedule to include contracts with Kroger, any objection from Kroger will be taken up at a later hearing.

| Counterparty/Objector | Summary[1] | Status |
|---|---|---|
| Ally Bank ("Ally")<br>[ECF No. 1090] | • Ally objects to the assumption of the Retail Installment Sale Contract asserting that it is not executory. | **Adjourned to a date to be determined** |
| Refresco US Inc. and Refresco Iberia S.A.U. ("Refresco")<br>[ECF No. 1093] | • Refresco objects to the proposed Cure Amount listed for its contracts.<br>• Refresco asserts that the descriptions of its contracts should be modified. | **Resolved** |
| Kuckelman Torline Kirkland ("KTK")<br>[ECF No. 1096] | • KTK objects to the proposed Cure Amount. | **Resolved** |
| Ardagh Metal Packaging USA Corp ("Ardagh")<br>[ECF No 1101] | • Ardagh objects to the proposed Cure Amount. | **Adjourned to a date to be determined.** |
| Graphic Packaging International ("Graphic")<br>[ECF No. 1102] | • Graphic objects to the proposed Cure Amount. | **Adjourned to a date to be determined** |
| Stellar Group, Inc. ("Stellar")<br>[ECF No. 1105] | • Stellar objects to the proposed Cure Amount. | **Resolved — Removed from Cure Schedule** |
| Fona International, Inc. ("Fona")<br>[ECF No. 1106] | • Fona objects to the proposed Cure Amount. | **Adjourned to a date to be determined** |
| Prologis Targeted US Logistics Fund L.P. ("Prologis")<br>[ECF Nos. 1108, 1577] | • Prologis objects to the proposed Cure Amount. | **Adjourned to a date to be determined** |

| Counterparty/Objector | Summary[1] | Status |
|---|---|---|
| Duke Secured Financing 2009-IPAC ("Duke") [ECF No. 1109] | • Duke objects to proposed Cure Amount. | **Resolved — Lease has been rejected** |
| Ball Metal Beverage Container Corp. ("Ball Metal") [ECF No. 1110] | • Ball Metal asserts its contract may not be assumable, and in the event it is, objects to the proposed Cure Amount. | **Adjourned to a date to be determined** |
| Circle K Procurement Brands, Ltd. and Circle K Stores Inc. ("Circle K") [ECF Nos. 1100, 1172] | • Circle K objects to the proposed Cure Amount, and the omission of certain contracts from the Cure Schedule. | **Resolved — Removed from Cure Schedule** |
| *Informal Objections* | | |
| YRC Freight ("YRC") | • YRC asserts that there is not an assignable executory contract. | **Resolved — Removed from Cure Schedule** |
| National Distributor, Inc. ("ND") | • ND informally objects to proposed Cure Amount. | **Resolved** |
| Dogwood Propco FL, L.P. ("Dogwood") | • Dogwood informally objects to proposed Cure Amount. | **Resolved** |
| EVOX Holdings LLC 20351 Sheridan Street ("Sheridan") | • Sheridan asserts its assignable executory contract is omitted from Cure Schedule. | **Resolved** |
| CK Waitt Industrial, LLC ("CK Waitt") | • CK Waitt informally objects to proposed Cure Amount. | **Resolved** |
| United HealthCare Services ("UHS") | • UHS asserts its assignable executory contract is omitted from Cure Schedule. | **Resolved** |

