**<u>DEBTORS EXHIBIT 50</u>**

## FORBEARANCE AGREEMENT

THIS FORBEARANCE AGREEMENT (this "Agreement"), dated as of March 11, 2022, is entered into by and among VITAL PHARMACEUTICALS, INC., a Florida corporation (the "Borrower"), the Guarantors party hereto, the Lenders party hereto, TRUIST BANK, in its capacity as administrative agent for the Lenders (the "Administrative Agent"), Swingline Lender, and Issuing Bank, and JOHN H. OWOC, an individual resident of the State of Florida (the "Owner Pledgor").

### RECITALS

WHEREAS, the Borrower, the Guarantors from time to time party thereto, the Lenders from time to time party thereto, the Administrative Agent, the Swingline Lender, and the Issuing Bank are parties to that certain Amended and Restated Revolving Credit and Term Loan Agreement dated as of August 14, 2020 (as amended by that certain First Amendment to Amended and Restated Revolving Credit and Term Loan Agreement dated as of June 15, 2021, that certain Second Amendment to Amended and Restated Revolving Credit and Term Loan Agreement dated as of June 30, 2021, and that certain Third Amendment to Amended and Restated Revolving Credit and Term Loan Agreement dated as of December 31, 2021, and as further amended, modified, extended, restated, replaced, or supplemented in writing from time to time, the "Credit Agreement").

WHEREAS, pursuant to the Owner Pledge Agreement, the Owner Pledgor has pledged certain assets to the Administrative Agent to secure the Secured Obligations (as defined therein).

WHEREAS, the Loan Parties have informed the Administrative Agent and the Lenders that certain Events of Default have occurred and are continuing as described in Part A of Schedule 1 attached hereto (collectively, the "Existing Events of Default").

WHEREAS, the Loan Parties have also informed the Administrative Agent and the Lenders that certain Defaults and Events of Default are anticipated to occur as described in Part B of Schedule 1 attached hereto (collectively, the "Anticipated Events of Default" and together with the Existing Events of Default, the "Acknowledged Events of Default").

WHEREAS, the Loan Parties and the Owner Pledgor have requested that the Administrative Agent and the Lenders agree to forbear from exercising their rights and remedies arising under the Loan Documents and applicable Laws as a result of the Acknowledged Events of Default during the Forbearance Period.

WHEREAS, the Administrative Agent and the Lenders have agreed to do so, but only pursuant to the terms and conditions set forth herein.

### AGREEMENT

NOW, THEREFORE, in consideration of these premises and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

1.    Definitions. Capitalized terms used herein but not otherwise defined herein shall have the meanings provided to such terms in the Credit Agreement. As used in this Agreement, the following terms shall have the meanings set forth below:

"Acknowledged Events of Default" has the meaning set forth in the Recitals.

CHAR2\2544963v6

CONFIDENTIAL

"Administrative Agent" has the meaning set forth in the preamble to this Agreement.

"Administrative Agent's Financial Advisor" has the meaning set forth in Section 12.

"Anticipated Events of Default" has the meaning set forth in the Recitals.

"Borrower" has the meaning set forth in the preamble to this Agreement.

"Capital Raise Transaction" means one transaction or a series of transactions in the form of a sale, financing, issuance of Capital Stock, other liquidity generating event or some combination thereof that is intended to generate proceeds for the payment of the Litigation Obligations.

"Cash Flow Forecast" has the meaning set forth in Section 9(a).

"Consenting Lender" and "Consenting Lenders" have the meanings set forth in Section 4.

"Credit Agreement" has the meaning set forth in the Recitals.

"Effective Date" has the meaning set forth in Section 16.

"Enterprise Valuator" has the meaning set forth in Section 13(a).

"Equity Contribution" has the meaning set forth in Section 6.

"Equity Contribution Amount" means an amount equal to (a) $11,000,000 less (b) the amount of any equity contribution by the Owner Pledgor to the Borrower made after the Effective Date in consideration of the issuance of Capital Stock in the Borrower not constituting Disqualified Capital Stock for use by the Borrower for its working capital and other general corporate purposes.

"Existing Events of Default" has the meaning set forth in the Recitals.

"Forbearance Fee" has the meaning set forth in Section 4.

"Forbearance Period" means the period from the Effective Date to (but excluding) the earliest date that a Forbearance Termination Event occurs.

"Forbearance Termination Event" means the earliest of the following to occur: (a) any Event of Default other than an Event of Default constituting an Acknowledged Event of Default; (b) any Default other than a Default constituting an Acknowledged Event of Default that continues unremedied for a period of seven (7) days after written (which may be by email) notice thereof by the Administrative Agent to the Borrower; (c) the breach by any Loan Party or the Owner Pledgor of any covenant or provision of this Agreement; (d) the Borrower's failure to challenge any final award or judgment against the Borrower by a Commercial Arbitration Tribunal of the America Arbitration Association in *Orange Bang, Inc. and Monster Energy Company v. Vital Pharmaceuticals, Inc d/b/a VPX Sports* (Case No. 01-20-0005-6081) (such proceeding, the "Orange Bang Arbitration") within the time legally permitted, including, but not limited to such challenges as may be available by way of vacatur, appeal or any other means; (e) the complete and final exhaustion of all of the Borrower's rights to challenge the award or judgment, including but not limited to challenges to the finality of the award or judgment, against the Borrower in the Orange Bang Arbitration; and (f) 11:59 p.m. (Eastern time) on June 17, 2022.

CONFIDENTIAL                                                                    VPX-JHO0000000175

"IB Scope" has the meaning set forth in Section 7(a).

"Investment Banker" has the meaning set forth in Section 7(a).

"Litigation Disclosure Summary" has the meaning set forth in Section 9(b).

