# **EXHIBIT 1**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

www.flsb.uscourts.gov

IN RE:                                                        Chapter 11 Cases

VITAL PHARMACEUTICALS, INC., *et al.*,[1]                      Case No.: 22-17842-PDR

    Debtors.                                               (Jointly Administered)

_____/

## DEBTORS' *EXPEDITED* MOTION TO APPROVE COMPROMISE BETWEEN (I) THE DEBTORS, (II) MONSTER ENERGY COMPANY, (III) MONSTER BEVERAGE CORPORATION, (IV) ORANGE BANG, INC., (V) THE COMMITTEE, AND (VI) THE SUPPORTING LENDERS[2]

**(Expedited Hearing requested for July 13, 2023 at 1:30 p.m.)**

**Statement of Exigent Circumstances**

**The Debtors respectfully request the Court conduct an expedited hearing on this Motion on July 13, 2023, the date of the hearing on approval of the successful bid in accordance with the Debtors' bidding procedures. If approved, the Debtors hope to consummate the proposed sale transaction as promptly as possible, and closing of such transaction is conditioned on, among other things, approval of the settlements described herein.**

Vital Pharmaceuticals, Inc. ("VPX"), Bang Energy Canada, Inc., JHO Intellectual

Property Holdings, LLC ("JHO"), JHO Real Estate Investment, LLC, Quash Seltzer, LLC, Rainbow

Unicorn Bev, LLC, and Vital Pharmaceuticals International Sales, Inc. (each a "Debtor," and

---

[1]  The address of the Debtors is 1600 N. Park Drive, Weston, FL 33326. The last four digits of the Debtors' federal tax identification numbers are: (i) Vital Pharmaceuticals, Inc. (8430); (ii) Bang Energy Canada, Inc. (5454); (iii) JHO Intellectual Property Holdings, LLC (0010); (iv) JHO Real Estate Investment, LLC (9394); (v) Quash Seltzer, LLC (6501); (vi) Rainbow Unicorn Bev, LLC (2254); and (vii) Vital Pharmaceuticals International Sales, Inc. (8019).

[2]  Contemporaneous with the filing of this Motion, the Debtors are filing *Debtors' Ex Parte Motion for Order Shortening Time for Hearing on Debtors' Expedited Motion to Approve Compromise Between (I) the Debtors, (II) Monster Energy Company, (III) Monster Beverage Corporation, (IV) Orange Bang, Inc., (V) the Committee, and (VI) the Supporting Lenders*, seeking to shorten the twenty-one (21) day notice period prescribed by Bankruptcy Rule 2002(a)(3), so that this Motion can be heard on July 13, 2023 at 1:30 p.m., which the Court indicated could be available for the Sale Hearing and the hearing on this Motion.

collectively, the "Debtors"), by undersigned counsel, move the Court, pursuant to Fed. R. Bankr. P. 9019 and Local Rule 9019-1, for entry of an Order approving a compromise between the Debtors, the DIP Agent and the Prepetition Agent (in each case as defined in the Final DIP Order (as defined herein)) (in such capacities, the "Agents"), the Supporting Lenders (as defined in the Settlement Agreement), the Official Committee of Unsecured Creditors (the "Committee"), Orange Bang, Inc. ("OBI"), Monster Energy Company ("MEC") and Monster Beverage Corporation ("MBC," together with MEC, "Monster" and, together with the Debtors, the Committee, OBI, the Agents, and the Supporting Lenders, collectively, the "Parties"). In support of this Motion, the Debtors respectfully state as follows.[3]

## Preliminary Statement

Since June 2022—four months before these chapter 11 cases were filed—the Debtors have been engaged in an effort to identify and execute on a value-maximizing financing or sale. The Debtors, with the consent of their DIP Lenders, have extended milestones and deadlines associated with that process multiple times in an effort to ensure that the Debtors had a full and fair opportunity to pursue a transaction that would be value maximizing and in the best interests of their estates and all stakeholders.

The Debtors' marketing efforts have culminated in the transaction embodied in the Monster APA, which contemplates the sale of substantially all of the Debtors' assets to an acquisition vehicle formed by Monster. The sale to Monster is supported by the Agents (at the direction of the Supporting Lenders) and the Committee, who collectively represent the vast majority of secured creditors and all of the unsecured creditors in these cases. As part of the negotiations among the Debtors, the DIP Lenders, the Committee, OBI, and Monster concerning the proposed

---

[3] Capitalized terms not defined herein have the meanings given in the Settlement Agreement (as defined below) or the Monster APA (as defined below).

sale, those parties agreed to resolve—on terms highly favorable to the Debtors' estates—various other issues and potential disputes that might have remained unresolved in a sale to another buyer, and threaten the ability for unsecured creditors to receive a recovery, and for the Debtors to confirm a chapter 11 plan. Specifically, subject to consummation of the sale, the Supporting Lenders and Monster have agreed to treat claims that the Supporting Lenders and Monster would otherwise assert are entitled to administrative (or, in the case of the Supporting Lenders, superpriority administrative) status as unsecured claims, in exchange for allowance of those and other existing unsecured claims. The settlement and sale go hand-in-hand, and collectively represent the only viable path that preserves the Debtors' ability to pursue a chapter 11 plan and provide a potential recovery to unsecured creditors, *notwithstanding that the DIP Lenders stand to receive less than payment in full in cash under the proposed sale and settlement*.

The Debtors and Monster were prepared to enter into the Monster APA the week of June 19, and seek approval of both the sale and this Settlement Agreement at the hearing scheduled for June 30. However, as noted at the June 22 hearing, just as the parties were preparing to sign the Monster APA, the Federal Trade Commission ("FTC") indicated that it would issue a "Second Request" in connection with its review of the Monster transaction under the Hart-Scott-Rodino Act ("HSR Act"), preventing the parties from closing a sale to Monster at least until they could substantially comply with the Second Request—a likely months long process. The Debtors immediately devoted all of their resources to pushing other potential bidders to submit best and final committed proposals by Monday, June 26. None of the proposals received were actionable.

On a parallel path, the Debtors have continued discussions with the FTC, but as of the filing of this Motion, there has been no change in the FTC's position and the parties still remain subject to the "Second Request." As a result, the Debtors now find themselves in a challenging and

uncertain position. A sale to Monster will clearly maximize the value of the Debtors' assets, benefitting *all creditors*. Monster requires that transaction to close in the near term (the Monster APA features an outside date of August 3), as do the Debtors' financial circumstances (*i.e.*, a DIP Facility that matures within days and no path to any incremental DIP financing). At the same time, the Debtors recognize that creditors and parties in interest need a reasonable opportunity to evaluate the Monster APA and related Settlement Agreement (and, if necessary, prepare objections), and that the Court will need sufficient time to evaluate the transactions and any objections thereto. Accordingly, despite the fact that the Debtors require a change in position from the FTC before the Monster sale and Settlement Agreement can be consummated, the Debtors determined that the best path forward was to file both now so that they can be heard on July 13, and preserve the possibility of closing the transaction before the Outside Date of August 3 in the event that the regulatory impediments fall away. In the event that those impediments do *not* fall away – by week's end – the Debtors will likely have no choice but to pivot to an orderly liquidation.

From the standpoint of the Debtors and their estates, there is no question that consummation of the Monster APA and Settlement Agreement represent the best path forward for these cases, and that the Settlement Agreement easily satisfies the standards for approval under Bankruptcy Rule 9019 and should be approved.

## Jurisdiction and Venue

1. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

2. Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3. The Debtors move for approval of that certain *Settlement Term Sheet* entered into between the Parties on June 20, 2023 (the "<u>Settlement Agreement</u>"), pursuant to

Fed. R. Bankr. P. 9019.  A true and correct copy of the Settlement Agreement is attached hereto as **Exhibit A**.

**Background**

### I. General Case Background

4.      On October 10, 2022 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of title 11 of the Bankruptcy Code.  A detailed description of the Debtors, their operations, and the circumstances leading to these chapter 11 cases can be found in the *Declaration of John C. DiDonato in Support of Chapter 11 Petitions and First Day Pleadings* [ECF No. 26] (the "First Day Declaration") filed on the Petition Date.

5.      The Debtors are operating their business and managing their affairs as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

6.      On November 1, 2022, the Office of the United States Trustee appointed the Committee in these chapter 11 cases [ECF No. 245].  On November 23, 2022, the United States Trustee reconstituted the Committee [ECF No. 400].

### II. Events Leading to the Settlement

#### A. *The Debtors' DIP Financing*

7.      As described in the First Day Declaration, the Debtors' need for liquidity was one catalyst for the chapter 11 filings:  the Debtors needed financing to both operate their business and run a marketing process, and could not obtain the required funding outside of Chapter 11 and the DIP Facility (as defined in the Final DIP Order).  On January 12, 2023, this Court entered a final order approving debtor-in-possession financing.[4]  The Final DIP Order was supported by the

---

[4] The *Final Order (I) Approving Postpetition Financing, (II) Authorizing Use of Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, and (VI) Granting Related Relief* [ECF No. 638] (the "Final DIP Order").  The Court had previously

Committee as a result of the compromises reached amongst the Debtors, the DIP Lenders, Monster, and the Committee, among others, prior to the final hearing on the DIP Financing Motion. *See* Final DIP Order ¶ 61.

8.     As approved by the Final DIP Order, the DIP Facility provided the Debtors with access to a maximum principal amount of $335 million in debtor-in-possession financing, comprised of: (a) $235 million in "rolled up" Prepetition Obligations (as defined in the Final DIP Order) and (b) $100 million in new money financing. Pursuant to the Final DIP Order, the DIP Lenders were granted an allowed, senior secured, superpriority administrative expense claim in these chapter 11 cases (the "DIP Superpriority Claim") for all DIP Obligations, subject to certain exceptions agreed upon as part of the global settlement of DIP objections described above. *See* Final DIP Order ¶¶ 7, 61. Notably, subject only to the Carve-Out (for certain professional fees) (as defined in the Final DIP Order), the DIP Superpriority Claim has "priority over any and all administrative expense claims and unsecured claims against the Debtors or their estates in any of the Cases and any Successor Cases, at any time existing or arising, of any kind or nature whatsoever . . . ." Final DIP Order ¶ 7. In other words, the Final DIP Order provides the DIP Lenders with a superpriority administrative expense claim for all claims arising under the DIP Facility, *including any deficiency claims.*

**B.     *Litigation Between the Debtors and Monster***

9.     Before the Petition Date, the Debtors had been engaged in litigation with Monster for years. The litigation, which is described in greater detail below, has included:

---

entered an interim order [ECF No. 120] on October 14, 2022 granting the *Debtors' Emergency Motion for Interim and Final Orders (I) Approving Postpetition Financing, (II) Authorizing Use of Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* [ECF No. 24] (the "DIP Financing Motion").

