## EXHIBIT A

**Asset Purchase Agreement**

*EXECUTION VERSION*

**ASSET PURCHASE AGREEMENT**

**BY AND AMONG**

**VITAL PHARMACEUTICALS, INC., AS THE SELLER,**

**EACH OF THE AFFILIATES OF THE SELLER LISTED ON SCHEDULE I**

**AND**

**BLAST ASSET ACQUISITION LLC, AS THE BUYER,**

**SOLELY FOR PURPOSES OF SECTION 7.16,**

**MONSTER ENERGY COMPANY**

**AND**

**SOLELY FOR PURPOSES OF SECTION 7.16 AND SECTION 10.16,**

**MONSTER BEVERAGE CORPORATION**

**DATED AS OF JUNE 28, 2023**

**TABLE OF CONTENTS**

**Page**

ARTICLE I DEFINITIONS ...................................................................................4

    Section 1.1    Definitions.........................................................................4
    Section 1.2    Construction ......................................................................21

ARTICLE II PURCHASE AND SALE ................................................................22

    Section 2.1    Purchase and Sale of Assets..............................................22
    Section 2.2    Excluded Assets ................................................................25
    Section 2.3    Assumed Liabilities ..........................................................27
    Section 2.4    Excluded Liabilities ..........................................................28
    Section 2.5    Assumption and Assignment of Certain Contracts..................29
    Section 2.6    Designation of Assets and Liabilities .................................31
    Section 2.7    Consents to Certain Assignments .......................................31
    Section 2.8    Wrong Pockets ..................................................................32

ARTICLE III PURCHASE PRICE; DEPOSIT ..................................................33

    Section 3.1    Purchase Price ...................................................................33
    Section 3.2    Deposit Escrow; Deposit Release .......................................34
    Section 3.3    Allocation.........................................................................36
    Section 3.4    Closing Cash Amount ........................................................37

ARTICLE IV THE CLOSING .............................................................................38

    Section 4.1    Time and Place of the Closing............................................38
    Section 4.2    Deliveries by the Seller .....................................................38
    Section 4.3    Deliveries by the Buyer .....................................................39

ARTICLE V REPRESENTATIONS AND WARRANTIES OF THE SELLING
ENTITIES ...........................................................................................................39

    Section 5.1    Organization, Standing and Corporate Power ......................39
    Section 5.2    Authority; Execution and Delivery; Enforceability ...............39
    Section 5.3    No Conflicts......................................................................40
    Section 5.4    Legal Proceedings and Orders ...........................................41
    Section 5.5    Permits .............................................................................41
    Section 5.6    Compliance with Law ........................................................42
    Section 5.7    Absence of Certain Developments.......................................42
    Section 5.8    Financial Statements .........................................................42
    Section 5.9    Employee Benefit Plans .....................................................43
    Section 5.10    Material Contracts.............................................................45
    Section 5.11    Intellectual Property; Information Technology .....................46
    Section 5.12    Data Privacy.....................................................................47
    Section 5.13    Taxes...............................................................................48

Section 5.14    Insurance ................................................................48
Section 5.15    Title to Assets; Real Property ................................49
Section 5.16    Environmental Matters ............................................50
Section 5.17    Brokers ....................................................................51
Section 5.18    OFAC; Foreign Corrupt Practices Act; Anticorruption Laws ..................51
Section 5.19    Material Customers; Material Suppliers ..................51
Section 5.20    Affiliate Transactions .............................................52
Section 5.21    Sufficiency of Assets ..............................................52
Section 5.22    Food Regulatory Matters ........................................52

ARTICLE VI REPRESENTATIONS AND WARRANTIES OF THE BUYER ......................53

Section 6.1    Organization and Good Standing .............................53
Section 6.2    Authority Relative to this Agreement ......................53
Section 6.3    No Violation; Consents ...........................................53
Section 6.4    Legal Proceedings and Orders .................................54
Section 6.5    Brokers ....................................................................54
Section 6.6    Buyer Funding ........................................................54
Section 6.7    Solvency ..................................................................55

ARTICLE VII COVENANTS OF THE PARTIES ..............................................55

Section 7.1    Conduct of Business of the Selling Entities .............55
Section 7.2    Allowed Claims of MEC and Orange Bang, Inc. .....57
Section 7.3    Access to and Delivery of Information; Maintenance of Records; Transition and Destruction ..............57
Section 7.4    Expenses ..................................................................59
Section 7.5    Further Assurances ..................................................59
Section 7.6    Public Statements ....................................................60
Section 7.7    Governmental Authority Approvals and Cooperation ......60
Section 7.8    Termination or Assumption of Certain Intellectual Property Licenses/Agreements ..............62
Section 7.9    Employee Matters ....................................................63
Section 7.10    Tax Matters .............................................................65
Section 7.11    Submission for Bankruptcy Court Approval ...........66
Section 7.12    Adequate Assurance ...............................................67
Section 7.13    Transfer of Purchased Assets; Wind-Down of Subsidiaries; Payments Received ..............67
Section 7.14    Name Changes .........................................................69
Section 7.15    Purchased Assets "AS IS;" Certain Acknowledgements ......69
Section 7.16    Mutual Release ........................................................70
Section 7.17    Withholding .............................................................73
Section 7.18    Title Matters ...........................................................74
Section 7.19    OBI/Monster Escrow ..............................................74
Section 7.20    Contributions ..........................................................75
Section 7.21    Reservation of Rights ..............................................75
Section 7.22    Vehicle Loans ..........................................................76

Section 7.23    Ratification ...................................................................................76

ARTICLE VIII CONDITIONS TO CLOSING...........................................................76

Section 8.1    Conditions to Each Party's Obligations to Effect the Closing.................76
Section 8.2    Conditions to Obligations of the Buyer .........................................77
Section 8.3    Conditions to Obligations of the Selling Entities .............................77
Section 8.4    Frustration of Closing Conditions................................................78

ARTICLE IX TERMINATION; WAIVER..................................................................78

Section 9.1    Termination.......................................................................78
Section 9.2    Procedure and Effect of Termination............................................81
Section 9.3    Extension; Waiver................................................................82

ARTICLE X MISCELLANEOUS PROVISIONS ........................................................82

Section 10.1    Amendment and Modification ...................................................82
Section 10.2    Survival .........................................................................82
Section 10.3    Notices ..........................................................................82
Section 10.4    Assignment ......................................................................83
Section 10.5    Severability .....................................................................84
Section 10.6    Governing Law ..................................................................84
Section 10.7    Acknowledgement and Release; Non-Recourse...................................84
Section 10.8    Submission to Jurisdiction; WAIVER OF JURY TRIAL ......................85
Section 10.9    Counterparts .....................................................................86
Section 10.10  Incorporation of Schedules and Exhibits .......................................87
Section 10.11  Entire Agreement .................................................................87
Section 10.12  Specific Performance .............................................................87
Section 10.13  Bulk Sales or Transfer Laws .....................................................88
Section 10.14  Seller Disclosure Schedule .......................................................88
Section 10.15  Mutual Drafting; Headings; Information Made Available .......................89
Section 10.16  Guarantee .........................................................................89
Section 10.17  Use of Retained Records..........................................................91
Section 10.18  Approval of the Bankruptcy Court ..............................................92

SCHEDULES

Schedule I                Other Selling Entities

Seller Disclosure Schedules

Section 1.1(a)        Business Marks
Section 1.1(b)        Permitted Encumbrances
Section 1.1(c)        Real Property Leases
Section 2.1(d)        Assumed Agreements
Section 2.1(e)        Assumed Real Property Leases
Section 2.1(f)        Owned Real Property
Section 2.1(h)        Personal Property Assets
Section 2.2           Excluded Assets
Section 2.4(j)        Additional Excluded Liabilities
Section 2.5(a)        Amounts Necessary to Cure Defaults of Assumed Contracts
Section 3.1(a)        Entourage Assets
Section 5.2           Authority; Execution and Delivery; Enforceability
Section 5.3(a)        Required Consents and Approvals
Section 5.4           Legal Proceedings and Orders
Section 5.5           Permits
Section 5.6           Compliance with Laws
Section 5.7           Absence of Certain Developments
Section 5.8           Financial Statements
Section 5.9           Employee Benefit Plans
Section 5.10          Material Contracts
Section 5.11          Intellectual Property
Section 5.13          Taxes
Section 5.14          Insurance
Section 5.15          Title to Assets; Real Property
Section 5.17          Brokers
Section 5.19          Material Customers; Material Suppliers
Section 5.20          Affiliate Transactions
Section 5.21          Sufficiency of Assets
Section 5.22          Food Regulatory Matters
Section 7.1           Conduct of Business of Selling Entities
Section 7.3           Trade Secret Cooperation
Section 7.8(b)        Termination of Certain Intellectual Property Licenses/Agreements
Section 7.8(c)        Assumption of Certain Intellectual Property Licenses/Agreements
Section 9.1(k)        Budget

EXHIBITS

Exhibit A             Form of Sale Order
Exhibit B             Form of Assignment and Assumption Agreement
Exhibit C             Form of Bill of Sale

Exhibit D          Form of Intellectual Property Assignment Agreements
Exhibit E          Escrow Agreement
Exhibit F          Form of Mutual Release of Liability
Exhibit G          Form of Owner's Affidavit
Exhibit H          Form of Deed

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (as amended, modified or supplemented from time to time, this "Agreement") is made and entered into as of June 28, 2023, by and among Vital Pharmaceuticals, Inc., a Florida corporation (the "Seller"), the Affiliates of the Seller listed on Schedule I (such Affiliates, together with the Seller, the "Selling Entities"), and Blast Asset Acquisition LLC, a Delaware limited liability company (the "Buyer"), solely for purposes of Section 7.16, Monster Energy Company, a Delaware corporation ("MEC"), and solely for purposes of Section 7.16 and Section 10.16, Monster Beverage Corporation, a Delaware corporation ("MBC"). Each of the Selling Entities and the Buyer are referred to herein as a "Party" and collectively as the "Parties." Capitalized terms used but not otherwise defined herein have the meanings set forth in Article I.

## RECITALS

**WHEREAS**, the Seller and the other Debtor Entities commenced voluntary cases under the Bankruptcy Code in the Bankruptcy Court on October 10, 2022 (the "Petition Date");

**WHEREAS**, each of the Seller and the other Debtor Entities continues to be in possession of its assets and is authorized under the Bankruptcy Code to continue the operation of its businesses as a debtor-in-possession;

**WHEREAS**, the Buyer desires to purchase from the Selling Entities, and the Selling Entities desire to sell to the Buyer, those assets of the Selling Entities which are more particularly described in the provisions hereof, and the Buyer desires to assume from the Selling Entities, certain specified liabilities, in each case pursuant to the terms and subject to the conditions set forth herein;

**WHEREAS**, as a condition and inducement to the Selling Entities' willingness to enter into this Agreement, MBC is joining in this Agreement to guarantee the obligations of the Buyer in connection with this Agreement (MBC in its capacity as the provider of such guarantee, the "Guarantor") pursuant to and to the extent set forth in Section 10.16 hereof;

**WHEREAS**, HSR filings were submitted by the Buyer and Seller on May 23, 2023, after which the Buyer withdrew its HSR filing on June 6, 2023, and the Buyer resubmitted that filing on June 7, 2023;

**WHEREAS**, the Buyer and Seller received second requests from the FTC on June 22, 2023;

**WHEREAS,** if the second requests are not rescinded by the FTC, the investigation is not closed, and/or the HSR Act waiting period (including any extensions thereof) has not expired or been terminated by June 30, 2023, this Agreement shall automatically terminate on such date, unless such date is expressly extended in writing by both the Buyer and the Selling Entities;

**WHEREAS,** upon this Agreement terminating pursuant to Section 9.1(g)(i) hereof, the Deposit shall immediately be returned to the Buyer;

3

**WHEREAS**, the Selling Entities and the Buyer have agreed that the sale, transfer and assignment of the Purchased Assets and the Assumed Liabilities from the Selling Entities to the Buyer shall be effected pursuant to sections 105, 363 and 365 of the Bankruptcy Code; and

**WHEREAS**, in connection with the Bankruptcy Case and subject to the terms and conditions contained herein, following entry of the Sale Order, the Selling Entities shall sell and transfer to the Buyer, and the Buyer shall purchase and acquire from the Selling Entities, pursuant to sections 105, 363 and 365 of the Bankruptcy Code, the Purchased Assets, and the Buyer shall assume from the Selling Entities the Assumed Liabilities, all as more specifically provided herein and in the Sale Order.

**NOW**, **THEREFORE**, in consideration of the premises and of the mutual covenants and agreements contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, hereby agree as follows:

## ARTICLE I
## DEFINITIONS

Section 1.1    Definitions.    A defined term has its defined meaning throughout this Agreement and in each Exhibit and Schedule to this Agreement, regardless of whether it appears before or after the place where it is defined.  As used in this Agreement, the following terms have the meanings specified below:

"9019 Motion" means the *Debtors' Expedited Motion to Approve Compromise between (I) the Debtors, (II) Monster Energy Company, (III) Monster Beverage Corporation, (IV) Orange Bang, Inc., (V) the Committee, and (VI) the Supporting Lenders.*

"9019 Order" means an order entered by the Bankruptcy Court granting the 9019 Motion, in form and substance reasonably acceptable to the Seller and the Buyer.

"ACA" has the meaning given to such term in Section 5.9(c).

"Accounting Firm" has the meaning given to such term in Section 3.3.

"Accounts Receivable" means any and all (a) accounts receivable, notes receivable, trade receivables and other amounts receivable generated by the Business or otherwise owed to the Selling Entities (whether current or non-current), together with all security or collateral therefor and any interest or unpaid financing charges accrued thereon, including all causes of action pertaining to the collection of amounts payable, or that may become payable, to the Selling Entities with respect to products sold or services performed on or prior to the Closing Date, (b) license and royalty receivables payable, or that may become payable, to the Selling Entities with respect to products sold or services performed on or prior to the Closing Date and (c) other amounts due to the Selling Entities which the Selling Entities have historically classified as accounts receivable in the Seller Financial Statements with respect to products sold or services performed on or prior to the Closing Date.

"Affiliate" means, with respect to any specified Person, any other Person that directly or indirectly, through one or more intermediaries, controls, is controlled by or is under common control with, such specified Person.  For purposes of this definition, "control" (and any similar term) means the power of one or more Persons to direct, or cause the direction of, the management or affairs of another Person by reason of ownership of voting stock, as general partner or managing member or by Contract or otherwise.

"Agreement" has the meaning given to such term in the Preamble hereto.

"Allocation" has the meaning given to such term in Section 3.3.

"Anticorruption Laws" means all Laws of any jurisdiction applicable to the Selling Entities or the Business from time to time concerning or relating to bribery or corruption.

"Assignment and Assumption Agreement" means one or more Assignment and Assumption Agreements to be executed and delivered by the Buyer and the Selling Entities at the Closing, with respect to the Assumed Agreements, Assumed Liabilities, and the Assumed Real Property Leases, substantially in the form of Exhibit B.

"Assumed Agreements" has the meaning given to such term in Section 2.1(d).

"Assumed Liabilities" has the meaning given to such term in Section 2.3.

"Assumed Real Property Leases" has the meaning given to such term in Section 2.1(e).

"Assumed WARN Act Liabilities" has the meaning given to such term in Section 7.9(b).

"Assumption Approval" has the meaning given to such term in Section 2.5(g).

"Balance Sheet Date" has the meaning given to such term in Section 5.8(a).

"Bankruptcy Case" means the Seller's and the Debtor Entities' cases commenced under Chapter 11 of the Bankruptcy Code jointly administered under Case No. 22-17842 (PDR) in the Bankruptcy Court.

"Bankruptcy Code" means Title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq*, as amended.

"Bankruptcy Court" means the United States Bankruptcy Court for the Southern District of Florida or such other court having competent jurisdiction over the Bankruptcy Case.

"Bill of Sale" means one or more Bills of Sale to be executed and delivered by the Selling Entities to the Buyer at the Closing, substantially in the form of Exhibit C.

"Business" means the business of designing, formulating, manufacturing, marketing, distributing and selling energy and performance beverages, nutritional supplements and low alcohol beverages and products, services and merchandising to the extent relating to the foregoing,

including under the Business Marks, in each case, as conducted by the Selling Entities in the United States of America.

"Business Day" means any day that is not a Saturday, Sunday or other day on which banks are required or authorized by Law to be closed in New York, New York.

"Business Marks" means all Trademarks in all classes of goods and services containing, in whole or in part, the names, terms or logos listed on Section 1.1(a) of the Seller Disclosure Schedule, or any combinations or variation thereof.

"Business Names" means "Bang," "Bang Energy" and any names being used by the Selling Entities as of the date of this Agreement.

"Buyer" has the meaning given to such term in the Preamble hereto.

"Buyer Default Termination" has the meaning given to such term in Section 3.2.

"Buyer Fundamental Representations" has the meaning given to such term in Section 8.3(b).

"Buyer Related Party" means, collectively, the Buyer and its Affiliates (including MEC and MBC) and each of the foregoing's respective current and former Representatives; but excluding, in all cases, any Excluded Parties.

"Buyer Releasing Party" has the meaning given to such term in Section 7.16(a).

"California District Court" means the United States District Court for the Central District of California.

"California District Court Action" means the action including the Seller, MEC, and John H. "Jack" Owoc filed in the California District Court, captioned *Monster Energy Co. v. Vital Pharmaceuticals, Inc.*, Case No. 18-cv-1882 (C.D. Cal., filed Sept. 4, 2018), including the appeals thereof and any other related Proceedings.

"California District Court Action Allowed Unsecured Claim" means an allowed general unsecured claim in the Bankruptcy Case in favor of MEC in an amount equal to (i) $292,939,761.00, minus the amount of any remittitur granted by the California District Court pursuant to any ruling on the Seller Post-Verdict Motion (or, in the case of a judgment notwithstanding the verdict in favor of the Seller or a grant of a new trial, minus the entire amount), plus accrued interest (if any) until the Petition Date, plus (ii) fifty percent (50%) of any additional award as shall be determined by the California District Court, including, pursuant to any ruling on the MEC Post-Verdict Motion, plus accrued interest until the Petition Date.

"Cash" means any cash and cash equivalents (including checks, deposits, demand deposits, money markets or similar accounts, escrow accounts, checking account balances, marketable securities, short-term instruments, certificates of deposits, time deposits, bankers' acceptances, commercial paper, security entitlements, securities accounts or deposits, commodity Contracts,

commodity accounts, government securities and any other cash equivalents, whether on hand, in transit, in banks or other financial institutions, or otherwise held by or on behalf of any Person).

"Cash Purchase Price" means an amount equal to (a) Three Hundred Sixty Two Million Dollars ($362,000,000.00) plus (b) the Closing Cash Amount minus (c) the Deposit.  For the purposes of the definition of "Cash Purchase Price," the "Deposit" shall include any interest accrued on the amount deposited by the Buyer into the Escrow Account pursuant to Section 3.2.

"Claim" has the meaning given to such term in Section 101(5) of the Bankruptcy Code, except when used in the definition of Excluded Estate Claims and in Section 7.16, in which cases it has the meaning given in Section 7.16.

"Closing" has the meaning given to such term in Section 4.1.

"Closing Cash Amount" means, without duplication, the aggregate amount of (i) the Purchased Assets which will be acquired by the Buyer at the Closing pursuant to and in accordance with Section 2.1(c), calculated based upon and consistent with the books and financial records of the Selling Entities; and (ii) to the extent the Buyer designates as an Assumed Agreement or an Assumed Real Property Lease, as applicable, in accordance with Section 2.5, any Non-Real Property Contract or Real Property Lease that any Selling Entity is seeking to reject, all amounts, costs and expenses incurred, owing or outstanding as of the Closing, or paid by the Selling Entities after (x) filing a motion to reject or (y) otherwise providing written notice to the Buyer of the Selling Entities' intent to reject, but as of or prior to the Closing (or if later, the date on which such Non-Real Property Contract or Real Property Lease, as applicable, is assumed by the Buyer), under all such Non-Real Property Contracts and Real Property Leases.

"Closing Date" has the meaning given to such term in Section 4.1.

"Closing Payroll Period" has the meaning given to such term in Section 7.9(d).

"Closing Statement" has the meaning given to such term in Section 3.4(b).

"COBRA" has the meaning given to such term in Section 7.9(b).

"Code" means the Internal Revenue Code of 1986, as amended.

"Cohen Matter" means the action including MEC and Stephen Cohen filed in the Superior Court for the State of California, County of San Diego, captioned *Monster Energy Co. v. Stephen Cohen*, Case No. 37-2019-00051917 (San Diego Super. Ct., filed Sept. 26, 2019).

"Confidentiality Agreement" means, collectively, (i) the Confidentiality and Non-Disclosure Agreement, by and between the Seller and MEC, dated February 15, 2023, and (ii) the Clean Team Addendum thereto dated as of the same date.

"Consent" means any approval, consent, ratification, designation, permission, clearance, waiver or other authorization.

"Contract" means, with respect to any Person, any lease, sublease, contract, license, sublicense or other agreement (including any employment, marketing, distributor or other type of contract or agreement) to which such Person is a party or by which such Person is bound, whether written or oral, and that is legally enforceable against such Person.

"Contract Notice Period" has the meaning given to such term in Section 2.5(d).

"Cure Payments" has the meaning given to such term in Section 2.5(f).

"Cure Schedule" has the meaning given to such term in Section 7.11(b).

"Debtor Entities" means (a) the Seller, (b) Bang Energy Canada, Inc., a Florida corporation, (c) JHO Intellectual Property Holdings, LLC, a Florida limited liability company, (d) JHO Real Estate Investment, LLC, a Florida limited liability company, (e) Quash Seltzer, LLC, a Florida limited liability company, (f) Rainbow Unicorn Bev, LLC, a Florida limited liability company, and (g) Vital Pharmaceuticals International Sales, Inc., a Delaware corporation.

"Deed" means one or more Special Warranty Deeds transferring fee simple title (or the local equivalent) of the applicable Owned Real Property to the Buyer to be executed, notarized, and delivered by the applicable Selling Entities to the Buyer at Closing, in each case, in all material respects in the form attached hereto as Exhibit H.

"Dees Matter" means the action including MEC and Bryan Shane Dees filed before JAMS, captioned *Monster Energy Co. v. Bryan Shane Dees*, Case No. 1310025232 (JAMS, filed Oct. 8, 2020).

"Deposit" has the meaning given to such term in Section 3.2.

"DIP Lenders" has the meaning given to such term in the DIP Order.

"DIP Obligations" has the meaning given to such term in the DIP Order.

"DIP Order" means the Final Order *(I) Approving Postpetition Financing, (II) Authorizing Use of Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, and (VI) Granting Related Relief*, ECF No. 638, filed on January 12, 2023.

"D&O Claims" means all rights, claims and causes of action against any current or former director, officer, equityholder or Transferred Employee of any Selling Entity and all rights, claims and causes of action under director and officer, fiduciary, employment practices and similar insurance policies maintained by any Selling Entity.

"D&O Insurance" has the meaning given to such term in Section 2.2(o).

"Documentary Materials" has the meaning given to such term in Section 2.1(i).

"DOJ" has the meaning given to such term in Section 7.7(a).

"DOL" has the meaning given to such term in Section 5.9(b).

"Employees" means all employees of the Selling Entities, including those on disability or a leave of absence, whether paid or unpaid.

"Encumbrance" means any charge, lien (statutory or otherwise), mortgage, lease, hypothecation, encumbrance, pledge, security interest, option, right of use, first offer or first refusal, easement, servitude, encroachment or similar restriction or other encumbrance affecting any right or title to the Purchased Assets.

"Entourage Assets" has the meaning given to such term in Section 3.1(a).

"Entourage Consideration" has the meaning given to such term in Section 3.1(a).

"Entourage IP Holdings" means Entourage IP Holdings, LLC, a Florida limited liability company.

"Environmental Laws" means Laws relating to pollution, natural resources, Hazardous Materials, or the protection of the environment or to occupational health and safety.

"Environmental Permits" means any permit, certificate, consent, registration, notice, approval, identification number, license or other authorization required under any applicable Environmental Law.

"ERISA" has the meaning given to such term in Section 5.9(a).

"ERISA Affiliate" has the meaning given to such term in Section 5.9(e).

"Escrow Account" has the meaning given to such term in Section 3.2.

"Escrow Agent" has the meaning given to such term in Section 3.2.

"Escrow Agreement" has the meaning given to such term in Section 3.2.

"Excluded Assets" has the meaning given to such term in Section 2.2.

"Excluded Estate Claims" means (i) any rights, claims or causes of action as of the Closing of any Selling Entity or any of its Affiliates (including any D&O Claims) against any of the Excluded Parties and (ii) any rights, claims or causes of action that relate to any Excluded Assets or Excluded Liabilities.

"Excluded Liabilities" has the meaning given to such term in Section 2.4.

"Excluded Parties" means each of John "Jack" H. Owoc, Megan E. Owoc, each of their family members, any of their Affiliates, and any trusts or other estate planning vehicles of which any of the foregoing are trustees or beneficiaries, in each case that are not Selling Entities, including Entourage IP Holdings, LLC, Cognitive IP Holdings, LLC, Fun Energy, LLC, Bang Energy Family, LLC, Bang Gyms, LLC, Candemonium, LLC, Captain Crunch Fishing, LLC, Liquid IP Holdings, LLC, The Fixx, LLC, Bang Vapes, LLC, Ultra Experiences, LLC, Bang

Foods, LLC, Energy Train, LLC, VPX Swim and Sports Gear, LLC, Stoked Seltzer, LLC, Stoked Brands, LLC, Birth Right, LLC, Bang Energy International, LLC, JHO GA-1 Investment, LLC, JHO NV-1 Investment, LLC, Sheridan Real Estate Investment A, LLC, Sheridan Real Estate Investment B, LLC and Sheridan Real Estate Investment C, LLC.

"Excluded WARN Act Liabilities" has the meaning given to such term in Section 7.9(b).

"FCPA" has the meaning given to such term in Section 5.18(b).

"FDA" has the meaning given to such term in the definition of "Food Regulatory Laws."

"Filing Fees" has the meaning given to such term in Section 7.7(a).

"Final Allocation" has the meaning given to such term in Section 3.3.

"Final Order" means a judgment or order of the Bankruptcy Court (or any other court of competent jurisdiction) entered by the clerk of the Bankruptcy Court (or such other court) on the docket in the Bankruptcy Cases (or the docket of such other court), which has not been modified, amended, reversed, vacated or stayed (other than such modifications or amendments that are consented in writing to by the Buyer) and as to which (a) the time to appeal, petition for certiorari, or move for a new trial, stay, reargument or rehearing has expired and as to which no appeal, petition for certiorari or motion for new trial, stay, reargument or rehearing shall then be pending or (b) if an appeal, writ of certiorari, new trial, stay, reargument or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court (or other court of competent jurisdiction) shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, stay, reargument or rehearing shall have expired, as a result of which such proceeding or order shall have become final in accordance with Rule 8002 of the Federal Rules of Bankruptcy Procedure; *provided* that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedures, or any analogous rule under the Federal Rules of Bankruptcy Procedure, may be filed relating to such order, shall not cause an order not to be a Final Order.

"Food Regulatory Laws" means all laws, regulations, and requirements relating to food and beverage manufacturing, storage, preparation, packaging, marketing, advertising, labeling and sale, including the Federal Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. § 301 et seq., the Federal Trade Commission Act, 15 U.S.C. § 41 et seq., the California Safe Drinking Water and Toxic Enforcement Act of 1986 (also known as Proposition 65), Cal. Health & Safety § 25249.5 et seq., relevant provisions of 9 C.F.R. pt. 66 (the United States Department of Agriculture's national mandatory bioengineered food disclosure standard), and other applicable laws and regulations administered or issued by the U.S. Food and Drug Administration ("FDA"), the FTC, or any similar governmental entity where the Selling Entities' products are manufactured, stored, prepared, packaged, marketed, advertised, labeled or sold.

"Fraud" means an act committed by (a) the Selling Entities, in the making to the Buyer of the representations and warranties expressly contained in Article V (as qualified by the Seller Disclosure Schedules and in accordance with the express terms and conditions (including limitations and exclusions) of this Agreement) or in the certificate to be delivered pursuant to Section 8.2(c), and (b) the Buyer, in the making to the Selling Entities of the representations and

warranties expressly contained in <u>Article VI</u> (in accordance with the express terms and conditions (including limitations and exclusions) of this Agreement) or in the certificate to be delivered pursuant to <u>Section 8.3(c)</u>, in any such case, that constitutes actual and intentional fraud under Delaware Law (and does not in any case include any fraud or claim based on equitable fraud, constructive knowledge, promissory fraud, reckless or negligent misrepresentation or omission, or a similar theory).

"<u>FTC</u>" has the meaning given to such term in <u>Section 7.7(a)</u>.

"<u>GAAP</u>" means generally accepted accounting principles in the United States.

"<u>General Enforceability Exceptions</u>" means (a) bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and other similar Laws of general application affecting or relating to the enforcement of creditors' rights generally and (b) general equitable principles, whether considered in a proceeding at law or in equity.

"<u>Governmental Authority</u>" means any federal, municipal, state, regional, provincial, local or foreign governmental, quasi-governmental, self-regulatory, administrative or regulatory authority, department, agency, board, bureau, commission or body (including any court, arbitral body or similar tribunal), including the Bankruptcy Court.

"<u>Governmental Authorization</u>" means any Permit or Consent issued, granted, given or otherwise made available by or under the authority of any Governmental Authority or pursuant to any Law.

"<u>Guaranteed Obligations</u>" is defined in <u>Section 10.16(a)</u>.

"<u>Guarantor</u>" has the meaning given to such term in the Recitals above.

"<u>Hazardous Materials</u>" means any material, substance or waste that is listed, classified, regulated, characterized or otherwise defined as "hazardous," "toxic," "radioactive," a "pollutant," or "contaminant," (or words of similar intent or meaning) under any Environmental Laws, including any quantity of asbestos in any form, urea formaldehyde, PCBs, radon gas, mold, crude oil or any fraction thereof, all forms of natural gas, petroleum products, petroleum breakdown products, petroleum by-products or petroleum derivatives.

"<u>HSR Act</u>" has the meaning given to such term in <u>Section 7.7(a)</u>.

"<u>Intellectual Property</u>" means the global intellectual or proprietary rights, which may exist or be created under the Laws of any jurisdiction in the world, including all: (a) rights associated with works of authorship (including can art, text, and graphics, packaging art, text and graphics, and website art, text and graphics and copyrights in the Trademarks), including exclusive exploitation rights, mask work rights, copyrights, and moral and similar attribution rights; (b) Trademarks, and design rights; (c) proprietary rights in internet domain names, IP addresses, social media and third-party website handles, pages, and accounts including the access information for the same; (d) trade secrets, formulas, recipes, and ingredients lists, including the access information for the same, know-how, technical data, processes, techniques, lists of or information relating to suppliers and customers, pricing lists and methodologies, cost and market share data,

marketing and business plans, financial forecasts and histories, and budgets; (e) patents, industrial design and other industrial property rights; (f) rights in or relating to any and all registrations, goodwill, issuances, provisionals, reissuances, continuations, continuations-in-part, revisions, substitutions, reexaminations, renewals, extensions, combinations, divisions, and reissues of, and applications for, any of the foregoing rights and all common law rights; (g) rights of publicity; and (h) rights to prosecute, sue, enforce, or recover or retain damages, costs, or attorneys' fees with respect to the past, present and future infringement, misappropriation, dilution, unauthorized use or disclosure, or other violation of any of the foregoing.

"Inventory" means all inventory (including raw materials, products in-process, finished products, goods in transit, packaging materials and other inventories) owned by any of the Selling Entities relating to the Business, wherever located and whether in the Selling Entities' warehouses, distribution facilities or otherwise.

"IP Assignment Agreements" means the Intellectual Property Assignment Agreements to be executed and delivered by the Selling Entities and the Buyer, substantially in the forms attached hereto as Exhibit D, or as amended as necessary to meet local jurisdictional requirements.

"IRS" means the U.S. Internal Revenue Service.

"IT Systems" means any and all information, payment and communications technologies owned or controlled by the Selling Entities and used in the conduct of the Business, including all computers, hardware, software (whether in object or source code form), databases, servers, workstations, routers, hubs, switches, data communication lines, networks and all other information technology systems included therein.

"Joint Defense Agreement" means that certain Common Interest and Joint Defense Agreement, to be entered into by the Parties' Representatives on behalf of the applicable Party, in the form mutually agreed upon by the Parties.

"Knowledge" means, as to a particular matter, the actual knowledge after reasonable due inquiry with respect to any Selling Entity, of John DiDonato (Chief Transformation Officer) and Gene Bukovi (Chief Operating Officer).

"Law" means any federal, state, local, municipal or foreign law, statute, legislation, common law, rule, regulation, ruling, directive, treaty, ordinance, code, or other similar requirement having the effect of law issued, enacted, adopted, promulgated, implemented or otherwise put into effect by any Governmental Authority.

"Leased Real Property" has the meaning given to such term in Section 5.15(d).

"Leopardo Matter" means the action including MEC, MBC, and Joao Paulo "JP" Leopardo filed in the United States District Court for the Central District of California, captioned *Monster Energy Co. v. Joao Paulo Leopardo*, Case No. 5:20-cv-02076 (C.D. Cal., filed Oct. 5, 2020).

"Liability" means any indebtedness, obligation, lien, loss, damage, claim, fine, penalty, judgment, duty, responsibility, expense (including reasonable attorneys' fees and reasonable costs of investigation and defense) or liability of any nature, whether known or unknown, asserted or

unasserted, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, direct or indirect, fixed, absolute or contingent, matured or unmatured, ascertained or ascertainable, disputed or undisputed, secured or unsecured, joint or several, vested or unvested, due or to become due, executory, determined or determinable, whether in contract, tort, strict liability, or otherwise.

