UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION
www.flsb.uscourts.gov

In re:                                          Chapter 11 Cases

VITAL PHARMACEUTICALS, INC., *et al*.,          Case No. 22-17842 (PDR)
                                                (Jointly Administered)
            Debtors.[1]

_____/

## DEBTORS' OBJECTION TO JOHN H. OWOC'S MOTION TO TERMINATE VITAL PHARMACEUTICALS, INC.'S S-CORP STATUS

1.       The above-captioned debtors and debtors-in-possession (collectively, the "Debtors") submit this Response to the *Emergency Motion of John H. Owoc's [sic] for Confirmation that the Automatic Stay Does Not Apply to Termination of Debtor's Subchapter S Corporation Status or, Alternatively, for Relief from Stay* [ECF No. 1627] (the "Motion").[2]

## PRELIMINARY STATEMENT

2.       Through the Motion, Mr. Owoc seeks to saddle the Debtors with a tax bill estimated to cost the estate upwards of $27.5 million — forcing a chapter 7 liquidation — while he walks away with deductions that could save him approximately $20 million on future taxes. On the other hand, if the Motion is denied, Mr. Owoc will be subject to only $3.4 million in taxes related to the sale this year, but will *still* retain deductions that could save him $19 million on future taxes.

3.       Since 1994, Mr. Owoc has been the beneficiary of tens of millions of dollars of tax savings from VPX's S-Corp status. Having reaped the benefits of VPX's S-Corp status for

_____

[1]  The address of the Debtors is 1600 N. Park Drive, Weston, FL 33326. The last four digits of the Debtors' federal tax identification numbers are: (i) Vital Pharmaceuticals, Inc. (8430); (ii) Bang Energy Canada, Inc. (5454); (iii) JHO Intellectual Property Holdings, LLC (0010); (iv) JHO Real Estate Investment, LLC (9394); (v) Quash Seltzer, LLC (6501); (vi) Rainbow Unicorn Bev, LLC (2254); and (vii) Vital Pharmaceuticals International Sales, Inc. (8019).

[2]  Capitalized terms not defined herein have the meanings given in the Motion.

12314991-1

decades, Mr. Owoc now wants to shed the potential burden of such status by terminating it — on the eve of closing of the sale of substantially all of the Debtors' assets — with the stated goal of forcing VPX to bear the tax bill for that sale. Mr. Owoc knew for months that the Debtors were contemplating a sale, and he knew that any gains on the sale would be passed through to him just as they had been for the past 29 years. But Mr. Owoc took no action. By delaying, Mr. Owoc has not only prevented the Debtors from structuring a transaction in a way that could have minimized taxes to the estate, but also captured over $22 million of net operating losses ("NOLs") in 2023 alone *for himself* that VPX could have used to offset its tax liability.

4.       Mr. Owoc argues that he should be able to foist these tax liabilities on the Debtors because, as VPX's sole shareholder, he could have terminated VPX's S-Corp status at any time pre-bankruptcy. And he now complains that, because VPX is in bankruptcy (a path that Mr. Owoc authorized and benefitted from), its S-Corp status means that Mr. Owoc pays taxes on the Monster Sale[3] even though he will not receive any proceeds from that sale. However, Mr. Owoc is wrong that his historical control over VPX means that valuable tax attributes *that benefit VPX* — and, in bankruptcy, its creditors — are his to destroy. Under the Bankruptcy Code, those tax attributes are assets of VPX that are to be distributed consistent with the absolute priority rule. And the automatic stay is designed so that Mr. Owoc cannot jump the line and pick up tax savings for himself at the expense of creditors.

---

[3] The "Monster Sale" means the sale of substantially all of the Debtors' assets to Monster Beverage Corporation pursuant to the Asset Purchase Agreement dated June 28, 2023 and the *Amended Order (I) Authorizing and Approving (A) the Sale of Substantially All of the Debtors' Assets Free and Clear of All Liens, Claims, and Encumbrances and (B) the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in connection therewith, and (II) Granting Related Relief* [D.I. 1658] (the "Sale Order"). The total purchase price payable to the Debtors in the Monster Sale is $370,200,000 (which amount is inclusive of assumed liabilities) and is expected to close by no later than July 31, 2023.

-2-

5.      What's more, the Motion is not just seeking to lift the stay so that Mr. Owoc can take what he represents to be unilateral action.  Mr. Owoc is also seeking to compel the Debtors' CEO to sign documents that will cause VPX to allocate 100% of the tax from the Monster Sale to itself.  The stay applies and Mr. Owoc does not and cannot show cause to lift it, particularly given there is no justification for compelling the Debtors to take affirmative action that will harm the estates and stakeholders.

6.      The Motion should be denied.

## BACKGROUND

### I.    Mr. Owoc has reaped millions in tax savings from VPX's S-Corp status.

7.      Under the Internal Revenue Code, VPX's S-Corp status meant that all of its income, losses, deductions, and credits were passed through to Mr. Owoc and taxed as though they were his own.  *See* 26 U.S.C. §§ 1363(a), 1366; Cabrera Report[4] ¶ 22.  Had VPX been a C-Corp, it would have paid corporate income tax each year.  *See* 26 U.S.C. § 11(a); Cabrera Report ¶ 22.  In addition to those taxes, any distributions that VPX made to Mr. Owoc as its sole shareholder would then have been taxed as Mr. Owoc's income on his individual tax returns.  *See* 26 U.S.C. § 301; Cabrera Report ¶ 8.  As the sole shareholder of VPX, Mr. Owoc would have effectively borne the full cost of this "double-taxation," as tax at VPX would reduce amounts available for distribution to Mr. Owoc.

8.      For example, in 2022 alone, VPX's operating losses of $57.5 million will translate to $20 million of potential future tax savings to Mr. Owoc.  *See* Cabrera Report ¶ 23.

---

[4] References to the "**Cabrera Report**" are to the Expert Report of Richard E. Cabrera, JD, CPA, attached hereto as **Exhibit 1**.  The Debtors intend to call Mr. Cabrera as an expert witness at trial, and expect Mr. Cabrera's testimony to be consistent with the statements contained in his report.

