# JOINT EXHIBIT 3

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION
www.flsb.uscourts.gov

In re:

VITAL PHARMACEUTICALS, INC., *et al.*,

Debtors.[1]

_____/

Chapter 11 Cases

Case No. 22-17842 (PDR)
(Jointly Administered)

## DEBTORS' OBJECTION TO JOHN H. OWOC'S MOTION TO TERMINATE VITAL PHARMACEUTICALS, INC.'S S-CORP STATUS

1.      The above-captioned debtors and debtors-in-possession (collectively, the "Debtors") submit this Response to the *Emergency Motion of John H. Owoc's [sic] for Confirmation that the Automatic Stay Does Not Apply to Termination of Debtor's Subchapter S Corporation Status or, Alternatively, for Relief from Stay* [ECF No. 1627] (the "Motion").[2]

### PRELIMINARY STATEMENT

2.      Through the Motion, Mr. Owoc seeks to saddle the Debtors with a tax bill estimated to cost the estate upwards of $27.5 million — forcing a chapter 7 liquidation — while he walks away with deductions that could save him approximately $20 million on future taxes. On the other hand, if the Motion is denied, Mr. Owoc will be subject to only $3.4 million in taxes related to the sale this year, but will *still* retain deductions that could save him $19 million on future taxes.

3.      Since 1994, Mr. Owoc has been the beneficiary of tens of millions of dollars of tax savings from VPX's S-Corp status. Having reaped the benefits of VPX's S-Corp status for

---

[1] The address of the Debtors is 1600 N. Park Drive, Weston, FL 33326. The last four digits of the Debtors' federal tax identification numbers are: (i) Vital Pharmaceuticals, Inc. (8430); (ii) Bang Energy Canada, Inc. (5454); (iii) JHO Intellectual Property Holdings, LLC (0010); (iv) JHO Real Estate Investment, LLC (9394); (v) Quash Seltzer, LLC (6501); (vi) Rainbow Unicorn Bev, LLC (2254); and (vii) Vital Pharmaceuticals International Sales, Inc. (8019).

[2] Capitalized terms not defined herein have the meanings given in the Motion.

12314991-1

decades, Mr. Owoc now wants to shed the potential burden of such status by terminating it — on the eve of closing of the sale of substantially all of the Debtors' assets — with the stated goal of forcing VPX to bear the tax bill for that sale.  Mr. Owoc knew for months that the Debtors were contemplating a sale, and he knew that any gains on the sale would be passed through to him just as they had been for the past 29 years.  But Mr. Owoc took no action.  By delaying, Mr. Owoc has not only prevented the Debtors from structuring a transaction in a way that could have minimized taxes to the estate, but also captured over $22 million of net operating losses ("NOLs") in 2023 alone *for himself* that VPX could have used to offset its tax liability.

4.      Mr. Owoc argues that he should be able to foist these tax liabilities on the Debtors because, as VPX's sole shareholder, he could have terminated VPX's S-Corp status at any time pre-bankruptcy.  And he now complains that, because VPX is in bankruptcy (a path that Mr. Owoc authorized and benefitted from), its S-Corp status means that Mr. Owoc pays taxes on the Monster Sale[3] even though he will not receive any proceeds from that sale.  However, Mr. Owoc is wrong that his historical control over VPX means that valuable tax attributes *that benefit VPX* — and, in bankruptcy, its creditors — are his to destroy.  Under the Bankruptcy Code, those tax attributes are assets of VPX that are to be distributed consistent with the absolute priority rule.  And the automatic stay is designed so that Mr. Owoc cannot jump the line and pick up tax savings for himself at the expense of creditors.

---

[3] The "Monster Sale" means the sale of substantially all of the Debtors' assets to Monster Beverage Corporation pursuant to the Asset Purchase Agreement dated June 28, 2023 and the *Amended Order (I) Authorizing and Approving (A) the Sale of Substantially All of the Debtors' Assets Free and Clear of All Liens, Claims, and Encumbrances and (B) the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in connection therewith, and (II) Granting Related Relief* [D.I. 1658] (the "Sale Order").  The total purchase price payable to the Debtors in the Monster Sale is $370,200,000 (which amount is inclusive of assumed liabilities) and is expected to close by no later than July 31, 2023.

12314991-1

5.      What's more, the Motion is not just seeking to lift the stay so that Mr. Owoc can take what he represents to be unilateral action.  Mr. Owoc is also seeking to compel the Debtors' CEO to sign documents that will cause VPX to allocate 100% of the tax from the Monster Sale to itself.  The stay applies and Mr. Owoc does not and cannot show cause to lift it, particularly given there is no justification for compelling the Debtors to take affirmative action that will harm the estates and stakeholders.

6.      The Motion should be denied.

## BACKGROUND

**I.    Mr. Owoc has reaped millions in tax savings from VPX's S-Corp status.**

7.      Under the Internal Revenue Code, VPX's S-Corp status meant that all of its income, losses, deductions, and credits were passed through to Mr. Owoc and taxed as though they were his own.  *See* 26 U.S.C. §§ 1363(a), 1366; Cabrera Report[4] ¶ 22.  Had VPX been a C-Corp, it would have paid corporate income tax each year.  *See* 26 U.S.C. § 11(a); Cabrera Report ¶ 22.  In addition to those taxes, any distributions that VPX made to Mr. Owoc as its sole shareholder would then have been taxed as Mr. Owoc's income on his individual tax returns.  *See* 26 U.S.C. § 301; Cabrera Report ¶ 8.  As the sole shareholder of VPX, Mr. Owoc would have effectively borne the full cost of this "double-taxation," as tax at VPX would reduce amounts available for distribution to Mr. Owoc.

8.      For example, in 2022 alone, VPX's operating losses of $57.5 million will translate to $20 million of potential future tax savings to Mr. Owoc.  *See* Cabrera Report ¶ 23.

---

[4]  References to the "**Cabrera Report**" are to the Expert Report of Richard E. Cabrera, JD, CPA, attached hereto as **Exhibit 1**.  The Debtors intend to call Mr. Cabrera as an expert witness at trial, and expect Mr. Cabrera's testimony to be consistent with the statements contained in his report.

II.   **Despite having many months of advance warning, Mr. Owoc seeks to change VPX's tax status only on the eve of the Monster Sale.**

9.     When VPX filed its chapter 11 petition in October 2022, Mr. Owoc was VPX's sole shareholder, sole director, and CEO.  *See* DiDonato First Day Decl. ¶ 23 [ECF No. 26].  Mr. Owoc was aware of VPX's chapter 11 filing.  July 11, 2023 Hearing Tr. 175:7-13 ("Q. [] Mr. Owoc, you just testified that you were aware that Vital Pharmaceuticals was in bankruptcy, correct?  A. Vital Pharmaceuticals, yes . . . .").  In the months leading up to the bankruptcy, Mr. Owoc had approved a marketing process that sought to sell Vital Pharmaceuticals' business.  *See* ECF No. 23, Ex. B (Rothschild Engagement Letter dated April 8, 2022, bearing Mr. Owoc's signature).  And while VPX was in bankruptcy, Mr. Owoc presided over weekly board meetings where the sale of VPX's assets was almost always discussed.  *See* DiDonato Decl.[5] ¶ 7.

10.    Mr. Owoc has received sophisticated tax advice regarding VPX's S-Corp status for years: he retained Grant Thornton to assist with both his and VPX's taxes in November 2020.  *See* Grant Thornton Application Ex. B [ECF. No. 643] (engagement letter); ECF No. 1317 at ¶ 6 ("Because VPX is taxed as an S corporation, Grant Thornton also was retained by John Owoc . . . to assist Mr. Owoc in preparing his own personal tax returns for the 2020 tax year cycle.").

11.    Mr. Owoc apparently has been preparing for a dispute over VPX's S-Corp status since at least April, when he objected to Grant Thornton's continued representation of VPX.  *See Objection to Expedited Supplemental Application for Approval to Employ Grant Thornton LLP* [ECF No. 1255] (Apr. 25, 2023).  Mr. Owoc argued that "[t]he Grant Thornton LLP services at issue—assisting with IRS audits and providing advice with respect to a sale of the Debtor's assets—could directly prejudice Mr. Owoc.  Tax savings for the Debtor could result in increased

---

[5] References to the "**DiDonato Decl.**" are to the *Declaration of John C. DiDonato in Support of Debtors' Objection to the Motion* dated July 26, 2023, attached hereto as **Exhibit 2**.

tax liability for Mr. Owoc." *Supplement to Objection to Expedited Supplemental Application for Approval to Employ Grant Thornton LLP* ¶ 5 [ECF No. 1306] (May 1, 2023).

12.     The Debtors, meanwhile, made no secret that they were considering an asset sale to Monster.  Given his deep involvement in the Debtors' affairs for the majority of this case, Mr. Owoc cannot seriously contend that he was unaware that a sale process was under way.  And he no doubt was aware that a sale would not result in a recovery to equity.[6]

13.     Yet, despite having many months to notify the Debtors of his desire to convert VPX to a C-Corp, Mr. Owoc instead waited to file the Motion until the day before the sale hearing.  *See* Motion [ECF No. 1627] (filed July 11, 2023).  By then, the Debtors had already entered into and filed the Monster APA, *see* ECF No. 1556, and were without time or funding to pivot to a transaction structure that could have minimized or otherwise addressed the taxes about which Mr. Owoc now complains, *see* ECF No. 1551.

14.     If the Motion were granted, Mr. Owoc's strategic delay would have the inequitable result of costing the Debtors upwards of $27.5 million while he would stand to receive millions of dollars of future tax savings.  Because Mr. Owoc can use operating losses from the period before VPX is converted into a C-Corp to offset his income and gain, it is in his interest to wait as long as possible (up until the Monster Sale closes).  The tax benefit is significant:  VPX has incurred an estimated $22 million in NOLs this year alone.  *See* Cabrera Report ¶ 24.  Had it been converted to a C-Corp before January 1, 2023, those losses could have offset part of the income generated by the Monster Sale.  *See id.*  Instead, if VPX is converted to a C-Corp and is forced to make the

---

[6]  *See* June 7, 2023 Hearing Tr. at 30:16-17 (the Court informing Mr. Owoc's counsel that "[t]here is no equity at the end of the day").

12314991-1

"closing-of-the-books" election on July 28, as the Motion requests, *Mr. Owoc* will retain those $22 million of loss carryforwards. *See* Cabrera Report ¶ 25.

