UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION
www.flsb.uscourts.gov

In re:                                                    Chapter 11 Cases

VITAL PHARMACEUTICALS, INC., *et al.*,                    Case No.: 22-17842-PDR

　　　　Debtors.[1]                                        (Jointly Administered)

_____/

## SECOND AMENDED DISCLOSURE STATEMENT FOR
## DEBTORS' SECOND AMENDED JOINT PLAN OF LIQUIDATION

**LATHAM & WATKINS LLP**
George A. Davis (admitted *pro hac vice*)
Tianjiao ("TJ") Li (admitted *pro hac vice*)
Brian S. Rosen (admitted *pro hac vice*)
Jonathan J. Weichselbaum (admitted *pro hac vice*)
1271 Avenue of the Americas
New York, NY 10020
Telephone:  (212) 906-1200
Email:  george.davis@lw.com
　　　　tj.li@lw.com
　　　　brian.rosen@lw.com
　　　　jon.weichselbaum@lw.com

**LATHAM & WATKINS LLP**
Andrew D. Sorkin (admitted *pro hac vice*)
555 Eleventh Street, NW, Suite 1000
Washington, D.C. 20004
Telephone:  (202) 637-2200
Email:  andrew.sorkin@lw.com

**LATHAM & WATKINS LLP**
Whit Morley (admitted *pro hac vice*)
330 North Wabash Avenue, Suite 2800
Chicago, IL 60611
Telephone: (312) 876-7700
Email:  whit.morley@lw.com

**BERGER SINGERMAN LLP**
Jordi Guso
Florida Bar No. 863580
Michael J. Niles
Florida Bar No. 107203
1450 Brickell Avenue, Suite 1900
Miami, FL 33131
Telephone:  (305) 755-9500
Email:  jguso@bergersingerman.com
　　　　mniles@bergersingerman.com

*Co-Counsel for the Debtors*
Dated: September 15, 2023

[1] The address of the Debtors is 1600 N. Park Drive, Weston, FL 33326.  The last four digits of the Debtors' federal tax identification numbers are: (i) Vital Pharmaceuticals, Inc. (8430); (ii) Bang Energy Canada, Inc. (5454); (iii) JHO Intellectual Property Holdings, LLC (0010); (iv) JHO Real Estate Investment, LLC (9394); (v) Quash Seltzer, LLC (6501); (vi) Rainbow Unicorn Bev LLC (2254); and (vii) Vital Pharmaceuticals International Sales, Inc. (8019).

12222379-23

## DISCLAIMER

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INCLUDED HEREIN FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE DEBTORS' SECOND AMENDED JOINT PLAN OF LIQUIDATION, DATED SEPTEMBER 15, 2023 (AS MAY BE AMENDED, MODIFIED, OR SUPPLEMENTED FROM TIME TO TIME, THE "**PLAN**"),[2] AND IS INTENDED TO BE USED SOLELY TO DETERMINE HOW TO VOTE ON THE PLAN.  A COPY OF THE PLAN IS ANNEXED HERETO AS **EXHIBIT 1**.  NO SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN MAY BE MADE EXCEPT PURSUANT TO SECTION 1125 OF TITLE 11 OF THE UNITED STATES CODE.

ALL CREDITORS ARE ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN **IN THEIR ENTIRETY** BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.  ALL HOLDERS OF CLAIMS SHOULD CAREFULLY READ AND CONSIDER FULLY THE RISK FACTORS SET FORTH IN <u>SECTION VI</u> OF THIS DISCLOSURE STATEMENT ("RISK FACTORS IN CONNECTION WITH THE PLAN") BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN AND THE EXHIBITS ANNEXED TO THE PLAN AND THIS DISCLOSURE STATEMENT, INCLUDING THE DEFINITIONS OF TERMS CONTAINED IN SUCH DOCUMENTS.  ALL EXHIBITS TO THE DISCLOSURE STATEMENT ARE INCORPORATED INTO AND ARE A PART OF THIS DISCLOSURE STATEMENT AS IF SET FORTH IN FULL HEREIN.

THIS DISCLOSURE STATEMENT CONTAINS A SUMMARY OF CERTAIN PROVISIONS OF THE PLAN.  ALTHOUGH THE DEBTORS (DEFINED HEREIN) BELIEVE AND HAVE MADE EVERY EFFORT TO ENSURE THAT THIS SUMMARY PROVIDES ADEQUATE INFORMATION WITH RESPECT TO THE PLAN, IT DOES NOT PURPORT TO BE COMPLETE AND IS QUALIFIED TO THE EXTENT IT DOES NOT SET FORTH THE ENTIRE TEXT OF THE PLAN.  IF THERE IS ANY INCONSISTENCY BETWEEN THE PLAN AND THE SUMMARY OF THE PLAN CONTAINED IN THIS DISCLOSURE STATEMENT, THE PLAN SHALL CONTROL.  ACCORDINGLY, EACH HOLDER OF A CLAIM SHOULD REVIEW THE PLAN IN ITS ENTIRETY.

THE DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE UNITED STATES BANKRUPTCY CODE AND RULE 3016(b) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND NOT NECESSARILY IN ACCORDANCE WITH OTHER NON-BANKRUPTCY LAW.  PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING, OR TRANSFERRING CLAIMS AGAINST THE DEBTORS SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSE FOR WHICH IT WAS PREPARED.  THIS DISCLOSURE STATEMENT SHALL NOT BE CONSTRUED TO BE ADVICE ON THE TAX, SECURITIES OR OTHER LEGAL EFFECTS OF THE LIQUIDATION OF THE DEBTORS AS TO HOLDERS OF CLAIMS AGAINST THE DEBTORS.

---

[2] Unless otherwise defined, capitalized terms used herein shall have the meaning ascribed to such terms in the Plan.

AS TO ANY CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS.  THIS DISCLOSURE STATEMENT WILL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PARTY, NOR WILL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST, OR EQUITY INTERESTS IN, THE DEBTORS AND DEBTORS-IN-POSSESSION IN THESE CHAPTER 11 CASES.

NO HOLDER OF A CLAIM SHOULD RELY ON ANY INFORMATION RELATING TO THE DEBTORS, THEIR PROPERTY OR THE PLAN OTHER THAN THAT CONTAINED IN THIS DISCLOSURE STATEMENT AND THE ATTACHED EXHIBITS.  THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF UNLESS ANOTHER TIME IS SPECIFIED HEREIN, AND (I) THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER THE DATE HEREOF, AND (II) THE DELIVERY OF THIS DISCLOSURE STATEMENT SHALL NOT CREATE AN IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE INFORMATION STATED SINCE THE DATE HEREOF.

THIS DISCLOSURE STATEMENT AND THE PLAN ARE THE ONLY DOCUMENTS CONDITIONALLY AUTHORIZED BY THE BANKRUPTCY COURT TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES ACCEPTING THE PLAN.  NO REPRESENTATIONS HAVE BEEN CONDITIONALLY AUTHORIZED BY THE BANKRUPTCY COURT CONCERNING THE DEBTORS OR THE PLAN, EXCEPT AS EXPLICITLY SET FORTH IN THE DISCLOSURE STATEMENT.  CONDITIONAL APPROVAL OF THIS DISCLOSURE STATEMENT BY THE BANKRUPTCY COURT DOES NOT INDICATE THAT THE BANKRUPTCY COURT RECOMMENDS EITHER ACCEPTANCE OR REJECTION OF THE PLAN NOR DOES SUCH CONDITIONAL APPROVAL CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT OF THE FAIRNESS OR MERITS OF THE PLAN OR OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT.

EXCEPT WHERE SPECIFICALLY NOTED, THE FINANCIAL INFORMATION CONTAINED HEREIN HAS NOT BEEN AUDITED BY A CERTIFIED PUBLIC ACCOUNTANT AND MAY NOT HAVE BEEN PREPARED IN ACCORDANCE WITH ACCOUNTING PRINCIPLES GENERALLY ACCEPTED IN THE UNITED STATES.

ALTHOUGH THE ATTORNEYS, ADVISORS AND OTHER PROFESSIONALS EMPLOYED BY THE DEBTORS HAVE ASSISTED IN PREPARING THIS DISCLOSURE STATEMENT BASED UPON FACTUAL INFORMATION AND ASSUMPTIONS RESPECTING FINANCIAL, BUSINESS, AND ACCOUNTING DATA FOUND IN THE BOOKS AND RECORDS OF THE DEBTORS, THEY HAVE NOT INDEPENDENTLY VERIFIED SUCH INFORMATION AND MAKE NO REPRESENTATIONS AS TO THE ACCURACY THEREOF.  THE ATTORNEYS, ADVISORS AND OTHER PROFESSIONALS

EMPLOYED BY THE DEBTORS SHALL HAVE NO LIABILITY FOR THE INFORMATION IN THE DISCLOSURE STATEMENT.

PRIOR TO THE EFFECTIVE DATE, THE DEBTORS DO NOT EXPECT TO UNDERTAKE A GENERAL CLAIMS OBJECTION PROCESS WITH RESPECT TO GENERAL UNSECURED CLAIMS, OR TO PURSUE RETAINED CAUSES OF ACTION, BUT THE DEBTORS RESERVE THE RIGHT TO OBJECT TO ANY CLAIM, OR PURSUE ANY RETAINED CAUSE OF ACTION, PRIOR TO THE EFFECTIVE DATE. ON AND AFTER THE EFFECTIVE DATE OF THE PLAN, THE LIQUIDATING TRUSTEE WILL BE VESTED WITH FULL AUTHORITY TO UNDERTAKE THE CLAIMS OBJECTION PROCESS WITH RESPECT TO ALL CLAIMS THAT HAVE NOT BEEN PREVIOUSLY RESOLVED BY COURT ORDER OR OTHERWISE (INCLUDING, BUT NOT LIMITED TO, GENERAL UNSECURED CLAIMS), AND TO PURSUE RETAINED CAUSES OF ACTION. THE FINAL AMOUNTS OF THE DISTRIBUTIONS UNDER THE PLAN TO THE HOLDERS OF ALLOWED GENERAL UNSECURED CLAIMS WILL BE DETERMINED AFTER COMPLETION OF THE CLAIMS OBJECTION PROCESS AND PURSUIT OF RETAINED CAUSES OF ACTION TO BE UNDERTAKEN BY THE LIQUIDATING TRUSTEE.

ALL OF THE PROJECTED RECOVERIES TO CREDITORS ARE BASED UPON THE ANALYSES PERFORMED BY THE DEBTORS AND THEIR PROFESSIONALS. ALTHOUGH THE DEBTORS HAVE MADE EVERY EFFORT TO VERIFY THE ACCURACY OF THE INFORMATION PRESENTED HEREIN AND IN THE EXHIBITS ATTACHED HERETO, THE DEBTORS CANNOT MAKE ANY REPRESENTATIONS OR WARRANTIES REGARDING THE ACCURACY OF THE INFORMATION.

THE DEBTORS BELIEVE THAT THE PLAN PROVIDES THE BEST POSSIBLE RECOVERIES FOR ALL HOLDERS OF CLAIMS. THE DEBTORS ALSO BELIEVE THAT THE PLAN WILL ENABLE THE DEBTORS TO ACCOMPLISH THE OBJECTIVES OF LIQUIDATION UNDER CHAPTER 11 AND THAT ACCEPTANCE OF THE PLAN IS IN THE BEST INTERESTS OF THE DEBTORS AND THEIR CREDITORS. THUS, IT IS THE OPINION OF THE DEBTORS THAT THE TREATMENT OF CREDITORS UNDER THE PLAN CONTEMPLATES A GREATER RECOVERY THAN THAT WHICH IS LIKELY TO BE ACHIEVED UNDER OTHER ALTERNATIVES FOR THE LIQUIDATION OF THE DEBTORS.

IF YOU ARE ENTITLED TO VOTE TO APPROVE THE PLAN, YOU ARE RECEIVING A BALLOT WITH YOUR NOTICE OF THIS DISCLOSURE STATEMENT. THE DEBTORS STRONGLY URGE CREDITORS TO VOTE TO ACCEPT THE PLAN.

THIS DISCLOSURE STATEMENT WAS NOT FILED WITH THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE AUTHORITY AND NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE AUTHORITY HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THIS DISCLOSURE STATEMENT OR UPON THE MERITS OF THE PLAN. NEITHER THIS DISCLOSURE STATEMENT NOR THE SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN CONSTITUTES AN OFFER TO SELL OR THE SOLICITATION OF AN OFFER TO BUY SECURITIES IN ANY

STATE OR JURISDICTION IN WHICH SUCH OFFER OR SOLICITATION IS NOT AUTHORIZED.

THIS DISCLOSURE STATEMENT MAY CONTAIN "FORWARD LOOKING STATEMENTS" WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995. SUCH STATEMENTS CONSIST OF ANY STATEMENT OTHER THAN A RECITATION OF HISTORICAL FACT AND CAN BE IDENTIFIED BY THE USE OF FORWARD-LOOKING TERMINOLOGY SUCH AS "MAY," "EXPECT," "ANTICIPATE," "ESTIMATE" OR "CONTINUE" OR THE NEGATIVE THEREOF OR OTHER VARIATIONS THEREON OR COMPARABLE TERMINOLOGY. THE READER IS CAUTIONED THAT ALL FORWARD-LOOKING STATEMENTS ARE NECESSARILY SPECULATIVE AND THERE ARE CERTAIN RISKS AND UNCERTAINTIES THAT COULD CAUSE ACTUAL EVENTS OR RESULTS TO DIFFER MATERIALLY FROM THOSE REFERRED TO IN SUCH FORWARD LOOKING STATEMENTS.

## QUESTIONS AND ADDITIONAL INFORMATION

All holders of Claims entitled to vote on the Plan will receive copies of this Disclosure Statement, the Plan, and the exhibits annexed thereto. If you are not entitled to vote on the Plan, but would like to obtain copies of this Disclosure Statement, the Plan, or any of the other documents attached hereto or referenced herein, or if you have questions about the solicitation and voting process or the Chapter 11 Cases more generally, please visit https://cases.stretto.com/VitalPharmaceuticals, or you may contact counsel for the Debtors, c/o Latham & Watkins LLP, 555 Eleventh Street, NW, Suite 1000 Washington, D.C. 20004, Attn: Andrew D. Sorkin, Esq., tel. 202.637.2200, email: andrew.sorkin@lw.com, or Berger Singerman LLP, 1450 Brickell Avenue, Suite 1900, Miami, Florida 33131, Attn: Jordi Guso, Esq., tel. 305.714.4375, email: jguso@bergersingerman.com; or Michael J. Niles, Esq., tel. 850.521.6736, email: mniles@bergersingerman.com.

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ................................................................................................ 1
    A.    Overview of Chapter 11 and the Plan Confirmation Process. ................ 2
    B.    Recommendation of the Debtors and Plan Overview. ............................ 3
    C.    Summary of Classification and Treatment of Claims Under the Plan. ......... 3
    D.    Summary of Voting Requirements for Plan Confirmation. ...................... 5

II. BACKGROUND INFORMATION .................................................................. 7
    A.    Overview of Business Operations. ......................................................... 7
    B.    The Corporate Structure and Governance of the Debtors. .................... 10
    C.    The Prepetition Capital Structure of the Debtors. ............................... 10
    D.    Notable Pre-Petition Litigation. .......................................................... 11

III. EVENTS LEADING TO THE FILING OF THE CHAPTER 11 CASES ................... 13

IV. EVENTS OCCURRING DURING DEBTORS' CHAPTER 11 CASES ...................... 14
    A.    Bankruptcy Filings, Hearings, and Certain Orders of the Bankruptcy Court. .......... 14
    B.    Retention and Employment of Bankruptcy Professionals. .................... 21
    C.    Appointment of Creditors' Committee. ................................................ 22
    D.    Meeting of Creditors. ........................................................................... 22
    E.    Schedules of Assets and Liabilities and Statements of Financial Affairs. .......... 22
    F.    Motions for Relief from Stay. ............................................................... 23
    G.    DIP Financing. ..................................................................................... 25
    H.    Changes in Corporate Governance. ..................................................... 26
    I.    Sale of the Purchased Assets. ............................................................... 26
    J.    Global Settlement Agreement ............................................................. 27
    K.    Motion to Dismiss JHO Real Estate Investment, LLC Case. ............... 28
    L.    Emergency Motion to Confirm That Automatic Stay Does Not Apply to Termination of VPX's Subchapter S Corporation Status. ................ 28
    M.    Pending Adversary Proceedings. .......................................................... 29
    N.    Retained Causes of Action. ................................................................... 31

V. THE CHAPTER 11 PLAN .............................................................................. 31

# TABLE OF CONTENTS
(continued)

Page

A.    Treatment of Claims and Equity Interests Under the Plan. ........................ 31

B.    Voting Classes; Presumed Acceptance by Non-Voting Classes. .................... 36

C.    Voting Classes; Acceptance and Rejection. ..................................... 36

D.    Confirmation Pursuant to Section 1129(a)(10) and 1129(b) of the
      Bankruptcy Code. ........................................................... 36

E.    Treatment of Claims and Equity Interests. ...................................... 37

F.    Means for Implementation of the Plan. .......................................... 39

G.    Liquidating Trust. ............................................................ 39

H.    Liquidating Trust Oversight Committee ......................................... 42

I.    Liquidating Trustee's Conflict of Interest. ..................................... 43

J.    Liquidating Trustee. .......................................................... 44

K.    Cash Investments. ............................................................ 46

L.    No Revesting of Liquidating Trust Assets. ...................................... 46

M.    Distribution of Liquidating Trust Assets. ....................................... 46

N.    Liquidating Trust Mechanics. .................................................. 46

O.    Corporate Governance. ........................................................ 52

P.    Distributions. ................................................................ 53

Q.    Procedures for Disputed Claims. ............................................... 57

R.    Executory Contracts. .......................................................... 59

S.    Conditions Precedent to the Effective Date ..................................... 62

T.    Effect of Confirmation ........................................................ 63

U.    Releases, Injunctions and Indemnification of Claims. ........................... 64

V.    Retention of Jurisdiction. ..................................................... 70

W.    Miscellaneous Provisions. ..................................................... 72

VI. RISK FACTORS IN CONNECTION WITH THE PLAN .............................. 77

A.    Non-confirmation of the Plan. ................................................. 77

B.    Nonconsensual Confirmation. .................................................. 78

C.    Claim Objections. ............................................................ 78

D.    Distributions. ............................................................... 78

E.    Jurisdiction. ................................................................. 78

F.    Administrative Insolvency. ..................................................... 79

12222379-23

# TABLE OF CONTENTS
(continued)

**Page**

| | | | |
|---|---|---|---|
| G. | Debtors Have No Duty to Update. | | 79 |
| H. | Amendment, Waiver, Modification, or Withdrawal of Plan. | | 80 |
| I. | Non-occurrence or Delayed Occurrence of the Effective Date. | | 80 |
| J. | Conversion to Chapter 7. | | 81 |
| K. | Dismissal of the Chapter 11 Cases. | | 81 |
| L. | Cost of Administering the Debtors' Estates. | | 81 |

**VII. PLAN CONFIRMATION AND CONSUMMATION** .................................................. **81**

| | | |
|---|---|---|
| A. | The Confirmation Hearing. | 81 |
| B. | Plan Confirmation Requirements Under the Bankruptcy Code. | 82 |

**VIII. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN** ............................................................................................................ **85**

| | | |
|---|---|---|
| A. | Chapter 7 Liquidation. | 86 |
| B. | Alternative Plan Pursuant to Chapter 11 of the Bankruptcy Code. | 86 |
| C. | Dismissal of the Debtors' Chapter 11 Cases. | 86 |

**IX. CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN** ....... **86**

| | | |
|---|---|---|
| A. | General. | 87 |
| B. | Consequences to the Debtors and to Holders of Existing Equity Interests as Relates to Consequences to the Debtors. | 88 |
| C. | Consequences to Certain Holders of Claims and Holders of Existing Equity Interests as Relates to Receiving Recovery under the Plan. | 90 |
| D. | Tax Treatment of the Liquidating Trust and Liquidating Trust Beneficiaries. | 92 |
| E. | Withholding on Distributions and Information Reporting. | 95 |

12222379-23

## **EXHIBITS**

Exhibit 1      Debtors' Second Amended Joint Plan of Liquidation dated September 15, 2023

Exhibit 2      Liquidation Analysis

Exhibit 3      Summary of Proceeds Received and Disbursements Made by Debtors at Closing

Exhibit 4      Organizational Chart

# I.

## INTRODUCTION

On October 10, 2022 (the "**Petition Date**"), Vital Pharmaceuticals, Inc. ("**VPX**"), Bang Energy Canada, Inc., JHO Intellectual Property Holdings, LLC ("**JHO**"), JHO Real Estate Investment, LLC ("**JHO RE**"), Quash Seltzer, LLC, Rainbow Unicorn Bev LLC, and Vital Pharmaceuticals International Sales, Inc. (collectively, the "**Debtors**" or the "**Company**") each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, as now in effect or as hereafter amended (the "**Bankruptcy Code**"). The Debtors' Chapter 11 Cases are being jointly administered under the caption *In re Vital Pharmaceuticals, Inc.*, Case No. 22-17842-PDR.

The Debtors submit this disclosure statement (the "**Disclosure Statement**"), pursuant to section 1125 of the Bankruptcy Code, and rule 3017 of the Federal Rules of Bankruptcy Procedure, as now in effect or as hereafter amended (the "**Bankruptcy Rules**"), in connection with the solicitation of votes on their proposed *Debtors' Second Amended Joint Plan of Liquidation,* dated as of September 15, 2023, as the same may be amended or modified from time to time by the Debtors (the "**Plan**") and attached hereto as **Exhibit 1**.[3]  The Debtors believe that confirmation and implementation of the Plan is in the best interests of the Debtors' Estates, creditors, and all other interested parties.

In particular and as set forth in greater detail in the Committee Support Letter, the Official Committee of Unsecured Creditors (the "**Creditors' Committee**"), as the statutory fiduciary representative of unsecured creditors of the Debtors, strongly urges the holders of General Unsecured Claims to vote in favor of the Plan.

This Disclosure Statement and the other documents described herein are being furnished by the Debtors to creditors in the Debtors' Chapter 11 Cases pending before the United States Bankruptcy Court for the Southern District of Florida (the "**Bankruptcy Court**"). This Disclosure Statement is intended to provide adequate information of a kind, and in sufficient detail, to enable the Debtors' creditors to make an informed judgment about the Plan, including whether to accept or reject the Plan. This Disclosure Statement sets forth certain information regarding: (1) the Debtors' prepetition operating and financial history; (2) the Debtors' need to file for relief under chapter 11 of the Bankruptcy Code; (3) significant events that have occurred to date in the Debtors' Chapter 11 Cases; (4) the terms of the Plan; (5) the manner in which distributions will be made under the Plan; (6) certain effects of confirmation of the Plan; (7) certain risk factors associated with the Plan; and (8) the confirmation process and the voting procedures that holders of Claims entitled to vote under the Plan must follow for their votes to be counted.

This Disclosure Statement is subject to the Bankruptcy Court's approval, as containing information of a kind, and in sufficient detail, adequate to enable a hypothetical, reasonable investor typical of each of the Classes whose votes are being solicited to make an informed judgment with respect to the Plan. **THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A DETERMINATION WITH**

---

[3] Any term not explicitly defined herein shall have the meaning attributed to it in the Plan.

**RESPECT TO THE MERITS OF THE PLAN. ALL CREDITORS ARE ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND ITS EXHIBITS CAREFULLY AND IN THEIR ENTIRETY BEFORE DECIDING TO VOTE TO ACCEPT OR REJECT THE PLAN**.

The summary of the Plan provided herein is qualified in its entirety by reference to the Plan. To the extent that the information provided in this Disclosure Statement and the Plan (including any Plan Supplements) conflict, the terms of the Plan (including any Plan Supplements) will control. Terms not otherwise specifically defined herein will have the meanings attributed to them in the Plan. Each definition in this Disclosure Statement and in the Plan includes both the singular and plural. Headings are for convenience or reference only and shall not affect the meaning or interpretation of this Disclosure Statement.

## THE PLAN

THE FOLLOWING IS A BRIEF SUMMARY OF CERTAIN OF THE MORE SIGNIFICANT MATTERS CONTEMPLATED BY, OR IN CONNECTION WITH THE CONFIRMATION OF THE PLAN. THUS, THE FOLLOWING SUMMARY IS QUALIFIED IN ITS ENTIRETY BY THE PLAN, WHICH IS ATTACHED TO THIS DISCLOSURE STATEMENT AS **EXHIBIT 1**. THIS SUMMARY ONLY HIGHLIGHTS CERTAIN SUBSTANTIVE PROVISIONS OF THE PLAN. CONSIDERATION OF THIS SUMMARY WILL NOT, NOR IS IT INTENDED TO, YIELD A THOROUGH UNDERSTANDING OF THE PLAN. CONSIDERATION OF THIS SUMMARY IS NOT A SUBSTITUTE FOR A FULL AND COMPLETE READING OF THE PLAN. ALL HOLDERS OF CLAIMS AND INTERESTS ARE URGED TO REVIEW THE PLAN CAREFULLY. THE PLAN, IF CONFIRMED, WILL BE BINDING ON EACH OF THE DEBTORS AND ALL HOLDERS OF CLAIMS AND INTERESTS.

**A.      Overview of Chapter 11 and the Plan Confirmation Process.**

Chapter 11 of the Bankruptcy Code allows debtors to reorganize or to liquidate and wind up their affairs for the benefit of the debtors and their creditors. Upon the commencement of a chapter 11 case, an estate is created comprised of all the legal and equitable interests of a debtor as of the date the petition is filed, which typically remain in control of the debtor as a debtor-in-possession.

The Debtors sold the Purchased Assets (i.e., substantially all of the Debtors' assets, as described in the Asset Purchase Agreement) in a transaction that closed on July 31, 2023, as described in greater detail herein, and the Debtors remain in possession of their remaining property without the oversight of a trustee.

Pursuant to section 362 of the Bankruptcy Code, the filing of a chapter 11 petition imposes an automatic stay of all attempts by creditors or third-parties to collect or enforce prepetition claims against a debtor or otherwise interfere with its property or business, unless relief from the automatic stay is obtained from the bankruptcy court.

The Bankruptcy Code is designed to encourage the parties-in-interest in a chapter 11 case to negotiate the terms of a chapter 11 plan so that it may be confirmed. A chapter 11 plan is the vehicle for satisfying or otherwise addressing the claims against and the interests in the debtor. Confirmation of a chapter 11 plan makes it binding on the debtor and all of its creditors and the prior obligations owed by the debtor to such parties are compromised in exchange for the obligations specified in the plan.

After a chapter 11 plan has been filed, the holders of impaired claims against the debtor are permitted to vote to accept or reject the plan. Before soliciting acceptances of the proposed plan, section 1125 of the Bankruptcy Code requires the debtor to file a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical, reasonable investor to make an informed judgment about the plan. This Disclosure Statement is presented to holders of Claims against the Debtors entitled to vote under section 1125 of the Bankruptcy Code in connection with the Debtors' solicitation of votes on the Plan.

**B.      Recommendation of the Debtors and Plan Overview.**

The Plan provides for, among other things, the establishment of a Liquidating Trust to distribute the Liquidating Trust Assets of the Debtors and appoint the Liquidating Trustee pursuant to the mechanics as set forth in the Plan. The following is a brief overview of the Plan and is qualified by reference to the Plan itself.

**C.      Summary of Classification and Treatment of Claims Under the Plan.**

Following the closing of the Sale Transaction, the remaining assets in the Estates include Cash on hand and the Retained Causes of Action (*see* Liquidation Analysis attached hereto as **Exhibit 2**). A brief summary of the Classes established under the Plan, including the treatment and voting rights of each Class, is set forth below. A complete description of the treatment of each class is set forth in <u>Article IV</u> of the Plan and Section V of this Disclosure Statement. Parties should refer to those sections for a complete description of the proposed treatment for each class.

| Class | Type of Claim or Interest | Status | Treatment | Entitled to Vote | Approx. Percentage Recovery |
|-------|---------------------------|--------|-----------|------------------|------------------------------|
| 1 | Other Secured Claims | Unimpaired | Except to the extent that a holder of an Allowed Other Secured Claim against any of the Debtors has agreed to less favorable treatment of such Claim, each such holder of an Allowed Other Secured Claim shall receive, at the option of, as applicable, the Debtors or the Liquidating Trustee, in full and final satisfaction of such Allowed Other Secured Claim, (i) payment in full in Cash, payable on the later of the Effective Date and the first Business Day after thirty (30) calendar days from the date on which such Other Secured Claim becomes an Allowed Other Secured Claim, or as soon as reasonably practical thereafter, (ii) abandonment to the holder of such Allowed Other Secured Claim of the collateral securing such Allowed Other Secured Claim and payment of any interest required under section 506(b) of the Bankruptcy Code, or (iii) such other treatment necessary to satisfy section 1129 of the Bankruptcy Code. | No; Deemed to Accept the Plan | 100% |

| Class | Type of Claim or Interest | Status | Treatment | Entitled to Vote | Approx. Percentage Recovery |
|---|---|---|---|---|---|
| 2 | Other Priority Claims | Unimpaired | Except to the extent that a holder of an Allowed Other Priority Claim against any of the Debtors has agreed to less favorable treatment of such Allowed Other Priority Claim, each such holder of an Allowed Other Priority Claim shall receive, in full and final satisfaction of such Allowed Other Priority Claim, Cash in an amount equal to such Allowed Other Priority Claim, payable on or as soon as reasonably practicable after the later of the Effective Date and the date on which such Other Priority Claim becomes an Allowed Other Priority Claim, or as soon as reasonably practical thereafter. | No; Deemed to Accept the Plan | 100% |
| 3 | General Unsecured Claims | Impaired | Except to the extent that a holder of an Allowed Class 3 Claim agrees to less favorable treatment: each holder of an Allowed General Unsecured Claim shall receive Liquidating Trust Interests entitling each such holder to receive its Pro Rata share of the Residual Cash, provided, however, that notwithstanding the foregoing, no distributions of Residual Cash or otherwise shall be made to holders of Settlement Parties' Allowed General Unsecured Claims (and such Claims shall not be considered for purposes of determining the Pro Rata share of Residual Cash to which holders of other Allowed General Unsecured Claims are entitled) unless and until: (x) in the case of the Allowed DIP Deficiency Claim, holders of Allowed General Unsecured Claims not constituting Settlement Parties' Allowed General Unsecured Claims have received distributions totaling, in the aggregate, at least (I) $5 million less (II) the positive difference, if any, between (A) the Debtors' good faith estimate of Residual Cash held by the Debtors as of the Effective Date and (B) $15.5 million minus the aggregate amount of Fee Claims for professional services rendered or costs incurred on or after the Closing Date through the Effective Date; and (y) in the case of all other Allowed Settlement Parties' Allowed General Unsecured Claims, Holders of Allowed General Unsecured Claims have received distributions totaling, in the aggregate, at least $5 million. Distributions to Holders of Allowed General Unsecured Claims shall be made at such times and in such intervals as determined by the Liquidating Trustee. | Yes; Entitled to Vote | 1% or greater depending on the results of claims reconciliation and monetization of Excluded Assets, including Retained Causes of Action |
| 4 | Intercompany Claims | Impaired and No Distribution | The holders of Intercompany Claims shall not receive or retain any property under the Plan on account of such Claims. | No; Deemed to Accept the Plan | 0% |
| 5 | Other Subordinated Claims | Impaired and No Distribution | Holders of Allowed Other Subordinated Claims shall not receive or retain any property under the Plan on account of such Claims. | No; Deemed to Reject the Plan | 0% |
| 6 | Existing Equity Interests | Impaired | Solely in the event that all Allowed Claims have been satisfied in full in accordance with the Bankruptcy Code and the Plan, each holder of an Existing Equity Interest may receive its amount of proceeds realized from the Liquidating Trust Assets consistent with such holder's rights of payment existing immediately prior to the Petition Date. The Liquidating Trustee shall determine, in the Liquidating Trustee's sole discretion, whether and when, to: (i) cancel and extinguish the | No; Deemed to Reject the Plan | 0% |

| Class | Type of Claim or Interest | Status | Treatment | Entitled to Vote | Approx. Percentage Recovery |
|-------|---------------------------|--------|-----------|------------------|------------------------------|
| | | | Existing Equity Interests; (ii) transfer the Existing Equity Interests into the Liquidating Trust; or (iii) provide other treatment for the Existing Equity Interests consistent with the terms of this Plan and the Sale Order. | | |

## D.    Summary of Voting Requirements for Plan Confirmation.

### (1)    In General.

Creditors should refer only to this Disclosure Statement and the Plan to determine whether to vote to accept or reject the Plan.  Under the Bankruptcy Code, only holders of Claims that are "impaired" are entitled to vote to accept or reject the Plan.  Under section 1124 of the Bankruptcy Code, a class of claims or interests is deemed to be "impaired" under a plan unless (1) the plan leaves unaltered the legal, equitable and contractual rights to which such claim or interest entitles the holder thereof; or (2) notwithstanding any legal right to an accelerated payment of such claim or interest, the plan, among other things, cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

An impaired class of creditors votes to accept a plan if the holders of at least two-thirds (2/3) in dollar amount, and more than one-half (1/2) in number, of those creditors in such class that actually cast ballots vote to accept such plan.  Those classes that are not impaired are not entitled to vote and are deemed to accept a plan.  Those classes that are not entitled to a distribution and will not retain property under a plan are deemed to reject a plan.

A class of interest holders is deemed to accept a plan if the holders of at least two-thirds (2/3) in amount of those interest holders that actually cast ballots vote to accept such plan.  A class of interest holders is impaired, not entitled to vote, and deemed to reject the plan if the plan treats such holders by providing that they will retain no property and receive no distributions under the plan.

Any Claim in an Impaired Class that is subject to a pending objection or is scheduled as unliquidated, disputed, or contingent is not entitled to vote unless the holder of such Claim has obtained an order of the Bankruptcy Court temporarily allowing the Claim for the purpose of voting on the Plan.

Pursuant to the Bankruptcy Code, only creditors who actually vote on the Plan will be counted for purposes of determining whether the required number of acceptances have been obtained.  Failure to deliver a properly completed ballot by the Voting Deadline (as defined herein) will result in an abstention; consequently, the vote will neither be counted as an acceptance or rejection of the Plan.-

(2)    Impaired Classes Entitled to Vote.

Only the Claims in Class 3 (General Unsecured Claims) are Impaired and entitled to vote to accept or reject the Plan.

(3)    Impaired and Unimpaired Classes Deemed to Accept the Plan.

Claims in Class 1 (Other Secured Claims) and Class 2 (Other Priority Claims) are Unimpaired and the vote of holders of such Claims in these Classes will not be solicited because they are deemed to accept the Plan under Bankruptcy Code section 1126(f). Claims in Class 4 (Intercompany Claims) are Impaired; however, the vote of holders of such Claims in Class 4 (Intercompany Claims) will not be solicited because they are claims held by the Debtors and are therefore deemed to accept the Plan.

(4)    Certain Classes Are Deemed to Reject the Plan and Do Not Vote.

Under Bankruptcy Code section 1126(g), Class 5 (Other Subordinated Claims) and Class 6 (Existing Equity Interests) are deemed to have rejected the Plan. The vote of holders of such Claims and Interests in these Classes will not be solicited.

(5)    Solicitation Package.

The solicitation package will contain: (i) the notice of this Disclosure Statement; (ii) the Plan; (iii) the Committee Support Letter; (iv) an appropriate Ballot, including voting instructions and a pre-addressed, postage prepaid return envelope; and (v) such other materials as the Bankruptcy Court may direct or approve or that the Debtors deem appropriate.

Holders of Claims or Interests in non-voting classes that are deemed to accept or reject the Plan will only receive the notice of this Disclosure Statement

(6)    Voting Deadline.

The Debtors have engaged Stretto, Inc. as their agent to assist in the transmission of voting materials with respect to the Plan. If a Creditor holds a Claim or Interest classified in a voting Class of Claims under the Plan as of **September 14, 2023**, the ("**Voting Record Date**"), that holder's acceptance or rejection of the Plan will be solicited. Votes must be returned to Stretto, Inc., the Debtors' balloting agent, by **October 19, 2023 at 5:00 p.m. (prevailing Eastern Time)** (the "**Voting Deadline**").

(7)    Voting Instructions.

IN ORDER FOR A VOTE TO BE COUNTED, THE BALLOT MUST BE PROPERLY COMPLETED IN ACCORDANCE WITH THE VOTING INSTRUCTIONS ON THE BALLOT

AND **ACTUALLY RECEIVED** BY STRETTO, INC. BY THE VOTING DEADLINE AT THE ADDRESS PRINTED ON THE BALLOT.

(8)     Ballots.

Creditors must use only the Ballot or Ballots sent to them with the notice of this Disclosure Statement.  If a Creditor has multiple Claims that it is entitled to vote, it should receive multiple Ballots.  IF A CREDITOR RECEIVES MORE THAN ONE BALLOT, THEN THE CREDITOR SHOULD ASSUME THAT EACH BALLOT IS FOR A SEPARATE CLAIM AND SHOULD COMPLETE AND RETURN EACH OF THE BALLOTS.

(9)     Additional Information.

If you have any questions about (1) the procedure for voting on your Claim, (2) the package of materials that you have received, (3) the amount of your Claim, (4) obtaining or replacing a Ballot, or (5) obtaining an additional copy of the Plan, this Disclosure Statement, or any exhibits to such documents, please contact Debtors' counsel c/o Latham & Watkins, LLP, 555 Eleventh Street, NW, Suite 1000 Washington, D.C. 20004, Attn: Andrew D. Sorkin, Esq., tel. 202.637.2200, email: andrew.sorkin@lw.com, or Berger Singerman LLP, 1450 Brickell Avenue, Suite 1900, Miami, Florida 33131, Attn: Jordi Guso, Esq., tel.  305.755-9500, email: jguso@bergersingerman.com;  or Michael J. Niles, Esq., tel.  850.521.6736, email: mniles@bergersingerman.com.

If you are a holder of a General Unsecured Claim and have questions about the Committee Support Letter, please contact Creditors' Committee counsel c/o Lowenstein Sander LLP, 1251 Avenue of the Americas, New York, NY, 10020, Attn: Jeffrey Cohen, Esq., tel. 212.419.5868, email:  jcohen@lowenstein.com;  Eric  Chafetz,  Esq.,  tel.  212.414.6886,  email: echafetz@lowenstein.com; Lindsay Sklar, Esq., tel. 646.414.6883, email: lsklar@lowenstein.com; or Erica Mannix, Esq., tel. 212.419.6020, email: emannix@lowenstein.com, or Sequor Law, P.A., 1111 Brickell Avenue, Suite 1250, Miami, FL 33131, tel. 305.372.8282, email: Leyza F. Blanco, Esq., lblanco@sequorlaw.com.

## II.

## BACKGROUND INFORMATION

A.     **Overview of Business Operations.**

(1)     Historically through September 30, 2022.

Established in 1993 and headquartered in Weston, Florida, the Debtors were a frontrunner in sports nutrition and a pioneer in the performance energy drink industry.  The Debtors produced novel and great tasting beverages, many without sugar, calories, carbohydrates, or artificial flavors, and with caffeine, electrolytes, and other performance ingredients.  The Debtors' leading product was Bang energy drink ("**Bang**"), which was launched by the Debtors in 2012, and was the fastest growing beverage in the United States non-alcoholic beverage sector in 2018.  Bang was the third best-selling energy drink in the United States as measured by retail sales and market share data, in

each case, as of April, 2022.

Starting in 2016, the Debtors' business historically had been profitable. As illustrated in the chart below, from 2016 to 2019, the Debtors demonstrated significant enterprise growth and experienced increased customer demand for their products.



| | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022E |
|---|---|---|---|---|---|---|---|
| Net Sales | $47.1 | $77.7 | $285.6 | $626.2 | $700.8 | $715.2 | $525.2 |
| EBITDA [1] | $9.4 | $17.5 | $83.7 | $175.1 | $127.3 | $25.5 | $(73.5) |

[1] Before income and expenses related to Pepsi distribution transition and separation

In 2019, prior to its distribution network transition, the Debtors achieved approximately $1.2 billion in retail sales, approximately $626 million in net revenue, and approximately $175 million in earnings before interest, taxes, depreciation, and amortization, and had a 184% compound annual growth rate from 2017 to 2019.

As of the Petition Date, the Debtors employed 1103 employees, of which 1013 were full time, 88 were part time, and 2 were seasonal employees.

(2)    Marketing Strategy.

The Debtors deployed a marketing strategy utilizing (a) digital marketing, including social media (*e.g.*, TikTok, Facebook, Instagram, and YouTube), (b) influencers and brand ambassadors, and (c) in-store promotion. Taken together, the Debtors' marketing strategy resulted in the Debtors becoming a dominant brand on social media, with over 4 million followers across its various social media accounts. As of September 30, 2022, the Debtors worked with approximately 1,000 influencers. In total, the Debtors' marketing efforts on social media reached approximately 1.3 billion followers through the Debtors' contracted influencers and brand ambassadors.

At times, the Debtors' marketing strategy was geared towards promoting fitness and performance for energy drink consumers. The Debtors hosted and sponsored music festivals, sporting events, concerts, and trade shows around the world to connect with customers at live gatherings and events. In addition, the Debtors introduced their products through sampling and

unique giveaways and utilized unique packaging and vibrant displays to make their products stand out in stores.

    (3)    Distribution Network and Transition.

    The Debtors' distribution network was critical to the sales of its products and overall business strategy. As detailed below, the Debtors spent several months prior to the Petition Date building out their network of distributors. Historically, the Debtors relied on a decentralized network of regional distributors to put their products in the hands of the ultimate consumers. In April 2020, to both centralize and expand its distribution footprint and achieve further growth, VPX changed paths and entered into an exclusive distribution agreement (the "**Pepsi Distribution Agreement**") with PepsiCo, Inc. ("**Pepsi**"), which encompassed the distribution of "BANG-branded Licensed Products" (as defined in the Pepsi Distribution Agreement).

    On October 23, 2020, VPX terminated the Pepsi Distribution Agreement due to its view that Pepsi's strategies were suboptimal and the parties' varying expectations and visions. Following the termination, various legal proceedings ensued.[4] While the legal proceedings were pending, VPX and Pepsi engaged in constructive dialogue toward a comprehensive settlement. On June 21, 2022, VPX and Pepsi entered into that certain confidential settlement agreement and release of all claims (the "**Pepsi Settlement**"), under which VPX and Pepsi agreed to, among other things, the dismissal of the Existing Legal Matters (as defined in the Pepsi Settlement) and the termination of the Pepsi Distribution Agreement, and entered into certain post-termination transition arrangements. In accordance with the resolution of the Existing Legal Matters, Pepsi continued to distribute products for VPX into 2022. In 2021, Pepsi's distribution accounted for approximately 81.6% of VPX's sales.

    Since entering the Pepsi Settlement and through the summer and early fall of 2022, the Debtors began the process of transitioning back to a decentralized distribution network, which consisted of (a) regional independent distributors, many of which distributed VPX's products prior to VPX's entry into the Pepsi Distribution Agreement, and (b) in-house direct store delivery ("DSD") using an existing Debtor-owned distribution fleet. As of the Petition Date, VPX had made significant progress in its transition to its new distribution network, which was expected to consist of 269 independent distributors.

    Post-petition, the Debtors continued to transition their distribution network. This transition included (a) expanding the territory and coverage of independent distributors that distributed the Debtors' Bang products; (b) adding independent distributors that previously had been part of VPX's distribution network prior to VPX's relationship with Pepsi, but had not served as independent distributors during the period when the Pepsi Distribution Agreement was in effect;

---

[4] Such legal proceedings are defined as "Existing Legal Matters" in the Pepsi Settlement Agreement and mean, collectively: *PepsiCo, Inc. v. Vital Pharm., Inc.*, Case 01-20-0015-8060, American Arbitration Association (filed Nov. 23, 2020); *Vital Pharm., Inc. v. PepsiCo, Inc.*, Case No. 0:20-cv-62415-RAR (S.D. Fla., filed Nov. 25, 2020); *Quash Seltzer, LLC v. PepsiCo, Inc.*, No. 21-CV-60191-RAR (S.D. Fla., filed Jan. 26, 2021); *PepsiCo, Inc. v. Vital Pharm., Inc.*, No. 0:22-cv-60805-RAR (S.D. Fla., filed Apr. 27, 2022); *JHO Intellectual Prop. Holdings, LLC, Elite IP Holdings, LLC, and Vital Pharm., Inc., v. PepsiCo, Inc.*, No. 2:22-cv-00353 (D. Ari., filed Jan. 28, 2022); *Vital Pharm., Inc. v. PepsiCo, Inc.*, No. 2:22-cv-00593 (D. Ari., filed Apr. 11, 2022); and *Vital Pharm., Inc. v. PepsiCo, Inc.*, No. 2:22-cv-00591 (D. Ari., filed Apr. 11, 2022).

(c) adding additional independent distributors that had not previously distributed the Bang products; and (d) reestablishing the DSD network.

As of October 3, 2022, 227 of such independent distributors (which covered 92.3% of the overall distribution volume) were under contract (whether through an Exclusive Distribution Agreement ("EDA") or a legacy agreement), 149 of such distributors had outstanding accounts receivable with VPX, and 105 of such distributors were already actively distributing VPX's products. The transition was expected to be substantially complete by mid-November 2022, after which point Pepsi would no longer distribute VPX products. During the Fall of 2022, the Debtors were negotiating for shelf space with major national retail outlets in order to maximize the performance of the distribution network. The implementation of the new distribution network was expected to return the Debtors to the trajectory of rapid growth it was on as recently as 2019 (prior to VPX's entry into the Pepsi Distribution Agreement). The Debtors completed this transition and build-out of their distribution network in the fourth quarter of 2022.

**B.    The Corporate Structure and Governance of the Debtors.**

An organizational chart reflecting the Debtors' corporate structure is attached hereto as **Exhibit 3**.

Historically, John H. Owoc, the founder and sole shareholder of the Debtors, served as the sole director or member, as well as the Chief Executive Officer or managing member, as applicable, of the each of the Debtor entities. In the months leading up to the filing of these Chapter 11 Cases and in order to facilitate a value-maximizing restructuring process, Mr. Owoc retained restructuring advisors and authorized a number of changes to the Debtors' governance structure.

*First*, on September 6, 2022, Mr. Owoc appointed John C. DiDonato as the Chief Transformation Officer of each of the Debtor entities, with a mandate to support, manage, and oversee the Debtors' restructuring activities. *Second*, Mr. Owoc expanded the size of the board of directors or managers, as applicable, of each of the Debtor entities to include five directors or managers, consisting of (a) two Debtor executives, Mr. Owoc and Kathleen Cole (who at the time served as VPX's Chief Operating Officer); (b) two additional members who were not full-time employees of the Debtors, Dr. Guillermo Escalante and Eric Hillman; and (c) Steve Panagos, a veteran restructuring advisor with extensive experience serving as an independent director for companies undergoing in-court or out-of-court restructurings. *Third*, each board would constitute a restructuring committee comprised solely of Mr. Panagos (the "**Restructuring Committee**"), which would be charged with overseeing the restructuring process and making recommendations to the full board with respect to the restructuring process and these Chapter 11 Cases.

**C.    The Prepetition Capital Structure of the Debtors.**

(1)    Revolving Credit Facility and Term Loans.

VPX, as borrower, certain subsidiaries and affiliates of VPX (collectively, with VPX, the "**Prepetition Loan Parties**"), as guarantors, the lenders from time to time party thereto (the "*Secured Lenders*"), and Truist Bank, as administrative agent (the "**Prepetition Agent**" and, together with the Secured Lenders, the "**Prepetition Secured Parties**"), are parties to the *Amended*

*and Restated Revolving Credit and Term Loan Agreement*, dated as of August 14, 2020, (as amended, modified, or supplemented from time to time, the "**Prepetition Credit Agreement**"). The Prepetition Credit Agreement provided two separate credit facilities: (a) a revolving credit facility (the "**Prepetition Revolving Credit Facility**"), and (b) a term loan A (the "**Prepetition Term Loan**" and, together with the Prepetition Revolving Credit Facility and all other obligations arising under the Prepetition Credit Agreement, the "**Prepetition Loans**"). As of the Petition Date, the aggregate outstanding principal of the Prepetition Loans was approximately $344.2 million, consisting of: (a) approximately $240.0 million in outstanding principal of the Prepetition Revolving Credit Facility, and (b) approximately $104.2 million in outstanding principal of the Prepetition Term Loan. As set forth below, the Debtors were in default under the Prepetition Credit Agreement for, among other things, failure to satisfy certain financial maintenance covenants since March 2022. The Prepetition Secured Parties agreed to forbear from exercising their rights and remedies in respect of those defaults pursuant to five forbearance agreements entered into with the Debtors and advanced critical funding (totaling approximately $60 million) to the Debtors.

In connection with the Prepetition Credit Agreement, the parties executed the *Amended and Restated Security and Pledge Agreement*, dated as of August 14, 2020 (as amended, supplemented or otherwise modified from time to time, the "**Prepetition Security Agreement**"). Under the Prepetition Security Agreement, the Prepetition Loans are secured by first-priority liens on the Collateral (as defined therein, the "**Prepetition Collateral**"), which includes substantially all of the assets of the Debtors.

     (2)     Unsecured Debt.

As of the Petition Date, the Debtors had no funded unsecured debt, but did incur trade debt with certain vendors and suppliers in connection with the operation of their businesses. As of the Petition Date, the Debtors had approximately $83 million in trade payables outstanding, excluding their obligations under the Customer Programs (described below)[5], litigation claims (described below), and the obligations owing to Pepsi under the Pepsi Settlement. In addition, the Debtors have other disputed and/or contingent liabilities related to litigation, pension, and employee obligations, certain of which are described herein. The OBI Judgment and the FAA Verdict (each as defined and described below) were two of the most significant litigation liabilities.

**D.     Notable Pre-Petition Litigation.**

As of the Petition Date, the Debtors were party to approximately sixty-three disputes in active litigation or threatened litigation. Certain material litigation disputes are described below.

     (1)     Orange Bang/Monster Arbitration.

In 2009, Orange Bang, Inc. ("**OBI**"), a closely held business that owns certain trademarks relating to the word "Bang," brought a trademark infringement action against VPX in the United

---

[5]  This sum excludes amounts charged by customers (*i.e.*, retailers) in connection with the execution of the Debtors' programs and promotions with respect to the Debtors' products (such as "buy one, get one free"), which amounts are assessed against the Debtors at a later date following the sale.

States District Court for the Central District of California, alleging that a then-existing pre-workout supplement product branded BANG was infringing on OBI's trademarks. In 2010, VPX and OBI resolved that lawsuit pursuant to a confidential settlement agreement (the "**OBI Settlement Agreement**") under which (among other terms): (a) VPX was permitted to use the BANG trademark regardless of trade channel for products that meet certain criteria, and (b) VPX was permitted to use the BANG trademark within specified trade channels for products that meet other criteria. The OBI Settlement Agreement included an arbitration provision.

In late September 2019, OBI assigned to Monster Energy Company ("**Monster**") certain of its rights and interest in the OBI Settlement Agreement, while retaining all rights and interest in the BANG trademark. On June 16, 2020, Monster and OBI served a joint demand for arbitration upon VPX, wherein Monster asserted breach of contract claims as assignee of the OBI Settlement Agreement and OBI asserted trademark infringement claims, among others, as the continued holder of the BANG trademarks (the "**BANG Mark**"). On July 23, 2020, VPX and JHO Intellectual Property Holdings, LLC ("**JHO**"), which is the owner of certain trademarks and VPX's licensor, commenced a federal action against OBI and Monster in the District Court for the Central District of California, captioned *Vital Pharms., Inc. and JHO Intellectual Prop. Holdings, LLC v. Orange Bang, Inc. and Monster Energy Co.*, Case No. 5:20-cv-1464 (the "**OBI District Court Action**"), seeking a judicial determination that the claims OBI and Monster had asserted in their demand for arbitration were not subject to arbitration. Monster and OBI counter-moved to compel arbitration. On November 30, 2020, the District Court for the Central District of California ordered VPX and JHO to submit to arbitration.

Following a two-week arbitration hearing in October 2021, on January 6, 2022, the arbitrator issued an interim arbitration award in favor of Monster and OBI and against VPX and JHO, pursuant to which Monster and OBI jointly elected (a) a $175 million disgorgement of profits award on OBI's trademark infringement claim, and (b) a royalty payment equal to 5% of net sales of BANG-branded beverages in lieu of VPX's discontinuing its use of the BANG Mark (the "**Interim Arbitration Award**"). On April 4, 2022, the arbitrator issued a final award, which provided: (a) approximately $9.3 million in fees and costs, (b) a $175 million disgorgement award that Monster and OBI had elected, and (c) a royalty payment equal to 5% of net sales of BANG-branded beverages in lieu of VPX's discontinuing its use of the BANG Mark (the "**Final Arbitration Award**").

On April 29, 2022, VPX and JHO moved to vacate the Final Arbitration Award in the OBI District Court Action. OBI and Monster opposed that motion and moved to confirm the Final Arbitration Award. On June 30, 2022, the District Court for the Central District of California denied the motion to vacate the Final Arbitration Award and granted the motion to confirm the award. On July 28, 2022, VPX and JHO initiated an appeal of the order confirming the Final Arbitration Award to the United States Court of Appeals for the Ninth Circuit (the "**OBI Appeal**").

On September 29, 2022, the District Court for the Central District of California entered a final judgment incorporating its confirmation of the Final Arbitration Award (the "**OBI Judgment**"), the appeal of which VPX and JHO expected would be consolidated with the previously-filed OBI Appeal. VPX did not have the financial ability to post a *supersedeas* bond in an amount sufficient to stay enforcement of the OBI Judgment. Accordingly, chapter 11

protection, including the protection of the automatic stay, was integral to the Debtors' ability to protect their business and estate assets while the OBI Appeal was pending. As discussed below, after the bankruptcy filing, the parties settled this litigation pursuant to the Global Settlement Agreement.

(2)    Monster's False Advertising Lawsuit Against VPX.

On September 4, 2018, Monster initiated a lawsuit against VPX and its CEO, John H. Owoc, in the District Court for the Central District of California, captioned *Monster Energy Co. v. Vital Pharms., Inc. and John H. Owoc.*, Case No. 5:18-cv-1882. The lawsuit included claims for alleged false advertising, trade secret misappropriation, violation of the Federal Computer Fraud and Abuse Act, and interference with Monster contracts for retail shelf space.

A jury trial was conducted in the action, and on September 29, 2022, the jury delivered a verdict in favor of Monster and against VPX and Mr. Owoc and awarded approximately $293 million in damages to Monster (the "**FAA Verdict**"). The parties engaged in post-verdict motion practice before the District Court for the Central District of California. As discussed below, after the bankruptcy filing, the parties settled this litigation pursuant to the Global Settlement Agreement.

### III.

### EVENTS LEADING TO THE FILING OF THE CHAPTER 11 CASES

The Debtors commenced these cases in order to (a) obtain "breathing room" from pending litigation, including the OBI Judgment and FAA Verdict, as well as consequences of pending defaults under the Prepetition Credit Agreement; (b) obtain an essential infusion of liquidity totaling $100 million to help stabilize the Debtors' operations at a critical juncture in the Debtors' business cycle (*i.e.*, on the precipice of launching its new distribution network) through the DIP Facility (as defined and described below); and (c) pursue a recapitalization, a replacement financing, or other transaction that would result in the payment in full of the Debtors' outstanding obligations under the Prepetition Credit Agreement and position the Debtors for success upon its emergence from chapter 11.

Since March 2022, the Debtors have been in default under the Prepetition Credit Agreement because of, among other things, failure to satisfy certain financial maintenance covenants. From March 2022 through September 30, 2022, the Prepetition Secured Parties agreed to forbear from exercising their rights and remedies in respect of those defaults pursuant to five forbearance agreements entered into with the Debtors. Between June 2022 and the Petition Date, the Secured Lenders also advanced critical funding (totaling approximately $60 million) to the Debtors to enable them to continue operations.

Beginning in late June 2022, the Debtors' management, together with the assistance of their advisors (in particular, Rothschild & Co US Inc. ("**Rothschild & Co**"), the Debtors' investment banker who was engaged in April 2022), commenced a robust financing process in pursuit of a capital raise transaction and other alternative transactions designed to (a) refinance the prepetition lenders, (b) generate sufficient liquidity for the Debtors' operations and capital

expenditures, and (c) if necessary, to post a *supersedeas* bond in connection with Ninth Circuit Appeal.  However, a feasible transaction that would achieve the Debtors' objectives did not materialize in the capital raise process due to, among other factors, uncertainty regarding the Debtors' then-nascent distribution network transition, and concerns about potential contingent liabilities related to outstanding litigation, as well as increasingly challenging macroeconomic factors more generally.

Although the Debtors remained in discussions regarding potential financing transactions with numerous parties as of the Petition Date, the Secured Lenders indicated that they would not continue to forbear past September 30, 2022, or advance additional funding outside of chapter 11. The Secured Lenders did, however, offer to provide sufficient funding for a chapter 11 process through the proposed facility under the DIP Credit Agreement, and afforded the Debtors an opportunity to continue their efforts to recapitalize their balance sheet and refinance or otherwise repay the obligations under the Prepetition Credit Facility.

## IV.

### EVENTS OCCURRING DURING DEBTORS' CHAPTER 11 CASES

**A.    Bankruptcy Filings, Hearings, and Certain Orders of the Bankruptcy Court.**

The Debtors commenced their Chapter 11 Cases on the Petition Date by filing voluntary petitions under chapter 11 of the Bankruptcy Code.  The Debtors are debtors in possession pursuant to Bankruptcy Code sections 1107(a) and 1108.  As described in more detail herein, the Debtors advanced a process to attract a value maximizing transaction including a replacement lender, purchaser, plan sponsor, or other transaction partner.  This process culminated in the Sale Transaction that is described below.

Prior to the first-day hearing that was held by the Court on October 13, 2022, the Bankruptcy Court entered orders which permitted (a) joint administration of the Debtors' Chapter 11 Cases [ECF No. 43[6]], and (b) the filing of a consolidated Case Management Summary [ECF No. 72] which, among other things, identifies the locations from which the Debtors operate, a list of officers and directors serving during the 1-year period preceding the Petition Date, and gross income for 2021 and 2022 up to August 31, 2022.  On the Petition Date, the Debtors filed their Consolidated Case Management Summary with the Court [ECF No. 27].

On October 13, 2022, the Bankruptcy Court held an initial hearing to consider certain "first day" matters and subsequently entered orders that, among other things:

(1)    Granted applications permitting the Debtors to retain and employ (a) Berger Singerman LLP, as local counsel to the Debtors ("**Berger Singerman Application**") [ECF No. 21]

---

[6] The references to "ECF" in this Disclosure Statement are to the "Electronic Case File" system which is the docket number in the Chapter 11 Cases for the referenced item. Many of the ECF documents referenced herein may be accessed without charge at https://cases.stretto.com/VitalPharmaceuticals. Under the order authorizing joint administration of the Debtors' Chapter 11 Cases, *Vital Pharmaceuticals, Inc.*, has been designated the "lead debtor" for purposes of filing pleadings and entry of orders.

on an interim basis [ECF No. 105]; (b) Latham & Watkins LLP as lead counsel to the Debtors ("**Latham & Watkins Application**") [ECF No. 22] on an interim basis [ECF No. 106]; and (c) Huron Consulting Services LLC to provide the services of a Chief Transformation Officer and Additional Personnel to the Debtors, and John C. DiDonato, as Chief Transformation Officer (the "**Huron Application**") [ECF No. 19] on an interim basis [ECF No. 104], with a final hearing scheduled on these retention applications scheduled for November 9, 2022 at 10:00 a.m., and (d) Stretto, Inc., as notice, claims and solicitation agent on a final basis [ECF No. 119].

(2)     Authorized the Debtors to file (a) a consolidated creditor matrix, and (b) a consolidated list of the top thirty unsecured creditors [ECF No. 110].

(3)     Approved the proposed form of notice of the commencement of the Chapter 11 cases and the proof of claim form to be used by creditors when filing claims in the Debtors' bankruptcy cases [ECF No. 114].

(4)     Granted the Debtors' motion to continue using their existing cash management system, bank accounts and business forms (the "**Cash Management Motion**") on an interim basis with a final hearing scheduled for November 9, 2022 at 10:00 a.m. [ECF No. 118].

(5)     Authorized the Debtors to maintain and continue administering their insurance policies, including payment of any outstanding premiums, on a final basis [ECF No. 109].

(6)     Authorized the Debtors to (a) pay certain prepetition obligations owed to foreign vendors, service providers, and governments, and (b) honor and continue paying foreign vendors in the ordinary course of business, on a final basis [ECF No. 111].

(7)     Authorized the Debtors to pay prepetition claims for critical vendors [ECF No. 112].

(8)     Authorized the Debtors to pay certain pre-petition claims, and honor certain contracts with, shippers and warehousemen, on a final basis [ECF No. 113].

(9)     Authorized the Debtors to (i) maintain and administer customer programs, (ii) honor or pay certain pre-petition obligations to their customers in the ordinary course of business, and (iii) continue, renew, modify, terminate, or replace, in their discretion, their customer programs, on a final basis [ECF No. 108].

(10)     Authorized the Debtors to pay pre-petition sales, use, trust fund, property, and other taxes and similar obligations, on a final basis [ECF No. 116].

(11)     Authorized the Debtors (i) to pay (a) certain pre-petition employee obligations and (b) pre-petition withholding obligations, (ii) to maintain employee benefit programs, and (iii) directing banks to honor relate pre-petition transfers [ECF No. 117].

(12)     Granted the Debtors' motion [ECF No. 24] (the "**DIP Financing Motion**") to incur post-petition financing from the DIP Lenders on an interim basis, and use the Prepetition Secured Parties' cash collateral on an interim basis, and scheduled a final hearing to consider the motion on November 9, 2022, at 10:00 a.m. [ECF No. 120].

(13)    At the hearing set on November 9, 2022, the interim matters set for final consideration that day were continued to November 21, 2022 to allow the Official Committee of Unsecured Creditors (the "**Creditors' Committee**") an opportunity to evaluate the matters [ECF No. 307].

(14)    At the November 21, 2022 hearing, the Court approved the following retention and employment applications on a final basis: (a) the Berger Singerman Application [ECF NO. 379]; (b) the Latham & Watkins Application [ECF No. 392]; and (c) the Huron Application [ECF No. 395] and granted the Cash Management Motion on a final basis [ECF No. 394].

Subsequent to the "first day" motions and applications, the Debtors filed various other motions, applications, and notices, which were filed and resolved by the Court, if necessary, as listed below:

(15)    On October 21, 2022, the Debtors filed a motion for an order establishing interim compensation procedures for chapter 11 professionals employed by the Debtors' estates (the "**Compensation Procedures Motion**") [ECF No. 194].  At the November 21, 2022 hearing, the Court approved the relief requested by the Debtors in the Compensation Procedures Motion [ECF No. 396] (later amended by Order dated December 12, 2022 [ECF No. 503].

(16)    On October 28, 2022, the Court approved the Debtors' motion [ECF No. 192] to reject non-residential real property leases for properties located in Rogers, AR, Colorado Springs, CO, and Denver, CO [ECF No. 230].

(17)    On October 28, 2022, the Court granted the Debtors' motion [ECF No. 193] for entry of an order (i) prohibiting utilities from altering, refusing, or discontinuing services, (ii) deeming utilities adequately assured of future performance, and (iii) establishing procedures for determining adequate assurance of payment, and request for waiver of Local Rule 9013-1(L)(2)(b) requirement [ECF No. 229].

(18)    On October 28, 2022, the Debtors filed a notice of abandonment of certain personal property remaining at the Colorado Springs, CO location, which the Debtors had vacated pre-petition [ECF No. 231].

(19)    On November 10, 2022, the Court granted the Debtors' agreed motion [ECF No. 309] for entry of an agreed order, which authorized the Debtors to redact confidential information from their schedules and statement of financial affairs [ECF No. 310].

(20)    On November 15, 2022, the Court granted the Debtors' request [ECF No. 342] to shorten the time for notice of Debtors' motion for entry of an order authorizing and approving a key employee retention plan [ECF No. 349].

(21)    On November 22, 2022, the Court granted the Debtors' motion [ECF No. 194] for establishing procedures for monthly and interim compensation and reimbursement of expenses for professionals [ECF No. 396], which was later amended by Order dated December 12, 2022 [ECF No. 503].

(22)    On December 1, 2022, the Court granted the Debtors' and Monster's joint motion [ECF No. 312] for limited relief from the automatic stay to continue Monster's false advertising action in a non-bankruptcy forum [ECF No. 450].

(23)    On December 2, 2022, the Court authorized and approved the Debtors' motion [ECF No. 341] for authorization and approval of their key employee retention plan [ECF No. 464].

(24)    On December 9, 2022, the Court approved the Debtors' motion [ECF No. 350] for approval of the compromise between Vital Pharmaceuticals, Inc. and Belvac Production Machinery, Inc., additionally allowing payment of a pre-petition claim of a storage facility [ECF No. 492].

(25)    On December 12, 2022, the Court granted the Debtors' request [ECF No. 493] for authorization to supplement their Exhibit "A" to their request for authorization to pay pre-petition claims of critical vendors [ECF No. 498].

(26)    On December 16, 2022, the Court granted the Debtors' motion [ECF No. 405] to authorize and approve sale of excess vehicles outside the ordinary course of business [ECF No. 537].

(27)    On December 19, 2022, the Debtors filed a notice of abandonment of certain equipment located at its facility located in Pembroke Pines, Florida, which is no longer used in the Debtors' operations [ECF No. 553].

(28)    On January 6, 2023, the Court granted the Debtors' request [ECF No. 559] to extend the deadline by which the Debtors could remove certain actions and related relief [ECF No. 616].

(29)    On January 12, 2023, the Court granted the Debtors' omnibus motion [ECF No. 534] for entry of an order authorizing rejection of executory contracts [ECF No. 640].

(30)    On January 12, 2023, the Court granted the DIP Financing Motion on a final basis [ECF No. 638].  The details of the DIP Financing Motion are discussed in further detail below.

(31)    On January 12, 2023, the Court granted the Debtors, Monster, and OBI's joint agreed motion [ECF No. 603] to approve an agreement regarding the escrow/payment of royalties that accrued post-petition under the Final Arbitration Award in the OBI dispute [ECF No. 639].

(32)    On January 23, 2023, the Court granted the Debtors' motion [ECF No. 571] for approval of settlement procedures and settlement terms for litigation matters [ECF No. 666].

(33)    On January 31, 2023, the Court granted the Debtors' motion [ECF No. 558] pursuant to section 503(b)(9) of the Bankruptcy Code to establish procedures for submitting and resolving claims related to goods received by the Debtors in the ordinary course within twenty days prior to the petition date [ECF No. 715].

(34)    On February 3, 2023, the Court granted the Debtors' request [ECF No. 671] to extend the deadline by which the Debtors could assume or reject unexpired leases of nonresidential real property and for related relief [ECF No. 745].

(35)    On February 3, 2023, the Court granted the Debtors' motion [ECF No. 672] for entry of an order (i) to extend the exclusive periods within which to file a chapter 11 plan and solicit acceptances thereof and (ii) granting related relief [ECF No. 744].

(36)    On February 17, 2023, the Court entered an order resolving the Debtors' request [ECF No. 773] for a protective order concerning Bankruptcy Rule 2004 notices directed to Kathleen Cole [ECF No. 826].

(37)    On February 17, 2023, the Court granted the Debtors' motion [ECF No. 775] for entry of a protective order and confidentiality agreement related to formal and informal discovery and the associated use of information produced in the Debtors' bankruptcy cases [ECF No. 823].

(38)    On February 17, 2023, the Court granted the Debtors' motion [ECF No. 812] for entry of an order authorizing all parties to redact names of certain confidential parties in interest related to the potential sale of substantially all of the Debtors' assets and granting related relief [ECF No. 818].

(39)    On February 17, 2023, the Debtors filed a notice of abandonment of remaining inventory with respect to remaining packaging and finished goods inventory and property located at the Debtors' San Antonio, TX location [ECF No. 825].

(40)    On February 24, 2023, the Court granted the Debtors' second omnibus motion [ECF No. 709] for entry of an order authorizing rejection of (a) unexpired non-residential real property lease with EastGroup Properties, L.P. and (b) executory contract with Portland Bottling Company [ECF No. 848, as amended by ECF No. 860].

(41)    On February 24, 2023, the Court entered an Order (I) Approving Bidding Procedures, (II) Authorizing the Debtors to Provide Bid Protections, and (III) Granting Related Relief (the "**Bidding Procedures Order**") [ECF No. 854].  Further details on the Bidding Procedures Order are addressed in the section discussing the Sale of the Purchased Assets (Section I of this Article, below).

(42)    On March 9, 2023, the Court granted the Debtors' motion [ECF No. 862] to approve the compromise between VPX, and Sidel Blowing and Services SAS and the order was entered on March 21, 2023 [ECF No. 989].

(43)    On March 9, 2023, the Court granted the Debtors' motion [ECF No. 878] to approve the compromise between VPX, Crown Cork & Seal, USA, Inc., and Crown Metal Packaging LP, and the order was entered on March 16, 2023 [ECF No. 950].

(44)    On March 17, 2023, the Court granted the Debtors' third omnibus motion [ECF No. 824] for entry of an order authorizing rejection of certain executory contracts [ECF No. 962].

(45)    On March 24, 2023, the Court granted the Debtors' motion [ECF No. 935] for authorization to enter into an excess insurance policy with XL Specialty Insurance Company [ECF No. 1025].

(46)    On March 31, 2023, the Court granted the Debtors' fourth motion [ECF No. 889] for entry of an order authorizing rejection of an executory contract with Intrastate Distributing [ECF No. 1088].

(47)    On April 24, 2023, the Court granted the Debtors' joint motion [ECF No. 1217] for an agreed order authorizing a lease amendment for a nonresidential lease between the Debtors and its landlord, CIVF VI – TX1M01-M04, LLC [ECF No. 1235].

(48)    On April 28, 2023, the Court granted the Debtors' fifth omnibus motion [ECF No. 1026] for entry of an order authorizing rejection of certain executory contracts [ECF No. 1287].

(49)    On May 1, 2023, the Court granted the Debtors' sixth motion [ECF No. 1069] for entry of an order authorizing rejection of an executory contract with ACAR Leasing Ltd. d/b/a GM Financial Leasing [ECF No. 1304].

(50)    On May 2, 2023, the Court granted the Debtors' motion [ECF No. 1204] for an order approving assumption of an unexpired commercial lease with Taro Patch Holdings, LLC [ECF No. 1311].

(51)    On May 4, 2023, the Court granted the Debtors' omnibus motion [ECF No. 1312] for approval of stipulations between the Debtors and certain lessors to extend the time to assume or reject unexpired leases of nonresidential real property [ECF No. 1322].

(52)    On May 5, 2023, the Court granted the Debtors' motion [ECF No. 1175] for entry of an order extending the exclusive periods within which to file a Chapter 11 Plan and solicit acceptances thereof, along with related relief [ECF No. 1324].

(53)    On May 8, 2023, the Court granted the Debtors' motion [ECF No. 1185] for entry of an order ruling that section 365 of the Bankruptcy Code, as extended by the Consolidated Appropriations Act of 2021 applied to the Debtors' deadline for assuming or rejecting unexpired leases of nonresidential property, and granting related relief [ECF No. 1348].

(54)    On June 8, 2023, the Court granted the Debtors' motion [ECF No. 1384] to approve the compromise between VPX and Webb & Gerritsen, Inc. [ECF No. 1444].

(55)    On June 27, 2023, the Court granted, in part, the Debtors' seventh omnibus motion [ECF No. 1399] for entry of an order authorizing rejection of certain executory contracts and indicated that the Court could continue the hearing with respect to the rejection of the Evox FL Lease [as defined ECF No. 1533]. The Court subsequently approved the Debtors' rejection of the Evox FL Lease on July 12, 2023 [ECF No. 1636].

(56)    On July 5, 2023, the Court granted the Debtors' eighth omnibus motion [ECF No. 1459] for entry of an order authorizing rejection of certain executory contracts [ECF No. 1565].

(57)    On July 12, 2023, the Court granted the Debtors' motion [ECF No. 1548] to approve the Global Settlement Agreement by and between the Debtors, the DIP Agent and the

Prepetition Agent, the Supporting Lenders, the Creditors' Committee, OBI, Monster, and Monster Beverage Corporation [ECF No. 1644]. Further details on this global compromise and settlement are addressed in the section discussing the Global Settlement Agreement (Section J of this Article, below).

(58)    On July 14, 2023, the Court entered an Order (I) Authorizing and Approving (A) the Sale of Substantially all of the Debtors' Assets Free and Clear of All Liens, Claims, and Encumbrances and (B) the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection therewith, and (II) Granting Related Relief (the "**Sale Order**") [ECF No. 1654; amended at ECF No. 1658 to correct Exhibit B]. Further details on the Sale Order are addressed in the section discussing the Sale of the Purchased Assets (Section I of this Article, below).

(59)    On July 14, 2023, the Court granted the Debtors' ninth motion [ECF No. 1468] for entry of an order authorizing rejection of an executory contract with Buffalo Rock Distributing Company, Inc. [ECF No. 1655].

(60)    On July 14, 2023, the Court granted the Debtors' motion [ECF No. 1513] to approve the compromise between VPX and JHO Intellectual Property Holdings, LLC, and PhD Marketing, Inc. [ECF No. 1656] pursuant to which the Debtors received $900,000 in settlement proceeds and the appeal filed by PhD Marketing, Inc. was dismissed.

(61)    On July 27, 2023, the Debtors filed a tenth omnibus motion [ECF No. 1745] for entry of an order authorizing rejection of certain executory contracts. As of the date of this Disclosure Statement, the motion is still pending.

(62)    On July 31, 2023, the Debtors filed a motion [ECF No. 1755] seeking authorization to enter into an excess insurance policy with Everest Indemnity Insurance Company, to provide additional Side A directors and officers liability insurance to the Debtors' officers. As of the date of this Disclosure Statement, the motion is still pending.

(63)    On July 31, 2023, the Debtors filed an eleventh omnibus motion [ECF No. 1756] for entry of an order authorizing rejection of certain executory contracts and unexpired leases. As of the date of this Disclosure Statement, the motion is still pending.

(64)    On August 7, 2023, the Debtors filed a twelfth omnibus motion [ECF No. 1781] for entry of an order authorizing rejection of certain executory contracts. As of the date of this Disclosure Statement, the motion is still pending.

(65)    On August 11, 2023, the Debtors filed a thirteenth omnibus motion [ECF No. 1799] for entry of an order authorizing rejection of certain executory contracts effective as of July 31, 2023. As of the date of this Disclosure Statement, the motion is still pending.

Significant material post-petition significant litigation and contested matters are further addressed below in Sections K, L, & M.

**B.      Retention and Employment of Bankruptcy Professionals.**

As mentioned above, on November 21, 2022, the Bankruptcy Court held a hearing at which it considered and approved, on a final basis, the Debtors' retention and employment of the following professionals to assist in the administration of the Debtors' Chapter 11 Cases: (i) Berger Singerman LLP, as local counsel to the Debtors [ECF No. 379]; (ii) Latham & Watkins LLP as co-counsel for the Debtors [ECF No. 392]; (iii) Huron Consulting Services LLC to provide the services of a Chief Transformation Officer and Additional Personnel to the Debtors, and John C. DiDonato, as Chief Transformation Officer [ECF No. 395]; and (iv) Rothschild & Co US Inc., as investment banker for the Debtors [ECF No. 393].

The Debtors sought Court approval to employ various additional counsel and/or professionals to advise and assist with certain matters. On January 23, 2023, the Court entered an Order [ECF No. 665] approving the Debtors' application [ECF No. 643] for approval of the employment of Grant Thornton LLP as financial advisors to the Debtors.

On February 14, 2023, the Court entered an Order [ECF No. 798] approving the Debtors' application [ECF No. 633] for an order authorizing employment of David M. Levine and the law firm of Sanchez Fischer Levine, LLP as special counsel to the Debtors for the 2019 Litigation and 2022 Litigation.[7] On February 24, 2023, the Court entered an Order [ECF No. 849] approving the Debtors' amended application [ECF No. 805] for approval of employment of Daniel L. Geyser, Richard D. Faulkner, and the law firm of Faulkner ADR Law, PLLC, as special counsel to the Debtors in connection with the OBI Appeal.[8]

On March 9, 2023, the Court entered an Order [ECF No. 926] approving the Debtors' application [ECF No. 511] for an order authorizing the employment of Andrew P. Beilfuss and the law firm of Quarles & Brady LLP as special counsel to the Debtors in the following matters:

(1)      *Monster Energy Co. v. Vital Pharmaceuticals, Inc.*, Case No. 18-cv-1882 (C.D. Cal.) consistent with the terms outlined in the limited stay relief described in the Court's Order Granting Debtors' and Creditor Monster Energy Company's Joint Agreed Motion for Relief from the Automatic Stay to Continue Action in Nonbankruptcy Forum [ECF No. 450];

(2)      The court-ordered mediation and ongoing negotiations in the appeal styled *Vital Pharmaceuticals, Inc. and JHO Intellectual Property Holdings, LLC v. PHD Marketing, Inc.*, Case No. 2:20-cv006745-RSWL-JC;

(3)      Webb & Gerritsen appeal for the limited purpose of seeking to enforce the automatic stay and obtain an extension of any ultimately-entered briefing schedule; and

(4)      The "General Counsel Matters" described in the Application and Engagement Letter.

---

[7]  "2019 Litigation" and "2022 Litigation" are used as defined in the application [ECF No. 633].
[8]  "OBI Appeal" is used as defined in the application [ECF No. 805].

On May 8, 2023, the Court approved Debtors' supplemental application [ECF No. 1188] requesting approval to employ Grant Thornton LLP to provide tax examination assistance and expand the scope of the transaction advisory services to the Debtors [ECF No. 1342].

## C.    Appointment of Creditors' Committee.

On November 1, 2022, the Office of the United States Trustee (the "**U.S. Trustee**") appointed the Creditors' Committee [ECF No. 245]. On November 23, 2022, the U.S. Trustee reconstituted the Creditors' Committee [ECF No. 400] to include additional creditors holding unsecured claims to ensure adequate representation of all unsecured creditors.

On November 27, 2022, Monster, OBI, and three additional unsecured creditors, filed a Motion for an Order Pursuant to 11 U.S.C. § 1102(a)(2) Directing the Appointment of an Official Committee of Creditors Holding Non-Trade Claims (the "**Motion for Second Creditors' Committee**") [ECF No. 408]. The United States Trustee, the Creditors' Committee, the Prepetition Agent,[9] the DIP Agent, and the Debtors (the "**Objectors**") filed objections to the Motion for Second Creditors' Committee [ECF Nos. 466, 499, 500, & 501]. The Objectors asserted several bases for denial of the Motion for Second Creditors' Committee, including the duplication of the efforts of the Creditors' Committee, that the Creditors' Committee had already been reconstituted to ensure adequate representation, and unnecessary costs of a second committee.

On December 19, 2022, the Court held an evidentiary hearing on the Motion for Second Creditors' Committee and on December 27, 2022, it entered an order denying the motion [ECF No. 581].

The Creditors' Committee includes the following nine members: (1) Stellar Group, Inc.[10]; (2) Archer Daniels Midland Co.; (3) Trinity Logistics, Inc.; (4) Ardagh Metal Packaging USA Corp.; (5) Crown Cork & Seal USA, Inc.; (6) QuikTrip Corporation; (7) XPO Logistics, L.L.C. a/k/a RXO Inc.; (8) Pepsi; and (9) Peter Fischer, c/o Daniel F. Harvath, putative class action plaintiff.

## D.    Meeting of Creditors.

On October 17, 2022, the U.S. Trustee filed the notice setting the section 341 meeting of creditors to take place telephonically on November 18, 2022 at 9:30 a.m. [ECF No. 132].

## E.    Schedules of Assets and Liabilities and Statements of Financial Affairs.

Rule 1007(c) of the Bankruptcy Rules requires that a debtor file its Schedules of Asset and Liabilities and Statements of Financial Affairs (collectively, the "**Schedules/SOFAs**") within 14 days after the commencement of the debtor's bankruptcy case. On October 19, 2022, the Debtors filed an *ex parte* motion requesting an extension of time, from October 24, 2022 through and including November 11, 2022, to file their Schedules/SOFAs [ECF No. 169] (the "**Schedules/SOFA Extension Motion**"). On October 20, 2022, the Bankruptcy Court entered an

---

[9]  The terms "Prepetition Agent" and "DIP Agent" are used here as defined in the DIP Financing Motion.
[10] On August 14, 2023, Stellar Group, Inc. resigned from the Creditors' Committee.

order approving the Schedules/SOFA Extension Motion [ECF No. 180]. On November 11, 2022, each of the Debtors filed their Schedules/SOFAs [ECF Nos. 323-325]. On May 25, 2023, the Debtor VPX filed an amended Schedule E/F [ECF No. 1396].

## F.    Motions for Relief from Stay.

The following motions have been filed in the Debtors' cases seeking relief from the automatic stay imposed by section 362 of the Bankruptcy Code including:

(1)    On October 19, 2022, EastGroup Properties, L.P. filed a *Motion for Relief from the Automatic Stay and Motion to Compel Immediate Payment of Administrative Rent* [ECF No. 172] requesting relief from stay based upon the VPX's failure to pay its October 1, 2022 rent and for payment of the administrative expense of the rent accrued from the Petition Date through the date of the motion. On October 27, 2022, the Court entered an agreed order granting the motion in part based upon VPX's intent to vacate the property and reject the lease [ECF No. 226].

(2)    On November 1, 2022, Mitsubishi HC Capital America, Inc. filed a *Motion for Relief from the Automatic Stay and for Waiver of the Fourteen (14) Day Stay Imposed by Rule 4001(d)* [ECF No. 246] requesting relief from the automatic stay to enforce its rights with respect to liens it held under two motor vehicle financing agreements, which enabled VPX to purchase certain trucks. On December 13, 2022, the Court entered an agreed order granting the motion in part providing for adequate assurance payments, additional payments upon the sale of the trucks that were subject to the liens, and associated relief [ECF No. 505].

(3)    On November 10, 2022, Ardagh Metal Packaging USA Corp. ("**Ardagh**") filed a Motion for Relief from the Automatic Stay and, Alternatively, for Adequate Protection, and for Allowance of an Administrative Claim [ECF No. 330] requesting relief from the automatic stay to pursue state law rights and remedies with respect to unreturned beverage can packaging, and for information from the Debtors on the location and amounts of such packaging. Alternatively, Ardagh requested adequate protection and an administrative expense claim. The evidentiary hearing to consider this motion has been continued several times to allow settlement discussions to take place between the Debtors and the movant, which discussions remain ongoing.

(4)    On November 11, 2022, the Debtors and Monster Energy Company filed a *Joint Motion for Relief from the Automatic Stay to Continue Action in Nonbankruptcy Forum* [ECF No. 312] requesting relief to allow them to complete their post-verdict briefing through final judgment in *Monster Energy Co. v. Vital Pharmaceuticals, Inc.*, Case No. 18-cv-1882 (C.D. Cal.). The motion was filed under the Court's negative notice procedure pursuant to Local Rule 4001-1(C). On December 1, 2022, the Court entered an order granting the motion without a hearing, based upon no objections having been filed [ECF No. 450].

(5)    On November 18, 2022, ACAR Leasing Ltd., Inc. d/b/a GM Financial Leasing filed a *Motion for Relief from the Automatic Stay* [ECF No. 369] requesting relief from the stay to exercise its rights and remedies with respect to a motor vehicle leased by VPX. On December 16, 2022, the Court entered an agreed order granting the motion in part providing adequate assurance payments, a cure payment for past-due amounts, insurance requirements for the vehicle, and related relief [ECF No. 536].

(6)     On November 23, 2022, AmeriCredit Financial Services, Inc. d/b/a GM Financial filed an *Omnibus Motion for Relief from the Automatic Stay* [ECF No. 399] requesting relief from the stay to exercise its rights and remedies with respect to 139 financed vehicles in possession of VPX.  On February 1, 2023, the Court entered an agreed order granting the motion in part and providing for adequate protection payments and related relief [ECF No. 736].

(7)     On December 18, 2022, Jasmin Williams filed a *Motion for Relief from Automatic Stay to Liquidate Prepetition Claim* [ECF No. 546] seeking relief from the stay to proceed with a prepetition class action she had filed in California against VPX for claims related to overtime wages.  On January 9, 2023, the Debtors filed an objection [ECF No. 623] to the motion based upon failure of the movant to demonstrate cause to support lifting of the automatic stay.  On February 7, 2023, Ms. Williams filed a supplement to the motion [ECF No. 768], and after a hearing on February 9, 2023, the Court denied the motion [ECF No. 784].

(8)     On January 13, 2023, U.S. Bank National Association d/b/a U.S. Bank Equipment Finance filed a *Verified Motion for Relief from the Automatic Stay, or in the Alternative, for Adequate Protection* [ECF No. 642] requesting relief from the stay to enforce its in rem security interest in certain leased equipment, or alternatively, for adequate protection.  On February 8, 2023, the Court entered an agreed order providing adequate protection payments and related relief [ECF No. 772].

(9)     On January 23, 2023, Faith Technologies Incorporated and Nexus Steel, LLC filed a *Joint Motion for Relief from the Automatic Stay to Continue Action in Non-Bankruptcy Forum* [ECF No. 670] seeking relief from the automatic stay to allow the parties to prosecute a case that Nexus Steel, LLC had filed in Maricopa County, Arizona, Case No. CV2022-008873 against JHO RE and VPX, along with several non-debtor defendants, including Faith Technologies Incorporated.  Several of the non-debtor defendants filed joinders to the motion [ECF Nos. 711, 738, & 741].  The Debtors and the Creditors' Committee objected to the requested relief [ECF Nos. 755 & 767].  On April 27, 2023, the Court entered an order conditionally denying the motion [ECF No. 1277].  The Court's denial was conditioned upon certain conditions with respect to the Debtors' sale of the property associated with the action and setting up a reserve in an escrow account pending the resolution of the underlying Arizona lawsuit.

(10)    On February 3, 2023, Santander Consumer USA, Inc. filed a *Motion for Relief from Stay* pursuant to the Court's negative notice procedure under Local Rule 4001-1(C) [ECF No. 743] seeking relief from stay to repossess certain vehicles upon which it had liens, so that it could sell the vehicles and apply the proceeds to amounts owed.  On February 23, 2023, the Court entered an agreed order resolving the motion, providing for adequate protection payments, insurance requirements, and providing related relief [ECF No. 846].

(11)    On March 31, 2023, the Debtors and Suddath Global Logistics, LLC ("**Suddath**") filed a *Joint Agreed Motion for Relief from Automatic Stay to Continue Action in Non-Bankruptcy Forum* [ECF No. 1083] requesting relief to allow Suddath and VPX to continue the state court action filed in Broward C County, Florida, *Vital Pharmaceuticals, Inc., et al, v. Suddath Global Logistics, LLC, et al*, Case No. CACE-21-003572.  The motion was filed under the Court's negative notice procedure pursuant to Local Rule 4001-1(C).  On April 17, 2023, the Court entered

an order granting the motion without a hearing, based upon no objections having been filed [ECF No. 1192].

(12)    On April 14, 2023, Webb & Gerritsen, Inc. filed a *Motion to Lift Automatic Stay to Allow the Debtor's Appeal Pending in Wisconsin Court of Appeals to Proceed* [ECF No. 1168] requesting relief from the stay to proceed on an appeal of a judgment entered by the Circuit Court for Waukesha County, Wisconsin by Vital Pharmaceuticals, Inc.  The motion was filed under the Court's negative notice procedure pursuant to Local Rule 4001-1(C).  On April 27, 2023, the Debtors filed an objection to the motion [ECF No. 1279].  On May 17, 2023, the Debtors filed a *Motion to Approve Compromise Between (I) Debtor, Vital Pharmaceuticals, Inc.; and (II) Webb & Gerritsen, Inc.* [ECF No. 1384], which included a resolution of the pending appeal that was the subject of the motion for relief from stay.  On June 8, 2023, the Court entered an order granting the motion to approve the compromise [ECF No. 1444].[11]

## G.    DIP Financing.

In the ordinary course of their businesses, the Debtors required additional financing to fund their working capital, liquidity needs, and other routine payables.  In addition, the Debtors required the use of cash on hand to fund their Chapter 11 Cases and to fund operations through a sale of their assets, and ultimately through confirmation of the Plan.  Accordingly, through the DIP Financing Motion, the Debtors sought authority to obtain (i) on an interim basis, post-petition financing from the DIP Lenders in the principal aggregate amount of up to $34 million (the "**Interim DIP Financing**") as reflected in the interim order authorizing such post-petition financing [ECF No. 120] (the "**Interim DIP Financing Order**"), and (ii) on a final basis, post-petition financing from the DIP Lenders of $454,770,201.56, consisting of $100,000,000 in new money and $354,770,201.56 of outstanding obligations under the Prepetition Credit Agreement that would be converted to DIP Obligations under the DIP Credit Agreement and paid down from post-petition collections (the "**Final DIP Financing**" and together with the Interim DIP Financing, collectively, the "**DIP Financing**").  Following negotiations between the Debtors, the DIP Agent (as defined in the Interim DIP Financing Order), Monster, OBI, and the Creditors' Committee, the parties reached a consensual resolution of the objections and informal comments to the DIP Financing.  As reflected in the final order authorizing such post-petition financing [ECF No. 638] (the "**Final DIP Financing Order**"), the Bankruptcy Court authorized the Debtors to obtain $335,000,000 in DIP Financing (consisting of $100,000,000 of new money financing and a $235,000,000 roll up of pre-petition secured obligations) on a senior secured, superpriority basis pursuant to the terms and conditions in the Superpriority Secured Debtor-in-Possession Credit Agreement (as thereafter amended by the First Amendment to Superpriority Secured Debtor-in-Possession Credit Agreement and the Second Amendment to Superpriority Secured Debtor-in-Possession Credit Agreement and Limited Waiver).[12]

---

[11] On April 14, 2023, Webb & Gerritsen also filed a motion to allow a late-filed proof of claim [ECF No. 1169].  On May 9, 2023, the Debtors filed an objection to the motion [ECF No. 1357].  After the Court's approval of the Webb & Gerritsen Settlement, Webb & Gerritsen withdrew the motion [ECF No. 1529].
[12] Capitalized terms not otherwise defined have the meanings ascribed to them in the Final DIP Financing Order [ECF No. 638].

### H.    Changes in Corporate Governance.

As of the Petition Date, among other titles, Mr. Owoc was the Company's Chief Executive Officer ("**CEO**") and sole member of the Board. Prior to the Petition Date, to satisfy certain covenants of the DIP Financing, the Debtors implemented changes to their corporate governance by expanding the composition of the Board to five (5) members. Following approval of the DIP Financing, Mr. Owoc appointed Steve Panagos, Kathleen Cole, Eric Hillman and Dr. Guillermo Escalante to serve on the Board with him. Following the resignations of Ms. Cole and Dr. Escalante, Mr. Stephen Gray and Mr. Bob Dickinson were appointed to replace them on the Board. Among other changes, the by-laws, operating agreements, and certain other organizational documents for each of the Debtors were also amended to provide that the Debtors' directors and managers, as applicable, may only be removed by a vote of the Board.

On March 9, 2023, the Board terminated Mr. Owoc from his positions with the Company, including his roles as CEO and Board member. At the same time, the Debtors' Board appointed Mr. DiDonato as Interim CEO in addition to his role as Chief Transformation Officer. On March 28, 2023, Mr. Hillman resigned from the Board. The Board then appointed Mr. Rich Caruso to replace Mr. Hillman. The Debtors' Board currently consists of the following five individuals: Steven Panagos, Stephen Gray, Rich Caruso, Bob Dickinson, and Gene Bukovi.

Mr. Panagos was duly appointed by written consent as a member of the Board on October 25, 2022 and as the sole member of the Restructuring Committee of the Board, also on October 25, 2022. Mr. Dickinson was appointed as a member of the board on December 14, 2022. Mr. Gray was appointed as a member of the Board on January 7, 2023. Mr. Caruso was appointed as a member of the Board on March 14, 2023. Mr. Bukovi was appointed to the Board on June 16, 2023.

### I.    Sale of the Purchased Assets.

On January 27, 2023, the Debtors filed a motion [ECF No. 707] (the "**Bidding Procedures Motion**") requesting an order (i) approving (a) bidding procedures for the sale of substantially all of the Debtors' assets, (b) procedures for the Debtors' assumption and assignment of certain executory contracts and unexpired leases, (c) the form and manner of notice of sale hearing, assumption procedures, and auction results, (d) dates for an auction and sale hearing, (e) the sale substantially all of the Debtors' assets, free and clear of all claims, liens, liabilities, rights, interests, and encumbrances, and (f) the Debtors' assumption and assignment of certain executory contracts and unexpired leases, (ii) authorizing the Debtors to provide bid protections, and (iii) granting related relief. On February 24, 2023, the Court entered the Bidding Procedures Order granting the Bidding Procedures Motion [ECF No. 854].

Given ongoing negotiations with several prospective bidders and other parties in interest, the Debtors adjourned the auction and sale hearing several times [ECF Nos. 1394, 1416, 1445 & 1592]. On June 28, 2023, the Debtors filed a notice of auction cancellation and successful bidder [ECF No. 1546] (the "**Sale Notice**"), informing interested parties that the Debtors only received one actionable bid for substantially all their assets[13] from Blast Asset Acquisition LLC ("**Blast**"),

---

[13] Pursuant to the Asset Purchase Agreement, the Debtors did not sell, and Blast did not purchase, certain of the Debtors' assets including Cash, certain Causes of Action and rights under insurance policies. The Excluded Assets

an acquisition vehicle affiliated with Monster Beverage Corporation. Pursuant to the Asset Purchase Agreement, Blast agreed to acquire substantially all of the assets of the Debtors for (i) $362,000,000, (ii) the assumption of certain liabilities, and (iii) an additional $10,000,000 of conditional consideration to be paid by Blast following its receipt of title to and ownership of certain intellectual property presently titled in the name of Entourage IP Holdings, LLC, a non-debtor. The Sale Notice provided that the Sale Hearing would take place on July 12, 2023, and that the deadline to object to (i) the identity of the Successful Bidder, and/or (ii) adequate assurance of future performance by the Successful Bidder, was not later than 4:00 p.m. (Prevailing Eastern Time) July 7, 2023. The Debtors also filed a notice of filing of a revised proposed sale order [ECF No. 1547].

After conducting a hearing on July 12, 2023 (the "**Sale Hearing**"), the Bankruptcy Court approved the Asset Purchase Agreement by and between the Debtors and Blast. In approving the Asset Purchase Agreement, the Court resolved the pending objections as indicated in the Sale Order. The Court's resolution of the objections included the objection by Mr. Owoc, which he agreed to withdraw in exchange for certain provisions that were included in the Sale Order. [ECF No. 1658, ¶ 46). On July 31, 2023, the Debtors and Blast closed on the purchase and sale. A summary of the proceeds received and disbursements made by the Debtors in connection with the closing is attached hereto as **Exhibit 3**. Presently, the Debtors estimate that the Estates will have between $9.0 and $11.6 million in Cash to contribute to the Liquidating Trust on the Effective Date of the Plan.

**J.      Global Settlement Agreement**

Contemporaneously with the filing of the Sale Notice, the Debtors filed an expedited motion to approve a compromise between (i) the Debtors, (ii) Monster, (iii) Monster Beverage Corporation, (iv) OBI, (v) the Creditors' Committee, and (vi) the Supporting Lenders[14] [ECF No. 1548] (the "**Global Settlement**"). The Global Settlement resolved various disputes that might have remained unresolved in a sale to a buyer other Blast, and was cross-conditioned on closing of the sale to Blast described above (i.e., neither the sale nor the Global Settlement would proceed if the other did not). The Supporting Lenders and Monster agreed to treat claims that the Supporting Lenders and Monster would otherwise assert are entitled to administrative (or, in the case of the Supporting Lenders, superpriority administrative) status as unsecured claims, in exchange for allowance of those and other existing unsecured claims. Further, Monster and the Supporting Lenders agreed to subordinate their right to receive a distribution from the first dollars distributable to holders of allowed general unsecured claims pursuant to the Plan so that the holders of other allowed general unsecured claims will receive those proceeds, as described in the treatment of Class 3 General Unsecured Claims set forth above. On July 14, 2023, the Bankruptcy Court entered an order [ECF No. 1656] approving the Global Settlement.

The parties to the Global Settlement agreed to support a chapter 11 liquidating plan consistent with the treatment of their claims set forth therein, and the terms of this Plan incorporate the relevant provisions of the Global Settlement.

---

retained by the Debtors are more particularly defined in the Asset Purchase Agreement.
[14] As defined in the Global Settlement Agreement.

K.    **Motion to Dismiss JHO Real Estate Investment, LLC Case.**

On June 16, 2023, Mr. Owoc filed a motion [ECF No. 1466] (the "**Motion to Dismiss**") seeking to dismiss the chapter case commenced by Debtor, JHO RE.  Mr. Owoc asserted that (a) he did not authorize the JHO RE bankruptcy filing; (b) JHO RE was not in financial distress in October 2022 when it filed for chapter 11; (c) his advisors failed to inform him of the consequences of a JHO RE filing; and (d) the Debtors failed to comply with Local Rule 9011-1 in respect of signatures related to the written consent authorizing JHO RE's chapter 11 petition.  Mr. Owoc filed a supplemental brief [ECF No. 1574] contending that, notwithstanding his extensive participation in the Chapter 11 Cases for a period of approximately eight months and his having filed a proof of claim in the JHO RE case, he did not ratify the filing nor did JHO RE receive any benefit from the filing.

On June 20, 2023 the Debtors filed their preliminary response to the Motion to Dismiss [ECF No. 1482] contesting, on a preliminary basis, the allegations asserted by Mr. Owoc and requesting the time to conduct discovery.  The U.S. Trustee also filed a preliminary objection to the Motion to Dismiss [ECF No. 1484].  On July 10, 2023, the Debtors filed their supplemental objection in opposition to the Motion to Dismiss [ECF No. 1588] asserting several bases against granting the Motion to Dismiss, including that Mr. Owoc signed the written consent authorizing the JHO RE filing just as he signed the authorizations for every other Debtor, on the same evening, in sequential order, with the same signature, on the same e-signature platform.   On July 10, 2023, the Creditors' Committee also filed a joinder to the Debtors' supplemental objection to the Motion to Dismiss [ECF No. 1597].  That same day, the Prepetition Agent and DIP Agent filed their objection and joinder to the Debtors' supplemental objection to the Motion to Dismiss [ECF No. 1589].

On July 11, 2023, the Bankruptcy Court conducted an evidentiary hearing on the Motion to Dismiss.  The Bankruptcy Court denied the Motion to Dismiss finding that Mr. Owoc duly authorized the filing of the JHO RE case, just as he had authorized the filing of chapter 11 cases by the other Debtors.  [ECF No. 1657].  The order denying the Motion to Dismiss was not appealed and thus became a final order.

L.    **Emergency Motion to Confirm That Automatic Stay Does Not Apply to Termination of VPX's Subchapter S Corporation Status.**

Since 1994, Debtor VPX has enjoyed Subchapter S ("**S-Corp**") tax status.  VPX's S-Corp status meant that all of its income, losses, deductions, and credits were passed through to Mr. Owoc and taxed as though they were his own, thereby legally avoiding the payment of taxes at the corporate level.  In addition to those taxes, any distributions that VPX made to Mr. Owoc as its sole shareholder would then have been taxed as Mr. Owoc's income on his individual tax returns. On July 11, 2023, after the sale to Blast has been disclosed but before the Bankruptcy Court had approved the sale, Mr. Owoc filed the *Emergency Motion of John H. Owoc's [sic] for Confirmation that the Automatic Stay Does Not Apply to Termination of Debtor's Subchapter S Corporation Status or, Alternatively, for Relief from Stay* [ECF No. 1627] (the "**Tax Motion**"). Pursuant to the Tax Motion, Mr. Owoc sought confirmation that the automatic stay did not enjoin him, as the sole shareholder of VPX, from revoking VPX's S-Corp status or, alternatively, if the

automatic stay did apply, for relief from the automatic stay to permit him to revoke the S-Corp status.

On July 26, 2023, the Debtors filed their objection to the Tax Motion [ECF No. 1717] noting, *inter alia*, that (a) under the Tax Code, only a corporation can revoke its S-Corp status; (b) VPX's tax attributes, including its S-Corp status are property of the estate protected by the automatic stay; and (c) Mr. Owoc could not establish "cause" to warrant terminating the automatic stay because the harm to VPX if the Tax Motion were granted far outweighed the harm to Mr. Owoc if the Tax Motion were denied. By the Debtors' estimate, granting the Tax Motion would cost the Debtors upwards of $27.5 million while Mr. Owoc would stand to receive millions of dollars of future tax savings. Because Mr. Owoc generally can use operating losses from the period before VPX is converted into a C-Corp to offset his income and gain, it was in his interest, and a strategic choice, to wait as long as possible before the sale to Blast to seek termination of VPX's S-Corp status. The tax benefit is significant: VPX has incurred an estimated $22 million in net operating losses in 2023. On July 26, 2023, the Creditors Committee also filed its objection and joinder to the Debtors' objection to the Tax Motion [ECF No. 1718].

On July 28, 2023, the Bankruptcy Court conducted an evidentiary hearing on the Tax Motion. On July 29, 2023, the Bankruptcy Court issued an order denying the Tax Motion to the extent it requested the Bankruptcy Court to compel VPX to file a statement revoking its S-Corp election and to compel VPX to file a "closing-of-the-books" election and reserving ruling on whether S-Corp status is property of the estate and, if it is, whether Mr. Owoc had established the cause requisite to warrant lifting the automatic stay. The Court also reserved ruling on other ancillary issues. Notably, the Tax Motion only sought relief for Mr. Owoc to revoke VPX's S-Corp status and did not seek relief from the Court to terminate the S-Corp status, which is accomplished by operation of law by, among others, ceasing to meet the requirements to qualify as a small business corporation under the Internal Revenue Code. [ECF No. 1746].

## M. Pending Adversary Proceedings.

The following adversary proceedings have been filed in the Debtors' Bankruptcy Proceeding:

(1) On November 14, 2022, the Debtors filed Adversary Proceeding Number 22-01428, against Atlantic Recording Corporation, Atlantic Records Group LLC, Warner Records Inc., Asylum Worldwide LLC, Bad Boy Records LLC, Rhino Entertainment Company, Rhino Entertainment LLC, Spinnin Records B.V., Warner Music International Services Limited, Warner Music Latina Inc., Gene Autry's Western Music Publishing Co., Unichappell Music Inc., W Chappell Music Corp., Warner Chappell Music, Inc., and Warner-Tamerlane Publishing Corp. The Debtors filed the adversary proceeding to secure injunctive relief against the defendants to enjoin or stay continued prosecution of an action brought against Debtor VPX and the Debtors' founder, sole shareholder, and then Chief Scientific Officer and Chief Executive Officer, John H. Owoc, pending in the United States District Court for the Southern District of Florida (as defined in the complaint). On December 6, 2022, March 16, 2023, and June 30, 2023, the parties stipulated to a stay of the action that the Debtors were seeking to enjoin. The Court has

approved these stipulations, and the third stipulation provides that the defendants' action is stayed through September 29, 2023.

(2)    On February 17, 2023, the Debtors filed Adversary Proceeding Number 23-01031, against OBI and Monster.  The Debtors filed the adversary proceeding seeking a declaratory judgment to prevent re-litigation of issues that were resolved in the pre-petition Orange Bang/Monster Arbitration (described in more detail in the Pre-Petition Litigation section above). Debtors also sought declaratory relief allowing them to sell, assign, or otherwise transfer their interest in a Continuing Fee Election (as defined in the complaint) to a purchaser of substantially all of their assets.  That same day, the Debtors filed a motion for summary judgment, to which the Creditors Committee filed a joinder.  On March 17, 2023, OBI and Monster filed a joint opposition to the motion.  On March 23, 2023, OBI and Monster filed a joint answer to the adversary complaint.  Monster and OBI also filed a motion requesting that the United States District Court for the Southern District of Florida withdraw the reference (the "Motion to Withdraw the Reference") of the adversary proceeding and transfer venue of the case to the United States District Court for the Central District of California.  On March 22, 2023, the Debtors filed their opposition to the Motion to Withdraw the Reference.  On May 17, 2023, the United States District Court for the Southern District Court of Florida entered an order, without a hearing, granting the Motion to Withdraw the Reference and on May 24, 2023, transferred venue of the case to the Central District of California.  Thereafter, the Central District of California Court transferred venue of the case back to the Southern District of Florida. On June 28, 2023, the Debtors filed a motion to approve their Global Settlement with Monster, Monster Beverage Corporation, OBI, the Creditors' Committee, and certain lenders (as described in the motion) [ECF No. 1548], which (along with the sale) obviated the need to continue the litigation concerning the assignability of the Continuing Fee Election.  On July 12, 2023, the Court granted the motion at the Sale Hearing [ECF No. 1644].

(3)    On March 14, 2023, the Debtors filed Adversary Proceeding Number 23-01051, against John H. Owoc and Megan E. Owoc.  The Debtors filed the adversary proceeding seeking declaratory relief and turnover of certain property belonging to the Debtors' estate (specifically, certain social media accounts).  On June 16, 2023, the Court entered a *Memorandum Opinion Granting Plaintiffs' Motion for Summary Judgment* [Adv. Pro. 23-1051, ECF No. 161], and on July 5, 2023, the Court entered a *Final Judgment in Favor of Plaintiffs* [Adv. Pro. 23-1051, ECF No. 183].

(4)    On June 16, 2023, the Debtors filed Adversary Proceeding Number 23-01125, against John H. Owoc and Entourage IP Holdings, LLC.  The Debtors filed the adversary proceeding seeking declaratory relief, turnover of certain property belonging to the Debtors' estate, and asserting usurpation of a corporate opportunity claim related to certain intellectual property controlled by non-debtor Entourage IP Holdings, LLC.  The defendants filed an answer to the complaint on July 31, 2023 generally denying the allegations and asserting certain affirmative defenses.  The Court set a scheduling conference in this case on August 24, 2023.

(5)    On July 5, 2023, ThermoLife International, LLC ("**ThermoLife**") filed Adversary Proceeding Number 23-01134 (the "**ThermoLife Adversary Proceeding**"), against Vital Pharmaceuticals, Inc. d/b/a Bang Energy d/b/a VPX.  In the complaint, ThermoLife asserts that VPX has infringed upon its patent post-petition.  ThermoLife seeks an award of damages based on the alleged infringement which if awarded would constitute an Administrative Expense Claim of

the VPX bankruptcy estate.  On August 7, 2023, the Court entered an order granting VPX's motion for an extension of time to respond to the complaint, which is now due on September 6, 2023.  On September 6, 2023, VPX filed an answer to the complaint and asserted affirmative defenses.  VPX selected  special counsel to represent it in the adversary proceeding, and retention is subject to the Court's approval.  The Court set a scheduling conference on September 20, 2023.

(6)      On July 13, 2023, the Debtors' board members Robert Dickinson, Stephen Gray, and Steven Panagos removed an action from Florida state court to the Bankruptcy Court and was assigned Adversary Proceeding Number 23-1139.  Mr. Owoc filed the action alleging he was wrongfully terminated as CEO and managing member of the Debtors [Adv. Pro. 23-1139, ECF No. 1].  The Debtors are not a party to the action.  Mr. Owoc filed a motion to remand the action to state court on July 14, 2023 [Adv. Pro. 23-1139, ECF No. 3].  On August 10, 2023, the Court held a hearing and denied the motion to remand.  On August 2, 2023, the defendants filed a motion to dismiss the adversary proceeding [Adv. Pro. 23-1139, ECF No. 19].  The motion remains pending.

**N.      Retained Causes of Action.**

On and after the Effective Date, subject to the terms of the Plan, the Settlement Agreement, and the Sale Order, the Liquidating Trustee shall have standing to and may pursue the Debtors' Retained Causes of Action.  A list of the Retained Causes of Action will be included in the Plan Supplement (as defined in the Plan).

Subject to the Sale Order, no preclusion doctrine, including the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion (judicial, equitable, or otherwise), or laches, shall apply to such Retained Causes of Action upon, after, or as a consequence of the Confirmation or Consummation of the Plan.  Prior to the Effective Date, the Debtors, and on and after the Effective Date, the Liquidating Trustee shall retain and shall have, including through its authorized agents or representatives, the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Retained Causes of Action and to decline to do any of the foregoing without the consent, notice to or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court subject to the terms of this Plan.  Notwithstanding anything contained herein to the contrary, the settlement of any Claims and Causes of Action which are expressly to be settled by Confirmation of the Plan itself shall be resolved only by Consummation of the Plan itself.

**V.**

THE CHAPTER 11 PLAN

**A.      Treatment of Claims and Equity Interests Under the Plan.**

THIS SECTION PROVIDES A SUMMARY OF THE STRUCTURE, CLASSIFICATION, TREATMENT, AND IMPLEMENTATION OF THE PLAN, AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN, WHICH IS ATTACHED TO THIS DISCLOSURE STATEMENT AS **EXHIBIT 1**.

The Claims and Interests against the Debtors are divided into Classes according to their seniority and other criteria. The Classes of Claims and Interests for each of the Debtors and the funds and other property to be distributed under the Plan are described more fully below.

THE DEBTORS BELIEVE THAT THE PLAN AFFORDS CREDITORS THE POTENTIAL FOR THE GREATEST REALIZATION OF THE VALUE OF THE DEBTORS' ASSETS.

(1) Administrative Expense Claims.

Except to the extent that a holder of an Allowed Administrative Expense Claim agrees to less favorable treatment, each holder of an Allowed Administrative Expense Claim shall receive, in full and final satisfaction of such Claim, Cash in an amount equal to such Allowed Administrative Expense Claim on, or as soon thereafter as is reasonably practicable, the later of (i) the Effective Date and (ii) the first Business Day after the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim; *provided that*, the Fee Claims shall receive the treatment provided in <u>Article II.B.</u> of the Plan; *provided further*, that Allowed Administrative Expense Claims representing liabilities incurred in the ordinary course of operating or liquidating the business by the Debtors shall be paid by the Debtors in the ordinary course of business without the requirement of filing with the Bankruptcy Court an application seeking allowance and payment of any such liabilities, consistent with past practice and in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing or other documents relating to such transactions.

Except as otherwise provided by a Final Order previously entered by the Bankruptcy Court, or as provided by <u>Article II.D.</u> of the Plan, requests for payment of Administrative Expense Claims, other than requests for payment of Fee Claims, must be filed and served on the Debtors no later than the Administrative Expense Claims Bar Date pursuant to the procedures specified in the Administrative Expense Claims Bar Date Order; *provided* that the Administrative Expense Claims Bar Date shall not apply to Indemnification Claims and no requests for payment in respect of such Claims need to be filed by such date.

Holders of Administrative Expense Claims that are required to file and serve a request for payment of such Administrative Expense Claims and that do not file and serve such a request by the Administrative Expense Claims Bar Date shall be forever barred, estopped, and enjoined from asserting such Administrative Expense Claims against the Debtors or their property, and such Administrative Expense Claims shall be deemed compromised, settled, and released as of the Effective Date. If prior to the Effective Date, the Debtors, or after the Effective Date, the Liquidating Trustee, shall either resolve all Administrative Expense Claims which are Disputed Claims or file and serve any objections to Administrative Expense Claims which are Disputed Claims on or before the Administrative Expense Claims Objection Bar Date. The Liquidating Trustee shall make distributions to the holders of Allowed Administrative Expense Claims. For the avoidance of doubt, the Administrative Expense Claims Bar Date shall not apply to any DIP Claims.

(2) Fee Claims.

Until the Effective Date, the Debtors are authorized to pay compensation to the Retained Professionals pursuant to, and in accordance with, the Interim Compensation Procedures Order [ECF No. 503]. All final requests for payment of Fee Claims for services rendered and reimbursement of expenses incurred prior to the Effective Date must be Filed no later than 30 days after the Effective Date. The Bankruptcy Court shall determine the Allowed amounts of such Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Code, the Bankruptcy Rules, and prior Bankruptcy Court orders. The Liquidating Debtors, through the Liquidating Trustee, shall pay Fee Claims owing to the Retained Professionals in Cash and in the amount the Bankruptcy Court Allows from funds held in the Professional Fee Escrow Account, as soon as reasonably practicable after such Fee Claims are Allowed by entry of an order of the Bankruptcy Court; *provided that*, the Debtors' and the Liquidating Trustee's obligations to pay Allowed Fee Claims shall not be limited or deemed to be limited to funds held in the Professional Fee Escrow Account. To the extent that funds held in the Professional Fee Escrow Account are insufficient to satisfy the Allowed amount of Fee Claims owing to the Retained Professionals, the Liquidating Debtors or the Liquidating Trustee shall pay such amounts from proceeds of the Sale Transaction within ten (10) Business Days of entry of the order approving such Fee Claims.

No later than the Effective Date, the Debtors or the Liquidating Trustee shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Escrow Amount. The Professional Fee Escrow Account shall be maintained in trust solely for the Retained Professionals and for no other Entities until all Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full in Cash to the Retained Professionals pursuant to one or more Final Orders of the Bankruptcy Court. No Liens, claims, or interests shall encumber the Professional Fee Escrow Account or Cash held in the Professional Fee Escrow Account in any way. No funds held in the Professional Fee Escrow Account shall be property of the Estates of the Debtors or the Liquidating Debtors. When all Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full in Cash to the Retained Professionals pursuant to one or more Final Orders of the Bankruptcy Court, any remaining funds held in the Professional Fee Escrow Account shall be retained by the Liquidating Trustee as Residual Cash without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

The Retained Professionals shall deliver to the Debtors a reasonable and good-faith estimate of their unpaid fees and expenses incurred in rendering services to the Debtors before and as of the Effective Date projected to be outstanding as of the anticipated Effective Date, and shall deliver such estimate no later than five Business Days prior to the anticipated Effective Date. For the avoidance of doubt, no such estimate shall be considered or deemed an admission or limitation with respect to the amount of the fees and expenses that are the subject of a Retained Professional's final request for payment of Fee Claims Filed with the Bankruptcy Court, and such Professionals are not bound to any extent by the estimates. If a Retained Professional does not provide an estimate, the Debtors may estimate the unpaid and unbilled fees and expenses of such Retained Professional. The total aggregate amount so estimated to be outstanding as of the anticipated Effective Date shall be utilized by the Debtors to determine the amount to be funded to the Professional Fee Escrow Account; *provided that*, the Liquidating Debtors or the Liquidating Trustee, as applicable, shall use Cash on hand to increase the amount of the Professional Fee Escrow Account to the extent fee applications are Filed after the Effective Date in excess of the amount held in the Professional Fee Escrow Account based on such estimates.

(3)      Priority Tax Claims.

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a different treatment, each holder of an Allowed Priority Tax Claim shall receive, in full and final satisfaction, settlement, and release of, and in exchange for such Allowed Priority Tax Claim, shall receive on account of such Claim: (i) Cash in an amount equal to such Allowed Priority Tax Claim on, or as soon thereafter as is reasonably practicable, the later of (a) the Effective Date, (b) the first Business Day after the date that is thirty (30) calendar days after the date such Priority Tax Claim becomes an Allowed Priority Tax Claim, and (c) the date such Allowed Priority Tax Claim is due and payable in the ordinary course; (ii) deferred Cash payments in the amount of such Allowed Claims with a present value, as of the Effective Date, that is equal to the Allowed amount of such Claims, consistent with section 1129(a)(9) of the Bankruptcy Code; or (iii) such other treatment as each holder of an Allowed Priority Tax Claim and the Liquidating Trustee shall agree; *provided, however,* that any Allowed Priority Tax Claim that has been expressly assumed by the Buyer in connection with the Sale Transaction shall not be an obligation of the Debtors.  On the Effective Date, any Liens securing any Allowed Priority Tax Claims shall be deemed released, terminated, and extinguished, in each case without further notice to or order of the Bankruptcy Court, act, or action, under applicable law, regulation, order or rule, or the vote, consent, authorization, or approval of any Person.

(4)      DIP Claims.

After application of the DIP Cash Paydown Amount received by the DIP Agent at Closing, the DIP Deficiency Claim is Allowed, classified and treated as a Class 3 Claim.  Effective upon payment of the DIP Cash Paydown Amount (or such lesser amount agreed to by the DIP Lenders), the Liens and security interests granted pursuant to the DIP Credit Agreement were cancelled and are of no further force and effect.  As to the Debtors, the DIP Deficiency Claim and the Prepetition Lenders' Deficiency Claim shall be Allowed, classified and treated as Class 3 Claims, and as to any non-debtor obligor under the Prepetition Credit Facility, the DIP Deficiency Claim and the Prepetition Lenders' Deficiency Claim shall be deemed Prepetition Facility Obligations.

(5)      Classification of Claims and Equity Interests.

*Classification in General.*

A Claim or Interest is placed in a particular Class for all purposes, including voting, confirmation, and distribution under the Plan and under sections 1122 and 1123(a)(1) of the Bankruptcy Code; provided, that a Claim or Interest is placed in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and such Claim or Interest has not been satisfied, released, or otherwise settled prior to the Effective Date.

*Formation of Debtor Groups for Convenience Only.*

The Plan groups the Debtors together solely for the purpose of describing treatment under the Plan, tabulating votes, and making distributions with respect of Claims against and Interests in the Debtors under the Plan.  Such groupings shall not affect any Debtor's status as a separate legal

entity, change the organizational structure of any Debtor's business enterprise, constitute a change of control of any Debtor for any purpose, cause a merger or consolidation of any legal entities, constitute a substantive consolidation of any of the Debtors, or cause the transfer of any assets. Except as otherwise provided by or permitted under the Plan, all Debtors continue to exist as separate legal entities.

*Summary of Classification.*

The following table designates the Classes of Claims against and Interests in each of the Debtors and specifies which of those Classes are: (i) Impaired or Unimpaired under the Plan; (ii) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code, and (iii) deemed to accept or reject the Plan. The Plan deems a Claim or Interest to be classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Interest qualifies within the description of such different Class. A Claim or an Interest is in a particular Class only to the extent that any such Claim or Interest is Allowed in that Class and has not been paid or otherwise settled prior to the Effective Date. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims, Fee Claims, Priority Tax Claims, and DIP Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests. All of the potential Classes for the Debtors are set forth in the Plan.

| Class | Designation | Treatment | Entitled to Vote? |
|-------|-------------|-----------|-------------------|
| 1 | Other Secured Claims | Unimpaired | No; Deemed to Accept the Plan |
| 2 | Other Priority Claims | Unimpaired | No; Deemed to Accept the Plan |
| 3 | General Unsecured Claims | Impaired | Yes; Entitled To Vote |
| 4 | Intercompany Claims | Impaired and No Distribution | No; Deemed to Accept the Plan |
| 5 | Other Subordinated Claims | Impaired and No Distribution | No; Deemed To Reject the Plan |
| 6 | Existing Equity Interests | Impaired | No; Deemed To Reject the Plan |

*Special Provision Governing Unimpaired Claims.*

Except as otherwise provided in the Plan, nothing under the Plan shall affect the rights of, as applicable, the Debtors or the Liquidating Trustee in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

*Elimination of Vacant Classes.*

Any Class that, as of the commencement of the Confirmation Hearing, does not have at least one holder of a Claim or Interest that is Allowed in an amount greater than zero for voting purposes shall be considered vacant, deemed eliminated from the Plan for purposes of voting to accept or reject the Plan, and disregarded for purposes of determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to such Class.  Any Claim or Interest in a Class that is considered vacant under the Plan shall receive no distribution.  For purposes of distributions under the Plan, all Allowed Unsecured Claims against each Debtor are treated and classified in the same class and shall receive Pro Rata distributions of the proceeds of Excluded Assets, without an allocation of such proceeds by Debtor.

**B.      Voting Classes; Presumed Acceptance by Non-Voting Classes.**

If a Class contains Claims eligible to vote and no holder of Claims eligible to vote in such Class votes to accept or reject the Plan, the Plan shall be presumed accepted by the holders of such Claims in such Class.

**C.      Voting Classes; Acceptance and Rejection.**

Acceptance by Certain Impaired Classes: Holders of Allowed Claims in Class 3 are entitled to vote to accept or reject the Plan.  An Impaired Class of Claims shall have accepted the Plan if (i) the holders of at least two-thirds (2/3) in amount of the Allowed Claims actually voting in such Class have voted to accept the Plan, and (ii) the holders of more than one-half (1/2) in number of the Allowed Claims actually voting in such Class have voted to accept the Plan.  A Class of Interests shall have accepted the Plan if the holders of more than two-thirds (2/3) in number of shares actually voting in such Class shall have voted to accept the Plan.  Holders of Claims in Classes 3 and 6 will receive ballots containing detailed voting instructions.

Deemed Accepted by Impaired and Unimpaired Classes: Holders of Claims in Classes 1, 2, and 4 are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Accordingly, such holders are not entitled to vote, and the votes of such holders will not be solicited with respect to those Claims.

Deemed Rejection by Impaired Classes:  Holders of Claims or Interests in Classes 5 and 6 are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Accordingly, such holders are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to those Claims.

**D.      Confirmation Pursuant to Section 1129(a)(10) and 1129(b) of the Bankruptcy Code.**

The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests.  The Debtors reserve the right to modify the Plan, with the consent of the Consent Right Parties, in accordance with Article XIV.D. of the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

(1)     Nonconsensual Confirmation.

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by an Impaired Class of Claims.  The Debtors shall seek Confirmation pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests.

(2)     Subordinated Claims.

The allowance, classification, and treatment of all Allowed Claims and Interests, and the respective distributions and treatments under the Plan, shall take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, except where otherwise provided herein, the Reorganized Debtors, reserve the right to re-classify any Claim or Interest in accordance with any contractual, legal, or equitable subordination rights relating thereto.

(3)     Single Satisfaction of Claims.

Holders of Allowed Claims or Allowed Interests may assert such Claims against or Interests in the Debtors obligated with respect to such Claims or Interest, and such Claims and Interests shall be entitled to share in the recovery provided for the applicable Claim against or Interest in the Debtors based upon the full Allowed amount of such Claims or Interests. Notwithstanding the foregoing, the holder of such a Claim or Interest that asserts such Claim against or Interest in more than one Debtor shall be entitled only to a single distribution on account of such Claim or Interest.

**E.      Treatment of Claims and Equity Interests.**

(1)     Other Secured Claims (Class 1).

Except to the extent that a holder of an Allowed Other Secured Claim against any of the Debtors has agreed to less favorable treatment of such Claim, each such holder of an Allowed Other Secured Claim shall receive, at the option of, as applicable, the Debtors or the Liquidating Trustee, in full and final satisfaction of such Allowed Other Secured Claim, (i) payment in full in Cash, payable on the later of the Effective Date and the first Business Day after thirty (30) calendar days from the date on which such Other Secured Claim becomes an Allowed Other Secured Claim, or as soon as reasonably practical thereafter, (ii) abandonment to the holder of such Allowed Other Secured Claim of the collateral securing such Allowed Other Secured Claim and payment of any interest required under section 506(b) of the Bankruptcy Code, or (iii) such other treatment necessary to satisfy section 1129 of the Bankruptcy Code.

(2)     Other Priority Claims (Class 2).

Except to the extent that a holder of an Allowed Other Priority Claim against any of the Debtors has agreed to less favorable treatment of such Allowed Other Priority Claim, each such holder of an Allowed Other Priority Claim shall receive, in full and final satisfaction of such

Allowed Other Priority Claim, Cash in an amount equal to such Allowed Other Priority Claim, payable on or as soon as reasonably practicable after the later of the Effective Date and the date on which such Other Priority Claim becomes an Allowed Other Priority Claim, or as soon as reasonably practical thereafter.

(3)    Allowed General Unsecured Claims (Class 3).

Except to the extent that a holder of an Allowed Class 3 Claim agrees to less favorable treatment, each holder of an Allowed General Unsecured Claim shall receive Liquidating Trust Interests entitling each such holder to receive its Pro Rata share of the Residual Cash, provided, however, that notwithstanding the foregoing, no distributions of Residual Cash or otherwise shall be made to holders of Settlement Parties' Allowed General Unsecured Claims (and such Claims shall not be considered for purposes of determining the Pro Rata share of Residual Cash to which holders of other Allowed General Unsecured Claims are entitled) unless and until: (x) in the case of the Allowed DIP Deficiency Claim, holders of Allowed General Unsecured Claims not constituting Settlement Parties' Allowed General Unsecured Claims have received distributions totaling, in the aggregate, at least (I) $5 million less (II) the positive difference, if any, between (A) the Debtors' good faith estimate of Residual Cash held by the Debtors as of the Effective Date and (B) $15.5 million minus the aggregate amount of Fee Claims for professional services rendered or costs incurred on or after the Closing Date through the Effective Date; and (y) in the case of all other Allowed Settlement Parties' Allowed General Unsecured Claims, Holders of Allowed General Unsecured Claims have received distributions totaling, in the aggregate, at least $5 million.  Distributions to Holders of Allowed General Unsecured Claims shall be made at such times and in such intervals as determined by the Liquidating Trustee.

Exclusive of duplicate and unliquidated Claims, asserted Claims in Class 3 total $2,686,314,000 before reconciliation.  The actual Allowed amount of Claims in Class 3 will be determined following the claims reconciliation process to be undertaken by the Liquidating Trustee in accordance with the terms of the Plan.

(4)    Intercompany Claims (Class 4).

The holders of Intercompany Claims shall not receive or retain any property under the Plan on account of such Claims.

(5)    Other Subordinated Claims (Class 5).

Holders of Allowed Other Subordinated Claims shall not receive or retain any property under the Plan on account of such Claims.

(6)    Existing Equity Interests (Class 6).

Solely in the event that all Allowed Claims have been satisfied in full in accordance with the Bankruptcy Code and the Plan, each holder of an Existing Equity Interest may receive its amount of proceeds realized from the Liquidating Trust Assets consistent with such holder's rights of payment existing immediately prior to the Petition Date.  The Liquidating Trustee shall determine, in the Liquidating Trustee's sole discretion, whether and when, to: (i) cancel and extinguish the Existing Equity Interests; (ii) transfer the Existing Equity Interests into the

Liquidating Trust; or (iii) provide other treatment for the Existing Equity Interests consistent with the terms of this Plan and the Sale Order.

**F.      Means for Implementation of the Plan.**

(1)      Joint Chapter 11 Plan.

The Plan is a joint chapter 11 plan for each of the Debtors, with the Plan for each Debtor being non-severable and mutually dependent on the Plan for each other Debtor.  In consideration for the classification, distributions, releases, and other benefits provided under the Plan, on the Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies resolved pursuant to the Plan.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, Causes of Action, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates and Holders of Claims and Interests is fair, equitable, and is within the range of reasonableness.  Distributions made to Holders of Allowed Claims are intended to be indefeasible.

(2)      Corporate Action.

On or before the Effective Date, by virtue of the solicitation of votes in favor of the Plan and entry of the Confirmation Order, all actions contemplated by the Plan (including any action to be undertaken by, as applicable, the Debtors or Liquidating Debtors) are authorized, approved, and, to the extent taken prior to the Effective Date, ratified without any requirement for further action by holders of Claims or Interests, the Debtors, or any other Entity or Person.  All matters provided for in the Plan involving the corporate structure of the Debtors, including but not limited to any Interest in any of the Debtors, and any corporate action required by the Debtors in connection therewith, shall be deemed to have occurred and shall be in effect, without any requirement of further action by the Interest holders, directors, members, managers, or officers of the Debtors or the Liquidating Trustee.  On or (as applicable) before the Effective Date, the authorized officers, managers, and directors of the Debtors, and the Chief Transformation Officer, as applicable, shall be authorized and directed to issue, execute, and deliver the agreements, documents and instruments contemplated by the Plan (or as necessary or desirable to effectuate the transactions contemplated by the Plan).  The authorizations and approvals contemplated by Article V.B. of the Plan shall be effective notwithstanding any requirements under non-bankruptcy law.

**G.      Liquidating Trust.**

(1)      Establishment of the Liquidating Trust.

On the Effective Date, the Liquidating Trust shall be established, for the benefit of the Liquidating Trust Beneficiaries, pursuant to the Liquidating Trust Agreement, which will be filed with the Bankruptcy Court as part of the Plan Supplement.  Upon establishment of the Liquidating Trust, all Liquidating Trust Assets shall be deemed transferred to the Liquidating Trust without any further action of the Debtors or any managers, employees, officers, directors, members, partners, shareholders, agents, advisors, or representatives of the Debtors.  The powers, authority,

responsibilities, and duties of the Liquidating Trust, and the Liquidating Trustee are set forth in and shall be governed by the Plan and the Liquidating Trust Agreement. The Liquidating Trust Agreement shall provide for the distribution of the Liquidation Trust Assets to the Liquidating Trust Beneficiaries. In the event of any conflict between the terms of Article VI of the Plan and the terms of a Liquidating Trust Agreement as such conflict relates to the establishment of a Liquidating Trust, the terms of Article VI of the Plan shall govern. The Liquidating Trust Agreement may provide powers, duties, and authorities in addition to those explicitly stated herein, but only to the extent that such powers, duties, and authorities do not affect the status of the Liquidating Trust as a "liquidating trust" for United States federal income tax purposes.

(2)     Purpose of the Liquidating Trust.

The Liquidating Trust shall be established pursuant to the Liquidating Trust Agreement to qualify as a "liquidating trust" within the meaning of Treasury Regulation Section 301.7701-4(d) and in compliance with Rev. Proc. 94-45, 1994-2 C.B. 684, for, among other purposes, the purpose of (i) receiving and holding the Liquidating Trust Assets; (ii) administering, disputing, objecting to, compromising, or otherwise resolving all Allowed Claims; (iii) making distributions to the Liquidating Trust Beneficiaries in accordance with this Plan and the Liquidating Trust Agreement; (iv) maximizing recoveries for the benefit of the Liquidating Trust Beneficiaries, with no objective to continue or engage in the conduct of a trade or business in accordance with Treasury Regulation Section 301.7701-4(d); (v) paying the charges it incurs on or after the Effective Date for professional fees, disbursements, expenses, or related support services without application to the Bankruptcy Court; and (vi) preparing and filing any and all informational returns, reports, statements, returns or disclosures relating to the Debtors that are required by any Governmental Unit or applicable law. The Liquidating Trust shall not be deemed a successor in interest of the Debtors for any purpose other than as specifically set forth herein or in the Liquidating Trust Agreement. Subject to the DOF Election, the Liquidating Trust is intended to qualify as a "grantor trust" for U.S. federal, and applicable state and local, income tax purposes within the meaning of sections 671 through 679 of the Tax Code, with the Liquidating Trust Beneficiaries treated as the sole grantors and owners of the Liquidating Trust. To the extent permitted by applicable law, all parties, including the Liquidating Trustee and any Liquidating Trust Beneficiaries, shall report consistently with the foregoing for all applicable tax reporting purposes (including consistent reporting for valuation purposes). To the extent permitted by applicable law, all parties, including the Liquidating Trustee and any Liquidating Trust Beneficiaries, shall report consistently with the foregoing for all applicable tax reporting purposes (including consistent reporting for valuation purposes).

(3)     Liquidating Trust Assets.

The corpus of the Liquidating Trust shall consist of the Liquidating Trust Assets. On the Effective Date, and in accordance with sections 1123 and 1141 of the Bankruptcy Code, all title and interest in all of the Excluded Assets, which constitute all assets of the Debtors that have not been distributed on or prior to the Effective Date, or sold and conveyed pursuant to the Sale Transaction, shall irrevocably and automatically vest in the Liquidating Trust, free and clear of all liens, Claims, encumbrances, and Interests (legal, beneficial, or otherwise) for the benefit of the Liquidating Trust Beneficiaries. Upon completion of the transfer of the Liquidating Trust Assets to the Liquidating Trust, the Debtors shall have no interest in or with respect to the Liquidating

Trust Assets or Liquidating Trust. Upon delivery of the Liquidating Trust Assets to the Liquidating Trust, the Debtors and their respective predecessors, successors, and assigns, shall be released from all liability with respect to the delivery thereof and shall have no reversionary or further interest in or with respect to the Liquidating Trust Assets or the Liquidating Trust in accordance with Article VI.C of the Plan.

For all U.S. federal income tax purposes, and subject to the DOF Election described at Article VI.H.(8) of the Plan, the Liquidating Trust is intended to qualify as a "liquidating trust" for U.S. federal income tax purposes. In general, a liquidating trust is not a separate taxable entity but rather is treated for U.S. federal income tax purposes as a "grantor" trust (i.e., a pass-through entity). The IRS, in Revenue Procedure 94-45, 1994-2 C.B. 684, set forth the general criteria for obtaining an IRS ruling as to the grantor trust status of a liquidating trust under a chapter 11 plan. The Liquidating Trust will be structured with the intention of complying with such general criteria. Pursuant to the Liquidating Trust, and in conformity with Revenue Procedure 94-45, all parties to the Liquidating Trust (including, without limitation, the Debtors, the Liquidating Trustee, and the Liquidating Trust Beneficiaries) shall treat the transfer of the Liquidating Trust Assets to the Liquidating Trust in accordance with the terms herein as (1) a transfer of the Liquidating Trust Assets directly to the Liquidating Trust Beneficiaries (other than to the extent any of the Liquidating Trust Assets are allocable to Disputed Claims), followed by (2) a transfer by such Liquidating Trust Beneficiaries of such assets to the Liquidating Trust in exchange for interests in the Liquidating Trust. Accordingly, except in the event of contrary definitive guidance, the Liquidating Trust Beneficiaries receiving interests in the Liquidating Trust would be treated for U.S. federal income tax purposes as the grantors and owners of their respective share of the Liquidating Trust Assets transferred to the Liquidating Trust (other than such Liquidating Trust Assets as are allocable to Disputed Claims). Although the following discussion assumes that the Liquidating Trust will be treated as a liquidating trust for U.S. federal income tax purposes, no ruling is expected to be requested from the IRS concerning the tax status of the Liquidating Trust as a grantor trust. Accordingly, there can be no assurance that the IRS will not take a contrary position to the classification of the Liquidating Trust as a grantor trust. If the IRS were to successfully challenge such classification, the U.S. federal income tax consequences to the Liquidating Trust and the Liquidating Trust Beneficiaries could vary from those discussed herein. Certain U.S. federal income tax consequences of the Liquidating Trust or portions thereof being treated as a "disputed ownership fund" within the meaning of Treasury Regulation section 1.468B-9 are also discussed below.

Notwithstanding the foregoing, for purposes of section 553 of the Bankruptcy Code, the transfer of the Liquidating Trust Assets to the Liquidating Trust shall not affect the mutuality of obligations that otherwise may have existed prior to the effectuation of such transfer. Such transfer shall be exempt from any stamp, real estate transfer, mortgage reporting, sales, use, or other similar tax, to the maximum extent provided by section 1146(a) of the Bankruptcy Code. In connection with the transfer of such Liquidating Trust Assets, any attorney client privilege, work product privilege or immunity attaching to any documents or communications (whether written or oral) transferred to the Liquidating Trust shall vest in the Liquidating Trust and its representatives, and the Debtors and the Liquidating Trustee are directed to take all necessary actions to effectuate the transfer of such privileges. The Liquidating Trustee shall agree to accept and hold the Liquidating Trust Assets in the Liquidating Trust for the benefit of the Liquidating Trust Beneficiaries, subject to the terms of the Plan and the Liquidating Trust Agreement. The Debtors, the Liquidating

Trustee, and any party under the control of such parties will execute any documents or other instruments and shall take all other steps as necessary to cause title to the Liquidating Trust Assets to be transferred to the Liquidating Trust.

(4)    Non-Transferability of Liquidating Trust Interests.

The Liquidating Trust Interests shall be non-transferable other than if transferred by will, intestate succession, or otherwise by operation of law.

(5)    Administration of Liquidating Trust.

The Liquidating Trust shall be administered by the Liquidating Trustee subject to the oversight of the Oversight Committee (as defined below) pursuant to a Liquidating Trust Agreement and the Plan.  In the event of an inconsistency between the Plan and a Liquidating Trust Agreement as such conflict relates to anything other than the establishment of a Liquidating Trust, the Liquidating Trust Agreement shall control.

**H.    Liquidating Trust Oversight Committee.**

The Liquidating Trust Oversight Committee (the "**Oversight Committee**") is hereby created in accordance with the Plan. The Oversight Committee initially shall be composed three (3) members total: two (2) members chosen by the Creditors' Committee, and one (1) member chosen by MEC (each, a "**Member**," and collectively, the "**Members**"), whose identity will be disclosed in the Plan Supplement. The Oversight Committee may authorize its own dissolution by filing with the Bankruptcy Court an appropriate notice that its responsibilities have concluded. Unless already dissolved, the Oversight Committee shall be dissolved as of the earlier of (i) the date upon which each Member receives a distribution from the Liquidating Trust in full satisfaction of its respective Allowed Claim; or (ii) the date the Chapter 11 Cases are closed. Further provisions concerning the duties and responsibilities of the Oversight Committee are as follows:

(1)    Reports to Oversight Committee. Notwithstanding any other provision in the Plan, the Liquidating Trustee shall provide a report (either in writing or orally via teleconference) to the Oversight Committee on an "as needed" basis, but in no event not fewer than two (2) times per calendar year. The Oversight Committee shall keep all such information strictly confidential.

(2)    Actions Requiring Approval of the Oversight Committee. The Liquidating Trustee shall obtain the approval of the Oversight Committee (by at least a majority vote, which may be obtained by negative notice) prior to taking any action regarding any of the following matters:

i.    The distribution or disposition of any assets having a valuation in excess of $250,000;

ii.    The abandonment of any non-Cash assets having a valuation of at least $1,000,000;

iii.    The settlement, compromise, or other resolution of any Disputed Claim, wherein the Allowed amount of the asserted Claim exceeds $1,000,000;

iv.    The settlement, compromise, or other resolution of any litigation, adversary proceedings, or claims pursued by the Liquidating Trust;

v.  The exercise of any right or action set forth in the Plan or any supplement thereto that expressly requires approval of the Oversight Committee;

vi.  The borrowing of any funds by the Liquidating Trust including, but not limited to, the obtaining of litigation financing or pledge of any portion of Cash or assets, provided, however, that unanimous approval of the Oversight Committee members shall be required for the matters set forth in this Article VI.F.(2)(vi); and

vii.  Any matter which could reasonably be expected to have a material adverse effect, as determined by the Liquidating Trustee in consultation with legal counsel, on the amount of distributions to be made by the Liquidating Trust.

I.  **Liquidating Trustee's Conflict of Interest.**

The Liquidating Trustee shall disclose to the Oversight Committee any conflicts of interest (actual or potential) that the Liquidating Trustee has with respect to any matter arising during administration of the Liquidating Trust.  In the event that the Liquidating Trustee cannot take any action by reason of an actual or potential conflict of interest, the Oversight Committee, acting by majority, shall be authorized to take any such action(s) in the Liquidating Trustee's place and stead, including without limitation the retention of professionals (which may include professionals retained by the Liquidating Trustee) for the purpose of taking such actions.  The Bankruptcy Court shall hear and finally determine any dispute arising out of this section.

To the extent required under the Plan, the Liquidating Trustee may obtain any approval or authorization required to be received from the Oversight Committee on three (3) business days' negative notice or less if the circumstances require it as determined by the Liquidating Trustee in his or her sole discretion.  The Liquidating Trustee may make requests on behalf of the Liquidating Trust for approval or authorization by the Oversight Committee in writing, which may be made in the form of an email.  In the event any Member of the Oversight Committee objects to the Liquidating Trustee's request, the Liquidating Trustee shall consult with the Oversight Committee about how to proceed.  If necessary, the Bankruptcy Court shall hear and finally determine any dispute arising out of Article VI.G. of the Plan.

Any Member of the Oversight Committee may resign at any time on notice (including email notice) to the other Members of the Oversight Committee and to the Liquidating Trustee. Any such resignation shall be effective on the later of: (i) the date specified in the notice delivered to the Liquidating Trustee and the other Members of the Oversight Committee; and (ii) the date that is thirty (30) days after the date such notice is delivered.  In the event of the resignation, death, incapacity, or removal of a Member of the Oversight Committee, the remaining Members of the Oversight Committee, in consultation with the Liquidating Trustee, shall select and appoint a replacement Member.  If the remaining members of the Oversight Committee cannot agree on the replacement Member, the Liquidating Trustee shall select the replacement Member.

The Oversight Committee shall be bound by and conduct its oversight activities in accordance and compliance with the bylaws established for the governance of the activities of the Creditors' Committee.

**J.      Liquidating Trustee.**

(1)      Appointment of the Liquidating Trustee.

The Liquidating Trustee shall be selected by the Creditors' Committee in consultation with MBC, MEC, and the DIP Agent.  Upon the occurrence of the Effective Date, the Liquidating Trustee shall also be deemed appointed to serve as the trustee and administrator of the Liquidating Trust established pursuant to the Plan and the Liquidating Trust Agreement.  The Liquidating Trustee, subject to the terms and conditions of the Plan and the Liquidating Trust Agreement, shall be authorized to execute, deliver, file, or record such documents, contracts, instruments, releases, and other agreements, and to take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  The Liquidating Trustee shall have and perform all of the duties, responsibilities, rights, and obligations set forth in the Plan and the Liquidating Trust Agreement, as applicable.

(2)      Liquidating Trustee as Representative of the Estate.

From and after the Effective Date, the Liquidating Trustee shall act as the exclusive representative of the Estate for all purposes.  Any successor Liquidating Trustee appointed pursuant to the Liquidating Trust Agreement shall be bound by and comply with the terms of this Plan and the Liquidating Trust Agreement.

(3)      Responsibilities and Authority of the Liquidating Trustee.

The responsibilities and authority of the Liquidating Trustee shall be as set forth in the Liquidating Trust Agreement, and shall include, among others, the following rights and responsibilities, which shall be the exclusive rights and responsibilities of the Liquidating Trustee: (i) preserving and liquidating the Liquidating Trust Assets; (ii) administering and paying taxes for the Liquidating Trust, including, among other things, (a) filing tax returns for the Liquidating Trust, and (b) representing the interest and account of the Liquidating Trust before any taxing authority in all matters including, without limitation, any action, suit, proceeding, or audit; (iii) retaining and paying, without the need for retention or fee applications, professionals in connection with the Liquidating Trustee's performance of its duties under this Plan and the Liquidating Trust Agreement; (iv) distributing information statements as required for U.S. federal income tax and other applicable tax purposes to the Liquidating Trust Beneficiaries; (v) filing an application for entry by the Bankruptcy Court of a final decree closing the Chapter 11 Case; (vi) making distributions to Liquidating Trust Beneficiaries in accordance with the Plan and Liquidating Trust Agreement; (vii) objecting to, reconciling, seeking to subordinate, compromising, or settling all Claims; (viii) making distributions to the Liquidating Trust Beneficiaries in accordance with the Plan and Liquidating Trust Agreement; (ix) requesting an expedited determination of taxes, including with respect to any reserve for Disputed Claims, under section 505(b) of the Bankruptcy Code; and (x) such other responsibilities as may be vested in the Liquidating Trustee pursuant to this Plan and the Liquidating Trust Agreement, or an order of the Bankruptcy Court, or as may be necessary and proper to carry out the provisions of this Plan.

(4)      Powers of the Liquidating Trustee.

The Liquidating Trustee shall have the power and authority to perform the acts described

in the Liquidating Trust Agreement, in addition to any powers granted by law or conferred to it by any other provision of the Plan, including without limitation any set forth herein, provided however, that enumeration of the following powers shall not be considered in any way to limit or control the power and authority of the Liquidating Trustee to act as specifically authorized by any other provision of this Plan, the Liquidating Trust Agreement, and/or any applicable law, and to act in such manner as the Liquidating Trustee may deem necessary or appropriate to take any act deemed appropriate by the Liquidating Trustee, including, without limitation, to discharge all obligations assumed by the Liquidating Trustee or provided herein and to conserve and protect the Liquidating Trust or to confer on the creditors the benefits intended to be conferred upon them by this Plan.

The powers of the Liquidating Trustee shall be as set forth in the Liquidating Trust Agreement, and shall include, among others, the following: (i) the power to invest funds of the Liquidating Trust (in demand and time deposits, or other temporary, liquid investments, except as otherwise determined to be reasonably necessary to maintain the value of the assets and to further the liquidating purpose of the Liquidating Trust), and withdraw, make distributions, and pay taxes and other obligations owed by the Liquidating Trust from such funds in accordance with this Plan and the Liquidating Trust Agreement; (ii) the power to engage and compensate, without prior Bankruptcy Court order or approval, employees and professionals to assist the Liquidating Trustee with respect to its responsibilities; or (iii) such other powers as may be vested in or assumed by the Liquidating Trustee pursuant to this Plan, the Liquidating Trust Agreement, or by an order of the Bankruptcy Court, or as may be necessary and proper to carry out the provisions of this Plan.

(5)    Compensation of the Liquidating Trustee.

The Liquidating Trustee shall be compensated as set forth in the Liquidating Trust Agreement. The Liquidating Trustee shall fully comply with the terms, conditions and rights set forth in this Plan and the Liquidating Trust Agreement. The Liquidating Trustee (and any Liquidating Trustee's retained professionals) shall not be required to file a fee application to receive compensation.

(6)    Retention and Payment of Professionals.

The Liquidating Trustee shall have the right, without Court approval, to retain the services of attorneys, accountants, and other professionals and agents, to assist and advise the Liquidating Trustee in the performance of his, her, or its duties, and to compensate and reimburse expenses of such professionals in accordance with the Liquidating Trust Agreement. For the avoidance of doubt, the Liquidating Trust may retain any professional currently retained by the Creditors' Committee.

(7)    Trust Expenses.

The Liquidating Trustee may, in the ordinary course of business and without the necessity for any application to, or approval of, the Bankruptcy Court, pay any accrued but unpaid Liquidating Trust expenses. All Liquidating Trust expenses shall be charged against and paid from the Liquidating Trust Assets.

(8)    DOF Election

The Liquidating Trust Agreement shall require the Liquidating Trustee to elect to treat that portion of the Liquidating Trust Assets subject to the Disputed Claims as a disputed ownership fund described in Treasury Regulation Section 1.468B-9 (the "DOF Election") unless, as of the Trust Election Date, either all of the Liquidating Trust Assets subject to Disputed Claims have been distributed to the Liquidating Trust Beneficiaries or the percentage of the Liquidating Trust Assets subject to Disputed Claims distributable to each of the Liquidating Trust Beneficiaries has become fixed and determinable.

**K.    Cash Investments.**

The Liquidating Trustee may invest Cash (including any earnings thereon or proceeds therefrom); provided, that such investments are investments permitted to be made by a "liquidating trust" within the meaning of Treasury Regulation Section 301.7701-4(d), as reflected therein, or under applicable IRS guidelines, rulings, or other controlling authorities.

**L.    No Revesting of Liquidating Trust Assets.**

No Liquidating Trust Asset will revest in the Debtor on or after the date such asset is transferred to the Liquidating Trust, but will best upon such transfer in the Liquidating Trust to be administered by the Liquidating Trustee in accordance with the Plan and the Liquidating Trust Agreement.

**M.    Distribution of Liquidating Trust Assets.**

The Liquidating Trustee shall distribute to the holders of Allowed Claims on account of their Liquidating Trust Interests on a semi-annual basis or with such other frequency as the Liquidating Trustee determines in the exercise of its business judgment, Cash representing its net income plus all net proceeds from the sale of its assets (including any Cash received from the Debtors and treating any permissible investment as Cash for purposes of Article VI.I. of the Plan), less such amounts that may be reasonably necessary to (i) meet contingent liabilities and to maintain the value of the Liquidating Trust Assets during liquidation, (ii) pay reasonably incurred or anticipated expenses (including, without limitation, any taxes imposed on or payable by the Debtors or the Liquidating Trust or in respect of the Liquidating Trust Assets), or (iii) satisfy other liabilities incurred or anticipated by such Liquidating Trust in accordance with the Plan or the Liquidating Trust Agreement; *provided, however*, that such Liquidating Trustee shall not be required to make a Distribution pursuant to Article VI.I. of the Plan if such Liquidating Trustee determines that the expense associated with making the Distribution would likely utilize a substantial portion of the amount to be distributed, thus making the Distribution impracticable.

**N.    Liquidating Trust Mechanics.**

(1)    Federal Income Tax Treatment of Liquidating Trust.

The U.S. federal income tax classification of the Liquidating Trust will be determined pursuant to subsection (2) and/or (3) below, as applicable.

(2)    Disputed Claims Resolved Before Trust Election Date.

Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt of an adverse determination by the IRS upon audit if not contested by such Liquidating Trustee), for all United States federal income tax purposes, all parties (including, without limitation, the Debtors, the Liquidating Trustee and the Liquidating Trust Beneficiaries) shall treat the transfer of Liquidating Trust Assets to a Liquidating Trust as (i) a transfer of Liquidating Trust Assets (subject to any obligations relating to those assets) directly to Liquidating Trust Beneficiaries (other than to the extent Liquidating Trust Assets are allocable to Disputed Claims), followed by (ii) the transfer by such beneficiaries to a Liquidating Trust of Liquidating Trust Assets in exchange for the related Liquidating Trust Interests.    Subject to Article VI.L.(2) of the Plan; (i) the Liquidating Trust is structured to qualify as a "liquidating trust" within the meaning of Treasury Regulation Section 301.7701-4(d) and in compliance with Revenue Procedure 94-45, 1994-2 C.B. 684, and, thus, as a "grantor trust" for U.S. federal income tax purposes within the meaning of Sections 671 through 679 of the Tax Code to the Liquidating Trust Beneficiaries, consistent with the terms of the Plan, and the Liquidating Trust Agreement shall provide as such; (ii) Liquidating Trust Beneficiaries shall be treated as the beneficiaries and grantors of the Liquidating Trust; (iii) the sole purpose of the Liquidating Trust shall be the liquidation and distribution of the Liquidating Trust Assets in accordance with Treasury Regulation Section 301.7701-4(d), including the resolution of Allowed Claims in accordance with this Plan, with no objective to continue or engage in the conduct of a trade or business; (iv) all parties (including the Debtor, Liquidating Trust Beneficiaries, and the Liquidating Trustee) shall report consistently with such treatment (including the deemed receipt of the Liquidating Trust Assets, subject to applicable liabilities and obligations, by the Liquidating Trust Beneficiaries, followed by the deemed transfer of such Liquidating Trust Assets to the Liquidating Trust); (v) all parties shall report consistently for federal income tax purposes, and otherwise, with the valuation (as determined pursuant to Article VI.L.(2) of the Plan) of the Liquidating Trust Assets transferred to the Liquidating Trust as determined by the Liquidating Trustee (or its designee); (vi) the Liquidating Trustee shall be responsible for filing returns for the Liquidating Trust as a grantor trust pursuant to Treasury Regulation Section 1.671-4(a); (vii) the Liquidating Trustee shall annually send to each Liquidating Trust Beneficiary a separate statement regarding the receipts and expenditures of the trust as relevant for U.S. federal income tax purposes; and (viii) all items of income, deductions and credit loss of the Liquidating Trust shall be allocated for federal income tax purposes to the Liquidating Trust Beneficiaries based on their respective interests in the Liquidating Trust, in such manner as the Liquidating Trustee deems reasonable and appropriate. The foregoing treatment shall also apply, to the extent permitted by applicable law, for state and local income tax purposes.  For the purpose of Article VI.L(2) of the Plan, the terms "party" and "Liquidating Trust Beneficiary" shall not include the United States or any agency or department thereof, or any officer or employee thereof acting in such capacity.

(3)    Disputed Claims Unresolved by Trust Election Date.

If all Disputed Claims have not been resolved by the Trust Election Date, then the Liquidating Trustee will elect to treat that portion of the Liquidating Trust Assets subject to the Disputed Claims as a "disputed ownership fund" as described in and governed by Treasury Regulation Section 1.468B-9, and all impacted parties (including the Debtor, and solely to the extent applicable, Liquidating Trust Beneficiaries, and the Liquidating Trustee), solely with

respect to the impacted assets, shall report for United States federal, state, and local income tax purposes consistently with such election. The Liquidating Trustee shall file all income tax returns with respect to any income attributable to the disputed ownership fund and shall pay the U.S. federal, state, and local income taxes attributable to such disputed ownership fund based on the items of income, deduction, credit, or loss allocable thereto. Any taxes imposed on the disputed ownership fund or its assets will be paid out of the assets of the disputed ownership fund (including any assets of the Liquidating Trust allocable to Disputed Claims) and any subsequent distributions in respect of the allowance or disallowance of such claims will be reduced accordingly. In the event, and to the extent, that any Cash in any disputed ownership fund is insufficient to pay the portion of any taxes attributable to taxable income arising from assets of the disputed ownership fund, assets of the disputed ownership fund (including those otherwise distributable) may be sold to pay such taxes. The undisputed portion of the Liquidating Trust Assets will be treated as held in a grantor trust, with deemed distribution to and contribution from the Liquidating Trust Beneficiaries, as described in the immediately preceding paragraph.

To the extent permitted by applicable law, all parties, including the Liquidating Trustee and any Liquidating Trust Beneficiaries, shall report consistently with the foregoing for all applicable tax reporting purposes (including consistent reporting for valuation purposes).

(4)    Tax Reporting.

Allocations of Liquidating Trust taxable income among Liquidating Trust Beneficiaries (other than taxable income allocable to any assets allocable to, or retained on account of, Disputed Claims, if such income is otherwise taxable at the Liquidating Trust) shall be determined by reference to the manner in which an amount of Cash representing such taxable income would be distributed (were such Cash permitted to be distributed at such time) if, immediately prior to such deemed Distribution, the Liquidating Trust had distributed all its assets (valued at their tax book value, other than, if applicable, assets allocable to Disputed Claims) to the holders of Liquidating Trust Interests, adjusted for prior taxable income and loss, and taking into account all prior and concurrent Distributions from a Liquidating Trust. Similarly, taxable loss of a Liquidating Trust shall be allocated by reference to the manner in which an economic loss would be borne immediately after a hypothetical liquidating distribution of the remaining Liquidating Trust Assets. The tax book value of Liquidating Trust Assets for purpose of this paragraph shall equal their fair market value on the date Liquidating Trust Assets are transferred to a Liquidating Trust, adjusted in accordance with tax accounting principles prescribed by the Tax Code, the applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements.

As soon as reasonably practicable after the Liquidating Trust Assets are transferred to a Liquidating Trust, the Liquidating Trustee shall make a good faith valuation of Liquidating Trust Assets. Such valuation shall be made available from time to time to all parties to the Liquidating Trust (including, without limitation, the Debtors and Liquidating Trust Beneficiaries), to the extent relevant to such parties for tax purposes, and shall be used consistently by such parties for all United States federal income tax purposes.

(5)     Dissolution.

The Liquidating Trustee and Liquidating Trust shall be discharged or dissolved, as the case may be, at such time as (i) all of the Liquidating Trust Assets have been distributed pursuant to the Plan and a Liquidating Trust Agreement, or (ii) the Liquidating Trustee determines, in its sole discretion, that the administration of any remaining Liquidating Trust Assets is not likely to yield sufficient additional Liquidating Trust proceeds to justify further pursuit; provided, however, that in no event shall a Liquidating Trust be dissolved later than three (3) years from the creation of such Liquidating Trust pursuant to Article VI.N. of the Plan unless the Bankruptcy Court, upon motion within the six-month period prior to the third (3rd) anniversary (or within the six-month period prior to the end of an extension period), determines that a fixed period extension (not to exceed three (3) years, together with any prior extensions, without a favorable private letter ruling from the IRS or an opinion of counsel satisfactory to the Liquidating Trustee that any further extension would not adversely affect the status of the trust as a liquidating trust for United States federal income tax purposes) is necessary to facilitate or complete the recovery and liquidation of the Liquidating Trust Assets.

If at any time the Liquidating Trustee determines, in reliance upon such professionals as the Liquidating Trustee may retain, (i) that the expense of administering a Liquidating Trust so as to make a final distribution to Liquidating Trust Beneficiaries is likely to exceed the value of the assets remaining in such Liquidating Trust, (ii) all Allowed Claims (other than those whose distributions are deemed undeliverable under the Plan) have been paid in full, or (iii) the amount of any final distributions to holders of Allowed Claims would be $100.00 or less and the aggregate amount of Cash available for distributions to holders of Allowed General Unsecured Claims is less than $25,000.00, then, such Liquidating Trustee may apply to the Bankruptcy Court for authority to (a) reserve any amount necessary to dissolve such Liquidating Trust, (b) donate any balance to one or more of the following organizations (each of which qualifies as a Tax Code section 501(c)(3) tax-exempt organization): (1) the Bankruptcy Bar Foundation of the Bankruptcy Bar Association of the Southern District of Florida, or (2) Legal Services of Greater Miami, Inc., or (3) another tax-exempt organization selected by the Liquidating Trustee with the consent of the Oversight Committee.

The Liquidating Trustee shall not be required to make any payment to any holder of an Allowed Claim on any Distribution Date of Cash less than $100.00; provided that, if any distribution is not made pursuant to Article VIII.H. of the Plan, such distribution shall be added to any subsequent distribution to be made on behalf of such holder's Allowed Claim.  If no further distribution shall be made by the Liquidating Trustee and any surplus Cash shall be donated and distributed to one or more of the following organizations (each of which qualifies as a tax-exempt organization under Section 501(c)(3) of the Tax Code), (a) the Bankruptcy Bar Foundation of the Bankruptcy Bar Association of the Southern District of Florida, or (b) Legal Services of Greater Miami, Inc., or (c) another tax-exempt organization selected by the Liquidating Trustee with the consent of the Oversight Committee.

(6)     Post-Effective Date Reporting.

No later than the 20th day of the month following the end of each calendar quarter, the Liquidating Trustee shall File with the Bankruptcy Court and serve on the Office of the United

States Trustee and counsel to the Indemnitees quarterly reports summarizing the Post-Confirmation receipts received and disbursements made by the Liquidating Trustee in the prior quarter.

(7)    Effectuating Documents; Further Transactions.

On and after the Effective Date, the Liquidating Trustee is authorized to and may issue, execute, deliver, file, or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement and further evidence the terms and conditions of the Plan in the name of and on behalf of the Debtors, without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan.

The Debtors and the Liquidating Trustee, as applicable, shall be authorized to implement the Plan in the manner most tax efficient to the DIP Lenders, Prepetition Lenders, the Creditors' Committee, and the Debtors as determined by the Debtors in their business judgment.

(8)    Withholding and Reporting Requirements.

*Withholding Rights.* In connection with the Plan, to the extent applicable, the Liquidating Trustee and/or any party issuing any instrument or making any distribution described in the Plan shall comply with all applicable withholding and reporting requirements imposed by any federal, state, or local taxing authority, and all distributions pursuant to the Plan and all related agreements shall be subject to any such withholding or reporting requirements. Any amounts withheld pursuant to the preceding sentence shall be deemed to have been distributed to and received by the applicable recipient for all purposes of the Plan. Notwithstanding the foregoing, each holder of an Allowed Claim or any other Person that receives a distribution pursuant to the Plan shall have responsibility for any taxes imposed by any Governmental Unit, including, without limitation, income, withholding, and other taxes, on account of such distribution. Any party issuing any instrument or making any distribution pursuant to the Plan has the right, but not the obligation, to not make a distribution until such holder has made arrangements satisfactory to such issuing or disbursing party for payment of any such tax obligations, including requiring as a condition to the receipt of a distribution, the compliance with Article VI.Q.(1) of the Plan. The Liquidating Trustee reserves the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support and other spousal awards, liens, and encumbrances. Additionally, in the case of a non-Cash distribution that is subject to withholding, the distributing party has the right, but not the obligation, to withhold an appropriate portion of such distributed property and either (a) sell such withheld property to generate Cash necessary to pay over the withholding tax (or reimburse the distributing party for any advance payment of the withholding tax), or (b) pay the withholding tax using its own funds and retain such withheld property.

*Forms.* Any party entitled to receive any property as an issuance or distribution under the Plan shall, upon request, deliver to the Liquidating Trustee or such other Person designated by the Liquidating Trustee (which entity shall subsequently deliver to the Liquidating Trustee any such forms received) an executed IRS Form W-9 or (if the payee is a foreign Person) the appropriate IRS Form W-8 (including all relevant attachments). If such request is made by the Liquidating Trustee or such other Person designated by the Liquidating Trustee and the holder fails to comply

before the date that is 90 calendar days after the request is made, the amount of such distribution shall irrevocably revert to the Liquidating Trustee and, the holder shall be forever barred from asserting any right to such distribution against any Debtors, the Debtors' Estates and the Liquidating Trustee.

(9)    Exemption From Certain Transfer Taxes.

To the maximum extent provided by section 1146(a) of the Bankruptcy Code, (i) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtors, (ii) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instruments of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, or (iii) any sale by any Debtor consummated post-Confirmation, and any other transfer from any Entity pursuant to, in contemplation of, or in connection with the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, sales tax, use tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, or other similar tax or governmental assessment, and the Confirmation Order shall direct the appropriate state or local government officials or agents to forego collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

(10)    Preservation of Rights of Action.

**The Debtors expressly reserve any and all Retained Causes of Action**.  No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Retained Cause of Action against them as any indication that the Debtors or the Liquidating Trustee will not pursue any and all available Retained Causes of Action against them.

Except as otherwise provided in the Plan or a Final Order of the Bankruptcy Court, nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any rights, Claims, Retained Causes of Action, rights of setoff or recoupment, or other legal or equitable defenses that each Debtor had immediately prior to the Effective Date on behalf of the respective Debtor's Estate or itself in accordance with any provision of the Bankruptcy Code or any applicable non-bankruptcy law, including, without limitation, any affirmative Retained Causes of Action against parties with a relationship with the Debtor, other than the Debtor Released Parties and the Released Parties.  Any Cause of Action of the Debtors or their Estates that is not (i) an Acquired Cause of Action purchased by the Buyer, or (ii) a Retained Cause of Action contributed to the Liquidating Trust on the Effective Date, shall be deemed released as of the Effective Date.

On and after the Effective Date, subject to the terms of this Plan, the Settlement Agreement and the Sale Order, the Liquidating Trustee shall have standing to and may pursue such Retained Causes of Action.  As soon as practicable after the Effective Date, the Liquidating Trustee shall be substituted for the Debtors in all pending adversary proceedings.

Subject to the Sale Order, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion (judicial, equitable, or otherwise), or laches,

shall apply to such Retained Causes of Action upon, after, or as a consequence of the Confirmation or Consummation. Prior to the Effective Date, the Debtors, and on and after the Effective Date, the Liquidating Trustee shall retain and shall have, including through its authorized agents or representatives, the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Retained Causes of Action and to decline to do any of the foregoing without the consent, notice to or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court subject to the terms of this Plan. Notwithstanding anything contained herein to the contrary, the settlement of any Claims and Causes of Action which are expressly to be settled by Confirmation of the Plan itself shall be resolved only by Consummation of the Plan itself. For the avoidance of doubt, the Retained Causes of Action shall include any and all Causes of Action against the Excluded Parties.

(11)    Closing of the Chapter 11 Cases.

After the Chapter 11 Cases of the Debtors have been fully administered, and all Disputed Claims have become Allowed or disallowed and all remaining Cash has been distributed in accordance with the Plan, the Liquidating Trustee shall promptly seek authority from the Bankruptcy Court to close the Debtors' Chapter 11 Cases in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules.

(12)    Notice of Effective Date.

As soon as practicable, but not later than three (3) Business Days following the Effective Date, the Debtors or the Liquidating Trustee shall file a notice of the occurrence of the Effective Date with the Bankruptcy Court.

**O.    Corporate Governance.**

(1)    Corporate Form.

The corporate form of the Debtors shall be as it was immediately prior to the Effective Date.

(2)    Post-Effective Date Governance of the Debtors.

Effective as of immediately prior to the Effective Date, automatically and without further action, each existing member of the board of managers or directors of the Debtors, as applicable, will be deemed to have resigned or will be deemed to have been terminated. Each Debtor shall be deemed to have issued one share or one membership interest, as applicable, to be held nominally by the Liquidating Trustee for purposes of administering the Plan.

On and after the Effective Date, (a) the Liquidating Trustee, in substitution for the management and the board of managers of the Debtors, shall be authorized and empowered, without action of the Debtors' respective members, or boards of managers, or managers (if any), to take any and all such actions as the Liquidating Trustee may determine are necessary or appropriate in the Liquidating Trustee's business judgment to implement, effectuate, consummate, and perform any and all actions, documents, or transactions contemplated by the Plan or the

Confirmation Order as reasonably required to implement the Plan and the wind up the Debtors subject to the terms of this Plan, and (b) the Liquidating Trustee shall act for the Debtors in the same fiduciary capacity as applicable to the board of managers or board of directors of the Debtors existing immediately prior to the Effective Date.  Prior to the Effective Date, one or more of the Debtors may provide the Liquidating Trustee with one or more Debtor's Power of Attorney.  On and after the Effective Date, the Liquidating Trustee may elect such additional managers, directors and officers as the Liquidating Trustee deems necessary to implement the Plan and the actions contemplated in the Plan.  The Liquidating Trustee shall also have the sole and exclusive power to act by written consent, including to appoint or remove any directors, managers, or officers at any time with or without cause.

       (3)    Corporate Existence.

Unless previously dissolved by the Liquidating Trustee, as soon as practicable on or after the entry of a final decree, the Debtors will be dissolved for all purposes without any other or further corporate action, or payment of any fees in connection therewith.

On and after the Effective Date, the Liquidating Trustee shall take commercially reasonable actions as required, consistent with applicable non-bankruptcy law and consistent with the implementation of the Plan, and when appropriate in the discretion of the Liquidating Trustee, to dissolve, liquidate, strike off, or take such other similar action with respect to each Debtor (including the cancellation of all Interests in a Debtor pursuant to the Confirmation Order) and complete the winding down of such Debtor as expeditiously as practicable without the necessity for any other or further actions to be taken by or on behalf of such Debtor or its shareholders or members, or any payments to be made in connection therewith subject to the filing of a certificate of dissolution with the appropriate governmental authorities or complying with the laws and procedures governing the winding down of any such Debtor; provided, however, that the foregoing does not limit the Liquidating Trustee's ability to otherwise abandon an Interest in a Debtor.  The Liquidating Trustee may, to the extent required by applicable non-bankruptcy law, maintain a Debtor as a limited liability company or corporation, as applicable, in good standing until such time as all aspects of the Plan pertaining to such Debtor and the winding down of such Debtor is complete.

       (4)    Certificates of Formation and By-Laws.

As of the Effective Date, the certificates of formation, operating agreements, by-laws, and any other organizational document of the Debtors shall be amended to the extent necessary to implement and carry out the provisions of the Plan.  The Liquidating Trustee is empowered to complete and file all final or otherwise required federal, state, and local tax returns, if any, and shall pay taxes required to be paid for any of the Debtors.

**P.**    **Distributions.**

       (1)    Distributions Generally.

On or after the Effective Date, the Liquidating Trustee shall make distributions only in accordance with the terms of the Plan and the Confirmation Order to holders of Allowed Claims, net of any reserve(s) for Disputed Claims, and only to the extent that the Liquidating Trustee (or

income and/or proceeds realized from Excluded Assets, which will be turned into cash) to make such payments in accordance with and to the extent provided for in the Plan and the Confirmation Order. The Liquidating Trustee may withhold from amounts distributable to any Person any and all amounts, determined by the Liquidating Trustee in its reasonable discretion, required by any law, regulation, rule, ruling, directive, or other governmental requirement.

(2)     Distribution Record Date.

As of the close of business on the Distribution Record Date, the various transfer registers for each of the Classes of Claims or Interests as maintained by the Debtors, the Liquidating Trustee, or their respective agents, shall be deemed closed for purposes of determining whether a holder of such a Claim or Interest is a record holder entitled to distributions under the Plan, and there shall be no further changes in the record of holders of any of the Claims or Interests. The Debtors or the Liquidating Trustee shall have no obligation to recognize any transfer of the Claims or Interests occurring on or after the Distribution Record Date.

(3)     Date of Distributions.

Except as otherwise provided in the Plan, the Debtors or the Liquidating Trustee, as applicable, shall make the Initial Distribution to holders of Allowed Claims no later than the Initial Distribution Date and thereafter, the Liquidating Trustee shall from time to time determine the subsequent Distribution Dates, if any; provided that, (i) Allowed Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business shall be paid or performed when due in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business or industry practice, and (ii) Allowed Priority Tax Claims, and Other Secured Claims shall be satisfied in accordance with the Plan. In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on or as soon as reasonably practicable after the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

(4)     Reserve on Account of Disputed Claims.

The Liquidating Trustee shall reserve an amount sufficient to pay holders of Disputed Claims the amount such holders would be entitled to receive under the Plan if such Claims were to become Allowed Claims. In the event the holders of Allowed Claims have not received payment in full on account of their Claims after the resolution of all Disputed Claims, then the Liquidating Trustee shall make a final distribution to all holders of Allowed Claims.

Except as otherwise provided in the Plan, a Final Order, or as agreed to by the relevant parties, distributions on account of Disputed Claims that become Allowed after the Effective Date shall be made on the next periodic Distribution Record Date that is at least forty-five (45) days after the Disputed Claim becomes an Allowed Claim; *provided that*, (i) Disputed Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business that become Allowed after the Effective Date shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice, (ii) Disputed Priority Tax Claims that become

Allowed Priority Tax Claims after the Effective Date shall be treated as Allowed Priority Tax Claims in accordance with the Plan, solely to the extent not assumed by the Buyer pursuant to the Sale Transaction, and (iii) the Liquidating Trustee shall administer the tax obligations of each Debtor and the Debtors' Estates, including (a) filing tax returns and paying tax obligations, if any, (b) requesting, if necessary, an expedited determination of any unpaid tax liability for all taxable periods ending after the Effective Date through the liquidation of the Debtors, if any, as determined under applicable law, and (c) representing the interests and account of each Debtor and the Debtors' Estates before any taxing authority in all matters including, without limitation, any action, suit, proceeding or audit.

 (5) Delivery of Distributions & Unclaimed Property.

 Subject to Bankruptcy Rule 9010, distributions to any holder or permitted designee of an Allowed Claim shall be made by the Liquidating Trustee who on behalf of the Debtors shall transmit such distribution to the applicable holders or permitted designees of Allowed Claims.

 In the event that any distribution to any holder is returned as undeliverable or is otherwise unclaimed, no further distribution to such holder shall be made unless and until the Liquidating Trustee is notified in writing of such holder's or permitted designee's, as applicable, then-current address, at which time all currently-due, missed distributions shall be made to such holder as soon as reasonably practicable thereafter without interest; provided, however, such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of six (6) months from the applicable Distribution Date. After such date, with no further action by the Liquidating Trustee, all unclaimed property or interests in property shall revert (notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary) to the Liquidating Trustee automatically and without need for a further order by the Bankruptcy Court for distribution in accordance with the Plan, and the Claim of any such holder to such property or interest in such property shall be released, settled, compromised, and forever barred. Nothing herein shall require the Liquidating Trustee to attempt to locate holders or permitted designees, as applicable, of undeliverable distributions and, if located, to assist in any way such holders or permitted designees, as applicable. Notwithstanding any provisions in the Plan to the contrary, all distributions to holders of Claims shall be deemed completed, and the obligations of the Liquidating Trustee to make such distributions under the Plan shall be deemed satisfied, when made by the Liquidating Trustee.

 (6) Manner of Distribution.

 At the option of the Debtors or the Liquidating Trustee, as applicable, any Cash payment to be made under the Plan may be made by a check, wire transfer, or ACH Transfer. The wire transfer fee will be deducted from the amount of the distribution that a holder of an Allowed Claim or Interest would otherwise receive.

 In order to receive a distribution under the Plan, a holder of an Allowed Claim must submit to the Liquidating Trustee both the applicable IRS Form W-9, or if the payee is a foreign person, Form W-8 (including all relevant attachments). Unless the Liquidating Trustee receives original, properly completed copies of each form with an amount of time sufficient, in the Liquidating Trustee's sole discretion (as applicable), to process in advance of a scheduled Distribution Date,

the holder of an Allowed Claim that would otherwise be entitled to a Distribution shall not receive any Distribution on the applicable Distribution Date.

(7) No Postpetition Interest on Claims.

Except as otherwise specifically provided for in the Plan, the Confirmation Order, or another order of the Bankruptcy Court or required by the Bankruptcy Code, postpetition interest, dividends or accruals shall not accrue or be paid on any Claims, and no holder of a Claim shall be entitled to interest accruing on such Claim on or after the Petition Date.

(8) Minimum Cash Distributions.

The Liquidating Trustee shall not be required to make any payment to any holder of an Allowed Claim on any Distribution Date of Cash less than $100.00; provided that, if any distribution is not made pursuant to Article VIII.H. of the Plan, such distribution shall be added to any subsequent distribution to be made on behalf of such holder's Allowed Claim. If either (i) all Allowed Claims (other than those whose distributions are deemed undeliverable under the Plan) have been paid in full, or (ii) the amount of any final distributions to holders of Allowed Claims would be $100.00 or less and the aggregate amount of Cash available for distributions to holders of Allowed General Unsecured Claims is less than $25,000.00, then no further distribution shall be made by the Liquidating Trustee and any surplus Cash shall be donated and distributed to one or more of the following organizations (each of which qualifies as a tax-exempt organization under Section 501(c)(3) of the Tax Code), (a) the Bankruptcy Bar Foundation of the Bankruptcy Bar Association of the Southern District of Florida, (b) Legal Services of Greater Miami, Inc., or (c) another tax-exempt organization selected by the Liquidating Trustee with the consent of the Oversight Committee.

(9) Setoffs and Recoupments.

The Debtors and the Liquidating Trustee, as applicable, may, but shall not be required to, set off or recoup against any Claim, any claims of any nature whatsoever that the Debtors or the Liquidating Trustee, as applicable, may have against the holder of such Claim; provided that, neither the failure to do so nor the allowance of any Claim under the Plan shall constitute a waiver or release by the Debtors or the Liquidating Trustee, as applicable, of any such claim the Debtors or the Liquidating Trustee may have against the holder of such Claim.

(10) Allocation of Distributions Between Principal and Interest.

Except as otherwise required by law (as reasonably determined by the Debtors or the Liquidating Trustee, as applicable), to the extent that any Allowed Claim entitled to a distribution under the Plan is comprised of indebtedness and accrued but unpaid interest thereon, such distribution shall be allocated to the principal amount (as determined for U.S. federal income tax purposes) of the Claim first, and then to the extent the consideration exceeds the principal amount of the Claim, to the portion of such Claim representing accrued but unpaid interest through the Petition Date.

(11)    Payment of Disputed Claims.

As Disputed Claims are resolved pursuant to Article VIII.K. of the Plan, the Liquidating Trustee shall make distributions on account of such Disputed Claims as if such Disputed Claims were Allowed Claims as of the Effective Date. As stated herein, such distributions shall be made on the first Distribution Date that is at least forty-five (45) calendar days after the date on which a Disputed Claim becomes an Allowed Claim, or on an earlier date selected by the Liquidating Trustee in the Liquidating Trustee's sole discretion. No holder of a Disputed Claim shall have any Claim against the Liquidating Trustee, the Debtors, or the Estates with respect to such Claim until such Disputed Claim becomes an Allowed Claim, and no holder of a Disputed Claim shall have any right to interest, dividends, or other distributions on account of such Disputed Claim except as provided for in the Plan.

Q.    **Procedures for Disputed Claims.**

(1)    Allowance of Claims.

On and after the Effective Date, and subject to any order of the Bankruptcy Court, the Liquidating Trustee shall be entitled to reconcile, object to, or settle Claims filed against the Debtors. On and after the Effective Date, the Liquidating Trustee shall have and shall retain any and all rights and defenses that the Debtors had with respect to any Claim, except with respect to any Claim deemed Allowed under the Plan, based on the limitations imposed by section 502 of the Bankruptcy Code. The Liquidating Debtors and Liquidating Trustee may contest the amount and validity of any Disputed Claim or contingent or unliquidated Claim in the ordinary course of business in the manner and venue in which such Claim would have been determined, resolved, or adjudicated if the Chapter 11 Cases had not been commenced. Except as expressly provided for in the Plan or in any order entered in the Chapter 11 Cases prior to the Effective Date (including, without limitation, the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under the Plan or the Bankruptcy Code or the Bankruptcy Court has entered a Final Order, including, without limitation, the Confirmation Order and the Final DIP Order, in the Chapter 11 Cases allowing such Claim.

(2)    Objections to Claims.

On and after the Effective Date, objections to, and requests for estimation of, Claims against the Debtors may be interposed and prosecuted only by the Liquidating Trustee. Such objections and requests for estimation shall be served and filed by the Claims Objection Bar Date. The Liquidating Trustee may move to extend the Claims Objection Bar Date without limitation.

(3)    Estimation of Claims.

The Liquidating Trustee may determine, resolve, and otherwise adjudicate all contingent, unliquidated, and Disputed Claims in the Bankruptcy Court. The Liquidating Trustee may at any time request that the Bankruptcy Court estimate any contingent, unliquidated, or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether the Debtors or the Liquidating Trustee previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including, without limitation,

during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any contingent, unliquidated, or Disputed Claim, the amount so estimated shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Debtors, or the Liquidating Trustee, as applicable, may pursue supplementary proceedings to object to the allowance of such Claim. All of the aforementioned objection, estimation, and resolution procedures are intended to be cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

(4)     No Distributions Pending Allowance.

If an objection to a Claim is filed as set forth in Article IX.B of the Plan, no payment or distribution provided under the Plan shall be made on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim; provided that, if only a portion of a Claim is Disputed, such Claim shall be deemed Allowed in the amount not Disputed and payment or distribution shall be made on account of such undisputed amount.

(5)     Resolution of Claims.

Except as otherwise provided in the Plan, the Confirmation Order, or in any contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan, in accordance with section 1123(b) of the Bankruptcy Code, the Liquidating Trustee shall retain and may enforce, sue on, settle, or compromise (or decline to do any of the foregoing) all Claims, Disputed Claims, rights, Causes of Action, suits and proceedings, whether in law or in equity, whether known or unknown, that the Debtors or their Estates may hold against any Person, without the approval of the Bankruptcy Court. The Liquidating Trustee or its successor may pursue such retained Claims, rights, Causes of Action, suits or proceedings, as appropriate, in accordance with the best interests of the Debtors.

(6)     Disallowed Claims.

All Claims held by persons or entities against whom or which any of the Debtors or the Liquidating Trustee has commenced a proceeding or sent a demand letter asserting a Cause of Action under sections 542, 543, 544, 545, 547, 548, 549, 550 and/or 553 of the Bankruptcy Code shall be deemed "disallowed" Claims pursuant to section 502(d) of the Bankruptcy Code and holders of such Claims shall not be entitled to vote to accept or reject the Plan. Claims that are deemed disallowed pursuant to Article IX.F shall (i) continue to be disallowed for all purposes until the avoidance action against such party has been settled or resolved by Final Order, and (ii) any sums due to the Debtors or the Liquidating Trustee from such party have been paid.

(7)     Claims Paid and Payable by Third Parties.

A Claim shall be disallowed without an objection thereto having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the holder of such Claim receives payment in full in Cash on account of such Claim from a party that is not the Debtors or the Liquidating Trustee. To the extent that a holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or

the Liquidating Trustee on account of such Claim, such holder shall repay, return, or deliver any distribution held by or transferred to the holder to the applicable Debtor or Liquidating Trustee to the extent the holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Allowed Claim as of the date of any such distribution.

(8)    Amendments to Proofs of Claim.

On or after the Effective Date, unless otherwise authorized by the Confirmation Order or other Final Order of the Bankruptcy Court, a Proof of Claim may not be filed or amended without the prior written consent of the Liquidating Trustee and any such underlying filed Proof of Claim, prior to any such amendment as authorized by Article IX.H of the Plan, shall be deemed disallowed in full and expunged without any further notice to, or action, order, or approval of, the Bankruptcy Court, to the maximum extent provided by applicable law.

**R.    Executory Contracts.**

(1)    Rejection of Executory Contracts.

On the Effective Date, except as otherwise provided in the Plan, each Executory Contract not previously rejected, assumed, or assumed and assigned shall be deemed automatically rejected pursuant to sections 365 and 1123 of the Bankruptcy Code, unless such Executory Contract: (i) is identified for assumption in the Plan Supplement; (ii) as of the Effective Date is subject to a pending motion to assume such Executory Contract; (iii) is a contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan; or (iv) is a D&O Policy.

(2)    Cure of Defaults for Assumed Executory Contracts.

Any Cure due under each Executory Contract to be assumed pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment in Cash on the Effective Date or as soon as reasonably practicable thereafter, subject to the limitation described below, by the Debtors or the Liquidating Trustee, as applicable, or on such other terms as the parties to such Executory Contracts may otherwise agree.

In the event of a dispute regarding (i) the amount of the Cure; (ii) the ability of the Debtors or any other applicable assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract; or (iii) any other matter pertaining to assumption or assumption and assignment (as applicable), the obligations of section 365 of the Bankruptcy Code shall be deemed satisfied following the entry of a Final Order or orders resolving the dispute and approving the assumption or assumption and assignment (as applicable); *provided, however*, that the Debtors or the Liquidating Trustee, as applicable, may settle any dispute regarding the amount of any Cure without any further notice to any party or any action, order, or approval of the Bankruptcy Court.

Assumption of any Executory Contract pursuant to the Plan, or otherwise, shall result in the full release and satisfaction of any defaults, subject to satisfaction of the Cure, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed

Executory Contract at any time before the Effective Date of such assumption and/or assignment.

(3)      Claims Based Upon Rejection of Executory Contracts.

Unless otherwise provided by an order of the Bankruptcy Court, any Proofs of Claim based on the rejection of the Debtors' Executory Contracts pursuant to the Plan, must be filed with the Bankruptcy Court and served on the Liquidating Trustee no later than thirty (30) calendar days after the filing and service of the notice of the occurrence of the Effective Date.  All Allowed Claims arising from the rejection of the Debtors' Executory Contracts shall be classified as a Class 4 General Unsecured Claims, except as otherwise provided by Final Order of the Bankruptcy Court.

**Any Claims arising from the rejection of an Executory Contract not filed with the Bankruptcy Court and served on the Liquidating Trustee on or before the earlier of either (i) 30 days after the filing and service of the notice of the occurrence of the Effective Date or (ii) 30 days after the effective date of the rejection of the contract or lease, will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtors, the Debtors' Estates, or the property of any of the foregoing without the need for any objection by the Liquidating Trustee or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of such Executory Contract shall be deemed fully compromised, settled, and released, notwithstanding anything in the Schedules or a Proof of Claim to the contrary.**

**Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption or Cure Cost will therefore be deemed to have assented to such assumption and Cure Cost.**

(4)      Modifications, Amendments, Supplements, Restatements, or Other Agreements.

Unless otherwise provided for in the Plan, each assumed Executory Contract shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract, and all Executory Contracts related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract, or the validity, priority, or amount of any Claims that may arise in connection therewith.

(5)      Reservation of Rights.

Neither the exclusion nor inclusion of any contract or lease on any exhibit, schedule, annex to the Plan or in the Plan Supplement as a contract or lease to be assumed, nor anything contained in the Plan or Sale Transaction documents, nor the Debtors' delivery of a notice of proposed assumption and proposed Cure Cost to any contract and lease counterparties, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or

Unexpired Lease or that the Debtors, Liquidating Trustee or Liquidating Debtors have any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or Liquidating Debtors, as applicable, shall have ten (10) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease. If there is a dispute regarding a Debtor's or Reorganized Debtor's liability under an assumed Executory Contract or Unexpired Lease, the Reorganized Debtors shall be authorized to move to have such dispute heard by the Bankruptcy Court. Except as otherwise provided in the Plan, nothing herein shall waive, excuse, limit, diminish, or otherwise alter any of the defenses, Claims, Causes of Action, or other rights of the Debtors and the Liquidating Trustee under any executory or non-executory contract or any unexpired or expired lease. Nothing in the Plan will increase, augment, or add to any of the duties, obligations, responsibilities, or liabilities of the Debtors, as applicable, under any executory or non-executory contract or any unexpired or expired lease.

(6)    Insurance Policies.

Notwithstanding anything to the contrary in the Plan, each insurance policy, including any D&O Policies to which the Debtors are a party as of the Effective Date, shall be deemed executory and shall be assumed by the Debtors on behalf of the applicable Debtor effective as of the Effective Date, pursuant to sections 365 and 1123 of the Bankruptcy Code, unless such insurance policy previously was assumed and assigned under the Asset Purchase Agreement, was rejected by the Debtors pursuant to a Final Order of the Bankruptcy Court, or is the subject of a motion to reject pending on the Effective Date, and coverage for defense and indemnity under the D&O Policy shall remain available to all individuals within the definition of "Insured" in the D&O Policy.

In addition, on and after the Effective Date, all officers, directors, agents, or employees who served in such capacity at any time before the Effective Date shall be entitled to the full benefits of any D&O Policy in effect or purchased as of the Effective Date for the full term of such policy regardless of whether such officers, directors, agents, and/or employees remain in such positions on or after the Effective Date, in each case, to the extent set forth in such policies.

(7)    Survival of Debtors' Indemnification Obligations.

To the fullest extent permitted by applicable law, any obligations of the Debtors pursuant to their corporate charters, by-laws, limited liability company agreements, memorandum and articles of association, or other organizational documents and agreements to indemnify any Indemnitee based upon any act or omission for or on behalf of the Debtors shall not be discharged, impaired, or otherwise affected by the Plan; provided that, notwithstanding anything herein, the Debtors shall not indemnify any Indemnitee for any claims or Causes of Action arising out of or relating to any act or omission (i) that is a criminal act unless such officer, director, agent, or employee had no reasonable cause to believe its conduct was unlawful; (ii) that is determined by a Final Order to be the result of fraud, gross negligence, or willful misconduct; or (iii) for any other acts or omissions that are excluded under the terms of the foregoing organizational documents. All such obligations, unless otherwise described in (i)-(ii) above, shall be deemed and treated as executory contracts to be assumed by the Debtors under the Plan unless such obligation previously was assumed and assigned under the Asset Purchase Agreement, was rejected by the Debtors

pursuant to a Final Order of the Bankruptcy Court, or is the subject of a motion to reject pending on the Effective Date.

On the Effective Date, the Debtors shall establish the Indemnity Reserve, which shall be segregated, separately maintained by the Liquidating Trustee and used solely to satisfy the Debtors' indemnification obligations to the Indemnitees who were serving as of the Effective Date ("Termination Date"); provided, that any amounts of Cash in the Indemnity Reserve not used for such purposes on or before the second (2nd) anniversary of the Effective Date shall revert to the Liquidating Trustee and become Residual Cash; *provided, further*, that (i) prior to the Termination Date the Liquidating Trustee and the Indemnitees who were serving as of the Effective Date of the Plan shall engage in good faith discussions regarding an extension of the Termination Date, and (ii) the Termination Date may be extended by the Liquidating Trustee in its sole discretion without further Order of the Bankruptcy Court.

**S.      Conditions Precedent to the Effective Date**

(1)      Conditions Precedent.

The occurrence of the Effective Date of the Plan is subject to the following conditions precedent:

the Bankruptcy Court shall have entered the Confirmation Order, such Confirmation Order shall be in form and substance reasonably acceptable to the Consent Right Parties, the Confirmation Date shall have occurred and the Confirmation Order shall not be subject to any stay, modification, vacation on appeal, and shall have become a Final Order;

the Plan Supplement and all of the Schedules, documents, and exhibits contained therein, and all other relevant schedules, documents, supplements and exhibits to the Plan, shall have been filed with the Bankruptcy Court and shall be reasonably acceptable to the Consent Right Parties; and

all actions, documents, and agreements necessary to implement and consummate the Plan, and the other transactions and other matters contemplated in the Plan, shall have been effected or executed.

(2)      Waiver of Conditions Precedent.  Each of the conditions precedent in Article XI.A of the Plan may be waived in writing by the Debtors, with notice to the Creditors' Committee, MBC and MEC, and without notice to or authorization of the Bankruptcy Court.

(3)      Effect of Failure of Conditions to Effective Date.  If the conditions listed in Article XI.A of the Plan are not satisfied, upon filing a notice with the Bankruptcy Court, the Debtors may deem the Plan null and void in all respects and in such a case, nothing contained in the Plan or the Disclosure Statement shall: (i) constitute a waiver or release of any Claims by or against or any Interests in the Debtor; (ii) prejudice in any manner the rights of any Entity; or (iii) constitute an admission, acknowledgement, offer, or undertaking by the Debtors or any other Entity.

**T.    Effect of Confirmation**

(1)    Vesting of Assets.

On the Effective Date, pursuant to section 1141(b) of the Bankruptcy Code, all property of the Estates not previously distributed to the holders of Allowed Claims shall vest in the Liquidating Trustee and be distributed according to this Plan, except as provided pursuant to the Sale Order, the Plan and the Confirmation Order.  On and after the Effective Date, the Liquidating Trustee may take any action, including, without limitation: (i) the operation of the Liquidating Debtors' businesses; (ii) the use, acquisition, sale, lease and disposition of property; (iii) the entry into transactions, agreements, understandings, or arrangements, to pursue the Retained Causes of Action, whether in or other than in the ordinary course of business; and (iv) executing, delivering, implementing and fully performing any and all obligations, instruments, documents, and papers or otherwise in connection with any of the foregoing, free of any restrictions of the Bankruptcy Code or Bankruptcy Rules and in all respects as if there was no pending cases under any chapter or provision of the Bankruptcy Code, except as expressly provided herein.  Without limiting the foregoing, the Liquidating Trustee may pay the charges it incurs on or after the Effective Date for professional fees, disbursements, expenses, or related support services without application to the Bankruptcy Court.

(2)    Release of Liens.

Except as otherwise provided in the Sale Order, Plan, or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and terminated.

(3)    Binding Effect.

As of the Effective Date, the Plan shall bind all holders of Claims against and Interests in the Debtor and their respective successors and assigns, notwithstanding whether any such holders were (i) Impaired or Unimpaired under the Plan; (ii) deemed to accept or reject the Plan; (iii) failed to vote to accept or reject the Plan; or (iv) voted to reject the Plan.

(4)    Sale Order.

Nothing contained in the Plan, the Disclosure Statement, or the Confirmation Order, constitutes or shall be construed to be inconsistent with the terms of the Sale Order, the Asset Purchase Agreement, or any modification or amendment to the Sale Order or the Asset Purchase Agreement.  In the event of any conflict between the Sale Order or the Asset Purchase Agreement, on the one hand, or the Plan, Disclosure Statement, or Confirmation Order, on the other, the Sale Order or Asset Purchase Agreement, as applicable, shall govern and control.

(5)    Term of Injunctions or Stays.

Unless otherwise provided in the Plan, the Confirmation Order, or in a Final Order of the Bankruptcy Court, all injunctions or stays arising under, or entered during, the Chapter 11 Cases under section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the

Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.

(6)     Compromise and Settlement.

Pursuant to sections 363 and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims and Interests (other than Causes of Action that have not been waived, relinquished, exculpated, released, compromised or settled in the Plan or by Final Order of the Bankruptcy Court including, for the avoidance of doubt, any claims (i) against the Excluded Parties; or (ii) preserved by the Asset Purchase Agreement).  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all Claims and Interests (other than Causes of Action that have not been waived, relinquished, exculpated, released, compromised or settled in the Plan by Final Order of the Bankruptcy Court including, for the avoidance of doubt, any claims (i) against the Excluded Parties; or (ii) preserved by the Asset Purchase Agreement), as well as a finding by the Bankruptcy Court that such compromises or settlements are fair, equitable, reasonable and in the best interests of the Debtors, the Estates and holders of Claims and Interests.

**U.     Releases, Injunctions and Indemnification of Claims.**

(1)     Debtor Release.

**AS OF THE EFFECTIVE DATE, EXCEPT AS OTHERWISE EXPRESSLY PROVIDED FOR IN THE PLAN, AND TO THE FULLEST EXTENT AUTHORIZED BY APPLICABLE LAW, FOR GOOD AND VALUABLE CONSIDERATION, THE ADEQUACY OF WHICH IS HEREBY CONFIRMED, EACH DEBTOR RELEASED PARTY IS DEEMED RELEASED BY THE DEBTORS, THEIR RESPECTIVE ESTATES, THE LIQUIDATING TRUSTEE, AND ANY PERSON OR ENTITY (OTHER THAN THE BUYER, MBC AND MEC), SEEKING TO EXERCISE THE RIGHTS OF THE DEBTORS OR THEIR ESTATES AND THEIR RESPECTIVE PROPERTY (AND EACH SUCH DEBTOR RELEASED PARTY SHALL BE DEEMED RELEASED BY EACH DEBTOR AND ITS ESTATE AND ITS RESPECTIVE PROPERTY) FROM ANY AND ALL CLAIMS, OBLIGATIONS, SUITS, JUDGMENTS, DAMAGES, DEMANDS, DEBTS, REMEDIES, CAUSES OF ACTION, RIGHTS OF SETOFF, OTHER RIGHTS, AND LIABILITIES WHATSOEVER, WHETHER FOR TORT, CONTRACT, VIOLATIONS OF FEDERAL OR STATE SECURITIES LAWS, AVOIDANCE ACTIONS, INCLUDING ANY DERIVATIVE CLAIMS, ASSERTED OR THAT COULD POSSIBLY HAVE BEEN ASSERTED DIRECTLY OR INDIRECTLY, WHETHER LIQUIDATED OR UNLIQUIDATED, FIXED OR CONTINGENT, MATURED OR UNMATURED, KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, EXISTING OR HEREAFTER ARISING, IN LAW, EQUITY, OR OTHERWISE, AND ANY AND ALL CAUSES OF ACTION ASSERTED OR THAT COULD POSSIBLY HAVE BEEN ASSERTED, BASED ON OR IN ANY WAY RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE DEBTORS, THEIR ESTATES OR THEIR AFFILIATES, THE CONDUCT OF THE DEBTORS' BUSINESS, THE FORMULATION, PREPARATION, SOLICITATION, DISSEMINATION, NEGOTIATION, OR FILING OF**

THE DIP CREDIT AGREEMENT, THE ASSET PURCHASE AGREEMENT, THE DISCLOSURE STATEMENT OR THE PLAN OR ANY CONTRACT, INSTRUMENT, RELEASE, OR OTHER AGREEMENT OR DOCUMENT CREATED OR ENTERED INTO IN CONNECTION WITH OR PURSUANT TO THE DIP CREDIT AGREEMENT, THE ASSET PURCHASE AGREEMENT, THE DISCLOSURE STATEMENT, THE PLAN, THE PREPARATION, FILING AND PROSECUTION OF THE CHAPTER 11 CASES, THE PURSUIT OF CONSUMMATION OF THE PLAN, THE SALE, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR INTEREST THAT IS TREATED IN THE PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN THE DEBTORS, THEIR ESTATES OR THEIR AFFILIATES, ON THE ONE HAND, AND ANY DEBTOR RELEASED PARTY, ON THE OTHER HAND, OR ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE BEFORE THE EFFECTIVE DATE; *PROVIDED*, *HOWEVER*, THAT THE RELEASES SET FORTH IN ARTICLE XII.G OF THE PLAN SHALL NOT OPERATE TO WAIVE OR RELEASE ANY CLAIMS OR CAUSES OF ACTION OF THE DEBTORS OR THEIR RESPECTIVE CHAPTER 11 ESTATES AGAINST A DEBTOR RELEASED PARTY FROM ANY CLAIMS RESULTING FROM AN ACT OR OMISSION DETERMINED BY A FINAL ORDER OF THE BANKRUPTCY COURT TO HAVE CONSTITUTED FRAUD, WILLFUL MISCONDUCT OR GROSS NEGLIGENCE, *PROVIDED THAT*, EACH SUCH DEBTOR RELEASED PARTY SHALL BE ENTITLED TO RELY UPON THE ADVICE OF COUNSEL CONCERNING ITS DUTIES PURSUANT TO, OR IN CONNECTION WITH, ITS ACTIONS OR INACTIONS. NOTWITHSTANDING ANYTHING IN THE PLAN OR THIS ARTICLE XII.G. TO THE CONTRARY, THE EXCLUDED PARTIES ARE NOT RECEIVING AND SHALL NOT RECEIVE A RELEASE UNDER THIS PLAN.

ENTRY OF THE CONFIRMATION ORDER SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE DEBTOR RELEASES, WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED IN THE PLAN, AND, FURTHER, SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE DEBTOR RELEASE IS: (I) IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE DEBTOR RELEASED PARTIES; (II) A GOOD-FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS RELEASED BY THE DEBTOR RELEASE; (III) IN THE BEST INTERESTS OF THE DEBTORS' ESTATES AND ALL HOLDERS OF CLAIMS AND INTERESTS; (IV) FAIR, EQUITABLE, AND REASONABLE; (V) GIVEN AND MADE AFTER DUE NOTICE AND THE OPPORTUNITY FOR A HEARING; AND (VI) A BAR TO ANY OF THE DEBTORS' ESTATES, OR THE LIQUIDATING TRUSTEE, ASSERTING ANY CLAIM OR CAUSE OF ACTION RELEASED PURSUANT TO THE DEBTOR RELEASE.

(2)    Releases by Holders of Claims and Interests.

EFFECTIVE AS OF THE EFFECTIVE DATE, THE RELEASING PARTIES SHALL BE DEEMED TO HAVE PROVIDED A FULL RELEASE TO THE RELEASED PARTIES, AND THEIR RESPECTIVE PROPERTY, FROM ANY AND ALL CLAIMS,

**OBLIGATIONS, SUITS, JUDGMENTS, DAMAGES, DEMANDS, DEBTS, REMEDIES, CAUSES OF ACTION, RIGHTS OF SETOFF, OTHER RIGHTS, AND LIABILITIES WHATSOEVER, WHETHER FOR TORT, CONTRACT, VIOLATIONS OF FEDERAL OR STATE SECURITIES LAWS, AVOIDANCE ACTIONS, INCLUDING ANY DERIVATIVE CLAIMS, ASSERTED OR THAT COULD POSSIBLY HAVE BEEN ASSERTED DIRECTLY OR INDIRECTLY, WHETHER LIQUIDATED OR UNLIQUIDATED, FIXED OR CONTINGENT, MATURED OR UNMATURED, KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, EXISTING OR HEREAFTER ARISING, IN LAW, EQUITY, OR OTHERWISE, AND ANY AND ALL CAUSES OF ACTION ASSERTED OR THAT COULD POSSIBLY HAVE BEEN ASSERTED, BASED ON OR IN ANY WAY RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE DEBTORS, THEIR ESTATES OR THEIR AFFILIATES, THE CONDUCT OF THE DEBTORS' BUSINESS, THE FORMULATION, PREPARATION, SOLICITATION, DISSEMINATION, NEGOTIATION, OR FILING OF THE DIP CREDIT AGREEMENT, THE ASSET PURCHASE AGREEMENT, THE DISCLOSURE STATEMENT OR THE PLAN OR ANY CONTRACT, INSTRUMENT, RELEASE, OR OTHER AGREEMENT OR DOCUMENT CREATED OR ENTERED INTO IN CONNECTION WITH OR PURSUANT TO THE DIP CREDIT AGREEMENT, THE ASSET PURCHASE AGREEMENT, THE DISCLOSURE STATEMENT, THE PLAN, THE PREPARATION, FILING AND PROSECUTION OF THE CHAPTER 11 CASES, THE PURSUIT OF CONSUMMATION OF THE PLAN, THE SALE, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR INTEREST THAT IS TREATED IN THE PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN THE DEBTORS, THEIR ESTATES OR THEIR AFFILIATES, ON THE ONE HAND, AND ANY DEBTOR RELEASED PARTY, ON THE OTHER HAND, OR ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE BEFORE THE EFFECTIVE DATE; _PROVIDED_, _HOWEVER_, THE RELEASES SET FORTH ABOVE (I) DO NOT RELEASE ANY POST-EFFECTIVE DATE OBLIGATIONS OF ANY PARTY OR ENTITY UNDER THE PLAN, (II) ARE APPLICABLE ONLY TO THE  MAXIMUM EXTENT PERMITTED BY LAW, (III) DO NOT RELEASE ANY PREPETITION SECURED PARTIES', BUYER'S, MBC'S, MEC'S, OR OBI'S CLAIMS, OBLIGATIONS, SUITS, JUDGMENTS, DAMAGES, DEMANDS, DEBTS, REMEDIES, CAUSES OF ACTION, RIGHTS OF SETOFF, OTHER RIGHTS, AND LIABILITIES UNDER ANY AGREEMENT ENTERED INTO BY THE DEBTORS AFTER THE PETITION DATE, (IV) DO NOT RELEASE ANY OBLIGATIONS OR RIGHTS UNDER THE ASSET PURCHASE AGREEMENT, (V) DO NOT RELEASE ANY CLAIMS, OBLIGATIONS, SUITS, JUDGMENTS, DAMAGES, DEMANDS, DEBTS, REMEDIES, CAUSES OF ACTION, RIGHTS OF SETOFF, OTHER RIGHTS, AND LIABILITIES BETWEEN ANY "BUYER RELEASING PARTY" AND ANY "SELLER RELEASING PARTY" (AS THE TERMS "BUYER RELEASING PARTY" AND "SELLER RELEASING PARTY" ARE DEFINED IN SECTION 7.16(A) AND SECTION 7.16(B), RESPECTIVELY, OF THE ASSET PURCHASE AGREEMENT), AND THE RELEASES BETWEEN SUCH PARTIES SHALL BE GOVERNED BY SECTION 7.16 OF THE ASSET PURCHASE AGREEMENT, AND (VI) DO NOT RELEASE ANY RIGHTS OR OBLIGATIONS BETWEEN OBI, MBC, MEC AND BUYER; _PROVIDED FURTHER_,**

*HOWEVER*, THAT THE RELEASES SET FORTH IN THIS <u>ARTICLE XII</u> SHALL NOT RELEASE ANY PERSON OR ENTITY FROM ANY RETAINED CAUSES OF ACTION OR CLAIMS RESULTING FROM AN ACT OR OMISSION DETERMINED BY A FINAL ORDER OF A COURT OF COMPETENT JURISDICTION TO HAVE CONSTITUTED FRAUD, WILLFUL MISCONDUCT OR GROSS NEGLIGENCE, *PROVIDED THAT*, EACH SUCH DEBTOR RELEASED PARTY SHALL BE ENTITLED TO RELY UPON THE ADVICE OF COUNSEL CONCERNING ITS DUTIES PURSUANT TO, OR IN CONNECTION WITH, ITS ACTIONS OR INACTIONS.

ENTRY OF THE CONFIRMATION ORDER SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE THIRD PARTY RELEASE, WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED IN THE PLAN, AND, FURTHER, SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE THIRD PARTY RELEASE BY THOSE CREDITORS OR INTEREST HOLDERS WHO DID NOT OPT-OUT OF THE RELEASE IS: (I) IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION AND SUBSTANTIAL CONTRIBUTIONS PROVIDED BY THE RELEASED PARTIES; (II) A GOOD FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS RELEASED BY THE THIRD PARTY RELEASE; (III) IN THE BEST INTERESTS OF THE DEBTORS AND ALL HOLDERS OF CLAIMS AND INTERESTS; (IV) FAIR, EQUITABLE, AND REASONABLE; (V) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING; AND (VI) A BAR TO ANY OF THE RELEASING PARTIES ASSERTING ANY CLAIM RELEASED PURSUANT TO THE THIRD PARTY RELEASE.

     (3)    Exculpation.

NOTWITHSTANDING ANYTHING IN THE PLAN TO THE CONTRARY, NO EXCULPATED PARTY WILL HAVE OR INCUR, AND EACH EXCULPATED PARTY IS ON THE EFFECTIVE DATE EXCULPATED FROM, ANY CLAIM, OBLIGATION, SUIT, JUDGMENT, DAMAGE, DEMAND, DEBT, RIGHT, CAUSE OF ACTION, REMEDY, LOSS, AND LIABILITY FOR ANY CLAIM RELATED TO ANY ACT OR OMISSION IN CONNECTION WITH OR ARISING OUT OF THE PREPARATION, FOR, AND ADMINISTRATION OF, THE CHAPTER 11 CASES; THE NEGOTIATION, FORMULATION, PREPARATION, IMPLEMENTATION, CONSUMMATION, AND PURSUIT OF THE DIP CREDIT AGREEMENT, THE ASSET PURCHASE AGREEMENT, THE DISCLOSURE STATEMENT, THE PLAN, AND THE SOLICITATION OF VOTES FOR, AND CONFIRMATION OF, THE PLAN; THE FUNDING AND CONSUMMATION OF THE PLAN, AND ANY RELATED AGREEMENTS, INSTRUMENTS, AND OTHER DOCUMENTS (IN EACH CASE IN FURTHERANCE OF THE FOREGOING); THE MAKING OF DISTRIBUTIONS UNDER THE PLAN; THE OCCURRENCE OF THE EFFECTIVE DATE; NEGOTIATIONS REGARDING OR CONCERNING ANY OF THE FOREGOING, OR THE ADMINISTRATION OF THE PLAN OR PROPERTY TO BE DISTRIBUTED UNDER THE PLAN; OR UPON ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT OR OTHER OCCURRENCE TAKING PLACE FROM THE PETITION DATE RELATING TO THE DEBTORS OR THE CHAPTER 11 CASES;

*PROVIDED*, *HOWEVER*, THAT THE EXCULPATION DOES NOT HAVE ANY IMPACT ON THE ENFORCEMENT AND VALIDITY OF THE ASSET PURCHASE AGREEMENT; *PROVIDED, FURTHER, HOWEVER*, THAT THE EXCULPATION DOES NOT HAVE ANY IMPACT ON AND DOES NOT AFFECT ANY CLAIMS, OBLIGATIONS, SUITS, JUDGMENTS, DAMAGES, DEMANDS, DEBTS, REMEDIES, CAUSES OF ACTION, RIGHTS OF SETOFF, OTHER RIGHTS, AND LIABILITIES BETWEEN ANY "BUYER RELEASING PARTY" AND ANY "SELLER RELEASING PARTY" (AS THE TERMS "BUYER RELEASING PARTY" AND "SELLER RELEASING PARTY" ARE DEFINED IN SECTION 7.16(A) AND SECTION 7.16(B), RESPECTIVELY, OF THE ASSET PURCHASE AGREEMENT); *PROVIDED*, *FURTHER*, *HOWEVER* THAT THE EXCULPATION SET FORTH IN THIS ARTICLE XII.I. SHALL NOT EXCULPATE ANY PERSON OR ENTITY FROM CLAIMS RESULTING FROM AN ACT OR OMISSION DETERMINED BY A FINAL ORDER OF THE BANKRUPTCY COURT TO HAVE CONSTITUTED FRAUD, WILLFUL MISCONDUCT OR GROSS NEGLIGENCE, *PROVIDED THAT*, EACH SUCH EXCULPATED PARTY SHALL BE ENTITLED TO RELY UPON THE ADVICE OF COUNSEL CONCERNING ITS DUTIES PURSUANT TO, OR IN CONNECTION WITH, ITS ACTIONS OR INACTIONS; *PROVIDED FURTHER*, *HOWEVER*, NOTHING IN THE PLAN SHALL LIMIT THE LIABILITY OF ATTORNEYS TO THEIR RESPECTIVE CLIENTS PURSUANT TO RULE 4-1.8(H) OF THE FLORIDA RULES OF PROFESSIONAL CONDUCT.  THIS EXCULPATION SHALL BE IN ADDITION TO, AND NOT IN LIMITATION OF, ALL OTHER RELEASES, INDEMNITIES, EXCULPATIONS AND ANY OTHER APPLICABLE LAW OR RULES PROTECTING SUCH EXCULPATED PARTIES FROM LIABILITY.  THE FOREGOING EXCULPATION SHALL BE EFFECTIVE AS OF THE EFFECTIVE DATE WITHOUT FURTHER NOTICE TO OR ORDER OF THE BANKRUPTCY COURT, ACT OR ACTION UNDER APPLICABLE LAW, REGULATION, ORDER, OR RULE OR THE VOTE, CONSENT, AUTHORIZATION OR APPROVAL OF ANY PERSON.

 (4)  **Injunctions.**

  **Except as otherwise provided in the Plan or the Confirmation Order, all Enjoined Parties are permanently enjoined and precluded, from and after the Effective Date, from: (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, Causes of Action, or liabilities; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims, Interests, Causes of Action, or liabilities; (3) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or Estates of such Entities on account of or in connection with or with respect to any such Claims, Interests, Causes of Action, or liabilities; (4) asserting any right of setoff, or subrogation against any obligation due from such Entities or against the property or Estates of such Entities on account of or in connection with or with respect to any such Claims or Interests unless such Holder has filed a motion or filed a claim requesting the right to perform such setoff or subrogation on or before the Confirmation Date; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, Causes of**

Action, or liabilities released or settled pursuant to the Plan.  For the avoidance of doubt, and notwithstanding anything in the Plan to the contrary, this Article XII.J does not apply to any claims, obligations, suits, judgments, damages, demands, debts, remedies, causes of action, rights of setoff, other rights, and liabilities between any "Buyer Releasing Party" and any "Seller Releasing Party" (as the terms "Buyer Releasing Party" and "Seller Releasing Party" are defined in Section 7.16(a) and Section 7.16(b), respectively, of the Asset Purchase Agreement).

(5) **"Gatekeeper Provision"**

No Enjoined Party may commence or pursue a Claim or Cause of Action of any kind against any Debtor Released Party that arose or arises from or is related to the Chapter 11 Cases, the negotiation of the Plan, the consummation or administration of the Plan or property to be distributed under the Plan, the wind down of the businesses of the Debtors, the administration of the Liquidating Trust, or the transactions in furtherance of the foregoing without the Bankruptcy Court (i) first determining, after notice and a hearing, that such Claim or Cause of Action represents a "colorable" Claim of any kind, including, but not limited to, negligence, bad faith, criminal misconduct, willful misconduct, fraud, or gross negligence against a Debtor Released Party and (ii) specifically authorizing such Enjoined Party to bring such Claim or Cause of Action against any such Debtor Released Party; provided, however, the foregoing will not apply to a Claim or Cause of Action against any Excluded Party. To the extent legally permissible and as provided for in Article XIII, the Bankruptcy Court will have sole and exclusive jurisdiction to determine whether a Claim or Cause of Action is "colorable" even if the Bankruptcy Court would not have jurisdiction to issue a final, non-appealable order on the underlying Claim or Cause of Action.  The Bankruptcy Court may, in its sole discretion, conduct an evidentiary hearing (during which it may, among other things, hear testimony and assess the credibility of any witness(es)) in order to determine whether a proposed Claim or Cause of Action is "colorable."  For purposes of the Bankruptcy Court's determination under this provision after taking into account any admissible evidence, "colorable" means that the proposed Claim or Cause of Action is (a) procedurally and legally sound, (b) not brought for an improper purpose, such as harassment, and (c) no part of the pleading fails to satisfy the Bankruptcy Court that it warrants a federal civil action or that the litigant's allegations are unlikely, especially when prior cases have shown the litigant to be untrustworthy or not credible.  See *Silver v. City of San Antonio*, 2020 WL 3803922, at *1 (W.D. Tex. July 7, 2020) (denying leave to file suit); *Silver v. Perez*, 2020 WL 3790489, at *1, 6 (W.D. Tex. July 7, 2020) (same).

Notwithstanding the foregoing or anything in the Plan to the contrary, Article XII.K. does not have any impact on and does not affect any claims, obligations, suits, judgments, damages, demands, debts, remedies, causes of action, rights of setoff, other rights, and liabilities between any "Buyer Releasing Party" and any "Seller Releasing Party" (as the terms "Buyer Releasing Party" and "Seller Releasing Party" are defined in Section 7.16(a) and Section 7.16(b), respectively, of the Asset Purchase Agreement).

## V.    Retention of Jurisdiction.

On and after the Effective Date, the Bankruptcy Court shall retain jurisdiction over all matters arising in, arising under, and related to the Chapter 11 Cases and the Plan for, among other things, the following purposes:

to hear and determine motions and/or applications for the assumption or rejection of Executory Contracts and the allowance, classification, priority, compromise, estimation or payment of Claims resulting therefrom;

to determine any motion, adversary proceeding, application, contested matter, or other litigated matter pending on or commenced after the Confirmation Date, including but not limited to the Retained Causes of Action;

to ensure that distributions to holders of Allowed Claims are accomplished as provided herein;

to consider Claims or the allowance, classification, priority, compromise, estimation, or payment of any Claim;

to enter, implement, or enforce such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, modified, or vacated;

to issue injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any Person with the Consummation, implementation or enforcement of the Plan, the Confirmation Order, or any other order of the Bankruptcy Court;

to hear and determine any application to modify the Plan in accordance with section 1127 of the Bankruptcy Code, to remedy any defect or omission or reconcile any inconsistency in the Plan, or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

to hear and determine all applications under sections 330, 331, and 503(b) of the Bankruptcy Code for awards of compensation for services rendered and reimbursement of expenses incurred before the Confirmation Date (e.g., Fee Claims);

to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, the Confirmation Order, the Asset Purchase Agreement, or any agreement, instrument, or other document governing or relating to any of the foregoing;

to take any action and issue such orders as may be necessary to construe, interpret, enforce, implement, execute, and consummate the Plan or to maintain the integrity of the Plan following Consummation;

to hear any disputes arising out of, and to enforce, any order approving alternative dispute resolution procedures to resolve personal injury, employment litigation and similar Claims pursuant to section 105(a) of the Bankruptcy Code;

to determine such other matters and for such other purposes as may be provided in the Confirmation Order;

to hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code (including any requests for expedited determinations under section 505(b) of the Bankruptcy Code);

to adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

to adjudicate any and all disputes arising from or relating to distributions under the Plan;

to hear and determine any other matters related hereto and not inconsistent with the Bankruptcy Code and title 28 of the United States Code;

to enter a final decree closing the Chapter 11 Cases;

to enforce all orders, judgments, injunctions, releases, exculpations, indemnifications, and rulings previously entered or approved by the Bankruptcy Court;

to recover all assets of the Debtors and property of the Debtors' Estates, wherever located; and

to hear and determine any rights, Claims or Causes of Action held by or accruing to the Debtors pursuant to the Bankruptcy Code or pursuant to any federal statute or legal theory.

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising out of the Plan, such abstention, refusal or failure of jurisdiction shall have no effect upon and shall not control, prohibit, or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

Notwithstanding the foregoing or anything to the contrary herein, as provided in Article XIII of the Plan, these provisions shall not apply to the California District Court Action, the OBI/Monster Matter, the Trade Secret Matters, the VPX Florida Matters, the Orange Bang Trademark License Action, the TTAB Matter, and/or any litigation or other Proceeding involving a "Buyer Releasing Party" and a "Seller Releasing Party" (as the terms "Buyer Releasing Party" and "Seller Releasing Party" are defined in Section 7.16(a) and Section 7.16(b), respectively, of the Asset Purchase Agreement) that was pending in any jurisdiction or other forum as of June 28, 2023.

**W.      Miscellaneous Provisions.**

(1)      Payment of Statutory Fees.

On the Effective Date and thereafter as may be required, the Liquidating Trustee shall pay in full in Cash all fees incurred pursuant to § 1930 of title 28 of the United States Code, together with interest, if any, pursuant to § 3717 of title 31 of the United States Code for each Debtor's case; provided, however, that after the Effective Date such fees shall only be payable until such time as a final decree is entered closing the Chapter 11 Cases, a Final Order converting such cases to cases under chapter 7 of the Bankruptcy Code is entered or a Final Order dismissing the Chapter 11 Cases is entered.

The U.S. Trustee shall not be required to file a request for payment of its quarterly fees, which shall be deemed an Administrative Claim against the Debtors and their estates.  All such fees due and payable prior to the Effective Date shall be paid by the Debtors on the Effective Date. After the Effective Date, the Liquidating Debtors or Liquidating Trustee, as applicable, shall pay any and all fees when due and payable, and shall file with the Bankruptcy Court quarterly reports in a form reasonably acceptable to the United States Trustee, until the earliest of the date on which the Chapter 11 Cases are converted, dismissed, or closed.

(2)      Post-Confirmation Reporting.

After the Effective Date, in accordance with guidelines established by the United States Trustee, the Liquidating Trustee will file quarterly operating reports with the Bankruptcy Court.

(3)      Substantial Consummation.

On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

(4)      Amendments.

*Plan Modifications.*  The Debtors reserve the right, with the consent of the Consent Right Parties, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify the Plan prior to the entry of the Confirmation Order, including amendments or modifications to satisfy section 1129(b) of the Bankruptcy Code, and after entry of the Confirmation Order, the Debtors may amend, modify or supplement the Plan in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law, in each case without additional disclosure pursuant to section 1125 of the Bankruptcy Code.  In addition, after the Confirmation Date, so long as such action does not materially and adversely affect the treatment of holders of Allowed Claims or Allowed Interests pursuant to the Plan, *prior to the Effective Date*, the Debtors, and with the consent of the Consent Right Parties but without the need for Bankruptcy Court approval, or *following the Effective Date*, the Liquidating Trustee may remedy any defect or omission or reconcile any inconsistencies in this Plan or the Confirmation Order with respect to such matters as may be necessary to carry out the purposes or effects of this Plan, and any holder of a Claim that has accepted this Plan shall be deemed to have accepted this Plan as amended, modified, or supplemented.

*Other Amendments.*    Before the Effective Date, the Debtors may make appropriate technical adjustments and modifications to the Plan and any of the documents prepared in connection herewith without further order or approval of the Bankruptcy Court.

(5)    Revocation or Withdrawal of the Plan.

The Debtors reserve the right to revoke or withdraw the Plan, including the right to revoke or withdraw the Plan for any Debtor or all Debtors, prior to the conclusion of the Confirmation Hearing.  If the Debtors revoke or withdraw the Plan, or if Confirmation or the occurrence of the Effective Date does not occur, then: (i) the Plan shall be null and void in all respects; (ii) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts affected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (iii) nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims or Interests; (b) prejudice in any manner the rights of the Debtors, the Debtors' Estates, or any other Entity; or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors, the Debtors' Estates, or any other Entity.

(6)    Severability of Plan Provisions Upon Confirmation.

If, before the entry of the Confirmation Order, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtors, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.    Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is (i) valid and enforceable pursuant to its terms; (ii) integral to the Plan and may not be deleted or modified without the consent of the Debtors or the Liquidating Trustee (as the case may be); and (iii) non-severable and mutually dependent.

(7)    Governing Law.

Except to the extent that the Bankruptcy Code or other federal law is applicable, or to the extent an exhibit hereto provides otherwise, the rights, duties and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of Florida, without giving effect to the principles of conflict of laws thereof; provided, that corporate or entity governance matters relating to any Debtor shall be covered by the laws of the state of incorporation or organization of the applicable Debtor.

Notwithstanding the foregoing or anything to the contrary herein, the governing law provision set forth in Article XIV.G. of the Plan shall not apply to the California District Court Action, the OBI/Monster Matter, the Trade Secret Matters, the VPX Florida Matters, the Orange Bang Trademark License Action, the TTAB Matter, and/or any litigation or other Proceeding

involving a "Buyer Releasing Party" and a "Seller Releasing Party" (as the terms "Buyer Releasing Party" and "Seller Releasing Party" are defined in Section 7.16(a) and Section 7.16(b), respectively, of the Asset Purchase Agreement) that was pending in any jurisdiction or other forum as of June 28, 2023.

> (8)    Time.

In computing any period of time prescribed or allowed by the Plan, unless otherwise set forth herein or determined by the Bankruptcy Court, the provisions of Bankruptcy Rule 9006 shall apply.

> (9)    Additional Documents.

On or before the Effective Date, the Debtors may issue, execute, deliver, and file with the Bankruptcy Court or record, as applicable, such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The Debtors, the Liquidating Trustee, and all holders of Claims or Interests receiving distributions pursuant to the Plan and all other parties in interest shall, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

> (10)    Dates of Actions to Implement the Plan.

In the event that any payment or act under the Plan is required to be made or performed on a date that is not on a Business Day, then the making of such payment or the performance of such act may be completed on or as soon as reasonably practicable after the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

> (11)    Immediate Binding Effect.

Notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan shall be immediately effective and enforceable and deemed binding upon and inure to the benefit of the Debtors, the holders of Claims and Interests, the Released Parties, the Exculpated Parties, and each of their respective successors and assigns, including, without limitation, the Liquidating Trustee.  For the avoidance of doubt, confirmation of the Plan does not provide the Debtors with a discharge under section 1141 of the Bankruptcy Code because the Debtors and their Estates will be wound down in accordance with the Plan.

> (12)    Deemed Acts.

Subject to and conditioned on the occurrence of the Effective Date, whenever an act or an event is expressed under the Plan to have been deemed done or to have occurred, it shall be deemed to have been done or to have occurred without any further act by any party, by virtue of the Plan and the Confirmation Order.

(13)    Successor and Assigns.

The rights, benefits, and obligations of any Person or Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor, or permitted assign, if any, of each Entity.

(14)    Solicitation of the Plan.

As of and subject to the occurrence of the Confirmation Date: (i) the Debtors shall be deemed to have previously solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code, including without limitation, section 1125(a) of the Bankruptcy Code, and any applicable non-bankruptcy law, rule or regulation governing the adequacy of disclosure in connection with such solicitation; and (ii) the Debtors and each of their respective directors, officers, managers, members, shareholders, representatives, principals, employees, Affiliates, agents, financial advisors, investment bankers, professionals, accountants, and attorneys shall be deemed to have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code in the offer and issuance of any securities under the Plan, and therefore, are not, and on account of such offer, issuance, and solicitation will not be, liable at any time for any violation of any applicable law, rule or regulation governing the solicitation of acceptances or rejections of the Plan or the offer and issuance of any securities under the Plan.

(15)    Plan Supplement.

Unless otherwise ordered by the Bankruptcy Court, the Plan Supplement shall be filed with the Bankruptcy Court by not later than the objection deadline for filing objections with respect to the Confirmation Hearing.  Upon its filing with the Bankruptcy Court, the Plan Supplement may be obtained online at the website of the Debtors' court-appointed noticing, claims and solicitation agent, Stretto, Inc., at https://cases.stretto.com/VitalPharmaceuticals.

(16)    Entire Agreement.

Except with respect to the Asset Purchase Agreement and all other documents and instruments executed and delivered in connection with consummation of the Sale Transaction, on the Effective Date, the Plan, the Plan Supplement, and the Confirmation Order shall supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.  If the Effective Date does not occur, nothing herein shall be construed as a waiver by any party in interest of any or all of such party's rights, remedies, claims, and defenses, and such parties expressly reserve and preserve any and all of their respective rights, remedies, claims, and defenses.  The Plan and the documents comprising the Plan Supplement, including any drafts thereof (and any discussions, correspondence, or negotiations regarding any of the foregoing) shall in no event be construed as, or be deemed to be, evidence of an admission or concession on the part of any party in interest of any claim or fault or liability or damages whatsoever.  Pursuant to Federal Rule of Evidence 408 and any applicable state rules of evidence, all negotiations, discussions, agreements, settlements, and compromises reflected in or related to the Plan and the documents comprising the Plan Supplement are part of a proposed settlement of matters that could

otherwise be the subject of litigation among various parties in interest, and such negotiations, discussions, agreements, settlements, and compromises shall not be admissible into evidence in any proceeding other than a proceeding to enforce the terms of the Plan and the documents comprising the Plan Supplement.

(17)    Exhibits to Plan.

All exhibits, schedules, supplements, and appendices to the Plan (including the Plan Supplement) are incorporated into and are a part of the Plan as if set forth in full herein.

(18)    Notices.

All notices, requests, and demands to or upon the Debtors and the Liquidating Trustee, as applicable, to be effective shall be in writing (including by electronic or facsimile transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

**To the Debtors:**

Vital Pharmaceuticals, Inc., Bang Energy Canada, Inc., JHO Intellectual Property Holdings, LLC, JHO Real Estate Investment, LLC, Quash Seltzer, LLC, Rainbow Unicorn Bev LLC and Vital Pharmaceuticals International Sales, Inc.
c/o Huron Consulting Group, LLC
1166 Avenue of the Americas, 3rd Floor
New York, NY 10036
Attn: John C. DiDonato, Chief Transformation Officer and Interim Chief Executive Officer
Tel:    (646) 520-0084
Email: jdidonato@hcg.com
       - and -
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, D.C. 20004
Tel:    (202) 637-2200
Attn: Andrew D. Sorkin, Esq.
Email: andrew.sorkin@lw.com
       - and -
BERGER SINGERMAN LLP
1450 Brickell Avenue
Miami, Florida 33131
Attn:    Jordi Guso, Esq. and Michael J. Niles, Esq.
Tel:    (305) 755-9500
Email: jguso@bergersingerman.com
       niles@bergersingerman.com

**To the Liquidating Trustee:** [to be provided in the Plan Supplement]

**To the Creditors' Committee:**

> SEQUOR LAW, P.A.
> 1111 Brickell Avenue, Suite 1250
> Miami, FL 33131
> Attn: Leyza F. Blanco, Esq., Fernando J. Menendez, Esq. and Juan J. Mendoza, Esq.
> Tel: (305) 372-8282
> Email: lblanco@sequorlaw.com
>         fmenendez@sequorlaw.com
>         jmendoza@sequorlaw.com
>
> - and -
>
> LOWENSTEIN SANDLER LLP
> 1251 Avenue of the Americas, 17th Floor
> New York, New York 10020
> Phone: (212) 419-5868
> Attn: Eric Chafetz, Esq., Jeffrey Cohen, Esq., Lindsay Sklar, Esq. and Erica Mannix, Esq.
> Email: echafetz@lowenstein.com
>         jcohen@lowenstein.com
>         lsklar@lowenstein.com
>         emannix@lowenstein.com

## VI.

### RISK FACTORS IN CONNECTION WITH THE PLAN

Parties in interest should read and carefully consider the following risk factors, as well as the other information set forth in this Disclosure Statement (and the documents delivered together herewith and/or incorporated by reference herein), before deciding whether to vote to accept or to reject the Plan.

**A.    Non-confirmation of the Plan.**

Although the Debtors believe that the Plan will satisfy all requirements necessary for Confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion, that modifications of the Plan will not be required for Confirmation, or that such modifications would not necessitate re-solicitation of votes.  Finally, there can be no assurances that the Plan will receive sufficient votes for Confirmation.  The Bankruptcy Code requires that a chapter 11 plan comply with certain requirements (including, but not limited to, the

requirements of section 1129 of the Bankruptcy Code) in order to be confirmed.  The Bankruptcy Court may determine that one or more of those requirements is not satisfied with respect to the Plan.  If the Bankruptcy Court makes such a determination, the Debtors could be required to restart the solicitation process and (i) seek the approval of a new disclosure statement, (ii) solicit or re-solicit votes from the holders of Claims or Interests, and/or (iii) seek the confirmation of a newly proposed plan.  Additionally, should the Plan fail to be approved, confirmed, or consummated, then non-Debtor parties in interest may be in a position to file alternative plans pursuant to section 1121 of the Bankruptcy Code.  As such, non-confirmation of the Plan would likely entail significantly greater risk of delay, expense, and uncertainty to the Debtors and their Estates.

**B.**      **Nonconsensual Confirmation.**

In the event that any impaired class of Claims or Interests entitled to vote on a plan of reorganization or liquidation does not accept such plan of reorganization or liquidation, respectively, a bankruptcy court may nevertheless confirm such plan at the proponent's request if at least one (1) impaired class has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the Bankruptcy Court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired classes.

**C.**      **Claim Objections.**

The Debtors may object to a proof of claim filed by or on behalf of a holder of a Claim. The distribution estimates set forth in this Disclosure Statement are not applicable to any holder of any Claim whose Claim is or may be subject to an objection.  Any such holder may not receive its specified share of the estimated distributions described in this Disclosure Statement.

**D.**      **Distributions.**

While the Debtors have endeavored to project what they believe are likely distributions, if any, to be made to parties holding Allowed Claims, there can be no certainty that the projections will be accurate and that holders will receive the distributions described in the Plan.  Actual distributions may be lower or higher than projections.

The ultimate distributions to Holders of Allowed General Unsecured Claims will necessarily be affected by, among other things: (i) recoveries generated in connection with the liquidation of all of the Debtors' remaining assets; (ii) the outcome of objections to Claims; and (iii) the cost and expenses of such actions and generally administering and winding down the Debtors' Estates.

**E.**      **Jurisdiction.**

After the Effective Date, the Bankruptcy Court or another court of competent jurisdiction may find that the Bankruptcy Court does not have jurisdiction to enforce certain provisions of the Plan with respect to the non-Debtors.

## F.    Administrative Insolvency.

Section 1129(a)(9)(A) of the Bankruptcy Code states that in order for a chapter 11 plan to be confirmed, it must provide that each holder of an allowed claim brought under section 507(a)(2) or 507(a)(3) of the Bankruptcy Code (*i.e.*, allowed administrative expense claims) receive cash equal to the full allowed amount of such claim, unless such holder agrees to different treatment. Additionally, section 1129(a)(9)(C) of the Bankruptcy Code states that in order for a chapter 11 plan to be confirmed, it must provide that each holder of an allowed claim entitled to priority under section 507(a)(8) of the Bankruptcy Code (*i.e.*, allowed priority tax claims), receives on account of such claim regular installment payments in the allowed amount of the claim within five years after the date of the order for relief, and in a manner that is not less favorable than the most favored nonpriority unsecured claim under such plan, unless the holder of the claim agrees to different treatment. Finally, other priority claims may similarly be required to receive a certain treatment under section 1129(a)(9) of the Bankruptcy Code (such as cash equal to the full allowed amount of such claim). The Debtors presently believe that they have sufficient Cash to pay all Allowed Administrative Expense Claims, Allowed Priority Tax Claims, Allowed Other Secured Claims, and Allowed Other Priority Claims and/or that they will be able to reach agreements with the holders of such Claims as to any different treatment of such Claims, as necessary. However, if the Debtors are administratively insolvent, including if ThermoLife prevails in the ThermoLife Adversary Proceeding and is awarded an Allowed Administrative Expense Claim for the damages it asserts as a result of VPX's alleged post-petition infringement, then the Bankruptcy Court may not confirm the Plan and the Bankruptcy Court may convert the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, either or both of which possible outcomes would likely entail significantly greater risk of delay, expense, and uncertainty to the Debtors and their Estates.

## G.    Debtors Have No Duty to Update.

The statements contained in this Disclosure Statement are made by the Debtors as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that date. The Debtors have no duty to update this Disclosure Statement unless otherwise ordered to do so by the Bankruptcy Court.

No representations outside the Disclosure Statement are authorized. No representations concerning or related to the Debtors, the Chapter 11 Cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code other than as set forth in this Disclosure Statement. Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement should not be relied upon by you in arriving at your decision.

No legal or tax advice is provided to you by this Disclosure Statement. The contents of this Disclosure Statement should not be construed as legal, business, or tax advice. Each holder of a Claim or Interest should consult his, her, or its own legal counsel and accountant as to legal, tax, and other matters concerning his, her, or its Claim or Interest.

This Disclosure Statement does not represent legal advice to you. This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or to object to Confirmation of the Plan.

Nothing contained herein or in the Plan shall constitute a representation of the tax or other legal effects of the Plan on the Debtors or on holders of Claims or Interests. Holders of Claims and/or Interests should seek advice from their own independent tax, legal or other professional advisors based on their own individual circumstances.

No reliance should be placed on the fact that any particular litigation claim, including but not limited to Causes of Action or Retained Causes of Action, or a projected objection to a particular Claim or Interest is, or is not, identified in this Disclosure Statement. The Liquidating Trustee may seek to investigate, file, and prosecute Retained Causes of Action and may object to Claims or Interests after the Confirmation or Effective Date of the Plan irrespective of whether this Disclosure Statement identifies such Retained Causes of Action or objections to such Claims or Interests.

Except as provided in the Plan, the vote by a holder of a Claim for or against the Plan does not constitute a waiver or release of any Claims, Retained Causes of Action or rights of the Debtors (or any entity, as the case may be) to object to that holder's Claim or Interest, or to recover any preferential, fraudulent, or other voidable transfer of assets as against any Excluded Parties, regardless of whether any Claims or Causes of Action or Retained Causes of Action of the Debtors or their respective Estates are specifically or generally identified in this Disclosure Statement.

## H.    Amendment, Waiver, Modification, or Withdrawal of Plan.

Under certain circumstances, the Debtors may, prior to the Confirmation or the substantial consummation of the Plan and subject to the provisions of section 1127 of the Bankruptcy Code, Bankruptcy Rule 3019, and the Plan, and with the consent of the Consent Right Parties (not to be unreasonably withheld), amend the terms of the Plan or waive any conditions thereto, if and to the extent such amendments or waivers are necessary or desirable to consummate the Plan. The potential impact of any such amendment or waiver on the holders of Claims cannot presently be foreseen, but may include a change in the economic impact of the Plan on some or all of the Classes or a change in the relative rights of such Classes.

The Debtors' advisors have relied upon information provided by the Debtors or by the Debtors' former employees in connection with the preparation of this Disclosure Statement. Although the Debtors' advisors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, they have not independently verified the information contained in this Disclosure Statement.

## I.    Non-occurrence or Delayed Occurrence of the Effective Date.

Although the Debtors believe that the Effective Date will occur shortly after the Confirmation Date following the satisfaction of any applicable conditions precedent, there can be no assurance as to the precise timing of the Effective Date. If the conditions precedent to the Effective Date, as described in Article XI of the Plan, have not occurred or have otherwise been waived by the date that is ninety (90) calendar days after the entry of the Confirmation Order or

by such later date as set forth by the Debtors in a notice filed with the Bankruptcy Court prior to the expiration of such period, then, upon filing a notice with the Bankruptcy Court, the Debtors may deem the Plan null and void in all respects. Under such circumstances, no distributions would be made under the Plan, the Debtors and all holders of Claims and Interests would be restored to the status quo as of the day immediately preceding the Confirmation Date, and the Debtors' obligations with respect to all Claims and Interests would remain unchanged.

**J.      Conversion to Chapter 7.**

If no plan can be confirmed, or if the Bankruptcy Court otherwise finds that it would be in the best interests of the creditors and/or the Debtors, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed or elected to liquidate the Debtors' assets for distribution in accordance with the priorities established by the Bankruptcy Code. The Debtors believe that liquidation under chapter 7 would result in smaller or no distributions being made to the Debtors' creditors than as provided for in the Plan.

**K.      Dismissal of the Chapter 11 Cases.**

If no plan can be confirmed, or if the Bankruptcy Court otherwise finds that it would be in the best interests of the creditors and/or the Debtors, one or more of the Chapter 11 Cases may be dismissed by order of the Bankruptcy Court.

**L.      Cost of Administering the Debtors' Estates.**

Liquidation of the Debtors' remaining assets and the disbursement of the proceeds of such liquidation, as well as the winddown of the Debtors will require certain administrative costs that may vary based on a variety of factors, including many out of the Debtors' control. Such administrative costs cannot be predicted with certainty and may affect recoveries under the Plan.

**VII.**

**PLAN CONFIRMATION AND CONSUMMATION**

**A.      The Confirmation Hearing.**

Bankruptcy Code section 1128(a) requires the Bankruptcy Court, after appropriate notice, to hold a hearing on confirmation of a plan (the "**Confirmation Hearing**"). On, or as promptly as practicable after the filing of the Plan and this Disclosure Statement, the Bankruptcy Court will schedule a hearing to consider whether to approve this Disclosure Statement (the "**Disclosure Statement Hearing**"). Prior to the Disclosure Statement Hearing, the Debtors may file a request with the Bankruptcy Court to approve certain aspects of the plan approval process, such as approving the form of ballots which Creditors will use to vote for or against approval of the Plan. If the Bankruptcy Court approves the Disclosure Statement, the Debtors will request, pursuant to the requirements of the Bankruptcy Code and the Bankruptcy Rules, that the Bankruptcy Court schedule the Confirmation Hearing. Notice of the Confirmation Hearing (the "**Confirmation Hearing Notice**") will be provided to all known Creditors or, if applicable, their representatives, as set forth in the order approving the Disclosure Statement. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an

announcement of the adjourned date made at the Confirmation Hearing or any subsequent adjourned Confirmation Hearing.

Pursuant to Bankruptcy Code section 1128(b), any party in interest may object to confirmation of a plan of reorganization or liquidation. Subject to the terms of the Confirmation Hearing Notice, any objection to confirmation of the Plan must otherwise be in writing, must conform to the Bankruptcy Rules, must set forth the name of the objector, the nature and amount of Claims or Interests held or asserted by the objector against the particular Plan Debtor(s), the basis for the objection and the specific grounds of the objection, and must be filed with the Bankruptcy Court, together with proof of service thereof, and served upon: (1) *the Debtors*, c/o (i) Vital Pharmaceuticals, Inc., Bang Energy Canada, Inc., JHO Intellectual Property Holdings, LLC, JHO Real Estate Investment, LLC, Quash Seltzer, LLC, Rainbow Unicorn Bev LLC and Vital Pharmaceuticals International Sales, Inc., c/o Huron Consulting Group, LLC, 1166 Avenue of the Americas, 3rd Floor, New York, NY 10036 (Attn: John C. DiDonato, Chief Transformation Officer, jdidonato@hcg.com) and (ii) *bankruptcy counsel for the Debtors*, Latham & Watkins LLP, 555 Eleventh Street, NW, Suite 1000, Washington, D.C. 20004 (Attn: Andrew D. Sorkin, Esq., andrew.sorkin@lw.com) and Berger Singerman LLP, 1450 Brickell Avenue, Suite 1900, Miami, FL 33131 (Attn: Jordi Guso, Esq., jguso@bergersingerman.com; Michael J. Niles, Esq., mniles@bergersingerman.com); (2) *Office of the United States Trustee*, 51 SW First Avenue, Room 1204, Miami, FL 33130 (Attn: Heidi A. Feinman, Esq., Heidi.a.feinman@usdoj.gov); 501 East Polk Street, Ste. 1200 Tampa, FL 33602 (Attn: J. Steven Wilkes, steven.wilkes@usdoj.gov); (3) *Official Committee of Unsecured Creditors*, Lowenstein Sandler LLP, Avenue of the Americas, 17th Floor, New York, New York 10020 (Attn: Eric Chafetz, Esq., echafetz@lowenstein.com) and Sequor Law, P.A., 1111 Brickell Avenue, Suite 1250, Miami, FL 33131 (Attn: Leyza F. Blanco, Esq., lblanco@sequorlaw.com); and (4) such other parties as the Bankruptcy Court may order, so as to be actually received no later than the objection deadline, date and time designated in the Confirmation Hearing Notice.

Bankruptcy Rule 9014 governs objections to confirmation of the Plan. UNLESS AN OBJECTION TO CONFIRMATION OF THE PLAN IS TIMELY SERVED UPON THE PARTIES LISTED ABOVE AND FILED WITH THE BANKRUPTCY COURT, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT IN DETERMINING CONFIRMATION OF THE PLAN.

## B.      Plan Confirmation Requirements Under the Bankruptcy Code.

In order for the Plan to be confirmed, the Bankruptcy Code requires that the Bankruptcy Court determine that the Plan complies with the technical requirements of chapter 11 of the Bankruptcy Code and that the disclosures concerning the Plan have been adequate and have included information concerning all payments made or promised in connection with the Plan and these Chapter 11 Cases. The Bankruptcy Code also requires that: (1) the Plan be accepted by the requisite votes of Creditors except to the extent that confirmation despite dissent is available under Bankruptcy Code section 1129(b); (2) the Plan is feasible (that is, there is a reasonable probability that the Debtors will be able to perform their obligations under the Plan without needing further financial reorganization not contemplated by the Plan); and (3) the Plan is in the "best interests" of all Creditors (that is, Creditors will receive at least as much under the Plan as they would receive in a hypothetical liquidation case under chapter 7 of the Bankruptcy Code). To confirm the Plan,

the Bankruptcy Court must find that all of the above conditions are met, unless the applicable provisions of Bankruptcy Code section 1129(b) are employed to confirm the Plan, subject to satisfying certain conditions, over the dissent or deemed rejections of Classes of Claims.

(1)    Best Interests of Creditors.

The Bankruptcy Code requires that, with respect to an impaired class of claims or interests, each holder of an impaired claim or interest in such class either (1) accepts a plan or (2) receives or retains under a plan property of a value, as of the effective date of such plan, that is not less than the amount (value) such holder would receive or retain if the debtor was liquidated under chapter 7 of the Bankruptcy Code on the effective date of such plan.

The Debtors, with the assistance of their professionals, have prepared the Liquidation Analysis attached hereto as **Exhibit 2**.  The Liquidation Analysis is based upon a hypothetical liquidation in a chapter 7 case.  In preparing the Liquidation Analysis, the Debtors have taken into account the nature, status and underlying value of the Debtors' assets, the ultimate realizable value of such assets, and the extent to which such assets are subject to liens and security interests.  The Liquidation Analysis provides an estimate of the Cash on hand in the Estates as of the expected Effective Date of the Plan.

Based upon the Liquidation Analysis, the Debtors believe that liquidation under chapter 7 would result in smaller or no distributions being made to Creditors than those provided for in the Plan because of: (a) the additional administrative expenses attendant to the appointment of a trustee and the trustee's employment of attorneys and other professionals; and (b) additional expenses and Claims, some of which would be entitled to priority, which would be generated during the liquidation.  In the opinion of the Debtors, the recoveries projected to be available in a chapter 7 liquidation are not likely to afford the holders of Claims as great a realization potential as afforded to them under the Plan.

Accordingly, the Debtors believe that in a chapter 7 liquidation, holders of Claims would receive less than such holders would receive under the Plan.  There can be no assurance, however, as to values that would actually be realized in a chapter 7 liquidation, nor can there be any assurance that a Bankruptcy Court would accept the Debtors' conclusions or concur with such assumptions in making its determinations under section 1129(a)(7) of the Bankruptcy Code.

(2)    Feasibility of the Plan.

Pursuant to section 1129(a)(11) of the Bankruptcy Code, a debtor must demonstrate that a bankruptcy court's confirmation of a plan is not likely to be followed by the liquidation or need for further financial reorganization of the debtor or its successor under the plan, unless such liquidation or reorganization is proposed under the plan.  The Debtors have sold substantially all of their assets.  Pursuant to the Plan, the Liquidating Trustee shall be vested with the Debtors' remaining assets for liquidating and distributions in accordance with the Plan.  Therefore, the Bankruptcy Court's confirmation of the Plan is not likely to be followed by liquidation or the need for any further reorganization.

(3)      Acceptance by Impaired Classes.

The Bankruptcy Code requires, as a condition to confirmation, that, except as described below, each class of claims or equity interests that is impaired under a plan, accepts such plan. A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required. As a general matter under the Bankruptcy Code, a class is "impaired," unless the plan: (a) leaves unaltered the legal, equitable and contractual rights to which the claim or the equity interest entitles the holder of such claim or equity interest; (b) cures any default and reinstates the original terms of such claim or equity interest; or (c) provides that, on the consummation date, the holder of such claim or equity interest receives cash equal to the allowed amount of that claim or, with respect to any equity interest, any fixed liquidation preference to which the holder of such equity interest is entitled to any fixed price at which the debtor may redeem the security.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in the number of the claims in that class, but for the purpose of considering both the dollar amount and the number, a plan proponent counts only those who actually vote to accept or to reject the plan. Thus, a class of claims will have voted to accept the plan only if two-thirds (2/3) in amount and a majority in number actually voting cast their ballots in favor of acceptance. A vote may be disregarded if the Bankruptcy Court determines, after notice and a hearing, that acceptance or rejection was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

Any Class of Claims that is not occupied as of the commencement of the Confirmation Hearing by an Allowed Claim or a Claim temporarily Allowed under Bankruptcy Rule 3018 shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code. If no votes to accept or reject the Plan are received with respect to a Class whose votes have been solicited under the Plan (other than a Class that is deemed eliminated under the Plan), such Class shall be deemed to have voted to accept the Plan.

(4)      Section 1129(b).

The Bankruptcy Code permits confirmation of a plan even if it is not accepted by all impaired classes, as long as: (a) the plan otherwise satisfies the requirements for confirmation; (b) at least one impaired class of claims has accepted it without taking into consideration the votes of any insiders in such class; and (c) the plan is "fair and equitable" and does not "discriminate unfairly" as to any impaired class that has not accepted the plan. These so called "cramdown" provisions are set forth in sections 1129(a)(10) and 1129(b) of the Bankruptcy Code.

(5)      No Unfair Discrimination.

The "no unfair discrimination" test requires that the plan not provide for unfair treatment with respect to classes of claims or interests that are of equal priority, but are receiving different treatment under the plan.

(6)    Fair and Equitable.

The fair and equitable requirement applies to classes of claims of different priority and status, such as secured versus unsecured.  A plan satisfies the fair and equitable requirement if no class of claims receives more than 100% of the allowed amount of the claims in such class. Further, if a class of claims is considered a dissenting class, i.e., a Class of Claims that is deemed to reject the Plan because the required majorities in amount and number of votes is not received from the Class (a "**Dissenting Class**"), the following requirements apply:

*Class of Secured Claims.*

Each holder of an impaired secured claim (a) retains its liens on the subject property, to the extent of the allowed amount of its secured claim and receives deferred cash payments having a value, as of the effective date of the plan, of at least the allowed amount of such claim, or (b) has the right to credit bid the amount of its claim if its property is sold and retains its liens on the proceeds of the sale, or (c) receives the "indubitable equivalent" of its allowed secured claim.

*Class of Unsecured Creditors.*

Either (a) each holder of an impaired unsecured claim receives or retains under the plan property of a value equal to the amount of its allowed claim or (b) the holders of claims and interests that are junior to the claims of the dissenting class will not receive any property under the plan.

*Class of Equity Interests.*

Either (a) each interest holder will receive or retain under the plan property of a value equal to the greater of (i) the fixed liquidation preference or redemption price, if any, of such stock and (ii) the value of the stock, or (b) the holders of interests that are junior to the interests of the dissenting class will not receive any property under the plan.

The Debtors believe the Plan does not "discriminate unfairly" and will satisfy the "fair and equitable" requirement notwithstanding that certain Classes of Claims and Equity Interests are deemed to reject the Plan because no Class that is junior to such Class will receive or retain any property on account of the Claims and Equity Interests in such Class and the Plan does not provide for unfair treatment with respect to Classes of Claims or Equity Interests that are of equal priority.

## VIII.

## ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

The Debtors believe the Plan is in the best interests of their Creditors and should accordingly be accepted and confirmed.  If the Plan as proposed, however, is not confirmed, the following three alternatives may be available to the Debtors: (a) a liquidation of the Debtors' assets pursuant to chapter 7 of the Bankruptcy Code; (b) an alternative plan of reorganization or

liquidation may be proposed and confirmed; or (c) the Debtors' Chapter 11 Cases may be dismissed.

## A.  Chapter 7 Liquidation.

If a plan pursuant to chapter 11 of the Bankruptcy Code is not confirmed by the Bankruptcy Court, the Debtors' Chapter 11 Cases may be converted to liquidation cases under chapter 7 of the Bankruptcy Code, in which a trustee would be elected or appointed, pursuant to applicable provisions of chapter 7 of the Bankruptcy Code, to liquidate the assets of the Debtors for distribution in accordance with the priorities established by the Bankruptcy Code.  The Debtors believe that such a liquidation would result in smaller or no distributions being made to the Debtors' Creditors than those provided for in the Plan because: (a) additional administrative expenses attendant to the appointment of a trustee and the trustee's employment of attorneys and other professionals; and (b) additional expenses and Claims, some of which would be entitled to priority, which would be generated during the liquidation.  The Debtors have found that confirmation of the Plan will provide each holder of an Allowed Claim with a recovery that is not less than such holder would receive pursuant to liquidation of the Debtors under chapter 7 of the Bankruptcy Code.

## B.  Alternative Plan Pursuant to Chapter 11 of the Bankruptcy Code.

If the Plan is not confirmed, the Debtors may propose a different plan, which might involve an alternative means for reorganization or liquidation of the Debtors' assets.  However, the Debtors believe that the terms of the Plan provide for an orderly and efficient liquidation of the Debtors' assets and will result in the realization of the most value for holders of Claims against the Debtors' Estates.

## C.  Dismissal of the Debtors' Chapter 11 Cases.

Dismissal of the Debtors' Chapter 11 Cases would have the effect of restoring (or attempting to restore) all parties to the *status quo ante*.  Upon dismissal of the Debtors' Chapter 11 Cases, the Debtors would lose the protection of the Bankruptcy Code, thereby requiring, at the very least, an extensive and time-consuming process of negotiation with the various creditors of the Debtors, and possibly resulting in costly and protracted litigation in various jurisdictions. Dismissal will also permit unpaid unsecured creditors to obtain and enforce judgments against the Debtors.  Dismissal of the Chapter 11 Cases would likely impede the prosecution of the Retained Causes of Action.  The Bankruptcy Court offers the most efficient venue prompt adjudication or resolution of the Retained Causes of Action.  Therefore, the Debtors believe that dismissal of the Debtors' Chapter 11 Cases is not a preferable alternative to the Plan.

## IX.

### CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

**THE FOLLOWING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL.  THE FOLLOWING DISCUSSION IS FOR INFORMATION**

PURPOSES ONLY AND IS NOT TAX ADVICE.  THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S PARTICULAR CIRCUMSTANCES.

ACCORDINGLY, EACH HOLDER IS STRONGLY URGED TO CONSULT ITS TAX ADVISOR REGARDING THE U.S. FEDERAL, STATE, LOCAL, AND APPLICABLE NON-U.S.  INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.

A.    **General.**

The following discussion summarizes certain material U.S. federal income tax consequences to the Debtors, the Liquidating Trust and holders of certain Claims and holders of Existing Equity Interests that are entitled to vote on the Plan.  This discussion is based on current provisions of the Internal Revenue Code of 1986, as amended (the "**Tax Code**"), applicable Treasury Regulations, judicial authority and current administrative rulings and pronouncements of the Internal Revenue Service (the "**Service**").  The U.S. federal income tax consequences of the contemplated transactions are complex and subject to significant uncertainties.  There can be no assurance that the Service will not take a contrary view, no ruling from the Service has been or will be sought nor will any counsel provide a legal opinion as to any of the expected tax consequences set forth below.

Legislative, judicial, or administrative changes or interpretations may be forthcoming that could alter or modify the statements and conclusions set forth herein.  Any such changes or interpretations may or may not be retroactive and could affect the tax consequences to holders of Claims, holders of Existing Equity Interests, the Liquidating Trust or the Debtors.  It cannot be predicted at this time whether any tax legislation will be enacted or, if enacted, whether any tax law changes contained therein would affect the tax consequences described herein.

The following summary is for general information only.  The tax treatment of a holder may vary depending upon such holder's particular situation.  This summary does not address all of the tax consequences that may be relevant to a holder, including any alternative minimum tax consequences or "Medicare" taxes on unearned income, nor does it address the tax consequences to a holder that has made an agreement to resolve its claim (in whole or in part) in a manner not explicitly provided for in the Plan, including in connection with any Sale Transaction.  This summary also does not address the U.S. federal income tax consequences to persons unimpaired or otherwise not entitled to vote on the Plan or holders subject to special treatment under the U.S. federal income tax laws, such as brokers or dealers in securities or currencies, certain securities traders, tax-exempt entities, financial institutions, insurance companies, foreign persons, persons that are, or hold Claims or Existing Equity Interests through, S corporations, partnerships and other pass-through entities or arrangements for U.S. federal income tax purposes, holders that have a "functional currency" other than the United States dollar, regulated investment companies, real estate investment trusts, retirement plans, individual retirement and other tax-deferred accounts, persons who use the accrual method of accounting that report income on an "applicable financial statement", persons holding Claims or Existing Equity Interests that are part of a straddle, hedging, constructive sale, or conversion transaction) and holders that have acquired Claims or Existing Equity Interests in connection with the performance of services.  Except where otherwise specified

below, the following summary assumes that the Claims and Existing Equity Interests are held by holders as "capital assets" (generally, property held for investment) within the meaning of Section 1221 of the Tax Code and that all Claims, Existing Equity Interests and other arrangements to which any of the Debtors is a party will be respected for U.S. federal income tax purposes in accordance with their form. In addition, this discussion does not address the Foreign Account Tax Compliance Act or U.S. federal taxes other than income taxes.

Each holder of a Claim or Interest is urged to consult its own tax advisor regarding the federal, state, and other tax consequences of the Plan and this Disclosure Statement.

**B.      Consequences to the Debtors and to Holders of Existing Equity Interests as Relates to Consequences to the Debtors.**

The Debtors are corporations or single member limited liability companies directly or indirectly wholly owned by Mr. Owoc. As discussed above, VPX believes that it presently has S-Corp status. Therefore, VPX is not subject to U.S. federal income tax and any items of its income, loss, deduction or credit are taken into account by holders of Existing Equity Interests. The Debtors believe that the Debtors other than VPX are presently entities treated as disregarded as separate from holders of Existing Equity Interests, [other than Vital Pharmaceuticals International Sales, Inc., which the Debtors believe is presently a domestic international sales corporation treated as an entity disregarded as separate from holders of Existing Equity Interests]. Therefore, such Debtors are not subject to U.S. federal income tax and all assets, liabilities, income, gain, loss, and expenses of such Debtors are deemed to be the assets, liabilities, income, gain, loss, and expenses of holders of Existing Equity Interests. Accordingly, so long as the foregoing classification of each Debtor remains in effect, the U.S. federal income tax consequences of the transactions under the Plan generally will not be borne by the Debtors but by holders of Existing Equity Interests. Nevertheless, Mr. Owoc has sought the Bankruptcy Court to compel VPX to take certain actions to terminate VPX's S-Corp status by the Tax Motion, as discussed above, and Mr. Owoc otherwise may take certain actions that could change any of the Debtors' tax status prior to the Effective Date. As of the date of this Disclosure Statement, the Debtors are not aware of any such actions and, therefore, this discussion assumes that the tax classification of each Debtor will remain in effect until the Effective Date (or, if earlier, through the date such Debtor is deemed liquidated for U.S. federal income tax purposes).

On July 31, 2023, the Debtors sold substantially all of their assets and ceased to conduct any business activities, and on August 1, 2023, the boards of directors of the Debtors adopted a resolution authorizing the Debtors and their officers to proceed with an immediate liquidation pursuant to the Plan. It is unclear whether such actions have resulted or could result in a deemed liquidation of one or more of the Debtors for U.S. federal income tax purposes. Accordingly, there is substantial uncertainty regarding, and the Debtors have not yet determined, whether the Debtors have liquidated for U.S. federal income tax purposes as of the date of this Disclosure Statement. In the event that the Debtors have liquidated for U.S. federal income tax purposes as of the date hereof or prior to the Effective Date, the consequences of the Plan could be materially different than described herein. All holders of Claims or Existing Equity Interests are strongly urged to consult their own tax advisors regarding the consequences to them of the Plan in the event any or all Debtors have liquidated or will liquidate for U.S. federal income tax purposes prior to the Effective Date.

(1)  Cancellation of Indebtedness.

In general, absent an exception, a taxpayer realizes and recognizes cancellation of indebtedness income ("**COD Income**") upon satisfaction of its outstanding indebtedness for total consideration less the amount of such indebtedness.  The amount of COD Income, in general, is the excess of (i) the adjusted issue price of the indebtedness satisfied, over (ii) the sum of (a) the amount of any cash and (b) the fair market value (or adjusted issue price, in the case of debt instruments) of any consideration, in each case, given in satisfaction of such indebtedness at the time of the exchange.  However, COD Income should not arise to the extent that payment of the indebtedness would have given rise to a deduction.  Under section 108 of the Tax Code, a taxpayer is not required to include COD Income in gross income (i) if the taxpayer is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that proceeding, or (ii) to the extent that the taxpayer is insolvent immediately before the discharge.  In that case, however, the taxpayer generally must reduce its tax attributes, such as its net operating losses, general business credits, capital loss carryforwards, and tax basis in assets, by the amount of the COD Income so excluded from gross income.  Generally, the reduction in the tax basis of assets cannot exceed the excess of the total basis of the debtor's property held immediately after the debt discharge over the total liabilities of the debtor immediately after the discharge.  Any attribute reduction will be applied as of the first day following the taxable year in which COD Income is recognized.

Although not free from doubt, the Service has ruled in certain private letter rulings that indebtedness of a debtor that is treated as an entity disregarded as separate from its owner for U.S. federal income tax purposes is treated as nonrecourse indebtedness (regardless of whether such indebtedness is recourse indebtedness for non-tax purposes), and that a discharge of such indebtedness in exchange for such debtor's property does not give rise to COD Income but is instead treated as an amount realized in connection with the transfer of such property.  Because the Debtors other than VPX are treated as entities disregarded as separate from holders of Existing Equity Interests for U.S. federal income tax purposes, the Debtors currently intend to take the position that the discharge of the Debtors' (other than VPX's) indebtedness pursuant to the Plan should not give rise to COD Income, but should instead be treated as amount realized in connection with the transfer of such Debtors' property.  Any such amount realized would be deemed to be incurred by holders of Existing Equity Interests.  The remainder of this discussion assumes that the foregoing intended treatment will be respected.  Nevertheless, the matter is not free from doubt, and therefore the Service could take the position that the discharge of such Debtors' (other than VPX's) indebtedness pursuant to the Plan should give rise to COD Income that would be deemed to be recognized by holders of Existing Equity Interests.

Any COD Income recognized by VPX would be allocated to holders of Existing Equity Interests unless any of the exceptions under section 108 of the Tax Code applies, which exceptions generally apply at the VPX-level.

If the Debtors determine, subject to the uncertainties discussed herein, that any or all Debtors have liquidated or will liquidate for U.S. federal income tax purposes prior to the Effective Date, any COD Income or amount realized would be incurred by any Debtor or holder of Existing Equity Interests, as applicable, at the time of such liquidation.  In the absence of such determination, COD Income and amount realized may be incurred by the Debtors or holders of

Existing Equity Interests, as applicable, either as a result of the confirmation and implementation of the Plan or, alternatively, on the Effective Date upon the formation of the Liquidating Trust. There can be no assurance that the Service will agree with either such characterization due to, among other things, the lack of direct authoritative guidance as to when COD Income or amount realized is incurred in the context of a liquidating chapter 11 plan, and thus there can be no assurance regarding the time upon which all or a substantial amount of the COD Income or amount realized will be incurred.  All holders of Claims or Existing Equity Interests are strongly urged to consult their own tax advisors regarding the consequences to them of the Plan in the event any or all Debtors have liquidated or will liquidate for U.S. federal income tax purposes prior to the Effective Date.

       (2)      <u>Transfer of Assets to the Liquidating Trust.</u>

Subject to the foregoing discussion and uncertainties discussed herein regarding the time of the Debtors' liquidation for U.S. federal income tax purposes, pursuant to the Plan certain of the Debtors' assets will be transferred to the Liquidating Trust on behalf of all or a portion of the respective claimants and/or holders of Interests of such Debtors.  The transfer of assets to the Liquidating Trust may result in the recognition of gain or loss by the Debtors and/or holders of Existing Equity Interests, depending in part on the value of such assets on the date of such transfer to the Liquidating Trust relative to the Debtors' tax basis in such assets.

**C.**      **Consequences to Certain Holders of Claims and Holders of Existing Equity Interests as Relates to Receiving Recovery under the Plan.**

The tax treatment of holders of Claims or Existing Equity Interests, as well as the character, amount and timing of income, gain or loss recognized as a consequence of the Plan and the distributions provided for by the Plan may vary, depending upon, among other things: (1) whether the Claim (or portion thereof) constitutes a Claim for principal or interest; (2) the type of consideration received by the holder in exchange for the Claim and whether the holder receives distributions under the Plan in more than one taxable year; (3) whether the holder is a citizen or resident of the United States for tax purposes, is otherwise subject to U.S. federal income tax on a net basis, or falls into any special class of taxpayers, such as those that are excluded from this discussion as noted above; (4) the manner in which the holder acquired the Claim; (5) the length of time that the Claim has been held; (6) whether the Claim was acquired at a discount; (7) whether the holder has taken a bad debt deduction with respect to the Claim (or any portion thereof) in the current or prior years; (8) whether the holder has previously included in income accrued but unpaid interest with respect to the Claim; (9) the method of tax accounting of the holder; (10) whether the Claim is an installment obligation for U.S. federal income tax purposes; and (11) whether the "market discount" rules are applicable to the holder.

For purposes of this discussion, a "**<u>U.S. Holder</u>**" is a holder of a Claim or an Existing Equity Interest that is: (1) an individual citizen or resident of the United States for U.S. federal income tax purposes; (2) a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the United States, any state thereof or the District of Columbia; (3) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (4) a trust (A) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more

United States persons (within the meaning of section 7701(a)(30) of the Tax Code) have authority to control all substantial decisions of the trust or (B) that has a valid election in effect under applicable Treasury Regulations to be treated as a United States person.

If a partnership (or other entity or arrangement treated as a partnership or other pass-through entity for U.S. federal income tax purposes) is a holder of a Claim or Interest, the tax treatment of a partner (or other beneficial owner) generally will depend upon the status of the partner (or other beneficial owner) and the activities of the partner (or other beneficial owner) and the entity or arrangement.  Partners (or other beneficial owners) of partnerships (or other pass-through entities or arrangements) that are holders of Claims or Interests should consult their respective tax advisors regarding the U.S. federal income tax consequences of the Plan.

(1)     Consequences to Holders of General Unsecured Claims.

In full and final satisfaction of the Allowed General Unsecured Claims, holders will receive Cash, as applicable, and may receive distributions of undivided interests in the assets of the Liquidating Trust.  Such exchange generally is expected to be treated as a taxable exchange of such Allowed General Unsecured Claims for a U.S. Holder for U.S. federal income tax purposes. Such a U.S. Holder generally will recognize gain or loss equal to the difference between (i) the sum of the amount of any Cash and the fair market value of any undivided interests in the Liquidating Trust Assets, as applicable, received on account of its Allowed General Unsecured Claims and (ii) such U.S. Holder's adjusted tax basis in its Allowed General Unsecured Claims (other than any adjusted tax basis attributable to accrued but unpaid interest or accrued OID previously included in the holder's taxable income).

A U.S. Holder of Allowed General Unsecured Claims is expected to recognize interest income to the extent of any consideration allocable to accrued but unpaid interest not previously included in income.  Although no assurance can be given that the Service will accept, or that a court will uphold the position, to the extent that any Allowed General Unsecured Claim has any accrued but unpaid interest thereon, the Plan specifies that any distribution received by the U.S. Holders of Allowed General Unsecured Claims will generally be allocated first to the principal amount of such Claim (as determined for U.S. federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of such Claim, to accrued but unpaid interest (*see* Article VIII.J of the Plan), except as otherwise required by law.  Any amount allocated to accrued but unpaid interest is taxable to a U.S. Holder as ordinary interest income if such amount has not been previously included in the U.S. Holder's gross income for U.S. federal income tax purposes, regardless of whether such U.S. Holder realizes an overall gain or loss as a result of surrendering its Allowed General Unsecured Claim.  Conversely, a U.S. Holder may be able to recognize a deductible loss to the extent that any accrued interest was previously included in the U.S. Holder's gross income but was not paid in full by the Debtors.

Each holder of Allowed General Unsecured Claims should consult its tax advisor for information that may be relevant to its particular situation and circumstances, and the particular tax consequences to such holder of the transactions contemplated by the Plan.

(2)     Consequences to Holders of Existing Equity Interests.

Solely in the event that all Allowed Claims have been satisfied in full in accordance with

the Bankruptcy Code and the Plan, holders of Existing Equity Interest may receive their amount of proceeds realized from the Liquidating Trust Assets consistent with such holders' rights of payment existing immediately prior to the Petition Date. Accordingly, holders of Existing Equity Interests may be treated for U.S. federal income tax purposes as receiving distributions of undivided interests in the assets of the Liquidating Trust. Although not free from doubt, any receipt of such undivided interests generally should be treated as amounts received in exchange for the Existing Equity Interests for U.S. federal income tax purposes. Any such amounts generally should be treated as a return of capital to the extent of the holder's adjusted basis in its Existing Equity Interests, and any excess generally should be treated as capital gain from the sale or exchange of such Existing Equity Interests.

Each holder of Existing Equity Interests should consult its tax advisor for information that may be relevant to its particular situation and circumstances, and the particular tax consequences to such holder of the transactions contemplated by the Plan, including any specific tax rules applicable to such holder related to the S-Corp status of VPX.

(3)     Character of Gain or Loss, Basis and Holding Period.

Generally, the gain or loss recognized by a U.S. Holder with respect to an Allowed General Unsecured Claim or Existing Equity Interests that are held as "capital assets" within the meaning of Section 1221 of the Tax Code will be a capital gain or loss (subject to, in the case of Allowed General Unsecured Claims, the "accrued interest" rules described above) and otherwise, the gain or loss recognized will be ordinary. Any such capital gain or loss generally is long-term if the U.S. Holder's holding period in the Allowed General Unsecured Claim or Existing Equity Interests is more than one year and otherwise expected to be short-term. The deductibility of capital losses is subject to certain limitations.

A U.S. Holder's aggregate tax basis in its undivided interest in Liquidating Trust Assets, if applicable, is expected to be equal to fair market value of such interest increased by its share of the Debtors' liabilities to which such assets remain subject upon transfer to the Liquidating Trust, and the U.S. Holder's holding period generally will begin the day following establishment of the Liquidating Trust.

(4)     Multiple Distributions.

In the event of the subsequent disallowance of any Disputed Claim or the reallocation of undeliverable distributions, it is possible that a U.S. Holder of a previously Allowed General Unsecured Claim or Existing Equity Interests may receive additional distributions in respect of its Claim or Existing Equity Interests. U.S. Holders of Allowed General Unsecured Claims or Existing Equity Interests that receive distributions on multiple dates are urged to consult with their own tax advisors as to the tax consequences of such distributions, including the application of the installment sale rules.

**D.     Tax Treatment of the Liquidating Trust and Liquidating Trust Beneficiaries.**

As indicated above, the Liquidating Trustee shall transfer some or all of the Debtors' assets to the Liquidating Trust on behalf of all of the holders of Allowed General Unsecured Claims and, if applicable, to holders of Existing Equity Interests.

(1)  Classification of a Liquidating Trust.

The Liquidating Trust is intended to qualify as a "liquidating trust" for U.S. federal income tax purposes (other than in respect of any portion of the Liquidating Trust Assets allocable to, or retained on account of, Disputed Claims, as discussed below), and the following discussion assumes that the Liquidating Trust will so qualify.  In general, a liquidating trust is not a separate taxable entity but rather is treated for U.S. federal income tax purposes as a "grantor" trust (i.e., a pass-through entity).  The Service, in Revenue Procedure 94-45, 1994-2 C.B. 684, set forth the general criteria for obtaining a Service ruling as to the grantor trust status of a liquidating trust under a chapter 11 plan.  Any liquidating trust will be structured with the intention of complying with such general criteria.  Pursuant to the Plan, and in conformity with Revenue Procedure 94-45 all parties (including, without limitation, the Debtors, the Liquidating Trustee and Liquidating Trust Beneficiaries) shall treat the transfer of Liquidating Trust Assets to a Liquidating Trust as (1) a transfer of Liquidating Trust Assets (subject to any obligations relating to those assets) directly to Liquidating Trust Beneficiaries (other than to the extent Liquidating Trust Assets are allocable to Disputed Claims), followed by (2) the transfer by such Liquidating Trust Beneficiaries (subject to any obligations relating to those assets) to a Liquidating Trust in exchange for Liquidating Trust Interests.  Accordingly, except in the event of contrary definitive guidance, Liquidating Trust Beneficiaries shall be treated for U.S. federal income tax purposes as the grantors and owners of their respective share of Liquidating Trust Assets (other than such Liquidating Trust Assets as are allocable to Disputed Claims).

While the following discussion assumes that the Liquidating Trust would be so treated for U.S. federal income tax purposes, no ruling will be requested from the Service concerning the tax status of the Liquidating Trust as a grantor trust.  Accordingly, there can be no assurance that the Service would not take a contrary position to the classification of the Liquidating Trust as a grantor trust.  If the Service were to challenge successfully such classification, the U.S. federal income tax consequences to the Liquidating Trust and the holders of Claims or Existing Equity Interests could vary from those discussed herein.  Certain U.S. federal income tax consequences of the Liquidating Trust or portions thereof being treated as a "disputed ownership fund" within the meaning of section 1.468B-9 of the Treasury Regulations are also discussed below.

Each Liquidating Trust Beneficiary is urged to consult with its own tax advisor regarding the treatment of the Liquidating Trust for U.S. federal income tax purposes.

(2)  General Tax Reporting by a Liquidating Trust and Beneficiaries.

For all U.S. federal income tax purposes, all parties must treat the Liquidating Trust as a grantor trust of which the holders of Liquidating Trust Interests are the owners and grantors, and treat the Liquidating Trust Beneficiaries as the direct owners of an undivided interest in the Liquidating Trust Assets (other than any assets allocable to Disputed Claims), consistent with their economic interests therein.  The Liquidating Trustee will file tax returns for a Liquidating Trust treating such Liquidating Trust as a grantor trust pursuant to section 1.671-4(a) of the Treasury Regulations.  The Liquidating Trustee also shall annually send to each holder of a Liquidating Trust Interest a separate statement regarding the receipts and expenditures of the Liquidating Trust as relevant for U.S. federal income tax purposes and will instruct all such holders to use such information in preparing their U.S. federal income tax returns or to forward the appropriate

information to such holder's underlying beneficial holders with instructions to utilize such information in preparing their U.S. federal income tax returns.

All taxable income and loss of the Liquidating Trust will be allocated among, and treated as directly earned and incurred by, holders of the Liquidating Trust Interest. Allocations of taxable income of the Liquidating Trust (other than taxable income allocable to any assets allocable to, or retained on account of, Disputed Claims, if such income is otherwise taxable at the Liquidated Trust) among the Liquidating Trust Beneficiaries shall be determined by reference to the manner in which an amount of cash equal to such taxable income would be distributed (were such cash permitted to be distributed at such time) if, immediately prior to such deemed distribution, the Liquidating Trust had distributed all its assets (valued at their tax book value, and, if applicable, other than assets allocable to Disputed Claims) to the Liquidating Trust Beneficiaries, adjusted for prior taxable income and loss and taking into account all prior and concurrent distributions from the Liquidating Trust. Similarly, taxable loss of the Liquidating Trust shall be allocated by reference to the manner in which an economic loss would be borne immediately after a liquidating distribution of the remaining Liquidating Trust Assets. The tax book value of the Liquidating Trust Assets for purposes of allocating taxable income and loss shall equal their fair market value on the date of the transfer of the Liquidating Trust Assets to the Liquidating Trust, adjusted in accordance with tax accounting principles prescribed by the Tax Code, applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements.

As soon as reasonably practicable after the transfer of the Liquidating Trust Assets to the Liquidating Trust, the Liquidating Trustee shall make a good faith valuation of the Liquidating Trust Assets. All parties to the Liquidating Trust (including, without limitation, the Debtors, holders of Allowed Claims, holders of Existing Equity Interests (if applicable), and the Liquidating Trust Beneficiaries) must consistently use such valuation for all U.S. federal income tax purposes. The valuation will be made available, from time to time, as relevant for tax reporting purposes.

Taxable income or loss allocated to a Liquidating Trust Beneficiary will be treated as income or loss with respect to such Liquidating Trust Beneficiary's undivided interest in the Liquidating Trust Assets, and not as income or loss with respect to its prior Allowed General Unsecured Claim or, if applicable, the Existing Equity Interests (other than distributions made as a result of the subsequent disallowance of Disputed Claims or the reallocation of undeliverable distributions). The character of any income and the character and ability to use any loss will depend on the particular situation of the Liquidating Trust Beneficiary. The Liquidating Trust Interests will be non-transferable other than if transferred by will, intestate succession, or otherwise by operation of law.

The U.S. federal income tax obligations of a holder with respect to its Liquidating Trust Interest are not dependent on the Liquidating Trust distributing any cash or other proceeds, subject to any portion(s) of the Liquidating Trust allocable to Disputed Claims. Thus, a holder of Liquidating Trust Interests may incur a U.S. federal income tax liability with respect to its allocable share of Liquidating Trust income even if the Liquidating Trust does not make a concurrent distribution to the holder. In general, other than in respect of cash retained on account of Disputed Claims and distributions resulting from undeliverable distributions (the subsequent distribution of which still relates to a holder's Allowed Claim or, if applicable, Existing Equity Interests), a distribution of cash by the Liquidating Trust will not be separately taxable to a Liquidating Trust

Beneficiary since the beneficiary is already regarded for U.S. federal income tax purposes as owning the underlying assets (and was taxed at the time the cash was earned or received by the Liquidating Trust). Holders are urged to consult their tax advisors regarding the appropriate U.S. federal income tax treatment of any subsequent distributions of cash originally retained by the Liquidating Trust on account of Disputed Claims.

The Liquidating Trustee will comply with all applicable governmental withholding requirements. Thus, in the case of any Liquidating Trust Beneficiaries that are not U.S. persons, the Liquidating Trustee may be required to withhold up to 30% of the income or proceeds allocable to such persons, depending on the circumstances (including whether the type of income is subject to a lower rate under an applicable income tax treaty). As indicated above, the foregoing discussion of the U.S. federal income tax consequences of the Plan does not generally address the consequences to non-U.S. holders; accordingly, such holders should consult their tax advisors with respect to the U.S. federal income tax consequences of the Plan, including owning an interest in the Liquidating Trust.

(3)    Tax Reporting for Assets Allocable to Disputed Claims.

Subject to definitive guidance from the Service or a court of competent jurisdiction to the contrary (including the receipt by the Liquidating Trustee of a Service private letter ruling if the Liquidating Trustee so requests one, or the receipt of an adverse determination by the Service upon audit if not contested by the Liquidating Trustee), the Liquidating Trustee (A) may elect to treat any Liquidating Trust Assets allocable to, or retained on account of, Disputed Claims as a "disputed ownership fund" governed by section 1.468B-9 of the Treasury Regulations, and (B) to the extent permitted by applicable law, will report consistently with the foregoing for state and local income tax purposes.

Accordingly, if a DOF Election is made, any amounts allocable to, or retained on account of, a Disputed Claims reserve will be subject to tax annually on a separate entity basis on any net income earned with respect to the Liquidating Trust Assets in such reserve (including any gain recognized upon the disposition of such assets). All distributions from such reserves (which distributions will be net of the expenses, including taxes, relating to the retention or disposition of such assets) will be treated as received by holders in respect of their Claims or, if applicable, Existing Equity Interests as if distributed by the Debtors. All parties (including, without limitation, the Debtors, the Liquidating Trustee and the Liquidating Trust Beneficiaries) will be required to report for tax purposes consistently with the foregoing.

A reserve in respect of Disputed Claims will be responsible for payment, out of the assets of the reserve, of any taxes imposed on the reserve or its assets. In the event, and to the extent, any cash in the reserve is insufficient to pay the portion of any such taxes attributable to the taxable income arising from the assets of such reserve (including any income that may arise upon the distribution of the assets in such reserve), assets of the reserve may be sold to pay such taxes.

**E.    Withholding on Distributions and Information Reporting.**

All distributions to holders of Allowed General Unsecured Claims or holders of Existing Equity Interests under the Plan are subject to any applicable tax withholding. Under U.S. federal

income tax law, interest, dividends, and other reportable payments may, under certain circumstances, be subject to "backup withholding" at the then applicable withholding rate (currently 24%). Backup withholding generally applies if the holder (a) fails to furnish its social security number or other taxpayer identification number, (b) furnishes an incorrect taxpayer identification number, (c) fails properly to report interest or dividends, or (d) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the tax identification number provided is its correct number and that it is not subject to backup withholding. Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax. Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions. Holders of Allowed Claims or Existing Equity Interests are urged to consult their tax advisors regarding the Treasury Regulations governing backup withholding and whether the transactions contemplated by the Plan would be subject to these Treasury Regulations.

In addition, Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders are urged to consult their tax advisors regarding these Treasury Regulations and whether the transactions contemplated by the Plan would be subject to these Treasury Regulations and require disclosure on the holder's tax return.

THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF U.S. FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. ALL HOLDERS OF CLAIMS AND INTERESTS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, OR FOREIGN TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.

[Remainder of this page intentionally left blank.]

## X.

RECOMMENDATION AND CONCLUSION

The Debtors believe the Plan is in the best interests of their Estates, Creditors, Existing Equity Interests, and other interested parties and urge the holders of Impaired Claims and Existing Equity Interests entitled to vote to accept the Plan and to evidence such acceptance by properly voting and timely returning their ballots.

Dated: September 15, 2023                    Respectfully submitted,

Vital Pharmaceuticals, Inc., *et al.*

By: */s/ John C. DiDonato*
Name:  John C. DiDonato
Title: Chief Transformation Officer and Interim Chief Executive Officer

**EXHIBIT "1"**

**PLAN OF LIQUIDATION**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION
www.flsb.uscourts.gov

| | |
|---|---|
| In re: | Chapter 11 Cases |
| VITAL PHARMACEUTICALS, INC., *et al.*, | Case No.: 22-17842-PDR |
| Debtors.[1] | (Jointly Administered) |

_____/

## **DEBTORS' SECOND AMENDED JOINT PLAN OF LIQUIDATION**

**LATHAM & WATKINS LLP**
George A. Davis (admitted *pro hac vice*)
Tianjiao ("TJ") Li (admitted *pro hac vice*)
Brian S. Rosen (admitted *pro hac vice*)
Jonathan J. Weichselbaum (admitted *pro hac vice*)
1271 Avenue of the Americas
New York, NY 10020
Telephone:  (212) 906-1200
Email:  george.davis@lw.com
          tj.li@lw.com
          brian.rosen@lw.com
          jon.weichselbaum@lw.com

**LATHAM & WATKINS LLP**
Andrew D. Sorkin (admitted *pro hac vice*)
555 Eleventh Street, NW, Suite 1000
Washington, D.C. 20004
Telephone:  (202) 637-2200
Email:  andrew.sorkin@lw.com

**LATHAM & WATKINS LLP**
Whit Morley (admitted *pro hac vice*)
330 North Wabash Avenue, Suite 2800
Chicago, IL 60611
Telephone: (312) 876-7700
Email:  whit.morley@lw.com

**BERGER SINGERMAN LLP**
Jordi Guso
Florida Bar No. 863580
Michael J. Niles
Florida Bar No. 107203
1450 Brickell Avenue, Suite 1900
Miami, FL 33131
Telephone:  (305) 755-9500
Email:  jguso@bergersingerman.com
          mniles@bergersingerman.com

*Co-Counsel for the Debtors*
Dated: September 15, 2023

---

[1] The address of the Debtors is 1600 N. Park Drive, Weston, FL 33326.  The last four digits of the Debtors' federal tax identification numbers are: (i) Vital Pharmaceuticals, Inc. ("Vital Pharmaceuticals") (8430); (ii) Bang Energy Canada, Inc. (5454); (iii) JHO Intellectual Property Holdings, LLC (0010); (iv) JHO Real Estate Investment, LLC (9394); (v) Quash Seltzer, LLC ("Quash Seltzer") (6501); (vi) Rainbow Unicorn Bev LLC (2254); and (vii) Vital Pharmaceuticals International Sales, Inc. (8019).

## TABLE OF CONTENTS

**Page**

**ARTICLE I. DEFINITIONS AND INTERPRETATION** ........................................ 1

    A.    Definitions. .................................................................................. 1

    B.    Interpretation; Application of Definitions and Rules of Construction. ................ 15

    C.    Controlling Document. ................................................................. 15

**ARTICLE II. ADMINISTRATIVE EXPENSE, PRIORITY & DIP CLAIMS** ................. 16

    A.    Administrative Expense Claims. ...................................................... 16

    B.    Fee Claims. .............................................................................. 16

    C.    Priority Tax Claims. .................................................................... 17

    D.    DIP Claims. ............................................................................. 18

**ARTICLE III. CLASSIFICATION OF CLAIMS AND INTERESTS** ............................ 18

    A.    Classification in General. .............................................................. 18

    B.    Formation of Debtor Groups for Convenience Only. .............................. 18

    C.    Summary of Classification. ............................................................ 19

    D.    Special Provisions Governing Unimpaired Claims. ............................... 19

    E.    Elimination of Vacant Classes. ...................................................... 19

    F.    Voting Classes; Presumed Acceptance by Non-Voting Classes. ................. 20

    G.    Voting Classes; Acceptance and Rejection. ........................................ 20

    H.    Confirmation Pursuant to Section 1129(a)(10) and 1129(b) of the
          Bankruptcy Code. ...................................................................... 20

    I.    Nonconsensual Confirmation. ........................................................ 20

    J.    Subordinated Claims. .................................................................. 21

    K.    Single Satisfaction of Claims. ......................................................... 21

**ARTICLE IV. TREATMENT OF CLAIMS AND INTERESTS** ................................ 21

    A.    Other Secured Claims (Class 1). ...................................................... 21

    B.    Other Priority Claims (Class 2). ...................................................... 22

    C.    Allowed General Unsecured Claims (Class 3). .................................... 22

    D.    Intercompany Claims (Class 4). ...................................................... 23

    E.    Other Subordinated Claims (Class 5). ............................................... 23

    F.    Existing Equity Interests (Class 6). .................................................. 23

**ARTICLE V. MEANS FOR IMPLEMENTATION OF THE PLAN** ........................... 23

    A.    Joint Chapter 11 Plan. .................................................................. 23

    B.    Corporate Action. ...................................................................... 24

## TABLE OF CONTENTS
(continued)

**Page**

**ARTICLE VI. LIQUIDATING TRUST**.................................................................24

    A.    Establishment of the Liquidating Trust...........................................24

    B.    Purpose of the Liquidating Trust. ..................................................24

    C.    Liquidating Trust Assets. ...............................................................25

    D.    Non-Transferability of Liquidating Trust Interests........................26

    E.    Administration of Liquidating Trust...............................................26

    F.    Liquidating Trust Oversight Committee .........................................26

    G.    Liquidating Trustee's Conflict of Interest. .....................................27

    H.    Liquidating Trustee. .......................................................................28

    I.    Cash Investments. ..........................................................................30

    J.    No Revesting of Liquidating Trust Assets......................................30

    K.    Distribution of Liquidating Trust Assets. .......................................30

    L.    Liquidating Trust Mechanics. ........................................................31

    M.    Tax Reporting. ...............................................................................32

    N.    Dissolution. ....................................................................................33

    O.    Post-Effective Date Reporting. ......................................................34

    P.    Effectuating Documents; Further Transactions. .............................34

    Q.    Withholding and Reporting Requirements. .....................................34

    R.    Exemption From Certain Transfer Taxes. .......................................35

    S.    Preservation of Rights of Action....................................................35

    T.    Closing of the Chapter 11 Cases. ...................................................36

    U.    Notice of Effective Date. ...............................................................36

**ARTICLE VII. CORPORATE GOVERNANCE** ...............................................36

    A.    Corporate Form...............................................................................36

    B.    Post-Effective Date Governance of the Debtors..............................36

    C.    Corporate Existence. ......................................................................37

    D.    Certificates of Formation and By-Laws..........................................37

**ARTICLE VIII. DISTRIBUTIONS** .....................................................................38

    A.    Distributions Generally...................................................................38

    B.    Distribution Record Date. ...............................................................38

    C.    Date of Distributions. .....................................................................38

    D.    Reserve on Account of Disputed Claims.........................................38

# TABLE OF CONTENTS
(continued)

**Page**

E.      Delivery of Distributions & Unclaimed Property. ...................................... 39

F.      Manner of Distribution. ................................................................................ 40

G.      No Postpetition Interest on Claims. ............................................................. 40

H.      Minimum Cash Distributions. ...................................................................... 40

I.      Setoffs and Recoupments. ............................................................................ 40

J.      Allocation of Distributions Between Principal and Interest. ........................ 41

K.      Payment of Disputed Claims. ...................................................................... 41

**ARTICLE IX. PROCEDURES FOR DISPUTED CLAIMS** ..................................... 41

A.      Allowance of Claims. .................................................................................. 41

B.      Objections to Claims. .................................................................................. 41

C.      Estimation of Claims. .................................................................................. 42

D.      No Distributions Pending Allowance. ......................................................... 42

E.      Resolution of Claims. .................................................................................. 42

F.      Disallowed Claims. ...................................................................................... 42

G.      Claims Paid and Payable by Third Parties. .................................................. 43

H.      Amendments to Proofs of Claim. ................................................................ 43

**ARTICLE X. EXECUTORY CONTRACTS** ............................................................... 43

A.      Rejection of Executory Contracts. .............................................................. 43

B.      Cure of Defaults for Assumed Executory Contracts. ................................... 43

C.      Claims Based Upon Rejection of Executory Contracts. ............................... 44

D.      Modifications, Amendments, Supplements, Restatements, or Other
        Agreements. ................................................................................................. 44

E.      Reservation of Rights. ................................................................................. 45

F.      Insurance Policies. ....................................................................................... 45

G.      Survival of Debtors' Indemnification Obligations. ...................................... 46

**ARTICLE XI. CONDITIONS PRECEDENT TO THE EFFECTIVE DATE** ................. 46

A.      Conditions Precedent to the Effective Date. ............................................... 46

B.      Waiver of Conditions Precedent. ................................................................. 47

C.      Effect of Failure of Conditions to Effective Date. ...................................... 47

**ARTICLE XII. EFFECT OF CONFIRMATION** ....................................................... 47

A.      Vesting of Assets. ........................................................................................ 47

B.      Release of Liens. ......................................................................................... 47

## TABLE OF CONTENTS
(continued)

**Page**

C. Binding Effect. ..................................................................................... 48

D. Sale Order. ........................................................................................... 48

E. Term of Injunctions or Stays. ................................................................ 48

F. Compromise and Settlement. ................................................................. 48

G. Debtor Release. ..................................................................................... 48

H. Releases by Holders of Claims and Interests ......................................... 50

I. Exculpation. .......................................................................................... 51

J. Injunctions. ........................................................................................... 53

K. Gatekeeper Provision. ........................................................................... 53

**ARTICLE XIII. RETENTION OF JURISDICTION** ............................................... 54

**ARTICLE XIV. MISCELLANEOUS PROVISIONS** ............................................... 56

A. Payment of Statutory Fees. .................................................................... 56

B. Post-Confirmation Reporting. ................................................................ 56

C. Substantial Consummation. ................................................................... 56

D. Amendments. ........................................................................................ 56

E. Revocation or Withdrawal of the Plan. ................................................... 57

F. Severability of Plan Provisions Upon Confirmation. ............................... 57

G. Governing Law. ..................................................................................... 57

H. Time. ..................................................................................................... 58

I. Additional Documents. .......................................................................... 58

J. Dates of Actions to Implement the Plan. ................................................ 58

K. Immediate Binding Effect. ..................................................................... 58

L. Deemed Acts. ........................................................................................ 59

M. Successor and Assigns. .......................................................................... 59

N. Solicitation of the Plan. .......................................................................... 59

O. Plan Supplement. ................................................................................... 59

P. Entire Agreement. .................................................................................. 59

Q. Exhibits to Plan. .................................................................................... 60

R. Notices. ................................................................................................. 60

.

Each of (i) Vital Pharmaceuticals, Inc., (ii) Bang Energy Canada, Inc., (iii) JHO Intellectual Property Holdings, LLC, (iv) JHO Real Estate Investment, LLC, (v) Quash Seltzer, LLC, (vi) Rainbow Unicorn Bev LLC and (vii) Vital Pharmaceuticals International Sales, Inc. (each a "Debtor" and collectively, the "Debtors") proposes the following joint chapter 11 plan of liquidation pursuant to section 1121(a) of the Bankruptcy Code.  Capitalized terms used herein shall have the means set forth in Article I.A. below.

Although proposed jointly for administrative purposes, the Plan constitutes a separate Plan for each Debtor for the resolution of outstanding Claims and Interests pursuant to the Bankruptcy Code.  The Debtors consummated the Sale Transaction in accordance with the Sale Order.  The Debtors are liquidating and winding down their Estates.

This Plan reflects the terms of a global settlement between the Debtors, Creditors' Committee, certain Prepetition Lenders, Prepetition Agent, certain DIP Lenders, DIP Agent, Monster, MEC, MBC and OBI as memorialized in the *Settlement Term Sheet* dated June 28, 2023 [ECF No. 1548], as approved by the Court on July 14, 2023 [ECF No. 1644].

## ARTICLE I.
## DEFINITIONS AND INTERPRETATION

### A.    Definitions.

Unless the context otherwise requires, the following terms shall have the following meanings when used in capitalized form herein:

(1)    "*Acquired Causes of Action*" means any Cause of Action sold, transferred and assigned by the Debtors to the Purchaser pursuant to, and in accordance with, the Asset Purchase Agreement.

(2)    "*Administrative Expense Claim*" means any Claim (other than an Intercompany Claim) for costs and expenses of administration during the Chapter 11 Cases pursuant to sections 328, 330, 331, 363, 365, 503(b), 507(a)(2), 507(b) or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estates and operating the businesses of the Debtors (such as wages, salaries, or commissions for services and payments for goods and other services and leased premises); (b) Fee Claims; (c) Section 503(b)(9) claims; and (d) all fees and charges assessed against the Estates pursuant to sections 1911 through 1930 of chapter 123 of title 28 of the United States Code, 28 U.S.C.  §§ 1-1401.

(3)    "*Administrative Expense Claims Bar Date*" means October 26, 2023.

(4)    "*Administrative Expense Claims Bar Date Order*" means the *Order Granting Debtors' Expedited Motion to Fix Bar Date for Filing Applications Seeking Administrative Expenses and to Designate Form and Manner of Notice of Bar Date* [ECF No.___].

(5)    "*Administrative Expense Claims Objection Bar Date*" means the first Business Day that is one hundred eighty (180) calendar days following the Effective Date, except as otherwise specifically set forth in the Plan; *provided that*, the Administrative Claims Objection Bar Date may

be extended pursuant to an order of the Bankruptcy Court upon a motion filed by the Liquidating Trustee after notice and a hearing.

(6) "*Affiliate*" has the meaning set forth in section 101(2) of the Bankruptcy Code.

(7) "*Allowed*" means with reference to any Claim (i) any Claim against the Debtors that has been listed in the Schedules, as such Schedules may be amended by the Debtors from time to time in accordance with Bankruptcy Rule 1009, as liquidated in amount and not disputed or contingent and for which no contrary proof of Claim has been filed, (ii) any Claim listed on the Schedules or included in a timely filed proof of Claim, as to which no objection to allowance has been, or subsequently is, interposed in accordance with Article IX.B. of the Plan or prior to the expiration of such other applicable period of limitation fixed by the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or as to which any objection has been determined by a Final Order to the extent such Final Order is in favor of the respective holder, (iii) any Claim expressly allowed by a Final Order or pursuant to the terms of the Plan, or (iv) any Claim that is compromised, settled, or otherwise resolved pursuant to the authority of the Debtors under this Plan.

(8) "*Asset Purchase Agreement*" means that certain Asset Purchase Agreement, dated June 28, 2023 by and among each of the Debtors, as sellers, Blast Asset Acquisition, LLC, as buyer, and Monster Energy Company (solely for purposes of Section 7.16 of the Asset Purchase Agreement) and Monster Beverage Corporation (solely for purposes of Sections 7.16 and 1016 of the Asset Purchase Agreement), inclusive of the terms of the Side Letter Agreement dated as of July 10, 2023, entered into by and between certain of the Debtors and Blast Asset Acquisition, LLC, pursuant to Section 10.1 of the Asset Purchase Agreement attached to the *Notice of Auction Cancellation and Successful Bidder* filed on the docket on June 28, 2023 [ECF No. 1546].

(9) "*Avoidance Actions*" means those actual and/or potential claims and causes of action under sections 502(d), 544, 545, 547, 548, 550 and 553 of the Bankruptcy Code, or any other avoidance actions under the Bankruptcy Code or state law equivalents.

(10) "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.*, as amended from time to time, as applicable in the Chapter 11 Cases.

(11) "*Bankruptcy Court*" means the United States Bankruptcy Court for the Southern District of Florida, Fort Lauderdale Division, having jurisdiction over the Chapter 11 Cases and, to the extent of any reference made under section 157 of title 28 of the United States Code, the unit of such District Court having jurisdiction over the Chapter 11 Cases under section 151 of title 28 of the United States Code.

(12) "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure, promulgated by the United States Supreme Court under 28 U.S.C. § 2075, the Local Rules of the Bankruptcy Court, and general orders and chambers procedures of the Bankruptcy Court, each as amended to be applicable to the Chapter 11 Cases.

(13) "*Bar Date Order*" means that certain *Notice of Chapter 11 Bankruptcy Case*" dated as of October 14, 2022 [ECF No. 114], establishing December 19, 2022 as the general bar date for filing proofs of Claim in the Chapter 11 Cases.

(14)   "*Bidding Procedures Order*" means that *Order (I) Approving Bidding Procedures, (II)* Authorizing *The Debtors to Provide Bid Protections, and (III) Granting Related Relief* dated February 24, 2023 [ECF No. 854].

(15)   "*Business Day*" means any day, other than a Saturday, a Sunday, a "legal holiday" (as that term is defined in Bankruptcy Rule 9006(a)), or any other day on which banking institutions in Miami, Florida are required to close by law or executive order.

(16)   "*Buyer*" means Blast Asset Acquisition LLC in its capacity as buyer under the Asset Purchase Agreement.

(17)   "*California District Court*" means the United States District Court for the Central District of California.

(18)   "*California District Court Action*" means the action involving Vital Pharmaceuticals, Inc., MEC, and John H. "Jack" Owoc filed in the California District Court, captioned *Monster Energy Co. v. Vital Pharmaceuticals, Inc.*, Case No. 18-cv-1882 (C.D. Cal., filed Sept. 4, 2018), including the appeals thereof and any other related Proceedings.

(19)   "*California District Court Action Allowed Unsecured Claim*" means an allowed general unsecured claim in the Chapter 11 Cases in favor of MEC in an amount equal to (i) $292,939,761.00, minus the amount of any remittitur granted by the California District Court pursuant to any ruling on the Seller Post-Verdict Motion (or, in the case of a judgment notwithstanding the verdict in favor of Vital Pharmaceuticals, Inc. or a grant of a new trial, minus the entire amount), plus accrued interest (if any) until the Petition Date, plus (ii) fifty percent (50%) of any additional award as shall be determined by the California District Court, including, pursuant to any ruling on the MEC Post-Verdict Motion, plus accrued interest until the Petition Date.

(20)   "*Cash*" means legal tender of the United States of America.

(21)   "*Carve-Out Escrow*" means $20,050,000 in proceeds of the Sale Transaction deposited by the Debtors in a segregated account in accordance with the Sale Order and the Final DIP Order, which shall be used by the Debtors and the Liquidating Trustee solely to pay Allowed Fee Claims.

(22)   "*Causes of Action*" means any action, Claim, cross-claim, third-party claim, cause of action, controversy, demand, right, Lien, indemnity, contribution, guaranty, suit, obligation, liability, debt, damage, judgment, account, defense, remedy, offset, power, privilege, license, and franchise of any kind or character whatsoever, known, unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, foreseen or unforeseen, direct or indirect, choate or inchoate, secured or unsecured, assertable directly or derivatively (including, without limitation, under alter ego theories), whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity or pursuant to any other theory of law.  For the avoidance of doubt, Causes of Action includes: (i) Avoidance Actions; (ii) any right of setoff, counterclaim or recoupment and any Claim for breach of contract or for breach of duties imposed by law or in equity; (iii) the right to object to Claims or Interests; (iv) any Claim or defense including fraud, mistake, duress, and usury and any other defenses set

forth in section 558 of the Bankruptcy Code; and (v) any Claims under any state or foreign law, including, without limitation, any fraudulent transfer or similar Claims.

(23)     "*Chapter 11 Cases*" means the cases under chapter 11 of the Bankruptcy Code commenced by the Debtors on October 10, 2022 under Case No. 22-17842-PDR.

(24)     "*Chief Transformation Officer*" means John DiDonato, Huron Consulting Group, LLC ("HCG"), and the other HCG personnel assisting John DiDonato in carrying out his duties and responsibilities pursuant to a Final Order of the Bankruptcy Court granting the HCG retention application [ECF No. 395].

(25)     "*Claim*" has the meaning set forth in section 101(5) of the Bankruptcy Code.

(26)     "*Claims Objection Bar Date*" means the first Business Day that is one hundred eighty (180) calendar days after the Effective Date; *provided that*, the Claims Objection Bar Date may be extended pursuant to an order of the Bankruptcy Court upon a motion filed by the Liquidating Trustee.  For the avoidance of doubt, the Claims Objection Bar Date is separate from the Administrative Expense Claims Bar Date.

(27)     "*Class*" means any group of Claims or Interests classified pursuant to <u>Article III</u> of the Plan.

(28)     "*Closing*" has the meaning given to such term in Section 4.1 of the Asset Purchase Agreement.

(29)     "*Closing Date*" has the meaning given to such term in Section 4.1 of the Asset Purchase Agreement.

(30)     "*Confirmation*" means the entry of the Confirmation Order on the docket of the Chapter 11 Cases.

(31)     "*Confirmation Date*" means the date on which the Confirmation Order is entered by the Bankruptcy Court.

(32)     "*Confirmation Hearing*" means the hearing to be held by the Bankruptcy Court regarding Confirmation of the Plan, as such hearing may be adjourned or continued from time to time.

(33)     "*Confirmation Order*" means the order of the Bankruptcy Court confirming the Plan.

(34)     "*Consent Right Parties*" means the Creditors' Committee, the DIP Agent, MBC, MEC and OBI.

(35)     "*Consummation*" means the occurrence of the Effective Date of the Plan.

(36)     "*Creditors' Committee*" means the statutory committee of unsecured creditors appointed by the U.S. Trustee in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy

12218776-23

Code, as the same may be reconstituted from time to time and its members, but only in such members' capacity as members of the Creditors' Committee.

(37)    "*D&O Policy*" means any insurance policy for directors, members, trustees, and officers liability maintained by the Debtors as of the Effective Date.

(38)    "*Debtor Released Parties*" means (i) the DIP Lenders; (ii) DIP Agent; (iii) the Prepetition Secured Parties; (iv) the Buyer, MBC and MEC; (v) OBI; (vi) the Creditors' Committee; (vii) with respect to each of the foregoing Persons in clauses (i) through (vi), such Persons' respective predecessors, successors, assigns, direct and indirect subsidiaries, and affiliates, current and former officers, directors, principals, shareholders, members, partners, managers, employees, agents, financial advisors, attorneys; and (viii) the Debtors' current and former officers, directors, managers, attorneys', accountants, investment bankers, investment managers, investment advisors, consultants, representatives, and other professionals, and such Person's respective heirs, executors, estates, and nominees, in each case in their capacity as such; *provided*, however, that notwithstanding anything in this Plan to the contrary, each of the Excluded Parties, in any capacity, shall not be a Debtor Released Party.

(39)    "*Debtors*" means (i) Vital Pharmaceuticals, Inc., (ii) Bang Energy Canada, Inc., (iii) JHO Intellectual Property Holdings, LLC, (iv) JHO Real Estate Investment, LLC, (v) Quash Seltzer, LLC, (vi) Rainbow Unicorn Bev LLC, and (vii) Vital Pharmaceuticals International Sales, Inc.

(40)    "*Deficiency Claim*" means a General Unsecured Claim for the difference between (a) the aggregate amount of an Allowed Secured Claim, and (b) the value received on account of such Claim from the proceeds of the Sale Transaction.

(41)    "*DIP Agent*" has the meaning set forth in the Final DIP Order.

(42)    "*DIP Cash Paydown*" means Cash proceeds of the Sale Transaction in the amount $269,000,000 paid to the DIP Agent for application to the DIP Claim in accordance with the DIP Credit Agreement on the Closing Date from the proceeds of the Sale Transaction.

(43)    "*DIP Claim*" means any Claim of the DIP Lenders arising under the DIP Credit Agreement, the DIP Documents, or the Final DIP Order.

(44)    "*DIP Collateral*" has the meaning set forth in the Final DIP Order.

(45)    "*DIP Credit Agreement*" means that certain *Superpriority Secured Debtor-In-Possession Credit Agreement* dated as of October 18, 2022, as amended, supplemented, or otherwise modified, by and among, Vital Pharmaceuticals, Inc., as borrower, its Affiliates and Subsidiaries identified therein as guarantors, and the DIP Lenders and the DIP Agent.

(46)    "*DIP Deficiency Claim*" means the Deficiency Claim of the DIP Lenders on account of the DIP Claim in the amount of $48 million plus accrued interest through the Effective Date, which is classified and treated as an Allowed Class 3 Claim.

(47)    "*DIP Documents*" has the meaning set forth in the Final DIP Order.

(48)    "*DIP Lenders*" has the meaning set forth in the Final DIP Order.

(49)    "*DIP* Obligations" has the meaning set forth in the Final DIP Order.

(50)    "*Disclosure Statement*" means the Disclosure Statement for this Plan, which is prepared and distributed in accordance with sections 1125, 1126(b) and/or 1145 of the Bankruptcy Code, Bankruptcy Rule 3018 and/or other applicable law.

(51)    "*Disputed Claim*" means with respect to a Claim, any such Claim (i) to the extent neither Allowed nor disallowed under the Plan or a Final Order nor deemed Allowed under section 502, 503, or 1111 of the Bankruptcy Code, or (ii) for which a Proof of Claim has been filed, to the extent the Debtors or any party in interest has interposed a timely objection or request for estimation before the Confirmation Date in accordance with the Plan, which objection or request for estimation has not been withdrawn or determined by a Final Order.

(52)    "*Distribution Date*" means a date or dates, including the Initial Distribution Date, as determined by the Liquidating Trustee in accordance with the terms of the Plan, on which the Liquidating Trustee makes a distribution to holders of Allowed Claims.

(53)    "*Distribution Record Date*" means the Effective Date of the Plan.

(54)    "*Effective Date*" means the date on which all conditions to the effectiveness of the Plan set forth in <u>Article XI</u> of the Plan have been either satisfied or waived in accordance with the terms of the Plan.

(55)    "*Enjoined Parties*" means all Entities who have held, hold, or may hold Claims, Interests, Causes of Action, or liabilities that: (i) are subject to compromise and settlement pursuant to the terms of the Plan; (ii) have been released pursuant to Article XII.G. of the Plan; (iii) have been released pursuant to Article XII.H. of the Plan; (iv) are subject to exculpation pursuant to Article XII.I. of the Plan; or, (v) are otherwise discharged, satisfied, stayed or terminated pursuant to the terms of the Plan.

(56)    "*Entity*" has the meaning set forth in section 101(15) of the Bankruptcy Code.

(57)    "*Estate*" or "*Estates*" means individually or collectively, the estate or estates of the Debtors created under section 541 of the Bankruptcy Code.

(58)    "*Excluded Assets*" has the meaning set forth in the Asset Purchase Agreement and shall include Retained Causes of Action.

(59)    "*Exculpated Parties*" means, collectively, each in their capacities as such: (i) the Debtors; (ii) the Estates; (iii) the DIP Lenders; (iv) the DIP Agent; (v) the Prepetition Secured Parties; (vi) the Buyer, MBC and MEC; (vii) OBI; (viii) the Creditors' Committee; (ix) with respect to each of the foregoing Persons in clauses (i) through (viii), such Persons' respective predecessors, successors, assigns, direct and indirect subsidiaries, and affiliates; (x) with respect to each of the foregoing Persons in clauses (i) through (vii), such Persons' current and former officers, directors, principals, shareholders, members, partners, managers, employees, agents, financial advisors, attorneys, Chief Transformation Officer, interim officers, accountants,

investment bankers, investment managers, investment advisors, consultants, representatives, and other professionals, and such Person's respective heirs, executors, estates, and nominees, in each case in their capacity as such and whether currently serving or having previously served post-petition; *provided, however*, that notwithstanding anything in this Plan to the contrary, each of the Excluded Parties, in any capacity, shall not be an Exculpated Party.

(60)    "*Excluded Parties*" means each of John "Jack" H. Owoc, Megan E. Owoc, each of their family members, any of their Affiliates, and any trusts or other estate planning vehicles of which any of the foregoing are trustees or beneficiaries, in each case that are not Selling Entities, including, but not limited to, Entourage IP Holdings, LLC, Cognitive IP Holdings, LLC, Fun Energy, LLC, Bang Energy Family, LLC, Bang Gyms, LLC, Candemonium, LLC, Captain Crunch Fishing, LLC, Liquid IP Holdings, LLC, The Fixx, LLC, Bang Vapes, LLC, Ultra Experiences, LLC, Bang Foods, LLC, Energy Train, LLC, VPX Swim and Sports Gear, LLC, Stoked Seltzer, LLC, Stoked Brands, LLC, Birth Right, LLC, Bang Energy International, LLC, JHO GA-1 Investment, LLC, JHO NV-1 Investment, LLC, Sheridan Real Estate Investment A, LLC, Sheridan Real Estate Investment B, LLC and Sheridan Real Estate Investment C, LLC.

(61)    "*Executory Contract*" means a contract or lease to which one of more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

(62)    "*Existing Equity Interests*" means any Interest in any of the Debtors held by a non-Debtor, including any common stock, preferred stock, limited liability company or membership interest, warrants, preemptive rights or other ownership interest.

(63)    "*Fee Claim*" means a Claim for professional services rendered or costs incurred on or after the Petition Date through the Effective Date by professional persons retained by the Debtors or the Creditors' Committee pursuant to sections 327, 328, 329, 330, 331, 363, 503(b) or 1103 of the Bankruptcy Code in the Chapter 11 Cases.

(64)    "*Final DIP Order*" means that certain *Final Order (I) Approving Postpetition Financing, (II) Authorizing Use of Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, and (VI) Granting Related Relief* [ECF No. 638], entered by the Bankruptcy Court in the Chapter 11 Cases on January 12, 2023.

(65)    "*Final Order*" means an order or judgment of a court of competent jurisdiction that has been entered on the docket maintained by the clerk of such court, which has not been reversed, vacated, or stayed and as to which (i) the time to appeal, petition for *certiorari*, or move for a new trial, reargument or rehearing shall have expired, or (ii) if an appeal, writ of *certiorari*, new trial, reargument or rehearing thereof has been sought, such order or judgment shall have been affirmed by the highest court to which such order was appealed, or *certiorari* shall have been denied, or a new trial, reargument or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for *certiorari* or move for a new trial, reargument or rehearing shall have expired; *provided, however*, that no order or judgment shall fail to be a "Final Order" solely because a motion pursuant to sections 502(j) or 1144 of the

7

Bankruptcy Code or under Rule 60 of the Federal Rules of Civil Procedure or Bankruptcy Rule 9024 has been or may be filed with respect to such order or judgment.

(66)    "*General Unsecured Claim*" means any Claim against any Debtor, other than an Administrative Expense Claim, Other Priority Claim, Priority Tax Claim, Intercompany Claim or Other Subordinated Claim, which Claim, for the avoidance of doubt, is not entitled to administrative expense treatment or other priority under the Bankruptcy Code or any order of the Bankruptcy Court.

(67)    "*Governmental Authority*" means any federal, municipal, state, regional, provincial, local or foreign governmental, quasi-governmental, self-regulatory, administrative or regulatory authority, department, agency, board, bureau, commission or body (including any court, arbitral body or similar tribunal), including the Bankruptcy Court.

(68)    "*Governmental Unit*" has the meaning set forth in section 101(27) of the Bankruptcy Code.

(69)    "*Impaired*" means, with respect to a Claim, Interest or Class of Claims or Interests, "*impaired*" within the meaning of section 1124 of the Bankruptcy Code.

(70)    "*Indemnification Claim*" means an Administrative Expense Claim of an Indemnitee against any Debtor for indemnification pursuant to the Debtors' corporate charters, by-laws, limited liability company agreements, memorandum and articles of association, or other organizational documents and agreements.

(71)    "*Indemnitee*" means the current and former officers, directors, agents, or employees of the Debtors entitled to indemnification from the Debtors pursuant to the Debtors' corporate charters, by-laws, limited liability company agreements, memorandum and articles of association, or other organizational documents and agreements; excluding, however, any Excluded Party.

(72)    "*Indemnity Reserve*" means Cash in the amount of $1,300,000.00, less any sums paid by the Debtors prior to the Effective Date under any indemnity obligations in favor of the Indemnitees, on account of retainers, fees or expenses to any professionals retained by the Debtors' Indemnitees.

(73)    "*Initial Distribution*" means the first distribution that either the Debtors or the Liquidating Trustee, as applicable, makes to holders of Allowed Claims.

(74)    "*Initial Distribution Date*" means the date selected by the Debtors or the Liquidating Trustee, as the case may be, on or as soon as reasonably practicable after the Effective Date.

(75)    "*Interests*" means any equity security in a Debtor as defined in section 101(16) of the Bankruptcy Code, including all common units, subordinated units, incentive distribution rights, membership units, or other instruments evidencing an ownership interest in any of the Debtors, whether or not transferable, and any option, warrant or right, contractual or otherwise, to acquire any such interests in a Debtor that existed immediately before the Effective Date.

8

(76) "*Interim Compensation Procedures Order*" means the *Order Granting Ex Parte Motion To Amend* The *Interim Compensation Procedures Order,* dated December 12, 2022 [ECF No. 503].

(77) "*Intercompany Claim*" means a Claim held by one Debtor against the other Debtor arising at any time prior to the Effective Date.

(78) "*Lien*" has the meaning set forth in section 101(37) of the Bankruptcy Code.

(79) "*Liquidating Trust*" means the trust created on the Effective Date in accordance with the provisions of Article VI of the Plan and a Liquidating Trust Agreement, for the benefit of holders of Allowed Claims, as determined by the Liquidating Trustee consistent with the purposes of any such Liquidating Trust pursuant to Article VI of the Plan.

(80) "*Liquidating Trust Agreement*" means an agreement setting forth the terms and conditions governing the administration of a Liquidating Trust, which shall be entered into prior to the establishment of such Liquidating Trust and pursuant to which a Liquidating Trustee shall manage and administer Liquidating Trust Assets and distribute the Recovery Proceeds in accordance with this Plan.

(81) "*Liquidating Trust Assets*" means the Excluded Assets of a Debtor to be transferred to the Liquidating Trust which shall be segregated between the Excluded Assets available under the Plan for those holders of (i) Allowed Class 3 Claims and (ii) Allowed Administrative Expense Claims which remain unpaid as of the Effective Date.

(82) "*Liquidating Trust Beneficiaries*" means those holders of (i) Allowed Class 3 Claims against a Debtor and (ii) Allowed Administrative Expense Claims against a Debtor which remain unpaid as of the Effective Date.

(83) "*Liquidating Trust Interests*" means the non-certificated beneficial interests of the Liquidating Trust allocable to Liquidating Trust Beneficiaries in accordance with the terms, conditions, and priorities set out in the Plan and the Liquidating Trust Agreement entitling each Liquidating Trust Beneficiary to distributions or proceeds (if any) of the Liquidating Trust.

(84) "*Liquidating Trustee*" means the Person who, as of the Effective Date, shall exercise the authority set forth in Article VI of the Plan pursuant to the Liquidating Trust Agreement in accordance with the terms of the Plan.

(85) "*MBC*" means Monster Beverage Corporation.

(86) "*MEC*" means Monster Energy Company.

(87) "*MEC Post-Verdict Motion*" means that certain Plaintiff Monster Energy Company's Post-*Verdict Motion for Equitable Relief, Fees, and Costs* filed at docket number 928 by MEC that is pending before the court in the California District Court Action.

(88) "*OBI*" means Orange Bang, Inc.

12218776-23

(89)    "*OBI/Monster Matter*" means the action including Vital Pharmaceuticals, Inc., JHO Intellectual Property Holdings, LLC, OBI, and MEC filed in the United States District Court for the Central District of California, captioned *Vital Pharms., Inc. and JHO Intellectual Prop. Holdings, LLC v. Orange Bang, Inc. and Monster Energy Co.*, Case No. 5:20-cv-1464, including the related arbitration proceedings and ruling, judgment, and appeals and other related Proceedings.

(90)    "*OBI/Monster Matter Allowed Unsecured Claim*" means an allowed general unsecured claim in the Chapter 11 Cases jointly in favor of MEC and OBI in the amount of $216,131,658.35, plus accrued interest until the Petition Date.

(91)    "*Orange Bang Trademark License Action*" means the adversary proceeding filed in the Bankruptcy Case by the Debtor Entities Vital Pharmaceuticals, Inc. and JHO Intellectual Property Holdings, LLC against OBI and MEC, captioned *Vital Pharmaceuticals, Inc. and JHO Intellectual Property Holdings, LLC v. Orange Bang, Inc. and Monster Energy Company*, Bankr. Adv. Pro. No. 23-01031, including the related Proceeding pending in the United States District Court for the Southern District of Florida, Case No. 23-cv-60599, the related Proceeding pending in the United States District Court for the Central District of California, Case No. 23-cv03862, and any other related Proceedings.

(92)    "*Other Secured Claim*" means a Secured Claim other than the DIP Claims.

(93)    "*Other Subordinated Claims*" means any Claim, (i) of any Person or Entity that is liable with the respective Debtor on or has secured the Claim of another creditor to the extent that such co-obligor's Claim is for indemnity, contribution, or reimbursement and is not Allowed on or before the Confirmation Date and which such Claim has not been paid pursuant to section 509(b) of the Bankruptcy Code, (ii) any Claim for penalties or punitive damages and any other Claim of the type described in section 726(a)(4) of the Bankruptcy Code (and notwithstanding the general inapplicability of chapter 7 of the Bankruptcy Code), including any lien securing such Claim, (iii) any Claim subordinated under section 510 of the Bankruptcy Code and any lien securing such Claim, or (iv) any Claim subordinated per the terms of the Plan, the Settlement Agreement, or otherwise by Final Order of the Bankruptcy Court.

(94)    "*Oversight Committee*" shall have the meaning ascribed to such term as set forth in Article VI.F. of the Plan.

(95)    "*Person*" has the meaning set forth in section 101(15) of the Bankruptcy Code.

(96)    "*Petition Date*" means October 10, 2022.

(97)    "*Plan*" means this joint chapter 11 plan of liquidation, including the exhibits hereto and the Plan Supplement, as the same may be amended or modified from time to time by the Debtors with the consent of the Consent Right Parties in accordance with Article XIV.D. of the Plan.

(98)    "*Plan Supplement*" means the compilation of documents containing, among other things, information required to be disclosed in accordance with section 1129(a)(5) of the Bankruptcy Code and filed pursuant to Article XIV.O. of the Plan; *provided that*, through the

10

Effective Date, the Debtors shall have the right, with the consent of the Consent Right Parties, to amend any schedules, exhibits, or amendments to any of the documents contained in, and exhibits to, the Plan Supplement.  The Plan Supplement shall include: (i) the identity of the Liquidating Trustee and the terms of his or her compensation; (ii) the Liquidating Trustee Agreement; (iii) the list of Retained Causes of Action; (iv) the list of Assumed Contracts and Leases; and (v) the Wind-Down Budget.

(99)    "*Post Confirmation Professionals*" means attorneys, accountants and other professionals retained by the Liquidating Trustee pursuant to Article VI.H.(6) of the Plan.

(100)    "*Post-Verdict* Motions" means, collectively, the MEC Post-Verdict Motion and the Seller Post-Verdict Motion.

(101)    "*Prepetition Agent*" means Truist Bank as administrative agent under the Prepetition Credit Agreement.

(102)    "*Prepetition Credit Agreement*" means the Amended and Restated Revolving Credit and Term Loan Agreement, dated as of August 14, 2020 (as amended and otherwise modified from time to time prior to the Petition Date), among, *inter alia*, the Borrower, the guarantors party thereto, the lenders party thereto and Truist Bank, in its capacity as Prepetition Agent.

(103)    "*Prepetition Collateral*" has the meaning set forth in the Final DIP Order.

(104)    "*Prepetition Facility Obligations*" means the "Obligations" under and as defined in the Prepetition Credit Agreement.

(105)    "*Prepetition Lenders*" means the "Lenders" under and as defined in the Prepetition Credit Agreement.

(106)    "*Prepetition Secured Parties*" has the meaning set forth in the Final DIP Order.

(107)    "*Priority Tax Claim*" means any secured or unsecured Claim of a Governmental Unit of the kind entitled to priority in payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

(108)    "*Pro Rata*" means the proportion that an Allowed Claim (i) in a particular Class bears to the aggregate amount of all Allowed Claims and Disputed Claims within such Class, or (ii) in a particular group of Classes bears to the aggregate amount of all Allowed Claims and Disputed Claims within such group of Classes.

(109)    "*Proceeding*" means any action, suit, arbitration, proceeding (including any civil, criminal, administrative, investigative or appellate proceeding or any informal proceeding) or investigation pending or being heard by or before, or otherwise involving, any Governmental Authority, arbitrator, arbitration panel, advertising self-regulatory body or any other Person.

(110) "*Professional Fee Escrow Account*" means an account established by the Debtors or the Liquidating Trustee, as applicable, for purposes of maintaining the Professional Fee Escrow Amount.

(111) "*Professional Fee Escrow Amount*" means Cash in the amount of (i) the Carve-Out Escrow, plus (ii) any additional Cash necessary to pay all unpaid Fee Claims through the Effective Date, including estimates of fees incurred by Retained Professionals through the Effective Date that have not yet been invoiced.

(112) "*Proof of Claim*" means a proof of Claim filed against any of the Debtors in the Chapter 11 Cases.

(113) "*Purchase Price*" has the meaning set forth in Section 3.2 of the Asset Purchase Agreement.

(114) "*Recovery Proceeds*" means the total distributable value of the Excluded Assets distributed by the Liquidating Trustee from time to time in accordance with the Plan.

(115) "*Released Parties*" means, collectively, and in each case solely in their capacities as such: (i) the Debtors; (ii) the Estates; (iii) the DIP Lenders (iv) the DIP Agent; (v) the Prepetition Secured Parties; (vi) the Creditors' Committee (vii) the Buyer, MBC and MEC; (viii) OBI; (ix) the Releasing Parties; and (x) with respect to each of the foregoing Persons in clauses (i) through (ix), each of their affiliates, predecessors, successors, assigns, direct and indirect subsidiaries, affiliated investment funds or investment vehicles, managed accounts, funds and other entities, investment advisors, subadvisors and managers with discretionary authority; and (xii) with respect to each of the foregoing Persons in clauses (i) through (xi), each of their respective current and former officers and directors, principals, equity holders, members, partners, managers, employees, subcontractors, agents, financial advisors, attorneys, Chief Transformation Officer, accountants, investment bankers, consultants, representatives, and other professionals, and such Person's respective heirs, executors, estates, servants, and nominees, in each case in their capacity as such; *provided, however*, that notwithstanding anything in this Plan to the contrary, none of the Excluded Parties in any capacity, shall be a Released Party.

(116) "*Releasing Parties*" means, collectively, and in each case solely in their capacity as such: (i) the holders of all Claims that vote to accept the Plan; (ii) the holders of Claims who are entitled to vote on the Plan and abstain from voting on the Plan <u>and</u> who do not affirmatively opt out of the releases provided by the Plan on the applicable Ballot indicating that they opt not to grant the releases provided in the Plan; (iii) the holders of all Claims and Interests who receive a Notice of Non-Voting Status <u>and</u> who do not affirmatively opt out of the releases provided by the Plan by indicating on the applicable Opt-Out Form that they opt not to grant the releases provided in the Plan; and (iii) the Released Parties.

(117) "*Retained Causes of Action*" means all Causes of Action of the Debtors or their Estates other than (i) Acquired Causes of Action, and (ii) any Cause of Action released, settled or compromised pursuant to the Settlement Agreement, Asset Purchase Agreement, or the Plan. Retained Causes of Action shall be identified in the Plan Supplement.

(118)   "*Retained Professional*" means an Entity: (i) employed in the Chapter 11 Cases pursuant to a Final Order in accordance with sections 327 and/or 1103 of the Bankruptcy Code and to be compensated for services rendered prior to the Effective Date, pursuant to sections 327, 328, 329, 330, or 331 of the Bankruptcy Code; or (ii) for which compensation and reimbursement has been allowed by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

(119)   "*Residual Cash*" means the Debtors' cash, including, without limitation, Cash proceeds of the Excluded Assets, less (i) amounts reserved for the administration of the Liquidating Trust from and after the Effective Date (including the fees and expenses of the Liquidating Trustee and its professionals) in accordance with the Wind-Down Budget, (ii) any Cash proceeds of the Sale Transaction required to be reserved and/or distributed to creditors pursuant to the Sale Order, and (iii) amounts required to make distributions on account of, or establish reserves for, Allowed Administrative Expense Claims, Allowed Fee Claims, Allowed Priority Tax Claims, Allowed Other Secured Claims, and Allowed Other Priority Claims, in accordance with this Plan.

(120)   "*Sale Order*" means that certain *Amended Order (I) Authorizing and Approving (A) The Sale of Substantially All of The Debtors' Assets Free and Clear of All Liens, Claims, And Encumbrances and (B) The Assumption and Assignment of Certain Executory Contracts and Unexpired Leases In Connection Therewith, and (II) Granting Related Relief* [ECF No. 1658].

(121)   "*Sale Proceeds*" means all proceeds from the Sale Transaction.

(122)   "*Sale Transaction*" means the sale of all or substantially all of the Debtors' assets pursuant to the Asset Purchase Agreement and Sale Order.

(123)   "*Schedules*" means the schedules of assets and liabilities and the statements of financial affairs filed by the Debtors pursuant to section 521 of the Bankruptcy Code, Bankruptcy Rule 1007, and the Official Bankruptcy Forms and Bankruptcy Rules, as such schedules and statements have been or may be supplemented or amended from time.

(124)   "*Secured Claim*" means a Claim to the extent (i) secured by property of the Estate, with the amount of such Claim being equal to or less than the value of such property (a) as set forth in the Plan, (b) as agreed to by the holder of such Claim and the Debtors or (c) as determined by a Final Order in accordance with section 506(a) of the Bankruptcy Code, or (ii) secured by the amount of any rights of setoff of the holder thereof under section 553 of the Bankruptcy Code.

(125)   "*Seller Post-Verdict Motion*" means that certain *Defendant Vital Pharmaceuticals Inc.'s Notice of Motion and Motion for JNOV, New Trial, and Remittitur* filed at docket number 921 that is pending in the California District Court Action.

(126)   "*Selling Entities*" has the meaning ascribed to such term in the Preamble to the Asset Purchase Agreement.

(127)   "*Settlement Agreement*" means the compromise and global settlement between the Debtors, Creditors' Committee, DIP Lenders, DIP Agent, Prepetition Lenders, Prepetition Agent, and MEC, MBC, and OBI, as memorialized in the *Settlement Term Sheet* dated June 28, 2023 [ECF No. 1548], as approved by the Court on July 14, 2023 [ECF No. 1644].

13

(128)  "*Settlement Parties' Allowed General Unsecured Claims*" means, collectively: (i) the DIP Deficiency Claim; (ii) the California District Court Action Allowed Unsecured Claim; (iii) the Trade Dress Action Allowed Unsecured Claim; and (iv) the 50% of the OBI/Monster Matter Allowed Unsecured Claim held by MEC.  For the avoidance of doubt, the 50% of the OBI/Monster Matter Allowed Unsecured Claim held by OBI is not a Settlement Parties' Allowed General Unsecured Claim.

(129)  "*Subordination Agreement*" has the meaning set forth in the Final DIP Order.

(130)  "*Tax Code*" means the United States Internal Revenue Code of 1986, as amended.

(131)  "*Trade Dress Action Allowed Unsecured Claim*" means the Allowed General Unsecured Claim of MEC in the amount of $58,000 as taxable litigation costs awarded to MEC and its affiliate Reign Beverage Company, LLC ("Reign") and due from Vital Pharmaceuticals, Inc. pursuant to that certain Order entered on December 17, 2021, granting the Motion for Bill of Costs filed by MEC and Reign against Vital Pharmaceuticals, Inc. in the case filed in the United States District Court for the Southern District of Florida, captioned *Vital Pharmaceuticals, Inc. v. Monster Energy Company et al.*, Case No. 0:19-cv-60809 (filed March 28, 2019)

(132)  "*Trade Secret Matters*" means the Cohen Matter, the Dees Matter, the Leopardo Matter, the Nguyen Matter, and the Troglia Matter, as those terms are defined in the Asset Purchase Agreement.

(133)  "*Trust Election Date*" means the date by which the Liquidating Trustee must, if necessary, elect to treat the relevant portion of the Liquidating Trust Assets subject to Disputed Claims as a "disputed ownership fund" pursuant to Treasury Regulation Section 1.468B-9.

(134)  "*TTAB Matter*" means the proceeding including JHO Intellectual Property Holdings, LLC and MEC filed in the United States Patent and Trademark Office before the Trademark Trial and Appeal Board (TTAB), captioned *Monster Energy Co. v. JHO Intellectual Prop. Holdings, LLC*, Cancellation No. 92070514 (TTAB, filed Feb.  5, 2019).

(135)  "*U.S. Trustee*" means the United States Trustee appointed under Article 591 of title 28 of the United States Code to serve in the Southern District of Florida.

(136)  "*Unimpaired*" means, with respect to a Claim, Interest, or Class of Claims or Interests, not "impaired" within the meaning of section 1123(a)(4) and 1124 of the Bankruptcy Code.

(137)  "*VPX Florida Matters*" means the actions Vital Pharmaceuticals, Inc. filed in the United States District Court for the Southern District of Florida, captioned (i) *Vital Pharmaceuticals, Inc. v. Monster Beverage Co., et al.*, No. 0:19-cv-61974 (S. D. Fla., filed Aug. 7, 2019); and (ii) *Vital Pharmaceuticals, Inc. v. Monster Beverage Corp., et al.*, No. 0:22-cv-61621 (S.D. Fla., filed Aug.  31, 2022).

(138)  "*Wind-Down Budget*" means a budget for the reasonable activities and expenses to be incurred in winding down the Chapter 11 Cases, including the liquidation of any Excluded Assets, as set forth in the Plan Supplement.

**B.      Interpretation; Application of Definitions and Rules of Construction.**

Unless otherwise specified, all section or exhibit references in the Plan are to the respective section in, or exhibit to, the Plan, as the same may be amended, waived, or modified from time to time.  The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to the Plan as a whole and not to any particular section, subsection, or clause contained therein and have the same meaning as "in the Plan," "of the Plan," "to the Plan," and "under the Plan," respectively.  The words "includes" and "including" are not limiting and shall be deemed to be followed by the words "without limitation."  The headings in the Plan are for convenience of reference only and shall not limit or otherwise affect the provisions hereof.  For purposes herein: (i) in the appropriate context, each term, whether stated in the singular or plural, shall include both the singular and plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (ii) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; and (iii) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be.

The provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.  Unless otherwise specified herein, any references to the Effective Date shall mean the Effective Date or as soon as reasonably practicable thereafter.

All references in the Plan to monetary figures refer to currency of the United States of America, unless otherwise expressly provided.

Except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtors or to the Liquidating Debtors mean the Debtors and the Liquidating Debtors, as applicable, to the extent the context requires

**C.      Controlling Document.**

Except as otherwise set forth in the Final DIP Order, the Sale Order or herein, in the event of an inconsistency between the Plan and the Plan Supplement, the terms of the relevant document in the Plan Supplement shall control unless otherwise specified in such Plan Supplement document or instrument.  The provisions of the Plan and of the Confirmation Order shall be construed in a manner consistent with each other so as to effectuate the purposes of each; *provided*, that if there is determined to be any inconsistency between any provision of the Plan and any provision of the Confirmation Order that cannot be so reconciled, then, solely to the extent of such inconsistency, the provisions of the Confirmation Order shall govern, and any such provisions of the Confirmation Order shall be deemed a modification of the Plan and shall control and take precedence.

# ARTICLE II.
## ADMINISTRATIVE EXPENSE, PRIORITY & DIP CLAIMS

**A.    Administrative Expense Claims.**

Except to the extent that a holder of an Allowed Administrative Expense Claim agrees to less favorable treatment, each holder of an Allowed Administrative Expense Claim shall receive, in full and final satisfaction of such Claim, Cash in an amount equal to such Allowed Administrative Expense Claim on, or as soon thereafter as is reasonably practicable, the later of (i) the Effective Date and (ii) the first Business Day after the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim; *provided that*, the Fee Claims shall receive the treatment provided in <u>Article II.B.</u> of the Plan; *provided further*, that Allowed Administrative Expense Claims representing liabilities incurred in the ordinary course of operating or liquidating the business by the Debtors shall be paid by the Debtors in the ordinary course of business without the requirement of filing with the Bankruptcy Court an application seeking allowance and payment of any such liabilities, consistent with past practice and in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing or other documents relating to such transactions.

Except as otherwise provided by a Final Order previously entered by the Bankruptcy Court, or as provided by <u>Article II.D.</u> hereof, requests for payment of Administrative Expense Claims, other than requests for payment of Fee Claims, must be filed and served on the Debtors no later than the Administrative Expense Claims Bar Date pursuant to the procedures specified in the Administrative Expense Claims Bar Date Order; *provided* that the Administrative Expense Claims Bar Date shall not apply to Indemnification Claims and no requests for payment in respect of such Claims need to be filed by such date.

Holders of Administrative Expense Claims that are required to file and serve a request for payment of such Administrative Expense Claims and that do not file and serve such a request by the Administrative Expense Claims Bar Date shall be forever barred, estopped, and enjoined from asserting such Administrative Expense Claims against the Debtors or their property, and such Administrative Expense Claims shall be deemed compromised, settled, and released as of the Effective Date.  The Debtors or the Liquidating Trustee, as applicable, must file and serve objections to Administrative Expense Claims on or before the Administrative Expense Claims Objection Bar Date.  The Liquidating Trustee shall make distributions to the holders of Allowed Administrative Expense Claims. For the avoidance of doubt, the Administrative Expense Claims Bar Date shall not apply to any DIP Claims.

**B.    Fee Claims.**

Until the Effective Date, the Debtors are authorized to pay compensation to the Retained Professionals pursuant to, and in accordance with, the Interim Compensation Procedures Order. All final requests for payment of Fee Claims for services rendered and reimbursement of expenses incurred prior to the Effective Date must be Filed no later than 30 days after the Effective Date. The Bankruptcy Court shall determine the Allowed amounts of such Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Code, the Bankruptcy Rules, and prior Bankruptcy Court orders.  The Liquidating Debtors, through the Liquidating

16

Trustee, shall pay Fee Claims owing to the Retained Professionals in Cash and in the amount the Bankruptcy Court Allows from funds held in the Professional Fee Escrow Account, as soon as reasonably practicable after such Fee Claims are Allowed by entry of an order of the Bankruptcy Court; *provided that*, the Debtors' and the Liquidating Trustee's obligations to pay Allowed Fee Claims shall not be limited or deemed to be limited to funds held in the Professional Fee Escrow Account. To the extent that funds held in the Professional Fee Escrow Account are insufficient to satisfy the Allowed amount of Fee Claims owing to the Retained Professionals, the Liquidating Debtors or the Liquidating Trustee shall pay such amounts from proceeds of the Sale Transaction within ten (10) Business Days of entry of the order approving such Fee Claims.

No later than the Effective Date, the Debtors or the Liquidating Trustee shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Escrow Amount. The Professional Fee Escrow Account shall be maintained in trust solely for the Retained Professionals and for no other Entities until all Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full in Cash to the Retained Professionals pursuant to one or more Final Orders of the Bankruptcy Court. No Liens, claims, or interests shall encumber the Professional Fee Escrow Account or Cash held in the Professional Fee Escrow Account in any way. No funds held in the Professional Fee Escrow Account shall be property of the Estates of the Debtors or the Liquidating Debtors. When all Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full in Cash to the Retained Professionals pursuant to one or more Final Orders of the Bankruptcy Court, any remaining funds held in the Professional Fee Escrow Account shall be retained by the Liquidating Trustee as Residual Cash without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

The Retained Professionals shall deliver to the Debtors a reasonable and good-faith estimate of their unpaid fees and expenses incurred in rendering services to the Debtors before and as of the Effective Date projected to be outstanding as of the anticipated Effective Date, and shall deliver such estimate no later than five Business Days prior to the anticipated Effective Date. For the avoidance of doubt, no such estimate shall be considered or deemed an admission or limitation with respect to the amount of the fees and expenses that are the subject of a Retained Professional's final request for payment of Fee Claims Filed with the Bankruptcy Court, and such Professionals are not bound to any extent by the estimates. If a Retained Professional does not provide an estimate, the Debtors may estimate the unpaid and unbilled fees and expenses of such Retained Professional. The total aggregate amount so estimated to be outstanding as of the anticipated Effective Date shall be utilized by the Debtors to determine the amount to be funded to the Professional Fee Escrow Account; *provided that*, the Liquidating Debtors or the Liquidating Trustee, as applicable, shall use Cash on hand to increase the amount of the Professional Fee Escrow Account to the extent fee applications are Filed after the Effective Date in excess of the amount held in the Professional Fee Escrow Account based on such estimates.

## C.    Priority Tax Claims.

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a different treatment, each holder of an Allowed Priority Tax Claim shall receive, in full and final satisfaction, settlement, and release of, and in exchange for such Allowed Priority Tax Claim, shall receive on account of such Claim: (i) Cash in an amount equal to such Allowed Priority Tax Claim on, or as soon thereafter as is reasonably practicable, the later of (a) the Effective Date, (b) the first Business

Day after the date that is thirty (30) calendar days after the date such Priority Tax Claim becomes an Allowed Priority Tax Claim, and (c) the date such Allowed Priority Tax Claim is due and payable in the ordinary course; (ii) deferred Cash payments in the amount of such Allowed Claims with a present value, as of the Effective Date, that is equal to the Allowed amount of such Claims, consistent with section 1129(a)(9) of the Bankruptcy Code; or (iii) such other treatment as each holder of an Allowed Priority Tax Claim and the Liquidating Trustee shall agree; *provided, however,* that any Allowed Priority Tax Claim that has been expressly assumed by the Buyer in connection with the Sale Transaction shall not be an obligation of the Debtors.  On the Effective Date, any Liens securing any Allowed Priority Tax Claims shall be deemed released, terminated, and extinguished, in each case without further notice to or order of the Bankruptcy Court, act, or action, under applicable law, regulation, order or rule, or the vote, consent, authorization, or approval of any Person.

> **D.    DIP Claims.**

After application of the DIP Cash Paydown Amount received by the DIP Agent at Closing, the DIP Deficiency Claim is Allowed, classified and treated as a Class 3 Claim.  Effective upon payment of the DIP Cash Paydown Amount (or such lesser amount agreed to by the DIP Lenders), the Liens and security interests granted pursuant to the DIP Credit Agreement were cancelled and are of no further force and effect.  As to the Debtors, the DIP Deficiency Claim and the Prepetition Lenders' Deficiency Claim shall be Allowed, classified and treated as Class 3 Claims, and as to any non-debtor obligor under the Prepetition Credit Facility, the DIP Deficiency Claim and the Prepetition Lenders' Deficiency Claim shall be deemed Prepetition Facility Obligations.

**ARTICLE III.**
**CLASSIFICATION OF CLAIMS AND INTERESTS**

> **A.    Classification in General.**

A Claim or Interest is placed in a particular Class for all purposes, including voting, confirmation, and distribution under the Plan and under sections 1122 and 1123(a)(1) of the Bankruptcy Code; *provided*, that a Claim or Interest is placed in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and such Claim or Interest has not been satisfied, released, or otherwise settled prior to the Effective Date.

> **B.    Formation of Debtor Groups for Convenience Only.**

The Plan groups the Debtors together solely for the purpose of describing treatment under the Plan, tabulating votes, and making distributions with respect of Claims against and Interests in the Debtors under the Plan.  Such groupings shall not affect any Debtor's status as a separate legal entity, change the organizational structure of any Debtor's business enterprise, constitute a change of control of any Debtor for any purpose, cause a merger or consolidation of any legal entities, constitute a substantive consolidation of any of the Debtors, or cause the transfer of any assets.  Except as otherwise provided by or permitted under the Plan, all Debtors continue to exist as separate legal entities.

18

C.    **Summary of Classification.**

The following table designates the Classes of Claims against and Interests in each of the Debtors and specifies which of those Classes are: (i) Impaired or Unimpaired under the Plan; (ii) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code, and (iii) deemed to accept or reject the Plan.  The Plan deems a Claim or Interest to be classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Interest qualifies within the description of such different Class.  A Claim or an Interest is in a particular Class only to the extent that any such Claim or Interest is Allowed in that Class and has not been paid or otherwise settled prior to the Effective Date.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims, Fee Claims, Priority Tax Claims, and DIP Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests.  All of the potential Classes for the Debtors are set forth in the Plan.

| Class | Designation | Treatment | Entitled to Vote? |
|-------|-------------|-----------|-------------------|
| 1 | Other Secured Claims | Unimpaired | No; Deemed to Accept the Plan |
| 2 | Other Priority Claims | Unimpaired | No; Deemed to Accept the Plan |
| 3 | General Unsecured Claims | Impaired | Yes; Entitled To Vote |
| 4 | Intercompany Claims | Impaired and No Distribution | No; Deemed to Accept the Plan |
| 5 | Other Subordinated Claims | Impaired and No Distribution | No; Deemed To Reject the Plan |
| 6 | Existing Equity Interests | Impaired | No; Deemed To Reject the Plan |

D.    **Special Provisions Governing Unimpaired Claims.**

Except as otherwise provided in the Plan, nothing under the Plan shall affect the rights of, as applicable, the Debtors or the Liquidating Trustee in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

E.    **Elimination of Vacant Classes.**

Any Class that, as of the commencement of the Confirmation Hearing, does not have at least one holder of a Claim or Interest that is Allowed in an amount greater than zero for voting purposes shall be considered vacant, deemed eliminated from the Plan for purposes of voting to accept or reject the Plan, and disregarded for purposes of determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to such Class.  Any Claim or Interest in a Class that is considered vacant under the Plan shall receive no distribution.  For purposes of distributions under the Plan, all Allowed Unsecured Claims against each Debtor are treated and classified in the same class and shall receive *Pro Rata* distributions of the proceeds of Excluded Assets, without an allocation of such proceeds by Debtor.

### F. Voting Classes; Presumed Acceptance by Non-Voting Classes.

If a Class contains Claims eligible to vote and no holder of Claims eligible to vote in such Class votes to accept or reject the Plan, the Plan shall be presumed accepted by the holders of such Claims in such Class.

### G. Voting Classes; Acceptance and Rejection.

(1) *Acceptance by Certain Impaired Classes*: Holders of Allowed Claims in Class 3 are entitled to vote to accept or reject the Plan. An Impaired Class of Claims shall have accepted the Plan if (i) the holders of at least two-thirds (2/3) in amount of the Allowed Claims actually voting in such Class have voted to accept the Plan, and (ii) the holders of more than one-half (1/2) in number of the Allowed Claims actually voting in such Class have voted to accept the Plan. Holders of Claims in Class 3 will receive ballots containing detailed voting instructions.

(2) *Deemed Accepted by Impaired and Unimpaired Classes*: Holders of Claims in Classes 1, 2 and 4 are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Accordingly, such holders are not entitled to vote, and the votes of such holders will not be solicited with respect to those Claims.

(3) *Deemed Rejection by Impaired Classes*: Holders of Claims in Class 5 and holders of Existing Equity Interests in Class 6 are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Accordingly, such holders are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to those Claims.

### H. Confirmation Pursuant to Section 1129(a)(10) and 1129(b) of the Bankruptcy Code.

The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests. The Debtors reserve the right to modify the Plan, with the consent of the Consent Right Parties, in accordance with Article XIV.D. of the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

### I. Nonconsensual Confirmation.

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by an Impaired Class of Claims. The Debtors shall seek Confirmation pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests.

**J.      Subordinated Claims.**

The allowance, classification, and treatment of all Allowed Claims and Interests, and the respective distributions and treatments under the Plan, shall take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, except where otherwise provided herein, the Reorganized Debtors, reserve the right to re-classify any Claim or Interest in accordance with any contractual, legal, or equitable subordination rights relating thereto.

**K.      Single Satisfaction of Claims.**

Holders of Allowed Claims or Allowed Interests may assert such Claims against or Interests in the Debtors obligated with respect to such Claims or Interest, and such Claims and Interests shall be entitled to share in the recovery provided for the applicable Claim against or Interest in the Debtors based upon the full Allowed amount of such Claims or Interests. Notwithstanding the foregoing, the holder of such a Claim or Interest that asserts such Claim against or Interest in more than one Debtor shall be entitled only to a single distribution on account of such Claim or Interest

## ARTICLE IV.
## TREATMENT OF CLAIMS AND INTERESTS

**A.      Other Secured Claims (Class 1).**

(1)      **Classification**: Class 1 consists of the Allowed Other Secured Claims.  To the extent that Other Secured Claims are secured by different collateral or different interests in the same collateral, such Claims shall be treated as separate subclasses of Class 1.

(2)      **Treatment**: Except to the extent that a holder of an Allowed Other Secured Claim against any of the Debtors has agreed to less favorable treatment of such Claim, each such holder of an Allowed Other Secured Claim shall receive, at the option of, as applicable, the Debtors or the Liquidating Trustee, in full and final satisfaction of such Allowed Other Secured Claim, (i) payment in full in Cash, payable on the later of the Effective Date and the first Business Day after thirty (30) calendar days from the date on which such Other Secured Claim becomes an Allowed Other Secured Claim, or as soon as reasonably practical thereafter, (ii) abandonment to the holder of such Allowed Other Secured Claim of the collateral securing such Allowed Other Secured Claim and payment of any interest required under section 506(b) of the Bankruptcy Code, or (iii) such other treatment necessary to satisfy section 1129 of the Bankruptcy Code.

(3)      **Voting**: Class 1 is Unimpaired, and the holders of Other Secured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the holders of Other Secured Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited.

**B.      Other Priority Claims (Class 2).**

(1)      **Classification:** Class 2 consists of the Allowed Other Priority Claims.

(2)      **Treatment**: Except to the extent that a holder of an Allowed Other Priority Claim against any of the Debtors has agreed to less favorable treatment of such Allowed Other Priority Claim, each such holder of an Allowed Other Priority Claim shall receive, in full and final satisfaction of such Allowed Other Priority Claim, Cash in an amount equal to such Allowed Other Priority Claim, payable on or as soon as reasonably practicable after the later of the Effective Date and the date on which such Other Priority Claim becomes an Allowed Other Priority Claim, or as soon as reasonably practical thereafter.

(3)      **Voting**: Class 2 is Unimpaired, and the holders of Allowed Other Priority Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the holders of Other Priority Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited.

**C.      Allowed General Unsecured Claims (Class 3).**

(1)      **Classification**: Class 3 consists of Allowed General Unsecured Claims including the OBI/Monster Matter Allowed Unsecured Claim.

(2)      **Treatment**: Except to the extent that a holder of an Allowed Class 3 Claim, agrees to less favorable treatment: each holder of an Allowed General Unsecured Claim shall receive Liquidating Trust Interests entitling each such holder to receive its Pro Rata share of the Residual Cash, *provided, however*, that notwithstanding the foregoing, no distributions of Residual Cash or otherwise shall be made to holders of Settlement Parties' Allowed General Unsecured Claims (and such Claims shall not be considered for purposes of determining the Pro Rata share of Residual Cash to which holders of other Allowed General Unsecured Claims are entitled) unless and until: (x) in the case of the Allowed DIP Deficiency Claim, holders of Allowed General Unsecured Claims not constituting Settlement Parties' Allowed General Unsecured Claims have received distributions totaling, in the aggregate, at least (I) $5 million *less* (II) the positive difference, if any, between (A) the Debtors' good faith estimate of Residual Cash held by the Debtors as of the Effective Date and (B) $15.5 million *minus* the aggregate amount of Fee Claims for professional services rendered or costs incurred on or after the Closing Date through the Effective Date; and (y) in the case of all other Allowed Settlement Parties' Allowed General Unsecured Claims, Holders of Allowed General Unsecured Claims have received distributions totaling, in the aggregate, at least $5 million.  Distributions to Holders of Allowed General Unsecured Claims shall be made at such times and in such intervals as determined by the Liquidating Trustee.

(3)      **Voting**: Class 3 is Impaired and, the holders of Claims in this Class are entitled to vote to accept or reject the Plan.

### D.      Intercompany Claims (Class 4).

(1)      **Classification**: Class 4 consists of Intercompany Claims against the Debtors.

(2)      **Treatment**: The holders of Intercompany Claims shall not receive or retain any property under the Plan on account of such Claims.

(3)      **Voting**: Class 4 is Impaired by the Plan.  As proponents of the Plan, the holders of Intercompany Claims are conclusively presumed to accept the Plan.

### E.      Other Subordinated Claims (Class 5).

(1)      **Classification**: Class 5 consists of Other Subordinated Claims.

(2)      **Treatment**: Holders of Allowed Other Subordinated Claims shall not receive or retain any property under the Plan on account of such Claims.

(3)      **Voting**: Class 5 is Impaired by the Plan and the holders of the Other Subordinated Claims are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  The holders of Subordinated Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited.

### F.      Existing Equity Interests (Class 6).

(1)      **Classification**: Class 6 consists of Existing Equity Interests.

(2)      **Treatment**: Solely in the event that all Allowed Claims have been satisfied in full in accordance with the Bankruptcy Code and the Plan, each holder of an Existing Equity Interests may receive its amount of proceeds realized from the Liquidating Trust Assets consistent with such holder's rights of payment existing immediately prior to the Petition Date.  The Liquidating Trustee shall determine, in the Liquidating Trustee's sole discretion, whether and when, to: (i) cancel and extinguish the Existing Equity Interests; (ii) transfer the Existing Equity Interests into the Liquidating Trust; or (iii) provide other treatment for the Existing Equity Interests consistent with the terms of this Plan and the Sale Order.

(3)      **Voting**: Class 6 is Impaired by the Plan and the holders of the Existing Equity Interests are deemed to reject the Plan.

## ARTICLE V.
## MEANS FOR IMPLEMENTATION OF THE PLAN

### A.      Joint Chapter 11 Plan.

The Plan is a joint chapter 11 plan for each of the Debtors, with the Plan for each Debtor being non-severable and mutually dependent on the Plan for each other Debtor.  In consideration for the classification, distributions, releases, and other benefits provided under the Plan, on the Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, Causes of Action and controversies resolved pursuant to the Plan.  The

23

entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, Causes of Action and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates and Holders of Claims and Interests is fair, equitable and is within the range of reasonableness. Distributions made to Holders of Allowed Claims are intended to be indefeasible.

### B.    Corporate Action.

On or before the Effective Date, by virtue of the solicitation of votes in favor of the Plan and entry of the Confirmation Order, all actions contemplated by the Plan (including any action to be undertaken by, as applicable, the Debtors or Liquidating Debtors) shall be deemed authorized, approved, and, to the extent taken prior to the Effective Date, ratified without any requirement for further action by holders of Claims or Interests, the Debtors, or any other Entity or Person. All matters provided for in the Plan involving the corporate structure of the Debtors, including but not limited to any Interest in any of the Debtors, and any corporate action required by the Debtors in connection therewith, shall be deemed to have occurred and shall be in effect, without any requirement of further action by the Interest holders, directors, members, managers, or officers of the Debtors or the Liquidating Trustee. On or (as applicable) before the Effective Date, the authorized officers, managers and directors of the Debtors, and the Chief Transformation Officer, as applicable, shall be authorized and directed to issue, execute, and deliver the agreements, documents and instruments contemplated by the Plan (or as necessary or desirable to effectuate the transactions contemplated by the Plan). The authorizations and approvals contemplated by this Article V.B. shall be effective notwithstanding any requirements under non-bankruptcy law.

### ARTICLE VI.
### LIQUIDATING TRUST

### A.    Establishment of the Liquidating Trust.

On the Effective Date, the Liquidating Trust shall be established and become effective for the benefit of the Liquidating Trust Beneficiaries. The powers, authority, responsibilities, and duties of the Liquidating Trust, and the Liquidating Trustee are set forth in and shall be governed by the Plan and the Liquidating Trust Agreement. The Liquidating Trust Agreement shall provide for the distribution of the Liquidation Trust Assets to the Liquidating Trust Beneficiaries. In the event of any conflict between the terms of this Article VI and the terms of a Liquidating Trust Agreement as such conflict relates to the establishment of a Liquidating Trust, the terms of this Article VI shall govern. The Liquidating Trust Agreement may provide powers, duties, and authorities in addition to those explicitly stated herein, but only to the extent that such powers, duties, and authorities do not affect the status of the Liquidating Trust as a "liquidating trust" for United States federal income tax purposes.

### B.    Purpose of the Liquidating Trust.

The Liquidating Trust shall be established pursuant to the Liquidating Trust Agreement to qualify as a "liquidating trust" within the meaning of Treasury Regulation Section 301.7701-4(d) and in compliance with Rev. Proc. 94-45, 1994-2 C.B. 684, for, among other purposes, the purpose

of (i) receiving and holding the Liquidating Trust Assets; (ii) administering, disputing, objecting to, compromising, or otherwise resolving all Disputed Claims; (iii) making distributions to the Liquidating Trust Beneficiaries in accordance with this Plan and the Liquidating Trust Agreement; d (iv) maximizing recoveries for the benefit of the Liquidating Trust Beneficiaries, with no objective to continue or engage in the conduct of a trade or business in accordance with Treasury Regulation Section 301.7701-4(d).  The Liquidating Trust shall not be deemed a successor in interest of the Debtors for any purpose other than as specifically set forth herein or in the Liquidating Trust Agreement.  Subject to the DOF Election, the Liquidating Trust is intended to qualify as a "grantor trust" for U.S. federal income tax purposes within the meaning of sections 671 through 679 of the Tax Code and, to the extent permitted by applicable law, for state and local income tax purposes, with the Liquidating Trust Beneficiaries treated as the sole grantors and owners of the Liquidating Trust.  To the extent permitted by applicable law, all parties, including the Liquidating Trustee and any Liquidating Trust Beneficiaries, shall report consistently with the foregoing for all applicable tax reporting purposes (including consistent reporting for valuation purposes).  To the extent permitted by applicable law, all parties, including the Liquidating Trustee and any Liquidating Trust Beneficiaries, shall report consistently with the foregoing for all applicable tax reporting purposes (including consistent reporting for valuation purposes).

## C.    Liquidating Trust Assets.

The Liquidating Trust shall consist of Liquidating Trust Assets.  On the Effective Date, and in accordance with sections 1123 and 1141 of the Bankruptcy Code, all title and interest in all of the Excluded Assets, which constitute all assets of the Debtors that have not been distributed on or prior to the Effective Date or sold and conveyed pursuant to the Sale Transaction, shall irrevocably and automatically vest in the Liquidating Trust, free and clear of all liens, Claims, encumbrances and Interests (legal, beneficial or otherwise) for the benefit of the Liquidating Trust Beneficiaries.  Upon the transfer of the Liquidating Trust Assets to the Liquidating Trust, the Debtors shall have no interest in or with respect to the Liquidating Trust Assets or Liquidating Trust.  Upon delivery of the Liquidating Trust Assets to the Liquidating Trust, the Debtors and their respective predecessors, successors and assigns, shall be released from all liability with respect to the delivery thereof and shall have no reversionary or further interest in or with respect to the Liquidating Trust Assets or the Liquidating Trust in accordance with this Article VI.C.  For all U.S. federal income tax purposes, and subject to the DOF Election described at Article VI.H.(8) below, all parties (including, without limitation, the Debtors, the Liquidating Trustee, and the Liquidating Trust Beneficiaries) shall treat the transfer of the Liquidating Trust Assets to the Liquidating Trust in accordance with the terms herein as a transfer to the Liquidating Trust Beneficiaries, followed by a transfer of such assets by such Liquidating Trust Beneficiaries to the Liquidating Trust, and the Liquidating Trust Beneficiaries will be treated as the grantors and owners thereof.  Notwithstanding the foregoing, for purposes of section 553 of the Bankruptcy Code, the transfer of the Liquidating Trust Assets to the Liquidating Trust shall not affect the mutuality of obligations that otherwise may have existed prior to the effectuation of such transfer.  Such transfer shall be exempt from any stamp, real estate transfer, mortgage reporting, sales, use, or other similar tax, to the maximum extent provided by section 1146(a) of the Bankruptcy Code.  In connection with the transfer of such Liquidating Trust Assets, any attorney client privilege, work product privilege or immunity attaching to any documents or communications (whether written or oral) transferred to the Liquidating Trust shall vest in the Liquidating Trust and its representatives, and the Debtors and the Liquidating Trustee are directed to take all necessary

actions to effectuate the transfer of such privileges. The Liquidating Trustee shall agree to accept and hold the Liquidating Trust Assets in the Liquidating Trust for the benefit of the Liquidating Trust Beneficiaries, subject to the terms of the Plan and the Liquidating Trust Agreement. The Debtors, the Liquidating Trustee, and any party under the control of such parties will execute any documents or other instruments and shall take all other steps as necessary to cause title to the Liquidating Trust Assets to be transferred to the Liquidating Trust.

### D.      Non-Transferability of Liquidating Trust Interests.

The Liquidating Trust Interests shall be non-transferable other than if transferred by will, intestate succession or otherwise by operation of law.

### E.      Administration of Liquidating Trust.

The Liquidating Trust shall be administered by the Liquidating Trustee pursuant to a Liquidating Trust Agreement and the Plan. In the event of an inconsistency between the Plan and a Liquidating Trust Agreement as such conflict relates to anything other than the establishment of a Liquidating Trust, the Liquidating Trust Agreement shall control.

### F.      Liquidating Trust Oversight Committee

The Liquidating Trust Oversight Committee (the "**Oversight Committee**") is hereby created in accordance with the Plan. The Oversight Committee initially shall be composed three (3) members total: two (2) members chosen by the Creditors' Committee, and one (1) member chosen by MEC (each, a "**Member**," and collectively, the "**Members**"), all of whom hereby accept their appointment as Members of the Oversight Committee. The Oversight Committee may authorize its own dissolution by filing with the Bankruptcy Court an appropriate notice that its responsibilities have concluded. Unless already dissolved, the Oversight Committee shall be dissolved as of the earlier of (i) the date upon which each Member receives a distribution from the Liquidating Trust in full satisfaction of its respective Allowed Claim; or (ii) the date the Chapter 11 Cases are closed. Further provisions concerning the duties and responsibilities of the Oversight Committee are as follows:

(1)      Reports to Oversight Committee. Notwithstanding any other provision in the Plan, the Liquidating Trustee shall provide a report (either in writing or orally via teleconference) to the Oversight Committee on an "as needed" basis, but in no event not fewer than two (2) times per calendar year. The Oversight Committee shall keep all such information strictly confidential.

(2)      Actions Requiring Approval of the Oversight Committee. The Liquidating Trustee shall obtain the approval of the Oversight Committee (by at least a majority vote, which may be obtained by negative notice) prior to taking any action regarding any of the following matters:

    i.      The distribution or disposition of any assets having a valuation in excess of $250,000;

    ii.      The abandonment of any non-Cash assets having a valuation of at least $1,000,000;

iii.     The settlement, compromise, or other resolution of any Disputed Claim, wherein the Allowed amount of the asserted Claim exceeds $1,000,000;

iv.     The settlement, compromise, or other resolution of any litigation, adversary proceedings, or claims pursued by the Liquidating Trust;

v.     The exercise of any right or action set forth in the Plan or any supplement thereto that expressly requires approval of the Oversight Committee;

vi.     The borrowing of any funds by the Liquidating Trust including, but not limited to, the obtaining of litigation financing or pledge of any portion of Cash or assets, provided, however, that unanimous approval of the Oversight Committee members shall be required for the matters set forth in this Article VI.F.(2)(vi); and

vii.     Any matter which could reasonably be expected to have a material adverse effect, as determined by the Liquidating Trustee in consultation with legal counsel, on the amount of distributions to be made by the Liquidating Trust.

**G.     Liquidating Trustee's Conflict of Interest.**

The Liquidating Trustee shall disclose to the Oversight Committee any conflicts of interest (actual or potential) that the Liquidating Trustee has with respect to any matter arising during administration of the Liquidating Trust.  In the event that the Liquidating Trustee cannot take any action by reason of an actual or potential conflict of interest, the Oversight Committee, acting by majority, shall be authorized to take any such action(s) in the Liquidating Trustee's place and stead, including without limitation the retention of professionals (which may include professionals retained by the Liquidating Trustee) for the purpose of taking such actions.  The Bankruptcy Court shall hear and finally determine any dispute arising out of this section.

To the extent required under the Plan, the Liquidating Trustee may obtain any approval or authorization required to be received from the Oversight Committee on three (3) business days' negative notice or less if the circumstances require it as determined by the Liquidating Trustee in his or her sole discretion.  The Liquidating Trustee may make requests on behalf of the Liquidating Trust for approval or authorization by the Oversight Committee in writing, which may be made in the form of an email.  In the event any Member of the Oversight Committee objects to the Liquidating Trustee's request, the Liquidating Trustee shall consult with the Oversight Committee about how to proceed.  If necessary, the Bankruptcy Court shall hear and finally determine any dispute arising out of this section or this Article.

Any Member of the Oversight Committee may resign at any time on notice (including email notice) to the other Members of the Oversight Committee and to the Liquidating Trustee. Any such resignation shall be effective on the later of: (i) the date specified in the notice delivered to the Liquidating Trustee and the other Members of the Oversight Committee; and (ii) the date that is thirty (30) days after the date such notice is delivered.  In the event of the resignation, death, incapacity, or removal of a Member of the Oversight Committee, the remaining Members of the Oversight Committee, in consultation with the Liquidating Trustee, shall select and appoint a replacement Member.  If the remaining members of the Oversight Committee cannot agree on the replacement Member, the Liquidating Trustee shall select the replacement Member.

The Oversight Committee shall be bound by and conduct its oversight activities in accordance and compliance with the bylaws established for the governance of the activities of the Creditors' Committee.

**H.     Liquidating Trustee.**

(1)     *Appointment of the Liquidating Trustee*

The Liquidating Trustee shall be selected by the Creditors' Committee in consultation with MBC, MEC and the DIP Agent.  Upon the occurrence of the Effective Date, the Liquidating Trustee shall also be deemed appointed to serve as the trustee and administrator of the Liquidating Trust established pursuant to the Plan and the Liquidating Trust Agreement.  The Liquidating Trustee, subject to the terms and conditions of the Plan and the Liquidating Trust Agreement, shall be authorized to execute, deliver, file, or record such documents, contracts, instruments, releases, and other agreements, and to take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  The Liquidating Trustee shall have and perform all of the duties, responsibilities, rights, and obligations set forth in the Plan and the Liquidating Trust Agreement, as applicable.

(2)     *Liquidating Trustee as Representative of the Estate*

From and after the Effective Date, the Liquidating Trustee shall act as the exclusive representative of the Estate for all purposes.  Any successor Liquidating Trustee appointed pursuant to the Liquidating Trust Agreement shall be bound by and comply with the terms of this Plan and the Liquidating Trust Agreement.

(3)     *Responsibilities and Authority of the Liquidating Trustee*

The responsibilities and authority of the Liquidating Trustee shall be as set forth in the Liquidating Trust Agreement, and shall include, among others, the following rights and responsibilities, which shall be the exclusive rights and responsibilities of the Liquidating Trustee: (i) preserving and liquidating the Liquidating Trust Assets; (ii) administering and paying taxes for the Liquidating Trust, including, among other things, (a) filing tax returns for the Liquidating Trust, and (b) representing the interest and account of the Liquidating Trust before any taxing authority in all matters including, without limitation, any action, suit, proceeding, or audit; (iii) retaining and paying, without the need for retention or fee applications, professionals in connection with the Liquidating Trustee's performance of its duties under this Plan and the Liquidating Trust Agreement; (iv) distributing information statements as required for U.S. federal income tax and other applicable tax purposes to the Liquidating Trust Beneficiaries; (v) filing an application for entry by the Bankruptcy Court of a final decree closing the Chapter 11 Case; (vi) making distributions to Liquidating Trust Beneficiaries in accordance with the Plan and Liquidating Trust Agreement; (vii) objecting to, reconciling, seeking to subordinate, compromising, defending or prosecuting any Causes of Action, or settling all Claims; (viii) making distributions to the Liquidating Trust Beneficiaries in accordance with the Plan and Liquidating Trust Agreement; (ix) requesting an expedited determination of taxes, including with respect to any reserve for Disputed Claims, under section 505(b) of the Bankruptcy Code; and (x) such other responsibilities as may be vested in the Liquidating Trustee pursuant to this Plan and the

12218776-23

Liquidating Trust Agreement, or an order of the Bankruptcy Court, or as may be necessary and proper to carry out the provisions of this Plan.

        (4)      *Powers of the Liquidating Trustee*

The Liquidating Trustee shall have the power and authority to perform the acts described in the Liquidating Trust Agreement, in addition to any powers granted by law or conferred to it by any other provision of the Plan, including without limitation any set forth herein, provided however, that enumeration of the following powers shall not be considered in any way to limit or control the power and authority of the Liquidating Trustee to act as specifically authorized by any other provision of this Plan, the Liquidating Trust Agreement, and/or any applicable law, and to act in such manner as the Liquidating Trustee may deem necessary or appropriate to take any act deemed appropriate by the Liquidating Trustee, including, without limitation, to discharge all obligations assumed by the Liquidating Trustee or provided herein and to conserve and protect the Liquidating Trust or to confer on the creditors the benefits intended to be conferred upon them by this Plan.

The powers of the Liquidating Trustee shall be as set forth in the Liquidating Trust Agreement, and shall include, among others, the following: (i) the power to invest funds of the Liquidating Trust (in demand and time deposits, or other temporary, liquid investments, except as otherwise determined to be reasonably necessary to maintain the value of the assets and to further the liquidating purpose of the Liquidating Trust), and withdraw, make distributions, and pay taxes and other obligations owed by the Liquidating Trust from such funds in accordance with this Plan and the Liquidating Trust Agreement; (ii) the power to engage and compensate, without prior Bankruptcy Court order or approval, employees and professionals to assist the Liquidating Trustee with respect to its responsibilities; or (iii) such other powers as may be vested in or assumed by the Liquidating Trustee pursuant to this Plan, the Liquidating Trust Agreement, or by an order of the Bankruptcy Court, or as may be necessary and proper to carry out the provisions of this Plan.

        (5)      *Compensation of the Liquidating Trustee*

The Liquidating Trustee shall be compensated as set forth in the Liquidating Trust Agreement.  The Liquidating Trustee shall fully comply with the terms, conditions and rights set forth in this Plan and the Liquidating Trust Agreement.  The Liquidating Trustee (and any Liquidating Trustee's retained professionals) shall not be required to file a fee application to receive compensation.

        (6)      *Retention and Payment of Professionals*

The Liquidating Trustee shall have the right, without Court approval, to retain the services of attorneys, accountants, and other professionals and agents, to assist and advise the Liquidating Trustee in the performance of his, her, or its duties, and to compensate and reimburse expenses of such professionals in accordance with the Liquidating Trust Agreement.  For the avoidance of doubt, the Liquidating Trust can retain any professional currently retained by the Creditors' Committee.

(7)     *Trust Expenses*

The Liquidating Trustee may, in the ordinary course of business and without the necessity for any application to, or approval of, the Bankruptcy Court, pay any accrued but unpaid Liquidating Trust expenses.  All Liquidating Trust expenses shall be charged against and paid from the Liquidating Trust Assets.

(8)     *DOF Election*

The Liquidating Trust Agreement shall require the Liquidating Trustee to elect to treat that portion of the Liquidating Trust Assets subject to the Disputed Claims as a disputed ownership fund described in Treasury Regulation Section 1.468B-9 (the "**DOF Election**") unless, as of the Trust Election Date, either all of the Liquidating Trust Assets subject to Disputed Claims have been distributed to the Liquidating Trust Beneficiaries or the percentage of the Liquidating Trust Assets subject to Disputed Claims distributable to each of the Liquidating Trust Beneficiaries has become fixed and determinable.

**I.     Cash Investments.**

The Liquidating Trustee may invest Cash (including any earnings thereon or proceeds therefrom); *provided*, that such investments are investments permitted to be made by a "liquidating trust" within the meaning of Treasury Regulation Section 301.7701-4(d), as reflected therein, or under applicable IRS guidelines, rulings or other controlling authorities.

**J.     No Revesting of Liquidating Trust Assets.**

No Liquidating Trust Asset will revest in the Debtor on or after the date such asset is transferred to the Liquidating Trust, but will best upon such transfer in the Liquidating Trust to be administered by the Liquidating Trustee in accordance with the Plan and the Liquidating Trust Agreement.

**K.     Distribution of Liquidating Trust Assets.**

The Liquidating Trustee shall distribute to the holders of Allowed Class 3 Claims  on account of their Liquidating Trust Interests on a semi-annual basis or with such other frequency as the Liquidating Trustee determines in the exercise of its business judgment, Cash representing its net income plus all net proceeds from the sale of its assets (including any Cash received from the Debtors and treating any permissible investment as Cash for purposes of this Article VI.K.), less such amounts that may be reasonably necessary to (i) meet contingent liabilities and to maintain the value of the Liquidating Trust Assets during liquidation, (ii) pay reasonably incurred or anticipated expenses (including, without limitation, any taxes imposed on or payable by the Debtors or the Liquidating Trust or in respect of the Liquidating Trust Assets), or (iii) satisfy other liabilities incurred or anticipated by such Liquidating Trust in accordance with the Plan or the Liquidating Trust Agreement; *provided*, *however*, that such Liquidating Trustee shall not be required to make a Distribution pursuant to this Article VI.K. of the Plan if such Liquidating Trustee determines that the expense associated with making the Distribution would likely utilize a substantial portion of the amount to be distributed, thus making the Distribution impracticable. The Liquidating Trustee shall make Distributions from the segregated Liquidating Trust Assets for

the benefit of the holders of Allowed Administrative Expenses in accordance with the Plan or the Liquidating Trust Agreement.

**L.**   **Liquidating Trust Mechanics.**

(1)   *Federal Income Tax Treatment of Liquidating Trust.*

The U.S. federal income tax classification of the Liquidating Trust will be determined pursuant to subsection (1) and/or (2) below, as applicable.

(2)   *Disputed Claims Resolved Before Trust Election Date*

Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt of an adverse determination by the IRS upon audit if not contested by such Liquidating Trustee), for all United States federal income tax purposes, all parties (including, without limitation, the Debtors, the Liquidating Trustee and the Liquidating Trust Beneficiaries) shall treat the transfer of Liquidating Trust Assets to a Liquidating Trust as (i) a transfer of Liquidating Trust Assets (subject to any obligations relating to those assets) directly to Liquidating Trust Beneficiaries (other than to the extent Liquidating Trust Assets are allocable to Disputed Claims), followed by (ii) the transfer by such beneficiaries to a Liquidating Trust of Liquidating Trust Assets in exchange for the related Liquidating Trust Interests.  Subject to Article VI.M.; (i) the Liquidating Trust is structured to qualify as a "liquidating trust" within the meaning of Treasury Regulation Section 301.7701-4(d) and in compliance with Revenue Procedure 94-45, 1994-2 C.B. 684, and, thus, as a "grantor trust" for U.S. federal income tax purposes within the meaning of Sections 671 through 679 of the Tax Code to the Liquidating Trust Beneficiaries, consistent with the terms of the Plan, and the Liquidating Trust Agreement shall provide as such; (ii) Liquidating Trust Beneficiaries shall be treated as the beneficiaries and grantors of the Liquidating Trust; (iii) the sole purpose of the Liquidating Trust shall be the liquidation and distribution of the Liquidating Trust Assets in accordance with Treasury Regulation Section 301.7701-4(d), including the resolution of Allowed Claims in accordance with this Plan, with no objective to continue or engage in the conduct of a trade or business; (iv) all parties (including the Debtor, Liquidating Trust Beneficiaries, and the Liquidating Trustee) shall report consistently with such treatment (including the deemed receipt of the Liquidating Trust Assets, subject to applicable liabilities and obligations, by the Liquidating Trust Beneficiaries, followed by the deemed transfer of such Liquidating Trust Assets to the Liquidating Trust); (v) all parties shall report consistently for federal income tax purposes, and otherwise, with the valuation (as determined pursuant to Article VI.M.(2) below) of the Liquidating Trust Assets transferred to the Liquidating Trust as determined by the Liquidating Trustee (or its designee); (vi) the Liquidating Trustee shall be responsible for filing returns for the Liquidating Trust as a grantor trust pursuant to Treasury Regulation Section 1.671-4(a); (vii) the Liquidating Trustee shall annually send to each Liquidating Trust Beneficiary a separate statement regarding the receipts and expenditures of the trust as relevant for U.S. federal income tax purposes; and (viii) all items of income, deductions and credit loss of the Liquidating Trust shall be allocated for federal income tax purposes to the Liquidating Trust Beneficiaries based on their respective interests in the Liquidating Trust, in such manner as the Liquidating Trustee deems reasonable and appropriate.  The foregoing treatment shall also apply, to the extent permitted by applicable law, for state and local income tax purposes. For the purpose of this Article VI.L.(2), the terms "party" and "Liquidating Trust Beneficiary"

shall not include the United States or any agency or department thereof, or any officer or employee thereof acting in such capacity.

 (3) *Disputed Claims Unresolved by Trust Election Date*

  If all Disputed Claims have not been resolved by the Trust Election Date, then the Liquidating Trustee will elect to treat that portion of the Liquidating Trust Assets subject to the Disputed Claims as a "disputed ownership fund" as described in and governed by Treasury Regulation Section 1.468B-9, and all impacted parties (including the Debtor, and solely to the extent applicable, Liquidating Trust Beneficiaries, and the Liquidating Trustee), solely with respect to the impacted assets, shall report for United States federal, state, and local income tax purposes consistently with such election. The Liquidating Trustee shall file all income tax returns with respect to any income attributable to the disputed ownership fund and shall pay the U.S. federal, state, and local income taxes attributable to such disputed ownership fund based on the items of income, deduction, credit, or loss allocable thereto. Any taxes imposed on the disputed ownership fund or its assets will be paid out of the assets of the disputed ownership fund (including any assets of the Liquidating Trust allocable to Disputed Claims) and any subsequent distributions in respect of the allowance or disallowance of such claims will be reduced accordingly. In the event, and to the extent, that any Cash in any disputed ownership fund is insufficient to pay the portion of any taxes attributable to taxable income arising from assets of the disputed ownership fund, assets of the disputed ownership fund (including those otherwise distributable) may be sold to pay such taxes. The undisputed portion of the Liquidating Trust Assets will be treated as held in a grantor trust, with deemed distribution to and contribution from the Liquidating Trust Beneficiaries, as described in the immediately preceding paragraph.

  To the extent permitted by applicable law, all parties, including the Liquidating Trustee and any Liquidating Trust Beneficiaries, shall report consistently with the foregoing for all applicable tax reporting purposes (including consistent reporting for valuation purposes).

 **M.** **Tax Reporting.**

 (1) Allocations of Liquidating Trust taxable income among Liquidating Trust Beneficiaries (other than taxable income allocable to any assets allocable to, or retained on account of, Disputed Claims, if such income is otherwise taxable at the Liquidating Trust) shall be determined by reference to the manner in which an amount of Cash representing such taxable income would be distributed (were such Cash permitted to be distributed at such time) if, immediately prior to such deemed Distribution, the Liquidating Trust had distributed all its assets (valued at their tax book value, other than, if applicable, assets allocable to Disputed Claims) to the holders of Liquidating Trust Interests, adjusted for prior taxable income and loss and taking into account all prior and concurrent Distributions from a Liquidating Trust. Similarly, taxable loss of a Liquidating Trust shall be allocated by reference to the manner in which an economic loss would be borne immediately after a hypothetical liquidating distribution of the remaining Liquidating Trust Assets. The tax book value of Liquidating Trust Assets for purpose of this paragraph shall equal their fair market value on the date Liquidating Trust Assets are transferred to a Liquidating Trust, adjusted in accordance with tax accounting principles prescribed by the Tax

Code, the applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements.

(2)     As soon as reasonably practicable after the Liquidating Trust Assets are transferred to a Liquidating Trust, the Liquidating Trustee shall make a good faith valuation of Liquidating Trust Assets.  Such valuation shall be made available from time to time to all parties to the Liquidating Trust (including, without limitation, the Debtors and Liquidating Trust Beneficiaries), to the extent relevant to such parties for tax purposes, and shall be used consistently by such parties for all United States federal income tax purposes.

### N.     Dissolution.

(1)     The Liquidating Trustee and Liquidating Trust shall be discharged or dissolved, as the case may be, at such time as (i) all of the Liquidating Trust Assets have been distributed pursuant to the Plan and a Liquidating Trust Agreement, or (ii) the Liquidating Trustee determines, in its sole discretion, that the administration of any remaining Liquidating Trust Assets is not likely to yield sufficient additional Liquidating Trust proceeds to justify further pursuit; *provided, however*, that in no event shall a Liquidating Trust be dissolved later than three (3) years from the creation of such Liquidating Trust pursuant to this Article VI.N.(1). of the Plan unless the Bankruptcy Court, upon motion within the six-month period prior to the third (3rd) anniversary (or within the six-month period prior to the end of an extension period), determines that a fixed period extension (not to exceed three (3) years, together with any prior extensions, without a favorable private letter ruling from the IRS or an opinion of counsel satisfactory to the Liquidating Trustee that any further extension would not adversely affect the status of the trust as a liquidating trust for United States federal income tax purposes) is necessary to facilitate or complete the recovery and liquidation of the Liquidating Trust Assets.

(2)     If at any time the Liquidating Trustee determines, in reliance upon such professionals as the Liquidating Trustee may retain, (i) that the expense of administering a Liquidating Trust so as to make a final distribution to Liquidating Trust Beneficiaries is likely to exceed the value of the assets remaining in such Liquidating Trust, (ii) all Allowed Claims (other than those whose distributions are deemed undeliverable under the Plan) have been paid in full, or (iii) the amount of any final distributions to holders of Allowed Claims would be $100.00 or less and the aggregate amount of Cash available for distributions to holders of Allowed General Unsecured Claims is less than $25,000.00, then, such Liquidating Trustee may apply to the Bankruptcy Court for authority to (a) reserve any amount necessary to dissolve such Liquidating Trust, (b) donate any balance to one or more of the following organizations (each of which qualifies as a Tax Code section 501(c)(3) tax-exempt organization): (1) the Bankruptcy Bar Foundation of the Bankruptcy Bar Association of the Southern District of Florida, or (2) Legal Services of Greater Miami, Inc., and (c) dissolve such Liquidating Trust.

(3)     The Liquidating Trustee shall not be required to make any payment to any holder of an Allowed Claim on any Distribution Date of Cash less than $100.00; *provided that*, if any distribution is not made pursuant to this Article VI.N.(3) of the Plan, such distribution shall be added to any subsequent distribution to be made on behalf of such holder's Allowed Claim.  If either (i no further distribution shall be made by the Liquidating Trustee and any surplus Cash shall be donated and distributed to one or more of the following organizations (each of which

qualifies as a tax-exempt organization under Section 501(c)(3) of the Tax Code), (a) the Bankruptcy Bar Foundation of the Bankruptcy Bar Association of the Southern District of Florida, (b) Legal Services of Greater Miami, Inc., or (c) another tax-exempt organization selected by the Liquidating Trustee with the consent of the Oversight Committee.

### O.    Post-Effective Date Reporting.

No later than the 20th day of the month following the end of each calendar quarter, the Liquidating Trustee shall File with the Bankruptcy Court and serve on the Office of the United States Trustee and counsel to the Indemnitees quarterly reports summarizing the Post-Confirmation receipts received and disbursements made by the Liquidating Trustee in the prior quarter.

### P.    Effectuating Documents; Further Transactions.

(1)    On and after the Effective Date, the Liquidating Trustee is authorized to and may issue, execute, deliver, file, or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement and further evidence the terms and conditions of the Plan in the name of and on behalf of the Debtors, without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan.

(2)    The Debtors and the Liquidating Trustee, as applicable, shall be authorized to implement the Plan in the manner most tax efficient to the DIP Lenders, Prepetition Lenders, the Creditors' Committee, and the Debtors as determined by the Debtors in their business judgment.

### Q.    Withholding and Reporting Requirements.

(1)    *Withholding Rights.*  In connection with the Plan, to the extent applicable, the Liquidating Trustee and/or any party issuing any instrument or making any distribution described in the Plan shall comply with all applicable withholding and reporting requirements imposed by any federal, state, or local taxing authority, and all distributions pursuant to the Plan and all related agreements shall be subject to any such withholding or reporting requirements.  Any amounts withheld pursuant to the preceding sentence shall be deemed to have been distributed to and received by the applicable recipient for all purposes of the Plan.  Notwithstanding the foregoing, each holder of an Allowed Claim or any other Person that receives a distribution pursuant to the Plan shall have responsibility for any taxes imposed by any Governmental Unit, including, without limitation, income, withholding, and other taxes, on account of such distribution.  Any party issuing any instrument or making any distribution pursuant to the Plan has the right, but not the obligation, to not make a distribution until such holder has made arrangements satisfactory to such issuing or disbursing party for payment of any such tax obligations, including requiring as a condition to the receipt of a distribution, the compliance with Article VI.Q.(2) below.  The Liquidating Trustee reserves the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support and other spousal awards, liens and encumbrances.  Additionally, in the case of a non-Cash distribution that is subject to withholding, the distributing party has the right, but not the obligation, to withhold an appropriate portion of such distributed property and either (a) sell such withheld property to

generate Cash necessary to pay over the withholding tax (or reimburse the distributing party for any advance payment of the withholding tax), or (b) pay the withholding tax using its own funds and retain such withheld property.

(2)     *Forms.*  Any party entitled to receive any property as an issuance or distribution under the Plan shall, upon request, deliver to the Liquidating Trustee or such other Person designated by the Liquidating Trustee (which entity shall subsequently deliver to the Liquidating Trustee any such forms received) an executed IRS Form W-9 or (if the payee is a foreign Person) the appropriate IRS Form W-8 (including all relevant attachments).  If such request is made by the Liquidating Trustee or such other Person designated by the Liquidating Trustee and the holder fails to comply before the date that is 90 calendar days after the request is made, the amount of such distribution shall irrevocably revert to the Liquidating Trustee and, the holder shall be forever barred from asserting any right to such distribution against any Debtors, the Debtors' Estates and the Liquidating Trustee.

### R.     Exemption From Certain Transfer Taxes.

To the maximum extent provided by section 1146(a) of the Bankruptcy Code, (i) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtors, (ii) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instruments of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, or (iii) any sale by any Debtor consummated post-Confirmation, and any other transfer from any Entity pursuant to, in contemplation of, or in connection with the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, sales tax, use tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, or other similar tax or governmental assessment, and the Confirmation Order shall direct the appropriate state or local government officials or agents to forego collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

### S.     Preservation of Rights of Action.

**The Debtors expressly reserve any and all Retained Causes of Action**.  No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement or the Disclosure Statement to any Retained Cause of Action against them as any indication that the Debtors or the Liquidating Trustee will not pursue any and all available Retained Causes of Action against them.

Except as otherwise provided in the Plan or a Final Order of the Bankruptcy Court, nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any rights, Claims, Retained Causes of Action, rights of setoff or recoupment, or other legal or equitable defenses that each Debtor had immediately prior to the Effective Date on behalf of the respective Debtor's Estate or itself in accordance with any provision of the Bankruptcy Code or any applicable non-bankruptcy law, including, without limitation, any affirmative Retained Causes of Action against parties with a relationship with the Debtor, other than the Debtor Released Parties and the Released Parties.  Any Cause of Action of the Debtors or their Estates that is not (i) an

35

Acquired Cause of Action purchased by the Buyer, or (ii) a Retained Cause of Action contributed to the Liquidating Trust on the Effective Date, shall be deemed released as of the Effective Date.

On and after the Effective Date, subject to the terms of this Plan, the Settlement Agreement and the Sale Order, the Liquidating Trustee shall have standing to and may pursue such Retained Causes of Action.

Subject to the Sale Order, no preclusion doctrine, including the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion (judicial, equitable, or otherwise), or laches, shall apply to such Retained Causes of Action upon, after, or as a consequence of the Confirmation or Consummation. Prior to the Effective Date, the Debtors, and on and after the Effective Date, the Liquidating Trustee shall retain and shall have, including through its authorized agents or representatives, the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Retained Causes of Action and to decline to do any of the foregoing without the consent, notice to or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court subject to the terms of this Plan. Notwithstanding anything contained herein to the contrary, the settlement of any Claims and Causes of Action which are expressly to be settled by Confirmation of the Plan itself shall be resolved only by Confirmation of the Plan itself. For the avoidance of doubt, the Retained Causes of Action shall include any and all Causes of Action against the Excluded Parties.

**T.      Closing of the Chapter 11 Cases.**

After the Chapter 11 Cases of the Debtors have been fully administered, and all Disputed Claims have become Allowed or disallowed and all remaining Cash has been distributed in accordance with the Plan, the Liquidating Trustee shall promptly seek authority from the Bankruptcy Court to close the Debtors' Chapter 11 Cases in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules.

**U.      Notice of Effective Date.**

As soon as practicable, but not later than three (3) Business Days following the Effective Date, the Debtors or the Liquidating Trustee shall file a notice of the occurrence of the Effective Date with the Bankruptcy Court.

**ARTICLE VII.**
**CORPORATE GOVERNANCE**

**A.      Corporate Form.**

The corporate form of the Debtors shall be as it was immediately prior to the Effective Date.

**B.      Post-Effective Date Governance of the Debtors.**

Effective as of immediately prior to the Effective Date, automatically and without further action, each existing member of the board of managers or directors of the Debtors, as applicable,

36

will be deemed to have resigned or will be deemed to have been terminated. Each Debtor shall be deemed to have issued one share or one member interest, as applicable, to be held nominally by the Liquidating Trustee for purposes of administering the Plan.

On and after the Effective Date, (a) the Liquidating Trustee, in substitution for the management and the board of managers of the Debtors, shall be authorized and empowered, without action of the Debtors' respective members, or boards of managers, or managers (if any), to take any and all such actions as the Liquidating Trustee may determine are necessary or appropriate in the Liquidating Trustee's business judgment to implement, effectuate, consummate and perform any and all actions, documents, or transactions contemplated by the Plan or the Confirmation Order as reasonably required to implement the Plan and the wind up the Debtors subject to the terms of this Plan, and (b) the Liquidating Trustee shall act for the Debtors in the same fiduciary capacity as applicable to the board of managers or board of directors of the Debtors existing immediately prior to the Effective Date. Prior to the Effective Date, one or more of the Debtors may provide the Liquidating Trustee with one or more Debtor's Power of Attorney. On and after the Effective Date, the Liquidating Trustee may elect such additional managers, directors and officers as the Liquidating Trustee deems necessary to implement the Plan and the actions contemplated in the Plan. The Liquidating Trustee shall also have the sole and exclusive power to act by written consent, including to appoint or remove any directors, managers or officers at any time with or without cause.

### C.    Corporate Existence.

Unless previously dissolved by the Liquidating Trustee, as soon as practicable on or after the entry of a final decree, the Debtors will be dissolved for all purposes other than for applicable state and local tax purposes without any other or further corporate action, or payment of any fees in connection therewith.

On and after the Effective Date, the Liquidating Trustee shall take commercially reasonable actions as required, consistent with applicable non-bankruptcy law and consistent with the implementation of the Plan, and when appropriate in the discretion of the Liquidating Trustee, to dissolve, liquidate, strike off or take such other similar action with respect to each Debtor (including the cancellation of all Interests in a Debtor pursuant to the Confirmation Order) and complete the winding down of such Debtor as expeditiously as practicable without the necessity for any other or further actions to be taken by or on behalf of such Debtor or its shareholders or members, or any payments to be made in connection therewith subject to the filing of a certificate of dissolution with the appropriate governmental authorities or complying with the laws and procedures governing the winding down of any such Debtor; *provided*, however, that the foregoing does not limit the Liquidating Trustee's ability to otherwise abandon an Interest in a Debtor. The Liquidating Trustee may, to the extent required by applicable non-bankruptcy law, maintain a Debtor as a limited liability company or corporation, as applicable, in good standing until such time as all aspects of the Plan pertaining to such Debtor and the winding down of such Debtor is complete.

### D.    Certificates of Formation and By-Laws.

As of the Effective Date, the certificates of formation, operating agreements, by-laws, and

37

any other organizational document of the Debtors shall be amended to the extent necessary to implement and carry out the provisions of the Plan. The Liquidating Trustee is empowered to complete and file all final or otherwise required federal, state, and local tax returns, if any, and shall pay taxes required to be paid for any of the Debtors.

# ARTICLE VIII.
# DISTRIBUTIONS

### A.    Distributions Generally.

On or after the Effective Date, the Liquidating Trustee shall make distributions only in accordance with the terms of the Plan and the Confirmation Order to holders of Allowed Claims, net of any reserve(s) for Disputed Claims, and only to the extent that the Liquidating Trustee (or income and/or proceeds realized from Excluded Assets, which will be turned into cash) to make such payments in accordance with and to the extent provided for in the Plan and the Confirmation Order. The Liquidating Trustee may withhold from amounts distributable to any Person any and all amounts, determined by the Liquidating Trustee in its reasonable discretion, required by any law, regulation, rule, ruling, directive, or other governmental requirement.

### B.    Distribution Record Date.

As of the close of business on the Distribution Record Date, the various transfer registers for each of the Classes of Claims or Interests as maintained by the Debtors, the Liquidating Trustee or their respective agents, shall be deemed closed for purposes of determining whether a holder of such a Claim or Interest is a record holder entitled to distributions under the Plan, and there shall be no further changes in the record of holders of any of the Claims or Interests. The Debtors or the Liquidating Trustee shall have no obligation to recognize any transfer of the Claims or Interests occurring on or after the Distribution Record Date.

### C.    Date of Distributions.

Except as otherwise provided in the Plan, the Debtors or the Liquidating Trustee, as applicable, shall make the Initial Distribution to holders of Allowed Claims no later than the Initial Distribution Date and thereafter, the Liquidating Trustee shall from time to time determine the subsequent Distribution Dates, if any; *provided that*, (i) Allowed Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business shall be paid or performed when due in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business or industry practice, and (ii) Allowed Priority Tax Claims, and Other Secured Claims shall be satisfied in accordance with the Plan. In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on or as soon as reasonably practicable after the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

### D.    Reserve on Account of Disputed Claims.

The Liquidating Trustee shall reserve an amount sufficient to pay holders of Disputed Claims the amount such holders would be entitled to receive under the Plan if such Claims were

38

to become Allowed Claims.  In the event the holders of Allowed Claims have not received payment in full on account of their Claims after the resolution of all Disputed Claims, then the Liquidating Trustee shall make a final distribution to all holders of Allowed Claims.

Except as otherwise provided in the Plan, a Final Order, or as agreed to by the relevant parties, distributions on account of Disputed Claims that become Allowed after the Effective Date shall be made on the next periodic Distribution Record Date that is at least forty-five (45) days after the Disputed Claim becomes an Allowed Claim; *provided that*, (i) Disputed Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business that become Allowed after the Effective Date shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice, (ii) Disputed Priority Tax Claims that become Allowed Priority Tax Claims after the Effective Date shall be treated as Allowed Priority Tax Claims in accordance with the Plan, solely to the extent not assumed by the Buyer pursuant to the Sale Transaction, and (iii) the Liquidating Trustee shall administer the tax obligations of each Debtor and the Debtors' Estates, including (a) filing tax returns and paying tax obligations, if any, (b) requesting, if necessary, an expedited determination of any unpaid tax liability for all taxable periods ending after the Effective Date through the liquidation of the Debtors, if any, as determined under applicable law, and (c) representing the interests and account of each Debtor and the Debtors' Estates  before any taxing authority in all matters including, without limitation, any action, suit, proceeding or audit.

### E.     Delivery of Distributions & Unclaimed Property.

Subject to Bankruptcy Rule 9010, distributions to any holder or permitted designee of an Allowed Claim shall be made by the Liquidating Trustee who on behalf of the Debtors shall transmit such distribution to the applicable holders or permitted designees of Allowed Claims.

In the event that any distribution to any holder is returned as undeliverable or is otherwise unclaimed, no further distribution to such holder shall be made unless and until the Liquidating Trustee is notified in writing of such holder's or permitted designee's, as applicable, then-current address, at which time all currently-due, missed distributions shall be made to such holder as soon as reasonably practicable thereafter without interest; *provided, however*, such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of six (6) months from the applicable Distribution Date.  After such date, with no further action by the Liquidating Trustee, all unclaimed property or interests in property shall revert (notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary) to the Liquidating Trustee automatically and without need for a further order by the Bankruptcy Court for distribution in accordance with the Plan, and the Claim of any such holder to such property or interest in such property shall be released, settled, compromised, and forever barred.  Nothing herein shall require the Liquidating Trustee to attempt to locate holders or permitted designees, as applicable, of undeliverable distributions and, if located, to assist in any way such holders or permitted designees, as applicable.  Notwithstanding any provisions in the Plan to the contrary, all distributions to holders of Claims shall be deemed completed, and the obligations of the Liquidating Trustee to make such distributions under the Plan shall be deemed satisfied, when made by the Liquidating Trustee.

F.     **Manner of Distribution.**

At the option of the Debtors or the Liquidating Trustee, as applicable, any Cash payment to be made under the Plan may be made by a check, wire transfer, or ACH Transfer. The wire transfer fee will be deducted from the amount of the distribution that a holder of an Allowed Claim or Interest would otherwise receive.

In order to receive a distribution under the Plan, a holder of an Allowed Claim must submit to the Liquidating Trustee both the applicable IRS Form W-9, or if the payee is a foreign person, Form W-8 (including all relevant attachments). Unless the Liquidating Trustee receives original, properly completed copies of each form with an amount of time sufficient, in the Liquidating Trustee's sole discretion (as applicable), to process in advance of a scheduled Distribution Date, the holder of an Allowed Claim that would otherwise be entitled to a Distribution shall not receive any Distribution on the applicable Distribution Date.

G.     **No Postpetition Interest on Claims.**

Except as otherwise specifically provided for in the Plan, the Confirmation Order, or another order of the Bankruptcy Court or required by the Bankruptcy Code, postpetition interest, dividends or accruals shall not accrue or be paid on any Claims, and no holder of a Claim shall be entitled to interest accruing on such Claim on or after the Petition Date.

H.     **Minimum Cash Distributions.**

The Liquidating Trustee shall not be required to make any payment to any holder of an Allowed Claim on any Distribution Date of Cash less than $100.00; *provided that*, if any distribution is not made pursuant to this Article VIII.H. of the Plan, such distribution shall be added to any subsequent distribution to be made on behalf of such holder's Allowed Claim. If either (i) all Allowed Claims (other than those whose distributions are deemed undeliverable under the Plan) have been paid in full, or (ii) the amount of any final distributions to holders of Allowed Claims would be $100.00 or less and the aggregate amount of Cash available for distributions to holders of Allowed General Unsecured Claims is less than $25,000.00, then no further distribution shall be made by the Liquidating Trustee and any surplus Cash shall be donated and distributed to one or more of the following organizations (each of which qualifies as a tax-exempt organization under Section 501(c)(3) of the Tax Code), (a) the Bankruptcy Bar Foundation of the Bankruptcy Bar Association of the Southern District of Florida, or (b) Legal Services of Greater Miami, Inc.

I.     **Setoffs and Recoupments.**

The Debtors and the Liquidating Trustee, as applicable, may, but shall not be required to, set off or recoup against any Claim, any claims of any nature whatsoever that the Debtors or the Liquidating Trustee, as applicable, may have against the holder of such Claim; *provided that*, neither the failure to do so nor the allowance of any Claim under the Plan shall constitute a waiver or release by the Debtors or the Liquidating Trustee, as applicable, of any such claim the Debtors or the Liquidating Trustee may have against the holder of such Claim.

40

J.      **Allocation of Distributions Between Principal and Interest.**

Except as otherwise required by law (as reasonably determined by the Debtors or the Liquidating Trustee, as applicable), to the extent that any Allowed Claim entitled to a distribution under the Plan is comprised of indebtedness and accrued but unpaid interest thereon, such distribution shall be allocated to the principal amount (as determined for U.S. federal income tax purposes) of the Claim first, and then to the extent the consideration exceeds the principal amount of the Claim, to the portion of such Claim representing accrued but unpaid interest through the Petition Date.

K.      **Payment of Disputed Claims.**

As Disputed Claims are resolved pursuant to Article VIII of the Plan, the Liquidating Trustee shall make distributions on account of such Disputed Claims as if such Disputed Claims were Allowed Claims as of the Effective Date.  As stated herein, such distributions shall be made on the first Distribution Date that is at least forty-five (45) calendar days after the date on which a Disputed Claim becomes an Allowed Claim, or on an earlier date selected by the Liquidating Trustee in the Liquidating Trustee's sole discretion.  No holder of a Disputed Claim shall have any Claim against the Liquidating Trustee, the Debtors or the Estates with respect to such Claim until such Disputed Claim becomes an Allowed Claim, and no holder of a Disputed Claim shall have any right to interest, dividends, or other distributions on account of such Disputed Claim except as provided for in the Plan.

**ARTICLE IX.**
**PROCEDURES FOR DISPUTED CLAIMS**

A.      **Allowance of Claims.**

On and after the Effective Date, and subject to any order of the Bankruptcy Court, the Liquidating Trustee shall be entitled to reconcile, object to, or settle Claims filed against the Debtors.  On and after the Effective Date, the Liquidating Trustee shall have and shall retain any and all rights and defenses that the Debtors had with respect to any Claim, except with respect to any Claim deemed Allowed under the Plan, based on the limitations imposed by section 502 of the Bankruptcy Code.  The Liquidating Debtors and Liquidating Trustee may contest the amount and validity of any Disputed Claim or contingent or unliquidated Claim in the ordinary course of business in the manner and venue in which such Claim would have been determined, resolved or adjudicated if the Chapter 11 Cases had not been commenced.  Except as expressly provided for in the Plan or in any order entered in the Chapter 11 Cases prior to the Effective Date (including, without limitation, the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under the Plan or the Bankruptcy Code or the Bankruptcy Court has entered a Final Order, including, without limitation, the Confirmation Order and the Final DIP Order, in the Chapter 11 Cases allowing such Claim.

B.      **Objections to Claims.**

On and after the Effective Date, objections to, and requests for estimation of, Claims against the Debtors may be interposed and prosecuted only by the Liquidating Trustee.  Such

objections and requests for estimation shall be served and filed by the Claims Objection Bar Date. The Liquidating Trustee may move to extend the Claims Objection Bar Date without limitation.

### C.    Estimation of Claims.

The Liquidating Trustee may determine, resolve and otherwise adjudicate all contingent, unliquidated, and Disputed Claims in the Bankruptcy Court. The Liquidating Trustee may at any time request that the Bankruptcy Court estimate any contingent, unliquidated, or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether the Debtors or the Liquidating Trustee previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including, without limitation, during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any contingent, unliquidated, or Disputed Claim, the amount so estimated shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Debtors or the Liquidating Trustee, as applicable, may pursue supplementary proceedings to object to the allowance of such Claim. All of the aforementioned objection, estimation and resolution procedures are intended to be cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

### D.    No Distributions Pending Allowance.

If an objection to a Claim is filed as set forth in <u>Article IX.B.</u> of the Plan, no payment or distribution provided under the Plan shall be made on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim; *provided that*, if only a portion of a Claim is Disputed, such Claim shall be deemed Allowed in the amount not Disputed and payment or distribution shall be made on account of such undisputed amount.

### E.    Resolution of Claims.

Except as otherwise provided in the Plan, the Confirmation Order or in any contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan, in accordance with section 1123(b) of the Bankruptcy Code, the Liquidating Trustee shall retain and may enforce, sue on, settle, or compromise (or decline to do any of the foregoing) all Claims, Disputed Claims, rights, Causes of Action, suits and proceedings, whether in law or in equity, whether known or unknown, that the Debtors or their Estates may hold against any Person, without the approval of the Bankruptcy Court. The Liquidating Trustee or its successor may pursue such retained Claims, rights, Causes of Action, suits or proceedings, as appropriate, in accordance with the best interests of the Debtors.

### F.    Disallowed Claims.

All Claims held by persons or entities against whom or which any of the Debtors or the Liquidating Trustee has commenced a proceeding or sent a demand letter asserting a Cause of Action under sections 542, 543, 544, 545, 547, 548, 549, 550 and/or 553 of the Bankruptcy Code shall be deemed "disallowed" Claims pursuant to section 502(d) of the Bankruptcy Code and

holders of such Claims shall not be entitled to vote to accept or reject the Plan. Claims that are deemed disallowed pursuant to this Article IX.F. shall (i) continue to be disallowed for all purposes until the avoidance action against such party has been settled or resolved by Final Order, and (ii) any sums due to the Debtors or the Liquidating Trustee from such party have been paid.

### G. Claims Paid and Payable by Third Parties.

A Claim shall be disallowed without an objection thereto having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the holder of such Claim receives payment in full in Cash on account of such Claim from a party that is not the Debtors or the Liquidating Trustee. To the extent that a holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or the Liquidating Trustee on account of such Claim, such holder shall repay, return, or deliver any distribution held by or transferred to the holder to the applicable Debtor or Liquidating Trustee to the extent the holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Allowed Claim as of the date of any such distribution.

### H. Amendments to Proofs of Claim.

On or after the Effective Date, unless otherwise authorized by the Confirmation Order or other Final Order of the Bankruptcy Court, a Proof of Claim may not be filed or amended without the prior written consent of the Liquidating Trustee and any such underlying filed Proof of Claim, prior to any such amendment as authorized by this Article IX.H. shall be deemed disallowed in full and expunged without any further notice to, or action, order, or approval of, the Bankruptcy Court, to the maximum extent provided by applicable law.

## ARTICLE X.
## EXECUTORY CONTRACTS

### A. Rejection of Executory Contracts.

On the Effective Date, except as otherwise provided in the Plan, each Executory Contract not previously rejected, assumed, or assumed and assigned shall be deemed automatically rejected pursuant to sections 365 and 1123 of the Bankruptcy Code, unless such Executory Contract: (i) is identified for assumption in the Plan Supplement; (ii) as of the Effective Date is subject to a pending motion to assume such Executory Contract; (iii) is a contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan; or (iv) is a D&O Policy.

### B. Cure of Defaults for Assumed Executory Contracts.

Any Cure due under each Executory Contract to be assumed pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment in Cash on the Effective Date or as soon as reasonably practicable thereafter, subject to the limitation described below, by the Debtors or the Liquidating Trustee, as applicable, or on such other terms as the parties to such Executory Contracts may otherwise agree.

In the event of a dispute regarding (i) the amount of the Cure; (ii) the ability of the Debtors or any other applicable assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract; or (iii) any other matter pertaining to assumption or assumption and assignment (as applicable), the obligations of section 365 of the Bankruptcy Code shall be deemed satisfied following the entry of a Final Order or orders resolving the dispute and approving the assumption or assumption and assignment (as applicable); *provided, however*, that the Debtors or the Liquidating Trustee, as applicable, may settle any dispute regarding the amount of any Cure without any further notice to any party or any action, order, or approval of the Bankruptcy Court.

Assumption of any Executory Contract pursuant to the Plan, or otherwise, shall result in the full release and satisfaction of any defaults, subject to satisfaction of the Cure, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract at any time before the Effective Date of such assumption and/or assignment.

### C.  Claims Based Upon Rejection of Executory Contracts.

Unless otherwise provided by an order of the Bankruptcy Court, any Proofs of Claim based on the rejection of the Debtors' Executory Contracts pursuant to the Plan, must be filed with the Bankruptcy Court and served on the Liquidating Trustee no later than thirty (30) calendar days after the filing and service of the notice of the occurrence of the Effective Date. All Allowed Claims arising from the rejection of the Debtors' Executory Contracts shall be classified as a Class 3 General Unsecured Claims, except as otherwise provided by Final Order of the Bankruptcy Court.

**Any Claims arising from the rejection of an Executory Contract not filed with the Bankruptcy Court and served on the Liquidating Trustee on or before the earlier of either (i) 30 days after the filing and service of the notice of the occurrence of the Effective Date or (ii) 30 days after the effective date of the rejection of the contract or lease, will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtors, the Debtors' Estates, or the property of any of the foregoing without the need for any objection by the Liquidating Trustee or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of such Executory Contract shall be deemed fully compromised, settled, and released, notwithstanding anything in the Schedules or a Proof of Claim to the contrary.**

**Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption or Cure Cost will therefore be deemed to have assented to such assumption and Cure Cost.**

### D.  Modifications, Amendments, Supplements, Restatements, or Other Agreements.

Unless otherwise provided for in the Plan, each assumed Executory Contract shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract, and all Executory Contracts related thereto, if any, including all

easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract, or the validity, priority, or amount of any Claims that may arise in connection therewith.

### E.    Reservation of Rights

Neither the exclusion nor inclusion of any contract or lease on any exhibit, schedule, annex to the Plan or in the Plan Supplement as a contract or lease to be assumed, nor anything contained in the Plan or Sale Transaction documents, nor the Debtors' delivery of a notice of proposed assumption and proposed Cure Cost to any contract and lease counterparties, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that the Debtors, Liquidating Trustee or Liquidating Debtors have any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or Liquidating Debtors, as applicable, shall have ten (10) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease. If there is a dispute regarding a Debtor's or Reorganized Debtor's liability under an assumed Executory Contract or Unexpired Lease, the Reorganized Debtors shall be authorized to move to have such dispute heard by the Bankruptcy Court. Except as otherwise provided in the Plan, nothing herein shall waive, excuse, limit, diminish, or otherwise alter any of the defenses, Claims, Causes of Action, or other rights of the Debtors and the Liquidating Trustee under any executory or non-executory contract or any unexpired or expired lease. Nothing in the Plan will increase, augment, or add to any of the duties, obligations, responsibilities, or liabilities of the Debtors, as applicable, under any executory or non-executory contract or any unexpired or expired lease.

### F.    Insurance Policies.

Notwithstanding anything to the contrary in the Plan, each insurance policy, including any D&O Policies to which the Debtors are a party as of the Effective Date, shall be deemed executory and shall be assumed by the Debtors on behalf of the applicable Debtor effective as of the Effective Date, pursuant to sections 365 and 1123 of the Bankruptcy Code, unless such insurance policy previously was assumed and assigned under the Asset Purchase Agreement, was rejected by the Debtors pursuant to a Final Order of the Bankruptcy Court, or is the subject of a motion to reject pending on the Effective Date, and coverage for defense and indemnity under the D&O Policy shall remain available to all individuals within the definition of "Insured" in the D&O Policy.

In addition, on and after the Effective Date, all officers, directors, agents, or employees who served in such capacity at any time before the Effective Date shall be entitled to the full benefits of any D&O Policy in effect or purchased as of the Effective Date for the full term of such policy regardless of whether such officers, directors, agents, and/or employees remain in such positions on or after the Effective Date, in each case, to the extent set forth in such policies.

45

### G.      Survival of Debtors' Indemnification Obligations.

To the fullest extent permitted by applicable law, any obligations of the Debtors pursuant to their corporate charters, by-laws, limited liability company agreements, memorandum and articles of association, or other organizational documents and agreements to indemnify any Indemnitee based upon any act or omission for or on behalf of the Debtors shall not be discharged, impaired, or otherwise affected by the Plan; provided that, notwithstanding anything herein, the Debtors shall not indemnify any Indemnitee for any claims or Causes of Action arising out of or relating to any act or omission (i) that is a criminal act unless such officer, director, agent, or employee had no reasonable cause to believe its conduct was unlawful; (ii) that is determined by a Final Order to be the result of fraud, gross negligence, or willful misconduct; or (iii) for any other acts or omissions that are excluded under the terms of the foregoing organizational documents. All such obligations, unless otherwise described in (i)-(ii) above, shall be deemed and treated as executory contracts to be assumed by the Debtors under the Plan unless such obligation previously was assumed and assigned under the Asset Purchase Agreement, was rejected by the Debtors pursuant to a Final Order of the Bankruptcy Court, or is the subject of a motion to reject pending on the Effective Date.

On the Effective Date, the Debtors shall establish the Indemnity Reserve, which shall be segregated, separately maintained by the Liquidating Trustee and used solely to satisfy the Debtors' indemnification obligations to the Indemnitees who were serving as of the Effective Date; *provided*, that any amounts of Cash in the Indemnity Reserve not used for such purposes on or before the second (2nd) anniversary of the Effective Date ("**Termination Date**") shall revert to the Liquidating Trustee and become Residual Cash; *provided, further*, that (i) prior to the Termination Date the Liquidating Trustee and the Indemnitees who were serving as of the Effective Date of the Plan shall engage in good faith discussions regarding an extension of the Termination Date, and (ii) the Termination Date may be extended by the Liquidating Trustee in its sole discretion without further Order of the Bankruptcy Court.

### ARTICLE XI.
### CONDITIONS PRECEDENT TO THE EFFECTIVE DATE

### A.      Conditions Precedent to the Effective Date.

The occurrence of the Effective Date of the Plan is subject to the following conditions precedent:

(1)      the Bankruptcy Court shall have entered the Confirmation Order, such Confirmation Order shall be in form and substance reasonably acceptable to the Consent Right Parties, the Confirmation Date shall have occurred and the Confirmation Order shall not be subject to any stay, modification, vacation on appeal, and shall have become a Final Order;

(2)      the Plan Supplement and all of the Schedules, documents, and exhibits contained therein, and all other relevant schedules, documents, supplements and exhibits to the Plan, shall have been filed with the Bankruptcy Court and shall be reasonably acceptable to the Consent Right Parties; and

(3)      all actions, documents, and agreements necessary to implement and consummate the Plan, and the other transactions and other matters contemplated in the Plan, shall have been effected or executed.

**B.      Waiver of Conditions Precedent.**

Each of the conditions precedent in <u>Article XI</u> of the Plan may be waived in writing by the Debtors, with notice to the Creditors' Committee, MBC and MEC, and without notice to or authorization of the Bankruptcy Court.

**C.      Effect of Failure of Conditions to Effective Date.**

If the conditions listed in <u>Article XI.A.</u> of the Plan are not satisfied, upon filing a notice with the Bankruptcy Court, the Debtors may deem the Plan null and void in all respects and in such a case, nothing contained in the Plan or the Disclosure Statement shall: (i) constitute a waiver or release of any Claims by or against or any Interests in the Debtor; (ii) prejudice in any manner the rights of any Entity; or (iii) constitute an admission, acknowledgement, offer, or undertaking by the Debtors or any other Entity.

**ARTICLE XII.**
**EFFECT OF CONFIRMATION**

**A.      Vesting of Assets.**

On the Effective Date, pursuant to section 1141(b) of the Bankruptcy Code, all property of the Estates not previously distributed to the holders of Allowed Claims shall vest in the Liquidating Trustee and be distributed according to this Plan, except as provided pursuant to the Sale Order, the Plan and the Confirmation Order.  On and after the Effective Date, the Liquidating Trustee may take any action, including, without limitation: (i) the operation of the Liquidating Debtors' businesses; (ii) the use, acquisition, sale, lease and disposition of property; (iii) the entry into transactions, agreements, understandings, or arrangements, to pursue the Retained Causes of Action, whether in or other than in the ordinary course of business; and (iv) executing, delivering, implementing and fully performing any and all obligations, instruments, documents, and papers or otherwise in connection with any of the foregoing, free of any restrictions of the Bankruptcy Code or Bankruptcy Rules and in all respects as if there was no pending cases under any chapter or provision of the Bankruptcy Code, except as expressly provided herein.  Without limiting the foregoing, the Liquidating Trustee may pay the charges it incurs on or after the Effective Date for professional fees, disbursements, expenses, or related support services without application to the Bankruptcy Court.

**B.      Release of Liens.**

Except as otherwise provided in the Sale Order, Plan, or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and terminated.

C.      **Binding Effect.**

As of the Effective Date, the Plan shall bind all holders of Claims against and Interests in the Debtor and their respective successors and assigns, notwithstanding whether any such holders were (i) Impaired or Unimpaired under the Plan; (ii) deemed to accept or reject the Plan; (iii) failed to vote to accept or reject the Plan; or (iv) voted to reject the Plan.

D.      **Sale Order.**

Nothing contained in the Plan, the Disclosure Statement, or the Confirmation Order, constitutes or shall be construed to be inconsistent with the terms of the Sale Order or any modification or amendment to the Sale Order.  In the event of any conflict between the Sale Order, on the one hand, or the Plan, Disclosure Statement, or Confirmation Order, on the other, the Sale Order shall govern and control.

E.      **Term of Injunctions or Stays.**

Unless otherwise provided in the Plan, the Confirmation Order, or in a Final Order of the Bankruptcy Court, all injunctions or stays arising under, or entered during, the Chapter 11 Cases under section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.

F.      **Compromise and Settlement.**

Pursuant to sections 363 and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims and Interests (other than Causes of Action that have not been waived, relinquished, exculpated, released, compromised or settled in the Plan or by Final Order of the Bankruptcy Court including, for the avoidance of doubt, any claims (i) against the Excluded Parties; or (ii) preserved by the Asset Purchase Agreement).  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all Claims and Interests (other than Causes of Action that have not been waived, relinquished, exculpated, released, compromised or settled in the Plan by Final Order of the Bankruptcy Court including, for the avoidance of doubt, any claims (i) against the Excluded Parties; or (ii) preserved by the Asset Purchase Agreement), as well as a finding by the Bankruptcy Court that such compromises or settlements are fair, equitable, reasonable and in the best interests of the Debtors, the Estates and holders of Claims and Interests.

G.      **Debtor Release.**

**AS OF THE EFFECTIVE DATE, EXCEPT AS OTHERWISE EXPRESSLY PROVIDED FOR IN THE PLAN, AND TO THE FULLEST EXTENT AUTHORIZED BY APPLICABLE LAW, FOR GOOD AND VALUABLE CONSIDERATION, THE ADEQUACY OF WHICH IS HEREBY CONFIRMED, EACH DEBTOR RELEASED PARTY IS DEEMED RELEASED BY THE DEBTORS, THEIR RESPECTIVE ESTATES, THE LIQUIDATING TRUSTEE, AND ANY PERSON OR ENTITY (OTHER THAN THE BUYER, MBC AND MEC), SEEKING TO EXERCISE THE RIGHTS OF THE DEBTORS**

48

OR THEIR ESTATES AND THEIR RESPECTIVE PROPERTY (AND EACH SUCH DEBTOR RELEASED PARTY SHALL BE DEEMED RELEASED BY EACH DEBTOR AND ITS ESTATE AND ITS RESPECTIVE PROPERTY) FROM ANY AND ALL CLAIMS, OBLIGATIONS, SUITS, JUDGMENTS, DAMAGES, DEMANDS, DEBTS, REMEDIES, CAUSES OF ACTION, RIGHTS OF SETOFF, OTHER RIGHTS, AND LIABILITIES WHATSOEVER, WHETHER FOR TORT, CONTRACT, VIOLATIONS OF FEDERAL OR STATE SECURITIES LAWS, AVOIDANCE ACTIONS, INCLUDING ANY DERIVATIVE CLAIMS, ASSERTED OR THAT COULD POSSIBLY HAVE BEEN ASSERTED DIRECTLY OR INDIRECTLY, WHETHER LIQUIDATED OR UNLIQUIDATED, FIXED OR CONTINGENT, MATURED OR UNMATURED, KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, EXISTING OR HEREAFTER ARISING, IN LAW, EQUITY, OR OTHERWISE, AND ANY AND ALL CAUSES OF ACTION ASSERTED OR THAT COULD POSSIBLY HAVE BEEN ASSERTED, BASED ON OR IN ANY WAY RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE DEBTORS, THEIR ESTATES OR THEIR AFFILIATES, THE CONDUCT OF THE DEBTORS' BUSINESS, THE FORMULATION, PREPARATION, SOLICITATION, DISSEMINATION, NEGOTIATION, OR FILING OF THE DIP CREDIT AGREEMENT, THE ASSET PURCHASE AGREEMENT, THE DISCLOSURE STATEMENT OR THE PLAN OR ANY CONTRACT, INSTRUMENT, RELEASE, OR OTHER AGREEMENT OR DOCUMENT CREATED OR ENTERED INTO IN CONNECTION WITH OR PURSUANT TO THE DIP CREDIT AGREEMENT, THE ASSET PURCHASE AGREEMENT, THE DISCLOSURE STATEMENT, THE PLAN, THE PREPARATION, FILING AND PROSECUTION OF THE CHAPTER 11 CASES, THE PURSUIT OF CONSUMMATION OF THE PLAN, THE SALE, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR INTEREST THAT IS TREATED IN THE PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN THE DEBTORS, THEIR ESTATES OR THEIR AFFILIATES, ON THE ONE HAND, AND ANY DEBTOR RELEASED PARTY, ON THE OTHER HAND, OR ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE BEFORE THE EFFECTIVE DATE; PROVIDED, HOWEVER, THAT THE RELEASES SET FORTH IN THIS ARTICLE XII.G. SHALL NOT OPERATE TO WAIVE OR RELEASE ANY CLAIMS OR CAUSES OF ACTION OF THE DEBTORS OR THEIR RESPECTIVE CHAPTER 11 ESTATES AGAINST A DEBTOR RELEASED PARTY FROM ANY CLAIMS RESULTING FROM AN ACT OR OMISSION DETERMINED BY A FINAL ORDER OF THE BANKRUPTCY COURT TO HAVE CONSTITUTED FRAUD, WILLFUL MISCONDUCT OR GROSS NEGLIGENCE, *PROVIDED THAT*, EACH SUCH DEBTOR RELEASED PARTY SHALL BE ENTITLED TO RELY UPON THE ADVICE OF COUNSEL CONCERNING ITS DUTIES PURSUANT TO, OR IN CONNECTION WITH, ITS ACTIONS OR INACTIONS. NOTWITHSTANDING ANYTHING IN THE PLAN OR THIS ARTICLE XII.G. TO THE CONTRARY, THE EXCLUDED PARTIES ARE NOT RECEIVING AND SHALL NOT RECEIVE A RELEASE UNDER THIS PLAN.

ENTRY OF THE CONFIRMATION ORDER SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE DEBTOR RELEASES, WHICH INCLUDES BY REFERENCE EACH OF THE

49

RELATED PROVISIONS AND DEFINITIONS CONTAINED IN THE PLAN, AND, FURTHER, SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE DEBTOR RELEASE IS: (I) IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE DEBTOR RELEASED PARTIES; (II) A GOOD-FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS RELEASED BY THE DEBTOR RELEASE; (III) IN THE BEST INTERESTS OF THE DEBTORS' ESTATES AND ALL HOLDERS OF CLAIMS AND INTERESTS; (IV) FAIR, EQUITABLE, AND REASONABLE; (V) GIVEN AND MADE AFTER DUE NOTICE AND THE OPPORTUNITY FOR A HEARING; AND (VI) A BAR TO ANY OF THE DEBTORS' ESTATES, OR THE LIQUIDATING TRUSTEE, ASSERTING ANY CLAIM OR CAUSE OF ACTION RELEASED PURSUANT TO THE DEBTOR RELEASE.

H.      Releases by Holders of Claims and Interests

EFFECTIVE AS OF THE EFFECTIVE DATE, THE RELEASING PARTIES SHALL BE DEEMED TO HAVE PROVIDED A FULL RELEASE TO THE RELEASED PARTIES, AND THEIR RESPECTIVE PROPERTY, FROM ANY AND ALL CLAIMS, OBLIGATIONS, SUITS, JUDGMENTS, DAMAGES, DEMANDS, DEBTS, REMEDIES, CAUSES OF ACTION, RIGHTS OF SETOFF, OTHER RIGHTS, AND LIABILITIES WHATSOEVER, WHETHER FOR TORT, CONTRACT, VIOLATIONS OF FEDERAL OR STATE SECURITIES LAWS, AVOIDANCE ACTIONS, INCLUDING ANY DERIVATIVE CLAIMS, ASSERTED OR THAT COULD POSSIBLY HAVE BEEN ASSERTED DIRECTLY OR INDIRECTLY, WHETHER LIQUIDATED OR UNLIQUIDATED, FIXED OR CONTINGENT, MATURED OR UNMATURED, KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, EXISTING OR HEREAFTER ARISING, IN LAW, EQUITY, OR OTHERWISE, AND ANY AND ALL CAUSES OF ACTION ASSERTED OR THAT COULD POSSIBLY HAVE BEEN ASSERTED, BASED ON OR IN ANY WAY RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE DEBTORS, THEIR ESTATES OR THEIR AFFILIATES, THE CONDUCT OF THE DEBTORS' BUSINESS, THE FORMULATION, PREPARATION, SOLICITATION, DISSEMINATION, NEGOTIATION, OR FILING OF THE DIP CREDIT AGREEMENT, THE ASSET PURCHASE AGREEMENT, THE DISCLOSURE STATEMENT OR THE PLAN OR ANY CONTRACT, INSTRUMENT, RELEASE, OR OTHER AGREEMENT OR DOCUMENT CREATED OR ENTERED INTO WITH OR PURSUANT TO THE DIP CREDIT AGREEMENT, THE ASSET PURCHASE AGREEMENT, THE DISCLOSURE STATEMENT, THE PLAN, THE PREPARATION, FILING AND PROSECUTION OF THE CHAPTER 11 CASES, THE PURSUIT OF CONSUMMATION OF THE PLAN, THE SALE, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR INTEREST THAT IS TREATED IN THE PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN THE DEBTORS, THEIR ESTATES OR THEIR AFFILIATES, ON THE ONE HAND, AND ANY DEBTOR RELEASED PARTY, ON THE OTHER HAND, OR ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE BEFORE THE EFFECTIVE DATE; *PROVIDED*, *HOWEVER*, THE RELEASES SET FORTH ABOVE (I) DO NOT RELEASE ANY POST-EFFECTIVE DATE OBLIGATIONS OF ANY PARTY OR ENTITY UNDER THE PLAN, (II) ARE

APPLICABLE ONLY TO THE MAXIMUM EXTENT PERMITTED BY LAW, (III) DO NOT RELEASE ANY PREPETITION SECURED PARTIES', BUYER'S, MBC'S, MEC'S, OR OBI'S CLAIMS, OBLIGATIONS, SUITS, JUDGMENTS, DAMAGES, DEMANDS, DEBTS, REMEDIES, CAUSES OF ACTION, RIGHTS OF SETOFF, OTHER RIGHTS, AND LIABILITIES UNDER ANY AGREEMENT ENTERED INTO BY THE DEBTORS AFTER THE PETITION DATE, (IV) DO NOT RELEASE ANY OBLIGATIONS OR RIGHTS UNDER THE ASSET PURCHASE AGREEMENT, (V) DO NOT RELEASE ANY CLAIMS, OBLIGATIONS, SUITS, JUDGMENTS, DAMAGES, DEMANDS, DEBTS, REMEDIES, CAUSES OF ACTION, RIGHTS OF SETOFF, OTHER RIGHTS, AND LIABILITIES BETWEEN ANY "BUYER RELEASING PARTY" AND ANY "SELLER RELEASING PARTY" (AS THE TERMS "BUYER RELEASING PARTY" AND "SELLER RELEASING PARTY" ARE DEFINED IN SECTION 7.16(A) AND SECTION 7.16(B), RESPECTIVELY, OF THE ASSET PURCHASE AGREEMENT), AND THE RELEASES BETWEEN SUCH PARTIES SHALL BE GOVERNED BY SECTION 7.16 OF THE ASSET PURCHASE AGREEMENT), AND (VI) DO NOT RELEASE ANY RIGHTS OR OBLIGATIONS BETWEEN OBI, MBC, MEC AND BUYER; *PROVIDED FURTHER*, *HOWEVER*, THAT THE RELEASES SET FORTH IN THIS ARTICLE XII.H. SHALL NOT RELEASE ANY PERSON OR ENTITY FROM ANY RETAINED CAUSES OF ACTION OR CLAIMS RESULTING FROM AN ACT OR OMISSION DETERMINED BY A FINAL ORDER OF A COURT OF COMPETENT JURISDICTION TO HAVE CONSTITUTED FRAUD, WILLFUL MISCONDUCT OR GROSS NEGLIGENCE, *PROVIDED THAT*, EACH SUCH DEBTOR RELEASED PARTY SHALL BE ENTITLED TO RELY UPON THE ADVICE OF COUNSEL CONCERNING ITS DUTIES PURSUANT TO, OR IN CONNECTION WITH, ITS ACTIONS OR INACTIONS.

ENTRY OF THE CONFIRMATION ORDER SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE THIRD PARTY RELEASE, WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED IN THE PLAN, AND, FURTHER, SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE THIRD PARTY RELEASE BY THOSE CREDITORS OR INTEREST HOLDERS WHO DID NOT OPT-OUT OF THE RELEASE IS: (I) IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION AND SUBSTANTIAL CONTRIBUTIONS PROVIDED BY THE RELEASED PARTIES; (II) A GOOD FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS RELEASED BY THE THIRD PARTY RELEASE; (III) IN THE BEST INTERESTS OF THE DEBTORS AND ALL HOLDERS OF CLAIMS AND INTERESTS; (IV) FAIR, EQUITABLE, AND REASONABLE; (V) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING; AND (VI) A BAR TO ANY OF THE RELEASING PARTIES ASSERTING ANY CLAIM RELEASED PURSUANT TO THE THIRD-PARTY RELEASE.

I.    **Exculpation.**

NOTWITHSTANDING ANYTHING IN THE PLAN TO THE CONTRARY, NO EXCULPATED PARTY WILL HAVE OR INCUR, AND EACH EXCULPATED PARTY IS ON THE EFFECTIVE DATE EXCULPATED FROM, ANY CLAIM, OBLIGATION, SUIT, JUDGMENT, DAMAGE, DEMAND, DEBT, RIGHT, CAUSE OF ACTION,

REMEDY, LOSS, AND LIABILITY FOR ANY CLAIM RELATED TO ANY ACT OR OMISSION IN CONNECTION WITH OR ARISING OUT OF THE PREPARATION, FOR, AND ADMINISTRATION OF, THE CHAPTER 11 CASES; THE NEGOTIATION, FORMULATION, PREPARATION, IMPLEMENTATION, CONSUMMATION, AND PURSUIT OF THE DIP CREDIT AGREEMENT, THE ASSET PURCHASE AGREEMENT, THE DISCLOSURE STATEMENT, THE PLAN, AND THE SOLICITATION OF VOTES FOR, AND CONFIRMATION OF, THE PLAN; THE FUNDING AND CONSUMMATION OF THE PLAN, AND ANY RELATED AGREEMENTS, INSTRUMENTS, AND OTHER DOCUMENTS (IN EACH CASE IN FURTHERANCE OF THE FOREGOING); THE MAKING OF DISTRIBUTIONS UNDER THE PLAN; THE OCCURRENCE OF THE EFFECTIVE DATE; NEGOTIATIONS REGARDING OR CONCERNING ANY OF THE FOREGOING, OR THE ADMINISTRATION OF THE PLAN OR PROPERTY TO BE DISTRIBUTED UNDER THE PLAN; OR UPON ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT OR OTHER OCCURRENCE TAKING PLACE FROM THE PETITION DATE RELATING TO THE DEBTORS OR THE CHAPTER 11 CASES; *PROVIDED*, *HOWEVER*, THAT THE EXCULPATION DOES NOT HAVE ANY IMPACT ON THE ENFORCEMENT AND VALIDITY OF THE ASSET PURCHASE AGREEMENT; *PROVIDED, FURTHER, HOWEVER*, THAT THE EXCULPATION DOES NOT HAVE ANY IMPACT ON AND DOES NOT AFFECT ANY CLAIMS, OBLIGATIONS, SUITS, JUDGMENTS, DAMAGES, DEMANDS, DEBTS, REMEDIES, CAUSES OF ACTION, RIGHTS OF SETOFF, OTHER RIGHTS, AND LIABILITIES BETWEEN ANY "BUYER RELEASING PARTY" AND ANY "SELLER RELEASING PARTY" (AS THE TERMS "BUYER RELEASING PARTY" AND "SELLER RELEASING PARTY" ARE DEFINED IN SECTION 7.16(A) AND SECTION 7.16(B), RESPECTIVELY, OF THE ASSET PURCHASE AGREEMENT); *PROVIDED*, *FURTHER*, *HOWEVER* THAT THE EXCULPATION SET FORTH IN THIS ARTICLE XII.I. SHALL NOT EXCULPATE ANY PERSON OR ENTITY FROM CLAIMS RESULTING FROM AN ACT OR OMISSION DETERMINED BY A FINAL ORDER OF THE BANKRUPTCY COURT TO HAVE CONSTITUTED FRAUD, WILLFUL MISCONDUCT OR GROSS NEGLIGENCE, *PROVIDED THAT*, EACH SUCH EXCULPATED PARTY SHALL BE ENTITLED TO RELY UPON THE ADVICE OF COUNSEL CONCERNING ITS DUTIES PURSUANT TO, OR IN CONNECTION WITH, ITS ACTIONS OR INACTIONS; *PROVIDED FURTHER*, *HOWEVER*, NOTHING IN THE PLAN SHALL LIMIT THE LIABILITY OF ATTORNEYS TO THEIR RESPECTIVE CLIENTS PURSUANT TO RULE 4-1.8(H) OF THE FLORIDA RULES OF PROFESSIONAL CONDUCT.  THIS EXCULPATION SHALL BE IN ADDITION TO, AND NOT IN LIMITATION OF, ALL OTHER RELEASES, INDEMNITIES, EXCULPATIONS AND ANY OTHER APPLICABLE LAW OR RULES PROTECTING SUCH EXCULPATED PARTIES FROM LIABILITY.   THE FOREGOING EXCULPATION SHALL BE EFFECTIVE AS OF THE EFFECTIVE DATE WITHOUT FURTHER NOTICE TO OR ORDER OF THE BANKRUPTCY COURT, ACT OR ACTION UNDER APPLICABLE LAW, REGULATION, ORDER, OR RULE OR THE VOTE, CONSENT, AUTHORIZATION OR APPROVAL OF ANY PERSON.

### J.      Injunctions.

Except as otherwise provided in the Plan or the Confirmation Order, all Enjoined Parties are permanently enjoined and precluded, from and after the Effective Date, from: (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, Causes of Action, or liabilities; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims, Interests, Causes of Action, or liabilities; (3) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or Estates of such Entities on account of or in connection with or with respect to any such Claims, Interests, Causes of Action, or liabilities; (4) asserting any right of setoff, or subrogation against any obligation due from such Entities or against the property or Estates of such Entities on account of or in connection with or with respect to any such Claims or Interests unless such Holder has filed a motion or filed a claim requesting the right to perform such setoff or subrogation on or before the Confirmation Date; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, Causes of Action, or liabilities released or settled pursuant to the Plan.  For the avoidance of doubt, and notwithstanding anything in the Plan to the contrary, this <u>Article XII.J.</u> does not apply to any claims, obligations, suits, judgments, damages, demands, debts, remedies, causes of action, rights of setoff, other rights, and liabilities between any "Buyer Releasing Party" and any "Seller Releasing Party" (as the terms "Buyer Releasing Party" and "Seller Releasing Party" are defined in Section 7.16(a) and Section 7.16(b), respectively, of the Asset Purchase Agreement).

### K.      Gatekeeper Provision.

No Enjoined Party may commence or pursue a Claim or Cause of Action of any kind against any Debtor Released Party that arose or arises from or is related to the Chapter 11 Cases, the negotiation of the Plan, the consummation or administration of the Plan or property to be distributed under the Plan, the wind down of the businesses of the Debtors, the administration of the Liquidating Trust, or the transactions in furtherance of the foregoing without the Bankruptcy Court (i) first determining, after notice and a hearing, that such Claim or Cause of Action represents a "colorable" Claim of any kind, including, but not limited to, negligence, bad faith, criminal misconduct, willful misconduct, fraud, or gross negligence against a Debtor Released Party; and (ii) specifically authorizing such Enjoined Party to bring such Claim or Cause of Action against any such Debtor Released Party; provided, however, the foregoing will not apply to a Claim or Cause of Action against any Excluded Party.  To the extent legally permissible and as provided for in <u>Article XIII</u>, the Bankruptcy Court will have sole and exclusive jurisdiction to determine whether a Claim or Cause of Action is "colorable" even if the Bankruptcy Court would not have jurisdiction to issue a final, non-appealable order on the underlying Claim or Cause of Action.  The Bankruptcy Court may, in its sole discretion, conduct an evidentiary hearing (during which it may, among other things, hear testimony and assess the credibility of any witness(es)) in order to determine whether a proposed Claim or Cause of Action is "colorable."  For purposes of the Bankruptcy Court's determination under this provision after taking into

account any admissible evidence, "colorable" means that the proposed Claim or Cause of Action is (a) procedurally and legally sound; (b) not brought for an improper purpose, such as harassment; and (c) no part of the pleading fails to satisfy the Bankruptcy Court that it warrants a federal civil action or that the litigant's allegations are unlikely, especially when prior cases have shown the litigant to be untrustworthy or not credible.  See *Silver v. City of San Antonio*, 2020 WL 3803922, at *1 (W.D. Tex.  July 7, 2020) (denying leave to file suit); *Silver v. Perez*, 2020 WL 3790489, at *1, 6 (W.D. Tex. July 7, 2020) (same).

Notwithstanding the foregoing or anything in this Plan to the contrary, this Article XII.K. does not have any impact on and does not affect any claims, obligations, suits, judgments, damages, demands, debts, remedies, causes of action, rights of setoff, other rights, and liabilities between any "Buyer Releasing Party" and any "Seller Releasing Party" (as the terms "Buyer Releasing Party" and "Seller Releasing Party" are defined in Section 7.16(a) and Section 7.16(b), respectively, of the Asset Purchase Agreement).

## ARTICLE XIII.
## RETENTION OF JURISDICTION

On and after the Effective Date, the Bankruptcy Court shall retain jurisdiction over all matters arising in, arising under, and related to the Chapter 11 Cases and the Plan for, among other things, the following purposes:

(1)    to hear and determine motions and/or applications for the assumption or rejection of Executory Contracts and the allowance, classification, priority, compromise, estimation or payment of Claims resulting therefrom;

(2)    to determine or adjudicate any motion, adversary proceeding, application, contested matter, or other litigated matter pending on or commenced or removed after the Confirmation Date, including but not limited to the Retained Causes of Action;

(3)    to ensure that distributions to holders of Allowed Claims are accomplished as provided herein;

(4)    to consider Claims or the allowance, classification, priority, compromise, estimation or payment of any Claim;

(5)    to enter, implement or enforce such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, modified or vacated;

(6)    to issue injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any Person with the Consummation, implementation or enforcement of the Plan, the Confirmation Order, or any other order of the Bankruptcy Court;

(7)    to hear and determine any application to modify the Plan in accordance with section 1127 of the Bankruptcy Code, to remedy any defect or omission or reconcile any inconsistency in the Plan, or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

54

(8)    to hear and determine all applications under sections 330, 331, and 503(b) of the Bankruptcy Code for awards of compensation for services rendered and reimbursement of expenses incurred before the Confirmation Date (e.g., Fee Claims);

(9)    to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, the Confirmation Order, the Sale Order, the Asset Purchase Agreement, or any agreement, instrument, or other document governing or relating to any of the foregoing;

(10)    to take any action and issue such orders as may be necessary to construe, interpret, enforce, implement, execute, and consummate the Plan or to maintain the integrity of the Plan following Consummation;

(11)    to hear any disputes arising out of, and to enforce, any order approving alternative dispute resolution procedures to resolve personal injury, employment litigation and similar Claims pursuant to section 105(a) of the Bankruptcy Code;

(12)    to determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(13)    to hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code (including any requests for expedited determinations under section 505(b) of the Bankruptcy Code);

(14)    to adjudicate, decide or resolve any and all matters related to section 1141 of the Bankruptcy Code;

(15)    to adjudicate any and all disputes arising from or relating to distributions under the Plan;

(16)    to hear and determine any other matters related hereto and not inconsistent with the Bankruptcy Code and title 28 of the United States Code;

(17)    to enter a final decree closing the Chapter 11 Cases;

(18)    to enforce all orders, judgments, injunctions, releases, exculpations, indemnifications and rulings previously entered or approved by the Bankruptcy Court;

(19)    to recover all assets of the Debtors and property of the Debtors' Estates, wherever located; and

(20)    to hear and determine any rights, Claims or Causes of Action held by or accruing to the Debtors pursuant to the Bankruptcy Code or pursuant to any federal statute or legal theory.

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising out of the Plan, such abstention, refusal or failure of jurisdiction shall have no effect upon and shall not control, prohibit, or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

Notwithstanding the foregoing or anything to the contrary herein, this <u>Article XIII</u> shall not apply to the California District Court Action, the OBI/Monster Matter, the Trade Secret Matters, the VPX Florida Matters, the Orange Bang Trademark License Action, the TTAB Matter, and/or any litigation or other Proceeding involving a "Buyer Releasing Party" and a "Seller Releasing Party" (as the terms "Buyer Releasing Party" and "Seller Releasing Party" are defined in Section 7.16(a) and Section 7.16(b), respectively, of the Asset Purchase Agreement) that was pending in any jurisdiction or other forum as of June 28, 2023.

## ARTICLE XIV.
## MISCELLANEOUS PROVISIONS

### A.    Payment of Statutory Fees.

On the Effective Date and thereafter as may be required, the Liquidating Trustee shall pay in full in Cash all fees incurred pursuant to § 1930 of title 28 of the United States Code, together with interest, if any, pursuant to § 3717 of title 31 of the United States Code for each Debtor's case; *provided, however*, that after the Effective Date such fees shall only be payable until such time as a final decree is entered closing the Chapter 11 Cases, a Final Order converting such cases to cases under chapter 7 of the Bankruptcy Code is entered or a Final Order dismissing the Chapter 11 Cases is entered.

The U.S. Trustee shall not be required to file a request for payment of its quarterly fees, which shall be deemed an Administrative Claim against the Debtors and their estates.  All such fees due and payable prior to the Effective Date shall be paid by the Debtors on the Effective Date. After the Effective Date, the Liquidating Debtors or Liquidating Trustee, as applicable, shall pay any and all fees when due and payable, and shall file with the Bankruptcy Court quarterly reports in a form reasonably acceptable to the United States Trustee, until the earliest of the date on which the Chapter 11 Cases are converted, dismissed, or closed.

### B.    Post-Confirmation Reporting.

After the Effective Date, in accordance with guidelines established by the United States Trustee, the Liquidating Trustee will file quarterly operating reports with the Bankruptcy Court.

### C.    Substantial Consummation.

On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

### D.    Amendments.

(1)    *Plan Modifications*.  The Debtors reserve the right, with the consent of the Consent Right Parties, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify the Plan prior to the entry of the Confirmation Order, including amendments or modifications to satisfy section 1129(b) of the Bankruptcy Code, and after entry of the Confirmation Order, the Debtors may amend, modify or supplement the Plan in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law, in each case without additional disclosure pursuant to section 1125 of the Bankruptcy Code.  In addition,

after the Confirmation Date, so long as such action does not materially and adversely affect the treatment of holders of Allowed Claims or Allowed Interests pursuant to the Plan, *prior to the Effective Date*, the Debtors, and with the consent of the Consent Right Parties but without the need for Bankruptcy Court approval, or *following the Effective Date*, the Liquidating Trustee may remedy any defect or omission or reconcile any inconsistencies in this Plan or the Confirmation Order with respect to such matters as may be necessary to carry out the purposes or effects of this Plan, and any holder of a Claim that has accepted this Plan shall be deemed to have accepted this Plan as amended, modified, or supplemented.

(2)    *Other Amendments.*  Before the Effective Date, the Debtors may make appropriate technical adjustments and modifications to the Plan and any of the documents prepared in connection herewith without further order or approval of the Bankruptcy Court.

### E.    Revocation or Withdrawal of the Plan.

The Debtors reserve the right to revoke or withdraw the Plan, including the right to revoke or withdraw the Plan for any Debtor or all Debtors, prior to the conclusion of the Confirmation Hearing.  If the Debtors revoke or withdraw the Plan, or if Confirmation or the occurrence of the Effective Date does not occur, then: (i) the Plan shall be null and void in all respects; (ii) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts affected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (iii) nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims or Interests; (b) prejudice in any manner the rights of the Debtors, the Debtors' Estates, or any other Entity; or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors, the Debtors' Estates, or any other Entity.

### F.    Severability of Plan Provisions Upon Confirmation.

If, before the entry of the Confirmation Order, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtors, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is (i) valid and enforceable pursuant to its terms; (ii) integral to the Plan and may not be deleted or modified without the consent of the Debtors or the Liquidating Trustee (as the case may be); and (iii) non-severable and mutually dependent.

### G.    Governing Law.

Except to the extent that the Bankruptcy Code or other federal law is applicable, or to the extent an exhibit hereto provides otherwise, the rights, duties and obligations arising under the

Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of Florida, without giving effect to the principles of conflict of laws thereof; *provided*, that corporate or entity governance matters relating to any Debtor shall be covered by the laws of the state of incorporation or organization of the applicable Debtor.

Notwithstanding the foregoing or anything to the contrary herein, this Article XIV.G. shall not apply to the California District Court Action, the OBI/Monster Matter, the Trade Secret Matters, the VPX Florida Matters, the Orange Bang Trademark License Action, the TTAB Matter, and/or any litigation or other Proceeding involving a "Buyer Releasing Party" and a "Seller Releasing Party" (as the terms "Buyer Releasing Party" and "Seller Releasing Party" are defined in Section 7.16(a) and Section 7.16(b), respectively, of the Asset Purchase Agreement) that was pending in any jurisdiction or other forum as of June 28, 2023.

**H.     Time.**

In computing any period of time prescribed or allowed by the Plan, unless otherwise set forth herein or determined by the Bankruptcy Court, the provisions of Bankruptcy Rule 9006 shall apply.

**I.     Additional Documents.**

On or before the Effective Date, the Debtors may issue, execute, deliver and file with the Bankruptcy Court or record, as applicable, such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The Debtors, the Liquidating Trustee, and all holders of Claims or Interests receiving distributions pursuant to the Plan and all other parties in interest shall, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

**J.     Dates of Actions to Implement the Plan.**

In the event that any payment or act under the Plan is required to be made or performed on a date that is not on a Business Day, then the making of such payment or the performance of such act may be completed on or as soon as reasonably practicable after the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

**K.     Immediate Binding Effect.**

Notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan shall be immediately effective and enforceable and deemed binding upon and inure to the benefit of the Debtors, the holders of Claims and Interests, the Released Parties, the Exculpated Parties, and each of their respective successors and assigns, including, without limitation, the Liquidating Trustee.  For the avoidance of doubt, confirmation of the Plan does not provide the Debtors with a discharge under section 1141 of the Bankruptcy Code because the Debtors and their Estates will be wound down in accordance with the Plan.

**L.      Deemed Acts.**

Subject to and conditioned on the occurrence of the Effective Date, whenever an act or an event is expressed under the Plan to have been deemed done or to have occurred, it shall be deemed to have been done or to have occurred without any further act by any party, by virtue of the Plan and the Confirmation Order.

**M.      Successor and Assigns.**

The rights, benefits and obligations of any Person or Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or permitted assign, if any, of each Entity.

**N.      Solicitation of the Plan.**

As of and subject to the occurrence of the Confirmation Date: (i) the Debtors shall be deemed to have previously solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code, including without limitation, section 1125(a) of the Bankruptcy Code, and any applicable non-bankruptcy law, rule or regulation governing the adequacy of disclosure in connection with such solicitation; and (ii) the Debtors and each of their respective directors, officers, managers, members, shareholders, representatives, principals, employees, Affiliates, agents, financial advisors, investment bankers, professionals, accountants, and attorneys shall be deemed to have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code in the offer and issuance of any securities under the Plan, and therefore, are not, and on account of such offer, issuance and solicitation will not be, liable at any time for any violation of any applicable law, rule or regulation governing the solicitation of acceptances or rejections of the Plan or the offer and issuance of any securities under the Plan.

**O.      Plan Supplement.**

Unless otherwise ordered by the Bankruptcy Court, the Plan Supplement shall be filed with the Bankruptcy Court by not later than the objection deadline for filing objections with respect to the Confirmation Hearing.  Upon its filing with the Bankruptcy Court, the Plan Supplement may be obtained online at the website of the Debtors' court-appointed noticing, claims and solicitation agent, Stretto, Inc., at https://cases.stretto.com/VitalPharmaceuticals.

**P.      Entire Agreement.**

Except with respect to the Asset Purchase Agreement and all other documents and instruments executed and delivered in connection with consummation of the Sale Transaction, on the Effective Date, the Plan, the Plan Supplement, and the Confirmation Order shall supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings and representations on such subjects, all of which have become merged and integrated into the Plan. If the Effective Date does not occur, nothing herein shall be construed as a waiver by any party in interest of any or all of such party's rights, remedies, claims, and defenses, and such parties expressly reserve and preserve any and all of their respective rights, remedies, claims, and defenses.  The Plan and the documents comprising the Plan Supplement, including any drafts

12218776-23

thereof (and any discussions, correspondence, or negotiations regarding any of the foregoing) shall in no event be construed as, or be deemed to be, evidence of an admission or concession on the part of any party in interest of any claim or fault or liability or damages whatsoever. Pursuant to Federal Rule of Evidence 408 and any applicable state rules of evidence, all negotiations, discussions, agreements, settlements, and compromises reflected in or related to the Plan and the documents comprising the Plan Supplement are part of a proposed settlement of matters that could otherwise be the subject of litigation among various parties in interest, and such negotiations, discussions, agreements, settlements, and compromises shall not be admissible into evidence in any proceeding other than a proceeding to enforce the terms of the Plan and the documents comprising the Plan Supplement.

**Q.     Exhibits to Plan.**

All exhibits, schedules, supplements, and appendices to the Plan (including the Plan Supplement) are incorporated into and are a part of the Plan as if set forth in full herein.

**R.     Notices.**

All notices, requests and demands to or upon the Debtors and the Liquidating Trustee, as applicable, to be effective shall be in writing (including by electronic or facsimile transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

**To the Debtors:**

> Vital Pharmaceuticals, Inc., Bang Energy Canada, Inc., JHO Intellectual Property Holdings, LLC, JHO Real Estate Investment, LLC, Quash Seltzer, LLC, Rainbow Unicorn Bev LLC and Vital Pharmaceuticals International Sales, Inc.
> c/o Huron Consulting Group, LLC
> 1166 Avenue of the Americas, 3rd Floor
> New York, NY 10036
> Attn: John C. DiDonato, Chief Transformation Officer and Interim Chief Executive Officer
> Tel:    (646) 520-0084
> Email: jdidonato@hcg.com
>
> - and –
> -
> LATHAM & WATKINS LLP
> 555 Eleventh Street, NW, Suite 1000
> Washington, D.C. 20004
> Tel:    (202) 637-2200
> Attn: Andrew D. Sorkin, Esq.
> Email: andrew.sorkin@lw.com

12218776-23

- and -

BERGER SINGERMAN LLP
1450 Brickell Avenue, Suite 1900
Miami, Florida 33131
Attn:   Jordi Guso, Esq. and Michael J. Niles, Esq.
Tel:    (305) 755-9500
Email: jguso@bergersingerman.com
       niles@bergersingerman.com

**To the Liquidating Trustee:** [to be provided in the Plan Supplement]

**To the Creditors' Committee:**

SEQUOR LAW, P.A.
1111 Brickell Avenue, Suite 1250
Miami, FL 33131
Attn: Leyza F. Blanco, Esq., Fernando J. Menendez, Esq. and
Juan J. Mendoza, Esq.
Tel:    (305) 372-8282
Email: lblanco@sequorlaw.com
      fmenendez@sequorlaw.com
      jmendoza@sequorlaw.com

- and –

LOWENSTEIN SANDLER LLP
1251 Avenue of the Americas, 17th Floor
New York, New York 10020
Phone: (212) 419-5868
Attn: Eric Chafetz, Esq., Jeffrey Cohen, Esq., Lindsay Sklar, Esq.
and Erica Mannix, Esq.
Email: echafetz@lowenstein.com
      jcohen@lowenstein.com
      lsklar@lowenstein.com
      emannix@lowenstein.com

After the Effective Date, the Debtors have the authority to send a notice to the Entities that to continue to receive documents pursuant to Bankruptcy Rule 2002, they must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002. After the Effective Date, the Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those entities who have filed such renewed requests.

Dated: September 15, 2023      Respectfully Submitted,
       Miami, Florida

                              By: */s/ John C. DiDonato*
                                  Name: John C. DiDonato
                                  Title: Chief Transformation Officer and
                                         Interim Chief Executive Officer

62

12218776-23

**EXHIBIT "2"**

**SALE PROCEEDS SUMMARY**

**TRANSACTION SOURCES & USES**

*Dated: September 1, 2023*

*In $US Dollars*

| Sources | | Uses | |
|---|---|---|---|
| **Description** | **$ Amount** | **Description** | **$ Amount** |
| Base Purchase Price | $362,000,000.00 a | Mechanics' liens segregated account | $16,500,000.00 c |
| (+) Closing Cash Amount | 870,581.30 | WARN Liabilities segregated account | 4,000,000.00 c |
| (+) Side Letter #2 Amount | 514,290.00 | Employee Liabilities segregated account | 4,000,000.00 c |
| **Total Purchase Price** | **363,384,871.30** | Carve Out segregated account | 20,050,000.00 c |
| (-) Deposit | (25,000,000.00) | Distributor payments segregated account | 2,804,000.00 c |
| (-) Interest on Deposit | (15,483.21) | Funds from VPX to Title Company | 200.00 d |
| **Amount to be paid at Closing** | **338,369,388.09** | Payment to Lender Agent (Partial DIP Recovery) | 269,000,000.00 e |
| (+) Deposit Escrow Account (remaining funds) | 10,015,483.21 b | Payment to Berry Law Group, PLLC | 12,081.22 e |
| | | Payment to Shutts & Bowen LLP | 31,520.00 e |
| | | Payment to Moore & Van Allen PLLC | 109,010.59 e |
| | | Payment to FTI Consulting | 218,068.94 e |
| | | Remaining Sale Proceeds segregated account | 31,659,990.55 c |
| **Total Sources** | **$348,384,871.30** | **Total Uses** | **$348,384,871.30** |

**Notes**

a  Base Purchase Price + Closing Cash Amount + Side Letter #2 Amount - (Deposit + Interest)

b  Assumes $10m of Monster deposit (plus accrued interest as of closing date)

c  To be held in a segregated account by VPX

d  Payment in addition to the purchase price

e  Includes all Lender payments, including DIP Agent professional fees per invoices provided

**EXHIBIT "3"**

**LIQUIDATION ANALYSIS**

($ in millions)

| Ref | | Estimated Plan Effective Date: November 22, 2023 | |
|---|---|---|---|
| | | **Chapter 7 Liquidation** | **Chapter 11 Plan - Consensual** |
| 1 | **Estimated Cash Balance on Effective Date** | $ 46.0 | $ 46.0 |
| 2 | Administrative Expense / Claims | $ (10.8) | $ (10.8) |
| 3 | Distributor Obligations | (10.7) | (10.7) |
| 4 | Priority Expenses / Claims | (1.1) | (1.1) |
| 5 | Unpaid Professional Fees through Effective Date | (10.8) | (10.8) |
| | **Total Outstanding Liabilities** | $ (33.4) | $ (33.4) |
| | **Remaining Proceeds** | $ 12.6 | $ 12.6 |
| 6 | *Estimated Liquidating Trustee Payment Based on Remaining Proceeds* | $ (0.4) | $ - |
| | **Proceeds available for the benefit of General Unsecured Creditors** | $ 12.2 | $ 12.6 |
| | **Estimated Recoveries to Creditor Classes** | | |
| | Estimated Priority Claim Balance [Class 2] | $ 1.1 | $ 1.1 |
| | Priority Claim Payments | (1.1) | (1.1) |
| | ***Remaining Priority Claim Balance*** | $ - | $ - |
| | *Recovery to Priority Creditor Class* | *100.0%* | *100.0%* |
| 7 | Estimated General Unsecured Claims [Class 3] | $ 2,686.3 | $ 2,686.3 |
| | Proceeds Available for the benefit of General Unsecured Creditors | (12.2) | (12.6) |
| | ***Remaining General Unsecured Claim Balance*** | $ **2,674.09** | $ **2,673.69** |
| | *Recovery to General Unsecured Creditor Class* | *0.4549%* | *0.4698%* |

<u>Notes</u>

1   Remaining net proceeds from Asset Purchase Agreement, excluding foreign cash balances, *plus* estimated recoveries of prepaid expenses/deposits related to real estate leases, royalties, freight and others, *less* paydown of claims through the Effective Date.

2   Post-petition trade (including 503(b)(9)), final employee wages and unpaid PTO, insurance and estimated legal fees for the senior management team (and directors and officers), and other miscellaneous settlements and reimbursements.

3   Estimated distributor liabilities related to post incentive programs, trade promotions and termination fees.

4   Estimated secured and priority tax claims, and other miscellaneous priority claims.

5   Outstanding professional fee balances as of the Plan Effective Date.

6   Calculated statutory fees incurred relating to a trustee administering a converted Chapter 7 liquidation at the Plan Effective Date but not in a Chapter 11 liquidation plan.

7   Exclusive of duplicate and unliquidated Claims, asserted Claims in Class 3 total $2,686,314,000 before reconciliation. The actual Allowed amount of Claims in Class 3 will be determined following the claims reconciliation process to be undertaken by the Liquidating Trustee in accordance with the terms of the Plan.

**EXHIBIT "4"**

**ORGANIZATIONAL CHART
AS OF THE PETITION DATE**

