

**ORDERED in the Southern District of Florida on October 6, 2023.**



**Peter D. Russin, Judge**
**United States Bankruptcy Court**

_____

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION
www.flsb.uscourts.gov

In re:

Vital Pharmaceuticals, *et al.*,

    Debtors.

_____/

Case No. 22-17842-PDR

Chapter 11
(Jointly Administered)

### MEMORANDUM OPINION AND ORDER DENYING JOHN H. OWOC'S EMERGENCY MOTION FOR CONFIRMATION THE AUTOMATIC STAY DOES NOT APPLY TO REVOCATION OF DEBTOR'S SUBCHAPTER S CORPORATE STATUS <u>OR, ALTERNATIVELY, FOR STAY RELIEF</u>

Vital Pharmaceuticals, the Debtor, has recently sold its assets for $370 million. Because Vital is an S corporation, any tax liability from the sale flows to its sole shareholder, John H. Owoc. To avoid the tax liability, Mr. Owoc seeks a determination that the Debtor's S election is not property of the estate and therefore the automatic stay does not apply to acts he may take that will result in its termination, which will shift the tax liability from him to Vital. Alternatively, Mr.

Owoc seeks stay relief to do so. For the reasons that follow, the Court concludes Vital's S election is property of the estate and is therefore protected by the automatic stay; Mr. Owoc has failed to demonstrate "cause" to lift the stay; and even if Mr. Owoc had demonstrated "cause," it would be futile to lift the stay because Mr. Owoc does not have the right to revoke Vital's S election. Accordingly, the Court denies Mr. Owoc's Motion.

## I.    Background.

Before S corporations were created in 1958, would-be business owners only had two choices.[1] They could incorporate as a C corporation and be shielded from individual liability for the corporation's debts, but they would be subject to taxation at the corporate level and again on distributions to the owners at the individual level (otherwise known as double taxation).[2] Or they could create a partnership to avoid double taxation, but they would be individually liable for the partnership's debts.[3]

Facing criticism that he favored "big business" over the "little guy," President Dwight D. Eisenhower embraced a proposal by the Treasury Department that eventually led to the creation of the S corporation in 1958, adding a third option that allowed owners to enjoy limited liability while also avoiding double taxation.[4] The S corporation, which was originally limited to small business with fewer than 10

[1] *The History and Challenges of America's Dominant Business Structure*, S-Corp, https://s-corp.org/our-history/.

[2] *Id.*

[3] *Id.*

[4] *Id.*

shareholders, passed corporate income, losses, deductions, and credits to the shareholders, who would then report the income and losses on their personal tax returns and pay taxes on any taxable income at their individual income tax rates.[5]

John H. "Jack" Owoc founded Vital Pharmaceuticals in 1993.[6] As its sole officer and director, Mr. Owoc elected, and as its sole shareholder, Mr. Owoc consented, at the company's inception that it be treated as an S corporation. As a result, Vital has avoided tax liability by passing its income, losses, deductions, and credits to Mr. Owoc. Mr. Owoc, has been able to avoid double taxation on all distributions from Vital for the past three decades, just as contemplated by the creators of the S corporation.[7]

In September 2022, significant judgments were entered against Vital. As a result, Vital appointed John DiDonato as the company's Chief Transformation Officer (CTO)[8] and the following month, filed for chapter 11 bankruptcy.[9] Not long after filing, Vital reconstituted its board of directors to add a majority of independent directors.[10] On March 9, 2023, Vital's board removed Mr. Owoc as an officer and director. Vital is currently governed by Mr. DiDonato, who serves as CTO and acting CEO, and a five-member board of directors.

---

[5] *Id.* Over the years, the cap on the number of shareholders has increased to 100, I.R.C. § 1361(b)(1), which is still a "small business" by today's standards.

[6] Joint Ex. 4, Doc. 1722-4, ¶ 2.

[7] *Id.*

[8] Joint Ex. 2, Doc. 1722-2, ¶ 2.

[9] Doc. 1.

[10] Doc. 637, ¶ 62(b).

In January 2023, Vital sought approval to conduct a competitive sale and auction process.[11] Vital eventually contracted to sell its assets to Blast Asset Acquisition LLC, a subsidiary of Monster Beverage Corporation.[12]

The sale price was $370 million, $362 million of which was cash.[13] The sale, however, after paying secured debt, was expected to only generate $11.6 million in proceeds for unsecured creditors and nothing for its shareholder, Mr. Owoc.[14] But, because Vital is an S corporation, all the taxable income from the sale would flow through to Mr. Owoc, making him liable for the resulting taxes.

On July 11, 2023, three weeks before the asset sale was scheduled to close, Mr. Owoc filed his Motion asking the Court to confirm that Vital's S election is not property of the estate and that the automatic stay does not bar him from revoking it.[15] Alternatively, if the Court concluded Vital's S election is property of the estate and that the automatic stay does apply, Mr. Owoc asked that the Court grant him relief from the stay so he can revoke it.[16]

Vital and the Official Committee of Unsecured Creditors objected to Mr. Owoc's Motion.[17] Aside from asserting that the S election is property of the estate and

---

[11] Joint Ex. 7, Doc. 1723-1.

[12] Joint Ex. 31, Doc. 1737-2.

[13] Joint Ex. 28, Doc. 1733-8.

[14] *Id.*

[15] Joint Ex. 4, Doc. 1722-4, ¶¶ 15 – 25.

[16] *Id.* ¶¶ 26 – 29.

[17] Joint Ex. 3, Doc. 1722-3; Doc. 1718.

therefore protected by the automatic stay,[18] they contended the doctrine of laches bars the relief Mr. Owoc seeks because he waited too long to file his Motion.[19] Vital and the Committee also argued there is no cause to lift the stay because if the stay is lifted and Vital's S election is revoked, the tax liability Vital would incur would eliminate the $11.6 million distribution to unsecured creditors and render the estate administratively insolvent.[20]

The Court conducted an evidentiary hearing on Friday, July 28, 2023. The parties' respective experts testified regarding the potential tax implications of the sale. The experts agreed that if Vital's S election is revoked, the tax year will be divided into two years—an "S Short Year" (the portion of the year before the S election is revoked) and a "C Short Year" (the period of the year after the S election is revoked)—and the income and expenses will then be allocated between the S Short Year and C Short Year in one of two ways.

The default under Internal Revenue Code § 1362(e)(2), referred to as the "pro rata allocation" approach, is to allocate income and expenses pro rata between the "S Short Year" and "C Short Year" based on how many months out of the year the company was an S corporation and how many months it was a C corporation.[21] For example, if Vital's S election was revoked on August 1, then 7/12th of its income and

---

[18] Joint Ex. 3, Doc. 1722-3, ¶¶ 43 – 51; Doc. 1718, ¶¶ 6 – 8.

