UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION
www.flsb.uscourts.gov

| | | |
|---|---|---|
| In re: | ) | Case No.: 22-17842-PDR |
| | ) | |
| VITAL PHARMACEUTICALS, INC., *et al.*,[1] | ) | Chapter 11 Cases |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

**MOTION OF JOHN H. OWOC TO COMPEL THE DEBTORS TO PRODUCE A WITNESS FOR EXAMINATION AND RELATED DOCUMENTS PURSUANT TO THE RULE 2004 NOTICE**

Creditor, equity holder and interested party John H. Owoc ("Mr. Owoc"), by and through his undersigned counsel, hereby files this *Motion of John H. Owoc to Compel the Debtors to Produce a Witness for Examination and Related Documents Pursuant to the Rule 2004 Notice* (the "Motion") in the chapter 11 bankruptcy cases (the "Chapter 11 Cases") of the above-captioned debtors and debtors-in-possession (the "Debtors"), pursuant to Federal Rule of Bankruptcy Procedure ("FRBP") 2004 ("FRBP 2004"), Federal Rules of Civil Procedure ("FRCP") 34, 37 and 45, made applicable by FRBP 7034, 7037 and 9016, and Local Rule 2004-1, in order to compel compliance by the Debtors with that certain *Notice of Rule 2004 Examination Duces Tecum* [Dkt. No. 1516] (the "Rule 2004 Notice") and related *Requests for Production of Documents* [Dkt. No. 1516-1] (the "Requests") and *Notice of Continued Rule 2004 Examination of Debtors' Corporate Representative* [Dkt. No. 2253] (the "Continued Notice").[2]  The Rule 2004 Notice, Requests and

---

[1]  The address of the Debtors is 1600 N. Park Drive, Weston, FL 33326.  The last four digits of the Debtors' federal tax identification numbers are: (i) Vital Pharmaceuticals, Inc. (8430); (ii) Bang Energy Canada, Inc. (5454); (iii) JHO Intellectual Property Holdings, LLC (0010); (iv) JHO Real Estate Investment, LLC (9394); (v) Quash Seltzer, LLC (6501); (vi) Rainbow Unicorn Bev LLC (2254); and (vii) Vital Pharmaceuticals International Sales, Inc. (8019).

[2]  Pursuant to the Debtors' Second Amended Joint Plan of Liquidation [Dkt. No. 1905] (the "Plan"), the Debtors, and the Liquidation Trust and/or Liquidation Trustee as successor to the Debtors, are bound by all pending orders and

1

Continued Notice are attached here as group **Exhibit A**. In support of the Motion, Mr. Owoc submits the accompanying declaration of Douglas E. Spelfogel (the "Declaration"), attached hereto as **Exhibit B**, and respectfully states as follows:

### PRELIMINARY STATEMENT[3]

1.     Mr. Owoc is the founder, sole shareholder and former CEO of the Debtors, having built the company from its inception into what was pre-bankruptcy nearly a billion dollar a year enterprise. Mr. Owoc, a former high school science teacher, started the company when he was in his thirties, serving as CEO for over 20 years, chairman of the board, and 100% shareholder and creating, amongst other things, Bang, a world-class product in the energy drink category.

2.     On July 12, 2023, Mr. Owoc filed an Amended Proof of Claim [Claim No. 767] (the "POC") by which he asserts a claim in excess of $168 million. The POC includes, among other things, amounts asserted for monies due by the Debtors and for contribution and reimbursement of amounts paid by Mr. Owoc under personal guarantees in excess of $120 million, which resulted in payment in full of amounts due by the Debtors under their pre-petition loan facilities to their lender, Truist Bank.

3.     On June 23, 2023, Mr. Owoc filed the Rule 2004 Notice and Requests in order to, among other things, obtain information concerning the administration of the Chapter 11 Cases, the assets and liabilities of and claims against the Debtors, including, but not limited to, the POC, as well as any valuation, potential conflicts of interest, issues relating to the operations, management,

---

demands in these Chapter 11 Cases, including the Rule 2004 Notice and Requests, which the Court, amongst other things, retains continuing jurisdiction over under the Plan. *See, e.g.*, *In re Buccaneer Res., LLC*, 2015 Bankr. LEXIS 4203, *21 (Bankr. S.D. Tex. Dec. 10, 2015) (upholding a FRBP 2004 order entered pre-confirmation prior to the existence of a post-confirmation Liquidating Trust where the Trust was the successor to the debtors).

[3]  Capitalized terms used, but not otherwise defined in this section, shall have the meanings ascribed to such terms below.

and sale of the business, tax issues, potential litigation claims by and against Mr. Owoc, and defenses thereof.

4.      To date, based on ongoing disputes with the Debtors, Mr. Owoc has yet to receive a complete production responsive to the Rule 2004 Notice and related Requests and the Debtors have refused to produce a witness.  In particular, and after multiple meet and confer conferences and numerous letters between the parties attempting to narrow issues and resolve objections, the Debtors' remain unwilling to produce (or even search for) certain categories of *responsive* documents that are well within the scope of FRBP 2004 and entirely relevant to the financial affairs of the Debtors, and administration of the Chapter 11 Cases.  Moreover, the Debtors now assert – *for the first time* – that they are unwilling to even produce a witness for oral examination.   Indeed, by the Requests, Mr. Owoc seeks an examination of and production by the Debtors related to the acts, conduct, property, liabilities and financial condition of the Debtors and related matters which may affect the administration of the Debtors' estates – the very mandate of FRBP 2004.

