

**ORDERED in the Southern District of Florida on June 6, 2025.**



Peter D. Russin, Judge
United States Bankruptcy Court

---

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF FLORIDA
### FORT LAUDERDALE DIVISION

In re:

Vital Pharmaceuticals, Inc., et al.,

    Debtors.

_____/

Case No. 22-17842-PDR

Chapter 11
(Jointly Administered)

## <u>ORDER DENYING RECUSAL MOTIONS</u>

When a litigant asks a judge to disqualify themselves from presiding over a case, the request implicates two fundamental and competing imperatives. On one hand, the judiciary must remain above reproach. A judge's continued participation must never be permitted to undermine public confidence in the fairness of the proceedings. On the other hand, the law does not—and cannot—permit litigants to convert dissatisfaction with judicial rulings into a license to disqualify judges at will.

These tensions are especially pronounced when the request for recusal comes from a pro se litigant who believes the system has failed them. Federal judges must approach such claims with rigor and humility. That includes a willingness to engage in meaningful self-examination: to consider whether, in the press of an emotionally charged case, unconscious bias may have crept in; whether courtroom management veered into undue impatience; whether a litigant's complaints, though exaggerated, reflect a deeper concern that merits acknowledgment. The integrity of the system depends not just on decisional correctness, but on the reality and perception of impartial adjudication.

Yet integrity cuts both ways. It also requires the judiciary to draw a clear line between genuine bias and baseless attack. Judges must be willing to do the hard work of distinguishing the two—listening without defensiveness, reflecting without retreat, and, when warranted, denying relief firmly and transparently. Recusal is not a remedy for unfavorable outcomes. It is a safeguard against actual partiality. When the record reveals none, the judge must remain in place and continue the work.

## I.  <u>Introduction and Procedural History</u>

Vital Pharmaceuticals, Inc. and its affiliated debtors (the "Debtors") filed for Chapter 11 relief in October 2022. Since then, this case has become one of the most procedurally active and administratively complex bankruptcy proceedings in recent memory in this District, encompassing more than 2,900 docket entries and over ten adversary proceedings.

John H. Owoc, the Debtors' founder and former Chief Executive Officer and Chairman of the Board, was removed from those roles in March 2023. His wife, Megan E. Owoc, a former employee of the Debtors, has participated in numerous filings throughout the case. Since Mr. Owoc's removal, the Court has presided over an array of contested matters. At nearly every stage, the Movants have participated— at times through counsel, at other times pro se—and have made their views known through a stream of motions, objections, and pleadings.

Increasingly, those pleadings have turned accusatory. The Movants have leveled allegations against nearly every fiduciary and professional in the case: the Debtors and their professionals, the creditors' committee and its professionals, the United States Trustee, the post-confirmation liquidating trust and its professionals and ultimately, this Court. The allegations range from claims of constitutional deprivation to conspiracies involving a broad cast of parties—none supported by evidence.

On May 23 and May 30, 2025, the Movants filed three overlapping motions now before the Court: *Emergency Motion Request for Disqualification of Bankruptcy Judge Peter D. Russin*,[1] *Emergency Motion to Disqualify Bankruptcy Judge Peter D. Russin*,[2] and *Emergency Motion to Recuse Judge Peter D. Russin for Cause*[3] (together,

---

[1] Doc. No. 2905.

[2] Doc. No. 2907.

[3] Doc. No. 2910.

the "Recusal Motions").[4] These filings demand the undersigned's disqualification under 28 U.S.C. §§ 144 and 455.

The trajectory of the Debtors and Mr. Owoc serves as a poignant example of dramatic ascent followed by precipitous decline. Mr. Owoc founded Vital in 1993, serving as its sole officer and shareholder. Under his leadership Vital experienced significant growth and success with its Bang Energy drink brand. However, the company faced substantial legal challenges that contributed to its financial difficulties. In one prominent case, Monster Energy Company ("Monster") sued Vital for false advertising related to the marketing of "Super Creatine" in the company's flagship product.[5] The jury determined that the claims were misleading since the drinks contained no actual creatine, resulting in a $293 million damages award in 2022.[6] This verdict was later upheld by the Ninth Circuit Court of Appeals in April 2025.[7]

