UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION
www.flsb.uscourts.gov

In re

VITAL PHARMACEUTICALS, INC., *et al.*[1]

Debtors.

_____/

Chapter 11 Cases

Case No.: 22-17842-PDR

(Jointly Administered)

**LIQUIDATING TRUSTEE'S RENEWED MOTION FOR ENTRY OF AN ORDER
PURSUANT TO BANKRUPTCY RULE 9019 (I) APPROVING SETTLEMENT
BETWEEN LIQUIDATING TRUST, STAG DEVELOPMENT, LLC, SHAW
INVESTMENTS & REALTY, INC., JONATHAN W. OWOC, BRANDEN SHAW, JW
OWOC ENTERPRISES, LLC, AND GLENN WALDMAN, AS RECEIVER FOR
TROPICAL SUNSET 117, LLC, AND (II) GRANTING RELATED RELIEF**

The Liquidating Trustee, on behalf of the Liquidating Trust[2] in the above-captioned chapter

11 bankruptcy cases (the "Chapter 11 Cases"), by and through undersigned counsel, hereby files

this renewed motion (the "Motion")[3] for entry of an order pursuant to section 105(a) of title 11 of

the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code") and Rule 9019 of the

Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"): (i) approving that certain

---

[1]    The address of the debtors in the above-captioned cases (the "Debtors") is 1600 N. Park Drive, Weston, FL 33326.  The last four digits of the Debtors' federal tax identification numbers are: (i) Vital Pharmaceuticals, Inc. (8430); (ii) Bang Energy Canada, Inc. (5454); (iii) JHO Intellectual Property Holdings, LLC (0010); (iv) JHO Real Estate Investment, LLC (9394); (v) Quash Seltzer, LLC (6501); (vi) Rainbow Unicom Bev LLC (2254); and (vii) Vital Pharmaceuticals International Sales, Inc. (8019).

[2]    Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Plan (defined herein) and/or Settlement Agreement (defined herein), as applicable.

[3]    This Motion renews the relief sought in the *Liquidating Trustee's Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 (I) Approving Settlement Between Liquidating Trust, Stag Development, LLC, Shaw Investments & Realty, Inc., Jonathan W. Owoc, Branden Shaw, JW Owoc Enterprises, LLC, and Glenn Waldman, as Receiver for Tropical Sunset 117, LLC, and (II) Granting Related Relief* [ECF No. 2887] (the "Original Motion") after obtaining approval of the settlement by the Receivership Court (defined here) as required by this Court at the hearing on June 11, 2025 (the "June 11 Hearing").

*Settlement Agreement and Mutual Release* (the "Settlement Agreement"), a copy of which is attached hereto as **Exhibit A**, between (a) the Liquidating Trust, (b) Stag Development, LLC, (c) Shaw Investments & Realty, Inc., (d) Jonathan W. Owoc, (e) Branden Shaw, (f) JW Owoc Enterprises, LLC,[4] and (g) Glenn Waldman, as receiver (the "Receiver") for Tropical Sunset 117, LLC and all of its wholly-owned subsidiaries;[5] and (ii) granting related relief.  In support of the Motion, the Liquidating Trustee relies on the: (i) *Declaration of Brent C. Williams in Support of the Liquidating Trustee's Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 (I) Approving the Settlement Between Liquidating Trust, Stag Development, LLC, Shaw Investments & Realty, Inc., Jonathan W. Owoc, Branden Shaw, JW Owoc Enterprises, LLC, and Glenn Waldman, as Receiver for Tropical Sunset 117, LLC, and (II) Granting Related Relief* (the "Williams Declaration"), attached hereto as **Exhibit B**; and (ii) *Declaration of Glenn Waldman, Esq., as Receiver for Tropical Sunset, 117, LLC* (the "Waldman Declaration"), attached hereto as **Exhibit C**, and states as follows:

## I. Summary of Requested Relief

1.      By this Motion, the Liquidating Trustee renews his request for entry of an order approving a settlement between the Liquidating Trust, the Stag Parties, and the Receiver, which will settle all claims made by the Liquidating Trust against the Stag Parties, Tropical Sunset and

---

[4]    Stag Development, LLC; Shaw Investments & Realty, Inc.; Jonathan W. Owoc; Branden Shaw; and JW Owoc Enterprises, LLC are collectively referred to in this Motion and the Settlement Agreement as the "Stag Parties."

[5]    The wholly-owned subsidiaries of Tropical Sunset 117, LLC, include, without limitation: (i) 3 Pelican Dr., LLC; (ii) JWO Real Estate Investment I, LLC; (iii) JWO Real Estate Investment II LLC; (iv) 167 Spyglass Ln, LLC; (v) 120 Spyglass Ln, LLC; and (vi) 2311 NE 33rd St. LLC (collectively, "Tropical Sunset").

several wholly-owned subsidiaries of Tropical Sunset,[6] in the matter of *VPX Liquidating Trust v. John H. Owoc, et al.*, Adv. Pro. No. 24-01009 (PDR) (the "Adversary Proceeding"), currently pending in the United States Bankruptcy Court for the Southern District of Florida (the "Bankruptcy Court"), as well as claims made by Stag Development, LLC against Tropical Sunset in the matter of *Stag Development LLC v. Tropical Sunset 117, LLC*, Case No. CACE 24-002312 (the "Receivership Action"), currently pending in the Circuit Court for the Seventeenth Judicial Circuit in and for Broward County, Florida (the "Receivership Court").

2.      Pursuant to this Court's instruction at the June 11 Hearing, the Receiver, the Stag Parties and the Liquidating Trustee filed that certain *Joint Motion to Approve Settlement* (the "Receivership Settlement Motion") in the Receivership Court, which sought approval of the Settlement including the following terms: (i) the settlement funds to be distributed to the Liquidating Trust will be held in escrow by the Liquidating Trust pending further order of the Bankruptcy Court upon the resolution of Liquidating Trust's claims against John H. Owoc ("Jack Owoc") in the Adversary Proceeding; and (ii) neither the Receivership Court's nor the Bankruptcy Court's approval of, or findings in connection with, the Settlement will adjudicate the issue of, or be used as evidence in determining, whether the VPX Capital transfers were legitimate distributions or improper transfers of VPX's assets.  On August 1, 2025, the Receivership Court entered an order (the "Receivership Approval Order") approving the Receivership Settlement Motion.[7]

---

[6]     The following wholly-owned subsidiaries of Tropical Sunset that are named as Defendants in the Adversary Proceeding are the subject of the Receivership: (i) 167 Spyglass Ln, LLC; (ii) 120 Spyglass Ln, LLC; and (iii) 3 Pelican Dr, LLC (collectively, the "Receivership Entities").

[7]     True and correct copies of the Receivership Settlement Motion, Receivership Approval Order, and transcript of the Receivership Court's hearing on July 28, 2025 on the Receivership Settlement Motion are attached hereto as **Exhibit D, Exhibit E**, and **Exhibit F**, respectively.

3.     As detailed below, and subject to entry of an order of this Court, (i) the Stag Parties have agreed to work diligently with the Receiver to finish the development of, and to sell, the Remaining Properties (defined herein), (ii) the Receiver has agreed to distribute certain proceeds of the sale of the Remaining Properties, which are equal to the VPX Capital (defined herein) transferred from the Debtors to, or for the benefit of, Tropical Sunset, to the Liquidating Trust subject to a waterfall embodied in the Settlement and consistent with the terms of the Tropical Sunset Operating Agreement, and (iii) the Liquidating Trust has agreed to accept those proceeds, to be held in escrow, in full and final settlement of all claims the Liquidating Trust may have against the Stag Parties and the Receivership Entities and the defenses asserted thereto including, but not limited to, those brought in the Adversary Proceeding and that could be brought in the Receivership Action (the "Settlement").  Specifically, as a result of the Settlement, twelve counts asserted by the Liquidating Trust in the Adversary Proceeding will be dismissed against the Stag Parties and Tropical Sunset, and eight of those counts will be dismissed in their entirety.[8]  As required by the Bankruptcy Court and Receivership Court, all Settlement proceeds distributed to the Liquidating Trust will be held in escrow by the Liquidating Trust pending further order of this Court and the Receivership Court upon the resolution of Liquidating Trust's claims against Jack Owoc in the Adversary Proceeding.

4.     As detailed below, in light of, among other things, the expense and uncertainty of continued litigation, the likelihood of an appeal from any judgment entered in the Adversary Proceeding, and the totality of the circumstances, the Liquidating Trustee believes that the Settlement falls well above the lowest point in the range of reasonableness and thus, easily meets

---

[8]    The twelve counts to be dismissed as to the Stag Parties and Tropical Sunset include Counts 7, 8, 10, and 18–26. Counts 7, 8, 10, and 22–25 will be dismissed in their entirety, and Counts 18–21, and 26 will be dismissed against the Stag Parties and Tropical Sunset, but will remain as to Jack Owoc.

4

the standards set forth in *Wallis v. Justice Oaks II, Ltd. (In re Justice Oaks II. Ltd.)*, 898 F.2d 1544 (11th Cir. 1990). Accordingly, the Liquidating Trustee asserts that the Settlement is in the best interests of the Debtors' estates and urges the Court to approve same.

## II. **Relevant Background**

5.      On October 10, 2022, the Debtors each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code, commencing the Chapter 11 Cases that are being jointly administered in the above-styled action.

6.      On November 8, 2023, the Bankruptcy Court entered the *Order (I) Approving On A Final Basis The Second Amended Disclosure Statement For Debtors' Second Amended Joint Plan Of Liquidation, And (II) Confirming The Debtors' Second Amended Joint Plan of Liquidation* [ECF. No. 2258] (the "Confirmation Order"), approving the *Debtors' Second Amended Joint Plan of Liquidation* [ECF No. 1905] (the "Plan") and any documents included in the Plan Supplement (as defined in the Plan) thereto, including that certain *Liquidating Trust Agreement* [ECF No. 2115] (the "LTA").

7.      Pursuant to the Plan, Confirmation Order, and LTA, upon the effective date of the Plan on November 21, 2023 (the "Effective Date"), Steven Balasiano was appointed as the Liquidating Trustee of the Liquidating Trust for the estates of Vital Pharmaceuticals, Inc. ("VPX") and the other Debtors, as successor-in-interest to the Debtors.

8.      Consistent with his fiduciary duties and statutory obligations, since shortly after his appointment, the Liquidating Trustee and his professionals have been investigating potential claims and causes of action for the benefit of the Debtors' estates and the Liquidating Trust Beneficiaries.

9.      On January 18, 2024, the Liquidating Trust initiated the Adversary Proceeding by filing its *Adversary Complaint for Breaches of Fiduciary Duty, Corporate Waste, Aiding and*

*Abetting Breaches of Fiduciary Duty, Unjust Enrichment, Avoidance and Recovery of Transfers Pursuant to 11 U.S.C. §§ 502, 547, 548 and 550 and Fla. Stat. § 726.105(1)(a), (b), and 726.108, Turnover of Property, Declaratory Judgment, and Disallowance of Claims*, naming, among others, Jack Owoc, the Stag Parties and Tropical Sunset as defendants.  [Adv. Pro. ECF No. 1.]

10.    On June 7, 2024, the Liquidating Trust filed its *Amended Complaint*.  [Adv. Pro. ECF No. 105.]

11.    On September 16, 2024, the Liquidating Trust filed its *Second Amended Complaint*. [Adv. Pro. ECF No. 148.]

12.    On February 7, 2025, the Clerk of the Bankruptcy Court filed the redacted version of the *Second Amended Complaint*.  [Adv. Pro. ECF No. 229.]

13.    The Adversary Proceeding, as it pertains to the Stag Parties and Tropical Sunset, arises from Jack Owoc's improper use of the Debtors' assets to fund the capital contributions of Tropical Sunset.

14.    Prior to the Petition Date, to fund the capital contributions of Tropical Sunset, cash in the amount of no less than $22,866,127.00 was disbursed to Tropical Sunset from an account owned and controlled by VPX (the "VPX Capital").  [*See* Williams Decl. ¶ 6.]

15.    Tropical Sunset also received cash from Jack Owoc that did not come from an account owned or controlled by VPX in the amount of $2,750,000.00 (the "Jack Owoc Capital," and together with the VPX Capital, the "Capital Contributions").

16.    Pursuant to Tropical Sunset's unsigned Limited Liability Company Agreement (the "LLC Agreement"), profit sharing in connection with Tropical Sunset (collectively, the "Tropical Profit Share") is as follows:

a. 60% in favor of Jack Owoc, individually (the "Jack Owoc Share"); and

b. 40% in favor of Stag Development, LLC (the "Stag Share").

17.    The following properties remain to be developed and/or sold by Tropical Sunset (collectively, the "Remaining Properties"):

a. 528 Riviera Dr., Fort Lauderdale, FL ("528 Riviera");

b. 120 Spyglass Ln., Jupiter, FL ("120 Spyglass"); and

c. 167 Spyglass Ln., Jupiter, FL ("167 Spyglass").

18.    On February 20, 2024, Stag Development, LLC, filed the Receivership Action.

19.    On February 20, 2024, the Receivership Court entered an order appointing the Receiver (the "Receivership Order"). A true and correct copy of the Receivership Order is attached hereto as **Exhibit G**. The Receivership Order granted the Receiver the following powers, among others:

a.    The power to employ professionals to carry out the dissolution of the Company and dispose of the Company assets in a commercially reasonable manner during the receivership . . .; and the power to present to the Court for determination the priorities of the distribution of the net proceeds from the judicial dissolution sale of the Company assets by the Receiver among the members of the Company;

b.    During the Receivership, the Receiver shall determine the priorities of the distribution of the net proceeds from the judicial dissolution and sale of assets within the judicial dissolution proceedings in accordance with Florida law and equity. For example, because the Vital Liquidating Suit seeks return of Jack Owoc's capital contributions to the Company, any funds expended to defend or settle said suit should first serve to; reduce Jack Owoc's capital account, prior to reducing the Company's profits or funds, profits, or distributions that may be owed to members. The Receiver may also cause the Company to reimburse Stag for its reasonable attorneys' fees and costs for this lawsuit or in defense of the Vital Liquidating Suit to the extent the Receiver deems it appropriate under the indemnity provisions in the Operating Agreement or the Florida Revised Limited Liability Company Act;

c.    The Receiver shall exercise all of the powers of the Company, through or in place of the Managers, officers, and directors of the Company, using best efforts to manage the affairs of the Company; and

> d. ***The Receiver shall institute, defend, or settle litigation for the benefit of the Company***.

*See* Ex. G, Receivership Order at 6–7, ¶6(a), (f), (h), and (m) (emphasis added).  Jack Owoc was timely served with the Receivership Order.

20.    On March 13, 2024, the Receivership Court entered an order granting the Receiver's motion to expand the powers and authority of the Receiver, which confirmed that the six subsidiary entities of Tropical Sunset were included within the purview of the receivership estate (the "Receivership Estate").

21.    On April 4, 2024, Jack Owoc, then-represented by Scott A. Mager, Esq. of Mager Paruas, LLC, filed a lengthy 41-page motion to dissolve the receivership (the "Dissolution Motion").

22.    On April 11, 2024 and April 12, 2024, the Receivership Court held an evidentiary hearing, during which it heard testimony from Jack Owoc; Jack Owoc's proffered expert, Paul Vidas, CPA; Jonathan W. Owoc, and others.  At the conclusion of the evidentiary hearing, the Receivership Court: (i) expressed serious concern with Jack Owoc's testimony that, without a receiver in place, he would convert "distributions" from Tropical Sunset to salary (i.e., dissipate the Receivership Estate's assets); and (ii) denied the Dissolution Motion.  *See* April 12, 2024 hearing transcript (the "April 12 Transcript") at 252:1–257:25.  A true and correct copy of the relevant portion of the April 12 Transcript is attached hereto as **Exhibit H**.

23.    On April 18, 2024, the Receivership Court entered the *Order Denying John H. Owoc's Motion to Intervene and to Dissolve or Modify Injunction and/or Discharge Receiver* (the "Order Denying Dissolution").  A true and correct copy of the Order Denying Dissolution is attached hereto as **Exhibit I**.

24.    Among other things, the Receivership Court found that:

4924-3817-4300, v. 1

a. "Plaintiff has far exceeded its burden to prove that the Receiver is necessary . . . ." Order Denying Dissolution ¶ 8.

b. "[A]t each and every level, Plaintiff has exceeded its burden to prove that a Receiver is necessary under all three sections." *Id.*

c. "[F]or the reasons revealed at the hearing, stated on the record, in Stag's Papers, and previously outlined in the Order Appointing Receiver that (1) it is not reasonably practicable to carry on TS117's activities and affairs in conformity with the articles of organization and the operating agreement; and (2) Jack Owoc has acted, is acting, and is reasonably expected to act in a manner that is illegal or fraudulent; and (3) TS117's assets are being misappropriated or wasted, causing injury to TS117 and its members. By way of example, and as noted on the record, the Court finds that Jack Owoc's intent to, and belief that he is legally permitted to, characterize what would otherwise be distributions from TS117 as salary for the purpose of avoiding creditors is incorrect and improper, and his refusal to allow the closing of the 3 Pelican Dr. Property pursuant to a contract with a bona-fide purchaser was also incorrect and improper. The Court also notes that Receivership is necessary to preserve and prevent Jack Owoc from dissipating TS117's assets." *Id.* ¶ 9.

25.     After consultation with his counsel and others, the Receiver made the determination that it would be in the best interest of the Receivership Estate to complete construction on the Remaining Properties prior to selling the Remaining Properties. [Waldman Decl., Ex. 1]. In connection with that decision, the Receiver employed and relied upon a MAI certified appraiser to assess the then-current freestanding value of the under-construction residences and the anticipated value of the completed projects and the profit which would be obtained by the Receivership Estate if the Receiver were to move forward to complete construction of the Remaining Properties. *Id.* at ¶ 7. Ultimately, the Receiver determined that completing the Remaining Properties would maximize the potential assets and value of the Receivership Estate. *Id.*

26.     No party to the Receivership Action challenged the foregoing determination and course of action adopted by the Receiver, and construction of the Remaining Properties continues apace.

9

27.      On April 21, 2025, the Liquidating Trustee filed the Original Motion in the Bankruptcy Court seeking approval of the Settlement Agreement.

28.      On May 20, 2025, Jack Owoc filed the *Motion to Exercise Right to Purchase Instead of Dissolution, Pursuant to Fla. Stat. § 605.0706, and Motion to Stay Proceedings to Schedule and Hold Evidentiary Hearing* (the "Owoc Purchase Motion") in the Receivership Court, which sought the Receivership Court's permission to exercise Jack Owoc's purported statutory right to "purchase instead of dissolution" and stay the Receivership proceedings so that the Receivership Court could hold a hearing to determine the value of certain assets of the Receivership Estate.  The Receiver and the Stag Parties filed objections to the Owoc Purchase Motion.

29.      That same day, on May 20, 2025, Jack Owoc and Megan Owoc (together, the "Owocs") filed the *Appellant's Response to Liquidating Trustee's Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 (I) Approving Settlement Between Liquidating Trust, Stag Development, LLC, Shaw Investments & Realty, Inc, Jonathan W. Owoc, Branden Shaw, and Glenn Waldman, as Receiver for Tropical Sunset 117, LLC, and (II) Granting Related Relief and Motion to Withhold Judgment* [ECF No. 2903] (the "Objection"), which requested this Court either deny the Original Motion or, in the alternative, defer its decision on the Original Motion pending the Receivership Court's adjudication of the Owoc Purchase Motion.

30.      On June 6, 2025, the Liquidating Trustee filed a reply to the Objection related to the Original Motion.

31.      On June 11, 2025, this Court held a hearing on the Original Motion and continued the hearing so that the Receiver, Stag Parties, and Liquidating Trust could, pursuant to this Court's instruction, first seek the Receivership Court's approval of the Settlement prior to seeking the Bankruptcy Court's approval.  At the hearing, this Court also indicated, among other things, that:

(i) any approval of the Settlement should not and will not adjudicate Jack Owoc's rights, if any, to the money distributed to the Liquidating Trust under the Settlement; and (ii) any Settlement proceeds received by the Liquidating Trust should be held in escrow until the claims asserted by the Liquidating Trust against Jack Owoc in the Adversary Proceeding are resolved.

32.     The very next day, the Receivership Court held a hearing on the Owoc Purchase Motion, and entered an order: (i) denying the Owoc Purchase Motion for the reasons stated on the record; and (ii) reaffirming its finding and Receivership Order that Stag owns 40% of the membership interests in Tropical Sunset and Jack Owoc owns the remaining 60% of the membership interests.

33.     On July 2, 2025, the Receiver, Stag Parties, and Liquidating Trust filed the Receivership Settlement Motion in the Receivership Court.

34.     On July 28, 2025, the Receivership Court held a hearing on the Receivership Settlement Motion and approved the Settlement, which required the distributions made to the Liquidating Trust to be held in escrow pending further order of this Court and the Receivership Court.

35.     On August 1, 2025, the Receivership Court entered an order approving the Receivership Settlement Motion.

### III. The Settlement Discussions and the Settlement[9]

36.     The Stag Parties and Receiver vehemently dispute the merits of the claims asserted in the Adversary Proceeding and believe that they have various meritorious defenses.  While the Liquidating Trustee believes that the Liquidating Trust would ultimately prevail in its pursuit of

---

[9]    As noted above, the following is a summary of the key terms of the Settlement. The terms of the Settlement Agreement control and all parties are urged to review same.

the claims in the Adversary Proceeding, in light of, among other things, the expense and uncertainty of continued litigation and to bring complete closure to all matters relating to the claims, the parties engaged in months long arms-length settlement negotiations in an attempt to resolve same. After extensive settlement discussions, the parties entered into the binding Settlement Agreement to memorialize their resolution of the disputes, which is now subject only to entry of an order of this Court approving the Settlement pursuant to Bankruptcy Rule 9019 (the "Approval Order") as the Receivership Court approved the Settlement on August 1, 2025 pursuant to the Receivership Approval Order.

37.     As set forth in the Settlement Agreement, the key terms of the Settlement are as follows:

- **Development of Remaining Properties**. The Stag Parties agree to work diligently with the Receiver to finish the development of and to sell the Remaining Properties. The Remaining Properties will remain in the control of the Receiver until they have been sold, and the proceeds of such sale(s) will first be used to satisfy any claims associated with the development and sale of the Remaining Properties (collectively, the "Claims").[10]

- **Available Cash**. The Settlement Agreement resolves, through a waterfall, how the distribution of all cash remaining in the Receivership Estate after the payment of the Claims, payment of all administrative costs of the Receivership (including the Stag Actions[11]), and retention by the Receiver of an amount of cash sufficient to allow him to carry out any remaining duties (the "Available Cash").

- **Budget**. The Receiver will propose a reasonable budget that may be modified from time to time for the administrative costs of the Receivership Estate and the remaining construction costs, which must be acceptable to the Liquidating Trust.

---

[10]    However, this will specifically exclude any claims of Jack Owoc or any creditors claiming a right to the proceeds by and through claims against Jack Owoc.

[11]    The "Stag Actions" are those actions required by the Stag Parties to work diligently with the Receiver to finish the development of the Remaining Properties.

- **Interim Distributions**. The Receiver must consider making, but shall not be required to make, interim distributions of Sales Proceeds in his possession, as follows:
  - Within sixty (60) days of the closing of the sale of 528 Riviera, the Receiver shall consider and make a determination regarding what, if any, portion of the Sales Proceeds may be distributed on an interim basis (an "Interim Distribution"), which determination shall take into account the need to develop the Remaining Properties, pay any Claims, the need to pay all administrative costs of the Receivership (including the Stag Actions), and retention by the Receiver of an amount of cash sufficient to allow him to carry out any remaining duties;
  - On a periodic basis thereafter, the Receiver shall again consider and make a determination regarding what, if any, Interim Distribution should be made;
  - For the avoidance of doubt, any Interim Distribution(s) shall be made in accordance with Paragraph 7 of the Settlement Agreement and only after said Interim Distribution has been approved by an Order of the Receivership Court after notice and a hearing; and
  - While the decision regarding making an Interim Distribution lies within the discretion of the Receiver, any party to this Agreement may challenge the Receiver's determination not to make an Interim Distribution by filing a motion to compel an Interim Distribution in the Receivership Court and by demonstrating to the Receivership Court by clear and convincing evidence that an Interim Distribution will not impact the Receiver's ability to develop the Remaining Properties, pay any Claims, pay all administrative costs of the Receivership (including the Stag Actions), and retain an additional amount of cash sufficient to allow the Receiver to carry out any remaining duties.

- **Distributions**. The Receiver will distribute the Available Cash as follows (collectively, the "Distributions"):
  - First, the Receiver shall distribute the Available Cash to the Liquidating Trust to be held in escrow in an amount equal to, and on account of, the VPX Capital.
  - Second, if the Available Cash is sufficient to satisfy in full the VPX Capital, any remaining Available Cash shall be distributed to the Receiver on account of the Jack Owoc Capital, which Available Cash shall be held by the Receiver pending further order of the Receivership Court.
  - Third, if the Available Cash is sufficient to satisfy in full the VPX Capital and Jack Owoc Capital, any remaining Available Cash shall be allocated and distributed consistent with the Tropical Profit Share as follows: (a) 60%

13

to the Jack Owoc Share, which Available Cash shall be held by the Receiver pending further order of the Receivership Court; and (b) 40% to the Stag Share and distributed to Stag Development, LLC.

- **Releases**. The Liquidating Trust will exchange mutual releases with the Receiver, the Receivership Entities, and the Stag Parties with respect to the claims in, or that could have been asserted in, the Adversary Proceeding and the Receivership Action.

- **Dismissal**. Within five business days of the entry of a final and non-appealable order approving the Settlement Agreement by the Bankruptcy Court *and* the Receivership Court, the Liquidating Trust will file a Notice of Dismissal with prejudice of all claims in the Adversary Proceeding against the Stag Parties and all entities in the Receivership Estate, including the Receiver.

## IV. Applicable Law

38.     There exists a strong public policy which favors settlement in all types of litigation. *In re Grau*, 267 B.R. 896, 899 (Bankr. S.D. Fla. 2001).

39.     Bankruptcy Rule 9019(a) provides: "On motion . . . and after a hearing on notice to creditors, the debtor . . . and to such other entities as the court may designate, the court may approve a compromise or settlement." Fed. R. Bankr. P. 9019(a).

40.     As this Court has previously found, "approval of a settlement in a bankruptcy proceeding is within the sound discretion of the Court, and will not be disturbed or modified on appeal unless approval or disapproval is an abuse of discretion." *In re Arrow Air, Inc.,* 85 B.R. 886, 891 (Bankr. S.D. Fla. 1988) (Cristol, J.) (citing *Rivercity v. Herpel (In re Jackson Brewing Co.)*, 624 F.2d 599, 602–03 (5th Cir. 1980)); *Anaconda-Ericsson, Inc. v. Hessen (In re Teltronics Servs., Inc.)*, 762 F.2d 185, 189 (2d Cir. 1985); *In re Prudence Co.,* 98 F.2d 559 (2d Cir. 1938), *cert. denied sub nom. Stein v. McGrath*, 306 U.S. 636 (1939)).

41.     Approval turns on whether the proposed settlement "falls below the 'lowest point in the range of reasonableness.'" *Arrow Air*, 85 B.R. at 891 (quoting *Teltronics Servs.*, 762 F.2d

at 189; *Cosoff v. Rodman (In re W.T. Grant Co.)*, 699 F.2d 599, 608 (2d Cir. 1983), *cert. denied* 464 U.S. 822 (1983)).

42.      According to the United States Eleventh Circuit Court of Appeals, when a bankruptcy court decides whether to approve or disapprove a proposed settlement, it must consider:

> (a)      the probability of success in the litigation;
> (b)      the difficulties, if any, to be encountered in the matter of collection;
> (c)      the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and
> (d)      the paramount interest of the creditors and a proper deference to their reasonable views in the premises.

*Justice Oaks II*, 898 F.2d at 1544; *see Arrow Air*, 85 B.R. at 891 (quoting *Jackson Brewing*, 624 F.2d at 602).

43.      In the instant case, each of the four *Justice Oaks* factors weighs heavily in favor of approval of the Settlement.

### A.      *Probability of Success in Litigation*

44.      The Liquidating Trustee believes that approval of the Settlement is in the best interests of the estates and the Liquidating Trust Beneficiaries because, among other things, the Settlement eliminates the expense and uncertainty of continued litigation against many defendants in the Adversary Proceeding, and the potential for an appeal of any final judgment. And while the Liquidating Trustee believes it more likely than not that he would prevail in the Adversary Proceeding, given (i) certain of the Stag Parties' and Receiver's defenses, and (ii) the inherent risks of litigation and the certainty to be provided under the Settlement, including the potential return of all of the VPX Capital, from the perspective of the Liquidating Trust, the Settlement easily falls well above the lowest point in the range of reasonableness of anticipated litigation outcomes.

### B. *Difficulties Associated with Collection*

45.    As in most cases, the Liquidating Trust does not have specific pre-judgment financial information regarding the Stag Parties and Tropical Sunset. However, as privately-held entities and individuals with unknown assets and liabilities, collection could be an issue in the event that the Liquidating Trust prevails.   As such, the Liquidating Trustee believes that there could be meaningful collection risk vis a vis the Stag Parties, which is obviated by the certainty to be provided under the Settlement Agreement.

46.    In addition, the Receiver is currently holding $[8,620,548.46] of cash on behalf of the Tropical Sunset Receivership Estate.   [Waldman Decl. ¶ 5.]   In order to preserve as much of that cash as possible, the Settlement Agreement requires the Receiver to propose a reasonable budget for the continued development and sale of the Remaining Properties and winding down the Receivership and other administrative costs, which must be acceptable to the Liquidating Trust. But for the Settlement, there would be less visibility into the costs of developing and selling the Remaining Properties and material additional costs expended by the Receiver defending the Adversary Proceeding.

### C. *Complexity, Expense, Inconvenience, and Delay*

47.    As with all litigation, there is expense, inconvenience and delay that would undoubtedly arise. And in light of, among other things, certain of the defenses asserted by the Stag Parties and the Receiver, the Liquidating Trustee believes that prevailing in the Adversary Proceeding could involve complex trial and appellate litigation,  including competing complex expert testimony on solvency, and the costs attendant to such litigation could be significant, with no assurance of a successful outcome or a net recovery—i.e., the potential return of all, or a majority of, the VPX Capital—greater than that achieved under the Settlement.

16

### D.    Paramount Interest of Creditors

48.    Finally, the Liquidating Trustee asserts that the "paramount interest of creditors" prong of the *Justice Oaks* test is satisfied because the Settlement provides the highest possible likelihood of a meaningful recovery—i.e., the potential return of all, or a majority of, the VPX Capital—and minimizes or eliminates further professional fees and costs associated with litigation with the Stag Parties and the Receiver in the Adversary Proceeding and Receivership Action.

49.    Indeed, given the Receiver's exercise of his business judgment, pursuant to the authority granted to him by the Receivership Court, the Liquidating Trust's ability to recover monies from Tropical Sunset turns upon (i) the Receiver's success in completing and profitably selling the Remaining Properties, and this Settlement eliminates both the distraction and expense to the Receivership Estate of litigating the Adversary Proceeding [*see* Waldman Decl. ¶ 7], and (ii) the resolution of the Liquidating Trust's claims asserted against Jack Owoc in the Adversary Proceeding.  What is more, assuming that the proceeds from the sales of the Remaining Properties are sufficient and this Court determines that Jack Owoc is not entitled to such proceeds through its adjudication of the claims pending against him in the Adversary Proceeding, the Settlement will result in the Liquidating Trust's recovery of nearly every dollar fraudulently transferred at the direction of Jack Owoc to Tropical Sunset.  [*See* Williams Decl. ¶ 6.]  For the avoidance of doubt, because (i) the Liquidating Trust is preserving its claims against Jack Owoc (who is not a party to the Settlement), and (ii) the Settlement proceeds distributed to the Liquidating Trust will be maintained in escrow by the Liquidating Trust pending resolution of its claims against Jack Owoc in the Adversary Proceeding, any potential right that Jack Owoc may have to the VPX Capital, if any due to the judgments against him individually and the IRS tax lien, is preserved and will be adjudicated by this Court.  As such, neither this Court's nor the Receivership's Court's approval of, or findings in connection with, the Settlement will adjudicate the issue of, or be used as

17

evidence in determining, whether the VPX Capital was legitimate distributions or improper transfers of VPX's assets or if the VPX Capital can be recovered through another cause of action in the Adversary Proceeding.

50.      It is, quite frankly, extremely unlikely that any better result could be obtained via continued litigation against the Stag Parties or Tropical Sunset.

51.      Accordingly, for the reasons set forth herein, the Liquidating Trustee asserts that the Settlement meets the standards set forth in *In re Justice Oaks II*, and therefore, requests approval of the Settlement because it (i) is fair and reasonable, (ii) falls well within the reasonable range of possible litigation outcomes, (iii) is above the lowest point in the range of reasonableness, and (iv) is in the best interest of the Debtors' estates and the Liquidating Trust Beneficiaries.