| Counterparty/Objector | Summary[1] | Status |
|---|---|---|
| Total Quality Logistics ("TQL") | • TQL informally objects to proposed Cure Amount. | **Resolved** |
| Extra Space Storage ("Extra Space") | • Extra Space asserts its assignable executory contract is omitted from Cure Schedule. | **Resolved** |
| CI421 4747 W. Buckeye LLC ("CI421") | • CI421 asserts its assignable executory contract is omitted from Cure Schedule. | **Resolved** |
| American Bottling Company "(ABC") | • ABC asserts that there is not an assignable executory contract. | **Resolved — Removed from Cure Schedule** |
| Taro Patch Holding, LLC ("Taro") | • Taro informally objects to proposed Cure Amount. | **Resolved— Lease has been assumed** |
| Ketone Labs ("Ketone") | • Ketone asserts its assignable executory contract is omitted from Cure Schedule. | **Resolved** |
| Seko Worldwide ("Seko") | • YRC asserts that there is not an assignable executory contract. | **Resolved — Removed from Cure Schedule** |
| Icon Owner Pool ("Icon") | • Icon asserts that there is not an assignable executory contract. | **Resolved — Removed from Cure Schedule** |
| Givaudian Flavors Corporation ("Givaudian") | • Givaudian asserts that there is not an assignable executory contract. | **Resolved — Removed from Cure Schedule** |
| Krones Inc. ("Krones") | • Krones asserts that the Cure schedule includes contracts that are not assignable executory contracts.<br>• Krones objects to the assumption and assignment of their contracts absent payment of certain post-petition amounts. | **Adjourned to a date to be determined** |

**Exhibit C**

**Adequate Assurance Objection Summary Chart**

**Adequate Assurance Objection Summary Chart**

| Counterparty/Objector | Summary[1] | Status |
|---|---|---|
| Archer Daniels Midland Company, ADM Wild Europe GmbH & Co. KG and Wild Flavors ("ADM") [ECF No. 1040] | • ADM reserved rights to object to the assumption and assignment of their contracts to the extent ADM does not receive adequate assurance of future performance. | **Closed**; ADM did not ultimately file an adequate assurance objection. |
| The Kroger Co. and 84.51 LLC ("Kroger") [ECF No. 1072] | • Kroger reserved rights to object to the assumption and assignment of their contracts to the extent Kroger does not receive adequate assurance of future performance | **Closed**; Kroger did not ultimately file an adequate assurance objection. |
| Federal Insurance Company, Great Northern Insurance Company, Chubb Custom Insurance Company, Vigilant Insurance Company ("Chubb") [ECF No. 1084] | • Chubb reserved rights to object to any assumption and assignment of the Policies. | **Resolved**; Sale Order includes agreed upon language. *See* Sale Order ¶ 44 |
| Doehler USA Inc. ("Doehler") [ECF No. 1087] | • Doehler reserved rights to object to the assumption and assignment of their contracts to the extent Doehler does not receive adequate assurance of future performance. | **Closed**; Doehler did not ultimately file an adequate assurance objection. |
| Refresco US Inc. and Refresco Iberia S.A.U. ("Refresco") [ECF No. 1093] | • Refresco reserved rights to object to the assumption and assignment of their contracts to the extent Refresco does not receive adequate assurance of future performance. | **Closed**; Refresco did not ultimately file an adequate assurance objection. |

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in, as applicable, the Reply, or if not defined therein, the applicable objection.

| Counterparty/Objector | Summary[1] | Status |
|---|---|---|
| Kuckelman Torline Kirkland ("KTK") [ECF No. 1096] | • KTK reserved rights to object to the assumption and assignment of their contracts to the extent KTK does not receive adequate assurance of future performance. | **Closed**; KTK did not ultimately file an adequate assurance objection. |
| Premier Distributing Company ("Premier") [ECF No. 1104 & 1581] | • Premier objects to the assumption and assignment of its contracts due to not receiving adequate assurance information from the Successful Bidder. | **Adjourned to a date to be determined.** |
| Fona International, Inc. ("Fona") [ECF No. 1106] | • Fona reserved rights to object to the assumption and assignment of their contracts to the extent Fona does not receive adequate assurance of future performance. | **Closed**; Fona did not ultimately file an adequate assurance objection. |
| Circle K Procurement Brands, Ltd. and Circle K Stores Inc. ("Circle K") [ECF No. 1172] | • Circle K reserved all rights to supplement the objection to the extent that Circle K is not provided with satisfactory adequate assurance. | **Resolved**; objection withdrawn. *See* ECF No. 1492. |
| U.S. Bank National Association d/b/a U.S. Bank Equipment Finance ("U.S. Bank") [ECF No. 1415] | • U.S. Bank seeks adequate assurance information to the extent their contracts are being assumed and assigned. | **Adjourned to a date to be determined.** |