"Litigation Obligations" means, collectively, the obligations arising, or reasonably expected (as determined by the Loan Parties in good faith after consultation with the Administrative Agent) to arise, under or in respect of any final, non-appealable judgment against the Borrower in favor of (a) PepsiCo, Inc. as a result of the issuance of a final award in the arbitration styled *PepsiCo, Inc. v. Vital Pharmaceuticals, Inc. d/b/a VPX*, Case No 01-20-0015-8060, pending before a Commercial Arbitration Tribunal of the American Arbitration Association, (b) Orange Bang, Inc and/or Monster Energy Company as a result of the issuance of a final award in the Orange Bang Arbitration, and (c) Monster Energy Company in the litigation styled *Monster Energy Company v. Vital Pharmaceuticals, Inc. d/b/a VPX Sports and John H. Owoc a.k.a. Jack Owoc*, Case No. 5:18-cv-1882, pending in the U.S. District Court for the Central District of California.

"Loan Parties' Financial Advisor" has the meaning set forth in Section 8.

"Loan Parties' Financial Advisor Scope" has the meaning set forth in Section 8.

"Orange Bang Arbitration" has the meaning set forth in the definition of "Forbearance Termination Event" in this Section 1.

"Owner Pledgor" has the meaning set forth in the preamble to this Agreement.

"Released Party" has the meaning set forth in Section 19.

"Updated Appraisals" has the meaning set forth in Section 13(b).

2.      Estoppel. Each Loan Party and the Owner Pledgor each hereby acknowledges and agrees that, as of the close of business on March 10, 2022, (a) the aggregate outstanding principal amount of the Revolving Loans was $180,000,000.00, (b) the aggregate outstanding principal amount of the Term Loans was $109,975,218.45, (c) the aggregate outstanding principal amount of the Swingline Loans was $0.00 and (d) the LC Exposure was $0.00, each of which constitutes a valid and subsisting obligation of each Loan Party, jointly and severally, owed to the Lenders that is not subject to any credits, offsets, defenses, claims, counterclaims, or adjustments of any kind.

3.      Consent, Acknowledgement and Reaffirmation. Each Loan Party and the Owner Pledgor each hereby: (a) acknowledges that (i) the Existing Events of Default have occurred and have not been waived, (ii) the Anticipated Events of Default are expected to occur and have not been waived, (iii) no Acknowledged Event of Default is being waived pursuant to this Agreement, and (iv) Default Interest that has accrued on all Obligations is not being waived pursuant to this Agreement and is due and payable in the ordinary course pursuant to the Credit Agreement; (b) acknowledges and consents to this Agreement and the terms and provisions hereof; (c) reaffirms the covenants and agreements contained in each Loan Document to which such Person is party, including, in each case, as such covenants and agreements may be modified by this Agreement and the transactions contemplated hereby; (d) reaffirms that each of the Liens created and granted in or pursuant to the Loan Documents in favor of the Administrative Agent for the benefit of the holders of the Obligations is valid and subsisting, and acknowledges and agrees that this Agreement shall in no manner impair or otherwise adversely affect such Liens; and (e) confirms that each

CONFIDENTIAL

Loan Document to which such Person is a party is and shall continue to be in full force and effect and the same is hereby ratified and confirmed in all respects.

4. <u>Forbearance Fee</u>. In consideration of the written consent of the Lenders that have delivered a duly executed signature page to this Agreement to the Administrative Agent by 12:00 p.m. (Eastern time) on the Effective Date (or such later time as may be agreed to by the Borrower and the Administrative Agent) (each a "<u>Consenting Lender</u>" and collectively, the "<u>Consenting Lenders</u>"), the Borrower shall pay to the Administrative Agent, for the account of each Consenting Lender, a forbearance fee (the "<u>Forbearance Fee</u>") in an amount in Dollars equal to ten basis points (0.10%) of the sum of (a) the outstanding principal balance of the Term Loans as of the Effective Date held by the Consenting Lenders plus (b) the amount of the Revolving Commitments as of the Effective Date held by the Consenting Lenders. The Forbearance Fee shall be fully earned and non-refundable as of the Effective Date and not applied to reduce the Obligations.

5. <u>Forbearance</u>.

(a) *Forbearance*. Subject to the terms and conditions set forth herein, the Administrative Agent and the Lenders shall, during the Forbearance Period, forbear from exercising any and all of the rights and remedies available to them under the Loan Documents and applicable Laws, but only to the extent that such rights and remedies arise exclusively as a result of the existence of the Acknowledged Events of Default; <u>provided, however,</u> that (i) the Administrative Agent and the Lenders shall be free to exercise any or all of their rights and remedies arising on account of the Acknowledged Events of Default at any time upon or after the occurrence of a Forbearance Termination Event and (ii) the Acknowledged Events of Default shall continue to exist and apply for all purposes and provisions under the Loan Documents, including those provisions, conditions, requirements, rights, and obligations that are dependent upon the absence of any Default or Event of Default. For the avoidance of doubt, during the Forbearance Period: (A) Default Interest shall continue to accrue on all Obligations; (B) the Lenders and the Issuing Bank (as applicable) shall have no obligation to make, additional Revolving Loans, additional Swingline Loans, or any other Credit Event; and (C) no Borrowing may be converted into, or continued as, a Eurodollar Borrowing.

(b) *Forbearance Period*. Nothing set forth herein or contemplated hereby is intended to constitute an agreement by the Administrative Agent or any Lender to forbear from exercising any of the rights or remedies available to the Administrative Agent and the Lenders under the Loan Documents or applicable Laws (all of which rights and remedies are hereby expressly reserved by the Administrative Agent and the Lenders) upon or after the occurrence of a Forbearance Termination Event.