- false advertising claims brought by Monster against the Debtors in California federal court,[5] along with a pending appeal brought by VPX;[6]

- an arbitration brought by Monster and OBI against VPX and JHO, and related proceedings in California federal court involving alleged breaches of a 2010 Settlement Agreement between OBI and VPX and related trademark infringement claims,[7] along with pending appeals brought by VPX and JHO;[8]

- trade dress claims brought by VPX against Monster in Florida federal court,[9] along with an adjudicated appeal thereof;[10]

- unfair trade practices claims brought by VPX against Monster in Florida federal court;[11] and

- an adversary proceeding brought in this Court to determine the Debtors' ability to assign to a buyer of the Debtors' business their right to pay 5% of net sales of Bang-branded products to OBI and Monster in exchange for the ability to continue marketing Bang-branded products pursuant to the confirmed arbitration award in the OBI/Monster dispute.[12]

10.    The proceedings listed above are in different stages, ranging from motion to dismiss briefings to post-verdict practice and the appeal process.  In all of the cases above that have gone to verdict, Monster has won significant damages awards against the Debtors and/or injunctive relief.

---

[5] *Monster Energy Co. v. Vital Pharmaceuticals, Inc.*, No. 18-cv-1882 (C.D. Cal., filed Sept. 4, 2018).

[6] *Vital Pharms., Inc. v. Monster Energy Co.*, No. 23-55438.

[7] *Vital Pharms., Inc. and JHO Intellectual Prop. Holdings, LLC v. Orange Bang, Inc. and Monster Energy Co.*, No. 20-cv-1464 (C.D. Cal., filed July 23, 2020).

[8] *Vital Pharmaceuticals, Inc and JHO Intellectual Property Holdings, LLC vs. Orange Bang, Inc. and Monster Energy Co.*, Nos. 22-55722 & 22-56019.

[9] *Vital Pharmaceuticals, Inc. v. Monster Energy Co. and Reign Beverage Co., LLC*, No. 19-cv-60809 (S.D. Fla., filed Mar. 28, 2019).

[10] *Vital Pharmaceuticals, Inc. v. Monster Energy Co. and Reign Beverage Co., LLC*, No. 21-13264.

[11] *Vital Pharmaceuticals, Inc. v. Monster Beverage Co.*, No. 19-cv-61974 (S.D. Fla., filed Aug. 7, 2019); *Vital Pharmaceuticals, Inc.* v. *Monster Beverage Corp.*, No. 22-cv-61621 (S.D. Fla., filed Aug. 31, 2022).

[12] *Vital Pharmaceuticals, Inc. and JHO Intellectual Property Holdings, LLC v. Monster Energy Co. and Orange Bang, Inc.*, Bankr. Adv. Pro. No. 23-01031 (Bankr. S.D. Fla., filed Feb. 17, 2023), bankruptcy court reference withdrawn to *Vital Pharmaceuticals, Inc. and JHO Intellectual Property Holdings, LLC v. Monster Energy Co. and Orange Bang, Inc.* 23-cv-60599 (S.D. Fla.).

      (a)     *The California District Court Action*

11.    On September 4, 2018, Monster initiated the action captioned *Monster Energy Co. v. Vital Pharmaceuticals, Inc.*, No. 18-cv-1882 (C.D. Cal.) (the "<u>California District Court Action</u>"), by filing a Complaint against VPX and its then-Chief Executive Officer and sole owner, John H. "Jack" Owoc, in the United States District Court for the Central District of California (the "<u>California District Court</u>").  The California District Court Action concerned, among other things, VPX's use of the term "Super Creatine" in the labeling of certain products, which Monster contended constituted false advertising, VPX's alleged interference with Monster's contracts for shelf space, and VPX's alleged misappropriation of Monster's trade secrets.

12.    On September 29, 2022, the jury returned a verdict in favor of Monster and against VPX on all five claims tried to the jury.  Among other findings, the jury found that:  (1) VPX and Mr. Owoc were liable for false advertising, (2) Monster shall be awarded $271,924,174 for damages allegedly sustained by VPX's and Mr. Owoc's false advertising, and (3) defendants' false advertising was deliberate.  The jury also found VPX liable for intentional interference with contract, misappropriation of trade secrets, and violation of the Computer Fraud and Abuse Act and awarded Monster a cumulative additional sum of $21,015,587 in damages on those claims, for a total award of $292,939,761.

13.    On December 1, 2022, this Court entered its *Order Granting Debtors' and Creditor Monster Energy Company's Joint Agreed Motion for Relief from Automatic Stay to Continue Action in Nonbankruptcy Forum [ECF No. 321]* [ECF No. 450], granting Monster and VPX relief from the automatic stay to allow Monster, VPX, and Mr. Owoc to continue litigating the California District Court Action until final judgment, including the Post-Verdict Motions (as defined below).

14.     On February 23, 2023, VPX filed a motion seeking an order for a new trial, a judgment notwithstanding the verdict, or a reduction in the damages awarded by the jury by way of remittitur (the "<u>VPX Post-Verdict Motion</u>").  Monster has filed an opposition and the VPX Post-Verdict Motion remains pending before the California District Court.

15.     On February 23, 2023, Monster filed a post-verdict motion seeking further equitable relief, disgorgement of profits (alleged to be $77.5 million), enhanced damages of ~$56.7 million plus additional damages of ~$190,000 per day until VPX and Mr. Owoc comply with any permanent injunction entered, a permanent injunction preventing VPX from interfering with Monster's contracted-for shelf space at retail locations, punitive damages, prejudgment interest of $39.5 million plus ~$42,000 per day, attorneys' fees of ~$21 million, expert witness expenses of ~$101,000, and other costs of ~$6.7 million (the "<u>Monster Post-Verdict Motion</u>," and together with the VPX Post-Verdict Motion, the "<u>Post-Verdict Motions</u>").   VPX has filed an opposition and the Monster Post-Verdict Motion remains pending before the California District Court.

16.     On April 12, 2023, the California District Court entered its *Order (1) Granting Plaintiff's Motion for a Permanent Injunction (Dkt. No. 901); and (2) Vacating the April 24, 2023 Hearing (in Chambers)*, which required VPX and Mr. Owoc to, among other things: (i) not falsely or deceptively use the word "creatine" in selling, offering to sell, marketing, promoting, or advertising any Bang drinks, (ii) not advertise that Bang drinks contain Super Creatine, provide benefits of creatine, or that Super Creatine is creatine, (iii) remove the word "creatine" from Bang cans, labels, packaging, and various other marketing content, including point-of-sale materials, media, presentations, messages, and other communications with third parties, and (iv) post a corrective statement on all webpages and social media they use to market or sell, offer to sell,

market, promote, or advertise Bang drinks. On May 10, 2023, VPX appealed. The U.S. Court of Appeals for the Ninth Circuit (the "Ninth Circuit") set a briefing schedule that is set to be completed in October 2023. On May 19, 2023, VPX filed a notice of bankruptcy before the Ninth Circuit and requested that the Ninth Circuit stay the appeal pending these chapter 11 cases. The Ninth Circuit has not yet stayed the appeal.

(b)     *The OBI/Monster Litigation*

17.     On September 9, 2009, OBI brought an action against VPX in the California District Court relating to VPX's use of the "BANG" and "BANG!" trademarks in connection with one of its then-existing products. OBI's claims included trademark infringement, false designation of origin, misrepresentation and unfair competition, and cancellation of VPX's trademark registrations.

18.     On August 11, 2010, OBI and VPX entered into a Settlement Agreement (the "2010 Settlement Agreement") that, among other things, addressed VPX's use of the BANG trademark.

19.     On September 23, 2019, Monster and OBI entered into an assignment agreement (the "Assignment Agreement") pursuant to which OBI assigned Monster "all of [OBI's] rights and interests in and to the [2010] Settlement Agreement, of whatever kind or nature, including any and all claims and/or causes of action against Vital Pharmaceuticals, Inc. arising under the [2010] Settlement Agreement," while OBI retained all trademark rights, including in the trademark "Bang" and any related trademark claims it may have had against VPX.

20.     On June 16, 2020, OBI and Monster initiated an arbitration styled as *Orange Bang, Inc. and Monster Energy Co. v. Vital Pharms., Inc.*, AAA Case No. 01-20-0005-6081 (the "Arbitration") against VPX. Within the Arbitration, Monster and OBI asserted claims against VPX, with Monster, as assignee of the 2010 Settlement Agreement, alleging breach of contract

claims against VPX, and OBI asserting trademark infringement claims against VPX for its allegedly infringing use of the word mark "BANG." JHO was subsequently joined in the arbitration.

21. On January 6, 2022, the arbitrator issued an Interim Arbitration Award—Phase 1 (the "Interim Award") in favor of Monster and OBI on all claims and counterclaims. The Interim Award granted Monster and OBI damages for VPX's past use of the "Bang" mark—allowing them to choose from a number of damages calculation methods—and also granted certain prospective equitable relief in respect of VPX's and JHO's continued use of the "BANG" mark. OBI and Monster had requested, as an alternative to the issuance of a permanent injunction, the award of a continuing royalty for future use of the BANG mark. The arbitrator then afforded VPX and JHO the opportunity to elect between (a) paying Monster and OBI 5% of net sales of Bang-branded products on a continuing basis for so long as VPX and JHO used the "Bang" mark or (b) the imposition of a permanent injunction limiting VPX's and JHO's right to use the "Bang" mark going forward.

22. As to the monetary relief, Monster and OBI jointly opted for the highest available figure—*i.e.*, $175,000,000—based upon disgorgement under a trademark infringement theory. On January 31, 2022, VPX and JHO elected to pay 5% of their net sales of "Bang" branded products to enable their continued sale of "Bang" branded products.