"Material Adverse Effect" means any event, change, condition, circumstance, development, occurrence or effect that has had or would have, individually or in the aggregate, a material adverse effect on (i) the results of operations and condition (financial or otherwise) of the Business, the Purchased Assets and the Assumed Liabilities, taken as a whole, or (ii) the ability of the Selling Entities to consummate the Transactions; *provided, however*, that none of the following events, changes, conditions, circumstances, developments, occurrences or effects shall be taken into account, individually or in the aggregate, in determining whether a "Material Adverse Effect" has occurred for purposes of the foregoing clause (i): (a) the identity of the Buyer and the announcement of the signing of this Agreement or the other Transaction Documents or the filing of the Petitions (including any action or inaction by the customers, suppliers, landlords, employees, consultants of the Selling Entities and their respective Affiliates as a result thereof) or compliance with any obligation (including any obligation to not take action) expressly required by this Agreement or the other Transaction Documents; (b) (i) the commencement or pendency of the Bankruptcy Case, (ii) any objections in the Bankruptcy Court to (A) this Agreement, the other Transaction Documents or any of the Transactions, (B) the Sale Order or the reorganization of the Selling Entities and their Affiliates, or (C) the assumption or rejection of any Assumed Agreements, or (iii) any Order of the Bankruptcy Court or any actions or omissions of the Debtor Entities in compliance therewith; (c) the negotiation, announcement or pendency of this Agreement or the Transactions, the identity, nature or ownership of the Buyer or the Buyer's plans with respect to the Purchased Assets and the Assumed Liabilities, including the impact thereof on the relationships, contractual or otherwise, of the Business with employees, customers, lessors, suppliers, distributors, vendors or other commercial partners or litigation arising from or relating to this Agreement or the Transactions; (d) (i) actions or omissions taken or not taken by or on behalf of the Selling Entities or any of their respective Affiliates (x) to the extent permitted or required pursuant to this Agreement or (y) at the express written request of the Buyer or its Affiliates or (ii) the failure to take any action if such action is expressly prohibited by this Agreement; (e) actions taken by the Buyer or its Affiliates; (f) actions not taken by or on behalf of the Selling Entities or any of their Affiliates which (i) require the approval of the Buyer, and (ii) with respect to which the Selling Entities have requested the approval of the Buyer and such approval was not timely provided (after the disclosure to the Buyer of all material relevant facts and information); (g) failure of any Selling Entity to meet any internal or published projections, forecasts, estimates, performance metrics, operating statistics or predictions (it being understood that the foregoing shall not preclude any assertion that the facts or occurrences giving rise to or contributing to such failure that are not otherwise excluded from the definition of Material Adverse Effect should be deemed to constitute, or be taken into account in determining whether there has been, or would be, a Material Adverse Effect); (h) changes in applicable Law, GAAP or other generally accepted accounting principles in any other applicable jurisdiction, or in the interpretation, directives or enforcement of any of the foregoing, or any changes or prospective changes in general legal, regulatory or political conditions; (i) volcanoes, tsunamis, pandemics, earthquakes, fires, floods, storms, hurricanes, tornadoes or other natural disasters; (j) changes in general economic conditions, currency exchange rates or United States or international debt or equity markets; (k) events or conditions generally affecting the industry or markets in which the

Selling Entities operate; (l) national or international political or social conditions (including tariffs, riots or protests) or any national or international hostilities, acts of terror or acts of war (whether or not declared), or any escalation or worsening of any such conditions, hostilities, acts of terror or acts of war (whether or not declared); and (m) any pandemic or epidemic (including COVID-19 or any variation thereof), including outbreaks or additional waves of outbreaks and any escalation or worsening thereof, of any contagious diseases and any direct or indirect consequence thereof; *provided*, *however*, that in the cases of clauses (h) through (m) above, such event, change, condition, circumstance, development, occurrence or effect will not be taken into account in determining whether there has been a "Material Adverse Effect" only to the extent that such event, change, condition, circumstance, development, occurrence or effect does not have a materially disproportionate impact on the Business, the Purchased Assets and the Assumed Liabilities, taken as a whole, as compared to other participants in the industries in which the Selling Entities operate.

"Material Contract" has the meaning given to such term in Section 5.10(a).

"Material Customers" has the meaning given to such term in Section 5.19(a).

"Material Suppliers" has the meaning given to such term in Section 5.19(b).

"MBC" has the meaning given to such term in the Preamble hereto.

"MEC" has the meaning given to such term in the Preamble hereto.

"MEC Post-Verdict Motion" means that certain *Plaintiff Monster Energy Company's Post-Verdict Motion for Equitable Relief, Fees, and Costs* filed at docket number 928 by MEC that is pending before the court in the California District Court Action.

"Nguyen Matter" means the action including MEC and Quang Nguyen filed before JAMS, captioned *Monster Energy Co. v. Quang Nguyen*, Case No. 1110026280 (JAMS, filed Oct. 8, 2020).

"Non-Real Property Contracts" means the Contracts (including any open purchase orders) related to the Business to which any Selling Entity is a party other than the Real Property Leases.

"OBI/Monster Escrow Account" means the escrow account established pursuant to the OBI/Monster Escrow Order.

"OBI/Monster Escrow Amount" means, as of the applicable date of determination, the amounts required to be funded by the Debtor Entities pursuant to the OBI/Monster Escrow Order into the OBI/Monster Escrow Account that, in the aggregate, are equal to 5% of actual net sales of BANG-branded products that take place on and after the Petition Date through the Closing Date.

"OBI/Monster Escrow Excess" means, as of the applicable date of determination, any amounts funded by the Debtor Entities into the OBI/Monster Escrow Account in excess of the OBI/Monster Escrow Amount.

"OBI/Monster Escrow Fund" means, as of the applicable date of determination, an aggregate amount equal to all amounts funded by the Debtor Entities into the OBI/Monster Escrow Account.

"OBI/Monster Escrow Order" means the *Order Granting Debtors' and Creditors Monster Energy Company and Orange Bang, Inc.'s Joint Agreed Motion to Approve Agreement Regarding Royalty that Accrues Postpetition* [Dkt. No. 639].

"OBI/Monster Escrow Shortfall" means, as of the applicable date of determination, only to the extent that the OBI/Monster Escrow Amount is greater than the OBI/Monster Escrow Fund, an amount equal to (i) the OBI/Monster Escrow Amount minus (ii) the OBI/Monster Escrow Fund. Notwithstanding anything to the contrary herein, if the OBI/Monster Escrow Fund is greater than or equal to the OBI/Monster Escrow Amount, then the OBI/Monster Escrow Shortfall shall be zero.

"OBI/Monster Matter" means the action including the Seller, JHO Intellectual Property Holdings, LLC, Orange Bang, Inc., and MEC filed in the United States District Court for the Central District of California, captioned *Vital Pharms., Inc. and JHO Intellectual Prop. Holdings, LLC v. Orange Bang, Inc. and Monster Energy Co.*, Case No. 5:20-cv-1464, including the related arbitration proceedings and ruling, judgment, and appeals and other related Proceedings.

"OBI/Monster Matter Allowed Unsecured Claim" means an allowed general unsecured claim in the Bankruptcy Case jointly in favor of MEC and Orange Bang, Inc. in the amount of $216,131,658.35, plus accrued interest until the Petition Date; *provided, however*, that MEC agrees to subordinate any recoveries on its 100% share of the California District Court Action Allowed Unsecured Claim and its 50% share of the OBI/Monster Matter Allowed Unsecured Claim until the Selling Entities recover $5 million from the Excluded Assets, including Excluded Estate Claims, for the benefit of their estates. MEC shall not have an allowed administrative claim in the Bankruptcy Case, provided that the DIP Lenders and the Prepetition Secured Parties agree that they also will not have any allowed administrative claims in the Bankruptcy Case.

"OFAC" has the meaning given to such term in Section 5.18(a).

"Offered Employee" has the meaning given to such term in Section 7.9(a).

"Orange Bang Trademark License Action" means the adversary proceeding filed in the Bankruptcy Case by the Debtor Entities Vital Pharmaceuticals, Inc. and JHO Intellectual Property Holdings, LLC against Orange Bang, Inc. and MEC, captioned *Vital Pharmaceuticals, Inc. and JHO Intellectual Property Holdings, LLC v. Orange Bang, Inc. and Monster Energy Company*, Bankr. Adv. Pro. No. 23-01031, including the related Proceeding pending in the United States District Court for the Southern District of Florida, Case No. 23-cv-60599, the related Proceeding pending in the United States District Court for the Central District of California, Case No. 23-cv-03862, and any other related Proceedings.

"Order" means any order, writ, judgment, injunction, decree, rule, ruling, directive, determination or other award made, issued, entered or rendered by or with any Governmental Authority, whether preliminary, interlocutory or final, including any Order entered by the Bankruptcy Court in the Bankruptcy Case (including the Sale Order).

"Ordinary Course of Business" means, with respect to the Business, the ordinary and usual course of day-to-day operations of the Business consistent with past practice, in each case taking into account the Business becoming distressed and the contemplation, commencement, consummation and pendency of the Bankruptcy Case.

"Outside Date" has the meaning given to such term in Section 9.1(g)(ii).

"Owned Real Property" has the meaning given to such term in Section 2.1(f).

"Party" or "Parties" has the meaning given to such term in the Preamble hereto.

"Permits" has the meaning given to such term in Section 5.5.

"Permitted Encumbrances" means: (a) Encumbrances for Taxes, special assessments, utilities or other governmental charges not yet due and payable, that are being contested in good faith (in the case of each such contest, to the extent constituting accrued liabilities on the financial statements of Selling Entities (or the applicable Selling Entity)) or the nonpayment of which is permitted or required by the Bankruptcy Code, (b) statutory Encumbrances and rights of set-off of landlords, carriers, warehousemen, mechanics, repairmen, workmen, customs brokers or agencies, suppliers and materialmen arising in the Ordinary Course of Business, in each case for amounts not yet delinquent or that are being contested in good faith (in each case of such a contest, which accrued as liabilities on the Selling Entities' balance sheet), (c) non-exclusive, and terminable without payment, licenses of or other grants of rights to use Intellectual Property that are not material to the Business granted in the Ordinary Course of Business, and excluding any licenses or grants of rights to Excluded Parties, (d) Laws now or hereafter in effect relating to real property, leases, license agreements and other occupancy agreements, Encumbrances that are zoning regulations, building codes, entitlements and easements and similar Encumbrances, and other similar matters affecting title to such real property and other title defects which do not have a Material Adverse Effect on the current use by the Selling Entities of the real property subject thereto, (e) all matters that would be disclosed on an accurate current survey or title report or are otherwise filed or recorded in the applicable public records of the Owned Real Property or property subject to Real Property Leases that do not materially interfere with the current use by the Selling Entities of the Owned Real Property or the property subject to Real Property Leases, taken as a whole, (f) statutory Encumbrances creating a security interest in favor of landlords with respect to property of the Selling Entities which do not interfere with the current use of such leased real property by the Selling Entities in any material respect, (g) Encumbrances arising from applicable Laws of general application which do not interfere with the current operation of the Business in any material respect, (h) Encumbrances contained in or created by the Assumed Agreements or the Assumed Real Property Leases, (i) Encumbrances arising by operation of law under Article 2 of any state's Uniform Commercial Code (or successor statute) in favor of a seller of goods or buyer of goods, (j) subdivision, site plan control, development, reciprocal, servicing, facility, facility cost sharing or similar agreements currently existing or entered into, which do not materially interfere with the current use by the Selling Entities of the Owned Real Property, (k) purchase money liens and Encumbrances securing rental payments under capital lease arrangements, (l) the Encumbrances disclosed on Section 1.1(b) of the Seller Disclosure Schedule, or (m) such other Encumbrances which would not be material to the Business, the Purchased Assets and the Assumed Liabilities, taken as a whole. For the avoidance of all doubt, in no event

shall the presence of any tenants or other persons or occupants in, at or on the Owned Real Property (in each case, without the Buyer's express written authorization) be deemed to be Permitted Encumbrances.

"Person" means any individual, corporation, partnership, limited partnership, limited liability company, syndicate, group, trust, association or other organization or entity or Governmental Authority.   References to any Person include such Person's successors and permitted assigns.

"Personal Information" means any information that is considered "personally identifiable information," "personal information" or "personal data" by any applicable Privacy Laws.

"Petition" means the voluntary petition under Chapter 11 of the Bankruptcy Code filed by the Debtor Entities with the Bankruptcy Court.

"Petition Date" has the meaning given to such term in the Recitals.

"Post-Closing Tax Period" means any taxable period beginning after the Closing Date and the portion of any Straddle Period beginning after the Closing Date.

"Post-Verdict Motions" means, collectively, the MEC Post-Verdict Motion and the Seller Post-Verdict Motion.

"Pre-Closing Tax Period" means any taxable period ending on or prior to the Closing Date and the portion of any Straddle Period ending on the Closing Date.

"Prepetition Secured Parties" has the meaning given to such term in the DIP Order.

"Privacy Laws" means any applicable Laws, regulations, and requirements relating to the data privacy, information security, data breach notification, and the processing of Personal Information, including as applicable, the Federal Trade Commission Act, General Data Protection Regulation ("GDPR"), and U.S. state privacy laws and regulations including the California Consumer Privacy Act.

"Proceeding" has the meaning given to such term in Section 5.4.

"Professional Services" has the meaning given to such term in Section 2.4(b).

"Property Taxes" has the meaning given to such term in Section 7.10(e).

"Purchase Price" has the meaning given to such term in Section 3.1(a).

"Purchased Assets" has the meaning given to such term in Section 2.1.

"Real Property Leases" means all leases, subleases, tenancy agreements, licenses, and other occupancy Contracts with respect to real property pursuant to which any Selling Entity is a party listed or described on Section 1.1(c) of the Seller Disclosure Schedule.

17

"Registered IP" means all Seller IP that is registered, filed, pending or issued under the authority of, with or by any Governmental Authority and all applications for any of the foregoing and renewals thereof.

"Regulatory Clearance" has the meaning given to such term in Section 8.1(b).

"Regulatory Laws" has the meaning given to such term in Section 7.7(b).

"Related Persons" has the meaning given to such term in Section 10.16(a).

"Release" means disposing, discharging, injecting, spilling, leaking, pumping, pouring, leaching, dumping, emitting, escaping or emptying into or upon the indoor or outdoor environment, including any soil, sediment, subsurface strata, surface water, drinking water, ground water, ambient air, the atmosphere or any other media.

"Representatives" means, with respect to a particular Person, any director, officer, manager, employee or other authorized representative of such Person or its Subsidiaries, including such Person's attorneys, accountants, consultants, investment bankers, professionals, financial advisors and restructuring advisors.

"Retained Employee" has the meaning given to such term in Section 7.9(a).

"Retained Records" has the meaning given to such term in Section 2.1.

"Sale Hearing" means the hearing at which the Bankruptcy Court considers entry of the Sale Order.

"Sale Order" means an Order of the Bankruptcy Court, substantially in the form attached hereto as Exhibit A (with any amendments and modifications thereto as the Title Company may reasonably request) or otherwise acceptable to the Buyer, which Order shall, among other things, (a) approve, pursuant to sections 105, 363 and 365 of the Bankruptcy Code, (i) the execution, delivery and performance by the Selling Entities of this Agreement, (ii) the sale of all of the Purchased Assets to the Buyer on the terms set forth herein and free and clear of all Encumbrances (other than Assumed Liabilities and Permitted Encumbrances), (iii) the assignment and assumption by the Selling Entities and the assignment to the Buyer of all Assumed Agreements and Assumed Real Property Leases, and (iv) the performance by the Selling Entities of their respective obligations under this Agreement, (b) authorize each of the Selling Entities and the Buyer to execute and file termination statements, instruments of satisfaction, releases and similar documents with respect to all Encumbrances that any Person has with respect to the Purchased Assets, (c) find that the Buyer is a buyer in good faith for purposes of section 363(m) of the Bankruptcy Code, and (d) order that the Buyer is receiving good and marketable title to all of the Purchased Assets free and clear of all Encumbrances (other than Assumed Liabilities and Permitted Encumbrances).

"Security Incident" means (a) any unauthorized access, acquisition, interruption, alteration or modification, loss, theft, corruption or other unauthorized processing of Personal Information or Seller IP, (b) inadvertent, unauthorized, and/or unlawful sale, or rental of Personal Information or other Seller IP, or (c) any breach of the security of or other unauthorized access to or use of or other compromise to the integrity or availability of the IT Systems.

"Seller" has the meaning given to such term in the Preamble hereto.

"Seller Compensation and Benefit Program" has the meaning given to such term in Section 5.9(a).

"Seller Disclosure Schedule" has the meaning given to such term in the Preamble to Article V.

"Seller Financial Statements" has the meaning given to such term in Section 5.8(a).

"Seller Fundamental Representations" has the meaning given to such term in Section 8.2(b).

"Seller IP" means all Intellectual Property owned by the Selling Entities.

"Seller Post-Verdict Motion" means that certain *Defendant Vital Pharmaceuticals Inc.'s Notice of Motion and Motion for JNOV, New Trial, and Remittitur* filed at docket number 921 that is pending before the court in the California District Court Action.

"Seller Properties" has the meaning given to such term in Section 5.15(b).

"Seller Related Party" means, collectively, the Selling Entities, their respective Subsidiaries and other Affiliates, and each of the foregoing's respective current and former Representatives and owners; but excluding, in all cases, any Excluded Parties.

"Seller Releasing Party" has the meaning given to such term in Section 7.16(b).

"Selling Entities" has the meaning given to such term in the Preamble hereto.

"Service Provider" has the meaning given to such term in Section 5.9(a).

"Specified Employees" has the meaning given to such term in Section 7.9(a).

"Specified Event" means that objections to entry of the Sale Order have been filed and served by one or more the Excluded Parties on or before June 26, 2023 at 12:00 p.m. (eastern time) or such other later objection deadline as may be established or allowed by the Bankruptcy Court or specified by agreement of the Debtor Entities.

"Specified Termination" means a termination of this Agreement by the Buyer pursuant to Section 9.1(i). Notwithstanding anything to the contrary herein or otherwise, any termination of this Agreement by the Buyer pursuant to Section 9.1(b), Section 9.1(c), Section 9.1(f), Section 9.1(g)(ii), Section 9.1(i), Section 9.1(j) or Section 9.1(k) at a time when the Seller would have been entitled to terminate this Agreement pursuant to Section 9.1(d) or Section 9.1(h) shall constitute a Buyer Default Termination and not a Specified Termination.

"Specified Termination Amount" means $10,000,000.

"Straddle Period" means any taxable period that includes, but does not end on, the Closing Date.

"Subsidiary" means, with respect to any Person, (a) any corporation or similar entity of which at least 50% of the securities or interests having, by their terms, ordinary voting power to elect members of the board of directors, or other persons performing similar functions with respect to such corporation or similar entity, is held, directly or indirectly by such Person and (b) any partnership, limited liability company or similar entity of which (i) such Person is a general partner or managing member or has the power to direct the policies, management or affairs or (ii) such Person possesses a 50% or greater interest in the total capitalization or total income of such partnership, limited liability company or similar entity.

"Tax" means all U.S. federal, state, local or non-U.S. income, gross receipts, capital gains, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental, capital stock, ad valorem, value added, inventory, franchise, profits, withholding, social security, unemployment, disability, real property, personal property, sales, use, transfer, registration, escheat or unclaimed property liability (whether or not considered a tax under local law), alternative or add-on minimum, estimated, and other taxes, assessments, charges, duties, fees, levies or other governmental charges of any kind whatsoever (whether payable directly or by withholding and whether or not requiring the filing of a return) imposed by any Governmental Authority (to the extent the foregoing are taxes or in the nature of a tax), and including any interest, penalty, or addition thereto.

"Tax Return" means any return, claim for refund, declaration, report, statement, information return or other similar document (including any related or supporting information, amendments, schedule or supplements of any of the foregoing) required to be filed with any Governmental Authority with respect to Taxes.

"Terminated Employee" has the meaning given to such term in Section 7.9(a).

"Title Company" means Chicago Title Company.

"Trade Dress Action Allowed Unsecured Claim" means an allowed general unsecured claim in the Bankruptcy Case in favor of MEC in the amount of $58,000 as taxable litigation costs awarded to MEC and its affiliate Reign Beverage Company, LLC ("Reign") and due from the Seller pursuant to that certain Order entered on December 17, 2021, granting the Motion for Bill of Costs filed by MEC and Reign against the Seller in the case filed in the United States District Court for the Southern District of Florida, captioned *Vital Pharmaceuticals, Inc. v. Monster Energy Company et al.*, Case No. 0:19-cv-60809 (filed March 28, 2019) (the "Trade Dress Action"); *provided, however*, that MEC agrees to subordinate any recoveries on its 100% share of Trade Dress Action Allowed Unsecured Claim until the Selling Entities recover $5 million from the Excluded Assets, including Excluded Estate Claims, for the benefit of their estates. MEC shall not have an allowed administrative claim in the Bankruptcy Case, provided that the DIP Lenders and the Prepetition Secured Parties agree that they also will not have any allowed administrative claims in the Bankruptcy Case.

"Trade Secret Matters" means the Cohen Matter, the Dees Matter, the Leopardo Matter, the Nguyen Matter, and the Troglia Matter.

"Trademarks" means any and all trade names, corporate names, logos, slogans, taglines, trade dress, trademarks, service marks, certification marks, collective marks, and other source or business identifiers and general intangibles of a like nature, and common law rights, as well as trademark and service mark registrations and applications therefor, and all goodwill associated with the foregoing, whether protected, created, or arising under the laws of the United States (including common law) or any other jurisdiction or under any international convention.

"Transaction Documents" means this Agreement (including the Seller Disclosure Schedule), the Assignment and Assumption Agreement, the Bill of Sale, the IP Assignment Agreements, the Deeds, the Escrow Agreement, the Joint Defense Agreement and any other Contract to be entered into by the Parties in connection with the Transactions.

"Transactions" means the transactions contemplated by this Agreement and the other Transaction Documents, including the purchase and sale of the Purchased Assets in exchange for the Purchase Price and the assumption of the Assumed Liabilities.

"Transfer Taxes" has the meaning given to such term in Section 7.10(a).

"Transferred Employees" has the meaning given to such term in Section 7.9(a).

"Troglia Matter" means the action including MEC and Shannon Troglia filed before JAMS, captioned *Monster Energy Co. v. Shannon Troglia*, Case No. 1110026279 (JAMS, filed Oct. 8, 2020).

"TTAB Matter" means the proceeding including JHO Intellectual Property Holdings, LLC and MEC filed in the United States Patent and Trademark Office before the Trademark Trial and Appeal Board (TTAB), captioned *Monster Energy Co.* v. *JHO Intellectual Prop. Holdings, LLC*, Cancellation No. 92070514 (TTAB, filed Feb. 5, 2019).

"Union" means a labor union, trade union, works council or any other employee representative body.

"VPX Florida Matters" means the actions including the Seller, MEC, and MBC filed in the United States District Court for the Southern District of Florida, captioned (i) *Vital Pharmaceuticals, Inc. v. Monster Beverage Co., et al.*, No. 0:19-cv-61974 (S.D. Fla., filed Aug. 7, 2019); and (ii) *Vital Pharmaceuticals, Inc. v. Monster Beverage Corp., et al.*, No. 0:22-cv-61621 (S.D. Fla., filed Aug. 31, 2022).

"WARN Act" means the federal Worker Adjustment and Retraining Notification Act, 29 U.S.C. § 2101 et seq. (1988) and any similar Laws, including Laws of any country, state or other locality that is applicable to a termination of employees.

"Willful Breach" has the meaning given to such term in Section 9.2.

Section 1.2    Construction.  The terms "hereby," "hereto," "hereunder" and any similar terms as used in this Agreement refer to this Agreement in its entirety and not only to the particular portion of this Agreement where the term is used.  The terms "including," "includes" or similar terms when used herein shall mean "including, without limitation," and will not be construed to

21

limit any general statement that it follows to the specific or similar items or matters immediately following it.  The word "or" when used in this Agreement is not meant to be exclusive unless expressly indicated otherwise.  The word "extent" in the phrase "to the extent" means the degree to which a subject or other thing extends, if applicable, and such phrase does not mean simply "if."  The word "will" shall be construed to have the same meaning as the word "shall."  Any reference to "days" means calendar days unless Business Days are expressly specified.  The meaning of defined terms shall be equally applicable to the singular and plural forms of the defined terms, and the masculine gender shall include the feminine and neuter genders, and vice versa, as the context shall require.  Any reference to any federal, state, provincial, local or foreign statute or Law shall be deemed also to refer to all rules and regulations promulgated thereunder, unless the context requires otherwise.  Unless otherwise indicated, references to (a) Articles, Sections, Schedules and Exhibits refer to Articles, Sections, Schedules and Exhibits of and to this Agreement, (b) references to $ (Dollars) are to United States Dollars and (c) a Contract means such Contract as amended from time to time.  When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period will be excluded.  If the last day of such period is a day other than a Business Day, the period in question will end on the next succeeding Business Day; *provided*, that the foregoing shall not apply to Section 3.4 and Section 7.4.  All references to dates and times herein, except as otherwise specifically noted, shall refer to New York City time.  All accounting terms used in this Agreement and not otherwise defined herein shall have the respective meanings ascribed to such terms under GAAP.

## ARTICLE II
## PURCHASE AND SALE

Section 2.1    Purchase and Sale of Assets.  Pursuant to sections 105, 363 and 365 of the Bankruptcy Code and on the terms and subject to the satisfaction of the conditions contained in this Agreement, at the Closing, the Selling Entities shall sell, assign, convey, transfer and deliver to the Buyer, and the Buyer shall purchase and acquire from the Selling Entities, all of the Selling Entities' right, title and interest, free and clear of all Liabilities and Encumbrances (other than the Assumed Liabilities and Permitted Encumbrances), in and to all of the properties, rights, interests and other tangible and intangible assets of the Selling Entities of every nature (wherever located, whether real, personal or mixed, whether or not required to be reflected on a balance sheet prepared in accordance with GAAP), including any assets acquired by the Selling Entities after the date hereof but prior to the Closing (collectively, the "Purchased Assets"); *provided*, *however*, that notwithstanding anything to the contrary herein, the Purchased Assets shall not include any Excluded Assets.  Without limiting the generality of the foregoing, the Purchased Assets shall include all of the Selling Entities' right, title and interest in and to the following (except to the extent listed as, or otherwise constituting, an Excluded Asset):

(a)    all Accounts Receivable of the Selling Entities, except any Accounts Receivable set forth in Section 2.2(k), in each case subject to any rights of set-off pursuant to Section 2.3(e);

(b)    all Inventory as of the Closing, including Inventory that is obsolete or otherwise not saleable;

(c)        (i) all royalties, advances, prepaid assets, prepaid expenses, prepaid license payments, prepaid rents, security and other deposits, prepayments and other current assets, including any non-fungible tokens or cryptocurrency, (ii) any other prepaid items and deferred items (including all prepaid rentals and unbilled charges, fees and deposits), (iii) all rent, real estate Taxes, utility, lease, association fees or other similar operating expenses or payments that have been paid for the month in which the Closing occurs, in each case prorated to reflect the number of days from and including the Closing Date to the end of the period for which such expense or payment relates (it being understood that the Buyer is to receive the benefit of such amounts for such post-Closing period), and (iv) all premiums and other amounts paid by the Selling Entities as of the Closing in respect of insurance policies of the Selling Entities under which the rights to insurance proceeds constitute Purchased Assets pursuant to Section 2.1(r)(ii), in each case prorated to reflect the remaining coverage period under such insurance policies from and including the Closing Date to the end of such coverage period, in the case of each of clauses (i), (ii) and (iii), to the extent relating to the Purchased Assets and the Assumed Liabilities as of the Closing and excluding, for the avoidance of doubt, the items set forth in Section 2.2(j);

(d)        all Non-Real Property Contracts listed in Section 2.1(d) of the Seller Disclosure Schedule (as amended from time to time in accordance with Section 2.5 hereof, the "Assumed Agreements") assumed and assigned to the Buyer pursuant to Section 2.5;

(e)        all Real Property Leases listed in Section 2.1(e) of the Seller Disclosure Schedule (as amended from time to time in accordance with Section 2.5 hereof, the "Assumed Real Property Leases") assumed and assigned to the Buyer pursuant to Section 2.5;

(f)        all real property and any buildings, fixtures, and improvements thereon or thereto owned by the Selling Entities as of the Closing (collectively, the "Owned Real Property") listed in Section 2.1(f) of the Seller Disclosure Schedule;

(g)        all Seller IP and with respect to art, text and graphics used on cans and product packaging for products or, to the extent in the Selling Entities' possession, proposed products of the Business, files containing such works for at least the past five (5) years;

(h)        all items of machinery, equipment, vehicles (as set forth on Schedule 1.1(b) attached to Section 1.1(b) of the Seller Disclosure Schedule and subject to Section 7.22), supplies, furniture, fixtures, leasehold improvements (to the extent of the Selling Entities' rights to any leasehold improvements under Assumed Real Property Leases) and other tangible personal property and fixed assets owned by the Selling Entities as of the Closing, including the personal property assets listed in Section 2.1(h) of the Seller Disclosure Schedule;

(i)        all books, records, information, files, data, plans, servers, e-mails, and archival backups (whether written, electronic or in any other medium), advertising and promotional materials and similar items of the Selling Entities as of the Closing (except as otherwise described in Section 2.2), including any and all customer, distributor, supplier and vendor lists, mailing lists, and video and media footage and related materials (whether edited or unedited) that was filmed by or on behalf of any of the Selling Entities, in each case other than those items in Section 2.1(l) and excluding the agreements and rights set forth in Section 2.2(c) (collectively, the "Documentary Materials");

23

(j)        the OBI/Monster Escrow Amount;

(k)        subject to <u>Section 2.8(b)</u>, all rights to the websites, domain names, telephone, and facsimile numbers and e-mail addresses used by each Selling Entity;

(l)        all rights of the Selling Entities under non-disclosure or confidentiality, invention and/or Intellectual Property assignment, work made for hire agreements with current Employees, former Employees or current or former directors, consultants, independent contractors and agents of any of the Selling Entities, and any records, documents or other information relating to Transferred Employees, and any materials to the extent containing information about any Transferred Employee in each case, that may be transferred under applicable Law, the written employment policies of the Selling Entities and the Seller Compensation and Benefit Programs, but in each case excluding (i) the agreements and rights set forth in <u>Section 2.2(c)</u> and (ii) any such rights to the extent necessary to pursue Excluded Estate Claims;

(m)       all of the rights and benefits accruing under all Permits (other than Environmental Permits which are addressed in <u>Section 2.1(n)</u>) held by the Selling Entities, in each case, to the extent related to the Business and to the extent such Permits are transferrable;

(n)        all Environmental Permits needed for operations at the Owned Real Property and sites subject to Assumed Real Property Leases, to the extent such Environmental Permits are transferable;

(o)        any credits, allowances, rebates (including any vendor or supplier rebates), or rights of setoff (other than against the Selling Entities) arising out of or relating to any of the Purchased Assets as of the Closing;

(p)        any rights, claims or causes of action as of the Closing of any Selling Entity (including any D&O Claims) relating to or arising from the Purchased Assets, the Assumed Liabilities, or the Bankruptcy Case, including (i) any of the foregoing against any Seller Related Parties, (ii) any of the foregoing against the Buyer and/or any of the Buyer's Affiliates (including MEC, MBC, and any of their respective Affiliates), and (iii) all preference or avoidance claims and all other causes of action of the Selling Entities, in the case of each of clauses (i), (ii) and (iii), excluding the items in <u>Section 2.1(r)</u>, the Excluded Estate Claims and any rights, claims or causes of action to the extent they relate to any Excluded Assets or Excluded Liabilities; *provided*, that any preference or avoidance claims acquired by the Buyer pursuant to clause (iii) above shall be automatically released upon Closing;

(q)        all rights, title, and interest (but only to the extent relating to the period from and after the Closing) to use the BANG trademark in exchange for a 5% continuing royalty on net sales of BANG-branded products payable to MEC and Orange Bang, Inc., pursuant to that certain judgment entered on September 29, 2022 by the Hon. Dale S. Fischer, U.S. District Judge for the Central District of California, adopting the final arbitration award issued on April 4, 2022 against the Seller and JHO Intellectual Property Holdings, LLC and in favor of Orange Bang, Inc. and MEC, in the case styled as *Vital Pharmaceuticals, Inc. v. Orange Bang, Inc.*, Case No. 5:20-cv-01464 (excluding any right, title and interest in and to the OBI/Monster Escrow Excess);

(r)      (i) other than the items set forth in the immediately following clause (ii), all rights, claims (including claims for past, present and future infringement or misappropriation or other violation of Seller IP), and causes of action of the Selling Entities as of the Closing against Persons (including the Buyer and/or any of the Buyer's Affiliates) other than the Selling Entities (regardless of whether or not such claims and causes of action have been asserted by the Selling Entities), (ii) to the extent that the Buyer notifies the Seller in writing (at Buyer's sole election) at least two (2) Business Days prior to the Closing Date of its election to assume as a Purchased Asset rights to claims or proceeds under any insurance policy of the Selling Entities (other than D&O Insurance or insurance policies described in Section 2.2(g)) with respect to Purchased Assets or Assumed Liabilities, all rights to claims or proceeds with respect to the Purchased Assets or Assumed Liabilities (regardless of whether such rights are currently exercisable) under such insurance policies so elected by the Buyer, and (iii) other than the items set forth in the immediately preceding clause (ii), all rights of indemnity, warranty rights, rights of contribution, rights to refunds, rights of reimbursement and other rights of recovery possessed by the Selling Entities as of the Closing (regardless of whether such rights are currently exercisable), in the case of each of clauses (i), (ii) and (iii), to the extent related to the Purchased Assets and/or the Assumed Liabilities, and in each case, excluding any rights, claims or causes of action to the extent they relate to any Excluded Assets or Excluded Liabilities; and

(s)      product bar codes and GTIN codes owned by each Selling Entity;

*provided*, that notwithstanding anything to the contrary or otherwise in this Section 2.1, and without limiting the scope of the Excluded Assets contained in Section 2.2, "Purchased Assets" will not include any books, records, information, correspondence, files or other similar information or materials (whether written, electronic or in any other medium), to the extent subject to attorney client, attorney work product or other privilege or to the extent reasonably necessary for any Debtor Entity to pursue any Excluded Estate Claims or all correspondences or communications prior to the Closing among any Selling Entity or any of its Affiliates and their respective Representatives and their counsel or any other third party that relate to the negotiation of Transactions or any other transaction relating to the sale of the assets of the Selling Entities or any of their Affiliates (including any archival copies of such communications) (collectively, the "Retained Records").