12314991-1

II.  **Despite having many months of advance warning, Mr. Owoc seeks to change VPX's tax status only on the eve of the Monster Sale.**

9.      When VPX filed its chapter 11 petition in October 2022, Mr. Owoc was VPX's sole shareholder, sole director, and CEO.  *See* DiDonato First Day Decl. ¶ 23 [ECF No. 26].  Mr. Owoc was aware of VPX's chapter 11 filing.  July 11, 2023 Hearing Tr. 175:7-13 ("Q. [] Mr. Owoc, you just testified that you were aware that Vital Pharmaceuticals was in bankruptcy, correct?  A. Vital Pharmaceuticals, yes . . . .").  In the months leading up to the bankruptcy, Mr. Owoc had approved a marketing process that sought to sell Vital Pharmaceuticals' business.  *See* ECF No. 23, Ex. B (Rothschild Engagement Letter dated April 8, 2022, bearing Mr. Owoc's signature).  And while VPX was in bankruptcy, Mr. Owoc presided over weekly board meetings where the sale of VPX's assets was almost always discussed.  *See* DiDonato Decl.[5] ¶ 7.

10.      Mr. Owoc has received sophisticated tax advice regarding VPX's S-Corp status for years: he retained Grant Thornton to assist with both his and VPX's taxes in November 2020.  *See* Grant Thornton Application Ex. B [ECF. No. 643] (engagement letter); ECF No. 1317 at ¶ 6 ("Because VPX is taxed as an S corporation, Grant Thornton also was retained by John Owoc . . . to assist Mr. Owoc in preparing his own personal tax returns for the 2020 tax year cycle.").

11.      Mr. Owoc apparently has been preparing for a dispute over VPX's S-Corp status since at least April, when he objected to Grant Thornton's continued representation of VPX.  *See Objection to Expedited Supplemental Application for Approval to Employ Grant Thornton LLP* [ECF No. 1255] (Apr. 25, 2023).  Mr. Owoc argued that "[t]he Grant Thornton LLP services at issue—assisting with IRS audits and providing advice with respect to a sale of the Debtor's assets—could directly prejudice Mr. Owoc.  Tax savings for the Debtor could result in increased

---

[5] References to the "**DiDonato Decl.**" are to the *Declaration of John C. DiDonato in Support of Debtors' Objection to the Motion* dated July 26, 2023, attached hereto as **Exhibit 2**.

tax liability for Mr. Owoc." *Supplement to Objection to Expedited Supplemental Application for Approval to Employ Grant Thornton LLP* ¶ 5 [ECF No. 1306] (May 1, 2023).

12.    The Debtors, meanwhile, made no secret that they were considering an asset sale to Monster.  Given his deep involvement in the Debtors' affairs for the majority of this case, Mr. Owoc cannot seriously contend that he was unaware that a sale process was under way.  And he no doubt was aware that a sale would not result in a recovery to equity.[6]

13.    Yet, despite having many months to notify the Debtors of his desire to convert VPX to a C-Corp, Mr. Owoc instead waited to file the Motion until the day before the sale hearing.  *See* Motion [ECF No. 1627] (filed July 11, 2023).  By then, the Debtors had already entered into and filed the Monster APA*, see* ECF No. 1556, and were without time or funding to pivot to a transaction structure that could have minimized or otherwise addressed the taxes about which Mr. Owoc now complains, *see* ECF No. 1551.

14.    If the Motion were granted, Mr. Owoc's strategic delay would have the inequitable result of costing the Debtors upwards of $27.5 million while he would stand to receive millions of dollars of future tax savings.  Because Mr. Owoc can use operating losses from the period before VPX is converted into a C-Corp to offset his income and gain, it is in his interest to wait as long as possible (up until the Monster Sale closes).  The tax benefit is significant:  VPX has incurred an estimated $22 million in NOLs this year alone.  *See* Cabrera Report ¶ 24.  Had it been converted to a C-Corp before January 1, 2023, those losses could have offset part of the income generated by the Monster Sale.  *See id.*  Instead, if VPX is converted to a C-Corp and is forced to make the

---

[6] *See* June 7, 2023 Hearing Tr. at 30:16-17 (the Court informing Mr. Owoc's counsel that "[t]here is no equity at the end of the day").

12314991-1

"closing-of-the-books" election on July 28, as the Motion requests, *Mr. Owoc* will retain those $22 million of loss carryforwards.  *See* Cabrera Report ¶ 25.

**III.   <u>If the Motion is granted, VPX is estimated to incur upwards of $27.5 million in taxes, and Mr. Owoc will still keep tens of millions in tax-reducing loss carryforwards.</u>**

15.     If Mr. Owoc wins the Motion, converts VPX to a C-Corp, and obtains an order requiring Mr. DiDonato to sign the form necessary to make the "closing-of-the-books" election, then VPX will be saddled with tax obligations that are estimated to be more than $27.5 million. *See* Cabrera Report ¶ 11.

16.     The Monster Sale is expected to yield approximately $11.6 million of residual proceeds for general unsecured creditors after amounts required under the Sale Order and other "100 cent" claims are paid or reserved for.  *See* DiDonato Decl. ¶¶ 9-10.  In other words, if Mr. Owoc wins the Motion, the taxes associated with the Monster Sale will swallow all the cash proceeds that were expected to generate recoveries for general unsecured creditors.

17.     In addition to saddling VPX with what is estimated to be a multi-million-dollar tax bill, Mr. Owoc will still retain significant tax benefits from VPX's historical S-Corp status.  Mr. Owoc would receive VPX's approximately $22 million of ordinary business losses from the period in 2023 before the S-Corp conversion, which equates to a potential benefit to Mr. Owoc of approximately $8 million. *See* Cabrera Report ¶ 12.  And upon VPX's liquidation, Mr. Owoc will realize capital losses of over $50 million, which he can carry forward to reduce current or future capital gains, potentially saving Mr. Owoc over $12 million in future taxes. *See id.* ¶ 13.