**III.  If the Motion is granted, VPX is estimated to incur upwards of $27.5 million in taxes, and Mr. Owoc will still keep tens of millions in tax-reducing loss carryforwards.**

15.     If Mr. Owoc wins the Motion, converts VPX to a C-Corp, and obtains an order requiring Mr. DiDonato to sign the form necessary to make the "closing-of-the-books" election, then VPX will be saddled with tax obligations that are estimated to be more than $27.5 million. *See* Cabrera Report ¶ 11.

16.     The Monster Sale is expected to yield approximately $11.6 million of residual proceeds for general unsecured creditors after amounts required under the Sale Order and other "100 cent" claims are paid or reserved for. *See* DiDonato Decl. ¶¶ 9-10. In other words, if Mr. Owoc wins the Motion, the taxes associated with the Monster Sale will swallow all the cash proceeds that were expected to generate recoveries for general unsecured creditors.

17.     In addition to saddling VPX with what is estimated to be a multi-million-dollar tax bill, Mr. Owoc will still retain significant tax benefits from VPX's historical S-Corp status. Mr. Owoc would receive VPX's approximately $22 million of ordinary business losses from the period in 2023 before the S-Corp conversion, which equates to a potential benefit to Mr. Owoc of approximately $8 million. *See* Cabrera Report ¶ 12. And upon VPX's liquidation, Mr. Owoc will realize capital losses of over $50 million, which he can carry forward to reduce current or future capital gains, potentially saving Mr. Owoc over $12 million in future taxes. *See id.* ¶ 13.

**IV.  Maintaining VPX's S-Corp status is estimated to cost Mr. Owoc $3.4 million in taxes this year, but he would also retain $72 million in loss carryforwards, reducing his future taxes.**

18.     If VPX's S-Corp status remains unchanged, then Mr. Owoc's tax bill is estimated to be approximately $3.4 million. *See* Cabrera Report ¶ 14. The delta between Mr. Owoc's

estimated tax bill following the Monster Sale if VPX remains an S-Corp ($3.4 million) and VPX's if it is converted to a C-Corp ($27.5 million) comes from the historical losses that the Debtors and their affiliates generated and passed on to Mr. Owoc — in other words, benefits of VPX's historical S-Corp status that Mr. Owoc will retain under any circumstance.

19.     However, even after accounting for 2023 taxes, Mr. Owoc would be expected to still carry forward a net capital loss of approximately $49 million, and a NOL of approximately $23 million, which together have the potential to reduce his future taxes by up to $19 million. *See id.* ¶¶ 15-16.

## ARGUMENT

20.     Mr. Owoc's delay in bringing the Motion should result in its denial; he could have acted months ago and his failure to do so has greatly prejudiced the Debtors.  The Motion is no ordinary lift-stay request; instead, Mr. Owoc is seeking to require the Debtors' CEO to execute tax filings that will divert tens of millions of dollars from creditors.  Even if Mr. Owoc were correct that he is entitled to lift the stay so that *Mr. Owoc* can make filings with the IRS, there is no basis for compelling *the Debtors* to act.  Moreover, Mr. Owoc is incorrect — S-Corp status is property of the estate and there is no reason to lift the stay here.

**I.    Mr. Owoc's unwarranted delay in bringing the Motion has greatly prejudiced the Debtors; the Motion is barred.**

21.     The Motion is precluded under the doctrine of laches because Mr. Owoc's delay in seeking to convert VPX from an S-Corp to a C-Corp is inexcusable and prejudicial to the Debtors. Laches "serves to bar suit by a [petitioner] 'whose unexcused delay, if the suit were allowed, would be prejudicial'" to the opposing party.  *Russell v. Todd*, 309 U.S. 280, 287 (1940).  The relief sought through the Motion is barred under the doctrine of laches if: (1) there was a delay in asserting a right or a claim, (2) the delay was not excusable, and (3) the Debtors will suffer undue

12314991-1

prejudice as a result.  *See General Lending Corp. v. Cancio*, 578 F. App'x 832, 834 (11th Cir. 2014).

22.     Whether laches bars a claim depends on "the circumstances of a case and is a question primarily addressed to the discretion of the trial court."  *In re Storick*, No. 18-15728, 2020 WL 211471, at *5 (Bankr. S.D. Fla. Jan. 13, 2020), *aff'd sub nom. Storick v. CFG LLC*, No. 20-CV-80126, 2021 WL 716695 (S.D. Fla. Jan. 21, 2021), *aff'd sub nom. In re Storick*, No. 21-10563, 2021 WL 3615358 (11th Cir. Aug. 16, 2021).  The effect of delay and whether allowing the claim would be inequitable to the respondent are the focal points.

> [L]aches does not result from a mere lapse of time but from the fact that, during the lapse of time, changed circumstances inequitably work to the disadvantage or prejudice of another if the claim is now to be enforced.

11A Charles Alan Wright, et al., FEDERAL PRACTICE & PROCEDURE § 2946 (3d ed. 2019).

23.     Here, Mr. Owoc's delay not only prejudiced the Debtors, but also unjustly enriches Mr. Owoc — to the tune of millions of dollars — at the estates' and creditors' expense.

24.     Prior to the Petition Date, Mr. Owoc was sole shareholder, CEO, and sole board member of VPX.  Mr. Owoc has long known that VPX would file for bankruptcy — he authorized it; would seek a sale of its assets in bankruptcy — he authorized that; and that Monster was a potential buyer — he attended weekly board meetings for months following the Petition Date discussing this possibility.  *See* DiDonato Decl. ¶¶ 6-7.  And the Debtors made no secret — to the public or to Mr. Owoc — that they were considering a section 363 sale.  A motion to approve bid procedures, which Mr. Owoc authorized, was filed on January 27, 2023.  *See* ECF No. 707.  The bid procedures were approved on February 24, 2023.  *See* ECF No. 854.  And, of course, Mr. Owoc had a front row seat, attending board meetings where the sale was discussed weekly.  *See* DiDonato Decl. ¶ 7.

12314991-1

25.     During this entire time, Mr. Owoc was receiving sophisticated tax advice from Grant Thornton, and both he and Grant Thornton were aware that any gains on VPX's assets would be taxable to Mr. Owoc as a result of VPX's S-Corp status.  Indeed, Mr. Owoc objected to Grant Thornton's retention in April, *see* ECF No. 1255, and argued that VPX's S-Corp status would cause a conflict because "tax savings for the Debtor could result in increased tax liability for Mr. Owoc," ECF No. 1306.

26.     During all of this time, Mr. Owoc could have sought to convert VPX from an S-Corp to a C-Corp, but he chose not to do so.  Instead, he filed the Motion on July 11, the day before the hearing to consider the Monster Sale.

27.     Mr. Owoc's delay in seeking to convert VPX to a C-Corp could translate to major tax savings for him, all at the estates' and creditors' expense.  Because Mr. Owoc can use NOLs from the period before VPX is converted into a C-Corp to offset his taxable income and gain, it is in his interest to wait as long as possible (up until just before the Monster Sale closes).  Here, the tax benefit of delaying conversion is significant:  VPX has incurred an estimated $22 million in NOLs so far this year.  *See* Cabrera Report ¶ 24.  Had it been converted to a C-Corp before January 1, 2023, those losses could have offset part of the income generated by the Monster Sale. *See id.*  Instead, if VPX is converted to a C-Corp and is somehow forced to make the "closing-of-the-books" election on July 28, 2023, Mr. Owoc will get the tax benefit of those losses.  *See id.*  In addition, had VPX been converted to a C-Corp before January 1, 2023, it would have been able to offset almost three quarters of the estimated taxable income associated with the Monster Sale using a $57.5 million NOL carryforward from 2022.  *See id.*  Instead, if the Motion is now granted, that NOL will inure to the benefit of Mr. Owoc.  *See id.* ¶ 25.

28.    Moreover, had Mr. Owoc acted sooner, the Debtors could have sought to structure a transaction to minimize any associated tax, including by implementing a change-of-control transaction through a chapter 11 plan.  Instead, by the time Mr. Owoc brought the Motion, the Debtors were already out of runway under the DIP Financing and had no viable alternative to the Monster Sale.  In short, if the Motion is granted, then the Debtors will still have to close the Monster Sale and incur the taxes, but proceeds would likely go to pay tax liabilities rather than be made available to unsecured creditors.  Had Mr. Owoc acted sooner, this inequitable outcome could have been avoided.  Instead, Mr. Owoc waited many months before filing the Motion, despite having all the information necessary to raise the issue in a timely manner.  During this time, Mr. Owoc was advised by sophisticated tax advisors and was individually represented by no fewer than six law firms in connection with the bankruptcy cases.  The delay not only threatens the Debtors' potential chapter 11 plan — by potentially saddling the Debtors with taxes that could have been reduced or avoided entirely had the Debtors had more notice of Mr. Owoc's plans — but also benefitted Mr. Owoc at the Debtors' expense by allowing him to harvest millions of dollars of tax deductions that would otherwise have belonged to the Debtors.  The Motion should be denied as the relief sought is barred under the doctrine of laches.

## II.  Mr. Owoc has provided no basis to force the Debtors to sign IRS forms that will greatly prejudice their creditors.

29.    In a typical lift-stay motion, the Court is asked to lift the stay so that *the movant* can take action that is otherwise stayed.  Here, by contrast, Mr. Owoc is seeking an extraordinary order that would not only allow *him* to file paperwork necessary to effect the conversion-by-revocation of VPX from an S-Corp to a C-Corp, but separately would compel *VPX* to sign the forms needed to saddle itself with what likely could be tens of millions of dollars in tax liabilities. *See* Motion ¶ 30 (requesting that the Court "direct the Debtors to cooperate with Mr. Owoc with

respect to any steps that are reasonably necessary to effectuate the termination VPX's status as an S-Corp"); *see also id.* ¶ 31 (same).

30.  Mr. Owoc requires this additional relief because the Internal Revenue Code *does not allow* a shareholder to unilaterally file the paperwork necessary to either (i) effect the S-Corp-to-C-Corp conversion-by-revocation and (ii) allocate 100% of the tax liability from the Monster transaction to VPX. Instead, the IRS will only accept the relevant forms if signed by an authorized representative of VPX, which Mr. Owoc is not.

**A.  Termination of VPX's S-Corp status "by revocation" requires a VPX officer's signature.**

31.  An S-Corp election may be "terminated by revocation," IRC § 1362(d)(1)(A), resulting in the corporation's conversion to a C-Corp. The election must be signed by a person authorized to sign the return required to be filed under IRC § 6037. *See* Treas. Reg. § 1.1362-6(a)(1). A return of an S-Corp must be signed by the president, vice-president, treasurer, assistant treasurer, chief accounting officer, or any other officer duly authorized so to act. *See* IRC § 6062; Treas. Reg. § 1.6062-1(a)(1) (same). By contrast, shareholders are required to sign a consent statement that is attached to the revocation form. *See* IRC § 1362(d)(1)(B); Treas. Reg. § 1.1362-2(a)(1), § 1.1362-6(a)(3)(i). But there is no role for the shareholder in executing the revocation form itself — that must be done by an officer of the corporation.