[19] Joint Ex. 3, Doc. 1722-3, ¶¶ 21 – 28; Doc. 1718, ¶ 1.

[20] Joint Ex. 3, Doc. 1722-3, ¶¶ 57 – 67; Doc. 1718, ¶¶ 9 – 14.

[21] Joint Ex. 1, Doc. 1722-1, ¶¶ 18 – 19; I.R.C. § 1362(e)(2).

expenses would be allocated to the "S Short Year," and 5/12th of its income and expenses would be allocated to the "C Short Year."[22] The shareholder then pays the taxes due for the "S Short Year," while the corporation pays the taxes due for the "C Short Year."[23]

Under the second method, referred to as the "close the books" approach, the corporation's books are closed as of the end of the day before the S election is revoked.[24] Any income and losses before the company's books are closed would be allocated to the S Short Year; any income and expenses accruing after the company's books are closed would be allocated to the C Short Year.[25]

The experts, however, disagreed about the extent of the parties' potential tax liability if the S election was not revoked. According to Vital's expert, if Vital retains its S election, Mr. Owoc would owe $3.4 million in taxes on the sale of Vital's assets, but he would also receive $49 million in net capital loss carry-forwards and $23 million in net operating loss carryforwards, which could reduce his future tax liability by nearly $20 million.[26] If Vital's S election was revoked, however, and the company

---

[22] Joint Ex. 1, Doc. 1722-1, ¶¶ 18 – 19; I.R.C. § 1362(e)(2).

[23] Joint Ex. 1, Doc. 1722-1, ¶¶ 18 – 19; I.R.C. § 1362(e)(2).

[24] Joint Ex. 1, Doc. 1722-1, ¶ 20; I.R.C. § 1362(e)(3)(A).

[25] Joint Ex. 1, Doc. 1722-1, ¶ 20; I.R.C. § 1362(e)(3)(A).

[26] Joint Ex. 1, Doc. 1722-1, ¶¶ 14 – 16.

elected to "close the books," Mr. Owoc would incur no tax liability, and the estate would have $27.5 million in tax liability.[27]

Mr. Owoc's expert painted a far more dire tax impact from the sale: he opined that Mr. Owoc's tax liability would range anywhere from $95.6 million to $197.4 million, depending on whether the IRS considers a settlement between Vital and Monster regarding the treatment of Monster's claims in this bankruptcy case, which was approved in connection with the sale of Vital's assets to its affiliate, Blast, to be compensation paid for Vital's assets.[28] Vital asserted that Monster's claims are not being released and are instead being partially subordinated, so that aspect of the settlement should have no tax impact.

Mr. DiDonato also testified at the hearing. According to Mr. DiDonato, he routinely attended board meetings and meetings of the board's restructuring committee, which have met once or twice a week since this case was filed. During the meetings, the board discussed the potential sale of Vital's assets. Mr. DiDonato testified Mr. Owoc was present at those meetings. But Mr. DiDonato was not aware at that time that Mr. Owoc would be seeking to have Vital's S election revoked. Had Mr. DiDonato known that, he testified that risk could have been mitigated when structuring the sale. Mr. DiDonato also testified that Vital's board met regarding Mr. Owoc's desire to have Vital revoke its S election and elect to "close the books," and

---

[27] *Id.* ¶ 21. If the S election is revoked and the "pro rata allocation" approach, rather than the "close the books" approach is used, Vital's expert estimates that Mr. Owoc would owe $10 million in taxes for the "S Short Year" and that Vital would owe $9.2 million in taxes for the "C Short Year." *Id.*

[28] Joint Ex. 30, Doc. 1737-1, Ex. A.

after receiving a presentation regarding the potential consequences of such actions the board voted to reject any such requests.

At the conclusion of the July 28 evidentiary hearing, the parties requested the Court rule on the Motion before the sale closed three days later on Monday, July 31, 2023. To accommodate the parties' request, the Court issued its oral ruling the next day, Saturday, July 29, 2023, and entered an order denying the Motion for the reasons stated on the record.[29] The Court denied the Motion because, as discussed below, the Court found that Vital controlled the S election and Mr. Owoc could not compel Vital to revoke it, nor could he compel Vital to "close the books," rendering the relief requested impossible to provide.

Therefore, the Court did not need to decide whether the S election was property of the estate, whether the stay applied, or whether stay relief should be granted, although the Court reserved jurisdiction to do so. On August 28, 2023, Mr. Owoc requested that the Court rule on these remaining issues because he was considering transferring his stock in Vital in a way that would cause Vital to become ineligible to be an S corporation and therefore result in its S election being terminated.[30] To accommodate Mr. Owoc, the Court issues this memorandum opinion.

## II.    Analysis.

As discussed below, the Court concludes that the doctrine of laches does not bar Mr. Owoc from seeking to revoke Vital's S election. But Vital's S election is

---

[29] Doc. 1746.

[30] Doc. 1853.

property of the estate and protected by the automatic stay. And this Court declines to grant Mr. Owoc stay relief to revoke Vital's S election because (1) the balance of harms weighs in favor of keeping the automatic stay in place; and (2) granting stay relief would be futile since it is Vital—not Mr. Owoc—that decides whether to revoke it.

A.    <u>The doctrine of laches does not bar Mr. Owoc from seeking to revoke Vital's S election</u>.

As a threshold matter, the doctrine of laches bars Mr. Owoc's Motion if (1) Mr. Owoc delayed in asserting his purported right to revoke Vital's S election; (2) his delay was inexcusable; and (3) Vital will be prejudiced if Mr. Owoc is allowed to assert his purported right to revoke Vital's S election.[31] The Court concludes that Vital has failed to satisfy the second and third elements.

Mr. Owoc knew at least as early as January 2023, that Vital was considering a § 363 sale when he authorized Vital's motion seeking approval of the sale process.[32] By April 2023, he appeared to have recognized the possibility that tax advice Vital was getting regarding the sale of its assets could result in a tax increase for Mr. Owoc.[33] Yet, Mr. Owoc did not file his motion seeking to revoke Vital's S election until July 11, 2023—just three weeks before the sale of Vital's assets was scheduled to close.

---

[31] *Gen. Lending Corp. v. Cancio*, 578 F. App'x 832, 834 (11th Cir. 2014).

[32] Joint Ex. 7, Doc. 1723-1.

[33] Joint Ex. 18, Doc. 1728-3, ¶ 5.

Vital, however, has failed to prove that the delay was inexcusable. Even if Mr. Owoc was aware that the sale might result in a tax liability for him, he asserted that he believed he would be receiving proceeds from the sale that could be used to satisfy all or part of his tax liability. Mr. Owoc could not have reasonably been expected to seek to revoke Vital's S election until he knew what his tax liability was going to be and whether he would receive any sales proceeds to cover it. There is no evidence in the record, however, regarding when Mr. Owoc first learned he would incur a $3.4 million (or more) tax liability from the sale of Vital's assets. Given the sale process, it would not be surprising if he learned as much only after it became clear that Blast was the winning bidder at $370 million. Mr. Owoc filed his Motion shortly thereafter. Absent evidence to the contrary, the Court finds Mr. Owoc's alleged delay in seeking to revoke Vital's S election excusable.