5.      The Debtors' continued non-compliance with the Rule 2004 Notice and continuing delay and refusal to provide full transparency and disclosures necessitated this Motion requesting that the Court compel the Debtors' compliance.  As detailed further below, the Debtors seek to improperly limit the scope of FRBP 2004 in contravention of well-established law, *without support*.

6.      *First*, the Debtors improperly make blanket assertions of privilege as to numerous requested communications without even reviewing such documents and identifying on a document-by-document basis any alleged privilege, as they are required to do.  In addition, and in any case, it is well-established that the mere fact that certain communications involved counsel is not sufficient to justify an assertion of privilege, as the Debtors do here, while the inclusion of

third parties on communications generally waives the privilege. Accordingly, the Debtors should be compelled to undertake a reasonable review of responsive documents, produce the non-privileged documents, and prepare a privilege log as to the documents for which they claim privilege excuses production, detailing the basis for such assertion of privilege.

7.      _Second_, the Debtors' assert that _all_ discovery related to any potential sale transaction of the Debtors is precluded based on (i) the order entered by the Court approving a sale of the Debtors' assets and (ii) the "pending proceeding" rule. Neither argument finds any basis in law or fact. As an initial matter, the Debtors misconstrue the subject Requests. Mr. Owoc is by no means seeking to relitigate the sale that was approved by the Court, but rather, seeks information regarding _any_ "Potential Sale Transaction" and related documents and communications regarding the same by and between the Debtors and their advisors. Indeed, as described below, there are numerous purposes for such Requests unrelated to the previously approved sale, including, but not limited to, claims by and against Mr. Owoc relating to the management of the Debtors, valuation, tax ramifications, and solvency, amongst other things. Further the "pending proceeding" rule is entirely inapplicable here where there is no _pending_ proceeding outside of bankruptcy in which Mr. Owoc's discovery might otherwise be obtained or to which his Requests are related. The Debtors do not, and cannot, state otherwise.

8.      _Third_, the Debtors' refuse to produce several categories of responsive documents based solely on their self-serving (and unsupported) _belief_ that such Requests somehow fall outside the scope of FRBP 2004. Such open-ended (and unsupportable) position covers broad swaths of documents, including documents relating to the financial affairs of the Debtors covering relevant issues such as operations, assets, and liabilities, amongst other things. However, as detailed below,

each Request is well within the broad scope of FRBP 2004 and the Debtors' belief to the contrary does not justify or excuse noncompliance.

9.      *Fourth*, the Debtors inexplicably refuse to produce a witness for oral examination. Notably, the Debtors advised Mr. Owoc of such refusal for the first time several months after the Rule 2004 Notice advising the Debtors of such an examination was served.  Notwithstanding, there is absolutely *no* basis under any applicable law for the Debtors' refusal – a basic mandate under the Bankruptcy Code – and the Debtors point to *none*.

10.      *Finally*, the Debtors refuse to produce information from what were Mr. Owoc's personal "CEO" email accounts during his nearly 30-year tenure as CEO of the Debtors, that since his removal as CEO, Mr. Owoc has not had no access to.  While the Debtors have argued that such Requests are overbroad and/or outside the scope of FRBP 2004 discovery, to the contrary, the requested information is directly relevant to, among other things, potential claims by and against Mr. Owoc (including the POC), tax obligations (of both the Debtors and Mr. Owoc), valuation of the Debtors and their assets, and other issues directly relevant to the administration of the Chapter 11 Cases.  Mr. Owoc agreed to narrow the Requests with certain targeted search terms and the Debtors only recently stated that responsive information have already been produced.  However, as described further below, the Debtors should confirm that they ran the proposed search terms in the email files for both email addresses and provide bates ranges for responsive documents and communications.

11.      For all of these reasons, each detailed further below, the Court should compel the Debtors to produce the requested information and anything else responsive to the Requests and provide a witness for oral examination pursuant to the Rule 2004 Notice.

## JURISDICTION

12.     This Court has jurisdiction over these Chapter 11 Cases pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue is proper in this District pursuant to 28 U.S.C. § 1408.  The statutory predicates for the relief sought herein are FRBP 2004, FRCP 34, 37 and 45, made applicable by FRBP 7034, 7037 and 9016, and Local Rule 2004-1

## FACTUAL BACKGROUND

### A.  The Chapter 11 Cases

13.     On October 10, 2022 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code initiating the Chapter 11 Cases.  The Debtors are operating their businesses and managing their affairs as debtors in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

### B.  The Rule 2004 Notice

14.     On June 23, 2023, Mr. Owoc filed the Rule 2004 Notice through which Mr. Owoc sought to examine a representative of the Debtors and requested various categories of documents and communications be produced.  Specifically, by his Requests, Mr. Owoc sought documents and communications in the possession and control of the Debtors related to, among other things: (i) the assets and liabilities of the Debtors and financial condition; (ii)  Debtor financial documents; (iii) the Debtors' related entities and liabilities to or from such entities; (iv) the Debtors' tax returns; (v) the Debtors' liabilities to and from Mr. Owoc; (vi) communications with the Debtors' Board of Directors; (vii) a potential sale transaction of Debtor assets; (viii) corporate governance matters; (ix) valuation of the Debtors; (x) documents relating to the filing of the Chapter 11 Cases; (xi) non-ordinary course transactions by the Debtors; (xii) D&O insurance policies of the Debtors or

their principals; (xiii) intellectual property of the Debtors or their related entities or principals; (xiv) the Debtors' articles of incorporation, by-laws, operating agreements and amendments thereto; (xv) the Debtors' current shareholders, officers, directors, managers and members; and (xvi) certain email communications of Mr. Owoc held exclusively by the Debtors on their servers.