---

[4] Although the Movants addressed their disqualification motion to Chief Bankruptcy Judge Erik P. Kimball, both 28 U.S.C. § 144 and § 455 place the responsibility for ruling on a motion to disqualify squarely with the judge whose impartiality is being questioned. Section 455(a) provides that "[a]ny justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." While the statute does not expressly reference bankruptcy judges, courts have uniformly applied it to them. *See, e.g.*, *In re Kensington Int'l Ltd.*, 368 F.3d 289, 301–02 (3d Cir. 2004). Likewise, under § 144, although the statute says the judge 'shall proceed no further' upon the filing of a sufficient affidavit, courts have consistently permitted the assigned judge to first assess the affidavit's legal sufficiency. *See, e.g., United States v. Balistrieri*, 779 F.2d 1191, 1199 (7th Cir. 1985). Accordingly, it is this Court's duty to determine in the first instance whether disqualification is warranted.

[5] *Monster Energy Co. v. Vital Pharms., Inc. et al.*, Case No. 5:18-cv-1882-JGB_SHK (C.D. Cal. September 29, 2022).

[6] Id. at Doc. 890.

[7] Id. at Doc. 1083.

In a separate arbitration case, Monster and Orange Bang, Inc. sued Vital for trademark infringement, resulting in a $175 million arbitration award and a 5% royalty on future Bang Energy sales.[8] These significant financial obligations placed immense strain on the company.

The Bang Energy drink, central to Vital's success, was the product at the heart of these legal issues. Its misleading marketing claims and trademark disputes called into question the long-term viability of the brand. The company, once a powerhouse generating billions in revenue, presumably allowed Mr. Owoc and his wife, Megan Owoc, to amass considerable wealth and influence. However, the judgments in such staggering amounts precipitated the company's bankruptcy and subsequent downfall.

The Court is mindful that the Movants are facing extraordinary personal and financial consequences from the downfall of Vital, and that such circumstances can produce deep frustration and a desire to externalize blame. But even acknowledging the emotional toll of these proceedings, there is no excuse for the baseless and inflammatory accusations they have chosen to level—against professionals, fiduciaries, and this Court. Judicial recusal is a safeguard for genuine conflicts of interest or bias; it is not a remedy for anger, disappointment, or adverse outcomes. The causes of Mr. Owoc's circumstances lie, in large part, at his own feet as a result of events that preceded this case—not in how Vital's bankruptcy case has been

---

[8] *Orange Bang, Inc. et al. v. Vital Pharms. Inc. et al.*, AAA Case No. 01-20-0005-6081 (April 4, 2022).

conducted. The Court remains committed to administering justice with impartiality, despite the Movants' efforts to impugn that process.

The Court, having reviewed the Recusal Motions and their voluminous exhibits, the record in this Chapter 11 case and related adversary proceedings, and being otherwise duly advised in the premises, hereby denies the Recusal Motions for the reasons that follow.[9]

## II.    Jurisdiction and Venue

This Court has subject matter jurisdiction over the proceeding under 28 U.S.C. § 1334. The Court has statutory authority to hear and determine this matter under 28 U.S.C. § 157(b)(2)(A). Venue is proper under 28 U.S.C. § 1408.

## III.    Legal Standards Under 28 U.S.C. §§ 144 and 455

Federal judges are presumed to be impartial. That presumption may be overcome, but only in circumstances where a reasonable, fully informed observer would doubt the judge's ability to remain fair and neutral, or where a judge in fact harbors a personal bias or prejudice that disqualifies them from presiding.[10] Section 455 of Title 28 sets out two principal grounds for disqualification.

---

[9] No evidentiary hearing was required because the motion is based on allegations that are not only unsupported, but demonstrably false and contradicted by the record. Courts are not compelled to entertain recusal motions grounded in fabrication, speculation, or bad faith. *See United States v. Greenough*, 782 F.2d 1556, 1558 (11th Cir. 1986) (recusal not warranted on the basis of "unsupported, irrational, or highly tenuous speculation.") A court is under no obligation to dignify such tactics with a hearing.

[10] *See In re Drexel Burnham Lambert Inc.*, 861 F.2d 1307, 1307 (2d Cir. 1988).