## V. <u>Other Related Relief</u>

### A.     *Notice*

52.      The Liquidating Trustee will serve this Motion on all appropriate parties and will file a separate certificate of service identifying the specific parties served with this Motion and the Notice of Hearing when issued.   The Liquidating Trustee requests that the Court make a determination that all necessary parties have received the requisite notice.

### B.     *Authority to Execute Necessary Documents and Take Necessary Actions*

53.      Assuming that the Settlement is approved, the Liquidating Trustee seeks authority to: (a) take such actions; and (b) execute such documents, including the Settlement Agreement, as he deems reasonable, necessary and/or desirable to effectuate the Settlement.

54.      Finally, assuming that the Settlement and Settlement Agreement are approved, the Liquidating Trustee requests that the Court retain personal and subject matter jurisdiction to: (a) interpret, implement, and enforce (i) the terms and conditions of the Settlement, Settlement Agreement, this Motion and the Approval Order, and (ii) all related matters; and (b) adjudicate

4924-3817-4300, v. 1

any and all disputes of any type arising from or related to (i) the Settlement, Settlement Agreement, this Motion and the Approval Order, and (ii) all related matters.

**WHEREFORE**, the Liquidating Trustee respectfully requests that the Court enter an Order: (1) granting the instant Motion; (2) finding that the Settlement embodied in the Settlement Agreement meets the factors set forth in *In re Justice Oaks II, Ltd.* and falls above the lowest point in the range of reasonableness; (3) finding that the Settlement constitutes a sound exercise and proper use of the Liquidating Trustee's business judgment and is consistent with his fiduciary duties; (4) approving the Settlement and the Settlement Agreement in their entirety; and (5) granting such other and further relief as this Court deems just and proper.

August 8, 2025

Respectfully submitted,

**BAST AMRON LLP**

By: */s/ Peter J. Klock, II*
Brett M. Amron (FBN 0148342)
Peter J. Klock, II (FBN 103915)
One Southeast Third Avenue, Suite 2410
Miami, Florida 33131
Telephone: (305) 379-7904
Email: bamron@bastamron.com
Email: pklock@bastamron.com


**LOWENSTEIN SANDLER LLP**
Jeffrey L. Cohen, Esq.
Eric Chafetz, Esq.
Michael A. Kaplan, Esq.
Erica G. Mannix, Esq.
1251 Avenue of the Americas
New York, New York 10020
Telephone: (212) 262-6700
Email: jcohen@lowenstein.com
Email: echafetz@lowenstein.com
Email: mkaplan@lowenstein.com
Email: emannix@lowenstein.com

*Counsel to the Liquidating Trust*

# EXHIBIT A

## SETTLEMENT AGREEMENT AND MUTUAL RELEASE AMONG THE VPX LIQUIDATING TRUST, STAG DEVELOPMENT, LLC, SHAW INVESTMENT & REALTY, INC., JONATHAN OWOC, BRANDEN SHAW, JW OWOC ENTERPRISES, LLC, AND GLENN WALDMAN, AS RECEIVER FOR TROPICAL SUNSET 117, LLC

This Settlement Agreement and Mutual Release ("Settlement Agreement") is made and entered into this _____ day of April, 2025, by and among: (i) the VPX Liquidating Trust for the estates of Vital Pharmaceuticals, Inc., f/d/b/a VPX/REDLINE and certain of its affiliates (the "Trust"); (ii) Stag Development, LLC ("Stag"); (iii) Shaw Investments & Realty, Inc. ("SIR"); (iv) Jonathan Owoc; (v) Branden Shaw; and (vi) Glenn Waldman, not individually, but solely in his capacity as receiver (the "Receiver") for Tropical Sunset 117, LLC and all of its wholly-owned subsidiaries including, without limitation, 3 Pelican Dr., LLC, JWO Real Estate Investment I, LLC, JWO Real Estate Investment II, LLC, 167 Spyglass Ln, LLC, 120 Spyglass Ln, LLC, JW Owoc Enterprises, LLC, and 2311 NE 33rd St. LLC (collectively, "Tropical Sunset"). Stag, SIR, Jonathan W. Owoc, and Branden Shaw are collectively referred to in this Agreement as the "Stag Parties". The Trust, the Stag Parties, and the Receiver are collectively referred to in this Agreement as the "Parties", and each a "Party".

### Recitals

WHEREAS, on or about October 10, 2022 (the "Petition Date"), Vital Pharmaceuticals, Inc. ("VPX") and its affiliated debtors (with VPX, the "Debtors") each filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code, in the United States Bankruptcy Court for the Southern District of Florida (the "Bankruptcy Court"), which was assigned Case No. 22-17842 (PDR) (Jointly Administered) (the "Bankruptcy Cases");

WHEREAS, on November 8, 2023, the Bankruptcy Court entered the *Order (I) Approving On A Final Basis The Second Amended Disclosure Statement For Debtors' Second Amended Joint*

*Plan Of Liquidation, And (II) Confirming The Debtors' Second Amended Joint Plan of Liquidation* [ECF No. 2258] (the "Confirmation Order"), approving the Debtors' Second Amended Joint Plan of Liquidation [ECF No. 1905] (the "Plan") and any supplements thereto, including the Liquidating Trust Agreement [ECF No. 2115] (the "LTA");

WHEREAS, pursuant to the Plan, Confirmation Order, and LTA, upon the effective date of the Plan on November 21, 2023 (the "Plan Effective Date"), Steven Balasiano was appointed as liquidating trustee (the "Liquidating Trustee") of the Trust for the bankruptcy estates of Vital Pharmaceuticals, Inc., and the other Debtors, as successor-in-interest to the Debtors;

WHEREAS, on January 18, 2024, the Trust filed its *Adversary Complaint for Breaches of Fiduciary Duty, Corporate Waste, Aiding and Abetting Breaches of Fiduciary Duty, Unjust Enrichment, Avoidance and Recovery of Transfers Pursuant to 11 U.S.C. §§ 502, 547, 548 and 550 and Fla. Stat. § 726.105(1)(a), (b), and 726.108, Turnover of Property, Declaratory Judgment, and Disallowance of Claims*, naming the Stag Parties as defendants;

WHEREAS, on June 7, 2024, the Trust filed its *Amended Complaint*;

WHEREAS, on September 16, 2024, the Trust filed its *Second Amended Complaint*;

WHEREAS, on February 7, 2025, the Clerk of the Bankruptcy Court filed the redacted version of the *Second Amended Complaint*;

WHEREAS, the Adversary Proceeding, as it pertains to the Stag Parties, arises from John H. Owoc's ("Jack Owoc") improper use of the Debtors' assets to fund the capital contributions of Tropical Sunset;

WHEREAS, on February 20, 2024, Stag derivatively sued Tropical Sunset, seeking judicial dissolution of Tropical Sunset and its subsidiaries, appointment of a receiver or custodian, and a preliminary injunction, in the matter styled *Stag Development LLC v. Tropical Sunset 117, LLC,*

Case No. CACE 24-002312 (the "<u>Receivership Action</u>") in the Circuit Court of the 17th Judicial Circuit in and for Broward County, Florida (the "<u>Receivership Court</u>");

WHEREAS, on February 20, 2024, the Receivership Court entered an order appointing the Receiver;

WHEREAS, on March 13, 2024, the Receivership Court entered an order granting the Receiver's motion to expand the powers and authority of the Receiver, which confirmed that the six subsidiary entities of Tropical Sunset were included within the purview of the receivership estate (the "<u>Receivership Estate</u>");

WHEREAS, prior to the Petition Date, to fund the capital contributions of Tropical Sunset, cash in the amount of $22,866,127.00 was disbursed to Tropical Sunset from an account owned by VPX (the "<u>VPX Capital</u>");

WHEREAS, Tropical Sunset also received cash from Jack Owoc that did not come from an account owned or controlled by VPX in the amount of $2,750,000.00 (the "<u>Jack Owoc Capital</u>," and together with the VPX Capital, the "<u>Capital Contributions</u>");

WHEREAS, pursuant to Tropical Sunset's unsigned Limited Liability Company Agreement (the "<u>LLC Agreement</u>"), profit sharing in connection with Tropical Sunset (collectively, the "<u>Tropical Profit Share</u>") is as follows:

        a. 60% by Jack Owoc, individually (the "<u>Jack Owoc Share</u>"); and

        b. 40% by Stag Development, LLC (the "<u>Stag Share</u>");

WHEREAS, the following properties remain to be developed and/or sold by Tropical Sunset (collectively, the "<u>Remaining Properties</u>"):

        a. 528 Riviera Dr., Fort Lauderdale, FL ("<u>528 Riviera</u>");

        b. 120 Spyglass Ln., Jupiter, FL ("<u>120 Spyglass</u>"); and

c. 167 Spyglass Ln., Jupiter, FL ("<u>167 Spyglass</u>");

WHEREAS, bona fide disputes and controversies exist among the Stag Parties, the Receiver, and the Trust, and by reason of such disputes and controversies, the Parties to this Settlement Agreement desire to settle all claims and causes of action of any kind whatsoever which the Parties have against each other; and

WHEREAS, the Parties intend that the full terms and conditions of their compromise and settlement be set forth in this Settlement Agreement.

NOW, THEREFORE, in consideration of the agreements contained in this Settlement Agreement and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

1. **<u>Adoption of Recitals.</u>** The Parties hereto adopt the above recitals as being true and correct, and they are incorporated herein as material parts of this Agreement, except that the Receiver cannot adopt recitals relating to factual occurrences prior to his appointment.

2. **<u>Authority.</u>** Each Party to this Settlement Agreement warrants and represents that it has the power and authority to enter into this Settlement Agreement and that this Settlement Agreement and all documents delivered pursuant hereto, to which it is a party, are valid, binding and enforceable upon it.

3. **<u>No Assignment/Indemnification.</u>** Each Party to this Settlement Agreement warrants and represents that it owns the claim or claims asserted or released in this Settlement Agreement and that no part of their claim or claims asserted or released in this Settlement Agreement have been assigned or transferred to any other person or entity other than as set forth above relating to the Debtors' bankruptcy proceedings and the Trust having the right to pursue the

claims asserted by the Debtors' against the Stag Parties and Tropical Sunset as successor in interest to the Debtors.

4. **Court Approval.** The Settlement Agreement and enforcement of the terms herein are subject to the approval of the Bankruptcy Court and Receivership Court.

5. **Development of Remaining Properties.**

a. The Stag Parties will work diligently with the Receiver to finish the development and sale of the Remaining Properties.

b. The Remaining Properties shall remain in the control of the Receiver until they have been sold, and the proceeds of such sale(s) used to satisfy any claims associated with the development and sale of the Remaining Properties (collectively, the "Claims"); *provided, however*, that this shall specifically exclude any claims of Jack Owoc or of creditors claiming by and through claims against Jack Owoc.

c. This Settlement Agreement shall resolve the distribution of the net proceeds from the sales of the Remaining Properties in the Receivership Estate (the "Sales Proceeds"), taking into account the need to pay any Claims, payment of all administrative costs of the Receivership (including the Stag Actions[1]), and retention by the Receiver of an amount sufficient to allow him to carry out any remaining duties (the "Available Cash").

d. The Receiver shall endeavor to propose a reasonable budget that may be modified from time to time for the administrative costs of the Receivership Estate (including possible litigation by and against the Receivership Estate) and the remaining construction costs, which must be reasonably acceptable to the Trust; *provided, however*, that the Receiver need not seek advance

---

[1]  The "Stag Actions" are those actions required for the Stag Parties to work diligently with the Receiver to finish the development of the Remaining Properties.

approval to modify the budget unless there is an anticipated increase exceeding ten percent (10%) of the most recent budget. If the Trust does not object within three business days of receiving notification that the Receivership Estate intends to modify the budget by 10% or more, the Trust shall be deemed to have accepted the modification.

6. **Consideration of Interim Distributions Required**. The Receiver must consider making, but shall not be required to make, interim distributions of Sales Proceeds in his possession, as follows:

a. Within sixty (60) days of the closing of the sale of 528 Riviera, the Receiver shall confer with the Trust and the Stag Parties, and shall consider and make a determination regarding what, if any, portion of the Sales Proceeds may be distributed on an interim basis ("Interim Distribution"), which determination shall take into account the need to develop the Remaining Properties, pay any Claims, payment of all administrative costs of the Receivership (including the Stag Actions), and retention by the Receiver of an amount sufficient to allow him to carry out any remaining duties;

b. Thereafter and on a periodic basis, the Receiver shall again confer with the Trust and the Stag Parties, and shall consider and make a determination regarding what, if any, Interim Distribution shall be made. If the Receive determines to make a distribution, then the Receiver shall notify the parties pursuant to ¶6(c), (d) and 7 of the Agreement

c. For the avoidance of doubt, any Interim Distribution(s) shall be made in accordance with Paragraph 7 of this Agreement and only after said Interim Distribution has been approved by an Order of the Receivership Court after notice and a hearing;

d.  While the decision regarding issuance of an Interim Distribution lies within the discretion of the Receiver, any party to this Agreement may challenge the Receiver's determination not to make an Interim Distribution by filing a motion to compel interim distribution in the Receivership Court and by demonstrating to the Receivership Court by clear and convincing evidence that an Interim Distribution will not impact the Receiver's ability to develop the Remaining Properties, pay any Claims, pay all administrative costs of the Receivership (including the Stag Actions), and retain an additional amount sufficient to allow the Receiver to carry out any remaining duties.

7.  **Distributions.** The Receiver shall distribute the Available Cash as follows (collectively, the "Distributions"):

a.  First, the Receiver shall distribute the funds to the Trust in an amount equal to, and on account of, the VPX Capital.

b.  Second, if the Available Cash is sufficient to satisfy in full the VPX Capital, any remaining Available Cash shall be distributed to the Receiver on account of the Jack Owoc Capital, which shall be held by the Receiver pending further order of the Receivership Court.

c.  Third, if the Available Cash is sufficient to satisfy in full the VPX Capital and Jack Owoc Capital, any remaining Available Cash shall be allocated to the Tropical Profit Share, and distributed as follows: (a) 60% to be allocated to the Jack Owoc Share, which shall be held by the Receiver pending further order of the Receivership Court; and (b) 40% shall be allocated to the Stag Share and distributed to Stag Development, LLC.

8.  **General Release and Acknowledgement among the Trust, Liquidating Trustee, Stag Parties, and Receiver.**

a. **Release by the Trust and Liquidating Trustee.** Effective upon the entry of a final and non-appealable order approving the Settlement Agreement by the Bankruptcy Court and Receivership Court, the Trust, successor-in-interest to the Debtors and the Liquidating Trustee generally release and forever discharge the Stag Parties, the Receiver, and Tropical Sunset from any and all claims, demands, and causes of action of whatever kind or character which the Trust, Liquidating Trustee, and/or Debtors have based on any events that have occurred prior to the date this Settlement Agreement is signed, whether or not arising out of or connected in any way with, the matters alleged in the Receivership Estate, Bankruptcy Cases, and Adversary Proceeding, save and except claims for breach of this Settlement Agreement. This release is intended to constitute a general release by the Debtors the Trust, successor-in-interest to the Debtors, and the Liquidating Trustee, of the Stag Parties,  the Receiver and Tropical Sunset of all claims of any kind, known or unknown.

b. **Release by the Stag Parties.** Effective upon the entry of a final and non-appealable order approving the Settlement Agreement by the Bankruptcy Court and Receivership Court, the Stag Parties generally release and forever discharge the Debtors, the Trust, and the Liquidating Trustee from any and all claims, demands, and causes of action of whatever kind or character which the Stag Parties have based on any events that have occurred prior to the date this Settlement Agreement is signed, whether or not arising out of or connected in any way with, the matters alleged in the Receivership Estate, Bankruptcy Cases, and Adversary Proceeding, save and except for claims for breach of this Settlement Agreement. This release is intended to constitute a general release by the Stag Parties the Debtors, the Trust, and the Liquidating Trustee of all claims of any kind, known or unknown.

c. **Release by the Receiver.** Effective upon the entry of a final and non-appealable order approving the Settlement Agreement by the Bankruptcy Court and Receivership Court, the Receiver and Tropical Sunset generally release and forever discharge the Trust, the Liquidating Trustee, and the Debtors from any and all claims, demands, and causes of action of whatever kind or character which the Receiver has based on any events that have occurred prior to the date this Settlement Agreement is signed, whether or not arising out of or connected in any way with, the matters alleged in the Receivership Estate, Bankruptcy Cases, and Adversary Proceeding, save and except for claims for breach of this Settlement Agreement. This release is intended to constitute a general release by the Receiver and Tropical Sunset of the Trust, the Liquidating Trustee, and the Debtors of all claims of any kind, known or unknown.

d. **Enforcement of Agreement.** The mutual releases above shall not bar any party from enforcing claims against the Receivership Estate related to payment of the Distributions on account of the VPX Capital or the Stag Equity.

e. **Preservation of Stag Interests.** Nothing in this Section 7 shall be deemed or construed to amend, alter or modify the Stag Parties' rights under the LLC Agreement or the Stag Share or any other applicable law, except as specifically set forth herein.

9. **Waiver of Claims.** Effective upon the entry of a final and non-appealable order approving the Settlement Agreement by the Bankruptcy Court and Receivership Court, the Stag Parties waive any and all claims against the Capital Contributions and the Jack Owoc Share.

10. **Agreement to Cooperate.** Effective upon the entry of a final and non-appealable order approving the Settlement Agreement by the Bankruptcy Court and Receivership Court, the Stag Parties agree to cooperate with all reasonable requests of the Trust with respect to the Trust's claims against other defendants in the Adversary Proceeding.

11. **Dismissal.** Within five (5) business days of the entry of a final and non-appealable order approving the Settlement Agreement by the Bankruptcy Court and Receivership Court, the Trust will file a Notice of Dismissal with prejudice of all claims in the Adversary Proceeding against the Stag Parties and all entities in the Receivership Estate, including the Receiver.

12. **Receivership Court Approval and Findings.** The Stag Parties, the Trust, and the Receiver shall jointly seek entry of a mutually agreeable order from the Receivership Court that approves and authorizes the Receiver to enter into the Settlement Agreement and will provide, *inter alia*:

    a.  A factual finding that the Tropical Profit Share is subject to the 60/40 split in accordance with the LLC Agreement:

        i.  Jack Owoc (or his successors and assigns): 60%; and

        ii.  Stag Development, LLC (or its successors and assigns): 40%;

    b.  A finding that the only Capital Contributions made to Tropical Sunset were the VPX Capital and the Jack Owoc Capital, and that both were made in the following amounts:

        i.  The VPX Capital: $22,866,127.00; and

        ii.  The Jack Owoc Capital: $2,750,000.00;

    c.  A finding that the Stag Parties cooperated with the Receiver and materially assisted with maximizing the value of the assets of the Receivership Estate; and

    d.  Except for any action commenced by the Receiver, an injunction barring litigation by any person or entity against the Receiver, the Trust, or the Stag Parties arising from or related to Tropical Sunset, the Capital Contributions, or the Tropical Profit Share without first (i) in the case of the Receiver or the Stag Parties, obtaining leave

of the Receivership Court, and (ii) in the case of the Trust, obtaining leave of the Bankruptcy Court.

13. **Bankruptcy Court Approval.** The Stag Parties, the Trust, and the Receiver shall jointly seek entry of a mutually agreeable order from the Bankruptcy Court that approves and authorizes the Trust to enter into this Settlement Agreement and will provide, *inter alia*, that all claims which were brought against or could have been brought against the Stag Parties, the Receiver, and Tropical Sunset in the Adversary Proceeding will be dismissed with prejudice.

14. **Business Judgment.** The Parties agree that this Settlement Agreement is entered into for settlement purposes only in order to avoid further uncertainty, litigation, risk of collection, and expense. The Parties acknowledge the business judgment of each other in entering into this Settlement Agreement.

15. **Advice of Counsel.** The Parties acknowledge that they have been represented by counsel of their own choice in the negotiations leading up to the execution of this Settlement Agreement, have read this Settlement Agreement, and have had the opportunity to receive an explanation from legal counsel regarding the legal nature and effect of same. The Parties have had the Settlement Agreement fully explained to them by their respective counsel and understand the terms and provisions of this Settlement Agreement and its nature and effect. The Parties further represent that they are entering into this Settlement Agreement freely and voluntarily, relying solely upon the advice of their own counsel, and not relying on any representation of any other party or of counsel for any other party.

16. **No Violation of Automatic Stay.** The Parties agree that this Settlement Agreement may be entered into despite any pending Automatic Stay.  The Parties shall seek a determination from

the Bankruptcy Court that entry into this Settlement Agreement is not a violation of the automatic stay.

17. **Joint Efforts.** This Settlement Agreement has been prepared by the joint efforts of the respective attorneys for each of the Parties.

18. **Neutral Interpretation.** In the event any dispute arises among the Parties with regard to the interpretation of any term of this Settlement Agreement, all of the Parties shall be considered collectively to be the drafting party and any rule of construction to the effect that ambiguities are to be resolved against the drafting party shall be inapplicable. Any disputes arising from the interpretation of this Agreement shall be submitted to the Bankruptcy Court or Receivership Court, as applicable, for resolution.

19. **Divisions and Headings.** The divisions of this Settlement Agreement into sections and subsections and the use of captions and headings in connection therewith are solely for convenience and shall have no legal effect in construing the provisions of this Settlement Agreement.

20. **No Admissions.** None of the Parties to this Settlement Agreement has expressed any facts, representations, or express or implied warranties, except as expressly contained in this Settlement Agreement.

21. **Attorneys' Fees and Costs.** Each Party will bear its own expenses, including any costs or attorneys' fees incurred in connection with the negotiation and execution of this Settlement Agreement and the legal work associated with obtaining the entry of a Final Order approving this Settlement Agreement in the Bankruptcy Court and the Receivership Court.

22. **Binding Effect.** The Settlement Agreement shall continue perpetually and shall be binding upon the Parties and their heirs, successors, and assigns and shall inure to the benefit of the Parties and their heirs, successors, and assigns.

23. **Entire Agreement.** This Settlement Agreement represents the entire agreement of the Parties and supersedes all prior written or oral agreements, and the terms are contractual and not mere recitals.

24. **No Alteration.** This Settlement Agreement may not be amended, altered, modified, or changed in any way except in writing signed by all the Parties to this Settlement Agreement.

25. **Acknowledgment of Terms.** THE PARTIES EXPRESSLY WARRANT THAT THEY HAVE CAREFULLY READ THIS SETTLEMENT AGREEMENT, UNDERSTAND ITS CONTENTS, AND SIGN THE AGREEMENT AS THEIR OWN FREE ACT.

26. **Execution of Documents.** The parties have executed this Settlement Agreement in multiple originals and signatures appear on the following pages.

[signatures on pages to follow]

Stag Development, LLC

_____

By:
Date: _____, 2025


Shaw Investments & Realty, Inc.

_____

By:
Date: _____, 2025


_____

Jonathan Owoc
Date: _____, 2025


_____

Branden Shaw
Date: _____, 2025


Glenn Waldman, Receiver

*Glenn J. Waldman*
_____
By: Glenn Waldman, not individually but as Court-appointed Receiver for Tropical Sunset 117, LLC


Date: April 17, 2025


The VPX Liquidating Trust for Vital Pharmaceuticals, Inc.

_____

By: Steven Balasiano, not individually but as Liquidating Trustee of the VPX Liquidating Trust

Date: _____, 2025

Stag Development, LLC

By: _____
Date: _____, 2025

Shaw Investments & Realty, Inc.

By: Branden Shaw
Date: April 18ᵗʰ, 2025

_____
Jonathan Owoc
Date: _____, 2025

_____
Branden Shaw
Date: April 18ᵗʰ, 2025

Glenn Waldman, Receiver

*Glenn J. Waldman*

By: Glenn Waldman, not individually but as Court-appointed Receiver for Tropical Sunset 117, LLC

Date: April 17, 2025

The VPX Liquidating Trust for Vital Pharmaceuticals, Inc.

_____
By: Steven Balasiano, not individually but as Liquidating Trustee of the VPX Liquidating Trust

Date: _____, 2025

Stag Development, LLC

By: _____
Date: ___4/18___, 2025

Shaw Investments & Realty, Inc.

By: _____
Date: _____, 2025

_____
Jonathan Owoc
Date: ___4/18___, 2025

_____
Branden Shaw
Date: _____, 2025

Glenn Waldman, Receiver

*Glenn J. Waldman*
_____
By: Glenn Waldman, not individually but as Court-
appointed Receiver for Tropical Sunset 117, LLC

Date: April 17, 2025

The VPX Liquidating Trust for Vital
Pharmaceuticals, Inc.

_____
By: Steven Balasiano, not individually but as
Liquidating Trustee of the VPX Liquidating Trust

Date: _____, 2025

#323085251.1
323133443.1

Stag Development, LLC

_____

By:
Date: _____, 2025


Shaw Investments & Realty, Inc.

_____

By:
Date: _____, 2025


_____

Jonathan Owoc
Date: _____, 2025


_____

Branden Shaw
Date: _____, 2025


Glenn Waldman, Receiver

*Glenn J. Waldman*
_____
By: Glenn Waldman, not individually but as Court-
appointed Receiver for Tropical Sunset 117, LLC


Date: April 17, 2025


The VPX Liquidating Trust for Vital
Pharmaceuticals, Inc.

*Steven Balasiano*
_____
By: Steven Balasiano, not individually but as
Liquidating Trustee of the VPX Liquidating Trust

Date: 4/18/2025 _____, 2025


00865109.DOCX 3                    00861885.DOCX 4                    14

#323085251.1
323133443.1

# EXHIBIT B

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FORT LAUDERDALE DIVISION**
**www.flsb.uscourts.gov**

| | |
|---|---|
| In re: | Chapter 11 Cases |
| VITAL PHARMACEUTICALS, INC., *et al.*,[1] | Case No. 22-17842 (PDR) |
| Debtors. | (Jointly Administered) |

**DECLARATION OF BRENT C. WILLIAMS IN SUPPORT OF THE LIQUIDATING TRUSTEE'S MOTION FOR ENTRY OF AN ORDER PURSUANT TO BANKRUPTCY RULE 9019 (I) APPROVING SETTLEMENT BETWEEN LIQUIDATING TRUST, STAG DEVELOPMENT, LLC, SHAW INVESTMENTS & REALTY, INC., JONATHAN W. OWOC, BRANDEN SHAW, JW OWOC ENTERPRISES, LLC, AND GLENN WALDMAN, AS RECEIVER FOR TROPICAL SUNSET 117, LLC, AND (II) GRANTING RELATED RELIEF**

Under 28 U.S.C. § 1746, Brent C. Williams hereby declares as follows under the penalty of perjury:

1.      I am the Co-Head of the Capital Advisory Group at Lincoln International LLC ("Lincoln"), a financial advisory firm retained by the VPX Liquidating Trust (the "Liquidating Trust") in connection with the above-referenced chapter 11 cases (the "Chapter 11 Cases"). Lincoln has expertise in operational and financial restructurings, mergers and acquisitions (M&A) and capital raising services to stakeholders in stressed and distressed situations.

---

[1]    The address of the Debtors is 1600 N. Park Drive, Weston, FL 33326. The last four digits of the Debtors' federal tax identification numbers are: (i) Vital Pharmaceuticals, Inc. (8430); (ii) Bang Energy Canada, Inc. (5454); (iii) JHO Intellectual Property Holdings, LLC (0010); (iv) JHO Real Estate Investment, LLC (9394); (v) Quash Seltzer, LLC (6501); (vi) Rainbow Unicorn Bev LLC (2254); and (vii) Vital Pharmaceuticals International Sales, Inc. (8019).

2.      I submit this declaration ("Declaration") in support of the *Liquidating Trustee's Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 (I) Approving Settlement Between Liquidating Trust, Stag Development, LLC, Shaw Investments & Realty, Inc., Jonathan W. Owoc, Branden Shaw, JW Owoc Enterprises, LLC, and Glenn Waldman, as Receiver for Tropical Sunset 117, LLC, and (II) Granting Related Relief* (the "Motion") of the Liquidating Trust, successor in interest to the above-captioned debtors and debtors-in-possession (collectively, the "Debtors").[2] Except as otherwise noted, I have personal knowledge of the matters set forth herein and, if called as a witness, I would testify competently thereto.

3.      Since the Effective Date of the Plan, Lincoln has provided financial advisory services to the Liquidating Trust and is familiar with the Debtors' books and records (the "Books and Records").

4.      Lincoln conducted a review of the Books and Records in connection with the Adversary Proceeding—specifically with respect to the Debtors' transfers of funds related to Tropical Sunset.

5.      After a review of the Books and Records, Lincoln was able to identify supporting documentation for a total of approximately $22,866,127.00 in transfers from the Debtors' bank accounts directly to entities and/or individuals that are (i) related to Tropical Sunset and (ii) not contested by Receiver and the Stag Parties.

6.      I declare, under penalty of perjury, that the foregoing statements are true and correct to the best of my knowledge, information and belief.

---

[2]     Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Motion.

00866929.DOCX 2                                    -2-

Dated:  April 16, 2025
         New York, New York

                                        /s/ Brent C. Williams
                                        Brent C. Williams

# EXHIBIT C

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FORT LAUDERDALE DIVISION**
**www.flsb.uscourts.gov**

| | |
|---|---|
| In re: | Chapter 11 Cases |
| VITAL PHARMACEUTICALS, INC., *et al.*,[1] | Case No. 22-17842 (PDR) |
| Debtors. | (Jointly Administered) |

**DECLARATION OF GLENN WALDMAN**
**AS COURT-APPOINTED RECEIVER FOR TROPICAL SUNSET 117, LLC**

Under 28 U.S.C. § 1746, Glenn Waldman, as Receiver for Tropical Sunset 117, LLC declares as follows under the penalty of perjury:

1.      This declaration is made based upon my personal knowledge of the matters set forth herein.

2.      On February 20, 2024, Stag Development, LLC ("Stag") derivatively sued Tropical Sunset, LLC ("Tropical Sunset") seeking judicial dissolution of Tropical Sunset and its subsidiaries, appointment of a receiver or custodian, and a preliminary injunction, in the matter styled *Stag Development LLC v. Tropical Sunset 117, LLC*, Case No. CACE 24-002312 (the "Receivership Action") in the Circuit Court (Levenson, J.) of the 17th Judicial Circuit in and for Broward County, Florida (the "Receivership Court").

---

[1]      The address of the Debtors is 1600 N. Park Drive, Weston, FL 33326. The last four digits of the Debtors' federal tax identification numbers are: (i) Vital Pharmaceuticals, Inc. (8430); (ii) Bang Energy Canada, Inc. (5454); (iii) JHO Intellectual Property Holdings, LLC (0010); (iv) JHO Real Estate Investment, LLC (9394); (v) Quash Seltzer, LLC (6501); (vi) Rainbow Unicorn Bev LLC (2254); and (vii) Vital Pharmaceuticals International Sales, Inc. (8019).

3.     On February 20, 2024, the Receivership Court entered an order appointing me as the Receiver of Tropical Sunset.

4.     On March 13, 2024, the Receivership Court entered an order granting a motion to expand the powers and authority of the Receiver, which confirmed that the six subsidiary entities of Tropical Sunset (i.e., 3 Pelican Dr., LLC, JWO Real Estate Investment I, LLC, JWO Real Estate Investment II, LLC, 167 Spyglass Ln, LLC, 120 Spyglass Ln, LLC, and 2311 NE 33rd St. LLC) were included within the purview of the receivership estate (the "Receivership Estate").

5.     On behalf of the Receivership Estate, I am currently holding $8,620,548.46.

6.     The following properties remain to be developed and/or sold by Tropical Sunset (collectively, the "Remaining Properties"):

a.     528 Riviera Dr., Fort Lauderdale, FL ("528 Riviera");

b.     120 Spyglass Ln., Jupiter, FL ("120 Spyglass"); and

c.     167 Spyglass Ln., Jupiter, FL ("167 Spyglass").

7.     As set forth in the Receiver's Status Report to the Receivership Court, attached hereto as Exhibit 1, on or before October 10, 2024,  after consultation with my counsel and others, I made the determination that it would be in the best interest, and would maximize the potential assets and value of the Receivership Estate, to complete construction and sell  the Remaining Properties. In connection with that decision, I employed and relied upon an MAI certified appraiser to assess the then-current freestanding value of the two Spyglass Lane, Jupiter, Florida  residences and the anticipated value of these completed projects and the anticipated profit which would be obtained by the Receivership Estate upon sale.

8.    Construction of the Remaining Properties is continuing as of the date of this Declaration and, in turn, each will be sold upon its completion.

9.    I declare, under penalty of perjury, that the foregoing statements are true and correct to the best of my knowledge, information and belief.


Dated:  April 16, 2025
       Fort Lauderdale, Florida

*Glenn J. Waldman*
Glenn Waldman, Esq.

# EXHIBIT 1

Filing # 208576328 E-Filed 10/10/2024 11:45:59 AM

## IN THE CIRCUIT COURT OF THE SEVENTEENTH JUDICIAL CIRCUIT IN AND FOR BROWARD COURNTY, FLORIDA

**STAG DEVELOPMENT, LLC,**            **CASE NO.: CACE 24-002312**
**A Florida limited liability company,**
**Derivatively on behalf of Tropical Sunset 11, LLC**

      **Plaintiff,**

vs.