6. <u>Post-Closing Equity Contribution</u>. Within five (5) Business Days of the Owner Pledgor's receipt of any refund of Taxes from the IRS: (a) the Borrower shall receive cash in an aggregate amount equal to the Equity Contribution Amount in consideration of the issuance of Capital Stock in the Borrower not constituting Disqualified Capital Stock for use by the Borrower for its working capital and other general corporate purposes (the "<u>Equity Contribution</u>"); and (b) the Borrower shall deliver evidence reasonably satisfactory to the Administrative Agent that the Equity Contribution has been made. Notwithstanding the requirements of Section 2.12 of the Credit Agreement to the contrary, during the Forbearance Period, the Borrower shall not be required to make a mandatory prepayment in respect of the Net Cash Proceeds from the Capital Stock issued in connection with the Equity Contribution or any other similar equity contribution by the Owner Pledgor made after the Effective Date to the extent that the aggregate amount of such Net Cash Proceeds does not exceed the Equity Contribution Amount during such period.

CONFIDENTIAL                                                                                              VPX-JHO0000000177

7.    <u>Investment Banking Process</u>.

(a)    *Investment Banker.* By no later than April 11, 2022, the Loan Parties shall engage, and at all times thereafter during the Forbearance Period the Loan Parties shall continue to retain, a recognized third-party investment banker (the "<u>Investment Banker</u>") reasonably acceptable to the Required Lenders and the Loan Parties. The Loan Parties shall be responsible for the fees and expenses incurred in connection with the engagement of the Investment Banker. The scope of the Investment Banker's engagement shall relate to a Capital Raise Transaction and be on terms reasonably acceptable to the Required Lenders and the Loan Parties (the "<u>IB Scope</u>"). The Investment Banker shall report to the Chief Executive Officer of the Borrower and work with management for the purpose of carrying out the IB Scope. Any material change, limitation, or revision to the IB Scope without the prior written consent of the Required Lenders, which consent shall not be unreasonably withheld, conditioned, or delayed, shall constitute an immediate Forbearance Termination Event; <u>provided</u>, that, notwithstanding the foregoing the Loan Parties may broaden the IB Scope without the consent of the Required Lenders. During the Forbearance Period, the Loan Parties shall be prohibited from terminating the Investment Banker's engagement without the prior written consent of the Required Lenders, which shall not be unreasonably withheld, conditioned, or delayed and shall not be required if the Investment Banker is replaced with another Investment Banker whose identity and scope of engagement are reasonably acceptable to the Required Lenders within five (5) Business Days of such termination.

(b)    *Investment Banking Strategic Assessment.* On or prior to the earlier to occur of (i) the date that is forty-five (45) days after the Loan Parties' engagement of the Investment Banker and (ii) May 25, 2022, the Loan Parties shall deliver to the Administrative Agent and the Lenders a written analysis and assessment of a Capital Raise Transaction the proceeds of which shall be used, at least in part, to satisfy the Litigation Obligations, which assessment shall be prepared in consultation with the Investment Banker and include an estimated timeline and milestones.

8.    <u>Loan Parties' Financial Advisor</u>. By no later than April 11, 2022, the Loan Parties shall engage, and at all times thereafter during the Forbearance Period the Loan Parties shall continue to retain, a financial advisor (the "<u>Loan Parties' Financial Advisor</u>") reasonably acceptable to the Required Lenders and the Loan Parties. The Loan Parties shall be responsible for the fees and expenses incurred in connection with the engagement of the Loan Parties' Financial Advisor. The scope of the Loan Parties' Financial Advisor's engagement shall be to assist the Loan Parties with financial performance and reporting and be on terms reasonably acceptable to the Required Lenders (the "<u>Loan Parties' Financial Advisor Scope</u>"). The Loan Parties' Financial Advisor shall report to the Chief Executive Officer of the Borrower and work with management for the purpose of carrying out the Loan Parties' Financial Advisor Scope. Any material change, limitation, or revision to the Loan Parties' Financial Advisor Scope without the prior written consent of the Required Lenders, which consent shall not be unreasonably withheld, conditioned, or delayed, shall constitute an immediate Forbearance Termination Event; <u>provided</u>, that, notwithstanding the foregoing the Loan Parties may broaden the Loan Parties' Financial Advisor Scope without the consent of the Required Lenders. During the Forbearance Period, the Loan Parties shall be prohibited from terminating the Loan Parties' Financial Advisor's engagement without the prior written consent of the Required Lenders, which shall not be unreasonably withheld, conditioned, or delayed and shall not be required if the Loan Parties' Financial Advisor is replaced with another Loan Parties' Financial Advisor whose identity and scope of engagement are reasonably acceptable to the Required Lenders within five (5) Business Days of such termination. Notwithstanding anything in this Agreement to the contrary, the Loan Parties may retain one institution reasonably acceptable to the Required Lenders to serve as both the Loan Parties' Financial Advisor and the Investment Banker, in each case in accordance with the other requirements described in this Agreement.