23. On April 4, 2022, the arbitrator issued the Final Arbitration Award (the "Final Award"), ordering VPX and JHO to pay Monster and OBI (a) $175 million in monetary relief; (b) pursuant to VPX's and JHO's election, 5% of net sales of Bang-branded products on a quarterly basis going forward; (c) $7,279,785 in attorneys' fees; and (d) $2,018,658.90 in costs, plus interest. The Final Award also identified "Categories of Persons Bound" by the permanent

injunction (in addition to VPX and JHO) and made certain clarifications to the scope of the permanent injunction.

24.     The Debtors have not made any of the above payments required by the Final Award. However, pursuant to this Court's order, issued at the joint request of the Debtors, Monster and OBI, the Debtors have been escrowing an amount equal to 5% of net sales of Bang-branded products since the Petition Date for the benefit of Monster and OBI. *See* ECF No. 639.

25.     On September 29, 2022, the Honorable Dale S. Fischer, U.S. District Judge for the California District Court, in the case styled as *Vital Pharmaceuticals, Inc., et al. v. Orange Bang, Inc.*, No. 20-cv-01464, entered a final judgment in favor of Monster and OBI confirming the terms set forth in the Final Award, after having denied VPX's and JHO's motion to vacate the Final Award.  VPX has appealed to the Ninth Circuit.  *See* Notice of Appeal, *Vital Pharmaceuticals, Inc. v. Orange Bang, Inc.*, Case No. 5:20-cv-01464 (C.D. Cal.) (Docket No. 131).  The Ninth Circuit stayed the appeal pending these chapter 11 cases.

(c)     *The Florida Unfair Trade Practices Litigation*

26.     On August 7, 2019, VPX initiated the action captioned *Vital Pharmaceuticals, Inc. v. Monster Beverage Co.*, No. 19-cv-61974 (S.D. Fla.) (the "2019 Florida Case") by filing a complaint against MBC, MEC, Reign Beverage Company, LLC ("Reign"), Energy Beverages, LLC, CSC Corporate Domains, Inc., Markerly, Inc., and other individual defendants in the United States District Court for the Southern District of Florida ("Florida District Court") alleging violations of the Lanham Act, violations of the Florida Deceptive and Unfair Trade Practices Act, unfair competition in violation of Florida common law, trade libel, tortious interference with business relationships, civil conspiracy, and copyright violations.  VPX filed a First Amended Complaint on February 21, 2020.  On July 1, 2020, the court entered an order administratively

closing the case due to jurisdictional discovery issues.  The case was reopened on March 21, 2023,

and VPX filed a Second Amended Complaint on the same day.  On May 4, 2023, the case was

stayed and administratively closed due to issues related to these chapter 11 cases.

27.     On August 31, 2022, VPX initiated the action captioned *Vital Pharmaceuticals,*

*Inc. v. Monster Beverage Corp.*, No. 22-cv-61621 (S.D. Fla.) (the "2022 Florida Case") by filing

a complaint against MBC, MEC, and Rodney Cyril Sacks (Chairman and Co-CEO of Monster) in

the Florida District Court alleging violations of the Lanham Act, deceptive and unfair trade

practices, and common law unfair competition.  On January 6, 2023, the defendants filed a motion

to dismiss the complaint, which was mooted when VPX filed an amended complaint on January

10, 2023.  The case was reopened on March 27, 2023, and defendants refiled their motion to

dismiss on April 14, 2023.  On May 5, 2023, the case was stayed and administratively closed due

to issues related to these chapter 11 cases.

(d)     *The Trade Dress Action*

28.     On March 28, 2019, VPX initiated the action captioned *Vital Pharmaceuticals, Inc.*

*v. Monster Energy Co.*, Case No. 19-cv-60809 (S.D. Fla.) (the "Trade Dress Action") by filing a

complaint against MEC and Reign in the Florida District Court alleging trade dress infringement,

federal and common law trademark infringement, unfair competition, and deceptive and unfair

trade practices.

29.     On June 11, 2019, MEC and Reign filed their First Amended Answer to VPX's

complaint and concurrently filed counterclaims against VPX and JHO alleging trademark

infringement, unfair competition, and petitioning to cancel JHO's Reign trademark.

30.     On May 20, 2020, the court struck VPX's claim for actual damages as a discovery sanction, which VPX appealed on September 22, 2021.  On August 3, 2022, the U.S. Court of Appeals for the Eleventh Circuit affirmed the discovery sanction.

31.     After conducting a bench trial, on August 24, 2021, the Florida District Court entered judgment in favor of MEC and Reign against VPX on all claims set forth in the complaint and all counterclaims asserted by MEC and Reign, cancelled JHO's trademark for Reign, and enjoined VPX from using the Reign trademark.

32.     On December 17, 2021, the Florida District Court ordered VPX to pay $58,000 to MEC and Reign to reimburse their litigation costs.  *See Order*, Trade Dress Action, ECF. No. 466. The case was closed in March 2021.

(e)     <i>The Trademark Adversary Proceeding</i>

33.     On February 17, 2023, the Debtors commenced an adversary proceeding in this Court seeking, among other things, a declaratory judgment that the Debtors could assign their rights in "BANG" marks, essential to the Debtors' business, and the right to pay 5% of net sales of BANG-branded products under the Final Award, to a third-party buyer without the consent of Monster or OBI and that Monster and OBI would be bound by the terms set forth in the Final Award under *res judicata* should the Debtors transfer the "BANG" marks to a potential buyer.  *See Vital Pharmaceuticals, Inc. v. Orange Bang, Inc.*, Bankr. Adv. Pro. No. 23-01031 (Bankr. S.D. Fla.) (the "Trademark Adversary Proceeding").  That adversary proceeding was prompted by Monster's and OBI's insistence that they had a right to withhold consent to an assignee of Debtors' business assets having the option to pay the 5% of net sales to continue using the "Bang" mark.

34.     While briefing on the Debtors' motion for summary judgment was in progress, Monster and OBI moved to withdraw the reference and transfer the Trademark Adversary

-14-

Proceeding to the California District Court. *See id.*, ECF No. 17. Monster and OBI also sought a stay of the Trademark Adversary Proceeding pending resolution of their motion to withdraw the reference, which this Court denied. *See id.*, ECF Nos. 18, 48.

35.     After the Debtors' motion for summary judgment had been fully briefed before this Court, and this Court had denied Monster's and OBI's motion for a stay, and mere hours before the scheduled summary judgment oral argument, the Honorable Rodney Smith of the Florida District Court stayed the Trademark Adversary Proceeding on March 28, 2023. *See Order Granting Defendants' Emergency Joint Motion to Stay Adversary Proceeding, Vital Pharmaceuticals, Inc. v. Orange Bang, Inc.*, No. 23-cv-60599-RS (S.D. Fla. Mar. 28, 2023), ECF No. 8.

36.     On May 17, 2023, Judge Smith entered an order withdrawing the reference and transferring venue to the California District Court, based upon a finding that VPX had failed to respond to Monster's motion to withdraw the reference.[13] VPX, which in fact had responded to Monster's motion to withdraw the reference—a fact that Monster does not dispute—immediately filed a motion for reconsideration. On May 24, 2023, Judge Smith dismissed VPX's motion for reconsideration, finding that—regardless of whether his prior order rested on a manifest error of fact—he no longer had jurisdiction following his entry of the transfer order.[14]

37.     On May 30, 2023, the Trademark Adversary Proceeding was transferred to the California District Court. On June 1, 2023, Judge Fischer of the California District Court ordered Monster and OBI to show cause by June 7, 2023, explaining why the case should not be transferred

---

[13] *See* Order Granting Defendants' Motion for Entry of an Order Withdrawing Reference and Transferring Venue of Adversary Proceeding to Central District of California, *Vital Pharmaceuticals, Inc. v. Orange Bang, Inc.*, No. 23-60599 (S.D. Fla. May 17, 2023), ECF No. 12.

[14] *See* Order Dismissing Plaintiffs' Emergency Motion for Reconsideration of Order Granting Defendants' Motion for Entry of an Order Withdrawing Reference and Transferring Venue of Adversary Proceeding to Central District of California, *Vital Pharmaceuticals, Inc. v. Orange Bang, Inc.*, No. 23-60599 (S.D. Fla. May 24, 2023), ECF No. 17.

back to the Florida District Court.[15]  On June 7, Monster and OBI filed their response to show cause.[16]  On June 8, 2023, Judge Fischer of the California District Court entered an order transferring the Trademark Adversary Proceeding back to the Florida District Court.[17]

### III.    The Sale Process and the Monster APA

38.     Beginning in June 2022, the Debtors began a marketing process in furtherance of a sale or financing transaction.  Despite months of effort, the Debtors could not effectuate a secured debt financing or sale transaction and filed for chapter 11 on October 10, 2022.  Following the Debtors' chapter 11 filing, Rothschild & Co US Inc. ("Rothschild & Co"), along with the Debtors and their other advisors, continued the marketing process in an effort to maximize the value of the Debtors' assets.  As part of that process, Rothschild & Co contacted approximately 150 potential transaction counterparties, over 45 of which executed non-disclosure agreements in order to obtain diligence information related to the Debtors' assets.  Rothschild & Co established a virtual data room containing over 7,600 files related to, among other things, the Debtors' assets, business, operations, and financials, in an effort to facilitate due diligence with potential buyers that executed non-disclosure agreements.

39.     On February 24, 2023, this Court entered an order [ECF No. 854] (the "Bidding Procedures Order") approving Bidding Procedures (as defined in the Bidding Procedures Order) for a sale of substantially all of the Debtors' assets under section 363(b) of the Bankruptcy Code. The Bidding Procedures originally set a bid deadline of April 24, 2023, and an auction date of

---

[15]  *See* Order to Show Cause Why Case Should Not Be Transferred Back to the Southern District of Florida, *Vital Pharmaceuticals, Inc. v. Monster Energy Co.*, No. CV 23-3862 (C.D. Cal. June 1, 2023), ECF No. 28.

[16]  *See* Response of Monster Energy Company and Orange Bang, Inc. to Order to Show Cause Why Case Should Not Be Transferred Back to the Southern District of Florida, *Vital Pharmaceuticals, Inc. v. Monster Energy Co.*, No. CV 23-3852 (C.D. Cal. June 7, 2023), ECF No. 30.