Section 2.2    Excluded Assets.  Notwithstanding any provision herein to the contrary, the Purchased Assets shall not include the following (collectively, the "Excluded Assets"):

(a)      (i) all of the capital stock or other equity interests owned by the Selling Entities in any of their respective Subsidiaries or other Affiliates, or any securities convertible into, exchangeable or exercisable for shares of capital stock or other equity interests of any of the Selling Entities, their respective Subsidiaries or Affiliates, and (ii) any properties, rights, interests and other tangible and intangible assets directly held by any Subsidiaries or other Affiliates of the Selling Entities;

(b)      except for the Documentary Materials and the items described in Section 2.1(l), any records, documents or other information relating to current or former Employees that are not Transferred Employees, and any materials to the extent containing information about any Employee (including any Transferred Employee), disclosure of which would violate applicable Law, the written employment policies of the Selling Entities, or any Seller Compensation and

Benefit Program, it being agreed that the Buyer shall, at any time prior to the Closing and without in any way affecting the Purchase Price, have the right, in its sole discretion, to designate additional records, data, documents and other information as Excluded Assets based upon the Buyer's determination that the transfer of the same to the Buyer would violate applicable Law, the written employment policies of the Selling Entities, or any Seller Compensation and Benefit Program;

(c)      any restrictive covenant, non-compete, non-solicit, no-hire or similar agreements with any current or former Employees and all rights of the Selling Entities under such agreements;

(d)      the Selling Entities' (i) minute books and other corporate books and records relating to their organization and existence and the Selling Entities' books and records relating to Taxes of the Selling Entities, including Tax Returns filed by or with respect to the Selling Entities, and (ii) books, records, information, files, data and plans (whether written, electronic or in any other medium), advertising and promotional materials and similar items exclusively relating to any Excluded Assets or Excluded Liabilities;

(e)      the Selling Entities' rights under this Agreement and the other Transaction Documents, and all cash and non-cash consideration payable or deliverable to the Selling Entities pursuant to the terms and provisions hereof and thereof;

(f)      any Contracts other than the Assumed Agreements and the Assumed Real Property Leases;

(g)      (i) all director and officer insurance policies, and (ii) all other current and prior insurance policies of the Selling Entities (x) related to any Excluded Asset or Excluded Liability or (y) to the extent not related to the Purchased Assets or the Business;

(h)      all rights, claims and causes of action of any Selling Entity and all rights of indemnity, warranty rights, rights of contribution, rights to refunds or prepayments, rights of reimbursement and other rights of recovery, including rights to insurance proceeds (including in all cases the proceeds of D&O Claims), of any Selling Entity (regardless of whether such rights are currently exercisable), in each case (i) related to any Excluded Asset or Excluded Liability or (ii) not related to the Purchased Assets or the Business;

(i)      all Retained Records;

(j)      (i) all Cash of the Selling Entities and their respective Subsidiaries and other Affiliates, (ii) the OBI/Monster Escrow Excess and (iii) all bank and deposit accounts of the Business, the Selling Entities and their respective Subsidiaries and other Affiliates (excluding, for the avoidance of doubt, the items set forth in Section 2.1(c) and Section 2.1(j));

(k)      (i) all intercompany Accounts Receivable of any Selling Entity owed to it by another Selling Entity or any of the Subsidiaries of the Selling Entities, (ii) any Accounts Receivable owing to any Selling Entity or any of the Subsidiaries of the Selling Entities by any Excluded Party, and (iii) any Accounts Receivable owing to any Subsidiary of any Selling Entity by any other Person;

(l)      any Seller Compensation and Benefit Program or stock option, restricted stock or other equity-based benefit plan of the Selling Entities, and the Selling Entities' right, title and interest in any assets of or relating thereto;

(m)      all Excluded Estate Claims;

(n)      all Tax refunds, overpayments, credits or other attributes with respect to Taxes that are Excluded Liabilities;

(o)      (i) any "tail" policy providing directors' and officers' liability insurance coverage for the benefit of those Persons who are covered by the Selling Entities' directors' and officers' liability insurance policies as of the date hereof or at the Closing with respect to matters occurring prior to the Closing (together with the policies described in Section 2.1(g)(i), "D&O Insurance"), and (ii) all rights and benefits of any nature of the Selling Entities with respect to insurance policies  (including those retained by the Selling Entities pursuant to Section 2.2(g)), including all insurance recoveries thereunder and rights to assert claims with respect to any such insurance recoveries, other than those rights to claims or proceeds that the Buyer has elected in writing to assume pursuant to Section 2.1(r)(ii);

(p)      the Selling Entities' right, title and interest in and to the other assets, if any, set forth in Section 2.2 of the Seller Disclosure Schedule; and

(q)      all assets that are directly or indirectly owned by the Excluded Parties.

Section 2.3      Assumed Liabilities.  Subject to the terms and conditions of this Agreement, effective as of the Closing, the Buyer shall assume and agree to pay, perform and discharge when due in accordance with their respective terms the Assumed Liabilities.  For purposes of this Agreement, "Assumed Liabilities" means, without duplication, only the following Liabilities (to the extent not paid prior to the Closing):

(a)      all Liabilities arising out of the conduct of the Business or relating to the Purchased Assets (including any accounts payable or other amounts payable), in each case, to the extent such Liabilities (i) arise from and after the Closing, or (ii) arise from or relate to (A) events, facts and circumstances first existing after the Closing, or (B) directly or indirectly manufacturing, selling, offering to sell, marketing, promoting or advertising any products or services, or the conduct of the Business, by the Buyer or any of its Affiliates, in each case, from and after the Closing;

(b)      all Liabilities of the Selling Entities arising under the Assumed Agreements and the Assumed Real Property Leases from and after the Closing Date (excluding any liability or obligation with respect to such Contracts as a result of any violation or breach of any such Contracts or any violation of Law or any tort in each case which first occurred or arose on or prior to the Closing Date), plus any such Liabilities of the Selling Entities arising under the Assumed Agreements and the Assumed Real Property Leases from and after the Petition Date that are accrued, but not yet due as of the Closing, in the Ordinary Course of Business;

(c)      the Cure Payments, to the extent not paid by the Buyer at Closing pursuant to Section 2.5(f) hereof;

(d)     any Liability for Taxes with respect to the Purchased Assets for any Post-Closing Tax Period (as determined in accordance with Section 7.10(a));

(e)     with respect to any Accounts Receivable that are Purchased Assets pursuant to Section 2.1(a), the amount of any corresponding Liability that is entitled to be set off with respect to such Accounts Receivable, in each case not to exceed the amount of such Accounts Receivable; and

(f)     the Assumed WARN Act Liabilities and Liabilities or obligations of the Selling Entities under COBRA, in each case pursuant to Section 7.9(b).

Section 2.4     Excluded Liabilities.  Notwithstanding anything to the contrary herein, the Buyer shall not assume or be obligated to pay, perform or otherwise discharge or in any other manner be liable or responsible for any Liabilities of, or Proceeding against, the Selling Entities, other than the Assumed Liabilities (all such Liabilities that the Buyer is not assuming being referred to collectively as the "Excluded Liabilities").  The Excluded Liabilities include the following (other than the Assumed Liabilities):

(a)     all Liabilities for (i) Transfer Taxes, (ii) Taxes with respect to the Purchased Assets for any Pre-Closing Tax Period (as determined in accordance with Section 7.10(b)) and (iii) Taxes of the Selling Entities and their equity holders;

(b)     all Liabilities of the Selling Entities relating to legal services, accounting services, financial advisory services, investment banking services or any other professional services ("Professional Services") performed in connection with this Agreement and any of the transactions contemplated hereby, and any pre-Petition or post-Petition Claims for such Professional Services;

(c)     all Liabilities of the Selling Entities with respect to current and former Employees, Service Providers, and current and former directors and officers of the Selling Entities (including Liabilities under or relating to any Seller Compensation and Benefit Program, any workers compensation and unemployment benefits related Liabilities, any Liabilities for deferred salary, wages, unused vacation, sick days, personal days or leave earned and/or accrued, and any Liabilities pursuant to the WARN Act, including the Excluded WARN Act Liabilities pursuant to Section 7.9(b)), in any case arising up to and including the Closing and in each case, other than any Assumed Liabilities set forth in Section 2.3(f);

(d)     all Liabilities of the Selling Entities arising under the Assumed Agreements and the Assumed Real Property Leases to the extent such Liabilities arise prior to the Closing Date or relate to events, facts and circumstances first existing prior to the Closing Date, other than any Assumed Liabilities;

(e)     all Liabilities relating to Excluded Assets, Excluded Parties, and all intercompany accounts payable and other amounts payable owed by any Selling Entity, and any other intercompany obligations owed by any Selling Entity, to any other Selling Entity, any Subsidiary, any Excluded Party, or any of their respective Affiliates;

(f)     all Liabilities of any Selling Entity, whether in respect of indebtedness for borrowed money or otherwise, to the extent such Liabilities arise prior to the Closing Date or relate to events, facts and circumstances first existing prior to the Closing Date, other than any Cure Payments and any Assumed Liabilities;

(g)     all Liabilities of any Selling Entity to any current, former or prospective shareholder or other holder of equity securities or equity-linked securities of such Selling Entity, including all Liabilities of such Selling Entity related to the right to or issuance of any capital stock or other equity securities or the payment of any dividend or other distribution on or in respect of any capital stock or other equity securities;

(h)     all Liabilities of the Subsidiaries (or any of them) of any Selling Entity;

(i)     subject in all respects to Section 2.3, all Liabilities (including with respect to product liability, false advertising, deceptive business practices, consumer protection laws, trademark infringement, trade dress infringement, false designation of origin, false patent marking, patent infringement, trade libel, unfair competition, breach of contract, breach of warranty, and unjust enrichment) arising out of the conduct of the business or relating to the Purchased Assets, in each case, to the extent such Liabilities (i) arise prior to the Closing, or (ii) arise from or relate to (A) events, facts and circumstances first existing before the Closing, (B) any product (including products containing Super Creatine) of the Selling Entities that was manufactured prior to the Closing, (C) any product (including products containing Super Creatine) of the Selling Entities that has been sold and delivered to third parties, including distributors and/or retailers prior to the Closing, or (D) any actions taken, directly or indirectly, in manufacturing, selling, offering to sell, marketing, promoting, or advertising Super Creatine or any products or services of the Selling Entities, or in the conduct of the Business, prior to the Closing; and

(j)     all Liabilities listed in Section 2.4(j) of the Seller Disclosure Schedule.

Section 2.5    Assumption and Assignment of Certain Contracts.  The Sale Order shall provide for the assumption by the Selling Entities, and the Sale Order shall provide for the assignment by the Selling Entities to the Buyer, effective upon the Closing, of the Assumed Agreements and the Assumed Real Property Leases on the terms and conditions set forth in the remainder of this Section 2.5.

(a)     The Debtor Entities have provided reasonably timely and proper written notice of the Sale Hearing to all parties to any executory Contracts or unexpired leases to which any Debtor Entity is a party that are (or may be) the Assumed Agreements or the Assumed Real Property Leases.  The Debtor Entities shall take all other actions reasonably necessary to cause such Contracts to be assumed by the Debtor Entities and assigned to the Buyer pursuant to section 365 of the Bankruptcy Code.  At the Closing, the Debtor Entities shall assume and assign to the Buyer the Assumed Agreements and the Assumed Real Property Leases that may be assigned by any such Debtor Entity to the Buyer pursuant to sections 363 and 365 of the Bankruptcy Code. Section 2.5(a) of the Seller Disclosure Schedule sets forth the Selling Entities' good faith estimate (on a vendor by vendor basis) as of the date of this Agreement of the amounts necessary to cure defaults, if any, with respect to each counterparty to any of the Assumed Agreements set forth in Section 2.1(d) of the Seller Disclosure Schedule, the Assumed Real Property Leases set forth in

Section 2.1(e) of the Seller Disclosure Schedule, and the Contracts listed in Section 7.8(c) of the Seller Disclosure Schedule, in each case as determined by the Selling Entities based on the their books and records and good faith judgment.  The Selling Entities shall provide an update of such good faith estimate not less than five (5) Business Days prior to the Closing Date.

(b)     From and after the date of this Agreement, unless this Agreement is terminated, until two (2) Business Days prior to the Closing, the Buyer may, in its sole discretion, designate any Contract of any Selling Entity as an Assumed Agreement or Assumed Real Property Lease, as applicable, or remove any such Contract from Section 2.1(d), Section 2.1(e), Section 2.5(a), or Section 7.8(c) of the Seller Disclosure Schedule, respectively, such that it is not an Assumed Agreement or Assumed Real Property Lease, in each case by providing written notice of such designation or removal to the Selling Entities, in which case Section 2.1(d), Section 2.1(e), Section 2.5(a), or Section 7.8(c) of the Seller Disclosure Schedule, as applicable, shall automatically be deemed to be amended to include or remove, as applicable, such Contract as an Assumed Agreement or an Assumed Real Property Lease, in each case, (i) without any adjustment to the Purchase Price (other than any Cure Payment, any adjustment in respect of the Closing Cash Amount or Section 3.4) and (ii) to the extent permitted by applicable Law.

(c)     In the case of any amendment by the Buyer of Section 2.1(d), Section 2.1(e), or Section 7.8(c) of the Seller Disclosure Schedule pursuant to Section 2.5(b), the Selling Entities shall give notice to the other parties to any Contract to which such amendment relates of the removal or addition of such Contract from Section 2.1(d), Section 2.1(e), or Section 7.8(c) of the Seller Disclosure Schedule, as applicable.

(d)     From and after the date of this Agreement until the earlier of the Closing and the termination of this Agreement, the Selling Entities may move to reject any Contract which is not an Assumed Agreement or an Assumed Real Property Lease; *provided* that the Selling Entities shall provide the Buyer with not less than five (5) Business Days prior written notice ("Contract Notice Period") of such motion and the Buyer may (in the Buyer's sole discretion) direct the Selling Entities not to move to reject such Contract during the Contract Notice Period; *provided, however*, that the Buyer may, at any time during the Contract Notice Period, designate such Contract as an Assumed Agreement or an Assumed Real Property Lease in accordance with Section 2.5(b) and the Selling Entities shall not thereafter reject or seek to reject such Contract.

(e)     The Debtor Entities shall file the Cure Schedule no later than one (1) week prior to the Closing Date.  The Bankruptcy Court shall deem any non-debtor party to a Contract included on the Cure Schedule that does not timely file an objection with the Bankruptcy Court to have given any required Consent to the assumption of such Contract by the Debtor Entity and assignment to the Buyer pursuant to section 365 of the Bankruptcy Code.

(f)     In connection with the assumption and assignment to the Buyer (as requested in writing by the Buyer) of any Assumed Agreement or Assumed Real Property Lease pursuant to this Section 2.5, in addition to the Purchase Price, the Buyer shall bear and pay, in addition to the Cash Purchase Price, all of the cure amounts, as determined by the Bankruptcy Court, if any, necessary to cure all defaults, if any (such amounts, collectively, the "Cure Payments"); *provided*, that to the extent such Cure Payments are not made prior to the Closing, all

Liabilities related to such Cure Payments shall be assumed by the Buyer at the Closing as Assumed Liabilities.  No Selling Entity shall have any liability for such Cure Payments.

(g)    The Seller shall use its reasonable best efforts to obtain an order of the Bankruptcy Court to assign the Assumed Agreements and the Assumed Real Property Leases to the Buyer (the "Assumption Approval") on the terms set forth in this Section 2.5.  In the event the Selling Entities are unable to assign any such Assumed Agreement or Assumed Real Property Lease to the Buyer pursuant to an order of the Bankruptcy Court, then the Parties shall use commercially reasonable efforts prior to the Closing to obtain, and to cooperate in obtaining, all Consents and Governmental Authorizations from Governmental Authorities and third parties necessary to assume and assign such Assumed Agreement or Assumed Real Property Lease to the Buyer; *provided*, *however*, that the Seller shall not be required to pay any amount or incur any obligation to any Person from whom any such Consent or Governmental Authorization may be required in order to obtain such Consent.

(h)    In addition to all other rights granted to the Buyer regarding the designation of Contracts to be Assumed Agreements or Assumed Real Property Leases hereunder, the Buyer shall have the right after the Closing to designate in writing, additional Contracts as Assumed Agreements or Assumed Real Property Leases, in each case to the extent permitted by applicable Law, until such Contracts are sold, transferred, rejected or wound down by the Debtor Entities. The Debtor Entities shall provide timely and proper written notice of such assumption and assignment to all parties to any such additional Assumed Agreements or Assumed Real Property Leases and take all other actions reasonably necessary to cause such Contracts to be assumed by the Debtor Entities and assigned to the Buyer pursuant to section 365 of the Bankruptcy Code. The Buyer shall be responsible for (i) any Cure Payments due and owing under such Assumed Agreements or Assumed Real Property Leases so designated by the Buyer post-Closing and (ii) any amounts (A) described in the definition of "Closing Cash Amount", or (B) contemplated by Section 3.4(a) to be paid by the Buyer in respect of such Assumed Agreements or Assumed Real Property Leases designated post-Closing.

Section 2.6    Designation of Assets and Liabilities.    From and after the date of this Agreement, unless this Agreement is terminated, until two (2) Business Days prior to the Closing Date, the Buyer may, in its sole discretion by written notice to the Selling Entities, (a) designate any of the Purchased Assets as additional Excluded Assets and/or (b) designate any of the Excluded Liabilities as additional Assumed Liabilities, which notice shall set forth in reasonable detail the assets or Liabilities so designated; *provided*, that (i) there shall be no increase or reduction in the Purchase Price in connection with any such designation by the Buyer (other than any adjustment in respect of the Closing Cash Amount or Section 3.4) and (ii) the Buyer shall not be permitted to designate as an Excluded Asset pursuant to this Section 2.6, any Purchased Assets or items included or taken into account in the Closing Cash Amount.  Notwithstanding any other provision hereof, the Liabilities of the Selling Entities under or related to any Purchased Asset excluded under this paragraph shall constitute Excluded Liabilities.

Section 2.7    Consents to Certain Assignments.    If notwithstanding the applicable provisions of Sections 363 and 365 of the Bankruptcy Code and the Sale Order and the commercially reasonable efforts of the Selling Entities and the Buyer pursuant to Section 2.5(g), (a) any Consent or Governmental Authorization is not obtained prior to Closing and as a result

31

thereof the Buyer shall be prevented by a third party from receiving the rights and benefits with respect to a Purchased Asset intended to be transferred hereunder, or (b) any Purchased Asset is not otherwise capable of sale and/or assignment (after giving effect to the Sale Order and the Bankruptcy Code), then, in any such case, the Selling Entities shall, prior to the closing of the Bankruptcy Case and subject to any approval of the Bankruptcy Court that may be required and at the request of the Buyer, cooperate with the Buyer in any lawful and commercially reasonable arrangement under which the Buyer would, to the extent practicable, obtain (for no additional cost or consideration) the economic claims, rights and benefits under such asset and assume the economic burdens and obligations with respect thereto in accordance with this Agreement, including by subcontracting, sublicensing or subleasing to the Buyer, and the Buyer shall assume any related burden and obligation with respect to such Purchased Asset to the extent such burden and obligation would constitute an Assumed Liability if such Purchased Asset was transferred at Closing; *provided*, that the Selling Entities' cooperation obligations contemplated by this <u>Section 2.7</u> shall not include any obligation by any Selling Entity or any of its Affiliates to pay money (advance or otherwise) to any third party or to incur out-of-pocket expenses unless the Buyer funds such amounts. The Buyer shall cooperate with the Selling Entities in order to enable the Selling Entities to provide to the Buyer the benefits contemplated by this <u>Section 2.7</u>. The Selling Entities shall as promptly as practicable pay to the Buyer when received all monies received by the Selling Entities attributable to such Purchased Asset from and after the Closing Date and the Buyer shall reasonably promptly pay the Selling Entities for all reasonable and documented out-of-pocket costs incurred by the applicable Selling Entities associated with, arising or resulting from such arrangement. Notwithstanding the foregoing, this <u>Section 2.7</u> shall not be deemed to require any Selling Entity or any of its Affiliates to make available, or enter into any arrangement to provide, any Permit or the use or benefit thereof to the Buyer or any of its Affiliates; *provided* that this sentence shall not limit the Selling Entities' obligations under <u>Section 7.5</u>.

Section 2.8    <u>Wrong Pockets</u>.

(a)    From and after the Closing, if either the Buyer or any Selling Entity becomes aware that any right, property or asset forming part of the Purchased Assets has not been transferred to the Buyer or that any right, property or asset forming part of the Excluded Assets has been transferred to the Buyer, such Party shall promptly notify the other Party and the Parties shall, as soon as reasonably practicable thereafter, use reasonable best efforts to cause such right, property or asset (and any related Liability) to be transferred at the expense of the Party that is seeking the assets to be transferred to it and with any necessary prior Consent, to (i) the Buyer, in the case of any right, property or asset forming part of the Purchased Assets which was not transferred to the Buyer at or in connection with the Closing, or (ii) the applicable Selling Entity, in the case of any right, property or asset forming part of the Excluded Assets which was transferred to the Buyer at the Closing. In furtherance of the foregoing, if after the Closing, the Buyer discovers any Contract that should have been disclosed in <u>Section 2.1(d)</u> of the Seller Disclosure Schedule or <u>Section 2.1(e)</u> of the Seller Disclosure Schedule that was not assumed, then the Buyer may at its sole discretion elect to include such Contract in <u>Section 2.1(d)</u> of the Seller Disclosure Schedule or <u>Section 2.1(e)</u> of the Seller Disclosure Schedule, as applicable, as if disclosed thereon at Closing or to exclude such Contract from the Purchased Assets; *provided* that in the event the Buyer elects to include such Contract, the Buyer shall be responsible to make all Cure Payments with respect to such Contract.

(b)     From and after the Closing, if either the Buyer or any Selling Entity or any of their respective Affiliates (other than any Excluded Parties) receives any (i) funds or property that is, in the reasonable determination of the receiving Party, intended for or otherwise the property of the other Party pursuant to the terms of this Agreement or any other Transaction Document, the receiving Party shall reasonably promptly (A) notify and (B) forward such funds or property to, the other Party (and, for the avoidance of doubt, the Parties acknowledge and agree that there is no right of offset with respect to such funds or property, whether in connection with a dispute under this Agreement or any other Transaction Document or otherwise) or (ii) mail, courier package, facsimile transmission, purchase order, invoice, service request or other document that is, in the reasonable determination of the receiving Party, intended for or otherwise the property of the other Party pursuant to the terms of this Agreement or any other Transaction Document, the receiving Party shall reasonably promptly (A) notify and (B) forward such document or property to, the other Party.

(c)     From and after the Closing, if either the Buyer or any Selling Entity or any of their respective Affiliates (other than any Excluded Parties) pays any amount to any third party in satisfaction of any Liability of the other Party pursuant to the terms of this Agreement or any other Transaction Document, (i) the paying Party shall promptly notify the other Party of such payment and (ii) to the extent the paying Party is not obligated to make such payment pursuant to the terms of this Agreement or any other Transaction Document, the other Party shall promptly reimburse the paying Party for the amount so paid by the paying Party to such third party (and, for the avoidance of doubt, the Parties acknowledge and agree that there is no right of offset with respect to such amount, whether in connection with a dispute under this Agreement or any other Transaction Document or otherwise).

## ARTICLE III
## PURCHASE PRICE; DEPOSIT

Section 3.1     Purchase Price.

(a)     The consideration for the sale and transfer of the Purchased Assets from the Selling Entities to the Buyer (collectively, the "Purchase Price") shall be: (i) an amount in cash equal to the Cash Purchase Price, plus (ii) the Deposit, plus (iii) the assumption of the Assumed Liabilities, plus (iv) an additional Ten Million Dollars ($10,000,000.00) (the "Entourage Consideration") paid by the Buyer in cash promptly (but not later than thirty (30) days) following the satisfaction of either of the following conditions: (A) the Buyer's receipt (pursuant to transfer documents in form and content reasonably satisfactory to the Buyer) of title to and ownership of the Intellectual Property owned by, or purported to be owned by, Entourage IP Holdings (the "Entourage Assets") free and clear of all Encumbrances (other than Permitted Encumbrances, and excluding any Entourage Assets that have been abandoned, invalidated or cancelled), or (B) the Selling Entities' exercise of commercially reasonable efforts to secure for the Buyer, the Entourage Assets set forth in Section 3.1(a)(i) and Section 3.1(a) (ii) of the Seller Disclosure Schedule (excluding any Entourage Assets that have been abandoned, invalidated or cancelled), resulting in the Buyer's receipt (pursuant to transfer documents in form and content reasonably satisfactory to the Buyer) of title to and ownership of at least the Entourage Assets set forth in Section 3.1(a)(i) of the Seller Disclosure Schedule (excluding any Entourage Assets that have been abandoned, invalidated or cancelled).  Upon such transfer of the applicable Entourage Assets, the Entourage

33

Assets (excluding any Entourage Assets that have been abandoned, invalidated or cancelled) shall be deemed Purchased Assets hereunder.

(b)     On the Closing Date, the Buyer shall pay or cause to be paid to the Seller or its designee(s), by wire transfer of immediately available funds to an account or series of accounts designated by the Seller prior to the Closing, an amount or amounts in cash equal, in the aggregate, to the Cash Purchase Price, Price, which Cash Purchase Price shall be used, directed and applied as provided in Section 3.1(c) below.

(c)     Concurrently with the Closing, the Selling Entities shall use, direct and apply the Cash Purchase Price as follows: (i) the amount necessary, currently estimated at approximately Sixteen Million Dollars ($16,000,000), shall be used to satisfy in full any outstanding Encumbrances imposed by Law against the Owned Real Property that have been or may be asserted by any mechanics, repairmen, workmen, suppliers or materialmen; (ii) Four Million Dollars ($4,000,000) shall be set aside in a segregated account and reserved for the payment of the Excluded WARN Act Liabilities; (iii) Four Million Dollars ($4,000,000) shall be set aside in a segregated account and reserved for the payment of all Liabilities owing to prior and/or current employees of the Selling Entities that constitute Excluded Liabilities other than the Excluded WARN Act Liabilities (it being agreed that following payment in full of all such Liabilities in subsections (i) through (iii) hereof, all amounts then remaining in such reserves shall be released to the Debtor Entities); and (iv) the remainder of the Cash Purchase Price shall be paid to the Debtor Entities, subject to payment of the DIP Obligations as set forth in the Sale Order. Notwithstanding anything to the contrary herein or otherwise, to the extent any portion of the Cash Purchase Price remains after the pursuit of the Excluded Estate Claims, such remaining consideration shall be retained for the benefit of the Debtor Entities' estates and not be distributed to any Buyer Related Party, the DIP Lenders and/or the Prepetition Secured Parties.

Section 3.2     Deposit Escrow; Deposit Release.  The Seller and the Buyer have entered into an escrow agreement (the "Escrow Agreement") with Citibank, N.A. (the "Escrow Agent"), a copy of which is attached hereto as Exhibit E, and the Buyer has deposited into an escrow account (the "Escrow Account") with the Escrow Agent an amount equal to Twenty-Five Million Dollars ($25,000,000) (together with any interest accrued thereon prior to the Closing Date, the "Deposit") by wire transfer of immediately available funds pursuant to the terms of this Agreement and the Escrow Agreement.  The Deposit shall not be subject to any Encumbrance, attachment, trustee process or any other judicial process of any creditor of any of the Parties; *provided,* that the Seller's right to receive the Deposit in accordance with the terms of this Agreement shall be subject to the liens securing the DIP Obligations.  The Deposit (or, in the case of a Specified Termination, a portion of the Deposit equal to the Specified Termination Amount, together with a pro rata portion of any received investment income on the Deposit, if any) shall become payable to the Seller upon the earliest to occur of (i) the Closing, (ii) a Specified Termination, and (iii) the termination of this Agreement (A) by the Seller pursuant to Section 9.1(d) or Section 9.1(h), (B) by the Buyer pursuant to Section 9.1(b), Section 9.1(c), Section 9.1(f), Section 9.1(g)(ii), Section 9.1(i), Section 9.1(j), or Section 9.1(k) or by the Seller pursuant to Section 9.1(g)(ii), in each case (solely with respect to this clause (B)) at a time when the Seller would have been entitled to terminate this Agreement pursuant to Section 9.1(d) or Section 9.1(h), or (C) a termination by the Buyer or the Seller pursuant to Section 9.1(g)(ii) (solely in the event that (I) all of the conditions set forth in Section 8.1 and Section 8.2 have been satisfied or waived (other than (x) those conditions to

Closing that by their terms or their nature are to be satisfied at the Closing, but subject to such conditions being satisfied assuming the Closing would occur and (y) the conditions in Section 8.1(c) and Section 8.2(e), solely as a result of the Sale Order having been entered but not having become a Final Order), (II) the Seller has confirmed in writing that it is ready, willing and able to waive the conditions in Section 8.1(c) and Section 8.3(d) and consummate the Closing, and (III) within three (3) days of such written confirmation from the Seller, (x) the Buyer fails to consummate the Closing, (y) the Buyer states in writing that it is not willing to waive the conditions in Section 8.1(c) and Section 8.2(e), or (z) the Buyer does not confirm in writing to the Seller that it is willing to waive the conditions in Section 8.1(c) and Section 8.2(e) (any such termination described in the foregoing clause (iii)(A), clause (iii)(B) or clause (iii)(C), a "Buyer Default Termination").  If the Closing occurs, the Deposit shall be delivered to an account designated by the Selling Entities by wire transfer of immediately available funds as payment of a portion of the Purchase Price.  Upon a termination of this Agreement by the Buyer pursuant to Section 9.1(j) or Section 9.1(k) or by virtue of an automatic termination pursuant to Section 9.1(g)(i) hereof, the Deposit (together with any investment income received thereon) shall be immediately delivered to an account designated by the Buyer (by wire transfer of immediately available funds) to be retained by the Buyer for its own account, except to the extent that there is a dispute between Buyer and Seller about a termination pursuant to Section 9.1(j) or Section 9.1(k) and the disposition of the Deposit is resolved consensually in writing or pursuant to an Order of the Bankruptcy Court (or other court having jurisdiction under this Agreement), in which event the Deposit will not be distributed to the Buyer and shall be held in the Escrow Account until any portion of the Deposit that is otherwise payable to the Seller pursuant to such consensual resolution or Order of the Bankruptcy Court (or other court having jurisdiction under this Agreement) (including in respect of the Specified Termination Amount) in connection with a Specified Termination or Buyer Default Termination shall be paid to the Seller (without duplication) in accordance with the provisions hereof.  If the Deposit (or, in the case of a Specified Termination, a portion of the Deposit equal to the Specified Termination Amount, together with a pro rata portion of any received investment income on the Deposit) becomes payable to the Seller by reason of a Specified Termination or Buyer Default Termination, as applicable, then either (A) the Seller and the Buyer shall jointly instruct the Escrow Agent to disburse, or (B) the Seller or the Buyer shall deliver to the Escrow Agent a final and non-appealable written Order from a court of competent jurisdiction directing the Escrow Agent to disburse, the Deposit (or, in the case of a Specified Termination, a portion of the Deposit equal to the Specified Termination Amount, together with a pro rata portion of any received investment income on the Deposit) to the Seller, in each case in accordance with the Escrow Agreement, and the Escrow Agent shall, within two (2) Business Days after receiving such written instruction or Order, as the case may be, disburse the Deposit (or, in the case of a Specified Termination, a portion of the Deposit equal to the Specified Termination Amount, as applicable and without duplication, together with a pro rata portion of any received investment income on the Deposit) to Seller by wire transfer of immediately available funds to the account designated in writing by the Seller to be retained by the Seller for its own account and, in the case of a Specified Termination, any amounts remaining in the Escrow Account after such disbursement to the Seller to Buyer by wire transfer of immediately available funds to the account designated in writing by Buyer to be retained by Buyer for its own account.  If this Agreement or the transactions contemplated herein are terminated other than for a termination which constitutes a Buyer Default Termination or a Specified Termination, then either (A) the Seller and the Buyer shall jointly instruct the Escrow Agent to refund, or (B) the Seller or the Buyer shall deliver to the Escrow

Agent a final and non-appealable written Order from a court of competent jurisdiction directing the Escrow Agent to refund, the Deposit to the Buyer, in each case in accordance with the Escrow Agreement, and the Escrow Agent shall, within two (2) Business Days after receiving such written instruction or Order, as the case may be, refund the Deposit to an account designated by the Buyer in writing by wire transfer of immediately available funds to be retained by the Buyer for its own account.  The Escrow Agent's escrow fees and charges shall be paid by the Buyer.  For purposes of this Section 3.2, "pro rata portion" shall be calculated based on the Specified Termination Amount expressed as a percentage of the Deposit (excluding any interest for this purpose).  For the avoidance of doubt, in the event of a Specified Termination, the Seller shall retain $10,000,000 of the Deposit and the Buyer shall receive a refund of $15,000,000 of the Deposit, plus each Party shall receive a prorated portion of any investment income on the Deposit.  Notwithstanding anything to the contrary herein (including in Article IX or Section 10.12), any recovery by the Seller of the Specified Termination Amount from the Deposit pursuant to the terms of this Section 3.2 solely in the case of a Specified Termination (and not in the case of a Buyer Default Termination or any other scenario, event, fact or circumstance) shall constitute the Seller's and the other Selling Entities' sole and exclusive remedy against the Buyer under this Agreement solely with respect to such Specified Termination (and not with respect to a Buyer Default Termination or any other scenario, event, fact or circumstance), other than in the event of Fraud; *provided* that until such time as the Buyer pays or causes to be paid to the Seller the Specified Termination Amount, the remedies available to the Seller and the Selling Entities hereunder shall be in addition to any other remedy to which it is entitled at law or in equity, and the election to pursue an injunction or specific performance shall not restrict, impair or otherwise limit the Selling Entities from, in the alternative, seeking to collect the Specified Termination Amount (for the avoidance of doubt and notwithstanding anything to the contrary herein (including in Section 9.2(a) hereof), while the Selling Entities may pursue both a grant of specific performance to the extent permitted by Section 10.12(b) in connection with any breach of this Agreement by the Buyer, MEC or MBC and the payment of the Specified Termination Amount, as applicable, under no circumstances shall the Selling Entities be permitted or entitled to (i) receive both a grant of specific performance to require the Buyer to consummate the Closing and payment of the Specified Termination Amount or (ii) solely with respect to a Specified Termination (and not with respect to a Buyer Default Termination or any other scenario, event, fact or circumstance), seek specific performance or any other remedy (other than collection of the Specified Termination Amount) in the event that Buyer has timely and validly exercised its rights hereunder to terminate this Agreement pursuant to a Specified Termination).