**IV.   <u>Maintaining VPX's S-Corp status is estimated to cost Mr. Owoc $3.4 million in taxes this year, but he would also retain $72 million in loss carryforwards, reducing his future taxes.</u>**

18.     If VPX's S-Corp status remains unchanged, then Mr. Owoc's tax bill is estimated to be approximately $3.4 million.   *See* Cabrera Report ¶ 14.  The delta between Mr. Owoc's

-6-

12314991-1

estimated tax bill following the Monster Sale if VPX remains an S-Corp ($3.4 million) and VPX's if it is converted to a C-Corp ($27.5 million) comes from the historical losses that the Debtors and their affiliates generated and passed on to Mr. Owoc — in other words, benefits of VPX's historical S-Corp status that Mr. Owoc will retain under any circumstance.

19.    However, even after accounting for 2023 taxes, Mr. Owoc would be expected to still carry forward a net capital loss of approximately $49 million, and a NOL of approximately $23 million, which together have the potential to reduce his future taxes by up to $19 million.  *See id.* ¶¶ 15-16.

## ARGUMENT

20.    Mr. Owoc's delay in bringing the Motion should result in its denial; he could have acted months ago and his failure to do so has greatly prejudiced the Debtors.  The Motion is no ordinary lift-stay request; instead, Mr. Owoc is seeking to require the Debtors' CEO to execute tax filings that will divert tens of millions of dollars from creditors.  Even if Mr. Owoc were correct that he is entitled to lift the stay so that *Mr. Owoc* can make filings with the IRS, there is no basis for compelling *the Debtors* to act.  Moreover, Mr. Owoc is incorrect — S-Corp status is property of the estate and there is no reason to lift the stay here.

**I.    Mr. Owoc's unwarranted delay in bringing the Motion has greatly prejudiced the Debtors; the Motion is barred.**

21.    The Motion is precluded under the doctrine of laches because Mr. Owoc's delay in seeking to convert VPX from an S-Corp to a C-Corp is inexcusable and prejudicial to the Debtors.  Laches "serves to bar suit by a [petitioner] 'whose unexcused delay, if the suit were allowed, would be prejudicial'" to the opposing party.  *Russell v. Todd*, 309 U.S. 280, 287 (1940).  The relief sought through the Motion is barred under the doctrine of laches if: (1) there was a delay in asserting a right or a claim, (2) the delay was not excusable, and (3) the Debtors will suffer undue

prejudice as a result.  *See General Lending Corp. v. Cancio*, 578 F. App'x 832, 834 (11th Cir. 2014).

22.     Whether laches bars a claim depends on "the circumstances of a case and is a question primarily addressed to the discretion of the trial court."  *In re Storick*, No. 18-15728, 2020 WL 211471, at *5 (Bankr. S.D. Fla. Jan. 13, 2020), *aff'd sub nom. Storick v. CFG LLC*, No. 20-CV-80126, 2021 WL 716695 (S.D. Fla. Jan. 21, 2021), *aff'd sub nom. In re Storick*, No. 21-10563, 2021 WL 3615358 (11th Cir. Aug. 16, 2021).  The effect of delay and whether allowing the claim would be inequitable to the respondent are the focal points.

> [L]aches does not result from a mere lapse of time but from the fact that, during the lapse of time, changed circumstances inequitably work to the disadvantage or prejudice of another if the claim is now to be enforced.

11A Charles Alan Wright, et al., FEDERAL PRACTICE & PROCEDURE § 2946 (3d ed. 2019).

23.     Here, Mr. Owoc's delay not only prejudiced the Debtors, but also unjustly enriches Mr. Owoc — to the tune of millions of dollars — at the estates' and creditors' expense.

24.     Prior to the Petition Date, Mr. Owoc was sole shareholder, CEO, and sole board member of VPX.  Mr. Owoc has long known that VPX would file for bankruptcy — he authorized it; would seek a sale of its assets in bankruptcy — he authorized that; and that Monster was a potential buyer — he attended weekly board meetings for months following the Petition Date discussing this possibility.  *See DiDonato Decl.* ¶¶ 6-7.  And the Debtors made no secret — to the public or to Mr. Owoc — that they were considering a section 363 sale.  A motion to approve bid procedures, which Mr. Owoc authorized, was filed on January 27, 2023.  *See ECF No. 707.*  The bid procedures were approved on February 24, 2023.  *See ECF No. 854.*  And, of course, Mr. Owoc had a front row seat, attending board meetings where the sale was discussed weekly.  *See DiDonato Decl.* ¶ 7.

12314991-1

25.     During this entire time, Mr. Owoc was receiving sophisticated tax advice from Grant Thornton, and both he and Grant Thornton were aware that any gains on VPX's assets would be taxable to Mr. Owoc as a result of VPX's S-Corp status.  Indeed, Mr. Owoc objected to Grant Thornton's retention in April, *see* ECF No. 1255, and argued that VPX's S-Corp status would cause a conflict because "tax savings for the Debtor could result in increased tax liability for Mr. Owoc," ECF No. 1306.

26.     During all of this time, Mr. Owoc could have sought to convert VPX from an S-Corp to a C-Corp, but he chose not to do so.  Instead, he filed the Motion on July 11, the day before the hearing to consider the Monster Sale.

27.     Mr. Owoc's delay in seeking to convert VPX to a C-Corp could translate to major tax savings for him, all at the estates' and creditors' expense.  Because Mr. Owoc can use NOLs from the period before VPX is converted into a C-Corp to offset his taxable income and gain, it is in his interest to wait as long as possible (up until just before the Monster Sale closes).  Here, the tax benefit of delaying conversion is significant:  VPX has incurred an estimated $22 million in NOLs so far this year.  *See* Cabrera Report ¶ 24.  Had it been converted to a C-Corp before January 1, 2023, those losses could have offset part of the income generated by the Monster Sale. *See id.*  Instead, if VPX is converted to a C-Corp and is somehow forced to make the "closing-of-the-books" election on July 28, 2023, Mr. Owoc will get the tax benefit of those losses.  *See id.*  In addition, had VPX been converted to a C-Corp before January 1, 2023, it would have been able to offset almost three quarters of the estimated taxable income associated with the Monster Sale using a $57.5 million NOL carryforward from 2022.  *See id.*  Instead, if the Motion is now granted, that NOL will inure to the benefit of Mr. Owoc.  *See id.* ¶ 25.