32.  The IRS mandates strict compliance with the "authorized officer" signatory requirement: The "requirement that the Form [] be signed by an authorized officer is not merely procedural or directory, but rather a substantive requirement . . . ." *Jon P. Smith*, TC Memo 1988-18, PH TCM P 88018, 54 CCH TCM 1535, pp. 3-4. And the IRS will not accept S-Corp-related elections that are not executed by an authorized *officer* of the corporation. *See id.* (finding the

subchapter S election to be defective where a completed form was unsigned by an authorized officer of the corporation).

**B.      Only VPX — not Mr. Owoc — can make the "closing-of-the-books" election and, again, only with a VPX officer's signature.**

33.      Converting VPX from an S-Corp to a C-Corp will not accomplish Mr. Owoc's goal of shifting 100% of tax from the Monster Sale to VPX.  Unless Mr. Owoc can also *force* VPX to make the "closing-of-the-books" election — something he cannot do unilaterally — he will still be allocated at least 58% of the resulting taxable income generated by the Monster Sale, and, possibly, all or substantially all of that income.

34.      When an S-Corp is converted to a C-Corp mid-year, its pre-conversion and post-conversion taxes must be calculated differently.  The Internal Revenue Code therefore creates two "short years" applicable to the entity — an "S short year" from before the conversion and a "C short year" on and after the date of conversion.  *See* 26 U.S.C. § 1362(e)(1)(A), (B).  Taxes during the "S short year" are paid by the shareholder, because for that portion of the year, the S-Corp election was in effect.  And taxes during the "C short year" are paid by the newly minted C-corporation.  *See* 26 U.S.C. §§ 11; 1363; 1366.

35.      *By default*, items of income, loss, deduction, or credit are allocated between the "S short year" and the "C short year" using the "pro rata allocation."  *See* 26 U.S.C. § 1362(e)(2).  Under the pro rata allocation, such items are allocated based on how much of the year had passed at the time that the conversion occurred and how long the company continues to operate following the conversion.  So if VPX was converted to a C-Corp on August 1, 2023, and continued to operate through December 31, 2023, seven-twelfths of the income, losses, deductions, and credits for the entire taxable year would be allocated to the "S short year" — *i.e.*, taxable to Mr. Owoc — and five-twelfths of the income, loss, deduction, and credits would be allocated to the "C short year"

— *i.e.*, taxable to VPX. *See id.* Here, that would translate to approximately $10 million in taxes payable by Mr. Owoc and approximately $9.2 million in taxes payable by VPX. *See* Cabrera Report ¶ 21. And if VPX were to liquidate before December 31, 2023, an even greater percentage of the taxes would be allocated to the "S short year," because the "C short year" would be smaller by comparison. *See* Cabrera Report ¶ 21. For example, if VPX converts to a C-Corp on August 1, 2023 and liquidates on August 31, 2023, then seven-eighths of the total tax liability would be allocated to Mr. Owoc.

36.     By contrast, if the corporation voluntarily makes the "closing-of-the-books" election, then the "normal tax accounting rules" apply, meaning that items are assigned to the "S short year" or the "C short year" depending on whether they occurred before or after the conversion. *See* 26 U.S.C. § 1362(e)(3). Here, if Mr. Owoc were able to compel the Debtors to make the "closing-of-the-books" election, then 100% of the income generated by the Monster Sale, and thus 100% of the resulting tax liability, would be allocated to VPX.

37.     The Internal Revenue Code is specific that "the corporation" must make the "closing-of-the-books" election. *See* 26 U.S.C. § 1362(e)(3)(A) (the "*corporation may* elect to have [the pro rata allocation] not apply" (emphasis added)); Treas. Reg. § 1.1362-6(a)(5) (same). And, as with the S-Corp-to-C-Corp conversion, the Internal Revenue Code lays out a specific role for the shareholder — not to file the form by which the election is made, but merely to indicate "consent" to the corporation's election. 26 U.S.C. § 1362(e)(3)(B); Treas. Reg. § 1.1362-6(a)(5).

38.     And, as with the S-Corp-to-C-Corp conversion by revocation, only an officer of VPX can authorize VPX's making the "closing-of-the-books" election. *See* Treas. Reg. § 1.1362-6(a)(5); Treas. Reg. § 1.1362-6(a)(1); 26 U.S.C. § 6037; 26 U.S.C. § 6062; Treas. Reg. § 1.6062-1(a)(1).

-13-

**C.    Mr. Owoc is not authorized to sign for VPX and he has offered no reason why VPX should be required to sign IRS documents against the will of its Board and officers.**

39.    Mr. Owoc was terminated as CEO on March 9, 2023, and simultaneously removed from VPX's Board of Directors. *See* DiDonato Decl. ¶ 8. The only authorized officer of VPX for IRS purposes is Mr. DiDonato, the Debtors' Interim CEO. *Id.* Mr. Owoc has no authorization to sign tax forms on behalf of VPX. *Id.*

40.    The VPX Board has duly considered the issue and unanimously voted to remain an S-Corp. *See* DiDonato Decl. ¶ 12. It has also duly considered and unanimously voted against making the "closing-of-the-books" election in the event that VPX is converted from an S-Corp to a C-Corp. *See id.* Neither result is surprising, as the Board's duty is to the company — not its shareholders — and, when the company is insolvent, the interests of creditors must be considered.[7]

41.    Even if Mr. Owoc is correct that VPX's S-Corp status is not property of the estate — he isn't — or if he's correct that the stay should be lifted so Mr. Owoc can take action to terminate VPX's S-Corp status — again, he isn't — he has offered no reason at all why VPX should *also* be required to take actions that will harm the Debtors' estates. It is one thing to seek to lift the automatic stay so that the movant can take unilateral action; it is an entirely different — and extraordinary — thing to ask the Court to *both* lift the stay *and* order a Debtor to take action that will harm the estates. Even if the Court agrees with Mr. Owoc that the stay does not apply or

---

[7] *See, e.g.*, *In re Sigma-Tech Sales, Inc.*, 570 B.R. 408 (Bankr. S.D. Fla. 2017) ("Under Florida law, an officer's or director's fiduciary duties are extended to the creditors of a corporation when the corporation becomes insolvent or is in the vicinity of insolvency."); *In re SOL, LLC*, No. 09-12684-BKC-AJC, 2012 WL 2673254, at *16 (Bankr. S.D. Fla. July 5, 2012) ("The fiduciary duties of officers and directors are extended to the creditors of a corporation when the corporation becomes insolvent or is in the 'vicinity of insolvency.'"); *In re Trafford Distrib. Ctr., Inc.*, 431 B.R. 263 (Bankr. S.D. Fla. 2010), judgment set aside sub nom. (S.D. Fla. 2019) ("Under Florida law, fiduciary duties of corporate officers and directors are extended to creditors of corporation when corporation becomes insolvent or is in the vicinity of insolvency.").

should be lifted, it should not order the Debtors to sign IRS forms and statements that are plainly against the estates' and creditors' interests.

42.     What's more, to obtain an injunction compelling the Debtors to sign IRS forms and statements, Mr. Owoc needed to file an adversary proceeding. *See* Fed. R. Bankr. P. 7001(7) ("The following are adversary proceedings: . . . a proceeding to obtain an injunction or other equitable relief . . . .").[8]  He has not.

### III.   VPX's S-Corp Status is Property of the Estate.

43.     The Bankruptcy Code broadly defines "property" to include "all legal or equitable interests of the debtor" "wherever located and by whomever held."  11 U.S.C. § 541; *see also United States* v. *Whiting Pools*, 462 U.S. 198, 204 (1983) ("Both the congressional goal of encouraging reorganizations and Congress' choice of methods to protect secured creditors suggest that Congress intended a broad range of property to be included in the estate.").  "[I]n determining the scope of § 541 [the Court] must consider the purpose animating the Bankruptcy Code," including to "bring anything of value that the debtors have into the estate."  *In re Prudential Lines Inc.*, 928 F.2d 565, 573 (2d Cir. 1991), *cert. denied sub nom.* 502 U.S. 821, (quoting H.R. Rep. No. 95-595, 95th Cong., 2d Sess. 176).

44.     The weight of the caselaw, applying this intentionally broad definition, concludes that a corporate debtor's special tax attributes — including S-Corp status — are a property interest within section 541.  *See, e.g.*, *In re Frank Funaro Inc.*, 263 B.R. 892, 898 (B.A.P. 8th Cir. 2001) (finding that the corporate debtor's prepetition right to make or revoke its subchapter S status constitutes "property" or "an interest of the debtor in property" within the meaning of the

---

[8]  Even if Mr. Owoc believes that the Debtors' S-Corp status is his property, and so the Debtors must be compelled to 'give it back' by signing IRS forms, an adversary proceeding would have been required. *See* Fed. R. Bankr. P. 7001(1) (adversary proceeding required for "a proceeding to recover money or property").

Bankruptcy Code); *In re Bakersfield Westar, Inc.*, 226 B.R. 227, 233-34 (B.A.P. 9th Cir. 1998) (finding that S-Corp status "has value to a debtor's estate and is therefore properly characterized as 'property'"); *In re Walterman Implement Inc.*, Adv. No. 06-9067, 2006 WL 1562401, at *3 (Bankr. N.D. Iowa May 22, 2006) (holding that debtor's subchapter S status is property of the estate); *In re Trans-Lines W., Inc.*, 203 B.R. 653, 661-62 (Bankr. E.D. Tenn. 1996) ("[T]his court holds that the Debtor possessed a property interest (i.e. a guaranteed right to use, enjoy and dispose of that interest) in its Subchapter S status.").

45.    With S-Corp status, in particular, the corporate debtor has the right to pass its taxable income and losses to its shareholder.  That right has significant benefits to the corporation — with the corporation paying zero tax — and to its shareholders — with the shareholders avoiding "double tax" on both the corporation's income and their distributions from it.