Vital has also failed to prove that it has been prejudiced by Mr. Owoc's alleged delay. Perhaps if Vital had known sooner that Mr. Owoc would seek to revoke the company's S election, it could have tried to structure the sale differently to avoid any potential tax liability to the estate or negotiated a different settlement with Monster. But as the term "perhaps" suggests, that is pure speculation. Mr. DiDonato, Vital's CTO and acting CEO, conceded he did not know what Vital could have done differently had it known that Mr. Owoc would seek to revoke the election. Vital was simply unable to prove it has been prejudiced by Mr. Owoc's alleged delay in filing the Motion.

B.    <u>Vital's S status is property of the estate</u>.

Bankruptcy Code § 541(a) provides that property of the estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case," wherever located and by whomever held.[34] In defining "property of the estate" that way, Congress intended for the term to have the broadest possible meaning.[35] As one leading commentator put it, "[b]ecause of the broad language in subsection (a), anything not specifically excluded under [§ 541(b)] should be included as property of the estate."[36]

Easy examples of property that courts have found fall within § 541(a) include hard assets such as real property, vehicles, equipment, inventory, and the like. Of course, courts have also found property of the estate to include intangible assets.[37] Obvious examples include causes of action and intellectual property rights.[38] Perhaps

---

[34] 11 U.S.C. § 541.

[35] "The scope of [§ 541(a)(1) ] is broad. It includes all kinds of property, including tangible or intangible property, causes of action (see Bankruptcy Act § 70a(6)), and all other forms of property currently specified in section 70a of the Bankruptcy Act." H.R. Rep. No. 95–595, at 367 (1977); S. Rep. No. 95–989, at 82 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5868, 6323; *U.S. v. Whiting Pools, Inc.*, 462 U.S. 198, 204 – 205 (1983) ("The House and Senate Reports on the Bankruptcy Code indicate that § 541(a)(1)'s scope is broad.").

[36] 5 *Collier on Bankruptcy* ¶ 541.01 (16th ed. 2023).

[37] *Logan v. JKV Real Estate Servs. (In re Bogdan)*, 414 F.3d 507, 512 (4th Cir. 2005) ("The meaning of 'property of the estate' under the Code has been construed 'broadly to encompass all kinds of property, including intangibles.'"); *Whetzal v. Alderson*, 32 F.3d 1302, 1303 (8th Cir.1994) (explaining that "[t]he scope of [section 541(a)(1) of the Bankruptcy Code] is very broad and includes property of all descriptions, tangible and intangible, as well as causes of action"); *In re Jones*, 768 F.2d 923, 926 (7th Cir. 1985) (explaining that "as a general rule, the estate created under section 541 will include all legal or equitable interests of the debtor in property, both tangible and intangible").

[38] *Estate of Townsend v. Berman (In re Fundamental Long Term Care, Inc.)*, ___ F.4th ___, 2023 WL 6057245, at *14 (11th Cir. Sep. 18, 2023) ("The property of the Debtor's bankruptcy estate included 'all legal or equitable interests of the debtor in property,' such as causes of action belonging to the debtor.") (citation omitted); *Henderson v. Franklin*, 782 F. App'x 866, 870 (11th Cir. 2019) ("Causes of

---

less obvious examples include a company's goodwill;[39] an FCC license;[40] and stock appreciation rights.[41]

It is important to distinguish what may be an asset from property. "Property" has a much broader meaning than "asset." For example, real property that has substantial environmental contamination and no value may, in fact, be a liability and therefore may not be considered an asset. Yet, it is still "property." That is why a trustee has the right—and is required—to abandon such property so the bankruptcy estate may avoid the liability. So, the term property should not be confused with asset.

According to the United States Supreme Court, tax attributes that reduce a company's tax liability are property of the estate too.[42] Nearly 60 years ago, in *Segal*

---

action belonging to a debtor at the initiation of his bankruptcy case become part of the bankruptcy estate.") (citing *Parker v. Wendy's Int'l, Inc.*, 365 F.3d 1268, 1272 (11th Cir. 2004)); *U.S. v. Inslaw, Inc.*, 932 F.2d 1467, 1471 (D.C. Cir. 1991) ("It is undisputed that [property of the estate] encompasses causes of action that belong to the debtor, as well as the debtor's intellectual property, such as interests in patents, trademarks and copyrights.").

[39] *Sheppard's Dental Ctrs., Inc. v. Sw. SDC, Inc. (In re Sheppard's Dental Ctrs., Inc.)*, 65 B.R. 274, 277 (S.D. Fla. 1986) ("This Court is not the first to recognize that property which is both intangible and transitory may nevertheless constitute property of a debtor's estate within the meaning of § 541. In *Glosband v. Watts Detective Agency, Inc.*, 21 B.R. 963 (D. Mass. 1981), the United States District Court recognized that lists of employees, lists of customers, and even corporate goodwill were all valuable property of a debtor's estate within the meaning of § 541, the Court further noting that goodwill is a property right which a court will regard as carefully as it would visible tangible property.").

[40] *Ramsay v. Dowden (In re Cent. Ark. Broad. Co.)*, 68 F.3d 213, 214 – 15 (8th Cir. 1995) ("In view of the broad definition of property under section 541(a)(1), we conclude the bankruptcy court correctly determined the [radio station operating] license was property of the estate.").

[41] *Parks v. Dittmar (In re Dittmar)*, 618 F.3d 1199, 1210 (10th Cir. 2010) ("Debtors' interest in the [stock appreciation rights] are sufficiently rooted in the pre-bankruptcy past. The [stock appreciation rights] are properly part of the bankruptcy estate under § 541.").

[42] *Segal v. Rochelle*, 382 U.S. 375, 381 (1966).

*v. Rochelle*, the United States Supreme Court held that net operating loss (NOL) carrybacks (the right to offset net operating losses against past income) were property of the estate under § 70(a)(5) of the Bankruptcy Act of 1898. After conceding it was "impossible to give any categorical definition to the word 'property,'"[43] the Supreme Court observed that courts had construed "property" "most generously."[44] According to the Supreme Court, the main limitation on whether an interest was "property" under § 70(a) was whether finding that an interest was "property" would impede a debtor's fresh start.[45] In *Segal*, the Supreme Court concluded it would not.[46] Thus, even though the debtors' future earnings might diminish or eliminate the NOL-carrybacks, the Supreme Court held that they were property of the estate.