15.    The foregoing Requests were intended to address numerous issues raised in and relevant to the Chapter 11 Cases.  First and foremost, Mr. Owoc is one of the largest creditors in the Chapter 11 Cases with a proof of claim filed in excess of $163 million.  As noted above, Mr. Owoc seeks, among other things, information concerning the administration of the Chapter 11 Cases, the assets and liabilities of and claims against the Debtors, including, but not limited to, the POC, as well as any valuation, potential conflicts of interest, issues relating to the operations, management, transfers of assets between the Debtors and third parties, sale of the business, tax issues, and potential litigation claims by and against Mr. Owoc, and defenses thereof.  This is particularly important given the Debtors' corporate structure (subchapter "s" status) and various interconnected corporate and tax reporting and transactions, which raises significant tax and related financial and reporting issues between Mr. Owoc and the Debtors, as well as with respect to claims asserted by and against Mr. Owoc concerning the operations of the business and disposition of assets.  Mr. Owoc seeks to avail himself of his right under FRBP 2004 to obtain relevant information and documents related to the foregoing.

**C.  The Debtors' Failure to Produce Responsive Documents Despite Numerous Meet and Confer Conferences**

16.    As initial matter, after the FRBP 2004 Notice was served, *no* documents responsive to the Requests were produced by the Debtors (even documents that were not subject to objections raised) until nearly 30 days later following a meet and confer conference between the parties.  And notably, the vast majority of documents produced at that time, and to date, are productions

previously provided by the Debtors to the Committee, requiring no further review or collection by the Debtors before production to Mr. Owoc.  Indeed, the Debtors initially provided such prior productions without even identifying which productions or ranges of documents were responsive to which Requests.  Thereafter, Mr. Owoc and the Debtors through counsel engaged in a series of meet and confers (followed by various correspondence) in an effort to narrow the issues and facilitate production.  Unfortunately, to date, despite significant efforts to resolve such, the Debtors have refused to produce responsive documents, or even search for such, and have refused to and/or affirmatively withheld relevant information in violation of the any basic notion of disclosure and transparency in violation of long-settled law under FRBP 2004.[4]

---

[4]    Following the Debtors' initial productions, the Debtors' production remained woefully incomplete and certain of the documents requested were required to address Mr. Owoc's *Emergency Motion for Confirmation that the Automatic Say Does Not Apply to Termination of Debtor's Subchapter S Corporation Status or, Alternatively, for Relief from Stay* [Dkt. No. 1627].  Accordingly, on July 25, 2023, Mr. Owoc's counsel wrote to the Debtors' counsel seeking to advance further production and address open issues and disputes.  On August 4, 2023 (responding to a follow up by Mr. Owoc's counsel), the Debtors responded requesting a further meet and confer conference, which was held on August 9, 2023 (the "August 9 Conference").

While disputes remained, it appeared progress was made during the August 9 Conference where the Debtors agreed to search for and provide additional documents and Mr. Owoc agreed to limit certain Requests and attempt to limit other Requests (all without prejudice) by, among other things, offering the Debtors specific search terms for particular Requests.  Having received nothing further from the Debtors, on August 18, 2023, Mr. Owoc's counsel sent correspondence (the "Owoc August 18 Email") reiterating the parties' agreements at the August 9 Conference and providing proposed search terms as to a particular disputed Request.

On August 21, 2023 – nearly two weeks after the August 9 Conference – the Debtors sent a letter to Mr. Owoc's counsel (the "Debtors' August 21 Letter," attached has **Exhibit 1** to the Declaration), which provided certain information agreed to at the August 9 Conference, but concluded that "we do not believe that any additional discovery beyond what has already been produced or has been agreed upon is warranted at this time."  In response, on August 25, 2023, Mr. Owoc's counsel sent a letter (the "Owoc August 25 Letter," attached as **Exhibit 2** to the Declaration) challenging various points raised in the Debtors' August 21 Letter and providing proposed search terms to attempt to narrow a further Request opposed by the Debtors.

Over two weeks after the Owoc August 25 Letter, on September 11, 2023, the Debtors sent a further letter (the "Debtors' Sept. 11 Letter," attached as **Exhibit 3** to the Declaration) but produced no further documents or agreed to any further production.  Rather, the Debtors' Sept. 11 Letter simply rehashes previous points made *and* raises new objections *for the first time* –months after the Rule 2004 Notice was first served.  Mr. Owoc's counsel responded by letter dated September 15, 2023 (the "Owoc Sept. 15 Letter," attached as **Exhibit 4** to the Declaration) in order to address the new issues raised and certain continued misstatements and misunderstandings contained in the Debtors' Sept. 11 Letter, and once again, requested the prompt production of responsive documents and/or a further meet and confer conference to address the same.  To date, the Debtors have not responded to the Owoc Sept. 15 Letter other than to contend that the request for examination of the Debtors was deficient because it did not list topics for the examination (notwithstanding that the Rule 2004 Notice expressly covered the statutory topics under FRBP 2004, and that such belated objection was not timely raised).  The Debtors' continued refusal to address any of the outstanding production issues after months of good faith negotiations by Mr. Owoc necessitated this Motion.