Under § 455(a), a judge must recuse "in any proceeding in which his impartiality might reasonably be questioned."[11] This is an objective test. The question is not whether the party before the court believes the judge is biased, but whether a reasonable person, fully informed of the relevant facts, would harbor doubts about the judge's impartiality.[12]

Under § 455(b)(1), recusal is required where a judge "has a personal bias or prejudice concerning a party."[13] This provision refers to actual bias—not perceived bias—and it must arise from an extrajudicial source, meaning it cannot be based solely on the judge's rulings, statements, or conduct in the case.[14] The Supreme Court has repeatedly emphasized that judicial rulings, even if harsh or erroneous, are almost never grounds for recusal. As the Court explained in *Liteky*, "[j]udicial rulings alone almost never constitute a valid basis for a bias or partiality motion. . . they are proper grounds for appeal, not for recusal."[15] Nor are "expressions of impatience, dissatisfaction, annoyance, and even anger" sufficient to disqualify a judge.[16]

Section 144 provides an additional—but narrower—basis for recusal. It applies where a party files a "timely and sufficient affidavit" demonstrating personal bias or

---

[11] 28 U.S.C. § 455(a).

[12] *See In re Drexel Burnham Lambert Inc.*, 861 F.2d 1307, 1307 (2d Cir. 1988); *United States v. Greenough*, 782 F.2d 1556, 1558 (11th Cir. 1986).

[13] 28 U.S.C. § 455(b)(1).

[14] *See United States* v. *Grinnell Corp.*, 384 U.S. 563, 583, 16 L. Ed. 2d 778, 86 S. Ct. 1698 (1966); *Loranger v. Stierheim*, 10 F.3d 776, 780 (11th Cir. 1994).

[15] *Liteky,* 510 U.S. at 555.

[16] Id. at 555–56.

prejudice on the part of the judge.[17] However, § 144 applies only to district judges, not to bankruptcy judges.[18] Even if it did apply, the judge to whom the affidavit is directed is permitted to assess its legal sufficiency before recusal is required.[19]

Courts must also guard against misuse of the recusal statutes. As the Eleventh Circuit noted in *United States v. Greenough*: "If a party could force recusal of a judge by factual allegations, the result would be a virtual 'open season' for recusal."[20] The integrity of the judiciary requires a careful balance: claims of bias must be taken seriously, but disqualification must not become a tool of tactical disruption.

## IV.   <u>Allegations and Analysis</u>

The Movants assert that the undersigned has demonstrated bias, committed constitutional violations, and enabled a far-reaching conspiracy involving estate fiduciaries, professionals, and third-party purchasers. Their submissions—spanning over 300 pages with exhibits—contain numerous accusations, which the Court addresses in general categories.

### A.  <u>Bias and Retaliation</u>

Movants allege the Court is personally biased against them, referencing, without citation, hearing exchanges in which the Court interrupted or admonished Mr. Owoc, limited his arguments, or denied his motions. They claim these reflect not

---

[17] 28 U.S.C. § 144.

[18] *See In re Damerau,* 525 B.R. 799, 802 (Bankr. S.D. Fla. 2015).

[19] *See United States v. Hines*, 696 F.2d 722, 729 (10th Cir. 1982); *United States v. Balistrieri*, 779 F.2d 1191, 1199 (7th Cir. 1985).

[20] United States v. Greenough, 782 F.2d 1556, 1558 (11th Cir. 1986).

courtroom management, but deep-seated antagonism. The Movants characterize these events as evidence of "vexatious abuse" and claim the Court has "weaponized" the bankruptcy process. They contend that the Court's failure to recuse in light of these prior rulings reinforces an appearance of impropriety under 28 U.S.C. § 455(a) and reflects an actual bias under § 455(b)(1). They also assert that their having filed judicial complaints against the Court—including with the Eleventh Circuit Judicial Council, the Department of Justice, and the FBI Bankruptcy Fraud Division—further disqualifies this Court from continuing to preside over the case.

The claim that the Court harbors personal bias is premised on adverse rulings, firm case management, and efforts to maintain procedural discipline. The Supreme Court has made clear that such actions—even when firm—do not support recusal.[21] Interruptions during hearings, admonitions to counsel, or pointed commentary on procedural failings fall well within the bounds of courtroom administration.