**TROPICAL SUNSET 117, LLC,**
**A Florida limited liability company**

      **Defendant.**

_____/

### RECEIVER'S STATUS REPORT

Glenn Waldman, Receiver, provides this Status Report for the above captioned Receivership proceeding as of September 30, 2024, as follows:

### General Background

On February 20, 2024, this Court entered its Order Granting Plaintiff' Ex-Parte Emergency Motion For Preliminary Status Of Injunction And Appointing A Receiver (the "Receivership Order") which appointed Glenn Waldman as Receiver.

Subsequent to the entry of the Receivership Order, this Court appointed Andrew Mann of the law firm of Mann Plyer (for real estate and corporate issues) and Paul Lopez and Ryan Lehrer of the law firm of Tripp Scott (for general and construction litigation issues) as his legal counsel.

On March 12, 2024 the Receiver filed his initial report as to the inventory in this estate.

Subsequent to the entry of the Receivership Order, it was determined that additional clarification was needed as to which entities are subject to the Receivership Order. An Order was

#2966693v1-221305.0001

entered by this Court clarifying that the assets of Tropical Sunset 117, and each of its named subsidiaries would be subject to the provisions of the Receivership Order.

One of the Receiver's initiatives was to establish a banking relationship for the Receivership estate. Based upon the current banking regulatory environment, many federally insured banks are reluctant to establish and maintain accounts for receivers. Additionally, because the Receiver is required to have all funds on deposit subject to 100% Federal insurance and to try to earn interest on the funds on deposit, given the $250,000 limit per account established by the FDIC, this can be a difficult proposition. Working through counsel, the Receiver established a banking relationship with Vista Bank, a federally insured banking institution, whereby the Receiver established separate operating bank accounts for each of the entities subject to the Receivership Order, and an insured sweep account where excess funds can be placed which will earn interest based upon federally guaranteed investments.

As a precaution, the Receiver arranged to close all of the existing bank accounts of the entities subject to the Receivership Order, and have the funds placed in the new accounts established by the Receiver.

Because the Receiver recognized that each of the entities subject to the Receivership Order had to have separate accounting of receipts and disbursements, and further recognizing that disbursements may have to be made from entities that had no funds, based upon an Order of this Court, the Receiver was able to borrow funds from one entity for utilization by another which would be documented by Receiver's Certificates. This avoided unnecessary borrowing expenses of traditional lending facilities.

The Receiver began an immediate investigation as to the real estate projects that were incomplete and ongoing at the time of the entry of the Receivership Order. The Receiver

determined that there were four ongoing projects: (i) 3 Pelican Drive, Ft. Lauderdale, FL 33301

("3 Pelican"); (ii) 528 Riviera Drive, Ft. Lauderdale, FL 33301 ("528 Riviera"); (iii) 120 Spyglass

Lane, Jupiter, FL 33477 ("120 Spyglass"); and (iv) 167 Spyglass Lane, Jupiter, FL 33477 ("167

Spyglass"). The Receiver conducted on-site inspections of each of the subject projects.  Further,

the Receiver conferred extensively with the minority equity owners of the entities subject to the

Receivership Order in order to gain information concerning the status of each project, and assess

the multiple issues involved with the ongoing construction and development of these properties.

Additionally, the Receiver conferred with contractors and subcontractors that had been working

on the projects prior to the entry of the Receivership Order. At the time of the entry of the

Receivership Order, all construction had ceased.  At the time of the entry of the Receivership

Order, 3 Pelican was near completion; 528 Riviera was mid completion; and each of 120 Spyglass

and 167 Spyglass were at the early stages of construction but far enough along that the viability of

each project was intact.

With respect to each of the properties under development, the following is a summary of

the steps taken by the Receivers since the entry of the Receivership Order:

### 3 Pelican

At the time of the entry of the Receivership Order, the residence under construction was

virtually completed, and was under contract of sale. The Receiver, working with counsel, was able

to move towards a closing on the sale of the house. A copy of the closing statement reflecting the

receipts and disbursements in connection with the closing is attached to this Status Report and

marked Exhibit A.

At the time of the closing on the sale of this property, there were several liens that had been

imposed by subcontractors as a result of claimed unpaid amounts for goods and services. In order

to pass good title, the Receiver agreed for the Buyer's closing attorney, Olive Judd, P.A., to hold in escrow the amounts necessary in order to fully satisfy the existing lien claims. The Receiver has investigated all of the lien claims and has dealt with them in the following manner:

- Italy Distribution LLC d/b/a La Dolce Vita recorded a claim of lien in the amount of $79,426.65, and said monies were held back at the sale of 3 Pelican and in the possession of Olive Judd, PA.  Through extensive negotiation efforts, the Receiver was able to obtain a full release of said claim of lien for $0 from the receivership, and with La Dolce Vita paying the Receivership Estate $7,500.  The $79,426.65 has been released by Olive Judd, PA to the Receivership Estate.

- Pave the Way: Claim of Lien for $1,500.00 is being actively negotiated.

- War CS LLC: Claim of Lien for $19,050.28 has been released in exchange for payment of $20,050.28.

- Skyworks: Claim of Lien for $17,976.72 is being actively negotiated.

- JALO Concrete Pumping Corp.: Claim of Lien for $7,512.40 has been released in exchange for payment in full.

- RFAbrams, Inc. current possesses a Claim of Lien in the amount of $86,588.95, and said monies were held back at the sale of 3 Pelican and in the possession of Olive Judd, PA.  Settlement discussions regarding said claim of lien are ongoing, and an agreement to resolve the Claim of Lien has been reached in principle.

Also at the time of the closing on the sale of this property, there were a number of punch list items that needed to be completed as a result of the alleged failure of the developing entity to comply with the provisions of the construction contract. The majority of the punch list items have been addressed, and the few that remain are being actively addressed.

### 120 and 167 Spyglass

The two properties under construction are high end residences in the Admirals Cove development in Jupiter, Florida. As a result of disputes and unpaid amounts owing to the general contractor employed to construct these residences, all work had stopped at the time of the entry of the Receivership Order. The Receiver, through counsel, negotiated a modified agreement with the general contractor so that the general contractor would continue to work on the construction projects.  The Receiver also negotiated settlements of three lawsuits involving these properties. Invision Builders, LLC filed a lawsuit against 167 Spyglass seeking to foreclose on a claim of lien. The Receiver was able to resolve the Invision Builders, LLC lawsuit for a total of $15,000 (inclusive of a claim for attorney's fees) and obtain a release of lien.  The Receiver also negotiated settlements of two lawsuits filed by The Club at Admirals Cove, Inc. filed against each of 120 Spyglass and 167 Spyglass whereby unpaid and accrued assessments were satisfied and the lawsuits dismissed on July 25, 2024.

The Receiver employed an MAI certified appraiser, David Aucamp, SRA, Aucamp, Dellenback & Whitney, in order to appraise the two unfinished houses in order for the Receiver to make a determination as to not only the current freestanding value of the under-construction residences, but also the anticipated value of the completed projects and the profit which would be obtained by the Receivership Estate if the Receiver were to move forward to complete the construction and sell the houses. The Receiver, after consultation with counsel and others, made the determination that it would be in the best interest of the Receivership Estate, and to maximize its potential assets and values, to complete the construction of the two Admirals Cove. Currently, the Receiver is moving forward with the completion of these two construction projects. The

Receiver anticipates that he will be able to sell each of the residences at a price that will provide a maximum recovery to the Receivership Estate.

### 528 Riviera

This property is estimated to be completed by January or February, 2025. Summit Structures General Contractors, Inc. has been hired to replace the original general contractor. The estimated cost to complete construction is $1,300,000.

To oversee construction and certify payments to the contractors, the Receiver entered into a Services Agreement with Stag Development, LLC.

The Receiver is actively defending a lawsuit filed by J&M Scaffolds of Florida, Inc. wherein a receivership entity, JWO Real Estate Investment I LLC (owner of 528 Riviera) is a named defendant. The lawsuit seeks foreclosure of a claim of lien, for which settlement negotiations are pending.

### Other Open Receivership Issues

Immediately upon his appointment, the Receiver recognized that there was ongoing litigation pending in the United States Bankruptcy Court for the Southern District of Florida where entities subject to the Receivership Order were named as defendants in an adversary proceeding brought by the liquidating trustee of VPX Liquidating Trust (the "Bankruptcy Proceeding"). The Receiver directed his counsel to enter an appearance on behalf of the Receiver in the Bankruptcy Proceeding, and to file the necessary pleadings in Order to respond to the then pending complaint. Since then, the Receiver, through counsel, has responded to amended complaints filed in the Bankruptcy Proceeding by the liquidating trustee, and currently the Receiver has been granted an extension to respond to the most recently filed amended complaint. In connection therewith, the

Receiver and his counsel are participating in discussions with the VPX liquidating trustee, his counsel and other parties to the bankruptcy proceeding in Order to try to reach a resolution.

The Receiver determined that shortly after his appointment, the builder's risk insurance (as well as applicable property insurance and commercial general liability insurance) on the entities and properties under construction was about to expire. So as to be able to make sure that there would be no casualty or occurrence that could expose the Receivership estate to an uninsured claim, the Receiver worked to obtain and/or continue all forms and lines of insurance coverage necessary to preserve and protect the projects.

As referenced above, at the time of the entry of the Receivership Order, there was litigation pending against the entities subject to the Receivership Order in multiple courts in the South Florida area. The Receiver, through counsel, took steps in each of these cases in order to stay the proceedings pending either a resolution or an ultimate determination by this Court.

The Receiver reviewed the ongoing operating expenses of the Receivership Estate, and, where appropriate, has continued to pay those expenses that need to be paid as appropriate and consistent with the provisions of the Receivership Order.

During the Receivership proceeding, John "Jack" Owoc, the former principal of the entities subject to the Receivership Order, filed a motion with this Court to effectively vacate the Receivership Order. The Receiver and his counsel successfully defeated the effort to do so. Additionally, Mr. Owoc has been engaged in ongoing, contentious discovery disputes with the Receiver and the Receivership Estate. It is the Receiver's position that Mr. Owoc does not have standing in order to effect discovery as against the Receiver or the entities that are subject to the Receivership Order.   Nevertheless, the Receiver has voluntarily provided Mr. Owoc with

documents, information and materials necessary to stay fully informed of the progress of the Receivership.

The Receiver was served with a substantial lien notice from the Internal Revenue Service based upon claimed unpaid taxes owed by John (and Megan) Owoc in an amount not less than $22,775,455.09. The Receiver, through counsel, has regularly communicated with representatives of the Internal Revenue Service in order to take what steps were necessary in Order to protect the interests of the estate and comply with applicable law.

As part of the Receiver's due diligence in the handling of various items for each of the aforementioned properties within the Receivership Estate, the Receiver is investigating issues involving KMR Construction Management, Inc., which was previously serving as general contractor for 528 Riviera and 3 Pelican. Appropriate records are being gathered and will be presented to this Court for consideration if needed.

### Financial Accounting

Attached hereto and marked Exhibit B (FILED UNDER SEAL) is a financial accounting of the receipts and disbursements of the Receiver through September 30, 2024.

### CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing has been sent via Florida's E-Portal System which sent Notice to all those entitled to Notice on this 10th day of October, 2024.

Respectfully submitted,

**TRIPP SCOTT, P.A.**

**Attorneys for GLENN WALDMAN, AS RECEIVER FOR TROPICAL SUNSET 117, LLC**
110 S.E. 6TH Street, Suite 1500

Fort Lauderdale, FL  33301
(Telephone) (954) 525-7500
(Facsimile) (954) 761-8475

By: */s/ Charles M. Tatelbaum*
CHARLES M. TATELBAUM
Florida Bar No.  177540
cmt@trippscott.com
hbb@trippscott.com
eservice@trippscott.com
RYAN H. LEHRER
Florida Bar No. 00884423
rhl@trippscott.com
sxc@trippscott.com
PAUL O. LOPEZ
Florida Bar No. 983314
pol@trippscott.com

| American Land Title Association | ALTA Settlement Statement - Combined |
|---|---|
| | Adopted 05-01-2015 |

| | |
|---|---|
| File No./Escrow No.: 22-16600 | **Olive Judd, P.A.** |
| Print Date & Time: 04/09/2024  3:55 PM | **1164621** |
| Officer/Escrow Officer: Alejandra Pena | **2426 E. Las Olas Boulevard** |
| Settlement Location:   2426 E. Las Olas | **Fort Lauderdale, FL 33301** |
| Boulevard | |
| Fort Lauderdale FL 33301 | |

Property Address:   3 Pelican Drive, Fort Lauderdale, FL 33301
Buyer:   Todd Wenzel
Seller:   3 PELICAN DR LLC
Lender:   Lake Michigan Credit Union ISAOA/ATIMA

Settlement Date:    April 10, 2024
Disbursement Date: April 10, 2024
Additional dates per state requirements:

| Seller | | Description | Borrower/Buyer | |
|---|---|---|---|---|
| **Debit** | **Credit** | | **Debit** | **Credit** |
| | | **Financial** | | |
| | 18,000,000.00 | Sale Price of Property | 18,000,000.00 | |
| | | Deposit | | 7,050,000.00 |
| | | Borrower's Loan Amount | | 6,000,000.00 |
| 10,000.00 | | Seller Credit - Attorney's Fees | | 10,000.00 |
| 56,536.82 | | Buyer's Construction Costs + Utilities | | 56,536.82 |
| 2,234,615.61 | | Excess Deposit | | |
| | | | | |
| | | **Prorations/Adjustments** | | |
| | 114.48 | City/town taxes from 04/10/2024 to 09/30/2024 | 114.48 | |
| 88,841.86 | | County taxes from 01/01/2024 to 04/10/2024 | | 88,841.86 |
| | | | | |
| | | **Loan Charges to Lake Michigan Credit Union ISAOA/ATIMA** | | |
| | | Processing Fee to Lake Michigan Credit Union ISAOA/ATIMA | 395.00 | |
| | | .1250% of Loan Amount (Points) to Lake Michigan Credit Union ISAOA/ATIMA | 7,500.00 | |
| | | Underwriting Fee to Lake Michigan Credit Union ISAOA/ATIMA | 495.00 | |
| | | Appraisal Fee to Lake Michigan Credit Union ISAOA/ATIMA | 4,000.00 | |
| | | Credit Report Fee to Lake Michigan Credit Union ISAOA/ATIMA | 116.00 | |
| | | Final Inspection Fee to Lake Michigan Credit Union ISAOA/ATIMA | 507.00 | |

Copyright 2015 American Land Title Association.
All rights reserved.

EXHIBIT A

| Seller | | Description | Borrower/Buyer | |
|---|---|---|---|---|
| Debit | Credit | | Debit | Credit |
| | | Flood Certification Fee to Lake Michigan Credit Union ISAOA/ATIMA | 7.50 | |
| | | Insurance Tracking Fee to Lake Michigan Credit Union ISAOA/ATIMA | 53.00 | |
| | | Tax Service Fee to Lake Michigan Credit Union ISAOA/ATIMA | 129.00 | |
| | | Prepaid Interest to Lake Michigan Credit Union ISAOA/ATIMA | 21,000.00 | |
| | | | | |
| | | **Other Loan Charges** | | |
| | | Homeowner's Insurance Premium to Lexington Insurance Company ($137,731.55 POCB) | | |
| | | Premium Flood Insurance to Wright Insurance ($4,058.00 POCB) | | |
| | | | | |
| | | **Impounds** | | |
| | | Flood Insurance 3 mo @ $338.17/mo | 1,014.51 | |
| | | Aggregate Adjustment | 338.13 | |
| | | | | |
| | | **Title Charges & Escrow / Settlement Charges** | | |
| | | Title - Settlement Agent Fee to Olive Judd, P.A. | 2,500.00 | |
| | | Title - Owner's title insurance (Optional) to Old Republic National Title Insurance Company | 42,325.00 | |
| | | Title - Lender's title insurance to Old Republic National Title Insurance Company | 25.00 | |
| | | Title - Lender's Title Endorsements: 6L, 8.1L, 9L, NSEL to Old Republic National Title Insurance Company | 8,520.00 | |
| 125.00 | | Title - Abstract/Search to Olive Judd, P.A. | | |
| | | Title - Estimated Attorney's Fees to Olive Judd, P.A. | 150,000.00 | |
| 235.00 | | Title - Lien Search to PropLogix, LLC | | |
| | | | | |
| | | **Commission** | | |
| 180,000.00 | | Real Estate Commission 180,000.00 to Miles Goldstein Real Estate | | |
| 540,000.00 | | Real Estate Commission 540,000.00 to Compass Florida, LLC | | |
| | | | | |
| | | **Government Recording and Transfer Charges** | | |
| | | Recording Fees  Deed: $35.50  Mtg: $188.50 | 224.00 | |
| 126,000.00 | | Deed Tax to State of Florida | | |
| | | Mortgage Intangible Tax to State of Florida | 12,000.00 | |
| | | Mortgage Tax to State of Florida | 21,000.00 | |
| 10.00 | | Recording Fee for Satisfaction and Release of Lien to Broward County Board of County Commissioners | | |
| 10.00 | | Recording Fee for Satisfaction and Release of Lien to Broward County Board of County Commissioners | | |
| 10.00 | | Recording Fee for Satisfaction and Release of Lien to Broward County Board of County Commissioners | | |
| 84.80 | | CSC E-Recording Fee to Olive Judd, P.A. | 10.30 | |
| 10.00 | | Recording Fee for Satisfaction and Release of Lien to Broward County Board of County Commissioners | | |

Copyright 2015 American Land Title Association.
All rights reserved.

| Seller | | Description | Borrower/Buyer | |
|---|---|---|---|---|
| Debit | Credit | | Debit | Credit |
| 27.00 | | Recording Fee for LLC Affidavit to Broward County Board of County Commissioners | | |
| 55.50 | | Recording Fee for Quit Claim Deeds to Broward County Board of County Commissioners | | |
| 35.50 | | Recording Fee for NOT to Broward County Board of County Commissioners | | |
| 35.50 | | Recording Fee for NOT to Broward County Board of County Commissioners | | |
| 35.50 | | Recording Fee for NOT to Broward County Board of County Commissioners | | |
| 52.50 | | Recording Fee for Release of Interest in Property to Broward County Board of County Commissioners | | |
| 69.50 | | Recording Fee for Order to Broward County Board of County Commissioners | | |
| 10.00 | | Recording Fee for Satisfaction and Release of Lien to Broward County Board of County Commissioners | | |
| 10.00 | | Recording Fee for Satisfaction and Release of Lien to Broward County Board of County Commissioners | | |
| 10.00 | | Recording Fee for Satisfaction and Release of Lien to Broward County Board of County Commissioners | | |
| | | | | |
| | | Payoff(s) | | |
| 86,588.95 | | Lien Payoff - RBAbrams, Inc. | | |
| 79,426.65 | | Lien Payoff - La Dolce Vita | | |
| 7,512.40 | | Lien Payoff - JALO Concrete Pumping Corp | | |
| 19,050.28 | | Lien Payoff - WAR CS LLC | | |
| 1,500.00 | | Lien Payoff - Pave the Way Engineering | | |
| 14,001,170.39 | | Seller Proceeds held by Receiver, Glenn Waldman, Esq. | | |
| | | | | |
| | | Miscellaneous | | |
| 62,910.82 | | 2023 Tax Bill to Broward County Tax Collector | | |
| 134.90 | | Permit Fees (FIR-GEN-24020033) to City of Fort Lauderdale | | |
| 5,000.00 | | Utility Escrow to Olive Judd, P.A. | | |
| 500,000.00 | | Escrow Holdback for Punchlist Items to Olive Judd, P.A. | | |
| | | | | |
| Seller | | | Borrower/Buyer | |
| Debit | Credit | | Debit | Credit |
| 18,000,114.48 | 18,000,114.48 | Subtotals | 18,272,273.92 | 13,205,378.68 |
| | | Due From Borrower | | 5,066,895.24 |
| | | Due To Seller | | |
| 18,000,114.48 | 18,000,114.48 | Totals | 18,272,273.92 | 18,272,273.92 |

Copyright 2015 American Land Title Association.
All rights reserved.

**Acknowledgement**

We/I have carefully reviewed the ALTA Settlement Statement and find it to be a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction and further certify that I have received a copy of the ALTA Settlement Statement. We/I authorize Olive Judd, P.A. to cause the funds to be disbursed in accordance with this statement.

Todd Wenzel

3 PELICAN DRIVE

By: Glenn Waldman, Esq., Receiver

Escrow Officer

Copyright 2015 American Land Title Association.
All rights reserved.

Page 4 of 4

# Exhibit D

IN THE CIRCUIT COURT OF THE 17TH
JUDICIAL CIRCUIT IN AND FOR
BROWARD COUNTY, FLORIDA

GENERAL JURISDICTION DIVISION

CASE NO: CACE-2024-002312

STAG DEVELOPMENT, LLC, a Florida
limited liability company,

      Plaintiff,

v.

TROPICAL SUNSET 117, LLC, a Florida
limited liability company,

      Defendant.

_____/

## JOINT MOTION TO APPROVE SETTLEMENT

      Glenn Waldman, as Court-appointed receiver (the "Receiver") for Tropical Sunset 117,

LLC and all of its wholly-owned subsidiaries,[1] Stag Development, LLC ("Stag"), and the VPX

Liquidating Trust (the "Liquidating Trust," and together with the Receiver and Stag, the

"Movants"), by and through undersigned counsel, hereby move for entry of an order (i) approving

that certain *Settlement Agreement and Mutual Release* (the "Settlement Agreement"), a copy of

which is attached hereto as **Exhibit A**, between (a) the Liquidating Trust, (b) Stag, (c) Shaw

Investments & Realty, Inc., (d) Jonathan W. Owoc, (e) Branden Shaw, (f) JW Owoc Enterprises,

LLC, and (g) the Receiver; and (ii) granting related relief. In support thereof, the Movants rely

upon the (i) *Declaration of Brent C. Williams in Support of the Liquidating Trustee's Motion for*

---

[1]    The wholly-owned subsidiaries of Tropical Sunset 117, LLC, include, without limitation: (i) 3 Pelican
Dr., LLC; (ii) JWO Real Estate Investment I, LLC; (iii) JWO Real Estate Investment II LLC; (iv) JW
Owoc Enterprises, LLC; (v) 167 Spyglass Ln, LLC; and (vi) 120 Spyglass Ln, LLC (collectively,
"Tropical Sunset").

1

*Entry of an Order Pursuant to Bankruptcy Rule 9019 (I) Approving the Settlement Between Liquidating Trust, Stag Development, LLC, Shaw Investments & Realty, Inc., Jonathan W. Owoc, Branden Shaw, JW Owoc Enterprises, LLC, and Glenn Waldman, as Receiver for Tropical Sunset 117, LLC, and (II) Granting Related Relief* (the "Williams Declaration"), attached hereto as **Exhibit B** and (ii) *Declaration of Glenn Waldman as Court-Appointed Receiver for Tropical Sunset, 117, LLC* (the "Waldman Declaration"), attached hereto as **Exhibit C**, and respectfully state as follows:

## I. Summary of Requested Relief

1.    The Movants seek entry of an order approving a settlement between the Liquidating Trust, the Stag Parties,[2] and the Receiver, which will settle claims made by the Liquidating Trust against the Stag Parties and Tropical Sunset in the matter styled *VPX Liquidating Trust v. John H. Owoc, et al.*, Adv. Pro. No. 24-01009 (PDR) (the "Adversary Proceeding"),[3] currently pending in the United States Bankruptcy Court for the Southern District of Florida (the "Bankruptcy Court"), as well as claims made by Stag against Tropical Sunset in the matter styled *Stag Development LLC v. Tropical Sunset 117, LLC*, Case No. CACE 24-002312 (the "Receivership Action"), currently pending in the Circuit Court for the Seventeenth Judicial Circuit in and for Broward County, Florida (the "Receivership Court" or this "Court").

2.    As detailed below, and subject only to entry of an order of this Court and the Bankruptcy Court approving the Settlement Agreement, (i) the Stag Parties have agreed to work

---

[2]    Stag, Shaw Investments & Realty, Inc., Jonathan W. Owoc, and Branden Shaw are collectively referred to in this Motion and the Settlement Agreement as the "Stag Parties."

[3]    The following wholly-owned subsidiaries of Tropical Sunset that are named as Defendants in the Adversary Proceeding are the subject of the Receivership: (i) JW Owoc Enterprises, LLC, (ii) 167 Spyglass Ln, LLC; (iii) 120 Spyglass Ln, LLC; and (iv) 3 Pelican Dr, LLC (collectively, the "Receivership Entities").

2

diligently with the Receiver to finish the development and sale of the Remaining Properties (defined herein), (ii) the Receiver has agreed to distribute certain proceeds of the sale of the Remaining Properties, which are equal to the VPX Capital (defined herein) transferred from Vital Pharmaceuticals, Inc. ("VPX") to, or for the benefit of, Tropical Sunset, to the Liquidating Trust subject to a waterfall set forth in the Settlement Agreement and consistent with the terms of that certain unsigned Limited Liability Company Agreement (the "LLC Agreement"), this Court's orders and findings confirming the course of dealing between Jack Owoc and Stag, and Jack Owoc's testimony, and (iii) the Liquidating Trust has agreed to accept those proceeds in full and final settlement of all claims the Liquidating Trust may have against the Stag Parties and the Receivership Entities and the defenses asserted thereto including, but not limited to, those brought in the Adversary Proceeding and that could be brought in the Receivership Action (the "Settlement"). Specifically, as a result of the Settlement, twelve counts asserted by the Liquidating Trust in the Adversary Proceeding will be dismissed against Tropical Sunset and the Stag Parties, and eight of those counts will be dismissed in their entirety.[4]

3.    In addition, after this Court's approval of the Settlement, the Liquidating Trust will file in the Bankruptcy Court an amended motion for approval of the Settlement, pursuant to which it shall seek entry of an order approving the Settlement and requiring that the Available Cash (defined herein) distributed to the Liquidating Trust be held in escrow by the Liquidating Trust pending further order of the Bankruptcy Court upon the resolution of the Liquidating Trust's claims against John H. Owoc ("Jack Owoc") in the Adversary Proceeding.

---

[4]    The twelve counts to be dismissed as to the Stag Parties and Tropical Sunset include Counts 7, 8, 10, and 18–26. Counts 7, 8, 10, and 22–26 will be dismissed in their entirety, and Counts 18–21 will be dismissed against the Stag Parties and Tropical Sunset but will remain pending as to Jack Owoc (defined herein). A true and correct copy of the Liquidating Trust's *Second Amended Complaint* is attached hereto **Exhibit D**.

3

4.     As detailed below, in light of, among other things, the expense and uncertainty of continued litigation, the likelihood of an appeal from any judgment entered in the Adversary Proceeding, and the totality of the circumstances, the Movants believe that the Settlement falls well above the lowest point in the range of reasonableness and thus, easily meets the standards set forth in *Wallis v. Justice Oaks II, Ltd. (In re Justice Oaks II. Ltd.)*, 898 F.2d 1544 (11th Cir. 1990).[5] Accordingly, the Movants assert that the Settlement is in the best interests of the Receivership Estate (defined herein) and urge this Court to approve same.

## II. Relevant Background

5.     On October 10, 2022, VPX and certain of its affiliates (collectively, the "Debtors") each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code, commencing the chapter 11 cases that are being jointly administered in the Bankruptcy Court.

6.     On November 8, 2023, the Bankruptcy Court entered the *Order (I) Approving On A Final Basis The Second Amended Disclosure Statement For Debtors' Second Amended Joint Plan Of Liquidation, And (II) Confirming The Debtors' Second Amended Joint Plan of Liquidation* [ECF. No. 2258] (the "Confirmation Order"), approving the *Debtors' Second Amended Joint Plan of Liquidation* [ECF No. 1905] (the "Plan") and any documents included in the Plan Supplement (as defined in the Plan) thereto, including that certain *Liquidating Trust Agreement* [ECF No. 2115] (the "LTA").[6]

---

[5]  While Florida law clearly recognizes the Receiver's right to settle claims and compromise actions on behalf of the Receivership Estate (defined herein) and also states that the Receiver may "[s]eek and obtain instruction from the court concerning receivership property," it lacks a clearly defined settlement approval standard. *See* discussion at Part V, below. For that reason, Movants rely upon the standard commonly used in the analogous context under bankruptcy law in which a court-appointed trustee seeks court approval of a settlement or compromise. *Id.*

[6]  Copies of the Confirmation Order, Plan, and LTA can be obtained at the Liquidating Trust's claims and noticing agent's website: https://cases.stretto.com/vitalpharmaceuticals/court-docket

4

7.      Pursuant to the Plan, Confirmation Order, and LTA, upon the effective date of the Plan on November 21, 2023 (the "Effective Date"), Steven Balasiano was appointed as the liquidating trustee (the "Liquidating Trustee") of the Liquidating Trust, the successor-in-interest to the Debtors' estates.

8.      Consistent with his fiduciary duties and statutory obligations, since shortly after his appointment, the Liquidating Trustee and his professionals have been investigating potential claims and causes of action for the benefit of the Debtors' estates and the Liquidating Trust Beneficiaries (as defined in the Plan).

9.      On January 18, 2024, the Liquidating Trust initiated the Adversary Proceeding by filing its *Adversary Complaint for Breaches of Fiduciary Duty, Corporate Waste, Aiding and Abetting Breaches of Fiduciary Duty, Unjust Enrichment, Avoidance and Recovery of Transfers Pursuant to 11 U.S.C. §§ 502, 547, 548 and 550 and Fla. Stat. § 726.105(1)(a), (b), and 726.108, Turnover of Property, Declaratory Judgment, and Disallowance of Claims*, naming, among others, the Stag Parties, Tropical Sunset, and Jack Owoc as defendants.  [Adv. Pro. ECF No. 1.]

10.     On June 7, 2024, the Liquidating Trust filed its *Amended Complaint*.  [Adv. Pro. ECF No. 105.]

11.     On September 16, 2024, the Liquidating Trust filed its *Second Amended Complaint*. [Adv. Pro. ECF No. 148.]

12.     On February 7, 2025, the Clerk of the Bankruptcy Court filed the redacted version of the *Second Amended Complaint*.  [Adv. Pro. ECF No. 229.]

13.     The Adversary Proceeding, as it pertains to the Stag Parties and Tropical Sunset, arises from Jack Owoc's alleged improper use of the Debtors' assets to fund certain of the capital contributions for Tropical Sunset.

5

14.     Prior to the Petition Date, to fund the capital contributions for Tropical Sunset, cash in the amount of no less than $22,866,127.00 was disbursed to Tropical Sunset from an account owned and controlled by VPX (the "VPX Capital").  [*See* Williams Decl. ¶ 6.]

15.     Tropical Sunset also received cash from Jack Owoc that did not come from an account owned or controlled by VPX in the amount of $2,750,000.00 (the "Jack Owoc Capital," and together with the VPX Capital, the "Capital Contributions").

16.     Pursuant to Tropical Sunset's LLC Agreement, the profit-sharing arrangement in connection with Tropical Sunset's operations (collectively, the "Tropical Profit Share") is as follows:

    a. 60% in favor of Jack Owoc, individually (the "Jack Owoc Share"); and

    b. 40% in favor of Stag (the "Stag Share").[7]

17.     The following properties remain to be developed and/or sold by Tropical Sunset (collectively, the "Remaining Properties"):

    a. 528 Riviera Dr., Fort Lauderdale, FL ("528 Riviera");[8]

    b. 120 Spyglass Ln., Jupiter, FL ("120 Spyglass"); and

    c. 167 Spyglass Ln., Jupiter, FL ("167 Spyglass," and together with 120 Spyglass, the "Spyglass Properties").

18.     On February 20, 2024, Stag, filed the Receivership Action.

19.     Also, on February 20, 2024, the Receivership Court entered an order appointing the Receiver.

---

[7]     Pursuant to the LLC Agreement and Jack Owoc's sworn testimony regarding the ownership of Tropical Sunset, this Court has also determined that Tropical Sunset is owned 60% by Jack Owoc and 40% by Stag. *See, e.g.,* discussion at Part IV, ¶ 31, below.

[8]     As of the filing of this motion, the estimate completion date for 528 Riviera is July 18, 2025, and an estimated closing of the property should be scheduled shortly thereafter.

6

20.     On March 13, 2024, the Receivership Court entered an order granting the Receiver's motion to expand the powers and authority of the Receiver, which confirmed that the six subsidiary entities of Tropical Sunset were included within the purview of the receivership estate (the "Receivership Estate").

21.     As set forth in the Receiver's Status Report to the Receivership Court dated October 10, 2024, on or before October 10th, the Receiver, after consultation with his counsel and others, made the determination that it would be in the best interest of the Receivership Estate to complete the construction of the Spyglass Properties instead of selling the Spyglass Properties in their current states of construction. [Waldman Decl., Ex. 1].  In connection with that decision, the Receiver employed and relied upon an MAI certified appraiser to assess the then-current freestanding value of 120 Spyglass and 167 Spyglass, the anticipated value of the completed projects, and the profit which would be obtained by the Receivership Estate if the Receiver were to move forward to complete construction of the Spyglass Properties.  *Id.* at ¶ 7.  Ultimately, the Receiver determined that completing the Spyglass Properties would maximize the value of the Receivership Estate. *Id.*

22.     No party to the Receivership Action challenged the foregoing determination and course of action adopted by the Receiver, and construction of the Remaining Properties continues apace.