CONFIDENTIAL                                                                                                    VPX-JHO0000000178

9.    Additional Reporting During Forbearance Period. In addition to all existing reporting requirements under the Credit Agreement and the other Loan Documents, during the Forbearance Period, the Loan Parties shall deliver to the Administrative Agent, for distribution to the Lenders, in each case in form and detail reasonably satisfactory to the Administrative Agent:

(a)    every four weeks beginning on March 17, 2022, and every fourth Thursday following this date during the Forbearance Period, a rolling 13-week forecast of cash flows for the Loan Parties and their Subsidiaries on a consolidated basis as of the last day of the immediately preceding week (each a "Cash Flow Forecast");

(b)    contemporaneously with the delivery of each Cash Flow Forecast, a written summary of every litigation or arbitration to which any Loan Party or the Owner Pledgor is party (each a "Litigation Disclosure Summary"); provided, that (i) the Litigation Disclosure Summary shall not be required to contain any information that the Loan Parties believe in good faith is subject to the attorney-client privilege and (ii) any estimate of liabilities or other projected outcomes set forth in the Litigation Disclosure Summary that is made in good faith shall be deemed a projection and not be the basis for any breach of any representation or warranty set forth in the Loan Documents;

(c)    every Thursday beginning on March 24, 2022, (i) a variance report showing a comparison of the previous week's actual cash flows for the Loan Parties and their Subsidiaries (on a consolidated basis) to the most recently previously delivered Cash Flow Forecast in both dollar and percentage units, together with a written explanation of any variance (positive or negative) for any line item that exceeds ten percent (10%), and (ii) a report of the previous week's sales volume, itemized by brand; and

(d)    as soon as available, but in any event within thirty (30) days after the end of each calendar month, commencing with the month ending February 28, 2022, an unaudited combined balance sheet of the Loan Parties and Subsidiaries as of the end of such calendar month, and the related unaudited combined statements of income or operations, changes in stockholders' equity and cash flows of the Loan Parties and Subsidiaries for such calendar month and the then elapsed portion of such Fiscal Year, all in reasonable detail and prepared in accordance with GAAP, such combined statements to be certified by the chief executive officer, chief financial officer, treasurer or controller (or a Responsible Officer of substantially equivalent title and authority) of the Borrower as presenting fairly the financial condition, results of operations, stockholders' equity and cash flows of the Loan Parties and Subsidiaries in accordance with GAAP, and including management discussion and analysis of operating results, profitability trends and customer retention, subject only to normal year-end audit adjustments and the absence of footnotes and, in the case of such combined statements, certified by the chief executive officer, chief financial officer, treasurer or controller (or a Responsible Officer of substantially equivalent title and authority) of the Borrower, to the effect that such statements are fairly stated in all material respects when considered in relation to the combined financial statements of the Loan Parties and Subsidiaries.

10.    Periodic Updates. During the Forbearance Period, the Loan Parties shall make certain representatives of the Loan Parties and their advisors (including, without limitation, the Investment Banker and the Loan Parties' Financial Advisor, in each case once engaged), as reasonably requested by the Administrative Agent, available to the Administrative Agent and the Lenders for periodic conference calls

to be held on a bi-weekly basis commencing the week of March 14, 2022, or more frequently as reasonably requested by the Administrative Agent.

11.     Post-Closing Matters. The Loan Parties shall be required to deliver to the Administrative Agent, within forty-five (45) days after the Effective Date (as such date may be extended by the Administrative Agent in its sole discretion): (a) a completed perfection certificate (the form of which the Administrative Agent shall provide to the Borrower) identifying all assets of the Loan Parties, subject to the materiality thresholds and exclusions set forth in the Loan Documents, and any matters that would reasonably be expected to impact the perfection or priority of the Liens of the Administrative Agent; and (b) any Controlled Account Agreements as may now be required to be delivered pursuant to Section 5.11(b) of the Credit Agreement.

12.     Administrative Agent's Financial Advisor. The Administrative Agent, through its counsel, may retain a financial advisor (the "Administrative Agent's Financial Advisor") to monitor the Loan Parties' financial and operational performance. During the Forbearance Period, and to the extent the Administrative Agent retains the Administrative Agent's Financial Advisor, the Loan Parties shall cooperate in good faith with the Administrative Agent's Financial Advisor and provide the Administrative Agent's Financial Advisor with reasonable access to the Loan Parties' facilities, books and records, officers and consultants (including, without limitation, the Investment Banker and the Loan Parties' Financial Advisor) and to any information reasonably necessary for the Administrative Agent's Financial Advisor to perform the services within the scope of its engagement.

13.     Valuations, Appraisals.

        (a)     *Enterprise Valuation.* If the Administrative Agent, or counsel to the Administrative Agent, engages an independent contractor to prepare and provide, exclusively for the benefit of the Administrative Agent and the Lenders, an enterprise valuation of the Loan Parties (the "Enterprise Valuator"), then the Loan Parties shall cooperate in good faith with the Enterprise Valuator and provide the Enterprise Valuator with reasonable access, at reasonable times and upon reasonable advance written (which may be by email) notice, to the Loan Parties' facilities, books and records, officers and consultants and any information reasonably necessary for the Enterprise Valuator to perform the services within the scope of its engagement.

        (b)     *Appraisals.* The Loan Parties shall permit the representatives and independent contractors of the Administrative Agent to prepare and provide, exclusively for the benefit of the Administrative Agent and the Lenders, one or more appraisals of the Mortgaged Property and any other Collateral (the "Updated Appraisals"). The Loan Parties shall cooperate in good faith in connection with the Updated Appraisals and provide reasonable access, at reasonable times and upon reasonable written (which may be by email) advance notice, to the Mortgaged Properties and the other Collateral.

14.     Fees and Expenses. Without in any way limiting the obligations of the Loan Parties and the Owner Pledgor under the Loan Documents, including without limitation Section 11.3 of the Credit Agreement, the Loan Parties shall, within ten (10) Business Days after written demand therefor, reimburse the Administrative Agent for all of its documented and invoiced out-of-pocket fees and expenses reasonably incurred in connection with this Agreement, the Credit Agreement, and the other Loan Documents (including, without limitation, (a) the documented and invoiced fees and out-of-pocket expenses of (i) Moore & Van Allen PLLC, as counsel to the Administrative Agent, (ii) the Administrative Agent's Financial Advisor, and (iii) the Enterprise Valuator and (b) the documented out-of-pocket fees and expenses incurred in connection with the Updated Appraisals).