[17]  *See* Order Transferring Case to the Southern District of Florida, *Vital Pharmaceuticals, Inc. v. Monster Energy Co.*, No. CV 23-3852 (C.D. Cal. June 8, 2023), ECF No. 31.

April 27, 2023.  However, when the Debtors were unable to secure any Qualified Bids (and no Stalking Horse Bidder (each as defined in the Bidding Procedures Order)) by April 24, 2023, the Debtors extended the deadlines in the hope of attracting additional bidders.[18]  The revised bid deadline was May 22, 2023, with an auction scheduled for May 25, 2023.[19]  As of that date, only one actionable and Qualified Bid for substantially all of the Debtors' assets had been received— from Monster.  The Debtors and Monster worked around-the-clock to reach agreement on the terms of a sale, and at the same time submitted the proposed sale transaction for clearance under the HSR Act.

40.     The Debtors were prepared to file a Monster APA the week of June 19, but the FTC indicated that it would issue a "Second Request," prolonging its investigation into the transaction and prohibiting the parties from consummating the transaction while the FTC's investigation remained pending.  Thus, rather than filing a notice of successful bidder that week, the Debtors cancelled the June 30 sale hearing[20] and devoted all of their resources to soliciting best and final offers from the remaining potential bidders, informally extending the bid deadline to June 26 at 5:00 p.m. Eastern time.  The Debtors received no actionable bids by that deadline, and for that reason and the others described in the Preliminary Statement above, filed a *Notice of Auction Cancellation and Successful Bidder*.[21]  The hearing to approve the sale to Monster is scheduled for July 13, 2023.[22]

---

[18] Under the Bidding Procedures, the Debtors can extend deadlines as needed to facilitate a competitive auction.  *See Bidding Procedures Order* ¶ 3.

[19] *See Notice of Extension of Certain Sale-Related Deadlines* [ECF No. 1283] filed on April 28, 2023.

[20] *See* Notice of Adjournment of Sale Hearing and Related Deadlines [ECF No. 1514] filed on June 23, 2023.

[21] *See Notice of Auction Cancellation and Successful Bidder* filed contemporaneously with the filing of this Motion.

[22] *See id.*

41.     The terms of the Monster APA[23] are summarized in the *Notice of Auction Cancellation and Successful Bidder*.[24]  Among other things, subject to the expiration or termination of the applicable waiting period under the HSR Act by June 30, Monster will pay $362 million for substantially all of the Debtors' assets, plus certain contingent consideration earmarked for the estates that could total an additional $10 million and Monster will assume certain of the Debtors' liabilities.

42.     Subject to closing of the sale to Monster:  (a) Monster has agreed to treat its potential administrative claims against the Debtors arising from the California District Court Action as general unsecured claims, and to only recover on account of its unsecured claims once $5 million (subject to adjustment in accordance with the terms of the Settlement Agreement) has been recovered by other general unsecured creditors; and (b) Monster's postpetition claims for the monetary relief described in paragraph 23 above in respect of the OBI/Monster Matter will be preserved, but may be satisfied in full from the escrowed amounts, resulting in no administrative claim.  In the event of a shortfall in the escrowed amounts, funds shall be set aside from the sale proceeds and paid to OBI and Monster in accordance with Section 7.19 of the Monster APA.

43.     The sale and settlement are cross-conditioned on one another.  Specifically, the settlement only becomes effective at closing of the sale, and Monster's obligation to close the sale is expressly conditioned on approval by the Court of the Settlement Agreement, which incorporates the treatment of Monster's claims and the Supporting Lenders' claims.[25]

---

[23]  "Monster APA" means that certain *Asset Purchase Agreement by and among Vital Pharmaceuticals, Inc., Blast Asset Acquisition LLC, Monster Energy Company, and Monster Beverage Corporation* attached as **Exhibit 1** to the *Notice of Cancellation of the Auction and Successful Bidder*.

[24]  *See Notice of Auction Cancellation and Successful Bidder* filed contemporaneously with the filing of this Motion.

[25]  *See* Settlement Agreement § 7; Monster APA § 8.1(d).

**Settlement Summary**[26]

44.    The Settlement Agreement is attached hereto as **Exhibit A**.  The Settlement
Agreement incorporates certain terms contained in the Monster APA and the proposed Sale Order,
and is conditioned on the consummation of the Monster APA.  Absent closing of the sale, the
compromises and settlements described in the Settlement Agreement and herein will be of no force
and effect.  The following table summarizes the key terms of the Settlement Agreement:[27]

| | |
|---|---|
| **Release of Monster Litigation** | All pending litigation between Monster and the Debtors shall cease and be settled in exchange for the allowed claims set forth below, other than with respect to the California District Court Action, the OBI/Monster Matter and the TTAB Matter, and the Debtors, the Supporting Lenders, and the Committee shall consent to allowance of Monster's claims to the extent outlined below. |
| **Treatment of Monster's Claims** | *California District Court Action Allowed Unsecured Claim.*  Monster's asserted claims against the Debtors (whether asserted as administrative or unsecured) on account of the California District Court Action shall be resolved in exchange for an allowed, unsecured, non-administrative claim equal to (i) $292,939,761.00, <u>minus</u> the amount of any remittitur granted by the California District Court pursuant to any ruling on the VPX Post-Verdict Motion (or, in the case of a judgment notwithstanding the verdict in favor of VPX or a grant of a new trial, <u>minus</u> the entire amount), plus accrued interest (if any) until the Petition Date, <u>plus</u> (ii) fifty percent (50%) of any additional award as shall be determined by the California District Court, including, pursuant to any ruling on the MEC Post-Verdict Motion, plus accrued interest until the Petition Date (the "California District Court Action Allowed Unsecured Claim").  Neither Monster nor the Debtors will appeal from, seek reconsideration of, or otherwise challenge the California District Court's ruling on such motions/requests for relief, except that Monster may appeal in the event any appeal is taken by Mr. John H. "Jack" Owoc in his individual capacity. |

---

[26] This summary is provided for the convenience of the Court and parties in interest.  To the extent there is any conflict between this summary and the Settlement Agreement, the latter governs in all respects.  This is a general overview, not a complete summary of all terms, and is subject in all respects to the terms of the definitive documents.  There are several adjustments and caveats.  Please read the documents carefully.

[27] This is a summary only and does not contain all terms of the Settlement Agreement.  The complete terms of the Settlement Agreement can be found at **Exhibit A**.

|  | *Allowed Monster Claims*. All of Monster's other potential administrative and unsecured claims shall be resolved in exchange for allowed unsecured, non-administrative claims in the following amounts: |
|--|--|
|  | • <u>OBI/Monster Matter Allowed Unsecured Claim</u>: $216,131,658.35 <u>plus</u> accrued prepetition interest not included in such amount (for the avoidance of doubt, such allowed claim shall be for the benefit of both OBI and Monster and no duplicative claim of OBI shall be allowed). In accordance with the terms of the Monster APA, VPX shall, following the Closing, cause the OBI/Monster Escrow Amount to be distributed to Monster and OBI, and VPX shall have no further obligation to make deposits into the escrow for sales following the Closing. For the avoidance of doubt, the Debtors shall be entitled to receive the OBI/Monster Escrow Excess, and if applicable, Monster shall be entitled to payment of the OBI/Monster Escrow Shortfall, as provided for in the Monster APA.. |
|  | • <u>Trade Dress Action Allowed Unsecured Claim</u>: $58,000.00, which amount is equal to the award entered in favor of Monster in the Trade Dress Action for certain litigation costs (the "<u>Allowed Monster Other Claims</u>," and together with the California District Court Action Allowed Unsecured Claim, the "<u>Allowed Monster Claims</u>"). |
|  | Neither MEC nor any Affiliates or Representative thereof shall have or be granted allowed claims in these chapter 11 cases (including any administrative expense claims) other than the Allowed Monster Claims. |
|  | The Allowed Monster Claims will be subject to the Limitations on Sources of Recovery described below in all respects. |
| **Treatment of OBI's Claims** | OBI shall receive the benefit of one-half of each of the OBI/Monster Matter Allowed Unsecured Claim and the OBI/Monster Escrow Amount as set forth above. No other claims of OBI, including those arising out of or related to the OBI/Monster Matter and including any administrative expense claims, shall be allowed.<br><br>For the avoidance of doubt, the Debtors shall be entitled to receive the OBI/Monster Escrow Excess as provided for in, and in accordance with the terms of, the Monster APA. |
| **Supporting Lenders' Deficiency Claim Treatment** | Supporting Lenders agree to support a chapter 11 plan providing that any portion of: (i) their claims on account of the DIP Liens and the DIP Superpriority Claims not satisfied from proceeds of the sale distributed on account of the DIP Obligations at Closing in accordance with the Sale Order will be recharacterized as Prepetition Facility Claims and allowed |

|  | as non-superpriority, non-administrative deficiency claims that are (A) unsecured by the assets of the Debtors and (B) secured by the assets of non-Debtor entities constituting Prepetition Collateral (as defined in the Final DIP Order) as if no Roll-Up (as defined in the Final DIP Order) had occurred; and (ii) the Prepetition Facility Claims not satisfied from proceeds of the sale distributed on account of such claims at Closing in accordance with the Sale Order or proceeds received from the sale of non-Debtor assets will be allowed as unsecured, non-superpriority, non-administrative deficiency claims (collectively, the "Allowed Lender Deficiency Claim").<br><br>In the event that a chapter 11 plan in these chapter 11 cases is not confirmed on or before October 31, 2023, or the Debtors' chapter 11 cases convert to cases under chapter 7 of the Bankruptcy Code and a chapter 7 trustee election process is initiated (as discussed herein), the Supporting Lenders agree that their respective portions of the Allowed Lender Deficiency Claim shall be treated as unsecured, non-superpriority, non-administrative deficiency claims, and will be subject to the Limitations on Sources of Recovery identified below.<br><br>The Supporting Lenders will not assert or be entitled to recover on account of any adequate protection claims, and the other Parties to the Settlement acknowledge that adequate protection previously received by Supporting Lenders is not subject to disgorgement. |
|---|---|
| **Limitations on Sources of Recovery** | The Allowed Monster Claims (excluding the 50% share of the OBI/Monster Matter Unsecured Claim attributable to OBI) and Allowed Lender Deficiency Claims of the Supporting Lenders shall not receive a distribution until all unsecured claims not held by the Supporting Lenders or Monster receive an aggregate distribution of $5 million; *provided*, that to the extent that cash on hand in the bankruptcy estates exceeds $15.5 million minus the aggregate amount of professional fees and expenses accrued since the Closing Date on the earlier of (i) the effective date of any chapter 11 plan or (ii) the date on which the Debtors' cases convert to cases under chapter 7 of the Bankruptcy Code, the $5 million threshold above which Allowed Lender Deficiency Claims of the Supporting Lenders may participate in recoveries to unsecured creditors shall be reduced dollar-for-dollar to the extent of such excess.<br><br>Monster and Supporting Lenders to agree to support a chapter 11 plan providing for such treatment as to all Allowed Lender Deficiency Claims and all Allowed Monster Claims. |
| **Plan and Other Support Obligations** | Monster and the Supporting Lenders will support and, subject to the solicitation of votes through a Court-approved disclosure statement, vote |