Section 3.3    Allocation.  The Buyer shall, not later than one hundred twenty (120) days after the Closing Date, prepare and deliver to the Seller an allocation of the Purchase Price (and the Assumed Liabilities and other relevant items, to the extent properly taken into account for Tax purposes) among the Purchased Assets  (the "Allocation") in accordance with Section 1060 of the Code, the Treasury Regulations thereunder and other applicable Law for the Seller's review and approval (such approval not to be unreasonably withheld, conditioned or delayed).  Any reasonable comments provided by the Seller to the Buyer in accordance with this Section 3.3 shall be considered by the Buyer in good faith.  The Allocation shall be conclusive and binding on the Parties unless the Seller notifies the Buyer in writing that the Seller objects to one or more items reflected in the Allocation, and specifies the reasonable basis for such objection, within thirty (30) days after delivery to the Seller of the Allocation.  In the case of such an objection, the Seller and the Buyer shall negotiate in good faith to resolve any disputed items.  Any resolution by the Seller

and the Buyer shall be conclusive and binding on the parties once set forth in writing (any such conclusive and binding Allocation, the "Final Allocation").  If the Seller and the Buyer are unable to resolve all disputed items within fifteen (15) days after the delivery of the Seller's written objection to the Buyer, the Buyer and the Seller shall jointly retain a mutually agreed independent internationally recognized accounting firm (the "Accounting Firm") (which may in turn select an appraiser, if needed) to resolve any disputed item(s).  The costs, fees and expenses of the Accounting Firm shall be borne equally by the Buyer and the Seller.  The Accounting Firm shall resolve any such dispute within ninety (90) days after the retention, and the Final Allocation shall be adjusted to reflect any such resolution of any disputed item(s).  The Parties agree to (and shall cause their Affiliates (in the case of the Selling Entities, other than any Excluded Parties) to) file all Tax Returns (including the filing of IRS Form 8594 with their U.S. federal income Tax Return for the taxable year that includes the date of the Closing) consistent with, and shall not take any position in connection with Tax matters that is inconsistent with, the Final Allocation unless otherwise required by a final determination within the meaning of Section 1313 of the Code or any corresponding provision of state, local or non-U.S. Law, or as the Buyer or the Seller (as applicable) determines is necessary to settle a dispute with a Tax authority after making a good faith effort to defend the Final Allocation.  In the event that a Governmental Authority disputes the Final Allocation, the Party receiving notice of such dispute shall promptly notify the other Party hereto, and the Seller and the Buyer shall, and shall cause their respective Affiliates (in the case of the Selling Entities, other than any Excluded Parties) to, use their reasonable best efforts to defend such Final Allocation in any applicable proceeding.

Section 3.4    Closing Cash Amount.

(a)    At least one (1) Business Day prior to the Closing Date, the Seller shall prepare and deliver, or cause to be prepared and delivered, to the Buyer a statement setting forth in reasonable detail the Seller's good faith calculation of the Closing Cash Amount.  During the period beginning on the delivery of such statement and ending upon the delivery of the Closing Statement pursuant to Section 3.4(b), the Buyer shall have an opportunity to review such statement and provide reasonable comments with respect to such statement to the Seller in good faith, and the Seller shall in good faith consider such comments so provided by the Buyer.  Notwithstanding anything to the contrary herein or otherwise, to the extent that, following the Closing, the Buyer identifies for the Seller in writing items set forth in Section 2.1(c) and the corresponding Contracts that the Buyer would like to acquire or assume as a Purchased Asset, then if and to the extent such item has not been sold, transferred, terminated, rejected or wound down, or returned to the Selling Entities, the applicable Selling Entity shall sell and transfer such item to the Buyer in exchange for payment by the Buyer to the Seller of the amount of such item (calculated in the same manner as the Closing Cash Amount, *mutatis mutandis*) by wire transfer of immediately available funds.

(b)    On the calendar day immediately preceding the Closing Date, the Seller shall prepare and deliver, or cause to be prepared and delivered, to the Buyer a statement (the "Closing Statement") setting forth in reasonable detail the Closing Cash Amount, taking into account any comments from the Buyer provided in accordance with Section 3.4(a) that the Seller in respect of the Closing Statement or the Closing Cash Amount has determined to incorporate into the Closing Statement; *provided*, that if there is any disagreement or dispute between the Buyer and the Seller with respect to the Closing Statement or the calculation of the Closing Cash Amount, such disagreement shall not delay or impede the Closing and the Seller's calculation of

the Closing Cash Amount, absent manifest error, set forth in the Closing Statement shall control; *provided further* that the Buyer shall have the opportunity to present any disagreement or dispute with respect to the Closing Statement to the Bankruptcy Court for determination after the Closing.

**ARTICLE IV**
**THE CLOSING**

Section 4.1   <u>Time and Place of the Closing</u>.   Upon the terms and subject to the satisfaction or, to the extent permitted by applicable Law, waiver of the conditions contained in <u>Article VIII</u> of this Agreement, the closing of the sale of the Purchased Assets and the assumption of the Assumed Liabilities contemplated by this Agreement (the "<u>Closing</u>") shall take place either by virtual means or at the offices of Latham & Watkins LLP, 1271 Avenue of the Americas, New York, NY 10020, at 9:00 a.m. (eastern time) as promptly as practicable, and at no time later than the third (3rd) Business Day following the date on which the conditions set forth in <u>Article VIII</u> have been satisfied or, to the extent permitted by applicable Law, waived by the applicable Party in writing (other than conditions which by their nature are to be satisfied at the Closing, but subject to the satisfaction or, to the extent permitted, waiver of such conditions at or prior to the Closing), or at such other place and time as the Buyer and the Seller may mutually agree.   The date on which the Closing actually occurs is herein referred to as the "<u>Closing Date</u>."

Section 4.2   <u>Deliveries by the Seller</u>.   At or prior to the Closing, the Seller shall deliver or cause to be delivered the following to the Buyer:

(a)   the Bill of Sale, duly executed by the Selling Entities;

(b)   the Assignment and Assumption Agreement, duly executed by the Selling Entities;

(c)   the IP Assignment Agreements, duly executed by the applicable Selling Entities;

(d)   Deeds with respect to all Owned Real Property, duly executed by the applicable Selling Entities;

(e)   a certified copy of the Sale Order as entered by the Bankruptcy Court;

(f)   the certificate contemplated by <u>Section 8.2(c)</u>; and

(g)   certified copies of the resolutions duly adopted by the Selling Entities' board of directors (or similar governing body) authorizing the execution, delivery and performance of this Agreement and each of the Transactions; and

(h)   a properly executed IRS Form W-9 from each Selling Entity (or, if applicable, its regarded owner for U.S. federal income tax purposes), but excluding any Selling Entity that transfers all of the Purchased Assets held by such Selling Entity to Seller in accordance with <u>Section 7.20</u> prior to the Closing; *provided*, that notwithstanding anything else contained herein to the contrary, the only remedy for a failure to make the delivery contemplated by this <u>Section 4.2(h)</u> shall be to make any withholding required by Law resulting therefrom as provided

38

in Section 7.17 and such failure shall not constitute a breach of covenant, agreement or obligation hereunder or constitute a failure of a condition precedent to Closing set forth in Section 8.1 or Section 8.2 to be satisfied.

Section 4.3    Deliveries by the Buyer.  At or prior to the Closing, the Buyer shall deliver or cause to be delivered the following to the Seller:

(a)    the Cash Purchase Price, payable in accordance with Section 3.1(b);

(b)    the Deposit in accordance with Section 3.2;

(c)    the Bill of Sale, duly executed by the Buyer (or its designee);

(d)    the Assignment and Assumption Agreement, duly executed by the Buyer (or its designee);

(e)    the IP Assignment Agreements, duly executed by the Buyer (or its designee);

(f)    certified copies of the resolutions duly adopted by the Buyer's board of directors (or similar governing body) authorizing the execution, delivery and performance of this Agreement and each of the Transactions; and

(g)    the certificate contemplated by Section 8.3(c).

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES OF THE SELLING ENTITIES

Except as set forth in the disclosure schedule delivered by the Seller to the Buyer (the "Seller Disclosure Schedule") pursuant to this Agreement and subject to such exceptions that result from the filing and commencement of the Bankruptcy Case, including the entry of the Sale Order and any other Orders of the Bankruptcy Court necessary to consummate the Transactions, each Selling Entity hereby represents and warrants to the Buyer (in the case of any assets or liabilities of the Selling Entities, solely with respect to the Purchased Assets and the Assumed Liabilities) as follows:

Section 5.1    Organization, Standing and Corporate Power.  Each Selling Entity is a corporation or other entity duly organized, validly existing and, to the extent applicable, in good standing (or its equivalent) under the laws of the jurisdiction of its incorporation or organization and has the requisite corporate or other entity power and authority to own or lease all of its properties and assets and to carry on its business as it is now being conducted.  Each Selling Entity is duly licensed or qualified to do business in each jurisdiction in which the nature of the business conducted by it or the character or location of the properties and assets owned or leased by it makes such licensing or qualification necessary, except where the failure to be so licensed or qualified would not have a Material Adverse Effect.

Section 5.2    Authority; Execution and Delivery; Enforceability.  Each of the Selling Entities has, subject to the entry and effectiveness of the Sale Order, all necessary power and

authority to execute and deliver this Agreement and the other Transaction Documents to which it is or will be a party, to perform and comply with each of its obligations hereunder and thereunder and, upon entry and effectiveness of the Sale Order, in accordance with the terms hereof and thereof, will have all necessary corporate or similar authority to consummate the Transactions. Subject to the entry and effectiveness of the Sale Order, the execution and delivery by the Selling Entities of this Agreement and the other Transaction Documents to which any Selling Entity is or will be a party, the performance and compliance by the Selling Entities with each of their obligations herein and therein, and the consummation by it of the Transactions have been duly and validly authorized and approved by all necessary corporate or other action on the part of the Selling Entities, and no other corporate or other Proceedings on the part of the Selling Entities and no other stockholder votes are necessary to authorize the execution of this Agreement or the other Transaction Documents, or the performance or consummation by the Selling Entities of the Transactions. Subject to the entry and effectiveness of the Sale Order, each Selling Entity has duly and validly executed and delivered this Agreement and will (as of the Closing) duly and validly execute and deliver the other Transaction Documents to which it is a party and, assuming the due authorization, execution and delivery by the Buyer of this Agreement and the other Transaction Documents to which it is party, and by the other parties to the Transaction Documents, this Agreement constitutes and the other Transaction Documents will constitute (as of the Closing) legal, valid and binding obligations of each Selling Entity, enforceable against such Selling Entity in accordance with its terms, subject in all cases the General Enforceability Exceptions.

Section 5.3    No Conflicts.

(a)    The authorization, execution and delivery of this Agreement and the other Transaction Documents does not and will not, and the performance by the Selling Entities of this Agreement and the other Transaction Documents will not, except to the extent excused by or unenforceable as a result of the filing of the Bankruptcy Case and except for the entry and effectiveness of the Sale Order, with or without notice, lapse of time or both, (i) conflict with or violate any provision of any Selling Entity's organizational or governing documents, (ii) assuming that all consents, approvals, authorizations and permits described in Section 5.3(b) have been obtained and all filings and notifications described in Section 5.3(b) have been made and any waiting periods thereunder have terminated or expired, conflict with or violate any Law, Permit or Order applicable to any Selling Entity or by which any property or asset of any Selling Entity is bound or affected (iii) except as set forth in Section 5.3(a) of the Seller Disclosure Schedule, require any notice, Consent or approval under, violate, result in any breach of or any loss of any benefit under, constitute a change of control or default (or an event which with notice or lapse of time or both would become a default) under or give to others any right of termination, vesting, amendment, acceleration or cancellation of, or result in the creation of an Encumbrance (other than a Permitted Encumbrance), in each case on or with respect to any Purchased Assets pursuant to or under, any Material Contract or material Permit to which any Selling Entity is party or (iv) result in the creation of any Encumbrance (other than Permitted Encumbrances) on any of the Purchased Assets, except, with respect to clauses (ii), (iii) and (iv), for any such conflicts, violations, breaches, defaults or other occurrences which would not, individually or in the aggregate, have a Material Adverse Effect.

(b)    Assuming the accuracy of the representations and warranties of the Buyer in Section 6.3(a), the execution and delivery by the Selling Entities of this Agreement and the other

Transaction Documents does not and will not, and the consummation by the Selling Entities of the Transactions and compliance by the Selling Entities with any of the terms or provisions hereof will not, require any Consent, approval, authorization or permit of, registration with, or filing with or notification to, any Governmental Authority, except (i) compliance with any applicable requirements under the Regulatory Laws, (ii) the entry of the Sale Order by the Bankruptcy Court and (iii) such other Consents where the failure to obtain such Consents would not, individually or in the aggregate, have a Material Adverse Effect.

Section 5.4    Legal Proceedings and Orders.  Except as would not be, individually or in the aggregate, material to the Business, the Purchased Assets and the Assumed Liabilities, taken as a whole, or except as described in Section 5.4 of the Seller Disclosure Schedule, other than in connection with the Bankruptcy Case, there is no pending or threatened in writing or to the Knowledge of the Selling Entities otherwise threatened, action, suit, arbitration, proceeding (including any civil, criminal, administrative, investigative or appellate proceeding or any informal proceeding) or investigation pending or being heard by or before, or otherwise involving, any Governmental Authority, arbitrator, arbitration panel, advertising self-regulatory body or any other Person (each a "Proceeding") against or affecting the Selling Entities, the Business, the Purchased Assets or the Assumed Liabilities and as of the date hereof, no Person has commenced or, threatened in writing, or to the Knowledge of the Selling Entities, otherwise threatened to commence any Proceeding (a) that relates to any of the Selling Entities, the Business, the Purchased Assets or the Assumed Liabilities, or (b) that would have the effect of preventing, materially delaying, making illegal or otherwise materially interfering with any of the transactions contemplated by this Agreement. Except as described in Section 5.4 of the Seller Disclosure Schedule, there is no material Order to which any of the Selling Entities or any of the Purchased Assets is subject.  Except as would not be, individually or in the aggregate, material to the Business, the Purchased Assets and the Assumed Liabilities, taken as a whole, no suit, action or other Proceeding is pending or threatened in writing before any Governmental Authority seeking to restrain the Selling Entities from consummating the Transactions or prohibit their entry into this Agreement or prohibit the Closing, or seeking damages as a result of the consummation of this Agreement or the Transaction Documents.

Section 5.5    Permits.    Except as set forth in Section 5.5 of the Seller Disclosure Schedule, other than in connection with or as a result of the Bankruptcy Case, each of the Selling Entities has all material federal, state, provincial, local and foreign governmental licenses, franchises, permits, certificates, registrations, consents, certificates, rights, agreements, consents, approvals, orders, exemptions, billing, qualifications and authorizations ("Permits") necessary for the conduct of their business and the use of their properties and assets, as presently conducted and used, and each of the Permits is valid, subsisting and in full force and effect in all material respects, and except as would not be, individually or in the aggregate, material to the Business, the Purchased Assets and the Assumed Liabilities, taken as a whole, no event has occurred or circumstance exists that may result in the revocation, default, withdrawal, suspension, cancellation, or modification of or to any Permit. The Selling Entities have not during the past five (5) years received any notice from any Governmental Authority or any other Person of (A) any actual or potential violation of any Permit, or (B) any actual or potential revocation, withdrawal, suspension, cancellation, termination of or modification of any such Permit and all applications for renewal and other filings required to have been made with respect to the Selling Entity's Permits have been duly made on a timely basis with the appropriate Governmental Authorities, in

each case, except as would not be, individually or in the aggregate, material to the Business, the Purchased Assets and the Assumed Liabilities, taken as a whole.

Section 5.6    Compliance with Law.  Each of the Selling Entities is in compliance in all material respects with, and since January 1, 2018 has been in compliance in all material respects with all Laws and Orders relating to the Purchased Assets, except (a) for such past noncompliance as has been remedied and imposes no continuing current or future obligations or costs on such Selling Entity or (b) as set forth in Section 5.6 of the Seller Disclosure Schedule.  Except as would not, individually or in the aggregate, have a Material Adverse Effect, none of the Selling Entities has received any written notice, citation, complaint, Order, or, to the Knowledge of the Selling Entities, other communication since January 1, 2018 from a Governmental Authority that alleges that such Selling Entity is not in compliance in any material respect with any Law or Order.

Section 5.7    Absence of Certain Developments.  Since the Balance Sheet Date, (a) no Material Adverse Effect has occurred, (b) except as set forth in Section 5.7 of the Seller Disclosure Schedule and other than in connection with the Bankruptcy Case, the Business has been conducted, in all material respects in the Ordinary Course of Business, and (c) none of the Selling Entities have taken or agreed to take any action that, if taken after the date hereof, would require the consent of the Buyer pursuant to Section 7.1.

Section 5.8    Financial Statements.

(a)    Section 5.8(a) of the Seller Disclosure Schedule contains: (i) the Selling Entities' consolidated unaudited balance sheet as of the latest date available prior to the date hereof (such date, the "Balance Sheet Date") and the related unaudited statements of income and cash flows for the 12-month period then ended, and (ii) the Selling Entities' consolidated unaudited balance sheet and statements of income and cash flows for the latest fiscal year available prior to the date hereof (all such financial statements referred to in (i) and (ii), the "Seller Financial Statements").  Except as set forth in Section 5.8(a) of the Seller Disclosure Schedule, the Seller Financial Statements present fairly in all material respects the financial condition, results of operations and cash flows of the Selling Entities as of the times and for the periods referred to therein in all material respects in accordance with GAAP, consistently applied (subject in the case of the unaudited financial statements to (x) the absence of footnote disclosures and other presentation items, and (y) changes resulting from year-end adjustments none of which are material). The Seller Financial Statements are based on the books and records of the Selling Entities, and the books and records are accurate and complete in all material respects.

(b)    All notes and accounts receivable of the Selling Entities related to the Business are reflected properly on their books and records, are valid receivables subject to no setoffs or counterclaims, and are current and collectible subject to the reserve for bad debts set forth on the applicable Seller Financial Statements as adjusted for the passage of time through the Closing in accordance with the past custom and practice of the Selling Entities related to the Business. The accounts payable and accruals of the Selling Entities related to the Business have arisen in bona fide arm's length transactions in the Ordinary Course of Business.

(c)    The Selling Entities do not have any material Liabilities required by GAAP to be reflected or reserved on a consolidated balance sheet of the Seller (or the notes thereto) except

42

(i) as expressly disclosed, reflected or reserved against in the most recent balance sheet included in the Seller Financial Statements or the notes thereto, (ii) for Liabilities arising out of or in connection with this Agreement, the other Transaction Documents, or the Transactions, or disclosed in Section 5.8(b) of the Seller Disclosure Schedule, (iii) for Liabilities that, individually or in the aggregate, have not been, or would not be, material to the Business, the Purchased Assets and the Assumed Liabilities, taken as a whole or (iv) Liabilities that will be or are Liabilities of the Selling Entities as debtors in the Bankruptcy Case, and that will not result in any Encumbrance (other than a Permitted Encumbrance) on the Purchased Assets following the entry of the Sale Order.

Section 5.9    Employee Benefit Plans.

(a)    Section 5.9(a) of the Seller Disclosure Schedule sets forth a true and complete list of each material (i) "employee benefit plan" as defined in Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), whether or not subject to ERISA, (ii) end of service or severance, termination protection, retirement, pension, profit sharing, deferred compensation, phantom, equity or equity-based, health or welfare, employment, independent contractor, vacation, change in control, transaction, retention, bonus or other incentive, fringe benefit, paid time off or similar plan, agreement, arrangement, program or policy, or (iii) other plan, Contract, policy or arrangement providing compensation or benefits, in each case whether or not written, in the case of clauses (i)-(iii), that is sponsored, maintained, administered, contributed to or entered into by any Selling Entity or any of their ERISA Affiliates (as defined in paragraph (e) below), for the benefit of any current or former directors, officers, employees or individual independent contractors of any Selling Entity (each, a "Service Provider" and, such programs, regardless of materiality, the "Seller Compensation and Benefit Programs"). No Seller Compensation and Benefit Program that is subject to Laws of any jurisdiction other than the United States is a defined benefit pension plan.

(b)    With respect to each material Seller Compensation and Benefit Program, the Seller has made available to the Buyer, as of the date hereof, or as reasonably practicable thereafter, to the extent applicable, true, correct and complete copies of (i) the Seller Compensation and Benefit Program document, including any amendments thereto, and all related trust documents, insurance contracts or other funding vehicles, (ii) a written description of such Seller Compensation and Benefit Program if such plan is not set forth in a written document, (iii) the most recent summary plan description together with the summary or summaries of all material modifications thereto, (iv) the most recent IRS determination or opinion letter, (v) the three most recent finalized and filed annual reports (Form 5500 series and all schedules and financial statements attached thereto), (vi) the three most recent yearly compliance testing results performed under the Code, and (vii) all material and non-routine correspondence to or from the IRS, the United States Department of Labor ("DOL"), the Pension Benefit Guaranty Corporation or any other Governmental Authority received in the last three (3) years prior to the date hereof with respect to such Seller Compensation and Benefit Program.

(c)    (i) Each Seller Compensation and Benefit Program has been administered in accordance with its terms and is in compliance (both in form and operation) with all applicable Laws, in each case in all material respects, including ERISA, the Code and the Patient Protection and Affordable Care Act of 2010, as amended (the "ACA"), (ii) there has been no material

violation of, or material failure to comply with, ERISA, the Code or the ACA with respect to the filing of applicable returns, reports, documents and notices regarding any of the Seller Compensation and Benefit Programs with any Governmental Authority or the furnishing of such notices or documents to the participants or beneficiaries of the Seller Compensation and Benefit Programs, and (iii) no material Proceeding has been brought, or to the Knowledge of the Selling Entities is threatened, against or with respect to any Seller Compensation and Benefit Program, including any material audit or inquiry by any Governmental Authority (other than routine claims for benefits and appeals thereof).

(d)     Each Seller Compensation and Benefit Program that is intended to be qualified under Section 401(a) of the Code has received or is the subject of a favorable determination letter from the IRS or, with respect to a pre-approved plan, can rely on an opinion or advisory letter from the IRS to the pre-approved plan sponsor, to the effect that such plan is exempt from federal income taxes under Section 401(a) of the Code.

(e)     None of the Selling Entities or any trade or business that, together with any Selling Entity would be deemed a single employer within the meaning of Section 4001 of ERISA (an "ERISA Affiliate") or other applicable Laws maintains, contributes to, or sponsors (or has in the past six years maintained, contributed to or sponsored), or otherwise has any Liability in respect of, a multiemployer plan as defined in Section 3(37) of ERISA, a plan subject to Title IV or Section 302 of ERISA or Section 412 of the Code, a "multiple employer welfare arrangement" within the meaning of Section 3(40) of ERISA, "multiple employer plan" within the meaning of Section 413(c) of the Code, or an employee welfare benefit plan (as defined in Section 3(1) of ERISA) that is a self-insured group health plan. No Seller Compensation and Benefit Program provides post-employment health or welfare benefits for any current or former director, officer, employee or individual independent contractor of any Selling Entity (or their dependents), in any jurisdiction, other than as required under Section 4980B of the Code at the participant's sole expense or as required by other applicable Law.

(f)     Except as set forth in Section 5.9(f) of the Seller Disclosure Schedule, neither the execution and delivery of this Agreement, shareholder approval of this Agreement, nor any of the transactions contemplated by this Agreement will (either alone or upon the occurrence of any additional or subsequent events): (i) entitle any current or former Service Provider to any increase in severance pay; (ii) accelerate the time of payment, funding or vesting, or materially increase the amount of compensation (including stock or stock-based compensation) due to any such individual under a Seller Compensation and Benefit Program; (iii) limit or restrict the right of the Selling Entities to merge, amend or terminate any Seller Compensation and Benefit Programs; or (iv) result in "excess parachute payments" within the meaning of Code section 280G(b) of the Code to any "disqualified individual" (as such term is defined in proposed Treasury Regulation section 1.280G-1). No Seller Compensation and Benefit Program provides for the gross-up or reimbursement of Taxes under Section 4999 or Section 409A of the Code or otherwise.

(g)     None of the Selling Entities is a party to, or otherwise bound by, any collective bargaining agreement or other Contract with a Union. No Employee (in such capacity) is represented by a Union. To the Knowledge of the Selling Entities, there are no Union organizing activities or demands of any Union for recognition or certification pending or threatened against

any Selling Entity, and there have been no such activities or demands for the past three (3) years prior to the date hereof.

Section 5.10    Material Contracts.

(a)    Section 5.10(a) of the Seller Disclosure Schedule sets forth a list of each Material Contract as of the date of this Agreement.  For purposes of this Agreement, "Material Contract" means any of the following types of the Contracts to which a Selling Entity is a party or by which a Selling Entity is bound:

(i)    any license or assignment of, or Encumbrance on, any material Intellectual Property whether or not it involves payments and any agreement that addresses the right to use any material Intellectual Property;

(ii)    any Contract or group of related Contracts with the same party for the purchase of products or services, in either case, under which the aggregate undelivered balance of such products and services has a selling price in excess of $50,000.00 and which is not terminable by such Selling Entity upon notice of ninety (90) days or less (other than purchase orders entered into in the Ordinary Course of Business);

(iii)    any Contract that contains any provision (A) materially limiting the right of the Selling Entities to engage in any business, compete with any Person, or operate anywhere in the world, or (B) granting any exclusivity right, right of first refusal, right of first negotiation or offer or similar right to any third party or containing a "most favored nation" provision in favor of any third party, other than a Contract that can be terminated upon notice of ninety (90) days or less;

(iv)    any Contract relating to any acquisition or disposition by such Selling Entity of any business (whether by asset or stock purchase or otherwise) or any merger, consolidation or similar business combination transaction, in each case, pursuant to which such Selling Entity has an outstanding obligation to pay purchase price in excess of $50,000.00;

(v)    any Contract with any Material Customer or Material Supplier;

(vi)    any Contract with any distributor;

(vii)    any Contract pursuant to which any Selling Entity offers or obligates itself to pay any material volume discounts, rebates or other promotional allowances or commissions; or

(viii)    any joint venture, shareholder, limited liability company operating, partnership or similar Contract or any Contract concerning the sharing of profits.

(b)    Each Material Contract is in full force and effect and a valid and binding obligation of each Selling Entity party thereto, as applicable, and, to the Knowledge of the Selling Entities, the other parties thereto, enforceable against each of them in accordance with its terms,

45

except, in each case, as set forth in Section 5.10(b) of the Seller Disclosure Schedule or as such enforceability may be limited by the General Enforceability Exceptions.

(c)      None of the Selling Entities is, and to the Knowledge of the Selling Entities, the other parties thereto are not, in material breach of or default under the Material Contracts (or is alleged to be in breach of or default under), has provided or received any notice of any intention to terminate any Material Contract, and none of the Selling Entities has waived any material rights under any Material Contracts, except, in each case, (i) as a result of the Bankruptcy Case, (ii) as set forth in Section 5.10(c) of the Seller Disclosure Schedule, (iii) as may be cured upon entry of the Sale Order and payment of the Cure Payments, or (iv) for Contracts that have been or will be rejected in the Bankruptcy Case. Complete and correct copies of each Material Contract (including all modifications, amendments, and supplements thereto and waivers thereunder) have been made available to the Buyer.

Section 5.11    Intellectual Property; Information Technology.

(a)      Section 5.11(a) of the Seller Disclosure Schedule sets forth, as of the date of this Agreement, a complete and accurate list of all (i) Registered IP, (ii) domain names included in the Seller IP, and (iii) social media handles included in the Seller IP.  Other than as filed by MEC or Orange Bang, Inc., and except as has not been, or would not be, individually or in the aggregate, material to the Business, the Purchased Assets and the Assumed Liabilities, taken as a whole, none of the Registered IP is involved in any opposition, cancellation, nullity, reissue, reexamination, inter partes review or proceeding, post-grant review, interference, derivation, or other proceeding or action challenging the use, validity, issuance, registration, enforceability, inventorship, authorship, or ownership of such Registered IP.

(b)      Except as has not been, or would not be, individually or in the aggregate, material to the Business, the Purchased Assets and the Assumed Liabilities, taken as a whole, or as set forth in Section 5.11(b) of the Seller Disclosure Schedule, the Seller IP that is being assigned per this Agreement together with all Intellectual Property licensed or made available to the Selling Entities pursuant to the Assumed Agreements contain all the material Intellectual Property needed to operate the Business in substantially the same manner as currently conducted by the Selling Entities.

(c)      Except as has not been, or would not be, individually or in the aggregate, material to the Business, the Purchased Assets and the Assumed Liabilities, taken as a whole, and as set forth in Section 5.11(c) of the Seller Disclosure Schedule, with respect to each trade secret being transferred as part of the Seller IP, including recipes, formulas, and ingredients lists, each Selling Entity has taken reasonable precautions to protect the secrecy, confidentiality, and value of its trade secrets and, to the Knowledge of the Selling Entities, the trade secrets have not been used, divulged, or appropriated either for the benefit of any Person (other than the Selling Entities) or to the detriment of the Selling Entities and no trade secret is subject to any adverse claim or has been challenged or threatened in any way.

(d)      Except as has not been, or would not be, individually or in the aggregate, material to the Business, the Purchased Assets and the Assumed Liabilities, taken as a whole, and as set forth in Section 5.11(d) of the Seller Disclosure Schedule, to the Knowledge of the Selling

Entities, none of the Selling Entities is infringing, misappropriating, diluting, or otherwise violating any Intellectual Property rights of any Person.  Except as would not have a Material Adverse Effect, there is no Proceeding pending and none of the Selling Entities has received any written charge, complaint, claim, demand, or notice (other than from any Buyer Related Party or Orange Bang, Inc. and any of its Affiliates) since January 1, 2020 (or earlier, if presently not fully resolved) alleging: either (i) any such infringement, misappropriation, dilution, or violation or (ii) challenging the use, validity, inventorship, authorship, ownership, or enforceability of any Seller IP.  To the Knowledge of the Selling Entities, none of the Selling Entities are in breach of any contract relating to the Seller IP, except (A) as a result of the Bankruptcy Case, (B) as has not been, or would not be, individually or in the aggregate, material to the Business, the Purchased Assets and the Assumed Liabilities, taken as a whole, (C) as may be cured upon entry of the Sale Order and payment of the Cure Payments, (D) for Contracts that have been or will be rejected in the Bankruptcy Case or (E) any such assertions by any Buyer Related Party or Orange Bang, Inc. and any of its Affiliates in any Proceeding.

(e)     To the Knowledge of the Selling Entities, except as has not been, or would not be, individually or in the aggregate, material to the Business, the Purchased Assets and the Assumed Liabilities, taken as a whole, no Person is infringing, misappropriating, diluting or otherwise violating any Seller IP.  No Selling Entity has made or asserted any charge, complaint, claim, demand or notice since January 1, 2020 alleging any such infringement, misappropriation, dilution, or violation.

(f)     To the Knowledge of the Selling Entities, the IT Systems operate as required by the Selling Entities.

Section 5.12    Data Privacy.

(a)     As it relates to the Business and Purchased Assets, the Selling Entities have been at all times since January 1, 2020, and remain in compliance in all material respects with all applicable: (i) externally published policies relating to the Selling Entities' processing of Personal Information; (ii) terms of any material agreements to which the Selling Entities are bound relating to the processing of Personal Information by the Selling Entities; and (iii) Privacy Laws.