28.     Moreover, had Mr. Owoc acted sooner, the Debtors could have sought to structure a transaction to minimize any associated tax, including by implementing a change-of-control transaction through a chapter 11 plan.  Instead, by the time Mr. Owoc brought the Motion, the Debtors were already out of runway under the DIP Financing and had no viable alternative to the Monster Sale.  In short, if the Motion is granted, then the Debtors will still have to close the Monster Sale and incur the taxes, but proceeds would likely go to pay tax liabilities rather than be made available to unsecured creditors.  Had Mr. Owoc acted sooner, this inequitable outcome could have been avoided.  Instead, Mr. Owoc waited many months before filing the Motion, despite having all the information necessary to raise the issue in a timely manner.  During this time, Mr. Owoc was advised by sophisticated tax advisors and was individually represented by no fewer than six law firms in connection with the bankruptcy cases.  The delay not only threatens the Debtors' potential chapter 11 plan — by potentially saddling the Debtors with taxes that could have been reduced or avoided entirely had the Debtors had more notice of Mr. Owoc's plans — but also benefitted Mr. Owoc at the Debtors' expense by allowing him to harvest millions of dollars of tax deductions that would otherwise have belonged to the Debtors.  The Motion should be denied as the relief sought is barred under the doctrine of laches.

## II. Mr. Owoc has provided no basis to force the Debtors to sign IRS forms that will greatly prejudice their creditors.

29.     In a typical lift-stay motion, the Court is asked to lift the stay so that *the movant* can take action that is otherwise stayed.  Here, by contrast, Mr. Owoc is seeking an extraordinary order that would not only allow *him* to file paperwork necessary to effect the conversion-by-revocation of VPX from an S-Corp to a C-Corp, but separately would compel *VPX* to sign the forms needed to saddle itself with what likely could be tens of millions of dollars in tax liabilities. *See* Motion ¶ 30 (requesting that the Court "direct the Debtors to cooperate with Mr. Owoc with

-10-

respect to any steps that are reasonably necessary to effectuate the termination VPX's status as an S-Corp"); *see also id.* ¶ 31 (same).

30.     Mr. Owoc requires this additional relief because the Internal Revenue Code *does not allow* a shareholder to unilaterally file the paperwork necessary to either (i) effect the S-Corp-to-C-Corp conversion-by-revocation and (ii) allocate 100% of the tax liability from the Monster transaction to VPX.  Instead, the IRS will only accept the relevant forms if signed by an authorized representative of VPX, which Mr. Owoc is not.

**A.     Termination of VPX's S-Corp status "by revocation" requires a VPX officer's signature.**

31.     An S-Corp election may be "terminated by revocation," IRC § 1362(d)(1)(A), resulting in the corporation's conversion to a C-Corp.  The election must be signed by a person authorized to sign the return required to be filed under IRC § 6037.  *See* Treas. Reg. § 1.1362-6(a)(1).  A return of an S-Corp must be signed by the president, vice-president, treasurer, assistant treasurer, chief accounting officer, or any other officer duly authorized so to act.  *See* IRC § 6062; Treas. Reg. § 1.6062-1(a)(1) (same).  By contrast, shareholders are required to sign a consent statement that is attached to the revocation form.  *See* IRC § 1362(d)(1)(B); Treas. Reg. § 1.1362-2(a)(1), § 1.1362-6(a)(3)(i).  But there is no role for the shareholder in executing the revocation form itself — that must be done by an officer of the corporation.

32.     The IRS mandates strict compliance with the "authorized officer" signatory requirement:  The "requirement that the Form [] be signed by an authorized officer is not merely procedural or directory, but rather a substantive requirement . . . ."  *Jon P. Smith*, TC Memo 1988-18, PH TCM P 88018, 54 CCH TCM 1535, pp. 3-4.  And the IRS will not accept S-Corp-related elections that are not executed by an authorized *officer* of the corporation.  *See id*. (finding the

subchapter S election to be defective where a completed form was unsigned by an authorized officer of the corporation).

**B.      Only VPX — not Mr. Owoc — can make the "closing-of-the-books" election and, again, only with a VPX officer's signature.**

33.      Converting VPX from an S-Corp to a C-Corp will not accomplish Mr. Owoc's goal of shifting 100% of tax from the Monster Sale to VPX.  Unless Mr. Owoc can also *force* VPX to make the "closing-of-the-books" election — something he cannot do unilaterally — he will still be allocated at least 58% of the resulting taxable income generated by the Monster Sale, and, possibly, all or substantially all of that income.

34.      When an S-Corp is converted to a C-Corp mid-year, its pre-conversion and post-conversion taxes must be calculated differently.  The Internal Revenue Code therefore creates two "short years" applicable to the entity — an "S short year" from before the conversion and a "C short year" on and after the date of conversion.  *See* 26 U.S.C. § 1362(e)(1)(A), (B).  Taxes during the "S short year" are paid by the shareholder, because for that portion of the year, the S-Corp election was in effect.  And taxes during the "C short year" are paid by the newly minted C-corporation.  *See* 26 U.S.C. §§ 11; 1363; 1366.

35.      *By default*, items of income, loss, deduction, or credit are allocated between the "S short year" and the "C short year" using the "pro rata allocation."  *See* 26 U.S.C. § 1362(e)(2).  Under the pro rata allocation, such items are allocated based on how much of the year had passed at the time that the conversion occurred and how long the company continues to operate following the conversion.  So if VPX was converted to a C-Corp on August 1, 2023, and continued to operate through December 31, 2023, seven-twelfths of the income, losses, deductions, and credits for the entire taxable year would be allocated to the "S short year" — *i.e.*, taxable to Mr. Owoc — and five-twelfths of the income, loss, deduction, and credits would be allocated to the "C short year"

-12-

12314991-1

— *i.e.*, taxable to VPX.  *See id.*  Here, that would translate to approximately $10 million in taxes payable by Mr. Owoc and approximately $9.2 million in taxes payable by VPX.  *See* Cabrera Report ¶ 21.  And if VPX were to liquidate before December 31, 2023, an even greater percentage of the taxes would be allocated to the "S short year," because the "C short year" would be smaller by comparison.  *See* Cabrera Report ¶ 21.  For example, if VPX converts to a C-Corp on August 1, 2023 and liquidates on August 31, 2023, then seven-eighths of the total tax liability would be allocated to Mr. Owoc.