46.    S-Corp status provides similar economic benefit to a debtor as other types of tax attributes that Florida courts have held are property under section 541.  *In re Taylor*, 386 B.R. 361 (Bankr. S.D. Fla. 2008) (NOL carrybacks are property of the estate); *United States v. Kapila*, 402 B.R. 56 (S.D. Fla. 2008) (NOL carryback waiver is property of the estate); *In re LaPlana*, 363 B.R. 259 (Bankr. S.D. Fla. 2007) (future tax refunds are property of the estate).  And, throughout the Eleventh Circuit, courts have found a wide variety of tax attributes to be property of the estate based on the benefit that the estate can realize, whether in the form of a tax refund or in the form of a tax savings.  *See, e.g.*, *In re Mooney*, 526 B.R. 421 (M.D. Ga. 2015) (tax credits are property of the estate).

47.    *Majestic*, which Mr. Owoc relies on extensively, attempted to distinguish away this body of precedent.  But it is neither binding on this Court nor persuasive.

48.    *First*, to state the obvious, *Majestic* is a Third Circuit case.

49.    *Second*, *Majestic* was considering a different issue: whether a non-debtor S-Corp's termination *of its own* S-Corp status (which, as a matter of law had the effect of automatically terminating the Debtor's qualified subchapter S subsidiary ("Q-sub") pass-through status) violated the stay.[9]  The *Majestic* court's reasoning relied heavily on the non-debtor's unilateral control over the decisions that caused the adverse tax effect to the Q-sub.  The issue in *Majestic* differs significantly from this situation because, as described above, Mr. Owoc is not only seeking to take unilateral action himself which will incidentally affect the Debtors' tax status, but he is also seeking an order affirmatively compelling VPX to sign tax documents that will affect the conversion and allocation of tax to itself.  *See* Argument § 2 *supra*.

50.    Most fundamentally, however, *Majestic*'s cramped view of 'property of the estate' is inconsistent with section 541.  As *Majestic* acknowledged, the Supreme Court has held NOL carrybacks to be property of the estate, based on the same logic as courts that have concluded S-Corp status is property of the estate:  "[T]he term 'property' has been construed most generously and an interest is not outside its reach because it is novel or contingent or because enjoyment must be postponed."  *Majestic Star Casino, LLC v. Barden Dev., Inc.* (*In re Majestic Star Casino, LLC*), 716 F.3d 736, 750 (3d Cir. 2013) (quoting *Segal v. Rochelle*, 382 U.S. 375, 379 (1966)) (internal quotation marks omitted).  *Majestic* sought to distinguish S-Corp status from NOLs on the ground that S-Corp status is ordinarily dictated by the shareholder through the shareholder's control over the corporation.  But the fact that a non-debtor can exercise control over property does not mean that a debtor has no interest in such property.  Indeed, NOLs themselves — which the Supreme Court has concluded are property of the estate — can be eliminated by the unilateral actions of

---

[9]  For this reason, even if it were binding, this Court could reject *Majestic*'s analysis as dicta:  only the paragraphs regarding Q-sub status towards the end of the opinion were necessary to reach the Court's result.

non-debtor shareholders.  Moreover, section 362(a)(3) would not need to protect against acts "to exercise control over property of the estate" if the fact that a third party could ordinarily exercise such control meant that such property was not property of the estate.  And many property interests of debtors are subject to control by non-debtors.  Nor does the fact that a debtor's interest is contingent, and subject to diminution by the actions of third parties, render it not property of the estate within section 541.  Again, it is quite common for debtors to have property interests that are contingent or that may never vest based on the actions of third parties.  NOLs are, again, just one example.  *See also, e.g.*, Opinion, *In re Boy Scouts of Am.*, No. 20-10343 (Bankr. D. Del. July 30, 2022), ECF No. 10136 (charitable organization's contingent right to residual assets of nondebtor franchisee upon franchisee's hypothetical liquidation was property of the estate).[10]

51.     Finally, it is not the case that treating S-Corp status as "property of the estate" would somehow expand the debtor's interest in that property.  *See* Motion ¶ 23.  Mr. Owoc and VPX still the same rights with respect to VPX's S-Corp status.  The only thing that has changed is that the automatic stay operates to stop Mr. Owoc from taking *unilateral action* to affect the debtor's property ahead of all of VPX's creditors.  But that is a feature of the Bankruptcy Code, not a bug. The automatic stay ensures that a party like Mr. Owoc, who is not entitled to any distribution from VPX's assets until secured and unsecured creditors are paid in full, does not get to violate the absolute priority rule by exercising control over the debtors' assets before others.  Mr. Owoc finds himself in the same position as any person who could — outside of bankruptcy — unilaterally force the debtor to take action or make a payment: once in bankruptcy, he must wait like everyone

---

[10] *See also In re Carlton*, 309 B.R. 67, 71 (Bankr. S.D. Fla. 2004) (finding that a stock option was property of the estate); *In re Knight*, 164 B.R. 372, 375 (Bankr. S.D. Fla. 1994) (finding that debtor's contingent remainder interest in trust was property of the estate).

else for the debtor's assets and liabilities to be determined and for distributions to be made in accordance with the absolute priority rule.

**IV. Even if VPX's S-Corp status is not "property *of* the estate," the stay prevents Mr. Owoc from "any act to obtain possession of . . . property *from* the estate."**

52.     Even if the Court were to find that VPX's S-Corp status is not "property of the estate," it should have no difficulty concluding that it is property *of someone* that is within the estate's possession and/or control, and therefore is still subject to the automatic stay.

53.     "Property" is nothing more than a collection of rights.  *See In re Trans Lines W. Inc.,* 203 B.R. 653, 661 (citing 63A Am.Jur.2d *Property* § 1 (1994); Black's Law Dictionary 1216 (6th ed. 1990)).  For the reasons described above, VPX's right to pass along its income and losses to its sole shareholder for tax purposes is best characterized as property of VPX.  However, if the Court were persuaded that Mr. Owoc's ability to cause VPX to terminate that right outside of bankruptcy makes VPX's S-Corp status property of Mr. Owoc, *it would still be property*.  And this property is within VPX's possession — VPX is the entity with S-Corp status in the IRS records and it is VPX that receives the benefit of not having to pay tax.

54.     The automatic stay does not just stay actions to "obtain possession of property of the estate," it also stays actions to "obtain possession of property . . .*from* the estate."  The caselaw and legislative history make clear that this is intended to allow the debtor to remain in possession of property, even if that property is alleged to belong to someone other than the debtor.  Congress intended for debtors to have time to assess the claims against them and against the property that they hold, even if the property is later determined to be owned by someone else. *See In re St. Clair*, 251 B.R. 660, 665 (D.N.J. 2000) ("The purpose of this provision is to prevent dismemberment of the estate.  Any distribution of property must be by the trustee after he has had an opportunity to familiarize himself with the various rights and interests involved and with the property available

for distribution." (quoting 362 Legislative History)); *see also, e.g.*, *In re McBride*, No. 11-03190, 2011 WL 3902991 (Bankr. S.D. Ala. Sept. 6, 2011) (debtor's possessory interest in vehicle was sufficient to invoke stay even if vehicle itself was not property of the estate and it was debatable whether lease of vehicle had been terminated prior to petition date).

55.     Here, that purpose is being served by allowing the Debtors to retain possession of their S-Corp status.  The Debtors believe — based on the many cases that have so held — that VPX's S-Corp tax status is *VPX's* property, not Jack's.  And the Debtors believe that the value of that property — like all other property of a debtor — is required to be distributed pursuant to the absolute priority rule.

56.     To the extent Mr. Owoc believes that he should be reimbursed for any tax liabilities that he incurs while the automatic stay prevents him from regaining control over VPX's S-Corp status, he can file a proof of claim based on that belief.[11]  That claim, *like all claims against the Debtors*, will be subject to reconciliation and then distribution consistent with the absolute priority rule.  By contrast, if Mr. Owoc is able to lift the stay and take control of the property back from the debtors, he will effectively jump to the front of the line, and saddle the estates with potentially millions of administrative claims.  Section 362(a)(3)'s application to attempts to attempts to obtain possession . . . of property *from* the estate is designed to preclude such a result.

## V.     There is no cause to lift the stay.

57.     In evaluating whether cause exists to lift the automatic stay, courts in the Eleventh Circuit have considered: (1) whether the debtor has acted in bad faith; (2) the "hardships imposed on the parties with an eye towards the overall goals of the Bankruptcy Code"; and (3) the status of

---

[11]  Nothing in this Objection should be construed as an admission by the Debtors that such a claim would be valid and, to the contrary, the Debtors expressly reserve the right to object to such a claim on any basis.

pending state court proceedings.[12]   *In re Feingold*, 730 F.3d 1268, 1277 (11th Cir. 2013); *see also Siewe v. Locci (In re Siewe)*, 730 F. App'x 871, 877 (11th Cir. 2018).  "The movant has the initial burden to show that 'cause' exists."  *In re Chan*, No. 6:18-bk-03297-KSJ, 2019 Bankr. LEXIS 2702, at *4 (Bankr. M.D. Fla. June 3, 2019).  Should the movant "fail[] to make an initial showing of cause, [] the court should deny relief without requiring any showing from the debtor that it is entitled to continued protection." *Jackson v. GMAC Mortg., LLC*, No. 12-00111-KD-B, 2013 U.S. Disk LEXIS 181066, at *8 (S.D. Ala. Dec. 30, 2013) (quoting *In re Sonnax Indus., Inc.*, 907 F.2d 1280, 1285 (2d Cir. 1990)).  Moreover, "[i]f the movant is an unsecured creditor, the policies of the automatic stay weigh against granting the relief requested." *Id.* at *7-8.

### A.  The Debtors have acted in good faith.

58.    The Debtors have been operating their business with the sole goal of maximizing the value of their estates for the benefit of creditors.  The Debtors have long disclosed their intent to sell substantially all of their assets in bankruptcy.  The Monster Sale, as the Court recently concluded, maximizes the value of the Debtors' assets.  *See* Sale Order ¶¶ M-P.  Had the Debtors received a higher offer for their assets that would have resulted in a payment to Mr. Owoc as shareholder, the Debtors would of course have accepted it, but no such higher offer was received after a months-long process.

59.    The Debtors' interest in maintaining their S-Corp status is not to prejudice Mr. Owoc, but to preserve limited assets for existing unsecured creditors.  Indeed, Mr. Owoc's tax liability from the sale — if VPX remains an S-Corp — is likely to be tens of millions of dollars less than the Debtors' liability if VPX is converted to a C-Corp, the Debtors have sought

---

[12]  This third factor is not relevant to the issues in this Motion.  As a result, the Debtors have not addressed it below.

resolutions that would cover a large portion of that liability, while still allowing for a net distribution of proceeds from the Monster Sale to creditors.

60.     In sum, the Debtors are seeking to use bankruptcy to maximize distributions to creditors.  That is the very definition of good faith.