The *Segal* Court declined to consider whether NOL-carryforwards (i.e., use of prepetition NOLs to offset future earnings) are property of the estate.[47] Since *Segal*, though, a number of courts—most notably the Second Circuit Court of Appeals thirty years ago in *In re Prudential Lines, Inc.*—held that NOL-carryforwards were also property of the estate.[48]

---

[43] *Id.* at 379 (quoting *Fisher v. Cushman*, 103 F. 860, 864 (1st Cir. 1900)).

[44] *Id.*

[45] *Id.*

[46] *Id.*

[47] *Id.* at 381.

[48] *Off. Comm. of Unsecured Creditors v. PSS Steamship Co. (In re Prudential Lines Inc.)*, 928 F.2d 565, 571 (2d Cir. 1991) ("This brings us to the question whether PLI's interest in the right to carryforward its $74 million NOL to offset future income is property of the estate within the meaning of § 541. We hold that it is.").

A number of bankruptcy courts have held that an S election is also property of the estate.[49] The seminal case is *In re Trans-Line West*, where the court ruled, for purposes of whether revocation of a debtor's S election was a "transfer of an interest of the debtor in property" under Bankruptcy Code § 548, that a debtor "possessed a property interest (i.e. a guaranteed right to use, enjoy and dispose of that interest) in its Subchapter S status."[50]

Relying on the Third Circuit Court of Appeal's decision ten years ago in *In re Majestic Star Casino*, however, Mr. Owoc argues that an S election is not property of the estate.[51] In that case, the debtor was a qualified subchapter S subsidiary ("QSub") of Barden Development.[52] After the debtor filed for bankruptcy, Barden revoked its own S election, which caused its subsidiary, the debtor, to lose its QSub status.[53] The debtor later filed an adversary proceeding seeking to undo the revocation, alleging that the revocation was an unlawful postpetition transfer in violation of Bankruptcy

---

[49] *See, e.g., Halverson v. Funaro (In re Frank Funaro Inc.)*, 263 B.R. 892, 898 (B.A.P. 8th Cir. 2001) (holding that "a corporation's right to use, benefit from, or revoke its Subchapter S status falls within the broad definition of property of the estate"); *Parker v. Saunders (In re Bakersfield Westar, Inc.)*, 226 B.R. 227, 233 − 34 (B.A.P. 9th Cir. 1998) ("[W]e hold that the debtor's prepetition right to make or revoke its subchapter S status constituted 'property' or 'an interest of the debtor in property' within the meaning of the Code."); *In re Walterman Implement Inc.*, 2006 WL 1562401, at *3 (Bankr. N.D. Iowa May 22, 2006) (holding that debtor's subchapter S status is property of the estate); *Guinn v. Lines (In re Trans-Lines W., Inc.)*, 203 B.R. 653, 661 − 62 (Bankr. E.D. Tenn. 1996) ("[T]his court holds that the Debtor possessed a property interest (i.e. a guaranteed right to use, enjoy and dispose of that interest) in its Subchapter S status.").

[50] *Trans-Line West*, 203 B.R. at 662.

[51] Doc. 1627 (citing *The Majestic Star Casino, LLC v. Barden Dev., Inc. (In re The Majestic Star Casino, LLC)*, 716 F.3d 736 (3d Cir. 2013)).

[52] *Majestic Star Casino*, 716 F.3d at 742 − 43.

[53] *Id.* at 743.

Code §§ 362 and 549.[54] On summary judgment, the bankruptcy court ruled that the debtor's QSub status was property of the estate and that Barden's (indirect) revocation of it was void.[55]

That ruling was significant. Confirmation was going to result in $170 million of "cancellation of debt" ("COD") income.[56] If revocation of the debtor's QSub status was void, then Barden would be liable for the taxes on the COD income. And because the debtor was not liable, it could retain tax attributes (deductions and credits) that would allow it to reduce its taxes in the future.[57] Barden appealed, and the district court certified direct appeal to the Third Circuit.

In concluding that a debtor's S election is not "property," the Third Circuit employed the following syllogism:[58]

> **Major Premise**: "The *Trans–Lines West* decision and those that follow it base their conclusion that S-corp status is 'property' on a series of precedents holding net operating losses ("NOLs") to be property."[59]

---

[54] *Id.* at 745.

[55] *Id.*

[56] *Id.* at 745 – 46.

[57] *Id.* Had the debtor been liable for the COD income, it could have availed itself of the so-called "Bankruptcy Exception," which allows a taxpayer in bankruptcy to avoid taxes on debt that is canceled or written down under a confirmed plan. *Id.* (citing 26 U.S.C. § 108(a)(1)(A)). But if the debtor availed itself of the "Bankruptcy Exception," it would have to reduce the value of its other tax attributes dollar-for-dollar. *Id.*

[58] A syllogism consists of a "major premise (an established rule), a minor premise (a factual statement showing the applicability or inapplicability of the rule to the present circumstance), and a conclusion (the application of the rule to the present circumstance." *Syllogism*, Black's Law Dictionary (10th ed. 2014).

[59] *Majestic Star Casino*, 716 F.3d at 753.

**Minor Premise**: "[T]he decision in *Trans–Lines West* and the other S-corp-as-property cases fail to consider important differences between the two putative property interests [e.g., NOLs have value that is readily determinable; are hardly contingent at all, are a function of the debtor's prepetition operations, and are not subject to revocation by its shareholders or termination by the IRS; an S election's value is dependent on not being revoked, as well the amount and timing of future earnings, and S elections are subject to termination by the corporation's shareholders]."[60]

**Conclusion**: "[Because of these important differences], we decline to follow the rationale of Trans–Lines West and its progeny, and we conclude that S-corp status is not "property" within the meaning of the Code."[61]

The Third Circuit's syllogistic reasoning, however, is faulty.

The major premise (i.e., *Trans-Line* and other decisions following it relied on *Segal* and other NOL cases) is faulty. The court in *Trans-Line* did not cite *Segal* or *Prudential* (or any other NOL case for that matter) in determining an S election is property of the estate. *Trans-Line* cited *In re Russell*, merely for the proposition that an election to carry forward NOLs was a "transfer"—not that it was "property."[62]

The Third Circuit's minor premise (i.e., there are important differences between an S election and loss-carrybacks or loss-carryforwards) is also faulty. One of the important "differences" between NOLs and S elections is not a "difference" at

---

[60] *Id.* at 755.

[61] *Id.* at 758.