## ARGUMENT

### A.  The Scope of FRBP 2004 Discovery Is Broad and Unfettered

17.     An examination under FRBP 2004(b) may relate to, among other things, "the acts, conduct, or property or to the liabilities and financial condition of the debtor, or to any matter which may affect the administration of the debtor's estate."  Fed. R. Bankr. P. 2004(b).  FRBP 2004(c) provides that "the production of documentary evidence may be compelled in the manner provided in Rule 9016," which permits the issuance of a subpoena.  Fed R. Bankr. P. 2004(c). Further, "Local Rule 2004-1(A) obviates the need for an Order as a condition precedent to the commencement of a Rule 2004 examination."  *In re Pan Am. Hosp. Corp.*, No. 04-11819-BKC-AJC, 2005 Bankr. LEXIS 734, *4 (Bankr. S.D. Fla. Feb. 25, 2005).   And no subpoena is necessary to compel production of documents from a debtor.  *See* Local Rule 2004-1(D).

18.     It is well-established that the scope of a FRBP 2004 examination and related requests for production of documents is "very broad."  *See* 9 COLLIER ON BANKRUPTCY ¶ 2004.01[1] (16th ed. 2021).  "Numerous courts have acknowledged the rule's broad scope, holding that a Rule 2004 examination can be legitimately in the nature of a 'fishing expedition.'"  *In re Pan Am. Hosp. Corp.*, 2005 Bankr. LEXIS 734 at *6 (Bankr. S.D. Fla. Feb. 25, 2005) (citing *In re M4 Enterprises, Inc.*, 190 B.R. 471, 474 (Bankr. N.D. Ga. 1995)); *see also*, *In re Mastro*, 585 B.R. 587, 597 (9th Cir. BAP 2018) ("As the Rule's text makes clear, the scope of a Rule 2004 examination is unfettered and broad; the rule essentially permits a fishing expedition.").  Indeed, Rule 2004 discovery is generally permissible as long as it relates "to the acts, conduct, or property or to the liabilities and financial condition of the debtor, or to any matter which may affect the administration of the debtor's estate or to the debtor's right to a discharge…"  *In re Pan Am. Hosp.*

*Corp.*, 2005 Bankr. LEXIS 734 at *7.  Moreover, the scope of a FRBP 2004 examination is generally broader than the scope of discovery under Rule 26 of the FRCP (*see In re Thow*, 392 B.R. 860, 864 (Bankr. W.D. Wash. 2007)), where "[o]ne of the primary purposes of a Rule 2004 examination is as a pre-litigation device."  *In re Wash. Mut., Inc.*, 408 B.R. 45, 53 (Bankr. D. Del. 2009).

19.    Notwithstanding, here, as detailed further below, by their objections to the Rule 2004 Notice, the Debtors seek to unduly limit the scope of FRBP 2004 in contravention of well-established law, *without support*.

**B.  The Debtors' Blanket Assertions of Attorney-Client Privilege Are Not Countenanced Under Well-Established Law**

20.    The Requests seek communications related to the Debtors' corporate governance issues; specifically, communications between the Board, as well as communications with the Debtors' third-party professionals, Huron and Rothschild.  *See* Request Nos. 1-4.  The Debtors have categorically refused to produce, *or even review*, such communications on the basis that "[c]orporate governance is a legal issue, and therefore discussions regarding corporate governance necessarily involved counsel and are therefore privileged."  *See* Debtors' Sept. 11 Letter at 3. Notably, however, the Debtors have not challenged the relevance of such Requests but assert a blanket privilege as to the various communications responsive to these Requests.  Such a blanket assertion of privilege is baseless and entirely improper.

21.    *First*, it is well-established that the party invoking an attorney client privilege bears the burden of proving the applicability of the privilege; and "[i]mportantly, blanket assertions of privilege will not suffice."  *In re Fundamental Long Term Care, Inc.*, 509 B.R. 387, 395 n. 33 (Bankr. M.D. Fla. 2014) (*citing In re Grand Jury Subpoena*, 831 F.2d 225, 226-27 (11th Cir. 1987)).  Indeed, as the Eleventh Circuit has confirmed, the attorney-client privilege must be

10

asserted "on a document-by-document basis." *In re Grand Jury Subpoena*, 831 F.2d at 227 (*citing United States v. El Paso Co.*, 682 F.2d 530, 539 (5th Cir. 1982) ("We have made clear that the attorney-client privilege may not be tossed as a blanket over an undifferentiated group of documents.  The privilege must be specifically asserted with respect to particular documents.")).  Here, it is patently improper for the Debtors to simply assert that large swaths of *unidentified* documents are subject to the attorney-client privilege.  *See id.* (holding that the decision to quash a subpoena based on a blanket assertion of attorney-client privilege "improperly cloaked some subpoenaed documents with the privilege's protection.").  Rather, the Debtors must review potentially responsive documents, produce those documents that are responsive and not otherwise subject to privilege, and prepare a privilege log detailing the basis for the determination to withhold or redact documents on privilege grounds.  *See, e.g., In re Royce Homes, LP*, 449 B.R. 709, 728 (Bankr. S.D. Tex. 2011) ("A privilege log should not only identify the date, the author, and all recipients of each document listed therein, but should also describe the document's subject matter, the purpose of its production, and a specific explanation of why the document is privileged or immune from discovery.") (internal citations and quotation marks omitted).  Accordingly, the Debtors cannot rest on the blanket assertion of privilege to avoid even reviewing potentially responsive documents.