### B. Allegations of Constitutional Violations

The movants allege multiple violations of their constitutional rights. They claim suppression of speech in violation of the First Amendment based on the Court's alleged order barring Mr. Owoc from using or regaining control over verified social media accounts (e.g., Instagram, Twitter/X, TikTok) and preventing him from criticizing "the South Florida bankruptcy community."

---

[21] *See Liteky*, 510 U.S. at 555.

They argue that the Court, in violation of the Fourth Amendment, unlawfully approved or condoned the warrantless seizure of Mr. Owoc's personal laptop, which they claim contains privileged medical, legal, and business information.

They assert violations of the Sixth and Fourteenth Amendments by the Court depriving of the right to counsel through judicial intimidation and interference, pointing to the withdrawal of multiple attorneys and the Court's refusal to authorize estate-funded counsel or approve a requested 60-day continuance.

Movants cite no controlling precedent directly addressing these allegations in a bankruptcy context, relying instead on general constitutional principles and case law governing civil and criminal proceedings. They are unsupported by any evidence and do not support recusal.

### C.  Suppression of a Keurig Dr Pepper Offer

The Movants allege that the Court actively suppressed a $3.7 billion acquisition offer from Keurig Dr Pepper ("KDP") to ensure a sale of the Debtors' assets to Monster. They claim that, during an unidentified hearing, the Court cleared the courtroom and disconnected Zoom access to prevent disclosure of the KDP offer, and that it refused to admit related exhibits. They further assert that estate counsel, and other parties and professionals knowingly participated in this suppression. The record contradicts this claim in every material respect.

The Movants refer to a March 26, 2025 hearing, but they cite no transcript showing that a KDP offer was mentioned or that access was cut off. They reference a board call where the Movants allegedly confronted Debtors' counsel Jordi Guso about

the missing offer, but they provide no transcript, affidavit, or documentation of that alleged call.

The February 28, 2023 Kroll valuation report cited by the Movants shows enterprise value ranges for Vital between $2.4 billion and $4.8 billion depending on methodology. It does not confirm, mention, or imply the existence of a $3.7 billion offer from KDP or any third party.

The Movants assert that Charles Delo of Rothschild and Co., the Debtors' investment banker, confirmed a KDP offer under oath, but provide no transcript, docket reference, or quotation from the alleged testimony. No such statement appears in the July 12, 2023 sale hearing transcript nor any sale-related filings.

The July 12, 2023 transcript shows that no objections were raised by Mr. Owoc or his then-counsel, Jonathan Feldman, regarding the sale to Monster or any alternative bids. At the outset of that hearing, the Court noted that there was no opposition to the proposed sale or compromise. Mr. Feldman did not object or introduce any evidence regarding a purported KDP offer.

Mr. Delo proffered sworn testimony describing a robust, global marketing process: 151 parties were contacted; 49 executed NDAs; 8 submitted indications of interest; only Monster submitted a qualified bid. At no point in Mr. Delo's testimony was KDP mentioned.

The Court's *Amended Order (1) Authorizing and Approving (A) The Sale of Substantially All of the Debtor's Assets Free and Clear of all Liens, Claims and Encumbrances and (B) The Assumption and Assignment of Certain Executory*

*Contracts and Unexpired Leases in Connection Therewith, and (III) Granting Related Relief* (the "Sale Order") found that the sale process was conducted in good faith and in compliance with the Bidding Procedures.[22] Paragraph H specifically states: "Because only one qualified bid was received for substantially all of the Debtors' assets, which was submitted by the buyer, no Auction was conducted."[23] The Sale Order also states that any objections to the sale had been resolved and references only one objection, which was made by creditor ThermoLife International, LLC.[24] The Court concluded that the Monster sale "constitutes the highest or otherwise best offer for the Purchased Assets. . . "[25]

The *Amended Notice of Auction Cancellation and Successful Bidder[26]* states unequivocally that "only one bid received for substantially all of the Debtors' assets, from Blast Asset Acquisition LLC [Monster's affiliate][27]. . . is a Qualified Bid for such assets."[28] No mention is made of a competing bid from KDP.