### III. The Settlement Discussions and the Settlement[9]

23.     The Receiver, Stag Parties, and Liquidating Trustee vehemently dispute the merits of the claims asserted in the Adversary Proceeding, and the Receiver and Stag Parties believe that

---

[9]    As noted above, the following is a summary of the key terms of the Settlement. The terms of the Settlement Agreement control and all parties are urged to review same.

they have various meritorious defenses to the claims. While each of the Movants believe that they would ultimately prevail in the Adversary Proceeding, in light of, among other things, the expense and uncertainty of continued litigation and to bring complete closure to all matters relating to the claims, the parties engaged in arms-length settlement negotiations in an attempt to resolve same. After extensive settlement discussions over the course of more than one year, the Movants entered into the binding Settlement Agreement to memorialize their resolution of the disputes, which is subject only to entry of an order of the Receivership Court approving the Settlement and the Bankruptcy Court approving the Settlement pursuant to Federal Rule of Bankruptcy Procedure 9019 (each an "Approval Order").

24.    As set forth in the Settlement Agreement, the key terms of the Settlement are as follows:

- **Development of Remaining Properties**. The Stag Parties agree to work diligently with the Receiver to finish the development of and to sell the Remaining Properties. The Remaining Properties will remain in the control of the Receiver until they have been sold, and the proceeds of such sale(s) will first be used to satisfy any claims associated with the develop and sale of the Remaining Properties (collectively, the "Claims").[10]

- **Available Cash**. The Settlement Agreement resolves through a waterfall the distribution of all cash remaining in the Receivership Estate after the payment of the Claims, payment of all administrative costs of the Receivership (including the Stag Actions[11]), and retention by the Receiver of an amount of cash sufficient to allow him to carry out any remaining duties (the "Available Cash").

- **Budget**. The Receiver will propose a reasonable budget that may be modified from time to time for the administrative costs of the Receivership Estate and the remaining construction costs, which must be acceptable to the Liquidating Trust.

---

[10]    However, this will specifically exclude any claims of Jack Owoc or creditors claiming by and through claims against Jack Owoc.

[11]    The "Stag Actions" are those actions required by the Stag Parties to work diligently with the Receiver to finish the development of the Remaining Properties.

8

- **Interim Distributions**. The Receiver must consider making, but shall not be required to make, interim distributions of Sales Proceeds in his possession, as follows:
  - o Within sixty (60) days of the closing of the sale of 528 Riviera, the Receiver shall consider and make a determination regarding what, if any, portion of the Sales Proceeds may be distributed on an interim basis (an "Interim Distribution"), which determination shall take into account the need to develop the Remaining Properties, pay any Claims, payment of all administrative costs of the Receivership (including the Stag Actions), and retention by the Receiver of an amount of cash sufficient to allow him to carry out any remaining duties;
  - o On a periodic basis thereafter, the Receiver shall again consider and make a determination regarding what, if any, Interim Distribution shall be made;
  - o For the avoidance of doubt, any Interim Distribution(s) shall be made in accordance with Paragraph 7 of the Settlement Agreement and only after said Interim Distribution has been approved by an Order of the Receivership Court after notice and a hearing;
  - o While the decision regarding making an Interim Distribution lies within the discretion of the Receiver, any party to this Agreement may challenge the Receiver's determination not to make an Interim Distribution by filing a motion to compel an interim distribution in the Receivership Court and by demonstrating to the Receivership Court by clear and convincing evidence that an Interim Distribution will not impact the Receiver's ability to develop the Remaining Properties, pay any Claims, pay all administrative costs of the Receivership (including the Stag Actions), and retain an additional amount of cash sufficient to allow the Receiver to carry out any remaining duties.

- **Distributions**. The Receiver will distribute the Available Cash as follows (collectively, the "Distributions"):
  - o First, the Receiver shall distribute the Available Cash to the Liquidating Trust in an amount equal to, and on account of, the VPX Capital.[12]

---

[12] As set forth herein, following approval of the Settlement by this Court, the Liquidating Trust will file an amended motion for approval of the Settlement in the Bankruptcy Court, which will seek entry of an order both approving the Settlement and requiring that the Distribution received by the Liquidating Trust be held in escrow pending resolution of the Liquidating Trust's claims against Jack Owoc in the Adversary Proceeding, and pending the resolution of any other yet-to-be-filed objections to the distribution of those monies (for instance, the Internal Revenue Service will have the opportunity to file an objection based upon its lien claim against Jack Owoc, which relates to the VPX Capital and was served upon the Receiver).

4898-9884-9103, v. 9
#3204912v1-890000.0245

○ Second, if the Available Cash is sufficient to satisfy in full the VPX Capital, any remaining Available Cash shall be distributed to the Receiver on account of the Jack Owoc Capital, which Available Cash shall be held by the Receiver pending further order of the Receivership Court.

○ Third, if the Available Cash is sufficient to satisfy in full the VPX Capital and Jack Owoc Capital, any remaining Available Cash shall be allocated and distributed consistent with the Tropical Profit Share as follows: (a) 60% to the Jack Owoc Share, which Available Cash shall be held by the Receiver pending further order of the Receivership Court; and (b) 40% to the Stag Share and distributed to Stag Development, LLC.

- **Releases**. The Liquidating Trust will exchange mutual releases with the Receiver, the Receivership Entities, and the Stag Parties with respect to the claims in, or that could have been asserted in, the Adversary Proceeding and the Receivership Action.

- **Dismissal**. Within five business days of the entry of a final and non-appealable order approving the Settlement Agreement by the Receivership Court *and* the Bankruptcy Court, the Liquidating Trust will file a Notice of Dismissal with prejudice of all claims in the Adversary Proceeding against the Stag Parties and all entities in the Receivership Estate, including the Receiver.

## IV. The Approval Motion, Jack Owoc's Objection, and the Stay Motion

25.     On April 21, 2025, the Liquidating Trustee filed its *Motion For Entry of An Order Pursuant To Bankruptcy Rule 9019 (I) Approving Settlement Between Liquidating Trust, Stag Development, LLC, Shaw Investments & Realty, Inc., Jonathan W. Owoc, Branden Shaw, And Glenn Waldman, As Receiver For Tropical Sunset 117, LLC, and (i) Granting Related Relief* (the "Settlement Motion") in the Bankruptcy Court.

26.     On May 14, 2025, Stag filed its *Notice of Filing Proposed Settlement Agreement* in this action.

27.     On May 20, 2025, Jack Owoc filed his *Motion to Exercise Right to Purchase Instead of Dissolution, Pursuant to Fla. Stat § 605.0706, and Motion to Stay Proceedings to Schedule and Hold Evidentiary Hearing* (the "Stay Motion") in this Court.

10

28.     On May 20, 2025, Jack Owoc also filed his objection to the Settlement Motion (the "Objection") in the Bankruptcy Court, in which he argued that the Settlement Motion should not be granted due to his filing of the Stay Motion and (what he claimed was) the likelihood of an imminent dissolution of the receivership and/or mediation and resolution of the Receivership Action.

29.     On June 11, 2025, the Bankruptcy Court held a hearing on the Settlement Motion (the "Approval Hearing"), during which Jack Owoc opposed the Settlement Motion on the grounds set forth in the Objection. Specifically, and among other arguments, Jack Owoc falsely represented that he is the sole equity-holder of Tropical Sunset, falsely represented that the this Court did not make a finding that Stag was an equity-holder of Tropical Sunset, and argued that approval of the Settlement Motion would amount to a premature adjudication of his right to the VPX Capital (or whatever lesser sum is received by the Liquidating Trust as a Distribution), which he maintained was contributed by him (through VPX) to Tropical Sunset as legitimate shareholder distributions and not fraudulently transferred.

30.     At the conclusion of the Approval Hearing, the Bankruptcy Court declined to approve the Settlement Motion until this Court had approved the Settlement.  The Bankruptcy Court also made it clear that, even if this Court approves the Settlement, the Bankruptcy Court's approval would be conditioned upon any Distribution received by the Liquidating Trust being held in escrow pending resolution of the Liquidating Trust's claims against Jack Owoc in the Adversary Proceeding.  Put differently, the Bankruptcy Court made it abundantly clear that its approval of the Settlement *will not* amount to an adjudication of Jack Owoc's right to the VPX Capital. Transcript of Approval Hearing at 68:9–13 ("The Court: . . . I just want to make sure that everyone's rights are protected and that I am not adjudicating Mr. Owoc's rights to that money by virtue of approving the settlement. Because, again, I'm not going to do that. Okay.").

11

31.     On June 12, 2025, during a case management conference in the Receivership Action, this Court considered and denied the Stay Motion. In the order denying the Stay Motion, the Court reaffirmed its previous unchallenged finding that Tropical Sunset is owned 60% by Jack Owoc and 40% by Stag. And, at the conclusion of the hearing, Jack Owoc's counsel represented that Jack Owoc is not asking the Court to revisit that finding.[13]

## V. <u>Applicable Law</u>

32.     In the state of Florida, there exists a strong public policy which favors settlement in all types of litigation. *See, e.g., Robbie v. City of Miami*, 469 So. 2d 1384 (Fla. 1985).

33.     Additionally, the Receiver's "right to settle claims and compromise actions with the approval and sanction of the [C]ourt is well recognized" under Florida law. *See Fugazy Travel Bureau, Inc. v. State by Dickinson*, 188 S. 2d 842, 844 (Fla. 4th DCA 1966) (citing *Bancroft v. Allen*, 138 Fla. 841, 190 (Fla. 1939). And § 714.12(1)(e), Florida Statutes, provides that the Receiver may "[s]eek and obtain instruction from the court concerning receivership property, exercise of the receiver's powers, and performance of the receiver's duties."

34.     The action of this Court in authorizing the Receiver to compromise an action cannot be disturbed absent an abuse of discretion. *Bancroft*, 138 Fla. at 190.

---

[13]     MR. BRADY: Not because I want it on the record, just because I want everyone to hear that it's ob -- the Court made a ruling that they're 40 percent owners in business and a multi-member LLC, Your Honor, I have spoken to my client and that's obviously a preferable ruling because it protects us from debtors, right? So I just wanted to explain the logic there that we weren't asking you to change that order. I have read through those orders and I think you're -- whether you're right or wrong, it's a beneficial decision, right? Obviously, my client wants to maintain a multi-member LLC. So I just wanted to be clear with you that I wasn't trying to get you to change what you did a year ago.

Transcript of Proceedings, June 12, 2025, at 52:9–25.

12

35.     While Florida law lacks a well-defined standard for granting approval, in an analogous bankruptcy context,[14] settlement approval turns on whether the proposed settlement "falls below the 'lowest point in the range of reasonableness.'" *Arrow Air*, 85 B.R. at 891 (quoting *Anaconda-Ericsson, Inc. v. Hessen (In re Teltronics Servs., Inc.)*, 762 F.2d 185, 189 (2d Cir. 1985)).

36.     According to the United States Eleventh Circuit Court of Appeals, when a bankruptcy court decides whether to approve or disapprove a proposed settlement, it must consider:

(a)     the probability of success in the litigation;
(b)     the difficulties, if any, to be encountered in the matter of collection;
(c)     the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and
(d)     the paramount interest of the creditors and a proper deference to their reasonable views in the premises.

*Justice Oaks II*, 898 F.2d at 1544; *see Arrow Air*, 85 B.R. at 891 (quoting *Jackson Brewing*, 624 F.2d at 602).

37.     In the instant case, each of the four *Justice Oaks* factors weighs heavily in favor of approval of the Settlement.

### A.     *Probability of Success in Litigation*

38.     The Receiver believes that approval of the Settlement is in the best interests of the Receivership Estate because, among other things, the Settlement eliminates the expense and uncertainty of continued litigation against the Liquidating Trust in the Adversary Proceeding, and the potential for an appeal of any final judgment. And while the Receiver believes that he could

---

[14]    "Approval of a settlement in a bankruptcy proceeding is within the sound discretion of the Court, and will not be disturbed or modified on appeal unless approval or disapproval is an abuse of discretion." *In re Arrow Air, Inc.*, 85 B.R. 886, 891 (Bankr. S.D. Fla. 1988) (Cristol, J.) (citing *Rivercity v. Herpel (In re Jackson Brewing Co.)*, 624 F.2d 599, 602–03 (5th Cir. 1980)).

13

prevail in the Adversary Proceeding, given (i) the extensive and well-documented misconduct, including breaches of fiduciary duty, of Jack Owoc leading to the Receiver's appointment,[15] (ii) the Receiver's review of evidence establishing the existence of transfers from VPX to or for the benefit Tropical Sunset totaling at least $22,866,127.00 – the propriety of which will be adjudicated in connection with the Adversary Proceeding, and (iii) the inherent risks of litigation and the certainty to be provided under the Settlement, including avoiding a judgment that would include pre- and post-judgment interest totaling millions of dollars in addition to the foregoing transfers, the Settlement easily falls well within the reasonable range of anticipated litigation outcomes and well above the lowest point in the range of reasonableness.

B.     **Difficulties Associated with Collection**

39.     Given the presumed and appraised value of the assets and cash in the possession of the Receiver, it is likely that the Liquidating Trust would not have any difficulty collecting a judgment against the Receivership Estate, even if it included the full amount of the VPX Capital as well as all accrued pre-and post-judgment interest.   Accordingly, the Settlement avoids the possibility of the Liquidating Trust's successful recovery of millions of dollars of pre- and post-judgment interest in addition to the avoidance and recovery of the full value of the VPX Capital.

C.     **Complexity, Expense, Inconvenience, and Delay**

40.     As with all litigation, there is expense, inconvenience and delay that would undoubtedly arise. And in light of, among other things, certain of the claims asserted by the

---

[15]   This Court issued its ruling appointing the Receiver based on what the Court described as Jack Owoc "illegal or fraudulent" including, without limitation, Jack Owoc's: (i) attempt to fraudulently characterize distributions as salary to avoid creditors; (ii) intent to use Tropical Sunset's assets to barter away his IRS debt; (iii) demand that Stag stop payments to vendors; (iv) firing of Tropical Sunset's lawyers in the face of a federal lawsuit; and (v) refusal to allow the sale of certain of Tropical Sunset's properties that were under contract for sale.  *See, e.g., Order Granting Plaintiff's Verified* Ex-Parte *Emergency Motion for Preliminary Status-Quo Injunction and Appointing a Receiver*, 3, 5.

14

Liquidating Trust in the Adversary proceeding (e.g., breach of fiduciary duty, aiding and abetting breach of fiduciary duty and to avoid and recover fraudulent transfers), the Receiver believes that prevailing in the Adversary Proceeding could involve complex trial and appellate litigation, including competing expert testimony on solvency, and the costs attendant to such litigation would be both significant and duplicative of the costs incurred by Jack Owoc in his own defense of the Adversary Proceeding. The Stag Parties too are expending tremendous resources both in this Court and the bankruptcy court, despite their primary source of income (payments from Tropical Sunset's sale of property) being, at a minimum, delayed. The Settlement therefore eliminates significant expense for the Receivership Estate and preserves Receivership Estate assets, dramatically increases efficiency in the Adversary Proceeding, and preserves Jack Owoc's right to litigate his entitlement to the VPX Capital and any Available Cash distributed to the Liquidating Trust in the Adversary Proceeding.

### D.    *Paramount Interest of Stakeholders*

41.    Finally, the Receiver asserts that the "paramount interest" prong of the *Justice Oaks* test is satisfied because the Settlement will result in each of the stakeholders obtaining all, or the majority of, the proceeds to which they are entitled and minimizes or eliminates further professional fees and costs associated with litigation with the Liquidating Trust in the Adversary Proceeding.

42.    Indeed, given the Receiver's exercise of his business judgment pursuant to the authority granted unto him by the Receivership Court, the stakeholders' ability to recover additional monies from Tropical Sunset turns upon the Receiver's success in completing and profitably selling the Remaining Properties, and this Settlement eliminates both the distraction and expense to the Receivership Estate of litigating the Adversary Proceeding. [*See* Waldman Decl. ¶ 7.] At the same time, because the Liquidating Trust is preserving its claims against Jack Owoc

15

(who is not a party to the Settlement), and the VPX Capital will be maintained in escrow by the Liquidating Trust pending a resolution of its claims against Jack Owoc in the Adversary Proceeding, any potential right that Jack Owoc may have to the VPX Capital is preserved and will be adjudicated in the Bankruptcy Court. As such, neither this Court's nor the Bankruptcy Court's approval of, or findings in connection with, the Settlement will adjudicate the issue of, or be used as evidence in determining, whether the VPX Capital was legitimate distributions or improper transfers of VPX's assets.

43.     It is, quite frankly, in the Receiver's view, extremely unlikely that any better result could be obtained via continued litigation against the Liquidating Trust.

44.     Accordingly, for the reasons set forth herein, the Movants assert that the Settlement meets the standards set forth in *In re Justice Oaks II*, and, therefore, request approval of the Settlement because it is fair and reasonable, falls well within the reasonable range of possible litigation outcomes and above the lowest point in the range of reasonableness, and is in the best interest of the Receivership Estate and its stakeholders.

## CONCLUSION

**WHEREFORE**, the Movants respectfully request that the Court enter an Order: (1) granting the instant motion; (2) finding that the Settlement embodied in the Settlement Agreement meets the factors set forth in *In re Justice Oaks II, Ltd.* and falls above the lowest point in the range of reasonableness; (3) finding that the Settlement constitutes a sound exercise and proper use of the Receiver's business judgment and is consistent with his fiduciary duties; (4) approving the Settlement and the Settlement Agreement in their entirety; and (5) granting such other and further relief as this Court deems just and proper.

16

July 2, 2025

Respectfully submitted,

**TRIPP SCOTT, P.A.**
***Attorneys for GLENN WALDMAN, AS***
***RECEIVER FOR TROPICAL SUNSET***
***117, LLC***
110 S.E. 6TH Street, Suite 1500
Fort Lauderdale, FL  33301
(Telephone) (954) 525-7500
(Facsimile) (954) 761-8475

By: */s/ Paul O. Lopez*
PAUL O. LOPEZ
Florida Bar No. 983314
pol@trippscott.com
CHARLES M. TATELBAUM
Florida Bar No.  177540
cmt@trippscott.com
aaa@trippscott.com
eservice@trippscott.com
RYAN H. LEHRER
Florida Bar No. 00884423
rhl@trippscott.com
sxc@trippscott.com


SHAW LEWENZ
110 S.E. 6th Street, Suite 2900
Ft. Lauderdale, FL 33301
Telephone: (954) 361-3633
Facsimile: (954) 989-7781

By: */s/ Jordan A. Shaw*
JORDAN A. SHAW, ESQ.
Fla. Bar No. 111771
jshaw@shawlewenz.com;
lgrealy@shawlewenz.com
ZACHARY D. LUDENS, ESQ.
Fla. Bar. No. 111620
zludens@shawlewenz.com
mlomastro@shawlewenz.com

*Counsel to Stag Development, LLC*

17

**BAST AMRON LLP**

By: */s/ Brett M. Amron*
Brett M. Amron (FBN 0148342)
Peter J. Klock, II (FBN 103915)
One Southeast Third Avenue, Suite 2410
Miami, Florida 33131
Telephone: (305) 379-7904
Facsimile: (786) 206-8740
Email: bamron@bastamron.com
Email: pklock@bastamron.com

**LOWENSTEIN SANDLER LLP**
Jeffrey L. Cohen, Esq.
Eric Chafetz, Esq.
Michael A. Kaplan, Esq.
Erica G. Mannix, Esq.
1251 Avenue of the Americas
New York, New York 10020
Telephone: (212) 262-6700
Facsimile: (212) 262-7402
Email: jcohen@lowenstein.com
Email: echafetz@lowenstein.com
Email: mkaplan@lowenstein.com
Email: emannix@lowenstein.com

*Counsel to the VPX Liquidating Trust*

18

# Exhibit E

## IN THE CIRCUIT COURT OF THE 17TH JUDICIAL CIRCUIT
## IN AND FOR BROWARD COUNTY, FLORIDA

CASE NO. <u>CACE24002312</u>   DIVISION: <u>09</u>   JUDGE: <u>Levenson, Jeffrey R (09)</u>

**Stag Development, LLC**

Plaintiff(s) / Petitioner(s)

v.

**Tropical Sunset 117, LLC**

Defendant(s) / Respondent(s)

_____/

## <u>ORDER APPROVING SETTLEMENT AGREEMENT</u>

This cause came before the Court on a Joint Motion to Approve Settlement ("Motion") filed by Stag Development, LLC ("Stag"), the VPX Liquidating Trust ("Liquidating Trust"), and Glenn Waldman as Court appointed receiver for Tropical Sunset 117, LLC ("Receiver"). ("Receiver, Liquidating Trust, and Stag, collectively "Settlement Parties"). On July 28, 2025, the Court held a hearing ("Hearing") on the Motion and heard argument of counsel for the Settlement Parties and Intervenor John H. "Jack" Owoc ("Jack Owoc"). After reviewing the Motion, the proposed settlement agreement filed in the record on May 14, 2025 ("Settlement Agreement"), the written submissions of the Settlement Parties and Jack Owoc, and pertinent transcripts and evidence in the record, it is ORDERED and ADJUDGED as follows:

1. Capitalized terms not defined herein shall have the meaning ascribed to them in the Settlement Agreement.

2. For the reasons stated on the record and those outlined in the Motion and argument of counsel for the Settlement Parties, and considering all pertinent factors, the Court finds the Settlement Agreement and its terms to be fair, adequate, and reasonable, and in the best interest of the Tropical Sunset 117, LLC receivership estate.

3. As such, the Motion is granted, and the Settlement Agreement is approved in its entirety. The

Receiver's execution of the Settlement Agreement is similarly approved.

4. The parties shall fully and faithfully comply with the Settlement Agreement and its terms.

5. The Court notes that by this Order the Settlement Parties have discharged their obligation to seek an order from the Receivership Court under section 12 of the Settlement Agreement.

6. After review and consideration of the Court's prior Orders and findings, record evidence, and reports and representations of the Receiver, the Court makes the following factual findings:

    a. As confirmed in the Court's prior Orders dated, February 20, 2024, April 18, 2024, and June 12, 2025, the Tropical Profit Share is 60% to Jack Owoc and 40% to Stag;

    b. The Capital Contributions made to Tropical Sunset were the VPX Capital and the Jack Owoc Capital in the following amounts:

        i. The VPX Capital: $22,866,127.00; and

        ii. The Jack Owoc Capital: $2,750,000.00.

    c. The Stag Parties have cooperated with the Receiver and materially assisted with maximizing the value of the assets of the Receivership Estate.

7. The approval of the Settlement Agreement and the entry of this Order shall not adjudicate the issue of, or be used as evidence in determining, whether Jack Owoc has any right to the VPX Capital, including whether the VPX Capital was legitimate distributions or improper transfers of the Debtors' assets.

8. Noting the Settlement Parties representation in the Motion and the reaffirmation of counsel for the Liquidating Trust at the Hearing, all proceeds distributed to the Liquidating Trust pursuant to the Settlement Agreement shall be held in escrow by the Liquidating Trust, pending further order of this Court and the United States Bankruptcy Court in connection with the chapter 11 cases of Vital Pharmaceuticals, Inc., et al., Case No. 22-17842-PDR pending in the Southern District of Florida and the related Adversary Proceeding styled as *VPX Liquidating Trust v. John H. Owoc, et al.*, Adv. Pro. No. 24-01009-PDR.

9. All remaining payments or distributions payable under the Settlement Agreement shall be

made pursuant to the terms thereof.

Except for any action commenced by the Receiver, the Court hereby enjoins any and all litigation by any person or entity against the Receiver or the Stag Parties, or their respective officers, directors, employees, agents, attorneys, or representatives, arising from or related to Tropical Sunset, the Capital Contributions, or the Tropical Profit Share without obtaining leave of the Receivership Court.

**DONE AND ORDERED** in Chambers at Broward County, Florida on <u>1st day of August, 2025</u>.

<u>CACE24002312 08-01-2025 12:20 PM</u>
Hon. Jeffrey Levenson
**CIRCUIT COURT JUDGE**
Electronically Signed by Jeffrey Levenson

**Copies Furnished To:**
Andrew L. Mann , E-mail : mann@mannplyler.com
Anthony J Carriuolo , E-mail : acarriuolo@bergersingerman.com
Anthony J Carriuolo , E-mail : drt@bergersingerman.com
Anthony J Carriuolo , E-mail : mnewland@bergersingerman.com
Brett M Amron , E-mail : kszolis@bastamron.com
Brett M Amron , E-mail : jdepina@bastamron.com
Brett M Amron , E-mail : bamron@bastamron.com
Charles Brady , E-mail : Filings@CharlesBradyLaw.com
Charles Brady , E-mail : Charles@CharlesBradyLaw.com
Charles Brady , E-mail : Admin@CharlesBradyLaw.com
Charles M. Tatelbaum , E-mail : aaa@trippscott.com
Charles M. Tatelbaum , E-mail : cmt@trippscott.com
Charles M. Tatelbaum , E-mail : eService@trippscott.com
Christian A. Petersen , E-mail : pleadings@olivejudd.com
Christian A. Petersen , E-mail : cpetersen@olivejudd.com
Christian A. Petersen , E-mail : mdoss@olivejudd.com
Christian Leto , E-mail : cleto@olivejudd.com
David Krempa , E-mail : jschiavone@pbattorneys.com
David Krempa , E-mail : dkrempa@pbattorneys.com
Eyal Berger , E-mail : jeanette.martinezgoldberg@akerman.com
Eyal Berger , E-mail : kimberly.shinder@akerman.com
Eyal Berger , E-mail : eyal.berger@akerman.com
Glenn J Waldman , E-mail : mnewman@gunster.com
Glenn J Waldman , E-mail : gwaldman@gunster.com
Jeremy Hart , E-mail : jmiranda@bastamron.com

Jeremy Hart , E-mail : jhart@bastamron.com
John H Owoc , E-mail : jackowoc.ceo@gmail.com
John H Owoc , E-mail : megliz@superstructures.miami
Jordan Alexander Shaw , E-mail : mlomastro@shawlewenz.com
Jordan Alexander Shaw , E-mail : lgrealy@shawlewenz.com
Jordan Alexander Shaw , E-mail : jshaw@shawlewenz.com
Lauren Nicole Palen , E-mail : lpalen@shawlewenz.com
Marc J. Gottlieb , E-mail : marc.gottlieb@akerman.com
Marc J. Gottlieb , E-mail : joyce.gutierrez@akerman.com
Michael I. Goldberg , E-mail : charlene.cerda@akerman.com
Michael I. Goldberg , E-mail : michael.goldberg@akerman.com
Michael I. Goldberg , E-mail : kimberly.smiley@akerman.com
Paul O Lopez , E-mail : sxc@trippscott.com
Paul O. Lopez , E-mail : pol@trippscott.com
Peter Joseph Klock II , E-mail : mdesvergunat@bastamron.com
Peter Joseph Klock II , E-mail : pklock@bastamron.com
Peter Joseph Klock II , E-mail : peter.j.klock@gmail.com
Ryan H. Lehrer , E-mail : rhl@trippscott.com
Samantha Roque , E-mail : sroque@bastamron.com
Scott Mager , E-mail : Service@MPJustice.com
Scott Mager , E-mail : Yonathan@MPJustice.com
Scott Mager , E-mail : Aitor@MPJustice.com
Suzan Prince , E-mail : sprince@bergersingerman.com
Todd S Payne , E-mail : tpayne@zpllp.com
Zachary Dean Ludens , E-mail : ZLudens@shawlewenz.com

# Exhibit F

```
1                           IN THE CIRCUIT COURT OF THE
                            17TH JUDICIAL CIRCUIT, IN AND
2                           FOR BROWARD COUNTY, FLORIDA

3                           CASE NO: CACE 24-002312

4

5    STAG DEVELOPMENT, LLC,
     A Florida limited liability
6    company, derivatively on behalf
     of Tropical Sunset II7, LLC,

7

8         Plaintiff,

9    vs

10   TROPICAL SUNSET 117, LLC,
     A Florida limited liability
11   company,

12        Defendant.

13   _____/

14                                July 28, 2025
                                  10:20 a.m. - 11:00 a.m.
15

16

17                    ***VIDEOCONFERENCE***

18

19

20        Pursuant to notice, the above-entitled case

21   came on for a hearing before the HONORABLE JEFFREY R.

22   LEVENSON, Circuit Court Judge, via videoconference, and

23   the proceedings were stenographically reported by Avril

24   Severin, Court Reporter.

25                    ------------------
```

```
1                    A P P E A R A N C E S

2


3      Appearing on behalf of Plaintiff, Stag Development, LLC:

4      SHAW LEWENZ
       BY JORDAN A. SHAW, ESQUIRE
5          110 Southeast 6th street
           Suite 2900
6          Fort Lauderdale, FL 33301
           (954)361-3633
7          JShaw@ShawLewenz.com

8


9      Appearing on behalf of Glenn Waldman, Court Appointed
       Receiver for Tropical Sunset 117, LLC:
10

11     TRIPP SCOTT, P.A.
       BY RYAN H. LEHRER, ESQUIRE
12         CHARLES TATELBAUM, ESQUIRE (via Zoom)
           110 Southeast 6th Avenue
13         Suite 1500
           Fort Lauderdale, FL 33301
14         (954)525-7500
           RHL@TrippScott.com
15         CMT@TrippScott.com

16


17     Appearing on behalf of Intervenor and Majority Member,
       Jack Owoc:
18

19     MR. CHARLES P. BRADY LAW OFFICE
       BY  CHARLES P. BRADY, ESQUIRE (via Zoom)
20         447 3rd Avenue
           Suite 408
21         Saint Petersburg, FL 33701
           (727)623-6914
22         Admin@CharlesBradyLaw.com

23


24


25
```

```
 1    Appearing on behalf of VPX Liquidating Trust:

 2    BAST AMRON LLP
      BY BRETT M. AMRON, ESQUIRE (via Zoom)
 3        PETER J. KLOCK, II, ESQUIRE (Via Zoom)
          One Southeast 3rd Avenue
 4        Suite 2410
          Miami, FL 33131
 5        (305) 379-7904
          BAmron@BastAmron.com
 6

 7    Appearing on behalf of Stag as Bankruptcy Counsel:

 8    K&L GATES, LLP
      BY JEFFREY KUCERA, ESQUIRE
 9        200 South Biscayne Boulevard
          Suite 3900
10        Miami, FL 33131
          (305)539-3300
11        Jeffrey.Kucera@KLGates.com

12

13    Appearing as Court-appointed Receiver for Tropical
      Sunset, 117, LLC:
14

15    WALDMAN LAW FIRM, P.A.
      BY GLENN J. WALDMAN (via Zoom)
16        450 East Las Olas Boulevard
          Suite 1400
17        Fort Lauderdale, FL 33301
          (954)468-1313
18        FWaldman@WaldmanLawFirm.com

19

20    Also in attendance, Representatives of Stag:

21        Jonathan W. Owoc
          Branden Shaw
22

23    Also:

24        John H. Owoc a/k/a Jack Owoc
          Megan Owoc
25
```

4

```
 1      Thereupon,
 2              THE COURT:  Mr. Waldman?
 3              MR. WALDMAN:  Good morning, Your Honor.
 4              THE COURT:  Nice to see you.
 5              Mr. Brady, you're here?
 6              MR. BRADY:  Yes, Your Honor.  Good morning.
 7              THE COURT:  Is your client going to be here?
 8              MR. BRADY:  I anticipated Megan Owoc would be
 9      present; is she in the courtroom?
10              THE COURT:  No.  So do you want to get a hold
11      of her to see when her ETA is?  I've got an 11
12      o'clock also.  I'm sorry.  I would have been happy
13      to accommodate you, so I apologize to you for that
14      but I have got an 11 o'clock today.  Okay?
15              MR. BRADY:  That's fair, Your Honor.  I will
16      reach out to her.  We can proceed without her if
17      she's not there.
18              THE COURT:  Are you sure?
19              MR. BRADY:  I am, yes.
20              THE COURT:  Okay.
21              MR. BRADY:  Thank you, Judge.
22              THE COURT:  No problem.  All right.  So I
23      think the --
24              MR. SHAW:  Judge, can we just get on the
25      record that Mr. Brady is okay with her not being
```

```
1          here?  We should put that on the --
2               THE COURT:  Well, we are already, she is
3          typing everything down.
4               MR. SHAW:  Okay.  I just wanted to make sure.
5               THE COURT:  You're taking everything down,
6          right?  Well, you're recording?
7               COURT REPORTER:  Yes, I am.
8               MR. SHAW:  Okay.  Perfect.
9               THE COURT:  I mean, you're recording what I'm
10         saying.
11              COURT REPORTER:  Yes.
12              THE COURT:  So we are here for John H. Owoc
13         versus -- we are here for Stag Development versus
14         Tropical Sunset.  Counsel, please announce your
15         appearance.  First we start off with plaintiff.
16              MR. SHAW:  Good morning, Your Honor.  Jordan
17         Shaw from Shaw Lewenz.  With me is Jonathan W. Owoc
18         and Branden Shaw, who are representatives of Stag.
19         And to my right is Jeffrey Kucera, who is
20         bankruptcy counsel for Stag.  He is from K&L Gates.
21              MR. LEHRER:  Good morning, Your Honor.  Ryan
22         Lehrer of Tripp Scott on behalf of the
23         court-appointed receiver, Glenn Waldman, who is
24         appearing via Zoom, and my partner Chuck Tatelbaum
25         is also appearing via Zoom.
```

```
1              THE COURT:  Great.  Other counsel?

2              MR. AMRON:  Good morning, Your Honor, Brett

3        Amron of Bast Amron on behalf of the VPX

4        Liquidating Trust and appearing also on Zoom with

5        me is my partner, Peter Klock.

6              THE COURT:  Okay.  And Mr. Brady?

7              MR. LEHRER:  Yes.  Thank you, Your Honor.

8        Good morning.  Charles Brady on behalf of

9        intervenor, Mr. John Henry Owoc, also known as Jack

10       Owoc.

11             THE COURT:  Where are you located, Mr. Brady?

12             MR. BRADY:  Where am I located?  My office is

13       in Saint Petersburg.

14             THE COURT:  No.  Are you in a car right now?

15             MR. BRADY:  I am.

16             THE COURT:  It's a great background.  I just

17       want to compliment you on it.  It's a great

18       background so you would never know you are in a

19       car.  That's good.

20             And predictably, Mr. Waldman has a background

21       with a conference room.

22             All right.  So let's get started here.  Let me

23       tell you first of all what I have endeavored to do.

24       I did read in painstaking detail the transcript of

25       the bankruptcy proceeding, okay, and I noticed a
```

1    couple things.  Judge Russin slipped and called me

2    Mr. Levenson but it was a very interesting

3    proceeding, so I understand the context why we are

4    here so you can assume I've read that.  All right?