CONFIDENTIAL                                                                                                    VPX-JHO0000000180

15.    Commercial Tort Claims (Schedule to Security Agreement). Schedule 3(j) of the Security Agreement is hereby amended and restated to read in the form of Schedule 2 attached hereto.

16.    Conditions Precedent. This Agreement shall be effective on the date (the "Effective Date") that each of the following conditions have been satisfied as determined by the Administrative Agent in its reasonable discretion, or waived by the Required Lenders in their sole discretion:

(a)    *Executed Agreement*. The Administrative Agent shall have received a copy of this Agreement duly executed by each of the Loan Parties, the Owner Pledgor, the Lenders constituting the Required Lenders, and the Administrative Agent.

(b)    *Forbearance Fee*. The Administrative Agent shall have received payment of the Forbearance Fee for the ratable benefit of the Consenting Lenders.

(c)    *Litigation Disclosure Summary*. The Administrative Agent shall have received the initial Litigation Disclosure Summary.

(d)    *Intellectual Property Matters*. The Administrative Agent shall have received such information, filings with the U.S. Copyright Office or the U.S. Patent and Trademark Office, and other documents as the Administrative Agent may reasonably request regarding intellectual property constituting Collateral.

(e)    *Officer's Certificate, Authorizing Resolutions, and Incumbencies.* The Administrative Agent shall have received certificates of resolutions or other action, incumbency certificates, and/or other certificates of the Secretary, Assistant Secretary, or other appropriate officer (or member or manager, as the case may be, in the case of limited liability companies) acceptable to the Administrative Agent, of each Loan Party, dated as of the Effective Date, addressing the matters set forth in Section 3.1(b)(i) of the Credit Agreement, in each case updated to reflect the transactions contemplated by this Agreement and in form reasonably satisfactory to the Administrative Agent; provided, that to the extent none of the foregoing has changed since they were most recently delivered to the Administrative Agent for a Loan Party, then such Loan Party may deliver a customary, short-form "bring down" certificate.

(f)    *Administrative Agent's Fees and Expenses*. The Administrative Agent shall have received: (i) all reasonable, documented, and invoiced fees payable to the Administrative Agent or any Affiliate thereof as agreed between the Administrative Agent and the Borrower; and (ii) reimbursement from the Loan Parties for all documented and invoiced out-of-pocket fees and expenses reasonably incurred in connection with this Agreement, the Credit Agreement, and the other Loan Documents (including, without limitation, the documented and invoiced fees and out-of-pocket expenses of Moore & Van Allen PLLC, as counsel to the Administrative Agent) through the Effective Date to the extent invoiced to the Loan Parties at least one (1) Business Day prior to the Effective Date, except to the extent otherwise agreed by the Administrative Agent.

17.    Representations of Loan Parties. Each Loan Party represents and warrants to the Administrative Agent and the Lenders as follows:

(a)    Such Loan Party has the requisite power and authority and has taken all necessary action to authorize the execution, delivery, and performance of this Agreement in accordance with its terms.

CONFIDENTIAL    VPX-JHO0000000181

(b)     This Agreement has been duly executed and delivered by such Loan Party and the Owner Pledgor and is the legally valid and binding obligation of such Person, enforceable against such Person in accordance with its respective terms, except as may be limited by Debtor Relief Laws or by equitable principles relating to enforceability.

(c)     The execution, delivery, and performance by such Loan Party and the Owner Pledgor of this Agreement and the consummation of the transactions contemplated by this Agreement do not and will not require, as a condition to the effectiveness thereof, any registration with, consent, or approval of, or notice to, or other action to, with, or by, any Governmental Authority except for (i) filings necessary to perfect, and/or maintain the perfection of, the Liens created under the Loan Documents or (ii) filings, recordings, or consents where failure to obtain or make could not reasonably be expected to have a Material Adverse Effect.

(d)     After giving effect to this Agreement: (i) the representations and warranties of the Loan Parties and the Owner Pledgor set forth in the Loan Documents (other than the representations and warranties set forth in Section 4.6 (solely as it relates to the Existing Events of Default) of the Credit Agreement) are true and correct in all material respects (but without duplication of any existing materiality qualifiers) on and as of the Effective Date to the same extent as though made on and as of such date except to the extent such representations and warranties specifically relate to an earlier date (in which case they are true, accurate and complete in all material respects (but without duplication of any existing materiality qualifiers) as of such earlier date); and (ii) no Default or Event of Default (other than any Existing Event of Default) exists on and as of the Effective Date.

(e)     The parties executing this Agreement as Guarantors include each Person that is required pursuant to Section 5.13 of the Credit Agreement to become a Loan Party as of the date hereof.

(f)     (i) the Owner Pledgor, and not any Loan Party, is the Person exclusively entitled to receive any refund of Taxes from the IRS in respect of the Loan Parties' income for the Fiscal Year ended on or about December 31, 2020; (ii) the Owner Pledgor and the Loan Parties, as the case may be, have filed with the IRS all documents necessary to obtain such refund of Taxes from the IRS; and (iii) the aggregate amount of such refund of Taxes from the IRS that the Owner Pledgor seeks and expects to receive, but which remains subject to the IRS' review and approval, is approximately $14,700,000.

If any representation and warranty set forth in this Section is incorrect in any material respect, then such incorrect representation and warranty shall constitute a new and immediate Forbearance Termination Event without regard to any otherwise applicable notice, cure, or grace period.

18.     Representations of the Owner Pledgor. The Owner Pledgor represents and warrants to the Administrative Agent and the Lenders as follows:

(a)     This Agreement has been duly executed and delivered by each Loan Party and the Owner Pledgor and is the legally valid and binding obligation of such Person, enforceable against such Person in accordance with its respective terms, except as may be limited by Debtor Relief Laws or by equitable principles relating to enforceability.