|  | their Allowed Monster Claims and Allowed Lender Deficiency Clams, as applicable, in favor of a chapter 11 plan that: |
|---|---|
|  | • is consistent with allowance of claims in amounts, and with priorities, identified in the Settlement Agreement; |
|  | • provides equivalent/pro rata treatment of Allowed Monster Claims and the Allowed Lender Deficiency Claims relative to other general unsecured claims, subject to the Limitations on Recovery; |
|  | • includes standard debtor and third-party releases and exculpation for benefit of the Debtors, Committee, Monster, the Buyer, the Buyer Related Parties, the Selling Related Parties, Supporting Lenders, the Agents, the other Prepetition Secured Parties (as defined in the Final DIP Order), and each of their Representatives, it being understood and agreed, that claims against all Excluded Parties will not be released or exculpated; and |
|  | • is not otherwise inconsistent with the Settlement Agreement. |
|  | In the event that the Debtors' chapter 11 cases convert to cases under chapter 7 of the Bankruptcy Code, Monster, OBI, and the Supporting Lenders (as well as the Agents) agree to support, and vote their Allowed Monster Claims, OBI/Monster Matter Allowed Unsecured Claim, and Allowed Lender Deficiency Claims (as applicable) for and in favor of a chapter 7 trustee to be identified by the Committee prior to the date of such conversion. |

45. As noted, the Settlement Agreement is expressly conditioned on approval of the Monster APA, and under the Monster APA, a condition to Monster's obligation to close the proposed sale is the Court's approval of the Settlement Agreement.

**Relief Requested and Basis Therefor**

46. The Debtors seek approval of the Settlement Agreement pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure.

47. Rule 9019(a) provides that, after notice and a hearing, a court may approve a proposed settlement of a claim. The decision of whether or not to approve a compromise is within

the sound discretion of the court.  *See, e.g., In re Carson*, 82 B.R. 847 (Bankr. S.D. Ohio 1987); *In re Mobile Air Drilling Co.*, 53 B.R. 605 (Bankr. N.D. Ohio 1985).

48.     In passing on proposed settlements, the standard that courts applied under the former Bankruptcy Act is the same standard that courts should apply under the Bankruptcy Code. *In re Carla Leather, Inc.*, 44 B.R. 457, 466 (Bankr. S.D.N.Y. 1984).  As stated by the United States Supreme Court in *Protective Comm. v. Anderson*, 390 U.S. 414 (1968), under the Act, to approve a proposed settlement, a court must find that the settlement was "'fair and equitable' based on an educated estimate of the complexity, expense, and likely duration of . . . litigation, the possible difficulties of collecting on any judgment which might be obtained and all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise." *Protective Comm.*, 390 U.S. at 424.  Courts within this district have held that a settlement should be approved unless it falls below the lowest point in the range of reasonableness. *See In re Jiangbo Pharms., Inc.*, 520 B.R. 316, 321 (Bankr. S.D. Fla. 2014); *In re Antonini*, No. 09-16850-AJC, 2010 WL 5315568, at *2 (Bankr. S.D. Fla. Dec. 20, 2010); *In re S&I Investments*, 421 B.R. 569, 583 (Bankr. S.D. Fla. 2009).

49.     The test articulated above was adopted by the Eleventh Circuit in *In re Justice Oaks II, Ltd.*, 898 F.2d 1544, 1549 (11th Cir. 1990), which provides additional guidance as to whether a compromise should be approved.  *Justice Oaks* established a four-part test for approval:

(a)     The probability of success in litigation;

(b)     The difficulties, if any, to be encountered in the matter of collection;

(c)     The complexity of the litigation involved and the expense, inconvenience and delay necessarily attending it; and

(d)     The paramount interest of the creditors and a proper deference to their reasonable views in the premises.

50.     The Settlement Agreement easily satisfies the *Justice Oaks* standard. Settlement of the various Monster litigations and allowance of Monster's claims as provided for in the Settlement Agreement and Monster APA will avoid significant litigation risks, uncertainty, delay, and costs. When combined with Monster's and the Supporting Lenders' respective agreements to subordinate their claims, if any, that could otherwise be entitled to administrative priority or superpriority administrative priority, respectively, and allow other unsecured creditors to recover ahead of those claims, the benefits of the settlement are even greater: they provide the Debtors with a chance to confirm a chapter 11 plan and to make distributions to unsecured creditors who would otherwise receive nothing in a liquidation. Finally, the settlement has the support of both the Supporting Lenders—approximately 95% of both the Debtors' DIP Lenders and Prepetition Secured Lenders—and the Committee, which collectively represent substantially all of the Debtors' creditors. The sale to Monster, which is part-and-parcel of this settlement, is the path that the Debtors' creditors have chosen, and will maximize their recoveries under the circumstances.

## IV.     The Probability of Success in Litigation

### A.     *The Monster litigation and treatment of Monster's claims*

51.     Under the Settlement Agreement, Monster will receive allowed unsecured claims in defined amounts for its claims in the OBI/Monster Matter, and the Trade Dress Action—consistent with what the courts in those cases have already awarded Monster—and in the California District Court Action, consistent with the final judgment to be entered in that case—and no allowed claims based on the other outstanding actions. Moreover, Monster will agree to treat all of its claims as general unsecured claims, even though certain of its claims (*i.e.*, false advertising) arise postpetition and could therefore be asserted as administrative expense claims.

52.     This treatment of Monster's claims reflects the significant risks to the Debtors associated with continued litigation against Monster.  To the extent Monster's claims are being allowed at agreed-upon amounts, they are being allowed in amounts that reflect the Debtors' low probability of success in overturning already-entered judgments.  To the extent litigation is being allowed to continue—in the California District Court Action—to liquidate the amount of Monster's allowed claim, the Settlement Agreement preserves *all* of the Debtors' upside in such continued litigation (*i.e.*, the opportunity to reduce or eliminate Monster's total claim), while limiting Monster's upside by virtue of their agreement to discount any such additional damages award by 50%.

       (a)     *The California District Court Action*

53.     Monster has already obtained a jury verdict awarding $292,939,761 in damages.  To reduce that amount, VPX must win the VPX Post-Verdict Motion or a subsequent appeal.  However, the Settlement Agreement allows VPX to pursue the VPX Post-Verdict Motion—including its arguments for remittitur and judgment notwithstanding the verdict—and potentially shrink the size of Monster's unsecured claim if VPX is successful in the California District Court.  Meanwhile, while the Monster Post-Verdict Motions—which seek additional damages—will also go forward for the purpose of liquidating Monster's claim against the Debtors, Monster has agreed that its resulting unsecured claim will only be allowed in an amount that is 50% the size of any enhanced or additional damages that are ultimately awarded by the California District Court.  Thus, by allowing the California District Court Action to go forward, the Debtors receive a significant benefit—they may be successful in reducing Monster's claim and, even if they are not successful and Monster instead obtains an increased damages award against the Debtors, that award will be half as large as it would have been otherwise.  Both Monster and VPX are also waiving their right

to appeal the California District Court's determination on the Post-Verdict Motions, except that Monster may appeal in the event any appeal is taken by Mr. John H. "Jack" Owoc in his individual capacity.

54.     Perhaps most critically, Monster would have colorable arguments for allowance of an administrative claim in respect of any additional damages accruing on account of false advertising after the Petition Date. Those administrative claims, if pursued and allowed, could eliminate any possibility of the Debtors being able to propose and confirm a plan that satisfies section 1129(a)(9) of the Bankruptcy Code. In exchange for the allowance of Monster's unsecured claim in respect of the California District Court Action as described above, Monster is agreeing to forgo any such administrative claim and preserve the Debtors' ability to pursue a plan.

(b)     *The OBI/Monster Litigation*

55.     Monster and OBI have already been awarded $175 million in damages, the payment of 5% of net sales of BANG-branded products for continued use of the "Bang" mark, $7,279,785 in attorneys' fees, and $2,018,658.90 in costs. The Final Arbitration Award was confirmed by the California District Court. While VPX has appealed, arbitration awards are, in general, very difficult to overturn in federal court, much less on appeal, and there is a high probability that the Debtors will not be successful. Under the circumstances, it is appropriate for the Debtors to agree to allowance of Monster's unsecured claim in connection with the OBI/Monster Matter at $216,131,658.35, plus accrued interest until the Petition Date—the full amount awarded by the arbitrator and confirmed by the California District Court—particularly when viewed in connection with the other compromises contained in the settlement.

(c)     *The Florida Unfair Trade Practices Litigation*

56.     Monster is not receiving any allowed claims on account of this litigation, which is effectively being dismissed.  Given the early stages of the litigation and the challenges faced by the Debtors in pursuing similar claims against Monster in other forums, there is a reasonable probability that the Debtors' claims against Monster in this action would not be successful if litigated to conclusion.

(d)     *The Trade Dress Action*

57.     The Debtors lost on all of their claims against Monster in this action, including their appeal seeking to set aside a discovery sanction.  The court ordered VPX and JHO to pay $58,000 of costs incurred by Monster and its wholly owned subsidiary, Reign.  Under the Settlement Agreement, Monster will receive an allowed unsecured claim for $58,000.