(b)     Since January 1, 2020, the Selling Entities have implemented and maintained, and continue to maintain as of the date hereof commercially reasonable administrative, technical, and physical measures designed to protect Personal Information with respect to the Business and Seller IP against loss, damage, and unauthorized access, use, modification, or other misuse and the continued, materially uninterrupted and error-free operation of its services and IT Systems as currently conducted by the Business. Except as has not been, or would not be, individually or in the aggregate, material to the Business, the Purchased Assets and the Assumed Liabilities, taken as a whole, since January 1, 2020, each of the Selling Entities have timely and reasonably remediated and addressed known critical and high security assessment findings relating to its implementation of administrative, technical, and physical security measures with respect to the Business.  To the Knowledge of the Selling Entities, as of the date of this Agreement, there are no unremediated security assessment findings that have been identified as "critical."

47

(c)     Except as set forth in Section 5.12(c) of the Seller Disclosure Schedule, since January 1, 2020, there have not been any Security Incidents related to the Business that would be material to the Business, the Purchased Assets and the Assumed Liabilities, taken as a whole, and to the Knowledge of the Selling Entities, there are currently no facts or circumstances which would serve as the basis for any such Security Incident.

Section 5.13     Taxes.

(a)     All income and other material Tax Returns relating to the Business or the Purchased Assets that are required by applicable Law to be filed by or with respect to any Selling Entity have been timely filed (taking into account any extension of time within which to file), and all such Tax Returns are true, complete, and accurate in all material respects.

(b)     Each of the Selling Entities has timely paid all material Taxes relating to the Business or the Purchased Assets due and owing by it (whether or not required to be shown on a Tax Return), including any material Taxes required to be withheld from amounts owing to, or collected from, any employee, creditor, or other third party and all such material Taxes required to be withheld have been properly withheld and remitted, other than Taxes not due as of the date of the filing of the Bankruptcy Case as to which subsequent payment was not required by reason of the Bankruptcy Case or Taxes that are being contested in good faith in appropriate Proceedings as set forth in Section 5.13(b) of the Seller Disclosure Schedule.

(c)     No material deficiencies for Taxes relating to the Business or the Purchased Assets have been claimed, proposed or assessed by any Governmental Authority in writing against the Selling Entities except for deficiencies which have been fully satisfied by payment, settled or withdrawn or adequately reserved for in accordance with GAAP or other generally accepted accounting principles applicable to the financial statements of the Selling Entities.

(d)     There are no material audits, examinations, investigations or other proceedings ongoing or pending against or with respect to the Selling Entities with respect to any Taxes relating to the Business or the Purchased Assets and no written notification has been received by the Selling Entities that such a material audit, examination, investigation or other proceeding has been proposed.

(e)     There are no Encumbrances for Taxes relating to the Business or the Purchased Assets upon any property or assets of the Selling Entities, except for Permitted Encumbrances.

(f)     After the Closing Date, the Buyer will not be required to include any material item of income in, or exclude any material item of deduction from, taxable income for any Post-Closing Tax Period with respect to the Purchased Assets or the Business as a result of any installment sale or other open transaction, undertaken, closing agreement entered into, change in accounting method made, improper method of accounting used, or any of the Purchased Assets constituting a prepaid amount or advanced payment received or deferred revenue accrued, in each case, prior to the Closing.

Section 5.14     Insurance.  The Selling Entities are insured with policies in such amounts and with such deductibles and covering such risks as the Selling Entities reasonably believe are

48

generally deemed adequate and customary in all material respects for the Business.  Except as set forth in <u>Section 5.14</u> of the Seller Disclosure Schedule, all premiums due and payable under the applicable insurance policies of the Selling Entities to the extent relating to the Business have been timely paid as of the date of this Agreement. No Selling Entity has been denied in writing any insurance coverage for which it has applied, except as would not be, or would not be, material to the Business, the Purchased Assets and the Assumed Liabilities, taken as a whole.

Section 5.15    <u>Title to Assets; Real Property</u>.

(a)    The Selling Entities have good and valid title to, or have good and valid leasehold interests in, all material tangible personal property that is included in the Business (other than the Excluded Assets), free and clear of all Encumbrances other than Permitted Encumbrances, and except (i) to the extent that such Encumbrances will not be enforceable against such material tangible personal property following the Closing in accordance with the Sale Order or (ii) as set forth in <u>Section 5.15(a)</u> of the Seller Disclosure Schedule.  The Purchased Assets and all other material tangible personal property owned or leased by the Selling Entities in connection with the Business are in good operating condition and repair, ordinary wear and tear excepted.

(b)    (i) A Selling Entity owns fee simple title to the Owned Real Property and (ii) the Selling Entity set forth in <u>Section 5.15(b)</u> of the Seller Disclosure Schedule, as applicable, has valid leasehold interests in the real property leased pursuant to the Real Property Leases (the real property described in the foregoing clauses (i) and (ii), collectively, the "<u>Seller Properties</u>"), in each case sufficient to conduct the Business as currently conducted and free and clear of all Encumbrances (other than Permitted Encumbrances).

(c)    Except as set forth in <u>Section 5.15(c)</u> of the Seller Disclosure Schedule or in any title commitment or title policy delivered to Buyer or its representatives:  (i) there is no pending or, to the Knowledge of the Selling Entities, threatened, condemnation, or expropriation or other Proceeding relating to the Owned Real Property; (ii) there are no leases, subleases, licenses, concessions or other Contracts of the Selling Entities, as applicable, written or oral, granting to any Person the right to use or occupy any portion of the Owned Real Property; (iii) to the Knowledge of Selling Entities, there are no rights of first refusal, reversionary rights, purchase options, rights of first offer recorded or unrecorded, affecting any portion of the Owned Real Property; (iv) to the Knowledge of Selling Entities, no Person (other than a Selling Entity) has the right to possess any portion of the Owned Real Property; and (v) none of the Selling Entities have received any written notice of any violation of applicable Laws relating to the Owned Real Property and, to the Knowledge of the Selling Entities, the Selling Entities and their respective Owned Real Property are in compliance, in all material respects, with all material applicable Laws relating to the Owned Real Property.

(d)    <u>Section 5.15(d)</u> of the Seller Disclosure Schedule contains a complete and accurate list of all of the Selling Entities' underlying leases, subleases, and sub-leases, tenancy agreements, licenses or other rights of occupation (written or oral) affecting any real property used or occupied, or permitted to be used or occupied, by the Selling Entities (the "<u>Leased Real Property</u>"), and all amendments, extensions, renewals, guaranties, modifications, or supplements thereto, together with the amount of security deposit thereunder. True, complete and correct copies of all the Real Property Leases have been delivered or made available to the Buyer prior to the

date hereof. There are no Real Property Leases entered into by the Selling Entities (with respect to the Business) that are currently in effect except as set forth in <u>Section 5.15(d)</u> of the Seller Disclosure Schedule. The Seller or a Selling Entity, as applicable, holds a valid leasehold interest in the Leased Real Property of which it is a lessee or sublessee free and clear of all Encumbrance (other than Permitted Encumbrances), and each Real Property Lease is fully enforceable against the Seller or a Selling Entity, as applicable, and, to the Knowledge of the Selling Entities, the applicable lessor(s), sublessor(s) or sublessee(s), as the case may be, in accordance with its terms. Neither the Seller or the Selling Entities nor, to the Selling Entities' Knowledge, the applicable lessor, sublessor and/or sublessee, as the case may be, is in default in the performance, observance or fulfillment of any material monetary obligation, covenant or condition contained in any Real Property Lease to which it is a party or bound, and no event has occurred that (with or without the giving of notice or lapse of time, or both) would constitute such a material monetary default by the Seller or the Selling Entities, as applicable.

(e)    To the Selling Entities' Knowledge, neither the Leased Real Property nor any part thereof has been expropriated or condemned, nor has any Selling Entities received any written notice of any proposed expropriation or condemnation. Neither the Seller nor any of the other Selling Entities has received written notice of, or has Knowledge of, any proposed assessment for public improvement with respect to the Leased Real Property. As of the date hereof, neither the Seller nor any of the other Selling Entities has provided or received any written notice of any material default with respect to any Real Property Lease, which material default has not been remedied. The present use and operation of the Leased Real Property conforms to the permitted use under each of the Real Property Leases in all material respects.

(f)    The Selling Entities have made available to the Buyer true and correct copies of the most recent title insurance commitments and policies and surveys for all Owned Real Property in their possession, and, where requested by the Buyer, any plans, specifications, manuals and reports relating to the physical condition of any improvements on the Owned Real Property, possessed by, or in the control of, the Selling Entities.

(g)    To the Knowledge of the Selling Entities, since January 1, 2022, no Selling Entity has received any written notice of any condition which would have a material adverse effect on the use and enjoyment of the Owned Real Property for the purposes for which the Selling Entities currently use the Owned Real Property, except (i) for any such condition which has been remedied in all material respects or no longer exists in any manner which would result in a material adverse effect on the use and enjoyment of the Owned Real Property for the purposes for which the Selling Entities currently use the Owned Real Property, or (ii) to the extent the party submitting such written notice to the Selling Entities has withdrawn or is deemed to have withdrawn such written notice.

Section 5.16    <u>Environmental Matters</u>.

(a)    None of the Selling Entities has received any written notification of any allegation of actual or potential responsibility for any material Release or threatened Release of any Hazardous Materials, the subject matter of which has not been resolved.

(b)    None of the Selling Entities has any material unresolved obligations pursuant to any consent decree or consent order or is otherwise subject to any material unresolved obligations pursuant to any judgment, decree, or judicial or administrative order, in each case, relating to material compliance with applicable Environmental Laws, Environmental Permits or to the investigation, sampling, monitoring, treatment, remediation, response, removal or cleanup of Hazardous Materials.

(c)    No Selling Entity has treated, stored, disposed of, arranged for the disposal of, transported, handled, released, nor, to the Knowledge of the Selling Entities, exposed any Person to, any Hazardous Materials except in compliance in all material respects with applicable Environmental Laws.

Section 5.17    Brokers.  Except for Rothschild & Co US Inc. or as set forth in Section 5.17 of the Seller Disclosure Schedule, none of the Selling Entities have used any investment banker, broker, finder or similar agent in connection with the Transactions, and no Person is entitled to any investment banker, brokerage, financial advisory, finder's or other similar fee or commission payable by any Selling Entity in connection with the Transactions.  Any such fees shall be paid in full by the Selling Entities.

Section 5.18    OFAC; Foreign Corrupt Practices Act; Anticorruption Laws.

(a)    Except as has not been, or would not be, individually or in the aggregate, material to the Business, the Purchased Assets and the Assumed Liabilities, taken as a whole, no Selling Entity or, to the Knowledge of the Selling Entities, any director, officer, or employee acting on behalf of such Selling Entity, is currently, or during the past five (5) years prior to the date hereof has been, subject to any U.S. sanctions administered by the Office of Foreign Assets Control of the U.S. Treasury Department ("OFAC").

(b)    Except as has not been, or would not be, individually or in the aggregate, material to the Business, the Purchased Assets and the Assumed Liabilities, taken as a whole, no Selling Entity or, to the Knowledge of the Selling Entities, any director, officer, agent, employee or other person acting on behalf of such Selling Entity has during the past five (5) years prior to the date hereof, in the course of its actions for, or on behalf of, such Selling Entity (i) used any corporate funds for any unlawful contribution, gift, entertainment or other unlawful expenses relating to political activity; (ii) made any direct or indirect unlawful payment to any domestic government official "foreign official" (as defined in the U.S. Foreign Corrupt Practices Act of 1977, as amended, and the rules and regulations thereunder (collectively, the "FCPA")) or employee from corporate funds; (iii) violated or is in violation of any provision of the FCPA or any applicable non-U.S. anti-bribery statute or regulation; or (iv) made any unlawful bribe, rebate, payoff, influence payment, kickback or other unlawful payment.

(c)    The Selling Entities have implemented and maintain in effect policies and procedures that are designed to ensure material compliance by the Selling Entities with Anticorruption Laws.

Section 5.19    Material Customers; Material Suppliers.

(a)      Section 5.19(a) of the Seller Disclosure Schedule sets forth a list of the twenty (20) largest customers (measured by revenue) of the Selling Entities, taken as a whole (collectively, the "Material Customers") during the twelve (12) month period ended May 31, 2023. Except as set forth in Section 5.19(a) of the Seller Disclosure Schedule, there has been no written or, to the Knowledge of the Selling Entities, oral notice received from any such party of any termination, cancellation or material limitation of, or any materially adverse modification or change in, the business relationship of the Selling Entities with any Material Customer.

(b)      Section 5.19(b) of the Seller Disclosure Schedule sets forth a list of the twenty (20) largest vendors and suppliers (measured by fees paid) of the Selling Entities, taken as a whole (collectively, the "Material Suppliers") during the twelve (12) month period ended May 31, 2023. Except as set forth in Section 5.19(b) of the Seller Disclosure Schedule, there has been no written or, to the Knowledge of the Selling Entities, oral notice received from any such party of any termination, cancellation or material limitation of, or any materially adverse modification or change in, the business relationship of the Selling Entities with any Material Suppliers.

Section 5.20    Affiliate Transactions.  Except as set forth in Section 5.20 of the Seller Disclosure Schedule and except for any Excluded Assets or Excluded Liabilities, no Affiliate of the Selling Entities (other than (x) another Selling Entity or Subsidiary of such Selling Entity or (y) any Excluded Party), or any officer or director of the Selling Entities or any Subsidiary of any Selling Entity or any former officers or directors of the Selling Entities or any of their respective Subsidiaries (a) is a party to any agreement or transaction with the Selling Entities having a potential or actual value or a contingent or actual liability exceeding $50,000.00, other than (i) loans and other extensions of credit to directors and officers of the Selling Entities for travel, business or relocation expenses or other employment-related purposes in the Ordinary Course of Business, (ii) employment arrangements in the Ordinary Course of Business and (iii) the Seller Compensation and Benefit Programs, (b) has any material interest in any material property used in the Business by the Selling Entities or any of their respective Subsidiaries or (c) owns any material interest in, or is an officer, director, employee or consultant of, any Person which is, or is engaged in business as a supplier or customer of the Selling Entities or their respective Subsidiaries.

Section 5.21    Sufficiency of Assets.  Except as set forth in Section 5.21 of the Seller Disclosure Schedules and except as has not been, or would not be, individually or in the aggregate, material to the Business, the Purchased Assets and the Assumed Liabilities, taken as a whole, the Purchased Assets are sufficient to allow the Buyer as of immediately following the Closing to conduct the Business as currently conducted by the Selling Entities.

Section 5.22    Food Regulatory Matters.

(a)      Except as set forth on Section 5.22(a) of the Seller Disclosure Schedules, each Selling Entity is, and has been since January 1, 2020, in material compliance with all Food Regulatory Laws.  Since January 1, 2020, the Selling Entities have not (i) received written notice of any adverse inspection, finding of deficiency, or other finding of non-compliance from any Governmental Authority or (ii) been part of or subject to any pending or, to the Knowledge of the Selling Entities, threatened FDA, FTC, Advertising Self-Regulatory Council, or equivalent state, local, or foreign agency action, including any FDA Form 483, Warning Letter, Untitled Letter,

Cyber Letter, civil investigative demand, seizure, injunction, detention, refusal of admittance, recall, market withdrawal, civil penalty, criminal investigation or penalty, disqualification or debarment, or class action demand letter alleging non-compliance with any applicable Food Regulatory Laws, in each case with respect to clauses (i) and (ii), except as would not be material to the Business, the Purchased Assets and the Assumed Liabilities, taken as a whole.

(b)      Since January 1, 2020, no recalls, withdrawals, post-sale warnings, safety alerts, suspensions, seizures, or similar actions are pending or, to the Knowledge of the Selling Entities, threatened, or have been conducted by the Selling Entities or in relation to any products manufactured or distributed by or on behalf of the Selling Entities, in each case except as would not be material to the Business, the Purchased Assets and the Assumed Liabilities, taken as a whole.

**ARTICLE VI**
**REPRESENTATIONS AND WARRANTIES OF THE BUYER**

The Buyer hereby represents and warrants to the Selling Entities as follows:

Section 6.1      Organization and Good Standing.  The Buyer is a limited liability company duly organized, validly existing and, to the extent applicable, in good standing (or its equivalent) under the jurisdiction of its incorporation or organization and has the requisite corporate power and authority to own or lease all of its properties and assets and to carry on its business as it is being conducted on the date hereof.  The Buyer is duly licensed or qualified to do business in each jurisdiction in which the nature of the business conducted by it or the character or location of the properties and assets owned or leased by it makes such licensing or qualification necessary, except for those licenses or qualifications the absence of which would not prevent or materially delay the consummation of the Transactions.

Section 6.2      Authority Relative to this Agreement.  The Buyer has all necessary power and authority to execute and deliver this Agreement and the other Transaction Documents to which it is party, to perform and comply with each of its obligations hereunder and thereunder and to consummate the Transactions.  The execution and delivery by the Buyer of this Agreement and the other Transaction Documents to which it is party, the performance and compliance by the Buyer with each of its obligations herein and therein and the consummation by the Buyer of the Transactions have been duly and validly authorized and approved by all necessary corporate or other action on the part of the Buyer and no other corporate or other proceedings on the part of the Buyer and no stockholder votes are necessary to authorize this Agreement, the other Transaction Documents to which it is party or the performance or consummation by the Buyer of the Transactions.  The Buyer has duly and validly executed and delivered this Agreement, and the other Transaction Documents to which it is party will be duly executed and delivered by the Buyer as of the Closing and, assuming the due and valid authorization, approval, execution and delivery by the Selling Entities of this Agreement and the other Transaction Documents, this Agreement and the other Transaction Documents to which the Buyer is party constitutes or will constitute the Buyer's legal, valid and binding obligation, enforceable against the Buyer in accordance with its terms, subject to the General Enforceability Exceptions.

Section 6.3      No Violation; Consents.

53

(a)    The authorization, execution and delivery of this Agreement or the other Transaction Documents by the Buyer does not and will not, and the performance by the Buyer of this Agreement and the other Transaction Documents to which it is party will not, with or without notice, lapse of time or both, (i) conflict with or violate any provision of the organizational documents of the Buyer, (ii) assuming that all consents, approvals, authorizations and permits described in Section 6.3(b) have been obtained and all filings and notifications described in Section 6.3(b) have been made and any waiting periods thereunder have terminated or expired, conflict with or violate any Law or Order applicable to the Buyer or its Affiliates, or by which any property or asset of the Buyer is bound or affected or (iii) require any consent or approval under, result in any breach of or any loss of any benefit under, constitute a change of control or default (or an event which with notice or lapse of time or both would become a default) under or give to others any right of termination, vesting, amendment, acceleration or cancellation of, or result in the creation of an Encumbrance on any property or asset of the Buyer, pursuant to, any Contract or Permit to which the Buyer is a party, except, with respect to clauses (ii) and (iii), for any such conflicts, violations, breaches, defaults or other occurrences which would not, individually or in the aggregate, prevent or materially delay the consummation of the Transactions.

(b)    Assuming the accuracy of the representations and warranties of the Selling Entities in Section 5.3(a), the execution and delivery by the Buyer of this Agreement and the other Transaction Documents to which it is party does not and will not, and the consummation by the Buyer of the Transactions and compliance by the Buyer with any of the terms or provisions hereof will not, require any consent, approval, authorization or permit of, or filing with or notification to, any Governmental Authority, except (i) compliance with any applicable requirements under the Regulatory Laws, (ii) the entry of the Sale Order by the Bankruptcy Court or (iii) such other Consents where failure to obtain such Consents would not, individually or in the aggregate, prevent or materially delay the Transactions.

Section 6.4    Legal Proceedings and Orders.  Except for the Bankruptcy Case, there is no Proceeding pending, or to the knowledge of the Buyer, threatened that, individually or in the aggregate, would prevent or materially delay the Transactions, and the Buyer is not subject to any outstanding Order that, individually or in the aggregate, would prevent or materially delay the Transactions.

Section 6.5    Brokers.  Except for Evercore Group L.L.C., the Buyer has not used any investment banker, broker, finder or similar agent in connection with the Transactions, and no Person is entitled to any investment banker, brokerage, financial advisory, finder's or other similar fee or commission payable by the Buyer or any of its Affiliates in connection with the Transactions.  Any such fees shall be paid in full by the Buyer.

Section 6.6    Buyer Funding.  The Buyer has, and will have at the Closing, sufficient available funds to pay the Purchase Price and any other payments to be made by the Buyer hereunder, including any fees, costs and expenses incurred or payable by the Buyer hereunder, under the other Transaction Documents or in connection with the Transactions.  The Buyer's obligations hereunder and under any other Transaction Documents are not subject to any condition regarding the Buyer's obtaining of funds to consummate the Transactions.

Section 6.7    <u>Solvency</u>.  Immediately after giving effect to the Transactions, the Buyer shall be solvent and shall: (a) be able to pay its debts as they become due; (b) own property that has a fair saleable value greater than the amounts required to pay its debt (including a reasonable estimate of the amount of all contingent liabilities); and (c) have adequate capital to carry on its business.  In connection with the Transactions, the Buyer has not incurred debts beyond its ability to pay as they become absolute and matured, which would render the Buyer insolvent as of the date hereof or immediately following the Closing.

**ARTICLE VII**
**COVENANTS OF THE PARTIES**

Section 7.1    <u>Conduct of Business of the Selling Entities</u>.  Except (u) as set forth on <u>Section 7.1</u> of the Seller Disclosure Schedules, (v) any limitations on operations imposed by the Bankruptcy Court or the Bankruptcy Code, (w) as required by applicable Law, Order or a Governmental Authority, (x) to the extent related to an Excluded Asset or an Excluded Liability, (y) as contemplated or required by the terms of any Transaction Document, or (z) as otherwise consented to in writing by the Buyer (which may not be unreasonably withheld, conditioned or delayed), during the period commencing on the date of this Agreement and continuing through the Closing or the earlier termination of this Agreement in accordance with its terms:

(a)    each of the Selling Entities shall use commercially reasonable efforts to (i) operate the Business in the Ordinary Course of Business, (ii) preserve in all material respects the Purchased Assets (excluding sales of Inventory), (iii) keep available the services of its present employees, (iv) comply in all material respects with all applicable Law, and (v) preserve its present relationships with Material Suppliers, Material Customers and other Persons having material business relations therewith; and

(b)    the Selling Entities shall not:

(i)    acquire (whether by merger, consolidation or acquisition of stock or assets or otherwise) or make any investment in any interest in, any material assets, securities, properties, interests or businesses for the conduct of the Business, tangible or intangible, other than purchases of Inventory in the Ordinary Course of Business;

(ii)    sell, lease (as lessor), license, transfer or otherwise dispose of (or permit to become subject to any Encumbrance, other than (A) Permitted Encumbrances, (B) Encumbrances arising under any Order of the Bankruptcy Court relating to the use of cash collateral (as defined in the Bankruptcy Code) or (C) Encumbrances arising in connection with any debtor-in-possession financing of the Selling Entities) any material Purchased Assets (including any Seller IP), except for (1) non-exclusive, revocable (upon sixty (60) days' notice or less without additional payment), licenses granted in the Ordinary Course of Business, except to any Excluded Parties, (2) the sale of Inventory in the Ordinary Course of Business, (3) the collection of receivables or the payment of payables, and (4) the use of prepaid assets or amounts and Documentary Materials in the conduct of the Business;

55

(iii)    incur or make any material capital expenditures, except (A) to the extent permitted by the terms of the Selling Entities' existing financing arrangements (including any existing debtor-in-possession financing), (B) capital expenditures made in the Ordinary Course of Business or (C) capital expenditures that are provided for in any Selling Entity's budget for calendar year 2023;

(iv)    amend in any material and adverse respect or voluntarily terminate any Assumed Agreement or Assumed Real Property Lease, in each case other than in the Ordinary Course of Business; *provided*, that no Selling Entity shall be required to enter into any extension or amendment with respect to any Assumed Agreement or Assumed Real Property Lease that would otherwise terminate prior to the Closing;

(v)    merge or consolidate with or into any legal entity, dissolve, liquidate or otherwise terminate its existence;

(vi)    amend the certificate of incorporation, bylaws or comparable organizational documents of any Selling Entity or in a manner that would materially delay or impede the Selling Entities' ability to consummate the Transactions;

(vii)    incur any material indebtedness for borrowed money, enter into any capital lease or guarantee any such indebtedness, in each case that would constitute an Assumed Liability, other than (A) the DIP Obligations, (B) in accordance with the DIP Order or (C) accounts payable or other amounts payable in the Ordinary Course of Business;

(viii)    make any material loans, advances or capital contributions to, or investments in, any other Person (other than any other Selling Entity) with respect to the Business;

(ix)    make any change in any method of accounting or accounting practice or policy, except as required by applicable Law or GAAP;

(x)    commence, settle or propose to settle any material Proceedings that could materially diminish the value of the Purchased Assets or impair title thereto, in each case other than (A) any Proceeding in respect of which any related liability is covered by an insurance policy, (B) any Proceeding involving an amount less than $300,000.00 or (C) any Proceeding that would otherwise be settled in the Ordinary Course of Business;

(xi)    materially change any Tax accounting elections, methods, principles or practices relating to the Business or the Purchased Assets, except insofar as may be required by applicable Law or GAAP or other generally accepted accounting principles applicable to any Selling Entity (or any interpretation thereof);

(xii)    except as required by Law or Contracts, employee benefit plans, as provided in any incentive or retention program or similar arrangement approved by the Bankruptcy Court, as disclosed in Section 5.9(a) of the Seller Disclosure Schedule that provide that liabilities are solely the liability of the Selling Entities, the Buyer or any Affiliate of the Buyer, or solely with respect to Specified Employees or Terminated

Employees for compliance with <u>Section 7.9</u>, (A) pay any material bonus or similar payment to, or increase the amount of the wages, salary, commissions, fringe benefits or other compensation or remuneration payable to, any Employees or Service Providers, other than immaterial payments or changes for non-executive management Employees in the Ordinary Course of Business, (B) become a party to, establish, amend, commence participation in, terminate or commit itself to the adoption of any plan that would be a Seller Compensation and Benefit Program, (C) accelerate the vesting of or lapsing of restrictions with respect to any stock-based compensation or other long-term incentive compensation under any Seller Compensation and Benefit Program, (D) grant any new awards under any Seller Compensation and Benefit Program, (E) amend or modify any outstanding award under any Seller Compensation and Benefit Program, or (F) enter into, amend or terminate any collective bargaining agreement or other agreement with a labor union, works council or similar organization; or

(xiii)   authorize any of the foregoing, or commit or agree to do any of the foregoing.

Section 7.2    <u>Allowed Claims of MEC and Orange Bang, Inc</u>.  Effective as of the Closing, and subject to entry of the 9019 Order, each of the Selling Entities hereby unconditionally and irrevocably agrees for all purposes that the following claims shall be deemed allowed in the Bankruptcy Case: the California District Court Action Allowed Unsecured Claim, the Trade Dress Action Allowed Unsecured Claim, and the OBI/Monster Matter Allowed Unsecured Claim.  MEC agrees to subordinate any recoveries on its 100% share of the California District Court Action Allowed Unsecured Claim and its 50% share of the OBI/Monster Matter Allowed Unsecured Claim until the Selling Entities recover $5 million from the Excluded Assets, including Excluded Estate Claims, for the benefit of their estates.  MEC shall not have an allowed administrative claim in the Bankruptcy Case, *provided* that the DIP Lenders and the Prepetition Secured Parties agree that they also will not have any allowed administrative claims in the Bankruptcy Case.   No Affiliates or Representatives of MEC shall have allowed claims in the Bankruptcy Case other than those of MEC provided for in this <u>Section 7.2</u>.   Immediately following execution of this Agreement, the applicable Parties shall enter into a joint stipulation to stay the Orange Bang Trademark License Action and any proceedings occurring therein, including any pending motion to withdraw the reference or any responses thereto, pending the occurrence of either (a) the Closing or (b) the termination of this Agreement.

Section 7.3    <u>Access to and Delivery of Information; Maintenance of Records; Transition and Destruction</u>.

(a)     From the date of this Agreement until the earlier of the Closing and the termination of this Agreement, to the extent permitted by applicable Law, the Selling Entities shall during ordinary business hours and upon reasonable prior notice (i) give the Buyer and the Buyer's Representatives reasonable access to the Seller's accountants, counsel, financial advisors and other authorized outside representatives, officers and senior management and the employees of the Selling Entities in their respective principal places of business, the Selling Entities' customers, vendors and creditors, all books, records and other documents and data in the locations in which they are normally maintained, and all offices and other facilities of the Selling Entities related to the Business; *provided*, *however*, that, in connection with such access, the Buyer and the Buyer's

Representatives shall minimize disruption to the Business; *provided, further,* that in connection with the Buyer's and/or the Buyer's Representatives' access of such offices and other facilities, the Buyer and/or the Buyer's Representatives shall not materially interfere with the use and operation of such offices and other facilities, and shall comply with all reasonable safety and security rules and regulations for such offices and other facilities, (ii) permit the Buyer and the Buyer's Representatives to make such reasonable inspections and copies of all books, records and other documents in the possession of the Selling Entities related to the Business, as the Buyer may reasonably request, and (iii) furnish the Buyer with such reasonably available financial and operating data and other information as the Buyer and the Buyer's Representatives may from time to time reasonably request. For the avoidance of doubt and without limiting the Selling Entities' other obligations under this Section 7.3, the Selling Entities shall use commercially reasonable efforts to provide to the Buyer, at the Buyer's sole cost and expense, all information and materials heretofore reasonably requested by the Buyer with respect to the Purchased Assets and/or the Assumed Liabilities. Notwithstanding anything to the contrary set forth in this Section 7.3(a), no access to, or examination of, any information or other investigation shall be permitted to the extent that it would require disclosure of information subject to attorney-client, attorney work product or other privilege, or would breach or violate any Contract to which any Selling Entity is a party (or is bound by or whose assets or properties are bound by or subject to) or any applicable Law (including the Retained Records). The Buyer agrees to, and will cause its Representatives to, sign any reasonable and customary access letters required in connection with any such provision of information or access or the conduct of any such investigation or examination contemplated by this Section 7.3(a) and Section 7.3(b). Notwithstanding anything to the contrary herein, in no event shall any of the Selling Entities or their respective Affiliates be required to provide the Buyer or any of its Affiliates or their respective Representatives with access to or copies of any trade secrets, recipes and formulas related to the Business at any time prior to the Closing, except as otherwise specifically set forth on Section 7.3(a) of the Seller Disclosure Schedules.

(b)     Between the Closing Date and the complete dissolution and liquidation of the Selling Entities (which shall occur no earlier than six (6) months after the Closing), the Buyer and the Buyer's Representatives shall have reasonable access to, and the opportunity (at the Buyer's sole cost) to copy, the Selling Entities' books and records, including access to passwords and log in information to access Seller IP, e.g. to access websites, social media, trade secrets including recipes, formulas, and ingredients lists, can art and packaging art digital files, etc. and all information pertaining to the Assumed Agreements and Assumed Real Property Leases, in the possession of the Selling Entities to the extent that (i) such books, records and information relate to any period prior to the Closing Date and are not already in the possession of the Buyer or the Buyer's Representatives and (ii) such access is reasonably required by the Buyer in connection with the Assumed Liabilities, the operation of the Business following the Closing, or the Purchased Assets. Such access shall be afforded by the Seller upon receipt of reasonable advance notice and during normal business hours and without undue disruption to its business or that of any other Selling Entity. Before disposing of any books and records constituting Excluded Assets (whether prior to or in connection with) its dissolution, the Seller shall (x) give the Buyer at least thirty (30) days prior written notice of such disposition and (y) give the Buyer a reasonable opportunity, at the Buyer's expense, to segregate and remove such books and records relating to the Purchased Assets, the Business, and the Assumed Liabilities as the Buyer may select and/or to copy at the Buyer's sole cost and expense such books and records to the extent relating to the Purchased Assets, the Business, and/or the Assumed Liabilities as the Buyer may select. Notwithstanding

anything to the contrary set forth in this Section 7.3(b), no access to, or examination of, any information or other investigation shall be permitted to the extent that it would require disclosure of information subject to attorney-client, attorney work product or other privilege, or would breach or violate any Contract to which any Selling Entity is a party (or is bound by or whose assets or properties are bound by or subject to) or any applicable Law (including the Retained Records).

(c)     Between the Closing Date and the complete dissolution and liquidation of the Selling Entities (up to a maximum of four (4) years following the Closing Date), the Selling Entities and their Representatives shall have reasonable access to (and the right to download and make copies of) all of the books, records, documents and information of the Selling Entities delivered to the Buyer at Closing or pursuant to Section 7.3(b) above, and reasonable access to, and the reasonable assistance of, the employees and other Representatives of the Buyer and the Business, to the extent that (i) such books, records, documents and information relate to any period prior to the Closing Date or the winding down of any remaining business, assets or liabilities of the Selling Entities, the dissolution and liquidation of the Selling Entities, the performance of the obligations of the Selling Entities hereunder and under the other Transaction Documents (including obligations under Section 2.8), or any Excluded Asset or Excluded Liability (including in connection with any Excluded Estate Claims) and (ii) such access is reasonably required by the Debtor Entities in connection with the Bankruptcy Case, the Excluded Liabilities or the Excluded Assets (including in connection with any Excluded Estate Claims). Such access shall be afforded by the Buyer upon receipt of reasonable advance notice and during normal business hours and without undue disruption to its business, and the Buyer shall permit the Selling Entities and their Representatives to make such reasonable copies of such books, records and information as they may reasonably request. Notwithstanding anything to the contrary set forth in this Section 7.3(c), no access to, or examination of, any information or other investigation shall be permitted to the extent that it would require disclosure of information subject to attorney-client, attorney work product or other similar privilege, or would breach or violate any Contract to which the Buyer or any Affiliate thereof is a party (or is bound by or whose assets or properties are bound by or subject to) or any applicable Law; *provided* that the Buyer shall use commercially reasonable efforts to cooperate and provide such information or access without waiving any such privilege or resulting in such breach or violation.