36.    By contrast, if the corporation voluntarily makes the "closing-of-the-books" election, then the "normal tax accounting rules" apply, meaning that items are assigned to the "S short year" or the "C short year" depending on whether they occurred before or after the conversion.  *See* 26 U.S.C. § 1362(e)(3).  Here, if Mr. Owoc were able to compel the Debtors to make the "closing-of-the-books" election, then 100% of the income generated by the Monster Sale, and thus 100% of the resulting tax liability, would be allocated to VPX.

37.    The Internal Revenue Code is specific that "the corporation" must make the "closing-of-the-books" election.  *See* 26 U.S.C. § 1362(e)(3)(A) (the "*corporation may* elect to have [the pro rata allocation] not apply" (emphasis added)); Treas. Reg. § 1.1362-6(a)(5) (same).  And, as with the S-Corp-to-C-Corp conversion, the Internal Revenue Code lays out a specific role for the shareholder — not to file the form by which the election is made, but merely to indicate "consent" to the corporation's election.  26 U.S.C. § 1362(e)(3)(B); Treas. Reg. § 1.1362-6(a)(5).

38.    And, as with the S-Corp-to-C-Corp conversion by revocation, only an officer of VPX can authorize VPX's making the "closing-of-the-books" election.  *See* Treas. Reg. § 1.1362-6(a)(5); Treas. Reg. § 1.1362-6(a)(1); 26 U.S.C. § 6037; 26 U.S.C. § 6062; Treas. Reg. § 1.6062-1(a)(1).

      **C.**    **Mr. Owoc is not authorized to sign for VPX and he has offered no reason why VPX should be required to sign IRS documents against the will of its Board and officers.**

39.     Mr. Owoc was terminated as CEO on March 9, 2023, and simultaneously removed from VPX's Board of Directors. *See* DiDonato Decl. ¶ 8. The only authorized officer of VPX for IRS purposes is Mr. DiDonato, the Debtors' Interim CEO. *Id.* Mr. Owoc has no authorization to sign tax forms on behalf of VPX. *Id.*

40.     The VPX Board has duly considered the issue and unanimously voted to remain an S-Corp. *See* DiDonato Decl. ¶ 12. It has also duly considered and unanimously voted against making the "closing-of-the-books" election in the event that VPX is converted from an S-Corp to a C-Corp. *See id.* Neither result is surprising, as the Board's duty is to the company — not its shareholders — and, when the company is insolvent, the interests of creditors must be considered.[7]

41.     Even if Mr. Owoc is correct that VPX's S-Corp status is not property of the estate — he isn't — or if he's correct that the stay should be lifted so Mr. Owoc can take action to terminate VPX's S-Corp status — again, he isn't — he has offered no reason at all why VPX should *also* be required to take actions that will harm the Debtors' estates. It is one thing to seek to lift the automatic stay so that the movant can take unilateral action; it is an entirely different — and extraordinary — thing to ask the Court to *both* lift the stay *and* order a Debtor to take action that will harm the estates. Even if the Court agrees with Mr. Owoc that the stay does not apply or

---

[7] *See, e.g.*, *In re Sigma-Tech Sales, Inc.*, 570 B.R. 408 (Bankr. S.D. Fla. 2017) ("Under Florida law, an officer's or director's fiduciary duties are extended to the creditors of a corporation when the corporation becomes insolvent or is in the vicinity of insolvency."); *In re SOL, LLC*, No. 09-12684-BKC-AJC, 2012 WL 2673254, at *16 (Bankr. S.D. Fla. July 5, 2012) ("The fiduciary duties of officers and directors are extended to the creditors of a corporation when the corporation becomes insolvent or is in the 'vicinity of insolvency.'"); *In re Trafford Distrib. Ctr., Inc.*, 431 B.R. 263 (Bankr. S.D. Fla. 2010), judgment set aside sub nom. (S.D. Fla. 2019) ("Under Florida law, fiduciary duties of corporate officers and directors are extended to creditors of corporation when corporation becomes insolvent or is in the vicinity of insolvency.").

should be lifted, it should not order the Debtors to sign IRS forms and statements that are plainly against the estates' and creditors' interests.

42.     What's more, to obtain an injunction compelling the Debtors to sign IRS forms and statements, Mr. Owoc needed to file an adversary proceeding.  *See* Fed. R. Bankr. P. 7001(7) ("The following are adversary proceedings: . . . a proceeding to obtain an injunction or other equitable relief . . . .").[8]  He has not.

### III.  <u>VPX's S-Corp Status is Property of the Estate.</u>

43.     The Bankruptcy Code broadly defines "property" to include "all legal or equitable interests of the debtor" "wherever located and by whomever held."  11 U.S.C. § 541; *see also United States* v. *Whiting Pools*, 462 U.S. 198, 204 (1983) ("Both the congressional goal of encouraging reorganizations and Congress' choice of methods to protect secured creditors suggest that Congress intended a broad range of property to be included in the estate.").  "[I]n determining the scope of § 541 [the Court] must consider the purpose animating the Bankruptcy Code," including to "bring anything of value that the debtors have into the estate."  *In re Prudential Lines Inc.*, 928 F.2d 565, 573 (2d Cir. 1991), *cert. denied sub nom.* 502 U.S. 821, (quoting H.R. Rep. No. 95-595, 95th Cong., 2d Sess. 176).