**B.     Lifting the stay will impose a much greater harm on the Debtors than on Mr. Owoc.**

61.     The "hardships imposed on the parties with an eye towards the overall goals of the Bankruptcy Code" clearly favor maintaining the stay here.

62.     If the Motion is granted, substantially all of the sale proceeds that would otherwise go to unsecured creditors in this matter will instead go to the IRS.  The Debtors will incur up to $27.5 million in taxes, which will need to be paid to confirm a plan.  *See* Cabrera Report ¶ 11.  The Debtors are only expected to have $11.6 million of proceeds from the Monster Sale available for unsecured creditors.  *See* DiDonato Decl. ¶ 10; Sale Order ¶ 16.  A $27.5 million tax liability would therefore ensure no plan can be confirmed, and force the Debtors to convert to chapter 7.

63.     In the event that Mr. Owoc is granted relief from stay to convert VPX to a C-Corp, but cannot force the Debtors to make the "closing-the-books" election, the Debtors expect to promptly liquidate.  *See* DiDonato Decl. ¶ 11.  Under the pro rata allocation, the sooner the Debtors liquidate, the shorter the "C short year" and the less tax allocable to the Debtors.  *See* Cabrera Decl. ¶ 21 ("If the Company were to liquidate before the end of the calendar year, the Shareholder would be allocated a larger share of the Company's taxable income.").  So if the stay is lifted, then it will therefore become imperative for the Debtors to liquidate as soon as possible to minimize their tax obligations.

64.     Changing VPX's tax status is particularly inequitable given the comparative size of Mr. Owoc's potential tax liability if VPX remains an S-Corp — $3.4 million — and the fact that

Mr. Owoc would also retain VPX's loss carryforwards that he could use to offset his future taxes by approximately $19 million. *See* Cabrera Report ¶¶ 14-16.

65. In sum, the harms to the Debtors — and their creditors — if the Motion is granted (up to $27.5 million in administrative priority claims and the liquidation of the Debtors) far outweigh impact on Mr. Owoc if the Motion is denied ($3.4 million in 2023 tax, paired with approximately $19 million of potential future tax savings to Mr. Owoc).[13]

**C.      Mr. Owoc is, at best, only an unsecured creditor; therefore, "the policies of the automatic stay weigh against" granting his motion.**

66. The automatic stay is designed to prevent a "race to the courthouse" that can destroy value as creditors compete to obtain as much as they can from a debtor as quickly as possible. Because unsecured creditors have no property interest in particular collateral/property of the debtor, the automatic stay has special force with respect to their claims.

67. Mr. Owoc did not loan the Debtors money on a secured basis. And while Mr. Owoc has recently filed amended proofs of claim asserting secured claims against the Debtors — even though his original proofs of claim asserted the same theories but without an assertion of secured status — the proofs of claim themselves make clear that Mr. Owoc himself is not asserting a secured claim. Instead, Mr. Owoc claims that certain entities of which he is a shareholder have subrogation rights against the Debtors based on payments that those entities may make to Truist. But Mr. Owoc himself has no basis to assert a secured claim. In fact, the Debtors do not believe that Mr. Owoc has *any* valid *unsecured* claims against them. At a minimum, however, Mr. Owoc

---

[13] Finally, if the Motion is denied, there is nothing stopping Mr. Owoc from asserting a claim against the Debtors if he believes that they should bear the tax. Although the Debtors will assert defenses to such a claim, if the Court concludes that Mr. Owoc is correct and the Debtors are required to reimburse him, then Mr. Owoc will have his claim paid in accordance with the absolute priority rule, just like all other creditors.

is not a secured creditor.  Under relevant caselaw, then, the policies of the automatic stay weigh against granting the Motion.

## CONCLUSION

68.     VPX's pass-through tax status is property of the estate, and is an asset that should be used for the benefit of its creditors and allocated consistent with the absolute priority rule. Mr. Owoc waited too long to claim otherwise and his late arguments fail on the merits.  Lifting the stay at this juncture would greatly prejudice the Debtors and their creditors, likely forcing a liquidation, while leaving it in place causes much less harm to Mr. Owoc.  The Motion should be denied.

Dated:   July 26, 2023
       Miami, Florida

George A. Davis (admitted *pro hac vice*)
Elizabeth A. Morris (admitted *pro hac vice*)
**LATHAM & WATKINS LLP**
1271 Avenue of the Americas
New York, NY 10020
Telephone:  (212) 906-1200
Email:  george.davis@lw.com
       elizabeth.morris@lw.com

– and –

Andrew D. Sorkin (admitted *pro hac vice*)
**LATHAM & WATKINS LLP**
555 Eleventh Street, NW, Suite 1000
Washington, D.C. 2004
Telephone:  (202) 637-2200
Email:  andrew.sorkin@lw.com

– and –

Joseph C. Celentino[14] (admitted *pro hac vice*)
**LATHAM & WATKINS LLP**
330 North Wabash Avenue, Suite 2800
Chicago, IL 60611
Telephone: (312) 876-7700
Email:  joe.celentino@lw.com

Respectfully submitted,

*/s/ Jordi Guso*
Jordi Guso
Florida Bar No. 863580
Michael J. Niles
Florida Bar No. 107203
**BERGER SINGERMAN LLP**
1450 Brickell Avenue, Suite 1900
Miami, FL 33131
Telephone:  (305) 755-9500
Email:  jguso@bergersingerman.com
       mniles@bergersingerman.com

*Co-Counsel for the Debtors*

---

[14]    Not admitted to practice in Illinois.  Admitted in New York.

12314991-1

# EXHIBIT 1

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION
www.flsb.uscourts.gov

In re:                                         Chapter 11 Cases

VITAL PHARMACEUTICALS, INC., *et al.*,          Case No.: 22-17842-PDR

    Debtors.[1]                              (Jointly Administered)

_____/


**EXPERT REPORT OF RICHARD E CABRERA, JD, CPA**


July 24, 2023


---

[1] The address of the Debtors is 1600 N. Park Drive, Weston, FL 33326.  The last four digits of the Debtors' federal tax identification numbers are: (i) Vital Pharmaceuticals, Inc. ("Vital Pharmaceuticals") (8430); (ii) Bang Energy Canada, Inc. (5454); (iii) JHO Intellectual Property Holdings, LLC (0010); (iv) JHO Real Estate Investment, LLC (9394); (v) Quash Seltzer, LLC ("Quash Seltzer") (6501); (vi) Rainbow Unicorn Bev LLC (2254); and (vii) Vital Pharmaceuticals International Sales, Inc. (8019).

## I.   QUALIFICATIONS

1.   My name is Richard Eric Cabrera.  I am a Director of Tax Services at Berkowitz Pollack Brant ("Berkowitz").  Berkowitz is a certified public accounting firm with more than 400 accountants, tax specialists and consultants.  I am the Director-in-Charge of Berkowitz's Business Tax Services Group, where our client base ranges from start-up companies to long-standing national and international entities, including closely held businesses, in a wide variety of industries.  I have been at Berkowitz for nearly ten years, starting as a Tax Associate.  During my time at Berkowitz, I have developed specialized experience in tax compliance and consulting services for high net worth companies and their individual shareholders, with a focus in corporate restructuring and tax planning.

2.   I earned a Bachelor of Science and Master's degree in Accounting at the University of Florida.  I received my J.D. and an LL.M. in Taxation from the University of Miami School of Law.  I have published the following articles over the last ten years:  *Avoiding IRS Challenges with Business Owner Compensation*,[2] *What Does the Inflation Reduction Act Mean to Taxpayers*,[3] *2019 Federal Income Tax Liabilities Due July 15*,[4] and *IRS Guidance Puts Businesses in a Tight Spot With New Parking Rules*.[5]  I have not provided any testimony or served as an expert witness in any other matters over the last four (4) years.  A copy of my curriculum vitae is attached to this report as **Exhibit A**.

3.   Berkowitz charges $515 per hour for my time on this matter.  Berkowitz's offices are located at 515 E, Las Olas Boulevard, 15th Floor, Fort Lauderdale, Florida.  Neither my compensation nor Berkowitz's is contingent upon the outcome of this matter.

---

[2] https://www.bpbcpa.com/avoiding-irs-challenges-with-business-owner-compensation-by-richard-e-cabrera-jd-llm-cpa/

[3] https://www.bpbcpa.com/what-does-the-inflation-reduction-act-mean-to-taxpayers-by-richard-cabrera-jd-llm-cpa/

[4] https://www.bpbcpa.com/2019-federal-income-tax-liabilities-due-july-15-by-richard-cabrera-jd-llm-cpa/

[5] https://www.bpbcpa.com/irs-guidance-puts-businesses-in-a-tight-spot-with-new-parking-rules-by-richard-e-cabrera-jd-cpa/

## II.    SCOPE

4.    In connection with the *Emergency Motion for Confirmation that the Automatic Stay Does Not Apply to Termination of Debtors' Subchapter S Corporation, or in the [Alternative] Motion for Relief from Stay* [Dkt. No. 1627] (the "Motion") I have been asked by counsel for Vital Pharmaceuticals, Inc. ("VPX") and its affiliates (together, the "Company")[6] to opine on:

    1.    the tax liabilities expected to be incurred by VPX and John H. Owoc as sole shareholder in connection with the Sale (as defined below), as well as the benefits potentially received by Mr. Owoc, if VPX's S corporation status is terminated and income is allocated using a "close the books" election as requested in the Motion;[7]

    2.    the amount of tax payable by Mr. Owoc as sole shareholder as a result of the Sale if VPX maintains its S corporation status;

    3.    the impact on VPX if its S corporation status is terminated but the "pro rata" allocation is used rather than the "close the books" election;

    4.    the benefits that Mr. Owoc received from VPX's status as a Subchapter S corporation;

    5.    the benefit that Mr. Owoc received by waiting until late July to seek to terminate VPX's S corporation status rather than terminating it sooner; and

    6.    in order for VPX to revoke the S corporation election or to make the "close the books" election, VPX would need to take affirmative action independent of Mr. Owoc.

5.    The analyses and opinions expressed in this report are based on the results of my analysis of the materials provided to me, my education and training, and my experience as an accountant and consultant. A list of the documents considered in forming my opinions can be found at **Exhibit B**. I reserve the right to amend, supplement, and/or revise my analyses, findings, and opinions if additional evidence becomes available, if the scope of discovery changes, or in response to any arguments made by other experts.

---

[6] Certain of the Company's affiliates are debtors in the above-captioned Chapter 11 Cases. When I refer to the "Debtors" I am referring only to those entities; whereas the term "Company" refers to all affiliates to VPX, regardless of whether they are debtors in bankruptcy or not.