[62] *Guinn v. Lines (In re Trans-Lines W., Inc.)*, 203 B.R. 653, 662 (Bankr. E.D. Tenn. 1996) (citing *Gibson v. United States (In re Russell)*, 927 F.2d 413 (8th Cir. 1991)); *see also Parker v. Saunders (In re Bakersfield Westar, Inc.)*, 226 B.R. 227, 233 – 34 (B.A.P. 9th Cir. 1998) (relying on *Russell* in holding that revocation of the S election was a "transfer" under Bankruptcy Code § 548, but not relying on either *Segal* or *Prudential*).

all. The Third Circuit says the "value of an NOL is readily determinable as a tax refund immediately available to the bankruptcy estate to the extent that it is applied to prior years' earnings."[63] How is that different from an S election? An S election shifts tax liability from the S corporation to the corporation's shareholders. The value of that tax savings is readily determinable and is immediately available to the corporation. This case is a perfect example: both parties can readily determine what Vital's tax liability from the asset sale would be if its S election were revoked and, as a result, how much Vital avoids in taxes by retaining its S election. In fact, while the parties disagreed with respect to the amount at trial, both believed the amounts were determinable. So, the tax savings from an S election are as equally determinable and available as are the tax savings from an NOL.

The other important "differences"—to the extent they are "differences" at all— are equally unavailing to support the Third Circuit's conclusion. For instance, the Third Circuit makes much of the (supposed) fact that an S corporation's shareholders "may elect to revoke that status 'at will.'"[64] But shareholders cannot revoke an S election. Instead, it is only the corporation that can revoke its S election, though it cannot do so without the consent of the majority of shareholders.[65] While it is true that shareholders of an S corporation can take actions that result in termination of the corporation's S status, such as by selling shares to a partnership or a foreign

---

[63] *Majestic Star Casino*, 716 F.3d at 755 – 56.

[64] *Id.* at 756.

[65] Treas. Reg. § 1.1362-6(a)(3).

citizen,[66] shareholders of a corporation can also unilaterally take action that results in limiting a corporation's right to deduct NOLs, such as when a shareholder who owns five percent of a corporation increases their ownership by more than 50%, triggering an "ownership change" under Internal Revenue Code § 382.[67]

The fact that a shareholder can take action that results in the termination of a corporation's S status is irrelevant to whether the S election is property of the estate. Bankruptcy Code § 541 does not, by its express terms, limit property of the estate in any way to property interests that are noncontingent.[68] The Supreme Court was unequivocal in *Segal* that an interest is property of the estate even if it is contingent:

> [T]he term 'property' has been construed most generously and an interest is not outside its reach because it is novel or contingent or because enjoyment must be postponed.[69]

Thus, to the extent there are differences between an NOL and an S election, those differences are not essential for determining whether an S election is property.

Even if the major and minor premises of the Third Circuit's syllogism were true, the Third Circuit's logic is still faulty because the syllogism contains an "illicit

---

[66] I.R.C. § 1362(d)(2); *see also* I.R.C. § 1361(b)(1).

[67] I.R.C. § 382.

[68] 11 U.S.C. § 541(a)(1) (defining property of the estate to include "[e]xcept as provided in subsections (b) and (c)(2) of this section, all legal or equitable interests of the debtor in property as of the commencement of the case").

[69] *Segal v. Rochelle*, 382 U.S. 375, 379 (1966).

major fallacy." An "illicit major fallacy" exists when a term in the major premises is referred to in the conclusion but not in the minor premises. Consider this example:

> All dogs are animals.
> No cats are dogs.
> Therefore, no cats are animals.

The logic of this syllogism is faulty—and the conclusion obviously false—because "animal" in the major premise is distributed to the conclusion but not the minor premise.

      The Third Circuit's syllogism suffers from the same logical fallacy. Reduced to its simplest form, the Third Circuit's syllogism can be stated as follows:

> NOLs are property
> An S election is not an NOL
> Therefore, an S election is not property.

Although the term "property" is distributed to the conclusion, it is not distributed to the minor premise. For that reason, the fact that an S election may not be an NOL does not mean an S election is not property any more than the fact that a cat is not a dog means that cats are not animals.

      After incorrectly concluding that an S election is not "property," the Third Circuit goes on to conclude that, even if it was, the debtor's QSub status was not "property of the estate."[70] According to the Third Circuit, the "S-corp debtor is merely a 'conduit' for tax benefits that flow through to shareholders."[71] So, in the Third

---

[70] *The Majestic Star Casino, LLC v. Barden Dev., Inc. (In re The Majestic Star Casino, LLC)*, 716 F.3d 736, 759 – 61 (3d Cir. 2013).

[71] *Id.* at 759.

Circuit's view, "the corporation retains no real benefit from its tax-free status in that, while there is no entity-level tax, all of its pre-tax income is passed on to its shareholders."[72] Moreover, the Third Circuit expressed policy concerns about the effects of finding that the debtor's QSub status was property of the estate:

> Moreover, allowing QSub status to be treated as the property of the debtor subsidiary rather than the non-debtor parent, as the Bankruptcy Court did in this case, places remarkable restrictions on the rights of the parent, restrictions that have no foundation in either the I.R.C. or the Code. First, the corporate parent loses not only the statutory right to terminate its subsidiary's QSub election, but also its right to terminate its own S-corp election, Second, the corporate parent loses the ability to sell the subsidiary's shares to any purchaser other than an S-corp, and would then be required to sell 100 percent of the shares, because any other sale would trigger the loss of the subsidiary's QSub status. Third, the S-corp parent and its shareholders lose the ability to sell the parent to a C-corporation, partnership, or other non-S-corp entity, to a nonresident alien, or to more than 100 shareholders, because any of those transactions would also trigger the loss of the subsidiary's QSub status. Filing a bankruptcy petition is not supposed to "expand or change a debtor's interest in an asset; it merely changes the party who holds that interest." But under the Bankruptcy Court's holding in this case, a QSub in bankruptcy can stymie legitimate transactions of its parent as unauthorized transfers of property of the estate, even though the QSub would have had no right to interfere with any of those transactions prior to filing for bankruptcy. [73]

Whatever the merits of those policy concerns, they are unmoored from the text of Bankruptcy Code § 541 and the Internal Revenue Code.

---

[72] *Id.*

[73] *Id.* at 760 – 61.

This Court ends its "property of the estate" analysis where it started: the text of § 541. Section 541 provides that it includes "all legal or equitable interests of the debtor in property as of the commencement of the case."[74] Section 541 does not define "property." But § 541's legislative history makes clear that the "scope of [§ 541] is broad" and that "it includes all kinds of property, including tangible or intangible property." The Supreme Court, in *Segal*, likewise made clear that "the term 'property' has been construed most generously."[75]

Consistent with the § 541 aim to broadly define property of the estate, Black's Law Dictionary defines "property" as "[c]ollectively, the rights in a valued resource such as land, chattel, or an intangible."[76] To determine if a debtor has rights in a valued resource, courts ordinarily look to state law.[77] If some federal interest requires a different result, however, then property interests may be defined by federal law.[78] Because the property interest at issue is Vital's S election, governed by federal statutes, this Court looks to federal law.