22.  *Second*, and in any case, the Debtors cannot rely merely upon the *alleged* fact that counsel were present on Board (or other) communications in determining that such communications are privileged.  *See In re Mongelluzzi*, 568 B.R. 702, 713 (Bankr. M.D. Fla. 2017) ("[T]he fact that an attorney is copied with a written communication among non-lawyers does not make the communication privileged.").  It is well-established that the attorney-client privilege attaches "only to communications made for the purpose of obtaining legal advice and "documents

that serve both business and legal functions are not protected communications." *Id*. Accordingly, and consistent with the rule against blanket assertions of privilege, the Debtors must establish whether *each* responsive communication on which counsel is copied is for the primary purpose of procuring legal advice, or if it more closely involves business matters – which would presumably include at least a significant portion of the Debtors' correspondence concerning corporate governance issues – but in any case, requires a document-by-document determination. *See In re Grand Jury Subpoena*, 831 F.2d at 227, *supra*.

23.    *Finally*, communications involving third-party advisors like Huron and Rothschild are not protected by attorney-client privilege merely because counsel is included.  Barring an exception to the general rule, privilege is either waived or is never applicable in the case of such communications with third parties. *See In re Int'l Oil Trading Co., LLC*, 548 B.R. 825, 831 (Bankr. S.D. Fla. 2016).  And in the rare occasions where communications with third parties retain their privileged character, it is because the communications are "addressed to an indispensable third party." *See United States v. Pepper's Steel & Alloys, Inc.*, No. 84-1443-CV, 1991 WL 1302864, at *3 (S.D. Fla. Mar. 20, 1991) (finding insurance broker was not "indispensable" for privilege purposes in an action involving insurance coverage obligations).  Here, the Debtors have not identified why any communications with particular third parties should remain within the protections of any attorney-client privilege.  Unless and until the Debtors make such a showing as to specific, responsive communications – which they clearly have not – the asserted privilege is inapplicable and responsive documents must be produced.

24.    Accordingly, the Debtors should be compelled to review all communications responsive to the subject Requests irrespective of the presence of counsel on such communications, and, to the extent that an assertion of privilege is made, the Debtors should be required to specify

in detail the exact basis for such assertion, consistent with the above standards, and all non-privileged documents must be produced.

**C.** **There Is No Basis to Preclude Discovery Related to Potential Sale Transactions by the Debtors**

     **1)** **The Approved Sale in the Chapter 11 Cases Does Not Preclude Such Discovery**

25.    The Debtors baselessly assert that any "sale-related discovery" is somehow precluded because the Court ultimately approved a sale of the Debtors' assets through a final order. Debtors' Sept. 11 Letter at 2.  However, such assertion grossly mischaracterizes the nature of Mr. Owoc's Requests.  Specifically, Mr. Owoc is by no means seeking to relitigate the sale that was approved by the Court, but rather, seeks information and documents which relate to the underlying analysis of valuation, solvency, management and operations, all of which relate to claims by and against Mr. Owoc, and the assets, liabilities and administration of the Chapter 11 Cases.  Such matters regarding *any* "Potential Sale Transaction,"[5] whether in the context of Board deliberations regarding a potential sale of the Debtors' assets (Request No. 1) or in the context of documents and communications by and between the Debtors' accountant, Huron, and/or financial advisor, Rothschild (Request Nos. 2-4) are relevant and well within the scope of FRBP 2004.

26.    Indeed, there are numerous purposes for such Requests unrelated to the previously approved sale.  For example, it is no secret that claims have been raised by and against Mr. Owoc relating to the management of the Debtors.  Information and documents relating to the valuation of the business, management, and sale process – particularly a sale process that yielded far less

---

[5] "Potential Sale Transaction" is defined in the Rule 2004 Notice as any potential merger, acquisition, refinancing, recapitalization, asset sale/purchase or other business combination or transaction relating to the Debtors including, without limitation, all related negotiations, parties, bidding procedures, offers, listings, agreements or other actions made or taken to refinance, recapitalize, market or sell any assets of the Debtors.

than anticipated and left a de minimis recovery for creditors like Mr. Owoc – is germane to such concerns and potential related claims and defenses (claims that have no bearing on the previously approved sale order).  There can be no question that such purpose is legitimate under FRBP 2004. Further, information about a potential sale of the Debtors' assets, including related documents and communications by and between the Debtors' Board and/or advisors, clearly relates to "the acts, conduct, or property or to the liabilities and financial condition of the debtor" and affects the overall administration of the Debtors' estates – the very mandate of FRBP 2004.  Fed. R. Bankr. P. 2004; *see also*, *In re Pan Am. Hosp. Corp.*, No. 04-11819-BKC-AJC, 2005 Bankr. LEXIS 734, *7 (Bankr. S.D. Fla. Feb. 25, 2005) ("Any party in interest that has raised legitimate concerns about the competence of a debtor's management may take [Rule 2004] discovery to prove or augment its case.").