The sale followed transparent and court-approved procedures. The auction was canceled after no other qualified bids emerged by the May 22, 2023 deadline. All sale-related documents—including the APA with Monster, notices, service affidavits, and

---

[22] Doc. No. 1658 at p. 8.

[23] Id. at p. 6.

[24] Id. at p. 2.

[25] Id. at p. 9.

[26] Doc. No. 1556.

[27] Blast Asset Acquisition LLC was the affiliate of Monster that ultimately purchased the assets.

[28] Doc No. 1556 at p. 2.

declarations from Rothschild's and Monster's representatives—were filed publicly and admitted into evidence without objection.

The Court did not close the courtroom, disable Zoom access, or exclude evidence. The July 12 hearing was open and transcribed. Mr. Owoc's attorney was present and had the opportunity to raise objections but did not. The Sale Order was never appealed.

The conspiracy theory posited by the Movants would necessarily involve criminal coordination among numerous independent fiduciaries, including: the secured lenders (who stood to benefit from a higher bid); the creditors' committee (who also stood to benefit from a higher bid); Rothschild & Co; the Debtors' and their independent directors and professionals; Monster (a publicly traded company subject to SEC oversight); and the Court. Such a theory is implausible on its face.

In sum, these assertions are contradicted by the transcript, sale documents, and complete absence of any objection or corroboration in the record and do not support recusal.

D. <u>Alleged Favoritism Toward Professionals and Monster</u>

Movants allege that the Court has displayed systemic favoritism toward estate professionals and Monster, asserting that the Court has facilitated or condoned a coordinated scheme to enrich insiders and suppress opposition. They specifically identify Lowenstein Sandler LLP (counsel to the creditors' committee), Bast Amron LLP (local counsel), Jordi Guso of Berger Singerman (Debtors' counsel), and other

professionals as participants in what they describe as a "racketeering scheme" protected by judicial action.

They contend that: (i) over $67 million in professional fees have been approved without scrutiny or adequate justification; (ii) the "One Satisfaction Rule" was violated by permitting Monster to acquire the Debtors' assets and simultaneously pursue a $400 million judgment against Mr. Owoc; and (iii) the Court denied multiple requests for discovery and Rule 2004 examinations, thereby shielding fiduciaries from accountability.

These claims rely on the Movants' interpretations of procedural rulings and summaries of fee applications. The alleged fee awards are exaggerated and regardless were entered pursuant to Bankruptcy Code §§ 330 and 331 after notice, hearing, and review of detailed billing records. The Movants had the opportunity to object, and in several instances did so. Their general disagreement with fee amounts or outcomes does not support a claim of favoritism.

As to the Monster judgment, this Court of course cannot and has not ruled on its enforceability against Mr. Owoc. Whether the judgment is subject to satisfaction, merger, or other limitation is a matter of law and procedural posture in the courts where that judgment is being pursued. The Court's approval of the sale to Monster did not address or affect Monster's status as a judgment creditor of Mr. Owoc in his individual or any other capacity.

The Movants' allegations of collusion and racketeering are entirely conclusory. They cite no communications, financial transactions, or conduct—by any firm or professional—demonstrating collusion.

The Court did deny certain Rule 2004 and discovery requests, but those denials were based on procedural grounds and relevance—not favoritism. The docket reflects multiple rulings balancing discovery scope, document protection, and proportionality. The Movants' failure to obtain the discovery they sought does not establish judicial bias.

E. <u>Allegations Concerning Asset Transfers and Handling of Electronic Data</u>

The Movants also challenge the treatment of specific assets and the handling of electronically stored information ("ESI"). They allege that the Court enabled improper or unlawful asset transfers and condoned the unlawful seizure of a personal laptop belonging to Mr. Owoc.

With respect to real and personal property, they assert that a Phoenix manufacturing facility was never estate property and was unlawfully seized based on a forged signature, without a deed or ownership documentation. They contend the Court acted as "notary, jury, and title officer," thereby depriving them of due process. They assert Bang Jets Inc., a non-debtor entity allegedly owned by Mr. Owoc, was stripped of its Gulfstream G550 jet without an adversary proceeding or veil-piercing analysis.