5    So with that in mind -- and I've also read your

6    submission.  So with that in mind, how do you want

7    to proceed?

8         MR. LEHRER:  Sure, Your Honor.  I was going to

9    start with giving Your Honor the benefit of some

10   background as to why we're here.  It sounds like

11   you've already read it.

12        THE COURT:  Why we're here is because Judge

13   Russin, it would appear, wants me to make a

14   decision first.

15        MR. LEHRER:  Yes and no, Your Honor.  Look,

16   this settlement agreement is the byproduct of

17   around nine months' worth of negotiations.  The

18   parties agreed that it needed to be presented to

19   both courts - Your Honor and to Judge Russin.  The

20   timing of it I guess ultimately did not matter as

21   to who went first but we went before Judge Russin.

22        THE COURT:  The issue with him was that there

23   also was the possibility if Mr -- he wants to

24   protect Mr. Owoc that in the event that he prevails

25   at the adversary proceeding, that he doesn't want

1    the money to be dissipated.  He wants the money to

2    VPX to be held until that's determined.  Am I

3    correct in reading that?

4        MR. LEHRER:  That's correct.  That was one of

5    the two arguments that Mr. Owoc was raising at the

6    hearing and Judge Russin said I'll be crystal clear

7    to you; no monies are going to be distributed that

8    is supposed to be going to you for your benefit,

9    will not be distributed to anyone unless and until

10   I have adjudicated the adversary claims against

11   you.

12       The other issue that Judge Russin was

13   presented with was Jack Owoc --

14       THE COURT:  May I interrupt you for a second?

15       MR. LEHRER:  Sure, Your Honor.

16       THE COURT:  Can everybody on the Zoom hear

17   adequately?

18       MR. AMRON:  Yes, Your Honor.

19       THE COURT:  I didn't mean to interrupt you.  I

20   wanted to make sure of that.

21       MR. LEHRER:  Sure.

22       THE COURT:  And you all have the Zoom in front

23   of you?

24       MR. LEHRER:  We do.

25       The other issue that Judge Russin was

1     presented with was Jack Owoc's position that in

2     actuality, he was the one hundred percent owner of

3     Tropical and we told the Judge that's not accurate.

4     Judge Russin said, hold on a second.  I am not that

5     close to that issue.  That needs to go before Judge

6     Levenson --

7         THE COURT:  I got you.

8         MR. LEHRER:  So I would like Judge Levenson to

9     chime in on that and rule on that before I

10    ultimately make a decision on whether or not we

11    will approve this under the strictures presented to

12    him with the case law in that context.  And so we

13    came back before Your Honor --

14        THE COURT:  That's the overage, though.

15    That's the money that's on top of whatever VPX

16    gets.

17        MR. LEHRER:  Correct.  But he was also

18    clarifying your capital contribution is not going

19    to be distributed to anyone and then the overage,

20    none of that is going to be distributed to anyone

21    unless and until -- this is how I understood Judge

22    Russin's ruling -- unless and until he has

23    adjudicated the adversary claims --

24        THE COURT:  I didn't understand it that way.

25    You could correct me.  I thought that the overage

```
 1          would be distributed if I deem it appropriate

 2          consistent with the 60 percent, 40 percent.

 3                  MR. LEHRER:  That's right.  To him but he has

 4          creditors and those creditors are before Judge

 5          Russin in a variety of capacities.

 6                  THE COURT:  Again, how that happens, where

 7          that money goes.

 8                  MR. LEHRER:  Right.

 9                  THE COURT:  I think one of the issues was --

10          right.  I got it.

11                  MR. LEHRER:  So we came back before Your

12          Honor, and this is the next day before you and we

13          had that discussion of the ownership structure of

14          Tropical and you entered an order reaffirming two

15          prior orders saying now it's 60 percent Mr. Owoc,

16          40 percent Stag.

17                  None of those orders have been appealed.  It's

18          the law of the case and quite frankly, we are

19          looking at the objection that Mr. Owoc filed at

20          2:00 a.m. this morning in violation of your

21          division's procedures, as essentially a

22          regurgitation of an objection he filed back in May

23          before Judge Russin and he also filed it here.

24                  But those are the two real arguments that he

25          is making, they being, one by Judge Russin giving
```

1      him the clarity he wants with respect to any monies

2      that are supposed to go to Jack and then with the

3      ownership structure which you've already ruled on

4      three times now.

5           THE COURT:  So Mr. Owoc is not here.

6      Mr. Brady, you said that the wife is going to be

7      here but he is not going to be here?

8           MR. BRADY:  I am not aware if either of

9      them -- I haven't heard back from either of them,

10     Your Honor.  I did anticipate them coming but they

11     may have changed their plan this morning.  I am not

12     sure but I am the one who filed that response and

13     the objections at 2:00 a.m. yesterday.

14          THE COURT:  Late night, pretty late night.

15     You know, I am good but I am not that good.  Okay?

16     I don't usually get up in the middle of the night

17     to look and see if something has been filed, just

18     to let you know that.  I know that other Terrapins

19     would do that but I won't.  I don't do that.

20          All right.  So with that being said, let's

21     proceed.  Okay.  I think we are in a position -- my

22     role, I have a certain part of this, Judge Russin

23     has a certain part of this and I'm willing to

24     proceed with that.

25          MR. LEHRER:  Great, Your Honor.  Look, from

1       the receivership's perspective, from Mr. Waldman's

2       perspective, this settlement greatly benefits the

3       receivership estate.  Number one, it gets the

4       receivership entities dismissed with prejudice from

5       the adversary claim without a single dollar coming

6       out of the receivership estate.  Okay?

7            It allows and contemplates the receiver is

8       going to finish developing the three remaining

9       projects, there is going to be a big pot of money

10      there at the end, and then it's going to be

11      distributed by accounting for Mr. Owoc's capital

12      contributions and it complied with the 60/40 split

13      that Your Honor has already ruled on.

14           From our perspective, that's an appropriate

15      great result here.  We are a little shocked that

16      Mr. Owoc is even objecting to it quite frankly

17      because it does benefit companies that he has an

18      interest in.  He certainly should not want us

19      dragging through the adversary complaint -- the

20      adversary proceedings and spending unnecessary

21      legal fees in that regard.

22           So from his perspective, this allows him to

23      concentrate on the big role that Your Honor

24      appointed him for, which is finishing these real

25      estate projects, which is exactly what he has been

1    doing.  And to be honest, we are following the

2    waterfall provision on the accounts, it's the 60/40

3    split --

4         THE COURT:  I don't look that up, to be honest

5    with you.  We don't deal with waterfalls too much

6    in the circuit court.

7         MR. LEHRER:  We brought before the court --

8    both courts provide for noticing an opportunity to

9    confer.  Mr. Owoc has made his two big objections

10   clear.  From our point of view they've been dealt

11   with appropriately by both Your Honor and by Judge

12   Russin.

13        THE COURT:  Listen, Mr. Brady, you and your

14   client have made the arguments.  They are preserved

15   okay, clearly.  I have gone over this time and time

16   again.  I just have a respectful disagreement with

17   your client and now you with how it's viewed.

18   However, I am happy to hear from you again if you

19   wish.

20        MR. BRADY:  Whenever it's my turn, Your Honor.

21        THE COURT:  Well, I think it is your turn now.

22        MR. BRADY:  Okay.  Well, first and foremost,

23   there is a procedural defect with this motion.  The

24   motion itself lacks a certificate of conferral,

25   Your Honor.  The motion is --

```
 1              THE COURT:  All right.  Let's talk about that.
 2         What about that conferral issue?
 3              MR. LEHRER:  It's a joint motion by parties to
 4         a settlement agreement to present it to the court
 5         to have it approved.  We weren't required to confer
 6         with Mr. Brady.  Your Honor appointed Mr. Waldman.
 7         I have the receivership orders here.  You made it
 8         very clear that he takes over the role as managing
 9         the company.  He has the power to assess claims and
10         how to decide how the money should be distributed
11         and to settle.
12              THE COURT:  Let's get past the conferral
13         issue.  Let's get to the substance.  Go ahead.
14              MR. BRADY:  Thank you, Your Honor.
15              And aside from the procedural issue with the
16         conferral, there is a factual concern that my
17         client is the majority member of this LLC and he
18         wasn't even consulted or asked for any input about
19         this settlement agreement.
20              The settlement agreement is not even attached
21         to the motion.  The Court doesn't even know the
22         full contents of what it says.  It has no idea of
23         whether Mr. Owoc's interests are going to be
24         protected therein now.  I am deeply concerned for
25         my client and I can explain why.
```

1      We all know what the injustice of settlements

2      of whether this settlement agreement should be

3      approved or not.  There is whether there is a

4      meritorious actual allegation from VPX in this

5      adversarial proceeding; there is weighing the costs

6      and there's also weighing the impact that the

7      settlement may have on the creditors, which include

8      Mr. Owoc.

9      The Court -- there is really no dispute and

10     the Court already has ruled in part on the fact

11     that Mr. Owoc has made -- have contributions and

12     has a capital account with Tropical Sunset.  I

13     don't even think that there is any dispute about

14     the amount that Mr. Owoc either paid directly or

15     directed from the account of VPX to Tropical

16     Sunset.

17     The Court also should already be aware that

18     Mr. Owoc was a one hundred percent owner of Vital

19     Pharmaceuticals at the time all these transfers

20     were made.  So in basic terms, Mr. Owoc made an

21     agreement with himself where he said instead of

22     paying me my dividends, I want you to direct my

23     dividends to Tropical Sunset.

24     THE COURT:  I think I read all that in the

25     bankruptcy proceeding.

```
 1            MR. BRADY:  Yes.  Judge Russin did recognize
 2       these defenses, he recognized that --
 3            THE COURT:  Which is why he framed it the way
 4       he did.  You know, he said that -- he said he is
 5       not going to make a decision on the substance, he
 6       said he will hold off on that but in terms of
 7       whether it's a viable -- one second please.
 8            Your clients have just arrived.  For record
 9       purposes -- good morning folks.
10            MR. JOHN OWOC:  Good morning, Your Honor.
11            MS. MEGAN OWOC:  Good morning.
12            THE COURT:  Nice to see you all.  Would you
13       please identify yourselves for the record?
14            MR. JOHN OWOC:  John Owoc.
15            MS. MEGAN OWOC:  Megan Owoc.
16            THE COURT:  Okay.  Have a seat.
17            So where we are, we started off with counsel
18       for the receiver and now we are listening to your
19       counsel about whether it would be -- but I'll hear
20       from you eventually.  Okay?
21            MS. MEGAN OWOC:  Thank you.
22            THE COURT:  And you can see the Zoom on there,
23       right?
24            MR. JOHN OWOC:  Yes.
25            THE COURT:  All right.  You may resume,
```

```
1          Mr. Brady.
2              MR. BRADY:  We are talking about a settlement
3      agreement here that purportedly agrees to pay Vital
4      Pharmaceuticals the full amount that Vital
5      Pharmaceuticals is alleging.  I have only heard of
6      one settlement ever in my career where they agreed
7      to pay the full amount.
8              THE COURT:  A hundred percent.  That's pretty
9      good.
10             MR. BRADY:  That's pretty impressive and
11     without concessions or any things given back to
12     Tropical at all.  They just wanted to make sure
13     that Stag Development was out of the lawsuit.
14     Tropical wasn't leaving Jack behind to defend
15     himself, which is ironically what he was doing in
16     the first place and what he is willing to do moving
17     forward.
18             Had they reached out to him, he would have
19     gladly agreed to do that which he had already been
20     doing before this case was filed, which is, provide
21     all the counsel and litigate this matter so that
22     Tropical and Stag don't have to pay a single penny
23     to defend the case.  He is willing to indemnify,
24     defend and hold them harmless.  He is willing to
25     let his money in Tropical sit as ransom to pay
```

```
 1          that, but please help us out here and not let this
 2          money go into VPX, into their trust where he will
 3          likely never see it again.
 4               THE COURT:  Wow, wow, that's not correct.
 5          Judge Russin at the bankruptcy proceeding said the
 6          opposite.  He said we're going trust so that if
 7          Mr. Owoc prevails, then he would have access to the
 8          money.  That's what was said.  Am I incorrect with
 9          that?
10               MR. SHAW:  No, Your Honor.  In fact in our
11          joint motion, I know that Mr. Klock and Mr. Amron
12          chimed in but I believe it was represented by the
13          Liquidating Trust, that they are in agreement to
14          not distribute anything to themselves of that --
15               THE COURT:  Money is held in until --
16               MR. SHAW:  All the distributions on the 60/40
17          overage --
18               THE COURT:  Yes.  So I think that's what --
19          clearly, that's what was reflected in the
20          transcript.
21               MR. BRADY:  I don't see it in the settlement
22          agreement, Your Honor.
23               THE COURT:  I apologize to you, Mr. Brady.
24          Have you had access to the transcript that was
25          filed by the receiver?  Have you read the
```

```
1            transcript?
2                 MR. BRADY:  I have.
3                 THE COURT:  Well, if you read the transcript,
4            it was pretty clear that was what Judge Russin was
5            going to do.
6                 MR. BRADY:  I believe Judge Russin said that
7            he wasn't going to grant the motion for settlement
8            if it effectively adjudicated Mr. Owoc's rights.
9            That was one of the larger concerns that he had.
10                THE COURT:  Right.  And as it stands, the
11           settlement agreement, do you believe it does affect
12           the rights?
13                MR. BRADY:  I do.
14                THE COURT:  How so?
15                MR. BRADY:  Well, these funds are held into
16           VPX's Trust.  First we have to one, rely on their
17           word that they are not going to move any of that
18           money.  And then two, we now have to file a
19           counterclaim in the adversarial proceeding to try
20           to recover that money, that with other values we'd
21           be entitled to have it distributed immediately if
22           the settlement were agreed to.
23                So the question to ask, Your Honor, is why
24           does VPX need that money in their trust?  It makes
25           no difference to them.  Why doesn't the settlement
```

1     agreement just simply say that Tropical will hold

2     that money?  Why is it so important to Vital

3     Pharmaceuticals that they have that money in their

4     trust and that's it's the full amount?  And

5     furthermore --

6          Your Honor, this is Mr. Owoc's money and

7     there's very, very little, very, to VPX's claim

8     over it.  You are talking about a company that is

9     generating around $200 million consistently on an

10    annual basis and he took about 18 million and a

11    couple million here and there, and Mr. Owoc has

12    left them like $3 million in salary and dividends

13    from Bang Energy each year.

14         So the question is, why didn't he pay himself

15    100 million, why not 200 million?  The company was

16    worth two to three billion dollars.  Why did he not

17    pay himself that?  What he did, he did it through

18    IRS Tax Code 351 exchange where he had the money

19    put from one company he controls to another company

20    that he also controls, which doesn't trigger a tax

21    event, allows him to lawfully avoid paying taxes

22    because it's a reinvestment into the economy.

23         And so, when he put this money into Tropical,

24    he didn't have to pay the income tax that you

25    normally pay had he had it transferred to himself

1          and then to Tropical.

2                So the only evidence that VPX has, the only

3          argument that they have, is that the money come out

4          of their account but they don't even have standing

5          to argue with Mr. Owoc when he said that he made an

6          agreement with himself to pay that money.  And

7          there is nobody that can say that's not what I

8          heard him say to himself.

9             The lawsuit itself will certainly fail and

10         that's why Mr. Owoc is willing to fully indemnify

11         and hold them harmless.  He will hire all the

12         attorneys and litigate this entire case and if he

13         is wrong, he will reimburse -- any damages he'll

14         cover; and any fees or any costs that are incurred

15         by Stag or Tropical, he will cover.  He will

16         indemnify and hold them harmless.

17            So there really is no need to settle with

18         Vital Pharmaceuticals, and we are asking you to

19         deny their motion, not allow this to happen, maybe

20         consider sending the parties to mediation and

21         allowing them to work this out.  I have tried to

22         settle with them to no avail.

23            I believe that there is a lot of

24         communications happening here that Mr. Owoc is not

25         being made privy to and at the end of the day, all

1    of the money that is put into Tropical was put into

2    Tropical by Mr. Owoc, according to him well over 25

3    million according to uncontested records.

4    According to Mr. Owoc, close to the $30 million

5    that he used to fund all these projects.  He is the

6    only one to put money in and yet, everybody else is

7    deciding where his money goes.

8         It just seems a little, just practically very

9    unusual.  And I am really concerned for my client

10   with why all these monies are being moved now into

11   Vital Pharmaceuticals his company, his former

12   company, and I am wondering why, why does that need

13   to happen.

14        THE COURT:  Okay.  And you're concerned that

15   Vital may take the money and dispose of it.

16        MR. BRADY:  Correct.

17        THE COURT:  And based on what?  So in other

18   words, Vital, as part of the process and they're

19   court ordered to hold money in a trust account and

20   you are worried they may take the money from the

21   trust account.  Why should we find that to be

22   credible?  Is that what you're arguing?  You are

23   suggesting they may divert the money even though

24   it's in a trust account and there is a court order

25   that says they can't dispose, they can't access the

1          money?  Are you saying that's your argument?

2               MR. BRADY:  I believe they'd follow a court

3          order but --

4               THE COURT:  Well, that's comforting to hear

5          you say that.

6               All right.  Let me hear from VPX.  Go ahead.

7               MR. SHAW:  Judge, before you continue, on May

8          14, 2025, we filed the signed settlement agreement.

9          So I don't know if Mr. Brady didn't have a chance

10         to see that and I can approach and hand it to you.

11              THE COURT:  I don't need it.

12              MR. SHAW:  Okay.

13              THE COURT:  I got it.

14              Counsel for VPX, go ahead.

15              MR. AMRON:  Good morning, Your Honor.  Brett

16         Amron on behalf of VPX Liquidating Trust.

17              So we heard that Mr. Owoc agrees and admits

18         that the funds that are at issue here for us came

19         out of VPX and went into Tropical to --

20              THE COURT:  Hold on for a second.

21              Go ahead.  I'm sorry.

22              MR. AMRON:  And that capital contributions are

23         to be repaid first, followed by a 60/40 split, and

24         so, we are in agreement on that.  The issue is

25         whether or not the funds, the capital contributions

1          are rightfully Mr. Owoc's or rightfully VPX

2          Liquidating Trust, and that is to be litigated

3          before Judge Russin.  And Judge Russin has said and

4          we've agreed on the record, we've agreed in the

5          joint motion that's filed before the court, I am

6          going to restate it here today; that those funds as

7          part of the settlement that come back into the VPX

8          Liquidating Trust remain with the VPX Liquidating

9          Trust pending the adjudication of the claims with

10         Mr. Owoc.

11              So Mr. Owoc who had his ability to litigate

12         those issues and if he prevails -- what is missing

13         from Mr. Brady's response in opposition here known

14         but no wiser is they didn't know certain facts and

15         Your Honor is aware of this, of course, given the

16         proceedings here.

17              Mr. Owoc himself has over $300 million in

18         judgments against him, plus he's got an IRS levy

19         that's been recorded against the receivership

20         estate.  So then to the extent that there is any

21         money that is going to Mr. Owoc or is entitled to

22         go to Mr. Owoc, it's not going to go to Mr. Owoc.

23         It will go elsewhere.

24              So what we are doing here today is codifying,

25         is memorializing, right, the settlement obviously

1        between our two estates but allowing for the

2        receivership estate to wind itself up, finish the

3        projects, pay out the money pursuant to what

4        everyone agrees is the waterfall here, which is,

5        repay the capital contributions, repay any

6        outstanding creditors, capital contributions, then

7        the 60/40 split and moving the funds over to VPX so

8        that the funds can stay there so that the VPX

9        Liquidating Trust and Mr. Owoc can litigate their

10       claims over this money, and then decide where it

11       goes.

12            And for Mr. Brady, I am glad that he finally

13       said that we and our client would abide by the

14       court order, but we are under the auspices and

15       control of Judge Russin and in his courtroom and of

16       course, those funds are not going to go anywhere,

17       any further order of that court.  And so, this

18       settlement is in the best interest of both estates,

19       which is why we have gone and negotiated this.

20            One last thing, Judge, to mention which is,

21       Mr. Brady says we are getting a hundred percent and

22       that VPX Liquidating Trust is getting a hundred

23       percent.  A couple things on that.  Number one, the

24       presumption on the settlement agreement is that

25       they are going to complete, the receiver is going

```
1          to complete these projects and that VPX Liquidating
2          Trust, then they have to sell them.  Right?  So
3          they're going to use funds that are currently on
4          hand.  Then they have to market and sell these
5          properties so it's --
6                What happens is, we don't know exactly how
7          much is coming in.  There is estimates in terms of
8          value but at the end of the day there's
9          market-driven and once those sales close, then the
10         net, whatever that may be gets paid out pursuant to
11         the waterfall.  Obviously, administrative expenses
12         come off the top for this receivership estate, any
13         creditors of Tropical and the capital, then 60/40.
14               So number one, it's up to the amount that was
15         put in.  Number two, the estate of VPX Liquidating
16         Trust as part of this negotiation has given up on
17         and has agreed to not seek the entitlement to
18         interest, the prejudgment interest that could be
19         millions of dollars given how long these funds were
20         removed from VPX and given the amounts at issue.
21         So with all that being said, this is compromise
22         between --
23               THE COURT:  But if you are getting a hundred
24         percent how is it a compromise?
25               MR. AMRON:  It is not a hundred percent,
```

```
 1          Judge.  It is the dollars that were paid in and it
 2          is up to that amount but because that's the
 3          waterfall.  Right?  So the way that, and nobody is
 4          disagreeing that the capital gets repaid first and
 5          Mr. Owoc is just saying, hey, I get it as opposed
 6          to VPX Liquidating Trust.  That's the dispute
 7          there.  It is not as to the amount.
 8               So first, the capital gets returned and then
 9          the 60/40 split of profit.  Of course, it is net,
10          Your Honor, of any administrative expenses and
11          any --
12          THE COURT:  Is his 60 percent going to be
13          subject to all those other creditors or liens and
14          so forth?
15          MR. AMRON:  Judge, yes, I think so.  If
16          Mr. Owoc and the law suggested it, Mr. Owoc owes
17          money on judgments - there is an IRS levy
18          personally as to Mr. Owoc, then to the extent that
19          Mr. Owoc is entitled to receive any monies, it
20          would be subject to the judgments and IRS levy, as
21          well.
22          THE COURT:  What about the other 40 percent
23          that's going to the other parties, what happens to
24          them?
25          MR. AMRON:  In terms of -- sorry, Judge.
```

```
 1            THE COURT:  Are they going to be subject also
 2       to the same liens and so forth?
 3            MR. AMRON:  I do not believe so because there
 4       is no judgments against them.  The judgments are --
 5            THE COURT:  Is that correct?
 6            MR. KUCERA:  That's correct, Your Honor.
 7            THE COURT:  Could you identify yourself again
 8       for the record?
 9            MR. KUCERA:  Sorry, Your Honor.  Jeffrey
10       Kucera from K&L Gates, bankruptcy counsel for Stag
11       Development, as well as the two individuals.
12            That is correct.  The 40 percent that goes to
13       Stag would not be subject to those judgment liens
14       or IRS levies against Mr. Jack Owoc because they
15       are separate entities.
16            THE COURT:  You know, hockey back to when we
17       had those evidentiary hearings, that was one of the
18       issues we had to grapple with, was that if the
19       money goes to Mr. Owoc with the best of intentions,
20       that money is not going to remain with him because
21       of all the other outside creditors or judgments
22       that were against him.  That was the problem and
23       the problem he had as you may recall that.
24            All right.  Let me move on to Mr. Shaw.  Go
25       ahead.
```

1           MR. SHAW:  Thank you, Your Honor.  I think in

2      some ways we are talking about the wrong thing here

3      because this is a resolution.  We are not talking

4      about merits and this is a resolution where there

5      is a release of one party.  There is a release of

6      the receivership.  There is a release of these two

7      individuals.  There is a release of their entities,

8      and there is also a release back.  Right?  So there

9      is a release by VPX Liquidating Trust of TS 117.

10     There is a release by Stag of TS 117.  This

11     settlement effectively resolves all these claims.

12           And what we are talking about is not a

13     settlement where there is a check being written.

14     And I appreciate Mr. Amron being, I'm not going to

15     say humble, but he didn't fully articulate the risk

16     that VPX Liquidating Trust is taking on.

17           They are not getting paid unless and until

18     these properties sell in this economy and sell for

19     a profit.  So no money gets paid to the VPX

20     Liquidating Trust if there is no money to be made.

21     That's a huge concession.  So in what type of

22     settlement agreement, Your Honor, do you see a

23     person or an entity with a 22 plus million dollar

24     claim saying, hey, in the interest of resolution

25     after nine months of negotiations, preserve the

1       money, preserve the money that we may be entitled

2       to.  That's all we are asking for Judge, preserve

3       it.  Make it so that it doesn't dissipate, which

4       has been the concern from day one, that's it, and

5       then we will provide a release to everyone.

6            The Stag parties continue to do what they have

7       done since day one; manage these properties,

8       develop these properties, oversee the contractors,

9       interact with the receiver and his team on a daily

10      basis, put in 40 hours a week seems light on these

11      properties – weekends, nights, mornings, meet

12      buyers, meet sellers, meet agents, meet brokers,

13      meet contractors, hire people, fire people, replace

14      people, put in all this time and they don't know if

15      they are going to get a dime either.

16           So everybody in this settlement agreement is

17      aligned.  Everybody in this settlement --

18           MR. JOHN OWOC:  They're all getting paid for

19      it.

20           THE COURT:  Mr. Owoc, I am going to have to

21      ask you to leave if you interrupt.  Okay?  Please

22      don't do that.  That's your first and last warning.

23      You got it?

24           MR. JOHN OWOC:  My apologies, Your Honor.

25           THE COURT:  You may resume, counsel.

1          MR. SHAW:  I think what Mr. Owoc is referring

2     to is a small stipend payment that they are

3     receiving monthly to make sure that they don't go

4     bankrupt.  Because job by job, they used to be

5     paid.  And if you remember, Mr. Owoc sat in his

6     chair and testified to the fact that after every

7     sale they would distribute funds.  Well, they

8     worked for years on 3 Pelican Drive.  It sold for

9     18 and-a-half million dollars.  They didn't see a

10     cent including Mr. Owoc.  And so, yes, to live,

11     they are charging a discounted management fee,

12     which is probably about a third if not less than a

13     third of what the receivership would have to pay to

14     an unrelated party.  So anyway --

15          THE COURT:  That's overseen by the receiver.

16          MR. SHAW:  Correct, and his team -- and his

17     legal team.  So let's talk about what this

18     settlement is.

19          It preserves, yes, my clients get their 40

20     percent profit if it sells for a profit and they

21     get their 40 percent based upon a waterfall.  And

22     if you look at the settlement agreement, Your

23     Honor, what it specifically says is that the Stag

24     parties have to date and will continue to cooperate

25     with the receivership, something that Mr. Owoc's

1     side and Mr. Owoc's camp, that's their decision,

2     have chosen not to do.  Instead they have filed yet

3     another motion last night seeking to remove the

4     receiver, dissolve the receiver, Bar complaints

5     against the receiver, lawsuits against counsel.

6     That's the strategy that they have chosen and that

7     is their prerogative.

8          But what we have today here is not an

9     evaluation of merits.  We are not evaluating

10    whether his claims win or lose.  What we are

11    evaluating and what we chose to do is bring this

12    before a court and say, hey, all parties have had

13    their day in court, multiple days in court, all

14    parties have signatories to a document which we

15    filed in May, and it resolves the claims.  It makes

16    this receivership process expedientially easier

17    because this waterfall dictates what the receiver

18    does next and how funds are distributed.  That's

19    what it does.

20         And so, we are now one step closer to a motion

21    for final order of dissolution pending the

22    settlement.  That's the next step, is a final order

23    of dissolution that this Court gets to evaluate and

24    enter and say, Stag Development -- excuse me --

25    Tropical Sunset shall be dissolved finally and

1      fully and this is how we pay out the funds.

2      Mr. Owoc's money is preserved with a court

3      overseeing entity, a liquidating trust that is

4      formed by operation of law in a bankruptcy court,

5      and everybody is protected.  My clients get paid.

6           And Your Honor, if you recall, I just want to

7      read this into the record, you already made this

8      finding from day one and what you held was:

9           During the receivership, the receiver shall

10     determine the priorities of distribution of the net

11     proceeds from the judicial dissolution and sale of

12     assets within the judicial dissolution proceeding

13     in accordance with Florida law in equity.

14           This is important.

15           For example, because the Vital liquidating

16     suit seeks return of Jack Owoc's capital

17     contributions to the company, any funds expended to

18     defend the self said suit should first serve to

19     reduce Jack Owoc's capital account prior to

20     reducing the company's profits or funds, profits or

21     distributions that may be owed to members.

22           And that's what this does except it's not

23     serving to reduce it.  It's just being put over

24     here in a corner and if he wins, then we determine

25     which of his creditors -- well not we -- the

```
 1      bankruptcy court will determine which of his
 2      creditors get the money first, and that's it.
 3           And so what we ask you to do, Your Honor, is
 4      just approve the settlement.  Let us go forward.
 5      We will go back to the bankruptcy court into the
 6      next step but no money is being paid after you sign
 7      this order, none.
 8           THE COURT:  I do think that there are proper
 9      safeguards that are included in this.  I think
10      that -- first of all, I think it's a very fair
11      settlement, all right, unquestionably.  And I think
12      that Mr. Owoc's position is somewhat complicated.
13      Okay.  I think the other members of the Stag party
14      is not as complicated but I think that the
15      objective is to resolve this part of it, put that
16      to rest.  I think the receiver has put his blessing
17      on it to resolve this part of it and I think it's
18      appropriate.
19           I think that Mr. Owoc's position is protected
20      or preserved because the money is going to go into
21      a trust account not to be disbursed, okay, with the
22      exception of the 60/40 disposition should there be
23      a profit.  But all the other monies will remain in
24      the trust account until the adversary process is
25      concluded.  So if Mr. Owoc prevails, then that
```

1        money, he'll have -- that money goes to him.  If he

2        doesn't prevail, then it will go accordingly to

3        VPX.

4             So based on that, based on the record before

5        the Court, the Court will --

6             MS. MEGAN OWOC:  I still need to --

7             THE COURT:  I apologize to you, ma'am.  You're

8        represented by counsel.

9             MS. MEGAN OWOC:  You told us that we could

10       speak when we came in --

11            THE COURT:  No.  This is not an evidentiary

12       hearing.  So Mr. Brady, anything else you want to

13       add?

14            MR. BRADY:  I would, Your Honor, if you would

15       hear me --

16            THE COURT:  In the bankruptcy proceeding, I

17       think Mr. Owoc was representing himself.  That's a

18       little different.  This isn't a news conference or

19       free fall.

20            Mr. Brady, anything you want to add before I

21       finally rule?

22            MR. BRADY:  Yes.  Just a few considerations,

23       Your Honor, that maybe will help us in the future

24       and I'll stick to the part where I kind of change

25       your mind about something adjudicated.