(b)     He is (i) a natural person, (ii) of the age of majority, (iii) a citizen of the United States, (iv) a resident of the State of Florida, (v) legally competent to enter into this Agreement, and (vi) sophisticated in business matters.

CONFIDENTIAL                                                                                                                                 VPX-JHO0000000182

(c)    (i) He, and not any Loan Party, is the Person exclusively entitled to receive any refund of Taxes from the IRS in respect of the Loan Parties' income for the Fiscal Year ended on or about December 31, 2020; (ii) he and the Loan Parties, as the case may be, have filed with the IRS all documents necessary to obtain such refund of Taxes from the IRS; and (iii) the aggregate amount of such refund of Taxes from the IRS that he seeks and expects to receive, but which remains subject to the IRS' review and approval, is approximately $14,700,000.

If any representation and warranty set forth in this Section is incorrect in any material respect, then such incorrect representation and warranty shall constitute a new and immediate Forbearance Termination Event without regard to any otherwise applicable notice, cure, or grace period.

19.    Release. Each Loan Party and the Owner Pledgor each hereby releases and forever discharges the Administrative Agent, the Swingline Lender, the Issuing Bank, each Lender, and each of their respective predecessors, successors, assigns, and Related Parties (each and every of the foregoing, a "Released Party") from any and all claims, counterclaims, demands, damages, debts, suits, liabilities, actions, and causes of action of any nature whatsoever, in each case through the Effective Date, whether arising at law or in equity, whether known or unknown, whether liability be direct or indirect, whether liquidated or unliquidated, whether absolute or contingent, whether foreseen or unforeseen, and whether or not heretofore asserted, which any Loan Party or the Owner Pledgor may have or claim to have against any Released Party.

20.    No Actions, Claims. Each Loan Party and the Owner Pledgor each hereby represents, warrants, acknowledges, and confirms that such Person has no knowledge of any action, cause of action, claim, demand, damage, or liability of whatever kind or nature, in law or in equity, against any Released Party arising from any action by such Person, or failure of such Person to act, in any way on or prior to the date hereof.

21.    Incorporation of Agreement. Except as specifically modified herein, the terms of the Loan Documents shall remain in full force and effect. The execution, delivery, and effectiveness of this Agreement shall not operate as a waiver of any right, power, or remedy of the Administrative Agent or the Lenders under the Loan Documents or constitute a waiver or amendment of any provision of the Loan Documents. The breach of any covenant or provision of this Agreement shall constitute an immediate Forbearance Termination Event and this Agreement shall constitute a Loan Document.

22.    No Third-Party Beneficiaries. This Agreement and the rights and benefits hereof shall inure to the benefit of each of the parties hereto and their respective successors and assigns, and the obligations hereof shall be binding upon the Loan Parties and the Owner Pledgor (as the case may be). No other Person shall have or be entitled to assert rights or benefits under this Agreement, other than any non-party Released Party with respect to Section 19 and Section 20 hereof (which Persons are intended to be third party beneficiaries of this Agreement).

23.    Entirety. This Agreement, the Credit Agreement, and the other Loan Documents embody the entire agreement among the parties hereto and supersede all prior agreements and understandings, oral or written, if any, relating to the subject matter hereof. This Agreement, the Credit Agreement, and the other Loan Documents represent the final agreement between the parties and may not be contradicted by evidence of prior, contemporaneous, or subsequent oral agreements of the parties.

24.    Counterparts. This Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. Delivery of an executed counterpart of a signature page of this

CONFIDENTIAL                                                                    VPX-JHO0000000183

Agreement by telecopy or other electronic imaging means (*e.g.*, "pdf" or "tif" format) shall be effective as delivery of a manually executed counterpart of this Agreement.

25.    <u>Governing Law; Jurisdiction; Consent to Service of Process; Waiver of Jury Trial</u>. The governing law, jurisdiction, consent to service of process, and waiver of jury trial provisions contained in Sections 11.5 and 11.6 of the Credit Agreement are hereby incorporated by reference *mutatis mutandis*.

26.    <u>Further Assurances</u>. Each of the parties hereto agrees to execute and deliver, or to cause to be executed and delivered, all such instruments as may reasonably be requested to effectuate the intent and purposes, and to carry out the terms, of this Agreement.

27.    <u>Miscellaneous</u>. Section headings in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose. Wherever possible, each provision of this Agreement shall be interpreted in such a manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under applicable law, then such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement. Except as otherwise provided in this Agreement, if any provision contained in this Agreement conflicts with, or is inconsistent with, any provision in any Loan Document, then the provision contained in this Agreement shall govern and control.

[<em>Remainder of page intentionally left blank.</em>]

CONFIDENTIAL                                                                                     VPX-JHO0000000184

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the date first above written.

BORROWER:               VITAL PHARMACEUTICALS, INC.,
a Florida corporation

By:
Name:  John H. Owoc
Title:    President, Chief Scientific Officer & Chief Executive Officer

GUARANTORS:           BANG ENERGY CANADA, INC.,
a Florida corporation
ELITE IP HOLDINGS, LLC,
a Florida limited liability company
JHO INTELLECTUAL PROPERTY HOLDINGS, LLC,
a Florida limited liability company
JHO GA-1 INVESTMENT, LLC,
a Florida limited liability company
JHO NV-1 INVESTMENT, LLC,
a Florida limited liability company
JHO REAL ESTATE INVESTMENT, LLC,
a Florida limited liability company
QUASH SELTZER, LLC,
a Florida limited liability company
SHERIDAN REAL ESTATE INVESTMENT A, LLC,
a Florida limited liability company
SHERIDAN REAL ESTATE INVESTMENT B, LLC,
a Florida limited liability company
SHERIDAN REAL ESTATE INVESTMENT C, LLC,
a Florida limited liability company
VITAL PHARMACEUTICALS INTERNATIONAL SALES, INC.,
a Delaware corporation