58.     There is virtually no likelihood of the Debtors obtaining a better result.  The order requiring the Debtors to pay $58,000 was entered in December 2021, and the time to appeal has long since passed.

(e)     *The Trademark Adversary Proceeding*

59.     Under the Settlement Agreement, the Trademark Adversary Proceeding will be dismissed.  Although the Debtors believe that they have a reasonable probability of success in that litigation, it would come after maturity of the DIP Facility.  In addition, a sale to Monster would moot the action.

**B.     Treatment of the Supporting Lenders' claims**

60.     The DIP Lenders' rights against the Debtors are clearly established under this Court's Final DIP Order:  they are entitled to superpriority administrative expense claims for the entire amount of the DIP Obligations, including any deficiency claims.  Notwithstanding that clear entitlement, under the Settlement Agreement, the Supporting Lenders will voluntarily subordinate these claims to general unsecured status and will—along with Monster—agree not to share in any

recoveries on account of these claims until general unsecured creditors have recovered $5 million, subject to change for the supporting Lenders in the event the Debtors' estates have in excess of $15.5 million of cash on hand in accordance with the terms of the Settlement Agreement. This treatment of the Supporting Lenders' claims is far superior to the likely result if the Debtors were to attempt to challenge the DIP Lenders' claims in ordinary litigation.

### V. The Difficulties to be Encountered in the Matter of Collection

61. Other than as set forth above with respect to the release of the Debtors' affirmative claims against Monster, this factor is not relevant to the matters resolved in the Settlement Agreement and should not bear on the Court's analysis.[28]

### VI. Litigation Complexity, Expense, Inconvenience, and Delay

#### A. *The Monster litigations and treatment of Monster's claims*

62. To obtain a more favorable result than the treatment of Monster's claims under the Settlement Agreement in each of the outstanding actions between Monster and the Debtors—to the extent possible at all—will be costly and will take more time than the Debtors have, given the impending maturity of their DIP Facility. The Debtors have already expended millions of dollars in legal fees prosecuting or defending the Monster litigations and, despite these investments, have yet to obtain a successful result in any of the actions. In those actions for which the Debtors have any possibility of success on the merits remaining, significant additional litigation costs would still be required and they would take a considerable amount of time. The Debtors only have a few weeks left to resolve all litigation: without the sale to Monster by the date on which the DIP

---

[28] *See In re Chira*, 567 F.3d 1307, 1313 (11th Cir. 2009) (upholding the bankruptcy court's approval of a 9019 settlement even though the bankruptcy court did not address the second *Justice Oaks* factor because this factor was "irrelevant in the instant case because collection difficulties . . . [were] not an issue").

Facility matures, the DIP Lenders will very likely foreclose on the Debtors' assets rather than continuing to fund litigation against Monster.

63.     Under these circumstances, the settlement avoids costs and delays that the Debtors simply cannot afford—this factor weighs strongly in favor of approving the Settlement Agreement.

(a)     *The California District Court Action*

64.     On September 29, 2022, the jury returned a verdict in favor of Monster and against VPX on all five claims tried to the jury, finding that Monster should be awarded $292,939,761 in damages.  Both Monster and VPX have filed Post-Verdict Motions, with Monster seeking additional damages and VPX seeking to vacate the jury verdict in its entirety or reduce the award. The Debtors are also currently appealing the permanent injunction issued by the California District Court.  Briefing on the appeal is currently scheduled to not be completed until October 2023— well after maturity of the DIP Facility—and will cost the Debtors significant resources to prosecute.

65.     The Settlement Agreement allows the California District Court Action to continue in order to liquidate Monster's unsecured claim with respect to the matter.  However, the Post-Verdict Motions (the only pending motions) are fully briefed, and so the only expenses attendant to this resolution are the costs associated with oral argument (if oral argument is even requested), which the Committee supports being borne by the estates following the sale to Monster.  Moreover, once the sale to Monster is approved, the amount of time that will be required to resolve the Post-Verdict Motions will no longer prejudice the Debtors.

66.     The Settlement Agreement also provides that neither party will appeal the determination of the California District Court (except that Monster may appeal in the event any

appeal is taken by Mr. John H. "Jack" Owoc, in his individual capacity), avoiding costs and delay associated with the appellate process.

> (b)    *The OBI/Monster Litigation*

67.    The Debtors are currently prosecuting an appeal to the Ninth Circuit seeking to set aside the arbitrator's award in favor of Monster and OBI.  The matter was stayed after a suggestion of bankruptcy was filed notifying the court of these chapter 11 cases and briefing was suspended on November 1, 2022, pending further order of the Ninth Circuit.  The appeal remains pending.  Litigating the appeal will cost significant estate resources and will take far more time to resolve than the Debtors have.

> (c)    *The Florida Unfair Trade Practices Litigation*

68.    The Florida Unfair Trade Practices litigation is in its early stages.  While VPX has filed a complaint and Monster filed a motion to dismiss, the case has been stayed since May 2023.  To obtain a resolution of the action, VPX will need to reopen the 2019 Florida Case, complete briefing on Monster's motion to dismiss, as well as potentially additional motions to dismiss, partake in discovery, summary judgment motions, and trial.  Final resolution is years and at least hundreds of thousands of dollars of attorneys' fees away.

> (d)    *The Trade Dress Action*

69.    The Trade Dress Action was closed in March 2021, and any opportunity for the Debtors to appeal the $58,000 award to Monster lapsed long ago.  Any litigation seeking to reopen the case, excuse the delay in seeking to reverse the damages award, and reverse the $58,000 award would almost certainly cost more than the award itself and take many months to complete.  Under the circumstances, allowing Monster's claim in the amount of the $58,000 award is appropriate.

> (e)    *The Trademark Adversary Proceeding*

70.     The Trademark Adversary Proceeding is currently pending in the Florida District Court.  The merits of the motion to withdraw the reference still need to be adjudicated.  If the reference is not withdrawn and the case is returned to this Court, the Court would then need to adjudicate the merits of VPX's motion for summary judgment.  Monster and OBI have also stated their intent to appeal any adverse judgment against them.  All of this would require significant attorney resources by the Debtors and could take months.

71.     By contrast, the sale to Monster and approval of the Settlement Agreement obviate the need for adjudication of the Trademark Adversary Proceeding, saving significant estate resources.

### B.     *Treatment of the Supporting Lenders' claims*

72.     Unlike the Monster litigations, litigation of the Supporting Lenders' claims will not be complex, costly, inconvenient, or require significant delay.  But that is because the DIP Lenders' rights against the Debtors are clearly established under this Court's Final DIP Order and would result in the DIP Lenders receiving superpriority administrative expense claims.  Notwithstanding that clear entitlement, under the Settlement Agreement, the Supporting Lenders will voluntarily subordinate these claims to general unsecured status and will—along with Monster—agree not to share in any recoveries on account of these claims until general unsecured creditors reach the required threshold.   To achieve such a result through litigation—aside from being highly improbable—would certainly require significant estate resources and time.

### VII.    The Paramount Interest of Creditors

73.     The Settlement Agreement is self-evidently in the best interests of creditors and enjoys near-universal support.

74.     It is essential to implement a sale to Monster of substantially all of the Debtors' assets that, at this stage in the cases, is clearly the best way—and likely the only way—for creditors

across the Debtors' prepetition capital structure to potentially receive distributions. The Debtors' months-long marketing process for their assets has yielded only one Qualified Bid for the Debtors' going-concern business, and only one sale transaction that has the potential to generate significant distributions to creditors other than the DIP Lenders and Prepetition Secured Lenders (as defined in the Final DIP Order).

75. Moreover, the sale to Monster and the Settlement Agreement are endorsed by the key creditor representatives in these cases: the Supporting Lenders represent approximately 95% of both the Debtors' DIP Lenders and Prepetition Secured Lenders. The Committee represents the rest of the Debtors' creditors. Both groups support the sale and settlement. Where, as here, all major creditor constituencies support a settlement, the paramount interest of creditors can be determined easily and strongly supports approval of the settlement.

## **Request for Relief**

**WHEREFORE**, the Debtors respectfully request that this Court enter an Order, substantially in the form attached hereto as **Exhibit B**, (a) granting this Motion; (b) approving the Settlement Agreement; and (c) granting such other and further relief as the Court deems just and proper.

*[Remainder of page intentionally blank]*

Dated: June 28, 2023
      Miami, Florida

George A. Davis (admitted *pro hac vice*)
Jonathan J. Weichselbaum (admitted *pro hac vice*)
**LATHAM & WATKINS LLP**
1271 Avenue of the Americas
New York, NY 10020
Telephone:  (212) 906-1200
Email:  george.davis@lw.com
       jon.weichselbaum@lw.com

– and –

Andrew D. Sorkin (admitted *pro hac vice*)
**LATHAM & WATKINS LLP**
555 Eleventh Street, NW, Suite 1000
Washington, D.C. 20004
Telephone:  (202) 637-2200
Email:  andrew.sorkin@lw.com

– and –

Joseph C. Celentino[29]  (admitted *pro hac vice*)
Whit Morley (admitted *pro hac vice*)
**LATHAM & WATKINS LLP**
330 North Wabash Avenue, Suite 2800
Chicago, IL 60611
Telephone: (312) 876-7700
Email:  joe.celentino@lw.com
      whit.morley@lw.com

Respectfully submitted,

*/s/ Jordi Guso*
Jordi Guso
Florida Bar No. 863580
Michael J. Niles
Florida Bar No. 107203
**BERGER SINGERMAN LLP**
1450 Brickell Avenue, Suite 1900
Miami, FL 33131
Telephone:  (305) 755-9500
Email:  jguso@bergersingerman.com
       mniles@bergersingerman.com

*Co-Counsel for the Debtors*

---

[29]  Not admitted in Illinois.  Admitted in New York.