(d)     All information obtained by the Buyer or the Buyer's Representatives pursuant to Section 7.3(a) shall be subject to the terms of the Confidentiality Agreement.

Section 7.4     Expenses.     Except to the extent otherwise specifically and expressly provided herein or in the Sale Order, whether or not the Transactions are consummated, all costs and expenses incurred in connection with this Agreement and the Transactions shall be borne by the Party incurring such costs and expenses.

Section 7.5     Further Assurances.

(a)     Subject to the terms and conditions of this Agreement, at all times prior to the earlier of the Closing and the termination of this Agreement in accordance with its terms, each of the Parties shall use its commercially reasonable efforts to take, or cause to be taken, all actions, and to do, or cause to be done, all things reasonably necessary, proper or advisable under applicable Laws to consummate and make effective the Transactions (including obtaining evidence of the

Selling Entities' authority to consummate the transactions contemplated by this Agreement, and authority of the person(s) executing the documents required to be executed by the Selling Entities); *provided*, that the foregoing shall not require any document, instrument, agreement or other item to be delivered or obtained, or any action to be completed, prior to the Closing (other than the Closing deliverables set forth in Section 4.2 and Section 4.3) as a condition precedent to the consummation of the Closing, and any such failure to deliver or obtain, or complete such action, shall not (by itself) result in the failure of any condition to Closing set forth in Article VIII.

(b)     From time to time, on or after the Closing Date until the dissolution and liquidation of the Selling Entities, as and when requested by either Party and at such requesting Party's expense, the other Party will execute and deliver, or cause to be executed and delivered, all such further conveyances, notices, assumptions, assignments, documents and other instruments as such requesting Party may reasonably deem necessary or desirable to evidence and effectuate the Transactions (including for the avoidance of doubt, the transfer and conveyance of any Purchased Assets that may be in the possession of the Selling Entities or their Affiliates (other than any Excluded Parties) to the Buyer).

(c)     Except as set forth herein, nothing in this Section 7.5 shall (i) require the Selling Entities or the Buyer to make any expenditure or incur any obligation on their own or on behalf of another Party or (ii) prohibit any Selling Entity from ceasing operations or winding up its affairs following the Closing.

(d)     From time to time prior to the Closing, each Party shall promptly notify the other in writing if such Party obtains knowledge that such Party's and, if applicable, MEC's or MBC's, representations, warranties, covenants or agreements in this Agreement or any disclosure schedules provided by the Seller to the Buyer are not true, correct and complete, to the extent such failure to be so true, correct and complete would cause any of the conditions to the Closing set forth in Section 8.1 or Section 8.3 to not be satisfied; *provided*, that such written notice provided pursuant to this Section 7.5(d) shall not amend, limit, modify or otherwise affect the rights or obligations of the Parties under this Agreement.

Section 7.6     Public Statements.  Unless (a) in the reasonable judgment of the disclosing Party after consultation with counsel, otherwise required by or necessary to comply with applicable Law or the rules or regulations of any applicable securities exchange, and (b) except for disclosure of matters that become a matter of public record as a result of the Bankruptcy Case or in connection with any litigation or other Proceeding, and any filings or notices related thereto, the Buyer, on the one hand, and the Selling Entities, on the other hand, shall consult with each other before issuing any press release or otherwise making any public statement with respect to this Agreement, the Transactions or the activities and operations of the other Parties and shall not issue any such release or make any such statement without the prior written consent of the Seller or the Buyer, respectively (such consent not to be unreasonably withheld, conditioned or delayed).

Section 7.7     Governmental Authority Approvals and Cooperation.

(a)     Each of the Buyer and the Selling Entities, having already submitted a notification and report form pursuant to the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended (the "HSR Act"), and the Buyer having withdrawn and refiled its notification

and report form pursuant to the HSR Act, shall, if required, assure that any additional notification and report forms and responses to supplemental requests for information to be made shall be made in substantial compliance with the requirements of the HSR Act. The Buyer shall bear and be responsible for all filing fees for any filings required to be made under any Regulatory Law (the "Filing Fees") by the Buyer and the Selling Entities. Each of the Buyer and the Selling Entities shall (and shall cause their respective Affiliates (other than any Excluded Parties) to) furnish to the other such necessary information and reasonable assistance as the other may reasonably request in connection with its preparation of any filing or submission which is necessary under the Regulatory Laws. The Selling Entities and the Buyer shall keep each other apprised of the status of any communications with, and any inquiries or requests for additional information received from, the United States Federal Trade Commission (the "FTC") and the United States Department of Justice (the "DOJ") relating to the transactions contemplated hereby. Each of the Buyer and the Selling Entities shall use its reasonable best efforts to obtain any clearance required under the Regulatory Laws for the consummation of the transactions contemplated hereby as promptly as reasonably practicable, including making a good faith effort to respond to reasonable requests in a so-called Voluntary Access Letter as promptly as practicable (with a goal of submitting responses within five (5) calendar days of receipt).

(b)    The Buyer and the Selling Entities shall each use reasonable best efforts to resolve such objections, if any, as may be asserted by any Governmental Authority with respect to the transactions contemplated by this Agreement under the HSR Act, the Sherman Act, as amended, the Clayton Act, as amended, the Federal Trade Commission Act, as amended, and any other applicable United States federal or state or foreign Laws that are designed to prohibit, restrict or regulate actions having the purpose or effect of monopolization or restraint of trade or lessening competition through merger or acquisition or any Laws with respect to foreign investment (collectively, the "Regulatory Laws"). The Buyer and the Selling Entities, including their Affiliates (in the case of the Selling Entities, other than any Excluded Parties), shall each use reasonable best efforts to take such action as may be reasonably required to cause the expiration of the notice periods under the HSR Act or other Regulatory Laws with respect to such transactions as promptly as possible after the execution of this Agreement. Notwithstanding anything to the contrary provided herein, the Buyer and the Selling Entities each agrees to use its reasonable best efforts, and to take any and all steps necessary, to eliminate each and every impediment under any Regulatory Law that is asserted by any Governmental Authority or any other Person so as to enable the Parties hereto to expeditiously close the transactions contemplated hereby, prior to the Outside Date, *provided*, *however*, the Buyer will have no obligation to (and the Selling Entities and their Affiliates (other than any Excluded Parties) will not, without the Buyer's consent) (i) propose, negotiate, commit to or effect, by hold separate orders, or otherwise, the sale, divesture or disposition of its assets, properties or businesses or any of the Purchased Assets, or enter into any consent decree or settlement agreement with any Governmental Authority, (ii) agree to limitations on the operation or conduct of the Buyer's or the Selling Entities' businesses or operations, including the Business, or (iii) waive any of the applicable conditions to this Agreement set forth in Article VIII. Without limiting the foregoing, the Buyer further agrees to use its reasonable best efforts to defend through litigation on the merits any claim asserted in court by any party in order to avoid entry of, or to have vacated or terminated, any decree, order or judgment (whether temporary, preliminary or permanent) that would prevent the Closing from occurring prior to the Outside Date.

(c)     Each Party (i) shall cooperate with each other Party in connection with the filings and Consents contemplated by this Section 7.7, (ii) shall promptly inform each other Party of any substantive communication received by such Party from any Governmental Authority (other than the Bankruptcy Court) concerning this Agreement, the Transactions and any filing, notification or request for Consent related thereto, and (iii) shall permit each other Party to review in advance any proposed written communication or information submitted to any such Governmental Authority (other than the Bankruptcy Court) in response thereto and in good faith consider the other Party's reasonable comments on drafts of any such communication or information.  In addition, none of the Selling Entities or the Buyer shall (and shall ensure that their respective Affiliates (in the case of the Selling Entities, other than any Excluded Parties) do not) agree to participate in any substantive meeting, discussion, telephone call or conference with any Governmental Authority (other than the Bankruptcy Court) in respect of any filings, investigation or other inquiry with respect to this Agreement, the Transactions or any such filing, notification or request for Consent related thereto unless it consults with the other Parties in advance and, to the extent permitted by any such Governmental Authority and applicable Law, gives the other Parties the opportunity to attend and participate thereat, in each case to the maximum extent practicable. Notwithstanding anything in this Agreement to the contrary, the Buyer will, on behalf of the parties control and lead all communications and strategy related to any review of the Transactions by a Governmental Authority under the Regulatory Laws after considering in good faith any reasonable advice provided by the Seller in good faith.  The Selling Entities and the Buyer shall, and shall cause their respective Affiliates (in the case of the Selling Entities, other than any Excluded Parties) to, furnish the Buyer or the Selling Entities (and the Buyer's Representatives and the Seller's Representatives, as applicable), as the case may be, copies of all material correspondence, filings and communications between it and its Affiliates (in the case of the Selling Entities, other than any Excluded Parties) (and the Buyer's Representatives and the Seller's Representatives, as applicable) on the one hand, and the Governmental Authority (other than the Bankruptcy Court) or members of its staff on the other hand, with respect to this Agreement, the Transactions or any such filing, notification or request for Consent related thereto (in each case, excluding documents and communications which are subject to preexisting confidentiality agreements or to the attorney-client privilege or work product doctrine).  Each of the Selling Entities and the Buyer shall (and shall cause their respective Affiliates (in the case of the Selling Entities, other than any Excluded Parties) to) furnish each other Party with such necessary information and assistance as such other Party and its Affiliates (in the case of the Selling Entities, other than any Excluded Parties) may reasonably request in connection with its preparation of necessary filings, registrations or submissions of information to any Governmental Authority in connection with this Agreement, the Transactions and any such filing, notification or request for Consent related thereto.

(d)     The Parties shall not take any action, or refrain from taking any action, or permit any action to be taken or not taken, that would have the effect of preventing, materially delaying, making illegal or otherwise materially interfering with the ability of the Parties to consummate any of the Transactions.

Section 7.8     Termination or Assumption of Certain Intellectual Property Licenses/Agreements.

(a)     At or prior to the Closing, the Selling Entities shall terminate the Trademark License Agreement, dated September 29, 2021, by and between JHO Intellectual Property

Holdings, LLC and Vital Pharmaceuticals, Inc. d/b/a Bang Energy, including any amendments thereto, including Amendment No. 1 to Trademark License Agreement, dated June 2022, by and between JHO Intellectual Property Holdings, LLC and Vital Pharmaceuticals, Inc. d/b/a Bang Energy, and as further amended by the parties thereto on April 25, 2023. For the avoidance of doubt, if this Agreement is terminated, the Selling Entities shall cease to have any obligations under this Section 7.8(a).

(b)    Thereafter, but at or prior to the Closing, the Selling Entities shall use commercially reasonable efforts to deliver a notice of termination for each intellectual property license and/or agreement (whether oral or in writing) set forth in Section 7.8(b) of the Seller Disclosure Schedule. For the avoidance of doubt, if this Agreement is terminated, the Selling Entities shall cease to have any obligations under this Section 7.8(b).

(c)    Prior to the earlier of the Closing and the termination of this Agreement, with respect to the Agreements listed in Section 7.8(c) of the Seller Disclosure Schedule, the Buyer may elect at its sole discretion to assume and maintain those agreements, and where necessary, the Selling Entities shall use commercially reasonable efforts to communicate with the other parties to such agreements and request consent to assign such agreements under the existing terms to the Buyer.

(d)    From and after the Closing and prior to the dissolution and liquidation of the Selling Entities, to the extent that the Buyer becomes aware of any other intellectual property licenses and/or agreements (whether oral or in writing) involving a grant of rights or license or Encumbrance in or to the Seller IP, the Buyer shall have the option to request by written notice to the Selling Entities that the Selling Entities use commercially reasonable efforts (at the Buyer's expense) to deliver a notice of termination for such license and/or agreement and the Selling Entities shall promptly take such commercially reasonable steps (at the Buyer's expense) to deliver such notice.

Section 7.9    Employee Matters.

(a)    Prior to the Closing or thereafter, the Buyer may make an offer of employment, to commence as of or following the Closing, to any of the Employees, in the Buyer's sole discretion (each such Employee who receives an offer of employment, an "Offered Employee"). Each Offered Employee who accepts such an offer of employment with the Buyer is referred to herein as a "Transferred Employee." Each Employee that is not an Offered Employee, and each Offered Employee that is not a Transferred Employee, shall be referred to herein as a "Specified Employee." The Selling Entities may elect to continue the employment of any Specified Employee following the Closing (such an Employee, a "Retained Employee"). The Selling Entities shall terminate the employment of all Employees, except any Retained Employees, effective as of the Closing, regardless of whether the Employees are Offered Employees, Transferred Employees or Specified Employees. Any Specified Employee who is terminated by the Selling Entities effective as of the Closing pursuant to this Section 7.9(a) is referred to herein as a "Terminated Employee." Notwithstanding the foregoing, nothing herein will, after the Closing Date, impose on the Buyer any obligation to retain any Transferred Employee in its employment for any amount of time or on any terms and conditions of employment.

(b)     Prior to and including the Closing Date, with respect to each current and former employee of the Selling Entities, the Selling Entities shall assume, pay and discharge the Liabilities of the Selling Entities for (i) all deferred salary, wages, unused vacation, sick days, personal days or leave earned and/or accrued by such current or former employee prior to and through the Closing Date, and (ii) any severance obligations or Liabilities, including any obligations or Liabilities that arise under any Seller Compensation and Benefit Program, arising prior to and including the Closing Date.  The Buyer shall be solely responsible for any Liabilities under the WARN Act that arise out of the termination of any Employee who works at, or who reports to, receives assignments from, or is otherwise assigned to, the Selling Entities' employment site in Phoenix, Arizona, except any Retained Employee, at any time upon or following the Closing (the "Assumed WARN Act Liabilities").  The Selling Entities shall be solely responsible for any Liabilities under the WARN Act that arise out of the termination of (x) any Retained Employee at any time prior to, on or after the Closing, and (y) any Employee up to and including the Closing who works at, or who reports to, receives assignments from, or is otherwise assigned to, any of the Selling Entities' employment sites other than the Selling Entities' employment site in Phoenix, Arizona (the "Excluded WARN Act Liabilities").  To the extent required by applicable Law, the Buyer shall assume, pay and discharge the Liabilities of the Selling Entities under Section 4980B of the Code ("COBRA") (and any comparable state law) for all individuals who are "M&A qualified beneficiaries," as such term is defined in U.S. Treasury Regulation Section 54.4980B-9, from and after the Closing.

(c)     After the execution of this Agreement through the Closing or the earlier termination of this Agreement in accordance with its terms, the Selling Entities shall provide the Buyer and its Affiliates with reasonable access to the Employees and with non-privileged information, including Employee records and Seller Compensation and Benefit Program data, as reasonably requested by the Buyer and such Affiliates, except as may be prohibited by Law as reasonably determined by the Selling Entities, and the written employment policies of the Selling Entities or any Seller Compensation and Benefit Program, to evaluate Employees to whom the Buyer may make an offer of employment. Except as otherwise required by applicable Law, the Buyer shall not be obligated to provide any severance, separation pay, notice pay, or other payments or benefits, including any employee retention payments or employee incentive plan payments, to any Employee on account of any termination of such Employee's employment by the Selling Entities on or prior to Closing, and such benefits (if any) shall remain obligations of the Selling Entities, except as to the Assumed WARN Act Liabilities.

(d)     Following the Closing, the Selling Entities shall process the payroll for, and pay (or cause to be paid) within the time limits required by applicable Law, the base wages, base salary, bonuses, and ordinary course sales commissions accrued during the payroll period in which the Closing Date falls (the "Closing Payroll Period"), and accrued but unused paid time off that must be paid following termination of employment pursuant to applicable Law, with respect to each Employee employed at any time during the Closing Payroll Period.  The Closing Payroll Period shall extend from the final payroll date preceding the Closing through and including the Closing Date.

(e)     Nothing in this Agreement is intended to (i) be treated as an amendment to any particular Seller Compensation and Benefit Program, (ii) prevent the Buyer or its Affiliates from amending or terminating any of its benefit plans, in accordance their terms, (iii) prevent the

Buyer or its Affiliates, after the Closing, from terminating the employment of any Transferred Employee or other Service Provider, or (iv) create any third-party beneficiary rights in any Employee or Service Provider employee, or any beneficiary or dependent thereof, with respect to the compensation, terms and conditions of employment and/or benefits that may be provided to any Employee or Service Provider or under any Seller Compensation and Benefit Program or any other plan maintained by the Buyer or its Affiliates.

Section 7.10    Tax Matters.

(a)    Any sales, use, goods and services, harmonized sales, property transfer or gains, documentary, stamp, registration, recording, value added, or similar Tax payable in connection with the sale or transfer of the Purchased Assets and the assumption of the Assumed Liabilities ("Transfer Taxes") shall be borne by the Selling Entities as an Excluded Liability and paid by the Selling Entities when any such Transfer Taxes are required by applicable Law to be paid. The Selling Entities and the Buyer shall (and shall cause their respective Affiliates (in the case of the Selling Entities, other than any Excluded Parties) to) cooperate in good faith to minimize the incidence of any Transfer Taxes. The Selling Entities shall prepare and file all necessary Tax Returns or other documents with respect to all such Transfer Taxes and promptly provide to the Buyer as-filed copies of such Tax Returns and proof of payment of all such Transfer Taxes.

(b)    For purposes of this Agreement, all Taxes and Tax Liabilities with respect to the Business and the Purchased Assets that relate to the Straddle Period shall be apportioned between the Pre-Closing Tax Period and Post-Closing Tax Period as follows: (i) in the case of property and similar Taxes on a per-diem basis, and (ii) in the case of all other Taxes (other than Transfer Taxes), as though the taxable year terminated at the close of business on the Closing Date.

(c)    The Seller and the Buyer agree to furnish or cause to be furnished to each other, upon request, as promptly as practicable, such information and assistance as is reasonably necessary for the filing of Tax Returns, the making of any election relating to Taxes, the preparation for any audit or other proceeding by Governmental Authority and the prosecution or defense of any claim, suit or other proceeding relating to any Tax. Such information and assistance shall include providing reasonable access to any of the books and records of the Selling Entities retained by the Selling Entities or delivered to the Buyer at Closing or provided pursuant to Section 7.3(b). Access to books and records shall be afforded upon receipt of reasonable advance notice and during normal business hours.

(d)    The Parties agree to treat any payment made from one Party to another pursuant to this Agreement that is not reflected as part of the Purchase Price under this Agreement as an adjustment to the Purchase Price for all income Tax purposes, unless otherwise required by applicable Law.

(e)    All real property Taxes, personal property Taxes and similar *ad valorem* Taxes with respect to the Purchased Assets ("Property Taxes") with respect to a Straddle Period shall be apportioned between the Selling Entities, on the one hand, and the Buyer, on the other hand, in accordance with Section 7.10(b). The Selling Entities shall be liable for the proportionate amount of such Property Taxes that is attributable to the Pre-Closing Tax Period, and the Buyer

shall be liable for the proportionate amount of such Property Taxes that is attributable to the Post-Closing Tax Period. Upon receipt of any bill for such Property Taxes (or in the case of any prepaid Property Taxes attributable to Post-Closing Tax Periods (which shall be offset by any Property Taxes for Pre-Closing Tax Periods that are reasonably estimated to be due after the Closing Date), on the Closing Date, or as promptly as practicable following the Closing Date), the Buyer or the Selling Entities, as applicable, shall present a statement to the other setting forth the amount of reimbursement to which each is entitled under this Section 7.10(e) (taking into account the amounts of Property Taxes, if any, that the Buyer or the Selling Entities remitted to a Governmental Authority for any taxable period (or portion thereof) for which the other is responsible pursuant to this Section 7.10(e) and taking into account the estimated amount of any Property Taxes for Pre-Closing Tax Periods offset against prepaid Property Taxes at the Closing), together with such supporting evidence as is reasonably necessary to calculate the proration and reimbursement amount. The proration amount shall be paid by the party owing it to the other within ten (10) days after delivery of such statement, absent manifest error. The Buyer shall cause any Tax Returns for Property Taxes with respect to the Purchased Assets that are due after the Closing for any Straddle Period to be prepared in a manner consistent with past practice, to the extent consistent with applicable Law. The Buyer shall provide a draft of any such Tax Return to the Selling Entities at least ten (10) days prior to the due date thereof for the Selling Entities' review and shall consider in good faith any of the Selling Entities' comments thereto provided to Buyer within five (5) days of receipt of such Tax Return.

Section 7.11    Submission for Bankruptcy Court Approval.

(a)    The Buyer agrees that it will promptly take such actions as are reasonably requested by the Debtor Entities to assist in obtaining entry of the Sale Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by the Buyer under this Agreement and any Assumed Agreements and demonstrating that the Buyer is a "good faith" purchaser under section 363(m) of the Bankruptcy Code. The Debtor Entities shall give notice under the Bankruptcy Code of the request for entry of the Sale Order to all Persons entitled to such notice, including all Persons that have asserted Encumbrances in the Purchased Assets and all non-debtor parties to the Assumed Agreements and the Assumed Real Property Leases, and other appropriate notice, including such additional notice as the Bankruptcy Court shall direct or as the Buyer may reasonably request, and provide appropriate opportunity for hearing, to all parties entitled thereto, of all motions, orders, hearings, or other Proceedings in the Bankruptcy Court relating to this Agreement or the Transactions.  The Debtor Entities shall be responsible for making all appropriate filings relating to this Agreement or the Transactions with the Bankruptcy Court, which filings shall be submitted, to the extent practicable, to the Buyer prior to their filing with the Bankruptcy Court for the Buyer's prior review.

(b)    An initial list of the agreements, contracts and other leases that may ultimately constitute the Assumed Agreements and the Assumed Real Property Leases (as amended, modified or supplemented from time to time, the "Cure Schedule") was filed prior to the date of execution of this Agreement, and an amended Cure Schedule was filed on June 13, 2023.  Upon revision of Section 2.1(d) or Section 2.1(e) of the Seller Disclosure Schedule in accordance with Section 2.5(b), the Seller shall add any Assumed Agreements or Assumed Real Property Leases, respectively, to the Cure Schedule or remove any Assumed Agreements or

Assumed Real Property Leases (other than Assumed Agreements and Assumed Real Property Leases irrevocably designated for assumption pursuant to Section 2.5(d)) from such exhibit, as applicable. The Cure Schedule shall set forth the amounts necessary to cure defaults under each Assumed Agreement and Assumed Real Property Lease shown thereon, as reasonably determined in good faith by the Seller. In cases in which the Seller is unable to establish that a default exists, the relevant cure amount shall be set at $0.00.

(c)     From the date of this Agreement, each Debtor Entity and the Buyer shall consult with one another regarding pleadings which any of them intends to file with the Bankruptcy Court in connection with, or which might reasonably affect, the Bankruptcy Court's entry of the Sale Order.

(d)     If the Sale Order or any other orders of the Bankruptcy Court relating to this Agreement or the Transactions shall be appealed by any Person (or if any petition for certiorari or motion for reconsideration, amendment, clarification, modification, vacation, stay, rehearing or reargument shall be filed with respect to the Sale Order or other such order), subject to rights otherwise arising from this Agreement, the Buyer and the Selling Entities shall use their reasonable best efforts to obtain an expedited resolution of any such appeal, petition or motion, in each case, that will facilitate consummation of the Transactions.

Section 7.12   Adequate Assurance. The Buyer shall provide adequate assurance as required under the Bankruptcy Code of the future performance by the Buyer of each Assumed Agreement and each Assumed Real Property Lease. The Buyer agrees that it will, and will cause its Affiliates to, promptly take all actions reasonably required to assist in obtaining a Bankruptcy Court finding that there has been an adequate demonstration of adequate assurance of future performance under the Assumed Agreements and Assumed Real Property Lease, including furnishing affidavits, non-confidential financial information and other documents or information for filing with the Bankruptcy Court and making the Buyer's Representatives available to testify before the Bankruptcy Court.

Section 7.13   Transfer of Purchased Assets; Wind-Down of Subsidiaries; Payments Received.

(a)     From and after the date hereof until the earlier of the termination of this Agreement and the Closing, the Parties will use commercially reasonable efforts to make all necessary arrangements for the Buyer to have access to, and take possession of, the Purchased Assets and, at the Buyer's expense, to transfer the same to a location owned or operated by the Buyer, to the extent necessary, in each case as promptly as practicable following the Closing. The foregoing includes, but is not limited to, using commercially reasonable efforts to transfer physical possession of all Seller IP, including formulas, recipes, ingredients and supplier lists, other trade secrets, graphics, can art, packaging art, and log in information for accessing the websites, domain names, and social media pages, in each case constituting Seller IP, in, as applicable, an electronic or digital format as used by the Selling Entities in the Ordinary Course of Business (such as working files (e.g. .ai files) for labels and artwork) or physical delivery of physical assets (e.g. printing plates, keys to access trade secrets) and documents to the Buyer as promptly as practicable following the Closing. From and after the date hereof until the earlier of the termination of this Agreement and the Closing, the Parties shall use commercially reasonable efforts to work together

in good faith to ensure that such delivery (whether physical, electronic, digital, or otherwise) contemplated by the preceding provisions of this Section 7.13(a) is in a format reasonably accessible and acceptable to Buyer.

(b)     The method for transferring any trade secrets constituting Seller IP to the Buyer following the Closing in accordance with the provisions hereof will be an industry standard method that is designed to be secure and subject to Buyer's approval, which approval will not be unreasonably withheld, conditioned or delayed.

(c)     Except as needed to fulfill any Selling Entity's obligations under this Agreement or with the Buyer's separate express written approval (such approval not to be unreasonably withheld, conditioned or delayed), and except as permitted pursuant to the proviso in Section 7.14, immediately following the Closing, the Selling Entities shall at their sole cost and expense cease all design, development, manufacture, use, sale, offering for sale, importation, exportation, and distribution of any products bearing or using any of the Seller IP.

(d)     Except as needed to fulfill any Selling Entity's obligations under this Agreement or with the Buyer's separate express written approval (such approval not to be unreasonably withheld, conditioned or delayed), and except as permitted pursuant to the proviso in Section 7.14, immediately following the Closing, the Selling Entities (i) shall hold in confidence (for non-public Seller IP) and not use commercially for their own benefit or for the benefit of anyone else, any Seller IP, (ii) shall limit dissemination of and access to the Seller IP only to Persons specified by Buyer and shall terminate access to the Seller IP from any other Persons, (iii) shall not provide to anyone else other than Persons specified by Buyer (in any form or format whatsoever) access to or copies of any of the Seller IP, and (iv) shall not misappropriate any of the Seller IP.

(e)     Except as needed to fulfill any Selling Entity's obligations under this Agreement or with the Buyer's separate express written approval, except as permitted pursuant to the proviso in Section 7.14, and except for any Excluded Assets, following the Closing, promptly after the Selling Entities transfer all of the Seller IP to Buyer pursuant to Section 7.13(a), and in a format deemed reasonably acceptable to Buyer in writing, the Selling Entities shall at their sole cost and expense, (i) destroy all remaining tangible and intangible information, documents, and materials (in whatever form or format) in Selling Entities' possession or control which evidence, include or contain to any extent all or any portion of the Seller IP through a third party service (other than the Seller's third party advisors (including legal and financial advisors)), and (ii) confirm to Buyer in writing by way of certificate of destruction that such destruction has been completed. Notwithstanding the foregoing, the Selling Entities shall not be required to destroy data from disaster recovery systems, archival backups or e-mail; *provided* that, the Selling Entities shall maintain the confidentiality of all non-public Seller IP included in such data, and all such data is destroyed in due course in line with the Selling Entities' standard retention and disposition procedures.

(f)     The Selling Entities shall use commercially reasonable efforts to wind-down and dissolve their respective Subsidiaries, as promptly as reasonably possible following the Closing; *provided* that, the foregoing shall not amend or modify the 90-day period set forth in Section 7.14 or limit or restrict any of the rights of the Selling Entities under Section 7.14.

Notwithstanding anything to the contrary in this Agreement, following the Closing, the Selling Entities shall be permitted to sell or destroy any Excluded Assets in connection with winding down, liquidation or dissolution of the Selling Entities or any of their Affiliates.

Section 7.14    Name Changes.  The Selling Entities shall, and shall cause their respective Affiliates (other than any Excluded Parties) to, use commercially reasonable efforts, at the Seller's sole cost and expense, to obliterate, mask or remove all Business Names from all public facing Excluded Assets that are owned by (or in the custody or control of) the Selling Entities, within ninety (90) days following the Closing Date (or such reasonable longer period as necessary to effectuate any wind down or dissolution of such entity); *provided* that, the Selling Entities and their respective Affiliates shall be permitted to (a) use the Business Names as former names for legal and notice purposes in connection with the Bankruptcy Case, in connection with the filing of Tax Returns and for the wind down process for the Selling Entities or their Affiliates or in other legal documents related to the foregoing, and (b) solely to the extent necessary to effectuate the foregoing reference the historic relationship between the Seller, the Selling Entities or their respective Affiliates and the Business.

Section 7.15    Purchased Assets "AS IS;" Certain Acknowledgements.

(a)    The Buyer agrees, warrants and represents that (i) the Buyer is purchasing the Purchased Assets on an "AS IS" and "WITH ALL FAULTS" basis based solely on the Buyer's own investigation of the Selling Entities, the Purchased Assets, the Assumed Liabilities, the Excluded Assets, the Excluded Liabilities and the Business, and (ii) neither the Selling Entities nor any of the Seller's Representatives has made any warranties, representations or guarantees, express, implied or statutory, written or oral, respecting the Selling Entities, the Purchased Assets, the Assumed Liabilities, the Excluded Assets, the Excluded Liabilities or the Business, the financial performance of the Selling Entities, the Purchased Assets, the Assumed Liabilities, the Excluded Assets, the Excluded Liabilities or the Business, or the physical condition of the Purchased Assets, except as expressly set forth in Article V (as modified by the Seller Disclosure Schedule) or in the other Transaction Documents.  The Buyer further acknowledges that the consideration for the Purchased Assets specified in this Agreement has been agreed upon by the Selling Entities and the Buyer after good-faith arms-length negotiation in light of the Buyer's agreement to purchase the Purchased Assets "AS IS" and "WITH ALL FAULTS."  The Buyer agrees, warrants and represents that, except for the express representations and warranties of the Selling Entities set forth in Article V of this Agreement (as modified by the Seller Disclosure Schedule) or in the other Transaction Documents, the Buyer has relied, and shall rely, solely upon its own investigation of all such matters, and that the Buyer assumes all risks with respect thereto. EXCEPT AS SET FORTH IN ARTICLE V OF THIS AGREEMENT (AS MODIFIED BY THE SELLER DISCLOSURE SCHEDULE) OR IN THE OTHER TRANSACTION DOCUMENTS, THE SELLING ENTITIES MAKE NO EXPRESS WARRANTY, NO WARRANTY OF MERCHANTABILITY, NO WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE, AND NO IMPLIED OR STATUTORY WARRANTY WHATSOEVER WITH RESPECT TO ANY REAL OR PERSONAL PROPERTY OR ANY FIXTURES OR THE BUSINESS OR THE SELLING ENTITIES, THE PURCHASED ASSETS, THE ASSUMED LIABILITIES, THE EXCLUDED ASSETS, THE EXCLUDED LIABILITIES OR THE BUSINESS.

(b)    The Selling Entities agree that neither the Buyer nor any of its Representatives has made any warranties, representations or guarantees, express, implied or statutory, written or oral, except as expressly set forth in Article VI.

Section 7.16    Mutual Release.