44.     The weight of the caselaw, applying this intentionally broad definition, concludes that a corporate debtor's special tax attributes — including S-Corp status — are a property interest within section 541.  *See, e.g.*, *In re Frank Funaro Inc.*, 263 B.R. 892, 898 (B.A.P. 8th Cir. 2001) (finding that the corporate debtor's prepetition right to make or revoke its subchapter S status constitutes "property" or "an interest of the debtor in property" within the meaning of the

---

[8]  Even if Mr. Owoc believes that the Debtors' S-Corp status is his property, and so the Debtors must be compelled to 'give it back' by signing IRS forms, an adversary proceeding would have been required.  *See* Fed. R. Bankr. P. 7001(1) (adversary proceeding required for "a proceeding to recover money or property").

12314991-1

Bankruptcy Code); *In re Bakersfield Westar, Inc.*, 226 B.R. 227, 233-34 (B.A.P. 9th Cir. 1998) (finding that S-Corp status "has value to a debtor's estate and is therefore properly characterized as 'property'"); *In re Walterman Implement Inc.*, Adv. No. 06-9067, 2006 WL 1562401, at *3 (Bankr. N.D. Iowa May 22, 2006) (holding that debtor's subchapter S status is property of the estate); *In re Trans-Lines W., Inc.*, 203 B.R. 653, 661-62 (Bankr. E.D. Tenn. 1996) ("[T]his court holds that the Debtor possessed a property interest (i.e. a guaranteed right to use, enjoy and dispose of that interest) in its Subchapter S status.").

45.     With S-Corp status, in particular, the corporate debtor has the right to pass its taxable income and losses to its shareholder.  That right has significant benefits to the corporation — with the corporation paying zero tax — and to its shareholders — with the shareholders avoiding "double tax" on both the corporation's income and their distributions from it.

46.     S-Corp status provides similar economic benefit to a debtor as other types of tax attributes that Florida courts have held are property under section 541.  *In re Taylor*, 386 B.R. 361 (Bankr. S.D. Fla. 2008) (NOL carrybacks are property of the estate); *United States v. Kapila*, 402 B.R. 56 (S.D. Fla. 2008) (NOL carryback waiver is property of the estate); *In re LaPlana*, 363 B.R. 259 (Bankr. S.D. Fla. 2007) (future tax refunds are property of the estate).  And, throughout the Eleventh Circuit, courts have found a wide variety of tax attributes to be property of the estate based on the benefit that the estate can realize, whether in the form of a tax refund or in the form of a tax savings.  *See, e.g.*, *In re Mooney*, 526 B.R. 421 (M.D. Ga. 2015) (tax credits are property of the estate).

47.     *Majestic*, which Mr. Owoc relies on extensively, attempted to distinguish away this body of precedent.  But it is neither binding on this Court nor persuasive.

48.     *First*, to state the obvious, *Majestic* is a Third Circuit case.

49.     *Second*, *Majestic* was considering a different issue: whether a non-debtor S-Corp's termination *of its own* S-Corp status (which, as a matter of law had the effect of automatically terminating the Debtor's qualified subchapter S subsidiary ("Q-sub") pass-through status) violated the stay.[9]  The *Majestic* court's reasoning relied heavily on the non-debtor's unilateral control over the decisions that caused the adverse tax effect to the Q-sub.  The issue in *Majestic* differs significantly from this situation because, as described above, Mr. Owoc is not only seeking to take unilateral action himself which will incidentally affect the Debtors' tax status, but he is also seeking an order affirmatively compelling VPX to sign tax documents that will affect the conversion and allocation of tax to itself.  *See* Argument § 2 *supra*.

50.     Most fundamentally, however, *Majestic*'s cramped view of 'property of the estate' is inconsistent with section 541.  As *Majestic* acknowledged, the Supreme Court has held NOL carrybacks to be property of the estate, based on the same logic as courts that have concluded S-Corp status is property of the estate:  "[T]he term 'property' has been construed most generously and an interest is not outside its reach because it is novel or contingent or because enjoyment must be postponed."  *Majestic Star Casino, LLC v. Barden Dev., Inc.* (*In re Majestic Star Casino, LLC*), 716 F.3d 736, 750 (3d Cir. 2013) (quoting *Segal v. Rochelle*, 382 U.S. 375, 379 (1966)) (internal quotation marks omitted).  *Majestic* sought to distinguish S-Corp status from NOLs on the ground that S-Corp status is ordinarily dictated by the shareholder through the shareholder's control over the corporation.  But the fact that a non-debtor can exercise control over property does not mean that a debtor has no interest in such property.  Indeed, NOLs themselves — which the Supreme Court has concluded are property of the estate — can be eliminated by the unilateral actions of

---

[9]  For this reason, even if it were binding, this Court could reject *Majestic*'s analysis as dicta:  only the paragraphs regarding Q-sub status towards the end of the opinion were necessary to reach the Court's result.

non-debtor shareholders. Moreover, section 362(a)(3) would not need to protect against acts "to exercise control over property of the estate" if the fact that a third party could ordinarily exercise such control meant that such property was not property of the estate. And many property interests of debtors are subject to control by non-debtors. Nor does the fact that a debtor's interest is contingent, and subject to diminution by the actions of third parties, render it not property of the estate within section 541. Again, it is quite common for debtors to have property interests that are contingent or that may never vest based on the actions of third parties. NOLs are, again, just one example. *See also, e.g.*, Opinion, *In re Boy Scouts of Am.*, No. 20-10343 (Bankr. D. Del. July 30, 2022), ECF No. 10136 (charitable organization's contingent right to residual assets of nondebtor franchisee upon franchisee's hypothetical liquidation was property of the estate).[10]

51. Finally, it is not the case that treating S-Corp status as "property of the estate" would somehow expand the debtor's interest in that property. *See* Motion ¶ 23. Mr. Owoc and VPX still the same rights with respect to VPX's S-Corp status. The only thing that has changed is that the automatic stay operates to stop Mr. Owoc from taking *unilateral action* to affect the debtor's property ahead of all of VPX's creditors. But that is a feature of the Bankruptcy Code, not a bug. The automatic stay ensures that a party like Mr. Owoc, who is not entitled to any distribution from VPX's assets until secured and unsecured creditors are paid in full, does not get to violate the absolute priority rule by exercising control over the debtors' assets before others. Mr. Owoc finds himself in the same position as any person who could — outside of bankruptcy — unilaterally force the debtor to take action or make a payment: once in bankruptcy, he must wait like everyone

---

[10] *See also In re Carlton*, 309 B.R. 67, 71 (Bankr. S.D. Fla. 2004) (finding that a stock option was property of the estate); *In re Knight*, 164 B.R. 372, 375 (Bankr. S.D. Fla. 1994) (finding that debtor's contingent remainder interest in trust was property of the estate).