[7] Throughout this opinion, when referring to tax liabilities of either VPX or Mr. Owoc I am using a state and federal tax blended rate, and when referring to any benefits received or potentially received by Mr. Owoc, I am not including any potential state tax savings.

3

## III.    BACKGROUND

6.    It is my understanding based on materials filed in these chapter 11 cases that the Company was established in 1993, and demonstrated significant growth in 2016-2019.  *See* First Day Declaration [Dkt. No. 26] ¶ 9.  It is my further understanding that John H. Owoc is the founder and sole shareholder ("Mr. Owoc" or the "Shareholder") of the VPX, which is classified as a Subchapter S corporation for federal and state tax purposes.  *See id.* ¶ 23.

7.    C corporations are currently subject to two layers of tax: first, the corporation pays federal taxes on its net income at a 21 percent rate, and second shareholders pay individual taxes on the dividend distributions they receive from the corporation at their ordinary income tax rates, which can be high as 37 percent, but usually 20 percent for US based C corporations, plus a 3.8 percent net investment income tax (NIIT).  Depending on where shareholders live and where the business operates, additional taxes may be imposed at the state and local levels.

8.    A C corporation may elect S corporation treatment as a "pass-through entity" (by timely filing IRS Form 2553) and avoid the double taxation referenced above.  The S corporation's income, losses, deductions and credits "pass through" to its shareholders, who are responsible for reporting this information on their individual income tax returns and paying applicable taxes at their individual ordinary income tax rates, the highest such federal rate being 37 percent.  In some instances, however, shareholders may be subject to a 20 percent capital gains tax (plus a potential 3.8 percent NIIT) on distributions received in excess of the shareholder's tax basis.

9.    I understand that the Debtors have entered into an Asset Purchase Agreement for the sale of substantially all of their assets to an affiliate of Monster Beverage Corporation, with a total purchase price of approximately $370,700,000, including assumed liabilities, and that sale is expected to close no later than July 31, 2023 (the "Sale").  I further understand that, through the Motion, Mr. Owoc is seeking through the Motion to terminate VPX's status as an S corporation such that it is taxed for purposes of the Sale as  C corporation.

## IV.   OPINIONS

10.   My calculations for each of the analyses associated with the below opinions can be found in the attached **Exhibit C**.

**Opinion 1 – Tax liabilities expected to be incurred by VPX and the Shareholder, as well as the benefits potentially received by Mr. Owoc, if the S election were terminated with a "close the books" election as requested in the Motion**

11.   If VPX's S corporation status is revoked, assuming that revocation is effective July 28, and VPX elected out of the pro-rata allocation (discussed further in Opinion 3), VPX's tax liability as a result of the Sale as a C corporation is estimated to be approximately $27,500,000.  All taxes arising from the Sale if VPX is a C corporation at closing would be payable by VPX rather than the Shareholder.

12.   In such a circumstance, Mr. Owoc would not report any of the gain on the sale of assets in 2023 — *i.e.*, he would have no tax liability as a result of the Sale. However, he would receive the benefit of approximately $22,000,000 of ordinary business losses from the 2023 business activity of VPX through the date of revocation, via Schedule K-1, to offset against other current or future active income that Mr. Owoc has. This equates to a potential tax benefit to Mr. Owoc of approximately $8,000,000.

13.   Upon the liquidation of VPX after the Sale, Mr. Owoc would recognize capital losses of over $50,000,000, as a result of deducting his remaining tax basis. Capital loss deductions are limited for individual taxpayers in the current year and therefore Mr. Owoc would carry forward this capital loss to utilize against current or future capital gains, which could result in a tax benefit of over $12,000,000.

**Opinion 2 – Tax liabilities expected to be incurred and potential benefits received by the Shareholder if VPX remains an S corporation**

14.   If VPX remains an S corporation at the time the Sale closes and throughout the 2023 tax year, all of the taxable income from the Sale will flow through to the Shareholder, who I estimate would owe approximately $3,438,144 in taxes as a result of the sale and liquidation.

15.   After applying Mr. Owoc's tax basis to the gain allocated via Schedule K-1, Mr. Owoc would carry forward a net capital loss of approximately $49,000,000, which could result in a net tax benefit of over $11,000,000 in future years.

16.   After applying VPX's 2022 Net Operating Loss (NOL) against 2023 Ordinary Income from VPX Schedule K-1, Mr. Owoc would carry forward the remaining excess 2022 NOL of approximately $23,000,000, which could result in a net tax benefit of over $8,000,000 in future years.

**Opinion 3 – Impact on VPX if the "pro rata" allocation is used rather than the "close the books" election**

17.    When a corporation terminates its S corporation status, the tax liability for that year takes into account the timing of the revocation and uses one of two methods to allocate income before and after that revocation.

18.    Under the Internal Revenue Code, upon conversion from an S corporation to a C corporation, two "short years" are created — an "S short year" before the conversion is effective and a "C short year" on and after the conversion is effective. *See* 26 U.S.C. 1362(e)(1)(A), (B). Taxes during the "S short year" are paid by the shareholder, because for that portion of the year, the S corporation election was in effect. And taxes during the "C short year" are paid by the resulting C corporation.

19.    By default, tax during the year of conversion is allocated between the "S short year" and the "C short year" using the "pro rata allocation," which prorates the company's income using the number of days covered by each return. *See* 26 U.S.C. 1362(e)(2). Under the pro rata allocation, tax is allocated between the two based on how much of the year has passed at the time that the conversion occurred, taking into account the time remaining in the year that the C corporation is in existence. So, if S corporation status is terminated on August 1, seven months of income would be allocated to the "S short year" and five months of income would be allocated to the "C short year" assuming that the C corporation continues to exist through December 31.

20.    A corporation may, instead, elect for the pro rata allocation to not apply. *See* 26 U.S.C. § 1362(e)(3)(A). This is referred to as the "close the books" election. Under the close the books election, the company's books are closed as of the end of the day before the S corporation termination date, and the tax attributes are allocated based on actual income and losses accrued through the termination date. Any income or deduction after the date of termination would contribute to the tax liability of the C- corporation short year. Thus, if VPX's S corporation status is terminated prior to the Sale, all Sale proceeds would be tax liabilities incurred in the C-Corp short year, 100% by VPX (as compared to 5/12th under the pro rata allocation for the full year).

21.    I estimate the Company's taxable income through December 31, 2023 would be $89,700,000. Under the pro rata allocation, through the end of the calendar year, approximately $52,300,000 of the taxable income would be allocated to the S-Corp short year (and thereby resulting in approximately $10,000,000 of tax payable by the shareholder) and approximately $37,400,000 of the taxable income would be allocated to the C-Corp short year (and thereby resulting in approximately $9,200,000 of tax payable by VPX). If the Company were to liquidate before the end of the calendar year, the Shareholder would be allocated a larger share of the Company's taxable income. Compared to the "close the books election," above, where a loss of $22,000,000 would be allocated to the 2023 S-Corp short year (and, therefore, Mr. Owoc would not pay any tax and would instead receive a tax benefit of approximately $20,000,000, as described in sections 13 and 14 of Opinion 1), and $111,200,000 of income would be allocated to the 2023 C-Corp short year (and, therefore, $27,500,000 of taxes would be payable by VPX).

6

**Opinion 4 – Historical benefits to the Shareholder as a result of VPX's S corporation classification**

22.     S corporation status for VPX means that all taxable amounts flow through to the Shareholder.  Without S corporation status, VPX would be taxed (which is ultimately a liability of the sole shareholder) and the shareholder would then be taxed on any dividends made by the company to the shareholder.  This is referred to as "double taxation."  As an S corporation, however, VPX's tax liability rolls up to the Shareholder.  That is, the Company's gains and losses were taxed only one time as though they were the Shareholder's personal income — there is no tax paid by VPX.

23.     In 2022, Mr. Owoc is estimated to receive a Schedule K-1 from VPX that reports approximately a $57,500,000 taxable loss.  As a result of the Excess Business Loss rules (which limits the use of business losses to offset non-business income to $250,000 Single and $500,000 Married filing joint), Mr. Owoc would only be able to deduct $500,000 against 2022 income, and the remaining $57,000,000 would be considered a Net Operating Loss.  Net Operating Losses can be carried forward into future years, allowing businesses suffering losses in one year to deduct those loses from future years' profits.  As an example, if a business suffered $50 million in losses in one year, and the next year earned $100 million in profits, without a carryforward provision, the business would be taxed on the full $100 million in the second year.  However, with a carryforward provision, the business can "carry forward" its $50 million loss in year one to reduce its taxable profits in the next year.  Here, Mr. Owoc would be able to carryforward $57,000,000 worth of losses that he can deduct in future tax years against all types of income.  An estimated tax rate of 37% would be applied to the losses carried forward, resulting in Mr. Owoc, potentially saving over $20,000,000 of taxes in future years.

**Opinion 5 – Benefit to Mr. Owoc of waiting until July 2023 to seek to terminate VPX's S corporation status**

24.     Had VPX S election been terminated in October 2022 when the bankruptcy petition was file, then VPX would be in the position to utilize parts of the 2022 and 2023 net operating losses to offset almost one-third of the estimated $111,200,000 of taxable income, by utilizing approximately $12,000,000 Net Operating Loss carryforward from 2022, and the estimated $22,000,000 Ordinary Loss from January 1, 2023 through the contemplated termination in July 2023.  In such a case, the tax payable by VPX for 2023 would be reduced by about $8,400,000, from $27,500,000 to $19,100,000.

25.     To the extent VPX's S election is terminated in late July 2023, as contemplated by the Motion, Mr. Owoc – as opposed to VPX – will obtain the benefit of any of VPX's historical tax attributes up to the date the election is terminated.

**Opinion 6 – In order for VPX to revoke the S corporation election or to make the "close the books" election, VPX would need to take affirmative action independent of Mr. Owoc**

26.     Pursuant to Treasury Regulation § 1.1362-6, an election statement (including for an election to revoke an S corporation status) must be signed by a person authorized to sign

the tax return of the corporation.  Under section 6062, a person authorized to sign the tax return of a corporation is such corporation's president, vice-president, treasurer, assistant treasurer, chief accounting officer or any other officer duly authorized so to act.  To revoke an election, the corporation files a statement that the corporation revokes the election made under section 1362(a).  The revocation statement must include the number of shares of stock (including non-voting stock) issued and outstanding at the time the revocation is made.  A revocation may be made only with the consent of shareholders who, at the time the revocation is made, hold more than one-half of the number of issued and outstanding shares of stock (including non-voting stock) of the corporation.