It may be true, as courts have pointed out, that a corporation's right to its S election is contingent on a shareholder not taking action that could cause the corporation to cease being a small business, thereby terminating the S election. It

---

[74] 11 U.S.C. § 541.

[75] *Segal v. Rochelle*, 382 U.S. 375, 379 (1966).

[76] *Property*, Black's Law Dictionary (10th ed. 2014).

[77] *Butner v. United States*, 440 U.S. 48, 55 (1979).

[78] *Id.*

may also be true, as courts have pointed out, that a debtor cannot transfer an S election. Section 541, however, says nothing about property having to be noncontingent or transferrable to qualify as property of the estate. This Court declines to read into § 541 limitations that do not exist in the text.

Absent the S election, the corporation's profits are taxed at the corporate rate and the shareholders are taxed on corporate distributions at their respective income tax rates, thus double taxation. The Internal Revenue Code gives small businesses such as Vital the right to elect to be an S corporation, to avoid this double taxation by paying no tax itself and passing its income, along with any losses, deductions, and credits, to the corporation's shareholders, leaving only the shareholders to be taxed.[79] Once a small business elects to be treated as an S corporation, it retains that status until revoked, unless the S election is terminated for reasons that are inapplicable here.[80] Thus, until terminated or revoked, an S corporation has the valued right of not having to pay taxes. There is no basis to suggest that the statutory right to avoid an expense, including taxes, is any less a property right than property that produces income. In other words, a corporation has a property interest in its right to avoid the tax expense otherwise known as the S election or status. Vital has a property interest

---

[79] I.R.C. § 1362(a)(1).

[80] I.R.C. § 1362(d). Internal Revenue Code § 1362(d) provides that a corporation's S election shall be terminated if (1) the corporation ceases to be a "small business corporation," which is defined as a domestic corporation that does not have more than 100 shareholders; have a shareholder (other than certain trusts) who is not an individual; have a nonresident alien as a shareholder; and have more than one class of stock; or (2) the corporation's passive income exceeds 25% of gross receipts for three consecutive taxable years and the corporation has accumulated earnings and profits. *Id.* §§ 1361(b); 1362(d)(2) – (3). Neither ground for termination applies here. There is no evidence Vital's passive income has exceeded 25% of its gross receipts, and Vital remains a "small business corporation."

in its S status because, once elected, that status gives Vital the right to avoid paying taxes. Vital's S election is, indeed, property of the estate.

C.    <u>Mr. Owoc failed to demonstrate he is entitled to stay relief</u>.

Vital's S election is property of the estate. It is axiomatic the automatic stay bars Mr. Owoc from attempting to revoke it.[81] On the request of a party, however, this Court shall grant relief from the automatic stay "for cause."[82] Here, Mr. Owoc fails to demonstrate "cause" entitling him to stay relief, and even if he could, stay relief would not be appropriate because the relief Mr. Owoc seeks is futile.

1.    <u>Mr. Owoc fails to demonstrate cause</u>.

Beyond saying it includes "lack of adequate protection," § 362(d)(1) does not define "cause." Courts considering whether "cause" exists under § 362(d)(1), however, have concluded that it "exist[s] when the harm that would result from a continuation of the stay would outweigh any harm that might be suffered by the debtor or the debtor's estate if the stay is lifted."[83] When balancing those potential harms, courts consider a number of factors, including (i) the harm to the party seeking relief from the stay if the stay is not lifted; (ii) the harm to the debtor if the stay is lifted; (iii) the

---

[81] 11 U.S.C. § 362(a)(3) (staying "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate"); *In re Burgess*, 234 B.R. 793, 799 (D. Nev. 1999) (holding that the county's attempt to revoke a debtor's brothel license fell within § 362(a)(3) because revocation of the license would essentially destroy the debtor's estate); *see also* 3 *Collier on Bankruptcy* ¶ 362.03[5] (16th ed. 2023) (explaining that § 362(a)(3) "applies to attempts to obtain or exercise control over both tangible and intangible property").

[82] 11 U.S.C. § 362(d)(1) (providing that "[o]n request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section . . . for cause").

[83] *Peerless Ins. Co. v. Rivera*, 208 B.R. 313, 315 (D.R.I. 1997).

interests of creditors; and (iv) the effect on the fair and efficient administration of justice.[84]

a.    The balance of harms do not weigh in favor of
granting Mr. Owoc stay relief.

If this Court grants stay relief, and Mr. Owoc were able to revoke Vital's S election (a point the Court will address below) and "close the books," as he requests, the estate would incur a $27.5 million tax liability.[85] If Vital's S election were revoked, but the "books were not closed," and the "pro rata" approach were used instead, the estate would incur $9.2 million in taxes.

As it stands, unsecured creditors are expected to receive $11.6 million from the sale.[86] So, best case scenario, the estate suffers a $9.2 million tax bill, in which case general unsecured creditors would see their distribution reduced by nearly 80%—from $11.6 million to $2.4 million. Worst case scenario, the estate suffers a $27.5 million tax bill, leaving no money available for unsecured creditors and not enough money to pay administrative claims in full, thereby jeopardizing Vital's ability to confirm a plan.[87]

If this Court denies stay relief, then Mr. Owoc, rather than Vital, will suffer the tax bill. The parties disagree over the size of that tax bill. According to Vital's

---

[84] Id.

[85] Joint Ex. 1, Doc. 1722-1, ¶ 11.

[86] Joint Ex. 2, Doc. 1722-2, & Ex. A; Joint Ex. 28, Doc. 1733-8.

[87] Joint Ex. 1, Doc. 1722-1, ¶ $11.

24

expert, the amount is $3.4 million.[88] Mr. Owoc's expert estimates the amount could be anywhere from $95 million to $197 million.

Having heard the testimony of the parties' experts, the Court finds Vital's expert more credible. In forming his opinion, Vital's expert relied on estimates from Grant Thornton, Vital's tax accounts (Grant Thornton also prepared Mr. Owoc's taxes for the past few years).[89] Mr. Owoc's expert, on the other hand, did not even request to speak with Grant Thornton.[90] Moreover, Mr. Owoc's expert incorrectly included $80 million in "cure costs" as part of the taxable income, thereby overstating Mr. Owoc's tax liability by roughly $16 million.[91] In his "worst-case scenario," in which Mr. Owoc's exert opined Mr. Owoc would incur $197 million in tax liability, he improperly assumed the IRS will treat Vital's settlement with Monster as taxable, adding $500 million to the taxable income.[92] As Vital's expert pointed out, the settlement was not part of the purchase price in the asset purchase agreement.[93] And the settlement did not involve a cancelation of debt; Monster agreed to subordinate its claims. Finally, and perhaps most important, Mr. Owoc's expert failed to consider potential loss-carryforwards Mr. Owoc could use to offset his tax liability, even though

---

[88] *Id.* ¶ 14.