### 2)  Nor Does the "Pending Proceeding" Rule Preclude Such Discovery

27.    The Debtors further assert – *for the first time* in their Sept. 11 Letter – that the so-called "sale-related" discovery is also not proper under FRBP 2004 "to the extent it is sought to support claims or defenses in other pending proceedings."  Debtors' Sept. 11 Letter at 2.[6]  As an initial matter, the Debtors inexplicably failed to raise this alleged issue until nearly three months after the Rule 2004 Notice was served.  Such delay is inexcusable and prejudicial, and this argument should be deemed waived.  In any case, however, that rule is entirely inapplicable here where there is no other pending proceeding in which Mr. Owoc's current Requests could be raised or are otherwise relevant to.  *See, e.g.*, *In re Pan Am. Hosp. Corp.*, 2005 WL 2445907 at *3 (noting

---

[6] The Debtors also assert that the "pending proceeding" rule precludes discovery relating to the Joint Stay Motion described below.  Debtors' Sept. 11 Letter at 3.  Such argument is baseless for the same reasons described here with respect to the so-called "sale-related" discovery.

that "blind invocation of the 'prior proceeding rule' elevates form over substance" and holding that an abated motion did not constitute a "pending proceeding").

28.    Tellingly, in both of the cases the Debtors' have relied on as invoking this rule (*see* Debtors' Sept. 11 Letter at 2-3), unlike here, there was pending litigation outside of the bankruptcy court where the same discovery could be sought.  *See In re Sanomedics, Inc.*, No. 16-21659-RAM, 2018 Bankr. LEXIS 2187, *5 (Bankr. S.D. Fla. July 24, 2018) (party seeking discovery conceded the documents sought in the bankruptcy case under Rule 2004 "are not only related to the District Court Case, but are the same documents that it would seek to obtain [] in the District Court."); *In re Wash. Mut., Inc.*, 408 B.R. at 50 (granting debtors' 2004 motion to examine a bank despite the existence of a related, pending adversary proceeding and district court action).  Indeed, as the court confirmed in *In re Wash. Mut.*, "[o]ne of the primary purposes of a Rule 2004 examination is as a pre-litigation device" – one exact purpose of Mr. Owoc's Requests here.  *In re Wash. Mut., Inc.*, 408 B.R. at 53.

29.    Accordingly, the Debtors should be compelled to produce documents and communications related to a Potential Sale Transaction.

**D.    The Debtors' Outright Refusal to Produce *Responsive* Documents Is Entirely Unjustified**

30.    In several instances, the Debtors flatly refuse to produce documents responsive to the Requests based on the Debtors' *belief* that such Requests somehow fall outside the scope of FRBP 2004.  To the contrary, each Request is well-within the "broad and unfettered" scope of FRBP 2004 and the Debtors' belief to the contrary does not justify or excuse noncompliance.

15

    **1)**   **Communications Related to the Debtors' Financial Condition Must Be Produced**

31.     Discovery into a debtor's financial condition is foundational to FRBP 2004. FRBP 2004 specifically provides that it may relate to "the liabilities and ***financial condition*** of the debtor's estate." Fed. R. Bankr. P. 2004(b) (emphasis added). Here, through Request No. 23, Mr. Owoc seeks all documents and communications "relating to the Debtors' financial condition, operations, solvency or ability to timely pay their debts as they come due." Dkt. No. 1516-1. While Debtors have purportedly produced responsive documents in their possession, there remains a dispute as to production of related communications.

32.     In the meet and confer conferences, the Debtors objected to the production of such communications as overly broad. While this was disputed, Mr. Owoc agreed to narrow such Request and in the Owoc August 18 Email, proposed specific search terms to be applied to relevant communications as a means to narrow the scope of such Request. By the Debtors' August 21 Letter, they state that "the [proposed] terms are overbroad and not appropriate under Rule 2004." Debtors' August 21 Letter at 5. Importantly, however, the Debtors do not explain why such terms are not appropriate under FRBP 2004 – *they clearly are* – and while the Debtors state they are overbroad, they do not provide any alternative proposed terms which they believe would be more limited or appropriate. Rather, the Debtors simply point to productions already made and baselessly conclude that any additional discovery beyond that is unwarranted. Such a naked refusal to produce (or even search for) all responsive documents concerning the Debtors' financial condition is directly counter to the broad scope of FRBP 2004 and completely unjustified here.

33.     Accordingly, the Debtors should be compelled to produce responsive, non-privileged communications related to the Debtors' financial condition.

**2)** **The Joint Stay Motion Directly Affects Administration of the Chapter 11 Cases and Related Documents Must Be Produced**

34.    Through Request No. 7, Mr. Owoc seeks all documents and communications relating to Monster and that certain *Joint Agreed Motion for Relief from Stay to Continue Action in Nonbankruptcy Forum* dated November 11, 2022 [Dkt. No. 312] between the Debtors and Monster (the "Joint Stay Motion").  By the Joint Stay Motion, the Debtors sought an order from the Court lifting the automatic stay to allow Monster and the Debtor, Vital Pharmaceuticals, Inc. ("VPX"), to proceed with certain California litigation initiated by Monster against VPX and Mr. Owoc.  Prior to the Petition Date, a verdict was entered in that litigation against VPX, and Monster asserted damages in excess of $292 million plus punitive and/or exemplary damages.  Importantly, as the Debtors concede through the Joint Stay Motion, the Chapter 11 Cases were commenced "in part to obtain 'breathing room' from the Verdict and other pending litigation" and argued that "allowing the [litigation] to proceed at this time will facilitate the administration of the Debtors' chapter 11 cases."  Joint Stay Motion ¶ 15.  As such, there can no question that the Joint Stay Motion bears on questions of the decision making and management of the Debtors that have been implicated in these Chapter 11 Cases and matters that "may affect the administration of the [Debtors'] estate[s]", as specifically provided for under FRBP 2004.   Fed. R. Bankr. P. 2004(b).