These allegations are inaccurate. The Phoenix facility and jet were addressed through ordinary motions and orders entered after notice and opportunity for

objection. The relevant pleadings, exhibits, and orders are on the docket. No adversary proceeding was required because title issues, if any, were resolved through uncontested evidentiary records. Regardless, any dispute over process is perhaps grounds for appeal but not recusal.

As to the laptop, Movants allege that the Court ordered its "seizure," violating Mr. Owoc's Fourth and Fifth Amendment rights. The record tells a different story.

After Mr. Owoc's termination, the Debtors sought the return of a laptop used by Mr. Owoc in his capacity as CEO. Recognizing the device may contain both corporate and personal data, the Court directed that it be held in neutral custody. Initially placed with Mr. Owoc's then-counsel's IT department, the laptop was later transferred to Avalon Legal, a neutral third-party vendor. The Court approved and modified a detailed ESI protocol, which governed access to and protection of data.[29]

The protocol required both sides to exchange search terms, identify potentially privileged or personal files, and resolve disputes. Mr. Owoc was given the opportunity to redact HIPAA, PII, and attorney-client material, to submit privilege logs, and to receive disputed files for review. He repeatedly failed to comply.

Ultimately, the Court ordered Avalon to return the laptop and all personal data to Mr. Owoc and all company data responsive to the company search terms to the Debtors, and to destroy all forensic copies.[30] At no time did the Court authorize estate professionals to access the data without procedure or oversight.

---

[29] *See* Doc. Nos. 2697, 2777.

[30] Doc. No. 2881.

The Court never reviewed private information, never granted unilateral access to the estate, and issued multiple rulings aimed at protecting both corporate and personal confidentiality. Where disputes arose, the Court resolved them in favor of Mr. Owoc where appropriate.

The Movants' characterization of these events as a "seizure" or "theft" is not only legally inaccurate—it is belied by the procedural safeguards, detailed rulings, and efforts made to balance competing interests. The Movants' refusal to engage with that process does not convert it into a due process violation, render it unconstitutional, or provide support for the Recusal Motions.

### F. Attorney Intimidation

The Movants allege that a pattern of judicial intimidation forced multiple attorneys to withdraw from representing Mr. Owoc. They suggest that the Court's conduct created an atmosphere of hostility, discouraging counsel from continuing their representation. Specifically, they reference four law firms or attorneys who withdrew: (i) Paul Battista (February 6, 2023);[31] (ii) Justin Luna (March 23, 2023);[32] (iii) Irwin Gilbert (August 11, 2023);[33] and (iv) Jonathan Feldman (May 14, 2024).[34]

While Movants imply that these withdrawals somehow reflect judicial coercion, the record does not support that inference. Each attorney filed a motion to withdraw in accordance with applicable rules. None of the motions cited judicial

---

[31] *See* Doc. No. 754.

[32] *See* Doc. No. 1017

[33] *See* Doc. No. 1798.

[34] *See* Doc. No. 2607.

conduct as the basis for withdrawal. No accompanying declaration or hearing transcript suggested fear, interference, or impropriety by the Court. All withdrawal motions were ruled on in open court with due consideration of client prejudice and case status. In each instance, the Movants were given time to secure replacement counsel or proceed pro se.

The Court has no recollection of having admonished counsel. Even if it had, due to, for example, procedural missteps or for filings that fell below professional expectations, such comments—delivered in the course of managing a complex Chapter 11 case with over 2,900 docket entries—do not reflect personal animus. As the Supreme Court observed in *Liteky v. United States*, "[e]xpressions of impatience, dissatisfaction, annoyance, and even anger. . . are within the bounds of what imperfect men and women, even after having been confirmed as federal judges, sometimes display."[35] Judicial criticism does not amount to intimidation. Nor does the withdrawal of counsel—especially in a case marked by contentious pro se filings and inflammatory rhetoric—demonstrate bias.

Movants offer no evidence—only speculation—that these withdrawals reflect judicial intimidation. To infer bias from the fact that multiple attorneys withdrew from representation is to invert the recusal standard: frustration with a judge, or difficulty securing counsel, does not prove judicial misconduct.