1          But in the future, I just want a record that

2      it's VPX that filed for bankruptcy, not Mr. Jack

3      Owoc.  I think that's really relevant to this.

4      There has been a lot of mention throughout this

5      case of creditors that Mr. Owoc may or may not owe,

6      judgments that may or may not have been satisfied

7      that may have been discharged or deferred or are

8      being renegotiated.  All of that is irrelevant to

9      this case and just because, just because Mr. Owoc

10      might have creditors out there he owes, has no

11      effect on VPX's right to this money.

12          And I think the easiest thing to do is look at

13      what might happen if the Court doesn't approve of

14      the settlement agreement.  What happens is all this

15      money stays with Tropical and then it would go all

16      to Mr. Owoc without having to wait for the

17      disposition or the final adjudication on this

18      adversarial proceeding in the bankruptcy.  He could

19      potentially get his house out of foreclosure

20      against his primary creditor who he owes money to.

21      He has been unable to pay his mortgage payments.

22      His house is in foreclosure right now because he

23      has no money.  This is a man who used to make

24      millions and had a billion-dollar corporation.  Now

25      it's all tied up in litigation.

1          The only money he really has left is this

2       money in Tropical, which he is willing to try to

3       use that money to buy out the other side and

4       preserve the business and preserve this

5       multi-member LLC, which would protect him from all

6       his creditors if he had the LLC, it would be

7       Tropical and the money stayed in it, which is why

8       we asked for that and why I am going to bring that

9       issue back before the court.

10          THE COURT:  That's for another day.  Right now

11       we are just looking at whether the Court should

12       approve the settlement.

13          MR. BRADY:  I only meant to take Jack's money

14       and move it and tie it up in this adversarial

15       proceeding will, you know, limit the money with

16       access, and as the receiver's attorney counsel

17       articulated, there may be nothing left for anybody.

18       It's all going to go to Vital Pharmaceuticals.

19          THE COURT:  We will have to cross that bridge

20       when we come to it.  All right.  At this time,

21       thank you very much.

22          Anything else, Mr. Brady?  I think we are

23       ready to conclude the proceeding.  I have got

24       another hearing.

25          MR. BRADY:  Another element of this --

1          THE COURT:  And one thing in the future, if

2     you could please refrain from filing pleadings at

3     2:00 a.m. in the morning and expect me to go

4     through them.  Okay?  We will deal with that at

5     another time.

6          So I do find that under the circumstances I'm

7     going to preserve, as contemplated the proceeds,

8     and that will remain with VPX.  I am directing VPX

9     to maintain them in a trust account, not to be

10    disbursed unless and until further order of the

11    court, or a further order of the bankruptcy court.

12    It should be held in trust.

13         And that, nonetheless, the distributions from

14    the profits from the real estate developments shall

15    be disbursed 60 percent to Mr. Owoc, and 40 percent

16    to the other individuals and the parties, and that

17    shall be consistent with the agreement, of course,

18    prior pronouncements at that time.

19         So I will approve the settlement agreement,

20    which is the task that the Court has before it

21    right now.

22         Any other issues or business before the Court

23    shall be scheduled at a different occasion in a

24    special set hearing.

25         Anything else from either party at this time?

1          MR. SHAW:  Nothing from plaintiff.

2          THE COURT:  All right.  Thank you.  Please

3     upload an order on that.  I appreciate it.  And

4     also share that with the esteemed bankruptcy judge,

5     Judge Russin, and I guess he can proceed how he

6     deems it appropriate.

7          Okay.  Anything else?

8          All right.  We will close the record.  Thank

9     you very much.

10   Whereupon,

11          (The hearing was concluded at 11:00 a.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                                CERTIFICATE

3     STATE OF FLORIDA

4     COUNTY OF BROWARD

5

6             I, AVRIL SEVERIN, Court Reporter, a Notary

7          Public in and for the State of Florida at Large,

8             DO HEREBY CERTIFY that the foregoing hearing

9          was taken before me via videoconference, on the

10         28th day of July, 2025, commencing at or about

11         10:20 a.m.; and the foregoing, Pages 1 through 40

12         inclusive are a true and correct transcription of

13         my Stenographic notes.

14             I FURTHER CERTIFY that I am not a relative or

15         employee of the parties, nor relative or employee

16         of such attorney or counsel, or financially

17         interested in the foregoing action.

18             DATED this 29th day of July, 2025, in the City

19     of Fort Lauderdale, County of Broward, State of Florida.

20

21

22

                            _____
23                          AVRIL SEVERIN, COURT REPORTER

24

25

**$200** 20:9
**$3** 20:12
**$30** 22:4
**$300** 24:17
**28th** 40:10
**29th** 40:18
**3rd** 2:20 3:3
**6th** 2:5,110
**abide** 25:13
**ability** 24:11
**about** 14:1,2,18 15:13 16:19
17:2 20:8,10 27:22 29:2,4,12
31:12,17 35:25 40:10 (16)
**aboveentitled** 20
**access** 18:7,24 22:25 37:16
(4)
**accommodate** 4:13
**accordance** 33:13
**according** 22:2,3,4
**accordingly** 35:2
**account** 15:12,15 21:4
22:19,21,24 33:19 34:21,24
38:9 (10)
**accounting** 12:11
**accounts** 13:2
**accurate** 9:3
**action** 40:17
**actual** 15:4
**actuality** 9:2
**add** 35:13,20
**adequately** 8:17
**adjudicated** 8:10 9:23 19:8
35:25 (4)
**adjudication** 24:9 36:17

2:22
**administrative** 26:11 27:10
**admits** 23:17
**adversarial** 15:5 19:19 36:18
37:14 (4)
**adversary** 7:25 8:10 9:23
12:5,19,20 34:24 (7)
**affect** 19:11
**after** 29:25 31:6 34:6
**again** 10:6 13:16,18 18:3 28:7
(5)
**against** 8:10 24:18,19
28:4,14,22 32:5,5 36:20 (9)

**agents** 30:12
**agreed** 7:18 17:6,19 19:22
24:4,4 26:17 (7)
**agreement** 7:16 14:4,19,20
15:2,21 17:3 18:13,22 19:11
20:1 21:6 23:8,24 25:24 29:22
30:16 31:22 36:14 38:17,19
(21)
**agrees** 17:3 23:17 25:4
**ahead** 14:13 23:6,14,21 28:25
(5)
**aka** 3:24
**aligned** 30:17
**allegation** 15:4
**alleging** 17:5
**allow** 21:19
**allowing** 21:21 25:1
**allows** 12:7,22 20:21
**already** 5:2 7:11 11:3 12:13
15:10,17 17:19 33:7 (8)
**also** 3:20,23 4:12 5:25 6:4,9
7:5,23 9:17 10:23 15:6,17
20:20 28:1 29:8 39:4 (16)
**am** 10,10 4:19 5:7 6:12,15 8:2
9:4 10:20 11:8,11,12,13,15,15
13:18 14:24 18:8 22:9,12 24:5
25:12 30:20 37:8 38:3,8 39:11
40:11,14 (29)
**amount** 15:14 17:4,7 20:4
26:14 27:2,7 (7)
**amounts** 26:20
**amron** 3:2,2 6:2,3,3 8:18
18:11 23:15,16,22 26:25
27:15,25 28:3 29:14 (15)
**andahalf** 31:9
**announce** 5:14
**annual** 20:10
**another** 20:19 32:3
37:10,24,25 38:5 (6)
**anticipate** 11:10
**anticipated** 4:8
**anybody** 37:17
**anyone** 8:9 9:19,20
**anything** 18:14 35:12,20
37:22 38:25 39:7 (6)
**anyway** 31:14
**anywhere** 25:16
**apologies** 30:24
**apologize** 4:13 18:23 35:7
**appealed** 10:17

**appear** 7:13
**appearance** 5:15
**appearing** 2:3,9,17 3:1,7,13
5:24,25 6:4 (9)
**appointed** 2:9 12:24 14:6
**appreciate** 29:14 39:3
**approach** 23:10
**appropriate** 10:1 12:14 34:18
39:6 (4)
**appropriately** 13:11
**approve** 9:11 34:4 36:13
37:12 38:19 (5)
**approved** 14:5 15:3
**are** 4:18 5:2,12,13,18
6:11,14,18 7:3 8:7 10:4,18,24
11:2,21 12:15 13:1,14 14:23
16:17,18 17:2 18:13 19:15,17
20:8 21:14,18 22:10,20,22
23:1,18,22,24 24:1,24
25:14,16,21,25 26:3,23
28:1,4,15 29:2,3,12,17 30:2,15
31:2,11 32:9,10,18,20 34:8,9
36:7 37:11,22 40:12 (64)
**argue** 21:5
**arguing** 22:22
**argument** 21:3 23:1
**arguments** 8:5 10:24 13:14
**around** 7:17 20:9
**arrived** 16:8
**articulate** 29:15
**articulated** 37:17
**aside** 14:15
**ask** 19:23 30:21 34:3
**asked** 14:18 37:8
**asking** 21:18 30:2
**assess** 14:9
**assets** 33:12
**assume** 7:4
**attached** 14:20
**attendance** 3:10
**attorney** 37:16 40:16
**attorneys** 21:12
**auspices** 25:14
**avail** 21:22
**avenue** 2:110,20 3:3
**avoid** 20:21
**avril** 23 40:6,22
**aware** 11:8 15:17 24:15
**back** 9:13 10:11,22 11:9
17:11 24:7 28:16 29:8 34:5

37:9 (10)
**background** 6:16,18,20 7:10 (4)
**bamron@bastamroncom** 3:5
**bang** 20:13
**bankrupt** 31:4
**bankruptcy** 3:7 5:20 6:25 15:25 18:5 28:10 33:4 34:1,5 35:16 36:2,18 38:11 39:4 (14)
**bar** 32:4
**based** 22:17 31:21 35:4,4 (4)
**basic** 15:20
**basis** 20:10 30:10
**bast** 3:2 6:3
**because** 7:12 12:17 20:22 27:2 28:3,14,20 29:3 31:4 32:17 33:15 34:20 36:9,9,22 (15)
**before** 21 7:21 9:5,9,13 10:4,11,12,23 13:7 17:20 23:7 24:3,5 32:12 35:4,20 37:9 38:20,22 40:9 (21)
**behalf** 6 2:3,9,17 3:1,7 5:22 6:3,8 23:16 (10)
**behind** 17:14
**being** 4:25 10:25 11:20 21:25 22:10 26:21 29:13,14 33:23 34:6 36:8 (11)
**believe** 18:12 19:6,11 21:23 23:2 28:3 (6)
**benefit** 7:9 8:8 12:17
**benefits** 12:2
**best** 25:18 28:19
**between** 25:1 26:22
**big** 12:9,23 13:9
**billion** 20:16
**billiondollar** 36:24
**biscayne** 3:9
**blessing** 34:16
**both** 7:19 13:8,11 25:18 (4)
**boulevard** 3:9,16
**brady** 2:19,19 4:5,6,8,15,19,21,25 6:6,8,11,12,15 11:6,8 13:13,20,22 14:6,14 16:1 17:1,2,10 18:21,23 19:2,6,13,15 22:16 23:2,9 25:12,21 35:12,14,20,22 37:13,22,25 (43)
**brady's** 24:13

**branden** 3:21 5:18
**brett** 3:2 6:2 23:15
**bridge** 37:19
**bring** 32:11 37:8
**brokers** 30:12
**brought** 13:7
**broward** 2 40:4,19
**business** 37:4 38:22
**buy** 37:3
**buyers** 30:12
**byproduct** 7:16
**c** 2:1
**cace** 3
**called** 7:1
**came** 21 9:13 10:11 23:18 35:10 (5)
**camp** 32:1
**can** 4:16,24 7:4 8:16 14:25 16:22 21:7 23:10 25:8,9 39:5 (11)
**can't** 22:25,25
**capacities** 10:5
**capital** 9:18 12:11 15:12 23:22,25 25:5,6 26:13 27:4,8 33:16,19 (12)
**car** 6:14,19
**career** 17:6
**case** 3,20 9:12 10:18 17:20,23 21:12 36:5,9 (9)
**cent** 31:10
**certain** 11:22,23 24:14
**certainly** 12:18 21:9
**certificate** 13:24 40:2
**certify** 40:8,14
**chair** 31:6
**chance** 23:9
**change** 35:24
**changed** 11:11
**charging** 31:11
**charles** 2:12,19,19 6:8 (4)
**check** 29:13
**chime** 9:9
**chimed** 18:12
**chose** 32:11
**chosen** 32:2,6
**chuck** 5:24
**circuit** 1,17,22 13:6 (4)
**circumstances** 38:6
**city** 40:18
**claim** 12:5 20:7 29:24

**claims** 8:10 9:23 14:9 24:9 25:10 29:11 32:10,15 (8)
**clarifying** 9:18
**clarity** 11:1
**clear** 8:6 13:10 14:8 19:4 (4)
**clearly** 13:15 18:19
**client** 4:7 13:14,17 14:17,25 22:9 25:13 (7)
**clients** 16:8 31:19 33:5
**close** 9:5 22:4 26:9 39:8 (4)
**closer** 32:20
**cmt@trippscottcom** 2:15
**code** 20:18
**codifying** 24:24
**come** 21:3 24:7 26:12 37:20 (4)
**comforting** 23:4
**coming** 11:10 12:5 26:7
**commencing** 40:10
**communications** 21:24
**companies** 12:17
**company** 6,11 14:9 20:8,15,19,19 22:11,12 33:17 (10)
**company's** 33:20
**complaint** 12:19
**complaints** 32:4
**complete** 25:25 26:1
**complicated** 34:12,14
**complied** 12:12
**compliment** 6:17
**compromise** 26:21,24
**concentrate** 12:23
**concern** 14:16 30:4
**concerned** 14:24 22:9,14
**concerns** 19:9
**concession** 29:21
**concessions** 17:11
**conclude** 37:23
**concluded** 34:25 39:11
**confer** 13:9 14:5
**conference** 6:21 35:18
**conferral** 13:24 14:2,12,16 (4)
**consider** 21:20
**considerations** 35:22
**consistent** 10:2 38:17
**consistently** 20:9
**consulted** 14:18
**contemplated** 38:7

**contemplates** 12:7
**contents** 14:22
**context** 7:3 9:12
**continue** 23:7 30:6 31:24
**contractors** 30:8,13
**contribution** 9:18
**contributions** 12:12 15:11
23:22,25 25:5,6 33:17 (7)
**control** 25:15
**controls** 20:19,20
**cooperate** 31:24
**corner** 33:24
**corporation** 36:24
**correct** 8:3,4 9:17,25 18:4
22:16 28:5,6,12 31:16 40:12
(11)
**costs** 15:5 21:14
**could** 9:25 26:18 28:7 35:9
36:18 38:2 (6)
**counsel** 3:7 5:14,20 6:1
16:17,19 17:21 23:14 28:10
30:25 32:5 35:8 37:16 40:16
(14)
**counterclaim** 19:19
**county** 2 40:4,19
**couple** 7:1 20:11 25:23
**course** 24:15 25:16 27:9
38:17 (4)
**court** 1,22,24 2:9
4:2,4,7,10,18,20,22
5:2,5,7,9,11,12 6:1,6,11,14,16
7:12,22 8:14,16,19,22
9:7,14,24 10:6,9 11:5,14
13:4,6,7,13,21 14:1,4,12,21
15:9,10,17,24 16:3,12,16,22,25
17:8 18:4,15,18,23 19:3,10,14
22:14,17,19,24 23:2,4,11,13,20
24:5 25:14,17 26:23 27:12,22
28:1,5,7,16 30:20,25 31:15
32:12,13,13,23 33:2,4 34:1,5,8
35:5,5,7,11,16 36:13
37:9,10,11,19 38:1,11,11,20,22
39:2 40:6,22 (110)
**courtappointed** 3:13 5:23
**courtroom** 4:9 25:15
**courts** 7:19 13:8
**cover** 21:14,15
**credible** 22:22
**creditor** 36:20
**creditors** 10:4,4 15:7 25:6

26:13 27:13 28:21 33:25 34:2
36:5,10 37:6 (12)
**cross** 37:19
**crystal** 8:6
**currently** 26:3
**daily** 30:9
**damages** 21:13
**date** 31:24
**dated** 40:18
**day** 10:12 21:25 26:8 30:4,7
32:13 33:8 37:10 40:10,18 (10)
**days** 32:13
**deal** 13:5 38:4
**dealt** 13:10
**decide** 14:10 25:10
**deciding** 22:7
**decision** 7:14 9:10 16:5 32:1
(4)
**deem** 10:1
**deems** 39:6
**deeply** 14:24
**defect** 13:23
**defend** 17:14,23,24 33:18 (4)
**defendant** 12
**defenses** 16:2
**deferred** 36:7
**deny** 21:19
**derivatively** 6
**detail** 6:24
**determine** 33:10,24 34:1
**determined** 8:2
**develop** 30:8
**developing** 12:8
**development** 5 2:3 5:13 17:13
28:11 32:24 (6)
**developments** 38:14
**dictates** 32:17
**didn't** 8:19 9:24 20:14,24
23:9 24:14 29:15 31:9 (8)
**difference** 19:25
**different** 35:18 38:23
**dime** 30:15
**direct** 15:22
**directed** 15:15
**directing** 38:8
**directly** 15:14
**disagreeing** 27:4
**disagreement** 13:16
**disbursed** 34:21 38:10,15
**discharged** 36:7

**discounted** 31:11
**discussion** 10:13
**dismissed** 12:4
**dispose** 22:15,25
**disposition** 34:22 36:17
**dispute** 15:9,13 27:6
**dissipate** 30:3
**dissipated** 8:1
**dissolution** 32:21,23 33:11,12
(4)
**dissolve** 32:4
**dissolved** 32:25
**distribute** 18:14 31:7
**distributed** 8:7,9 9:19,20 10:1
12:11 14:10 19:21 32:18 (9)
**distribution** 33:10
**distributions** 18:16 33:21
38:13
**divert** 22:23
**dividends** 15:22,23 20:12
**division's** 10:21
**document** 32:14
**does** 12:17 19:11,24 22:12
32:18,19 33:22 (7)
**doesn't** 7:25 14:21 19:25
20:20 30:3 35:2 36:13 (7)
**doing** 13:1 17:15,20 24:24 (4)
**dollar** 12:5 29:23
**dollars** 20:16 26:19 27:1 31:9
(4)
**done** 30:7
**down** 5:3,5
**dragging** 12:19
**drive** 31:8
**during** 33:9
**e** 2:1,1
**each** 20:13
**easier** 32:16
**easiest** 36:12
**east** 3:16
**economy** 20:22 29:18
**effect** 36:11
**effectively** 19:8 29:11
**either** 11:8,9 15:14 30:15
38:25 (5)
**element** 37:25
**else** 22:6 35:12 37:22 38:25
39:7 (5)
**elsewhere** 24:23
**employee** 40:15,15

end 12:10 21:25 26:8
endeavored 6:23
energy 20:13
enter 32:24
entered 10:14
entire 21:12
entities 12:4 28:15 29:7
entitled 19:21 24:21 27:19
30:1 (4)
entitlement 26:17
entity 29:23 33:3
equity 33:13
esquire 2:4,11,12,19 3:2,3,8
(7)
essentially 10:21
estate 12:3,6,25 24:20 25:2
26:12,15 38:14 (8)
estates 25:1,18
esteemed 39:4
estimates 26:7
eta 4:11
evaluate 32:23
evaluating 32:9,11
evaluation 32:9
even 12:16 14:18,20,21 15:13
21:4 22:23 (7)
event 7:24 20:21
eventually 16:20
ever 17:6
every 31:6
everybody 8:16 22:6 30:16,17
33:5 (5)
everyone 25:4 30:5
everything 5:3,5
evidence 21:2
evidentiary 28:17 35:11
exactly 12:25 26:6
example 33:15
except 33:22
exception 34:22
exchange 20:18
excuse 32:24
expect 38:3
expedientially 32:16
expended 33:17
expenses 26:11 27:10
explain 14:25
extent 24:20 27:18
fact 15:10 18:10 31:6
facts 24:14

factual 14:16
fail 21:9
fair 4:15 34:10
fall 35:19
fee 31:11
fees 12:21 21:14
few 35:22
file 19:18
filed 10:19,22,23 11:12,17
17:20 18:25 23:8 24:5 32:2,15
36:2 (12)
filing 38:2
final 32:21,22 36:17
finally 25:12 32:25 35:21
financially 40:16
find 22:21 38:6
finding 33:8
finish 12:8 25:2
finishing 12:24
fire 30:13
firm 3:15
first 5:15 6:23 7:14,21 13:22
17:16 19:16 23:23 27:4,8
30:22 33:18 34:2,10 (14)
fl 2:6,33301,21 3:33131,10,17
(6)
florida 2,5,10 33:13 40:3,7,19
(7)
folks 16:9
follow 23:2
followed 23:23
following 13:1
foreclosure 36:19,22
foregoing 40:8,11,17
foremost 13:22
formed 33:4
former 22:11
fort 2:6 3:17 40:19
forth 27:14 28:2
forward 17:17 34:4
framed 16:3
frankly 10:18 12:16
free 35:19
front 8:22
full 14:22 17:4,7 20:4 (4)
fully 21:10 29:15 33:1
fund 22:5
funds 19:15 23:18,25 24:6
25:7,8,16 26:3,19 31:7 32:18
33:1,17,20 (14)

further 25:17 38:10,11 40:14
(4)
furthermore 20:5
future 35:23 36:1 38:1
fwaldman@waldmanlawfirm
com 3:18
gates 3:8 5:20 28:10
generating 20:9
get 4:10,24 6:22 11:16
14:12,13 27:5 30:15 31:19,21
33:5 34:2 36:19 (13)
gets 9:16 12:3 26:10 27:4,8
29:19 32:23 (7)
getting 25:21,22 26:23 29:17
30:18 (5)
given 17:11 24:15
26:16,19,20 (5)
giving 7:9 10:25
glad 25:12
gladly 17:19
glenn 2:9 3:15 5:23
go 9:5 11:2 14:13 18:2
23:6,14,21 24:22,22,23 25:16
28:24 31:3 34:4,5,20 35:2
36:15 37:18 38:3 (20)
goes 10:7 22:7 25:11 28:12,19
35:1 (6)
going 4:7 7:8 8:7,8 9:18,20
11:6,7 12:8,9,10 14:23 16:5
18:6 19:5,7,17 24:6,21,22
25:16,25,25 26:3 27:12,23
28:1,20 29:14 30:15,20 34:20
37:8,18 38:7 (35)
gone 13:15 25:19
good 4:3,6 5:16,21 6:2,8,19
11:15,15 16:9,10,11 17:9
23:15 (14)
got 4:11,14 9:7 10:10 23:13
24:18 30:23 37:23 (8)
grant 19:7
grapple 28:18
great 6:1,16,17 11:25 12:15
(5)
greatly 12:2
guess 7:20 39:5
h 2:11 3:24 5:12
hand 23:10 26:4
happen 21:19 22:13 36:13
happening 21:24
happens 10:6 26:6 27:23

36:14 (4)
**happy** 4:12 13:18
**harmless** 17:24 21:11,16
**has** 6:20 9:22 10:3 11:17,23
12:13,17,25 13:9 14:9,22
15:10,11,12 20:11 21:2
24:3,17 26:16,17 30:4 34:16
36:4,10,21,23 37:1 38:20 (28)
**haven't** 11:9
**having** 36:16
**he** 5:20 7:23,24,25 8:1
9:2,17,22 10:3,22,23,24 11:1,7
12:17,18,25 14:8,9,17 15:21
16:2,3,4,4,4,4,5,6
17:15,16,18,19,23,24 18:2,6,7
19:7,9 20:10,14,16,17,17,18,19
,20,23,24,25
21:5,5,11,12,13,15,15 22:5,5
24:12 25:12 28:23 29:15 33:24
35:1 36:10,18,20,21,22
37:1,2,6 39:5,5 (76)
**he'll** 21:13 35:1
**he's** 24:18
**hear** 8:16 13:18 16:19 23:4,6
35:15 (6)
**heard** 11:9 17:5 21:8 23:17
(4)
**hearing** 21 8:6 35:12 37:24
38:24 39:11 40:8 (7)
**hearings** 28:17
**held** 8:2 18:15 19:15 33:8
38:12 (5)
**help** 18:1 35:23
**henry** 6:9
**her** 4:11,11,16,16,25 (5)
**here** 4:5,7 5:1,12,13 6:22
7:4,10,12 10:23 11:5,7,7 12:15
14:7 17:3 18:1 20:11 21:24
23:18 24:6,13,16,24 25:4 29:2
32:8 33:24 (28)
**hereby** 40:8
**hey** 27:5 29:24 32:12
**him** 7:22 9:12 10:3 11:1
12:22,24 17:18 20:21 21:8
22:2 24:18 28:20,22 35:1 37:5
(15)
**himself** 15:21 17:15
20:14,17,25 21:6,8 24:17
35:17 (9)
**hire** 21:11 30:13

**his** 12:22 13:9 17:25
22:7,11,11 24:11 25:15 27:12
30:9 31:5,16,16 32:10 33:25
34:1,16 36:19,20,21,22 37:6
(22)
**hockey** 28:16
**hold** 4:10 9:4 16:6 17:24 20:1
21:11,16 22:19 23:20 (9)
**honest** 13:1,4
**honor** 4:3,6,15 5:16,21 6:2,7
7:8,9,15,19 8:15,18 9:13 10:12
11:10,25 12:13,23 13:11,20,25
14:6,14 16:10 18:10,22 19:23
20:6 23:15 24:15 27:10 28:6,9
29:1,22 30:24 31:23 33:6 34:3
35:14,23 (42)
**honorable** 21
**hours** 30:10
**house** 36:19,22
**how** 7:6 9:21 10:6 13:17
14:10,10 19:14 26:6,19,24
32:18 33:1 39:5 (13)
**however** 13:18
**huge** 29:21
**humble** 29:15
**hundred** 9:2 15:18 17:8
25:21,22 26:23,25 (7)
**i'll** 8:6 16:19 35:24
**i'm** 4:12 5:9 11:23 23:21
29:14 38:6 (6)
**i've** 4:11 7:4,5
**idea** 14:22
**identify** 16:13 28:7
**ii** 3:3
**ii7** 7
**immediately** 19:21
**impact** 15:6
**important** 20:2 33:14
**impressive** 17:10
**include** 15:7
**included** 34:9
**including** 31:10
**inclusive** 40:12
**income** 20:24
**incorrect** 18:8
**incurred** 21:14
**indemnify** 17:23 21:10,16
**individuals** 28:11 29:7 38:16
**injustice** 15:1
**input** 14:18

**instead** 15:21 32:2
**intentions** 28:19
**interact** 30:9
**interest** 12:18 25:18 26:18,18
29:24 (5)
**interested** 40:17
**interesting** 7:2
**interests** 14:23
**interrupt** 8:14,19 30:21
**intervenor** 2:17 6:9
**into** 18:2,2 19:15 20:22,23
22:1,1,10 23:19 24:7 33:7
34:5,20 (13)
**ironically** 17:15
**irrelevant** 36:8
**irs** 20:18 24:18 27:17,20
28:14 (5)
**is** 4:7,9,11,25
5:2,17,19,19,20,23,25 6:5,12
7:12,16 8:8 9:18,20,21
10:12,25 11:5,6,7
12:7,9,16,24,25 13:21,23,25
14:16,17,20 15:3,3,5,9,13
16:3,4 17:5,15,16,20,23,24
18:15 19:23 20:2,6,8,14
21:3,7,10,13,17,23,24
22:1,5,6,22,24 23:24
24:2,12,14,15,20,21,21,24,25
25:4,4,18,19,20,22,24,25
26:6,7,7,21,24,25
27:1,2,3,5,7,9,12,17,19
28:4,5,12,20 29:3,4,5,5,6,7,8,9,
10,12,13,16,20 30:16
31:1,2,12,18,23 32:7,8,11,22
33:1,2,3,5,14
34:3,6,12,14,15,19,20,24 35:11
36:8,12,14,22,23 37:1,2,7
38:20 (149)
**isn't** 35:18
**issue** 7:22 8:12,25 9:5
14:2,13,15 23:18,24 26:20
37:9 (11)
**issues** 10:9 24:12 28:18 38:22
(4)
**itself** 13:24 21:9 25:2
**j** 3:3,15
**jack** 2:17 3:24 6:9 8:13 9:1
11:2 17:14 28:14 33:16,19
36:2 (11)
**jack's** 37:13

**jeffrey** 21 3:8 5:19 28:9 (4)
**jeffreykucera@klgatescom** 3:11
**job** 31:4,4
**john** 3:24 5:12 6:9 16:10,14,14,24 30:18,24 (9)
**joint** 14:3 18:11 24:5
**jonathan** 3:21 5:17
**jordan** 2:4 5:16
**jshaw@shawlewenzcom** 2:7
**judge** 22 4:21,24 7:1,12,19,21 8:6,12,25 9:3,4,5,8,21 10:4,23,25 11:22 13:11 16:1 18:5 19:4,6 23:7 24:3,3 25:15,20 27:1,15,25 30:2 39:4,5 (35)
**judgment** 28:13
**judgments** 24:18 27:17,20 28:4,4,21 36:6 (7)
**judicial** 17 33:11,12
**july** 14 40:10,18
**just** 4:24 5:4 6:16 11:17 13:16 16:8 17:12 20:1 22:8,8 27:5 33:6,23 34:4 35:22 36:1,9,9 37:11 (19)
**k&l** 3:8 5:20 28:10
**kind** 35:24
**klock** 3:3 6:5 18:11
**know** 6:18 11:15,18,18 14:21 15:1 16:4 18:11 23:9 24:14 26:6 28:16 30:14 37:15 (14)
**known** 6:9 24:13
**kucera** 3:8 5:19 28:6,9,10 (5)
**lacks** 13:24
**large** 40:7
**larger** 19:9
**las** 3:16
**last** 25:20 30:22 32:3
**late** 11:14,14
**lauderdale** 2:6,33301 3:17 40:19 (4)
**law** 2:19 3:15 9:12 10:18 27:16 33:4,13 (7)
**lawfully** 20:21
**lawsuit** 17:13 21:9
**lawsuits** 32:5
**leave** 30:21
**leaving** 17:14
**left** 20:12 37:1,17
**legal** 12:21 31:17

**lehrer** 2:11 5:21,22 6:7 7:8,15 8:4,15,21,24 9:8,17 10:3,8,11 11:25 13:7 14:3 (18)
**less** 31:12
**let** 6:22 11:18 17:25 18:1 23:6 28:24 34:4 (7)
**let's** 6:22 11:20 14:1,12,13 31:17 (6)
**levenson** 22 7:2 9:6,8 (4)
**levies** 28:14
**levy** 24:18 27:17,20
**lewenz** 2:4 5:17
**liability** 5,10
**liens** 27:13 28:2,13
**light** 30:10
**like** 7:10 9:8 20:12
**likely** 18:3
**limit** 37:15
**limited** 5,10
**liquidating** 3:1 6:4 18:13 23:16 24:2,8,8 25:9,22 26:1,15 27:6 29:9,16,20 33:3,15 (17)
**listen** 13:13
**listening** 16:18
**litigate** 17:21 21:12 24:11 25:9 (4)
**litigated** 24:2
**litigation** 36:25
**little** 12:15 20:7 22:8 35:18 (4)
**live** 31:10
**llc** 5,7,10 2:3,117 3:117 14:17 37:5,6 (9)
**llp** 3:2,8
**located** 6:11,12
**long** 26:19
**look** 7:15 11:17,25 13:4 31:22 36:12 (6)
**looking** 10:19 37:11
**lose** 32:10
**lot** 21:23 36:4
**m** 3:2
**ma'am** 35:7
**made** 3:9,14 14:7 15:11,20,20 21:5,25 29:20 33:7 (10)
**maintain** 38:9
**majority** 2:17 14:17
**make** 5:4 7:13 8:20 9:10 16:5 17:12 30:3 31:3 36:23 (9)