By:
Name:  John H. Owoc
Title:    President, Chief Scientific Officer & Chief Executive Officer

OWNER PLEDGOR:     JOHN H. OWOC,
an individual resident of the State of Florida

By:

VITAL PHARMACEUTICALS, INC.
FORBEARANCE AGREEMENT**ERROR! UNKNOWN DOCUMENT PROPERTY NAME.Error! Unknown document property name.**

CONFIDENTIAL                                    

ADMINISTRATIVE AGENT:

TRUIST BANK,
as Administrative Agent

By: _____
Name:  Jade Silver
Title:  Senior Vice President

VITAL PHARMACEUTICALS, INC.
FORBEARANCE AGREEMENT

VPX-JHO0000000186

LENDERS:

TRUIST BANK,
as a Lender, as Swingline Lender, and as Issuing Bank

By: _____
Name:  Jade Silver
Title:  Senior Vice President

VITAL PHARMACEUTICALS, INC.
FORBEARANCE AGREEMENT

VPX-JHO0000000187

COBANK, ACB,
as a Lender

By: *John B. Trawick*
Name: John B. Trawick
Title: Vice President

CONFIDENTIAL

AGCOUNTRY FARM CREDIT SERVICES, FLCA,
as a Lender

By:＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿
Name:   Lisa Caswell
Title:   Vice President

VITAL PHARMACEUTICALS, INC.
FORBEARANCE AGREEMENT

CONFIDENTIAL

VPX-JHO0000000189

FARM CREDIT BANK OF TEXAS,
as a Lender

By: _Ria Estrada_____
Name: Ria Estrada
Title: Vice President

CONFIDENTIAL

VPX-JHO0000000190

CITIZENS BANK, N.A.,
as a Lender

By: _____
Name:  Michael Flynn
Title:    Senior Vice President

VITAL PHARMACEUTICALS, INC.
FORBEARANCE AGREEMENT

CONFIDENTIAL

VPX-JHO0000000191

COMPEER FINANCIAL, PCA,
as a Lender

By:_____
Name: Betty Janelle
Title:   Director, Capital Markets

SYNOVUS FINANCIAL,
as a Lender

By: _____

Name: Michael Sawicki
Title: Director Corporate Banking

VITAL PHARMACEUTICALS, INC.
FORBEARANCE AGREEMENT

VPX-JHO0000000193

FEDERAL AGRICULTURAL MORTGAGE
CORPORATION,
as a Lender

By: _____
Name: Kyle Weaver
Title: Managing Director

VITAL PHARMACEUTICALS, INC.
FORBEARANCE AGREEMENT

VPX-JHO0000000194

THE HUNTINGTON NATIONAL BANK,
as a Lender

By: *Nathan Drews*_____

Name: Nathan Drews
Title: Financial Recovery Representative

VITAL PHARMACEUTICALS, INC.
FORBEARANCE AGREEMENT

GREENSTONE FARM CREDIT SERVICES, FLCA,
as a Lender

By: _____

Name: Kyle Hernández
Title: Vice President – Capital Markets

VITAL PHARMACEUTICALS, INC.
FORBEARANCE AGREEMENT

VPX-JHO0000000196

COMERICA BANK,
as a Lender

By: _____

Name:   Cynthia B. Jones
Title:    Vice President

VITAL PHARMACEUTICALS, INC.
FORBEARANCE AGREEMENT

HSBC Bank USA, National Association,
as a Lender

By:_____

Name: Jay Fort
Title: Senior Vice President

VITAL PHARMACEUTICALS, INC.
FORBEARANCE AGREEMENT

CONFIDENTIAL

VPX-JHO0000000198

UNITED COMMUNITY BANK d/b/a SEASIDE
BANK AND TRUST,
as a Lender

By:_____

Name: Robert J. Head
Title: Senior Vice President

VITAL PHARMACEUTICALS, INC.
FORBEARANCE AGREEMENT

CONFIDENTIAL

VPX-JHO0000000199

## SCHEDULE 1

### Acknowledged Events of Default

**A.  Existing Events of Default**

1.   Certain Events of Default have occurred and are continuing under Section 8.1(d) of the Credit Agreement as a result of:

   a.   the Loan Parties' failure to comply with the Combined Total Leverage Ratio covenant set forth in Section 6.1 of the Credit Agreement for the Fiscal Quarter ended December 31, 2021; and

   b.   the Loan Parties' failure to comply with the Combined Fixed Charge Coverage Ratio covenant set forth in Section 6.2 of the Credit Agreement for the Fiscal Quarter ended December 31, 2021.

**B.  Anticipated Events of Default**

1.   Certain Defaults are anticipated to occur, and certain Events of Default are anticipated to occur under Section 8.1(d) of the Credit Agreement, as the case may be, as a result of:

   a.   the Loan Parties' failure to comply with Section 5.1(a) of the Credit Agreement with respect to the annual audited report for the Fiscal Year ended December 31, 2021 for the Loan Parties and Subsidiaries as a result of such report and opinion of the Loan Parties' independent public accounting firm not being unqualified as to "going concern" or like qualification or scope of such audit; provided, that the Loan Parties' failure to deliver to the Administrative Agent and each Lender a substantially final copy of such audit (which copy may, for the avoidance of doubt, include such qualification(s)) on or prior to April 30, 2022 would constitute Forbearance Termination Event;

   b.   the Loan Parties' failure to comply with the Combined Total Leverage Ratio covenant set forth in Section 6.1 of the Credit Agreement for the Fiscal Quarter ending March 31, 2022;

   c.   the Loan Parties' failure to comply with the Combined Fixed Charge Coverage Ratio covenant set forth in Section 6.2 of the Credit Agreement for the Fiscal Quarter ending March 31, 2022; and

   d.   the Loan Parties' failure to provide notice under Section 5.2(a)(i) of the Credit Agreement in connection with the occurrence of any of the other Acknowledged Events of Default.