# **EXHIBIT A**

## **Settlement Agreement**

# VITAL PHARMACEUTICALS, INC., *ET AL.*

## SETTLEMENT TERM SHEET

### June 28, 2023

This term sheet (the "***Settlement Term Sheet***") is entered into as of the date set forth above and presents the terms and conditions of a settlement (the "***Settlement***") between and among Vital Pharmaceuticals, Inc. ("***VPX***"), Bang Energy Canada, Inc., JHO Intellectual Property Holdings, LLC ("***JHO***"), JHO Real Estate Investment, LLC, Quash Seltzer, LLC, Rainbow Unicorn Bev, LLC, and Vital Pharmaceuticals International Sales, Inc. (each a "***Debtor***," and collectively, the "***Debtors***"), Truist Bank, as the DIP Agent and the Prepetition Agent (in each case as defined in the Final DIP Order (as defined herein)) (in such capacities, the "***Agents***"), the undersigned Prepetition Lenders (as defined in the Final DIP Order) and DIP Lenders (collectively, the "***Supporting Lenders***"), the Official Committee of Unsecured Creditors (the "***Committee***"), Monster Energy Company ("***MEC***"), Monster Beverage Corporation ("***MBC***," together with MEC, "***Monster***"), and Orange Bang, Inc. ("***OBI***"). The Debtors, the Agents, the Supporting Lenders, the Committee, Monster, and OBI are each individually referred to as a "***Party***" and, collectively, as the "***Parties***" to this Settlement Term Sheet.

This Settlement Term Sheet is being entered into simultaneously and in connection with that certain *Asset Purchase Agreement*[1] (the "***Monster APA***") and the effectiveness of the settlements contemplated herein is expressly conditioned on entry of both an order of the Bankruptcy Court approving the Settlement as well as an order of the Bankruptcy Court authorizing the transaction contemplated in the Monster APA and the consummation of such transaction.[2] These and other conditions precedent to the Settlement are described further below. To the extent there is a conflict between this Settlement Term Sheet and the Monster APA with respect to the rights of the Parties to the Monster APA, the terms of the Monster APA shall control.

Nothing contained in this Settlement Term Sheet shall be an admission of fact or liability.

| 1. Release of Monster Litigation | To the extent provided for in Section 7.16 of the Monster APA, and subject to the terms and conditions thereof in all respects, releases of the litigation claims between Monster and the Debtors shall be exchanged, and the Debtors, the Supporting Lenders, and the Committee shall consent to allowance of the California District Court Action Allowed Unsecured Claim, the OBI/Monster Matter Allowed Unsecured Claim, and the Trade Dress Action Allowed Unsecured Claim, as provided for below. |
|---|---|

---

[1]   *Asset Purchase Agreement* (as amended, modified or supplemented from time to time) made and entered into as of June 28, 2023, by and among VPX, a Florida corporation, the Affiliates of VPX listed on Schedule I thereto, and Blast Asset Acquisition LLC, a Delaware limited liability company, solely for purposes of Section 7.16, MEC, a Delaware corporation, and solely for purposes of Section 7.16 and Section 10.16, MBC, a Delaware corporation.

[2]   Terms used but not defined herein have the meanings given in the Monster APA.

| 2. **Treatment of Monster's Claims** | To the extent provided for in Section 7.2 of the Monster APA, Monster shall receive the allowed claims (the "***Allowed Monster Claims***") provided for below. The Allowed Monster Claims will be subject to the Limitations on Sources of Recovery in all respects. |
|---|---|
| | *California District Court Action Allowed Unsecured Claim*: Monster's asserted claims against the Debtors (whether asserted as administrative or unsecured) on account of the California District Court Action shall be resolved in exchange for an allowed, unsecured, non-administrative claim equal to (i) $292,939,761.00, <u>minus</u> the amount of any remittitur granted by the California District Court pursuant to any ruling on the VPX Post-Verdict Motion (or, in the case of a judgment notwithstanding the verdict in favor of VPX or a grant of a new trial, <u>minus</u> the entire amount), plus accrued interest (if any) until the Petition Date, <u>plus</u> (ii) fifty percent (50%) of any additional award as shall be determined by the California District Court, including, pursuant to any ruling on the MEC Post-Verdict Motion, plus accrued interest until the Petition Date. Neither Monster nor the Debtors will appeal from, seek reconsideration of, or otherwise challenge the California District Court's ruling on such motions/requests for relief, except that Monster may appeal in the event any appeal is taken by Mr. John H. "Jack" Owoc in his individual capacity. |
| | *OBI/Monster Matter Allowed Unsecured Claim*: Monster's asserted claims against the Debtors (whether asserted as administrative or unsecured) on account of the OBI/Monster Matter shall be resolved in exchange for an allowed, unsecured, non-administrative claim equal to $216,131,658.35 <u>plus</u> accrued prepetition interest not included in such amount. Such allowed claim shall be for the benefit of both OBI and Monster and no duplicative claim of OBI shall be allowed. In accordance with the terms of the Monster APA, VPX shall, following the Closing, cause the OBI/Monster Escrow Amount to be distributed to Monster and OBI, and VPX shall have no further obligation to make deposits into the escrow for sales following the Closing. For the avoidance of doubt, the Debtors shall be entitled to receive the OBI/Monster Escrow Excess, and if applicable, Monster shall be entitled to payment of the OBI/Monster Escrow Shortfall, as provided for in the Monster APA. |
| | *Trade Dress Action Allowed Unsecured Claim*: Monster's asserted claims against the Debtors (whether asserted as administrative or unsecured) on account of the Trade Dress Action shall be resolved in exchange for an allowed, unsecured, non-administrative claim equal to $58,000.00, which amount is equal to the award entered in favor of Monster in the Trade Dress Action as taxable litigation costs. |

| | | Neither MEC nor any Affiliates or Representative thereof shall have or be granted allowed claims in the Bankruptcy Case (including any administrative expense claims) other than the California District Court Action Allowed Unsecured Claim, the OBI/Monster Matter Allowed Unsecured Claim, and the Trade Dress Action Allowed Unsecured Claim. |
| 3. | **Treatment of OBI's Claims** | OBI shall receive the benefit of one-half of each of the OBI/Monster Matter Allowed Unsecured Claim and the OBI/Monster Escrow Amount as set forth above. No other claims of OBI, including those arising out of or related to the OBI/Monster Matter and including any administrative expense claims, shall be allowed. |
| | | For the avoidance of doubt, the Debtors shall be entitled to receive the OBI/Monster Escrow Excess as provided for in, and in accordance with the terms of, the Monster APA. |
| 4. | **Treatment of Supporting Lenders' Deficiency Claim** | The Supporting Lenders agree to support a chapter 11 plan providing that any portion of: (i) their claims on account of the DIP Liens and the DIP Superpriority Claims[3] not satisfied from proceeds of the sale distributed on account of the DIP Obligations at Closing in accordance with the Sale Order will be recharacterized as Prepetition Facility Claims and allowed as non-superpriority, non-administrative deficiency claims that are (A) unsecured by the assets of the Debtors and (B) secured by the assets of non-Debtor entities constituting Prepetition Collateral (as defined in the Final DIP Order) as if no Roll-Up (as defined in the Final DIP Order) had occurred; and (ii) the Prepetition Facility Claims not satisfied from proceeds of the sale distributed on account of such claims at Closing in accordance with the Sale Order or proceeds received from the sale of non-Debtor assets will be allowed as unsecured, non-superpriority, non-administrative deficiency claims (collectively, the "<u>Allowed Lender Deficiency Claim</u>"). |
| | | In the event that a chapter 11 plan in the Bankruptcy Case is not confirmed on or before October 31, 2023, or the Debtors' chapter 11 cases convert to cases under chapter 7 of the Bankruptcy Code and a chapter 7 trustee election process is initiated (as discussed herein), the Supporting Lenders agree that their respective portions of the Allowed Lender Deficiency Claim shall be treated as unsecured, non- |

---

[3]   "*DIP Liens*," "*DIP Superpriority Claims*," and "*Prepetition Facility Claims*" have the meanings given in the *Final Order (I) Approving Postpetition Financing, (II) Authorizing Use of Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, and (VI) Granting Related Relief* [ECF No. 638] (the "*Final DIP Order*").

|  | superpriority, non-administrative deficiency claims, and will be subject to the Limitations on Sources of Recovery identified below. |
|---|---|
|  | The Supporting Lenders will not assert or be entitled to recover on account of any adequate protection claims, and the other Parties to the Settlement acknowledge that adequate protection previously received by Supporting Lenders is not subject to disgorgement. |
| **5. Limitations on Sources of Recovery** | The Allowed Monster Claims (excluding the 50% share of the OBI/Monster Matter Unsecured Claim attributable to OBI) and Allowed Lender Deficiency Claims of the Supporting Lenders shall not receive a distribution until all unsecured claims not held by the Supporting Lenders or Monster receive an aggregate distribution of $5 million; *provided*, that to the extent that cash on hand in the bankruptcy estates exceeds $15.5 million minus the aggregate amount of professional fees and expenses accrued since the Closing Date on the earlier of (i) the effective date of any chapter 11 plan or (ii) the date on which the Debtors' cases convert to cases under chapter 7 of the Bankruptcy Code, the $5 million threshold above which Allowed Lender Deficiency Claims of the Supporting Lenders may participate in recoveries to unsecured creditors shall be reduced dollar-for-dollar to the extent of such excess. |
|  | Monster and the Supporting Lenders agree to support a chapter 11 plan providing for such treatment as to all Allowed Lender Deficiency Claims and all Allowed Monster Claims. |
| **6. Plan and Other Support Obligations** | Monster and the Supporting Lenders will support and, subject to the solicitation of votes through a Court-approved disclosure statement, vote their Allowed Monster Claims and Allowed Lender Deficiency Claims, as applicable, in favor of a chapter 11 plan that: |
|  | • is consistent with allowance of claims in amounts, and with priorities, identified in this Settlement Term Sheet; |
|  | • provides equivalent/pro rata treatment of Allowed Monster Claims and the Allowed Lender Deficiency Claims relative to other general unsecured claims, subject to the Limitations on Recovery; |
|  | • includes standard debtor and third-party releases and exculpation for benefit of the Debtors, Committee, Monster, the Buyer, the Buyer Related Parties, the Selling Related Parties, Supporting Lenders, the Agents, the other Prepetition Secured Parties (as defined in the Final DIP Order), and each of their Representatives, it being understood and agreed, that claims |