(a)    Effective as of the Closing, the Buyer, MEC and MBC, on behalf of themselves and each Buyer Related Party (each, a "Buyer Releasing Party") hereby unconditionally and irrevocably and forever releases and discharges the Seller Related Parties, of and from, and hereby unconditionally and irrevocably waives, and dismisses with prejudice, any and all claims, debts, losses, expenses, proceedings, covenants, liabilities, suits, judgments, damages, actions and causes of action, obligations, accounts, and liabilities of any kind or character whatsoever (collectively, regardless of who owns or holds them, the foregoing items are referred to as "Claims"), known or unknown, suspected or unsuspected, in contract, direct or indirect, at law or in equity, relating to the Bankruptcy Case, the Purchased Assets, the Assumed Liabilities, the VPX Florida Matters, and the Orange Bang Trademark License Action that such Buyer Releasing Party ever had, now has or ever may have or claim to have against any Seller Related Party, for or by reason of any matter, circumstance, event, action, inaction, omission, cause or thing whatsoever arising prior to the Closing (including in respect of the management or operation of the Business or the Bankruptcy Case), including, for the avoidance of doubt, any Claims that are Purchased Assets; *provided, however*, that (i) the release contained in this Section 7.16(a) does not in any way apply to, affect, limit, waive, compromise, release, discharge or otherwise alter or impair any of the past, present or future rights, claims, causes of action, damages, remedies, defenses, or rights of any kind or nature whatsoever that the Buyer or any Buyer Related Party (including MEC and MBC) may have against John H. "Jack" Owoc or any Excluded Parties; (ii) subject to entry of the 9019 Order, MEC or the Buyer (or its designee) shall be deemed to have, for all purposes and with the unconditional and irrevocable agreement of the Selling Entities and any Seller Related Party, which is hereby granted, the California District Court Action Allowed Unsecured Claim, the Trade Dress Action Allowed Unsecured Claim, and the OBI/Monster Matter Allowed Unsecured Claim, in full satisfaction of any liabilities or other obligations the Selling Entities and any Seller Related Parties may have on account of the California District Court Action, the Trade Dress Action, and OBI/Monster Matter and the facts and circumstances at issue in such matters; (iii) the release contained in this Section 7.16(a) does not apply to, affect, limit, waive, compromise, release, discharge or otherwise alter any claims, causes of action, defenses, or rights of any kind or nature whatsoever of the Buyer or any Buyer Related Party (including MEC and MBC) asserted in, arising out of, or relating to the California District Court Action, the OBI/Monster Matter, and the TTAB Matter; *provided*, that subject to and upon allowance of the claims set forth in clause (ii) above, neither the Buyer nor any Buyer Related Party shall seek to recover any fees, costs or other monetary relief against the Selling Entities or any Seller Related Parties except amounts awarded by the jury's verdict or already raised in the MEC Post-Verdict Motions, without duplication of the California District Court Action Allowed Unsecured Claim, and such matters shall proceed as to the Seller for the sole purpose of liquidating the California District Court Action Allowed Unsecured Claim; and (iv) the release contained in this Section 7.16(a) shall not apply to or otherwise affect (A) the Buyer's, MEC's or MBC's rights, or any Selling Entity's obligations, under this Agreement or any other Transaction Document, or (B) any claim of any Buyer Related Party that is based upon Fraud.  Except for the matters described in clauses (i), (ii), (iii) and (iv) in the immediately preceding sentence (subject to the limitations set

forth therein, as applicable) and Section 7.16(e), Section 7.16(f) and Section 7.16(g) below, the Buyer, MEC and MBC hereby covenant not to sue, and to cause each other Buyer Releasing Party not to sue, any Seller Related Party in any Proceeding for any of the Claims expressly released pursuant to the preceding sentence, and each of the Buyer Releasing Parties agrees that in the event that any such Proceeding shall be commenced, the covenant not to sue contained in this Section 7.16(a) shall constitute a complete defense to any such Proceeding so instituted. For the avoidance of doubt, the Buyer and each Buyer Related Party (or its designee) may (in its sole discretion) litigate and pursue with the unconditional and irrevocable agreement of the Selling Entities (which is hereby granted) and enforce the judgments or other results and determinations of the California District Court Action, the OBI/Monster Matter, and the TTAB Matter; *provided* that the Buyer, MEC and MBC hereby covenant not to, and to cause each other Buyer Releasing Party to agree not to, (A) appeal any judgment entered in the California District Court Action; (B) appeal the judgment entered in the OBI/Monster Matter; and (C) seek recovery of monetary damages, fees, costs, or other monetary relief from any Selling Entity or Seller Related Party in the TTAB Matter or, subject to allowance of the California District Court Action Allowed Unsecured Claim and the OBI/Monster Matter Allowed Unsecured Claim as set forth above, the California District Court Action or OBI/Monster Matter. Notwithstanding the foregoing or anything to the contrary herein or otherwise, in the event that any appeal is taken in any Proceeding, including the matters described in clauses (A), (B) and (C) in the immediately preceding sentence, by John H. "Jack" Owoc, any Excluded Parties, or any Persons acting in concert with, participation with, or at the direction of John H. "Jack" Owoc or any Excluded Parties, the Buyer, MEC, MBC, and each Buyer Related Party (or its designee) may (in its sole discretion) file an appeal in such Proceeding solely with respect to such party or parties (or any other party except the Selling Entities or any Seller Related Parties).

(b)     Effective as of the Closing, each of the Selling Entities, on behalf of itself and each Seller Related Party (each, a "Seller Releasing Party") hereby unconditionally and irrevocably and forever releases and discharges the Buyer Related Parties, of and from, and hereby unconditionally and irrevocably waives, and dismisses with prejudice, any and all Claims, known or unknown, suspected or unsuspected, in contract, direct or indirect, at law or in equity, relating to the Bankruptcy Case, the OBI/Monster Matter, the California District Court Action (other than those matters expressly preserved in this Section 7.16(b)), the VPX Florida Matters, the Orange Bang Trademark License Action, the TTAB Matter, the Purchased Assets, or the Assumed Liabilities that such Seller Releasing Party ever had, now has or ever may have or claim to have against any Buyer Related Party, for or by reason of any matter, circumstance, event, action, inaction, omission, cause or thing whatsoever arising prior to the Closing, *provided, however*, that the Seller may (in its sole discretion) continue to litigate and pursue the specific matters it raised in its already-filed Post-Verdict Motions in the California District Court Action (for the avoidance of doubt, the Seller cannot seek to recover any fees, costs, or other relief it has not already raised in the Post-Verdict Motions), and such matters shall proceed as to the Seller for the sole purpose of liquidating the California District Court Action Allowed Unsecured Claim; *provided further that* this release (i) shall not apply to or otherwise affect any Selling Entity's rights, or the Buyer's, MEC's or MBC's obligations, under this Agreement or any other Transaction Document and (ii) shall not apply to any claim of any Seller Related Party that is based upon Fraud by any Buyer Related Party. Each of the Selling Entities hereby covenants to, and to cause each other Seller Releasing Party to (A) stipulate to and agree not to appeal or otherwise challenge any judgment entered in the California District Court Action, (B) dismiss with prejudice any appeals of the

71

California District Court Action, (C) stipulate to and agree not to appeal or otherwise challenge the judgment entered in the OBI/Monster Matter, (D) dismiss with prejudice any appeals of the OBI/Monster Matter, and (E) dismiss with prejudice the VPX Florida Matters and the Orange Bang Trademark License Action against all known and unknown persons, entities, and parties. Each of the Selling Entities hereby covenants not to sue, and to cause each other Seller Releasing Party not to sue, any Buyer Related Party in any Proceeding for any of the Claims expressly released pursuant to this Section 7.16(b), and each of the Seller Releasing Parties agrees that in the event that any such Proceeding shall be commenced, the covenant not to sue contained in this Section 7.16(b) shall constitute a complete defense to any such Proceeding so instituted. Each of the Selling Entities hereby expressly agrees to, and acknowledges, the California District Court Action Allowed Unsecured Claim, the Trade Dress Action Allowed Unsecured Claim, and the OBI/Monster Matter Allowed Unsecured Claim, and agrees not to assert any objection thereto at any time.

(c)    Without limiting the foregoing, each of the Parties, on behalf of itself and the other Buyer Releasing Parties and Seller Releasing Parties, respectively, with respect to the Claims expressly released in Section 7.16(a) and Section 7.16(b) above only, expressly waives and releases any and all rights and benefits under Section 1542 of the California Civil Code (or any analogous law of any other state), which reads as follows: "A general release does not extend to claims which the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release and that, if known by him or her, would have materially affected his or her settlement with the debtor or released party." As to the Claims expressly released in Section 7.16(a) and Section 7.16(b) above only, each of the Parties, on behalf of itself and the other Buyer Releasing Parties and Seller Releasing Parties, respectively, expressly waives all rights afforded by any statute which limits the effect of a release with respect to unknown claims. Each of the Parties, on behalf of itself and the other Buyer Releasing Parties and Seller Releasing Parties, respectively, understands the significance of this release of unknown claims as to the Claims expressly released in Section 7.16(a) and Section 7.16(b) above only and the waiver of statutory protection against a release of unknown claims as to the Claims expressly released in Section 7.16(a) and Section 7.16(b) above only, and acknowledges and agrees that this waiver is an essential and material term of this Agreement. As to the Claims expressly released in Section 7.16(a) and Section 7.16(b) above only, each of the Parties, on behalf of itself and the other Buyer Releasing Parties and Seller Releasing Parties, respectively acknowledges that each Party will be relying on the waivers and releases provided in this Section 7.16 in connection with entering into this Agreement and that this Section 7.16 is intended for the benefit of, and will grant express third party beneficiary rights to, each Seller Related Party and Buyer Related Party, respectively, to enforce this Section 7.16.

(d)    Notwithstanding anything to the contrary herein or otherwise, each beneficiary of a release under this Section 7.16 shall be an express third party beneficiary of this Section 7.16 with the full power to enforce the terms of this Section 7.16 as if it were a party to this Agreement for such purpose.

(e)    Notwithstanding anything to the contrary herein or otherwise, and for the avoidance of doubt, nothing in this Section 7.16 or any other provision of this Agreement (or as part of any other agreement or as a condition to acquiring any of the Purchased Assets) shall in any way apply to, affect, limit, waive, compromise, release, discharge or otherwise alter or impair

any of the past, present or future rights, claims, causes of action, damages, remedies, defenses, or rights of any kind or nature whatsoever that the Buyer or any Buyer Related Party (including MEC and MBC) may have against the Excluded Parties, including rights, claims, causes of action, damages, remedies, defenses, and rights of any kind or nature whatsoever asserted in, arising out of, or relating to the California District Court Action, that certain jury verdict and award in an amount not less than $271,924,174 that was entered on September 29, 2022 in the California District Court Action, and any rights, claims, causes of actions, damages, remedies, defenses, and rights of any kind or nature whatsoever as they relate to the Seller IP, all of which rights, claims, causes of actions, damages, remedies, defenses, and rights of any kind or nature whatsoever the Buyer and each Buyer Related Party hereby expressly preserves.

(f)     Notwithstanding anything to the contrary herein or otherwise, and for the avoidance of doubt, nothing in this Section 7.16 or any other provision of this Agreement (or as part of any other agreement or as a condition to acquiring any of the Purchased Assets) shall in any way apply to, affect, limit, waive, compromise, release, discharge or otherwise alter or impair any of the past, present or future rights, claims, causes of action, damages, remedies, defenses, or rights of any kind or nature whatsoever that the Buyer or any Buyer Related Party (including MEC and MBC) may have against the Excluded Parties, all of which rights, claims, causes of action, damages, remedies, defenses, and rights of any kind or nature whatsoever the Buyer and each Buyer Related Party hereby expressly preserves.

(g)     Notwithstanding anything to the contrary herein or otherwise, and for the avoidance of doubt, nothing in this Section 7.16 or any other provision of this Agreement (or as part of any other agreement or as a condition to acquiring any of the Purchased Assets) shall in any way apply to, affect, limit, waive, compromise, release, discharge or otherwise alter or impair any of the past, present or future rights, claims, causes of action, damages, remedies, defenses, or rights of any kind or nature whatsoever asserted in, arising out of, or relating to the Trade Secret Matters or that the Buyer or any Buyer Related Party (including MEC and MBC) may have against Stephen Cohen, Bryan Shane Dees, Joao Paulo "JP" Leopardo, Quang Nguyen, and/or Shannon Troglia, all of which rights, claims, causes of action, damages, remedies, defenses, and rights of any kind or nature whatsoever the Buyer and each Buyer Related Party hereby expressly preserves, *provided, however,* that MEC will dismiss with prejudice the Trade Secret Matters as to those, if any, of Stephen Cohen, Bryan Shane Dees, Joao Paulo "JP" Leopardo, Quang Nguyen, and Shannon Troglia who execute and deliver to MEC a mutual release of liability substantially in the form of Exhibit F within seven (7) Business Days after the Closing Date.

Section 7.17   Withholding.  Notwithstanding anything herein to the contrary, any Selling Entity, the Buyer or any of their respective Affiliates (in the case of the Selling Entities, other than any Excluded Parties) shall be entitled to deduct and withhold from any amounts payable by them pursuant to this Agreement such amounts (and only such amounts) as it is required to deduct and withhold with respect to such payment under any provision of U.S. federal, state, local or non-U.S. Tax Law.  Except in the case of compensatory payments or failure to deliver a duly completed IRS Form W-9 to the extent required by Section 4.2(h), the Buyer shall notify the Seller of its intention to deduct or withhold no later than five (5) Business Days prior to any such deduction or withholding, and shall cooperate in good faith with the Seller and its Affiliates (other than any Excluded Parties) to minimize any such deduction and withholding.  Any amounts so deducted and withheld in accordance with this Section 7.17 and timely paid over to the appropriate

Governmental Authority shall be treated for all purposes of this Agreement as having been paid to the Party that would otherwise have received such amount but for the required deduction or withholding.

      Section 7.18   <u>Title Matters</u>.

      (a)    Prior to the earlier of the Closing and the valid termination of this Agreement pursuant to <u>Article IX</u>, the applicable Selling Entity shall (i) execute and provide an owner's title affidavit in the form and content attached as <u>Exhibit G</u> hereto, and (ii) without limiting the obligations of the applicable Selling Entity set forth in <u>Section 2.1</u> and/or <u>Section 7.5</u> of this Agreement, use commercially reasonable efforts to satisfy any other reasonable requests of the Title Company for information or documentation from the applicable Selling Entity in connection with the issuance to Buyer of Title Company's owner's policy of title insurance with respect to the Owned Real Property. For the avoidance of all doubt, the Parties' respective rights and obligations under this <u>Section 7.18</u> are cumulative with (and do not limit in any respect) their respective rights and obligations under <u>Section 7.5</u> hereof.

      (b)    If, prior to the earlier of the Closing and the valid termination of this Agreement pursuant to <u>Article IX</u>, the Buyer provides written notice to the Seller that (i) the Title Company has refused to issue an owner's policy of title insurance with respect to the Owned Real Property substantially in the form agreed to between the Buyer and the Title Company as of the date hereof, and (ii) the Buyer desires that the Seller use commercially reasonable efforts to assist the Buyer in obtaining an owner's policy of title insurance with respect to the Owned Real Property, then the Seller shall use commercially reasonable efforts, at the Buyer's sole cost and expense, to contact and coordinate with nationally recognized title insurance companies approved by the Buyer in writing (such approval not to be unreasonably withheld, conditioned or delayed) in furtherance of assisting the Buyer in obtaining an owner's policy of title insurance with respect to the Owned Real Property; *provided*, that the foregoing shall not require any owner's policy of title insurance, document, instrument, agreement or other item to be delivered or obtained, or any action to be completed, or any liability, indemnity or other obligation not expressly set forth herein to be undertaken, at or prior to the Closing as a condition precedent to the consummation of the Closing, and any failure to deliver or obtain any of the foregoing or complete or undertake any of the foregoing shall not (by itself) result in the breach or failure of any obligation of the Seller or the Selling Entities or of any condition to Closing set forth in <u>Article VIII</u>.

      Section 7.19   <u>OBI/Monster Escrow</u>.  Promptly following the Closing (and no later than five (5) Business Days after the Closing), the Seller shall notify the Buyer of the Seller's calculation of the OBI/Monster Escrow Amount.  The Buyer shall provide the Seller and its Representatives with post-Closing access to and copies of such books, records and other information constituting Purchased Assets as may be reasonably necessary for the Seller to provide such calculation.  The Buyer shall have three (3) Business Days to object in writing to the Seller's calculation.  Absent such objection, the Seller shall cause the OBI/Monster Escrow Amount to be distributed to a designated trust account of intellectual property counsel for MEC and Orange Bang Inc. in final settlement and full satisfaction of any post-petition amounts payable to MEC or Orange Bang Inc. in connection with the OBI/Monster Matter and neither MEC nor Orange Bang Inc. shall have any Claim against the Selling Entities or their estates with respect to such amounts. For the avoidance of doubt, the Selling Entities shall (i) use commercially reasonable efforts to make the

first July 2023 payment due and payable to the OBI/Monster Escrow Account in accordance with the OBI/Monster Escrow Order, and (ii) be entitled to keep the OBI/Monster Escrow Excess and, in the event of an OBI/Monster Escrow Shortfall, the Buyer shall be paid such amount from reserves from the sale proceeds established by the Seller in accordance with the Sale Order and coordinate with Orange Bang Inc. as to its share of any such OBI/Monster Escrow Shortfall.

Section 7.20    Contributions.    Between the date hereof and the earlier of the termination of this Agreement in accordance with its terms and the Closing Date, each of the following Selling Entities, (a) JHO Intellectual Property Holdings, LLC, (b) JHO Real Estate Investment, LLC, (c) Quash Seltzer, LLC and (d) Rainbow Unicorn Bev, LLC may, at such Selling Entity's sole discretion, (i) contribute and transfer all of its respective right, title and interest (free and clear of all Liabilities and Encumbrances other than the Assumed Liabilities and Permitted Encumbrances or as set forth on Section 2.1 of the Seller Disclosure Schedule) in and to all of the assets (including any Purchased Assets) of or held by such Selling Entity to the Seller via a contribution of such assets to the Seller and such contribution and transfer shall be deemed to have occurred prior to the Closing and/or (ii) assign and transfer all of the Liabilities of such Selling Entity (including any Assumed Liabilities) to the Seller via an assignment and assumption of such Liabilities by the Seller; *provided* that the documents evidencing any contribution and transfer of any Seller IP pursuant to the foregoing provisions of this Section 7.20 shall be in forms similar to those set forth in Exhibit D hereto.  The Seller shall provide the Buyer with drafts of documents evidencing any contribution and transfer to the Seller pursuant to this Section 7.20 at least two (2) Business Days prior to the execution thereof and shall consider any reasonable comments thereto proposed by the Buyer in good faith.  For the avoidance of doubt, this Section 7.20 is not intended to, and shall not (i) modify the scope of the Purchased Assets, the Assumed Liabilities, the Excluded Assets and/or the Excluded Liabilities under this Agreement or (ii) adversely affect, in any material respect, the Buyer's rights under this Agreement.

Section 7.21    Reservation of Rights.    Notwithstanding anything to the contrary in this Agreement, but subject to the other provisions of this Section 7.21, each of the Selling Entities, the Buyer and their respective Affiliates reserves the right to take the position against the Excluded Parties or other unaffiliated third parties that the Excluded Assets (including Intellectual Property) of the Excluded Parties are owned by Persons other than the Excluded Parties.  Nothing in this Agreement shall, vis-à-vis the Excluded Parties or other unaffiliated third parties, (a) limit the ability of any of the Selling Entities, the Buyer or their respective Affiliates to take the position that the Excluded Parties do not own the Excluded Assets or (b) be interpreted as an admission or acknowledgement that the Excluded Parties do own any Excluded Assets.  Notwithstanding anything to the contrary herein, the Parties acknowledge and agree that Seller IP shall not be deemed to include any Intellectual Property held in the name of, or purported to be owned by, any of the Excluded Parties; *provided* that, to the extent that any Person is successful in enforcing against the Excluded Parties the position that the Excluded Parties do not own certain Intellectual Property treated as Excluded Assets hereunder and such items of Intellectual Property would have been Seller IP if such determination was in effect prior to the Closing, then, and only then, any such Intellectual Property shall be deemed to be Purchased Assets hereunder.  For purposes of this Section 7.21, "unaffiliated third parties" shall mean Persons who are not parties to this Agreement and who are not Affiliates (other than the Excluded Parties) of any Party; *provided*, in no event shall any Excluded Party be deemed an "unaffiliated third party" for purposes of this Section 7.21.

Section 7.22    Vehicle Loans.    At or reasonably promptly following the Closing, the applicable Selling Entities shall, using a portion of the Cash Purchase Price paid by the Buyer to the Seller hereunder, make payments to pay in full all principal and interest under the loan agreements, financing agreements or lease agreements with respect to the vehicles that constitute the Purchased Assets to the extent outstanding as of the Closing and, upon receipt of the title certificates to such vehicles from the applicable lienholder or lessor, as applicable, to deliver such title certificates to the Buyer.

Section 7.23    Ratification.    In the event that the Buyer submits a request in writing to the applicable Selling Entity, in each case, by no later than 5:00 p.m., Eastern Time on Thursday, July 6, 2023, then, such Selling Entity shall deliver to the Buyer prior to or at the Closing, an unanimous written consent of the board of directors or board of managers, as applicable, of such Selling Entity pursuant to which such board of directors or board of managers, as applicable, ratifies the chapter 11 filing by such Selling Entity in connection with the Bankruptcy Case and such Selling Entity's consummation of the Transactions.

## ARTICLE VIII
## CONDITIONS TO CLOSING

Section 8.1    Conditions to Each Party's Obligations to Effect the Closing.    The respective obligations of each Party to consummate the Closing shall be subject to the satisfaction or, to the extent permitted by applicable Law, waiver in a joint writing by the Buyer and the Seller, at or prior to the Closing, of the following conditions:

(a)    (i) no Law or Order shall have been enacted, entered, promulgated, adopted, issued or enforced by the Bankruptcy Court or any other Governmental Authority having competent jurisdiction that is then in effect and has the effect of making the transactions contemplated by this Agreement illegal or otherwise prohibiting, restraining or enjoining the consummation of the transactions contemplated hereby, (ii) no temporary restraining order, preliminary or permanent injunction or other Order issued by any court of competent jurisdiction or other similar legal restraint shall be in effect that has the effect of prohibiting, restraining, enjoining or otherwise making illegal the consummation of any of the transactions contemplated by this Agreement and (iii) there shall be no pending or threatened Governmental Authority investigation under the Regulatory Laws of any of the transactions contemplated by this Agreement;

(b)    the HSR Act waiting period (including any extensions thereof) shall have expired or been terminated and no temporary restraining Order, preliminary or permanent injunction or other Order issued by any court of competent jurisdiction at the request of the FTC or the DOJ shall be in effect that has the effect of enjoining, prohibiting, restraining, or otherwise making illegal the consummation of any of the Transactions (together, the "Regulatory Clearance");

(c)    the Bankruptcy Court shall have entered a Sale Order and such Sale Order shall be a Final Order; and

(d)    the Bankruptcy Court shall have entered the 9019 Order.

Section 8.2    <u>Conditions to Obligations of the Buyer</u>.  The obligation of the Buyer to consummate the Closing shall be subject to the satisfaction or, to the extent permitted by applicable Law, waiver at or prior to the Closing of the following additional conditions:

(a)    the Selling Entities shall have performed and complied in all material respects with the covenants contained in this Agreement which are required to be performed and complied with by the Selling Entities on or prior to the Closing Date;

(b)    (i) the representations and warranties of the Selling Entities set forth in <u>Article V</u> (other than the Seller Fundamental Representations and <u>Section 5.7(a)</u> (*Absence of Certain Developments*)), disregarding for these purposes any exception in such representations and warranties relating to materiality or a Material Adverse Effect, shall be true and correct as of the date of this Agreement and as of the Closing Date as though made at and as of the Closing Date (except for those representations and warranties which address matters only as of an earlier date in which case such representation or warranty shall have been true and correct as of such earlier date), except for such failures to be true and correct as would not have a Material Adverse Effect, (ii) the representations and warranties set forth in <u>Section 5.1</u> (*Organization, Standing and Corporate Power*), <u>Section 5.2</u> (*Authority; Execution and Delivery; Enforceability*), <u>Section 5.3(a)(i)</u> (*No Conflicts*) and <u>Section 5.17</u> (*Brokers*) (collectively, the "<u>Seller Fundamental Representations</u>"), disregarding for these purposes any exception in such representations and warranties relating to materiality or a Material Adverse Effect, shall be true and correct in all respects, except for any de minimis breaches or inaccuracies, as of the date of this Agreement and as of the Closing Date as though made at and as of the Closing Date (except for those representations and warranties which address matters only as of an earlier date in which case such representation or warranty shall have been true and correct as of such earlier date), and (iii) the representations and warranties set forth in <u>Section 5.7(a)</u> (*Absence of Certain Developments*) shall be true and correct in all respects as of the date of this Agreement and as of the Closing Date as though made at and as of the Closing Date;

(c)    the Buyer shall have received a certificate from an officer of the Seller, solely in such individual's capacity as an officer of the Seller, to the effect that the conditions set forth in <u>Section 8.2(a)</u> and <u>Section 8.2(b)</u> have been satisfied;

(d)    the Buyer shall have received the other items to be delivered to it pursuant to <u>Section 4.2</u>; and

(e)    the Bankruptcy Court shall have entered a Sale Order and such Sale Order shall be a Final Order.

Any condition specified in this <u>Section 8.2</u> may be waived by the Buyer; *provided, however*, that no such waiver shall be effective against the Buyer unless it is set forth in a writing executed by the Buyer.

Section 8.3    <u>Conditions to Obligations of the Selling Entities</u>.  The obligation of the Selling Entities to consummate the Closing shall be subject to the satisfaction or, to the extent permitted by applicable Law, waiver at or prior to the Closing of the following additional conditions:

(a)       the Buyer shall have performed and complied in all material respects with the covenants and agreements contained in this Agreement which are required to be performed and complied with by the Buyer on or prior to the Closing Date;

(b)       (i) the representations and warranties of the Buyer set forth in Article VI (other than the Buyer Fundamental Representations), disregarding for these purposes any exception in such representations and warranties relating to materiality, shall be true and correct as of the date of this Agreement and as of the Closing Date as though made at and as of the Closing Date (except for those representations and warranties which address matters only as of an earlier date in which case such representation or warranty shall have been true and correct as of such earlier date), except for such failures to be true and correct as would not have a material adverse effect on the Buyer or its ability to consummate the Transactions, and (ii) the representations and warranties set forth in Section 6.1 (*Organization and Good Standing*), Section 6.2 (*Authority Relative to this Agreement*), Section 6.3(a)(i) (*No Violation; Consents*) and Section 6.5 (*Brokers*) (collectively, the "Buyer Fundamental Representations"), disregarding for these purposes any exception in such representations and warranties relating to materiality, shall be true and correct in all respects, except for any de minimis breaches or inaccuracies, as of the date of this Agreement and as of the Closing Date as though made at and as of the Closing Date (except for those representations and warranties which address matters only as of an earlier date in which case such representation or warranty shall have been true and correct as of such earlier date);

(c)       the Seller shall have received a certificate from an officer of the Buyer, solely in such individual's capacity as an officer of the Buyer, to the effect that the conditions set forth in Section 8.3(a) and Section 8.3(b) have been satisfied;

(d)       the Bankruptcy Court shall have entered a Sale Order and such Sale Order shall be a Final Order; and

(e)       the Seller shall have received the other items to be delivered to it pursuant to Section 4.3.

Any condition specified in this Section 8.3 may be waived by the Seller; *provided*, *however*, that no such waiver shall be effective against the Seller unless it is set forth in a writing executed by the Seller.

Section 8.4    Frustration of Closing Conditions.  None of the Selling Entities or the Buyer may rely on or assert the failure of any condition set forth in Article VIII to be satisfied if such failure was proximately or primarily caused by such Party's failure to comply with this Agreement in all material respects.

## ARTICLE IX
## TERMINATION; WAIVER

Section 9.1    Termination.  This Agreement may be terminated at any time prior to the Closing by:

(a)       mutual written consent of the Seller and the Buyer;

(b)      the Seller or the Buyer, if (i) there shall be any applicable Law that makes consummation of the Transactions illegal or otherwise prohibited, or (ii) consummation of the Transactions would violate any nonappealable final Order, decree or judgment of the Bankruptcy Court or any other Governmental Authority having competent jurisdiction; *provided*, that no termination may be made by a Party under this Section 9.1(b) if such Party is then in material breach of any of its representations, warranties, covenants or agreements hereunder such that the conditions set forth in Article VIII would not then be satisfied;

(c)      the Buyer, if the Sale Order is not entered by July 14, 2023; *provided*, that no termination may be made by the Buyer under this Section 9.1(c) if the Buyer is in material breach of any of its representation, warranties, covenants or agreements hereunder;

(d)      the Seller, if:

(i)      any of the representations and warranties of the Buyer contained in Article VI shall be inaccurate such that the condition set forth in Section 8.3(b) would not then be satisfied; or

(ii)      the Buyer shall have failed to perform or comply with any of the covenants or agreements contained in this Agreement to be performed and complied with by the Buyer prior to the Closing Date, such that the condition set forth in Section 8.3(a) would not then be satisfied;

*provided, however*, that if an inaccuracy in any of the representations and warranties of the Buyer or a failure to perform or comply with a covenant or agreement by the Buyer is curable by the Buyer within ten (10) Business Days after the date of written notice from the Seller to the Buyer of the occurrence of such inaccuracy or failure, then the Seller may not terminate this Agreement under this Section 9.1(d) on account of such inaccuracy or failure (x) prior to the earlier of (1) the date that is ten (10) Business Days following the delivery of such written notice to the Buyer and (2) the Outside Date or (y) if such inaccuracy or failure shall have been fully cured (1) during such ten (10) Business Day period or (2) if the Outside Date occurs prior to the end of such ten (10) Business Day period, on or prior to the Outside Date; *provided, further*, that no termination may be made by the Seller under this Section 9.1(d) if the Seller is in material breach of any of its representations, warranties, covenants or agreements hereunder;

(e)      the Buyer, if:

(i)      any of the representations and warranties of the Selling Entities contained in Article V shall be inaccurate such that the condition set forth in Section 8.2(b) would not then be satisfied; or

(ii)      the Selling Entities shall have failed to perform or comply with any of the covenants or agreements contained in this Agreement to be performed and complied with by the Selling Entities prior to the Closing Date, such that the condition set forth in Section 8.2(a) would not then be satisfied;

*provided, however*, that if an inaccuracy in any of the representations and warranties of the Selling Entities or a failure to perform or comply with a covenant or agreement by any of the Selling Entities is curable by it within ten (10) Business Days after the date of written notice from the Buyer to the Seller of the occurrence of such inaccuracy or failure, then the Buyer may not terminate this Agreement under this Section 9.1(e) on account of such inaccuracy or failure (x) prior to the earlier of (1) the date that is ten (10) Business Days following the delivery of such written notice to the Seller and (2) the Outside Date or (y) if such inaccuracy or failure shall have been fully cured (1) during such ten (10) Business Day period or (2) if the Outside Date occurs prior to the end of such ten (10) Business Day period, on or prior to the Outside Date; *provided, further*, that no termination may be made by the Buyer under this Section 9.1(e) if the Buyer is in material breach of any of its representations, warranties, covenants or agreements hereunder;

(f)        the Buyer, if the Bankruptcy Case is dismissed or converted to a case under Chapter 7 of the Bankruptcy Code and neither such dismissal nor conversion expressly contemplates the Transactions; *provided*, that no termination may be made by the Buyer under this Section 9.1(f) if the Buyer is in material breach of any of its representations, warranties, covenants or agreements hereunder;

(g)        (i) automatic effect and without the need for further action by Seller or Buyer, if the Regulatory Clearance has not been obtained and the condition set forth in Section 8.1(b) has not been satisfied by 11:59 p.m. Eastern Time on June 30, 2023, unless Buyer and Seller, in their respective sole discretion, mutually elect in writing to extend such deadline, or (ii) the Buyer or the Seller, if the Closing has not occurred within seventeen (17) days after entry of the Sale Order and, in any event, by August 3, 2023 (such date set forth in this clause (ii) the "Outside Date"); *provided*, that the right to terminate this Agreement under clause (ii), under this Section 9.1(g) shall not be available to any Party if such Party is then in material breach of any of its representations, warranties, covenants or agreements hereunder such that the conditions set forth in Article VIII would not then be satisfied;

(h)        the Buyer or the Seller, if (i) in the case of the Seller being the terminating Party, all of the conditions set forth in Section 8.1 and Section 8.2, and in the case of the Buyer being the terminating Party, all of the conditions set forth in Section 8.1 and Section 8.3, have been satisfied or waived (other than those conditions to Closing that by their terms or their nature are to be satisfied at the Closing, but subject to such conditions being satisfied assuming a Closing would occur), (ii) the Buyer or the Seller, as applicable, has confirmed in writing that it is ready, willing and able to consummate the Closing, and (iii) the other Party has failed to consummate the Closing by the date the Closing is required to have occurred pursuant to Section 4.1; *provided*, that no termination may be made by a Party under this Section 9.1(h) if such Party is in material breach of any of its representations, warranties, covenants or agreements hereunder;

(i)        the Buyer by written notice to the Seller within two (2) Business Days following the occurrence of a Specified Event; *provided*, that no termination may be made by the Buyer under this Section 9.1(i) if the Buyer is in material breach of any of its representations, warranties, covenants or agreements hereunder; *provided, further*, that if such written notice is not received by the Seller prior to such deadline specified in this Section 9.1(i), the Buyer's right to

80

terminate this Agreement pursuant to this <u>Section 9.1(i)</u> shall be automatically and irrevocably waived;

(j)    the Buyer by written notice to Seller within two (2) Business Days following any issuance by the Bankruptcy Court of a stay of the Sale Order after the entry of the Sale Order; *provided*, that no termination may be made by the Buyer under this <u>Section 9.1(j)</u> if the Buyer is in material breach of any of its representations, warranties, covenants or agreements hereunder; *provided, further*, that if such written notice is not received by the Seller prior to such deadline specified in this <u>Section 9.1(j)</u>, the Buyer's right to terminate this Agreement pursuant to this <u>Section 9.1(j)</u> shall be automatically and irrevocably waived; or

(k)    the Buyer or the Seller, if (i) the DIP Lenders fail to forbear from exercising any remedies relating to the DIP Obligations through the Closing Date or to fund the Selling Entities through the entry of the Sale Order or (ii) if the Buyer, the Selling Entities, and the DIP Lenders do not agree upon a financing arrangement that will allow the Selling Entities' operations to continue in the Ordinary Course of Business through the Closing Date, which financing arrangement provides for financing of the Selling Entities' operations based upon the budget attached in <u>Section 9.1(k)</u> of the Seller Disclosure Schedules; *provided*, that no termination may be made by any Party under this <u>Section 9.1(k)</u> if such Party is in material breach of any of its representations, warranties, covenants or agreements hereunder.