12314991-1

else for the debtor's assets and liabilities to be determined and for distributions to be made in accordance with the absolute priority rule.

**IV. Even if VPX's S-Corp status is not "property *of* the estate," the stay prevents Mr. Owoc from "any act to obtain possession of . . . property *from* the estate."**

52.    Even if the Court were to find that VPX's S-Corp status is not "property of the estate," it should have no difficulty concluding that it is property *of someone* that is within the estate's possession and/or control, and therefore is still subject to the automatic stay.

53.    "Property" is nothing more than a collection of rights.  *See In re Trans Lines W. Inc.,* 203 B.R. 653, 661 (citing 63A Am.Jur.2d *Property* § 1 (1994); Black's Law Dictionary 1216 (6th ed. 1990)).  For the reasons described above, VPX's right to pass along its income and losses to its sole shareholder for tax purposes is best characterized as property of VPX.  However, if the Court were persuaded that Mr. Owoc's ability to cause VPX to terminate that right outside of bankruptcy makes VPX's S-Corp status property of Mr. Owoc, *it would still be property*.  And this property is within VPX's possession — VPX is the entity with S-Corp status in the IRS records and it is VPX that receives the benefit of not having to pay tax.

54.    The automatic stay does not just stay actions to "obtain possession of property of the estate," it also stays actions to "obtain possession of property . . .*from* the estate."  The caselaw and legislative history make clear that this is intended to allow the debtor to remain in possession of property, even if that property is alleged to belong to someone other than the debtor.  Congress intended for debtors to have time to assess the claims against them and against the property that they hold, even if the property is later determined to be owned by someone else.  *See In re St. Clair*, 251 B.R. 660, 665 (D.N.J. 2000) ("The purpose of this provision is to prevent dismemberment of the estate.  Any distribution of property must be by the trustee after he has had an opportunity to familiarize himself with the various rights and interests involved and with the property available

-19-

for distribution." (quoting 362 Legislative History)); *see also, e.g.*, *In re McBride*, No. 11-03190, 2011 WL 3902991 (Bankr. S.D. Ala. Sept. 6, 2011) (debtor's possessory interest in vehicle was sufficient to invoke stay even if vehicle itself was not property of the estate and it was debatable whether lease of vehicle had been terminated prior to petition date).

55.    Here, that purpose is being served by allowing the Debtors to retain possession of their S-Corp status.  The Debtors believe — based on the many cases that have so held — that VPX's S-Corp tax status is *VPX's* property, not Jack's.  And the Debtors believe that the value of that property — like all other property of a debtor — is required to be distributed pursuant to the absolute priority rule.

56.    To the extent Mr. Owoc believes that he should be reimbursed for any tax liabilities that he incurs while the automatic stay prevents him from regaining control over VPX's S-Corp status, he can file a proof of claim based on that belief.[11]  That claim, *like all claims against the Debtors*, will be subject to reconciliation and then distribution consistent with the absolute priority rule.  By contrast, if Mr. Owoc is able to lift the stay and take control of the property back from the debtors, he will effectively jump to the front of the line, and saddle the estates with potentially millions of administrative claims.  Section 362(a)(3)'s application to attempts to attempts to obtain possession . . . of property *from* the estate is designed to preclude such a result.

**V.    <u>There is no cause to lift the stay.</u>**

57.    In evaluating whether cause exists to lift the automatic stay, courts in the Eleventh Circuit have considered: (1) whether the debtor has acted in bad faith; (2) the "hardships imposed on the parties with an eye towards the overall goals of the Bankruptcy Code"; and (3) the status of

---

[11]  Nothing in this Objection should be construed as an admission by the Debtors that such a claim would be valid and, to the contrary, the Debtors expressly reserve the right to object to such a claim on any basis.

pending state court proceedings.[12]  *In re Feingold*, 730 F.3d 1268, 1277 (11th Cir. 2013); *see also Siewe v. Locci (In re Siewe)*, 730 F. App'x 871, 877 (11th Cir. 2018).  "The movant has the initial burden to show that 'cause' exists."  *In re Chan*, No. 6:18-bk-03297-KSJ, 2019 Bankr. LEXIS 2702, at *4 (Bankr. M.D. Fla. June 3, 2019).  Should the movant "fail[] to make an initial showing of cause, [] the court should deny relief without requiring any showing from the debtor that it is entitled to continued protection."  *Jackson v. GMAC Mortg., LLC*, No. 12-00111-KD-B, 2013 U.S. Disk LEXIS 181066, at *8 (S.D. Ala. Dec. 30, 2013) (quoting *In re Sonnax Indus., Inc.*, 907 F.2d 1280, 1285 (2d Cir. 1990)).  Moreover, "[i]f the movant is an unsecured creditor, the policies of the automatic stay weigh against granting the relief requested."  *Id.* at *7-8.

**A.  The Debtors have acted in good faith.**

58.     The Debtors have been operating their business with the sole goal of maximizing the value of their estates for the benefit of creditors.  The Debtors have long disclosed their intent to sell substantially all of their assets in bankruptcy.  The Monster Sale, as the Court recently concluded, maximizes the value of the Debtors' assets.  *See* Sale Order ¶¶ M-P.  Had the Debtors received a higher offer for their assets that would have resulted in a payment to Mr. Owoc as shareholder, the Debtors would of course have accepted it, but no such higher offer was received after a months-long process.