27.     To elect not to apply the pro rata allocation rules to an S termination year, a corporation files a statement that it elects under section 1362(e)(3) not to apply the rules provided in section 1362(e)(2), and instead to apply the "close the books" allocation method.  The statement must set forth the cause of the termination and the date thereof.  Pursuant to Treasury Regulation § 1.1362-6, the election statement must be signed by a person authorized to sign the tax return of the corporation, which under section 6062 includes the corporation's president, vice-president, treasurer, assistant treasurer, chief accounting officer or any other officer duly authorized so to act.  The statement must be filed with the corporation's return for the C short year.  This election may be made only with the consent of all persons who are shareholders at any time during the S short year and with the consent of all persons who are shareholders of the corporation on the first day of the C short year.

28.     Because of the Treasury Regulations, a shareholder's role with respect to terminating an S election or to making a "close the books" election is limited to consenting to the corporate action.  The practical effect of these regulations is that Mr. Owoc cannot independently enforce a "close the books" election.  Rather, VPX would have to take action independent of Mr. Owoc.  The board would need to first make the decision to make such an election, and then an authorized corporate officer would be required to sign on behalf of the corporation in order for the corporation to close the books.

Dated: July 24, 2023

/s/ *Richard E. Cabrera*
Richard E. Cabrera

**Exhibit A**

**Cabrera Profile**



CURRICULUM VITAE

# RICHARD ERIC CABRERA

**PROFESSIONAL EXPERIENCE**

**TAX DIRECTOR -** BERKOWITZ POLLACK BRANT ADVISORS AND CPAs, LLP, Ft. Lauderdale, FL    2014 TO PRESENT

**Practice Areas Include:**
- Domestic Income Tax Compliance
- Tax & Estate Planning for Business Owners
- High-net-worth tax issues
- Corporate restructuring
- Mergers and acquisitions

**Professional Affiliations**
- American Institute of Certified Public Accountants (AICPA)
- Florida Institute of Certified Public Accountants (FICPA)
- Florida Bar Association, Tax Law Section

**Education**
- University of Miami – Master of Law in Taxation (LLM)
- University of Miami – Juris Doctor, *cum laude*
- University of Florida– Master of Science in Accounting
- University of Florida – Bachelor of Science in Accounting

**Published Articles**
*Avoiding IRS Challenges with Business Owner Compensation,*[1]
*What Does the Inflation Reduction Act Mean to Taxpayers,*[2]
*2019 Federal Income Tax Liabilities Due July 15,*[3]
*IRS Guidance Puts Businesses in a Tight Spot With New Parking Rules.*[4]

---

[1] https://www.bpbcpa.com/avoiding-irs-challenges-with-business-owner-compensation-by-richard-e-cabrera-jd-llm-cpa/
[2] https://www.bpbcpa.com/what-does-the-inflation-reduction-act-mean-to-taxpayers-by-richard-cabrera-jd-llm-cpa/
[3] https://www.bpbcpa.com/2019-federal-income-tax-liabilities-due-july-15-by-richard-cabrera-jd-llm-cpa/
[4] https://www.bpbcpa.com/irs-guidance-puts-businesses-in-a-tight-spot-with-new-parking-rules-by-richard-e-cabrera-jd-cpa/

**Exhibit B**

**Documents Considered**

Documents Considered in Expert Analysis

- 2020 through 2021 Form 1120S Federal Income Tax Returns for and S Corporation of Vital Pharmaceuticals Inc.

- 2015 through 2021 Federal Income Tax Returns of John H and Megan Owoc

- 2022 Taxable Income Estimate for Vital Pharmaceuticals Inc, including 2022 year financials

- 2023 Taxable Income Estimate for Vital Pharmaceuticals Inc

- *Declaration of John C. DiDonato in support of Chapter 11 Petitions and First Day Pleadings* [ECF No. 24]

- *Emergency Motion of John H. Owoc's [sic] for Confirmation that the Automatic Stay Does Not Apply to Termination of Debtor's Subchapter S Corporation Status or, Alternatively, for Relief from Stay* [ECF No. 1627]

- *Majestic Star Casino, LLC v. Barden Dev., Inc. (In re Majestic Star Casino, LLC),* 716 F.3d 736 (3d Cir. 2013)

- Vital Pharmaceuticals, Inc. (the "Company"), Estimated C Corporation Income Taxes on Sale of Assets in Bankruptcy


Tax Law References in Analysis

- Internal Revenue Code Section 1362

- Treasury Regulation Section 1.1362-1 thru 1.1362-6

- Internal Revenue Code Section 6012, 6037, 6062

- Form 1120S Instructions

- Form 1040 Instructions

- Form 2553 Instructions

**Exhibit C**

**Supporting Calculations**

**Supporting Calculations for Expert Report prepared by Richard E Cabrera**

**Opinion 1**    **VPX's tax liability as a result of the Sale as a C corporation**

| | |
|---|---:|
| Total Purchase Price | 370,700,000.00 |
| less: Tax Basis of Assets | (248,900,000.00) |
| Gain/(Loss) on Sale of Assets | 121,800,000.00 |
| | |
| *COMPANY ACTIVITY FOLLOWING REVOCATION* | |
| Estimated Ordinary Income from Business Activity  (July & August) | (7,300,000.00) |
| Estimated Deferred Expenses deductible upon assumption of Buyer | (2,800,000.00) |
| | |
| Estimated Federal Taxable income upon Bankruptcy Sale | 111,700,000.00 |
| Estimated Effective Tax Rate | 24.64% |
| | |
| **Estimated Federal and State Income Tax on Sale in Bankruptcy as a C Corporation (rounded)** | **27,500,000.00** |

**Opinion 1**    **Mr. Owoc Tax Basis Calcualtion at Revocation**

| | |
|---|---:|
| Per Mr. Owoc's 2021 Tax Return | 123,127,088.00 |
| Projected 2022 Taxable Income (Loss) from VPX Schedule K-1 | (57,556,918.00) |
| 2022 Capital Contributions | 11,000,000.00 |
| 2022 Cash Distributions | (755,197.00) |
| Projected 2023 Taxable Income (Loss) from VPX Schedule K-1 | (22,000,000.00) |
| **Tax basis of C Corporation stock after revocation** | **53,814,973.00** |
| | |
| Projected 2023 Taxable Income (Loss) from VPX Schedule K-1 | (22,000,000.00) |
| Estimated Effective Tax Rate | 37.00% |
| **Potential tax savings carried forward by Shareholder, Mr. Owoc, if VPX terminated S-Corp election** | **(8,140,000.00)** |
| | |
| Projected Loss on liquidation of VPX Stock | (53,814,973.00) |
| Estimated Effective Tax Rate | 23.80% |
| **Potential tax savings carried forward by Shareholder, Mr. Owoc, if VPX terminated S-Corp election** | **(12,807,963.57)** |

**Opinion 2**    **Tax liability incurred by Shareholder, Mr. Owoc, if VPX remains an S-Corp**

| | |
|---|---:|
| **2023 Estimated K-1 from VPX** | |
| Box 8a : Long-Term Capital Gain | 47,400,000.00 |
| Projected Capital Loss on liquidation of VPX | (96,114,973.00) |
| Net Capital Gain Income /(Loss) for Mr. Owoc's 2023 tax return | (48,714,973.00) |
| | |
| Box 1: Ordinary Income | 42,300,000.00 |
| Projected 2022 NOL available in 2023 | (57,056,918.00) |
| (80 percent of taxable income before NOL limitation) | (33,840,000.00) |
| Net Ordinary Income for Mr. Owoc's 2023 tax return | 8,460,000.00 |
| | |
| Estimated Effective Tax Rate on Ordinary Income | 40.640% |
| **Net Estimated Tax Liability for Mr. Owoc for 2023** | **3,438,144.00** |

**Opinion 2**    **Potential tax savings carried forward by Shareholder, Mr. Owoc, if VPX remains an S-Corp**

| | |
|---|---:|
| Remaing Capital Loss Carryforward after 2023 | (48,714,973.00) |
| Estimated Effective Tax Rate | 23.80% |
| **Projected Tax Benefit** | **(11,594,163.57)** |
| | |
| Remaining NOL Carryforward after 2023 | (23,216,918.00) |
| Estimated Effective Tax Rate | 37.00% |
| **Projected Tax Benefit** | **(8,590,259.66)** |

**Opinion 3**   **Pro-rata vs. Close the Books Allocations**

| | |
|---|---:|
| Taxable Loss through potentional revocation | (22,000,000.00) |
| Taxable loss post-revocation | (10,100,000.00) |
| Ordinary Gain on Sale of Assets | 74,400,000.00 |
| Capital Gain on Sale of Assets | 47,400,000.00 |
| **Total income to be allocated** | **89,700,000.00** |

| | |
|---|---:|
| **Allocation under "Close the Books" method** | |
| VPX Taxable Income (Loss) Allocation | 111,700,000.00 |
| Shareholder Taxable Income (Loss) Allocation | (22,000,000.00) |
| | |
| **Allocation under "Pro-rata" method** | |
| VPX Taxable Income (Loss) Allocation | 37,400,000.00 |
| Estimated Effective Corporate Tax Rate | 24.64% |

| | |
|---|---:|
| Shareholder Taxable Income (Loss) Allocation - Capital Gain (offset against capital losses) | 27,600,000.00 |
| Shareholder Taxable Income (Loss) Allocation - Ordinary Income | 24,700,000.00 |
| Estimated Effective Tax Rate on Ordinary Income | 40.640% |
| **Estimated Federal and State Individual Income Tax (only on Ordinary income)** | **10,000,000.00** |

**Opinion 4**   **Historical Benefit of S-Status**

| | |
|---|---:|
| Projected 2022 Taxable Income (Loss) from VPX Schedule K-1 | (57,556,918.00) |
| Amount usable in 2022 tax return | 500,000.00 |
| Potential Carryforward of 2022 S Corp Loss | (57,056,918.00) |
| Estimated Effective Tax Rate | 37.00% |
| **Projected Tax Benefit** | **(21,111,059.66)** |

**Opinion 5**   **Detriment to VPX of Mr. Owoc delay to see to terminate S election**

| | |
|---|---:|
| Pro Rata Allocation of 2022 Net Operating Loss to C corpotation short year | (12,000,000.00) |
| 2023 Taxable Loss through potentional termination | (22,000,000.00) |
| Estimated Effective Corporate Tax Rate | 24.64% |
| **Estimated Federal and State Corporate Income Tax** | **(8,400,000.00)** |

# EXHIBIT 2

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FORT LAUDERDALE DIVISION**
**www.flsb.uscourts.gov**

| | |
|---|---|
| In re: | Chapter 11 Cases |
| VITAL PHARMACEUTICALS, INC., *et al.*, | Case No.: 22-17842-PDR |
| Debtors.[1] | (Jointly Administered) |

_____/

**DECLARATION OF JOHN C. DIDONATO IN SUPPORT OF DEBTORS' RESPONSE TO JOHN H. OWOC'S MOTION TO TERMINATE VITAL PHARMACEUTICALS, INC.'S S-CORP STATUS**

Under 28 U.S.C. § 1746, I, John C. DiDonato, hereby declare as follows under the penalty of perjury:

1.     I am the Interim Chief Executive Officer ("CEO") of Vital Pharmaceuticals, Inc. ("VPX") and the other debtors and debtors in possession (together with VPX, the "Company" or the "Debtors") in the above-captioned cases (collectively, the "Chapter 11 Cases"). Prior to my appointment as interim CEO on March 9, 2023, I was the Company's Chief Transformation Officer ("CTO") and retained as such in early September 2022. Through my roles as CTO and interim CEO, I am familiar with the Debtors' day-to-day operations, businesses, and financial affairs.