[89] Doc. 1796, p. 157, l. 19 – p. 159, l. 25.

[90] *Id.* p. 138, ll. 5 – 1

[91] *Id.* p. 129, l. 22 – p. 131, l. 11.

[92] *Id.* p. 140, ll. 7 – 17.

[93] *Id.* p. 161, l. 3 – p. 162, l. 18.

Mr. Owoc's expert conceded the loss-carryforwards were relevant to determining Mr. Owoc's tax liability.[94] Because the Court finds Vital's expert more credible, the Court presumes that Mr. Owoc is likely to incur a $3.4 million tax liability if stay relief is not granted.

The Court concludes the harm to Mr. Owoc from the $3.4 million tax liability is far outweighed by the harm that would be caused by granting stay relief so he could avoid it. First, although Mr. Owoc will incur a $3.4 million tax liability from the sale, that harm is mitigated by the fact that he will also receive significant tax benefits. Mr. Owoc would be able to carry forward $49 million in net capital losses and $23 million in net operating losses, which could yield $19 million in tax benefits in future years ($11 million from the net capital losses and $8 million from the net operating losses). Second, the Court cannot overlook the fact that, for thirty years, Mr. Owoc has benefitted from Vital's S election by avoiding double taxation on his distributions from the company. So, the harm to Mr. Owoc is mitigated not only by the tax benefits now (which can be applied in future years)—but also by the tax benefits he has received during the past three decades. Third, while Mr. Owoc will incur a $3.4 million tax liability if stay relief is not granted, if it is, unsecured creditors will lose anywhere from $9.2 million to $11.6 million and administrative creditors will not be paid in full. It is a fundamental principle of bankruptcy that the rights of shareholders of an insolvent corporation are subordinate to the rights of the

---

[94] *Id*. p. 141, l. 10 – p. 143, l. 13.

corporation's creditors.[95] Granting Mr. Owoc stay relief will effectively allow him to avoid a $3.4 million tax liability at the expense of Vital's unsecured and administrative creditors, running afoul of this fundamental principle. Because any harm Mr. Owoc will suffer if stay relief is not granted is far outweighed by the harm to Vital's unsecured and administrative creditors if stay relief is granted, Mr. Owoc has failed to demonstrate "cause" for lifting the stay under § 362(d)(1).

### b. It would not be inequitable to deny Mr. Owoc stay relief.

According to Mr. Owoc, "tax burdens are typically borne by those who derive some benefit from the taxed income."[96] Here, Mr. Owoc argues that if this Court does not grant stay relief, he will be saddled with all the tax liability from the sale because Vital is an S corporation but none of the income to pay the tax liability because Vital is in bankruptcy.[97]

That argument is grounded in the faulty premise that outside of bankruptcy, proceeds from the sale of Vital's assets would have flowed to Mr. Owoc to pay the taxes. But Mr. Owoc has not proved that would be the case. After an extensive marketing and protracted sales process, the sale of Vital's assets generated only $362 million in cash.[98] The only reason there is $11.6 million available to pay unsecured creditors is because Vital's secured creditors agreed to reduce their secured claims by

---

[95] *Louisville Trust Co. v. Louisville, New Albany & Chicago Railway Co.*, 174 U.S. 674, 684 (1899).

[96] Joint Ex. 4, Doc. 1722-4, ¶ 3.

[97] *Id.* ¶¶ 3, 28 & 29.

[98] Joint Ex. 28, Doc. 1733-8.

$50 million as part of a Court-approved compromise to ensure the sale went through.[99] Outside bankruptcy, that would not be the case, or at least Mr. Owoc offered no evidence that it would. The only difference is that outside bankruptcy, Mr. Owoc may have remained in control of Vital's decision whether to revoke the S election. But even then, as an officer or director of an insolvent corporation, Mr. Owoc would have a duty not to have it revoke the S election for his personal gain at the expense of the creditors. Because there would be no money flowing to Mr. Owoc to pay any taxes from the sale of Vital assets even if Vital were not in bankruptcy, it would not be inequitable to deny Mr. Owoc stay relief.

2.    <u>It would be futile to grant Mr. Owoc stay relief.</u>

Even if he had demonstrated "cause" for stay relief, Mr. Owoc cannot accomplish what he wants—i.e., to revoke Vital's S election and elect the "close the books" approach to allocating tax liability. Mr. Owoc alleges that "it is undisputed that [he] has the unfettered right to determine the tax status of [Vital]."[100] But it is Vital—not Mr. Owoc—who has the right to decide whether to revoke its S election.

Internal Revenue Code § 1362 provides that a "*small business corporation may elect . . . to be an S corporation.*"[101] Under Internal Revenue Code § 1362, that election is valid "only if all persons who are shareholders in such corporation on the day on

---

[99] Joint Ex. 14, Doc. 1726-1; Joint Ex. 15, Doc. 1726-2.

[100] Doc. 1738, ¶ 35.

[101] I.R.C. § 1362(a)(1) (emphasis added).

which such election is made consent to such election."[102] Treasury Regulation §
1.1362-6 then proscribes the manner of making that initial election: "*A small business
corporation makes an election* under section 1362(a) to be an S corporation by filing a
completed Form 2553," though the election is not valid unless all shareholders give
their consent.[103]

Internal Revenue Code § 1362 and Treasury Regulation § 1.1362-6 establish a
similar scheme for revocation. Under Treasury Regulation § 1.1362-6, "[t]o revoke an
election, the *corporation files* a statement that the corporation revokes the
election."[104] The regulation clarifies that the "revocation may be made only with the
consent of shareholders who, at the time the revocation is made, hold more than one-
half of the number of issued and outstanding shares of stock (including non-voting
stock) of the corporation."[105]

Reading § 1362 and Treasury Regulation § 1.1362-6, one theme emerges: it is
the corporation that "makes" the election or "revokes" it—not the shareholders; the
role of the shareholders is limited to giving (or denying) their "consent" to the election
or revocation. "Consent" is defined by Merriam-Webster as "approval of what is done
or proposed by another."[106] Thus, under the plain language of the relevant Tax Code

---

[102] *Id.* § 1362(a)(2).

[103] Treas. Reg. § 1.1362-6(a)(2) (emphasis added).

[104] *Id.* § 1.1362-6(a)(3) (emphasis added).

[105] *Id.*

[106] *Consent*, Merriam-Webster Dictionary, *available at* https://www.merriam-webster.com/dictionary/consent.

and IRS regulations, both the corporation and the shareholders have a role in the decision to "make" or "revoke" an election: the corporation decides whether to make an election or revoke it; the shareholders have the right to give or deny their consent to what the corporation proposes.