35.    Notwithstanding, to date, the Debtors have refused to provide any documents responsive to Request 7 and state in the Debtors' August 21 Letter: "we believe this is outside the scope of Rule 2004 discovery…"   Again, however, the Debtors provide no basis for their *belief*, which is entirely baseless, particularly where – by their own admission – the Joint Stay Motion affects the administration of the Chapter 11 Cases.  Indeed, the Debtors' position here strains credulity where an admitted purpose of the filing of the Chapter 11 Cases was to provide "breathing room" from the very litigation the Joint Stay Motion requests the Court allow to proceed.  Even

putting aside the ultimate merits of the decision to enter the Joint Stay Motion, it cannot honestly be said that such decision did not directly – *and substantially* – affect the Debtors' property, liabilities and financial condition and as a result, the administration of the Debtors' estates (and the related mechanics and decision-making by various parties) – the very issues and information FRBP 2004 is intended to elicit.

36.    Accordingly, the Debtors' refusal to produce any responsive documents is directly counter to the purpose of FRBP 2004 and completely unjustified here.  The Debtors should be compelled to produce all documents and communications related to Monster and the Joint Stay Motion.

### 3)  <u>Any Documents Related to the Value of the Debtors' Assets Must Be Produced</u>

37.    Through Request Nos. 6 and 24, Mr. Owoc seeks all documents and communications relating to Kroll and its provision of valuation advisory services, including any valuation by Kroll.  Clearly, anything related to the value of the Debtors' assets relates to "property or to the liabilities and financial condition of the [Debtors]" and "may affect the administration of the debtor's estate" as specifically provided for under FRBP 2004.  Fed. R. Bankr. P. 2004(b).

38.    Notwithstanding, however, the Debtors refuse to produce *any* documents related to Kroll based on their own determination that "such information is not possibly relevant to the administration of the Debtors' estates or any potential claims or defenses by any party."  *See* Debtors' August 21 Letter at 4-5.  According to the Debtors, the valuation performed by Kroll was done "at the direction of Mr. Owoc despite clear instruction from the Board to the contrary." Debtors' Sept. 11 Letter at 3.  Importantly, the Debtors concede that Kroll's analysis was requested by Mr. Owoc, the Debtors' former CEO and board member.  And regardless of who directed its preparation (or whether Kroll stands by it today), any opinion or analysis on value of the Debtors'

estates is directly relevant and well-within the broad scope of FRBP 2004.  Indeed, the Debtors' refusal to produce information they apparently do not like is counter not only to the broad scope of FRBP 2004, but to bankruptcy's general mandate for transparency for creditors and parties in interest.  Moreover, the Debtors do not (and cannot) assert any burden in producing such a discrete set of documents clearly known and readily available to them.[7]

### E.  The Debtors Inexplicably Refuse to Produce a Witness for Examination

39.    The Debtors further assert – *for the first time* in their Sept. 11 Letter – that Mr. Owoc's request for a corporate representative deposition is deficient because deposition topics are not identified and because the Debtors believe they have provided enough documentation to avoid such a deposition.  Debtors' Sept. 11 Letter at 4.  As an initial matter, as described above, the Debtors inexplicably failed to raise this alleged issue until nearly three months after the Rule 2004 Notice was served.  Such delay is inexcusable and prejudicial, and these arguments should be deemed waived.  In any case, however, these are not proper bases for refusing to supply a witness for an oral examination as required under FRBP 2004 and Local Rule 2004-1(A).

40.    Indeed, there is absolutely no basis in the applicable rules, or otherwise, for the Debtors' unilateral assertion (*without authority*) that providing even a single witness for examination by the Debtors' sole shareholder and largest remaining claimant is improper.[8]  Rather,

---

[7] The Debtors further assert their belief that Mr. Owoc has the requested information as a basis not to produce the same.  Debtors' Sept. 11 Letter at 3.  To be clear, however, Mr. Owoc does not believe he ever received all of the documents/information including email correspondence, as requested.  Further, any in any case, as described, there is no relative burden for the Debtors to produce the requested, discrete information to ensure full disclosure and transparency.

[8] In subsequent email correspondence, the Debtors argued that Federal Rule of Civil Procedure 30 ("FRCP 30") applies to 2004 examinations and requires that deposition topics be identified for a FRBP 2004 examination.  As an initial matter, the Rule 2004 Notice provides that the subject matter is as delineated under FRBP 2004.  Irrespective, however, it is well-established that FRCP 30 only applies in adversary proceedings or contested matters.  *See, e.g.*, *In re Steffen*, 406 B.R. 139, 144 (Bankr. M.D. Fla. 2009) ("Federal Rules of Civil Procedure 30, as adopted by Federal Rules of Bankruptcy Procedure 7030, applies in adversary proceedings and sets forth the procedure to conduct oral depositions."); *In re Enron Corp.*, 281 B.R. 836, 840 (Bankr. S.D.N.Y. 2002) ("[O]nce an adversary proceeding or

the Debtors are required to provide full disclosure and transparency as a bedrock of the basic requirements under the Bankruptcy Code.  In any event, as described in the Owoc September 15 Letter, Mr. Owoc anticipates that the oral examination will cover the topics outlined in the Rule 2004 Notice and the information in the documents produced by the Debtors pursuant thereto.

41.    Accordingly, the Debtors should be compelled to produce a representative for oral examination consistent with FRBP 2004 and Local Rule 2004-1.