### G. The Federal Lawsuit Filed Against the Undersigned

---

[35] *Liteky v. United States*, 510 U.S. 540, 555–56 (1994).

On January 24, 2025, the Movants filed a complaint in the United States District Court for the Southern District of Florida, naming the undersigned as a defendant.[36] The complaint alleges violations of the Racketeer Influenced and Corrupt Organizations Act (RICO), as well as constitutional and statutory claims. The lawsuit repeats many of the same allegations asserted in the Recusal Motions. It does not introduce new facts, identify extrajudicial sources of bias, or point to conduct outside the judicial role.

Allowing a litigant to trigger disqualification simply by filing a complaint would erode the independence of the judiciary and incentivize precisely the sort of abuse § 455 is designed to prevent. It is well settled that a litigant may not manufacture grounds for recusal by initiating a lawsuit against the presiding judge; Courts have long rejected such attempts as improper efforts at forum manipulation.[37] The lawsuit merely repackages the same claims raised here. It does not support disqualification under §§ 144 or 455.

### H. Additional Relief Requested by Movants

In addition to seeking the undersigned's disqualification, the Movants request extraordinary relief, including:

(i)     Vacatur of all rulings issued by this Court since the inception of the case;

(ii)    Immediate return of all seized digital and physical property;

---

[36] *Owoc v. Hon. Peter D. Russin*, Case No. 25-cv-60138-RS (S.D. Fla.).

[37] *See United States v. Grismore*, 564 F.2d 929, 933 (10th Cir. 1977) (holding that "a judge is not disqualified merely because a litigant sues or threatens to sue him"); *In re Martin-Trigona*, 573 F. Supp. 1237, 1243–44 (D. Conn. 1983), aff'd, 770 F.2d 157 (2d Cir. 1985) (refusing to recuse despite pro se litigant's multiple lawsuits against judges).

(iii)    Reinstatement of control over social media accounts and associated content;

(iv)    Disgorgement and clawback of all professional fees paid to estate professionals;

(v)    Referral of this matter to the FBI, United States Attorney's Office, and the Eleventh Circuit Judicial Council for criminal investigation and judicial discipline;

(vi)    A complete restart of the Chapter 11 case before a different judge.

These remedies are not supported by any statutory authority or factual record. Vacatur of prior rulings would require a finding of actual bias, procedural defect, or jurisdictional error—none of which are present. The Court has issued detailed orders addressing each of the underlying disputes, and those orders were subject to appellate review.

Similarly, the return of estate property, reinstatement of social media accounts, or retroactive disqualification of estate professionals must be sought through properly supported motions or adversary proceedings—not through a motion for recusal grounded in mere speculation and invectives.

## V.    <u>Conclusion</u>

Recusal is a serious remedy, reserved for circumstances in which a judge's impartiality is genuinely in doubt. That doubt must be grounded in fact, not supposition; in evidence, not rhetoric. The record reflects no such circumstance.

What it does reflect is a pattern of escalating accusations, unsupported by transcripts, documents, or sworn testimony—allegations that shift with each filing but remain unmoored from the procedural and evidentiary record. The Court has taken each claim seriously. It has reviewed the sale process, the ESI protocol, the conduct of counsel, and the allegations of constitutional and statutory violations. In each instance, the factual record rebuts the claims. The Movants' motions reflect dissatisfaction with the Court's rulings, not proof of bias. They rely on inference and insult rather than legal standards or admissible evidence.

A judge's duty in such circumstances is not to withdraw in the face of unfounded attack, but to remain and discharge the responsibilities of the office with integrity. As the Second Circuit has aptly stated, "[a] judge is as much obliged not to recuse himself when it is not called for as he is obliged to when it is."[38] Here, the undersigned is obliged not to recuse.

Having carefully reviewed the record, the Recusal Motions, and all applicable law, the Court finds no basis for disqualification under 28 U.S.C. §§ 144 or 455 or the other remedies sought. Accordingly, it is **ORDERED**:

1. The Recusal Motions are **DENIED**.

# # #

Copies To:
All parties in interest.

---

[38] *In re Drexel Burnham Lambert, Inc.*, 861 F.2d 1307, 1312 (2d Cir. 1988).