**makes** 19:24 32:15
**making** 10:25
**man** 36:23
**manage** 30:7
**management** 31:11
**managing** 14:8
**market** 26:4
**marketdriven** 26:9
**matter** 7:20 17:21
**may** 8:14 10:22 11:11 15:7 16:25 22:15,20,23 23:7 26:10 28:23 30:1,25 32:15 33:21 36:5,5,6,6,7 37:17 (21)
**maybe** 21:19 35:23
**me** 5:17 6:5,22 7:1,13 9:25 15:22 23:6 28:24 32:24 35:15 38:3 40:9 (13)
**mean** 5:9 8:19
**meant** 37:13
**mediation** 21:20
**meet** 30:11,12,12,12,13 (5)
**megan** 3:24 4:8 16:11,15,15,21 35:6,9 (8)
**member** 2:17 14:17
**members** 33:21 34:13
**memorializing** 24:25
**mention** 25:20 36:4
**meritorious** 15:4
**merits** 29:4 32:9
**miami** 3:10
**middle** 11:16
**might** 36:10,13
**million** 20:9,10,11,12,15,15 22:3,4 24:17 29:23 31:9 (11)
**millions** 26:19 36:24
**mind** 7:5,6 35:25
**missing** 24:12
**money** 8:1,1 9:15 10:7 12:9 14:10 17:25 18:2,8,15 19:18,20,24 20:2,3,6,18,23 21:3,6 22:1,6,7,15,19,20,23 23:1 24:21 25:3,10 27:17 28:19,20 29:19,20 30:1,1 33:2 34:2,6,20 35:1,1 36:11,15,20,23 37:1,2,3,7,13,15 (54)
**monies** 8:7 11:1 22:10 27:19 34:23 (5)
**monthly** 31:3
**months** 29:25

months' 7:17
morning 4:3,6 5:16,21 6:2,8
10:20 11:11 16:9,10,11 23:15
38:3 (13)
mornings 30:11
mortgage 36:21
motion 13:23,24,25 14:3,21
18:11 19:7 21:19 24:5 32:3,20
(11)
move 19:17 28:24 37:14
moved 22:10
moving 17:16 25:7
ms 16:11,15,21 35:6,9 (5)
much 13:5 26:7 37:21 39:9
(4)
multimember 37:5
multiple 32:13
my 5:19,24 6:5,12 11:21
13:20 14:16,25 15:22,22 17:6
22:9 30:24 31:19 33:5 40:13
(16)
n 2:1
need 19:24 21:17 22:12 23:11
35:6 (5)
needed 7:18
needs 9:5
negotiated 25:19
negotiation 26:16
negotiations 7:17 29:25
net 26:10 27:9 33:10
never 6:18 18:3
news 35:18
next 10:12 32:18,22 34:6 (4)
nice 4:4 16:12
night 11:14,14,16 32:3 (4)
nights 30:11
nine 7:17 29:25
no 3 4:10,22 6:14 7:15 8:7
14:22 15:9 18:10 19:25
21:17,22 24:14 28:4 29:19,20
34:6 35:11 36:10,23 (20)
nobody 21:7 27:3
none 9:20 10:17 34:7
nonetheless 38:13
nor 40:15
normally 20:25
notary 40:6
notes 40:13
nothing 37:17 39:1
notice 20

noticed 6:25
noticing 13:8
now 6:14 10:15 11:4 13:17,21
14:24 16:18 19:18 22:10 32:20
36:22,24 37:10 38:21 (14)
number 12:3 25:23 26:14,15
(4)
o'clock 4:12,14
objecting 12:16
objection 10:19,22
objections 11:13 13:9
objective 34:15
obviously 24:25 26:11
occasion 38:23
off 5:15 16:6,17 26:12 (4)
office 2:19 6:12
olas 3:16
once 26:9
one 8:4 9:2 10:9,25 11:12
12:3 15:18 16:7 17:6 19:9,16
20:19 22:6 25:20,23 26:14
28:17 29:5 30:4,7 32:20 33:8
38:1 (23)
only 17:5 21:2,2 22:6 37:1,13
(6)
operation 33:4
opportunity 13:8
opposed 27:5
opposite 18:6
opposition 24:13
order 10:14 22:24 23:3
25:14,17 32:21,22 34:7
38:10,11 39:3 (11)
ordered 22:19
orders 10:15,17 14:7
other 6:1 8:12,25 11:18 19:20
22:17 27:13,22,23 28:21
34:13,23 37:3 38:16,22 (15)
our 12:14 13:10 18:10
25:1,13 (5)
out 4:16 12:6 17:13,18 18:1
21:3,21 23:19 25:3 26:10 33:1
36:10,19 37:3 (14)
outside 28:21
outstanding 25:6
over 13:15 14:8 20:8 22:2
24:17 25:7,10 33:23 (8)
overage 14:4,19,25 18:17 (4)
oversee 30:8
overseeing 33:3

overseen 31:15
owe 36:5
owed 33:21
owes 27:16 36:10,20
owner 9:2 15:18
ownership 10:13 11:3
owoc 2:17 3:21,24,24,24 4:8
5:12,17 6:9,10 7:24 8:5,13
10:15,19 11:5 12:16 13:9
15:8,11,14,18,20
16:10,11,14,14,15,15,21,24
18:7 20:11 21:5,10,24 22:2,4
23:17 24:10,11,17,21,22,22
25:9 27:5,16,16,18,19 28:14,19
30:18,20,24 31:1,5,10 34:25
35:6,9,17 36:3,5,9,16 38:15
(68)
owoc's 9:1 12:11 14:23 19:8
20:6 24:1 31:25 32:1
33:2,16,19 34:12,19 (13)
p 2:1,1,19,19 (4)
pa 2:11 3:15
pages 40:11
paid 15:14 26:10 27:1
29:17,19 30:18 31:5 33:5 34:6
(9)
painstaking 6:24
part 11:22,23 15:10 22:18
24:7 26:16 34:15,17 35:24 (9)
parties 7:18 14:3 21:20 27:23
30:6 31:24 32:12,14 38:16
40:15 (10)
partner 5:24 6:5
party 29:5 31:14 34:13 38:25
(4)
past 14:12
pay 17:3,7,22,25
20:14,17,24,25 21:6 25:3
31:13 33:1 36:21 (13)
paying 15:22 20:21
payment 31:2
payments 36:21
pelican 31:8
pending 24:9 32:21
penny 17:22
people 30:13,13,14
percent 9:2 10:2,2,15,16
15:18 17:8 25:21,23 26:24,25
27:12,22 28:12 31:20,21
38:15,15 (18)

**perfect** 5:8
**person** 29:23
**personally** 27:18
**perspective** 12:1,2,14,22 (4)
**peter** 3:3 6:5
**petersburg** 2:21 6:13
**pharmaceuticals** 15:19
17:4,5 20:3 21:18 22:11 37:18
(7)
**place** 17:16
**plaintiff** 8 2:3 5:15 39:1 (4)
**plan** 11:11
**pleadings** 38:2
**please** 5:14 16:7,13 18:1
30:21 38:2 39:2 (7)
**plus** 24:18 29:23
**point** 13:10
**position** 9:1 11:21 34:12,19
(4)
**possibility** 7:23
**pot** 12:9
**potentially** 36:19
**power** 14:9
**practically** 22:8
**predictably** 6:20
**prejudgment** 26:18
**prejudice** 12:4
**prerogative** 32:7
**present** 4:9 14:4
**presented** 7:18 8:13 9:1,11
(4)
**preserve** 29:25 30:1,2 37:4,4
38:7 (6)
**preserved** 13:14 33:2 34:20
**preserves** 31:19
**presumption** 25:24
**pretty** 11:14 17:8,10 19:4 (4)
**prevail** 35:2
**prevails** 7:24 18:7 24:12
34:25 (4)
**primary** 36:20
**prior** 10:15 33:19 38:18
**priorities** 33:10
**privy** 21:25
**probably** 31:12
**problem** 4:22 28:22,23
**procedural** 13:23 14:15
**procedures** 10:21
**proceed** 4:16 7:7 11:21,24
39:5 (5)

**proceeding** 6:25 7:3,25
15:5,25 18:5 19:19 33:12
35:16 36:18 37:15,23 (12)
**proceedings** 23 12:20 24:16
**proceeds** 33:11 38:7
**process** 22:18 32:16 34:24
**profit** 27:9 29:19 31:20,20
34:23 (5)
**profits** 33:20,20 38:14
**projects** 12:9,25 22:5 25:3
26:1 (5)
**pronouncements** 38:18
**proper** 34:8
**properties** 26:5 29:18
30:7,8,11 (5)
**protect** 7:24 37:5
**protected** 14:24 33:5 34:19
**provide** 13:8 17:20 30:5
**provision** 13:2
**public** 40:7
**purportedly** 17:3
**purposes** 16:9
**pursuant** 20 25:3 26:10
**put** 5:1 20:19,23 22:1,1,6
26:15 30:10,14 33:23 34:15,16
(12)
**question** 19:23 20:14
**quite** 10:18 12:16
**r** 21 2:1
**raising** 8:5
**ransom** 17:25
**reach** 4:16
**reached** 17:18
**read** 6:24 7:4,5,11 15:24
18:25 19:3 33:7 (8)
**reading** 8:3
**ready** 37:23
**reaffirming** 10:14
**real** 10:24 12:24 38:14
**really** 15:9 21:17 22:9 36:3
37:1 (5)
**recall** 28:23 33:6
**receive** 27:19
**receiver** 3:13 5:23 12:7 16:18
18:25 25:25 30:9 31:15
32:4,4,5,17 33:9 34:16 (14)
**receiver's** 37:16
**receivership** 12:3,4,6 14:7
24:19 25:2 26:12 29:6
31:13,25 32:16 33:9 (12)

**receivership's** 12:1
**receiving** 31:3
**recognize** 16:1
**recognized** 16:2
**record** 4:25 16:8,13 24:4 28:8
33:7 35:4 36:1 39:8 (9)
**recorded** 24:19
**recording** 5:6,9
**records** 22:3
**recover** 19:20
**reduce** 33:19,23
**reducing** 33:20
**referring** 31:1
**reflected** 18:19
**refrain** 38:2
**regard** 12:21
**regurgitation** 10:22
**reimburse** 21:13
**reinvestment** 20:22
**relative** 40:14,15
**release** 29:5,5,6,7,8,9,10 30:5
(8)
**relevant** 36:3
**rely** 19:16
**remain** 24:8 28:20 34:23 38:8
(4)
**remaining** 12:8
**remember** 31:5
**remove** 32:3
**removed** 26:20
**renegotiated** 36:8
**repaid** 23:23 27:4
**repay** 25:5,5
**replace** 30:13
**reported** 23
**reporter** 24 5:7,11 40:6,22 (5)
**representatives** 3:20 5:18
**represented** 18:12 35:8
**representing** 35:17
**required** 14:5
**resolution** 29:3,4,24
**resolve** 34:15,17
**resolves** 29:11 32:15
**respect** 11:1
**respectful** 13:16
**response** 11:12 24:13
**rest** 34:16
**restate** 24:6
**result** 12:15
**resume** 16:25 30:25

**return** 33:16
**returned** 27:8
**rhl@trippscottcom** 2:14
**right** 4:22 5:6,19 6:14,22 7:4
10:3,8,10 11:20 14:1 16:23,25
19:10 23:6 24:25 26:2 27:3
28:24 29:8 34:11 36:11,22
37:10,20 38:21 39:2,8 (28)
**rightfully** 24:1,1
**rights** 19:8,12
**risk** 29:15
**role** 11:22 12:23 14:8
**room** 6:21
**rule** 9:9 35:21
**ruled** 11:3 12:13 15:10
**ruling** 9:22
**russin** 7:1,13,19,21 8:6,12,25
9:4 10:5,23,25 11:22 13:12
16:1 18:5 19:4,6 24:3,3 25:15
39:5 (21)
**russin's** 9:22
**ryan** 2:11 5:21
**s** 2:1
**safeguards** 34:9
**said** 8:6 9:4 11:6,20 15:21
16:4,4,6 18:5,6,8 19:6 21:5
24:3 25:13 26:21 33:18 (17)
**saint** 2:21 6:13
**salary** 20:12
**sale** 31:7 33:11
**sales** 26:9
**same** 28:2
**sat** 31:5
**satisfied** 36:6
**say** 20:1 21:7,8 23:5 29:15
32:12,24 (7)
**saying** 5:10 10:15 23:1 27:5
29:24 (5)
**says** 14:22 22:25 25:21 31:23
(4)
**scheduled** 38:23
**scott** 2:11 5:22
**seat** 16:16
**second** 8:14 9:4 16:7 23:20
(4)
**see** 4:4,11 11:17 16:12,22
18:3,21 23:10 29:22 31:9 (10)
**seek** 26:17
**seeking** 32:3
**seeks** 33:16

**seems** 22:8 30:10
**self** 33:18
**sell** 26:2,4 29:18,18 (4)
**sellers** 30:12
**sells** 31:20
**sending** 21:20
**separate** 28:15
**serve** 33:18
**serving** 33:23
**set** 38:24
**settle** 14:11 21:17,22
**settlement** 7:16 12:2
14:4,19,20 15:2,7 17:2,6 18:21
19:7,11,22,25 23:8 24:7,25
25:18,24 29:11,13,22 30:16,17
31:18,22 32:22 34:4,11 36:14
37:12 38:19 (32)
**settlements** 15:1
**severin** 24 40:6,22
**shall** 32:25 33:9 38:14,17,23
(5)
**share** 39:4
**shaw** 2:4,4 3:21 4:24
5:4,8,16,17,17,18 18:10,16
23:7,12 28:24 29:1 31:1,16
39:1 (19)
**she** 4:9 5:2
**she's** 4:17
**shocked** 12:15
**should** 5:1 12:18 14:10
15:2,17 22:21 33:18 34:22
37:11 38:12 (10)
**side** 32:1 37:3
**sign** 34:6
**signatories** 32:14
**signature** 40:22
**signed** 23:8
**simply** 20:1
**since** 30:7
**single** 12:5 17:22
**sit** 17:25
**slipped** 7:1
**small** 31:2
**so** 4:10,13,22 5:12 6:18,22
7:3,4,5,6 9:8,12 10:11 11:5,20
12:22 15:20 16:17 17:21
18:6,18 19:14,23 20:2,14,23
21:2,17 22:17 23:9,17,24
24:11,20,24 25:7,8,17
26:2,5,14,21 27:3,8,14,15

28:2,3 29:8,19,21 30:3,16
31:10,14,17 32:20 34:3,25
35:4,12 38:6,19 (63)
**sold** 31:8
**some** 7:9 29:2
**something** 11:17 31:25 35:25
**somewhat** 34:12
**sorry** 4:12 23:21 27:25 28:9
(4)
**sounds** 7:10
**south** 3:9
**southeast** 2:5,110 3:3
**speak** 35:10
**special** 38:24
**specifically** 31:23
**spending** 12:20
**split** 12:12 13:3 23:23 25:7
27:9 (5)
**stag** 5 2:3 3:7,20 5:13,18,20
10:16 17:13,22 21:15 28:10,13
29:10 30:6 31:23 32:24 34:13
(18)
**standing** 21:4
**stands** 19:10
**start** 5:15 7:9
**started** 6:22 16:17
**state** 40:3,7,19
**stay** 25:8
**stayed** 37:7
**stays** 36:15
**stenographic** 40:13
**stenographically** 23
**step** 32:20,22 34:6
**stick** 35:24
**still** 35:6
**stipend** 31:2
**strategy** 32:6
**street** 2:5
**strictures** 9:11
**structure** 10:13 11:3
**subject** 27:13,20 28:1,13 (4)
**submission** 7:6
**substance** 14:13 16:5
**such** 40:16
**suggested** 27:16
**suggesting** 22:23
**suit** 33:16,18
**suite** 2:13 3:4
**sunset** 7,10 2:117 5:14
15:12,16,23 32:25 (8)

supposed 8:8 11:2
sure 4:18 5:4 7:8 8:15,20,21
11:12 17:12 31:3 (9)
take 22:15,20 37:13
taken 40:9
takes 14:8
taking 5:5 29:16
talk 14:1 31:17
talking 17:2 20:8 29:2,3,12
(5)
task 38:20
tatelbaum 2:12 5:24
tax 20:18,20,24
taxes 20:21
team 30:9 31:16,17
tell 6:23
terms 15:20 16:6 26:7 27:25
(4)
terrapins 11:18
testified 31:6
than 31:12
thank 4:21 6:7 14:14 16:21
29:1 37:21 39:2,8 (8)
that's 4:15 6:19 8:2,4
9:3,14,15,15 10:3 12:14
17:8,10 18:4,8,18,19 20:4
21:7,10 23:1,4 24:5,19
27:2,6,23 28:6 29:21 30:2,4,22
31:15 32:1,6,18,22 33:22 34:2
35:17 36:3 37:10 (41)
their 11:11 18:2 19:16,24
20:3 21:4,19 25:9 29:7
31:19,21 32:1,7,13 (14)
them 11:9,9,10 17:24 19:25
20:12 21:11,16,21,22 26:2
27:24 28:4 38:4,9 (15)
themselves 18:14
there's 15:6 20:7 26:8
therein 14:24
thereupon 4:1
these 12:24 15:19 16:2 19:15
22:5,10 26:1,4,19 29:6,11,18
30:7,8,10 (15)
they'd 23:2
they're 22:18 26:3 30:18
they've 13:10
thing 25:20 29:2 36:12 38:1
(4)
things 7:1 17:11 25:23
think 4:23 10:9 11:21 13:21

15:13,24 18:18 27:15 29:1
31:1
34:8,9,10,11,13,14,16,17,19
35:17 36:3,12 37:22 (23)
third 31:12,13
those 10:4,17,24 24:6,12
25:16 26:9 27:13 28:13,17 (10)
though 9:14 22:23
thought 9:25
three 11:4 12:8 20:16
through 12:19 20:17 38:4
40:11 (4)
throughout 36:4
tie 37:14
tied 36:25
time 13:15,15 15:19 30:14
37:20 38:5,18,25 (8)
times 11:4
timing 7:20
today 4:14 24:6,24 32:8 (4)
told 9:3 35:9
too 13:5
took 20:10
top 9:15 26:12
transcript 6:24 18:20,24
19:1,3 (5)
transcription 40:12
transferred 20:25
transfers 15:19
tried 21:21
trigger 20:20
tripp 2:11 5:22
tropical 7,10 2:117 3:13 5:14
9:3 10:14 15:12,15,23
17:12,14,22,25 20:1,23 21:1,15
22:1,2 23:19 26:13 32:25
36:15 37:2,7 (26)
true 40:12
trust 3:1 6:4 18:2,6,13
19:16,24 20:4 22:19,21,24
23:16 24:2,8,9 25:9,22 26:2,16
27:6 29:9,16,20 33:3 34:21,24
38:9,12 (28)
try 19:19 37:2
ts 29:9,10
turn 13:20,21
two 8:5 10:14,24 13:9 19:18
20:16 25:1 26:15 28:11 29:6
(10)
type 29:21

typing 5:3
ultimately 7:20 9:10
unable 36:21
uncontested 22:3
under 9:11 25:14 38:6
understand 7:3 9:24
understood 9:21
unless 8:9 9:21,22 29:17
38:10 (5)
unnecessary 12:20
unquestionably 34:11
unrelated 31:14
until 8:2,9 9:21,22 18:15
29:17 34:24 38:10 (8)
unusual 22:9
up 11:16 13:4 25:2 26:14,16
27:2 36:25 37:14 (8)
upload 39:3
upon 31:21
us 12:18 18:1 23:18 34:4
35:9,23 (6)
use 26:3 37:3
used 22:5 31:4 36:23
usually 11:16
value 26:8
values 19:20
variety 10:5
versus 5:13,13
very 7:2 14:8 20:7,7,7 22:8
34:10 37:21 39:9 (9)
via 22 2:12,19 3:2,3,15
5:24,25 40:9 (9)
viable 16:7
videoconference 17,22 40:9
view 13:10
viewed 13:17
violation 10:20
vital 15:18 17:3,4 20:2 21:18
22:11,15,18 33:15 37:18 (10)
vpx 3:1 6:3 8:2 9:15 15:4,15
18:2 19:24 21:2 23:6,14,16,19
24:1,7,8 25:7,8,22 26:1,15,20
27:6 29:9,16,19 35:3 36:2
38:8,8 (30)
vpx's 19:16 20:7 36:11
vs 9
w 3:21 5:17
wait 36:16
waldman 2:9 3:15,15 4:2,3
5:23 6:20 14:6 (8)

waldman's 12:1
want 4:10 6:17 7:6,25 12:18
15:22 33:6 35:12,20 36:1 (10)
wanted 5:4 8:20 17:12
wants 7:13,23 8:1 11:1 (4)
warning 30:22
wasn't 14:18 17:14 19:7
waterfall 13:2 25:4 26:11
27:3 31:21 32:17 (6)
waterfalls 13:5
way 9:24 16:3 27:3
ways 29:2
we'd 19:20
we're 7:10,12 18:6
we've 24:4,4
week 30:10
weekends 30:11
weighing 15:5,6
well 5:2,6 13:21,22 19:3,15
22:2 23:4 27:21 28:11 31:7
33:25 (12)
went 7:21,21 23:19
weren't 14:5
whatever 9:15 26:10
when 4:11 20:23 21:5 28:16
35:10 37:20 (6)
whenever 13:20
where 6:11,12 10:6 15:21
16:17 17:6 18:2 20:18 22:7
25:10 29:4,13 35:24 (13)
whereupon 39:10
whether 9:10 14:23 15:2,3
16:7,19 23:25 32:10 37:11 (9)
which 11:3 12:24,25 15:7
16:3 17:15,19,20 20:20
25:4,19,20 30:3 31:12 32:14
33:25 34:1 37:2,5,7 38:20 (21)
who 5:18,19,23 7:21 11:12
24:11 36:20,23 (8)
why 7:3,10,12 14:25 16:3
19:23,25 20:2,14,15,16 21:10
22:10,12,12,21 25:19 37:7,8
(19)
wife 11:6
will 4:15 8:9 9:11 16:6 18:2
20:1 21:9,11,13,15,15 24:23
30:5 31:24 34:1,5,23 35:2,5,23
37:15,19 38:4,8,19 39:8 (26)
willing 11:23 17:16,23,24
21:10 37:2 (6)

win 32:10
wind 25:2
wins 33:24
wiser 24:14
wish 13:19
within 33:12
without 4:16 12:5 17:11
36:16 (4)
won't 11:19
wondering 22:12
word 19:17
words 22:18
work 21:21
worked 31:8
worried 22:20
worth 7:17 20:16
would 4:8,12 6:18 7:13 9:8
10:1 11:19 16:12,19 17:18
18:7 25:13 27:20 28:13
31:7,13 35:14,14 36:15 37:5,6
(21)
wow 18:4,4
written 29:13
wrong 21:13 29:2
year 20:13
years 31:8
yes 4:6,19 5:7,11 6:7 7:15
8:18 16:1,24 18:18 27:15
31:10,19 35:22 (14)
yesterday 11:13
yet 22:6 32:2
you're 4:5 5:5,6,9 22:14,22
35:7 (7)
you've 7:11 11:3
your 4:3,6,7,15 5:14,16,21
6:2,7 7:5,8,9,15,19 8:8,15,18
9:13,18 10:11,20 11:10,25
12:13,23 13:11,13,17,20,21,25
14:6,14 16:8,10,18 18:10,22
19:23 20:6 23:1,15 24:15
27:10 28:6,9 29:1,22 30:22,24
31:22 33:6 34:3 35:14,23,25
(56)
yourself 28:7
yourselves 16:13
zoom 2:12,19 3:2,3,15
5:24,25 6:4 8:16,22 16:22 (11)
305 3:5
351 20:18
408 2:408

447 2:20
450 3:16
1020 40:11
1100 10 39:11
1400 3:1400
1500 2:13
2025 14 23:8 40:10,18 (4)
2410 3:4
2900 2:2900
3900 3:3900
6040 12:12 13:2 18:16 23:23
25:7 26:13 27:9 34:22 (8)
33131 3:33131,10
33301 2:6,33301 3:17
33701 2:21
3797904 3:5
24002312 3
9545257500 2:14

# Exhibit G

IN THE CIRCUIT COURT OF THE SEVENTEENTH JUDICIAL CIRCUIT
IN AND FOR BROWARD COUNTY, FLORIDA

CASE NO.: 2024-2312

STAG DEVELOPMENT, LLC,
a Florida limited liability company,
derivatively on behalf of Tropical Sunset 117, LLC

     Plaintiff,

vs.

TROPICAL SUNSET 117, LLC,
a Florida limited liability company

     Defendant.

_____/



**ORDER GRANTING PLAINTIFF'S VERIFIED EX-PARTE EMERGENCY MOTION
FOR PRELIMINARY STATUS-QUO INJUNCTION AND APPOINTING A RECEIVER**

     This cause came before the Court on Plaintiff's Verified Ex-Parte Emergency Motion for
Preliminary Status-Quo Injunction and Appointment of a Receiver (the "Motion"). The Court,
having reviewed the Motion, exhibits, and sworn pleadings, and having heard sworn testimony of
Jonathan W. Owoc and Branden Shaw on February 20, 2024, and being otherwise fully advised in
the premises, hereby makes the following findings of fact and conclusions of law:

## FINDINGS OF FACT

### Background

     Defendant Tropical Sunset 117, LLC (the "Company") is a real estate entity owned 40%
by Plaintiff Stag Development, LLC ("Stag" or "Plaintiff"), and 60% by Jack Owoc, individually.
Plaintiff Stag is owned 50% by Jonathan W. Owoc and 50% Shaw Investments & Realty, Inc.
("SIR"). SIR is owned by Branden Shaw. The Company's business is the purchase, development,
and sale of real property. Plaintiff provided evidence that the Company currently owns four
properties through four wholly owned single-purpose entities: 3 Pelican Drive, Fort Lauderdale,
Florida 33301, owned by 3 Pelican Dr., LLC; 528 Riviera Drive, Fort Lauderdale, Florida 33301,
owned by JWO Real Estate Investment I, LLC; 167 Spyglass Lane, Jupiter, Florida 33477, owned
by 167 Spyglass Ln, LLC; and 120 Spyglass Lane, Jupiter, Florida 33477, owned by 120 Spyglass
Ln, LLC.

     Plaintiff provided evidence that the Parties have been operating as though the Operating
Agreement of Superstructure Development Company, LLC (the "Operating Agreement"), was
binding on the Company and its members. The Operating Agreement, other evidence, and the
operations of the Company reveal that Plaintiff Stag was the Manager of the Company and would

[2544476/1]          1

identify, develop, manage, and sell the Company's real estate projects, while Jack Owoc would fund the acquisitions, construction, and general operating expenses.

<u>Plaintiff Seeks Judicial Dissolution, a Status Quo Injunction, and the Appointment of a Receiver</u>

Plaintiff argues that the Company must be dissolved, and a receiver appointed for several reasons—all of which yield the same result.

At the outset, Plaintiff argues that the Operating Agreement provides for dissolution of the Company if Plaintiff Stag is removed as the Manager or if Jack Owoc vetoed requests for capital. Jack Owoc removed Stag as the Manager of the Company and all of its subsidiaries on or about February 7, 2024. Jack Owoc confirmed this removal and demanded that Stag cease and desist from taking any action on behalf of the Company or its subsidiaries. Jack Owoc also noted that he would not fund the Company, including the necessary defense of the below described lawsuit, unless he was in full control of the Company and his conditions met and memorialized in writing. Along those lines, Plaintiff Stag provided competent evidence that Jack Owoc has not funded the Company since approximately November of 2022. Thus, under the Operating Agreement, the Company may be dissolved, and a receiver appointed.

Plaintiff, however, notes that, despite his prior written confirmation of its applicability, Jack Owoc is now wavering on his position about his agreement to the Operating Agreement and its terms. Plaintiff therefore also moves for dissolution and appointment of a receiver under 605.0702.

Plaintiff provided overwhelming evidence that Jack Owoc's conduct has made it nearly impossible for the Company to Operate. Jack Owoc has refused to fund the projects currently in progress, let alone any future projects and the Company is therefore unable to buy, build, or renovate real estate. Importantly, Plaintiff also provided evidence that Jack Owoc, now in control of the Company, has directed Stag to stop making payments to venders and others. Plaintiff argues that this will lead to liens, lawsuits, foreclosures, and the loss of irreplaceable real property, all of which appear to be avoidable.

Plaintiff also provided evidence that two properties—3 Pelican Dr. and 528 Riviera Dr. are under contract for sale. Because of Jack Owoc's refusal to pay for construction, the buyers of the respective properties have offered to pay the Company's obligations for their respective projects using escrow deposits. Jack Owoc has emphatically demanded that the buyers stop funding the projects, leaving the Company helpless.

Moreover, because of Jack Owoc's prior conduct, the a Bankruptcy Court liquidating trustee has filed a lawsuit (the "Vital Liquidating Suit") in connection with the bankruptcy of Jack Owoc's former company Vital Pharmaceuticals, Inc. The Vital Liquidating Suit seeks to recover every single asset that the Company owns. The Court makes no findings as to the validity of the claims in the Vital Liquidating Suit. However, the size and severity of the allegations in the Vital Liquidating Suit and its impact on the Company and its members cannot go unnoticed.

Plaintiff also presented competent evidence that Jack Owoc seemingly plans to use the Company as an asset protection vehicle to the detriment of the Company and Plaintiff Stag, by disguising distributions as "salary," while perhaps also using the Company's assets to satisfy his personal tax liabilities in "cooperation with the IRS."

In addition, Plaintiff provided evidence that Jack Owoc is refusing to adhere to the Company's contractual obligation to sell a property to an arm's length buyer, because it would require Jack Owoc to agree not to take the sale proceeds. As noted above, the Company's wholly owned subsidiary, 3 Pelican Dr., LLC, is under contract with a buyer to sell the property located at 3 Pelican Dr. in Fort Lauderdale. The closing is set to take place on February 29, 2024. Because of the lawsuit from the Bankruptcy Court liquidating trustee, the buyer's title company is requiring that the Bankruptcy Court liquidating trustee waive claims against the property itself. The title company is also requiring that the sale proceeds be placed in escrow pending resolution of the Vital Liquidating Lawsuit. According to Plaintiff Stag, the Bankruptcy Court liquidating trustee indicated its agreement, the buyer of the 3 Pelican Property indicated his agreement, and Plaintiff Stag also indicated its agreement. Jack Owoc, however, will not agree to escrow the funds and will cause the Company to default on its contract causing irreparable harm to not only the Company but also to its members and the buyer.

Jack Owoc removed Stag as the Company's Manager. He has seemingly not, however, decided whether he, himself, is or is not the Manager. He fired Stag's chosen counsel and demanded that Stag refrain from hiring counsel or defending the Vital Liquidating Lawsuit. He later demanded that Stag or its representatives sign an engagement letter for a lawyer that Jack Owoc had chosen, but neither Stag nor its members had met or agreed to hire. Within a one-hour span, Jack Owoc then lambasted his son and Stag for refusing to sign an engagement letter with a lawyer neither his son nor Stag had met or spoken to, and then subsequently confirmed that neither stag nor its representatives had managerial powers. Thus, the Parties are deadlocked, and, without dissolution and receivership, the Company will default in the Vital Liquidating Lawsuit or be unable to properly defend itself. The Company is also currently unable to contract for or close the sales of any real estate transactions because it does not currently have counsel and Stag is unable—according to Jack Owoc—to hire counsel on behalf of the Company.

## CONCLUSIONS OF LAW

### Plaintiff is Likely to Prevail on a Dissolution Action

The Court finds that Plaintiff Stag has a high likelihood of prevailing on an action for dissolution under the Operating Agreement or Florida Statutes Section 605.0702. Indeed, based upon the substantial evidence presented, the Court finds that there is little possibility that dissolution does not occur. Pursuant to Section 605.0702(b)(2) the Court finds it is not reasonably practicable to carry on the company's activities and affairs in conformity with the articles of organization and the Operating Agreement. The Court finds that dissolution is likely proper under Section 605.0702(b)(3) because the controlling member of the Company, Jack Owoc, has acted, is acting, and is reasonably expected to continue to act in a manner that is illegal or fraudulent. The Court finds dissolution is likely proper under Section 605.0702(b)(4) because the Company's assets appear to be being misappropriated or wasted, causing injury to the limited liability company or to one or more of its members. Finally, the Court also finds that the managers or the members of the limited liability company are deadlocked in the management of the limited liability company's activities and affairs, the members are unable to break the deadlock, and irreparable injury to the limited liability company is threatened or being suffered, and thus dissolution is likely proper under Section 605.0702(b)(5).

<u>No Notice Required</u>

The Florida Supreme Court and Fourth DCA dictate that trial courts may issue injunctions and appoint receivers **without notice**. *State v. Beeler*, 530 So. 2d 932, 933 (Fla. 1988); *Karafilakis v. Stavroulakis*, 150 So. 277, 277 (Fla. 1933) action); *Inverrary Gardens Condo. I Ass'n, Inc. v. Spender*, 939 So. 2d 1159, 1160 (Fla. 4th DCA 2006)

"A temporary injunction may be granted without written or oral notice to the adverse party if: (A) it appears from the specific facts shown by affidavit or verified pleading that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition; and (B) the movant's attorney certifies in writing any efforts that have been made to give notice and the reasons why notice should not be required." Fla. R. Civ. P. 1.610(a)(1). "To satisfy the rule's mandate of establishing why notice should not be required, a Plaintiff seeking an ex parte temporary injunction must demonstrate (1) how and why the giving of notice would accelerate *or* precipitate the injury or (2) that the time required to notice a hearing would actually permit the threatened irreparable injury to occur." *Smith v. Knight*, 679 So. 2d 359, 361 (Fla. 4th DCA 1996) (citations omitted). *See also Tobin et al v. Hanna et al*, 2012 WL 12335474 (Fla. 17th Cir., August 8, 2012)

Similarly, the Court may appoint receiver without notice to adverse party when (1) it appears from specific facts disclosed in verified pleading or affidavit that immediate and irreparable damage will occur before a hearing can be held; (2) movant's attorney discloses in verified writing what efforts have been made to give notice, or why such notice is not required; and (3) court enters findings as to both matters. *Phillips v. Greene*, 994 So. 2d 371 (Fla. 3d DCA 2008).