2.   Certain Defaults are anticipated to occur, and certain Events of Default are anticipated to occur under Section 8.1(e) of the Credit Agreement, as the case may be, as a result of the Loan Parties' failure to comply with Section 5.11(b) of the Credit Agreement prior to the Effective Date.

*[Remainder of page intentionally left blank; end of Schedule I.]*

VITAL PHARMACEUTICALS, INC.
FORBEARANCE AGREEMENT (SCHEDULE 1)

## SCHEDULE 2

### Updated Schedule 3(j) of Security Agreement

1.  Commercial Tort Claims asserted by Vital Pharmaceuticals, Inc. against ProSupps et al. in connection with claims for (i) usurpation of corporate opportunity by former Executive Vice-President of Sales, (ii) tortious interference/non-compete against former Executive Vice-President of Sales and other former Vital Pharmaceuticals, Inc. employees and competing supplement company, and (iii) leave to seek punitive damages against former Executive Vice-President of Sales, with litigation pending in case number CACE-12-007083 in Broward County Circuit Court, Florida.

2.  Commercial Tort Claims asserted by Vital Pharmaceuticals, Inc. against Ball Metal et al. in connection with a breach/product liability action against a can supplier for defective can liner, with arbitration pending before the Commercial Arbitration Tribunal of the American Arbitration Association in case number 01-21-0000-1032.

3.  Commercial Tort Claims asserted by Vital Pharmaceuticals, Inc. against Suddath Global Logistics et al. in connection with a claim against a logistics company for mismanagement of Vital Pharmaceuticals, Inc's inventory, with litigation pending in case number CACE-21-003572 in Broward County Circuit Court, Florida.

4.  Commercial Tort Claims asserted by Vital Pharmaceuticals, Inc. against Daniel Yepes in connection with a claim against a former employee and conspirator for theft, with litigation pending in case number CACE-21-015520 in Broward County Circuit Court, Florida.

5.  Commercial Tort Claims asserted by Vital Pharmaceuticals, Inc. against Alejandro Machado in connection with a claim against a former employee for civil theft, with proceedings in (i) Broward County Circuit Court, Florida, in case no. CACE-17-022732, (ii) United States Bankruptcy Court, Southern District of Florida, in case number 21-17098-PDR and (iii) an adversary proceeding in the United States Bankruptcy Court, Southern District of Florida, in case number 21-01369-PDR.

6.  Commercial Tort Claims asserted by Vital Pharmaceuticals, Inc. against Berlin Manufacturing in connection with a claim under Section 1 of the Sherman Act with litigation pending in the Northern District of Illinois, United States District Court in case number 21-cv-6866-GSF.

7.  Commercial Tort Claims asserted by Vital Pharmaceuticals, Inc. against Triller et al. in connection with claims for failure to render services and defamation, with litigation pending in Broward County Circuit Court, Florida, in case number CACE-20-016430.

8.  Commercial Tort Claims asserted by Vital Pharmaceuticals, Inc. against NutraBlend Foods LLC et al. in connection with claims against a co-packer for delivering non-conforming product, with litigation pending in Broward County Circuit Court, Florida, in case number CACE-16-010090.

9.  Commercial Tort Claims asserted by Vital Pharmaceuticals, Inc. and Bang Jets, LLC against Gulfstream & Expert Aviation et al. in connection with claims for unfair trade practices, with litigation pending in Broward County Circuit Court, Florida in case number CACE-20-013100.

VITAL PHARMACEUTICALS, INC.
FORBEARANCE AGREEMENT (SCHEDULE 2)

VPX-JHO0000000201

10.    Commercial Tort Claims asserted by Vital Pharmaceuticals, Inc. against Brightfractl, Inc. in connection with a dispute over adequacy of social media ad placement services, with litigation pending in Palm Beach Circuit Court, Florida in case number 50-2020-CA-005690-XXXX.

11.    Commercial Tort Claims asserted by Vital Pharmaceuticals, Inc. against Monster Energy Company et al. in connection with a claim of trade disparagement, with litigation pending in the Southern District of Florida, United States District Court in case number 19-cv-61974-CMA, which case was previously administratively closed but not dismissed. Vital Pharmaceuticals, Inc. is in the process of reopening the matter.

12.    Commercial Tort Claims asserted by Quash Seltzer, LLC against PepsiCo Inc. in connection with claims for tortious interference with hard seltzer sales, with litigation stayed in the Southern District of Florida, United States District Court in case number 21-cv-601910-RAR, and the issuance of a Final Partial Award by the Commercial Arbitration Tribunal of the American Arbitration Association in case number 01-20-0015-8060.

13.    Commercial Tort Claims asserted by Vital Pharmaceuticals, Inc., JHO Intellectual Property Holdings LLC, and Elite IP Holdings LLC against PepsiCo Inc. in connection with claims for (i) declaratory relief that a certain Vital Pharmaceuticals, Inc. product is not subject to a certain distribution agreement nor otherwise subject to arbitration, and (ii) tortious interference, with litigation removed to the District Court of Arizona, United States District Court in case number 2:22-cv-00353-DLR from the Maricopa County Superior Court in case number CV2022-001132 as well as arbitration pending before the Commercial Arbitration Tribunal of the American Arbitration Association in case number 01-20-0015-8060.

*[Remainder of page intentionally left blank; end of Schedule 2.]*

VITAL PHARMACEUTICALS, INC.
FORBEARANCE AGREEMENT (SCHEDULE 2)

VPX-JHO0000000202