| | |
|---|---|
| | against all Excluded Parties will not be released or exculpated; and<br><br>• is not otherwise inconsistent with this Settlement Term Sheet.<br><br>In the event that the Debtors' chapter 11 cases convert to cases under chapter 7 of the Bankruptcy Code, Monster, OBI, and the Supporting Lenders (as well as the Agents) agree to support, and vote their Allowed Monster Claims, OBI/Monster Matter Allowed Unsecured Claim, and Allowed Lender Deficiency Claims (as applicable) for and in favor of a chapter 7 trustee to be identified by the Committee prior to the date of such conversion. |
| **7. Implementation/ Conditions Precedent/ Termination** | The Settlement shall be effective only upon all of the following conditions (the "***Conditions Precedent***") having been satisfied:<br><br>• each of the Parties having executed this Settlement Term Sheet;<br><br>• entry of an order of the Bankruptcy Court approving the Settlement in its entirety and without modifications (the "***9019 Order***");<br><br>• entry of an order of the Bankruptcy Court, in form and substance reasonably acceptable to the Parties, approving the Monster APA in its entirety; and<br><br>• closing of the transaction contemplated in the Monster APA.<br><br>Notwithstanding the foregoing, immediately upon execution hereof, each Party further agrees:<br><br>• to use good faith and commercially reasonable efforts to implement the Settlement and achieve satisfaction of the Conditions Precedent; and<br><br>• that the 9019 Order approving the Settlement shall be in form and substance reasonably acceptable to the Parties hereto (except as otherwise provided in the Monster APA with respect to the parties thereto).<br><br>The foregoing obligations of the Parties shall terminate automatically upon the occurrence of any of the following events: (a) the motion to approve the Settlement is denied by the Bankruptcy Court; (b) the Monster APA is terminated in accordance with its terms prior to the Closing; or (c) after entry, the 9019 Order is vacated, reversed, or modified in a manner not acceptable to any Party. |

|   | In the event that any Party materially breaches its obligations under this Settlement Term Sheet (including, without limitation, this Section 7), nothing herein shall waive, prejudice, or otherwise limit any rights or remedies available to the non-breaching Parties in law or equity. |
|---|---|
| **8. Governing Law** | Except to the extent provided otherwise in Section 10.6 of the Monster APA, this Settlement Term Sheet and the Settlement memorialized herein shall be governed by, and construed in accordance with, the laws of the State of Delaware, without regard to choice or conflict of law principles that would result in the application of any laws other than the laws of the State of Delaware.<br><br>Except to the extent provided otherwise in Section 10.8 of the Monster APA, the Bankruptcy Court shall have jurisdiction over any matter or dispute arising from or relating to the implementation of the Settlement or this Settlement Term Sheet. |

*[Remainder of page intentionally left blank]*

IN WITNESS WHEREOF, the Parties hereto have caused this Settlement Term Sheet to be executed as of the date first written above.

**DEBTORS:**

**VITAL PHARMACEUTICALS, INC.**

By: _____
Name: John DiDonato
Title: Chief Transformation Officer

**VITAL PHARMACEUTICALS**
**INTERNATIONAL SALES, INC.**

By: _____
Name: John DiDonato
Title: Chief Transformation Officer

**JHO INTELLECTUAL PROPERTY**
**HOLDINGS, LLC**

By: _____
Name: John DiDonato
Title: Chief Transformation Officer

**JHO REAL ESTATE INVESTMENT, LLC**

By: _____
Name: John DiDonato
Title: Chief Transformation Officer

**QUASH SELTZER, LLC**

By: _____
Name: John DiDonato
Title: Chief Transformation Officer

*[Signature Page to Settlement Term Sheet]*

**BANG ENERGY CANADA, INC.**

By: _____

Name: John DiDonato

Title: Chief Transformation Officer

**RAINBOW UNICORN BEV, LLC**

By: _____
Name: John DiDonato
Title: Chief Transformation Officer

AGENTS:

TRUIST BANK,
as DIP Agent and Prepetition Agent

By: _____

Name:  Jade Silver
Title:  Senior Vice President

SUPPORTING LENDERS:

TRUIST BANK,
as a Supporting DIP Lender and a Supporting Prepetition Lender

By: _Jade Silver_____

Name:  Jade Silver
Title:   Senior Vice President

COBANK, ACB,
as a Supporting DIP Lender and a Supporting Prepetition
Lender

By: _____

Name: Janet Downs
Title:   Lead Special Assets Officer

AGCOUNTRY FARM CREDIT SERVICES, FLCA,
as a Supporting DIP Lender and a Supporting Prepetition
Lender

By: _____
Name:  Lisa Caswell
Title:    Vice President Capital Markets

FARM CREDIT BANK OF TEXAS,
as a Supporting DIP Lender and a Supporting Prepetition
Lender

By: _____

Name: Mike C. Hawkins
Title: Director – Capital Markets

CITIZENS BANK, N.A.,
as a Supporting DIP Lender and a Supporting Prepetition
Lender

By: _____

Name: Michael Flynn
Title:  Senior Vice President

COMPEER FINANCIAL, PCA,
as a Supporting DIP Lender and a Supporting Prepetition
Lender


By: _Kevin Buente_____
Name: Kevin Buente
Title: Principal Credit Officer

SYNOVUS BANK,
as a Supporting DIP Lender and a Supporting Prepetition
Lender

By: _____

Name: John M. Quarles, Jr.
Title:   Senior Special Assets Officer

FEDERAL AGRICULTURAL MORTGAGE
CORPORATION,
as a Supporting DIP Lender and a Supporting Prepetition
Lender


By: _____
Name: Stephen W. Yose
Title:  Director, Senior Credit Risk Officer

GREENSTONE FARM CREDIT SERVICES, FLCA,
as a Supporting DIP Lender and a Supporting Prepetition
Lender


By: _____

Name: Mark Strebel
Title:  Vice President of Risk Assets

COMERICA BANK,
as a Supporting DIP Lender and a Supporting Prepetition
Lender

By:_____

Name: Cynthia B. Jones
Title:   Vice President

HSBC BANK USA, N.A.,
as a Supporting DIP Lender and a Supporting Prepetition
Lender

By: :
Name:  Rino Falsone
Title:   Vice President

UNITED COMMUNITY BANK d/b/a SEASIDE
BANK AND TRUST,
as a Supporting DIP Lender and a Supporting Prepetition
Lender

By: _____
Name: J. Brett Brown
Title: Sr. Vice President

**LOWENSTEIN SANDLER LLP**, on behalf of the **OFFICIAL COMMITTEE OF UNSECURED CREDITORS**

By: _____

Name: Jeffrey L. Cohen

Title: Partner

By signing above, Lowenstein Sandler LLP represents that it has been duly authorized by the Official Committee of Unsecured Creditors (the "Committee") to bind the Committee to the terms of this Settlement Agreement Term Sheet

**MONSTER ENERGY COMPANY**

By: _____
Name: Hilton H. Schlosberg
Title:  Vice Chairman of the Board of Directors,
        Co-Chief Executive Officer


**MONSTER BEVERAGE CORPORATION**

By: _____
Name: Hilton H. Schlosberg
Title:  Vice Chairman of the Board of Directors,
        Co-Chief Executive Officer

VITAL PHARMACEUTICALS, INC.
SETTLEMENT AGREEMENT TERM SHEET

**ORANGE BANG, INC.**

By: _____

Name:  PRESIDENT

Title:  06/16/23

VITAL PHARMACEUTICALS, INC.
SETTLEMENT AGREEMENT TERM SHEET

**EXHIBIT B**

**Proposed Order**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION
www.flsb.uscourts.gov

In Re:                                          Chapter 11 Cases

VITAL PHARMACEUTICALS, INC., *et al.*,[1]       Case No.: 22-17842-PDR

    Debtors.                                (Jointly Administered)
_____/

**ORDER GRANTING DEBTORS' *EXPEDITED* MOTION
TO APPROVE COMPROMISE BETWEEN (I) THE DEBTORS, (II) MONSTER
ENERGY COMPANY, (III) MONSTER BEVERAGE CORPORATION, (IV) ORANGE
BANG, INC., (V) THE COMMITTEE, AND (VI) THE SUPPORTING LENDERS**

**THIS MATTER** having come before the Court upon the *Debtors' Expedited Motion to*

*Approve Compromise Between (I) the Debtors, (II) Monster Energy Company, (III) Monster*

*Beverage Corporation, (IV) Orange Bang, Inc., (V) the Committee, and (VI) the Supporting*

---

[1] The address of the Debtors is 1600 N. Park Drive, Weston, FL 33326.  The last four digits of the Debtors' federal tax identification numbers are: (i) Vital Pharmaceuticals, Inc. (8430); (ii) Bang Energy Canada, Inc. (5454); (iii) JHO Intellectual Property Holdings, LLC (0010); (iv) JHO Real Estate Investment, LLC (9394); (v) Quash Seltzer, LLC (6501); (vi) Rainbow Unicorn Bev, LLC (2254); and (vii) Vital Pharmaceuticals International Sales, Inc. (8019).

*Lenders* (the "Motion") [ECF No. _____] filed by the Debtors[2]. The Court, having considered the Motion [,the [●] Declaration,] and the Settlement Agreement attached to the Motion as **Exhibit A**, and being otherwise fully advised in the premises, and for good cause, it is hereby:

**ORDERED** and **ADJUDGED** as follows:

1.      The Motion is **GRANTED**.

2.      The Settlement Agreement attached as **Exhibit A** to the Motion and this Order is **APPROVED** in its entirety, and each and every provision of the Settlement Agreement is incorporated herein as if fully set forth in this Order.

3.      The parties to the Settlement Agreement are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the Settlement Agreement.

4.      The Parties are directed to comply with the terms of the Settlement Agreement and the Court reserves jurisdiction to enforce the terms of the Settlement Agreement.

#   #   #

Submitted by:
Jordi Guso, Esq.
Michael J. Niles, Esq.
BERGER SINGERMAN LLP
1450 Brickell Avenue, Ste. 1900
Miami, FL  33131
Telephone: (305) 755-9500
Facsimile: (305) 714-4340
Email:  jguso@bergersingerman.com
Email:  mniles@bergersingerman.com

*(Attorney Guso is directed to serve this order upon all non-registered users who have yet to appear electronically in this case and file a conforming certificate of service.)*

---

[2] Capitalized terms used but not defined herein shall have the meanings ascribed in the Motion.

**Exhibit A**

**Settlement Agreement**