Section 9.2    <u>Procedure and Effect of Termination</u>.  In the event of termination of this Agreement by either the Seller or the Buyer pursuant to <u>Section 9.1</u>, written notice thereof shall forthwith be given by the terminating Party to the other Party and this Agreement shall terminate and the transactions contemplated hereby shall be abandoned, without further action by any of the Parties; *provided, however*, that (a) neither Party shall be relieved of, or released from, any Liability arising from any Willful Breach by such Party prior to the termination of this Agreement pursuant to this <u>Article IX</u>, except in the event that Buyer has timely and validly exercised its rights hereunder to terminate this Agreement solely pursuant to a Specified Termination (and not with respect to a Buyer Default Termination or any other scenario, event, fact or circumstance), with respect to which receipt of the Specified Termination Amount is Seller's and the Selling Entities' exclusive remedy pursuant to <u>Section 3.2</u> hereof, (b) no Party shall be relieved of, or released from, any Liability arising from Fraud by such Party, and (c) this <u>Section 9.2</u>, <u>Section 3.2</u>, <u>Section 7.4</u> and <u>Article X</u> and the Confidentiality Agreement shall remain in full force and effect and survive any termination of this Agreement.  For the avoidance of all doubt, the Buyer and the Selling Entities hereby expressly agree that to the extent of any inconsistency between the terms and provisions of this Agreement and those of any bid procedures or other order of the Bankruptcy Court in the Bankruptcy Case regarding the handling and disposition of the Deposit, the terms and provisions of this Agreement shall govern and control.  For purposes of this Agreement, "<u>Willful Breach</u>" means with respect to any breaches of, or failures to perform, any of the representations, warranties, covenants, obligations or agreements contained herein, a material breach that is a consequence of an act or failure to act undertaken by the breaching Person with knowledge that such Person's act or failure to act would, or would reasonably be expected to, result in or constitute a material breach of this Agreement.

Section 9.3    <u>Extension; Waiver</u>.  At any time prior to the Closing, the Seller (on behalf of each of the Selling Entities), on the one hand, or the Buyer, on the other hand, may, to the extent

permitted by applicable Law (a) extend the time for the performance of any of the obligations or other acts of the Buyer (in the case of an agreed extension by the Seller) or the Seller (in the case of an agreed extension by the Buyer), (b) waive any inaccuracies in the representations and warranties of the Buyer (in the case of a wavier by the Seller) or the Seller (in the case of a waiver by the Buyer) contained herein or in any document delivered pursuant hereto, (c) waive compliance with any of the agreements of the Buyer (in the case of a wavier by the Seller) or the Seller (in the case of a waiver by the Buyer) contained herein, or (d) waive any condition to its obligations hereunder. Any agreement on the part of the Seller, on the one hand, or the Buyer, on the other hand, to any such extension or waiver shall be valid only if set forth in a written instrument signed on behalf of the Seller or the Buyer, as applicable. The failure or delay of any Party to assert any of its rights under this Agreement or otherwise shall not constitute a waiver of those rights, nor shall any single or partial exercise of any right under this Agreement preclude any other or further exercise of any rights hereunder.

## ARTICLE X
## MISCELLANEOUS PROVISIONS

Section 10.1    <u>Amendment and Modification</u>. This Agreement may be amended, modified or supplemented only by a written instrument signed by the Seller, on behalf of each of the Selling Entities, and the Buyer.

Section 10.2    <u>Survival</u>. None of the representations and warranties of the Parties in this Agreement, in any instrument delivered pursuant to this Agreement, or in the Schedules or Exhibits attached hereto shall survive the Closing, and no Party hereto shall, or shall be entitled to, make any claim or initiate any action against any other Party with respect to any such representation or warranty from or after the Closing. None of the covenants or agreements of the Parties in this Agreement shall survive the Closing, and no Party hereto shall, or shall be entitled to, make any claim or initiate any action against any other Party with respect to any such covenant or agreement from or after the Closing, other than (a) the covenants and agreements of the Parties contained in this <u>Article X</u>, <u>Section 3.2</u> and <u>Section 3.3</u>, which shall survive the consummation of the Transactions until fully performed in accordance with their respective terms, (b) those other covenants and agreements contained herein that by their terms apply, or that are to be performed in whole or in part, after the Closing, which shall survive the consummation of the Transactions until fully performed in accordance with their respective terms, (c) any rights or remedies of any Person for breach of any such surviving covenant or agreement and (d) any Liability on account of Fraud.

Section 10.3    <u>Notices</u>. All notices or other communications required or permitted under, or otherwise made in connection with, this Agreement shall be in writing and shall be deemed to have been duly given or made (a) when delivered in person, (b) when sent if delivered or transmitted by email (*provided*, no "bounce back" or notice of non-delivery is generated), (c) upon receipt after dispatch by registered or certified mail, postage prepaid, or (d) on the next Business Day if transmitted by national overnight courier (with confirmation of delivery), in each case, addressed as follows:

(a)    If to any Selling Entity or the Selling Entities, to:

Vital Pharmaceuticals, Inc.
1600 N Park Drive
Weston, FL 33326
Attention:     Gregg Metzger
                      John Didonato
Email: gregg.metzger@bangenergy.com
          jdidonato@hgc.com

with a mandated copy (which shall not constitute notice) to:

Latham & Watkins LLP
1271 Avenue of the Americas
New York, NY 10020
Attention:     Andrew Sorkin
                      Daniel Mun
                      Caroline Reckler
Email: andrew.sorkin@lw.com
          daniel.mun@lw.com
          caroline.reckler@lw.com

(b)     If to the Buyer, to:

Monster Energy Company
1 Monster Way
Corona, California 92879
Attention:  Aaron P. Sonnhalter, Sr. Vice President
Email:  aaron.sonnhalter@monsterenergy.com

with a mandated copy (which shall not constitute notice) to:

Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA  90067
Attention:     Richard M. Pachulski
                      Teddy Kapur
Email: rpachulski@pszjlaw.com
          tkapur@pszjlaw.com

Section 10.4   <u>Assignment</u>.   Neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by any Party (whether by operation of law or otherwise) without the prior written consent of the other Parties, and any such assignment shall be null and void; *provided*, *however*, that nothing in this Agreement shall limit the right of the Buyer to assign its rights or delegate its responsibilities, liabilities and obligations under this Agreement in whole or in part to any Affiliate of the Buyer or to assign, license, transfer, or otherwise dispose of any of the Seller IP and other Purchased Assets in any manner in its sole discretion; *provided*, *further*, that no such assignment shall be permitted to the extent it would subject any amounts payable to the Seller or any other Selling Entities in connection with this Agreement to any incremental

withholding or other Tax that would be borne by the Seller, the other Selling Entities or their respective Affiliates or direct or indirect equity holders. No assignment by any Party shall relieve such Party of any of its obligations hereunder. Any attempted or purported assignment in violation of this <u>Section 10.4</u> will be deemed void *ab initio*. Subject to the foregoing, this Agreement and all of the provisions hereof shall be binding upon, inure to the benefit of and be enforceable by the Parties and their respective successors and permitted assigns, including, in the case of the Selling Entities, the trustee in the Bankruptcy Case. For the avoidance of all doubt, nothing in this <u>Section 10.4</u> or elsewhere in this Agreement shall, but subject in all respects to the second proviso to the first sentence of this <u>Section 10.4</u>) be deemed to restrict or prohibit the Buyer from, in the Buyer's sole discretion, designating an Affiliate(s) to take title to the Purchased Assets (or any portion(s) thereof).

Section 10.5   <u>Severability</u>.  If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any rule of Law or public policy, all other terms, conditions and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any Party. Upon a determination that any term or other provision of this Agreement is invalid, illegal or incapable of being enforced, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the fullest extent possible.

Section 10.6   <u>Governing Law</u>.  Except to the extent the mandatory provisions of the Bankruptcy Code apply, this Agreement, and all claims and causes of action arising out of, based upon, or related to this Agreement or the negotiation, execution or performance hereof, shall be governed by, and construed, interpreted and enforced in accordance with, the Laws of the State of Delaware, without regard to choice or conflict of law principles that would result in the application of any Laws other than the Laws of the State of Delaware. Notwithstanding the foregoing or anything to the contrary herein, this <u>Section 10.6</u> shall not apply to the California District Court Action, the OBI/Monster Matter, the Trade Secret Matters, the VPX Florida Matters, the Orange Bang Trademark License Action, and/or any litigation or other Proceeding involving a Buyer Releasing Party and a Seller Releasing Party that is currently pending in any jurisdiction or other forum as of the date of this Agreement.

Section 10.7   <u>Acknowledgement and Release; Non-Recourse</u>.

(a)   The Buyer acknowledges that the Selling Entities are the sole Persons bound by, or liable with respect to, the obligations and Liabilities of the Selling Entities under this Agreement and the other Transaction Documents, and that no Affiliate of any Selling Entity or any of their respective subsidiaries or any current or former officer, director, stockholder, agent, attorney, employee, representative, advisor or consultant of any Selling Entity or any such other Person shall be bound by, or liable with respect to, any aspect of this Agreement and the other Transaction Documents; *provided, however*, that no Person shall be relieved of, or released from, any Liability arising from Fraud by such Person. Each of the Selling Entities acknowledges that the Buyer is the sole Persons bound by, or liable with respect to, the obligations and Liabilities of the Buyer under this Agreement and the other Transaction Documents, and that no Affiliate of the Buyer or any of their respective subsidiaries or any current or former officer, director, stockholder,

agent, attorney, employee, representative, advisor or consultant of the Buyer or any such other Person shall be bound by, or liable with respect to, any aspect of this Agreement and the other Transaction Documents; *provided*, *however*, that no Person shall be relieved of, or released from, any Liability arising from Fraud by such Person.  This Agreement may only be enforced against, and any claims or causes of action that may be based upon, arise out of or relate to this Agreement, or the negotiation, execution or performance of this Agreement may only be made against the entities that are expressly identified as parties hereto and no other Person that is not a party hereto shall have any liability for any Liabilities of the parties to this Agreement or for any claim (whether in tort, contract or otherwise) based on, in respect of, or by reason of, the Transactions or in respect of any oral representations made or alleged to be made in connection herewith.  In no event shall any party hereto or any of its Affiliates, and the Parties hereby agree not to and to cause their respective Affiliates (in the case of the Selling Entities, other than any Excluded Parties) not to, seek to enforce this Agreement against, make any claims for breach of this Agreement against, or seek to recover monetary damages from, any Person not a party to this Agreement.

(b)    Notwithstanding anything to the contrary herein or otherwise, each beneficiary of this Section 10.7 shall be an express third party beneficiary of this Section 10.7 with the full power to enforce the terms of this Section 10.7 as if it were a party to this Agreement for such purpose.

Section 10.8    Submission to Jurisdiction; WAIVER OF JURY TRIAL.

(a)    Any action, claim, suit or Proceeding arising out of, based upon or relating to this Agreement or the transactions contemplated hereby shall be brought solely in the Bankruptcy Court (or any court exercising appellate jurisdiction over the Bankruptcy Court).  Each Party hereby irrevocably submits to the exclusive jurisdiction of the Bankruptcy Court (or any court exercising appellate jurisdiction over the Bankruptcy Court) in respect of any action, claim, suit or Proceeding arising out of, based upon or relating to this Agreement or any of the rights and obligations arising hereunder, and agrees that it will not bring any action arising out of, based upon or related thereto in any other court; *provided*, *however*, that, if the Bankruptcy Case is closed or dismissed, any action, claim, suit or Proceeding arising out of, based upon or relating to this Agreement or the Transactions shall be heard and determined solely in a state or federal court located in the State of Delaware and any state appellate court therefrom within the State of Delaware.  Each Party hereby irrevocably waives, and agrees not to assert as a defense, counterclaim or otherwise, in any such action, claim, suit or Proceeding, (a) any claim that it is not personally subject to the jurisdiction of the above named courts for any reason other than the failure to serve process in accordance with Section 10.3, (b) any claim that it or its property is exempt or immune from jurisdiction of any such court or from any legal process commenced in such courts (whether through service of notice, attachment prior to judgment, attachment in aid of execution of judgment, execution of judgment or otherwise) and (c) to the fullest extent permitted by applicable Law, any claim that (i) the suit, action or Proceeding in such court is brought in an inconvenient forum, (ii) the venue of such suit, action or Proceeding is improper or (iii) this Agreement or any other agreement or instrument contemplated hereby or entered into in connection herewith, or the subject matter hereof or thereof, may not be enforced in or by such courts.  Each Party agrees that notice or the service of process in any action, claim, suit or Proceeding arising out of, based upon or relating to this Agreement or any of the rights and obligations arising hereunder or thereunder, shall be properly served or delivered if delivered in

85

the manner contemplated by Section 10.3.  Notwithstanding anything to the contrary, the foregoing shall not limit the right to pursue actions, claims, counter-claims or other challenges before the US Patent and Trademark Office, U.S. Trademark Trial and Appeal Board, WIPO, any IP office globally, or any similar administrative forum or tribunal in the U.S. or in foreign jurisdictions, including any appeals thereto, at the Federal Circuit or other administrative forum or court, or to pursue takedowns via any website.  Notwithstanding the foregoing or anything to the contrary herein, this Section 10.8(a) shall not apply to, and nothing contained in this Agreement (or any other agreement or as a condition to acquiring any of the Purchased Assets) shall affect the governing law, jurisdiction, venue and forum of, the California District Court Action, the OBI/Monster Matter, the Trade Secret Matters, the VPX Florida Matters, the Orange Bang Trademark License Action, and/or any litigation or other Proceeding involving a Buyer Releasing Party and a Seller Releasing Party that is currently pending in any jurisdiction or other forum as of the date of this Agreement.

(b)      EACH OF THE PARTIES HERETO IRREVOCABLY WAIVES TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW ANY AND ALL RIGHT SUCH PARTY MAY HAVE TO TRIAL BY JURY IN ANY ACTION, CLAIM, SUIT OR PROCEEDING (WHETHER BASED IN CONTRACT, TORT OR OTHERWISE) BETWEEN THE PARTIES HERETO ARISING OUT OF, BASED UPON OR RELATING TO THIS AGREEMENT OR THE OTHER TRANSACTION DOCUMENTS OR THE NEGOTIATION, EXECUTION OR PERFORMANCE HEREOF OR THEREOF.  Notwithstanding the foregoing or anything to the contrary herein, this Section 10.8(b) shall not apply to the California District Court Action, the OBI/Monster Matter, the Trade Secret Matters, the VPX Florida Matters, the Orange Bang Trademark License Action, and/or any litigation or other Proceeding involving a Buyer Releasing Party and a Seller Releasing Party that is currently pending in any jurisdiction or other forum as of the date of this Agreement.

Section 10.9    Counterparts.  This Agreement, the agreements referred to herein, and each other agreement or instrument entered into in connection herewith or therewith or contemplated hereby or thereby, and any amendments hereto or thereto, to the extent signed and delivered by means of a photographic, photostatic, facsimile, portable document format (.pdf), DocuSign, electronic signature or similar reproduction of such signed writing using a facsimile machine or electronic mail shall be treated in all manner and respects as an original agreement or instrument and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person. No party hereto or to any such agreement or instrument shall raise the use of a facsimile machine or electronic mail to deliver a signature or the fact that any signature or agreement or instrument was transmitted or communicated through the use of a facsimile machine or electronic mail or that any signature is in facsimile or electronic format (including .pdf or DocuSign) as a defense to the formation or enforceability of a contract and each such party forever waives any such defense. To the extent that any such signature is considered not acceptable by any authority or governmental body, the Parties agree to re-execute any such agreements in a manner acceptable to such authority or governmental body.

Section 10.10  Incorporation of Schedules and Exhibits.    All Schedules, the Seller Disclosure Schedule and all Exhibits attached hereto and referred to herein are hereby incorporated herein by reference and made a part of this Agreement for all purposes as if fully set forth herein.

Section 10.11 <u>Entire Agreement</u>.  This Agreement (including all Schedules, the Seller Disclosure Schedule and all Exhibits), the Confidentiality Agreement and the other Transaction Documents constitute the entire agreement among the Parties with respect to the subject matter hereof and supersede all prior agreements and understandings among the Parties with respect thereto, *provided* that (i) the Confidentiality Agreement shall automatically terminate as of the Closing and (ii) to the extent that any other provision of this Agreement (including Section 7.3 hereof) conflicts with any term or provision of the Confidentiality Agreement, such other provision of this Agreement shall govern and control.

Section 10.12 <u>Specific Performance</u>.

(a)    The Selling Entities agree that irreparable damage may occur in the event that any provision of this Agreement is not performed in accordance with its specific terms or was otherwise breached and that monetary damages may not be an adequate remedy for any breach or threatened breach of any of the provisions of this Agreement.  It is accordingly agreed that (i) the Buyer shall be entitled to an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement, and any such injunction shall be in addition to any other remedy to which the Buyer is entitled, at law or in equity, (ii) the Selling Entities waive any requirement for the securing or posting of any bond in connection with the obtaining of any specific performance or injunctive relief and (iii) the Selling Entities will waive, in any action for specific performance, the defense of adequacy of a remedy at Law.  The Buyer's pursuit of specific performance at any time will not be deemed an election of remedies or waiver of the right to pursue any other right or remedy to which the Buyer may be entitled, including the right to pursue remedies for liabilities or damages incurred or suffered by the Buyer in the case of a breach of this Agreement.

(b)    The Buyer agrees that irreparable damage may occur in the event that any provision of this Agreement is not performed in accordance with its specific terms or was otherwise breached and that monetary damages may not be an adequate remedy for any breach or threatened breach of any of the provisions of this Agreement.  It is accordingly agreed that (i) the Selling Entities shall be entitled to an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement, and any such injunction shall be in addition to any other remedy to which the Selling Entities are entitled, at law or in equity, (ii) the Buyer waives any requirement for the securing or posting of any bond in connection with the obtaining of any specific performance or injunctive relief and (iii) the Buyer will waive, in any action for specific performance, the defense of adequacy of a remedy at Law. The Selling Entities' pursuit of specific performance at any time will not be deemed an election of remedies or waiver of the right to pursue any other right or remedy to which the Selling Entities may be entitled, including the right to pursue remedies for liabilities or damages incurred or suffered by the Selling Entities in the case of a breach of this Agreement.

Section 10.13 <u>Bulk Sales or Transfer Laws</u>.  Each of the Parties hereby waives compliance with the provisions of the bulk sales, bulk transfers, or similar Laws of all applicable jurisdictions that may be applicable to the sale of the Purchased Assets under this Agreement.

Section 10.14 <u>Seller Disclosure Schedule</u>.  The Seller Disclosure Schedule has been arranged for purposes of convenience in separately numbered sections corresponding to the

sections of this Agreement, and it is expressly understood and agreed that (a) the disclosure of any fact or item in any section of the Seller Disclosure Schedule shall be deemed disclosure with respect to any other Section or subsection of the Seller Disclosure Schedule to the extent the applicability of the disclosure to such other Section or subsection is reasonably apparent on the face of such disclosure without the need for a cross-reference, (b) the disclosure of any matter or item in the Seller Disclosure Schedule shall not be deemed to constitute an acknowledgement that such matter or item is required to be disclosed therein, (c) the mere inclusion of an item in the Seller Disclosure Schedule as an exception to a representation or warranty shall not be deemed an admission that such item represents a material exception, any violation of Law or breach of Contract or material fact, event or circumstance or that such item has had or would be reasonably likely to have a Material Adverse Effect, (d) the information and disclosures contained therein shall not be construed or otherwise deemed to constitute, any representation, warranty, covenant or obligation of the Selling Entities or any other Person except to the extent explicitly provided in this Agreement, and (e) the disclosures set forth in the Seller Disclosure Schedule shall not be deemed to expand the scope of any, or create any new, representation, warranty, covenant or agreement set forth herein.  The specification of any dollar amount or the inclusion of any item in the representations and warranties contained in this Agreement, the Seller Disclosure Schedule or the attached exhibits is not intended to imply that the amounts, or higher or lower amounts, or the items so included, or other items, are or are not required to be disclosed (including whether such amounts or items are required to be disclosed as material or threatened) or are within or outside of the Ordinary Course of Business, and neither Party will use the fact of the setting of the amounts or the fact of the inclusion of any item in this Agreement, the Schedules or exhibits in any dispute or controversy between the Parties as to whether any obligation, item or matter not set forth or included in this Agreement, the Seller Disclosure Schedule or Exhibits hereto is or is not required to be disclosed (including whether the amount or items are required to be disclosed as material or threatened) or are within or outside of the Ordinary Course of Business.  The information contained in this Agreement, in the Seller Disclosure Schedule and Exhibits hereto is disclosed solely for purposes of this Agreement.  The Selling Entities may (but shall not be obligated to), with the consent of the Buyer in its sole discretion, supplement or amend the Seller Disclosure Schedule to reflect (i) any fact, event or condition arising after the date hereof and prior to the Closing which, if existing or occurring as of the date of this Agreement, would have been required to be described in the Seller Disclosure Schedule in order to avoid any representation or warranty of the Selling Entities contained in this Agreement from being untrue or inaccurate and (ii) any fact, event or condition which first became known to a Knowledge party of any Selling Entity listed in clause (b) of the definition of "Knowledge" after the date hereof which, if known to such person prior to the date of this Agreement, would have been required to be described in the Seller Disclosure Schedule in order to avoid any representation or warranty of the Selling Entities contained in this Agreement which is subject to the Knowledge of the Selling Entities or any other Selling Entity from being untrue or inaccurate.  To the extent that there are any additional Purchased Assets, Excluded Assets, Assumed Liabilities or Excluded Liabilities identified after the date of this Agreement, the Selling Entities and the Buyer shall work together in good faith to address any modifications, amendments, supplements or the like that may be required or appropriate to the Seller Disclosure Schedules in accordance with the other provisions hereof.

Section 10.15 <u>Mutual Drafting; Headings; Information Made Available</u>.  The Parties participated jointly in the negotiation and drafting of this Agreement and the language used in this Agreement shall be deemed to be the language chosen by the Parties to express their mutual intent.

If an ambiguity or question of intent or interpretation arises, then this Agreement will accordingly be construed as drafted jointly by the Parties, and no presumption or burden of proof will arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement. The descriptive headings and table of contents contained in this Agreement are included for convenience of reference only and shall not affect in any way the meaning or interpretation of this Agreement. To the extent this Agreement refers to information or documents to be made available (or delivered or provided) to the Buyer or its Representatives, the Selling Entities shall be deemed to have satisfied such obligation if the Seller or any of its Representatives has made such information or document available (or delivered or provided such information or document) to the Buyer or any of its Representatives, whether in an electronic data room, via electronic mail, in hard copy format or otherwise.

Section 10.16  <u>Guarantee</u>.

(a)     Guarantor hereby irrevocably, absolutely and unconditionally guarantees the due, punctual and complete performance and payment (and not merely collection) in full of Buyer's obligations under this Agreement up to the Purchase Price as and when due and payable and as and when required to be performed pursuant to this Agreement (the "<u>Guaranteed Obligations</u>") and agrees that the Selling Entities shall be entitled to enforce directly against Guarantor any of the Guaranteed Obligations thirty (30) days after having made written demand of the Buyer. Guarantor irrevocably expressly waives (i) any and all rights or defenses arising by reason of any applicable Law which would otherwise require any election of remedies by the Selling Entities, (ii) presentment to, demand of payment from and protest to any other Person of any of the Guaranteed Obligations, and also waives notice of acceptance of its guarantee and notice of protest for nonpayment not provided for in this <u>Section 10.16</u>, (iii) all defenses which may be available by virtue of any valuation, stay, moratorium or other similar applicable Law now or hereafter in effect, any right to require the marshaling of assets of the Buyer, Guarantor or any other Person interested in the Transactions, and all suretyship defenses generally, (iv) any and all rights or defenses arising by reason of any applicable Law which would otherwise require any election of remedies by any Selling Entity, (v) any requirement that the Selling Entities exhaust any right or take any action against the Buyer or any other Person, any collateral security or any other guarantor or surety, and (vi) any right to subrogation to any of the rights of the Buyer or any other Person against the Selling Entities, reimbursement, indemnification or contribution from the Selling Entities in respect of payments made by Guarantor hereunder or any other similar rights. The Guaranteed Obligations shall not be subject to any reduction, limitation, impairment or termination for any reason, including any claim of waiver, release, surrender, alteration or compromise, and shall not be subject to any defense or setoff, counterclaim, recoupment or termination whatsoever by reason of the invalidity, illegality or unenforceability of the Guaranteed Obligations. Guarantor hereby agrees and acknowledges that its obligations hereunder shall not be released or discharged in whole or in part, or otherwise affected by (A) any change in the corporate existence, structure or ownership of the Buyer or Guarantor or any insolvency, bankruptcy, reorganization or other similar Proceeding of the Buyer or Guarantor or any of their respective former, current or future direct or indirect equity holder, controlling person, general or limited partner, officer, director, employee, investment professional, manager, stockholder, member, agent, Affiliate, assignee, representative or financing source of any of the foregoing (collectively, the "<u>Related Persons</u>") or affecting any of their respective assets, (B) any change in the manner, place or terms of payment or performance, or any change or extension of the time of

payment or performance of, renewal or alteration of, the Guaranteed Obligations, any liability incurred directly or indirectly in respect thereof, or any amendment or waiver in accordance with the terms and conditions of this Agreement or the documents entered into in connection therewith, in each case, made in accordance with the terms thereof, (C) the right by statute or otherwise to require any Selling Entity to institute suit against the Buyer or any of its Related Persons or to exhaust any rights and remedies which such Selling Entity has or may have against the Buyer or any of its Related Persons, (D) the failure or delay on the part of the Selling Entities to assert any claim or demand or to enforce any right or remedy against the Buyer or Guarantor, (E) the existence of any claim, set-off or other similar right which the Guarantor may have at any time against the Buyer or the Selling Entities or their respective Affiliates, whether in connection with the Guaranteed Obligations or otherwise, (F) the adequacy of any other means the Selling Entities may have of obtaining payment of the Guaranteed Obligations, (G) the value, genuineness, validity, regularity, illegality or enforceability (as it relates to the Buyer) of this Agreement or the Transaction Documents, or (H) any other act or omission that may in any manner or to any extent vary the risk of the Guarantor.   Notwithstanding any of the foregoing or anything else in this Section 10.16, nothing herein shall be deemed to waive or limit Guarantor's right or ability to assert as defenses to this guarantee any claims, defenses or other rights that the Buyer may have to the enforcement of Buyer's obligations under this Agreement. This guarantee shall be binding upon the successors and assigns of Guarantor and shall inure to the benefit of the Seller and its successors and assigns. In the event that Guarantor or any of its successors or assigns transfers or conveys in one transaction or a series of transactions all or substantially all of its assets to any Person, Guarantor shall cause proper provision to be made so that such successor or assign shall expressly assume this guarantee.

(b) Guarantor represents and warrants the following as of the date hereof and as of the Closing:

(i) Guarantor is a corporation, duly organized, validly existing and in good standing under the Laws of the State of Delaware and has all necessary power and authority to own, operate or lease the properties and assets now owned, operated or leased by it and to carry on its business as it has been and is currently conducted.

(ii) Guarantor has all necessary corporate authority and legal capacity to enter into, deliver and perform this Agreement and each Transaction Document to which it is, or will be as of the Closing, a party, to carry out its obligations hereunder and thereunder and to consummate the Transaction. Guarantor is duly licensed or qualified to do business and is in good standing in each jurisdiction in which the properties owned or leased by it or the operation of its business makes such licensing or qualification necessary, except to the extent that the failure to be so licensed, qualified or in good standing would not adversely affect the ability of Guarantor to carry out its obligations under this Agreement and to consummate the Transaction. The execution and delivery of this Agreement and the Transaction Documents by Guarantor, the performance by Guarantor of its obligations hereunder and thereunder and the consummation by Guarantor of the Transactions have been duly authorized by all requisite action on the part of Guarantor. This Agreement has been duly executed and delivered by Guarantor, and (assuming due authorization, execution and delivery by the Selling Entities), Guarantor's obligations under this Section 10.16 constitutes the legal, valid and binding obligations of Guarantor,

enforceable against Guarantor in accordance with its terms, except as enforcement hereof may be limited by the General Enforceability Exceptions.

(iii)     Assuming that all applicable requirements of the HSR Act have been satisfied with respect to the Transactions, the execution, delivery and performance of this Agreement by Guarantor does not and will not (A) violate, conflict with or result in the breach of governing documents of Guarantor, (B) conflict with or violate any Law or Order applicable to Guarantor or its assets, properties or businesses, or (C) contravene or conflict with, result in any breach or violation of, constitute a default (or event which with the giving of notice or lapse of time, or both, would become a default) under, require any consent under, or give to others any rights of termination, amendment, acceleration, suspension, revocation or cancellation of, any Contract to which Guarantor is a party, except, in the case of clauses (B) and (C), for any such conflicts, violations, breaches, defaults or other occurrences which would not, individually or in the aggregate, prevent Guarantor from performing or complying with, or materially delay the performance by Guarantor of or compliance by Guarantor with, its obligations under this Section 10.16.

(iv)     The execution, delivery and performance of the provisions of this Section 10.16 by Guarantor does not and will not require any Governmental Authorization or notice to any Governmental Authority, except applicable requirements of the HSR Act with respect to the Transactions.

(v)     Guarantor has, and will have at all times that this Agreement is in effect, financial means at its disposal to enable Guarantor to pay the Guaranteed Obligations immediately when due pursuant to the terms and subject to the conditions of this Agreement, and immediately after giving effect to the Transactions, Guarantor will be solvent and have adequate capital to carry on its business.

(c)     Notwithstanding anything to the contrary in this Section 10.16, in no event shall any damages recovered against Guarantor on account of the Guaranteed Obligations exceed an amount equal to the Purchase Price.

Section 10.17  Use of Retained Records.  Notwithstanding anything to the contrary herein or otherwise, the Buyer agrees that the Buyer, its Affiliates and their respective Representatives shall not, directly or indirectly, use any Retained Records in connection with any Proceeding, whether pending, threatened, or not yet asserted or threatened against or with respect to (a) the Selling Entities, their Affiliates or any of their respective directors, officers, employees, managers, counsel, accountants, consultants or other Representatives, or (b) any assets or properties of the Selling Entities.  The Buyer agrees, on its own behalf and on behalf of its directors, officers, managers, employees, and Affiliates and their respective Representatives, that, as to all Retained Records, all applicable privileges and other protections shall remain vested in the Selling Entities and shall not transfer to the Buyer, or be claimed by the Buyer any of its Affiliates or their respective Representatives.

Section 10.18  Approval of the Bankruptcy Court.  Notwithstanding anything herein to the contrary, any and all of the Selling Entities' obligations from and after the Closing under this Agreement are subject to approval of the Bankruptcy Court.  Once this Agreement is fully executed

by the Parties, the Selling Entities shall be bound by the terms of this Agreement applicable prior to the Closing and shall not have the right, whether on estate fiduciary grounds or otherwise, to terminate this Agreement except pursuant to the express terms of Section 3.2 and Section 9.1 hereof.  Notwithstanding anything to the contrary herein, the Selling Entities' rights and interests (and the Buyer's, MBC's and MEC's obligations) under this Agreement shall be effective immediately upon execution of this Agreement by the Parties.

* * * * *

IN WITNESS WHEREOF, the Parties hereto have caused this Asset Purchase Agreement to be executed as of the date first written above.

<u>**SELLING ENTITIES:**</u>

**VITAL PHARMACEUTICALS, INC.**

By: _____
Name: John DiDonato
Title: Chief Transformation Officer

**VITAL PHARMACEUTICALS INTERNATIONAL SALES, INC.**

By: _____
Name: John DiDonato
Title: Chief Transformation Officer

**JHO INTELLECTUAL PROPERTY HOLDINGS, LLC**

By: _____
Name: John DiDonato
Title: Chief Transformation Officer

**JHO REAL ESTATE INVESTMENT, LLC**

By: _____
Name: John DiDonato
Title: Chief Transformation Officer

**QUASH SELTZER, LLC**

By: _____
Name: John DiDonato
Title: Chief Transformation Officer

**RAINBOW UNICORN BEV, LLC**

By: _____
Name: John DiDonato
Title: Chief Transformation Officer

**BUYER:**

**BLAST ASSET ACQUISITION LLC, A
DELAWARE LIMITED LIABILITY
COMPANY**

By: _____
Name: Hilton H. Schlosberg
Title:  Co-Chief Executive Officer

[Signature Page to Asset Purchase Agreement]

THE UNDERSIGNED HEREBY JOINS IN THIS AGREEMENT FOR THE SOLE AND EXCLUSIVE PURPOSE OF AGREEING TO THE TERMS AND PROVISIONS OF SECTION 7.16 HEREOF:

**MONSTER ENERGY COMPANY**

By: _____
Name: Hilton H. Schlosberg
Title:  Vice Chairman of the Board of Directors,
        Co-Chief Executive Officer

[Signature Page to Asset Purchase Agreement]

THE UNDERSIGNED HEREBY JOINS IN THIS AGREEMENT FOR THE SOLE AND EXCLUSIVE PURPOSE OF AGREEING TO THE TERMS AND PROVISIONS OF SECTION 7.16 AND SECTION 10.16 HEREOF:

**MONSTER BEVERAGE CORPORATION**

By: _____
Name: Hilton H. Schlosberg
Title:  Vice Chairman of the Board of Directors,
        Co-Chief Executive Officer

[Signature Page to Asset Purchase Agreement]

## Schedule I

1. Vital Pharmaceuticals International Sales, Inc., a Delaware corporation

2. JHO Intellectual Property Holdings, LLC, a Florida limited liability company

3. JHO Real Estate Investment, LLC, a Florida limited liability company

4. Quash Seltzer, LLC, a Florida limited liability company

5. Rainbow Unicorn Bev, LLC, a Florida limited liability company