59.     The Debtors' interest in maintaining their S-Corp status is not to prejudice Mr. Owoc, but to preserve limited assets for existing unsecured creditors.  Indeed, Mr. Owoc's tax liability from the sale — if VPX remains an S-Corp — is likely to be tens of millions of dollars less than the Debtors' liability if VPX is converted to a C-Corp, the Debtors have sought

---

[12]  This third factor is not relevant to the issues in this Motion.  As a result, the Debtors have not addressed it below.

resolutions that would cover a large portion of that liability, while still allowing for a net distribution of proceeds from the Monster Sale to creditors.

60.     In sum, the Debtors are seeking to use bankruptcy to maximize distributions to creditors.  That is the very definition of good faith.

**B.    Lifting the stay will impose a much greater harm on the Debtors than on Mr. Owoc.**

61.     The "hardships imposed on the parties with an eye towards the overall goals of the Bankruptcy Code" clearly favor maintaining the stay here.

62.     If the Motion is granted, substantially all of the sale proceeds that would otherwise go to unsecured creditors in this matter will instead go to the IRS.  The Debtors will incur up to $27.5 million in taxes, which will need to be paid to confirm a plan.  *See* Cabrera Report ¶ 11.  The Debtors are only expected to have $11.6 million of proceeds from the Monster Sale available for unsecured creditors.  *See* DiDonato Decl. ¶ 10; Sale Order ¶ 16.  A $27.5 million tax liability would therefore ensure no plan can be confirmed, and force the Debtors to convert to chapter 7.

63.     In the event that Mr. Owoc is granted relief from stay to convert VPX to a C-Corp, but cannot force the Debtors to make the "closing-the-books" election, the Debtors expect to promptly liquidate.  *See* DiDonato Decl. ¶ 11.  Under the pro rata allocation, the sooner the Debtors liquidate, the shorter the "C short year" and the less tax allocable to the Debtors.  *See* Cabrera Decl. ¶ 21 ("If the Company were to liquidate before the end of the calendar year, the Shareholder would be allocated a larger share of the Company's taxable income.").  So if the stay is lifted, then it will therefore become imperative for the Debtors to liquidate as soon as possible to minimize their tax obligations.

64.     Changing VPX's tax status is particularly inequitable given the comparative size of Mr. Owoc's potential tax liability if VPX remains an S-Corp — $3.4 million — and the fact that

12314991-1

Mr. Owoc would also retain VPX's loss carryforwards that he could use to offset his future taxes by approximately $19 million. *See* Cabrera Report ¶¶ 14-16.

65.     In sum, the harms to the Debtors — and their creditors — if the Motion is granted (up to $27.5 million in administrative priority claims and the liquidation of the Debtors) far outweigh impact on Mr. Owoc if the Motion is denied ($3.4 million in 2023 tax, paired with approximately $19 million of potential future tax savings to Mr. Owoc).[13]

**C.    Mr. Owoc is, at best, only an unsecured creditor; therefore, "the policies of the automatic stay weigh against" granting his motion.**

66.     The automatic stay is designed to prevent a "race to the courthouse" that can destroy value as creditors compete to obtain as much as they can from a debtor as quickly as possible. Because unsecured creditors have no property interest in particular collateral/property of the debtor, the automatic stay has special force with respect to their claims.

67.     Mr. Owoc did not loan the Debtors money on a secured basis. And while Mr. Owoc has recently filed amended proofs of claim asserting secured claims against the Debtors — even though his original proofs of claim asserted the same theories but without an assertion of secured status — the proofs of claim themselves make clear that Mr. Owoc himself is not asserting a secured claim. Instead, Mr. Owoc claims that certain entities of which he is a shareholder have subrogation rights against the Debtors based on payments that those entities may make to Truist. But Mr. Owoc himself has no basis to assert a secured claim. In fact, the Debtors do not believe that Mr. Owoc has *any* valid *unsecured* claims against them. At a minimum, however, Mr. Owoc

---

[13]  Finally, if the Motion is denied, there is nothing stopping Mr. Owoc from asserting a claim against the Debtors if he believes that they should bear the tax. Although the Debtors will assert defenses to such a claim, if the Court concludes that Mr. Owoc is correct and the Debtors are required to reimburse him, then Mr. Owoc will have his claim paid in accordance with the absolute priority rule, just like all other creditors.

12314991-1

is not a secured creditor.  Under relevant caselaw, then, the policies of the automatic stay weigh against granting the Motion.

## **CONCLUSION**

68.    VPX's pass-through tax status is property of the estate, and is an asset that should be used for the benefit of its creditors and allocated consistent with the absolute priority rule. Mr. Owoc waited too long to claim otherwise and his late arguments fail on the merits.  Lifting the stay at this juncture would greatly prejudice the Debtors and their creditors, likely forcing a liquidation, while leaving it in place causes much less harm to Mr. Owoc.  The Motion should be denied.

Dated:    July 26, 2023
          Miami, Florida

George A. Davis (admitted *pro hac vice*)
Elizabeth A. Morris (admitted *pro hac vice*)
**LATHAM & WATKINS LLP**
1271 Avenue of the Americas
New York, NY 10020
Telephone:  (212) 906-1200
Email:  george.davis@lw.com
        elizabeth.morris@lw.com

– and –

Andrew D. Sorkin (admitted *pro hac vice*)
**LATHAM & WATKINS LLP**
555 Eleventh Street, NW, Suite 1000
Washington, D.C. 2004
Telephone:  (202) 637-2200
Email:  andrew.sorkin@lw.com

– and –

Joseph C. Celentino[14] (admitted *pro hac vice*)
**LATHAM & WATKINS LLP**
330 North Wabash Avenue, Suite 2800
Chicago, IL 60611
Telephone: (312) 876-7700
Email:  joe.celentino@lw.com

Respectfully submitted,

*/s/ Jordi Guso*
Jordi Guso
Florida Bar No. 863580
Michael J. Niles
Florida Bar No. 107203
**BERGER SINGERMAN LLP**
1450 Brickell Avenue, Suite 1900
Miami, FL 33131
Telephone:  (305) 755-9500
Email:  jguso@bergersingerman.com
        mniles@bergersingerman.com

*Co-Counsel for the Debtors*

---

[14]    Not admitted to practice in Illinois.  Admitted in New York.

12314991-1