2.     In addition to my current role with the Debtors, I am a Managing Director of Huron Consulting Services LLC ("Huron") and Huron's Business Advisory Capability Leader. Huron is

---

[1]     The address of the Debtors is 1600 N. Park Drive, Weston, FL 33326. The last four digits of the Debtors' federal tax identification numbers are: (i) Vital Pharmaceuticals, Inc. (8430); (ii) Bang Energy Canada, Inc. (5454); (iii) JHO Intellectual Property Holdings, LLC (0010); (iv) JHO Real Estate Investment, LLC (9394); (v) Quash Seltzer, LLC ("Quash Seltzer") (6501); (vi) Rainbow Unicorn Bev LLC (2254); and (vii) Vital Pharmaceuticals International Sales, Inc. (8019).

an operationally focused consulting firm that specializes in, among other things, bankruptcy, interim management, financial, operational, transformation consulting to financially distressed businesses.  I have more than 35 years of experience counseling distressed companies through operational turnarounds, capital raising, merger integrations, financial consulting, restructuring, serving underperforming companies both in chapter 11 and in-out-of-court situations.  I have served more than 100 debtors, functioning for many as a chief restructuring strategist.  My expertise encompasses a wide range of industries, including consumer products, logistics and distribution, automotive, aerospace, engineering, construction, metals, equipment leasing, retail among many others.

3.      Except as otherwise specified herein, all the facts set forth in this declaration (the "Declaration") are based upon my personal knowledge, my discussions with members of the Debtors' management, the Huron team, the Debtors' other advisors, my review of relevant documents and information concerning the Debtors' operations, financial affairs, and restructuring initiatives, or my opinions based upon my experience and knowledge.

4.      I submit this Declaration in support of the *Debtors' Objection to John H. Owoc's Motion to Terminate Vital Pharmaceuticals, Inc.'s S-Corp Status* (the "Objection") and against the *Emergency Motion of John H. Owoc's [sic] for Confirmation that the Automatic Stay Does Not Apply to Termination of Debtor's Subchapter S Corporation Status or, Alternatvely [sic], for Relief from Stay* [D.I. 1627] (the "Motion").[2]  If called as a witness, I could and would testify competently to the facts set forth in this Declaration.  I am authorized to submit this Declaration on behalf of the Debtors.

### THE DEBTORS' BOARD OF DIRECTORS AND/OR MANAGERS

---

[2]      Capitalized terms used but not defined herein have the meanings ascribed to such terms in the Objection.

5.    I regularly attend meetings of the Boards of Directors and/or Managers (collectively, the "Board"), and am familiar with the composition of the Board over my tenure working with the Debtors.  The Debtors' Board currently consists of the following five individuals: Steven Panagos, Stephen Gray, Rich Caruso, Bob Dickinson, and Gene Bukovi.  Mr. Panagos was duly appointed by written consent as a member of the Board on October 25, 2023 as a member of the Board and as the sole member of the Restructuring Committee of the Board on October 25, 2023. Mr. Dickinson was appointed as a member of the board on December 14, 2022.  Mr. Gray was appointed as a member of the Board on January 7, 2023.  Mr. Caruso was appointed as a member of the Board on March 14, 2023.  And Mr. Bukovi was appointed to the Board on June 16, 2023.

6.    Mr. Owoc is the Company's founder and sole shareholder, and he was the Company's CEO and a member of the Board until March 9, 2023, at which time he was terminated from his positions with the Company, including his roles as CEO and Board member.

7.    Since the Petition Date, the Board has met approximately once per week.  In addition, the Restructuring Committee met approximately once per week beginning in October 2022 through March 9, 2023.  I have attended most, if not all, of the Board and Restructuring Committee meetings since the Petition Date.  Mr. Owoc attended most of these meetings and at many of these meetings the potential sale of the Debtors' assets was discussed.  Up until his termination as CEO on March 9, 2023, Mr. Owoc was present at most, if not all, of the Board and Restructuring Committee meetings, and a potential sale of all or substantially all of the Debtors' assets was discussed at the vast majority of those meetings.  Over the course of the Board and Restructuring Committee meetings that took place between the Petition Date and Mr. Owoc's

termination, at no point did he indicate he was considering action that would convert VPX's status as a Subchapter S corporation ("S-Corp") to a C corporation ("C-Corp").

8.      On March 9, 2023, Mr. Owoc was removed from all of his management positions with the Debtors, including as a Board member, an officer, or authorized representative of any of the Debtors, including VPX.  Mr. Owoc is not currently authorized to sign tax filings (or any other filings) on behalf on the VPX.  As the interim CEO of the Debtors appointed by the Board, I am the only individual at VPX authorized by VPX to sign tax filings on its behalf.  As to tax extensions, in addition to myself, Greg Robbins, the Debtors' Chief Financial Officer, is also authorized to sign such documents on behalf of VPX.

## THESE CHAPTER 11 CASES AND THE MONSTER SALE

9.      The Debtors have invested significant resources in the Chapter 11 Cases, and have worked cooperatively with their constituents, including the Official Committee of Unsecured Creditors, to maximize value of the estates for the benefit of all stakeholders.  The Debtors and their professionals have worked tirelessly to run a value-maximizing sale process, culminating in the Monster Sale (as defined in the Objection)—a sale of the Debtors' assets that has been approved by this Court, and which is scheduled to close on July 31, 2023.  The Monster Sale, and accompanying settlement among the Debtors, the Official Committee of Unsecured Creditors, the DIP Agent and supporting DIP Lenders, Monster, and Orange Bang, are expected to facilitate payment in full of all administrative expense and other "100-cent" claims and confirmation of a chapter 11 plan.

10.     Huron, at my direction, performed an analysis of the flow of funds from the Monster Sale.  A true and correct copy of this analysis is attached hereto as **Exhibit A**.  According to the analysis, the Monster Sale is expected to yield approximately $11.6 million of proceeds for the unsecured creditors.

## THE RELIEF SOUGHT IN THE MOTION

11.     If Mr. Owoc were to convert VPX from an S-Corp into a C-Corp, particularly in this eleventh hour, the estate would suffer significant consequences.  The impacts of such a conversion are set forth in the Expert Report of Richard Cabrera, dated July 24, 2023.  If VPX's S-Corp status is terminated, the estate will be saddled with unexpected taxes, likely leaving unsecured creditors (other than the Internal Revenue Services and other taxing authorities) with no recovery and depriving the Debtors of the ability to confirm and consummate a Chapter 11 plan. Moreover, such a conversion would force the estates to bear significant tax liability that may also compromise the Debtors' ability to pursue a plan and could force a conversion of these Chapter 11 Cases into a Chapter 7 liquidation.

12.     Since the filing of the Motion, the Board has met to discuss the relief sought in the Motion, including the potential conversion of VPX from an S-Corp into a C-Corp.  Following discussions with the Debtors' advisors and presentation of information regarding the likely impact of a conversion to a C-Corp, the Board concluded that it would not be acting in the best interest of the Debtors' estates by consenting to convert VPX from an S-Corp into a C-Corp and/or subsequently making a "close the books" election because such actions would have the effect of diverting all or substantially all of the proceeds from the sale of the Debtors' assets that would otherwise satisfy unsecured claims to satisfy anticipated tax liability at VPX, which would inure only to the benefit of Mr. Owoc and would adversely impact recoveries for all other stakeholders. Moreover, in the event that Mr. Owoc is granted relief from the stay to convert VPX to a C-Corp, but cannot force the Debtors to make the "closing-the-books" election, the Debtors expect to promptly liquidate.

I declare under penalty of perjury that the foregoing is true and correct to the best of my information, knowledge, and belief.

Dated: July 26, 2023

/s/ *John C. DiDonato*
John C. DiDonato
Chief Transformation Officer and Interim Chief
Executive Officer

# Exhibit A

*In re Vital Pharmaceuticals, Inc.*

Funds Flow Summary in connection with Monster Sale

*($ in millions)*

**Proceeds from Sales Transaction**

| | | |
|---|---|---|
| Cash Purchase Price[1] | $362.0 | |
| Less: funding for operations from Deposit | (22.0) | |
| Available from Cash Purchase Price | **$340.0** | [a] |

**Payments in Accordance to Sale Order**

| | | |
|---|---|---|
| Lien release and employee related payments | $24.6 | |
| Closing and Non-Lender Professional Fees | 21.9 | |
| DIP Repayment and Lender Professional Fees | 269.8 | |
| Total Sale Order Payments | **$316.4** | [b] |
| **Remaining Sale Proceeds** | $    23.6 | [c] = [a] - [b] |

**Additional Funding Sources**

| | | |
|---|---|---|
| Recovery of prepaid expenses | $    4.5 | |
| Cash on hand | 3.8 | |
| Proceeds from sale of assets | 0.8 | |
| Additional available cash | **$9.2** | [d] |
| **Available Proceeds before Administrative & Priority Claims** | $    32.8 | [e] = [c] + [d] |

| | | |
|---|---|---|
| Total Administrative Expense / Claims | $16.6 | |
| Estate Wind Down Expenses | 1.2 | |
| Total Priority Expenses / Claims[2] | 3.4 | |
| Administrative and Priority Expenses / Claims | **$21.2** | [f] |
| **Available Proceeds to pursue litigation claims / repay GUCs** | $    11.6 | [g] = [e] - [f] |

**Notes**

[1] To be finalized in closing statement

[2] Excludes impact of converting to C-Corp