That reading of the Tax Code and regulations is consistent with the examples provided by Treasury Regulation § 1.1362-6. Consider "Example 1" to subparagraph (3), which deals with revocation of the S election:

> A calendar year S corporation has issued an outstanding 40,000 shares of class A voting common stock and 20,000 shares of class B non-voting common stock. The *corporation wishes to revoke* its election of subchapter S status. *Shareholders* owning 11,000 shares of class A stock *sign revocation consents*. *Shareholders* owning 20,000 shares of class B stock *sign revocation consents*. The corporation has obtained the required shareholder consent to revoke its subchapter S election because shareholders owning more than one-half of the total number of issued and outstanding shares of stock of the corporation consented to the revocation.[107]

Note how the regulation describes the roles of the corporation and its shareholders: it is the "corporation" that "wishes to revoke" the election, while the shareholders are limited to "sign[ing] revocation consents." Example 2 is the same:

> In June 1993, a calendar year S *corporation determines* that it will revoke its subchapter S election effective August 1, 1993. To do so it must file its revocation statement with consents attached on or before August 1, 1993, and the statement must indicate that the revocation is intended to be effective August 1, 1993.[108]

---

[107] Treas. Reg. § 1.1362-6(a)(3)(iii).

[108] *Id.*

Once again, it is the corporation that "determines" it "will revoke" the S election and that "files its revocation statement."

Giving both the corporation and the shareholders a role in making and revoking an S election makes sense. This case is a perfect example. For thirty years, Vital has operated as an S corporation, which means Mr. Owoc, as the sole shareholder, benefitted by avoiding three decades of double taxation that would have resulted had Vital been a C corporation. But now Mr. Owoc would like to avoid the tax liability from the sale of Vital's assets by revoking Vital's S election, which would subject Vital to $27.5 million in tax liability. It is inconceivable that Vital, as Mr. Owoc contends, would have no say in the matter. If a shareholder could simply revoke the S election at any time—subjecting the corporation to sudden and significant tax liability—it would wreak havoc on the corporation's business.

It may be true that 99% of the time the distinction between the corporation and its shareholder is irrelevant because typically the shareholders of a closely held S-Corp are also the corporation's officers and directors. So, when two shareholders decide to revoke their small company's S election, they are doing so wearing their shareholder hats and their corporate officer or director hats. But just because it may be that in the typical scenario, the interests of the officers and directors—and their fiduciary duties—are aligned with those of the shareholders, that does not mean the corporation plays no role in the decision to revoke an S election.

Here, we have perhaps the rare case where the officers and directors and the shareholders are not the same—and their fiduciary duties and interests are not

31

aligned. Mr. Owoc is the sole shareholder. But he is no longer an officer or director and, therefore, no longer owes a fiduciary duty to Vital or its creditors. Vital, however, has a CTO and an acting CEO (John DiDonato), as well as a five-member board of directors, who do owe fiduciary duties to Vital's creditors. Mr. DiDonato and the board met and, based on a discussion with Vital's advisors, concluded it would not be in the best interest of the bankruptcy estate to revoke Vital's S election and to elect to "close the books" because doing so would divert proceeds from the sale of Vital's assets to pay the tax liability from the sale—thereby depriving unsecured creditors of all (or nearly all) the $11.6 million in proceeds that has been allocated to pay general unsecured creditors and possibly the administrative creditors.

That is Vital's decision to make—not Mr. Owoc's. Under Internal Revenue Code § 1362 and Treasury Regulation § 1.1362-6, Mr. Owoc cannot force Vital to revoke its S election. This Court would certainly not order the officers and directors of Vital to breach their fiduciary duties by doing so.

Indeed, this Court could not order Vital to revoke its S election and elect to "close the books." That relief is really a request for an injunction. Under Bankruptcy Rule 7001(7), requests for injunctive or other equitable relief, with certain exceptions not applicable here, must be brought by adversary proceeding.[109] Had Mr. Owoc filed an adversary proceeding, as required by Rule 7001(7), he would have then had to file a motion—and satisfy the stringent requirements for obtaining—a preliminary injunction.

---

[109] Fed. R. Bankr. P. 7001(7).

Mr. Owoc has not offered any authority for circumventing the requirements of Bankruptcy Rule 7001 and the stringent requirements for injunctive relief. Nor is there any evidence that Mr. Owoc could satisfy those stringent requirements. To obtain an injunction, Mr. Owoc would have to prove that (1) he has a substantial likelihood of success on the merits; (2) he will suffer irreparable harm if the court does not issue an injunction; (3) the irreparable harm outweighs whatever damages the injunction may cause the opposing party; and (4) the injunction would not be adverse to the public interest.[110]

Mr. Owoc can satisfy none of these requirements. As discussed at great length above, Vital's S election is property of the estate, and even if it was not, Mr. Owoc has no right to revoke it or, if it was somehow revoked, force the company to "close the books." Mr. Owoc will not be irreparably harmed. He will likely incur $3.4 million in tax liability. But he will also receive tax attributes that can be used to offset more than $3.4 million in tax liability in the future. That harm does not outweigh the harm to Vital if it were forced to revoke the S election and close the books. If Vital were forced to do so, it will incur a $27.5 million tax liability, rendering the estate administratively insolvent and denying any recovery to unsecured creditors. And it goes without saying that forcing Vital's officers and directors to breach their fiduciary duties is not in the public interest.

---

[110] *Vital Pharm., Inc. v. Owoc (In re Vital Pharm.)*, 2023 WL 3689540, at *4 (Bankr. S.D. Fla. May 26, 2023).

For these reason, it would be inappropriate to grant stay relief when stay relief would be futile.[111]

## III.    Conclusion

For three decades, Jack Owoc, as Vital's sole shareholder, enjoyed the benefits of Vital's S election, avoiding double taxation. Now that Vital is in bankruptcy, Mr. Owoc seeks to avoid the burdens of that S election and foist them on Vital's chapter 11 estate, to the detriment of unsecured and administrative creditors. Because Vital's S election gives it the valued right to avoid tax liability, the S election is property of the estate and therefore protected by the automatic stay. Mr. Owoc cannot prove cause for stay relief because the harm from lifting the stay far outweighs the harm in keeping it in place. And it would be inappropriate to grant stay relief when stay relief would be futile.

Accordingly, it is

**ORDERED** that John H. Owoc's Emergency Motion for Confirmation that the Automatic Stay Does Not Apply to Termination of Debtor's Subchapter S Corporation Status or, Alternatively, for Stay Relief[112] is DENIED.

### ###

Copies to:

All parties in interest

---

[111] *See, e.g., In re Denman*, 513 B.R. 720, 727 (Bankr. W.D. Tenn. 2014) (denying stay relief so a party in interest could exercise because it would be futile); *In re GGC, LLC*, 329 B.R. 36, 39 (Bankr. W.D. Pa. 2005) (denying stay relief to permit party in interest to perfect lien because it would be futile).

[112] Doc. 1627.