**F.  Mr. Owoc Is Entitled to Information from His "CEO" Accounts**

42.    As has been well-documented here, Mr. Owoc founded the Debtors and dedicated his life to their businesses for nearly 30 years until he was removed during these Chapter 11 Cases. As a result, and not surprisingly, Mr. Owoc's personal life and business affairs were often entangled.  As one example, Mr. Owoc used certain Debtor email addresses that he created (CEO@bangenergy.com and ceomeetings@bangenergy.com), not only for business but all of his personal affairs, which often overlapped.  This includes critical issues to both the Debtors' businesses and Mr. Owoc personally like taxes, insurance, real estate and mortgages where all related communications were handled on such email addresses housed on Debtor servers.  Since his removal, Mr. Owoc has had no access to such emails.  Because these emails include information directly relevant to, among other things, potential claims by and against Mr. Owoc (including the POC), tax obligations (of both the Debtors and Mr. Owoc), valuation of the Debtors and their assets, and other issues directly relevant to the administration of the Chapter 11 Cases (and in some cases, Mr. Owoc personally), as well as information that Mr. Owoc has no other

---

contested matter is commenced, discovery should be pursued under the Federal Rules of Civil Procedure and not by Rule 2004.").  Here, there is no adversary proceeding and the Rule 2004 Notice was not served in the context of a contested proceeding.  Moreover, the Debtors relied on *In re Analytical Sys., Inc.*, 71 B.R. 408, 412 (Bankr. N.D. Ga. 1987) but in that case, the debtor sought the subject FRBP 2004 examination in connection with a contested matter. .

means of obtaining, by Request Nos. 32 and 33 Mr. Owoc seeks access to those emails held solely by the Debtors.

43.     From the outset, the Debtors objected to these Requests as overly broad and argued that any documents personal in nature to Mr. Owoc would not be appropriate under FRBP 2004 (which is contested).[9]  *See, e.g.*, Debtors' August 21 Letter at 5.  To address such concerns (and without prejudice), in the Owoc August 25 Letter, Mr. Owoc proposed limited search terms to be run across the email files for the two subject addresses.  In the Debtors' Sept. 11 Letter, they state that each of the proposed searches are "the subject of prior discovery and/or Mr. Owoc's other Requests, and responsive information has already been produced."  Debtors' Sept. 11 Letter at 3. However, it is unclear exactly what this means.  The Debtors should confirm that they ran the proposed search terms in the email files for both addresses and provide bates ranges for responsive documents and communications.  To the extent such searches have not been run, as requested, the Debtors should be compelled to do so, and Mr. Owoc reserves all rights.[10]

## CONCLUSION

44.     For all of the foregoing reasons, the Motion should be granted, and the Debtors should be compelled to review and produce the documents and communications requested and described herein, consistent with the Rule 2004 Notice, FRBP 2004 and Local Rule 2004-1.

---

[9] While disputed, exceptions are often made for documents that are otherwise outside the scope of a particular discovery rule where the requesting party has no other way to obtain such information, which is the case for Mr. Owoc here.  *See, e.g., Strike 3 Holdings, LLC v. Doe*, 2022 U.S. Dist. LEXIS 197853, *2-3 (M.D. Fla. Oct. 31, 2022) (granting early discovery under FRCP 26 where movant "has shown it has no way to obtain" the requested information).  Moreover, "good cause" for FRBP 2004 discovery can be shown where denial "would cause undue hardship or injustice."  *In re Defoor Ctr., LLC*, 634 B.R. 630, 638 (Bankr. M.D. Fla. 2021).  Here, even assuming, *arguendo*, that these Requests seek information of a personal nature to Mr. Owoc, where he has no other way of obtaining such critical information held solely by the Debtors after his nearly 30-year tenure as CEO, denial would cause undue hardship for Mr. Owoc.

[10] In any case, Mr. Owoc reserves the right to seek further production from these email accounts and/or turnover of his emails in such accounts where, as described above, he used these accounts both professionally and personally for nearly 30 years and has no other way of obtaining such critical information.

**WHEREFORE**, Mr. Owoc respectfully requests that this Court enter an order, in the form attached hereto as **Exhibit C**, compelling the Debtors to (1) review and produce all non-privileged documents responsive to the Requests; (2) provide an appropriate privilege log identifying any documents for which the Debtors claim privilege excuses production and detailing the basis for such assertion of privilege; and (3) produce a witness for oral examination, and granting such other further relief as is appropriate under the circumstances.

Dated: November 27, 2023  
      New York, New York

**MAYER BROWN LLP**  
Douglas E. Spelfogel (admitted *pro hac vice*)  
Derek L. Wright (admitted *pro hac vice*)  
1221 Avenue of the Americas  
New York, New York 10020  
Telephone: (212) 506-2500  
Facsimile: (212) 506-1910  
Email: dspelfogel@mayerbrown.com  
        dwright@mayerbrown.com

-and-

**PHANG & FELDMAN, P.A.**  
2 S. Biscayne Boulevard, Suite 1600  
One Biscayne Tower  
Miami, Florida 33131  
Telephone: (305) 614-1223

By: */s/ Jonathan S. Feldman*  
      Jonathan S. Feldman (12682)  
      feldman@katiephang.com  
      service@katiephang.com

*Attorneys for John H. Owoc*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true and correct copy of the foregoing was electronically filed

and served on November 27, 2023, via the Court's Notice of Electronic Filing (CM/ECF) on all

Registered Users, including those set forth in Local Rule 4001-1(A), including Debtors' counsels.

 By:    */s/ Jonathan S. Feldman*
        Jonathan S. Feldman (12682)
        feldman@katiephang.com