The Court finds that Plaintiff has far exceeded its requirement to prove why notice should not be provided for an injunction or receivership. The Court finds that, in light of the impending deadlines relating to the sale of the 3 Pelican Property and the necessary defense of the Vital Liquidating Suit, notice, and the time required for notice would cause the Company additional, immediate, and irreparable harm. In addition, Plaintiff has provided substantial evidence that if notice is given to Jack Owoc, he will cause additional harm to the Company as he has done in similar scenarios—the Court notes of the onslaught of emails sent in response to the simple hiring of counsel or sending a demand and shares Plaintiff's concerns. Lastly, the deadlock in hiring counsel likely makes notice obsolete. The Court, therefore, finds that no notice is required.

<u>An Injunction and Appointment of Receiver is Justified under Florida Statute § 605.0703, et seq.</u>

As noted herein, dissolution of the Company is warranted. In addition, the Court finds that, in light of the dispute over hiring counsel, and the potential of future lawsuits, liens, and loss of unique, high-valued assets, and the likelihood of harm to the consuming public, the facts herein warrant the appointment of a receiver for the winding down of the Company. The Court also finds that Plaintiff is entitled to a status quo temporary injunction until the time that a receiver is hired and apprised of the current operations and obligations of the Company.

In seeking a temporary injunction, the movant must show: (1) irreparable harm if the status quo is not maintained; (2) no adequate remedy at law; (3) a clear legal right to the relief requested; (4) that any public interest will not be disserved; and (4) a substantial likelihood of success on the merits. *Shafer v. Shafer*, 898 So. 2d 1053, 1055 (Fla. 4th DCA 2005) (citing to *Wexler v. Lepore*,

878 So.2d 1276, 1281 (Fla. 4th DCA 2004), *rev. denied,* 888 So. 2d 625). Florida Statute Section 605.0703 specifically provides that "A court in a proceeding brought to dissolve a limited liability company may issue injunctions, appoint a receiver or custodian pendente lite with all powers and duties the court directs, take other action required to preserve the limited liability company's assets wherever located, and carry on the business of the limited liability company until a full hearing can be held." (emphasis added). Additionally, a court of equity is empowered to issue injunctive relief to prevent officers or directors of a corporation from wrongfully dealing with corporate assets. *See Schwadel v. Uchitel, et al.*, 455 So. 2d 401 (Fla. 3d DCA 1984).

The Court finds that Plaintiff has satisfied these elements. The potential loss of unique assets—the Company's primary assets—meets the criteria for irreparable harm. In addition, Jack Owoc's apparent plans for the Company (disguised distributions, IRS liens, and failure to pay debts, adhere to obligations) will irreparably destroy the Company. Money damages will not remedy the Company's loss of real property, reputation, and ability to operate. The Court finds that the public interest will not be disserved by the entry of a status quo injunction or the appointment of a receiver—in fact, the public will benefit from the entry of a status quo injunction in that both will ensure that *bona-fide* purchasers will be able to close on their homes. And lastly, as noted herein, the Court finds that Plaintiff has a substantial likelihood of success on the merits of its dissolution action pursuant to both the terms of the Operating Agreement and Florida's Revised Limited Liability Company Act.

The Court further finds that a receiver is necessary to facilitate the accomplishment of the purposes of the Company during dissolution. *See Key Caisee Corp. v. Seashore Shell Co.*, 470 So. 2d 792, 792–93 (Fla. 3d DCA 1985) *Kosow v. Kovens*, 473 So. 2d 776 (Fla. 3d DCA 1985) (holding that trial court's appointment of receiver in dissolution was proper). Specifically, the Court finds that a receiver is necessary to effectuate wind up and sale of the Company and its assets. The Court also finds that a receiver is necessary to ensure the Company's defense of the Vital Liquidating Lawsuit.

<u>A Receiver is Otherwise Necessary</u>

In addition, the Court finds sufficient evidence of irreparable harm, corporate waste, and management deadlock to support the appointment of a receiver for the Company. *See Inverrary Gardens Condo. I Ass'n, Inc. v. Spender*, 939 So. 2d 1159, 1160 (Fla. 4th DCA 2006); *Wenzel v. Burman*, 76 So. 3d 1005 (Fla. 3d DCA 2011) (affirming appointment of receiver); *Cox Enterprises, Inc. v. News-Journal Corporation*, 2008 WL 11334440 (M.D. Fla. April 7, 2008). Therefore, the Court once again finds that the appointment of a receiver is necessary.

## **HOLDING**

Based upon the Motion and its attachments, the case law cited, and Plaintiff's verified allegations, all of which is expressly incorporated herein, the Court, hereby **ORDERS** and **ADJUDGES** as follows:

1.      The Motion is **GRANTED**. The Court hereby appoints a receiver and enters a temporary status quo injunction as follows:

2.      For the purposes of this Order, the Company shall include Tropical Sunset 117, LLC and all wholly owned subsidiaries including, without limitation 3 Pelican Dr., LLC; JWO Real Estate Investment I, LLC; 167 Spyglass Ln, LLC; 120 Spyglass Ln, LLC.

3.    The status quo of the Company shall be maintained until the Receiver files its Notice. Status quo includes compliance with the Company's ordinary payment obligations to the extent reasonably possible and the sale of 3 Pelican Dr. to its buyer. The proceeds of the sale, however, shall be held in escrow pending agreement of the Parties, further order of this Court, or at the direction of the Receiver.

Powers of the Receiver

4.    The Court hereby appoints Glenn Waldman, Esq. (Fla. Bar No. 374113) as a receiver (the Court appoints Daniel Neman Esq. as an alternate Trustee in the event Glenn Waldman, Esq. declines the appointment). Within five days of this Order, the Company shall engage Glenn Waldman, Esq., as the receiver for the Company (the "Receiver"). Plaintiff Stag shall have the power and authority to ensure that Glenn Waldman is engaged and informed. The Receiver shall file a notice with the Court alerting the Court of his acceptance of the appointment and certifying that he is ready, willing, and able to neutrally accomplish and wind up the Company's affairs (the "Notice"). Once the Notice is filed, the status quo injunction shall, by operation of this Order, dissolve in favor of the Receiver's control and discretion.

5.    As of the date of this Order, neither Jack Owoc nor Plaintiff, through themselves or their entities, agents, managers, affiliates, or employees, shall have decision-making power on behalf of the Company and shall not have the ability to bind the Company, Plaintiff shall have the power to effectuate the retention of the Receiver and otherwise comply with this Order.

6.    The Receiver is ordered and directed to take over the management and control of the Company and the assets of the Company, and the Receiver shall have all necessary powers for the operation of the Company, including but not limited to these powers:

a.   The Receiver shall have all normal and customary powers under Florida law, including those expressly referenced in Section 605.0704, Florida Statutes; the power to institute judicial dissolution proceedings for the Company pursuant to Section 605.0703, Florida Statutes; the power to issue Receiver's Certificates to third parties to raise necessary money to operate the Company during the receivership; the power to employ professionals to carry out the dissolution of the Company and dispose of the Company assets in a commercially reasonable manner during the receivership; the power to perform under any current contracts of the Company, including the contract for the sale of 3 Pelican Dr., 528 Riviera Dr., and the Company's other properties; and the power to present to the Court for determination the priorities of the distribution of the net proceeds from the judicial dissolution sale of the Company assets by the Receiver among the members of the Company.

b.   The Receiver, within a reasonable time after acceptance of the appointment, the timing being in his reasonable discretion, is directed to carry out a judicial dissolution of the Company under Sections 605.0702 through 605.0712, Florida Statutes.

c.   During the Receivership, the Receiver shall determine the priorities of the distribution of the net proceeds from the judicial dissolution and sale of assets within the judicial dissolution proceedings in accordance with Florida law and equity. For example, because the Vital Liquidating Suit seeks return of Jack Owoc's capital contributions to the Company, any funds expended to defend or settle said suit should first serve to

reduce Jack Owoc's capital account, prior to reducing the Company's profits or funds, profits, or distributions that may be owed to members. The Receiver may also cause the Company to reimburse Stag for its reasonable attorneys' fees and costs for this lawsuit or in defense of the Vital Liquidating Suit to the extent the Receiver deems it appropriate under the indemnity provisions in the Operating Agreement or the Florida Revised Limited Liability Company Act.

d.   The Receiver shall exercise all of the powers of the Company, through or in place of the Managers, officers, and directors of the Company, using best efforts to manage the affairs of the Company;

e.   The Receiver shall pay or caused to be paid all costs reasonably necessary to protect the assets and interests of the Company;

f.   The Receiver shall dispose of any part of the assets of the Company, wherever located, at a public or private sale, in his name as the Receiver for the Company.

g.   The Receiver shall pay expenses regularly incurred in the operation of the Company, which costs shall be paid from the income or assets of the Company, or from the sale of the assets of the Company;

h.   The Receiver shall assess the claims of creditors of the Company and pay those claims deemed necessary and appropriate to be paid in the discretion of the Receiver;

i.   The Receiver shall take control over all assets, including licenses and bank accounts held in the name of the Company or for the benefit of the Company;

j.   The Receiver shall open additional bank accounts in the name of the Receiver for the benefit of the Company if necessary, to fulfill the Receiver's duties under this Order;

k.   The Receiver shall ensure that all aspects of the Company and its operation and management comply with all laws, regulations, order, and requirements affecting the Company issued by any federal, state, county, or municipal authority having jurisdiction thereof;

l.   The receiver shall employ such agents and professionals as are necessary to carry out the Receiver's duties;

m.   The Receiver shall institute, defend, or settle litigation for the benefit of the Company; and

n.   The Receiver shall exercise any remaining powers set forth in Florida Statues Section 605.0704.

7.    Within twenty (20) days of the date of this Order, the Receiver shall file and deliver to the Parties or their counsel of record an inventory of the assets of the Company which inventory shall list: (i) cash and accounts; (ii) real property; and (iii) material miscellaneous tangible and intangible property. *See* Fla. R. Civ. P. 1.620.

8.    The Receiver is directed to serve on the parties, on or before the 20th day of every 3rd month, commencing on the 20th day of the first full month beginning after the date of this Order, any additional property which the receiver has discovered or which shall have come to the

receiver's hands since appointment, and of the amount remaining in the hands of or invested by the receiver, and of the manner in which the same is secured or invested, stating the balance due from or to the receiver at the time of rendering the last account and the receipts and expenditures since that time. There shall no penalty to the Receiver for a reasonable delay in reporting.

9.      The Company, its members, and their respective entities, managers, employees, affiliates, and agents are enjoined from interfering with the Receiver's duties. The Receiver or any Party to this action may move the Court for further Receiver's powers or limitations on his powers or instructions deemed necessary to enable the Receiver to perform his duties. The Company and its members shall upon the request of the Receiver deliver to the Receiver such documents relating the Company as reasonably necessary or available.

10.     The Receiver is authorized to record this Order in the Public Records of Broward County, Florida, and to serve this Order on any person as he deems appropriate in furtherance of his responsibilities in this matter.

11.     The Receiver will be paid at a reasonable hourly rate for his services. The Receiver shall submit to the parties or their counsel an accounting of his fees and the fees of any professional he has hired to assist him. The Receiver is authorized to retain counsel to represent him or to prosecute or defend litigation for the Company. The fees and costs of the Receiver and professionals he has hired shall be paid out of the income of the Company. The Receiver shall not be directly, indirectly, or derivatively liable for the debts of the Company or its members.

12.     The Receiver may borrow the necessary funds, from a third party or himself at the then-prevailing interest rates for the purpose of performing his duties hereunder and shall file with this Court one or more certificates to evidence such borrowing, and the Receiver shall be permitted to repay any such loan evidenced by a certificate from the operation of the Company. The principal and interest evidenced by each such certificate shall be a first and prior lien and security interest upon the assets of the Company.

13.     The Court will retain jurisdiction over this matter and all Parties for all purposes in connection with this Order and will order such other and further relief that this Court deems appropriate under the circumstances. No person or entity may file suit against the Receiver or take other action against the Receiver without an order of the Court permitting such action. No subpoenas shall be served on the Receiver without leave of this Court.

14.     Stag shall post a bond in the amount of $10,000.00, which the Court finds reasonable in light of the extremely limited risk of harm to the Company.

**15.     Willful and/or intentional violations of this Order by those with notice of it shall result in sanctions by the Court, including, without limitation contempt, incarceration, monetary sanctions, or other remedies at law or in equity.**

DONE AND ORDERED in Broward County, Florida on this 20th day of February, 2024.

_____
JUDGE JEFFREY LEVENSON
CIRCUIT COURT JUDGE

# Exhibit H

```
 1              IN THE CIRCUIT COURT OF THE 17TH CIRCUIT
                  IN AND FOR BROWARD COUNTY, FLORIDA
 2


 3
    STAG DEVELOPMENT, LLC,           CASE NO:  CACE 2024-2312
 4                                     (JUDGE LEVENSON)
              Plaintiff,
 5
     vs.
 6
    TROPICAL SUNSET 117, LLC,
 7
              Defendant.
 8   _____/

 9
                BEFORE HONORABLE JUDGE JEFFREY R LEVENSON
10
     John H. Owoc's Verified Motion To Intervene and To Dissolve
11         Or Modify Injunction and/or Discharge Receiver

12                          Volume 2
                        (Pages 120 - 271)
13

14   DATE TAKEN:   April 12, 2024
     PLACE:        Broward County Courthouse
15                 201 SE 6th Street
                   Room 16150
16                 Fort Lauderdale, Florida 33301
     TIME:         Scheduled for 9:30 a.m.
17                 Commencing at 9:22 a.m. to 11:57 a.m.

18

19                   Hearing taken before:

20
                       Carol Singh, FPR
21              Florida Professional Reporter
                   Empire Legal Reporting
22            110 SE 6th Street, Suite 1700
                Fort Lauderdale, Florida 33301
23                    (954) 241-1010

24

25
```

```
 1   APPEARANCES:

 2               On behalf of the Plaintiff:
                 JORDAN A. SHAW, ESQUIRE
 3               LAUREN N. PALEN, ESQUIRE
                 TODD S. PAYNE, ESQUIRE
 4               ZEBERSKY PAYNE LLP
                 110 SE 6th Street, Suite 2900
 5               Fort Lauderdale, FL 33301-5016
                 (954) 989-6333
 6               jshaw@zpllp.com
                 lpalen@zpllp.com
 7               tpayne@zpllp.com

 8
                 On behalf of the Defendant:
 9               SCOTT A MAGER, ESQUIRE
                 MAGER PARUAS, LLC
10               2719 Hollywood Boulevard, Floor 2
                 Hollywood, Florida 33020-4821
11               (954) 763-2800
                 scott@mpjustice.com
12

13               On behalf of Glenn Waldman, Receiver:
                 RYAN H LEHRER, ESQUIRE
14               JONATHAN M. BORNSTEIN, ESQUIRE
                 TRIPP SCOTT, PA
15               110 SE 6th Street, Floor 15
                 Fort Lauderdale, Florida 33301-5004
16               (954) 525-7500
                 rhl@trippscott.com
17               jmb@trippscott.com

18
                 On behalf of VPX Liquidating Trust:
19               BRETT M. AMRON, ESQUIRE
                 PETER J. KLOCK, II, ESQUIRE
20               BAST AMRON LLP
                 SunTrust International Center
21               1 SE 3rd Avenue, Suite 2410
                 Miami, Florida 33131-1700
22               (305) 379-7904
                 bamron@bastamron.com
23               pklock@bastamron.com

24               And

25
```

```
 1                    On behalf of VPX Liquidating Trust:
                      MICHAEL A. KAPLAN, ESQUIRE
 2                    LOWENSTEIN SANDLER, LLP
                      One Lowenstein Drive
 3                    Roseland, New Jersey 07068
                      (973) 597.2500
 4                    mkaplan@lowenstein.com

 5
                      On behalf of Monster Energy:
 6                    MARC J. GOTTLIEB, ESQUIRE
                      AKERMAN LLP
 7                    The Main Las Olas
                      201 E Las Olas Boulevard, Suite 1800
 8                    Fort Lauderdale, Florida 33301-4442
                      (954) 463-2700
 9                    marc.gottlieb@akerman.com

10
     ALSO PRESENT:
11            YONATHAN NATHANSON, Mager Paruas, LLC
              BRANDEN SHAW
12            MEG LIZ OWOC

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                        I N D E X

 2    HEARING BEFORE:  JUDGE JEFFREY LEVENSON      PAGE NO.
      TESTIMONY OF JOHN H. OWOC
 3    Cross-Examination (continued) By MR. MAGER      129
      Redirect Examination By MR. SHAW               137
 4
      TESTIMONY OF PAUL VIDAS
 5    Direct Examination By MR. MAGER                142
      Cross-Examination By MR. SHAW                  159
 6    Redirect Examination By MR. MAGER              163

 7    TESTIMONY OF ROBERT REYNOLDS
      Direct Examination By MR. MAGER                167
 8    Cross-Examination By MR. SHAW                   177

 9    TESTIMONY OF JONATHAN W. OWOC
      Direct Examination By MR. SHAW                 187
10    Cross-Examination By MR. MAGER                 206
      Redirect Examination By MR. AMRON              225
11    Redirect Examination By MR. SHAW               226
      Recross-Examination By MR. MAGER               227
12
      CLOSING ARGUMENTS
13              By MR. SHAW                           234
                By MR. GOTTLIEB                       245
14              By MR AMRON                           248
                By MR. MAGER                          252
15              By MR. SHAW                           266
      THE COURT's Ruling                             267
16    THE COURT REPORTER's Certificate               271

17
                  RECEIVER'S EXHIBIT INDEX
18
      No.        Description                     Page No.
19    1          3 Pelican closing packet            230

20
                    COURT'S EXHIBIT INDEX
21
      No.        Description                     Page No.
22    1          PowerPoint                          232

23    (Reporter's note:  All Exhibits were retained by THE COURT.)

24                        -  -  -

25
```

1          THE COURT:  And you are advocating for the receiver?

2          MR. AMRON:  We're advocating for the protection and

3     the preservation of these assets.  And we believe

4     Mr. Waldman is -- and the cost attendant to having

5     Mr. Waldman in place -- we think, is de minimis compared

6     to the potential harm if Mr. Owoc is given unfettered

7     access to these assets.

8          THE COURT:  All right, thank you very much.

9          MR. AMRON:  Thank you, Judge.

10          THE COURT:  All right, Mr. Mager.

11          MR. MAGER:  Thank you.

12          THE COURT:  What is the harm to your client if the

13     receiver remains in place?  In other words, everybody

14     agrees that his financial position will be preserved.

15     That's not what's in dispute here.  Why is there... what

16     is the harm to your client?

17          MR. MAGER:  The harm?

18          THE COURT:  At this point.

19          MR. MAGER:  The harm that any person has who has

20     control over money, and having somebody arbitrarily tell

21     you what --

22          THE COURT:  Well, how do you respond to them, oh,

23     no, you know, they're lining up against you here.  But how

24     do you respond to the requirements under 605.0702(1)(b)?

25     You know, I heard your client testify on the stand?

1          MR. MAGER:  Sure.

2          THE COURT:  He believes that if he converts money to

3     salary, then he's honky dory, you know, and he can.

4     That's wrong.  The case law is wrong on that.

5          Now, you saw the struggle we had to get him to close

6     on the property.  I had to do an order to get him to do

7     that.  I mean, look, you're an excellent lawyer, and

8     you've done a great job of presenting everything in the

9     best light for him, but how am I to have the confidence

10    that he's not going to go out and dissipate these assets?

11         MR. MAGER:  Well, he hasn't dissipated the assets

12    beforehand.

13         THE COURT:  Well, he hasn't because he hasn't had

14    the opportunity.

15         MR. MAGER:  Well, that's not true.  He absolutely

16    had control over the first 11 properties.  He could have

17    done anything he wanted with them.

18         The key to the receivership is you have to show that

19    there's either fraud or you have to show that there's an

20    intention to commit fraud.

21         THE COURT:  Well, it seems like he testified that

22    that was what he's going to do.

23         MR. MAGER:  No.

24         THE COURT:  He said, I'm going to.  Salary?  I can

25    take salary.  It's not a problem.

 1          MR. MAGER:  Well, if --

 2          THE COURT:  Do you agree, he can take salary?  Is

 3     that your position that he can convert any distributions

 4     to salary and that's acceptable?

 5          MR. MAGER:  I can't a -- I'm not -- I'm not taking a

 6     legal position as to what and when..

 7          THE COURT:  You're his advocate.  I mean, he got on

 8     the stand and said he received, I don't know, advice from

 9     somebody that said he can do that.  That is completely --

10     you saw the case law.

11          MR. MAGER:  Well, I don't know if the case law

12     stands for what they --

13          THE COURT:  He cannot do that.  And he said he was

14     going to do that.

15          MR. MAGER:  Right.

16          THE COURT:  Okay.  He was not -- he was unwilling.

17     You -- everyone else at the hearing on Monday, we want to

18     close on that property.  He wasn't going to do it without

19     a court order.

20          MR. MAGER:  Yes, but the reason --

21          THE COURT:  Do I have to babysit and do court orders

22     for this for him?

23          MR. MAGER:  No.  As he -- as he testified -- your

24     points are all taken.  As he testified, he said that he

25     would sign documents in the future because now --

1          THE COURT:  What evidence do we have?  In other

2     words, his behavior up to this point and all these other

3     pendent actions has demonstrated that he has not complied.

4     That he has acted improperly.  What gives me the

5     confidence that he is going to act and follow court

6     orders?

7          MR. MAGER:  He has $29,000,000 capital investment

8     and 60 percent of the profit --

9          THE COURT:  Coming from the creditor, he just stood

10     up and said it's their money.

11          MR. MAGER:  Well --

12          THE COURT:  It came from the entity.

13          MR. MAGER:  It probably -- listen -- he could do

14     nothing in this case and the money could go where it goes.

15          The tax lien -- their tax lien's probably going be

16     priority.  And you're right, they probably are going to

17     take up to the first $29,000,000.

18          And then, let's say the houses and the property

19     sells for $60,000,000.  If the Liquidating Trustee -- not

20     the trustee -- if Monster has a judgment, and they get a

21     proper charging lien, and they're going to take his piece

22     of the action, then they can take that.  But he's entitled

23     to maximize the amount of money, whether he recovers it or

24     not, whether the tax lien takes it over or not, there's

25     every interest --

1          THE COURT:  But the way --

2          MR. MAGER:  -- for him --

3          THE COURT:  The way it's set up --

4          MR. MAGER:  --to get the maximum amount of money.

5     Sorry?

6          THE COURT:  The way it's set up though, he's not

7     going to lose a dime, in terms of the way the receiver is

8     not going to dissipate the assets.  The receiver is not

9     going to.  The receiver is going to maintain, to the

10    extent possible, the status quo so that his capital

11    contribution will be reserved.  So where is the prejudice

12    to your client?

13         MR. MAGER:  In every case where there's a receiver

14    appointed, you can always successfully argue that once the

15    receiver's appointed, what's the problem.  They're going

16    to marshal the assets properly.  The test is, you have to

17    step back and say, was there a basis for the injunction in

18    the first place which gave rise to the receiver.  And,

19    what did they argue?

20         THE COURT:  And why wasn't there?  Why wasn't there?

21         MR. MAGER:  Well, because what they argue in their

22    motion, the motion that gave the grounds for the receiver,

23    their argument was that judgments and liens will occur if

24    Jack takes over the property.  There's not a scintilla of

25    evidence that's been presented.

1        THE COURT:  Were you not listening to what they had

2    to say?

3        MR. MAGER:  Whether Jack takes over the property or

4    not has nothing to do with those things.  Nothing to do

5    with those things.

6        THE COURT:  Is that true?

7        MR. MAGER:  Of course it is.  Their lien -- if they

8    have a lien, their lien is because of a piece of

9    litigation.

10        For example, if you take the Monster lien.  If the

11    Monster's getting the lien it's because they received a

12    judgment in another state, and they're domesticating that.

13    He's not causing that.  They're going to get that lien

14    regardless.  That is, whether there's a receiver there or

15    not, that lien's going to be there.

16        And as it relates to the liquidating --

17        THE COURT:  Unless.  Unless he takes salary, and he

18    dissipates it.  Unless he takes the $14,000,000 and

19    dissipates that.

20        MR. MAGER:  Listen, he said that he would not take

21    something that was improper.  I agree with you that he did

22    say he was going to take salary.  If he's -- I'm not his

23    lawyer for that -- but if he's legally --

24        THE COURT:  I think that's very wise on your part.

25        MR. MAGER:  Okay.

# Exhibit I

# IN THE CIRCUIT COURT OF THE 17TH JUDICIAL CIRCUIT
# IN AND FOR BROWARD COUNTY, FLORIDA

CASE NO. **CACE24002312**   DIVISION: **09**   JUDGE: **Levenson, Jeffrey R. (09)**

**Stag Development, LLC**

Plaintiff(s) / Petitioner(s)

v.

**Tropical Sunset 117, LLC**

Defendant(s) / Respondent(s)

_____ /

## ORDER DENYING JOHN H. OWOC'S MOTION TO INTERVENE AND TO DISSOLVE OR MODIFY INJUNCTION AND/OR DISCHARGE RECEIVER

This cause came before the Court on John H. Owoc's Motion to Intervene and To Dissolve or Modify Injunction and/or Discharge Receiver ("Jack Owoc's Motion to Dissolve"). The Court, after receiving evidence and hearing testimony and argument of counsel during an in-person Evidentiary Hearing on April 11–12, 2024, and after reviewing (1) Jack Owoc's Motion to Dissolve and the attachments thereto (2) Jack Owoc's Reply to Plaintiff's Response to Owoc's Motion to Dissolve or Modify Injunction and to Discharge Receiver and the attachments thereto ("Jack Owoc's Reply") (Jack Owoc's Motion to Dissolve and Jack Owoc's Reply, collectively "Jack Owoc's Papers"), (3) Plaintiff Stag Development LLC's ("Stag") Verified Response to Intervenor, Jack Owoc's Motion To Dissolve Injunction And Discharge Receiver And Integrated Motion to Strike And Prohibit use of Jonathan Owoc's 2004 Examination Filed In Violation of Federal Court Order and attachment's thereto ("Stag's Response"), and (4) Plaintiff Stag Development, LLC's Verified Ex-Parte Emergency Motion for Preliminary Status-Quo Injunction and Appointment of a Receiver and attachments thereto ("Stag's Verified Motion") (Stag's Verified Motion and Stag's Response, collectively "Stag's Papers"), and having reviewed and considered other items in the record, such as (1) Intervenor VPX Liquidating Trust's ("VPX") Response In Opposition To John H. Owoc's Motion To Dissolve Injunction and Discharge Receiver ("Trust Response") and (2) Non-Party Monster Energy Company's ("Monster") Statement Re: John H. Owoc's

Verified Motion to Intervene and To Dissolve or Modify Injunction and/or Discharge Receiver ("Monster Statement"), and being otherwise fully advised in the premises, hereby **ORDERS and ADJUDGES** as follows:

### Brief Background

1. On February 20, 2024, following an emergency ex-parte evidentiary hearing, the Court granted Stag's Verified Motion and entered the Order Granting Plaintiff's Verified Ex-Parte Emergency Motion for Preliminary Status-Quo Injunction and Appointing a Receiver ("Order Appointing Receiver"), which put Tropical Sunset 117, LLC and all of its subsidiaries (collectively, "TS117") into receivership.

2. On February 21, 2024, the Court appointed Receiver, **Glenn Waldman, Esq.**, filed his Notice of Acceptance, and the Receivership proceeded per the Order Appointing Receiver.

3. On April 4, 2024, John H. "Jack" Owoc ("Jack Owoc") filed Jack Owoc's Motion to Dissolve.

4. On April 5, 2024, Jack Owoc requested an expedited hearing pursuant to Florida Rule of Civil Procedure 1.610.

5. In opposition to Jack Owoc's Motion to Dissolve, Plaintiff filed Stag's Response, Intervenor VPX Liquidating Trust filed the Trust Response, and Non-Party Monster Energy Company filed the Monster Statement.

6. Pursuant to Jack Owoc's request, on April 11, 2024, and April 12, 2024, the Court held a trial-like evidentiary hearing. The Court heard opening statements from counsel, took documentary and electronic evidence, and heard testimony from Jack Owoc; Scott Reynolds, Esq.; Jack Owoc's proffered expert, Paul Vidas, CPA; and Jonathan W. Owoc. The Court then heard closing arguments from counsel and statements from counsel for VPX and Monster without objection.

### Holding

7. In light of the evidence presented, relevant authorities, and argument of counsel, the Court incorporates and reaffirms the findings in its Order Appointing Receiver. The parties agree that, following the Receiver's Notice of Acceptance, the injunction is dissolved by the terms of the February 20, 2024, Order, and there is no longer a need to address that issue.

8. In addition, the Court finds that Plaintiff has far exceeded its burden to prove that a Receiver is necessary under Florida Statute § 605.0702(1)(b)(2), (3), and (4). Florida Statute § 605.0704(1) permits the Court to appoint a receiver in a dissolution action if Plaintiff demonstrates the factors in just one of the preceding

sections. The Court finds that at each and every level, Plaintiff has exceeded its burden to prove that a Receiver is necessary under all three sections.

9. Specifically, the Court finds, for the reasons revealed at the hearing, stated on the record, in Stag's Papers, and previously outlined in the Order Appointing Receiver that (1) it is not reasonably practicable to carry on TS117's activities and affairs in conformity with the articles of organization and the operating agreement; and (2) Jack Owoc has acted, is acting, and is reasonably expected to act in a manner that is illegal or fraudulent; and (3) TS117's assets are being misappropriated or wasted, causing injury to TS117 and its members. By way of example, and as noted on the record, the Court finds that Jack Owoc's intent to, and belief that he is legally permitted to, characterize what would otherwise be distributions from TS117 as salary for the purpose of avoiding creditors is incorrect and improper, and his refusal to allow the closing of the 3 Pelican Dr. Property pursuant to a contract with a bona-fide purchaser was also incorrect and improper. The Court also notes that Receivership is necessary to preserve and prevent Jack Owoc from dissipating TS117's assets.

10. After considering the arguments, authorities, and evidence, and for the reasons stated herein, on the record, in the Order Appointing Receiver, and in Stag's Papers, the Court hereby **DENIES** Jack Owoc's Motion to Dissolve except to the extent that the Court granted Jack Owoc's request to intervene to pursue his Motion to Dissolve. **The Court <u>GRANTS</u> Plaintiff Stag Development LLC's request for the Court to reaffirm the Order Appointing Receiver.**

**DONE AND ORDERED** in Chambers at Broward County, Florida on <u>18th day of April, 2024</u>.

CACE24002312 04-18-2024 3:54 PM

<u>CACE24002312 04-18-2024 3:54 PM</u>
Hon. Jeffrey Levenson
**CIRCUIT COURT JUDGE**
Electronically Signed by Jeffrey Levenson

**Copies Furnished To:**
Brett M Amron , E-mail : bamron@bastamron.com
Brett M Amron , E-mail : kszolis@bastamron.com
Brett M Amron , E-mail : jdepina@bastamron.com
Charles M. Tatelbaum , E-mail : hbb@trippscott.com
Charles M. Tatelbaum , E-mail : eService@trippscott.com
Charles M. Tatelbaum , E-mail : cmt@trippscott.com
Eyal Berger , E-mail : jeanette.martinezgoldberg@akerman.com
Eyal Berger , E-mail : kimberly.shinder@akerman.com

Eyal Berger , E-mail : eyal.berger@akerman.com
Glenn J Waldman , E-mail : mnewman@gunster.com
Glenn J Waldman , E-mail : gwaldman@gunster.com
Jeremy Hart , E-mail : jhart@bastamron.com
Jordan Alexander Shaw , E-mail : jshaw@zpllp.com
Jordan Alexander Shaw , E-mail : lgrealy@zpllp.com
Jordan Alexander Shaw , E-mail : mlomastro@zpllp.com
Lauren Nicole Palen , E-mail : lpalen@zpllp.com
Marc J. Gottlieb , E-mail : marc.gottlieb@akerman.com
Marc J. Gottlieb , E-mail : joyce.gutierrez@akerman.com
Michael I. Goldberg , E-mail : michael.goldberg@akerman.com
Michael I. Goldberg , E-mail : charlene.cerda@akerman.com
Michael I. Goldberg , E-mail : kimberly.smiley@akerman.com
Paul O. Lopez , E-mail : pol@trippscott.com
Peter Joseph Klock II , E-mail : mdesvergunat@bastamron.com
Peter Joseph Klock II , E-mail : pklock@bastamron.com
Peter Joseph Klock II , E-mail : peter.j.klock@gmail.com
Ryan H. Lehrer , E-mail : rhl@trippscott.com
Scott Mager , E-mail : Service@MPJustice.com
Scott Mager , E-mail : Yonathan@MPJustice.com
Scott Mager , E-mail : Aitor@MPJustice.com
Todd S Payne , E-mail : mguerrero@zpllp.com
Todd S Payne , E-mail : soquendo@zpllp.com
Todd S Payne , E-mail : tpayne@zpllp.com
Zachary Dean Ludens , E-mail : ZLudens@zpllp.com